## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD | ) | Master File No. 2:13-CV-20000-RDP |
| ANTITRUST LITIGATION | ) | |
| (MDL No. 2406) | ) | This document relates to all cases. |

## RESPONSE OF JOE R. WHATLEY, JR. AND EDITH M. KALLAS
## TO THIS COURT'S ORDER OF APRIL 19, 2013

Joe R. Whatley, Jr. and Edith M. Kallas submit this response to the Court's April 19, 2013 Order, Doc. 52. As indicated by the previous filings on the subject, we believe that the Objection raised by Carefirst is meritless and presents no obstacle to the appointment of Joe R. Whatley, Jr and Edith M. Kallas as interim class counsel in the MDL litigation.

## I.       INTRODUCTION

The scorched-earth strategy pursued by Mr. de Gravelles, Carefirst's Litigation General Counsel, demonstrates how crucial this litigation is to our nation's healthcare system and the reform of that system.  In that strategy, Carefirst has shown again that it prides itself in following a policy of intimidation to prevent providers from exercising their rights to receive a fair, market-based competition and to prevent subscribers from using the coverage, including out-of-network coverage,[1] for which they overpay as a result of the excessive market power illegally maintained by the Defendants.  **EVEN AFTER WE AGREED IN WRITING TO MR. DE GRAVELLES THAT WE WOULD ACCEPT SERVICE FOR OUR CLIENTS AND EVEN AFTER WE PROVIDED HIM CASES STATING THAT HIS EFFORTS TO**

---

[1] The *Advanced Surgery* Complaint describes how Carefirst has threatened and retaliated against Providers for assisting Subscribers in using their out-of-network benefits.  We fully expect that we will need the assistance of this Court to prevent further attempts at retaliation from Carefirst against doctors affiliated with the Plaintiffs in the *Advanced Surgery* case.

**ENFORCE THE CONFIDENTIALITY AGREEMENT WERE ILLEGAL, MR. DE GRAVELLES SERVED EACH OF OUR CLIENTS WITH A MOTION FOR PRELIMINARY INJUNCTION.** Carefirst and Mr. de Gravelles have proven that all Plaintiffs, especially the Providers, need lead counsel who are both capable and willing to stand up to these scorched-earth intimidation tactics, and our response has proven that we are those lead counsel for the providers. We urge that tomorrow morning the Court approve the Special Master's recommendations and appoint all the counsel he has recommended after lengthy and serious deliberation. The Providers and Subscribers of America need for this litigation to proceed in order to correct conditions that have produced the policies like those of Carefirst, and they need that remedy as soon as practicable.

After we served Carefirst with our Reply to its Objection, including cases that state that the effort to use the Confidentiality Agreement as a shield to prevent the enforcement of the antitrust laws is both invalid and itself a violation of the antitrust laws, Mr. de Gravelles exacerbated his illegal conduct on behalf of Carefirst by serving us with a motion for preliminary injunction. His email is attached as Exhibit E.[2] The Motion is Exhibit F. We requested the supporting Affidavits for the Motion, and the only one provided to us is the Affidavit of Andrea Pomykala ("Pomykala Affidavit"), Exhibit G. In the meanwhile, we have removed the action Carefirst filed against us and marked it related to the case that was assigned to Judge Motz and will promptly file a Notice of Potential Tag-Along with the Judicial Panel on Multidistrict Litigation. The Removal Petition is Exhibit H. Our hope is that that case would ultimately be heard by this Court, regardless. Nevertheless, by telling this Court that it was objecting to the appointment of Whatley Kallas as lead counsel, but at the same time asking the Court not to

---

[2] To avoid confusion we will begin the lettering of the Exhibits to this Memorandum with where we ended in our Reply. The Reply included Exhibits A through D.

inquire about the merits of the alleged dispute with Whatley Kallas, Carefirst has in essence asked this Court to shoot first, ask questions never.  In fact, not only did Carefirst ask the Court not to look at the merits, it failed to give the Court critical documents that present a fair picture of the nature of the relief they request from the Maryland court and make clear the weakness of their claims. As demonstrated in our original reply, and in Carefirst's own words, no confidential information was disclosed by Whatley Kallas, and Carefirst has attempted to elevate a simple potential discovery dispute into both duplicate state court litigation and a baseless, essentially *ad hominem*, attack against hard working lawyers.  The fact that Carefirst, in its original papers, was unable to articulate even a single reason why this litigation would complicate the pursuit of the Provider Class's antitrust action is telling of the true intent of their "objection."[3] While we believe that the Court must reach the merits of the dispute in order to even consider Carefirst's Objection, we also note that, given the procedural posture of the underlying case, this issue will ultimately be before this Court in any event unless Carefirst chooses to dismiss its action and have it heard as a compulsory counterclaim in the *Advanced Surgery* case.

## II.    BACKGROUND

As documented in the original filings, Carefirst contends that Whatley Kallas violated the Confidentiality Agreement by filing the *Advanced Surgery* complaint.   The *Advanced Surgery* complaint was filed in the District of Maryland on March 12, 2013 where it was assigned to Judge Motz.  It was transferred to this Court by the MDL Panel on March 25, 2013 as a tag-along action separate from any class action pending in this MDL proceeding.  If Carefirst truly believed that the complaint contained any confidential material, it had a simple remedy:  it could

---

[3] We imagine that the Plaintiffs will be willing to discuss an appropriate Protective Order with Carefirst.  If Carefirst is not interested in such an Order, it appears that it is Carefirst, not counsel for the Plaintiffs, who is *complicating* the litigation.

have moved to seal the complaint in the District of Maryland before Judge Motz. Carefirst made no effort to do so. When the case was transferred to this Court, Carefirst could have filed a motion to seal the complaint here. Again, Carefirst made no effort to do so. In its Objection filed in the public record before this Court, Carefirst has now discussed the negotiations between the parties and the result of those negotiations in at least as much detail as used by the *Advanced Surgery* Plaintiffs, if not more. If Carefirst truly believed those facts to be confidential, then it would have moved to file the Objection under seal or taken any number of other steps to actually protect, rather than highlight, the disclosure of that information.

The Objection alleges that the *Advanced Surgery* Complaint "discloses a significant amount of confidential information delivered by CFMI to SurgCenter and Whatley Kallas in violation of the confidentiality agreement." The Objection itself leaves the nature of the confidential information "disclosed" totally unclear to the Court, though it once again attaches the Complaint which contains the information it claims is Confidential.[4] Contrary to Carefirst's contention, as will be discussed in detail in this Response, the *Advanced Surgery* Complaint did not disclose any confidential information, but rather only contained general statements characterizing Carefirst's offers as "rock bottom" and "significantly below market" in support of the Complaint's allegations, namely that Carefirst failed to meaningfully negotiate. As such, the allegations are not materially different from allegations made in numerous other complaints filed against CareFirst in connection with the MDL, which Carefirst admits do not contain

---

[4] In addition, Carefirst suggests in its Objection that Whatley Kallas's leadership "is likely to complicate the smooth administration of this MDL proceeding." Objection at ¶11. Carefirst leaves it to the Court's and our imagination to determine how that smooth administration might be complicated by facts CareFirst itself has alleged are not related to the Section 1 allegations. Exhibit C, ¶¶ 61-67. As discussed below, entry of Confidentiality and Protective Orders in these kinds of antitrust cases is routine, and the Court itself discussed such an Order at its last status conference. After the entry of such an order, Carefirst would have no reasonable objection to the production of this pricing information on confidentiality grounds.

confidential information.  In fact, a review of all of Carefirst's various filings demonstrates that CareFirst's real interest lies not in protecting confidential information, but solely in stopping in its tracts the antitrust litigation against it.

In its Complaint, filed on April 3, 2013, Carefirst alleges that Whatley Kallas breached the confidentiality provision by alleging in the *Advanced Surgery* Complaint that Carefirst refused to negotiate a business relationship with plaintiff ambulatory surgery centers in a meaningful way and that Carefirst would only offer anti-competitive, rock-bottom, below-market rates to compensate for the ambulatory surgical center services provided to Carefirst's insureds. Exhibit C, ¶¶ 67-74.    The April 3, 2013 Complaint seeks to enjoin the *Advanced Surgery* litigation before this Court. *See, e.g.* Exhibit C ,¶ 87 ("such injunctive relief should include a prohibition against the Defendants prosecuting the [*Advanced Surgery*] Antitrust Lawsuit as currently pled, because doing so will inevitably entail further disclosure of the Confidential Information.")    In addition, in the state court complaint, Carefirst fully demonstrates its extraordinary overreaching.  CareFirst cites exactly 10 paragraphs (3 not counting one over-inclusive block citation) of the 231 paragraph *Advanced Surgery* Complaint as containing confidential information.  The state court complaint includes exactly two quotes from paragraphs 3 and 94 of the *Advanced Surgery* Complaint (which Carefirst itself filed as an open record in Maryland and again as part of its Objection). Exhibit C, ¶ 70.

In that paragraph, CareFirst quotes the following as the disclosed "confidential information":

> For example, the [ambulatory surgical center ("ASC")] Defendants allege that 'CareFirst [] has refused to negotiate in any meaningful sense and instead it insists on achieving the anti-competitive rock bottom rate it desires.' Ex. 2 ¶ 3.  ASC Defendants also allege '[a]fter further negotiations, CareFirst still only offered rates that were significantly below market rates for facility reimbursements.'

Id. ¶ 94.  ASC Defendants go on to further characterize the pricing information offered by CareFirst in paragraph 95 of Exhibit 2.

*Id.*   In support of this theory, Carefirst further cites paragraphs 3 and 87 through 95 of the *Advanced Surgery* Complaint.   *Id.* ¶¶ 70-71.

None of these paragraphs disclose any confidential information, trade secrets or sensitive pricing data. Rather, these paragraphs describe generally and simply, and without disclosing any confidential information, Carefirst's failure to meaningfully negotiate and merely characterize Carefirst's offers as "rock bottom" and "significantly below market rates".[5]  This is hardly the picture of disclosure of a "significant amount of confidential information delivered by CFMI to SurgCenter and Whatley Kallas" that the Objection paints for the Court. *See Objection* at ¶ 9. Moreover, as discussed below at pages 8-9, Carefirst has now provided an affidavit from its negotiator that makes it clear that it viewed the confidential information to be the pricing data, which we have not disclosed.

As Exhibit D demonstrates, Carefirst made no effort to attempt to resolve any confidentiality issue it had before filing its state court Complaint.  Instead, it is now clear that Carefirst's avowed purpose is to insulate itself from its violations of federal antitrust law by asking a state court to enjoin an action in federal court.   Essentially, Carefirst has attempted to turn what was at best a potential discovery dispute - calling for the entry of a protective order as part of federal antitrust litigation rightfully before this Court - into separate duplicative litigation in a state court forum.

---

[5] It is telling, for purposes of this litigation, that Carefirst does not quarrel with the description of their failure to meaningfully negotiate or the characterization of their offers as "rock bottom" or "below market rates", but rather implicitly agrees to the truth of these allegations by calling them "trade secrets."

On Friday April 22, 2013, shortly before this Court entered its Order requesting additional briefing, Mr. De Gravelles informed Joe Whatley that he intended to file a Motion for Preliminary Injunction and attendant affidavits with the Maryland state court. Exhibit E.  In that Motion (Exhibit F), Carefirst makes clear that it is only seeking to halt the litigation against it and is not actually interested in protecting any confidential information.  Carefirst has now explicitly asked the Maryland state court to enjoin the *Advanced Surgery* litigation before this Court and has asked the Maryland state court to set a Preliminary Injunction hearing for June 3, 2013.  The Motion for Preliminary Injunction asks the Maryland Court to enjoin the Plaintiffs from "disclosing or using… any information learned through negotiations with Carefirst" including in the MDL.[6] Exhibit F at 9.

In fact, Carefirst describes the basis for its request for a preliminary injunction specifically in light of the costs of having to defend the antitrust litigation:

> Second, there is the inestimable cost of going through a federal antitrust lawsuit as a central defendant.  There will obviously be hard costs associated with defending such a suit.  But what about the intangible negative impacts?  How will CareFirst be compensated for the negative press?  For the loss of its business reputation among the provider community, not to mention among purchasers of health insurance?  And of course this negative publicity comes at a time when Maryland is about to launch its own health insurance exchange, which is designed to further increase competition amongst carriers.   None of this will be measurable, and therefore recoverable, at trial.

Exhibit F at 7.

---

[6] Throughout its Complaint, Objection and now Motion for Preliminary Injunction, Carefirst fails to identify the actual confidential information it believes has actually been disclosed by the *Advanced Surgery* Complaint. This Court recognized the same in its Order. In its Motion for Preliminary Injunction, Carefirst has expanded its request beyond confidential information to cover "any information," which shows the amorphous nature of their claims at this stage.

As its interpretation of the Confidentiality Agreement makes clear, Carefirst believes the *Advanced Surgery* Plaintiffs have waived their right to sue Carefirst for antitrust violation, citing the costs of that litigation as *damages* for breach of the Confidentiality Agreement.

Carefirst also argues that the release of the "pricing information" in the *Advanced Surgery* Complaint jeopardizes its bargaining position, describing the injury caused by the *Advanced Surgery* Complaint this way:

> The information at issue could be extremely detrimental to CareFirst's bargaining positions *vis-à-vis* other would be participating ASCs. In effect, the pricing and other concessions that Carefirst was willing to make to the Defendant ASCs could, if such information became public, set a floor below which Carefirst would not be able to negotiate in the future.

Exhibit F at 6.   Leaving aside that this paragraph casts doubt on whether confidential pricing information has even become public ("*if* such information *became* public"), this argument is essentially nonsense.   At best, Carefirst argues that the information in the *Advanced Surgery* Complaint, if leaked to the public, would raise the price floor for other ASCs.   This effect is the opposite of what the *Advanced Surgery* Complaint alleges. The *Advanced Surgery* Complaint only stresses the extent to which Carefirst drives prices down to "rock-bottom" or "below market" levels.   If anything, release of this information to the public would reinforce Carefirst's ability to push for low rates, not damage it.   Unfortunately, this sort of half-baked reasoning underlies Carefirst's entire position.

In support of its Motion, Carefirst includes the Affidavit of Carefirst's Contract Manager for Institutional and Vendor Contracting, Provider Contracting and Reimbursement Implementation, Medical and Networks Management Division, Andrea Pomykala, to make the same kinds of conclusory allegations about disclosure of confidential information previously included within Carefirst's Complaint and Objection.   Here, though, unlike the Complaint and

Objection (neither of which describe in any way the confidential information allegedly disclosed), Ms. Pomykala outright contradicts Carefirst's arguments by describing what information, in her opinion, might be confidential under the agreement:

> This information included pricing data that was developed just for SurgCenter-affiliated ASCs, as well as other sensitive data about terms and conditions that CareFirst was offering those ASCs.

Exhibit G, ¶19.

Of course, review of the *Advanced Surgery* Complaint and Ms. Pomykala's Affidavit shows that the Complaint does not reveal any "significant amount" of "pricing data" or "other sensitive data about terms and conditions," and Carefirst has not identified any other such disclosure. Any future "disclosure" of that information in litigation can be simply remedied by the entry of a routine protective order. We believe that what Carefirst actually wants is not protection of its confidential information, but rather a release of all future antitrust claims by those who choose to negotiate prices with it. Such an interpretation of the Confidentiality Agreement would render it void. Carefirst's Objection is unfortunately just another example of the lengths many of the Defendants will go to in order to protect their monopolies.

## III.   RESPONSE

### A.   The *Advanced Surgery* Complaint Does Not Disclose Any Confidential Information

The Confidentiality Agreement at issue defines the "Confidential Information" as follows:

> 1. **Confidential Information.** As used in this Agreement, "Confidential Information" means all information disclosed by a Party (the "Disclosing Party") to the other Party (the "Receiving Party") which contains trade secrets, business plans, information related to customer groups or individual subscribers, medical information, financial information relating to Disclosing Party's business, proprietary data of Disclosing Party or any other entity which has provided such data to Disclosing Party, software and related documentation, and all other information which is not generally available

to the public or which is designated as confidential by the Disclosing Party. Confidential Information does not include information that is:  known to the Receiving Party prior  to its disclosure under this Agreement; available to the general public without restriction; independently developed by the Receiving Party without violating this Agreement; or received by the Receiving Party from a third party without restriction.

Exhibit A.

In her Affidavit, Andrea Pomykala of CareFirst identifies the types of information that would be considered confidential as the pricing data and other sensitive data about the terms and conditions that Carefirst had proposed to the Advanced Surgery Center plaintiffs.  Exhibit G, ¶19.

CareFirst alleges that Whatley Kallas breached this provision by filing the *Advanced Surgery* Complaint on behalf of its clients alleging that Carefirst refused to negotiate a business relationship with them in a meaningful way and that Carefirst would only offer anti-competitive, rock-bottom, below-market rates to compensate for the ambulatory surgical center services they provide.  Exhibit B, ¶¶ 67-74.  In support of this theory, CareFirst cites paragraphs 3 and 87 through 95 of the *Advanced Surgery* Complaint.   Exhibit B, State Court Complaint¶¶ 70-71.

Paragraphs 87 through 92 of the *Advanced Surgery* Complaint include allegations regarding CareFirst's dealings with health care providers who were not parties to the Confidentiality Agreement. *Advanced Surgery* Complaint, ¶¶ 87-92 (summarizing certain of Plaintiff's dealings with Maryland Pain & Spine and Dr. Torres, Dr. Gunawardane, Dr. Peterson, Dr. Bender, Dr. Rothenm, and Dr. Somashekhar Bellary, including threats of termination). Those allegations are plainly outside the definition of Confidential Information set forth in the Confidentiality Agreement.  Paragraphs 3 and 93 through 95 of the *Advanced Surgery* Complaint allege only that Carefirst would not negotiate in a meaningful way or offer competitive reimbursement rates.  *Advanced Surgery* Complaint ¶ 3 ("CareFirst, however, has refused to

negotiate in any meaningful sense and instead it insists on achieving the anti-competitive rock bottom rates it desires"); ¶ 93 ("The parties sought to negotiate but CareFirst never offered competitive rates to the Plaintiffs."); ¶ 94 ("After further negotiations, CareFirst still only offered rates that were significantly below market rates for facility reimbursements."); ¶ 95 ("The rates proposed by CareFirst, including its final proposal, were well below any reasonable market rates.").  Further, none of these paragraphs disclose any "pricing data that was developed just for SurgCenter… or sensitive data about terms and conditions" that Carefirst's own witness, Ms. Pomykala, has defined as being confidential under the agreement. Exhibit G, ¶19.

Despite Carefirst's contention to the contrary, these allegations are not materially different from allegations made in numerous other complaints filed against Carefirst in connection with this MDL, though Carefirst admits those complaints do not contain confidential information.  *See* Exhibit B, Carefirst's Complaint, ¶ 66 ("[n]one of those other lawsuits, however, relied in any way on information about proposed pricing or other types of information concerning negotiations of participating provider agreements"); *The Surgical Center for Excellence, LLLP v. Blue Cross and Blue Shield of Alabama*, No. 5:12-cv-00388-RS-CJK (N.D. Fla.), Complaint (Dkt. # 1), ¶ 6 ("the BCBS Defendants have the unfettered power to force healthcare providers into a quintessential Catch 22 situation of either acquiescing to anticompetitive rates and terms or foregoing access to a dominant portion of healthcare subscribers"); ¶ 7 ("Because the BCBS Defendants and other Blues have agreed not to compete and have established and solidified their dominant market position, healthcare providers have no bargaining power…. As a result, healthcare providers are subject to much lower rates and less favorable terms than they would be absent the Defendants' agreement not to compete."); *Sult v. Blue Cross Blue Shield of Alabama*, No. 0:13-00033 (D. Minn.), Complaint (Dkt. # 1), ¶¶ 6-7

(same); *Heritage Medical Partners, LLC v. Blue Cross Blue Shield of Alabama*, No. 9:13-cv-00081 (D.S.C.), Complaint (Dkt. # 1), ¶¶ 6-7 (same); *Chiropractic Plus, P.C. v. Blue Cross Blue Shield of Alabama*, No. 4:13-cv-00234 (S.D. Tex.); Complaint (Dkt. # 1), ¶¶ 6-7 (same).

Moreover, in opposing the appointment of Whatley Kallas as interim lead counsel, Carefirst has itself disclosed the fact that it negotiated with Whatley Kallas's client SurgCenter Development and that those negotiations were unsuccessful.  Carefirst of Maryland's Response to Rule 23 Report Recommending Appointment of Whatley Kallas LLC as Interim Lead Counsel (Dkt. # 49), at ¶ 2 ("Over a considerable period of time prior to the commencement of the present litigation, [Carefirst] and SurgCenter Development ("SurgCenter") engaged in extensive negotiations by which, if successful, [Carefirst] would have entered into a provider contract with certain SurgCenter ambulatory surgery centers ("SurgCenter ASCs").");  ¶ 6 ("The negotiations for a provider contract with SurgCenter did not conclude successfully.").  As the information alleged in the *Advanced Surgery* Complaint is no different from information alleged in numerous other complaints in the public record (that Carefirst admits do not contain confidential information) or information that Carefirst itself has disclosed through its own filings, it is clear that Whatley Kallas has not disclosed any confidential information in breach of the Confidentiality Agreement.

Given the fact that in its Objection Carefirst discloses everything we disclosed in the *Advanced Surgery* Complaint and even more after the Pomykala Affidavit - which defines the confidential information as the reimbursement rates that Carefirst offers or agrees to pay - it is beyond dispute that we have not disclosed any confidential information in the *Advanced Surgery* Complaint.  Carefirst's real effort, therefore, is to enforce the "use restrictions" in the Confidentiality Agreement, and it is this effort that creates the inconsistency with and violation

of the antitrust laws.  Carefirst is actually taking the position that, even if it violates the antitrust laws in its contracting proposals, Providers cannot use that information because they agreed to confidentiality.  The cases we have cited to the Court previously, and discuss further below, demonstrate that Carefirst's position is contrary to the law.

Moreover, the "use restrictions" in Carefirst's Confidentiality Agreement and similar provisions that are in many of the Defendants' Provider Agreements are used to maintain and abuse the market power that they have developed.  The Court should be aware that, since the filing of the *Conway* Complaint, we have engaged in a very significant amount of work product investigation that will be reflected in the Consolidated Amended Complaint.  Many of the Defendants have contractual provisions that prohibit the use of the reimbursement rates they pay in agreements with any other payor.  When one of the Defendants has a significant market share, those "use restrictions" function as most favored nations clauses that insure that other payors with less market share will have to pay higher reimbursement rates, something that in turn preserves the Defendants' market power.

The Pomykala Affidavit at ¶ 20 also establishes that it is an important policy of Carefirst to keep the prices it pays Providers confidential.[7] Every college economics student knows that competitive markets require information - especially info about prices - and that perfectly competitive markets require that perfect information be available to all participants in the market. *See, e.g.,* William J. Baumol & Alan S. Blinder, *Microeconomics: Principles and Policy* 156 (9th ed. 2005); Karl E. Case et al., *Principles of Microeconomics* 103 (7th ed. 2004); Joseph E. Stiglitz & Carl E. Walsh *Principles of Microeconomics* 228, 287 (3rd ed.  2002). Yet, Carefirst

---

[7]As described in this response, Carefirst's argument that the characterization of its rates as "rock bottom" somehow increases the "price floor" is beyond bizarre; it makes no sense.

has now admitted that it has a policy that is contrary to a competitive market.  In this litigation, we will show that practically all of the Defendants follow the same policy as Carefirst.

Moreover, based on our work product investigation totally independent of the Surgcenter negotiations, we know that before entering into a contract with a Provider, Carefirst generally requires providers to supply a matrix showing a matrix of reimbursement rates from other health insurance companies and that Carefirst insists on being the lowest payor.  In order words, Carefirst requires agreements that keep the rates it pays Providers confidential while requiring that Providers disclose the rates that they are paid by other payors.  This asymmetry of information gives Carefirst bargaining power and preserves its market power.

This discussion about Carefirst, which we expect to apply in many respects to most if not all of the Defendants, is just another example of how the Defendants abuse the market power that they have obtained and continue to maintain through the horizontal agreement that they will not compete with each other.

Carefirst's alternative argument, raised in its Preliminary Injunction papers, that it would be harmed by disclosure of pricing information during discovery in the litigation, is also a red herring.  As noted above, Carefirst argues in its Motion for Preliminary Injunction that it has been damaged because the disclosure of pricing information would "set a floor" for prices in other negotiations. Exhibit F at 6.   As this Court is no doubt aware, and certainly counsel for both sides is aware, this case will rely on pricing and payment data both for subscribers and providers from each and every one of the Defendants.   This data will almost certainly be governed by a multi-layer protective order. Sensitive pricing information of the type Carefirst believes *will* be (but has not yet been) disclosed in litigation is routinely produced subject to protective and confidentiality orders. Once such a protective order is in place, there is simply no

basis for the belief that Carefirst's pricing information will be available to other parties that it is negotiating against.    Finally, the *Advanced Surgery* Plaintiffs are not Plaintiffs in the Class Action case.  The *Advanced Surgery* Plaintiffs are not interested in pursuing the Class Action case, as they have additional claims that are not part of the original *Conway* Provider class action. There is no issue raised by Carefirst that could not be resolved either by a simple Protective Order in the MDL cases or by way of a discovery dispute.

        2.      **Carefirst's Interpretation of the Confidentiality Agreement is Void As Against Public Policy**

As the Court noted in its Order, there is reason for the Court to consider the "interplay between Confidentiality Agreements and federal antitrust laws."  Dkt. # 52.   Carefirst has made clear that it believes that the signing of the confidentiality agreement prohibits both the Plaintiffs and Whatley Kallas from pursuing Sherman Act claims against it.   Carefirst has asked the Maryland court to enjoin the enforcement of the antitrust laws by these Plaintiffs, and has asked this Court to penalize Whatley Kallas for the vigorous enforcement of these laws on behalf of its clients. By claiming that the Confidentiality Agreement requires a Maryland court to enjoin these claims and prevent the full enforcement of the federal antitrust laws, Carefirst has likely admitted to what amounts to a separate Section 1 violation (outlawing "agreement[s]… in restraint of trade").

    In addition, even if the Court found that Carefirst's flawed theory that the Confidentiality Agreement bars antitrust litigation were correct, such a finding would render the Confidentiality Agreement void as a matter of public policy.  It is well established law that an agreement which acts to render a Defendant immune from antitrust liability is void as against public policy. *Redel's, Inc. v. General Electric Co*., 498 F.2d 95, 98 (5th Cir. 1974) ("***The prospective***

*application of a general release to bar private antitrust actions arising from subsequent violations is clearly against public policy.*")(emphasis added); *Fox Midwest Theatres v. Means,* 221 F.2d 173, 180 (8th Cir. 1955) ("Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy. This is because the effect of such a release could be to permit a restraint of trade to be engaged in, which would have impact, not simply between the parties, but upon the public as well") (internal citation omitted); *Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322, 329 (1955) ("[I]n view of the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the  private treble-damage action," an agreement which confers even "a partial immunity from civil liability for future violations" of the antitrust laws is inconsistent with the public interest); *In re American Exp. Merchants' Litig.,* 667 F.3d 204, 214 (2d Cir. 2012), *cert granted,* 133 S. Ct. 594 ("[A]n agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void as a matter of public policy."); *Fernandes v. Holland Am. Line,* 810 F. Supp. 2d 1334, 1338 (S.D. Fla. 2011) (finding "[t]he cases cited by the Court to support this pronouncement all recognize the well-settled rule that it is against public policy to prospectively waive a private party's right to pursue treble damages for subsequent antitrust violations" and citing *Redel's Inc*.); *AT&T Mobility LLC v. Fisher*, 2011 U.S. Dist. LEXIS 124839, *16-17 (D. Md. Oct. 28, 2011) ("We merely note that in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning  the agreement as against public policy."). The U.S. Supreme Court has noted that the public policy supporting the Sherman and Clayton Acts reflects "Congress' appraisal of the value of economic freedom; they guarantee the vitality of the entrepreneurial

spirit. Questions arising under these Acts are among the most important in public law. The unique public interest in the enforcement of the antitrust laws is repeatedly reflected in the special remedial scheme enacted by Congress." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 652 (U.S. 1985). The law is settled that agreements that act to prohibit the enforcement of the antitrust laws violate its unique and broad public policy goals.

While none of these cases deal explicitly with Confidentiality Agreements (most arise in the context of a settlement release agreement or arbitration agreement), all support the view that any agreement which serves to render a defendant immune from future antitrust violation, or prevent the enforcement of the federal antitrust laws, is void. *Fox Midwest Theatres v. Means,* 221 F.2d at 180 ("Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy.)   Carefirst's reading of the agreement, if it allows a state court to enjoin the enforcement of the federal antitrust laws, would have the clear effect of preventing the enforcement of the antitrust laws.  As noted above, Carefirst has clearly requested that the state court order "should include a **prohibition against the Defendants prosecuting the [*Advanced Surgery*] Antitrust Lawsuit as currently pled**, because doing so will inevitably entail further disclosure of the Confidential Information.")   *See, e.g.* Carefirst Complaint ,¶ 87.  The Motion for a Preliminary Injunction, filed Friday in Maryland state court, makes Carefirst's actual concern crystal clear. In describing the basis for such an injunction, Carefirst cites not the loss of the information itself, but the fact of litigation against it—"there is the inestimable cost of going through a federal antitrust lawsuit as a central defendant.  There will obviously be hard costs associated with defending such a suit….   None of this will be measurable, and therefore recoverable, at trial." Exhibit F at 7.  Carefirst is not concerned about the underlying information:

it simply wants to prohibit the *Advanced Surgery* Plaintiffs, and Whatley Kallas, from litigating antitrust claims against it.

Carefirst routinely uses such a Confidentiality Agreement for its "negotiations."  If this interpretation of the Confidentiality Agreement were permissible, not only would the Plaintiffs neither be able to vindicate their rights under the Sherman Act, nor protect the public's interest in seeing those laws enforced against monopolists like Carefirst, but other future plaintiffs whose rights have been violated by Carefirst would similarly be unable to pursue such claims.   In concert, these Confidentiality Agreements would render Carefirst immune from antitrust suits involving the prices they offer to Providers.

*Redel's*, a case decided by the old Fifth Circuit, makes clear that such an interpretation of the Confidentiality Agreement cannot be supported by this Court. The Fifth Circuit found in the context of an agreement purportedly releasing future antitrust claims:

> The prospective application of a general release to bar private antitrust actions arising from subsequent violations is clearly against public policy. A right conferred on a private party by federal statute, but granted in the public interest to effectuate legislative policy, may not be released if the legislative policy would be contravened thereby. Releases may not be executed which absolve a party from liability for future violations of our antitrust laws. The Eighth Circuit explained this principle succinctly in *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955): "Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy [Citation omitted]. This is because the effect of such a release could be to permit a restraint of trade to be engaged in, which would have impact, not simply between the parties, but upon the public as well. Such a release, if recognized as having any validity of that nature, could therefore itself operatively serve as a contract 'in restraint of trade.'" The Supreme Court in Zenith, supra, reiterated the underlying policy in stating that private antitrust suits are considered "one of the surest weapons for effective enforcement of the antitrust laws."

*Redel's, Inc.*, 98 F.2d at 98.

Carefirst's interpretation of the Confidentiality Agreement as preventing use of negotiations as the basis of a Sherman Act claim amounts to preemptive release of subsequent antitrust claims. *Redel's* and *Fox Midwest Theatres* make clear that such an agreement is unenforceable. If anything, a general release agreeing to release future claims should be *more* likely to support a waiver of future antitrust claims. In that case, the agreement might at least evidence some intent to actually release those claims. Here, there is no evidence that the parties to the Confidentiality Agreement intended to release any antitrust claims at all. At minimum, this supports a reading of the Confidentiality Agreement different from the one Carefirst has presented to the Maryland court (and alluded to in this Court).

Further, in the arbitration context, the U.S. Supreme Court has stated that contractual provisions which act to waive a party's ability to enforce their statutory remedies under the Sherman Act are against public policy. *Mitsubishi Motors,* 473 U.S. at 637. In *Mitsubishi,* the Court found:

> Where the parties have agreed that the arbitral body is to decide a defined set of claims which includes, as in these cases, those arising from the application of American antitrust law, the tribunal therefore should be bound to decide that dispute in accord with the national law giving rise to the claim. *Cf. Wilko v. Swan*, 346 U.S., at 433-434. And so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.

*Id.* at 636-37. The Court also noted:

> [I]n the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy. *See, e. g., Redel's Inc. v. General Electric Co*., 498 F.2d 95, 98-99 (CA5 1974); *Gaines v. Carrollton Tobacco Board of Trade, Inc.,* 386 F.2d 757, 759 (CA6 1967); *Fox Midwest Theatres v. Means,* 221 F.2d 173, 180 (CA8 1955). *Cf. Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 329 (1955). See generally 15 S. Williston, Contracts § 1750A (3d ed. 1972).

*Id.* at 637, n. 19.  There is no reason to limit this rule to arbitration claims when the public interest protected by the Sherman Act is the same, if not greater, in the context of an attempt to protect pricing information by way of a confidentiality agreement. Unlike the arbitration context, there is no federal statute like the FAA encouraging the enforcement of confidentiality agreements.

CareFirst's attempt to read its Confidentiality Agreement as a bar to the *Advanced Surgery* Plaintiffs' Sherman Act claims against it would render the Confidentiality Agreement itself void as against public policy. Given the broad public policy interest underlying the antitrust laws, the Confidentiality Agreement poses no impediment to Whatley Kallas acting as Class Counsel in this case.

> **3.     The Claims Against Whatley Kallas Will Be Dismissed**
>
> **a.  Whatley Kallas Did Not Breach the Confidentiality Agreement**

As discussed in detail above, in filing the *Advanced Surgery* Complaint, Whatley Kallas did not violate the Confidentiality Agreement, and therefore, the claims against Whatley Kallas will be dismissed.

> **b.  Whatley Kallas Has Not Violated Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law §§ 11-1201, *et seq.* ("MUTSA")**

In addition to alleging that Whatley Kallas has violated the Confidentiality Agreement, Carefirst also alleges that Whatley Kallas violated the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law §§ 11-1201, *et seq.* ("MUTSA"), which provides remedies for a plaintiff alleging misappropriation of a trade secret.  MUTSA defines "trade secrets" as "information, including a formula, pattern, compilation, program, device, method, technique, or process that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic

value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Md. Code Ann., Com. Law § 11-1201(e). The information alleged in the *Advanced Surgery* Complaint fails to meet either prong of this definition.

First, the information at issue does not derive independent economic value from being generally unknown. Courts have expressly found that the type of general pricing information that Carefirst alleges was misappropriated does not constitute a trade secret. For example, in *Optic Graphics, Inc. v. Agee*, 591 A.2d 578, 584 (Md. Ct. Spec. App. 1991), the plaintiff alleged that the defendant misappropriated certain trade secrets, including pricing information. Agreeing with the trial court, the Maryland Court of Special Appeals found that the information the plaintiff relied on did not constitute trade secrets, as the information was "(1) subject to change, (2) subject to market forces, (3) subject to the type of machinery used, and so forth." *Id.* at 587. Because of these characteristics, the Court of Special Appeals affirmed the trial court in finding that it was unlikely that the appellees "could obtain economic value from its disclosure or use as required by the Act." *Id.* (internal quotation omitted). *See also Diamond v. T. Rowe Price Assocs.*, 852 F. Supp. 372, 412 (D. Md. 1994) (despite the fact that former employee took more than 10,000 documents, and regardless of whether T. Rowe Price might gain utility from the information contained within those documents, the information still did not constitute trade secrets because "there [was] no evidence that they have any independent economic value for anyone else.").

Secondly, Carefirst has undertaken no efforts to maintain the secrecy of the information. In this regard, Carefirst has neither sought to have the *Advanced Surgery* Complaint sealed nor requested that Whatley Kallas destroy that complaint pursuant to the terms of the Confidentiality

Agreement.  *See* Complaint, Ex. 1, ¶ 5 ("Return of Confidential Information.  The Receiving Party agrees to return to the Disclosing Party (or at the option of Disclosing Party, to destroy) all Confidential Information upon written request of the Disclosing Party or upon the termination of this Agreement, whichever is earlier.").  To the contrary, Carefirst has actually gone to great lengths to publicize the purported confidential information by needlessly filing an unsealed lawsuit against Whatley Kallas in a separate state court proceeding in Maryland and attaching the *Advanced Surgery* Complaint to its filing.  Indeed, as noted above, Carefirst has itself publicly disclosed the fact that it negotiated with Whatley Kallas's client SurgCenter Development and that those negotiations were unsuccessful. Objection at ¶¶ 2, 6.

The purported pricing information at issue -- that is, the mere description of CareFirst's reimbursement rates as below market -- does not constitute trade secrets.  Thus, not only has Whatley Kallas not breached the Confidentiality Agreement, it has not disclosed any trade secrets in violation of MUTSA.

## IV.    CONCLUSION

For the above stated reasons, the Court should find that Whatley Kallas has not disclosed any Confidential Information or trade secrets, further find that CareFirst's interpretation of the Confidentiality Agreement is incorrect and void as against public policy, overrule CareFirst's Objection, and appoint Joe R. Whatley, Jr. and Edith M. Kallas as interim co-lead counsel for the Providers.

Respectfully submitted,

/s/ Joe R. Whatley, Jr.
Joe R. Whatley, Jr., Esq.
W. Tucker Brown
Charlene P. Ford
WHATLEY KALLAS, LLC

2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel: (205) 488-1200
Fax: (800) 922-4851
Email:  jwhatley@whatleykallas.com
Email:  tbrown@whatleykallas.com
Email:  cford@whatleykallas.com

/s/Edith M. Kallas
Edith M. Kallas (admitted pro hac vice)
Ilze Thielmann
WHATLEY KALLAS, LLC
380 Madison Avenue, 23rd Floor
New York, NY  10017
Tel:  (212) 447-7060
Fax: (800) 922-4851
Email: ekallas@whatleykallas.com
Email:  ithielmann@whatleykallas.com

Patrick J. Sheehan
WHATLEY KALLAS, LLC
60 State Street, 7th Floor
Boston, MA  02109
Tel:  (617) 573-5118
Fax: (617) 573-5090
Email: psheehan@whatleykallas.com

Deborah Winegard (admitted *pro hac vice*)
WHATLEY KALLAS, LLC
1068 Virginia Avenue, NE
Atlanta, GA  30306
Tel:  (404) 607-8222
Fax: (404) 607-8451
Email: dwinegard@whatleykallas.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 22nd day of April, 2013, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Joe R. Whatley, Jr.
Joe R. Whatley, Jr.