FILED

2013 Jul-01  PM 05:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

GALACTIC FUNK TOURING, INC.;
AMERICAN ELECTRIC MOTOR
SERVICES, INC.; CB ROOFING, LLC;
LINDA MILLS; FRANK CURTIS; JUDY
SHERIDAN; JENNIFER RAY DAVIDSON;
LAWRENCE W. COHN, AAL, ALC;
SACCOCCIO & LOPEZ; MONIKA
BHUTA; MICHAEL E. STARK; FALCON
PICTURE GROUP LLC; RENEE E. ALLIE;
JOHN G. THOMPSON; HARRY M.
MCCUMBER; GASTON CPA FIRM;
JEFFREY S. GARNER; ERIK BARSTOW;
GC/AAA FENCES, INC.; KEITH O.
CERVEN; TERESA M. CERVEN; SHGI
CORP.; KATHLEEN SCHELLER; IRON
GATE TECHNOLOGY, INC.; NANCY
THOMAS; SHRED 360, LLC; DANNY J.
CURLIN; AMEDIUS, LLC; and BRETT
WATTS,

    **Plaintiffs,**

  **v.**

BLUE CROSS BLUE SHIELD OF
ALABAMA; PREMARA, D/B/A/
PREMARA BLUE CROSS BLUE SHIELD
OF ALASKA AND PREMERA BLUE
CROSS OF WASHINGTON; BLUE CROSS
BLUE SHIELD OF ARIZONA; USABLE
MUTUAL INSURANCE COMPANY, D/B/A/
ARKANSAS BLUE CROSS BLUE SHIELD;
WELLPOINT, INC., D/B/A/ ANTHEM
BLUE CROSS LIFE AND HEALTH
INSURANCE COMPANY, BLUE CROSS
OF CALIFORNIA, BLUE CROSS OF
SOUTHERN CALIFORNIA, BLUE CROSS
OF NORTHERN CALIFORNIA, ROCKY
MOUNTAIN HOSPITAL AND MEDICAL
SERVICE INC. AS ANTHEM BLUE
CROSS BLUE SHIELD OF COLORADO
AND ANTHEM BLUE CROSS BLUE

**CLASS ACTION COMPLAINT**

**MDL No. 2406**

**JURY TRIAL DEMANDED**

Case No. _____

SHIELD OF NEVADA, ANTHEM BLUE
CROSS BLUE SHIELD OF
CONNECTICUT, BLUE CROSS BLUE
SHIELD OF GEORGIA, ANTHEM BLUE
CROSS BLUE SHIELD OF INDIANA,
ANTHEM BLUE CROSS BLUE SHIELD
OF KENTUCKY, ANTHEM BLUE CROSS
BLUE SHIELD OF MAINE, ANTHEM
BLUE CROSS BLUE SHIELD OF
MISSOURI, RIGHTCHOICE MANAGED
CARE, INC., HMO MISSOURI INC.,
ANTHEM HEALTH PLANS OF NEW
HAMPSHIRE AS ANTHEM BLUE CROSS
BLUE SHIELD OF NEW HAMPSHIRE,
EMPIRE HEALTHCHOICE ASSURANCE,
INC. AS EMPIRE BLUE CROSS BLUE
SHIELD, COMMUNITY INSURANCE
COMPANY AS ANTHEM BLUE CROSS
BLUE SHIELD OF OHIO, ANTHEM BLUE
CROSS AND BLUE SHIELD OF
VIRGINIA, AND ANTHEM BLUE CROSS
BLUE SHIELD OF WISCONSIN;
CALIFORNIA PHYSICIANS' SERVICE
INC., D/B/A BLUE SHIELD OF
CALIFORNIA; HIGHMARK HEALTH
SERVICES, D/B/A/ HIGHMARK BLUE
CROSS BLUE SHIELD OF DELAWARE,
HIGHMARK BLUE CROSS BLUE
SHIELD, HIGHMARK BLUE SHIELD,
AND HIGHMARK BLUE CROSS BLUE
SHIELD OF WEST VIRGINIA;
CAREFIRST BLUECROSS BLUESHIELD,
D/B/A/ GROUP HOSPITALIZATION AND
MEDICAL SERVICES AND CAREFIRST
BLUE CROSS BLUE SHIELD OF
MARYLAND; BLUE CROSS BLUE
SHIELD OF FLORIDA; HAWAI'I
MEDICAL SERVICE ASSOCIATION
D/B/A/ BLUE CROSS AND BLUE SHIELD
OF HAWAI'I; BLUE CROSS OF IDAHO
HEALTH SERVICE INC.; CAMBIA
HEALTH SOLUTIONS, INC., D/B/A/
REGENCE BLUE SHIELD OF IDAHO,
REGENCE BLUE CROSS BLUE SHIELD
OF OREGON, REGENCE BLUE CROSS
BLUE SHIELD OF UTAH, AND REGENCE

**BLUE SHIELD OF WASHINGTON;
HEALTH CARE SERVICE
CORPORATION, D/B/A/ BLUE CROSS
BLUE SHIELD OF ILLINOIS, BLUE
CROSS BLUE SHIELD OF NEW MEXICO,
BLUE CROSS BLUE SHIELD OF
OKLAHOMA, AND BLUE CROSS BLUE
SHIELD OF TEXAS; WELLMARK, INC.,
D/B/A/ WELLMARK BLUE CROSS BLUE
SHIELD OF IOWA AND WELLMARK
BLUE CROSS BLUE SHIELD OF SOUTH
DAKOTA; BLUE CROSS BLUE SHIELD
OF KANSAS; LOUISIANA HEALTH
SERVICE AND INDEMNITY COMPANY
D/B/A/ BLUE CROSS BLUE SHIELD OF
LOUISIANA; BLUE CROSS BLUE SHIELD
OF MASSACHUSETTS; BLUE CROSS
BLUE SHIELD OF MICHIGAN; BLUE
CROSS BLUE SHIELD OF MINNESOTA;
BLUE CROSS BLUE SHIELD OF
MISSISSIPPI; BLUE CROSS BLUE
SHIELD OF KANSAS CITY; BLUE CROSS
BLUE SHIELD OF MONTANA; BLUE
CROSS BLUE SHIELD OF NEBRASKA;
HORIZON BLUE CROSS BLUE SHIELD
OF NEW JERSEY; HEALTHNOW NEW
YORK INC., D/B/A/ BLUE CROSS BLUE
SHIELD OF WESTERN NEW YORK AND
BLUE SHIELD OF NORTHEASTERN
NEW YORK; EXCELLUS BLUE CROSS
BLUE SHIELD; BLUE CROSS BLUE
SHIELD OF NORTH CAROLINA;
NORIDIAN MUTUAL INSURANCE
COMPANY D/B/A/ BLUE CROSS BLUE
SHIELD OF NORTH DAKOTA;
HOSPITAL SERVICE ASSOCIATION OF
NORTHEASTERN PENNSYLVANIA
D/B/A/ BLUE CROSS OF
NORTHEASTERN PENNSYLVANIA;
CAPITAL BLUE CROSS;
INDEPENDENCE BLUE CROSS; TRIPLE-
S SALUD; BLUE CROSS BLUE SHIELD
OF RHODE ISLAND; BLUE CROSS BLUE
SHIELD OF SOUTH CAROLINA; BLUE
CROSS BLUE SHIELD OF TENNESSEE;
BLUE CROSS BLUE SHIELD OF**

**VERMONT; BLUE CROSS BLUE SHIELD OF WYOMING; and BLUE CROSS AND BLUE SHIELD ASSOCIATION,**

**Defendants.**

## SUBSCRIBER TRACK CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

NATURE OF THE CASE                                                          3

JURISDICTION AND VENUE                                                      7

PARTIES                                                                     9
  Plaintiffs                                                      9
  Defendants                                                      13

TRADE AND COMMERCE                                                         54

CLASS ACTION ALLEGATIONS                                                   54

FACTUAL BACKGROUND                                                         62
  History of the Blue Cross and Blue Shield Plans and of BCBSA     62
    Development of the Blue Cross Plans                  62
    Development of the Blue Shield Plans                 64
    Creation of the Blue Cross and Blue Shield Association  65

  Allegations Demonstrating Control of BCBSA By Member Plans      68

  License Agreements and Restraints on Competition                69

  Horizontal Agreements                                          72

  The Horizontal Agreements Not To Compete                        74

  The Anticompetitive Acquisition Restrictions                    81

  The BCBSA Licensing Agreements Have Reduced Competition In Regions Across The United States                                          83

  Supra-Competitive Premiums Charged by BCBS Plans                 86

  The Widespread Use By BCBSA Licensees Of Anticompetitive Most Favored Nation Clauses                                               86

  Individual Blue Plans' Market Power In Relevant Markets          92
    Relevant Product Market                              92
    Relevant Geographic Markets                          95
    Alabama                                              95
    Arkansas                                             98
    California                                          100
    Florida                                             104
    Hawai'i                                             106

i

Illinois                                                                                        108

Louisiana                                                                                       111

Michigan                                                                                        114

Mississippi                                                                                     117

Missouri                                                                                        119

New Hampshire                                                                                   122

North Carolina                                                                                  124

Western Pennsylvania                                                                            133

Rhode Island                                                                                    138

South Carolina                                                                                  140

Tennessee                                                                                       142

Texas                                                                                           145

State Insurance Laws Do Not Protect Subscribers from the Market Allocation Scheme               149

VIOLATIONS ALLEGED                                                                              152

RELIEF REQUESTED                                                                                293

Plaintiffs, Galactic Funk Touring, Inc.; American Electric Motor Services, Inc.; CB Roofing, LLC; Linda Mills; Frank Curtis; Judy Sheridan; Jennifer Ray Davidson; Lawrence W. Cohn, AAL, ALC; Saccoccio & Lopez; Monika Bhuta; Michael E. Stark; Falcon Picture Group LLC; Renee E. Allie; John G. Thompson; Harry M. McCumber; Gaston CPA Firm; Jeffrey S. Garner; Erik Barstow; GC/AAA Fences, Inc.; Keith O. Cerven; Teresa M. Cerven; SHGI Corp.; Kathleen Scheller; Iron Gate Technology, Inc.; Nancy Thomas; Shred 360, LLC; Danny J. Curlin; Amedius, LLC; and Brett Watts, on behalf of themselves and all others similarly situated, for their Complaint against Defendants Blue Cross Blue Shield of Alabama ("BCBS-AL"); Premera, d/b/a/ Premera Blue Cross Blue Shield of Alaska ("BCBS-AK") and Premera Blue Cross of Washington ("BC-WA"); Blue Cross Blue Shield of Arizona ("BCBS-AZ"); USAble Mutual Insurance Company, d/b/a/ Arkansas Blue Cross Blue Shield ("BCBS-AR"); WellPoint, Inc., d/b/a/ Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California as well as Blue Cross of Southern California and Blue Cross of Northern California (together, "BC-CA"), Rocky Mountain Hospital & Medical Service Inc. as Anthem Blue Cross Blue Shield of Colorado ("BCBS-CO") and Anthem Blue Cross Blue Shield of Nevada ("BCBS-NV"), Anthem Blue Cross Blue Shield of Connecticut ("BCBS-CT"), Blue Cross Blue Shield of Georgia ("BCBS-GA"), Anthem Blue Cross Blue Shield of Indiana ("BCBS-IN"), Anthem Blue Cross Blue Shield of Kentucky ("BCBS-KY"), Anthem Blue Cross Blue Shield of Maine ("BCBS-ME"), Anthem Blue Cross Blue Shield of Missouri as well as RightCHOICE Managed Care, Inc. and HMO Missouri Inc. ("BCBS-MO"), Anthem Health Plans of New Hampshire as Anthem Blue Cross Blue Shield of New Hampshire ("BCBS-NH"), Empire HealthChoice Assurance, Inc. as Empire Blue Cross Blue Shield ("Empire BCBS"), Community Insurance Company as Anthem Blue Cross Blue Shield of Ohio ("BCBS-OH"), Anthem Blue Cross and

Blue Shield of Virginia ("BCBS-VA"), and Anthem Blue Cross Blue Shield of Wisconsin ("BCBS-WI"); California Physicians' Service Inc., d/b/a Blue Shield of California ("BS-CA"); Highmark Health Services, d/b/a/ Highmark Blue Cross Blue Shield of Delaware ("BCBS-DE"), Highmark Blue Cross Blue Shield and Highmark Blue Shield ("Highmark BCBS"), and Highmark Blue Cross Blue Shield of West Virginia ("BCBS-WV"); CareFirst BlueCross BlueShield, d/b/a/ Group Hospitalization and Medical Services ("BCBS-DC") and Carefirst Blue Cross Blue Shield of Maryland ("BCBS-MD"); Blue Cross Blue Shield of Florida ("BCBS-FL"); Hawai'i Medical Service Association d/b/a/ Blue Cross and Blue Shield of Hawai'i ("BCBS-HI"); Blue Cross of Idaho Health Service Inc. ("BC-ID"); Cambia Health Solutions, Inc., d/b/a/ Regence Blue Shield of Idaho ("BS-ID"), Regence Blue Cross Blue Shield of Oregon ("BCBS-OR"), Regence Blue Cross Blue Shield of Utah ("BCBS-UT"), and Regence Blue Shield of Washington ("BS-WA"); Health Care Service Corporation, d/b/a/ Blue Cross Blue Shield of Illinois ("BCBS-IL"), Blue Cross Blue Shield of New Mexico ("BCBS-NM"), Blue Cross Blue Shield of Oklahoma as well as GHS Property and Casualty Insurance Company and GHS Health Maintenance Organization ("BCBS-OK"), Blue Cross Blue Shield of Texas ("BCBS-TX"); Wellmark, Inc. d/b/a/ Wellmark Blue Cross Blue Shield of Iowa ("BCBS-IA") and Wellmark Blue Cross Blue Shield of South Dakota ("BCBS-SD"); Blue Cross Blue Shield of Kansas ("BCBS-KS"); Louisiana Health Service & Indemnity Company d/b/a/ Blue Cross Blue Shield of Louisiana ("BCBS-LA"); Blue Cross Blue Shield of Massachusetts ("BCBS-MA"); Blue Cross Blue Shield of Michigan ("BCBS-MI"); Blue Cross Blue Shield of Minnesota ("BCBS-MN"); Blue Cross Blue Shield of Mississippi ("BCBS-MS"); Blue Cross Blue Shield of Kansas City ("BCBS-KC"); Blue Cross Blue Shield of Montana ("BCBS-MT"); Blue Cross Blue Shield of Nebraska ("BCBS-NE"); Horizon Blue Cross Blue Shield of New Jersey ("BCBS-NJ");

HealthNow New York, Inc., d/b/a/ Blue Cross Blue Shield of Western New York ("BCBS-Western NY") and Blue Shield of Northeastern New York ("BS-Northeastern NY"); Excellus Blue Cross Blue Shield ("Excellus BCBS"); Blue Cross Blue Shield of North Carolina ("BCBS-NC"); Noridian Mutual Insurance Company d/b/a/ Blue Cross Blue Shield of North Dakota ("BCBS-ND"); Hospital Service Association of Northeastern Pennsylvania d/b/a/ Blue Cross of Northeastern Pennsylvania ("BC-Northeastern PA"); Capital Blue Cross ("Capital BC"); Independence Blue Cross ("Independence BC"); Triple S-Salud ("BCBS-Puerto Rico"); Blue Cross Blue Shield of Rhode Island ("BCBS-RI"); Blue Cross Blue Shield of South Carolina ("BCBS-SC"); Blue Cross Blue Shield of Tennessee ("BCBS-TN"); Blue Cross Blue Shield of Vermont ("BCBS-VT"); and Blue Cross Blue Shield of Wyoming ("BCBS-WY") (collectively, the "Individual Blue Plans"); and the Blue Cross and Blue Shield Association ("BCBSA"), allege as follows:

## NATURE OF THE CASE

1.    The Supreme Court has repeatedly stated: "Collusion is the supreme evil of antitrust." *F.T.C. v. Actavis, Inc.*, --- S. Ct. ----, 2013 WL 2922122, at *13 (June 17, 2013).  The Supreme Court has also explained the types of collusion long condemned by the antitrust laws: "Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984).  These prohibitions on *per se* illegal conduct are at the core of antitrust law's protection of our free enterprise system.  As Robert Bork has explained about "the doctrine of *per se* illegality . . . (*e.g.*, price fixing and market division)": "Its contributions to consumer welfare over the decades have been enormous."  Robert H. Bork, *The Antitrust Paradox* 263 (rev. ed. 1993).

2.      This is a class action brought on behalf of subscribers of the Individual Blue Plans to enjoin an ongoing conspiracy between and among the Individual Blue Plans and BCBSA to allocate markets in violation of the prohibitions of the Sherman Act.  In addition, this action seeks to recover damages for classes of subscribers in the form of supra-competitive premiums that the Individual Blue Plans have charged – and lower competitive premiums that non-competing Blue plans have not charged – as a result of this illegal conspiracy.  This action also seeks these damages as a result of anticompetitive conduct the Individual Blue Plans have taken in their illegal efforts to establish and maintain monopoly power throughout the regions in which they operate.  This action also asserts related claims under the laws of the following states: Arkansas, California, Florida, Hawai'i, Illinois, Louisiana, Michigan, Mississippi, Missouri, New Hampshire, North Carolina, Rhode Island, South Carolina, Tennessee, and Texas.

3.      The Antitrust Division of the Department of Justice defines *per se* illegal market division as follows: "Market division or allocation schemes are agreements in which competitors divide markets among themselves.  In such schemes, competing firms allocate specific customers or types of customers, products, or territories among themselves.  For example, one competitor will be allowed to sell to, or bid on contracts let by, certain customers or types of customers.  In return, he or she will not sell to, or bid on contracts let by, customers allocated to the other competitors.  In other schemes, competitors agree to sell only to customers in certain geographic areas and refuse to sell to, or quote intentionally high prices to, customers in geographic areas allocated to conspirator companies."

4.      Defendants are engaging in and have engaged in *per se* illegal market division. These market allocation agreements are reached and implemented in part through the Blue Cross and Blue Shield license agreements between each of the Individual Blue Plans and BCBSA, an

association owned and controlled by all of the Individual Blue Plans, as well as the BCBSA Membership Standards and Guidelines.   In part through the artifice of the Plan owned and controlled BCBSA, an entity that the Individual Blue Plans created and wholly control, Defendants have engaged in prohibited market allocation by entering into *per se* illegal agreements under the federal antitrust laws that:

  a. Prohibit the Individual Blue Plans from competing against each other using the Blue name by allocating territories among the individual Blues;

  b. Limit the Individual Blue Plans from competing against each other, even when they are not using the Blue name, by mandating the percentage of their business that they must do under the Blue name, both inside and outside each Plan's territory; and/or

  c. Restrict the right of any Individual Blue Plan to be sold to a company that is not a member of BCBSA, thereby preventing new entrants into the individual Blues' markets.

 5. An Individual Blue Plan that violates one or more of these restrictions faces license and membership termination from BCBSA, which would mean both the loss of the brand through which it derives the majority of its revenue and the required payment of a large fee to BCBSA that would help to fund the establishment of a competing health insurer.

 6. These territorial limitations among actual or potential competitors (*i.e.* horizontal parties) severely limit the ability of the Individual Blue Plans to compete outside of their geographic areas, even under their non-Blue brands.

 7. Many of the Individual Blue Plans have developed substantial non-Blue brands that could compete with other of the Individual Blue Plans.  But for the illegal agreements not to

compete with one another, these entities could and would use their Blue brands and non-Blue brands to compete with each other throughout their Service Areas, which would result in greater competition and competitively priced premiums for subscribers.

8.      The Individual Blue Plans enjoy remarkable market dominance in regions throughout the United States.  The Blue Plans agreed to entrench and perpetuate the dominant market position that each of them has historically enjoyed in its specifically defined geographic market ("Service Area"), insulating the Individual Blue Plans from competition in each of their respective service areas.  Their dominant market shares are the direct result of the illegal conspiracy to unlawfully divide and allocate the geographic markets for health insurance in the United States.  This series of agreements has enabled many Individual Blue Plans, including Defendants in this case, to acquire and maintain grossly disproportionate market shares for health insurance products in their respective regions, where these Plans enjoy market and monopoly power.

9.      The Individual Blue Plans' anticompetitive conduct has also resulted in higher premiums for their enrollees for over a decade.  This anticompetitive behavior, and the lack of competition the Individual Blue Plans face because of their market allocation scheme and monopoly power and anticompetitive behavior, have prevented subscribers from being offered competitive prices and have caused supra-competitive premiums charged to Plan customers.

10.      These inflated premiums would not be possible if the market for health insurance in these Individual Blue Plans' Service Areas were truly competitive.  Competition is not possible so long as the Individual Blue Plans and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of thirty-seven of the nation's largest health insurance companies from competing with each other.

## JURISDICTION AND VENUE

11.     This Court, and the federal district courts in which the subscriber track cases were originally filed, have federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiffs bring their claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against the Individual Blue Plans and BCBSA for the injuries sustained by Plaintiffs and the Classes by reason of the violations, as hereinafter alleged, of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

12.     This Court, and the federal district courts in which the subscriber track cases were originally filed, also have pendant ancillary jurisdiction over the state claims asserted herein under California Business and Professions Code § 17200 and the Cartwright Act, California Business and Professions Code §§16720, *et seq.*, and 16727; Fla. Stat. §§ 542.18, 542.19, and 542.22; 740 ILCS 10/3 *et seq.*; La.R.S. 51:122-23; Michigan Antitrust Reform Act §§ 445.772, 445.773; Mississippi Antitrust Act, Sec. 75-21-1; Missouri Antitrust Law §§ 416.031.1, 416.031.2; N.H. Rev. Stat. Ann. §§ 356:2, 356:3; North Carolina General Statute Sections 75-1, 75-1.1, and 58-63-10; Rhode Island General Laws §§ 6-36-4, 6-36-5; Tennessee Trade Practices Act, Sec. 47-25-101; and Tex. Bus. & Com. Code Ann. §§ 15.05(a), 15.05(b), and 15.21; pursuant to 28 U.S.C. § 1337(a).

13.     This action is also instituted to secure injunctive relief against BCBSA and the Individual Blue Plans to prevent them from further violations of Sections 1 and 2 of the Sherman Act as hereinafter alleged.

14.     Venue is proper in this district and the districts in which these subscriber track cases were originally filed, pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391.

15.     All Plaintiffs note that they do not waive their rights under *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerech*, 523 U.S. 26 (1998).

## PARTIES

**Plaintiffs**

1.       **Plaintiff American Electric Motor Services, Inc.** is an Alabama corporation with its principal office located at 2012 1st Avenue North, Irondale, AL 35210. Plaintiff American Electric Motor Services, Inc. has purchased BCBS-AL health insurance to cover its 4 employees during the relevant class period.

2.       **Plaintiff CB Roofing, LLC** is an Alabama corporation with its principal office located in Chelsea, AL. Plaintiff CB Roofing, LLC has purchased BCBS-AL health insurance to cover its employees during the relevant class period.

3.       **Plaintiff Linda Mills** is a resident citizen of Judsonia, White County, Arkansas. She has been enrolled in an individual BCBS-AR health insurance policy since approximately 1997.

4.       **Plaintiff Frank Curtis** is a resident citizen of Arkansas.  He has purchased BCBS-AR health insurance to cover himself and his family members during the relevant class period.

5.       **Plaintiff Judy Sheridan** is a resident citizen of Los Angeles, California.  She has purchased an individual health insurance policy from BC-CA during the relevant class period. The policy contract or agreement between Plaintiff Sheridan and BC-CA contains an arbitration provision.  Plaintiff Sheridan does not believe that this arbitration provision can or would govern the claims brought in this lawsuit.  Nevertheless, for the purposes of this Complaint, Plaintiff Sheridan expressly only brings suit against those Defendants that are not parties to the arbitration provision in her policy contract or agreement, *i.e.*, BCBSA and all the Individual Blue Plans except for BC-CA.

6.     **Plaintiff Jennifer Ray Davidson** is a resident citizen of Lynn Haven, Bay County, Florida.  She has been enrolled in an individual BCBS-FL health insurance policy during the relevant class period.

7.     **Plaintiff Lawrence W. Cohn, AAL, ALC** is a Hawai'i business that has purchased BCBS-HI health insurance to cover its employees during the relevant class period.

8.     **Plaintiff Saccoccio & Lopez** is a Hawai'i business with its principal office located at 66-037 Kamehameha Highway, Suite 3, Haleiwa, HI 96712. Plaintiff Saccoccio & Lopez has purchased BCBS-HI health insurance to cover its 3 employees since around 2000.

9.     **Plaintiff Monika Bhuta** is a resident citizen of Chicago, IL. She has been enrolled in an individual BCBS-IL health insurance policy during the relevant class period.

10.     **Plaintiff Michael E. Stark** is a resident citizen of Illinois.  He has been enrolled in an individual BCBS-IL health insurance policy since April 1, 2005.

11.     **Plaintiff Falcon Picture Group LLC** is an Illinois corporation with its principle office located at 1051 E. Main Street, Suite 105, East Dundee, IL 60118.  Plaintiff Falcon Picture Group LLC has purchased BCBS-IL health insurance to cover its 5 employees since 2001.

12.     **Plaintiff Renee E. Allie** is a resident citizen of New Orleans, Louisiana. She has been enrolled in an individual BCBS-LA health insurance policy since October 15, 2008.

13.     **Plaintiff Galactic Funk Touring, Inc.** is a Louisiana corporation with its principal office located at 1020 Franklin Avenue, New Orleans, LA 70117. Plaintiff Galactic Funk Touring, Inc. has purchased BCBS-LA health insurance to cover its employees since November 15, 2008.

14.     **Plaintiff John G. Thompson** is a resident citizen of Clark Township, Mackinac County, Michigan. He was enrolled in an individual BCBS-MI health insurance policy for 35 years, including during the relevant class period.

15.     **Plaintiff Harry M. McCumber** is a resident citizen of Hinds County, Mississippi. He has been enrolled in an individual BCBS-MS health insurance policy during the relevant class period.

16.     **Plaintiff Gaston CPA Firm** is a Mississippi corporation with its principal office located in Coahoma County, MS. Plaintiff Gaston CPA Firm has purchased BCBS-MS health insurance to cover its employees during the relevant class period.

17.     **Plaintiff Jeffrey S. Garner** is a resident citizen of St. Charles County, Missouri. He has been enrolled in BCBS-MO health plans almost continuously since 2001, including in an individual BCBS-MO health insurance policy since 2011.

18.     **Plaintiff Erik Barstow** is a resident citizen of Portsmouth, Rockingham County, New Hampshire. He has been enrolled in an individual BCBS-NH health insurance policy since January 2012.

19.     **Plaintiff GC/AAA Fences, Inc.** is a New Hampshire corporation with its principal office located at 292 Durham Road, Dover, NH 03820. Plaintiff GC/AAA Fences, Inc. has purchased BCBS-NH health insurance to cover its employees since 2009.

20.     **Plaintiff Keith O. Cerven** is a resident citizen of Mooresville, NC. He has been enrolled in an individual BCBS-NC health insurance policy since 2007.

21.     **Plaintiff Teresa M. Cerven** is a resident citizen of Mooresville, NC.  She has purchased BCBS-NC health insurance to cover herself and her children since 2007.

22.     **Plaintiff SHGI Corp.** is a North Carolina corporation with its principal office located at 122 Lyman Street, Building #1, Asheville, NC 28801. Plaintiff SHGI Corp. has purchased BCBS-NC health insurance to cover its employees since January 1, 2006.

23.     **Plaintiff Kathleen Scheller** is a resident citizen of Valencia, Pennsylvania. She has been enrolled in an individual Highmark BCBS health insurance policy since 1996.

24.     **Plaintiff Iron Gate Technology, Inc.** is a Western Pennsylvania corporation with its principal office located at The Cardello Building, 1501 Reedsdale Street, Suite 107, Pittsburgh, PA 15233. Plaintiff Iron Gate Technology, Inc. has purchased Highmark BCBS health insurance to cover its 3 employees since January 2012.

25.     **Plaintiff Nancy Thomas** is a resident citizen of Cranston, Rhode Island.  She has been enrolled in an individual BCBS-RI health insurance policy since October 2011.

26.     **Plaintiff Shred 360, LLC** is a South Carolina corporation with its principal office located at 7001 St. Andrews Road, Columbia, South Carolina. Plaintiff Shred 360, LLC has purchased individual BCBS-SC health insurance to cover some of its employees, and has paid fifty percent of these monthly premium payments, through September 2011.

27.     **Plaintiff Danny J. Curlin** is a resident citizen of Memphis, Shelby County, Tennessee.  He has been enrolled in an individual BCBS-TN health insurance policy since approximately 2007.

28.     **Plaintiff Amedius, LLC** is a Tennessee corporation with its principal office located at 890 Willow Tree Circle, Cordova, TN 38018. Plaintiff Amedius, LLC has purchased BCBS-TN health insurance to cover its employees since 2005.

29.     **Plaintiff Brett Watts** is a resident citizen of Dallas County, Texas. He has been enrolled in an individual BCBS-TX health insurance policy during the relevant class period.

30.     All Plaintiffs other than Plaintiff Judy Sheridan are unaware of any arbitration provision in their contracts or agreements with the Individual Blue Plans.

**Defendants**

31.     **Defendant BCBSA** is a corporation organized under the state of Illinois and headquartered in Chicago, Illinois.   It is owned and controlled by thirty-eight (38) health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was created by these plans and operates as a licensor for these plans.   Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million – or one in three – Americans.   A BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states.

32.     The principal headquarters for BCBSA is located at 225 North Michigan Avenue, Chicago, IL 60601.

33.     BCBSA has contacts with all 50 States, the District of Columbia, and Puerto Rico by virtue of its agreements and contacts with the Individual Blue Plans.   In particular, BCBSA has entered into a series of license agreements with the Individual Blue Plans that control the geographic areas in which the Individual Blue Plans can operate.   These agreements are a subject of this Complaint.

34.     **Defendant BCBS-AL** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in the state of Alabama.   Like many other Blue Cross and Blue Shield plans nationwide, BCBS-AL is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Alabama.

35.     The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway East, Birmingham, AL 35244.  BCBS-AL does business in each county in the state of Alabama.

36.     BCBS-AL is by far the largest health insurance company operating in Alabama and currently exercises market power in the commercial health insurance market throughout Alabama.  As of 2008, at least 93 percent of the Alabama residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-AL.  As of 2011, BCBS-AL maintained 86 percent market share in the individual market, and 96 percent market share in the small group market. Two recent studies concluded that Alabama has the *least* competitive health insurance market in the country. Alabama's Department of Insurance Commissioner has recognized that "the state's heath insurance market has been in a non-competitive posture for many years."

37.     As the dominant player in Alabama, BCBS-AL has led the way in causing premiums to be increased each year.  From 2006 to 2010, BCBS-AL small group policy premiums rose 28 percent from 2006 to 2010 per member per month.  In 2010, BCBS-AL raised some premiums by as much as 17 percent and others by as much as 21 percent. The National Association of Insurance Commissioners reports that BCBS-AL's premiums increased almost 42 percent over the past several years.  As a result of these and other inflated premiums, between 2001 and 2009, BCBS-AL increased its surplus from $433.7 million to $649 million. In 2011, BCBS-AL reported net income of $256.92 million, 58 percent higher than the previous year, resulting in a profit of almost $94 million for FY 2011.  From 2000 to 2009, the average employer-sponsored health insurance premium for families in Alabama increased by approximately 88.7 percent, whereas median earnings rose only 22.4 percent during that same period.

38.   **Defendant BCBS-AK** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and tradenames in Alaska.  Like many other Blue Cross and Blue Shield plans nationwide, BCBS-AK is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Alaska.

39.   The principal headquarters for BCBS-AK is located at 2550 Denali Street, Suite 1404, Anchorage, AK 99503.  BCBS-AK does business in each county in Alaska.

40.   BCBS-AK currently exercises market power in the commercial health insurance market throughout Alaska.  As of 2010, approximately 60 percent of the Alaska residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-AK – vastly more than are subscribers of the next largest commercial insurer operating in Alaska, Aetna, which carries approximately 30 percent of such subscribers.  As of 2011, BCBS-AK held at least a 58 percent share of the individual full-service commercial health insurance market and at least a 72 percent share of the small group full-service commercial health insurance market.

41.   As the dominant insurer in Alaska, BCBS-AK has led the way in causing supra-competitive prices.  From 2000 to 2007, median insurance premiums in Alaska increased nearly 74 percent while median income increased only 13 percent.  Thus, health insurance premiums increased nearly six times faster than income in Alaska during that period.  In 2011 alone, BCBS-AK reported reserves of more than $1 billion.

42.   **Defendant BCBS-AR** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Arkansas.  Like many other Blue Cross and Blue Shield plans nationwide, BCBS-AR is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Arkansas.

43.     The principal headquarters for BCBS-AR is located at 601 S. Gaines Street, Little Rock, Arkansas, 72201.  BCBS-AR does business in each county in Arkansas.

44.     BCBS-AR currently exercises market power in the commercial health insurance market throughout Arkansas.  As of 2010, at least 78 percent of the Arkansas residents who subscribe to full-service individual commercial health insurance and at least 55 percent of the Arkansas residents who subscribe to small group policies are subscribers of BCBS-AR – vastly more than are subscribers of the next largest commercial insurer operating in Arkansas, which carries only 7 percent of individual subscribers and 19 percent of small group subscribers.

45.     As the dominant insurer in Arkansas, BCBS-AR has led the way in causing premiums to be increased each year.  As a result, from 2007 to 2011, BCBS-AR's net income increased by 64 percent, while its membership remained relatively flat, growing by only 5 percent; as of 2011, it increased its surplus to a stunning $581.7 million.

46.     **Defendant BCBS-AZ** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Arizona.  Like many other Blue Cross and Blue Shield plans nationwide, BCBS-AZ is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Arizona.

47.     The principal headquarters for BCBS-AZ is located at 2444 West Las Palmaritas Drive, Phoenix, AZ 85021.  BCBS-AZ does business in each county in Arizona.

48.     BCBS-AZ currently exercises market power in the commercial health insurance market throughout Arizona.  As of 2011, at least 49 percent of the Arizona residents who subscribe to full-service individual commercial health insurance and at least 26 percent of the Arizona residents who subscribe to small group policies are subscribers of BCBS-AZ.

49.     As the dominant insurer in Arizona, BCBS-AZ has led the way in causing supra-competitive prices.  As a result, by 2010, BCBS-AZ held surpluses in excess of $570 million.

50.     **Defendant BC-CA** is the health insurance plan operating under the Blue Cross trademark and tradename in California.  Like many other Blue Cross and Blue Shield plans nationwide, BC-CA is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of California.

51.     The principal headquarters for BC-CA is located at One Wellpoint Way, Thousand Oaks, CA 91362.  BC-CA does business in each county in California.

52.     **Defendant BS-CA** is the health insurance plan operating under the Blue Shield trademark and tradename in California.  Like many other Blue Cross and Blue Shield plans nationwide, BS-CA is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of California.

53.     The principal headquarters for BS-CA is located at 50 Beale Street, San Francisco, CA 94105-1808.  BS-CA does business in each county in California.

54.     BC-CA, together with BS-CA, currently exercises market power in the relevant commercial health insurance markets throughout California.  As of 2010, at least 29 percent of the California residents who subscribe to full-service commercial health insurance are BC-CA subscribers alone; as of 2011, at least 37 percent of the California residents who subscribe to individual full-service commercial health insurance and at least 15 percent of the California residents who subscribe to small group full-service commercial health insurance are BC-CA subscribers alone.

55.     As the dominant insurers in California, BC-CA and BS-CA have led the way in causing supra-competitive prices.  As one result, by 2010, BS-CA alone held surpluses in excess of $2.2 billion.

56.     **Defendant BCBS-CO** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Colorado.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-CO is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Colorado.

57.     The principal headquarters for BCBS-CO is located at 120 Monument Circle, Indianapolis, IN 46204.  BCBS-CO does business in each county in Colorado.

58.     BCBS-CO currently exercises market power in the commercial health insurance market throughout Colorado.  As of 2010, at least 22 percent of the Colorado residents who subscribe to full-service commercial health insurance are subscribers of BCBS-CO.

59.     As the dominant insurer in Colorado, BCBS-CO has led the way in causing supra-competitive prices.

60.     **Defendant BCBS-CT** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Connecticut.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-CT is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Connecticut.

61.     The principal headquarters for BCBS-CT is located at 370 Bassett Road, North Haven, CT 06473.  BCBS-CT does business in each county in Connecticut.

62.     BCBS-CT currently exercises market power in the commercial health insurance market throughout Connecticut.  As of 2011, at least 48 percent of the Connecticut residents who

subscribe to full-service individual commercial health insurance and at least 31 percent of the Connecticut residents who subscribe to small group policies are subscribers of BCBS-CT.

63.     As the dominant insurer in Connecticut, BCBS-CT has led the way in causing supra-competitive prices.

64.     **Defendant BCBS-DE** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Delaware.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-DE is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Delaware.

65.     The principal headquarters for BCBS-DE is located at 800 Delaware Avenue, Wilmington, DE 19801.  BCBS-DE does business in each county in Delaware.

66.     BCBS-DE currently exercises market power in the commercial health insurance market throughout Delaware.  As of 2011, at least 51 percent of the Delaware residents who subscribe to full-service individual commercial health insurance and at least 61 percent of the Delaware residents who subscribe to small group policies are subscribers of BCBS-DE.

67.     As the dominant insurer in Delaware, BCBS-DE has led the way in causing supra-competitive prices.  As a result, by mid-2011, it had built a surplus of over $180 million, an increase of 48 percent since the end of 2008.

68.     **Defendant BCBS-FL** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Florida.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-FL is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Florida.

69.     The principal headquarters for BCBS-FL is located at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246.  BCBS-FL does business in each county in Florida.

70.     BCBS-FL currently exercises market power in the commercial health insurance market throughout Florida.  As of 2010, at least 31 percent of the Florida residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies), and as much as 83 percent of those residents in certain regions of the state, are subscribers of BCBS-FL.  As of 2011, at least 48 percent of the Florida residents who subscribe to individual full-service commercial health insurance and at least 28 percent of the Florida residents who subscribe to small group full-service commercial health insurance are BCBS-FL subscribers.

71.     As the dominant insurer in Florida, BCBS-FL has led the way in causing supra-competitive prices.

72.     **Defendant BCBS-GA** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Georgia.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-GA is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Georgia.

73.     The principal headquarters for BCBS-GA is located at 3350 Peachtree Road NE, Atlanta, GA 30326.  BCBS-GA does business in each county in Georgia.

74.     BCBS-GA currently exercises market power in the commercial health insurance market throughout Arizona.  As of 2011, at least 48 percent of the Georgia residents who subscribe to full-service individual commercial health insurance and at least 41 percent of the Georgia residents who subscribe to small group policies are subscribers of BCBS-GA.

75.     As the dominant insurer in Georgia, BCBS-GA has led the way in causing supra-competitive prices.

76.   **Defendant BCBS-HI** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Hawai'i.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-HI is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Hawai'i.

77.   The principal headquarters for BCBS-HI is located at 818 Keeaumoku Street, Honolulu, HI 96814.  BCBS-HI does business in each county in Hawai'i.

78.   BCBS-HI currently exercises market power in the commercial health insurance market throughout Hawai'i.  As of 2010, at least 69 percent of the Hawai'i residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-HI – vastly more than are subscribers of the next largest commercial insurer operating in Hawai'i, Kaiser Permanente, which carries only 20 percent of such subscribers.  A 2012 study by the American Medical Association found that Hawai'i had the second-least competitive commercial health-insurance market in the country.

79.   As the dominant insurer in Hawai'i, BCBS-HI has led the way in causing supra-competitive prices.  In 2008, for example, BCBS-HI raised its premiums for its Preferred Provider and HPH Plus plans 9.9% and 11.5%, respectively; from 2003 to 2011 individual and family insurance premiums in Hawai'i increased, on average, 61% and 74%, respectively, while median household income in Hawai'i has failed to keep pace with those increases, rising only 16% for individuals and *falling* 1% for families during the same period.  As a result of these and other inflated premiums, BCBS-Hawai'i has increased its profits to the point where it holds reserves in the amount of approximately $400 million.

80.   **Defendant BC-ID** is the health insurance plan operating under the Blue Cross trademark and trade name in Idaho.  Like other Blue Cross and Blue Shield plans nationwide,

21

BC-ID is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Idaho.

81.     The principal headquarters for BC-ID is located at 3000 East Pine Avenue, Meridian, ID 83642.  BC-ID does business in each county in Idaho.

82.     BC-ID, together with BS-ID, currently exercises market power in the commercial health insurance market throughout Idaho.  As of 2010, at least 47 percent of the Idaho residents who subscribe to full-service commercial health insurance, including (as of 2011), 44 percent of those who subscribe to individual products and at least 48 percent of those who subscribe to small group products, are subscribers of BC-ID.

83.     **Defendant BS-ID** is the health insurance plan operating under the Blue Shield trademark and trade name in Idaho.  Like other Blue Cross and Blue Shield plans nationwide, BS-ID is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of Idaho.

84.     The principal headquarters for BS-ID is located at 1602 21st Ave, Lewiston, ID 83501.  BS-ID does business in each county in Idaho.

85.     As the dominant insurers in Idaho, BC-ID and BS-ID have led the way in causing supra-competitive prices.  As a result of these inflated premiums, as of 2010, BC-ID had more than $415.5 million in capital and surplus.

86.     **Defendant BCBS-IA** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Iowa.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-IA is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Iowa.

22

87.     The principal headquarters for BCBS-IA is located at 1331 Grand Avenue, Des Moines, IA 50306.  BCBS-IA does business in each county in Iowa.

88.     BCBS-IA currently exercises market power in the commercial health insurance market throughout Iowa.  As of 2011, at least 83 percent of the Iowa residents who subscribe to full-service individual commercial health insurance and at least 61 percent of the Iowa residents who subscribe to small group policies are subscribers of BCBS-IA.

89.     As the dominant insurer in Iowa, BCBS-IA has led the way in causing supra-competitive prices.  Each year from 2002 to 2012, Iowans' premiums have increased an average rate of 10 percent annually, leaving BCBS-IA's parent company, Wellmark, with a surplus of over $1 billion.

90.     **Defendant BCBS-IL** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Illinois.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-IL is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Illinois.

91.     The principal headquarters for BCBS-IL is located at 300 E. Randolph Street, Chicago, IL 60601.  BCBS-IL does business in each county in Illinois.

92.     BCBS-IL currently exercises market power in the commercial health insurance market throughout Illinois.  As of 2010, at least 55 percent of the Illinois residents who subscribe to full-service commercial health insurance for small groups and at least 65 percent of the Illinois residents who subscribe to full-service commercial health insurance for individuals are subscribers of BCBS-IL – vastly more than are subscribers of the next largest commercial insurer operating in Illinois, United Healthcare, which carries only 12 percent of Illinois residents who subscribe to full-service commercial health insurance.

23

93.     As the dominant insurer in Illinois, BCBS-IL has led the way in causing supra-competitive prices.  BCBS-IL raised premiums 10.2 percent in 2007, 18 percent in 2008, and 8.4 percent in 2009, for some customers.  As a result of these and other inflated premiums, HCSC, which owns BCBS-IL, grew its surplus from $6.1 billion in 2007 to $6.7 billion in 2009, up from $4.3 billion just four years earlier in 2005.  The company's surplus is five times the minimum required for solvency protection.

94.     **Defendant BCBS-IN** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Indiana.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-IN is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Indiana.

95.     The principal headquarters for BCBS-IN is located at 120 Monument Circle, Indianapolis, IN 46204.  BCBS-IN does business in each county in Indiana.

96.     BCBS-IN currently exercises market power in the commercial health insurance market throughout Indiana.  As of 2010, at least 56 percent of the Indiana residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-IN – vastly more than are subscribers of the next largest commercial insurer operating in Indiana, United Healthcare, which carries only 15 percent of such subscribers.  Its parent company, WellPoint, is the largest publicly traded commercial health benefits company in terms of membership in the United States.

97.     As the dominant insurer in Indiana, BCBS-IN has led the way in causing supra-competitive prices.  As a result of these and other inflated premiums, BCBS-IN's parent company, WellPoint, has a surplus in excess of $300 million.

98.    **Defendant BCBS-KS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Kansas.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-KS is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Kansas.

99.    The principal headquarters for BCBS-KS is located at 1133 SW Topeka Boulevard, Topeka, KS 66629.  BCBS-KS does business in each county in Kansas.

100.    BCBS-KS currently exercises market power in the commercial health insurance market throughout Kansas.  As of 2011, at least 47 percent of the Kansas residents who subscribe to full-service individual commercial health insurance and at least 58 percent of the Kansas residents who subscribe to small group policies are subscribers of BCBS-KS.

101.    As the dominant insurer in Kansas, BCBS-KS has led the way in causing supra-competitive prices.

102.    **Defendant BCBS-KY** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Kentucky.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-KY is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Kentucky.

103.    The principal headquarters for BCBS-KY is located at 13550 Triton Park Blvd., Louisville, KY 40223.  BCBS-KY does business in each county in Kentucky.

104.    BCBS-KY currently exercises market power in the commercial health insurance market throughout Kentucky.  BCBS-KY commands at least 85 percent of the market for individual health insurance plans, with nearly 127,000 customers. The next largest carrier in Kentucky, Humana, has less than 12 percent of the market, demonstrating the complete lack of meaningful competition within this market.  A 2007 study published by the American Medical

25

Association shows BCBS-KY's statewide market share for PPO plans was 66 percent. However, in Owensboro it was at least 73 percent and in Bowling Green the market share was at least 79 percent. A 2012 report published by the University of Kentucky indicates that BCBS-KY has at least 53 percent market share in HMO enrollment in Kentucky. These figures represent a steep increase from earlier years. For example, data submitted to the U.S. Securities and Exchange Commission shows BCBS-KY's overall market share in Kentucky in 1993 was just 38 percent.

105.    As the dominant insurer in Kentucky, BCBS-KY (another WellPoint Blue) has led the way in causing supra-competitive prices. As a result of its inflated premiums, BCBS-KY collects $326 million in premiums annually. The state's next largest insurer, Humana, collects just $27 million, or less than 10 percent as much as BCBS-KY.

106.    **Defendant BCBS-LA** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Louisiana. Like other Blue Cross and Blue Shield plans nationwide, BCBS-LA is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Louisiana.

107.    The principal headquarters for BCBS-LA is located at 5525 Reitz Avenue, Baton Rouge, LA 70809. BCBS-LA does business in each parish in Louisiana.

108.    BCBS-LA currently exercises market power in the commercial health insurance market throughout Louisiana. As of 2010, at least 73 percent of the Louisiana residents who subscribe to full-service commercial health insurance in the individual market and at least 80 percent of the Louisiana residents who subscribe to full-service commercial health insurance in the small group market are subscribers of BCBS-LA – vastly more than are subscribers of the next largest commercial insurer operating in Louisiana, United Healthcare.

109.    As the dominant insurer in Louisiana, BCBS-LA has led the way in causing supra-competitive prices.   In fact, from 2000 to 2007, Louisiana health insurance premiums increased by 75.3 percent, 3.3 times faster than Louisiana wages, which only increased by 22.9 percent. Additionally, a 2009 forecast predicted that an average Louisiana worker would spend nearly 60 percent of her or his income on health insurance by 2016, one of the highest predicted nationwide ratios.   As a result of its inflated premiums, BCBS-LA has amassed a massive surplus; between 2004 and 2008, its surplus rose from $352.7 million to $621.1 million.   As of the end of 2010, BCBS-LA's surplus exceeded $706.6 million.

110.    **Defendant BCBS-ME** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Maine.   Like other Blue Cross and Blue Shield plans nationwide, BCBS-ME is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Maine.

111.    The principal headquarters for BCBS-ME is located at 2 Gannett Drive, South Portland, ME 04016.   BCBS-ME does business in each county in Maine.

112.    BCBS-ME currently exercises market power in the commercial health insurance market throughout Maine.   As of 2011, at least 45 percent of the Maine residents who subscribe to full-service individual commercial health insurance and at least 50 percent of the Maine residents who subscribe to small group policies are subscribers of BCBS-ME.

113.    As the dominant insurer in Maine, BCBS-ME has led the way in causing supra-competitive prices.

114.    **Defendant BCBS-MD** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Maryland.   Like other Blue Cross and Blue

Shield plans nationwide, BCBS-MD is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Maryland.

115.    The principal headquarters for BCBS-MD is located at 10455 and 10453 Mill Run Circle, Owings Mill, MD 21117.  BCBS-MD does business in each county in Maryland.

116.    BCBS-MD currently exercises market power in the commercial health insurance market throughout Maryland.  As of 2011, at least 70 percent of the Maryland residents who subscribe to full-service individual commercial health insurance and at least 72 percent of the Maryland residents who subscribe to small group policies are subscribers of BCBS-MD.

117.    As the dominant insurer in Maryland, BCBS-MD has led the way in causing supra-competitive prices.  As a result, BCBS-MD's parent company, CareFirst, accumulated nearly $1 billion in surplus by the end of 2011.

118.    **<u>Defendant BCBS-MA</u>** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Massachusetts.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-MA is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Massachusetts.

119.    The principal headquarters for BCBS-MA is located at 401 Park Drive, Boston, MA 02215.  BCBS-MA does business in each county in Massachusetts.

120.    BCBS-MA currently exercises market power in the commercial health insurance market throughout Massachusetts.  As of 2011, at least 63 percent of the Massachusetts residents who subscribe to full-service individual commercial health insurance and at least 40 percent of the Massachusetts residents who subscribe to small group policies are subscribers of BCBS-MA.

121.    As the dominant insurer in Massachusetts, BCBS-MA has led the way in causing supra-competitive prices.  As a result, by mid-2010, BCBS-MA had amassed a surplus of $1.4

28

billion.   In 2011, BCBS-MA paid one of its departing executives a severance of over $11 million.

122.   **Defendant BCBS-MI** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Michigan.   Like other Blue Cross and Blue Shield plans nationwide, BCBS-MI is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Michigan.

123.   The principal headquarters for BCBS-MI is located at 600 E. Lafayette Blvd., Detroit, MI 48226.  BCBS-MI does business in each county in Michigan.

124.   BCBS-MI currently exercises market power in the commercial health insurance market throughout Michigan.   As of 2010, at least 69 percent of the Michigan residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-MI – vastly more than are subscribers of the next largest commercial insurer operating in Michigan, Priority Health, which carries only 9 percent of such subscribers.   The American Medical Association ranks Michigan as the third least competitive state for commercial coverage, as of 2010.

125.   As the dominant insurer in Michigan, BCBS-MI has led the way in causing supra-competitive prices.   Premiums in the small group market grew by 9% and 13% in 2010 and 2011.  BCBS-MI raised rates on individuals 22% in 2009 alone.   As a result of these and other inflated premiums, BCBS-MI earned profits of $222 million and $40 million in 2010 and 2011, respectively, and currently maintains a reserve of approximately $3 billion.  This "non-profit" pays its CEO compensation of $3.8 million annually. Additionally, facing increasing political pressure to reform its practices, BCBS-MI has used its "profits" to increase its political influence.   In the 1990 election cycle, BCBS-MI spent about $155,000 through its political

action committee on campaign contributions.  That number now has soared to $1.2 million in the 2011-2012 campaign cycle.

126.   **Defendant BCBS-MN** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Minnesota.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-MN is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Minnesota.

127.   The principal headquarters for BCBS-MN is located at 3535 Blue Cross Road, St. Paul, MN 55164.  BCBS-MN does business in each county in Minnesota.

128.   BCBS-MN currently exercises market power in the commercial health insurance market throughout Minnesota.  As of 2011, at least 63 percent of the Minnesota residents who subscribe to full-service individual commercial health insurance and at least 37 percent of the Minnesota residents who subscribe to small group policies are subscribers of BCBS-MN.

129.   As the dominant insurer in Minnesota, BCBS-MN has led the way in causing supra-competitive prices.  As a result, by 2011, BCBS-MN had accumulated more than $250 million in surplus.  In 2010, BCBS-MN paid its then-current CEO, Peter Geraghty, $1.5 million in compensation, the highest salary for any Minnesota non-profit leader.

130.   **Defendant BCBS-MS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Mississippi.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-MS is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Mississippi.

131.   The principal headquarters for BCBS-MS is located at 3545 Lakeland Drive, Flowood, MS 39232.  BCBS-MS does business in each county in Mississippi.

132.    BCBS-MS currently exercises market power in the commercial health insurance market throughout Mississippi.  As of 2011, at least 57 percent of the Mississippi residents who subscribe to full-service commercial health insurance through individual policies and at least 73 percent of the Mississippi residents who subscribe to full-service commercial health insurance through small group plans are subscribers of BCBS-MS – vastly more than are subscribers of the next largest commercial insurer operating in Mississippi, United Healthcare.

133.    As the dominant insurer in Mississippi, BCBS-MS has led the way in causing supra-competitive prices.  As a result of these and other inflated premiums, BCBS-MS now has a surplus of approximately $561 million.

134.    **Defendant BCBS-MO** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Missouri, except for 32 counties in greater Kansas City and NW Missouri.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-MO is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Missouri, except the 32 counties in greater Kansas City and NW Missouri.

135.    The principal headquarters for BCBS-MO is located at 1831 Chestnut Street, St. Louis, MO 63103.  BCBS-MO does business in all but 32 counties in the state of Missouri.

136.    **Defendant BCBS-KC** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in the 32 counties of greater Kansas City and NW Missouri, plus Johnson and Wyandotte counties in Kansas.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-Kansas City is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the 32 counties of greater Kansas City and NW Missouri, plus Johnson and Wyandotte counties in Kansas.

31

137.    The principal headquarters for BCBS-Kansas City is located at 2301 Main Street, One Pershing Square, Kansas City, MO 64108.  BCBS-Kansas City does business in each county in the 32 counties of greater Kansas City and NW Missouri, plus Johnson and Wyandotte counties in Kansas.

138.    BCBS-MO, with BCBS-KC, currently exercises market power in the commercial health insurance market throughout Missouri (with the exception of certain counties which are not part of its service area).  As of 2010, at least 26 percent of the Missouri residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-MO, including at least 32 percent of those with individual insurance products and at least 48 percent of those with small group insurance products.  In parts of its service area in Missouri, BCBS-KC has as much as 62 percent market share, or more.

139.    As the dominant insurers in Missouri, BCBS-MO and BCBS-KC have led the way in causing supra-competitive prices.  In fact, health insurance premiums for Missouri working families increased 76 percent from 2000 to 2007. For family health coverage in Missouri from 2000 to 2007, the average employer's portion of annual premiums rose 72 percent, while the average worker's share grew by 91 percent.

140.    **Defendant BCBS-MT** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Montana.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-MT is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of Montana.

141.    The principal headquarters for BCBS-MT is located at 560 N. Park Avenue, Helena, MT 59604-4309.  BCBS-MT does business in each county in Montana.

142.    BCBS-MT currently exercises market power in the commercial health insurance market throughout Montana.  As of 2011, at least 56 percent of the Montana residents who subscribe to full-service individual commercial health insurance and at least 72 percent of the Montana residents who subscribe to small group policies are subscribers of BCBS-MT.

143.    As the dominant insurer in Montana, BCBS-MT has led the way in causing supra-competitive prices.  In 2010, for example, BCBS-MT raised some insurance premiums by as much as 40 percent.

144.    **Defendant BCBS-NE** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Nebraska.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-NE is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Nebraska.

145.    The principal headquarters for BCBS-NE is located at 1919 Aksarban Drive, Omaha, NE 68180.  BCBS-NE does business in each county in Nebraska.

146.    BCBS-NE currently exercises market power in the commercial health insurance market throughout Nebraska.  As of 2011, at least 65 percent of the Nebraska residents who subscribe to full-service individual commercial health insurance and at least 42 percent of the Nebraska residents who subscribe to small group policies are subscribers of BCBS-NE.

147.    As the dominant insurer in Nebraska, BCBS-NE has led the way in causing supra-competitive prices.  In 2012, BCBS-NE raised premiums an average of 10 percent, some by as much as 17 percent.

148.    **Defendant BCBS-NV** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Nevada.  Like other Blue Cross and Blue Shield

plans nationwide, BCBS-NV is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of Nevada.

149.    The principal headquarters for BCBS-NV is located at 9133 West Russell Rd. Suite 200, Las Vegas, NV 89148.  BCBS-NV does business in each county in Nevada.

150.    BCBS-NV currently exercises market power in the commercial health insurance market throughout Nevada.  As of 2010, BCBS-NV had as much as 31 percent market share of full-service commercial health insurance in regions of its service area.

151.    As one of the dominant insurers in Nevada, BCBS-NV has led the way in causing supra-competitive prices.

152.    **Defendant BCBS-NH** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in New Hampshire.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-NH is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of New Hampshire.

153.    The principal headquarters for BCBS-NH is located at 3000 Goffs Falls Rd, Manchester, NH 03103.  BCBS-NH does business in each county in New Hampshire.

154.    BCBS-NH currently exercises market power in the commercial health insurance market throughout New Hampshire.  As of 2010 and 2011, at least 51 percent of the New Hampshire residents who subscribe to full-service commercial health insurance—including at least 76 percent of those who subscribe to individual plans and at least 67 percent of those who subscribe to small group plans—are subscribers of BCBS-NH – vastly more than are subscribers of the next largest commercial insurer operating in New Hampshire, Harvard Pilgrim, which carries only 20 percent of such subscribers.

155.   As the dominant insurer in New Hampshire, BCBS-NH has led the way in causing supra-competitive prices.   For example, from 2009 to 2010 the cost of insurance coverage for small groups and individuals rose 15% and 39%, respectively.   As a result of these and other inflated premiums, between 2006 and 2011, BCBS-NH reported annual income between $26 million and $112 million and a cumulative profit of approximately $360 million.

156.   **Defendant BCBS-NJ** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in New Jersey.   Like other Blue Cross and Blue Shield plans nationwide, BCBS-NJ is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of New Jersey.

157.   The principal headquarters for BCBS-NJ is located at Three Penn Plaza East, Newark, NJ 07105.   BCBS-NJ does business in each county in New Jersey.

158.   BCBS-NJ currently exercises market power in the commercial health insurance market throughout New Jersey.   As of 2011, at least 63 percent of the New Jersey residents who subscribe to full-service individual commercial health insurance and at least 59 percent of the New Jersey residents who subscribe to small group policies are subscribers of BCBS-NJ.

159.   As the dominant insurer in New Jersey, BCBS-NJ has led the way in causing supra-competitive prices.   In 2010, CEO and President William Marino received $8.7 million in compensation, three other executives made more than $2 million in total compensation, and six others made more than $1 million.

160.   **Defendant BCBS-NM** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in New Mexico.   Like other Blue Cross and Blue Shield plans nationwide, BCBS-NM is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of New Mexico.

35

161.    The principal headquarters for BCBS-NM is located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, NM 87113.  BCBS-NM does business in each county in New Mexico.

162.    BCBS-NM currently exercises market power in the commercial health insurance market throughout New Mexico.  As of 2011, at least 52 percent of the New Mexico residents who subscribe to full-service individual commercial health insurance and at least 31 percent of the New Mexico residents who subscribe to small group policies are subscribers of BCBS-NM.

163.    As the dominant insurer in New Mexico, BCBS-NM has led the way in causing supra-competitive prices.  As a result, BCBS-NM's parent company, Health Care Service Corp., was able to amass an estimated $6.1 billion in surplus by 2007.  For at least three years following, some BCBS-NM subscribers faced annual rate hikes of up to 20 percent.

164.    **Defendant Empire BCBS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Eastern and Southeastern New York.  Like other Blue Cross and Blue Shield plans nationwide, Empire BCBS is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the 28 counties of Eastern and Southeastern New York state.

165.    The principal headquarters for Empire BCBS is located at One Liberty Plaza, New York, NY 10006.  Empire BCBS does business in each county in New York.

166.    **Defendant BCBS-Western New York** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Western New York.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-Western New York is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as Western New York state.

167.     The principal headquarters for BCBS-Western New York is located at 257 West Genesee Street, Buffalo, NY 14202.  BCBS-Western New York does business in a number of counties in Western New York.

168.     **Defendant BS-Northeastern New York** is the health insurance plan operating under the Blue Shield trademark and trade name in Northeastern New York.  Like other Blue Cross and Blue Shield plans nationwide, BS-Northeastern New York is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as 13 counties in Northeastern New York.

169.     The principal headquarters for BS-Northeastern New York is located at 257 West Genesee Street, Buffalo, NY 14202.  BS-Northeastern New York does business in 13 counties in Northeastern New York.

170.     **Defendant Excellus BCBS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in central New York.  Like other Blue Cross and Blue Shield plans nationwide, Excellus BCBS is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as 31 counties in central New York.

171.     The principal headquarters for Excellus BCBS is located at 165 Court Street, Rochester, NY 14647.  Excellus BCBS does business in each county in the 31 counties of central New York.

172.     Empire BCBS, BCBS-Western New York, BS-Northeastern New York, and Excellus BCBS currently exercise market power in the commercial health insurance market throughout their respective service areas of New York.  As of 2010, at least 67 percent of the

New York residents who subscribe to full-service commercial health insurance are subscribers of these New York Individual Blue Plans.

173.    As the dominant insurers in New Mexico, Empire BCBS, BCBS-Western New York, BS-Northeastern New York, and Excellus BCBS have led the way in causing supra-competitive prices.

174.    **Defendant BCBS-NC** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in North Carolina.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-NC is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of North Carolina.

175.    The principal headquarters for BCBS-NC is located at 5901 Chapel Hill Road, Durham, NC 27707.  BCBS-NC does business in each county in North Carolina.

176.    BCBS-NC currently exercises market power in the commercial health insurance market throughout North Carolina.  According to the North Carolina Department of Insurance ("NCDOI"), over 73 percent of the North Carolina residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-NC – vastly more than the next largest full-service commercial insurer, Coventry Health Care, which carries only 7 percent of all subscribers.  BCBS-NC currently has a greater than 50 percent share of full-service commercial health insurance enrollees in all fifteen of the major metropolitan health insurance markets in the State, and a greater than 75 percent share in ten of those fifteen markets.  As of 2011, BCBS-NC had at least an 83 percent share of the individual market and at least a 63 percent share of the small group market.

177.    As the dominant insurer in North Carolina, BCBS-NC has led the way in causing supra-competitive prices.  As a result of these inflated premiums, BCBS-NC now has a surplus

of over $1.4 billion and has paid its executives salaries and bonuses in the millions of dollars each year.

178.   **Defendant BCBS-ND** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in North Dakota.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-ND is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of North Dakota.

179.   The principal headquarters for BCBS-ND is located at 4510 13th Avenue South, Fargo, ND 58121.  BCBS-ND does business in each county in North Dakota.

180.   BCBS-ND currently exercises market power in the commercial health insurance market throughout North Dakota.  As of 2011, at least 75 percent of the North Dakota residents who subscribe to full-service individual commercial health insurance and at least 85 percent of the North Dakota residents who subscribe to small group policies are subscribers of BCBS-ND.

181.   As the dominant insurer in North Dakota, BCBS-ND has led the way in causing supra-competitive prices.  In 2011, BCBS-ND raised premiums for some subscribers by as much as 17 percent; in 2009, an audit revealed that the insurer had spent nearly $35,000 for a farewell party for an unnamed executive the year before.

182.   **Defendant BCBS-OH** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Ohio.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-OH is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Ohio.

183.   The principal headquarters for BCBS-OH is located at 120 Monument Circle, Indianapolis, IN 46203.  BCBS-OH does business in each county in Ohio.

184.   BCBS-OH currently exercises market power in the commercial health insurance market throughout Ohio.  As of 2011, at least 36 percent of the Ohio residents who subscribe to full-service individual commercial health insurance and at least 41 percent of the Ohio residents who subscribe to small group policies are subscribers of BCBS-OH.

185.   As the dominant insurer in Ohio, BCBS-OH has led the way in causing supra-competitive prices.  In 2013, the insurer raised rates for small group subscribers by an average of 12 percent.

186.   **Defendant BCBS-OK** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Oklahoma.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-OK is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Oklahoma.

187.   The principal headquarters for BCBS-OK is located at 1400 South Boston, Tulsa, OK 74119.  BCBS-OK does business in each county in Oklahoma.

188.   BCBS-OK currently exercises market power in the commercial health insurance market throughout Oklahoma.  As of 2010, at least 45 percent of the Oklahoma residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-OK – vastly more than are subscribers of the next largest commercial insurer operating in Oklahoma, Aetna, which carries only 19 percent of such subscribers.  As of 2011, BCBS-OK maintained at least 58 percent market share in the individual market, and at least 48 percent market share in the small group market.  The 2012 Oklahoma Insurance Department Annual Report placed BCBS-OK's individual plan market share at 70 percent and group plan market share at 56 percent.

40

189.     As the dominant insurer in Oklahoma, BCBS-OK has led the way in causing supra-competitive prices.  From 2005 (when Health Care Service Corp. purchased BCBS-OK) to 2011, BCBS-OK nearly doubled its premium revenue, from $956 million to $1.8 billion.  Health Care Service Corp. now has a surplus of over $620 million.

190.     **Defendant BCBS-OR** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Oregon.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-OR is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Oregon.

191.     The principal headquarters for BCBS-OR is located at 100 SW Market Street, Portland, OR 97207.  BCBS-OR does business in each county in Oregon.

192.     BCBS-OR currently exercises market power in the commercial health insurance market throughout Oregon.  As of 2011, at least 35 percent of the Oregon residents who subscribe to full-service individual commercial health insurance and at least 21 percent of the Oregon residents who subscribe to small group policies are subscribers of BCBS-OR.

193.     As the dominant insurer in Oregon, BCBS-OR has led the way in causing supra-competitive prices.  From 2009 to 2010, while building a surplus of $565 million (3.6 times the regulatory minimum), BCBS-OR raised rates on some individual plans by an average of 25 percent.

194.     **Defendant Highmark BCBS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Western Pennsylvania and the Blue Shield trademarks and trade names throughout the entire state of Pennsylvania.  Like other Blue Cross and Blue Shield plans nationwide, Highmark BCBS is the largest health insurer, as measured by number of subscribers, within its Blue Cross and Blue Shield service area, which is

41

defined as the 29 counties of Western Pennsylvania: Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, Centre (Western portion), Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Green, Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren, Washington, and Westmoreland Counties.  (As described below, Highmark BCBS has entered into illegal and anticompetitive agreements with at least two of the other Individual Blue Plans in Pennsylvania, which prevent Highmark BCBS from competing under its Blue Shield trademark in Northeastern and Southeastern Pennsylvania.)

195.    The principal headquarters for Highmark BCBS is located at 120 Fifth Avenue Place, Pittsburgh, PA 15222.  Highmark BCBS does business in each county in Western Pennsylvania.

196.    **Defendant BC-Northeastern PA** is the health insurance plan operating under the Blue Cross trademark and trade name in Northeastern Pennsylvania.  Like other Blue Cross and Blue Shield plans nationwide, BC-Northeastern PA is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the 13 counties that make up Northeastern Pennsylvania: Bradford, Carbon, Clinton, Lackawanna, Luzerne, Lycoming, Monroe, Pike, Sullivan, Susquehanna, Tioga, Wayne, and Wyoming Counties.

197.    The principal headquarters for BC-Northeastern PA is located at 19 North Main Street, Wilkes-Barre, PA. 18711.  BC-Northeastern PA does business in each county in Northeastern Pennsylvania.

198.    **Defendant Capital BC** is the health insurance plan operating under the Blue Cross trademark and trade name in central Pennsylvania.  Like other Blue Cross and Blue Shield plans nationwide, Capital BC is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the 21 counties that make up central

Pennsylvania: Adams, Berks, Centre (Eastern portion), Columbia, Cumberland, Dauphin, Franklin, Fulton, Juaniata, Lancaster, Lebanon, Lehigh, Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, and York Counties.

199.    The principal headquarters for Capital BC is located at 2500 Elmerton Avenue, Harrisburg, PA 17177.  Capital BC does business in 21 counties in central Pennsylvania.

200.    **<u>Defendant Independence BC</u>** is the health insurance plan operating under the Blue Cross trademark and trade name in Southeastern Pennsylvania.  Like other Blue Cross and Blue Shield plans nationwide, Independence BC is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the 5 counties that make up Southeastern Pennsylvania: Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties.

201.    The principal headquarters for Independence BC is located at 1901 Market Street, Philadelphia, PA 19103.   Independence BC does business in each county in Southeastern Pennsylvania.

202.    Highmark BCBS, BC-Northeastern PA, Capital BC, and Independence BC currently exercise market power in the commercial health insurance market in their respective services areas of Pennsylvania, including Highmark BCBS throughout Western Pennsylvania. Since 2000, between 60% and 80% of the Western Pennsylvania residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of Highmark. Highmark Executive Vice President John Paul has stated publicly that Highmark is "an insurer that clearly dominates the commercial market" and "it's pretty obvious [Highmark] control[s] finance of health care in western Pennsylvania."  As of 2006, at least 60 percent of the Northeastern Pennsylvania residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are

subscribers of BC-Northeastern PA, at least and at least 62 percent of the Southeastern Pennsylvania residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of Independence BC.

203.    As the dominant insurers in Pennsylvania, Highmark BCBS, BC-Northeastern PA, Capital BC, and Independence BC have led the way in causing supra-competitive prices. From 2002-2006, health insurance premiums for single individuals in the Pittsburgh area rose approximately 55% and health insurance premiums for Pittsburgh families rose approximately 51%. In 2008, Highmark raised its rates for its CompleteCare program by 15%. In 2012, Highmark filed for premium rate increases of 9.8% for its small group plans. As a result of these and other inflated premiums, net income increased from less than $50 million in 2001 to approximately $444.7 million in 2011. By the end of 2005, Highmark's surplus (*i.e.*, assets in excess of legally required reserves to pay claims) exceeded $2.8 billion; by 2011, it exceeded $4.1 billion. In 2012, Highmark paid its CEOs more than $6 million and paid its Board of Directors $1.9 million.

204.    **Defendant BCBS-Puerto Rico** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Puerto Rico. Like other Blue Cross and Blue Shield plans nationwide, BCBC-Puerto Rico is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the territory of Puerto Rico.

205.    The principal headquarters for BCBS-Puerto Rico is located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920. BCBS-Puerto Rico does business throughout Puerto Rico.

206.    BCBS-Puerto Rico currently exercises market power in the commercial health insurance market throughout Puerto Rico.  As a dominant insurer in Puerto Rico, BCBS-Puerto Rico has led the way in causing supra-competitive prices.

207.    **Defendant BCBS-RI** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Rhode Island.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-RI is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Rhode Island.

208.    The principal headquarters for BCBS-RI is located at 500 Exchange Street, Providence, RI 02903.  BCBS-RI does business in each county in Rhode Island.

209.    BCBS-RI currently exercises market power in the commercial health insurance market throughout Rhode Island.  As of 2012, at least 71 percent of the Rhode Island residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-RI – vastly more than are subscribers of the next largest commercial insurer operating in Rhode Island, United Healthcare, which carries only 15 percent of such subscribers.  As of 2011, BCBS-RI maintained a stunning 95 percent market share in the individual market, and at least 74 percent market share in the small group market.

210.    As the dominant insurer in Rhode Island, BCBS-RI has led the way in causing supra-competitive prices.  From 2003 to 2011, individual and family insurance premiums rose 59 percent and 61 percent, respectively.  From 2000 to 2009, the average employer-sponsored health insurance premiums for families in Rhode Island increased by approximately 105.8 percent, whereas median earnings rose only 22.4 percent during that same period.  In 2011, BCBS-RI raised premiums by about 10%.  As a result of these and other inflated premiums, by 2011, BCBS-RI had amassed an approximately $320 million surplus.

211.   **Defendant BCBS-SC** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in South Carolina.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-SC is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of South Carolina.

212.   The principal headquarters for BCBS-SC is located at 2501 Faraway Drive, Columbia, SC 29212.  BCBS-SC does business in each county in South Carolina.

213.   BCBS-SC currently exercises market power in the commercial health insurance market throughout South Carolina.  As of 2010, at least 60 percent of the South Carolina residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-SC – vastly more than are subscribers of the next largest commercial insurer operating in South Carolina, Cigna, which carries only 15 percent of such subscribers.  As of 2011, BCBS-SC maintained 55 percent market share in the individual market, and 70 percent market share in the small group market.

214.   As the dominant insurer in South Carolina, BCBS-SC has led the way in causing supra-competitive prices.  As a result of these inflated premiums, BCBS-SC now has a surplus of reserves over $1.7 billion.

215.   **Defendant BCBS-SD** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in South Dakota.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-SD is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of South Dakota.

216.   The principal headquarters for BCBS-SD is located at 1601 W. Madison, Sioux Falls, SD 57104.  BCBS-SD does business in each county in South Dakota.

217.    BCBS-SD currently exercises market power in the commercial health insurance market throughout South Dakota.  As of 2011, at least 74 percent of the South Dakota residents who subscribe to full-service individual commercial health insurance and at least 62 percent of the South Dakota residents who subscribe to small group policies are subscribers of BCBS-SD.

218.    As the dominant insurer in South Dakota, BCBS-SD has led the way in causing supra-competitive prices.  As a result, as of 2012, its parent company, Wellmark, held a surplus of over $1 billion.

219.    **Defendant BCBS-TN** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Tennessee.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-TN is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Tennessee.

220.    The principal headquarters for BCBS-TN is located at 1 Cameron Hill Circle, Chattanooga, TN 37402.  BCBS-TN does business in each county in Tennessee.

221.    BCBS-TN currently exercises market power in the commercial health insurance market throughout Tennessee.  As of 2010, at least 46 percent of the Tennessee residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-TN – vastly more than are subscribers of the next largest commercial insurer operating in Tennessee, Cigna, which carries only 24 percent of such subscribers.  As of 2011, BCBS-TN maintained at least 36 percent market share in the individual market and at least 70 percent market share in the small group market.

222.    As the dominant insurer in Tennessee, BCBS-TN has led the way in causing supra-competitive prices.  As a result of these inflated premiums, BCBS-TN now has a surplus of almost $1.6 billion.

223.   **Defendant BCBS-TX** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Texas.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-TX is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Texas.

224.   The principal headquarters for BCBS-TX is located at 1001 E. Lookout Drive, Richardson, TX 75082.  BCBS-TX does business in each county in Texas.

225.   BCBS-TX currently exercises market power in the commercial health insurance market throughout Texas.  As of 2010, at least 35 percent of the Texas residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-TX – vastly more than are subscribers of the next largest commercial insurer operating in Texas, Aetna, which carries only 22 percent of such subscribers.  As of 2011, BCBS-TX maintained 57 percent market share in the individual market and 46 percent market share in the small group market.

226.   As the dominant insurer in Texas, BCBS-TX has led the way in causing supra-competitive prices.  As a result of these inflated premiums, BCBS-TX's parent company, Health Care Service Corp., now has a surplus of more than $620 million.

227.   **Defendant BCBS-UT** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Utah.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-UT is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of Utah.

228.   The principal headquarters for BCBS-UT is located at 2890 East Cottonwood Parkway, Salt Lake City, UT 84121.  BCBS-UT does business in each county in Utah.

229.    BCBS-UT currently exercises market power in the commercial health insurance market throughout Utah.  As of 2011, at least 17 percent of the Utah residents who subscribe to full-service individual commercial health insurance and at least 23 percent of the Utah residents who subscribe to small group policies are subscribers of BCBS-UT.

230.    As one of the dominant insurers in Utah, BCBS-UT has led the way in causing supra-competitive prices.

231.    **Defendant BCBS-VT** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Vermont.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-VT is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Vermont.

232.    The principal headquarters for BCBS-VT is located at 445 Industrial Lane, Berlin, VT 05602.  BCBS-VT does business in each county in Vermont.

233.    BCBS-VT currently exercises market power in the commercial health insurance market throughout Vermont.  As of 2011, at least 77 percent of the Vermont residents who subscribe to full-service individual commercial health insurance and at least 43 percent of the Vermont residents who subscribe to small group policies are subscribers of BCBS-VT.

234.    As the dominant insurer in Vermont, BCBS-VT has led the way in causing supra-competitive prices.   In 2010, Vermont's Banking, Insurance, Securities, and Health Care Administration Department found that BCBS-VT had overpaid its former President and CEO William Milnes Jr. by roughly $3 million, having paid him $7.2 million in 2008 upon his retirement, in violation of state law.

235.    **Defendant BCBS-VA** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in most of Virginia, with the exception of a small

portion of Northern Virginia in the Washington, DC suburbs.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-VA is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Virginia, excepting a small portion of Northern Virginia in the Washington, DC suburbs.

236.    The principal headquarters for BCBS-VA is located at 2235 Staples Mill Road, Suite 401, Richmond, VA 23230.  BCBS-VA does business in each county in Virginia.

237.    BCBS-VA currently exercises market power in the commercial health insurance market throughout Virginia.  As of 2011, at least 74 percent of the Virginia residents who subscribe to full-service individual commercial health insurance and at least 50 percent of the Virginia residents who subscribe to small group policies are subscribers of BCBS-VA.

238.    As the dominant insurer in Virginia, BCBS-VA has led the way in causing supra-competitive prices.  In 2009, BCBS-VA's parent company, WellPoint, raised its CEO Angela Braly's total compensation by 51 percent, to $13 million.

239.    **Defendant BC-WA** is the health insurance plan operating under the Blue Cross trademarks and trade names in Washington.  Like other Blue Cross and Blue Shield plans nationwide, BC-WA is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of Washington.

240.    The principal headquarters for BC-WA is located at 7001 220th Street SW, Mountlake Terrace, WA 98043-4000.  BC-WA does business in each county in Washington.

241.    **Defendant BS-WA** is the health insurance plan operating under the Blue Shield trademarks and trade names in Washington.  Like other Blue Cross and Blue Shield plans nationwide, BS-WA is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of Washington.

242.    The principal headquarters for BS-WA is located at 1800 Ninth Avenue, Seattle, WA 98111.  BS-WA does business in each county in Washington.

243.    BC-WA and BS-WA currently exercise market power in the commercial health insurance market throughout Washington.  As of 2011, at least 36 percent of the Washington residents who subscribe to full-service individual commercial health insurance are subscribers of BC-WA, while at least 37 percent of those residents are subscribers of BS-WA (for a total of 73 percent).  At least 32 percent of the Washington residents who subscribe to small group policies are subscribers of BC-WA, while at least 33 percent of those residents are subscribers of BS-WA (for a total of 65 percent).

244.    As the dominant insurers in Washington, BC-WA and BS-WA have led the way in causing supra-competitive prices.  In 2012, BC-WA's CEO threatened to increase premium rates for individual plans by as much as 50 to 70 percent.

245.    **Defendant BCBS-DC** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Washington, DC and its suburbs.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-DC is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as Washington, DC and a small portion of Northern Virginia in the Washington, DC suburbs.

246.    The principal headquarters for BCBS-DC is located at 10455 Mill Run Circle, Owings Mill, MD 21117.  BCBS-DC does business throughout Washington, DC.

247.    BCBS-DC currently exercises market power in the commercial health insurance market throughout the Washington, DC region.  As of 2011, at least 69 percent of the Washington, DC region residents who subscribe to full-service individual commercial health

51

insurance and at least 76 percent of the Washington, DC region residents who subscribe to small group policies are subscribers of BCBS-DC.

248.    As the dominant insurer in the Washington, DC region, BCBS-DC has led the way in causing supra-competitive prices.  In 2010, BCBS-DC raised rated by as much as 35 percent, so high that the insurance regulator for the District of Columbia rescinded the rate.

249.    **Defendant BCBS-WV** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in West Virginia.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-WV is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of West Virginia.

250.    The principal headquarters for BCBS-WV is located at 700 Market Square, Parkersburg, West Virginia 26101.  BCBS-WV does business in each county in West Virginia.

251.    BCBS-WV currently exercises market power in the commercial health insurance market throughout West Virginia.  As of 2011, at least 44 percent of the West Virginia residents who subscribe to full-service individual commercial health insurance and at least 57 percent of the West Virginia residents who subscribe to small group policies are subscribers of BCBS-WV.

252.    As the dominant insurer in West Virginia, BCBS-WV has led the way in causing supra-competitive prices.  In 2012, BCBS-WV's parent company, Highmark, paid eight current or former executives more than $1 million in compensation.

253.    **Defendant BCBS-WI** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Wisconsin.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-WI is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of Wisconsin.

254.    The principal headquarters for BCBS-WI is located at 120 Monument Circle, Indianapolis, IN 46204.  BCBS-WI does business in each county in Wisconsin.

255.    BCBS-WI currently exercises market power in the commercial health insurance market throughout Wisconsin.  As of 2011, at least 19 percent of the Wisconsin residents who subscribe to full-service individual commercial health insurance and at least 12 percent of the Wisconsin residents who subscribe to small group policies are subscribers of BCBS-WI.

256.    As one of the dominant insurers in Wisconsin, BCBS-WI has led the way in causing supra-competitive prices.

257.    **Defendant BCBS-WY** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Wyoming.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-WY is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of Wyoming.

258.    The principal headquarters for BCBS-WY is located at P.O. Box 2266, Cheyenne, WY 82003.  BCBS-WY does business in each county in Wyoming.

259.    BCBS-WY currently exercises market power in the commercial health insurance market throughout Wyoming.  As of 2011, at least 38 percent of the Wyoming residents who subscribe to full-service individual commercial health insurance and at least 61 percent of the Wyoming residents who subscribe to small group policies are subscribers of BCBS-WY.

260.    As the dominant insurer in Wyoming, BCBS-WY has led the way in causing supra-competitive prices.

## TRADE AND COMMERCE

261. The Individual Blue Plans, which own and control BCBSA, are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. BCBSA enters into agreements with health insurance companies throughout the country that specify the geographic areas in which those companies can compete. The Individual Blue Plans provide commercial health insurance that covers residents of their respective regions (which together include all 50 states) when they travel across state lines, purchase health care in interstate commerce when these residents require health care out of state, and receive payments from employers outside of their regions on behalf of their regions' residents.

## CLASS ACTION ALLEGATIONS

262. Plaintiffs bring this action on behalf of themselves individually and on behalf of 18 different classes of plaintiffs. First, all Plaintiffs bring this action seeking injunctive relief on behalf of a class of plaintiffs pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, with such class (the "Nationwide Class") defined as:

> All persons or entities in the United States of America who are currently insured by any health insurance plan that is currently a party to a license agreement with BCBSA that restricts the ability of that health insurance plan to do business in any geographically defined area.

263. Second, Plaintiffs American Electric Motor Services, Inc. and CB Roofing, LLC bring this action seeking damages on behalf of themselves individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Alabama Class") defined as:

> All persons or entities who, during the period from April 17, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-AL for individual or small group full-service commercial health insurance.

264.    Third, Plaintiffs Linda Mills and Frank Curtis bring this action seeking damages on behalf of themselves individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Arkansas Class") defined as:

> All persons or entities who, during the period from October 1, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-AR for individual or small group full-service commercial health insurance.

265.    Fourth, Plaintiff Judy Sheridan brings this action seeking damages on behalf of herself individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "California Class") defined as:

> All persons or entities who, during the period from October 1, 2008 to the present (the "Class Period"), have paid health insurance premiums to BC-CA or BS-CA for individual or small group full-service commercial health insurance.

266.    Fifth, Plaintiff Jennifer Ray Davidson brings this action seeking damages on behalf of herself individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Florida Class") defined as:

> All persons or entities who, during the period from October 1, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-FL for individual or small group full-service commercial health insurance.

267.    Sixth, Plaintiffs Lawrence W. Cohn, AAL, ALC and Saccoccio & Lopez bring this action seeking damages on behalf of themselves individually and on behalf of a class

pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of

Civil Procedure, with such class (the "Hawai'i Class") defined as:

> All persons or entities who, during the period from October 1, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-HI for individual or small group full-service commercial health insurance.

268.    Seventh, Plaintiffs Monika Bhuta, Michael E. Stark, and Falcon Picture Group

LLC bring this action seeking damages on behalf of themselves individually and on behalf of a

class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules

of Civil Procedure, with such class (the "Illinois Class") defined as:

> All persons or entities who, during the period from August 21, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-IL for individual or small group full-service commercial health insurance.

269.    Eighth, Plaintiffs Renee E. Allie and Galactic Funk Touring, Inc. bring this action

seeking damages on behalf of themselves individually and on behalf of a class pursuant to the

provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure,

with such class (the "Louisiana Class") defined as:

> All persons or entities who, during the period from June 6, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-LA for individual or small group full-service commercial health insurance.

270.    Ninth, Plaintiff John G. Thompson brings this action seeking damages on behalf

of himself individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule

23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Michigan

Class") defined as:

> All persons or entities who, during the period from October 1, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-MI for individual or small group full-service commercial health insurance.

271.     Tenth, Plaintiffs Harry M. McCumber and Gaston CPA Firm bring this action seeking damages on behalf of themselves individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Mississippi Class") defined as:

> All persons or entities who, during the period from October 1, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-MS for individual or small group full-service commercial health insurance.

272.     Eleventh, Plaintiff Jeffrey S. Garner brings this action seeking damages on behalf of himself individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Missouri Class") defined as:

> All persons or entities who, during the period from October 1, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-MO or BCBS-KC for individual or small group full-service commercial health insurance.

273.     Twelfth, Plaintiffs Erik Barstow and GC/AAA Fences, Inc. bring this action seeking damages on behalf of themselves individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "New Hampshire Class") defined as:

> All persons or entities who, during the period from October 1, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-NH for individual or small group full-service commercial health insurance.

274.     Thirteenth, Plaintiffs Keith O. Cerven, Teresa M. Cerven, and SHGI Corp. bring this action seeking damages on behalf of themselves individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "North Carolina Class") defined as:

> All persons or entities who, during the period from February 7, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-NC for individual or small group full-service commercial health insurance.

275.    Fourteenth, Plaintiffs Kathleen Scheller and Iron Gate Technology, Inc. bring this action seeking damages on behalf of themselves individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Western Pennsylvania Class") defined as:

> All persons or entities who, during the period from October 1, 2008 to the present (the "Class Period"), have paid health insurance premiums to Highmark BCBS for individual or small group full-service commercial health insurance.

276.    Fifteenth, Plaintiff Nancy Thomas brings this action seeking damages on behalf of herself individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Rhode Island Class") defined as:

> All persons or entities who, during the period from October 1, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-RI for individual or small group full-service commercial health insurance.

277.    Sixteenth, Plaintiff Shred 360, LLC brings this action seeking damages on behalf of itself individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "South Carolina Class") defined as:

> All persons or entities who, during the period from October 1, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-SC for individual or small group full-service commercial health insurance.

278.    Seventeenth, Plaintiffs Danny J. Curlin and Amedius, LLC bring this action seeking damages on behalf of themselves individually and on behalf of a class pursuant to the

provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Tennessee Class") defined as:

> All persons or entities who, during the period from May 9, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-TN for individual or small group full-service commercial health insurance.

279. Eighteenth, Plaintiff Brett Watts brings this action seeking damages on behalf of himself individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Texas Class") defined as:

> All persons or entities who, during the period from October 1, 2008 to the present (the "Class Period"), have paid health insurance premiums to BCBS-TX for individual or small group full-service commercial health insurance.

280. The Classes are so numerous and geographically dispersed that joinder of all members is impracticable. While Plaintiffs do not know the number and identity of all members of the Classes, Plaintiffs believe that there are millions of Class members, the exact number and identities of which can be obtained from BCBSA and the Individual Blue Plans.

281. There are questions of law or fact common to the Classes, including but not limited to:

> a. Whether the restrictions set forth in the BCBSA license agreements are *per se* violations of Section 1 of the Sherman Act, or are otherwise prohibited under Section 1 of the Sherman Act;
>
> b. Whether, and the extent to which, premiums charged by the Individual Blue Plans to Class members have been artificially inflated as a result of the illegal restrictions in the BCBSA license agreements;

    c.    Whether the use of Most Favored Nation ("MFN") provisions in certain Individual Blue Plans' provider agreements is anti-competitive, by raising barriers of entry and by increasing the costs of care and insurance; and

    d.    Whether, and the extent to which, premiums charged by the Individual Blue Plans have been artificially inflated as a result of the anticompetitive practices adopted by them.

282.    The questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

283.    All Plaintiffs are members of the Nationwide Class; their claims are typical of the claims of the members of that Class; and Plaintiffs will fairly and adequately protect the interests of the members of that Class.

284.    Each set of Plaintiffs seeking to represent their respective damages Class are members of that Class, their claims are typical of the members of that Class, and Plaintiffs will fairly and adequately protect the interests of the members of that Class.

285.    Plaintiffs and their respective classes are direct purchasers of individual or small group full-service commercial health insurance from the Individual Blue Plan that dominates their state or region, and their interests are coincident with and not antagonistic to other members of that Class.  In addition, Plaintiffs have retained and are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

286.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for BCBSA and the Individual Blue Plans.

287.    BCBSA and the Individual Blue Plans have acted on grounds generally applicable to the Nationwide Class, thereby making appropriate final injunctive relief with respect to the Nationwide Class as a whole.

288.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Classes are readily definable and are ones for which the Individual Blue Plans have records.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action does not present any difficulties of management that would preclude its maintenance as a class action.

## FACTUAL BACKGROUND

### History of the Blue Cross and Blue Shield Plans and of BCBSA

289.     The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently, that they jointly conceived of the Blue Cross and Blue Shield marks in a coordinated effort to create a national brand that each would operate within its local area, and that they quickly developed into local monopolies in the growing market for health care coverage.  While originally structured as non-profit organizations, since the 1980s, these local Blue plans have increasingly operated as for-profit entities: either by formally converting to for-profit status, or by generating substantial surpluses that have been used to fund multi-million dollar salaries and bonuses for their administrators.

290.     BCBSA was created by the local Blue plans and is entirely controlled by those plans.  Moreover, the history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

### Development of the Blue Cross Plans

291.     In 1934, an administrator named E.A. von Steenwyck helped develop a prepaid hospital plan in St. Paul, Minnesota.  In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross, and used the symbol and the name "Blue Cross" to identify the plan.  This is believed to be the first use of the Blue Cross symbol and name as a brand symbol for a health care plan.  Within the year, other prepaid hospital plans began independently using the Blue Cross symbol.

292.     In 1937, Blue Cross plan executives met in Chicago.  At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA.  In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans.  One such principle was that the plans would not compete with each other.  When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

293.     In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

294.     In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard: that approval would be denied to any plan operating in another plan's service area.  Despite this, the independently formed prepaid hospital plans, now operating under the Blue Cross name, engaged in fierce competition with each other and often entered each others' territories.  The authors of *The Blues: A History of the Blue Cross and Blue Shield System*, which BCBSA sponsored and its officers reviewed prior to publication, describe the heated competition at that time:

> The most bitter fights were between intrastate rivals . . . .  Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example. . . . John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans."  At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown . . . . By then there were also eight Plans in New York and four in West Virginia. . . . Various reciprocity agreements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

295.     For many years, Cross-on-Cross competition continued, as described in Odin Anderson's *Blue Cross Since 1929: Accountability and the Public Trust*, which was funded by

the Blue Cross Association, one predecessor to BCBSA.  Anderson points to Illinois and North

Carolina, where "[t]he rivalry [between a Chapel Hill plan and a Durham plan] was fierce," as

particular examples, and explains that though "Blue Cross plans were not supposed to overlap

service territories," such competition was "tolerated by the national Blue Cross agency for lack

of power to insist on change."

296.    By 1975, the Blue Cross plans had a total enrollment of 84 million subscribers.

**Development of the Blue Shield Plans**

297.    The development of what became the Blue Shield plans followed, and largely

imitated, the development of the Blue Cross plans.  Blue Shield plans were designed to provide a

mechanism for covering the cost of physician care, just as the Blue Cross plans had provided a

mechanism for covering the cost of hospital care.  Similarly, the Blue Cross hospital plans were

developed in conjunction with the AHA (which represents hospitals), while the Blue Shield

medical society plans were developed in conjunction with the American Medical Association

("AMA") (which represents physicians).

298.    Like the Blue Cross symbol, the Blue Shield symbol was developed by a local

medical society plan, and then proliferated as other plans adopted it.

299.    In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a

national body intended to coordinate and "approve" the independent Blue Shield plans.  When

the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was

"approved," the AMA responded, "It is inconceivable to us that any group of state medical

society Plans should band together to exclude other state medical society programs by patenting

a term, name, symbol, or product."  In 1960, the AMCP changed its name to the National

Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

300.    By 1975, the Blue Shield plans had a total enrollment of 73 million.

**Creation of the Blue Cross and Blue Shield Association**

301.    Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.  During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan.  Cross-on-Cross and Shield-on-Shield competition also flourished.

302.    By the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market.  Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million policies.  While the Blues remained dominant in most markets, this growth of competition was a threat.

303.    From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed.  One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

304.    During the 1950s, while competing with commercial insurers for the opportunity to provide insurance to federal government employees, the Plans were at war with one another.  As the former marketing chief of the National Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate.  Two boards; two sets of managements.  Rivalries, animosities, some days . . . pure, unadulterated hatred of each other."

305.     To address the increasing competition, the Blues sought to ensure "national cooperation" among the different Blue entities.  The Plans accordingly agreed to centralize the ownership of their trademarks and trade names.  In prior litigation, BCBSA has stated that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

306.     In 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA.  In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

307.     Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which in 1976 was renamed the Blue Shield Association.

308.     During the 1970s, local Blue Cross and Blue Shield plans all over the U.S. began merging.  By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year.  In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (now called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

309.     In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA.  At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans.

310.     In November 1982, after heated debate, BCBSA's member plans agreed to two propositions: (1) by the end of 1984, all existing Blue Cross plans and Blue Shield plans would consolidate at a local level to form Blue Cross and Blue Shield plans; and (2) by the end of 1985,

all Blue plans within a state would further consolidate, ensuring that each state would have only

one Blue plan.  As a result of these goals, the number of member plans declined sharply from

110 in 1984, to 75 in 1989, to 38 today.

311.    Even consolidation did not end competition between Blue plans.  In the early

1980s, for example, Blue Cross of Northeastern New York and Blue Shield of Northeastern New

York competed head-to-head.

312.    During the 1980s and afterwards, the plans began to operate less like charitable

entities and more like for-profit corporations, accumulating substantial surpluses.  In 1986,

Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

313.    In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-

for-profit entities.  As a result, many member plans converted to for-profit status.  One such plan,

now called WellPoint, has grown to become, by some measures, the largest health insurance

company in the country.  While nominally still characterized as not-for-profit, a number of the

Individual Blue Plans generate substantial earnings and surpluses, and pay their senior

administrators and officials substantial salaries and bonuses – often in the multi-million dollar

range.

314.    From 1981 to 1986, the Blue plans lost market share at a rate of approximately

one percent per year.  At the same time, the amount of competition among Blue plans, and from

non-Blue subsidiaries of Blue plans, increased substantially.  As a result of this increased

competition, in April of 1987, the member plans of BCBSA held an "Assembly of Plans" -- a

series of meetings held for the purpose of determining how they would and would not compete

against each other.  During these meetings, these independent health insurers and competitors

agreed to maintain exclusive service areas when operating under the Blue brand, thereby

eliminating "Blue on Blue" competition.  However, the Assembly of Plans did not restrain

competition by non-Blue subsidiaries of Blue plans – an increasing "problem" that had caused

complaints from many Blue plans.

315.    After the 1986 revocation of the Blues' tax-exempt status and throughout the

1990s, the number of non-Blue subsidiaries of Blue plans increased.  As quoted in *The Blues: A*

*History of the Blue Cross and Blue Shield System*, former BCBSA counsel Marv Reiter

explained in 1991, "Where you had a limited number of subsidiaries before, clearly they

mushroomed like missiles. . . . We went from 50 or 60 nationally to where there's now 400 and

some."  These subsidiaries continued to compete with Blue plans.  As a result, the member plans

of BCBSA discussed ways to rein in such non-Blue branded competition.

316.    At some later date, the Blue Cross and Blue Shield plans together agreed to

restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as well as

the ability of non-members of BCBSA to control or acquire the member plans.  These illegal

restraints are discussed below.

## Allegations Demonstrating Control of BCBSA By Member Plans

317.    BCBSA calls itself "a national federation of 38 independent, community-based

and locally operated Blue Cross and Blue Shield companies" and "the trade association for the

Blue Cross Blue Shield companies."

318.    The Plans are the members of, and govern, BCBSA.  BCBSA is entirely

controlled by its member plans, all of whom are independent health insurance companies that

license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any

agreements to the contrary, could and would compete with one another.  On its website, BCBSA

admits that in its "unique structure," "the Blue Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its] governing Board."

319.     As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

320.     The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.  In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer."  The current chairman of the Board of Directors, Alphonso O'Neil-White, is also the current President and CEO of BlueCross BlueShield of Western New York.  The CEO of each of the Individual Blue Plans serves on the Board of Directors of BCBSA.  The Board of Directors of BCBSA meets at least annually.

## License Agreements and Restraints on Competition

321.     The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC").  The PPFSC is a standing committee of the BCBSA Board of Directors that is composed of nine member Plan CEOs and three independent members.

322.     The independent Blue Cross and Blue Shield licensees control the entry of new members into BCBSA.  In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority

vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue

Marks will not fall into the hands of a stranger the Association has not approved."

323.     The independent Blue Cross and Blue Shield licensees control the rules and

regulations that all members of BCBSA must obey.  According to the brief BCBSA filed during

litigation in the Sixth Circuit Court of Appeals, these rules and regulations include the Blue

Cross License Agreement and the Blue Shield License Agreement (collectively, the "License

Agreements"), the Membership Standards Applicable to Regular Members (the "Membership

Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

324.     The License Agreements state that they "may be amended only by the affirmative

vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all

the Plans."  Under the terms of the License Agreements, a plan "agrees . . . to comply with the

Membership Standards."  In its Sixth Circuit brief, BCBSA described the provisions of the

License Agreements as something the member plans "deliberately chose," "agreed to," and

"revised."  The License Agreements explicitly state that the member plans most recently met to

adopt amendments, if any, to the licenses on June 21, 2012.

325.     The Guidelines state that the Membership Standards and the Guidelines "were

developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially

became effective as of December 31, 1994;" that the Membership Standards "remain in effect

until otherwise amended by the Member Plans;" that revisions to the Membership Standards

"may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted

vote;" that "new or revised guidelines shall not become effective . . . unless and until the Board

of Directors approves them;" and that the "PPFSC routinely reviews" the Membership Standards

and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

326.     The independent Blue Cross and Blue Shield licensees police the compliance of all members of BCBSA with the rules and regulations of BCBSA.  The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards.  Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."  In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."  In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

327.     The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations.  The Guidelines describe three responses to a member plan's failure to comply— "Immediate Termination," "Mediation and Arbitration," and "Sanctions"—each of which is administered by the PPFSC and could result in the termination of a member plan's license.

328.     The independent Blue Cross and Blue Shield licensees likewise control the termination of existing members from BCBSA.  The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may

accept, reject, or modify the recommendation."  However, according to the Guidelines, "a Plan's

licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater

affirmative Plan and Plan weighted vote."  In its Sixth Circuit brief, BCBSA admitted that the

procedure for terminating a license agreement between BCBSA and a member plan includes a

"double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters

vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes

weighted primarily according to the number of subscribers."

### Horizontal Agreements

329.    The independent Blue Cross and Blue Shield licensees are potential competitors

that use their control of BCBSA to coordinate their activities.  As a result, the rules and

regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member

plans on themselves.

330.    Each BCBSA licensee is an independent legal organization.  In a pleading

BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he

formation of BCBSA did not change each plan's fundamental independence."  The License

Agreements state that "[n]othing herein contained shall be construed to constitute the parties

hereto as partners or joint venturers, or either as the agent of the other."  As BCBS-AL's group

health insurance policy contract explains, "Blue Cross and Blue Shield of Alabama is an

independent corporation operating under a license from the Blue Cross and Blue Shield

Association, an association of independent Blue Cross and Blue Shield plans.  The Blue Cross

and Blue Shield Association permits us to use the Blue Cross and Blue Shield service marks in

the state of Alabama.  Blue Cross and Blue Shield is not acting as an agent of the Blue Cross and

Blue Shield Association."

331.     The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States.  By some measures, WellPoint is the largest health insurance company in the nation.  Similarly, fifteen of the twenty-five largest health insurance companies in the country are BCBSA licensees.  On its website, BCBSA states that its members together provide "coverage for nearly 100 million people – one-third of all Americans" and that, nationwide, "more than 96% of hospitals and 91% of professional providers contract with Blue Cross and Blue Shield companies – more than any other insurers."  Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health insurance.

332.     In its Sixth Circuit brief, BCBSA admitted that the Member Plans formed the precursor to BCBSA when they "recognized the necessity of national coordination."  The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other—and each other's parent Blue Plans—in the marketplace.  Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market.  New forms of competition were springing up at every turn, and market share was slipping year by year.  Survival was at stake.  The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

333.     On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that BCBSA "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies."  As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38]

independent licensed companies compete as a cooperative federation against non-Blue insurance companies."  One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

334.    As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance companies to enter into agreements that restrain competition.  Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

## The Horizontal Agreements Not To Compete

335.    The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance.  As such, they are a *per se* violation of Section 1 of the Sherman Act.

336.    Defendants have divided U.S. health care markets for insurance among themselves by dividing the nation into exclusive service areas allocated to individual Blues. Through the License Agreements, Guidelines, and Membership Standards, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, each independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area."  The License Agreement defines each licensee's Service Area as "the

geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

337.    Further, Defendants have allocated U.S. health care markets for insurance among themselves by agreeing to limit their competition against one another when not using the Blue names.  The Guidelines and Membership Standards, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, and with which each licensee must agree to comply as part of the License Agreements, establish two key restrictions on non-Blue competition.  First, each independent Blue Cross and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names.  This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business.  This provision also thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.  It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

338.    Second, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names.  The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66-2/3 percent of its national enrollment from its Blue-brand business.  This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to

develop non-Blue brands that could and would compete with Blue plans.  It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

339.    The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its Service Area.  To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third cap.  Should the licensee offer services and products under the non-Blue brand within its Service Area (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area.  Thus, the potential upside of making an investment in developing business outside of a designated area is severely limited, which obviously creates a disincentive from ever making that investment.

340.    In sum, each independent Blue Cross and Blue Shield licensee has agreed with its potential competitors that each will exercise the exclusive right to use the Blue brand within a designated geographic area, derive *none* of its revenue from services offered under the Blue brand outside of that area, and derive *at most* one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand.  The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

341.    The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements between competitors to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act.

342.    More than one Blue Cross and Blue Shield licensee has publicly admitted the existence of these territorial market divisions.  For example, the former Blue Cross licensee in

Ohio alleged that BCBSA member plans agreed to include these restrictions in the Guidelines in 1996 in an effort to block the sale of one member plan to a non-member that might present increased competition to another member plan.

343.     The largest Blue licensee, WellPoint, is a publicly-traded company, and therefore is required by the SEC rules to describe the restrictions on its ability to do business.  Thus, in its Form 10-K filed February 22, 2013, WellPoint stated that it had "no right to market products and services using the Blue Cross and Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross and Blue Shield products."  WellPoint has further stated that the "license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the Blue Cross and Blue Shield names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined local net revenue, as defined by the BCBSA, attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the Blue Cross and Blue Shield names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national net revenue, as defined by the BCBSA, attributable to health benefit plans must be sold, marketed, administered or underwritten under the Blue Cross and Blue Shield names and marks."

344.     Likewise, in its Form 10-K filed March 14, 2013, Triple-S Salud, the Blue licensee for Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its Service Area] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) health care plans and related services both in [and outside its Service Area], must be sold, marketed, administered, or underwritten through use of the Blue Cross Blue Shield" name and mark.  Further, the Triple-S licensee stated that the territorial restrictions "may limit the extent to

which we will be able to expand our health care operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the Blue Cross Blue Shield Names and Marks is already present."

345.    Despite these public admissions, both BCBSA and its member plans have attempted to keep the territorial restrictions as secret as possible.  When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's general counsel responded that "BCBSA licensed companies may compete anywhere with non-Blue branded business . . . . The rules on what the plans do in this regard are contained in the license.  However, the license terms themselves are proprietary to BCBSA, and . . . we would prefer not to share such trade secrets with BCBSA's competitors."

346.    The member plans of BCBSA have agreed to impose harsh penalties on those that violate the territorial restrictions.  According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination."  If a member plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry."  In addition, in the event of termination, a plan must pay a fee to BCBSA.  According to WellPoint's February 22, 2013 Form 10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee through December 31, 2012, "would allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield license in the vacated service area."

347.    In sum, a terminated licensee would (1) lose the brand through which it derived the majority of its revenue; and (2) fund the establishment of a competing health insurer that

would replace it as the Blue licensee in its local area.  These penalties essentially threaten to put out of existence any Blue member plan that breaches the territorial restrictions.

348.    It is unsurprising, then, that most member plans do not operate outside of their Service Areas.  Thus, while there are numerous Blue plans, and non-Blue businesses owned by such plans, that could and would compete effectively in each others' Service Areas but for the territorial restrictions, almost none compete outside their Service Areas under non-Blue names and brands, despite their ability to do so.

349.    Even in the relatively rare instance in which Blue plans conduct operations outside of their Service Areas, they have been required to keep those operations tightly under control by preventing growth – exactly the opposite of how they would normally operate.  The relationship between WellPoint and its non-Blue subsidiary, UniCare, is an illustrative example.  WellPoint reported in its Form 10-K for the year ending December 31, 1999 that approximately 70 percent of its total medical membership was sold by its Blue-licensed subsidiary, Blue Cross of California.  In its Form 10-K for the year ending December 31, 2000, this percentage decreased to approximately 67 percent.  In its Form 10-K for the year ending December 31, 2001, after WellPoint had acquired the BCBSA member plans operating in Georgia and part of Missouri, it reported that approximately 78 percent of its total medical membership was in its Blue-licensed subsidiaries.

350.    By the time WellPoint filed its 10-K for the year ending December 31, 2005, it had acquired the Blue licensees in fourteen states.  For the first time, it admitted the existence of the territorial restrictions in the BCBSA licenses and stated that it was in compliance with them.  As a result of these restrictions, from 1999 to 2002, while other Texas health insurers experienced average revenue growth of 17 percent, UniCare experienced growth of only 1.4

percent in Texas.  During those same years, UniCare experienced virtually no growth in the state of Washington, while overall health insurance revenue in the state grew by 17 percent. Similarly, in New Jersey from 2000 to 2002, the number of out-of-Service-Area enrollees of WellChoice (now part of WellPoint and known as Empire BlueCross BlueShield) did not increase, despite an overall 25 percent growth rate for health insurers in the state during the same period.  In Mississippi, between 2001 and 2002, premium revenue earned by most health insurance companies increased by more than 10 percent, but revenue for the non-Blue business of out-of-state Blue plans was either flat (in the case of UniCare) or negative (in the case of Anthem, now part of WellPoint).

351.    In another example, as of 2010, one Pennsylvania Blue plan, Independence Blue Cross, had 2.4 million Blue-brand commercial health insurance enrollees in its service area of Southeastern Pennsylvania, and had close to 1 million non-Blue brand Medicare and Medicaid enrollees (to which the territorial restrictions do not apply) in Indiana, Kentucky, Pennsylvania, and South Carolina, but its non-Blue brand commercial health insurance subsidiary, AmeriHealth, which operates in New Jersey and Delaware, had an enrollment of only approximately 130,000, or 4 percent of Independence Blue Cross's total commercial health insurance enrollment.

352.    The territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing member plans from competing with each other and with non-Blue plans.  These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

## The Anticompetitive Acquisition Restrictions

353.    In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which the independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan.

354.    First, the rules and regulations prohibit acquisition of a Plan by a non-Blue entity without the approval of BCBSA.  The Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee."  However, as alleged above, the member plans control the entry of new members into BCBSA.  Should a non-member attempt to join BCBSA to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans accordingly may block its membership by majority vote.

355.    Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (*i.e.*, to those licensees who would otherwise be capable of having their shares acquired).  These include four situations in which a member plan's license will terminate *automatically*:  (1) if any institutional investor become beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor become beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if any person become beneficially entitled to 20 percent or more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan

81

conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities.  These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans.  These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

356.    These acquisition restraints reduce competition in violation of the Sherman Act because they substantially reduce the ability of non-member insurance companies to expand their business and compete against the Individual Blue Plans.  To expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area.  Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan.  By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

357.     Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans.  During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans: in 1996, there were 62 Blue licensees; at present, there are only 38.

358.     By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition.  The net effect is less competition and higher premium costs for consumers.

## The BCBSA Licensing Agreements Have Reduced Competition In Regions Across The United States

359.     The Individual Blue Plans, as licensees, members, and parts of the governing body of BCBSA, have conspired with each other (the member plans of BCBSA) to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the *per se* illegal territorial restrictions in the License Agreements and Guidelines.

360.     But for the *per se* illegal territorial restrictions, many of the Individual Blue Plans would otherwise be significant competitors of each other in their respective Service Areas.  As alleged above, fifteen of the twenty-five largest health insurance companies in the country are Blue plans:  if all of these plans, together with all other BCBSA members, were able to compete with each other, the result would be lower costs and thus lower premiums paid by their enrollees.

361.     For example, WellPoint is the largest health insurer in the country by total medical enrollment, with approximately 36 million enrollees.  It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New

York City metropolitan and surrounding counties, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare.   But for the illegal territorial restrictions summarized above, WellPoint would be likely to offer its health insurance services and products in many more regions across the United States in competition with the Individual Blue Plans in those regions.   Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

362.    Similarly, with more than 13 million members, Health Care Service Corporation ("HCSC"), which operates BCBS-IL, BCBS-NM, BCBS-OK, and BCBS-TX, is the largest mutual health insurance company in the country and the fourth largest overall.   But for the illegal territorial restrictions summarized above, HCSC would be likely to offer its health insurance services and products in many more regions across the United States in competition with the Individual Blue Plans in those regions.   Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

363.    BCBS-MI is the ninth largest health insurer in the country by total medical enrollment, with approximately 4.5 million enrollees in its Service Area of Michigan.   But for the illegal territorial restrictions summarized above, BCBS-MI would be likely to offer its health insurance services and products in more regions across the United States in competition with the Individual Blue Plans in those regions.   Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

364.    Highmark, Inc. is the tenth largest health insurer in the country by total medical enrollment, with approximately 4.1 million enrollees.   Its affiliated Blue plans include Highmark BCBS, BCBS-WV, and BCBS-DE.   But for the illegal territorial restrictions summarized above,

84

Highmark would be likely to offer its health insurance services and products in more regions across the United States in competition with the Individual Blue Plans in those regions.  Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

365.    BCBS-AL is the thirteenth largest health insurer in the country by total medical enrollment, by some measures, with approximately 3.5 million enrollees.  But for the illegal territorial restrictions summarized above, BCBS-AL would be likely to offer its health insurance services and products in more regions across the United States in competition with the Individual Blue Plans in those regions.  Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

366.    CareFirst Blue Cross and Blue Shield, which operates the Blue Plans Maryland, Washington, DC, and parts of Virginia, is the fourteenth largest health insurer in the U.S. and the largest health care insurer in the Mid-Atlantic region, with approximately 3.33 million subscribers. But for the illegal territorial restrictions summarized above, CareFirst would be likely to offer its health insurance services and products in more regions across the United States in competition with the Individual Blue Plans in those regions.  Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

367.    BCBS-MA is the seventeenth largest health insurer in the country by total medical enrollment, with approximately 3 million enrollees in its service area of Massachusetts.  But for the illegal territorial restrictions summarized above, BCBS-MA would be likely to offer its health insurance services and products in more regions across the United States in competition with the Individual Blue Plans in those regions.  Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

368.     BCBS-FL is the eighteenth largest health insurer in the country by total medical enrollment, with approximately 2.9 million enrollees in its service area of Florida. But for the illegal territorial restrictions summarized above, BCBS-FL would be likely to offer its health insurance services and products in more regions across the United States in competition with the Individual Blue Plans in those regions.  Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

### Supra-Competitive Premiums Charged by BCBS Plans

369.     From February 7, 2008 to the present, the Individual Blue Plans' illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs, leading to artificially inflated and/or supra-competitive premiums for individuals and small groups purchasing the Plans' full-service commercial health insurance in the relevant geographic markets.

370.     Plaintiffs were damaged by paying supra-competitive premiums, which are to be calculated by estimating the premiums that would have been actually charged to consumers but for the Individual Blue Plans' antitrust violations, not the base rates or rate "schedules" filed with a state agency.

371.     Plaintiffs have also suffered damages as a result of not being offered lower health insurance premium rates by competitors or potential competitors that have not entered the relevant market.

### The Widespread Use By BCBSA Licensees Of Anticompetitive Most Favored Nation Clauses

372.     Over the past two decades (if not longer), numerous Blue plans have adopted what are described in the industry as "Most Favored Nation" ("MFN") clauses in their reimbursement agreements.

373.     MFNs (also known as "most favored customer," "most favored pricing," "most favored discount," or "parity" clauses) require a service provider to charge a Blue entity's competitors either more than, or no less than, what the provider charges the Blue entity for the same services.  MFNs that require the amount the provider charges the Blue entity's competitor to be higher than the amount the provider charges the Blue entity are often known as "MFN-plus" clauses, and typically require the amount to be higher by a specified percentage.

374.     Use of MFNs by the Blues unreasonably reduces competition for a number of reasons.  First, MFNs establish that the dominant market provider will be charged the lowest prices charge.  The Blues have the ability to pass through costs, thus making them indifferent to the actual price charged in markets in which they are dominant, as long as they are not competitively disadvantaged.  The MFNs thus reduce competition by eliminating an incentive for the Plans to reduce overhead prices.

375.     Second, MFNs limit competition by preventing other health insurers in the region from achieving lower costs with providers and thereby becoming significant competitors to the MFN user.  Because of the Blues' market power in their respective Service Areas, the MFN user can pass its own higher costs onto consumers through higher premiums without fearing that its competitors will be able to reduce premiums and draw consumers from it.

376.     MFNs also effectively establish a price floor below which providers will not sell services to the MFN user's competitors.  MFNs enable the MFN user to raise that price floor.  The price floors deter competition among health insurers in the relevant region.  By reducing the ability of the MFN user's competitors to compete against the MFN user, MFNs ensure that the Plans can substantially raise premiums while maintaining, or even increasing, its market share.

377.    Moreover, if the MFN user is certain that no insurer will pay less to a provider than it will, it will be willing to pay more to that provider than it would otherwise.  The more the MFN user agrees to pay that provider, the more its competitors must pay that provider.  And by raising the price floor, the MFN user keeps other insurers' costs artificially high, forcing those insurers to offset the higher costs by raising premiums.

378.    Third, MFNs raise barriers to entry in the market for commercial health insurance. If a provider can reduce the price it charges an insurer with little to no market share only by reducing the price it charges a market-dominant MFN user, the provider has a strong incentive not to lower prices.  Without the ability to compete on price, a new competitor will be unable to price below the market-dominant MFN user, and thus will be unable to survive.

379.    A number of the independent Blue Cross and Blue Shield licensees, including BCBS-MI, BCBS-NC, Highmark BCBS, and BCBS-SC, have used and/or continue to use MFNs to exploit the monopoly power they hold in their respective Service Areas.  These independent Blue Cross and Blue Shield licensees, including BCBS-MI, BCBS-NC, Highmark BCBS, and BCBS-SC, have coordinated their use of MFNs with other Blue entities.

380.    Use of MFNs and related techniques is widespread and pervasive among Blue plans.  The member plans of BCBSA have discussed the legality and usefulness of MFNs at BCBSA gatherings, such as the BCBSA 41st Annual Lawyers Conference, held May 3, 2007 in Miami, Florida.  There, a presenter informed representatives of the member plans that "DOJ and FTC have focused on potential anticompetitive character of MFN clauses, particularly on exclusionary impact" and that "[w]here [an] MFN has overall exclusionary effect on competition and entrenches market power, it could be actionable."

381.    On October 18, 2010, the U.S. Department of Justice and the Attorney General of

Michigan filed a joint complaint in the United States District Court for the Eastern District of

Michigan, accusing BCBS-MI of engaging in a widespread anticompetitive use of MFNs.  In the

complaint, the Department of Justice alleges that BCBS-MI "currently has agreements

containing MFNs or similar clauses with at least 70 of Michigan's 131 general acute care

hospitals" and that these MFNs were sought and obtained "in exchange for increases in prices

[the insurer] pays for the hospitals' services," "likely raising prices for health insurance in

Michigan."  On March 25, 2011, the *Wall Street Journal* reported that the U.S. Department of

Justice expanded its probe into the use of MFNs by the member plans operating in the North

Carolina, the District of Columbia, Kansas, Missouri, Ohio, South Carolina, and West Virginia.

The Department of Justice voluntarily dismissed its suit against BCBS-MI after the state of

Michigan passed legislation prohibiting BCBS-MI from continuing to exploit its market power

through MFN use.

382.    There is direct evidence that, like BCBS-MI and its fellow member plans of

BCBSA, BCBS-NC uses MFNs in its contracts with providers.  On July 13, 2006, BCBS-NC

admitted that "BCBSNC's favorable pricing [MFN] clause has been in use for years."  BCBS-

NC's use of MFNs has raised the costs of its competitors, has protected it from competition (and

thereby protected its ever-growing market share), and has contributed to the artificial inflation of

its health insurance premiums in North Carolina.

383.    From 2006 to 2009, BCBS-NC used at least four form provider agreements that

included MFNs.  These form provider agreements (May 15, 2006, December 19, 2007, May 21,

2008, and May 8, 2009) all included an MFN stating that:

> Provider acknowledges and warrants that, as of [date], Provider [has notified BCBSNC
> of] [does not have [and will not enter into]] any contract, agreement, or other

arrangement under which it provides services, treatments, or supplies at a rate of payment and/or through any payment mechanism, which results [or will result in] lower [or equal] aggregate payments to the Provider by any such similar payor than BCBSNC's payments would produce under this Agreement.

384.    There is direct evidence that, like its fellow member plans of BCBSA, Highmark BCBS uses MFNs in its contracts with providers.  Highmark BCBS's use of MFNs has raised the costs of its competitors, has protected it from competition (and thereby protected its ever-growing market share), and has contributed to the artificial inflation of its health insurance premiums in Western Pennsylvania.

385.    Multiple Highmark BCBS provider contracts, publicly available on PID's website, evidence Highmark BCBS's recent and current use of MFNs.  Highmark BCBS's MFNs in provider contracts come in at least two forms.  In one type of provider contract, Highmark BCBS defines "Usual Charges" as "the amount that the Provider bills other payors and/or patients for the same services" and then states that "Highmark agrees to pay the Provider for Provider Services provided to eligible Members and determined to be Covered Services *the lesser of*: (A) the payment due in accordance with Highmark's payment rates as currently in effect at the time the Provider Services are rendered; or (b) *one hundred percent (100%) of the Provider's Usual Charges*" (emphasis added).  This type of MFN appeared in a Highmark BCBS freestanding renal dialysis ancillary provider agreement filed June 3, 2008; a Highmark BCBS ground ambulance transport ancillary provider agreement filed June 3, 2008; a Highmark BCBS durable medical equipment and/or respiratory therapy equipment ancillary provider agreement filed June 3, 2008; a Highmark BCBS oncology ancillary provider agreement filed February 13, 2009; a Highmark BCBS home infusion therapy ancillary provider agreement filed August 25, 2009; a Highmark BCBS laboratory services ancillary provider agreement filed January 12, 2011; and potentially others.

90

386.     In the second type of MFN, Highmark BCBS states that it will pay the contracting

provider a rate established by agreement "*or one hundred percent (100%) of the [contracting*

*provider's] total covered charges for such services, whichever is less*" (emphasis added).  This

type of MFN appeared in a Highmark BCBS acute care facility agreement filed September 2,

2008; a Highmark BCBS freestanding ambulatory surgery facility agreement filed September 10,

2008; a Highmark BCBS managed care products hospital facility agreement filed September 15,

2008; a Highmark BCBS traditional products only hospital facility agreement filed September

15, 2008; a Highmark BCBS home health agency provider agreement filed September 26, 2008;

a Highmark BCBS long term acute care facility agreement filed October 9, 2008; a Highmark

BCBS home health agency provider agreement filed October 24, 2008; a Highmark BCBS

managed care products hospital facility agreement filed March 28, 2008; a Highmark BCBS

traditional products only hospital facility agreement filed March 28, 2008; a Highmark BCBS

traditional products only hospital facility agreement filed May 29, 2009; a Highmark BCBS

managed care products hospital facility agreement filed June 5, 2009; a Highmark BCBS

traditional products only hospital facility agreement filed June 5, 2009; a Highmark BCBS acute

care facility agreement filed June 16, 2009; and potentially others.

387.     There is direct evidence that, like its fellow member plans of BCBSA, BCBS-SC

uses MFNs in its contracts with providers.  In a recent *Post and Courier* article, a BCBS-SC

spokesman admitted that BCBS-SC used MFNs, claiming that they are intended "to ensure that

our customers get the best possible pricing for their health care services" and "reflect our

intention to obtain the best value for our customers as we possibly can."  Instead, BCBS-SC's

use of MFNs has raised the costs of its competitors, protected it from competition (and thereby

protected its ever-growing market share), and contributed to the artificial inflation of its health insurance premiums in South Carolina.

388.     In 2006, the South Carolina Legislature repealed a decades-old insurance code, stripping the State's authority to regulate provider contracts between insurers and health care providers.  This deletion allows BCBS-SC to negotiate and execute provider contracts that include MFNs, with no review or approval required from the South Carolina Department of Insurance.

<u>**Individual Blue Plans' Market Power In Relevant Markets**</u>

**Relevant Product Market:**

389.     The relevant product market is the sale of full-service commercial health insurance products to individuals and small groups (up to 199 people).

390.     To properly define a health insurance product market, it is useful to consider the range of health insurance products for sale and the degree to which these products substitute for one another, *i.e.*, whether, in a competitive market, an increase in the price of one product would increase demand for the second product.  The characteristics of different products are important factors in determining their substitutability.  For a health insurance product, important characteristics include:

391.     <u>Commercial versus government health insurance</u>:  Unlike *commercial* health insurance products, *government* health insurance programs such as Medicare and Medicaid and privately operated government health insurance programs such as Medicare Advantage are available only to individuals who are disabled, elderly, or indigent.  Therefore, commercial health insurance and government health insurance programs are not substitutes.

392.   <u>Full-service versus single-service health insurance</u>:  *Full-service* health insurance provides coverage for a wide range of medical and surgical services provided by hospitals, physicians, and other health care providers.  In contrast, *single-service* health insurance provides narrow coverage restricted to a specific type of health care, *e.g.*, dental care.  Single-service health insurance is sold as a compliment to full-service health insurance when the latter excludes from coverage a specific type of health care, *e.g.*, dental care.  Thus, full-service health insurance and single-service health insurance are not substitutes.

393.   Full-service commercial health insurance includes *HMO* products and *PPO* products, among others.  Traditionally, HMO health insurance plans pay benefits only when enrollees use in-network providers; PPO health insurance plans pay a higher percentage of costs when enrollees use in-network providers and a lower percentage of costs when enrollees use out-of-network providers.  Both types of full-service commercial health insurers compete for consumers based on the price of the premiums they charge, the quality and breadth of their health care provider networks, the benefits they do or do not provide (including enrollees' out-of-pocket costs such as deductibles, co-payment, and coinsurance), customer service, and reputation, among other factors.  Economic research suggests that HMO and PPO health insurance products *are* substitutes.

394.   <u>Fully-insured health insurance versus ASO products</u>:  When a consumer purchases a *fully-insured* health insurance product, the entity from which the consumer purchases that product provides a number of services: it pays its enrollees' medical costs, bears the risk that its enrollees' health care claims will exceed its anticipated losses, controls benefit structure and coverage decisions, and provides "administrative services" to its enrollees, *e.g.*, processes medical bills and negotiates discounted prices with providers.  In contrast, when a

consumer purchases an *administrative services only* ("ASO") product, sometimes known as "no risk," the entity from which the consumer purchases that product provides administrative services only.  Therefore, fully-insured health insurance products and ASO products are only substitutes for those consumers able to self-insure, *i.e.*, able to pay their own medical costs and bear the risk that claims will exceed their anticipated losses.

395.    <u>Individual, small group, and large group consumers</u>:  Consumers of health insurance products include both *individuals* and *groups*, such as employers who select a plan to offer to their employees and typically pay a portion of their employees' premiums.  Group consumers are broken down into two categories, *small group* and *large group*, based on the number of persons in the group.  The Kaiser Family Foundation, which publishes an influential yearly survey of employer health benefits offered across the United States, defines small groups as those with up to 199 employees and large firms as those with 200 or more employees.

396.    For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance product market.  In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self-insure and the bulk of competition occurs between firms offering ASO products.  Across the United States, 84 percent of small group consumers do not self-insure, while 83 percent of large group consumers do self-insure.  Even apart from the prevalence of ASO products in each market, individual, small group, and large group product markets are distinct because health insurers can set different prices for these different consumers.  Thus, pricing in the large group market would not impact competition in the small group market, and vice versa.

**Relevant Geographic Markets:**

397.     In defining a geographic market, it is important to focus on an essential part of a full-service commercial health insurer's product: its provider network.  An insurer's provider network is composed of the health care providers with which it contracts.  Enrollees in both HMO and PPO full-service commercial health insurance products pay less for an "in-network" provider's health care services than they would for the same services from an "out of network" provider.  As a result, health insurance consumers pay special attention to an insurer's provider network when choosing a health insurance product, preferring insurers with networks that include local providers.  This suggests that health insurers compete in distinct geographic markets.

398.     There are a number of different ways to analyze the geographic markets for the sale of full-service commercial health insurance to individual and small group consumers of a particular Individual Blue Plan.  The potentially relevant geographic markets could be defined alternatively as (a) that Blue Plan's service area; and (b) each of the regions, known as "Metropolitan Statistical Areas," "Micropolitan Statistical Areas," and counties, into which the U.S. Office of Management and Budget divides the counties that make up that service area.

**Alabama**

399.     However the geographic market is defined, BCBS-AL has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Alabama.

400.     BCBS-AL does business throughout the state of Alabama, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Alabama, and has agreed with the other member plans of BCBSA that only BCBS-AL will do business in

Alabama under the Blue brand.  Therefore, the state of Alabama can be analyzed as a relevant geographic market within which to assess the effects of BCBS-AL's anticompetitive conduct. As of 2008, BCBS-AL held at least a 93 percent share of the relevant product market in Alabama.  As of 2011, BCBS-AL held at least a 90 percent market share in the relevant individual market and at least a 97 percent market share in the relevant small group market.

401.    The U.S. Office of Management and Budget divides the 67 counties of Alabama into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."  Therefore, each of Alabama's 12 Metropolitan Statistical Areas,[1] 13 Micropolitan Statistical Areas,[2] and 24 counties[3] that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBS-AL's anticompetitive conduct.  As of 2010, BCBS-AL held at least the following shares of the relevant product market

---

[1]  The Anniston-Oxford Metropolitan Statistical Area, the Auburn-Opelika Metropolitan Statistical Area, the Birmingham-Hoover Metropolitan Statistical Area, the Alabama portions of the Columbus Metropolitan Statistical Area, the Decatur Metropolitan Statistical Area, the Dothan Metropolitan Statistical Area, the Florence-Muscle Shoals Metropolitan Statistical Area, the Gadsden Metropolitan Statistical Area, the Huntsville Metropolitan Statistical Area, the Mobile Metropolitan Statistical Area, the Montgomery Metropolitan Statistical Area, and the Tuscaloosa Metropolitan Statistical Area.

[2]  The Albertville Micropolitan Statistical Area, the Alexander City Micropolitan Statistical Area, the Cullman Micropolitan Statistical Area, the Daphne-Fairhope-Foley Micropolitan Statistical Area, the Enterprise-Ozark Micropolitan Statistical Area, the Eufaula Micropolitan Statistical Area, the Fort Payne Micropolitan Statistical Area, the Scottsboro Micropolitan Statistical Area, the Selma Micropolitan Statistical Area, the Talladega-Sylacauga Micropolitan Statistical Area, the Troy Micropolitan Statistical Area, the Tuskegee Micropolitan Statistical Area, and the Valley Micropolitan Statistical Area.

[3]  Bullock, Butler, Cherokee, Choctaw, Clarke, Clay, Cleburne, Conecuh, Covington, Crenshaw, Escambia, Fayette, Franklin, Lamar, Marengo, Marion, Monroe, Perry, Pickens, Randolph, Sumter, Washington, Wilcox, and Winston Counties.

in these Metropolitan Statistical Areas: the Anniston-Oxford Metropolitan Statistical Area: 88 percent; the Auburn-Opelika Metropolitan Statistical Area: 90 percent; the Birmingham-Hoover Metropolitan Statistical Area: 85 percent; the Decatur Metropolitan Statistical Area: 92 percent; the Dothan Metropolitan Statistical Area: 91 percent; the Florence-Muscle Shoals Metropolitan Statistical Area: 91 percent; the Gadsden Metropolitan Statistical Area: 94 percent; the Huntsville Metropolitan Statistical Area: 88 percent; the Mobile Metropolitan Statistical Area: 84 percent; the Montgomery Metropolitan Statistical Area: 89 percent; and the Tuscaloosa Metropolitan Statistical Area: 91 percent.

402.    BCBS-AL's powerful market share is far from the only evidence of its market power.  As alleged below, BCBS-AL's market power has significantly raised costs, resulting in higher premiums for BCBS-AL enrollees.

*Supra-Competitive Premiums Charged By BCBS-AL*

403.    From March 1, 2007 to the present, BCBS-AL's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Alabama, leading to inflated and/or supra-competitive premiums for individuals and small groups purchasing BCBS-AL's full-service commercial health insurance in the relevant geographic markets.  BCBS-AL's market power and its use of anticompetitive practices in Alabama have reduced the amount of competition in the market and ensured that BCBS-AL's few competitors face higher costs than BCBS-AL does.  Without competition, and with the ability to increase premiums without losing customers, BCBS-AL faces little pressure to keep prices low.

404.    Over the past decade, BCBS-AL generally raised individual and small group premiums by amounts greater than the national average.  In 2010, for example, BCBS-AL raised individual premiums more than 17 percent in some instances.

405.    Plaintiffs were damaged by paying supra-competitive premiums, which are to be calculated by estimating the premiums that would have been actually charged to consumers but for the Individual Blue Plans' antitrust violations, not the base rates or rate "schedules" filed with a state agency.

406.    These rising premiums have enabled BCBS-AL to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization.  From 2001 to 2009, BCBS-AL grew its surplus by 68 percent, from $433.7 million to $649 million. In 2011, BCBS-AL reported net income of $256.92 million, up 58 percent from 2010.

**Arkansas**

407.    However the geographic market is defined, BCBS-AR has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Arkansas.

408.    BCBS-AR does business throughout the state of Arkansas, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Arkansas, and has agreed with the other member plans of BCBSA that only BCBS-AR will do business in Arkansas under the Blue brand.  Therefore, the state of Arkansas can be analyzed as a relevant geographic market within which to assess the effects of BCBS-AR's anticompetitive conduct. As of 2011, BCBS-AR held at least a 79 percent share of the relevant individual product market and at least a 56 percent share of the relevant small group product market in Arkansas.

409.    The U.S. Office of Management and Budget divides the 75 counties of Arkansas into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.   It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."   Therefore, each of Arkansas's 8 Metropolitan Statistical Areas,[4] 13 Micropolitan Statistical Areas,[5] and 36 counties[6] that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBS-AR's anticompetitive conduct.   BCBS-AR has the following market shares in the following Metropolitan Statistical Areas: Fayetteville-Springdale-Rogers (at least 26 percent), Fort Smith (at least 25 percent), Hot Springs (at least 41 percent), Jonesboro (at least 55 percent), Little Rock-North Little Rock-Conway (at least 34 percent), and Pine Bluff (at least 49 percent).

---

[4]  The Fayetteville-Springdale-Rogers Metropolitan Statistical Area, the Fort Smith Metropolitan Statistical Area, the Hot Springs Metropolitan Statistical Area, the Jonesboro Metropolitan Statistical Area, the Little Rock-North Little Rock-Conway Metropolitan Statistical Area, the Memphis Metropolitan Statistical Area, the Pine Bluff Metropolitan Statistical Area, and the Texarkana Metropolitan Statistical Area

[5]  The Arkadelphia Micropolitan Statistical Area, the Batesville Micropolitan Statistical Area, the Blytheville Micropolitan Statistical Area, the Camden Micropolitan Statistical Area, the El Dorado Micropolitan Statistical Area, the Forrest City Micropolitan Statistical Area, the Harrison Micropolitan Statistical Area, the Helena-West Helena Micropolitan Statistical Area, the Magnolia Micropolitan Statistical Area, the Malvern Micropolitan Statistical Area, the Mountain Home Micropolitan Statistical Area, the Paragould Micropolitan Statistical Area, the Russellville Micropolitan Statistical Area, and the Searcy Micropolitan Statistical Area.

[6]  Arkansas County, Ashley County, Bradley County, Carroll County, Chicot County, Clay County, Cleburne County, Conway County, Cross County, Dallas County, Desha County, Drew County, Fulton County, Howard County, Izard County, Jackson County, Johnson County, Lafayette County, Lawrence County, Lee County, Little River County, Logan County, Marion County, Monroe County, Montgomery County, Pike County, Polk County, Prairie County, Randolph County, Scott County, Searcy County, Servier County, Sharp County, Stone County, Van Buren County, and Woodruff County.

410.    BCBS-AR's powerful market share is far from the only evidence of its market power.  As alleged below, BCBS-AR's market power has significantly raised costs, resulting in higher premiums for BCBS-AR enrollees.

*Supra-Competitive Premiums Charged By BCBS-AR*

411.    From October 1, 2008 to the present, BCBS-AR's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Arkansas, leading to inflated and/or supra-competitive premiums for individuals and small groups purchasing BCBS-AR's full-service commercial health insurance in the relevant geographic markets.  BCBS-AR's market power and its use of anticompetitive practices in Arkansas have reduced the amount of competition in the market and ensured that BCBS-AR's few competitors face higher costs than BCBS-AR does. Without competition, and with the ability to increase premiums without losing customers, BCBS-AR faces little pressure to keep prices low.

412.    Over the past decade, BCBS-AR generally raised individual and small group premiums by amounts greater than the national average.

413.    These rising premiums have enabled BCBS-AR to lavishly compensate its executives and grow its surplus in excessive amounts—close to $600 million as of 2011—unsual practices for a self-described non-profit organization.

**California**

414.    However the geographic market is defined, BC-CA has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of California.

BS-CA also has a dominant market position and exercises market power in those markets throughout the state of California.

415.    BC-CA does business throughout the state of California, is licensed to use the Blue Cross trademark and trade name throughout the state of California, and has agreed with the other member plans of BCBSA that only BC-CA will do business in California under the Blue Cross brand.  BS-CA does business throughout the state of California, is licensed to use the Blue Shield trademark and trade name throughout the state of California, and has agreed with the other member plans of BCBSA that only BS-CA will do business in California under the Blue Shield brand.  Therefore, the state of California can be analyzed as a relevant geographic market within which to assess the effects of BC-CA's and BS-CA's anticompetitive conduct.  As of 2010, BC-CA held at least a 29 percent share of the relevant product market in California; as of 2011, BC-CA held at least 37 percent of the relevant individual product market and at least 15 percent of the relevant small group product market.  As of 2011, BS-CA held at least a 20 percent share of the relevant individual product market and at least 18 percent of the relevant small group product market.

416.    The U.S. Office of Management and Budget divides the 58 counties of California into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."  Therefore, each of California's 26 Metropolitan Statistical Areas,[7] 8 Micropolitan Statistical Areas,[8] and 13 counties[9] that are not part of Statistical Areas is

---

[7]  The Bakersfield Metropolitan Statistical Area, the Chico Metropolitan Statistical Area, the El Centro Metropolitan Statistical Area, the Fresno Metropolitan Statistical Area, the Hanford-Corcoran

a relevant geographic market within which to assess the effects of BC-CA's and BS-CA's anticompetitive conduct.  BC-CA has the following market shares in the following Metropolitan Statistical Areas: Bakersfield (at least 45 percent), Chico (at least 47 percent), El Centro (at least 60 percent), Fresno (at least 43 percent), Hanford-Corcoran (at least 61 percent), Los Angeles-Long Beach-Anaheim (at least 31 percent), Madera (at least 49 percent), Merced (at least 59 percent), Modesto (at least 29 percent), Napa (at least 42 percent), Oxnard-Thousand Oaks-Ventura (at least 41 percent), Redding (at least 60 percent), Riverside-San Bernadino-Ontario (at least 24 percent), the Sacramento-Roseville-Arden-Arcade (at least 19 percent), Salinas (at least 68 percent), San Diego-Carlsbad (at least 21 percent), San Francisco-Oakland-Hayward (at least 22 percent), San Jose-Sunnyvale-Santa Clara (at least 23 percent), San Luis Obispo-Paso Robles-Arroyo Grande (at least 62 percent), Santa Cruz-Watsonville (at least 47 percent), Santa Maria-Santa Barbara (at least 45 percent), Santa Rosa (at least 21 percent), Stockton-Lodi (at least 24

---

Metropolitan Statistical Area, the Los Angeles-Long Beach-Anaheim Metropolitan Statistical Area, the Madera Metropolitan Statistical Area, the Merced Metropolitan Statistical Area, the Modesto Metropolitan Statistical Area, the Napa Metropolitan Statistical Area, the Oxnard-Thousand Oaks-Ventura Metropolitan Statistical Area, the Redding Metropolitan Statistical Area, the Riverside-San Bernadino-Ontario Metropolitan Statistical Area, the Sacramento-Roseville-Arden-Arcade Metropolitan Statistical Area, the Salinas Metropolitan Statistical Area, the San Diego-Carlsbad Metropolitan Statistical Area, the San Francisco-Oakland-Hayward Metropolitan Statistical Area, the San Jose-Sunnyvale-Santa Clara Metropolitan Statistical Area, the San Luis Obispo-Paso Robles-Arroyo Grande Metropolitan Statistical Area, the Santa Cruz-Watsonville Metropolitan Statistical Area, the Santa Maria-Santa Barbara Metropolitan Statistical Area, the Santa Rosa Metropolitan Statistical Area, the Stockton-Lodi Metropolitan Statistical Area, the Vallejo-Fairfield Metropolitan Statistical Area, the Visalia-Porterville Metropolitan Statistical Area, and the Yuba City Metropolitan Statistical Area.

[8]  The Clearlake Micropolitan Statistical Area, the Crescent City Micropolitan Statistical Area, the Eureka-Arcata-Fortuna Micropolitan Statistical Area, the Red Bluff Micropolitan Statistical Area, the Sonora Micropolitan Statistical Area, the Susanville Micropolitan Statistical Area, the Truckee-Grass Valley Micropolitan Statistical Area, and the Ukiah Micropolitan Statistical Area.

[9]  Alpine, Amador, Calaveras, Colusa, Glenn, Inyo, Mariposa, Modoc, Mono, Plumas, Sierra, Siskiyou, and Trinity Counties.

percent), Vallejo-Fairfield (at least 24 percent), Visalia-Porterville (at least 58 percent), and Yuba City (at least 72 percent).  BS-CA has the following market shares in the following Metropolitan Statistical Areas: Chico (at least 40 percent), El Centro (at least 29 percent), Fresno (at least 21 percent), Hanford-Corcoran (at least 26 percent), Madera (at least 22 percent), Merced (at least 20 percent), Redding (at least 29 percent), Salinas (at least 14 percent), San Luis Obispo-Paso Robles-Arroyo Grande (at least 26 percent), Santa Cruz-Watsonville (at least 19 percent), Santa Maria-Santa Barbara (at least 21 percent), Visalia-Porterville (at least 23 percent), and Yuba City (at least 10 percent).

417.   BC-CA's and BS-CA's powerful market share is far from the only evidence of their market power.  As alleged below, BC-CA's and BS-CA's market power has significantly raised costs, resulting in higher premiums for BC-CA and BS-CA enrollees.

*Supra-Competitive Premiums Charged By BC-CA and BS-CA*

418.   From October 1, 2008 to the present, BC-CA's and BS-CA's illegal anticompetitive conduct, including their territorial market division agreements with the thirty-six other members of BCBSA, has increased health care costs in California, leading to inflated and/or supra-competitive premiums for individuals and small groups purchasing BC-CA's and BS-CA's full-service commercial health insurance in the relevant geographic markets.  BC-CA's and BS-CA's market power and their use of anticompetitive practices in California have reduced the amount of competition in the market and ensured that BC-CA and BS-CA's few competitors face higher costs than BC-CA and BS-CA do.  Without competition, and with the ability to increase premiums without losing customers, BC-CA and BS-CA face little pressure to keep prices low.

419.     Over the past decade, BC-CA and BS-CA each generally raised individual and small group premiums by amounts greater than the national average.

420.     These rising premiums have enabled BC-CA and BS-CA to lavishly compensate their executives and grow their surpluses in excessive amounts.

**Florida**

421.     However the geographic market is defined, BCBS-FL has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Florida.

422.     BCBS-FL does business throughout the state of Florida, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Florida, and has agreed with the other member plans of BCBSA that only BCBS-FL will do business in Florida under the Blue brand.  Therefore, the state of Florida can be analyzed as a relevant geographic market within which to assess the effects of BCBS-FL's anticompetitive conduct.  As of 2010 and 2011, BCBS-FL held at least a 31 percent share of the relevant product market in Florida, including at least a 48 percent share of individual products.

423.     The U.S. Office of Management and Budget divides the 67 counties of Florida into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."  Therefore, each of Florida's 22 Metropolitan Statistical Areas,[10] 7 Micropolitan Statistical Areas,[11] and 16 counties[12] that are not part of Statistical Areas

---

[10]  The Cape Coral-Fort Myers Metropolitan Statistical Area, the Crestview-Fort Walton Beach-Destin Metropolitan Statistical Area, the Deltona-Daytona Beach-Ormond Beach Metropolitan Statistical Area,

is a relevant geographic market within which to assess the effects of BCBS-FL's anticompetitive conduct. BCBS-FL has the following share of the relevant product market in the following Metropolitan Statistical Areas: Cape Coral-Fort Myers (at least 35 percent), Crestview-Fort Walton Beach-Destin (at least 59 percent), Deltona-Daytona Beach-Ormond Beach (at least 42 percent), Gainesville (at least 63 percent), Jacksonville (at least 30 percent), Lakeland-Winter Haven (at least 22 percent), Naples-Immokalee-Marco Island (at least 46 percent), Ocala (at least 55 percent), Panama City (at least 69 percent), Pensacola-Ferry Pass-Brent (at least 49 percent), Port St. Lucie (at least 48 percent), Punta Gorda (at least 31 percent), Sebastian-Vero Beach (at least 60 percent), and Tallahassee (at least 83 percent).

424.   BCBS-FL's powerful market share is far from the only evidence of its market power. As alleged below, BCBS-FL's market power has significantly raised costs, resulting in higher premiums for BCBS-FL enrollees.

*Supra-Competitive Premiums Charged By BCBS-FL*

---

the Gainesville Metropolitan Statistical Area, the Homosassa Springs Metropolitan Statistical Area, the Jacksonville Metropolitan Statistical Area, the Lakeland-Winter Haven Metropolitan Statistical Area, the Miami-Fort Lauderdale-West Palm Beach Metropolitan Statistical Area, the Naples-Immokalee-Marco Island Metropolitan Statistical Area, the North Port-Sarasota-Bradenton Metropolitan Statistical Area, the Ocala Metropolitan Statistical Area, the Orlando-Kissimmee-Sanford Metropolitan Statistical Area, the Palm Bay-Melbourne-Titusville Metropolitan Statistical Area, the Panama City Metropolitan Statistical Area, the Pensacola-Ferry Pass-Brent Metropolitan Statistical Area, the Port St. Lucie Metropolitan Statistical Area, the Punta Gorda Metropolitan Statistical Area, the Sebastian-Vero Beach Metropolitan Statistical Area, the Sebring Metropolitan Statistical Area, the Tallahassee Metropolitan Statistical Area, the Tampa-St. Petersburg-Clearwater Metropolitan Statistical Area, and the The Villages Metropolitan Statistical Area.

[11]  The Arcadia Micropolitan Statistical Area, the Clewiston Micropolitan Statistical Area, the Key West Micropolitan Statistical Area, the Lake City Micropolitan Statistical Area, the Okeechobee Micropolitan Statistical Area, the Palatka Micropolitan Statistical Area, and the Wauchula Micropolitan Statistical Area.

[12]  Bradford, Calhoun, Dixie, Franklin, Glades, Hamilton, Holmes, Jackson, Lafayette, Levy, Liberty, Madison, Suwannee, Taylor, Union, and Washington Counties.

425.    From October 1, 2008 to the present, BCBS-FL's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Florida, leading to inflated and/or supra-competitive premiums for individuals and/or small groups purchasing BCBS-FL's full-service commercial health insurance in the relevant geographic markets.  BCBS-FL's market power and its use of anticompetitive practices in Florida have reduced the amount of competition in the market and ensured that BCBS-FL's few competitors face higher costs than BCBS-FL does.  Without competition, and with the ability to increase premiums without losing customers, BCBS-FL faces little pressure to keep prices low.

426.    Over the past decade, BCBS-FL generally raised individual and small group premiums by amounts greater than the national average.

427.    These rising premiums have enabled BCBS-FL to lavishly compensate its executives and grow its surplus in excessive amounts.

**Hawai'i**

428.    However the geographic market is defined, BCBS-HI has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Hawai'i.

429.    BCBS-HI does business throughout the state of Hawai'i, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Hawai'i, and has agreed with the other member plans of BCBSA that only BCBS-HI will do business in Hawai'i under the Blue brand.  Therefore, the state of Hawai'i can be analyzed as a relevant geographic market within which to assess the effects of BCBS-HI's anticompetitive conduct.  As of 2011, BCBS-HI held at least a 69 percent share of the relevant product market in Hawai'i, including at

least a 52 percent share in the relevant individual market and at least a 50 percent share in the relevant small group market.

430.    The U.S. Office of Management and Budget divides the five counties of Hawai'i into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."  Therefore, each of Hawai'i's 2 Metropolitan Statistical Areas[13] and 2 Micropolitan Statistical Areas[14] is a relevant geographic market within which to assess the effects of BCBS-HI's anticompetitive conduct.  BCBS-HI had at least a 71 percent market share of the Urban Honolulu Metropolitan Statistical Area as of 2010.

431.    BCBS-HI's powerful market share is far from the only evidence of its market power.  As alleged below, BCBS-HI's market power has significantly raised costs, resulting in higher premiums for BCBS-HI enrollees.

*Supra-Competitive Premiums Charged By BCBS-HI*

432.    From October 1, 2008 to the present, BCBS-HI's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Hawai'i, leading to inflated and/or supra-competitive premiums for individuals and small groups purchasing BCBS-HI's full-service commercial health insurance in the relevant geographic markets.  BCBS-HI's market power and its use of anticompetitive practices in Hawai'i have reduced the amount of competition in the market and

---

[13]  The Kahului-Wailuku-Lahaina Metropolitan Statistical Area and the Urban Honolulu Metropolitan Statistical Area.

[14]  The Hilo Metropolitan Statistical Area and the Kapaa Metropolitan Statistical Area.

ensured that BCBS-HI's few competitors face higher costs than BCBS-HI does.  Without competition, and with the ability to increase premiums without losing customers, BCBS-HI faces little pressure to keep prices low.

433.    Over the past decade, BCBS-HI generally raised individual and small group premiums by amounts greater than the national average.  In 2008, for example, BCBS-Hawai'i raised its premiums for its Preferred Provider and HPH Plus plans 9.9 percent and 11.5 percent, respectively.

434.    These rising premiums have enabled BCBS-HI to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization.  As a result of these and other inflated premiums, BCBS-Hawai'i has increased its profits to the point where it holds reserves in the amount of approximately $400 million.

**<u>Illinois</u>**

435.    However the geographic market is defined, BCBS-IL has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Illinois.

436.    BCBS-IL does business throughout the state of Illinois, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Illinois, and has agreed with the other member plans of BCBSA that only BCBS-IL will do business in Illinois under the Blue brand.  Therefore, the state of Illinois can be analyzed as a relevant geographic market within which to assess the effects of BCBS-IL's anticompetitive conduct.  As of 2011, BCBS-IL held at least a 57 percent share of the relevant small group insurance product market in

Illinois, and at least a 66 percent share of the relevant individual insurance product market in Illinois.

437.    The U.S. Office of Management and Budget divides the 102 counties of Illinois into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."  Therefore, each of Illinois's 12 Metropolitan Statistical Areas,[15] 23 Micropolitan Statistical Areas,[16] and 37 counties[17] that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBS-IL's

---

[15]  The Bloomington-Normal Metropolitan Statistical Area, the Champaign-Urbana Metropolitan Statistical Area, the Chicago-Naperville-Joliet Metropolitan Statistical Area, the Decatur Metropolitan Statistical Area, the Kankakee-Bradley Metropolitan Statistical Area, the Rockford Metropolitan Statistical Area, the Springfield Metropolitan Statistical Area, the Peoria Metropolitan Statistical Area, the Illinois portion of the St. Louis MO-IL Metropolitan Statistical Area, the Illinois portion of the Davenport-Moline-Rock Island IA-IL Metropolitan Statistical Area, the Danville Metropolitan Statistical Area, and the Illinois portion of the Cape Girardeau-Jackson MO-IL Metropolitan Statistical Area.

[16]  The Illinois portion of the Burlington IA-IL Micropolitan Statistical Area, the Canton Micropolitan Statistical Area, the Carbondale Micropolitan Statistical Area, the Centralia Micropolitan Statistical Area, the Charleston-Mattoon Micropolitan Statistical Area, the Dixon Micropolitan Statistical Area, the Effingham Micropolitan Statistical Area, the Freeport Micropolitan Statistical Area, the Galesburg Micropolitan Statistical Area, the Harrisburg Micropolitan Statistical Area, the Jacksonville Micropolitan Statistical Area, the Lincoln Micropolitan Statistical Area, the Macomb Micropolitan Statistical Area, the Marion-Herrin Micropolitan Statistical Area, the Mount Vernon Micropolitan Statistical Area, the Ottawa-Streator Micropolitan Statistical Area, the Illinois portion of the Paducah KY-IL Micropolitan Statistical Area, the Pontiac Micropolitan Statistical Area, the Illinois portion of the Quincy IL-MO Micropolitan Statistical Area, the Rochelle Micropolitan Statistical Area, the Sterling Micropolitan Statistical Area, and the Taylorville Micropolitan Statistical Area.

[17]  Franklin, Randolph, Montgomery, Iroquois, Jo Daviess, Perry, Shelby, Fayette, Crawford, Douglas, Hancock, Edgar, Union, Lawrence, Wayne, DeWitt, Pike, Richland, Clark, Carroll, Moultrie, White, Washington, Mason, Greene, Clay, Cass, Johnson, Wabash, Jasper, Schuyler, Brown, Edwards, Pulaski, Gallatin, Pope and Hardin counties.

anticompetitive conduct.  As of 2010, BCBS-IL held at least the following shares of the relevant product market in these Metropolitan Statistical Areas:  55 percent in the Bloomington-Normal Metropolitan Statistical Area; 47 percent in the Champagne-Urbana Metropolitan Statistical Area; 63 percent in the Chicago-Naperville-Joliet Metropolitan Statistical Area; 57 percent in the Decatur Metropolitan Statistical Area; 48 percent in the Kankakee-Bradley Metropolitan Statistical Area; 46 percent in the Lake County-Kenosha County IL-WI Metropolitan Statistical Area; 58 percent in the Rockford Metropolitan Statistical Area; and 36 percent in the Springfield Metropolitan Statistical Area.

438.    BCBS-IL's powerful market share is far from the only evidence of its market power.  As alleged below, BCBS-IL's market power has significantly raised costs, resulting in higher premiums for BCBS-IL enrollees.

*Supra-Competitive Premiums Charged By BCBS-IL*

439.    From August 21, 2008 to the present, BCBS-IL's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Illinois, leading to inflated and/or supra-competitive premiums for individuals and small groups purchasing BCBS-IL's full-service commercial health insurance in the relevant geographic markets.  BCBS-IL's market power and its use of anticompetitive practices in Illinois have reduced the amount of competition in the market and ensured that BCBS-IL's few competitors face higher costs than BCBS-IL does.  Without competition, and with the ability to increase premiums without losing customers, BCBS-IL faces little pressure to keep prices low.

440.    Over the past decade, BCBS-IL generally raised individual and small group premiums by amounts greater than the national average.  For example, on August 29, 2012, BCBS-IL hiked premiums up 8.60 percent for some policies.

441.    These rising premiums have enabled BCBS-IL to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization. In 2012, BCBS-IL's parent company, HCSC, had over $20 billion in revenues and a net income of over $1 billion, which lead to an overall surplus of $9.6 billion.  In comparison, HCSC collected $1.7 billion in HMO revenues and earned $1.4 billion surplus in 2002.

**Louisiana**

442.    However the geographic market is defined, BCBS-LA has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Louisiana.

443.    BCBS-LA does business throughout the state of Louisiana, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Louisiana, and has agreed with the other member plans of BCBSA that only BCBS-LA will do business in Louisiana under the Blue brand.  Therefore, the state of Louisiana can be analyzed as a relevant geographic market within which to assess the effects of BCBS-LA's anticompetitive conduct. As of 2011, BCBS-LA held at least a 72 percent share of the relevant individual product market and at least an 81 percent share of the relevant small group product market in Louisiana.

444.    The U.S. Office of Management and Budget divides the 64 parishes of the state of Louisiana into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a

metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core." Therefore, each of Louisiana's 8 Metropolitan Statistical Areas,[18] 17 Micropolitan Statistical Areas,[19] and 17 parishes[20] that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBS-LA's anticompetitive conduct.

445.    BCBS-LA's powerful market share is far from the only evidence of its market power. As alleged below, BCBS-LA's market power has significantly raised costs, resulting in higher premiums for BCBS-LA enrollees.

*Supra-Competitive Premiums Charged By BCBS-LA*

446.    From June 5, 2008 to the present, BCBS-LA's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Louisiana, leading to inflated and/or supra-

---

[18] The Alexandria Metropolitan Statistical Area, the Baton Rouge Metropolitan Statistical Area, the Houma-Bayou Cane-Thibodaux Metropolitan Statistical Area, the Lafayette Metropolitan Statistical Area, the Lake Charles Metropolitan Statistical Area, the Monroe Metropolitan Statistical Area, the New Orleans-Metairie-Kenner Metropolitan Statistical Area, and the Shreveport-Bossier City Metropolitan Statistical Area.

[19] The Abbeville Micropolitan Statistical Area, the Bastrop Micropolitan Statistical Area, the Bogalusa Micropolitan Statistical Area, the Crowley Micropolitan Statistical Area, the DeRidder Micropolitan Statistical Area, the Fort Polk South Micropolitan Statistical Area, the Hammond Micropolitan Statistical Area, the Jennings Micropolitan Statistical Area, the Minden Micropolitan Statistical Area, the Morgan City Micropolitan Statistical Area, the Natchez Micropolitan Statistical Area, the Natchitoches Micropolitan Statistical Area, the New Iberia Micropolitan Statistical Area, the Opelousas-Eunice Micropolitan Statistical Area, the Pierre Part Micropolitan Statistical Area, the Ruston Micropolitan Statistical Area, and the Tallulah Micropolitan Statistical Area

[20] Allen Parish, Avoyelles Parish, Bienville Parish, Caldwell Parish, Catahoula Parish, Claiborne Parish, East Carroll Parish, Evangeline Parish, Franklin Parish, La Salle Parish, Red River Parish, Richland Parish, Sabine Parish, St. James Parish, Tensas Parish, West Carroll Parish, and Winn Parish.

competitive premiums for individuals and small groups purchasing BCBS-LA's full-service commercial health insurance in the relevant geographic markets.  BCBS-LA's market power and its use of anticompetitive practices in Louisiana have reduced the amount of competition in the market and ensured that BCBS-LA's few competitors face higher costs than BCBS-LA does. Without competition, and with the ability to increase premiums without losing customers, BCBS-LA faces little pressure to keep prices low.

447.    Over the past decade, BCBS-LA generally raised individual and small group premiums by amounts greater than the national average.  From 2000 to 2007, Louisiana health insurance premiums increased by 75.3 percent, 3.3 times faster than Louisiana wages, which only increased by 22.9 percent. Additionally, a 2009 forecast predicted that an average Louisiana worker would spend nearly 60 percent of her or his income on health insurance by 2016, one of the highest predicted nationwide ratios.

448.    These rising premiums have enabled BCBS-LA to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization.  As a result of its inflated premiums, BCBS-LA has amassed a massive surplus; between 2004 and 2008, its surplus rose from $352.7 million to $621.1 million.  As of the end of 2010, BCBS-LA's surplus exceeded $706.6 million.

449.    BCBS-LA's market and monopoly power provide it with immense leverage over health care providers, whose failure to contract with BCBS-LA could result in the loss of a substantial amount of customers.  BCBS-LA exercises this leverage by demanding that providers grant it below-market reimbursement rates.  For instance, in 2008 contract negotiations reached a breaking point between BCBS-LA and one of Louisiana's largest providers, the Franciscan Missionaries of Our Lady ("FMOL"), which then provided care to 512,000 people. Announcing

the failed contract negotiations, FMOL stated "we have asked Blue Cross for an increase in rates to cover the services the Lake provides. The rates continue to take into consideration the volume of Blue Cross business and offer them the best pricing though closing the gap between them and their competitors."  Similarly, in 2010, while in the process of addressing mounting operating losses, New Orleans area East Jefferson General Hospital ("EJGH") sought to negotiate new and increased rates with BCBS-LA.  When the negotiation reached a breaking point, EJGH issued the following statement: "We wouldn't even need to ask for an increase if Blue Cross had paid East Jefferson fairly all these years."  Both FMOL and EJGH eventually quickly re-joined the BCBS-LA's network.

**Michigan**

450.    However the geographic market is defined, BCBS-MI has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Michigan.

451.    BCBS-MI does business throughout the state of Michigan, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Michigan, and has agreed with the other member plans of BCBSA that only BCBS-MI will do business in Michigan under the Blue brand.  Therefore, the state of Michigan can be analyzed as a relevant geographic market within which to assess the effects of BCBS-MI's anticompetitive conduct.  As of 2010, BCBS-MI held at least a 69 percent share of the full-service commercial health insurance product market in Michigan, at least a 59 percent market share of the relevant individual product market in Michigan and at least a 63 percent market share of the relevant small group product market.

452.     The U.S. Office of Management and Budget divides the 83 counties of Michigan into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."  Therefore, each of Michigan's 15 Metropolitan Statistical Areas,[21] 18 Micropolitan Statistical Areas,[22] and 34 counties[23] that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBS-MI's anticompetitive conduct.  As of 2010, BCBS-MI held at least the following market shares of the relevant product market in the following Michigan Metropolitan Statistical Areas: Ann Arbor (at least 73 percent); Battle Creek (at least 78 percent); Bay City (at least 77 percent); Detroit-

---

[21]  The Ann Arbor Metropolitan Statistical Area, the Battle Creek Metropolitan Statistical Area, the Bay City Metropolitan Statistical Area, the Detroit-Livonia-Dearborn Metropolitan Statistical Area, the Flint Metropolitan Statistical Area, the Grand Rapids-Wyoming Metropolitan Statistical Area, the Holland-Grand Haven Metropolitan Statistical Area, the Jackson Metropolitan Statistical Area, the Kalamazoo-Portage Metropolitan Statistical Area, the Lansing-East Lansing Metropolitan Statistical Area, the Monroe Metropolitan Statistical Area, the Muskegon-Norton Shores Metropolitan Statistical Area, the Niles-Benton Harbor Metropolitan Statistical Area, the Saginaw-Saginaw Township North Metropolitan Statistical Area, and the Warren-Farmington Hills-Troy Metropolitan Statistical Area.

[22]  The Houghton Micropolitan Statistical Area, the Marquette Micropolitan Statistical Area, the Sault Ste. Marie Micropolitan Statistical Area, the Iron Mountain Micropolitan Statistical Area, the Escanaba Micropolitan Statistical Area, the Marinette Micropolitan Statistical Area, the Traverse City Micropolitan Statistical Area, the Alpena Micropolitan Statistical Area, the Cadillac Micropolitan Statistical Area, the Big Rapids Micropolitan Statistical Area, the Mount Pleasant Micropolitan Statistical Area, the Midland Micropolitan Statistical Area, the Alma Micropolitan Statistical Area, the Owosso Micropolitan Statistical Area, the Allegan Micropolitan Statistical Area, the Sturgis Micropolitan Statistical Area, the Coldwater Micropolitan Statistical Area, and the Adrian Micropolitan Statistical Area.

[23]  Ontonagon, Baraga, Gogebic, Iron, Alger, Schoolcraft, Luce, Mackinac, Emmet, Cheboygan, Presque Isle, Charlevoix, Antrim, Otsego, Montmorency, Crawford, Oscoda, Alcona, Manistee, Roscommon, Ogemaw, Iosco, Mason, Lake, Osceola, Clare, Gladwin, Arenac, Oceana, Montcalm, Huron, Tuscola, Sanilac, and Hillsdale Counties.

Livonia-Dearborn (at least 56 percent); Flint (at least 71 percent); Grand Rapids-Wyoming (at least 44 percent); Holland-Grand Haven (at least 36 percent); Jackson (at least 72 percent); Kalamazoo-Portage (at least 68 percent); Lansing-East Lansing (at least 63 percent); Monroe (at least 69 percent); Muskegon-Norton Shores (at least 58 percent); Niles-Benton Harbor (at least 81 percent); Saginaw-Saginaw Township North (at least 75 percent); and Warren-Farmington Hills-Troy (at least 71 percent).

453.     BCBS-MI's powerful market share is far from the only evidence of its market power.  As alleged below, BCBS-MI's market power has significantly raised costs, resulting in higher premiums for BCBS-MI enrollees.

*Supra-Competitive Premiums Charged By BCBS-MI*

454.     From October 1, 2008 to the present, BCBS-MI's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Michigan, leading to inflated and/or supra-competitive premiums for individuals and small groups purchasing BCBS-MI's full-service commercial health insurance in the relevant geographic markets.  BCBS-MI's market power and its use of anticompetitive practices (including MFNs) in Michigan have reduced the amount of competition in the market and ensured that BCBS-MI's few competitors face higher costs than BCBS-MI does.  Without competition, and with the ability to increase premiums without losing customers, BCBS-MI faces little pressure to keep prices low.

455.     Over the past decade, BCBS-MI generally raised individual and small group premiums by amounts greater than the national average.  In 2009, for example, BCBS-MI raised individual premiums 22 percent in some instances.

456.     These rising premiums have enabled BCBS-MI to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization.   BCBS-MI's reserve amounts to approximately $3 billion and BCBS-MI pays its CEO $3.8 million annually.   From 2011-2012, BCBS-MI's political action committee spent $1.2 million in campaign contributions.

**Mississippi**

457.     However the geographic market is defined, BCBS-MS has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Mississippi.

458.     BCBS-MS does business throughout the state of Mississippi, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Mississippi, and has agreed with the other member plans of BCBSA that only BCBS-MS will do business in Mississippi under the Blue brand.   Therefore, the state of Mississippi can be analyzed as a relevant geographic market within which to assess the effects of BCBS-MS's anticompetitive conduct.   As of 2011, BCBS-MS held at least a 57 percent share of the relevant individual product market and at least a 73 percent share of the relevant small group product market in Mississippi.

459.     The U.S. Office of Management and Budget divides the 82 counties of Mississippi into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.   It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."   Therefore, each of Mississippi's 4 Metropolitan Statistical

Areas,[24] 18 Micropolitan Statistical Areas,[25] and 39 counties[26] that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBS-MS's anticompetitive conduct.  As of 2010, BCBS-MS held at least the following market shares of the relevant product market in the following Mississippi Metropolitan Statistical Areas: the Gulfport-Biloxi-Pascagoula (at least 50 percent); Hattiesburg (at least 44 percent); and Jackson (at least 49 percent).

460.    BCBS-MS's powerful market share is far from the only evidence of its market power.  As alleged below, BCBS-MS's market power has significantly raised costs, resulting in higher premiums for BCBS-MS enrollees.

*Supra-Competitive Premiums Charged By BCBS-MS*

461.    From October 1, 2008 to the present, BCBS-MS's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Mississippi, leading to inflated and/or supra-

---

[24]  The Gulfport-Biloxi-Pascagoula Metropolitan Statistical Area, the Hattiesburg Metropolitan Statistical Area, the Jackson Metropolitan Statistical Area, and the Mississippi portion of the Memphis TN-MS-AR Metropolitan Statistical Area.

[25]  The Brookhaven Micropolitan Statistical Area, the Clarksdale Micropolitan Statistical Area, the Cleveland Micropolitan Statistical Area, the Columbus Micropolitan Statistical Area, the Corinth Micropolitan Statistical Area, the Greenville Micropolitan Statistical Area, the Greenwood Micropolitan Statistical Area, the Grenada Micropolitan Statistical Area, the Indianola Micropolitan Statistical Area, the Laurel Micropolitan Statistical Area, the McComb Micropolitan Statistical Area, the Meridian Micropolitan Statistical Area, the Mississippi portion of the Natchez MS-LA Micropolitan Statistical Area, the Oxford Micropolitan Statistical Area, the Picayune Micropolitan Statistical Area, the Starkville Micropolitan Statistical Area, the Tupelo Micropolitan Statistical Area, and the Vicksburg Micropolitan Statistical Area.

[26]  Attala, Calhoun, Chickasaw, Choctaw, Clay, Covington, Franklin, George, Greene, Holmes, Humphreys, Issaquena, Jefferson, Jefferson Davis, Lawrence, Leake, Marion, Monroe, Montgomery, Neshoba, Newton, Noxubee, Panola, Prentiss, Quitman, Scott, Sharkey, Smith, Stone, Tallahatchie, Tippah, Tishomingo, Union, Walthall, Wayne, Webster, Wilkinson, Winston, and Yalobusha Counties.

competitive premiums for individuals and small groups purchasing BCBS-MS's full-service commercial health insurance in the relevant geographic markets. BCBS-MS's market power and its use of anticompetitive practices in Mississippi have reduced the amount of competition in the market and ensured that BCBS-MS's few competitors face higher costs than BCBS-MS does. Without competition, and with the ability to increase premiums without losing customers, BCBS-MS faces little pressure to keep prices low.

462.    Over the past decade, BCBS-MS generally raised individual and small group premiums by amounts greater than the national average. These rising premiums have enabled BCBS-MS to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization.

**Missouri**

463.    However the geographic market is defined, BCBS-MO and BCBS-KC have dominant market positions, and exercise market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets in each of their service areas in the state of Missouri.

464.    BCBS-MO does business throughout the state of Missouri, with the exception of the 32 counties of greater Kansas City and Northwest Missouri; is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout that Missouri service area; and has agreed with the other member plans of BCBSA that only BCBS-MO will do business that Missouri service area under the Blue brand. Therefore, BCBS-MO's Missouri service area can be analyzed as a relevant geographic market within which to assess the effects of BCBS-MO's anticompetitive conduct. As of 2011, BCBS-MO held at least a 32 percent share of individual

products and at least a 48 percent share of small group products in the entire state, making it likely that BCBS-MO's market share in its Missouri service area is even higher.

465.    BCBS-KS does business in the 32 counties of greater Kansas City and Northwest Missouri (in addition to 2 counties in Kansas), is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout that Missouri service area; and has agreed with the other member plans of BCBSA that only BCBS-KC will do business that Missouri service area under the Blue brand.  Therefore, BCBS-KC's Missouri service area can be analyzed as a relevant geographic market within which to assess the effects of BCBS-KC's anticompetitive conduct. As of 2010, BCBS-KC held between a 32 and 62 percent share of the relevant product market in regions in its service area of Missouri.

466.    The U.S. Office of Management and Budget divides the 114 counties of Missouri into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."  Therefore, each of Missouri's 9 Metropolitan Statistical Areas,[27] 19 Micropolitan Statistical Areas,[28] and 58 counties[29] that are not part of Statistical

---

[27]  The Missouri portion of the Cape Girardeau MO-IL Metropolitan Statistical Area, the Columbia Metropolitan Statistical Area, the Missouri portion of the Fayetteville-Springdale-Rogers AR-MO Metropolitan Statistical Area, the Jefferson City Metropolitan Statistical Area, the Joplin Metropolitan Statistical Area, the Missouri portion of the Kansas City MS-KS Metropolitan Statistical Area, the Missouri portion of the St. Joseph MO-KA Metropolitan Statistical Area, the Missouri portion of the St. Louis MO-IL Metropolitan Statistical Area, and the Springfield Metropolitan Statistical Area.

[28]  The Branson Micropolitan Statistical Area, the Farmington Micropolitan Statistical Area, the Fort Leonard Wood Micropolitan Statistical Area, the Missouri portion of the Fort Madison-Keokuk IA-IL-MO Micropolitan Statistical Area, the Hannibal Micropolitan Statistical Area, the Kennett Micropolitan Statistical Area, the Kirksville Micropolitan Statistical Area, the Lebanon Micropolitan Statistical Area,

Areas is a relevant geographic market within which to assess the effects of BCBS-MO's and BCBS-KC's anticompetitive conduct.   BCBS-MO holds at least the following shares of the relevant product market in each of the following Metropolitan Statistical Areas:  Jefferson City (at least 35 percent), Joplin (at least 32 percent), St. Joseph (at least 14 percent), St. Louis (at least 29 percent).   BCBS-KC holds at least the following shares of the relevant product market in each of the following Metropolitan Statistical Areas: Kansas City (32 percent), St. Joseph (62 percent).

467.   BCBS-MO's and BCBS-KC's powerful market shares are far from the only evidence of their market power.  As alleged below, BCBS-MO's and BCBS-KC's market power has significantly raised costs, resulting in higher premiums for BCBS-MO and BCBS-KC enrollees.

*Supra-Competitive Premiums Charged By BCBS-MO and BCBS-KC*

468.   From October 1, 2008 to the present, BCBS-MO's and BCBS-KC's illegal anticompetitive conduct, including their territorial market division agreements with the thirty-six other members of BCBSA, have increased health care costs in Missouri, leading to inflated and/or supra-competitive premiums for individuals and small groups purchasing BCBS-MO's and BCBS-KC's full-service commercial health insurance in the relevant geographic markets.

the Marshall Micropolitan Statistical Area, the Maryville Micropolitan Statistical Area, the Mexico Micropolitan Statistical Area, the Moberly Micropolitan Statistical Area, the Poplar Bluff Micropolitan Statistical Area, the Missouri portion of the Quincy IL-MO Micropolitan Statistical Area, the Rolla Micropolitan Statistical Area, the Sedalia Micropolitan Statistical Area, the Sikeston Micropolitan Statistical Area, the Warrensburg Micropolitan Statistical Area, and the West Plains Micropolitan Statistical Area.

[29]  Atchison, Barry, Barton, Benton, Camden, Carroll, Carter, Cedar, Chariton, Cooper, Dade, Daviess, Dent, Douglas, Gasconade, Gentry, Grundy, Harrison, Henry, Hickory, Holt, Howard, Iron, Knox, Lawrence, Linn, Livingston, Macon, Madison, Maries, Mercer, Miller, Mississippi, Monroe, Montgomery, Morgan, New Madrid, Oregon, Ozark, Pemiscot, Perry, Pike, Putnam, Reynolds, Ripley, St. Clair, St. Genevieve, Scotland, Shannon, Shelby, Stoddard, Sullivan, Texas, Vernon, Washington, Wayne, Worth, and Wright counties.

BCBS-MO's and BCBS-KC's market power and their use of anticompetitive practices in Missouri have reduced the amount of competition in the market and ensured that BCBS-MO and BCBS-KC's few competitors face higher costs than BCBS-MO and BCBS-KC do. Without competition, and with the ability to increase premiums without losing customers, BCBS-MO and BCBS-KC face little pressure to keep prices low.

469.    Over the past decade, BCBS-MO and BCBS-KC generally raised individual and small group premiums by amounts greater than the national average.

470.    These rising premiums have enabled BCBS-MO and BCBS-KC to lavishly compensate their executives and grow their surpluses in excessive amounts.

**New Hampshire**

471.    However the geographic market is defined, BCBS-NH has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of New Hampshire.

472.    BCBS-NH does business throughout the state of New Hampshire, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of New Hampshire, and has agreed with the other member plans of BCBSA that only BCBS-NH will do business in New Hampshire under the Blue brand. Therefore, the state of New Hampshire can be analyzed as a relevant geographic market within which to assess the effects of BCBS-NH's anticompetitive conduct. As of 2010, BCBS New Hampshire held at least a 51 percent share of the relevant product market, including (as of 2011), a 76 percent share of the relevant individual product market and a 67 percent share of the relevant small group market.

473.    The U.S. Office of Management and Budget divides the 10 counties of New Hampshire into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."   Therefore, each of New Hampshire's 2 Metropolitan Statistical Areas,[30] 5 Micropolitan Statistical Areas,[31] and 1 county[32] that is not part of a Statistical Area is a relevant geographic market within which to assess the effects of BCBS-NH's anticompetitive conduct.  BCBS-NH has the following shares of the relevant product market in the following Metropolitan Statistical Areas: Manchester (at least 45 percent); Nashua NH-MA (at least 42 percent); Portsmouth NH-ME (at least 51 percent); Rochester-Dover (at least 57 percent).

474.    BCBS-NH's powerful market share is far from the only evidence of its market power.  As alleged below, BCBS-NH's market power has significantly raised costs, resulting in higher premiums for BCBS-NH enrollees.

*Supra-Competitive Premiums Charged By BCBS-NH*

475.    From October 1, 2008 to the present, BCBS-NH's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in New Hampshire, leading to inflated and/or supra-

---

[30]  The New Hampshire portion of the Boston-Cambridge-Newton MA-NH Metropolitan Statistical Area and the Manchester-Nashua Metropolitan Statistical Area.

[31]  The New Hampshire portion of the Berlin NH-VT Micropolitan Statistical Area, the New Hampshire portion of the Claremont-Lebanon NH-VT Micropolitan Statistical Area, the Concord Micropolitan Statistical Area, the Keene Micropolitan Statistical Area, and the Laconia Micropolitan Statistical Area.

[32] Carroll County.

competitive premiums for individuals and small groups purchasing BCBS-NH's full-service commercial health insurance in the relevant geographic markets.  BCBS-NH's market power and its use of anticompetitive practices in New Hampshire have reduced the amount of competition in the market and ensured that BCBS-NH's few competitors face higher costs than BCBS-NH does.  Without competition, and with the ability to increase premiums without losing customers, BCBS-NH faces little pressure to keep prices low.

476.     Over the past decade, BCBS-NH generally raised individual and small group premiums by amounts greater than the national average.  For example, from 2009 to 2010 the cost of insurance coverage for small groups and individuals rose 15% and 39%, respectively.

477.     These rising premiums have enabled BCBS-NH to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization.  Between 2006 and 2011, BCBS-NH reported annual income between $26 million and $112 million and a cumulative profit of approximately $360 million.

**North Carolina**

478.     However the geographic market is defined, BCBS-NC has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of North Carolina.

479.     There are a number of different ways to analyze the geographic markets for the sale of full-service commercial health insurance to individual and small group consumers in North Carolina.  The potentially relevant geographic markets could be defined alternatively as (a) the entire state of North Carolina; (b) the six regions, known as "Offices," into which BCBS-NC divides North Carolina; and (c) the seventy regions, known as "Metropolitan Statistical

Areas," "Micropolitan Statistical Areas," and counties, into which the U.S. Office of Management and Budget divides North Carolina.  However the geographic market is defined, the result is the same:  BCBS-NC has the dominant market position, and exercises market power.

480.    BCBS-NC does business throughout the state of North Carolina, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of North Carolina, and has agreed with the other member plans of BCBSA that only BCBS-NC will do business in North Carolina under the Blue brand.  Therefore, the state of North Carolina can be analyzed as a relevant geographic market within which to assess the effects of BCBS-NC's anticompetitive conduct.  As of December 31, 2009, BCBS-NC had a 73.81 percent share of the relevant product market in North Carolina, including a stunning *95.9 percent* of the individual full-service commercial health insurance market as measured by premiums earned.

481.    In analyzing its own business, BCBS-NC divides the state of North Carolina into six Offices, which compose three Regions: the Western Region, containing the Hickory Office and the Charlotte Office; the Triad Region, containing the Greensboro Office; and the Eastern Region, containing the Raleigh Office, the Wilmington Office, and the Greenville Office. BCBS-NC explains that these "field offices are located across the state and are assigned territories; each . . . supports its provider community by specific geographic region."  Therefore, each BCBS-NC Office and Region can be analyzed as a relevant geographic market within which to assess the effects of BCBS-NC's anticompetitive conduct.  Based on data from the North Carolina Department of Insurance, as of December 31, 2009, BCBS-NC had 66.07 percent of the relevant product market in the Western Region: a 65.32 percent share in the Hickory Office area and a 66.55 percent share in the Charlotte Office area; 71.50 percent of the relevant product market in the Triad Region: a 71.50 percent share in the Greensboro Office area; and

80.48 percent of the relevant product market in the Eastern Region: an 80.33 percent share in the Raleigh Office area, an 80.73 percent share in the Wilmington Office area, and an 84.18 percent share in the Greenville Office area.

482.    The U.S. Office of Management and Budget divides the counties of the state of North Carolina into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."  Therefore, each of North Carolina's 15 Metropolitan Statistical Areas, 26 Micropolitan Statistical Areas, and 29 counties that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBS-NC's anticompetitive conduct.  As of December 31, 2009, BCBS-NC had:

    a.  81.03 percent of the relevant product market in the Asheville Metropolitan Statistical Area;

    b.  65.69 percent of the relevant product market in the Burlington Metropolitan Statistical Area;

    c.  65.47 percent of the relevant product market in the North Carolina portion of the Charlotte-Gastonia-Rock Hill Metropolitan Statistical Area;

    d.  81.32 percent of the relevant product market in the Durham-Chapel Hill Metropolitan Statistical Area;

    e.  57.39 percent of the relevant product market in the Fayetteville Metropolitan Statistical Area;

f.   87.57 percent of the relevant product market in the Goldsboro Metropolitan
Statistical Area;

g.   70.21 percent of the relevant product market in the Greensboro-High Point
Metropolitan Statistical Area;

h.   73.66 percent of the relevant product market in the Greenville Metropolitan
Statistical Area;

i.   76.61 percent of the relevant product market in the Hickory-Lenoir-
Morganton Metropolitan Statistical Area;

j.   86.83 percent of the relevant product market in the Jacksonville Metropolitan
Statistical Area;

k.   80.36 percent of the relevant product market in the Raleigh-Cary Metropolitan
Statistical Area;

l.   86.20 percent of the relevant product market in the Rocky Mount
Metropolitan Statistical Area;

m.  85.75 percent of the relevant product market in the North Carolina portion of
the Virginia Beach-Norfolk-Newport News Metropolitan Statistical Area;

n.   87.05 percent of the relevant product market in the Wilmington Metropolitan
Statistical Area;

o.   75.14 percent of the relevant product market in the Winston-Salem
Metropolitan Statistical Area;

p.   74.13 percent of the relevant product market in the Albemarle Micropolitan
Statistical Area;

q.  80.68 percent of the relevant product market in the Boone Micropolitan
Statistical Area;

r.  81.55 percent of the relevant product market in the Brevard Micropolitan
Statistical Area;

s.  77.70 percent of the relevant product market in the Dunn Micropolitan
Statistical Area;

t.  78.08 percent of the relevant product market in the Elizabeth City
Micropolitan Statistical Area;

u.  78.12 percent of the relevant product market in the Forest City Micropolitan
Statistical Area;

v.  66.26 percent of the relevant product market in the Henderson Micropolitan
Statistical Area;

w.  91.44 percent of the relevant product market in the Kill Devil Hills
Micropolitan Statistical Area;

x.  88.56 percent of the relevant product market in the Kinston Micropolitan
Statistical Area;

y.  42.62 percent of the relevant product market in the Laurinburg Micropolitan
Statistical Area;

z.  68.49 percent of the relevant product market in the Lincolnton Micropolitan
Statistical Area;

aa. 62.73 percent of the relevant product market in the Lumberton Micropolitan
Statistical Area;

bb. 93.63 percent of the relevant product market in the Moorehead City
    Micropolitan Statistical Area;

cc. 81.96 percent of the relevant product market in the Mount Airy Micropolitan
    Statistical Area;

dd. 88.85 percent of the relevant product market in the New Bern Micropolitan
    Statistical Area;

ee. 81.33 percent of the relevant product market in the North Wilkesboro
    Micropolitan Statistical Area;

ff.  82.72 percent of the relevant product market in the Roanoke Rapids
    Micropolitan Statistical Area;

gg. 56.31 percent of the relevant product market in the Rockingham Micropolitan
    Statistical Area;

hh. 72.63 percent of the relevant product market in the Salisbury Micropolitan
    Statistical Area;

ii.  81.06 percent of the relevant product market in the Sanford Micropolitan
    Statistical Area;

jj.  67.99 percent of the relevant product market in the Shelby Micropolitan
    Statistical Area;

kk. 63.19 percent of the relevant product market in the Southern Pines-Pinehurst
    Micropolitan Statistical Area;

ll.  73.71 percent of the relevant product market in the Statesville-Mooresville
    Micropolitan Statistical Area;

mm.    71.33 percent of the relevant product market in the Thomasville-Lexington Micropolitan Statistical Area;

nn. 88.13 percent of the relevant product market in the Washington Micropolitan Statistical Area;

oo. 85.33 percent of the relevant product market in the Wilson Micropolitan Statistical Area;

pp.  79.93 percent of the relevant product market in Alleghany County;

qq. 85.57 percent of the relevant product market in Ashe County;

rr.  86.34 percent of the relevant product market in Avery County;

ss. 75.56 percent of the relevant product market in Bertie County;

tt.  79.71 percent of the relevant product market in Bladen County;

uu. 69.59 percent of the relevant product market in Caswell County;

vv. 76.13 percent of the relevant product market in Cherokee County;

ww.    86.34 percent of the relevant product market in Chowan County;

xx. 83.86 percent of the relevant product market in Clay County;

yy. 82.97 percent of the relevant product market in Columbus County;

zz. 84.83 percent of the relevant product market in Duplin County;

aaa.    81.42 percent of the relevant product market in Gates County;

bbb.    58.67 percent of the relevant product market in Graham County;

ccc.    81.40 percent of the relevant product market in Granville County;

ddd.    71.11 percent of the relevant product market in Hertford County;

eee.    63.09 percent of the relevant product market in Hyde County;

fff. 67.81 percent of the relevant product market in Jackson County;

ggg.   89.40 percent of the relevant product market in Macon County;

hhh.   87.96 percent of the relevant product market in Martin County;

iii.  65.05 percent of the relevant product market in McDowell County;

jjj.  89.50 percent of the relevant product market in Mitchell County;

kkk.   74.72 percent of the relevant product market in Montgomery County;

lll.  75.73 percent of the relevant product market in Polk County;

mmm.  78.66 percent of the relevant product market in Sampson County;

nnn.  80.99 percent of the relevant product market in Swain County;

ooo.   68.53 percent of the relevant product market in Tyrrell County;

ppp.   82.80 percent of the relevant product market in Warren County;

qqq.   76.19 percent of the relevant product market in Washington County; and

rrr.  88.20 percent of the relevant product market in Yancey County.

483.   BCBS-NC's powerful market share is far from the only evidence of its market power.  As alleged below, BCBS-NC's market power has significantly raised costs, resulting in higher premiums for BCBS-NC enrollees.

484.   Moreover, BCBS-NC's statewide share of the relevant product market has increased each year despite its substantial premium increases.  BCBS-NC's share of the full-service commercial health insurance market in North Carolina rose 48.1 percent from December 31, 2000 to December 31, 2009, including growth of more than 5 percent during the Class Period.  BCBS-NC's ability to retain and increase enrollment while charging artificially inflated and/or supra-competitive prices is evidence of its market power.

*Supra-Competitive Premiums Charged By BCBS-NC*

485.    From February 2, 2008 to the present, BCBS-NC's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in North Carolina, leading to inflated and/or supra-competitive premiums for individuals and small groups purchasing BCBS-NC's full-service commercial health insurance in the relevant geographic markets.  BCBS-NC's market power and its use of MFNs and other anticompetitive practices in North Carolina have reduced the amount of competition in the market and ensured that BCBS-NC's few competitors face higher costs than BCBS-NC does.  Without competition, and with the ability to increase premiums without losing customers, BCBS-NC faces little pressure to keep prices low.  As BCBS-NC President and CEO Brad Wilson admitted, "[w]hile many insurers lost customers, Blue Cross and Blue Shield of North Carolina is holding its own."

486.    These rising premiums have enabled BCBS-NC to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization.  In 2010, at least three BCBS-NC executives took home $1 million or more in salary, bonuses, and other compensation—President and CEO Brad Wilson (approximately $1.9 million), Executive Vice President Maureen O'Connor (approximately $1.3 million), and Senior Vice President John Roos (approximately $1 million).  In 2009, six BCBS-NC executives received $1 million or more and BCBS-NC grew its surplus to $1.4 billion, while spending substantial funds on a widely criticized "robo-call" marketing campaign against federal health care reform that resulted in a $95,000 fine for violating North Carolina law.  From 2002 to 2004, salaries paid to BCBS-NC's top executives rose 70 percent.  During that period, former CEO Robert Greczyn's compensation increased from $1.12 million in 2002 to $2.15 million in 2004.

132

**Western Pennsylvania**

487.    However the geographic market is defined, Highmark BCBS has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout Western Pennsylvania.

488.    Highmark BCBS does business throughout Western Pennsylvania, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout Western Pennsylvania (and is licensed to use the Blue Shield trademark and trade name throughout the entire state of Pennsylvania), and has agreed with the other member plans of BCBSA that only Highmark BCBS will do business in Western Pennsylvania under the Blue brand.  Therefore, Western Pennsylvania can be analyzed as a relevant geographic market within which to assess the effects of Highmark BCBS's anticompetitive conduct.  During the period from 2005 to 2011, Highmark BCBS's share of the relevant product market in Western Pennsylvania increased from 60% to 65%.

489.    The U.S. Office of Management and Budget divides the 29 counties of Western Pennsylvania into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."  Therefore, each of Western Pennsylvania's 5 Metropolitan Statistical Areas,[33] 10 Micropolitan Statistical Areas,[34] and 8 counties[35] that are not part of

---

[33] The Altoona Metropolitan Statistical Area, the Erie Metropolitan Statistical Area, the Johnstown Metropolitan Statistical Area, the Pittsburgh Metropolitan Statistical Area, and a portion of the State College Metropolitan Statistical Area.

Statistical Areas is a relevant geographic market within which to assess the effects of Highmark BCBS's anticompetitive conduct.

490.    Highmark BCBS has also entered into illegal anticompetitive agreements with at least two other Individual Blue Plans operating in Pennsylvania, as described below.

*Highmark BCBS's Illegal Anticompetitive Agreement with BC-Northeastern PA*

491.    On April 29, 2005, Highmark BCBS and BC-Northeastern PA, the Blue Cross licensee for the thirteen counties of Northeastern Pennsylvania, entered into an agreement not to compete, pursuant to Highmark BCBS's acquisition of a 40 percent share in BC-Northeastern PA's subsidiaries First Priority Life Insurance Company and First Priority Health (d/b/a/ HMO of Northeastern Pennsylvania).  The agreement is set forth in two Shareholders Agreements dated April 29, 2005.  In the agreement, Highmark BCBS promises that as long as it is a shareholder of the relevant subsidiary, plus an additional two years, it will not "market, sell or service, . . . or have ownership interest in any Person, other than [First Priority Life Insurance Company] or First Priority Health, that directly or indirectly markets, sells or services, any Branded Health Insurance Products [full-service commercial health insurance products offered and/or sold using the Blue Cross and/or Blue Shield names and marks] in [Blue Cross of Northeastern Pennsylvania's thirteen county] Service Area."  While there are limited exceptions, they only apply "provided that . . . the Core Health Insurance Products [full-service commercial health insurance products] in question are not offered, sold or serviced in the Service Area as

---

[34] The Bradford Micropolitan Statistical Area, the DuBois Micropolitan Statistical Area, the Huntingdon Micropolitan Statistical Area, the Indiana Micropolitan Statistical Area, the Meadville Micropolitan Statistical Area, the New Castle Micropolitan Statistical Area, the Oil City Micropolitan Statistical Area, the St. Marys Micropolitan Statistical Area, the Somerset Micropolitan Statistical Area, and the Warren Micropolitan Statistical Area.

[35] Bedford, Cameron, Clarion, Forest, Green, Jefferson, Mercer, and Potter Counties.

Branded Health Insurance Products." In sum, Highmark BCBS has agreed to restrict its use of the Blue Shield name and mark, which it is licensed to use in the entire state of Pennsylvania, so as not to compete against BC-Northeastern PA. Highmark BCBS remains a shareholder of the subsidiaries. Therefore, the two competitors' agreement not to compete currently restricts competition throughout the state of Pennsylvania, including in the Western Pennsylvania market.

*Highmark BCBS's Illegal Anticompetitive Agreement with Independence BC*

492.     Highmark BCBS was formed from the 1996 merger of two Pennsylvania BCBSA member plans: Blue Cross of Western Pennsylvania, which held the Blue Cross license for the twenty-nine counties of Western Pennsylvania, and Pennsylvania Blue Shield, which held the Blue Shield license for the entire state of Pennsylvania.

493.     Prior to this merger, Pennsylvania Blue Shield and Independence BC, the Blue Cross licensee for the five counties of Southeastern Pennsylvania, had competed in Southeastern Pennsylvania through subsidiaries: Keystone Health Plan East, an HMO plan that Pennsylvania Blue Shield established in 1986 after Independence rejected its offer to form a joint venture HMO plan in Southeastern Pennsylvania; and Delaware Valley HMO and Vista Health Plan (also an HMO), which Independence BC acquired in response to Keystone Health Plan East's entry into the market. In 1991, Independence BC and Pennsylvania Blue Shield agreed to combine these HMOs into a single, jointly-owned venture under the Keystone Health Plan East name, and Pennsylvania Blue Shield acquired a 50 percent interest in an Independence PPO, Personal Choice. When Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to form Highmark BCBS, Pennsylvania Blue Shield sold its interests in Keystone Health Plan East and Personal Choice to Independence BC. As part of the purchase agreement, Pennsylvania Blue Shield (now Highmark BCBS) and Independence BC entered into a decade-long agreement

not to compete.  Specifically, Pennsylvania Blue Shield agreed not to enter Southeastern

Pennsylvania, despite being licensed to compete under the Blue Shield name and mark

throughout Pennsylvania.

494.    On information and belief, this agreement remains in place, though it putatively

expired in 2007.  Instead of entering the Southeastern Pennsylvania market at that time,

Highmark BCBS announced that it and Independence BC intended to merge.  After an

exhaustive review by the Pennsylvania Insurance Department ("PID"), Highmark BCBS and

Independence BC withdrew their merger application.  In commenting on this withdrawal, then-

Pennsylvania Insurance Commissioner Joel Ario stated that he was "prepared to disapprove this

transaction because it would have lessened competition . . . to the detriment of the insurance

buying public."  Currently, despite its past history of successful competition in Southeastern

Pennsylvania, despite holding the Blue Shield license for the entire state of Pennsylvania, despite

entering Central Pennsylvania and the Lehigh Valley as Highmark Blue Shield and thriving,

despite entering West Virginia through an affiliation with Mountain State Blue Cross Blue

Shield (now Highmark Blue Cross Blue Shield of West Virginia), despite entering Delaware

through an affiliation with Blue Cross and Blue Shield of Delaware (now Highmark Blue Cross

Blue Shield of Delaware), and despite the supposed "expiration" of the non-compete agreement

with Independence BC, Highmark BCBS has still not attempted to enter Southeastern

Pennsylvania.  This illegal, anticompetitive agreement not to compete has reduced competition

throughout the state of Pennsylvania, including in the Western Pennsylvania market.

495.    Highmark BCBS's powerful market share and illegal anticompetitive agreements

are far from the only evidence of its market power.  As alleged below, Highmark BCBS's market

power has significantly raised costs, resulting in higher premiums for Highmark BCBS enrollees.

*Supra-Competitive Premiums Charged By Highmark BCBS*

496.    From October 1, 2008 to the present, Highmark BCBS's illegal anticompetitive conduct, including its territorial market division agreements with the 37 other members of BCBSA, has increased health care costs in Western Pennsylvania, leading to inflated and/or supra-competitive premiums for individuals and small groups purchasing Highmark BCBS's full-service commercial health insurance in the relevant geographic markets.  Highmark BCBS's market power and its use of MFNs and other anticompetitive practices in Western Pennsylvania have reduced the amount of competition in the market and ensured that Highmark BCBS's few competitors face higher costs than Highmark BCBS does.  Without competition, and with the ability to increase premiums without losing customers, Highmark BCBS faces little pressure to keep prices low.

497.    Over the past decade, Highmark BCBS generally raised individual and small group premiums by amounts greater than the national average. From 2000 to 2009 in Western Pennsylvania, the average annual employer-based health insurance premium in Pennsylvania rose 95.2 percent for families and 93.9 percent for individuals, while median earnings increased only 17.5 percent.  From 2002-2006, health insurance premiums for single individuals in the Pittsburgh area rose approximately 55% and health insurance premiums for Pittsburgh families rose approximately 51%.   In 2008, Highmark BCBS raised its rates for its CompleteCare program by 15%.  In 2010, Pennsylvania Insurance Commissioner Joe Ario testified that Highmark shifted all of its small group customers from its wholly-owned non-profit Blue-brand subsidiaries, the premiums of which the PID regulates, to its wholly-owned *for profit* subsidiary, Highmark Health Insurance Company (also a BCBSA licensee), the premiums of which PID has no power to regulate, and then raised small group premiums up to 79 percent, triggering what

Ario said was the largest number of complaints ever received by PID against a carrier involving renewal quotes.  In 2012, Highmark BCBS filed for premium rate increases of 9.8% for its "small-group" accounts.

498.    These rising premiums have enabled Highmark BCBS to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization. Highmark BCBS's reserves swelled to $4.7 billion on profits of nearly half a billion   in 2011.  In 2012, Highmark BCBS paid its CEOs more than $6 million and paid its Board of Directors $1.9 million.

**Rhode Island**

499.    However the geographic market is defined, BCBS-RI has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Rhode Island.

500.    BCBS-RI does business throughout the state of Rhode Island, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Rhode Island, and has agreed with the other member plans of BCBSA that only BCBS-RI will do business in Rhode Island under the Blue brand.  Therefore, the state of Rhode Island can be analyzed as a relevant geographic market within which to assess the effects of BCBS-RI's anticompetitive conduct.  As of 2010, BCBS-RI held at least a 63 percent share of the relevant product market in Rhode Island, including at least 95 percent of the individual market and at least 74 percent in the small group market.

501.    The U.S. Office of Management and Budget divides the 5 counties of Rhode Island into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to

published standards applied to U.S. Census Bureau data. It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core." Therefore, Rhode Island's 1 Metropolitan Statistical Area,[36] 0 Micropolitan Statistical Areas, and 4 counties[37] that are not part of Statistical Areas are a relevant geographic market within which to assess the effects of BCBS-RI's anticompetitive conduct.

502. BCBS-RI's powerful market share is far from the only evidence of its market power. As alleged below, BCBS-RI's market power has significantly raised costs, resulting in higher premiums for BCBS-RI enrollees.

*Supra-Competitive Premiums Charged By BCBS-RI*

503. From October 1, 2008 to the present, BCBS-RI's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Rhode Island, leading to inflated and/or supra-competitive premiums for individuals and small groups purchasing BCBS-RI's full-service commercial health insurance in the relevant geographic markets. BCBS-RI's market power and its use of anticompetitive practices in Rhode Island have reduced the amount of competition in the market and ensured that BCBS-RI's few competitors face higher costs than BCBS-RI does. Without competition, and with the ability to increase premiums without losing customers, BCBS-RI faces little pressure to keep prices low.

504. Over the past decade, BCBS-RI generally raised individual and small group premiums by amounts greater than the national average. For example, in 2011, BCBS-RI

---

[36] The Rhode Island portion of the Providence-Warwick RI-MA Metropolitan Statistical Area.

[37] Bristol, Kent, Newport, and Washington Counties.

increased premiums by approximately 10% and, just recently, announced its intention to increase premiums by 15% for small groups and 18% for individual insurance purchasers.

505.    These rising premiums have enabled BCBS-RI to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization.  As a result of these and other inflated premiums, by 2011, BCBS-RI had amassed an approximately $320 million surplus.

**South Carolina**

506.    However the geographic market is defined, BCBS-SC has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of South Carolina.

507.    BCBS-SC does business throughout the state of South Carolina, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of South Carolina, and has agreed with the other member plans of BCBSA that only BCBS-SC will do business in South Carolina under the Blue brand.  Therefore, the state of South Carolina can be analyzed as a relevant geographic market within which to assess the effects of BCBS-SC's anticompetitive conduct.  As of 2010, BCBS-SC held at least a 60 percent share of the relevant product market in South Carolina, including a 55 percent share in the individual market and a 70 percent in the small group market.

508.    The U.S. Office of Management and Budget divides the 46 counties of South Carolina into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial

population nucleus, together with adjacent communities having a high degree of economic and social integration with that core." Therefore, each of South Carolina's 10 Metropolitan Statistical Areas,[38] 7 Micropolitan Statistical Areas,[39] and 14 counties[40] that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBS-SC's anticompetitive conduct. BCBS-SC has the following shares of the relevant product market in the following Metropolitan Statistical Areas: Anderson (at least 61 percent); Charleston-North Charleston (at least 62 percent); Columbia (at least 61 percent), Florence (at least 63 percent), and Greenville (at least 53 percent).

509. BCBS-SC's powerful market share is far from the only evidence of its market power. As alleged below, BCBS-SC's market power has significantly raised costs, resulting in higher premiums for BCBS-SC enrollees.

*Supra-Competitive Premiums Charged By BCBS-SC*

510. From October 1, 2008 to the present, BCBS-SC's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in South Carolina, leading to inflated and/or supra-

---

[38] The South Carolina portion of the August-Richmond County GA-SC Metropolitan Statistical Area, the Charleston-North Charleston Metropolitan Statistical Area, the Charlotte-Concord-Gastonia Metropolitan Statistical Area, the Columbia Metropolitan Statistical Area, the Florence Metropolitan Statistical Area, the Greenville-Anderson-Mauldin Metropolitan Statistical Area, the Hilton Head Island-Bluffton-Beaufort Metropolitan Statistical Area, the South Carolina portion of the Myrtle Beach-Conway-North Myrtle Beach Metropolitan Statistical Area, the Spartanburg Metropolitan Statistical Area, and the Sumter Metropolitan Statistical Area.

[39] The Bennettsville Micropolitan Statistical Area, the Gaffney Micropolitan Statistical Area, the Georgetown Micropolitan Statistical Area, the Greenwood Micropolitan Statistical Area, the Newberry Micropolitan Statistical Area, the Orangeburg Micropolitan Statistical Area, the Seneca Micropolitan Statistical Area.

[40] Allendale, Bamberg, Barnwell, Chester, Chesterfield, Clarendon, Colleton, Dillon, Hampton, Lee, McCormick, Marion, Richland, and Williamsburg, counties.

competitive premiums for individuals and small groups purchasing BCBS-SC's full-service commercial health insurance in the relevant geographic markets. BCBS-SC's market power and its use of anticompetitive practices (including MFNs) in South Carolina have reduced the amount of competition in the market and ensured that BCBS-SC's few competitors face higher costs than BCBS-SC does. Without competition, and with the ability to increase premiums without losing customers, BCBS-SC faces little pressure to keep prices low.

511.    Over the past decade, BCBS-SC generally raised individual and small group premiums by amounts greater than the national average.

512.    These rising premiums have enabled BCBS-SC to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization. In 2010, at least three BCBS-SC executives took home $1 million or more in salary, bonuses, and other compensation—then President and CEO M. Edward Sellers (approximately $2.26 million), Senior Vice President Stephen Wiggins (approximately $1.0 million), and Chief Financial Officer Robert Leichtle (approximately $1.3 million). Furthermore, each of the nine members of the BCBS-SC board of directors doubled their reported pay since 2009, according to compensation reports filed with the SCDOI. Some members increased their pay by as much as 163 percent in one year. All of the members of the board earned between $100,000 and $160,000 in 2010 for their limited board duties.

**Tennessee**

513.    However the geographic market is defined, BCBS-TN has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Tennessee.

514.     BCBS-TN does business throughout the state of Tennessee, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Tennessee, and has agreed with the other member plans of BCBSA that only BCBS-TN will do business in Tennessee under the Blue brand.  Therefore, the state of Tennessee can be analyzed as a relevant geographic market within which to assess the effects of BCBS-TN's anticompetitive conduct. As of 2010, BCBS-TN held at least a 46 percent share of the relevant product market in Tennessee, including (by 2011), including at least 70 percent of the small group market.  The next largest insurer, Cigna, held only a 23 percent share of the relevant product market in Tennessee.

515.     In analyzing its own business, BCBS-TN divides the state of Tennessee into three Offices, which compose three Regions: the West Tennessee Regional Office, containing counties in Western Tennessee; the Central Tennessee Regional Office, containing counties in central Tennessee, and the East Tennessee Regional Office, containing counties in Eastern Tennessee. Therefore, each BCBS-TN Regional Office region can be analyzed as a relevant geographic market within which to assess the effects of BCBS-TN's anticompetitive conduct.

516.     The U.S. Office of Management and Budget divides the 95 counties of Tennessee into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."  Therefore, each of Tennessee's 10 Metropolitan Statistical Areas,[41] 15 Micropolitan Statistical Areas,[42] and 34 counties[43] that are not part of Statistical

---

[41]  The Tennessee portion of the Chattanooga TN-GA Metropolitan Statistical Area, the Tennessee portion of the Clarksville TN-KY Metropolitan Statistical Area, the Cleveland Metropolitan Statistical

Areas is a relevant geographic market within which to assess the effects of BCBS-TN's anticompetitive conduct.  BCBS-TN has the following shares of the relevant product market in the following Metropolitan Statistical Areas: Chattanooga TN-GA (at least 46 percent), Clarksville TN-KY (at least 31 percent), Cleveland (at least 50 percent), Jackson (at least 53 percent), Johnson City (at least 41 percent), Kingsport-Bristol-Bristol TN-VA (at least 27 percent), Knoxville (at least 39 percent), Memphis TN-MS-AR (at least 21 percent), Morristown (at least 50 percent), and Nashville-Davidson-Murfreesboro-Franklin (at least 51 percent).

517.    BCBS-TN's powerful market share is far from the only evidence of its market power.  As alleged below, BCBS-TN's market power has significantly raised costs, resulting in higher premiums for BCBS-TN enrollees.

*Supra-Competitive Premiums Charged By BCBS-TN*

518.    From October 1, 2008 to the present, BCBS-TN's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Tennessee, leading to inflated and/or supra-

---

Area, the Jackson Metropolitan Statistical Area, the Johnson City Metropolitan Statistical Area, the Tennessee portion of the Kingsport-Bristol-Bristol TN-VA Metropolitan Statistical Area, the Knoxville Metropolitan Statistical Area, the Tennessee portion of the Memphis TN-MS-AR Metropolitan Statistical Area, the Morristown Metropolitan Statistical Area, and the Nashville-Davidson-Murfreesboro-Franklin Metropolitan Statistical Area.

[42]  The Athens Micropolitan Statistical Area, the Cookeville Micropolitan Statistical Area, the Crossville Micropolitan Statistical Area, the Dayton Micropolitan Statistical Area, the Dyersburg Micropolitan Statistical Area, the Lawrenceburg Micropolitan Statistical Area, the Lewisburg Micropolitan Statistical Area, the Martin Micropolitan Statistical Area, McMinnville Micropolitan Statistical Area, the Newport Micropolitan Statistical Area, the Paris Micropolitan Statistical Area, the Sevierville Micropolitan Statistical Area, the Shelbyville Micropolitan Statistical Area, the Tullahoma-Manchester Micropolitan Statistical Area, and the Tennessee portion of the Union City TN-KY Micropolitan Statistical Area.

[43]  Benton, Bledsoe, Carroll, Claiborne, Clay, Decatur, DeKalb, Fentress, Gibson, Giles, Greene, Grundy, Hancock, Hardeman, Hardin, Haywood, Henderson, Houston, Humphreys, Johnson, Lake, Lauderdale, Lewis, Lincoln, McNairy, Meigs, Monroe, Perry, Pickett, Scott, Stewart, Van Buren, Wayne, and White Counties.

competitive premiums for individuals and small groups purchasing BCBS-TN's full-service commercial health insurance in the relevant geographic markets. BCBS-TN's market power and its use of anticompetitive practices in Tennessee have reduced the amount of competition in the market and ensured that BCBS-TN's few competitors face higher costs than BCBS-TN does. Without competition, and with the ability to increase premiums without losing customers, BCBS-TN faces little pressure to keep prices low.

519.    Over the past decade, BCBS-TN generally raised individual and small group premiums by amounts greater than the national average.

520.    These rising premiums have enabled BCBS-TN to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization. From 2006 to 2011, BCBS-TN doubled the salary its pays its directors and chief executive officer, raising part-time Chairman Lamar Partridge's salary to $100,000 and increasing CEO Vicky Gregg's compensation package to more than $4.4 million. Most BCBS-TN directors received from $75,000 to $90,000 each to attend quarterly board meetings and other committee and company sessions in 2010.

**Texas**

521.    However the geographic market is defined, BCBS-TX has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Texas.

522.    BCBS-TX does business throughout the state of Texas, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Texas, and has agreed with the other member plans of BCBSA that only BCBS-TX will do business in Texas under the Blue brand. Therefore, the state of Texas can be analyzed as a relevant geographic market

within which to assess the effects of BCBS-TX's anticompetitive conduct.  As of 2011, BCBS-TX held at least 57 percent of the relevant individual market and at least 46 percent of the relevant small group market in Texas.

523.    The U.S. Office of Management and Budget divides the 254 counties of Texas into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."  Therefore, each of Texas's 25 Metropolitan Statistical Areas,[44] 43 Micropolitan Statistical Areas,[45] and 126 counties[46] that are not part of Statistical Areas is a

---

[44]  The Abilene Metropolitan Statistical Area, the Amarillo Metropolitan Statistical Area, the Austin-Round Rock Metropolitan Statistical Area, the Beaumont-Port Arthur Metropolitan Statistical Area, the Brownsville-Harlington Metropolitan Statistical Area, the College Station-Bryan Metropolitan Statistical Area, the Corpus Christi Metropolitan Statistical Area, the Dallas-Fort Worth-Arlington Metropolitan Statistical Area, the El Paso Metropolitan Statistical Area, the Houston-The Woodslands-Sugar Land Metropolitan Statistical Area, the Killeen-Temple Metropolitan Statistical Area, the Laredo Metropolitan Statistical Area, the Longview Metropolitan Statistical Area, the Lubbock Metropolitan Statistical Area, the McAllen-Edinburg-Mission Metropolitan Statistical Area, the Midland Metropolitan Statistical Area, the Odessa Metropolitan Statistical Area, the San Angelo Metropolitan Statistical Area, the San Antonio-New Braunfels Metropolitan Statistical Area, the Sherman-Denison Metropolitan Statistical Area, the Texas portion of the Texarkana TX-AR Metropolitan Statistical Area, the Tyler Metropolitan Statistical Area, the Victoria Metropolitan Statistical Area, Waco Metropolitan Statistical Area, and the Wichita Falls Metropolitan Statistical Area.

[45]  The Alice Micropolitan Statistical Area, the Andrews Micropolitan Statistical Area, the Athens Micropolitan Statistical Area, the Bay City Micropolitan Statistical Area, the Beeville Micropolitan Statistical Area, the Big Spring Micropolitan Statistical Area, the Borger Micropolitan Statistical Area, the Brenham Micropolitan Statistical Area, the Brownwood Micropolitan Statistical Area, the Corsicana Micropolitan Statistical Area, the Del Rio Micropolitan Statistical Area, the Dumas Micropolitan Statistical Area, the Eagle Pass Micropolitan Statistical Area, the El Campo Micropolitan Statistical Area, the Fredericksburg Micropolitan Statistical Area, the Gainesville Micropolitan Statistical Area, the Hereford Micropolitan Statistical Area, the Huntsville Micropolitan Statistical Area, the Jacksonville Micropolitan Statistical Area, the Kerrville Micropolitan Statistical Area, the Kingsville Micropolitan Statistical Area, the Lamesa Micropolitan Statistical Area, the Levelland Micropolitan Statistical Area, the Lufkin Micropolitan Statistical Area, the Marshall Micropolitan Statistical Area, the Mineral Wells

relevant geographic market within which to assess the effects of BCBS-TX's anticompetitive conduct. BCBS-TX has the following shares of the relevant product market in the following Metropolitan Statistical Areas: Abilene (at least 54 percent), Amarillo (at least 32 percent), Austin-Round Rock (at least 42 percent), Beaumont-Port Arthur (at least 49 percent), Brownsville-Harlington (at least 53 percent), College Station-Bryan (at least 56 percent), Corpus Christi (at least 45 percent), Dallas-Fort Worth-Arlington (at least 29 percent), El Paso (at least 27 percent), Killeen-Temple (at least 25 percent), Laredo (at least 68 percent), Longview (at least 54 percent), Lubbock (at least 57 percent), McAllen-Edinburg-Mission (at least 57 percent), Midland (at least 60 percent), Odessa (at least 65 percent), San Angelo (at least 72 percent), San Antonio-New Braunfels (at least 33 percent), Sherman-Denison (at least 46 percent), Texarkana TX-AR (at least 43 percent), Tyler (at least 62 percent), Victoria (at least 53 percent), Waco (at least 40 percent), and Wichita Falls (at least 74 percent). BCBS-TX is able to provide the information needed to calculate the remaining geographical markets.

---

Micropolitan Statistical Area, the Mount Pleasant Micropolitan Statistical Area, the Nacogdoches Micropolitan Statistical Area, the Palestine Micropolitan Statistical Area, the Pampa Micropolitan Statistical Area, the Paris Micropolitan Statistical Area, the Pecos Micropolitan Statistical Area, the Plainview Micropolitan Statistical Area, the Port Lavaca Micropolitan Statistical Area, the Raymondville Micropolitan Statistical Area, the Rio Grande City Micropolitan Statistical Area, the Snyder Micropolitan Statistical Area, the Stephenville Micropolitan Statistical Area, the Sulpher Springs Micropolitan Statistical Area, the Sweetwater Micropolitan Statistical Area, the Uvalde Micropolitan Statistical Area, the Vernon Micropolitan Statistical Area, and the Zapata Micropolitan Statistical Area.

[46] Bailey, Baylor, Blanco, Borden, Bosque, Brewster, Briscoe, Brooks, Burnet, Camp, Cass, Castro, Childress, Cochran, Coke, Coleman, Collingsworth, Colorado, Comanche, Concho, Cottle, Crane, Crockett, Culberson, Dallam, Delta, DeWitt, Dickens, Dimmit, Donley, Duval, Eastland, Edwards, Fannin, Fayette, Fisher, Floyd, Foard, Franklin, Freestone, Frio, Gaines, Garza, Gonzales, Grimes, Hall, Hamilton, Hansford, Hardeman, Hartley, Haskell, Hemphill, Hill, Houston, Jack, Jackson, Jasper, Jeff Davis, Jim Hogg, Karnes, Kent, Kimble, King, Kinney, Knox, La Salle, Lamb, Lavaca, Lee, Leon, Limestone, Lipscomb, Live Oak, Llano, Loving, Madison, Marion, Mason, McCulloch, McMullen, Menard, Milam, Mills, Mitchell, Montague, Morris, Motley, Ochiltree, Panola, Parmer, Pecos, Polk, Presidio, Rains, Reagan, Real, Red River, Refugio, Roberts, Runnels, Sabine, San Augustine, San Jacinto, San Saba, Schleicher, Shackelford, Shelby, Sherman, Stephens, Sterling, Stonewall, Sutton, Swisher, Terrell, Terry, Throckmorton, Tyler, Upton, Van Zandt, Ward, Wheeler, Winkler, Wood, Yoakum, Young, and Zavala counties.

524.    BCBS-TX's powerful market share is far from the only evidence of its market power.  As alleged below, BCBS-TX's market power has significantly raised costs, resulting in higher premiums for BCBS-TX enrollees.

*Supra-Competitive Premiums Charged By BCBS-TX*

525.    From October 1, 2008 to the present, BCBS-TX's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Texas, leading to inflated and/or supra-competitive premiums for individuals and small groups purchasing BCBS-TX's full-service commercial health insurance in the relevant geographic markets.  BCBS-TX's market power and its use of anticompetitive practices in Texas have reduced the amount of competition in the market and ensured that BCBS-TX's few competitors face higher costs than BCBS-TX does.  Without competition, and with the ability to increase premiums without losing customers, BCBS-TX faces little pressure to keep prices low.

526.    Over the past decade, BCBS-TX generally raised individual and small group premiums by amounts greater than the national average, including by as much as 25 percent on some policyholders.

527.    These rising premiums have enabled BCBS-TX to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization.  As a result of these premiums, BCBS-TX's parent company, Health Care Service Corp., has a surplus of more than $620 million.

## State Insurance Laws Do Not Protect Subscribers from the Market Allocation Scheme

528.    At least some, and perhaps all, of the Defendant Individual Blue Plans charge their subscribers actual health insurance premiums rates that are not filed with or approved by state insurance authorities.

529.    At least some, and perhaps all, of the Defendant Individual Blue Plans charge their subscribers more than the health insurance premium rates that are filed with or approved by state insurance authorities, to the extent any are.

530.    The Individual Blue Plans that charge their subscribers actual health insurance premium rates that are never filed include, but are likely not limited to:

     a.    BCBS-AL: BCBS-AL's actual charged premium rates vary from the base rates it files with the state based on certain characteristics of the subscriber and other reasons.

     b.    BCBS-IL: BCBS-IL's actual charged premium rates vary from the base rates it files with the state based on certain characteristics of the subscriber and other reasons.

     c.    BCBS-LA: BCBS-LA does not file any actual premium rates it charges its subscribers, even sample or "base" premium rates.

     d.    BCBS-MI: BCBS-MI's actual charged premium rates vary from the base rates it files with the state, for certain policies.

     e.    BCBS-MO: BCBS-MO does not file any actual premium rates it charges its subscribers, even sample or "base" premium rates.

     f.    BCBS-NC: BCBS-NC's actual charged premium rates vary by as much as 25 percent from the base rates it files with the state.

g.  Highmark BCBS: Highmark BCBS does not file any actual premium rates it charges its subscribers, even sample or "base" premium rates, for certain policies, and for other policies, permits insurers to deviate from the rates they do file by as much as 10 percent annually, so long as the rates charged are not 15 percent higher than the "base rate."

h.  BCBS-RI: BCBS-RI's actual charged premium rates vary from the base rates it files with the state based on certain characteristics of the subscriber, for certain policies.

i.  BCBS-SC: BCBS-SC does not file any actual premium rates it charges its subscribers, even sample or "base" premium rates, for certain policies.

j.  BCBS-TN: BCBS-TN does not file any actual premium rates it charges its subscribers, even sample or "base" premium rates, for certain policies.

k.  BCBS-TX: BCBS-TX does not file any actual premium rates it charges its subscribers, even sample or "base" premium rates.

531.  Defendants that have conspired to allocate markets and thereby not enter a market of another Blue Plan do not file rates in the markets that they have not entered. Those Defendants are also not subject to state insurance regulatory authorities for the markets they have not entered.

532.  Further, BCBSA is not regulated by state insurance regulatory authorities.

533.  The state insurance authorities in any of the Defendant Individual Blue Plans' states do not regulate the division of markets and allocation of customers that is the subject of this Complaint.

534.     No state insurance authority in any of the Defendant Individual Blue Plans' states clearly articulates and affirmatively expresses as state policy the challenged restraints on trade that are the subject of this Complaint, *i.e.*, division of markets and allocation of customers.  Nor does any state insurance authority in any of the Individual Blue Plans' states actively supervise the challenged restraints on trade that are the subject of this Complaint.

535.     No Defendant Individual Blue Plan filed its insurance rate(s) with a federal regulatory agency.

536.     No Defendant Individual Blue Plan disclosed the challenged restraints on trade that are the subject of this Complaint to any insurance authority.

537.     The conspiracy alleged in this Complaint hindered the development of the health care markets defined herein, because the Defendant Individual Blue Plans acted to inhibit lower cost competitors from entering such markets.

538.     The Defendant Individual Blue Plans breached their duties of good faith and fair dealing with subscribers.

## VIOLATIONS ALLEGED

## NATIONWIDE CLASS

(All Plaintiffs and the Nationwide Class Against All Defendants)

### Count One
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

539.    The License Agreements, Membership Standards, and Guidelines agreed to by the Individual Blue Plans and BCBSA represent horizontal agreements entered into between the Individual Blue Plans, all of whom are competitors or potential competitors in the market for commercial health insurance.

540.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Individual Blue Plans represents a contract, combination and/or conspiracy within the meaning of Section 1 of the Sherman Act.

541.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and the Individual Blue Plans have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (the Individual Blue Plans) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

542.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Nationwide Class have suffered injury.

543.    Plaintiffs and the Nationwide Class seek an injunction prohibiting the Individual Blue Plans and BCBSA from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete.

**<u>Count Two</u>**
(Conspiracy to Monopolize in Violation of Sherman Act, Section 2)

544.    Each of the Service Areas in which the Individual Blue Plans compete constitutes a market or markets in which competition may be harmed.

545.    The License Agreements, Membership Standards, and Guidelines agreed to by the Individual Blue Plans and BCBSA represent horizontal agreements entered into between the Individual Blue Plans, all of whom are competitors or potential competitors in the market for commercial health insurance.

546.    Each of the Individual Blue Plans and BCBSA possessed the specific intent to monopolize when conceiving of and implementing the policies challenged in this Complaint.

547.    The License Agreements, Membership Standards, and Guidelines agreed to by each of the Individual Blue Plans and BCBSA, as well as meetings between the Individual Blue Plans and attempts by the Individual Blue Plans to enforce the policies challenged in this Complaint, represent overt acts in furtherance of the Individual Blue Plans' conspiracy to monopolize.

548.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Nationwide Class have suffered injury.

549.    Plaintiffs and the Nationwide Class seek money damages from BCBSA and the Individual Blue Plans for their violations of Section 2 of the Sherman Act.

## ALABAMA

(Plaintiffs American Electric Motor Services, Inc. and CB Roofing, LLC and the Alabama Class
Against Defendants BCBS-AL and BCBSA)

### Count Three
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

550.     Plaintiffs repeat and reallege the allegations in all Paragraphs above.

551.     The License Agreements, Membership Standards, and Guidelines agreed to by
BCBS-AL and BCBSA represent horizontal agreements entered into between BCBS-AL and the
37 other member plans of BCBSA, all of whom are competitors or potential competitors in the
market for commercial health insurance.

552.     Each of the License Agreements, Membership Standards, and Guidelines entered
into between BCBSA and BCBS-AL represents a contract, combination and/or conspiracy within
the meaning of Section 1 of the Sherman Act.

553.     Through the License Agreements, Membership Standards, and Guidelines,
BCBSA and BCBS-AL have agreed to divide and allocate the geographic markets for the sale of
commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA
members.  By so doing, the BCBSA members (including BCBS-AL) have conspired to restrain
trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per
se* illegal under Section 1 of the Sherman Act.

554.     The market allocation agreements entered into between BCBS-AL and the thirty-
seven other BCBSA member plans (executed through the BCBSA License Agreements and
related Membership Standards and Guidelines) are anticompetitive.

555.    BCBS-AL has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

556.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.    Reducing the number of health insurance companies competing with BCBS-AL throughout Alabama;

      b.    Unreasonably limiting the entry of competitor health insurance companies into Alabama;

      c.    Allowing BCBS-AL to maintain and enlarge its market power throughout Alabama;

      d.    Allowing BCBS-AL to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

      e.    Depriving consumers of health insurance of the benefits of free and open competition.

557.    The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

558.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

559.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other

members of the Alabama Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-AL than they would have paid with increased competition and but for the Sherman Act violations.

560.   Plaintiffs and the Alabama Class seek money damages from BCBS-AL and BCBSA for their violations of Section 1 of the Sherman Act.

**Count Four**
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Sherman Act, Section 2)

561.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

562.   BCBS-AL has monopoly power in the individual and small group full-service commercial health insurance market in Alabama. This monopoly power is evidenced by, among other things, BCBS-AL's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

563.   BCBS-AL has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

564.   BCBS-AL's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

565.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Alabama Class have suffered injury and damages in an amount to be proven at

trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-AL than they would have paid but for the Sherman Act violations.

566.    Plaintiffs and the Alabama Class seek money damages from BCBS-AL for its violations of Section 2 of the Sherman Act.

<b><u>Count Five</u></b><br>(Willful Attempted Monopolization in the Relevant Market<br>for Private Health Insurance in Violation of Sherman Act, Section 2)

567.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

568.    BCBS-AL has acted with the specific intent to monopolize the relevant markets.

569.    There was and is a dangerous possibility that BCBS-AL will succeed in its attempt to monopolize the relevant markets because BCBS-AL controls a large percentage of those markets already, and further success by BCBS-AL in excluding competitors from those markets will confer a monopoly on BCBS-AL in violation of Section 2 of the Sherman Act.

570.    BCBS-AL's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Alabama Class.  Premiums charged by BCBS-AL have been higher than they would have been in a competitive market.

571.    Plaintiffs and the Alabama Class have been damaged as the result of BCBS-AL's attempted monopolization of the relevant markets.

## ARKANSAS

(Plaintiffs Linda Mills and Frank Curtis and the Arkansas Class Against Defendants BCBS-AR and BCBSA)

### Count Six
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

572.     Plaintiffs repeat and reallege the allegations in all Paragraphs above.

573.     The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-AR and BCBSA represent horizontal agreements entered into between BCBS-AR and the 37 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

574.     Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-AR represents a contract, combination and/or conspiracy within the meaning of Section 1 of the Sherman Act.

575.     Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-AR have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-AR) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

576.     The market allocation agreements entered into between BCBS-AR and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

577.    BCBS-AR has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

578.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.    Reducing the number of health insurance companies competing with BCBS-AR throughout Arkansas;

      b.    Unreasonably limiting the entry of competitor health insurance companies into Arkansas;

      c.    Allowing BCBS-AR to maintain and enlarge its market power throughout Arkansas;

      d.    Allowing BCBS-AR to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

      e.    Depriving consumers of health insurance of the benefits of free and open competition.

579.    The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

580.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

581.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other

members of the Arkansas Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-AR than they would have paid with increased competition and but for the Sherman Act violations.

582.    Plaintiffs and the Arkansas Class seek money damages from BCBS-AR and BCBSA for their violations of Section 1 of the Sherman Act.

## Count Seven
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Sherman Act, Section 2)

583.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

584.    BCBS-AR has monopoly power in the individual and small group full-service commercial health insurance market in Arkansas. This monopoly power is evidenced by, among other things, BCBS-AR's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

585.    BCBS-AR has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

586.    BCBS-AR's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

587.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Arkansas Class have suffered injury and damages in an amount to be proven at

trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-AR than they would have paid but for the Sherman Act violations.

588.    Plaintiffs and the Arkansas Class seek money damages from BCBS-AR for its violations of Section 2 of the Sherman Act.

**Count Eight**
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

589.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

590.    BCBS-AR has acted with the specific intent to monopolize the relevant markets.

591.    There was and is a dangerous possibility that BCBS-AR will succeed in its attempt to monopolize the relevant markets because BCBS-AR controls a large percentage of those markets already, and further success by BCBS-AR in excluding competitors from those markets will confer a monopoly on BCBS-AR in violation of Section 2 of the Sherman Act.

592.    BCBS-AR's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Arkansas Class. Premiums charged by BCBS-AR have been higher than they would have been in a competitive market.

593.    Plaintiffs and the Arkansas Class have been damaged as the result of BCBS-AR's attempted monopolization of the relevant markets.

**Count Nine**
(Unjust Enrichment)

594.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

595.    BCBS-AR has benefitted from its unlawful acts through Plaintiffs' and the Arkansas Class's overpayments for health insurance premiums to BCBS-AR.  BCBS-AR has unjustly enriched itself at the expense of the Plaintiffs and the Arkansas Class.

596.    It would be inequitable for BCBS-AR to be permitted to retain the benefit of these supra-competitive premiums that were conferred by Plaintiffs and the Arkansas Class and retained by BCBS-AR.

597.    By reason of its unlawful conduct, BCBS-AR must make restitution to Plaintiffs and the Arkansas Class.

## CALIFORNIA

(Plaintiff Judy Sheridan and the California Class Against Defendants BS-CA and BCBSA)

### Count Ten
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

598.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

599.    The License Agreements, Membership Standards, and Guidelines agreed to by BC-CA and BCBSA and BS-CA and BCBSA represent horizontal agreements entered into between BC-CA, BS-CA, and the 36 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

600.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BC-CA and BCBSA and BS-CA represents a contract, combination and/or conspiracy within the meaning of Section 1 of the Sherman Act.

601.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA, BC-CA, and BS-CA have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BC-CA and BS-CA) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

602.    The market allocation agreements entered into between BC-CA and the thirty-seven other BCBSA member plans and BS-CA and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

163

603.    BC-CA and BS-CA have market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

604.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.   Reducing the number of health insurance companies competing with BC-CA and BS-CA throughout California;

      b.   Unreasonably limiting the entry of competitor health insurance companies into California;

      c.   Allowing BC-CA and BS-CA to maintain and enlarge their market power throughout California;

      d.   Allowing BC-CA and BS-CA to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

      e.   Depriving consumers of health insurance of the benefits of free and open competition.

605.    The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

606.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

607.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiff and other

members of the California Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BC-CA and BS-CA than they would have paid with increased competition and but for the Sherman Act violations.

608.    Plaintiff and the California Class seek money damages from BS-CA and BCBSA for their violations of Section 1 of the Sherman Act.

## Count Eleven
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Sherman Act, Section 2)

609.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

610.    BC-CA and BS-CA have monopoly power in the individual and small group full-service commercial health insurance market in California.  This monopoly power is evidenced by, among other things, BC-CA's and BS-CA's high market shares of the commercial health insurance market, including their increasing market share even as they have raised premiums.

611.    BC-CA and BS-CA have abused and continue to abuse their monopoly power to maintain and enhance their market dominance by unreasonably restraining trade, thus artificially inflating the premiums they charge to consumers.

612.    BC-CA's and BS-CA's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

613.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiff and other members of the California Class have suffered injury and damages in an amount to be proven at

trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BC-CA and BS-CA than they would have paid but for the Sherman Act violations.

614.    Plaintiff and the California Class seek money damages from BS-CA for BC-CA's and BS-CA's violations of Section 2 of the Sherman Act.

**Count Twelve**
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

615.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

616.    BC-CA and BS-CA have acted with the specific intent to monopolize the relevant markets.

617.    There was and is a dangerous possibility that BC-CA and BS-CA will succeed in their attempts to monopolize the relevant markets because BC-CA and BS-CA each control a large percentage of those markets already, and further success by BC-CA and BS-CA in excluding competitors from those markets will confer monopolies on BC-CA and BS-CA in violation of Section 2 of the Sherman Act.

618.    BC-CA's and BS-CA's attempted monopolizations of the relevant markets has harmed competition in those markets and have caused injury to Plaintiff and the California Class. Premiums charged by BC-CA and BS-CA have been higher than they would have been in a competitive market.

619.    Plaintiff and the California Class have been damaged as the result of BC-CA's and BS-CA's attempted monopolizations of the relevant markets.

## Count Thirteen

(Contract, Combination, or Conspiracy in Restraint of Trade in Violation of the Cartwright Act, California Business and Professions Code §§16720, *et seq.*)

620. Plaintiff repeats and realleges the allegations in all Paragraphs above.

621. The License Agreements, Membership Standards, and Guidelines agreed to by BC-CA and BCBSA and BS-CA and BCBSA represent horizontal agreements entered into between BC-CA, BS-CA, and the 36 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

622. Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BC-CA and BS-CA and BCBSA represents a contract, combination and/or conspiracy within the meaning of the Cartwright Act.

623. Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BC-CA have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members. By so doing, the BCBSA members (including BC-CA and BS-CA) have conspired to restrain trade in violation of the Cartwright Act. These market allocation agreements are *per se* illegal under the Cartwright Act.

624. The market allocation agreements entered into between BC-CA, BS-CA, and the thirty-six other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

625. BC-CA and BS-CA have market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

626.     Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

    a.   Reducing the number of health insurance companies competing with BC-CA and BS-CA throughout California;

    b.   Unreasonably limiting the entry of competitor health insurance companies into California;

    c.   Allowing BC-CA and BS-CA to maintain and enlarge their market power throughout California;

    d.   Allowing BC-CA and BS-CA to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

    e.   Depriving consumers of health insurance of the benefits of free and open competition.

627.     The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

628.     The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of the Cartwright Act.

629.     As a direct and proximate result of the Individual Blue Plans' continuing violations of the Cartwright Act described in this Complaint, Plaintiff and other members of the California Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BC-CA and BS-CA than they would have paid with increased competition and but for the Cartwright Act violations.

630.    Plaintiff and the California Class seek money damages from BS-CA and BCBSA for their violations of the Cartwright Act.

### Count Fourteen

(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of the Cartwright Act, California Business and Professions Code §16727)

631.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

632.    BC-CA and BS-CA have monopoly power in the individual and small group full-service commercial health insurance market in California.  This monopoly power is evidenced by, among other things, BC-CA's and BS-CA's high market shares of the commercial health insurance market, including their increasing market shares even as they have raised premiums.

633.    BC-CA and BS-CA have abused and continue to abuse their monopoly power to maintain and enhance their market dominance by unreasonably restraining trade, thus artificially inflating the premiums they charge to consumers.

634.    BC-CA's and BS-CA's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of §16727 of the Cartwright Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

635.    As a direct and proximate result of the Individual Blue Plans' continuing violations of §16727 of the Cartwright Act described in this Complaint, Plaintiff and other members of the California Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BC-CA and BS-CA than they would have paid but for the Cartwright Act violations.

636.    Under California Business and Professions Code §16750(a), Plaintiff and the California Class seek money damages and attorneys' fees from BS-CA.

## Count Fifteen
(Willful Attempted Monopolization in the Relevant Market for Private Health Insurance in Violation of the Cartwright Act, California Business and Professions Code §16727)

637.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

638.    BC-CA and BS-CA have acted with the specific intent to monopolize the relevant markets.

639.    There was and is a dangerous possibility that BC-CA and BS-CA will succeed in their attempts to monopolize the relevant markets because BC-CA and BS-CA control a large percentage of those markets already.   Further success by BC-CA and BS-CA in excluding competitors from those markets is an attempt to monopolize, or an attempt to combine or conspire to monopolize, and will confer a monopoly on BC-CA and BS-CA in violation of §16727 of the Cartwright Act.

640.    BC-CA's and BS-CA's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the California Class. Premiums charged by BC-CA and BS-CA have been higher than they would have been in a competitive market.

641.    Plaintiff and the California Class have been damaged as the result of BC-CA's and BS-CA's attempted monopolization of the relevant markets and seek treble damages from BS-CA.

## Count Sixteen
(Violation of California Business and Professions Code §17200, *et seq*.)

642.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

643.     Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BC-CA and BCBSA and BS-CA have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BC-CA and BS-CA) have engaged in unfair competition, including unlawful and unfair business practices and conduct.

644.     The License Agreements, Membership Standards, and Guidelines entered into between BC-CA, BS-CA, and the thirty-six other BCBSA member plans are anticompetitive and in violation of the Sherman Act Sections 1 and 2 and the Cartwright Act, California Business and Professions Code §16720 *et seq*.

645.     As a result of BC-CA's and BS-CA's conduct challenged in this Complaint, the California Class has suffered substantial injury that the Class could not reasonably have avoided and that is not outweighed by any countervailing benefits to consumers or to competition.

646.     BC-CA's and BS-CA's conduct challenged in this Complaint offends established laws, including the Sherman and Cartwright Acts, and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

647.     Plaintiff and the California Class seek an injunction prohibiting BS-CA from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete.

### Count Seventeen
(Unjust Enrichment)

648.     Plaintiff repeats and realleges the allegations in all Paragraphs above.

649.     BC-CA and BS-CA have benefitted from their unlawful acts through the overpayments for health insurance premiums of Plaintiff and the California Class.

650. It would be inequitable for BC-CA and BS-CA to retain the benefit of these overpayments that were conferred by Plaintiff and the California Class and retained by BC-CA and BS-CA.

651. By reason of its unlawful conduct, BS-CA must make restitution to Plaintiff and the California Class.

652. Further, any action that might have been taken by Plaintiffs and the California Class to pursue administrative remedies would have been futile. In equity, BC-CA and BS-CA cannot retain the economic benefits derived from their improper conduct and BS-CA should be ordered to pay restitution and prejudgment interest to Plaintiff and the California Class.

## FLORIDA

(Plaintiff Jennifer Ray Davidson and the Florida Class Against Defendants BCBS-FL and BCBSA)

### Count Eighteen
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

653.   Plaintiff repeats and realleges the allegations in all Paragraphs above.

654.   The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-FL and BCBSA represent horizontal agreements entered into between BCBS-FL and the 37 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

655.   Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-FL represents a contract, combination and/or conspiracy within the meaning of Section 1 of the Sherman Act.

656.   Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-FL have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-FL) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

657.   The market allocation agreements entered into between BCBS-FL and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

658.   BCBS-FL has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

659.   Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.   Reducing the number of health insurance companies competing with BCBS-FL throughout Florida;

      b.   Unreasonably limiting the entry of competitor health insurance companies into Florida;

      c.   Allowing BCBS-FL to maintain and enlarge its market power throughout Florida;

      d.   Allowing BCBS-FL to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

      e.   Depriving consumers of health insurance of the benefits of free and open competition.

660.   The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

661.   The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

662.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiff and other

members of the Florida Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-FL than they would have paid with increased competition and but for the Sherman Act violations.

663.    Plaintiff and the Florida Class seek money damages from BCBS-FL and BCBSA for their violations of Section 1 of the Sherman Act.

## Count Nineteen
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

664.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

665.    BCBS-FL has monopoly power in the individual and small group full-service commercial health insurance market in Florida.  This monopoly power is evidenced by, among other things, BCBS-FL's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

666.    BCBS-FL has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

667.    BCBS-FL's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

668.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiff and other members of the Florida Class have suffered injury and damages in an amount to be proven at

175

trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-FL than they would have paid but for the Sherman Act violations.

669. Plaintiffs and the Florida Class seek money damages from BCBS-FL for its violations of Section 2 of the Sherman Act.

**Count Twenty**
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

670. Plaintiff repeats and realleges the allegations in all Paragraphs above.

671. BCBS-FL has acted with the specific intent to monopolize the relevant markets.

672. There was and is a dangerous possibility that BCBS-FL will succeed in its attempt to monopolize the relevant markets because BCBS-FL controls a large percentage of those markets already, and further success by BCBS-FL in excluding competitors from those markets will confer a monopoly on BCBS-FL in violation of Section 2 of the Sherman Act.

673. BCBS-FL's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the Florida Class. Premiums charged by BCBS-FL have been higher than they would have been in a competitive market.

674. Plaintiff and the Florida Class have been damaged as the result of BCBS-FL's attempted monopolization of the relevant markets.

**Count Twenty-One**
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Fla. Stat. § 542.18)

675. Plaintiff repeats and realleges the allegations in all Paragraphs above.

676. The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-FL and BCBSA represent horizontal agreements entered into between BCBS-FL and the

37 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

677.   Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-FL represents a contract, combination and/or conspiracy within the meaning of Fla. Stat. § 542.18.

678.   Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-FL have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.   By so doing, the BCBSA members (including BCBS-FL) have conspired to restrain trade in violation of Fla. Stat. § 542.18.   These market allocation agreements are *per se* illegal under Fla. Stat. § 542.18.

679.   The market allocation agreements entered into between BCBS-FL and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

680.   BCBS-FL has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

681.   Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.   Reducing the number of health insurance companies competing with BCBS-FL throughout Florida;

      b.   Unreasonably limiting the entry of competitor health insurance companies into Florida;

    c.   Allowing BCBS-FL to maintain and enlarge its market power throughout Florida;

    d.   Allowing BCBS-FL to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

    e.   Depriving consumers of health insurance of the benefits of free and open competition.

682.    The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

683.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Fla. Stat. § 542.18.

684.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Fla. Stat. § 542.18 described in this Complaint, Plaintiff and other members of the Florida Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-FL than they would have paid with increased competition and but for the violations of Fla. Stat. § 542.18.

685.    Under Fla. Stat. § 542.22, Plaintiff and the Florida Class seek money damages from BCBS-FL and BCBSA for their violations of Fla. Stat. § 542.18.

### Count Twenty-Two
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Fla. Stat. § 542.19)

686.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

687.     BCBS-FL has monopoly power in the individual and small group full-service commercial health insurance market in Florida.  This monopoly power is evidenced by, among other things, BCBS-FL's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

688.     BCBS-FL has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

689.     BCBS-FL's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Fla. Stat. § 542.19, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

690.     As a direct and proximate result of the Individual Blue Plans' continuing violations of Fla. Stat. § 542.19 described in this Complaint, Plaintiff and other members of the Florida Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-FL than they would have paid but for the violations of Fla. Stat. § 542.19.

691.     Under Fla. Stat. § 542.22, Plaintiff and the Florida Class seek money damages from BCBS-FL for its violations of Fla. Stat. § 542.19.

### Count Twenty-Three
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Fla. Stat. § 542.19)

692.     Plaintiff repeats and realleges the allegations in all Paragraphs above.

693.     BCBS-FL has acted with the specific intent to monopolize the relevant markets.

179

694.     There was and is a dangerous possibility that BCBS-FL will succeed in its attempt to monopolize the relevant markets because BCBS-FL controls a large percentage of those markets already, and further success by BCBS-FL in excluding competitors from those markets will confer a monopoly on BCBS-FL in violation of Fla. Stat. § 542.19.

695.     BCBS-FL's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the Florida Class.  Premiums charged by BCBS-FL have been higher than they would have been in a competitive market. Plaintiff and the Florida Class have been damaged as the result of BCBS-FL's attempted monopolization of the relevant markets.

# HAWAI'I

(Plaintiffs Lawrence W. Cohn, AAL, ALC and Saccoccio & Lopez and the Hawai'i Class
Against Defendants BCBS-HI and BCBSA)

## Count Twenty-Four
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

696.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

697.    The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-HI and BCBSA represent horizontal agreements entered into between BCBS-HI and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

698.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-HI represents a contract, combination and/or conspiracy within the meaning of Section 1 of the Sherman Act.

699.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-HI have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-HI) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

700.    The market allocation agreements entered into between BCBS-HI and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

701.    BCBS-HI has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

702.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

> a.  Reducing the number of health insurance companies competing with BCBS-HI throughout Hawai'i;
>
> b.  Unreasonably limiting the entry of competitor health insurance companies into Hawai'i;
>
> c.  Allowing BCBS-HI to maintain and enlarge its market power throughout Hawai'i;
>
> d.  Allowing BCBS-HI to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;
>
> e.  Depriving consumers of health insurance of the benefits of free and open competition.

703.    The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

704.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

705.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Hawai'i Class have suffered injury and damages in an amount to be proven at

trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-HI than they would have paid with increased competition and but for the Sherman Act violations.

706.    Plaintiffs and the Hawai'i Class seek money damages from BCBS-HI and BCBSA for their violations of Section 1 of the Sherman Act.

**Count Twenty-Five**
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Sherman Act, Section 2)

707.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

708.    BCBS-HI has monopoly power in the individual and small group full-service commercial health insurance market in Hawai'i.  This monopoly power is evidenced by, among other things, BCBS-HI's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

709.    BCBS-HI has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

710.    BCBS-HI's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

711.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Hawai'i Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-

competitive and higher health insurance premiums to BCBS-HI than they would have paid but for the Sherman Act violations.

712.    Plaintiffs and the Hawai'i Class seek money damages from BCBS-HI for its violations of Section 2 of the Sherman Act.

## Count Twenty-Six
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

713.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

714.    BCBS-HI has acted with the specific intent to monopolize the relevant markets.

715.    There was and is a dangerous possibility that BCBS-HI will succeed in its attempt to monopolize the relevant markets because BCBS-HI controls a large percentage of those markets already, and further success by BCBS-HI in excluding competitors from those markets will confer a monopoly on BCBS-HI in violation of Section 2 of the Sherman Act.

716.    BCBS-HI's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Hawai'i Class. Premiums charged by BCBS-HI have been higher than they would have been in a competitive market.

717.    Plaintiffs and the HI Class have been damaged as the result of BCBS-HI's attempted monopolization of the relevant markets.

## Count Twenty-Seven
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of H.R.S. §§ 480-4 and 480-2)

718.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

719.    The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-HI and BCBSA represent horizontal agreements entered into between BCBS-HI and the

thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

720.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-HI represents a contract, combination and/or conspiracy within the meaning of H.R.S. § 480-4 and an unfair method of competition within the meaning of H.R.S. § 480-2.

721.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-HI have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-HI) have conspired to restrain trade in violation of H.R.S. § 480-4, and employed an unfair method of competition in violation of H.R.S. § 480-2.  These market allocation agreements are *per se* illegal under H.R.S. §§ 480-2 and 480-4.

722.    The market allocation agreements entered into between BCBS-HI and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

723.    BCBS-HI has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

724.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.    Reducing the number of health insurance companies competing with BCBS-HI throughout Hawai'i;

b.   Unreasonably limiting the entry of competitor health insurance companies into Hawai'i;

c.   Allowing BCBS-HI to maintain and enlarge its market power throughout Hawai'i;

d.   Allowing BCBS-HI to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

e.   Depriving consumers of health insurance of the benefits of free and open competition.

725.   The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

726.   The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of H.R.S. §§ 480-2 and 480-4.

727.   As a direct and proximate result of the Individual Blue Plans' continuing violations of H.R.S. §§ 480-2 and 480-4 described in this Complaint, Plaintiffs and other members of the Hawai'i Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-HI than they would have paid with increased competition and but for the violations of H.R.S. §§ 480-2 and 480-4.

728.   Plaintiffs and the Hawai'i Class seek money damages under H.R.S. 480-13 from BCBS-HI and BCBSA for their violations of H.R.S. §§ 480-4 and 480-2.

## Count Twenty-Eight
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of H.R.S. § 480-9)

729.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

186

730.    BCBS-HI has monopoly power in the individual and small group full-service commercial health insurance market in Hawai'i.  This monopoly power is evidenced by, among other things, BCBS-HI's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

731.    BCBS-HI has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

732.    BCBS-HI's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of H.R.S. § 480-9, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

733.    As a direct and proximate result of the Individual Blue Plans' continuing violations of H.R.S. § 480-9 described in this Complaint, Plaintiffs and other members of the Hawai'i Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-HI than they would have paid but for the violations of H.R.S. § 480-9.

734.    Plaintiffs and the Hawai'i Class seek money damages under H.R.S. 480-13 from BCBS-HI for its violations of H.R.S. § 480-9.

### Count Twenty-Nine
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of H.R.S. § 480-9)

735.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

736.    BCBS-HI has acted with the specific intent to monopolize the relevant markets.

737.   There was and is a dangerous possibility that BCBS-HI will succeed in its attempt to monopolize the relevant markets because BCBS-HI controls a large percentage of those markets already, and further success by BCBS-HI in excluding competitors from those markets will confer a monopoly on BCBS-HI in violation of H.R.S. § 480-9.

738.   BCBS-HI's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Hawai'i Class. Premiums charged by BCBS-HI have been higher than they would have been in a competitive market.

739.   Plaintiffs and the Hawai'i Class have been damaged as the result of BCBS-HI's attempted monopolization of the relevant markets.

## Count Thirty
### (Unjust Enrichment)

740.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

741.   BCBS-HI has benefitted from its unlawful acts through Plaintiffs' and the Hawai'i Class's overpayments for health insurance premiums.

742.   It would be inequitable for BCBS-HI to be permitted to retain the benefit of these supra-competitive premiums that were conferred by Plaintiffs and the Hawai'i Class and retained by BCBS-HI.

743.   In equity, BCBS-HI should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiffs and the Hawai'i Class.

## ILLINOIS

(Plaintiffs Monika Bhuta, Michael E. Stark, and Falcon Picture Group LLC and the Illinois Class
Against Defendants BCBS-IL and BCBSA)

### Count Thirty-One
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

744.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

745.    The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-IL and BCBSA represent horizontal agreements entered into between BCBS-IL and the thirty-seven other members of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

746.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-IL represents a contract, combination and/or conspiracy within the meaning of Section 1 of the Sherman Act.

747.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-IL have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-IL) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

748.    The market allocation agreements entered into among BCBS-IL and the thirty-seven other BCBSA members (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

749.   BCBS-IL has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

750.   Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

     a.   Reducing the number of health insurance companies competing with BCBS-IL throughout Illinois;

     b.   Unreasonably limiting the entry of competitor health insurance companies into Illinois;

     c.   Allowing BCBS-IL to maintain and enlarge its market power throughout Illinois;

     d.   Allowing BCBS-IL to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts; and

     e.   Depriving Class members and other consumers of health insurance of the benefits of free and open competition.

751.   The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

752.   The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

753.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other

members of the Illinois Class have suffered injury and damages in an amount to be proven at trial and are entitled to injunctive relief.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-IL than they would have paid with increased competition and but for the Sherman Act violations.

754.    Plaintiffs and the Illinois Class seek money damages from BCBS-IL and BCBSA for their violations of Section 1 of the Sherman Act.

### Count Thirty-Two
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

755.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

756.    BCBS-IL has monopoly power in the individual and small group full-service commercial health insurance market in Illinois.  This monopoly power is evidenced by, among other things, BCBS-IL's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

757.    BCBS-IL has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

758.    BCBS-IL's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

759.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Illinois Class have suffered injury and damages in an amount to be proven at

trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-IL than they would have paid but for the Sherman Act violations.

760. Plaintiffs and the Illinois Class seek money damages from BCBS-IL for its violations of Section 2 of the Sherman Act.

## Count Thirty-Three
### (Willful Attempted Monopolization in the Relevant Market for Private Health Insurance in Violation of Sherman Act, Section 2)

761. Plaintiffs repeat and reallege the allegations in all Paragraphs above.

762. BCBS-IL has acted with the specific intent to monopolize the relevant markets.

763. There was and is a dangerous possibility that BCBS-IL will succeed in its attempt to monopolize the relevant markets because BCBS-IL controls a large percentage of those markets already, and further success by BCBS-IL in excluding competitors from those markets will confer a monopoly on BCBS-IL in violation of Section 2 of the Sherman Act.

764. BCBS-IL's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Illinois Class. Premiums charged by BCBS-IL have been higher than they would have been in a competitive market.

765. Plaintiffs and the Illinois Class have been damaged as the result of BCBS-IL's attempted monopolization of the relevant markets.

## Count Thirty-Four
### (Contract, Combination, or Conspiracy in Restraint of Trade in Violation of Illinois Antitrust Law 740 ILCS 10/3 *et seq.*)

766. Plaintiffs repeat and reallege the allegations in all Paragraphs above.

767. The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-IL and BCBSA represent horizontal agreements entered into between BCBS-IL and the

thirty-seven other members of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

768.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-IL represents a contract, combination and/or conspiracy within the meaning of 740 ILCS 10/3(1).

769.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-IL have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-IL) have conspired to restrain trade in violation of 740 ILCS 10/3(1)a, 740 ILCS 10/3(1)c, and 740 ILCS 10/3(2).  These market allocation agreements are *per se* illegal under the aforesaid provisions.

770.    The market allocation agreements entered into among BCBS-IL and the thirty-seven other BCBSA members (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

771.    BCBS-IL has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

772.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.  Reducing the number of health insurance companies competing with BCBS-IL throughout Illinois;

      b.  Unreasonably limiting the entry of competitor health insurance companies into Illinois;

193

c.  Allowing BCBS-IL to maintain and enlarge its market power throughout Illinois;

d.  Allowing BCBS-IL to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts; and

e.  Depriving Class members and other consumers of health insurance of the benefits of free and open competition.

773.    The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

774.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of 740 ILCS 10/3(1)a, 740 ILCS 10/3(1)c, and 740 ILCS 10/3(2).

775.    As a direct and proximate result of the Individual Blue Plans' continuing violations of 740 ILCS 10/3(1)a, 740 ILCS 10/3(1)c, and 740 ILCS 10/3(2) described in this Complaint, Plaintiffs and other members of the Illinois Class have suffered injury and damages in an amount to be proven at trial and are entitled to injunctive relief.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-IL than they would have paid with increased competition and but for the violations of 740 ILCS 10/3(1)a, 740 ILCS 10/3(1)c, and 740 ILCS 10/3(2).

776.    Plaintiffs and the Illinois Class seek money damages from BCBS-IL and BCBSA for their violations of 740 ILCS 10/3 *et seq*.

**<u>Count Thirty-Five</u>**
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of 740 ILS 10/3(3))

777.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

778.     BCBS-IL has monopoly power in the individual and small group full-service commercial health insurance market in Illinois.  This monopoly power is evidenced by, among other things, BCBS-IL's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

779.     BCBS-IL has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

780.     BCBS-IL's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of 740 ILS 10/3(3).

781.     As a direct and proximate result of the Individual Blue Plans' continuing violations of 740 ILS 10/3(3) described in this Complaint, Plaintiffs and other members of the Illinois Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-IL than they would have paid but for these violations.

782.     Plaintiffs and the Illinois Class seek money damages from BCBS-IL for its violations of 740 ILS 10/3 *et seq.*

## Count Thirty-Six
(Willful Attempted Monopolization in the Relevant Market for Private Health Insurance in Violation of 740 ILS 10/3(3))

783.     Plaintiffs repeat and reallege the allegations in all Paragraphs above.

784.     BCBS-IL has acted with the specific intent to monopolize the relevant markets.

785.     There was and is a dangerous possibility that BCBS-IL will succeed in its attempt to monopolize the relevant markets because BCBS-IL controls a large percentage of those

markets already, and further success by BCBS-IL in excluding competitors from those markets will confer a monopoly on BCBS-IL in violation of 740 ILS 10/3(3).

786.    BCBS-IL's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Illinois Class.  Premiums charged by BCBS-IL have been higher than they would have been in a competitive market.

787.    Plaintiffs and the Illinois Class have been damaged as the result of BCBS-IL's attempted monopolization of the relevant markets and seek treble damages.

## Count Thirty-Seven
### (Unjust Enrichment)

788.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

789.    BCBS-IL has benefitted from its unlawful acts through Plaintiffs' and the Illinois Class's overpayments for health insurance premiums to BCBS-IL.  BCBS-IL has unjustly enriched itself at the expense of the Plaintiffs and the Illinois Class.

790.    It would be inequitable and in violation of principles of justice and good conscience for BCBS-IL to be permitted to retain the benefit of these supra-competitive premiums that were conferred by Plaintiffs and the Illinois Class and unjustly retained by BCBS-IL.

791.    By reason of its unlawful conduct, BCBS-IL must make restitution to Plaintiffs and the Illinois Class.  Further, any actions which might have been taken by Plaintiffs to pursue administrative remedies would have been futile.

792.    In equity, BCBS-IL should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiffs and the Illinois Class.

## LOUISIANA

(Plaintiffs Renee E. Allie and Galactic Funk Touring, Inc. and the Louisiana Class Against
Defendants BCBS-LA and BCBSA)

### Count Thirty-Eight
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

793.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

794.    The License Agreements, Membership Standards, and Guidelines agreed to by

BCBS-LA represent horizontal agreements entered into between BCBS-LA and the thirty-seven

other member plans of BCBSA, all of whom are competitors or potential competitors in the

market for commercial health insurance.

795.    Each of the License Agreements, Membership Standards, and Guidelines entered

into between BCBSA and BCBS-LA represents a contract, combination, and/or conspiracy

within the meaning of Section 1 of the Sherman Act.

796.    Through the License Agreements, Membership Standards, and Guidelines,

BCBSA and BCBS-LA have agreed to divide and allocate the geographic markets for the sale of

commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA

members.  By so doing, the BCBSA members (including BCBS-LA) have conspired to restrain

trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per

se* illegal under Section 1 of the Sherman Act.

797.    The market allocation agreements entered into between BCBS-LA and the thirty-

seven other BCBSA member plans (executed through the BCBSA License Agreements and

related Membership Standards and Guidelines) are anticompetitive.

197

798.     BCBS-LA has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

799.     Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

     a.  Reducing the number of health insurance companies competing with BCBS-LA throughout Louisiana;

     b.  Unreasonably limiting the entry of competitor health insurance companies into Louisiana;

     c.  Allowing BCBS-LA to maintain and enlarge its market power throughout Louisiana;

     d.  Allowing BCBS-LA to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

     e.  Depriving consumers of health insurance of the benefits of free and open competition.

800.     The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

801.     The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

802.     As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other

members of the Louisiana Class have suffered injury and damages in an amount to be proven at

trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-

competitive and higher health insurance premiums to BCBS-LA than they would have paid with

increased competition and but for the Sherman Act violations.

803.     Plaintiffs and the Louisiana Class seek money damages from BCBS-LA for its

violation of Section 1 of the Sherman Act.

### Count Thirty-Nine
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Care Insurance in Violation of Sherman Act, Section 2)

804.     Plaintiffs repeat and reallege the allegations in all Paragraphs above.

805.     BCBS-LA has monopoly power in the individual and small group full-service

commercial health insurance market in Louisiana.  This monopoly power is evidenced by,

among other things:

a.   BCBS-LA's ability to enter into agreements with providers at below-market

reimbursement rates, which evidences BCBS-LA's ability to control prices

and exclude competitors;

b.   BCBS-LA's high market share of the commercial health insurance market,

including its increasing market share even as it has raised premiums.

806.     BCBS-LA has abused and continues to abuse its monopoly power to maintain and

enhance its market dominance by unreasonably restraining trade, thus artificially inflating the

premiums it charges to consumers.

807.     BCBS-LA's conduct constitutes unlawful monopolization and unlawful anti-

competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and

such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

808.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Louisiana Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-LA than they would have paid but for the Sherman Act violations.

809.    Plaintiffs and the Louisiana Class seek money damages from BCBS-LA for its violations of Section 2 of the Sherman Act.

### Count Forty
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

810.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

811.    BCBS-LA has acted with the specific intent to monopolize the relevant markets.

812.    There was and is a dangerous possibility that BCBS-LA will succeed in its attempt to monopolize the relevant markets because BCBS-LA already controls a large percentage of those markets.  Further success by BCBS-LA in excluding competitors from those markets will confer a monopoly on BCBS-LA in violation of Section 2 of the Sherman Act.

813.    BCBS-LA's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Louisiana Class. Premiums charged by BCBS-LA have been higher than they would have been in a competitive market.

814.    Plaintiffs and the Louisiana Class have been damaged as the result of BCBS-LA's attempted monopolization of the relevant markets.

### Count Forty-One
(Contract, Combination, or Conspiracy in Restraint of Trade in violation of La.R.S. 51:122)

815.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

816.    The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-LA represent horizontal agreements entered into between BCBS-LA and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

817.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-LA represents a contract, combination and/or conspiracy within the meaning of La.R.S. 51:122.

818.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-LA have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-LA) have conspired to restrain trade in violation of La.R.S. 51:122.  These market allocation agreements are *per se* illegal under La.R.S. 51:122.

819.    The market allocation agreements entered into between BCBS-LA and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

820.    BCBS-LA has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

821.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

        a.   Reducing the number of health insurance companies competing with BCBS-LA throughout Louisiana;

        b.   Unreasonably limiting the entry of competitor health insurance companies into Louisiana;

        c.   Allowing BCBS-LA to maintain and enlarge its market power throughout Louisiana;

        d.   Allowing BCBS-LA to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

        e.   Depriving consumers of health insurance of the benefits of free and open competition.

822.    The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

823.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of La.R.S. 51:122.

824.    As a direct and proximate result of the Individual Blue Plans' continuing violations of La.R.S. 51:122 described in this Complaint, plaintiffs and other members of the Louisiana Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-LA than they would have paid with increased competition and but for the Louisiana Antitrust violations.

825.     Plaintiffs and the Louisiana Class seek money damages from BCBS-LA for its violation of La.R.S. 51:122.

## Count Forty-Two

(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Care Insurance in Violation of La.R.S. 51:123)

826.     Plaintiffs repeat and reallege the allegations in all Paragraphs above.

827.     BCBS-LA has monopoly power in the commercial health insurance market in Louisiana.  This monopoly power is evidenced by, among other things:

a.     BCBS-LA's ability to enter into agreements with providers at below-market reimbursement rates, which evidences BCBS-LA's ability to control prices and exclude competitors;

b.     BCBS-LA's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

828.     BCBS-LA has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating premium prices charged to consumers.

829.     BCBS-LA's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of La.R.S. 51:123.

830.     As a direct and proximate result of the Individual Blue Plans' continuing violations of La.R.S. 51:123 described in this Complaint, plaintiffs and other members of the Louisiana Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-LA than they would have paid but for the La.R.S. 51:123 violations.

831.    Plaintiffs and the Louisiana Class seek money damages from BCBS-LA for its

violations of La.R.S. 51:123.

# MICHIGAN

(Plaintiff John G. Thompson and the Michigan Class Against Defendants BCBS-MI and BCBSA)

## Count Forty-Three
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

832.     Plaintiff repeats and realleges the allegations in all Paragraphs above.

833.     The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-MI and BCBSA represent horizontal agreements entered into between BCBS-MI and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

834.     Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-MI represents a contract, combination and/or conspiracy within the meaning of Section 1 of the Sherman Act.

835.     Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-MI have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-MI) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

836.     The market allocation agreements entered into between BCBS-MI and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

837.  BCBS-MI has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

838.  Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

a.  Reducing the number of health insurance companies competing with BCBS-MI throughout Michigan;

b.  Unreasonably limiting the entry of competitor health insurance companies into Michigan;

c.  Allowing BCBS-MI to maintain and enlarge its market power throughout Michigan;

d.  Allowing BCBS-MI to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts; and

e.  Depriving consumers of health insurance of the benefits of free and open competition.

839.  The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

840.  The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

841.  As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiff and other

members of the Michigan Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MI than they would have paid with increased competition and but for the Sherman Act violations.

842.    Plaintiff and the Michigan Class seek money damages from BCBS-MI and BCBSA for their violations of Section 1 of the Sherman Act.

### Count Forty-Four
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

843.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

844.    BCBS-MI has monopoly power in the individual and small group full-service commercial health insurance market in Michigan.  This monopoly power is evidenced by, among other things, BCBS-MI's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

845.    BCBS-MI has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

846.    BCBS-MI's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

847.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiff and other members of the Michigan Class have suffered injury and damages in an amount to be proven at

trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MI than they would have paid but for the Sherman Act violations.

848.    Plaintiff and the Michigan Class seek money damages from BCBS-MI for its violations of Section 2 of the Sherman Act.

**Count Forty-Five**
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

849.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

850.    BCBS-MI has acted with the specific intent to monopolize the relevant markets.

851.    There was and is a dangerous possibility that BCBS-MI will succeed in its attempt to monopolize the relevant markets because BCBS-MI controls a large percentage of those markets already, and further success by BCBS-MI in excluding competitors from those markets will confer a monopoly on BCBS-MI in violation of Section 2 of the Sherman Act.

852.    BCBS-MI's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the Michigan Class. Premiums charged by BCBS-MI have been higher than they would have been in a competitive market.

853.    Plaintiff and the Michigan Class have been damaged as the result of BCBS-MI's attempted monopolization of the relevant markets.

## Count Forty-Six
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of § 445.772 of the Michigan Antitrust Reform Act)

854.     Plaintiff repeats and realleges the allegations in all Paragraphs above.

855.     The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-MI and BCBSA represent horizontal agreements entered into between BCBS-MI and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

856.     Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-MI represents a contract, combination and/or conspiracy within the meaning of § 445.772 of the Michigan Antitrust Reform Act.

857.     Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-MI have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-MI) have conspired to restrain trade in violation of § 445.772 of the Michigan Antitrust Reform Act.  These market allocation agreements are *per se* illegal under § 445.772 of the Michigan Antitrust Reform Act.

858.     The market allocation agreements entered into between BCBS-MI and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

859.     BCBS-MI has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

860.     Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

    a.   Reducing the number of health insurance companies competing with BCBS-MI throughout Michigan;

    b.   Unreasonably limiting the entry of competitor health insurance companies into Michigan;

    c.   Allowing BCBS-MI to maintain and enlarge its market power throughout Michigan;

    d.   Allowing BCBS-MI to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts; and

    e.   Depriving consumers of health insurance of the benefits of free and open competition.

861.     The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

862.     The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of § 445.772 of the Michigan Antitrust Reform Act.

863.     The market allocation agreements were not designed to, and did not, lower the cost of healthcare in Michigan.

864.     The market allocation agreements were not approved by Michigan's Insurance Commissioner.

865.    As a direct and proximate result of the Individual Blue Plans' continuing violations of § 445.772 of the Michigan Antitrust Reform Act described in this Complaint, Plaintiff and other members of the Michigan Class have suffered injury and damages in an amount to be proven at trial.   These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MI than they would have paid with increased competition and but for the violations § 445.772 of the Michigan Antitrust Reform Act.

866.    Plaintiff and the Michigan Class seek money damages from BCBS-MI and BCBSA for their violations of § 445.772 of the Michigan Antitrust Reform Act.

## Count Forty-Seven
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of § 445.773 of the Michigan Antitrust Reform Act)

867.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

868.    BCBS-MI has monopoly power in the individual and small group full-service commercial health insurance market in Michigan.  This monopoly power is evidenced by, among other things, BCBS-MI's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

869.    BCBS-MI has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

870.    BCBS-MI's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of § 445.773 of the Michigan Antitrust Reform Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

211

871.    The market allocation agreements were not designed to, and did not, lower the cost of healthcare in Michigan.

872.    The market allocation agreements were not approved by Michigan's Insurance Commissioner.

873.    As a direct and proximate result of the Individual Blue Plans' continuing violations of § 445.773 of the Michigan Antitrust Reform Act described in this Complaint, Plaintiff and other members of the Michigan Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MI than they would have paid but for the violations of § 445.773 of the Michigan Antitrust Reform Act.

874.    Plaintiff and the Michigan Class seek money damages from BCBS-MI for its violations of § 445.773 of the Michigan Antitrust Reform Act.

### Count Forty-Eight
(Willful Attempted Monopolization in the Relevant Market for Private Health Insurance in Violation of § 445.773 of the Michigan Antitrust Reform Act)

875.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

876.    BCBS-MI has acted with the specific intent to monopolize the relevant markets.

877.    There was and is a dangerous possibility that BCBS-MI will succeed in its attempt to monopolize the relevant markets because BCBS-MI controls a large percentage of those markets already, and further success by BCBS-MI in excluding competitors from those markets will confer a monopoly on BCBS-MI in violation of § 445.773 of the Michigan Antitrust Reform Act.

878.    The market allocation agreements were not designed to, and did not, lower the cost of healthcare in Michigan.

879.     The market allocation agreements were not approved by Michigan's Insurance Commissioner.

880.     BCBS-MI's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the Michigan Class. Premiums charged by BCBS-MI have been higher than they would have been in a competitive market.

881.     Plaintiff and the Michigan Class have been damaged as the result of BCBS-MI's attempted monopolization of the relevant markets.

### Count Forty-Nine
(Unjust Enrichment)

882.     Plaintiff repeats and realleges the allegations in all Paragraphs above.

883.     BCBS-MI has benefitted from its unlawful acts through the overpayments for health insurance premiums by Plaintiff and the Michigan Class.

884.     It would be inequitable for BCBS-MI to be permitted to retain the benefit of these supra-competitive premiums that were conferred by Plaintiff and the Michigan Class and retained by BCBS-MI.

885.     By reason of its unlawful conduct, BCBS-MI should make restitution to Plaintiff and the Michigan Class.

886.     In equity, BCBS-MI should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiff and the Michigan Class.

**MISSISSIPPI**

(Plaintiffs Harry M. McCumber and Gaston CPA Firm and the Mississippi Class Against
Defendants BCBS-MS and BCBSA)

**Count Fifty**
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

887.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

888.    The License Agreements, Membership Standards, and Guidelines agreed to by
BCBS-MS and BCBSA represent horizontal agreements entered into between BCBS-MS and the
37 other member plans of BCBSA, all of whom are competitors or potential competitors in the
market for commercial health insurance.

889.    Each of the License Agreements, Membership Standards, and Guidelines entered
into between BCBSA and BCBS-MS represents a contract, combination and/or conspiracy
within the meaning of Section 1 of the Sherman Act.

890.    Through the License Agreements, Membership Standards, and Guidelines,
BCBSA and BCBS-MS have agreed to divide and allocate the geographic markets for the sale of
commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA
members.  By so doing, the BCBSA members (including BCBS-MS) have conspired to restrain
trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per
se* illegal under Section 1 of the Sherman Act.

891.    The market allocation agreements entered into between BCBS-MS and the thirty-
seven other BCBSA member plans (executed through the BCBSA License Agreements and
related Membership Standards and Guidelines) are anticompetitive.

892.    BCBS-MS has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

893.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

a.  Reducing the number of health insurance companies competing with BCBS-MS throughout Mississippi;

b.  Unreasonably limiting the entry of competitor health insurance companies into Mississippi;

c.  Allowing BCBS-MS to maintain and enlarge its market power throughout Mississippi;

d.  Allowing BCBS-MS to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

e.  Depriving consumers of health insurance of the benefits of free and open competition.

894.    The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

895.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

896.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other

members of the Mississippi Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MS than they would have paid with increased competition and but for the Sherman Act violations.

897.    Plaintiffs and the Mississippi Class seek money damages from BCBS-MS and BCBSA for their violations of Section 1 of the Sherman Act.

### Count Fifty-One
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Sherman Act, Section 2)

898.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

899.    BCBS-MS has monopoly power in the individual and small group full-service commercial health insurance market in Mississippi. This monopoly power is evidenced by, among other things, BCBS-MS's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

900.    BCBS-MS has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

901.    BCBS-MS's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

902.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Mississippi Class have suffered injury and damages in an amount to be proven at

trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MS than they would have paid but for the Sherman Act violations.

903.    Plaintiffs and the Mississippi Class seek money damages from BCBS-MS for its violations of Section 2 of the Sherman Act.

**Count Fifty-Two**
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

904.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

905.    BCBS-MS has acted with the specific intent to monopolize the relevant markets.

906.    There was and is a dangerous possibility that BCBS-MS will succeed in its attempt to monopolize the relevant markets because BCBS-MS controls a large percentage of those markets already, and further success by BCBS-MS in excluding competitors from those markets will confer a monopoly on BCBS-MS in violation of Section 2 of the Sherman Act.

907.    BCBS-MS's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Mississippi Class. Premiums charged by BCBS-MS have been higher than they would have been in a competitive market.

908.    Plaintiffs and the Mississippi Class have been damaged as the result of BCBS-MS's attempted monopolization of the relevant markets.

**Count Fifty-Three**
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of the Mississippi Antitrust Act, Sec. 75-21-1, *et seq.*)

909.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

217

910.    The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-MS and BCBSA represent horizontal agreements entered into between BCBS-MS and the 37 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

911.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-MS represents a contract, combination and/or conspiracy within the meaning of the Mississippi Antitrust Act, Sec. 75-21-1, *et seq.*.

912.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-MS have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-MS) have conspired to restrain trade in violation of the Mississippi Antitrust Act, Sec. 75-21-1, *et seq*.

913.    The market allocation agreements entered into between BCBS-MS and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

914.    BCBS-MS has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

915.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

        a.    Reducing the number of health insurance companies competing with BCBS-MS throughout Mississippi;

b. Unreasonably limiting the entry of competitor health insurance companies into Mississippi;

c. Allowing BCBS-MS to maintain and enlarge its market power throughout Mississippi;

d. Allowing BCBS-MS to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

e. Depriving consumers of health insurance of the benefits of free and open competition.

916. The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

917. The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of the Mississippi Antitrust Act, Sec. 75-21-1, *et seq*.

918. As a direct and proximate result of the Individual Blue Plans' continuing violations of the Mississippi Antitrust Act, Sec. 75-21-1, *et seq*. described in this Complaint, Plaintiffs and other members of the Mississippi Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MS than they would have paid with increased competition and but for the violations of the Mississippi Antitrust Act, Sec. 75-21-1, *et seq*.

919. Plaintiffs and the Mississippi Class seek money damages from BCBS-MS and BCBSA for their violations of the Mississippi Antitrust Act, Sec. 75-21-1, *et seq*.

920.   BCBS-MS's illegal conduct has substantially affected Mississippi commerce and caused injury to consumers in Mississippi.  Specifically, BCBS-MS's understandings, contracts, agreements, trusts, combinations, or conspiracies substantially affected Mississippi commerce as follows:

   a.   <u>Substantial Effects on Mississippi Trade or Commerce</u>: BCBS-MS's conduct has been far-reaching and has substantially affected Mississippi commerce. BCBS-MS health insurance products were purchased by many thousands of enrollees in Mississippi, in all segments of society.

   b.   <u>Substantial Monetary Effects on Mississippi Trade or Commerce</u>: BCBS-MS's conduct is ongoing, and over the Class Period, BCBS-MS collected millions of dollars in health insurance premiums in Mississippi

   c.   <u>Substantially Harmful Effect on the Integrity of the Mississippi Market</u>: The Mississippi market is vulnerable and can be manipulated by conspirators either from outside Mississippi, inside Mississippi, or both.   Without enforcing Mississippi's antitrust law to its fullest extent, companies that break the law will remain unpunished, and they will remain able to prey upon Mississippi without consequence.  The purpose of Mississippi's antitrust laws is to protect the state's trade and commerce affected by anticompetitive conduct.   BCBS-MS had shattered this very purpose by its illegal victimization of the market.

   d.   <u>Length of Substantial Effect on Mississippi Commerce</u>: Some arrangements, contracts, agreements, combinations, or conspiracies are short-lived.   The conspiracy in this case has lasted for several years and is ongoing, providing

BCBS-MS with illegal profits and permitting BCBS-MS to continue victimizing consumers and substantially affect Mississippi commerce.

### Count Fifty-Four
(Unjust Enrichment)

921.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

922.    BCBS-MS has benefitted from its unlawful acts through the overpayments for health insurance premiums by Plaintiffs and the Mississippi Class.

923.    It would be inequitable for BCBS-MS to be permitted to retain the benefit of these supra-competitive premiums that were conferred by Plaintiffs and the Mississippi Class and retained by BCBS-MS.

924.    By reason of its unlawful conduct, BCBS-MS should make restitution to Plaintiffs and the Mississippi Class.  To the extent Plaintiffs are required to have exhausted administrative remedies before bringing an unjust enrichment claim, exhaustion of any such remedies is not required in this instance because: (a) the issues are of the type that would be appropriate for judicial determination, and (b) applying the doctrine here would result in substantial financial hardship, inequality, and economic inefficiency and would violate public policy.  Further, any action that might have been taken by Plaintiffs to pursue administrative remedies would have been futile.

925.    In equity, BCBS-MS should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiffs and the Mississippi Class.

## MISSOURI

(Plaintiff Jeffrey S. Garner and the Missouri Class Against Defendants BCBS-MO, BCBS-KC, and BCBSA)

### Count Fifty-Five
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

926.     Plaintiff repeats and realleges the allegations in all Paragraphs above.

927.     The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-MO and BCBSA and BCBSA and BCBS-KC represent horizontal agreements entered into between BCBS-MO, BCBS-KC, and the 36 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

928.     Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-MO and BCBSA and BCBS-KC represents a contract, combination and/or conspiracy within the meaning of Section 1 of the Sherman Act.

929.     Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-MO and BCBSA and BCBS-KC have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-MO and BCBS-KC) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

930.     The market allocation agreements entered into between BCBS-MO, BCBS-KC, and the thirty-six other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

222

931.    BCBS-MO and BCBS-KC have market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

932.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

a.  Reducing the number of health insurance companies competing with BCBS-MO and BCBS-KC throughout Missouri;

b.  Unreasonably limiting the entry of competitor health insurance companies into Missouri;

c.  Allowing BCBS-MO and BCBS-KC to maintain and enlarge their market power throughout Missouri;

d.  Allowing BCBS-MO and BCBS-KC to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

e.  Depriving consumers of health insurance of the benefits of free and open competition.

933.    The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

934.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

935.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiff and other

members of the Missouri Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MO and BCBS-KC than they would have paid with increased competition and but for the Sherman Act violations.

936.    Plaintiff and the Missouri Class seek money damages from BCBS-MO, BCBS-KC, and BCBSA for their violations of Section 1 of the Sherman Act.

### Count Fifty-Six
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

937.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

938.    BCBS-MO and BCBS-KC have monopoly power in the individual and small group full-service commercial health insurance market in Missouri. This monopoly power is evidenced by, among other things, BCBS-MO's and BCBS-KC's high market shares of the commercial health insurance market, including their increasing market share even as they have raised premiums.

939.    BCBS-MO and BCBS-KC have abused and continue to abuse their monopoly power to maintain and enhance their market dominance by unreasonably restraining trade, thus artificially inflating the premiums they charge to consumers.

940.    BCBS-MO's and BCBS-KC's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

941.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiff and other

members of the Missouri Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MO and BCBS-KC than they would have paid but for the Sherman Act violations.

942. Plaintiff and the Missouri Class seek money damages from BCBS-MO and BCBS-KC for their violations of Section 2 of the Sherman Act.

### Count Fifty-Seven
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

943. Plaintiff repeats and realleges the allegations in all Paragraphs above.

944. BCBS-MO and BCBS-KC have acted with the specific intent to monopolize the relevant markets.

945. There was and is a dangerous possibility that BCBS-MO and BCBS-KC will succeed in their attempts to monopolize the relevant markets because BCBS-MO and BCBS-KC control a large percentage of those markets already, and further success by BCBS-MO and BCBS-KC in excluding competitors from those markets will confer a monopoly on BCBS-MO and BCBS-KC in violation of Section 2 of the Sherman Act.

946. BCBS-MO's and BCBS-KC's attempted monopolizations of the relevant markets have harmed competition in those markets and have caused injury to Plaintiff and the Missouri Class. Premiums charged by BCBS-MO and BCBS-KC have been higher than they would have been in a competitive market.

947. Plaintiff and the Missouri Class have been damaged as the result of BCBS-MO's and BCBS-KC's attempted monopolizations of the relevant markets.

**Count Fifty-Eight**
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of § 416.031.1 of the Missouri Antitrust Law)

948.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

949.    The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-MO and BCBSA and BCBS-KC and BCBSA represent horizontal agreements entered into between BCBS-MO, BCBS-KC, and the 36 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

950.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-MO and BCBSA and BCBS-KC represents a contract, combination and/or conspiracy within the meaning of § 416.031.1 of the Missouri Antitrust Law.

951.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-MO and BCBSA and BCBS-KC have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-MO and BCBS-KC) have conspired to restrain trade in violation of § 416.031.1 of the Missouri Antitrust Law.  These market allocation agreements are *per se* illegal under § 416.031.1 of the Missouri Antitrust Law.

952.    The market allocation agreements entered into between BCBS-MO, BCBS-KC, and the thirty-six other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

953.    BCBS-MO and BCBS-KC have market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

226

954.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

    a.  Reducing the number of health insurance companies competing with BCBS-MO and BCBS-KC throughout Missouri;

    b.  Unreasonably limiting the entry of competitor health insurance companies into Missouri;

    c.  Allowing BCBS-MO and BCBS-KC to maintain and enlarge their market power throughout Missouri;

    d.  Allowing BCBS-MO and BCBS-KC to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

    e.  Depriving consumers of health insurance of the benefits of free and open competition.

955.    The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

956.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of § 416.031.1 of the Missouri Antitrust Law.

957.    As a direct and proximate result of the Individual Blue Plans' continuing violations of § 416.031.1 of the Missouri Antitrust Law described in this Complaint, Plaintiff and other members of the Missouri Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MO and BCBS-KC than they

would have paid with increased competition and but for the violations of § 416.031.1 of the Missouri Antitrust Law.

958.    Pursuant to § 416.121.1 of the Missouri Antitrust Law, Plaintiff and the Missouri Class seek money damages from BCBS-MO, BCBS-KC, and BCBSA for their violations of § 416.031.1 of the Missouri Antitrust Law.

### Count Fifty-Nine
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of § 416.031.2 of the Missouri Antitrust Law)

959.    Plaintiff repeat and reallege the allegations in all Paragraphs above.

960.    BCBS-MO and BCBS-KC have monopoly power in the individual and small group full-service commercial health insurance market in Missouri.  This monopoly power is evidenced by, among other things, BCBS-MO's and BCBS-KC's high market shares of the commercial health insurance market, including their increasing market shares even as they have raised premiums.

961.    BCBS-MO and BCBS-KC have abused and continue to abuse their monopoly power to maintain and enhance their market dominance by unreasonably restraining trade, thus artificially inflating the premiums they charge to consumers.

962.    BCBS-MO's and BCBS-KC's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of § 416.031.2 of the Missouri Antitrust Law, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

963.    As a direct and proximate result of the Individual Blue Plans' continuing violations of § 416.031.2 of the Missouri Antitrust Law described in this Complaint, Plaintiff and other members of the Missouri Class have suffered injury and damages in an amount to be

proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MO and BCBS-KC than they would have paid but for the violations of § 416.031.2 of the Missouri Antitrust Law.

964.    Pursuant to § 416.121.1 of the Missouri Antitrust Law, Plaintiff and the Missouri Class seek money damages from BCBS-MO and BCBS-KC for their violations of § 416.031.2 of the Missouri Antitrust Law.

### Count Sixty

(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of § 416.031.2 of the Missouri Antitrust Law)

965.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

966.    BCBS-MO and BCBS-KC have acted with the specific intent to monopolize the relevant markets.

967.    There was and is a dangerous possibility that BCBS-MO and BCBS-KC will succeed in their attempts to monopolize the relevant markets because BCBS-MO and BCBS-KC control a large percentage of those markets already, and further success by BCBS-MO and BCBS-KC in excluding competitors from those markets will confer monopolies on BCBS-MO and BCBS-KC in violation of § 416.031.2 of the Missouri Antitrust Law.

968.    BCBS-MO's and BCBS-KC's attempted monopolizations of the relevant markets have harmed competition in those markets and have caused injury to Plaintiff and the Missouri Class.  Premiums charged by BCBS-MO and BCBS-KC have been higher than they would have been in a competitive market.

969.    Plaintiff and the Missouri Class have been damaged as the result of BCBS-MO's and BCBS-KC's attempted monopolizations of the relevant markets.

**Count Sixty-One**
(Unjust Enrichment)

970.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

971.    BCBS-MO and BCBS-KC have benefitted from their unlawful acts through Plaintiff and the Missouri Class's overpayments for health insurance premiums to BCBS-MO and BCBS-KC.  BCBS-MO and BCBS-KC have unjustly enriched themselves at the expense of Plaintiff and the Missouri Class.

972.    It would be inequitable for BCBS-MO and BCBS-KC to be permitted to retain the benefit of these supra-competitive premiums that were conferred by Plaintiff and the Missouri Class and retained by BCBS-MO and BCBS-KC.

973.    By reason of their unlawful conduct, BCBS-MO and BCBS-KC must make restitution to Plaintiff and the Missouri Class.

**NEW HAMPSHIRE**

(Plaintiffs Erik Barstow and GC/AAA Fences, Inc. and the New Hampshire Class Against
Defendants BCBS-NH and BCBSA)

**Count Sixty-Two**
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

974.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

975.    The License Agreements, Membership Standards, and Guidelines agreed to by
BCBS-NH and BCBSA represent horizontal agreements entered into between BCBS-NH and the
thirty-seven other member plans of BCBSA, all of whom are competitors or potential
competitors in the market for commercial health insurance.

976.    Each of the License Agreements, Membership Standards, and Guidelines entered
into between BCBSA and BCBS-NH represents a contract, combination and/or conspiracy
within the meaning of Section 1 of the Sherman Act.

977.    Through the License Agreements, Membership Standards, and Guidelines,
BCBSA and BCBS-NH have agreed to divide and allocate the geographic markets for the sale of
commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA
members.  By so doing, the BCBSA members (including BCBS-NH) have conspired to restrain
trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per
se* illegal under Section 1 of the Sherman Act.

978.    The market allocation agreements entered into between BCBS-NH and the thirty-
seven other BCBSA member plans (executed through the BCBSA License Agreements and
related Membership Standards and Guidelines) are anticompetitive.

979.     BCBS-NH has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

980.     Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

     a.  Reducing the number of health insurance companies competing with BCBS-NH throughout New Hampshire;

     b.  Unreasonably limiting the entry of competitor health insurance companies into New Hampshire;

     c.  Allowing BCBS-NH to maintain and enlarge its market power throughout New Hampshire;

     d.  Allowing BCBS-NH to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

     e.  Depriving consumers of health insurance of the benefits of free and open competition.

981.     The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

982.     The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

983.     As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other

members of the New Hampshire Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-NH than they would have paid with increased competition and but for the Sherman Act violations.

984. Plaintiffs and the New Hampshire Class seek money damages from BCBS-NH and BCBSA for their violations of Section 1 of the Sherman Act.

### Count Sixty-Three
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

985. Plaintiffs repeat and reallege the allegations in all Paragraphs above.

986. BCBS-NH has monopoly power in the individual and small group full-service commercial health insurance market in New Hampshire. This monopoly power is evidenced by, among other things, BCBS-NH's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

987. BCBS-NH has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

988. BCBS-NH's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

989. As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and other members of the New Hampshire Class have suffered injury and damages in an amount to be

proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-NH than they would have paid but for the Sherman Act violations.

990.    Plaintiffs and the New Hampshire Class seek money damages from BCBS-NH for its violations of Section 2 of the Sherman Act.

### Count Sixty-Four
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

991.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

992.    BCBS-NH has acted with the specific intent to monopolize the relevant markets.

993.    There was and is a dangerous possibility that BCBS-NH will succeed in its attempt to monopolize the relevant markets because BCBS-NH controls a large percentage of those markets already, and further success by BCBS-NH in excluding competitors from those markets will confer a monopoly on BCBS-NH in violation of Section 2 of the Sherman Act.

994.    BCBS-NH's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the New Hampshire Class. Premiums charged by BCBS-NH have been higher than they would have been in a competitive market.

995.    Plaintiffs and the New Hampshire Class have been damaged as the result of BCBS-NH's attempted monopolization of the relevant markets.

### Count Sixty-Five
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of N.H. Rev. Stat. Ann. § 356:2)

996.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

997.    The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-NH and BCBSA represent horizontal agreements entered into between BCBS-NH and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

998.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-NH represents a contract, combination and/or conspiracy within the meaning of N.H. Rev. Stat. Ann. § 356:2.

999.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-NH have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-NH) have conspired to restrain trade in violation of N.H. Rev. Stat. Ann. § 356:2.  These market allocation agreements are *per se* illegal under N.H. Rev. Stat. Ann. § 356:2.

1000.   The market allocation agreements entered into between BCBS-NH and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

1001.   BCBS-NH has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

1002.   Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.   Reducing the number of health insurance companies competing with BCBS-NH throughout New Hampshire;

b.  Unreasonably limiting the entry of competitor health insurance companies into New Hampshire;

c.  Allowing BCBS-NH to maintain and enlarge its market power throughout New Hampshire;

d.  Allowing BCBS-NH to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

e.  Depriving consumers of health insurance of the benefits of free and open competition.

1003.  The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

1004.  The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of N.H. Rev. Stat. Ann. § 356:2.

1005.  As a direct and proximate result of the Individual Blue Plans' continuing violations of N.H. Rev. Stat. Ann. § 356:2 described in this Complaint, Plaintiffs and other members of the New Hampshire Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-NH than they would have paid with increased competition and but for the violations of N.H. Rev. Stat. Ann. § 356:2.

1006.  Plaintiffs and the New Hampshire Class seek money damages from BCBS-NH and BCBSA for their violations of N.H. Rev. Stat. Ann. § 356:2.

236

**Count Sixty-Six**
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of N.H. Rev. Stat. Ann. § 356:3)

1007.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1008.   BCBS-NH has monopoly power in the individual and small group full-service commercial health insurance market in New Hampshire.  This monopoly power is evidenced by, among other things, BCBS-NH's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

1009.   BCBS-NH has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

1010.   BCBS-NH's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of N.H. Rev. Stat. Ann. § 356:3, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

1011.   As a direct and proximate result of the Individual Blue Plans' continuing violations of N.H. Rev. Stat. Ann. § 356:3 described in this Complaint, Plaintiffs and other members of the New Hampshire Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-NH than they would have paid but for the violations of N.H. Rev. Stat. Ann. § 356:3.

1012.   Plaintiffs and the New Hampshire Class seek money damages from BCBS-NH for its violations of N.H. Rev. Stat. Ann. § 356:3.

**Count Sixty-Seven**
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of N.H. Rev. Stat. Ann. § 356:3)

1013.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1014.   BCBS-NH has acted with the specific intent to monopolize the relevant markets.

1015.   There was and is a dangerous possibility that BCBS-NH will succeed in its attempt to monopolize the relevant markets because BCBS-NH controls a large percentage of those markets already, and further success by BCBS-NH in excluding competitors from those markets will confer a monopoly on BCBS-NH in violation of N.H. Rev. Stat. Ann. § 356:3.

1016.   BCBS-NH's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the New Hampshire Class. Premiums charged by BCBS-NH have been higher than they would have been in a competitive market.

1017.   Plaintiffs and the New Hampshire Class have been damaged as the result of BCBS-NH's attempted monopolization of the relevant markets.

**Count Sixty-Eight**
(Unjust Enrichment)

1018.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1019.   BCBS-NH has benefitted from its unlawful acts through Plaintiffs' and the New Hampshire Class's overpayments for health insurance premiums to BCBS-NH.  BCBS-NH has unjustly enriched itself at the expense of the Plaintiffs and the New Hampshire Class.

1020.   It would be inequitable for BCBS-NH to be permitted to retain the benefit of these supra-competitive premiums that were conferred by Plaintiffs and the New Hampshire Class and retained by BCBS-NH.

1021.   By reason of its unlawful conduct, BCBS-NH must make restitution to Plaintiffs and the New Hampshire Class.

# NORTH CAROLINA

(Plaintiffs Keith O. Cerven, Teresa M. Cerven, and SHGI Corp. and the North Carolina Class
Against Defendants BCBS-NC and BCBSA)

## Count Sixty-Nine
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

1022.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1023.   The License Agreements, Membership Standards, and Guidelines agreed to by
BCBS-NC and BCBSA represent horizontal agreements entered into between BCBS-NC and the
37 other member plans of BCBSA, all of whom are competitors or potential competitors in the
market for commercial health insurance.

1024.   Each of the License Agreements, Membership Standards, and Guidelines entered
into between BCBSA and BCBS-NC represents a contract, combination and/or conspiracy
within the meaning of Section 1 of the Sherman Act.

1025.   Through the License Agreements, Membership Standards, and Guidelines,
BCBSA and BCBS-NC have agreed to divide and allocate the geographic markets for the sale of
commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA
members.  By so doing, the BCBSA members (including BCBS-NC) have conspired to restrain
trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per
se* illegal under Section 1 of the Sherman Act.

1026.   The market allocation agreements entered into between BCBS-NC and the thirty-
seven other BCBSA member plans (executed through the BCBSA License Agreements and
related Membership Standards and Guidelines) are anticompetitive.

1027.   BCBS-NC has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

1028.   Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

     a.   Reducing the number of health insurance companies competing with BCBS-NC throughout North Carolina;

     b.   Unreasonably limiting the entry of competitor health insurance companies into North Carolina;

     c.   Allowing BCBS-NC to maintain and enlarge its market power throughout North Carolina;

     d.   Allowing BCBS-NC to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

     e.   Depriving consumers of health insurance of the benefits of free and open competition.

1029.   The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

1030.   The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

1031.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other

members of the North Carolina Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-NC than they would have paid with increased competition and but for the Sherman Act violations.

1032. Plaintiffs and the North Carolina Class seek money damages from BCBS-NC and BCBSA for their violations of Section 1 of the Sherman Act.

## Count Seventy
(MFNs; Sherman Act Section 1 Violation)

1033. Plaintiffs repeat and reallege the allegations above.

1034. BCBS-NC has market power in the sale of commercial health insurance to individuals and small groups in each relevant geographic market alleged herein.

1035. The provider agreements BCBS-NC entered into between BCBS-NC and health care providers in North Carolina that contain MFN provisions constitute contracts, combinations, and conspiracies within the meaning of Section 1 of the Sherman Act.

1036. Each of the BCBS-NC provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

a. Raising the prices of health care services to commercial health insurers in competition with BCBS-NC;

b. Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurance in competition with BCBS-NC from obtaining competitive pricing from health care providers;

    c.   Unreasonably restricting the ability of health care providers to offer to BCBS-NC's competitors or potential competitors reduced prices for services that the health care providers and insurers consider to be in their mutual interest;

    d.   Depriving consumers of health care services and health insurance of the benefits of free and open competition.

1037.   The procompetitive benefits, if any, of the BCBS-NC provider agreements containing MFN provisions do not outweigh the anticompetitive effects of the agreements.

1038.   Each agreement between BCBS-NC and a health care provider that contains an MFN unreasonably restrains trade in violation of Section 1 of the Sherman Act.

1039.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other members of the North Carolina Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-NC than they would have paid but for the Sherman Act violations.

1040.   Plaintiffs and the NC Class seek money damages from BCBS-NC for its violations of Section 1 of the Sherman Act.

### Count Seventy-One
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

1041.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1042.   BCBS-NC has monopoly power in the individual and small group full-service commercial health insurance market in North Carolina.  This monopoly power is evidenced by, among other things, BCBS-NC's ability to enter into MFN agreements with providers, which

evidences BCBS-NC's ability to control prices and exclude competitors, and BCBS-NC's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

1043.   BCBS-NC has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

1044.   BCBS-NC's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

1045.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and other members of the North Carolina Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-NC than they would have paid but for the Sherman Act violations.

1046.   Plaintiffs and the North Carolina Class seek money damages from BCBS-NC for its violations of Section 2 of the Sherman Act.

### Count Seventy-Two
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

1047.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1048.   BCBS-NC has acted with the specific intent to monopolize the relevant markets.

1049.   There was and is a dangerous possibility that BCBS-NC will succeed in its attempt to monopolize the relevant markets because BCBS-NC controls a large percentage of those markets already, and further success by BCBS-NC in excluding competitors from those markets will confer a monopoly on BCBS-NC in violation of Section 2 of the Sherman Act.

1050.   BCBS-NC's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the North Carolina Class. Premiums charged by BCBS-NC have been higher than they would have been in a competitive market.

1051.   Plaintiffs and the North Carolina Class have been damaged as the result of BCBS-NC's attempted monopolization of the relevant markets.

### Count Seventy-Three
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of North Carolina General Statute Sections 58-63-15, 75-1, and 75-1.1)

1052.   Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 174.

1053.   The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-NC and BCBSA represent horizontal agreements entered into between BCBS-NC and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

1054.   Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-NC represents a contract, combination, and/or conspiracy within the meaning of North Carolina General Statute Section 75-1 and constitutes an unfair method of competition in or affecting commerce and unfair or deceptive practice affecting commerce within the meaning of North Carolina General Statute Section 75-1.1, and an unfair

method of competition and unfair or deceptive act or practice in the business of insurance within the meaning of North Carolina General Statute Section 58-63-10.

1055.   Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-NC have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-NC) have conspired to restrain trade in violation of North Carolina General Statute Sections 75-1, 75-1.1, and 58-63-10.  These market allocation agreements are *per se* illegal under North Carolina General Statute Sections 75-1, 75-1.1, and 58-63-10.

1056.   The market allocation agreements entered into between BCBS-NC and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

1057.   BCBS-NC has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

1058.   Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

> a.  Reducing the number of health insurance companies competing with BCBS-NC throughout North Carolina;
>
> b.  Unreasonably limiting the entry of competitor health insurance companies into North Carolina;
>
> c.  Allowing BCBS-NC to maintain and enlarge its market power throughout North Carolina;

     d.   Allowing BCBS-NC to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

     e.   Depriving consumers of health insurance of the benefits of free and open competition.

1059.   The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

1060.   The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of North Carolina General Statute Sections 75-1, 75-1.1, and 58-63-10.

1061.   As a direct and proximate result of the Individual Blue Plans' continuing violations of North Carolina General Statute Sections 75-1, 75-1.1, and 58-63-10 described in this Complaint, Plaintiffs and other members of the North Carolina Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-NC than they would have paid with increased competition and but for the North Carolina General Statute violations.

1062.   Plaintiffs and the North Carolina Class seek money damages from BCBS-NC and BCBSA for their violations of North Carolina General Statute Sections 75-1, 75-1.1, and 58-63-10.

### Count Seventy-Four
(MFNs; Violation of North Carolina General Statute Section 75-1, 75-1.1, and 58-63-10)

1063.   Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 185.

1064.   BCBS-NC has market power in the sale of commercial health insurance to individuals and small groups in each relevant geographic market alleged herein.

1065.   The provider agreements BCBS-NC entered into between BCBS-NC and health care providers in North Carolina that contain MFN provisions constitute contracts, combinations, and conspiracies within the meaning of North Carolina General Statute Section 75-1, and constitute an unfair method of competition in or affecting commerce and unfair or deceptive practice affecting commerce within the meaning of North Carolina General Statute Section 75-1.1, and an unfair method of competition and unfair or deceptive act or practice in the business of insurance within the meaning of North Carolina General Statute Section 58-63-10.

1066.   Each of the BCBS-NC provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

   a.   Raising the prices of health care services to commercial health insurers in competition with BCBS-NC;

   b.   Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurance in competition with BCBS-NC from obtaining competitive pricing from health care providers;

   c.   Unreasonably restricting the ability of health care providers to offer to BCBS-NC's competitors or potential competitors reduced prices for services that the health care providers and insurers consider to be in their mutual interest;

   d.   Depriving consumers of health care services and health insurance of the benefits of free and open competition.

248

1067.   The procompetitive benefits, if any, of the BCBS-NC provider agreements containing MFN provisions do not outweigh the anticompetitive effects of the agreements.

1068.   Each agreement between BCBS-NC and a health care provider that contains an MFN unreasonably restrains trade in violation of North Carolina General Statute Sections 75-1, 75-1.1, and 58-63-10.

1069.   As a direct and proximate result of the Individual Blue Plans' continuing violations of North Carolina General Statute Sections 75-1, 75-1.1, and 58-63-10 described in this Complaint, Plaintiffs and other members of the North Carolina Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-NC than they would have paid but for the North Carolina General Statute violations.

1070.   Plaintiffs and the North Carolina Class seek money damages from BCBS-NC for its violations of North Carolina General Statute Section 75-1, 75-1.1, and 58-63-10.

## Count Seventy-Five
### (Unjust Enrichment)

1071.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1072.   BCBS-NC has benefitted from its unlawful acts through Plaintiffs' and the North Carolina Class's overpayments for health insurance premiums to BCBS-NC.  BCBS-NC has unjustly enriched itself at the expense of the Plaintiffs and the North Carolina Class.

1073.   It would be inequitable for BCBS-NC to be permitted to retain the benefit of these supra-competitive premiums that were conferred by Plaintiffs and the North Carolina Class, retained by BCBS-NC, and were not gratuitous.

1074.   By reason of its unlawful conduct, BCBS-NC must make restitution to Plaintiffs and the North Carolina Class.

**WESTERN PENNSYLVANIA**

**Count Seventy-Six**

(Plaintiffs Kathleen Scheller and Iron Gate Technology, Inc. and the Western Pennsylvania Class
Against Defendants Highmark BCBS, BC-Northeastern PA, Independence BC, and BCBSA)

(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

1075.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1076.   The License Agreements, Membership Standards, and Guidelines agreed to by
Highmark BCBS and BCBSA, BC-Northeastern PA and BCBSA, and Independence BC and
BCBSA represent horizontal agreements entered into between Highmark BCBS, BC-
Northeastern PA, Independence BC and the 35 other member plans of BCBSA, all of whom are
competitors or potential competitors in the market for commercial health insurance.

1077.   Each of the License Agreements, Membership Standards, and Guidelines entered
into between BCBSA and Highmark BCBS, BC-Northeastern PA and BCBSA, and
Independence BC and BCBSA represents a contract, combination and/or conspiracy within the
meaning of Section 1 of the Sherman Act.

1078.   Through the License Agreements, Membership Standards, and Guidelines,
BCBSA and Highmark BCBS, BC-Northeastern PA and BCBSA, and Independence BC and
BCBSA have agreed to divide and allocate the geographic markets for the sale of commercial
health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.
By so doing, the BCBSA members (including Highmark BCBS, BC-Northeastern PA, and
Independence BC) have conspired to restrain trade in violation of Section 1 of the Sherman Act.
These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

1079.   The market allocation agreements entered into between Highmark BCBS, BC-
Northeastern PA, and Independence BC and the thirty-five other BCBSA member plans

251

(executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

1080.   Highmark BCBS has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

1081.   Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

    a.   Reducing the number of health insurance companies competing with Highmark BCBS throughout Western Pennsylvania;

    b.   Unreasonably limiting the entry of competitor health insurance companies into Western Pennsylvania;

    c.   Allowing Highmark BCBS to maintain and enlarge its market power throughout Western Pennsylvania;

    d.   Allowing Highmark BCBS to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

    e.   Depriving consumers of health insurance of the benefits of free and open competition.

1082.   The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

1083.   The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

1084.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Western Pennsylvania Class have suffered injury and damages in an amount to be proven at trial.   These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to Highmark BCBS than they would have paid with increased competition and but for the Sherman Act violations.

1085.   Plaintiffs and the Western Pennsylvania Class seek money damages from Highmark BCBS, BC-Northeastern PA, Independence BC, and BCBSA for their violations of Section 1 of the Sherman Act.

## Count Seventy-Seven
(Plaintiffs Kathleen Scheller and Iron Gate Technology, Inc. and the Western Pennsylvania Class Against Defendants Highmark BCBS and BC-Northeastern PA)

(Illegal Anticompetitive Agreement with BC-Northeastern PA; Section 1 Violation)

1086.   Plaintiffs repeat and reallege the allegations above.

1087.   Highmark BCBS has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic market alleged herein.

1088.   The agreement Highmark BCBS entered into with BC-Northeastern PA in which the two competitors agreed to refrain from competing constitutes a contract, combination, and/or conspiracy within the meaning of Section 1 of the Sherman Act.

1089.   The non-compete agreement between Highmark BCBS and BC-Northeastern PA has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.   Reducing the number of health insurance companies competing with

         Highmark BCBS throughout Western Pennsylvania;

b.   Unreasonably limiting the entry of competitor health insurance companies into Western Pennsylvania;

c.   Allowing Highmark BCBS to maintain and enlarge its market power throughout Western Pennsylvania;

d.   Allowing Highmark BCBS to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

e.   Depriving consumers of health insurance of the benefits of free and open competition.

1090.   The procompetitive benefits, if any, of the non-compete agreement between Highmark BCBS and BC-Northeastern PA do not outweigh the anticompetitive effects of the agreement.

1091.   The non-compete agreement between Highmark BCBS and BC-Northeastern PA unreasonably restrains trade in violation of Section 1 of the Sherman Act.

1092.   As a direct and proximate result of Highmark BCBS and BC-Northeastern PA's continuing violations of Section 1 of the Sherman Act, Plaintiffs and other members of the Western Pennsylvania Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to Highmark BCBS than they would have paid but for the Sherman Act violations.

1093.   Plaintiffs and the Western Pennsylvania Class seek money damages from Highmark BCBS and BC-Northeastern PA for their violations of Section 1 of the Sherman Act.

**Count Seventy-Eight**

(Plaintiffs Kathleen Scheller and Iron Gate Technology, Inc. and the Western Pennsylvania Class
Against Defendants Highmark BCBS and Independence BC)

(Illegal Anticompetitive Agreement with Independence BC; Section 1 Violation)

1094.   Plaintiffs repeat and reallege the allegations above.

1095.   Highmark BCBS has market power in the sale of full-service commercial health
insurance to individual and small group consumers in each relevant geographic market alleged
herein.

1096.   The agreement Highmark BCBS entered into with Independence BC in which the
two competitors agreed to refrain from competing constitutes a contract, combination, and/or
conspiracy within the meaning of Section 1 of the Sherman Act.

1097.   The non-compete agreement between Highmark BCBS and Independence BC has
had substantial and unreasonable anticompetitive effects in the relevant markets, including but
not limited to:

      a.   Reducing the number of health insurance companies competing with
          Highmark BCBS throughout Western Pennsylvania;

      b.   Unreasonably limiting the entry of competitor health insurance companies
          into Western Pennsylvania;

      c.   Allowing Highmark BCBS to maintain and enlarge its market power
          throughout Western Pennsylvania;

      d.   Allowing Highmark BCBS to supra-competitively raise the premiums charged
          to consumers by artificially inflated, unreasonable, and/or supra-competitive
          amounts;

   e.   Depriving consumers of health insurance of the benefits of free and open competition.

1098.   The procompetitive benefits, if any, of the non-compete agreement between Highmark BCBS and Independence BC do not outweigh the anticompetitive effects of the agreement.

1099.   The non-compete agreement between Highmark BCBS and Independence BC unreasonably restrains trade in violation of Section 1 of the Sherman Act.

1100.   As a direct and proximate result of Highmark BCBS and Independence BC's continuing violations of Section 1 of the Sherman Act, plaintiffs and other members of the Western Pennsylvania Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to Highmark BCBS than they would have paid but for the Sherman Act violations.

1101.   Plaintiffs and the Western Pennsylvania Class seek money damages from Highmark BCBS and Independence BC for their violations of Section 1 of the Sherman Act.

**Count Seventy-Nine**

(Plaintiffs Kathleen Scheller and Iron Gate Technology, Inc. and the Western Pennsylvania Class Against Defendant Highmark BCBS)

(MFNs; Sherman Act Section 1 Violation)

1102.   Plaintiffs repeat and reallege the allegations above.

1103.   Highmark BCBS has market power in the sale of commercial health insurance to individuals and small groups in each relevant geographic market alleged herein.

1104. The provider agreements Highmark BCBS entered into between Highmark BCBS and health care providers in Western Pennsylvania that contain MFN provisions constitute contracts, combinations, and conspiracies within the meaning of Section 1 of the Sherman Act.

1105. Each of the Highmark BCBS provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a. Raising the prices of health care services to commercial health insurers in competition with Highmark BCBS;

      b. Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurance in competition with Highmark BCBS from obtaining competitive pricing from health care providers;

      c. Unreasonably restricting the ability of health care providers to offer to Highmark BCBS competitors or potential competitors reduced prices for services that the health care providers and insurers consider to be in their mutual interest;

      d. Depriving consumers of health care services and health insurance of the benefits of free and open competition.

1106. The procompetitive benefits, if any, of the Highmark BCBS provider agreements containing MFN provisions do not outweigh the anticompetitive effects of the agreements.

1107. Each agreement between Highmark BCBS and a health care provider that contains an MFN unreasonably restrains trade in violation of Section 1 of the Sherman Act.

1108.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Western Pennsylvania Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to Highmark BCBS than they would have paid but for the Sherman Act violations.

1109.   Plaintiffs and the Western Pennsylvania Class seek money damages from Highmark BCBS for its violations of Section 1 of the Sherman Act.

**Count Eighty**
(Plaintiffs Kathleen Scheller and Iron Gate Technology, Inc. and the Western Pennsylvania Class
Against Defendant Highmark BCBS)

(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

1110.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1111.   Highmark BCBS has monopoly power in the individual and small group full-service commercial health insurance market in Western Pennsylvania.  This monopoly power is evidenced by, among other things, Highmark BCBS's ability to enter into MFN agreements with providers, which evidences Highmark BCBS's ability to control prices and exclude competitors, and Highmark BCBS's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

1112.   Highmark BCBS has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

1113.   Highmark BCBS's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act,

and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

1114.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Western Pennsylvania Class have suffered injury and damages in an amount to be proven at trial.   These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to Highmark BCBS than they would have paid but for the Sherman Act violations.

1115.   Plaintiffs and the Western Pennsylvania Class seek money damages from Highmark BCBS for its violations of Section 2 of the Sherman Act.

**Count Eighty-One**
(Plaintiffs Kathleen Scheller and Iron Gate Technology, Inc. and the Western Pennsylvania Class
Against Defendant Highmark BCBS)

(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

1116.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1117.   Highmark BCBS has acted with the specific intent to monopolize the relevant markets.

1118.   There was and is a dangerous possibility that Highmark BCBS will succeed in its attempt to monopolize the relevant markets because Highmark BCBS controls a large percentage of those markets already, and further success by Highmark BCBS in excluding competitors from those markets will confer a monopoly on Highmark BCBS in violation of Section 2 of the Sherman Act.

1119.   Highmark BCBS's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Western Pennsylvania

259

Class.  Premiums charged by Highmark BCBS have been higher than they would have been in a competitive market.

      1120.   Plaintiffs and the Western Pennsylvania Class have been damaged as the result of Highmark BCBS's attempted monopolization of the relevant markets.

## RHODE ISLAND

(Plaintiff Nancy Thomas and the Rhode Island Class Against Defendants BCBS-RI and BCBSA)

### Count Eighty-Two
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

1121.   Plaintiff repeats and realleges the allegations in all Paragraphs above.

1122.   The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-RI and BCBSA represent horizontal agreements entered into between BCBS-RI and the 37 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

1123.   Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-RI represents a contract, combination and/or conspiracy within the meaning of Section 1 of the Sherman Act.

1124.   Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-RI have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-RI) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

1125.   The market allocation agreements entered into between BCBS-RI and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

261

1126. BCBS-RI has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

1127. Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a. Reducing the number of health insurance companies competing with BCBS-RI throughout Rhode Island;

      b. Unreasonably limiting the entry of competitor health insurance companies into Rhode Island;

      c. Allowing BCBS-RI to maintain and enlarge its market power throughout Rhode Island;

      d. Allowing BCBS-RI to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

      e. Depriving consumers of health insurance of the benefits of free and open competition.

1128. The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

1129. The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

1130. As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiff and other

members of the Rhode Island Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-RI than they would have paid with increased competition and but for the Sherman Act violations.

1131. Plaintiff and the Rhode Island Class seek money damages from BCBS-RI and BCBSA for their violations of Section 1 of the Sherman Act.

### Count Eighty-Three
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

1132. Plaintiff repeats and realleges the allegations in all Paragraphs above.

1133. BCBS-RI has monopoly power in the individual and small group full-service commercial health insurance market in Rhode Island. This monopoly power is evidenced by, among other things, BCBS-RI's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

1134. BCBS-RI has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

1135. BCBS-RI's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

1136. As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiff and other members of the Rhode Island Class have suffered injury and damages in an amount to be proven

at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-RI than they would have paid but for the Sherman Act violations.

1137.  Plaintiff and the Rhode Island Class seek money damages from BCBS-RI for its violations of Section 2 of the Sherman Act.

### Count Eighty-Four
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

1138.  Plaintiff repeats and realleges the allegations in all Paragraphs above.

1139.  BCBS-RI has acted with the specific intent to monopolize the relevant markets.

1140.  There was and is a dangerous possibility that BCBS-RI will succeed in its attempt to monopolize the relevant markets because BCBS-RI controls a large percentage of those markets already, and further success by BCBS-RI in excluding competitors from those markets will confer a monopoly on BCBS-RI in violation of Section 2 of the Sherman Act.

1141.  BCBS-RI's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the Rhode Island Class. Premiums charged by BCBS-RI have been higher than they would have been in a competitive market.

1142.  Plaintiff and the Rhode Island Class have been damaged as the result of BCBS-RI's attempted monopolization of the relevant markets.

### Count Eighty-Five
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Rhode Island General Laws § 6-36-4)

1143.  Plaintiff repeats and realleges the allegations in all Paragraphs above.

1144.   The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-RI and BCBSA represent horizontal agreements entered into between BCBS-RI and the 37 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

1145.   Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-RI represents a contract, combination and/or conspiracy within the meaning of Rhode Island General Laws § 6-36-4.

1146.   Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-RI have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-RI) have conspired to restrain trade in violation of Rhode Island General Laws § 6-36-4.  These market allocation agreements are *per se* illegal under Rhode Island General Laws § 6-36-4.

1147.   The market allocation agreements entered into between BCBS-RI and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

1148.   BCBS-RI has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

1149.   Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

        a.   Reducing the number of health insurance companies competing with BCBS-RI throughout Rhode Island;

    b.   Unreasonably limiting the entry of competitor health insurance companies into Rhode Island;

    c.   Allowing BCBS-RI to maintain and enlarge its market power throughout Rhode Island;

    d.   Allowing BCBS-RI to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

    e.   Depriving consumers of health insurance of the benefits of free and open competition.

1150.   The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

1151.   The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Rhode Island General Laws § 6-36-4.

1152.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Rhode Island General Laws § 6-36-4 described in this Complaint, Plaintiff and other members of the Rhode Island Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-RI than they would have paid with increased competition and but for the violations of Rhode Island General Laws § 6-36-4.

1153.   Plaintiff and the Rhode Island Class seek money damages from BCBS-RI and BCBSA for their violations of Rhode Island General Laws § 6-36-4.

**Count Eighty-Six**

(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Rhode Island General Laws § 6-36-5)

1154.   Plaintiff repeats and realleges the allegations in all Paragraphs above.

1155.   BCBS-RI has monopoly power in the individual and small group full-service commercial health insurance market in Rhode Island.  This monopoly power is evidenced by, among other things, BCBS-RI's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

1156.   BCBS-RI has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

1157.   BCBS-RI's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Rhode Island General Laws § 6-36-5, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

1158.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Rhode Island General Laws § 6-36-5 described in this Complaint, Plaintiff and other members of the Rhode Island Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-RI than they would have paid but for the violations of Rhode Island General Laws § 6-36-5.

1159.   Plaintiff and the Rhode Island Class seek money damages from BCBS-RI for its violations of Rhode Island General Laws § 6-36-5.

### **Count Eighty-Seven**
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Rhode Island General Laws § 6-36-5)

1160.   Plaintiff repeats and realleges the allegations in all Paragraphs above.

1161.   BCBS-RI has acted with the specific intent to monopolize the relevant markets.

1162.   There was and is a dangerous possibility that BCBS-RI will succeed in its attempt to monopolize the relevant markets because BCBS-RI controls a large percentage of those markets already, and further success by BCBS-RI in excluding competitors from those markets will confer a monopoly on BCBS-RI in violation of Rhode Island General Laws § 6-36-5.

1163.   BCBS-RI's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the Rhode Island Class. Premiums charged by BCBS-RI have been higher than they would have been in a competitive market.

1164.   Plaintiff and the Rhode Island Class have been damaged as the result of BCBS-RI's attempted monopolization of the relevant markets.

## Count Eighty-Eight
(Unjust Enrichment)

1165.   Plaintiff repeats and realleges the allegations in all Paragraphs above.

1166.   BCBS-RI has benefitted from its unlawful acts through Plaintiff and the Rhode Island Class's overpayments for health insurance premiums.

1167.   It would be inequitable for BCBS-RI to be permitted to retain the benefit of these supra-competitive premiums that were conferred by Plaintiff and the Rhode Island Class and retained by BCBS-RI.

1168.   In equity, BCBS-RI should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiff and the Rhode Island Class.

## SOUTH CAROLINA

(Plaintiff Shred 360, LLC and the South Carolina Class Against Defendants BCBS-SC and
BCBSA)

### Count Eighty-Nine
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

1169.   Plaintiff repeats and realleges the allegations in all Paragraphs above.

1170.   The License Agreements, Membership Standards, and Guidelines agreed to by
BCBS-SC and BCBSA represent horizontal agreements entered into between BCBS-SC and the
37 other member plans of BCBSA, all of whom are competitors or potential competitors in the
market for commercial health insurance.

1171.   Each of the License Agreements, Membership Standards, and Guidelines entered
into between BCBSA and BCBS-SC represents a contract, combination and/or conspiracy within
the meaning of Section 1 of the Sherman Act.

1172.   Through the License Agreements, Membership Standards, and Guidelines,
BCBSA and BCBS-SC have agreed to divide and allocate the geographic markets for the sale of
commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA
members.  By so doing, the BCBSA members (including BCBS-SC) have conspired to restrain
trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per
se* illegal under Section 1 of the Sherman Act.

1173.   The market allocation agreements entered into between BCBS-SC and the thirty-
seven other BCBSA member plans (executed through the BCBSA License Agreements and
related Membership Standards and Guidelines) are anticompetitive.

269

1174.   BCBS-SC has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

1175.   Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

   a. Reducing the number of health insurance companies competing with BCBS-SC throughout South Carolina;

   b. Unreasonably limiting the entry of competitor health insurance companies into South Carolina;

   c. Allowing BCBS-SC to maintain and enlarge its market power throughout South Carolina;

   d. Allowing BCBS-SC to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

   e. Depriving consumers of health insurance of the benefits of free and open competition.

1176.   The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

1177.   The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

1178.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiff and other

270

members of the South Carolina Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-SC than they would have paid with increased competition and but for the Sherman Act violations.

1179.   Plaintiff and the South Carolina Class seek money damages from BCBS-SC and BCBSA for their violations of Section 1 of the Sherman Act.

## Count Ninety
(MFNs; Sherman Act Section 1 Violation)

1180.   Plaintiff repeats and realleges the allegations above.

1181.   BCBS-SC has market power in the sale of commercial health insurance to individuals and small groups in each relevant geographic market alleged herein.

1182.   The provider agreements BCBS-SC entered into between BCBS-SC and health care providers in South Carolina that contain MFN provisions constitute contracts, combinations, and conspiracies within the meaning of Section 1 of the Sherman Act.

1183.   Each of the BCBS-SC provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      e.   Raising the prices of health care services to commercial health insurers in competition with BCBS-SC;

      f.   Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurance in competition with BCBS-SC from obtaining competitive pricing from health care providers;

g.   Unreasonably restricting the ability of health care providers to offer to BCBS-SC's competitors or potential competitors reduced prices for services that the health care providers and insurers consider to be in their mutual interest;

h.   Depriving consumers of health care services and health insurance of the benefits of free and open competition.

1184.   The procompetitive benefits, if any, of the BCBS-SC provider agreements containing MFN provisions do not outweigh the anticompetitive effects of the agreements.

1185.   Each agreement between BCBS-SC and a health care provider that contains an MFN unreasonably restrains trade in violation of Section 1 of the Sherman Act.

1186.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiff and other members of the South Carolina Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-SC than they would have paid but for the Sherman Act violations.

1187.   Plaintiff and the South Carolina Class seek money damages from BCBS-SC for its violations of Section 1 of the Sherman Act.

**Count Ninety-One**
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

1188.   Plaintiff repeats and realleges the allegations in all Paragraphs above.

1189.   BCBS-SC has monopoly power in the individual and small group full-service commercial health insurance market in South Carolina.  This monopoly power is evidenced by, among other things, BCBS-SC's ability to enter into MFN agreements with providers, which

evidences BCBS-SC's ability to control prices and exclude competitors, and BCBS-SC's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

1190.   BCBS-SC has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

1191.   BCBS-SC's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

1192.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiff and other members of the South Carolina Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-SC than they would have paid but for the Sherman Act violations.

1193.   Plaintiff and the South Carolina Class seek money damages from BCBS-SC for its violations of Section 2 of the Sherman Act.

### Count Ninety-Two
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

1194.   Plaintiff repeats and realleges the allegations in all Paragraphs above.

1195.   BCBS-SC has acted with the specific intent to monopolize the relevant markets.

1196.   There was and is a dangerous possibility that BCBS-SC will succeed in its attempt to monopolize the relevant markets because BCBS-SC controls a large percentage of those markets already, and further success by BCBS-SC in excluding competitors from those markets will confer a monopoly on BCBS-SC in violation of Section 2 of the Sherman Act.

1197.   BCBS-SC's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the South Carolina Class. Premiums charged by BCBS-SC have been higher than they would have been in a competitive market.

1198.   Plaintiff and the South Carolina Class have been damaged as the result of BCBS-SC's attempted monopolization of the relevant markets.

### Count Ninety-Three
(Unjust Enrichment)

1199.   Plaintiff repeats and realleges the allegations in all Paragraphs above.

1200.   BCBS-SC has benefitted from its unlawful acts through Plaintiff and the South Carolina Class's overpayments for health insurance premiums.

1201.   It would be inequitable for BCBS-SC to be permitted to retain the benefit of these supra-competitive premiums that were conferred by Plaintiff and the South Carolina Class and retained by BCBS-SC.

1202.   In equity, BCBS-SC should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiff and the South Carolina Class.

**TENNESSEE**

(Plaintiffs Danny J. Curlin and Amedius, LLC and the Tennessee Class Against Defendants
BCBS-TN and BCBSA)

**Count Ninety-Four**
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

1203.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1204.   The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-TN and BCBSA represent horizontal agreements entered into between BCBS-TN and the 37 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

1205.   Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-TN represents a contract, combination and/or conspiracy within the meaning of Section 1 of the Sherman Act.

1206.   Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-TN have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-TN) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

1207.   The market allocation agreements entered into between BCBS-TN and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

1208.  BCBS-TN has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

1209.  Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

> a.  Reducing the number of health insurance companies competing with BCBS-TN throughout Tennessee;
>
> b.  Unreasonably limiting the entry of competitor health insurance companies into Tennessee;
>
> c.  Allowing BCBS-TN to maintain and enlarge its market power throughout Tennessee;
>
> d.  Allowing BCBS-TN to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;
>
> e.  Depriving consumers of health insurance of the benefits of free and open competition.

1210.  The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

1211.  The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

1212.  As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other

members of the Tennessee Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-TN than they would have paid with increased competition and but for the Sherman Act violations.

1213. Plaintiffs and the Tennessee Class seek money damages from BCBS-TN and BCBSA for their violations of Section 1 of the Sherman Act.

**Count Ninety-Five**
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

1214. Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1215. BCBS-TN has monopoly power in the individual and small group full-service commercial health insurance market in Tennessee. This monopoly power is evidenced by, among other things, BCBS-TN's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

1216. BCBS-TN has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

1217. BCBS-TN's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

1218. As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Tennessee Class have suffered injury and damages in an amount to be proven at

trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-TN than they would have paid but for the Sherman Act violations.

1219.  Plaintiffs and the Tennessee Class seek money damages from BCBS-TN for its violations of Section 2 of the Sherman Act.

### Count Ninety-Six
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

1220.  Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1221.  BCBS-TN has acted with the specific intent to monopolize the relevant markets.

1222.  There was and is a dangerous possibility that BCBS-TN will succeed in its attempt to monopolize the relevant markets because BCBS-TN controls a large percentage of those markets already, and further success by BCBS-TN in excluding competitors from those markets will confer a monopoly on BCBS-TN in violation of Section 2 of the Sherman Act.

1223.  BCBS-TN's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Tennessee Class. Premiums charged by BCBS-TN have been higher than they would have been in a competitive market.

1224.  Plaintiffs and the Tennessee Class have been damaged as the result of BCBS-TN's attempted monopolization of the relevant markets and seek money damages from BCBS-TN and BCBSA for their violations of Section 2 of the Sherman Act.

### Count Ninety-Seven
(Arrangement, Contract, Agreement, or Conspiracy to Lessen Competition in Violation of the
Tennessee Trade Practices Act, Sec. 47-25-101 *et seq.*)

1225.  Plaintiffs repeat and reallege the allegations in the foregoing paragraphs.

1226.  The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-TN and BCBSA represent horizontal agreements entered into between BCBS-TN and the 37 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

1227.  Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-TN represents a contract, combination and/or conspiracy within the meaning of the Tennessee Trade Practices Act, Sec. 47-25-101.

1228.  Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-TN have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-TN) have conspired to restrain trade in violation of the Tennessee Trade Practices Act, Sec. 47-25-101.  These market allocation agreements are *per se* illegal under the Tennessee Trade Practices Act, Sec. 47-25-101.

1229.  The market allocation agreements entered into between BCBS-TN and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

1230.  BCBS-TN has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

1231.  Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.  Reducing the number of health insurance companies competing with BCBS-TN throughout Tennessee;

b. Unreasonably limiting the entry of competitor health insurance companies into Tennessee;

c. Allowing BCBS-TN to maintain and enlarge its market power throughout Tennessee;

d. Allowing BCBS-TN to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

e. Depriving consumers of health insurance of the benefits of free and open competition.

1232.   The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

1233.   The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of the Tennessee Trade Practices Act, Sec. 47-25-101.

1234.   As a direct and proximate result of the Individual Blue Plans' continuing violations of the Tennessee Trade Practices Act, Sec. 47-25-101 described in this Complaint, open and fair competition has been unreasonably restrained, leading to diminished consumer choices, reduced innovation, and artificially-elevated premiums, and Plaintiffs and other members of the Tennessee Class have suffered and will continue to suffer injury to their business and property.

1235.   As a direct and proximate result of the Individual Blue Plans' continuing violations of the Tennessee Trade Practices Act, Sec. 47-25-101, Plaintiffs and other members of the Tennessee Class have suffered injury and damages in an amount to be proven at trial.  These

damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-TN than they would have paid with increased competition and but for the violations of Tennessee Trade Practices Act, Sec. 47-25-101.

1236.   Plaintiffs and the Tennessee Class seek money damages from BCBS-TN and BCBSA for their violations of the Tennessee Trade Practices Act.

1237.   BCBS-TN's illegal conduct has substantially affected Tennessee commerce and caused injury to consumers in Tennessee.  Specifically, BCBS-TN's understandings, contracts, agreements, trusts, combinations, or conspiracies substantially affected Tennessee commerce as follows:

      a.   Substantial Effects on Tennessee Trade or Commerce: BCBS-TN's conduct has been far-reaching and has substantially affected Tennessee commerce.  BCBS-TN health insurance products were purchased by many thousands of enrollees in Tennessee, in all segments of society.

      b.   Substantial Monetary Effects on Tennessee Trade or Commerce: BCBS-TN's conduct is ongoing, and over the Class Period, BCBS-TN collected millions of dollars in health insurance premiums in Tennessee

      c.   Substantially Harmful Effect on the Integrity of the Tennessee Market: The Tennessee market is vulnerable and can be manipulated by conspirators either from outside Tennessee, inside Tennessee, or both. Without enforcing Tennessee's antitrust law to its fullest extent, companies that break the law will remain unpunished, and they will remain able to prey upon Tennessee without consequence.  The

purpose of Tennessee's antitrust laws is to protect the state's trade and commerce affected by anticompetitive conduct. BCBS-TN had shattered this very purpose by its illegal victimization of the market.

    d.  <u>Length of Substantial Effect on Tennessee Commerce</u>: Some arrangements, contracts, agreements, combinations, or conspiracies are short-lived. The conspiracy in this case has lasted for several years and is ongoing, providing BCBS-TN with illegal profits and permitting BCBS-TN to continue victimizing consumers and substantially affect Tennessee commerce.

**<u>Count Ninety-Eight</u>**
(Unjust Enrichment)

1238.  Plaintiffs repeat and reallege the allegations in all Paragraphs above.

1239.  BCBS-TN has benefitted from its unlawful acts through the overpayments for health insurance premiums by Plaintiffs and the Tennessee Class.

1240.  It would be inequitable for BCBS-TN to be permitted to retain the benefit of these supra-competitive premiums that were conferred by Plaintiffs and the Tennessee Class and retained by BCBS-TN.

1241.  By reason of its unlawful conduct, BCBS-TN should make restitution to Plaintiffs and the Tennessee Class. To the extent Plaintiffs are required to have exhausted administrative remedies before bringing an unjust enrichment claim, exhaustion of any such remedies is not required in this instance because: (a) the issues are of the type that would be appropriate for judicial determination, and (b) applying the doctrine here would result in substantial financial hardship, inequality, and economic inefficiency and would violate public policy. Further, any

282

action that might have been taken by Plaintiffs to pursue administrative remedies would have been futile.

    1242.   In equity, BCBS-TN should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiffs and the Tennessee Class.

## TEXAS

(Plaintiff Brett Watts and the Texas Class Against Defendants BCBS-TX and BCBSA)

### Count Ninety-Nine
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

1243.   Plaintiff repeats and realleges the allegations in all Paragraphs above.

1244.   The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-TX and BCBSA represent horizontal agreements entered into between BCBS-TX and the 37 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

1245.   Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-TX represents a contract, combination and/or conspiracy within the meaning of Section 1 of the Sherman Act.

1246.   Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-TX have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-TX) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

1247.   The market allocation agreements entered into between BCBS-TX and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

1248. BCBS-TX has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

1249. Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a. Reducing the number of health insurance companies competing with BCBS-TX throughout Texas;

      b. Unreasonably limiting the entry of competitor health insurance companies into Texas;

      c. Allowing BCBS-TX to maintain and enlarge its market power throughout Texas;

      d. Allowing BCBS-TX to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

      e. Depriving consumers of health insurance of the benefits of free and open competition.

1250. The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

1251. The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

1252. As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiff and other

members of the Texas Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-TX than they would have paid with increased competition and but for the Sherman Act violations.

1253.   Plaintiff and the Texas Class seek money damages from BCBS-TX and BCBSA for their violations of Section 1 of the Sherman Act.

### Count One Hundred
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

1254.   Plaintiff repeats and realleges the allegations in all Paragraphs above.

1255.   BCBS-TX has monopoly power in the individual and small group full-service commercial health insurance market in Texas.  This monopoly power is evidenced by, among other things, BCBS-TX's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

1256.   BCBS-TX has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

1257.   BCBS-TX's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

1258.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiff and other members of the Texas Class have suffered injury and damages in an amount to be proven at trial.

These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-TX than they would have paid but for the Sherman Act violations.

1259.  Plaintiff and the Texas Class seek money damages from BCBS-TX for its violations of Section 2 of the Sherman Act.

### Count One Hundred and One
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

1260.  Plaintiff repeats and realleges the allegations in all Paragraphs above.

1261.  BCBS-TX has acted with the specific intent to monopolize the relevant markets.

1262.  There was and is a dangerous possibility that BCBS-TX will succeed in its attempt to monopolize the relevant markets because BCBS-TX controls a large percentage of those markets already, and further success by BCBS-TX in excluding competitors from those markets will confer a monopoly on BCBS-TX in violation of Section 2 of the Sherman Act.

1263.  BCBS-TX's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the Texas Class.  Premiums charged by BCBS-TX have been higher than they would have been in a competitive market.

1264.  Plaintiff and the Texas Class have been damaged as the result of BCBS-TX's attempted monopolization of the relevant markets.

### Count One Hundred and Two
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Tex. Bus. & Com. Code Ann. § 15.05(a))

1265.  Plaintiff repeats and realleges the allegations in all Paragraphs above.

1266.  The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-TX and BCBSA represent horizontal agreements entered into between BCBS-TX and the

287

37 other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

1267.   Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-TX represents a contract, combination and/or conspiracy within the meaning of Tex. Bus. & Com. Code Ann. § 15.05(a).

1268.   Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-TX have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-TX) have conspired to restrain trade in violation of Tex. Bus. & Com. Code Ann. § 15.05(a).   These market allocation agreements are *per se* illegal under Tex. Bus. & Com. Code Ann. § 15.05(a).

1269.   The market allocation agreements entered into between BCBS-TX and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

1270.   BCBS-TX has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

1271.   Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

> a.  Reducing the number of health insurance companies competing with BCBS-TX throughout Texas;
>
> b.  Unreasonably limiting the entry of competitor health insurance companies into Texas;

    c.   Allowing BCBS-TX to maintain and enlarge its market power throughout Texas;

    d.   Allowing BCBS-TX to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts;

    e.   Depriving consumers of health insurance of the benefits of free and open competition.

1272.   The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

1273.   The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Tex. Bus. & Com. Code Ann. § 15.05(a).

1274.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Tex. Bus. & Com. Code Ann. § 15.05(a) described in this Complaint, Plaintiff and other members of the Texas Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-TX than they would have paid with increased competition and but for the violations of Tex. Bus. & Com. Code Ann. § 15.05(a).

1275.   Pursuant to Tex. Bus. & Com. Code Ann. § 15.21, Plaintiff and the Texas Class seek money damages from BCBS-TX and BCBSA for their violations of Tex. Bus. & Com. Code Ann. § 15.05(a).

**Count One Hundred and Three**
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Tex. Bus. & Com. Code Ann. § 15.05(b))

1276.   Plaintiff repeat and reallege the allegations in all Paragraphs above.

1277.   BCBS-TX has monopoly power in the individual and small group full-service commercial health insurance market in Texas.  This monopoly power is evidenced by, among other things, BCBS-TX's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

1278.   BCBS-TX has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

1279.   BCBS-TX's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Tex. Bus. & Com. Code Ann. § 15.05(b), and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

1280.   As a direct and proximate result of the Individual Blue Plans' continuing violations of Tex. Bus. & Com. Code Ann. § 15.05(b) described in this Complaint, Plaintiff and other members of the Texas Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-TX than they would have paid but for the violations of Tex. Bus. & Com. Code Ann. § 15.05(b).

1281.   Pursuant to Tex. Bus. & Com. Code Ann. § 15.21, Plaintiff and the Texas Class seek money damages from BCBS-TX for its violations of Tex. Bus. & Com. Code Ann. § 15.05(b).

**Count One Hundred and Four**
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Tex. Bus. & Com. Code Ann. § 15.05(b))

1282.   Plaintiff repeat and reallege the allegations in all Paragraphs above.

1283.   BCBS-TX has acted with the specific intent to monopolize the relevant markets.

1284.   There was and is a dangerous possibility that BCBS-TX will succeed in its attempt to monopolize the relevant markets because BCBS-TX controls a large percentage of those markets already, and further success by BCBS-TX in excluding competitors from those markets will confer a monopoly on BCBS-TX in violation of Tex. Bus. & Com. Code Ann. § 15.05(b).

1285.   BCBS-TX's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the Texas Class.  Premiums charged by BCBS-TX have been higher than they would have been in a competitive market.

1286.   Plaintiff and the Texas Class have been damaged as the result of BCBS-TX's attempted monopolization of the relevant markets.

**Count One Hundred and Five**
(Unjust Enrichment)

1287.   Plaintiff repeats and realleges the allegations in all Paragraphs above.

1288.   BCBS-TX has benefitted from its unlawful acts through the overpayments for health insurance premiums by Plaintiff and the Texas Class.

1289.   It would be inequitable for BCBS-TX to be permitted to retain the benefit of these supra-competitive premiums that were conferred by Plaintiff and the Texas Class and retained by BCBS-TX.

1290.   By reason of its unlawful conduct, BCBS-TX should make restitution to Plaintiff and the Texas Class.  Any action that might have been taken by Plaintiff to pursue administrative remedies would have been futile.

1291.   In equity, BCBS-TX should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiff and the Texas Class.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that this Court:

a.     Determine that this action may be maintained as a class action under Fed. R. Civ. P. 23;

b.     Enjoin BCBSA and each of the Individual Blue Plans from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member plan may compete;

c.     Adjudge and decree that BCBSA and each of the Individual Blue Plans have conspired to monopolize in violation of Section 2 of the Sherman Act and award the Nationwide Class damages in the form of three times the amount by which premiums charged by the Individual Blue Plans have been artificially inflated above their competitive levels during the Class Period;

d.     Adjudge and decree that BCBSA, BCBS-AL, BCBS-AR, BC-CA, BS-CA, BCBS-FL, BCBS-HI, BCBS-IL, BCBS-LA, BCBS-MI, BCBS-MS, BCBS-MO, BCBS-KC, BCBS-NH, BCBS-NC, Highmark BCBS, BC-Northeastern PA, Independence BC, BCBS-RI, BCBS-SC, BCBS-TN, and BCBS-TX have violated both Section 1 and Section 2 of the Sherman Act;

e.     Award Plaintiffs American Electric Motor Services, Inc. and CB Roofing, LLC and the Alabama Class damages in the form of three times the amount by which premiums charged by BCBS-AL have been artificially inflated above their competitive levels during the Class Period;

f.     Award Plaintiffs Linda Mills and Frank Curtis and the Arkansas Class damages in the form of three times the amount by which premiums charged by BCBS-AR

have been artificially inflated above their competitive levels during the Class Period;

g.    Award Plaintiff Judy Sheridan and the California Class damages in the form of three times the amount by which premiums charged by BC-CA and BS-CA have been artificially inflated above their competitive levels during the Class Period;

h.    Adjudge and decree that BCBSA, BC-CA, and BS-CA have violated the Cartwright Act, California Business and Professions Code §§16720, *et seq*. and 16727 and the California Business and Professions Code §17200 and award Plaintiff Judy Sheridan and the California Class appropriate damages and relief;

i.    Enjoin BS-CA from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member plan may compete;

j.    Award Plaintiff Jennifer Ray Davidson and the Florida Class damages in the form of three times the amount by which premiums charged by BCBS-FL have been artificially inflated above their competitive levels during the Class Period;

k.    Adjudge and decree that BCBSA and BCBS-FL have violated Fla. Stat. §§ 542.18, 542.19, and 542.22 and award Plaintiff Jennifer Ray Davidson and the Florida Class appropriate damages and relief;

l.    Award Plaintiffs Lawrence W. Cohn, AAL, ALC and Saccoccio & Lopez and the Hawai'i Class damages in the form of three times the amount by which premiums charged by BCBS-HI have been artificially inflated above their competitive levels during the Class Period;

294

m.    Adjudge and decree that BCBSA and BCBS-HI have violated H.R.S. §§ 480-4, 480-2, and 480-9 and award Plaintiffs Lawrence W. Cohn, AAL, ALC and Saccoccio & Lopez and the Hawai'i Class appropriate damages and relief;

n.    Award Plaintiffs Monika Bhuta, Michael E. Stark, Falcon Picture Group LLC and the Illinois Class damages in the form of three times the amount by which premiums charged by BCBS-IL have been artificially inflated above their competitive levels during the Class Period;

o.    Adjudge and decree that BCBSA and BCBS-IL have violated 740 ILCS 10/3 *et seq*. and award Plaintiffs Monika Bhuta, Michael E. Stark, Falcon Picture Group LLC and the Illinois Class appropriate damages and relief;

p.    Award Plaintiffs Renee E. Allie and Galactic Funk Touring, Inc. and the Louisiana Class damages in the form of three times the amount by which premiums charged by BCBS-LA have been artificially inflated above their competitive levels during the Class Period;

q.    Adjudge and decree that BCBSA and BCBS-LA have violated La.R.S. 51:122-23 and award Plaintiffs Renee E. Allie and Galactic Funk Touring, Inc. and the Louisiana Class appropriate damages and relief;

r.    Award Plaintiff John G. Thompson and the Michigan Class damages in the form of three times the amount by which premiums charged by BCBS-MI have been artificially inflated above their competitive levels during the Class Period;

s.    Adjudge and decree that BCBSA and BCBS-MI have violated the Michigan Antitrust Reform Act §§ 445.772, 445.773 and award Plaintiff John G. Thompson and the Michigan Class appropriate damages and relief;

t.      Award Plaintiffs Harry M. McCumber and Gaston CPA Firm and the Mississippi Class damages in the form of three times the amount by which premiums charged by BCBS-MS have been artificially inflated above their competitive levels during the Class Period;

u.      Adjudge and decree that BCBSA and BCBS-MS have violated Mississippi Antitrust Act, Sec. 75-21-1 and award Plaintiffs Harry M. McCumber and Gaston CPA Firm and the Mississippi Class appropriate damages and relief;

v.      Award Plaintiff Jeffrey S. Garner and the Missouri Class damages in the form of three times the amount by which premiums charged by BCBS-MO and BCBS-KC have been artificially inflated above their competitive levels during the Class Period;

w.      Adjudge and decree that BCBSA, BCBS-MO, and BCBS-KC have violated Missouri Antitrust Law §§ 416.031.1, 416.031.2 and award Plaintiff Jeffrey S. Garner and the Missouri Class appropriate damages and relief;

x.      Award Plaintiffs Erik Barstow and GC/AAA Fences, Inc. and the New Hampshire Class damages in the form of three times the amount by which premiums charged by BCBS-NH have been artificially inflated above their competitive levels during the Class Period;

y.      Adjudge and decree that BCBSA and BCBS-NH have violated N.H. Rev. Stat. Ann. §§ 356:2, 356:3 and award Plaintiffs Erik Barstow and GC/AAA Fences, Inc. and the New Hampshire Class appropriate damages and relief;

z.      Award Plaintiffs Keith O. Cerven, Teresa M. Cerven, and SGHI Corp. and the North Carolina Class damages in the form of three times the amount by which

premiums charged by BCBS-NC have been artificially inflated above their competitive levels during the Class Period;

aa.    Adjudge and decree that BCBSA and BCBS-NC have violated North Carolina General Statute Sections 75-1, 75-1.1, and 58-63-10 and award Plaintiffs Keith O. Cerven, Teresa M. Cerven, and SGHI Corp. and the North Carolina Class appropriate damages and relief;

bb.    Award Plaintiffs Kathleen Scheller and Iron Gate Technology, Inc. and the Western Pennsylvania Class damages in the form of three times the amount by which premiums charged by Highmark BCBS have been artificially inflated above their competitive levels during the Class Period;

cc.    Award Plaintiff Nancy Thomas and the Rhode Island Class damages in the form of three times the amount by which premiums charged by BCBS-RI have been artificially inflated above their competitive levels during the Class Period;

dd.    Adjudge and decree that BCBSA and BCBS-RI have violated Rhode Island General Laws §§ 6-36-4, 6-36-5 and award Plaintiff Nancy Thomas and the Rhode Island Class appropriate damages and relief;

ee.    Award Plaintiff Shred 360, LLC and the South Carolina Class damages in the form of three times the amount by which premiums charged by BCBS-SC have been artificially inflated above their competitive levels during the Class Period;

ff.    Award Plaintiffs Danny J. Curlin and Amedius, LLC and the Tennessee Class damages in the form of three times the amount by which premiums charged by BCBS-TN have been artificially inflated above their competitive levels during the Class Period;

gg.    Adjudge and decree that BCBSA and BCBS-TN have violated Tennessee Trade Practices Act, Sec. 47-25-101 and award Plaintiffs Danny J. Curlin and Amedius, LLC and the Tennessee Class appropriate damages and relief;

hh.    Award Plaintiff Brett Watts and the Texas Class damages in the form of three times the amount by which premiums charged by BCBS-TX have been artificially inflated above their competitive levels during the Class Period;

ii.    Adjudge and decree that BCBSA and BCBS-TX have violated Tex. Bus. & Com. Code Ann. §§ 15.05(a), 15.05(b), and 15.21 and award Plaintiff Brett Watts and the Texas Class appropriate damages and relief;

jj.    Adjudge and decree that BCBS-AR, BS-CA, BCBS-HI, BCBS-IL, BCBS-NC, BCBS-MS, BCBS-MO, BCBS-KC, BCBS-NH, BCBS-RI, BCBS-SC, BCBS-TN, and BCBS-TX have been unjustly enriched by their wrongful conduct, and award restitution to the related Plaintiffs and Classes;

kk.    Reform any agreements between BCBS-NC and health care providers, Highmark BCBS and health care providers, and BCBS-SC and health care providers, so as to strike any MFN clauses as void and unenforceable;

ll.    Award costs and attorneys' fees to Plaintiffs;

mm.    For a trial by jury; and

nn.    Award any such other and further relief as may be just and proper.

This the 1st of July, 2013.

Respectfully submitted,

/s/ David Boies
David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749-8200
dboies@bsfllp.com

Michael Hausfeld
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeldllp.com

*Subscriber Plaintiffs' Co-Lead Counsel*

Chris T. Hellums
PITTMAN, DUTTON & HELLUMS, P.C.
2001 Park Place N, 1100 Park Place Tower
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
chrish@pittmandutton.com

*Subscriber Plaintiffs' Local Facilitating
Counsel*

William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW
Washington, DC 20015
Tel: (202) 237-2727
Fax: (202) 237-6131
wisaacson@bsfllp.com

Gregory Davis
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Tel: (334) 832-9080
Fax: (334) 409-7001
gldavis@knology.net

Megan Jones
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Tel: (415) 744-1970
Fax: (415) 358-4980
mjones@hausfeldllp.com

Kathleen Chavez
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
kcc@fmcolaw.com

Cyril V. Smith
ZUCKERMAN SPAEDER, LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Tel: (410) 949-1145
Fax: (410) 659-0436
csmith@zuckerman.com

*Subscriber Plaintiffs' Steering Committee*

Eric L. Cramer
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: 1-800-424-6690
Fax: (215) 875-4604
ecramer@bm.net

Tanya Chutkan
Karen Dyer
Hamish P.M. Hume
Kathleen Kiernan
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW
Washington, DC 20015
Tel: (202) 237-2727
Fax: (202) 237-6131
tchutkan@bsfllp.com
kdyer@bsfllp.com
hhume@bsfllp.com
kkiernan@bsfllp.com

Patrick Cafferty
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
101 North Main Street, Suite 565
Ann Arbor, MI 48104
Tel: (734) 769-2144
Fax: (734) 769-1207
pcafferty@caffertyclobes.com

Bryan Clobes
Ellen Meriwether
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
1101 Market Street, Suite 2650
Philadelphia, PA 19107
Tel: (215) 864-2800
Fax: (215) 864-2810
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

Douglas Dellaccio
CORY WATSON CROWDER & DEGARIS, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 32505
Tel: (205) 328-2200
Fax: (205) 324-7896
ddellaccio@cwcd.com

Chris Cowan
THE COWAN LAW FIRM
209 Henry Street
Dallas, TX 74226-1819
Tel: (214) 826-1900
Fax: (214) 826-8900
chris@cowanlaw.net

Edwin J. Kilpela, Jr.
Benjamin Sweet
DEL SOLE CAVANAUGH STROYD LLC
200 First Avenue, Suite 300
Pittsburgh, PA 15222
Tel: (412) 261-2393
Fax: (412) 261-2110
ekilpela@dsclaw.com
bsweet@dsclaw.com

Robert M. Foote
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
rmf@fmcolaw.com

Charles T. Caliendo
GRANT & EISENHOFER
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
ccaliendo@gelaw.com

Robert Eisler
GRANT & EISENHOFER
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
reisler@gelaw.com

David Guin
Tammy Stokes
GUIN, STOKES & EVANS, LLC
The Financial Center
505 20th Street North, Suite 1000
Birmingham, AL 35203
Tel: (205) 226-2282
Fax: (205) 226-2357
davidg@gseattorneys.com
tammys@gseattorneys.com

Daniel Gustafson
Daniel C. Hedlund
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

William Butterfield
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
wbutterfield@hausfeldllp.com

Arthur Bailey
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Tel: (415) 744-1970
Fax: (415) 358-4980
abailey@hausfeldllp.com

Brent Hazzard
HAZZARD LAW, LLC
447 Northpark Drive
Ridgeland, MS 39157
Tel: (601) 977-5253
Fax: (601) 977-5236
brenthazzard@yahoo.com

John Saxon
JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203-3314
Tel: (205) 324-0223
Fax: (205) 323-1583
jsaxon@saxonattorneys.com

Lawrence Jones
JONES WARD PLC
312 South Fourth Street, Sixth Floor
Louisville, Kentucky 40202
Tel: (502) 882-6000
larry@jonesward.com

Andrew Lemmon
LEMMON LAW FIRM
650 Poydras Street, Suite 2335
New Orleans, LA 70130
Tel: (504) 581-5644
Fax: (504) 581-2156
andrew@lemmonlawfirm.com

Virginia Buchanan
LEVIN PAPANTONIO THOMAS MITCHELL
RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7000
Fax: (850) 435-7020
vbuchanan@levinlaw.com

Robert Methvin
James M. Terrell
McCALLUM, METHVIN & TERRELL, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, AL 35205
Tel: (205) 939-0199
Fax: (205) 939-0399
rgm@mmlaw.net
jterrell@mmlaw.net

Michael McGartland
McGARTLAND & BORCHARDT LLP
1300 South University Drive, Suite 500
Fort Worth, TX 76107
Tel: (817) 332-9300
Fax: (817) 332-9301
mike@attorneysmb.com

H. Lewis Gillis
MEANS GILLIS LAW, LLC
3121 Zelda Court
Montgomery, AL 36106
Tel: 1-800-626-9684
hlgillis@tmgslaw.com

David J. Hodge
MORRIS, KING & HODGE
200 Pratt Avenue NE
Huntsville, AL 35801
Tel: (256) 536-0588
Fax: (256) 533-1504
lstewart@alinjurylaw.com

Dianne M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com

Patrick W. Pendley
Christopher Coffin
PENDLEY, BAUDIN & COFFIN, LLP
Post Office Drawer 71
Plaquemine, LA 70765
Tel: (225) 687-6369
pwpendley@pbclawfirm.com
ccoffin@pbclawfirm.com

Edgar D. Gankendorff
Eric R.G. Belin
PROVOSTY & GANKENDORFF, LLC
650 Poydras Street, Suite 2700
New Orleans, LA 70130
Tel: (504) 410-2795
Fax: (504) 410-2796
egankendorff@provostylaw.com
ebelin@provostylaw.com

Richard Rouco
QUINN, CONNOR, WEAVER, DAVIES &
ROUCO LLP
2700 Highway 280 East, Suite 380
Birmingham, AL 35223
Tel: (205) 870-9989
Fax: (205) 870-9989
rrouco@qcwdr.com

Garrett Blanchfield
REINHARDT, WENDORF & BLANCHFIELD
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com

Jason Thompson
SOMMERS SCHWARTZ
One Towne Square, 17th Floor
Southfield, MI 48076
Tel: (248) 355-0300
jthompson@sommerspc.com

Larry McDevitt
David Wilkerson
Van Winkle Law Firm
11 North Market Street
Asheville, NC 28801
Tel: (828) 258-2991
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Carl S. Kravitz
Zuckerman Spaeder LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: (202) 778-1800
Fax: (202) 822-8106
ckravitz@zuckerman.com

*Subscriber Plaintiffs' Committee Chairs and
Members*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Subscriber Track

Consolidated Class Action Complaint was served by ECF, this 7st day of July, 2013, upon all

counsel of record.

 

 

 

         /s/ Kathleen Kiernan
Kathleen Kiernan