# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406)** ) ) ) ) | **Master File No. 2:13-CV-20000-RDP** <br><br> **This document relates to:** <br> **THE PROVIDER TRACK** |

_____ )

**Jerry L. Conway, D.C.,** )
**Corey Musselman, M.D.,** )
**The San Antonio Orthopaedic Group,LLP,** )
 **Orthopaedic Surgery Center of San** )
**Antonio, L.P.,** )
**Charles H. Clark III, M.D.,** )
 **Crenshaw Community Hospital,** )
**Bullock County Hospital,** )
**Fairhope Cosmetic Dentistry and Fresh** )
**Breath Center, P.C.,** )
**Sports and Ortho, P.C.,** )
**Kathleen Cain, M.D.,** )
**Northwest Florida Surgery Center, LLC,** )
**Wini Hamilton, D.C.,** )
**Bradley Moseng, D.C.,** )
**Jay Korsen, D.C.,** )
**North Jackson Pharmacy, Inc., and** )
**IntraNerve, L.L.C.on behalf of** )
**himself and all others similarly situated,** )
 )
        **Plaintiffs,** )
 )
**v.** )
 )
**Blue Cross and Blue Shield of Alabama,** )
**WellPoint, Inc.,** )
**Health Care Service Corporation,** )
**Cambia Health Solutions, Inc.,** )
**CareFirst, Inc.,** )
**Premera Blue Cross,** )
**Premera Blue Cross and Blue Shield** )
 **of Alaska,** )
**Blue Cross Blue Shield of Arizona, Inc.,** )
**Arkansas Blue Cross and Blue Shield,** )
**Blue Cross of California d/b/a Anthem** )

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Blue Cross of California,              )
California Physicians' Service Inc.    )
  d/b/a Blue Shield of California,    )
Rocky Mountain Hospital and Medical  )
  Service, Inc.,                  )
Anthem Blue Cross and Blue Shield   )
of Colorado,                   )
Anthem Health Plans, Inc.        )
d/b/a Anthem Blue Cross and Blue   )
Shield of Connecticut,          )
Highmark, Inc.,              )
Highmark Blue Cross and Blue Shield  )
of Delaware,                  )
Group Hospitalization and Medical   )
Services, Inc.,               )
Blue Cross and Blue Shield of      )
Florida, Inc.,                )
Blue Cross and Blue Shield of      )
Georgia, Inc.,               )
Hawaii Medical Service Association   )
d/b/a Blue Cross and Blue Shield of Hawaii, )
Blue Cross of Idaho Health Service, Inc., )
Regence BlueShield of Idaho, Inc.,   )
Blue Cross and Blue Shield of Illinois,  )
Anthem Insurance Companies, Inc.   )
d/b/a Anthem Blue Cross and Blue Shield )
 of Indiana,                 )
Wellmark, Inc. d/b/a/ Wellmark Blue  )
Cross and Blue Shield of Iowa,     )
Blue Cross and Blue Shield of Kansas,  )
Anthem Health Plans of Kentucky, Inc., )
Louisiana Health Service and Indemnity )
 Company d/b/a/ Blue Cross and Blue  )
Shield of Louisiana,          )
Anthem Health Plans of Maine, Inc.,   )
CareFirst of Maryland, Inc.       )
d/b/a CareFirst Blue Cross Blue Shield  )
 of Maryland,               )
Blue Cross and Blue Shield of      )
Massachusetts, Inc.,          )
Blue Cross and Blue Shield of Michigan, )
BCBSM, Inc. d/b/a/ Blue Cross and Blue )
 Shield of Minnesota,         )
Blue Cross and Blue Shield of Mississippi,)
Blue Cross and Blue Shield of Missouri,  )
Blue Cross and Blue Shield of Kansas City, Inc.,)

Blue Cross and Blue Shield of Montana, Inc.,  )
Blue Cross and Blue Shield of Nebraska,  )
Anthem Blue Cross and Blue Shield of Nevada,)
Anthem Health Plans of New Hampshire, Inc. )
d/b/a Blue Cross and Blue Shield          )
 of New Hampshire,                        )
Horizon Health Care Services, Inc.        )
d/b/a Horizon Blue Cross and Blue         )
 Shield of New Jersey,                    )
Blue Cross and Blue Shield of New Mexico, )
HealthNow New York Inc.,                  )
Blue Cross and Blue Shield of            )
Northeastern New York,                    )
Blue Cross and Blue Shield of            )
Western New York,                         )
Empire HealthChoice Assurance, Inc.       )
d/b/a Empire Blue Cross Blue Shield,      )
Excellus Health Plan, Inc.               )
d/b/a Excellus Blue Cross Blue Shield,    )
Blue Cross and Blue Shield of North Carolina,   )
Noridian Mutual Insurance Company         )
d/b/a Blue Cross Blue Shield of North Dakota,  )
Community Insurance Company               )
d/b/a Anthem Blue Cross and Blue Shield of Ohio,   )
Blue Cross and Blue Shield of Oklahoma,  )
Regence BlueCross BlueShield of Oregon,  )
Hospital Service Association of           )
Northeastern Pennsylvania                 )
d/b/a Blue Cross of Northeastern Pennsylvania,  )
Capital Blue Cross,                       )
Highmark Health Services, Inc.            )
d/b/a/ Highmark Blue Cross Blue Shield   )
 and d/b/a Highmark Blue Shield,          )
Independence Blue Cross, Inc.,           )
Triple S – Salud, Inc.,                  )
Blue Cross and Blue Shield of Rhode Island, Inc.,)
Blue Cross and Blue Shield of South      )
Carolina, Inc.,                          )
Wellmark of South Dakota, Inc.           )
d/b/a Wellmark Blue Cross and Blue       )
Shield of South Dakota,                  )
BlueCross BlueShield of Tennessee, Inc., )
Blue Cross and Blue Shield of Texas,     )
Regence BlueCross BlueShield of Utah,    )
Blue Cross Blue Shield of Vermont,       )
Anthem Health Plans of Virginia, Inc.    )

| | |
|---|---|
| **d/b/a Anthem Blue Cross and Blue** | ) |
| **Shield of Virginia,** | ) |
| **Regence Blue Shield of Washington,** | ) |
| **Highmark West Virginia, Inc.** | ) |
| **d/b/a Highmark Blue Cross Blue Shield** | ) |
| **West Virginia, Inc.,** | ) |
| **Blue Cross Blue Shield of Wisconsin** | ) |
| **d/b/a Anthem Blue Cross and Blue** | ) |
| **Shield of Wisconsin,** | ) |
| **Blue Cross Blue Shield of Wyoming and** | ) |
| **Blue Cross and Blue Shield** | ) |
| **Association,** | ) |
| | ) |
| **Defendants.** | ) |

## CONSOLIDATED AMENDED COMPLAINT

Plaintiffs, Jerry L. Conway, D.C., Corey Musselman, M.D., The San Antonio Orthopaedic Group, L.L.P., Orthopaedic Surgery Center of San Antonio, L.L.P., Charles H. Clark III, M.D., Crenshaw Community Hospital, Bullock County Hospital, Fairhope Cosmetic Dentistry and Fresh Breath Center, P.C., Sports and Ortho, P.C., Kathleen Cain, M.D., Northwest Florida Surgery Center, L.L.C., Wini Hamilton, D.C., Bradley Moseng, D.C., Jay Korsen, D.C., North Jackson Pharmacy, Inc., and IntraNerve, L.L.C. (collectively "Plaintiffs" or "Provider Plaintiffs"), on behalf of themselves and all others similarly situated, for their Complaint against Defendants, Blue Cross and Blue Shield of Alabama, WellPoint, Inc., Health Care Service Corporation, Cambia Health Solutions, Inc., CareFirst, Inc., Premera Blue Cross, Premera Blue Cross and Blue Shield of Alaska, Blue Cross Blue Shield of Arizona, Inc., Arkansas Blue Cross and Blue Shield, Blue Cross of California d/b/a Anthem Blue Cross of California, California Physicians' Service Inc. d/b/a Blue Shield of California, Rocky Mountain Hospital and Medical Service, Inc., Anthem Blue Cross and Blue Shield of Colorado, Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut, Highmark, Inc.,

Highmark Blue Cross and Blue Shield of Delaware, Group Hospitalization and Medical Services, Inc., Blue Cross and Blue Shield of Florida, Inc., Blue Cross and Blue Shield of Georgia, Inc., Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii, Blue Cross of Idaho Health Service, Inc., Regence BlueShield of Idaho, Inc., Blue Cross and Blue Shield of Illinois, Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana, Wellmark, Inc. d/b/a/ Wellmark Blue Cross and Blue Shield of Iowa, Blue Cross and Blue Shield of Kansas, Anthem Health Plans of Kentucky, Inc., Louisiana Health Service and Indemnity Company d/b/a/ Blue Cross and Blue Shield of Louisiana, Anthem Health Plans of Maine, Inc., CareFirst of Maryland, Inc. d/b/a CareFirst Blue Cross Blue Shield of Maryland, Blue Cross and Blue Shield of Massachusetts, Inc., Blue Cross and Blue Shield of Michigan, BCBSM, Inc. d/b/a/ Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of Mississippi, Blue Cross and Blue Shield of Missouri, Blue Cross and Blue Shield of Kansas City, Inc., Blue Cross and Blue Shield of Montana, Inc., Blue Cross and Blue Shield of Nebraska, Anthem Blue Cross and Blue Shield of Nevada, Anthem Health Plans of New Hampshire, Inc. d/b/a Blue Cross and Blue Shield of New Hampshire, Horizon Health Care Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey, Blue Cross and Blue Shield of New Mexico, HealthNow New York Inc., Blue Cross and Blue Shield of Northeastern New York, Blue Cross and Blue Shield of Western New York, Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield, Excellus Health Plan, Inc. d/b/a Excellus Blue Cross Blue Shield, Blue Cross and Blue Shield of North Carolina, Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota, Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio, Blue Cross and Blue Shield of Oklahoma, Regence BlueCross BlueShield of Oregon, Hospital Service Association of Northeastern Pennsylvania

d/b/a Blue Cross of Northeastern Pennsylvania, Capital Blue Cross, Highmark Health Services, Inc. d/b/a/ Highmark Blue Cross Blue Shield and d/b/a Highmark Blue Shield, Independence Blue Cross, Inc., Triple S – Salud, Inc., Blue Cross and Blue Shield of Rhode Island, Inc., Blue Cross and Blue Shield of South Carolina, Inc., Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota, BlueCross BlueShield of Tennessee, Inc., Blue Cross and Blue Shield of Texas, Regence BlueCross BlueShield of Utah, Blue Cross Blue Shield of Vermont, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Regence Blue Shield of Washington, Highmark West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia, Inc., Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin, Blue Cross Blue Shield of Wyoming (these independent Blue Cross Blue Shield licensees are referred to herein collectively, as "the Blues") and the Blue Cross and Blue Shield Association ("BCBSA" or the "Association") (collectively "Defendants" or "BCBS Defendants") allege violations of antitrust laws as follows:

### NATURE OF THE CASE

1.      Plaintiffs are providers of healthcare services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed. Many of Plaintiffs' patients are insured by the Blues or are included in employee benefit plans administered by the Blues.

2.      Defendants are the Blue Cross Blue Shield Association and its thirty-eight Member Plans and their affiliated companies.  The Blues provide health insurance coverage for approximately 100 million people in the United States and, according to the BCBSA's own estimates, more than 91% of professional providers and more than 96% of hospitals in the United States contract directly with the Blues.  The BCBSA exists solely for the benefit of the Blues and to facilitate their concerted activities.

3.      In this action, the Plaintiff healthcare providers challenge the explicit agreement reached by the Defendants to divide the United States into what the Defendants term "Service Areas" and then to allocate those geographic markets among the Blues, free of competition (the "BCBS Market Allocation Conspiracy").  Plaintiffs also challenge the agreement reached by the Defendants to fix prices for services rendered by healthcare providers such as Plaintiffs (the "BCBS Price Fixing Conspiracy").

4.      In furtherance of the BCBS Market Allocation Conspiracy, the Defendants agreed that each Defendant would be allocated a defined Service Area and further agreed that each Defendant's ability to operate and to generate revenue outside its geographic Service Area would be severely restricted.  Accordingly, Defendants have agreed to an allocation of markets and have agreed not to compete with each other within those markets.

5.      The Blues, which are organized and operated independently, constitute potential competitors and, absent the BCBS Market Allocation Conspiracy, the Blues would, in fact, compete.  The BCBSA readily admits on its own website that the Blues are "independent companies" that operate in "exclusive geographic areas."  Defendants' agreement to allocate markets is a horizontal restraint in violation of Section 1 of the Sherman Act.

6.      The BCBS Market Allocation Conspiracy has significantly decreased competition in the market for healthcare insurance and, accordingly, in the market for payment of healthcare provider services.  For example, Blue Cross Blue Shield of Alabama controls access to 93% of privately insured patients in the State of Alabama.  As a result of decreased competition, healthcare providers, including Plaintiffs, are paid much less than they would be absent the BCBS Market Allocation Conspiracy.  Healthcare providers who contract with the Blues are also

subjected to less favorable terms than they would be absent the conspiracy. The BCBS Market Allocation Conspiracy is a *per se*[1] violation of Section 1 of the Sherman Act.

7. Defendants have further exploited the market dominance they have secured through the Market Allocation Conspiracy by entering into a Price Fixing Conspiracy. In furtherance of the Price Fixing Conspiracy, each Defendant has agreed to participate in the Blue Card program. According to the BCBSA, the Blue Card program "links participating healthcare providers and the independent Blue Cross and Blue Shield companies across the country through a single electronic network for claims processing and reimbursement." The Blue Card program applies when a subscriber of one of the Defendants receives healthcare services within the Service Area of another Defendant. In effect, the Blue Card program locks in the discounted reimbursement rates that each Defendant achieves through market dominance in its Service Area and makes those below-market rates available to all other Blues without the need for negotiation or contracting. Accordingly, Defendants have fixed the prices for healthcare reimbursement in each Service Area. As a result, a healthcare provider who renders services to a patient who is insured or administered by a Defendant in another Service Area receives significantly lower reimbursement than the healthcare provider would receive absent the Price Fixing Conspiracy. The BCBS Price Fixing Conspiracy is a *per se* violation of Section 1 of the Sherman Act.

8. For example, Defendants' actions have significantly injured Plaintiffs and other healthcare providers. Defendants' agreements have also harmed competition by decreasing the options available to healthcare consumers. Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower than competitive prices that the Blues pay. In addition, many hospitals and other healthcare

---

[1] Plaintiffs believe that the Defendants' actions are *per se* violations of Section 1 of the Sherman Act. Plaintiffs hereby specifically reserve their rights to add market specific claims, including claims under Section 2 of the Sherman Act, should the Court not agree that the Defendants violations are subject to *per se* treatment.

facilities are closing or reducing services or are not expanding to provide additional services as a result of the Blues' low prices. The only beneficiaries of Defendants' antitrust violations are Defendants themselves. Absent injunctive relief, Defendants' antitrust violations will continue unabated to the detriment of competition and to the harm of healthcare providers.

## JURISDICTION AND VENUE

9.     Plaintiffs' federal antitrust claims are instituted under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.

10.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391, because a significant part of the events, acts and omissions giving rise to this action occurred in the District.

## INTERSTATE COMMERCE

11.     The activities of Defendants that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

12.     Many of the healthcare providers, including Plaintiffs, provide services, supplies, or equipment to persons who reside in other states.

13.     The Blue Card Program is itself interstate commerce and transaction for healthcare services.

14.     Plaintiffs and other healthcare providers have used interstate banking facilities and have purchased substantial quantities of goods and services across state lines for use in providing healthcare services to individuals.

## **PLAINTIFFS**

15.     Plaintiff Jerry L. Conway, D.C. is a chiropractor and a citizen of Brent, Alabama. Dr. Conway practiced for thirty-eight years before his retirement in 2010. During the relevant time period, Dr. Conway provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same. Dr. Conway was paid less for those services than he would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Conway has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than he would have been in a competitive market. As set forth herein, Dr. Conway has been injured in his business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

16.     Plaintiff Corey Musselman, M.D. is a family practice physician and a citizen of Cary, North Carolina. During the relevant time period, Dr. Musselman provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina pursuant to his in-network contract with BCBS-NC, and billed BCBS-NC for the same. Dr. Musselman was paid less for those services than he would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Musselman has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than he would have been in a competitive market. As set

forth herein, Dr. Musselman has been injured in his business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

17.     Plaintiff The San Antonio Orthopaedic Group, L.L.P. is a physician office in San Antonio, Texas.  During the relevant time period, The San Antonio Orthopaedic Group provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Texas pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the same.  The San Antonio Orthopaedic Group was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.  On September 18, 2008, The San Antonio Orthopaedic Group's contract with BCBS-TX was terminated; since that time, The San Antonio Orthopaedic Group has provided medically necessary services to BCBS-TX insureds, and has billed BCBS-TX for these services outside of any contractual relationship.  For these services, The San Antonio Orthopaedic Group has been paid less than it would have been in a competitive market.  On information and belief, The San Antonio Orthopaedic Group has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market.  As set forth herein, The San Antonio Orthopaedic Group has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws. The San Antonio Orthopaedic Group opted out of the *Love* Settlements in Florida.

18.     Plaintiff Orthopaedic Surgery Center of San Antonio, L.P. is an outpatient surgical center in San Antonio, Texas.  During the relevant time period, Orthopaedic Surgery Center of San Antonio provided medically necessary, covered services to patients insured by

Blue Cross and Blue Shield of Texas or who are included in employee benefit plans administered by the Blues pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the same. Orthopaedic Surgery Center of San Antonio was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On September 18, 2008, Orthopaedic Surgery Center of San Antonio's contract with BCBS-TX was terminated; since that time, Orthopaedic Surgery Center of San Antonio has provided medically necessary services to BCBS-TX insureds, and has billed BCBS-TX for these services outside of any contractual relationship. For these services, Orthopaedic Surgery Center of San Antonio has been paid less than it would have been in a competitive market. On information and belief, Orthopaedic Surgery Center of San Antonio has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market. As set forth herein, Orthopaedic Surgery Center of San Antonio has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

19. Plaintiff Charles H. Clark III, M.D. is a neurosurgeon and a citizen of Birmingham, Alabama. During the relevant time period, Dr. Clark provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same. Dr. Clark was paid less for those services than he would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Clark has also provided medically necessary, covered services to other Blue Cross and Blue

Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than he would have been in a competitive market. As set forth herein, Dr. Clark has been injured in his business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

20. Plaintiff Crenshaw Community Hospital is a non-profit, general medicine hospital in Luverne, Alabama. During the relevant time period, Crenshaw Community Hospital provided medically necessary, covered services to members of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Crenshaw Community Hospital was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, Crenshaw Community Hospital has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market. As set forth herein, Crenshaw Community Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

21. Plaintiff Bullock County Hospital is a general medicine and surgical hospital in Union Springs, Alabama. During the relevant time period, Bullock County Hospital provided medically necessary, covered services to members of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Bullock County Hospital was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, Bullock County Hospital has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and

has been paid less for those services than it would have been in a competitive market. As set forth herein, Bullock County Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

22. Plaintiff Fairhope Cosmetic Dentistry and Fresh Breath Center, P.C. is a dental practice in Fairhope, Alabama. During the relevant time period, Fairhope Cosmetic Dentistry provided medically necessary, covered services to members of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Fairhope Cosmetic Dentistry was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, Fairhope Cosmetic Dentistry has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market. As set forth herein, Fairhope Cosmetic Dentistry has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

23. Plaintiff Sports and Ortho P.C. is a physical therapy provider in Chicago, Illinois. During the relevant time period, Sports and Ortho provided medically necessary, covered services to members of Blue Cross and Blue Shield of Illinois pursuant to its in-network contract with BCBS-IL, and billed BCBS-IL for the same. Sports and Ortho was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, Sports and Ortho has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market. As set forth herein, Sports and Ortho has been

injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws. Sports and Ortho specifically reserves any and all claims it has or may have for denied requests for payments related to services provided to City of Chicago employees.

24. Plaintiff Kathleen Cain, M.D. is a pediatrician and a citizen of Topeka, Kansas. During the relevant time period, Dr. Cain provided medically necessary, covered services to members of Blue Cross and Blue Shield of Kansas pursuant to her in-network contract with BCBS-KS, and billed BCBS-KS for the same. Dr. Cain was paid less for those services than she would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Cain has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than she would have been in a competitive market. As set forth herein, Dr. Cain has been injured in her business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

25. Plaintiff Northwest Florida Surgery Center, L.L.C. is a multispecialty outpatient ambulatory surgery center located in Panama City, Florida. During the relevant time period, Northwest Florida Surgery Center provided medically necessary, covered services to members of Blue Cross and Blue Shield of Florida pursuant to its in-network contract with BCBS-FL, and billed BCBS-FL for the same. Northwest Florida Surgery Center was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, Northwest Florida Surgery Center has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market. As set forth herein, Northwest Florida Surgery

Center has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

26.     Plaintiff Wini Hamilton, D.C. is a chiropractor and a citizen of Seattle, Washington.  During the relevant time period, Dr. Hamilton provided medically necessary, covered services to patients insured by Premera Blue Cross of Washington or who are included in employee benefit plans administered by Premera Blue Cross of Washington pursuant to her in-network contract with Premera, and billed Premera for the same.  Dr. Hamilton was paid less for those services than she would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Hamilton has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than she would have been in a competitive market.  As set forth herein, Dr. Hamilton has been injured in her business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

27.     Plaintiff Bradley Moseng, D.C. is a chiropractor and a citizen of Montevideo, Minnesota.  During the relevant time period, Dr. Moseng provided medically necessary, covered services to members of Blue Cross and Blue Shield of Minnesota pursuant to his in-network contract with BCBS-MN, and billed BCBS-MN for the same.  Dr. Moseng was paid less for those services than he would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Moseng has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than he would have been in a competitive market.  As set forth herein, Dr. Moseng has

been injured in his business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

28.     Plaintiff Jay S. Korsen, D.C. is a chiropractor and a citizen of Narragansett, Rhode Island.  During the relevant time period, Dr. Korsen provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Rhode Island or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Rhode Island pursuant to his in-network contract with BCBS-RI, and billed BCBS-RI for the same.  Dr. Korsen was paid less for those services than he would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.  In 2009, Dr. Korsen's contract with BCBS-RI was terminated; since that time, Dr. Korsen has provided medically necessary services to BCBS-RI insureds, and has billed BCBS-RI for these services, outside of any contractual relationship.  For these services, Dr. Korsen has been paid less than he would have been in a competitive market.  On information and belief, Dr. Korsen has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than he would have been in a competitive market.  As set forth herein, Dr. Korsen has been injured in his business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

29.     Plaintiff North Jackson Pharmacy, Inc. is a pharmacy in Stevenson, Alabama. During the relevant time period, North Jackson Pharmacy provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same.  North Jackson Pharmacy was paid less for those services than it would have been in a competitive market and

has been injured by Defendants' conduct as a result thereof. On information and belief, North Jackson Pharmacy has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market. As set forth herein, North Jackson Pharmacy has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

30.     Plaintiff IntraNerve, L.L.C. is a provider of Intraoperative Neurophysiological Monitoring services based in Colorado Springs, Colorado. During the relevant time period, IntraNerve provided medically necessary, covered services to members of Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield pursuant to its in-network contract with Anthem Blue Cross and Blue Shield, and billed Anthem Blue Cross and Blue Shield for the same. IntraNerve was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, IntraNerve has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market. As set forth herein, IntraNerve has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

31.     Plaintiffs provide healthcare services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed, to patients who are insured by a Blue or who are included in an employee benefit plan administered by a Blue. Plaintiffs are entitled to payment for their services, equipment, supplies or for use of their facilities either pursuant to a contractual agreement with one of the Defendants or pursuant to assignments from

patients who are covered by a plan that is insured and administered by a Blue. All Plaintiffs have been paid less than they would have been paid absent Defendants' violation of the antitrust laws. All Plaintiffs have a right to bring these claims. But for the Defendants' agreements not to compete, out-of-network providers would have been offered the ability to contract with the Blues at more competitive rates. Accordingly, all Plaintiffs have standing and all have sustained antitrust injury.

32.     This Complaint is operative only with regard to the Class Action litigation and is not intended to supersede any additional claims brought by or intended to be litigated by "tag-along" Plaintiffs, such as the claims under Section 2 of the Sherman Act brought in the *Advanced Surgery Center* and the *Lifewatch* complaints. Those claims are to be litigated separately from this Class Action litigation.

33.     Certain of the named Provider Plaintiffs in this action, Corey Musselman, M.D., Charles H. Clark III, M.D., and Kathleen Cain, M.D., ("the *Love* Providers"), all medical doctors, were members of the Settlement classes in class settlements with some of the BCBS Defendants consummated in the Southern District of Florida before Judge Moreno. The San Antonio Orthopaedic Group opted-out of the *Love* Settlement but not the related *WellPoint*, *Highmark* and *Capital* settlements in the Southern District of Florida. For purposes of this Complaint, those Providers do not bring claims against any of the released parties in those Settlements. As this issue is currently being litigated in *Musselman v. Blue Cross of Alabama*, et al Case No. 1:13-cv-20050-FAM (S.D. Fl), the *Love* Providers wish to allege here that:

a.      they seek to preserve their claims against the Released Parties in those Settlements as they do not believe the claims alleged in this Complaint were released by those Settlements, because of the timing, scope or coverage of those

releases. Accordingly, those claims would be included in this Complaint but for the BCBS Defendants' insistence that if the claims are alleged here, they will immediately seek to have the *Love* Providers held in contempt of the injunctions entered by Judge Moreno. The *Musselman* action has been undertaken in good faith and Plaintiffs believe that litigation will toll any applicable statute of limitations;

b.     they intend to amend to add claims against the Released Parties who are Defendants once the *Musselman* litigation is resolved in their favor or once Judge Moreno defers the release issues to this Court for review;

c.     they continue to pursue their Sherman Act claims against the "Non-Released Blues" (listed below) who were not Releasing Parties in the Southern District of Florida and for whom there is no argument that any class-wide claims were previously released or are subject to any injunction in the Southern District of Florida.

34.     As is noted in the Plaintiffs' allegations, at least one of the named Physician Provider Plaintiffs opted out of the *Love* Settlement in Florida. Those non-Settling physician Plaintiffs pursue claims on behalf of the class against all of the Defendants who were released in *Love.*

35.     The Agreements between various Defendants and some of the named Provider Plaintiffs contain what Defendants will likely argue are binding arbitration provisions. Plaintiffs do not believe that these arbitration provisions can or would govern the claims brought in this lawsuit. Nevertheless, for purposes of this Complaint, those Plaintiffs with arbitration agreements arguably covering the claims or parties at issue in this litigation expressly only bring

suit against those Defendants who are not parties to the arbitration provisions in their agreements. For instance, a Provider with an arbitration provision in her contract with Blue Cross and Blue Shield of Kansas is not asserting claims against BCBS of Kansas, but rather is only pursuing her Sherman Act Section 1 claims against all Defendants other than BCBS of Kansas, none of whom are parties to her agreement.

## DEFENDANTS

36.     Defendant Blue Cross and Blue Shield of Alabama is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama. Blue Cross and Blue Shield of Alabama is by far the largest provider of healthcare benefits in Alabama, providing coverage to more than three million people. The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway East, Birmingham, Alabama. Blue Cross and Blue Shield of Alabama is referred to as "Blue Cross and Blue Shield of Alabama" or "BCBS-AL" in this Complaint.

37.     Defendant WellPoint, Inc. is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204. WellPoint, Inc., its subsidiaries, including Anthem Insurance Companies, Inc., Anthem Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., and its health care plans, are collectively referred to as "WellPoint" in this Complaint. WellPoint, the largest licensee within the BCBSA, is a publicly-traded, for-profit company. By some measures WellPoint is the largest health benefits company in the nation with more than 36 million members in its affiliated health plans. WellPoint, by and through its subsidiaries and affiliated health plans, operates in fourteen states, including California, Colorado, Connecticut, Georgia,

Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.

38.     Defendant Health Care Service Corporation, a Mutual Legal Reserve Company, is an Illinois corporation with its corporate headquarters located at 300 East Randolph Street, Chicago, IL 60601-5099.  With more than 13 million members, Health Care Service Corporation is the largest customer-owned health insurer in the United States.   Health Care Service Corporation does business as Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Texas.  In September 2012, it was announced that Blue Cross and Blue Shield of Montana would join Health Care Service Corporation as its fifth member plan, contingent on approval from the Department of Insurance.  In each of its four service areas, Health Care Service Corporation exercises market dominance.  Health Care Service Corporation, its subsidiaries and health care plans are collectively referred to as "HCSC" in this Complaint.

39.     Defendant Cambia Health Solutions, Inc. is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201.  Formerly known as The Regence Group, Inc., Cambia Health Solutions, Inc. officially changed its name in November 2011.  Cambia Health Solutions, Inc. is the largest health insurer in the Northwest or Intermountain Region, serving approximately 2.2 million members through its subsidiaries and affiliated health plans.  Cambia Health Solutions, Inc., through its subsidiary companies and its affiliated health care plans, including Regence Blue Cross Blue Shield of Oregon, Regence Blue Shield of Washington, Regence Blue Cross Blue Shield of Utah, and Regence Blue Shield of Idaho, exercises market dominance in its states of operation or within areas of those states.

Cambia Health Solutions, Inc., its subsidiaries, and health care plans are collectively referred to as "Cambia Health" or "Cambia" in this Complaint.

40.    Defendant CareFirst, Inc. is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mills, MD 21117.  With approximately 3.4 million members, CareFirst, Inc., through its subsidiaries CareFirst of Maryland, Inc. and Group Hospitalization and Medical Services, Inc., is the largest health care insurer in the Mid-Atlantic Region.  Through its subsidiaries and health plans, CareFirst, Inc. exercises market dominance in Maryland, the District of Columbia, and Virginia, or within areas of those states.  CareFirst, Inc., its subsidiaries and health care plans are collectively referred to as "CareFirst" in this Complaint.

41.    Defendant Premera Blue Cross is a Washington corporation with its corporate headquarters located at 7001 220th SW, Mountlake Terrace, WA 98043.  Premera Blue Cross is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.7 million members in Alaska and Washington.  Premera Blue Cross does business in Washington as Premera Blue Cross and in Alaska as Premera Blue Cross Blue Shield of Alaska.  Premera Blue Cross, its subsidiaries and health care plans are collectively referred to as "Premera Blue Cross" or "Premera" in this Complaint.

42.    Defendant Premera Blue Cross Blue Shield of Alaska is a division of Defendant Premera Blue Cross with its principal place of business located at 2550 Denali Street, Suite 1404, Anchorage, AK 99503.  Premera Blue Cross Blue Shield of Alaska, its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of Alaska" or "BCBS-AK" in this Complaint.

43.     Blue Cross Blue Shield of Arizona, Inc. is an Arizona corporation with its corporate headquarters located at 2444 W. Las Palmaritas Dr., Phoenix, AZ, 85021.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.3 million enrollees in various health care plans in Arizona.  Blue Cross Blue Shield of Arizona, Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of Arizona" or "BCBS-AZ" in this Complaint.

44.     Defendant Arkansas Blue Cross and Blue Shield is an Arkansas corporation with its corporate headquarters located at 601 S. Gaines Street, Little Rock, Arkansas 72201.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 860,000 enrollees in various health care plans in Arkansas, or approximately one-third of Arkansans, making it the largest health insurer in the state.  Arkansas Blue Cross and Blue Shield, its subsidiaries and health care plans are collectively referred to as "Arkansas Blue Cross and Blue Shield" or "BCBS-AR" in this Complaint.

45.     Defendant Blue Cross of California d/b/a/ Anthem Blue Cross of California is a California corporation with its corporate headquarters located at 21555 Oxnard Street, Woodland Hills, CA 91367.  It is a subsidiary of Anthem Holding Corp., which is in turn a subsidiary of Defendant WellPoint.  Blue Cross of California is the parent corporation of a number of subsidiaries that provide health care services to approximately 8.3 million enrollees in various health care plans in California, more than any other carrier in the state.  Blue Cross of California, its subsidiaries and health care plans are collectively referred to as "Blue Cross of California" or "BC-CA" in this Complaint.

46.     Defendant California Physicians' Service Inc. d/b/a Blue Shield of California is a California corporation with its corporate headquarters located at 50 Beale Street, San Francisco,

CA 94105-1808. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 3.5 million enrollees in various health care plans in California. California Physicians' Service Inc., its subsidiaries and health care plans are collectively referred to as "Blue Shield of California" or "BS-CA" in this Complaint.

47.     Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado in Colorado and d/b/a Anthem Blue Cross and Blue Shield of Nevada in Nevada is a subsidiary of Defendant WellPoint and is a Colorado corporation with its corporate headquarters located at 700 Broadway, Denver, CO 80273. It is the parent corporation of a number of subsidiaries that provide health care services to members through various health care plans in Colorado and Nevada.

48.     Defendant Anthem Blue Cross and Blue Shield of Colorado is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its headquarters located at 700 Broadway, Denver, CO 80273. Anthem Blue Cross and Blue Shield of Colorado and its parent, Rocky Mountain Hospital and Medical Service, Inc., are subsidiaries of Defendant WellPoint. Anthem Blue Cross and Blue Shield of Colorado, its subsidiaries and health plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Colorado" or "BCBS-CO" in this Complaint.

49.     Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut is a subsidiary of Defendant WellPoint. It is a Connecticut corporation with its corporate headquarters located at 370 Bassett Road, North Haven, Connecticut 06473 and is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.4 million enrollees in various health care plans in Connecticut. Anthem Blue Cross and Blue

Shield of Connecticut, its subsidiaries and health plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Connecticut" or "BCBS-CT."

50.     Defendant Highmark, Inc. is a Pennsylvania corporation with its corporate headquarters located at Fifth Avenue Place, 120 Fifth Avenue, Pittsburgh, PA 15222. Highmark, Inc. is the parent corporation of a number of subsidiaries that serve 5.3 million members in Pennsylvania, West Virginia and Delaware. Highmark, Inc., its subsidiaries and health care plans are collectively referred to as "Highmark" in this Complaint.

51.     Defendant Highmark Blue Cross and Blue Shield of Delaware is a subsidiary of Highmark, Inc. It is a Delaware corporation with its corporate headquarters located at 800 Delaware Avenue, Wilmington, Delaware 19801. Highmark Blue Cross and Blue Shield of Delaware was formerly known as Blue Cross and Blue Shield of Delaware. It became affiliated with Highmark, Inc. on December 30, 2011 and changed its name to Highmark Blue Cross and Blue Shield of Delaware in July, 2012. Highmark Blue Cross and Blue Shield of Delaware provides health care services to approximately 300,000 members in various health care plans in Delaware. According to a 2007 study, Highmark Blue Cross and Blue Shield held a 56% market share in the state of Delaware. Highmark Blue Cross and Blue Shield of Delaware, its subsidiaries and health care plans are collectively referred to as "Highmark Blue Cross and Blue Shield of Delaware" or "BCBS-DE" in this Complaint.

52.     Group Hospitalization and Medical Services, Inc. shares the business name CareFirst BlueCross and BlueShield with CareFirst of Maryland, Inc. and provides services in the District of Columbia, Maryland and areas of Virginia. It is incorporated in the District of Columbia and is a subsidiary of CareFirst, Inc. Its principal place of business is located at 10455 Mill Run Circle, Owings Mills, MD 21117. Group Hospitalization and Medical Services, Inc.,

its subsidiaries and health care plans are collectively referred to as "CareFirst BlueCross and BlueShield" in this Complaint.

53.    Defendant Blue Cross and Blue Shield of Florida, Inc. is a Florida corporation with its corporate headquarters located at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 7 million enrollees in various health care plans in Florida.  Blue Cross and Blue Shield of Florida, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Florida" or "BCBS-FL" in this Complaint.

54.    Defendant Blue Cross and Blue Shield of Georgia, Inc. and its affiliated company, Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., a health maintenance organization, are subsidiaries of Defendant WellPoint and are Georgia corporations with corporate headquarters located at 3350 Peachtree Road, N.E., Atlanta, Georgia 30326.  Blue Cross and Blue Shield of Georgia, by and through its subsidiaries, controls approximately 61% of the state's healthcare market.  Blue Cross and Blue Shield of Georgia, Inc. is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.1 million enrollees in various health care plans in Georgia.  Blue Cross and Blue Shield of Georgia, its affiliates, including Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Georgia" or "BCBS-GA" in this Complaint.

55.    Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii is a Hawaii corporation with its corporate headquarters located at 818 Keeaumoku Street, Honolulu, Hawaii 96814.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 676,000 members in various health care plans in

Hawaii.  Hawaii Medical Service Association, its subsidiaries and health care plans are collectively referred to as "Hawaii Medical Service Association" or "BCBS-HI" in this Complaint.

56.     Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho is an Idaho corporation with its corporate headquarters located at 3000 E. Pine Avenue, Meridian, Idaho 83642.  It is the parent corporation of a number of subsidiaries that provide health care services to more than 300,000 members in various health care plans in Idaho.  Blue Cross of Idaho Health Service, Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross of Idaho" or "BC-ID" in this Complaint.

57.     Regence BlueShield of Idaho, Inc. is a subsidiary of Defendant Cambia Health and is an Idaho corporation with its corporate headquarters located at 1602 21st Avenue, Lewiston, Idaho 83501.  Regence BlueShield of Idaho is the parent corporation of a number of subsidiaries that provide health care services to more than 150,000 members in various health care plans in Idaho.  Regence BlueShield of Idaho, Inc., its subsidiaries and health care plans are collectively referred to as "Regence BlueShield of Idaho" or "BS-ID" in this Complaint.

58.     Defendant Blue Cross and Blue Shield of Illinois is a division of Defendant HCSC with its principal place of business located at 300 East Randolph Street, Chicago, Illinois 60601.  It is the parent of a number of subsidiaries that provide health care services to approximately 6.5 million members in various health care plans in Illinois.  Blue Cross and Blue Shield of Illinois, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Illinois" or "BCBS-IL" in this Complaint.

59.     Defendant Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana is a subsidiary of Defendant WellPoint.  It is an Indiana corporation with its

corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204.  It is the parent corporation of a number of subsidiaries that provide health care services to enrollees in various health care plans in Indiana.  Anthem Insurance Companies, Inc. d/b/a Blue Cross and Blue Shield of Indiana, its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Indiana" or "BCBS-IN" in this Complaint..

60.     Defendant Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa is an Iowa corporation with its headquarters located at 1331 Grand Avenue, Des Moines, IA 50309.  It is the parent of a number of subsidiaries that provide health care services to approximately 1.4 million members in Iowa.  Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, its subsidiaries and health care plans in Iowa are collectively referred to as "Blue Cross and Blue Shield of Iowa" or "BCBS-IA" in this Complaint.

61.     Defendant Blue Cross and Blue Shield of Kansas, Inc. is a Kansas corporation with its corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, Kansas 66629.  Blue Cross and Blue Shield of Kansas is the parent corporation of a number of subsidiaries, including Premier Health, Inc., that provide health care services to approximately 880,000 members in various health care plans in Kansas.  Blue Cross and Blue Shield of Kansas, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Kansas" or "BCBS-KS."

62.     Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky is a subsidiary of Defendant WellPoint and is a Kentucky corporation with its corporate headquarters located at 13550 Triton Boulevard, Louisville, KY 40223.  Anthem Health Plans of Kentucky, Inc., its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Kentucky" or "BCBS-KY" in this Complaint.

63.     Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana is a Louisiana corporation with its corporate headquarters located at 5525 Reitz Avenue, Baton Rouge, Louisiana 70809.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.3 million enrollees in various health care plans in Louisiana.  Louisiana Health Service & Indemnity Company, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Louisiana" or "BCBS-LA" in this Complaint.

64.     Defendant Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine is a subsidiary of Defendant WellPoint.  It is a Maine corporation with its corporate headquarters located at 2 Gannett Drive, South Portland, Maine 04016.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 140,000 enrollees in various health care plans in Maine.  Anthem Health Plans of Maine, its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Maine" or "BCBS-ME" in this Complaint.

65.     Defendant CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield of Maryland is a subsidiary of Defendant CareFirst and is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mill, Maryland 21117. CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield of Maryland is the parent corporation of a number of subsidiaries that provide health care services to enrollees in various health care plans in Maryland.  CareFirst of Maryland, Inc., its subsidiaries and health care plans are collectively referred to as "CareFirst BlueCross BlueShield of Maryland" in this Complaint.

66.     Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a Massachusetts corporation with its corporate headquarters located at 401 Park Drive, Boston, Massachusetts

02215. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.8 million enrollees in various health care plans in Massachusetts. Blue Cross and Blue Shield of Massachusetts, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Massachusetts" or "BCBS-MA" in this Complaint.

67.     Defendant Blue Cross and Blue Shield of Michigan is a Michigan corporation with its corporate headquarters located at 600 E. Lafayette Blvd., Detroit, Michigan 48226. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 4.8 million enrollees in various health care plans in Michigan. Blue Cross and Blue Shield of Michigan, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Michigan" or "BCBS-MI" in this Complaint.

68.     Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota is a Minnesota corporation with its corporate headquarters located at 3535 Blue Cross Road, St. Paul, Minnesota 55164. BCBSM, Inc. is a wholly owned subsidiary of Aware Integrated, Inc. BCBSM, Inc. is the parent corporation of a number of subsidiaries that provide health care services to approximately 2 million enrollees in various health care plans in Minnesota. Blue Cross and Blue Shield of Minnesota, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Minnesota" or "BCBS-MN" in this Complaint.

69.     Defendant Blue Cross and Blue Shield of Mississippi is a Mississippi corporation with its corporate headquarters located at 3545 Lakeland Drive, Flowood, Mississippi 39232. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1 million enrollees in various health care plans in Mississippi. Blue Cross and Blue Shield of Mississippi, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Mississippi" or "BCBS-MS" in this Complaint.

70.     Defendant Blue Cross and Blue Shield of Missouri d/b/a Anthem Blue Cross Blue Shield of Missouri is a subsidiary of Defendant WellPoint.  It is a Missouri corporation with its corporate headquarters located at 1831 Chestnut Street, St. Louis, Missouri 63103.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.8 million enrollees in a various health care plans in Missouri.  Defendant Anthem Blue Cross and Blue Shield of Missouri, its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Missouri" or "BCBS-MO" in this Complaint.

71.     Defendant Blue Cross and Blue Shield of Kansas City, Inc. is a Missouri corporation with its corporate headquarters located at 2301 Main Street, One Pershing Square, Kansas City, Missouri 64108.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 805,000 enrollees in various health care plans in Kansas City and its suburbs in Kansas and Missouri.  Blue Cross and Blue Shield of Kansas City, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Kansas City or "BCBS – Kansas City" in this Complaint.

72.     Defendant Blue Cross and Blue Shield of Montana, Inc. is a Montana corporation with its corporate headquarters located at 560 North Park Avenue, Helena, MT 59604.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 272,000 members in various health care plans in Montana.  In September 2012, it was announced that Blue Cross and Blue Shield of Montana would join Defendant HCSC as its fifth member plan contingent on approval from the Department of Insurance.  On June 27, 2013, this "merger" was approved by the Montana Attorney General with conditions.  Blue Cross Blue Shield of Montana, Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Montana" or "BCBS-MT" in this Complaint.

73. Defendant Blue Cross and Blue Shield of Nebraska is a Nebraska corporation with its corporate headquarters located at 1919 Aksarben Drive, Omaha, Nebraska 68180. It is the parent corporation of a number of subsidiaries that provide health care services to over 700,000 enrollees in various health care plans in Nebraska. Blue Cross and Blue Shield of Nebraska, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Nebraska" or "BCBS-NE" in this Complaint.

74. Defendant Anthem Blue Cross and Blue Shield of Nevada is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its headquarters located at 700 Broadway, Denver, CO 80273. Anthem Blue Cross and Blue Shield of Nevada has a principal place of business in Nevada located at 9133 West Russell Rd., Suite 200, Las Vegas, NV 89148. Anthem Blue Cross and Blue Shield of Nevada and its parent, Rocky Mountain Hospital and Medical Service, Inc. are subsidiaries of Defendant WellPoint. Anthem Blue Cross and Blue Shield of Nevada, its subsidiaries and health plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Nevada" or "BCBS-NV."

75. Defendant Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire is a subsidiary of Defendant WellPoint. It is a New Hampshire corporation with its corporate headquarters located at 300 Goffs Falls Road, Manchester, New Hampshire 03111. Anthem Health Plans of New Hampshire, Inc. is the parent corporation of a number of subsidiaries that provide health care services to over 600,000 members in various health care plans in New Hampshire. Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire, its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of New Hampshire" or "BCBS-NH" in this Complaint.

76.     Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey is a New Jersey corporation with its corporate headquarters located at Three Penn Plaza East, Newark, New Jersey 07105.  It is the parent corporation of a number of subsidiaries that provide health care services to more than 3.2 million enrollees in various health care plans in New Jersey.  Horizon Healthcare Services, Inc., its subsidiaries and health care plans are collectively referred to as "Horizon Blue Cross and Blue Shield of New Jersey" or "BCBS-NJ" in this Complaint.

77.     Defendant Blue Cross and Blue Shield of New Mexico is a division of Defendant HCSC with its principal place of business located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113.  Blue Cross and Blue Shield of New Mexico is the parent of a number of subsidiaries that provide health care services to approximately 236,000 enrollees in various health care plans in New Mexico.  Blue Cross and Blue Shield of New Mexico, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of New Mexico" or "BCBS-NM" in this Complaint.

78.     Defendant HealthNow New York, Inc. is a New York corporation with its corporate headquarters located at 257 West Genesee Street, Buffalo, NY 14202.  HealthNow New York, Inc. does business as Blue Cross Blue Shield of Western New York and Blue Shield of Northeastern New York.  HealthNow New York, Inc. is the parent corporation of a number of subsidiaries that provide health care services to enrollees in various health care plans in New York.  HealthNow New York, Inc., its subsidiaries and health care plans are collectively referred to as "HealthNow" in this Complaint.

79.     Defendant Blue Shield of Northeastern New York is a division of Defendant HealthNow with its principal place of business located at 257 West Genesee Street, Buffalo, NY

14202.  Blue Shield of Northeastern New York is the parent of a number of subsidiaries that provide health care services to enrollees in various health care plans in New York.  Blue Shield of Northeastern New York, its subsidiaries and health care plans are collectively referred to as "Blue Shield of Northeastern New York" or "BS-Northeastern NY" in this Complaint.

80.     Blue Cross Blue Shield of Western New York, Inc. is a division of Defendant HealthNow with its principal place of business located at 257 West Genesee Street, Buffalo, NY 14202.  Blue Cross Blue Shield of Western New York is the parent of a number of subsidiaries that provide health care services to more than 800,000 enrollees in various health care plans in New York.  Blue Cross Blue Shield of Western New York, Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of Western New York" or "BCBS-Western NY" in this Complaint.

81.     Defendant Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is a subsidiary of Defendant WellPoint.  It is a New York corporation with its corporate headquarters located at One Liberty Plaza, New York, NY 10006.  Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is the parent corporation of a number of subsidiaries that provide health care services to nearly 6 million enrollees in various health care plans in New York.  Empire Blue Cross and Blue Shield, its subsidiaries and health care plans are collectively referred to as "Empire Blue Cross and Blue Shield" or "Empire-BCBS" in this Complaint.

82.     Defendant Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield of New York is a subsidiary of Lifetime Healthcare, Inc. and is a New York corporation with its corporate headquarters located at 165 Court Street, Rochester, New York 14647.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.8

million enrollees in various health care plans in the state of New York. Excellus, Inc., its subsidiaries and health care plans are collectively referred to as "Excellus BlueCross BlueShield" in this Complaint.

83. Defendant Blue Cross and Blue Shield of North Carolina is a North Carolina corporation with its corporate headquarters located at 5901 Chapel Hill Road, Durham, North Carolina 27707. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 3.6 million members in various health care plans in North Carolina. Blue Cross and Blue Shield of North Carolina, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of North Carolina" or "BCBS-NC" in this Complaint.

84. Defendant Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota is a North Dakota corporation with its corporate headquarters located at 4510 13th Avenue, South Fargo, ND 58121. Noridian Mutual Insurance Company is the parent company of a number of subsidiaries that provides health insurance products and related services to nearly 500,000 members in the midwestern and western United States. Blue Cross Blue Shield of North Dakota is the parent of a number of subsidiaries that provide health care services to approximately 390,000 members in various health care plans in North Dakota. Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota, its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of North Dakota" or "BCBS-ND" in this Complaint.

85. Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is a subsidiary of Defendant WellPoint. It is an Ohio corporation with its headquarters located at 4361 Irwin Simpson Rd, Mason, OH 45040. Community Insurance

Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is the parent corporation of a number of subsidiaries that provide health care services to more than 3 million members in various health care plans in Ohio. Community Insurance Co., its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Ohio" or "BCBS-OH."

86.     Defendant Blue Cross and Blue Shield of Oklahoma is a division of Defendant HCSC with its principal place of business located at 1400 South Boston, Tulsa, Oklahoma 74119. Blue Cross and Blue Shield of Oklahoma is the parent of a number of subsidiaries that provide health care services to approximately 2.8 million enrollees in various health care plans in Oklahoma. Blue Cross and Blue Shield of Oklahoma, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Oklahoma" or "BCBS-OK" in this Complaint.

87.     Defendant Regence Blue Cross Blue Shield of Oregon is a subsidiary of Defendant Cambia Health. It is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201. Regence Blue Cross Blue Shield of Oregon is the parent corporation of a number of subsidiaries that provide health care services to more than 750,000 members in various health care plans in Oregon. Regence Blue Cross Blue Shield of Oregon, its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of Oregon" or "BCBS-OR" in this Complaint.

88.     Defendant Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania is a Pennsylvania corporation with its corporate headquarters located at 19 North Main Street, Wilkes-Barre, Pennsylvania 18711. It is the parent corporation of a number of subsidiaries that provide health care services to approximately

570,000 enrollees in various health care plans in Pennsylvania. Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, its subsidiaries and health care plans are collectively referred to as "Blue Cross of Northeastern Pennsylvania" or "BCBS-NE PA" in this Complaint.

89. Defendant Capital Blue Cross is a Pennsylvania corporation with its corporate headquarters located at 2500 Elmerton Avenue, Susquehanna Township, Harrisburg, PA 17177. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.3 million enrollees in various health care plans in Pennsylvania. Capital Blue Cross, its subsidiaries and health care plans are collectively referred to as "Capital Blue Cross" in this Complaint.

90. Defendant Highmark Health Services d/b/a Highmark Blue Cross Blue Shield and also d/b/a Highmark Blue Shield is a subsidiary of Defendant Highmark and is a Pennsylvania corporation with its corporate headquarters located at 1800 Center Street, Camp Hill, Pennsylvania 17011. Highmark Health Services is the parent of a number of subsidiaries that provide health care services to approximately 4.2 million members in various health care plans in Pennsylvania. Highmark Health Services, its subsidiaries and health care plans are collectively referred to as "Highmark Health Services" in this Complaint.

91. Defendant Independence Blue Cross is a Pennsylvania corporation with its corporate headquarters located at 1901 Market Street, Philadelphia, Pennsylvania 19103. It is the parent corporation of a number of subsidiaries that provide health care services to more than 3 million enrollees in Pennsylvania. Independence Blue Cross, its subsidiaries and health care plans are collectively referred to as "Independence Blue Cross" or "IBC" in this Complaint.

92.     Defendant Triple S – Salud, Inc. is a subsidiary of Triple-S Management Company and is a Puerto Rico corporation with its corporate headquarters located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920.  It is the parent corporation of a number of subsidiaries that provide health care services to more than 600,000 enrollees in Puerto Rico. Triple S – Salud, Inc., its subsidiaries and health care plans are collectively referred to as "Triple-S of Puerto Rico" in this Complaint.

93.     Defendant Blue Cross and Blue Shield of Rhode Island, Inc. is a Rhode Island corporation with its corporate headquarters located at 15 LaSalle Square, Providence, Rhode Island 02903.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 600,000 enrollees in various health care plans in Rhode Island.  Blue Cross and Blue Shield of Rhode Island, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Rhode Island" or "BCBS-RI" in this Complaint.

94.     Defendant Blue Cross and Blue Shield of South Carolina, Inc. is a South Carolina corporation with its corporate headquarters located at 2501 Faraway Drive, Columbia, South Carolina 29223.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately one million members in various health care plans in South Carolina. Blue Cross and Blue Shield of South Carolina, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of South Carolina" or "BCBS-SC" in this Complaint.

95.     Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota is a South Dakota corporation with its corporate headquarters located at 1601 W. Madison, Sioux Falls, South Dakota 57104.  Wellmark of South Dakota, Inc. is a subsidiary of Defendant Wellmark, Inc.  Wellmark of South Dakota, Inc. is the parent

corporation of a number of subsidiaries that provide health care services to approximately 250,000 enrollees in South Dakota. Wellmark of South Dakota, its subsidiaries and health care plans are collectively referred to as "Wellmark Blue Cross and Blue Shield of South Dakota" or "BCBS-SD" in this Complaint.

96. Defendant Blue Cross and Blue Shield of Tennessee, Inc. is a Tennessee corporation with its corporate headquarters located at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.3 million members in various health care plans in Tennessee. Blue Cross and Blue Shield of Tennessee, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Tennessee" or "BCBS-TN" in this Complaint.

97. Defendant Blue Cross and Blue Shield of Texas is a division of Defendant HCSC with its principal place of business located at 1001 E. Lookout Drive, Richardson, Texas 75082. Blue Cross and Blue Shield of Texas is the parent of a number of subsidiaries that provide health care services to approximately 2.9 million enrollees in various health care plans in Texas. Blue Cross and Blue Shield of Texas, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Texas" or "BCBS-TX" in this Complaint.

98. Regence Blue Cross Blue Shield of Utah is a subsidiary of Defendant Cambia Health and is a Utah corporation with its corporate headquarters located at 2890 E Cottonwood Parkway, Salt Lake City, UT 84121. Regence Blue Cross Blue Shield of Utah is the parent corporation of a number of subsidiaries that provide health care services to more than 320,000 members in various health care plans in Utah. Regence Blue Cross Blue Shield of Utah, its subsidiaries and health care plans are collectively referred to as "Regence Blue Cross Blue Shield of Utah" or "BCBS-UT" in this Complaint.

99.     Defendant Blue Cross and Blue Shield of Vermont is a Vermont corporation with its corporate headquarters located at 445 Industrial Lane, Berlin, Vermont 05602.  It is the parent corporation of a number of subsidiaries that provide health care services to 160,000 enrollees in various health care plans within the state of Vermont.  Blue Cross and Blue Shield of Vermont, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Vermont" or "BCBS-VT" in this Complaint.

100.    Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia is a subsidiary of Defendant WellPoint.  It is a Virginia corporation with its corporate headquarters located at 2015 Staples Mill Road, Richmond, Virginia 23230. Anthem Blue Cross and Blue Shield of Virginia, Inc. is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.2 million enrollees in various health care plans in Virginia.   Anthem Blue Cross and Blue Shield of Virginia, Inc., its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Virginia" or "BCBS-VA" in this Complaint.

101.    Defendant Regence Blue Shield of Washington is a subsidiary of Defendant Cambia Health and is a Washington corporation with its corporate headquarters located at 1800 9th Avenue, Seattle, WA 98101.  Regence Blue Shield of Washington is the parent corporation of a number of subsidiaries that provide health care services to more than 925,000 members in various health care plans in Washington.  Regence Blue Shield of Washington, its subsidiaries and health care plans are collectively referred to as "Regence Blue Shield of Washington" in this Complaint.

102.    Defendant Highmark of West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield of West Virginia is a subsidiary of Defendant Highmark and is a West Virginia

corporation with its corporate headquarters located at 614 Market Square, Parkersburg, West Virginia 26101. Highmark Blue Cross Blue Shield of West Virginia, formerly known as Mountain State Blue Cross Blue Shield, is the parent corporation of a number of subsidiaries that provide health care services to approximately 300,000 enrollees in various health care plans in West Virginia and one county in Ohio. Highmark Blue Cross Blue Shield of West Virginia, its subsidiaries and health care plans are collectively referred to as "Highmark Blue Cross Blue Shield of West Virginia" or "BCBS-WV" in this Complaint. BCBS-WV exercises market dominance in the states of West Virginia and Ohio or within areas of those states.

103.    Defendant Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin is a subsidiary of Defendant WellPoint and is a Wisconsin corporation with its corporate headquarters located at 401 West Michigan Street, Milwaukee, WI 53203. Blue Cross Blue Shield of Wisconsin, is the parent corporation of a number of subsidiaries, including Compcare Health Services Insurance Corporation, that provide health care services to approximately 900,000 enrollees in various health care plans in Wisconsin. Blue Cross Blue Shield of Wisconsin, its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of Wisconsin" or "BCBS-WI" in this Complaint.

104.    Defendant Blue Cross Blue Shield of Wyoming is a Wyoming corporation with its company headquarters located at 4000 House Avenue, Cheyenne, WY 82001. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 100,000 enrollees in various health care plans in Wyoming. Blue Cross Blue Shield of Wyoming, its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of Wyoming" or "BCBS-WY" in this Complaint.

105.     As a result of the Market Allocation Conspiracy, many of the Blues have market power in all, or large parts of, their defined service areas.

106.     Defendant BCBSA is a corporation organized in the State of Illinois and headquartered at 225 N. Michigan Avenue, Chicago, Illinois 60601.  It is owned and controlled by 38 health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names.  BCBSA was created by these plans and operates as the licensor.  Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million - or one in three - Americans.  BCBSA itself does not provide health services and does not contract with physicians for the provisions of services, but it operates to create consistency and cooperation among its 38 members.  It is owned and controlled by its members and is governed by a board of directors, two-thirds of which must be composed of either plan chief executive officers or plan board members.  The 38 plans fund Defendant BCBSA.

107.     BCBSA, and all other Defendants, have contacts with the State of Alabama by virtue of their conspiracy with BCBS-AL.

108.     The list of Non-Released Blues (described above) includes: Blue Cross Blue Shield of Arizona, Arkansas Blue Cross Blue Shield, Blue Shield of California, Blue Cross and Blue Shield Delaware, Blue Cross of Idaho, Blue Cross and Blue Shield of Kansas, Blue Cross and Blue Shield of Kansas City, Blue Cross Blue Shield of Nebraska, HealthNow, Noridian Mutual Insurance Co. d/b/a Blue Cross Blue Shield of North Dakota, Blue Cross Blue Shield of Vermont, Blue Cross and Blue Shield of Wyoming, and Premier Health, Inc.  Additionally, while Excellus entered a settlement in New York state court, it did not obtain a release for any doctors other than those in New York, and that release does not affect the claims made in this

amended complaint. Excellus is therefore also treated as a Non-Released Blue for purposes of this Complaint.

## FACTUAL ALLEGATIONS

### The BCBS Defendants

109. Defendants are independent health insurance companies that operate and offer healthcare coverage in all 50 states, the District of Columbia and Puerto Rico, and cover 100 million Americans. According to the BCBSA, more than 96% of hospitals and 91% of professional providers contract with one of the Defendants nationwide – "more than any other insurer."

110. The Blues include many of the largest potentially competitive health insurance companies in the United States. Indeed, WellPoint is the largest health insurance company in the country by total medical enrollment, with approximately 34 million enrollees. Similarly, 15 of the 25 largest health insurance companies in the country are Blues. Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health insurance.

111. For example, WellPoint is the largest health insurer in the country by total medical enrollment, with approximately 36 million enrollees. It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, portions of Virginia, California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding counties, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country

through its non-Blue brand subsidiary, UniCare. WellPoint also operates in a number of additional states through its Medicaid subsidiary, Amerigroup. But for the illegal territorial restrictions summarized above, WellPoint would be likely to offer its health insurance services and products in many more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

112. Similarly, with more than 13 million members, Health Care Service Corporation ("HCSC"), which operates BCBS-IL, BCBS-NM, BCBS-OK, and BCBS-TX, is the largest mutual health insurance company in the country and the fourth largest health insurance company overall. But for the illegal territorial restrictions summarized above, HCSC would be likely to offer its health insurance services and products in many more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

113. BCBS-MI is the ninth largest health insurer in the country by total medical enrollment, with approximately 4.5 million enrollees in its Service Area of Michigan. BCBS-MI already operates in other states on a limited basis through its Medicare subsidiary. But for the illegal territorial restrictions summarized above, BCBS-MI would be likely to offer its health insurance services and products in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

114. Highmark, Inc. is the tenth largest health insurer in the country by total medical enrollment, with approximately 4.1 million enrollees. Its affiliated Blue plans include Highmark BCBS in Western Pennsylvania, Highmark BS throughout the entire state of Pennsylvania,

BCBS-WV, and BCBS-DE. But for the illegal territorial restrictions summarized above, Highmark would be likely to offer its health insurance services and products in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

115. Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer in the country by total medical enrollment, by some measures, with approximately 3.5 million enrollees. But for the illegal territorial restrictions summarized above, Blue Cross Blue Shield of Alabama would be likely to offer its health insurance services and products in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

116. CareFirst Blue Cross and Blue Shield, which operates the Blue Plans in Maryland, Washington, DC, and parts of Virginia, is the fourteenth largest health insurer in the U.S. and the largest health care insurer in the Mid-Atlantic region, with approximately 3.33 million subscribers. But for the illegal territorial restrictions summarized above, CareFirst would be likely to offer its health insurance services and products in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

117. BCBS-MA is the seventeenth largest health insurer in the country by total medical enrollment, with approximately 3 million enrollees in its service area of Massachusetts. But for the illegal territorial restrictions summarized above, BCBS-MA would be likely to offer its health insurance services and products in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

118.    BCBS-FL is the eighteenth largest health insurer in the country by total medical enrollment, with approximately 2.9 million enrollees in its service area of Florida.  But for the illegal territorial restrictions summarized above, BCBS-FL would be likely to offer its health insurance services and products in more regions across the United States in competition with the Blue in those regions.  Such competition would result in higher payment rates to Providers in those areas.

119.    The Blues are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks or trade names and, but for agreements to the contrary, could and would compete with one another.

120.    The BCBSA is a separate legal entity that purports to promote the common interests of the Blues. The BCBSA describes itself as "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies."  The BCBSA refers to the 38 Blue Cross and Blue Shield companies as Member Plans.

121.    The BCBSA serves as the epicenter for the Defendants' communications and arrangements in furtherance of their agreements not to compete.  As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."  One Defendant admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

122.    Every Blue is a member of the BCBSA, every Blue CEO is on the Board of Directors of BCBSA and every Blue participates in numerous BCBSA Committees.

123.    The Blues govern BCBSA.  BCBSA is entirely controlled by its member plans, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.

124.    As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans."  *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).  The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.

125.    In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer."  The current chairman of the Board of Directors, Alphonso O'Neil-White, is also the current President and CEO of BlueCross BlueShield of Western New York.  The CEO of each of the Individual Blue Plans serves on the Board of Directors of BCBSA.  The Board of Directors of BCBSA meets at least annually.

126.    BCBSA meetings provide a forum for representatives of Defendants to share information on management of Defendants and specific health insurance issues common to Defendants, and this information is disseminated to all 38 members.  The BCBSA includes numerous committees governed by the Defendants and sponsors various meetings, seminars, and conferences Defendants attend.  The BCBSA produces manuals, reports, list serves, and other correspondence to the Blues.  All of these activities are in furtherance of Defendants' conspiracy.

127.   The Blues also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC").   The PPFSC is a standing committee of the BCBSA Board of Directors that is composed of nine member Plan CEOs and three independent members.

128.   The Blues control the entry of new members into BCBSA.   In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

129.   The Blues control the rules and regulations that all members of BCBSA must obey.   According to the brief BCBSA filed during litigation in the Sixth Circuit Court of Appeals, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

130.   The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans."   Under the terms of the License Agreements, a plan "agrees . . . to comply with the Membership Standards."   In its Sixth Circuit brief, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised."   The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on June 21, 2012.

131.   The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially

became effective as of December 31, 1994"; that the Membership Standards "remain in effect until otherwise amended by the Member Plans"; that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote"; that "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them"; and that the "PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

132.    The Blues themselves police the compliance of all members of BCBSA with the rules and regulations of BCBSA.  The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards.  Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."  In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."  In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

133.    The Blues control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations.  The Guidelines describe three responses to a member plan's failure to comply - "Immediate Termination," "Mediation and Arbitration," and

"Sanctions" - each of which is administered by the PPFSC and could result in the termination of a member plan's license.

134.     The Blues likewise control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."  In its Sixth Circuit brief, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

135.     The Blues are potential competitors that use their control of BCBSA to coordinate their activities.  As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

136.     Each BCBSA licensee is an independent legal organization.  The BCBSA has never taken the position that the formation of BCBSA changed the fundamental independence of the individual Blues.  The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

137.     In its Sixth Circuit brief, BCBSA admitted that the Blues formed the precursor to BCBSA when they "recognized the necessity of national coordination."  The authors of *The*

*Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other - and each other's parent Blue Plans - in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market. New forms of competition were springing up at every turn, and market share was slipping year by year. Survival was at stake. The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

138. On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that BCBSA "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies."

139. BCBSA is simply a vehicle used by admittedly independent health insurance companies to conspire, coordinate, and enter into agreements that restrain competition. Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

140. As detailed herein, the BCBSA not only enters into anticompetitive agreements with the Blues to allocate markets, but also facilitates the cooperation and communications between Defendants to suppress competition. BCBSA is a convenient organization through which the Defendants enter into illegal territorial restraints between and among themselves.

### The BCBS Market Allocation Conspiracy

141. Defendants allocate the geographic markets for health insurance by limiting each Defendant's activity outside of a designated geographic Service Area. Accordingly, these provisions insulate each Defendant from competition by other Blues in each of their respective

geographic Service Areas. These provisions have no economic justification other than protecting Defendants from competition.

142. Defendants' anticompetitive practices and resulting market power permit Defendants to pay in-network and out-of-network providers less than what they would have paid absent these violations of the antitrust laws. Defendants pay in-network providers directly pursuant to provider agreements. Precisely because of Defendants' market power within each of their exclusive geographical markets, providers wishing to join the Blue network have virtually no bargaining power, and the terms of the provider agreements – including the offered payments for medical services – are given on a "take it or leave it" basis. There is, as a general rule, no negotiation of payment terms.

143. The vast majority of Blues pay out-of-network providers with assignments from patients directly when required by state law, such as in Tennessee and New Jersey, but refuse to honor assignments otherwise. Defendants do this to discourage providers from remaining out-of-network, since out-of-network providers must look to their patients to collect any monies due to them for their services, or bill their patients at the time the services are rendered. Defendants coerce providers who attempt to be out-of-network into network at below market rates. Defendants also retaliate against providers who attempt to operate out-of-network.

144. Defendants undertook a coordinated effort to allocate the market in which each Defendant would operate free of competition from other Blues. They did this through a licensing scheme, requiring geographic restrictions in the exclusive trademark licenses granted to each Defendant.

145. At the time of their initial formation, Blue Cross plans and Blue Shield plans were separate and distinct and were developed to meet differing needs. The Blue Cross plans

developed in conjunction with the American Hospital Association ("AHA") and were designed to provide a mechanism for covering the cost of hospital care. The Blue Shield plans provided a mechanism for covering the cost of healthcare and were developed in conjunction with the American Medical Association ("AMA"), an organization that represents physicians.

146. In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "[i]t is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product." In 1960, the AMCP changed its name to the "National Association of Blue Shield Plans" and, in 1976, changed its name to the "Blue Shield Association."

147. Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan.

148. However, by the late 1940s, the Blues faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blues and were now entering the market.

149. From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blues, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

150.    Instead, to address competition from commercial insurers, including other Blues, and to ensure national cooperation among the different Blue entities, the Blues agreed to centralize the ownership of their trademarks and trade names.

151.    Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA.  In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.  Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

152.    In the 1970's, the two Associations consolidated.  By 1982, the process of the merger to form BCBSA had been completed.

153.    From 1981 to 1986, the Blue plans lost market share at a rate of approximately one percent per year. At the same time, the amount of competition among Blue plans, and from non-Blue subsidiaries of Blue plans, increased substantially.

154.    In September 1982, the Board of Directors of the combined BCBSA adopted a Long Term Business Strategy under which Defendants agreed not to compete with each other. The BCBSA was aware at the time that Defendants were violating the antitrust laws.

155.    To address the increasing competition, the Blues sought to ensure "national cooperation" among the different Blue entities.  The Plans accordingly agreed to centralize the ownership of their trademarks and trade names.  In prior litigation, BCBSA has stated that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

156.    At that time, BCBSA became the sole owner of the Blue Cross Blue Shield trademarks and trade names that had previously been owned by the local plans.  BCBSA's Member Plans agreed to two propositions:  (1) by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and (2) by the end of 1985, all Blue Cross and Blue Shield plans within a state should further consolidate, ensuring that each state would have only one Blue.  As a result of these goals, the number of Member Plans went from 110 in 1984, to 75 in 1989, to 38 today.

157.    In 1987, the Member Plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would not compete against each other.  During these meetings, Defendants agreed to maintain exclusive Service Areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.  However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Defendants, an increasing "problem" that had caused complaints from many Blues.  After the 1986 revocation of the Blues' tax-exempt status and throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased.  As quoted in *The Blues: A History of the Blue Cross and Blue Shield System*, former BCBSA counsel Marv Reiter explained in 1991, "Where you had a limited number of subsidiaries before, clearly they mushroomed like missiles. . . . We went from 50 or 60 nationally to where there's now 400 and some."  These subsidiaries continued to compete with the other Blues.  As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

158.    Subsequently, Defendants agreed to restrict the territories in which Defendants would operate under any brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the Member Plans.

159.    Pursuant to the agreement of Defendants, the BCBSA has developed strict rules and regulations that all members of BCBSA must obey concerning members' Licensing Agreements and the guidelines proposed members must adhere to prior to joining the BCBSA. These rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"). Those regulations provide for amendment with a vote of three fourths of the Member Plans. These agreements were revised or amended as recently as 2012.

160.    Under the License Agreements, each Blue agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a specifically designated geographic "Service Area," which is either the geographical area(s) served by the Plan on June 10, 1972, or the area to which the Blue has been granted a subsequent license.

161.    Under the Guidelines and Membership Standards, each Member Plan agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. Each Defendant also agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside or outside of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66.66% of its national

enrollment from its Blue business. Both provisions directly limit the ability of each Blue to generate revenue from non-Blue branded business, and thereby limit the ability of each plan to develop non-Blue brands that could and would compete with other Blues.

162. Therefore, Defendants have agreed that in exchange for having the exclusive right to use the Blue Cross Blue Shield brand and trademark within a designated geographic area, each Blue will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive at most one-third of its revenue from outside of its exclusive area using services offered under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

163. WellPoint, in its February 17, 2011 Form 10-K filed with the United States Securities and Exchange Commission, described the limitations on its business, stating that it had "no right to market products and services using the Blue Cross Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross Blue Shield products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the Blue Cross Blue Shield names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the Blue Cross Blue Shield names and marks" and "a requirement that at least 66 and 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the Blue Cross Blue Shield names and marks."

164.     The BCBS structure and the long-term relationship between the Blues create an environment that encourages tacit agreements that injure competition.

165.     The Blues have reached agreements with each other not to compete in addition to the restrictions agreed to in the Licensing Agreements and the Guidelines and Membership Standard.  For example, under the licensing agreement, each Blue is allowed to contract one county into a contiguous Defendant's territory.  However, many of the Blues entered into what they call "gentlemen's agreements" not to compete in those counties.  In addition, HCSC refused to enter into contracts with facilities in St. Louis, Missouri because it and WellPoint had agreed not to compete in each other's Service Areas, despite being allowed to do so by the Licensing Agreement.

166.     In addition, there have been other side agreements not to compete.  Highmark BCBS was formed from the 1996 merger of two Pennsylvania BCBSA member plans: Blue Cross of Western Pennsylvania, which held the Blue Cross license for the twenty-nine counties of Western Pennsylvania, and Pennsylvania Blue Shield, which held the Blue Shield license for the entire state of Pennsylvania.

167.     Prior to this merger, Pennsylvania Blue Shield and Independence BC, the Blue Cross licensee for the five counties of Southeastern Pennsylvania, had competed in Southeastern Pennsylvania through subsidiaries: Keystone Health Plan East, an HMO plan that Pennsylvania Blue Shield established in 1986 after Independence rejected its offer to form a joint venture HMO plan in Southeastern Pennsylvania; and Delaware Valley HMO and Vista Health Plan (also an HMO), which Independence BC acquired in response to Keystone Health Plan East's entry into the market.  In 1991, Independence BC and Pennsylvania Blue Shield agreed to combine these HMOs into a single, jointly-owned venture under the Keystone Health Plan East

name, and Pennsylvania Blue Shield acquired a 50 percent interest in an Independence PPO, Personal Choice. When Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to form Highmark BCBS, Pennsylvania Blue Shield sold its interests in Keystone Health Plan East and Personal Choice to Independence BC. As part of the purchase agreement, Pennsylvania Blue Shield (now Highmark BCBS) and Independence BC entered into a decade-long agreement not to compete. Specifically, Pennsylvania Blue Shield agreed not to enter Southeastern Pennsylvania, despite being licensed to compete under the Blue Shield name and mark throughout Pennsylvania.

168. On information and belief, this agreement remains in place, though it putatively expired in 2007. Instead of entering the Southeastern Pennsylvania market at that time, Highmark BCBS announced that it and Independence BC intended to merge. After an exhaustive review by the Pennsylvania Insurance Department ("PID"), Highmark BCBS and Independence BC withdrew their merger application. In commenting on this withdrawal, then-Pennsylvania Insurance Commissioner Joel Ario stated that he was "prepared to disapprove this transaction because it would have lessened competition . . . to the detriment of the insurance buying public." Currently, despite its past history of successful competition in Southeastern Pennsylvania, despite holding the Blue Shield license for the entire state of Pennsylvania, despite entering Central Pennsylvania and the Lehigh Valley as Highmark Blue Shield and thriving, despite entering West Virginia through an affiliation with Mountain State Blue Cross Blue Shield (now Highmark Blue Cross Blue Shield of West Virginia), despite entering Delaware through an affiliation with Blue Cross and Blue Shield of Delaware (now Highmark Blue Cross Blue Shield of Delaware), and despite the supposed "expiration" of the non-compete agreement with Independence BC, Highmark BCBS has still not attempted to enter Southeastern

Pennsylvania. This illegal, anticompetitive agreement not to compete has reduced competition throughout the state of Pennsylvania, including in the Western Pennsylvania market. In addition, Highmark has been involved in similar arrangements with other Pennsylvania Blues.

169. It has long been established that a trademark cannot be used as a device to circumvent the Sherman Act. The Trademark Act itself penalizes use of a trademark in violation of the antitrust laws. The agreed-to restrictions on the ability of the Blues to generate revenue outside of their specified Service Areas constitute agreements to divide and allocate geographic markets, and, therefore, are *per se* violations of Section 1 of the Sherman Act.

170. Numerous Blues and non-Blue businesses owned by Defendants could and would compete effectively in other Service Areas but for the territorial restrictions. The likelihood of increased competition is demonstrated in several ways. First, as set forth above, the restrictions were specifically put in place to eliminate "Blue on Blue" competition. If there was no likelihood of competition, the restrictions would have been unnecessary. In fact, as set forth above, the restrictions did not initially address competition by non-Blue plans owned by Defendants; however, when it became evident that such competition was an "increasing problem" the restrictions were revised to address this as well. Second, in certain portions of four states, *limited* competition among two Defendants has been permitted. For instance, in California, Blue Cross and Blue Shield are both allowed to operate under Blue trade names and to engage in limited competition in California. Likewise, Highmark and Capital compete in Pennsylvania, with both operating effectively and successfully. In fact, the combined market share of Highmark and Capital is comparable to the market share of many individual Blues. Obviously, these markets are far from competitive due to the agreements of the *other* Defendants not to compete in these Service Areas. However, this competition demonstrates that competition

among Blue Cross and Blue Shield Plans is not only possible but, in fact, does not undermine the Blue brand or trademark. Third, certain Blues have, in fact, expanded beyond their initial Service Areas by merging with other Blues. For example, WellPoint, which was initially the Blue Cross licensee for California, is currently the BCBSA licensee for fourteen states. Prior to its merger with WellPoint, Anthem, which was initially the BCBSA licensee for Indiana, had expanded to become the BCBSA licensee for eight states. Undoubtedly, absent the current restrictions, WellPoint would readily compete in additional Service Areas and, in all likelihood, would compete nationally. Other Defendants, including HCSC, have, in fact, recently expanded into other areas. Fourth, various Defendants have demonstrated that, absent the restrictions that each of the Blues agreed to put into the licensing agreement, they would expand into other geographic areas and states. For example, WellPoint has expanded into many states where it is not licensed to operate as a Blue entity first through Unicare and, more recently, through its purchase of Amerigroup. WellPoint also operates Caremore Centers in Arizona despite the fact that WellPoint is not the Blue Cross Blue Shield licensee in Arizona. In addition, Defendant Blue Cross of Michigan operates outside of Michigan through a subsidiary or division that provides Medicaid managed care services. Other Blues have likewise expanded into other Service Areas in a similar manner. Of course, these expansions are currently extremely limited by the restrictions on competition. While the Blues remain subject to the territorial restrictions of the Licensing Agreement, true competition cannot occur in the market for provision of healthcare services.

171. Absent competition, the Blues have achieved significant market power and domination in the markets in their Service Areas. The territorial restrictions have therefore

barred competition from the respective commercial health insurance markets and the market for payment of healthcare providers.

172.     The BCBSA is tasked with policing compliance with Defendants' agreements and is empowered to impose harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination."  If a Member Plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry."  In addition, in the event of termination, a plan must pay a fee to BCBSA.  According to WellPoint's February 17, 2011 Form 10-K, there was a "re-establishment fee" of $98.33 per enrollee.

## The BCBS Price Fixing Conspiracy

173.     As a result of the Market Allocation Conspiracy, Defendants achieved market dominance and low pricing for healthcare provider services in each Service Area.  Defendants therefore reached agreement and implemented a Price Fixing Conspiracy through the Blue Card Program in order to leverage the low provider pricing they had achieved in each Service Area to benefit all Blues.

174.     Defendants achieved this end by agreeing that all Defendants would participate in the Blue Card Program, which determines the price and the payment policies to be utilized when a patient insured by a Blue or included in an employee benefit plan administered by a Defendant receives healthcare services within the Service Area of another Blue.  The Blue Card Program most commonly applies when employees reside in a different Service Area than the headquarters of their employer.  The Blue Card Program is also used to process claims for medical services for Blue members while traveling.  Plaintiffs regularly treat patients who are insured by a Defendant

or who are included in an employee benefit plan administered by a Defendant outside the Service Area where the medical treatment is rendered.

175.    Within the Blue Card Program, the Blue through which the subscriber is enrolled is referred to as the "Home Plan," while the Blue located in the Service Area where the medical service is provided is referred to as the "Host Plan."   The website of Defendant CareFirst describes Blue Card in the following manner:

### Key terms
Host Plan
Also called the local plan, where the actual medical service is provided; CareFirst is the Host Plan when a BCBS member from another Blue Plan service area obtains healthcare services from a CareFirst provider
Home Plan
The contracted BlueCross BlueShield Plan where the insured member is enrolled; The logo of the Home plan can be found on the member's BCBS insurance card.
Out-of-Area-Insured
An insured individual who is enrolled in a Blue Cross and Blue Shield other than CareFirst.

### Example
When you see an out-of-area insured patient like Julie Gilbert, submit your claims to CareFirst - the local or Host Plan. CareFirst then coordinates the claims process for you through the BlueCard program.



As the Host Plan, CareFirst receives your claim, codes and prices it according to contracted provider agreements, then sends an electronic submission to Julie's Seattle-based Home Plan.
When the Seattle-based Home Plan receives the information, the claim is processed by applying the Plan's medical policy, claim adjudication edits, and the member's benefit exclusions or limitations. The BCBS Plan then sends an electronic disposition back to the Host Plan, with instructions for paying the claim according to the Plan fee-schedule.
CareFirst then generates a voucher, pays you, and notifies the Home plan how the claim was paid.

176.    As a result of the BCBS Price Fixing Conspiracy, a healthcare provider treating a patient who is enrolled in a Blue in another Service Area is not permitted to negotiate a separate agreement with that Defendant.   Instead, the Home Plan pays the healthcare provider the

discounted rate the Host Plan has achieved as a result of the Market Allocation Conspiracy. For example, many members of plans insured or administered by Defendants Empire, BCBS of Illinois and BCBS of Michigan spend time in Florida during the winter months. Rather than being permitted to negotiate prices with these Defendants, however, healthcare providers in Florida must accept the prices paid by Defendant Blue Cross of Florida.

177. Accordingly, Defendants have agreed to fix the prices for healthcare reimbursement within each Service Area. Healthcare providers providing services to patients insured by or included in employee benefit plans administered by a Blue from another Service Area, including Plaintiffs, receive significantly lower reimbursement than they would receive absent Defendants' agreement to fix prices. The Price Fixing Conspiracy is a *per se* violation of Section 1 of the Sherman Act.

178. In addition to lower payments for providers, the Blue Card Program also imposes numerous inefficiencies and burdens on them. While the rates paid for medical services are dictated by the Host Plan, the medical policies, claims adjudication edits and coverage rules are determined by the Home Plan. The Home Plan's medical policies, claims edits, and coverage rules may differ and may not be known or be available to healthcare providers in the Host Plan's Service Area. Coverage rules include matters such as preauthorization and pre-notification requirements that must be satisfied before a Plan will pay for services provided to one of its members. For example, Defendant Blue Cross of Tennessee administers the Nissan Employee Benefit Plan, which covers the many Nissan employees who reside in Mississippi and, accordingly, seek medical treatment there. For these patients, Defendant Blue Cross of Tennessee is the Home Plan, while Defendant Blue Cross of Mississippi is the Host Plan. Blue Cross of Mississippi determines the price paid for services rendered by a healthcare provider in

Mississippi. However, the coverage rules, such as preauthorization or pre-notification requirements, are determined by Blue Cross of Tennessee. While the Mississippi provider has access to the rules for preauthorization or pre-notification for Blue Cross of Mississippi, the provider does not have ready access to Blue Cross of Tennessee's rules. In this example, the Mississippi healthcare provider can innocently fail to comply with the rules of Blue Cross of Tennessee and be paid nothing by Blue Cross of Tennessee, not even receiving the discounted amount that would result from the BCBS Price Fixing Conspiracy. When this happens, the healthcare provider has no recourse. Healthcare providers spend innumerable hours attempting to locate and understand Home Plan medical policies, claims edits and coverage rules, frequently to no avail despite the fact that the providers have made no agreement with the Home Plan. Moreover, the illustration includes only one Home Plan, whereas, in reality, a healthcare provider may treat patients who are enrolled in various plans that are insured or administered by multiple Blues other than the Blue in the provider's Service Area.

179.    As a result of their Price Fixing Conspiracy, Defendants reduce their payments to healthcare providers by in excess of ten billion dollars every year. These reductions, of course, are the result of the depressed prices paid to healthcare providers, including Plaintiffs.

**Other Abuses That Preserve the Blues' Enhanced Market Power**

180.    In addition to the harms set forth above, healthcare providers are harmed in other numerous ways as a result of Defendants' abuse of the significant market power that has resulted from their conspiracy.

181.    For example, a number of the Blues use most favored nations' clauses ("MFNs") with hospitals and other facilities. According to at least some defense counsel, Defendant Blue Cross of Michigan says that its "medical cost advantage, delivered primarily through its facility

discounts, is its largest source of competitive advantage." The statement of Blue Cross of Michigan also applies to other Blues. The Blues that use MFNs, as well as those that do not use explicit MFNs, put clauses in contracts with providers that prohibit the use of the price terms in any other contract. Defendant Blue Cross of Alabama is one of the Defendants that uses such terms in its contracts with hospitals. As a result of the extremely high market share held by Blue Cross of Alabama, this prohibition of use provision is effectively the same as an MFN.

182. All or practically all of the Blues also include confidentiality clauses in their contracts with healthcare providers that prohibit the disclosure of price terms among providers, even if the disclosure is done in compliance with Statement Six of the Statement of Antitrust Enforcement Policy in Health Care issued by the U.S. Department of Justice and the Federal Trade Commission (August 1996). By preventing the full disclosure of price terms of the contracts, Defendants undermine competition.

183. In addition, Defendants, including CareFirst, require Plaintiffs to disclose the rates (prices) that other health insurance companies are paying to them, while Defendants refuse to disclose the rates that they pay to other providers. Defendants thereby create asymmetric information in the market for the purchase of healthcare provider services, preventing the market from functioning competitively and giving Defendants an advantage in any bargaining that occurs between Defendants and providers.

184. Finally, Defendants, specifically Defendant Highmark, have threatened to utilize their extraordinary and excessive "reserves" (almost $5 billion in the case of Highmark) to enter (and have already done so in some cases) the market as providers of healthcare services if providers do not acquiesce to the far below market rates offered in a market free from

competition from other Blues. All of this is undertaken in an attempt to further drive down payment rates to providers and to raise barriers for competing firms to enter these markets.

## Antitrust Injury

185. Defendants' illegal activities have resulted in antitrust injury and harm to competition.

186. Through their violations of the antitrust laws, Defendants have suppressed prices and competition depriving patients of choices in the marketplace for healthcare providers.

187. By definition, Defendants have harmed competition by virtue of their agreements in that they have agreed not to compete with one another in each of the Blues' Services Areas. For instance, competition in the state of Alabama has been and continues to be harmed in that the other 37 Blues agree not to enter the Alabama market to compete with Blue Cross Blue Shield of Alabama no matter the circumstances.

188. Additionally, because most of the Blues are monopolists in the insurance market, in addition to monopsonists, it does not stand to reason that lower payment rates necessarily lower consumers' premiums. R. Hewitt Pate, a former Assistant Attorney General of the Antitrust Division, in a 2003 statement before the Senate Judiciary Committee, remarked:

> A casual observer might believe that if a merger lowers the price the merged firm pays for its inputs, consumers will necessarily benefit. The logic seems to be that because the input purchaser is paying less, the input purchaser's customers should expect to pay less also. But that is not necessarily the case. Input prices can fall for two entirely different reasons, one of which arises from a true economic efficiency that will tend to result in lower prices for final consumers. The other, in contrast, represents an efficiency-reducing exercise of market power that will reduce economic welfare, lower prices for suppliers, and may well result in higher prices charged to final consumers.

189. In the long run, the Blues monopsony power gained by virtue of their unlawful agreements will harm consumers. Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower than

competitive prices the Blues pay.  A number of reports conclude that the United States already faces a critical shortage of primary care and other physicians.  "Doctor Shortage Getting Worse," CNBC.com (Mar. 13, 2013) (shortage of 16,000 primary care physicians); "Physicians Foundation Survey of American Physicians," *available at* http://www.physiciansfoundation.org/uploads/default/Physicians_Foundation_2012_Biennial_Survey.pdf (Sept. 21, 2012) (44,250 full-time equivalent physicians to be lost from the workforce over the next four years).  Many providers are considering leaving the marketplace due to inadequate reimbursements paid by and other burdens created by Defendants.  According to the 2012 Physician Practice Trends Survey, one-third of all physicians say they plan on leaving the practice of medicine over the next decade, blaming low compensation.

190.    Further, consumer choices have been reduced with regard to facilities where medical and surgical procedures are performed as a result of the Blues' low payments.  Hospitals and other facilities are closing.  Other facilities are reducing services offered to consumers.  Still others that would otherwise expand are not doing so as a result of the Blues' low payments.

191.    In the end, economic consensus has clearly found that consumer welfare is best protected by a competitive marketplace for purchasing provider services.

192.    In addition, Plaintiffs suffer because agreements not to compete also restrict their choices in the market.  Because the other Blues agree not to compete in other Service Areas, providers are not offered the opportunity to contract directly with any Blue other than the Blue in the providers' Service Area.  This has the effect of depressing the payment rates in the market for in- and out-of-network services, as there is virtually no competition to drive these costs of healthcare services up.

193. Defendants' illegal activities have resulted in harm to competition. Moreover, Defendants' activities have been undertaken with the aim of forcing Plaintiffs to choose between non-competitive rates or being put out of business through coercion.

194. Defendants' illegal activities have also resulted in antitrust injury to Plaintiffs, including lost revenues resulting from decreased use of Plaintiffs' services and facilities and in threatened future harm to Plaintiffs' business and property.

195. If Defendants' actions are not enjoined, harm to competition and injury to Plaintiffs will continue.

## **Defendants, Even Those Organized As Not For Profit, Enjoy Supracompetitive Profit**

196. Defendants' anticompetitive practices have resulted in their collection of supracompetitive profits. Absent competition, Defendants have been able to pay healthcare providers much less for medical and surgical services provided to patients enrolled in plans they insure or administer. This tremendous savings has resulted in significantly higher profits and/or larger surpluses than Defendants could have realized in a competitive marketplace. As Defendant Blue Cross of Michigan has explained, its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage." Indicia of supracompetitive profits include high underwriting margins and surpluses well above statutory requirements.

197. Although the Blues were originally established as non-profits, they soon operated like for-profit corporations. In 1986, after Congress revoked Defendants' tax-exempt status, the Blues formed for-profit subsidiaries. The majority then converted to for-profit status and still operate as such today. Those that have not officially converted are only nominally characterized

as not-for-profit as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.

198.    The manner in which many of the formerly "charitable" Blues have been structured within complex holding company systems makes it difficult to detect excessive and unnecessary expenses.

199.    Often these holding company systems include both "not-for-profit" and "for-profit" affiliates.  The numerous affiliates have "cost sharing" arrangements that are often daunting and nearly impossible for auditors and regulators to unravel.  Unlike for-profit companies that have shareholders, Defendants are often accountable to no one other than their officers.

200.    Blues nationwide have many common threads which reach throughout their network.  Officers share with each other their otherwise well-kept expense schemes.  These shared schemes enable the officers to benefit from hidden increases to their salaries, bonuses, travel and even excess medical claim benefit perks.  These perks offer nice privileges to management but also buttress the Blues' "expenses," which they use to benefit the officers of the corporation.

201.    Sometimes Blue executives make the task of scrutinizing excessive expenses more difficult by disguising the true nature of expenditures as if they are providing meaningful and benevolent services.  Often, substantial campaign contributions or lobbying fees paid by Blues affiliated "charitable foundations" are designed only to perpetuate loose regulations.

202.    By way of example, the below are some of Defendants' actual expenses (despite Charter requiring maximum benefit at minimum costs):

- Around the world, 14-day, first-class junkets in five-star luxury lodging;

- Top executive salaries and bonuses effectively doubled by using affiliates with secret payrolls;

- Corporate aircraft used/misused to shuttle executives and politicians to undisclosed events;

- Affiliated "for-profit" entities charged "not-for-profit" Blue excessive and undocumented charges for rent, salaries and services;

- Cost Allocations not arms-length or fair and reasonable;

- Top executives and politicians had their medical claims paid at 100% (sometimes more than 100%) despite contractual limitations on such claims;

- The Blues caused their executives to make personal campaign contributions to regulators and simultaneously "grossed up" bonuses to the executivess to cover the contributions and related income tax on the additional bonus.

203. The mazes of self-dealing and related and affiliated companies can make it nearly impossible for those dealing with Defendants to tell when they are being treated fairly or being taken advantage of by these "charitable non-profit" companies.

204. For instance, Defendants often charge "hidden fees" to long time customers including "retained" amounts that are not used to cover medical claims, but rather are kept by the company or one of its affiliated entities. Blue Cross of Michigan was recently found liable for $5 million in damages for breach of its ERISA duties to one of its administered plans.

205. In addition, despite claiming to be "not-for-profit," many of these Blues hold outrageous "reserves" built off the net income spread between the high premiums they charge customers and the below market rates they pay to Providers.

206. Below is an example of the outrageous capital being held in excess of requirements by a number of not-for-profit Blues. As of Sept. 30, 2010, 33 not-for-profit Blues held more than **$27 billion in capital in excess** of the minimum threshold reserves required by the BCBSA. The chart below details those "reserves":

| Blue Defendant | Total Capital Through Sept. 30, 2010 | Required Capital | Risk-Based Capital as of Sept. 30, 2010 | Cash in Excess of 375% RBC ratio |
| --- | --- | --- | --- | --- |
| Blue Cross Blue Shield of Arizona | $759,169,863 | $50,241,418 | 1,511% | $570,764,546 |
| Blue Cross and Blue Shield of Florida | $3,089,379,410 | $250,758,634 | 1,232% | $2,149,034,534 |
| Blue Cross and Blue Shield of Kansas City | $681,331,625 | $69,850,616 | 975% | $419,391,814 |
| Blue Cross and Blue Shield or Kansas | $657,756,002 | $68,392,066 | 962% | $401,285,756 |
| Blue Cross and Blue Shield of Louisiana | $1,060,702,152 | $94,426,785 | 1,123% | $706,601,707 |
| Blue Cross and Blue Shield of North Carolina | $1,732,704,038 | $153,706,313 | 1,127% | $1,156,305,366 |
| Blue Cross of Northeastern Pennsylvania | $489,132,680 | $72,974,803 | 670% | $215,477,169 |
| Blue Cross & Blue Shield of Rhode Island | $247,199,104 | $54,482,474 | 454% | $42,889,827 |
| BlueCross BlueShield of South Carolina | $1,811,174,723 | $194,431,399 | 932% | $1,082,056,976 |
| BlueCross BlueShield of Tennessee | $1,235,082,852 | $118,031,970 | 1,046% | $792,462,965 |
| Blue Shield of California | $3,170,391,000 | $235,930,000 | 1,344% | $2,285,653,500 |
| Capital BlueCross | $1,182,747,208 | $208,224,574 | 568% | $401,905,057 |
| CareFirst BlueCross BlueShield (D.C., Md. and Va.) | $1,927,125,304 | $224,626,310 | 858% | $1,084,776,641 |
| Health Care Service Corp. (Ill., N.M., Texas and Okla.) | $7,701,653,731 | $749,191,427 | 1,028% | $4,892,185,878 |
| Highmark Inc. | $4,771,186,547 | $705,802,706 | 676% | $2,124,426,401 |
| Horizon Blue Cross Blue Shield | $1,701,431,026 | $260,792,429 | 652% | $723,459,418 |
| Independence Blue Cross | $3,897,022,250 | $782,587,061 | 498% | $962,320,770 |

SOURCE: Citigroup Global Markets, based on data filed with the National Association of Insurance Commissioners. December 2010.

207.     Many of the Blues undersell their actual reserves substantially by citing only the surplus from the mainline company, but not the general reserves on the companies' combined reporting statements, which accounts for all lines of business.

208.     In South Carolina, for instance, "Blue Cross Blue Shield's net income generated has increased considerably, while the number of members has increased only modestly, according to data provided by the state Department of Insurance."

209.     Members of the Board of South Carolina Blue Cross Blue Shield "made up of prominent lawyers, bankers and development and business leaders . . . earned between about $100,000 and $160,000 in 2010 for their board duties, documents show."  They were required to do little but show up to the occasional meeting.

210.     This is nothing compared to the compensation paid to high level executives of these "not-for-profit" companies.  South Carolina Blue Cross paid executives in the millions of dollars in 2010.

211.     HCSC, a conglomerate of several Blues, including Illinois, posted over a billion dollars in "net income," what most companies call profit, on its fully insured business alone in 2010, 2011 and 2012.  This net income does not even account for large blocks of plans it merely administers for the self-insured.  "CEO Patricia Hemingway Hall's 2012 base salary was just $1.1 million, but the nurse-turned-executive garnered a $14.9 million bonus.  The CEO of Chicago-based Health Care Service Corp. received $12.9 million in 2011."  "Each of HCSC's 10 highest-paid executives got at least $1.2 million more in 2012 than they did in 2011. Executive Vice President and Chief Operating Officer Colleen Foley Reitan more than doubled

her total compensation to $8.7 million in 2012." *See*

http://www.chicagobusiness.com/article/20130411/NEWS03/130419970/blue-cross-parent-ceos-compensation-rockets-past-16-million

212.     These supra-competitive profits are built on the strength of Defendants' agreement not to compete, its price fixing Blue Card regime and its market power, in particular its ability to force Providers to join their networks at below market rates.  A spokeswoman for Blue Cross of South Carolina noted that the Plan's outrageous increases are priced "to reflect its superior networks."  Thus, the market power of the Blues allows them to pay below market rates to Providers.  This leads to huge surplus profits for companies supposedly organized as not for profit or charitable companies.

213.     If Defendants' actions are not enjoined, harm to competition and injury to Plaintiffs will continue.

## Class Action Allegations

214.     Plaintiffs bring this action on behalf of themselves and on behalf of a class of healthcare providers.  First, Plaintiffs bring this action seeking injunctive relief pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of the following Class (the "Nationwide Injunction Class"):

> All healthcare providers, not owned or employed by any of the Defendants,  who currently provide healthcare services, equipment or supplies in the United States of America.

215.     Further, Plaintiffs bring this action seeking damages pursuant to the provisions of Rule 23(a), (b)(1) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

> All healthcare providers, not owned or employed by any of the Defendants,  in the United States of America provided covered services,

equipment or supplies to any patient who was insured by, or who was a member or beneficiary of any plan administered by, a Defendant within four years prior to the date of the filing of this action.

Plaintiffs reserve the right to amend the class definitions including to present subclasses, and/or add additional class representatives prior to the time that the Court grants class certification.

216.    Plaintiffs are all members of both Classes, their claims are typical of the claims of the other Class members, and Plaintiffs will fairly and adequately protect the interests of the Class.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class-action antitrust litigation.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.

217.    The anticompetitive conduct of Defendants alleged herein has imposed, and threatens to impose, a common antitrust injury on the Class Members.  The Class Members are so numerous that joinder of all members is impracticable.

218.    Defendants' relationships with the Class Members and Defendants' anticompetitive conduct have been substantially uniform.  Common questions of law and fact will predominate over any individual questions of law and fact.

219.    Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to Class Members, thereby making appropriate final injunctive relief with respect to Members of the Nationwide Injunctive Class as a whole.

220.    There will be no extraordinary difficulty in the management of this Class Action. Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members.  Among the questions of law and fact common to Class Members, many of which cannot be seriously disputed, are the following:

a. Whether Defendants violated Section 1 of the Sherman Act;

b. Whether Defendants participated in a contract, combination or conspiracy in restraint of trade as alleged herein;

c. Whether Defendants engaged in a scheme to allocate the United States healthcare market according to an agreed upon geographic division and agreed not to compete within another plan's geographic area;

d. Whether Defendants' agreements, including its Price Fixing Conspiracy, constitute *per se* illegal restraint of trade in violation of Section 1 of the Sherman Act;

e. Whether any pro-competitive justifications that Defendants may proffer for their conduct alleged herein do exist, and if such justifications do exist, whether those justifications outweigh the harm to competition caused by that conduct;

f. Whether Class Members have been impacted or may be impacted by the harms to competition that are alleged herein;

g. Whether Defendants' conduct should be enjoined;

h. The proper measure of damages sustained by the Provider Class as a result of the conduct alleged herein;

221. These and other questions of law and fact are common to Class Members and predominate over any issues affecting only individual Class Members.

222. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

223. This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible. The damages suffered by many Class Members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## COUNT I

### Contract, Combination, or Conspiracy in Restraint of Trade
### In Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (The BCBS Market Allocation Conspiracy)

224. Plaintiffs incorporate the allegations set forth in paragraphs 1 through 223 as though set forth herein.

225. The License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Blues represent a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C § 1.

226. Through the License Agreements, Membership Standards, and Guidelines, BCBSA, and the other Blue Cross entities have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the 38 BCBSA members. By so doing, the BCBSA members have agreed to suppress competition and to increase their profits by decreasing the rates paid to healthcare providers in violation of Section 1 of the Sherman Act. Due to the lack of competition which results from Defendants' illegal conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide. Defendants' market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

227. As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have with increased competition and but for Defendants' anticompetitive agreement.

228. Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

229. Defendants' unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete.

## COUNT II

### Contract, Combination, or Conspiracy in Restraint of Trade
### In Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (The BCBS Price Fixing Conspiracy)

230. Plaintiffs incorporate the allegations set forth in paragraphs 1 through 229 as though set forth herein.

231. The BCBS Price Fixing Conspiracy, in addition to the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Blues, represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act.

232. Through the BCBS Price Fixing Conspiracy, the Blues have agreed to fix reimbursement rates for providers among themselves by agreeing to accept the "host plan" reimbursement rate through the Blue Card Program. By so doing, Defendants have agreed to

suppress competition by fixing and maintaining the rates paid to healthcare providers at less than competitive levels in violation of Section 1 of the Sherman Act. Defendants' price fixing agreement through the Blue Card Program is *per se* illegal under Section 1 of the Sherman Act.

233. As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have with increased competition and but for Defendants' anticompetitive agreement.

234. Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

235. Defendants' unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting Defendants from entering into, or from honoring or enforcing, any agreements that fix the prices paid by Defendants for services rendered by healthcare providers.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

a. Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and Appoint Plaintiffs as Class Representatives, and Counsel for Plaintiffs as Class Counsel;

b. Adjudge and decree that Defendants have violated Section 1 of the Sherman Act;

c.      Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member plan may compete;

d.      Permanently enjoin Defendants from utilizing the Blue Card Program to pay healthcare providers and from developing any other program or structure that is intended to or has the effect of fixing prices paid to healthcare providers;

e.      Award Plaintiffs and the Damages Class damages in the form of three times the amount of damages suffered by Plaintiffs and members of the Class as proven at trial;

f.      Award costs and attorneys' fees to Plaintiffs;

g.      Award prejudgment interest;

h.      For a trial by jury; and

i.      Award any such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  July 1, 2013                                    Respectfully submitted,


*/s/ Edith M. Kallas*                                   */s/ Joe R. Whatley, Jr.*
Edith M. Kallas – *Co-Lead Counsel*                    Joe R. Whatley, Jr. – *Co-Lead Counsel*
WHATLEY KALLAS, LLP                                    W. Tucker Brown
380 Madison Avenue, 23rd Floor                         WHATLEY KALLAS, LLP
New York, NY 10017                                     2001 Park Place North
Tel:  (212) 447-7060                                   1000 Park Place Tower
Fax:  (800) 922-4851                                   Birmingham, AL 35203
Email: ekallas@whatleykallas.com                       Tel:  (205) 488-1200
                                                       Fax:  (800) 922-4851
                                                       Email: jwhatley@whatleykallas.com
                                                              tbrown@whatleykallas.com

Patrick J. Sheehan
WHATLEY KALLAS, LLP
60 State Street, 7th Floor
Boston, MA 02109
Tel: (617) 573-5118
Fax: (617) 573-5090
Email: psheehan@whatleykallas.com

E. Kirk Wood, Jr. – *Local Facilitating Counsel*
WOOD LAW FIRM LLC
P. O. Box 382434
Birmingham, AL 35238
Tel: (205) 612-0243
Fax: (205) 705-1223
Email: ekirkwood1@bellsouth.net

Debra B. Hayes – *Plaintiffs' Steering Committee*
Dennis C. Reich – *Chair, Damages Committee*
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel: (713) 622-7271
Fax: (713) 623-8724
Email: dhayes@dhayeslaw.com
        dreich@rbfirm.net

Dennis Pantazis – *Plaintiffs' Steering Committee*
Brian Clark – *Discovery Committee*
WIGGINS CHILDS QUINN & PANTAZIS, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel: (205) 314-0500
Fax: (205) 254-1500
Email: dgp@wcqp.com
        bclark@wcqp.com

Deborah J. Winegard
WHATLEY KALLAS, LLP
1068 Virginia Avenue, NE
Atlanta, GA 30306
Tel: (404) 607-8222
Fax: (404) 607-8451
Email: dwinegard@whatleykallas.com

Aaron S. Podhurst – *Plaintiffs' Steering Committee*
Peter Prieto – *Chair, Expert Committee*
PODHURST ORSECK, P.A.
25 West Flagler Street, Suite 800
Miami, FL 33130
Tel: (305) 358-2800
Fax: (305) 358-2382
Email: apodhurst@podhurst.com
        pprieto@podhurst.com

U.W. Clemon – *Plaintiffs' Steering Committee*
J. Mark White – *Litigation Committee*
Augusta S. Dowd – *Chair, Litigation Committee*
Linda G. Flippo – *Discovery Committee*
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel: (205) 323-1888
Fax: (205) 323-8907
Email: uwclemon@whitearnolddowd.com
        adowd@whitearnolddowd.com
        mwhite@whitearnolddowd.com
        lflippo@whitearnolddowd.com

Van Bunch – *Chair, Class Certification Committee*
BONNETT FAIRBOURN FRIEDMAN & BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel: (602) 274-1100
Fax: (602) 274-1199
Email: vbunch@bffb.com

Nicholas B. Roth – ***Chair, Discovery Committee***
Julia Smeds Roth – ***Discovery Committee***
EYSTER KEY TUBB ROTH MIDDLETON
  & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email: nroth@eysterkey.com
       jroth@eysterkey.com


David A. Balto – ***Expert Committee***
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email: david.balto@dcantitrustlaw.com


Joey K. James – ***Litigation Committee***
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel:  (256) 764-0095
Fax:  (256) 767-5705
Email: joey@bunchandjames.com


John C. Davis – ***Written Submissions
Committee***
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel:  (850) 222-4770
Email: john@johndavislaw.net


D. Brian Hufford – ***Chair, Written Submissions
Committee***
Robert J. Axelrod – ***Chair, Written Submissions
Committee***
POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS, LLP
600 Third Avenue, 20th Floor
New York, NY 10016
Tel:  (212) 661-1100
Fax:  (212) 661-8665
Email: bhufford@pomlaw.com
       rjaxelrod@pomlaw.com


W. Daniel Miles, III – ***Written Submissions
Committee***
BEASLEY ALLEN CROW METHVIN PORTIS
  & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel:  (800) 898-2034
Fax:  (334) 954-7555
Email: dee.miles@beasleyallen.com


Peter H. Burke – ***Class Certification Committee***
Richard S. Frankowski – ***Discovery Committee***
J. Allen Schreiber – ***Litigation Committee***
BURKE HARVEY & FRANKOWSKI, LLC
One Highland Place
2151 Highland Avenue, Suite 120
Birmingham, AL 35205
Tel:  (888) 880-9046
Fax:  (205) 588-8671
Email: pburke@bhflegal.com
       rfrankowski@bhflegal.com
       aschreiber@bhflegal.com


Michael C. Dodge – ***Expert Committee***
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel:  (972) 419-7172
Email: mdodge@gpm-law.com

Mark K. Gray – *Discovery Committee*
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel:  (502) 805-1800
Fax:  (502) 618-4059
Email: mgray@grayandwhitelaw.com

Stephen M. Hansen – *Class Certification Committee*
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel:  (253) 302-5955
Fax:  (253) 301-1147
Email: steve@stephenmhansenlaw.com

Harley S. Tropin – *Damages Committee*
Javier A. Lopez – *Discovery Committee*
KOZYAK TROPIN &
  THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email: hst@kttlaw.com
          jal@kttlaw.com

C. Wes Pittman – *Settlement Committee*
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel:  (850) 784-9000
Fax:  (850) 763-6787
Email: wes@pittmanfirm.com

Robert B. Roden – *Litigation Committee*
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel:  (205) 933-8383
Fax:  (205) 933-8386
Email: rroden@shelbyroden.com

Michael E. Gurley, Jr. – *Discovery Committee*
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel:  (205) 908-6512
Email: Michael@gurleylaw.net

Lynn W. Jinks, III – *Expert Committee*
Christina D. Crow – *Discovery Committee*
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel:  (334) 738-4225
Fax:  (334) 738-4229
Email: ljinks@jinkslaw.com
          ccrow@jinkslaw.com

Myron C. Penn – *Discovery Committee*
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel:  (334) 738-4486
Fax:  (334) 738-4432
Email: myronpenn28@hotmail.com

Troy A. Doles – *Discovery Committee*
SCHLICHTER BOGARD & DENTON, LLP
100 S. 4th Street, Suite 900
St. Louis, MO 63102
Tel:  (314) 621-6115
Fax:  (314) 621-7151
Email: tdoles@uselaws.com

J. Preston Strom, Jr. – *Litigation Committee*
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel:  (803) 252-4800
Fax:  (803) 252-4801
Email: petestrom@stromlaw.com

Gary E. Mason – *Class Certification Committee*
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DK 20036
Tel:  (202) 429-2290
Fax:  (202) 640-1160
Email:  gmason@wbmllp.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel:  (719) 471-1984
Fax:  (719) 577-4356
Email:  lance@searsandswanson.com

Thomas V. Bender
WALTERS BENDER STROHBEHN
 & VAUGHAN, P.C.
2500 City Center Square, 1100 Main
Kansas City, MO 64105
Tel:  (816) 421-6620
Fax:  (816) 421-4747
Email:  tbender@wbsvlaw.com

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel:  (320) 289-2363
Fax:  (320) 289-2369
Email:  brian@wojtalewiczlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 1st day of July 2013, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Joe R. Whatley, Jr.*
Joe R. Whatley, Jr.