FILED
2014 Jan-15  PM 04:14
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

———————————————————— )
IN RE: BLUE CROSS BLUE SHIELD     )    **Master File No. 2:13-CV-20000-RDP**
**ANTITRUST LITIGATION**            )
**(MDL NO. 2406)**                     )    **This document relates to all cases.**
———————————————————— )


## PROVIDER PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS (Doc. 108, 120)

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .............................................................................................................. 1

STANDARD OF REVIEW .................................................................................................. 4

ARGUMENT ....................................................................................................................... 4

     I.     THE BLUES' USE OF THE BLUECARD PROGRAM TO FIX PRICES
          IS A *PER SE* VIOLATION OF THE SHERMAN ACT ...................................... 4

          A.     The Complaint Adequately Alleges That the BlueCard Program
               Is an Agreement to Fix Prices ................................................................... 5

          B.     The Blues' Use of the BlueCard Program to Fix Prices Is
               Unlawful *Per Se* ....................................................................................... 9

               1.     The BlueCard Program Cannot Evade *Per Se* Analysis as a
                    Joint-Purchasing Agreement ........................................................ 11

               2.     The BlueCard Program Does Not Fall Within the Narrow
                    "New Product" Exception to the *Per Se* Rule .............................. 16

               3.     Judicial Experience with Price-Fixing Agreements Justifies
                    the Use of the *Per Se* Rule ......................................................... 19

CONCLUSION .................................................................................................................. 20

CERTIFICATE OF SERVICE ............................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*,
 135 F.3d 740 (11th Cir. 1998) ....................................................................... 16, 17, 18, 19

*Am. Needle, Inc. v. Nat'l Football League*,
 130 S.Ct. 2201 (2010) ............................................................................................... 20

*Arizona v. Maricopa County Medical Society*,
 457 U.S. 332 (1982) ............................................................................................ passim

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ...................................................................................................... 4

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ...................................................................................................... 4

*Brennan v. Concord EFS, Inc.*,
 369 F. Supp. 2d 1127 (N.D. Cal. 2005) ..................................................................... 21

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc. (BMI)*,
 441 U.S. 1 (1979) ................................................................................................. 21, 22

*Catalano v. Target Sales, Inc.*,
 446 U.S. 643 (1980) .................................................................................................... 11

*Dacosta v. Nwachukwa*,
 304 F.3d 1045 (11th Cir. 2002) ................................................................................... 4

*Doe v. Ariz. Hosp. & Healthcare Ass'n*,
 No. CV 07-1292, 2009 U.S. Dist. LEXIS 42871 (D. Ariz. Mar. 19, 2009) ......... 12, 13, 19

*Freeman v. San Diego Ass'n of Realtors*,
 322 F.3d 1133 (9th Cir. 2003) .............................................................................. 22, 23

*Int'l Outsourcing Servs., LLC v. Blistex*,
 420 F. Supp. 2d 860 (N.D. Ill. 2006) ......................................................................... 13

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
 626 F.3d 1327 (11th Cir. 2010) ............................................................................ 10, 11

*Kamakahi v. Am. Soc'y for Reproductive Med.*,
 No. C 11-01781, 2013 U.S. Dist. LEXIS 61250 (N.D. Cal. Mar. 29, 2013) .................... 12

*Kartell v. Blue Shield of Mass., Inc.*,
 749 F.2d 922 (1st Cir. 1984) ...................................................................................... 14

*Log Creek, L.L.C. v. Kessler*,
 717 F. Supp. 2d 1239 (N.D. Fla. 2010)............................................................... 5

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
 334 U.S. 219 (1948).......................................................................................... 9, 12

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla. (NCAA)*,
 468 U.S. 85 (1984)................................................................................................ 21

*New York ex rel. Spitzer v. Saint Francis Hosp.*,
 94 F. Supp. 2d 399 (S.D.N.Y. 2000)................................................................. 6, 10

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
 472 U.S. 284 (1985)........................................................................................ 15, 16

*Omnicare, Inc. v. UnitedHealth Group, Inc.*,
 524 F. Supp. 2d 1031 (N.D. Ill. 2007)........................................................... 6, 7, 13

*Powderly v. Blue Cross Blue Shield of N.C.*,
 No. 3:08-cv-109 (W.D.N.C. Aug. 21, 2008) ...................................................... 24

*Ratino v. Med. Serv. of D.C. (Blue Shield)*,
 718 F.2d 1260 (4th Cir. 1983) ............................................................................. 9

*United States v. Alston*,
 974 F.2d 1206 (9th Cir. 1992) ...................................................................... 20, 23

*United States v. Container Corp. of Am.*,
 393 U.S. 333 (1969)............................................................................................ 6, 7

*United States v. Sealy, Inc.*,
 388 U.S. 350 (1967)......................................................................................... 2, 19

*United States v. Socony-Vaccum Oil Co.*,
 310 U.S. 150 (1940).............................................................................. 5, 6, 8, 12

*United States v. Topco Assocs.*,
 405 U.S. 596 (1972).............................................................................................. 2

**Statutes**

Cal. Bus. & Prof. Code §§ 511.1−.4 .......................................................................... 15

**Rules**

Fed. R. Civ. P. 12(b)(6)............................................................................................... 4

## INTRODUCTION

This case is simple.  The Plaintiffs have alleged in detail that the Defendant Blue Cross and Blue Shield plans, which are independent companies, agreed with each other to carve the United States into "service areas" in which only one Blue plan can sell health insurance and contract with healthcare providers.  This practice is known as horizontal market allocation, and it is illegal *per se*, without regard for any benefits it might have.  The Provider Plaintiffs have alleged that the BlueCard price-fixing program provides the *quid pro quo* for the Blues' agreement not to complete.  Through the BlueCard program, the Blues have agreed to fix the prices they pay to providers who treat subscribers of a Blue plan outside their "service area."  The agreement not to compete limits the competition that each Blue plan faces and allows each of them to reduce the prices that they pay to providers below competitive levels.  The non-competing Blue plans then collectively get the benefit of those below-market prices.  Price fixing also is illegal *per se*.

The only reason that these motions to dismiss have required hundreds of pages of briefing is that the Blues have decided to attack the Plaintiffs' factual allegations and seek dismissal on the basis of facts not contained in the complaints.  The Blues will have a chance to tell their side of the story at the proper time, either at summary judgment or trial, but not now.  On a motion to dismiss, all that matters are the Plaintiffs' allegations, which establish the Blues' flagrant violation of the antitrust laws.

The Blues first try to muddy the waters when describing their history.  To allege that the Blues have violated the antitrust laws, the Plaintiffs must allege that the Blues are potential competitors.  In fact, the Plaintiffs alleged that Blues competed vigorously with each other until the 1980s, when they began to enter a series of license agreements that forced them to

consolidate and severely restricted their ability and incentive to compete.  Relying primarily on documents that cannot be considered on a motion to dismiss, the Blues claim that their competition before the 1980s was minimal, but their account of their history ends abruptly right before they entered the agreements on which this case is based.  Their approach is like ending a history of the Civil War with the Battle of Chancellorsville in May of 1863.  The Blues' version of history is as misleading as a history of the Civil War that ends before Gettysburg.  At this point, however, the Court need not resolve this dispute.  The Plaintiffs have alleged that the Blues were competitors, and that is all that matters on a motion to dismiss.

The heart of the Blues' motion to dismiss is their argument that their horizontal market allocation is not a *per se* violation of the antitrust laws.  The Supreme Court foreclosed this argument in *United States v. Sealy, Inc.*, 388 U.S. 350 (1967), a case remarkably similar to this one, in which trademark licensing agreements that allocated territories among potential competitors were held to be illegal *per se*.  The Court reaffirmed and expanded on *Sealy* in *United States v. Topco Assocs.*, 405 U.S. 596 (1972).  The Blues claim that *Sealy* and *Topco* are no longer good law, but they have not cited a single decision by the Supreme Court or the Eleventh Circuit that would call these cases into question.  Unable to knock *Sealy* and *Topco* down, the Blues try to go around them, arguing that their horizontal market allocation has procompetitive benefits, and that it allows the Blues to offer a new product that otherwise would not exist.  Neither of these arguments is appropriate on a motion to dismiss.  Moreover, any procompetitive benefits are irrelevant as a matter of law when a practice is a *per se* violation of the antitrust laws, and the Blues' "new product" is defined far too narrowly to qualify for an exemption from the *per se* rule.

2

The Blues also argue that their common-law rights to the Blue Cross and Blue Shield trademarks prevent them from competing with each other. The Plaintiffs have alleged that this is incorrect as a matter of fact, because the Blues did compete against each other (and as demonstrated in the Kansas proceeding, they still do compete against each other in certain parts of the country), which would be impossible if the Blues' trademark rights prohibited competition. The Blues are also incorrect as a matter of law: they have no right to the exclusive use of their trademarks in their territory at common law, and they ignore a century of Supreme Court precedent holding that intellectual property rights, including trademarks, cannot be used to violate the antitrust laws.

The Blues' defense of their use of the BlueCard program to fix the prices they pay to providers fails for similar reasons. Price fixing is every bit as illegal as horizontal market allocation. The Blues admit that the BlueCard program cannot survive scrutiny as a joint purchasing agreement, and their claim that the BlueCard program is essential to the creation of a "new product" of nationwide insurance is belied by the fact that other insurers without a national presence can use several lawful methods to offer coverage nationwide.

The Blues' final argument, that the McCarran-Ferguson Act exempts their conduct from the federal antitrust laws, fails because the Blues' illegal restrictions on competition do not constitute the "business of insurance" and are not "regulated by State law" for purposes of the Act. Moreover, the controlling Supreme Court case on point makes clear that the McCarran-Ferguson Act does not apply to contracts between insurers and healthcare providers.

To avoid duplicative briefing, the Provider Plaintiffs and Subscriber Plaintiffs are filing two common briefs, one addressing the Blues' Motion to Dismiss Plaintiffs' Antitrust Conspiracy Claims ("Conspiracy Br.") (Doc. 120), and the other addressing the Motion of

Certain Defendants to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Doc. 125). This brief will address an issue in the Conspiracy Brief that is unique to the Provider Plaintiffs: their claim that the BlueCard program constitutes illegal price-fixing.  The Provider Plaintiffs will file a separate brief addressing the motion to dismiss filed by Blue Cross Blue Shield of Michigan (Doc. 114).

## STANDARD OF REVIEW

A court may not dismiss a complaint under Rule 12(b)(6) if the plaintiff provides "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In deciding a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the complaint as true and construe the facts in a light most favorable to the non-moving party."  *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002).  Therefore, a defendant cannot win dismissal by disputing the allegations of the complaint.  *See Log Creek, L.L.C. v. Kessler*, 717 F. Supp. 2d 1239, 1243 (N.D. Fla. 2010).

## ARGUMENT

## I.    THE BLUES' USE OF THE BLUECARD PROGRAM TO FIX PRICES IS A *PER SE* VIOLATION OF THE SHERMAN ACT

In their brief treatment of the Provider Plaintiffs' price-fixing claim, the Blues essentially advance two arguments.  First, they contend that the Provider Plaintiffs have not adequately pled the existence of a price-fixing agreement.  Second, they contend that the Sherman Act's *per se* prohibition on price-fixing is inapplicable to the BlueCard program.  The first argument fails because it overlooks numerous allegations plainly establishing that the Blues have exploited the

4

BlueCard program to fix the Provider Plaintiffs' reimbursement rates, and the second fails because it is inconsistent with a host of decisions of the Supreme Court and lower courts applying the Sherman Act's *per se* rule to agreements just like the BlueCard program.

### A.   The Complaint Adequately Alleges That the BlueCard Program Is an Agreement to Fix Prices

An illegal agreement or conspiracy to fix prices consists of "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity." *United States v. Socony-Vaccum Oil Co.*, 310 U.S. 150, 223 (1940). More generally, a "limitation or reduction of price competition" falls within the Sherman Act's ban on price-fixing, for "interference with the setting of price by free market forces is unlawful *per se*." *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969); *see also Omnicare, Inc. v. UnitedHealth Group, Inc.*, 524 F. Supp. 2d 1031, 1039 (N.D. Ill. 2007) ("When an agreement between competitors is entered into for the purpose of restraining price competition, and actually does restrain or contribute to the restraint of such competition, such an agreement constitutes price fixing, which is a per se unreasonable practice under section 1 of the Sherman Act."). Prohibited price-fixing is thus not limited to "the mere establishment of uniform prices." *Socony-Vacuum Oil Co.*, 310 U.S. at 222; *see also New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 412 (S.D.N.Y. 2000) ("[T]he per se ban on price fixing is not limited to an express horizontal agreement setting a uniform price for a product or service.").

Contrary to the Blues' assertions, the Provider Plaintiffs' complaint does not lack allegations of a price-fixing agreement. It is packed with them. Indeed, the website of Defendant CareFirst, which is quoted in the Amended Complaint, describes the conspiracy in plain English. (Provider Plaintiffs' Consolidated Amended Complaint ("Prov. Compl.") ¶ 175, Doc. 86.)

The conspiracy works as follows.  A provider contracts with an individual Blue plan in his or her own state to become an in-network provider, which requires the provider to accept the reimbursement rates set forth in the contract as payment in full for his or her services.  (*Id.* ¶ 142.)  Due to the Blues' market power within their exclusive geographical markets, the provider often has no bargaining power and is forced to accept the reimbursement rates offered by the Blue plan, which are far below competitive rates.  (*Id.* ¶¶ 7, 142, 173, 226–27.)  When the provider treats a subscriber of any other Blue plan (for example, when a provider in Mississippi treats a subscriber of BlueCross BlueShield of Tennessee), the Blue plan in the provider's state (Blue Cross & Blue Shield of Mississippi) is called the "Host Plan," and the subscriber's Blue plan (BlueCross BlueShield of Tennessee) is called the "Home Plan."  Through the BlueCard program, all Blue plans have agreed with each other to pay the provider the same reimbursement rate set forth in the provider's contract with the Host Plan when the provider treats a Home Plan's subscribers.  (*Id.* ¶¶ 175–76.)  Every provider is bound by this agreement among the Blue plans, even though the provider has no contract with any Blue plan other than the Host Plan. (*Id.*)  The Home Plans and the provider are not permitted to negotiate separate agreements or higher reimbursement rates with each other.  (*Id.* ¶ 176.)  The purpose and effect of this program is to "leverage the low provider pricing [the Blues] had achieved in each Service Area to benefit all Blues."  (*Id.* ¶¶ 173–74.)[1]

This program constitutes a price-fixing conspiracy because it completely eliminates the possibility of price competition among the Blues for the Provider Plaintiffs' services.  *See Container Corp.*, 393 U.S. at 337; *Omnicare*, 524 F. Supp. 2d at 1039.  Without the program, the Provider Plaintiffs could select which individual out-of-area Blues to deal with, and out-of-area

---

[1] The Host Plan is able to dictate the low provider pricing because the other Blues have agreed not to compete with the Host Plan.

Blues could offer to pay higher reimbursement rates to the Provider Plaintiffs to entice them to provide services to the Blues' subscribers. Instead, through the BlueCard program, the Blues, which are all independent entities, have all agreed to pay each provider the same low price for that provider's services, and thus have "fixed" the price for those services. *See Socony-Vaccum Oil Co.*, 310 U.S. at 222 ("prices are fixed . . . if the prices paid or charged are to be at a certain level"). Indeed, it is virtually self-evident that an agreement among competitors on the rates to pay providers constitutes price-fixing. The BlueCard program, therefore, is "a combination formed for the purpose and with the effect of . . . fixing" the prices paid to the Provider Plaintiffs. *Id.* at 223.

In *Arizona v. Maricopa County Medical Society*, 457 U.S. 332 (1982), the Supreme Court held that a similar combination constituted price-fixing. In that case, a medical society composed of physicians established a schedule of maximum fees that participating doctors agreed to accept as payment in full for services performed for patients whose insurance plans were approved or administered by the medical society. *Id.* at 339. Since the medical society was controlled by physicians, the Court viewed its creation of a maximum fee schedule as "competing doctors . . . adopting, revising, and agreeing to use a maximum-fee schedule in implementation of the insurance plans." *Id.* at 342. The Court held that the medical society's conduct constituted *per se* illegal price-fixing. *Id.* at 343–57; *see also Ratino v. Med. Serv. of D.C. (Blue Shield)*, 718 F.2d 1260 (4th Cir. 1983) (reversing summary judgment in favor of a Blue Shield plan on the plaintiff physician's claim that the plan's customary fee schedule constituted *per se* illegal price fixing).

Like the medical society's fee schedule in *Maricopa*, the BlueCard program constitutes price-fixing because it involves potentially competing insurers "adopting, revising, and agreeing

to use a maximum-fee schedule in implementation of the insurance plans." *Id.* at 342.**Error! Bookmark not defined.**  The BlueCard program transforms each Host Plan's fee schedule with its in-network providers into a maximum-fee schedule for those providers through the agreement of all other Blue plans to use that fee schedule to compensate those providers.   That the competitors in *Maricopa* were doctors and the competitors here are insurers is a meaningless difference, for both combinations had the same ultimate purpose and effect of eliminating price competition, and the Sherman Act's prohibition on price-fixing does not distinguish between buyers and sellers.  *See Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948).  It is also immaterial that the BlueCard program has not created one uniform maximum-fee schedule applicable across the country, but instead adopts different maximum-fee schedules in each service area, because the anticompetitive character of the conduct is the same—it prevents providers in each service area from separately negotiating reimbursement fees with competing out-of-area insurers and fixes the fees that all Blues pay those providers.

The Blues nonetheless contend that the BlueCard program does not constitute price fixing, because each Blue plan separately negotiates its own rates and establishes its own medical policies, claims adjudication edits, and coverage rules (essentially, the rules governing payment of claims).  (Conspiracy Br. 42 (citing Prov. Compl. ¶ 178), Doc. 120.)  This argument misses the point of the Provider Plaintiffs' price-fixing claim.  That an individual Host Plan may separately "negotiate" rates with its own in-network providers is irrelevant; the price-fixing occurs when all other Blue plans agree to use those rates to pay the Host Plan's providers for treating their subscribers.  Also, "[t]he fact defendants' contract terms are negotiated with [providers] rather than set unilaterally does not save defendants from *per se* liability."  *Saint Francis Hosp.*, 94 F. Supp. 2d at 413.  Additionally, the fact that each Blue plan establishes its

own medical policies, claims adjudication edits, and coverage rules is irrelevant because none of those terms affect or permit competition on the *rates* paid to providers; if anything, as alleged in the Provider Plaintiffs' complaint, they tend to create additional inefficiencies and reduce the compensation ultimately paid to providers by excluding coverage for certain services and editing submitted claims.  (Prov. Compl. ¶ 178.)

The complaint's clear description of the Blues' price-fixing conspiracy avoids the pleading deficiencies in *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327 (11th Cir. 2010), on which the Blues rely.  In that case, the complaint alleged that a manufacturer and its distributors, both of which sold the same product directly to consumers, charged the same minimum price to consumers, but failed to allege that the manufacturer and its distributors signaled to each other how and when to maintain or adjust prices.  *Id.* at 1341, 1343.  The court ruled that this allegation of parallel conduct was not "suggestive enough to render a § 1 [horizontal price-fixing] conspiracy plausible, when the inference of conspiracy is juxtaposed with the inference of independent economic self interest," *id.* at 1343 (internal quotation marks omitted) (citations omitted), because it was in the manufacturer's and distributors' self interest to sell the product at the same price, *id.* at 1341–42.  Here, in contrast, the complaint contains explicit allegations of an actual agreement among the Blues, and more importantly, the Blues' own published documents admit to and describe the agreement.  (Prov. Compl. ¶¶ 173–75.)  Thus, unlike the plaintiff in *Jacobs*, the Provider Plaintiffs here need not rely on an inference of a conspiracy.  Its existence is indisputable.

### B.     The Blues' Use of the BlueCard Program to Fix Prices Is Unlawful *Per Se*

The Blues concede that horizontal price-fixing agreements and conspiracies are *per se* violations of Section 1 of the Sherman Act.  (Conspiracy Br. 41); *see also Catalano v. Target*

*Sales, Inc.*, 446 U.S. 643, 647 (1980) ("It has long been settled that an agreement to fix prices is unlawful *per se*."); *Maricopa County*, 457 U.S. at 347 ("We have not wavered in our enforcement of the *per se* rule against price fixing.").  As the Supreme Court reasoned over a half-century ago, "[w]hatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness.  They are all banned because of their actual or potential threat to the central nervous system of the economy." *Socony-Vacuum*, 310 U.S. at 224 n.59.

This *per se* prohibition applies to horizontal price-fixing agreements and conspiracies among both buyers and sellers alike.  *Mandeville Island Farms*, 334 U.S. at 235 ("It is clear that the [price-fixing] agreement is the sort of combination condemned by the [Sherman] Act, even though the price-fixing was by purchasers, and the persons specially injured under the treble damage claim are sellers, not customers or consumers."); *Doe v. Ariz. Hosp. & Healthcare Ass'n*, No. CV 07-1292, 2009 U.S. Dist. LEXIS 42871, at *14 (D. Ariz. Mar. 19, 2009) ("Price-fixing agreements among buyers, like those among sellers, are prohibited by the Sherman Act, even where the damage caused by the agreement is to sellers and not consumers.").  As a result, numerous courts have denied motions to dismiss *per se* price-fixing claims against purchasers. *See, e.g.*, *Kamakahi v. Am. Soc'y for Reproductive Med.*, No. C 11-01781, 2013 U.S. Dist. LEXIS 61250, at *21–26 (N.D. Cal. Mar. 29, 2013); *Doe*, 2009 U.S. Dist. LEXIS 42871, at *15– 18; *Omnicare*, 524 F. Supp. 2d at 1039–40; *Int'l Outsourcing Servs., LLC v. Blistex*, 420 F. Supp. 2d 860, 864–65 (N.D. Ill. 2006).

Notwithstanding this clear line of authority establishing that horizontal price-fixing is *per se* illegal, the Blues argue that the *per se* rule is inapplicable to the BlueCard program for three reasons.  First, they contend that courts have upheld joint-purchasing arrangements against *per se*

attacks.  Second, they claim that the BlueCard program permits the creation of a new product with competitive benefits.  And third, they assert that judicial experience has not demonstrated that the BlueCard program is manifestly anticompetitive.  None of these arguments is persuasive.

### 1.  The BlueCard Program Cannot Evade *Per Se* Analysis as a Joint-Purchasing Agreement

The Blues cite three cases that they claim uphold joint purchasing agreements against *per se* attacks.  This line of argument is bewildering because the Provider Plaintiffs did not allege, and do not claim now, that the BlueCard program is a joint-purchasing agreement, and the Blues deny that it is a joint-purchasing agreement as well.  (Conspiracy Br. 42–43 ("Even if Blue Plans were 'jointly' negotiating with the provider (which they are not), courts routinely uphold such 'joint purchasing' arrangements . . . .").)  Thus, even if the cases the Blues cite upheld joint-purchasing agreements (in fact, one did not even involve a joint-purchasing agreement), they would not help the Blues.

Nonetheless, even if the Blues' conduct could be characterized as a joint-purchasing agreement, the three cases the Blues cite do not undermine the applicability of the *per se* rule here.[2]  The first case, *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922 (1st Cir. 1984), actually supports the Provider Plaintiffs' claims.  In that case, physicians challenged a *single* Blue plan's ban on balance billing, which prohibited in-network providers from billing the Blue plan's subscribers for any fees beyond what the Blue plan paid those providers.  *Id.* at 923.  The court held that the Blue plan was, for purposes of the antitrust laws, "the purchaser of the doctor's services."  *Id.* at 924.  As such, it was an independent actor, and its conduct did not implicate cases in which numerous independent actors combined "to suppress their otherwise competitive instinct to bid up prices."  *Id.* at 925.  Indeed, the court was careful to note that "the antitrust

---

[2] If the Court agrees that the Blues have disclaimed the argument that the BlueCard program is a joint-purchasing agreement, the Court is welcome to skip to page 16 of this brief.

problems at issue when a single firm sets a price . . . are very different from those associated with agreements by competitors to limit independent decision-making." *Id.* at 930. Since the Provider Plaintiffs allege that the BlueCard program limits the Blues' independent decision-making and competitive instinct to bid up prices for providers' services, *Kartell* supports the Provider Plaintiffs' claims by recognizing that this limitation implicates the Sherman Act.

The next case the Blues cite, *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985), did not even involve a price-fixing claim. In that case, a retailer that was expelled from a purchasing cooperative alleged that its expulsion constituted a *per se* illegal concerted refusal to deal. *Id.* The cooperative functioned as the primary wholesaler and provided warehousing facilities to the member retailers. *Id.* at 286. Retailers that were not members of the cooperative were also free to purchase wholesale supplies from the cooperative at the same prices as members. *Id.* At the end of each year, the cooperative distributed its profits to its members. *Id.* Although the plaintiff never challenged the existence of the cooperative, the Supreme Court observed that "[w]holesale purchasing cooperatives . . . are not a form of concerted activity characteristically likely to result in predominantly anticompetitive effects." *Id.* at 295. Ultimately, the Court held that *per se* analysis should not be applied to the cooperative's expulsion of the plaintiff, because the plaintiff failed to make a threshold showing that "the cooperative possess[ed] market power or unique access to a business element necessary for effective competition." *Id.* at 298.

The Blues rely on the Court's observation regarding the anticompetitive potential of wholesale purchasing cooperatives, but that observation is irrelevant because the BlueCard program in no way resembles a wholesale purchasing cooperative. The cooperative was established as a separate, legitimate entity, sold its inventory to non-members, distributed its

profits to its members, and functioned as a wholesaler and provided wholesale facilities to its members. The BlueCard program does none of those things. Rather, it is a naked horizontal agreement among potential competitors who would otherwise have to pay competitive rates for providers' services.

If anything, *Northwest Wholesale Stationers* supports the Provider Plaintiffs' claim because it reaffirmed the applicability of *per se* analysis to expulsion from a purchasing cooperative when a plaintiff shows that the cooperative "possesses market power or exclusive access to an element essential to effective competition." *Id.* at 296. The complaint satisfies these criteria by alleging that the Blues possess dominant market power, gained as a result of their horizontal market allocation conspiracy, (Prov. Compl. ¶¶ 6–7, 109–18, 142, 173), and possess unique access to an overwhelming number of subscribers, which are, of course, the essential business elements for providers, (*id.* ¶¶ 2, 6, 51, 54, 105, 109–18, 171).

The third case the Blues cite, *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740 (11th Cir. 1998), also is of no use to them. In that case, twelve hospitals in one county set up a preferred provider program ("PPP") whereby they solicited bids from temporary nursing agencies and then selected agencies to be preferred providers of such services. *Id.* at 744. Eight of the sixteen agencies that submitted bids were selected as preferred providers. *Id.* Each hospital then entered into individual contracts with each preferred agency at the prices that each particular agency had bid. *Id.* The contracts all contained an "escape clause," enabling each agency to terminate its contract with a particular hospital on 30 days' notice. *Id.* Several agencies then sued the hospitals, alleging, among other things, that the PPP constituted a *per se* illegal price-fixing conspiracy. *Id.* at 746.

The court held, on the basis of a trial record, that the *per se* rule did not apply because, although the PPP had some impact on price, it was not an inherently anticompetitive practice. *Id.* at 748.  In reaching this conclusion, the court emphasized the significance of the fact that the case "involves lots of distinct contracts," *id.* at 747, and that the escape clause permitted agencies to sever their ties with particular hospitals and "reenter the market free to charge the prices it chooses," *id.*, thereby permitting "the market and not the [PPP] to be the ultimate decisionmaker for each hospital and each agency on the issues of price, demand, supply, and terms of dealing," *id.* at 748.  The court also focused on the fact that "all agencies are still able to provide nurses to medical facilities other than hospitals and even to hospitals should the need for nurses not be met by the preferred agencies."  *Id.*

None of these facts—all of which were developed at a trial, not at the motion-to-dismiss stage—are present here.  The Provider Plaintiffs do not have separate contracts with each Blue plan; generally, they just have one contract with a single Blue plan.  More importantly, the BlueCard program does not provide the Provider Plaintiffs with an escape clause.  Unlike the preferred agencies in *All Care*, providers cannot pick and choose with which Blue plans to deal through the BlueCard program, or even whether to participate in the BlueCard program at all. They must choose to either accept everyone or no one, and it is not really even a choice due to the Blues' dominant market power; declining to become an in-network Blues provider would be tantamount to retiring for many providers.  Whereas the agencies that did not participate in the PPP could still provide services to many other facilities outside the PPP, the Provider Plaintiffs' options are much more limited due to the Blues' overwhelming number of subscribers.  The PPP, thus, did not restrict the prospect of price competition nearly as much as the BlueCard program does.

The anticompetitive effect of the BlueCard program is particularly strong because of the Blues' horizontal market allocation conspiracy. The Supreme Court has held that the existence and impact of one anticompetitive practice cannot be ignored when determining whether another connected practice is *per se* illegal. *Sealy*, 388 U.S. at 355 ("[T]he existence and impact of the [price-fixing practice] cannot be ignored in our appraisal of the territorial limitations."). The Blues' market allocation and price-fixing conspiracies work hand-in-hand. By surgically dividing the country into insulated service areas free from competition, the Blues' market allocation conspiracy enables each Blue plan to achieve market dominance in its respective service area, and as a result, extract anticompetitive fee agreements from providers. Their BlueCard conspiracy then leverages these low fees by making them available to all the Blues, thus multiplying the effect and damage of their market allocation conspiracy. Given the nefarious connection between these two conspiracies, and the Provider Plaintiffs' inability to sever their ties with particular Blue plans and reenter the market to charge higher prices, it cannot be said here, unlike in *All Care*, that "the market . . . [is] the ultimate decisionmaker . . . on the issues of price, demand, supply, and terms of dealing." 135 F.3d at 748; *see also Doe*, 2009 U.S. Dist. LEXIS 42871, at *16–17 (rejecting a joint-purchasing defense on a motion to dismiss).[3]

Thus, even if the BlueCard program were characterized as a joint-purchasing agreement, the *per se* rule would apply to it.

---

[3] The Blues also rely on a California statute that regulates the completely different practice of a "contracting agent" selling, leasing, or transferring a provider network to an insurer. Cal. Bus. & Prof. Code §§ 511.1–.4. Whether or not the California Blue Cross and Blue Shield plans meet the definition of "contracting agent," the California law in no way purports to protect the joint activity of separate contracting agents. Therefore, the statute provides no defense against application of the *per se* rule to the alleged conspiracy. Nor could any state law, for that matter, due to the Supremacy Clause.

### 2. The BlueCard Program Does Not Fall Within the Narrow "New Product" Exception to the *Per Se* Rule

The Blues rely on "a very narrow class of cases," *United States v. Alston*, 974 F.2d 1206, 1209 (9th Cir. 1992), to argue that the BlueCard program permits the creation of a new product with procompetitive benefits that justifies departing from the *per se* rule. The Plaintiffs have already explained why the Blues' horizontal market allocation does not meet this standard in Part I.D. of their joint opposition to the Blues' motion to dismiss, and similar reasoning applies to the Blues' price-fixing conspiracy. Certainly at the motion-to-dismiss stage of the case, the so-called "new product" defense cannot carry the day. The purported "procompetitive benefits" of the BlueCard program, "a national provider network for Blue Plan members and efficient claims processing," (Conspiracy Br. 43), are irrelevant because a court cannot consider procompetitive benefits when a practice is illegal *per se*. *Marciopa County*, 457 U.S. at 351. To the extent that the Blues argue that the "new product" is specifically "a national provider network for Blue Plan members," they are simply arguing that they are fixing the price of a cartel product. (*See* Part I.D. of the Plaintiffs' joint opposition (citing *Am. Needle, Inc. v. Nat'l Football League*, 130 S. Ct. 2201, 2214 n.7 (2010) ("Members of any cartel could insist that their cooperation is necessary to produce the "cartel product" and compete with other products.")).) Moreover, both *NCAA* and *BMI*, on which the Blues rely, are inapplicable on a motion to dismiss because they both involved long trials, during which the purported procompetitive benefits were established. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla. (NCAA)*, 468 U.S. 85, 88 (1984); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc. (BMI)*, 441 U.S. 1, 6 (1979). To justify a "new product" exception to the *per se* rule requires the development of facts not present on a motion to dismiss. *Brennan v. Concord EFS, Inc.*, 369 F.

Supp. 2d 1127, 1133–35 (N.D. Cal. 2005) (denying motion to dismiss and distinguishing *NCAA* and *BMI* on the grounds that they followed long trials).

The Blues' "new product" claim fails on the merits as well because the Blues never explain how setting anticompetitive reimbursement rates is essential to the purported benefits of the BlueCard program.  In fact, the Blues do not even say when this so-called "new product" was established.  The Blues contend that the "new product" created by the BlueCard Program is a national provider network for Blue plan members with efficient claims processing.  (Conspiracy Br. 43.)  But that is not a "new product" in the sense described in *BMI*.  Unlike the blanket license, which was "quite different from anything any individual owner could issue," 441 U.S. at 23, any one of the Blues could create a national provider network, if not for its own self-imposed restrictions on competition.

Indeed, other insurers—even those without a strong presence nationwide—have figured out how to offer a national provider network to their subscribers without engaging in illegal price fixing.  There are already several national provider networks, including Multiplan and Three Rivers Network, that could be "leased" to any of the Blues.[4]  Insurers like Aetna and UnitedHealthcare use these networks to offer coverage in parts of the country where they do not contract with doctors directly.  In this way, they can cover subscribers nationwide, even in areas where they do not operate.  Aetna does not need to agree with UnitedHealthcare that it will force its contracted providers to accept UnitedHealthcare's patients at the prices Aetna sets.  And leasing a national provider network is just one of the Blues' options.  Just as they do with out-of-network providers in their service areas, the Blues could agree to pay an out-of-area provider a certain percentage of their in-network rates, or a certain percentage of the provider's charges.

---

[4] The Multiplan and Three Rivers contracts result in significantly higher provider reimbursement rates, something the Provider Plaintiffs will show when they are establishing the "but-for" world to show the damages from the Defendants' Blue Card price fixing scheme.

These options demonstrate that the BlueCard program, as is currently exists, is not essential to the creation of a "national network for Blue Plan members," (Conspiracy Br. 43), and it is absurd for the Blues to suggest that this Court should determine otherwise on a motion to dismiss, when all reasonable inferences are drawn in the Plaintiffs' favor.

Additionally, *BMI* and *NCAA* are inapplicable here.  *BMI* is inapplicable because fixing providers' fees is not a "necessary consequence," 441 U.S. at 21, of the BlueCard program's role in processing claims.  *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1151 (9th Cir. 2003) (holding that *BMI* was inapplicable because the fixed fees were not a necessary consequence of the challenged agreement).  The individual Blue plans could establish a mechanism for centrally processing claims from other states, and obtain the claims-processing benefits the program purports to achieve without agreeing to pay providers the rates that each Blue plan separately negotiated for its own in-network business.  *See id*.  *NCAA* is inapplicable as well because the "health care market is not such an industry [in which horizontal restraints on competition are essential if the product is to be available at all]."  *Alston*, 974 F.2d at 1209.  Thus, it is not surprising that the Blues do not explain how fixing prices improves the efficiency of processing claims.

Ultimately, there is nothing unique or novel about the BlueCard program that warrants an exception to the *per se* rule.  The BlueCard program is simply the way the Blues have lowered their own costs below competitive levels, and thus unfairly increased their own profits.  That is not an acceptable justification for price-fixing under *BMI* or *NCAA*.  *See Maricopa County*, 457 U.S. at 356 ("Their combination in the form of the foundation does not permit them to sell any different product.  Their combination has merely permitted them to sell their services to certain customers at fixed prices and arguably to affect the prevailing market price of medical care.").

"Firms cannot fix prices as a mere quid pro quo for providing consumers with a better product. Antitrust law presumes that competitive markets offer sufficient incentives and resources for innovation, and that cartel pricing leads not to a dedication of newfound wealth to the public good but to complacency and stagnation."  *Freeman*, 322 F.3d at 1152.

### 3. Judicial Experience with Price-Fixing Agreements Justifies the Use of the *Per Se* Rule

The Blues' final argument is apparently that because one other district court has dismissed an antitrust claim that challenged the BlueCard program and observed that it has procompetitive benefits, it is completely immune from the *per se* rule.  (Conspiracy Br. 43–44 (citing *Powderly v. Blue Cross Blue Shield of N.C.*, No. 3:08-cv-109 (W.D.N.C. Aug. 21, 2008)).)  The oral ruling in *Powderly*, however, is inapposite because the case did not involve a price-fixing claim.  As the Plaintiffs explained in their joint brief, the plaintiff in *Powderly* challenged the BlueCard program as an illegal boycott, not as a price-fixing conspiracy.  Further, the Blues emphasize the court's statement that "the BlueCard program . . . cannot be construed as a conspiracy to harm consumers," (Conspiracy Br. 43), but the Blues' low payments to providers under the BlueCard program—an allegation not at issue in *Powderly*—harms providers and consumers alike by reducing output of provider services and thereby reducing consumer welfare.

In any event, the Blues' argument once again "indicates a misunderstanding of the *per se* concept.  The anticompetitive potential in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some."  *Maricopa*, 457 U.S. at 351**Error! Bookmark not defined.**.  In *Maricopa*, the defendants' argument for relief from the *per se* rule, much like the Blues' argument here, was that "the doctors' agreement not to charge certain insureds more than a fixed price facilitates the successful marketing of an attractive

insurance plan." *Id.* at 349.  The Court rejected this argument, holding that "the claim that the price restraint will make it easier for customers to pay does not distinguish the medical profession from any other provider of goods or services." *Id.*  The BlueCard program, thus, must be treated like any other horizontal price-fixing conspiracy.  It should be deemed illegal *per se*.[5]

### CONCLUSION

For the reasons above, the Blues' motion to dismiss the Provider Plaintiffs' price-fixing claim should be denied.

Dated:  January 15, 2014                                Respectfully submitted,


 */s/ Edith M. Kallas*                                  */s/ Joe R. Whatley, Jr.*
Edith M. Kallas – *Co-Lead Counsel*          Joe R. Whatley, Jr. – *Co-Lead Counsel*
Henry C. Quillen                                        W. Tucker Brown
WHATLEY KALLAS, LLP                           WHATLEY KALLAS, LLP
380 Madison Avenue, 23rd Floor               2001 Park Place North
New York, NY 10017                                 1000 Park Place Tower
Tel:  (212) 447-7060                                  Birmingham, AL 35203
Fax:  (800) 922-4851                                 Tel:  (205) 488-1200
Email:  ekallas@whatleykallas.com            Fax:  (800) 922-4851
             hquillen@whatleykallas.com       Email:  jwhatley@whatleykallas.com
                                                                    tbrown@whatleykallas.com


Barry Alan Ragsdale – *Plaintiffs' Liaison*     E. Kirk Wood, Jr. – *Local Facilitating Counsel*
*Counsel and Discovery Liaison Counsel*      WOOD LAW FIRM LLC
SIROTE & PERMUTT P.C.                           P. O. Box 382434
P.O. Box 55727                                           Birmingham, AL 35238
Birmingham, AL 35255-5727                       Tel:  (205) 612-0243
Tel: (205) 930-5114                                    Fax:  (205) 705-1223
Fax: (205) 212-2932                                   Email:  ekirkwood1@bellsouth.net
Email: bragsdale@sirote.com

---

[5] The Blues take issue with the Provider Plaintiffs' allegations that the Blues "have prohibited them from using 'price terms' in contracts with other health insurers (Prov. Compl. ¶ 181); have required them to disclose the rates other health insurers pay while preventing providers from disclosing defendants' rates to other health insurers (*id.* ¶¶ 182–83); and have threatened to 'enter . . . the market as providers' if providers did not agree to low prices (*id.* ¶ 184)."  (Conspiracy Br. 41 n.20.)  The Blues claim that these allegations are "entirely unrelated to [Provider Plaintiffs'] claims" and do not "come close to the type of conduct that ever has been considered under the per se rule."  (*Id.*)  These allegations are relevant because they show the lengths to which the Blues will go to protect the pricing advantages they have obtained by allocating markets and fixing prices through the BlueCard program.

J. Mark White – *Litigation Committee*
Augusta S. Dowd – *Chair, Litigation Committee*
U.W. Clemon – *Plaintiffs' Steering Committee*
Linda G. Flippo – *Discovery Committee*
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel:  (205) 323-1888
Fax:  (205) 323-8907
Email: uwclemon@whitearnolddowd.com
          adowd@whitearnolddowd.com
          mwhite@whitearnolddowd.com


Aaron S. Podhurst – *Plaintiffs' Steering Committee*
Peter Prieto – *Chair, Expert Committee*
PODHURST ORSECK, P.A.
25 West Flagler Street, Suite 800
Miami, FL 33130
Tel:  (305) 358-2800
Fax:  (305) 358-2382
Email: apodhurst@podhurst.com
          pprieto@podhurst.com

Dennis C. Reich – *Chair, Damages Committee*
Debra B. Hayes – *Plaintiffs' Steering Committee*
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (713) 622-7271
Fax:  (713) 623-8724
Email: dreich@rbfirm.net
          dhayes@dhayeslaw.com

Dennis Pantazis – *Plaintiffs' Steering Committee*
Brian Clark – *Discovery Committee*
WIGGINS CHILDS QUINN & PANTAZIS, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel:  (205) 314-0500
Fax:  (205) 254-1500
Email: dgp@wcqp.com
          bclark@wcqp.com

Nicholas B. Roth – **Chair, Discovery Committee**
Julia Smeds Roth – **Discovery Committee**
EYSTER KEY TUBB ROTH MIDDLETON
  & ADAMS, LLP
402 East Moulton Street
Decatur, AL 35601
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email:  nroth@eysterkey.com
        jroth@eysterkey.com

Robert J. Axelrod – **Chair, Written Submissions Committee**
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, NY 10016
Tel:  (212) 661-1100
Fax:  (212) 661-8665
Email:  rjaxelrod@pomlaw.com

Van Bunch – **Chair, Class Certification Committee**
BONNETT FAIRBOURN FRIEDMAN &
  BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel:  (602) 274-1100
Fax:  (602) 274-1199
Email:  vbunch@bffb.com

David A. Balto – **Expert Committee**
DAVID A. BALTO LAW OFFICES
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email:  david.balto@dcantitrustlaw.com

Peter H. Burke – *Class Certification Committee*
Richard S. Frankowski – *Discovery Committee*
BURKE HARVEY & FRANKOWSKI, LLC
One Highland Place
2151 Highland Avenue, Suite 120
Birmingham, AL 35205
Tel:  (888) 880-9046
Fax:  (205) 588-8671
Email:  pburke@bhflegal.com
         rfrankowski@bhflegal.com

John C. Davis – *Written Submissions Committee*
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel:  (850) 222-4770
Email:  john@johndavislaw.net

Lynn W. Jinks, III – *Expert Committee*
Christina D. Crow – *Discovery Committee*
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel:  (334) 738-4225
Fax:  (334) 738-4229
Email:  ljinks@jinkslaw.com
         ccrow@jinkslaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I have on this 15th day of January, 2014, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Joe R. Whatley, Jr.
Joe R. Whatley, Jr.