FILED
2014 Jun-18  PM 03:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD | } | Master File No.:  2:13-CV-20000-RDP |
| | } | |
| ANTITRUST LITIGATION | } | This document relates to all cases. |
| (MDL NO.: 2406) | } | |
| | } | |

## MEMORANDUM OPINION

This matter is before the court on various Motions to Dismiss filed by Defendants. (Docs. # 107, 108, 110, 112-14, 116, 119, 121, 122, 125, and 135).  On April 9, 2014, the court heard argument on certain aspects of the Motions to Dismiss with general application to Defendants and both categories of Plaintiffs.  After careful review and with the benefit of oral argument, the court denies certain of the Motions to Dismiss without prejudice.

## I.    Introduction

This multidistrict litigation involves a series of allegations by two separate putative classes which seek to represent Blue Cross/Blue Shield Providers and Subscribers, respectively, from across the country. The Provider and Subscriber Putative Classes have each filed Master Complaints in this litigation.  Both complaints allege, among other things, that the Defendant Blue Cross/Blue Shield Plans, which are independent companies, along with the Blue Cross Blue Shield Association, have engaged in a conspiracy to horizontally allocate geographic markets ("the BCBS Market Allocation Conspiracy") by agreeing with each other to carve the United States into "service areas" in which only one designated Blue plan is permitted to sell health insurance to customers (*i.e.*, the Subscribers) and contract with healthcare professionals and

entities[1] (*i.e.*, the Providers). Plaintiffs allege that this practice is per se illegal under Section 1 of the Sherman Act.

Defendants have moved to dismiss the Master Complaints on a number of grounds. To be clear, this Memorandum Opinion does *not* address all of those arguments. Rather, this ruling is limited to Defendants' contentions that Plaintiffs have failed to state a Sherman Act Section 1 claim, and, in any event, that their antitrust claims are barred, at least in part, by the McCarran-Ferguson Act and the Filed Rate Doctrine.  The court also addresses, but makes no ruling upon, the parties' arguments about personal jurisdiction and venue.

## II.     Plaintiffs' Claims

The court will not attempt to discuss in detail all of the claims advanced by class counsel for the Providers and Subscribers in this litigation.  However, it does provide a summary of Plaintiffs' claims and Defendants' motions to dismiss (or at least those arguments related to the issues discussed in this Memorandum Opinion) as background for the court's disposition of these motions.

### A.     The Subscribers' Claims

The Subscribers allege the existence of an ongoing conspiracy between and among the Individual Blue Plans (sometimes referred to as "the Blues" or "the Blue Plans") and the Blue Cross and Blue Shield Association ("BCBSA" or "the Association") to allocate markets in violation of the Sherman Act. Their Master Complaint seeks both injunctive relief and damages. In particular, the Subscribers seek damages consisting of the difference between the supra-competitive premiums that the Individual Blue Plans have charged and lower competitive

---

[1] The Providers include not only healthcare professionals and medical and surgical centers, but also others providing equipment and supplies.

premiums that the noncompeting Blue Plans have not charged as a result of this illegal conspiracy. (Doc. # 99-1 at ¶ 2). In support of their market allocation claims, the Subscribers allege, *inter alia*, that Defendants have agreed to do the following:

a. Prohibit individual Blue Plans from competing against each other using the Blue name by allocating territories among the individual Blues;

b. Limit individual Blue Plans from competing against each other, even when they are not using the Blue trade name, by mandating the percentage of their business that they may conduct under the Blue name, both inside and outside each Plan's territory;

c. Restrict the right of any individual Blue Plan to be sold to a company that is not a member of BCBSA, thereby preventing new entrants into the individual Blues' markets;

d. Place severe territorial limitations upon the individual Blue Plans' ability to compete outside of their geographic areas, even when using their non-Blue brands; and/or

e. Not to utilize non-Blue brands to compete with other individual Blue Plans.

(Doc. # 99-1 at ¶ 4). But for these and other illegal agreements not to compete with one another, the Subscribers contend Defendants could (and would) use their Blue brands and non-Blue brands to compete with each other throughout their Service Areas, which would result in greater competition and competitively priced premiums for the Subscribers. (Doc. # 99-1 at ¶¶ 5-7).

## B. Providers' Claims

Similar to the allegations made by the Subscribers, the Providers allege that Defendants previously reached an explicit agreement to divide the United States into what they term "Service Areas" and then to allocate those geographic markets among the Blues, free of competition from one another. The Providers specifically allege that Defendants have created geographic markets and allocated those among themselves by agreeing not to compete with each

other within those markets.   The Providers further allege that, as a result of decreased competition due to the market allocation, they are paid much less by the Blues than they would be absent Defendants' conspiratorial conduct.  (Doc. # 86 at ¶¶ 4-6).

The Providers contend that the alleged BCBS Market Allocation Conspiracy is a per se violation of Section 1 of the Sherman Act.[2]

### C.    Defendants' Motions

As noted above, Defendants' motions to dismiss assert a number of theories.  However, at the hearing held on April 9, 2014, the court heard argument limited to the following issues:

1.   Whether Plaintiffs have adequately pled per se violations of Section 1 of the Sherman Act related to their horizontal market allocation claims;

2.   Whether proper consideration of Defendants' motions requires some factual development;

3.   The effect, if any, of common law trademarks on Plaintiffs' Section 1 market allocation claims;

4.   Whether the Filed Rate Doctrine bars some of Plaintiffs' claims;

5.   Whether the McCarran-Ferguson Act bars Plaintiffs' claims; and

6.   What rule of law controls as to personal jurisdiction and/or venue issues raised by certain Defendants.

(Doc. # 187).  Again, the court will not attempt to capture and restate Defendants' arguments in their entirety.  However, a summary of their arguments is provided below.

---

[2] The Providers also allege that Defendants reached an agreement to fix prices to be paid for services rendered by healthcare providers such as Plaintiffs (the "BCBS Price Fixing Conspiracy").  (Doc. # 86 at ¶ 3).  As to price fixing, the Providers allege that each Defendant has agreed to participate in the Blue Card program which locks in discounted reimbursement rates that the various Defendants have unlawfully achieved through market dominance in their respective Service Areas.  Plaintiffs claim that the Blues' conduct results in all Providers receiving reimbursement rates that are well below market.  (Doc. # 86 at ¶ 7). As a result, the Providers allege that they receive a significantly lower reimbursement rate for rendering service to a patient who is insured or administered by Defendants in other Service Areas because of this Price Fixing Conspiracy.  (Doc. # 86 at ¶ 7).  The court does not address the Providers' price fixing claims in this ruling.

First, Defendants argue that their alleged market allocation actually relates to a network of service areas that have existed for more than half a century, and which originally arose from common law trademark rights.  Defendants also contend that their service agreements create a unique product because they allow Defendants to compete like a nationally integrated health insurer, while still preserving a focus on meeting the health insurance needs of their local communities.  For these (and other) reasons, Defendants assert that Plaintiffs cannot state a per se claim under Section 1 of the Sherman Act because the license agreements they challenge cannot constitute an *unlawful* agreement to restrict Blue-on-Blue competition. That is, they argue the license agreements do not restrain trade, but merely adopt pre-existing rights to local geographic exclusivity acquired either independently by operation of trademark law, or vertically through lawful licenses granted by the American Hospital Association ("AHA") or the American Medical Association ("AMA").  They also contend that the service areas have procompetitive benefits[3] and have been the subject of review by such federal agencies as the Federal Trade Commission and Department of Justice.

Second, Defendants contend that Plaintiffs' Section 1 claims cannot be shoehorned into what they characterize as the ever-narrowing per se rule, a rule they claim applies only to a shrinking slice of restraints that result from agreements (1) among direct (*i.e.*, "horizontal") competitors; (2) which have no plausible procompetitive justifications; and (3) can be condemned without analysis by virtue of the judiciary's vast experience with them. Indeed, they argue that the per se rule does not apply to horizontal agreements which have plausible procompetitive justifications; rather, those restraints must be evaluated under the rule of reason.

---

[3] Plaintiffs have alleged to the contrary.  *See e.g.*, Doc. # 85 at ¶¶ 9, 10, 336-52; Doc. # 86 at ¶¶ 3-6, 157, 160-63.

Third, Defendants argue that the Subscribers' "fallback" rule of reason claim also fails because their alleged product and geographic markets are improper.[4]

Fourth, Defendants argue that Plaintiffs' claims are barred, at least in part, by operation of the McCarran-Ferguson Act and the Filed Rate doctrine. The former exempts the "business of insurance" from the reach of federal antitrust laws; the latter precludes damages claims based on certain rates filed with state regulators.

Finally, certain of the Defendants have raised challenges based upon a purported lack of personal jurisdiction and venue. Although the court does not rule on these threshold challenges, it does provide guidance to the parties regarding the analysis it will employ in making such rulings.

The court discusses each of these five issues, in turn.

## II.    Standard of Review

In most instances, the Federal Rules of Civil Procedure require only that the complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Nevertheless, to survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). The complaint must include enough facts "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Pleadings that

---

[4] Without admitting that their per se claim under the Sherman Act is subject to dismissal, the Provider Plaintiffs tacitly conceded at argument that they had not at this point attempted to state a rule of reason claim. They requested the opportunity to supplement their Master Complaint to allege such a claim, and the court has permitted them to do so.

contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels or conclusions" or "naked assertion[s]" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557.  To be plausible on its face, the claim must contain enough facts that "allow [] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

Antitrust claims are subject to the general standards of Rule 8 pleading. *See Twombly*, 550 U.S. at 554-55.  The court must construe pleadings broadly and resolve inferences in a plaintiff's favor. *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006). However, the court need not accept inferences that are unsupported by the facts asserted in the complaint. *Snow v. DirecTV, Inc*., 450 F.3d 1314, 1320 (11th Cir. 2006). Ultimately, the well-pleaded complaint must present a reasonable inference from the facts it alleges that show a defendant is liable. *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1215 (11th Cir. 2012). To survive Defendants' Motion, the allegations of Plaintiffs' Complaints must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct."  *Iqbal*, 129 S. Ct. at 1949.

## III.    Analysis

Defendants have proffered several arguments in support of their motions to dismiss.  The court deals with four of those below and also addresses the starting point for a proper personal jurisdiction and venue analysis.

### A.    Defendants' Common Law Trademarks Arguments

Defendants argue that Plaintiffs' Section 1 claims are due to be dismissed because the alleged agreements at issue are not illegal, as they merely recognize pre-existing trademarks.

However, at this early stage of the proceedings, the Blues' contention misses the mark.  Plaintiffs have offered a number of arguments as to why the court should, at least for now, reject Defendants' assertions related to prior trademark rights.  Although the court addresses three of those below, to be sure, there are others.

First, Plaintiffs have alleged in their pleadings that the current market allocation agreements do more than merely recognize pre-existing trademarks.  For example, they contend that the agreements also restrict competition under non-Blue or non-trademarked brands.  Specifically, Plaintiffs allege that Defendants have illegally agreed to place limits on the extent to which Blues can compete under their non-Blue brands and that impermissible agreement had the effect of reducing competition between Blues and non-Blue subsidiaries to which pre-existing trademark rights are irrelevant.[5]  (Doc. # 86 at ¶¶ 111, 153-58; Doc. # 99-1 at ¶¶ 6, 7, 328-31).

Second, it is plausibly alleged in the Master Complaints that, before the challenged market allocations and under the pre-existing trademarks, the Blues actually competed in the areas in which they now contend they had exclusive and enforceable trademark rights. (Doc. # 99-1 at ¶¶ 316-19).  Thus, Plaintiffs have alleged that, *prior* to the alleged agreement to allocate markets and curtail competition between them, but *after* the alleged formation of common law trademark rights, Defendants actually engaged in competition.  Plaintiffs also allege that the

_____

[5] Moreover, even if the alleged market allocation agreement merely enforced pre-existing trademarks (and, to be sure, Plaintiffs have alleged that is not the case), that fact does not necessarily insulate the agreement from antitrust analysis.  The Supreme Court has been clear on this issue in its *Sealy* decision.  "In *Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951), as in the present case, it was argued that the restraints were reasonable steps incident to a valid trademark licensing system. But the Court summarily rejected the argument, as we do here. It pointed out that the restraints went far beyond the protection of the trademark and included non-trademarked items, and it concluded that: 'A trademark cannot be legally used as a device for Sherman Act violation.'" *United States v. Sealy, Inc.*, 388 U.S. 350, 357 (1967) (quoting *Timken*, 341 U.S. at 599).

market allocation agreement imposes additional restraints on trade that did not exist, or at least were not enforced, when the Blues were purportedly exercising their common law trademark rights.

Finally, and in any event, Plaintiffs have alleged that, as part of the scheme at issue here, the individual Blue Plans surrendered their trademark rights to the Association, and that the Association is nothing more than an entity controlled by the Blues.[6] According to Plaintiffs' allegations, because the Blues control the Association, they in turn control—collectively—each individual Blue Plan's rights to assert a trademark claim.  Plaintiffs have claimed that this arrangement was put in place in furtherance of the conspiracy to eliminate competition.  Thus, even assuming the accuracy of the Blues' characterization of the history related to the Blues' common law trademark rights, this presents a significantly different scenario than that which existed prior to their alleged scheme.

The court has not attempted to reference (much less address) all of the details regarding Plaintiffs' allegations about the alleged scheme.  But the contentions discussed above make clear that Plaintiffs have alleged a viable market allocation scheme.  If that scheme is proven, it may subject Defendants to antitrust liability.

## B.      The Attack on Plaintiffs' Section 1 Per Se Claim

Section 1 of the Sherman Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."

---

[6] Plaintiffs allege that BCBSA was created by its 38 independent Blue Plans that operate under Blue Cross and Blue Shield trademarks and trade names, and that it is "the trade association for the Blue Cross Blue Shield companies."  (Doc. # 99 at ¶ 332; Doc. # 86 at ¶ 106).  Plaintiffs further allege that the Plans are the members of, and govern, BCBSA, and that BCBSA is entirely controlled by its member plans.  (Doc. # 99 at ¶ 333; Doc. # 86 at ¶ 106).  Thus, they argue the agreements to allocate markets and fix prices are in fact horizontal and constitute per se violations of Section 1.

15 U.S.C. § 1.  However, an important question to be answered in assessing any Section 1 claim is this:  what standard of review will be utilized in assessing the challenged restraint(s).  Here, Plaintiffs allege that Defendants have engaged in concerted activity that has produced two different types of illegal restraints:  horizontal market allocation and horizontal price fixing.

In *Topco*, the Supreme Court made clear that it meant what it said in *Sealy*:[7]  horizontal territorial restraints are per se violations of the Sherman Act.  *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608 (1972).  Nevertheless, the parties are in dispute as to *Topco's* (and *Sealy's*) continuing viability.  The Blues contend that *Topco* is essentially outdated, and that the Supreme Court's antitrust analysis has moved away from pronouncing horizontal market allocations illegal as a matter of law.  They note that in recent years, the Supreme Court has "presumptively applie[d] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful."  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).  The Court has also expressed reluctance to classify agreements as per se illegal:  "*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'"[8] *Id.* (quoting *National Soc. of Professional Engineers v. United States*, 435 U.S. 679, 692 (1978)).

Plaintiffs, on the other hand, are quick to note that *Sealy* and *Topco* have never been overruled and, in fact, the Court has never expressly called those decisions into question.  Moreover, the lower courts have also frequently (as well as recently) mentioned horizontal

---

[7] *United States v. Sealy*, 388 U.S. 350, 357 (1967).

[8] Of course, even after expressing such reluctance, the *Dagher* Court stated plainly that "[p]rice-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are per se unlawful."  *Dagher*, 547 U.S. at 5.

market allocation as an example of a combination that is "so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused." *E.g., In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262, 271 (6th Cir. 2014) (quoting *Copperweld Corp. v. Independence Tube Corp*., 467 U.S. 752, 768 (1984)); *see also Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1334 (11th Cir. 2010).

No "bright line separat[es] per se from Rule of Reason analysis." *Nat'l Coll. Athletic Ass'n ("NCAA") v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n. 26 (1984). Moreover, somewhere on the continuum between the per se rule and the rule of reason lies the "quick look" approach, which applies to a limited number of intermediate cases where the anticompetitive impact of a restraint is clear from a quick look (as in a per se case), but procompetitive justifications for the restraint also exist. *See NCAA*, 468 U.S. at 101; *In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262, 274-75 (6th Cir. 2014) (the quick look analysis is a third type of category arising from the blurring of the line between per se and rule of reason cases); *In re Terazosin Hydrochloride Antitrust Litigation*, 352 F.Supp.2d 1279, 1312 (S.D. Fla. 2005). "This less-rigid approach aligns with the Supreme Court's recognition of the value of the 'quick look' approach as an abbreviated form of the rule of reason analysis used for situations in which 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" *In re Southeastern Milk Antitrust Litigation*, 739 F.3d at 274 (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)). Applying "this test is useful when the anticompetitive nature of an agreement is so blatant that a detailed review of the surrounding marketplace would be unnecessary." *Id.* (citing *Cal. Dental Ass'n*, 526 U.S. at 769-70).

As to the per se versus rule of reason question,[9] it is, as the court explained at the April 9, 2014 hearing, simply too early to assess which standard of review should be applied to Plaintiffs' allegations.  The court fully appreciates that whether "a per se[, quick look] or rule of reason analysis [applies] is a question of law[;] [however, that question] is predicated on a *factual inquiry* into the restraint's competitive effect."  *National Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 596 (11th Cir. 1986) (citing *NCAA*, 468 U.S. at 104) (emphasis added).  Thus, while the mode of analysis is certainly a question of law, "underpinning that purely legal decision are numerous factual questions."  *In re Wholesale Grocery Products Antitrust Litigation*, ____ F.3d ____, 2014 WL 2109122 *5 (8th Cir. 2014).  To decide upon "[t]he true test of legality … the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable."  *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 n.15 (1977) (quoting *Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)).

In *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 344 F.3d 1294 (11th Cir. 2003), the Eleventh Circuit addressed an agreement between brand name and generic drug manufacturers not to compete.  The district court granted partial summary judgment on liability.  In doing so, the trial court characterized the plaintiffs' Section 1 claims as attacking geographic market allocation agreements between horizontal competitors as per se illegal under Section 1. *Valley Drug Co.*, 344 F.3d at 1301. The district court entertained, but rejected, the defendants' argument

---

[9] In addition to their assertion that the Supreme Court has retreated from its application of a per se analysis in a horizontal market allocation case, Defendants also assert that the challenged restraints are not, in fact, horizontal.  In making this argument, they point to their relationship with BCBSA, and even before that, the historical involvement of the American Medical Association and the American Hospital Association.  This argument contradicts Plaintiffs' allegations in this case and is one more properly made as part of a Rule 56 motion as it will require fact development through discovery.

that there were procompetitive justifications for the agreements. *Valley Drug Co*., 344 F.3d at 1302.  However, the court did not analyze whether the agreements not to compete were broader than the exclusionary rights granted by the underlying patents.[10]  *Valley Drug Co.*, 344 F.3d at 1301-02.  The Eleventh Circuit reversed, holding that any such characterization was premature without further analysis of that issue.  *Id.* at 1304.  Thus, *Valley Drug* supports a conclusion that any similar characterization of Plaintiffs' claims at the stage in this case would be premature. Neither the parties nor the court has had the opportunity to develop the factual record necessary to make that determination. *NaBanco*, 779 F.2d at 596.  Accordingly, Defendants' motions to dismiss Plaintiffs' Section 1 claims on this ground are due to be denied at this time.

### C.    Defendants' Filed Rate Doctrine Arguments

The so-called Filed Rate Doctrine generally operates to bar antitrust suits that are, in actuality, based upon challenges to rates that have been filed with regulatory agencies.  The Supreme Court first set forth the Filed Rate Doctrine in *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156 (1922), although its origin can be traced back even further.[11]  The

---

[10] Defendants argue that the License Agreements themselves do not contain any provision which constitutes an illegal restraint on trade.  However, that assertion is inapposite here because Plaintiffs need not tie their allegations of concerted activity to any particular agreement.  To allege a Sherman Act violation, Plaintiffs must merely allege concerted action.  "When there is sufficient concert of action to implicate the purposes of the Sherman Act, the statute is applied without any need or attempt to classify that concerted action as a contract, a combination, or a conspiracy."  6 P. Areeda & H. Hovenkamp, *Antitrust Law*, ("Areeda") ¶ 1403 at 20 (3d ed. 2010).  The "core concern" of Section 1 is when "competitors cooperate to substitute common action for competition and thereby effect an anticompetitive restraint that could not otherwise be achieved." Areeda, ¶ 1402a3, at 10.  Thus, the court must focus on all of Plaintiffs' allegations of concerted action rather than accept Defendants' invitation to parse through specific written agreements.

[11] As the Eleventh Circuit states in *Taffet v. Southern Co.*:

> The origin of the filed rate doctrine can be traced back to *Texas & Pacific Railway v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907), in which the Supreme Court addressed the issue of whether a shipper could maintain a common law action for damages against a common carrier for "the exaction of an alleged unreasonable rate, although the rate collected and complained of was the rate stated in the schedule filed with the Interstate Commerce Commission…." *Id*. at 436.  The Court held that the shipper could not

plaintiff in *Keogh* alleged that a railroad company conspired to fix freight rates, in violation of antitrust laws.  The Supreme Court held that where a plaintiff challenges a rate filed with and deemed reasonable by the Interstate Commerce Commission ("ICC"), the district court correctly dismissed the suit for failure to state a claim upon which relief can be granted.  *Keogh*, 260 U.S. at 164-65.

The doctrine bars consumers' claims that would undermine the regulator's rate-setting authority by challenging the rate that the regulator had approved.  *Hill v. BellSouth Telecommunications, Inc.*, 364 F.3d 1308, 1317 (11th Cir. 2004).  Even a claim which on its face does not challenge reasonableness of the rate but nevertheless seeks purely monetary damages may be barred by the Filed Rate Doctrine.  *Id*. at 1317.  The rationale is that a consumer is barred from challenging the reasonableness of a rate because the consumer has no legal right to pay any rate other than that set by the administrative agency.  *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992).  The doctrine "recognizes that where a legislature has established a scheme for utility rate-making, the rights of the rate-payer in regard to the rate he pays are defined by that scheme."  *Id*. at 1490.

---

maintain such an action.  After acknowledging that, at common law, a shipper had a right of action for damages against a carrier who refused to carry goods except upon the payment of an unreasonable sum, *id.*, the Court held that the Interstate Commerce Act implicitly had changed the common law, *id*. at 436, and that the shipper's only redress was through the Interstate Commerce Commissions (ICC) which had the power to alter established rates.  *Id*. at 448.  The Court reasoned that the existence of a shipper's right to recover damages on the basis that the established rate was unreasonable was "wholly inconsistent with the administrative power conferred upon the [ICC], and with the duty, which the [Interstate Commerce Act] casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed."  *Id*. at 440-41.

Following *Abilene Cotton*, federal courts have applied the filed rate doctrine in a variety of contexts to bar recovery by those who claim injury by virtue of having paid a filed rate.  *See, e.g., Keogh v. Chicago & Northwestern Ry.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) (plaintiff may not recover under federal antitrust laws for asserted injury related to paying the rate approved by the ICC).

967 F.2d 1483, 1488-89 (parallel and additional citations omitted).

14

The Filed Rate Doctrine serves two main goals: (1) respecting statutory grants of rate-setting authority to agencies (the "nonjusticiability rationale"), *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981); and (2) preventing discrimination between similarly situated rate-payers (the "nondiscrimination rationale"), *Keogh*, 260 U.S. at 163. *See also Hill*, 364 F.3d at 1316-17. Initially, the doctrine was applied in the context of federal claims involving rates set or approved by federal regulatory bodies. *See, e.g., Keogh*, 260 U.S. at 165 (affirming dismissal of antitrust claims that challenged a rate set by the ICC). However, since that time, its application has not been limited to federal regulatory bodies. Indeed, the Eleventh Circuit[12] has applied this doctrine to dismiss a complaint bringing federal claims that challenged rates set by state agencies.[13] *See, e.g., Taffet*, 967 F.2d at 1494 (affirming dismissal of RICO claims challenging rates set by Alabama and Georgia utility commissions). Our Circuit has also relied upon the doctrine in the context of federally approved rates which formed the basis for the assertion of state law causes of action. *See Hill*, 364 F.3d at 1317 (affirming dismissal of two state law claims challenging rates filed with the Federal Communications Commission).

As part of their argument, Defendants contend that the Filed Rate Doctrine bars the claims of some, but not all, of Subscriber Plaintiffs' claims.[14] In particular, they contend that rates were filed with state regulators such that those rates are legal rates, and, as a matter of law,

---

[12] In cases transferred pursuant to 28 U.S.C. § 1407, a federal district court applies the clearly settled law of the transferee court. *See Murphy v. Federal Deposit Ins. Corp*., 208 F.3d 959, 965 (11th Cir. 2000), *cert. denied*, 531 U.S. 1049 (2001) (adjudicating choice of law in the context of a transfer under 28 U.S.C. § 1406).

[13] For this reason, at least in this Circuit, the argument advanced by the Amici Curiae Antitrust Law professors (Doc. # 159)—that the Filed Rate Doctrine only applies when the rate is "filed" with a federal agency—is wide of the mark.

[14] This argument does not apply to the Provider Plaintiffs, nor to Plaintiffs in states where rates are not filed. The states in which Defendants assert rates have been filed are: Alabama, Arkansas, Florida, Hawaii, Mississippi, New Hampshire, North Carolina, Pennsylvania, Rhode Island, South Carolina, and Tennessee.

those Subscriber Plaintiffs cannot state a claim or assert legally cognizable injury based on payment of these rates.  (Doc. # 120 at 71).  In opposition, Plaintiffs argue that (1) the Filed Rate Doctrine does not bar claims for declaratory and injunctive relief (Doc. # 153 at 37-38); (2) the conduct challenged by the Subscriber Plaintiffs is the agreement not to enter any market assigned to another BCBSA licensee[15] (Doc. # 153 at 38); (3) state law filed rates cannot trump federal antitrust claims because such a scenario would run afoul of the most basic principles of federalism (Doc. # 153 at 39); and (4) the Filed Rate Doctrine cannot apply to bar damages incurred from rates that are never filed with a state regulator, or rates that depart from the base rate that is filed (Doc. # 153 at 39).

Plaintiffs are correct that, even if this court were to decide to apply the Filed Rate Doctrine, application of that doctrine would only bar recovery of money (including treble) damages, not declaratory or injunctive relief.  *Square D Co. v. Niagara Frontier Tariff Bureau, Inc*., 476 U.S. 409, 422 n.28 (1986); *Florida Mun. Power Agency v. Florida Power & Light Co*., 64 F.3d 614, 616 (11th Cir. 1995).  Thus, not only would application of the doctrine only apply to a subset of Plaintiffs, it would also only apply to a subset of those particular Plaintiffs' claims for relief.

The court also believes that Plaintiffs correctly note that logic dictates the Filed Rate Doctrine could only apply to claims against a Blue in the state or states in which that particular Blue filed rates.  Thus, for example, although claims brought by Alabama Subscribers against Blue Cross and Blue Shield of Alabama ("BCBS Alabama") might be barred by the Filed Rate Doctrine, claims by BCBS Alabama Subscribers in any other states (in which BCBS Alabama

---

[15] Plaintiffs further assert that it follows that each Defendant agreed not to file rates in any other Blue's markets, or to subject itself to the authority of the state insurance regulators of any such market, and the Filed Rate Doctrine cannot possibly shelter defendants who did not file rates in those markets.

does not file rates) would not be barred.  It follows that even if this court were to apply the doctrine, it would have limited application here.

There is a split of authority as to the propriety of examining whether there is a "meaningful" review of the rates at issue.  In *Square D*, the Supreme Court rejected the petitioner's contention that the Filed Rate Doctrine was inapplicable even though, unlike in *Keogh*, no ICC hearing reviewing the rate had been held. *Square D*, 476 U.S. at 417 n. 19. Although the *Square D* Court did not definitively resolve the question of whether the doctrine may apply even when no such review has occurred, that approach has been followed by other federal courts.  *See, e.g., Goldwasser v. Ameritech Corp*., 222 F.3d 390, 402 (7th Cir. 2000); *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 420 (1st Cir. 2000).  Two other circuit decisions, however, have reached a different conclusion.  *See Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332 (9th Cir. 1990) (where no review is mandated by a statutory scheme, the filed rate doctrine may be inapplicable); *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386 (9th Cir. 1992) (relying primarily on *Wileman Bros*.).

The Eleventh Circuit has not squarely addressed the issue, but the emerging trend in this Circuit appears to be in line with the Ninth Circuit's approach—before applying the doctrine, the court should make an inquiry into the extent of administrative oversight of the rates at issue. *E.g., In re Managed Care Litig.*, 150 F.Supp.2d 1330, 1344 (S.D. Fla. 2001) (Moreno, J.) ("The filed rate doctrine does not apply to the present case because these states do not appear to conduct administrative oversight in the extensive manner typical of situations implicating the doctrine."); *Abels v. JPMorgan Chase Bank, N.A.*, 678 F.Supp.2d 1273, 1277 (S.D. Fla. 2009) (King, J.) (declining to apply the Filed Rate Doctrine because a defendant bank was not subject to the same extensive administrative oversight as insurance companies); *see also Taffet*, 967 F.2d

at 1490-91 ("To determine whether the appellants in the cases at hand have alleged a cognizable injury …, we examine the rate-making schemes in Alabama and Georgia which define the rights these appellants enjoy in regard to the rates they pay for electric power."). Moreover, as the Eleventh Circuit has noted, "[i]n decisions subsequent to *Keogh*, the Court has emphasized the limited scope of the filed rate doctrine to preclude damage claims only where there are *validly* filed rates." *Fla. Mun. Power Agency v. Fla. Power & Light Co.*, 64 F.3d 614, 617 (11th Cir. 1995) (emphasis added).

The court believes that a decision about whether to apply the Filed Rate Doctrine at this time, even only to claims against those Blues who filed rates in the jurisdictions in which they were required to file rates, would be premature.  At this early stage, the court cannot make a determination about the applicability of the Filed Rate Doctrine because such a decision may require an inquiry into the extent of administrative oversight exercised by the various states' insurance regulators over the filing of rates in relevant states.  Moreover, delaying this decision until at least the summary judgment stage will not prejudice Defendants because (1) again, the doctrine is not a complete bar to all of Plaintiffs' claims, and (2) at a minimum, discovery on Plaintiffs' declaratory/injunctive claims would still be in order.  Some inquiry is needed into which Defendants have filed rates and in which jurisdictions, and discovery may also be required concerning the extent of administrative oversight Defendants were subjected to in each jurisdiction in which they filed rates.

### D.    Defendants' Invocation of the McCarran-Ferguson Act's Antitrust Exemption

Defendants also assert that "[P]laintiffs cannot attack [the] Blue Plans' use of service areas under federal antitrust law because the practice is exempt under the McCarran-Ferguson Act as part of the 'business of insurance.'" (Doc. # 120 at 66).  However, to the contrary, the

court concludes that because the conduct alleged by Plaintiffs cannot be construed as the "business of insurance"—but rather involves the business of insurance companies—Plaintiffs' claims are not barred by the McCarran-Ferguson Act's antitrust exemption.

The McCarran-Ferguson Act ("the Act") provides that any conduct that (1) constitutes the "business of insurance," (2) is regulated by state law, and (3) does not amount to an "act of boycott, coercion, or intimidation," is exempt from the strictures of federal antitrust law. 15 U.S.C. §§ 1012(b); 1013(b).  Although the Act does not define the term "business of insurance," the Supreme Court has articulated three guidelines to be used in determining whether particular behavior can be designated as such: "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982).  Each of *Pireno's* "business of insurance" factors is relevant, but no single one is individually dispositive. *Id*.

In arguing that the conduct attributed to them by Plaintiffs is exempt from antitrust scrutiny under the Act, Defendants rely heavily on the Eleventh Circuit's most recent treatment of the exemption in *Gilchrist v. State Farm Mutual Automobile Insurance Company*, 390 F.3d 1327 (11th Cir. 2004).  *Gilchrist* involved an antitrust suit in which it was alleged that numerous insurance companies conspired with each other to use cheap parts in the repair of automobiles, thereby reducing repair costs and allowing the insurance companies to retain a greater percentage of the premiums they charged. 390 F.3d at 1330.  Starting with the premise that "both rate-making and the performance of an insurance contract—including the adjustment of claims—constitute the business of insurance," the *Gilchrist* court had no difficulty holding that the

19

insurance companies' discount repair scheme constituted the "business of insurance."  *Id.* at 1331-32.  The court reasoned that the *Gilchrist* plaintiffs' suit amounted to (1) "an indirect allegation of price-fixing and, therefore, a direct attack on the integrity of Insurers' rate-making," and (2) "an attack on how Insurers perform their contractual obligations to their policyholders." *Id*. at 1331-32.

Attempting to extend *Gilchrist*'s reasoning to this case, Defendants frame Plaintiffs' market-allocation theory as "an attack on premiums" and conclude that Plaintiffs' suit "is a camouflaged attack on rates ... barred by McCarran." (Doc. # 120 at 67-68).  However, *Gilchrist* is distinguishable from this case.  Here, Plaintiffs allege that Defendants entered into geographic market allocation agreements among themselves, limiting competition and thereby maintaining rates—*i.e.*, premiums (Subscribers) and reimbursements (Providers)—at anti-competitive levels. (Doc. # 85 at 10-12; Doc. # 86 at 7-8).  The factual allegations here are markedly different from those in *Gilchrist*.

First, there is a distinct contrast in the anticompetitive behavior alleged in each of the cases—Plaintiffs' primary allegation in this case is horizontal allocation of geographic markets, whereas "cost-fixing" formed the basis of the underlying allegations in *Gilchrist*.  To be sure, in a very general sense, allocation of geographic markets can be said to ultimately influence rates. However, the mere fact that an insurance company's conduct affects rates is not necessarily dispositive as to whether such conduct constitutes the "business of insurance."  Indeed, the Supreme Court noted in *Royal Drug* that, at least in some manner, "every business decision made by an insurance company has some impact on its reliability, its ratemaking, and its status as a reliable insurer."  *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 216-17 (1979). Nevertheless, the Court warned that viewing the "business of insurance" in such an

expansive manner would "be plainly contrary to the statutory language [of the Act], which exempts the 'business of insurance' and not the 'business of insurance companies.'" *Id.* To be sure, the cost-fixing in *Gilchrist* was more directly aimed at transferring/spreading risk of the insurer, in that it allowed participating insurance companies to fix the costs of repair and ensured that they would enjoy larger profit margins on premiums.

In addition, *Gilchrist* differs from this case in the degree to which the challenged practices directly implicate the core insurance relationship, *i.e.*, that between insurer and insured. In *Gilchrist*, the defendants' conduct went to the heart of the insurance relationship, affecting the manner in which insurers serviced their insureds' policies.   In contrast, the Blues' alleged behavior here is more attenuated, bearing more on the relationship between fellow insurers, rather than insurers and insureds.[16]

Finally, the conduct at issue in *Gilchrist*—fixing the cost of servicing policyholders' claims—was unique to the insurance industry.  In stark contrast, the conduct alleged in the present case—horizontal allocation of geographic markets—is not specific to the insurance industry.  That is, allocating geographic markets between competitors is a practice that can occur in any number of industries, not just the insurance area.

The present case also stands out from other prominent McCarron-Ferguson Act cases decided by the Eleventh Circuit, particularly because of our Circuit's unique focus on horizontal allocation of geographic markets. *See Slagle v. ITT Hartford*, 102 F.3d 494 (11th Cir. 1996); *Uniforce Temporary Personnel, Inc. v. National Council on Compensation Insurance, Inc.*, 87

---

[16] Although none of the *Pireno* factors are singlehandedly dispositive, 458 U.S. at 129, the fact that the Providers are not parties to an insurance relationship (*i.e.*, either insurer or insured) strongly weighs against the application of the Act's antitrust exemption to their claims. *See Royal Drug*, 440 U.S. at 216 (holding that the antitrust exemption was inapplicable, in part, because the complained-of "Pharmacy Agreements [were] not 'between insurer and insured'").

F.3d 1296 (11th Cir. 1996).  These cases are also distinguishable and the court addresses them, in turn.

The *Slagle* case involved the actions of the Florida Windstorm Underwriting Association ("FWUA"), a state-mandated, insurer-funded organization that offered windstorm insurance in coastal areas where such insurance was not otherwise available on the open market. 102 F.3d at 496.  The member insurers did not offer windstorm insurance; rather, they were proportionally responsible for any losses suffered by the FWUA. *Id.*  The Eleventh Circuit found that such conduct, which the plaintiff challenged as both horizontal price-fixing and market allocation, was exempted by the Act. *Id.* at 499.  The court's application of the statutory antitrust exemption was relatively straightforward:  the court (1) held that the windstorm insurance program was a quintessential example of spreading/transferring a policyholder's risk (*i.e.*, the "business of insurance"); (2) noted that the FWUA bore the imprimatur of the State of Florida; and (3) determined that the insurance scheme did not trigger the Act's boycott exception. *Id.* at 497-99.  Indeed, the *Slagle* court characterized the FWUA's conduct as "rate-fixing," not horizontal market allocation,[17] and, as such, its reasoning has dubious applicability in the present case. *Id.* at 498.

Nor does this case squarely align with *Uniforce*.  There, an agency for temporary workers brought suit against a variety of insurance entities, alleging antitrust violations in the area of workers' compensation insurance. 87 F.3d at 1298.  The temp agency was unable to obtain workers' compensation insurance through the voluntary or self-insurance markets, and instead

---

[17] The court is aware that in *Gilchrist*, the panel, referring to the allegations in *Slagle*, loosely characterized them as involving "premium stabilization through horizontal market allocation."  *Gilchrist*, 390 F.3d at 1333.  However, a review of the actual facts in *Slagle* makes crystal clear that the *Gilchrist* court's short hand reference to "horizontal market allocation" was neither critical to its holding in *Gilchrist* (and therefore is non-binding dicta) nor is it an accurate description of the plaintiff's theory in *Slagle* (and therefore is not helpful).  Indeed, in *Slagle*, plaintiffs did not complain of horizontal market allocation, at least in the sense alleged here.

had to insure its workers with "assigned risk" policies from the residual market. *Id*.  The temp agency alleged that the target insurance carriers acted in concert to set premiums for "assigned risk" policies at unreasonable levels and prevent temporary worker agencies from accessing the voluntary market for workers compensation insurance. *Id*. at 1299.   The Eleventh Circuit determined that those allegations actually concerned "rate-making activity" and further concluded that the alleged conduct satisfied all of *Pireno*'s "business of insurance" criteria.  Like *Slagle*, *Uniforce* did not address the allocation of geographic markets—the primary allegation here.

Based upon Plaintiffs' allegations, the most analogous set of facts to those here are found in *In re Insurance Brokerage Antitrust Litigation*, a case in which insurers were accused of impermissibly entering into an agreement not to compete for one another's established customers. 618 F.3d 300, 356 (3d Cir. 2010) ("[W]e are left with plaintiffs' allegations that [defendants] agreed with one another not to compete for incumbent business.").  There, the Third Circuit held that the alleged agreement fell outside the purview of the Act's antitrust exemption because it did not directly concern the spreading of risk (and, consequently, did not constitute the "business of insurance"). *Id*. at 357.[18]  In reaching its conclusion, the court distinguished more risk-centric agreements (*e.g.*, agreements as to eligibility for coverage, extent/type of coverage, or price of coverage), and, in doing so, the Third Circuit reasoned that an agreement to allocate incumbent customers only affects an insurance company's risk exposure in an incidental manner. *Id*. at 357-58 ("Here, not only is defendants' alleged agreement not to compete for incumbent

---

[18] As the Third Circuit put it, "Plaintiffs allege only that defendants colluded in order to influence with which of them a given policy could be placed.  In other words, the complaint asserts conduct affecting not *whether* or *to what extent* a prospective insurance purchaser would transfer its risk to an insurer, but merely to *which* insurer that risk would be transferred.  [Accordingly], . . . we cannot say that defendants' challenged agreement, as alleged in the complaint, affected the spreading of risk within the meaning of the 'business of insurance.'" *Id*.

business different than the cooperative ratemaking efforts described in *Royal Drug*, but it also appears to have been unrelated to reliability; it does not involve any restriction on the type of coverage offered or the risk profile of insurable entities. . . . Defendants' alleged agreement was designed to ensure only that once an insurer had won a client's business—by providing the client with an acceptable coverage package at an acceptable premium—another insurer would not attempt to poach that business by offering a more attractive price when it came up for renewal.").

The court finds the Third Circuit's reasoning persuasive.  Because Defendants' alleged allocation of geographic markets is similarly unrelated to the spreading of risk, the court concludes that the conduct challenged by Plaintiffs does not fall within the definition of the "business of insurance."  Accordingly, Plaintiffs' claims are not barred by the McCarran-Ferguson Act's antitrust exemption.

### E.     An Overview of the Proper Personal Jurisdiction and Venue Analysis

In addition to Defendants' primary motion to dismiss (Doc. #108), some of the Blues have filed motions to dismiss based upon lack of personal jurisdiction and/or improper venue (Docs. #107, #112, #113, #119, #121, #122, #125, #135).[19]   The court and parties briefly discussed these motions at the hearing held on April 9, 2014, but that argument was limited to the question of what rule of law should be applied to determine personal jurisdiction and venue in the antitrust context.  The court similarly limits its analysis to that same, narrow issue.

---

[19]  The Motions to Dismiss for Lack of Personal Jurisdiction and/or Improper Venue were filed by Defendants Triple S Salud, Inc. (Doc. # 107), Capital Blue Cross (Docs. # 112, 119, and 135), Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield (Doc. # 113), Blue Cross of Northeastern Pennsylvania (Doc. # 121), Blue Cross Blue Shield of Mississippi (Doc. # 122), Blue Cross Blue Shield of Arizona (Doc. # 125), Blue Cross and Blue Shield of Kansas, Inc. (Doc. # 125), Blue Cross Blue Shield of North Dakota (Doc. # 125), Blue Cross Blue Shield of Wyoming (Doc. # 125), and HealthNow New York, Inc. (Doc. # 125).

A federal antitrust plaintiff may properly establish personal jurisdiction and venue against an out-of-state, *corporate* defendant in one of two ways.  First, an antitrust plaintiff may rely on traditional principles of personal jurisdiction and venue, demonstrating that the forum state's long-arm statute provides for personal jurisdiction and that venue is proper under the general federal venue statute, 28 U.S.C. § 1391.[20]  Second, an antitrust plaintiff may invoke Section 12 of the Clayton Act, which provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.  Section 12 has two distinct clauses, the first addressing venue and the second addressing service of process, but the appropriate interaction of these two clauses is somewhat murky, resulting in a circuit split.  And although a number of circuits have weighed in on the question, the Eleventh Circuit has not yet squarely addressed the issue.

The majority view, subscribed to by the Seventh, Second, and D.C. Circuits, is that the two clauses are meant to operate in concert with each other.  *See KM Enterprises, Inc. v. Global Traffic Technologies, Inc.*, 725 F.3d 718 (7th Cir. 2013); *Daniel v. American Board of Emergency Medicine*, 428 F.3d 408 (2d Cir. 2005); *GTE New Media Services Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000).  This interpretation is commonly-referred to as the "integrated" approach. According to this viewpoint, if an antitrust plaintiff wishes to avail itself

---

[20] Under Section 1391(b)(1), venue is proper where one of the defendants resides in the relevant district and all of the defendants reside in the state in which the district is located.  However, pursuant to Section 1391(c)(2), corporate defendants are "deemed to reside" in any judicial district in which they are subject to personal jurisdiction. As a result, in the context of corporate defendants, venue is proper wherever personal jurisdiction exists.

of the second clause's nationwide service of process procedure (which produces nationwide personal jurisdiction),[21] that plaintiff must also use the first clause to determine venue.[22]

The minority view, championed by the Ninth Circuit, understands the two clauses of Section 12 to exist independent of one another, meaning that they do not have to be utilized in conjunction, but instead may be "mixed-and-matched" with other statutory provisions. *Go-Video, Inc. v. Akai Electric Company, Ltd.*, 885 F.2d 1406 (9th Cir. 1989).[23]  In the context of personal jurisdiction and venue, this interpretation allows plaintiffs to pair Section 12's nationwide service of process clause with the general federal venue statute, 28 U.S.C. §1391, an amalgamation which essentially produces proper venue anywhere in the nation, as a plaintiff can

---

[21] Regardless of approach, all courts seemingly agree with the notion that Section 12 grants nationwide personal jurisdiction in antitrust cases involving corporate defendants. *Compare KM Enterprises*, 725 F.3d at 724 ("Section 12 provides for both personal jurisdiction and venue in the case of a corporate defendant . . . the second clause provides for nationwide (indeed, worldwide) service of process and therefore nationwide personal jurisdiction."); *with Go-Video, Inc. v. Akai Electric Company, Ltd.*, 885 F.2d 1406, 1415 (9th Cir. 1989) ("[W]e believe that the district judge [was] clearly correct in his view and that the worldwide service provision of § 12 justifies its conclusion that personal jurisdiction may be established in any district, given the existence of sufficient national contacts.").

[22] In both their briefs and at oral argument, Defendants characterize the "integrated" approach in reverse fashion, asserting that it stands for the proposition that Section 12's nationwide service of process procedure may only be utilized if its venue provision is first satisfied. *See, e.g.*, (Doc. # 125-1 at 15—"Most of the Courts of Appeal addressing the relationship between the venue and service clauses of Section 12, including the District of Columbia, Second, and Seventh Circuits, adopt an 'integrated approach,' reading the two clauses together and requiring that plaintiffs first establish that venue is appropriate under Section 12 before taking advantage of its nationwide service of process clause."); (Doc. # 187 at 231—"[Y]ou only get through the gate to nationwide service if you show that you meet the venue test that's in the first clause.").  Defendants appear to have misunderstood the crux of the circuit split: The debate's focus is not whether a plaintiff must first satisfy Section 12's venue clause before being able to employ Section 12's nationwide service of process procedure, but rather whether a plaintiff who has chosen to employ Section 12's nationwide service measure is then forced to also use Section 12 to determine venue or may instead look to Section 1391 in making such a determination. *See KM Enterprises*, 725 F.3d at 724-25 ("The structure of Section 12 raises a question, however: must its venue and service-of-process provisions be read as an integrated whole?  That is, if a plaintiff chooses to take advantage of Section 12's nationwide service-of-process provision (and thus in effect rely on nationwide personal jurisdiction), must she then establish venue under Section 12 as well, or may she mix and match, relying on the Clayton Act for personal jurisdiction and Section 1391 for venue?").

[23] The Third Circuit has also adopted a "mix-and-match" interpretation of Section 12 in *In re: Automotive Refinishing Paint Antitrust Litigation*, 358 F.3d 288, 297 & n.10 (3d Cir. 2004).  However, its holding was limited to *alien* corporate defendants. *Id.*  Although *Go-Video* also involved an alien corporate defendant, the Ninth Circuit explicitly extended its holding to *domestic* corporate defendants in *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1179-80 (9th Cir. 2004).

use Section 12's nationwide service of process clause to establish personal jurisdiction in any judicial district and then use Section 1391 to establish proper venue based upon personal jurisdiction. *Go-Video*, 885 F.2d at 1415.

As noted above, the Eleventh Circuit has not conclusively weighed in on the circuit split described above. However, it did tangentially address the interplay between Section 12 of the Clayton Act and Section 1391 in *Delong Equipment Company v. Washington Mills Abrasive Co.*, 840 F.2d 843 (11th Cir. 1988). There, the court separately addressed issues of service and venue, holding that (a) the district court properly applied Section 12's nationwide service of process provision to a corporate defendant, and (b) venue was proper under Section 1391. *Delong*, 840 F.2d at 848, 855. These independent conclusions have been construed as an endorsement by the Eleventh Circuit of the notion that invocation of Section 12's nationwide service of process provision does not automatically require a venue analysis rooted in Section 12's venue clause. *Go-Video*, 885 F.2d at 1409; Plaintiff's Brief in Opposition, Doc. # 150 at 11-13. But such a reading of *Delong* is off the mark because it ignores the entirety of the court's analysis—including an extensive evaluation of the propriety of service under the forum state's long-arm statute[24]—and fails to acknowledge that the court's opinion was not rendered in the context of the current circuit split.[25] As such, *Delong* does not answer the question before the court, and the court is tasked with determining the appropriate rule of law to apply in this case without the aid of circuit precedent.

---

[24] *Delong*, 840 F.2d at 848-53.

[25] *Delong* was decided in March 1988, almost a year and a half before the Ninth Circuit's decision in *Go-Video* (September 1988), the first in the line of cases that comprise the current circuit split.

The court is well aware that the "starting point for all statutory interpretation is the language of the statute itself." *U.S. v. DBB, Inc.*, 180 F.3d 1277, 1281 (1999) (citing *Watt v. Alaska*, 451 U.S. 259, 265 (1981)).  However, the court agrees with the Seventh Circuit that the plain language of Section 12 is ambiguous, *KM Enterprises*, 725 F.3d at 728-29, and, thus, relies on secondary canons of interpretation in reaching its conclusion.  This court finds that the "integrated" approach, which was most fully developed by that circuit in its *KM Enterprises* opinion, represents the best understanding of Section 12's operation.  The court's preference for the "integrated" approach primarily lies in its avoidance of the odd outcomes that accompany the "mix-and-match" or "independent" approach.  Indeed, the minority viewpoint, which understands Section 12 to provide nationwide venue, not only renders Section 12's venue provision superfluous, but also eviscerates Section 1391's limits on venue. *KM Enterprises*, 725 F.3d at 729-30.  Cognizant that "interpretations that render words of a statute superfluous are disfavored as a general matter"[26] and "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available,"[27] the court chooses to adhere to the Seventh Circuit's sensible interpretation, avoiding the statutory Frankenstein that is the predictable result of the "mix-and-match" approach.

At this time, the court declines to substantively determine whether the Northern District of Alabama is the proper venue under Section 12 for all of the various suits that have been consolidated here, and that question will likely require further briefing.  However, in light of the court's conclusion that the "integrated" approach is the correct rule of law, the venue issue will

---

[26] *KM Enterprises*, 725 F.3d at 729 (citing *Astoria Fed'l Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991)).

[27] *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

be assessed under Section 12's venue provision (at least to the extent Plaintiffs have utilized

Section 12's nationwide service of process procedure).

## IV.    Conclusion

For the reasons stated above, Defendants' Motions (Docs. # 107, 110,[28] 112, 113, 114,

116,[29] 119, 121, 122, 125, and 135) are due to be denied without prejudice.   Defendants'

Consolidated Motion to Dismiss (Doc. # 108) is due to be denied in part.

The court will enter a separate order consistent with this opinion.

**DONE** and **ORDERED** this June 18, 2014.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[28] With regard to Defendants' Motion to Dismiss (Doc. # 110), the court finds this motion is directed to the allegations of a Complaint filed in the underlying case in the District of Maryland (and that case was centralized as part of this MDL (*see* Doc. # 19)).   Pursuant to this court's May 30, 2013 Order (Doc. # 79), however, the Consolidated Complaints filed respectively by the Providers and the Subscribers (Docs. # 85, 86) are the operative complaints for purposes of this MDL, and supersede all other complaints filed in any of the actions centralized in this MDL.   Therefore, Defendants' Motion to Dismiss (Doc. # 110) is due to be denied without prejudice.

[29] In Defendants' Motion (Doc. # 116), Defendants argue that Shred 360 does not have standing because, pursuant to the allegations of the Subscribers' Master Complaint, Shred 360 was not a direct purchaser.   The court agrees with Plaintiffs that the allegations of the Master Complaint should be read in the light most favorable to Plaintiffs.   And, also, a decision on that disputed issue is more appropriate for determination on a developed factual record.   Therefore, Defendants' motion (Doc. # 116) is due to be denied without prejudice.