FILED
2015 Sep-02  PM 02:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No.: 2406) | **Master File No.: 2:13-CV-20000-RDP** <br><br> This document relates to all cases. |

## DISCOVERY ORDER No. 9

Argued and submitted to the court is the <u>Joint Motion to Compel BCBS-SC Production of 30(b)(6) Witnesses and Documents and Memorandum of Points and Authorities in Support Thereof</u> (Doc. 387), filed under seal[1] by the Subscribers and Providers tracks on July 21, 2015.  Defendant Blue Cross Blue Shield of South Carolina ("BCBS-SC") has filed its opposition to the motion and the court has heard arguments on it.  This discovery matter was referred to the undersigned magistrate judge by the district judge presiding in this MDL litigation.

As brief background, this is a collection of anti-trust actions transferred to this court for pretrial management by the Multi-District Litigation Panel.  The "Subscribers" and "Providers" are plaintiffs who are, respectively, policyholders of

---

[1]  Although the motion and related briefing were filed under seal, the court does not believe it is necessary that its resolution of the motion be sealed.

Blue Cross Blue Shield medical insurance and providers of medical services (such as doctors and hospitals) who are paid through the insurance issued by Blue Cross Blue Shield carriers.   BCBS-SC is one of the Blue Cross entities sued in this collection of actions.   In general terms, the plaintiffs have alleged that the Blue Cross Blue Shield entities have conspired to monopolistically dominate their respective medical insurance markets by avoiding competition among themselves. Discovery is ongoing.

In Case Management Order No. 1, entered on January 9, 2013, the court required every party to take "reasonable steps to preserve documents and other records, including electronic documents, containing information potentially relevant to the subject matter of this litigation."  (Doc. 6, p. 2).  In January 2014, the Subscriber and Provider plaintiffs propounded 159 questions for production of documents to the defendants, including BCBS-SC.   In July 2014, BCBS-SC discovered that tapes storing internal emails[2] from 2002 to 2010 had been destroyed by BCBS-SC employees.  BCBS-SC promptly notified the plaintiffs of the destruction and hired a law firm not otherwise involved in this litigation to conduct an investigation and prepare a report concerning the circumstances of the

---

[2]   The court has tried to be careful in its characterization of the tapes because the parties dispute what they were.  BCBS-SC calls them "disaster recovery tapes," while the plaintiffs refer to them as "archival tapes."  Alston & Byrd called them simply "back-up tapes."

destruction.  The investigating law firm, Alston & Byrd, produced a written report dated April 23, 2015, a copy of which has been provided to the plaintiffs.

In their instant motion to compel, the plaintiffs seek "an Order compelling BCBS-SC to produce 30(b)(6) witnesses to testify and documents regarding: (1) its preservation plan for potentially relevant evidence in this litigation; (2) custodian interviews regarding preservation of evidence; and (3) its investigation into the spoliation of evidence."  (Doc. 387).  Defendant opposes the motion, contending that much of what plaintiffs seek is protected by the attorney-client privilege and the work-product doctrine.  For example, BCBS-SC argues that the preservation plan itself reflects attorney legal advice and work product, in that the attorney advised BCBS-SC of its duty to preserve certain information and how to do so in relation to this ongoing litigation.   Also, "custodian interviews" and Alston & Byrd's investigation of the destruction, BCBS-SC contends, are clear attorney work product.  Plaintiffs reply that, once spoliation is established, these privileges and protections are loosened or even unavailable, so that the court and parties can inquire into the circumstances of the loss of evidence and how it should be sanctioned or remedied.  Following discussions between the parties, it appears that only two categories of documents for production remain in dispute: (1) the actual litigation hold circulated to employees of BCBS-SC to notify them of the need and

scope of preservation, and (2) the attorney notes taken in interviews conducted during the Alston & Byrd investigation.

Defendant BCBS-SC first asserts that no spoliation has occurred, despite the admitted destruction of over eight years' worth of email back-up tapes, because the tapes were only for disaster recovery, not archival storage.   It cites Zubalake v. UBS Warburg LLC, 220 F.R.D. 212 (S.D.N.Y. 2003), for the proposition that there is no duty to preserve mere disaster recovery tapes.   But there are several problems with the argument.   First, Zubulake does not rest on the label someone may put on backup tapes, but on their relative accessibility.   What that case points out is the reasonable notion that litigation holds ordinarily do not reach *inaccessible* backup tapes.   There is no showing here that the backup tapes destroyed by BCBS-SC were inaccessible.

Moreover, Zubulake was decided before the 2006 amendments to Fed. R. Civ. P. 26(b)(2)(B), designed to balance the need for discovery of electronically stored information ("ESI") against the costs and burdens of accessing it.   The 2006 Committee Comments for the rule make clear that "[a] party's identification of electronically stored information as not reasonably accessible does not relieve the party of its common-law or statutory duties to preserve evidence."   Notwithstanding whatever Zubulake may stand for, the 2006 amendment to

Rule 26 does not agree that the duty of preservation disappears simply because some ESI may be difficult to access.

Finally, whatever the effect of <u>Zubulake</u> and Rule 26(b)(2)(B), the court had entered a preservation Order in this very case eight or nine months prior to the apparent destruction of the tapes.[3] That Order was sufficient to impose a duty of preservation even if neither the case law nor the Rule itself did so. The court agrees with the plaintiffs that the destruction of the backup tapes, however they are denominated, appears to be spoliation.[4]

Turning to the two remaining specific issues, the court is required to determine whether the actual litigation-hold memorandum or letter circulated to various employees of BCBS-SC, notifying them of the duty to preserve potential evidence relevant to the case, is protected by the attorney-client privilege or the work-product doctrine. Also, the court must address whether the notes kept by lawyers during interviews with BCBS-SC employees as part of Alston & Byrd's

---

[3] According to the Alston & Byrd report, the first batch of tapes was destroyed after September 25, 2013, followed by another batch in October 20013. Thus, the tapes were destroyed eight or nine months after the court's Case Management Order No. 1 was entered in January 2013, expressly requiring every party to preserve potential evidence.

[4] The court does not mean to suggest that the spoliation was willful, in bad faith, reckless, or due to be sanctioned. The term is used here only to indicate that evidence was lost under circumstances that were preventable.

investigation are similarly protected by the attorney-client privilege or work-product doctrine.[5]

The court is unpersuaded that the litigation-hold document circulated to BCBS-SC employees is privileged or protected under either doctrine. The attorney-client privilege is intended to protect confidential communications between a client and an attorney where legal advice is sought or provided. See Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S. Ct. 677, 682, 66 L. Ed. 2d 584 (1981) (The privilege's "purpose is to encourage full and frank communication between attorneys and their clients…."). The privilege covers communications in which the client conveys information to the attorney as well as the actual legal advice stated by the lawyer to the client. As Upjohn explains, employees of a corporation may be deemed within the privilege existing between the corporation and corporate counsel if those employees are required to provide information to counsel necessary for counsel to formulate legal advice for the corporation. This is viewed conceptually as the corporate client itself speaking to counsel.

According to BCBS-SC's brief, the defendant corporation "immediately issued a series of legal holds pertaining to this litigation," which were "sent to the

---

[5]   It is the court's understanding that BCBS-SC has agreed to designate a person (or persons) to testify as a Rule 30(b)(6) representative of the company on subjects dealing with the litigation hold, to whom it was circulated, how it was monitored, and other issues arising from the spoliation. The court also understands that BCBS-SC agrees to produce to plaintiffs a list of all persons interviewed during the Alston & Byrd investigation.

owners of the BCBSSC TAO data[6]…."  From this, it appears that the actual litigation holds—the preservation instructions circulated to employees of BCBS-SC---did not involve communications of factual information from those employees to BCBS-SC's counsel, nor did it involve a communication directly from counsel. The brief makes clear that, based on whatever advice BCBS-SC received from counsel, litigation holds were prepared and circulated by the corporation itself.  It was the corporation's duty to preserve the relevant evidence.  As one court has explained, "The obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials."  Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 73 (S.D.N.Y.1991); see also Swofford v. Eslinger, 671 F. Supp. 2d 1274, 1279 (M.D. Fla. 2009).  The litigation holds, therefore, were instructions from the corporation to its employees, not a confidential communication between counsel and the corporate client.  Even if counsel were involved in the preparation and drafting of the litigation holds, their circulation to corporate employees was nothing more than giving managerial instructions, which are not privileged.  Just as an employee policy manual drafted by an employer's counsel and given to each employee is not an attorney-client communication, but is evidence of the employer's policies, a

---

[6]    The TAO data is a reference to the email-system back-up tapes.  Prior to June 2010, BCBS-SC emails operated under a system referred to as TAO.

litigation hold drafted by counsel to assist his client in carrying out the duty to preserve evidence is nothing more than a managerial instruction given to subordinate employees.

In measuring whether the spoliation of the backup tapes was reckless or in bad faith,[7] the plaintiffs are entitled to see what preservation instructions were given to which of BCBS-SC's employees.  The scope and content of the holds and the manner in which they were conveyed to the employees with a need to know of them are simple, historic facts, which are not shielded by the attorney-client privilege.  The holds are themselves material evidence of the manner in which BCBS-SC carried out its duty of preservation and the sufficiency of that effort.  To hold otherwise would be to allow a litigant to hide the *facts* of its bad faith failure to preserve evidence behind the veil of the privilege.  A litigant could proclaim its good faith by stating that it instructed its employees to preserve evidence without ever having the *facts* of that good faith tested by inquiry into the scope and adequacy of the preservation instructions.  The attorney-client privilege does not shield *facts* material to a party's good faith, only the *communication* of those facts between client and counsel.

---

[7]   "[A]n adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997), citing Vick v. Texas Employment Comm'n, 514 F.2d 734, 737 (5th Cir. 1975).

For essentially the same reason, BCBS-SC's litigation holds are not work product. It is certainly true that the litigation holds were "prepared in anticipation" of this litigation, indeed *because* of this litigation. Nevertheless, they were prepared for the reason that, as a litigant possessing potentially material evidence, BCBS-SC had a duty to preserve certain evidence, not because it wanted to use the evidence at trial, or even for analysis of the evidence that might be used at trial, but because of the obligation imposed on all litigants to promote the truth-finding function of litigation. In a real sense, the circulation of the litigation holds was an ordinary business activity, much like keeping records, accounting for income, and paying taxes.

The original rationale for the work-product protection, dating back to Hickman v. Taylor, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947), was to give parties the assurance that they and their representatives could gather, analyze, and present evidence without fear that they would be required to turn over their efforts to their adversaries.

> In performing his various duties…, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. *Proper preparation of a client's case* demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in

> interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case… as the 'Work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

Id. at 510-11, 67 S. Ct. at 393-94, 91 L. Ed. 451 (1947) (internal citation omitted) (italics added).  The Court's attention was on the need of the lawyer and the party to prepare to meet the merits of the claims and defenses pleaded in the litigation.  Here, the litigation holds, whether drafted by BCBS-SC's counsel or not, do not represent something prepared to help BCBS-SC meet the merits of the claims or defenses in the litigation.  Rather they were part of any litigant's over-arching duty to promote the truth by preserving evidence reasonably known to be material to the case.  An instruction circulated to employees to preserve certain evidence, pursuant to a duty to preserve that evidence, is not work product, but something ancillary to the litigation.  Such an instruction is not "case preparation" as that term relates to work product, but simply the party performing the duty it bears.  And, as discussed above, the scope and content of such an instruction are *factual evidence* in and of themselves on questions related to the adequacy or good faith of a litigant's performance of the preservation duty.

Additionally, when one focuses on the purpose for the creation of the litigation holds,[8] it is clear that no party anticipated litigation on the subject of the holds.    The holds were at least superficially intended to carry out an uncontroversial duty to preserve evidence, as required by Case Management Order No. 1.  At the time they were drafted and circulated, no one anticipated that there would be controversy and "litigation" involving the sufficiency of the holds to preserve evidence.   Certainly, BCBS-SC cannot say that it anticipated *likely* litigation because one of its employees would, in the future, destroy evidence.  Such litigation holds are intended to *avoid* litigation over the loss of evidence.  Thus, in the parlance of Rule 26, the litigation holds were not created in "anticipation of litigation" arising from the loss of evidence they were, at least hypothetically, intended to prevent.[9]

For these reasons, the court finds that BCBS-SC is required to produce to the plaintiffs a complete and accurate copy of each litigation hold circulated to its employees as a result of or in compliance with the court's Case Management Order

---

[8]    In this circuit, whether a document was "created" in anticipation of litigation, and therefor work product, turns on the "primary motivating purpose" for its creation.  Although "litigation need not necessarily be imminent," a document is protected as work product "as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation."   United States v. Davis, 636 F.2d 1028, 1040 (5th Cir. 1981), citing Osterneck v. E.T. Barwick Industries, Inc., 82 F.R.D. 81, 87 (N.D.Ga.1979); 8 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 2024, at 198 (1970).   When a document is created primarily for a purpose other than for use in anticipated litigation, it is not work product.

[9]    The court should not be understood here as suggesting one way or another that the holds were insufficient or in bad faith.  That is a question for later.  The court has not and does not wish to prejudge the merits of whether spoliation requires a sanction or remedy.

No. 1.  In the event any such holds contain or reflect an *actual* communication between counsel and BCBS-SC (beyond the simply that counsel drafted the hold), or contain a reflection of counsel's opinions or thoughts about the merits of this litigation, BCBS-SC may submit such holds to the court for *in camera* review by the undersigned.  Otherwise, complete and accurate copies of all relevant holds shall be produced to plaintiffs within fifteen (15) days.

The second category of documents sought by plaintiffs to which defendant objects is the actual notes kept by Alston & Byrd attorneys during interviews of BCBS-SC employees as part of the investigation into the destruction of the backup tapes.  Although the distinction from the litigation holds may be subtle, the court believes that such notes *are* attorney opinion work product and need not be produced.

As was true of the litigation holds, there is no question that these notes were prepared because of this litigation and, in a broad sense, do not relate to preparation needed to meet the merits of the claims and defenses in this case.  The notes were prepared as part of an ancillary matter involving potential sanctions in the litigation, not the ultimate merits of the litigation.  Unlike the litigation holds, these notes were made in *clear* anticipation that litigation would ensue over the loss of the backup tapes.  The notes were kept as part of an investigation into that alleged spoliation, which was never anticipated at the time the litigation holds were

drafted and circulated.  By the time Alston & Byrd attorneys began conducting interviews and keeping their notes, the prospect of ancillary litigation on the possibility of a sanction for spoliation was well-known and fully anticipated. Thus, unlike the litigation holds, the notes were created in anticipation of litigation, even if ancillary to the main action, and are protected work product.  BCBS-SC will not be required to produce the attorney interview notes.[10]

Therefore, it is ORDERED, in accordance with the discussion above, the plaintiffs' motion to compel is GRANTED as follows:

1.  BCBS-SC shall, within fifteen (15) days after this Order, designate one or more persons to testify as Rule 30(b)(6) representatives of BCBS-SC as to those subjects of inquiry set forth in the plaintiffs' Rule 30(b)(6) notice of deposition; and

2.  BCBS-SC shall, within fifteen (15) days, produce to plaintiffs a complete and accurate copy of each litigation hold it circulated to employees as a result of or in compliance with Case Management Order No. 1, subject to the right of BCBS-SC to first submit to the court for *in camera* review those portions of the litigation holds it contends reflect *actual* attorney-client communications between it and

---

[10]   It remains the court's understanding that BCBS-SC either has or is willing to disclose to plaintiffs the identities of the people interviewed.  While the contents of notes taken during the interviews are work product, the identities of witnesses interviewed are not.  Therefore, nothing in this Order should be read as excusing BCBS-SC from disclosing the witnesses' identities to the plaintiffs, who may then conduct their own interviews or depositions to discover what the witnesses know.

counsel, or which reflect attorney opinions, conclusions, or impressions about the merits of the claims or defenses in this action.

3.  In all other respects the plaintiffs' motion to compel is DENIED, subject to the agreements the parties have reached for resolution of some issues raised by the motion.


**DONE** and **ORDERED** on September 2, 2015.


_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE