```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF ALABAMA
                        SOUTHERN DIVISION
 3

 4

    IN RE BLUE CROSS BLUE SHIELD  *  December 15, 2015
 5  ANTITRUST LITIGATION MDL 2406 *  Birmingham, Alabama
    2:13-cv-20000-RDP             *  2:27 p.m.
 6

 7            ***************************

 8

 9            TRANSCRIPT OF DISCOVERY CONFERENCE
           BEFORE THE HONORABLE T. MICHAEL PUTNAM
              UNITED STATES MAGISTRATE JUDGE
10

11         FOR THE PLAINTIFFS:

12         MR. BARRY A. RAGSDALE, ESQ.
           SIROTE & PERMUTT
13         2311 Highland Avenue South
           P O Box 55727
14         Birmingham, AL 35255
           205-930-5100
15

           MR. WILLIAM BUTTERFIELD, ESQ.
16         HAUSFELD LLP
           1700 K Street NW
17         Washington, DC 20006
           202-540-7143
18

           MR. W. TUCKER BROWN, ESQ.
19         WHATLEY KALLAS
           2001 Park Place North
20         Suite 1000
           Birmingham, AL 35203
21         205-488-1200

22

23

24

25
```

1        FOR THE DEFENDANTS:

2        MS. KIMBERLY R. WEST, ESQ.
         WALLACE JORDAN RATLIFF & BRANDT LLC
3        800 Shades Creek Parkway
         Suite 400
4        Birmingham, AL 35209
         205-870-0555
5
         MS. EMILY M. YINGER, ESQ.
6        HOGAN LOVELLS US LLP
         7930 Jones Branch Drive
7        9th Floor Park Place Building
         McLean, VA 22102
8        703-610-6100

9        MS. CHRISTA C. COTTRELL, ESQ.
         KIRKLAND & ELLIS
10       300 North Lasalle
         Chicago, IL 60654
11       312-862-2000

12       MR. JOHN T. A. MALATESTA, III, ESQ.
         MAYNARD, COOPER & GALE
13       1901 Sixth Avenue North
         Suite 2400
14       Birmingham, AL 35203
         205-244-1000

15

16       SPECIAL MASTER:

17       MR. EDGAR C. GENTLE, III, ESQ.
         GENTLE, TURNER, SEXTON & HARBISON
18       501 Riverchase Parkway East
         Suite 100
19       Hoover, AL 35244
         205-716-3000

20

21       ALSO PRESENT:

22       CHRIS KIMBLE, ESQ.
         CARL BURTCHALTER, ESQ.
23       STEVE ROWE, ESQ.
         KENINA LEE, ESQ.
24       TRACY ROMAN, ESQ.
         ANDREW LEMMON, ESQ
25       CHRIS HELLUMS, ESQ.
         PATRICK McDOWELL, ESQ.

```
1              JIM PRIESTEA, ESQ.
               HELEN E. CHINGER, ESQ.
2              JOSHUA PAYNE, ESQ.
               GREG DAVIS, ESQ.
3              ADAM SHAW, ESQ.
               SARAH GLOVER, ESQ.
4              DENNIS PANTAZIS, ESQ.
               KIRK WOOD, ESQ.
5              MICHAEL GURLEY, ESQ.
               MARK HOGEWOOD, ESQ.
6              STEPHEN WADSWORTH, ESQ.
               LUCILE COHEN, ESQ.
7              DAN LAYTIN, ESQ.
               NICK ROTH, ESQ.

8

9              ALSO PRESENT BY TELEPHONE:

10             MICHAEL NARANJO, ESQ.
               LAUREN McCRAY, ESQ.
11             CRAIG HOOVER, ESQ.
               SARAH CYLKOWSKI, ESQ.
12             ERIC ZOLNER, ESQ.
               CARLOS HERNANDEZ, ESQ.
13             JOHN SCHMIDT, ESQ.
               BRIAN NORMAN, ESQ.
14             JOHN MARTIN, ESQ.
               CHUCK SWARIS, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

## P R O C E E D I N G S

THE COURT:  Good afternoon.  This is in

the In Re Blue Cross Blue Shield Antitrust Litigation, MDL

2406.  And that is a Northern District of Alabama number,

2:13-cv-20000-RDP.

And let me apologize for the late start.  But as is

usually the case, we had a brand new sound system and

telephone system put in about two weeks ago.  And as with

most government contracts, of course, it doesn't work.  So we

finally have something patched up here and working.  But I

wanted to go ahead and get started with the discovery

conference.

I have on the agenda this afternoon to get some

updated information, again, about the meet and confer

process, as we've been going for some time.

Mr. Ragsdale?

MR. RAGSDALE:  Thank you, Your Honor.

We have continued the meet and confer process

pursuant to the directions that we received from the Court

and, frankly, from each other over the course of the last

several weeks.

There were at least two in-person meet and confers

with various parties as well as a number of telephone meet

and confers.  And I think all counsel were able to work that

in through their holiday schedule; although, we're not done

1    yet; although, we made a lot of progress.  Some of that has

2    been set out in the papers that you have received.

3           Progress has been made on a number of fronts.

4    Remaining are some meet and confers we're going to try to

14:28:54  5    work in, including tomorrow.

6           One of the issues that we are hoping to discuss is

7    what discovery needs to be done or planned or anticipated

8    involving the defendants' anticipated filed rate motions,

9    including that to be filed by Blue Cross of Alabama.   In

14:29:10 10    fact, we're talking about getting together and discussing

11    that tomorrow.

12           We're very close to having finalized agreements on a

13    number of points.  Obviously, there are still points of

14    disagreement that we continue to talk about, at least one of

14:29:24 15    which -- or two of which -- is on the docket for you today.

16                THE COURT:  Okay.  And I guess sort of

17    dovetailing into that is sort of looking down the road at the

18    horizon, what sort of discovery issues might yet still be

19    coming out of the meet and confer process that we might be

14:29:40 20    dealing with in January?

21                MR. RAGSDALE:  I think a fairly broad

22    spectrum of issues still remain.  We know there's -- we

23    anticipate at least once we have the opportunity to set out

24    the types of discovery, for example, that we want on filed

14:29:54 25    rate -- although I suspect we will be able to reach an

1    agreement on most of that, there may still be some scheduling

2    issues.  Some of that will depend on, frankly, Judge

3    Proctor's scheduling of how those motions are going to be

4    filed and the deadlines that may be created for the

14:30:08  5    consideration of those motions.

6           In addition to that, depending on, frankly, how some

7    of the time period issues get resolved between the parties,

8    certainly involving the association, that may provide

9    guidelines for the other defendants in terms of how we want

14:30:22  10   to proceed.

11          We're close.  I think very close.  Probably even

12   done with an end-date agreement on structured data, for

13   example, that we hope we can get all the defendants to agree

14   to once we're able to reach that.

14:30:36  15          Other than that, I don't know what might pop up.

16   But I suspect, just based on past experience, that we will be

17   able to reach agreement on most things and be unable to reach

18   agreement on some things.

19                   THE COURT:  All right.

14:30:52  20          Ms. Yinger?  Ms. West?

21                   MS. WEST:  Ms. Yinger is going to address

22   the Court.

23                   THE COURT:  Thank you.

24                   MS. YINGER:  Good afternoon, Your Honor.

14:31:06  25          I think the only thing I would add is that we are

1    continuing to meet and confer on behalf of the non-Alabama

2    defendants with respect to what discovery the plaintiffs plan

3    to prioritize in the accelerated actions for the non-Alabama

4    defendants.

14:31:28    5         I think that -- you know, the defendants had

6    proposed that we go ahead and talk about that right away.

7    But the plaintiffs wanted a little more time.

8         We're expecting a proposal from them on December

9    23rd.  And that will give us a better sense of where that

14:31:46    10   filed rate discovery fits into that bigger picture.

11        So I think once we have more information from the

12   plaintiffs about how they see discovery rolling out next

13   year, we'll be able to address a number of issues with the

14   Court, if needed.

14:32:08    15              THE COURT:  All right.

16              MS. YINGER:  Thanks.

17              THE COURT:  Thank you.

18        The next item that I have down on the agenda is the

19   plaintiffs' motion to compel Blue Cross Blue Shield of

14:32:22    20   Alabama to designate two particular people, Koko Mackin and

21   Robin Stone, as production custodians.

22        Mr. Ragsdale?

23              MR. RAGSDALE:  Thank you, Your Honor.

24        As is the case with the other defendants, frankly,

14:32:38    25   we made substantial progress with Blue Cross of Alabama,

1    negotiating on this particular issue; that is, the

2    designation of custodians.  We were able to reach agreement

3    on all but two.  And the two are outlined in the motion that

4    we have put before you.

14:32:56   5        We believe -- and I think it's important to put it

6    in context, of course.  We haven't taken depositions yet.

7    We've begun to receive documents but not nearly what we

8    anticipate.  So that, to some degree, this motion has to be

9    made based on what we anticipate.

14:33:12   10        And so that -- I think, for example, when Blue Cross

11    of Alabama argues that we have not definitively established

12    what we will get from these two custodians, that's true,

13    because we haven't had the opportunity to find out yet.

14        And that's what -- we think our motion focuses on

14:33:30   15    the fact that these two individuals are almost certainly

16    likely to have unique information regarding their dealings

17    with third parties and the outside public.  It is the nature

18    of their jobs.

19        Ms. Mackin is vice-president of corporate

14:33:44   20    communication and community relations.  She is the face and

21    the spokesperson for Blue Cross.

22        Mr. Stone is the vice-president of governmental

23    affairs and is the registered -- and has been a registered

24    lobbyist for Blue Cross of Alabama for more than several

14:34:02   25    years.

1        We believe that it is important that we preserve and

2    have access to the documents of these two individuals.  And

3    it seems to me that their relevance, frankly, is clear on the

4    face of the fact that this case will focus on a number of

14:34:20  5    issues involving Blue Cross of Alabama, not the least of

6    which is simply their participation in what we have alleged

7    to be a nationwide conspiracy, but in addition to the fact

8    that, for example, filed rate will be a significant issue in

9    this case.

14:34:34  10        The fact that we've asked them to preserve the

11    records of their vice-president for governmental affairs who

12    would have interactions with the regulators and the

13    governmental entities which ostensibly set that filed rate

14    puts this, frankly, right in the wheelhouse of the defense

14:34:54  15    that we anticipate that Blue Cross will raise as a result of

16    that.

17        We believe that these two individuals, based on what

18    we have access to -- Blue Cross of Alabama is very critical

19    of the fact we're relying on media reports.  But, at least at

14:35:08  20    this point, that's what we have access to.  And it provides

21    the clues for these two individuals.

22        The real question is:  Is there a concomitant

23    increase in the burden on Blue Cross of Alabama to have to

24    have these two individuals designated as custodians?

14:35:26  25        I would simply point out that I believe Blue Cross

1    of Alabama's arguments are almost self-contradictory.  Their

2    argument is that it's thousands and thousands and thousands

3    of additional documents that would have to be reviewed.

4          But on the same token, they argue that there's

14:35:44  5    nothing unique about any of the information that they have

6    access to; that it will be redundant and duplicative of

7    documents that we're getting from other sources.  Both of

8    those things can't be true.

9          Either the information is unique and, therefore,

14:35:56  10   should be subject to discovery, or it's duplicative and,

11   frankly, would be weeded out through the process that they,

12   undoubtedly, will go through in which duplicate documents

13   won't be produced.

14         There's -- it's called de-duping.  And it is a

14:36:14  15   process by which -- completely different than duping, by the

16   way.

17              THE COURT:  I've been on the end of that

18   many times.

19              MR. RAGSDALE:  Okay.  Yeah.  Not nearly as

14:36:20  20   much fun.  But --

21              THE COURT:  No.

22              MR. RAGSDALE:  -- duplicate -- to the

23   extent that there are emails or other documents which are

24   duplicates of documents that are already being produced or

14:36:30  25   preserved, they won't be produced.  There's no additional

1    burden that has to be done.

2         If they are not -- and more importantly, if they

3    involve communications with people outside the Blue Cross

4    structure, then they are unique.  And they are discoverable.

14:36:42  5    And they are the kind of information that should be preserved

6    and produced.  And we believe that, frankly, Blue Cross has

7    not made the kind of showing that's necessary that adding

8    these two individuals will substantially increase the

9    discovery burden that will be imposed on them.

14:36:58  10        Other than that, I think our position is set out in

11   our paper.  If you have questions, I'd be glad to answer

12   them.

13                  THE COURT:  All right.  Thank you.

14                  MR. RAGSDALE:  Thank you, Judge.

14:37:04  15                  THE COURT:  Argument for Blue Cross

16   Alabama?

17                  MS. WEST:  Yes, Your Honor.

18        Mr. Malatesta will be arguing.

19                  THE COURT:  Thank you.

14:37:10  20        Mr. Malatesta?

21                  MR. MALATESTA:  Good afternoon, Judge.

22                  THE COURT:  Good afternoon.

23                  MR. MALATESTA:  Forgive me.  I got a

24   little bit of a cold today.

14:37:16  25        I'm not as organized.  I got to set up, unlike

1    Mr. Ragsdale.

2          All right.  Before I get into the argument, Your

3    Honor, what I would like to do is provide a little bit more

4    context to how we got here.  Because I think it's

14:37:38  5    important to set the backdrop.  Especially in light of some

6    of Mr. Ragsdale's remarks that they're operating with

7    incomplete information.

8          I would argue, to the extent they have any

9    intelligence on those witnesses that they believe to be

14:37:48 10    relative to the proceedings in this case, it would be Koko

11    Mackin and Robin Stone.  Because the foundation for their

12    position has always been it's in light of the public

13    statements they've made, either in articles or to the

14    legislature.

14:38:02 15          So over the course of the last six months, we have

16    been negotiating production custodians.  And the backdrop for

17    that has been our production of organizational charts.  And

18    they've had the benefit of those organizational charts.  And

19    we, obviously, have consulted with our client to identify who

14:38:18 20    we believe are the employees within the company that are best

21    positioned to answer these specific RFPs.

22          And so back in July, we sent them a fairly lengthy

23    letter that outlined our position not only on the scope of

24    the requests for production but how those RFPs should be

14:38:38 25    assigned within the organization.

1        And what we did is we took filed rate approach.  We

2   basically got eight divisions.  We got our executive office.

3   And then we've identified seven specific business divisions

4   where we think there are individuals within those divisions

14:38:48 5   that are going to have information responsive to the RFPs:

6   Sales and marketing, actuarial, claims, networks, legal, and

7   then the chief medical officers and the executives.

8        And what we did is identify 23 individuals within

9   the executive office and those business divisions that we

14:39:10 10   felt would be -- would have documents responsive to these

11   requests for production.  And in many instances, as we noted

12   in our papers, we've already assigned, on average, seven

13   custodians to these requests that are at issue today.

14        So we believe we have taken a defensible approach to

14:39:28 15   the identification of production custodians and have

16   identified those individuals that are likely to have

17   responsive records.

18        Now, the plaintiffs have articulated that the

19   standard is relevance, in and of itself.  And we disagree,

14:39:40 20   and we've articulated to the Court that we believe that there

21   is sort of a three-prong standard that must be examined in

22   order for the Court to find that the motion should be

23   granted.  That is, first showing of relevance; second, that

24   these individuals do have unique, noncumulative information

14:40:00 25   responsive to the RFPs; and third, that the additional burden

1    is, in fact, proportionate to the needs of the case.

2           And I'm going to walk through each of those in turn,

3    although there's certainly some redundancy on some of those

4    issues.

14:40:12  5           Let me begin first with relevance.  It is the

6    plaintiffs' burden to prove relevance.  And we appreciate the

7    fact that, to some degree, they are operating in a vacuum.

8    But nevertheless, with the benefit of the organizational

9    charts, we were able to reach agreement on the production

14:40:28 10   custodians.

11           And again, their foundation for having Mackin and

12   Stone designated as production custodians has been their

13   public statements.

14           So during the meet and confer process, time and time

14:40:38 15  again, we said, show us the underlying statements that

16   Ms. Mackin and Mr. Stone have made to substantiate the

17   requests, and we'll take it under review.

18           During meet and confer process, they cited the

19   single article to Koko Mackin.  It's a September, 2007,

14:40:54 20  *Birmingham Business Journal* article that really sort of just

21   documents her progression through the company.

22           At the time, she was involved with project

23   management issues and then became the vice-president of

24   corporate communications in April, 2009.

14:41:06 25          With respect to Mr. Stone, during the meet and

1    confer process, they just identified generically several

2    issues that they claim he had taken up either in Montgomery

3    with the legislature or had been quoted in various roundtable

4    discussions.  And now the Court has the benefit of some

14:41:20  5    articles that they have cited in their brief.

6         We have prepared for the Court a summary of those.

7    And we're happy to submit the actual articles themselves if

8    you would like.  May I approach with a copy?

9                   THE COURT:  Sure.

14:41:52 10                   MR. MALATESTA:  And Your Honor, there's

11   obviously a fair amount of detail here.  But we would

12   encourage the Court to review these after the hearing to

13   inform its decision on the motion.  Because when you really

14   study these articles, what you realize is that there is no

14:42:04 15   factual nexus between the statements which they contend to be

16   underpinnings for having these two individuals designated as

17   production custodians and then the RFPs themselves.

18        And I'm going to walk through some illustrative

19   examples.  We did so in our papers, as well.

14:42:10 20        But when you look at these articles -- and I'll

21   begin with Ms. Mackin.  14 of the articles deal with the

22   impact of healthcare reform.  There's a lot of discussion in

23   the press, as you would anticipate, when President Obama was

24   contemplating the Affordable Care Act.  And then, of course,

14:42:24 25   it was upheld constitutionally by the Supreme Court in 2012.

1    And there were a lot of articles discussing what's the impact

2    of that going to be on the healthcare marketplace, generally,

3    and then, more specifically, healthcare insurers, one of

4    which, obviously, is our client.

14:42:44    5        Notably, you know, most of the Affordable Care Act

6    was not even put into effect until after these lawsuits were

7    filed.  So marginal relevance in that regard.

8        And then several of the articles are commentary on

9    these lawsuits.  Just standard commentary by Ms. Mackin and

14:43:02   10    others that, you know, we're going to vigorously defend the

11    lawsuit.  That does not provide indicia of relevant, unique

12    information responsive to these RFPs.

13        Others are what I would label high-level statements

14    about the company's financial performance.  You know,

14:43:18   15    comments by Ms. Mackin about how the company performed

16    financially in 2009, 2010.

17        There are one or two articles that may speak to

18    market share or premium increases.  Again, we don't believe

19    that those limited citations substantiate having them

14:43:34   20    designated to comb their records for what could be, depending

21    on how the Court rules on discovery time frame, a decade of

22    information.

23        And then with Mr. Stone, we feel like it's even more

24    tangential when you look at the specific articles.  One is

14:43:48   25    Mr. Stone's comments on a bill pending in the legislation

about whether or not the legislation should impart a mandate on certain autism benefits.

Another concerns Medicare Advantage increases for certain residents of Hale and Tuscaloosa Counties on the Medicare Advantage product.  Again, very tethered -- or not tethered, I should say, to the underlying RFPs.

So when you look at the requests -- and this has really been the focus of our position during the meet and confer process is let's compare these statements which you contend are clearly relevant to the underlying RFPs for which they want to be designated.

They want to designate Ms. Mackin for 62 of the requests for production.  They want to designate Mr. Stone for 66 of the requests for production.  So we're talking about about 40 percent of the 159.

The requests are as follows:  The creation of the association, Requests 7 through 10; the rules and regulations of license agreement, 14 and 23; association committee meetings and board activities by the association, Requests 15 through 19; the creation of Blue Card back in the mid-90s; the pre-curser to the operation of the Blue Card in the 1980s and early 1990s; the various interaction between control plans and participating plans in the national account scheme; organizational charts; the use of MFNs; our interaction with the consortium.

1          Those are the requests that they believe we should

2     designate Stone and Mackin to be production custodians.  The

3     articles have nothing to do with those issues.  And for that

4     reason, we've said, this dog won't hunt.  They should not be

14:45:30 5     designated as production custodians.

6          Then for some of those issues that I mentioned

7     earlier, like, financial performance; market share; you know,

8     premium increases, there's very limited discourse by

9     Ms. Mackin on those issues.  Again, very high-level

14:45:42 10     statements about, you know, how those are going to improve.

11          By way of example, here's one on financial -- the

12     financial performance that they cite.  This is a "Blue Cross

13     Returns to Profitability," an August 8th, 2010, article from

14     the *Birmingham Business Journal*.  The quote from Ms. Mackin

14:46:02 15     is as follows:  Quote, there were several factors that led to

16     our net loss in 2009:  The downturn in the economy,

17     struggling financial markets, and increasing healthcare

18     costs.  That's their -- that's their factual justification

19     for making her a production custodian on financial RFPs.

14:46:22 20          What we've said to the plaintiffs and what we ask

21     the Court to do so here is say that the existing production

22     custodians we've designated for our financial issues is more

23     than sufficient.  What we've done is actually go to the

24     controller of the company and say, produce information

14:46:36 25     responsive to their financial requests for production, like,

1    total revenues, Blue Card payments.  That is the correct

2    source of this information.

3         There's no reason for Blue Cross Blue Shield of

4    Alabama to now look for high-level statements about

14:46:50  5    operational performance when we know we're going to get that

6    information directly out of the financial department.  In

7    fact, we've made a production of our audited financial

8    statements.  That should speak to the financial performance

9    of the company.

14:47:00 10         There's no need to go look at Ms. Mackin's records

11    for the very same thing, which leads to the second part of

12    our argument which is that to the extent some of these

13    issues, like, market share or financial performance, do touch

14    about issues that Ms. Mackin and Mr. Stone have addressed in

14:47:16 15    the media, it's cumulative.  And it's certainly not going to

16    lead to the unique information.

17         The 11th Circuit has said the following:  Quote,

18    where a significant amount of discovery has been obtained and

19    it appears that further discovery would not be helpful in

14:47:30 20    resolving the issues, a request for further discovery is

21    properly denied.  And that's exactly where we find ourselves

22    here.

23         As we've represented to the Court in our papers,

24    we've already collected ten million files to be searched.  We

14:47:46 25    believe that is a more-than-adequate response to capture

1    information responsive to these RFPs.

2            We don't see the need to now engage in discovery of

3    what amounts to approximately 500,000 additional files that

4    belong to Ms. Mackin and Mr. Stone.

14:47:58  5            We believe that this is certainly calling for the

6    production of cumulative information, which the 11th Circuit

7    has discouraged.

8            And we would ask that the Court deny the motion in

9    that regards, as well.

14:48:10  10            When you look at specific issues, like, market share

11    or premium increases, again, Your Honor, they've asked

12    Ms. Mackin and Mr. Stone to be designated as production

13    custodians for Requests 66 through 81.  Those deal with

14    market-share type issues.

14:48:26  15            We've already said our entire sales and marketing

16    department and all of -- I should clarify.  The seven people

17    we've designated within our sales and marketing department,

18    the seven people we've designated within our network

19    department, and our CEO and our former CEO -- we agreed to

14:48:42  20    search all of those records to recover information about

21    market share.

22            Why do we now need to go to Ms. Mackin and

23    Mr. Stone?  It's completely redundant.  It's going to require

24    the consumption of resources and time that we don't need to

14:48:54  25    direct on those individuals, given the streamlining order

1     that the Court has entered.

2             And then third and lastly, this would not be

3     proportional to the needs of this case, as Rule 26 mandates

4     and which has been reinforced by the recent amendments to the

14:49:10  5     Federal Rules of Civil Procedure.

6             We've cited some cases, Your Honor, where there is

7     no foundation to have these individuals designated.

8             Mr. Ragsdale said we need to speculate to some

9     degree.  Your Honor, I would say that if any speculation

14:49:24  10    needs to be made here, it is that there is no additional

11    information to be uncovered from Mackin and Stone that's

12    unique to these issues in the case.

13            And we would ask that the Court deny the motion on

14    those, as well.

14:49:36  15                 THE COURT:  All right.

16                 MR. MALATESTA:  That's it, Your Honor,

17    unless you have any questions.

18                 THE COURT:  I guess the question that

19    comes to my mind is, certainly, Rule 26(B)(1) in the

14:49:46  20    definition of the scope of discovery talks about the

21    relevance of the discovery and has moved the proportionality

22    considerations that previously were under 26(B)(2) -- have

23    moved those up now into the definition of the scope.

24            I'm curious about where this idea of uniqueness

14:50:08  25    comes from unless it has something to do with the

1    burdensomeness of discovery, perhaps some element of

2    proportionality.

3           But is there a requirement in Rule 26 that the

4    discovery requested from multiple sources within an

14:50:30  5    organization -- that each one of those sources be unique in

6    some sort of way?

7                     MR. MALATESTA:  Yes, Your Honor.  Rule

8    26(B)(2)(c), Roman Numeral I, quote, the Court must limit the

9    frequency or extent of discovery otherwise allowed by these

14:50:48  10   rules or by local court -- local rule if it determines that

11   the discovery sought is unreasonably cumulative or

12   duplicative.

13          And then as I cited earlier, Your Honor, to the 11th

14   Circuit, where it has prohibited additional discovery.  And

14:51:00  15   so we would believe not only do the rules but the controlling

16   caselaw deny the motion.

17                    THE COURT:  All right.  So you equate

18   uniqueness with or the absence of uniqueness with being the

19   same thing as unreasonably cumulative or duplicative?

14:51:22  20                    MR. MALATESTA:  We do.

21                    THE COURT:  Okay.

22                    MR. MALATESTA:  I mean, Your Honor --

23                    THE COURT:  There's no middle ground

24   between them anywhere?

14:51:26  25                    MR. MALATESTA:  Well, we acknowledge that

                1    there is some overlap with our existing slate of production

                2    custodians.  And that's why we've agreed to go to different

                3    business divisions within the company to say we expect sales

                4    and marketing to have the primary documentation on market

14:51:40        5    share, by way of example, but we're also going to look to our

                6    executive office files, because we obviously anticipate that

                7    Mr. Kellogg, the president/CEO of the company, may have

                8    information.  And that could spill over to some other areas.

                9    And so we've designated those individuals.

14:51:54       10              THE COURT:  On all of these requests for

               11    production -- and I have to say that, frankly, I'm looking

               12    for a little bit of redundancy.  But -- I'm not asking for an

               13    unreasonable degree of redundancy.

               14         But on requests for production, it seems to me that

14:52:16       15    there ought to be multiple potential sources from which

               16    information responsive to a request might come so that you're

               17    not so limited in -- limiting yourself to one person or one

               18    source to get information that may well be known to the

               19    company in some other place.

14:52:38       20         You're telling me that you're going to actually be

               21    looking at different sources.

               22              MR. MALATESTA:  Yes, Your Honor.

               23         Our argument is that those additional sources should

               24    not be Koko Mackin and Robin Stone.

14:52:48       25              THE COURT:  Oh, I understand.

1          You know, but the example you give:  You're going to

2     be looking in sales, but you're also going to be looking for

3     essentially that same information in the executives.

4                    MR. MALATESTA:  Yes, Your Honor.

14:52:56  5          I mean, we looked at our production slate before we

6     submitted our response.  And what we found is, on average, we

7     are designating at least seven production custodians to each

8     RFP.

9                    THE COURT:  All right.  All right.

14:53:14 10          Mr. Ragsdale?

11                    MR. RAGSDALE:  What it boils down to,

12    Judge, is 23 custodians is perfectly fine, but 25 would just

13    gum up the whole process.  Those two additional custodians

14    would bog us down to the point we couldn't complete

14:53:40 15    discovery.

16          We don't believe that's true.  We don't believe that

17    the 500,000 files that they talk about -- they've not told

18    us, for example, how many of those involve communication with

19    people outside of the Blue Cross hierarchy where we may not

14:53:54 20    have any other source of being able to get that information.

21          It is -- they have not shown, for example, that

22    there are not communications with governmental regulators,

23    governmental authorities, which might not include some of the

24    other custodians that they have done.

14:54:12 25          As I hear the argument, we should already know what

1    we want before we ask for it; we should already know what's

2    in their files before we ask for them; and that we have some

3    burden to demonstrate to this Court what exactly we're going

4    to get when we ask the question.  That's not discovery.  It

14:54:32   5    wouldn't be called discovery.  It would be called

6    confirmation if that were the case.

7         The second problem with their argument is I think

8    they assume that we are only strictly limited, based on

9    relevancy, to the public comments that found their way into

14:54:46  10    the media.  That's not true at all.

11         Simply we have pointed to those as examples of where

12    they have made public statements which indicate that they are

13    involved in the issues which are involved in the case.

14         And frankly, the summary which they've provided to

14:55:04  15    you on Page 8, even there there's an article that's quoted

16    from May 8th, 2012, in which it says a spokesman for Blue

17    Cross disputed that it gave the company a monopoly, noting

18    that other providers had until 2014 to build their networks.

19    I have no idea what other emails there may be related to

14:55:30  20    statements like that.

21         The truth is this, Judge:  If this case is decided

22    on a rule of reason analysis, which we, of course, don't

23    believe it should be, but that is a possibility, Alabama will

24    be trying to demonstrate its procompetitive effect of its

14:55:48  25    market approach.  And that will implicate not only the type

of governmental affairs and regulations that we've talked about but all of these public statements that talk about the community-wide effects of Blue Cross.

And these are the two individuals who are uniquely situated to make those kind of disclosures and have those kinds of documents.

Again, their argument is we've asked for a lot of things that neither of these two people will have any involvement in.  If that's true, there won't be any documents related to those topic areas that they will have to produce.

The point is there are topics which clearly they will have some involvement with and which we believe they are likely to have discoverable information which may not be produced through the other 23 custodians that they have designated.

I would also say this -- and I think this is important -- is the notion that we attempted in the meet and confer process to say why don't we go RFP by RFP through all of them to try to do that.  And frankly, they were not interested unless we could guarantee that it was less than five RFPs that would involve these two individuals, which we couldn't, of course, do beforehand.

So their complaint about the fact that we've included some RFPs which may not implicate these two custodians is a little bit of a red herring, because, in this

1    instance, we tried to do that.  They weren't interested in

2    that.  There is some reason they don't want these two

3    particular individuals to be designated.  And it doesn't make

4    sense that it's purely economy of scale.

14:57:30  5           Any other questions that I can answer?

6           Thank you, Judge.

7                     THE COURT:  Mr. Malatesta?

8                     MR. MALATESTA:  Your Honor, brief reply.

9           We cite in our response the following from the

14:57:42 10    United States District Court for the Middle District of

11    Alabama in the case *Auburn University versus IBM*, 2011 West

12    Law 5190821:  Quote, if the theoretical possibility that more

13    documents exist sufficed to justify additional discovery,

14    discovery would never end.

14:57:58 15           And Your Honor, during the meet and confer process,

16    our opening offer was 18 production custodians.  They then

17    countered and said, we would like you to take into

18    consideration an additional 22 people.  We ultimately agreed

19    to five of them.

14:58:12 20           And Your Honor, as you said, the standard here is

21    what is a reasonable approach to discovery.  It is not

22    perfection.  If that was the standard, we'd have to designate

23    hundreds of individuals within the company.  We believe that

24    the ten million files we've collected for search from these

14:58:30 25    23 individuals are the central figures to revolve these RFPs.

1    We don't need to go exploring Ms. Mackin and

2    Mr. Stone's files, given the very -- the lack of the factual

3    nexus that's been demonstrated through these articles.

4    The one that Mr. Ragsdale specifically cites is an

14:58:46  5    AL.com article from May 8th, 2012, concerning a potential

6    bill to require that any insurer who participates in the

7    state exchange must offer their health insurance products in

8    all 67 counties, which Alabama does.  Other competitors have

9    cherry picked and only placed themselves in certain counties

14:59:02  10    within the state.

11    That is not responsive to an RFP.  And that's where

12    there's the fatal flaw in the plaintiffs' approach here.

13    And Ms. Ragsdale's mischaracterized the negotiation

14    process.

14:59:16  15    What we said during negotiations was if you can

16    demonstrate a specific set of RFPs for which you believe

17    Ms. Mackin and Mr. Stone truly possess unique information,

18    we'll take under advisement.  They've hung their hat on the

19    60-some-odd requests that they want from those two

14:59:36  20    individuals.

21    There is no justification for making us add these

22    two individuals for 40 percent of the RFPs.  And our concern

23    is we have to draw the line in the sand somewhere.  We feel

24    like we've taken a reasonable approach.  The volumes are

14:59:50  25    already enormous.  And discovery has got to end somewhere.

1    And these certainly -- these two certainly should not fall

2    into the fold.

3                    THE COURT:  All right.  Thank you.  All

4    right.

15:00:00  5            The next item on the agenda is Blue Cross Blue

6    Shield Association's motion to limit the time frames under

7    which document production is to be searched; that is, to

8    limit the time that they are required to search for

9    responsive documents.

15:00:20  10                   MS. WEST:  Ms. Cottrell will address that,

11   Your Honor.

12                   THE COURT:  Good afternoon.

13                   MS. COTTRELL:  Good afternoon, Your Honor.

14           As this Court is aware, we have been working through

15:00:30  15   what I'll call threshold discovery issues with plaintiffs for

16   sometime now.

17           These are those issues that have to be decided

18   before we can get to the real work:  Processing all that

19   data; putting it in our tar engine; and, finally, reviewing

15:00:40  20   it and actually producing it to plaintiffs.

21           At the last hearing, in an effort to bring all these

22   issues to a close, we proposed that we spend a few weeks

23   working them out with plaintiffs, but if we couldn't, we

24   would bring them to Your Honor today.

15:00:56  25           We've made progress, in large part because we've

1    agreed to give a lot of documents from a long period of time.

2         On historical RFPs, plaintiffs served 61 RFPs that

3    relate primarily to key historical events in their complaint.

4    We've agreed to go back and search our historical files from

15:01:20  5    any time period.  All the way back to the 1930s, if we need

6    to.  So those are off the table.

7         On structured data, Mr. Ragsdale referenced this

8    already.  They've asked for structured data from 1995 up

9    through 2015.  We've agreed to give them structured data from

15:01:36  10   a 20-year time period.

11        There are other concessions, as well.  The upshot is

12   that we will be producing billions -- I had to double check

13   this number.  Billions, with a B, of rows of structured data.

14   And our IT vendor estimates that we're going to have to

15:01:52  15   process for review 33 million pages of unstructured data.

16        So that's what we've already agreed to do.  Those

17   issues are resolved.

18        But there is one threshold issue that remains in

19   dispute.  I call them the bookends.  On the unstructured

15:02:10  20   data, the start date for 80 RFPs -- so it's not for all RFPs,

21   because we come to an agreement, like I mentioned, on those

22   historical.  But there are 80 that concern primarily our

23   ongoing business operations.

24        We also dispute over the end date.  Now, the end

15:02:28  25   date is for all 159 unstructured RFPs.  The parties agree

that there needs to be a reasonable start date and an end

date.  We just disagree over what they should be.  We propose

a start date of 2005.  That's two years before the statute of

limitations period.  Plaintiffs propose a start date of 1995,

12 years before the start of that period.

As for an end date, we propose 2012, the date of the

filing of the original complaint.  And plaintiffs?  Up

through 2015.

If we implement plaintiffs' proposal, their sweeping

20-year proposal, our IT vendor estimates that 33 million

pages we're processing for review is going to skyrocket to

20 -- to 55 million pages.

Now, I want to pause here and highlight the fact

that this is not new information to plaintiffs.  I know in

their brief they talk about how they're willing to continue

meeting and conferring but that they need information

justifying our burden.

On November 10th, I flew to Alabama and met with

plaintiffs in person.  And I sat across from them to say, I

hear you.  I hear you on what you want.  But I'm telling you:

Our vendor is telling me that the data skyrockets by 40

percent if we don't impose a reasonable end date.  If we go

to 2015, we're going to be dealing with millions upon

millions of additional pages.

I then wrote them a letter on November 17th and

1    said, in writing, we're seeing an increase of about 40

2    percent, on average.

3                    THE COURT:  Do I understand that as far as

4    going backward and looking for the time period from 1995 to

15:04:16  5    2005, if that's added into the pot, that really only adds

6    about four million pages?

7                    MS. COTTRELL:  That's exactly right.

8                    THE COURT:  It's really the later

9    information that generates the huge bulk of the additional

15:04:30 10    pages that have to be analyzed?

11                    MS. COTTRELL:  I think there are two

12    burden concerns.  One is that on the end date, you're right.

13    When we're talking about the bulk of these documents, the 24

14    million, that's the 2012 to 2015 time period.

15:04:42 15            On the start end, the 1995 up through 2005, that's

16    about four million pages.  Again, these are estimates,

17    because we're really dealing in terabytes.

18                    THE COURT:  Sure.

19                    MS. COTTRELL:  But there's an additional

15:04:56 20    burden problem with respect to those documents.

21            What we're hearing from our vendor -- and they

22    haven't yet been processed, so this is based on their

23    experience --

24                    THE COURT:  You may have access problems,

15:05:04 25    too.  Accessibility, format problems.

```
 1                    MS. COTTRELL:  Right.  I'm not saying all,
 2          but our vendor is saying, look.  The older the data, legacy
 3          data, we're in, you know, Windows 98.  We're dealing with
 4          Word Perfect applications.  It is a different world.  And so
15:05:16  5 pulling those may lead to difficulties on that side.
 6                    THE COURT:  We couldn't dial our phone
 7          today.
 8                    MS. COTTRELL:  Fair point.
 9                 Unless Your Honor wants to spend more on the start
15:05:30 10 date, I was going to turn back to the end date.
11                 So as I mentioned, we've pulled documents now from
12          25 custodians.  That leads to two terabytes.  The 33 million,
13          again, is from 2005 to 2012.  And we go an additional 24
14          million pages -- again an estimate -- if we add this other
15:05:48 15 time period.
16                 The reason for that is the way documents are stored.
17          So the closer in time you are to the present, if you look at
18          my email inbox or anyone's inbox, you're going to get more
19          documents the closer you are to current.
15:06:00 20                 We've gone to plaintiffs, and we've told them about
21          this issue.  And we've asked them, why do you really need the
22          post 2012 documents?  Why are they so important?  Can we work
23          out a deal where we factor in what you want and work out a
24          compromise?
15:06:18 25                 We've consistently heard three things:  We need them
```

1      because we allege an ongoing conspiracy and we have an

2      injunction claim.  We need them because we have a damages

3      class up through the present.  And we need them because there

4      just could be things we don't know about right now but they

15:06:30  5   could become important later on.  And we want to be able to

6      insure our rights to get that information.

7               So we crafted a compromise in response to that.  We

8      said, okay.  On ongoing conspiracy, this is not a case where

9      we call it, you know, a game of Clue.  We do not need to sift

15:06:48  10  through millions of pages to figure out was there an

11     agreement and, if so, what was it.  It's out in the open.

12     It's in the license agreements.

13              So we told plaintiffs, we'll give you the license

14     agreements and the membership standards that contain the

15:07:00  15  restraints at issue up through the present.

16              On the damages point, we also worked out an

17     agreement.  We said, if you are able to certify a damages

18     class or a settlement class, we'll give you the structured

19     data you need to make up those classes and show damages.

15:07:18  20           On the final point, this case has been pending for

21     some time.  Three years.  And plaintiff should know if there

22     are documents post 2012 that are relevant to their case.  And

23     they should be able to tell us right now what those key

24     documents are.

15:07:34  25           If there are new issues that come up, for example,

          1    the Anthem-Cigna merger, we're willing to entertain targeted
          2    requests where good cause can be shown.
          3         What we're seeing in the caselaw is that the default
          4    end date is the filing of the complaint.  And we don't see
15:07:50  5    any reason to deviate from that here.  We think our proposal
          6    with those carve outs to the present, along with the 2012 end
          7    date, makes a lot of sense.  Especially in light of the huge
          8    burden.
          9         THE COURT:  You say the standard discovery
15:08:04 10    situation.  And I recognize this is not a standard case.  But
         11    the standard, run of the mill federal lawsuit that -- the
         12    standard for discovery is that the end date should be the
         13    filing of the complaint -- there's not a requirement of
         14    supplementation of ongoing discovery even after the -- during
15:08:24 15    the pendency of the lawsuit?
         16         MS. COTTRELL:  So I would say the
         17    standard, under the caselaw, is a reasonable ending.  But
         18    what we see in the cases that we've cited, *RF Properties*;
         19    *U.S. V. King*; *In re Ready-Mixed*; and *Heartland Surgical* --
15:08:36 20    what we're seeing is that, oftentimes, what is a reasonable
         21    date coincides with the filing of the complaint.  In terms of
         22    an ongoing conspiracy charge in both *RF Properties* and *U.S.*
         23    *King*, there was an ongoing misconduct.  And the Court still
         24    said an end date of the filing of the complaint is reasonable
15:08:56 25    and makes sense.

1    Unless there's other questions on the end date, I
2    will turn back now to the start date.
3         THE COURT:  Sure.
4         MS. COTTRELL:  So in terms of the start
15:09:06  5    date, again, plaintiffs want 1995 for those 80 RFPs I
6    mentioned that generally concern business operations.  We're
7    proposing two years before the start of the statute of
8    limitations period.  2005.

9         Again, we think this is consistent with what we see
15:09:22 10    in the caselaw.  Generally, Courts say it should be limited
11    to the statute of limitations period.  And sometimes, you may
12    go back a year -- the year or two before that.

13         When you look at the RFPs at issue, it doesn't make
14    a lot of sense to go all the way back to 1995.  So for
15:09:40 15    example, plaintiffs are requesting documents regarding plans'
16    reimbursement methodologies or setting of reimbursement
17    rates.

18         How plans set reimbursement rates in 1995 doesn't
19    have a lot of relevance to the case.  The question is how are
15:09:58 20    they set during the class period.  What would they be in the
21    but-for world.

22         They seek documents relating to procedures for
23    claims administration and payment of provider claims.  Again,
24    how providers were paid 20 years ago with technology from 20
15:10:12 25    years ago doesn't seem that relevant to the core issues.

1      They seek information on our policies and procedures

2  concerning financial reporting.  How we recognized revenues

3  in 1998, you know, not a core issue.  I think they're more

4  interested in how to interpret our financial information, you

15:10:34  5  know, during the class period.

6      The requests also seek information relating to how

7  fee schedules are set, provider cost metrics, provider

8  quality data.  So provider quality information from the 90s

9  up through '05.  How reserves were set -- again, this would

15:10:48 10  be under different regulations from decades earlier.  How old

11  admin fees were set.

12      We're agreeing to give this information.  We're just

13  saying it should be limited to '05 to 2012.  We don't see the

14  justification or the relevance, really, of going back in time

15:11:06 15  two decades.

16      Now, we touched briefly on the burden argument

17  before.  The relevance here we really think is tangential.

18  There are at least four million pages.  And that's just

19  electronic documents, Your Honor.  We didn't factor in any

15:11:22 20  paper documents from that time period.

21      But there are also other burdens that are unknown.

22  Once we get in, dealing with legacy data, problems that are

23  going to sidetrack us.

24      As Your Honor knows, we have a tight timeline.  We

15:11:36 25  are committed to meeting the Court's deadlines.  We have a

1    lot to do.  And we've already agreed to give billions of rows

2    of structured data.  We're reviewing tens of millions of

3    pages of unstructured data.  We just think that the

4    reasonable end date of two years before the start of the

15:11:50  5    statute of limitations period up through the filing of the

6    complaint is sufficient in this case.

7              Unless there are any questions --

8                      THE COURT:  Well, when y'all set the

9    timeframes of 1995 to 2005, surely y'all recognized the

15:12:04 10    cutting-of-the-baby compromise at that, right?  I mean -- and

11    I'm not saying that this is what I will do or should do, but

12    I mean, that ten-year difference sort of says the easy

13    compromise here is to just put it in 2000.  Something like

14    that.  Is there -- is there some thought given to that?

15:12:28 15                      MS. COTTRELL:  In terms of our discussions

16    with plaintiffs?

17                      THE COURT:  Yes.

18                      MS. COTTRELL:  So we've talked with

19    plaintiffs about whether or not they'd compromise on this pre

15:12:32 20    time period.  And it's really -- we've heard nothing from

21    plaintiffs.  No wiggle room or movement, really, on these

22    RFPs other than I will say we started with 159.  61 we agreed

23    to give unlimited.  There were 20 -- only 20, but there were

24    20 that plaintiffs said they could accept an '05 or an '08

15:12:50 25    start date.  Other than that, for this 80, we haven't talked

1    about the splitting-the-baby option.

2            I will say, just given the way electronic documents

3    are stored, I don't know how much that would help us.  I

4    think that we are going to see legacy problems when you go

15:13:06  5    back to 2000 --

6                    THE COURT:  Sure.

7                    MS. COTTRELL:  -- for that five-year time

8    period.  And I think the bulk of that four million is

9    actually from the early 2000s time period.

15:13:16  10                    THE COURT:  Is there some -- and I don't

11   mean to use a pejorative, like, magic about 2005, but was

12   there some kind of technology change or server change or

13   software change or something that makes 2005 an appropriate

14   cutoff date of some sort?

15:13:38  15                    MS. COTTRELL:  So I don't want to misspeak

16   on the technology.  There's nothing that I am aware of today.

17   Doesn't mean it doesn't exist.

18                    THE COURT:  Right.

19                    MS. COTTRELL:  The 2005 thinking was

15:13:46  20   really the statute of limitations period here is 2007.  And

21   that was our original proposal.  So we moved off that '07

22   proposal and went back to 2005.  Because what we're seeing is

23   that a lot of cases limit it to the statute of limitations

24   period, but some, when there's reasons, will go back a couple

15:14:04  25   of years.  So that was our compromised proposal.

1          I'll also just add that the real compromise on our

2     part I think was agreeing to go back an unlimited time period

3     for those historical RFPs.

4          I mean, we're giving them -- you know, where a

15:14:18  5     document request is focused on a historical event, we're

6     giving it to them.  We're giving it to them.

7          You know, on this structured data, they really made

8     a push for that.  We're giving it to them.

9          But when it comes to these where it's hard for us to

15:14:28  10    see the rationale for going back earlier in time -- I just --

11    I read the requests and I struggle with it.  And there is a

12    burden associated there.  In light of those other significant

13    concessions we already made on time period, you know, we're

14    already going back to the 1930s and up to 2015 in some cases.

15:14:44  15    It just feels like this -- these particular requests should

16    be narrowed to that time period.

17              THE COURT:  All right.  Thank you.

18          Mr. Ragsdale?

19              MR. RAGSDALE:  Thank you, Your Honor.

15:15:00  20    I'm going to make some preliminary comments.  And

21    then Mr. Butterfield is going to present the argument.

22          Let me first say we were frankly surprised that the

23    defendants' response was a motion that was filed on Thursday.

24    It does not comply with this Court's order regarding

15:15:20  25    submission of discovery motions.  Not filed 14 days before.

1    We just reached an agreement on that; that motions had to be

2    filed 14 days before the conference here.  And this does not.

3    And there was no discussion about filing a formal motion at

4    this time.

15:15:36  5          I went back and looked at the transcript of our last

6    hearing.  We talked about competing proposals.  That's why

7    ours came in the form of a letter, as we had done previously,

8    not in the form of a formal motion.

9              THE COURT:  Do you feel like you've had an

15:15:50  10   adequate opportunity to respond to it?  And if you don't, I'm

11   certainly happy to -- I want everybody to have their full say

12   about these things.

13             MR. RAGSDALE:  Fortunately, we've put a

14   little thought into that response.  And we certainly are

15:16:02  15   prepared to argue.  And we don't want this delayed another

16   month for that to be done.  What we would ask is that,

17   pursuant to the order that was entered, amending discovery

18   order Number 1 that we have the opportunity to present a

19   written response to the motion.  And we would ask that we be

15:16:18  20   allowed to have until Monday to do that.

21             THE COURT:  All right.

22             MR. RAGSDALE:  And of course, pursuant to

23   the order that was entered, there's no reply.  So that will

24   be submitted to you by Monday, if that is acceptable.

15:16:28  25             THE COURT:  That's fine.

1          MR. RAGSDALE:  But we do intend to proceed

2    to argue the motion.

3          Some of the information that we got on Thursday was

4    new to us.  We certainly had not seen the affidavit of

15:16:40  5    Mr. Ackert previously.  Some of that information was

6    expanding on things that had been represented to us by

7    counsel.  So we do feel like we need the opportunity to make

8    a written response.

9          I think, as Mr. Butterfield is going to point out,

15:16:52 10    as well, some of the accessibility aspects of the objection

11    we, frankly, had not heard before or had an opportunity to

12    address.

13          As I said, Mr. Butterfield is going to address the

14    substance of those things.  But with that understanding, we

15:17:08 15    will provide a written response.

16              THE COURT:  We certainly will wait to get

17    a response on Monday, then.  Great.

18          Mr. Butterfield?

19              MR. BUTTERFIELD:  Good afternoon, Your

15:17:24 20    Honor.

21              THE COURT:  Good afternoon.

22              MR. BUTTERFIELD:  I do agree with

23    Ms. Cottrell that it is useful to think of this issue in

24    terms of bookends.  So there's a period that goes before

15:17:40 25    2005, and then there's a period that goes after 2012.

1          And let me just say that, in general, you know,

2     the -- you know, motion itself in my readings -- it basically

3     says we're asking for a lot of stuff here and the post 2012

4     material dramatically increases the amount of production.

15:18:12  5     That's a given.  It's not a revelation, Your Honor, that, you

6     know, the later in time one goes in discovery issues, the

7     more ESI you're going to have because ESI does increase

8     exponentially.

9          And while the motion cites the new text of Rule

15:18:34 10     26(B)(1) which adds proportionality to the scope of

11     discovery, it doesn't really address proportionality.  It

12     talks in terms of burden, burden, burden, burden.  But that's

13     not the same, Your Honor, as proportionality.

14          So what I see in the motion is that it conflates the

15:18:54 15     concepts of proportionality, relevance, and accessibility.

16     And I want to unpack that a little bit today.

17          So in terms of relevance, I don't see anything new

18     in the motion, Your Honor.  We've talked about the relevance.

19     And we've filed motions.  We've argued here about why the

15:19:22 20     pre-2005 material is relevant.  I don't intend to repeat that

21     today.  We will address it, you know, in what we file after

22     this if you think there are questions there.

23          But -- and in terms of the accessibility of that

24     material, it's up to the defendants to raise the 26(B)(2)(b)

15:19:46 25     motion.  They haven't.  So we have asked them from Day 1:  If

you think that anything that you have is inaccessible, tell
us and we'll talk about that.

And until we saw this motion -- and the motion only
talks in terms of general -- in general terms about
accessibility.  We're all ears.  If they want to say, you
know, this -- we have Word Perfect documents or we have this
information in a place that's legacy data, we will talk about
that.  We will -- we're happy to address that.

But this is not the proper way to raise
accessibility issues.  That's raised in a Rule 26(B)(2)(b)
motion.  That is their burden to raise them, to tell us and
the Court what they deem inaccessible and what they do not
intend to search for because it is inaccessible.  And they
owe us an explanation and they owe the Court an explanation
as to why it's inaccessible and what the cost of recovery or
production would be.  They haven't done those things.

So the fact that -- eluding to -- you know, eluding
to the fact that there may be issues with respect to that
older data, again, is not a revelation.  We remain open to
talking with them about that.  And we remain open to seeing a
Rule 26(B)(2)(b) motion if it's properly filed.

With respect to the later material, you know, I
looked closely at Mr. Ackert's affidavit.  And what I learned
is -- so the total ESI collected, to date, is a little over
two terabytes.  But -- this is a big but -- that information

1    hasn't been processed.  So it hasn't been filtered for dates,

2    hasn't been de-duped.  And we've learned from Mr. Ragsdale

3    what that means.  It hasn't been deNisted.  What that means

4    is they haven't removed, like, program files that are not

15:21:56   5    relevant to this.  And so -- and it hasn't been subject to

6    email threading.

7          So once that happens, according to their own expert,

8    that's going to cut in half the volume of that information.

9    So it will be down to one terabyte.

15:22:14  10          Your Honor, this is a big case.  Like others in the

11    room, we litigate big cases.  A terabyte -- I don't want -- I

12    don't want to make light of it.  A terabyte is a lot of

13    information.  Okay?  And I -- and it's -- and we all know ESI

14    is expensive.  And I don't sit here and deny it.  But in a

15:22:34  15    case like this, is a terabyte a lot of information?  In my

16    experience, Your Honor, no.  It's not.

17                    THE COURT:  Kind of like the old

18    prisoner's joke.  You can do a terabyte standing on your

19    head.

15:22:46  20                    MR. BUTTERFIELD:  And I know they can.

21    I'm confident they can.

22          So and as you correctly pointed out, Your Honor,

23    it -- what they said in that affidavit cuts both ways because

24    what they've demonstrated is the burden, as they use it, in

15:23:04  25    producing that older data really isn't there.  There's not

1    that much there to produce.

2          So if there is a burden, it's going to be an

3    accessibility burden.  They have to tell us what that is, and

4    we have to address it.  With respect -- but -- so, you know,

15:23:20  5    what is glaringly missing from the motion is, although they

6    use the word, "burden," and although they cite Rule 26(B)(1),

7    they don't actually go to the proportionality factors.

8    There's five factors there.  And I submit to you they don't

9    go through them because they all cut against them.

15:23:44  10          There's significant issues at stake in this case.

11    There's -- it's no revelation that there's well over a

12    billion dollars that we're litigating about.

13          There's a new factor called the relative access to

14    relevant information.  And when the rules committee came out

15:24:00  15    with that, everybody was scratching their head.  Well, what

16    that means, Your Honor, is that in asymmetrical cases, one

17    side has the information; one side bears a greater burden to

18    produce that information.  But that's not -- there's nothing

19    wrong with that.  And the rules committee said so.

15:24:18  20          So -- and all of -- I submit that all of the factors

21    in Rule 26(B)(1), if you look at those and weigh those

22    factors, is the production of this information -- and while

23    it involves a burden -- I don't -- you know, it involves --

24    any ESI of this magnitude involves a burden, but is it

15:24:38  25    proportional to this case?  I submit it is.

1          So we submit -- as far as why we need the newer

2     information, I mean, this is -- Ms. Cottrell summarized what

3     we've said in meet and confers.  But this is -- you know,

4     this is a claim for injunctive relief.  It's a claim

15:25:00 5     involving ongoing conduct.

6          And the fact that we filed the case a few years ago

7     doesn't mean that that conduct is not ongoing.  And it

8     doesn't make less relevant what has happened since we filed

9     the complaint.

15:25:10 10          So I -- other than the fact that there's a lot of

11     information and, according to BCBSA, that causes a burden

12     really doesn't -- really doesn't address whether or not the

13     information is relevant and whether or not it is proportional

14     to this case.

15:25:32 15          We submit it is both relevant and proportional and

16     it should be produced.

17                    THE COURT:  Ms. Cottrell makes the

18     argument, though, that insofar as the injunctive relief claim

19     is concerned, whether or not there is some kind of

15:25:46 20     anticompetitive effect in the membership association, the

21     membership agreements, all of that -- that's all there in the

22     papers anyway, but there's nothing, really, in the last

23     couple of years that's going to change any of that.

24          So she's raising the point that the discovery period

15:26:04 25     from February of '12 up through today is not going to add

significant new information about the business model, about

whatever the membership agreements say and that sort of

thing.

And then insofar as a damage claim for ongoing

15:26:24   damages for anticompetitive effects after the filing of the

lawsuit from February of '12 to date, she's saying that the

structured data, as opposed to unstructured data, can supply

that information.

What do you say to that?

15:26:40   MR. BUTTERFIELD:  Well, Your Honor, I

think, you know, we will -- we will -- I think it's better

addressed in the papers, frankly.  And I think we would like

to do that.  But we have indicated in numerous meet and

confers why we think that, you know, there's a need for

15:26:56   ongoing unstructured data.  And I think probably it's best

addressed in the papers.

But there are -- there is -- you know, there

continue to be market analyses.  There continue to be things

that we've requested in discovery that show the impact of the

15:27:14   structure that's been put in place by the defendants.  And

those --

THE COURT:  Conceivably --  and I'm

dubious that you'll find this, but conceivably, there could

be some market study done by Blue Cross Association that

15:27:26   says, oh my word.  Look at the anticompetitive effect our

1    business model has.

2                    MR. BUTTERFIELD:  And it's hard for us,

3    Your Honor, to point to documents we haven't seen.

4                    THE COURT:  Sure.  Sure.

15:27:38  5                    MR. BUTTERFIELD:  So, you know, we -- you

6    know, we have put forward a series of documentary requests.

7    And, you know, we believe that -- them to be relevant.  And

8    that hasn't really been an issue in the court.

9         So if they were relevant in 2011, that doesn't make

15:27:56 10   them less relevant in 2012.  But we will -- you know, in our

11   papers, we will explain a little more about -- in answer to

12   your question.

13         I do want to say one thing.  I did learn in the

14   affidavit -- we have been asking in meet and confers, okay.

15:28:10 15  When did you collect this information?  Because we were --

16   you know, we threw out a date as far as an end date.  But we

17   realized that, you know, once information is collected, it's

18   going to be difficult to collect it again.

19         So we did see more information about that in

15:28:30 20  Mr. Ackert's affidavit.  And knowing that information -- what

21   I proposed, Your Honor, in a meet and confer was for them to

22   give us a schedule, a custodian by custodian -- when was your

23   collection complete on this custodian.  That would make it

24   easier for us to objectively reach an end date with the

15:28:52 25  proviso that there may be a need to go back much later in the

1   case on good cause and ask them to collect new information.

2           But for the time being, you know, if they can give

3   us that kind of information, I think we could probably get

4   there as far as coming up with an end date.

15:29:10  5           And it's interesting, Your Honor, that they've

6   collected this information, according to Mr. Ackert's

7   affidavit, all the way into the summer of 2015.  So it's been

8   collected.  It just has to be processed and reviewed and

9   produced.  I understand that there's some burden with that.

15:29:26  10  But they've gone through the trouble to collect this

11  information.

12          And we -- you know, for the reasons we've submitted

13  already and we will submit in the papers, we think it's

14  relevant and we think it's more than proportional to the

15:29:40  15  issues at stake and the other factors that go with Rule

16  26(B)(2)(1).

17          THE COURT:  I have generally said that the

18  request for production documents seem to me to be relevant to

19  issues in the lawsuit.  But I want to be clear about that;

15:29:58  20  that the time frame that you're talking about may impact the

21  relevance of particular -- not generally all of them but

22  particular requests for production.

23          For example, if you're asking about the methodology

24  by which some accounting occurs, it seems to me that it's

15:30:20  25  much more relevant to ask that in 2010 than it would be in

1   1995.  But, now, y'all understand your case far better than I

2   do.  So you may need to explain to me why certain requests

3   for production, going back to 1995, would still be relevant.

4           I mean, I don't want to mislead everybody to believe

15:30:42 5   that I have entirely foreclosed the question about whether

6   every particular request for production is relevant for every

7   time frame.

8           It may well be that on a request-by-request basis,

9   there are some that are relevant to 1995 and there are

15:31:00 10   others, it strikes me, that they're not relevant to 1995.

11          And going back to what I had previously asked the

12   parties to do is to group those requests into particular time

13   frames.  That didn't seem to work as well as I had hoped it

14   would when I asked for it.  But that was the thought behind

15:31:22 15   that is that there are certain requests that make sense and

16   make relevant sense, even back to 1995.  There may be others

17   that do not make sense to me back to 1995.

18                   MR. BUTTERFIELD:  And Your Honor, the

19   parties have engaged in a lot of that dialog.  And, as

15:31:40 20   Ms. Cottrell indicated, there's been agreement that some

21   documents go back, you know, historically before 1995.

22                   THE COURT:  Sure.  Decades.

23                   MR. BUTTERFIELD:  But there's also been

24   discussion on a document-request-by-document-request basis

15:31:56 25   and, as Ms. Cottrell said, there have been agreements to 20

1    requests not to go back to 1995.  So we have engaged in some

2    of that analysis.  That doesn't mean that we won't continue

3    to do it.  But, you know, we note your concern there, Your

4    Honor.

15:32:12  5                        THE COURT:  All right.  Thank you.

6                        MR. BUTTERFIELD:  Thank you, Your Honor.

7                        THE COURT:  Ms. Cottrell?

8                        MS. COTTRELL:  Your Honor, in terms of an

9    additional filing by plaintiffs, we obviously have no

15:32:30  10   objection to that.

11             We will say this is a critical threshold issue that

12   we need decided soon so that we can load everything into our

13   tar engine and begin the review here.  Every day that we

14   don't have an answer on this, it further delays our

15:32:44  15   processing which is why we raised it with Your Honor.

16             On the new Rule 26, Mr. Butterfield highlighted a

17   few factors, but he also left out a couple factors; namely,

18   the importance of the discovery being sought in resolving the

19   issues and whether the burden or expense outweighs its likely

15:33:08  20   benefit.

21             When we think about these RFPs, especially when we

22   think about these 80 RFPs, going back to 1995 up to 2005, it

23   is difficult to see how they are important to resolving the

24   issues in the case.

15:33:20  25             How we set reimbursement rates in 1998, how we paid

1    providers in 1999, what right or quality metrics were in 2000

2    just don't relate.

3            And I haven't heard from plaintiffs in any of the

4    meet and confers -- I'll tell you I talk to them sometimes

15:33:34  5    almost daily.  I haven't heard from them in any of the meet

6    and confers why these are relevant.

7            They didn't go through the process, as you

8    requested, of grouping these RFPs by time period and telling

9    us for those time periods why are they relevant.  They don't

15:33:48  10    do anything in their brief about why they are relevant.  And

11    today, Mr. Butterfield also punted on that question and said,

12    we'll address that in our motion.

13            The reason is because they have difficulty

14    articulating how these particular RFPs that go to our

15:34:02  15    business and how our business is run, really, need to go back

16    in time.  The historical RFPs we've already agreed to give.

17            Now, Your Honor, we have reached agreement on the

18    scope of the RFPs because, as they were originally drafted,

19    some were broad.  Some were hard for us to understand.  So

15:34:20  20    we've gone back and forth.  And that is one area where we've

21    reached agreement.  And I have a chart here that summarizes

22    our correspondence back and forth and what the current state

23    of play is of how that RFP should be interpreted.

24            And if I may approach, I'd like to give Your Honor a

15:34:36  25    copy of that.

1                    THE COURT:  Sure.  That's fine.

2                    MS. COTTRELL:  The bottom line here, Your

3    Honor, is that plaintiffs spent a lot of time talking about

4    how this is a big case, about how a terabyte of data, which,

15:35:02  5    again, equates to 60 million pages of unstructured data for

6    review, isn't a lot of information in a big case.  But they

7    don't spend a lot of time talking about how the RFPs for

8    these bookends and why these RFPs on these bookends matter in

9    this case.  The reason they avoid that issue is because they

15:35:22 10    aren't that relevant.

11         We've shown that the burden is immense.

12    Particularly early with the post 2012 documents, it's huge.

13    And we have a tight schedule to meet in this case.  We're

14    doing literally everything in our power to meet that

15:35:36 15    schedule.  We have all hands on deck, pulling data,

16    collecting data.  But it's going to take us a long time.

17         To suggest somehow that adding another 24 million

18    pages in this one-year period isn't going to be a huge burden

19    on us that could significantly delay discovery in this case

15:35:56 20    is just not reasonable.

21         At the end of the day, we've agreed to give

22    historical documents for an unlimited period; billions of

23    rows of structured data from our system from a 20-year time

24    period; information from 25 production custodians in response

15:36:12 25    to 150 document requests.

1          We've given them a sufficient amount of information

2     for a case of this size.  More than enough information for a

3     case of this size.

4          Mr. Butterfield made the point that he wants to know

15:36:24  5     the date of collection in 2015 because if we've collected on

6     that date, there can't be an additional burden on us of

7     having now to process that data and review it.

8          That entirely ignores the burden.  The burden is not

9     in collecting the data.  The burden is in processing it.

15:36:40 10     Adding it to our tar engine and then reviewing all of those

11     millions of additional pages for confidentiality, privilege,

12     and responsiveness.

13          That's where the burden comes in.  Not only from a

14     cost perspective but also from a time perspective.

15:36:56 15          And just the practical consideration here is that

16     we've already given a lot of data.  We have a very short

17     discovery time period.  And we just don't have time to focus

18     on tangential issues.

19          Unless Your Honor has any other questions --

15:37:12 20               THE COURT:  No.  Thank you.  All right.

21          Mr. Butterfield, anything else?

22               MR. BUTTERFIELD:  Your Honor, I have

23     nothing further.  Thank you.

24               THE COURT:  Thank you.

15:37:24 25          The final matter that I have on the agenda this

```
 1    afternoon is the joint notice of agreement to amend discovery

 2    order Number 1.  And I've read that.  And as I understand it,

 3    basically, it's just an extension of deadlines for coming up

 4    with supplemental custodian lists.

 5           Mr. Ragsdale, do you want to educate me about it?

 6                   MR. RAGSDALE:  Not particularly.  But I

 7    will -- I think that's correct.  That is the analysis.

 8           We had gotten together and discussed the fact that

 9    that deadline was approaching and thought it made sense to

10    extend that.  And we were able to reach that agreement which

11    all sides agree to.

12                   THE COURT:  All right.  Nobody has any

13    problem, then, with proposed order that's been submitted with

14    the motion?  I can just go ahead and enter that, Ms. West?

15                   MS. WEST:  I think that's right, Your

16    Honor.

17                   THE COURT:  All right.  Anyone else have a

18    comment about that just to make sure?  Anyone out in the

19    ether?

20                   MR. RAGSDALE:  The only other point -- and

21    I don't know if you're at the end of your agenda, but I had a

22    question about obviously we have a discovery conference and a

23    status conference coming up on January 14th both with you and

24    then with Judge Proctor.

25           And my question was:  Does that take the place of
```

Timestamps:
15:37:42 (line 5)
15:37:58 (line 10)
15:38:12 (line 15)
15:38:24 (line 20)
15:38:40 (line 25)

1    the normally, regularly-scheduled discovery conference that

2    we would have later in January?

3                      THE COURT:  That would be my anticipation.

4            Anyone have any questions about that or problem with

15:38:58  5    that?

6                      MS. WEST:  Your Honor, if I might.

7                      THE COURT:  Yes.

8                      MS. WEST:  Since we're not going to see

9    you again until January, I'm sure I speak for all parties in

15:39:08  10   wishing you a -- and your staff a very happy holiday season.

11                     THE COURT:  Thank you.  Thank you.  I

12   appreciate that.

13          And I will certainly keep in mind Ms. Cottrell's

14   remarks that I need to get to this bookend issue as quickly

15:39:22  15   as possible.

16                     MS. COTTRELL:  Taking into account your

17   holiday, of course.

18                     THE COURT:  So I will try to commit to get

19   that to you as quickly as possible after I get the

15:39:30  20   plaintiffs' response on Monday.

21          Any other matters that we need to take up this

22   afternoon, then?

23          Mr. Ragsdale?

24                     MR. RAGSDALE:  None for plaintiff.

15:39:38  25                     THE COURT:  Ms. West, anything else?

1                    MS. WEST:  None from the defendants, Your

2      Honor.

3                    THE COURT:  All right.  Thank y'all very

4      much.  I wish all of you a very happy holiday, as well.

15:39:48  5    Thank you.

6                    (The Proceedings were concluded at

7      approximately 3:39 p.m. on December 12, 2015.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

15:41:38  25

1

2                    C E R T I F I C A T E

3

4

5          I, the undersigned, hereby certify that the

6   foregoing pages contain a true and correct transcript of the

7   aforementioned proceedings as is hereinabove set out, as the

8   same was taken down by me in stenotype and later transcribed

9   utilizing computer-aided transcription.

10         This is the 18th day of December of 2015.

11

                    _Cheryl K Powell_

13   _____

14              Cheryl Renae King Powell, CCR, RPR, FCRR

15              Federal Certified Realtime Reporter

16

17

18

19

20

21

22

23

24

25