FILED

2016 Oct-20  PM 04:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406) | ) ) ) ) ) ) | **Master File No. 2:13-CV-20000-RDP**  **This document relates to the Provider Track.** |

## MEMORANDUM OPINION

This matter is before the court on the Motion for Summary Judgment filed by Defendants National Account Service Company, LLC ("NASCO") and Consortium Health Plans, Inc. ("CHP"). (Doc. # 658). NASCO and CHP argue that they are entitled to summary judgment because Provider Plaintiffs[1] have failed to present evidence showing that there is a genuine factual dispute on two issues: (1) whether NASCO or CHP is an instrumentality to the alleged conspiracies between Blue Cross/Blue Shield insurance plans (collectively referred to as "Blue Plans") and the Blue Cross Blue Shield Association of America ("BCBSA"); and (2) whether NASCO or CHP has consciously committed to the alleged conspiracies between the Blue Plans and BCBSA.

## I.    Background

In the big picture, the parties' litigation over this particular motion for summary judgment may be seen as merely a skirmish in this mammoth multidistrict litigation. The court's ruling will not substantially affect the litigation landscape.[2] Nevertheless, the court understands this: the motion is very important to both NASCO and CHP who, based on the claims in the

---

[1] For ease of reference, this opinion refers to Provider Plaintiffs as "Plaintiffs."

[2] Importantly, the court notes that both NASCO and CHP have explicitly refrained from addressing whether Plaintiffs have shown anticompetitive conduct by the other Defendants. (Doc. # 658, Brief in Support of NASCO's and CHP's Motion for Summary Judgment at 14 n. 6).

Complaint, face the prospect of joint and several liability on claims seeking significant damages, costs, and attorney's fees.  Accordingly, the court has given its full consideration to the briefs and evidence presented by the parties.  After careful review, and for the reasons explained below, the court concludes that NASCO and CHP are entitled to summary judgment on all of Plaintiffs' Section 1 and Section 2 conspiracy claims.

## II.   The Rule 56 Evidence and the Undisputed Facts[3]

### A.  Procedural History

In the Second Amended Provider Complaint, Plaintiffs allege that, decades ago, the Blue Plans agreed to consolidate geographically.  As a result, by the end of 1985 only one Blue Plan existed in each state.  (Doc. # 236 at ¶ 189).  According to Plaintiffs, by 1987, the Defendants who were then members of BCBSA agreed to operate in exclusive service areas.  (Doc. # 236 at ¶ 190).  BCBSA set rules and regulations for Blue Plans to abide by in the Blue Cross License Agreement and Blue Shield License Agreement (collectively referred to as "Licensing Agreements").  (Doc. # 236 at ¶ 192).  Under the Licensing Agreements, the Blue Plans agreed to not use the Blue Cross and Blue Shield trademarks and tradenames outside a designated service area.  (Doc. # 236, ¶ 196).  Moreover, Plaintiffs allege that Defendants conspired to fix prices for medical providers in geographic service areas by achieving market dominance through their allocation of geographic service areas.  (Doc. # 236 at ¶ 229).   Finally, Plaintiffs contend that the Blue Plans engaged in a horizontal conspiracy in which each refused to deal with (and

---

[3]  The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts that could be established through live testimony at trial.  *See Cox v. Admr. U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994**).**

collectively boycotted) healthcare providers outside of its exclusive geographic area.  (Doc. # 236 at ¶ 229-30).

In the Second Amended Provider Complaint, Plaintiffs also allege that the Blue Plans and BCBSA implemented these conspiracies through NASCO and CHP.  (Doc. # 236 at ¶¶ 238-46). They allege that NASCO is owned by certain Blue Plans and BCBSA, and that it exists to implement the alleged anticompetitive conspiracies among the Blue Plans by (1) ensuring Blue Plans' compliance with BCBSA mandates, (2) providing a forum for them to conduct the conspiracies, and (3) ensuring that the agreements in the conspiracy were implemented.  (Doc. # 236 at ¶¶ 239-40).  With regard to CHP, Plaintiffs assert that CHP implements the conspiracies by providing a forum to "share claims data reflecting provider reimbursements on a nationwide basis."  (Doc. # 236 at ¶ 241).

NASCO and CHP moved to dismiss the claims against them.  (Doc. # 259).  The court denied their motion to dismiss because the Second Amended Complaint presents plausible antitrust conspiracy claims against NASCO and CHP.  (Doc. # 370).  Nevertheless, the court granted expedited discovery to determine the role that NASCO and CHP played in the alleged antitrust conspiracies.  (Doc. # 370).

**B.  Formation of the National Accounts Program**

In 1982, BCBSA proposed a Long-Term Business Strategy.  (Doc. # 689, Ex. 3 at 22). This strategy suggested that all Blue Cross insurance plans and Blue Shield insurance plans should become joint Blue Cross and Blue Shield plans by 1984.  (Doc. # 689, Ex. 3 at 53). Moreover, it proposed that only one Blue Plan should conduct business in a single state, "except where business reasons dictate otherwise, by [the] end of 1985."  (Doc. # 689, Ex. 3 at 54).

BCBSA identified several critical factors for long-term success, including "greater uniformity and consistency of performance for national accounts." (Doc. # 689, Ex. 3 at 41). To improve market performance, BCBSA stated that Control Plans[4] should have full authority to "structure national account syndicates" in order to "retain the present book of business and aid new business."[5] (Doc. # 689, Ex. 3 at 58). It also proposed that Blue Plans "[i]nvestigate the feasibility of establishing a national account marketing company to concentrate on new business acquisition" because selling insurance to national accounts required specialized staff. (Doc. # 689, Ex. 3 at 59). BCBSA and "select Control Plans" intended to prepare a report on sponsorship of the marketing company, ownership, capitalization, and the role of Blue Plans in reserving accounts. (Doc. # 689, Ex. 3 at 59).

In 1992, BCBSA's National Account Marketing Committee recommended that Blue Plans "with a vested interest" in national accounts should create a "voluntary consortium" that would formulate strategies for selling insurance to national accounts, develop relationships with consultants, and "develop expertise in managed care." (Doc. # 689, Ex. 33 at 32). The Marketing Committee also recommended that the Blue Plans in the consortium develop a national pricing strategy. (Doc. # 689, Ex. 33 at 32). It recognized that "national account business is not a sound investment for many [Blue] Plans." (Doc. # 689, Ex. 33 at 36). It suggested that BCBSA maintain authority over membership issues and "use of the name and mark." (Doc. # 689, Ex. 33 at 36).

## C. NASCO

---

[4] A Control Plan is a Blue Plan that controls the geographic area in which a national account is headquartered and enjoys a contractual relationship with that national account. (*See* Doc. # 658, Ex. 1 at 59; Ex. 4 at 40).

[5] According to CHP's Chief Executive Officer, the BCBSA defines a national account as "any account with members headquartered in one service area, members outside a service area, and two hundred fifty or more members or employees. (Doc. # 658, Ex. 5 at 48-49).

NASCO was founded in 1987 as a general partnership between BCBSA and subsidiaries of five specific Blue Plans.  (Doc. # 658, Ex. 1 at 28-30).  NASCO was initially formed to provide "a national account servicing capability for the [Blue Cross Blue Shield] System." (Doc. # 659, Ex. 2 at 3).  NASCO is incorporated as a for-profit corporation, but it seeks to earn a "minimal profit" of approximately $500,000 per year.  (Doc. # 659, Ex. 1 at 121-22). Generally, it uses any additional profits to develop new systems and capabilities for the Blue Plans.  (Doc. # 659, Ex. 1 at 122).

NASCO's executive committee, which is comprised of the Chief Executive Officer of NASCO and a representative from each of its Blue owners, is responsible for the day-to-day business operations of the company.  (Doc. # 658, Ex. 1 at 57, 89).  Among other duties, the executive committee approves the prices charged to NASCO's users for various services.  (Doc. # 658, Ex. 1 at 60-61).

Currently, NASCO provides "back office business functions" exclusively to Blue Plans, including systems that support member enrollment, billing, claims processing, "member and provider servicing," and reporting.  (Doc. # 659, Ex. 1 at 41, 44).  It integrates certain BlueCard software into its claims processing system.[6]  (Doc. # 658, Ex. 1 at 62).

The parties dispute whether NASCO participates in the Blue Plans' process of obtaining discounts from medical providers.  According to NASCO, it is not involved in negotiating contracts with medical providers, negotiating provider discounts, creating provider networks, or negotiating with providers.  (Doc. # 658, Ex. 1 at 290-91).  According to Plaintiffs, NASCO's systems assist Blue Plans in obtaining provider discounts by integrating BlueCard and Blue

---

[6] A representative for NASCO stated that it integrates BlueCard software into its claims processing system because all Blue Plans are required to support the BlueCard system, and NASCO's integration of the software eliminates the need of its members "to do that development work in-house."  (Doc. # 658, Ex. 1 at 96).

software from BCBSA.[7]   (Doc. # 689 at 4-5).   Specifically, Plaintiffs assert that NASCO integrated a Blue feature into its system that allows a Blue Plan to access provider pricing data in the database of another Blue Plan.   (*See* Doc. # 689, Ex. 5 at 1 (stating that a Blue update allowed users "to see another Plan's Formats Database"); Doc. # 689, Ex. 4 at 132-33 (indicating that the Formats Database included "Institutional Line Level Pricing")).   Moreover, Plaintiffs state that NASCO has a "stated purpose[ ] to help Blue Plans secure and increase provider differentials."   (Doc. # 689 at 4).   But, the 1989 report cited by Plaintiffs shows only that NASCO's business plan built on the "Par Plan concept" established by BCBSA and that NASCO endorsed a marketing recommendation to "[s]ecure and increase provider differentials," not that NASCO acted with a purpose of increasing provider differentials.   (Doc. # 689, Ex. 1 at 3, 22, 27).

The parties also dispute whether NASCO is involved in enforcing the exclusive service areas allegedly created by BCBSA.   NASCO avers that it has no involvement in "developing, maintaining, or enforcing plan service areas."   (Doc. # 658, Ex. 1 at 291).   In contrast, Plaintiffs maintain that NASCO complies with BCBSA mandates and has required Control Plans to verify that they have not violated the exclusive service areas created in the license agreement with BCBSA.   (Doc. # 689, Ex. 1 at 24 ("NASCO requires that all Control Plans using its system verify that the acceptance of each account will not violate the designated service area . . . ."); Doc. # 689, Ex. 6 at 6 (asserting that Blue Plans select NASCO due to its compliance with "BCBS mandates")).   NASCO's corporate representative testified that BCBSA is a member of NASCO because it "wanted to make sure that [it] had a voice in the strategy and the oversight of

---

[7] Blue, or BlueSquared, is a web application developed by BCBSA that facilitates claims processing between Blue Plans.   BCBSA requires Blue Plans to use Blue, but they are free to use it inside or outside of NASCO's system.   (Doc. # 658, Ex. 1 at 247-48).

NASCO" and because NASCO "had to make sure [it was] aligned with the requirements that the [Blue Plans] had to meet."  (Doc. # 658, Ex. 1 at 44).  He further testified that BCBSA joined NASCO so that NASCO would have more credibility with prospective Blue Plan members. (Doc. # 658, Ex. 1 at 45).

Finally, the parties dispute whether NASCO acts as an agent for BCBSA or the Blue Plans.  Plaintiffs assert that NASCO is not an agent for either BCBSA or the Blue Plans.  In support of this assertion, they cite to a Data Access Agreement between BCBSA, an unidentified Blue Plan, and NASCO, which states that "[e]ach Party's status in all matters pursuant to this Agreement shall be that of an independent vendor and not an agent of the other party."  (Doc. # 689, Ex. 32 at 1, 8).  NASCO responds that Plaintiffs' characterization of its relationship with the Blue Plans and BCBSA is inaccurate because its status in the Data Access Agreement is inapposite as to whether it shares a unity of interest with them.  (Doc. # 731 at 8).

### D.  CHP

CHP was founded in 1994 as a for-profit corporation.  (Doc. # 659-6 at 7).  It is owned by several Blue Plans.  (Doc. # 658-5).  And while only "Blue-owned entities" can become members of CHP (Doc. # 658-4 at 61), BCBSA does not own any portion of CHP (Doc. # 658-4 at 56).  Nevertheless, CHP and its member plans "collaborate with the [BCBSA] to develop programs and capabilities to support national accounts," and CHP's representative described the company's relationship with BCBSA as "a very collaborative relationship" where the parties "try to delineate responsibilities so that we can effectively use [their] plan resources."  (Doc. # 658-4 at 56).  CHP "has agreed to comply with all [BCBSA] rules and regulations."  (Doc. # 658-4 at 271).  Moreover, it is undisputed that CHP only assists a Blue Plan with responding to a request for information if (1) the prospective purchaser is headquartered in the Blue Plan's service area

or (2) if the account has been ceded by the Blue Plan who operates in the service area where the purchaser is located.  (Doc. # 689-58 ¶ 63).

CHP's board of directors includes its Chief Executive Officer and one representative from each of the Blue Plans that own CHP.  (Doc. # 658-4 at 49).  CHP charges Blue Plans for services on a fee-for-service model.  (*See* Doc. # 659-8 at 9 (fee schedule for services to member and non-member Blue Plans)).  CHP has never distributed profits to shareholders and "strive[s] to set a budget that allows [it] to break even every year," although it has earned a profit some years.  (Doc. # 658-4 at 94).

CHP offers services that assist Blue Plans in obtaining business from large health insurance accounts.  The parties do not dispute that CHP provides sales strategy and training, targeted marketing, relationship development with brokers for certain health insurance accounts, market research, and assistance in responding to requests for information.  (Doc. # 658, Undisputed Relevant Material Facts ¶ 19, Doc. # 689 ¶ 19).  Among other marketing tools, CHP produces ValueQuest, which provides an estimate of the total cost of care for a population of consumers.  (Doc. # 658-6 at 9).  To access ValueQuest, Blue Plans must provide CHP with "claims and membership data."   (Doc. # 658-6 at 10).

Additionally, CHP manages a "Transfer Reimbursement Program," and all of its members agree to comply with the "Transfer Pricing Program Manual."  (Doc. # 659-11 at 3).  CHP members "agree to disclose . . . provider discounts to the Control Member in all Consortium National Accounts at the time of each claim."  (Doc. # 659-4 at 3).  If a member is unable to identify the applicable provider discount for an individual claim, it must provide "its best estimate of the discount" and provide that discount to the national account or the control member.  (Doc. # 659-11 at 3).

The parties disagree about the extent to which CHP shares provider pricing information from one Blue Plan with other Blue Plans. CHP asserts that it collects claims data from its members, sends it to a third party for aggregation, and uses the aggregated data. (*See* Doc. # 658-4 at 195-96). CHP's Membership Policies provide that "information concerning marketing and sales efforts" from one member "will be available to each of the Members; *provided, however,* that in no event will Members be provided with . . . other non-aggregated pricing or price-related information of another Member." (Doc. # 659-11 at 4 (emphasis in original)).

In contrast, Plaintiffs assert that CHP shares data between members, and that data includes provider discounts and differentials. (*See* Doc. # 689 Relevant Material Facts ¶ 64 ("The data CHP shares between Blue [P]lans is sufficient to show provider discounts and differentials.")). Specifically, the CHP Capabilities Book notes that CHP provides "[d]iscount benchmarking analysis" for Blue Plans, through which Blue Plans receive analysis of their "network discounts relative to competitors' networks." (Doc. # 689-33 at 23). CHP produces the discount benchmarks with data that Blue Plans submit for ValueQuest. (Doc. # 689-33 at 23). The intended primary users of benchmarking analysis are sales executives, actuaries, and provider contracting and network executives for Blue Plans. (Doc. # 689-33 at 24).

Furthermore, CHP's Sales Executive Team has indicated that a goal of CHP is to "[s]upport client objective to drive membership to higher quality, lower cost providers." (Doc. # 689-37 at 9). This goal is achieved, in part, by ensuring "[n]ational delivery of benefit differentials" through several mechanisms, including "hard steerage." (Doc. # 689-37 at 9). CHP's Chief Executive Officer described hard steerage as an "employer benefit plan design" where a national account can specify that it will only reimburse employees for certain medical services if they use certain providers. (*See* Doc. # 658-4 at 173).

Finally, the parties also dispute whether CHP acts as an agent for BCBSA.  Plaintiffs assert that CHP is not an agent of BCBSA and point to a National Account Support Agreement between CHP and BCBSA that designates the parties' status "in all matters under this Agreement" as that of an independent contractor.  (Doc. # 689-36 at 1, 10).  NASCO, like CHP, responds that Plaintiffs' characterization of the relationship between CHP and BCBSA is both inaccurate and unsupported by the cited exhibit.  (Doc. # 731 at 11).

## III.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and – by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file – designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*").  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477

U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

The summary judgment standard of Rule 56 applies to an antitrust suit, just as it applies to any other suit.  *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1208-09 (N.D. Ala. 2011) (discussing the Supreme Court's disavowal of cases disfavoring summary judgment in antitrust suits), *aff'd*, 721 F.3d 1281 (11th Cir. 2013).  "But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case," as "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  Indeed, "summary judgment may be especially appropriate in an antitrust case because of the chill antitrust litigation can have on legitimate price competition."  *McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1493 (11th Cir. 1988) (citing *Matsushita*, 475 U.S. at 594). Therefore, an antitrust plaintiff must present evidence that tends to exclude the possibility that a defendant's conduct was as consistent with permissible competition as with illegal conduct, when viewed in the light most favorable to the plaintiff.  *Gulf States*, 822 F. Supp. 2d at 1209.

## V.    Analysis

Plaintiffs claim that NASCO and CHP conspired with their codefendants to violate Section 1 of the Sherman Act by allocating geographic service areas, engaging in a group boycott of medical providers outside of the Blue Plans' respective geographic service areas, and

12

fixing prices for services provided by medical providers.[8]   NASCO and CHP contend that

Plaintiffs' Section 1 Sherman Act conspiracy claims fail for two reasons.   First, Defendants

argue that they cannot be parties to the alleged conspiracies between the Blue Plans and BCBSA

because they are not competitors to the Blue Plans, do not function as instrumentalities to further

the conspiracies, and act as "pawns" to their owners who cannot engage in concerted action with

them.   Second, Defendants claim that Plaintiffs have presented insufficient evidence of their

"conscious commitment" to the conspiracies.   The court addresses below Defendants' arguments

for summary judgment, and Plaintiffs' responses, in turn.

### A.  Legal Standards for a Conspiracy Under Section 1 of the Sherman Act

Section 1 of the Sherman Act provides that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in
> restraint of trade or commerce among the several States, or with foreign nations,
> is declared to be illegal.

15 U.S.C. § 1.  The Supreme Court has recognized, though, that Section 1's prohibition of all

contracts and conspiracies that restrain trade does not apply to "every conceivable agreement"

between persons or companies because Section 1 is not meant to address "the entire body of

private contract."  *American Needle, Inc. v. National Football League*, 560 U.S. 183, 189-90

(2010) (internal quotation omitted) ("Not every instance of cooperation between two people is a

---

[8] NASCO and CHP argue that any claim against them under Section 2 of the Sherman Act fails because:
(1) Plaintiffs have not claimed that NASCO or CHP engaged in independent conduct that violated Section 2; and
(2) Plaintiffs cannot show that NASCO or CHP are capable of concerted conduct with the Blue Plans and the
BCBSA or that they consciously committed to a conspiracy to monopsonize healthcare provider markets.  (Doc. #
658, Brief in Support of NASCO's and CHP's Motion for Summary Judgment at 15 n. 7).  Regarding the Section 2
claims, the court concludes that Plaintiffs' monopsonization claim (Count IX of the Consolidated Second Amended
Provider Complaint) does not include as its targets either NASCO or CHP because Count IX limits the Defendants
targeted to "ones identified as a having a market share of 40% or more in at least one geographic area."  (Doc. # 236
¶ 443).  Obviously, NASCO and CHP do not fall within that definition.  Moreover, Plaintiffs' monopsonization
conspiracy claim against NASCO and CHP (Count X of the operative Provider Complaint) fails because they have
not pointed to any admissible evidence that NASCO or CHP deliberately entered into a conspiracy "with the specific
intent of achieving a [monopsony]."  *Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1556 (11th
Cir. 1996) (including specific intent to achieve a monopoly as an element of a Section 2 conspiracy claim).

potential 'contract, combination …, or conspiracy, in restraint of trade.'").  Section 1 of the Sherman Act is distinct from Section 2 because it only applies to defendants that engage in concerted action.  *Id.* at 190-91.  "[C]oncerted action susceptible to sanction by section 1 is activity in which multiple parties join their resources, rights, or economic power together in order to achieve an outcome that, but for the concert, would naturally be frustrated by their competing interests (by way of profit-maximizing choices)."  *Virginia Vermiculite, Ltd. v. Historic Green Springs, Inc.*, 307 F.3d 277, 282 (4th Cir. 2002).

The key question to be asked in determining whether defendants have engaged in "concerted action" is whether a conspiracy joins together separate decisionmakers, who are separate economic actors pursuing separate economic interests, "such that the agreement deprives the marketplace of independent centers of decisionmaking."  *American Needle*, 560 U.S. at 195 (internal quotation omitted).  Applying this standard, the court examines the substance of the relationship between the parties to the alleged conspiracy, rather than the form of their relation, in order to determine whether they are capable of conspiring.  *Id.*  For example, coordinated action between a corporation and an unincorporated division or a wholly owned subsidiary does not constitute concerted action because the coordinated action "does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests."  *Id.* at 195-96 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 770-71 (1984)).  On the other hand, if an agreement joins together independent centers of decisionmaking, then the entities are capable of entering a conspiracy under Section 1, "and the court must decide whether the restraint of trade is an unreasonable and therefore illegal one." *Id.* at 196.

For any Sherman Act conspiracy, an antitrust plaintiff must present direct or circumstantial evidence that reasonably tends to show that the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764 (internal quotation omitted). Thus, an antitrust plaintiff must present evidence excluding the possibility that the alleged conspirators acted independently. *Dunnivant v. Bi-State Auto Parts*, 851 F.2d 1575, 1580 (11th Cir. 1988). And a party does not consciously commit to an anticompetitive conspiracy if it merely "agree[s] to purchase products or provide a service under conditions set by the other party." *Toscano v. Professional Golfers Assn.*, 258 F.3d 978, 984 (9th Cir. 2001).

### B. NASCO and CHP are Not Instrumentalities of the Alleged Sherman Act Conspiracies

Defendants NASCO and CHP argue that, as a matter of law, they are not capable of engaging in concerted action with the Blue Plans and BCBSA. More specifically, they claim that they are not instrumentalities of the conspiracies. The court agrees.

Members of a single legal entity may violate Section 1 of the Sherman Act when the entity is controlled by a group of competitors and "serve[s], in essence, as a vehicle for ongoing concerted activity." *American Needle*, 560 U.S. at 191. Plaintiffs contend that NASCO and CHP are fundamentally similar to the joint ventures classified as instrumentalities in *American Needle*, *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972), and *United States v. Sealy, Inc.*, 388 U.S. 350 (1967). (Doc. # 689 at 20). A close analysis of the functions performed by NASCO and CHP reveals, though, that they are quite different from the instrumentalities in these cases and actually perform no anticompetitive conduct.

In *Sealy*, approximately thirty manufacturer-licensees owned almost all of the stock in Sealy, which provided licenses to sell products under the Sealy name and trademarks. *Sealy*, 388

U.S. at 351-52.   Sealy conspired with the manufacturers to fix minimum prices for Sealy products, police the prices, and allocate exclusive territories.   *Id.*   Specifically, Sealy agreed to not authorize another license to manufacture or sell products in a designated area, and the licensee agreed to not manufacture or sell products with the Sealy label outside of its designated area.   *Id.* at 352.   The Supreme Court held that Sealy was "an instrumentality of the licensees for purposes of the horizontal territorial allocation" because it was a joint venture by the licensees, the licensees controlled Sealy's operations, and its actions were approved by directors who were licensees and stockholders.   *Id.* at 353-54.

Similarly, in *Topco*, approximately twenty-five independent supermarket chains formed a cooperative association to purchase and distribute branded products.   *Topco*, 405 U.S. at 598. The supermarket chains who were members of Topco owned all of its stock and had complete control over its operations.   *Id.* at 598-99.   Topco entered into agreements with its members that designated the territory in which they could sell the branded products, and all members had an exclusive license or a "de facto exclusive" license to sell products within a geographic territory. *Id.* at 602.   Moreover, Topco allocated some territorial areas "to members who [did] no actual business in those areas on the theory that they may wish to expand at some indefinite future time."   *Id.*   The Supreme Court held that Topco's actions constituted a *per se* violation of Section 1 in the form of a horizontal allocation of territory because Topco's structure and decisionmaking process was essentially similar to the instrumentality's structure, decisionmaking process, and anticompetitive territorial allocation in *Sealy*.   *Id.* at 608-09.

And, in *American Needle*, the Supreme Court held that National Football League Properties (NFLP), a joint venture between thirty-two National Football League (NFL) teams, could commit concerted activity in violation of Section 1 by making decisions on how to market

16

the NFL teams' intellectual property.  *American Needle*, 560 U.S. at 187, 200.  The NFLP's decisions regarding marketing of intellectual property were classified as concerted conduct because the competing NFL teams each owned a share of the jointly managed assets, decided who received licenses to use the intellectual property, acted in their own financial interests by deciding how to license use of the intellectual property, and received individual economic benefits separate from the NFLP's profits by licensing the intellectual property through a joint venture.  *Id.* at 200-01.

Plaintiffs argue that NASCO and CHP are instrumentalities of the conspiracies alleged in this case.  They contend that NASCO is structurally identical to the instrumentalities in *American Needle*, *Topco*, and *Sealy*, has committed itself to the goals of the conspiracies, and has endorsed the conspirators' goals of securing and increasing provider differentials.  Moreover, Plaintiffs claim that NASCO "continues to develop ways to implement the Blues' conspiracies" by allowing Blue Plans to access provider pricing information and implementing software to support BlueCard claims processing.  (Doc. # 689 at 19).  Likewise, they contend that CHP is structurally identical to the instrumentalities in *American Needle*, *Topco*, and *Sealy* as it helps Blue Plans obtain anticompetitive rates from medical providers by supporting the national delivery of benefit differentials, providing pricing information to Blue Plans from other Blue Plans, and enforcing exclusive service areas.  (Doc. # 689 at 21-22).  According to Plaintiffs, NASCO and CHP do not need to be competitors to engage in concerted action because they are instrumentalities of the conspiracies.  (Doc. # 689 at 24-25).

After careful review of the Rule 56 record, the court concludes that Plaintiffs have failed to show that NASCO and CHP act as instrumentalities of the conspiracies because they have not shown that NASCO or CHP perform anticompetitive conduct on behalf of their Blue Plan

owners.  Unlike the instrumentalities in the *Topco* and *Sealy* cases, NASCO and CHP do not directly allocate territories to the Blue Plans; rather, it is alleged that BCBSA is responsible for the territory allocation.  (*See* Doc. # 236 ¶¶ 192, 196 (describing the Licensing Agreements between the Blue Plans and BCBSA)).  *Cf. Topco*, 405 U.S. at 602 (evidence showed agreements between Topco and supermarket chains to only sell branded products in designated markets); *Sealy*, 388 U.S. at 352 (agreements between Sealy and manufacturers to not grant a license to another manufacturer in a geographic area).  Moreover, unlike the instrumentality in *American Needle*, NASCO and CHP do not negotiate with medical providers, sign contracts for medical providers, or set reimbursement rates for medical providers.  *Cf. American Needle*, 560 U.S. at 187 (NFLP granted licensing agreements for NFL teams' intellectual property).  Certainly, CHP responds to requests for information from national accounts.  But, the Rule 56 evidence shows that its involvement in selling insurance to subscribers does not equate to involvement in the market for obtaining providers for the Blue Plans' insurance networks.  Thus, NASCO and CHP do not serve "as a vehicle for ongoing concerted activity" between the Blue Plans and BCBSA.

In fact, Plaintiffs do not argue that NASCO's or CHP's conduct, itself, would be unlawful under Section 1, absent the conspiracies between the Blue Plans.  (Doc. # 689 at 25-26).  Thus, their conduct is clearly distinguishable from the conduct performed by the instrumentalities in *American Needle*, *Topco*, and *Sealy*.  That is, to the extent a conspiracy took place here, the conduct of NASCO and CHP falls far short of unlawful conduct under Section 1 of the Sherman Act.  And, the instrumentalities in *American Needle*, *Topco*, and *Sealy* engaged in conduct that the antitrust plaintiffs in those cases contended violated Section 1 by creating exclusive licensing agreements for intellectual property, granting exclusive manufacturing and sales territories, and fixing minimum prices for goods.

Plaintiffs contend that NASCO and CHP enforce the market allocation agreements between the Blue Plans and BCBSA because they do not provide services to Blue Plans if those services would violate the Licensing Agreements that exist between a Blue Plan and BCBSA. But Plaintiffs point to no Rule 56 evidence indicating that NASCO or CHP have ever enforced the geographic market allocations. Indeed, Plaintiffs concede in their response to the Motion for Summary Judgment that CHP has never "exercised [its] enforcement mechanisms by expelling a member." (Doc. # 689 at 15). Moreover, NASCO's and CHP's unwillingness to work with a Blue Plan in violation of the Licensing Agreements is actually conduct consistent with competing for work with the Blue Plans, as a Blue Plan is unlikely to work with a contractor who assists another Blue Plan in violating the Licensing Agreements.

Likewise, Plaintiffs' argument that NASCO and CHP enable the Blue Plans to coordinate and set prices by sharing pricing information holds no water. Although CHP collects claims data from Blue Plans in order to produce benchmarks, its membership policies specifically prevent CHP from providing non-aggregated pricing data from one Blue Plan to another Blue Plan. (Doc. # 659-11 at 4). Moreover, while NASCO provides access to Blue software that provides access to a Formats Database, and the Formats Database includes "Institutional Line Level Pricing," Plaintiffs have presented no Rule 56 evidence of what is contained in the line level pricing field or whether NASCO integrated the Blue software in order to enable Blue Plans to access provider pricing data. (Doc. # 689-7 at 132-33, Doc. # 689-27 at 1). In short, Plaintiffs' "proof" that Blue Plans share provider price information through NASCO and CHP falls short of a sufficient showing that they fix prices through NASCO or CHP, especially given that NASCO and CHP do not negotiate contracts with medical providers or determine reimbursement rates for providers. For these reasons, Plaintiffs have not presented sufficient evidence for a reasonable

jury to conclude that NASCO or CHP is an instrumentality to the claimed conspiracies between the Blue Plans and BCBSA.

### C.  NASCO and CHP Are Pawns of Their Owners

In support of their Motion for Summary Judgment, NASCO and CHP argue that they actually are "pawns" of their owners who cannot conspire to commit anticompetitive conduct because they share unified interests with their owners, provide ancillary services exclusively to the Blue Plans, do not seek to maximize profits, and share economic interests with the Blue Plans and BCBSA.  The argument is on the mark.  The court concludes that the Rule 56 evidence, even when viewed in the light most favorable to Plaintiffs, shows that NASCO and CHP are pawns of their owners, and, thus, incapable of conspiring with them to violate Section 1 of the Sherman Act.

"The Areeda treatise draws a distinction between 'pawns' and 'principal actors' due to the pawn's 'subordinate role in performing a discrete, designated task at the direction of [its] principal.'"  *Gulf States*, 822 F. Supp. 2d at 1219 (quoting 7 P. Areeda & H. Hovenkamp, *Antitrust Law*, ¶ 1403 (3d ed. 2010)), *aff'd*, 721 F.3d 1281 (11th Cir. 2013).  "[C]ertain types of corporate agents, even if separately incorporated, are not capable of conspiring with their principal where their relationship necessary involves a unity of economic interest and design." *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1134 (3d Cir. 1995).  For example, the plaintiffs in the *Siegel Transfer* litigation alleged that Carrier Express, a freight broker for Bethlehem Steel, conspired with its commissioned agents and Oak Management, a management company that oversaw its day-to-day operations.  *See* 54 F.3d at 1128, 1134 (describing one of the antitrust conspiracy claims raised by the plaintiffs).  But the Third Circuit held that Oak Management was incapable of conspiring with Carrier Express to violate Section 1 of the

Sherman Act because the agents and their principal, Carrier Express, shared "a similar unity of interest and purpose." *Id.* at 1135. Oak Management constituted "an inseparable part of Carrier Express' structure" because it handled all of Carrier Express's day-to-day operations, its economic success was tied to Carrier Express's success because it received a percentage of Carrier Express's revenue, and it did not compete with Carrier Express. *Id.*

Several cases address when a separately-incorporated sales agent is incapable of conspiring with a principal for whom it sells products. For example, the plaintiffs in *Siegel Transfer* also claimed that Carrier Express conspired with its commissioned agents to violate Section 1 of the Sherman Act. 54 F.3d at 1135. But, again, the Third Circuit disagreed, holding that the commissioned agents were unable to conspire with their principal, Carrier Express, to violate Section 1 of the Sherman Act because they did not compete with Carrier Express, acted as an essential conduit between Carrier Express and the companies that hauled its freight, and had "entirely congruent" economic interests with Carrier Express because they received commissions for each load of freight for which they arranged transport. *Id.* Similarly, the Eighth Circuit has held that sales agents for a furniture manufacturer were incapable of conspiring with the manufacturer to violate Section 1 of the Sherman Act because they "were so closely entwined in economic interest and purpose" with the manufacturer that they all formed a unified economic conscience. *Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1317 (8th Cir. 1986). The sales agents in *Pink Supply* did not constitute a separate level in the distribution chain because they: (1) did not sell furniture directly; (2) merely generated business for other furniture dealers; (3) had no authority to set prices, arrange terms of sale, or accept orders; and (4) received a commission from the manufacturer based on total sales of furniture within their designated territories. *Id.* at 1316-17.

Here, the undisputed evidence demonstrates that CHP is incapable of conspiring with its Blue Plan owners to violate Section 1 of the Sherman Act because it is actually a "pawn" of its owners.  As in *Siegel Transfer* and *Pink Supply*, CHP does not compete with its owners to obtain services from medical providers.  Moreover, CHP essentially serves as a conduit of information between certain Blue Plans and entities associated with purchasing insurance for national accounts by producing targeted marketing materials, developing relationships with brokers, and responding to requests for information pertaining to national accounts.  Therefore, although Plaintiffs correctly assert that CHP collects provider pricing information from Blue Plans, CHP uses the information to produce benchmarks, which serve as a marketing tool for Blue Plans.[9] Finally, CHP's economic interests are entirely congruent with the economic interests of its members.  It receives all of its operating income from Blue Plans that use its services, it does not seek to obtain a profit for providing those services, and it receives income for performing services as the Blue Plans request them.[10]

Likewise, NASCO is a pawn of its Blue Plan owners and BCBSA; therefore, it cannot conspire with them to violate Section 1 of the Sherman Act because it lacks an independent economic consciousness from its owners.  Like CHP, NASCO does not compete with the Blue Plans to obtain contracts with medical providers.  Rather, it offers back-office services for Blue

---

[9]  Likewise, CHP's involvement in hard steerage does not alter its primary role as a conduit of information between Blue Plans and insurance purchasers.  Notably, there is no indication in the Rule 56 record that CHP is involved with negotiations between Blue Plans and medical providers, even if it can be said that it is involved in negotiations between Blue Plans and insurance purchasers.

[10]  NASCO and CHP differ somewhat from the pawns described in *Siegel Transfer* and *Pink Supply* because their income derives from fees for various services, rather than a contingency payment for total income or total sales obtained by the principal.  *See Siegel Transfer*, 54 F.3d at 1135; *Pink Supply*, 788 F.2d at 1316-17. Nevertheless, their economic interests are sufficiently congruent with their owners' interests that they do not have a separate economic consciousness.  Moreover, the Seventh Circuit has recognized that a single firm can contain competing financial interests without being subject to scrutiny under Section 1 of the Sherman Act.  *See Chicago Professional Sports Ltd. Partnership v. National Basketball Assn.*, 95 F.3d 593, 598 (7th Cir. 1996) (discussing potential financial conflicts between different divisions in a company or partners in a professional firm).

Plans who seek to obtain business from national accounts.  Although NASCO does not act as a conduit between the Blue Plans and insurance purchasers or medical providers, it performs discrete tasks that are designated to it by its owners, and those owners control its executive committee.  *See Gulf States*, 822 F. Supp. 2d at 1219 (describing an entity that performs discrete, designated tasks as a potential pawn in a conspiracy).  Finally, NASCO's economic interests are entirely congruent with the economic interests of its owners because it only provides services for Blue Plans, it seeks to obtain a minimal profit, and it is paid fees for providing services requested by the Blue Plans.

In conclusion, the court finds that the Rule 56 evidence, even when taken in the light most favorable to Plaintiffs, shows that NASCO and CHP are pawns of their Blue Plan owners who perform discrete, designated tasks on the owners' behalf.  NASCO and CHP share united economic interests with their Blue Plan owners, and those united interests foreclose them from entering a conspiracy with their owners to violate Section 1 of the Sherman Act.  While this finding obviously does not foreclose the possibility that NASCO and CHP conspire with entities other than their owners, here, Plaintiffs rely on the instrumentality theory to argue that NASCO and CHP are proper parties to the conspiracy claims.  (*See* Doc. # 689 at 29 ("NASCO and CHP are instrumentalities of the Blues' unlawful conspiracies.").  Thus, for the reasons explained above, Plaintiffs have failed to present a genuine dispute of material fact to support their claim that NASCO and CHP operate as instrumentalities of the alleged Section 1 conspiracies. NASCO and CHP are entitled to summary judgment on the Section 1 Sherman Act conspiracy claims.

### D. Alternatively, NASCO and CHP Have Not Consciously Committed to the Alleged Section 1 Conspiracies

As an alternative ground for summary judgment, NASCO and CHP argue that they have not consciously committed to the Section 1 conspiracies alleged by Plaintiffs.  In particular, NASCO contends that it does not know of any anticompetitive purpose for the alleged conduct and that it merely performs a service that facilitates possible restraints of trade.  Likewise, CHP argues that it provides normal business services to Blue Plans, its services are not directed to excluding competitors, and it has no involvement in negotiating contracts or reimbursement for medical providers.  Although this issue presents a closer question than those addressed above, the court agrees with NASCO and CHP that the evidence before it is insufficient to raise a genuine question of NASCO's or CHP's conscious commitment to the Sherman Act conspiracies raised in the operative Provider Complaint.

Even if Plaintiffs had presented sufficient evidence that would permit a reasonable jury to conclude that NASCO and CHP are instrumentalities of the Sherman Act conspiracies (and, to be clear, they have not), they have not presented evidence that excludes the possibility that NASCO and CHP acted independently from its codefendants and did not commit to the anticompetitive schemes at issue in this case.  *Dunnivant*, 851 F.2d at 1580.  To support its claim that NASCO and CHP are consciously committed to the Sherman Act conspiracies, Plaintiffs rely on (1) NASCO's endorsement of certain goals of the anticompetitive conspiracies, (2) CHP's advertisements pertaining to provider reimbursements, and (3) a statement from CHP's CEO that it would not assist a Blue Plan who intended to bid for business outside of its exclusive service area.  (*See* Doc. # 689 at 29).  But none of these actions or statements are inconsistent with a competitor seeking business from a Blue Plan by acquiescing to its rules of business.  Even though NASCO and CHP undoubtedly have acquiesced to the Blue Plans' territorial

restrictions and provider reimbursement rates, there is no Rule 56 evidence that NASCO or CHP were involved in or influenced the Blue Plans' territorial allocations or geographic restrictions on contracting with medical providers. *See Toscano*, 258 F.3d at 984 ("[W]here real estate developers and mortgage lenders acquiesced to an investor's 'restrictive commitment letters' prohibiting them from hiring nonunion labor, and where there was 'no evidence that these individuals influenced or were at all involved in the establishment of the union-only investment policy,' there was no section 1 Sherman Act conspiracy, and summary judgment was appropriate." (quoting *Beutler Sheetmetal Works v. McMorgan & Co.*, 616 F. Supp. 453, 456 (N.D. Cal. 1985))). Indeed, the evidence demonstrates that the Blue Plans and BCBSA agreed to the territorial restrictions and the Control Plan's authority over contracting with medical providers within its territory before NASCO or CHP were formed. (*See, e.g.*, Doc. # 689-6 at 54 (proposing in 1982 that one Blue Plan should operate in each state)). Ultimately, NASCO's and CHP's actions, even when taken in the light most favorable to Plaintiffs, are consistent with an independent competitor accepting the Blue Plans' pre-existing conditions for services. Thus, Plaintiffs have failed to exclude the possibility that NASCO and CHP acted independently from the Blue Plans and BCBSA by providing discrete ancillary services without agreeing to the anticompetitive aims of the alleged Sherman Act conspiracies. *See Dunnivant*, 851 F.2d at 1580.

Finally, Plaintiffs contend that NASCO and CHP are distinguishable from vendors who provide services in furtherance of another party's anticompetitive aims without consciously committing to the conspiracy because they are founded, owned, and controlled by the Blue Plans and exclusively work for the Blue Plans. (Doc. # 689 at 29). However, while these facts indicate that NASCO and CHP do not operate independently from their owners, they simply do not demonstrate that NASCO and CHP were committed to conspiracies established by their

owners.  Indeed, if the court relied on the relationship between NASCO, CHP, and their Blue Plan owners to exclude the possibility that NASCO and CHP acted independently, then it follows (and this would be an illogical result) that any subsidiary of a corporation would be able to consciously commit to a conspiracy if it followed the corporation's policy that was established for an anticompetitive purpose through concerted conduct, even if the subsidiary played no role in the formation or enforcement of the anticompetitive policy.  The court agrees with the Ninth Circuit's holding in *Toscano* that mere acquiescence to service policies created by an alleged coconspirator does not demonstrate conscious commitment to the anticompetitive scheme when an antitrust plaintiff fails to present some evidence that a party influenced or was involved in the service policies at issue.  *Toscano*, 258 F.3d at 984.  Therefore, NASCO and CHP are entitled to summary judgment because Plaintiffs have failed to present evidence demonstrating a genuine factual issue concerning their conscious commitment to the alleged anticompetitive schemes.

## VI.  Conclusion

For all these reasons, Defendants' NASCO and CHP Motion for Summary Judgment is due to be granted.  The court will enter a separate order.

**DONE** and **ORDERED** this October 20, 2016.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE