**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406) | )<br>)<br>)<br>)<br>)<br>) |

Master File No. 2:13-CV-20000-RDP

This document relates to both tracks.

## MEMORANDUM OPINION

### I.    Introduction

This case is before the court on five Motions to Dismiss (*e.g.*, Docs. # 208, 210, 211, 212, 213, Case No. 2:12-cv-02169-RDP) that have been filed by nine of the thirty-eight Defendant Blue Plans[1] (collectively referred to as "Moving Defendants").  In their motions, these nine Defendants contest personal jurisdiction over them with respect to the actions filed in the Northern District of Alabama ("Northern District") and contend venue is improper in the Northern District for these actions.[2]  The other twenty-nine Blues have not challenged personal jurisdiction or venue.  The motions are fully briefed.  (*See, e.g.*, Docs. # 209-13, 218, 220-22, 227, Case No. 2:12-cv-02169-RDP; Docs. # 369, 374-77, Case No. 2:12-cv-02532-RDP).  After careful review, and with the benefit of oral argument from the parties, the court concludes that Moving Defendants' motions to dismiss are due to be denied.

---

[1] The Moving Defendants are (1) Blue Cross & Blue Shield of Mississippi, (2) Triple-S Salud, Inc.,  (3) Blue Cross Blue Shield of Arizona, (4) Blue Cross and Blue Shield of Kansas, (5) Noridian Mutual Insurance Company, d/b/a Blue Cross Blue Shield of North Dakota, (6) Blue Cross Blue Shield of Wyoming, (7) HealthNow New York, Inc., d/b/a BlueCross BlueShield of Western New York and BlueShield of Northeastern New York, (8) Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield, and (9) Capital BlueCross.

[2] Motions to dismiss have been filed in the following actions: (1) *Conway, et al., v. Blue Cross & Blue Shield of Alabama, et al.*, Case No. 2:12-cv-02169-RDP (N.D. Ala.); (2) *American Electric Motor Services, Inc., et al., v. Blue Cross Blue Shield of Alabama, et al.*, Case No. 2:12-cv-02532-RDP (N.D. Ala.); (3) *Pettus Plumbing & Piping, Inc. v. Blue Cross Blue Shield of Alabama, et al.*, Case No. 3:16-cv-00297-RDP (N.D. Ala.); and (4) *Pearce, Bevill, Leesburg, Moore, P.C. v. Blue Cross Blue Shield of Alabama, et al.*, Case No. 2:16-cv-00464-RDP (N.D. Ala.).

## II.   Relevant Factual Allegations from Provider Plaintiffs' and Subscriber Plaintiffs' Master Complaints

In their operative complaint, Provider Plaintiffs assert several grounds for the court's personal jurisdiction over Defendants.  (Doc. # 236 at ¶¶ 12-13, Case No. 2:13-cv-20000-RDP). First, they claim that Defendants are subject to the court's personal jurisdiction under Section 12 of the Clayton Act because they "transact business in this [d]istrict."  (*Id.* at ¶ 13).  Second, they contend that the court may exercise personal jurisdiction over Defendants under the conspiracy theory of jurisdiction because (1) Defendants have participated in a conspiracy, and (2) at least one co-conspirator, Blue Cross and Blue Shield of Alabama ("BCBS-AL"), has committed overt acts in furtherance of the conspiracy within Alabama.  (*Id.* at ¶¶ 12-13).  Third, they claim that all Defendants have maintained minimum contacts with Alabama by paying health care entities and individuals that provide services within Alabama.  (*Id.* at ¶ 13).

In their consolidated complaint, Provider Plaintiffs allege that Defendants have violated various federal and state competition laws, including the Sherman Act, by agreeing to allocate geographic service areas between Blue Cross and Blue Shield entities (or plans) ("Blue Plans"), fix prices for certain products and services available from health care providers, and boycott all health care providers who reside outside of a Blue Plan's allocated geographic service area. (*See, e.g.*, *id.* at ¶¶ 4, 169, 229).  Specifically, they allege that in September 1982 the Board of Directors for the Blue Cross Blue Shield Association[3] ("BCBSA" or "Association") adopted a Long Term Business Strategy, through which "Defendants agreed not to compete with each other."  (*Id.* at ¶ 187).  The Blue Plans agreed to "centralize the ownership of their trademarks

---

[3]   BCBSA is an Illinois corporation that has its headquarters in Illinois.  (Doc. # 236 at ¶ 133, Case No. 2:13-cv-20000-RDP).

and trade names" and to ensure that by the end of 1985 "each state would only have one Blue [Plan]." (*Id.* at ¶¶ 188-89).

According to Provider Plaintiffs, all of the Blue Plan Defendants (including Moving Defendants) held a series of meetings in 1987, during which they agreed to sell insurance under the Blue Cross and Blue Shield trademarks in exclusive geographic service areas. (*Id.* at ¶ 190). Thereafter, each Blue Plan entered into Blue Cross License Agreements and Blue Shield License Agreements (collectively referred to as "License Agreements") with the Association. (*Id.* at ¶ 192). These License Agreements prevent a Blue Plan or its subsidiaries from competing under the Blue Cross and Blue Shield trademarks outside of a designated geographic service area. (*Id.* at ¶ 196). Moreover, the License Agreements dictate that the entity owning a Blue Plan for a certain geographic service area must obtain at least 80 percent of its annual revenue generated within that designated service area from services offered under the Blue Cross and Blue Shield trademarks. (*Id.* at ¶ 197).

Additionally, the License Agreements mandate that Blue Plans participate in various BCBSA national programs, including the BlueCard Program and the National Accounts Program. (*Id.* at ¶ 229). Pursuant to the National Accounts Program, Blue Plans agree, with limited exceptions, not to solicit services from or contract with health care providers outside of their designated geographic service areas. (*Id.* at ¶ 230). If a Blue Plan's member requires health care services while he or she is outside of the Blue Plan's geographic service area, the BlueCard Program allows that member to receive health care services from a provider who has a contract with the Blue Plan that controls that geographic service area. (*See id.* at ¶ 231). When a health care provider serves a member of a Blue Plan from another geographic service area, the provider submits a claim to the Blue Plan within that geographic service area (called the Host

Plan).   (*Id.* at ¶ 236).   The Host Plan "prices [the claim] according to contracted provider agreements, then sends an electronic submission" to the member's out-of-area Blue Plan (called the Home Plan).   (*Id.*).   The Home Plan reviews the submitted claim from the Host Plan and sends a disposition to the Host Plan, which is responsible for reimbursing the health care provider.   (*Id.*).

Provider Plaintiffs allege that BCBS-AL is the thirteenth largest health insurer in the nation and that it would likely offer health care financing in regions other than the state of Alabama but for the territorial restrictions in the License Agreements.[4]   (*Id.* at ¶ 141).   According to Provider Plaintiffs, BCBS-AL has market power throughout Alabama in the health care financing market, with an 86 percent market share in the entire state.   (*Id.* at ¶ 259).   They claim that BCBS-AL's reimbursement rates for primary care physicians are so low that many primary care physicians retire because it is not worthwhile for them to continue practicing medicine.   (*Id.* at ¶ 326).   Moreover, BCBS-AL prohibits providers from offering similar price terms to other health care insurers.   (*Id.* at ¶ 340).   Accordingly, "competition in the state of Alabama has been and continues to be harmed in that the other 36 Blue[ ] [Plans] agree not to enter the Alabama market to complete with Blue Cross Blue Shield of Alabama[,] no matter the circumstances." (*Id.* at ¶ 346).

Plaintiffs allege that, on at least one occasion, BCBS-AL enforced this price fixing conspiracy against an Alabama hospital when the hospital billed a higher rate to another Blue Plan.   According to Provider Plaintiffs' complaint:

> [W]hen a hospital in east Alabama billed other Defendant Blues directly for their subscribers, those Blues, including Blue Cross of Minnesota[,] paid for those services at the rates that it normally pays, which are higher than the rates paid by Blue Cross of Alabama.   When Blue Cross of Alabama learned of those

---

[4]   BCBS-AL's headquarters are located in Birmingham, which is in the Northern District.   (Doc. # 236 at ¶ 61, Case No. 2:13-cv-20000-RDP).

4

> payments, it then recouped the difference between those higher rates and the Blue Cross of Alabama rates from payments due for services for Blue Cross of Alabama subscribers.  Based on information and belief, Plaintiffs allege that Blue Cross of Alabama and the other Blues divided the funds recouped under the procedures established by the Defendant Blues.

(*Id.* at ¶ 234).

In their operative complaint, Subscriber Plaintiffs point to several grounds upon which this court may assert personal jurisdiction over Defendants.  First, Subscriber Plaintiffs rely on Section 12 of the Clayton Act.  (Doc. # 244 at ¶ 12A, Case No. 2:13-cv-20000-RDP).  Second, they rely on the conspiracy theory of personal jurisdiction because Defendants participated in a conspiracy that injured subscribers in Alabama, and overt acts were committed to further the conspiracy in Alabama.  (*See id.* at ¶ 12A(a)).  Third, they contend that Defendants have maintained minimum contacts with Alabama because Defendants have either (1) committed intentional acts that were intended to cause harm in Alabama and actually caused harm in Alabama, or (2) committed intentional acts that they knew were likely to cause injury within Alabama.  (*See id.* at ¶ 12A(b)-(c)).  Fourth, they allege that Defendants have maintained minimum contacts with Alabama because they have members in Alabama or they transact business within Alabama.  (*See id.* at ¶ 12A(f)).

With regard to the conspiracies alleged in these cases, Subscriber Plaintiffs contend that in 1982 the Association became the sole owner of the Blue Cross and Blue Shield trademarks after the Blue Cross Association and the Blue Shield Association merged.[5]  (*Id.* at ¶ 324). According to Subscriber Plaintiffs, BCBSA is actually controlled by the Blue Plans, and its rules and regulations are actually horizontal agreements between the Blue Plans.  (*Id.* at ¶ 344). Through the License Agreements, membership guidelines, and membership standards, the Blue

---

[5]   In the 1950s, the Blue Plans transferred their rights to the Blue Cross and Blue Shield trademarks to centralized entities.  (*Id.* at ¶¶ 321-22).

Plans have conspired with each other "to divide the geographic market for health insurance." (*Id.* at ¶¶ 350-51). Defendants' agreement to allocate geographic markets has resulted in the following harms to the residents of Alabama: (1) a reduction of health insurance companies competing with BCBS-AL for business; (2) unreasonable limitations on entering the Alabama health insurance market; (3) the maintenance and enlargement of BCBS-AL's market power; (4) supra-competitive premiums; and (5) the deprivation of "benefits of free and open competition," including the deprivation of access to a market whose prices have been established in the absence of non-price restraints on competition. (*Id.* at ¶¶ 571, 573).

In addition, Provider Plaintiffs allege that BCBS-AL is licensed to use the Blue Cross and Blue Shield trademarks and has agreed to conduct business under those brands only in Alabama.[6] (*Id.* at ¶ 415). They claim that BCBS-AL has at least a 90 percent market share in the individual health insurance market and at least a 97 percent market share in the small group health insurance market. (*Id.*). Moreover, they assert that BCBS-AL has used its market power to charge supra-competitive premiums to individuals and small groups that purchased health insurance. (*Id.* at ¶ 418). For example, it increased individual premiums by more than 17 percent in 2010. (*Id.* at ¶ 419).

Provider Plaintiffs also contend that venue is proper in this court for two reasons. First, venue is proper under Section 12 of the Clayton Act because Defendants "transact business" in the Northern District of Alabama. (Doc. # 236 at ¶ 14, Case No. 2:13-cv-20000-RDP). Second,

---

[6] The court notes that Plaintiffs have not stated where BCBS-AL agreed to the License Agreements, membership standards, or membership guidelines. (*See, e.g.*, Doc. # 244 at ¶¶ 565-69, Case No. 2:13-cv-20000-RDP). At oral argument, counsel for five of the Moving Defendants informed the court that the License Agreements are governed by Illinois law. (Doc. # 905 at 144, Case No. 2:13-cv-20000-RDP).

venue is proper under 28 U.S.C. § 1391 because a significant part of the events, acts, and omissions resulting in this action occurred in the Northern District.[7] (*Id.*).

### III.     Record Evidence Concerning Personal Jurisdiction and Venue

#### A.     Common Jurisdictional Facts

Through their submitted affidavits, Moving Defendants have presented the following common evidence regarding particular contacts they lack with the state of Alabama.  First, none of the Moving Defendants are registered in Alabama or licensed to do business in Alabama.[8] Second, none maintain an office in Alabama or the Northern District.[9]  Third, none have an employee based in Alabama.[10]  Fourth, none direct marketing activities towards potential

---

[7]    Similarly, Subscriber Plaintiffs also rely on Section 12 of the Clayton Act and 28 U.S.C. § 1391 to demonstrate that venue is proper in this district.  (Doc. # 244 at ¶ 14, Case No. 2:13-cv-20000-RDP).  They claim in their complaint that venue is proper in this district under Sections 4 and 16 of the Clayton Act.  (*See id.*).  But the court has not considered these proposed alternative grounds for venue because Subscriber Plaintiffs have proffered no argument in support of them in their response to Moving Defendants' motions.  (*See generally* Doc. # 369, Case No. 2:12-cv-02532-RDP).

[8]    (*See, e.g.*, Doc. # 122, Ex. A at 1, Case No. 2:13-cv-20000-RDP; Doc. # 210, Ex. 1 at 1, Case No. 2:12-cv-02169-RDP (stating that Triple-S Salud is licensed to conduct business in Puerto Rico and the U.S. Virgin Islands); Doc. # 211 Ex. 1 at 1, Case No. 2:12-cv-02169-RDP;  Doc. # 211, Ex. 2 at 1, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 3 at 1, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 4 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 5 at 1, Case No. 2:12-cv-02169-RDP; Doc. # 212, Ex. G at 1-2, Case No. 2:12-cv-02169-RDP; Doc. # 213, Ex. 1 at 3, Case No. 2:12-cv-02169-RDP).

[9]    (*See, e.g.*, Doc. # 122, Ex. A at 1, Case No. 2:13-cv-20000-RDP; Doc. # 210, Ex. 1 at 3, Case No. 2:12-cv-02169-RDP; Doc. # 211 Ex. 1 at 2, Case No. 2:12-cv-02169-RDP;  Doc. # 211, Ex. 2 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 3 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 4 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 5 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 212, Ex. C, Case No. 2:12-cv-02169-RDP; Doc. # 213, Ex. 1 at 3, Case No. 2:12-cv-02169-RDP).

[10]    (*See, e.g.*, Doc. # 122, Ex. A at 1, Case No. 2:13-cv-20000-RDP; Doc. # 210, Ex. 1 at 3, Case No. 2:12-cv-02169-RDP (asserting that Triple-S Salud has no employees or agents in any of the fifty states); Doc. # 211 Ex. 1 at 2, Case No. 2:12-cv-02169-RDP;  Doc. # 211, Ex. 2 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 3 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 4 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 5 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 212, Ex. C, Case No. 2:12-cv-02169-RDP; Doc. # 213, Ex. 1 at 3, Case No. 2:12-cv-02169-RDP).

insurance customers in Alabama, solicit business from individual residents of Alabama, or solicit business from companies headquartered in Alabama.[11]

Eight of the nine Moving Defendants own no real property in the state of Alabama.[12] Likewise, eight of the nine Moving Defendants have no telephone number or mailing address in Alabama.[13]  Moreover, eight of the nine Moving Defendants do not maintain a bank account in Alabama.[14]  Finally, seven of the nine Moving Defendants have stated that they do not issue insurance policies or contracts in Alabama.[15]

---

[11]  (*See, e.g.*, Doc. # 122, Ex. A at 2, Case No. 2:13-cv-20000-RDP; Doc. # 210, Ex. 1 at 2, Case No. 2:12-cv-02169-RDP (stating that Triple-S Salud conducts no marketing or advertising in the fifty states); Doc. # 211 Ex. 1 at 2, Case No. 2:12-cv-02169-RDP;  Doc. # 211, Ex. 2 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 3 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 4 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 5 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 212, Ex. F, Case No. 2:12-cv-02169-RDP; Doc. # 213, Ex. 1 at 3, Case No. 2:12-cv-02169-RDP).

[12]  (*See, e.g.*, Doc. # 122, Ex. A at 2, Case No. 2:13-cv-20000-RDP; Doc. # 210, Ex. 1 at 3, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 2 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 3 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 4 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 5 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 212, Ex. B, Case No. 2:12-cv-02169-RDP; Doc. # 213, Ex. 1 at 3, Case No. 2:12-cv-02169-RDP). Blue Cross Blue Shield of Arizona "has owned an interest in three real estate funds that collectively owned two properties in Alabama."  (Doc. # 211, Ex. 1 at 2, Case No. 2:12-cv-02169-RDP).

[13]  (*See, e.g.*, Doc. # 122, Ex. A at 2, Case No. 2:13-cv-20000-RDP; Doc. # 210, Ex. 1 at 3, Case No. 2:12-cv-02169-RDP; Doc. # 211 Ex. 1 at 2, Case No. 2:12-cv-02169-RDP;  Doc. # 211, Ex. 2 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 3 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 4 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 5 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 212, Ex. C, Case No. 2:12-cv-02169-RDP). Capital BlueCross has not stated whether it maintains a telephone number or mailing address in Alabama.  (*See generally* Doc. # 213, Ex. 1, Case No. 2:12-cv-02169-RDP).

[14]  (*See, e.g.*, Doc. # 122, Ex. A at 2, Case No. 2:13-cv-20000-RDP; Doc. # 211 Ex. 1 at 2, Case No. 2:12-cv-02169-RDP;  Doc. # 211, Ex. 2 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 3 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 4 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 5 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 212, Ex. D, Case No. 2:12-cv-02169-RDP; Doc. # 213, Ex. 1 at 3, Case No. 2:12-cv-02169-RDP). Triple-S Salud has not asserted whether it has opened or maintained a bank account in Alabama.  (*See generally*, Doc. # 210, Ex. 1, Case No. 2:12-cv-02169-RDP).

[15]  (*See, e.g.*, Doc. # 210, Ex. 1 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211 Ex. 1 at 3, Case No. 2:12-cv-02169-RDP;  Doc. # 211, Ex. 2 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 3 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 4 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 211, Ex. 5 at 2, Case No. 2:12-cv-02169-RDP; Doc. # 213, Ex. 1 at 2, Case No. 2:12-cv-02169-RDP (averring that all of Capital BlueCross's insurance policies are issued in Pennsylvania)).  Blue Cross & Blue Shield of Mississippi and Excellus BlueCross BlueShield do not directly address in their affidavits whether they issue insurance policies in Alabama, but both have stated that they are not licensed to sell insurance in Alabama.

### B.    Blue Cross & Blue Shield of Mississippi ("BCBS-MS")[16]

According to a vice president for BCBS-MS, it is a Mississippi corporation whose principal place of business is in Mississippi.  (Doc. # 122, Ex. A at 1, Case No. 2:13-cv-20000-RDP).   As of December 31, 2012, 4,198 BCBS-MS members resided in Alabama and 1,840 BCBS-MS members resided in the Northern District in particular as of that date.   (Doc. # 177, Ex. A at 2, Case No. 2:13-cv-20000-RDP).   Approximately 8,000 BCBS-MS members "received covered services through the BlueCard program from providers located in the state of Alabama in 2012."   (*Id.*).   Of the BCBS-MS members who received covered services in Alabama, 3,740 of them received those services from providers located in the Northern District.  (*Id.*).   Accordingly, less than one percent of BCBS-MS's membership resided in the Northern District in 2012, and less than one percent of its members received health care services from providers in the Northern District.  (*See id.*).   BCBS-MS does not pay income taxes or property taxes in Alabama.  (Doc. # 122, Ex. A at 2, Case No. 2:13-cv-20000-RDP).

BCBS-MS has entered into contracts with nine physicians who reside in the Northern District.  (Doc. # 256, Ex. 1 at 1, Case No. 2:13-cv-20000-RDP).   BCBS-MS did not solicit the physicians' services; rather, it received unsolicited applications from the physicians who sought to join BCBS-MS's provider network.  (*Id.* at 2).   BCBS-MS allowed these physicians to join its provider network because they operated in a county (in Alabama) that is contiguous to the state of Mississippi.   (*Id.*).    BCBS-MS's corporate representative testified that these providers conducted their "primary business" within Mississippi but have physical offices in a contiguous county to the state of Mississippi.  (Doc. # 371, Ex. 37 at 71, Case No. 2:12-cv-02532-RDP).

---

[16]  This opinion discusses the individual Moving Defendants in descending order by number of members in Alabama.

BCBS-MS offers health insurance to employers with employees who reside outside the state of Mississippi.  (*Id.* at 21).  If an employer has employees in other states, including Alabama, BCBS-MS is aware of that fact when it agrees to provide health insurance products to the employer.  (*Id.* at 25).  It acts as a host plan for employees who work for employers based in Alabama.  (*Id.* at 39-40).  It can determine a subscriber's location of residence through enrollment information provided by an employer, an initial enrollment form completed by an individual purchasing an insurance plan, or an individual's address change in the electronic "membership portal."  (*Id.* at 49-50).  It does not issue health insurance to individual applicants who do not reside in Mississippi when they apply.  (*Id.* at 50).

From 2008 to 2013, an average of 4,186 subscribers and 7,463 members of BCBS-MS resided in the state of Alabama each year.  (*See* Doc. # 218, Ex. 22, Case No. 2:12-cv-02169-RDP (averaging the subscribers and members provided for each calendar year in the chart)).  During those years, BCBS-MS received an average of $369,148.83 in premiums per year from Alabama subscribers.  (*See id.*).  Health care providers in Alabama submitted an average of 42,077 BlueCard claims to BCBS-MS per year, and BCBS-MS paid an average of $7,369,179.41 per year to settle those claims.  (*See id.*).  Moreover, from 2008 to 2013, an average of 1,894 BCBS-MS subscribers and 3,202 BCBS-MS members resided in the Northern District, and BCBS-MS received an average of $189,286.80 per year in premiums from subscribers in the Northern District.  (*See id.*).  Health care providers in the Northern District submitted an average of 18,651 BlueCard claims per year to BCBS-MS, and BCBS-MS paid an average of $2,710,749.23 to settle those claims.  (*See id.*).

BCBS-MS owns a subsidiary, Bluebonnet Life Insurance Company, that conducts business in Alabama and is licensed to sell life insurance in Alabama.  (Doc. # 371, Ex. 37 at 67-

68, Case No. 2:12-cv-02532-RDP).   Currently, Bluebonnet Life Insurance Company does not actively sell or market life insurance to groups or individuals residing outside of Mississippi. (*Id.* at 68-69).

    **C.**    **HealthNow New York, Inc., d/b/a BlueCross BlueShield of Western New York and BlueShield of Northeastern New York ("HealthNow")**

HealthNow is a nonprofit corporation that is incorporated in New York and has its principal place of business in New York.   (Doc. # 211, Ex. 4 at 1, Case No. 2:12-cv-02169-RDP).   HealthNow's manager of national accounts has averred that, from 2013 to June 2016, HealthNow did not file tax returns or pay taxes in Alabama.   (*Id.* at 2).   From 2013 to 2016, an average of 2,084 HealthNow members resided in Alabama per year, and an average of 1,027 of those members resided in the Northern District.   (*Id.* at 3).   According to HealthNow's affidavit, approximately 0.4 percent of its members resided in Alabama during those years, and approximately 0.2 percent resided in the Northern District.   (*See id.*).   On average, during a four year period referenced in HealthNow's supplemental affidavit, it received $2,850,465 per year in premiums from its members in Alabama and an average of $902,248 per year in premiums from its members in the Northern District.   (Doc. # 220, Ex. 4 at 2, Case No. 2:12-cv-02169-RDP).

From 2012 to 2015, an average of 2,254 HealthNow members each year received health care services in Alabama through the BlueCard Program.   (Doc. # 211, Ex. 4 at 3, Case No. 2:12-cv-02169-RDP).   An average of 1,741 members each year received health care services in the Northern District.   (*Id.*).   Thus, less than one percent of HealthNow's total membership received health care services in Alabama or the Northern District.   (*See id.* at 4).   To settle providers' BlueCard claims, HealthNow paid an average of $4,333,427 per year to providers in Alabama, of which an average of $2,707,830 per year was paid to providers in the Northern District.   (Doc. # 220, Ex. 3 at 3, Case No. 2:12-cv-02169-RDP).

### D.    Capital BlueCross ("Capital")

Capital "is a Pennsylvania hospital plan corporation."  (Doc. # 213, Ex. 1 at 1, Case No. 2:12-cv-02169-RDP).   According to a Capital paralegal, Capital only issues individual health insurance plans for individuals who reside in 21 counties within Pennsylvania and group health insurance plans for employers who are headquartered or have a "corporate presence within Capital's 21-county service area."   (*Id.* at 2).   Capital's insurance policies are issued in Pennsylvania, governed by Pennsylvania law, and contain forum selection clauses that require disputes to be handled by courts located in Dauphin County, Pennsylvania.  (*Id.* at 2-3).  Capital does not contract with medical providers in Alabama.  (*Id.* at 3).

As of April 2015, Capital has 245 subscribers and 587 members who reside in Alabama.  (*Id.*).   Of those subscribers and members, 148 subscribers and 386 members reside in the Northern District.  (*Id.* at 3-4).  According to Capital, "approximately 0.080% of [its] members" reside in the state of Alabama, and "approximately 0.053%" of its members reside in the Northern District.  (*Id.* at 4).

Capital's affiant has asserted that it "derives no revenue from its activities" in Alabama.  (*Id.* at 3).  In 2012, it paid $2,074,988.83 to settle BlueCard claims arising from health care services provided in Alabama.  (*Id.* at 4).  During the first eight months of 2013, Capital received 8,888 claims from Alabama-based providers of health care services and paid $2,375,717.59 to settle those claims.  (*See* Doc.  # 218, Ex. 24, Case No. 2:12-cv-02169-RDP).  Of those claims, 6,645 claims came from providers based in the Northern District, for which Capital paid $2,061,697.57.   (*See id.*).   During those eight months, Capital obtained approximately $720,859.26 in premiums and $149,405.57 in administrative fees from subscribers residing in Alabama.  (*Id.* at 2).

Capital offers group insurance plans to employers with employees who reside outside of Capital's geographic service area.  (Doc. # 218, Ex. 6 at 27-28, Case No. 2:12-cv-02169-RDP). According to Capital's corporate representative, Capital is aware that some of its subscribers live and work outside of its geographic service area.  (*Id.* at 33).  Having said that, if an insurance group has between one and one hundred members, Capital requires that at least twenty-five percent of the employer's enrolling subscribers reside within Capital's geographic service area. (*Id.* at 34-35).  For small and midsize group plans, Capital is aware of where subscribing employees reside before it issues insurance coverage because enrollment applications must include an employee's residential address.  (*Id.* at 42-43).  For large group plans, Capital is aware of the subscribers' residential locations at the time that the group plan is formed because the employees' residential addresses are submitted in order for Capital to produce an "experience-rated" quote.  (*Id.* at 44).

### E.    Blue Cross Blue Shield of Arizona ("BCBS-AZ")

BCBS-AZ is an Arizona corporation whose principal place of business is in Arizona. (Doc. # 211, Ex. 1 at 1, Case No. 2:12-cv-02169-RDP).  According to BCBS-AZ's corporate ombudsman, from 2013 to 2015, an average of 474 BCBS-AZ members resided in Alabama each year; of those members, an average of 266 resided in the Northern District.   (*Id.* at 3). Additionally, from 2012 to 2016, an average of 530 BCBS-AZ members received health care services in Alabama per year, and an average of 411 of those members received medical services in the Northern District.  (*Id.*).  From 2012 to 2015, BCBS-AZ collected an average of $427,064 per year in premiums from its subscribers in Alabama, including an average of $234,976 per year in premiums from subscribers in this district.  (Doc. # 220, Ex. 1 at 2, Case No. 2:12-cv-02169-RDP).  From 2013 to 2015, BCBS-AZ paid an average of $1,967,555 per year to settle claims

submitted by Alabama providers through the BlueCard Program.  (*Id.* at 2-3).  And BCBS-AZ paid an average of $1,550,888 per year to providers in the Northern District.[17]  (*Id.*).

A corporate representative for BCBS-AZ acknowledged that it is able to provide health insurance to employees who reside outside of Arizona if their employer is based in Arizona, unless the employee resides in Washington or Mississippi.  (Doc. # 218, Ex. 7 at 21-22, Case No. 2:12-cv-02169-RDP).  BCBS-AZ cannot "transact insurance" in Washington or Mississippi due to license requirements in those states.  (*Id.* at 22).  When an employer seeks to purchase health insurance from BCBS-AZ, BCBS-AZ requests that the employer provide residency information about its employees so that it can produce an accurate quote.  (*Id.* at 40-41).  BCBS-AZ stores residency information about its subscribers in a database.  (*Id.* at 41).

### F.   Noridian Mutual Insurance Company, d/b/a/ Blue Cross Blue Shield of North Dakota ("BCBS-ND")

 BCBS-ND is a North Dakota company whose principal place of business is in North Dakota.  (Doc. # 211, Ex. 5 at 1, Case No. 2:12-cv-02169-RDP).  According to a vice president's affidavit, BCBS-ND has not entered into a contractual relationship with a health care provider in Alabama.  (*Id.* at 2).  It has not filed tax returns or paid taxes in Alabama.  (*Id.*).

From 2013 to 2016, an average of 364 BCBS-ND members resided in Alabama each year.  (*Id.* at 3).  Of these members, an average of 306 resided in the Northern District.  (*Id.*).  From 2012 to 2015, BCBS-ND collected an average of $748,299 per year in premiums from its members in Alabama.  (Doc. # 220, Ex. 5 at 2, Case No. 2:12-cv-02169-RDP).  Its members in the Northern District paid an average of $599,361 per year in premiums.  (*Id.*).

Moreover, from 2012 to 2015, an average of 760 BCBS-ND members received health care services from Alabama providers through the BlueCard Program each year.  (Doc. # 211,

---

[17]   The court has not included BCBS-AZ's BlueCard payments to providers in 2012 in its yearly average of payments because BCBS-AZ has only provided payment data for the final seven months of 2012.

Ex. 5 at 3, Case No. 2:12-cv-02169-RDP).  Of these members, on average, 656 received health care services in the Northern District.  (*Id.*).

BCBS-ND's corporate representative testified that the company requests the addresses for subscribers if it is producing a quote for a group.  (Doc. # 218, Ex. 15 at 22, Case No. 2:12-cv-2169-RDP).  Therefore, it sometimes knows the residential address of an out-of-state subscriber before issuing insurance  coverage to the subscriber.  (*Id.*).  For large employers, it might obtain the residential address of potential subscribers "through a census" of the employer.  (*Id.* at 23).  However, for small employers, "it's pretty well understood where [the employees] live."  (*Id.*).

### G.    Blue Cross Blue Shield of Kansas ("BCBS-KS")

BCBS-KS is a Kansas corporation whose principal place of business is in Kansas.  (Doc. # 211, Ex. 2 at 1, Case No. 2:12-cv-02169-RDP).  From 2013 to 2016, an average of 149 BCBS-KS members resided in Alabama.  (*Id.* at 3).  Unlike the other Moving Defendants, BCBS-KS has averred that it cannot calculate the monetary amount of premiums that it has received from its members in Alabama or its members in the Northern District because the company collects lump-sum premium payments from its group subscribers.  (Doc. # 220, Ex. 2 at 2, Case No. 2:12-cv-02169-RDP).

From 2012 to 2015, an average of 369 BCBS-KS members received health care services each year in Alabama through the BlueCard Program.  (Doc. # 211, Ex. 2 at 3, Case No. 2:12-cv-02169-RDP).  Of these members, approximately 321 each year received health care services in the Northern District.  (*Id.*).  During those years, BCBS-KS paid an average of $654,261 per year to settle BlueCard claims from health care providers located in Alabama.  (Doc. # 220, Ex. 2 at

2, Case No. 2:12-cv-02169-RDP).  And it paid approximately $553,266 per year for claims from providers located in this district.  (*Id.*).

BCBS-KS's corporate representative confirmed that it receives census forms from employers seeking to insure more than 50 employees.  (Doc. # 218, Ex. 4 at 39, Case No. 2:12-cv-02169-RDP).  Its census forms require the employer to provide a residential address for each employee.  (*Id.*).

### H.  Excellus BlueCross BlueShield ("Excellus")

Excellus is a New York corporation whose principal place of business is in New York. (Doc. # 212, Ex. G at 1, Case No. 2:12-cv-02169-RDP).  According to Excellus's vice president of sales, at the end of 2013, Excellus had 137 subscribers in the Northern District.  (Doc. # 212, Ex. H, Case No. 2:12-cv-02169-RDP). In 2013, Excellus obtained approximately $109,000 in premiums from its subscribers in the Northern District.[18]  Excellus's vice president of claims has averred that it paid $949,429.95 to providers in the Northern District for claims submitted in 2013.  (*Id.*, Ex. I).  And Excellus's counsel has also averred that the 2013 data from Excellus fairly represents its contacts with the Northern District.  (Doc. # 369, Ex. 27 at 1, Case No. 2:12-cv-02532-RDP ("Excellus . . . has no reason to believe that 2013 is not representative of the several years prior or since[.]").  According to Excellus's director of contract negotiations, it currently has no contracts with health care providers in Alabama.  (Doc. # 212, Ex. E, Case No. 2:12-cv-02169-RDP).

Excellus's corporate representative confirmed that it receives information about the geographic location of a group's employees during the application process through a census. (Doc. # 218, Ex. 8 at 103, Case No. 2:12-cv-02169-RDP).  The representative did not know how

---

[18]  Subscriber and Provider Plaintiffs have calculated the amount of premiums obtained by Excellus from Northern District subscribers, and Excellus has not disputed their calculations.  (*See* Doc. # 222 at 4, Case No. 2:12-cv-02169-RDP).

Excellus stored residential information about its subscribers.  (*See id.*).  The representative also was unaware of how many Excellus subscribers lived in Alabama or the Northern District.  (*Id.* at 104).

I.      **Blue Cross Blue Shield of Wyoming ("BCBS-WY")**

BCBS-WY is a Wyoming company whose principal place of business is in Wyoming. (Doc. # 211, Ex. 3 at 1, Case No. 2:12-cv-02169-RDP).  BCBS-WY has filed tax returns in Alabama for income that it derived from a partnership.  (*Id.* at 2).  Its affiant did not state how much income BCBS-WY derived from that partnership, but he noted that the income from this partnership constituted less than 0.01 percent of BCBS-WY's total income per year.  (*Id.*). BCBS-WY has contracted with one laboratory located in the Northern District.  (*Id.*).  But its affiant does not state how much business BCBS-WY conducted with that laboratory.  (*See id.*). According to a corporate representative, the laboratory, LabCorp, is headquartered in Alabama but has laboratories throughout the nation, including laboratories in Wyoming.  (Doc. # 218, Ex. 9 at 54-55, Case No. 2:12-cv-02169-RDP).

From 2013 to 2016, an average of 12 BCBS-WY members resided in Alabama each year, and approximately 4 of those members resided in the Northern District.  (*Id.* at 3).  From 2012 to 2015, BCBS-WY collected an average of $40,936 per year in premiums from its members in Alabama.  (Doc. # 220, Ex. 3 at 2, Case No. 2:12-cv-02169-RDP).  And it collected an average of $12,508 per year in premiums from its members in the Northern District.  (*Id.*).

From 2012 to 2015, an average of 386 BCBS-WY members received health care services in Alabama through the BlueCard Program each year; of those members, an average of 343 received heath care services each year in the Northern District.  (*Id.* at 3).  On average, BCBS-

WY paid $94,411 per year to settle claims from providers in Alabama through the BlueCard Program, and it paid $86,708 per year to settle claims from providers in this district. (*Id.*).

BCBS-WY's corporate representative asserted that it is not a control plan for a national account. (Doc. # 218, Ex. 9 at 65, Case No. 2:12-cv-02169-RDP). In most circumstances, BCBS-WY requires that a majority of a group plan's employees must live in Wyoming in order for it to issue health insurance to that group. (*See id.* at 26-27).

### J.    Triple-S Salud ("Triple-S")

According to an associate general counsel for Triple-S Management, Triple-S is licensed to conduct business in Puerto Rico and the U.S. Virgin Islands. (Doc. # 210, Ex. 1 at 1, Case No. 2:12-cv-02169-RDP). For the years 2008 to 2015, Triple-S had a maximum of 4 members reside in Alabama and a maximum of 3 members that resided in the Northern District. (*Id.*). As of March 31, 2016, two Triple-S members reside in Alabama. (*Id.*). Fifteen (15) Triple-S members received healthcare services in Alabama from January 2015 to March 2016 through the BlueCard Program. (*Id.* at 2). In 2012, Triple-S received 781 claims from Alabama providers through the BlueCard Program.[19] (Doc. # 369 at 9 & n. 25, Case No. 2:12-cv-02532-RDP). From 2011 to 2015, Triple-S obtained approximately $42,360 in premiums from ten different Alabama subscribers. (Doc. # 218, Ex. 28, Case No. 2:12-cv-02169-RDP).

From 2008 to 2010, Triple-S paid approximately $735,000 to ActekSoft, a Birmingham-based firm that produces software for the insurance and health care payer markets.[20] (Doc. #

---

[19]   Triple-S has not disputed this factual assertion by Provider Plaintiffs. (*See* Doc. # 382 at 4, Case No. 2:12-cv-02532-RDP).

[20]   Triple-S has produced a spreadsheet outlining payments that it made to a single vendor. (Doc. # 218, Ex. 27 at 4, Case No. 2:12-cv-02169-RDP). The spreadsheet notes that three of the payments were made to "Actek." However, neither the spreadsheet nor the cover letter sent by Triple-S's counsel identified the vendor who received the rest of these payments. At oral argument, Triple-S's counsel confirmed that all of the payments were made to ActekSoft, not just the payments identified by check marks placed on the document. (Doc. # 905 at 162, Case No. 2:13-cv-20000-RDP). Because the spreadsheet does not indicate that Triple-S received any discounts from

218, Ex. 27 at 4, Case No. 2:12-cv-02169-RDP).  *See also* Lauren B. Cooper, *California Firm Buys Birmingham's ActekSoft*, Birmingham Business Journal (Feb. 10, 2010, 12:17 PM), http://www.bizjournals.com/birmingham/stories/2010/02/08/daily16.html.   Triple-S   regularly paid ActekSoft several times each year.  (*See* Doc. # 218, Ex. 27 at 4, Case No. 2:12-cv-02169-RDP).  Also, Triple-S paid BECPR, Inc. $5,000 in September 2010 and $10,000 in January 2011 for professional consulting services.  (*Id.* at 5-6).

According to Triple-S's corporate representative, it does not know how many members live in Alabama because it relies on members to self-report their residences.  (Doc. # 371, Ex. 7 at 40-41, Case No. 2:12-cv-02532-RDP).  But the representative provided inconsistent answers when asked whether Triple-S receives information about the geographic location of out-of-territory subscribers before it issues health insurance to an employer headquartered in Puerto Rico.  On the one hand, when asked whether Triple-S obtains documents from an employer showing the geographic location of its employees "as part of the due diligence for Triple-S providing coverage," the representative responded that Triple-S receives such documents.  (*Id.* at 127).  In addition, the representative testified that employers seeking group health coverage inform Triple-S during negotiations whether they want Triple-S to provide health insurance to employees living outside of Puerto Rico.  (*Id.* at 128).  The representative also confirmed that Triple-S could sometimes learn of the geographic location of employees who would be covered by a proposed insurance group through a census of an employer.  (*Id.* at 130).  On the other hand, the representative testified that Triple-S clearly informs employers seeking health insurance "that the service area is Puerto Rico."  (*Id.* at 129-30).  And she denied that Triple-S receives written

---

ActekSoft, the court infers that Triple-S paid ActekSoft the amount requested in its invoices, as reflected by the spreadsheet.

information concerning where potential subscribers reside when it decides whether to issue an insurance contract.  (*Id.* at 131).

### K.  BlueCard Program

The BlueCard Program allows a member of a Blue Plan to obtain health care services "while traveling or living in another [Blue Plan's] Service Area"  (Doc. # 369, Ex. 36 at 3, Case No. 2:12-cv-02532-RDP).  The Program allows a member to receive the benefits provided by their Home Plan while accessing the "provider networks and savings" from the Host Plan.  (*Id.*).

When a member of an out-of-area Blue Plan receives medical services from a health care provider, the provider submits a claim to the local Host Plan, not the member's Home Plan.  (*Id.* at 5).  The Host Plan "validates the provider information and applies its pricing . . . using a set of standard pricing methods and rules."  (*Id.*).  The Host Plan must inform the out-of-area Home Plan about the discounts and differentials that it receives from the health care provider.  (*Id.* at 5-6).  When a Home Plan receives a BlueCard submission from a Host Plan, the Home Plan reviews the member's coverage and determines whether the member was eligible to receive the medical services rendered by the provider.  (*Id.* at 6).  The Home Plan approves or denies the claim and sends its adjudication to its member.  (*Id.*).  Also, it sends a disposition of the claim to the Host Plan, which includes an authorization to pay the provider, standard administrative expense allowances, and any applicable "network access fee."  (*Id.*).  The Host Plan may charge a network access fee for "delivering the benefits of its provider contracts or networks" to an out-of-area Blue Plan.  (*Id.*).  According to the Internal Revenue Service, "Access Fees are usually computed as a percentage of the savings between a provider's standard rate and [the Host Plan's] contracted rates."  (*Id.*).

## IV.     Standard of Review

A Rule 12(b)(2) motion tests the court's exercise of personal jurisdiction over a defendant.  *See* Fed. R. Civ. P. 12(b)(2).   "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction."  *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009); *see also Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 (11th Cir. 1999) ("A plaintiff seeking to obtain jurisdiction over a nonresident defendant initially need only allege sufficient facts to make out a prima facie case of jurisdiction.").  If a plaintiff satisfies his initial burden and a defendant then challenges personal jurisdiction by submitting affidavit evidence in objection to personal jurisdiction, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.  *See Meier ex rel. Meier v. Sun International Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002); *see also Posner*, 178 F.3d at 1214 ("The plaintiff bears the burden of proving 'by affidavit the basis upon which jurisdiction may be obtained' only if the defendant challenging jurisdiction files 'affidavits in support of his position.'" (citation omitted)).   When the issue of personal jurisdiction is decided on the evidence, but without a discretionary hearing, a plaintiff demonstrates a "prima facie case of personal jurisdiction" by submitting evidence sufficient to defeat a motion made pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.  *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1317 (11th Cir. 2006). At this evidentiary juncture, the court construes the complaints' allegations as true if they are uncontroverted by affidavits or deposition testimony, *id.*, and where there are conflicts, the court "construe[s] all reasonable inferences in favor of the plaintiff[s]." *Whitney Info. Network, Inc. v. Xcentric Ventures, LLC*, 199 F. Appx. 738, 741 (11th Cir. 2006) (unpublished) (quoting *Meier*, 288 F.3d at 1269).

A Rule 12(b)(3) motion tests whether venue is proper in the court selected by a plaintiff. *See* Fed. R. Civ. P. 12(b)(3). "When venue is challenged by a Rule 12(b)(3) motion, [a] plaintiff has the burden of showing that venue in the forum is proper." *Pritchett v. Paschall Truck Lines, Inc.*, 714 F. Supp. 2d 1171, 1172 (M.D. Ala. 2010). The court must accept the complaint's allegations as true, unless those allegations are contradicted by a defendant's affidavit testimony. *Id.* If an allegation in the complaint is challenged, "the court may examine facts outside of the complaint to determine whether venue is proper" and "may make factual findings necessary to resolve motions to dismiss for improper venue." *Id.* (quoting *Bryant v. Rich*, 530 F.3d 1368, 1376 (11th Cir. 2008)).

## V.      Analysis

Provider Plaintiffs and Subscriber Plaintiffs have provided four possible grounds to justify the court's exercise of personal jurisdiction over Moving Defendants. First, according to Plaintiffs, Section 12 of the Clayton Act grants the court personal jurisdiction over Moving Defendants because all Moving Defendants transact business in Alabama and the court's exercise of personal jurisdiction comports with the Fifth Amendment's Due Process Clause. Second, all Moving Defendants are subject to personal jurisdiction under Alabama's long-arm statute because they are parties to a conspiracy and at least one of their co-conspirators has taken overt acts in furtherance of the conspiracy in Alabama. Third, Alabama's long-arm statute authorizes personal jurisdiction over Moving Defendants because they have established minimum contacts with the state of Alabama, and the court's exercise of personal jurisdiction comports with the Fourteenth Amendment's Due Process Clause. Finally, Plaintiffs claim that personal jurisdiction is appropriate under Alabama's long-arm statute because Moving

Defendants have committed an intentional tort and the effects of that tort were aimed towards Alabama.

Additionally, Provider Plaintiffs and Subscriber Plaintiffs argue that venue is proper in this court for two reasons.  First, Section 12 of the Clayton Act, in addition to establishing personal jurisdiction in this court, establishes venue in this district because all Moving Defendants transact business within this district.  Second, venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the actions giving rise to Defendants' market allocation conspiracy occurred in this district.

The court first will address whether Section 12 of the Clayton Act establishes personal jurisdiction and venue in this district under the integrated approach.   Then, the court will examine whether it may exercise personal jurisdiction over Moving Defendants under the conspiracy theory of personal jurisdiction.   Next, the court will address whether Moving Defendants have established minimum contacts in Alabama by purposefully availing themselves of the privilege of conducting business in this state.[21]   Finally, the court will discuss whether venue is proper in this court under 28 U.S.C. § 1391, the general venue statute.

---

[21]   After careful review and lengthy deliberation, the court concludes that it need not determine whether Moving Defendants are subject to the court's personal jurisdiction under the effects test applied in *Calder v. Jones*, 465 U.S. 783 (1984).   Most of the cases applying the *Calder* effects test to antitrust actions use the test to demonstrate that a foreign defendant has expressly aimed its conduct towards the United States as a whole, rather than towards a particular state.   *See, e.g.*, *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 207-08 (2d Cir. 2003).   And, although the Ninth Circuit has applied the *Calder* effects test to establish personal jurisdiction over domestic defendants, the defendants in that case had  made "wash sales" and had conducted other acts to manipulate the natural gas market in a particular state, Wisconsin.   *See In re Western States Wholesale Natural Gas Antitrust Litigation*, 715 F.3d 716, 742-45 (9th Cir. 2013), *aff'd sub nom.*, *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015). Here, in contrast, Moving Defendants have a stronger argument that their market allocation scheme was not directed at a particular state.   Rather, to the extent any scheme existed, it was conducted nationwide and was, by all accounts, intended to have nationwide effect.   Because the court finds that Moving Defendants are subject to the court's personal jurisdiction on three alternative grounds, it declines to rule upon whether they are subject to personal jurisdiction in Alabama under the *Calder* effects test.

**A.     The Court May Exercise Personal Jurisdiction Over Moving Defendants Under Section 12 of the Clayton Act Because Venue is Proper in This District Against All Moving Defendants Under Section 12**

Provider and Subscriber Plaintiffs both assert that Moving Defendants are subject to the court's personal jurisdiction because the actions currently at issue are brought under the antitrust laws and Moving Defendants conduct substantial business within the Northern District of Alabama. (*See* Doc. # 218 at 8-19, Case No. 2:12-cv-02169-RDP; Doc. # 369 at 3-14, Case No. 2:12-cv-02532-RDP).   In challenging this basis for personal jurisdiction and venue, Moving Defendants first argue that they do not conduct substantial business within the Northern District because (1) they do not meet the factors for conducting substantial business in this district, and (2) only a small percentage of their members have resided in this district or received health care services from providers in this district.[22]   Second, Moving Defendants assert that the court's exercise of personal jurisdiction under Section 12 does not comport with their due process rights because it would impose an unreasonable burden on them, the federal interests present in these actions do not outweigh that burden, and they only have limited and incidental contacts with Alabama.[23]

For the reasons explained below, the court concludes that venue is proper in the Northern District for the claims against all Moving Defendants under Section 12 of the Clayton Act because all Moving Defendants have conducted substantial business in this district. Accordingly, for the following reasons, the court finds that venue is proper in this court under Section 12 of the Clayton Act, for that reason it may exercise personal jurisdiction over

---

[22]   (*See* Docs. # 209 at 4-8; 210 at 18 ; 211, Memorandum of Certain Defendants in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, at 9-10; 212 at 4; 213 at 6, Case No. 2:12-cv-02169-RDP).

[23]   (*See* Docs. # 209 at 8; 210 at 19-23; 211, Memorandum of Certain Defendants in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, at 10-13; 213 at 6-7, Case No. 2:12-cv-02169-RDP).

Defendants under Section 12, and that this exercise of personal jurisdiction does not offend the Due Process Clause of the Fifth Amendment.

### i) The Relevant Legal Standards

Under Section 12 of the Clayton Act:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. Section 12 contains both a personal jurisdiction provision and a venue provision for corporate defendants sued under the antitrust laws. *KM Enters., Inc. v. Global Traffic Techs., Inc.*, 725 F.3d 718, 724 (7th Cir. 2013). Venue is appropriate in any district where the corporation (1) is an inhabitant, (2) is found, or (3) transacts business.[24] *Id.* Section 12's personal jurisdiction clause "provides for nationwide (indeed, worldwide) service of process and therefore nationwide personal jurisdiction." *Id.*

Section 12 of the Clayton Act enlarged the specific antitrust venue provision contained in Section 7 of the Sherman Act, which had permitted plaintiffs to bring an antitrust suit in any district where a corporate defendant could be found or resided. *United States v. Scophony Corp. of America*, 333 U.S. 795, 804-05 (1948). Congress enacted Section 12 to "relieve[ ] persons injured through corporate violations of the antitrust laws from the often insuperable obstacle of resorting to distant forums for redress of wrongs done in the places of their business or residence." *Id.* at 808 (internal quotation marks omitted). Thus, "Section 12 venue is broader than venue under either the Sherman Act or the general venue statute as it existed in 1914." *KM Enters.*, 725 F.3d at 730. Nevertheless, although Congress intended for the Clayton Act to

---

[24] Neither group of Plaintiffs has argued that any of the Moving Defendants are an inhabitant of the Northern District or that they can be found in the Northern District. Thus, the court's discussion is limited to the transacts-business prong for establishing venue under Section 12.

provide broader procedural remedies for plaintiffs who had suffered antitrust injuries, "it was . . .

quite careful in expanding venue, rejecting several broader proposals than the one finally enacted

in Section 12." *Daniel v. Am. Bd. of Emergency Medicine*, 428 F.3d 408, 425 (2d Cir. 2005)

(quoting *United States v. National City Lines*, 334 U.S. 573, 588 (1948)).  Instead, "it created

specific limits on venue—limits that for many corporations would result in a set of permissible

districts much smaller than the entire United States." *KM Enters.*, 725 F.3d at 730.

In an earlier opinion, the court addressed the ongoing circuit split on the issue of whether

the personal jurisdiction and venue clauses of Section 12 must be applied in conjunction or

whether a plaintiff can mix and match these clauses with other statutory provisions. *In re Blue

Cross Blue Shield Antitrust Litigation*, 26 F. Supp. 3d 1172, 1194-96 (N.D. Ala. 2014).  In that

opinion, the court noted that the Eleventh Circuit had not addressed (as of the time of the

opinion) the circuit split. *Id.* at 1195.  To the court's knowledge, the Eleventh Circuit still has

not addressed this circuit split.  In the absence of binding authority, the court adopted the

majority "integrated" approach, as best articulated by the Seventh Circuit in its *KM Enterprises*

opinion. *Id.* at 1196.  Thus, "[t]o avail oneself of the privilege of nationwide service of process,

a plaintiff must satisfy the venue provisions of Section 12's first clause.  If she wishes to

establish venue exclusively through Section 1391, she must establish personal jurisdiction some

other way." *KM Enters.*, 725 F.3d at 730.

Under Section 12, venue is appropriate for an antitrust suit against a corporate defendant

in any district where the defendant engages in "any substantial business operations." *Scophony

Corp.*, 333 U.S. at 807.  A court must judge whether a defendant transacts substantial business in

a district "from the point of view of the average businessman and not in proportion to the sales or

26

revenues of the defendant." *Black v. Acme Markets, Inc.*, 564 F.2d 681, 687 (5th Cir. 1977).[25]
Both purchases by a defendant in a district and sales by a defendant in a district are considered
transactions of business for purposes of Section 12. *Id.* And the purchases and sales considered
by a court to determine whether a defendant has conducted substantial business in a district need
not be connected to the subject matter of the antitrust suit. *Id.* A corporation can transact
business within a district even if all of the relevant transactions are interstate in character. *King
v. Johnson Wax Assocs., Inc.*, 565 F. Supp. 711, 716 (D. Md. 1983).

According to the *King* opinion, "courts generally are in agreement that a corporation's
contacts with a district must be somewhat regular and continuous; meager, sporadic dealings
within the district are not sufficient." *Id.* Although there is no "singular definitive test for
transacting business," the most important factor to consider is "the dollar amount of business
transacted in the district." *In re Chicken Antitrust Litigation*, 407 F. Supp. 1285, 1291 (N.D. Ga.
1975).

At oral argument and in their briefs, the Moving Defendants have pointed the court to
certain authority in support of their arguments that the court should consider the percentage of
their total business conducted within this district as a factor weighing against the propriety of
Section 12 venue in this district. (*See, e.g.*, Doc. # 209 at 5-6, Case No. 2:12-cv-02169-RDP
(citing *KM Enterprises*, *Jung v. Association of American Medical Colleges*, 300 F. Supp. 2d 119
(D.D.C. 2004), *Sanderson v. Spectrum Labs, Inc.*, 227 F. Supp. 2d 1001 (N.D. Ind.), *aff'd*, 248
F.3d 1159 (7th Cir. 2000) (unpublished), and *Buckeye Associates, Ltd. v. Fila Sports, Inc.*, 616 F.

---

[25] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit
adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30,
1981. The court has not discovered any Eleventh Circuit opinion discussing in any detail the test for "transacting
business" under Section 12. *Cf. DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 855 n. 16
(11th Cir. 1988) (declining to address whether venue was proper in a district court under Section 12 of the Clayton
Act because it was proper under 28 U.S.C. § 1391).

Supp. 1484 (D. Mass. 1985), in support of BCBS-MS's Section 12 venue argument; (*see also* Doc. # 211, Memorandum of Certain Defendants in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, at 9-10, Case No. 2:12-cv-02169-RDP (citing *KM Enterprises*, *Daniel*, *Sanderson*, and *Austad v. United States Steel Corp.*, 141 F. Supp. 437 (N.D. Cal. 1956), in support of five Moving Defendants' Section 12 venue argument)). The problem for them in making this argument is that the authority they rely upon is non-binding and wholly inconsistent with binding precedent in the former Fifth Circuit which addresses Section 12's application in determining when a corporation has transacted substantial business in a particular district. Over sixty years ago, in *Green v. United States Chewing Gum Manufacturing Co.*, the former Fifth Circuit reviewed whether a chewing gum manufacturer had transacted substantial business in a district where it had shipped gum to customers who had ordered it by mail but had not solicited business from those customers within the district. 224 F.2d 369, 369-70 (5th Cir. 1955). Like the Moving Defendants in these cases, the gum manufacturer in *Green* challenged the propriety of venue under Section 12 by averring that the business it obtained from the Northern District of Texas was "a very small part of [its] total business." *Id.* at 370-71. It had only two regular customers in the district, sold 6,000 pounds of chewing gum per month to customers in the district, and had approximately $25,000 per year in sales within the district. *Id.* The Fifth Circuit held that the manufacturer's deliveries to the district constituted substantial business within the meaning of the Act. *Id.* In so holding, the former Fifth Circuit rejected the defendant's argument that Section 12 venue was inapplicable because the defendant had conducted only a small percentage of its total business in the district. *Id.* at 371-72. "[F]or if that were the rule, we would have different tests of substantiality applying to different

corporations according to their size; a large corporation could, with impunity, engage in the same acts which would subject a smaller corporation to jurisdiction and venue."[26]  *Id.* at 372.

This binding precedent continued in *Black*.  There, the former Fifth Circuit held that venue was proper in the district where the suit had been filed because the defendant had purchased nearly $1.5 million in products from the district in one year.  564 F.2d at 687-88.  It noted that the defendant had purchased approximately $375,000 in aluminum foil directly from a manufacturer in the district and further stated (in a footnote) that this purchase alone was sufficiently significant to support venue under Section 12.  *Id.* at 687 & n. 10.   The court concluded that venue could also be supported by the defendant's purchases from a corporation headquartered in the district, which totaled more than $1 million, even though an unspecified portion of those purchases were made through a broker in another district.  *Id.* at 687 n. 10. Similarly, the former Fifth Circuit held in another case that a single sale within a district was sufficient to establish venue under Section 12 where the defendant personally solicited the plaintiff's business in Alabama, made an offer to the plaintiff, and agreed to license films to the plaintiff for $32,000, payable over 35 months.  *Pape Television Co. v. Associated Artists Prod. Corp.*, 277 F.2d 750, 751-52 (5th Cir. 1960).

---

[26] During oral argument, counsel for BCBS-MS insisted that the former Fifth Circuit looked to the nature of a defendant's industry in order to determine whether it had conducted substantial business in a district, referring to *Datamedia Computer Service, Inc. v. AVM Corp.*, 441 F.2d 604 (5th Cir. 1971).  (Doc. # 905 at 146, Case No. 2:13-cv-20000-RDP).  But the *Datamedia Computer* opinion provides no help to Moving Defendants on this issue for two reasons.  First, the *Datamedia Computer* court relied on *Green's* holding that the court must look to the average businessperson's point of view, not the percentage of business that the defendant transacted within the district, to determine whether that defendant conducted substantial business in a district.  *See Datamedia Computer*, 441 F.2d at 606, 608.  Second, the *Datamedia Computer* court considered the nature of a defendant's industry to explain why that defendant had conducted substantial business even though it had made only periodic sales in the district.  *Id.* at 608 ("We are here dealing with an industry which, by its very nature, makes sales, and can expect to make sales, only at intervals, governed largely by the periodical nature of the electoral process.").  Moreover, as discussed more fully below, the *Datamedia Computer* panel simply was not authorized to depart from *Green's* rule that a small percentage of business in a district does not allow an antitrust defendant to escape the drop of Section 12's net.

As an initial matter, the court concludes that the Moving Defendants' "percentage of revenue" approach to the substantial business test heads in the wrong direction. Although they cite several opinions (most of which arise from the Seventh Circuit or district courts within that circuit) that have considered the percentage of a defendant's sales in a particular district as a factor relevant to whether a defendant had conducted substantial business within a district, the court finds this approach is off the mark.[27] Some courts, particularly those in the Seventh Circuit, consider the percentage of sales within a district as a factor when determining whether a corporation has conducted substantial business within that district. *See KM Enters.*, 725 F.3d at 731-32 (noting that a defendant's "negligible sales" constituted "the weakest support for venue" where its $2,327 of direct sales in a district constituted 0.002 percent of its total sales during a four year period). But the binding precedent in our circuit expressly prohibits this court from considering the percentage of a defendant's purchases or sales within the Northern District when reviewing whether a defendant has conducted substantial business within this district. *Black*, 564 F.2d at 687; *Green*, 224 F.2d at 371-72.

Furthermore, even if binding precedent did not foreclose this court from applying the percentage of revenue approach advocated here (and, to be clear, it does), such an approach does not comport with the basic principles behind Section 12's transacts-business test.[28] First, the Supreme Court recognized in *Scophony Corporation* that the transacts-business prong of Section 12 "sloughed off the highly technical distinctions . . . glossed upon" the Sherman Act's venue provision in favor of a "practical and broader business conception of engaging in any substantial

---

[27]   (*E.g.*, Doc. # 209 at 5-6, Case No. 2:12-cv-02169-RDP (citing *KM Enterprises*, *Sanderson*, *Jung*, and *Buckeye Associates*); Doc. # 211, Memorandum of Certain Defendants in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, at 9, Case No. 2:12-cv-02169-RDP (citing *KM Enterprises*, *Sanderson*, and *Industrial Models, Inc. v. SNF, Inc.*, 2015 WL 2399089, at *2 (N.D. Ill. May 18, 2015) (unpublished))).

[28]   On this issue, the court disagrees with the Seventh Circuit's well-reasoned *KM Enterprises* opinion.

business operations." *Scophony Corp.*, 333 U.S. at 807.  The percentage of revenue approach adds a technical factor that an antitrust plaintiff would be required to consider in determining whether a particular district is an appropriate venue under Section 12.  That is, not only would a plaintiff be called upon to determine whether a defendant makes substantial sales or purchases in a district, it would also have to discern the percentage of a defendant's total revenue that it obtained from sales in the district.  The *Green* court emphatically rejected that application of Section 12 for this reason: such an approach favors large corporations over small corporations because, in marginal cases, a large corporation could make an identical amount of sales as a small business in a particular district but avoid jurisdiction under Section 12 based on its larger pool of total sales.  *Green*, 224 F.2d at 371-72.  Finally, as the *Scophony Corporation* Court observed, the transacts-business prong of Section 12 relieves antitrust plaintiffs of the burden of filing antitrust suits in far-flung districts.  333 U.S. at 808.  Under the percentage of revenue approach, a large corporation can (consciously or otherwise) place the burden on a plaintiff to file suit in distant districts (or, in the instance of a conspiracy case, be forced to split its claims up among a number of districts), even where that corporation makes tens (or hundreds) of thousands of dollars in sales in a particular district at issue.  For these reasons, the court declines to apply the percentage of revenue approach preferred by Moving Defendants.

> **ii)** **All Moving Defendants Have Conducted Substantial Business in the Northern District**

The Moving Defendants have consistently argued that they are regional entities who each issue insurance contracts in a particular geographic service area and solicit business from that particular geographic area.  But the affidavits submitted by Moving Defendants, along with the voluminous record produced by Provider and Subscriber Plaintiffs, paint a different portrait of the Moving Defendants.  To be sure, each of the Moving Defendants only issues insurance

contracts within a specific geographic service area.  But they all have subscribers throughout the United States (including some within in the Northern District), they all have entered into the BlueCard Program in order to access a nationwide provider network, and they all settle (and have settled) claims made by providers in the Northern District through the BlueCard Program.  Thus, after careful review of the submitted evidence, the court finds that all of the Moving Defendants have engaged in substantial business activities within the Northern District.

First, BCBS-MS clearly has transacted substantial business within the Northern District, as (1) it has received an average of $189,286.80 per year in premiums from subscribers in the Northern District from 2008 to 2013, and (2) its provider network has included nine physicians who reside in the Northern District.  (Doc. # 218, Ex. 26, Case No. 2:12-cv-02169-RDP; Doc. # 256, Ex. 1 at 1-2, Case No. 2:13-cv-20000-RDP).  Frankly, it is incredible for BCBS-MS to assert that its collection of approximately $190,000 in premiums per year from approximately 1,900 subscribers in this district constitutes *de minimis* business.  That in itself would be enough for the court to conclude that BCBS-MS engages in substantial business in this district.  But there is more.  The court also notes the millions of dollars in payments that BCBS-MS has made to providers in the Northern District for treatment received by its members.  (*See* Doc. # 218, Ex. 26, Case No. 2:12-cv-02169-RDP).  While BCBS-MS argues that its subscribers and network providers unilaterally located themselves in the Northern District, BCBS-MS accepted the in-district providers into its network with knowledge that they resided in the Northern District.  (Doc. # 256, Ex. 1 at 1-2, Case No. 2:13-cv-20000-RDP).  Because of BCBS-MS's substantial revenues from premiums paid by subscribers in the Northern District, and its inclusion of nine in-district providers within its provider network, the court finds that BCBS-MS conducts substantial business within the Northern District, notwithstanding the specific facts that BCBS-

MS has introduced to show its lack of presence in the Northern District.  *Cf. King*, 565 F. Supp. at 716 (confirming that a corporation can conduct substantial business in a district solely through interstate transactions).

Second, the court finds that HealthNow, Capital, BCBS-AZ, BCBS-ND, and Excellus each conduct substantial business within the district, based on the amount of premiums and administrative fees that these companies have received from subscribers within the Northern District.  According to their own affidavits, HealthNow collected approximately $900,000 per year in premiums from subscribers in the Northern District, BCBS-ND collected approximately $600,000 per year, and BCBS-AZ collected approximately $235,000 per year.  (Doc. # 220, Exs. 1 at 2, 3 at 2, 5 at 2, Case No. 2:12-cv-02169-RDP).  And the submitted affidavits demonstrate that HealthNow, BCBS-AZ, and BCBS-ND consistently conduct substantial business with subscribers in the Northern District, even though those subscribers mainly enter the Blue Plans' insurance networks through group insurance plans issued in the Blue Plans' respective geographic service areas.  (*See id.*).  Likewise, Capital's submitted affidavit demonstrates that it has conducted a large amount of business in the Northern District, as it received approximately $870,000 in premiums and administrative fees during an eight-month period in 2013.  (*See* Doc. # 218, Ex. 24 at 2, Case No. 2:12-cv-02169-RDP).  Capital has not indicated that its number of subscribers in this district has substantially decreased, nor has it provided more recent information about the amount of premiums and fees it has collected from Northern District subscribers.  Finally, Excellus has admitted that it obtained $109,000 in premiums from subscribers in the Northern District.  (*See* Doc. # 222 at 4, Case No. 2:12-cv-02169-RDP). Thus, even though HealthNow, Capital, BCBS-AZ, BCBS-ND, and Excellus do not have offices or employees in the Northern District and do not issue insurance contracts in the Northern

District, they all have conducted substantial business here because they have received over $100,000 per year in premiums from this district. *Cf. Green*, 224 F.2d at 371, 374 (concluding that a corporation conducted substantial business in a district when it sold $25,000 of products in the district per year).

Third, the court finds with little difficulty that BCBS-KS has conducted substantial business within this district based on the number of subscribers and members BCBS-KS has within the district and the considerable sum of money it pays to health care providers in this district for services received by its members. BCBS-KS has not provided the court with evidence regarding the amount of premiums it has received from subscribers in the Northern District. Since the court lacks easily reviewable evidence concerning the amount of premiums received by BCBS-KS, it has reviewed other factors to determine whether this Blue Plan has conducted substantial business within the district. BCBS-KS has had well over 100 subscribers within the Northern District per year and has made over $500,000 in payments to health care providers within the district. *Cf. Green*, 224 F.2d at 371, 374 (affirming the propriety of venue under Section 12 where a defendant had two regular customers in a district). Moreover, BCBS-KS has entered into the BlueCard Program in order to obtain discounts for health care services from an in-state corporation (BCBS-AL). BCBS-KS and the other Moving Defendants do not enter the BlueCard Program merely to obtain access to emergency or urgent medical care for traveling members. Rather, Moving Defendants know (or reasonably should know) that some of their members reside in Alabama, due to the hundreds or thousands of BlueCard claims each Moving Defendant receives from BCBS-AL, and they use the BlueCard Program to access discounted services from providers in this district. Plainly, these factors weigh heavily in favor

of finding that BCBS-KS has conducted substantial business within this district, notwithstanding its lack of offices and employees here.

BCBS-KS, along with other Moving Defendants, has argued that the presence of some of its members within this district does not establish that it transacts business here and has cited *Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426 (5th Cir. 1977), in support of this argument. The court is not convinced that the cases before it are analogous to *Golf City*. In *Golf City*, the Fifth Circuit held that the Professional Golf Association (PGA) did not transact substantial business within a district where (1) members of the PGA resided, (2) the PGA received free advertising through a golf magazine distributed in the district, (3) PGA membership applications were made available, and (4) the PGA granted memberships to a self-created club. 555 F.2d at 437-38. Here, unlike the PGA in the *Golf City* action, all of the Moving Defendants, including BCBS-KS and Excellus, have paying customers within this district and provide a service to those customers that requires them to pay third parties in this district for services rendered. Thus, the members of the Moving Defendants' insurance groups are quite distinct from the members of a professional organization. In addition, Moving Defendants have transacted business in this district by entering into an agreement with another insurance company who maintains a provider network within this district (BCBS-AL) to provide access to medical services for insured parties. Thus, the court finds it appropriate here to consider the number of subscribers and members (or, in simpler language, customers) a Moving Defendant has within this district to determine whether it has conducted substantial business in this district.

Finally, the court considers whether BCBS-WY and Triple-S have conducted substantial business within the Northern District. These Defendants' motions have presented a closer

question as they have historically maintained less than ten subscribers in this district.  However, for the reasons discussed below, the court finds that both have conducted substantial business here, and venue is appropriate for the antitrust claims against them under Section 12 of the Clayton Act.

With regard to BCBS-WY, several facts demonstrate that it has conducted substantial business in this district.  First, over a four year period, BCBS-WY has allowed approximately four members from the Northern District to remain in its insurance network.  (Doc. # 211, Ex. 3 at 3, Case No. 2:12-cv-02169-RDP).  *Cf. Green*, 224 F.2d at 371, 374 (affirming the propriety of venue under Section 12 where a defendant had two regular customers in a district).  Second, it has collected approximately $12,508 per year in premiums from its members in the Northern District.  (Doc. # 220, Ex. 3 at 2, Case No. 2:12-cv-02169-RDP).  *Cf. Green*, 224 F.2d at 371, 374 (affirming the propriety of venue under Section 12 where a defendant made $25,000 annually in sales in that district).  Third, BCBS-WY has paid an average of approximately $86,700 per year through the BlueCard Program to settle claims from providers in this district. (Doc. # 220, Ex. 3 at 2, Case No. 2:12-cv-02169-RDP).  Fourth, it has entered into the BlueCard Program and settled claims from Northern District providers through the BlueCard Program in order to provide its customers in the Northern District access to a provider network and to obtain discounts from those providers.  Even upon consideration of the facts presented in BCBS-WY's affidavits regarding its lack of traditional business activities in the state, the court concludes that BCBS-WY's interstate transactions involving this district constitute substantial business under Section 12 of the Clayton Act.  Therefore, BCBS-WY is subject to personal jurisdiction in this district.

Likewise, Triple-S has conducted substantial business operations in the Northern District. Triple-S appears to have maintained two to three members in the Northern District during the period between 2008 and 2015.  (Doc. # 210, Ex. 1 at 1, Case No. 2:12-cv-02169-RDP).  *Cf. Green*, 224 F.3d at 371, 374 (holding that a manufacturer conducted substantial business in a district where it had two regular customers).  And, even more significantly, from 2008 to 2011, Triple-S made over $750,000 in purchases from companies in this district.  (Doc. # 218, Ex. 27, Case No. 2:12-cv-02169-RDP).  *Cf. Black*, 564 F.2d at 687 & n. 10 (indicating that a single purchase of approximately $375,000 would qualify as substantial business operations in a district).  In addition, Triple-S received over 700 claims for payment from Alabama providers in 2012 through the BlueCard Program.  (Doc. # 369 at 9 & n. 25, Case No. 2: 12-cv-02532-RDP).  And, Triple-S entered into the BlueCard Program in order to receive discounted rates from health care providers throughout the United States, including those in the Northern District.  Through the BlueCard Program, Triple-S received claims processing services from BCBS-AL, which is headquartered in the Northern District.  Based on Triple-S's large purchases in this district, the presence of some Triple-S members in this district, the significant number of BlueCard claims Triple-S received from subscribers in Alabama, and Triple-S's receipt of discounted rates from health care providers through its participation in the BlueCard Program, the court concludes that Triple-S has conducted substantial business operations in this forum and is thus subject to personal jurisdiction in this district under Section 12.

> ### iii.   The Court's Exercise of Personal Jurisdiction Under Section 12 of the Clayton Act Comports with the Fifth Amendment's Due Process Clause

Moving Defendants argue that the court's exercise of personal jurisdiction over them under Section 12 of the Clayton Act does not comport with due process.  First, Moving

Defendants contend that litigating in this district imposes an unreasonable burden on them. (*See*, *e.g.*, Doc. # 211, Memorandum of Certain Defendants in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, at 11-12, Case No. 2:12-cv-02169-RDP). Second, Moving Defendants claim that the federal interests in litigating these actions in this district do not outweigh the burdens imposed upon them because "there is no clear congressional intent for all alleged antitrust co-conspirators to be tried in the same court," Section 12 does not establish nationwide venue or nationwide personal jurisdiction, and Plaintiffs' federal rights can be vindicated in other forums. (*See, e.g.*, *id.* at 12-13). The court disagrees with these arguments.

Like the Fourteenth Amendment's personal jurisdiction test, the Fifth Amendment's Due Process Clause requires a defendant to have fair notice that its activities may subject it to a suit in a particular forum. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 944-45 (11th Cir. 1997). A defendant may have fair warning if it has purposefully directed activities at residents of the forum. *Id.* at 945. When a court determines the constitutionality of exercising personal jurisdiction under the Fifth Amendment, though, the court must consider the United States as the relevant forum, not an individual state. *Id.* at 945 n. 16. Thus, where a defendant is a domestic corporation, that defendant has purposefully directed its activities towards the United States by incorporating in one of the states. *Id.* As all of the Moving Defendants are incorporated in the United States and issue insurance contracts within the United States, all of them have purposefully directed activity towards the United States.

The Fifth Amendment, like the Fourteenth Amendment, protects litigants from facing "the burdens of litigation in an unduly inconvenient forum." *Id.* at 945. When evaluating whether jurisdiction is fair and reasonable under the Fifth Amendment, "courts should balance

the burdens imposed on the individual defendant against the federal interest involved in the litigation." *Id.* at 946.  But, before the court weighs the federal interests in maintaining the suit against those personal burdens, the defendant must present a "compelling case" that jurisdiction is unreasonable. *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

When examining the burden on a defendant, a court must evaluate a defendant's aggregate contacts with the nation as a whole. *Id.* at 946-47.  In *BCCI Holdings*, the Eleventh Circuit held that the defendants had failed to present "any constitutionally significant inconvenience" and relied on three factors to support that holding.  *Id.* at 948.  First, the defendants were large corporations that provided services in metropolitan areas "along the eastern seaboard." *Id.*  Second, the *BCCI Holdings* action required worldwide discovery, indicating that Florida was not significantly more inconvenient to the defendants than other forums. *Id.*  Finally, the defendants presented no evidence that the Florida forum would significantly compromise their ability to litigate the case. *Id.*

Here, as in *BCCI Holdings*, Moving Defendants have failed to demonstrate that the court's exercise of personal jurisdiction under Section 12 would cause them to suffer constitutionally significant inconvenience.  First, all of the Moving Defendants are relatively large corporations who conduct significant amounts of business within the United States. *Cf. BCCI Holdings*, 119 F.3d at 948.  All of the Moving Defendants unquestionably have minimum contacts with the United States.  Although each Moving Defendant primarily conducts business in a single geographic service area, the Eleventh Circuit considered the defendants' lack of significant contacts with a particular state in the *BCCI Holdings* case and found that factor insufficient to override other factors favoring jurisdiction. *See id.*  Second, this case has involved (and will continue to involve) nationwide discovery, so this forum is not significantly more

inconvenient to Moving Defendants than other possible forums in the United States. *See id.* Finally, as discussed in detail below, Moving Defendants have not demonstrated how the continued litigation of these antitrust claims in this district impairs their ability to defend themselves from the claims.[29]   *Id.*   For these reasons, the court concludes that Moving Defendants have not demonstrated that they face "constitutionally significant inconvenience" from participating in these actions, and the court's exercise of personal jurisdiction pursuant to Section 12 of the Clayton Act accordingly comports with the Fifth Amendment's Due Process Clause. *See id.* Nevertheless, in the interest of completeness, the court will discuss the federal interests at stake in this case.

The federal interests presented by this case outweigh any burdens presented by Moving Defendants. The Supreme Court has described the federal interest in enforcing antitrust laws as "both familiar and substantial," as the antitrust laws preserve "economic freedom and our free-enterprise system." *Cal. Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110-11 (1980) (discussing the federal interest in antitrust enforcement as compared to the states' interest in regulating liquor) (citing *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972)). Indeed, Congress exercised its full authority under the Commerce Clause in Article I of the Constitution when it enacted the Sherman Act. *Id.* at 111. This federal antitrust enforcement interest is particularly well-served by maintaining these antitrust actions in Alabama because Alabama is a market in which a Blue Plan (here BCBS-AL) has a particularly high share of the health insurance market. (*See, e.g.*, Doc. # 244 at ¶ 415, Case No. 2:13-cv-20000-RDP). The strong federal interest in antitrust enforcement clearly outweighs the Moving Defendants'

---

[29] The court observes that *if* BCBS-AL is found to have agreed to a nationwide antitrust conspiracy with other Blue Plans through the Association, all Moving Defendants would necessarily be confronted with any appropriate injunctive relief that Provider Plaintiffs and Subscriber Plaintiffs might have available to them in addressing that conspiracy.

generalized assertions regarding burdens they will face by defending themselves in this forum. Moreover, as the Eleventh Circuit has recognized, a "strong federal interest" to have complex lawsuits conducted efficiently exists, and the procedure proposed by Moving Defendants would be inefficient because it would require Plaintiffs to file and litigate an antitrust suit in each forum where a Blue Plan operates. *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 850-51 (11th Cir. 1988). As Provider and Subscriber Plaintiffs each allege one overarching antitrust conspiracy between the Blue Plans through the Association, from which other antitrust violations flow, it makes sense to litigate the antitrust claims in one court, rather than in several courts.

In conclusion, venue is proper in this district for these actions under Section 12 of the Clayton Act because all Moving Defendants have transacted substantial business within the Northern District. The court may exercise personal jurisdiction over all Moving Defendants under Section 12, and the court's exercise of personal jurisdiction comports with the Fifth Amendment's Due Process Clause. Accordingly, Moving Defendants' motions to dismiss are due to be denied because personal jurisdiction and venue are appropriate under Section 12 of the Clayton Act.

> **B.** **Alternatively, Moving Defendants are Subject to this Court's Personal Jurisdiction Because Plaintiffs Have Sufficiently Alleged a Conspiracy to Which All Moving Defendants are Parties**

Both Provider and Subscriber Plaintiffs argue that Moving Defendants are subject to personal jurisdiction in Alabama because (1) Moving Defendants are parties to a conspiracy, (2) BCBS-AL has undertaken overt acts in furtherance of the conspiracy within Alabama, and (3) Moving Defendants were aware that the effects of the conspiracy would be felt in Alabama. (*See, e.g.*, Doc. # 371 at 14-19, Case No. 2:12-cv-02532-RDP; Doc. # 218 at 24-29, Case No.

2:12-cv-02169-RDP).   Moving Defendants contest this basis for personal jurisdiction on four grounds.   First, Moving Defendants assert that Provider and Subscriber Plaintiffs have made "vague and conclusory allegations of a conspiracy" that are insufficient, as a matter of law, to establish personal jurisdiction over nonresident parties to the alleged conspiracy.   (*See, e.g.*, Doc. # 211, Memorandum of Certain Defendants in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, at 21, Case No. 2:12-cv-02169-RDP).   Second, they argue that both Provider and Subscriber Plaintiffs have failed to allege that each Moving Defendant purposefully availed itself of the privilege of conducting business in Alabama.   (*See, e.g.*, *id.* at 22).   Third, they contend that both Provider and Subscriber Plaintiffs have failed to allege a conspiracy that has a substantial connection to Alabama.   (*See, e.g.*, Doc. # 210 at 23-24, Case No. 2:12-cv-02169-RDP).   Finally, they claim that the court's exercise of personal jurisdiction pursuant to the Alabama long-arm statute would not comport with fair play and substantial justice.   (*See, e.g.*, Doc. # 211, Memorandum of Certain Defendants in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, at 10-13, 22, Case No. 2:12-cv-02169-RDP).   The court disagrees with each of these contentions.

### i)        The Relevant Legal Standards

The determination of whether the exercise of personal jurisdiction over a nonresident defendant is appropriate involves a two-part analysis.   *See Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 855 (11th Cir. 1990); *see also Alexander Proudfoot Co. World Headquarters L.P. v. Thayer*, 877 F.2d 912, 919 (11th Cir. 1989).   First, the jurisdictional question under the state long-arm statute is considered.   *See Cable/Home Communication Corp.*, 902 F.2d at 855; *see also Alexander Proudfoot Co.*, 877 F.2d at 919. Second, if there is a basis for the assertion of personal jurisdiction under the state statute (that is,

if there are minimum contacts with the forum), the next determination to be made is whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *see also Cable/Home Communication Corp.*, 902 F.2d at 855; *Alexander Proudfoot Co.*, 877 F.2d at 919.   The nature and quality of the contacts may vary depending on whether the type of jurisdiction being asserted is specific or general.  *See Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000).  Only if both prongs of the analysis are satisfied may a federal or state court exercise personal jurisdiction over a nonresident defendant.

The reach of the Alabama long-arm statute is a matter of Alabama law.  Federal courts are required to construe the statute as would the Supreme Court of Alabama.  *See Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 890-91 (11th Cir. 1983).   Alabama's long-arm statute permits personal jurisdiction to the extent it "is not inconsistent with the constitution of this state or the Constitution of the United States."  Ala. R. Civ. P. 4.2(b).  Thus, the real question here is whether assertion of personal jurisdiction over Moving Defendants comports with the Fourteenth Amendment's Due Process Clause.  *See Olivier v. Merritt Dredging Co.*, 979 F.2d 827, 830 (11th Cir. 1992) (citing *Alabama Waterproofing Co. v. Hanby*, 431 So. 2d 141, 145 (Ala. 1983)).  Compliance with the Fourteenth Amendment's Due Process Clause exists where a defendant has minimum contacts with the forum state, and where the exercise of personal jurisdiction does not offend "traditional notions of fair play and substantial justice."  *Olivier*, 979 F.2d at 830-31 (quoting *International Shoe*, 326 U.S. at 316); *Madara v. Hall*, 916 F.2d 1510, 1516 (11th Cir. 1990).

The Alabama Supreme Court has recognized and adopted the conspiracy theory of personal jurisdiction. *See Ex parte United Ins. Cos.*, 936 So. 2d 1049, 1055 (Ala. 2006); *Ex parte McInnis*, 820 So. 2d 795, 806-07 (Ala. 2001). Under a conspiracy theory, a defendant who otherwise may not be subject to personal jurisdiction might be hailed into court if the plaintiff "plead[s] with particularity the conspiracy as well at the overt acts within the forum taken in furtherance of the conspiracy."[30] *McInnis*, 820 So. 2d at 806-07 (internal quotation omitted) (quoting *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997)). The Alabama Supreme Court has stated, though, that this is not a heavy pleading burden. *Ex parte Reindel*, 963 So. 2d 614, 623 (Ala. 2007). In *Reindel*, that court held that a plaintiff had sufficiently pled a *prima facie* case of personal jurisdiction based on the conspiracy theory where the plaintiff alleged that the defendants had conspired to conceal the financial condition of a company through fraudulent financial reports and to commit investment fraud, which involved negotiations with the plaintiff in Alabama. *Id.* at 624. In another case, the Eleventh Circuit in an unpublished opinion held that a plaintiff had pled an overt act in furtherance of an investment fraud conspiracy in Alabama where it had alleged that a defendant made a presentation in Alabama to the plaintiff about enrolling in a plan. *J&M Assocs., Inc. v. Romero*, 488 F. Appx. 373, 376 (11th Cir. 2012).

In *Ex parte Barton*, the Alabama Supreme Court considered whether a defendant had sufficient contacts with the state of Alabama in a case where the plaintiffs relied on the conspiracy theory to support personal jurisdiction. 976 So. 2d 438, 443-47 (Ala. 2007). The *Barton* court stated that "[a]llegations of fraud or a civil conspiracy, in certain circumstances, have been held to be sufficient to establish personal jurisdiction over an alleged out-of-state

---

[30] "The elements of civil conspiracy in Alabama are: (1) concerted action by two or more persons to (2) achieve an unlawful purpose or a lawful purpose by unlawful means." *J&M Assocs., Inc. v. Romero*, 488 F. Appx 373, 375 (11th Cir. 2012).

conspirator." *Id.* at 443.  The *Barton* plaintiffs, who were residents of Alabama, alleged that the defendants had conspired to make misrepresentations to them so that the defendants would be included as partners in an entity that plaintiffs operated in Alabama.  *Id.* at 445.  The defendant who challenged the court's personal jurisdiction presented general facts about his lack of contacts with Alabama, but did not contest the conspiracy allegations presented by the plaintiffs. *See id.*  The Alabama Supreme Court held that the defendant had failed to establish a *prima facie* lack of personal jurisdiction through his affidavit because (1) the affidavit did not challenge the conspiracy allegations in the complaint, which the court considered to be true, and (2) the conspiracy allegations demonstrated "contact through the conspiracy." *Id.* at 446-47.

"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476 (quoting *International Shoe*, 326 U.S. at 320).  Such factors include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Id.* at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (internal quotation marks omitted)).  A court's exercise of personal jurisdiction over a defendant does not violate due process when "these factors do not militate against otherwise permitted jurisdiction." *Licciardello v. Lovelady*, 544 F.3d 1280, 1284 (11th Cir. 2008).

ii) **Provider and Subscriber Plaintiffs Have Adequately Pled that the Moving Defendants Entered Into the Conspiracies Alleged in This Alabama Litigation**

Moving Defendants contend that Plaintiffs have made only vague and conclusory allegations of an unlawful conspiracy, but that argument is amiss.  Indeed, at a minimum, both Provider and Subscriber Plaintiffs have alleged that all Blue Plan Defendants, including Moving Defendants, agreed in 1987 to enter a Section 1 conspiracy to allocate geographic service areas by entering into License Agreements with the jointly-controlled BCBSA, through which they agreed (1) to only sell health insurance within a designated geographic service area under the Blue Cross and Blue Shield trademarks and (2) not to sell health insurance under the trademarks outside of their designated geographic service areas.  (*See, e.g.*, Docs. # 236 at ¶¶ 190, 192, 196; 244 at ¶¶ 350-51, Case No. 2:13-cv-20000-RDP).  These allegations present an adequately specific civil conspiracy by all Moving Defendants to violate Section 1 of the Sherman Act.  *See Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1262 (11th Cir. 1998) ("A § 1 conspiracy to restrain trade . . .  must allege 1) an agreement to enter a conspiracy, 2) designed to achieve an unlawful objective.").  In addition, Provider Plaintiffs have pled an adequately specific Section 1 conspiracy between the Blue Plans to fix prices for health care services by agreeing to not contract with health care providers outside of their designated geographic service areas and by agreeing to limit reimbursements paid by all Blue Plans to the rates negotiated by the Blue Plan within the provider's geographic area.  (*See* Doc. # 236 at ¶¶ 229-30).  Accordingly, both Provider and Subscriber Plaintiffs have pled a conspiracy between Moving

Defendants and other Defendants with the particularity required under Alabama law to support personal jurisdiction over Moving Defendants.[31]   *See McInnis*, 820 So. 2d at 806-07.

**iii)   Provider Plaintiffs and Subscriber Plaintiffs Have Adequately Pled that BCBS-AL Took Actions in Furtherance of the Alleged Conspiracies in Alabama**

After careful review of the complaints, the court concludes that both Provider and Subscriber Plaintiffs have adequately pled overt actions taken in Alabama in furtherance of the alleged conspiracies to which Moving Defendants allegedly agreed to join.

Provider Plaintiffs have alleged that BCBS-AL enforced the price fixing conspiracy by reimbursing an Alabama hospital at a lower rate for in-network claims to account for a higher rate that the hospital had charged Blue Cross Blue Shield of Minnesota.  (Doc. # 236 at ¶ 234, Case No. 2:13-cv-20000-RDP).   Moreover, Provider Plaintiffs have asserted that BCBS-AL negotiated lower provider reimbursement rates with Alabama health care providers, prevented those providers from offering the same rates to other health insurance companies, and allowed other Blue Plans to access those supra-competitive rates obtained from providers through the BlueCard Program.  (*Id.* at ¶¶ 326, 340).  The court finds that all of these asserted actions would have furthered the market allocation conspiracy between the Blue Plans which Plaintiffs have alleged because they allowed other Blue Plans to offer a nationwide provider network while at the same time maintaining their geographic market allocations.   Additionally, BCBS-AL has acted in Alabama to further the price fixing conspiracy by enforcing its terms against individual health care providers.   Accordingly, Provider Plaintiffs have sufficiently alleged overt acts in Alabama by BCBS-AL that furthered the alleged antitrust conspiracies.

---

[31]   The court is not suggesting that these are the *only* adequately-pled conspiracy claims in the operative Provider Plaintiff and Subscriber Plaintiff Complaints.   In the interest of efficiency, the court refrains from reviewing the adequacy of every conspiracy claim in the operative complaints.

Likewise, Subscriber Plaintiffs have adequately alleged that BCBS-AL has taken overt acts in furtherance of the nationwide conspiracies in the state of Alabama. First, they allege that BCBS-AL has agreed to only provide health insurance in Alabama under the Blue Cross and Blue Shield trademarks and has foregone opportunities to provide health insurance in other states.   (Doc. # 244 at ¶ 351, Case No. 2:13-cv-20000-RDP).   Second, they claim that all Blue Plans (including BCBS-AL) accept and process claims filed by health care providers in their designated geographic service areas through the BlueCard Program for out-of-state Blue Plans. (*Id.* at ¶ 236).   Although the consolidated complaint does not specify that BCBS-AL acts as a Home Plan in the BlueCard Program, this fact has not been disputed.   BCBS-AL acts in furtherance of the market allocation conspiracy by processing claims for other Blue Plans through the BlueCard Program because the BlueCard Program allows the Blue Plans to offer competitive health insurance services to national employers while maintaining their strict service area allocations.   If BCBS-AL did not accept claims from in-state health care providers on behalf of other Blue Plans, the other Blue Plans would be compelled *not* to offer health insurance to individuals residing in Alabama or threaten the geographic service area allocation by contracting with providers in Alabama.   Thus, BCBS-AL acts in furtherance of the alleged market allocation conspiracy by processing BlueCard claims on behalf of other Blue Plans, and its actions in furtherance of the alleged conspiracy support the court's exercise of personal jurisdiction over Moving Defendants.

The Moving Defendants incorrectly argue that Plaintiffs must demonstrate that they purposefully directed activities towards Alabama in order to support personal jurisdiction through the conspiracy theory.   Moving Defendants have cited this court's opinion in *Giraldo v. Drummond Co.*, 2012 WL 2358306 (N.D. Ala. June 20, 2012) (unpublished), *aff'd sub. nom*,

*Doe v. Drummond Co.*, 782 F.3d 576 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016), to support this argument.  But the conspiracy allegations in the *Giraldo* litigation were far afield from those made by Plaintiffs in this case.  In *Giraldo*, the plaintiffs alleged that certain defendants had formed a conspiracy in Colombia with a guerilla group to commit violations of the law of nations.  *See Giraldo*, 2012 WL 2358306, at *1, 6.  They also alleged that one defendant, James Adkins, had approved payments to the guerilla group in Alabama and had consented to strategic decisions while in Alabama, but did not allege that Adkins "had anything to do with war crimes and extrajudicial killings that occurred in Colombia."  *Id.* at *6.  Thus, the court concluded that the plaintiffs in *Giraldo* had failed to plead a conspiracy connected to Alabama.  *See id.*  Here, in contrast, Provider and Subscriber Plaintiffs have pled that one conspirator, BCBS-AL, operates, sells insurance, and forms contracts with health care providers in Alabama.  And, as explained more fully above, Plaintiffs have also pled that BCBS-AL acted in Alabama to further the conspiracy on behalf of the other Blue Plans, including each of the Moving Defendants.  Thus, the court's *Giraldo* opinion is inapposite to the facts presented here, as no conspirator in that case had committed actions in furtherance of the alleged conspiracy while in Alabama.

Likewise, Triple-S's argument that the alleged conspiracies lack a substantial connection to Alabama is off the mark.  (Doc. # 210 at 23-24, Case No. 2:12-cv-02169-RDP).  As an initial matter, Triple-S relies on *Matthews v. Brookstone Stores, Inc.*, 469 F. Supp. 2d 1056 (S.D. Ala. 2007) for its proposed "substantial connection" standard, but *Matthews* does not cite any binding case law to support its observation that the conspiracy theory of personal jurisdiction generally requires a substantial connection between an alleged conspiracy and the forum state.  *See Matthews*, 469 F. Supp. 2d at 1066 (citing *Remmes v. International Flavors & Fragrances, Inc.*,

435 F. Supp. 2d 936, 941 (N.D. Iowa 2006)).  And, perhaps even more importantly, this court has not discovered any Alabama Supreme Court opinion that requires a plaintiff to show a substantial connection between a conspiracy and the state of Alabama in order to rely upon the conspiracy theory to assert personal jurisdiction in Alabama.  However, even assuming that the *Matthews* court correctly summarized the standard for pleading personal jurisdiction under the conspiracy theory, the court concludes that the overt acts committed by BCBS-AL in furtherance of the alleged conspiracies demonstrate a substantial connection between those conspiracies and Alabama.[32]

Accordingly, for these reasons, Provider and Subscriber Plaintiffs have sufficiently pled the requisite facts for the court to exercise personal jurisdiction over Moving Defendants under the conspiracy theory of personal jurisdiction.  As none of the Moving Defendants have challenged the alleged conspiracies through affidavits or other evidence, the court accepts the Plaintiffs' conspiracy allegations as true at this stage of the proceedings.  *See Barton*, 976 So. 2d at 446-47 (denying a defendant's request for mandamus relief on personal jurisdiction grounds where the court had to accept the plaintiff's conspiracy allegations as true and the defendant had not contested those conspiracy allegations in his affidavit to the trial court).

### iv) The Court's Exercise of Personal Jurisdiction Over Moving Defendants Comports With Fair Play and Substantial Justice

Moving Defendants present several arguments as to why the court's exercise of personal jurisdiction violates their due process rights under the Fourteenth Amendment.  First, Moving

---

[32]  Provider and Subscriber Plaintiffs have pled other information from which a court may find a substantial connection between the alleged conspiracies and the state of Alabama.  For example, Provider Plaintiffs have alleged that BCBS-AL controls 86 percent of the health care financing market in Alabama.  (Doc. # 236 at ¶ 259, Case No. 2:13-cv-20000-RDP).  They also have claimed that BCBS-AL has used its market power to include clauses in provider contracts that prohibit those providers from offering similar price discounts to other insurance companies.  (*Id.* at ¶ 340).  Similarly, Subscriber Plaintiffs have alleged that BCBS-AL uses its market power to obtain supra-competitive premiums from subscribers that rose at a higher annual rate than the national average. (Doc. # 244 at ¶¶ 418-19, Case No. 2:13-cv-20000-RDP).

Defendants argue they would be unduly burdened by defending themselves in this forum because they do not solicit or conduct business in this forum and limit themselves to operating in certain geographic service areas. (*See, e.g.*, Doc. # 211, Memorandum of Certain Defendants in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, at 11, Case No. 2:12-cv-02169-RDP). Second, they assert that Alabama does not have a significant interest in adjudicating this dispute because it has never issued a license to any Moving Defendant to sell insurance and Moving Defendants are not registered to do so in this state. (*Id.* at 11-12). Third, they contend that Plaintiffs can obtain relief for their claims in other forums because they have brought similar antitrust claims against Moving Defendants in the forums where each Moving Defendant operates. (*Id.* at 12; Doc. # 213 at 6, Case No. 2:12-cv-02169-RDP). Finally, one Moving Defendant claims that the court's exercise of personal jurisdiction will not promote judicial efficiency because that type of efficiency is already being served by the multi-district nature of this litigation. (Doc. # 210 at 22, Case No. 2:12-cv-02169-RDP). After careful review, the court concludes that these arguments are unpersuasive.

To start, Moving Defendants have not shown that they face "especially onerous" burdens from litigating in this forum or that the inconvenience of litigating in this forum rises to a "constitutional magnitude." *Diamond Crystal Brands, Inc. v. Food Movers International, Inc.*, 593 F.3d 1249, 1274 (11th Cir. 2010). Indeed, Moving Defendants have provided little indication to the court of what specific burdens they face from litigating in this forum, and generalized statements that litigation in a particular forum is burdensome are typically insufficient to show that the forum's exercise of personal jurisdiction offends due process. *See Grail Semiconductor, Inc. v. Stern*, 2012 WL 5903817, at *5 (S.D. Fla. Nov. 26, 2012) (unpublished). For at least two decades, our court of appeals has recognized that "modern

methods of transportation and communication have significantly ameliorated" the burdens that corporations face when defending suits in states where they are not incorporated and do not have places of business. *See Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 632 (11th Cir. 1996). The court certainly understands that such a burdensomeness argument by a foreign defendant would require close examination. *Id.* at 631. But here, all of the Moving Defendants are American corporations. Therefore, the court finds that Moving Defendants have failed to demonstrate that the court's exercise of personal jurisdiction over them places a constitutionally significant burden upon them.

Additionally, the state of Alabama "has a very strong interest in affording its residents a forum to obtain relief from intentional misconduct of nonresidents causing injury in [Alabama]." *Licciardello*, 544 F.3d at 1288. Both Provider and Subscriber Plaintiffs have alleged that Moving Defendants intentionally entered into anticompetitive conspiracies that have caused significant harm to Alabama insurance purchasers and Alabama health care providers. With regard to Moving Defendants' third argument, a plaintiff is not obligated to seek out a defendant in its home state in order to obtain redress from a defendant who through its conduct knowingly causes an injury in the plaintiff's home state. *Id.* In this case, Provider and Subscriber Plaintiffs would face an especially burdensome task if they had to sue each Blue Plan in its home state for its participation in the alleged anticompetitive conspiracies because some thirty-nine (39) currently operating Blue Plans and entities (including the Association) have been involved in the alleged conspiracies.

Finally, the judicial interest in efficient resolution of this action is best served by the court's exercise of personal jurisdiction over all Moving Defendants in the Alabama actions. Although the court currently is presiding over multi-district litigation involving the antitrust

claims against the Blue Plans and BCBSA, each case in the multi-district litigation is an individual action where defendants will be able to raise personal jurisdiction challenges (which have been expressly preserved with the blessing of this transferee court and all Plaintiffs) in the relevant transferor forum.  And the Alabama residents in the putative Plaintiff classes, along with the judicial system, have an interest in "quick, convenient, and effective relief" that would be harmed by requiring Plaintiffs to file suit in each state for harms they suffered in Alabama from the alleged anticompetitive conspiracies.  *Olivier*, 979 F.2d at 830, 834 (concluding that a plaintiff should not have to file suit in two states against two insurance guaranty companies because multiple suits would waste judicial resources).

In conclusion, as an alternative ground, the court finds that Moving Defendants are subject to personal jurisdiction under Alabama's conspiracy doctrine of personal jurisdiction and that this exercise of personal jurisdiction comports with due process.

### C.   Alternatively, the Court May Exercise Specific Personal Jurisdiction Over Moving Defendants Because All Moving Defendants Have Sufficient Minimum Contacts with Alabama

In their motions to dismiss, Moving Defendants provide several arguments as to why they lack minimum contacts with the state of Alabama.  First, Moving Defendants contend that the presence of subscribers or in-network health care providers in this state does not demonstrate sufficient contacts with the state because these subscribers and providers have unilaterally located themselves in this forum.  (Doc. # 209 at 9-10, Case No. 2:12-cv-02169-RDP).  Second, they claim that they have not purposefully availed themselves in this forum by allowing their members to receive treatment through the BlueCard Program because "non-resident insurers' membership in a national program that facilitates the provision of services to insureds . . . at discounted rates does not constitute purposeful availment."  (Doc. # 211, Memorandum of

Certain Defendants in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, at 15-16, Case No. 2:12-cv-02169-RDP). Third, they claim that merely paying for services that health care providers in Alabama have rendered to subscribers does not establish personal jurisdiction. (*Id.* at 17).

Provider Plaintiffs respond that Moving Defendants have established minimum contacts with Alabama because they "have availed themselves of the privilege of conducting business in Alabama through their participation in the BlueCard and National Accounts programs." (Doc. # 369 at 20, Case No. 2:12-cv-02532-RDP). They contend that Moving Defendants have invoked the protections of Alabama law because health care providers in Alabama have agreed to accept subscribers from out-of-state Blue Plans through the BlueCard Program, and those providers' contracts with BCBS-AL are governed by Alabama law. (*Id.* at 22). Moreover, all of the Moving Defendants have subscribers who reside in Alabama, and the Northern District in particular, and those subscribers all rely on the BlueCard Program to receive health care services. (*Id.*). "All the moving Defendants knowingly cover Alabama residents, and all of them pay BlueCard claims submitted on behalf of Alabama residents." (*Id.* at 23). Thus, for these reasons also, the court determines that (1) all Moving Defendants have sufficient minimum contacts with Alabama such that they were on notice that they may be hailed into its courts, and (2) Plaintiffs' antitrust claims arise from Moving Defendants' contacts with Alabama.

### i. The Relevant Legal Standards

The exercise of specific jurisdiction is proper over a nonresident defendant when he "has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 472-73, 475 (internal citations omitted). The requirement that there be minimum contacts is grounded in

fairness.  It assures that "the defendant's conduct and connection with the forum State [is] such that he should reasonably anticipate being haled into court there."  *World-Wide Volkswagen*, 444 U.S. at 297.

To show that litigation "arises out of" the activities in the forum state, the Eleventh Circuit does not use "mechanical or quantitative" tests.  *See Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1222 (11th Cir. 2009).  Nevertheless, it is "not enough that there [is] some similarity between the activities that connect the defendant to the forum and the plaintiff's claim."  *Licciardello*, 544 F.3d at 1284 n. 3 (internal emphasis omitted).  Rather, the defendant's contacts with the forum must be related to the "operative facts of the controversy."  *Id.* (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996)).  Questions of specific jurisdiction are examined in the context of the particular claims asserted – here, those claims are grounded in intentional tort.  To determine jurisdiction, "a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'"  *Calder v. Jones*, 465 U.S. 783, 788 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

Moving Defendants have pointed the court to a few opinions where courts have addressed whether a health insurer's payment of claims from health care providers established minimum contacts within the provider's forum of residence.  For example, in *Choice Healthcare, Inc. v. Kaiser Foundation Health Plan of Colorado*, the Fifth Circuit considered whether Kaiser, a group of health maintenance organizations ("HMOs"), was subject to specific personal jurisdiction in Louisiana, a state where its insureds received treatment at a hospital.  *See generally* 615 F.3d 364 (5th Cir. 2010).  The Kaiser entities did not enroll Louisiana residents into their insurance plans, but they had entered into a contract with a preferred provider network in order to receive discounted rates for health care services provided by certain entities in

Louisiana.  *Id.* at 366-67.  The plaintiffs, Louisiana health care providers, had rendered health care services to approximately fifty (50) individuals in Kaiser plans during a three-year period. *Id.* at 367.  The Fifth Circuit held that Louisiana courts lacked specific personal jurisdiction for claims arising from the payments made to plaintiffs for medical services provided to Kaiser insured individuals.  *Id.* at 369-72.  According to the Fifth Circuit, Kaiser's pre-treatment approval of medical care for its insureds and "payment of a limited number of claims for treatment" in Louisiana did not demonstrate that Kaiser purposefully directed commercial conduct towards Louisiana because (1) Kaiser directed individuals in the HMOs to obtain health care services within the area that the insureds lived and worked, (2) Kaiser only provided out-of-area coverage for emergency care and urgent health needs, and (3) Kaiser insured individuals "fortuitously required such [emergency] treatment" in Louisiana.  *Id.* at 369-70.  The Fifth Circuit determined that "Kaiser [had] made the payments because its insureds independently and without encouragement from Kaiser presented to a Louisiana hospital for urgent care while visiting Louisiana."  *Id.* at 370.

Likewise, in a case involving an insurance coverage dispute, a district court held that Blue Cross Blue Shield of Louisiana's participation in the BlueCard Program did not constitute purposeful availment in Texas on the basis that Blue Cross Blue Shield of Louisiana could reasonably foresee that its insureds would receive covered health care services in Texas.  *St. Luke's Episcopal Hosp. v. La. Health Service & Indemnity Co.*, 2009 WL 47125, at *7-10 (S.D. Tex. Jan. 6, 2009) (unpublished) (favorably cited in *Choice Healthcare*, 615 F.3d at 371-72). First, the court determined that "merely providing out-of-state health coverage to insureds does not subject an insurer to personal jurisdiction in every foreign state in which an insured happens to obtain medical services."  *Id.* at *8.  Second, the court considered whether entering into the

BlueCard Program constituted purposeful availment in a state where a Blue Plan received discounts for services by medical providers in that state.[33]  Ultimately, in *St. Luke's*, the court concluded that a Blue Plan's entry into the BlueCard Program did not demonstrate that it had purposefully availed itself of the benefits and privileges of operating in Texas because the BlueCard Program did not involve a Texas contract, a contract between a Blue Plan and a Texas health care provider, or a substantial connection to Texas, since the BlueCard Program was operated by a national organization (BCBSA).  *See id.* at *9.

### ii.    Analysis of Moving Defendants' Minimum Contacts with Alabama

Here, in contrast to *Choice Healthcare* and *St. Luke's*, the court finds that all Moving Defendants have sufficient minimum contacts with Alabama to demonstrate that they have purposefully availed themselves of the privilege of conducting business in this state.  The court acknowledges *St. Luke*'s conclusion that a Blue Plan's mere participation in the BlueCard Program is insufficient to demonstrate that a Blue Plan has purposefully directed commercial activities towards this state.  But Plaintiffs in these cases have presented evidence showing more. That is, Plaintiffs have shown that Moving Defendants did more than pay claims from Alabama health care providers through the BlueCard system.  Indeed, the record available to this court reveals that the Moving Defendants have agreed to provide health insurance to group plans that include employees who reside in multiple states, including Alabama, and that they know the addresses of many applicants to their health plans before they agree to establish a group plan.

Representatives from four of the Moving Defendants testified in their depositions that those particular Moving Defendants receive the addresses of employees who are covered by

---

[33]    The court in *St. Luke's* identified certain aspects of the BlueCard Program that could support the conclusion that a Blue Plan purposefully avails itself of the benefits of operating in a state by participating in the program. These factors include the ability to obtain discounted rates from health care providers in that state through contracts in that state between an in-state insurer and in-state providers and the processing of claims in the forum state by an in-state insurer pursuant to the BlueCard Program.  *St. Luke's*, 2009 WL 47125, at *8.

certain group insurance plans before the Moving Defendants issue a group policy.  (*See, e.g.*, Doc. # 371, Ex. 37 at 50-51, Case No. 2:12-cv-02532-RDP; Doc. # 218, Exs. 4 at 39, 9 at 25, 15 at 22, Case No. 2:12-cv-02169-RDP).   Although the Moving Defendants issue their group insurance policies in states other than Alabama, Moving Defendants generally know that some of their subscribers are located outside of their respective geographic service areas when they issue group plans to employers with locations in multiple states, including Alabama.  Moreover, they know (or reasonably should know) that their subscribers in Alabama will use covered health care services in Alabama that are paid for through the BlueCard Program.  Thus, the evidence before this court demonstrates that Moving Defendants have purposefully availed themselves of the privileges of conducting business in Alabama by (1) entering into contracts to provide health insurance that include subscribers in Alabama, (2) collecting premiums from Alabama subscribers, and (3) entering into the BlueCard Program in order to access provider discounts negotiated by BCBS-AL.

Unlike the *Choice Healthcare* and *St. Luke's* cases, the antitrust claims in Plaintiffs' complaints arise from both the Moving Defendants' contracts to provide health insurance to groups that include Alabama subscribers and the BlueCard Program.  This is so because Subscriber Plaintiffs have alleged that Moving Defendants, along with other Blue Plans, have charged supra-competitive premiums to subscribers by conspiring to limit their expansion so that each geographic service area only has one Blue Plan.  Moreover, Provider Plaintiffs' claims also arise from these geographic market allocations, which restrict the Blue Plans' ability to contract with providers outside of a specific geographic service area.  And the BlueCard Program furthers the goals of the market allocation conspiracy by allowing all Blue Plans to access provider discounts in other states without creating provider networks in other states that could threaten the

cohesion of the market allocations.  In contrast, the *Choice Healthcare* and *St. Luke's* cases involved coverage disputes arising from care provided to individuals who did not reside in the forum state and fortuitously needed care in the forum state.  *See Choice Healthcare*, 615 F.3d at 369-72; *St. Luke's*, 2009 WL 47125, at *7-10.  Such coverage claims are not connected to a health insurer's contracts that cover subscribers in the forum state.

Accordingly, the court finds that Moving Defendants have availed themselves of the privileges of conducting business in Alabama, such that this court may exercise specific personal jurisdiction over them under Alabama's long-arm statute.  In addition, for the reasons explained above, the court's exercise of personal jurisdiction over Moving Defendants does not violate their due process rights.  For these reasons, the court finds, in the alternative, that Moving Defendants' motions to dismiss are due to be denied because the court may exercise personal jurisdiction over them based on their minimum contacts with Alabama.

### D.   Venue is Appropriate in the Northern District Under 28 U.S.C. § 1391

In their motions to dismiss, Moving Defendants make three arguments with respect to venue.  First, they assert that venue is not proper under Section 1391(b)(1) because the Moving Defendants, who are all corporations, are not subject to personal jurisdiction in Alabama.  (*See, e.g.*, Doc. # 211, Memorandum of Certain Defendants in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, at 23-24, Case No. 2:12-cv-02169-RDP).  Second, they contend that Provider and Subscriber Plaintiffs' allegations fail to show that a substantial part of the acts giving rise to the claims occurred in this district.  (*See, e.g.*, *id.* at 24).  Third, they argue that venue is not appropriate under Section 1391(b)(3) because Provider and Subscriber Plaintiffs have failed to prove that the action cannot be brought in another district where venue is appropriate for all defendants.  (*See, e.g.*, *id.*).  In response to these contentions, Plaintiffs claim

that venue is proper in this district under Section 1391(b)(2) because a substantial part of the actions giving rise to this case occurred in the Northern District, where BCBS-AL is headquartered.  (Doc. # 218 at 31-32, Case No. 2:12-cv-02169-RDP).  Plaintiffs have the better of the arguments.

As the relevant statute makes plain, venue is appropriate in "a judicial district in which any defendant resides" or in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b)(1)-(2).  In a state with more than one judicial district, a corporate defendant resides in any district in that state "within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate state."  *Id.* § 1391(d).

Here, as already discussed above, all Moving Defendants are corporate entities, and their contacts with this district are sufficient to subject them to personal jurisdiction under the conspiracy theory of personal jurisdiction.  This is so because BCBS-AL, a co-conspirator, committed overt acts within this district in furtherance of the antitrust conspiracies alleged in the complaints.  Significantly, BCBS-AL paid discounted rates to at least one health care provider in Alabama to account for higher payments that the provider had received from an out-of-state Blue Plan.  (Doc. # 236 at ¶ 234, Case No. 2:13-cv-20000-RDP).  Then, BCBS-AL shared the discount it received from the provider with the out-of-state Blue Plan, furthering the market allocation and group boycott conspiracies by encouraging other Blue Plans to not negotiate with providers in Alabama for lower rates.  (*See id.*).  And BCBS-AL accepted claims from Alabama health care providers through the BlueCard Program on behalf of other Blue Plans, sent the claims to the out-of-state Blue Plans for adjudication, and paid the in-state health care providers at its own negotiated rates to settle those claims.  (*See id.* at ¶ 236) (describing how health care

60

providers obtain reimbursement for providing care to a person insured by an out-of-state Blue Plan).  BCBS-AL's processing of Blue Card claims sent by providers in this district furthered the alleged conspiracies by allowing out-of-state Blue Plans to access health care providers residing in the Northern District while complying with the market allocation conspiracy.  Accordingly, because all Moving Defendants are corporate defendants who are subject to personal jurisdiction in this district under the conspiracy theory, venue is proper in this district under Section 1391(b)(1).

The court notes that the vast majority of the defendants in these actions, including the Association, have not contested personal jurisdiction and venue.[34]  *See* Fed. R. Civ. P. 12(h)(1)(B).  To the extent that the court must have personal jurisdiction over all corporate defendants in order for venue to be proper in this court under Section 1391(b)(1), the court notes that Plaintiffs have alleged that all Blue Plan Defendants were parties to the conspiracies and that all Blue Plans entered into Licensing Agreements with the Association.  Moreover, it finds that

---

[34]  The court is still unsure why some of the Blue Plan Defendants have argued against personal jurisdiction and the propriety of venue when a number of Blue Plans who are similarly situated did not file motions on these grounds.  Even after the extensive briefing and submissions presented by Moving Defendants, the court remains befuddled for the same reasons it discussed with the parties during the first round of discussions on these issues:

> Mississippi claims that there's no in personam jurisdiction over here, but Hawaii, California, Georgia, Florida, and Tennessee don't claim that.

> Pennsylvania says no jurisdiction here, but not Virginia, West Virginia, [and] North Carolina.  In New York, several entities - - a couple entities in New York claim that, but not Rhode Island, Connecticut, New Hampshire, Massachusetts, or Delaware.

> Kansas claims it, but not Nebraska or Kansas City.  North Dakota and Wyoming claim it, but not South Dakota, Montana, [or] Washington State.  And Arizona claims it but not New Mexico or Nevada.

> Now, maybe they all just have always had a lifelong dream of [litigating] in the Northern District of Alabama, or maybe they've heard I'm the most fun judge in the federal judiciary.  I doubt those two things are true.

(Doc. # 347 at 17-18).  And as the court asked during the first round of oral argument on the personal jurisdiction and venue motions: "If these are solid winning arguments, why am I not hearing them from other Blues who are perhaps even more attenuated than Capital with 386 subscribers here or Mississippi that camps on the border of the western edge of the state?"  (Doc. # 371 at 26).

the Association is a corporation which allegedly agreed to enter into the conspiracies, accepted control over the Blue Cross and Blue Shield trademarks, and subsequently entered into Licensing Agreements with the Blue Plans that contained geographic market limitations.  Thus, all of the defendants in these actions are corporations who are subject to the court's personal jurisdiction under the conspiracy doctrine, and venue is proper in this district under Section 1391(b)(1).

Alternatively, the court concludes that venue is appropriate in this district for the claims against BCBS-MS under Section 1391(b)(2).  Admittedly, the record does not indicate where the Blue Plans negotiated or signed the Licensing Agreements with the Association.  *See Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003) (concluding that Georgia was the appropriate venue for claims arising from a violation of a non-compete clause where the contract at issue was presented to defendant in Georgia and signed in Georgia).  Having said that, Plaintiffs' antitrust claims did not arise solely from the execution of the Licensing Agreements (i.e., the written agreements that memorialized the allocation of geographic markets).  Those claims also arose from the Blue Plans' collective refusal to compete outside of their allocated geographic service areas and their creation of the BlueCard Program and National Accounts Program, which permitted the Blue Plans to provide health insurance services to employers with employees outside of discrete geographic service areas.   In these Alabama cases, BCBS-AL's actions in Alabama constitute a substantial part of the activities giving rise to the market allocation conspiracy between BCBS-AL and geographically contiguous Blue Plans.  This is so because, at a minimum, BCBS-AL processes BlueCard claims in Alabama for Blue Plans in geographically contiguous service areas so that geographically contiguous Blue Plans can sell health insurance to group plans with employees in Alabama without creating a competing provider network in Alabama.  If BCBS-AL did not participate in the BlueCard Program, there is

a substantial question as to whether BCBS-MS would create a competing provider network in portions of Alabama -- and portions of the Northern District -- in order to obtain discounts for covered services to its thousands of subscribers and members in Alabama and the Northern District.  Indeed, BCBS-MS already contracts with nine providers who reside in the Northern District.  (Doc. # 256, Ex. 1 at 1-2, Case No. 2:13-cv-20000-RDP).  Accordingly, the court concludes that a significant part of the actions giving rise to the claims by Alabama plaintiffs against BCBS-MS have occurred in the Northern District.

## VI.    Conclusion

For the reasons explained above, the court concludes that Moving Defendants are subject to the court's personal jurisdiction under Section 12 of the Clayton Act and Alabama's long-arm statute.  Moreover, the court's exercise of personal jurisdiction through each of these avenues comports with Moving Defendants' due process rights.  Finally, venue is proper in this district under Section 12 of the Clayton Act and under 28 U.S.C. § 1391.  Therefore, Moving Defendants' motions to dismiss are due to be denied.  The court will enter separate orders on the master docket and in the four active Alabama cases in this multi-district litigation.

**DONE** and **ORDERED** this December 21, 2016.


R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE