FILED

2017 Feb-23  PM 03:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD | } | Master File No.:  2:13-CV-20000-RDP |
| | } | |
| ANTITRUST LITIGATION | } | This document relates to all cases. |
| (MDL NO.: 2406) | } | |
| | } | |

## MEMORANDUM OPINION

This matter is before the court on the following cross motions for partial summary judgment: (1) Defendants' Amended and Restated Motion Based on the Filed Rate Doctrine for Summary Judgment on the Alabama Subscribers' Damages Claims (Doc. # 733); and (2) Alabama Subscriber Plaintiffs' Cross-Motion for Partial Summary Judgment on the Filed-Rate Doctrine (Doc. # 770).  The motions have been fully briefed.  (Docs. # 734, 805, 835, 838, 839, 903, and 904).

## I.    Introduction

The Filed Rate Doctrine[1] is judicially created and finds its origins in principles of federal preemption.  *See Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222 (1998); *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915). In the antitrust context, it operates to bar treble damages claims that are based upon challenges to rates that have been filed with regulatory agencies. *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156 (1922); *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409 (1986); *Taffet v. Southern Co.*, 967 F.2d 1483 (11th Cir. 1992); *Hill v. BellSouth Telecommunications, Inc.*, 364 F.3d 1308 (11th Cir.

---

[1] The doctrine is also occasionally referred to as the Filed Tariff Doctrine, *e.g., McCray v. Fidelity National Title Insurance Company*, 636 F.Supp.2d 322, 326 (D. Del. 2009) or the *Keogh* Doctrine, *e.g., Blaylock v. First American Title Insurance Company*, 504 F. Supp. 2d 1091, 1099 n. 6 (W.D. Wash. 2007), referencing *Keogh v. Chicago & Northwestern Railway Company*, 260 U.S. 156 (1922).  Although the *Keogh* decision is sometimes credited with initially recognizing the doctrine, as the Eleventh Circuit has observed, it was case law decided even before *Keogh* that set the early moorings of the doctrine. *Taffet v. Southern Co.*, 967 F.2d 1483, 1488 (11th Cir. 1992). However, *Keogh* was the first reported case to apply the doctrine in the antitrust context.

2004).  Defendants contend that application of the doctrine entitles them to summary judgment on the damages claims asserted by the two named Subscriber Plaintiffs.  Subscriber Plaintiffs respond that it is actually they who are entitled to judgment as a matter of law on this affirmative defense because Blue Cross and Blue Shield of Alabama ("BCBSAL") has systematically charged rates that varied from the rates they filed with the Alabama Department of Insurance ("DOI").  After careful review, and with the benefit of oral argument and supplemental briefing, the court concludes that both Motions are due to be granted in part and denied in part.

## II.    Relevant Undisputed Facts

Pursuant to Alabama Code § 10A-20-6.10, the Alabama DOI is tasked with reviewing certain insurance rates that are filed with it and either approving or disapproving them. (Doc. # 738-58 pp. 243-255; Doc. # 738-2 ¶ 19).  The setting of BCBSAL's rates is also governed by the Alabama Department of Insurance Regulation 482-1-116 ("Regulation 116").  Ala. DOI Reg. 482-l-116.  (Doc. # 738-82).  BCBSAL is the only defendant in this action that has filed rates with the DOI.  No other "Blue" filed rates in Alabama with the DOI.  (Doc. # 738-58 pp. 125-26).

On an annual basis, BCBSAL submits rate filings for each insurance product in each of three market segments: individual policies, group policies with 2-14 eligible employees, and group policies with 15-50 eligible employees.  Regulation 116 does not require the filing of rates for group policies which cover more than 50 eligible employees. Ala. DOI Reg. 482-l-116. (Doc. # 738-82)  The purpose of DOI filings is to set forth the rating factors used to determine

"reasonable" rates.   (Doc. # 738-58 pp. 87, 88-89, 90-91; Doc. # 773-10 pp. 63, 64-66).[2]

BCBSAL has employed rating classifications for its group insurance products as follows:  (a) for

groups of 2-14, BCBSAL has applied a "community-rating" methodology, and adjusts base rates

using benefit plan and group-size adjustment factors (*see* Doc. # 738-2 ¶¶ 14-18; Doc. # 738-68;

Doc. # 773-5); (b) for groups of 15-50, BCBSAL has applied a "demographic-rating"

methodology, and adjusts base rates using demographic adjustment factors (such as gender and

age); and (c) for groups of 50 or more, BCBSAL has applied an "experience-rating," or "merit-

rating," methodology, adjusting base rates using the claims experience of each group (*see* Doc. #

738-68; Doc. # 738-58 p. 282).

Regulation 116 defines a "small employer" based upon the number of "eligible

employees" who work 30 or more hours per week.  Ala. DOI Reg. 482-l-116-.04(18) (Doc. #

738-87).  During the relevant time period, BCBSAL did not define or measure its groups based

on the number of "eligible employees." (Doc. # 773-10 pp. 73-75, 77-80).  Instead, BCBSAL

defined its groups based on the number of "enrolled subscribers," or the number of employees

who opted to purchase insurance under the employer's plan. (*Id.*). That is, rather than counting

all "eligible employees" pursuant to Regulation 116, BCBSAL classified groups based only on

those who actually enrolled in a given plan.  (*Id.*).  This is an important distinction because

smaller size rating classifications are generally associated with higher insurance premiums.  For

example, in BCBSAL's 2011 small group rate filing, groups with fewer than 15 enrolled

subscribers had a rate adjustment factor of 1.15, whereas groups with 15 to 50 enrolled

---

[2] Document 773-10 is the deposition of Noel Carden, BCBSAL's Vice President and Chief Actuary. Citations to Carden's deposition are made to the page number of the transcript, not the CM/ECF docket page number.

subscribers had a rate adjustment factor of 1.00.  In other words, the smallest groups paid premiums that were 15% higher than the larger groups.  (Doc. # 738-68; Doc. # 775-23).

Rate filings made with the DOI are required to contain an actuarial certification that the carrier is in compliance with the governing regulations and that the rating methods are actuarially sound.  *See* Ala. DOI Reg. 482-l-116-.05(g)(2).  (Doc. # 738-87).  In its Small Group rate filings with the DOI from 2008 through 2013, BCBSAL certified that "[a]ll premium rates for this [Small Group] category have been developed in compliance with the Alabama Department of Insurance Departmental Regulation No. 482-1-116."  (Doc. # 738-82).

In a May 3, 2016 report regarding BCBSAL's 2013 Medical Loss Ratio, the Centers of Medicaid and Medicare Services ("CMS") found a "lack of accurate documentation supporting group size and market classification determinations," which prevented CMS from (1) assessing BCBSAL's medical loss ratios and (2) determining whether BCBSAL could face rebate liability in its small group or large group markets.  (Doc. # 738-77 p. 4; Doc. # 738-58 pp. 162-63).  As CMS explained: "The Company did not correctly obtain the number of employees of each group policyholder at the time of initial application or policy renewal and therefore could not correctly determine each group's size and market classification."  (Doc. # 738-77 pp. 5, 10).  Further, the CMS found that, "[i]n addition to not employing procedures to correctly determine the number of employees," BCBSAL "did not consistently assign policies to the correct market classification… ."  (Doc. # 738-77 p. 10).  The CMS also found examples of group policies "incorrectly classified as small group policies" that "should have been reported in the large group market."  (*Id.*).

As to the DOI's evaluation of the rates filed with it, the only "test" for whether the DOI should approve a rate filing is "reasonableness," and, somewhat surprisingly, there are no written

standards for determining whether a proposed rate is "reasonable." (Doc. # 738-58 pp. 61-62, 63-64; Doc. # 738-65). Although the statute provides that rates will be deemed approved if the DOI does not respond within thirty days, the record indicates that provision has never been triggered on BCBSAL's rate filings, at least since Steve Ostlund, the DOI's Life and Health Actuary, joined the DOI in 2007. (Doc. # 738-58 pp. 26, 245, 262-63; Doc. # 738-2 ¶ 22).

In connection with its review of BCBSAL's rates, the DOI often requests additional information in order "to gain an understanding so [it can] review the rates properly." (Doc. # 738-58). For example, in 2007, the Department performed a detailed examination of BCBSAL's rating assumptions, enrollment, trend factors, claims experience, and other aspects of such filings. (Doc. # 738-2 ¶ 27). On April 15, 2009, the DOI submitted "several questions and concerns regarding the small group employer and special open enrollment filings" before it approved the requested rates in those filings. (*Id.* ¶ 28). On April 13, 2011, the DOI inquired about BCBSAL's methodology regarding the use of trend rates and filing factors in the development of BCBSAL's Small Group premiums which were to become effective July 1, 2011. (*Id.* ¶ 29). And, in 2013, 2014, and 2015, the DOI continued to ask questions of BCBSAL about its rate filings. When asked, BCBSAL responded to those questions. (Doc. # 773-19 pp. 274-76; Doc. # 738-59).

Since 2007, the DOI reviewed and eventually approved each of BCBSAL's rate filings for its Individual, CPlus, and Small Group products. (Doc. # 738-58 pp. 252-538; Doc. # 738-2 ¶¶ 5, 22, 31). On a number of occasions, BCBSAL revised its proposed rates in response to DOI concerns. On those occasions, BCBSAL revised the proposed rates and re-filed them, subject to the DOI's approval process. (Doc. # 738-2 ¶ 32). In addition, at times, the DOI indicated that it would only approve a rate lower than BCBSAL originally filed or proposed.

5

(Doc. # 738-2 ¶ 33; Doc. # 738-58 p. 252).  For example, in 2006, BCBSAL requested a 7.4% increase for the Community-Rated Small Group category of business. But the DOI approved a rate increase of only 5.75%, and BCBSAL implemented that lower rate increase. (Doc. # 738-2 ¶ 34).  On September 17, 2009, the DOI asked BCBSAL to consider reducing its rate increase request for its Medicare Supplement plan. Although BCBSAL originally requested a rate increase of 10.76%, the DOI ultimately approved a rate increase of only 7.5%. (*Id.* ¶ 35). On October 12, 2009, BCBSAL proposed a 9.6% composite premium increase for existing customers of BCBSAL's Individual Blue category of business. The DOI requested BCBSAL's underlying analysis to evaluate the reasonableness of the requested rate increase. Following that review, the DOI approved and BCBSAL implemented a composite premium increase of only 7.75%. (*Id.* ¶ 36.)

There have been instances in which BCBSAL has not actually charged the filed rate. That is, the Rule 56 record also contains evidence regarding certain variances which BCBSAL implemented after approval of rates.  Noel Carden, BCBSAL's vice president and chief actuary, testified that, despite its filings with the DOI, BCBSAL in fact systematically varied the rates it actually charged its customers from the rates it filed with the DOI.  (Doc. # 773-10 pp. 171-74, 182-84).  BCBSAL did not disclose these variances in its rate filings. (*Id.*).  To be sure, there are variances that DOI permits. Under Regulation 116, a "small employer carrier [] may only vary the adjusted community rate" for the following reasons: "Geographic area," "Family composition," "Age," or "Sex."  *See* Ala. DOI Reg. 482-1-116-.05. (Doc. # 738-87).  But the variances referenced above (and discussed in more detail below) were not "approved" variances based upon these categories.

The record evidence shows that BCBSAL applied a particular type of variance -- referred to as its "cap" and "hold" variance program -- to all renewals of small groups with between 15 and 50 contract holders, to some groups with between 2 and 14 contract holders, and for some groups with more than 50 contract holders.[3]  (Doc. # 773-10 pp. 182-84, 186, 226-31).  BCBSAL deviated from the filed rate by applying the following criteria: where a subscriber's premium, if calculated according to the methodology filed with DOI, was set to decrease by more than a particular amount determined by BCBSAL, BCBSAL "held" the premium at a higher level – *i.e.*, it charged those subscribers rates *above* those approved by the DOI.  (*Id.* pp. 171-74).  The Rule 56 record also shows that, on occasion, BCBSAL "capped" premiums *below* the filed rate.  So-called "caps" were the flip side of BCBSAL's holds: if BCBSAL determined that its rate filings resulted in premium increases that it deemed too "high," BCBSAL "capped" the premium at a rate different from that called for in BCBSAL's rate filing.  (*Id.* pp. 171-74; Doc. # 775-5).[4]

BCBSAL never disclosed the "cap" and "hold" variance program in any of its rate filings.[5]  (Doc. # 773-10 pp. 193-95).  Nor were these variance criteria based upon factors allowable under Regulation 116.  Again, these variances were not based upon geographic area, family composition, age, or sex.  *See generally* Ala. Code § 10A-20-6; Ala. DOI Reg. 482-l-116-.05(a)(1). (Doc. # 773-10 pp. 195-96; Doc. # 738-87)   Nonetheless, for most years before 2014,

---

[3] Rate filings for some groups with more than 50 contract holders occurred due to BCBSAL's practice of defining groups based on the number of "enrolled subscribers," rather than the number of "eligible employees." (Doc. # 773-10 pp. 73-75, 77-80). As discussed more fully below, though the record evidence on this issue is incomplete, this practice may have forced larger groups (who normally would receive lower premiums) into smaller groups (who generally were charged higher premiums).

[4] BCBSAL asserts that the caps, holds, and misclassifications have not occurred since policy year 2013. (Doc. # 904 at 12 n.7).

[5] Nor was this information included in Carden's declaration. This led Carden to concede that the omission of the information from his declaration could be viewed as misleading. (Doc. # 773-10 p. 199).

Carden certified to the DOI that BCBSAL's rate filings showed the base rates and adjustment factors intended for use in calculating rates. (Doc. # 773-10 pp. 62-65; *see, e.g.*, Doc. # 773-6). Yet, in his deposition, Carden admitted that those filings omitted the criteria used by BCBSAL in varying from the filed rates. (Doc. # 773-10 pp. 194-204, 213-14).

From January 1, 2008 through the present, the two Alabama Subscriber Plaintiffs named in the Subscriber Track Amended Consolidated Class Action Complaint (Doc. # 244), CB Roofing, Inc. ("CB Roofing") and American Electric Motor Services, Inc. ("AEMS"), purchased products covered by BCBSAL's Small Group category of business. (Doc. # 738-2 ¶¶ 3, 6). CB Roofing became a BCBSAL customer in 2009. Since 2009, CB Roofing has had either two or three enrolled subscribers. (*Id.* ¶ 8). AEMS became a BCBSAL customer before 2008. Since 2008, AEMS has had between two and four enrolled subscribers. (*Id.* ¶ 9). BCBSAL's undisclosed cap and hold variances were not applied to the premiums paid by either CB Roofing or AEMS. (*Id.* ¶¶ 6-10). That is, CB Roofing and AEMS paid rates which were wholly consistent with rates BCBSAL had filed, and the rates DOI had approved. (*Id.*).

On November 14, 2016, Subscriber Plaintiffs moved for leave to amend their Complaint in *American Electric Motor Services, Inc., et al. v. Blue Cross Blue Shield of Alabama, et al.*, and to file a Second Amended Consolidated Class Action Complaint in *In Re Blue Cross Blue Shield Antitrust Litigation MDL 2406* to add small group plaintiffs Consumer Financial Education Foundation of America, Inc., Fort McClellan Credit Union, Rolison Trucking Co. LLC, Conrad Watson Air Conditioning, Inc., Hilton Cooper Contracting, Inc., and Bradford Building Company, Inc. (Case No. 2:12-cv-02169-RDP, Doc. # 235; Case No. 2:13-cv-20000-RDP, Doc. # 843). On November 22, 2016, the court granted Subscriber Plaintiffs' motions (Case No. 2:12-cv-02169-RDP, Doc. # 237; Case No. 2:13-cv-20000-RDP, Doc. # 869), and on December 2 and

7, 2016, respectively, Subscriber Plaintiffs filed their Amended Class Action Complaint (Case No. 2:12-cv-02169-RDP, Doc. # 239) and their Second Amended Consolidated Class Action Complaint (Case No. 2:13-cv-20000-RDP, Doc. # 897) adding those Plaintiffs.  According to the allegations of the new Complaints, BCBSAL charges at least some of their Subscribers health insurance premium rates that were never filed or approved because these rates vary from the base rates it files with the state.  (Case No. 2:12-cv-02169-RDP, Doc. # 239 ¶ 384; Case No. 2:13-cv-20000-RDP, Doc. # 897 ¶ 689).

With regard to the Filed Rate Doctrine, the parties have stipulated to the following facts: (1) the doctrine does not apply to the damages claims of Plaintiffs whose groups contained more than fifty members because BCBSAL did not file rates for this market segment; and (2) the parties consent to entry of judgment as a matter of law against BCBSAL with respect to its Filed Rate Defense targeted at Plaintiffs' groups which contain more than fifty members.  (Doc. # 775-21).  Thus, the issue now before the court is whether the Filed Rate Doctrine operates to preclude Plaintiffs with individual policies, group policies with 2-14 eligible employees, and group policies with 15-50 eligible employees from recovering treble damages under our nation's antitrust laws.

## III.    Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or

filings that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, the Rule requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations."  *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).  As *Anderson v. Liberty Lobby, Inc.* teaches, Rule 56(c) "does not allow the plaintiff to simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof of trial, he must come forward with at least some evidence to support each element essential to his case at trial."  *Anderson*, 477 U.S. at 252.  "Mere allegations" made by a plaintiff are insufficient.  *Id.*

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.  "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative."  *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear … that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV.    Analysis

After careful review, and for the reasons discussed below, the court concludes that both parties' motions are due to be granted in part and denied in part.

### A.    Under Facts of This Case, Does the Filed Rate Doctrine Bar Subscriber Plaintiffs' Damages Claims?

In a previous opinion issued in this case, this court has already discussed the law applicable to the Filed Rate Doctrine. *See In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172 (N.D. Ala. 2014).  The court assumes familiarity with that discussion, but a summary of the rationale behind the Doctrine bears repeating here. The Filed Rate Doctrine serves two main goals: (1) respecting statutory grants of rate-setting authority to agencies (the "nonjusticiability rationale"), *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981); and (2) preventing discrimination between similarly situated rate-payers (the "nondiscrimination rationale"), *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 163 (1922).  *See also Hill*, 364 F.3d at 1316-17.  As the Eleventh Circuit has correctly observed, the "nonjusticiability rationale" "keep[s] courts out of the rate-making process ... ."  *Hill*, 364 F.3d at 1316 (quoting

*Marcus v. AT&T Corp.*, 138 F.3d 46, 58 (2d Cir.1998)).  And the non-discrimination rationale serves to ensure equitable treatment of rate-payers who are similarly situated.  *Id.* at 1316-17.

Initially, the Filed Rate Doctrine was applied in the paradigm of federal claims involving rates set or approved by *federal* regulatory bodies.  *See, e.g., Keogh*, 260 U.S. at 165 (affirming dismissal of antitrust claims that challenged a rate set by the Interstate Commerce Commission ("ICC")).  In *Keogh*, the plaintiffs alleged that the railways had illegally conspired to agree on shipping rates for excelsior and tow.  *Keogh*, 260 U.S. at 160.  In responding to that allegation, the railways had but one defense, and that defense only was put forth to shield them from private money damages claims: the rates they charged had been filed with and approved by the ICC. *Id.* The Court agreed that the Filed Rate Doctrine precluded the plaintiffs from pursuing their damages claims.

> If a shipper could recover under section 7 of the Antitrust Act for damages resulting from the exaction of a rate higher than that which would otherwise have prevailed, the amount recovered might, like a rebate, operate to give him a preference over his trade competitors. It is no answer to say that each of these might bring a similar action under section 7. Uniform treatment would not result, even if all sued, unless the highly improbable happened, and the several juries and courts gave to each the same measure of relief.

*Id.* at 163.

After *Keogh* was decided, a question arose as to whether the Filed Rate Doctrine applied only to rates filed and approved by federal agencies.  Two and a half decades ago, the Eleventh Circuit[6] made clear that the doctrine applies equally to a complaint asserting federal claims that challenge rates set by a *state* agency. *See, e.g., Taffet*, 967 F.2d at 1494 (affirming dismissal of

---

[6] In cases transferred pursuant to 28 U.S.C. § 1407, a federal district court applies the clearly settled law of the transferee court. *See Murphy v. Federal Deposit Ins. Corp.*, 208 F.3d 959, 965 (11th Cir. 2000), *cert. denied*, 531 U.S. 1049 (2001) (adjudicating choice of law in the context of a transfer under 28 U.S.C. § 1406).  In any event, in this opinion the court only addresses the claims asserted in the two actions before the court on these Motions, not any of the claims asserted in actions transferred for centralization from courts in other states.

RICO claims challenging rates set by Alabama and Georgia utility commissions).  Therefore, the doctrine is fully applicable to a case such as this which involves a challenge to rates filed with a state agency.  *Id.*[7]

"Simply stated, the doctrine holds that any 'filed rate' -- that is, one approved by the governing regulatory agency -- is per se reasonable and unassailable in judicial proceedings ... ." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).  But, just as the doctrine insulates rates that are filed with a regulatory agency, "[t]he filed rate doctrine [] 'forbids a regulated entity to *charge* rates for its services *other than* those properly filed with the appropriate federal regulatory authority.'" *Hill*, 364 F.3d at 1315 (quoting *Arkansas Louisiana Gas Co.*, 453 U.S. at 577) (emphasis added).

Over time, the doctrine has certainly been questioned and challenged.  *See McCray v. Fid. Nat'l Title Ins. Co.*, 636 F. Supp. 2d 322, 327-332 (D. Del. 2009) (reviewing how the doctrine developed and questions as to its propriety). In fact, in 1985, Judge Henry J. Friendly of the Second Circuit severely criticized the doctrine. *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 760 F.2d 1347 (2d Cir. 1985), *aff'd*, 476 U.S. 409 (1986). There, the plaintiffs alleged that a rating bureau and a group of motor carriers conspired together, in violation of

---

[7] Plaintiffs have also argued that, under the Supremacy Clause of the United States Constitution, the Filed Rate Doctrine should not apply where a newly created state regulatory scheme would bar a preexisting federal claim under the Sherman Act.  "Typically, of course, the Supremacy Clause of the United States Constitution requires that a state law yield to a conflicting federal law."  *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 380 (4th Cir. 2012) (citing U.S. Const. art. VI, cl. 2; *Kurns v. R.R. Friction Prods. Corp.*, 132 S.Ct. 1261, 1266 (2012)). However, "[i]n 1945, [] Congress enacted the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015, to restore the states' preeminent position in insurance regulation." *ESAB Grp., Inc.*, 685 F.3d at 380 (citing *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 500 (1993); *Life Partners, Inc. v. Morrison*, 484 F.3d 284, 292 (4th Cir. 2007)).  Under the McCarran–Ferguson Act, "state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise." *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 507, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993) (quoting 15 U.S.C. § 1012(b)). Although this court previously held that the McCarran–Ferguson Act does not bar Plaintiffs' claims in this case, that Act explains why Subscribers' arguments regarding the Supremacy Clause fall on deaf ears.

Section 1 of the Sherman Act, to fix prices and engage in other anticompetitive activity. Judge Friendly openly asked the question of whether the Filed Rate Doctrine is outdated. *See, e.g., id.* at 1352 ("Although the *Keogh* opinion has the 'relentless quality' characteristic of Justice Brandeis, many of his arguments do not seem so compelling today as they did in 1922.").

The Supreme Court granted *certiorari* but refused to overrule *Keogh*. Among other things, the Court noted that the *Keogh* decision was three score and five years old, but Congress had never disturbed its application. *Square D*, 476 U.S. at 423. As the Court concluded, "[i]f there is to be an overruling of the *Keogh* rule, it must come from Congress, rather than from this Court." *Id.* at 424.

At issue in this case are three categories of rates: those that were filed and charged to the insureds consistent with the rates filed by BCBSAL and approved by DOI; those charged to contract holders that were higher than the rates filed and approved by the DOI; and those charged that were lower than those filed and approved. The court addresses each of these categories in turn.

> **1.    BCBSAL Rates that were Charged as Filed by BCBSAL and Approved by the DOI**

In the briefing in support of their Motion, Defendants argue that the court need only consider the first category of rates: those that were filed and approved by the DOI. Defendants say this is so because it is undisputed that the two Alabama Subscriber Plaintiffs named in the Consolidated Class Complaint, CB Roofing and AEMS, were charged rates that were filed. Defendants contend that those rates were filed by BCBSAL and approved by the DOI, they are therefore legal rates, and these legal rates were actually charged to contract holders employed by CB Roofing and AEMS.

### a.   Is There a Requirement of Meaningful Review?

When the court addressed the application of the Filed Rate Doctrine at the pleadings stage, questions were raised about whether there was a requirement that filed rates be subject to "meaningful review" in order to be insulated from attack under the doctrine.  Some courts have held that, where filed rates are the product of anticompetitive activity, but are not afforded meaningful review by the state agency, the Filed Rate Doctrine does not apply. *See Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 394 (9th Cir. 1992); *Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332 (9th Cir. 1990). "[I]f a regulatory agency is so powerless that it only rubber-stamps the rates filed, then it may be inappropriate to apply the filed rate doctrine." *Rios v. State Farm Fire & Cas. Co.*, 469 F. Supp. 2d 727, 736 (S.D. Iowa 2007) (citing *Hanson v. Acceleration Life Ins. Co.*, 1999 WL 33283345, at *4 (D. N.D. Mar. 16, 1999)).

And, to be sure, the court previously reserved ruling on the question of whether application of the Filed Rate Doctrine depends on whether a state agency has engaged in such a meaningful review. (Doc. # 204 at 17-18).  After carefully considering the competing arguments, this court adopts the reasoning of those courts following *Square D* in holding "that the filed rate doctrine applies regardless of the level of agency review." *In re Pennsylvania Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 674 (E.D. Pa. 2009).  In *Square D,* the Supreme Court rejected the argument that agency investigation and approval of the rates filed is a prerequisite to application of the Filed Rate Doctrine.  *Square D*, 476 U.S. at 417 n. 19.  In fact, "the Supreme Court has never indicated that the filed rate doctrine requires a certain type of agency approval or level of regulatory review. Instead, the doctrine applies as long as the agency has in fact authorized the challenged rate." *McCray v. Fid. Nat. Title Ins. Co.*, 682 F.3d 229, 238 (3d Cir. 2012).  As the First Circuit explained, the "*filing* of the tariffs, and not any affirmative approval or scrutiny by

the agency, ... triggers the filed rate doctrine." *Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 420 (1st Cir. 2000) (emphasis in original); *see also Dolan v. Fidelity National Title Ins. Co.*, 365 F. App'x. 271, 274 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 261 (2010) (citing *Square D Co.*, 476 U.S. at 417 & n. 19) ("It is well-established that the doctrine applies to all filed rates, not merely those rates investigated before their approval."). "[A]s long as the regulatory scheme requires the filing of rates with a government agency that has legal authority to review those rates, the filed rate doctrine applies regardless of the actual degree of agency review of those filed rates." *In re Pennsylvania Title Ins. Antitrust Litig.*, 648 F. Supp. 2d at 674-75.

The court concludes that when the Eleventh Circuit uses the term "validly filed rates," it is referring not to the meaningfulness of the review of those rates, but to whether the rates were filed with the regulatory body and thereafter approved. *Florida Mun. Power Agency v. Florida Power & Light Co.*, 64 F.3d 614, 616 (11th Cir. 1995). In discussing that issue, our circuit explained as follows:

> In decisions subsequent to *Keogh*, however, the [Supreme] Court has emphasized the limited scope of the filed rate doctrine to preclude damage claims only where there are validly filed rates. In *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 216, 86 S.Ct. 781, 783, 15 L.Ed.2d 709 (1966), the Court held that a shipper's implementation of rate-making agreements *which were not approved* by the Federal Maritime Commission *was subject to the antitrust laws*. In discussing the *Carnation* case, the Court later noted: "The specific *Keogh* holding ... was not even implicated in *Carnation* ..., because the ratemaking agreements challenged in that case *had not been approved by, or filed* with [the Commission]." *Square D*, 476 U.S. at 422 n. 29, 106 S.Ct. at 1930 n. 29.

*Florida Mun. Power*, 64 F.3d at 616 (emphasis added). Thus, it appears that what the Eleventh Circuit intended to impart in using the phrase "validly filed rates" is this: where rates are *not* filed with the agency, or *not* approved by the agency, the doctrine does not apply and those rates

*are* subject to antitrust challenge.  When rates are validly filed and approved after filing, it is not for the courts to judicially second guess how meaningful the review was leading to that approval.

### b. Even Assuming Meaningful Review is Required, Did it Occur Here?

Alternatively, even if the court were to adopt a requirement of meaningful review, the undisputed facts before the court make clear that the Alabama DOI conducted a meaningful review of the rates at issue that were filed by BCBSAL.  There is undisputed evidence in the Rule 56 record that, on a number of occasions, the DOI examined, questioned, and even rejected proposed rate increases that were initially filed by BCBSAL.  There is further evidence that DOI suggested different rates than those filed and that, in response to DOI's rejection or push back on proposed rate increases, BCBSAL filed revised rates implementing smaller rate increases than those initially "filed."  Thus, under these circumstances, even if the court were to conclude that "meaningful" review is required, the review performed by the DOI was in fact meaningful for purposes of the Filed Rate Doctrine. And this is the case despite the fact that there are no written standards for determining whether a proposed rate is reasonable. The Rule 56 evidence before the court still makes clear that DOI actually reviews the rates and acts when it questions whether the rate is reasonable.

Eleventh Circuit precedent holds that the Filed Rate Doctrine "'is applied strictly to prevent a plaintiff from bringing a cause of action even in the face of apparent inequities whenever either the nondiscrimination strand or the nonjusticiability strand underlying the doctrine is implicated by the cause of action the plaintiff seeks to pursue.'" *Hill*, 364 F.3d at 1316 (quoting *Marcus*, 138 F.3d at 59).  "The doctrine bars *all* claims which would effectively result in a rate lower than the filed rate." *Fowler v. Caliber Home Loans, Inc.*, 2016 WL

4761838, at *7 (S.D. Fla. Sept. 13, 2016) (citing *Fla. Mun. Power*, 64 F.3d at 615) (emphasis in original).

Here, Subscriber Plaintiffs theorize that the premiums charged by BCBSAL were artificially inflated because of the Blues' alleged anticompetitive conduct.[8]  That theory directly challenges the rates that were filed by BCBSAL, approved by DOI, and charged to subscribers at the approved rate.  And the two Subscriber Plaintiffs named in the Subscriber Track Amended Consolidated Class Action Complaint, CB Roofing and AEMS, actually paid the rates that were filed and approved.  They now seek damages measured by the difference between the rate they paid and some lower, as yet to be determined rate (which they contend they would have paid if the Blues' alleged market allocation had not stifled competition); accordingly, their damages claims fall squarely within the ambit of the Filed Rate Doctrine.  *See Taffet*, 967 F.2d  at 1494 ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate[.]") (quotation marks and citation omitted); *Square D*, 476 U.S. at 416–17 (noting that parties' rights defined by the filed rate "cannot be varied or enlarged by either contract or tort").  Defendants are entitled to judgment as a matter of law on the antitrust damages claims of those Plaintiffs who paid rates that were actually filed with the DOI and approved by the DOI.

### c.   Are the Rates Filed and Approved Void as a Matter of Law?

Before concluding its analysis of this issue, the court will address Plaintiffs' assertion that, even for the rates that were filed with the DOI, the Filed Rate Doctrine does not apply

---

[8] "[T]his action seeks to recover damages for classes of subscribers in the form of supra-competitive premiums that the Individual Blue Plans have charged – and lower competitive premiums that non-competing Blue plans have not charged – as a result of this illegal conspiracy." (Case No. 2:13-cv-20000-RDP, Doc. # 244 ¶ 2). "Plaintiffs have also suffered damages as a result of not being offered lower health insurance premium rates by competitors or potential competitors that have not entered the relevant market." (*Id.* ¶ 386).

because the rate filing is "void as a matter of law" under *Security Services, Inc. v. K Mart Corp.*, 511 U.S. 431 (1994).  In that case, the petitioner -- a corporation that agreed to deliver goods for Kmart -- sued Kmart to enforce the petitioner's filed delivery rates.  The Filed Rate Doctrine was invoked.  The Supreme Court, however, held that the rates were unenforceable because they were "incomplete" and therefore "insufficient to support a reliable calculation of charges." *Id.* at 443.[9]  The Eleventh Circuit has explained that the *Security Services, Inc.* case stands for the unremarkable proposition that the Filed Rate Doctrine does not apply where "there is an absence of a calculable rate." *Whitaker v. Frito–Lay, Inc.*, 88 F.3d 952, 961 (11th Cir. 1996).  Plaintiffs argue that BCBSAL's rate filings make it impossible for consumers to calculate the chargeable rates. *See Security Services, Inc.*, 511 U.S. at 443.  In particular, at oral argument, Plaintiffs asserted that the information on group size adjustments (a rate adjustment factor of 1.15 for groups with fewer than 15 enrolled subscribers, and of 1.00 for groups with 15 to 50 enrolled subscribers (Doc. # 738-68; Doc. # 775-23)) is not only (1) impermissible under Regulation 116, but also (2) not available to potential subscribers to enable them to accurately calculate possible rates.  The information regarding the group size adjustments (permissible or not) was, however, disclosed to the DOI, and the DOI nonetheless approved of BCBSAL's rate filing.  Overall, therefore, with regard to the rates BCBSAL actually filed, it "properly filed" those rates with the "appropriate ... regulatory authority," thus triggering application of the Filed Rate Doctrine. *McCray*, 682 F.3d at 241 (citing *Arkansas Louisiana Gas Co.*, 453 U.S. at 577).[10]

---

[9] The court notes that the *Security Services, Inc.* case is distinguishable from the case at hand because, there, the Filed Rate Doctrine was used in an offensive manner on behalf of the entity that filed rates. 511 U.S. at 434.

[10] The court notes that there is potentially another category of putative Plaintiffs – those whose groups were misclassified based on Defendant's practice of determining group size by enrolled subscribers rather than by eligible subscribers pursuant to Regulation 116.  Plaintiffs argue that the fact that this category exists is further evidence that

2.      **Rates Charged to Policyholders that were Subject to Systematic Variance, Not Disclosed to the DOI, and Higher than the Rates Approved by the DOI**

Notwithstanding the court's ruling on rates filed, approved, and charged as filed and approved, this question still remains: what about those putative class members -- or now named Plaintiffs -- who paid rates that varied higher than the filed rates?  Defendants initially argued that this issue is not before the court because, at the time their briefs were filed, the only named Subscriber Plaintiffs (CB Roofing and AEMS) to which their motions for summary judgement are directed had been charged and paid the rates filed and approved.  But now that the variance program has come to light, and Plaintiffs have amended their Class Complaint to add Plaintiffs who they allege paid rates that varied from the filed rates, it makes sense for the court to address the issue that is now presented.

This point is as tautological as it is true: where rates are *not* filed, "Defendants may *not* use the filed rate doctrine as a shield from civil liability." *In re Transpacific Passenger Air Transp. Antitrust Litig*., 69 F. Supp. 3d 940, 961 (N.D. Cal. 2014) (emphasis added) (citing *E. & J. Gallo Winery v. EnCana Corp.,* 503 F.3d 1027, 1040 (9th Cir. 2007)).[11]  Thus, while the claims of a plaintiff who actually paid a rate filed and approved are barred by the Filed Rate

---

there was an absence of a calculable rate and that the Filed Rate defense should therefore not be available to BCBSAL. However, the court does not believe that this issue is properly before it. The court does not have sufficient information to determine whether any of the named Plaintiffs were in fact misclassified.  Nonetheless, it is worth noting that groups having 15 to 50 enrolled subscribers, but more than 50 eligible employees are not "small groups" as that term is defined by Regulation 116.  That is, if these groups had been properly classified, they would have paid rates that were not subject to filing, and not subject to the Filed Rate Doctrine.  Therefore, BCBSAL's systematic misclassification *may* have created for itself a defense to claims by Plaintiffs not properly subject that defense.  For those groups with 2 to 14 enrolled subscribers, but 15 or more eligible employees, the misclassification *may* have resulted in premiums that were fifteen percent higher than they would have been if the group had been properly classified.  But, for now at least, on the current Rule 56 record, this issue is not before the court, and the court declines to issue an advisory opinion with respect to it.

[11] Applying its state's law, the Alabama Supreme Court has adopted the same rule.  *Birmingham Hockey Club, Inc. v. Nat'l Council on Comp. Ins., Inc*., 827 So. 2d 73, 83 (Ala. 2002).

Doctrine, the same does not hold true for those plaintiffs who paid rates that were higher than those filed or disclosed to the DOI.  The "nondiscrimination" principle underlying the Filed Rate Doctrine provides "that the regulated entities [may] charge only those rates that the agency has approved or been made aware of as the law may require." *H.J., Inc. v. Nw. Bell Tel. Co*., 954 F.2d 485, 488 (8th Cir. 1992).  The impetus for the development of the Filed Rate Doctrine was stabilizing rates and preventing pricing discrimination amongst ratepayers. "The duty to file rates … and the obligation to charge only those rates have always been considered essential to preventing price discrimination and stabilizing rates." *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 126 (1990).  Similarly, among the stated purposes of Regulation 116 are (1) "to prevent abusive rating practices," (2) "to require disclosure of rating practices to purchasers," and (3) "to improve the overall fairness and efficiency of the small group health insurance market." Ala. DOI Reg. 482-1-116-.02

To the extent it systematically varied upward from those rates filed and approved, BCBSAL cannot take advantage of the defense to monetary damages -- including treble damages -- offered by the Filed Rate Doctrine.  That is, BCBSAL's charging of "unfiled" rates that were higher than those that were filed violated the Filed Rate Doctrine.  BCBSAL's systematic upward rate variances have not worked to stabilize rates or prevent price discrimination.  Nor has this practice fostered disclosure of rating practices to purchasers or improved overall fairness of the small group health insurance market. And by charging an amount higher than the rates filed and approved, it cannot be said that BCBSAL has filed or charged a legal rate. To hold otherwise under these circumstances would be contrary to the purposes of the Filed Rate Doctrine, as well as the underlying state regulatory scheme.  *See Carlin v. DairyAmerica, Inc*., 705 F.3d 856, 880 (9th Cir. 2013) (concluding that it would be contrary to the statutory purposes of the underlying

statutory scheme to hold that a filer who misreports required data should be able to avoid liability under the Filed Rate Doctrine).  The Filed Rate Doctrine simply does not protect a rate filer who, after securing approval of a filed rate, charges its policyholders a rate higher than that approved. Therefore, BCBSAL's conduct in charging rates which were neither filed with the DOI, nor disclosed to the DOI, is *not* insulated by the Filed Rate Doctrine.

### 3. Rates Charged to Policyholders that were Subject to the Systematic Variance but were Lower than those Filed with and Approved by DOI

How the Filed Rate Doctrine might affect the category of subscribers who paid less than the legal rate raises an interesting question. As noted above, our circuit precedent holds that the Filed Rate Doctrine "'is applied strictly to prevent a plaintiff from bringing a cause of action … whenever *either* the nondiscrimination strand *or* the nonjusticiability strand underlying the doctrine is implicated by the cause of action the plaintiff seeks to pursue.'" *Hill*, 364 F.3d at 1316 (emphasis added) (quoting *Marcus*, 138 F.3d at 59).  And the "nondiscrimination" rationale for the Filed Rate Doctrine provides "that the regulated entities [may] charge *only* those rates that the agency has approved or been made aware of as the law may require." *H.J., Inc.*, 954 F.2d at 488.  At least arguably, therefore, because this class of plaintiffs did not pay a filed rate -- even when it varied lower than the legal rate -- the Filed Rate Doctrine would not apply to bar their monetary damages claims. On the other hand, the fact that this category of subscribers paid rates that were lower than the filed rate means that they paid *less* than what has been determined to be the legal rate.  If the Filed Rate Doctrine applies, they would be precluded from pursuing monetary damages, including treble damages, as a matter of law.  If the Filed Rate Doctrine does not apply, they may technically be able to pursue those claims, but may be rendered unable to prove, factually in this instance, that they have suffered monetary damages inasmuch as they

22

paid a rate which was *less* than what was determined to be a legal rate.    The court does not have sufficient information or briefing to weigh in on this issue at present.

> **4.      Plaintiffs' Claims Against Non-Alabama Blues Who Allegedly Conspired with BCBSAL but who did not Themselves File Rates with DOI**

One key issue must still be addressed: What about the Blues, other than BCBSAL, who did not file rates in Alabama?  The court's previous ruling took a swing at the answer to this question: "logic dictates [that] the Filed Rate Doctrine could only apply to bar claims against a Blue in the state or states in which that particular Blue filed rates." *In re Blue Cross Blue Shield Antitrust Litig*., 26 F. Supp. 3d at 1189.  Unfortunately, upon more careful consideration, the court realizes that was a swing and a miss.

As the court has already concluded, Subscriber Plaintiffs may not assert treble damages claims against BCBSAL to the extent those claims challenge the filed rate (that is, the rate submitted by BCBSAL and approved by DOI as the legal rate).  But BCBSAL is not the only target of a claim based on Subscriber Plaintiffs' challenge to DOI-approved rates.  In addition, Subscriber Plaintiffs assert that other Blues are subject to liability for treble damages due to their conspiratorial agreement to not enter the Alabama market.  And, as part and parcel to that claim, Subscriber Plaintiffs assert that the rate they paid would have been lower if true competition had occurred in Alabama. (*See* Doc. # 897 ¶ 715(d) (claiming that the Blues have entered into anticompetitive agreements that "[allowed BCBSAL] to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive

amounts").[12]   But, upon more careful review, the court concludes that this assertion is a nonstarter because it flies right into the teeth of the Filed Rate Doctrine.

Just as Subscriber Plaintiffs may not challenge the filed rate in a damages claim against BCBSAL, they are likewise precluded from arguing that more robust competition by BCBSAL's co-conspirators would have led to something less than the legal rate approved by DOI.  *Cf. Wegoland*, 27 F.3d at 18 (noting that the main thrust of the Filed Rate Doctrine is that agency-approved rates are "per se reasonable and unassailable in judicial proceedings brought by ratepayers").

In making this argument, Subscriber Plaintiffs point to *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144 (3d Cir. 1993), as persuasive authority.  But the court is not persuaded.   In that case, five steel companies, three dock companies, and three trucking companies accused railroads of conspiring to block a "triad" of lower cost competitors (*e.g.,* trucking companies, non-railroad docks, and self-unloading vessels) from entering the market to transport iron ore.  *Id.* at 1151.  The Third Circuit refused to apply the Filed Rate Doctrine and held that damages may be measured by the difference between a competitive price in the "but for" world and the "filed rate" charged by railroads in the actual world.  *Id.* at 1169.

> We conclude that the district court correctly characterized B&LE's anti-competitive activity as market preclusion, and *Keogh's* protective rule cannot apply to forbid recovery for the resulting economic detriment. As the Supreme Court has succinctly stated, *Keogh* merely prevents private shippers from sustaining an award of treble damages by claiming that ICC-approved rates were the product of an antitrust violation. *Square D*, 476 U.S. at 422, 106 S. Ct. at 1929. That statement of *Keogh's* protection *does not preclude liability based on non-rate anticompetitive activity*. Indeed, the steel companies' case involves

---

[12]  Subscriber Plaintiffs also have charged that the Blues' anticompetitive agreements -- such as the alleged market allocation agreement -- reduced the number of health insurers competing with BCBSAL and deprived the Subscribers "of the benefits of free and open competition."  (Doc. # 897 ¶ 715(a) & (e)).  These allegations are made in further support of their contention that a free and open insurance market would lead to lower premium rates.

damage claims based on non-rate activity that targeted potential low-cost competitors.

*Id.* at 1159 (emphasis added). Plaintiffs point to the following language of the Third Circuit to make their argument:

> We recognize that the success of anticompetitive non-rate activity would coincidentally implicate rates promulgated under the jurisdiction of the ICC. It is fully consistent with *Keogh*, however, to accept these rates as lawful and nonetheless to conclude that through non-rate activities, particularly the restriction on the sale or lease of dock space and the refusal to deal with potential competitors, the railroads effectively retarded entry of lower cost competitors to the market. *The instrument of damage to the steel companies was the absence of the lower-cost combination.*

*Id.* (emphasis added). Respectfully, depending upon how the Third Circuit's opinion is read, it either is easily distinguished or misses the target, and misses it badly.

As a matter of law, when a regulator approves a filed rate, that becomes the legal rate. Any challenge to the legal rate -- even one that compares it to some hypothetical[13] "competitive rate" -- amounts to just that, a challenge to the legal rate. *See Taffet*, 967 F.2d at 1494 ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate[.]") (quotation marks and citation omitted); *Square D*, 476 U.S. at 416–17 (noting that parties' rights defined by the filed rate "cannot be varied or enlarged by either contract or tort"). So, it is entirely conceivable that what the *Lower Lake Erie* court concluded is this: (1) the

---

[13] Anyone who questions that what the Third Circuit had in mind in *Lower Lake Erie* is a hypothetical rate need only look at that court's own language:

> Here, the question of *hypothetical* lower rates is ancillary. If the self-unloader/private dock/trucking triad had been permitted to develop, *conceivably* the steel companies would no longer be captive customers of the railroads and the rates charged by them would not be so pervasive a consideration.

*In re Lower Lake Erie.*, 998 F.2d at 1160 (emphasis added).

25

railroads' anticompetitive behavior precluded the aforementioned triad of entities from entering the market, and (2) "but for" those illegal barriers, the steel companies could have benefitted by paying a wholly different rate to non-railroad transporters for comparable services (which would not have been regulated by the ICC's railroad rate bureaus). If that was the Third Circuit's rationale, the opinion mounts no assault on the filed rate (*i.e.*, the legal rate) approved by the railroads' regulator.[14]  Indeed, such a claim simply does not implicate the Filed Rate Doctrine; rather, it challenges only the anticompetitive conduct of a regulated entity that foreclosed its customers' access to a comparable product that was not regulated by the same rate-setting agency.

Of course, the problem for the Subscriber Plaintiffs is that particular reading of *Lower Lake Erie* does not help them in any way here.  In these cases, if non-Alabama Blues had entered the Alabama health insurance market, by law, they would have been required to file their rates with the same regulator as BCBSAL, and would have been subject to the same rate approval process as BCBSAL.  That was not the case with respect to the triad of competitors in *Lower Lake Erie*.  As non-rail carriers, they would not have been subject to the same ICC rate review regime as the railroads.[15]  Thus, the non-Alabama Blues simply are not similarly situated to the triad, and, based upon such a reading, *Lower Lake Erie* is distinguishable from the cases before the court.

---

[14]  Indeed, if that is the rationale behind the *Lower Lake Erie* decision, the court agrees with its conclusion that *Keogh* would have no application in that context.

[15]  In other words, if the triad had entered the iron ore transportation market, it would *not* have been subject to the same regulatory rate approval process administered by the ICC which applied to the railroads.  However, in this case, if the non-Alabama Blues had entered the health insurance market in Alabama, they necessarily would have been required to file their rates with the DOI.

In fairness, however, based on their arguments, Subscriber Plaintiffs appear to read the *Lower Lake Erie* ruling more broadly. They argue that *Lower Lake Erie* stands for the proposition that *Keogh* only applies in a case where the alleged anti-competitive activity directly achieves the legal rate (*i.e.*, the rate filed by the defendant, approved by the regulator, and which thereby becomes the legal rate), and not in a case where the anti-competitive behavior may have only had some conceivable effect on the legal rate. But such a result makes no sense.[16] The baseline for the claim here must (and always will) begin with a challenge to the legal rate. To the extent *Lower Lake Erie* can be read to say that the Filed Rate Doctrine does not apply when an antitrust plaintiff alleges there were illegal barriers erected by a defendant, those barriers squelched additional competition, and that additional competition would have lowered the legal rate, it directly conflicts with *Hill*. There, the Eleventh Circuit applied the Filed Rate Doctrine to claims that a telecommunications company violated state law by misrepresenting the basis for a filed rate to customers after the rate had been approved. *See Hill*, 364 F.3d at 1312 n. 2, 1316-17 (holding that claims concerning negligent misrepresentation of a tariff and unfair trade practices involving the tariff were barred by the Filed Rate Doctrine because the claims, if successful, would have retroactively reduced the legal rate and would have constituted a retroactive determination that the filed rate was unreasonable). So, depending upon how it is viewed, the *Lower Lake Erie* decision is either distinguishable from, or contrary to, binding Eleventh Circuit precedent. Judicial consideration of a damages claim against even non-Alabama Blues which attacks the filed rate would result in "unnecessary interjection of the courts into the rate-making

---

[16] Indeed, such an analysis would reach this incongruent result: the Filed Rate Doctrine bars damages claims in a case presenting a *per se* violation (price fixing), but not one which must be analyzed under the Rule of Reason (market entry barriers).

process where they [the courts] have no expertise or valid reason to interfere." *Carlin*, 705 F.3d at 868.  This would violate the non-justiciability principle.

### 5.     What Challenges Survive Application of the Filed Rate Doctrine?

Therefore, while the Filed Rate Doctrine bars claims by Plaintiffs who paid the filed rate, based upon the court's ruling (and the parties' previously-referenced stipulation) the court concludes two types of Alabama damages claims in this case are *not* barred by the Doctrine: (1) claims by Subscriber Plaintiffs who paid BCBSAL higher rates than those filed and approved based upon BCBSAL's "cap" and "hold" program (*i.e.*, rates that systematically varied higher than the legal rates) and (2) claims by Subscriber Plaintiffs who were in groups larger than 50[17] because no rates were filed with respect to those groups.  (Doc. # 775-21).  The court reserves ruling on Subscriber Plaintiffs' claims to the extent some subscribers were charged less than the legal rate.

### B.     The Limited Scope of the Filed Rate Doctrine

One final note is in order.  The Filed Rate Doctrine is not some sort of panacea for any ills Defendants may (or may not) have in this case.  Even where it applies, "[t]he Filed Rate Doctrine does not create an antitrust immunity." *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 848–49 (N.D. Ohio 2010) (citing *Square D*, 476 U.S. at 422 (rejecting the proposition that the filed rate doctrine is properly characterized as an immunity)).  "A critical distinction remains between an absolute immunity from all antitrust scrutiny and a far more limited nonavailability of the private treble-damages remedy." *Id*. at 422 n. 28.  The Filed Rate Doctrine only bars

---

[17]   In assessing which Subscriber Plaintiffs were in groups larger than 50, the parties appear to dispute whether the appropriate unit for measuring the size of a group is the number of eligible employees or enrolled employees.  (Doc. # 775-21 at 1-2).  Regulation 116 makes clear that the size of an insurance group is measured by the number of *eligible* employees.

recovery of money (including treble) damages; it has no effect on claims for declaratory or injunctive relief. *Square D Co.*, 476 U.S. at 422 n. 28; *Florida Mun. Power Agency*, 64 F.3d at 616. Thus, the Filed Rate Doctrine only bars claims for money damages by Subscriber Plaintiffs who were charged and paid rates that were actually filed and approved.

### IV.   Conclusion

For the reasons discussed above, Defendants' Amended and Restated Motion Based on the Filed Rate Doctrine for Summary Judgment on the Alabama Subscribers' Damages Claims (Doc. # 733), and Alabama Subscriber Plaintiffs' Cross-Motion for Partial Summary Judgment on the Filed-Rate Doctrine (Doc. # 770) are each due to be granted in part and denied in part. A separate order will be entered.

**DONE** and **ORDERED** this February 23, 2017.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE