**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD | } | **Master File No.:  2:13-CV-20000-RDP** |
| | } | |
| **ANTITRUST LITIGATION** | } | |
| **(MDL NO.: 2406)** | } | |

## MEMORANDUM OPINION

This matter is before the court on Defendants' Motion to Dismiss Providers' Consolidated Fourth Amended Complaint. (Doc. # 1187). The matter has been fully briefed (Docs. # 1237 and 1252), and on June 8, 2017, the court heard argument on the Motion. For the reasons explained below, the Motion is due to be denied.

## I.    Introduction

In their Motion, Defendants contend that Provider Plaintiffs (hereinafter Providers) "still have not plausibly alleged relevant markets under the Eleventh Circuit's standards, and therefore the Court should dismiss their rule of reason and Section 2 claims." (Doc. # 1187-1 at 6). In particular, they contend that Providers' rule of reason and Section 2 claims are deficient for the following reasons: (1) Providers' alleged relevant market lumps all providers into one market or three alternative markets; (2) Providers' alleged relevant market implausibly excludes many other buyers of healthcare goods and services both inside and outside of Alabama; and (3) the named Providers do not plausibly allege that they have been harmed in the vast majority of the relevant markets they allege. (*Id.*).

Providers disagree and argue that: (1) Defendants adopt the wrong standard of review for a Motion to Dismiss in an antitrust action; (2) they have plausibly alleged relevant product and geographic markets; (3) the named Provider Plaintiffs have standing to represent all class

members; and (4) even though they have properly alleged relevant product and geographic markets, a market definition is not necessary to state a claims because Providers allege Defendants caused actual detrimental effects on competition. (Doc. # 1237).

## II.     Standard of Review

The Federal Rules of Civil Procedure require that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations. *Id.* at 555, 557. In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in the complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

In considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. Appx. 136, 138 (11th Cir. 2011) (unpublished) (quoting *Am. Dental Assn. v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)). That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Twombly*, 550 U.S. at 570.

The Eleventh Circuit has held that "Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases."[1] *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004) (citing *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983)). Antitrust plaintiffs making allegations about relevant markets "must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010). Providers argue that because the definition of relevant markets is a factual question, it is seldom suitable for a resolution on a motion to dismiss. (Doc. # 1237 at 6 (citing *Griffiths v. Blue Cross & Blue Shield of Ala.*, 147 F. Supp. 2d 1203, 1213–14 (N.D. Ala. 2001) (in turn citing *Harris*

---

[1] The Eleventh Circuit has not abrogated this rule following the Supreme Court's *Twombly* opinion. And, other district courts have relied on this Eleventh Circuit rule post-*Twombly* in denying motions to dismiss. *Lakeland Reg. Med. Ctr. v. Astellas U.S., LLC*, 2011 WL 3035226, at *3 (M.D. Fla. July 25, 2011); *Parsons v. Bright House Networks, L.L.C.*, 2010 WL 5094258, at *4 (N.D. Ala. Feb. 23, 2010); *SecurityPoint Media, LLC v. The Adason Grp., LLC*, 2007 WL 2298024, at *2 (M.D. Fla. Aug. 7, 2007).

*Young & Assocs. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991); *Alan's of Atlanta,*

*Inc. v. Minolta Corp.*, 903 F.2d 1414, 1429 (11th Cir. 1990))).

## III.  Relevant Allegations of the Consolidated Fourth Amended Complaint

In their Consolidated Fourth Amended Complaint, Providers allege their proposed

product and geographic markets as follows:

> 339. The Defendant Blues have market power in many markets over prices or
> payment rates for healthcare providers. Even in markets where Defendant Blues
> do not have high market concentrations, they have market power or have
> otherwise exploited anticompetitive actions, through the more than one hundred
> million subscribers of Blues involved in the Inter-Plan or national programs. This
> access provides market power beyond what might be suggested by the local
> enrollment share.

> 340.   This case involves a number of product markets in which the Defendants
> participate. One is the market for the sale of commercial healthcare financing
> services (excluding Medicare Advantage and managed Medicaid), which includes
> the various means of paying or reimbursing for healthcare goods and services
> other than the direct payment by individuals who are not insured or indemnified.
> The market includes the sale of the full package of healthcare financing services,
> including insurance, as well as, for self-insured groups, the sale of other
> healthcare financing services, including access to a network of healthcare
> providers at reduced prices and the administration of healthcare-related employee
> benefit plans, which together form a relevant product market. This relevant
> product market can be described as the market for the sale of commercial health
> insurance and includes both fully insured plans and Administrative Service Only
> (ASO) plans. The purchasers of commercial health insurance do not have
> reasonable alternatives, as described in more detail in Paragraphs 341–346. Some
> employers are required by the Affordable Care Act to offer healthcare benefits to
> their employees. Employers who are required to offer these benefits, as well as
> employers who are not required to offer these benefits but wish to do so, have no
> reasonable alternative but to purchase commercial health insurance. For these
> employers, forgoing coverage or trying to self-supply, in other words managing
> all aspects of their employees' health benefits on their own, is not feasible.
> Therefore, a profit maximizing hypothetical monopolist in this market likely
> would raise prices above competitive levels by imposing at least a small but
> significant and non-transitory increase in price, or SSNIP. The number of
> employers or other groups substituting away from commercial health insurance is
> likely to be insufficient to make the SSNIP unprofitable.

> 341.   Within the market for the sale of commercial health insurance, the
> Defendants participate in a number of submarkets. These submarkets are alleged

in the alternative to be relevant product markets for purposes of Provider Plaintiffs' claims.

342.　The first submarket is the sale of commercial health insurance to national accounts with 5,000 employees or more, who are spread over more than one state. The relevant submarket can be described as the sale of commercial health insurance to these national accounts and includes both fully-insured plans and ASO plans. There is no reasonable substitute for this product. Large multistate employers have unique needs when seeking commercial health insurance for their employees. They desire a national network, a high degree of plan customization, and sophisticated claims administration, customer service, and data reporting. If faced with a SSNIP, a national account would have only two alternatives: self-supply by handling all aspects of the insurance product themselves, or forgo the purchase of commercial health insurance altogether. Neither is a reasonable substitute. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a SSNIP. Because other insurance products, such as those without national networks, do not meet the unique needs of national accounts, the substitution between commercial health insurance for national accounts and other health insurance products is low, as reflected in measures such as a low cross elasticity of demand. Moreover, "national account" is a well-understood term in the health insurance industry. Insurance brokers and benefits consultants generally consider national accounts to constitute a separate line of business. Many of the largest insurers in the country, including Defendant Anthem, manage national accounts separately from their other business. Cigna and Defendant Anthem both use 5,000 employees as the threshold for defining national accounts, and that figure is considered to be reasonable by insurance brokers and benefits consultants.

343.　The second submarket is the sale of commercial health insurance to large group employers. The relevant submarket can be described as the sale of commercial health insurance to large group employers and includes both fully insured plans and ASO plans. "Large group" is defined as an employer with more than 50 employees. This is the threshold established by the Affordable Care Act for "large employers." 42 U.S.C. § 18024(b)(1). Although the Affordable Care Act gives states the option to change this threshold to 100 employees, Alabama has not done so. There is some overlap between this submarket and the submarket for the sale of commercial health insurance to national accounts. The insurance industry recognizes a clear distinction between insurance for small groups (employers with 50 or fewer employees) and large groups because small group insurance is defined by state regulation and subject to state and federal statutes. Large group insurance is subject to less stringent regulation, and it permits more customization and differentiation. Insurers can profitably target large groups—in other words, engage in price discrimination—because they can easily identify large groups; prices for large group products are negotiated individually; and arbitrage is impossible. There are no reasonable substitutes for commercial health insurance sold to large groups. A large group employer can respond to a SSNIP in

one of three ways: (1) forgo the purchase of group health insurance for their employees; or (2) self-supply by handling all aspects of the insurance product themselves; or (3) somehow morph into small groups. Forgoing health insurance is not a reasonable substitute because virtually all large employers offer health coverage to their employees. Handling all aspects of the insurance product is impractical. And large groups are not in a position to reduce their numbers of benefits-eligible employees below state-law thresholds. In other words, the substitution between large group insurance and other healthcare financing options is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in this market would likely raise prices above competitive levels by imposing at least a SSNIP.

344.    The third submarket is the sale of commercial health insurance to small group employers. The relevant submarket can be described as the sale of commercial health insurance to small group employers and includes both fully insured plans and ASO plans. "Small group" is defined as an employer with 50 employees or fewer. This is the threshold established by the Affordable Care Act for "small employers." 42 U.S.C. § 18024(b)(2). Although the Affordable Care Act gives states the option to change this threshold to 100 employees, Alabama has not done so. The insurance industry recognizes a clear distinction between insurance for small groups (employers with 50 or fewer employees) and large groups because small group insurance is defined by state regulation and subject to state and federal statutes. There are no reasonable substitutes for small group insurance. A small group employer can respond to a SSNIP in one of three ways: (1) forgo the purchase of group health insurance for their employees; or (2) self-supply by handling all aspects of the insurance product themselves; or (3) hire enough new employees to become a large group. Forgoing health coverage is not a reasonable substitute because health coverage is considered to be an important benefit. Handling all aspects of the insurance product is impractical. And hiring more employees for the sole purpose of being able to purchase different insurance is impractical. In other words, the substitution between small group insurance and other healthcare financing options is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a SSNIP.

345.    For the relevant product markets described above, the State of Alabama is a relevant geographic market. Sellers of commercial health insurance compete for the business of employers, in part, by offering attractive provider networks in the geographic areas where employers' employees live and work. Individuals tend to get their healthcare services in locations near to where they live and work. If the hypothetical monopolist of commercial health insurance in Alabama were to implement a SSNIP, employers in Alabama would not substitute commercial health insurance in other states because their employees in Alabama value access to providers in Alabama. For employers in Alabama, there are no reasonable substitutes to commercial health insurance in Alabama. Further, in response to a

SSNIP, employers will not move their employees to other states. In other words, the substitution between commercial health insurance in Alabama and commercial health insurance outside Alabama is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in these product markets in the State of Alabama would likely increase prices above competitive levels by imposing at least a SSNIP.

346.    In the alternative, for the relevant product markets described above, Alabama Core-Based Statistical Areas, and counties or combinations of counties not part of one of these areas, are relevant geographic markets. "Core-Based Statistical Areas" is a term used by the United States Office of Management and Budget to encompass Metropolitan Statistical Areas and Micropolitan Statistical Areas. Metropolitan Statistical Areas especially are used in the ordinary course of business in the insurance industry when examining local markets. Defining markets for commercial health insurance as local is consistent with the desire of employers to provide health plans with networks of local providers, specifically providers located near where their employees live and work. In other words, the substitution between commercial health insurance in an employer's local area and commercial health insurance outside the employer's local area is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in these product markets in Alabama Core-Based Statistical Areas, and counties or combinations of counties not part of one of these areas, likely would increase prices above competitive levels by imposing at least a SSNIP.

347.    In addition to the market for commercial health insurance, the Defendants participate in the market for the purchase of goods and services from healthcare providers. Outside of payments by the government, the vast majority of those goods and services are paid through or by health insurance companies, with the 36 independent Blues being the largest collection of those companies. Of the goods and services of healthcare providers that are paid for by health insurance companies, the vast majority are provided through in-network contracts.

348.    The purchase of goods and services from healthcare providers by commercial buyers (excluding the purchase of prescription drugs and purchases for Medicare Advantage and managed Medicaid) is a relevant product market. Prescription drugs are excluded from this relevant market because they are largely purchased indirectly, through pharmacy benefit managers. These commercial buyers are the companies in the business of selling commercial health insurance or administering commercial health plans for private employers or other groups. These companies have separate business units dedicated to contracting for the purchase of goods and services from healthcare providers. For healthcare providers, there is no reasonable alternative to contracting with these commercial buyers in order to be in-network providers for the health plans sold to private employers or groups. Sellers of healthcare goods and services are not in a position to forgo sales to commercial buyers, in favor of patients who pay out of pocket, a

group that essentially does not exist. Nor can they obtain enough Medicare or Medicaid patients, insured either under the government's traditional programs or managed care programs, to replace the volume they would lose from dropping commercial insurance. Further, the prices paid to healthcare providers by the government programs, including Medicare Advantage and managed Medicaid, are lower than the prices paid for the commercial health plans of private employers or groups. In other words, for providers, the substitution between commercial buyers and other payors is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopsonist in this market likely would lower prices paid to providers below competitive levels by imposing at least a small but significant and non-transitory reduction in price (SSNRP). The prices paid to healthcare providers by the government programs, including Medicare Advantage and managed Medicaid, are different than the prices paid for the commercial health plans of private employers or groups. Also some healthcare providers have separate contracts for Medicare Advantage and managed Medicaid, and some insurers have separate contracting teams for these products.

349.    This market need not be segmented by the type of provider at issue. Healthcare providers participate in what is known as two-stage competition; first they compete for inclusion in the provider networks of insurers' plans, and then they compete for patients within a plan. This market relates to the first stage of that competition. For a healthcare provider in Alabama, the fundamental question in defining this product market is not, "Who will my patients be?" but "Who are the payors with whom I can contract?" In Alabama, where the Blues combine to make the vast majority of commercial insurance payments, the answer is the same, regardless of who the provider is—the Blues, the few non-Blue commercial insurers with a small presence in the state, and government programs including traditional Medicare, Medicare Advantage, Medicaid, and managed Medicaid. All providers, regardless of their type, face these options. Moreover, multiple types of providers can form a "cluster market," a concept widely accepted in healthcare antitrust cases and scholarly economic analyses.

350.    In the alternative, three submarkets within this market are relevant product markets. These are the purchase of goods and services from healthcare professionals, the purchase of goods and services from healthcare facilities, and the purchase of durable medical equipment (DME), all by commercial buyers of healthcare goods and services who are the companies in the business of selling commercial health insurance or administering commercial health plans (excluding the purchase of prescription drugs and purchases for Medicare Advantage and managed Medicaid). The submarket for DME is limited to DME provided to Alabama residents. Practical indicia support the segmentation into three submarkets. For example, the industry recognizes distinctions among healthcare professional services, healthcare facility services, and DME, and insurers often differ in the reimbursement methodologies they employ for each of these groups. For example, many commercial buyers reimburse healthcare facilities for inpatient services based on diagnosis-related group codes instead of paying for

each good or service individually. Commercial buyers' contracting teams and processes also differ among these submarkets. Nonetheless, providers of healthcare professional services and providers of healthcare facility services face the same options for the purchase of their goods and services described above in Paragraph 347-349. As a result, in each of these submarkets, the substitution between commercial insurance and other payors is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopsonist in these submarkets would likely lower prices paid to providers below competitive levels by imposing at least a SSNRP.

351.   For the relevant product markets described in Paragraphs 342 to 350, other than DME, the State of Alabama is a relevant geographic market. Healthcare providers, who have built their patient base and have invested in physical assets located in Alabama, are unlikely to respond to a SSNRP by moving their practice out of the state. Therefore, a profit-maximizing hypothetical monopsonist in these product markets in the State of Alabama would likely reduce prices below competitive levels by imposing at least a SSNRP.

352.   In the alternative, for the relevant product markets described in Paragraphs 342 to 350 (other than the market for DME), Alabama Core-Based Statistical Areas, and counties or combinations of counties not part of one of these areas, are relevant geographic markets. Healthcare professionals and healthcare facilities usually provide services to patients living or working in relatively close proximity to their offices or other facilities. Healthcare professionals and healthcare facilities have invested in physical capital in their local geographic areas and invested in their human capital (reputation and referral patterns) that is specific to their local geographic areas. Therefore, they are unlikely to respond to a SSNRP by moving their practice out of their local area. The disincentive to moving is even more compelling in the real world than in the world of the hypothetical monopsonist because BCBS-AL has market power throughout Alabama, and Alabama providers cannot contract with out-of-state Blues except in limited circumstances due to the Blues' horizontal market allocation. Therefore, leaving the provider's local area makes little difference unless the provider is willing to leave the state entirely. In other words, in the product markets for the purchase of healthcare services, the substitution between commercial buyers in the local geographic markets identified above and commercial buyers outside the local geographic markets identified above is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopsonist in these product markets in the geographic markets identified above would likely reduce prices below competitive levels by imposing at least a SSNRP.

353.   In the alternative, for the product market defined as the purchase of goods and services from healthcare facilities by commercial buyers (excluding prescription drugs their purchases for Medicare Advantage and managed Medicaid), Dartmouth Atlas Hospital Referral Regions and Dartmouth Atlas

Hospital Service Areas are relevant geographic markets. The Dartmouth Atlas of Health Care is produced by the Dartmouth Institute for Health Policy and Clinical Practice. Hospital Referral Regions represent regional health care markets for tertiary medical care that generally requires the services of a major referral center. Hospital Service Areas are local health care markets for hospital care. Healthcare facilities, including hospitals, treat patients from these areas and have invested in physical capital and built goodwill in these areas. Therefore, they are unlikely to respond to a SSNRP by moving their facilities. The disincentive to moving is even more compelling in the real world than in the world of the hypothetical monopsonist because BCBS-AL has market power throughout Alabama, and Alabama providers cannot contract with out-of-state Blues except in limited circumstances due to the Blues' horizontal market allocation. Therefore, leaving the facility's Hospital Referral Region or Hospital Service Area makes little difference unless the facility is willing to leave the state entirely. In other words, the substitution in the relevant product markets between commercial buyers in these geographic markets and commercial buyers outside these geographic markets is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopsonist in this product markets in these geographic markets would likely reduce prices below competitive levels by imposing at least a SSNRP.

354.    Because DME can be shipped across state lines, the geographic market for DME is national.

355.    BCBS-AL's market power with respect to DME shipped to Alabama residents, however, is high because of the Blues' geographic market allocation and BCBS-AL's practice of offering contracts to DME providers that cover only shipments made from Alabama (or possibly from a contiguous county).

356.    The Provider Plaintiffs reserve the right to further refine their definitions of the relevant product markets and relevant geographic markets as more data and expert analysis become available.

(Doc. # 1083 at ¶¶ 339 – 356).

**IV. Analysis**

**A. Defendants' Challenge to Providers' Product Markets**

After careful review, the court concludes that Providers have plausibly alleged a proper market and Defendants' motion to dismiss (Doc. # 1187) is due to be denied.

### 1. In Antitrust Cases, Dismissals Under Rule 12(b)(6) for Improperly Pled Markets are Disfavored

The scope of the relevant market in an antitrust case is driven by marketplace facts; therefore, motions to dismiss in this area rarely are successful. *E.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."). This is unquestionably the rule in the Eleventh Circuit, even after the Supreme Court's *Twombly* opinion, which addressed the pleading standard for an antitrust conspiracy. *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1070 (discussing the Eleventh Circuit's disfavor towards Rule 12(b)(6) dismissals in fact-intensive antitrust cases); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994–95 (11th Cir. 1983) (same). Of course, while "the 'parameters of a given market are questions of fact,' *Thompson v. Metro. Multi–List, Inc.*, 934 F.2d 1566, 1573 (11th Cir. 1991), antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs*, 626 F.3d at 1336. "On a motion to dismiss, the court need not engage in extensive analyses of reasonable interchangeability and cross elasticity of demand." *In re Webkinz Antitrust Litig.*, 2010 WL 4168845, at *3 (N.D. Cal. Oct. 20, 2010) (internal quotation marks and brackets omitted). Against this backdrop, the issue here is whether Defendants' motion pushes this case into the rare category of cases where dismissal on the pleadings is warranted. After review, the court concludes it does not.

## 2.       Providers Have Plausibly Alleged Relevant Product Markets

In advancing a rule of reason claim, an antitrust plaintiff may show either actual or potential harm to competition. *Jacobs*., 626 F.3d at 1336; *Levine v. Cent. Fla. Med. Affiliates, Inc*., 72 F.3d 1538, 1551 (11th Cir. 1996). "Regardless of whether the plaintiff alleges actual or potential harm to competition, however, he must identify the relevant market in which the harm occurs." *Jacobs*, 626 F.3d at 1336 (citing *Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986)). "Like claims under Section One, Section Two claims require harm to competition that must occur within a 'relevant,' that is, a distinct market, with a specific set of geographical boundaries and a narrow delineation of the products at issue." *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1074 (11th Cir. 2004) (citing *U.S. Anchor Mfg. v. Rule Indus*., 7 F.3d 986, 995 (11th Cir.1993) ("Defining a relevant product market is primarily a process of describing those groups of producers which, because of the similarity of their products, have the ability-actual or potential-to take significant amounts of business away from each other.")).

> Normally, the [product] market is composed of products that have reasonable interchangeability for the purposes for which they are produced - price, use and qualities considered. In economists' terms, two products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand. Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product. Thus, the inquiry is whether a hypothetical cartel would be substantially constrained from increasing prices by the ability of customers to switch to other producers.

> There is a danger in applying these factors mechanically in the context of monopsony or oligopsony. These factors are reversed in the context of a buyer-side conspiracy. In such a case, the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes. A greater availability of substitute buyers indicates a smaller quantum of market power on the part of the buyers in question.

*Todd*, 275 F.3d at 202 (internal quotation marks omitted); *see Jacobs*, 626 F.3d at 1337 ("The market is composed of products that have reasonable interchangeability.") (Internal quotations

omitted). Thus, the proper focus of the market analysis in monopsony cases is "the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers." *Todd*, 275 F.3d at 202 (internal quotation marks omitted). *See also Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176, at *9 (C.D. Ill. Sept. 30, 2016) (explaining that, in an antitrust suit between competing hospital corporations, the product market analysis "turns on the substitutability of a buyer from the perspective of the seller; that is, are commercially insured patients reasonably interchangeable with government patients from the providers' point of view").

Defendants argue that Providers' product market improperly excludes alternative payors for goods and services from healthcare providers.[2] Specifically, they contend the market is not plausible because it excludes government payors and private individual payors, and they cite cases which stand for the proposition that government payors should have been included in the market. (Doc. # 1187-1 at 14).

Providers respond that, given the commercial realities of reimbursement for healthcare, there are differences between reimbursement by commercial payers on the one hand, and private individual payors and reimbursement by government payors on the other. They further claim that substitution between commercial payors and other payors is low (Doc. # 1237 at 13), owing to such factors as the small fraction of people who pay out of pocket for health care service and the

---

[2] At oral argument, Defendants relied heavily upon *United States v. Engelhard Corp.*, 970 F. Supp. 1463, 1483 (M.D. Ga.), *aff'd*, 126 F.3d 1302 (11th Cir. 1997), a case cited in their reply brief. (Doc. # 1252 at 9-10) (citing the Eleventh Circuit's opinion on appeal). They assert that *Engelhard's* application here requires the court, in evaluating a product market, to look at all of the different options available to plaintiffs to which they could switch their business. Indeed, the court in *Engelhard* conducted such a detailed analysis. However, it did so *after a three-week bench trial*. In that case, the United States sought to enjoin Engelhard, one of the top two leading manufacturers of gel quality attapulgite clay, from acquiring the assets of the other top manufacturer. *Engelhard*, 970 F. Supp. at 1465. The issue before Judge Sands was whether the plaintiff had sufficiently *proved*, after a three-week bench trial, a relevant product market. *Id.* at 1483-84. In contrast, the issue before this court is whether Plaintiffs have plausible *pled* relevant product market. Nothing in *Engelhard* is inconsistent with the Eleventh Circuit rule disfavoring Rule 12(b)(6) dismissals in fact-intensive antitrust cases. *Spanish Broad Sys. of Fla., Inc.*, 376 F.3d at 1070.

limited number of Medicare and Medicaid patients. In the Consolidated Fourth Amended Complaint, Providers further allege that "the prices paid to healthcare providers by the government programs, including Medicare Advantage and managed Medicaid, are lower than the prices paid for the commercial health plans of private employers or groups." (Doc. # 1083 ¶ 348). For this reason, they have alleged that "substitution between commercial buyers and other payors is low, as reflected in measures such as a low cross elasticity of demand." (*Id.*).[3]

Other courts have found similar alleged product markets plausible. In *Methodist Health Services Corp. v. OSF Healthcare System*, Methodist Health alleged that access to privately-insured patients is critical to a healthcare provider's long-term sustainability in light of the comparatively low prices providers are required to charge patients covered by government plans for the same services. 2015 WL 1399229, at *7 (C.D. Ill. Mar. 25, 2015). Based on this allegation, the court held that it could not find, as a matter of law, that the sales of inpatient hospital and outpatient surgical services to commercial health insurers are interchangeable with the sales of these same services to government payors. *Methodist Health Servs. Corp.,* 2015 WL 1399229 at *7). Therefore, the court refused to dismiss the plaintiff's federal antitrust claims for failing to plead plausible relevant product markets. *Id.*; *see also Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 997 F. Supp. 2d 142, 161 (D.R.I. 2014) (finding that alleged product market, which ignored the presence of Medicare and Medicaid, was plausibly pled because private insurance payors and government payors are not interchangeable). This court agrees with this analysis.[4] Providers' alleged product markets which exclude

---

[3] As the Providers have noted, in *United States of America et al v. Anthem, Inc. et al*, Anthem admitted that "government programs generally reimburse providers at far lower rates than do commercial health insurers." (U.S. District Court for the District of Columbia Case No. 1:16-cv-01493-ABJ, Doc. # 15 ¶ 67).

[4] The court acknowledges the Eighth Circuit's holding in *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009), that a seller cannot rely on a product market limited to a single method of payment when it accepts other methods of payment. But the Eighth Circuit's holding there is not binding on this

government payors and private payors is plausible because it reflects the reality that "the substitution between commercial buyers and other payors is low, as reflected in measures such as a low cross elasticity of demand."[5] (Doc. # 1083 at 134).

## B. Different Types of Providers May Properly Participate in One Market

Courts have described the requirement of defining a relevant product market in various ways. But the key is to identify the products or services, as well as the buyers or suppliers of those products, that compete to some substantial degree with each other. That is, the process involves identifying the group of buyers or suppliers that are able (actually or potentially) to take away substantial supply or business from each other. Defendants argue that Providers' proposed markets implausibly lump together into one "amorphous mass" tens of thousands of "radically" different providers who have "radically" different purchasers of their services. They argue that healthcare goods and services cannot be a relevant product market because the Providers come in a variety of shapes and sizes, and the ability to sell those goods and services to payors other than commercial payors will vary from provider to provider. (Doc. # 1187-1 at 9-12).

---

court. And that decision has been distinguished by other courts in antitrust suits brought by healthcare providers. *See Methodist Health Servs. Corp.*, 2016 WL 5817176, at *9; *Steward Health Care Sys.*, 997 F. Supp. 2d at 161-62. Indeed, in a summary judgment opinion on the antitrust claims in *Methodist Health Services Corporation*, the district court adopted a product market that excluded government payors because the plaintiff's Rule 56 evidence indicated that payments from government insurers failed to cover the providers' costs. *Methodist Health Servs. Corp.*, 2016 WL 5817176, at *9. It distinguished *Little Rock Cardiology* because that opinion did not indicate whether the complaint in that case had discussed the substantially lower rates paid by government insurers. *Id.* Here, Providers have discussed the lower rates paid by government insurers, and the court must accept those allegations as true.

[5] In addition, as another judge on this court recognized in an earlier antitrust action against Blue Cross and Blue Shield of Alabama, many Section 2 Sherman Act cases are dismissed at the Rule 12(b)(6) stage because they present implausibly narrow markets "in order to artificially inflate the defendant's power in the relevant market." *Griffiths v. Blue Cross & Blue Shield of Ala.*, 147 F. Supp. 2d 1203, 1215 (N.D. Ala. 2001) (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997), *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998), *Elliott v. United Ctr.*, 126 F.3d 1003, 1004–05 (7th Cir. 1997), and *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992)). An implausibly narrow market (like the product market at issue in *Jacobs*) is much easier to discern from the pleadings than an implausibly broad market because obvious alternatives to a product or service are easier to identify than the outer edges of a market for a particular product or service. Moreover, it must be noted that the broad markets and sub-markets alleged by Providers place additional burdens on them at the class certification and summary judgment stages of litigation.

Providers respond by noting that even if some individual providers may be able to substitute for commercial insurance more easily than others, they (Providers) have sufficiently alleged that in the market as a whole, the ability of providers to substitute away from commercial insurance is limited enough that a hypothetical monopsonist could profitably lower the prices it pays providers below competitive levels. (Doc. # 1083 ¶¶ 348-50). Thus, Providers have alleged that all types of providers (*i.e.*, even "radically" different providers) have suffered the same type of alleged injury, although the *extent* of the alleged damages may differ between types of providers. A relevant product market with all types of providers is plausible because, as the Fourth Amended Complaint alleges, all providers face the same basic set of options for selling their goods and services: commercial payers, government payers, and patients who pay out of pocket. (Doc. # 1083 ¶ 348).

In this case, the appropriate question is whether Providers, as sellers of healthcare goods and services to commercial payors, can reasonably substitute using non-commercial payors. There is "no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities." *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966). The commercial reality of the market alleged by Plaintiffs is that the options available to Providers do not depend on the type of provider. Providers all have the same options for payors: commercial payors; government payors; and patients who pay out of pocket.[6] (Doc. # 1083 ¶ 348).

---

[6] Defendants argue that the product market for antitrust claims premised on anticompetitive conduct by purchasers should be defined by the commonality of sellers rather than the commonality of purchasers. In a monopsony claim, however, the market is defined by the buyers perceived to be reasonably good substitutes by sellers. *Todd*, 275 F.3d at 202. In their reply brief, Defendants rely heavily on *Rock v. National Collegiate Athletic Association*, 928 F. Supp. 2d 1010 (S.D. Ind. Mar. 1, 2013), to support their argument that Providers have alleged an overly broad product market due to the differences between providers. (*See* Doc. # 1252 at 6). The *Rock* court found that a product market including all NCAA student athletes was facially implausible because it did not account for "germane differences such as gender and sport played." *Rock*, 928 F. Supp. 2d at 1022. What Defendants fail to acknowledge, however, is that the same court later accepted a product market in the same case consisting of football

After careful review, and based on the court's judicial experience and common sense, the court concludes that Providers' allegations are plausible. Moreover, Providers have represented to the court that they can support their market allegations with expert testimony. (*See* Doc. # 1278 at 36). Defendants obviously disagree with the factual allegations of the Consolidated Fourth Amended Complaint. But a factual dispute is not appropriate for resolution here. In resolving Defendants' motion, the court must take the Providers' allegations to be true.

### C.    Providers Have Plausibly Alleged a Geographic Market and Sub-Markets

Providers allege that "the State of Alabama is a relevant geographic market" and that "[i]n the alternative, for the relevant product markets described above, Alabama Core-Based Statistical Areas, and counties or combinations of counties not part of one of these areas, are relevant geographic markets." (Doc. # 1083 at ¶¶ 345-46). Providers further allege that "'Core-Based Statistical Areas' is a term used by the United States Office of Management and Budget to encompass Metropolitan Statistical Areas and Micropolitan Statistical Areas" which are "used in the ordinary course of business in the insurance industry when examining local markets." (Doc. # 1083 at ¶ 346). Further, they allege that "the substitution between commercial health insurance

---

players in both Football Bowl Subdivision and Football Championship Subdivision schools, even though "quality distinctions" existed between "the top and bottom buyers as well as the top and bottom sellers." *Rock v. Nat'l Collegiate Athletic Ass'n*, 2013 WL 4479815, at *11 (S.D. Ind. Aug. 16, 2013). In other words, the court accepted a product market as plausibly pled that was so broad as to include elite starters playing on scholarship for the University of Alabama Crimson Tide and benchwarmers on scholarship playing for the Elon University Phoenix. On the face of the pleadings, this court is unable to reliably determine whether any quality discrepancy within the proposed provider class is equal to or greater than the quality range between football players recruited to all Division I NCAA football programs. Moreover, the court observes that the district court in *Rock* was bound by Seventh Circuit precedent to consider substitution by both buyers and sellers in defining a market for any antitrust claim. *Rock*, 928 F. Supp. 2d at 1021 (quoting *Blue Cross & Blue Shield Un. of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1410 (7th Cir. 1995)). Other courts reviewing product market definitions in monopsony cases have defined the relevant market in terms of the interchangeability of products or services from the perspective of the group affected by the anticompetitive conduct. *See Todd*, 275 F.3d at 202 ("At issue is the interchangeability, from the perspective of an [ ] employee, of a job opportunity in the oil industry with, for example, one in the pharmaceutical industry."). In the court's view, the latter is the correct approach.

in an employer's local area and commercial health insurance outside the employer's local area is low, as reflected in measures such as a low cross elasticity of demand." (*Id.*).

Defendants argue that Providers have failed to allege that they could not shift enough sales for goods and services to non-Alabama buyers to offset a price cut by Alabama buyers. (Doc. # 1187-1 at 17). They further assert that there are certain providers who will more easily be able to shift to non-Alabama buyers. (*Id.*). But, as Providers contend, even if some in the market "can substitute for commercial insurance more easily than others, the Providers have nevertheless alleged that in the market as a whole, the ability of providers to substitute away from commercial insurance is limited enough that a hypothetical monopsonist could profitably lower the prices it pays providers below competitive levels." (Doc. # 1237 at 9) (citing Doc. # 1083 at ¶¶ 348–50). Moreover, these arguments ignore Providers' allegations (admittedly found at least in part in another section of the Consolidated Fourth Amended Complaint) that, for example, "healthcare providers in Florida must accept the prices paid by Defendant Blue Cross of Florida" regardless of whether they treat a patient outside of Florida. (Doc. # 1083 at ¶ 202). Thus, an Alabama provider treating an out-of-state Blue Plan member is paid at the BCBSAL reimbursement rate, no matter where the patient resides. Providers argue that, under these and other Blue Card Rules, "the Blues prevent providers from defeating a reduction in price by attracting members of the Blue Plans from other states." (Doc. # 1237 at 19). The court cannot say that Providers' Alabama geographic market fails to reflect commercial realities, some of which are alleged to be imposed by the Blues themselves. Furthermore, Defendants have not explained (at least at this stage) why Alabama is not an appropriate geographic market in light of Providers' allegations that the Blues' rules essentially limit Providers to the Alabama market.

Finally, at the pleading stage, the alternative geographic markets consisting of the Alabama Code-Based Statistical Areas are also plausible. According to the allegations of the Consolidated Fourth Amended Complaint, defining local commercial health insurance markets "is consistent with the desire of employers to provide health plans with networks of local providers … located near where their employees live and work." (Doc. # 1083 at ¶ 346). "The Office of Management and Budget, a federal agency, identifies standard metropolitan statistical areas for the purpose of collecting and publishing statistical information. The agency establishes these areas by grouping counties that have close economic and social links with a particular urban center." *Robinson v. Magovern*, 521 F. Supp. 842, 880 (W.D. Pa. 1981), *aff'd*, 688 F.2d 824 (3d Cir. 1982). "The use of statistical metropolitan data, such as the MSA, is plausible to establish the geographical area alleged in [a] Complaint." *United States v. Blue Cross Blue Shield of Michigan*, 809 F. Supp. 2d 665, 673 (E.D. Mich. 2011). Based on this court's "judicial experience and common sense," the court finds Providers' alleged geographic markets sufficiently plausible to survive a motion to dismiss.

### D. Providers Have Standing to Represent Class Members

Defendants' final argument is that Providers have not plausibly alleged how their fourteen named representatives have suffered harm in the vast majority of the alleged markets. (Doc. # 1187-1 at 18). "The difficulty with Defendants' argument is that it conflates standing and class certification. Although both concepts 'aim to measure whether the proper party is before the court to tender the issues for litigation, ... [t]hey spring from different sources and serve different functions.'" *Melendres v. Arpaio*, 784 F.3d 1254, 1261 (9th Cir. 2015), *cert. denied sub nom. Maricopa Cty., Ariz. v. Melendres*, 136 S. Ct. 799 (2016) (quoting 1 William B. Rubenstein, *Newberg on Class Actions* § 2:6 (5th ed.)). "*Standing* is meant to ensure that the

injury a plaintiff suffers defines the scope of the controversy he or she is entitled to litigate. *Class certification*, on the other hand, is meant to ensure that named plaintiffs are adequate representatives of the … class." *Melendres*, 784 F.3d at 1261 (emphasis in original). The Eleventh Circuit follows the class certification approach on this issue.[7] *Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279–80 (11th Cir. 2000) (a court must first determine whether "at least one named class representative has Article III standing," then "question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others" (internal quotation marks omitted)). "Under the class certification approach, therefore, 'any issues regarding the relationship between the class representative and the passive class members -- such as dissimilarity in injuries suffered -- are relevant only to class certification, not to standing.'" *Melendres*, 784 F.3d at 1262 (quoting *Newberg on Class Actions* § 2:6; *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155–61 (1982) (treating dissimilarities in injuries between named and unnamed plaintiffs as an issue of class certification under Rule 23(a) rather than one of standing)). "In a properly certified class action, the named plaintiffs regularly litigate not only their own claims but also claims of other class members based on transactions in which the

---

[7] Defendants' reliance on *Griffin v. Dugger*, 823 F.2d 1476 (11th Cir. 1987), is misplaced. In *Griffin*, the Eleventh Circuit analyzed whether a plaintiff employee who had passed an employer's written entry-level test had Article III standing to raise Title VII discrimination claims on behalf of individuals who failed that entry-level test. 823 F.2d at 1483-84. It held that the plaintiff lacked such constitutional standing because he had not been harmed by the employer's use of the written test, since he had passed it and had been hired. *Id.* Defendants rely on the general principle from *Griffin* that at least one named plaintiff must suffer the injury giving rise to a claim asserted on behalf of a class. (Doc. # 1187-1 at 18) (citing *Griffin*, 823 F.2d at 1482). The court understands Defendants' contention that, because Section 2 and rule of reason antitrust claims require a product market and a geographic market, antitrust claims by plaintiffs in distinct geographic markets differ even if the claims ultimately rest on the same anticompetitive conduct. However, Providers nonetheless possess Article III standing to prosecute Section 2 and rule of reason antitrust claims on behalf of health care providers who suffered harm in a different Metropolitan Statistical Area or Dartmouth Atlas Hospital Service Area. This is because the named Providers allegedly suffered injury from the same anticompetitive conduct as the unnamed putative class members in distinct geographic areas -- that is, the anticompetitive conduct alleged in this action consists mainly of statewide conspiracies to commit anticompetitive conduct and statewide practices of the Blues (*i.e.*, a practice of placing most favored nation clauses in all provider network contracts in a particular state). *E.g.*, *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (holding that a class representative must "possess the same interest and suffer the same injury" as unnamed class members). In any event, at this stage of the proceedings, the court accepts the statewide markets pled in the Consolidated Fourth Amended Complaint as plausible geographic markets.

named plaintiffs played no part." *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 769 (1st Cir. 2011).

Here, Providers allege similar injuries regardless of the geographic market. And, to be sure, all Providers allege injury within the state of Alabama. "[A]t the pleading stage, this plausible allegation of substantial similarity is sufficient. Any further questions about potential differences among the injuries suffered by proposed class members must be adjudicated at the class certification stage, and does not present a standing problem." *Garnica v. HomeTeam Pest Def., Inc.*, 2015 WL 13066140, at *2 (N.D. Cal. Dec. 21, 2015) (citing *Melendres*, 784 F.3d at 1261-64).

## V.   Conclusion[8]

For all of the foregoing reasons, Defendants' Motion to Dismiss Providers' Consolidated Fourth Amended Complaint (Doc. # 1187) is due to be denied. A separate order will be entered.

**DONE** and **ORDERED** this June 28, 2017.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

---

[8] The court need not address whether pleading "actual effects" obviated the need to prove a relevant market because the court has concluded that Providers have pled plausible relevant markets.