FILED

2017 Jul-17  PM 07:04
U.S. DISTRICT COURT
N.D. OF ALABAMA



**raIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|  |  |
|---|---|
| IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406) | ) **Master File** ) **No. 2:13-CV-20000-RDP** ) ) This document relates to all cases. ) |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' SECTION 1, PER SE, AND QUICK LOOK CLAIMS**

**PUBLICLY FILED REDACTED VERSION**

Dated: July 17, 2017

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ...................................................................................................................... 1

UNDISPUTED RELEVANT MATERIAL FACTS ................................................................... 3

     A.    Service areas arose out of local trademark rights and the requirements of oversight organizations such as the AHA and AMA. ............ 3

     B.    Plans developed as complements, not competitors. ........................................... 4

     C.    As the market evolved, Plans had to cooperate and integrate to create joint national products. ...................................................................................... 5

     D.    The Blue System provides significant benefits to subscribers and providers. ..................................................................................................... 11

     E.    All three branches of government have approved of the Blue System and rules........................................................................................................... 17

LEGAL STANDARD .............................................................................................................. 19

ARGUMENT ............................................................................................................................ 19

I.    Undisputed Facts Prove That § 1 Does Not Supply The Relevant Standard Of Review ....................................................................................................................... 19

     A.    Defendants operate as a single entity with respect to governance of the use of the Blue Marks nationwide. .................................................................. 20

         1.    The function at issue is the governance of the use of the Blue Marks. ......................................................................................... 21

         2.    Defendants constitute a single entity for governance of the use of the Blue Marks because they have integrated the assets essential to that function......................................................................... 21

     B.    Undisputed facts demonstrate that service areas are the product of common-law trademark rights, not an unlawful agreement. ......................... 24

II.    Even If § 1 Were To Apply, Undisputed Facts Establish The Challenged Rules Are Governed By The Rule Of Reason. .............................................................. 25

     A.    Plaintiffs cannot establish that the challenged rules lack plausible procompetitive benefits. ................................................................................ 27

         1.    The challenged rules facilitate the creation of new products.............. 28

2.      The challenged rules create additional procompetitive efficiencies. ................................................................................ 33

B.      Plaintiffs cannot demonstrate that lengthy judicial experience confirms the challenged rules are manifestly anticompetitive. ...................... 36

1.      Blue Plans' service areas are based on trademark rights and unlike any restraint condemned as per se unlawful. ......................... 37

2.      BlueCard is not price-fixing, much less "naked" price-fixing. ........... 41

3.      The Best Efforts and acquisition rules do not fit any of the potential per se categories. .................................................... 43

C.      Plaintiffs cannot demonstrate that the restraints are purely horizontal. .............................................................................. 44

III.    Undisputed Facts Establish That "Quick Look" Is Not Applicable. ......................... 45

CONCLUSION ......................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc.*,
   135 F.3d 740 (11th Cir. 1998) .................................................................... 41, 42

*Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*,
   249 F.3d 564 (6th Cir. 2001) ............................................................................. 24

*American Needle, Inc. v. National Football League*,
   560 U.S. 183 (2010)............................................................................... passim

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................................ 19

*Augusta News Co. v. Hudson News Co.*,
   269 F.3d 41 (1st Cir. 2001)................................................................... 26, 39, 42

*Blue Cross & Blue Shield Association v. Group Hospitalization & Medical Services., Inc.*,
   744 F. Supp. 700 (E.D. Va. 1990) ............................................................ 18, 38

*Broadcast Music, Inc v. Columbia Broadcasting System, Inc.*,
   441 U.S. 1 (1979)................................................................................... 29, 33, 42

*California Dental Association v. F.T.C.*,
   224 F.3d 942 (2000)............................................................................................ 34

*California Dental Association v. F.T.C.*,
   526 U.S. 756 (1999)............................................................................... 27, 45, 46

*Central Benefits Mutual Insurance Co. v. Blue Cross & Blue Shield Association*,
   711 F. Supp. 1423 (S.D. Ohio 1989) ....................................................... 18, 38

*Chicago Professional Sports Ltd. Partnership v. National Basketball Association*,
   95 F.3d 593 (7th Cir. 1996) ............................................................................. 21

*Consultants & Designers, Inc. v. Butler Service Group, Inc.*,
   720 F.2d 1553 (11th Cir. 1983) .......................................................................... 28

*Continental T. V., Inc. v. GTE Sylvania Inc.*,
   433 U.S. 36 (1977)............................................................................... 1, 33, 39, 45

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984)............................................................................... 20, 23, 40

**Page(s)**

*Crystal Entertainment & Filmworks, Inc. v. Jurado*,
    643 F.3d 1313 (11th Cir. 2011) ............................................................. 24, 34

*DeLong Equipment Co. v. Washington Mills Abrasive Co.*,
    887 F.2d 1499 (11th Cir. 1989) ............................................................. 44

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
    610 F.3d 820 (3d Cir. 2010)................................................................... 46

*F.T.C. v. Actavis, Inc.*,
    133 S. Ct. 2223 (2013) ...................................................................... passim

*Fuddruckers, Inc. v. Fudpucker's, Inc.*,
    436 F. Supp. 2d 1260 (N.D. Fla. 2006)................................................. 25

*Group Hospitalization & Medical Services, Inc. v.*
    *Blue Cross & Blue Shield of National Capital Area, Inc.*,
    819 F.2d 1138 (4th Cir. 1987) ............................................................. 18

*Group Hospitalization & Medical Services, Inc. v. Blue Cross & Blue Shield of Virginia*,
    No. 85–1123–A (E.D. Va. Apr. 8, 1986) ............................................. 18, 38

*Gulf States Reorganization Group, Inc. v. Nucor Corp.*,
    822 F. Supp. 2d 1201 (N.D. Ala. 2011) ............................................... 19

*In re Blue Cross Blue Shield Antitrust Litigation*,
    26 F. Supp. 3d 1172 (N.D. Ala. 2014) ................................................. 46

*In re Sulfuric Acid Antitrust Litigation*,
    703 F.3d 1004 (7th Cir. 2012) ......................................................... 24, 31, 44

*Joyce Beverages of New York, Inc. v. Royal Crown Cola Co.*,
    555 F. Supp. 271 (S.D.N.Y. 1983) ...................................................... 35

*Kimble v. Marvel Entertainment, LLC*,
    135 S. Ct. 2401 (2015)......................................................................... 39

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)................................................................. 27, 36, 39, 45

*Levine v. Central Florida Medical Affiliates, Inc.*,
    72 F. 3d 1538 (11th Cir. 1996) ............................................................. 26

*Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*,
    106 F.3d 355 (11th Cir. 1997) ............................................................. 25

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................. 19

**Page(s)**

*Midwestern Waffles, Inc. v. Waffle House, Inc.*,
734 F.2d 705 (11th Cir. 1984) .................................................................. 34, 40

*Mueller v. Wellmark, Inc.*,
861 N.W.2d 563 (Iowa 2015) ............................................................. 18, 30, 42

*National Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
779 F.2d 592 (11th Cir. 1986) .................................................... 30, 33, 36, 42

*National Collegiate Athletic Association v. Board of Regents of University of Oklahoma*,
468 U.S. 85 (1984) ............................................................................................. 33

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
472 U.S. 284 (1985) .......................................................................................... 44

*Palmer v. BRG of Georgia, Inc.*,
498 U.S. 46 (1990) ............................................................................................ 28

*Polk Bros., Inc. v. Forest City Enterprises, Inc.*,
776 F.2d 185 (7th Cir. 1985) ................................................................... passim

*Powderly v. Blue Cross & Blue Shield of North Carolina*,
No. 3:08–cv–00109 (W.D.N.C. Aug. 21, 2008) ............................................. 18

*Princo Corp. v. International Trade Commission*,
616 F.3d 1318 (Fed. Cir. 2010) ...................................................................... 44

*Procaps S.A. v. Patheon Inc.*,
36 F. Supp. 3d 1306 (S.D. Fla. 2014) ............................................................ 25

*Procaps S.A. v. Patheon, Inc.*,
845 F.3d 1072 (11th Cir. 2016) ............................................................... passim

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
792 F.2d 210 (D.C. Cir. 1986) ................................................................. 34, 35

*Spinelli v. National Football League*,
96 F. Supp. 3d 81 (S.D.N.Y. 2015) ............................................................... 23

*Standard Oil Co. (Kentucky) v. Humble Oil & Refining Co.*,
363 F.2d 945 (5th Cir. 1966) .......................................................................... 40

*Texaco Inc. v. Dagher*,
547 U.S. 1 (2006) ....................................................................... 26, 31, 42, 43

*Timken Roller Bearing Co. v. United States*,
341 U.S. 593 (1951) .................................................................................. 40, 41

**Page(s)**

*Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008) .......................................................................... 45

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
    959 F.2d 468 (3d Cir. 1992) .......................................................................... 26

*United States v. Anthem, Inc.*,
    2017 WL 685563 (D.D.C. Feb. 21, 2017) ........................................ 18, 19, 43

*United States v. Anthem, Inc.*,
    855 F.3d 345 (D.C. Cir. 2017), *cert. dismissed*,
    2017 WL 1807377 (U.S. June 12, 2017) .................................................. 18, 19

*United States v. Sealy, Inc.*,
    388 U.S. 350 (1967) ........................................................................ 22, 39, 41

*United States v. Sealy, Inc.*,
    1964 WL 8089 (N.D. Ill. Oct. 6, 1964) ........................................................ 39, 40

*United States v. Topco Associates, Inc.*,
    405 U.S. 596 (1972) ........................................................................ 22, 39, 40

*United States v. Topco Associates. Inc.*,
    319 F. Supp. 1031 (N.D. Ill. 1970), *rev'd*, 405 U.S. 596 (1972) ...................... 41

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
    344 F.3d 1294 (11th Cir. 2003) ............................................................ passim

*VMG Enterprises, Inc. v. F. Quesada & Franco, Inc.*,
    788 F. Supp. 648 (D.P.R. 1992) ................................................................ 25, 40

*Washington v. National Football League*,
    880 F. Supp. 2d 1004 (D. Minn. 2012) ...................................................... 22, 23

*Washington v. National Football League*,
    No. 11-cv-03354, Tr. of Proceedings, Doc. 25 (June 14, 2012) ...................... 22

*Wisconsin Interscholastic Athletic Association v. Gannett Co.*,
    658 F.3d 614 (7th Cir. 2011) ...................................................................... 38

**Statutes**

15 U.S.C. § 1 .............................................................................................. passim

15 U.S.C. § 2 .............................................................................................. passim

**Rules**

Fed. R. Civ. P. 56(c) ...................................................................................... 19

**Page(s)**

**Regulations**

Ala. Dep't of Insurance Reg. 482-1-116.......................................................................... 14

## INTRODUCTION

The Eleventh Circuit recently reaffirmed: "Our precedent makes clear that just because an agreement is capable of being characterized as a market allocation agreement does not mean that the per se rule applies." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1083 (11th Cir. 2016). As this Court recognized, the potential applicability of the per se rule turns on the "facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable." (6/18/14 Mem. Op. at 12, Dkt. 204 (*quoting Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 n.15 (1977).) And where a restraint—including a horizontal market allocation—has plausible procompetitive benefits, a per se claim cannot survive summary judgment. *E.g.*, *F.T.C. v. Actavis Inc.*, 133 S. Ct. 2223, 2235–36 (2013) (rule of reason governs horizontal market allocation that has possible "offsetting or redeeming virtues"); *Procaps*, 845 F.3d at 1084–85 (affirming summary judgment against per se claim where "some procompetitive efficiencies . . . might flow" from horizontal market allocation). After millions of pages of discovery and dozens of depositions, Plaintiffs have no evidence—let alone evidence sufficient to defeat summary judgment—demonstrating that the challenged rules are "naked" restraints with no purpose except stifling competition.

As an initial matter, Plaintiffs' per se claims fail because no standard of review deriving from § 1 of the Sherman Act applies, for two reasons. First, the Blue System operates as a single entity with respect to governance of the Blue Marks, and therefore is incapable of concerted action under § 1. This conclusion flows directly from the undisputed facts that national licensing organizations and individual Blue Plans integrated their separately owned trademark rights to create a single, nationwide trademark asset. Second, service areas derive from independently acquired common-law trademark rights, not any unlawful agreement. Thus, the relevant standard

of review derives only from § 2 of the Sherman Act, which has no per se rule. Defendants are entitled to summary judgment on Plaintiffs' § 1 claims for these reasons alone.

Even if § 1 were applicable to some of Plaintiffs' claims, the rule of reason must govern those claims for three separate reasons. First, a per se claim cannot survive summary judgment where, as here, the record indicates the challenged rules *might* foster any *plausible* procompetitive benefits at the time they were adopted. *See Procaps*, 845 F.3d at 1084; *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188 (7th Cir. 1985). The uncontroverted evidence shows the Blue System is replete with plausible—indeed, compelling—procompetitive benefits. The challenged rules—and service areas in particular—promote productive cooperation among Plans, increase subscriber choice, and enhance interbrand competition. Through integration made possible only by these rules, Defendants created a new, joint, nationwide product that no Plan could have offered alone.

Second, Plaintiffs have no evidence that "lengthy judicial experience" condemns the Blue System as anticompetitive. The unique facts of the Defendants' history of formation, intellectual property rights, and productive cooperation necessary to the operation of the nationwide Blue System are vastly different from those any court has found per se illegal. This alone precludes any per se claim. Moreover, the government—including multiple courts—has repeatedly ***reviewed and recognized the benefits of*** the specific rules challenged here.

Third, the challenged rules are not purely horizontal; they derive from local trademark rights or vertical agreements between Plans and the AHA or AMA and their respective successors. These vertical elements independently preclude use of the per se rule.

For these reasons, the Court should analyze Plaintiffs' claims under the monopolization or attempted monopolization standards of § 2 or, in the alternative, under the rule of reason.

## UNDISPUTED RELEVANT MATERIAL FACTS[1]

**A.      Service areas arose out of local trademark rights and the requirements of oversight organizations such as the AHA and AMA.**

1.      During the Great Depression, hospital occupancy and revenues dropped drastically, leaving hospitals in financial distress. (Ex. 1, BCBSA00289695 at 9717; Ex. 4, 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 48:17–24.) At the same time, the majority of the population was medically underserved because it could not afford hospital and medical care. (Ex. 2, BCBSA00292643 at 2687.)

2.      In response, local hospitals and medical societies developed prepaid plans to serve Americans' healthcare needs in local areas. (Ex. 1, BCBSA00289695 at 9717, 9841; Ex. 4, 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 48:17–49:9.)

3.      On occasion, a subscriber prepaid at one hospital, but desired services from a different hospital at the time of illness. (Ex. 1, BCBSA00289695 at 9714–15, 9941–42; Ex. 3, BCBSA00290026 at 0072; Ex. 4, 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 45:20–49:9.) To remedy this mismatch, geographically exclusive, multi-hospital plans became the norm. (*Id.*) Having one plan per area preserved subscribers' "freedom of choice" among providers at the time of illness. (*Id.*)

4.      In 1934, the St. Paul hospital plan began using a blue cross symbol. (Ex. 2, BCBSA00292643 at 2666–67.) In 1939, the Buffalo medical plan began using a blue shield symbol. (*Id.* at 2704–05.) Other plans began using these same symbols in their local areas as well. (Ex. 5, BCBSA00115501 at 5501, 5508; *see*, *e.g.*, Ex. 6, BCBSA00086793; Ex. 7, BCBSAL_0001466350.) Through such use, Plans acquired local trademark rights and the

---

[1] Citations to "Undisputed Relevant Material Facts" herein are noted as "URMF."

accompanying ability to preclude other entities from using confusingly similar marks in the same area. (Ex. 8, 4/12/2017 M. Rotunno 30(b)(6) Dep. Tr. at 36:1–9.)

5.      The AHA and AMA soon thereafter approved the concept of prepayment plans, and promulgated approval standards for such plans. (Ex. 1, BCBSA00289695 at 9826–31, 9851; Ex. 5, BCBSA00115501 at 5506, 5508.) Plans did not control the AHA or AMA. (*E.g.*, Ex. 1, BCBSA00289695 at 9826, 9851.) The AHA standards required Plans to operate in exclusive areas, among other quality controls. (Ex. 1, BCBSA00289695 at 9834; Ex. 9, BCBSA00024996 at 5000 ("Plans should be established only where needs of a community are not adequately served by existing non-profit hospital care insurance plans."); Ex. 10, BCBSA00024971 at 4979–80; Ex. 4, 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 44:6–49:9.) Similarly, the AMA required a Plan to receive approval from its local medical society and follow quality controls, which effectively resulted in exclusive areas. (Ex. 1, BCBSA00289695 at 0003–04; 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 62:21–63:17.) In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"). (Ex. 1, BCBSA00289695 at 9851.) The AMCP also adopted approval standards, which governed after the AMA discontinued its approval program. (*Id.*)

6.      Hospital plans that satisfied the approval standards could "identify the plan by using the seal of the [AHA] superimposed upon a blue cross." (Ex. 12, BCBSA00034640 at 4643–44.) Medical-care plans that met the AMA/AMCP's standards likewise could use a blue shield emblazoned with a caduceus. (Ex. 13, BCBSA00049938 at 9952.)

**B.      Plans developed as complements, not competitors.**

7.      Service areas grew naturally out of Plans' local focus, desire to provide subscribers with freedom of choice among providers, individual trademark rights, standards set by the AHA and AMA/AMCP, and certain state enabling statutes. (Ex. 1, BCBSA00289695 at 0003–04, 9717–25, 9779–81, 9834, 9840, 9934; Ex. 2, BCBSA00292643 at 2663–64; Ex. 10,

BCBSA00024971 at 4979–80; Ex. 8, 4/12/2017 M. Rotunno 30(b)(6) Dep. Tr. at 36:1–9, 73:24–74:1; Ex. 3, BCBSA00290026 at 0072; Ex. 4, 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 43:22–49:9, 62:18–63:17.)

8.      Instances of Cross-on-Cross and Shield-on-Shield competition were rare and temporary. (Ex. 1, BCBSA00289695 at 9720–25, 9852, 9855; Ex. 15, HCSC-HC000190386 at 0456, 0464; Ex. 8, 4/12/2017 M. Rotunno 30(b)(6) Dep. Tr. at 47:18–48:17; Ex. 16, Rotunno Dep. Ex. 002-A; Ex. 4, 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 64:5–11.) Given their disparate roots—hospital for Cross and medical for Shield—overlapping Cross and Shield Plans generally did not compete. (Ex. 1, BCBSA00289685 at 9852, 9856, 9942; *see also* Ex. 17, BCBSA00036124.) Rather, the norm was for such Plans to act as complements to cover the full suite of provider services. (Ex. 1, BCBSA00289685 at 9852, 9856, 9942; Ex. 5, BCBSA00115501 at 5510.)

**C.      As the market evolved, Plans had to cooperate and integrate to create joint national products.**

9.      After World War II, fringe benefits became tax deductible (which led to employers expanding such benefits), employers expanded and consolidated across the country, multi-state labor unions developed, and nationwide integrated commercial competitors entered the marketplace. (Ex. 1, BCBSA00289695 at 9745, 9769, 9943; Ex. 2, BCBSA00292643 at 2710, 2712–13.)

10.      The local Plans could not compete with the uniform nationwide offerings of commercial insurers. As the 1947 Public Health Service Report explained:

> From the standpoint of serving national employers or national unions (under industry wide bargaining agreements) the plans are handicapped by the lack of uniformity in benefits and rates, in conditions for which care will be provided, and in enrollment procedures, billing procedures and the like. Instead of dealing with a multiplicity of plans, with different (and changing) rates and benefits, these concerns or these unions would prefer to deal with a single organization which at

5

a specified charge would provide uniform benefits for all employees or members wherever located.

(Ex. 1, BCBSA00289695 at 9943; *see also* Ex. 18, BCBSA00035273 at 5276–78; Ex. 2, BCBSA00292643 at 2713, 2760–64.)

11.     Plans "needed an integrative mechanism—a national organization capable of standardizing numerous policies and generating a cohesive product for large employee groups that spanned the geographical boundaries of individual programs" to serve customers with regional or national needs. (Ex. 19, C.F. Chapin, *Ensuring America's Health: The Public Creation of the Corporate Health Care System* at 127 (Cambridge U. Press 2015)); *see also* Ex. 2, BCBSA00292643 at 2729–36.)

12.     Plans, the AHA, and the AMCP took several steps to address this weakness. Shortly after passage of the Lanham Act in 1946, the AHA and the AMCP applied for and obtained federal registrations of the Blue Cross and Blue Shield marks (previously referred to as the "Blue Marks"), respectively. (*See*, *e.g.*, Ex. 20, Trademark Application 71/531,753 at 167 (solid blue cross); Ex. 21, Service Mark Registration No. 554,818 (blue cross with AHA seal); Ex. 22, Trademark Application 71/536,214 at 168 (words "Blue Cross"); Ex. 23, Trademark Application 71//549,601 at 48 (words "Blue Cross Plan"); Ex. 24, Trademark Application 71/616,543 at 100 (solid blue shield) Ex. 25, Trademark Application 71/670,326 at 106 (blue shield with caduceus); Ex. 26, Trademark Application 71/636,199; Ex. 27, Trademark Application 71/589,371 at 29 (words "Blue Shield"); Ex. 28, Trademark Application 71/606,403 at 115 (words "Blue Shield"); *see also* Ex. 4, 6/30/17 R. Wilson 30(b)(6) Dep. Tr. at 29:13–31:4; Ex. 5, BCBSA00115501 at 5506, 5509.) The AHA and AMCP explained in their registration applications that the Blue Marks were first used in the 1930s, that they were used by the relevant

national organization and its member Plans, and that the national organizations performed quality-control, advertising, clearinghouse, and other functions. (Exs. 20–28.)

13.     No Plan has ever held nationwide rights to the Blue Marks and no Plan has ever owned any of the federally registered Blue Marks or been able to license or govern their use. (Ex. 5, BCBSA00115501 at 5506, 5509; Ex. 29, BCBSA00364277 at 4277–78; Ex. 31, BCBSA00026888 at 6888–89.)

14.     Plans also pooled their local assets to begin creating a nationwide product. For example, Cross Plans agreed to reciprocity of hospitalization benefits and established the Inter-Plan Service Benefits Bank to facilitate inter-Plan hospitalization claims. (Ex. 30, BCBSA00109420 at 9422.) Plans also consolidated their independently acquired common-law trademark rights in the AHA and AMCP to ensure uniform quality control and a centralized owner of the Blue Marks. (Ex. 29, BCBSA00364277 at 4277–78; Ex. 31, BCBSA0026888 at 6889; Ex. 5, BCBSA00115501 at 5506, 5509.) The AHA and AMCP then licensed rights to use the Blue Marks back to Plans for use in each Plan's same, pre-existing service area. (*Id.*; Ex. 120, 30(b)(6) Wilson Dep. Ex. 001 at 2; Ex. 4, 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 252:20–23, 253:24–256:25; *see also* Ex. 1, BCBSA00289695 at 9834, 9852–9855.) The AHA eventually transferred ownership of the Blue Cross Marks to the Blue Cross Association ("BCA"), which, like the AHA, entered into license agreements with each Plan, granting each Plan the exclusive right to use the Mark in the Plan's same, pre-existing service area. (Ex. 57, BCBSA00023856; Ex. 118, BCBSA02909429 at 9429; Ex. 120, 30(b)(6) Wilson Dep. Ex. 001; Ex. 4, 6/30/17 R. Wilson 30(b)(6) Dep. Tr. at 31:24-32:15.) On the Shield side, the AMCP went through various name changes and eventually became the Blue Shield Association ("BSA"). (Ex. 120, 30(b)(6) Wilson Dep. Ex. 001; Ex. 4, 6/30/17 R. Wilson 30(b)(6) Dep. Tr. at 32:16–33:9.)

15.     By pooling their local assets, Plans were able to combine their complementary offerings to service national accounts, including the Federal Employees Health Benefit Program. (Ex. 32, Murphy Rpt. ¶¶ 30–35.)

16.     Plans' early joint programs (*e.g.*, the Inter-Plan Service Benefit Bank, Syndicates, Reciprocity Program), were highly manual, *ad hoc*, and costly to set up and administer for each account. (*See*, *e.g.*, Ex. 33, BCBSA00294214 at 4261–4267, 4289; Ex. 34, BCBSA00163720 at 3721, 3729–3738; Ex. 35, BCBSA00094047 at 4075–4076; Ex. 36, 5/20/17 J. Voss 30(b)(1) Dep. Tr. at 25:9–26:8; Ex. 4, 6/30/17 R. Wilson 30(b)(6) Dep. Tr. at 236:19–237:15.) Providers experienced bad debt, inaccurate and untimely payments. (*See* Ex. 37, BCBSA00128634 at 8643–44, 8655–58; Ex. 36, 5/20/17 J. Voss 30(b)(1) Dep. Tr. at 166:22–167:6.)

17.     By the early 1980s, the Blue System was in decline. (*See*, *e.g.*, Ex. 38, BCBSA00011505 at 1511–1526.) Plans were rapidly losing customers, and multiple Plans were in severe financial distress. (*Id.*; *see also* Ex. 39, BCBSA01907590 at 7591–7593; Ex. 4, 6/30/17 R. Wilson 30(b)(6) Dep. Tr. at 69:18–23, 81:20–82:13, 233:22–234:20.)

18.     Plans recognized the urgent need to "become a cohesive national unit[]" to compete effectively. (Ex. 40, BCBSA00144148 at 4148; *see also* Ex. 38, BCBSA00011505 at 1525–26; Ex. 2, BCBSA00292643 at 2847–52.) They understood that "continuity of purpose can only be accomplished by working together as one unit." (Ex. 40, BCBSA00144148 at 4148.)

19.     At the same time, the BCA and BSA merged to create the Blue Cross and Blue Shield Association, combining the separate associations under one umbrella organization and ensuring a single owner and protector of all the Blue Marks. (Ex. 4, 6/30/17 R. Wilson 30(b)(6) Dep. Tr. at 33:10–24; Ex. 119, BCBSA-CID-015337 at 5338–39; *see also* Ex. 5, BCBSA00115501 at 5516; Ex. 64, BCBSA03331494 at 1535.)

20.     The Long-Term Business Strategy ("LTBS") and Assembly of Plans ("AOP") in the 1980s helped accomplish the collaboration necessary to remain competitive and offer customer-oriented products by (1) encouraging consolidation of complementary assets (*e.g.*, Cross/Shield mergers), (2) establishing uniform standards and increasing quality controls, and (3) improving inter-Plan products and programs. (Ex. 41, BCBSA00302656; Ex. 39, BCBSA01907590 at 7606; Ex. 5, BCBSA00115501 at 5516–17; Ex. 4, 6/30/17 R. Wilson 30(b)(6) Dep. Tr. at 80:6–17, 81:17–82:13.)

21.     LTBS and AOP did not affect service areas, recognizing that ███████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████ (Ex. 42, BCBSA00031942 at 1966; *see also* Ex. 43, BCBSA00028854 at 8865.) This is reflected in the 1991 License Agreements, which—like previous licenses—codified Plans' pre-existing service areas. (*See*, *e.g.*, Ex. 44, BCBSA00000001 at 0003 ███████████████████████████████████ ███████████████████████████████████████████████████████████████████ █████████████████████ Ex. 45, BCBSA00000054 at 0056 (same); *see also* Ex. 4, 6/30/17 R. Wilson 30(b)(6) Dep. Tr. at 241:10–242:21.)

22.     The Blue System improvements resulting from LTBS and AOP laid the foundation for BlueCard, a program to provide seamless national delivery and "ensure that Blue Cross and Blue Shield subscribers will receive consistent benefits outside of their Plans' service areas." (Ex. 46, BCBSA00223711 at 3713.) BlueCard required each Plan to make its local provider discounts available to other Plans' members. (Ex. 47, BCBSA00228287 at 8296; Ex. 48, BCBSA00228480 at 8492.) This ensured that Blue members would not face price-discrimination by providers. (Ex. 48, BCBSA00228480 at 8492; *c.f.* Ex. 14, BCBSA00097033

at 7084.) As before, each Plan would negotiate independently with local providers; the rule merely required that the Plan negotiate on behalf of all Blue members. (Ex. 48, BCBSA00228480 at 8492, 8495; Ex. 56, BCBSA00083968 at 3973–75.)

23.     Recognizing that commitment to the Blue System is necessary to the Blue System's ability to serve subscribers and providers nationwide, in 1994, BCBSA adopted the Local Best Efforts rule to incentivize Plans to place primary focus on Blue-branded business and ███████████████████████████████████████████ ███████████████████████████████ (Ex. 49, BCBSA00260341 at 0358; *see also* Ex. 11, 6/16/17 S. Putziger 30(b)(6) Dep. at 39:17–21.) This rule requires a Plan to derive at least 80% of its in-area health insurance revenue under the Blue brands. (Ex. 50, BCBSA03879143 at 9176.)

24.     In 1996, BCBSA adopted acquisition rules to ████████████████████ ██████████████████████████████████ and prevent an adverse party from acquiring a Plan in order to undermine the Blue System as a whole. (Ex. 51, BCBSA01171349 at 1363; *see also* Ex. 52, BCBSA00072295 at 2296.) These rules prevent a Plan from transferring its license to a non-Blue entity without meeting certain standards. (Ex. 50, BCBSA03879143 at 9185–87.) For example, the acquiring entity must apply to become a licensee, and the merged entity must obtain at least 66-2/3% of its national health insurance revenue under the Blue brands. (*Id.*)

25.     In 2005, a National Best Efforts rule was adopted to ensure that all Blue Plans used ████████████████████████████████ of the marks not only within their service areas, but on a national basis as well. (Ex. 112, BCBSA00206094 at 6001–02, 6132.) The rule was adopted to ensure Plans were committed to developing Blue-branded business in each area, supporting national account activities and cooperating to compete successfully against national

10

competitors. (*Id.*; Ex. 55, BCBSA00037625 at 7626; *see also* Ex. 111, BCBSA02587313 at slide 4; Ex. 53, BCBSA03541053 at 1053; Ex. 54, BCBSA00263923 at 3926–3929; Ex. 32, Murphy Rpt. ¶¶ 83–86.) This rule requires a Plan to derive at least 66-2/3% of its national health insurance revenue under the Blue brands. (Ex. 50, BCBSA03879143 at 9176.) The 66-2/3% was chosen, in part, in response to a suggestion by the Department of Justice to provide symmetry with the existing acquisition rule. (Ex. 110, BCBSA03806804 at 6844–46; Ex. 4, 6/30/17 R. Wilson 30(b)(6) Dep. Tr. at 150:20–152:5, 316:5–23; *see also* Ex. 111, BCBSA02587313 at slide 3; Ex. 55, BCBSA00037625 at 7626.)

26.     Today, the data shows that Plans have significant room to expand their non-Blue branded businesses if they wish to do so. (*See*, *e.g.*, Ex. 58, BCBSA00105983; Ex. 59, BCBSA00012832; Ex. 60, BCBSA03156067; Ex. 61, BCBSA03601708; *see also* Ex. 110, BCBSA03806804 at 6844–85; Ex. 32, Murphy Rpt. ¶ 86.) In addition, many Plans have had at various times, and today continue to have, significant unbranded business. (*See*, *e.g.*, Ex. 58, BCBSA00105983; Ex. 59, BCBSA00012832; Ex. 60, BCBSA03156067; Ex. 61, BCBSA03601708.)

27.     Plans compete with at least four other national insurers, and hundreds of local and regional insurers nationwide, for robust interbrand competition. (*See*, *e.g.*, Ex. 62, BCBSA01421500 at 1513–1520; Ex. 63, BCBSA01425975 at 5976; Ex. 32, Murphy Rpt. ¶ 103.) The challenged rules facilitate this interbrand competition. (Ex. 32, Murphy Rpt. ¶¶ 70–71, 81, 113, 115.)

**D.     The Blue System provides significant benefits to subscribers and providers.**

28.     The challenged rules—and service areas in particular—facilitate the cooperation needed for Plans and BCBSA to function as an integrated national Blue System, create competitive joint products, and meet customers' needs efficiently. (Ex. 4, 6/30/2017 R. Wilson

30(b)(6) Dep. Tr. at 339:7–340:14; Ex. 67, BCBSA03737178 at 7183–87; Ex. 64, BCBCSA03331494 at 1518; Ex. 32, Murphy Rpt. ¶¶ 54, 57, 60, 67–68, 81, 83, 111; Ex. 76, BCBSA02061503 at slide 10). Through collaboration, Plans can create new products by combining their complementary offerings to serve multi-state accounts and subscribers who travel. (*See* Ex. 65, BCBSA02363596 at 3596; Ex. 66, BCBSA-CID-029405 at 9405–06; Ex. 32, Murphy Rpt. ¶¶ 31–35, 46–49.)

29.     The Blue System framework encourages each Plan to invest deeply in its local area. (*See* Ex. 68, BCBSA00261759 at 1760–61; Ex. 4, 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 261:17–262:2; *see also* Ex. 32, Murphy Rpt. ¶¶ 58–59, 79–85.) Service areas also prevent consumer confusion. (*See* Ex. 68, BCBSA00261759 at 1760–61; Ex. 69, 06/02/17 C. Rolfe Dep. Tr. at 57:7–58:4, 99:10–20; Ex. 70, 12/08/16 C. Rogan Dep. Tr. at 107:6–108:9; *see also* Ex. 71, BCBSA01715995 at 5995–96; Ex. 72, BCBSA00504379 at 4380–81; Ex. 73, BCBSA00721359 at 1360–61; Ex. 32, Murphy Rpt. ¶ 112.)

30.     Plans maintain strong local focus, cover their entire area, build strong networks of local providers, and continue offering broad coverage even where margins are thin or negative. (*See* Ex. 66, BCBSA-CID-029405 at 9406; Ex. 68, BCBSA00261759 at 1760–62; Ex. 74, BCBSA02409509 at slide 38; Ex. 117, 06/28/17 R. Cullen Dep Tr. at 152:19–153:25; Ex. 121, 05/19/17 G. Verdon Dep. Tr. at 55:2–56:20; Ex. 32, Murphy Rpt. ¶¶ 41–45, 106–07.)

31.     Conversely, national competitors tend to selectively enter and exit. (Ex. 32, Murphy Rpt. ¶¶ 41–45, 106–07; *see also* Ex. 121, 05/19/17 G. Verdon Dep. Tr. at 55:2–56:20.) Competitors often choose to serve only the healthier and wealthier areas and populations. (Ex. 32, Murphy Rpt. ¶¶ 41–45; Ex. 75, Arit John, *Insurers Are Avoiding Poor Rural Counties, Leading to Higher Obamacare Premiums*, The Atlantic (Feb. 13, 2014),

https://www.theatlantic.com/politics/archive/2014/02/insurers-are-avoiding-poor-rural-counties-leading-higher-obamacare-premiums/358061/ (visited 97/09/17).) The ACA exchanges are a prime example: competitors entered narrowly and then exited quickly when profits were lower than expected. (Ex. 32, Murphy Rpt. ¶¶ 41–45, 106–07.) BCBS-AL participated in the ACA exchange in every Alabama county since 2014, even though it has repeatedly lost money. (*Id.* ¶ 44.) Without Blue Plans, some consumers might have no insurance options at all. (*Id.* ¶¶ 41–42, Exs. 1, 2.)

32.     BlueCard is one key element of Defendants' cooperative joint product. (Ex. 76, BCBSA02061503 10; Ex. 32, Murphy Rpt. ¶¶ 63–71.) BlueCard incorporates and relies on joint operational assets. (*See*, *e.g.*, Ex. 122, BCBSA-CID-020329 at 0334, 0345–50, 0386, 0540; *see also* Ex. 79, BCBSA0009361 at 3640–41, 3644–45; Ex. 32, Murphy Rpt. ¶ 39.) For example, BCBSA built a technological "backbone" of hardware and software to support inter-Plan claims processing. (Ex. 77, BCBSA00277507; Ex. 78, BCBSA00009085 at 9100; Ex. 79, BCBSA00093619.) After BlueCard launched, Blue enrollment reversed its historical decline and increased from 65 million in 1995 to 100 million in 2013. (*See* Ex. 76, BCBSA02061503 at slide 10; Ex. 4, 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 237:9–15.)

33.     BlueCard enhances efficiencies, including by providing subscribers "a single point of contact for education, contracting, claims payment/adjustments and issue resolution." (Ex. 66, BCBSA-CID-029405 at 9405; *see also* Ex. 80, BCBSA02300709 at slides 37–38; Ex. 117, 06/28/17 R. Cullen Dep. Tr. at 152:23-153:1.) Dollar General, a putative subscriber class member, testified that eliminating BlueCard would be "an administrative nightmare." (*See* Ex. 81, 04/25/17 M. Latham 30(b)(6) Dep. Tr. at 45:13–46:10.)

34.     In addition to BlueCard, the challenged rules make possible other joint programs. (Ex. 32, Murphy Rpt. ¶¶ 33, 81.) Through the Federal Employee Program ("FEP") Plans jointly provide health insurance coverage for over five million federal employees, retirees and their families. (Ex. 82, BCBSA01692169 at 2188.) The Blue Distinction program designates providers that have demonstrated expertise in delivering quality healthcare in specialty areas nationally, including innovative payment programs and patient-centered, value-based care. (Ex. 83, BCBSA01162847 at 2848.) Blue365 allows Plans to provide their members with information, special discounts, and savings for a full slate of health and wellness services. (Ex. 84, BCBSA02175887 at 5888–89, 5904.)

35.     By encouraging investment in the Blue brands and facilitating cooperation that allows Defendants to offer joint national products, all of the challenged rules increase interbrand competition. (Ex. 32, Murphy Rpt. ¶¶ 11–13, 39, 58, 70–71, 81, 83.)

36.     Subscribers recognize Blue premiums are competitive and reasonable. (*See* Ex. 70, 12/08/16 C. Rogan 30(b)(6) Dep. Tr. at 50:3–5; Ex. 85, 3/27/2017 B. Jacome 30(b)(6) Dep. Tr. at 72:4–12; Ex. 81, 04/25/17 M. Latham 30(b)(6) Dep. Tr. at 83:18–22.) Many Plaintiffs' premiums are actively regulated. (*See, e.g.*, Ala. Code § 10A-20-6.10; Order, Dkt. 997, at 2–3 (citing Ala. DOI Reg. 482-1-116).)

37.     Plans offer low premiums by operating efficiently and providing reliable payment and nationwide volume to providers; in turn, Plans are able to provide discounts. (*See* Ex. 66, BCBSA-CID-029405 at 9407; Ex. 81, 04/25/17 M. Latham 30(b)(6) Dep. Tr. at 39:17–20; Ex. 70, 12/08/16 C. Rogan 30(b)(6) Dep. Tr. at 119:11–120:5; Ex. 117, 06/28/17 R. Cullen Dep. Tr. at 164:10–20; Ex. 94, 05/17/17 K. Wright 30(b)(6) Dep. Tr. at 65:18–68:1; Ex. 86, BCBSA02359030 at slide 7; *see also* Ex. 32, Murphy Rpt. ¶¶ 64, 70, 73, 94.)

38.     BCBS-AL and other Plans have narrow profit margins—far smaller than competitors. (Ex. 32, Murphy Rpt. ¶¶ 97–99, 103, Exs. 8, 9, 19–22.) Blue Plan surpluses are highly regulated and are necessary to weather economic downturns or other impactful events. (*Id.* ¶¶ 100–101.) Plan market share is not correlated with higher margins. (*Id.* ¶ 102.)

39.     The Blue System also delivers significant benefits to providers, including high patient volume, ease of claims submissions, and prompt payment. (Ex. 87, BCBSA03293379 at slide 7;   Ex. 88,   05/05/17   J. Ackerson   30(b)(6)   Dep.   Tr.   at   27:1–8;   Ex. 89, BCBSAL_0000096731 at 6734; Ex. 90, BCBSA02464320 at slide 11; Ex. 117, 06/28/17 R. Cullen Dep. Tr. at 152:23–153:8, 153:20–25, 140:11–16; Ex. 94, 05/17/17 K. Wright 30(b)(6) Dep. Tr. at 65:18–68:16; Ex. 32, Murphy Rpt. ¶¶ 45, 94.) Providers have indicated high satisfaction with BlueCard claims-processing. (Ex. 91, BCBSAL_0000108664 at 8667, 8670; Ex. 90, BCBSA02464320 at slide 11; *see also* Ex. 94, 05/17/17 K. Wright 30(b)(6) Dep. Tr. at 65:18–68:16.) Plans pay providers reasonable reimbursement rates, often more than competitors. (Ex. 92, 04/10/17 C. Clark Dep. Tr. at 91:25–92:11; 94:13–95:9; Ex. 93, 05/03/17 B. Eisemann 30(b)(6) Dep. Tr. at 42:7–17; Ex. 88, 05/05/17 J. Ackerson Dep. Tr. at 117:2–118:9; Ex. 94, 05/17/17 K. Wright 30(b)(6) Dep. Tr. at 63:3–64:20.) Providers that contract with Blue Plans can be permitted to display small signs with the Blue Marks on their premises and to issue communications within their service area indicating participation in Blue programs, subject to certain requirements. (Ex. 95, BCBSA02720774 at 0846, 0850.)

40.     The Blue System delivers broad and deep networks—with more than 96% of hospitals and 92% of physicians in-network nationwide—and provides choice and inclusiveness. (Ex. 96, BCBSA00422420 at slide 4; *see also* Ex. 81, 04/25/17 M. Latham 30(b)(6) Dep. Tr. at 26:3–8; Ex. 97, Sub.Plf(PBLM)000001791 at 1791; *see also* Ex. 32, Murphy Rpt. ¶¶ 41–45.)

Subscribers prefer the BlueCard network to competitors' offerings. (*See* Ex. 98, BCBSA00717654 at 7675.)

41.    Given Plans' local dedication, high quality, and competitive prices, subscribers often prefer and trust Blue Plans over other insurers. (Ex. 96, BCBSA00422420 at slide 3; Ex. 90, BCBSA02464320 at slide 5; Ex. 99, BCBSA00635345 at slide 4; Ex. 100, R. Sadler 30(b)(6) Dep. Tr. at 76:24–77:8;  Ex. 101,  BCBSA-CID-015545  at  5550;  Ex. 102, BCBSA02264735 at slide 4; Ex. 103, BCBSA00640581 at 0612; Ex. 81, 04/25/17 M. Latham 30(b)(6) Dep. Tr. at 83:18–22; *see also* Ex. 32, Murphy Rpt. ¶¶ 95–96, Exs. 5, 6, 7.) Blue Cross Blue Shield is ██████████████████████████████ (Ex. 104, 12/16/16 R. Roshek 30(b)(6) Dep. Tr. at 87:9–11; *see also* Ex. 70, 12/08/16 C. Rogan 30(b)(6) Dep. Tr. at 54:25–56:5.) Blue Plans provide healthcare insurance for over 106 million Americans. (Ex. 127, Blue Cross Blue Shield Association, *The Blue Cross Blue Shield System*, http://www.bcbs.com/about-us/blue-cross-blue-shield-system (visited July 13, 2017).)

42.    Numerous subscribers testified that Blue Plans provide the best insurance. (*See*, *e.g.*, Ex. 70, 12/08/16 C. Rogan 30(b)(6) Dep. Tr. at 30:3–15, 51:7–20, 54:25–55:3; Ex. 81, 04/25/17 M. Latham 30(b)(6) Dep. Tr. at 77:17–78:13; Ex. 100, 03/28/17 R. Sadler 30(b)(6) Dep. Tr. at 77:2–8; *see also* Ex. 97, Sub.Plf(PBLM)000001791 at 1791; Ex. 66, BCBSA-CID-029405 at 9406.) In fact, Perdido Beach Resort *advertises* Blue Cross Blue Shield as its insurance provider "[b]ecause everybody in our area knows that Blue Cross-Blue Shield health insurance is the best that is out there[.]" (Ex. 105, 12/15/16 P. Groux 30(b)(6) Dep. Tr. at 76:12–17.)

43.    Named subscriber Plaintiff Pearce, Bevill, Leesburg, Moore, P.C. testified that BCBS-AL saved it $1.249 million in 2015 alone and nearly $4.5 million in the last five years.

(*See* Ex. 106, 03/07/17 J. Lassiter 30(b)(6) Dep. Tr. at 163:17–164:9, 165:13–19, 167:10–15, 168:19–24; *see also* Ex. 107, BCBSAL_0001906396 at 6408; Ex. 123, BCBSAL_0001906324 at 6325; Ex. 124, BCBSAL_0001906288 at 6289; Ex. 125, BCBSAL_0001906360 at 6361.) In 2009, Pearce Bevill worked with a consultant to review other insurance options, and "determined that the way to obtain the best possible coverage for premium dollar was to stay with Blue Cross-Blue Shield of Alabama." (Ex. 106, 03/07/17 J. Lassiter 30(b)(6) Dep. Tr. at 142:21–25.)

**E.     All three branches of government have approved of the Blue System and rules.**

44.     In 1947, the United States Public Health Service conducted an in-depth review of the Blue System and specifically approved of exclusive service areas. (Ex. 1, BCBSA00289695, at 9720–25, 9834, 9933–34.) The report also called for overlapping Plans, Cross and Shield Plans, and sub-state Plans to merge. (*Id.* at 6238–408, 6392–94.)

45.     In 1979, the FTC's Bureau of Competition staff issued a 400-page report that recognized Blue Shield Plans operate in service areas and generally do not compete with each other, but took no action. (Ex. 15, HCSC-HC000190386 at 0456–57, 0464.) The report recognized Plans' cooperative nature, enhancing their ability to compete against other insurers. (*Id.* at 0465.)

46.     In 1985, the DOJ looked into service areas, but took no action. (Ex. 108, BCBSA03382797 at 2797.) In clearing the Anthem/Wellpoint merger in 2004, the DOJ specifically noted that service areas prevent Blue-branded competition—without suggesting this might be anticompetitive in any way. (Ex. 109, BCBSA00713934 at 3934–35.)

47.     The DOJ also inquired into BCBSA's acquisition rules. (Ex. 110, BCBSA03806804 at 6807.) Not only did the DOJ close its investigation in 2004 without action, the DOJ repeatedly questioned the lack of symmetry in *not* applying a 66-2/3% Blue revenue requirement to *existing* Plans. (*Id.* at 6844–46; Ex. 4, 6/30/17 R. Wilson Dep. Tr. at 150:20–

152:5, 316:5–23; *see also* Ex. 111, BCBSA02587313 at slide 3.) A year later, BCBSA adopted

the suggested rule (*i.e.*, National Best Efforts). (*See* Ex. 112, BCBSA00206094 at 6101–02.)

48.     Blue representatives testified regarding service areas to Congress multiple times.

(*See*, *e.g.*, Ex. 113, BCBSA00087172 at 7180; Ex. 114, RMC00009531 at 9569–70.)

49.     Courts enforced service areas; one explicitly distinguished *Sealy*. (*BCBSA v. Grp.*

*Hosp. & Med. Servs., Inc.*, 744 F. Supp. 700, 719–20 n.7 (E.D. Va. 1990), *aff'd*, 911 F.2d 720

(4th Cir. 1990); Ex. 115, BCBSA00159470 at 9472, 9479, *Grp. Hosp. & Med. Servs., Inc. v.*

*Blue Cross & Blue Shield of Va.*, No. 85–1123–A (E.D. Va. Apr. 8, 1986); *Grp. Hosp. & Med.*

*Servs., Inc. v. Blue Cross & Blue Shield of Nat'l Capital Area, Inc.*, 819 F.2d 1138 (4th Cir.

1987); *Cent. Benefits Mut. Ins. Co. v. BCBSA*, 711 F. Supp. 1423, 1425 (S.D. Ohio 1989).)

Chief District Judge Albert V. Bryan, Jr. not only enforced service areas, but specifically defined

a Plan boundary. (*See* Ex. 115, BCBSA00159470 at 9479, *aff'd*, 819 F.2d 1138 (4th Cir. 1987).)

50.     Multiple courts rejected antitrust challenges to BlueCard. (Ex. 116 at 70–71,

*Powderly v. Blue Cross & Blue Shield of N.C.*, No. 3:08–cv–00109 (W.D.N.C. Aug. 21, 2008);

*Mueller v. Wellmark, Inc.*, 861 N.W.2d 563, 573 (Iowa 2015), *reh'g denied* (Apr. 22, 2015)

("The BlueCard® network is a national program used by health insurers and clients across the

country. We should be reluctant to declare these arrangements flatly illegal, without considering

their relative procompetitive or anticompetitive effects.")).

51.     In *United States v. Anthem*, the DOJ, district court, and D.C. Circuit each

examined service areas and the National Best Efforts rules. (No. CV 16–1493, 2017 WL 685563,

at *6–10, *53 (D.D.C. Feb. 21, 2017) (recognizing National Best Efforts was "designed to

strengthen and protect the Blue brand"); 855 F.3d 345, 350 (D.C. Cir. 2017), *cert. dismissed*,

No. 16-1342, 2017 WL 1807377 (U.S. June 12, 2017).) Not one suggested the rules were

anticompetitive, let alone per se illegal. (*See generally* 2017 WL 685563 at \*53; 855 F.3d at 350.) In fact, all three recognized Blue Plans as a single competitive force, and one of only four national competitors. (*See* 2017 WL 685563 at \*33; 855 F.3d at 348, 352.)

52.     In short, government entities have repeatedly scrutinized the Blue System—including every rule challenged here—and not once suggested any of these rules is per se illegal.

## LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure requires summary judgment when the pleadings and supporting materials demonstrate that there is no genuine issue of material fact and the moving party is entitled to prevail as a matter of law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Although the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party, *Gulf States Reorg. Grp., Inc. v. Nucor Corp.,* 822 F. Supp. 2d 1201, 1209 (N.D. Ala. 2011) (Proctor, J.), *aff'd* 721 F.3d 1281 (11th Cir. 2013), neither "the mere existence of *some* alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986), is sufficient to defeat a motion for summary judgment.

## ARGUMENT

### I.     Undisputed Facts Prove That § 1 Does Not Supply The Relevant Standard Of Review.

A threshold question in any antitrust matter is whether the case is governed by § 1 or § 2 of the Sherman Act. By its own terms, § 1 applies only to a "contract," "combination," or "conspiracy." 15 U.S.C. § 1. Here, undisputed facts demonstrate the absence of any contract, combination, or conspiracy, for two reasons. First, with respect to governance of the use of the Blue Marks, Defendants function as a single entity incapable of concerted action under § 1.

Second, service areas derive from independently acquired common-law trademark rights, not any unlawful agreement.

### A. Defendants operate as a single entity with respect to governance of the use of the Blue Marks nationwide.

Recognizing that § 1 applies only to a "contract, combination . . . or conspiracy between separate entities," the Supreme Court has held that coordinated activities between separately incorporated entities that do not "deprive[] the marketplace of . . . independent centers of decisionmaking" should be treated as the acts of a single entity. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768–69 (1984); *see also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 194 (2010) (Where separate entities are "controlled by a single center of decisionmaking and they control a single aggregation of economic power[,] [j]oint conduct by two such entities . . . does not constitute a 'contract, combination . . . or conspiracy' for the purposes of § 1.") (citations omitted).

There are two key determinations attendant to the single-entity analysis: (1) the proper definition of the function at issue, and (2) the extent to which formally separate entities have integrated the assets necessary to perform that function. *Am. Needle*, 560 U.S. at 200–01. Where true asset integration exists such that decisionmaking authority over the joint function does not (and could not) reside with any separate entity, decisions regarding the joint function "do[] not deprive the marketplace of independent centers of decisionmaking," because only the integrated enterprise has the power to make such decisions. *Id.* at 194 (quotations omitted).

Applied to a small handful of undisputed facts, these principles compel the conclusion that, with respect to the governance of the use of the Blue Marks, Defendants are a single economic entity. (*E.g.*, URMF ¶¶ 1–7, 10–15, 19, 28–30.)

**1.      The function at issue is the governance of the use of the Blue Marks.**

Courts analyze single-entity status on a function-by-function basis: actions of formally separate entities may be the actions of a single entity with respect to a particular function, while actions related to a different function may be the independent actions of the separate entities. *Am. Needle,* 560 U.S. at 198. For example, the Court in *American Needle* analyzed whether the defendants acted as a single entity with respect to the licensing of intellectual property owned by the individual teams—the specific function at issue in the case. *Id.* ("The NFL respondents may be similar in some sense to a single enterprise . . . but they are not similar in the relevant functional sense."). *See also Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593 (7th Cir. 1996) (Easterbrook, J.) (explaining that it is possible that the NBA is best understood as one firm (and so outside § 1) when selling broadcast rights, but as a joint venture (and so subject to § 1) in other circumstances).

Here, Plaintiffs' core allegation is that individual Blue Plans have entered into license agreements with BCBSA that illegally prohibit Plans from using the Blue Marks outside of exclusive service areas. It is from this alleged limitation on intrabrand competition among Plans that the majority of Plaintiffs' claims flow. The appropriate inquiry is therefore whether BCBSA and the Blue Plans are a single economic entity with respect to this particular challenged function—governance of the use of the Blue Marks.

**2.      Defendants constitute a single entity for governance of the use of the Blue Marks because they have integrated the assets essential to that function.**

Once the function at issue was properly defined, the Court in *American Needle* next considered whether the affiliated entities had integrated the assets essential to perform that function. 560 U.S. at 200–01. The Court found that the teams had not integrated the assets (each team's logo) essential to the challenged function (exclusively licensing those logos). *Id.* Rather,

each team retained separate ownership of its logo. *Id.* That the teams managed those separately owned assets through NFLP was not enough to confer single-entity status: "Apart from their agreement to cooperate in exploiting those assets, including their decisions as the NFLP, there would be nothing to prevent each of the teams from making its own market decisions." *Id.* at 200. Because each team owned the asset necessary to make its own licensing decision, joint licensing of those assets "deprive[d] the marketplace of independent centers of decisionmaking" such that § 1 could apply. *Id.* at 199.[2]

The Court's conclusion in *American Needle* suggests, and subsequent cases involving the NFL hold, that where the converse is also true—where the affiliated entities *do not* separately own the relevant assets, but rather have integrated those assets—the resulting joint enterprise constitutes a single entity. Actual integration of the assets so they no longer reside with the separate entities distinguishes such enterprises from the NFL in *American Needle*, where there was "nothing to prevent" each team from making its own decision with respect to its separately owned intellectual property. *Id.* at 200.

Courts interpreting *American Needle* have applied this distinction even with respect to the NFL itself. For example, for purposes of licensing game footage made up of "the marks and logos of the National Football League and its member clubs . . . [where] players appear along with NFL marks and logos on the uniforms that they wore and on the field on which they played," the NFL and NFL teams constitute a single entity. Ex. 126, *Washington v. NFL*, No. 11-CV-03354, Tr. of Proceedings, Dkt. 25 (June 14, 2012) ("6/14/12 Tr."), at 4; *Washington v. NFL*, 880 F. Supp. 2d 1004, 1006 (D. Minn. 2012). *Washington* distinguished *American Needle*

---

[2] *American Needle*'s citations to *United States v. Sealy*, 388 U.S. 350 (1967) and *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) do not disturb the applicability of *American Needle*'s holding here. Unlike the defendants in *Sealy* and *Topco*, BCBSA and Blue Plans actually integrated assets. Consequently, the Defendants are a single entity with respect to the governance of the use of those assets. Other key distinctions with respect to *Sealy* and *Topco* are addressed *infra* at Part II.B.1 of this brief.

because the NFL and the teams had integrated their IP assets (the NFL's shield and the teams' logos) into a single, cohesive product. *Id.* Neither the NFL nor any individual team could make licensing decisions regarding this product without infringing the other parties' IP rights. *Id. See also Spinelli v. NFL*, 96 F. Supp. 3d 81, 114 (S.D.N.Y. 2015) (holding that the NFL and teams constituted a single entity for purposes of selling stock photos because the photos "contain intellectual property owned by the NFL and at least one NFL Club . . . and in many cases two NFL Clubs . . . the NFL and NFL Clubs 'must cooperate to produce and sell these images; no one entity can do it alone.'"). The critical factor is that the defendants integrated separately owned assets such that no single participant could control the resulting product.

Defendants fit comfortably within these cases. Individual Blue Plans contributed their separately owned, geographically limited trademark rights to BCBSA's predecessors in interest, which held the federal registrations. (URMF ¶¶ 12–14, 19.) Integration of these separate assets was necessary to create a cohesive, integrated, and usable nationwide trademark asset. (*Id.* ¶¶ 10–15.) Because Plans actually integrated their assets (rather than simply licensing them, as in *American Needle*, or simply contributing capital, as in *Sealy* and *Topco*), decisions regarding the governance of the use of the Blue Marks are the actions of a single center of decisionmaking and do not "deprive[] the marketplace of independent centers of decisionmaking." *Am. Needle*, 560 U.S. at 194; *Copperweld*, 467 U.S. at 771. Differently stated, because no individual Blue Plan has ever owned the Blue Marks, (URMF ¶¶ 12–13), no individual Blue Plan has ever had the ability independently to govern the use of those trademarks.

Because Defendants are a single entity with respect to the governance of the Blue Marks, they are not capable of concerted action or "conspiracy" under § 1 with respect to that function.[3]

---

[3] For these same reasons, summary judgment should be granted on any § 2 conspiracy claims, as well as any state-law analogues to § 1 or § 2 conspiracy claims.

Accordingly, § 1 does not apply to claims flowing from the governance of the Blue Marks, including challenges to service areas, BlueCard, and Best Efforts rules. Rather, the challenged conduct must be analyzed under § 2's standards for monopolization or attempted monopolization.

### B.    Undisputed facts demonstrate that service areas are the product of common-law trademark rights, not an unlawful agreement.

Section 1 does not apply for the additional reason that service areas do not derive from an unlawful agreement. Courts are clear that a challenged restraint is evaluated "at the time it was adopted," lest companies be deterred from entering procompetitive endeavors. *Polk Bros.*, 776 F.2d at 189 (applying rule of reason even though cooperation ceased ten years prior); *see also Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F.3d 1294, 1306 (11th Cir. 2003) (considering IP rights in effect when the challenged agreement was made, even if the patent was subsequently invalidated); *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1010–11 (7th Cir. 2012) (Posner, J.). Here, service areas were the product of common-law trademark rights, not any unlawful agreement.

Service areas arose organically as Plans sought to ensure local subscribers freedom to choose among providers. (URMF ¶¶ 3, 7.) In the 1930s and 1940s—long before entering the challenged license agreements—Plans used the Blue Marks in their local areas and thus acquired state-law trademark rights. (*Id.* ¶ 4.) These rights gave each Plan the ability to preclude any other entity (including any other Plan) from using confusingly similar marks in its area. *See Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 572 (6th Cir. 2001) ("The first to use a mark in the sale of goods or services is the 'senior user' of the mark and gains common law rights to the mark in the geographic area in which the mark is used."); *see also Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1320 (11th Cir. 2011) (recognizing

"bedrock principle of trademark law that a mark can identify and distinguish only a single commercial source").

License agreements between a Plan and a national oversight organization merely recognized each Plan's service area resulting from pre-existing trademark rights. (*Id.* ¶¶ 14, 19.) The current BCBSA license agreements are no exception as they do not allocate Blue Plan territories. Instead, they reaffirm the Blue Plans' pre-existing exclusive trademark rights in ████ ██████████████████████████████████ (*Id.* ¶ 21.)

Agreements that merely recognize pre-existing concurrent trademark rights do not violate § 1. In *VMG Enterprises, Inc. v. F. Quesada & Franco, Inc.*, the court held that the defendants' "agreement for a territorial trademark division" did not violate the antitrust laws because it "did not 'create' a trademark territorial division . . . it merely recognized it." 788 F. Supp. 648, 657 (D.P.R. 1992). The court reasoned the territories in the agreement were created "by independent (not concerted) action," and that the agreement simply stated what was "already a reality as a matter of trademark law," and was not "some illegal, mutually pre-arranged scheme." *Id.*[4]

The license agreements here are no different. Because service areas derive from common-law trademark rights, not an unlawful agreement, § 1 does not apply. Rather, § 2 supplies the standard of review.

## II.    Even If § 1 Were To Apply, Undisputed Facts Establish The Challenged Rules Are Governed By The Rule Of Reason.

There is a strong presumption against the per se rule because it "carries the risk of condemning activity that promotes competition." *Procaps S.A. v. Patheon Inc.*, 36 F. Supp. 3d

---

[4] *VMG* is no aberration; courts routinely uphold and enforce agreements that allow "concurrent use" of the same (or confusingly similar) trademarks in the distinct territories where the parties had pre-existing trademark rights. *See, e.g.*, *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 365–66 (11th Cir. 1997) (allowing defendant to use a mark in Georgia, while allowing plaintiff to use a mark outside of Georgia); *Fuddruckers, Inc. v. Fudpucker's, Inc.*, 436 F. Supp. 2d 1260, 1269 (N.D. Fla. 2006) (similar).

1306, 1323 (S.D. Fla. 2014); *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) ("[T]his Court presumptively applies rule of reason analysis . . ."). At summary judgment, the *plaintiff* bears the burden of presenting sufficient evidence to overcome this presumption. *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F. 3d 1538, 1549–51 (11th Cir. 1996) (affirming summary judgment where plaintiff "has not proven" agreement warranting per se treatment); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479 n.12 (3d Cir. 1992) ("[T]he [nonmoving] plaintiffs, not [defendant], shoulder the burden" of establishing their per se claim).

To survive summary judgment, Plaintiffs must prove much more than a horizontal agreement to allocate markets. The Eleventh Circuit recently reiterated, "Our precedent makes clear that just because an agreement is capable of being characterized as a market allocation agreement does not mean that the per se rule applies." *Procaps*, 845 F.3d at 1083; *see also Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 48 (1st Cir. 2001) ("[I]t is commonly understood today that *per se* condemnation is limited to 'naked' market division agreements, that is, to those that are not part of a larger pro-competitive joint venture.").

In fact, the Supreme Court's two most recent horizontal market allocation cases both rejected any standard but the rule of reason because the agreements had plausible procompetitive benefits. *See Actavis*, 133 S. Ct. at 2235–36 (rule of reason governs temporal market allocation among drug manufacturers that has possible "offsetting or redeeming virtues"); *Am. Needle*, 130 S. Ct. at 2216 (rule of reason governs NFL teams' agreement not to compete in the IP licensing market because the agreement had a "perfectly sensible justification").

Accordingly, no per se claim can survive summary judgment unless Plaintiffs demonstrate, with uncontroverted evidence, an agreement that (1) has ***no*** plausible procompetitive benefits, (2) has had its anticompetitive character confirmed by lengthy judicial

experience, **and** (3) is purely horizontal. *See*, *e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007); *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 771–73 (1999); *Procaps*, 845 F.3d at 1083. Here, undisputed evidence precludes Plaintiffs from establishing any one of these elements, let alone all three. The Plaintiffs therefore cannot meet their burden.

### A.   Plaintiffs cannot establish that the challenged rules lack plausible procompetitive benefits.

Only six months ago, the Eleventh Circuit affirmed that where undisputed evidence reflects "procompetitive efficiencies that *might* flow" from a horizontal market allocation agreement, a per se claim cannot survive summary judgment. *Procaps*, 845 F.3d at 1084 (emphasis added). There, two competitors in the softgel industry, Procaps and Patheon, agreed to allocate markets as part of a collaboration. *Id.* at 1077. Rather than compete, the companies "decided to pool their complementary attributes to create a new, more effective competitor." *Id.* Under the parties' "Collaboration Agreement," marketing opportunities would be allocated exclusively to Patheon, manufacturing opportunities would be allocated exclusively to Procaps, and product development opportunities would be allocated by ad hoc mutual agreement. *Id.* at 1077–78. Patheon later purchased a third competitor that, like Procaps, had strong manufacturing capabilities. *Id.* at 1078. Procaps sued, contesting that the merger transformed the Collaboration Agreement into a per se illegal market allocation.

The court held that, even after the merger, the per se rule could not apply. ***First***, the court recognized it did "not have a great deal of experience with the kind of case at issue here." *Id.* at 1084. Although the Eleventh Circuit had dealt with plenty of market allocation claims, it had not dealt with one arising in a *fact pattern* similar to that presented. *Id.* at 1083–84. The court relied on *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, which also "involved what could reasonably be described as a series of market allocation agreements," but declined to apply the

per se rule because the market allocation agreements arose "in a new factual context"—reverse payment settlements among branded and generic drug manufacturers (*i.e.*, the same type of agreement later at issue in *Actavis*). *Id.* at 1083.

**Second**, the court held that there were "some procompetitive efficiencies that *might* flow from the [collaboration], even post-acquisition." *Id.* at 1084 (emphasis added). For example, some products might be cheaper to produce, and the companies could take advantage of the third competitor's manufacturing facilities. This distinguished the case from *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990), which "presented a simpler case of two competitors agreeing to not compete in particular markets, *uncoupled from any legitimate joint venture*. . . . Because this agreement served *no purpose other than to allocate territories* and thus raise the price of bar review courses, the per se rule applied." 845 F.3d at 1083 (emphasis added).

As Judge Easterbrook has explained: "Cooperation is the basis of productivity. It is necessary for people to cooperate in some respects before they may compete in others, and cooperation facilitates efficient production." *Polk Bros.*, 776 F.2d at 188. Thus, the key question is whether the restraint is a "naked" agreement with no purpose except to stifle competition, or whether instead it *could* facilitate productive cooperation that *might* lead to benefits such as more efficiency or new products. *Id. See also Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1561 (11th Cir. 1983) (per se rule is limited to practices that are "totally devoid of redeeming value" and does not apply to horizontal restraints that have "a legitimate and valid business purpose"). As discussed below, the procompetitive benefits in this case go far beyond what courts have held sufficient to preclude application of the per se rule.

### 1.      The challenged rules facilitate the creation of new products.

Integrating efforts or assets to create new products or competitive offerings is precisely the type of procompetitive benefit that renders the per se rule inapplicable. Plans have done

exactly this by pooling their assets and cooperating to establish the nationwide Blue System not only to service national accounts but also to provide a national network of providers for subscribers. Plaintiffs have even acknowledged that there is a "new product" exception to the per se rule. (Pls' Joint Mot. to Dismiss Resp. at 16 n.13, Dkt. 149 (recognizing "the new product" defense and disputing only its applicability); *see also*, *e.g.*, *Broad. Music, Inc v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 22–24 (1979) ("*BMI*"). For instance, in *BMI*, otherwise competing artists agreed to create a blanket license system "different from anything any individual" competitor could have offered. *BMI*, 441 U.S. at 23. The defendants' cooperation eliminated the need for purchasers to negotiate with every artist and facilitated the productive "integration of sales, monitoring, and enforcement against unauthorized . . . use." *Id.* at 20. In light of the new product, which was "truly greater than the sum of its parts," a full rule of reason analysis was necessary. *Id.* at 21–22, 24.

The Blue System and its supporting products are also "truly greater than the sum of [their] parts" and, therefore, should be subject to rule of reason analysis. *See id.* This collaboration has enabled nationwide healthcare products available to all Blue subscribers and providers, including BlueCard, the Federal Employee Program, Blue Distinction, and Blue365. (URMF ¶¶ 15, 22, 28, 32–34; Ex. 32, Murphy Rpt. ¶¶ 30–35, 60, 81.) Similar to the new product in *BMI*, the Blue System provides one point of contact for providers to service all Blue members nationwide, and one point of contact for subscribers to receive nationwide coverage. (URMF ¶¶ 22, 33.) In addition, it draws strength and quality from each Plan's deep local focus. (*Id.* ¶¶ 21, 29–30.) No individual Plan would have been able to develop the type of comprehensive, high-quality, locally focused products that they provide jointly today. (*Id.* ¶¶ 9– 11, 17–18; Ex. 32, Murphy Rpt. ¶¶ 13, 49, 68 ("BlueCard harnessed a major strength of the

Plans—broad provider networks and relationships within their service area—to overcome what otherwise was a weakness—each Plan's lack of a broad national provider network.").)

Indeed, at least one court has already held BlueCard alone to be a "new product" sufficient to defeat application of the per se rule on summary judgment. *See Mueller*, 861 N.W.2d at 570. This was no surprise. Even before BlueCard, to address their respective weaknesses, Plans "needed an integrative mechanism—a national organization capable of standardizing numerous policies and generating a cohesive product for large employee groups that spanned the geographic boundaries of individual programs." (URMF ¶¶ 9–11.) Plans integrated their efforts and pooled their local IP and operational assets to meet these early consumer needs, transferring ownership of the Blue Marks to the AHA and AMCP (and eventually BCBSA) and developing inter-Plan reciprocity programs. (*Id.* ¶¶ 12, 14–15.)

Plaintiffs might argue that, unless the challenged restraints are *necessary* to create the new product at all, the per se rule can apply. This is a misreading of the case law. Indeed, the Eleventh Circuit has already rejected the argument. In *National Bancard*, the court held the plaintiff's argument that the challenged rule (a uniform processing fee) was not "necessary" to create the VISA card system "misse[d] the mark." *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.,* 779 F.2d 592, 602 (11th Cir. 1986). What mattered was that the *efficiency* (universality of acceptance) "could not be guaranteed absent prearranged interchange rules." *Id.* Since the restraint facilitated the efficiency, it was evaluated under the rule of reason. *Id.*

Courts routinely mandate rule-of-reason analysis for restraints that are not remotely necessary to create the defendants' products. *See*, *e.g.*, *Actavis*, 133 S. Ct. at 2231–32 (requiring rule of reason for temporal market allocation even though defendants had independently created the drugs at issue before such allocation); *Am. Needle Am. Needle*, 130 S. Ct. at 2216 (applying

rule of reason to horizontal exclusive IP licensing agreement even though such agreement was not necessary to create football); *Procaps*, 845 F.3d at 1084 (rejecting per se and quick look challenges to horizontal market allocation even though both defendants independently manufactured and sold softgels pre-agreement); *In re Sulfuric Acid*, 703 F.3d at 1013–14 (applying the rule of reason to exclusive territory agreement even though such agreement was not necessary to produce sulfuric acid); *Polk Bros.*, 776 F.2d at 190 (mandating rule of reason for horizontal product allocation even though both parties independently sold the products at issue pre-agreement).

Similarly, the product need not be one that requires cooperation or integration to be available at all (although here, in fact, that is the case). In *Actavis* and *Procaps*, the defendants were already independently manufacturing the products in question before they agreed to allocate markets. *See also Dagher*, 547 U.S. at 6 n.1 (defendants independently produced petroleum products before the challenged restraint, but because the cooperative venture had "numerous synergies and cost efficiencies," the per se rule was not applicable).

And the defendants in *Polk Brothers* were not manufacturing anything at all. Rather, the two retailers were selling overlapping selections of *other parties'* products. In that case, the defendants collaborated to develop a side-by-side storefront, and allocated (previously overlapping) products each would sell—one would sell appliances, and the other would sell yard equipment and building materials. The agreement increased output by increasing overall retail capacity and by offering a convenience to consumers. Importantly, "[t]he covenant allocating items between the retailers played an important role in inducing the two retailers to cooperate." *Polk Bros.*, 776 F.2d at 190. Without the horizontal product allocation, the court explained "[i]t might be tempting for [one] retailer to take a free ride" on the other's advertising or other

investments. *Id.* The court rejected any per se claim because the product allocation was "part of a cooperative venture with prospects for increasing output." *Id.*

These cases and countless others reaffirm that the per se rule cannot apply to arrangements (including market allocations) that could facilitate productive cooperation in any form—whether that cooperation might manifest itself as a new product, an improvement to an existing product, an easier way for customers to buy or use a product (old or new), a way to reduce costs or uncertainty, or some other plausible efficiency. If the parties are doing more than just allocating markets for the sole purpose of stifling competition, the rule of reason governs.

Here, it is more than "plausible" that the challenged rules directly enable, and at a minimum enhance, the productive cooperation that has led to Defendants' nationwide products. (Ex. 32, Murphy Rpt. ¶ 13 ("The challenged rules are integral to the operation and success of the Blue business model. . . . that enable Blues to engage in cooperative inter-Plan activities to create integrated and improved products")) Service areas are necessary for Plans to cooperate. (*Id.* ¶¶ 54–62.) They also prevent free-riding and preserve Plans' deep local focus. (*Id.*) The Best Efforts rules likewise encourage trust and cooperation, minimize free-riding, and promote the quality and strength of the Blue Brand. (*Id.* ¶¶ 79–88.) The BlueCard rules—including preventing price-discrimination by providers—facilitate the competitiveness of the product, as evidenced in part by the problems subscribers and providers faced pre-BlueCard. (*Id.* ¶¶ 65–74.) The challenged rules also minimize negative externalities (*e.g.*, increased costs and uncertainty to subscribers because of costly and time consuming Blue-on-Blue trademark and/or dilution litigation) by incentivizing cooperation among Plans, given the potential for harmful spillover effects to all Plans if one Plan's conduct damages the Blue Brand. (*Id.* ¶¶ 61, 70–71, 81, 85, 89.)

Under these circumstances, Plaintiffs cannot prove the challenged rules have "no purpose except stifling of competition." *BMI*, 441 U.S. at 20. Far from it, the rules were intended to—and indeed do—facilitate Plans' nationwide products, which are "quite different from anything any individual [Plan] could issue." *Id.* at 23; *see NCAA v. Bd. of Regents of University of Oklahoma*, 468 U.S. 85, 113 (1984). On this basis alone, the Court should grant summary judgment on Plaintiffs' per se claims.

### 2. The challenged rules create additional procompetitive efficiencies.

In addition, the record establishes that each of the challenged rules promotes interbrand competition, enhances efficiency and quality, and benefits subscribers and providers—all well-recognized procompetitive benefits. (*See* Ex. 32, Murphy Rpt. ¶¶ 53–96.) The *mere possibility* of such benefits warrants summary judgment against Plaintiffs' per se claims. *See*, *e.g.*, *Procaps*, 845 F.3d at 1084; *Nat'l Bancard*, 779 F.2d at 599.

***First,*** service areas incentivize Plans to focus on local needs of their members and providers, and to tailor their offerings to the specific needs of their service area. (URMF ¶¶ 29–31.) Because a Plan can use the Blue Marks only in its service area, it has the incentive to provide service *throughout* that area, including to certain consumers and providers that other insurers often exclude. (*Id.*; Ex. 32, Murphy Rpt. ¶ 58.) The ACA exchanges are a prime example. In Alabama, for example, competitors entered narrowly and then quickly exited when profits were lower than expected, while BCBS-AL has participated in the exchanges in every county since 2014, even though it has repeatedly lost money. (URMF ¶ 31.) This "local focus" is important to the national network of course. Just as a chain is only as strong as its weakest link, so is a nationwide network weakened by weak local networks.

Service areas also promote interbrand competition by facilitating the existence of a national Blue System, preventing free-riding, and preventing consumer confusion. *See*, *e.g.*, *GTE*

*Sylvania*, 433 U.S. at 54 (vertical restrictions that promote interbrand competition have "redeeming virtues" that are "implicit in every decision sustaining vertical restrictions under the rule of reason"); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 720 (11th Cir. 1984) (territorial restrictions can "promote interbrand competition").

If a Plan could enter another Plan's area under the Blue Marks, it could free-ride on the local Plan's goodwill and investments, which would reduce the local Plan's incentives to invest in the first place, not to mention the incentive to collaborate with the second Plan. (Ex. 32, Murphy Rpt. ¶¶ 59–60 ("Without ESAs, every other Plan is a potential competitor offering Blue-branded insurance, which will discourage inter-Plan cooperation.").) *See Polk Bros.*, 776 F.2d at 190 (agreement not to compete "played an important role in inducing the two retailers to cooperate" because it reduced defendants' ability to "take a free ride" on the other's efforts); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 221–22, 228–29 (D.C. Cir. 1986) (prohibition on use of equipment or marks for unbranded business reduced free-riding, and so was governed by rule of reason). This investment and collaboration strengthens Blue offerings and thus promotes the interbrand competition that is at the heart of the antitrust rules.

Service areas also prevent consumer confusion that would result if Plans used the Blue Marks to compete with each other. Consumer confusion in current overlap areas, where one Plan uses the Cross and another the Shield (URMF ¶ 29), is a fraction of what would occur if all Plans were free to use both Marks simultaneously anywhere in the country. *See Crystal Entm't & Filmworks, Inc.*, 643 F.3d at 1323 (market exclusively serves the public interest because it avoids "unnecessary consumer confusion"); *Cal. Dental Ass'n v. F.T.C.*, 224 F.3d 942, 952 (9th Cir. 2000) (marketing restrictions were procompetitive because they prevented buyer confusion).

*Second,* the Best Efforts rules ensure that each Plan is primarily focused on building Blue-branded business, which enables, facilitates, and enhances Defendants' ability to compete against other national insurers. (URMF ¶¶ 23, 25.) When BCBSA adopted the Best Efforts rules, Plans recognized that ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ (*Id.* ¶ 25; Ex. 54, BCBSA00263923 at 3926–27.) Indeed, without the Best Efforts rules, a Plan might underinvest in its Blue business, or might not invest in national Blue programs out of concern that other Plans will underinvest or use its investments to undercut it. (Ex. 32, Murphy Rpt. ¶¶ 80–85.) Either scenario would create a weakness or gaps in the national Blue System. (*Id.* ¶¶ 79–87.) *See Rothery*, 792 F.2d at 229 (non-branded business restriction was "ancillary to the contract integration or joint venture" and "preserve[d] the efficiencies of the nationwide [joint product] by eliminating the problem of the free ride"); *Joyce Beverages, Inc. v. Royal Crown Cola Co.*, 555 F. Supp. 271, 278 (S.D.N.Y. 1983) (exclusive dealership agreements ensured dealer's "loyalty to its particular brand and that it competes vigorously against all competing brands"). The temptation to underinvest in Blue business is particularly strong where a Plan could benefit a large non-Blue business by doing so.

*Third,* the Blue System increases output and benefits consumers and providers. Plans offer high-quality insurance products to subscribers, including local focus and dedication, competitive premiums, broad networks, and a wide range of offerings. (URMF ¶¶ 21–22, 28–43.) Subscribers trust Blue Plans, and favor them over competitors. (*Id.* ¶¶ 40–44.) In turn, Plans can offer providers nationwide patient volume and other value in exchange for discounts, which in turn reduces premiums. (*Id.* ¶¶ 37, 39.) BlueCard further benefits providers through prompt payments, ease of claims processing and lower administrative costs. (*Id.* ¶ 39.) Each of these

benefits—enabled by the challenged rules—increases the Blue System's competitiveness against other commercial healthcare insurers, strengthening interbrand competition.

This litany of procompetitive benefits was important when each of the challenged rules was adopted, and remains critical to the cohesion and competitiveness of the Blue System today. (*See id.* ¶¶ 9–27.) Since undisputed facts demonstrate "some procompetitive efficiencies that might flow" (and that indeed do flow) from the challenged rules, the Court should grant summary judgment on the per se claims for this reason as well. *Procaps*, 845 F.3d at 1084.[5]

### B. Plaintiffs cannot demonstrate that lengthy judicial experience confirms the challenged rules are manifestly anticompetitive.

It is well settled that the per se rule can apply "only when history and analysis have shown that *in sufficiently similar circumstances* the rule of reason *unequivocally* results in a finding of liability." *Procaps*, 845 F.3d at 1083 (emphasis added). In conducting this analysis, courts look past labels like "market allocation." Where courts have not thoroughly studied the *factual circumstances* that gave rise to the restraint, the per se rule cannot survive summary judgment. *Id.*; *Valley Drug*, 344 F.3d at 1304; *Nat'l Bancard*, 779 F.2d at 599. Even Plaintiffs concede that the per se rule applies only to "garden-variety" restraints, not unique arrangements. (*See* Pls' Joint Mot. to Dismiss Resp. at 12, 15 n.11, Dkt. 149).

Here, there is no evidence that any of the challenged rules is sufficiently similar to any factual circumstances previously found by courts to be unequivocally anticompetitive. For this independent reason, the rule of reason must apply.

---

[5] Although the potential existence of procompetitive benefits alone precludes application of the per se rule, the absence of evidence proving obvious anticompetitive effects puts another nail in the coffin. Application of the per se rule "must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Leegin*, 551 U.S. at 887 (citation omitted). Plaintiffs cannot meet their burden of showing that the challenged rules produce "manifestly anticompetitive effects" in light of the numerous procompetitive benefits that flow from the challenged rules. *Id.* at 886; *Procaps*, 845 F.3d at 1083; Ex. 32, Murphy Rpt. ¶¶ 53–96; URMF ¶¶ 28–43.

### 1. Blue Plans' service areas are based on trademark rights and unlike any restraint condemned as per se unlawful.

Defendants' service areas are anything but a garden-variety naked horizontal market allocation agreement. Service areas arose organically as Plans sought to ensure local subscribers' freedom to choose among providers. (URMF ¶¶ 3, 7.) As discussed above, long before entering the challenged license agreements, Plans used the Blue Cross and Blue Shield symbols in their local areas and thus acquired common-law and/or state-law trademark rights. (*Id.* ¶ 4.) These rights gave each Plan the ability to preclude any other entity from using confusingly similar marks in its area. (*Id.*) In addition, national oversight organizations—the AHA, AMA, and AMCP—quickly adopted standards that approved only one Plan per area. (*Id.* ¶ 5.) The AHA approved Plans "only where needs of a community are not adequately served by existing non-profit hospital service plans." (*Id.*) Similarly, the AMA required Plans to be approved by the local medical society, effectively creating exclusive service areas. (*Id.*) The ensuing license agreements between those national organizations (and their respective successors) and each Plan merely codified that Plan's existing service area. (*Id.* ¶¶ 14, 21.) Service areas also made possible productive cooperation, yielding new, joint products and other efficiencies.

The per se rule does not apply to restrictions—like Blue service areas—that are reasonably related to the exercise of intellectual property rights. *Actavis*, 133 S. Ct. at 2231–32 (holding rule of reason must apply to reverse payment settlement given the exclusionary potential of a patent, even though the restrictions may have gone beyond the scope of the patent); *Valley Drug*, 344 F.3d at 1306 (holding that the exclusionary effects of a market allocation agreement related to a patent "are at the heart of the patent right and cannot trigger the *per se* label"). Since Defendants' service areas are founded in pre-existing trademark rights, their exclusionary effect stems from legitimate intellectual property rights and fosters valid

procompetitive benefits, including preventing consumer confusion, minimizing free-riding, preventing lengthy and costly trademark and/or dilution litigation among Plans, and incentivizing Plans to invest broadly and deeply in their local markets. For this reason as well, they should be considered under the rule of reason. *See, e.g., Actavis*, 133 S. Ct. at 2231–32; *Valley Drug*, 344 F.3d at 1306; *Wis. Interscholastic Athletic Ass'n v. Gannett Co., Inc.*, 658 F.3d 614, 627 (7th Cir. 2011).[6]

Even if service areas were not based on IP rights, no court has ever examined anything close to this arrangement—with its unique history, purpose, and procompetitive benefits—and found it unequivocally anticompetitive. In fact, courts have *enforced* Blue service areas. *Grp. Hosp.*, 744 F. Supp. at 719–20, n.7 (holding BCBSA's license agreements do not violate the antitrust laws); Ex. 115, *Grp. Hosp.*, No. 85–1123–A (enforcing D.C. and Virginia Plans' service areas); *Cent. Benefits*, 711 F. Supp. at 1425 (enjoining Blue Plan from operating outside its service area). One of those explicitly distinguished *Sealy*. *Grp. Hosp.*, 744 F. Supp. at 719–20, n.7. In another, Chief Judge Bryan not only enforced Plans' service areas, he defined them. Ex. 115, *Grp. Hosp.*, No. 85–1123–A.

The U.S. Public Health Service also recognized the benefits of service areas:

> ***The basic formula of the hospital plans***—non-profit status, ***one plan per area***, free choice of hospital and the right of all qualified hospitals to participate, the provision of benefits on a service basis—***is sound and mutually beneficial for patients and hospitals***. ***The prevailing pattern of the medical plans***—non-profit status, ***one plan per area***, free choice of physician, and the right of all qualified physicians in the area to participate—***is also good***.

(Ex. 1, BCBSA00289695 at 9934 (emphasis added).) The Public Health Service noted that geographic exclusivity avoided "competitive solicitation of subscribers, denial of freedom of

---

[6] As discussed in § I(B) *supra*, Defendants' pre-existing trademark rights preclude application of § 1. But even if there was an agreement subject to § 1, any such agreement arose in different circumstances than those in which courts have applied the per se rule, including because they are uniquely related to pre-existing intellectual property rights, and thus must be analyzed under the rule of reason.

choice to subscribers at the time of illness, and interference with physicians' prerogatives and practices in the care of private patients." (*Id.* at 9714; *see also id.* at 9941.) Professor Murphy likewise concluded "the historical context in which the challenged rules were adopted" suggests they are not naked restraints on competition. (Ex. 32, Murphy Rpt. ¶ 39.)

Neither *Topco* nor *Sealy* is analogous.[7] **First,** neither case involved the type of ongoing productive cooperation evinced by the Blue System's creation of new products. In both cases, the defendants sold the same products before and after the agreements—mattresses and groceries. All that changed was the geography in which they were sold and the label placed on the products. Conversely, the restraints at issue here produce an entirely new product—nationwide, but locally-focused, Blue System healthcare financing—precluding per se treatment. *Procaps* likewise distinguished *Palmer* on this basis. *Procaps*, 845 F.3d at 1083 (the agreement in *Palmer* "served no purpose other than to allocate territories"); *see also Augusta News*, 269 F.3d at 48 (explaining "[i]t is not a *per se* violation for local competitors to join in providing region-wide service that none alone provided before" and distinguishing *Palmer* as "a sham transaction to disguise a naked market division arrangement that did not involve a bona fide joint venture").

**Second,** the *Topco* and *Sealy* defendants did not possess exclusive trademark rights in their own territories prior to the challenged agreement. *Sealy*, 388 U.S. at 352–54; *Topco*, 405 U.S. at 598–600, 601–02; *United States v. Sealy, Inc.*, No. 60 C 844, 1964 WL 8089, at *4–6,

---

[7] *Topco* and *Sealy* are also inconsistent with modern antitrust jurisprudence. The Supreme Court recently explained that it has "felt relatively free to revise [its] legal analysis as economic understanding evolves and (just as [petitioner] notes) to reverse antitrust precedents that misperceived a practice's competitive consequences." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2412–13 (2015); *see also GTE Sylvania*, 433 U.S. at 56 (overturning decade-old precedent holding certain non-price vertical restraints were per se illegal); *Leegin*, 551 U.S. at 889 (overturning century-old precedent holding that resale price maintenance was per se illegal); *Actavis*, 133 S. Ct. at 2236 (holding that the rule of reason must be used to evaluate a horizontal market allocation that might have "offsetting or redeeming virtues"). The Court "has viewed *stare decisis* as having less-than-usual force in cases involving the Sherman Act." *Kimble*, 135 S. Ct. at 2412. Consistent with this, neither *Actavis*, *American Needle*, nor *Procaps* cited *Sealy* or *Topco* in rejecting the applicability of the per se rule to horizontal market allocations. To the extent that *Sealy* and *Topco* are still viable at all considering the state of modern antitrust jurisprudence, they should be limited to their precise facts.

17–18 (N.D. Ill. Oct. 6, 1964). Trademarks do not violate the antitrust laws because they only restrict the right to use a trademark, not the ability to compete. *Midwestern Waffles*, 734 F.2d at 713; *Standard Oil Co. (Ky.) v. Humble Oil & Refining Co.*, 363 F.2d 945, 954 (5th Cir. 1966). Agreements that recognize *pre-existing* concurrent trademark rights likewise do not violate the antitrust laws, and at a minimum must be considered under the rule of reason. *See VMG Enters.*, 788 F. Supp. at 657 (defendants' "agreement for a territorial trademark division" was lawful because it "did not 'create' a trademark territorial division . . . it merely recognized it"). This case falls squarely within the latter category. (URMF ¶¶ 2–8, 12–14.) Because Defendants' trademark rights existed *before* the challenged agreements, this case is unlike *Sealy*, *Topco* and *Timken* where the defendants did not have pre-existing separate, concurrent trademark rights. *See Topco*, 405 U.S. at 598–600 (the Topco brand was first created by a group of independent grocery chains together that "allocated" territorial areas); *Sealy*, 1964 WL 8089, at *4–6, 17–18 (because none of the licensees had separate trademark rights they engaged in wholesale "reallotment of territories"); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 596 (1951), *overruled by Copperweld*, 467 U.S. 752 (defendants "allocated trade territories among themselves").

**Third,** in the case of *Sealy*, the Supreme Court's decision was driven by the pervasive price-fixing arrangement. The Sealy Board, its Executive Committee and other committees discussed, agreed upon, and set (a) the retail prices at which Sealy products could be sold; (b) the retail prices at which Sealy products could be advertised; (c) the comparative retail prices at which the stockholder-licensees and the Sealy retailers could advertise Sealy products; (d) the comparative retail prices at which the stockholder-licensees and the products could *not* be

advertised; and (e) the minimum retail prices below which Sealy products could *not* be sold. *Sealy*, 388 U.S. at 355.[8]

**Fourth,** the commercial healthcare insurance industry is multi-faceted and vastly more complex than the sale of mattresses or groceries. It is also heavily regulated by legislatures and administrative agencies. (URMF ¶¶ 36, 38.) And because the provision of healthcare insurance directly impacts the health and wellness of all Americans, condemning rules at the very heart of the Blue System—which delivers healthcare insurance to over 106 million Americans—without a full consideration of their demonstrated procompetitive benefits could have disastrous consequences. This is precisely what the rule of reason is designed to prevent.

**Finally,** the defendants in *Sealy* and *Topco* actively modified territories throughout the conspiracy. *Sealy*, 1964 WL 8089 at *17; *United States v. Topco Assocs., Inc.*, 319 F. Supp. 1031, 1037 (N.D. Ill. 1970), *rev'd*, 405 U.S. 596 (1972). Here, the license agreements merely codified existing territories that grew organically through trademark rights. (URMF ¶¶ 14, 21.)

## 2. BlueCard is not price-fixing, much less "naked" price-fixing.

BlueCard is not price-fixing at all.[9] Providers cannot identify evidence of uniform or "fixed" rates, or that Plans collectively agreed to rates, or even that any Plan influenced the rates of another Plan. Accordingly, *All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc.*, 135 F.3d 740 (11th Cir. 1998), precludes any argument that Defendants' conduct constitutes price-fixing. There, member hospitals jointly bargained with each nursing agency. Once a rate was set, all hospitals paid the *same* rate for that agency's services. *Id*. at 744. The court expressly

---

[8] Like *Sealy*, *Timken* was at bottom a naked price-fixing arrangement. *See, e.g.*, *Timken*, 341 U.S. at 595–98. Furthermore, *Timken* did not involve the creation of any new product or service whatsoever. It is plain from the opinion that the Timken licensing of affiliates British Timken and French Timken were nothing other than a device to facilitate price-fixing and the exclusion of rivals to the greatest extent practicable. *Id.*

[9] Defendants' BlueCard program is directly related to service areas and can therefore readily be disposed of under *American Needle* as outlined above. It is the product of the action of a single entity inasmuch as it is part and parcel of the governance of the use and licensing of the Blue Marks.

held that did not constitute price-fixing because the price was not "preset" by *ex ante* agreement among the hospitals; rather, the hospitals accepted the price resulting from the arrangement's joint bargaining efforts. *Id.* at 747. The same is true here. Plans do not agree on preset provider prices, they simply accept the local Plan's negotiated rate, whatever it may be. (URMF ¶ 22.)[10]

Moreover, in a cooperative venture, such as BlueCard, the participants to the venture must decide on a price for the products it buys or sells. *Dagher*, 547 U.S. at 6–7. Although Plaintiffs may argue that this price is "fixed" in some abstract sense, it is not "fixed" in the way that matters under the antitrust laws. *BMI*, 441 U.S. at 8–9. No court has ever found BlueCard or any comparable system to be "a naked restraint of trade with no purpose except stifling of competition." *Id.* at 9–10, 20–21 (quotation omitted) (rejecting per se price-fixing claim as the Court had "never examined a practice like [that] one before"); *Nat'l Bancard*, 779 F.2d at 599 ("[W]hile some price fixing is per se illegal, other arrangements that literally fix prices are judged under the rule of reason."); *Augusta News*, 269 F.3d at 47 (price-fixing that is "part of a larger, legitimate economic venture" is not per se illegal). Quite the opposite.

At least two courts have already rejected per se challenges to BlueCard. In *Mueller*, providers asserted that BlueCard is naked price-fixing. The Iowa Supreme Court rejected any per se claim, holding that the BlueCard rules are "not naked price-fixing arrangements but are more akin to joint ventures" and have obvious and abundant procompetitive benefits. *Mueller*, 861 at 570–73.

---

[10] Providers might argue that the *All Care Nursing* agreement included an "opt out" provision similar to that demanded by Providers here. This argument rests on a misunderstanding of *All Care Nursing*. There, a nursing agency could provide a bid to the joint purchasing organization. If a bid was accepted, the agency was bound to that price for a year. However, the agency could opt out of the contract altogether—and stop selling *any* services to the *any* of the hospital(s) with which it had contracted—if it wished to test a different price. 135 F. 3d at 744, 748. The same is already true here: a provider can opt out of the Blue System—*i.e.*, become an out-of-network provider—at any point. But there is no basis here (nor was there in *All Care Nursing*) to allow a provider to pick and choose the elements of the Blue System (or the BlueCard Program) it likes and discard the rest.

Similarly, in *Powderly*, a provider asserted that BlueCard was per se illegal because it prevented him from contracting directly with out-of-area Plans—Providers' precise argument here. The court dismissed this claim, holding that BlueCard "encourages trade and competition in the relevant markets by allowing members of Blue plans across the country to obtain services from preferred providers in any other Blue plans network." (Ex. 116, *Powderly* Hr'g Tr. at 70–71.) Per se treatment of BlueCard would therefore be inappropriate here.

### 3. The Best Efforts and acquisition rules do not fit any of the potential per se categories.

Plaintiffs concede that the acquisition rule is outside the per se rule. (Pls' Joint Mot. to Dismiss Resp. at 10–11 n.7, Dkt. 149.) For good reason. Among other things, this rule prevents weaknesses or gaps in the national Blue System by ensuring that only firms committed to the Blue Brand can control companies licensed to use that Brand. (URMF ¶ 24; Ex. 32, Murphy Rpt. ¶ 89.) The DOJ reviewed the acquisition rule and took no action. (*Id.* ¶ 47.)

Nor can Plaintiffs show that the Best Efforts rules fall into any category of potential per se liability. Like the acquisition rule, the Best Efforts rules preserve the cohesiveness of the national network and Blue System by ensuring that each Plan develops its (irreplaceable) piece of the Blue System. These rules merely require a Plan to derive a certain percentage of its revenue from Blue-branded business. (*Id.* ¶¶ 23, 25.) As the district court in *United States v. Anthem* recognized, the National Best Effort rule was "designed to strengthen and protect the Blue brand." No. CV 16–1493, 2017 WL 685563, at *1, *6–9, *53 (D.D.C. Feb. 21, 2017). In fact, it mirrors the acquisition rule, as suggested by the DOJ. (URMF ¶ 25.)

Courts routinely hold that banning collaborators from competing against cooperative joint products *at all*—a far greater restraint than Best Efforts—is not per se illegal. *See, e.g., Dagher*, 547 U.S. at 5–8 & n.1 (per se rule inapplicable to Shell/Texaco joint venture to jointly sell

gasoline, despite parties' ability to compete in that market); *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985) (per se rule inapplicable to retailer cooperative's ban on competing with the cooperative's wholesale operations); *Procaps*, 845 F.3d at 1080 ("Like most joint venture agreements, the Collaboration Agreement provided that the two parties would not compete with each other within the scope of the Agreement."); *Princo Corp. v. Int'l Trade Com'n*, 616 F.3d 1318, 1334–37 (Fed. Cir. 2010) (per se rule inapplicable to Sony/Philips agreement not to market products that could compete with parties' joint output).

Moreover, as discussed above, the Best Efforts rules facilitate collaboration and other well-recognized procompetitive benefits, such as interbrand competition and investment in the Blue Brands. (URMF ¶¶ 23, 25; Ex. 32, Murphy Rpt. ¶¶ 36–37, 79–88.) And Plaintiffs cannot show any obvious anticompetitive effect, as Plans have sufficient "unused" revenue or "headroom" to engage in—or expand existing—unbranded business if they desire. (URMF ¶ 26.)

## C.  Plaintiffs cannot demonstrate that the restraints are purely horizontal.

Plaintiffs' per se claims also fail because the challenged rules are not purely horizontal. A horizontal agreement—*i.e.*, "restraints between competitors at the same level of distribution"—is a necessary element of a per se claim. *DeLong Equip. Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1505 (11th Cir. 1989). As discussed above, a restraint is evaluated at the time it was adopted, even if circumstances later change. *Valley Drug*, 344 F.3d at 1306; *In re Sulfuric Acid*, 703 F.3d at 1010–11; *Polk Bros.*, 776 F.2d at 189.

Here, the challenged rules were not the product of horizontal agreements at inception, nor are they today. Undisputed evidence shows service areas arose from local trademark rights or vertical requirements imposed by AHA and AMA/AMCP, national oversight organizations that did not compete with Plans. (URMF ¶¶ 1–8, 12–14.) The current license agreements merely codify service areas as they already existed. (*Id.* ¶¶ 14, 21.) Thus, undisputed evidence shows

44

that at the time of adoption, service areas were not the product of horizontal agreement between the individual Plans, and therefore the per se rule cannot apply. *See*, *e.g.*, *Leegin*, 551 U.S. at 899 (rule of reason is the appropriate standard for all vertical price restraints); *GTE Sylvania*, 433 U.S. at 59 (rule of reason governs all vertical non-price restraints).

Other challenged rules are also not the product of horizontal agreement. BlueCard precursors developed vertically. For example, the Inter-Plan Service Benefits Bank, which provided reciprocity for out-of-area hospitalization, was adopted under AHA supervision. (URMF ¶ 14.) And the Best Efforts rules were adopted by BCBSA as successor licensor, and are ancillary to protecting and promoting the licensed Blue Marks.

Further, if a vertical arrangement facilitates horizontal agreements, the horizontal agreements are also governed by the rule of reason. *E.g.*, *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008) (relying on *Leegin*, 551 U.S. at 893). Even if service areas, BlueCard, or the Best Efforts rules could be characterized as the product of horizontal agreement—and they cannot be—they must still be analyzed under the rule of reason because they were facilitated by vertical arrangements with governing national organizations.

## III.   Undisputed Facts Establish That "Quick Look" Is Not Applicable.

Quick look may apply only where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Actavis*, 133 S. Ct. at 2237 (quoting *Cal. Dental*, 526 U.S. at 770). *Actavis* and *Procaps* both rejected quick look for horizontal market allocations, citing plausible procompetitive benefits and the lack of readily apparent anticompetitive effects. *Id.* (quick look is inappropriate where the likelihood of anticompetitive effects depended on numerous complexities, including the industry and any convincing justifications); *Procaps*, 845

F.3d at 1084 n.3 (quick look is inapplicable where "[t]he effects of the arrangements in this case are far from readily apparent").

When a restraint might plausibly have a net procompetitive effect, a full rule of reason analysis is required. *Cal. Dental*, 526 U.S. at 773, 775 (quick look was inapplicable because "it is not implausible" that procompetitive benefits would outweigh any costs to competition); *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 832 (3d Cir. 2010) (to justify a quick look, "the burden remains on the [plaintiff] to demonstrate that the proffered procompetitive effect does not plausibly result in a net procompetitive effect") (internal quotations omitted).

Defendants have identified numerous plausible procompetitive benefits for every restraint at issue—backed with uncontroverted evidence and expert testimony. Highly credentialed economists have found the Blue System to be replete with procompetitive benefits, decisions from a host of courts have recognized them, and at least one federal court has actively participated in deciding the boundaries of Blue Plan exclusive service areas. (URMF ¶¶ 44–52; Ex. 32, Murphy Rpt. ¶¶ 53–96.) In stark contrast, no economists, other expert witnesses, or courts have found the challenged rules to be anticompetitive. Against this evidence, Plaintiffs cannot meet their burden of proving that no such benefit is plausible. *See Cal. Dental*, 526 U.S. at 775; *Actavis*, 133 S. Ct. at 2237.

This case simply is not one of the "limited number of intermediate cases where the anticompetitive impact . . . is clear from a quick look" and "a detailed review of the surrounding marketplace" is unnecessary. *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1185–86 (N.D. Ala. 2014) (internal quotations and citations omitted). (*See*, *e.g.*, Ex. 32, Murphy Rpt. ¶ 12 ("A firm that performs intermediary functions in serving two customer groups"—as the Blue Plans do—"may balance interests of one customer group against those of the other in

complex ways, taking into account the nature of the competitive environment and the realities of the marketplace. The result may be that one group could be benefited (perhaps only in the short run) by eliminating or changing a rule, but the other will be harmed immediately and in the longer run by doing so. Harm to competition from accepting one group of Plaintiffs' demands without evaluating how it affects the other group is likely without a full competitive analysis."); *see also id.* ¶¶ 73, 90, 104.) Defendants are not aware of any case that the Eleventh Circuit has found straightforward enough to warrant a quick look. The largest antitrust MDL in history, a case that places at issue an eighty-year old system at the heart of healthcare for roughly one in three Americans, ought not be the first one that is. Given the overwhelming procompetitive benefits presented, the unique history of the Blue System, and the complexities of the healthcare industry and challenged rules, Plaintiffs cannot meet their burden to exclude the possibility that the challenged restraints might plausibly have a net procompetitive effect on competition.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' motion for summary judgment and hold that Plaintiffs' claims must be analyzed under the monopolization or attempted monopolization standards of § 2 of the Sherman Act, or in the alternative, that Plaintiffs' § 1 claims must be analyzed under the rule of reason.

Dated:  July 17, 2017                        Respectfully submitted,

                                             */s David J. Zott*_____
                                             David J. Zott, P.C.
                                             Daniel E. Laytin, P.C.
                                             Sarah J. Donnell
                                             Christa C. Cottrell
                                             Zachary D. Holmstead
                                             KIRKLAND & ELLIS LLP
                                             300 North LaSalle
                                             Chicago, IL 60654
                                             Tel:  (312) 862-2000
                                             Fax:  (312) 862-2200
                                             david.zott@kirkland.com
                                             daniel.laytin@kirkland.com
                                             sarah.donnell@kirkland.com
                                             christa.cottrell@kirkland.com
                                             Zachary.holmstead.kirkland.com

                                             *Counsel for Defendant*
                                             *Blue Cross Blue Shield Association*

E. Desmond Hogan
Craig A. Hoover
J. Robert Robertson
Justin Bernick
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
robby.robertson@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com

Emily M. Yinger
N. Thomas Connally, III
HOGAN LOVELLS US LLP
Park Place II
7930 Jones Branch Drive, 9th Floor
McLean, VA 22102
Tel: (703) 610-6100
Fax: (703) 610-6200
emily.yinger@hoganlovells.com
tom.connally@hoganlovells.com

*Co-Coordinating Counsel for the Defendants*

Cavender C. Kimble
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

John Martin
Lucile H. Cohen
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255-9421
Fax: (803) 255-9054
john.martin@nelsonmullins.com

Daniel E. Laytin, P.C.
David J. Zott, P.C.
Sarah J. Donnell
Christa C. Cottrell
Zachary Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
daniel.laytin@kirkland.com
david.zott@kirkland.com
sdonnell@kirkland.com
ccottrell@kirkland.com
zachary.holmstead@kirkland.com
jessica.staiger@kirkland.com

*Co-Coordinating Counsel for the Defendants*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE JORDAN RATLIFF &
BRANDT LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Defendants' Liaison Counsel*

*With Kirkland & Ellis, counsel for
Defendants, Blue Cross and Blue Shield
Association; National Account Service LLC;
Consortium Health Plans, Inc.*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
Misti Jones
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL 35203

lucie.cohen@nelsonmullins.com

*With Hogan Lovells, counsel for Anthem, Inc.,
f/k/a WellPoint, Inc., and all of its named
subsidiaries in this consolidated action; Blue
Cross and Blue Shield of North Carolina, Inc.;
Blue Cross and Blue Shield of Florida, Inc.;
Louisiana Health Service & Indemnity Company
(Blue Cross and Blue Shield of Louisiana); Blue
Cross and Blue Shield of Massachusetts, Inc.;
BCBSM, Inc. (Blue Cross and Blue Shield of
Minnesota); Blue Cross and Blue Shield of South
Carolina; Hawaii Medical Service Association
(Blue Cross and Blue Shield of Hawaii); Horizon
Healthcare Services, Inc. (Horizon Blue Cross
and Blue Shield of New Jersey); Blue Cross &
Blue Shield of Rhode Island; Blue Cross and Blue
Shield of Vermont; Cambia Health Solutions,
Inc.; Regence Blue Shield of Idaho; Regence Blue
Cross Blue Shield of Utah; Regence Blue Shield
(of Washington); Regence Blue Cross Blue Shield
of Oregon*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON
LLP
1420 Fifth Ave, Suite 3700
Seattle, WA 98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

J. Bentley Owens, III
WALLACE, ELLIS, FOWLER, HEAD
& JUSTICE
113 North Main Street
Columbiana, AL 35051-0587
Tel: (205) 669-6783
Fax: (205) 669-4932
bowens@wefhlaw.com

*Counsel for Defendants, Premera Blue Cross
d/b/a Premera Blue Cross Blue Shield of Alaska;
Premera Blue Cross of Washington*

Brian K. Norman

Tel: (205) 254-1000
Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com
mjones@maynardcooper.com

Pamela B. Slate
HILL HILL CARTER FRANCO COLE &
BLACK, P.C.
425 South Perry Street
Montgomery, AL 36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*Counsel for Defendant, Blue Cross Blue
Shield of Alabama*

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
Erica B. Zolner
Casey R. Fronk
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
hwitt@kirkland.com
jzeiger@kirkland.com
ezolner@kirkland.com
cfronk@kirkland.com

Kimberly R. West (*Liaison Counsel*)
Mark H. Hogewood
WALLACE JORDAN RATLIFF &
BRANDT LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35253
Tel: (205) 870-0555
Fax: (205) 871-753
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants, Health Care Service*

SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX 75234
Tel: (214) 987-1745
Fax: (214) 521-9033
bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
63 South Royal Street, 13th Floor
Riverview Plaza
Mobile, AL 36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

*Counsel for Defendants, Carefirst, Inc.; Carefirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.*

Rafael Escalera Rodríguez
Sylmarie Arizmendi
Gustavo A. Pabón Rico
REICHARD & ESCALERA
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, PR 00917-1913
Tel.: (787) 777-8888
Fax: (787) 765-4225
escalera@reichardescalera.com
arizmendis@reichardescalera.com
pabong@reichardescalera.com

*Counsel for Defendant, Triple-S Salud, Inc.*

R. David Kaufman
M. Patrick McDowell
BRUNINI, GRANTHAM, GROWER
& HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS 39201
Tel: (601) 948-3101
Fax: (601) 960-6902
dkaufman@brunini.com

*Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.; Counsel for Defendant, Blue Cross of Northeastern Pennsylvania*

Jonathan M. Redgrave
Victoria A. Redgrave
REDGRAVE, LLP
14555 Avion Parkway, Suite 275
Chantilly, VA 20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com
vredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark Defendants*

Andy P. Campbell
Stephen D. Wadsworth
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL, GUIN, WILLIAMS, GUY & GIDIERE LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Tel: (205) 224-0750
Fax: (205) 224-8622
andrew.campbell@campbellguin.com
stephen.wadsworth@campbellguin.com
todd.campbell@campbellguin.com
yawanna.mcdonald@campbellguin.com

Jason R. Gourley
Sarah L. Cylkowski
BODMAN PLC

pmcdowell@brunini.com

Cheri D. Green
BLUE CROSS BLUE SHIELD OF MISSISSIPPI
P. O. Box 1043
Jackson, MS 39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

John Martin
Lucile H. Cohen
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255-9421
Fax: (803) 255-9054
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com

*Counsel for Defendant, Blue Cross Blue Shield of
Mississippi, a Mutual Insurance Company*

Michael A. Naranjo
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA 94104-1520
Tel: (415) 984-9847
Fax: (415) 434-4507
mnaranjo@foley.com

Alan D. Rutenberg
Benjamin R. Dryden
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Tel: (202) 672-5300
Fax: (202) 672-5399
arutenberg@foley.com
bdryden@foley.com

*Counsel for Defendant, USAble Mutual Insurance
Company, d/b/a Arkansas Blue Cross and Blue
Shield*

Charles L. Sweeris

201 South Division Street, Suite 400
Ann Arbor, MI 48104
Tel: (734) 761-3780
Fax: (734) 930-2494
aharris@bodmanlaw.com
jgourley@bodmanlaw.com
scylkowski@bodmanlaw.com

Bruce Hoffman
Todd Stenerson
Timothy J. Slattery
SHEARMAN & STERLING LLP
401 9th Street, NW
Suite 800
Washington, DC 20004-2128
Tel: (202) 508-8000
Fax: (202) 508-8100
bruce.hoffman@shearman.com
todd.stenerson@shearman.com
timothy.slattery@shearman.com

*Counsel for Defendant, Blue Cross and Blue
Shield of Michigan*

John Briggs
Rachel Adcox
AXINN, VELTROP & HARKRIDER, LLP
950 F Street, N.W.
Washington, DC 20004
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
radcox@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5000
Fax: (205) 250-5034
steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendant, Independence Blue*

Law Department
BLUE SHIELD OF CALIFORNIA
50 Beale Street
San Francisco, CA 94105
Tel: (415) 229-5107
Fax: (415) 229-5343
charles.sweeris@blueshieldca.com

*Counsel for California Physicians' Service d/b/a*
*Blue Shield of California*

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Mary G. Menge
Morgan B. Franz
SPOTSWOOD SANSOM & SANSBURY LLC
One Federal Place
1819 5th Avenue North, Suite 1050
Birmingham, AL 35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
mmenge@spotswoodllc.com
mfranz@spotswoodllc.com

*Counsel for Defendant Capital BlueCross*

Christine Varney
Evan Chesler
Karin DeMasi
Lauren Kennedy
CRAVATH SWAINE & MOORE
825 8th Avenue
New York, NY 10019
Tel: (212) 474-1000
Fax: (212) 474-3700
cvarney@cravath.com
echesler@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.

*Cross*

Edward S. Bloomberg
John G. Schmidt
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY 14203
Tel: (716) 847-7096
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com

Stephen A. Walsh
ADAMS and REESE LLP
1901 Sixth Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5000
Fax: (205) 250-5091
Stephen.walsh@arlaw.com

*Counsel for Defendant, Excellus Health*
*Plan, Inc., d/b/a Excellus BlueCross*
*BlueShield, incorrectly sued as Excellus*
*BlueCross BlueShield of New York*

Kathleen Taylor Sooy
Tracy A. Roman
April N. Ross
Michael W. Lieberman
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com
aross@crowell.com
mlieberman@crowell.com

John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN & WHITE LLC
The Clark Building

3530 Independence Drive
Birmingham, AL 35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendant Blue Cross and Blue
Shield of Tennessee, Inc.*

400 20th Street North
Birmingham, AL 35203
Tel: (205) 581-0716
Fax: (205) 380-9116
jjohnson@lightfootlaw.com

*Counsel for Defendants, Blue Cross of Idaho
Health Service, Inc.; Blue Cross and Blue
Shield of Kansas, Inc.; Blue Cross and Blue
Shield of Kansas City; Blue Cross and Blue
Shield of Nebraska; Blue Cross Blue Shield
of Arizona; Blue Cross Blue Shield of North
Dakota; Blue Cross Blue Shield of Wyoming;
HealthNow New York Inc.; BlueShield of
Northeastern New York; BlueCross
BlueShield of Western New York*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
Anne I. Salomon
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com
anne.salomon@kirkland.com

*Counsel for Defendants Wellmark of South
Dakota, Inc. (Wellmark Blue Cross and Blue
Shield of South Dakota); Wellmark, Inc.
(Wellmark Blue Cross and Blue Shield of
Iowa)*

54

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 17, 2017, the foregoing was electronically filed with the

Clerk of Court using the CM/ECF system which will send notification of such filing to all

counsel of record.

*/s David J. Zott*

David J. Zott