FILED

2017 Jul-17  PM 07:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 1

# BLUE CROSS AND
# MEDICAL SERVICE PLANS



Please return to':

Dept. of Statistics and Information
AMERICAN OSTEOPATHIC ASSOCIATION
212 E. Ohio St.
Chicago 11, Illinois

Please Return
To MISS SEYL

# FEDERAL SECURITY AGENCY
## U. S. PUBLIC HEALTH SERVICE
### WASHINGTON, D. C.

CONFIDENTIAL

BCBSA00289695



CONFIDENTIAL

BCBSA00289696

# BLUE CROSS AND

# MEDICAL SERVICE PLANS

by

Louis S. Reed

Health Economist

Division of Public Health Methods

———

FEDERAL SECURITY AGENCY

U. S. PUBLIC HEALTH SERVICE

WASHINGTON, D. C.

OCTOBER 1947

For sale by the Superintendent of Documents, U. S. Government Printing Office
Washington 25, D. C. - Price $1.25

CONFIDENTIAL

BCBSA00289697

# CONTENTS

## PART I

### INTRODUCTION AND HOSPITAL PLANS

1. **INTRODUCTION: SCOPE, PURPOSE AND METHOD OF SURVEY** ............................... 1
   Types of Voluntary Health Insurance Organizations ............... 1
   Purpose, Scope and Procedures of the Survey .................... 6
   Organization of the Report .................................... 8

2. **THE DEVELOPMENT OF HOSPITAL SERVICE PLANS** ...................................... 9
   Forerunners of Community Plans ................................ 9
   The First Community Plans ..................................... 10
   The First Enabling Legislation ................................ 11
   Subsequent Growth of the Movement ............................. 12
   Sponsorship and Initial Funds ................................. 13
   The Role of the American Hospital Association ................. 14

3. **PRESENT PLANS, AND AREA AND POPULATION SERVED** ................................ 16
   Size of Plans ................................................. 21
   Population Served ............................................. 22
   Growth Trends ................................................. 22
   Environmental Factors Affecting Development and
     Growth of the Plans ........................................ 28

4. **SUBSCRIPTION RATES AND BENEFITS** .............................................. 32
   Types of Contracts Offered .................................... 32
   Subscription Rates ............................................ 34
   Enrollment Fees ............................................... 35
   Days of Care Provided ......................................... 35
   Hospital Services Provided .................................... 36
   Coverage of Certain Special Conditions ........................ 37
   Allowances Towards Better Accommodations ...................... 40
   Non-Member Hospital Allowances ................................ 41
   Inter-Plan Service Benefit Agreements ......................... 41
   Period of Contract ............................................ 42
   A Proposed National Contract .................................. 43
   The Trend Towards More Comprehensive Benefits ................. 43
   Extent of Coverage of the Hospital Bill ....................... 44

5. **MEMBER HOSPITALS AND THEIR REMUNERATION** ...................................... 46
   Which Hospitals May Become Member Hospitals? .................. 46
   Payments to Member Hospitals .................................. 48
   Advantages and Disadvantages of the Various Methods
     of Payment ................................................. 50
   Principles Governing the Relationship Between
     Hospitals and Blue Cross Plans Adopted by the
     American Hospital Association .............................. 53
   Relationship of Plan Payments to Regular Charges of
     Hospitals .................................................. 53
   Hospital Guarantee of Benefits ................................ 54
   Some Observations Relative to Hospital Underwriting ........... 57

- i -

BCBSA00289698

6.  **ENROLLMENT POLICIES AND PROCEDURES** ........................... 59
    Group Enrollment ................................................ 59
    Payment of Subscription Charges ................................. 60
    Individual and Community Enrollment ............................. 61
    Rural Enrollment ................................................ 63
    Age Restrictions ................................................ 64
    Competition with Insurance Companies ............................ 65
    Employer Participation .......................................... 65
    Blue Cross Protection Established Through Collective
      Bargaining Agreements ........................................ 66
    Advertising ..................................................... 67
    Enrollment of National Concerns ................................. 68
    Transfer of Members Between Plans ............................... 68
    A Note on the Relationship Between Enrollment and
      Income Status ............................................... 69

7.  **LEGAL STATUS OF HOSPITAL PLANS** ............................... 72
    Development of Enabling Legislation ............................. 72
    Provisions of Acts Relating to Non-Profit Hospital
      Service Plans ............................................... 75
    Administration of Laws Relating to Hospital Service
      Plans ....................................................... 80
    Status of Plans Under Federal Tax Legislation ................... 80

8.  **THE CONTROL OF HOSPITAL PLANS** ............................... 81
    Selection of Boards of Directors ................................ 81
    Composition of Boards ........................................... 83
    The Representation of the Public ................................ 86
    Who Control the Plans? .......................................... 88
    Who Should Control the Plans? ................................... 91

9.  **ADMINISTRATIVE ORGANIZATION AND PROCEDURES** ................. 92
    Enrollment ...................................................... 92
    Billing and Record Keeping ...................................... 92
    Confirmation of Hospital Eligibility and Payment
      of Hospitals ................................................ 93

10. **THE FINANCES OF HOSPITAL PLANS** ............................. 95
    Factors Affecting the Hospitalization Expense Ratio ............. 96
    Factors Affecting Administrative Expense Ratios ................. 98
    Reserves ........................................................ 101
    Financial Soundness of the Plans ............................... 105
    Are the Plans Genuinely Non-Profit? ............................ 105

11. **CANCELLATIONS** ............................................. 107
    Reasons for Cancellations ....................................... 108
    Past Trends in Cancellation Rates .............................. 109
    Cancellation and Length of Membership .......................... 110
    Effect of Cancellations on Selection of Risks .................. 110
    Ways and Means of Reducing Cancellations ....................... 111

12. **HOSPITAL UTILIZATION EXPERIENCE** ........................... 112
    Admission Rates, Length of Stay, Days Utilized ................. 112
    Distribution of Cases by Length of Stay ........................ 117
    Hospital Utilization of Blue Cross Subscribers
      Compared with that of the Population as a Whole .............. 117

CONFIDENTIAL

BCBSA00289699

Diagnosis and Utilization........................................ 119
Composition of the Hospital Bill................................. 119

13.  THE NATIONAL COORDINATION OF THE PLANS                        122
       The Approval Program........................................ 123
       The Standards of Approval................................... 123
       Operation and Problems of the Approval Program............. 128
       Some Observations on the Approval Program.................. 133

## PART II

### MEDICAL PLANS

14.  THE DEVELOPMENT AND GROWTH OF MEDICAL SERVICE PLANS           136
       The Rise of Medical Plans in Washington and Oregon.......... 136
       California Physicians' Service.............................. 137
       Michigan Medical Service.................................... 139
       Other Plans Established in 1940............................. 141
       Plans Established in 1941, 1942 and 1943.................... 143
       Recent Developments......................................... 145
       Coordinating Agency and Role of the American
           Medical Association..................................... 146

15.  PRESENT PLANS, AREA AND POPULATION SERVED                     148
       Population Enrolled......................................... 153

16.  SUBSCRIPTION RATES AND BENEFITS                               155
       Surgical Contracts.......................................... 155
       Contracts Covering Surgery, Obstetrics and Hospital
           Calls................................................... 158
       Contracts Providing Surgery, Obstetrics and Office,
           Home and Hospital Calls................................. 159
       Maternity Benefits: Conditions Excluded from Coverage....... 160
       Service and Indemnity Benefits.............................. 160
       Indemnity Allowances........................................ 165
       Benefits When Subscribers Utilize Non-Participating
           Physicians.............................................. 165

17.. PARTICIPATING PHYSICIANS AND PAYMENTS TO THEM: PHYSICIAN
     GUARANTEE OF BENEFITS                                         169
       Extent to Which Physicians Are Participating................ 170
       Payments to Participating Physicians........................ 173
       Relationship Between Plan Payments and Physicians' Charges.. 173
       Adequacy of Payments to Physicians.......................... 176
       Physician Guarantee of Benefits............................. 179

18.  LEGAL STATUS OF MEDICAL PLANS                                 182
       Relationship of Medical and Hospital Prepayment............. 183
       Provisions of Enabling Legislation for Medical
           Service Plans........................................... 183

19.  THE CONTROL OF MEDICAL PLANS                                  187
       The Composition of the Boards of Directors.................. 188
       Some Observations on the Control of Medical Plans........... 190
       The Selection of Public Representatives..................... 192

- ,iii -

20. ADMINISTRATION OF MEDICAL PLANS; FINANCES; CANCELLATIONS;
    UTILIZATION; NATIONAL COORDINATION                                193
        Administration .............................................  193
        Finances ...................................................  194
        Cancellations ..............................................  198
        Utilization ................................................  199
        National Coordination ......................................  201

## PART III

### SOME PROBLEMS OF HOSPITAL AND MEDICAL PLANS

21. SERVICE AND INDEMNITY                                             204
        Service and Indemnity Under Hospital Prepayment.............  204
        Service and Indemnity Under Medical Prepayment.............   205
        Some Observations on Indemnity Plans.......................   207
        Some Observations Relative to Service Plans................   209
        Some Observations Relative to Service-Indemnity
            Plans..................................................   212
        Service Benefits for all Subscribers.......................   215
        Conclusions................................................   217

22. THE COORDINATION OF MEDICAL AND HOSPITAL PLANS                    218
        Comparison of the Four Relationships.......................   219
        Coordination Between Hospital and Medical Plans
            at the National Level..................................   223
        Conclusions................................................   224

23. THE INCLUSION OF RADIOLOGY, PATHOLOGY, ANESTHESIOLOGY
    AND PHYSICAL THERAPY IN HOSPITAL AND MEDICAL PLANS.............   226

## PART IV

### CONCLUSIONS

24. CONCLUSIONS                                                       230
        Benefits of the Plans......................................   230
        How the Plans Could be Improved............................   231
        Enrollment Potentialities..................................   241

### APPENDICES

A.  List of Approved Blue Cross Plans in the United States, January 1,
    1947, Giving Address of Plan and Name of Executive Director....   245

B.  Areas Served by Local (Non-State-wide) Plans...................   249

C.  Enrollment in Each Hospital Plan as of January First, 1936 - 1947   253

D.  Contract Provisions of Blue Cross Plans........................   255
        Table 1.  Types of Contracts Offered and Definition of
                  Accommodations...................................   255
        Table 2.  Group Subscription Rates - Monthly...............   257
        Table 3.  Duration of Service for Contract Benefits For
                  Medical and Surgical Cases.......................   260
        Table 4.  Hospital Services Provided.......................   263

CONFIDENTIAL                                                          BCBSA00289701

D.  Contract Provisions of Blue Cross Plans (Continued)

Table 5.  Contract Benefits for Maternity Cases.............. 266
Table 6.  Contract Benefits for Nervous and Mental,
          Tuberculosis and Quarantinable Cases.............. 269
Table 7.  Allowances Towards "Better" Accommodations.......... 273
Table 8.  Non-Member Hospital Allowances...................... 276
Table 9.  Plans Participating in Inter-Plan Service
          Benefit Agreement ................................. 280

E.  Methods and Amounts of Payment by Blue Cross Plans to Member
    Hospitals for Contract Benefits, December 1, 1946.............. 282

F.  Principles Governing the Relationship Between Hospitals and
    Blue Cross Plans.................................................. 290

G.  Model Law to Enable the Formation of Non-Profit Hospital and/or
    Medical Service Plans, Proposed by the Blue Cross Commission··· 294

H.  Financial Data, Blue Cross Plans, 1945......................... 297

I.  Enrollment in Each Medical Service Plan as of January First,
    1940 - 1947............................................... 300

J.  Standards of Acceptance for Medical Care Plans, American
    Medical Association...................................... 301

K.  Commercial Hospital, Surgical and Medical Expense Insurance   304
    Group Insurance........................................... 304
    Individual Insurance...................................... 315

L.  Financial Data, Blue Cross Plans, 1946......................... 319

M.  List of Medical Service Plans in the United States,
    January 1, 1947, Giving Address of Plan and Name of
    Executive Director........................................ 322

LIST OF TABLES

1.  Types of Organizations Providing Health Services on a Prepayment
    Basis or Insurance Against the Costs of Such Services, and
    Number of Persons Covered for Designated Services,
    January 1, 1947........................................... 2

2.  Number of and Enrollment in Approved Hospital Service Plans in
    the United States, 1933 - 1947........................... 12

3.  Blue Cross Plans, Area Served, Date of First Enrollment, Present
    Enrollment............................................... 18

4.  Enrollment by State on January 1, 1947, Estimated Civilian Popula-
    tion as of July 1945, Percent of Total Population Enrolled, and
    Percent of Population Enrolled During 1946 and 1945............. 24

5.  Ranking of States According to Per Capita Income, Percent of
    Population Enrolled in Blue Cross Plans, and Percent of
    Population Living in Urban Areas............................... 29

- v -

CONFIDENTIAL

BCBSA00289702

6.   Percent of Subscriber's Hospital Bill Covered by Plan . . . . . . . . . . .   45

7.   Percent of Regular Billings of Hospitals Met by Plan and
       Subscriber Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54

8.   Composition of Boards of Directors of Surveyed Plans . . . . . . . . . . . .   84

9.   Distribution of Income by Size of Plan, 1945 . . . . . . . . . . . . . . . . . .   96

10.  Distribution of Plans According to Percent of Income Used for
       Hospitalization, 1945 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   97

11.  Distribution of Plans According to Percent of Income Used for
       Administration, 1945 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98

12.  Comparison of Administrative Expense Ratios and Annual Adminis-
       trative Costs per Subscriber for a Number of Plans, 1945 . . . . . .   99

13.  Distribution of Plans According to (A) Dollar Reserves per
       Participant, and (B) Number of Reserve-Months of Hospi-
       talization, December 31, 1945 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   102

14.  Salaries of Plan Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   106

15.  Annual Admission Rates, Average Length of Stay and Patient Days
       per Participant, 1940-1946 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   113

16.  Admission Rates, Length of Stay and Patient Days by Sex, and
       Type of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   113

17.  Distribution of Non-Maternity Cases by Length of Stay . . . . . . . . . . .   118

18.  Distribution of Cases and Days of Care According to Diagnosis . . . .   120

19.  Distribution of Cases, Days of Care and Hospitalization Ex-
       pense According to Diagnosis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   121

20.  Average Hospital Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   121

21.  Medical Service Plans, Area Served, Date of First Enrollment,
       Scope of Benefits, Type of Benefits, Relationships with Hospi-
       tal Plan, Enrollment, and Percent of Hospital Plan Members En-
       rolled in Medical Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   149

22.  Enrollment in Medical Plans by States, January 1, 1947, Percent
       of the Total Population Enrolled and 1946 Growth . . . . . . . . . . . . . .   154

23.  Subscription Rates Charged and Benefits Provided . . . . . . . . . . . . . . .   156

24.  Maternity Benefits and Conditions Excluded . . . . . . . . . . . . . . . . . . . .   161

25.  Income Limits and Other Requirements for Service Benefits
       Under Service-Indemnity Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   164

26.  Allowances Provided When Non-Participating Physicians Are
       Used . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   166

27.  Percent of Active Physicians of the Area Participating in
       Medical Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   171

- vi -

CONFIDENTIAL

BCBSA00289703

28. Fees Paid or Indemnity Allowances Provided for Certain
    Services.............................................. 174

29. Comparison of Plan Payments and Doctors' Charges, Dela-
    ware Surgical Plan, January 1 - September 26, 1946........... 175

30. Comparison of Fees or Indemnity Allowances Paid for Specified
    Services by Medical Service Plans in Various States, and
    Fees Paid by the Veterans Administration in these States..... 177

31. Composition of Boards of Directors of Medical Plans............ 189

32. Finances of Medical Plans, 1945............................... 195

33. Annual Member Cancellation Rates in Allied Medical and
    Hospital Plans............................................ 198

34. Distribution of Services and Payments by Type of Service,
    Michigan Medical Service, Jan. 1, 1943 to Jan. 1, 1946....... 199

35. Distribution of Cases and Costs by Type of Procedure, The
    Delaware Plan, May 1943 - July 1946......................... 200

## LIST OF FIGURES

1. Areas Served by Blue Cross Hospital Service Plans,
   January 1, 1947........................................... 17

2. Enrollment in Blue Cross Hospital Service Plans,
   January 1, 1947........................................... 23

3. Percentage of Population Enrolled in Blue Cross Hospital
   Service Plans, January 1, 1947............................ 25

4. Percentage of U. S. Population Enrolled in Blue Cross
   Hospital Service Plans, 1937-46........................... 26

5.-8. Blue Cross Enrollment Trends in Specified States and
   Localities, 1937-46....................................... 27

9. Baltimore, Md., Percentage of Population Enrolled in
   Each Census Tract, December 1944.......................... 70

10. Baltimore, Md., Median Monthly Rent in each Census Tract,
    April 1940............................................... 71

11. States with Enabling Acts for Hospital Service Plans
    (As of May 1, 1946)...................................... 74

12. Monthly Variation in Hospital Admission Rates and Average
    Length of Stay, 1943-46.................................. 114

13. Areas Served by Medical Service Plans, January 1, 1947......... 151

14. States with Enabling Acts for Medical Plans or For Joint
    Hospital-Medical Plans (As of May 1, 1946)............... 184

CONFIDENTIAL                                                        BCBSA00289704

# CHAPTER I

## INTRODUCTION:  SCOPE, PURPOSE AND METHOD OF SURVEY

Within the last decade there has been a rapid development of voluntary health insurance in the United States.  As of January 1, 1947 approximately 39,700,000 people -- more than one out of every four persons in the popula- tion -- were enrolled in organizations providing hospital service on a pre- payment basis or had insurance protection against the cost of this service. Of these about 16,100,000 were also covered for physicians' services in surgical and obstetrical cases and of the latter number about 5,000,000 were also covered for physicians' services for medical cases in the hospital. About 3,700,000 persons were covered for office and home services, most, though not all of whom, were covered for the other services.

## TYPES OF VOLUNTARY HEALTH INSURANCE ORGANIZATIONS

The types of organizations providing health services on a prepayment basis or furnishing insurance against the costs of these services are briefly described below.  Table 1 shows the number of people covered for designated services by each type.

### BLUE CROSS HOSPITAL SERVICE PLANS

From the standpoint of the number of participants, the leading type of existing prepayment or insurance plans is the Blue Cross hospital service plans.  The distinguishing features of these plans are that they are non- profit, that the subscriber has free choice among the hospitals of the area, that they are sponsored or endorsed by the hospitals of the area, that they operate through contracts with the member hospitals which in return for spe- cified payments agree to provide specified services to subscribers, and finally that the plans meet the standards of and are approved by the Ameri- can Hospital Association.  The Blue Cross plan movement, from its beginning in 1932, has grown with great rapidity.  On January 1, 1947 there were 24,250,000 persons enrolled in the 81 plans in the United States.

A few Blue Cross plans have expanded their services to include certain types of physicians' services, mainly surgery and obstetrical service.  Nine plans have done this and 604,000 of their members are enrolled for these latter services.

### MEDICAL SERVICE PLANS

Closely allied with hospital service plans are the non-profit, free- choice medical service plans, sponsored by medical societies.  The major de- velopment of these plans has come since 1939.  As of January 1, 1947 there were

1

CONFIDENTIAL

BCBSA00289705

### TABLE I

Types of Organizations Providing Health Services on a Prepayment
Basis or Insurance Against the Costs of Such Services, and Number
of Persons Covered for Designated Services, January 1, 1947

**(Continental United States)**

| TYPE OF ORGANIZATION | HOSPITALIZATION | SERVICES COVERED | | |
|---|---|---|---|---|
| | | SURGERY AND OBSTETRICS | MEDICAL CASES IN THE HOSPITAL | OFFICE AND HOME VISITS |
| | | PHYSICIANS' SERVICES | | |
| BLUE CROSS HOSPITAL SERVICE OR JOINT HOSPITAL—MEDICAL SERVICE PLANS | 24,250,000 | 604,000 | 135,000 | — |
| MEDICAL SERVICE PLANS SPONSORED BY MEDICAL SOCIETIES AND/OR AFFILIATED WITH BLUE CROSS PLANS | 452,000 | 3,832,000 | 1,704,000 | 513,000 |
| INSURANCE COMPANIES 1/ | 12,500,000 | 9,300,000 | 850,000 | 750,000 |
| INDUSTRIAL MEDICAL PLANS 2/ | 1,435,000 | 1,395,000 | 1,342,000 | 1,394,000 |
| FARMERS HOME ADMINISTRATION PLANS 3/ | 134,000 4/ | 164,000 5/ | 166,000 6/ | 166,000 6/ |
| PRIVATE GROUP CLINICS | 375,000 | 388,000 | 406,000 | 328,000 |
| CONSUMER SPONSORED PLANS | 194,000 | 181,000 | 182,000 | 315,000 |
| UNIVERSITY HEALTH SERVICES | 100,000 | 100,000 | 100,000 | 100,000 |
| OTHER | 250,000 | 100,000 | 100,000 | 100,000 |
| TOTAL | 39,690,000 7/ | 16,064,000 7/ | 4,985,000 7/ | 3,666,000 7/ |

2

CONFIDENTIAL

BCBSA00289706

## TABLE I (Cont'd.)

1/ Based on assumption of 2 1/2 dependents per employee with dependent coverage.

2/ Data as of January – May 1945. Includes plans for employees of governmental agencies. The figures presented are to be regarded as minimums. Undoubtedly some plans were missed in the canvass.

3/ Data as of June 30, 1946. Includes the experimental plans for farm families established by the Department of Agriculture.

4/ Does not include 67,000 persons covered through enrollment in Blue Cross plans.

5/ Covered for surgery only. Does not include approximately 8,000 persons covered through enrollment in medical plans.

6/ Includes obstetrical care.

7/ In general each total is included within the total to the left, i. e., virtually all of those covered for physicians' services for medical cases in the hospital are also covered for surgery and obstetrics, and virtually all of those covered for the latter services are also covered (through the same or another type of plan) for hospitalization. Most, though not all, of those covered for home and office visits are also covered for the other services.

SOURCES:

Figures on participants in hospital and medical service plans are based on data of the Blue Cross Commission.

The number of persons having protection through insurance companies is based on data from a survey by the Life Insurance Association of America showing number of employees and dependents covered under group insurance as of December 31, 1945. These figures were adjusted for increase during 1946 on the basis of data from five principal companies, and to the totals for group business thus arrived at was added the estimated coverage under individual policies. See Appendix K.

The data on persons covered under industrial medical plans are from *Prepayment Medical Care Organizations* by Margaret C. Klem (Bureau Memorandum No. 55, Third Edition, Bureau of Research and Statistics, Social Security Board, June 1945).

Data on enrollment in the Farmers Home Administration plans were obtained directly from that organization.

The figures for private group clinics and consumer sponsored plans are from *Prepayment Medical Care Organizations*.

Figures for university health services are token estimates only. No recent satisfactory data are available.

The figures on the coverage of "other" plans or organizations are estimates based on the known coverage of a few organizations in this category.

CONFIDENTIAL

BCBSA00289707

35 plans[1]/ (other than those fully integrated with hospital service plans) with a total enrollment of 3,832,000.[2]/  New plans are currently being organized in many localities or States.  Most of the medical service plans cover either surgical and obstetrical service only, or these services and physicians' services for hospitalized medical cases.  Only a few cover physicians' service in the office and home, and generally such coverage is restricted to employed persons.  All of the separate medical plans, with four exceptions, are jointly operated with the hospital service plans of their areas in that the hospital service plan enrolls new subscribers, collects subscription charges and maintains subscriber records for the medical plan, or there is joint control over these activities.  The four exceptions are the plans in Washington, Oregon, northern California and Pennsylvania, which have no relationships with the hospital service plans serving the areas.  The first three of these provide physicians' services and hospitalization.

#### HOSPITAL, SURGICAL AND MEDICAL INSURANCE BY INSURANCE COMPANIES

Within the past ten years there has been a considerable development of commercial insurance providing indemnification against, or reimbursement of, expenses incurred for medical care.  It is estimated that, as of January 1, 1947, approximately 12,500,000 persons were covered for hospital care and about 9,300,000 for surgical and obstetrical service. Coverage of physicians' services, other than surgical and obstetrical service, is relatively new and largely experimental and probably not more than 850,000 people had this coverage.

This insurance is sold on both a group and individual basis.  About 75 percent of the persons protected are insured on a group basis, i.e., through group contracts with the employer.  Most of the group insurance has been written by the large life insurance companies which sell group life and disability insurance and until recently was only sold by these companies in conjunction with these other types of insurance.  Hospital and surgical indemnity insurance is sold on an individual basis by a large number of companies, mainly casualty companies offering accident and health insurance.

The estimated number of persons insured against hospital, surgical and medical costs by insurance companies includes only those persons whose policies afford an appreciable degree of coverage against the risk. There are many millions of persons holding commercial "health and accident" policies providing for weekly or monthly payments, often $50 or $100 a month, in the event of disability due to illness or accident or to accident alone.  Many of these policies provide that an extra payment, usually one-half of the regular indemnity, will be paid for any period during which the policy holder is in a hospital.  In most instances this would mean that the policy holder would be entitled to about $1.00 or a $1.50 for each day in the hospital -- a payment so small as to mean negligible coverage of the hospital bill.

#### INDUSTRIAL MEDICAL SERVICE PLANS

Over 100 industrial, railroad and mining companies have established

---

1/ The numerous county medical society plans in Washington are here considered as if they were one plan.  Similarly, the various plans in Oregon are considered as one plan.

2/ Includes two plans not sponsored by medical societies but affiliated with Blue Cross plans.

4

CONFIDENTIAL

BCBSA00289708

their own plans for providing medical care to their employees and in some
cases to the dependents of employees.  In most instances service is provided
by staffs of salaried physicians; the companies may or may not have their
own hospitals.  Usually all or the major portion of the cost is borne by the
employees through periodic contributions deducted from pay.  Generally quite
comprehensive care is furnished, i.e., hospitalization, and physicians' care
in the office, home and hospital.  Examples of such industrial medical serv-
ice plans are those of the Tennessee Coal, Iron and Railroad Company in
Birmingham, Alabama, the Endicott Johnson Company of Johnson City, New York,
and the Southern Pacific Railway.

Most company medical service plans are of fairly long standing, i.e.,
have existed for 20 or 30 years or more. Railroad and mining companies often
found it necessary to establish such plans because of the absence of other
medical facilities.

A thorough canvass of these organizations by the Social Security Board
in 1945 obtained information on 115 plans covering approximately 1,435,000
persons for hospitalization and slightly smaller numbers for other types of
services.[3]  The number of people covered by plans of this type has not in-
creased much in recent years, and from 1943 to 1945 there was actually a
small decrease.[4]

**FARMERS HOME ADMINISTRATION PLANS**

These are plans for low income farm families who are borrowers from
the Administration (formerly the Farm Security Administration).  The plans
operate through agreements with the local hospitals, physicians and dentists.
The annual dues, which vary from $10 to $50 depending upon the scope and
costs of services, are loaned to the families and are repaid by the families
during the course of the year along with the loans made for other purposes.
The scope of the services provided under these plans varies widely.  Some
provide quite complete care:  hospitalization, physicians' services, some
dentistry, nursing.  Others provide hospitalization only, or physicians'
services only, or hospitalization and surgical services only.  At one time,
in 1942, these plans served over 500,000 persons; as of June 30, 1946 some
134,000[5] persons were covered for hospitalization and 165,000 for physi-
cians' services.[5]

**PRIVATE GROUP CLINICS**

In a number of localities groups of physicians have established group
clinics which provide care on a prepayment basis.  The outstanding example
of such a clinic is the Ross-Loos Medical Group in Los Angeles.  Some 400,000
persons secure surgical care and physicians' services in the hospital through
such organizations, a somewhat smaller number obtain other services.

[3] Klem, Margaret, C., Prepayment Medical Care Organizations, Bureau Memorandum No. 55, Bureau of Re-
search and Statistics, Social Security Board, 1945.

[4] The same, p. 17.

[5] The figures do not include Farmers Home Administration borrowers enrolled in Blue Cross and medi-
cal service plans, but do include the membership in the experimental rural health programs estab-
lished by the Department of Agriculture.

5

CONFIDENTIAL
BCBSA00289709

## CONSUMER SPONSORED PLANS

In a number of localities groups of consumers have established prepayment plans for obtaining medical services. In some instances these plans have their own facilities and staffs of physicians; in other instances care is purchased from local hospitals and physicians on a fee basis. Some 315,000 persons secure physicians office and home visits through these arrangements; a smaller number are covered for other services.

## UNIVERSITY HEALTH SERVICES

Many colleges and universities have developed arrangements for providing certain medical services to students, the students paying an annual fee towards the support of this service. No adequate figures on the number of students participating are available. It may be roughly estimated that at least 100,000 students secure care through these arrangements.

## OTHER PLANS

A number of hospitals have prepayment plans of their own, and there are a few hospital service plans -- plans providing the services of a number of hospitals on a prepayment basis -- which are not approved Blue Cross plans. In the State of Oregon a number of commercial organizations known as "hospital associations" provide hospitalization and physicians' services on a prepayment basis. All told these plans cover about 250,000 persons for hospital care and perhaps 100,000 for physicians' services.

### PURPOSE, SCOPE AND PROCEDURES OF THE SURVEY

The growth of voluntary health plans led the U.S. Public Health Service to believe that detailed knowledge of these plans would be desirable. It was decided first to undertake a survey of the Blue Cross hospital service plans and the medical service plans operated in conjunction with them since these plans had the largest number of subscribers and were growing at the fastest rate.

Accordingly, in December 1943, the Surgeon General of the United States Public Health Service wrote a letter to the director of the Blue Cross Commission (then called the Hospital Service Plan Commission) of the American Hospital Association stating the desire of the Service to make a survey of Blue Cross plans and asking whether the Commission and the plans would wish to cooperate in such an undertaking. The Commission replied that it and the Board of Trustees of the American Hospital Association would welcome such a survey and would give it their cooperation. The Commission appointed five representatives to confer with the U. S. Public Health Service in regard to the survey. In conferences between these representatives and representatives of the Service, the following statement of the purposes, procedure, and scope of the proposed survey were agreed upon:

I. Purpose of Study

The need for adequate health service to the people of America makes it desirable that the U.S. Public Health Service have an informed opinion of the present and potential usefulness of existing methods of distributing medical and hospital care.

6

CONFIDENTIAL

BCBSA00289710

The U.S. Public Health Service is interested in making a study to determine how well the Blue Cross Plans are now serving and may best serve public needs. Blue Cross Plans also are interested in learning how they may be made more effective. This study has been proposed in the public interest and its purpose is to appraise the advantages and limitations of Blue Cross Plans, which have enrolled thirteen million (January 1944) subscribers throughout the United States.

The Board of Trustees of the American Hospital Association and the Hospital Service Plan Commission have endorsed this study and have recommended that all Blue Cross Plans cooperate with the U. S. Public Health Service.

II. Procedures of Study

The study will include conferences with the Directors and Staffs of representative Plans and, in cooperation with the Plan Directors, conferences with representatives of the hospitals, the medical profession, and the general public in the community.

III. Scope of Study

The study will include all aspects necessary for an understanding of the Plans as individual entities and of the Blue Cross movement as a whole. This will cover the history, growth, subscription rates and benefits, contracts with hospitals, legal status, enrollment policies and problems, financial status, utilization experience, and relations with hospitals, the medical profession and the general public. It will also include data as regards inter-plan relationships and the American Hospital Association approval program.

The question of cooperation in the survey was submitted to all of the plans by the Blue Cross Commission at a conference of the plans in March 1944, and a majority of the plans voted to approve the survey. Subsequently the individual plans indicated their willingness to participate in the survey. Originally 41 of the then 71 plans in this country volunteered to be studied. Later many other plans indicated their willingness to be included so that there were few restrictions upon the choice of plans to be surveyed.

The field work of the survey was performed during the period March 1944 to February 1945. The plans visited were selected from among those willing to participate in the survey, and were chosen so as to obtain a representative sample of all plans with respect to size, geographical location, and other factors. An endeavor was made to include as many of those with affiliated medical plans as possible. In all, 39 of the hospital service plans and 17 (all but two of the then existing) medical plans were visited. (Table 3, chapter 3, gives a list of the plans and indicates those visited.) The hospital service plans surveyed had a total enrollment of over two-thirds the enrollment of all the hospital plans and the medical plans visited had an aggregate enrollment of over 95 percent of the total enrollment of these plans.

CONFIDENTIAL

BCBSA00289711

The plans were visited either singly or jointly by the writer and an assistant. [6]/ Surveys of the plans took from two weeks in the case of the larger plans to one or two days in the case of the smaller plans. The surveys covered all aspects necessary for a proper understanding of the plan and its operation. This included data on the establishment of the plan, its history and growth, the area served, the rates charged and benefits provided, the basis and rates of payment to hospitals, the enrollment policies and problems, the legal status of the plan, how it was controlled, its financial status, its utilization experience, and its relations with the hospitals, the medical profession and the general public. Analogous data were obtained in the case of medical plans. Conferences were held with hospital superintendents, physicians and employers and with representatives of hospital councils, medical societies, labor unions, and community organizations in order to determine the attitudes of these individuals towards the plans.

Since conclusion of the formal surveys, additional data have been secured through occasional visits to plans, by attendance at plan conferences and through correspondence.

## ORGANIZATION OF THE REPORT

The present report gives the findings and conclusions of this survey.

The hospital and medical service plans are closely related, being jointly administered in most cases. The close relationship between the two types of plans, which almost makes them a single phenomenon, must be kept in mind. However, for purposes of exposition it is best to discuss first the hospital plans and then the medical plans, and this will be the procedure followed.

As the survey progressed it became clear that an appraisal of the hospital and medical service plans could not be made without first-hand knowledge of hospital, surgical and medical insurance offered by commercial insurance companies. Accordingly, visits were made to six of the leading insurance companies in this field, and data were secured by correspondence from other principal companies. Appendix K contains a description of this insurance, its extent, the policies offered, rates charged, methods of selling and administration, and financial experience.

---

[6]/ Henry F. Vaughan, Jr.

8

CONFIDENTIAL

BCBSA00289712

# CHAPTER 2

## THE DEVELOPMENT OF HOSPITAL SERVICE PLANS

Hospital service plans arose out of a desire on the part of the public for protection against the risk of burdensome sickness costs, and a desire on the part of hospitals to meet this need of the public's and to increase and stabilize their own incomes by making it easier for the public to pay hospital bills.

Hospital service plans were by no means the first form of health prepayment or insurance plans to develop in this country. As early as the seventies and eighties a number of industrial, mining and railroad companies developed prepayment plans for providing medical care to their employees. In Washington and Oregon beginning as early as 1906 a number of so-called "hospital associations" had developed. These made contracts with employers to provide medical care for employees, first for industrial accidents and later for ordinary illness as well. Prior to the thirties a few groups of doctors here and there had started plans for providing their services on a prepayment basis.

### FORERUNNERS OF COMMUNITY PLANS

The forerunners of community hospital service plans were single hospitals which developed plans for providing their own services on a prepayment basis. Such arrangements were developed as far back as 1880 by a number of hospitals in northern Minnesota. This hospital insurance was sold to lumberjacks. These plans worked satisfactorily for a while and then failed owing, it is said, to the fact that lumberjacks who had spent their money in celebrations after the spring thaw discovered that they could secure free bed and board at the hospital under their hospital contracts.

In 1921 a hospital in Grinnell, Iowa developed a plan whereby a payment of $8.00 a year entitled the beneficiary to three weeks of hospital care, including room, board, and floor nursing, but not including the special hospital services. This plan had a few hundred subscribers and is still in operation though now restricted to local college students.

The single-hospital plan which in effect was the real father of the hospital service plan movement was the Baylor University plan. In 1929 the white school teachers of Dallas, Texas decided that they wished protection against hospital costs and approached the Baylor University hospital to see if some plan could be worked out. Dr. Justin Ford Kimball, vice president of the University, sympathized with their desire and evolved a plan whereby each teacher would be eligible for three weeks hospitalization in return for a payment of $3.00 a semester, $6.00 a year. Over 1500 of the school teachers became members. The experiment was successful from the point of view of both the hospital and the subscribers, and before long other employed groups in the

9

BCBSA00289713

city requested similar privileges. Soon membership in the Baylor "group hos-pitalization" plan was extended to several thousand persons.

A brochure of 1930 lists the benefits. Care was provided for 21 days in a $5.00 private or semi-private room, plus a 33-1/3 percent discount for 344 additional days. Services were quite complete including use of the operating room, anesthesia, all medicines, dressings and full laboratory service. A 50 percent discount on regular charges was allowed for maternity cases. There is no mention in the pamphlet of any maternity waiting period. Cases not ordin-arily admitted to Baylor, such as tuberculosis, mental and nervous diseases, acute venereal disease and virulently contagious cases, were not covered. If a patient wished a better room a $5.00 credit was allowed. There was no pro-vision for service in hospitals other than the Baylor University hospital.

Administration costs of the plan were borne by the hospital. There were no age limits or enrollment percentage requirements; the only requirement was employment in a group. The school teachers were found to be a bad risk and after $2,000 was lost on them, their rate was raised to $8.00 a year. In 1933 coverage was extended to dependents. At the end of 1934 there were 408 groups with 23,000 persons included in the plan.

The success of the Baylor University Hospital plan stimulated other hos-pitals in Dallas and the southwest to start similar plans.

Encouraged by the apparent success of some of the early plans, many hos-pital administrators throughout the country began to develop or considered developing single hospital plans in their own institutions. However, if each hospital in a community developed its own plan the result would be competitive solicitation of subscribers, denial of freedom of choice to subscribers at the time of illness, and interference with physicians' prerogatives and practices in the care of private patients. It was soon apparent that instead of each hospital organizing its own plan, it would be far better for all the hospitals of a community to get together and jointly offer a plan. In this way the un-ethical and unsound features attending solicitation of patients by individual hospitals would be eliminated and subscribers would retain freedom of choice as to the hospital they desired. Soon city-wide free-choice plans made their appearance.

### THE FIRST COMMUNITY PLANS

The first city-wide plan was that offered by the hospitals of Sacramento, California, in July 1932. This plan evolved out of an effort by one of the hospitals, Sutter Hospital, to provide hospital insurance to its own employ-ees. The other hospitals in the city asked that the plan be broadened so that they could include their own employees. After some trial it was deter-mined to make the plan available to the general public. The plan was set up as a mutual insurance company, initial capital being supplied by the hospital.

The next plan to start was in Newark, New Jersey, in January 1933. A small group of business men had decided that hospitalization insurance had commercial possibilities. They approached the secretary of the Essex County Hospital Association who later took a trip to Texas to study the Baylor Uni-versity Plan. He returned a convert to the idea but certain that any plan should be established on a city-wide basis. The Hospital Council authorized a promotion agency formed by the business men to contract with employed people in Newark for hospital care. After six months the initial working

10

BCBSA00289714

capital provided by the sales agency was returned and the Hospital Council, through its executive secretary, took over the management of the plan. In 1937 this plan became the Hospital Service Plan of New Jersey.

In July 1933 eight voluntary hospitals of St. Paul, Minnesota, offered group hospitalization to the public. These hospitals together contributed a fund of $857 with which to start the new organization. It was this plan which in its early years developed the idea of a Blue Cross as the symbol of the movement. In 1935 the St. Paul plan was expanded to include Minneapolis and the name was changed to Minnesota Hospital Service Association.

Four other plans were also started in 1933. In Durham, North Carolina, the Watts Hospital and the Duke University Hospital agreed to back the Hospital Care Association. A plan -- subsequently discontinued or merged with a later formed plan -- was started in San Jose, California; and two plans -- both of which failed subsequently to receive approval -- were started in West Virginia.

In February 1934, the Hospital Service Association of New Orleans was started. This Association took over certain contracts of the Touro Infirmary which had had an experimental plan since 1932. In the spring of 1934 a plan was started in Washington, D. C., the initial capital being provided by the Community Chest. In July 1934, the Cleveland Hospital Service Association was launched. This plan was fostered and organized by the Cleveland Hospital Council and working capital was loaned by the Cleveland Welfare Federation.

In 1935 nine plans were started, three in New York State, one in Delaware, one in North Carolina, one in Pennsylvania, one in Tennessee, and two in Virginia.

### THE FIRST ENABLING LEGISLATION

The New York plans were the first the establishment of which had to wait upon the passage of special enabling legislation. In the other States previously the groups interested in the establishment of plans had assumed that these plans did not constitute insurance but represented simply the sale of hospital service on a prepayment basis. When the attorney-generals or departments of insurance in these States had been requested for a ruling, they had ruled that group hospitalization constituted the sale of service rather than insurance, and that as such these plans could incorporate under the general incorporation laws and were exempt from the regulations covering stock and mutual insurance companies. This exemption was important since it meant that the plans would not need to make their subscribers liable for assessments, and could start without the sizable capital required of stock companies.

In New York, the State Superintendent of Insurance ruled that the projected hospital service plans would be engaging in insurance. It was therefore evident that special enabling legislation would be required if the projected plans were to be exempt from the ordinary insurance regulations. The desired legislation was proposed by civic, hospital and medical leaders and became a law on May 16, 1934.

The act stated that any corporation organized for the purpose of operating a non-profit hospital service plan should be governed by the provisions of this act, and should be exempt from all other provisions of the insurance law; that at least a majority of the directors of such corporations must be administrators or trustees of hospitals which have contracted to render service; that such organizations shall be incorporated only with the consent of

CONFIDENTIAL

BCBSA00289715

the insurance and welfare departments; that the rates charged subscribers shall be subject to the review of the insurance department and the rates of payment to hospitals subject to the approval of the welfare department; that such organizations shall render reports to and be subject to examination by the superintendent of insurance; and that every such corporation is declared to be a charitable and benevolent institution and exempt from State or local taxes other than taxes on real estate and office equipment. From this time on, in virtually all of the remaining States, the passage of somewhat similar legislation was a prerequisite for the starting of plans.

## SUBSEQUENT GROWTH OF THE MOVEMENT

In 1936 eight new plans were started and by January 1st of 1937 26 plans were in operation with a total enrollment of 608,365 persons. By January 1, 1940, as Table 2 shows, there were 59 plans in this country with a total enrollment of 4,409,543. By January 1, 1942, the number of plans had risen to 66 and the number of participants to 8,399,433. On January 1, 1947, there were 81 plans in operation in this country with a total enrollment of 24,250,083.

TABLE 2

Number of and Enrollment in Approved Hospital
Service Plans in the United States, 1933-1947.[1]/

| DATE | NUMBER OF PLANS | NUMBER OF PARTICIPANTS |
|------|-----------------|------------------------|
| JANUARY 1, 1933 | 1 | 2,000 |
| "    "    1934 | 6 | 11,538 |
| "    "    1935 | 10 | 54,494 |
| "    "    1936 | 17 | 214,313 |
| "    "    1937 | 26 | 608,365 |
| "    "    1938 | 38 | 1,364,975 |
| "    "    1939 | 48 | 2,874,055 |
| "    "    1940 | 59 | 4,409,543 |
| "    "    1941 | 65 | 6,012,483 |
| "    "    1942 | 66 | 8,399,433 |
| "    "    1943 | 74 | 10,215,241 |
| "    "    1944 | 73 | 12,659,313 |
| "    "    1945 | 75 | 15,747,558 |
| "    "    1946 | 80 | 18,881,222 |
| "    "    1947 | 81 | 24,250,083 |

[1]/ Based on data of the Blue Cross Commission. The Approval program of the American Hospital Association was not instituted until 1937 and the data for the years prior to that time included plans which subsequently did not meet the approval standards.

12

BCBSA00289716

Blue Cross plans have also been established in Canada and Puerto Rico. On January 1, 1947, the five Canadian plans had a total enrollment of 1,593,251 and the Puerto Rico plan had an enrollment of 33,090.

In the beginning all of the plans were started as local plans serving a particular city. Some of these plans later expanded the territory served so that they served the whole State. From 1939 on, with one exception, all of the plans started in States, no part of which was previously served by a plan, have been started on a State-wide basis. In fact, the Blue Cross Commission of the American Hospital Association has definitely discouraged the starting of new plans on any other basis.

The first few plans that were started offered enrollment at first only to employed persons or provided only small discounts on the cost of care for dependents. Only gradually did the plans extend coverage to dependents, some by providing increasingly larger discounts, others by providing full benefits for dependents but at the same charge per person as for the employed subscriber. Only since 1937 or 1938 have most of the new plans initially offered full coverage of dependents at a family rate.

The increasing emphasis placed by all of the plans upon the family as the unit of enrollment is seen in the shifting proportions of subscribers and dependent participants. At the beginning of 1937, 63 percent of the total participants in all plans were subscribers and 37 percent were family participants. In January 1947, 44 percent of all participants were subscribers and 56 percent were family dependents.


### SPONSORSHIP AND INITIAL FUNDS


In most cases the initiative and main drive for the starting of the various plans came from the hospitals of the community -- from hospital administrators and trustees. These persons were interested in establishing plans because they believed the plans would benefit both the hospitals and the public. The interest of hospitals in establishing plans was definitely stimulated during the depression by the financial predicament in which hospitals found themselves -- income from paying patients decreasing and demands for free care increasing. Hospitals hoped that hospital care insurance would increase and stabilize their income and cut down on the load of charity care. However, the interest of hospitals in establishing and fostering the plans did not diminish with the end of the depression but has continued unabated.

Hospital administrators and trustees were not the only ones interested in establishing plans. Civic leaders other than hospital trustees, civic organizations and the local medical profession helped. In a few cases an individual who hoped to become the executive director of the plan played a major role in promoting its establishment. The role played by various groups in the formation of a plan is usually rather definitely indicated by the interests or groups which provided the starting capital. Of the 39 plans surveyed, in 22 instances the hospitals contributed the starting capital; in six, the funds required to start were contributed by the local Community Chest or a local foundation. In the case of three plans all of the initial funds were provided by civic leaders. In five plans the funds were provided jointly by civic leaders and the hospitals, in one plan by the local medical society and the hospitals, in one plan jointly by civic leaders and the

13

CONFIDENTIAL

BCBSA00289717

individual who promoted the plan and became its head.  One plan had no start-
ing capital whatever except the services of its promoter and the agreement of
the hospitals to accept delayed payments.

It is amazing on what small sums these plans were able to make their
start.  Of 35 plans for which this information was obtained, one plan had no
initial capital; two plans had starting funds of less than $1,000; 13 plans
had from $1,000 to $5,000; seven from $5,000 to $10,000; four from $10,000 to
$20,000; and eight from $20,000 to $30,000.  None had more than $30,000.  In
all or virtually all cases the starting capital was repaid when the plan was
on its financial feet.

## THE ROLE OF THE AMERICAN HOSPITAL ASSOCIATION

The establishment of hospital service plans was encouraged and guided by
the American Hospital Association.  In February 1933, the Board of Trustees
of the Association adopted the following resolution:

"Resolved:  That the Board of Trustees of the American Hos-
pital Association approve the principle of hospital insurance as a
practicable solution of the distribution of the cost of hospital
care, which would relieve from financial embarrassment and even from
disaster in the emergency of sickness those who are in receipt of
limited incomes; that the Trustees, therefore, refer this subject
to the Council on Community Relations and Administrative Practice
for study and recommendations."

In the spring of 1933 the Council on Community Relations and Administra-
tive Practice issued a small folder entitled "Essentials of an Acceptable
Plan for Group Hospitalization."  The essentials were: [1]/

1.  *"Emphasis on Public Welfare"*:  Group hospitalization should be or-
ganized, in principle and in fact, as a public service.

2.  *"Limitation to Hospital Charges"*:  The plans should cover payments
for hospital care only and should not cover the professional services of
physicians rendered to patients.

3.  *"Enlistment of Professional and Public Interests"*:  In establishing
plans advice should be sought, and interest enlisted, from the medical pro-
fession, hospital trustees, and other qualified persons or groups interested
in public service.

4.  *"Choice of physician and Hospital"*:  The subscriber's freedom to
choose his physician or hospital should remain unchanged.

5.  *"Non-Profit Organization"*:  Group hospitalization plans should be
organized and introduced on a non-profit basis.  No individual or group should
be allowed to enjoy any financial gain from a plan, other than a reasonable
and proper return for necessary services.

6.  *"Economic Soundness"*:  Each plan should be economically sound with
regard to such details as subscription rates, scope of benefits, remuneration
of hospitals, eligibility of subscribers and accumulation of reserves.

7.  *"Cooperative and Dignified Promotion"*:  Plans should encourage par-
ticipation by all hospitals of standing in the community.  The ultimate
responsibility should be assumed by the participating hospitals which should
agree to render service to subscribers in exchange for the subscriptions

[1]/ The summaries of the essentials are our own.

14

CONFIDENTIAL

BCBSA00289718

collected. The plans should be introduced in a dignified manner, in keeping with the professional ideals of hospital service. Publicity should be limited to the plan itself rather than to participating hospitals.

In the autumn of 1932 the Council on Community Relations and Administrative Practice of the Association requested Dr. C. Rufus Rorem of the staff of the Julius Rosenwald Fund to act as its consultant on group hospitalization. His first act was to draft the "Essentials" previously referred to. Dr. Rorem spent an increasing portion of his time in providing consultation and advice to groups interested in starting plans and in serving as a central clearing house of information for the plans. In September 1936 the Julius Rosenwald Fund, recognizing the potential importance of the development of group hospitalization, granted a request from the American Hospital Association to establish the Commission on Hospital Service (first called the Committee on Hospital Service) at the headquarters of the Association with Dr. Rorem as full time director. [2]/ After the expiration of a five-year Rosenwald grant, the work of the Commission was financed by the plans themselves.

The functions of the newly formed Commission were stated early in 1937 to be as follows:

(a) "to provide information and advice to hospitals or communities contemplating the establishment of voluntary hospital care insurance plans."

(b) "to serve as a clearing house of information for the executives of existing hospital service associations."

(c) "to study other related problems of hospital administration and finance."

Among the first activities of the new Commission was the calling of a national meeting of executives of non-profit hospital service plans in Chicago, in February 1937. This gathering set the precedent for regular meetings of hospital service plans. At this same meeting it was announced that the trustees of the American Hospital Association had authorized associate institutional membership in the Association for any non-profit plan. Out of this action developed the present approval program, i.e., the approval of plans meeting specified standards for membership in the Association. Approval entitles the plan to use the Blue Cross symbol and to call itself a Blue Cross plan.

---

[2]/ The name of the Commission was subsequently changed to Hospital Service Plan Commission and in January 1946 to Blue Cross Commission.

15

CONFIDENTIAL

BCBSA00289719

# CHAPTER 3

## PRESENT PLANS, AND AREA AND POPULATION SERVED

As of January 1, 1947 there were 81 approved Blue Cross plans in the continental United States. Some of these plans serve an entire State, others serve local communities, mainly large metropolitan areas. Table 3 lists the plans and gives for each the area served, the date on which the plan first began enrollment, and the enrollment as of January 1, 1947. [1]/  The accompanying map shows the location of plans and the areas served.

Of the 81 plans, 26 are state-wide. One additional plan serves two States (New Hampshire and Vermont) jointly. Two other plans are state-wide, but serve a single State, North Carolina, in competition with each other. The remaining 52 plans serve local areas.

A number of plans, other than the one already cited, cross State lines. Thus the Sioux City, Iowa, plan serves the southeast corner of South Dakota. The Kansas City, Missouri, plan serves two counties in Kansas. The St. Louis, Missouri, plan serves nearby portions of Illinois. The Sacramento, California, plan serves one county in Nevada. A few other unimportant instances could be cited. With these exceptions, however, the plans confine their operations to a single State, and this pattern seems to be rather definitely established.

In terms of the areas of the United States which are served by plans, there are 28 States and the District of Columbia which are served by single plans on a state-wide basis; one State (North Carolina) is served by two competing state-wide plans; ten States (California, Illinois, Iowa, Kentucky, Missouri, New York, Ohio, Pennsylvania, Tennessee, Virginia) are served by two or more local plans which together cover the entire area of the State; three States (Georgia, Louisiana, and West Virginia) are served by local plans which cover only portions of the State; two States (Nevada and South Dakota) are served in part by plans with headquarters in other States; and four States (Arkansas, Mississippi, South Carolina, and Wyoming) are not served by any Blue Cross plan.

The above description is in terms of the declared or claimed jurisdictions of the various plans, and not in terms of the areas in which aggressive enrollment efforts are being made. A plan may, for example, be state-wide in name and intention but may in fact be conducting enrollment only in certain portions of the State.

The rule is that the plans serve mutually exclusive areas, a particular State or area being served by only one plan. The primary exception to this rule is the situation in North Carolina where two state-wide plans serve the

---

[1]/  Appendix A gives the address of each plan and the name of the executive director. Appendix B defines the areas served by local (non-state-wide) plans. Appendix C gives the enrollment in each plan for the years 1936 to 1947.

CONFIDENTIAL

BCBSA00289720

AREAS SERVED BY BLUE CROSS HOSPITAL SERVICE PLANS
JANUARY 1, 1947

FIGURE 1

CONFIDENTIAL

BCBSA00289721

TABLE 3

BLUE CROSS PLANS, AREA SERVED, DATE OF FIRST ENROLLMENT, PRESENT ENROLLMENT. a/

\* Plan has affiliated medical plan or offers medical service coverage.     Data as of January 1, 1947
\# indicates plan included in field survey.                                              (United States only)

| STATE | NAME OF PLAN AND HEADQUARTERS CITY | AREA SERVED b/ | DATE OF FIRST ENROLLMENT | ENROLLMENT JAN. 1, 1947 |
|---|---|---|---|---|
| ALABAMA | # * HOSPITAL SERVICE CORP. OF ALABAMA, BIRMINGHAM | STATE—WIDE | APR. 1936 | 174,822 |
| ARKANSAS | NO PLAN | – | – | – |
| ARIZONA | ASSOC. HOSPITAL SERVICE OF ARIZONA, PHOENIX | STATE—WIDE | OCT. 1944 | 35,432 |
| CALIFORNIA | # * HOSPITAL SERVICE OF SO. CALIFORNIA, LOS ANGELES | SOUTHERN CALIFORNIA | MAR. 1938 | 304,735 |
| | # * HOSPITAL SERVICE OF CALIFORNIA, OAKLAND | OAKLAND – SAN FRANCISCO AND NEARBY AREAS | JAN. 1937 | 196,421 |
| | # * INTERCOAST HOSPITALIZATION INS. ASS., SACRAMENTO | NORTHERN CALIFORNIA AND PART OF NEVADA | JULY 1932 | 51,933 |
| COLORADO | # * COLORADO HOSPITAL SERVICE, DENVER | STATE—WIDE | OCT. 1938 | 415,757 |
| CONNECTICUT | CONNECTICUT HOSPITAL SERVICE, INC., NEW HAVEN | STATE—WIDE | FEB. 1937 | 650,000 |
| DELAWARE | # * GROUP HOSPITAL SERVICE, INC., WILMINGTON | STATE—WIDE | NOV. 1935 | 130,956 |
| DISTRICT OF COLUMBIA | GROUP HOSPITALIZATION, INC., WASHINGTON, D.C. | DISTRICT OF COLUMBIA | JUNE 1934 | 296,300 |
| FLORIDA | * FLORIDA HOSPITAL SERVICE CORP., JACKSONVILLE | STATE—WIDE | JULY 1944 | 73,735 |
| GEORGIA | # UNITED HOSPITALS SERVICE ASS., ATLANTA | ATLANTA AND AREA WITHIN A 50 MILE RADIUS | JAN. 1938 | 49,536 |
| | # HOSPITAL SERVICE ASS. OF SAVANNAH, SAVANNAH | SAVANNAH AND ADJACENT COUNTIES | JUNE 1939 | 21,234 |
| IDAHO | IDAHO HOSPITAL SERVICE, BOISE | STATE—WIDE | JULY 1946 | 25,233 |
| ILLINOIS | GROUP HOSPITAL SERVICE OF ILLINOIS, ALTON | ALTON AND SOUTH CENTRAL ILLINOIS | JUNE 1938 | 99,680 |
| | BLUE CROSS PLAN FOR HOSPITAL CARE, CHICAGO | CHICAGO METROPOLITAN AREA | JAN. 1937 | 1,178,584 |
| | ASSOCIATED HOSPITALS OF DANVILLE, DANVILLE | VERMILION AND EDGAR COUNTIES | AUG. 1937 | 11,760 |
| | DECATUR HOSPITAL SERVICE CORP., DECATUR | DECATUR AND NEARBY COUNTIES | JAN. 1938 | 30,848 c/ |
| | CENTRAL ILLINOIS HOSP. SERVICE ASS., PEORIA c/ | CENTRAL ILLINOIS | DEC. 1936 | 123,556 c/ |
| | # NORTHERN ILLINOIS HOSP. SERVICE, INC., ROCKFORD | NORTHERN ILLINOIS AND SCATTERED AREAS | MAY 1939 | 326,992 |
| INDIANA | * BLUE CROSS HOSPITAL SERVICE, INDIANAPOLIS | STATE—WIDE | OCT. 1944 | 224,990 |
| IOWA | # * HOSPITAL SERVICE, INC. OF IOWA, DES MOINES | CENTRAL AND EASTERN IOWA | JAN. 1940 | 344,061 |
| | * ASSOCIATED HOSPITALS SERVICE, INC., SIOUX CITY | WESTERN IOWA AND PART OF SOUTH DAKOTA | MAR. 1940 | 61,010 |
| KANSAS | # * KANSAS HOSPITAL SERVICE ASSN., INC., TOPEKA | KANSAS EXCEPT JOHNSON & WYANDOTTE COUNTIES | JULY 1942 | 217,548 |
| KENTUCKY | ASHLAND HOSPITAL SERVICE, ASHLAND | ASHLAND AND EASTERN KENTUCKY | APR. 1936 | 14,610 |
| | COMMUNITY HOSPITAL SERVICE, LOUISVILLE | CENTRAL AND WESTERN KENTUCKY | AUG. 1938 | 182,110 |
| LOUISIANA | * HOSPITAL SERVICE ASSN. OF ALEXANDRIA, ALEXANDRIA | CENTRAL LOUISIANA | OCT. 1938 | 16,041 |
| | * HOSPITAL SERVICE ASSN. OF BATON ROUGE, BATON ROUGE | BATON ROUGE AND NEARBY PARISHES | NOV. 1938 | 14,201 |
| | # * HOSPITAL SERVICE ASSN. OF NEW ORLEANS, NEW ORLEANS | SOUTHERN LOUISIANA | FEB. 1934 | 126,477 |
| MAINE | # ASSOCIATED HOSPITAL SERVICE OF MAINE, PORTLAND | STATE—WIDE | NOV. 1938 | 190,000 |

18

BCBSA00289722

| | | | | | |
|---|---|---|---|---|---|
| MARYLAND | # | ASSOCIATED HOSP. SERVICE OF BALTIMORE, BALTIMORE | STATE-WIDE | NOV. 1937 | 440,575 |
| MASSACHUSETTS | # * | MASSACHUSETTS HOSPITAL SERVICE, INC., BOSTON | STATE-WIDE | OCT. 1937 | 1,991,000 |
| MICHIGAN | # | MICHIGAN HOSPITAL SERVICE, DETROIT | STATE-WIDE | MAR. 1939 | 1,267,365 |
| MINNESOTA | # | MINNESOTA HOSPITAL SERVICE ASSN., ST. PAUL | STATE-WIDE | JULY 1933 | 757,489 |
| MISSISSIPPI | | NO PLAN | - | - | - |
| MISSOURI | # * | GROUP HOSPITAL SERVICE, INC., KANSAS CITY | NORTHWESTERN MISSOURI AND JOHNSON AND WYANDOTTE COUNTIES IN KANSAS | JULY 1938 | 185,000 |
| | # * | GROUP HOSPITAL SERVICE, INC., ST. LOUIS | REMAINDER OF MISSOURI AND PART OF SOUTHERN ILLINOIS | APR. 1936 | 755,153 |
| MONTANA | * | HOSPITAL SERVICE ASSN. OF MONTANA, HELENA | STATE-WIDE | FEB. 1941 | 55,243 |
| NEBRASKA | # * | ASSOCIATED HOSPITAL SERVICE OF NEBRASKA, OMAHA | STATE-WIDE | FEB. 1939 | 80,907 |
| NEW HAMPSHIRE | # * | NEW HAMP.-VERMONT HOSPITALIZATION SERV., CONCORD | NEW HAMPSHIRE AND VERMONT | DEC. 1942 | 197,249 |
| NEW JERSEY | # * | HOSPITAL SERVICE PLAN OF NEW JERSEY, NEWARK | STATE-WIDE | JAN. 1933 | 929,915 |
| NEW MEXICO | * | HOSPITAL SERVICE, INC., ALBUQUERQUE | STATE-WIDE | JULY 1940 | 8,683 |
| NEW YORK | | ASSOC. HOSPITAL SERV. OF CAPITAL DIST., ALBANY | ALBANY AND NORTHEASTERN NEW YORK | SEP. 1936 | 181,984 |
| | * | HOSPITAL SERVICE CORP. OF WESTERN N.Y., BUFFALO | BUFFALO AND ADJACENT COUNTIES | JAN. 1937 | 421,002 |
| | | CHAUTAUQUA REGION HOSPITAL SERV. CORP., JAMESTOWN | CHAUTAUQUA COUNTY | FEB. 1937 | 27,767 |
| | # * | ASSOCIATED HOSPITAL SERVICE OF N.Y., N.Y. CITY | NEW YORK CITY & SOUTHEASTERN NEW YORK | MAY 1935 | 2,779,811 |
| | # * | ROCHESTER HOSPITAL SERVICE CORP., ROCHESTER | ROCHESTER AND ADJACENT COUNTIES | JUNE 1935 | 313,364 |
| | * | GROUP HOSPITAL SERVICE, INC., SYRACUSE | SYRACUSE AND ADJACENT COUNTIES | JAN. 1936 | 231,021 |
| | * | HOSPITAL PLAN, INC., UTICA | UTICA AND NORTHCENTRAL NEW YORK | FEB. 1937 | 136,049 |
| | | HOSPITAL SERVICE CORP. OF JEFFERSON COUNTY, WATERTOWN | JEFFERSON COUNTY | JULY 1937 | 13,607 |
| NEVADA | | NO PLAN - RENO AREA IS SERVED BY SACRAMENTO PLAN | | - | - |
| NORTH CAROLINA | # * | HOSPITAL SAVING ASSN. OF NORTH CAROLINA, CHAPEL HILL | STATE-WIDE | DEC. 1935 | 313,000 |
| | # * | HOSPITAL CARE ASSN. INC., DURHAM | STATE-WIDE | AUG. 1933 | 144,544 |
| NORTH DAKOTA | * | NORTH DAKOTA HOSPITAL SERVICE ASSN., FARGO | STATE-WIDE | APR. 1940 | 52,955 |
| OHIO | | AKRON HOSPITAL SERVICE, AKRON | AKRON AND ADJACENT COUNTIES | JAN. 1937 | 148,423 |
| | | HOSPITAL SERVICE INC. OF STARK COUNTY, CANTON | CANTON AND ADJACENT COUNTIES | OCT. 1938 | 104,178 |
| | # * | HOSPITAL CARE CORP., CINCINNATI | CINCINNATI AND SOUTHEASTERN OHIO | SEP. 1939 | 639,920 |
| | * | CLEVELAND HOSPITAL SERVICE ASSN., CLEVELAND | CLEVELAND AND ADJACENT COUNTIES | SEP. 1934 | 970,000 |
| | * | CENTRAL HOSPITAL SERVICE, COLUMBUS | COLUMBUS AND SOUTHCENTRAL OHIO | DEC. 1938 | 194,400 |
| | | HOSPITAL SERVICE INC., LIMA | LIMA AND ADJACENT COUNTIES | JUNE 1940 | 49,862 |
| | | PORTSMOUTH HOSPITAL SERVICE ASSN. PORTSMOUTH | SCIOTO COUNTY | JAN. 1939 | 22,768 |
| | * | HOSPITAL SERVICE ASSN. OF TOLEDO, TOLEDO | TOLEDO AND NORTHWESTERN OHIO | APR. 1938 | 262,797 |
| | | ASSOCIATED HOSP. SERVICE, INC., YOUNGSTOWN | YOUNGSTOWN AND EASTERN BORDER COUNTIES | MAR. 1938 | 175,076 |
| OKLAHOMA | * | GROUP HOSPITAL SERVICE, TULSA | STATE-WIDE | MAY 1940 | 170,597 |
| OREGON | # * | NORTHWEST HOSPITAL SERVICE PLAN, PORTLAND | STATE-WIDE | JUNE 1942 | 64,019 |
| PENNSYLVANIA | | HOSPITAL SERVICE PLAN OF LEHIGH VALLEY, ALLENTOWN | LEHIGH & NORTHAMPTON COUNTIES | OCT. 1935 | 139,214 |
| | | CAPITAL HOSPITAL SERVICE, INC., HARRISBURG | HARRISBURG AND SOUTHCENTRAL PENNSYL-VANIA | MAR. 1938 | 291,585 |
| | # | ASSOCIATED HOSPITAL SERVICE OF PHILADELPHIA, PHILADELPHIA | PHILADELPHIA METROPOLITAN AREA IN PENNSYLVANIA | NOV. 1938 | 1,062,207 |
| | | HOSPITAL SERVICE ASSN. OF PITTSBURGH, PITTSBURGH | WESTERN PENNSYLVANIA | JAN. 1938 | 1,047,691 |

19

CONFIDENTIAL

BCBSA00289723

**TABLE 3**
**BLUE CROSS PLANS, AREA SERVED, DATE OF FIRST ENROLLMENT, PRESENT ENROLLMENT. a/**

\* Plan has affiliated medical plan or offers medical service coverage.    Data as of January 1, 1947
\# Indicates plan included in field survey.                                  (United States only)

| STATE | NAME OF PLAN AND HEADQUARTERS CITY | AREA SERVED b/ | DATE OF FIRST ENROLLMENT | ENROLLMENT JAN. 1, 1947 |
|---|---|---|---|---|
| PENNSYLVANIA | # HOSPITAL SERVICE ASSN. OF NORTHEASTERN PA., WILKES-BARRE | NORTHEASTERN PENNSYLVANIA | DEC. 1938 | 195,371 |
| RHODE ISLAND | # HOSPITAL SERVICE CORP. OF RHODE ISLAND, PROVIDENCE | STATE-WIDE | SEP. 1939 | 463,362 |
| SOUTH CAROLINA | NO PLAN | - | - | - |
| SOUTH DAKOTA | NO PLAN - SERVED TO SOME EXTENT BY THE SIOUX CITY PLAN | | | |
| TENNESSEE | TENNESSEE HOSPITAL SERVICE ASSN., CHATTANOOGA | STATE EXCEPT KINGSPORT AREA | OCT. 1945 | 102,052 |
| | COMMUNITY HOSPITAL SERVICE, KINGSPORT | KINGSPORT AND AREA WITHIN 25 MILE RADIUS | AUG. 1939 | 31,665 |
| TEXAS | # * GROUP HOSPITAL SERVICE, DALLAS | STATE-WIDE | JUNE 1939 | 215,660 |
| UTAH | * INTERMOUNTAIN HOSPITAL SERVICE, SALT LAKE CITY | STATE-WIDE | JAN. 1945 | 75,794 |
| VERMONT | SERVED BY NEW HAMPSHIRE-VERMONT PLAN | | | |
| VIRGINIA | # PIEDMONT HOSPITAL SERVICE ASSN., LYNCHBURG | LYNCHBURG AND ADJOINING COUNTIES | SEP. 1938 | 7,913 |
| | * VIRGINIA PENINSULA HOSPITAL SERVICE ASSN., NEWPORT NEWS | NEWPORT NEWS AND NEARBY COUNTIES | MAY 1938 | 18,334 |
| | # * TIDEWATER HOSPITAL SERVICE ASSN., NORFOLK | NORFOLK CITY AND NORFOLK AND PRINCESS ANNE COUNTIES | SEP. 1935 | 37,142 |
| | # * VIRGINIA HOSPITAL SERVICE ASSN., RICHMOND | CENTRAL AND NORTHERN VIRGINIA | OCT. 1935 | 155,424 |
| | # * HOSPITAL SERVICE ASSN. OF ROANOKE, ROANOKE | ROANOKE AND ADJACENT AREAS | OCT. 1939 | 54,429 |
| WASHINGTON | # WASHINGTON HOSPITAL SERVICE, SEATTLE | STATE-WIDE | JUNE 1942 | 93,817 |
| WEST VIRGINIA | * HOSPITAL SERVICE, INC., CHARLESTON | CHARLESTON AND CENTRAL WEST VIRGINIA | JAN. 1933 | 57,970 |
| | # * HUNTINGTON HOSPITAL SERVICE, INC., HUNTINGTON | HUNTINGTON AND WESTERN WEST VIRGINIA | JAN. 1939 | 37,068 |
| WISCONSIN | * ASSOCIATED HOSPITAL SERVICE, INC., MILWAUKEE | STATE-WIDE | JAN. 1940 | 589,200 |
| WYOMING | NO PLAN | - | - | - |
| PUERTO RICO | PUERTO RICO HOSPITAL SERVICE ASSOCIATION | ISLAND-WIDE | JAN. 1944 | 33,090 |

NOTES:
a/ Data from Blue Cross Commission.
b/ See Appendix B for precise description of areas served by local (non-state-wide) plans.
c/ Merged with the Chicago plan, January 21, 1947.

20

CONFIDENTIAL

State in competition with each other.  A few other exceptions exist.  Here local plans in expanding into new territory are serving certain counties claimed by other plans to be within their territory, or the jurisdictional boundaries between two local plans expanding toward each other have not as yet been defined.  For example, in California, the plan serving the southern part of the State has recently begun to conduct enrollment in counties to the north which have been thinly served by another plan.  In Illinois an aggressive plan has invaded territory claimed by other plans as being within their jurisdiction.  In two or three other States a particular county or two are served by two plans.  In general such situations are probably of a temporary character only.

New plans are constantly being started.  Thus in 1944, 1945 and 1946 plans were started in Arizona, Florida, Idaho, Indiana, Tennessee, and Utah; and previously existing plans in New Mexico, Charleston (West Virginia), and Alexandria (Louisiana) were reorganized and approved.  The Blue Cross Commission reports developments under way in the States now without plans which make it likely that in another year or two most or all of these States will have state-wide plans.

As indicated in the previous chapter the plans first established were designed to serve a local community.  In recent years certain disadvantages attending the existence of multiple plans within a State have been manifest, and in the last four or five years the Blue Cross Commission has discouraged the establishment of plans except on a state-wide basis.  In one State, Connecticut, two former plans were amalgamated in 1943 to form a state-wide plan.  In a number of States proposals have been made that the various local plans merge or federate into a state-wide plan.  Many Blue Cross leaders believe that there should be no more than 49 plans in the continental United States -- one for each State and the District of Columbia.

### SIZE OF PLANS

The plans vary greatly in size.  Some are large organizations with over a million or a half million participants; others, many of them but recently started, have only a few thousand or tens of thousands of subscribers.

The number of plans of different size groups and their aggregate enrollment, as of January 1, 1947, was as follows:

| SIZE OF PLAN (PARTICIPANTS) | NUMBER OF PLANS | TOTAL NUMBER OF PARTICIPANTS | PERCENT OF TOTAL PARTICIPANTS IN ALL PLANS |
|---|---|---|---|
| 500,000 OR MORE | 13 | 14,518,335 | 59.9 |
| 200,000 - 500,000 | 16 | 5,082,749 | 21.0 |
| 100,000 - 200,000 | 21 | 3,353,903 | 13.8 |
| LESS THAN 100,000 | 31 | 1,295,096 | 5.3 |
| ALL PLANS | 81 | 24,250,083 | 100.0 |

It is evident that a small number of the larger plans have a large share of the total participants in all plans.  Thus the 13 plans with 500,000 or more participants had 59.9 percent of the total participants in all plans.

21

CONFIDENTIAL BCBSA00289725

On the other hand, the 31 plans with less than 100,000 participants each, together had only 5.3 percent of the total participants.

## POPULATION SERVED

The plans had a total enrollment as of January 1, 1947 of 24,250,083. As indicated by Table 4 and Figure 2, there is a fairly high degree of concentration of these members in a few States. The six States of New York, Ohio, Pennsylvania, Massachusetts, Illinois, and Michigan, which have 36 percent of the total population of the country, have 59 percent of all Blue Cross members. The Northeastern and North Central States, which have 57 percent of the total population of the country have 83 percent of the total Blue Cross enrollment; the South and the West, with 43 percent of the country's population, have only 17 percent of all Blue Cross members.

As of January 1, 1947 the plans had enrolled 19.0 percent of the total population of the country. [2]/ In a few States a substantial portion of the population has been enrolled. The Rhode Island plan has enrolled two-thirds of the population of its State. In Massachusetts and Delaware almost half of the population has been enrolled. In Colorado, Ohio, Connecticut, the District of Columbia, New York and Minnesota between 30 and 40 percent of the population are Blue Cross members. In another ten States (Pennsylvania, Missouri, New Hampshire and Vermont (considered as a unit), Maine, Illinois, New Jersey, Maryland, Michigan and Wisconsin) between 20 and 30 percent of the population are enrolled. By contrast, there are four States in which none of the population is enrolled, and another eight States in which less than five percent of the population are plan members. [3]/

In a number of localities, a high percentage of the population has been enrolled. The Cleveland plan has enrolled 66 percent of the population of its area. This plan has probably enrolled over 70 percent of the population of the city of Cleveland. The Rochester plan reports that it has enrolled over 75 percent of the population of the city of Rochester. The Rockford (Illinois) plan has enrolled over 56 percent of the population of Winnebago County and close to 75 percent of the population of the city of Rockford.

## GROWTH TRENDS

In general the plans have been enrolling an increasing percentage of the population each year. Thus in 1942 the plans enrolled 1.42 percent of the total population; in 1943, 1.92 percent; in 1944, 2.43 percent; 1945, 2.46 percent; [4]/ and in 1946, 4.21 percent. (See Figure 4).

---

[2]/ Of the estimated civilian population as of July 1, 1945 the most recent date for which estimates of the population by States are available. Of the total population of approximately 140,000,000, 17.3 percent have been enrolled.

[3]/ See Table 5. Both South Dakota and Nevada have less than five percent of their populations enrolled.

[4]/ Enrollment gains during the last half of 1945 were cut down owing to high labor turnover due to reconversion.

22

BCBSA00289726

ENROLLMENT IN BLUE CROSS HOSPITAL SERVICE PLANS, JANUARY 1, 1947

EACH ● REPRESENTS 100,000 PARTICIPANTS

FIGURE 2

CONFIDENTIAL

BCBSA00289727

TABLE 4

Enrollment by State on January 1, 1947, Estimated Civilian
Population as of July 1945, Percent of Total Population Enrolled,
and Percent of Population Enrolled During 1946 and 1945. a/

| STATE | NO. OF PLANS | ENROLLMENT JAN. 1, 1947 | ESTIMATED CIVILIAN POPULATION JULY 1945 b/ | PERCENT OF POPULATION ENROLLED JAN. 1, 1947 | PERCENT OF POPULATION ENROLLED DURING 1946 | PERCENT OF POPULATION ENROLLED DURING 1945 |
|---|---|---|---|---|---|---|
| Rhode Island | 1 | 463,362 | 698,903 | 66.30 | 17.47 | 13.52 |
| Massachusetts | 1 | 1,991,000 | 4,086,197 | 48.73 | 13.69 | 11.41 |
| Delaware | 1 | 130,956 | 277,455 | 47.20 | 7.35 | 4.90 |
| Colorado | 1 | 415,757 | 1,060,239 | 39.21 | 9.50 | 4.10 |
| Ohio | 9 | 2,567,424 | 6,823,137 | 37.63 | 6.39 | 1.01 |
| Connecticut | 1 | 650,000 | 1,768,602 | 36.75 | 7.06 | 4.23 |
| District of Columbia | 1 | 296,300 | 836,900 | 35.40 | 7.32 | 3.30 |
| New York | 8 | 4,104,605 | 12,343,450 | 33.25 | 6.54 | 3.87 |
| Minnesota | 1 | 757,489 | 2,484,993 | 30.48 | 4.80 | 1.28 |
| Pennsylvania | 5 | 2,736,068 | 9,142,797 | 29.93 | 7.01 | 3.60 |
| Missouri | 2 | 940,153 | 3,481,949 | 27.00 | 6.11 | 4.15 |
| New Hampshire-Vermont | 1 | 197,249 | 756,141 | 26.09 | 9.50 | 6.51 |
| Maine | 1 | 190,000 | 772,621 | 24.59 | 6.47 | 4.31 |
| Illinois | 6 | 1,771,420 | 7,548,109 | 23.47 | 6.17 | 2.49 |
| New Jersey | 1 | 929,915 | 4,104,176 | 22.66 | 3.25 | 3.56 |
| Maryland | 1 | 440,575 | 2,017,971 | 21.83 | 5.34 | 2.73 |
| Michigan | 1 | 1,167,365 | 5,435,092 | 21.48 | -1.48 | .02 |
| Wisconsin | 1 | 589,200 | 2,934,044 | 20.08 | 5.74 | 4.79 |
| Iowa and South Dakota | 2 | 405,071 | 2,762,810 | 14.66 | 4.35 | 2.40 |
| North Carolina | 2 | 457,544 | 3,333,999 | 13.72 | 2.45 | 1.12 |
| Kansas | 1 | 217,548 | 1,656,588 | 13.13 | 3.95 | 4.72 |
| Utah | 1 | 75,794 | 591,910 | 12.80 | 8.21 | 4.66 |
| Montana | 1 | 55,243 | 452,539 | 12.21 | 7.63 | 1.39 |
| North Dakota | 1 | 52,955 | 519,709 | 10.19 | 2.11 | .89 |
| Virginia | 5 | 273,242 | 2,810,278 | 9.72 | 2.04 | 1.73 |
| Oklahoma | 1 | 170,597 | 1,941,499 | 8.79 | 2.49 | 1.83 |
| Kentucky | 2 | 196,720 | 2,520,537 | 7.80 | 2.14 | 1.58 |
| Nebraska | 1 | 80,907 | 1,155,744 | 7.00 | 2.01 | 1.49 |
| California and Nevada | 3 | 553,089 | 8,255,794 | 6.70 | 3.11 | .77 |
| Louisiana | 3 | 156,619 | 2,343,406 | 6.68 | 1.09 | -.32 |
| Indiana | 1 | 224,990 | 3,387,463 | 6.64 | 2.49 | 3.91 |
| Alabama | 1 | 174,822 | 2,728,120 | 6.41 | 1.24 | .20 |
| Arizona | 1 | 35,432 | 589,221 | 6.01 | 2.77 | 3.07 |
| West Virginia | 2 | 95,038 | 1,716,944 | 5.53 | .88 | 2.82 |
| Idaho | 1 | 25,233 | 459,938 | 5.49 | 5.49 | - - |
| Oregon | 1 | 64,019 | 1,193,702 | 5.36 | 1.16 | .71 |
| Washington | 1 | 93,817 | 1,953,725 | 4.80 | .32 | 1.31 |
| Tennessee | 2 | 133,717 | 2,832,480 | 4.72 | 3.04 | .71 |
| Florida | 1 | 73,735 | 2,059,505 | 3.58 | 2.22 | 1.17 |
| Texas | 1 | 215,660 | 6,338,309 | 3.40 | 1.20 | .45 |
| Georgia | 2 | 70,770 | 3,002,896 | 2.36 | .47 | .20 |
| New Mexico | 1 | 8,683 | 490,302 | 1.77 | 1.30 | .47 |
| Total U.S. Served by Blue Cross plans | 81 | 24,250,083 | 121,670,174 | 19.93 | 4.41 | 2.58 |
| States not served by Blue Cross plans: | | | | | | |
| Arkansas | -- | -- | 1,716,914 | -- | -- | -- |
| Mississippi | -- | -- | 1,990,073 | -- | -- | -- |
| South Carolina | -- | -- | 1,797,583 | -- | -- | -- |
| Wyoming | -- | -- | 234,553 | -- | -- | -- |
| Total United States | 81 | 24,250,083 | 127,409,297 | 19.03 | 4.21 | 2.46 |
| Puerto Rico | 1 | 33,090 | 1,869,255 c/ | 1.77 | .83 | -.34 |

a/  Enrollment data from Blue Cross Commission.
b/  Latest date for which estimates of population by State are available.
c/  1941.

24

CONFIDENTIAL

BCBSA00289728



FIGURE 3

CONFIDENTIAL

BCBSA00289729



Fig. 4

    In a few States the plans have been enrolling the population at a rapid
rate.  Thus during 1945 and 1946 the Rhode Island plan enrolled 31.0 percent
of the population of that State; in the same period the Massachusetts plan
enrolled 25.1 percent of the population of that State.  In 1946 the New
Hampshire-Vermont plan enrolled 9.5 percent of the population of these two
States.  On the other hand there were 9 States, exclusive of those without
plans, in which less than 2 percent of the State's population were enrolled
during 1946.

    Figures 5 and 6 show the growth in percentage of the population enrolled
in the 10 States which on January 1, 1947 had the highest percentage of the
population enrolled.  Figure 7 shows for three local plans -- New York City,
Cleveland and Rochester -- the growth in the percentage of the population of
the area enrolled.  Figure 8 shows the enrollment growth in the five States
which have the least percentage of the population enrolled.

    Some plans, as these graphs illustrate, have grown at quite steady rates,
that is, in each year of their life, except perhaps the first or second, they
have enrolled about the same percentage of the population of their areas.
Others have grown at uneven rates.  Frequently a plan grows quite rapidly for
a period.  Then follows a year or so in which growth is slow, during which
the plan consolidates its gains, overcomes some difficulty, revises adminis-
trative procedures to handle the expanded enrollment, develops new enrollment
techniques to tap new segments of the population, etc.  Then growth will again

26

CONFIDENTIAL

BCBSA00289730

# BLUE CROSS ENROLLMENT TRENDS IN SPECIFIED STATES AND LOCALITIES
## 1937 – 1946



CONFIDENTIAL

BCBSA00289731

proceed rapidly.  An example is the New York City plan which grew rapidly during 1938, encountered difficulties in 1939 as a result of which it was forced to cancel out large numbers of subscribers enrolled on an individual basis, and which did not begin again to grow rapidly until 1944.  Another outstanding example (not shown in the graphs) is the Michigan plan.  This increased its enrollment from 330,000 on January 1, 1941 to 817,000 a year later.  The following year it grew hardly at all -- it was raising its subscription rates (which meant that the time of the enrollment representatives was absorbed in changing existing groups to the new basis, rather than in selling new groups) and revising internal administration.  Then during 1943 and 1944 growth was again rapid.  During 1945 and 1946 the plan had administrative and financial problems and grew not at all.

Some plans have grown at relatively moderate rates during the first few years of their existence, and then have rapidly accelerated the pace of enrollment.  An example is the Massachusetts plan which from its establishment in 1937 had enrolled 460,000 persons (11.3 percent of the population) by January 1, 1943.  Then enrollment began rapidly to increase, and by January 1, 1947 had reached 1,990,000 (48.7 percent of the population).  On the other hand, some plans have grown only slowly throughout their entire history. Thus the two plans in Georgia, established in 1938 and 1939 respectively, have thus far managed to enroll only 70,000 people.

The growth history of the plans which have achieved substantial enrollment suggests that the first five or ten percent of the population is the hardest to enroll; thereafter enrollment is easier, or at any rate proceeds more rapidly.  It has sometimes been suggested that the plans as they achieve substantial enrollment in their area would reach a saturation point -- a point at which they would have enrolled all those in their territory who could be reached or who could afford the subscription costs.  Thus far the growth trends of the plans show no evidence of any such point having been reached.

## ENVIRONMENTAL FACTORS AFFECTING DEVELOPMENT AND GROWTH OF THE PLANS

By and large the plans have made the greatest headway in those areas characterized by strong, well organized voluntary hospitals, relatively adequate hospital facilities, a high degree of urbanization and industrialization, and relatively high per capita income.  By contrast the movement has made least progress in areas where hospitals are weak and are largely proprietary or governmental, where hospital facilities are inadequate, where the population is largely rural and agricultural, and where per capita incomes are low.  Most of these factors go together.

Generally the plans have been started by the voluntary hospitals of the area and it is these hospitals which have been identified with and have supported the plans.  Consequently the plans have been started earliest and with most success in communities with strong voluntary hospitals, which are organized into a council or association, and are used to working together, and which feel a high degree of responsibility towards the community as a whole.

The movement has made relatively little headway thus far in the Pacific coast States.  Here all the conditions except one are seemingly favorable. The exception is that the voluntary hospitals of these States are not strong or more accurately they are not strongly voluntary.  Many of the voluntary

28

CONFIDENTIAL

BCBSA00289732

TABLE 5

Ranking of States According to Per Capita Income, Percent of Population
Enrolled in Blue Cross Plans, and Percent of Population
Living in Urban Areas

| STATE | 1942-44 PER CAPITA INCOME | RANKING OF STATE ACCORDING TO PER CAPITA INCOME | PER CENT OF POP. ENROLLED IN BLUE CROSS PLANS JAN. 1, 1947 | RANKING OF STATE ACCORDING TO POP. ENROLLED | PERCENT OF POP. LIVING IN URBAN AREAS (1940) | RANKING OF STATE ACCORDING TO PERCENT OF URBAN POP. |
|---|---|---|---|---|---|---|
| | $ | | % | | | |
| CONNECTICUT | 1,431 | 1 | 36.75 | 6 | 67.8 | 8 |
| NEVADA | 1,372 | 2 | 3.51 a/ | 41 | 39.3 | 29 |
| CALIFORNIA | 1,366 | 3 | 6.75 | 30 | 71.0 | 7 |
| NEW YORK | 1,343 | 4 | 33.25 | 8 | 82.8 | 4 |
| WASHINGTON | 1,336 | 5 | 4.80 | 38 | 53.1 | 18 |
| DELAWARE | 1,287 | 6 | 47.20 | 3 | 52.3 | 20 |
| NEW JERSEY | 1,261 | 7 | 22.66 | 16 | 81.6 | 5 |
| DISTRICT OF COLUMBIA | 1,254 | 8 | 35.40 | 7 | 100.0 | 1 |
| OREGON | 1,204 | 9 | 5.36 | 37 | 48.8 | 23 |
| RHODE ISLAND | 1,198 | 10 | 66.30 | 1 | 91.6 | 2 |
| MICHIGAN | 1,183 | 11 | 21.48 | 18 | 65.7 | 11 |
| MASSACHUSETTS | 1,177 | 12 | 48.73 | 2 | 89.4 | 3 |
| ILLINOIS | 1,175 | 13 | 23.47 | 15 | 73.6 | 6 |
| MARYLAND | 1,169 | 14 | 21.83 | 17 | 59.3 | 12 |
| OHIO | 1,167 | 15 | 37.63 | 5 | 66.8 | 9 |
| PENNSYLVANIA | 1,048 | 16 | 29.93 | 10 | 66.5 | 10 |
| INDIANA | 1,040 | 17 | 6.64 | 32 | 55.1 | 16 |
| MONTANA | 1,008 | 18 | 12.21 | 24 | 37.8 | 31 |
| UTAH | 972 | 19 | 12.80 | 23 | 55.5 | 14 |
| MAINE | 968 | 20 | 24.59 | 14 | 40.5 | 28 |
| WISCONSIN | 966 | 21 | 20.08 | 19 | 53.5 | 17 |
| KANSAS | 961 | 22 | 13.13 | 22 | 41.9 | 26 |
| IOWA | 936 | 23 | 17.97 | 20 | 42.7 | 25 |
| COLORADO | 935 | 24 | 39.21 | 4 | 52.6 | 19 |
| WYOMING | 934 | 25 | no plan | no plan | 37.3 | 33 |
| IDAHO | 930 | 26 | 5.49 | 36 | 33.7 | 39 |
| NEBRASKA | 920 | 27 | 7.00 | 29 | 39.1 | 30 |
| MISSOURI | 885 | 28 | 27.00 | 11 | 51.8 | 21 |
| MINNESOTA | 876 | 29 | 30.48 | 9 | 49.8 | 22 |
| NORTH DAKOTA | 872 | 30 | 10.19 | 25 | 20.6 | 48 |
| VERMONT | 863 | 31 | 26.09 b/ | 13 | 34.3 | 38 |
| ARIZONA | 833 | 32 | 6.01 | 34 | 34.8 | 36 |
| FLORIDA | 828 | 33 | 3.58 | 40 | 55.1 | 15 |
| SOUTH DAKOTA | 817 | 34 | .59 a/ | 45 | 24.6 | 45 |
| VIRGINIA | 814 | 35 | 9.72 | 26 | 35.3 | 34 |
| NEW HAMPSHIRE | 804 | 36 | 26.09 b/ | 12 | 57.6 | 13 |
| TEXAS | 791 | 37 | 3.40 | 42 | 45.4 | 24 |
| OKLAHOMA | 720 | 38 | 8.79 | 27 | 37.6 | 32 |
| W. VIRGINIA | 692 | 39 | 5.53 | 35 | 28.1 | 43 |
| LOUISIANA | 678 | 40 | 6.68 | 31 | 41.5 | 27 |
| NEW MEXICO | 660 | 41 | 1.77 | 44 | 33.2 | 40 |
| TENNESSEE | 645 | 42 | 4.72 | 39 | 35.2 | 35 |
| GEORGIA | 624 | 43 | 2.36 | 43 | 34.4 | 37 |
| NORTH CAROLINA | 606 | 44 | 13.72 | 21 | 27.3 | 44 |
| KENTUCKY | 589 | 45 | 7.80 | 28 | 29.8 | 42 |
| ALABAMA | 579 | 46 | 6.41 | 33 | 30.2 | 41 |
| SOUTH CAROLINA | 560 | 47 | no plan | no plan | 24.5 | 46 |
| ARKANSAS | 522 | 48 | no plan | no plan | 22.2 | 47 |
| MISSISSIPPI | 468 | 49 | no plan | no plan | 19.8 | 49 |
| UNITED STATES | $1,005 | | 19.03 | | 56.5 | |

a/  Approximate
b/  Data not available on division of enrollment between
    Vermont and New Hampshire.  Percentage for combined
    enrollment, 26.09, used for both States.

29

CONFIDENTIAL

BCBSA00289733

hospitals of these States were formerly proprietary and only changed to a non-profit status within the last decade or so. They provide virtually no free care and receive no aid from community chests or the public generally. They stand on their own financial legs. To provide care to those unable to pay, the city and county governments have established large, well maintained governmental hospitals. The voluntary hospitals of these States have been slow in starting or giving solid support to hospital plans and as a result the plans have as yet made relatively little headway.

The presence or absence of hospital facilities is a decisive factor. Obviously plans will not be started in communities without good hospital facilities. Nor can hospital protection be sold to a population which has no hospitals to go to, and which is not hospital minded.

The presence of industry and commerce is a favorable factor. People in employed groups can be easily reached and enrolled. The plans find it far more difficult to reach farm and rural families.

Income plays an important role, partly directly partly indirectly. The greater their income the more able people are to pay the subscription costs. Also communities characterized by high income levels generally have good hospital facilities and people who are hospital minded and health conscious. The conditions favorable to growth of the plans have been present in greatest degree in the northcentral and northeastern States and it is here that the plans have had their largest growth.

Table 5 compares the ranking of the States according to per capita income, percent of the population enrolled, and percent of the population living in urban areas. It will be apparent that in general the wealthier and more urban States have the highest percentage of their population enrolled. However there are significant exceptions to this general relationship. For example California ranks third in per capita income but has only a small proportion of its population enrolled. Colorado which is below the average in both per capita income and degree of urbanization stands fourth in percent of the population enrolled. Minnesota stands in 29th place as regards income and in 22nd place as regards percent of population living in urban areas, but stands in ninth place with respect to percent of population enrolled. New Hampshire and Vermont, considered as a unit, rank 12th among the States in enrollment but have lower per capita incomes and less of their population residing in urban areas than the country as a whole. Thus in certain States able plan leadership, aggressive enrollment efforts and good support from the hospitals have resulted in enrollment far greater than that achieved in other States with higher per capita income and a higher degree of urbanization.

* * * *

30

CONFIDENTIAL

BCBSA00289734

## NOTE ON RECENT CHANGES

Between January 1st and June 1, 1947 the following events have taken place: Plans have been approved and have begun enrollment in Wyoming and South Carolina. Both of these are on a state-wide basis. A plan with head-quarters in Memphis, Tennessee, has been approved and has begun enrollment. This will serve Memphis and surrounding territory. The Danville and Peoria plans in Illinois have been merged with the Chicago plan. The Ashland plan in Kentucky has been merged with the Huntington, West Virginia, plan.

As of April 1, 1947, the plans reported a total enrollment for the United States of 25,147,386, this being 19.74 percent of the estimated civilian population as of July 1945.

\* \* \* \*

31

CONFIDENTIAL

BCBSA00289735

# CHAPTER 4

## SUBSCRIPTION RATES AND BENEFITS*

Blue Cross plans operate through contracts with subscribers and hospitals. The plans contract with subscribers to furnish certain hospital services in return for certain subscription charges paid periodically. The plans provide the specified services to subscribers through their "member" hospitals, i. e., hospitals of the area which contract to furnish the stipulated hospital services to subscribers in return for certain payments by the plans

The provisions of the subscriber contracts, as reported by the plans to the Blue Cross Commission as of December 1, 1946, are shown in detail in Appendix D, Tables 1 to 9. Changes are constantly occuring in the contract provisions of the various plans so that any description of these provisions rapidly becomes obsolete.[1]

### TYPES OF CONTRACTS OFFERED

Most Blue Cross plans offer what is known as a "semi-private" contract. Of the 81 plans (continental United States only) 68 offer such a contract. (See Appendix Table D-1.) Of these, 23 also offer a "ward contract" and 3 a "private room" contract. Seven plans offer a ward contract only and six offer both ward and private room contracts. No plan offers a private room contract only.

These designations of the contracts of the plans are those generally used by the plans themselves or by the Blue Cross Commission. However, the designations are in part simply labels of convenience and need to be understood in the light of the fact that definitions of the various types of accommodations vary from plan to plan, that in some areas accommodations considered semi-private would elsewhere be considered ward, and vice versa, and that some plans define the room accommodations furnished in terms of a dollar room allowance which may or may not suffice to provide in all or most of the hospitals of the area the type of accommodations designated by the label of the contract.

Thus, most of the plans with so-called semi-private contracts define a semi-private room as one with two or two to four beds (See Appendix Table D-1). One defines it as a room with two to six beds, another as a room with three to five beds. Some of the plans do not define the term in their contracts and the hospital provides what it considers to be a semi-private room. A goodly number of the plans -- almost a third -- with so-called semi-private contracts

---

* All data as of Dec. 1, 1946 unless otherwise noted.

1/ As part of the survey, copies of subscriber contracts were obtained from all plans as of July 1, 1945 and tables were compiled similar to those in Appendix D showing the contract provisions. However, by the time this report was ready for publication all of this material was so out-dated that it was decided not to use it, but to rely upon the published data of the Blue Cross Commission instead.

CONFIDENTIAL

BCBSA00289736

provide dollar room allowances, ranging from $3.00 to $6.00. These contracts are labelled semi-private because the dollar room allowance approximates, or originally (when the contract was first issued) approximated the cost of a semi-private room in most or all of the hospitals of the area. However, these contracts do not assure care in semi-private accommodations.

Similarly, the plans offering ward contracts have different definitions of what is meant by ward accommodations (many do not define the term) and some provide a dollar room allowance (ranging from $3.00 to $5.00) which may or may not meet the cost of a ward bed.

The situation being what it is perhaps the most accurate way of summarizing the contracts issued by the plans would be to say that of approximately 113 main or standard contracts[2] issued by the 81 plans, 5 provide care in a private room, 48 provide care in semi-private accommodations as these are defined by the plan or the hospitals of the area, 30 provide care in ward accommodations, and 30 provide a dollar room allowance.[3]

The type of contract offered by a plan is determined very largely by the availability of the various types of accommodations in the area served by the plan, and by the relative popularity of these accommodations among the types of people that the plan reaches or hopes to reach. In areas where the hospitals have large numbers of semi-private rooms and where this is the type of accommodation generally used by persons of moderate means, the plan will offer a semi-private contract. In the south the hospitals have few semi-private rooms and mainly offer either ward or private room service. For this reason most of the southern plans offer ward contracts or ward and private room contracts. In the Pacific Coast States, the hospitals have few so-called semi-private beds. The plans in these States offer contracts which provide care in rooms with three or four beds, i. e., accommodations which are termed ward but in the east would be considered semi-private.[4]

---

[2]  This chapter is restricted to the main or standard contracts of the plans.  A few of the plans have special or subsidiary contracts in addition.

[3]  The provision by some plans of a dollar room allowance instead of care in specified accommodations is a recent development.  In part the development is due to the fact that such a definition of the room accommodations to which the subscriber is entitled is a more precise one than, say, a "semi-private" room.  Thus, a given hospital may have several types of semi-private rooms with differing rates, and some of its semi-private rooms may be more costly than some of its private rooms.  Also some hospitals may charge more for their semi-private rooms than other hospitals charge for their private rooms, and a dollar room allowance, in effect, gives all subscribers rooms of equal value irrespective of the hospital used.  The tendency toward definition of room accommodations in terms of dollars is also due in large part to the fact that as hospital costs have mounted, the difficulties of the plans and hospitals in reaching agreement as to a fair rate of remuneration have increased.  Specification of the room accommodations to be furnished in terms of a dollar allowance tends to remove the room cost from the area of dispute and thus facilitates agreement as to remuneration of hospitals.  However, it is recognized that this procedure puts the plan in the position of offering indemnity (dollar) rather than service benefits, and there is much dispute among the plans as to whether the tendency is a wholesome one.

[4]  In most plans which offer both semi-private and ward contracts, the former is the more popular -- in fact in some plans the proportion of people holding the ward contract is very small.  In 11 plans the proportion of total participants having the ward contract is (1944 data) as follows: Michigan 45, Massachusetts 14, Philadelphia 1, Rhode Island 20, Toledo 46, Utica 7, Texas 8, Wilkes-Barre 17, Delaware 4, Oklahoma 13, Cincinnati 31.
     The extent to which subscribers or potential subscribers are inclined towards the ward contract, in plans where both ward and semi-private contracts are offered, has diminished very perceptibly in recent years.  Several plans brought forth ward contracts in 1939 or 1940, and the reception to them seemed promising.  However, these plans now have virtually ceased to offer these contracts because of the lack of subscriber interest.  Whether this situation will continue with changing economic conditions remains to be seen.

33

CONFIDENTIAL

BCBSA00289737

## SUBSCRIPTION RATES

Subscription charges for the semi-private contract range, for the most part, from $.75 to $1.00 a month for a single person, from $1.50 to $2.00 for two persons, and from $2.00 to $2.50 for a family.   (See Appendix Table D-2.) Some plans have a dual rate structure, one charge for a single person and another for a husband and wife or a family.  Typical dual rates are $.75 and $2.00, or $1.00 and $2.25 or $2.50.  Subscription charges for the ward contract usually run about a third or a quarter lower than for the companion semi-private contract.  Typical rates are $.60, $1.20 and $1.50 or simply $.60 and $1.50 [5]/

Under the family contracts the husband and wife and all dependent un-married children under specified ages are entitled to care.[6]/  The age limit for eligible dependent children varies from plan to plan; in most plans it is 18 or 19.[7]/  A majority of the plans do not provide care to newborn infants during the first few months of life.  In July 1945 out of 79 plans, 20 plans extended coverage to newborn infants only after 30 days; 6 plans extended such coverage only after 60 days; 18 plans accepted infants only after 90 days; 2 plans after 4 and 6 months respectively; 3 plans only after 12 months.  One plan permitted the addition of a child only at the beginning of the parents' next contract year. The remaining 29 plans had no such provision and extended coverage to infants from the day of their birth.  Some of the plans which ex-clude infants from coverage under the terms of their contracts do not in prac-tice enforce this provision, but supply care to all infants whose parents have family coverage.[8]/

A few (10) of the plans do not provide full benefits to dependents. (See Notes to Appendix Table D-4.)  In these plans the dependents make a certain payment to the hospital, usually $1.00 for each day of care received.  These plans usually have relatively low husband and wife and family rates.  Partial dependent coverage was inaugurated by the Minnesota plan in the early days of the movement when it was not certain that families could be "sold" on the idea of paying the rates which would be required to furnish full coverage.  Exper-

---

[5]/ The dual rate structure is now used by 23 plans in their semi-private or higher cost contract. The number is constantly growing. Many of the recently established plans have adopted this rate structure, and some of the older plans have changed over.  The dual rate structure has many advan-tages.  It simplifies administration; there is no need to change the contract when a child is added or dropped; and it is simpler to present to the public.  Under the triple rate structure of most plans, where the charge for husband and wife is double that for the individual, the proportion of in-come used for hospitalization has usually been considerably greater for husband and wife contracts than for single person or family contracts.  This means that the husband and wife contracts are con-tributing relatively less to the maintenance of the plan as a whole than the other two types of con-tracts.  Under the dual rate structure, single persons and husbands and wives will contribute rela-tively more to the maintenance of the plan than families, which is a fairer arrangement since the former two groups usually have a greater ability to pay.

[6]/ About a third of the plans accept so-called sponsored dependents, i. e., dependents, living with the subscriber, other than the spouse and eligible children.  The charge for each such dependent is usually the same as that for a single person.

[7]/ As of July 1, 1945 in 79 plans, the age limit was 16 in 1 plan, 18 in 22 plans, 19 in 53 plans and 21 in 3 plans.

[8]/ The reasons for these restrictions on the care of infants are not clear, and many of the plans with these restrictions do not seem to offer a clear explanation of the need for them.  In part the restrictions may flow from administrative considerations.  Undoubtedly some of the plans have this restriction because they believe, rightly or wrongly, that infants during the first few months of life are poor risks.  Perhaps it would be more accurate to say that this last was the original reason for the restriction and that many of the plans have never re-examined this assumption.

CONFIDENTIAL

BCBSA00289738

ience has demonstrated that people prefer to pay a little more and receive full coverage and one after another plans which have had partial coverage of dependents have gone over to full coverage.

The subscription rates set forth in Appendix Table D-2 are those paid by group subscribers who pay through their place of employment. A good many of the plans charge higher rates to individually enrolled or "group conversion" subscribers -- subscribers who make direct payments to the plan usually on a quarterly, semi-annual or annual basis. The reasons for the higher rates charged to these subscribers are the higher cost of handling these accounts and the desirability of giving such subscribers an incentive to transfer to payroll deduction groups wherever that is possible.

It is interesting to compare the rates charged by the various plans. Probably the best basis of comparison is the family rate charged for the semi-private contract by plans which offer full dependent coverage. Of 59 plans, 10 charge less than $2.00; 23 charge exactly $2.00; 23 charge between $2.01 and $2.50; 3 charge over $2.50.

## ENROLLMENT FEES

An enrollment fee, usually $1.00, is charged by 18 of the plans. (See Appendix Table D - 2.) This fee is the same for an individual or family subscriber. The charging of enrollment fees was far more common years ago; it is gradually being discarded.[9]/

## DAYS OF CARE PROVIDED

Appendix Table D-3 shows the days of care provided. Approximately half of the plans provide a maximum of 21 days of care during the first year of membership. The majority of these increase the days of care in subsequent years providing, for example, 25 days in the second contract year and 30 days in the third and subsequent years of membership. Some 28 of the plans provide 30 or 31 days of care per contract year and a few 40 or 60 days or thereabouts. Generally these latter plans do not increase the number of days of coverage in subsequent membership years.

The great majority of the plans provide partial coverage for an additional period after the period of full coverage. The most common provision is a 50 percent discount, on those items of the hospital bill which the plan covers, for a period of 90 days after the cessation of full coverage.

A small but growing number of plans (8) provide full coverage for a certain number of days per hospital admission or for each distinct illness, instead of so many days per contract year. This provides greater protection to the member and also simplifies administration. The number of days provided by these plans ranges from 21 to 90. A few plans have developed special contracts which are offered to large groups with a high percentage of enrollment. Thus the "comprehensive" contract of the Rhode Island plan (offered to large groups with 90 percent enrollment) provides 150 days of care per year, not more than 75 days being allowed for the same cause. The comprehensive contract of the Massachusetts plan provides 120 days per admission.

The average hospital stay of Blue Cross members is eight days. Coverage for 21 days will provide complete protection in about 94 percent of all gener-

---

[9]/ In July 1945 23 of the plans charged such a fee.

35

CONFIDENTIAL                                                    BCBSA00289739

al hospital cases and will pay the bill for about 76 percent of all hospital days. (See Chapter 12.)

## HOSPITAL SERVICES PROVIDED

Appendix Table D-4 shows the hospital services which are furnished to subscribers. All of the plans provide room and board (or a dollar allowance towards the cost). All provide the general nursing service of the hospital and use of the operating room. All but eight provide whatever special diets the patient may require.

A majority of the plans (65 of the 81) cover to some extent the administration of anesthesia. The great majority of these plans provide this service when it is given by a salaried employee of the hospital. A few of the plans will also pay the fee, up to a certain amount, charged by a physician for the administration of anesthesia. Some 15 plans cover hospital charges for anesthetic supplies but not the charges for the administration.

In this field, and also with respect to pathology, x-ray and certain other services, the plans conform to prevailing practices in the area and the desires of hospitals and the medical profession. In those areas wherein it is the prevailing practice for anesthesia to be administered by nurse anesthetists employed by the hospitals, this service is commonly considered to be a hospital service and is covered by the plan. In areas where anesthesia is commonly given by physicians paid on a fee basis, this service is often considered a medical rather than a hospital service and has not been included under the plan unless the medical profession so desired. Where the plan offers medical service contracts or has an affiliated medical plan, the administration of anesthesia when not covered by the hospital plan will always or almost always be covered under the medical contract.[10]/

All plans cover laboratory services to some extent. Some provide only what is described as routine laboratory service, which usually consists of blood count, urinalysis, and coagulation test, while others provide complete laboratory services including examinations of pathological tissues. Again the extent of laboratory services offered under the plan is largely determined by prevailing relationships in the area between hospitals and pathologists, and the desire of the latter that their services should or should not be included under the plan. Again pathology services not offered under the hospital plan will be offered under the companion medical contract, if any.

All plans provide drugs to some extent. A majority of the plans (58) provide all drugs that may be prescribed by the physician, including penicillin. Most of the remaining plans provide what are described as "ordinary" or "routine" medications. In most cases this would mean all drugs that the hospital is equipped to provide from its pharmacy except a certain few expensive drugs such as penicillin. The great majority of the plans provide all dressings, including casts and splints, that may be necessary. Others provide only "ordinary" dressings, casts and splints.

X-ray service is covered to a greater or lesser degree by 51 plans. Of these, 23 provide whatever service may be necessary, while the remainder give only partial coverage. Most of the latter plans furnish the services up to a dollar limit, frequently $15.00. What has been said above relative to anes-

---

[10]/ The problems of the inclusion of anesthesia, pathology, radiology and physical therapy services in hospital and medical plans are discussed in chapter 28.

CONFIDENTIAL

BCBSA00289740

thesia and pathology services also applies here. In many localities the in-clusion of x-ray services has been a bone of contention among the hospitals, the medical profession and the plan. Roentgenologists have often maintained that x-ray services, being medical services, should not be included in a hos-pital plan. Hospitals have often maintained that these services, being pro-vided through equipment owned by the hospital and the charges being generally included on the hospital bill, are hospital services and should be included in the plan.

Basal metabolism tests are covered (in full or subject to certain limits) by 59 plans, the provision of oxygen by 58, electrocardiograms (usually the making of the test but not its interpretation) by 43 plans. Use of the phys-ical therapy equipment is covered by 41 plans. Emergency room service (usual-ly limited to the first visit within 24 hours of an accident) is covered, to some extent, by 69 plans. Ambulance service, usually limited, is furnished by 13 plans.

It will be seen that there is considerable diversity among the plans in the services covered and not covered. Some plans by providing little more than room, board, use of the operating or delivery room, and routine drugs, may leave the hospitalized subscriber, especially one who needs elaborate lab-oratory and x-ray services, with an appreciable bill to pay when he leaves the hospital. Other plans provide a complete service, and the subscriber who takes the room accomodations furnished by his contract and does not have an over-long stay, will have no hospital bill whatever to pay, unless it be charges for guest trays and telephone calls.

## COVERAGE OF CERTAIN SPECIAL CONDITIONS

All of the plans have special provisions as regards maternity care and many either exclude certain other types of cases from coverage or impose special limitations on the care provided.

### MATERNITY CARE

All of the plans provide service for maternity cases, but all, in order to protect the plan against adverse selection of risks, provide that such care will be furnished only if the patient has been a member of the plan for at least a certain period. The required waiting period is 6 months in the case of one plan, 7 months in another, 8 months in another, 9 months in 15 plans, 10 months in 40 plans, 11 months in 3 plans, 12 months in 20 plans.[11] (See Appendix Table D-5.) Many plans -- 15 of the 39 plans which were person-ally visited in 1944 and 1945, and the proportion is certainly higher now -- waive the maternity waiting period for large employed groups where 75 percent or more of the employees enroll.

Most of the plans will provide maternity service only to persons enrolled under a husband or wife or a family contract; 25 plans provide this care only under a family contract.

The majority of plans, in order to prevent abuse, place a limit upon the number of days for which care will be provided in uncomplicated maternity cases. This limit is usually 10 days. Most plans give full service benefits

[11]/ Two plans (Massachusetts and Rhode Island) have special "comprehensive" contracts, sold to large groups with a high percentage of enrollment, under which there is no waiting period.

CONFIDENTIAL

BCBSA00289741

during the allowed quota of days; some plans place a dollar limit upon the care which will be furnished, or require the patient to pay a portion of the cost.

## NERVOUS AND MENTAL CONDITIONS

Most general hospitals do not accept so-called nervous and mental conditions, at least those diagnosed as such. The plans were largely organized by general hospitals and were designed, it was thought, primarily to cope with the problem of general illness. Hence, most plans, at least in the beginning, excluded nervous and mental conditions from coverage. In recent years a tendency to provide care for these cases for a limited duration has been manifest.

At present (See Appendix Table D-6) 41 of the 81 plans in the United States provide some coverage for these conditions, although only 17 of these plans provide the same duration of service as for general illness and some provide the care only in member or general hospitals and not in mental hospitals. Seven plans provide care until the condition has been diagnosed, and 33 plans provide no care in these conditions.

## TUBERCULOSIS

The situation with respect to tuberculosis is roughly similar to that for nervous and mental cases and generally each plan has the same provisions for both. Forty plans give some coverage for this disease. Only 10 of these give the same duration of care as for general illness and a few provide the care only in member or general hospitals. Twelve plans provide benefits until the condition has been diagnosed, and the remainder exclude care for this disease.

## QUARANTINABLE DISEASES

The situation with respect to these diseases is roughly comparable to that for mental disease and tuberculosis. At present (See Appendix Table D-6) 58 plans provide some coverage and 23 do not. A majority (34) of the plans which cover these diseases provide the same duration of care as in general illness; most of the others provide the same number of days at full benefits but give no partial benefits for any further period. A few of the plans provide benefits only in member hospitals.

## PRE-EXISTING CONDITIONS

Up-to-date information on the provisions of the plans with respect to these conditions is not available. At the time of our own study of the contracts of the plans, in July 1945, 45 out of 79 plans stated in their contracts that care for pre-existing conditions, i. e., conditions which existed prior to enrollment or for which care had been advised prior to enrollment would not be furnished. An additional 11 plans provided that care would be

38

CONFIDENTIAL

BCBSA00289742

furnished for such conditions only after a waiting period, usually 1 year.
The remaining 23 plans provided care for pre-existing conditions without
qualification. [12]/

The reason for this exclusion, where it exists, is to avoid providing
care to persons who learn of some condition requiring hospitalization and then
join the plan simply to receive care for this condition. However, the dis-
cernment of cases hospitalized for care of pre-existing conditions presents
difficulties. To weed out such cases a plan would have rigorously to scruti-
nize the diagnosis on each hospital admission and in suspected cases request
information from the attending physician on the history of the case. Few
plans which exclude pre-existing conditions in their contracts do this. Most
of them feel that such rigorous policing would cost them more than they would
save, and they are content simply to reject an occasional flagrant case --
"the member who signs up on his way to the hospital."

A constantly growing number of plans accept pre-existing conditions with-
out qualification. These plans rely on enrollment of high percentages of
persons within groups to assure an average selection of risks in this regard.
A good many plans, which state in their contracts that they exclude pre-exist-
ing conditions, waive this exclusion in the case of large groups where more
than a 75 percent enrollment is obtained. [13]/

## ADMISSION FOR DIAGNOSIS ONLY

A majority of the plans (47 out of 79 in July 1945) state in their con-
tracts that care will not be provided in cases where the patient is admitted
to the hospital for diagnosis only. [14]/ Many of the plans which accept such
cases do not provide x-ray or complete laboratory service, so that the plan
gives little incentive to the subscriber to enter the hospital for diagnostic
services only.

There are two main reasons for this exclusion. One is so that the plan
may avoid providing care to persons who do not need care as bed patients but
simply wish to avail themselves of the diagnostic services offered by the plan.
Another reason is that if these cases were accepted the plan would be encour-
aging a possibly unfair type of competition between hospital x-ray and labor-
atory departments and roentgenologists and laboratories not associated with
hospitals.

From an administrative standpoint the exclusion of this type of case
presents difficulties for both the plan and physicians. In practice the plans
are undoubtedly accepting many cases of this sort. They do so because the
attending physician, who is aware that his patient is a subscriber and can
receive x-ray and laboratory services without direct cost if hospitalized,
will so word the admitting diagnosis that it will not appear that admission
was solely or primarily for diagnosis. In the course of the survey a few
physicians complained to the writer that the situation puts them under pres-

---

[12]/ A recent study of the Blue Cross Commission (Feb. 1947) finds that of 80 U. S. plans, 36 cover
pre-existing conditions, 10 cover them after a waiting period and 34 do not cover these conditions.

[13]/ Virtually all of the plans which waive the waiting period for maternity benefits in the case of
large groups with a high percentage of enrollment also waive the exception of pre-existing conditions,
if they have this exception, for the same groups.

[14]/ The Blue Cross Commission reports that in February 1947, 42 U. S. plans covered these cases, 38
did not.

CONFIDENTIAL                                                    BCBSA00289743

sure to perjure themselves. It is doubtful whether there can be any good
solution to this problem unless and until plans are developed providing
physicians' services, including x-ray and laboratory services, to non-
hospitalized patients.

## OTHER CONDITIONS

.Venereal diseases were excluded from coverage by many of the early plans.
As of July 1945, 46 of the plans covered these cases and 33 did not.[15]/ Many
of the early plans excluded care for alcoholism and drug addiction. The trend
is towards coverage of these conditions. In July 1945, approximately 60 per-
cent of the plans covered them. These cases arise so infrequently that plans
save very little by excluding them or incur very little cost through covering
them. Self-inflicted injuries were not covered by nine plans in July 1945,
and congenital defects by seven plans.

All of the plans exclude from coverage cases for which care is available
under workmen's compensation. One plan -- the Massachusetts plan -- will in
the case of its semi-private contract holders pay the hospital charges for
the difference between a semi-private room and the ward accomodations to which
the person is entitled under workmen's compensation. With one or two excep-
tions, the plans do not pay for care received in veterans' hospitals or in
other governmental facilities wherein the patient receives or can receive care
free of charge.

### ALLOWANCES TOWARDS BETTER ACCOMMODATIONS.

All of the plans permit members to take better accomodations in the hos-
pital than those to which they are entitled under their contract. Thus a
ward contract holder may at the time of hospitalization take a semi-private
or private room and the semi-private contract holder may take a private room.
To the patient who does this, the plan provides an allowance more or less
equivalent to the cost of the care to which he was entitled, towards the cost
of the better accomodations.

The more common provision, which obtains in 47 of the plans, (see Appen-
dix Table D-7) is that the member is entitled to the special hospital servic-
es provided under his contract and receives an allowance of a fixed amount,
commonly $4.50 or $5.00, towards the cost of the better accomodations. This
fixed amount usually represents the prevailing or usual charge for semi-pri-
vate or ward accomodations, as the case may be, in the area. In 22 plans the
member receives all special services and pays the hospital the difference be-
tween its charges for the accomodations to which he is entitled and the accom-
modations which he chooses.

A number of plans provide a less advantageous arrangement. For example,
the Philadelphia plan provides the member who takes better accomodations with
(a) a dollar allowance towards the room cost, and (b) credits for the special
hospital services equivalent to the hospital's regular charges for these ser-
vices to semi-private patients. The patient pays the difference between these
credits and the hospital's actual charges. The New York City plan provides
the member with what is essentially an, indemnity equivalent to what the plan
would have paid the hospital had the member taken a semi-private room, or

---

[15]/ In February 1947, 52 plans covered these cases, 28 did not.

40

CONFIDENTIAL

BCBSA00289744

alternatively a certain number of dollars per day of stay.[16]/  The necessity of these arrangements flows out of the fact that hospitals in some areas customarily vary their charges for the special services in accordance with the type of room accommodations used by the patient.  Thus the private room patient will pay more than a semi-private patient for use of the operating room, etc.

Appreciable proportions -- generally from 20 to 40 percent -- of subscriber-patients take better accommodations than their contract calls for. Some sample figures are:  The New Jersey plan, 19%; the New York City plan, 25%; the Rochester plan, 30%; the Cincinnati plan, 29%; the Maryland plan, 35%; the Colorado plan, 40%; the Kansas City plan, 40%; the Wilkes-Barre plan 50 percent.

### NON-MEMBER HOSPITAL ALLOWANCES

All plans pay certain amounts towards meeting the hospital bills of members who are hospitalized in non-member hospitals.  Non-member hospitals may be institutions within the plan's area, which have not been accepted as or do not desire to become member hospitals.  Far more generally they are hospitals outside the plan's area.  About nine percent of hospitalized subscribers receive care in non-member hospitals; in the great majority of these instances the subscriber is hospitalized outside the plan's territory.

The usual allowance for care in non-member hospitals, whether outside or within the plan area, is payment of the hospital's charges up to, but not exceeding, a fixed amount per day.  (See Appendix Table D-8.)  The typical payment is up to $6.00 per day under semi-private contracts or up to $4.50 or $5.00 per day under ward contracts for each day of full coverage and correspondingly lowered amounts for each day of any further period for which the plan provides partial benefits.  Some plans provide higher allowances for short stay cases.  For example, the New York City plan pays up to $15.00 for a one day stay, $25.00 for two days, $34.00 for three days, etc.  The California plans will pay non-member hospitals, in or out of the State, their regular charges for the services and accommodations provided under their contracts.

### INTER-PLAN SERVICE BENEFIT AGREEMENTS

The limited payments made by most plans for subscribers hospitalized outside of the plan area will usually fall short of covering the bill, and this is recognized as a disadvantage.  To overcome this the central organization of the plans has fostered a program of reciprocity agreements among the plans for the provision of service benefits in out-of-the-area cases.  Under these arrangements if a member of plan A enters a member hospital of plan B with which it has a reciprocal agreement, the member receives the service benefits of plan B.  Plan B pays the hospital for its services at its contractual rates and secures reimbursement from plan A.

Virtually all plans which have entered into these agreements give the member the option of either receiving the plan's own non-member hospital allowances or the service benefits of the "host" plan, whichever will be of

---

[16]/  This has recently been changed so that the subscriber who takes a private room receives a $6.00 room allowance and all of the special services.

41

CONFIDENTIAL

BCBSA00289745

greater benefit to him. Where the service benefits of the "host" plan are meager and the "home" plan provides generous non-member hospital allowances the member may be better off with the latter. Generally, however, the subscriber will find it to his advantage to take the service benefits of the "host" plan.

The inter-plan service benefit program has two parts. Plans participating in Part I request service benefits for their subscribers hospitalized in the areas of other participating plans. Plans participating in Part II agree to provide their service benefits to subscribers of other participating plans. As of February, 1947, (see Appendix Table D-9) 37 plans with about two-thirds of the total enrollment in all plans are participating in both parts of the program. A few plans are participating in Part II but not Part I.

The inter-plan service benefit program, on its present basis, has disadvantages for certain plans -- those in low cost hospital areas or which have less comprehensive benefits than other plans -- and many of these have refused to participate. The program asks these plans to pay more for the care of their subscribers outside their territory than they would pay within it. On the other hand the program is easy on the plans with high cost hospitals and comprehensive subscriber benefits. It costs these plans less to provide the service benefits of other plans than to provide their own service benefits.

Because of the above factors the inter-plan service benefit program, on its present basis, has probably gone about as far as it can go, i. e., the plans which have thus far refused to participate will probably continue to do so. Hence the plans are giving consideration to other approaches to the problem. The approach being given most consideration is one proposed by Mr. Webb, the executive director of the Maine plan. He proposes that the Blue Cross Commission set up an Inter-Plan Service Benefit Bank. Each plan would, in effect, pay to this bank for each day of care provided by other plans to its subscribers an amount equal to *its average per diem payments to its own member hospitals*. Subscribers would receive the service benefits of the "host" plan; the latter would pay the hospital at its regular rates and would be reimbursed by the bank. In other words the plans as a whole would share the burdens of providing reciprocal service benefits. Any net gain or deficit incurred by the bank would be shared among the plans pro rata.

### PERIOD OF CONTRACT

In the early days of the movement the plans tended to issue subscriber contracts which could not be cancelled or revised by the plan except at the end of a year. This was found to be disadvantageous in one important respect. It meant that if a plan wished to change its rates or benefits, it would only do so gradually over a year's period, each subscriber's contract being cancelled as it expired and the revised contract substituted. This situation, as compared with one in which the plan could revise all its contracts at one time, increased the administrative cost of any revision of contracts and impaired the ability of a plan quickly to adjust its rates and benefits in case of need. In recent years more and more of the plans have issued contracts which are cancellable on short notice. As of July 1945 almost three-fourths of the plans had contracts which could be cancelled or revised on notice of 30 days or less; the remainder had contracts which could only be cancelled or revised at the end of the contract year.

CONFIDENTIAL

BCBSA00289746

# A PROPOSED NATIONAL CONTRACT

The plans have recognized that greater uniformity in their benefits would be desirable. The diversity in benefits is an especial handicap in the enrollment of national concerns; such concerns particularly when they are paying part of the cost, desire that all of their employees wherever located should receive the same benefits.

In an endeavor to obtain uniformity of benefits representatives of the plan agreed in 1944 to recommend to their respective plans adoption of a so-called national contract. A plan could offer this contract to all of its subscribers or could make it available as a special offering solely to employees of national firms.[17]/

Few of the plans actually adopted the proposed national contract, and at present the issue is no longer a live one. However, since the adoption of this resolution many of the plans have revised their benefits so as to bring them nearer or up to the level of the proposed national contract. At the same time a considerable number of other plans have offered benefits which in certain respects go beyond those of the national contract. As a result of this process, the plans have made progress towards provision of more comprehensive care but have approached little, if any, closer to uniformity of benefits. It is doubtful if uniformity of benefits can be attained until the plans provide completely comprehensive service.

## THE TREND TOWARDS MORE COMPREHENSIVE BENEFITS

There has been a consistent trend among the plans towards the provision of more comprehensive benefits. Some indication of the strength of this tendency is called for.

In November 1943, among the 74 plans in the United States, 57 plans had a duration of service of less than 30 days during the first year of membership, 16 provided 30 days or more and one provided 30 days per admission. In December 1946, out of 81 plans, 41 provided less than 30 days per year, 33 provided 30 days or more and 7 provided 21 days or more per admission. In November 1943, 15 out of 74 plans provided only partial benefits to dependents. In December 1946, 10 out of 81 plans provided partial benefits to dependents.

With respect to the special services, in November 1943, 47 out of 74 plans provided complete coverage of drugs and medicines; in December 1946, 59 out of 81 plans provided this coverage. In November 1943, 26 of 74 plans provided some coverage of electrocardiograms, in December 1946, 44 out of 81 plans. In the former period, 34 plans provided emergency room service, in the latter period, 63 plans. In November 1943, 41 and 50 plans (out of 74)

---

[17]/ The contract provided 30 days of care each year and an additional 90 days at 50 percent benefit. All conditions would be covered except that care for mental disease and tuberculosis would be provided in member hospitals only and for not more than 30 days. Care for quarantinable diseases would be limited to $3.00 per day ($1.50 after 30 days) and care for maternity would be limited to 10 days with a waiting period of 9 months. This waiting period would be eliminated for those groups where 75 percent of all employees and at least 50 employees enrolled. Pre-existing conditions would be covered. The hospital services provided would be semi-private room, use of operating and delivery room, all drugs and dressings (except blood and blood plasma), x-ray examinations up to $15.00, complete laboratory service, anesthesia up to $10.00, plaster casts, basal metabolism tests, oxygen therapy and use of cystoscopic room, cardiographic equipment and physiotherapeutic equipment. The same benefits would be available in the member hospitals of all plans. For care in non-member hospitals an allowance of up to $6.00 per day would be made.

CONFIDENTIAL

BCBSA00289747

provided some coverage of x-ray and anesthesia service, respectively; in December 1946, 49 and 65 plans (of 81) provided some coverage. In the former period 43 plans provided complete laboratory service, in the latter period, 50. (The main movement towards coverage of these last three services has come through the development of allied medical plans providing this coverage.)

With respect to conditions and diseases covered: In July 1945, 31 of 79 plans gave some coverage of tuberculosis, in December 1946, 40 of 81. In July 1945, 31 of 79 plans gave some coverage of mental illness; in December 1946, 41 of 81. However, there appears also to be a trend towards cutting down the period of coverage for these diseases, i. e., restricting service to not over 21 or 30 days.

## EXTENT OF COVERAGE OF THE HOSPITAL BILL

Data on the extent of coverage of the subscriber's hospital bill were obtained from about half of the plans surveyed. The figures that were obtained took various forms and are not easily comparable. They are set forth in the accompanying table (Table 6).

Figures for 20 plans show that the percent of the hospital bill covered (for the period of full and partial days of service) ranged from 62 to 86 percent.[18] Two of the plans with less than 70 percent coverage gave only partial coverage of dependents. A large proportion of hospital charges not covered represents the cost of better accommodations. Subscribers who took the accommodations provided by their contract had 77 to 95 percent of the bill covered. Those who took better accommodations than their contract provided had 43 to 71 percent coverage of the hospital bill.

---

[18] Very few general hospital cases (6/100 of one percent) have a hospital stay of more than 111 days, which is the period of full plus partial coverage of most of the plans, and the proportion of all general hospital days not included in this period of coverage is inconsequential (about one percent).

44

CONFIDENTIAL

BCBSA00289748

### TABLE 8

### Percent of Subscriber's Hospital Bill Covered by Plan

#### (Data from Certain of the Surveyed Plans)

| PLAN AND APPROXIMATE PERIOD TO WHICH DATA RELATE | | SUBSCRIBERS TAKING ACCOMMODATIONS SPECIFIED IN CONTRACT (SP=Semi-Private, W=Ward) | SUBSCRIBERS TAKING BETTER ACCOMMODATIONS THAN THOSE SPECIFIED IN CONTRACT | ALL SUBSCRIBERS |
|---|---|---|---|---|
| | | % | % | % |
| LOS ANGELES, CAL | (1946) | 90. | - | 75. |
| COLORADO | (1946) | - | - | 73.(approx.) |
| DELAWARE | (1946) | SP86.-W90 | 71.4 | 81.2 |
| KANSAS | (1946) | - | - | 68. |
| MARYLAND | (1946) | - | - | 78. |
| MICHIGAN | (1946) | - | - | 86.2a/ |
| MINNESOTA | (1946) | - | - | 62.4b/ |
| KANSAS CITY, MO. | (1946) | 80.-85. | 60. | - |
| CINCINNATI, OHIO | (1946) | - | - | 82.5(approx.) |
| PHILADELPHIA, PA. | (1946) | SP88.-W84. | 56. | 79. |
| RICHMOND, VA. | (1946) | 91.1c/ | - | 83.8c/ |
| ROANOKE, VA. | (1946) | - | - | 81.6 |
| ALABAMA | (1944) | - | - | 80. |
| ATLANTA, GA. | (1944) | - | - | 85.2 |
| MASSACHUSETTS | (1944) | 90.3d/ | - | - |
| ST. LOUIS, MO. | (1944) | - | - | 67.6/ |
| NEW YORK CITY, N.Y. | (1944) | 85.1e/ | 42.7e/ | 64.7e/ |
| ROCHESTER, N.Y. | (1944) | 76.7 | 57.2 | - |
| CHAPEL HILL, N.C. | (1944) | 95.f/ | 60.f/ | - |
| WILKES-BARRE, PA. | (1944) | - | - | 78.6 |
| NORFOLK, VA. | (1944) | - | - | 73.1 |

a/ Probably applies to period of full coverage only.

b/ Plan gave only partial coverage to dependents at this period. Under new contract a much larger proportion of the bill will be covered.

c/ For period of full coverage only.

d/ Under new "comprehensive" contract subscribers receive complete hospital care for up to 120 days.

e/ Figures in the first two columns are for non-maternity cases only. The hospital bill includes charges for special nurses.

f/ Estimate.

45

CONFIDENTIAL

BCBSA00289749

# CHAPTER 5

## MEMBER HOSPITALS AND THEIR REMUNERATION

Blue Cross plans provide hospital services to subscribers through contracts with their "member" hospitals, the member hospital agreeing to furnish the specified services to subscribers in return for certain payments by the plan.

### WHICH HOSPITALS MAY BECOME MEMBER HOSPITALS?

Three factors determine which hospitals in the area of a plan are or may become member hospitals: first, the requirements, if any, set forth in any State law governing the operation of the plan; second, the requirements or standards which the plan itself may set up; and third, the desire of the particular hospital to become a member hospital. These will be discussed in turn.

Laws providing for the establishment of non-profit hospital service plans have thus far been passed in 34 States and the District of Columbia.[1]/ These laws will be discussed in a later chapter. It suffices to say here that of the 35 laws 22 set up certain requirements which hospitals must meet in order that the plan may contract with them for the provision of service. In 15 States plans may contract only with hospitals approved by a State agency-- generally the State welfare, insurance or health department, or by two of these departments. In four States the plans may contract only with hospitals approved by a private agency-- the American Hospital Association, the American Medical Association, the state hospital association, or the state medical society, or by two of these organizations. In three States the plans may contract only with non-profit or governmental hospitals.

None of the laws requiring approval of member hospitals by a State agency sets up any standards on the basis of which the State agency shall grant or withhold approval. In those States which have a hospital licensing act and which require approval of member hospitals by a State agency, the State agency which licenses hospitals will generally be the one to which is delegated the responsibility of approving member hospitals. This State agency will then generally approve any hospital which it has licensed. State insurance departments are not well qualified to pass on the qualifications of hospitals, and where these departments are delegated the responsibility of approving member hospitals it generally means that the department approves any hospital which the plan believes should be approved.

In addition to any legal requirements, the plans may have certain rules of their own as to which hospitals will be accepted as member hospitals. Of course where there are no legal requirements, then the plan's own rules are

---

[1]/ As of May 1, 1946.

46

CONFIDENTIAL

BCBSA00289750

the sole governing factor.  Data as to eligibility requirements for member hospitals are available only for the 39 plans personally surveyed.  Of these 39 plans, 10 plans will accept as member hospitals only hospitals registered by the American Medical Association.  Five plans, including the three where this requirement is written into the law, will accept only non-profit hospitals.  One plan accepts only hospitals approved by the American College of Surgeons, but this high standard was adopted because it happens that all of the hospitals in its area which the plan wishes to accept are approved by the College.  Most of the plans do not have formal or crystallized eligibility requirements of their own.  They will accept any hospital which meets the requirements set forth in the law or which is deemed by the plan's board of directors to be reputable and to be meeting a community need.

In general, the eligibility requirements of the plans are not at all strict.  The Minnesota plan is an exception to the general trend in that it has very explicit requirements.  Member hospitals must be non-profit, and have the approval of the American College of Surgeons, or the American Medical Association, or the State or county medical association.  The medical staff of the hospital must certify that it wishes the plan introduced in the community.  The hospital must have an organized, open medical staff, maintain adequate records, have adequate nursing service, laboratory facilities, competent personnel, and a good physical plant.  It must submit a financial statement.  The director of the plan, a former hospital superintendent, inspects each institution desiring membership.  The plan has steadfastly refused to admit proprietary hospitals, and over the course of years a considerable number of formerly proprietary hospitals in this State have changed to a non-profit status in order to become members.

Few, if any, of the plans exclude from membership tuberculosis or mental hospitals.  Nevertheless, few plans do have tuberculosis and mental hospitals as member hospitals.  The great majority of plans do not provide care for these conditions or offer such limited care that it would not be any particular advantage to the plan to have such hospitals as members or any advantage to these hospitals to be members.  No Blue Cross plan (to our knowledge) refuses participation to governmental hospitals but the number of such hospitals which participate in plans is relatively small.  The reason is that many governmental general hospitals which serve the general community accept charity patients only.

The third factor in determining which hospitals in an area are member hospitals is the desire of the individual hospital to participate in the plan.  Generally hospitals desire to participate because the plan is beneficial to them and to the public.  In fact the great majority of plans have contracts with all the eligible general hospitals of their area.  In an area with a well established plan a hospital would find it urgently desirable to be a participating hospital, and if it were not accorded this privilege it might be seriously handicapped.  This follows from the fact that subscribers are accorded greater benefits in member than non-member hospitals, and accordingly prefer to go to member hospitals when they have the choice.  From a standpoint of equity it is exceedingly important that hospitals which desire to become member hospitals of a plan should not be denied this privilege except on fair grounds.

The determination of whether certain hospitals of low or questionable standards should be accepted as member hospitals poses difficult problems for a plan.  In offering the services of its member hospitals to its subscribers

CONFIDENTIAL

BCBSA00289751

a plan assumes a certain responsibility for the quality of service rendered. A plan is naturally reluctant to offer its subscribers the services of an unworthy institution. On the other hand a plan must face the fact that such hospitals are serving the general public and that the primary purpose of the plan is to prepay hospital costs, not to raise hospital standards. A plan which puts its standards so high that it rules out hospitals in which any appreciable portion of the population is accustomed to receiving service is apt neither to be very successful nor to perform a great service to the people of the area.

A few plans do not accept proprietary hospitals as members. If this rule were applied to Alabama, for example, it would rule out well over half of all hospitals in the State which are registered by the American Medical Association. In such a State a plan could not very well be established if it refused to accept proprietary hospitals. On the other hand the character of a non-profit plan which is controlled by hospitals, most of which are proprietary, is certainly open to question.

In some plans the question of the acceptance or non-acceptance of hospitals which accord osteopaths the use of their facilities has caused difficulties. A number of plans accept osteopathic hospitals; many plans do not.

In sum, how far the plans should go in endeavoring to assure good quality of service to their subscribers is a moot question. Many plan directors feel that the plans must accept hospitals as they are and that it should be the responsibility of the general community to see that unworthy institutions do not exist. In practice the interest of the plans in seeing that their subscribers receive hospital care of good quality frequently leads to an interest in hospital licensing legislation, and a number of plans have played leading roles in securing the passage of such legislation.

As of October 1, 1944, there were 2,933 hospitals in the United States with a total of 306,871 beds, which were member hospitals of Blue Cross plans. Of the total number of beds all but 35,000 were in non-governmental hospitals. The bed capacity of Blue Cross member hospitals constituted 72 percent of the total number of beds in all non-governmental hospitals which were registered by the American Medical Association -- 79 percent if beds in non-governmental tuberculosis and mental hospitals and the hospital departments of institutions were excluded. These figures were for the country as a whole and included areas in which Blue Cross plans did not operate and thus had no member hospitals.

## PAYMENTS TO MEMBER HOSPITALS

The basis and rates of payments to hospitals are determined by negotiation between the plan and the member hospitals. A wide variety of bases of payment are in use. All parties agree that hospitals should be fairly paid for their services but there is considerable difference of opinion as to the basis of payment which will best achieve this result.

Since 1943 or 1944 the problems of remuneration of hospitals have become more acute. In part this is due to the sheer growth of the plans -- when hospitals derive 40 or 50 percent of their income from the plans, as is the case in some localities, then the rate of remuneration is obviously all important. In good part it has been due to advancing prices and hospital costs. This situation has placed a strain upon the relationships of plans and the hospitals. It has made it difficult to arrive at a fair rate of remuneration, and no sooner is

48

CONFIDENTIAL

BCBSA00289752

a rate negotiated than advancing costs make hospitals dissatisfied with it and call for a re-opening of negotiations. In certain areas the hospitals have been quite dissatisfied with the remuneration obtained from the plan, and here and there hospitals have withdrawn from participation. On the other hand the plans complain that some hospitals are demanding excessive remuneration. The development of a mutually satisfactory basis of remuneration is one of the most important problems facing the plans and hospitals at this time.

There are three basic methods of payment in use: flat rate per diem payments uniform for all hospitals or groups of hospitals; payments based on each hospital's regular charges; and per diem payments based on each hospital's costs of operation. Modification and combination of these three basic methods exist.

The methods and rates of payment used by the individual plans, as of December 1, 1946, as shown by a recent study of the Blue Cross Commission, are set forth in Appendix E. Of the 81 plans in the United States, 37 can be classified as paying uniform rates or some variation thereof, 25 pay on a regular charge basis, 6 pay on a cost basis and the remaining 13 plans pay on some combination of these three bases.

A simple flat rate basis is used by 31 plans. Almost all of these make higher per diem payments in short stay cases. Thus the Washington D. C. plan pays $15.00 for a one day stay, $20.00 for a two day stay, $27.00 for a three day stay, with graded payments up to $91.00 for a 14 day stay and a straight $6.50 per day for all cases lasting 15 days or more. The Alabama plan pays $10.00 for a one day stay and $8.00 a day for all cases lasting two days or more. The reason for the higher payments in short stay cases is to reimburse the hospital for the costs of the special services which constitute a large part of the bill in these cases.

A few plans paying flat rates group their hospitals and pay different flat rates to each group. Thus the Colorado plan has a basic rate of $6.75 per day but pays a few rural hospitals $6.25 a day. The Rochester plan classifies its hospitals into three groups according to the scope of their facilities and the services provided. The Rochester hospitals are paid $8.50 per day, and the hospitals outside Rochester are paid $7.75 or $7.25 a day.

A few plans (4) which give the subscriber a dollar room allowance pay the hospital the same amount on account of room and board and then pay according to a fixed schedule for the special services.

Of the 25 plans which pay on a regular charge basis, only a few (7) pay 100 percent of regular charges without qualification or modification. An additional two plans pay 97 and 98 percent of charges, respectively. Another two plans pay 90 percent of charges currently, and then at periodic intervals these payments are adjusted to 100 percent of charges, if and to the extent that the finances of the plan permit. Some six plans pay regular charges or a percent thereof, but with a fixed ceiling. In some plans this ceiling operates for the individual case; in others on the average of all cases over a period. (It is hard to know whether to classify these plans as paying flat rates or regular charges.) Four plans pay regular charges or a percent thereof but with a ceiling on the room charge and another four give a dollar room allowance and pay regular charges only for the special services.

The plans which pay regular charges ask the hospitals to submit a schedule of their regular charges, and these plans then check the bills of the hospital against the schedule. At the time of the survey some of the plans paying regular charges would permit increases in these charges only on six

49

CONFIDENTIAL

BCBSA00289753

months' notice. One plan which did this would refuse to approve increases in a hospital's charges if it deemed the proposed rates out of line with those of comparable hospitals. How successful these plans have been in maintaining this control through the past year or two of mounting hospital charges is not known.

Per diem costs of operation, generally subject to certain maximum and minimum limits, are paid by six plans.

Of the 13 plans paying on some combination of the above bases a few pay flat rates which are subsequently adjusted "up" to average regular charges or a percent thereof. In the case of three plans this latter adjustment is made if and to the extent that the finances of the plan permit. Two plans pay flat rates or charges, whichever are the lower, three pay costs or charges whichever are the lower, another pays regular charges in surgical cases and a flat rate per diem amount in medical cases.

## ADVANTAGES AND DISADVANTAGES OF THE VARIOUS METHODS OF PAYMENT

All of the present methods have their advantages and their drawbacks. One method may work best at one stage of a plan's development, another method at another stage.

The flat rate method of payment was the one generally used by the early plans. It has many advantages. It is simple and time conserving both for the hospitals and the plan. It has a certain justice: all hospitals are paid alike and the more efficiently conducted hospital will be able, with a given payment, to provide a superior grade of service. Perhaps this method of payment would be more equitable if hospitals were grouped according to their facilities or services and appropriate payments made to each group.

A disadvantage of this method of payment is that in terms of their regular billings or charges, some hospitals appear to be "overpaid" and others "underpaid". In many plans with this method of payment one finds payments to some hospitals running 10 to 15 percent in excess of their regular charges, while payments to other hospitals fall short of regular charges to a corresponding extent. This situation is especially apt to exist in the case of state-wide plans with member hospitals ranging from the elaborate city institution to the simple rural hospital.

It is difficult for a plan to justify to itself, the public and other hospitals, payments to some hospitals in excess of what these hospitals would collect from the same patients if they were not members of the plan. (Yet such payments may help a struggling hospital to improve its services.) Equally, if not more serious, is the apparent "underpayment" of some hospitals. An "underpayment" of, say, 10 percent may not be serious for a hospital if only 10 percent of the hospital's patients are plan members, but when 40 or 50 percent of the hospital's patients are plan members such an "underpayment" becomes quite serious.

It is this situation which was caused more and more plans to shift from the uniform rate method of payment to one which takes account of regular charges.

The method of paying hospitals according to their regular charges avoids the above problem. It is designed to give hospitals the same income from plan patients as they secure from non-plan paying patients, and in this there is a certain justice. However, this method of payment also has important disadvantages.

CONFIDENTIAL

BCBSA00289754

In the first place the established charges of a hospital are presumably determined so as to give the hospital the income it needs, taking account of the fact that some collection losses are incurred and that a certain volume of free work is performed. However, there are no collection losses for Blue Cross patients, and a certain proportion of Blue Cross patients would have been charity cases were they not members of the plan. Hence it would seem that something less than 100 percent of regular charges would represent fair payment.[2]/

In the second place a hospital's regular charges may bear no close relation to its costs of operation nor to the quality and scope of service rendered. The regular charges of some hospitals rendering an inferior service may be higher than those of the better hospitals of the area.[3]/ In the case of proprietary hospitals, to pay regular charges would appear questionable. In a sense payment of regular charges, when these are subject to no control by the plan, is a unilateral arrangement -- it is not a rate determined by negotiation between the two parties -- and there is some reason to believe that ultimately it may result in the plan going onto a dollar allowance basis in self protection.

Another disadvantage of the regular charge method is that it is cumbersome and costly from an administrative standpoint. Each hospital bill must be checked over to see that the charges are in accordance with the hospital's schedule of charges. It is time consuming to do this accurately. (A hospital's schedule of charges, including charges for all the different x-ray and laboratory services and drugs, may run to over a dozen pages.) The Cincinnati plan has five or six employees who do nothing else but check hospital bills. The costs of this process runs into sizable amounts of money, and if the plan could save these amounts, it, the subscribers and the hospitals would in the end be better off.

---

[2]/ The following comments by Dr. Peter D. Ward are pertinent in this regard. In reporting upon a meeting between Trustees of the American Hospital Association, of which he was then president, and Blue Cross representatives, he wrote:

"This is all by way of saying that the trustees were greatly impressed by the comments of one of the plan directors regarding the standard of effectiveness which is being generally employed by hospitals - the comparison of total receipts from Blue Cross subscriber patients against total billings for the care of such patients. The spokesman for the plans pointed out what each of the hospital administrators present agreed was the truth, that average per diem receipts had been greatly increased by Blue Cross.

What are the troubles then? They appear to rest first upon the general adoption of the idea by hospital administrators that total receipts of anything less than total billings represent this much loss to the hospital -- even though this loss over the whole of a Blue Cross plan's experience may not be more than 7 or 8 percent, and in spite of the great gain which hospitals have achieved through Blue Cross in the encouraged use of higher priced facilities, in the diminishing of free cases, in the lessening of collection losses and the greatly expanded volume resulting from Blue Cross.

The long term interests of hospitals now require that we judge Blue Cross not upon a comparison of total receipts and total billings but upon the comparison of receipts from Blue Cross subscriber patients and the receipts from all other paying patients including those who use pay ward facilities. The accounting practice which certain hospitals regularly follow -- that of obtaining board approval month by month to wipe out Blue Cross losses -- cannot but serve to embarrass Blue Cross plans and create further misunderstandings. Boards of trustees of hospitals should be shown the advantages of the Blue Cross income as well as the billing losses." (Hospitals, August, 1946 p. 12)

[3]/ The Massachusetts plan in paying regular charges found that on the average it was paying more per diem to hospitals not approved by the American College of Surgeons than to those approved. To correct this it has placed ceilings on the room charge, one ceiling for hospitals approved for residencies and training of internes, a lower ceiling for other hospitals approved by the American College of Surgeons and a still lower ceiling for other hospitals.

51

CONFIDENTIAL

BCBSA00289755

Perhaps the most important disadvantage of the regular charge method, at least when charges are uncontrolled, i.e., where there is no ceiling and hospitals are free to change their charges at will, is that the plan does not have a fixed per diem cost for hospital care. The plans base their subscription rates which they cannot easily or frequently change on the calculation that they will need to provide so many days of hospital care per thousand subscribers per year, at a cost of so much per day of care. If they pay their hospitals on a regular charge basis and hospitals are free to advance their charges at will, the plan may find its calculations upset by an advance in its per diem costs of care. This has been especially serious during the past two years of rapidly advancing hospital costs and charges. Many plans paying uncontrolled regular charges have found themselves in financial "hot water", costs exceeding income and reserves dwindling. It has been this situation, i. e., the need of stabilizing their hospital costs, which has been partly responsible for causing many plans to shift to a dollar room allowance basis.

Remuneration of hospitals on a cost basis, i. e., per diem costs of operation plus an allowance for depreciation of plant, would seem to have many advantages. Hospital costs of operation are definite and can be ascertained. Payment on this basis reduces the element of bargaining which must inevitably enter in when hospitals are paid on a flat rate basis. Since costs are the main basis of hospital charges, it would seem desirable to resort directly to this basis.

There are however several obstacles or drawbacks to payment on a cost basis. One is that while the over-all per diem cost can be ascertained, it may not be possible accurately to calculate the cost of furnishing semi-private care, or of ward care, as the case may be. Again use of a cost basis would be feasible if the plan provides complete hospital service, but there are difficulties when the plan's contract does not cover certain services such as x-rays which may enter into the calculation of over-all per diem costs.

In some localities costs would not be acceptable to the hospitals, at least at present, because of the factor of charity care. Where hospitals are called upon to render large amounts of care to charity patients, and where they receive no remuneration for this care from government or from community agencies, or where the remuneration provided is less than the cost of furnishing the care, then obviously hospitals, in order to finance this free care, must charge paying patients more than the cost of the service provided them. Until and unless hospitals are paid cost for care provided to the indigent, they may not find it feasible to accept remuneration on a cost basis from the plans.

A more fundamental drawback of the cost basis is that it might tend to subsidize inefficiency. If two hospitals in a given locality are providing the same quality and scope of service, but one has costs 10 percent higher than the other, why should the plan pay one more than the other? Certainly under a situation in which all or the vast majority of hospital patients were plan patients it would hardly be possible to utilize costs alone as a basis of remuneration. Hospitals would then not have strong incentives to keep costs down. Almost assuredly it would be necessary to impose a ceiling beyond which costs would not be met. However, the same ceiling for all hospitals would tend to bring down the level of care in the better hospitals and would encourage rural and small town hospitals needlessly to expand the scope of their services. Almost certainly different ceilings varying with the size

52

CONFIDENTIAL

BCBSA00289756

and type of hospitals and the scope of service they were prepared to offer would be necessary.

Sooner or later it would seem, the factors of quality and efficiency will need to be brought into the formula of payment. It would seem that hospitals would have to be graded, in one way or another, as to the quality and scope of the service they render, and standards established as to the necessary cost of providing care of a given quality and scope.[4]/

## PRINCIPLES GOVERNING THE RELATIONSHIP BETWEEN HOSPITALS AND BLUE CROSS PLANS ADOPTED BY THE AMERICAN HOSPITAL ASSOCIATION

In October 1946 the House of Delegates of the American Hospital Association adopted certain principles governing the relationships between hospitals and the Blue Cross plans, which had been formulated by the Council on Administrative Practice with representatives of the plans participating. These principles, necessarily couched in broad terms, will probably serve as guide posts to hospitals and the plans in their dealings with one another for some time to come. The salient points of the principles are as follows:

(a) "Hospitals should not expect to receive rates of payment from Blue Cross plans for basic services provided to subscribers in excess of the cost of such services, cost to include an allowance for depreciation of buildings and equipment and allowances for other contingencies..." nor in excess of "100 percent of the average gross earnings at established rates for all private patients occupying similar accommodations in the hospital."

(b) The basis and rates of payment should in all cases be negotiated between representatives of the plan and representatives of the hospitals, both groups having at hand the facts (financial and service data) necessary for enlightened decisions.

(c) Both groups, as public service agencies, should bear in mind the needs of the other.

These principles are quoted in full in Appendix F.

## RELATIONSHIP OF PLAN PAYMENTS TO REGULAR CHARGES OF HOSPITALS

In appraising the adequacy or fairness of the payments made to hospitals it would be useful to know the relationship of these payments (plus the payments made directly by subscribers for items of service not covered by the plan) to (a) the hospital's costs of operation, (b) the average per diem income received from all pay and part pay patients and (c) the average per diem income which would be received by the hospital in plan cases, if its regular charges were paid in full. Data of the first two sorts are not available, or at any rate have not been obtained from any plan. Data on the relationship of income from plan patients to the regular charges of hospitals have been obtained from a sample of the plans, and are presented in Table 7.

---

[4]/ In one city the average per diem charges made to the plan by the hospitals (including maternity and children's hospitals) ranged as follows: x-ray service, $.25 to $.88; laboratory service, $.11 to $.86; drugs and dressings $.24 to $.62; use of operating and delivery rooms, $.68 to $1.34. One wonders if these charges accurately reflect costs, and if so, assuming that the hospitals used similar cost accounting procedures, whether the costs reflect quality and adequacy of service.

53

CONFIDENTIAL

BCBSA00289757

**TABLE 7**

Percent of Regular Billings of Hospitals Met by Plan and Subscriber Payments

Data for Certain Plans, 1945-6.[1]/

| PLAN AND PERIOD | PERCENT OF REGULAR BILLINGS MET |
|---|---|
| A  (1946) | A LITTLE BELOW  90 [2]/ |
| B  (1946) | ABOUT  80  (ABOUT 90 PRIOR TO 1946) [3]/ |
| C  (1945) | 91.9 |
| D  (1946) | 85 [4]/ |
| E  (1946) | 90 [4]/ FOR LARGER HOSPITALS: LESS FOR SMALLER ONES |
| F  (1945) | 92.4 |
| G  (1946) | FROM 92 IN JANUARY TO 85 IN DECEMBER |
| H  (1946) | ABOUT  95 |
| I  (1946) | 92 |
| J  (1946) | ABOUT  97 |
| K  (1946) | 94.3  (WILL PAY ADDITIONAL AMOUNTS TO BRING THIS TO 96) |
| L  (1ST HALF 1946) | 97  (LESS IN LAST HALF OF YEAR) |
| M  (1946) | 95 [5]/ |
| N  (1ST HALF 1946) | 91.6 |

[1]/  The plans represented here are the following:  Los Angeles, Colorado, Delaware, Kansas, Maryland, Michigan, Minnesota, New Jersey, Rochester, New York City, Philadelphia, Wilkes-Barre, Richmond and Roanoke.

[2]/  Revising schedule so that hospitals will average about 95 percent of billings.

[3]/  Revising method of payment so as to pay hospitals their costs.

[4]/  Increased scale of payment in latter part of year.

[5]/  Rate increased in November.

In the case of 14 plans, hospital income from plan patients during part or all of 1946 (in the case of 2 plans during 1945) ranged from 80 to 97 percent of hospital billings at their regular charges.  In providing this information a number of the plans, including the four which paid less than 90 percent of charges, indicated that they had recently revised or were in process of revising their rates so as to give hospitals a return closer to regular charges.

The situation during 1946 was unusual in that the rapid advance in hospital costs and charges during this period tended to leave plan payments behind.

### HOSPITAL GUARANTEE OF BENEFITS

In most, though not all, Blue Cross plans the member hospitals guarantee the provision of benefits to subscribers and this guarantee forms an important part of the relationship between plans and hospitals. This guarantee of benefits or hospital underwriting of the plan, as it is sometimes called, exists by virtue of provisions in the contract between a plan so underwritten and

54

CONFIDENTIAL
BCBSA00289758

its member hospitals whereby the member hospital agrees to provide the contractual benefits to subscribers irrespective of the remuneration received from the plan.

Hospitals undertake this obligation towards the plans because of their sponsorship of the plans and because such an obligation, at least in the case of new plans, is necessary for the protection of the subscribers. The plans, as we have seen, start with very little funds. The hospitals' guarantee of benefits takes the place of the reserve or capital funds which the plan, engaging in an activity which partakes of the nature of insurance, would otherwise need for the protection of its subscribers. This fact is recognized in the enabling acts of 14 States which stipulate that the contracts issued by a hospital service plan shall constitute direct obligations of the member hospitals.

On a number of occasions hospitals have been called upon to make good upon their guarantee of subscriber benefits. Thus the New York City plan was helped out of financial difficulties in 1939 when for a few months its member hospitals accepted a 25 percent reduction in the rates of payment. Here the hospitals did this even, though not bound to do so by the terms of their contract with the plan. During the same year the Massachusetts plan reduced payments to hospitals by 20 percent for a few months. In 1944 the Des Moines plan was forced to cut its payments to hospitals by 25 percent for a few months. There have been other instances. In all cases the action of the hospitals in temporarily accepting a reduction in payment enabled the plan to regain its financial feet and gave it time to adjust its rates and benefits so as to place itself on a sound basis. In all cases the amounts withheld from the hospitals were later repaid in full.[5]/

With this introduction let us see to what extent the plans are contractually underwritten by their member hospitals. It would appear that a contractual obligation of hospitals to underwrite a plan involves two elements: (a) a definite agreement on the part of the hospitals to provide the contractual services to subscribers whether or not the plan pays hospitals at the rates scheduled in the hospital contract, and (b) a definite obligation on the part of the hospitals to provide such service and to accept reduced payments, if necessary, for a period sufficiently long to give the plan time to adjust its rates, benefits, or hospital payments, so as to regain a sound operating basis. For this latter purpose a period of at least six months' duration would seem to be necessary.[6]/

---

[5]/  In five plans (Des Moines, Minnesota, Oklahoma, Wilkes-Barre and Texas) the contract with the hospitals (as of December, 1946) provides for a specified remuneration with additional payments if the finances of the plan permits.

[6]/  Some students of this problem hold that if hospitals agree to accept reduced payments and if the period of notice required for cancellation by the hospital of its contract exceeds the period of notice required for cancellation by the plan of its contract with subscribers, there is hospital underwriting. According to this view, hospital underwriting exists if a plan can cancel its contract with its subscribers on, say, 15 days' notice and member hospitals can cancel their contract with the plan on, say, 30 days' notice. The writer is unable to share this view. A period of 30 days is too short for a plan to put a change in rates into effect. It is true that a plan which was heading for financial difficulties, but which still had an excess of assets over liabilities, could conceivably cancel its contracts with subscribers on, say, 15 or 30 days' notice, and not replace the old with a new contract. However, to do this would mean liquidation of the plan. It would seem that real hospital underwriting exists only if the hospitals agree to back up the plan financially for a period sufficiently long so that the plan can revise its subscriber and hospital contracts and continue as a going concern.

CONFIDENTIAL                                                                    BCBSA00289759

In the case of the plans included in the field survey the provisions relative to hospital underwriting in the plan's contract with the hospitals fall into six main types as follows:

1. The hospitals definitely agree to accept reduced payments if necessary. Hospitals can terminate their contract with the plan only on a year's notice. Or the hospitals can terminate their agreements on six months' notice, but agree to provide service to subscribers for the remainder of each subscriber's contract year.

Here there is very definite and real underwriting. Of 36 plans, for which definite information was obtained, 10 were in this group.[7]

2. The hospitals definitely agree to accept reduced payments if necessary, but they can terminate their agreement on short notice, usually one or two months. However, they must provide service to subscribers, as of the termination date, during the remainder of each subscriber's contract year.

These provisions entail hospital underwriting, but to a somewhat less degree than exists under 1 above. Hospitals would have to accept reduced payments for varying periods for various subscribers depending upon the months to run in their contract years.[8] Of the 36 plans, 11 were definitely in this category and possibly two others depending on the interpretation of the contract.[9]

3. Hospitals agree to accept reduced payments, but can terminate their agreements on 30 or 60 days' notice. They do not agree to provide service after the termination date.

According to the language of the contract, the value of the underwriting obligation here undertaken seems relatively small. It will not help a plan very much if the hospitals will accept reduced payments for only 30 or 60 days, because such a period would be insufficient for the plan to revise its contracts. Two plans have provisions of this type.[10]

4. The hospitals do not agree to accept reduced payments. Hospitals can terminate the agreement on short notice but agree to provide service (presumably only if paid at the pre-existing rate) on existing contracts during the remainder of the contract year of each subscriber.

It is difficult to determine from the contracts of these plans whether the plans are underwritten or not. On the whole the plans do not appear to

---

[7] The Delaware, Des Moines, Kansas City, Maryland, Massachusetts, New Orleans, St. Louis, Texas, Richmond, and Roanoke plans. The listing of plans under this and subsequent classifications is on the basis of the provisions of the hospital contract at the time when visited. (March, 1944-February, 1945.) The plans have been listed according to our interpretation of the contracts, which may be at variance with the opinion of the plan personnel or what a court of law would hold.

[8] In the case of some plans the underwriting provisions are somewhat out of line with the provisions of the subscriber contracts. Thus, 5 of the 10 plans with this type of agreement can cancel or revise their subscriber contracts on either 15 or 30 days' notice. In practice these plans, if they wished to revise their contracts, would cancel all old contracts at the same time and substitute the revised contract; they would not wait until each subscriber's contract year expired, which would mean staggering the revision over a year's period. It would be better for these plans if their hospitals agreed to accept reduced payments for a six months' period for all subscribers. This would not impose a greater obligation upon the hospitals, but their effective help to the plan would be greater.

[9] The Kansas, Rhode Island, New Hampshire, Nebraska, Utica, Oregon, Minnesota, Norfolk, Savannah, Michigan and Washington, and possibly the Philadelphia and Cincinnati plans.

[10] Huntington and Maine. However, Maine's enabling act definitely requires that subscriber contracts shall constitute a direct obligation of the hospitals. The new West Virginia law (passed in March 1946) has the same provision. The act which was in effect when the Huntington plan was visited did not have this stipulation.

CONFIDENTIAL

BCBSA00289760

be underwritten by their hospitals, because if the plan reduces the rate of payment it breaks the contract and hospitals would be relieved of any obligations towards the plan.  Two plans are in this group and two others are either in group 2 or this group.[11]/

5.  The hospitals do not agree to accept reduced payments.  Hospitals can terminate the agreement only on long notice, i. e., on notice of six months or more.

Such plans do not appear to be underwritten by their hospitals.  If the plan lowers the rate of payment, it breaks the contract.  Two plans have provisions of this type.[12]/

6.  The hospitals do not agree to accept reduced payments.  Hospitals can terminate the agreement on short notice, i. e., usually 30 or 60 days.

Such plans do not appear to be underwritten by their hospitals, for the same reasons as under "5."  Of 36 plans 7 were in this group.[13]/

It will thus be seen that of 36 surveyed plans for which definite information on this point was obtained, 23 plans appear to be definitely and firmly underwritten by their member hospitals.  An additional plan is underwritten to some extent, and in one instance it is difficult to decide whether or not there is hospital underwriting.  The 11 remaining plans do not appear *according to the terms of their contracts* to be underwritten by their member hospitals.

Assuming that the surveyed plans can be accepted as representative of all of the plans, it would appear that slightly more than two-thirds of all of the plans are contractually underwritten by their member hospitals, while a little less than one-third of the plans are not so underwritten.  However, it should be added that it is the writer's impression that in the case of most of the plans in which hospitals do not guarantee subscriber benefits the hospitals would come to the rescue of the plan if it got into financial difficulties.  (This backing, however, might depend upon whether the hospitals thought the plans well managed and upon the extent of aid required.)  In other words the hospitals of these plans feel a certain moral obligation toward the plan which would in all probability lead them to back up the plan.  The self-interest of hospitals would also impel in the same direction since hospitals could hardly afford to permit the collapse of a plan which had become valuable to them.

### SOME OBSERVATIONS RELATIVE TO HOSPITAL UNDERWRITING

It is obvious that guarantee of subscriber benefits by the hospitals is enormously valuable to a new plan.  In fact, unless the plan starts with substantial initial funds, it is essential.  Otherwise the plan operates upon a "shoe string" and subscribers have no real protection.  The enabling acts of the various States uniformly relieve hospital service plans of complying with the requirements as regards capital or reserves which are imposed upon insurance companies.  It would seem that the plans could safely be relieved of these requirements only if they are underwritten by the hospitals.

[11]/ Chapel Hill and New Jersey.  The Cincinnati and Philadelphia plans are either in group 2 or this group.  However, inasmuch as the Ohio law stipulates that hospitals must assume responsibility for the provision of benefits to subscribers, it would seem that the Cincinnati plan can be regarded as definitely underwritten by its member hospitals.

[12]/ Rochester and Wilkes-Barre.

[13]/ Sacramento, Colorado, Durham, Los Angeles, New York City, Oakland, and Rockford.

CONFIDENTIAL

BCBSA00289761

In the case of a mature plan which has accumulated substantial reserves it is not necessary for the protection of subscriber benefits. However, such guarantee is advantageous in many ways. It enables the plan safely to operate with smaller reserves than would otherwise be necessary and thus currently to provide more generous benefits to subscribers. It is an added protection to the subscribers. It ties the hospitals and the plan together and gives the hospitals a direct interest in the plan and its welfare. It is evidence to the public of the real backing and cooperation of the participating hospitals.

In this connection, however, it should be recognized that as a plan matures and develops a substantial reserve the underwriting burden is shared between the public, which has contributed the plan's reserve, and the hospitals. Further as a plan enrolls a larger and larger proportion of the population of its area, the ability of hospitals to make good on any guarantee of subscriber benefits becomes qualified. When only, say, 5 percent of the population of the area is enrolled it is entirely possible for the hospitals to accept a reduction of payments of, say, 25 percent for six months or a year. But if 60 or 75 percent of the population were enrolled, it would be difficult if not impossible for the hospitals to accept such a reduction for even a short period of time. Under these conditions it would seem that more and more of the underwriting burden must be assumed by the subscribing public, i. e., through the plan having an adequate reserve.[14]

In recent years hospital underwriting has received less emphasis in the thinking of the leaders of the movement. In part this is due to the fact that most of the plans have developed substantial reserves and that these plans tend to look for their security to their reserves rather than to the hospitals. In other words most plans are run so as to avoid recourse to the need for hospitals to make good on their guarantee. The hospitals of some areas have indicated a desire to be free from the underwriting obligation and in at least one case (Washington, D. C.) the underwriting provision has been removed from a plan's contract with its hospitals.

The guarantee of benefits by a plan's member hospitals carries important implications as regards the nature of the plan and its control. A plan which looks entirely to its member hospitals for its security, which has no reserves of its own, tends to be an agent of its member hospitals. It becomes independent, so to speak, only as it achieves some measure of financial independence. Obviously hospitals have much stronger claim to dominant control of a plan when they guarantee the plan's benefits than when they do not.

---

[14] As an indication of the thinking of some leaders in this field may be cited the following remarks by Dr. Ward (see footnote 2 this chapter):

"The second general problem for all hospitals, as well as plans, is the varying degree of financial responsibility of Blue Cross plans across the country and a lessening confidence which develops when hospitals cancel contracts. It was apparent to me on the basis of this discussion that full confidence in Blue Cross nationally by all hospitals will never be achieved until every Blue Cross plan is as interested in the standing of every other plan as in its own. This probably means that the plans will have to develop a reinsurance fund administered by themselves.

"Under such a proposal, as it has been roughly sketched out, each Blue Cross plan would pledge certain assets into a general fund which could be drawn upon in the case of financial failure by any Blue Cross plan.

"The service contract of hospitals, important as it was at the beginning of Blue Cross, and still may be as evidence of the good faith of participating hospitals, can no longer be regarded as sufficient guaranty to either public or hospitals. In some areas Blue Cross now accounts for about 50 percent of entire hospital income. The risk of failure is too great to be borne with any degree of assurance. A possible debt greater than the debtor can bear is not a sound basis for extending credit nor a keystone to be used in the development of a voluntary health insurance system." (Hospitals, August 1946, p. 12.)

CONFIDENTIAL

BCBSA00289762

# CHAPTER 6

## ENROLLMENT POLICIES AND PROCEDURES

The enrollment methods of Blue Cross plans are designed to secure the largest possible enrollment at the least possible expense and to assure actuarial soundness. The last consideration dictates that either enrollment should be through groups, with a sufficient percentage of the members of each group joining so as to assure that those enrolled will comprise a fair selection of risks, or that enrollment of persons on an individual basis should be conducted under methods which will avoid adverse selection of risks.

### GROUP ENROLLMENT

The main method of enrollment is through groups of employed persons at their place of employment. To guard against adverse selection of risks minimums are set as to the size of groups which will be accepted and the percentage of the members of the group who must enroll. Some plans accept groups of two or three persons; many of the plans do not ordinarily accept groups of less than five persons; a few accept only groups of 10 or more. The general trend is for the plans to accept smaller and smaller groups.

The minimum percentage of the members of a group who must enroll if the group is to be accepted varies with the size of the group. Commonly the plans require one hundred percent enrollment in groups of 10 or less, ninety to fifty percent among groups of 10 to twenty-five, the percentage decreasing progressively as the size of the group increases, and forty or fifty percent among groups of twenty-five or more.

The first step in enrollment of an employed group is to persuade the employer to make the plan available to his employees. By making the plan available to his employees is meant that the employer provides an opportunity for explanation of the plan to employees and agrees to set up an arrangement for collection of the subscription charges.

The next step is to explain the plan to the employees. This is done partly through the distribution of literature. However, some mode of oral presentation, either in group meetings or individually, is generally essential. Group meetings involve a stoppage of work for the time being and are sometimes difficult to arrange in noisy factories. They have the disadvantage that oftentimes individuals are reluctant to ask more or less personal questions before a group. A method used by many of the plans is that of individual solicitation. On the day or days of the enrollment campaign, enrollment representatives are stationed throughout the plant and interview each employee individually. With good endorsement of the plan by the employer, the union, or both and proper presentation to the employees a 75 percent or higher "sign-up" is common.

The plans differ in the extent to which they let the employer assume responsibility for the enrollment effort. A few ask the employer to assume

59

CONFIDENTIAL

BCBSA00289763

the major burden of presentation and achieve good results. Others prefer to conduct their own solicitation campaign among the employees.

Often unions play a decisive role in the enrollment of a group. The employees through their union may request the employer to make the plan avail-to them. Frequently, then, the union will sponsor presentation of the plan to the individual employees.

After a group is enrolled, arrangements must be made for subsequent enrollment of new employees and of those who had not joined previously. In the case of small groups the opportunity of enrollment is made available to new and old employees through group re-openings, customarily held once or twice a year. On such re-openings, very much the same procedures are gone through as in the original solicitation.

In the case of large firms, the plans customarily have different procedures for enrollment of new employees and of old employees who had previously not joined. Usually new employees will be given the opportunity of enrolling when they are first employed, their applications to become effective immediately or in a month or two. (The reason for holding such applications for a month or more before making them effective is to avoid the expense of enrolling "floaters", and to avoid any adverse selection due to persons taking employment with a concern for a short period solely to obtain hospital protection; this last may be important when a plan waives its customary restrictions on care for maternity and preexisting conditions.) Old employees who have not previously joined are given the opportunity of enrolling at group re-openings held semi-annually or annually. The reason for not permitting employees, who had previously not joined, to enroll whenever they desire is to avoid acceptance of a disproportionate number of persons who have an immediate need for hospital care.

The technique of group enrollment can be used for many types of groups other than those composed of employees working for a common employer. Many plans have enrolled physicians, dentists, nurses, lawyers, school teachers, and similar groups through their professional associations. Such persons are enrolled on a group basis but usually pay the subscription charges directly to the plan on an annual, semi-annual or quarterly basis. A number of plans have enrolled independent grocers, lumber dealers, and other retail and wholesale dealers through their associations on the same basis. Some plans have enrolled building trade workers, taxicab drivers and similar groups of workers who do not work regularly for any single employer, through their unions. The workers pay the subscription charges along with their union dues or directly to the plan. As will be related in more detail later, members of local Farm Bureau, Grange, and Farmers' Union groups and of farm cooperatives have been enrolled on the same basis, the enrolled members either paying directly or through the organization.

All plans permit persons leaving the group through which they enrolled to continue membership by paying the plan directly.

### PAYMENT OF SUBSCRIPTION CHARGES

Subscription charges are paid through three methods: payroll deduction, a group treasurer arrangement, or direct payment.

Payroll deduction is the usual method for employed groups. Here the employer deducts the subscription charges from the pay due the employee and remits the total to the plan. The plan facilitates this by sending the employ-

CONFIDENTIAL

BCBSA00289764

er each month a list of the enrolled members with the amounts due from each. The advantages of payroll deduction for the plan are that the burden of collecting the subscription charges is assumed by the employer, the collection of charges will in general be performed accurately and promptly, the chances of members not paying through forgetfulness or temporary absence are removed, and the continuation of membership is more or less automatic. In other words, having once given the authorization for the deduction, the employee does not have to make a positive decision each month as to whether he shall continue his membership. He is thus more likely to continue.

The group treasurer system can be used both for employed and other types of groups. Under this system the employer or the members of the group selects one individual to be responsible for collecting the monthly subscription charges and forwarding them to the plan. In the case of an employed group, the group treasurer makes the collections on company time, but this is usually the extent of company responsibility for the arrangement. The group treasurer receives no compensation from the plan and performs his duties simply as a service to the other members of the group.

As compared with payroll deduction the group treasurer system has several disadvantages. The group treasurer may leave the company or the group and another individual must be found to take his place. Individuals forget to pay the group treasurer, or they do not have the money or are absent at the time the charges are due. The member must dig down into his pocket each time, and this raises in his mind the question of whether the protection is worthwhile and should be continued.

Because of the great advantages of payroll deduction, many plans have adopted the fixed policy of not accepting an employed group unless the employer will agree to payroll deduction, if it is legally possible. Federal agencies are prohibited from making deductions from the pay of Federal employees, and some State and local governments have similar prohibitions.

Under direct payment, the subscriber pays the plan directly, either by mail or over the counter, usually on a quarterly, semi-annual or annual basis. In most plans the main classification of members paying directly are the so-called group conversion subscribers -- those who originally enrolled with an employed group but have left this place of employment. Persons enrolled through groups other than employed groups, members of very small employed groups, and persons enrolled on an individual basis usually pay the plan directly.

In order to encourage all direct payment subscribers to transfer to groups when they can, a good many of the plans have slightly higher rates for these subscribers.

## INDIVIDUAL AND COMMUNITY ENROLLMENT

Within the last few years the Blue Cross plans have given increasing attention to enrollment of individuals other than through groups at the place of employment. The plans recognize that their social purposes and public relations require that the opportunity of enrollment should be available to all members of the population.

In 1937 and 1938 a number of plans made enrollment available to individuals. Applications were accepted by mail or over the counter, and these persons were issued the same contract as group subscribers. The results were unhappy. A disproportionate number of persons enrolled who knew they needed

61

CONFIDENTIAL

BCBSA00289765

hospitalization or who were planning to have a baby. In the case of the New York City plan which accepted substantial numbers of such subscribers, the rate of hospital utilization among these subscribers was so great as to jeopardize the plan's financial position, and approximately 100,000 of these subscribers had to be cancelled out. 1/ These experiences demonstrated that enrollment of individuals was dangerous unless conducted under methods which would avoid adverse selection of risks.

At the present time most of the plans have arrangements through which individuals can join at one time or another on a non-group basis. Some do this through so-called permanent direct enrollment programs wherein individuals are accepted at any time; others conduct community enrollment campaigns wherein enrollment is thrown open to individuals for a limited period of time. Some plans have both types of enrollment programs.

At the time of the survey about a quarter of the surveyed plans had permanent direct enrollment programs. The number of plans with such programs has been constantly increasing. Most of the plans with this type of enrollment require the applicant to fill out a detailed health history statement. These applications are then carefully screened and applications from persons whose health history indicates that they may be poor risks are rejected. A few of these plans accept applicants only after a physical examination.

Most of the plans accepting individuals on this basis charge a higher rate to them than to group enrollees; all exclude preexisting conditions from the coverage offered these subscribers; about half exclude maternity care; and several provide a contract which is restricted in other respects as compared with that offered group subscribers. Almost all of the plans accepting individuals on this basis refuse persons over 65 years of age.

Few of the plans accepting individuals on this basis have enrolled any large number of them. The need of guarding against adverse selection compels restrictions and procedures which are costly and not susceptible to use on a mass basis.

Mass enrollment of individuals through community enrollment offers larger possibilities of reaching people who cannot be reached through group enrollment. This type of enrollment was first undertaken by the Minnesota plan in 1938 and 1939. At the present time a large majority of all of the plans are doing some community enrollment, and other plans are fast adopting the idea.

In community enrollment an enrollment drive lasting anywhere from a week to a month is put on in a particular community. During this campaign enrollment is offered to those who work in groups on a group basis and to individuals on an individual basis. All possible use is made of publicity, community civic groups, and civic spirit. At the end of the drive enrollment on an individual basis is closed until the next campaign which may be held six months or a year later.

While the techniques of these community enrollment drives vary from plan to plan and with the size of the community, the essential principle is the same. An intensive effort of limited duration is made to inform the whole community about Blue Cross. Success is obtained by using some of the tech-

---

1/ For a period the plan accepted so-called self-formed groups, i. e., a person who wanted to join would get a specified number of others to agree to join and all would be accepted as a group. It is understood that a good part of the plan's difficulties came from this type of enrollment.

CONFIDENTIAL

BCBSA00289766

niques of a "Community Chest Drive". The first requisite of success is full and enthusiastic support by the hospital or hospitals and the medical profession. The next is ample publicity obtained through all possible devices, including paid advertising. The third is some central place where individuals may enroll and the utilization of teams of enrollment representatives to call on employers.

In small communities some of the plans get a local organization -- the women's club, the Red Cross, etc. -- to sponsor and carry on the drive. This organization appoints a committee to head the effort. The town may be split into sections and a leader in each section canvasses the families and enrolls them. The key to successful community enrollment is presentation of the plan as a community service and utilization of all community sponsorship and aid. Plans report that in well-organized community enrollments in small places, fifty percent or more of the population is frequently enrolled.

An average selection of risks tends to be assured under community enrollment because of the limited period during which individual enrollment is permitted. In other words, people join at the time set by the plan and not when they learn of some condition requiring hospital care. In small communities where intensive drives are undertaken sound selection of risks is also assured because as high a proportion of the whole community enrolls as would be considered necessary in the case of an employed group. Indeed some plans will not undertake a community enrollment except with the understanding that their usual group requirements will be met, i. e., unless 40 or 50 percent of the eligible residents sign up.

A great many of the plans are conducting variations of community enrollment drives in large cities. The Rhode Island plan has conducted several state-wide campaigns, making extensive use of paid advertising. The New York City plan on several occasions during the last three years has appointed two or three week periods during which individuals could enroll without the necessity of filling out a health history statement. Paid newspaper advertising was used to announce this opportunity. Many other plans have done or are doing likewise. The plans are finding that such campaigns give marked stimulus to group enrollment, and that often far more people are enrolled in groups during the period than are enrolled as individuals.

It would appear that through the device of community enrollment, or, if one prefers, of individual enrollment limited to specific periods of time, the plans have found a way of cheaply and soundly making their services available to individuals not eligible for group enrollment.

### RURAL ENROLLMENT

Within the last few years the plans have given increasing attention to rural enrollment. According to a recent survey of the Blue Cross Commission well over half of the plans are now making some efforts to enroll farm and rural people.

The method of rural enrollment used most generally, or at any rate that which has resulted thus far in the greatest number of subscribers, is community enrollment. The method next most generally used is that of enrollment through organizations such as the Farm Bureau, Grange, Farmers Union, farm cooperatives, etc. These organizations facilitate enrollment of their members, and the enrolled members pay the subscription costs either directly or through the organization. State Farm Bureau Federations in Texas, Minnesota, Missouri, Nebraska and other States have assigned special workers to promote enrollment

CONFIDENTIAL

BCBSA00289767

of their members in the plans.  In a number of States the plans have enrolled
farm families who are borrowers from the Farmers Home Administration (former-
ly Farm Security Administration) through cooperative arrangements with the
latter.  The FHA enrolls as a group its client families who wish to partici-
pate and pays the subscription charges on their behalf.  The families repay
these costs along with other loans.

Enrollment through the above organizations is necessarily limited to the
members of these organizations.  The Colorado and Des Moines (Iowa) plans,
particularly the latter, have launched a program of developing county rural
health associations to make enrollment available to all farm families.  The
purpose of these associations, which are usually organized with the coopera-
tion of local farm groups, is to promote general health activities and to en-
roll their members as a group in the plan.  The members pay annual dues of,
say, $1.00 an adult person and these go to pay the expenses of the associa-
tion and to provide some remuneration to a secretary-treasurer.  The organi-
gation sets up procedures for enrollment of farm families and for collection
of the subscription charges.  In Iowa 52 county "Health Improvement Associa-
tions" have been organized in rural counties, during the last two years.
Through these associations over 50,000 rural Iowans have thus far (April 1946)
been enrolled.

In reporting on rural enrollment to the Blue Cross Commission as of July
1946 some 53 plans in the United States estimated that they had enrolled
1,480,000 rural persons.[2]  Of these, 17 plans reported that members of their
rural enrollment groups numbered over 10 percent of the rural population of
their areas.  While these estimates are of necessity rather rough and while
some of the figures may be exaggerated, nevertheless they indicate that in
certain areas serious efforts at rural enrollment are being made and that
promising enrollment techniques have been developed.

## AGE RESTRICTIONS

Age restrictions are an enrollment policy which may appropriately be com-
mented on here.  Of the 81 plans in the United States (data as of December 1,
1946) 52 have no basic age limit for group enrollment, although some of these
apply an age restriction for special types of members, as for example sponsor-
ed dependents and for community enrollment.[3]  The remaining 29 plans apply
an age limit for original group enrollment -- 65 years of age in the case of
26 plans, 66 years in 2 plans and 70 years in one plan.  Four plans do not
permit membership to be continued beyond an age limit -- 65 in all four cases.
As indicated previously, almost all (34 out of 40 U. S. plans for which data
are available) apply an age limit for non-group enrollment, usually 65 years.

The purpose of these age restrictions is to guard against adverse selec-
tion of risks; persons 65 and over have a hospital utilization rate approxi-
mately double that for persons of all ages.

---

[2] Special Study No. 84; Survey on Blue Cross Rural Enrollment.

[3] Data from Blue Cross Commission, *Adult Age Limits Applied by Blue Cross Plans, Special Study No. 85*, December 1, 1946.

CONFIDENTIAL

BCBSA00289768

## COMPETITION WITH INSURANCE COMPANIES

There is keen competition between the Blue Cross plans and insurance companies. Appendix K describes the policies offered by these companies and their methods of operation. Thus far the Blue Cross plans appear to be in the lead in this competition in that they have by far the larger total enrollment and are growing more rapidly.

The competition between the Blue Cross plans and insurance companies doing a group business is especially keen in the case of large national concerns, concerns with plants or offices in different localities and states. Insurance companies have an advantage in the case of these concerns which does not exist in the case of local concerns in that the insurance company can provide the concern with a single policy which at a uniform rate gives uniform dollar benefits to all employees wherever they may be located. The need of meeting this competition is driving the Blue Cross plans toward closer coordination, as will be brought out later.

## EMPLOYER PARTICIPATION

Since 1943 employer participation in paying part or all of the subscription costs has become an important factor in enrollment.

It has always been more or less customary for employers to pay part of the cost of group life and disability insurance for their employees. Employer participation in paying the cost of hospital and medical protection is simply a projection of the same development in these other fields and proceeds, in general, from the same motives. In other words, employers find that this protection is beneficial to the employees and they find it worthwhile to encourage it or make it possible by paying part of the cost.

Employer participation in paying the cost of hospital and medical protection, as with other forms of group insurance, was stimulated during the war by excess profits taxation and by the freezing of wage rates. By paying part or all of the cost of group insurance employers could give a small wage increase to their employees at very little net cost to themselves. While these factors have now disappeared, the plans report no diminution in the extent of employer participation, on the contrary a steady growth.

A recent study by the Blue Cross Commission of the extent of employer participation found that as of December 1946, employers were paying part or all of the subscription costs for 1,530,000 persons in this country, 7.3 percent of the total membership.[4]/ Since enrollment in employed groups probably does not constitute more than 80 percent of the total enrollment, on the average, it may be calculated that employers were contributing to the costs of membership for about nine percent of their employees and the latter's dependents.

The proportion of the total membership paid for, in whole or in part, by employers varied from zero in one plan to 72 percent in the case of the Kingsport (Tenn.) plan, (82 percent in the case of the British Columbia plan). The proportion of contributory to total enrollment was highest in the New England and Pacific Coast States and was considerably higher (12 percent) in Canada than in this country. The percent of contributory membership was greatest

---

[4]/ Blue Cross Commission, *Employer Participation in Cost of Blue Cross Membership, Special Study No. 92*, February 27, 1947. The data are based on reports from 77 plans with 92 percent of the total membership.

CONFIDENTIAL

BCBSA00289769

(15.1 percent) among plans with 50,000 to 100,000 members, and least (5.6 percent) among the largest plans, those with 500,000 or more members. There seemed to be little correlation between percent of area population enrolled and percent of contributory membership. Some of the plans with the highest percentage of the area population enrolled reported very few contributory members.

Of the 11,782 firms reported as meeting part of the cost of membership 83.2 percent paid at least the full cost of membership for the employee; 37.9 percent paid the full cost for both the employee and family members, and an additional 9.9 percent made a partial payment toward the cost of membership for the family.

Special data are available for the Rhode Island plan which, after the Kingsport, Tenn. plan, leads in extent of employer participation. As of December 31, 1946 this plan had 446,128 subscribers of whom 319,600 were enrolled on a group basis through the place of employment. This plan has a "comprehensive" contract which it makes available to groups of over 25 employees where at least 90 percent of the employees enroll. This contract is rarely sold without employer contributions. Of the total group enrollment 60 percent were covered under the "comprehensive" contract, from which it may be assumed that employers were paying for almost this proportion of the total enrollment in employed groups. The plan estimates that employers were contributing 71 percent of the total annual income from the "comprehensive" groups and 38 percent of the total income from all groups. The plan's director believes that the high extent of employer participation is due largely to the plan's comprehensive contract which, since it offers greater benefits at lower cost than the standard contract, provides an inducement to employers to enter into the program.

Employer participation is important to the plans not only because it increases membership by making the plan available to persons who could otherwise not afford to join but because it improves selection: with employer participation virtually 100 percent participation is obtained. Employer participation is especially important in the sale of medical plan coverage. Many plans report that whereas there is little sales resistance at present to hospital service protection, there is appreciable sales resistance (this may lessen with greater familiarity) to the combined hospital and medical coverage at double the cost. Some plans report that they make little effort to sell the combined coverage without employer participation. (On the other hand, other plans report ready sale of the combined coverage without this aid.) In any case it may be assumed that a survey of employer participation in the case of medical plans would show a far greater extent of such participation.

## BLUE CROSS PROTECTION ESTABLISHED THROUGH
## COLLECTIVE BARGAINING AGREEMENTS

In a great many instances, as has been previously indicated, the employees of a concern through their union have requested or demanded that the employer make Blue Cross protection available to them. Since 1943 unions have manifested increasing interest in arriving at agreements with their employers whereby hospital protection or other health benefits will be made available to their members, with the employer paying part or all of the cost. According to a recent study approximately 1,250,000 workers were employed early in 1947 under such agreements, this being double the number covered two

66

CONFIDENTIAL

BCBSA00289770

years earlier.[5]/ Probably not more than 40 percent or half of these workers are covered under agreements providing for hospital protection.

Some of these agreements apply to a single concern, others cover an entire industry. In most cases the program is financed entirely by the employer who frequently pays a definite percentage of his payroll, usually two or three percent.

Under some of these plans the employer agrees to make certain benefits available, and in the case of hospital protection, such protection is made available by the employer through Blue Cross or a commercial company. Under other agreements the employer's contribution goes into a fund which is administered either jointly or by the union alone, and this fund pays the cost of group insurance, including hospital protection, for the members of the union. Hospital protection may be provided either through Blue Cross or a commercial company or through a plan especially set up by the fund or the union.

The specification of Blue Cross protection under employer-union agreements has made special headway in the New York City area. Between September, 1944 and September, 1945, benefits of the Associated Hospital Service of New York were specified in more than 340 collective bargaining agreements of 31 AFL and CIO national and local unions. These agreements, it is reported, cover more than 175,000 employees and dependents. In 75 percent of the contracts the employer pays the entire cost.

The development of union health and welfare programs may well have an important effect upon the future growth of Blue Cross plans. Both the American Federation of Labor and the Congress of Industrial Organizations have urged their constituent organizations to secure the establishment of such programs under collective bargaining agreements.

## ADVERTISING

The introduction and development of a Blue Cross plan in a community is, in a very real sense, a program of public education. One way of informing or educating the public about a plan is through advertising.

Up until a few years ago the plans did not make use of paid advertising. It was thought that such advertising might be considered inconsistent with their non-profit, civic-service character, and that it might result in the loss of certain free types of publicity which the plans enjoyed.

Since 1942 or 1943 some of the plans have begun to make use of advertising. In the beginning this was mainly for the announcement of new benefits -- it is far cheaper to announce such benefits through advertising than through direct mail. Later some plans began to use advertising in connection with community enrollment campaigns or to announce the acceptance of individual enrollees for a limited period. The experience of these plans with advertising was such as to encourage its further use.

Since 1945 the Massachusetts plan has made extensive and continuous use of advertising. The plan attributes its rapid growth -- except for Rhode Island it leads all other state-wide plans in percent of population enrolled -- to the extensive use of advertising and has been exhorting the other plans to follow its example.

[5]/ *Health Benefit Programs Established Through Collective Bargaining*, by Florence Peterson, Everett Kassalow, and Jean Nelson, Monthly Labor Review, August 1946, p. 191. Also *Collective Bargaining Developments in Health and Welfare Plans*, Monthly Labor Review, February 1947, p. 191.

CONFIDENTIAL

BCBSA00289771

## ENROLLMENT OF NATIONAL CONCERNS

Special problems arise in the enrollment of employees of national con-
cerns, i. e., concerns having plants or establishments in the areas of two or
more plans. The individual plans are often unable to deal with these prob-
lems or to spend the time and energy necessary to enroll a concern only a
part of whose employees will become members of the local plan. To aid in
enrollment of these concerns the plans have established a National Enrollment
Office under the Blue Cross Commission.

The diversity of benefits and subscription rates of the plans have been
handicapping factors in the enrollment of national concerns. A much more
serious problem in the enrollment of national concerns has been the differ-
ences in enrollment regulations of the plans. There has been the greatest
diversity with respect to such matters as minimum size of groups which would
be accepted, minimum percentage of members of the group required, time when
new contracts become effective, procedures for group re-openings and enroll-
ment of new employees, etc. (A national concern which wishes to have all of
its employees covered and finds that, say, its three branch office employees
in a certain city cannot be enrolled because the plan of that area does not
accept groups of less than five is naturally dissatisfied.) At the March
1946 conference the plans voted to adopt a set of uniform enrollment regula-
tions and procedures for all national concerns. As of March 1947 the vast
majority of the plans had adopted these regulations and procedures.

Another problem in the handling of national accounts arises in the case
of those national concerns which pay all employees, wherever they may be
located, through the headquarters office and who want a single consolidated
billing on behalf of all the plans in which their employees may be enrolled.
At the October 1946 conference the plans voted to cooperate in arrangements
to provide such concerns with a consolidated billing. It was also voted to
establish a consolidated billing office in conjunction with the national
enrollment office to handle or expedite such arrangements.

A concrete example may help to make clear what is here involved. An
eastern railroad has recently taken Blue Cross protection. This railroad has
employees in the areas of more than 20 plans. All of its employees are paid
from the headquarters office and it wants a consolidated billing. To develop
a consolidated billing on behalf of 20 plans would be too complicated. The
arrangement developed is that all of the employees will be enrolled in six
principal plans, and these will cooperate in developing a consolidated bill-
ing which will be handled by the plan serving the headquarters office of the
railroad. The other 14 plans have agreed to provide service benefits under
the inter-plan service benefits agreements to the employees hospitalized in
their area. In other words, under the arrangement all employees will receive
service benefits when hospitalized in the areas of any of the 20 plans.

## TRANSFER OF MEMBERS BETWEEN PLANS

Members of a plan, when they move to another area having a plan, usually
desire to transfer their membership to this plan in order to have the con-
venience of payroll deduction and so that, if hospitalized in their new home
community, they may receive service benefits. Such persons also desire that
the new plan should recognize any period of membership in the old plan in ful-

CONFIDENTIAL

BCBSA00289772

fillment of waiting periods under the new plan. In order to meet these problems the Commission has stimulated the development among the plans of transfer agreements. At the present time, practically all the plans (there may be two or three exceptions) will unconditionally accept persons transferring from another plan, and will recognize the previous continuous enrollment period in another plan or plans as the basis for meeting their own waiting period requirements.

## A NOTE ON THE RELATIONSHIP BETWEEN ENROLLMENT AND INCOME STATUS

The question of what income groups are enrolled by the plans, i. e., to what extent the plans enroll a cross section of the population or whether enrollment is concentrated among the high or middle income groups, is of great importance. Very little definitive data was obtained on this point in the survey. The plans do not have data on the income or occupation of their subscribers.

The Baltimore plan has made an analysis of the areas in which its members reside according to census districts, and has calculated the percentage of the total population of each area which has been enrolled. This information is shown on the accompanying map. By comparison with the map showing the median rent paid in each district, it is apparent that the percentage of enrollment varies with economic status -- as economic status goes up so does the percentage of the population enrolled.

Various surveys or studies indicate, as one would expect, that the plans tend to enroll proportionately more of the better than of the less well off income groups. Thus a survey in Rochester, N. Y. in 1940 showed the following distribution by income of those with and without hospital insurance:[6]/

| INCOME GROUP | ESTIMATED DISTRIBUTION OF ALL FAMILIES AND SINGLE PERSONS | DISTRIBUTION OF THOSE | |
|---|---|---|---|
| | | WITH INSURANCE | WITHOUT INSURANCE |
| OVER $5,000 | 7 | 6 | 1 |
| $2,200-4,999 | 16 | 11 | 5 |
| $1,300-2,199 | 48 | 23 | 25 |
| $800 TO $1,299 | 20 | 4 | 16 |
| UNDER $800 | 9 | 0 | 9 |
| TOTAL | 100 | 44 | 56 |

At the time of this survey the Rochester plan had probably enrolled about 40 percent of the population of the city. At the present time the plan has enrolled approximately 75 percent of the population of the city proper. It is evident therefore that in the years since the survey the plan must have extended its enrollment considerably among the lower income groups.

---

[6]/ Smillie, Wilson, G., M. D., *A Survey of the Facilities for Care of the Sick of Rochester, N. Y.,* Rochester Community Chest, 1941, p. 110.

CONFIDENTIAL

BCBSA00289773



BALTIMORE, MD.
PERCENTAGE OF POPULATION ENROLLED
IN EACH CENSUS TRACT, DECEMBER 1944

LEGEND

| | |
|---|---|
| 30% AND OVER | 15 - 20 % |
| 25 - 30% | 10 - 15 % |
| 20 - 25% | 5 - 10% |

UNDER 5%

PUBLIC AND SEMIPUBLIC AREAS    INDUSTRIAL AREAS

**FIGURE 9**

A canvass made in Michigan in 1944 found that the proportion among the different occupational groups who belonged to a hospital or medical prepayment plan was as follows:[7]

| | | PERCENT |
|---|---|---|
| GROUP A | (EXECUTIVES, PROFESSIONAL MEN, SUCCESSFUL MERCHANTS, ETC.) | 49 |
| GROUP B | (WHITE COLLAR AND SKILLED MANUAL WORKERS, ABOVE AVERAGE FARMERS AND SMALL BUSINESS PROPRIETORS, ETC.) | 48 |
| GROUP C | (MANUAL LABORERS, STORE CLERKS, SMALL FARMERS, ETC.) | 37 |
| GROUP D | (UNSKILLED MANUAL LABORERS, THE SMALLEST FARMERS, CASUAL WORKERS) | 28 |

[7]/ *Public Relations of the Medical Profession, State of Michigan.* Prepared for the Michigan Health Council by the General Research Bureau of Foote, Cone and Belding, Chicago, Ill., 1944.

70

CONFIDENTIAL

BCBSA00289774



BALTIMORE, MD.
MEDIAN MONTHLY RENT IN EACH CENSUS
TRACT, APRIL 1940

LEGEND

| | |
|---|---|
| ⬜ $50 AND OVER | $25.00-29.99 |
| $35.00-49.99 | $20.00-24.99 |
| $30.00-34.99 | $15.00-19.99 |
| ⬛ UNDER $15.00 | |
| PUBLIC AND SEMIPUBLIC AREAS | INDUSTRIAL AREAS |

FIGURE 10

Various other surveys also show that the plans have enrolled proportion-
ately more of the upper than of the lower income groups. [8] The fact that,
as shown in Table 5 (Chapter 3), the plans have enrolled higher percentages
of the population in the more prosperous than in the less prosperous States
also confirms this general showing.

That the plans have enrolled proportionately more of the upper than of
the lower income groups is not equivalent to saying that the plans have their
enrollment mainly among the middle or upper income groups. This may well be
true in the case of those plans which have enrolled but a small proportion of
the population of their area. Where the plans have enrolled appreciable por-
tions of the population, of necessity they must have enrolled large numbers
of those in the lower income groups.

_____

[1] For example, a survey made by the Commission on Medical Care in New York State. *Medical Care for
the People of New York State*, Report of the New York State Legislative Commission on Medical Care,
1946, p. 223.

CONFIDENTIAL                                                      BCBSA00289775

# CHAPTER 7

## LEGAL STATUS OF HOSPITAL PLANS* [1]

When Baylor University Hospital in 1929 contracted with school teachers in Dallas to provide hospital care in return for specified payments, the Texas insurance department did not consider the hospital to be engaging in the insurance business.  The hospital was simply selling its services on a group or prepaid basis.  Later when hospitals in other States established or contemplated the establishment of similar arrangements the attorney generals or departments of insurance in some of these States ruled that the offering of such contracts constituted or would constitute "insurance" and would be subject to the State's insurance code.

Presumably because of such a ruling, the first community-wide hospital service plan, the Sacramento plan, was established as a mutual insurance company.  When the next plan, that in St. Paul, Minnesota, was launched early in 1933 its backers assumed that the plan was simply selling the services of its member hospitals and was not engaged in the insurance business.  Late in that year the plan was forced by a ruling of the insurance department of the State to re-write its contracts with hospitals in such a way as to make the plan an agent of the member hospitals.  Otherwise the plan, in the opinion of the insurance department, would be engaging in insurance.

### DEVELOPMENT OF ENABLING LEGISLATION

In 1933 when a group of civic leaders, hospital representatives and physicians desired to start a plan in New York City, the State Superintendent of Insurance ruled that the contemplated activity, although desirable, was one which could only be legally carried on by organizations meeting the requirements for stock or mutual insurance companies.  To organize the plan as a stock insurance company would mean that the plan would presumably be for profit and that a large amount of capital would be required.  To organize it as a mutual insurance company would mean that the participants would be subject to assessments.  The requirements for neither type of organization seemed consistent with what the backers of the contemplated plan had in mind, and accordingly this group sponsored a proposal for special enabling legislation which became law in May 1934.

The same developments occurred elsewhere.  From this time on the attorney generals or insurance departments in other States generally held that the offering of hospital service contracts would constitute "insurance", and it became apparent in most States either that plans would have to meet the requirements for stock or mutual insurance companies or that special legisla-

---

* All data as of May 1, 1946.

[1] In the writing of this chapter, the booklet "State Enabling Legislation for Non-Profit Hospital and Medical Plans, 1944," by Odin W. Anderson, School of Public Health, University of Michigan, has been helpful.

CONFIDENTIAL

BCBSA00289776

tion would be required.  Following New York's lead one State after another
has passed laws providing for the establishment and operation of non-profit
hospital service plans.

At present (May 1946) 34 States and the District of Columbia have such
legislation.  The States having such laws and the years in which the initial
acts were passed, are as follows: [2]/

| 1934 | New York |
| 1935 | Alabama, California, Illinois, Maryland |
| 1936 | Massachusetts, Mississippi |
| 1937 | Georgia, Pennsylvania |
| 1938 | Kentucky, New Jersey |
| 1939 | Connecticut, District of Columbia, Florida, Iowa, Maine, Michigan, New Hampshire, New Mexico, Ohio, Rhode Island, South Carolina, Texas, Vermont, Wisconsin |
| 1940 | Virginia |
| 1941 | Kansas, Minnesota, Nebraska, North Carolina |
| 1942 | - - - - |
| 1943 | North Dakota, West Virginia |
| 1944 | - - - - |
| 1945 | Arizona, South Dakota, Tennessee |

In a number of jurisdictions, plans were started in advance of the
passage of enabling legislation.  This happened in the District of Columbia,
Minnesota, New Jersey, North Carolina, Ohio, Tennessee, Texas, Virginia and
West Virginia.  In all of these States, except Ohio, the backers of the plan
assumed or State officials had originally ruled that the plan did not con-
stitute "insurance".  Subsequently the plans came to feel that their legal
basis was uncertain and insecure (officials could change their minds or be re-
placed) and they moved to obtain the passage of legislation which would give
them an unequivocal legal status.  In Ohio plans were established under a
1903 law which permitted hospital service associations to offer the services
of hospitals as the agent of these hospitals.  This latter law had certain
disadvantages and in 1939 Ohio passed legislation more specifically suited to
the needs of the plans.

Blue Cross plans exist in a number of States which have not passed any
legislation specifically providing for the establishment of non-profit hospi-
tal service plans.  In five States -- Colorado, Delaware, Missouri, Montana
and Utah -- it has been ruled that the plans do not constitute "insurance" or
the plans, despite questioning of their status, have succeeded thus far in
maintaining that they are not subject to the insurance code.  In two States,
Indiana and Oklahoma, the plans are organized as mutual insurance com-
panies. [3]/

---

[2]/  Many of the States have amended their laws two or three times.

[3]/  Repeated efforts in Indiana to obtain enabling legislation failed and the plan was organized as a
mutual insurance company because apparently it could be established in no other way.  The plan calls
itself "Blue Cross Hospital Service".  It has been held exempt from Federal income taxes, and is now
requesting exemption from a State one percent tax on premiums.  The Oklahoma plan was organized as a
mutual because the State's Mutual Casualty Act seemed to provide adequate scope for a plan.  The plan
is called "Group Hospital Service", and pays no taxes except a small licensing fee.

CONFIDENTIAL

BCBSA00289777



FIGURE II

CONFIDENTIAL

BCBSA00289778

The Louisiana plans qualify under a 1938 law providing for service insurance companies.  This exempts organizations coming within the definition of service insurance companies from the insurance code and subjects them to licensure, examination and some degree of supervision by the Secretary of State.  A 1940 amendment to this act provides that any non-profit mutual association operating a hospital service plan, a majority of the directors of which are administrators, trustees or members of the clinical staffs of member hospitals, shall be exempt from all state and local taxation, except taxes on real estate and office equipment.

The Oregon plan qualifies under a Hospital Association Act passed in 1917 and amended in 1930, which states that organizations contracting to furnish hospital and medical services shall be subject to the provisions of this act, and thus (by implication) exempt from the laws governing insurance.  This legislation, which was passed primarily to legalize the operation of commercial hospital associations described in Chapter 1, provides that such organizations shall be licensed by and supervised to some extent by the department of insurance.  The plan in Washington functions, from the standpoint of its legal status, as a division of the Oregon plan.[4]

The legal status of the plans in the various states may be recapitulated as follows:  In 31 States and the District of Columbia the plans function under legislation providing for non-profit hospital service plans.[5]  In five States, the plans have been organized under the general corporation laws or under laws providing for non-profit organizations and are considered as not engaging in the insurance business.  In two States the plans are organized as mutual insurance companies.  In three States the plans qualify under legislation designed to authorize and regulate analogous types of organizations.  Three States have passed legislation which would permit the operation of hospital service plans but have no plans, although one of these States is partially served by a plan with headquarters in another State.  Four States have neither laws nor plans, although one of these is partially served by a plan from another State.

## PROVISIONS OF ACTS RELATING TO NON-PROFIT HOSPITAL SERVICE PLANS

All of the 35 acts providing for non-profit hospital service plans have certain common elements.[6]  All authorize non-profit corporations to contract to furnish hospital service to subscribers, such corporations to be subject to the provisions of the act in question and to be exempt from all provisions of the insurance code, except as otherwise designated.[7]  All provide that such corporations shall be supervised in certain particulars by the insurance

---

[4] The hospitals in Washington have been endeavoring to obtain passage of enabling legislation which would permit the establishment of a completely separate plan in that State.

[5] However, the Sacramento plan in California is organized as a mutual insurance company.  Also Vermont has enabling legislation but is served by a plan with headquarters in New Hampshire.  Both States passed laws which, in effect, permit a plan established in either State to serve the other.

[6] Appendix G gives the text of a "model law" to enable the formation of "Non-Profit Hospital and/or Medical Service Corporations", which has been drawn up by the Blue Cross Commission.  Except that this model law provides for plans which can offer both hospital and medical service its provisions are rather typical of those of most of the acts.

[7] Except in Mississippi where a plan could be for profit.

CONFIDENTIAL

BCBSA00289779

department of the State.[8]/  All provide that such corporations are declared
to be charitable and benevolent institutions and exempt from all State and
local taxes (except in some cases taxes on real estate).[9]/

The chief provisions of the acts may be summarized as follows:

*BOARD OF DIRECTORS*. The composition of the boards of directors of non-profit
hospital service plans is mentioned in 24 of the acts. In 10 it is specified
that a majority of the directors must be trustees or administrators of hospi-
tals which contract with the plan for provision of service.[10]/  Five acts re-
quire that a majority shall be hospital representatives or physicians.[11]/  One
act (Alabama) apparently requires all board members to be either hospital rep-
resentatives or physicians. In four acts it is stipulated that the board must
be composed of hospital representatives, of physicians, and of representatives
of the public, in equal proportions.[12]/  None of these acts with the exception
of that of the District of Columbia states how the public representatives are
to be selected.  The act of Congress providing for a charter for the plan in
the District of Columbia states that the public representatives are to be de-
signated by the Commissioners of the District.  A number of acts provide
that the board shall include representatives of the hospitals, the medical
profession and the public but do not specify the proportions.

*HOSPITALS WITH WHICH THE CORPORATION MAY CONTRACT*.  Almost all of the acts
state that the corporation may enter into contracts for the provision of care
to subscribers with hospitals maintained by any governmental agency or with
hospitals operating under the hospital laws of the State.  A few acts have
more detailed specifications.  The acts of six States stipulate that the plan
may only contract with hospitals approved by the State department of welfare.
[13]/  In five other States the hospitals must be approved by the insurance
departments; [14]/ in three by the health department; [15]/ in one (New Jersey) by
both the welfare and insurance departments.  The Connecticut act specifies
that the hospitals must be annually approved by the State Medical Examining
and the Homeopathic Medical Examining Boards.  A number of the acts specify
that the hospitals with which the plan contracts must be approved by certain
private organizations. In Alabama the hospitals must be approved by the State
hospital and medical associations. In North Carolina the hospitals must be ap-
proved by the American Medical Association and/or the State hospital associa-
tion; in South Carolina by the State hospital association.  In three States,
the plan may contract only with non-profit hospitals. [16]/ The act of one State
(North Carolina) states that "nothing in the act shall be construed to dis-
criminate against hospitals conducted by other schools of medical practice."

Although certain of the acts, as indicated above, make certain stipula-
tions concerning hospitals with which the plan may enter into contracts, only

---

8/ Except in Arizona and Virginia where supervision is exercised by the Corporation Commission.

9/ Except in California, Iowa, Mississippi, South Dakota and Tennessee.

10/ Florida, Georgia, Illinois, Massachusetts, Minnesota, New Jersey, New Mexico, Ohio, Rhode
   Island, Texas.

11/ California, Iowa, Maine, North Dakota, Wisconsin.

12/ District of Columbia, Kansas, Nebraska, Tennessee.

13/ Georgia, Illinois, Maine, Massachusetts, New York and Pennsylvania.

14/ Florida, Nebraska, New Mexico, South Dakota, Tennessee.

15/ California, Kansas, Kentucky.

16/ Michigan, New Jersey and Ohio.

76

CONFIDENTIAL

BCBSA00289780

one (West Virginia) stipulates that the plan must enter into contract with all hospitals meeting these requirements. [17]/ None of the acts states what recourse a hospital has which is refused a contract by the plan.

*HOSPITAL UNDERWRITING.* The acts of 14 States stipulate that a plan must be underwritten by its member hospitals.[18]/ This stipulation is usually expressed in terms similar to that in the Michigan act which reads: "All contracts issued by such corporation to the subscribers shall constitute direct obligations of the hospital or hospitals with which such corporation has contracted for hospital service."

*SUPERVISION BY THE STATE INSURANCE DEPARTMENT.* All of the acts call for some degree of supervision of the plan by a State agency -- with two exceptions the State insurance department.[19]/ All require the submission of financial reports, either annually or at such times as the department may require, these reports to contain such information as the department specifies. Virtually all of the acts, specifically or by implication, gives the insurance department [20]/ the additional power of visitation and examination of the organization. [21]/ A number of the acts require that examinations must be made at least once every three years; most acts do not contain this stipulation.

The great majority of the acts require the corporation, before offering contracts to subscribers, to secure a license or certificate from the insurance department. Such license is given upon submission to and approval by the department of the proposed contracts with subscribers and hospitals, statement of the proposed rates, the articles of incorporation, the names of the directors, etc. Some States require that such a license needs to be obtained only initially; other States require annual licensure.

All except four of the acts require approval by the insurance department of the subscriber contracts and the rates to be charged subscribers. [22]/ Some of the acts provide only for initial approval, i. e., state that any contract to be offered must be approved as to content and rates before it can be offered. Other acts stipulate that the rates charged subscribers shall at all times be subject to the approval of the insurance department.

Few of the acts make any statement as to the basis upon which rates shall be approved or disapproved. The implication in most of the acts is that rates are to be approved from the standpoint of being adequate to provide the stipulated benefits and to preserve the plan in sound financial condition. A few acts recognize that it might be a disservice to the public if rates were higher than necessary so that the plan simply piled up large reserves.

---

17/ The law states that "every approved hospital shall be eligible for participation," but does not define an "approved" hospital.

18/ Arizona, Georgia, Kansas, Maine, Maryland, Michigan, Nebraska, Ohio, South Carolina, Tennessee, Texas, South Dakota, Virginia and West Virginia.

19/ In Arizona and Virginia this supervision is exercised by the State Corporation Commission.

20/ Or corporation commission. From this point on it will be understood that insurance department refers to corporation commission in the two States where the latter is the supervising agency.

21/ The District of Columbia act seems to provide the only exception to this rule.

22/ Arizona, District of Columbia, Minnesota, and Wisconsin. The Corporation Commission of Arizona must approve the form of the contract but not the rates. The District of Columbia act provides that the plan must annually file with the superintendent of insurance a financial statement. If the superintendent shall have reason to believe that the corporation is not complying with its charter, or is being operated for profit, or fraudulently conducted, he shall cause to be instituted the necessary proceedings to enjoin such improper conduct, or to dissolve the corporation. Beyond this no supervision is exercised.

CONFIDENTIAL

BCBSA00289781

Thus in New York the superintendent of insurance may refuse approval if he finds that "rates are excessive, inadequate or unfairly discriminatory". The Maine and South Dakota acts require that the rates and benefits shall be "fair and reasonable".

*RATES OF PAYMENT TO HOSPITALS.* The acts of 19 States specify that the plan's rates of payment to hospitals shall be subject to the approval of a State agency. In 15 of these States rates of payment are to be approved by the insurance department;[23]/ in three States by the welfare department.[24]/ An additional State (New York) requires that rates of payment to hospitals shall be approved "as to adequacy" by the welfare department and "as to reasonableness" by the insurance department.

*RESERVES.* It would seem that in almost all States the insurance department has some power to influence the amount of reserves maintained by a plan owing to its supervision of the rates to be charged subscribers. The acts of 13 States make specific mention of reserves. In four States, the acts simply specify that adequate reserves shall be maintained. [25]/ In the other nine States the law names specific amounts of reserves which the plans must maintain as a minimum. [26]/ The New York law requires that plans shall each year set aside in a contingent surplus fund not less than four percent of net premium income until this fund amounts to 25 percent of the year's net premium income. This fund may not be reduced below this limit except with the approval of the superintendent of insurance. In most acts specifying a minimum amount of reserves, the minimum so specified is so low as to be totally inadequate for a large plan.[27]/ For example, the California act stipulates that a plan with over 5,500 subscribers must maintain a reserve of at least $20,000. The New Jersey act requires that a plan should add to its special contingent surplus at the rate of two percent of its net premium income, until such surplus shall be not less than $100,000.

The North Carolina act is the only one which sets maximum as well as minimum limits to reserves. This act requires plans to set aside certain percentages of gross premimums until contingent reserves are not less than three times nor more than six times monthly expenditures for hospital claims and administration.

*ADMINISTRATION AND ACQUISITION COSTS.* Provisions relative to these costs are contained in 24 acts. In eleven of these it is stated that administration and acquisition costs are at all times subject to the approval of the insurance

23/ California, Florida, Georgia, Iowa, Maryland, Michigan, Nebraska, New Mexico, North Dakota, South Carolina, Pennsylvania,. South Dakota, Tennessee, Texas, West Virginia.

24/ Illinois, Massachusetts, New Jersey.

25/ Maine, Michigan, Pennsylvania, Virginia. The Virginia act which is not clear in many respects states: "It shall not be necessary except as may be required by the State Corporation Commission in the exercise of its discretion and with a view to the ultimate success and continuance of any plan... that there be any particular reserve, or that rates for the services be necessarily sound and proper from the actuarial standpoint, but the Commission...shall take into purview the financial and moral responsibility, and the ability and capacity to render the services contracted for...

26/. Alabama, Arizona, California, Kentucky, New Jersey, New York, North Carolina, South Carolina, Tennessee.

27/ The Blue Cross Commission has recommended that plans maintain a reserve of about five times monthly income or seven times monthly hospital expense. (The 1946 revision of the standards of approval for Blue Cross plans of the American Hospital Association requires an approved plan, in the absence of hospital-responsibility for contract-benefits, to establish a reserve equal to 25 percent of current annual income.)

78

CONFIDENTIAL

BCBSA00289782

department.[28]/  In six acts, acquisition costs alone are subject to this approval.[29]/  In the other seven it is stipulated that acquisition or administration cost, either separately or combined, shall not exceed a certain percentage of income.[30]/  The New York law, for example, specifies that (after the first two years) no plan may spend more than 10 percent of income for acquisition nor more than 20 percent for administration.  The Kansas law imposes limits of 10 and 15 percent respectively for these purposes.  In virtually all cases the percentage of income so specified are far above those which the plans in these States are actually spending for these purposes.  The acts of a considerable number of States forbid the employment of salesmen or agents on other than a salaried basis.

*DEFINITION OF HOSPITAL CARE OR HOSPITAL SERVICE.*  The vast majority of the acts do not define hospital care or hospital service.  Whatever services are customarily furnished by hospitals can be included under the plan.  A few states (Iowa and North Dakota, and possibly others) define hospital service in such a way as to exclude x-ray, pathology and anesthesia services, thereby reflecting the desire of the medical profession in some places that these services should not be included under a hospital service plan.  The California law defines hospital services as including "indemnification of the beneficiary or subscriber for the costs and expense of professional medical service rendered during hospitalization."

*MEDICAL SERVICES.*  In the last three years a number of States have passed legislation providing for the formation of joint hospital and medical service plans or amending their existing hospital service plan act so as to permit the hospital service plan to provide medical services as well as hospitalization.  In most cases so far the wording of the legislation does not take full cognizance of the implications of the step taken, i. e., the law still speaks of the plan as a "hospital service plan" even though it can offer medical as well as hospital services.  In one instance, Maryland, the full implications of the step have been recognized.  Here the amended law omits all reference to a hospital service plan and speaks simply of "health service plans" which may offer hospital, medical, dental and other health services.

At present, (May 1946) in nine States (Alabama, Arizona, Florida, Maine, Maryland, North Carolina, Rhode Island, Virginia and West Virginia) one plan (whether described in the law as a hospital service plan, a medical and hospital service plan or a health service plan) may offer both hospital and medical services to subscribers.  Maine and North Carolina amended their acts in 1943 so as to permit the hospital service plan to cover medical services as well.  Alabama did the same in 1945 and provided for medical representation on the Board of the plan which previously could be composed of hospital representatives only.  Maryland transformed its hospital service plans act into a health service plans act in 1945.  In the same year Florida passed an entirely new act providing for "non-profit medical and/or surgical and/or hospital service plan or plans".  The Arizona act also passed in 1945 likewise provides for hospital

---

28/ Connecticut, Georgia, Iowa, Kentucky, Michigan, Nebraska, New Hampshire, North Carolina, North Dakota, South Carolina, South Dakota.

29/ Alabama, Florida, Massachusetts, New Mexico, Pennsylvania, Virginia.

30/ Arizona, California, Kansas, New Jersey, New York, Tennessee, Texas.

CONFIDENTIAL

BCBSA00289783

or medical service plans or combinations thereof. In the same year Rhode Island passed an act providing for non-profit medical service corporations, one paragraph of which specifies that a corporation organized under the hospital service plan act may, with the consent of the Rhode Island Medical Society, amend its articles of association and exercise the powers of a non-profit medical service corporation. The 1940 Virginia Act apparently permits one corporation to offer both hospital and medical service. The West Virginia amended act passed in 1946 provides for hospital service corporations and medical service corporations. Apparently one organization could offer both hospital and medical services.

If the passage of the above legislation constitutes a trend it is one which presages a thorough transformation of the existing legislation relating to hospital service plans. The provisions relative to medical services of the laws in the above-mentioned States will be described in the chapter relating to the legal status of medical service plans.

### ADMINISTRATION OF LAWS RELATING TO HOSPITAL SERVICE PLANS

Laws which are on the statute books may or may not be effectively carried out. To what degree, in practice, are hospital service plans supervised by insurance departments in accordance with the respective laws? Upon this point we are only able to offer impressions founded in most cases upon statements by the plan directors. The impression was received that, by and large, the character and degree of supervision varied with the strength of the insurance department of the State. In States, such as New York and Massachusetts, with strong, well-financed departments the laws relating to the plans are ably administered, and the plans are subjected to a close, understanding, and helpful supervision. In States, where the insurance departments are weak -- where they are meagerly financed or poorly staffed -- then the supervision exercised is often not at all close. The situation in the various states ranges between these poles. In at least two States with plans but no legislation, the plans are opposed to the passage of legislation because they believe that supervision by the state insurance department would be detrimental rather than helpful.

In most States the supervision has been directed solely towards seeing that the plans are in a sound financial condition and able to meet their obligations to subscribers. Only in a few instances has the supervision aimed to assure that the plans provide maximum service to the subscribing public and the community at large.

### STATUS OF PLANS UNDER FEDERAL TAX LEGISLATION

The plans are affected by Federal tax legislation. The plans have been ruled exempt from Federal income taxes as meeting the requirements of an "organization for social welfare". The plans have been ruled not exempt from social security taxes, not being regarded as charitable organizations under Chapter 9 of the Internal Revenue Code.

CONFIDENTIAL

BCBSA00289784

# CHAPTER 8

## THE CONTROL OF HOSPITAL PLANS

Hospital service plans are controlled by their boards of directors. These boards appoint the executive director of the plan and decide all larger matters of policy. Most commonly the boards consist of from 10 to 20 persons. Usually they are composed of persons designated to represent the hospitals, the medical profession and the public.

### SELECTION OF BOARDS OF DIRECTORS

The boards are appointed or elected in a great variety of ways. Some typical arrangements may be cited by way of illustration.

*The Maryland plan has a board of 14 directors, who are elected by the members of the corporation. Each member hospital designates one member of the corporation. The Baltimore medical society designates an equal total number of members. The hospital members of the corporation elect four hospital and three public representatives and the medical members elect four medical and three public representatives.*

*The Chapel Hill (N.C.) plan has a board of 12 members. Four are selected by the State hospital association and four by the State medical association. These directors elect four other directors to represent the public.*

*The New York City plan has a board of 25. Directors are selected by the voting members of the corporation who consist of the directors of the United Hospital Fund (prominent civic leaders), the presidents of the Greater New York Hospital Association, the Brooklyn Hospital Council, the New York Academy of Medicine, the State Medical Society, and the medical societies of each of the five boroughs of New York City. The directors are chosen from four categories, six from the hospitals of whom three must be administrators and three trustees, six from the medical profession, six from subscribers, and seven "at large" chosen from among persons who would be eligible for election in any other category. Directors of the first three categories serve for three years each and those from the fourth category for one year. The six medical members are nominated from names sent in by the medical societies. The three hospital administrators are nominated from names sent in by the hospital associations. The three hospital trustees are nominated from names submitted by the nominating committee of the board. The seven "at large" directors are chosen so as to have three represent large subscriber groups, two to represent the point of view of labor, one to represent the point of view of proprietary hospitals, and one is the president (executive director) of the corporation.*

*The Rochester plan has a board of 34. The board is self-perpetuating, i.e., new directors are elected by the existing directors. The by-laws specify that a majority of the executive committee of nine which largely manages the plan shall be hospital trustees.*

*The board of the Kansas plan, in accordance with State law, is composed of an equal number of representatives of the hospitals, the medical profession and the general public. The directors are elected by the members of the corporation, con-*

CONFIDENTIAL

BCBSA00289785

sisting of the original incorporators and such other persons as are elected by tl directors.

The Los Angeles plan has a board of 18. Each member hospital is a member of the corporation. The members of the corporation at an annual meeting elect the board. The by-laws stipulate that six of the directors shall be hospital representatives and six shall be physicians.

The Michigan plan has a board of 28. The by-laws specify that 13 of the board members shall represent the hospitals, of whom seven shall be trustees and six administrators (or vice versa), six members shall represent the medical profession and nine shall represent the public. The hospital representatives are nominated by the hospitals in each of the nine districts, at least two persons being nominated for each representative to be elected. The board of trustees elects the representatives of the hospitals from the persons so nominated, the medical representatives from persons designated by the State medical society, and the public representatives.

The methods by which the boards of directors are selected appear to fall into five main categories. Three of these are of relatively equal frequency; the other two are far less common.

In 11 of the 38 plans[1] surveyed, the hospital representatives on the board are elected or designated by the member hospitals, the medical representatives are elected or designated by the local or state medical society, and the board members thus elected, in effect, elect a number of other board members to represent the public.

In 10 of the 38 plans, the board is self-perpetuating, i.e., new members of the board are elected by the board itself. These plans may or may not have by-laws specifying a certain composition of the board, for example, that a majority must at all times be trustees or administrators of hospitals. In some of the plans with this type of arrangement, the self-perpetuation of the board is indirect, i.e., the board is elected by the members of the corporation who in turn are elected by the directors. Sometimes board members and members of the corporation are one and the same persons.

In nine of the 38 plans surveyed, the member hospitals elect or designate some members of the board. The board, as a whole, elects the other board members. In other words the board is partly self-perpetuating, partly selected by the member hospitals.

A less common arrangement, which obtained in five of the plans visited, is one where all the members of the board are elected or appointed by the member hospitals. Usually these boards have one or more physicians on them, but the by-laws do not specify that any physicians appointed shall be named or designated by the medical society.

The least common arrangement, which occurred in only three of the plans surveyed, is where the members of the board are elected by vote of the subscribers, each subscriber being entitled to one vote. In practice, such boards are self-perpetuating.

In the great majority of the plans, the directors who represent the hospitals or the medical profession are, in fact, elected or appointed by those whom they are to represent. Thus the board members representing the hospitals may be appointed or designated by the member hospitals, if these are not too numerous, or elected by the State or local hospital association, or appointed

---

[1] At the time of the survey the Washington and Oregon plans, though they functioned largely as separate plans, were from a legal standpoint one plan.

82

CONFIDENTIAL

BCBSA00289786

by the duly constituted officials of such association.  Similarly the board members representing the medical profession are elected by the local or State medical association or appointed by the duly constituted officials of this association.

Such is not the case with the so-called public representatives.  With some few exceptions which will be described later, persons designated to represent the public are (a) elected either by the representatives of the hospitals and the medical profession, or by persons who in the first instance were appointed or elected by such representatives, or (b) they are elected by the existing board members.  Though the public representatives may have the public's benefit, as they see it, solely in mind, nevertheless they are not elected by the subscribing public or their duly constituted representatives.

## COMPOSITION OF BOARDS

The by-laws of most plans specify that the Board shall be composed of persons designated to represent, or selected by, the hospitals, the medical profession and the public in certain numbers or proportions.  As indicated in the last chapter, in a number of States the enabling act specifies to a certain degree the composition of the board.  In 10 States a majority of the board must be hospital administrators or trustees; in six States a majority must be composed of hospital administrators, trustees, or physicians; in four the board must be composed one-third of hospital representatives, one-third of physicians and one-third of representatives of the public.

Table 8 shows the composition of the Boards of the surveyed plans at the time of visit.  Where the by-laws of the plan did not provide for the designation of directors as representatives of one or the other of the three groups, board members who were hospital trustees or administrators were classified as hospital representatives, physicians were classified as representatives of the medical profession, and lay persons who were neither hospital trustees nor administrators were classified as representatives of the public.

It will be apparent that in most cases there is representation, formal or informal, of all three groups.  In general there is more representation of the hospitals than of either of the other two interests.  In a little over half of the plans (21 out of 39) the persons selected by the hospitals to represent them or who, being either hospital administrators or trustees, could be classified as hospital representatives, constitute a clear majority of the board.  In a few plans (6) there is equal representation of the three groups or interests.  If one takes all the plans together, giving equal weight to each, 55 percent of the directors are representatives of hospitals, 17 percent are representatives of the medical profession and 28 percent are representatives of the public.[2]

These figures as indicative of the proportional representation of the different groups or interests do not take account of two fundamental factors.  The first is that frequently the public representatives are elected by the hospitals and the medical profession or by the representatives of these groups.  The second factor is that generally, as Table 8 shows, the representatives of hospitals consist of two sorts of persons: hospital trustees and hospital

---

[2] To obtain these figures, the number of directors in each plan was taken as 100 percent and the percent of the representatives of each group to the total was calculated.  The figures for all plans for which complete data were available were then added together.

83

CONFIDENTIAL

BCBSA00289787

TABLE 8

## Composition of Boards of Directors of Surveyed Plans

### Data as of time of survey (Mar. 1944 - Feb. 1945)

| PLAN | TOTAL NO. OF DIRECTORS | REPRESENTATIVES OF | | | CHARACTER OF HOSPITAL REPRESENTATIVES | | |
|---|---|---|---|---|---|---|---|
| | | HOSPITALS | MEDICAL PROFESSION | THE PUBLIC | LAY TRUSTEES | ADMINISTRATORS OR OWNERS | PHYSICIANS OTHER THAN ADM. OR OWNERS |
| ALABAMA ∠ | 61 | 61 | 0 | 0 | a/ | _/ b/ | a. b/. |
| LOS ANGELES, CAL. ∠ | 18 | 6 | 6 | 6 | a/ | a/ | a/ |
| OAKLAND, CAL. ∠ | 9 | 3 | 3 | 3 | 0 | 3 | 0 |
| SACRAMENTO, CAL. ∠ | 7 | 3 | 2 | 2 | 0 | 3 | 0 |
| COLORADO | 15 | 8 | 2 | 5 | 3 | 3 | 2 |
| DELAWARE | 16 | 8 | 4 | 4 | 8 | 0 | 0 |
| ATLANTA, GA. * | 11 | 8 | 3 | 0 | 4 | 4 | 0 |
| SAVANNAH, GA.* | 23 | 12 | 0 | 11 | 3 | 5 | 4 |
| ROCKFORD, ILL.* | 7 | 4 | 1 | 2 | 3 | 1 | 0 |
| DES MOINES, IOWA ∠ | 16 | 9 | 2 | 5 | 7 | 2 | 0 |
| TOPEKA, KANSAS # | 24 | 8 | 8 | 8 | 6 | 2 | 0 |
| NEW ORLEANS, LA. | 22 | 16 | 1 | 5 | 11 | 4 | 1 |
| MAINE ∠ | 14 | 7 | 3 | 4 | 7 | 0 | 0 |
| MARYLAND | 14 | 4 | 4 | 6 | 1 | 3 | 0 |
| MASSACHUSETTS * | 18 | 10 | 5 | 3 | 5 | 4 | 1 |
| MICHIGAN | 28 | 13 | 6 | 9 | 7 | 6 | 0 |
| MINNESOTA* | 17 | 14 | 2 | 1 | 5 | 9 | 0 |
| ST. LOUIS, MO | 15 | c/ | c/ | c/ | c/ | c/ | c/ |
| KANSAS CITY, MO. | 12 | 4 | 4 | 4 | a/ | a/ | 0 |
| NEBRASKA # | 60 | 20 | 20 | 20 | 6 | 14 | 0 |
| NEW HAMPSHIRE | 17 | a/ d/ | a/ | a/ | a/ | 3 | a/ |
| NEW JERSEY * | 30 | 16 | 7 | 7 | 13 | 3 | 0 |
| NEW YORK CITY, N.Y. | 25 | 6 e/ | 8 e/ | 11 e/ | 3 | 3 | 0 |
| ROCHESTER, N.Y. | 36 | 20 f/ | 5 f/ | 11 | 15 f/ | 0 | 5 f/ |
| UTICA, N.Y. | 39 | g/ | g/ | g/ | g/ | g/ | 0 |
| CHAPEL HILL, N.C. | 12 | 4 | 4 | 4 | 0 | 4 | 0 |
| DURHAM, N.C. | 5 | 5 h/ | 0 | 0 | 4 h/ | 1 | 0 |
| CINCINNATI, OHIO * | 27 | 15 | 2 | 10 | 14 | 1 | 0 |
| OREGON i/ | 7 | 4 | 1 | 2 | 0 | 4 | 0 |
| PHILADELPHIA, PA. | 27 | 12 | 6 | 9 | 9 | 3 | 0 |
| WILKES-BARRE, PA. | 12 | 12 j/ | 0 | 0 | 11 | 0 | 1 |
| RHODE ISLAND * | 20 | 11 | 1 | 8 k/ | 10 | 0 | 1 |
| TEXAS * | 21 | 12 | 3 l/ | 6 | 2 | 10 | 0 |
| LYNCHBURG, VA. | 15 | 9 | 2 | 4 | 6 | 3 | 0 |
| NORFOLK, VA. | 10 | 10 | 0 | 0 | 7 | 0 | 3 |
| RICHMOND, VA. | 15 | 7 m/ | 1 | 7 | 1 | 6 | 0 |
| ROANOKE, VA. | 19 | 10 | 2 | 7 n/ | 1 | 7 | 2 |
| HUNTINGTON, W. VA. | 13 | 6 | 2 | 5 n/ | 1 | 5 | 0 |
| WASHINGTON o/ | 7 | 4 | 2 | 1 | 0 | 4 | 0 |

NOTE: In those cases where the by-laws of the plan did not specify that directors shall be chosen by the various parties or designated to represent them, directors were classified on the basis of their affiliation, i.e., persons who were hospital administrators or trustees were classified as hospital representatives, physicians were classified as representatives of the medical profession and lay persons not affiliated with hospitals were classified as representatives of the public.

FOOTNOTES:
* State law specifies majority must be hospital trustees or administrators.
∠ State law specifies majority must be trustees, administrators or physicians.
# State law specifies one-third must be hospital trustees or administrators, one-third physicians, and one-third public representatives

84

CONFIDENTIAL

BCBSA00289788

a/ Information not obtained.

b/ There are 38 M.D.'s on the Board, most of whom are probably administrators or owners of hospitals.

c/ Plan does not designate board members as representatives of the various groups except to stipulate that three members of the Board shall be representatives of the medical profession and three shall be hospital administrators.

d/ Majority of board must be administrators or trustees.

e/ Differs from the provisions of by-laws which are as of a later date.  The given number of public representatives includes the plan's director.  The given number of representatives of the medical profession includes two physicians selected as directors "at large".

f/ The board is self-perpetuating and board members are not designated as representatives of the various groups.  There are 20 hospital trustees of whom five are physicians.  There are five other physicians.

g/ The board is self-perpetuating and board members are not designated as representatives of the various groups.  There are 24 hospital trustees, one of whom is a physician.  There are seven other physicians.

h/ None of these are hospital trustees though they are appointed by hospitals.

i/ Executive Committe for Oregon.

j/ Board members are not designated as representatives of the various groups.  All board members happen to be hospital trustees but this is not obligatory.  Many were picked not because they were hospital trustees but because they were civic leaders.

k/ Three of these are physicians.

l/ One of these owns a hospital.

m/ Includes six physicians.

n/ Includes the executive director.

o/ Executive Committee for Washington.

administrators, the former being the more numerous (a total of 173 as against 117).  In terms of their attitude towards the plan and the interests which they represent in reality, trustees and administrators tend to be quite different.

A hospital administrator is interested primarily in his own hospital. He will tend to consider questions of plan policy -- at least where plan policy affects the hospitals -- largely in terms of the effect of this policy upon hospitals in general and his own hospital in particular.  The hospital trustee, on the other hand, is generally a civic leader.  He will probably be a successful man of affairs -- the head of a large concern, a banker, a leading lawyer, etc.  He has been asked to become a hospital trustee because of the confidence which people of the community repose in him and because of his interest in the hospital as a means of serving the public.  On a plan board, this individual has an allegiance, so to speak, both to his hospital and to the plan and in any conflict of interest between the two, such as might arise over remuneration, he will tend to weigh the interests and needs of both and try to arrive at a fair decision.  Generally he tends to view the plan as an agency designed to serve the public or both the public and the hospitals, rather than one designed to serve primarily the hospitals.  In practice, therefore, the hospital trustee on a plan board frequently has about the same attitude toward the plan and is as much a representative of the public as those designated specifically as public representatives.[2]/

If one takes this latter circumstance into consideration, then one reaches quite different conclusions as to the proportionate representation of various interests on plan boards.  For example, the Delaware plan has eight so-called hospital representatives on its board of 16.  But all of these hospital representatives are hospital trustees, not one is an administrator.  In effect the plan board is made up of 12 lay civic leaders and 4 physicians.

2/ Hospital administrators have a common saying to the effect that when a hospital trustee gets on a plan board he is lost as a hospital trustee.  By this they mean that his interest in the hospital becomes subordinate to his interest in the plan

CONFIDENTIAL

BCBSA00289789

For all of the surveyed plans together, if one classifies hospital trustees as representatives of the public rather than as representatives of hospitals, then it appears that of all board members, giving each plan equal weight, 57 percent are representatives of the public, 21 percent representatives of the medical profession and 22 percent representatives of the hospitals. This summation is quite different from that previously given. The truth probably lies somewhere in between.

## THE REPRESENTATION OF THE PUBLIC

It has previously been pointed out that while in most cases the representatives of the hospitals and the medical profession are democratically selected, in that they are elected or selected by those whom they represent, this is not the case with representatives of the subscribing public. Some of the plans have been conscious of this problem and have endeavored to meet it in one way or another. The matter obviously presents difficulties. With several hundred or several thousand subscriber groups, ranging in size from, say, 5 up to 10,000 persons it is difficult for a plan to arrange for selection of five or ten persons who may be said to represent the subscribers. The device of giving each subscriber a vote and having them elect some or all of the directors obviously does not work well. Under such a situation subscribers have no means of voting intelligently, the attendance at the annual meeting is negligible, virtually all votes are cast by proxy, and the slate nominated by the existing directors is elected. Such a process also runs the risk that a small group of subscribers with some special interest might be rounded up to vote for an alternative group of directors, who really might be far less representative of the whole body of subscribers than those picked by the existing board.

A few plans endeavor to obtain direct representation of the subscribers in one way or another. The Massachusetts plan provides that its board of directors shall be elected by the voting members of the corporation. The State hospital association and the State medical society are each members and are allotted 25 votes each; two votes each are allotted to the Boston Council of Social Agencies and the Associated Industries of Massachusetts, and 46 votes are allotted to large subscriber groups, selected by turns, each of which has one vote. This arrangement looks well on paper. However, since the representatives of the subscriber groups are brought together only once -- to vote for a previously nominated slate of directors -- one can doubt whether it results in effective representation of the subscribers. However, if an important issue involving control of the plan were to arise, if subscribers felt that their interests were being slighted, it is possible that the arrangement would provide a means whereby subscribers could influence control of the plan.

The arrangement of the New York City plan, that in which places on the plan's board are given in turn to representatives of large subscribers groups, has already been described.

The Philadelphia plan provides that a certain number of its "public representatives" shall be nominated by the board of directors but elected at an annual meeting of the subscribers. Subscribers who have been members for three years or more are eligible to vote. Nomination may be made from the floor. In a recent year the plan spent several thousands of dollars to advertise the annual meeting, but only 10 or 20 subscribers appeared. The arrangement is democratic in theory but obviously doesn't work in practice.

86

CONFIDENTIAL

BCBSA00289790

The District of Columbia plan has a distinctive method of selection of its public representatives. The Act of Congress providing for the incorpora- tion of the plan specifies that the Board of directors shall be appointed one- third by the hospitals of the city, one-third by the medical society and one-third by the commissioners of the District of Columbia. This appears to be a good device for obtaining effective representation of the public. (How- ever, in this particular instance it does not seem to have resulted in mak- ing the plan especially responsive to its subscribers.)

The Cincinnati plan has developed a unique arrangement for giving the subscriber a voice in the plan -- the Subscribers' Councils. In each major area of the plan each enrolled group is asked to send a representative -- this can be either a member of the firm, the personnel director, a union rep- resentative, or whomever the employer or the group selects -- to a Council. This meets once a year, hears officers of the plan report, discusses affairs of the plan, and elects a so-called regional Subscribers' Committee. These committees meet on call and combine to form a Subscribers' Committee for the plan as a whole, composed of some 80 members. The Chairman -- changed every year -- of this Committee is automatically a member of the Board of Trustees.

The Subscribers' Committees are not self-actuating. A member of the staff of the plan acts as secretary and makes the arrangements for meetings, etc. The Committees do not meet at regular intervals, only when there is something to discuss.

These subscribers' councils and committees have been useful, probably more so in the smaller than in the larger places. They have aided in making the members feel that the plan is their own, have provided an effective sound- ing board for the membership, and have provided a means whereby the plan can ascertain the desires of its members and explain the need for changes. The organizations have been especially useful on occasions when the plan was con- sidering changing its contract, providing more inclusive services, increas- ing rates, etc.

The Kansas plan has developed members' councils along similar lines.[4/] The County Health Improvement Associations organized by the Des Moines, Iowa

---

[4/] The organization of these councils and the spirit in which they are being developed is indicated in the following letter from the plan's director of public relations:

"Our Directors felt that as we build a Blue Cross Movement here in Kansas we should provide channels through which the Members could express their desires as to the kind, quality and extent of hospital care which they would like to provide for themselves on a prepaid basis.

"Accordingly we sent out regular announcements to all groups as they were formed to the effect they could appoint a Member to a local Subscribers' Council. We then formed these Councils in stra- tegic communities with the four fold purpose of:

1. An up-to-date, comprehensive report by the Blue Cross representative.
2. Consideration by the Council of any criticism, whatever its nature.
3. Discussion of ideas for the further development of service to be rendered through the Blue Cross.
4. Discussion of plans for additional members. At the discretion of the Council, subsequent enrollment campaigns will be held under its auspices.

"The results of the discussions in local Councils were to be brought, through a representative, to a State Subscribers' Council at Topeka, meeting annually. The recommendations of this body have been brought to the Board of Directors' Annual Meeting through the Chairman of the Council who was automatically a member of the Board.

"Meanwhile, however, we have been rapidly developing a method of county-wide enrollment with an emphasis on the word membership as against subscriber and are developing County-wide Members' Councils who are to appoint committees who will act as local Blue Cross headquarters for matters of informa- tion, enrollment, plans for future growth and development and references in case of local difficulty in the operation of the plan.

"It is the belief of the Directors and of the People here in Kansas that a consciousness of mem- bership will make Blue Cross essentially a Peoples Movement. Through such a Movement they will pro- vide in good times and bad for the continuity and extension of health services which they want and for which they are willing and able to pay."

CONFIDENTIAL

BCBSA00289791

plan, and described in a preceding chapter, tend to fulfill the same purpose, i.e., of developing two-way communication with the members and of making the plan responsible to the membership.

All of the above constitute special devices of one sort or another for securing democratic representation of the subscribing public. The main method used by the plans is that of electing to their boards as public representatives individuals who, it is thought, will in spirit be representative of the general public, and who will bring to the plan judgment, acumen, experience of affairs and a willingness to devote much time and thought to the problems of the plan.

Most of the public representatives on plan boards are business or professional men -- heads of large concerns, lawyers, bankers.[5] One finds an occasional plan with a representative of a church group. Frequently the boards will contain one or more persons active in a women's organization, a community agency, etc. There are approximately 15 plans which have officials of labor unions on their boards.[6] A few have representatives of farm organizations. In general there is far more representation of business or employers than of labor or farm groups and in some plans one gets the impression that the so-called public representatives, although they have the public interest as they see it in mind, are quite far away from or out of touch with those whom they are supposed to represent.

These hospital plans are large organizations, some of them with an income of millions of dollars a year. They need competent management. How to secure this while at the same time assuring that the organization will be responsive to the subscribing public is a problem which is not easy to solve.

### WHO CONTROL THE PLANS?

In practice, the numerical representation of one group or another on the plan board may indicate little as to the real control of the plan. The real control of a plan seems to depend largely upon the play of personalities. It depends first upon the relationship of the plan's director and his board, to what extent the director dominates the board or the board dominates the director. Then it depends upon the personalities on the board. Individuals who are keenly interested in the plan, who devote much thought to it, who always attend meetings, and whose judgment is sound, so that time and time again they make the right decisions -- such individuals exercise an influence beyond all proportion to their number. Two or three such key individuals often come to exercise such real leadership that they, together with the plan director, really control the plan.

The question, "Who controls?" is inevitably bound up with the question "Controls for what?" This necessitates a discussion of the interests of the various participants.

---

5/ The character of the public representatives of the Philadelphia plan is probably typical. This plan has six public representatives, and three directors are selected by the Bishop of the Catholic Archdiocese of Philadelphia (this last is not typical). At the time of the visit to the plan these nine directors were: a lawyer, a judge, the head of a leather company, a partner in an investment banking concern, the head of an educational institution, a Federal government official, the President of the League of Women Voters, the president of a telephone company, a physician (the last, an appointee of the Bishop).

6/ Statement of C. Rufus Rorem, Director of the Blue Cross Commission, in the Hearings before the Senate Committee on Education and Labor, 79th Congress, Second Session, on S. 1606, Part 2., p. 947, April, 1946.

CONFIDENTIAL

BCBSA00289792

In theory the executive director of a plan and his staff are the servants of the plan board; their function is to carry out the policies decided by the board. In actuality the plan director (and in a large plan his key staff) play important roles in the formulation of policy. The plan director works at the plan's affairs eight hours a day; he lives with the plan problems constantly; he has a technical competence or familiarity with the affairs of the plan which exceeds that of the board members; he has at his finger tips the information required for determination of policy. Hence it comes about that a strong executive director will be a leader in the development of plan policy, and that he will be constantly educating his board as to necessary courses of action.[7] (However it is also true that a plan director who gets out of touch with his board, who does not faithfully carry out policies decided by the board or endeavors to lead them in directions that they do not wish to go is apt sooner or later to be out of a job.)

The primary interest of the plan director is to make the plan a success. Success is very largely measured by the number of subscribers and maximum growth is fostered by offering the most attractive possible proposition to the public, i.e., by giving as much as possible in benefits for as little as possible. The plan director is, of course, interested in salary and the security of his job, but favorable prospects here go along with the success of his plan. The plan director will know that if the plan is to succeed it must have the enthusiastic support of its hospitals. Such support will not be forthcoming unless the hospitals are fairly remunerated for their services. But this is regarded as a means and not an end. Practically without exception, the directors of all the plans surveyed felt that the primary purpose of their plan was to serve the public. With few exceptions, they regarded the plan not as an agency of the hospitals, but as a civic enterprise.

Hospitals wish the plans to succeed because of the benefits to the public and themselves. At the same time hospitals want to be fairly paid for their services and there may be differences of opinion as to what constitutes fair remuneration. Sometimes what the hospitals think is fair remuneration is more than other interests on the plan board think they (the hospitals) should have.

It is true that virtually all hospitals, at least in point of bed capacity, are not for profit and have no other aim than to serve the public, i.e., to provide the best service at the lowest cost. Nevertheless it is possible for hospitals to benefit themselves at the expense of the plan (and vice versa). Again under a situation in which a large proportion of the population was enrolled and hospitals were paid on a cost basis, hospital administrators would wish in general to provide a more and more perfect or elaborate service, and to make this possible would ask for higher and higher rates of payment. At some point the public would desire to call a halt, preferring to spend its money for other purposes. In the long run the public should and will desire to say how much it should spend for hospital care, and will not be content to leave this decision to the hospitals.

---

[7] It may be pointed out that nationally the Blue Cross movement really consists of the plan directors. The semi-annual conferences of the plans at which important decisions affecting all the plans are made are attended mainly by the plan directors and key staff members; few board members attend. (At the April 1947 conference there were perhaps 10 trustees present.) The Blue Cross Commission under the new reorganization will be composed of 12 plan directors and 3 representatives of the American Hospital Association.

CONFIDENTIAL

BCBSA00289793

As indicated previously hospital administrators faced with the day to day problem of balancing their hospitals' budgets frequently look at the problem of remuneration through the glasses of their own needs. Trustees tend to look at the situation broadly and to weigh both the needs of hospitals and the needs of the plan.

The medical profession's main interest in hospital service plans is that they facilitate the provision of care to patients. The profession's interests on this side are largely the same as those of the general public, it wishes to see rates as low as possible and benefits as broad as possible in order that the plan may have a maximum growth. The profession also wishes to see the plans remunerate hospitals fairly and adequately, because otherwise standards of hospital care would be lowered. Various groups of physicians, the roentgenologists, pathologists, anesthetists, have had special interests relative to the plans. They have been concerned, at times, to have their services excluded from hospital plans on the ground that they were medical services and should not be offered under a hospital plan. Where their services have been offered they have naturally wanted the remuneration paid for these services to be adequate, and there may be difference of opinion between these specialists on the one hand and the hospitals or the plans on the other hand, as to what constitutes adequate remuneration.

The public's interest in the plans is that they should provide the most benefits for the least cost, consistent with financial soundness, good administration, and fair remuneration to hospitals. It is a decidedly short view which would have it that the plans can benefit by underpaying hospitals.

In summary, while there are certain conflicts of interest, on the whole there is a large measure of indentity of interests on the part of all concerned. All agree that service to the public is the real aim. All agree on the principle that hospitals should be fairly remunerated. Any differences tend to be confined to the technical point of what constitutes fair remuneration. The substantial identity of interests of all participants undoubtedly explains why it is that different plans, some dominated by lay persons, others by hospital administrators, still others by physicians, seem to behave in very much the same way.

The plans then are controlled by persons who wish to see the plans succeed. Success means benefits to the public and is largely measured in terms of people enrolled. Those in control tend to do those things which will make the plan most successful. The plan becomes an entity in itself, the success of which is forwarded by certain moves, held back by others.

The plan must on all counts remain solvent. Support of the hospitals is necessary, so the plan does what is necessary, consistent with other objectives, to win the support of hospitals. The same is true as regards the medical profession. The plan needs the good will of large employers because these make the plan available to their employees and influence other employers to do the same. Where labor organizations are strong, the plan will reach out for the support of these organizations, possibly by putting a representative of labor on the board. For the plan to be of maximum success it must give the general public the feeling that the plan belongs to the public, that it is in truth a civic organization, of, by and for the public. The endeavor to do this tends ultimately to be reflected in the control of the plan.

In the field surveys, an endeavor was made to determine what groups or persons really controlled the plan, i.e., to go behind the nominal representation of various groups on the board of directors. This type of appraisal is not easy, especially in a short visit. Naturally main reliance must be

CONFIDENTIAL

BCBSA00289794

placed upon information provided by the plan director, who in some cases may be biased and in other cases may not correctly evaluate the role played by key figures on his board.

Of the 39 plans visited, it seemed to the surveyors that 16 plans were in reality controlled by the "public", i.e., by lay persons whose sole or dominant aim was benefit to the public. In a considerable number of cases, these lay persons were hospital trustees. Six of the plans surveyed seemed to be firmly controlled by the hospitals. Largely these were plans in which the hospital representatives on the plan boards were entirely or mainly hospital administrators. Three plans seemed to be jointly controlled by hospitals and the public representatives, three plans seemed to be controlled by the plan director. In one of these cases the plan director seemed to give undue consideration to his own interests, at any rate he was paid a salary out of line with the salaries paid the directors of other plans with comparable membership. In the other two cases, the directors apparently ran the plan for what they conceived to be the public's interests. Two plans seemed to be dominated by the plan director and the medical profession; two other plans, by the hospitals and the medical profession jointly. In two instances, control of the plan seemed to be pretty well diffused among hospital, medical and public representatives. In the case of the five remaining plans, no definite decision could be made as to where control really lay.

It has been largely assumed that hospital service plans are controlled by the hospitals. The truth seems to be that more often they are controlled by persons who think of themselves as representing the public.[8/]

## WHO SHOULD CONTROL THE PLANS?

Among executive directors and board members there seems to be two theories as to which groups or interests should control the plans. One theory runs to the effect that the plan is simply a projection of the hospitals, that it is an agency of the hospitals for selling or providing their services to the public. This view naturally holds that hospitals should have dominant control of the plan.

The second theory is that the plan is a civic enterprise, that it is an agency of the public rather than of the hospitals. This view holds that the plan should be independent of the hospitals, and that since the aim of the plan is service to the public and since the public foots the bill, dominant control should lie with the public.

The question of which of these views is the more correct depends perhaps upon the stage of development of the plan. A new plan which hospitals have started and which they underwrite is in a very real sense a creature of the hospitals. However, as the plan grows it stands more and more on its own feet. As it accumulates a reserve the underwriting burden is lifted from the hospitals and is shared between the plan and the hospitals. As the number of subscribers grows public interest in the plan intensifies. After a certain stage it would seem that dominant control should shift to the public.

Perhaps the relationship of parents to children supplies a good analogy here. When children are young parents should control them. When the children have grown, when they support themselves, then parental control is neither desirable nor possible.

8/ It is of interest in this connection that in addressing the plans at the April 1947 conference Mr. Hayes, president of the American Hospital Association, stated that from the standpoint of hospitals Blue Cross had two failings, first that plan payments to hospitals had not kept pace with hospital costs, and secondly that the plans did not have a sufficient proportion of hospital people on their boards -- people who knew hospital costs and were familiar with hospital problems.

91

CONFIDENTIAL

BCBSA00289795

# CHAPTER 9

## ADMINISTRATIVE ORGANIZATION AND PROCEDURES

Most hospital service plans have three main departments: an enrollment department, which enrolls new subscribers; a record-keeping department, which bills subscriber groups and subscribers for the subscription charges, maintains records of subscribers eligible for care, and keeps the accounts of the organization; and a hospital department, which confirms to the hospitals the eligibility of subscribers for hospital care and pays the hospitals for care provided to subscribers. Many plans have two other departments which report directly to the executive director, a public education or publicity department, which handles publicity, gets up the promotional or enrollment literature of the plan and aids on public relations; and a statistical or research department, which compiles reports on hospital utilization, actuarial experience, and the like.

Another way of indicating the administrative organization of the plans would be to say that the operation of a plan entails a number of functions. These are: enrollment, billing, maintenance of subscriber records, confirmation of hospital eligibility, payment of hospitals, accounting for funds, public education and statistical analysis. These functions can each become the basis of a separate department. In most plans they are, however, grouped in the three main and two subsidiary departments indicated above.

### ENROLLMENT

The function of enrollment includes (a) the enrollment of new groups, and (b) the enrollment of additional subscribers in existing groups.

The enrollment of subscribers in new groups entails explanation of the plan by the enrollment representative to the employer, persuading the employer to make the plan available to his employees, the distribution of literature to the employees, explanation of the plan to them either in groups or individually, and securing from as many as possible a signed application blank.

The enrollment of new subscribers in existing groups consists of making arrangements with employers for enrollment of new employees within a certain period of their acceptance of employment, and for holding re-enrollments within the group. The enrollment of subscribers in existing groups tends to be more of a routine 'service' function than the 'selling' of new groups, and some plans have seen fit to assign the two functions to separate units within the enrollment department.

### BILLING AND RECORD KEEPING

The application cards from newly enrolled subscribers go to the billing and record keeping department which issues to the subscriber a contract and an identification card. Almost all of the plans use business machine equipment, and there is now punched from the application card a billing card, which gives the name of the subscriber, his group and contract number, the type of contract which he holds, (i.e., semi-private or ward, and single person, hus-

92

BCBSA00289796

band and wife, or family) the monthly charge, and such other data as the plan may wish to include for billing or statistical purposes. The billing cards are usually filed alphabetically by groups, and the application cards are usually filed in the same manner in an adjacent file.

The billing cards are then run each month to produce the group bill, two copies of which are usually sent to the employer, who keeps one and returns the other with his remittance. If an employee leaves the concern or cancels, his card is removed from the group billing file so that this file always maintains a record of paid up subscribers in this group.

Many plans assign a certain number of subscriber groups to so-called "units" consisting of two or three clerks. The personnel of each unit is responsible for maintenance of the records for its groups, for getting out the billings, for taking care of transfers between groups, or of changes in the type of contract held by a subscriber, and for all relations with their firms and with subscribers in these groups. The unit is also responsible for the certification of the paid up status of the subscriber in the case of a hospital admission. The unit system decentralizes the files of subscriber records and centralizes responsibility for a certain group of accounts upon one or more persons.

Many plans, in the case of very large firms, have discarded the so-called positive method of billing (in which the bill lists each subscriber-employee with the amount due from each) in favor of what is known as negative billing. Under this system the firm and the plan each maintain a file of current subscribers, but the plan sends no detailed monthly listing to the employer. Instead the employer supplies the plan with changes made (employees added, dropped, changes in types of contracts made, etc.) in such manner that a complete reconciliation between the previous month's remittance and the current month's remittance can be made. This procedure has been found to be a saving for both the plan and the employer.

Pay direct subscribers are handled by separate units. Generally the cards for these subscribers are placed in separate groups depending upon whether payment is made quarterly, semi-annually or annually. At the appropriate time the cards are run to produce bills, much like utility bills, which are then mailed to the subscribers. The subscriber detaches the stub and returns it with his remittance.

## CONFIRMATION OF HOSPITAL ELIGIBILITY AND PAYMENT OF HOSPITALS

When a member is admitted to a hospital he presents his identification card and gives to the hospital admitting clerk such data as the plan may require in order to identify him or her as an eligible subscriber. The hospital then sends to the plan an admission notice, giving this and other required data such as the admitting diagnosis and name of doctor. These admission notices are received in the hospital department and are routed to the appropriate units for the subscribers in question. The clerk in the unit verifies the subscriber's paid up status and indicates on the notice whether the person is entitled to care and the number of days (remaining over from any previous admission) to which he is entitled. The clerk will also post on a card or jacket affixed to the application card the name of the person admitted, the date of admission, and a code number for the hospital. A copy of the admission notice with liability for the case accepted or rejected is then returned to the hospital.

93

CONFIDENTIAL

BCBSA00289797

When the patient is discharged, the hospital makes out a bill for the case. This gives the date of admission and discharge, the number of days charged for, the hospital's regular charges for the services rendered, and the amount the hospital is entitled to at the rates of payment provided by the plan. This bill is matched with a copy of the admission notice and checked for correctness. The bill is then sent to the appropriate unit where the date of discharge and number of days used is posted onto the subscriber's service record. A hospital claim punched card is then made from the bill. This card is used in preparing the voucher, listing the cases paid for, which accompanies the plan's check to the hospital. Most plans pay their hospitals once a month.

A number of plans follow a somewhat different procedure in determining the number of days for which a subscriber is eligible. The admission notice is forwarded to the unit which enters on the subscriber's service record a claims number. A punched card is then made for the hospital admission, this card being completed when the hospital bill is received. A record of these claims may then be run off which is consulted when any new hospital admission is received for this subscriber in order to ascertain the number of days for which he is still eligible. Alternatively the claims records are filed alphabetically and this file is inspected to ascertain any previous admissions during the year for the member in question and the number of days used.

These are the main operations which must be performed in the administration of a hospital service plan. Probably no two plans perform all of these operations in exactly the same way, but the essential principle is the same.[1]

---

[1] An important administrative innovation is so-called blanket coverage of dependents. This procedures was first instituted by the Buffalo plan; it is now used by some seven or eight plans and will probably be widely adopted. Under this procedure the plan maintains no current record of the dependents of a subscriber. It authorizes hospital care for any eligible dependent of a subscriber (who has family coverage), on the basis of data on the hospital admission notice.

This procedure eliminates much costly record keeping. Since no record of the names of dependents is maintained no change of record must be made when there is a change in a subscriber's dependents, e.g., spouse dies or is divorced, a child is added or a child reaches the upper age limit and is dropped. No system for tagging the latter children as they reach the age limit needs to be maintained. In a large plan the volume of these changes is enormous and they are costly to make. (The Buffalo plan estimated that each such change used to cost it 60 cents.)

Under this arrangement the plan does not have a detailed count of the number of dependents; however, this can be approximated through spot checks. Experience indicates that there are no drawbacks from the standpoint of possible fraudulent admissions. The method has the great advantage that it facilitates coverage of new born infants from the first day. Blanket coverage is only feasible under a dual rate structure.

CONFIDENTIAL

BCBSA00289798

# CHAPTER 10

## THE FINANCES OF HOSPITAL PLANS

Blue Cross is "big business". At the end of 1945 the 80 approved plans in this country had total assets of $80,311,953, liabilities of $32,292,617 and reserves of $48,019,336. As expected, a large part of this money is concentrated in a few plans. The 12 plans with over 500,000 participants had total assets of $50,791,944 and reserves of $30,067,661.

The total income of the 80 plans in 1945 was $123,333,241. From this income $100,654,286 or 81.6 percent was paid to hospitals, $14,990,598 or 12.2 percent was used for administration and $7,688,357, 6.2 percent, went into reserves.

The distribution of income during the past six years has been as follows:[1]*

| Year | Hospitalization Expense % | Administration % | Additions to Reserves % |
|------|---------------------------|------------------|-------------------------|
| 1945 | 81.6 | 12.2 | 6.2 |
| 1944 | 76.5 | 12.3 | 11.2 |
| 1943 | 75.9 | 12.3 | 11.8 |
| 1942 | 74.8 | 12.1 | 13.1 |
| 1941 | 70.6 | 12.3 | 17.1 |
| 1940 | 74.0 | 13.8 | 12.2 |

It will be seen that since 1941 the proportion of income used for hospitalization has increased, while the percentage of income added to reserves has dropped. The 1945 distribution of income probably is somewhat abnormal. Because of rapidly rising hospital costs many plans found it necessary to increase their rates of payment to hospitals. A good many of these plans did not immediately raise their rates to subscribers but for a certain period financed the increased payments by dipping into reserves. As a result 13 of the plans had a net deficit for the year and many others had an uncomfortably small margin of net income. Appendix H gives the salient financial data for each of the plans.

As might be expected there is great variation among the plans in the proportion of income used for hospitalization, administration, and additions to

[1] Plans in the United States only.

* As this report was being prepared for press, 1946 financial data for the plans became available. In 1946 the plans (United States only) had a total income of $168,602,501. Hospital expense amounted to $135,157,308 (82.6%), administrative expenses amounted to $21,249,712 (13.0%) and additions to reserves, $7,195,481 (4.4%). Total reserves at the end of the year amounted to $56,545,616. The data for the individual plans are set forth in Appendix L.

95

CONFIDENTIAL

BCBSA00289799

reserves.  Thus in **1945** (considering only plans in operation more than three full years) the percent of income used for hospitalization varied from 59.1 for the Sacramento plan to 103.3 in the case of the Akron plan.  The percent used for administration varied from Akron's 6.5 to Durham's 29.3[2/].  The percent of income added to reserves varied from a deficit of 9.8 for the Akron plan to 26.7 for Maryland.

Two factors which exert some influence on the distribution of a plan's income among hospitalization, administration and additions to reserves, are the age and the size of a plan.  Administration costs, for obvious reasons, are relatively high during the plan's first two or three years. (In the first few months of operation, administrative expenses often exceed income.) Hospital expense tends to be low during this initial period, chiefly because of the maternity waiting period.  After two or three years hospital and administrative expense ratios tend to be stabilized and from then on it is the size, rather than the age of the plan, which influences these ratios.

The size of a plan appears to exert a definite influence on the proportion of income used for administration.  As indicated in Table 9 the larger plans use an appreciably smaller proportion of income for administration than do the smaller plans.  There does not seem to be any clear relationship be-

|  | TABLE 9 |  |  |
| --- | --- | --- | --- |
| Distribution of Income by Size of Plan, 1945. (Does not include plans in operation less than three full years) | | | |
| SIZE GROUP NO. OF PARTICIPANTS | HOSPITAL EXPENSE % | ADMINIS-TRATIVE EXPENSE % | ADDITIONS TO RESERVES % |
| OVER 500,000 (12 PLANS) | 83.6 | 11.4 | 5.0 |
| 200,000 TO 500,000 (12 PLANS) | 78.2 | 11.6 | 10.2 |
| 100,000 TO 200,000 (23 PLANS) | 77.8 | 14.6 | 7.6 |
| UNDER 100,000 (28 PLANS) | 80.2 | 14.7 | 5.1 |

tween size of plan and proportion of income used for hospitalization, although in both 1945 and 1944 the largest plans -- those with over 500,000 participants -- used more of their income for hospitalization than any other size group.[3/]

## FACTORS AFFECTING THE HOSPITALIZATION EXPENSE RATIO

Table 10 shows the distribution of plans according to proportion of income used for hospitalization.  What factors are responsible for the wide variation?

2/ Not counting the New Mexico plan (1945 administrative expense ratio 52.8 percent) which although in operation as a local plan for several years was reorganized as a state-wide plan and first approved in 1945.

3/ In 1944, the proportion of income used for hospitalization by the plans of different size groups was as follows (plans in operation less than three full years excluded):  Over 500,000 participants, 78.2 percent; 200,000 to 500,000 participants, 76.1; 100,000 to 200,000 participants, 72.5; 50,000 to 100,000 participants, 70.7; and under 50,000 participants, 73.0.

CONFIDENTIAL

BCBSA00289800

| TABLE 10 |
| :-: |
| Distribution of Plans According to Proportion of Income Used for Hospitalization, 1945 (Does not Include Plans in Operation Less than Three Full Years) |

| PERCENT RANGE | NUMBER OF PLANS |
| :-- | :-: |
| UNDER 60.0 | 1 |
| 60 - 64.9 | 1 |
| 65 - 69.9 | 7 |
| 70 - 74.9 | 9 |
| 75 - 79.9 | 21 |
| 80 - 84.9 | 17 |
| 85 - 89.9 | 10 |
| OVER 90 | 8 |
| TOTAL | 74[1] |

1/ Excludes New Mexico plan. See footnote 2.

The plan's per diem payments to hospitals, the duration of benefits, and the hospital utilization rate among its subscribers, determine the amount of hospitalization expense. A plan's subscription rates affect the ratio of this expense to income. If two plans spend the same amounts per subscriber for hospitalization but one has more income per subscriber than the other, the first will have a lower hospitalization expense ratio than the second.

The proportion of its income that a plan utilizes for hospitalization expense or for additions to reserves depends in part upon circumstances but in the long run reflects very largely the policy or philosophy of the plan. Naturally these proportions are affected by the percent of income which the plan has to use or chooses to use for administration. In any particular period a plan may use for hospitalization a higher or lower proportion of its income than it had counted on, owing to hospital utilization or per diem costs of hospital care, being higher or lower than had been anticipated. But in the long run a plan tends to adjust its rates, its subscriber benefits or its payments to hospitals so that the proportion of income used for hospitalization or, conversely, added to reserves, more or less reflects conscious policy.

The plans have pursued different policies in this regard. Some, as for example the Michigan plan, which over the three years, 1943-5, used 88.7 percent of income for hospitalization and only 1.4 percent for reserves, have thought it best to keep reserves at a minimum and to return to the subscriber in current benefits as large a proportion of his subscription dollar as possible. Other plans, with the same social motivation, have preferred to steer what they regarded as a safer course. At the opposite extreme are plans like the Sacramento plan, (which in the years 1943-5 has put 56.3 percent of income into hospitalization and 18.9 into reserves) which have probably retarded their growth by returning so little in benefits to their subscribers.

The policy pursued in this regard very largely reflects the temperament of the plan's director and the leading figures on the board. It reflects also the degree of backing given by the plan's hospitals. A plan which is firmly underwritten by its member hospitals can afford to have less reserves than one which is not underwritten by its hospitals and must depend solely on its own reserves for financial security. The policy pursued also reflects past experiences. The New York plan was "burned" by its experience in 1939 and for several years thereafter pursued a quite conservative policy.

97

CONFIDENTIAL

BCBSA00289801

## FACTORS AFFECTING ADMINISTRATIVE EXPENSE RATIOS

In the aggregate the plans use 12.2 percent of income for administration. But the variation in this regard, as Table 11 shows is great. One mature plan operated on less than 7 percent of income, while 5 plans (over three years old)● used over 20 percent of income for administration. What is the explanation of this variation?

| TABLE 11 |
| --- |
| Distribution of Plans According to Percent of Income Used for Administration, 1945 (Does not include plans in operation less than three full years) |

| PERCENT RANGE | NUMBER OF PLANS |
| --- | --- |
| UNDER  7.00 | 1 |
| 7 -  9.99 | 12 |
| 10 - 12.99 | 29 |
| 13 - 15.99 | 11 |
| 16 - 18.99 | 12 |
| 19 - 21.99 | 5 |
| 22 - 24.99 | 2 |
| 25 - 27.99 | 1 |
| 28 - 30.99 | 1 |
| TOTAL | 74[1] |

1/ Does not include New Mexico plan. See footnote 2.

One quite important factor is the plan's rates and benefits. Some plans provide predominantly ward care or give only partial benefits to subscribers, and their subscription rates are correspondingly lower than those of other plans. Yet these plans must go through practically the same administrative procedures -- the enrollment of new subscribers, the keeping of subscriber records, paying hospitals, etc., as the plans with greater benefits and higher income per subscriber. The cost of performing these administrative procedures, in terms of dollars and cents per subscriber per year, is about the same whatever the dollar value of the benefits provided. The result is that plans with restricted benefits and low rates tend to show higher administrative expense ratios than plans with comprehensive benefits and high subscription rates.

That percent of income used for administration and annual cost of administration per subscriber do not necessarily go together is shown by the data of Table 12. It is evident that a low administrative cost ratio is not in itself an index of administrative efficiency. It may simply indicate that the plan has a relatively high income per subscriber. In some respects administrative costs per member are a better index of high or low cost of administration.

In part, therefore, the variation in administrative expense ratios among the plans may simply reflect differences in income per subscriber. In part the variation is due to differences in managerial talent among the plan directors -- some plans are administered more efficiently than others. The size of the salaries which the plan chooses to pay affects administrative cost, and some plans pay more than others for about the same talent.   A few plans are

98

CONFIDENTIAL

BCBSA00289802

TABLE 12

Comparison of Administrative Expense Ratios and
Annual Administrative Costs per Subscriber for
a Number of Plans, 1945.

| PLAN | PERCENT OF INCOME USED FOR ADMINISTRATION | ANNUAL ADMINISTRATIVE COSTS PER SUBSCRIBER [1/] |
|---|---|---|
| | % | $ |
| CLEVELAND, OHIO | 7.0 | 0.46 |
| RHODE ISLAND | 8.8 | 0.61 |
| COLORADO | 10.1 | 0.59 |
| MICHIGAN | 10.5 | 0.77 |
| MINNESOTA | 11.1 | 0.59 |
| KINGSPORT, TENN. | 11.2 | 0.55 |
| ROCHESTER, N. Y. | 11.5 | 0.80 |
| SAVANNAH, GA. | 11.9 | 1.03 |
| DELAWARE | 12.0 | 0.76 |
| NORFOLK, VA. | 12.0 | 1.09 |
| NEW YORK, N. Y. | 12.9 | 1.07 |
| OAKLAND, CALIF. | 16.2 | 1.71 [2/] |
| ASHLAND, KY. | 18.7 | 1.01 |
| LOS ANGELES, CALIF. | 19.0 | 1.75 |
| CHAPEL HILL, N. C. | 19.4 | 1.10 [2/] |

1/ Administrative expenses for the year divided by the average
of the number of participants at the beginning and end of the
year. Appendix H gives this information for each plan.

2/ These plans issue both hospital and medical contracts, and
the costs shown include administration of both contracts.

subject to taxes from which other plans are exempt. Thus the plans in Cali-
fornia all must pay a 2-1/2 percent premium tax. The type and size of the
area served makes a difference. A plan which serves a large, sparsely settled
area will, other things being equal, have far higher costs for travel, tele-
phone, etc., than a plan which serves a densely populated metropolitan area.

Acquisition costs in some plans are a very large part of all administra-
tion costs, and these costs vary greatly from plan to plan. Figures for a
few plans for which these data are available are presented: [4/]

| Plan | Acquisition Expense (% of Income) | Administrative Expense other than for Acquisition (% of Income) | Total Administrative Expense (% of Income) |
|---|---|---|---|
| Rochester | 1.4 | 9.4 | 10.8 |
| Alabama | 4.6 | 10.3 | 14.9 |
| Texas | 6.3 | 14.2 | 20.5 |
| Sacramento | 9.5 | 14.4 | 23.9 |
| Huntington | 11.3 | 11.4 | 22.7 |
| Chapel Hill | 8.3 | 11.9 | 20.2 |
| Durham | 14.8 | 11.0 | 25.8 |
| Kansas | 7.1 | 10.1 | 17.2 |
| Delaware | 3.2 | 14.4 | 17.6 |
| Massachusetts | 2.4 | 9.2 | 11.6 |

4/ The data are for either 1943 or 1944. This sample is defective in that it includes an unduly high
proportion of plans with high administrative costs. For the plans as a whole acquisition costs probably run
at about 2 to 3 percent of income.

99

CONFIDENTIAL

BCBSA00289803

It is apparent from these figures that differences in acquisition expenses account for a considerable part of the variation in administrative costs among plans.  Acquisition costs, as a percent of income, are especially heavy in a new plan.  They are apt to be far greater for plans serving rural, than for those serving urban areas.  They will be greater where the average size of enrolled groups is small than where it is large.

The size of a plan affects administrative expense.  In general the larger plans use a smaller proportion of income for administration and have a smaller administrative expense per member than do the smaller plans.  That large size seems to make for economy of administration may seem to be belied by the fact that there are a considerable number of small plans with quite low administrative expenses per member and administrative cost ratios.  However, with few exceptions these plans serve a very restricted area and they have had for years a very slow growth.  In some cases these small plans appear to have achieved low operating costs by economizing on enrollment efforts.

Why is it that the smaller plans do not appear to be able to operate as cheaply as the larger ones?  In part it is due to the fact that the plans must incur certain fixed or overhead charges and these charges, at least up to a certain point, do not increase proportionately with the size of the plan.  Thus in 1944, the salary of the director of the smallest plan amounted to 9.4 percent of that plan's total income, whereas the very much greater salary of the director of the largest plan amounted to but 16/100's of one percent of that plan's income.  The plans must incur expense for office rent, telephone, light, etc., and these expenses tend to be proportionately greater for a small than for a moderate sized plan, though after a certain size is reached these expenses probably increase more or less proportionately.  If a small plan uses mechanical tabulating equipment, the expense for this equipment will remain fixed regardless of number of members until the plan reaches that size at which additional equipment is needed.  The smaller plans cannot achieve the full advantages of specialization; they cannot afford, as do the larger plans, to have one person assigned to publicity, another to hospital relations, etc.  Small plans tend to have less prestige and secure less publicity than larger ones, simply because they are small.

The administrative expenses of the Durham plan (29.3 percent in 1945) are so far out of line as to call for special note.  Primarily the explanation lies in the fact that this plan in addition to its regular contracts offers an "industrial insurance" type of contract.  These latter contracts are sold on a commission basis by agents who collect the premiums weekly.  Acquisition and administrative costs on these contracts run close to 50 percent.  The plan's defense of these contracts is that they enable it to reach low income subscribers who could not be reached on any other basis.

In considering administration costs it should be borne in mind that a low administration expense ratio or a low cost of administration per subscriber do not necessarily indicate efficient administration.  Efficient administration is indicated both by cost of administration and the results of administration -- the latter probably being best reflected in the growth of the plan.  Some plans have achieved a low cost of administration by employing few enrollment representatives.  Still others have achieved a low cost by skimping on certain services which in the long run are necessary for intelligent operation of the plan.  The efficiently conducted plan is one that has a good record of achievement and a low cost of administration.

CONFIDENTIAL

BCBSA00289804

## RESERVES

The following figures show the distribution of plans according to percent of net income, i.e., percent of income added to reserves. Both 1945 and 1944 figures are given since the 1945 experience, for reasons previously indicated, is probably abnormal.

| Percent of Income Added to Reserves | Number of Plans 1945 | 1944 |
|---|---|---|
| Deficit | 13 | 3 |
| 0.0 to 5.0 | 21 | 9 |
| 5.1 to 10.0 | 24 | 19 |
| 10.1 to 15.0 | 11 | 21 |
| 15.1 to 20.0 | 7 | 11 |
| 20.1 to 25.0 | 3 | 8 |
| 25.1 to 30.0 | 1 | 2 |
| Total | 80 | 73[1] |

[1] / Data for 3 plans not available.

The reasons for the variation among the plans have to some extent already been dealt with. From one point of view, additions to reserves may be thought of as the residual after hospitalization and administrative costs have been met. Perhaps, however, it is more realistic to view additions to reserves as a determining factor: in the long run the plan decides what margin of net income it wants and then adjusts its rates and benefits so that it will have this net income. Ordinarily a plan will try to put into reserves in any current period the amount required in order gradually to build reserves up to or maintain them at, the level the plan believes is desirable.

At the end of 1945 the plans had aggregate reserves equal to $2.54 per participant and sufficient to meet hospitalization expense for 5.3 months for the then current number of participants (See Appendix H). Table 13 shows the distribution of the plans according to reserves per participant and reserve-months of hospitalization. Some plans it will be seen have almost no reserves -- one plan which has been carried by its member hospitals is in debt to them. On the other hand, there are a few plans with reserves sufficient, without further income, to provide hospitalization to the then current number of subscribers for over a year.

What is an adequate reserve? This depends on a number of factors. It depends first and foremost upon whether the plan is firmly underwritten by its member hospitals and upon whether or not they are willing in effect, to make temporary loans to the plan to carry it over any period in which expense exceeds income. For example, when the manager of the Kansas plan was employed he was told by his board that they wanted the plan run without large reserves. In other words the hospitals not only agreed to guarantee the benefits but they were ready, if need be, to take fluctuating payments in order to permit the plan to pay out close to 100 percent of current income in benefits and administration.

The hospitals of most plans contractually agree to underwrite the plan, but generally they want the plan run so that they can count on steady and assured payments, in other words so that the possibility of their having to make good on their guarantee of benefits will be a remote contingency. Hence the plan needs a reserve to cushion the impact of any temporary unfavorable

101

CONFIDENTIAL

BCBSA00289805

TABLE 13

Distribution of Plans According to
(A) Dollar Reserves per Participant, and
(B) Number of Reserve-Months of Hospitalization,
December 31, 1945

(Does not Include Plans in Operation
Less than Three Full Years)

| A.  Dollar Reserves per Participant | | B.  Reserve Months of Hospitalization | |
|---|---|---|---|
| DOLLAR RESERVES PER PARTICIPANT | NUMBER OF PLANS | RESERVE-MONTHS OF HOSPITALIZATION [1] | NUMBER OF PLANS |
| $ | | (month) | |
| LESS THAN 5.00 | 1 | LESS THAN 0 | 1 |
| .00 - .49 | 4 | .0 - 0.9 | 4 |
| .50 - .99 | 8 | 1.0 - 1.9 | 6 |
| 1.00 - 1.49 | 13 | 2.0 - 2.9 | 9 |
| 1.50 - 1.99 | 8 | 3.0 - 3.9 | 6 |
| 2.00 - 2.49 | 14 | 4.0 - 4.9 | 8 |
| 2.50 - 2.99 | 7 | 5.0 - 5.9 | 10 |
| 3.00 - 3.49 | 5 | 6.0 - 6.9 | 4 |
| 3.50 - 3.99 | 7 | 7.0 - 7.9 | 7 |
| 4.00 - 4.49 | 2 | 8.0 - 8.9 | 1 |
| 4.50 - 4.99 | 1 | 9.0 - 9.9 | 3 |
| 5.00 - 5.49 | 2 | 10.0 - 10.9 | 1 |
| 5.50 - 5.99 | 3 | 11.0 - 11.9 | 2 |
| 6.00 - 6.49 | 1 | 12.0 - 12.9 | 2 |
| 6.50 - 6.99 | 1 | 13.0 - 13.9 | 2 |
| TOTAL | 75 | TOTAL | 72 [2] |

[1] Average monthly hospitalization expense per participant times the current number of participants divided into total reserves. Specifically, the figures for each plan (See Appendix H) were obtained by dividing the average number of participants during the year (average of number of participants at the beginning and end of the year) into one-twelfth of the year's total hospitalization expense. The result multiplied by the number of participants on January 1, 1946 was divided into total reserves as of that date.

[2] Full data not available for three plans.

experience and to prevent this experience resulting in reduced payments to hospitals.

At the other extreme are plans, such as the Sacramento and Oakland plans, which are not underwritten by the member hospitals (such was the situation at the time of the survey visit) and where these hospitals really undertake no obligation whatever to the plan. These plans have to stand entirely on their own financial legs. Hence they maintain large reserves -- $6.78 per participant in the Sacramento plan, $5.58 in the Oakland plan.

The reserve needed by a plan also depends upon its ability to make adjustments quickly -- upon whether or not it can change the subscription rates and benefits on short notice. Some plans have subscriber contracts which run for a year's period, and the plan can only change the subscription rates and benefits at the expiration of the contract. Such a plan, when it determines that a change in rates or benefits is necessary, can only make the change

102

CONFIDENTIAL

BCBSA00289806

gradually over a year's period -- replacing each subscriber's contract as it expires. These plans need more reserves than the vast majority of plans which can change subscription rates and benefits on short notice or without notice. (As of July 1945, three-fourths of the plans had contracts which could be cancelled or revised on 30 days notice or less, and the whole trend has been in the direction of such provisions, as opposed to contracts which can only be cancelled or revised at the end of the contract year.)

A plan which is at liberty to change its contracts on 30 days notice or less could institute a rate change in two to four months, i. e., it would require this period of time to inform all subscriber groups of the change, reenroll subscribers at the new rate (when this is necessary), change its billing cards, etc.

The contingencies against which a plan needs or might seem to need reserves are the following: (a) sudden increase in hospital utilization owing to a public disaster or epidemic; (b) sudden increase in utilization owing to various other contingencies; (c) unanticipated increase in per diem hospital costs; (d) gradual increase in hospital utilization owing to changes in medical practice, greater tendency of the public to seek hospital care, etc.

Any conceivable public disaster would probably entail but a small overall increase in hospital utilization. This is so because the need for hospitalization owing to such a disaster would probably exist only for a few weeks following such a disaster, and because the amount of care which could be provided in regular hospitals is limited by existing hospital capacity. Hospitalization in emergency facilities would probably be provided by public authorities at no cost to the patient or the plan. A plan which served a whole State or a large metropolitan area would probably feel the consequences of a public disaster less than one which served but a small community.

Possible increases in hospitalization due to an epidemic tend to be limited by the following facts: (a) certain types of infectious disease cases are ordinarily not admitted to general hospitals, (b) hospital capacity at any one time is limited and an increase in admissions of epidemic disease cases is apt to be offset by a decrease in admissions of other cases, and (c) an epidemic in any one community is not likely to last more than a few months. An epidemic which filled all hospitals in a community to 110 percent of normal capacity for three months would probably result in excess hospitalization expense to a plan equal to between $1\frac{1}{2}$ and 2 months' normal utilization.

No epidemic in recent years in this country has resulted (so far as we have been able to ascertain) in any appreciable over-all increase in hospital utilization. Epidemics of infantile paralysis, typhoid, meningitis, etc., which may receive considerable newspaper publicity at the time have not been important from a hospital utilization standpoint since the number of cases has been negligible in comparison with the ordinary hospital admissions. While the influenza outbreak of the winter of 1943-1944 resulted in an increase in the percentage of admissions of influenza and pneumonia cases from an ordinary level of 5 percent to a peak in December 1943 of 18 percent, it did not result in any increase in total admissions. In fact the over-all admission rate was less in December 1943 than in December 1942 or 1944.

A plan needs a reserve against various other contingencies which might suddenly increase hospital utilization rates. Thus utilization might be increased because of unsound enrollment methods, by provision of greater benefits, the addition of a medical plan, greater availability of hospital facilities, etc. (Since the war the plans have experienced an increase of 10 percent or so in hospital utilization rates.) It has been factors of this sort

CONFIDENTIAL                                                                    BCBSA00289807

and increases in per diem costs of hospital care, not epidemics, which have been responsible on past occasions when plans have gotten into difficulties.

A reserve is necessary to give a plan time to revise its rates in case of an increase in per diem hospital costs. The reserve for this purpose will need to be larger in a period of unsettled economic conditions, when price levels are rapidly changing, than in a period of relatively stable prices. A plan which pays its hospitals on a regular charge basis, with no control over increases in charges, will of course need far larger reserves than one which pays its hospitals on a fixed per diem basis. If the plan's contract with hospitals holds for a specified period, say, a year or six months, then a plan which pays its hospitals on a fixed per diem basis need maintain only small reserves against increasing hospital costs. If negotiations with hospitals result in a sizeable increase in per diem hospital payments, the plan will have had adequate notice and can institute an increase in subscription rates to compensate.

It would not seem necessary or desirable for a plan to maintain reserves against the long run effects of gradual upward trends in hospital utilization rates owing to increasing age of the population, changes in medical practice, greater tendency on the part of the public to use hospitals, etc. Increased utilization due to such developments can be taken care of by rate revisions in due course. But a plan does need reserves to give it time to institute rate revisions as the short run effects of these trends become manifest.

It should be emphasized that in these hospital service plans the purpose of a reserve is not to guard against future long time contingencies but rather to give the plan a "breathing space" in case of the development of an unfavorable experience -- to give it time to adjust its rates, benefits or payments to hospitals so as to regain a sound basis.

As a yardstick for the purpose of appraising the adequacy of present reserves let it be assumed that a plan which has been putting 5 percent of income into reserves suddenly experiences an increase in hospitalization expense of, say, 25 percent and finds itself with a deficit of 15 percent of monthly income. A plan with reserves equal to 35 percent of current annual income -- which was the approximate situation of all the plans together at the end of 1945 -- would have 28 months in which to assess the causes for the development and make the necessary adjustments, i.e., cancel out the unsoundly enrolled groups, revise subscription rates or benefits, or hospital payments. Assuming developments resulting in a deficit of 30 percent of monthly income, a plan with reserves equal to 35 percent of current annual income would have 14 months to make the necessary adjustments.

In 1942 the Blue Cross Commission recommended that plans maintain reserves equal to five times monthly income or seven times monthly hospital expense, whichever was the greater.[5/] In the 1946 revision of the American Hospital Association's standards of approval it was specified that plans, in the absence of hospital-responsibility for contract benefits, should maintain reserves equal to 25 percent of current income. Both of these standards - the latter, of course, is a minimum - seem reasonable in the light of current knowledge. At the end of 1945 the plans, with reserves equal to 5.3 months of hospitalization, were maintaining less reserves than the Commission had

---

5/ For the basis of this recommendation see, Norby, Maurice, J., *Blue Cross Contingency Reserves: Their Amount and Adequacy*, Hospitals, March, 1942.

CONFIDENTIAL

BCBSA00289808

earlier recommended.  **However**, with aggregate reserves equal to approximately 35 percent of current annual income they were well above the minimum standard quite apart from the factor of hospital guarantee of benefits.

## FINANCIAL SOUNDNESS OF THE PLANS

It is obvious that most hospital plans are in a strong financial position. Not only are most -- two-thirds -- of the plans contractually underwritten by their member hospitals, but most plans have reserves which would seem to be adequate to provide against all possible contingencies, quite apart from the backing of their member hospitals.

However, it is equally obvious, as an examination of Appendix H will show, that certain plans do not share this strong position. For example, at the end of 1945 there were seven plans -- Montana, Florida, Washington, North Dakota, Kansas, Indiana and Michigan -- which had reserves equivalent to less than one month's hospitalization expense. Unless these plans were firmly and contractually underwritten by their member hospitals, they were in a weak financial position. Of these plans, three -- Michigan, Kansas and Washington -- were visited during the survey and were found to be contractually underwritten by their member hospitals. Copies of their hospital contracts (as of January 1947) have been obtained from the other four plans. All four plans are definitely and firmly underwritten by their member hospitals.

An examination of the financial position of the individual plans also shows that some plans have piled up reserves beyond need. These plans have carried caution to excess. It may be seen that some of the plans with the largest reserves have a relatively poor enrollment record. By charging relatively high rates or giving relatively small benefits they have presented a less attractive proposition to the public than other plans and the public's response has been correspondingly less enthusiastic.

## ARE THE PLANS GENUINELY NON-PROFIT?

The plans declare themselves to be non-profit organizations. Is the actual operation of the plans in accordance with their declared character? In practice is there any tendency for those in control of the plans to use them for their private profit? Is there any tendency for the managerial staffs of the plans to be paid salaries which are inconsistent with the non-profit character of the plans?

In the course of the survey no audits of plan finances were made; the financial statements prepared by the plans were depended upon. In no instance among the 39 plans surveyed was there any reason to question the fundamental non-profit character of the plan. A few instances were observed in which directors of plans secured some remuneration or advantage from the plan. In two instances -- perhaps there are others -- a member of a plan's board served as legal counsel for the plan and was paid for his services. This fact was known to all the other members of the board and quite probably the legal services provided were worth many times what the plan paid for them. In a number of instances plans had funds on deposit with banks of which an official was a member of the plan board. Here again this fact was known to the other members of the board. In some of these cases the plan had funds on deposit with practically every large bank in the city and not to have used the bank in question would have constituted a discrimination. In some instances

105

CONFIDENTIAL

BCBSA00289809

the plan was using this particular bank before the officer in question became a director of the plan. It is not suggested that any of the instances cited were improper. Situations of this sort however do point to the need of the plans to formulate what might be termed codes of ethics governing cases in which there are or may be financial relationships between the plan and individual members of its board.[6]

Complete data on the salaries of plan directors were not obtained. However, the following table showing the salaries (at the time of the survey visit) of the directors of certain of the surveyed plans, classified according to size, probably gives a representative picture.

| | | | | |
|---|---|---|---|---|
| **TABLE 14** | | | | |
| **Salaries of Plan Directors** | | | | |
| **(At time of survey visit - March 1944 - February 1945)** | | | | |
| AMOUNT OF SALARY | **SIZE OF PLAN (Number of Members)** | | | |
| | OVER 500,000 | 200,000 TO 500,000 | 100,000 TO 200,000 | 50,000 TO 100,000 | UNDER 50,000 |
| $20,000 | 1 | | | | |
| 15,000 | 2 | | | | |
| 12,000 to $14,000 | 3 | 1 | | | |
| 10,000 | | | 2 | | 1 |
| 9,000 to 9,999 | 1 | | 2 | | |
| 8,000 to 8,999 | | | | 2 | |
| 7,000 to 7,999 | | 3 | 1 | 3 | |
| 6,000 to 6,999 | | 1 | 1 | 2 | 1 |
| 5,000 to 5,999 | | | 1 | | 1 |
| 3,000 | | | | | 1 |

On the whole the salaries paid to the plan directors seem to be reasonable in view of the responsibilities involved. It is true that there are a few cases where the salary seems to be out of line. Some directors are far better compensated than others considering their ability and the size of their plan. But on the whole it does not appear that the management of these nonprofit plans is being unduly rewarded.

---

[6] In at least two instances, the executive directors of plans are members of the board of directors. This may or may not be a desirable practice.

CONFIDENTIAL

BCBSA00289810

# CHAPTER II

## CANCELLATIONS

Cancellations, i.e., terminations of subscriber memberships, are an important factor in the operation of Blue Cross plans. In a mature plan with large membership, sizable numbers of new members must be enrolled each month or year solely to offset the steady loss of persons who for one reason or another leave the plan. For example, the Rochester plan in 1943 enrolled 40,000 new persons, lost 20,000 through cancellations, and thus had a net gain in enrollment of only 20,000. The Kansas City plan, to take an extreme example, in 1944 enrolled 30,000 new persons, lost 26,000 old members and made a net gain in enrollment for the whole year of only 4,000. In short, some plans must make strenuous enrollment efforts to 'bail out the boat faster than it is leaking'. Cancellations entail increased enrollment and other administration costs. They also may tend to affect adversely a plan's selection of risks.

The plans do not use uniform procedures in the compilation of statistics on cancellations. Each plan appears to have its own working definition of what constitutes a cancellation. The definitions of the plans differ in detail so that one plan will count as a cancellation what another plan would not consider to be a cancellation.[1] For these reasons the present cancellation rates of the plans are probably not strictly comparable. However, the rates, such as they are, do tend to show the magnitude of the problem.

Annual cancellation rates (number of participants cancelled divided by the average number of participants during the year) were obtained for 27 of the plans visited. The lowest rate was 9.3 percent; the highest 30.6 percent; the median rate was 16.0 percent. The distribution of the plans according to their rates was as follows:

| Rates % | Number of Plans[2] |
|---------|--------------------|
| 9 – 11.9 | 6 |
| 12 – 14.9 | 5 |
| 15 – 17.9 | 5 |
| 18 – 20.9 | 3 |
| 21 – 23.9 | 3 |
| 24 – 26.9 | 2 |
| 27 – 29.9 | 2 |
| 30 – 32.9 | 1 |
| All | 27 |

[1] For example, the following may or may not be treated as cancellations: a child reaches 19 and is dropped from a family contract; a subscriber dies but his wife and children continue under a family contract; two holders of single contracts convert their contracts into a husband and wife contract.

[2] Data are for either 1943 or 1944, mainly the former. In most cases the rate was derived by the rough and ready method of dividing the number of participant cancellations by the average of the number of participants at the beginning and end of the year.

107

CONFIDENTIAL

BCBSA00289811

The four plans with the highest rates were the Kansas City (30.6%), Chapel Hill (28.3%), Durham (26.6%), and New Orleans (27.0%) plans.  Very high labor turnover in war industries probably accounted for the high cancellation rates in the Kansas City and New Orleans plans.  The high rates for the two North Carolina plans may perhaps be explained in part by the fact that both use enrollment agents paid on a commission basis, (a practice which tends to make for high pressure selling).  Both of these plans also have special contracts for farm families who are borrowers from the Farm Security Administration and among whom the cancellation rate is very high (in one of the plans 65%).

### REASONS FOR CANCELLATIONS

A few plans keep track of the reasons for cancellations.  The following are derived from data of the Rhode Island plan for the year 1946:

| Reason for Cancellation | Percent |
|---|---|
| Dropped membership when left group | 72.5 |
| Transferred to another plan | 1.1 |
| Entered military service | .2 |
| Deceased | 1.0 |
| Dropped voluntarily | .4 |
| Dropped for non-payment | 21.5 |
| Dependent child reached 19 | 3.3 |
| Total | 100.0 |

Below are figures from the St. Louis plan:

| Reason for Cancellation | Year 1942-3 % | Year 1943-4 % |
|---|---|---|
| Left employ of concern | 59.3 | 68.0 |
| Left city | 1.5 | .6 |
| Non-payment | 7.8 | 5.6 |
| Deceased | 1.4 | 1.9 |
| Took another policy | .7 | 1.1 |
| Military service | 20.9 | 12.8 |
| Miscellaneous | 8.4 | 10.0 |
| All | 100.0 | 100.0 |

The Philadelphia plan reports the following for the year 1942.  This plan does not differentiate between cancellations due to non-payment of subscription charges when a subscriber leaves his place of employment and non-payment under other circumstances.

| Reason for Cancellation | Percent |
|---|---|
| Non-payment of dues | 64.0 |
| Suspended for military service | 23.5 |
| Merged with another contract | 6.3 |
| Subscriber deceased | 3.1 |
| Subscriber left Philadelphia area | 3.1 |
| All | 100.0 |

CONFIDENTIAL

BCBSA00289812

It will be seen that a majority of all cancellations occur when a subscriber leaves the employ of the concern where he has been enrolled. Most cancellations, therefore, reflect the shifting of workers from job to job and from place to place. If a subscriber who leaves his place of employment immediately takes a new job with a concern which has a group, he may request transfer to this group, in which case his subscription continues without break. If the new concern does not have a group, the subscriber's membership will lapse unless he chooses to go on "direct payment". Even if the new concern does have a group, a good many subscribers fail to request transfer but let their membership lapse and probably re-enroll when this concern is again re-solicited for members.

When a plan is notified by a concern that the subscription charges for a certain member are not being paid because the subscriber has left its employ, the plan will usually send this subscriber at his home address a notice that membership can be continued by payment of charges directly to the plan, and a bill for the first three months' charges. Usually only about half of those thus solicited pay this first bill and thus go on "direct payment". Among those who do choose to continue membership on this basis, the subsequent rate of cancellation is also high.

The plans report that few subscribers who are on a payroll deduction basis ever request the plan to discontinue their membership or request the concern to cease deducting the charges from their pay. In other words, deliberate cancellation by a subscriber on payroll deduction, because he decides that the plan is no longer worthwhile, is rather rare.

## PAST TRENDS IN CANCELLATION RATES

Cancellation rates greatly increased during the war years due to the induction of men and women into the armed services, the increased mobility of the population and the great increase in labor turnover.[2]  The 1943-1945 rates óf most plans were anywhere from 50 to 150 percent higher than these same plans experienced before the war. For example the St. Louis plan reports the following figures:

| Year | Percent | Year | Percent | Year | Percent |
|------|---------|------|---------|------|---------|
| 1936-37 | 10.2 | 1939-40 | 10.2 | 1942-43 | 20.9 |
| 1937-38 | 10.0 | 1940-41 | 12.5 | 1943-44 | 15.6 |
| 1938-39 | 9.3 | 1941-42 | 15.4 | 1944-45 | 14.4 |
| | | | | 1945-46* | 17.1 |
| | | April 1 - Dec. 31, 1946 | | | 10.3 |

*Fiscal year ends March 31st.

[2] The United States Department of Labor reports that *monthly* separation rates in manufacturing plants in 1939 ranged between 2.6 and 3.5 separations per hundred workers employed. In 1943 the comparable *monthly* rates were 6.6 and 8.6.

109

CONFIDENTIAL

BCBSA00289813

The Delaware plan reports the following:

| Year | Contract Cancellations Per Contract Year (percent) | Member Cancellations Per Member Year (percent) |
|------|------|------|
| 1939 | 6.2 | 6.1 |
| 1940 | 6.9 | 6.7 |
| 1941 | 10.1 | 9.8 |
| 1942 | 17.5 | 14.9 |
| 1943 | 17.0 | 14.7 |
| 1944 | 15.7 | 14.7 |
| 1945 | 18.7 | 18.7 |
| 1946 | 14.1 | 14.3 |

Cancellation rates reached a peak in the months immediately following V-J day, and have since begun to decline.

## CANCELLATION AND LENGTH OF MEMBERSHIP

The rate of cancellations is greatest among new subscribers. Conversely, the longer a subscriber stays with a plan the less likely he is to cancel. This is illustrated by the following figures from the Maryland plan covering the years 1937-8 to 1945:[4]

| Year of Membership Life | Rate of Cancellations per 100 Member Years |
|------|------|
| 1st year | 19.90 |
| 2nd year | 15.29 |
| 3rd year | 10.25 |
| 4th year | 8.27 |
| 5th year | 6.68 |
| 6th year | 5.65 |
| 7th year | 4.32 |
| 8th year | 3.45 |
| Total | 12.61 |

## EFFECT OF CANCELLATIONS ON SELECTION OF RISKS

Data from various plans indicate that cancellation rates are greatest among single subscribers and are less among husband and wife and family subscribers. Cancellations are, therefore, greatest among those from whom the plans ordinarily derive the largest margin of income over hospitalization expense. That the more advantageous risks tend to cancel and the least advantageous tend to retain membership is also shown by the fact that the rate of utilization among group conversion members (those originally enrolled in groups who have converted to direct payment) is often 50 to 100 percent higher than for the whole body of subscribers. The explanation of this, of course,

---

[4] J. D. Colman and H. V. Keyser, *A Study of Cancellation and Conversion Experience*, Associated Hospital Service of Baltimore, October 10, 1946.

CONFIDENTIAL

BCBSA00289814

is that those who will shortly need maternity care or who know of some condition requiring hospitalization will tend to retain their membership when making a change of employment. The tendency of cancellations to lower a plan's quality of risks would be serious if cancellations were not offset by new membership. In practice, however, they are. By constantly increasing enrollment the plans are continually refreshing their average quality of risks, in other words they are constantly enrolling or re-enrolling the better risks whom they lose through cancellations.

### WAYS AND MEANS OF REDUCING CANCELLATIONS

During recent years the plans have taken greater interest in the problem of cancellations. Because the rate of cancellation among "direct payment" subscribers is high and the costs of collecting subscription charges in this manner is higher than through payroll deduction, a number of the plans have taken steps to encourage direct payment subscribers whenever possible to transfer to groups. (Some subscribers who go on direct payment after leaving an employed group, stay on this basis even though subsequently they take employment at a place with an enrolled group.) One device being resorted to more and more frequently is to impose an extra "service" charge on direct payment subscribers so as to give such subscribers an incentive to transfer to a group when they can.

In order to keep cancellations at a minimum during the reconversion period following V-J day many of the plans took special measures. First through newspaper stories, advertisements, radio announcements, posters in plants, etc., these plans broadcast the message to the public that membership could be retained when changing employment. Emphasis was placed both on the advantages of retaining membership and the means of so doing. Secondly, special efforts were made to reach employees about to be laid off. With the cooperation of management, transfer forms were distributed among such employees and enrollment representatives were stationed in the personnel offices during the mass termination period. Concerns were requested to allow extra or double deductions from the separation pay and promptly to transmit to the plans information on employee terminations and the home addresses of terminated employees.

It is probable that a good many of the plans will make continuing use of the techniques developed during the reconversion period in order to hold cancellations to a minimum. The idea is gaining currency that cancellation rates can be affected by plan policy. The main occasion for cancellations is change in employment. The extent of cancellations on these occasions depends upon education of the subscribing public as to the advantages of retaining membership and the means of so doing.

111

CONFIDENTIAL

BCBSA00289815