# CHAPTER 12

## HOSPITAL UTILIZATION EXPERIENCE

The purpose of this chapter is not to give an exhaustive study of the actuarial experience of Blue Cross plans, but to present those few basic facts concerning hospital utilization experience which are necessary for an understanding of the operation of the plans.

### ADMISSION RATES, LENGTH OF STAY, DAYS UTILIZED

The early Blue Cross plans established their rates and benefits on the calculation, based on various studies, that in any one year one out of every ten participants would be hospitalized, that the average length of stay per case would be 10 days, and that the overall utilization of care would be one day per participant per year. The per diem cost of the hospital service to be provided, plus allowances for administrative expense and additions to reserves, indicated the income per participant which the plan's rates would need to yield.

In recent years the average admission rate has tended to be slightly higher than, and the average length of stay to be lower than, the rates indicated by these earlier studies. In 1946, the average annual admission rate for the plans reporting this rate to the Blue Cross Commission, was .1112 per participant (111.2 admissions per thousand participants). The average length of stay was 8.30 days. The approximate average utilization indicated by these data was .923 days per participant.

Figure 12 shows the annual admission rates and average length of stay per case by months during 1943, 1944, 1945 and 1946. It will be seen that admission rates are relatively high and average length of stay low during the summer months. This is due chiefly to the large number of tonsillectomies performed on children during these months. Admission rates in December are low because of the postponement of elective operations during the Christmas season, and the average length of stay in this and the other winter months tends to be relatively long.

As shown by Table 15, both admission rates and the average length of stay per case dipped during the war years and increased in 1945 and again in 1946.

As shown by the following data, participants under the family contract use the least amount of care per participant, and participants under the two person contract the most:[1]

| | One Person Contract | Two Person Contract | Family Contract |
|---|---|---|---|
| Admissions per participant | .10 | .10 | .09[2] |
| Average Length of Stay | 8.72 | 9.33 | 7.17 |
| Patient Days per participant | .92 | .97 | .67 |

[1] Based on data from 31 plans for the year 1944. The figures are the medians. Data from the Blue Cross Commission.

[2] The median average number of participants per family contract is 3.84 (52 plans).

112

CONFIDENTIAL

BCBSA00289816

## TABLE 15

### Annual Admission Rates, Average Length of Stay and Patient Days per Participant, 1940-1946. Medians and Averages for All Reporting Plans.[1]

| | ADMISSIONS PER PARTICIPANT | | AVERAGE LENGTH OF STAY | | PATIENT DAYS PER PARTICIPANT | |
|---|---|---|---|---|---|---|
| YEAR | MEDIAN | MEAN | MEDIAN | MEAN | MEDIAN | MEAN |
| 1940 | .105 | | 8.1 | | .91 | |
| 1941 | .107 | | 7.6 | | .81 | |
| 1942 | .108 | .1080 | 7.8 | | .83 | |
| 1943 | .103 | .1062 | 7.8 | 7.55 | .79 | .802 |
| 1944 | | .1032 | | 7.26 | | .749 |
| 1945 | | .1067 | | 8.08 | | .862 |
| 1946 | | .1112 | | 8.30 | | .923 |

[1] Based on data from all plans reporting for each period. Only the medians (not averages) are available for the years 1940-42. The median number of patient days per participant does not necessarily equal the product of the admissions per participant and average length of stay. The averages are the weighted averages for all reporting plans, e.g., total admissions divided by average total number of participants, etc. Monthly admissions were reported by 50 to 81 plans during 1942-46; average length of stay by 16 to 32 plans. The average number of patient days per participant is obtained by multiplying the admission rates and average length of stay for the reporting plans, and thus is an approximation. A number of the plans count hospital visits of ambulatory patients (emergency room service) as hospital admissions. The number of such visits is not known, but it is believed to be relatively small. Their inclusion tends to increase the hospital admission rate and decrease the average length of stay.

SOURCE:   *Special Studies, Series No. 67* of the Blue Cross Commission; also other data from the Commission.

Similar data classified by sex are presented in Table 16.   It will

## TABLE 16

### Admission Rates, Length of Stay and Patient Days by Sex, and Type of Contract.[1]

(Median data for 15-17 Plans, 1944)

| | ONE PERSON CONTRACT | | TWO PERSON CONTRACT | | FAMILY CONTRACT | | |
|---|---|---|---|---|---|---|---|
| | ADULT MALE | ADULT FEMALE | ADULT MALE | ADULT FEMALE | ADULT MALE | ADULT FEMALE | CHILDREN |
| ADMISSIONS PER PARTICIPANT | .10 | .10 | .07 | .14 | .06 | .15 | .08 |
| AVERAGE LENGTH OF STAY | 9.23 | 9.08 | 8.96 | 9.60 | 7.71 | 9.03 | 4.56 |
| PATIENT DAYS PER PARTICIPANT | .95 | .93 | .71 | 1.28 | .51 | 1.31 | .40 |

[1] Data from the Blue Cross Commission.

be seen that single adult males and females use approximately the same amount of care.  Married females use more than twice as much care as married adult

113

CONFIDENTIAL

BCBSA00289817



MONTHLY VARIATION IN HOSPITAL ADMISSION RATES AND AVERAGE LENGTH OF STAY, 1943-46

FIGURE 12

males.  Children use the least amount of care per person.  They are admitted to hospitals at almost the same frequency as single subscribers, but their average stay is less than half that of adults, due in good part to short stay tonsil and adenoid cases.

As may be surmised there is considerable variation among the plans in their hospital utilization rates.  In 1943, for example, utilization ranged from .47 patient days per participant in one plan to 1.17 days per participant at the other extreme.  The distribution of 55 reporting plans according to patient days per participant in this year was as follows:[8/]

| Range Patient days per Participant | | Number of Plans |
|---|---|---|
| .40 - | .49 | 1 |
| .50 - | .59 | 2 |
| .60 - | .69 | 6 |
| .70 - | .79 | 21 |
| .80 - | .89 | 11 |
| .90 - | .99 | 9 |
| 1.00 - 1.09 | | 4 |
| 1.10 . 1.19 | | 1 |
| Total | | 55 |

[8/] Data from the Blue Cross Commission.

114

CONFIDENTIAL

BCBSA00289818

These differences may, in part, reflect possible differences in illness rates among the general populations of the different areas. To a much greater degree they reflect differences among the enrolled populations in age and sex composition, marital status, customs in the utilization of hospitals, health consciousness, length of membership (which effects eligibility for maternity care), etc. They also reflect differences among the plans in the extent to which the enrolled participants constitute an average selection of risks, in the scope and duration of benefits (comprehensive scope of benefits encourages utilization), in the conditions covered, in the degree of cooperation secured from participating hospitals, in the extent to which crowding of hospitals in the various areas may have acted to curtail admissions and shorten stays, etc. Differences among the plans in the inclusion of out patient cases as hospital admissions are also a factor.

## UTILIZATION BY METHOD OF ENROLLMENT AND PAYMENT

The following figures show the median patient days per participant, according to type of participant, as reported by 11 plans for the year 1943:[4]

| Type of Participant | Median Patient days per participant |
|---|---|
| Group Remittance | .759 |
| Group Direct | 1.034 |
| Group Conversion | 1.158 |
| Miscellaneous [5] | .917 |
| All | .794 |

It is evident that group remittance participants, i. e., those who pay through organized groups, have the lowest utilization rates and hence constitute the better risks. Group direct participants, i. e., those enrolled on a group basis, but who pay the plan direct (members of medical, dental, nursing and legal associations tend to comprise the great majority of this class), are relatively poor risks. This is probably due not so much to the methods of enrollment and payment, as to the fact that these participants because of their occupations and cultural status, are extremely health and hospital conscious. Group conversion participants, i. e., those who have left organized groups and now pay the plan direct, have the highest utilization rates. This group tends to become adversely selected since (a) persons leaving employment because of sickness or maternity tend to continue their membership by going on a direct payment basis, (b) among persons leaving employed groups, those who anticipate needing hospital care in the near future keep up their membership in far greater proportion than those who have no such anticipation.

---

[4] Data from the Blue Cross Commission.

[5] Miscellaneous participants comprise sponsored dependents and any other participants not included in the other categories.

115

CONFIDENTIAL

BCBSA00289819

## UTILIZATION UNDER WARD AND SEMI-PRIVATE CONTRACTS

The following data, based on reports from ten plans for the year 1943, shows that utilization is appreciably less under ward than under semi-private contracts:[6]

|  | Ward Contracts | Semi-Private Contracts |
|---|---|---|
| Median Admissions per contract | .198 | .214 |
| Median Admissions per participant | .077 | .100 |
| Median Average Length of Stay | 7.31 | 7.94 |
| Median Patient Days per participant | .564 | .784 |

In part the lesser utilization per participant is due to the greater presence of children, with their low rate of utilization, among ward than semi-private subscribers. But in large part, the difference is probably due to differences between the two groups of subscribers, in health consciousness, in ability to afford physicians' services and in proneness to seek hospital care.

## OTHER FACTORS INFLUENCING UTILIZATION

The experience of the plans appears to justify the following observations.

Residents of cities use more hospital care than residents of rural areas. This is probably due largely to city dwellers being more accustomed to using hospitals and being nearer to them.

Professional groups use more care than other occupational groups. Utilization is particularly high among physicians, nurses and hospital employees. (Utilization is so high among hospital employees, that most plans enroll such employees only with the proviso that the plan will not pay out in benefits more than a certain proportion of the income received from these subscriptions, the hospital being responsible for any excess.)

Plans providing a comprehensive scope of hospital service tend to have higher utilization rates than those which provide limited benefits.

Plans with full coverage of dependents experience higher utilization rates among dependents than plans with partial coverage of dependents.

Utilization among persons 65 and over is about double that for all ages.[7]

---

[6] Data from the Blue Cross Commission.

[7] For example, data from the Baltimore plan for the year 1945 show the following rates:

| Age | Patient Days to Discharge per Person-Month* |
|---|---|
| 0-4 | .0366 |
| 5-19 | .0426 |
| 20-29 | .0674 |
| 30-39 | .0716 |
| 40-64 | .0785 |
| 65 plus | .1334 |
| Average | .0643 |

*Out-Patient Visits counted as one day.

116

CONFIDENTIAL

BCBSA00289820

## DISTRIBUTION OF CASES BY LENGTH OF STAY

The following data (Table 17) from the New York City plan, illustrates the general pattern of the distribution of hospital cases according to length of stay.

It will be seen from this experience that a plan which provided 21 days of care for each illness would provide full coverage of about 92 percent of all non-maternity cases and of 69 percent of all days of hospitalization for such illnesses. If 30 days of care were provided, 96 percent of all cases and 79 percent of all days of hospitalization would be covered in full. The inclusion of maternity cases, which, in the New York experience, comprised almost 24 percent of all hospital cases, would serve to bring up the degree of coverage. Most plans place a limit of 10 days on maternity stays and this length of stay probably suffices for most uncomplicated maternity cases. Based on this experience it may be roughly calculated that a plan which provided 21 days of care in each illness would provide full coverage for about 94 percent of all (both non-maternity and maternity) general hospital cases and about 76 percent of all days of care. If the plan provided 30 days of care for each illness, about 97 percent of all cases and 84 percent of all days would be covered in full.

It is obvious that an increase in the days of coverage afforded by a plan does not involve a corresponding increase in the plan's hospitalization expense. For example, an increase in days of care provided from 21 per illness to 30 per illness would increase the days of care for which the plan would have to be responsible by about 10 percent.[8/]  An increase in the number of days provided from 30 to 45 would increase the total days of care for which the plan would be responsible by about 8 percent. The increase in hospitalization expense would be considerably less than these figures indicate inasmuch as the hospital expenses for these days would include very little expense for the special services. However, a plan in increasing the days of coverage provided must take into account the possibility that the extension of coverage may in itself tend to alter hospital usage, i. e., increase the stay of long stay cases. Column two of Table 17 shows a sharp drop in the number of cases staying 22 days as compared with those staying 20 and 21 days, indicating a certain tendency of cases presumably requiring prolonged care to stay up to the limit of the coverage provided and to terminate their stay when coverage is no longer available.

## HOSPITAL UTILIZATION OF BLUE CROSS SUBSCRIBERS
## COMPARED WITH THAT OF THE POPULATION AS A WHOLE.

The hospital admission rate among Blue Cross subscribers (106.7 per 1,000 in 1945) is higher than the rate (96.8 per 1,000) at which the civilian population of the country as a whole in 1945 was admitted to general [9/] hospitals.[10/]  The average stay of Blue Cross patients (8.1 days per case) is

---

8/ For both maternity and non-maternity cases.

9/ i.e., all hospitals other than mental and tuberculosis hospitals.

10/ Calculated from data in *Hospital Service in the United States*, 1946; *Journal of the American Medical Ass'n.*, April 20, 1946. Civilian admissions and patient days were calculated by subtracting from total admissions and total census, the admissions and census in all mental and tuberculosis hospitals and in all general, special and institutional hospitals operated by the Federal government, and then by adding the admissions and census in Federal general hospitals in peace time (1938).

CONFIDENTIAL

BCBSA00289821

## TABLE 17

### Distribution of Non-maternity Cases by Length of Stay
### (Associated Hospital Service of New York -- 90,753
### Claims Incurred in 1942 and Paid to April 1, 1943.)

| LENGTH OF STAY | NUMBER OF CASES | NUMBER OF DAYS | PERCENT OF CASES | PERCENT OF DAYS | CUMULATIVE PERCENT OF CASES | CUMULATIVE PERCENT OF DAYS |
|---|---|---|---|---|---|---|
| 1 | 17,049 | 17,049 | 18.79 | 1.90 | 18.79 | 1.90 |
| 2 | 7,688 | 15,376 | 8.47 | 1.72 | 27.26 | 3.62 |
| 3 | 4,994 | 14,982 | 5.50 | 1.67 | 32.76 | 5.29 |
| 4 | 4,854 | 19,416 | 5.35 | 2.17 | 38.11 | 7.46 |
| 5 | 4,577 | 22,885 | 5.04 | 2.56 | 43.15 | 10.02 |
| 6 | 4,225 | 25,350 | 4.66 | 2.83 | 47.81 | 12.85 |
| 7 | 4,056 | 28,392 | 4.47 | 3.17 | 52.28 | 16.02 |
| 8 | 3,607 | 28,856 | 3.97 | 3.23 | 56.25 | 19.25 |
| 9 | 3,427 | 30,843 | 3.78 | 3.45 | 60.03 | 22.70 |
| 10 | 3,851 | 38,510 | 4.24 | 4.30 | 64.27 | 27.00 |
| 11 | 3,601 | 39,611 | 3.97 | 4.42 | 68.24 | 31.42 |
| 12 | 3,059 | 36,708 | 3.37 | 4.10 | 71.61 | 35.52 |
| 13 | 2,941 | 38,233 | 3.24 | 4.27 | 74.85 | 39.79 |
| 14 | 3,274 | 45,836 | 3.61 | 5.12 | 78.46 | 44.91 |
| 15 | 2,589 | 38,835 | 2.85 | 4.34 | 81.31 | 49.25 |
| 16 | 2,149 | 34,384 | 2.37 | 3.84 | 83.68 | 53.09 |
| 17 | 1,783 | 30,311 | 1.96 | 3.39 | 85.64 | 56.48 |
| 18 | 1,501 | 27,018 | 1.66 | 3.02 | 87.30 | 59.50 |
| 19 | 1,276 | 24,244 | 1.40 | 2.71 | 88.70 | 62.21 |
| 20 | 1,354 | 27,080 | 1.50 | 3.02 | 90.20 | 65.23 |
| 21 | 1,440 | 30,240 | 1.58 | 3.38 | 91.78 | 68.61 |
| 22 | 681 | 14,982 | 0.75 | 1.67 | 92.53 | 70.28 |
| 23 | 562 | 12,926 | 0.62 | 1.45 | 93.15 | 71.73 |
| 24 | 467 | 11,208 | 0.52 | 1.25 | 93.67 | 72.98 |
| 25 | 450 | 11,250 | 0.49 | 1.26 | 94.16 | 74.24 |
| 26 | 371 | 9,646 | 0.41 | 1.08 | 94.57 | 75.32 |
| 27 | 344 | 9,288 | 0.38 | 1.03 | 94.95 | 76.35 |
| 28 | 402 | 11,256 | 0.44 | 1.26 | 95.39 | 77.61 |
| 29 | 259 | 7,511 | 0.29 | 0.84 | 95.68 | 78.45 |
| 30 | 238 | 7,140 | 0.26 | 0.80 | 95.94 | 79.25 |
| 31 | 232 | 7,192 | 0.26 | 0.80 | 96.20 | 80.05 |
| 32-45 | 1,868 | 69,858 | 2.05 | 7.80 | 98.25 | 87.85 |
| 46-60 | 804 | 41,793 | 0.89 | 4.67 | 99.14 | 92.52 |
| 61-70 | 271 | 17,632 | 0.30 | 1.97 | 99.44 | 94.49 |
| 71-81 | 148 | 11,177 | 0.16 | 1.25 | 99.60 | 95.74 |
| 82-90 | 90 | 7,743 | 0.10 | 0.87 | 99.70 | 96.61 |
| 91-111 | 219 | 22,895 | 0.24 | 2.56 | 99.94 | 99.17 |
| OVER 111 | 50 | 7,467 | 0.06 | 0.83 | 100.00 | 100.00 |
| TOTAL | 90,753 | 895,123 | 100.00 | 100.00 | 100.00 | 100.00 |

markedly shorter than the average stay (12.4 days) of general hospital patients among the whole civilian population. The patient days per participant (.86 in 1945) reported by the Blue Cross plans is less than the average per capita number of days of care in general hospitals (1.20 days) received by the whole civilian population in 1945.

118

CONFIDENTIAL

BCBSA00289822

The higher admission rate among Blue Cross subscribers than among the general population may perhaps be due primarily to a tendency of insured persons, owing to removal of the financial barrier, to seek hospital care earlier in illness and in less severe conditions than non-insured persons. A factor is that the admissions reported by some plans include out-patient admissions. The same factors, and those indicated below may explain the shorter average stay of Blue Cross subscribers.

The lower overall utilization rate (which largely eliminates the factor of out-patient admissions) among Blue Cross subscribers than among the general population may be due primarily to differences in the composition of the two population groups and to the fact that the plans do not cover all types of cases. Blue Cross subscribers do not constitute a cross section of the population; they consist almost entirely of actively employed persons and their dependent spouses and children -- the aged, the invalid and the chronically ill do not have the opportunity of becoming members. At any one time close to one-fifth of Blue Cross subscribers are not eligible for maternity care. The plans do not cover workmen's compensation cases and cases hospitalized in veterans' hospitals.

### DIAGNOSIS AND UTILIZATION

Table 18, giving data from the New York City plan, shows the distribution of cases and patient days of care according to diagnosis. Maternity cases constitute the most important single group both from the standpoint of admissions and days. Tonsillectomies constitute a large proportion (11.7%) of all cases, but because of the short stay, are relatively unimportant from a standpoint of days of care. Appendicitis cases constitute 5.7 percent of all cases and are responsible for 6.5 percent of all days of care.

Table 19 shows those diagnoses which accounted for more than one percent of the total hospitalization cost to the New Jersey plan in 1943.

### COMPOSITION OF THE HOSPITAL BILL

A plan, in determining what hospital service benefits to provide and what rates to charge, must know the frequency with which the various special hospital services are provided to patients and the average charges for these services per case and per day of care. Table 20 presents the necessary data for an over-all picture of the situation. These data are from an inter-plan study of representative hospital bills for semi-private, non-maternity care.

It will be seen that charges for room and board constitute about two-thirds of the total charges for semi-private hospital care. Charges for use of the operating room constitute 10.7 percent of average charges, those for laboratory service, 8.6 percent, and charges for x-ray service, 6.3 percent of the total. Charges for anesthesia constitute 3.3 percent of total charges and those for drugs 3.7 percent. None of the other hospital services involve charges of more than one percent of total charges, on the average.

CONFIDENTIAL                                                    BCBSA00289823

**TABLE 18**

**Distribution of Cases and Days of Care**
**According to Diagnosis**
**(Associated Hospital Service of New York**
**Summary of 121,053 claims paid in 1943.)**

| DISEASE CLASSIFICATION | NUMBER OF CASES | AVERAGE DAYS' STAY | PERCENT OF TOTAL CASES | PERCENT OF TOTAL DAYS |
|---|---|---|---|---|
| MATERNITY | | | | |
|   DELIVERY | 25,289 | 10.5 | 20.89 | 21.88 |
|   OTHERS | 3,477 | 6.4 | 2.87 | 1.83 |
| INFECTIOUS & PARASITIC | 851 | 17.2 | 0.70 | 1.21 |
| MALIGNANT TUMORS | 2,463 | 21.9 | 2.03 | 4.45 |
| BENIGN TUMORS | | | | |
|   FEMALE GENITAL ORGANS | 4,881 | 14.0 | 4.03 | 5.63 |
|   FEMALE BREAST | 1,086 | 5.5 | .90 | 0.49 |
|   OTHERS | 2,877 | 7.5 | 2.38 | 1.78 |
| RHEUMATIC & NUTRITIONAL | 2,351 | 15.1 | 1.94 | 2.93 |
| BLOOD & BLOOD FORM. ORG. | 648 | 11.5 | 0.54 | 0.61 |
| CHRONIC POISON & INTOX. | 67 | 6.2 | 0.06 | 0.04 |
| NERV. SYS. & SENSE ORG. | 4,176 | 12.0 | 3.45 | 4.13 |
| CIRCULATORY SYSTEM | | | | |
|   HEMORRHOIDS | 1,948 | 7.8 | 1.61 | 1.25 |
|   OTHERS | 4,925 | 15.7 | 4.07 | 6.37 |
| RESPIRATORY SYSTEM | | | | |
|   TONSILLECTOMY | 14,227 | 1.3 | 11.75 | 1.52 |
|   INFLUENZA, BRONCHITIS, | | | | |
|    AND PNEUMONIA | 6,929 | 11.3 | 5.72 | 6.45 |
|   OTHERS | 5,952 | 7.6 | 4.92 | 3.73 |
| DIGESTIVE SYSTEM | | | | |
|   APPENDICITIS | 6,855 | 11.5 | 5.66 | 6.50 |
|   HERNIA | 2,069 | 15.3 | 1.71 | 2.61 |
|   GALLBLADDER & DUCT. | 2,122 | 15.8 | 1.75 | 2.76 |
|   OTHERS | 6,694 | 11.3 | 5.53 | 6.23 |
| GENITO-URINARY SYSTEM | 8,096 | 10.1 | 6.69 | 6.74 |
| SKIN DISEASES | 2,133 | 8.5 | 1.76 | 1.49 |
| BONES & ORG. OF MOVE. | 2,488 | 15.1 | 2.06 | 3.10 |
| INJURIES & POISONINGS | 7,235 | 8.6 | 5.98 | 5.13 |
| MISCELLANEOUS | 1,214 | 11.4 | 1.00 | 1.14 |
| TOTAL | 121,053 | 10.0 | 100.00 | 100.00 |

CONFIDENTIAL

BCBSA00289824

**TABLE 19**

**Distribution of Cases, Days of Care and Hospitalization Expense According to Diagnosis. Data from New Jersey Plan, 1943.**

| DIAGNOSIS | PERCENT OF TOTAL CASES | PERCENT OF TOTAL DAYS' CARE | PERCENT OF TOTAL EXPENSES |
|---|---|---|---|
| MATERNITY | 22.97 | 25.29 | 28.19 |
| TONSILS & ADENOIDS | 16.69 | 2.73 | 4.48 |
| APPENDICITIS | 9.97 | 11.95 | 12.03 |
| FEMALE DISEASES | 9.74 | 10.62 | 10.84 |
| ACCIDENTS | 6.74 | 5.65 | 4.92 |
| CHEST COLDS | 4.97 | 5.64 | 5.32 |
| TUMORS | 2.71 | 2.51 | 2.46 |
| RECTAL | 2.54 | 2.24 | 2.35 |
| HERNIA | 1.98 | 3.39 | 3.26 |
| GALL BLADDER | 1.89 | 2.99 | 2.85 |
| INTESTINAL DISORDERS | 1.81 | 2.01 | 1.87 |
| INFECTIONS | 1.77 | 1.57 | 1.50 |
| KIDNEY | 1.77 | 1.95 | 1.87 |
| HEART | 1.42 | 2.95 | 2.35 |
| ULCER | 1.33 | 2.09 | 1.92 |
| BLOOD DISEASES | 1.21 | 1.87 | 1.56 |
| CANCER | 1.05 | 2.44 | 1.89 |
| GLAND | 0.93 | 1.32 | 1.24 |
| ALL OTHER | 8.51 | 10.79 | 9.10 |
| TOTAL | 100.00 | 100.00 | 100.00 |

**TABLE 20**

**AVERAGE HOSPITAL CHARGES**

**Based on 6,420 representative hospital cases of 29 plans, 1942.  Semi-private, non-maternity cases only.[1]**

| SERVICE | AVERAGE CHARGES PER DAY | AVERAGE CHARGES PER CASE | PERCENT OF CHARGES | PERCENT OF CASES CHARGED FOR SERVICE | AVERAGE CHARGE WHEN CHARGED FOR SERVICE |
|---|---|---|---|---|---|
| ROOM AND BOARD | $4.71 | $38.56 | 64.7% | 100.0% | $38.56 |
| OPERATING ROOM | .78 | 6.37 | 10.7 | 62.8 | 10.14 |
| ANESTHESIA | .24 | 1.99 | 3.3 | 28.6 | 6.97 |
| LABORATORY | .62 | 5.10 | 8.6 | 85.5 | 5.97 |
| X-RAY | .46 | 3.74 | 6.3 | 23.4 | 15.97 |
| DRUGS | .27 | 2.23 | 3.7 | 49.4 | 4.50 |
| DRESSINGS | .06 | .51 | 0.9 | 16.1 | 3.16 |
| ELECTRO-CARDIOGRAM | .02 | .12 | 0.2 | 1.4 | 8.54 |
| BASAL METABOLISM | .02 | .12 | 0.2 | 1.8 | 6.76 |
| PHYSIO-THERAPY | .03 | .23 | 0.4 | 1.7 | 12.98 |
| OXYGEN THERAPY | .02 | .19 | 0.3 | 1.4 | 13.52 |
| RADIUM THERAPY | .01 | .05 | 0.1 | 0.2 | 30.40 |
| OTHER SERVICES | .04 | .40 | 0.6 | 3.7 | 9.97 |
|  | $7.28 | $59.60 | 100.0% |  |  |

[1] Thompson, Allen B. *Inter-Plan Study of Semi-Private Non-Maternity Hospital Bills.* Associated Hospital Service of New York. 1944.

CONFIDENTIAL

BCBSA00289825

# CHAPTER 13

## THE NATIONAL COORDINATION OF THE PLANS

Blue Cross plans are coordinated through a central organization, an approval program and various other measures.

The central authority of the plans is the conference of representatives of the plans. Such conferences are usually held twice a year, each plan being represented by a duly accredited delegate, usually the executive director. In voting at such conferences, each plan has one vote for each 20,000 subscriber contracts or fraction thereof, with a minimum of one vote and a maximum of ten votes per plan. In certain respects the actions of the conference of plans may be over-ruled or superseded by action of the Board of Trustees of the American Hospital Association or its House of Delegates, and in the last analysis the latter organization may perhaps be considered the final repository of authority for the plans.

All approved plans have the privilege of becoming institutional members of the American Hospital Association and the latter has created a special type of membership (Type IV) for which the plans are eligible. All of the approved plans except one have exercised the privilege of this membership. The exception is the District of Columbia plan which has refused to accept membership on the grounds that the plans should not be affiliated with the American Hospital Association.

The coordinating agency of the plans is the Blue Cross Commission of the American Hospital Association. Up until December 1946 this Commission was composed of nine persons, selected for overlapping three year terms, three of whom were selected by the American Hospital Association and six of whom were elected by weighted vote of the plans.   At a meeting in December 1946 the plans voted to reorganize the Commission so as to make it more representative of and bring it closer to the plans. Under the proposed reorganization, which does not become formally effective until ratified by the House of Delegates of the American Hospital Association, the Commission will consist of 15 persons, 3 selected by the Association and 12 by the plans. The plans will be grouped into 12 districts, 11 in the United States and one in Canada, and each district will elect its representative to the Commission on the basis of one vote per plan.

The Commission meets several times a year and determines matters of broad policy. Its executive activities are carried on by a permanent staff with headquarters at the office of the American Hospital Association. The funds of the Commission are obtained by dues paid by the plans, in the amount of two mills monthly per subscriber contract, with a minimum payment of $32 and a maximum of $800 a month. The Commission's budget for 1946 was $134,000.

CONFIDENTIAL

BCBSA00289826

The Commission in cooperation with the Board of Trustees of the American Hospital Association carries on the approval program.  In addition it serves as a clearing house of information, carries on research and statistical studies, consults with individual plans on administrative and other problems, carries on a broad educational or publicity program to interpret the Blue Cross movement to the general public and its various component groups, maintains the national enrollment office, provides advice and guidance to groups interested in the establishment of new plans, acts as spokesman for the plans before government bodies and industrial, labor, farm and other groups, arranges conferences of the plans, and develops procedures for coordination of the services and activities of the individual plans.

## THE APPROVAL PROGRAM

The approval program was initiated in 1938 with the primary purpose of enabling the public to differentiate between the non-profit hospital-sponsored plans and insurance companies.  It soon became evident that the public was attaching to approval an implication that the American Hospital Association guaranteed the financial responsibility of the several plans.  To meet this implication the approval program laid stress on the financial status of the plans.  In recent years, in addition to designating for the public plans which were non-profit, financially sound and backed by the hospitals, an attempt has been made to use the program as a means of strengthening the movement as a whole and increasing its growth.

The final responsibility for the approval program rests with the Board of Trustees of the American Hospital Association.  The Board establishes the standards and may from time to time amend them.  It may in its discretion waive or vary specific requirements in the consideration of individual applications for approval.[1]/

Approval of a plan entitles it to the privilege of membership in the American Hospital Association, enables the plan to utilize the Blue Cross symbol (the seal of the Association superimposed upon a Blue Cross) and to call itself a Blue Cross plan.  Plans are approved or reapproved each year. Each year a certain date is designated as "Approval Day" at which time announcement of approval and reapproval of plans is made.

A great deal of responsibility in connection with the approval program is carried by the Commission.  The plans are required to submit to the Commission financial, enrollment and other data needed for appraisal.  The Commission considers carefully all applications for approval or reapproval and submits to the Board of Trustees its recommendations for action to be taken, together with data required for the appraisal of plans.  The Commission and the Trustees together will hear any complaints or data to be presented in connection with approval or reapproval of individual plans.

## THE STANDARDS OF APPROVAL

The standards of approval were revised in September 1946.  They are in two parts, a statement of "Principles" which serves as a basis for considera-

---

[1]/ The by-laws of the American Hospital Association state that "The Board of Trustees shall establish standards for and administer a program of annual approval for organizations operating non-profit hospital service plans which apply for such approval.  The purpose of the standards shall be to protect the interests of the subscribers, the medical profession and the hospitals."

123

tion of plans for initial approval, and standards for annual re-approval. They are as follows:

## I.   PRINCIPLES OF ORGANIZATION AND OPERATION FOR BLUE CROSS PLANS

These principles are the basis for consideration of applications from non-profit hospital service plans for original approval by the American Hospital Association.  Approval makes such plans eligible for membership in the Association and authorizes their use of the seal of the Association, superimposed upon a Blue Cross, as the identifying symbol of a hospital service plan's organization and operation.

1.   Adequate representation of hospitals, the medical profession and the general public.  The interests and the responsibilities of participating hospitals make it desirable that a majority of the policy-making body be hospital trustees, administrators, and/or authorized representatives of the member hospitals.

2.   Non-profit sponsorship and control.  Trustees or board members of the hospital service plan should receive no remuneration for service as trustees or board members.

Initial working capital may be provided by individuals, hospitals, chests, councils, or other civic agencies, but should be repayable only out of earned income, over and above operating expenses, payments to participating hospitals, and legal reserve.

No organizations or individuals advancing initial capital should attempt to influence or direct the management of Blue Cross Plans because of their financial support.

3.   Free choice of hospital and physician.   Opportunity should be given for all institutions of standing in each enrollment area to become member hospitals in the Blue Cross Plan, and subscribers should have free choice of hospital at the time of sickness, such choice to be consistent with the staff privileges of the subscribers' attending physicians.

A majority of the hospitals of standing, containing a majority of the bed capacity, should be member hospitals in each area where a Blue Cross Plan enrolls subscribers, and arrangements should be made for provision of service in non-member hospitals.

In case of physical impossibility to provide service in member hospitals or others, equitable arrangements should be made for protection of the subscribers' interests, but which would not threaten the Plan's stability and continuity in the event of epidemic or disaster.

Blue Cross Plans should not interfere with existing relationships between physicians and hospitals or between physicians and patients.

4.   Responsibility for benefits to subscribers.  The ultimate economic responsibility for benefits to subscribers enrolled at any given time must be assumed by the member hospitals, through definite contractual agreements with the Blue Cross Plan, which express such intent by the hospitals.  In the absence of a provision in the hospital contract which establishes hospital-responsibility for contract-benefits, each Plan shall proceed to establish contingency reserves (over and above all liabilities)  equal to at least 5 percent of its previous annual income, beginning with the calendar year 1947, until such contingency reserves shall equal 25 percent of the Plan's current annual income.

Hospital service provided through a Blue Cross Plan should be determined by the practices of the member hospitals of the particular plan.  Member hospitals

CONFIDENTIAL

BCBSA00289828

are urged to cooperate with Blue Cross Plans in providing complete hospital care as service benefits under the subscribers' contracts.

5. <u>Enrollment areas and practices.</u>  Plans should be established only where needs of a state or province are not adequately served by existing Blue Cross Plans.

Adequate spread of risk, efficient management, and effective co-ordination require that each Plan serve the largest possible geographic area that legal restrictions and economic conditions permit.

A hospital service plan located in or near an area already adequately served by an approved plan will not necessarily be approved by the Board of Trustees, even though such plan may enjoy sound financial position and reputable local sponsorship.  Plans applying for approval will be expected to "show cause" why they should not merge their activities with approved Blue Cross Plans which are in a position to serve the trading area economically and effectively.  The trading area for each Blue Cross Plan should have a population of at least 500,000 persons.

Enrollment practices shall be such as can reasonably be expected to assure a utilization approximating that of the general population and such as will not expose the plan to adverse selection.  The group enrollment principle is the only method that has completely proven its ability to accomplish this result.  Experimentation in other enrollment methods is encouraged but with such controls as may be expected to safeguard the interest of subscribers and member hospitals.

Where community response has been slow, as measured by enrollment, the Blue Cross Plans should review and, if necessary, revise their rates, benefits, administration, enrollment methods, or public policies; also, consider the possibility of expanding their service by increasing the territory to be served or by merger with other Blue Cross Plans which might serve their respective areas more effectively.

6. <u>Sound accounting practices.</u>  The Hospital Service Plan Commission shall enforce minimum standards of sound accounting practices not inconsistent with the requirements of state regulatory bodies.  The Hospital Service Plan Commission shall also require each approved plan to submit reports (at least semi-annually) of financial experience in such form as may be prescribed by the Hospital Service Plan Commission.

Before certifying to the Board of Trustees of the American Hospital Association that the plan has conformed to its minimum standards of sound ac-counting practices, the Hospital Service Plan Commission shall satisfy itself that the plan's balance sheet contains an accurate statement of its liabilities, including allowances for accounts and notes payable and unearned subscription income, as well as adequate reserves for unreported and undischarged hospital cases.

7. <u>Adequate general or contingency reserves.</u>  Initial working capital should be sufficient to carry all acquisition costs and operating expenses for at least four months after contracts first become effective.

The Hospital Service Plan Commission shall expect each plan to estab-lish, over and above all liabilities, a reserve for contingencies to cover such items as fluctuations in morbidity, major epidemics, future maternity claims, fluctuations in asset values, etc.

It is recognized that the rate at which a plan establishes a reserve adequate for these purposes will depend upon many factors, such as rate of membership growth, administrative policy, age of the Plan, type of benefits offered, rate structure, etc.  The interests of subscribers and member hospitals

125

CONFIDENTIAL
BCBSA00289829

make it imperative that administrative expenses of Blue Cross Plans be as low as consistent with effective public service.

8. **Adequate statistical records.** As a minimum statistical record of its operation each approved plan should currently assemble and report the following data (preferably quarterly):

The number of contracts, participants and participants eligible for maternity service, as of the end of the period; the number of patients, patient days, maternity patients, and cost of hospital care during the period, classified as to type of contract and method of enrollment.

Compilation of additional data by individual plans on their specific problems is essential to an understanding of their operation. Each plan is expected to undertake statistical studies in addition to the minima outlined above.

9. **Equitable payments to hospitals.** In the development of any method of payment by Blue Cross Plans for contract benefits in member-hospitals, the representatives of hospitals and Blue Cross Plans should insist upon having adequate financial and service data concerning the operation of hospitals and Blue Cross Plans.

Officially appointed representatives of the Blue Cross Plans should meet with officially appointed hospital representatives in any given area for a free and frank expression of opinion on the rates to be paid to hospitals, and the principles and the formula on which such rates would be established. Any conclusion reached by the representatives of the two organizations, plans and hospitals, should not become effective until approved by at least 50 percent of the member hospitals representing at least three-fourths of the patient days of service rendered Blue Cross subscribers during the past 12 months. Any rate approved should be reviewed at least once a year for such adjustments as might be necessary to protect the interests of subscribers, hospitals and plans.

10. **Dignified promotion and administration.** Employees of a Blue Cross Plan should be reimbursed by salary as opposed to a commission basis. A private sales organization must not be given responsibility for promotion or administration on the basis of a percentage of premiums. Promotion and administrative policies should be dignified in nature, consistent with the professional ideals of the hospitals concerned.

11. **Inter-plan coordination.** Individual Blue Cross Plans should coordinate their activities through uniform and equitable policies and procedures which will maximize their service to the entire population throughout the United States and Canada. This applies to (a) convenient transfer of members who change their permanent residence, (b) reciprocal service benefits for subscribers hospitalized outside the enrollment area of their "home" plan, (c) uniform enrollment and billing procedures for employees of national firms enrolled through two or more plans, (d) consolidated billing for employees of national firms which request such procedure.

There should be a clear-cut understanding as to the plan with which a member-hospital signs a guarantee contract. Under ordinary circumstances, the hospitals should sign contracts with only one plan.

Where legally permissible, hospitals are urged to provide service benefits to subscribers of other Blue Cross Plans on some basis agreeable to both Plans. Where it is illegal or impractical for a Blue Cross Plan to arrange service benefits in the member hospitals of other plans, each Blue Cross Plan is urged to adjust out-of-town allowances to amounts which provide the maximum contract benefits consistent with sound financial operation.

CONFIDENTIAL

BCBSA00289830

II.   STANDARD OF ANNUAL REAPPROVAL OF BLUE CROSS HOSPITAL SERVICE PLANS

1.   THERE WILL BE representation of hospitals, the medical profession, and the general public upon the governing boards.

2.   Non-profit sponsorship and control shall be required.   Trustees or board members of the hospital service plan should receive no remuneration for services as trustees or board members.

Initial working capital may be provided by individuals, hospitals, chests, councils, or other civic agencies, but should be repayable only out of earned income, over and above operating expenses, payments to participating hospitals, and legal reserve.

No organizations or individuals advancing initial capital should attempt to influence or direct the management of Blue Cross Plans because of their financial support.

3.   Free choice of hospital and physician shall be required.   Opportunity should be given for all institutions of standing in each enrollment area to become member-hospitals in the Blue Cross Plan serving the area.   Subscribers should have free choice of member-hospital consistent with the privileges of their attending physicians, and be entitled to stated benefits in other hospitals when service in member-hospitals cannot be obtained.

4.   Hospitals shall be responsible for benefits to subscribers.   The ultimate economic responsibility for service to subscribers enrolled at any given time must be assumed by the member hospitals, through definite contractual agreements with the Blue Cross Plan, which express such intent by the member hospitals.

In the absence of a provision in the hospital-contract which establishes hospital responsibility for contract benefits, each Plan shall proceed to establish contingency reserves (over and above all liabilities) equal to at least 5 percent of its previous annual income beginning with the calendar year 1947, until such contingency reserves shall equal 25 percent of the Plan's current annual income.

5.   Sound accounting practices and adequate statistical records shall be maintained.   The Blue Cross Commission shall prescribe minimum standards of sound accounting practices not inconsistent with the requirement of state regulatory bodies.   The Blue Cross Commission should also require each approved plan to submit periodic reports of financial experience (at least semi-annually) in such form as may be prescribed by the Blue Cross Commission.

Before certifying to the Board of Trustees of the American Hospital Association that the plan has conformed to its minimum standards of sound accounting practices, the Blue Cross Commission shall satisfy itself that the plan's balance sheet contains an accurate statement of its liabilities, including allowances for accounts and notes payable and unearned subscription income, as well as adequate reserves for unreported and undischarged hospital cases.

6.   There shall be no interference with professional relationships.   Blue Cross Plans should not interfere with existing relationships between physicians and hospitals or between physicians and patients.

7.   All approved Blue Cross Plans shall make every effort to comply in full with the Principles Governing the Organization and Operation of Blue Cross Plans, as established by the American Hospital Association.

127

CONFIDENTIAL

BCBSA00289831

## OPERATION AND PROBLEMS OF THE APPROVAL PROGRAM

The operation of the approval program may perhaps best be understood through consideration of specific issues which have arisen. The differences between the standards for original approval and for reapproval and between the present standards and the former ones (prior to September 1946) also serve to indicate problems with which the movement is grappling and some of the present tendencies or trends.

CONTROL OF THE PLANS. The present standard for original approval states that majority representation of the hospitals on plan boards is desirable. The standard for reapproval requires merely that there should be representation of hospitals, the medical profession, and the public. The former (pre-1946) standards required majority representation of hospitals.

The analysis of the composition of the boards of the surveyed plans in 1944-5 indicated that in almost half of the cases hospital representatives were not in a majority. Hence it is obvious that the former standard was not being enforced; indeed because of differences of opinion as to the wisdom of the standard no consistent effort to enforce it was made. The change to the present standard recognizes overt facts and indicates that the movement has, in a sense, burst out of the former pattern of ideas wherein it was taken for granted that dominant control of the plans should lie with the hospitals.

HOSPITAL GUARANTEE OF BENEFITS - FINANCIAL SOUNDNESS. The old standard No. 4 required unequivocally that hospitals guarantee subscriber benefits. The new standards stress the idea of hospital guarantee of benefits but do not require it.

It will be recalled that the analysis of the hospital contracts indicated that in almost a third of the plans subscriber benefits are not contractually guaranteed by the hospitals. The Commission used its influence to see to it that the contracts between plans and hospitals contained a clear-cut underwriting obligation. Where the hospitals of the area would not undertake to underwrite the plan, the Commission and the American Hospital Association felt that little would be gained by endeavoring to force the issue. The change in the standards recognizes overt facts and gives sanction to arrangements under which hospitals assume less responsibility toward the plans, and hence have less claim to control.

The matter of financial soundness is closely tied up with hospital guarantee of benefits. The Commission in administering the approval program has always placed considerable emphasis upon financial soundness. Thus the only two occasions on which approval was withdrawn from a plan were because the Commission deemed that the plan had become financially unsound.[2]/ Within the last few years the Commission has been concerned over the small contingency reserves held by some plans. This concern of the Commission has been shared by various of the individual plans which have recognized that the failure of any plan would weaken the prestige of the whole movement. Indeed on at least one occasion certain of the plans have threatened to withdraw from the movement and to cease use of the Blue Cross symbol unless the Commission took steps to improve the financial situation of certain plans. In May 1945 the Commission recommended to the Board of Trustees that "no plan be approved unless it comply fully with (former) standard No. 7 (requiring adequate con-

---

2/ The Chapel Hill, N. C. plan was disapproved in 1939 and reapproved in 1940; the Easton, Pa., plan (which later became the Allentown plan) was disapproved in 1939 and reapproved in 1942.

128

CONFIDENTIAL

BCBSA00289832

tingency reserves) by January 1, 1947 or 3 years after first approval, which-
ever is later."

Although an endeavor was made to persuade certain plans which were
thought to be skating on thin ice to build up larger reserves, the Commission
and the Board of Trustees in recent years have not withdrawn approval from
any plan on these grounds. Difficulties in enforcement of the standards may
have been due in part to differences of opinion as to what constitutes
adequate contingency reserves in a situation in which hospitals firmly
guarantee subscriber benefits. To this extent the revised standards represent
a step forward in that they lay down definite requirements for contingency
reserves for plans not underwritten by their member hospitals.

From some aspects disapproval of a plan if it should get into an unsound
financial position is not the best method of correcting the situation or pro-
tecting the public's interests. The withdrawal of approval at such a time
conceivably might cause appreciable numbers of the plan's subscribers to
desert it, the plan thus being placed in worse straits than before. Since
October 1945 the plans have been giving consideration to the idea of estab-
lishing a national pool of reserves -- an inter-plan guaranty fund. The
general idea is that each plan would put into such a fund a certain fraction
of its current gross income, and that the Commission could then draw upon
this fund to aid any plan in difficulty. Implicit in this arrangement would
be the need for establishing and enforcing definite standards as to the re-
serves to be maintained by the individual plans, the power of the national
organization to audit the funds of the plans, and assumption by the national
organization of temporary control of any plan aided by the fund. In other
words it would be necessary for each plan when entering into this arrangement
to agree that if it did get into difficulty and asked aid from the guaranty
fund the national organization would assume control of its affairs, even to
the extent of replacing the management, until such time as the plan was again
upon its feet and no longer in debt to the national fund.

The implications of any such arrangement are large, and many of the
plans are reluctant to delegate to the national organization such authority
or potential authority as would be necessary for its working. Any such
guarantee fund would have an important impact upon the idea of hospital guarantee
of benefits. To the extent that such a fund replaced the hospitals as the
source of the ultimate guarantee of subscriber benefits, it would affect the
whole character of the movement.

**SERVICE BENEFITS.** The former (pre-1946) standards required that "Benefits
in member hospitals should be expressed in "service contracts" which describe
specifically the ... services to which the subscribers are entitled." With-
in the last few years a growing number of the plans have offered contracts
providing a dollar room allowance rather than care in specified room accommo-
dations. At the March 1946 conference the plans deplored this tendency and
resolved to recommend to the American Hospital Association that in the future
plans be disapproved the member hospitals of which do not provide benefits on
a "service basis."

However the pressure of circumstances in this period of rising hospital
costs -- the difficulties of reaching agreement on a basis of fair remunera-
tion, the need of the plans to stabilize their per diem hospital costs --
have been too much for the plans and the hospitals. At present writing
(March 1947) the number of plans providing dollar room allowances is greater
than ever before.

129

CONFIDENTIAL

BCBSA00289833

The differences of opinion among hospital and plan personnel as to the wisdom and feasibility of complete service benefits are recognized in the new standards. The first part of the standards contains the statement, "Member hospitals are urged to cooperate with Blue Cross plans in providing complete hospital care as service benefits under the subscribers' contracts." The standards for reapproval do not mention the subject.

**AREAS SERVED BY PLANS.** The standards for original approval make it clear that Blue Cross plans are intended to serve exclusive areas, that no area should be served by more than one plan. Prior to 1946 the standards which indicated this intent were a requirement for all plans.

In North Carolina there are two competing plans, one of which is endorsed by the State Hospital and medical associations. The competition of the two plans weakens the support of the hospitals, the medical profession, and the public and greatly increases administrative and acquisition costs.

In Illinois the territories of certain of the plans have not been clearly defined and one plan has conducted enrollment in areas considered by other plans to be part of their territory. The defense made by this plan -- a contention which appears to have some merit -- is that certain of the other plans were not making strenuous or successful efforts to enroll the population of their areas. There are a number of other instances of plans serving the same areas.

The Commission approached these situations with caution. It recognized their disadvantages, but hesitated to enforce the standards upon the offending plans lest the net result be that the plans go on as before outside of rather than within the movement. Furthermore to give full title to a territory to a plan which was not successfully enrolling its population might satisfy the standards but impair service to the public. The Commission has temporized with these situations, has endeavored to persuade the plans to follow appropriate courses of action, and has been hopeful that in time the situations would work themselves out to a reasonably satisfactory solution. The new standards for reapproval do not specify that plans must serve exclusive areas or that they must serve areas of a size and character consistent with successful operation.

The Commission has been more successful in coping with this problem as regards new plans. It has on a number of occasions refused to give original approval to plans serving areas already served, or which could well be served, by existing plans. For example it denied approval to a non-profit plan operating in the Philadelphia area and steps to merge this plan with the Philadelphia plan are now underway. Since 1942 the Commission has refused to approve any new plan in a State not already served by a plan unless the plan had the intention and prospect of serving the entire State.

In West Virginia, which has a considerable number of local non-approved plans the Commission has granted approval only to two plans in the hope that eventually this State might be served by one or at the most two plans instead of by a multiplicity of local plans.

**PLANS WITH POOR ENROLLMENT RECORD.** The former standards made reapproval conditional upon the record of community service. There are a number of plans which over a period of years have shown very little growth. Examples are the Lynchburg, Virginia plan, which was established in 1938 and on January 1, 1947 had 7,913 members; the Danville, Illinois plan (established 1937, 11,760 members); the Watertown, New York plan (established 1937, 13,600 members); the Baton Rouge, Louisiana plan (established 1938, 14,100 members);

CONFIDENTIAL

BCBSA00289834

the Portsmouth, Ohio plan (established 1939, 22,800 members); the Newport News, Virginia plan (established 1938, 18,300 members); the Norfolk, Virginia plan (established 1935, 37,100 members); the Sacramento, California plan, the oldest of the Blue Cross plans, (membership 52,000). A number of other plans in the same category could be cited. [3]/

The Commission has been conscious of the problem posed by "weak" plans, but apparently has not been certain of the best remedy. To withdraw approval might result in nothing more than the plan going on as before. On the other hand, there is the possibility that by suggestion and persuasion these plans might voluntarily merge with stronger plans or become revitalized. Within the last few years a number of plans have merged with others. [4]/

In 1944 the Blue Cross Plan Approval Committee of the American Hospital Association (the functions of this Committee have now been taken over by the Commission) recommended to the Board of Trustees of the Association that certain of the plans be advised by the Commission that reapproval for 1945 would be contingent upon substantial increases in enrollment. It was further recommended that the Commission staff confer with these plans with a view to effecting wider community service through coordination, federation or consolidation with other plans, reconsideration of enrollment policies, rates and benefits, and clarification of enrollment areas served. The plans so advised were all of the plans in the States of California, Georgia, Illinois, Kentucky, and Virginia; the Baton Rouge, La., the Sioux City, Ia., plans, the three smallest plans in New York State, [5]/ the Canton, Lima and Portsmouth plans in Ohio, and the Texas plan.

Although some of the plans so notified had little increase in enrollment in 1944 nevertheless all of these plans were reapproved for 1945. The Commission's concern with the problem was indicated at its March, 1945 meeting when it voted to request the Chairman of the Commission and the Chairman of the Approval Committee "to explore and recommend methods for more effective application of the standards of approval for Blue Cross plans."

In May 1945 the Commission recommended to the Board of Trustees that "no plan be approved for 1946, regardless of solvency, unless it has an enrollment of 25,000 as of January 1, 1946, or within three years from date of first approval, whichever is later, and that no plan be approved in January 1946, regardless of solvency, unless it has reached an enrollment equal to one percent of its population during each year of operation since first approval...."

The Board of Trustees referred these recommendations to the House of Delegates which after lengthy discussion postponed action. Discussion on the floor indicated sympathy with the objectives, but doubt as to the wisdom, of the proposed steps. Several speakers suggested that these plans needed an increased measure of help from the Commission; one went so far as to suggest

---

[3]/ A number of these and other plans serve such restricted areas that it is doubtful if they will ever have a good record of community service. Prime examples are the Jamestown and Watertown plans in New York State, each of which serves a single county of 115,000 and 77,000 people respectively; the Danville plan in Illinois which serves two counties with an aggregate population of less than 100,000; the Portsmouth plan in Ohio, and the Newport News plan and the Lynchburg plan in Virginia, each of which serves a single very moderate sized city. These plans manifestly ought to be merged with others.

[4]/ The Geneva, (N.Y.) plan merged with the Rochester plan in 1945; the Flint Goodridge plan, a single hospital plan, merged with the New Orleans plan in 1943, and the two Connecticut plans consolidated in 1944. The Peoria, Ill., plan merged with the Chicago plan in January 1947.

[5]/ One of these (Geneva) has since merged with another plan.

CONFIDENTIAL

BCBSA00289835

that the Commission should inject itself directly into these situations and should in effect temporarily take over the plan and put it on its feet.

The revised standards do not make reapproval conditional upon a record of community service. The change in the standards presumably indicates that the Commission and the American Hospital Association felt that the old standard was unenforceable, or that the problem was one which could not be successfully handled through the device of the approval program. In good part weak plans are weak because they do not have the support of the hospitals, or because the hospitals and the public of the area do not care sufficiently about the plans to have them otherwise. The prime requisite for a change in the situation is a change of attitude and a development of interest on the part of the hospitals or the public or both.

INTER-PLAN COORDINATION. The principles of organization state that the plans should coordinate their activities through uniform procedures, including transfer of members, reciprocal service benefits, uniform enrollment and billing procedures for national concerns and consolidated billing for such concerns when they desire it. The standards for reapproval do not mention these subjects.

There is great need for inter-plan coordination along these lines and the plans have made considerable progress in the development of such coordination.

The enrollment of national concerns would be facilitated if all the plans adopted a uniform contract either for all subscribers or employees of national concerns. Developments with respect to a proposed national uniform contract have been previously mentioned. The main difficulties in the way of adoption of uniform benefits are first, the differences in hospital and medical practices among communities (as a result of which some plans, for example, are able to offer x-ray services, others not), and secondly, the fact that the real goal in mind is comprehensive coverage and from this point of view standardization of coverage on any level short of this goal may not be desirable. Thus far the main accomplishments of discussions of a national uniform contract have been to encourage plans to increase the scope of benefits offered.

Workable arrangements for transfer of members between plans have been developed and all except two or three plans are cooperating in these arrangements.

The present program for reciprocity in provision of service benefits to subscribers hospitalized outside of the home plan area has the adherence of about one-third of the plans, these plans having two-thirds of the total enrollment. The plans which provide less comprehensive benefits than most or which operate in low cost hospital areas may have valid objections to the program on its present basis and some change in the nature of the program may be necessary. Obviously the operation of the program for those plans which desire to participate is hindered so long as there are other plans which refuse to participate.

The plan directors in their conferences have voted to adopt uniform enrollment regulations and billing procedures for national concerns and also to cooperate in the provision of consolidated billing for national concerns which desire this procedure. At present writing (March 1947) it is not known whether all of the plans have actually adopted the uniform enrollment and billing procedures for national concerns and are actually cooperating in consolidated billing arrangements, or not. It is suspected that some plans are in practice refusing to cooperate. Obviously such cooperation is vital if national concerns are to be satisfactorily served.

132

CONFIDENTIAL

BCBSA00289836

## SOME OBSERVATIONS ON THE APPROVAL PROGRAM

This recital of the issues involved in the approval program serves to indicate some of the basic problems facing the movement. In the past it appears that the approval program has been administered by the Commission with considerable wisdom. The program has functioned largely as an educational device. Its influence in molding the plans to common patterns has been great. The Commission has steered a perilous course between on the one hand overlooking departures from the standards to the extent that the standards become meaningless and, on the other hand, exercising its putative authority in ways which would have had a disruptive effect upon the movement. Merely to have held the plans together has at times been an accomplishment. Always it must be held in mind that the movement is an association of locally controlled, independent and autonomous plans, and that the individual plans will suffer only so much direction or restraint from the national organization as will appear to carry to that individual plan a net residuum of advantages over disadvantages.

The present standards for reapproval require little of any plan: it must be non-profit, have representation of the hospitals, the medical profession and the public in its control, provide free choice of hospital. The requirements stress financial soundness but do not rigorously require it: the alternative to financial backing by the hospitals is not that the plan must have certain contingency reserves but that it must be in process of developing them. The present standards give the central organization of the plans no foothold by which to assure that any given plan is economically and efficiently administered, serves a suitable area, is performing an increasing measure of service to the public, is cooperating in inter-plan coordination services necessary for maximum service to the public.

From the above standpoint the September 1946 revision of the standards might seem to have been a step backwards, as if the teeth had been removed from the standards. However, in fact the old standards had only the semblance of teeth -- many of the old standards were not being enforced and were unenforceable. The present standards have the virtue of frankness. They pose starkly the problems confronting the plans.

It appears that the movement faces two basic problems. One is the reformulation of a philosophy. What is or should be the nature of the plans? The idea that the plans are organizations of the hospitals, that they should be controlled by them and financially backed by them apparently can no longer serve as the common denominator of the movement.

The other is the problem of plan sovereignty as over against the need for joint action and unified control.

The plans are only too well aware of these problems. There is keen recognition that somehow, someway the approval program needs to be strengthened and a stronger central organization developed.

A significant move was taken at the October 1946 conference. It was proposed that a new central organization to be known as American Blue Cross be created. The Hospital Service Plan Commission, shorn of all staff and funds, would be retained as the connecting link between the new organization and the American Hospital Association.[6]/

---

6/ The new organization would not be part of the American Hospital Association.

CONFIDENTIAL

BCBSA00289837

The plans would be grouped into twelve districts, and the plans in each district would elect one representative to the governing board of the new central organization. Each district would have a council composed of representatives from the constituent plans. The whole idea of the proposal was to make the central organization more representative of the plans, more responsive to them, with the thought that only to a body so constituted would the plans delegate the powers that a central organization needed to have.

At a meeting in January 1947 the plans adopted much of this proposal.[7] However, instead of a new organization the Blue Cross Commission was revamped, as has been set forth earlier in this chapter.

By the time this account appears further changes in the nature of the central organization and of the approval program may have taken place. Events are moving so fast that no snapshot of the situation at any given movement has any real value. This account has endeavored to give some notion of the general background situation, the problems and the forces at work.

---

[7] The organization of the plans into districts has been carried out, and representatives of the plans in each district have been meeting together to elect their representative to the Commission and for discussion of common problems. In a few districts the plans have made considerable progress in developing closer coordination, common procedures, cooperation on enrollment, etc. Many plan directors regard this development as a most significant one and believe it will go much farther. If the plans in each district can develop close coordination with each other with regard to enrollment, transfer of members, inter-plan service benefits, consolidated billing, greater uniformity of benefits, etc., the ability of the plans to achieve the same coordination on a national basis will be increased.

CONFIDENTIAL

BCBSA00289838

# PART II

## MEDICAL PLANS

CONFIDENTIAL                                                    BCBSA00289839

# CHAPTER 14

## THE DEVELOPMENT AND GROWTH OF MEDICAL SERVICE PLANS

This discussion of medical service plans is restricted to a particular
type of plan, namely non-profit plans open to the general public of a particular
State or locality, offering free choice of physician, and either sponsored by
the medical profession or affiliated with a Blue Cross plan, or both.  The
first plans of this type were established in 1929-1935. But these early plans
had relatively little influence on subsequent developments. New  beginnings
were made in 1939 and 1940.  But not until 1943 did the movement really begin
to gain impetus.  The whole development is relatively new, and in many re-
spects patterns have not yet crystallized.

### THE RISE OF MEDICAL PLANS IN WASHINGTON AND OREGON

The first medical plans were established in various counties in Wash-
ington and Oregon.  One plan was started as early as 1929, - indeed one re-
port has it that a plan was started as early as 1917, - but most of them
were established in 1931-1935.  All these plans had a common background.

In both States during the latter part of the nineteenth and the early
years of the present century, mines, railroads, sawmills and logging com-
panies developed the practice of entering into contracts with physicians,
hospitals, clinics and "hospital associations" for the provision of medical
care to workers injured in the course of employment.  The cost of these con-
tracts was usually divided equally between employer and employee, the em-
ployee's share being deducted from pay.  Later these practices were given
formal recognition by the workmen's compensation laws of the two States.

In both Washington and Oregon a considerable number of private group
clinics and so-called hospital associations, - some of which owned and others
did not own hospitals, - developed to take such contracts.  In most cases
these organizations were started by physicians but later came under lay con-
trol.  Gradually employers began to contract with these same organizations
for ordinary medical care for their employees, the cost usually being met by
the employees through payroll deductions.

By the late twenties an appreciable part of the medical care of wage
earners in the two States had come under the control of these organizations,
and the medical profession was feeling the effects.  Abuses developed.  The
hospital associations were in a position to throw their work to designated
hospitals and physicians, and, by playing one hospital and one physician off
against another, they forced rates of remuneration to extremely low levels.

The general medical profession feeling the inroads of these organiza-
tions determined to "fight fire with fire".  Beginning in 1929, and with
greater impetus as the depression set in, one by one the county medical so-
cieties formed so-called medical service bureaus.  Stock in these bureaus was
owned by the participating physicians -- all physicians in the area being el-
igible to participate.  The medical service bureaus contracted with em-
ployers for care of employees, the latter having free choice amongst all par-

136

CONFIDENTIAL

BCBSA00289840

ticipating physicians. The bureaus paid the hospitals, nurses, and suppliers of orthopedic equipment for their services in full; then they divided what was left among the participating physicians on a prorata fee basis.

For many years the operation of these bureaus was a source of much debate among the physicians of the two States. The whole idea of provision of care on a prepayment or "contract" basis was under suspicion. Since the bureaus solicited contracts, many physicians doubted that they were any more "ethical" than the commercial hospital associations or private clinics. Gradually, however, the bureaus won acceptance both among the profession and the public and began to outcompete the clinics and hospital associations.

At the present time in the State of Washington there are some 22 county medical service bureaus. An endeavor to merge these bureaus into a State-wide organization is under way. In Oregon all except seven of the county bureaus were merged in 1943 into a State-wide organization -- Oregon Physicians' Service.

All of these organizations provide a fairly comprehensive service for the employee: hospitalization, complete physicians' service (except for maternity care) in the office, home and hospital, special nursing when required, some orthopedic supplies. The charges range from $1.75 to $2.75 per month, possibly higher. Since 1944 coverage of varying scope has been extended to dependents. The bureaus in Washington generally do not accept employees with incomes over $2500 annually. Oregon Physicians' Service has no such income limit.[1]

For some years the hospitals in Washington and Oregon have been dissatisfied with the medical service plans because (a) they had no share in the control of these plans, and (b) such slow progress was being made in the extension of hospital service on a prepayment basis to the whole population. Accordingly, in 1942 and 1943 the hospitals in the two States started their own Blue Cross plans. Bitter competition ensued between the two types of plans. Lately elements on both sides have recognized the disadvantages of this situation, but so far a basis of cooperation has not been found.

### CALIFORNIA PHYSICIANS' SERVICE

By 1937 or 1938 the medical profession began to be aware that the public strongly desired to purchase medical care on a prepayment basis. The profession felt that it should endeavor to meet this demand. In 1938 the Governor of California sponsored a bill for compulsory health insurance. These two factors were primarily responsible for the establishment in 1939 of California Physicians' Service by the California Medical Association. The Association advanced $42,000 to the plan as starting capital. In the beginning two contracts were offered, one at a cost of $1.70 a month, which provided complete physicians' service, and a two-visit deductible contract, at a

---

[1] At the time of the field visit to these plans in January, 1945, most of them were not making aggressive enrollment efforts. The threat to private practice from the clinics and commercial hospital associations had largely been overcome, and under the then prevailing situation physicians felt that they stood to gain little from further expansion of the bureaus. During the war years, physicians had more patients than they could well take care of, and it was felt that prepayment would only swell the demand for medical attention. Perhaps more important was the fact that the fees paid by the bureaus were generally somewhat under prevailing charges to non-insured patients, and many physicians thought they could earn more from the same group of wage earners as non-subscribers than as subscribers. Since 1945 the plans have increased their fee schedules and it is understood that at present (March 1947) efforts to expand enrollment are being made.

CONFIDENTIAL

BCBSA00289841

cost of $1.20 a month, which provided the same services but wherein the sub-
scriber paid directly for the first two visits in any illness. Most of the
contracts sold were of the first type. Subscription was limited to employed
persons only -- it was hoped that coverage could be extended to dependents
later. Only persons earning less than $3,000 a year were accepted. (At the
very beginning persons earning over this income level were accepted but with
the proviso that physicians could charge them extra. This did not work out
and in effect enrollment was limited to those earning less than $3,000 a
year.) Cooperative arrangements were entered into with the three hospital
service plans in California providing for joint selling of the hospital and
medical contracts and joint collection of the subscription charges. Control
of CPS was vested in a Board of Trustees composed of ten physicians and one
lay person.

Growth was slow. By January, 1940, CPS had 7,000 members; by January,
1941, 22,000; and by January, 1942, 40,000 members.

The experience, especially under the more comprehensive contract, was
disastrous. The number of services demanded by subscribers far exceeded ex-
pectations, with the result that the plan had to reduce the compensation pro-
vided to physicians. Physicians were paid on a "unit" basis. The unit had a
par value of $2.50 which was the fee for an office visit, other services being
priced at a multiple of this unit. The plan started off paying a unit value
of $1.75. This gradually, declined. By January, 1940, it had decreased to
$1.50. It reached a low of $1.10 in December of that year and remained rather
constantly at $1.25 through 1941.

A good many physicians in California had not been persuaded of the ne-
cessity of establishing CPS in the first place, and the organization did not
have the united support of the profession. The decline in the unit value
still further diminished enthusiasm. Many participating physicians resigned.
Others refused to accept CPS patients without making an extra charge directly
to the patient; some treated CPS patients as if they were charity patients.
A considerable part of all CPS contracts had been sold in Alameda county to
subscribers of the Oakland Blue Cross plan. Hence, the Alameda physicians
suffered severely from the reduction of the unit value, and in 1942 a large
group of these physicians resigned *en masse*.

Sale of the full coverage contract was stopped in the fall of 1941 and
two contracts, one providing for surgical service and for x-ray and laboratory
service while hospitalized, and a rider to the latter providing for obstet-
rics and for medical service on a two-visit deductible basis, were substituted.
The surgical contract was offered to both employed persons and depend-
ents; the medical rider was offered only to employed persons. Beginning in
1942 the full coverage contracts were cancelled out or converted to the lim-
ited contracts, and by 1943 the last of these contracts had been retired. The
effect of this change, coupled with an increase in 1943 in the rates for new-
ly enrolled groups, was reflected in the unit value which reached $1.50 by the
end of 1942, $1.75 early in 1943, and $2.25 in February 1944.

The limitation of enrollment to persons with incomes under $3,000 was
found to hinder public acceptance of the plan, and in 1942 special contracts
on an indemnity basis were offered to persons having incomes over $3,000.
This did not fully solve the problem. In the press of mass selling, persons
with incomes over $3,000 often received the "service" contract, and physicians
protested when they were compelled to accept CPS fees for these patients and
could not charge extra. Accordingly, in 1944, the special indemnity contract
for those with incomes over $3,000 was done away with. One contract was sold

CONFIDENTIAL

BCBSA00289842

to all irrespective of income, and this contract provided that participating physicians would not make extra charges to those with incomes under $3,000.

In 1942 the cooperative arrangements with the Blue Cross plans with headquarters in Oakland (Alameda County) and Sacramento broke down, owing in part to the then disaffection of the doctors in these areas with CPS. In order to protect themselves in competition with CPS and commercial companies these two plans developed their own surgical indemnity insurance riders which they sold in conjunction with their hospital contracts. CPS was also forced by the competitive situation to develop its own hospitalization contracts which it sold in the northern part of the State. The cooperative arrangement with the Blue Cross plan in the southern part of the State remained in force.

By the beginning of 1944 the general position of CPS had improved. The unit value had been raised to $2.25, and this, based on a rather high fee schedule, was providing fairly satisfactory remuneration to the profession. In August, 1944, CPS repaid the loan of $42,000 originally made by the State society. In 1945 numerous bills for compulsory health insurance were introduced in the State legislature. All of these developments caused the profession to give staunch backing to CPS and to encourage aggressive enrollment efforts.

Early in 1945 the plan raised its subscription rates (to $3.00 for a family for the surgical contract and $.90 for the individual for the medical rider). Despite this increased income the demand for service was such as to force the plan to reduce the unit value to $2.00. The plan has not yet succeeded in attaining a stable basis of operation. Nevertheless firm support from the profession continues, and, under a new (lay) administrator, enrollment has steadily increased.[2]

## MICHIGAN MEDICAL SERVICE

The Michigan State Medical Society has long believed that the profession should assume leadership in the development of arrangements for making medical care more available to the public. At a special session of the House of Delegates in January, 1939, the Council of the Society was empowered to cooperate with labor, industry and other groups in the formation of a non-profit group medical care organization. Before such a plan could be established, State enabling legislation was necessary. The hospitals of Michigan at this time were also desirous of starting a hospital plan. Together representatives of the hospitals and the medical profession asked for the necessary legislation, and in the spring of 1939 two acts, one enabling the formation of hospital plans, the other enabling the formation of medical plans, were passed.

The establishment of Michigan Medical Service was made possible by an advance of $17,800 from the State society. The plan was controlled by a board of 35, all but 11 of whom were doctors of medicine. The plan had its own executive director and administrative staff, but a cooperative arrangement was entered into with Michigan Hospital Service, which had started operations some months previously, for enrollment and collection of subscription charges.

The plan first offered a contract for virtually complete medical service at charges of $2.00 a month for an individual, $3.50 for husband and wife and $4.50 for a family. The subscriber paid directly for the first $5.00 worth

---

[2] No mention in this account is made of CPS's housing or rural medical programs. These illustrate, probably, the good intentions of the plan, but the final results have not been significant.

CONFIDENTIAL

BCBSA00289843

of medical services in any contract year. This full contract was in existence from March, 1940 to July, 1942. It achieved a peak enrollment of only 10,000 persons. The public displayed little interest in it but showed infinitely keener interest in the surgical contract subsequently offered at a much lower cost. It was soon apparent that the charges under the comprehensive contract were insufficient to meet the costs, and the plan and the profession were not eager to push its sale.

When Michigan Medical Service opened its doors for enrollment early in 1940, Michigan Hospital Service was in the midst of negotiations with the Ford Motor Company for coverage of its employees. The company was not interested in complete care. It wanted a coverage which would take care of the catastrophic illness and would cost the employee not more than $1.00 a month. The two plans developed contracts to meet this specification. Michigan Hospital Service offered a hospital contract at $.60 a month for the single individual while Michigan Medical Service developed a contract providing surgical, obstetrical, x-ray, and anesthesia service for hospitalized bed patients at a cost of $.40 a month for a single person, $1.20 for husband and wife and $2.00 for a family. It was agreed that participating physicians would accept the fees of the plan as full payment for their services in the case of single subscribers with incomes under $2,000 a year and married subscribers with incomes under $2,500.

These contracts were acceptable to the company and over 60,000 Ford employees were signed up within the month. By the end of six months, 78,000 Ford employees were enrolled. At the close of the contract year the Ford Company cancelled its coverage with the two plans and took out insurance with a commercial carrier. However, the plans during that year enrolled substantial numbers of General Motors and Chrysler Corporation employees, and by January 1, 1942, Michigan Medical Service's enrollment stood at 450,000.

The plan had a favorable experience with the Ford group but lost money on its other groups and on the comprehensive contract, so that by the end of 1942 it had a deficit of $439,000. To meet this situation rates were increased in 1941 and again in 1942.

Continued operation of the plan during 1941 and 1942 despite the mounting "book" deficit was made possible by two devices. From April to September, 1941, the plan prorated and paid participating physicians only 80 percent of what was due them. The effect of this was bad. Physicians tended to lose faith in the plan. Officials of the plan state that, when proration was stopped and payment on the full fee schedule resumed, it was as if the plan had received a blood transfusion.

The second device resorted to was delay in the payment of doctors' bills. In July, 1942, physicians' bills were being paid on an average time interval of 33 days between receipt of bill and mailing of the check. By November, 1942, this time interval had increased to 60 days.

On the rates introduced in 1942 Michigan Medical Service was able to put its financial house fully in order. Since then the deficit has been erased, the lag in payment of physicians' bills has been eliminated, the amounts -- aggregating $127,000 -- withheld from the physicians during the period of proration have been paid back, and a substantial reserve has been accumulated. In the spring of 1945, benefits to subscribers were increased somewhat.

During the period of financial difficulties the plan curbed new enrollment -- indeed the State insurance department prohibited it from taking on new groups. The bar to new enrollment was partially lifted in the fall of

CONFIDENTIAL

BCBSA00289844

1943 and fully lifted in the spring of 1944. Since then enrollment has sub-
stantially increased.

## OTHER PLANS ESTABLISHED IN 1940

The growing interest of the medical profession and the public in prepay-
ment medical plans was shown by the passage in 1939 of enabling acts for med-
ical service plans in the States of Connecticut, New York, Pennsylvania, and
Vermont -- as well as in Michigan. In the following year plans were started
in two of these States, - in Buffalo and Utica, New York, and in Pennsylvania.

The profession took the lead in the establishment of the two New York
plans with the thought that just as hospital plans had been mutually advan-
tageous to the public and the hospitals, so prepayment medical plans would be
mutually advantageous to the public and the profession. In both instances
the establishment of the plans was materially aided by the existence of Blue
Cross plans to which responsibility for administration of the medical plans
could be and was delegated.

In both Buffalo and Utica the profession was convinced that public demand
and need could be met only by the provision of comprehensive service, and both
plans were consequently started on this basis. The Buffalo plan at the outset
or soon after also offered a limited surgical contract, but this had a very
small enrollment compared with the comprehensive contract. The Buffalo plan
was on a "service" basis for subscribers under certain income limits, i. e.,
for subscribers under these income limits the participating physicians agreed
to take the plan's fees as full payment for their services and not to make
extra charges to the subscribers. The Utica plan was on a service basis for
all subscribers irrespective of income.

Both plans provided for a certain degree of co-insurance, in that sub-
scribers were to pay directly for, or share the cost of, the first few calls
in any illness. Neither plan functioned successfully on the original basis.
In both cases the demand for service exceeded expectations, and proration of
fees had to be resorted to. Both plans encountered problems in the control
of a few physicians who made excessive numbers of calls on their patients.
The Utica physicians were dissatisfied because they felt that the plan had en-
rolled a disproportionate number of well-to-do persons -- persons who would
ordinarily be charged higher fees than those paid by the plan. In Buffalo,
the discrimination in benefits between subscribers over and under the income
limits -- the plan was administered so as to necessitate information on in-
comes from the employer or the employee -- caused difficulties. In Utica
public response to the plan was disappointing; people thought that the charges
were high for what the plan provided.

It was not long before changes were made in both plans. After about a
year the Utica plan brought forth a limited service contract (surgery, ob-
stetrics, x-ray, laboratory and anesthesia services for hospitalized patients)
at a cost about half of that for the comprehensive contract. This contract
was on a straight "indemnity" basis, i. e., the plan provided stipulated fees
for the different services and physicians could make extra charges if they
desired. 8/ This contract proved popular with both the public and the profes-

---

8/ The term "indemnity" may perhaps not be the best term to describe this arrangement  In medical
economics the term indemnity has often been used to denote arrangements where the payment is made
directly to the patient.  Under most of the present non-profit plans on a so-called indemnity basis,
the payment is made directly to the physician.  Under the other plans the check is usually made out
to both the physician and the patient jointly and is sent to the patient.  However, the latter may
assign his benefits to the physician in which case the check is sent to the latter.  The real dif-
ference between "service" and "indemnity" plans is that under the first physicians cannot charge
extra, while under the second they can.

141

CONFIDENTIAL

BCBSA00289845

sion; it was also successful financially. Soon after the comprehensive contract was discontinued, and a "medical call" rider to the surgical contract covering hospital calls in medical cases was offered. These two contracts have been successful, and enrollment has steadily increased.

In Buffalo, early in 1943, new comprehensive and surgical contracts were offered. These were on a straight indemnity basis. The new comprehensive contract did away with the co-insurance features but placed limits on the number of calls to which a subscriber would be entitled in any one year. The new features plus a slight increase in rates permitted the plan to pay the full scheduled fees on the new contracts, although proration was continued on the old. Sale of the old type contracts was discontinued and gradually these have been liquidated. For a while all went well and enrollment increased. Contrary to the experience elsewhere the public showed much greater interest in the comprehensive contract (selling at $3.00 a month for a family) than in the limited surgical contract ($1.70 a month for a family) and the former far outsold the latter. However, in 1945 the experience with the comprehensive contract turned unsatisfactory and the plan was forced to discontinue its sale.

The original Pennsylvania enabling act permitted the enrollment only of persons with incomes under certain limits. The State society organized a plan which had its own director and administrative staff but which entered into cooperative relationships with the Pittsburgh hospital service plan for enrollment and billing. Although it had been the intention at first to offer a comprehensive service, the experience of other plans warned against this, and a limited contract providing surgical and obstetrical services only was offered. It was found that the restriction of enrollment to persons with incomes under the specified level crippled enrollment efforts, and in 1943 the State society sponsored an amendment to the medical service plan act permitting enrollment of all persons regardless of income. Following this step, enrollment has been offered to all, participating physicians being free to make extra charges to persons over certain income limits.

Up until 1944 the plan was not vigorously pushed by the State Society, since then it has been. The cooperative relations with the Pittsburgh Blue Cross plan broke down and thus far (March 1947) the plan and the Blue Cross plans of the State have been unable to agree on a mutually satisfactory basis of cooperation. Thus far growth has been small.

A medical plan was also established in 1940 in North Carolina. In that year, Hospital Care Association, one of the two competing Blue Cross plans in the State, organized a medical service adjunct known as Medical Service Association. This organization had its own board of directors but otherwise was administered by the hospital plan. The plan enrolled members only in counties where its operations were indorsed by the county medical society. A contract offering stipulated allowances for surgical and obstetrical services and hospital calls was offered. In 1943 Hospital Care Association began to offer a surgical indemnity rider to its hospital contract, thus transforming itself into a joint hospitalization and medical plan. Since then it has pressed the sale of its own surgical contract rather than the contracts of its medical adjunct. It has, however, continued to use Medical Service Association as a vehicle for the extension of special low cost contracts to Farm Security Administration borrowers.

142

CONFIDENTIAL

BCBSA00289846

## PLANS ESTABLISHED IN 1941, 1942 AND 1943

The increasing interest of the medical profession and the public in medical prepayment was shown by the passage of enabling legislation in four States - Massachusetts, New Jersey, Ohio and Virginia - in 1940 and 1941 and by four States in 1943. Although a few plans have been started without the benefit of legislation, in most States the establishment of medical plans, as with hospital plans, has had to wait upon the passage of enabling legislation. In some States the legislation permits the establishment of separate medical service plans; in other States it permits either separate plans or plans which can provide both hospital and medical prepayment.

At this point cognizance should be taken of a new force which from 1940 on has played an important role in the establishment of medical plans. This new force is the Blue Cross plans. These plans have two interests in the formation of allied medical plans or in the transformation of themselves into joint hospital and medical plans. In the first place, the plans are under pressure from their subscribers. The subscribers, in effect, tell them: "Since a plan covering hospital services works so well, why cannot a similar arrangement be developed for physicians' services?" Secondly, the plans in selling hospital service contracts are in competition with commercial insurance companies which in 1939 or 1940 began to offer surgical coverage along with their hospitalization policies. From 1941 on the plans increasingly found that their inability to offer surgical coverage handicapped them in competition with the commercial companies.

Since 1940 or 1941 the directors and board members of Blue Cross plans have interested themselves more and more in the establishment of medical plans. In a few places these men stimulated groups of physicians to think about the problem, and the latter in turn then led their medical society to take action. Often Blue Cross administrators, being experienced in this field and having the necessary data at their command, aided the medical society by developing the actuarial basis for the proposed plan. In a few places where the medical profession was not greatly interested in the establishment of a plan, the hospital plan carried the major burden in the work of organizing and establishing a plan, even supplying the necessary capital. Where the medical society was definitely and enthusiastically interested, then the establishment of a plan often became in reality a cooperative endeavor of the society and the Blue Cross plan.

Practical considerations -- the ease of selling medical coverage to the already enrolled members of the hospital plan and the disinclination of employers to make payroll deductions for two separate organizations -- made cooperation between hospital and medical plans almost an absolute necessity. Hence, except in northern California, Oregon, Pennsylvania and Washington, all of the medical plans have been allied with the existing hospital plan or plans serving the same territory. The device usually adopted was for the medical plan to be set up as a separate corporation with its own board of directors, but to contract for administration with the Blue Cross plan, the same individual serving as executive director of both plans.

Plans were started in 1941 and 1942 in five States (in addition to California where two of the hospital service plans extended their coverage to include physicians' services). In two instances, North Carolina and New York City, the major role in establishment of the medical plan was played by the

143

CONFIDENTIAL

BCBSA00289847

existing Blue Cross plan.  In three other States – Colorado, New Jersey and Massachusetts -- all or most of the initiative came from the medical profession.

In 1941, Hospital Saving Association of North Carolina, the larger Blue Cross plan in the State, which is controlled by a board on which the hospitals, the medical profession and the public have equal representation, began to feel the need of offering medical service benefits in order to meet the competition of the other Blue Cross plan in the State and of commercial companies.  Accordingly, the plan began to offer a surgical indemnity contract along with its hospital contract.  The reserve of the hospital plan served as a reserve for the surgical benefits as well; the plan was not underwritten by the profession.

The plan developed late in 1942 by the New York City Blue Cross plan followed, in a sense, a similar pattern.  The Blue Cross plan wanted to develop a medical contract both to satisfy public demand and to meet competition from commercial insurance companies.  The medical profession in New York City was not anxious to start a plan.  The profession was willing to see service benefits guaranteed only to persons with incomes under $2500, whereas the officials of the plan thought the income limit for service benefits should be placed at $3500.  Unable to secure agreement the plan went ahead and formed its own medical adjunct.  (The New York law prohibits one plan from offering both hospital and medical benefits, although a hospital or medical plan could act as agent for the other.)  The medical plan had its own board of directors but had no staff of its own and was administered entirely by the Blue Cross plan.  A limited surgical contract on a straight indemnity basis was offered.

Late in 1944 a compromise agreement was reached with the medical profession over the issue of the income limit for service benefits.  It was agreed that participating physicians would not make extra charges to single persons and families with incomes under $1800 and $2500, respectively, and that persons in families with incomes between $2500 and $3500 if they were charged extra and wished to protest might appeal to a committee for review of the charge.  Thereupon the medical profession agreed officially to sponsor the medical plan, and the plan offered new contracts incorporating the above provisions relative to service benefits.  It continued, however, to offer the old straight indemnity contracts.[4/]

In the case of the plans started in 1942 in New Jersey, Massachusetts, and Colorado, primary initiative came from the State medical association.  The State society in New Jersey advanced $5,000 and in Massachusetts $25,000 as starting capital.  Both plans were started on a service-indemnity basis.  The New Jersey plan at first provided that patients who took ward or semi-private accommodations would not be subjected to extra charges.  Physicians objected to this, and after a time the plan adopted the more common provision that patients with incomes under certain limits would not be charged extra, with the added proviso that subscribers, regardless of income, who voluntarily took private rooms, could be charged extra.

The Colorado plan initially limited enrollment to persons under certain income limits.  This proved unworkable and for two years the plan made little progress.  In 1944 the restriction was removed and the plan began really to function.

---

[4/] Until late in 1946.

144

BCBSA00289848

In 1943 three plans were started, – in Delaware, Kansas City, Mo., and Charleston, W. Va. All three offered a limited surgical contract. The Delaware and Charleston, W. Va.,[5] plans were on a straight indemnity basis; the Kansas City, Mo. plan offered a service contract to those under a given income limit and an indemnity contract to those above this limit. The Kansas City and Charleston plans had separate boards but were administered by the hospital plan. In Delaware no separate board was created, and the existing hospital plan, with which the Delaware medical profession was well pleased, simply issued surgical contracts and thus transformed itself into a joint hospital and medical plan.

## RECENT DEVELOPMENTS

From 1944 on, the development of medical plans has gone ahead with increased impetus. In 1944 three plans were launched, in 1945, 10 plans, in 1946, 12 plans. Furthermore from 1944 on, enrollment in the older plans, some of which had for a period been quiescent, began rapidly to increase.

The operation of existing plans, chiefly Michigan Medical Service, had served to convince the medical profession that medical prepayment was workable, sound, and in the interests of both the public and the profession. The profession everywhere had become convinced that the public wanted the opportunity of obtaining medical service on a prepayment basis, and that it (the profession) should endeavor to meet that demand. The Wagner-Murray-Dingell bill and other proposals for compulsory insurance also served to spur the profession to action. From 1943 on the American Medical Association actively encouraged State and local medical societies to establish plans. Public response to existing plans and the live interest of the Blue Cross plans were also factors in the rapid development of the movement.

Most of the plans started since 1944 follow the conventional pattern of a non-profit service plan organized under special enabling legislation, and with control firmly vested in the medical profession. However, several of the plans serve to illustrate the varied forces now active in this field.

The Ohio enabling act for medical plans, passed in 1941 at the instigation of the medical profession, contained an ironclad prohibition against any plan enrolling persons with incomes over $2400 a year. This has prevented the establishment of medical plans on the usual basis. The need for a companion medical plan to the successful hospital plan in Cleveland had long been recognized. To meet this need outstanding civic and industrial leaders in Cleveland late in 1945 organized Medical Mutual of Cleveland, as a mutual insurance company. Capital to start the plan was advanced by these civic and industrial leaders and by a philanthropic foundation. The plan has its own executive director, but enrollment is conducted through the Blue Cross plan, and contracts are offered only to those who have the Blue Cross coverage.

Shortly after establishment of Medical Mutual of Cleveland the medical profession of Ohio launched its own plan – Ohio Medical Indemnity, Incorporated. This plan is organized as a stock insurance company. Capital was provided by the sale of preferred stock to the profession. Holders of this stock will receive dividends at five percent, but the stock will be retired

---

5/. It is understood that there are 10 hospital and 9 medical service plans now operating in the State. Only 2 of the hospital plans are approved Blue Cross plans and information has been obtained only about the medical plans affiliated with the 2 Blue Cross plans.

CONFIDENTIAL

BCBSA00289849

out of the earnings of the company as rapidly as possible. The common stock on which no dividends are payable is held by the State medical society. This plan has entered into cooperative relations with the Cincinnati and Toledo Blue Cross plans and aims to develop similar arrangements with the other plans.[8]

In New York City in 1945 a group of civic and medical leaders, among whom was Mayor La Guardia, formed an organization known as the Health Insurance Plan of Greater New York. Funds to permit preliminary organization were secured from a number of foundations. The plan will provide a comprehensive medical service through medical groups, and it has stimulated the formation of 18 such groups some of the groups being affiliated with hospitals, some not. Hospitalization will be obtained through the Blue Cross plan. The plan, which does not have the endorsement of the medical societies of the city, began enrollment in January 1947.

In a number of States the medical profession was for a period reluctant to establish its own plan and gave consideration to an arrangement whereby insurance companies would provide policies with fee schedules approved by the society, and physicians would then agree to accept these fees as full payment for their services in the case of patients with incomes under certain amounts. Arrangements of this nature were at one time decided upon in Wisconsin and Illinois but the profession in both States has since reconsidered and has decided to establish its own plan or plans. In Connecticut the State Medical Society has voted to encourage insurance companies to offer medical insurance rather than to develop a plan of its own.

A recital of the history of medical plans would perhaps not be complete without touching upon the developments set forth above. Yet it should be emphasized that these have been atypical. The main current has been the organization by the medical profession of plans under special enabling legislation.

The growth in number of plans and in enrollment has been as follows:

| Period | Number of Plans [1] | Total Enrollment [2] |
|---|---|---|
| Jan. 1, 1940 | 3 | 167,000 |
| Jan. 1, 1941 | 8 | 370,000 |
| Jan. 1, 1942 | 10 | 775,000 |
| Jan. 1, 1943 | 15 | 965,000 |
| Jan. 1, 1944 | 19 | 1,235,000 |
| Jan. 1, 1945 | 22 | 1,768,000 |
| Jan. 1, 1946 | 32 | 2,535,000 |
| Jan. 1, 1947 | 44 | 4,436,000 |

[1] The various county plans in Washington are counted as a single plan and the same is true of Oregon Physicians' Service and its affiliated plans.

[2] Data for the years 1940-44 includes estimated figures for some plans.

## COORDINATING AGENCY AND ROLE OF THE AMERICAN MEDICAL ASSOCIATION

In 1943 the then existing medical plans formed a central organization known as the Medical Service Plans Council of America. This organization had no paid staff, and it served mainly as an agency to call meetings of adminis-

---

[8] As of May 1947 the plan had entered into cooperative arrangements with almost all of the Blue Cross plans except the Cleveland plan.

146

CONFIDENTIAL

BCBSA00289850

trators of the plans from time to time.  Under the aegis of this organization several of the medical plans adopted as their symbol a Blue Shield and called themselves Blue Shield plans, and this example has subsequently been followed by a good many of the medical plans.

Throughout 1944 and 1945 the Council on Medical Service and Public Relations of the American Medical Association served in some respects as a coordinating agency of the existing medical plans, and endeavored to give guidance to local and State medical societies in the establishment of new plans. The attitude of the American Medical Association toward prepayment medical plans was rather definitely and firmly crystallized by passage of a resolution by the House of Delegates in December 1945 which instructed the Board of Trustees and the Council on Medical Service and Public Relations,

> "to proceed as promptly as possible with the development of a specific national health program with emphasis upon the nation-wide organization of locally administered prepayment plans sponsored by medical societies."

At a meeting of medical plans held in February 1946 under the sponsorship of the American Medical Association a new central coordinating agency known as Associated Medical Care Plans, Inc., was formed.  This organization will aid in the establishment of new plans, collect and circulate statistics, stimulate the development of arrangements for transfer of members and reciprocity of benefits among the plans, and in general perform the same functions as the Blue Cross Commission performs for the hospital plans.

Later in 1946 the Council on Medical Service and Public Relations of the A. M. A. announced tentative standards of approval for medical plans. Plans approved by the Council are entitled to display the Seal of Acceptance of the American Medical Association on their contracts and literature.  As of February 1947 the Council had approved 52 plans.[7]  The Seal of Acceptance is a circle within which is a Blue Shield emblazoned with a caduceus and the letters "A.M.A."

---

[7] Includes 22 plans in Washington, 5 plans in Oregon and 4 in West Virginia.

147

CONFIDENTIAL

BCBSA00289851

# CHAPTER 15

## PRESENT PLANS, AREA AND POPULATION SERVED

As of January 1, 1947, 44 medical plans were in operation. This includes nine joint hospital-medical plans. [1]  Table 21 lists the plans, shows the area served and gives other relevant data.  (Appendix M gives the address of each plan and the name of the Executive Director.)

Of the 44 plans 24 serve an entire State, one serves two States (New Hampshire and Vermont) and 19 serve local areas within States. [2]  Relatively more of the medical than of the hospital plans are on a state-wide basis.  At the present time, (January 1, 1947) 20 States are served by a single State-wide plan; one State (California) is served by a State-wide plan and by two local plans which compete with it; another State (North Carolina) has three state-wide plans, one of which serves Farm Security borrower families exclusively, and the other two of which compete with each other; another State (Oregon) has two competing state-wide plans; four States are served by local plans which together serve the entire State; four States have one or more local plans which together do not serve the entire area of the State, and 17 States and the District of Columbia have no plan at all.  Such is the present tempo of activity in this field that in another year or two plans will be in operation in most or all of the States now without them.

Of the 44 plans 16 offer coverage of surgery and obstetrics only (and x-ray, pathology and anesthesia services where these are not offered by the allied hospital plan), 22 go further and provide coverage of physicians' services in the hospital for medical cases and six plans go still further and provide some coverage of physicians' service in the office and home.

Of the 44 plans, four are on a straight service basis, 17 on a mixed service-indemnity basis and 23 on a straight indemnity basis.  In point of enrollment, 9 percent of the total number of people served are in the service plans, 62 percent in the service-indemnity and 29 percent in the indemnity plans.

The relationships between the medical plans and the Blue Cross plans serving the same territory run the gamut all the way from no relationship or even outright competition to that in which the two plans are one and the same, i. e., one plan issues both medical and hospital contracts.

The most common relationship, which exists between 20 allied medical and hospital plans, is that in which the two plans though established as separate corporations, each with its own board of directors, are completely unified administratively, i.e., the same individual serves as executive director for both plans and there is a single staff.  Administrative expenses are shared

---

[1] The county medical bureaus in Washington which are in the process of being coordinated into a state-wide organization known as Washington Medical Bureau, are here considered as if they were one plan.  Likewise Oregon Physicians' Service and its affiliated county bureaus are also considered as if they were one plan.  There are a few plans in West Virginia which are not included in this count.

[2] Ohio Medical Indemnity, Inc. and Louisiana Physicians' Service both of which are state-wide in intention but at present are operating only in local areas, are here counted as local plans.

148

CONFIDENTIAL

BCBSA00289852

TABLE 21

**Medical Service Plans, Area Served, Date of First Enrollment, Scope of Benefits, Type of Benefits, Relationship with Hospital Plan, Enrollment, and Percent of Hospital Plan Members Enrolled in Medical Plan.**

Data as of January 1, 1947

| STATE | NAME OF PLAN AND HEADQUARTERS CITY | AREA SERVED | DATE OF FIRST ENROLLMENT | SCOPE OF BENEFITS (SEE CODE) | TYPE OF BENEFITS (SEE CODE) | RELATIONSHIP WITH HOSPITAL PLAN (SEE CODE) | ENROLLMENT | PERCENT OF HOSPITAL PLAN MEMBERS ENROLLED IN MEDICAL PLAN |
|---|---|---|---|---|---|---|---|---|
| ALABAMA | HOSPITAL SERVICE CORP. OF ALABAMA, BIRMINGHAM | STATE-WIDE | 1945 | 2 | I | C | 45,791 | 26.2 |
| ARKANSAS | NO PLAN | | | | | | | |
| ARIZONA | NO PLAN | | | | | | | |
| CALIFORNIA | CALIFORNIA PHYSICIANS' SERVICE, SAN FRANCISCO | STATE-WIDE | SEPT. 1939 | 4 | S-I | B-C | 419,672 | 1/ |
| | HOSPITAL SERVICE OF CALIFORNIA, OAKLAND | 9 COUNTIES — BAY AREA | 1942 | 2 | I | C | 116,655 | 59.4 |
| | INTERCOAST HOSPITAL INSURANCE ASSOCIATION, SACRAMENTO | 39 COUNTIES — NORTHERN CALIFORNIA | 1941 | 2 2/ | I | C | 37,221 | 71.7 |
| COLORADO | COLORADO MEDICAL SERVICE, INC., DENVER | STATE-WIDE | MAY 1942 | 1 | S-I | A | 174,132 | 41.9 |
| CONNECTICUT | NO PLAN | | | | | | | |
| DELAWARE | GROUP HOSPITAL SERVICE, WILMINGTON | STATE-WIDE | MAY 1943 | 1 | I | C | 100,983 | 77.1 |
| DISTRICT OF COLUMBIA | NO PLAN | | | | | | | |
| FLORIDA | FLORIDA MEDICAL SERVICE CORP., JACKSONVILLE | STATE-WIDE | 1946 | 1 | S-I | A | 2,919 | 4.0 |
| GEORGIA | NO PLAN | | | | | | | |
| IDAHO | NO PLAN | | | | | | | |
| ILLINOIS | NO PLAN | | | | | | | |
| INDIANA | MUTUAL MEDICAL INSURANCE, INC., INDIANAPOLIS | STATE-WIDE | 1946 | 1,2 | I | A | 82,531 | 36.7 |
| IOWA | IOWA MEDICAL SERVICE, DES MOINES | STATE-WIDE | SEPT. 1945 | 1,2 | S-I | B | 17,214 | 4.2 |
| KANSAS | KANSAS PHYSICIANS' SERVICE, TOPEKA | STATE — EXCEPT KANSAS CITY AREA | JAN. 1946 | 2 | S-I | A | 14,558 | 6.7 |
| KENTUCKY | NO PLAN | | | | | | | |
| LOUISIANA | LOUISIANA PHYSICIANS SERVICE, INC., NEW ORLEANS | STATE-WIDE (BUT NOT NOW OPERATING IN NEW ORLEANS AREA) | 1946 | 1 | S-I | B | 5,972 | 19.8 |
| | HOSPITAL SERVICE OF NEW ORLEANS, NEW ORLEANS | 21 PARISHES — SOUTHERN LOUISIANA | JUNE 1945 | 1 | I | C | 15,412 | 12.2 |
| MAINE | NO PLAN | | | | | | | |
| MARYLAND | NO PLAN | | | | | | | |
| MASSACHUSETTS | MASSACHUSETTS MEDICAL SERVICE, BOSTON | STATE-WIDE | 1942 | 2 | S-I | A | 461,000 | 23.2 |
| MICHIGAN | MICHIGAN MEDICAL SERVICE, DETROIT | STATE-WIDE | MARCH 1940 | 1,2 | S-I | B | 850,000 | 72.8 |
| MINNESOTA | NO PLAN | | | | | | | |
| MISSISSIPPI | NO PLAN | | | | | | | |
| MISSOURI | SURGICAL CARE INC., KANSAS CITY | GREATER KANSAS CITY AND NORTHEASTERN MISSOURI | JUNE 1943 | 1,2 | S-I | A | 115,000 | 62.2 |
| | MISSOURI MEDICAL SERVICE, ST. LOUIS | STATE — EXCEPT AREA SERVED BY KANSAS CITY PLAN | 1945 | 2 | I | A | 66,849 | 8.9 |
| MONTANA | MONTANA PHYSICIANS' SERVICE, HELENA | STATE-WIDE | 1946 | 2 | S-I | B | 8,996 | 16.3 |
| NEBRASKA | NEBRASKA MEDICAL SERVICE, OMAHA | STATE-WIDE | NOV. 1944 | 2 | I | A | 21,540 | 26.6 |
| NEW HAMPSHIRE | NEW HAMPSHIRE-VERMONT PHYSICIAN SERVICE, CONCORD, N.H. | NEW HAMPSHIRE AND VERMONT | AUG. 1944 | 1,3 | I | A | 85,970 | 43.5 |
| NEW JERSEY | MEDICAL-SURGICAL PLAN OF NEW JERSEY, NEWARK | STATE-WIDE | JULY 1942 | 2 | S-I | B | 88,088 | 9.5 |
| NEW MEXICO | NEW MEXICO PHYSICIANS' SERVICE, ALBUQUERQUE | STATE-WIDE | 1946 | 2 | S-I | B OR A | 2,583 | 29.7 |
| NEW YORK | WESTERN NEW YORK MEDICAL PLAN, BUFFALO | 7 COUNTIES — WESTERN NEW YORK | 1940 | 1 | I | A | 102,458 | 24.3 |
| | UNITED MEDICAL SERVICE, NEW YORK CITY | SOUTHEASTERN NEW YORK | DEC. 1942 | 1,2 | S-I | A | 405,744 | 14.6 |
| | GENESEE VALLEY MEDICAL CARE INC., ROCHESTER | 6 COUNTIES — ROCHESTER AREA | 1946 | 1 | I | A | 11,700 | 3.7 |
| | CENTRAL NEW YORK MEDICAL PLAN, SYRACUSE | 10 COUNTIES IN CENTRAL NEW YORK | 1945 | 1,3 | I | A | 10,078 | 4.4 |
| | MEDICAL AND SURGICAL CARE, UTICA | 15 COUNTIES IN NORTHCENTRAL NEW YORK | APRIL 1940 | 1,2 | I | A | 68,514 | 50.4 |
| NEVADA | NO PLAN | | | | | | | |

149

BCBSA00289853

**TABLE 21**

Medical Service Plans, Area Served, Date of First Enrollment, Scope of Benefits, Type of Benefits,
Relationship with Hospital Plan, Enrollment, and Percent of Hospital Plan Members
Enrolled in Medical Plan

Data as of January 1, 1947

| STATE | NAME OF PLAN AND HEADQUARTERS CITY | AREA SERVED | DATE OF FIRST ENROLLMENT | SCOPE OF BENEFITS (SEE CODE) | TYPE OF BENEFITS (SEE CODE) | RELATIONSHIP WITH HOSPITAL PLAN (SEE CODE) | ENROLLMENT | PERCENT OF HOSPITAL PLAN MEMBERS ENROLLED IN MEDICAL PLAN |
|---|---|---|---|---|---|---|---|---|
| NORTH CAROLINA | HOSPITAL SAVING ASSOCIATION, CHAPEL HILL | STATE-WIDE | AUG. 1941 | 1 | I | C | 179,800 | 57.4 |
|  | HOSPITAL CARE ASSOCIATION, DURHAM | STATE-WIDE | MAY 1943 | 1 | I | C 2/ |  | 4/ |
|  | MEDICAL SERVICE ASSOCIATION, DURHAM 3/ | STATE-WIDE | 1940 | 1,3 | I | A 3/ | 158,704 | 4/ |
| NORTH DAKOTA | NORTH DAKOTA PHYSICIANS SERVICE, FARGO | STATE-WIDE | 1946 | 1 | S | A | 6,185 | 11.7 |
| OHIO | MEDICAL MUTUAL OF CLEVELAND, CLEVELAND | 5 COUNTIES — NORTHEASTERN OHIO | JUNE 1945 | 1 | I | B | 46,429 | 4.8 |
|  | OHIO MEDICAL INDEMNITY, COLUMBUS | STATE-WIDE (NOW OPERATING IN CINCINNATI AND TOLEDO AREAS ONLY) | FEB. 1946 | 1 | I | B | 71,895 | 8.0 |
| OKLAHOMA | OKLAHOMA PHYSICIANS' SERVICE, TULSA | STATE-WIDE | JUNE 1945 | 1 | I | A | 20,283 | 11.9 |
| OREGON | OREGON PHYSICIANS' SERVICE AND AFFILIATED COUNTY BUREAUS, PORTLAND | STATE-WIDE | 1929 | 5 | S | D | 92,000 8/ | 8/ |
|  | NORTHWEST HOSPITAL SERVICE PLAN, PORTLAND |  | 1946 | 2 | I | C | 4,741 | 7.4 |
| PENNSYLVANIA | MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA, HARRISBURG | STATE-WIDE | OCT. 1940 | 1,2 | S-I | D | 59,000 8/ | 8/ |
| RHODE ISLAND | NO PLAN |  |  |  |  |  |  |  |
| SOUTH CAROLINA | NO PLAN |  |  |  |  |  |  |  |
| SOUTH DAKOTA | NO PLAN |  |  |  |  |  |  |  |
| TENNESSEE 2/ | NO PLAN |  |  |  |  |  |  |  |
| TEXAS | GROUP MEDICAL AND SURGICAL SERVICE, DALLAS | STATE-WIDE | 1945 | 2 | I | A | 32,242 | 15.0 |
| UTAH | MEDICAL SERVICE BUREAU OF THE UTAH STATE MEDICAL ASSOCIATION, INC., SALT LAKE CITY | STATE-WIDE | 1946 | 1 | S-I | B OR A | 4,044 | 5.5 |
| VERMONT | SERVED BY NEW HAMPSHIRE-VERMONT PLAN |  |  |  |  |  |  |  |
| VIRGINIA | VIRGINIA MEDICAL SERVICE ASSOCIATION, RICHMOND | EASTERN AND CENTRAL VIRGINIA | 1945 | 2 | S-I | A-B | 42,989 | 33.4 |
|  | SURGICAL CARE INCORPORATED, ROANOKE | WESTERN VIRGINIA | NOV. 1945 | 1 | S | A | 32,070 | 58.9 |
| WASHINGTON 2/ | WASHINGTON MEDICAL BUREAU AND AFFILIATED COUNTY PLANS, SEATTLE 2/ | STATE-WIDE 2/ | 1933 | 5 | S | D | 250,000 8/ | 8/ |
| WEST VIRGINIA | MEDICAL SERVICE, INCORPORATED, CHARLESTON | 9 COUNTIES IN CENTRAL WEST VIRGINIA | NOV. 1943 | 2 | I | A | 21,700 8/ | 47.8 |
|  | HUNTINGTON HOSPITAL SERVICE, HUNTINGTON | 7 COUNTIES IN WESTERN WEST VIRGINIA | 1944 | 1 | I | C | 3,742 | 10.1 |
| WISCONSIN | SURGICAL CARE, MILWAUKEE | MILWAUKEE | 1946 | 2 | S-I | A | 66,900 | 11.4 |
| WYOMING | NO PLAN |  |  |  |  |  |  |  |

**SCOPE OF BENEFITS CODE**

1. Surgical and obstetrical benefits with or without coverage of x-ray, anesthesia and laboratory services.
2. Same as type 1 plus hospital calls in medical cases.
3. Calls in home, office and hospital for medical cases.
4. Comprehensive physicians' services, including obstetrical care, to employed persons. Only surgical service available to dependents.
5. Comprehensive physicians' services (except obstetrics) for employed subscriber. Service available to dependents varies from none to comprehensive.

**RELATIONSHIP WITH HOSPITAL PLAN CODE**

A. Plans are separate corporations and have separate boards of directors, but they have a single executive director and administrative staff.
B. Plans are separate corporations; they have separate executive directors, but to some extent combined administrative staffs. One plan performs enrollment and billing for the other or there is joint control of these functions.
C. One organization with a single board of directors, executive director and staff offers both hospital and medical service.
D. Plan entirely separate - no relationship.

**SERVICE, SERVICE-INDEMNITY OR INDEMNITY CODE**

S. Plan provides service benefits to all subscribers.
S-I Plan provides service benefits to subscribers under certain income limits and indemnity benefits to subscribers above these limits.
I Plan provides indemnity benefits to all subscribers.

**FOOTNOTES**

1/ In southern California, where CPS and Blue Cross are cooperating, over 50% of Blue Cross members are also enrolled in CPS. In northern California members of CPS and the hospital plans are not the same persons.
2/ Includes obstetrical care only if 75% of a large group enroll.
3/ This plan is administered by Hospital Care Ass'n. Membership consists of Farm Security Administration borrowers.
4/ Many of the FSA members of Medical Service Association are enrolled for hospitalization with Hospital Saving Association.
5/ Approximate

6/ Medical Plan members and Blue Cross members are not the same persons.
7/ There are 22 county medical service bureaus, all of which have been "accepted" by the A.M.A. An effort to merge these into a State-wide plan is underway. The bureau in Yakima County cooperates with the Blue Cross plan. The bureau in Clark County (Vancouver) cooperates with the Oregon Blue Cross plan.
8/ In addition to the plans listed there are seven other plans with a total enrollment of about 45,000. Headquarters of these plans are at Clarksburg, Fairmont, Morgantown, Parkersburg, Weston, Wheeling and Williamson.

150

CONFIDENTIAL



AREAS SERVED BY MEDICAL SERVICE PLANS,
JANUARY 1, 1947

FIGURE 13

California
1. Cal. Phys. Service
2. Oakland
3. Sacramento

Kansas
1. Topeka
2. Kansas City

Louisiana
1. New Orleans B. C. plan
2. Louisiana Phys. Service

Missouri
1. St. Louis
2. Kansas City

New York
1. Buffalo
2. Rochester
3. Syracuse
4. Utica
5. New York City

North Carolina
1. Chapel Hill
2. Durham
3. Medical Service Assoc.

Ohio
1. Cleveland
2. Ohio Medical
   Indemnity

Oregon
1. Oregon Phys.
   Service
2. Oregon B. C.
   plan

Virginia
1. Richmond
2. Roanoke

West Virginia
1. Huntington
2. Charleston

Wisconsin
1. Milwaukee

Areas Served

Areas Served by Competing Plans

CONFIDENTIAL

BCBSA00289855

between the two plans usually on the basis of their relative gross incomes.

The next most common relationship is that in which the two plans are separate corporations with separate boards and different executive directors, but there is some administrative coordination between them. Generally the hospital plan performs enrollment and billing for the medical plan, or there is joint control of these functions. In some cases the staff of the hospital plan also handles the payment of medical claims, or again there is joint control over this function. This relationship exists between 9 medical plans and 14 hospital plans, [3] and possibly in the case of two other pairs of plans for which definite information is not at hand. It is found in a number of instances in which the medical plan is on a state-wide basis but cooperates with two or more hospital plans serving local areas, as in Iowa, Louisiana, and Ohio.

In nine cases the medical and hospital plans are one and the same. [4] All of these plans began as hospital plans and subsequently expanded to provide medical coverage. All of these medical plans issue indemnity contracts and with some exceptions, of which Delaware is one, they do not have the strong support of the medical profession of the area. Four of them (Oakland, Sacramento, New Orleans and Oregon) serve areas in which the medical profession has its own plan.

In three States and part of another there is no cooperation between the medical plans sponsored by the medical profession and the hospital plans. In Washington active competition exists between the county medical bureaus, which include hospitalization in their contracts, and the State-wide Blue Cross plan. However, two bureaus, those of Yakima and Clark (Vancouver) Counties have dropped hospitalization from their contracts and have entered into cooperative relationships, the one with the Washington Blue Cross plan and the other with the Oregon Blue Cross plan. In Oregon, sharp competition exists between Oregon Physicians' Service and its affiliated county bureaus, which include hospitalization in their contracts, and the Oregon Blue Cross plan which since 1946 has offered medical coverage. In California, there is very close administrative cooperation between California Physicians' Service and the Los Angeles Blue Cross plan -- indeed the two plans really function as a single administrative unit. However, in the northern part of the State there is competition between CPS and the two Blue Cross plans. In Pennsylvania, the state-wide medical plan and the five local Blue Cross plans have not been able to agree upon a suitable basis of cooperation, although it is understood that efforts in this direction are being made.

In a number of States cooperative relationships between the medical and hospital plans are impeded or will be impeded because of differences in the areas served. In California, Louisiana, Iowa, Ohio and Pennsylvania the plan sponsored by the medical profession is or intends to be on a state-wide basis, but there are two or more hospital plans serving these States. In Virginia the plan which serves the eastern part of the State must cooperate with four separate hospital plans. [5] Obviously close cooperation or administrative

---

3/ Between the medical and hospital plans in Southern California, Michigan, Montana, New Jersey, Cleveland, and between (a) Louisiana Physicians' Service and the Alexandria and Baton Rouge Blue Cross plans, (b) Ohio Medical Indemnity and the Cincinnati and Toledo plans, (c) Iowa Medical Service and the two Iowa hospital plans, and (d) Virginia Medical Service and the Lynchburg, Newport News and Norfolk plans. This relationship may also exist between the New Mexico hospital and medical plans and the Utah hospital and medical plans -- definite information on this point is not at hand.

4/ Alabama, Oakland, Sacramento, Delaware, New Orleans, Chapel Hill, Hospital Care Ass'n. of Durham, Northwest Hospital Service of Oregon, Huntington.

5/ Virginia Medical Service, operated by the Richmond Blue Cross plan.

CONFIDENTIAL

BCBSA00289856

unification in these areas is difficult or impossible unless either the medical plan breaks down into two or more local plans, or the local hospital plans consolidate into a state-wide plan.

## POPULATION ENROLLED

As of January 1, 1947 the medical plans had a total enrollment of 4,436,000. A considerable part of this enrollment, almost half, is in four plans -- Michigan, Massachusetts, California Physicians' Service and New York City.

In the case of some medical plans enrollment is rapidly catching up with enrollment in the allied hospital plan. Thus in 8 plans, over 50 percent of the members of the hospital plan have been enrolled for medical benefits. In southern California, well over 80 percent of the members of the hospital plan are enrolled with the medical plan. In Delaware 77 percent of those with hospital coverage also have medical coverage. In Michigan the proportion is 73 percent, in Kansas City 62 percent. A number of allied or integrated hospital and medical plans now offer the combined coverage at a single price, and prospective subscribers customarily take both coverages or neither.

Table 22 shows the enrollment in medical plans by States, the percentage of the population enrolled, and net growth during 1946. In Delaware 36 percent of the population of the State have been enrolled, in New Hampshire 19 percent, 6/ in Colorado 16 percent, in Michigan 16 percent. In 6 other States between 5 and 13 percent of the State population are members. During 1946, two plans, Delaware and New Hampshire, had a net growth in enrollment of more than 10 percent of the State's population, and two others, Colorado and Massachusetts had a net growth of between 5 and 10 percent. The Michigan plan had a decrease in enrollment owing largely to administrative difficulties of the hospital plan which conducts enrollment for it. 7/

## NOTE ON RECENT CHANGES

Since January 1, 1947 and up to June 1, the following changes have occurred:

The plan with headquarters in Milwaukee, Wisconsin has been extended to serve the entire State. Ohio Medical Indemnity has entered into cooperative relationships with all or virtually all of the Blue Cross plans in the State, excepting the Cleveland plan, so that it serves all or most of Ohio outside of the Cleveland area. A plan with headquarters in Albany, N. Y., and affiliated with the Albany Blue Cross plan, has begun enrollment.

The medical plans affiliated with Blue Cross plans reported a total enrollment as of April 1, 1947 of 4,565,138 (this is exclusive of the plans outside the United States, and of the Yakima plan in Washington). Addition of the total (approximate) enrollment in Oregon, Pennsylvania and Washington as of the first of the year, brings the total enrollment to 4,957,000.

---

6/ The New Hampshire medical plan was expanded to include Vermont only in November 1946. Hence virtually all of its enrollment as of January 1, 1947 was in New Hampshire.

7/ Appendix I shows the enrollment history of each plan since its establishment.

153

CONFIDENTIAL

BCBSA00289857

### TABLE 22

#### Enrollment in Medical Plans by States, Jan. 1, 1947
#### Percent of the Total Population Enrolled and 1946 Growth

| STATE | ESTIMATED CIVILIAN POPULATION JULY 1, 1945 | ENROLLMENT JAN. 1, 1947 | PERCENT OF POPULATION ENROLLED | 1946 GROWTH | PERCENT OF POPULATION ENROLLED IN 1946 |
|---|---|---|---|---|---|
| DELAWARE | 277,455 | 100,983 | 36.4 | 31,465 | 11.3 |
| NEW HAMPSHIRE 1/ | 445,930 | 85,370 | 19.1 | 48,507 | 10.9 |
| COLORADO | 1,060,239 | 174,132 | 16.4 | 78,770 | 7.4 |
| MICHIGAN | 5,435,092 | 850,000 | 15.6 | -8,235 | 2/ |
| WASHINGTON | 1,953,725 | 250,000 3/ | 12.8 | 50,000 3/ | 2.6 3/ |
| MASSACHUSETTS | 4,086,197 | 461,000 | 11.3 | 239,155 | 5.9 |
| NORTH CAROLINA | 3,333,999 | 318,504 | 9.6 | 112,875 | 3.4 |
| OREGON | 1,193,702 | 96,741 3/ | 8.1 | 11,741 3/ | 1.0 3/ |
| CALIFORNIA | 8,120,105 | 573,546 | 7.1 | 328,551 | 4.0 |
| MISSOURI | 3,481,949 | 181,849 | 5.2 | 109,854 | 3.2 |
| NEW YORK | 12,343,450 | 598,474 | 4.8 | 328,993 | 2.7 |
| VIRGINIA | 2,810,278 | 105,059 | 3.7 | 73,009 | 2.6 |
| INDIANA | 3,387,463 | 82,531 | 2.4 | 82,531 | 2.4 |
| WISCONSIN | 2,934,044 | 66,900 | 2.3 | 66,900 | 2.3 |
| NEW JERSEY | 4,104,176 | 88,088 | 2.1 | 38,647 | 0.9 |
| MONTANA | 452,519 | 8,996 | 2.0 | 8,996 | 2.0 |
| NEBRASKA | 1,155,744 | 21,540 | 1.9 | 15,961 | 1.4 |
| WEST VIRGINIA | 1,716,944 | 31,442 | 1.8 | 10,608 | 0.6 |
| OHIO | 6,823,137 | 118,324 | 1.7 | 99,957 | 1.5 |
| ALABAMA | 2,728,120 | 45,791 | 1.7 | 38,773 | 1.4 |
| NORTH DAKOTA | 519,709 | 6,185 | 1.2 | 6,185 | 1.2 |
| OKLAHOMA | 1,941,499 | 20,283 | 1.0 | 17,672 | 0.9 |
| LOUISIANA | 2,343,406 | 21,384 | 0.9 | 16,157 | 0.7 |
| KANSAS | 1,656,588 | 14,558 | 0.9 | 14,558 | 0.9 |
| IOWA | 2,236,203 | 17,214 | 0.8 | 14,069 | 0.6 |
| UTAH | 591,910 | 4,044 | 0.7 | 4,044 | 0.7 |
| PENNSYLVANIA | 9,142,797 | 55,000 3/ | 0.6 | 34,000 3/ | 0.4 3/ |
| NEW MEXICO | 490,302 | 2,583 | 0.5 | 2,583 | 0.5 |
| TEXAS | 6,338,309 | 32,242 | 0.5 | 21,388 | 0.3 |
| FLORIDA | 2,059,505 | 2,919 | 0.1 | 2,919 | 0.1 |
| OTHER STATES | 32,244,801 | 0 | 0 | 0 | 0 |
| TOTAL U.S.A. | 127,409,297 | 4,435,682 | 3.48 | 1,908,868 | 1.5 |

1/ The New Hampshire medical plan was expanded to include Vermont in
November 1946.  Hence, almost all enrollment as of the end of the
year was in New Hampshire.

2/ Decrease

3/ Approximate

154

CONFIDENTIAL

BCBSA00289858

# CHAPTER 16

## SUBSCRIPTION RATES AND BENEFITS

Table 23 shows the rates charged and the scope of benefits provided by the various medical plans.

In general the contracts offered by the medical plans -- some plans offer more than one type of contract -- fall into the following three main groups:

1. Contracts covering surgical and obstetrical service, with or without coverage of x-ray, anesthesia and laboratory services.
2. Contracts covering these same services, and in addition hospital calls in medical cases. This coverage may be offered in a single inclusive contract or through a contract of type 1 supplemented by a separate contract covering hospital calls.
3. Contracts providing surgery, obstetrics and office, home and hospital calls. This expanded coverage may be offered through a contract of type 1 supplemented by a contract offering office, home and hospital calls or through a single contract.

## SURGICAL CONTRACTS

A little more than one third of the plans offer only the first type of contract. These limited contracts are usually known as surgical contracts; actually, however, both surgery and obstetrics are covered. The contracts offered by some plans cover only surgery performed in the hospital; other plans cover surgery performed in both the hospital or office, and still other plans -- more numerous than either of the other two groups -- cover all surgery irrespective of where it is performed. Actually these distinctions are not very important, since almost all surgical procedures of any complexity are performed in the hospital in any case. Some contracts cover only obstetrical service performed in a hospital; others do not have this restriction. Again the distinction is unimportant since the medical coverage is only sold to persons enrolled in the hospital plan, and a woman who has hospital coverage will certainly go to the hospital for her confinement.

The coverage of x-ray, anesthesia and laboratory services under the surgical contract is determined very largely by the scope of the allied hospital plan. In general, the surgical plan will offer such of these services as are not offered under the hospital plan. In most instances, when these services are offered, they are available only to hospitalized patients or are offered only in connection with surgical cases covered by the plan.

About two thirds of the medical plans provide x-ray service. Very few of these provide the service without limit, most furnish the service up to a dollar limit -- commonly $15.00 - per contract year or per admission. Limitations of the same sort are also imposed, though less frequently, upon anesthesia and laboratory service. A number of the plans provide electrocardiograph and basal metabolism tests.

155

BCBSA00289859

**TABLE 23**

**SUBSCRIPTION RATES CHARGED AND BENEFITS PROVIDED**

LEGEND : "X" Means Benefit is Provided                        Data as of December 1946

| PLAN | MONTHLY SUBSCRIPTION RATES | | | SURGICAL BENEFITS (including orthodonics) | | | OBSTETRICAL BENEFITS | SPECIAL BENEFITS (see code) | | | | | MEDICAL BENEFITS (for non-surgical and non-obstetrical cases) | | | | LIMITATIONS ON TOTAL LIABILITY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SINGLE PERSONS | HUSBAND AND WIFE | FAMILY | HOSPITAL | OFFICE | HOME | | X-RAY | ANES-THESIA | LABO-RATORY | OTHER | LIMITATIONS ON SPECIAL BENEFITS | HOSPITAL | OFFICE | HOME | LIMITATIONS ON MEDICAL BENEFITS | |
| ALABAMA | .75 | 1.50 | 2.60 | X | X | – | X | $15Y | $15Y | $15Y | 1,2,3,4,12 | H | X | – | – | 25 VISITS PER YEAR. | $200 A YEAR FOR SURGERY |
| CAL. PHYS. SERV. I | 1/ | 2.90 | 3.90 | X | X | X | X 2/ | – | – | – | 1,2,4,5,6,12 | 2/ | X | X | X | TWO-VISIT DEDUCTIBLE, EACH ILLNESS. MEDICAL BENEFITS AVAILABLE TO EMPLOYED SUBSCRIBERS ONLY. | THREE MONTHS' SERVICE IN CHRONIC CONDITIONS |
| II | 2/ | 2.00 | 3.00 | X | X | X | X | X | X | X | 5,6 | 3,H | X | – | – | – | – |
| OAKLAND, CAL. | 1/ | 1.50 | 2.40 | X | – | – | X 2/ | – | – | – | – | – | X | – | – | – | FOR SURGERY $225 PER DISABILITY |
| SACRAMENTO, CAL. | 1/ | 1.30 | 2.15 | X | X | X | 1/ | – | – | – | – | – | X | – | – | – | $150 PER DISABILITY |
| COLORADO | .75 | 1.50 | 2.00 | X | X | – | X | $15Y | $15Y | $15Y | 1,2,5 | S | – | – | – | – | – |
| DELAWARE | .50 | – | 1.65 | X | X | X | X | $10Y | $10A | – | – | – | H | – | – | – | $150 PER DISABILITY |
| FLORIDA | .60 | – | 2.00 | X | 1/ | 1/ | X | $15A | $10A | $7.50A | – | – | H | – | – | – | – |
| INDIANA I | .75 | – | 2.00 | X | X/ | X/ | X | – | – | – | – | – | X | – | – | FOR 21 DAYS AFTER 3RD DAY } | $150 PER DISABILITY WITHIN ANY |
| II | 1.00 | – | 2.25 | X | X/ | X/ | X | – | – | – | – | – | X | – | – | | ONE 6 MONTHS' PERIOD |
| IOWA I | 1.00 | – | 2.90 | X | X | X | X | $15A | $10A | – | – | – | S | X | – | – | FOR 21 DAYS AFTER 3RD DAY | |
| II | 1.25 | – | 3.25 | X | X | X | X | $15A | $10A | – | – | – | S | X | – | – | | |
| KANSAS | .90 | – | 2.25 | X | X | X | X | $15Y | X | – | – | – | X | – | – | FOR 30 DAYS PER YEAR AFTER 3RD DAY | FOR THOSE WITH INDEMNITY COVERAGE: $175 PER DISABILITY, $900 PER YEAR PER INDIVIDUAL; $1,000 PER YEAR PER FAMILY OF 4 OR MORE. |
| LOUISIANA PHY. SERV. | .65 | 1.85 | 2.10 | X | X | X | X | $15Y | $15Y | $ 5A | – | S | – | – | – | – | $150 A YEAR PER DISABILITY, $300 A YEAR PER INDIVIDUAL. |
| NEW ORLEANS, LA. | .75 | 1.50 | 2.00 | X | X | – | X | – | – | – | – | – | X | – | – | 21 DAYS PER ADMISSION. | $150 PER DISABILITY |
| MASSACHUSETTS | .65 | 1.65 | 2.00 | X | – | – | X | $15A | X | – | 5,6 | – | – | – | – | 30 DAYS PER YEAR | $150 A YEAR FOR RELATED SURGERY |
| MICHIGAN I | .60 | 1.50 | 2.20 | X | – | – | X | $15Y | X | – | – | – | H | – | – | 30 DAYS PER YEAR | – |
| II | .90 | 2.20 | 3.25 | X | – | – | X | $15Y | X | – | – | – | H | – | – | | |
| KANSAS CITY, MO. I | .75 | 1.50 | 2.00 | X | X | X | X | $15Y | X | – | 1,2,3,13 | S | X | X | X | 21 DAYS A YEAR IN STAYS OF 4 OR MORE DAYS | $150 PER DISABILITY, $300 PER PERSON, $600 FOR HUSBAND AND WIFE, AND $900 PER FAMILY. WITH MEDICAL RIDER (SAME LIMITATIONS AS ST. LOUIS. |
| II | .10 | 1.00 | .25 | X | X | X | X | 2 | | | | H | | | | | |
| ST. LOUIS, MO. | .65 | 1.65 | 2.25 | X | – | – | X | $25Y | X | X | 1,2,3 | H | X | – | – | 21 DAYS A YEAR IN STAYS OF 4 OR MORE DAYS | $150 PER DISABILITY, $600 PER PERSON, $900 FOR HUSBAND AND WIFE, $1,400 PER FAMILY. |
| MONTANA | 1.30 | 2.60 | 3.90 | X | – | – | X | 2/ | X | 2/ | 4,5,6 | H | X 2/ | – | – | ALL NECESSARY SERVICE UP TO 90 DAYS PER CASE. (30 DAYS FOR CHRONIC CASES.) | – |
| NEBRASKA | 1.00 | 2.00 | 2.50 | X | X | – | X | $20Y | X | – | 1,4 | S | X | – | – | 21 DAYS A YEAR IN STAYS OF 4 OR MORE DAYS | $300 A YEAR PER PERSON |
| NEW HAMPSHIRE I | .75 | 1.50 | 1.75 | X | X | X | X | $25Y | $10Y | $13Y | 6 | S | – | – | – | – | FOR SURGERY, $150 PER DISABILITY |
| II | .65 | 1.30 | 1.50 | – | – | – | X | $25Y | $10Y | $15Y | 6 | S | X | X | X | TWO VISIT DEDUCTIBLE EACH AILMENT.  LIMIT OF 30 CALLS A YEAR PER PERSON. | |
| NEW JERSEY | .75 | – | 2.00 | X | – | – | X | – | X | – | 5 | H | – | – | – | 21 DAYS A YEAR IN STAYS OF 4 OR MORE DAYS | – |
| NEW MEXICO | 1.25 | 2.25 | 3.90 | X | – | – | X | $15Y | X | X | – | H | X | – | – | ALL NECESSARY SERVICE UP TO 90 DAYS PER CASE. (15 DAYS FOR CHRONIC CASES.) | – |
| BUFFALO, N. Y. | .60 | – | 1.70 | X | X | X | X | $15Y | $10A | – | – | – | S | – | – | – | FOR SURGERY, $150 PER DIS-ABILITY |
| NEW YORK, N. Y. I | .40 | 1.00 | 1.20 | X | – | – | X | – | – | – | – | – | – | – | – | – | $150 FOR OPERATIONS FOR SAME ILL-NESS OR CONDITION 1/ |
| II | .64 | 1.35 | 2.35 | X | – | – | X | – | X | – | – | – | X | – | – | FOR 168 DAYS AFTER 3RD DAY | |
| III | 1.60 | 4.00 | 4.00 | X | X | X | X | X | X | X | 1,2,3,4,5,12,13 | – | X | X | X | 20 VISITS PER ILLNESS.  ADDITIONAL VISITS MUST BE AUTHORIZED BY PLAN. | |
| ROCHESTER, N. Y. | .60 | – | 1.70 | X | – | – | X | $15Y | $10A0/ | – | – | – | S | – | – | – | $150 FOR OPERATIONS IN ANY 3 MONTHS PERIOD. |
| SYRACUSE, N. Y. I | .50 | – | 1.70 | X | X | X | X | $15Y | $10A | – | 1,2,3,4,5,12 | – | – | – | – | 25 CALLS PER SUBSCRIBER, 15 PER DEPENDENT EACH YEAR. | FOR SURGERY, $150 PER DISABILITY |
| II | .90 | – | 1.90 | X | X | X | – | 2/ | – | $15Y | | | X | X | X | | |

CONFIDENTIAL

BCBSA00289860

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UTICA, N.Y. I | .48 | .99 | 1.38 | X g/ | X g/ | X g/ | X | $18Y. | $10Y | $ 5Y | r/ | H | — | — | — | $928 Y PER SUBSCRIBER; $100 Y PER DEPENDENT; $925 Y PER FAMILY. |
| " | .75 | 1.50 | 1.98 | X g/ | X g/ | X g/ | X | $3.0Y | $10Y | $ 9Y | 1,2 | H | — | — | — | $928 Y PER SUBSCRIBER; $125 Y PER DEPENDENT; |
| " III | .40 | .75 | 1.00 | — | — | — | — | — | — | — | — | H | — | X | X g/ | $950-Y PER FAMILY. |
| | | | | | | | | | | | | | | | | X g/ | 21 CALLS PER HOSPITAL STAY.  LIMIT OF 48 CALLS PER PERSON A YEAR, 150 CALLS PER FAMILY. |
| CHAPEL HILL, N.C. I g/ | .60 | — | .90 | X | X | X | X | — | — | — | — | — | — | — | — | $100 PER DISABILITY |
| " II g/ | .75 | — | 1.40 | X | X | X | X | — | — | — | — | — | — | — | — | $180 PER DISABILITY |
| HOSPITAL CARE ASS'N., DURHAM, N.C.g/ | .50 | — | .90 | X | X | X | X | — | — | — | — | — | — | — | — | $75 PER DISABILITY; $100 Y PER PERSON |
| MEDICAL SERV. ASS'N., DURHAM, N.C.h/ | — | — | 2.35 | X | X | X | -X | — | — | — | — | — | X | X | X | $75 FOR SURGICAL SERVICES |
| NORTH DAKOTA | .75 | 1.50 | 2.25 | X | — | — | — | — | — | — | — | — | — | — | — | $180 A YEAR PER DISABILITY |
| CLEVELAND, O. | .60 | 1.20 | 1.90 | X | — | — | X | — | — | — | — | — | — | — | — | $180 PER DISABILITY |
| OHIO MEDICAL INDEMNITY | .60 | — | 1.50 | X g/ | — | — | X | — | — | — | — | — | — | — | — | $150 PER DISABILITY WITHIN ANY ONE 6 MONTHS' PERIOD |
| OKLAHOMA | .75 | 1.50 | 2.00 | X | X | — | X | — | — | — | — | — | — | — | — | $300 Y PER PERSON; $600 Y PER HUSBAND AND WIFE; $1,000 Y PER FAMILY. |
| OREGON PHYSICIANS' SERVICE I | 3.00 | — | — | X | X | X | — | X | X | X | 1 THROUGH 13 | — | X | X | X | CARE FOR ONE YEAR PER DISABILITY |
| " II | — | 5.00 | 6.35g/ | X | X | X | X | X | X | X | 1,2,3,7 | H | — | — | — | CARE FOR SIX MONTHS PER DISABILITY |
| NORTHWEST HOSP. SERV., OREGON | 1.00 | 2.00 | 3.00 | — | — | X | — | — | — | — | — | H | — | — | — | $3.00 A DAY FOR 21 DAYS.  $1.50 A DAY FOR AN ADDITIONAL 90 DAYS. |
| PENNSYLVANIA I | .60 | 1.25 | 2.00 | X | — | — | X | — | — | — | — | — | — | — | — | — |
| " II | 1.10 | 2.20 | 3.25 | X g/ | — | — | X | — | — | — | — | — | — | — | — | $180 IN MEDICAL CASES PER ANY ONE HOSPITAL STAY. |
| | | | | | | | | | | | | | | | | 21 DAYS FIRST YEAR; 24 DAYS SECOND YEAR; 27 DAYS THIRD YEAR, 30 DAYS THEREAFTER. |
| TEXAS g/ | .75 | — | 2.00 | X | X | X | X | — | $10A | — | — | — | X | — | — | FOR 28 DAYS AFTER 7TH DAY. |
| UTAH | 1.00 | — | 2.50 | X | — | — | X | $15Y | $10A | — | — | S | — | — | — | $180 PER DISABILITY |
| RICHMOND, VA. | .85 | — | 2.00 | X | — | — | X | $10Y | — | — | 5 | — | S | — | — | — |
| ROANOKE, VA. | .75 | 1.50 | 1.75 | Xg/ | — | — | X | — | — | — | — | — | S | — | — | 35 DAYS A YEAR IN STAYS OF 4 OR MORE DAYS |
| WASHINGTON (KING COUNTY) I h/ | 1.75 | — | — | X | X | — | X | -X | X | 1,2,3,5,6,7,8,10,11 | — | X | X | X | CARE FOR 26 WEEKS PER ILLNESS |
| " h/ | 2.75 | — | — | X | X | — | X | — | X | X | 1,2,3,4,5,6,7,8,10,11 | — | X | X | X | CARE FOR 6 MONTHS PER ILLNESS |
| CHARLESTON, W. VA. | .75 | 1.65 | 2.05 | X | — | — | X | — | X | — | — | H | — | — | — | $180 PER DISABILITY |
| HUNTINGTON, W. VA. | 1.00 | — | 2.00 | X | — | — | X | — | — | — | — | H | — | — | — | $150 PER DISABILITY |
| MILWAUKEE, WISC. | .90 | — | 2.50 | X | — | — | X | — | X | — | 5 | H | X | — | — | AFTER 360 AND NOT AFTER 13TH DAY IN HOSPITAL (NO MORE THAN 10 DAYS SERVICE) |

## FOOTNOTES

a/ Anesthesia also covered when administered in doctor's office or clinic

b/ $1.70 for males; $2.10 for females

c/ Available to employed subscriber, not to dependents

d/ Available to employed subscriber only.  Dependents receive only benefits listed under Contract II.

e/ $.80 for males; $1.20 for females

f/ $.60 for males; $.90 for females

g/ $5.00 a day

h/ $.55 for males; $.75 for females

i/ Covered only for large group with 75 percent enrollment

j/ Covered only for emergency surgical services within 24 hours of accident

k/ Covered only for fractures, dislocations and tonsillectomies

l/ Unless separated by an interval of 3 months or more

m/ Diagnostic x-ray and laboratory service in the office is provided for cases hospitalized within 30 days as a result of the findings

n/ Also first visit emergency service in an accident for hospital out-patients

o/ Per case

p/ An additional $10 a year is allowed

q/ Dependents receive half benefits.  The difference between the two contracts is in the indemnity allowances.

r/ A total of $5.00 is allowed for laboratory, electrocardiogram and basal metabolism tests

s/ Within 10 days of discharge from hospital only.  Limit of 3 such calls per case

t/ Data as of March 1946

u/ Later available information shows hospital and surgical rates combined and a variety of plans ranging from a $75 maximum surgical allowance to a $150 maximum.

v/ Contract for Farm Security Administration borrowers

w/ Service for fracture cases, tonsillectomies, adenoidectomies and obstetrical cases also provided in home or physician's office

x/ Employee, spouse and first child.  Additional $.75 for second child; additional $.50 for third child.  Maximum family rate $7.80.

y/ Maternity cases in the home are also covered

z/ Data as of March, 1946

aa/ Maternity cases (pre-natal and post-natal), fractures and dislocations are also covered when treated in home or physician's office

bb/ Data as of March, 1946

## CODE

Y—Y MAXIMUM PER YEAR.

A—A MAXIMUM PER ADMISSION

H  Services available only to hospitalized patients.

S  Services available only in surgical cases.

1.  Electrocardiograms

2.  Basal Metabolism Tests

3.  Physiotherapy

4.  Radium and-or X-ray therapy

5.  Consultation

6.  Assistant Surgeon

7.  Hospitalization

8.  Special Nursing

9.  Annual physical examination

10.  Refractions

11.  Ambulance service

12.  Allergy tests

13.  Clinical and surgical pathology

CONFIDENTIAL

BCBSA00289861

The rates charged for the surgical contract tend to be about the same or somewhat less than those charged by the hospital plans for hospital coverage. Some examples are: the Colorado plan -- $.75 a month for a single person, $1.50 for husband and wife, and $2.00 for a family; the Delaware plan -- $.60 for a single person and $1.65 for a husband and wife or a family; the New York City plan -- $.40, $1.00 and $1.80 for a single person, husband and wife, and a family respectively. The lowest rates for this type of contract are those of the two North Carolina plans, both of which issue, at a family rate of $.90 a month, contracts with a low schedule of allowances, $75 being the maximum paid for any operation. (Both plans also offer contracts carrying a higher schedule of allowances.)   The highest rate charged for this type of contract is that of California Physicians' Service. This plan charges $.80 a month for a single male, $1.20 for a single female, $2.00 for a husband and wife, and $3.00 for a family, and the contract does not provide obstetrical service. The plan has a high fee schedule, and unlike most other plans, provide a fee for the services of an assistant at an operation.

### CONTRACTS COVERING SURGERY, OBSTETRICS AND HOSPITAL CALLS

A growing number of plans (at present 22 out of 44) cover surgery, obstetrics and physicians' services in hospitalized medical cases. Most plans offer this coverage in a single contract. A few -- usually those which previously offered only a surgical contract -- offer a hospital call contract as an optional supplementary contract to the surgical contract. A number of plans offer both the surgical contract and the surgical and hospital call contract, and the subscriber takes his choice. The general tendency is for the plan to push the sale of the more comprehensive contract and in time the less comprehensive contract is dropped.

Under most of the plans hospital calls are covered only after a waiting period, usually three days, i.e., coverage begins with, say, the fourth day of hospitalization. However, a few of the plans provide coverage from the first day of hospitalization, and a few others provide coverage from the first day in cases staying in the hospital four days or more. The reason for the waiting period, of course, is to prevent any tendency for people to request hospitalization in minor illnesses solely so that the plan would pay the physician's bill.

All or virtually all of the plans offering this type of coverage place strict limits on the number of hospital calls for which the plan will pay.[1] Thus, the Charleston plan will pay for no more than one visit per day for not more than 42 days per year. The two Missouri plans cover physicians' visits for 21 days in stays of 4 or more days. The New York City plan pays physicians' charges to the extent of $3.00 for each day of hospitalization from the 4th till the 21st day, and thereafter up to $10 a week, up to the 111th day of hospitalization. The Utica plan will pay for 21 calls per hospital stay. The same plan, probably to guard against the possibility that patients might stay in the hospital solely to obtain payment of the physician's bill, will also pay for up to 3 home or office calls within 10 days of discharge from the hospital.

Monthly subscription charges for the surgical, obstetrical and hospital call contract tend to run $.25 to $.75 (for a family) more than those for the

---

[1] Where the subscriber is entitled to indemnity benefits, coverage of hospital calls may be provided by allowing either a certain payment for each call or a given amount for each day in the hospital.

CONFIDENTIAL

BCBSA00289862

surgical contract, in plans which offer both types of contracts.  Typical charges are:  The Massachusetts plan, $.85 for a single person, $1.65 for husband and wife and $2.00 for a family;[2]  Michigan, $.90, $2.20, $3.25; St. Louis, $.85, $1.85 and $2.25.  The Kansas City plan charges a family rate of $.25 a month for its separate hospital call contract sold as a supplementary contract to the surgical contract.

## CONTRACTS PROVIDING SURGERY, OBSTETRICS AND OFFICE, HOME AND HOSPITAL CALLS

Seven plans offer this coverage.  However, one of these plans (Medical Service Association of Durham, N. C.) is restricted to Farm Security Administration borrowers, and another offers this coverage only on an experimental basis.

The New Hampshire-Vermont and the Syracuse plans offer a so-called medical contract covering physicians' office, home and hospital calls, as an optional, supplementary contract to the surgical one.[3]  The first plan charges $.65 a month for a single person, $1.30 for husband and wife and $1.50 for a family for its contract.  It is on a two-visit deductible basis, i. e., the subscriber pays for the first two visits in any illness, and has a limit of 30 calls a year per person.  As of January 1, 1947 about 20 percent of the subscribers in the plan had enrolled for this contract.  The Syracuse plan charges $.90 a month for a single person and $1.30 for husband and wife or a family.  There is a limit of 25 calls per year for the subscriber and 15 for each dependent.

California Physicians' Service provides its medical coverage only to the employed person. The charge is $.90 a month over and above the charge for the surgical contract.  Care is furnished up to a year for each non-chronic illness but the subscriber must pay for the first two calls in each separate illness or accident.  CPS furnishes obstetrical care under this contract rather than under the surgical contract as do the other plans.

The plans in Washington and Oregon offer a comprehensive service, except for obstetrics, to the employed person and some of these plans have recently extended partial or comprehensive coverage to dependents.  The King County (Seattle) Medical Service Bureau, the largest plan in Washington, charges $1.75 a month to the employed person for its so-called Standard Contract.[4]  This provides physicians' care and hospitalization for 26 weeks in any one illness. Care is not provided for childbirth, pre-existing conditions, conditions not common to both sexes, venereal disease, chronic ailments and various other conditions.  A contract which provides physicians' care for eight months and hospitalization for six months in any one illness and which covers practically all conditions, except obstetrical, is offered for $2.75 a month. Oregon Physicians' Service charges $3.00 a month and offers physicians' services for one year and hospitalization for six months for any illness.  An annual health examination is included.  Special nursing, extractions, and ambulance service are also provided.  Obstetrical and a number of other condi-

---

[2] These were formerly the rates for the surgical contract.  The plan added hospital calls without increasing the subscription cost.

[3] The Buffalo plan used to offer a contract of this type but was forced to discontinue its sale because of unfavorable experience.

[4] Data as of February 1946.  Later data not available.

CONFIDENTIAL

BCBSA00289863

tions are not covered. This contract is available only to employed persons. Recently contracts providing hospitalization and surgical service for dependents have been offered.

Some of the county plans in Washington have begun to offer to dependents the comprehensive service that was formerly offered only to employed persons. The charge for the employed person and his dependents is said to range from $5.00 to $10.00 a month.

The New York City plan has offered on an experimental basis a contract providing quite comprehensive coverage of physicians' services, i. e., surgery, obstetrics and hospital, office and home visits. Calls in excess of 20 for any one illness are subject to specific authorization of the plan. The charge is $1.60 a month for a single person and $4.00 a month for husband and wife or a family. Enrollment has been held to about 15,000 persons.

### MATERNITY BENEFITS; CONDITIONS EXCLUDED FROM COVERAGE

Table 24 shows the provisions of the plans with respect to maternity benefits and certain conditions which are not covered or are covered only after a waiting period. In all instances the plans provide care for maternity only after the woman has been enrolled for a certain period -- usually 9 or 10 months. Most plans also require that a woman to be eligible for maternity care must be enrolled under either a husband and wife or a family contract. The provisions of a medical plan with respect to maternity benefits are virtually always the same as those of the hospital plan with which it is allied.

A little less than half (19 out of 44) of the plans exclude care for pre-existing conditions, and an additional 11 provide service for such conditions only after the member has been enrolled for a certain period -- usually six months or a year. As with hospital prepayment some of the plans waive this exclusion in the case of large groups with a high percentage of enrollment. Some 29 of the plans will provide a tonsil operation only after the member has been enrolled for a certain period -- 3 months to a year; 11 plans have a waiting period for hernia operations and a few (8) for hemmorrhoid operations. The rationale of these restrictions, of course, is to prevent abuse of the plan by persons who learn that they need an operation and then enroll in the plan.

Of the 44 plans 22 exclude plastic surgery for cosmetic reasons, 14 exclude service for tuberculosis after diagnosis, the same number do not provide care for mental disorders and 13 exclude care for venereal disease. A number of the plans have one or two or more other exclusions. Common ones are service in drug addiction or alcoholism cases, self-inflicted injuries and congenital conditions.

### SERVICE AND INDEMNITY BENEFITS

The plans fall into three main groups: those on a straight service basis; those on a service-indemnity basis; and those on a straight indemnity basis.[5/]

---

5/ Again it is emphasized that the distinction between "service" and "indemnity" does not lie in whether the plan pays the doctor or the patient. Most of the indemnity plans pay the physician directly. The distinction lies in whether or not the physician agrees to accept the plan's payment as full remuneration for his services and to make no extra charge to the patient. Possibly the term "indemnity" is not fully descriptive. In some respects the term "dollar allowance" might be better. But indemnity will be used because it is the one in current usage.

CONFIDENTIAL

BCBSA00289864

### TABLE 24
### Maternity Benefits and Conditions Excluded
### (Data as of December 1946)

| PLAN | MATERNITY BENEFITS ARE PROVIDED | | CONDITIONS EXCLUDED "X" OR CODE LETTER INDICATES EXCLUSION NUMBER INDICATES WAITING PERIOD IN MONTHS | | | | | | | |
| | UNDER SPECIFIED TYPE OF CONTRACT A – SINGLE B – HUSBAND AND WIFE C – FAMILY | AFTER THE FOLLOWING WAITING PERIOD (in months) | PRE-EXISTING CONDITIONS | TONSILS AND ADENOIDS | HERNIA | PLASTIC SURGERY FOR COSMETIC PURPOSES | TUBERCULOSIS AFTER DIAGNOSIS | MENTAL DISEASES | VENEREAL DISEASES | OTHER (See Code) |
|---|---|---|---|---|---|---|---|---|---|---|
| ALABAMA | C | 12 | x | 3 | – | x | – | – | x | d,f |
| CALIFORNIA PHYSICIANS' SERVICE | A | 12 | – | – | – | x | – | – | – | – |
| OAKLAND, CALIFORNIA | A,B,C | 10 | x | – | – | – | – | x | – | – |
| SACRAMENTO, CALIFORNIA | B1/, C1/ | 10 | x | – | – | – | x | x | – | c,k |
| COLORADO | B,C | 12 | 2/ | – | – | x | – | – | – | – |
| DELAWARE | C | 10 | 12 | 12 | 12 | x | – | – | – | n |
| FLORIDA | C | 10 | x | 3 | – | x | – | – | x | a,b |
| INDIANA | C | 10 | 10 | 6 | – | x | – | – | – | – |
| IOWA | C | 9 | – | 9 | – | x | – | – | – | – |
| KANSAS | C | 8 | 8 | 8 | – | x | x | x | – | g |
| LOUISIANA PHYSICIANS SERVICE | C | 10 | 12 | 3 | 3 | x | – | – | – | b,q |
| NEW ORLEANS | C | 10 | x | 12 | 12 | x | – | – | – | h,n |
| MASSACHUSETTS | B,C | 9 | – | 12 | – | x | – | – | – | – |
| MICHIGAN | A,B,C | 9 | – | – | – | x | – | – | – | – |
| KANSAS CITY, MISSOURI | C | 10 | x | 6 | – | x | – | – | x | a,b,d,h |
| ST. LOUIS, MISSOURI | C | 10 | x | 10 | – | x | – | – | – | – |
| MONTANA | B,C | 9 | – | – | – | x | – | – | – | – |
| NEBRASKA | C | 12 | x | 6 | 6 | x | – | – | x | a,b,c,d,h,j |
| NEW HAMPSHIRE – VERMONT | C | 12 | 12 | 12 | 12 | – | – | – | x | a,h |
| NEW JERSEY | C | 9 | – | 9 | – | x | – | – | – | – |
| NEW MEXICO | B,C | 10 | – | 6 | 6 | – | x | x | – | p |
| BUFFALO, NEW YORK | C | 12 | x | 10 | 10 | – | – | x | – | a,h,o |
| NEW YORK, NEW YORK | C | 10 | 11 | 6 | – | x | x | x | – | a,c,d,3/ |
| ROCHESTER, NEW YORK | C | 10 | 12 | 12 | 12 | – | – | – | – | a,h,n,r |
| SYRACUSE, NEW YORK | C | 12 | x | 10 | 10 | – | – | – | – | a,h,o |
| UTICA, NEW YORK | B,C | 10 | x | 6 | 6 | – | – | – | – | – |
| CHAPEL HILL, NORTH CAROLINA | C | 10 | x | – | – | – | x | – | x | – |
| HOSPITAL CARE ASS'N., DURHAM, N. C. | B,C | 10 | x | 10 | – | – | x | x | x | a,b |
| MEDICAL SERV. ASS'N., DURHAM, N.C. 4/ | C | 0 | – | x | – | – | x | – | – | – |
| NORTH DAKOTA | C | 10 | x | 6 | – | x | x | x | – | – |
| CLEVELAND, OHIO | C | 12 | – | – | – | – | – | – | – | – |
| OHIO MEDICAL INDEMNITY | C | 9 | – | 6 | – | x | – | – | – | – |
| OKLAHOMA | A,B,C | 10 | x | – | – | – | x | x | x | a,b,c,e |
| OREGON PHYSICIANS' SERVICE 5/ | B,C | 10 | x | 12 | – | – | x | x | x | a,b,c,d |
| NORTHWEST HOSPITAL SERVICE, OREGON | B,C | 10 | x | – | – | – | x | x | x | a,d 6/ |
| PENNSYLVANIA | B 1/, C | 12 | – | 8/ | – | – | – | – | – | – |
| TEXAS 9/ | C | 12 | x | 5 | – | x | – | – | – | – |
| UTAH | C | 10 | x | 10 | – | x | – | – | – | d |
| RICHMOND, VIRGINIA | C | 10 | 12 | 12 | 12 | x | – | – | – | i |
| ROANOKE, VIRGINIA | C | 9 | 12 | 6 | – | x | – | – | – | – |

161

CONFIDENTIAL

BCBSA00289865

TABLE 24

Maternity Benefits and Conditions Excluded
(Data as of December 1946)

| PLAN | MATERNITY BENEFITS ARE PROVIDED | | CONDITIONS EXCLUDED "X" OR CODE LETTER INDICATES EXCLUSION NUMBER INDICATES WAITING PERIOD IN MONTHS | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | UNDER SPECIFIED TYPE OF CONTRACT A – SINGLE B – HUSBAND AND WIFE C – FAMILY | AFTER THE FOLLOWING WAITING PERIOD (in months) | PRE-EXIST-ING CONDI-TIONS | TONSILS AND ADENOIDS | HERNIA | PLASTIC SURGERY FOR COSMETIC PURPOSES | TUBERCU-LOSIS AFTER DIAGNOSIS | MENTAL DISEASES | VENEREAL DISEASES | OTHER (see code) |
| WASHINGTON (KING COUNTY) 10/ | 11/ | 11/ | 12/ | – | – | – | x | x | x | a,b |
| CHARLESTON, WEST VIRGINIA | A,B,C | 10 | 6 | 6 | – | – | x | x | x | a,b,c,m |
| HUNTINGTON, WEST VIRGINIA | C | 10 | – | – | – | – | x | x | x | a,b,c |
| MILWAUKEE, WISCONSIN | C | 9 | – | – | – | – | – | – | – | – |

FOOTNOTES

1/ Maternity benefits are covered only in large groups with at least 75 percent enrollment.

2/ Services are not available for conditions for which a person is in a hospital or ill at home on the effective date (first day) of the contract.

3/ All exclusions specified in the various contracts offered by plan are listed herein.

4/ For Farm Security Administration borrowers.

5/ Provisions of single contract for employed subscribers are not shown. They do not include maternity benefits; there is no waiting period for tonsillectomies; and the specific exclusions vary from those shown in the table.

6/ There are a few other relatively unimportant conditions excluded under the plan's hospital contract.

7/ Under medical-surgical plan. Under surgical plan, maternity benefits are provided only in family contracts.

8/ Under medical-surgical plan. Under surgical plan, there is a six months waiting period for dependents.

9/ Data as of March 1946.

10/ Data as of March 1945.

11/ Maternity care not provided.

12/ Under lower cost contract, pre-existing conditions and diseases not common to both sexes are excluded.

CODE FOR CONDITIONS EXCLUDED

a Drug addiction and alcoholism

b Self-inflicted injuries

c Contagious diseases

d Congenital conditions

e Arthritis

f Tuberculosis except for thoracoplasty

g Diabetes

h Plan does not provide service to individuals who have ever had cancer, diabetes, osteomylitis, tuberculosis, or (except Nebraska) chronic nephritis or coronary thrombosis.

i Waiting period (12 months) for tuberculosis and nervous and mental conditions.

j Waiting period (6 months) for chronic appendicitis, hemorrhoids, gall-bladder, ulcers, and certain gynecological and urological conditions.

k Waiting period (12 months) for diseases – not common to both sexes.

m Waiting period (6 months) for diseases peculiar to women.

n Waiting period (12 months) for hemorrhoids

o Waiting period (10 months) for hemorrhoids

p Waiting period (6 months) for hemorrhoids

q Waiting period (3 months) for hemorrhoids

r Waiting period (12 months) for menopausal conditions

CONFIDENTIAL

BCBSA00289866

The plans in Washington and Oregon, and the North Dakota and Roanoke plans, constitute the first group. The full service character of the Washington and Oregon plans requires qualification in the light of the fact that some of them do not enroll all population groups irrespective of income. Some of the county medical society plans in Washington have an income limit for subscribers -- they usually endeavor to limit enrollment to those with incomes under $2500; others have no such income limit. Oregon Physicians' Service has no formal income limit (some of its affiliated county plans do) but endeavors to avoid enrollment of persons with high incomes.

Of the 44 plans, 17, including most of those with large enrollment, offer service benefits to some of their subscribers, depending upon income or hospital accomodations used, or both, and indemnity benefits to others.[6] The remaining 23 plans offer indemnity benefits only.[7]

Under the service-indemnity plans, as Table 25 shows, the income limits for service benefits are generally $1500, $1800 or $2,000 for a single person and $2500 or $3,000 for husband and wife or a family. The Montana and New Mexico plans have the highest limits -- $4,000 for a single person or a family. Colorado has the lowest limits -- $1500 for a single person, $1920 for a couple and $2400 for a family.

Two plans, New Jersey and Michigan, stipulate that a subscriber to be entitled to service benefits must not only have an income under the specified level but must occupy a ward or semi-private room at the hospital. If he occupies a private room, when use of such a room is not required by the nature of the illness, the physician can charge him extra. One plan, Utah, has no income limits for service benefits. If the subscriber takes ward or semi-private hospital accommodations he is entitled to service benefits; if he takes a private room, unless this is required by the nature of his illness, the physician can make an extra charge.

The full service plans provide their subscribers with a contract which states that they are entitled to certain services as needed. The indemnity plans provide their subscribers with a contract which contains a schedule of indemnity allowances for each operation or service. The service-indemnity plans pursue different policies in this regard. The contracts of a few plans -- Kansas, Kansas City, New York City and Richmond -- contain a schedule of dollar allowances and a statement that participating physicians have agreed

---

[6] The New York City plan has been included among the plans on a service-indemnity basis. There may be some question as to this classification. This plan has been issuing both indemnity and service-indemnity contracts. Recently the plan has raised the allowances paid under the indemnity contracts to the same amounts (except for delivery) as those paid under the service-indemnity contracts. Since participating physicians agree to accept these amounts as full payment for subscribers under the designated income limits, the contracts that were formerly on an indemnity basis have for all practical purposes been put on a service-indemnity basis.

[7] There appears to be a trend towards the service-indemnity type of plan and away from the straight indemnity type. Thus of the 10 plans started in 1945, one was on a service, 2 were on a service-indemnity, and 7 on an indemnity basis. Of the 12 plans started in 1946, one was on a service, 7 were on a service-indemnity, and 4 on an indemnity basis.

163

CONFIDENTIAL

BCBSA00289867

**TABLE 25**

**Income Limits and Other Requirements for Service Benefits Under Service-Indemnity Plans**

**Data as of December 1946**

| PLAN | INCOME LIMITS | | | OTHER REQUIREMENTS |
|------|------|------|------|------|
| | SINGLE PERSON | HUSBAND AND WIFE | FAMILY | |
| | $ | $ | $ | |
| CALIFORNIA PHYSICIANS' SERVICE | 3,000 | 3,000 | 3,000 | – |
| COLORADO | 1,500 | 1,920 | 2,400 | – |
| FLORIDA | 2,000 | 3,000 | 3,000 | – |
| IOWA | 1,500 | 2,500 | 2,500 | – |
| KANSAS | 1,800 | 2,400 | 2,400 | – |
| LOUISIANA PHYSICIANS SERVICE | 2,000 | 3,000 | 3,000 | – |
| MASSACHUSETTS | 2,000 | 2,500 | 2,500 a/ | – |
| MICHIGAN | 2,000 | 2,500 | 2,500 | WARD OR SEMI-PRIVATE ACCOM-(MODATIONS |
| KANSAS CITY, MO. | 1,800 | 2,400 | b/ | – |
| MONTANA | 4,000 | 4,000 | 4,000 | – |
| NEW JERSEY | 2,000 | 2,500 | c/ | WARD OR SEMI-PRIVATE ACCOM-(MODATIONS |
| NEW MEXICO | 4,000 | 4,000 | 4,000 | – |
| NEW YORK, N. Y. | 1,800 | 2,500 | 2,500 d/ | – |
| PENNSYLVANIA | 1,560 | 2,340 | 3,120 | WARD OR SEMI-PRIVATE ACCOM-(MODATIONS |
| UTAH | – | – | – | – |
| RICHMOND, VA. | 2,000 | 2,500 | 3,000 | – |
| MILWAUKEE, WISC. | 2,000 | 3,600 | 3,600 | – |

a/ This was raised early in 1947 to $3,000.

b/ Husband, wife and one child, $2,600; two children, $2,800; three or more children, $3,000.

c/ Husband and wife, $2,500; $250 additional for each child.

d/ A family subscriber with income between $2,500 and $3,500 may ask for review of the reason-ableness of any extra charge by a special committee of physicians.

to accept the stated allowances as full payment in the case of subscribers under the specified income limits. The remaining plans provide their sub-scribers with a contract which states that subscribers with incomes under certain levels, etc., are entitled to specified medical services, but that participating physicians may make an extra charge to subscribers not entitled to service benefits.

These latter plans, it is apparent, do not make plain to the subscribers not entitled to service benefits (and these subscribers often constitute more than 50 percent of the total) just what benefits they are entitled to. Such subscribers are not guaranteed service benefits and the dollar allowances to which they are entitled are not set forth in the contract.[8]

8/ As a result these plans have a large demand from subscribers for copies of their fee schedules for, naturally, over-income subscribers want to know the indemnity allowances to which they are entitled.

164

CONFIDENTIAL

BCBSA00289868

Indeed such subscribers under most or all of these plans are not guaranteed a fixed and definite benefit. By implication these subscribers are entitled to an indemnity allowance equal to what would be paid to the physician in the case of a subscriber entitled to service benefits. But this indemnity allowance is not a fixed and certain amount. If the plan is paying 100 percent of its fee schedule to participating physicians, then the indemnity allowances are equal to the fees in the schedule. If, however, the plan because of financial difficulties reduced its payments to participating physicians to, say, 80 percent of the scheduled fees, then it is not clear whether subscribers not qualifying for service benefits would be entitled to credits against physicians' charges equal to 100 percent or only 80 percent of the fee schedule.

## INDEMNITY ALLOWANCES

At this point in the exposition, the schedules of indemnity allowances given under the plans which provide indemnity benefits in whole or in part might well be set forth, for under these plans these are the benefits provided to subscribers. However, it is useful to compare the indemnity allowances under these plans with the payments made to physicians under the plans providing service benefits. The discussion of payments to physicians comes in the next chapter and hence discussion of the indemnity allowances will be deferred until that chapter.

## BENEFITS WHEN SUBSCRIBERS UTILIZE NON-PARTICIPATING PHYSICIANS

All of the service and service-indemnity plans and about half of the indemnity plans provide their benefits through so-called participating physicians. These are physicians who have entered into an agreement with the plan to serve its subscribers and to accept payment therefor from the plan. In most cases these physicians also agree to underwrite the plan financially, that is to accept reduced fees from the plan if necessary while still providing the contractual benefits to subscribers. Under the plans which provide service benefits in whole or in part, participating physicians also agree to accept the plan's fees as full payment for their services to "service" subscribers. Some of the indemnity plans do not have contracts with physicians and thus have no participating physicians.

The majority of the plans with participating physicians provide reduced benefits when the subscriber utilizes a non-participating physician. The reason for this, of course, is the belief that since participating physicians undertake certain obligations towards the plan it would be unfair to these physicians and would lessen inducements to participate if non-participating physicians were accorded the same rights and were paid the same fees.

Some of the plans provide relatively more valuable benefits when the subscriber is served by a non-participating physician outside the plan's area than when he is served by a non-participating physician within the plan's area. Here again the reason is plain: the first physician cannot be expected to participate; the second can be and the plan uses such pressures as it can to make him participate.

Table 26 shows the benefits accorded to subscribers when they utilize non-participating physicians within and without the plan's area.

165

CONFIDENTIAL

BCBSA00289869

**TABLE 26**

**Allowances Provided When Non-Participating Physicians Are Used**
**Data as of December 1946**

(Note:  These are the allowances set forth in the contracts.
Some plans deviate from these provisions in practice; see text)

| | IN PLAN AREA | | OUTSIDE PLAN AREA | |
|---|---|---|---|---|
| | % OF IN-DEMNITY SCHEDULE | % OF FEE PAID PARTICIPATING PHYSICIANS | % OF IN-DEMNITY SCHEDULE | % OF FEE PAID PARTICIPATING PHYSICIANS |
| ALABAMA | a/ | – | a/ | – |
| CALIFORNIA PHYSICIANS' SERVICE | – | 0 | – | 100 b/ |
| OAKLAND | a/ | – | a/ | – |
| SACRAMENTO | a/ | – | a/ | – |
| COLORADO | – | 100 b/ | – | 100 b/ |
| DELAWARE | 80 | – | 100 | – |
| FLORIDA | – | 100 b/ | – | 100 b/ |
| INDIANA | a/ | – | a/ | – |
| IOWA | – | 75 | – | 75 |
| KANSAS | 95 | – | 75 | – |
| LOUISIANA PHYSICIANS SERVICE | c/ | – | 100 | – |
| NEW ORLEANS, LA. | a/ | – | a/ | – |
| MASSACHUSETTS | – | AT LEAST 50 b/ | – | AT LEAST 75 b/ |
| MICHIGAN | – | 100 b/ | – | 100 b/ |
| KANSAS CITY, MO. | – | 50 b/ | – | 75 b/ |
| ST. LOUIS, MO. | – | 50 | 100 b/ | – |
| MONTANA | – | 0 | – | 100 |
| NEBRASKA | a/ | – | a/ | – |
| NEW HAMPSHIRE–VERMONT | 75 | – | 75 | – |
| NEW JERSEY | – | 100 | – | 100 |
| NEW MEXICO | – | 0 | – | 100 |
| BUFFALO, N. Y. | 50 | – | 100 | – |
| NEW YORK, N. Y. | 100 d/ | – | 100 d/ | – |
| ROCHESTER, N. Y. | 50 b/ | – | 100 b/ | – |
| SYRACUSE, N. Y. | 50 b/ | – | 100 b/ | – |
| UTICA, N. Y. | 100 a/ | – | 100 a/ | – |
| CHAPEL HILL, N. C. | 100 | – | 100 | – |
| HOSPITAL CARE ASS'N., DURHAM, N. C. | a/ | – | a/ | – |
| MEDICAL SERVICE ASS'N., DURHAM, N. C. | 100 | – | 100 | – |
| NORTH DAKOTA | – | 75 b/ | – | 100 b/ |
| CLEVELAND, OHIO | a/ | – | a/ | – |
| OHIO MEDICAL INDEMNITY | a/ | – | a/ | – |
| OKLAHOMA | – | – | a/ | – |
| OREGON PHYSICIANS' SERVICE | – | 100 b/ | – | 100 f/ |
| OREGON BLUE CROSS PLAN | a/ | – | – | – |
| PENNSYLVANIA | – | 100 b/ | – | 100 b/ |
| TEXAS g/ | a/ | – | a/ | – |
| UTAH | – | 50 b/ | – | 75 b/ |
| RICHMOND, VA. | 100 | – | 100 | – |
| ROANOKE, VA. | – | 75 | – | 75 |
| WASHINGTON (KING COUNTY) h/ | – | 100 b/ | – | 100 b/ |
| CHARLESTON, W. VA. | – | 75 | – | 75 |
| HUNTINGTON, W. VA. | a/ | – | 1/ | – |
| MILWAUKEE, WISC. | – | 100 | – | 100 |

a/  Plan does not have participating physicians; pays all physicians on the same basis.

b/  Services from non-participating physicians paid for only in emergency cases.

c/  Information not available.

d/  Under certain contracts allowances for non-participating physicians' services are limited to 75 percent of what plan would pay participating physicians for the same service. However, it is believed that the plan disregards this in practice and pays non-participating physicians on the same basis as participating ones.

e/  Provisions of surgical indemnity contracts.  Under the medical-surgical contract, allowances for non-participating physicians' services are limited to two-thirds the amount the plan pays participating physicians for the same service.

f/  Maximum liability is $50. for professional services outside the State.

g/  Data as of March, 1946.

h/  Data as of March, 1945.

i/  Plan has no participating physicians.  Provisions of contract stipulate that surgical and obstetrical benefits are payable only when the services are rendered by doctors of medicine licensed under the laws of West Virginia.

166

CONFIDENTIAL
BCBSA00289870

As regards non-participating physicians within the area, three plans (California, Montana and New Mexico) state in their contracts that benefits are provided only if subscribers are served by participating physicians, i.e., no payment whatever is made for the services of non-participating physicians. Another 12 plans state in their contracts that services of non-participating physicians within the plan's area will be paid for only in cases of accidents or emergency illness. Six of these plans provide that in such cases the non-participating physician will be paid what a participating physician would have received for the same service, another (Massachusetts) provides a payment equal to "at least 50 percent" and the remaining plans pay either 75 or 50 percent of what would have been paid to a participating physician or of the amounts set forth in their indemnity schedule.

Some of these plans do not in practice adhere to these provisions of their contracts. Since June 1946 California Physicians' Service has been paying non-participating physicians at the same rate as participating ones, no question being raised as to whether the service was of an emergency character or not. The Michigan plan, virtually from the beginning, has followed the same policy. The Massachusetts plan has never refused a claim from a non-participating physician and pays all such claims 100 percent. The Colorado plan does not extend participation to osteopaths but pays an approved list of osteopaths at the same rates as participating physicians. It is believed that a few of the other plans construe all cases in which subscribers are served by non-participating physicians as emergency ones and pay 100 percent of what would be payable to a participating physician.

Of the remaining 16 plans with participating physicians, 4 pay non-participating physicians 50 percent, 5, 75 percent and 7, 100 percent either of the amounts in their indemnity schedule (if the contract contains an indemnity schedule) or alternatively (if the plan is on a service or service-indemnity basis and the contract contains no schedule of indemnity allowances) of what would have been paid a participating physician for the same service.

There is a distinction between these last two provisions, i. e., as to whether the plan pays a certain percentage of its indemnity schedule or a certain percentage of what would be paid a participating physician, which it is well to understand. The first gives subscribers a definite benefit when they utilize non-participating physicians and the subscriber knows what it is. The latter does not give subscribers this information and as a matter of fact the benefit is not a fixed and definite one, i. e., if the plan reduced its payments to participating physicians below its regular fee schedule, the credit which a subscriber received when utilizing a non-participating physician would be reduced in the same proportion.[9/]

As regards payments for the services of physicians outside the plan area: Of the 31 plans with participating physicians, 12 state in their contracts that they will pay for the services of physicians outside the plan area only in cases of emergency. Again it is known that some of these plans disregard this provision in practice. Most of the plans (whether they limit payments to emergency cases or not) will pay 100 percent of what would have

---

9/ It may be noted that by contrast the indemnity allowance which a subscriber to a hospital plan receives when he goes to a non-participating hospital is definite, is set forth in the contract, and does not depend upon what the plan is paying participating hospitals at the time.

CONFIDENTIAL                                                         BCBSA00289871

been paid to a participating physician or 100 percent of their indemnity allowance schedule; a few pay only 75 percent of one or the other of these amounts.

There have been discussions among the medical plans of the possibility of developing reciprocity arrangements whereby subscribers served in another plan's area would receive service benefits. It is understood that the profession-sponsored plans in seven Western States, under the leadership of CPS, have set up reprocity arrangements of this character.

CONFIDENTIAL

BCBSA00289872

# CHAPTER 17

## PARTICIPATING PHYSICIANS AND PAYMENTS TO THEM:
## PHYSICIAN GUARANTEE OF BENEFITS

Most of the plans provide service through participating physicians. What physicians or practitioners are eligible to participate?

This is determined in the first instance by the relative provisions, if any, of the enabling act under which the plan operates. As will be shown in more detail in Chapter 18 about half of the present enabling acts restrict participation to doctors of medicine. Some of these acts stipulate that participation shall be limited to duly licensed physicians, a term which in some States would include osteopathic physicians. A few specify that doctors of medicine and osteopaths may participate or prohibit any discrimination between schools of practice. A few of the acts specify that all physicians or all qualified physicians in the area shall have the right to participate.

The great majority of plans permit any licensed doctor of medicine to participate and restrict participation to such individuals. The exceptions to this general rule are few. The New Hampshire-Vermont plan extends participation only to members of the medical societies of the two States. [1] The Milwaukee plan limits participation to members of the State society. It is believed that the plans in the State of Washington have a similar rule. The Utica plan states that doctors of medicine and osteopaths may participate. The other plans in New York State permit "any duly licensed physician" to participate, and it is believed that under the laws of this State this phrase would include osteopathic physicians. California Physicians' Service and the Colorado and Michigan plans restrict participation to doctors of medicine but in practice pay osteopaths on the same basis as doctors of medicine.

In many places the inclusion or exclusion of osteopaths has been a source of difficulties and controversy. California Physicians' Service formerly excluded osteopaths. However, the latter are numerous and have a considerable following in this State and it was found that this rule impeded presentation of the plan to the public. Hence in 1946 the California Medical Association voted to pay for service rendered by osteopaths. In Kansas City, Mo. a considerable part of the population uses the services of osteopaths as is indicated by the fact that the number of these practitioners is one-half as great as the number of doctors of medicine. Osteopaths are not permitted to participate in the plan, as a result of which they have advised their patients not to join the plan. Undoubtedly the hostility of the osteopaths has slowed down the growth of both the medical plan and the hospital plan (which excludes osteopathic hospitals) of this city.

---

[1] This was true of the New Hampshire plan before it was expanded to Vermont and it is believed that the same rule still applies.

CONFIDENTIAL

BCBSA00289873

In Maine there is one osteopath for every two doctors of medicine.  It is probable that a plan which did not permit patients to use osteopaths would not have wide public acceptance.  The physicians of the State have been unwilling to start or sponsor a plan which would be open to osteopaths, with the result that thus far no plan at all has been established.

In Rhode Island the medical society wishes to start a plan which would exclude osteopaths and wants the Rhode Island Blue Cross plan to administer this plan.  The latter refuses to administer any plan which would exclude osteopaths on the ground that it does not feel free to deny to its subscribers the right to have the services of any legally qualified surgeon.  For over a year this deadlock has prevented the establishment of a plan.

It is also of interest to consider what practitioners may provide service under the plans which do not have participating physicians.  With possibly one exception these plans will only provide their benefits when the subscriber is served by a doctor of medicine.[2]  Two of these plans, the New Orleans and Alabama plans, go further and provide that the subscriber must be served by a physician who is a member of his county medical society.

## EXTENT TO WHICH PHYSICIANS ARE PARTICIPATING

Medical plans face a different problem than hospital plans in obtaining the participation of those giving service.  Most hospital plans do not have more than 50 or 100 hospitals in their area and once the terms of participation have been agreed upon between the plan and a committee representing the hospitals, it is relatively easy for the plan to secure the participation of the hospitals in its area.  In the great majority of the plans, all of the recognized hospitals in the area are participating.

It is otherwise with the medical plans.  Here the number of physicians whose participation should be won often runs into the thousands.  There are difficulties in the way of reaching all of these individuals and explaining the plan to them.  The fact that the medical society has launched or endorsed the plan by no means assures that all or even a large proportion of the physicians will participate.  In general it is only as (a) the medical society actively and enthusiastically pushes the plan and exhorts physicians to participate, and (b) individual physicians become convinced that the operation of the plan will be both helpful to the public and advantageous to themselves, that substantial participation is obtained.

Accurate figures for the various plans on the extent to which all active practitioners in the area have agreed to participate are hard to obtain, are often misleading and become quickly obsolete.  It is for example more important for a surgical plan to have the participation of surgeons who are doing most of the surgical work than of, say, pediatricians who are doing very little surgery.  A state-wide plan may show an average participation of, say, only 80 percent, but it may have almost 100 percent participation in those areas in which it is actively selling contracts, and small participation in other areas where it has not yet become active.

Table 27 gives data for certain of the plans, including most of the older ones, on the extent of participation.  It will be seen that the extent of participation (in general as of December 1946) ranges from 33 percent in

---

[2] The possible exception may be the Indiana plan which provides benefits when subscribers are served by physicians, a physician being defined as one "holding an unlimited license to render unlimited medical or surgical service."

CONFIDENTIAL

BCBSA00289874

Iowa, where the plan is relatively new to practically 100 percent in Delaware and Roanoke.

## TABLE 27

### Percent of Active Physicians of the Area Participating in Medical Plans

### Data for Certain Plans, Various Dates

| PLAN | BASIS OF PLAN (Service or Indemnity) | DATE OF INFORMATION | PERCENT OF PHYSICIANS REPORTED TO BE PARTICIPATING |
|---|---|---|---|
| CALIFORNIA PHYSICIANS' SERVICE. | S-I | DEC. 1946 | 82 |
| COLORADO | S-I | DEC. 1946 | 83 1/ |
| DELAWARE | I | AUG. 1945 | PRACTICALLY 100 |
| IOWA | S-I | DEC. 1946 | ABOUT 33 2/ |
| KANSAS | S-I | DEC. 1946 | ABOUT 90 |
| MASSACHUSETTS | S-I | DEC. 1946 | 92 |
| MICHIGAN | S-I | DEC. 1946 | 75 |
| KANSAS CITY | S-I | DEC. 1946 | 97 |
| NEW HAMPSHIRE | I | DEC. 1945 | 68 3/ |
| NEW JERSEY | S-I | FEB. 1946 | 82 |
| BUFFALO | I | DEC. 1945 | 95 |
| NEW YORK CITY | S-I | DEC. 1946 | 65 4/ |
| NORTH DAKOTA | S | DEC. 1946 | 95 5/ |
| ROCHESTER | I | JAN. 1947 | 86 6/ |
| OREGON PHYSICIANS' SERVICE | S | DEC. 1946 | 92 7/ |
| PENNSYLVANIA | S-I. | NOV. 1946 | MORE THAN 50 8/ |
| ROANOKE, VA. | S | DEC. 1946 | PRACTICALLY 100 |
| WASHINGTON, VARIOUS COUNTY PLANS | S | FEB. 1945 | 80 - 100 |

1/ Of members of State Medical Society. Participation in Denver to which the plan formerly confined operations is close to 100 percent. Extent of participation outside Denver is rapidly increasing.

2/ Most of the participating physicians are located in certain cities. Reasons for low participation are not known, except that the plan is relatively new.

3/ Percent of participation in various counties ranged from 94 percent to 36 percent.

4/ The main reason for low participation is the large number of physicians in the area and the difficulty of reaching them - there are 17 county medical societies and many physicians do not attend meetings. Few if any physicians have refused to participate. It is mainly that the plan has not been brought effectively to their attention.

5/ Plan thus far is operating in Cass County. Here 95 percent of all members of the medical society are participating.

6/ In five counties. Physicians in another county have not yet voted whether to participate or not.

7/ It is believed that some of the non-participating physicians are obstetricians and pediatricians who have not participated in the past because their services were not covered.

8/ Plan has been in effective operation only a short period. Extent of participation has been held back by differences between some of the county societies and the state society, and the inability of the plan and the Blue Cross plans to reach a satisfactory cooperative arrangement.

The situation in certain areas calls for special comment. In California there has been a reluctance on the part of some physicians to participate because the plan all along has paid less than its scheduled fees. The physicians of certain counties have voted in their county societies not to participate, holding that the plan should be on an indemnity basis. However,

171

CONFIDENTIAL

BCBSA00289875

in 1946 the physicians of the Sacramento area who for seven years held out against CPS voted to participate.  In Michigan right from the start the physicians of certain counties refused to participate, holding that the plan should be on an indemnity basis.  However, many of the physicians in these counties are "cooperating" with the plan even though not formally participating.  In various other plans differences of opinion as regards the principle of "service" or "indemnity" have at one time or another held back participation.

In general, and as one would expect, the extent of participation is somewhat higher in the plans that are on an indemnity basis than in those on a service basis in part or in whole.  However, this factor is by no means a determining one, as may be seen from the fact that of the two plans which have practically 100 percent participation one is on a straight indemnity and the other on a full service basis.  Certain of the indemnity plans have not been able to obtain 100 percent participation of the physicians in their area; the dissenting physicians are against prepayment in principle, or have no interest whatever in it, or find the plan faulty in some detail.  In most plans with relatively low participation the main explanation is that the plan is new and has not been enthusiastically supported by the medical society or societies of the area.

In a letter written in December 1946 to the executive directors of representative plans the writer asked these individuals to give the main reasons for non-participation.  The plan directors were further asked to indicate the character of non-participating physicians -- were they the more qualified or less qualified physicians, the high priced specialists or general practitioners, the rural or urban physicians, etc.

The replies indicated that the non-participating physicians could not be placed in any single category.  Some of these physicians were men just returned from military service who had not yet become familiar with the plan.  Several of the executive directors stated that most of the non-participating physicians were older men who were not interested in anything new and whose ideas of medical economics were behind the times.  Some of the comments may be quoted:  "The physicians who are not participating are the older ones... and a few prima donna specialists...  Participation is approximately the same in rural and urban areas."  "In general the physicians who are not participating are those who are not aware of the plan...The high priced specialists were among the first to execute the participating physicians agreement....So far as I know there is no tendency on the part of any type of practitioner, specialist or general practitioner...to withhold participation."

"The physicians who are not participating are those who are against the prepaid movement, those who are too busy with their own private practice, and those who are going to retire soon... These men are the average physicians, not the poorer ones or the specialists or the general practitioners."

"In the main the non-participating ones are those who are not familiar with the program... There are fewer than a half dozen high pressure specialists who have explicitly stated that they are not interested.  I do not believe it is a matter of higher fees with them, rather that they are so tremendously overburdened that they feel, erroneously of course, that participation would give them added volume which they cannot physically handle."

"I am sure our participating physicians are at least average...practically all the top men are enrolled."

172

CONFIDENTIAL

BCBSA00289876

## PAYMENTS TO PARTICIPATING PHYSICIANS

To set forth and compare for all of the plans the fees paid for the multitude of surgical and other procedures would be neither feasible nor useful. However, the general level of the payments to physicians can be indicated by the fees paid for certain of the more common procedures or services. The data are set forth in Table 28.

In comparing the fees paid by the different plans, it should be borne in mind that in the case of subscribers entitled to service benefits, the payments represent the entire payment to the physician, whereas in other cases, the fees allowed are in the nature of credits against the physician's charge. Except in Washington, Oregon, California and Buffalo the plans have currently been paying 100 percent of their fee schedules. The plans in Washington and Oregon have been paying, it is believed, about 90 or 95 percent of their fee schedules. California Physicians' Service has been paying at the rate of 80 or 90 percent of its fee schedule. The Buffalo plan temporarily reduced payments to its physicians in 1946 because of financial difficulties steming from coverage of home and office calls.

The fee or indemnity allowance most commonly paid for a normal delivery is $50. The two North Carolina plans both pay only $25.00 for this service under their lower cost contracts, more under their higher cost contracts. A few plans pay $40, including Massachusetts. (Under this latter plan general practitioners agree to accept this fee as full payment for "service" subscribers, but specialists in obstetrics may make a specified extra charge.) A few plans pay $60 or $75 for a delivery. California Physicians' Service pays $100. Most of the plans pay either $75 or $100 for an appendectomy, - the lowest payment is $50, the highest $125. Most of the plans pay either $75 or $100 for a unilateral hernia operation, the range being between $50 and $110. The plans commonly pay $3.00 or $2.00 for a hospital call or office visit and a dollar more for a home call. Some of the plans pay higher fees for the initial than for subsequent calls.

## RELATIONSHIP BETWEEN PLAN PAYMENTS AND PHYSICIANS' CHARGES

In the case of the indemnity and service-indemnity plans interest attaches to the relationship between the plan's payments or indemnity allowances and physicians' charges to subscribers. This relationship, of course, indicates the degree of protection given subscribers by these plans. Data are available for only a few plans.

Table 29 provides data from the Delaware plan which is on a straight indemnity basis. During the first 9 months of 1946 the plan's payments covered the doctor's charge in full in 68 percent of the cases and in the aggregate met 74 percent of total charges.

During the year 1945 plan payments covered doctors' charges in full in 72.5 percent of all cases and met 76 percent of total charges.

173

BCBSA00289877

**TABLE 28**

Fees Paid or Indemnity Allowances Provided for Certain Services. Data as of December, 1946

| PLAN | TYPE OF BENEFIT (SERVICE, INDEMNITY, SERVICE-INDEMNITY) | AMOUNT FOR | | | | HOSPITAL CALLS | | OFFICE CALLS | | HOME CALLS | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | APPEN-DECTOMY | SINGLE HERNIA | CHILD'S TONSIL-LECTOMY | NORMAL DELIVERY | FIRST | SUBSEQUENT | FIRST | SUBSEQUENT | FIRST | SUBSEQUENT |
| | | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| Alabama | I | 100. | 75. | 25. | 50. | 2. | 2. | - | - | - | - |
| California Physicians' Service | S-I | 125. | 100. | 40. | 100. | 3.75 | 3.75 | 5.00 | 2.50 | 5.00 | 3.75 |
| Oakland, Cal. | I | 125. | 60. | 35. | - | 3. | 3. | - | - | - | - |
| Sacramento, Cal. | I | 100. | 50. | 30. | 50. | 3. | 3. | - | - | - | - |
| Colorado | S-I | 75. | 75. | 25. | 50. | - | - | - | - | - | - |
| Delaware | I | 100. | 75. | 25. | 50. | - | - | - | - | - | - |
| Florida | S-I | 100. | 100. | 25. | 50. | - | - | - | - | - | - |
| Indiana | I | 100. | 50. | 25. a/ | 50. | 3. | 3. | - | - | - | - |
| Iowa | S-1 | 100. | 75. | 25. | 55. | 10. | 3. | - | - | - | - |
| Kansas | S-I | 100. | 75. | 35. | 50. | 5. | 3. | - | - | - | - |
| Louisiana Physicians Service | S-I | 100. | 75. | 35. | 50. | - | - | - | - | - | - |
| New Orleans, La. | I | 100. | 75. | 25. | 50. | - | - | - | - | - | - |
| Massachusetts | S-I | 75. | 75. | 25. | 40. | 5. | 3. | - | - | - | - |
| Michigan | S-I | 75. | 75. | 30. | 40. | - | - | - | - | - | - |
| Kansas City, Mo. | S-I | 100. | 75. | 35. | 75. | 3. | 3. | - | - | - | - |
| St. Louis, Mo. | I | 100. | 75. | 25. | 50. | 3. | 3. | - | - | - | - |
| Montana | S-I | 125. | 100. | 50. | 50. | 3.75 | 3.75 | - | - | - | - |
| Nebraska | I | 100. | 100. | 35. | 50. | 3. | 3. | - | - | - | - |
| New Hampshire-Vermont | I | 75. | 75. | 25. | 40. | 2. | 2. | 2. | 2. | 3. | 3. |
| New Jersey | S-I | 100. | 75. | 40. | 50. | 5. | 3. | - | - | - | - |
| New Mexico | S-I | b/ | | | | | | | | - | - |
| Buffalo, N. Y. | I | 75. | 75. | 30. | 50. | - | - | - | - | - | - |
| New York, N. Y. | S-I | 100. | 75. | 25. | 60. g/ | 3. | 3. d/ | 2. | 2. | 3. | 3. |
| Rochester, N. Y. | I | 75. | 75. | 30. | 50. | - | - | - | - | - | - |
| Syracuse, N. Y. | I | 75. | 75. | 25. | 50. | 2. | 2. | 2. | 2. | 3. | 3. |
| Utica, N. Y. e/ | I | 75. f/ | 50. f/ | 25. f/ | 50. | 2. | 2. | 2. | 2. | 3. | 3. |
| Chapel Hill, N. C.  I | I | 60. | 50. | 17.50 | 25. | - | - | - | - | - | - |
|   II | I | 75. | 75. | 25. | 40. | - | - | - | - | - | - |
| Hospital Care Ass'n., Durham, N. C. g/  I | I | 50. | 50. | 15. | 25. | - | - | - | - | - | - |
|   II | I | 100. | 75. | 25. | 50. | - | - | - | - | - | - |
| Medical Serv. Ass'n., Durham, N. C. h/ | I | 50. | 50. | - | 25. | 2. | 2. | 2. | 2. | 3. | 3. |
| North Dakota | S | 100. | 75. | 35. | 50. | - | - | - | - | - | - |
| Cleveland, Ohio | I | 100. | 75. | 25. | 60. | - | - | - | - | - | - |
| Ohio Medical Indemnity | I | 100. | 75. | 25. | 50. | - | - | - | - | - | - |
| Oklahoma | I | 100. | 75. | 25. | 50. | - | - | - | - | - | - |
| Oregon Physicians' Service | S | 100. | 85. | 35. | 50. | 4. | 2.50 | 3.50 | 2.50 | 5. | 4. |
| Northwest Hosp. Service, Oregon | I | 125. | 60. | 35. | 50. | 3. | 3. | - | - | - | - |
| Pennsylvania | S-I | 100. | 75. | 25. | 50. | 5. i/ | 3. | - | - | - | - |
| Texas j/ | I | 75. | 75. | 25. | 50. | 3. | 3. | - | - | - | - |
| Utah | S-I | 125. | 100. | 35. | 50. | - | - | - | - | - | - |
| Richmond, Va. | S-I | 75. | 75. | 25. | 50. | 5. | 3. | - | - | - | - |
| Roanoke, Va. | S | 100. | 75. | 35. | 75. | - | - | - | - | - | - |
| Washington (King County) k/ | S | 110. | 110. | 35. l/ | - | 3.50 | 2. | 3.50 | 2. | 4. | 4. |
| Charleston, W. Va. | I | 75. | 50. | 25. | 50. | - | - | - | - | - | - |
| Huntington, W. Va. | I | 75. | 50. | 25. | 50. | - | - | - | - | - | - |
| Milwaukee, Wis. | S-I | 100. | 75. | 35. | 50. | 3. | 3. | - | - | - | - |

a/ With general anesthetic; with local anesthetic, $35.
b/ Data not available.
c/ Participating physicians can charge extra. Other contracts of this plan provide $75.00 for normal deliveries.
d/ $3.00 per day for the 4th through the 21st day of hospitalization, then $10.00 per week through the 111th day.
e/ Fees shown are for higher cost contract.
f/ For dependents, one-half of these indemnity allowances are paid by the plan.
g/ Plan also has intermediate schedule.
h/ For Farm Security Administration borrowers.
i/ $3.00 per day for first two days.
j/ Data as of March 1946.
k/ Data as of March 1946.
l/ If performed in hospital. In office, $60.

174

CONFIDENTIAL

BCBSA00289878

**TABLE 29**
Comparison of Plan Payments and Doctors' Charges,
Delaware Surgical Plan, Jan. 1 - Sept. 26, 1946

|  | PERCENT OF TOTAL CASES PAID IN FULL | PERCENT OF TOTAL CHARGES PAID |
|---|---|---|
| SURGICAL PROCEDURES | 54.5 | 73.7 |
| X-RAY | 73.2* | 73.6* |
| ANESTHESIA | 81.0 | 80.1 |
| TRANSFUSIONS | 90.0 | 80.2 |
| ALL CASES | 68.1 | 74.1* |

*Part of the charges for x-ray service are paid by the hospital plan.  Payments made by the hospital plan are included where x-ray claims are paid in full but are not included where they are not paid in full.  Together the two plans met approximately 90 percent of doctors' charges for x-ray service.

Under this plan there is a wide variation in the ratio of plan payments to doctors' charges by type of surgery or procedure.  Thus in fracture cases plan payments met 90 percent of total charges, in appendectomies 89.5 percent, in female genital cases 80.1, in deliveries 71.5, in tonsil and adenoid cases 62.5, in eye cases 53.9, and in cases involving surgery of the mouth other than tonsil and adenoid cases, 43.7.  Obviously this plan's idemnity schedule is closer to the standard or average charges for certain operations or procedures than for others.

Data are available for the Buffalo N. Y. plan for the period September 1944 to February 1945.  During this period the plan's payments met 81.3 percent of the physicians' charges in medical cases (at that time the plan covered home, office and hospital calls), 70.9 percent in surgical cases, 72.6 percent in gynecological cases, 72.3 percent in maternity cases, and for all cases together 76 percent of the aggregate of physicians' charges.

The New Hampshire Plan (also straight indemnity basis) reports that from its inception up to August 1945, its payments covered 84.4 percent of the total of physicians' charges for surgery and obstetrics, 77.4 percent of the charges for anesthesia, 100 percent of the charges for x-ray service and for all services together 84.1 percent.  The 1946 annual report of the plan states that in many areas physicians are accepting the plan's allowances as full payment in the case of all subscribers, and that complaints from subscribers of extra charges on the part of physicians are rare.

One indemnity plan made a study in 1945 of a sample of its claims.  This plan at that time had an indemnity schedule which was the same as that used by insurance companies and which these companies had found low for the area in question.  It was found that the plan payment covered the physician's charge in full in 19.3 percent of all cases, met from 80 to 99 percent of the charge in 2.8 percent of the cases, met from 60 to 79 percent of the bill in 33.2 percent of the cases, from 40 to 59 percent of the bill in 24.7 percent of the cases, and met less than 40 percent of the bill in 20 percent of the cases.  The plan payments met a larger portion of the charge in cases carrying a high scheduled payment than in cases with a low scheduled payment, and for all cases together it appeared that the plan was meeting about 65 percent of the total of doctors' charges.

The New Jersey plan (service-indemnity basis) reports that for November and December 1945 the plan payments met the doctors' charges in full in 57.7 percent of the cases and covered about 80 percent of the aggregate of physicians' charges.

Data for no other plans are available.  The executive directors of some of the service-indemnity plans report that some physicians currently accept

175

CONFIDENTIAL

BCBSA00289879

the plan's payments as full payment for all subscriber-patients. Some plans receive numerous complaints from subscribers, who are over the income ceilings for service benefits, of extra charges by physicians. (This matter will be discussed in more detail in a later chapter.) However, the plans apparently have no data showing what the situation really is, and the degree of protection afforded by these plans to those of their subscribers not entitled to service benefits remains a mystery.

In sum, under 4 indemnity plans and one service-indemnity plan the degree of protection, at various periods in the past, has ranged from about 65 to 85 percent.

### ADEQUACY OF PAYMENTS TO PHYSICIANS

It is difficult to appraise the adequacy of the fees or indemnity allowances paid under the plans. It must be borne in mind of course that under the indemnity plans or as regards the subscribers of the service-indemnity plans entitled only to indemnity benefits, the fees paid do not necessarily represent the total received by the physician.

One way of appraising the adequacy or fairness of these fees might be to compare them with the fees regularly charged by physicians to non-plan patients, or the fees actually collected from such patients [2] Unfortunately data for such a comparison are not available.

One possible test of the adequacy or inadequacy of the scheduled fees or indemnity allowances is provided by comparison with the fees paid under the Veterans Administration "Home Town" medical care program. These latter fee schedules have been jointly negotiated between the State medical society and the Veterans Administration and presumably represent levels of remuneration which are fair both for the government and the medical profession. This comparison is made for six plans in Table 30.

In the case of California Physicians' Service, in seven out of nine selected procedures the fees payable by the plan (before proration) are identical with those paid by the Veterans Administration. In one operation the CPS fee is lower than the VA fee; in another instance it is higher. In general the two schedules are the same. Physicians accept the VA fees as full payment for all veterans; they agree to accept the CPS fees as full payment only for those with incomes under $3,000. This comparison would seem to indicate that the CPS schedule is high as it applies to persons with incomes under $3,000 or, alternatively, that the profession could fairly accept these fees for the entire subscribing public, irrespective of income. However, it must be borne in mind that CPS has never paid its scheduled fees 100 percent.

In the case of the Michigan plan the plan's fees and the VA's fees are identical in 8 out of 9 operations, and in one the VA fee is higher by 20 percent. Roughly therefore the VA schedule can be regarded as about 2 or 3 percent higher overall than the plan's schedule. On the basis of the same reasoning as above, and assuming that the VA schedule represents fair remuneration, Michigan's schedule can be regarded as high for the income groups entitled to service benefits, or alternatively physicians should be willing to accept these same fees for all subscriber-patients.

---

[2] A survey in 1929 found that physicians collected 81.5 percent of their charges. (Leven, Maurice, *The Incomes of Physicians,* Committee on the Costs of Medical Care, Publication No. 24, University of Chicago Press, 1932.)

CONFIDENTIAL

BCBSA00289880

## TABLE 30

### Comparison of Fees or Indemnity Allowances Paid for Specified Services by Medical Service Plans in Various States and Fees Paid by the Veterans Administration in these States.
### (Data as of August 1946)

| PLAN | APPENDECTOMY | HERNIOTOMY (SINGLE) | CHOLECYSTECTOMY | DELIVERY | HYSTERECTOMY | HEMORRHOIDECTOMY (INTERNAL) | PROSTATIC RESECTION TRANSURETHRAL | THYROIDECTOMY | TONSILLECTOMY (ADULT) |
|---|---|---|---|---|---|---|---|---|---|
| **CALIFORNIA** | | | | | | | | | |
| CALIFORNIA PHYSICIANS' SERVICE | $ 125.00 | $ 100.00 | $ 200.00 | $ 75.00 | $ 150.00 | $ 75.00 | $ 100.00 | $ 175.00 | $ 60.00 |
| V. A. | 125.00 | 100.00 | 200.00 | 75.00 | 150.00 | 100.00 | 100.00 | 175.00 | 50.00 |
| **KANSAS** | | | | | | | | | |
| KANSAS PHYSICIANS SERVICE | 100.00 | 75.00 | 150.00 | 50.00 | 125.00 d/ | 50.00 | 100.00 | 125.00 | 35.00 |
| V. A. | 100.00 | 75.00 a/ | 150.00 | g/ | 150.00 d/ | 75.00 | 125.00 | 150.00 | 35.00 h/ |
| **MICHIGAN** | | | | | | | | | |
| MICHIGAN MEDICAL SERVICE | 75.00 | 75.00 | 140.00 | 40.00 | 150.00 d/ | 50.00 | 100.00 | 125.00 g/ | 30.00 |
| V. A. | 75.00 | 75.00 | 140.00 | 40.00 | 150.00 | 60.00 | 100.00 | 125.00 | 30.00 |
| **NEW JERSEY** | | | | | | | | | |
| NEW JERSEY MEDICAL SURGICAL PLAN | 100.00 | 75.00 a/ | 125.00 | 50.00 | 150.00 | 50.00 | 100.00 | 125.00 | 40.00 |
| V. A. | 100.00 | 100.00 | 140.00 | 50.00 | 150.00 | 62.50 | 100.00 | 125.00 | 40.00 h/ |
| **OHIO** | | | | | | | | | |
| OHIO MEDICAL INDEMNITY, INC. | 100.00 | 75.00 | 125.00 | 50.00 | 150.00 | 50.00 | 150.00 | 150.00 | 35.00 |
| V. A. | 100.00 | 100.00 | 150.00 | g/ | 150.00 | 50.00 | 150.00 | 150.00 | 40.00 h/ |
| **NORTH CAROLINA** | | | | | | | | | |
| HOSPITAL SAVINGS ASSOC. OF NORTH CAROLINA | | | | | | | | | |
| $100.00 SCHEDULE | 60.00 | 50.00 | 75-100.00 b/ | 25.00 | 75.00 | 25.00 g/ | 50.00 | 75.00 | 17.50 |
| $150.00 SCHEDULE | 75.00 | 75.00 | 75-150.00 b/ | 40.00 | 100.00 | 35.00 f/ | 75.00 | 100.00 | 25.00 |
| V. A. | 75.00 | 75.00 | 140.00 | 40.00 | 150.00 | 62.50 g/ | 100.00 | 125.00 | 30.00 |

a/ Ventral $100.00
b/ Grouped with other abdominal operations
c/ Not listed
d/ Vaginal or abdominal
e/ Does not state whether internal or external
f/ External
g/ One stage, sub-total
h/ Extra fee paid if adenoidectomy performed at the same time.

177

CONFIDENTIAL

The VA schedule for Kansas is somewhat higher than that of the Kansas plan and the same is true for New Jersey and Ohio. The VA schedule for North Carolina is appreciably higher than the higher of the two indemnity schedules of the North Carolina plan. In comparison with the VA schedules the schedules of all four plans, regarded as minimums, would not seem to be excessive.

In Oregon the fee schedule of Oregon Physicians' Service and that of the VA are identical. The same is true for Montana. On the same reasoning as above, the fee schedule of Oregon Physicians' Service, being a full service plan can be regarded as reasonable; that of the Montana plan, holding as it does only for those with incomes under $4,000, might seem to be a little high.

These observations must obviously be accepted with caution. The yardstick employed is one which changes from State to State.

Another possible approach to an evaluation of the fee or indemnity schedules of these medical plans is to compute what these payments would mean in terms of income to the profession if the whole population of the area were enrolled in the plan. This may be done by assuming that the subscription costs of the plan are fixed so as to support the given fee schedule, and that subscription costs per subscriber, after deduction of reasonable allowances for administrative costs and additions to reserves, represent income to the profession.

The New Jersey plan estimates that its income from subscribers equals $.67 per person a month. If the whole (1940) population of the State were enrolled the plan's income would be approximately $33,447,000 a year. Assuming that administrative expenses and additions to reserves will in the long run require 20 percent of this amount, there would be left approximately $26,757,000 as income for the profession, – an amount which divided among the approximately 4700 (pre-war) active private practitioners of the State would give each an annual gross income of $5693 a year. This would yield a net income of about $3400. This income would be derived from surgery, obstetrics and hospital calls on medical cases, services from which the profession probably now derives only about a third of its income, the remainder coming from office and home calls. It would appear from this that if the whole population of the State were enrolled at present subscription rates and the profession received 80 percent of the plan's gross income, the profession would do well financially, even if no extra charges were made to subscribers over the income limits for service benefits. There is one qualification which must be made to such a calculation: the total volume of medical work would probably be considerably greater under the assumed conditions and the present physicians might have to work considerably harder, or an increased number of physicians would be needed. If this last were true the average income per physician would be reduced.

A similar calculation may be made for Michigan. In 1945 officials of the plans estimated that if the whole population were enrolled at the then present subscription rates the plan's income (after deduction of 20 percent for administration and additions to reserves) would yield each active private practitioner in the State an annual gross income of about $5600. This income would have been derived from surgical, obstetrical, x-ray and anesthesia service in hospitals. The analogous figure at the plan's present subscription rates ($3.25 per family) for the surgical, obstetrical and hospital call contract would be about $8000 for an expanded scope of service.

178

CONFIDENTIAL
BCBSA00289882

In general it appears that the medical profession would fare well finan-
cially if the whole population were enrolled in these plans.[4/]

## PHYSICIAN GUARANTEE OF BENEFITS

Medical prepayment, like hospital prepayment, is based on the principle
of insurance. The plan receives from its subscribers certain periodic pay-
ments in return for which it obligates itself to provide these subscribers
with certain services or benefits as the need for these arises. It is of
the greatest importance, naturally, that the plan should not default upon
its obligations to subscribers – having received their subscriptions it must
be in a position at all times to carry out its obligations to them and to
provide the contractual benefits or services. The special characteristics
of insurance and the need for protection of the public has led in all States
to public regulation and supervision of the insurance business.

There are three ways by which the soundness of medical plans -- their
ability to provide the contractual benefits to their subscribers -- can be
assured.

The first method is by the plan having capital and reserves of an
amount sufficient to carry it through any temporary period in which benefit
expense plus the cost of administration exceeds income, and to give it time
to adjust its rates and benefits, if need be, so as to regain a financially
sound position.

The second method is through agreement of the participating physicians
to provide the contractual services or benefits to subscribers even though
the plan is unable to pay physicians at its scheduled rates. Under this
situation the plan's resources are in effect augmented by the resources of
all the participating physicians.

A third possible method by which the delivery of benefits to subscribers
may be guaranteed is through the agreement of subscribers to pay special as-
sessments if the financial situation of the plan so requires. This method
of underwriting is the one generally used by so-called mutual insurance com-
panies, although many such companies after they have accumulated sufficient
reserves to assure their financial stability eliminate the liability of
policy holders to assessments. While the liability of subscribers to asses-
ments seems, on paper at least, an effective means of guaranteeing the
ability of a plan to provide its scheduled benefits, one may doubt whether
in practice this guarantee adds anything more than is given by a plan's
ability readily to adjust its rates and benefits. Subscribers to a medical
plan, unlike the policy holders of a life insurance company, are not held to
the plan by long term contracts. In practice many subscribers would prob-
ably drop out when asked to pay a special assessment and, in any case, the
time required by the plan to levy and collect a special assessment would
probably be as great as that required to institute a change in rates and
benefits.

Medical plans are as yet very largely in an experimental stage and the
possibility that any plan may get into financial difficulties is not at all
remote. Hence it would seem essential for the protection of the subscrib-

---

4/ A Department of Commerce survey found that in 1941 physicians in private practice had an average
net income of $5,047. (Incomes in Selected Professions, Survey of Current Business, October 1942.)
The magazine Medical Economics found that in 1943 non-salaried physicians had an average net income
of $9,186. (Medical Economics, February 1945, p. 45.)

179

CONFIDENTIAL

BCBSA00289883

ing public that such plans should be firmly underwritten in one way or another. The importance of this is indicated by the history of several of the existing plans which have run into financial difficulties in the past and would probably today not be in existence except for the fact that they were underwritten by their participating physicians.

What is the current situation regarding the underwriting of medical plans?

Of the 42 plans (as of Jan. 1, 1947) for which full data are available 20 are definitely and firmly underwritten by their participating physicians.[5] In these plans the participating physicians agree to provide the specified services or indemnity credits to subscribers even though the plan is unable to make its scheduled payments to physicians. The physicians further agree not to cancel their participation except on a year's notice, or, if cancellation on shorter notice is permitted, to provide the specified services and credits to subscribers during the remainder of the contract year on then-existing contracts or until such contracts can be cancelled.

Three of these plans (CPS, Oregon Physicians' Service and the plans in Washington) use proration of fees as a current part of their operations. The other plans in this group as well as all the other plans aim to build up reserves to provide the initial defense against an unfavorable experience, relying upon the underwriting by participating physicians as a second defense.

In eight other plans there is some degree of underwriting by participating physicians.[6] The participating physicians of these plans agree to provide the service or credits and to accept reduced fees if necessary. However, the contracts with participating physicians permit these physicians to withdraw on short notice - 15 or 30 days - or no notice at all.[7] If a plan so situated should reduce its payments to physicians and all or any large number of the participating physicians withdrew from the plan, there would, of course, be no effective underwriting. In practice, it is highly improbable that most or many of the physicians would withdraw if the plan reduced its payments. Probably they would continue to provide the service. Nevertheless, from a contractual standpoint the plan is not firmly underwritten.

Fourteen of the plans are not underwritten in any way by the medical profession.[8] These plans do not have participating and non-participating physicians. All of them are on a straight indemnity basis and they pay the same indemnity allowances to all physicians in or out of their area.

Of these 14 plans, three are organized as mutual insurance companies and are presumably underwritten by their subscribers since the latter are liable to assessments.[9] Three other plans are also organized as mutual insurance companies, but are not underwritten by their subscribers, the latter not being subject to assessments.[10] Presumably this is because these plans

---

[5] California Physicians' Service, Delaware, Iowa, Kansas, Massachusetts, Kansas City, Montana, New Hampshire, New Jersey, New Mexico, Buffalo, Rochester, Syracuse, Utica, North Dakota, Oregon Physicians' Service, Richmond, Roanoke, Milwaukee, and the plans in Washington. It is not altogether certain that Kansas belongs in this group as the underwriting obligation is a little indefinite.

[6] Colorado, Louisiana, Michigan, New York City, Medical Service Assoc. of Durham, Pennsylvania, St. Louis, and Charleston.

[7] Colorado, 30 days; Louisiana, 30 days; Michigan, 15 days; Medical Service Assoc. of Durham, 30 days; Pennsylvania, 30 days; St. Louis, 30 days; New York City, no notice: Charleston, 30 days.

[8] Alabama, Sacramento, Oakland, Indiana, New Orleans, Nebraska, Hospital Care Assoc. of Durham, Hospital Saving Assoc. of Chapel Hill, Ohio Medical Indemnity, Cleveland, Oklahoma, Northwest Hospital Service of Oregon, Texas and Huntington.

[9] Indiana, Oklahoma and Nebraska.

[10] Cleveland, Sacramento, and Texas.

CONFIDENTIAL                                                                 BCBSA00289884

have sufficient capital or reserves so that they are permitted under the laws of their State to issue policies without contingent liability of the policy holders. One plan (Ohio Medical Indemnity, Inc.) is organized as a stock insurance company; it is underwritten so to speak by its contributed capital.

The remaining seven plans in this group are all joint hospital-medical plans.[11/] Two of these plans (New Orleans and Oregon) and possibly another (Huntington) are underwritten by their member hospitals, which means that the hospitals are also responsible for the obligations of the medical contracts; three plans (Durham, Oakland and Chapel Hill) are not underwritten by the hospitals and for one plan (Alabama) definite information on this point was not available.

It will be seen from this review that about two-thirds of the present medical plans are financially backed up by the medical profession, although in some of these plans the underwriting is not contractually secure. The proportion of medical plans underwritten by the medical profession is about the same as the proportion of hospital plans underwritten by the hospitals. It would seem that in order to protect the subscribing public the insurance departments of the various states should see that medical plans which are not firmly and definitely underwritten by the medical profession (or by hospitals) should have reserves of an amount which would permit them to do business if organized as mutual or stock insurance companies under the State law. In other words medical plans should be firmly underwritten by the medical profession (or by hospitals - if hospitals wish to undertake this obligation) or they should have sufficient capital or reserves to give the subscribing public adequate assurance that they will not default upon their obligations.

In connection with the underwriting of plans by the medical profession the following factor needs to be taken into consideration. The underwriting of a plan by its participating physicians is practicable when the plan provides service benefits, but the same conclusion might not hold when the plan provides indemnity benefits in whole or in part. Under the latter type of plan, if prorating had to be resorted to, some physicians might increase their charges to subscriber-patients in order to make up for the reduction in fees paid by the plan. For example, if the scheduled indemnity benefit or credit for a certain operation was $100, but under proration physicians received only $90, some physicians might increase by $10 the charge that they might otherwise make to these patients. To the extent that this happened in practice, it would be the public and not the profession which was really underwriting the plan.

---

[11/] Alabama, Oakland, New Orleans, Hospital Care Assoc. of Durham, Hospital Saving Assoc. of Chapel Hill, Northwest Hospital Service (of Oregon) and Huntington.

CONFIDENTIAL

BCBSA00289885

# CHAPTER 18

## LEGAL STATUS OF MEDICAL PLANS*

The provision of medical service on a prepayment basis is an activity of the same general nature as the provision of hospital service on a prepayment basis, and the legal status of non-profit plans offering medical service is identical with or similar to that of hospital service plans.

Most of the hospital service plan acts passed previous to 1943 did not permit these plans to offer medical service contracts. Hence, when the medical profession and civic groups desired to establish medical prepayment plans, they found it necessary or desirable, in most States, to request the passage of legislation which would permit the establishment of medical service plans as separate organizations or would permit the existing hospital service plan or plans to broaden the scope of their activity and offer medical service as well. In the last two or three years several of the States which did not previously have enabling acts for hospital plans have adopted legislation which would enable the formation of hospital or medical plans, or both, or combined hospital and medical plans.[1]

The first legislation authorizing medical prepayment by non-profit plans was passed in 1939. To date such legislation has been enacted in 26 States. The States having such legislation and the years in which the initial laws were passed are as follows:

| | |
|---|---|
| 1939: | California*, Connecticut, Michigan, New York, Pennsylvania and Vermont |
| 1940: | New Jersey and Virginia* |
| 1941: | Massachusetts and Ohio |
| 1942: | - - - - - |
| 1943: | Maine*, New Hampshire, North Carolina*, West Virginia |
| 1944: | - - - - - |
| 1945: | Alabama*, Arizona*, Florida*, Illinois, Iowa, Kansas Maryland*, Minnesota, North Dakota, Rhode Island*, Tennessee and Wisconsin. |

*Permits one plan to issue both hospital and medical service contracts.

Not all of the present medical or combined hospital and medical plans are organized under this legislation. Five plans (Cleveland, Nebraska, Oklahoma, Sacramento, and Texas) are organized as mutual insurance companies in compliance with the state laws regulating such organizations. Five plans (California Physicians' Service[2], and the Colorado, Delaware and the two

---

* As of May 1946.

[1] Appendix G contains the text of a model law of this type, drawn up by the Blue Cross Commission.

[2] The Insurance Commissioner of California began an action in 1940 against California Physicians' Service on the ground that it was illegally engaging in the insurance business. The District Court of Appeal in February 1945 handed down a decision to the effect that CPS is not in the insurance business but is a service organization in the nature of a cooperative.

182

CONFIDENTIAL

BCBSA00289886

Missouri plans) and the numerous county medical society plans in Washington[3/] have been considered or consider themselves as not engaging in the insurance business and operate without special enabling legislation. The plans in New Orleans and Oregon operate under legislation designed to permit the operation of "service insurance" companies and "hospital associations", respectively.[4/]

## RELATIONSHIP OF MEDICAL AND HOSPITAL PREPAYMENT

Of the 26 laws providing for medical prepayment by non-profit plans, the acts of 17 States provide for medical service plans separate and distinct from hospital plans.[5/] In these States medical and hospital plans must be organized as separate corporations.[6/]

The acts of the other nine States make it possible for one and the same plan to offer both hospital and medical prepayment. The laws of Arizona, Florida, North Carolina and Virginia[7/] authorize the establishment of separate hospital and/or medical plans or of combined plans. The Maryland law provides for health service plans which may offer either hospital, medical or dental service or any combination of these services. The Alabama and Maine acts authorize hospital service plans to offer both hospital and medical service. The Rhode Island law provides for non-profit medical service corporations, but also specifies that a corporation organized under the hospital service plan act may, with the consent of the State medical society, amend its articles of association, and may then exercise the powers of a non-profit medical service corporation. The California Act is of a different nature from the others in that it was not intended to provide for general medical prepayment. The legislation, passed as an amendment to the hospital service plan act, was designed to permit hospital service plans to cover x-ray, pathology and similar medical services in the hospital. The act permits hospital service plans to offer "indemnification of the beneficiary or subscriber for the costs and expense of professional medical service rendered during hospitalization", and under this wording the Oakland and Sacramento plans have offered indemnification for the cost of physicians' service in the hospital.

## PROVISIONS OF ENABLING LEGISLATION FOR MEDICAL SERVICE PLANS

This review of the provisions of enabling legislation for medical service plans will not deal with those acts which permit combined hospital and medical plans, since the provisions of these laws, except for the sections

---

3/ The Attorney General of the State of Washington has questioned the legal status of the county medical service plans but as yet no adverse determination of their legal status has been made.

4/ See Chapter 7.

5/ Connecticut, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, New Hampshire, New Jersey, New York, North Dakota, Ohio, Pennsylvania, Tennessee, Vermont, West Virginia and Wisconsin.

6/ There is nothing in the acts of any of these States which would prevent some interlocking of the directorates of medical and hospital plans — indeed in most States it would be legally possible for the directors of the two corporations to be the same people. However, in many States the hospital or medical plan act contains provisions, such as that a majority of the board of directors must be hospital representatives or physicians, which would constitute a practical barrier to the two corporations having identical directorates.

7/ The Virginia act is so verbose, unnecessarily complicated and in part contradictory that it is hard to tell what it means. It certainly seems to provide that one plan may offer both hospitalization and medical services in the hospital, and it is believed to provide that one plan may offer both hospitalization and medical service in or out of the hospital.

CONFIDENTIAL

BCBSA00289887



STATES WITH ENABLING ACTS FOR MEDICAL PLANS OR FOR JOINT HOSPITAL-MEDICAL PLANS

( AS OF MAY 1, 1946 )

Act enables establishment of separate medical plan.

Act enables establishment of separate medical plans or joint hospital-medical plans, or both.

FIGURE 14

184

CONFIDENTIAL

BCBSA00289888

relating to participating physicians and underwriting by physicians, were described in the chapter dealing with the legal status of hospital plans. This review, therefore, will concern itself solely with the provisions of the 17 acts providing for separate medical plans and the sections of the acts providing for combined plans which were not previously dealt with.

In general the acts providing for medical service plans resemble quite closely the hospital service plan act of the same State, except for those provisions relating particularly to medical service. All provide for the organization of such plans, state that these shall be subject to the provisions of the act in question and exempt them from all provisions of the insurance code, except as otherwise designated. All provide for some degree of regulation by the State insurance department. Except in a few states,[8] the plans are exempted from state and local taxes (except in some cases state or local taxes on real estate).

## BOARD OF DIRECTORS.

Control over medical service plans is definitely given to the medical profession in most of the 17 acts providing for separate medical plans. Six acts stipulate that a majority of the Board of Directors shall be physicians.[9] In one State[10] all the directors, and in three States[11] a majority of the directors must be approved by the State medical society or the officers thereof. Two acts[12] do not mention the composition of the board but provide that all the incorporators must be physicians, which means that initially, at any rate, the profession may determine the composition of the board. The Wisconsin act provides that only State or local medical societies may establish plans.

The Kansas act contains a provision which is worth noting. It provides that the Governor of the State shall appoint two members of the public to the board.

## PRACTITIONERS ELIGIBLE TO PARTICIPATE

Of the 26 acts about half stipulate that the plan may extend the privilege of participation to, or may offer the services of, doctors of medicine only. Some other acts state only that participation is limited to duly licensed physicians, which may be interpreted to include osteopaths in a few of these States. In Iowa a medical plan may contract with "physicians and surgeons, osteopathic physicians or osteopathic physicians and surgeons." The Wisconsin law states that the insured shall be free to choose any medical or osteopathic physician who has agreed to abide by the plan according to its terms. The New York act states that "every such plan shall be open to the participation of duly licensed physicians without discrimination against schools of medical practice defined in the education law." There is a similar provision in the Maine law.

In Maryland and Vermont dentists may be included in a medical plan, or they may participate in independent plans. In Vermont osteopaths (and other types of limited practitioners as well) may organize their own plan. A number of the acts permit the plans to offer nursing services.

The Minnesota act does not permit a medical service plan to contract with any physician for the provision of service to a subscriber. Thus, a plan in this State can operate only on an indemnity basis.

---

8/ Iowa and Tennessee.  The situation in a few other States is not clear.
9/ Illinois, Iowa, North Dakota, Pennsylvania, Tennessee and West Virginia.
10/ New Jersey.
11/ Massachusetts, Michigan and New Hampshire.
12/ Minnesota and Vermont.

185

CONFIDENTIAL

BCBSA00289889

The laws of a number of States (Illinois, Massachusetts, North Dakota, Pennsylvania, Tennessee and possibly others) specifically state that every licensed physician or every licensed physician in good standing shall have the right to participate.

The Pennsylvania law is of interest in that it is the only one which specifies how a medical plan may refuse participation to a licensed doctor of medicine. It is stated that the corporation, with the approval of the State Department of Health, may refuse to place the name of any doctor of medicine on its register. A physician on the register may be removed, again subject to the health department's approval.

## UNDERWRITING BY PHYSICIANS

Only 7 of the 26 acts mention this subject. In six States the law requires the plan to be underwritten by its participating physicians.[13] On the other hand, the Tennessee act provides that "such contracts (with subscribers) shall make clear that the responsibility for service rests with the Corporation and not with the participating physician."

## SUPERVISION BY THE STATE INSURANCE DEPARTMENT

In general, there is great similarity between the hospital and medical service acts in this respect. All of the 17 acts providing for separate medical service plans provide for some supervision by the State insurance department, except that in Wisconsin the degree of supervision is so slight as to be almost non-existent. Except in Wisconsin, all plans must submit annual reports, and visitation and examination by the department is either compulsory or at the department's discretion. Except in Wisconsin, all plans must obtain a license from the insurance commissioner before commencement of business. In Pennsylvania the health department must approve before a license can be issued by the insurance department. Except in North Dakota and Wisconsin all subscriber contracts, including the rates to be charged, must be approved by the insurance commissioner. In Wisconsin the insurance commissioner approves the form of the contracts only. The acts of three States give the insurance commissioner supervision over rates of payment to physicians.[14] Where the plans issue indemnity contracts the insurance Commissioner has some control over the payments to physicians since the indemnity fee schedule is part of the subscriber contract. The provisions regarding reserves and administration and acquisition costs are for the most part of the same general nature as those of the hospital plans and need not here be described.

## OTHER PROVISIONS

The Ohio law provides that no medical service plan shall issue a contract to a single or married person with incomes during the preceding six months of more than $900 or $1200, respectively. This provision has made it impracticable to organize plans in this State under the enabling legislation.

---

13/ Arizona, Florida, Kansas, Maryland, Virginia and West Virginia.

14/ Massachusetts, Pennsylvania and Tennessee.

CONFIDENTIAL                                                                 BCBSA00289890

# CHAPTER 19

## THE CONTROL OF MEDICAL PLANS

In discussing the control of medical plans, a sharp distinction must be made between those plans which are organized as separate corporations with their own boards of directors and those plans wherein both medical and hospital prepayment contracts are offered by a single corporation with one board of directors.

There are nine plans of the latter type.[1/]  The method of selection of the boards of directors of these plans has been discussed in Chapter 8.  It suffices to say here that in most cases the boards are so selected as to give representation to the hospitals, the medical profession and the public.

In the great majority of the separate medical plans the by-laws of the plan fix control definitely and firmly in the medical profession.

Some typical arrangements are as follows:

*The board of directors of California Physicians' Service consists of 12 persons all of whom are elected by the House of Delegates of the California Medical Society.*

*The Michigan plan has a board of 24 members.  Board members are elected by the voting members of the corporation who consist of all members of the House of Delegates of the Michigan Medical Society, the board members themselves and others elected by the board.  The by-laws stipulate that at least two-thirds of the directors must be doctors of medicine.*

*Board members of the Massachusetts plan (15 in number) are elected by the voting members of the corporation, all of whom are named by the State medical society.*

*The New York City plan (United Medical Service) has a board of 24 members.  Board members are elected by the voting members of the corporation who consist of the presidents of the 17 county medical societies, the president of the State society, the president of the New York Academy of Medicine and the board members themselves.  A majority of the directors must be physicians.*

*In the Utica plan the incorporators elect the first board which from then on is self-perpetuating.  A majority of the directors must be physicians.*

*The Cleveland plan is organized as a mutual insurance company.  Each subscriber has one vote at any annual meeting for the election of trustees, but the votes of absent members are cast, through a system of automatic proxies, by the existing trustees, so that in effect the board of trustees is self-perpetuating.*

In general the plans fall into three groups with respect to the method of selection of the boards of directors.

*(a) The boards of directors are elected by the house of delegates or board of trustees of the state or local medical society, or by the participating physicians of the plan, or by the voting members of the corporation, all or a majority of whom are elected by the state or local medical society.*

---

[1/] Alabama, Oakland, Sacramento, Delaware, New Orleans, Chapel Hill, Durham, Northwest Hospital Service of Oregon and Huntington.

CONFIDENTIAL

BCBSA00289891

The majority of the plans (16 of the 26 plans which were in existence in February 1946) are in this category.[2]  Most of these plans stipulate that a majority of the directors must be physicians.

> (b) The boards of directors are self-perpetuating or are elected by the voting members of the corporation who in turn are named by the board of directors, or by the board of directors and the medical society jointly, the society naming not more than half.

Six (out of 26) of the plans are in this category.[3]  In three of these plans[4] there are provisions which would assure the profession a dominant voice in conducting the plan.  One plan provides that a majority of the directors must be approved by the medical society, another that one-half of the directors must be physicians, a third that two-thirds of the directors must be physicians.

> (c) The plan is organized as a mutual insurance company, and the directors are elected by majority vote of the subscribers at an annual meeting.

Four (out of 26) plans are in this group.[5]  In theory these plans are controlled by their subscribers.  In practice the boards of directors are self perpetuating.  Few subscribers will attend the annual meeting and the existing board can always obtain sufficient proxies to secure election of the desired individuals.  Some of these plans have provisions which assure this result.  Those of the Cleveland plan have already been indicated.  Under the Nebraska plan no notice of the annual meeting need be given subscribers.  Two of these plans have stipulations which assure medical control. The Oklahoma plan requires that nine of the 15 directors shall be physicians.  The articles of incorporation of the Nebraska plan stipulate that six of the nine directors shall be members of the state medical association.

## THE COMPOSITION OF THE BOARDS OF DIRECTORS

The following table shows the composition of the boards of the various plans.

It is evident that the boards of the separate medical plans are composed very largely of physicians.  In only four of the separate medical plans are physicians not in a majority.  In seven of these plans there is not a lay person on the board. This situation has its reverse counterpart in Cleveland, where the plan does not have a physician on its board.  The joint hospital and medical plans, as might be expected, present a different picture.  Here the physicians tend to be a minority.

The dominant position held by physicians in the control of nearly all of the separate medical plans is modified or tempered to a certain extent by two factors.  One factor is that almost all of these plans are administered and offered to the public by the hospital plan with which it is allied.  Joint offering of the two plans requires dovetailing of some of their provisions, as for instance waiting periods, enrollment policies, promotion methods, etc.

---

2/ California Physicians' Service, Iowa, Kansas, Massachusetts, Michigan, Kansas City, New Jersey, Buffalo, New York City, Syracuse, Ohio Medical Indemnity (directors elected by shareholders), Oregon, Pennsylvania, Richmond, Washington, Charleston (probably).  This classification is based on data as as of late 1945 or early 1946 and it includes only the plans which were in existence in February 1946.

3/ Colorado, St. Louis, Utica, New Hampshire and Medical Service Ass'n. of Durham, Roanoke (probably in this group).  See note 2.

4/ New Hampshire, St. Louis and Utica.  See note 2.

5/ Nebraska, Cleveland, Oklahoma and Texas.  See note 2.

CONFIDENTIAL                                            BCBSA00289892

TABLE 31

Composition of Boards of Directors of Medical Plans
(Data as of late 1945 or early 1946 unless otherwise indicated)

| PLAN | TOTAL NUMBER OF DIRECTORS | NUMBER OF DOCTORS OF MEDICINE | NUMBER OF OTHER PERSONS |
|---|---|---|---|
| **SEPARATE MEDICAL PLANS** | | | |
| CALIFORNIA PHYSICIANS' SERVICE [1] | 12 | 10 | 2 |
| COLORADO | 14 | 8 | 6 |
| FLORIDA | 2/ | 2/ | 2/ |
| INDIANA | 2/ | 2/ | 2/ |
| IOWA | 17 | 11 | 6 |
| KANSAS | 19 | 16 | 3 [1] |
| LOUISIANA PHYSICIANS SERVICE [1] | 11 | 10 | 1 [1] |
| MASSACHUSETTS | 15 | 5 | 10 |
| MICHIGAN | 24 | 17 | 7 |
| KANSAS CITY | ALL FIFTEEN DIRECTORS ARE PHYSICIANS | | |
| ST. LOUIS | 20 | 15 | 5 |
| MONTANA [1] | ALL NINE DIRECTORS ARE PHYSICIANS | | |
| NEBRASKA | 9 | 6 | 3 |
| NEW HAMPSHIRE | 17 | 8 | 9 |
| NEW JERSEY | 8 | 7 | 1 |
| NEW MEXICO [1] | ALL ELEVEN DIRECTORS ARE PHYSICIANS | | |
| BUFFALO | 24 | 16 | 8 |
| NEW YORK CITY | 24 | 13 | 11 |
| ROCHESTER [1] | 22 | 14 | 8 |
| SYRACUSE | 24 | 15 | 9 |
| UTICA | 23 | 13 | 10 [4] |
| MEDICAL SERVICE ASS'N., DURHAM | 11 | 6 | 5 |
| NORTH DAKOTA | 2/ | 2/ | 2/ |
| CLEVELAND | 21 | 0 | 21 |
| OHIO MEDICAL INDEMNITY | 21 | 13 | 8 |
| OKLAHOMA | 15 | 9 | 6 |
| OREGON | ALL DIRECTORS ARE PHYSICIANS | | |
| PENNSYLVANIA | 11 | 9 | 2 |
| TEXAS | 28 | 9 | 19 |
| UTAH [1] | ALL NINE DIRECTORS ARE PHYSICIANS [6] | | |
| RICHMOND | 27 | 20 | 7 |
| ROANOKE | 9 | 6 | 3 |
| WASHINGTON (KING COUNTY) | ALL DIRECTORS ARE PHYSICIANS | | |
| CHARLESTON | ALL TEN DIRECTORS ARE PHYSICIANS | | |
| MILWAUKEE | 2/ | 2/ | 2/ |
| **JOINT HOSPITAL AND MEDICAL PLANS** | | | |
| ALABAMA | 59 | 38 [1] | 21 |
| OAKLAND | 9 | 5 | 4 |
| SACRAMENTO | 7 | 2 | 5 |
| DELAWARE | 16 | 4 | 12 |
| NEW ORLEANS | 22 | 3 | 19 |
| CHAPEL HILL | 12 | 4 | 8 |
| HOSPITAL CARE ASS'N., DURHAM | 5 | 0 | 5 |
| NORTHWEST HOSPITAL SERVICE (OREGON) [1] | 14 | 3 | 11 |
| HUNTINGTON | 13 | 5 | 8 |

1/Data as of late 1946 or early 1947.

2/Information not obtained.

3/This lay member is the executive director.

4/Includes one osteopathic physician.

5/Most of these are owners or administrators of hospitals.

6/Seven of the nine are known to be physicians and it is believed that the other two are also.

CONFIDENTIAL

BCBSA00289893

Further the hospital plan might conceivably refuse to offer a medical plan which it thought to be unsound or unattractive to the public. Therefore, in a measure the hospital plan may be said to exercise, at least potentially, some degree of control relative to the medical plan. The second factor is that almost all of these plans are administered by the lay person who administers the hospital plan. In the last analysis, as was pointed out in the discussion of the control of hospital plans, this person's success and job depends upon public acceptance of the plans. Therefore, his influence upon the control of the two plans, which is considerable, will tend to be thrown towards making the plans as attractive to the public as possible.

## SOME OBSERVATIONS ON THE CONTROL OF MEDICAL PLANS

What should be the composition of the boards of medical plans? Should these plans be controlled entirely by the medical profession, entirely by the public, or should both parties share in the control, and if so in what proportions?

The answer would seem to depend in great part upon what is considered to be the nature and purpose of these organizations.

The plans might be viewed as having the nature of producers' cooperatives, organizations owned by the profession and operated for the profession's advantage and benefit, with participating physicians taking both the gains of the enterprise and the risk of loss. If this is the real nature of the plans then it would seem that exclusive control should lie with the medical profession, and there is no reason why there should be any public representation whatever. Only in Washington and possibly in Oregon do the plans formally have this character, though undoubtedly this conception of the possible nature of the plans has influenced the thinking of physicians elsewhere.

Generally the plans have been presented to the public as non-profit organizations operated primarily for the benefit of the public. If this is the purpose of the plans, then it would seem that some representation on the boards of the plans should be given to those whom the plans are designed to serve.

Assuming that both the medical profession and the public should be represented on the boards, then the relative share of the two groups in the control of the plans would be affected, among other factors, by which group underwrites the plan. If the profession underwrites the plan then clearly its share in the control of the plan should be greater than if no such obligation is undertaken. Indeed it might well be argued that where the plan is underwritten exclusively by the profession, then the profession ought to have majority control, for why should the physicians assume the risk of loss unless they are in a position to see that losses do not occur.

In Chapter 17 the conclusion was reached that it was important that a new plan (unless from the outset it is provided with sufficient capital funds to assure that it will be able to meet its contractual obligations to subscribers) should be underwritten by the profession. However, as a plan accumulates reserves then these reserves also serve to guarantee the plan's contracts. The plan's reserves belong to the public. Hence as a plan gains adequate reserves and begins to stand on its own financial legs, then even though the profession continues to underwrite the plan contractually, in reality the underwriting burden is shared between the public and the profession. When this state is reached, it is not so clear that the profession should have majority control. Indeed, given the purpose of the plan -- to

CONFIDENTIAL

BCBSA00289894

serve the public -- it would seem that under these conditions majority control should lie with the public.

Everywhere the medical profession has more or less instinctively assumed that it should control these plans. The reasoning of physicians which leads them to this conclusion is based less on the above mentioned factors than on the feeling that the plan is a *medical* plan, that physicians are the only ones who have any competence in medical matters and that accordingly the profession should control.

It is suggested that in this reasoning the profession confuses two things -- the practice of medicine and medical economics. Only physicians are competent to provide medical service, but the questions of how medical services shall be paid for and at what rates are ones on which the public should have as much, if not more, say than the profession.

Control of the plans carries with it the determination of what fees or remuneration shall be paid to physicians for their services. If the whole population were enrolled then control of the plans would carry with it determination of the incomes of the profession. Physicians would hardly maintain that this is something on which only they should have a voice.[6/] In the last analysis it is the public which will determine what it will pay for medical service. On this basis, it would seem that control of the plans should lie with the public and that the fees to be paid by the plans should be arrived at by negotiation between the plan and the organized medical profession.[7/]

The considerations presented above are largely of a theoretical nature, which, however, should not diminish their importance. During the course of the survey it was observed that in practice overwhelming medical domination of the plans is often prejudicial to their success. Most medical plans need a greater degree of lay representation on their board for two reasons.

First, the plans need to obtain the point of view of the subscribing public. Physicians tend to see medical economic questions from one point of view; the public from another. Where the plan's board is entirely or almost entirely made up of physicians, the board may pursue unwise policies because it is uninformed as to what the reaction of the subscribing public is or will be. The plans are for the public and they need representatives of the public on their boards so that they may be responsive to the needs of the subscribing public.

---

6/ A non-profit plan which is controlled by persons engaged in the practice of medicine for profit seems to be a contradiction in terms.

7/ Physicians commonly assume that they set their own fees. Actually of course they do not; fees are determined by the interplay of supply and demand forces. The average physician must charge at the market rate for his services if he wishes to have patients. The following extract from a speech by John Hunton, Executive Secretary of California Medical Ass'n., indicates the situation:

".....A few years ago at one of our meetings I happened to be in a conversation with two gynecologists, and one of them was talking about the fees that he charged. The other said "Who sets your fees?"

"I set my own fees."

"What do you mean, you set your own fee?"

"Why I tell every patient what my fee is going to be, and that is what it is."

"Wait a minute! You don't set your own fee. A woman comes to you and you examine her and you say she should have a certain piece of surgery performed. She says 'How much will it cost me?' You say it will be $200, and she replies 'I want to talk it over with my husband.' The next week you see her in a hospital and somebody else is operating on her, and he doesn't charge the high fee that you do. Or she comes in and you say 'My fee is $200.' You operate on her and send her a bill for $200, and she pays you $100. Who sets your fee? The public sets your fee -- your patients set your fee. You are not doing it yourself at all." *(The Journal of the American Medical Association* - Feb. 23, 1946, pg. 515.)

191

CONFIDENTIAL

BCBSA00289895

Secondly, in the long run the success of medical plans, as well as hos-
pital plans, depends upon the extent to which these are identified with the
community and become looked upon as community organizations.  If the plans
are to have a full measure of success the public must feel that the plan be-
longs to the public, that it is their plan.  People will not feel that the
plan is for the public's benefit -- that it is a community organization --
when 100 or 80 percent of the board members are physicians.  In short the plan
cannot be successfully presented as a public plan, unless the public has a
fair share in its control -- unless it really belongs to the public.

## THE SELECTION OF PUBLIC REPRESENTATIVES

The selection of public representatives on the boards of the plans raises
difficult problems.  The medical members can be elected by the State or local
medical society, or appointed by the governing body of the society.  If the
public representatives are also elected or appointed by the medical society,
or are elected by the remainder of the board, a majority of whom are physi-
cians, then it may well be that no proper representation of the public will
be provided for.  Election of the lay members by the subscribers at an annual
meeting does not work.[9/]  Use of this device means that the board as a whole
or its lay members are self-perpetuating.

Then how shall the lay members of the board be selected?  Perhaps the lay
members could be appointed or selected by the board as a whole, but under
formal or informal provisions which would require that persons should be
selected who would be endorsed or nominated by significant public groups,
e. g., the State or local council of labor organizations, an organization of
farm groups, a State or local organization of employers, an organization of
social agencies.  A provision that the health officer of the State or (if the
plan is a local one) of the principal city in the plan's area should always
be a member of the board might help to secure representation of the public's
interests.  Use of devices of this sort might well result in a board which
would in fact give representation to the various parties at interest.

In the final analysis perhaps the best and most democratic method of
selection of the lay members of the board would be to have them appointed by
the Governor of the State or (if the plan is a local one) the mayor or council
of the principal city of the area.  This is done in Kansas where the enabling
law requires that two members of the board shall be appointed by the Governor.

----

9/ See Chapter 8.

CONFIDENTIAL

BCBSA00289896

# CHAPTER 20

## ADMINISTRATION OF MEDICAL PLANS; FINANCES; CANCELLATIONS; UTILIZATION;  NATIONAL COORDINATION

### ADMINISTRATION

Many of the functions involved in the administration of medical plans are of the same character as those performed under a hospital plan. This is true of enrollment, billing, and maintenance of subscriber records, and in integrated or allied medical and hospital plans these operations are performed jointly for both plans. When a hospital plan is expanded administratively into a hospital-medical plan the only new operations involved are direction of the medical prepayment activity as a whole, the payment of physicians (or medical claims), and the maintenance of relations with the medical profession.

When a hospital admits a subscriber it sends an admission notice to the plan to ascertain whether the latter accepts responsibility for the bill. This step is generally eliminated under the medical plans. The physician when he first accepts a case can if he wishes send in an initial service report to the plan to ascertain the patient's eligibility, but most physicians do not do this. The physician assumes from the patient's statement or identification card that he is a member in good standing, performs the service, and after the patient's discharge from the hospital or at the end of the month, sends in to the plan a bill or report of service. This gives the patient's name and other identifying information, the diagnosis, the date on which service was performed, the nature of the service or services performed, etc.

The plan checks this against its subscriber records to ascertain if the recipient of service is a subscriber and is paid up. A record of the service performed and the physician performing it is then entered on the subscriber's record or claim card. Some plans maintain these cards separately from the hospital record card; in other plans they are attached to the card showing hospital service received, or the same card is used for both.

After the amount due the physician is determined, a punched card is prepared for accounting and statistical purposes. These cards are later run to prepare the voucher for each physician and the check.

Most of the larger plans have a full or part time medical director who aids in the interpretation of the physician's bill or report of service in instances where there is question as to just what service was performed and what amount is payable. This physician frequently tends to become the point of contact between individual physicians and the plan.

Most of the plans have a medical review or advisory committee appointed by the medical society. This committee will review cases in which there is some question as to the fee to be paid, for example where a physician claims that he should be paid more than the standard fee for an operation because of the unusual nature of the case, complications, etc. By virtue of consideration of many such cases the committee is able fairly to appraise the diffi-

CONFIDENTIAL

BCBSA00289897

culties or complications in a case and set a fair fee. The committee's deci-
sion as to the fee to be paid is generally accepted without demurrer, whereas
a decision by the medical director might not be so accepted. In any case ap-
peals from the medical director's decision can be made to the committee.
Some plans state that the role of such a committee is a vital one.

Virtually all medical plans, whether allied with a hospital plan or not,
have lay executive directors. The only exception, to the writer's knowledge,
is the New Jersey plan. California had a physician as executive director for
some years and replaced him with a lay administrator. Most of the functions
performed in administration of a plan are of a business or insurance charac-
ter, and the administrative talent required is more apt to be found among lay
persons than among physicians. The lay administrator delegates to the medi-
cal director those functions requiring medical knowledge.

In plans providing office and home calls, controls are necessary to pro-
tect the plan against bills for unnecessary services. The controls (which go
beyond office and home calls) utilized by the King County Medical Service Bu-
reau in Washington, may be cited as an example. This plan will not pay for
an operation, except in emergency cases, unless there was prior consultation
and the physician consulted agreed to the necessity of the operation. Tonsil
and hernia cases will not be paid for unless the plan's medical director has
himself examined the patient. In cases where the physician desires to recom-
mend extensive laboratory and x-ray work, he must receive the medical direc-
tor's approval before ordering these tests.

The medical director routinely inspects all bills and cuts down those
wherein in his opinion an excessive number of calls have been made. For in-
stance the physician may have billed for five home calls; the medical direc-
tor may judge that the case should have been handled with three calls and
will allow payment accordingly. The bills of most physicians are not "adjust-
ed". But there are a few physicians who tend to "chisel" or who in all good
faith routinely make more calls per case than do most physicians. The deci-
sions of the medical director are rarely questioned. He has the confidence
of the local profession.

It is probable that controls of this character would be required under
any plan covering home and office services.

## FINANCES

Table 32 gives the salient financial data on the operation of medical
plans. Data are presented only for those plans which were in operation dur-
ing the full year of 1945;[1] data for plans with less than a full year of op-
eration are generally not significant for the purposes in hand.

The present medical plans, as these data tend to show, have been run on
two different principles. A few of them -- Oregon Physicians' Service, the
plans in the State of Washington (for which data are not available), and Cal-
ifornia Physicians' Service -- are operated on a theory which holds that the
plans have no or little need of reserves.[2] These plans depend on the pro-
rating of payments to physicians as a necessary and customary part of their
functioning. The plans in Washington, Oregon and California (the latter in

[1] Data were not obtained from a few plans.

[2] CPS would like to accumulate reserves and stop *prorata* reduction of payments, but thus far it has
been unable to do so.

CONFIDENTIAL

BCBSA00289898

**TABLE 32**

**Finances of Medical Plans, 1945**

| PLAN | NUMBER OF PARTICIPANTS DEC. 31, 1945 | TOTAL INCOME 1945 | PHYSICIAN EXPENSE | | ADMINISTRATIVE EXPENSE | | ADDITIONS TO RESERVE (OR DEFICIT) | | RESERVES DEC. 31, 1945 | RESERVES PER PARTICIPANT DEC. 31, 1945 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | AMOUNT | PER-CENT | AMOUNT | PER-CENT | AMOUNT | PER-CENT | | |
| | | $ | $ | | $ | | $ | | $ | $ |
| SEPARATE MEDICAL PLANS | | | | | | | | | | |
| MICHIGAN | 858,235 | 5,420,351 | 4,298,285 | 79.3 | 620,908a/ | 11.5 | 501,158 | 9.2 | 695,175 | .81 |
| MASSACHUSETTS | 221,845 | 1,112,165 | 649,083 | 58.4 | 159,200 | 14.3 | 303,882 | 27.3 | 406,308 | 1.83 |
| CALIFORNIA PHYS. SERV. | 169,810 | 1,695,874b/ | 1,436,380b/ | 86.7 | 365,317 | 22.1 | -145,823 | -8.8 | 0 | 0 |
| NEW YORK CITY | 159,473 | 738,457 | 434,826 | 58.9 | 95,430 | 12.9 | 208,201 | 28.2 | 241,133 | 1.51 |
| COLORADO | 95,362 | 435,871c/ | 384,842 | 88.3 | 41,045 | 9.4 | 9,984 | 2.3 | 24,691c/ | .26c/ |
| OREGON | 85,000 | 911,353d/ | 781,181d/ | 85.7 | 124,686 | 13.7 | 5,486 | .6 | 39,476d/ | .46d/ |
| BUFFALO | 61,813 | 490,311 | 447,932 | 91.3 | 67,991 | 13.9 | -25,612 | -5.2 | -14,058 | -.23 |
| KANSAS CITY | 51,746 | 320,008 | 240,284 | 75.1 | 46,315 | 14.5 | 33,409 | 10.4 | e/ | - |
| NEW JERSEY | 49,441 | 327,112 | 208,288 | 63.7 | 57,057 | 17.4 | 61,767 | 18.9 | 90,567 | 1.83 |
| UTICA | 44,695 | e/ | - | - | - | - | e/ | - | e/ | - |
| NEW HAMPSHIRE | 36,863 | 149,707 | 61,009 | 40.8 | 22,910 | 15.3 | 65,788 | 43.9 | 61,457 | 1.67 |
| CHARLESTON | 18,075 | 101,346 | 70,804 | 69.9 | 10,142 | 10.0 | 20,400f/ | | 18,427 | 1.02 |
| NEBRASKA | 5,579 | 22,513 | 6,688 | 29.7 | 10,052 | 44.6 | 5,773f/ | 25.7 | 23,558 | 4.22 |
| TOTAL | 1,857,937 | 11,685,068 | 9,019,602 | 77.2 | 1,621,053 | 13.9 | 1,044,413 | 8.9 | 1,586,734 | .90i/ |
| COMBINED HOSPITAL-MEDICAL PLANS | | | | | | | | | | |
| DELAWARE | 69,518g/ | 350,774g/ | 247,442g/ | 70.6 | 42,503 | 12.1 | 60,829g/ | 17.3 | 116,506g/ | 1.68 |
| CHAPEL HILL | 110,907 | e/ | e/ | 71.3h/ | e/ | - | e/ | - | j/ | = |
| OAKLAND | 56,143i/ | 227,150g/ | 144,332g/ | 63.5 | 36,923 | 16.3 | 45,895g/ | 20.2 | j/ | = |

a/  Includes contribution of $10,000 to Michigan Fund for Medical and Health Education.

b/  For the fiscal year ending March 31, 1945.  Data include income and expense from hospital contracts.

c/  For the period 5/1/45 to 2/28/46.  Reserves as of Feb. 28, 1946.

d/  For the first six months of 1945. Reserves as of June 30, 1945. "Physician expense" includes expense for hospitalization, dental services, nursing, first aid services, etc.

e/  Information not obtained.

f/  Excess of income over expenditures, i.e., no allowance having been made for claims incurred but not reported.

g/  Medical contracts only.

h/  Ratio of surgical claims to surgical income.

i/  Participants in the Kansas City and Utica plans excluded in computing this figure.

j/  Plan does not maintain separate reserve for medical contracts.

CONFIDENTIAL

BCBSA00289899

the northern part of the State where it has hospital contracts outstanding) pay hospitals, and other providers of service, except physicians, at the scheduled rates. Then if the amounts remaining over and above administrative costs are insufficient to pay physicians at the scheduled rates, payments to the latter are reduced *prorata*.

This type of arrangement has the advantage that the plan can use all income, except that necessary for administration, to provide benefits to subscribers. It has the great disadvantage that many physicians do not like it. Physicians having rendered service cannot count on receiving any set amount. What they will receive will depend upon the value of the "unit" for that month.

The remaining plans are run on the same basis as the hospital plans. These plans aim to accumulate a reserve to carry them over any temporary period of unfavorable experience and to give them a chance to adjust subscription rates or fee schedules so as to regain a sound financial position. Some of these plans are underwritten by their participating physicians, but the obligation of these physicians to accept reduced payments, if necessary, is looked upon as a secondary line of defense. The plan is glad to have it, but it is operated in such a way as to obviate the need for drawing upon it. The reserve constitutes the first line of defense against adverse experience.

Aside from two or three plans which tend to operate without reserves, the general picture presented by these data is very much the same as in the case of the hospital plans. In the aggregate the plans used 77.2 percent of total income for payment of physicians' fees, 13.9 percent for administration, and 8.9 percent for additions to reserves. (These figures are powerfully weighted by Michigan Medical Service the income of which almost equals that of all the other plans together.)

As compared with the hospital plans, the medical plans seem to show relatively greater variation in the proportion of income used for benefits. This is understandable in the light of the newness of the medical plans and the fact that they are feeling their way, as it were. Some of the plans, the Massachusetts, New York City and New Hampshire plans for example, have pursued a very conservative financial policy; they have wanted to gain experience and to build up a good reserve before liberalizing benefits. In Massachusetts the insurance department, mindful of Michigan's early experience, has forced the plan to pursue a very conservative policy.

Thus far the administrative costs of the medical plans run higher, on the average, than those of the hospital plans. One reason for this is the expense which new medical plans are under to "educate" the profession in their area, to explain the plan to county medical societies, etc., and to persuade physicians to participate. The activities which must be undertaken in this regard are far more extensive than those which a new hospital plan must undertake to win the participation of a limited number of hospitals.

Whether in the long run it will cost more, in terms of percent of income, to administer medical than hospital prepayment, it is difficult to say. Many plan directors think that it will. They base this conclusion on the fact that in processing a hospital bill there is only the one item to be dealt with and the one payment to be made, whereas in a surgical case, for example, there may be bills from three or four physicians for the same case--the surgeon, the assistant, the anesthetist and the radiologist. These plan directors also point out that it costs about the same amount to process a claim whether the amount of the claim be small or large, and that the average

CONFIDENTIAL

BCBSA00289900

claim will be smaller under medical than under hospital prepayment. By the same reasoning it is concluded that the administrative costs under a medical plan providing comprehensive service, wherein there would be a great multitude of small claims or bills to be paid, would be relatively high. Be this as it may, it may be noted that Oregon Physicians' Service and Buffalo, both of which provided relatively comprehensive service, were administered in 1945 for 13.7 and 13.9 percent of income respectively. The plans in the State of Washington, which provide a comprehensive service are said to have administrative costs of seven to eight percent of income.[3]/ Officials of King County Medical Bureau (Seattle) stated that in 1944 their administrative costs were only 6.04 percent of income.

The combined hospital-medical plans, such as Delaware, keep track of income and benefit expense for hospital and medical contracts separately. (Some of them do not report this breakdown in their annual financial reports.) None of these plans, however, make any effort to go into the cost accounting procedures which would be necessary to determine administrative costs separately for the two types of contracts. In calculating the financial status of each type of contract these plans simply apportion their total administrative costs between hospital and medical prepayment on the basis of the income derived from each.

Only one of the combined hospital-medical plans -- Delaware -- sets up a separate bookkeeping reserve for its medical contracts. The other plans simply have the one reserve for both contracts. In all of these plans, Delaware included, from a legal standpoint the plan's total reserve is equally available to back up hospital and medical contracts.

For all of the separate medical plans together, the amount of reserves per participant at the end of 1945 was $.90. This varied among the plans from a minus figure in the case of the Buffalo plan to $1.83 in the case of the Massachusetts and New Jersey plans.

Some comment upon the showing of a few of the plans is in order. The Buffalo plan had experienced a much greater demand for its comprehensive contract covering physicians' services in the home, office and hospital than for the limited surgical contract. However, over the years the number of services utilized per subscriber under the comprehensive contract steadily increased -- the increase in 1945 being such as to result in a substantial deficit for the plan. As a result in January 1946 the plan discontinued further sale of this contract. The experience indicates the lack of settled actuarial knowledge of utilization to be expected under contracts covering home and office calls.

California Physicians' Service began to have an unfavorable financial experience in the early summer of 1944. At the time of the visit to the plan in February 1945, officials of the plan were not certain of the causes for this development. This gave the plan a substantial deficit for its fiscal year ending March 31, 1945. Despite the rate increase installed in the spring of 1945, the unfavorable experience continued and the plan was forced later in 1945 to reduce the unit from $2.25 to $2.00 (par is $2.50).

The showing of the Nebraska plan is probably affected by the fact that the plan was established in November 1944 and that the initial organizational expenses are probably reflected in the 1945 statement.

---

[3]/ It must be borne in mind that in comprehensive plans income per subscriber is relatively high. Hence high administrative costs per subscriber are compatible with a low administrative expense ratio.

CONFIDENTIAL

BCBSA00289901

## CANCELLATIONS

Data on cancellation rates have been obtained from a few plans.  These are presented, along with the comparable rates for the allied hospital plans in Table 33.

<div style="border:1px solid">

### TABLE 33

#### Annual Member Cancellation Rates in Allied Medical and Hospital Plans

(Data for the year 1946 unless otherwise specified)

| PLAN | MEDICAL PLAN | HOSPITAL PLAN |
|------|--------------|---------------|
| DELAWARE | 14.3 | 14.2 |
| KANSAS | 1.5[1] | 2.0[1] |
| ST. LOUIS | 15.3[2] | 17.1[3]<br>10.3[4] |
| NEBRASKA | 20.3 | 14.7 |
| BUFFALO | 21.7[5] | 21.5[5] |
| NEW YORK CITY | 29.9[6] | 23.6[6] |
| ROANOKE | 7.2 | 13.2 |

[1]/For the month of February, 1947

[2]/For the 20 months up to March 1947

[3]/For the period April 1, 1945 to March 30, 1946

[4]/For the period April 1, 1946 to December 31, 1946

[5]/Contract cancellation rates

[6]/These are gross not net cancellation rates, i.e., any change of contract as for example from a husband and wife to a family contract, has been counted as a cancellation.  True net cancellation rates would be considerably lower.  The figures are significant only as regards the relation of the hospital and medical plan rates.

</div>

These data indicate that is some plans the cancellation rates under the two types of plans are very close or identical.  In other plans the medical cancellation rate exceeds the hospital cancellation rate,  and in still other

198

CONFIDENTIAL

BCBSA00289902

plans the reverse is true.[4/]  The available data are so meagre that they hardly provide a basis for generalization.

## UTILIZATION

Few of the medical plans have developed data showing utilization of services. The reason for this is the newness of the plans and the fact that as regards surgery, at any rate, neither an overall case rate or detailed case rates for the multitude of different types of operations are apt to be very meaningful or useful to the plan.

Certain data from the Michigan plan are presented below. (Table 34.)

| TYPE OF SERVICE | NO. OF SERVICES | AMOUNT PAID | SERVICES % TO TOTAL | AMOUNT % TO TOTAL | SERVICES PER 1000 MEM. MOS. | COST PER 1000 MEM. MOS. | SERVICES PER 1000 MEM. YRS. | COST PER 1000 MEM. YRS. |
|---|---|---|---|---|---|---|---|---|
| GENERAL SURGERY | 10,406 | $ 536,887.55 | 4.06 | 5.21 | .46 | $ 23.88 | 5.56 | 286.61 |
| ANESTHESIA | 22,420 | 177,804.50 | 8.75 | 1.73 | 1.00 | 7.91 | 11.97 | 94.92 |
| THORACIC SURGERY | 990 | 40,475.50 | .37 | .39 | .04 | 1.80 | .51 | 21.61 |
| ABDOMINAL SURGERY | 2,566 | 268,837.50 | 1.02 | 2.61 | .11 | 11.96 | 1.37 | 143.52 |
| HERNIOTOMIES | 5,681 | 490,688.00 | 2.22 | 4.76 | .25 | 21.83 | 3.03 | 261.95 |
| APPENDECTOMIES | 18,551 | 1,439,915.60 | 7.24 | 13.98 | .83 | 64.06 | 9.90 | 768.69 |
| CHOLECYSTECTOMIES | 2,716 | 336,966.75 | 1.06 | 3.27 | .12 | .14.99 | 1.45 | 179.89 |
| PROCTOLOGY | 7,193 | 430,498.50 | 2.81 | 4.18 | .32 | 19.15 | 3.84 | 229.82 |
| UROLOGY | 14,003 | 354,627.75 | 5.46 | 3.44 | .62 | 15.78 | 7.48 | 189.32 |
| GYNECOLOGY | 24,746 | 2,340,386.90 | 9.66 | 22.94 | 1.10 | 104.12 | 13.21 | 1,249.40 |
| DELIVERIES | 32,167 | 1,353,792.60 | 12.56 | 12.92 | 1.43 | 60.22 | 17.17 | 722.72 |
| OPHTHALMOLOGY | 1,554 | 102,676.00 | .61 | 1.00 | .07 | 4.57 | .83 | 54.81 |
| OTOLOGY | 713 | 51,950.00 | .28 | .51 | .03 | 2.31 | .38 | 27.73 |
| NOSE AND THROAT | 3,503 | 174,586.75 | 1.36 | 1.69 | .26 | 7.77 | 1.87 | 93.20 |
| TONSILLECTOMIES | 45,731 | 1,155,396.75 | 17.86 | 11.22 | 2.04 | 51.40 | 24.41 | .616.80 |
| NEURO-SURGERY | 1,045 | 65,102.50 | .41 | .63 | .05 | 2.90 | .56 | 34.76 |
| BONE, JOINT AND TENDON | 8,378 | 405,194.00 | 3.27 | 3.93 | .37 | 18.02 | 4.47 | 216.31 |
| X-RAY | 53,789 | 575,673.50 | 21.00 | 5.59 | 2.39 | 25.61 | 28.72 | 307.32 |
| MISCELLANEOUS | 7 | 127.50 | .00 | .00 | .00 | .01 | .00 | .07 |
| | 256,119 | $10,301,588.15 | 100.00 | 100.00 | 11.39 | $458.29 | 136.73 | 5,499.45 |

**TABLE 34**

**Distribution of Services and Payments by Type of Service, Michigan Medical Service, Jan. I, 1943 to Jan. I, 1946***

\* Based on 22,478,448 member months of coverage.

These figures show that during the three years, 1943, 1944 and 1945 surgical services in the field of gynecology constituted the largest source of cost to the plan (22.9 percent of the total), followed by appendectomies

---

4/ Under all or virtually all plans the subscriber cannot obtain medical coverage without having hospital coverage. Hence if enrollment for both coverages were about the same, cancellation rates under the medical plan would always exceed cancellation rates under the hospital plan. However, in a situation where only a proportion of the hospital plan subscribers have medical coverage it is possible for cancellation rates of the hospital plan to exceed those of the medical plan.

CONFIDENTIAL

BCBSA00289903

14.0 percent), deliveries (12.9) and tonsillectomies (11.2) in the order named.  Aside from x-ray service, tonsillectomies constitute the most frequent type of case, constituting 17.9 percent of all cases.

Table 35 presents similar data from the Delaware plan.

<div>

## TABLE 35

### Distribution of Cases and Costs by Type of Procedure, The Delaware Plan, May 1943 - July 1946

(Procedures are listed in order by percent of total paid)

| SURGICAL PROCEDURE | NUMBER CASES | % of TOTAL CASES | CASES PER 10,000 EXPOSURE YEARS | AMOUNT PAID | % OF TOTAL PAID | AMOUNT PAID PER 10,000 EXPOSURE YEARS |
|---|---|---|---|---|---|---|
| FEMALE GENITAL | 1042 | 4.8 | 81.5 | $82878.12 | 14.7 | $6480.32 |
| APPENDECTOMY | 769 | 3.5 | 60.1 | 77091.82 | 13.7 | 6027.88 |
| MATERNITY | 1325 | 6.0 | 103.6 | 67089.49 | 11.9 | 5245.79 |
| X-RAY* | 6840 | 31.2 | 534.8 | 66556.98 | 11.8 | 5204.16 |
| ANESTHESIA | 5762 | 26.3 | 450.5 | 34671.67 | 6.2 | 2711.01 |
| TONSILS AND ADENOIDS | 1244 | 5.7 | 97.3 | 31069.91 | 5.5 | 2429.38 |
| ABDOMEN AND INTESTINES (excludes append. and hernia) | 269 | 1.2 | 21.0 | 29765.82 | 5.3 | 2327.42 |
| FRACTURES | 592 | 2.7 | 46.3 | 27255.78 | 4.8 | 2131.16 |
| SKIN AND TISSUES | 1064 | 4.9 | 83.2 | 22313.46 | 4.0 | 1744.71 |
| RECTUM AND ANUS | 390 | 1.8 | 30.5 | 16419.41 | 2.9 | 1283.85 |
| URINARY SYSTEM | 401 | 1.8 | 31.4 | 16074.32 | 2.9 | 1256.87 |
| EAR, NOSE AND THROAT (excludes tonsils and adenoids) | 328 | 1.5 | 25.6 | 15790.57 | 2.8 | 1234.68 |
| HERNIA | 164 | 0.7 | 12.8 | 13856.32 | 2.5 | 1083.44 |
| REPAIR OPERATIONS | 146 | 0.7 | 11.4 | 11242.30 | 2.0 | 879.05 |
| EYE | 208 | 0.9 | 16.3 | 9793.33 | 1.7 | 765.75 |
| MALE GENITAL | 276 | 1.3 | 21.6 | 7835.65 | 1.4 | 612.68 |
| HEAD AND NECK | 67 | 0.3 | 5.2 | 7580.00 | 1.3 | 592.69 |
| BREAST | 129 | 0.6 | 10.1 | 5479.97 | 1.0 | 428.48 |
| ARTERIES AND VEINS (excludes transfusions) | 111 | 0.5 | 8.7 | 4863.25 | 0.9 | 380.26 |
| TRANSFUSIONS | 418 | 1.9 | 32.7 | 6200.50 | 1.1 | 484.82 |
| CHEST | 57 | 0.3 | 4.5 | 3176.66 | 0.6 | 248.39 |
| MOUTH | 227 | 1.0 | 17.7 | 3287.98 | 0.6 | 257.09 |
| DISLOCATIONS | 39 | 0.2 | 3.0 | 1098.00 | 0.2 | 85.85 |
| AMPUTATIONS | 34 | 0.2 | 2.7 | 1309.66 | 0.2 | 102.40 |
| MISCELLANEOUS | 5 | 0.0 | 0.4 | 156.33 | 0.0 | 12.22 |
| TOTAL | 21907 | 100.0 | 1712.9 | $562857.30 | 100.0 | $44010.36 |

* In case of hospitalized patients the hospital plan paid 50 percent of the x-ray charges in addition to the amount listed here.

</div>

The bulk of the services and costs are for dependents.  The Michigan plan found for the period April 1, 1942 to March 31, 1944 that 31 percent of all payments by the plan were on account of services for subscribers, 69 per-

CONFIDENTIAL

BCBSA00289904

cent for services for dependents. By sex and as between adults and children the showing was as follows:

| | Number of Services | Amount Paid | Percent of Services | Percent of Amount Paid |
|---|---|---|---|---|
| Adult Male | 25,145 | $996,011 | 19.71 | 19.25 |
| Adult Female | 58,657 | 3,022,445 | 45.97 | 58.41 |
| Male Children | 24,966 | 614,991 | 19.56 | 11.88 |
| Female Children | 18,837 | 541,093 | 14.76 | 10.46 |
| Total | 127,605 | $5,174,540 | 100.00 | 100.00 |

The New York City plan reports the following cost of claims for the year 1946 per 1000 contracts and per 1000 subscribers:

| | Per 1,000 contracts | Per 1,000 subscribers |
|---|---|---|
| Individual Male | $1,984 | $1,984 |
| Individual Female | 3,119 | 3,119 |
| Husband and Wife | 5,730 | 2,883 |
| Family | 13,367 | 4,108 |
| Total | $ 6,621 | $3,550 |

## NATIONAL COORDINATION

As previously indicated the medical plans have recently formed a central organization, Associated Medical Care Plans. This organization will perform for the medical plans about the same functions as the Blue Cross Commission performs for the hospital plans.

Any plan organization, currently in operation, which meets the standards for medical care plans of the Council on Medical Service and Public Relations of the American Medical Association is eligible for full membership. Plans in process of organization may become associate members. All legislative power resides in the full members voting in meetings. The officers of the central organization consist of a president, vice-president, treasurer and secretary (the latter office may be filled by the executive director) and nine commissioners. The first four officers are elected for one year terms. Certain of the commissioners first to be elected serve for one or two year terms, but thereafter all commissioners shall serve for three year terms. Three of the commissioners shall be members of the Council on Medical Service and Public Relations of the A.M.A. The commission has employed a full time executive director, and is housed at the headquarters of the American Medical Association.

The central organization is financed by dues paid by full members in the amount of ½ mill per month per participant with a minimum payment of $10.00 per month and a maximum of $250.

The standards of acceptance of the A.M.A. are such that the seal of acceptance could presumably be given to an insurance company the policies and rates of which were approved by a State or local medical society. Because of this many medical plans formerly hesitated to affiliate. The executive di-

CONFIDENTIAL

BCBSA00289905

rector of AMCP has recently been able to give definite assurance to all medical plans that only non-profit plans would be accepted as members. As of April 1947 a large majority of the medical plans then in operation had become members or had applied for membership.

The preliminary standards of acceptance of the Council on Medical Service and Public Relations are quoted in full in Appendix J. As previously indicated, the standards are such that conceivably insurance companies might receive approval. (To date, however, approval has only been given to non-profit plans.) The standards give equal approval to cash indemnity and service plans and make no statement as to which type of plan would be preferable.

CONFIDENTIAL

BCBSA00289906

# PART III

## SOME PROBLEMS OF

## HOSPITAL AND MEDICAL

## PLANS

CONFIDENTIAL

BCBSA00289907

# CHAPTER 21

## SERVICE AND INDEMNITY

An important problem of hospital and medical plans is whether they should provide benefits on a service or indemnity basis.[1]

This problem is not really acute as regards the hospital plans; the plans are mainly on a service basis; there is wide recognition of the value of this basis; present waverings from this basis will probably lead simply to reaffirmation of the service principle and greater efforts to solve the technical problems involved.

It is otherwise as regards the medical plans. Here there is full debate as to whether the plans should be on a service or indemnity basis.

It might seem that discussion of the problem should be confined to the medical plans. Actually the main principles involved are the same for both hospital and medical prepayment and reference to the practical problems in the one field tends to clarify issues and problems in the other.

### SERVICE AND INDEMNITY UNDER HOSPITAL PREPAYMENT

Hospital plans are largely, though not entirely, on a service basis. The exceptions to the service basis are: (a) some plans provide dollar allowances for certain of the special services, e.g., x-ray, and laboratory services; (b) about a quarter of the plans provide a dollar room allowance instead of care in specified accommodations; (c) insofar as subscribers take better accommodations than their contract calls for and pay the difference in room cost, an indemnity element enters in.

The subscribing public certainly wants the privilege of receiving care in better accommodations than are specified in the contract. Aside from this there is every evidence that the public wants benefits on a service basis. Only on such a basis does the subscriber have a definite and adequate protection. Dollar allowances against the cost of any special service or of the special services in general open the door to the possibility that the subscriber, in case he requires an unusual amount of one or more of the special services, may have a large hospital bill to pay.[2]

Similarly the provision of a dollar room allowance instead of care in specified accommodations exposes the subscriber to the possibility of a sizable hospital bill. The room allowance may cover the cost of care in ward or semi-private hospital accommodations or may fall short of it. In a time of rising prices any specified room allowance falls further and further behind hospital charges. Thus the manager of the Kansas plan (which provides

---

[1] By service basis is meant that the plan provides its benefits in the form of service; by indemnity basis that the plan provides certain dollar allowances or credits against the hospital's or physician's charge and the latter have the right of charging extra.

[2] For example one plan recently reported paying a hospital bill of $2,338.10 for a 62 day hospital stay. Eighty-eight percent of the bill was for drugs and dressings. Protection limited to a moderate dollar allowance against the special services would have left this subscriber with a huge bill to pay.

CONFIDENTIAL

BCBSA00289908

a dollar room allowance) writes the member hospitals to the effect that sub-scribers are saying "Blue Cross goes less far year by year." (In 1943 the plan covered 85 percent of the subscriber's bill, in 1945, 80 percent and in 1946, 68 percent.)

The provision of the special services on a service basis is more im-portant than the provision of room and board on that basis. The subscriber cannot know how much of the special services he will need, whereas with a dollar room allowance he can estimate his hospital stay, recognize that in any given accommodations he will have so much extra per day to pay, and can elect his accommodations accordingly. However, service benefits as regards both elements are necessary. Nothing else gives complete and adequate pro-tection against the cost of essential (non-luxury) hospital service.

The provision of service benefits requires cooperation between hospitals and the plan. It requires that hospitals must agree to provide certain benefits to subscribers in return for a specified remuneration from the plan. And the plan must provide fair remuneration to hospitals -- otherwise the arrangement is untenable and breaks down.

The service basis means that hospitals give up the freedom of fixing their charges as they please, and that they accept the responsibility of pro-viding service to the public at rates which are agreed upon between all hos-pitals and the plan as fair and reasonable. A voluntary hospital which re-fuses to accept this responsibility would seem to disregard the obligations which go with its status and purpose.

In the long run the only basis of fair remuneration of hospitals is the cost of providing the service -- either the actual cost of operating the hospital or the cost at which an efficiently operated institution can provide service of a given quality and scope. However -- and this is exceedingly important -- the ability of hospitals to accept remuneration on a cost basis from the plan will depend in large measure upon their receiving remuneration at cost for the care of charity patients and governmental charges. In other words so long as the hospital provides care free or at less than cost to some patients and must finance this care from the receipts from paying patients, then of necessity it must charge these latter more than cost. Only when the care of the indigent is recognized as a responsibility of the community as a whole -- rather than a responsibility of paying hospital patients -- can hos-pitals accept remuneration on a cost basis from plan subscribers and other paying patients. (Unless, of course, the amount of free care given is in-consequential or the hospital can finance free care out of income from endow-ments or from special gifts.)

Once cost as a basis of remuneration is departed from, then there is no firm basis of reference, and remuneration is fixed by a process of bargaining. Under such a situation the plans to protect themselves may find it necessary to provide dollar allowances against the room cost or the special services or both, or hospitals to protect themselves may insist on a basis of remunera-tion which leads to this result. Thus in the long run and to a very con-siderable extent the provision of service benefits is bound up with the as-sumption by the community at large of the responsibility of paying hospitals at cost for service provided to those unable to pay.

### SERVICE AND INDEMNITY UNDER MEDICAL PREPAYMENT

The principles involved here are largely the same as under hospital pre-payment. The practical problems while different are analogous.

— 205

CONFIDENTIAL

BCBSA00289909

There is no doubt that *other things being equal* the public would much prefer the service basis. The other things that have to be equal are that people should have free choice of .physician (a service plan that offers a limited choice of physicians, particularly if it does not offer the services of the better physicians, may be less desirable than an indemnity plan); that, the service arrangement will not affect quality of service adversely; and that the subscription rates (which in effect reflect rates of remuneration to the physicians) are reasonable.

Under the service basis the subscriber has full protection; if he needs medical services covered by his contract he is entitled to them and has no bill to pay. The indemnity basis, on the other hand, gives but an incomplete and uncertain protection. The indemnity allowances afforded may meet the doctor's charge or may fall far short of it. Further the subscriber can never know, until he arranges for service and learns the doctor's charge, how much protection he has. The indemnity arrangement may at times operate to increase the charge to the patient; the doctor knowing that the patient has insurance may charge more than he otherwise would, over and above the indemnity allowance.

.Under the service basis physicians are paid what are decided between the plan and the profession to be fair fees. There is a definite control of doctors' charges. Under the indemnity basis there is no such control and the subscriber-patient is left open to what may be exorbitant charges -- charges such as (to quote some examples recently cited by a physician) "$90 to cystoscopy and pyelography; $175 for an appendectomy on a shop girl; $300 on the line for cystoscopic investigation of dysuria; $500 for a transurethral resection on a man whose income was a little over $500 in his old age."[9]/

The remarks of Mr. George F. Addes, Secretary-Treasurer of the United Automobile Workers (UAW-CIO), in testifying on the Wagner-Murray-Dingell Bill, are to the point here:

> "The hospital service plan has been the more successful of the two Blue Cross plans. (In Michigan the medical plan calls itself a Blue Cross plan.) This success was due to the fact that in most cases total hospital costs have been paid by the Service and only in a limited number of cases has the worker been required to pay an additional amount...
>
> .....The Michigan Medical Service has proved completely inadequate to provide for the medical needs of our members. While we have supported the plan because we have felt it is the best available plan, it has demonstrated to us that voluntary plans are definitely not the answer to the health needs of the American people. The plan has a number of fundamental weaknesses:
>
> • • • • •
>
> (2) It provides only limited protection even for the restricted surgical services. The plan pays the doctor on the basis of an established fee schedule. If the subscriber's own doctor is not a participating member of the plan, he is not bound to accept the fee schedule of the Michigan Medical Service and he may charge any fee which he feels is reasonable and apply the amount received from the Service on his bill.
>
> Where the subscriber's doctor does participate in the plan, he may nevertheless charge the subscriber more than the schedule rate if the income of the subscriber and his family is more than $2500 per year.

---

9/  Cited by Dr. James C. McCann, President of Massachusetts Medical Service, in an address to the House of Delegates of the California Medical Association, California Medicine, July 1946, p. 12.

CONFIDENTIAL

BCBSA00289910

This income limitation provision has completely destroyed the original objective of the plan. For the past four years most of our members have averaged more than $2500 income per year. They have discovered that in a very large proportion of the cases they are billed over and above the amount which the doctor receives from the Michigan Medical Service. So the worker finds that his premium has only partly paid for the limited surgical service which the plan provides.

As an illustration of this development, in 1941 the average cost to a Detroit worker for an appendectomy was $75.00. The Michigan Medical Service provided a $75.00 fee which usually took care of the doctor's entire bill. By 1946 the average cost to the Detroit worker for an appendectomy had risen to $150.00. The worker today finds that after paying his premium to the Michigan Medical Service he still has a $75.00 bill to pay the doctor.

(3) No real effort has been made to safeguard the interest of the subscriber so far as it concerns the amount of the fee charged by the doctor. The plan is controlled by the doctors and I suppose it is only natural that there has been little inclination on their part to remedy the complaints of subscribers." .... 4/

Mr. Addes's figures may be open to question, but there is no doubt that he expresses the feelings of the union members that they would prefer a plan wherein they had a certain and definite protection.

In some ways the indemnity basis is quite satisfactory for the physician. It subjects him to no restraints, leaves him free to charge what he wishes or what the traffic will bear; it provides the least deviation from past usages. However, the indemnity arrangement is unfairly advantageous to the doctor, and by so much is unfair to the patient. For the physician it is a sort of "eat your cake and have it too" arrangement. It puts a floor under his charges but imposes no ceiling. It protects the physician's income rather than the patient's pocketbook.

The service basis has advantages for physicians which compensate for its restraints upon their freedom in the matter of charges. In a sense the profession exists to serve the public and what is good for the public, in the long run, ought also be good for the profession. Prepayment facilitates the collection of charges, cuts down collection losses, enables physicians to secure fair fees from some patients from whom they would, in the absence of prepayment, obtain little or nothing. If prepayment works best and is most attractive to the public on a service basis then, assuming that the profession is equitably remunerated, it should be to the advantage of the profession to have it on this basis.

Another consideration is of importance. An indemnity arrangement is really one between the insuring agency and the insured; the physician is not fundamentally involved in it and therefore really deserves no place in its control. A service plan does involve the physician. By accepting the obligations which go with it, the profession earns the right to share in its control.

## SOME OBSERVATIONS ON INDEMNITY PLANS

Indemnity plans are easy to establish. They can be established without any cooperation or action whatever on the part of the organized profession or individual physicians.

4/ Hearings before the Committee on Education and Labor, U. S. Senate, 79th Congress, Second Session, on S. 1606, Part 4, p. 2020.

CONFIDENTIAL

BCBSA00289911

That prepayment on this basis is readily salable to the public, at least
until something superior is available, is shown by commercial insurance --
surgical expense insurance having been sold to over 9,000,000 people -- and
by the record of some of the non-profit indemnity plans. Thus the Delaware
plan has sold its medical indemnity contract to 36 percent of the population
of the State, and leads all other plans in percent of population of the area
enrolled.

The value of these plans to their subscribers depends primarily upon the
degree of protection afforded, i.e., on the extent to which the indemnity
allowances meet physicians' charges in full. As indicated previously the
Delaware plan on the average is meeting 74 percent of physicians' charges and
the Buffalo and New Hampshire plans, according to data of a year or so ago,
were meeting 76 and 84 percent of total physicians' charges respectively.
Another plan was meeting about 65 percent of charges. From these figures one
may judge that some of these plans are probably giving about the same results
as some of the service-indemnity plans, i. e., they are in effect providing
service benefits to most subscribers of low income.[5/]

Some of the indemnity plans operate on the basis of understandings with
the organized profession of the area which tend to protect their low income
subscribers against the possibility of extra charges by physicians. For
example, in Delaware the State medical society has approved the indemnity
schedule as representing fair fees for patients of moderate income. Thus
though there is no formal restraint on physicians charging extra to low income
patients there may be a certain moral restraint. In Ohio, the State society
is encouraging physicians to accept the indemnity allowances of Ohio Medical
Indemnity as full payment in the case of low income subscribers. There are
one or two other indemnity plans where the same situation exists.

There is some evidence that indemnity plans, providing the allowances
approximate the average level of fees in the area, have a certain tendency to
"set" physicians' charges. The executive directors of some of the indemnity
plans and insurance company officials having to do with medical expense in-
surance report such a tendency. These individuals would, of course, like to
believe that such a tendency exists and to some extent the wish may be father
to the thought.

Any such tendency, if it exists, only comes into play, of course, when a
particular plan (or insurance company) has enrolled an appreciable proportion
of the population of the area. The reasoning is that both doctors and sub-
scribers have the indemnity allowances in mind and that the schedule tends to
become a benchmark for both. Subscribers, it is said, tend to ask their
physician if he will perform the operation for the allowed amount and to show
some partiality for physicians who will give their services without an extra
charge. Some physicians find it competitively worthwhile to let it be known
that they will accept the plan's allowances "clear across the board" and will
make no extra charge to any subscriber. The influence of an indemnity sched-
ule upon physicians' charges is stronger in rural areas and small towns, where
charges tend to be uniform, than in large cities where there is much greater
diversity in charges.[6/]   The writer has talked with physicians in a rural

---

5/ The New Hampshire plan comes nearer to covering physicians' charges in full than the New Jersey
plan (80 percent in Nov.-Dec. 1945), but this does not indicate that an indemnity plan in New Jersey
would give higher coverage or that a service-indemnity plan in New Hampshire might not give still
better coverage than the indemnity plan.

6/ Or, at any rate, an indemnity plan will tend to give better coverage of physicians' charges in a
rural area where fees are uniform, than in an urban area.

CONFIDENTIAL

BCBSA00289912

state who were reluctant to participate in the indemnity plan of that state because they were certain it would "fix" their charges.

Whatever the natural effect of an indemnity plan upon doctors' charges may be, such a plan could do much to protect subscribers from extra charges by (a) publicizing its fee schedule, (b) urging subscribers to ask the physician ahead of time what his charge is going to be, and (c) publishing the names of those physicians who agree to accept the plan's allowances as full payment. However, such a program is unlikely in a plan controlled by the medical profession.

The big disadvantage of indemnity plans is that they do not give definite or complete protection. No matter what the average relationship of the plan's allowances to physicians' charges may be, instances do occur under these plans where subscribers of low income are charged fees double or even triple the allowances of the plan.

This defect can only be cured by the plan going on to a service basis. The average degree of coverage of physicians' charges can be increased by raising the plan's scheduled allowances. But to some physicians such an increase would only be an invitation to raise their own charges still higher. If full protection is to be given there must be agreement on the part of physicians to accept certain amounts as full payment for their services.

It is of significance that the executive directors and some of the physician board members of some of the more successful indemnity plans are thinking and hoping that in time their plans can be placed upon a service basis -- either for all subscribers or for all except those of quite high income. Other factors suggest that the indemnity basis may be an unstable one. The appetite for prepayment grows by what it feeds upon: the more the subscribing public becomes familiar with these plans the more it is likely to demand complete protection. If these plans grow and enroll a large proportion of the population of the area, sooner or later the question would come up, why not increase the allowances and have physicians accept them as full payment. Again, if and when a plan achieves a large coverage of the population of its area its schedule of indemnity allowances is bound to be a prime factor in the medical economics of the area. The profession would certainly wish to have a voice in the determination of this schedule as "fair". But if the allowances do represent "fair" charges either for all subscribers or for those under certain income levels then the question arises as to why physicians should be permitted to charge extra.

## SOME OBSERVATIONS RELATIVE TO SERVICE PLANS

Plans operating on a service basis are more difficult to establish than indemnity plans. Service plans require the cooperation of the profession. If the profession will not give this cooperation then only indemnity plans can be established. Thus far only in a few States or areas has the profession been willing to cooperate in a plan providing service benefits to all subscribers irrespective of income.

A service plan cuts across the previously existing usages and customs of the profession. A full service plan, of course, does away with the sliding scale of charges -- the adjusting of charges to the patient's means.

### PROBLEMS OF FAIR REMUNERATION UNDER A SERVICE PLAN

A service plan cannot work unless it provides fair remuneration to all physicians. Any scheme of fair remuneration must take quality of service in-

<div align="center">209</div>

BCBSA00289913

to account; it must permit the more experienced and qualified physicians to earn the higher incomes to which they are entitled. A fee schedule which is uniform for all physicians assumes that the services of all physicians are of equal value. The only way in which the more qualified physician can earn a higher income is by performing those services which give a higher return per unit of time required, or by performing a larger volume of service.

The prevailing differences in charges as between specialists and general practitioners in certain fields, e. g., obstetrics, suggest that a service plan, if it is to gain the participation of all or virtually all physicians, may find it necessary in certain fields to pay higher fees to qualified specialists than to non-specialists. The practices under a few existing plans tend to confirm this. Thus Massachusetts Medical Service provides that a subscriber (under the income limits for service benefits) is only entitled to service benefits for obstetrical care if she is delivered by a general practitioner; qualified obstetricians may levy a specified extra charge. Thus, this plan in effect provides for differential remuneration of specialists and general practitioners in this field. The King County (Seattle) plan has experimented with payment of extra fees to internists. The New York City service-indemnity plan under its experimental comprehensive contracts pays higher fees to qualified specialists, for services within the field of their speciality, than to general practitioners, this differential applying to virtually all of the specialties other than surgery.[7/]

Just how far it might be necessary to go in providing differential remuneration to qualified specialists and to non-specialists is not clear. This for example might not be necessary in certain fields, possibly surgery. It is possible that here, because a large proportion of the work is performed by specialists, the prevailing fees tend to be what specialists ordinarily charge.

To be successful service plans must enable the exceptionally skilled or talented physician to earn the higher remuneration to which he is entitled. The payment of higher fees to qualified specialists (for services in the field of their speciality) will aid in this direction. It is also necessary that the fee schedule of the plan should provide adequate remuneration for the more difficult and complex procedures in relation to the fees paid for the less difficult or complex procedures. Some of the present plans fail to do this.

For example, there is in the mind of surgeons a relative value between a simple appendectomy and a complicated procedure such as a lung resection. Many of the present plans have a top fee of $150 for any procedure. Many also pay $75 for an appendectomy. If the fee for an appendectomy is fair, the fees paid for the more complicated surgical procedures are (by relation) unfairly low. The fees for these complicated procedures -- which are relatively infrequent in incidence -- will need to be increased if the plan is to provide fair remuneration to the exceptionally talented physicians who tend to perform most of these procedures.

## NON-PARTICIPATING PHYSICIANS

It is doubtful if any service plan will work 100 percent upon a service basis. It is likely that there will always be some physicians, who may or

---

7/ Under the EMIC program in certain States qualified specialists in obstetrics are paid higher fees for maternity care than are non-specialists.

CONFIDENTIAL

BCBSA00289914

may not be of outstanding competence, who because of their reputation can charge (and collect) fees that are higher than those which a service plan would pay. These physicians will not find it worthwhile to participate and the only way in which a service plan can offer the services of these men to its subscribers would be through the provision of dollar allowances, equal to or somewhat less than the fees payable to participating physicians. Under a service plan, participating and non-participating physicians will be in competition, and subscribers will, other things being equal, prefer to receive service from participating physicians. In the long run, if a plan publicizes its list of participating physicians, and if it makes non-participating physicians collect their own fees (by paying the dollar allowance to the subscriber and not to the physician) the number of physicians who can afford not to participate will be small.

### SOME DIFFICULTIES OF SERVICE PLANS

There are difficulties, other than those already mentioned, which confront service plans. One difficulty is the intense individualism of the profession. The individual physician feels that it is his prerogative to set his own fees and dislikes having any group even his own profession, "fix his fees." There is also the difficulty of securing agreement on a particular fee schedule. Some plans serve rural and urban areas. A fee schedule appropriate for the one may be a little low for the other. Each specialty group has its own ideas as to the value of its services, this value frequently being higher than that which other specialty groups believe warranted. The difficulty of reaching agreement on a fee schedule is obviously much greater under a service than under an indemnity plan, because under the former the plan's fee is all the doctor gets.

Another obstacle is the large number of individuals whose cooperation must be won. A hospital plan has to secure agreement only from a limited number of hospitals -- say 20 to 50. But a medical plan has to win the participation of hundreds or thousands of physicians.

The war years have been difficult ones for the establishment of service plans. The shortage of physicians and the high incomes of the public resulted in a "sellers" market. Physicians were able to demand and collect good fees. Because physicians had more patients than they could handle there was little incentive for them to enter a service plan with the idea that such a plan might increase the number of paying patients. As the medical situation reverts to normal more physicians will be willing to accept the obligations that go with a service plan in order to reap the benefits.

But the big difficulty in the way of the adoption or successful operation of service plans has been securing the necessary support and cooperation of the profession. Physicians have not had an adequate understanding of the potential benefits of prepayment to themselves and to the public. They have felt that a service plan was wrong in principle or have been fearful that it might diminish their incomes.

In brief, there are substantial practical difficulties in the way of establishment of service plans. If and when the medical profession believes wholeheartedly that prepayment will be advantageous to the public and itself, these difficulties can be overcome. Medical prepayment on a service basis is more than a fiscal undertaking. It is an arrangement under which the combined funds of a group of people are used for the provision of medical service to this group. It involves new habits, new ways of cooperation on the part of

211

CONFIDENTIAL

BCBSA00289915

both the public and the profession.  Education of both groups is essential.
A plan cannot succeed until both groups are ready to make the effort to make
it work.

## SOME OBSERVATIONS RELATIVE TO SERVICE-INDEMNITY PLANS

At present the bulk of the subscribers to medical plans are in the serv-
ice-indemnity plans.  If numbers are an indication these plans consitute the
more successful type of plan at the moment.  The advantage of these plans
over the indemnity plans is that they guarantee service benefits to a portion
of the subscribers.  How much an advantage this is depends upon the propor-
tion of subscribers entitled to service benefits, the proportion of the
physicians of the area who are participating and the extent to which sub-
scribers entitled to service benefits actually receive them.

Under a few of the plans with relatively high income limits for service
benefits, a large proportion of the subscribers or potential subscribers will
be entitled to service benefits.  Under the plans with low income limits,
say, $2500 for a family, only a small portion of the subscribers will be so
entitled.  When the Michigan plan was first organized it was estimated that
80 percent of the subscribers would be entitled to service benefits.  At
present income limits probably not more than 10 or 20 percent of the sub-
scribers come under the plan's income limits for service benefits.

The same shift has taken place with the other plans.  Only one plan,
Massachusetts, has raised its original ceiling for service benefits.  As
a result of the increase in income levels all of these plans are on more of
an indemnity basis than when they were first started.  Indeed the description
of certain of these plans as "service" plans is misleading.  The "service"
element has become so diluted that the plans are really indemnity plans.

Against the advantage, greater or less, which accrues to these plans by
virtue of the provision of service benefits to some subscribers, are certain
disadvantages.

1.  Insofar as the plans are on an indemnity basis they are a particu-
larly bad type of indemnity plan in that generally the subscriber's contract
does not contain a schedule of indemnity allowances, and hence the subscriber
does not know just what he is entitled to by way of credits against the
doctor's charge.

There is a certain praiseworthy frankness about a straight indemnity
plan.  The subscriber knows that he is entitled simply to certain dollar al-
lowances.  The subscriber knows what these are and he can make his bargain
with the doctor accordingly.  He is, so to speak, put on guard.  The service-
indemnity plans, on the other hand, which do not contain any schedule of in-
demnity allowances in the contract, give the subscriber a false security.
The whole form of the contract, the talk about the plan being a "service"
plan, leads him to expect that he will not be subject to an extra charge.
These contracts give the impression of promising more than they actually
deliver.

From this point of view those service-indemnity plans, which put a
schedule of indemnity allowances in the contract together with a statement
that participating physicians have agreed to accept these amounts as full
payment for those under certain income limits, are on a better basis.

2.  Any differentiation between those entitled or not entitled to service
benefits on the basis of certain income limits is bound to be unfair and

CONFIDENTIAL

BCBSA00289916

arbitrary in certain cases.  Thus under some plans a man and wife with an in-
come of $2400 would be entitled to service benefits, but a man and wife with
three children and an income of $2600 would not be so entitled.

3.  It is difficult for the plans to guard against additional charges to
patients entitled to service-benefits.  It is not practical for the plan to
secure and maintain any record of the subscriber's current income.  Any in-
formation as to income, which the plan may request of the subscriber at the
time of joining, soon becomes out-of-date.  Hence, it is really up to the
physician and the patient to enforce the service provision.  To avoid the
possibility of an extra charge the physician must ask the patient what his
income is.  Many physicians dislike to do this and some patients may re-
sent it.  However, if the physician does not inquire what the subscriber's
income is and if the subscriber does not volunteer this information to the
physician, an extra charge may readily occur.[8]

4.  In some respects a service-indemnity plan is more difficult to
present successfully to the public than either a straight indemnity or a
straight service plan would be.  People dislike discriminations based on in-
come.  The idea that some subscribers are entitled to one type of benefit
whereas others are entitled to another type may alienate some potential sub-
scribers.  Salesmen of the Michigan plan frequently present this plan to
potential subscriber groups as a straight indemnity plan.  In many groups so
few persons would be entitled to service benefits that it is felt wiser to
delete all mention of the "service" feature.

5.  Under some of the service-indemnity plans there is serious complaint
from subscribers, just over the income limits for service benefits, of extra
charges by physicians.  This last point and some of the others are well il-
lustrated by the following remarks of Dr. Atha Thomas, the president of
Colorado Medical Service.  He was speaking to members of the Denver Medical
Society.

> "....I wish to bring to your attention a major problem that is of vital
> concern to the Plan and to you.  The growth of Colorado Medical Service during
> the past four years has been very gratifying....
>
> "On the other hand, cancellations at the request of subscribers in the
> past year number 17,000.  This is a disturbing figure as it represents a larger
> percentage of cancellations than in the past.  It is particularly disturbing in
> that many of these subscribers have cancelled their Colorado Medical Service but
> not their Blue Cross contracts.
>
> "We have discussed with you on numerous occasions the problem of the par-
> ticipating physicians; committees have been appointed by the specialty groups to
> make adjustments in the fee schedules, and we have otherwise made requested
> changes which are of benefit to the doctors.  Rarely, however, have we discussed
> with you the Plan from the standpoint of benefits to the subscriber.  I am
> bringing this problem to you because the time is fast approaching – if not al-
> ready here – when we must answer to the subscriber as to whether or not he
> actually benefits by being a member of the Colorado Medical Service.  Illus-
> trative of this problem, let me quote from a letter recently received from the

---

[8]  The Virginia plan (and possibly some others) uses the following device.  Physicians are required
to send their total bill to the plan, no bill being sent directly to the patient.  The plan notes on
a copy of this bill the amount of its payment to the physician and sends this to the patient with a
slip enclosed to the effect that no extra charge needs to be paid if the subscriber's income is below
the specified levels.

213

CONFIDENTIAL

BCBSA00289917

head of a concern whose employes make up one of our large subscriber groups, and who, incidentally, is an enthusiastic supporter of the Plan:

"'I wish to call to your attention a matter of some concern to me. It may be that I just happened to be in the way recently to receive what seems to me an increasing number of reports of unhappiness by Medical Service policyholders over alleged overcharges for services by participating physicians. A number of these instances have been mentioned by our employes which reminds me that perhaps we should do something to educate policyholders at least among the folks at our company, on the important question of 'How to Buy an Operation.' Perhaps some of the comment has been created by the recent poll of our employes to adopt the Comprehensive Blue Cross Plan. At that time a number of remarks were made. A typical one was 'Blue Cross service is all right, but if they were to raise the Surgical Plan even a dime, it would only give me an excuse to drop my surgical insurance...'"

"Recently committees from the Denver Police and Fire Department called the Office of Colorado Medical Service to discuss this same problem. They complained about the excessive surgical fees charged beyond the amount paid by Colorado Medical Service. The only statement that we could make in reply to this complaint was that any employe having surgery performed could expect to be charged an additional amount by his doctor if his income is over the specified limit, which, in the Police Department at present, is the case with the majority of their employes. Following this incident, there was a large cancellation of Surgical Plan subscribers from the Police Department, and we are further advised that we may expect similar action from the Fire Department.

"The Bureau of Reclamation, the largest group enrolled under the Surgical Plan, has also informed us through their group leaders that the plan is not favored because in their opinion it gives financial protection to the doctor but not to the patient. They have arrived at this conclusion through their own experience. They charge discrimination against the subscribers in the efforts of the Colorado Medical Service to protect the doctor financially.

"Because of the fact that the additional charges made by many doctors are considered by both the patient and his employer as exorbitant, some employers have insisted that the employe consult them before he resorts to surgical treatment in order that they may advise the employe as to what doctors are making these so-called exorbitant fees. This in our opinion is effecting a black list of physicians and is a very undesirable practice; yet it is justified in the opinion of the employer. The rumblings of these charges are to be heard in any group of Colorado Medical Service subscribers, and they are getting louder every day. Cancellations of Surgical Plan contracts are getting heavier because of these complaints.

"This plan is sold to subscribers as the doctors' own plan, initiated and sponsored by organized medicine, and for that reason is presented as superior to any commercial indemnity insurance and we know that it is superior. It is a service plan through which we promise persons in low income brackets that their surgery is to be paid in full. Because of post-war inflation this same group of people which constitute the greater proportion of our subscribers have had salary increases. These increases have not really taken them out of the low income group, but merely put them over the income limits of Colorado Medical Service. These brackets were made in 1939 when it was estimated that 75 percent of the employed people would be under this limit. A large percentage of our present subscribers enroled in the plan when their wages were in this income limit, and even though their wages have been raised, they are actually poorer now than they were then, because of the tremendous increase in the cost of

CONFIDENTIAL

BCBSA00289918

living.  Imagine then how they feel after an operation, to learn that they are
expected to pay considerably more than the prescribed fee paid by Colorado Medi-
cal Service!  As a result, it is difficult to convince them that they have bene-
fitted in any way by belonging to the Colorado Medical Service.  We are not asking
for any action or decision on this problem by the Society at this time, but we
do wish to call it to your attention, because we feel dire consequences will
result unless more consideration is given these subscribers by participating
physicians."[9]/

It is the writer's belief that the problem here stressed, that of com-
plaint against extra charges from subscribers with incomes just over the in-
come limits for service benefits, confronts other service-indemnity plans.
This is certainly true of the Michigan plan.  The very nature of the service-
indemnity plan breeds these complaints.  In the press of mass selling, many
subscribers above the income limits for service benefits are apt to receive
the notion that they are entitled to service benefits.  The fact that some
subscribers are entitled to service-benefits makes others, little better off
economically, desire the same benefits.  The very nature of the contract, the
stress upon "service", the fact that there is no indemnity schedule in the
contract, gives people the idea that they are entitled to service as needed
and makes them dissatisfied when they are charged extra.[10]/

There are three ways by which service-indemnity plans can meet the situa-
tion outlined.  One is to shift to a straight indemnity basis, a move which
is hardly likely to impress the public as being in its interest.  The second
is to raise the income limits for service benefits.  This latter step will
alleviate the problem somewhat, but will project the issues and the complaint
to a new, higher-income, group of subscribers.  It would seem that the only
final solution would lie in putting the plan on a full service basis, i. e.,
service benefits for all regardless of income.

It is evident from all this that the service-indemnity basis, as a sort
of half way house between indemnity and service, has serious defects.  By
calling attention to these defects the writer does not mean to imply that
these plans are not more valuable to their subscribers than straight indemnity
plans would be.[11]/  By and large they probably are more valuable.  But they
are, it seems to the writer, an unstable arrangement; their operation gener-
ates forces which are likely, sooner or later, to result in their being placed
upon a full service basis.

### SERVICE BENEFITS FOR ALL SUBSCRIBERS

In the long run if medical plans are to meet the needs of the public
it would seem that they would have to be placed on a full service basis.

---

9/   Editorial, Rocky Mountain Medical Journal, January, 1947.  Quoted in Public Health Economics,
(School of Public Health, University of Michigan) March 1947, pp. 186-188.

10/  It is of interest that the straight indemnity plans do not report any widespread complaint from
physicians.  These plans make it quite clear what the subscriber is entitled to.  They do not promise
more than they deliver.

11/  *The value of service-indemnity plans to their subscribers cannot be determined without data show-
ing the proportion of cases in which subscribers receive service benefits, and as regards cases in
which there is an extra charge, the extent to which plan payments meet total charges.  Apparently
there is not a single one of the service-indemnity plans which is now compiling such data.
The indemnity plans need the same type of data for any evaluation of their usefulness.  Only one
of these plans is routinely compiling this information.*

CONFIDENTIAL                                                                   BCBSA00289919

Such a step would make the plans far more attractive to the public. It would enormously simplify promotion and sales effort. Also in the long run the plans will be more likely to succeed from the standpoint of the interest and backing of the profession if the prepayment effort is an all out one.

The extension of service benefits to all income groups would require the provision of fair and adequate remuneration to the profession and the ability of the plan to enroll a cross-section of the population. If a certain level of fees (as indicated by a fee of, say, $75 for a simple appendectomy) gives fair remuneration to the profession under a plan with an income ceiling for service benefits such that, say, half of the population is entitled to service benefits, then a certain higher level of fees (as might be indicated by a fee of $85 or $90 for a simple appendectomy) would provide fair remuneration if all income groups were entitled to service benefits. This matter would be affected by current practices with regard to payment for care of the indigent. If physicians in an area are expected to provide care for the indigent without remuneration then the level of fees under a plan providing service benefits to all income groups would have to be higher than under a situation in which physicians were fairly and adequately paid for their services to the indigent.

The plan must also be able to enroll a fair cross-section of the population and convince the medical profession of its ability to do this. If fees are set at a level which would give the profession a fair income if a cross-section of the population joined, but actually enrollment was mainly among high income groups, the profession would tend to lose income. The profession would be accepting lower fees than it now secures from the higher income group, without the compensation of receiving higher fees than it now receives from the lower income group.

Some idea of what would be involved in placing some of the present indemnity and service-indemnity plans upon a full service basis can be gained by considering the present experience of these plans. The Delaware plan is now meeting about 74 percent of the aggregate charges to subscribers. To meet the aggregate of doctors' charges in full it would be necessary to increase the fee schedule by about a third. The analogous figures for the Buffalo, New Jersey and New Hampshire plans are 32, 25 and 19 percent, respectively. Actually, since physicians do not collect their full charges by a considerable margin, no such increases would be required in order to give the profession as a whole the same average income per patient as it is now receiving. Further it must also be taken into consideration that the operation of a prepayment plan enables physicians to secure a fair fee from many subscriber-patients from whom they would otherwise obtain little or nothing. The decision as to what increase, if any, would be necessary needs to be made in the light of what fee schedule would be necessary to provide adequate remuneration to the profession as a whole. In some cases the present plans could probably be placed upon a full service basis without any increase in the fee schedule; in other cases some increase, but less than that required to meet present average charges in full, would be required.

CONFIDENTIAL

BCBSA00289920

## CONCLUSIONS

1.  Hospital and medical plans should provide their benefits in the form of service rather than in the form of indemnity allowances.  Only on a service basis can the plans adequately meet the needs of the public.

2.  Prepayment on a service basis requires fair and adequate remuneration of hospitals and physicians.  It requires the full cooperation of both and their desire to make prepayment work.

3.  The provision of fair compensation to physicians probably requires differential remuneration of qualified specialists (for services within the field of their specialty) and non-specialists. It requires also that the more difficult procedures shall be adequately compensated relative to the less difficult ones.

4.  Indemnity and service-indemnity medical plans are unstable arrangements. Their operation generates forces which press towards placing the plans upon a full service basis.  Both types of plans have defects which can only be eliminated by their transformation into full service plans.

CONFIDENTIAL

BCBSA00289921