FILED

2017 Jul-17  PM 07:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 2



Cunningham

# The Blues

## A History of the Blue Cross and Blue Shield System

Northern
Illinois

BCBSA00292643

# The Blues

BCBSA00292644

Robert Cunningham III and Robert M. Cunningham Jr.

Foreword by Rosemary A. Stevens

# The Blues

## A History of the Blue Cross and Blue Shield System

NORTHERN ILLINOIS

UNIVERSITY

PRESS

DEKALB

1997

BCBSA00292645

© 1997 by Blue Cross and Blue Shield Association.

All rights reserved.

Published by the Northern Illinois University Press,

DeKalb, Illinois 60115

Manufactured in the United States using acid-free paper

Design by Julia Fauci

Blue Cross®, Blue Shield®, and the Cross and Shield
symbols are Registered Marks of the Blue Cross Blue Shield
Association, an Association of Independent Blue Cross and
Blue Shield Plans.

Library of Congress Cataloging-in-Publication Data
Cunningham, Robert, III.
The blues: a history of the Blue Cross and Blue Shield system
/ Robert Cunningham, III and Robert M. Cunningham, Jr.
: foreword by Rosemary A. Stevens.
p.  cm.
Includes bibliographical references and index.
ISBN 0-87580-224-9 (alk. paper)
1. Blue Cross and Blue Shield Association—History.
2. Insurance, Health—United States—History.  3. Insurance
companies—United States—History.  I. Cunningham,
Robert M. (Robert Maris), 1909–.  II. Title.
HG9398.B57C86   1997
368.38'2'006573—dc2196-54810
CIP

BCBSA00292646

# Contents

1 Prepayment Pioneers   3

2 The Doctors' Dilemma   34

Foreword  vii

3 The 1940s: Challenges of Growth   56

Acknowledgments  xiii

4 The 1950s: Burdens of Leadership   88

5 The Double Bind: Health Care for the Elderly   118

Glossary   255

6 The Intermediaries   145

Notes   265

7 The 1970s: Accountability and Discontent   171

Works Cited   287

8 The 1980s: Swimming with the Sharks   200

Index   301

9 Old Wine, New Bottles   235

BCBSA00292647

# Foreword

Rosemary A. Stevens

BLUE CROSS AND BLUE SHIELD PLANS, collectively, have shaped the economics and politics of health care in the United States, from the 1930s to the present. They are a uniquely American phenomenon. Formed out of pragmatic grassroots approaches to financing hospital and physician services between the late 1920s and 1940s, with a strong service and community rhetoric, the Plans became transformed into a powerful national force. The Blues are now a multibillion dollar industry, competing head-on with commercial insurance corporations and self–insuring health care systems. They provide health care coverage for tens of millions of individuals. They run the nation's largest managed care network. Along the way, the Plans became major agents for huge federal programs for the health insurance of government employees and their dependents and, through Medicare, for virtually all of the elderly in the United States. The Blue Cross and Blue Shield Association is embedded in national politics in the United States. Quite simply, one cannot understand the peculiar, constantly evolving, even Byzantine challenges of health care organization and financing in the United States in the twentieth century without also understanding the role, the changes, and the continuing dilemmas of Blue Cross and Blue Shield Plans, past and present.

The first and most obvious historical observation to be made about the Blue Cross and Blue Shield movement is that if the United States had developed health insurance under government auspices, as was the case in most advanced industrial nations well before the 1920s, there would have been little reason for these Plans to exist. This is no idle observation, for the various cases for and against federal and/or state health insurance interweave throughout the Plans' history, as this book shows quite clearly. For a few years of progressive optimism, between 1915 and 1920, government-sponsored health insurance seemed a practical possibility in the United States, as it has on other occasions; four states had reports in favor of state health insurance at the beginning of 1920: California, New Jersey, Ohio, and New York.[1] In this

BCBSA00292648

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 8 of 182

earlier period, as on later occasions, the political tide soon turned. Although the United States eventually did legislate, in 1965, a limited but crucial form of national health insurance—Medicare—the history of health care in the United States is a complex, barreling story of how this rich and powerful nation could (and can) get along without a government plan for health care coverage for the majority or the whole of the population.

But Blue Cross and Blue Shield Plans are not only major players in the history of health care policy in the United States: they have wider implications. Throughout this century, medicine has held enormous economic and symbolic importance in the United States. Americans are proud of the assertion (however true) that their country has the "best medicine in the world." One out of every seven dollars spent in the United States is dedicated to our huge, diverse health care system. The Blues, as longtime influential insurers in this system with ties both to private for-profit enterprise and to government, are exemplars of themes that distinguish the more general history of the United States: the commitment to private solutions to public needs, buttressed by strong support from government; the belief in local initiative wherever possible, rather than distant control from corporate headquarters or from Washington; the adaptability of successful organizations to technological, political, and economic change and their eager exploitation of such change; the impact of able, often flamboyant leaders; and the permeability of boundaries between business corporations, nonprofit organizations, and governmental entities. All of these themes can be found in this book.

In the 1920s the consumer market boomed. Health care became a recognized commodity. Hospitals rapidly expanded their services to the new, affluent, middle-class market, making this a decade of exuberant growth—a growth too large, as it turned out. One-third of all hospital beds lay empty in 1929 (a similar proportion as today). Over the decade, a major hallmark of American medicine was set: the commitment to technological enthusiasm, reflected in high rates of surgery for those who could afford it and an abundance of diagnostic tests.[2] It was in this environment that Justin Ford Kimball developed the plan for Baylor Hospital in Dallas, which was to become known as the first expression of the Blue Cross movement. Kimball was a creative pragmatist; Baylor was in financial straits, only thirty days ahead of the sheriff. Kimball's genius—along with that of Bryce Twitty, who was instrumental in publicizing the program—was to draw on the experience of earlier private health insurance ventures (in the lumber business, for example) and extend the concept to actuarially designed coverage of other working populations.

The essential role of private health insurance as the broker of health care in the United States forms a second major theme of this book. Blue Cross Plans (originally for hospital insurance) and the later Blue Shield Plans (originally for physician insurance) were true "third parties." By drawing their clientele from populations of employees in an insurance system that was characteristically employee-based from the beginning, the Plans have remained organizationally independent of the corporations that employ these individuals. The

BCBSA00292649

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 9 of 182

growing involvement of for-profit insurers in health care after World War II—spurred on by federal fringe-benefit policy and by leadership of major unions, notably in the vast steel and automobile industries—built on the success of the Blue Cross and Blue Shield system of independent Plans in this respect. Both types of health coverage providers rode the crest of expansionism in the postwar decades, neck and neck. While only 9 percent of the U.S. population was covered for hospital insurance in 1940, 81 percent had coverage by 1966.[3] Simultaneously (in the terminology of the 1990s), both the (then) nonprofit Blue Cross and Blue Shield Plans and their competitors, the commercial insurers, changed and expanded their insurance products in order to extend their market share. And the growth has continued. Private health insurers, in the aggregate, currently channel about $300 billion annually to health care providers.[4] The United States is the home of a huge, tumultuous, independent health insurance industry; and at the center of this industry are the Blue Cross and Blue Shield Plans.

A third theme is the relationship, both actual and perceived, between the Blue Cross and Blue Shield Plans and the providers of services, in the past chiefly hospitals and doctors but now an array of providers through managed care organizations. The early leaders of Blue Cross Plans were extraordinary, bold individuals connected in some way with hospitals, who sought workable solutions to the problems of hospital costs for the working population in the 1930s. After the booming 1920s came the ravages of the Great Depression. Hospital admissions fell, the number of patients unable to pay their bills increased, and revenue plummeted. Hard times, wrote a contemporary hospital analyst, "are clutching the hospitals like a giant pair of pincers."[5] Probably, irrespective of the Depression, hospital insurance would have received some attention in the 1930s, but practical issues of survival—by both hospitals and patients—made the situation desperate.

The blue-ribbon Committee on the Costs of Medical Care (CCMC), sponsored by private foundations, quite naturally assumed that patients were consumers of medical care whose costs must be shared across large populations, since the erratic (and increasingly expensive) specter of sickness could not readily be assumed as an individual risk. Making health insurance "compulsory as a general program for the United States" seemed impractical to this group, as to others in the 1930s.[6] Although strong efforts were made to include compulsory health insurance in the Social Security Act of 1935, through the Wagner proposals in 1939 and the Wagner-Murray-Dingell bills in the 1940s, there was no alternative (or competitor) to private efforts. Men like Frank Van Dyk in New Jersey, E. A. van Steenwyk in St. Paul, and John Mannix in Cleveland (together with many others) created local and regional opportunities to actuarialize the costs of hospital care through cooperative efforts among hospitals, doctors, and community leaders. The early Plans were tailored by local leaders for perceived local needs. For this generation of pioneers, the development of "group prepayment" was a crusade that joined entrepreneurial and communitarian objectives while increasing the revenue of the hospitals they served.

BCBSA00292650

The Depression affected doctors' incomes as well as everyone else's, and the early opposition by medical groups to private health insurance geared to hospitals reflected understandable hostility to the threat of hospitals as powerful, potentially monopolistic organizations—as the seat of salaried positions for doctors that might undercut private practice, and as direct competitors for the patient's purse. As this book demonstrates, the conflict was eventually resolved in two ways, both of which entailed long-term ramifications. The first was the publication in 1934 of a set of standards to be upheld by all plans approved by the American Hospital Association (AHA), which was then supervising the hospital prepayment plans.[7] With a view to extending the movement in an organized framework, the hospital organization appointed C. Rufus Rorem, who had previously worked for the Committee on the Costs of Medical Care, as its national consultant on prepayment plans. Rorem became the director of the AHA's Committee on Hospital Service, the forerunner of the Blue Cross Commission. (The national organization is now the Blue Cross and Blue Shield Association.)

These standards, or "essentials," went out of their way to allay the fears of organized medicine. Plans were presented as quasi-public in role, with defined service areas and as cooperative local forces that would enable hospitals and doctors to work harmoniously together. Most telling in terms of the 1930s rules is that approved Blue Cross Plans were for years required to exclude the attending physician's fees and to confirm the right of all physicians to have hospital appointments. The way was thus open for physicians to develop a parallel set of insurance plans at the local or state level, with no necessary coordination with hospital insurance.

By extension, then, the second approach to accommodation between hospitals and doctors in the 1930s and 1940s was the development of the Blue Shield Plans. California Physicians' Service, begun in 1939, was the first full-fledged example of a medical society–sponsored plan. Although tensions and sometimes out-and-out hostilities (conflicts that are well documented in this book) between the two types of organization continued for many years at both local and national levels, the overall success of both types of organization—if through rocky passages on occasion—must be credited to their incremental, pragmatic, and mutually reinforcing gestation. The two organizations came together at the national level in 1982.

A fascinating aspect of this history from the perspective of the 1990s (and a fourth major theme of the book) is the recurring nature of many of the ideas built into the older versions of the Blue Plans, despite major shifts in philosophy, role, and scope. The Blue Cross and Blue Shield Association has recently reinforced the idea of strong standards for all Plans, in the form of restructured licenses for the Blue Cross and Blue Shield names and marks. Although, after deep internal divisions within the organization, the insistence on nonprofit status for the Plans was dropped in 1994, the basic commitment to service benefits rather than indemnity insurance has strengthened in the last few years through the focus on managed care. The importance of the local population, built into the very structure of the Blue Cross and Blue Shield organization,

BCBSA00292651

which remains a diverse federation of independent licensed Plans and affiliates, has gained new strength. Modern information systems allow the Blues system to function as a national network—a major goal of the organization since World War II. Community rating (spreading the insurance risk through standard premiums across populations of the healthy and the sick), rather than segmenting populations by relative risk, seemed an increasingly old-fashioned, even moribund concept from the 1940s through the 1980s but reemerged in the 1990s, albeit in modified forms, as key to the development of an effective private alternative to government health reform proposals. And the early special connections with providers, roundly criticized as unfair competition in the 1980s, have become transmuted into doctrines of preferred providers, selective contracting, and managed care—doctrines that are now generally embraced by private insurers and major employers.

These are heady days for the Blue Cross and Blue Shield Plans. Begun as nonprofit, local corporations providing an alternative to both government and commercial health insurance in the 1930s and 1940s, the Plans have changed radically since the watershed of World War II. They have become more "private" in the sense that they are now in many ways indistinguishable from commercial insurance carriers. This trend began with the rapid rise in the health insurance market in the 1940s and 1950s but has accelerated since the 1980s. The repeal of federal tax exemption in 1986 opened the door to (indeed sanctioned) profit making. By 1991 there were more than two hundred subsidiary companies operating under the Blue Cross and Blue Shield service marks. Current ventures include, as an example, HMO Blue, West Texas, a branded entity owned by Blue Cross and Blue Shield of Texas.

Simultaneously, during the last fifty years the organization has become significantly more "public." Its strong role in the passage and management of Medicare is well documented in this book. If Rufus Rorem was the champion of community, nonprofit rhetoric for the Plans in the 1930s, Walter McNerney was the consummate organizational leader who brought them into the political mainstream in the 1960s. Over the years, constituent organizations have worked with both federal and state governments on Medicaid, on hospital planning and regulation, and on health policy at all levels. During the first several years of the 1990s, Bernard Tresnowski, then-president and CEO of the Blue Cross and Blue Shield Association, adeptly positioned the Blues at the hub of a business-government consensus on managed care. Now, in the late 1990s, with the congressional move to privatize Medicare and push Medicaid back to the states, the Blues Plans are again poised to seize new opportunities.

I like to refer to the entities we call the Blues as an organizational chameleon. In its history the Blues network has run a gamut of roles, from creative local service organization to mega-corporation. It has presented itself, as context has suggested, both as a quasi-public alternative to government health insurance and as an effective competitor with (and member of) the profit-making sector. Threads of public service still weave through the corporate culture, marking the Blue Cross and Blue Shield Plans as not quite the same as other companies. How will the organization of independent Plans

BCBSA00292652

define itself and negotiate its mission in the future? Perhaps it is destined always to include some ambiguity.

Large organizations can create an illusion of permanence. Robert Cunningham Jr. and Rob Cunningham III, in presenting the history of the Blue Cross and Blue Shield system and independent Plans, warts and all, show the contingent and contextual character of the Plans, from their beginnings to the present. As one might expect, there have been battles, inside as well as outside the organization, and failures. The failure of the West Virginia Plan in 1990 sent a harsh message across the network that survival was not preordained. Widespread publicity of the failings in management practices at Empire Blue Cross and Blue Shield in New York City sent along another strong message. In the future the organization may prosper, whether as a leader in privately organized managed care or as a partner in a public-private health care system. There may be other periods of doldrums, such as the "Blues bashing" years in the late 1960s and early 1970s, or missed opportunities. The Cunninghams point, for example, to the failure to develop service delivery systems (HMOs) in the 1970s, thus delaying what now seems to be an obvious development: the identification of insurance with organized systems. There may be fabulous successes. We cannot foresee the future. What we can do, however, is position ourselves in time, up to the present. That is why this history is so important for participants and observers of health policy today.

The two Cunninghams, father and son, are the ideal tellers of this history. A full-scale study has not been done before, chiefly because of the scope of the project (a history of the organization must also take into account the history of the independent, licensed Plans) and access to data. The late Robert Cunningham Jr. had a strong commitment to history as a form of organizational self-examination and an equally strong view that history is a vital ingredient in effecting organizational change. He was instrumental in organizing and building the archives of the Blue Cross and Blue Shield Association in the late 1980s—without which a one-volume history of the entire organization could never have been written—and in creating the Blue Cross and Blue Shield Plan History Project. This book, co-authored by Rob Cunningham, is the major outcome of that project.

The book shows, most of all, that the Blue Cross and Blue Shield network of independent Plans has a history of rapid adaptation to change. It has made a virtue of its structure as an association of independent corporations linked by brand names—a group of scrappy corporations trying to work collectively. It is at the center of debates about the future of the health care system: Will federal policy change the role of the organization yet again? It is a testing ground for the survival or abandonment of the nonprofit idea. Socialism appears to have had its day, at least from the perspective of the 1990s. Will voluntary nonprofit enterprise go with it?

Future historians will tell of the story's next step; it is still to be created. As a proxy we can learn from past experience—and help to make the history of the future.

BCBSA00292653

# Acknowledgments

THIS WORK WAS SPONSORED BY the Blue Cross and Blue Shield Association. It was begun in 1988 by Robert M. Cunningham Jr.—then a consultant to the Association—and taken over in 1990 by his son, Robert M. Cunningham III, after illness forced the senior author to stop working. The work was completed in 1992, with chapters 8 and 9 later updated and rewritten, respectively.

The sponsorship agreement stipulated that the Association would not interfere with the content of the book, and the agreement has been honored. Several Association officers have read the manuscript at various stages and made useful suggestions, many of which were incorporated at the author's discretion. The word "Plan," when it refers to a Blue Cross and Blue Shield company, is rendered with an uppercase "P" throughout the text, at the behest of the Association's counsel, who also required the words "Plan" or "Plans" to be inserted frequently in the text to preclude the use of the terms "Blue Cross" and "Blue Shield" as nouns.

Extensive use has been made of an unpublished work by James Stuart, a longtime leader of the Blue Cross organization in Cincinnati and of the national Blue Cross Commission. Odin Anderson interviewed 61 people for his slim 1975 account, "Blue Cross Since 1929"; and the transcripts of these interviews have been invaluable. Lewis Weeks's oral history series for the American Hospital Association also produced many long, thoughtful, and fact-filled interviews. Walter McNerney and Bernard Tresnowski, former Blue Cross and Blue Shield Association presidents, delivered very useful annual reports to Plan leaders and gave the authors extensive interviews, as did many other present and former Blues officials. Finally, it would be difficult to overpraise Louis Reed's definitive 1947 study for the U.S. Public Health Service, "Blue Cross and Medical Service Plans."

The surviving author wishes also to acknowledge posthumously the special assistance and encouragement of the late Donald R. Cohodes, the support of Bernard Tresnowski, and the indispensable editorial labors of Marilyn Cutler.

BCBSA00292654

# The Blues

BCBSA00292655



# Prepayment Pioneers

*The high cost of health care has created a real burden for the great financial middle class, composed of self-respecting people who are too proud to accept free service and too poor to be able to afford the costly private rooms, highly paid surgeons and the expensive laboratory studies that have done so much to take the guesswork out of modern medicine and surgery.*
—Editorial, *Saturday Evening Post,* 1926

AT FIRST GLANCE, Justin Ford Kimball seems an unlikely man to have started a revolution in medical economics. He had no experience in the health field and would later show only passing interest in the innovation with which his name became forever linked. In the summer of 1929, he had spent about three months at a new job as vice president in charge of scientific departments at Baylor University in Dallas. A crusty and colorful Texan of the old school, Kimball came to Baylor at the age of fifty-six as a professional administrator with a knack for financial management. He was a worldly, erudite man who claimed kinship to half the population of the state and was well connected to the Dallas upper crust. He had worked as an insurance lawyer, school superintendent, and university professor. Officials at Baylor drafted him to oversee their medical education programs and—more urgently—to shore up the shaky finances of University Hospital.

The cost of doing business at the hospital had risen steadily during the 1920s. Like many another American hospital, University Hospital was on the way to being transformed from a nineteenth-century almshouse into a

BCBSA00292656

gleaming palace of technology. Reforms in medical education and advances in science had steadily driven up payroll, equipment, and operating costs. To meet the increasing demand for services, the hospital had embarked on an ambitious building program. But clouds of economic depression were beginning to gather, occupancy rates had fallen, and patients were having trouble paying their bills. The charitable contributions that usually patched over operating deficits were dwindling. During the 1920s bed capacity had doubled in



In 1929, a Texan named Justin Ford Kimball founded the prototype prepaid hospital plan upon which Blue Cross Plans were later based. He overcame potential resistance from physicians to hospital prepayment because of his reputation for probity in Dallas business and professional circles. (BCBSA archives)

the nation's hospitals, but in 1928 occupancy rates had gone down by 12 percent from the previous year, and by 1929 more than a third of all general hospital beds were empty.[1] University Hospital was behind in its current bills and overdue to the tune of $1.5 million on its bonded construction debt. As one observer of the hospital's financial predicament put it, "Baylor was just 30 days ahead of the sheriff."[2]

According to legend, Kimball was sitting in his office one afternoon discussing the crisis with Bryce Twitty, an enthusiastic young middle manager whom Kimball, shortly after his arrival at Baylor, had hired away from the Dallas school system. "I asked him why we couldn't do for sick people what lumber camps and railroads had done for their employees," Twitty later recalled, referring to the "contract medicine" or "company doctor" approach that rail, mining, and lumber companies had employed for years to keep their workers healthy. It seems Kimball considered this a good idea.[3]

BCBSA00292657

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 17 of 182

Ten years earlier, as superintendent of schools in Dallas, Kimball had created a sick benefit fund for the city's teachers, to protect their livelihoods during the great influenza epidemic that was sweeping the nation. A membership contribution of $1 a month entitled those who fell sick to compensation of $5 a day, which offset lost earnings after the first week of illness.[4] The project had intrigued Kimball, in part because it allowed him to make use of knowledge he had acquired as a young lawyer in Waco, Texas. As counsel for the receiver in the case of a bankrupt chain of insurance companies, Kimball had taken an interest in actuarial science. Now he paired Twitty's notion of group care with his own knowledge of insurance and the teachers' fund and looked at University Hospital's financial crisis in a new light.

Within a few weeks, as the school year started, he was calling on his former colleagues among the Dallas school administrators to ask if the teachers might be interested in a way to budget against future hospital bills, just as the earlier sick fund had allowed them to budget against lost earnings. Kimball's reputation was such that the idea was taken seriously from the start. The stock market crash in October 1929 added urgency to the teachers' worries about economic security and increased their interest in the hospitalization fund.

The biggest challenge was to work out the numbers. No one had done anything like this before. There were no actuarial data to guide Kimball in estimating how often and for how long teachers might need to go to the hospital, and how much they would need to contribute to the fund to make it work. But Kimball had made sure that the original teachers' sick benefit fund kept good records; thus, he could borrow those files to get an idea of the frequency of illness among his prospective subscribers. He recalled later:

> Those records . . . were the only actuarial material I could find anywhere in the U.S. I had designed the forms myself to extract this information, having been an insurance lawyer. . . . After the opening of the schools in the fall of 1929, a mimeographed circular of information was sent through the schools to each teacher, in which Baylor Hospital offered the proposal that if 75 percent of the teaching group would sign up and send in 50 cents each month beginning with their November sick-benefit dues, Baylor Hospital would accept the amount as prepayment for hospital care when needed.[5]

An unpublished history of Blue Cross Plans by James E. Stuart, a subsequent leader in the Blue Cross organization, describes the essential features of the Baylor Plan:

> The Plan was hospital prepayment in its simplest and purest form. There was no third party. The hospital collected the money directly, underwrote the risk directly, guaranteed the benefits and had the means of control of utilization under its thumb (insofar as it is possible for a hospital to exercise control of cost, extent and amounts of usage). . . . It is important to note that the protection provided and the benefits offered were always expressed in terms of days of service and never in dollars of indemnity against the cost of hospital care.[6]

BCBSA00292658

The hospital made a particular effort to avoid confusion in the minds of potential subscribers between the prepayment plan and a conventional insurance policy. "Baylor uses no sales agency or middlemen, but prefers to deal directly with each group," explained a brochure describing the plan, "so that all group hospitalization fees paid may be used only for hospital care of members and not for any personal profit." Benefits included free hospitalization for up to twenty-one days a year and a one-third discount on any additional days. Patients were entitled to a private or semiprivate room costing $5 a day, with meals and nursing and professional care from resident staff. Also included in the coverage were operating room, laboratory, and anesthesia services, along with medication, dressings, and casts, although coverage was limited to 50 percent for electrocardiograms, maternity care, and a few other specified services. Not included was the cost of hospitalization for diagnosis only or for pulmonary tuberculosis, chronic mental and nervous disorders, venereal infections, and smallpox. "Never was it intended to pay an entire hospital bill," Kimball said, "only the major and unavoidable portions."[7]

By early December 1929, there were 1,356 teachers enrolled, a number comfortably above the 75 percent threshold that Kimball had calculated the Plan would need to work. Benefits became effective for the teachers on December 20, 1929, the first day of that year's Christmas vacation. It was not a moment too soon for Mrs. Alma Dickson, who slipped on an icy sidewalk a few days later and broke her ankle. When Dickson's doctor told her she would need a cast put on the fracture, she was shocked: "I can't go to the hospital," she told him, presumably clutching at her purse. "Aren't you a member of this school thing they're going to try?" the doctor asked. She said she was, but she did not know if it would pay her hospital bill or not. All she knew was that "Dr. Kimball's got another club he wants us to work at, and I paid fifty cents." Mrs. Dickson spent an all-expenses-paid Christmas in University Hospital and went down in history as the first patient in the prepaid, group hospital service movement that would later be known as the Blue Cross organization.[8]

Kimball himself was curiously diffident about his involvement in the adventure that was to follow. He said later:

> My interest in the problem—I might as well make this clear—was primarily actuarial, having worked out a formula and having gotten an experimental group [the teachers] on which I could secure actuarial data of definite limitations as to origin of costs and amount of costs. Having worked out the formula, my interest was primarily ended.

Twitty, however, was transformed into a man with a mission. "Without him, I never would have pushed it. I'm not a salesman," Kimball said. "But to Bryce Twitty, it [the Plan] was a godsend to thousands."[9] Twitty hit the lecture circuit, making enthusiastic speeches to civic groups and buttonholing influential business people to pitch the new idea. After the teachers, one of the first em-

BCBSA00292659

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 19 of 182

ployee groups he tried to sign up was at the *Dallas Morning News*. At first, no one at the paper seemed to get the point, but then Twitty had a stroke of luck:

> I had enrolled one young woman named Marion Snyder [a clerk in the newspaper's "morgue," or library]. The night after she had enrolled, she was stricken with appendicitis and came to the hospital during the night. After she found her bill was paid . . . she certainly told everybody employed [there] and they all came in and we had no trouble whatever in getting them enrolled. In fact they came in 100 percent.

Employees at Republic National Bank and the *Times Herald* soon joined the Plan as well, and the project blossomed. Within five years, it would include 408 employee groups with twenty-three thousand members.[10]

Kimball did not consult with the medical staff of the hospital about his experiment but seemed to consider himself the guardian of their interests. "After this thing got started, the doctors began to sit up and take notice. I had drawn the Plan very carefully so that it would not infringe on the relationship between the doctor and the patient," he said. For good measure, Kimball also did a little politicking. "Dr. E. H. Cary [dean of the Baylor medical college] was in a little club with me and we ate dinner together frequently. He was asked about the ethics of the Plan and said, 'I don't know a thing about the Plan, but if Kimball drew it, it's ethical, all right.'"[11]

In view of the complex and prickly relations that would later develop between the hospital prepayment movement and the medical profession, Kimball's connection with Cary was ironic. A prominent ophthalmologist in Dallas, Cary was also a conservative political activist who was elected president of the American Medical Association (AMA) in 1932. In an official history of the AMA he is described as "a two-fisted frontiersman" with "a zest for political hardball . . . Cary was a born gunfighter."[12] In the late 1940s, he would lead the right wing of the AMA in a fierce, confrontational propaganda war against government-sponsored health insurance. But in 1929, Justin Ford Kimball conveniently neutralized the ferocious Dr. Cary over a few good steak dinners.

## Early Forms of Prepayment

Although around the ceremonial campfires of the Blue Cross and Blue Shield organization today Kimball is justly celebrated as a founding father, no one has ever suggested either that he conceived the idea of hospital prepayment out of thin air or that he perfected it in a burst of personal genius. Kimball's achievement was the recognition and pulling together of some of the most promising tools then available for dealing with the problems of cost and access to care, thereby setting the table for a generation of social engineers who were determined to make care available for anyone who needed it. Although Kimball's brainstorm occurred on the eve of an economic crisis that

BCBSA00292660

would exacerbate these problems and compel more systematic efforts to address them, it came after nearly three centuries of widely scattered and diverse experiments to solve problems of cost and access in health care. In the 1660s, for example, a Montreal physician subscribed a group of families to a plan for comprehensive prepaid coverage for an annual premium of 100 sous. In 1798, Congress created a sick fund for seamen based on a monthly payroll deduction of fifteen cents. In the 1890s, St. Mary's Hospital in Saginaw, Michigan, sold certificates for $5 that entitled the bearer to a full range of hospital and physician services.

In Kimball's time, prepaid group health care was exemplified by the company doctor in the mine and mill towns of the Pacific Northwest and the Mesabi Range of the Midwest. These pioneers treated ordinary illnesses as well as industrial accidents and cared for workers' spouses and children, receiving fees for services not covered in the contract practice. This system was most developed in the state of Washington, where contracts providing care to lumber company employees often entailed the services of groups of physicians and eventually became the responsibility of local medical societies. These county medical bureaus, as they became known, dominated the practice of medicine in many communities in Washington and Oregon in the early years of the twentieth century.

Elsewhere, local prepayment plans took a variety of forms. In 1918 in Grinnell, Iowa, for example, doctors organized a hospital service plan but declined to include coverage of physician fees. In 1917 a group of textile and paper mills in Roanoke Rapids, North Carolina, created a payroll deduction plan for their workers after the group built a hospital; in this plan, doctors were paid by the companies. At the same time, a welfare association in New Bedford, Connecticut, organized a health insurance fund that covered hospital and physician services but included substantial out-of-pocket payments from patients.[13]

Commercial insurance companies were slow to find their market in health coverage. "Sickness insurance," as some forays into the field were called, was considered a poor risk because of the danger of adverse selection and "moral hazard." The threat was that people who knew they were in poor health were more likely to buy and use insurance. John Dryden, founder of the Prudential Insurance Company, abandoned the practice of "sickness insurance" after a brief experiment in the late nineteenth century. He thought that "the assurance of a stipulated sum during sickness can only safely be transacted, and then only in a limited way, by fraternal organizations having a perfect knowledge of and complete supervision over the individual members." Organizations such as local welfare societies did provide sickness benefits for their members, like that which the Dallas teachers received at Kimball's prompting during the 1918–1919 influenza epidemic. But, Paul Starr points out, the actuarial base, financial reserves, and managerial skills of most fraternal organizations and immigrant "friendly societies" were too slight for them to tackle the whole problem.[14]

BCBSA00292661

Pierce Williams reported in 1932 that roughly 670,000 American workers were covered by some form of industrial "fixed payment medical service." The covered population was spread over twenty-one states, but clustered mostly in the Appalachian coalfields and the Pacific Northwest: almost all covered workers were in the mining and lumber industries. Commercial insurance companies offered accident and health policies, which provided cash indemnity payments toward some medical expenses resulting from injuries and various illnesses. But these benefits were merely small add-ons to other accident and disability coverage and in no case covered the full cost of medical, hospital, or nursing care per se.[15] Otherwise, prepayment before the 1930s was strictly local, ad hoc, and experimental.

The last defining circumstance for those who followed Kimball's lead was a record of persistent governmental reluctance to venture far into the field of health insurance. The nation's first venture in social insurance began under the leadership of President Theodore Roosevelt, whose advocacy of workers' compensation (a concept distinct from but akin to health insurance) led by 1919 to the passage of compensation programs in thirty-seven states. Industry was not obliged to pay the medical or hospital costs of workers injured on the job; it merely was responsible to replace a portion of the earnings of those who were incapacitated.

In Germany and England, concern about the social costs of injury and illness already had led to enactment of national health insurance programs in the late nineteenth century. The European example—and the remaining momentum of the Progressive movement, which had peaked under Theodore Roosevelt—prompted U.S. social reformers to mount a drive for compulsory health insurance, beginning in about 1915. In 1917 two state medical societies endorsed the notion, and the AMA's House of Delegates ratified a favorable report on the subject. The American Hospital Association (AHA) also discussed the issue and eventually gave a token endorsement to the idea of compulsory state health insurance.[16] Yet by this time, the United States had entered World War I, which steered public opinion toward the view that because compulsory health insurance was originally a German idea, it was suspiciously foreign in character. The conclusion of the war, accompanied by a backlash against the prewar Progressive movement, drove most remaining advocates of a government-sponsored plan into a discreet silence, which lasted more than a decade.

*///*

Besieged by the effects of the Depression, hospital leaders soon recognized that the success of the Baylor experiment made it worth investigating. Fritz Lattner, a hospital administrator in Des Moines during the 1930s and later an Iowa Blue Cross Plan executive, recalled:

> I could remember the difficulties we had then, trying to keep our doors open. . . . People brought chickens in and meat to pay their bills. They would paint or do

BCBSA00292662

> work around the hospital of some kind. . . . Nurses would come in and beg us to
> give them a job without pay, for room and board, because they were starving.[17]

AHA officials asked Justin Ford Kimball to make a presentation on his prepayment plan at their 1931 annual meeting in Toronto. Although he was unable to attend, Kimball sent a report to be read at the meeting.

It was not the AHA that took the lead in promulgating hospital service plans, however. By all accounts, the driving force behind the spread of the prepayment movement of the 1930s was local initiative. This local momentum was sparked at first, perhaps, by the power of suggestion and was shaped through the years by a sharing of experience and an increased structuring of the networks that linked the hospital service plans together, while never losing its essential hometown identity and autonomy. "None of the people involved in the Plan at that time knew each other," said Cleveland's John Robert Mannix, who was to become one of the foremost national leaders of the movement. "But all had been working on the same basic idea. . . . Eventually we got to know one another and we all became fast friends. But what happened certainly was a perfect demonstration of an idea whose time had come."[18]

A not-for-profit arrangement that guaranteed a service rather than the dollar indemnity paid by insurance companies, the Dallas model lacked one significant feature, which had to be developed before the prepayment movement would really catch on. Prompted by the success of the Baylor Plan, two other hospitals soon created similar arrangements, which gave Dallas employee groups three plans to choose from. The choice created a dilemma: if every hospital attempted to develop its own plan, as Louis S. Reed put it, "the result would be competitive solicitation of subscribers, denial of freedom of choice [of hospitals] to subscribers at the time of illness, and interference with physicians' prerogatives and practices in the care of private patients." As hospital leaders began tackling these obstacles in their efforts to replicate the Baylor Plan, they turned to each other for help, usually through the medium of local hospital councils. In a 1947 report on group hospitalization for the U.S. Public Health Service, Reed wrote:

> It was soon apparent that instead of each hospital organizing its own plan, it
> would be far better for all the hospitals of a community to get together. In this
> way the unethical and unsound features attending solicitation of patients by individual hospitals would be eliminated and subscribers would retain freedom of
> choice as to the hospital they desired.[19]

The habit of competing for patients and charitable dollars made it difficult for many hospital leaders to accept the concept of joint prepayment plans. But in the early 1930s—although tax-supported hospitals caring for veterans and the indigent were full—occupancy rates at voluntary hospitals nationwide had fallen to 50 percent, and before the end of the decade, four hundred voluntary and for-profit hospitals went out of business. Those wanting to survive had to act.

BCBSA00292663

The first joint hospital prepayment plan was organized in Sacramento, California, in June 1932 by two hospitals that pooled their resources to underwrite the cost of the plan. The effort began as one of them, Sutter Hospital, sought a way to provide its own employees with hospitalization insurance. Other hospitals that later joined the plan were interested chiefly in their own employees also, but the plan eventually broadened to include the general public. Membership was offered to employee groups and individuals at an annual rate of $12 per subscriber. By 1935, the association had expanded to include seven hospitals and had nearly six thousand members.[20] About a decade later, the plan in Sacramento began enrolling members through an outside agency that received sales commissions, which violated an early standard developed by the Blue Cross organization, and the plan dropped out of the group.

It was Frank Van Dyk, an energetic salesman with only an eighth-grade education, who launched the first multihospital plan in what became the Blue Cross system, in Newark and Essex County, New Jersey. In 1931, after working in newspapers, public relations, advertising, and fund raising, Van Dyk became the executive director of the seventeen-member Essex County Hospital Council. His principal duty was to collect overdue bills from former patients of member hospitals. The experience was discouraging: people wanted to pay, he was convinced, but families needed every penny to keep warm, dry, and fed. They did not have the money to pay hospital bills. "It occurred to me what a wonderful thing it would be if you could remove the cashier's window from the hospital," he said later, describing his collection efforts as "a tragic thing. There ought to be a better method of doing things. . . . Everywhere in the state, people had to put off going to the hospital because of inability to pay."[21]

By this time, Van Dyk had heard of the Baylor Plan, and in 1932 he scraped together the money to see it for himself. When he arrived in Dallas, he found not just one plan but three. For the most part, he discovered, the hospitals and plan members seemed happy with what they had. But some subscribers were grousing because their personal physicians were not on the staff of the hospital whose plan their group had joined. Doctors with patients in this situation were also unhappy. Van Dyk concluded that it was confusing and divisive to have three plans in one city. He was also unable to find data about admissions, lengths of stay, and hospital prices, which New Jersey officials had asked him to collect: "They didn't know anything about that. They just collected the money. It was more money than they had before, so what the hell. That was their philosophy at the time. There were no records as to incidence."[22]

Undaunted by his lack of formal training, Van Dyk decided after his return to New Jersey to prepare his own actuarial study of prepayment, so that members of the Essex County Hospital Council could make an informed decision concerning their own plan. Despite Van Dyk's work and their own desire to take some action, council members were skeptical and sought advice from commercial insurers. According to Stuart, the companies replied that,

"without proper actuarial-statistical tables, the gamble in the health-insurance field would be too great." He goes on to quote Van Dyk: "'We found out that the idea had to be run on a voluntary nonprofit basis. More than that, we had to blaze utterly new trails because there was nothing to guide us. We had to create our own statistics, our own experience and be guided by it.'"[23] As it



After launching the first multi-hospital Blue Plan in New Jersey in the early 1930s, master salesman Frank Van Dyk moved on to New York City, where the Blue Plan's offer of generous maternity benefits helped propel spectacular enrollment growth but precipitated a financial crisis. (Paul Parker Photo)

turned out, Van Dyk's data were good. Started in 1933, the Newark Plan offered up to twenty-one days of semiprivate hospitalization for $10 a year, not including maternity or dependent care. Business was slow at first, but the Plan ran fairly smoothly for six months. Then the Essex County Hospital Council added dependent coverage, and local industry began to cooperate in enrolling employee groups. Within a year, six thousand people had joined and thirty hospitals were participating.

Just as every early prepayment plan had its own peculiar local roots, so the early leaders of the movement seem to have been cut from distinct bolts of cloth. E. A. van Steenwyk, for example, was the son of an Iowa boot and harness maker. He had tried teaching and real estate before going to work shortly after the crash of 1929 for a publishing company in St. Paul, Minnesota, where his duties included selling advertising for a hospital magazine. The enterprising van Steenwyk was soon soaking up knowledge about the medical field and attending meetings where he met hospital administrators—meetings dominated

BCBSA00292665

in St. Paul as elsewhere by worry over empty beds and unpaid bills.[24]

In 1932, two St. Paul hospital administrators—Dr. Peter Ward and Arthur Calvin—had traveled to the AHA annual meeting, hoping to learn more about the Baylor Plan and another one like it at the Touro Infirmary, New Orleans (the city in which the meeting had convened). On their return to St. Paul, they began discussions with a group of fellow administrators about forming a multihospital plan that would avoid the pitfalls Van Dyk had noted in the Dallas Plan. In the summer of 1933, van Steenwyk was hired as manager of the new eight-member Hospital Service Association and, in a one-room office in downtown St. Paul, began taking applications for coverage. Van Steenwyk later told an interviewer:

> In those days, we didn't have an opportunity to advertise because we had no money, but radio was just starting and offered all kinds of help. . . . I remember one characteristic duty of that time was going to a radio station and telling my little story about prepayment over the air, telling people the phone number of the association and then running back to my office to intercept the telephone calls that came in.[25]

The association offered contracts to groups of five or more employees, with a preference for groups in which at least half the members joined the Plan. Employees of the St. Paul Union Stockyards Company were the first group to enroll. Subscribers paid 75 cents a month for their basic coverage. For an additional dollar a year, they could get 25 percent off regular hospital charges for dependents. The basic coverage entitled them to twenty-one days of hospitalization per year and covered all routine costs including surgery, discounts on special services such as X-rays, and 50 percent of maternity care for those who had been members at least ten months.[26]

Van Steenwyk's initial strategy was to sell the prepayment Plan to employers. He soon learned, however, that when employees were the first to hear about the Plan, they pressed their bosses to participate. Employee meetings were a primary medium of communication, along with the radio announcements, and (since payroll deductions were as yet unheard of) employee representatives collected monthly payments from co-workers. Before long, another multihospital plan sprang up across the river in Minneapolis, and by 1936, the two plans had merged to amass a joint membership of sixty-six thousand.

Van Steenwyk sometimes said that prepayment was such a good idea that the Plans would sell themselves; enrollment depended not so much on salesmanship as on the mere dissemination of information. Not all his peers shared his views on promotion, however. In 1934, Frank Van Dyk called promotion the "greatest problem encountered in the development of group hospitalization" (an overstatement that may reflect Van Dyk's background in the sales field). "A mere presentation of the benefits listed and emphasis on low cost will not meet the situation," he declared, calling on his colleagues to stimulate demand by educating the public about the indispensability of hospital care.[27]

BCBSA00292666

Van Steenwyk may not have considered himself a promoter, but he turned out to have a knack for "presentation" that any salesman would envy. In 1934, he commissioned a poster to advertise the Hospital Service Association, which showed Sally the Student Nurse wearing a uniform emblazoned with a blue Geneva cross. "But Sally did not have the kind of long-term currency we needed. We needed something that didn't change over a long period of time," he explained.[28] Then he hit on the image of the simple blue cross, a shape traditionally associated with hospitals. Within the year, new Plans springing up spontaneously all over the country were appropriating van Steenwyk's symbol, which would eventually provide a common name for them all.

By the end of 1934, major multihospital service Plans were launched in Durham, North Carolina, in Washington, D.C., and in Cleveland. Each Plan added new ingredients to the formula as each tackled a particular set of circumstances. The Hospital Care Association formed in Durham was the first to include complete dependent coverage and thus can boast of the first Blue Cross baby, Ann Woodard, born in Chapel Hill on December 17, 1933. The Plan received help from the dean of the Duke University medical school and an industrialist who was chairman of the board of Watts Hospital in Durham. The Watts and Duke Hospitals each pledged $1,000 to underwrite benefits for the first eighteen months, and subscribers could purchase full family coverage for about $20 a year. To include maternity care as a regular benefit was considered "daring if not foolhardy in those early days," Stuart commented, but the Durham experience demonstrated that this did not bankrupt the Plan or prompt an epidemic of babies, as some had feared.[29]

In 1934, Group Hospitalization was formed in Washington, D.C., and in its early years survived scorn and patronization as part of the opposition of local doctors. In a memoir, founder of the Plan and its first chief executive, E. J. Henryson, recalled the doubts of some hospital executives when he first proposed emulating the Dallas model: "Do you mean to tell me that you, with no money and no experience, can do something in the insurance field that the big companies, with years of experience and millions in assets, have not been able to do?" one of them asked. Henryson said yes. A *Washington Post* editorial in 1933 considered Group Hospitalization an interesting experiment: "From the viewpoint of making hospital service more readily available to those of moderate means, it appears to be a step in the right direction." A greater challenge was the proposal debated at a meeting of the District of Columbia medical society to censure the Plan for allegedly inadequate medical fees. A newspaper headline the next day read, "Doctors Cheer Savage Attack on Group Plan." But the society voted down the proposed censure, and its president pronounced himself satisfied with the way the Plan protected the interests of the medical profession.[30]

The importance of support from community leaders was nowhere more evident than in the founding of the Cleveland Hospital Service Association in 1934. The Cleveland Plan was sponsored by the city's hospital council, and all

BCBSA00292667

major hospitals were involved from the beginning. The local medical society endorsed it, and the city's welfare federation contributed $7,500 toward start-up costs. The city's major employers—part of a tightly knit business community—were early supporters of the Plan and encouraged their workers to take part. The first contract was signed in August 1934, and 2,600 subscribers had been enrolled by the end of October, including employees of Standard Oil, Royal Typewriter, White Sewing Machine Company, and the YMCA. Community support helped fill the staff with enthusiasm: "Each of us did whatever was necessary to get the day's job done. Traditionally, no one left the office until contracts had been issued to all subscribers from whom applications had been received during that day," an original staffer later told George Condon when he was compiling a Plan history. Another early staffer said:

> Travel from place to place was chiefly by streetcar. Buses weren't popular in Cleveland, and the expense account wouldn't allow for an automobile. An advantage of riding on the streetcar was that one could do some of the work that was necessary on the applications. The contract certificates were in pads of one hundred, and when we hit the bottom of each pad the cardboard bottom was waved gleefully in the air as a signal that we had reached another milestone.[31]

By the end of 1934, membership in the Cleveland Plan had risen to 3,220 and 57 members had received hospital care under the Plan. On June 30, 1935, a year after the association had been created, the ten thousandth member was signed up, and in September 1935 the Plan repaid the $7,500 that had been advanced by the welfare federation. A month before the Plan's third anniversary, Cleveland Mayor Harold Burton became the fifty thousandth member, and in another year that number had doubled. James Stuart recalled events of the period in his unpublished history:

> Wherever the Plan secured and kept such public identification, the membership growth was rapid and beyond the dreams of the most optimistic manager. In these areas, governors and mayors proclaimed Blue Cross enrollment periods, service clubs took part in promotion, Boy Scouts delivered enrollment material to prospects, and clergymen from the pulpit urged people to enroll in this community enterprise. Such promotion could not be bought at any price.[32]

One of the Plan's most valuable assets was a young hospital administrator named John Mannix, a self-taught accountant who, before the advent of prepayment, had tackled problems of costs and charges with clairvoyant originality at hospitals he worked for in Cleveland and Elyria, Ohio. Mannix helped guide the Cleveland Hospital Council's quest for a prepayment plan after the group got wind of developments in Dallas. He helped focus discussion of the prepayment idea among his peers in Ohio and, nationally, he stirred up debate over aspects of hospital service that would for many years prove crucial to the movement.

BCBSA00292668

After he finished high school, Mannix's first job was in the business office of Cleveland's Mount Sinai Hospital. His office was near the hospital cashier's window and he could watch the patients as they paid their bills. He noticed that they were rarely concerned about the daily room charges on the bill but frequently were upset and often complained about the special charges for items such as operating room, X-ray, and laboratory services. He debated the possibility of totaling all charges for "extras" for all patients and arriving at a daily total per patient, which could be added to the room charge. This would provide the same revenue for the hospital and eliminate the special service charges that so upset people. After experimentation and modifications, the hospital introduced an "inclusive rate" method, which was widely discussed by hospital people for several years but (although the method was adopted by some) never became the prevailing practice he thought it might.[33]

At the age of twenty-four, Mannix was hired as administrator of Elyria Memorial Hospital outside Cleveland, where he again did the necessary arithmetic to introduce the inclusive daily rate. After further studying the records, he observed that there were certain diagnoses for which all patients received exactly the same services, so he took his idea another step and introduced uniform rates (for maternity and tonsillectomy patients, for example). "These rates included a charge for room, meals, delivery, room service, nursery service, laboratory and drug charges. This was probably the first 'DRG,'" Mannix wrote in 1988 (referring to the "diagnosis related groups" introduced in the federal government's Medicare program in 1983).[34]

In 1928, Mannix compared local population and hospital-expense figures for Elyria and found that the total cost of hospitalization came to a little less than $5 per person per year. He used these data as the foundation of a proposal for hospital coverage that he presented to two local insurance companies. He was astonished when they were not interested. He returned to Cleveland in 1930—at a time when interest in prepayment was beginning to stir among members of the Cleveland Hospital Council—to become assistant administrator of Lakeside Hospital. The bright young accountant was then appointed to chair a Cleveland Hospital Council committee formed to study prepayment plans: "I thought at the time it was the council's way to get rid of me," he quipped.[35]

Mannix had also participated in one of the first formal discussions of prepayment, at the AHA annual meeting in Atlantic City in 1929. Already, he showed a clear grasp of the issues that could make or break the prepayment movement. He explained:

> Insurance companies have pointed out the danger. The thing that makes them skeptical about the Plan is that you are going to have a great increase in the hospitalization demand. Many more people are going to come for illness and observation [who] don't come to the hospital . . . at present. For example, less than half the women having babies come to hospitals for maternity care; but if this Plan were in effect, all those who have the insurance would come, and you have to worry about that.

BCBSA00292669

Mannix apparently was not worried. "If this Plan is successful," he commented later on in the meeting, "it will be easy enough to build more hospitals."[36]

## A National Phenomenon

Fear that the introduction of prepayment would prompt a flood of hospital admissions—and thus bankrupt hospital service plans—was just one of the many obstacles faced by those who were interested in the idea. The obstacles conquered by the pioneer Plans—lack of actuarial experience, competition among hospitals, legal roadblocks, scanty budgets, enrollment doldrums—were potential stumbling blocks for any community interested in doing something so new and untested in such a complex field. None of these threats was more chilling than the prospect of the opposition from doctors, however. E. J. Henryson in Washington, D.C., had learned that the best way to forestall physicians' resistance was to invite doctors to participate in managing the Plan. But the danger remained formidable for would-be Plans whose leaders could not understand and address physicians' concerns. Opposition from state medical societies and the AMA had played a major role in sinking the national health insurance movement a decade earlier and at times threatened to do the same to voluntary hospital service prepayment Plans. The most celebrated outbreak of hostility occurred in 1932.

It was evident before the stock market crash in 1929 that rising hospital and medical costs were a growing concern, not just for needy families but also for the middle class. In 1926 a consortium of health-oriented foundations raised $1 million to fund a private study of cost and access problems by a group called the Committee on the Costs of Medical Care (CCMC). Headed by Dr. Ray Lyman Wilbur, president of Stanford University (and who would later become Herbert Hoover's secretary of the interior), the group eventually grew to include fifty economists, physicians, administrators, scholars, and public health specialists. During the next six years the committee published twenty-seven reports on hospital construction costs, the incidence of illness, access to care, group medical practice, group hospitalization plans, and other issues. Odin Anderson wrote in his history of the Blue Cross organization that these reports "were a valiant attempt to introduce rationality into the emerging debates on health financing, voluntary and compulsory health insurance, and types of delivery systems." The CCMC produced the first reliable estimate of the nation's total health bill, $3.6 billion in 1929 (or 4 percent of national income), and concluded in its final report, issued in 1932, that despite this considerable expense, "insufficient [health] care is the rule" among all income groups: "The amount of care which people need is far greater than that which they are aware of needing, and greater than that for which they are able to pay."[37] In the face of the demonstrated need to increase spending on care, the report—endorsed by thirty-five CCMC members—called for the promotion of group practice and prepayment plans, although it stressed that any form of

BCBSA00292670

insurance should be voluntary rather than compulsory.

When, in advance of its publication, a draft of the report was circulated to members of the committee, its recommendations met with strong dissent among physician members, who saw group practice and prepayment as a threat to their professional independence and sovereignty. Nine CCMC members, including eight physicians, submitted a minority report. The editor of the *Journal of the American Medical Association (JAMA)*, Dr. Morris Fishbein, obtained a copy of the final CCMC report and promptly published an editorial that denounced the committee's recommendations as "socialism and communism—inciting to revolution." According to the prominent health policy leader Wilbur Cohen many years later, Fishbein's "use of that incendiary language set the tone for years to come."[38]

Fishbein helped shape the uncongenial political environment into which fledgling hospital service Plans (and, before long, medical service Plans) were born. The CCMC organizers had picked a staunch Hoover Republican as their leader and had relied exclusively on private financial support in order to avoid any taint of radicalism in their work. That these safeguards failed to satisfy public opinion, according to Paul Starr, "confirmed the suspicions of many that it was risky even to advocate voluntary health insurance."[39]

The inflammatory rhetoric also discouraged incoming President Franklin D. Roosevelt's interest in the issue. The chilling effect of Fishbein's words pervaded the work of Roosevelt's Committee on Economic Security when the Roosevelt group crafted Social Security legislation of 1935. New Deal architect Harry Hopkins wanted to include health insurance in the package, as did members of the committee that drafted the bill. But as Daniel Hirshfield's careful study of the episode explains, "influential members of the administration were worried that the inclusion of health insurance would endanger the entire Economic Security Bill."[40] By leaving health insurance out of the New Deal package, Roosevelt created a policy vacuum that fueled demand for a nongovernmental alternative.

The private, nonprofit organizational formula defused crude litmus tests. "In the late 1920s and early '30s, prepayment proponents became accustomed to hearing their views termed 'radical,'" according to an account of John Mannix's career published by Blue Cross and Blue Shield of Michigan. "Occasionally," Mannix recalled, his "presence sparked the incendiary remark, 'That fellow's a damned Red!'" The Michigan document describes a confrontation between Mannix and a critic at a meeting with Ford Motor Company officials during the drive to build the Michigan Plan:

> [The critic] reeled into a spectacular, patriot-rousing oration. The plug was: "Such important capitalists as you at Ford ought to deal with another stock company and not with a company that leans towards socialism." . . .
> Granted the floor, Mannix first assured the group of [the] Blue Cross' [organization's] profound allegiance to free enterprise. He next pointed out that, al-

BCBSA00292671

> though Mr. Ford had started a capitalistic automobile manufacturing concern, when he decided to start Ford Hospital, he made it non-profit. . . .
> The next day, Ford called to enroll.[41]

By the end of 1933, there were six Plans nationwide with 11,500 members; a year later, there were ten Plans with 55,000 members; and at the end of 1935, seventeen Plans were in existence, with nearly 215,000 people enrolled.[42] In 1934, both the American Hospital Association and the American College of Surgeons gave formal approval to group hospitalization. Local autonomy remained a hallmark of the movement, but the rapid spread of the idea and the sharing of lessons and experiences from one community to another no longer depended so much on spontaneous inspiration as it had when Van Dyk first made his pilgrimage to Dallas in 1932.

Just a year after Van Dyk's trip, a former CCMC member who had become a strong believer in the prepayment movement volunteered his services to the AHA as an unpaid consultant and began to develop a canon of successful group hospitalization practices. A former professor of accounting at the University of Chicago, C. Rufus Rorem was a soft-spoken Quaker who said he was known as "a safe man" in the health field, despite the controversy surrounding the CCMC and the fact that he "never believed that private practice and commercial insurance could solve the problems of providing and financing health service. It seemed to me that they were important parts of the problem."[43]

On loan to the AHA from his employer, the Julius Rosenwald Fund in Chicago, Rorem brought a keen awareness of the strategic dilemma facing nonprofit institutions that provided public service through private means. Neither the commercial nor the governmental approach to the problem of health care costs seemed adequate: "Governments tend to emphasize equity, not efficiency; certainty not originality. They do not provide a basis for much experiment or innovation, which are natural fields for private enterprise," he told Odin Anderson later. On another occasion, he recalled:

> pioneers in the voluntary hospitalization movement were not philosophers. They were not social reformers. They were social organizers. The voluntary Plans were an attempt to organize the public buying power on a voluntary basis, without the disadvantage of political control, a means by which an employed group of people could finance medical care for itself. They were dealing with a practical problem in a practical way.[44]

Continuing in the role he had played in the CCMC as a researcher on current hospital practices, and now with an exclusive emphasis on prepayment, Rorem began to codify the collective experience of the local Plans for the AHA. Careful inspection, if not actual supervision, of the group Plans was becoming an accepted feature of the AHA's operation. For example, in one of

BCBSA00292672

his reports to the AHA in 1935, Rorem reached this conclusion:

> The American Hospital Association has discouraged the formation of all arrangements which limit the subscribers' choice to a single hospital in a community with several institutions. Such limitations interfere with the selection of an appropriate physician, arouse antagonism of medical staffs and trustees of other institutions, and make it difficult to obtain free and continuous publicity.[45]

Some observers have noted that while prepayment plans offered jointly by all or most of the hospitals in a community would give subscribers a greater choice of hospitals, such arrangements offered less choice or no choice at all concerning which prepayment plan to join. Paul Starr, in his history of American medicine, attributes the development of the multihospital Blue Plans partly to the participating hospitals' desire to maintain control over the new means of financing care.[46] The diversity of influences at work in the genesis of the prepayment movement certainly allows for such motives. But the emergence of multihospital Blue Plans as the dominant form of prepayment is more often explained in the comments of the early leaders as a matter of practical necessity. The acquiescence of doctors—who were jealous of any intrusion into their relationships with patients—was a prerequisite in order for any Plan to be viable. Any arrangement that limited physicians' hospital privileges was likely to provoke opposition. Prospective patients voiced concerns about having to make any restrictive advance choice of the location where their treatment was to be administered. In addition, the cost of managing an enrollment program would have been prohibitive for most individual hospitals, already staggering under the burdens of the Depression. Blue Cross organization leader and historian James Stuart says simply: "It soon became obvious . . . that a general community need could not be met through single-hospital service Plans, nor could the ever-worsening financial situation of the community hospitals be solved in this manner."[47]

Rorem continued to preach a gospel that included, in addition to nonprofit operation and the free choice of hospital and physician, the appointment of doctors and community leaders to governing boards, the assurance of financial integrity and "dignified promotion," and the restriction of coverage to hospital care alone. By 1936 he had published more than forty articles on prepayment and related topics and was named director of the AHA's newly formed Committee on Hospital Service, formalizing both the AHA's commitment to nurturing the movement and Rorem's role as the embodiment of that goal. According to Stuart, "Rorem [more than anyone else] shaped the philosophy of the movement." He was in constant demand to consult with new Plan directors, staffs, and board members who were feeling their way through a forest of decisions to be made about community needs and means, risks, and rates. Simultaneously, he was dealing with interested groups and avoiding conflicts among hospitals, physicians, employers, and local authorities, all seeking some kind of foothold in the new enterprise. Under Rorem's leadership, the AHA Committee on Hospital Service developed a reciprocal

BCBSA00292673

relationship with the local Plans. "By patient explanation, persistent urging and careful exhortation, he led without authority to do more than counsel and advise."[48]

Rorem was a resource for the Plans, offering information and suggestions, outlining options, and relaying accounts of other Plans elsewhere. He was also a mentor, coaxing and cajoling Plan leaders to make choices that were consistent with the principles he believed practical and proper, principles that were themselves a distillation of local experience. The Plans generally went along with his ideas, although at times with reluctance, fearing national control and loss of local autonomy. They clearly understood that some kind of national office was necessary to disseminate information among the local units and to compile national information about membership, hospital use, and financial resources. According to his longtime colleague J. Douglas Colman, Rorem "laid down the principles on which we operated and gave them visibility, credibility and integrity."[49]

## Problem Solving

Early Plans added to the growing practical knowledge about prepayment through their own trials and errors in solving local problems. In Pittsburgh, for example, early advocates had a difficult time with some of the city's physicians. By 1935, the steel industry and other Pittsburgh businesses were beginning to recover from the Depression. But a three-year study of health care in the area concluded gloomily that voluntary hospitals were still on the verge of collapse. Patients were remaining untreated, and physicians' incomes were declining. In several other states, pressure on the health care delivery system had prompted some government intervention—at least in the area of indigent care. The study advised the Pittsburgh hospital association to consider sponsoring a hospital prepayment program: "Such Plans make it possible for people to budget the cost of their hospital care, and because [it] is prepaid, they are more likely to be able to manage the other costs of illness, especially payment to physicians."[50]

Despite the appeal to the interests of the Pittsburgh doctors, many of them responded warily to the potential intrusion into their relations with patients. Morris Fishbein's battle cry still rang in the air, although it was effectively parried by one pro-prepayment medical society leader who suggested that "a successful voluntary program could silence the 'agitators' by providing medical service they believed was possible only through socialized medicine."[51] The knottiest problems were raised by doctors in hospital-based specialties such as pathology, radiology, and anesthesiology. Coverage of these services boosted the potential appeal of a Plan to subscribers for the same reasons that Mannix had sought inclusive rates in his hospital billing system. But some specialists argued that such a system would appear to put hospital administrators improperly in the business of practicing medicine and threaten the doctors' control over their own fees.

A hospital administrator who led the drive for group hospitalization in

BCBSA00292674

Pittsburgh, Abe Oseroff attacked the problem by inviting a radiologist and a pathologist to study a prepayment proposal as members of a group sponsored by the hospital association. The study group included a surgeon who was sensitive to the specialists' concerns and enjoyed their respect. Other doctors in the group appealed to their colleagues' sense of duty to ensure that patients needing care received it. Not until 1938 did the newly formed Hospital Service Association Plan reach agreement with the Allegheny County Medical Society on a face-saving compromise: instead of paying hospitals $6 a day for all services (laboratory and X-rays included), the Hospital Service Association Plan would pay $4 for "hospital care" and $2 for "medical services."[52]

Similar debates were a regular feature in the early development of almost all the Plans. The debates helped emphasize the necessity of including leaders from the medical community on local Plan boards to ensure the future of the prepayment movement.

New York was a laboratory for legal and actuarial experiments. In 1933, even before the Pittsburgh group sought similar legislation, the United Hospital Fund in New York City asked the state insurance superintendent whether a hospital service plan would fall under New York's insurance statutes (which imposed premium taxes and reserve requirements). The superintendent, Louis H. Pink, responded that the state's insurance laws were not broad enough to cover the type of activity proposed. He suggested developing special legislation to cover it. An act was passed the following year; it provided for incorporation of nonprofit tax-exempt group hospitalization plans with supervision by the state insurance department to govern rates, benefits, and responsibilities of member hospitals. The law recognized that such plans were not insurance companies subject to other insurance regulations (including reserve requirements and premium taxes).[53] The New York law became a model that was followed eventually by about forty other states, although in a few cases state insurance departments refused to exempt Blue Plans from conventional insurance regulation.

The Associated Hospital Service of New York started doing business in mid-1935. Frank Van Dyk moved over from New Jersey to become executive director. In this case, however, Van Dyk's self-taught actuarial rules nearly led to disaster, even though the Plan's initial successes were spectacular: it enrolled 100,000 people in its first year and enlisted 160 participating hospitals. All laboratory and X-ray services were covered, as well as full maternity care. "New York comes closer to having an ideal setup with respect to absence of extra charges . . . than any place in the United States," E. A. van Steenwyk reported with admiration after a visit in 1936. The New York Plan used publicity to the fullest possible extent, van Steenwyk noted: "It uses the radio, newspapers, bulletin boards, and all the methods that soundly promote an intelligent understanding of any community project."[54]

Yet the Plan's amateur underwriters had not realized that the first people to sign up for hospitalization insurance would probably either know or sus-

BCBSA00292675

pect that they had medical problems that would soon require medical or hospital care. Most of the early hospital service Plans sought to enroll primarily large groups and required a minimum percentage of the total group to join before any would be accepted: some required percentages as high as 75 percent, some took 50 percent, and a few accepted as little as 40 percent of the total. In New York, the underwriting rules had been largely ignored, and the Associated Hospital Service came to the brink of bankruptcy after three years of operation. Groups with as few as five members had been permitted to enroll, and it later transpired that even some individuals not a part of any group had been accepted. For several years, the number of new members disguised the poor quality (from an underwriting standpoint) of the enrolled population. Referring to the New York experience in her history of Blue Cross of Western Pennsylvania, Margaret Albert wrote, "It is important to remember that actuarial projection was even less an exact science in the 1930s than it is today." The lack of accumulated data about health coverage made it even more unpredictable than its better established counterparts such as fire and life insurance: "the data the early Plans needed, let alone the sophistication to interpret those data, simply weren't there." Albert describes the 1930s:

> Providing service benefits obviously carried a greater risk for the Plans than did indemnity coverage, which contained a built-in "cap" by limiting the cash payment per day or per service. Even greater, however, was the risk of "adverse selection" in enrolling individuals, small employee groups, or small proportions of a group. . . . Actuarial projection—the way insurance companies decide how much to charge in premiums by projecting the number of claims they can expect to pay during the coming year—is based on the average hospital costs in the overall population or in a large group of individuals composed of people of all ages and income levels, including those who are healthy and those who are not. . . . The trade-off is fair: "Those who need care are lucky to have their sickness bills paid," Rorem observed . . . "and those who are not sick are lucky to be well."[55]

Word of the trouble in New York did not surface until the 1939 AHA annual meeting, where van Steenwyk urged the AHA to postpone plans for a public education campaign to promote the idea of group hospitalization and to instead conduct an intensive study of all the Plans, with the aim of determining actuarial and financial facts throughout the entire group. Disaster had only narrowly been averted in New York;[56] Van Dyk's reputation was tarnished, although he insisted that the Plan's board had gone against his advice in adopting liberal enrollment policies—especially when it came to maternity care.[57] The scare prompted Plans elsewhere, whose enrollment practices had become careless, to tighten up their rules in order to stay out of financial trouble.

Van Steenwyk's 1936 visit to New York was part of a tour of several Plans he undertook in his de facto role as one of the emerging national leaders of the movement. Still busily and successfully engaged with the Minnesota

BCBSA00292676

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 36 of 182

group, he became aware as he was helping others organize that he really did not know much about the details of any operation except his own. The best way to ensure the quality of the advice he was handing out to new Plans was to compare it with other operations and results. In addition to New York, van Steenwyk visited Chapel Hill, N.C., Washington, D.C., Rochester, N.Y., and Cleveland, Ohio. All these Plans had been in business long enough to furnish



E. A. van Steenwyk founded a Blue Plan in Minnesota where he created the Blue Cross symbol, then went to Philadelphia where he led the influential Philadelphia Blue Cross Plan for many years, and was later a leader of the national Blue Cross organization during early discussions in the 1950s of a government program for the elderly. (BCBSA archives)

records of rates and payments over time and examples of common errors to avoid. His findings shed light on varieties of local experience and contributed to the development of a unifying canon of sound prepayment practices.

The Chapel Hill Plan—called the Hospital Savings Association—was the only statewide operation in existence and was in competition with the thriving Hospital Care Association in Durham, established in 1933. At the time of van Steenwyk's visit, the Durham Plan, with twelve thousand members, was twice the size of the Chapel Hill group. Van Steenwyk concluded that the statewide reach of the Chapel Hill Plan was more a burden than an advantage because it made the task of enlisting local community hospital support more difficult. Because the state hospital association sponsored the Chapel Hill group, the hospitals assumed the association would do all the work, and they therefore remained comparatively inactive. Cosponsorship from the state medical association also became a liability when the association insisted that enrollment should be limited to subscribers making less than $20 a week—a severe provi-

BCBSA00292677

sion that made enrollment very difficult to accomplish, especially since commercial insurers (although they shunned sickness insurance elsewhere) were active in North Carolina and provided nearly full hospitalization coverage. On a side trip to Charlotte, van Steenwyk met with officials of the Duke Endowment who had helped launch the Chapel Hill Plan with a $25,000 grant. He got the impression that the Duke Endowment "is not entirely certain that they have backed the right horse."[58] A comparison of the Durham and Chapel Hill Plans left no doubt about the importance of active and committed participation of member hospitals in the planning, promotion, enrollment, and management of the enterprise.

Van Steenwyk was impressed (and gratified, no doubt, given the primary purpose of his tour) by the record keeping and the "authentic information as to its experience" of Henryson's Washington Plan, which by this time had enrolled twenty-six thousand members, almost all of them federal employees.[59] It had greater reserves in relation to its size than any other Plan in the country, although the actual value of these reserves was kept confidential. No benefits were offered for dependents, but van Steenwyk observed with interest that the Washington Plan offered full maternity care, though only after a ten-month waiting period.

From the beginning, the groups had been cautious in their approach to coverage for dependents. "Everybody said you couldn't cover the family," recalled J. Douglas Colman, a founder of the Maryland Plan who later became an important national leader in the Blue Cross organization. Paranoia about malingering clouded the typical actuary's attitude toward nonworking dependents, Colman suggested in a 1971 interview: "You couldn't insure the unemployed person because they had no obligations, they didn't have to go to work, they would just go to the hospital and lie down. This was uninsurable."[60]

Coverage of hospitalized maternity care was seen as an especially poor risk and a threat to group stability because hospitalization was, in effect, planned in advance; the hospitalization and payment for it were a matter of choice. Some of the groups simply ruled out maternity benefits altogether. Others offered limited coverage, sometimes only after extended waiting periods, or only at higher premium cost, or both. However, as always, there were a few brave (or perhaps reckless) Plans that plunged ahead, adding dependent coverage or maternity coverage at the standard membership or family price. To everybody's surprise, these experiments were generally successful. Nobody decided to have a baby just to con a Plan into paying the hospital bill, and birth rates during the Depression were low. Gradually most of the Plans began to cover maternity services, some with waiting periods and extra charges, and some without. The idea that coverage of families was a bad risk persisted, however, and extra charges or limits on dependents' hospital stays continued at many of the Plans.

After their stop in New York City, van Steenwyk and the group of associates accompanying him on his tour went to Rochester, New York, where they

BCBSA00292678

found a Plan that was in many respects different from all others. In Rochester, sixty-five cents a month provided all the benefits a subscriber in the Minnesota Plan received for ninety-five cents. The Rochester Plan was endorsed officially by the local medical society, and sixteen of its thirty directors were hospital trustees. The Plan had twenty thousand members and seventeen thousand dependents, although it had been in operation for only about a year. Benefits for older members were being increased from three weeks of hospitalization to four. Ambulance service was covered, and some employers were paying a portion of their workers' fees. Reserves were high, dependent utilization low, and Plan officials were working on ways to offer complete family protection at an annual cost of between eighteen and twenty dollars.

> The Rochester Plan cannot be compared to any other citywide Plan in the United States because in the first place the Eastman Kodak Company enrolled 5,000 members before the Plan began to operate. A number of other large industries have sold their entire groups of employees on the Plan without any help from the association. The employers in this section seem to have more generally enlightened employee policies. Employees in this section are automatically granted many privileges which employees in the Midwest and South have to struggle for.[61]

On his visits to the flourishing Rochester and Cleveland Plans, van Steenwyk seems to have been disappointed only by a lack of detailed records to build an actuarial database. "Like the Rochester organization, Cleveland made no effort to keep the experience of groups and persons within the groups. Age, sex and marital status and other statistical information were not obtained either upon application or at the time of hospitalization," he reported. Van Steenwyk did note a couple of unique wrinkles in the Cleveland Plan. One was that subscribers had a choice between paying seventy-five cents a month for prospective semiprivate accommodations or fifty cents for ward accommodations. Cleveland also required that all group payments be made through payroll deduction.[62]

Van Steenwyk returned to Minnesota satisfied that he was running his business along the right lines, although he was torn between prudence and generosity regarding dependent coverage. Both Cleveland and Rochester covered dependents at about half the normal subscriber rate; for this price subscribers received about a 50 percent discount on covered services for their dependents. St. Paul offered only 25 percent coverage for dependents. Van Steenwyk was sure that low-income subscribers would opt for dependent coverage only if they knew family members would need care, thereby introducing an adverse selection bias into the risk pool. But he admitted that if other Plans were offering better benefits and were staying afloat (indeed, both Rochester and Cleveland reported healthy reserves), then his Plan might have to try to do so too. He predicted "that the time would come when comprehensive protection for dependents would be necessary."[63]

BCBSA00292679

## A Blue-Colored Cross

Starting in Toronto in 1931, the focal point for sharing experiences among pioneering Plan leaders was the AHA annual meeting. At these meetings, beginning in 1933, Rufus Rorem—in his capacity as coordinator for the movement—made annual reports on hospital service Plans. He presided over many lively discussions, where information was exchanged, problems or questions raised, and matters of principle debated. How much money does it take to start a Plan? Should there be age limits for enrollees? Should employers be asked to contribute? The discussions frequently indicated that hospital leaders from many communities felt bound together by a common interest in the integrity of all the Plans. Anyone who compromised the quality of care or failed to take good care of subscribers' money was a threat to the reputation of all the others.[64]

In 1936, the Rosenwald Fund decided to close down the medical economics program through which Rorem's work had been funded. As a parting gesture, the fund offered him a grant of $100,000 to continue his work, provided he could find a reputable sponsor. The AHA responded late in 1936 by creating a Committee on Hospital Service, "for the study and development of hospital insurance and related problems of health service finance."[65] To carry out the work, Rorem was named an associate director of the AHA, a job he would hold for the next ten years. This group was the embryo from which a formidable national organization of Blue Cross Plans would eventually develop.

Rorem was one of several interesting characters on the five-member committee, which included three physicians. The presence of Dr. Robin C. Buerki—administrator of Wisconsin General Hospital in Madison and AHA president—demonstrates the importance to the AHA of the budding hospital Plans. Dr. Sigismund S. Goldwater—past president of the AHA, commissioner of hospitals in New York City, and future president of the city's Blue Cross Plan—played a particularly useful role, according to van Steenwyk: "Dr. Goldwater, with his broad background in public health work and in hospital work and also in medicine, saw that unless standards were developed, the Blue Cross program would become merely an individual, local insurance Plan; some good, some bad."[66] The chairman of the committee was Dr. Basil C. MacLean, administrator of Strong Memorial Hospital in Rochester in 1936, who in later years would also serve as AHA president and (like Goldwater) as New York hospital commissioner. He also became the first chief executive of the national Blue Cross organization, formed in 1956 when the Plans finally weaned themselves from the AHA and started life on their own.

The fifth member of the original AHA Committee on Hospital Service was Monsignor Maurice F. Griffin, a Cleveland cleric and officer in the national Catholic Hospital Association. Griffin appears later in this narrative as part of a cabal against Rorem (see chapter 3) and epitomizes early contradictions in the relationship between the Blue Cross Plans and the hospitals. Early on, Griffin declared that through group hospitalization plans hospitals could

BCBSA00292680

ensure their financial health and retain control of their destinies. In his report on the 1933 AHA convention in Milwaukee, Rorem paraphrases Griffin:

> He indicated that any such program should be thought of and properly regarded as a creature of the hospitals; that hospitalization Plans are, in a sense, a funnel or conduit by which funds reached the institution. He expressed fear lest the influence of much money would prompt outsiders and meddlers to get concerned with hospital finance.

Rorem goes on to report Griffin's call for "a plan that financially will save our hospitals from state medicine, state compulsory insurance, and leave the financing of our institutions in our own hands." Rorem delivered a delayed rejoinder in a paper presented at the following year's AHA convention in Philadelphia:

> Group hospitalization is a way of putting hospital care in the family budget. It is not primarily a way of putting money into the hospital budget. The public has no particular interest in problems of hospital finance, but the ordinary citizen has a lively interest in the problem of his personal finance. Group hospitalization is a way by which people pay hospital bills and not a way by which the hospital pays its own bills.[67]

Rorem's work for the CCMC included a 1932 study entitled "The Public's Investment in Hospitals," which found that 90 percent of the capital for the nation's hospitals came from public sources, that is, philanthropy and tax funds. "These are the facts; the public owns the hospitals," the study concluded.[68] Years after he left the Blue Cross organization, Rorem commented on his disagreements with Griffin in terms that reflected clearly the orientation produced by this early research: "He never accepted my concept that hospitals belonged to the people rather than the governing bodies, or that health practitioners were essentially servants responsible to the public which legalized and financed their services."[69]

Under the auspices of the new AHA committee, Rorem called the first national meeting of Plan executives in Chicago in February 1937 to discuss common problems and exchange ideas. At that meeting, AHA officials announced an offer of associate institutional membership to any nonprofit group organization that met its standards of approval. By that time, twenty-six Plans had been formed with a total of 608,000 members. The following year, when the approval program went into effect, there were thirty-eight Plans and membership had more than doubled for the fifth straight year (to 1,365,000).[70] Meeting the fourteen standards adopted by the AHA in 1937 would qualify an approved Plan to display a symbol of affiliation in the form of a blue-colored cross with the AHA seal at its center.

The standards represented a summary of practical experience, a sort of a how-to-do-it guide. They reflected the combined effort of the Plans and the AHA to consolidate their position in the middle ground between for-profit

BCBSA00292681

enterprise and government. They also provided a principled framework (not unlike the U.S. Constitution in some respects) in which to balance the diversity and autonomy of the Plans with the need to establish a basis for unity among them. Among the 1937 standards:

- The corporate body should include representation of hospitals, the medical profession, and the general public.

- No private investors should provide money as stockholders or owners.

- Opportunities should be given for all hospitals in the community to participate in the hospitalization Plan, and subscribers should have free choice of hospital at times of illness.

- Benefits to subscribers should be guaranteed through service contracts with member hospitals, as opposed to cash indemnification contracts for hospital expenses.

- Annual subscription rates should be sufficient to remunerate hospitals properly for services rendered to subscribers.

- Subscriptions received should be currently separated into earned and unearned income.[71] The earned income should be apportioned to special accounts, each earmarked for special purposes, as follows:
  (a) Hospital care: charges against this account should include estimated payments for undischarged cases.
  (b) Reserve: in ratios determined by law as to minimum.
  (c) Operations: acquisition costs and office administration.

- Statistics should be maintained as follows:
  (a) Number of subscribers (classified by age, sex, marital status, and so on).
  (b) Number of hospital admissions (classified).
  (c) Number of patient days of care (classified).

- Uniform rates should be paid to participating hospitals for nominally similar services. Payments to hospitals should be based on the costs of services provided to subscribers in hospitals of the community, district, or region. This does not preclude . . . agreement by member hospitals to provide service at rates less than full operating costs.

- Employees of a nonprofit hospitalization Plan should be reimbursed by a salary as opposed to a commission basis. A private sales organization should not be given responsibility for promotion or administration on a percentage basis. Promotion and administration policies should be dignified in nature and consistent with the professional standards of the hospitals involved.

- Hospital services provided through hospitalization Plans should be determined by the practices of the hospitals and the wishes of the attending medical staffs in their communities.

BCBSA00292682

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 42 of 182

- Hospitalization Plans should not interfere with existing relationships be-
tween physicians and hospitals, among physicians, or between physicians
and patients.

- A hospitalization Plan should meet with the general approval of the AHA
Committee on Hospital Service.[72]

The standard requiring that payments to hospitals be based on costs had
not been hammered out easily. It was probably the most important, and most
delicate, of all the issues the Plans had to negotiate with member hospitals.
Rorem had challenged the Plans to come up with a formula that led to "the
best possible coverage to the largest possible number of people at the lowest
possible cost."[73] But it was up to the parties at risk to negotiate the actual
price of that coverage. It was plain that too low a price would beggar the hos-
pital and too high a price would beggar the Plan. There were no precedents.
The payment rate had to be decided by negotiation, in good faith on both
sides, with the kind of trust made possible by common purpose and no
thought that either could profit from the result. It is remarkable that there
were apparently no deadlocks, no broken negotiations, and no recriminations
during the first decade after the creation of these standards. In the nonprofit
environment, payment rate negotiation was not seen solely as a game of win-
ners and losers.

According to Odin Anderson, Rorem's efforts "to solidify Blue Cross
[Plan] philosophy and principles" met with "apparent success on the surface
but with constant restiveness underneath."[74] The adoption of standards and
an AHA approval program amounted to the adoption of the prepaid group
hospitalization Plans as the children of the hospitals. Some hospitals saw the
Plans as gifted offspring and were proud of their accomplishments. Others
feared they would cause trouble if not kept in line with stern discipline. The
variety in attitudes toward the Plans struck James Stuart as nothing less than
kaleidoscopic:

> a mere collection agency for the hospital . . . a growing power that might even-
> tually dictate policy and program . . . a great social and economic force to bring
> the services of the hospital within reach of all members of the community . . . a
> temporary device to tide the hospitals over a time of financial need. [But in most
> cases] hospitals saw [the] Blue Cross [Plan] as something to encourage and pro-
> mote, even if at times their motives seemed to be mixed.[75]

However varied their views, the hospital parents had by 1938 imparted to
their offspring Plans a fundamental system of values, in the tradition of the pri-
vate, voluntary, not-for-profit hospital that dominated the American scene. (In
1940, about 70% of all hospital admissions were to nonprofits, whereas 20%
were to government-owned and 10% to proprietary facilities.)[76] The voluntary
spirit was reflected not only in terms of nonprofit incorporation and the ideal

BCBSA00292683

of community service frequently invoked by early leaders, but also in the fundamental differences between the Plans' approach to paying for care and conventional underwriting practice. The keys to this approach were the concepts of the service benefit and of a single, communitywide premium rate. As Stuart observed, the idea of underwriting the entire cost of hospitalization, whether it be $10 or $10,000, "violated basic insurance principles and was in direct contrast to the commercial insurance concept of paying a predetermined fixed indemnity to a policy holder against his loss."[77] It is doubtful whether the promise of service made by the Plans could have been kept unfailingly without the parentage of the hospitals, since in many cases the initial capital available to the Plans was limited and the hospitals' ability to underwrite the cost of the benefit in kind was the ultimate guarantor of the service contract.

Another innovation that helped lend the early Plans their distinctive character proved much less durable. Most of the Plans offered the same rates to all subscriber groups regardless of age, sex, occupation, or other characteristics that might affect the frequency with which members of the group would require hospitalization. Although this approach—to become known as "community rating"—was equitable and administratively simple, it violated a long-established insurance principle of tailoring rates to the risk potential of a subscriber group. Actuarially, there was nothing the matter with pooling high and low risk groups. The large pool kept the overall rates low enough to be tolerable for those who got sick the least often and generated enough capital to meet the need at the other end of the risk continuum. Eventually, however, the enormous success of the Blue Cross Plans overcame the reservations that commercial insurance companies held about writing health insurance. And when the competition sought to break into the market by partitioning the risk pool and cutting rates at the low end, the choice that faced many of the nonprofits was either to change their rating practices or to become extinct.

In the pioneering period, Stuart observed, "financial safeguards common to traditional private insurance operation were not sought by Blue Cross [Plans]. In fact, all these insurance principles were consciously discarded at the beginning." The early Plans often shied away from hiring people with insurance experience as managers, even when such candidates were eager for a chance in the new field. Stuart, for example, was a social worker in Cincinnati when that city's Hospital Care Corporation was founded in 1939. Some months later he was approached by a friend, a successful agent for a large life insurance company, who wanted Stuart to recommend him for the job of executive director of the hospital service Plan. Stuart dutifully made the pitch to the president of the Plan's board of trustees, who was another friend. Stuart recalled:

> I was sure that I had done the best sales job of my career. . . . After a moment's hesitation, [the president] responded, "Well, you've made a good case for your friend, but we aren't interested in an insurance man. This is not insurance and we have decided that an insurance background may be a hindrance rather than a help. . . ." He paused. "How about you taking the job?"[78]

Although their sense of mission sometimes struck their opposite numbers in the insurance business as sanctimonious, there was never a question about the Blue Cross system pioneers' commitment to an ideal of private enterprise. The private sector orientation was rooted in the parent hospitals and reflected an intersection of practical and philosophical considerations. "I have often



As a young hospital administrator in Northern Ohio in the 1930s, John Mannix conceived the idea of bundled payments for hospital services, similar to what eventually became known as diagnosis-related groups or DRGs. He went on to become a Blue Cross leader in Cleveland and Detroit, later arguing unsuccessfully for creation of a single, national Blue Cross organization. (Julian Apsel Photo)

said that man's best friend is himself," Rorem wrote in 1987. "The conviction that most people prefer to take care of themselves financially as well as physically was basic to the development of prepaid voluntary hospitalization Plans." Odin Anderson characterized Rorem, Mannix, van Steenwyk, and Van Dyk as "products of a stratum of American society trained from childhood to be self-reliant and to cope with facts, figures and organizations. They were basically Calvinists." But their idealism was modest and unassuming, according to Harold Maybee, a founder of the Blue Cross Plan in Delaware: "I don't think I ever heard in all my experience anybody among us older fellows even saying out loud that this was satisfying, this was ennobling. They would have been a little embarrassed to talk about it. The fact is we never thought about it very much. It just was, that's all."[79]

The successes of prepayment during the first ten years (enrollment reached 2.8 million by the end of 1938) could have only strengthened the faith of the early leaders in the private nonprofit formula. But it also attracted notice from

BCBSA00292685

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 45 of 182

public policy makers. In 1938, an interdepartmental group in the Roosevelt administration revived discussion of government intervention in health insurance. The group issued a report that recommended state subsidies for health programs, federal aid for hospital construction, increased medical aid for the indigent, federal disability compensation, and "consideration of a general medical care program supported by taxes, insurance, or both." Although generally keeping the issue at arm's length, in July Roosevelt called a conference in Washington on national health programs, which energized reform-minded progressives. The conference shocked the AMA's House of Delegates into endorsing disability compensation, the expansion of public health services, and indigent aid. Starr thought that "The aim of this new and more receptive stance was plainly to isolate compulsory insurance from other issues and thus bring about its defeat." A conservative swing in the 1938 elections and an increasing preoccupation with events in Europe sank the administration's gambit, however. Stuart expressed the prevailing attitude among Blue Cross organization people with his comment that the Washington conference and renewed discussion of compulsory health insurance was "one small strange cloud . . . in an otherwise clear sky." Stuart described the episode as part of "the long struggle to keep hospital insurance a voluntary venture."[80]



Sally the Student Nurse did not last long as a symbol of what some called the prepayment "movement." But the blue-colored cross in this poster commissioned in 1934 by E. A. van Steenwyk—initially for use by the newly formed Hospital Service Association (later called Blue Cross of Minnesota)—perpetuated itself as a unifying force. (Courtesy Blue Cross and Blue Shield of Minnesota)

BCBSA00292686



# The Doctors' Dilemma

*The AMA hierarchy was unalterably opposed to*
*Blue Cross and Blue Shield [Plans].*

—F. L. Feierabend, M.D.

WHILE THE BLUE CROSS PLANS in their early years radiated an aura of sunny good fortune, the birth of medical prepayment was a problematic affair. The rapid growth of hospital prepayment created strong public demand for complementary medical service plans. Doctors were susceptible to many of the same pressures to find new ways to pay for care that had prompted hospitals to organize prepayment plans. It was clear even before the Great Depression years that many patients were going without needed care because they could not afford it. Doctors were hurting, too. Their willingness to accept hospital prepayment was based on both concern for patients and self-interest. "Hospital service plans reduce for the patient any financial worry which so frequently retards recovery," explained a leader of the St. Louis Medical Society, Dr. Carl Vohs, at the 1937 AHA convention. "Nor is it too crass to take cognizance of the fact that the patient without a hospital bill to pay can more readily meet the expense of medical fees."[1]

When the demand for doctor plans arose in the 1930s, the medical profession had for twenty years been debating proposals to change the way physicians were paid. The profession was more divided on the subject by this time than it had been when the argument started. The form that health insurance was to take for the rest of the century—a bifurcated system that paid hospitals one way and doctors another—had its roots in this stubborn, heated, and confounding controversy.

BCBSA00292687

Alternatives to fee-for-service medicine did exist at the time the first Blue Cross Plans were founded. In isolated industries such as mining, timber, and railroads, for example, contract practice had been a familiar arrangement for decades. Before the United States entered World War I, some prominent leaders of organized medicine had entertained visions of radical changes in physician payment. Doctors were worried about their livelihoods, both in the United States and in Europe. Increases in public health services were taking patients away. Advances in medical and surgical techniques were shifting the locus of care from the home or doctor's office to the hospital, which was often too expensive for the typical worker. Between 1883 and 1913 ten European countries had adopted various forms of compulsory health insurance. When the British adopted a limited system in 1911, American doctors began to take notice. In the words of Ronald Numbers, "The spread of compulsory health insurance to an English-speaking nation convinced many that its appearance in America would not be far distant."[2]

The pages of *JAMA* began to fill with reports on the progress of the European experiments. Fresh from fights to expand public health services, which began at the turn of the century, the AMA was fully aware that many Americans had no access to care. The organization was naturally intrigued by any proposal that appeared to address this problem effectively. Despite early reports that German doctors had suffered economically from their country's program, *JAMA*'s London correspondent reported in 1913 that some British doctors practicing in poor industrial neighborhoods had doubled their income, while others had seen increases of between 20 and 50 percent. *JAMA* reported in 1916 that the spread of workers' compensation laws in the United States during this decade was viewed by many as an entering wedge for a more comprehensive program of health coverage. According to AMA historian James G. Burrow, "the United States stood practically alone among the large industrial nations that had not adopted compulsory health insurance," which tended to create a sense of inevitability and acquiescence among many doctors. From 1916 to 1920, compulsory insurance bills were introduced in fifteen state legislatures and debated in Congress. "Much of the best informed opinion of the country is in favor of these proposals," *JAMA* declared. "The introduction of these bills marks the inauguration of a great movement."[3]

The unraveling of this "great movement" came with extraordinary swiftness and generated a backlash both stronger and longer lasting than the movement itself. After the first favorable reports from Britain, overseas correspondents took a second look and decided that, despite some success stories, "the British medical profession was suffering." With the shortage of doctors pushing up physicians' incomes in the United States, unfavorable comparisons were inevitable.

The blow that killed the compulsory health insurance movement, however, came after German submarines began attacking American merchant ships in the Atlantic in 1917 and the United States was drawn into war. Germany was the country that had given birth to European-style compulsory insurance.

BCBSA00292688

Tarred by its opponents because of its country of origin, the idea of state-sponsored health coverage soon became the target of patriotic denunciations, derided as Teutonic, un-American, Bolshevik.

Another set of developments that laid a minefield for future advocates of prepayment involved the rapid growth of contract medical practice during and after the war. This growth was fueled by the spread of workers' compensation laws from 1910 to 1920 and by the rapid advances in technology resulting from the massive medical mobilization required by the war. According to Burrow:

> Physicians, returning [from wartime duties] to private practice in areas where the supply of medical facilities lagged far behind scientific advancement and public need, found the idea of group practice even more attractive. . . . In many localities, only a physicians' merger movement held promise of providing the type of facilities that few acting alone could afford.

Burrow explains how the bitter controversy over contract medicine then unfolded: "The newly-adopted workmen's compensation laws had carried contract schemes far beyond their original purposes. . . . local hospitals, often under lay control, secured these contracts and then initiated ruinous competition among physicians by bargaining for medical services with the lowest bidder."[4]

In the state of Washington, county medical societies in the Seattle and Tacoma area responded to the threat by going into contract practice themselves. "They were convinced of the necessity of assuring organized medicine's influence in, if not control of, this form of practice," states a history of Seattle-based King County Medical Blue Shield. In 1917, the local medical societies in King County and neighboring Pierce County set up "industrial service bureaus," which were empowered to make contracts with employers and employees on behalf of the doctors' organizations.

Interested doctors purchased a share in a bureau. Workers with contracts could seek treatment from any physician participating in the bureau program, and fees were paid from contract proceeds. Before the year was out, 80 percent of the King County Medical Society had joined the bureau and six thousand people were covered. Participation flagged during the boom years of the 1920s, however, and the King County bureau closed temporarily. But it revived at the onset of the Depression. Meanwhile, prompted by the example of Seattle and their own familiarity with the regional history of contract practice, county medical societies throughout Washington and Oregon were forming similar bureaus. As Reed put it, "By the late Twenties an appreciable part of the medical care of wage earners in the two states had come under the control of these organizations."[5]

Organized medicine at the national level sought to counteract the threat from contract practice by using professional rule-making authority to impose

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 49 of 182

controls and limits. In response to postwar concern about economic rivalry among doctors and the unseemly specter of bargain basement medicine practiced by groups competing for workers' compensation contracts, the AMA in 1922 added to its code of ethics a prohibition against advertising. In 1927 the AMA's judicial council outlined further standards prohibiting schemes that compensated doctors at less than the rates normally charged in a given area; that encouraged doctors to underbid each other for contracts; that involved solicitation of patients; or that interfered with patients' free choice of physicians. In 1930, the AMA added a warning against "all contact with hospitals that had adopted any system of collecting fees for medical service."[6]

Sharp clashes resulted when medical societies, determined to curb contract practice, confronted groups of physicians who were convinced they had found an improved way to deliver care. In Los Angeles in 1929, Dr. Donald Ross and Dr. Clifford Loos began a prepaid practice on contract with employees of the Los Angeles Department of Water and Power. The Ross-Loos clinic flourished and by 1935 had enrolled twelve thousand workers—most of them city and county employees—plus twenty-five thousand dependents. Ross said later that he did not consider the effort so much a major innovation as an extension of the established norms of industrial medicine. Nevertheless, "the success of this early group practice prepayment plan aroused the ire of the local medical society and a long, drawn out battle took place." Ross and Loos survived expulsion and calumny, however, and their clinic prospered.[7]

Even more controversial was Dr. Michael Shadid's medical cooperative in Elk City, Oklahoma, which was organized in 1929 with the help of the Oklahoma Farmers Union. The business affairs of the Hospital Cooperative Association were managed by consumers, while Shadid retained strict medical control. Shadid was a medical missionary who campaigned for the cooperative ideal throughout the western regions of the United States and Canada, touting it as an alternative to compulsory health insurance and other forms of government intervention. However, the local medical society in Elk City and the state doctors' organization were unremittingly hostile. First they expelled Shadid, then they tried to discourage the doctors he was recruiting, and finally they sought unsuccessfully to enact legislation that would give them the power to revoke his license. After twenty years of fighting, the Hospital Cooperative Association sued the state and county medical societies for alleged antitrust violations in their campaign against Shadid. Eventually the two sides settled out of court, when other litigation clarified the right of doctors to form cooperatives and to accept payments not based on a fee-for-service principle.[8]

## The Birth Pangs of Medical Prepayment

So by the time the hospital service movement began to flourish in the early years of the Depression, doctors were already sensitive on the subjects of insurance, medical service contracts, and prepayment. Publication of the final CCMC report in 1932 drew a line in the sand for the debate to come. A

BCBSA00292690

majority of CCMC members had agreed that the cost of care should be spread over groups of people and over periods of time, through insurance, taxation, or both. But the backlash against this recommendation was formidable. The vituperative response of Dr. Morris Fishbein, the arch-conservative editor of *JAMA,* might be written off as individual iconoclasm, but a biting minority report by dissenting physicians on the CCMC left little doubt that distrust of prepayment ran deep among doctors:

> Voluntary insurance systems are now in operation in many parts of the United States and are increasing in number and size. . . . That they are giving rise to all the evils inherent in contract practice is well known. Wherever they are established there is solicitation of patients, destructive competition among professional groups, inferior medical service, loss of personal relationship of patient and physician, and demoralization of the professions. It is clear that all such schemes are contrary to sound public policy and that the shortest road to the commercialization of the practice of medicine is through the supposedly rosy path of insurance.[9]

Making no distinction between voluntary, compulsory, and government insurance plans, the AMA's House of Delegates adopted the minority report as a statement of its own position in 1933.

The more patients got used to prepaid hospital service, the more they wondered why they could not make the same kind of arrangement for services received from surgeons and other physicians who saw them at the hospital, as well as for office visits to their family doctor. With patients increasingly unable to pay their bills as the Depression progressed, many doctors mulled over the same question as they struggled to meet operating expenses and maintain their incomes. The burgeoning of the hospital prepayment movement created intense pressure for a breakthrough.

If an organization controlled by laypeople or hospital representatives were to become involved as a third party in the payment of medical fees, the sovereign relationship between doctor and patient might be compromised and the practice of medicine subordinated to bureaucratic regimentation. The nascent Blue Cross hospital Plans recognized the need for cooperation within the medical profession. In 1933, Rufus Rorem had urged fledgling Plans to exclude coverage for medical services from their benefit packages. Many state laws enabling hospital Plans expressly prohibited such coverage, usually at the insistence of state medical societies, whose assent was almost always necessary to win passage of such legislation.[10]

One thorny set of problems arose around the status of hospital-based specialists such as pathologists, radiologists, and anesthesiologists. In some areas, the specialists worked on contract with their host hospitals and their fees were included in hospital billings. Elsewhere, specialists functioned as private practitioners and billed patients separately. Before hospital prepayment, the specialist's bill was just another item on a long list of charges. Once patients got

BCBSA00292691

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 51 of 182

used to prepaid hospital service, however, that bill became a major irritant. The patient had paid for hospital services in advance. Why, then, was there an additional charge? This was difficult for the patient to understand. But a hospital-based specialist found it difficult to accept payment for services rendered from an ill-defined third party instead of the patient, a third party who would inevitably attempt to influence what the doctor charged and how he or she practiced.

The way medical prepayment plans developed during the 1930s, then, generally hinged on the way young plans worked out their inherited conflicts with organized medicine. Plans that chose to buck the medical establishment usually encountered stiff opposition, although a few independent organizations survived early pressures and flourished. When prepayment advocates chose to work through the system, they needed infinite perseverance.

The most successful of the plans that chose to go it alone—in the tradition of Doctors Shadid, Ross, and Loos—began in 1933 in the desert east of Los Angeles, when Dr. Sidney Garfield began providing care for five thousand workers building an aqueduct to bring water from the Colorado River and the Sierra Nevada to the growing urban population of Southern California. The insurance companies providing workers' compensation coverage paid $1.50 per worker per month to Garfield and his colleagues. Workers contributed a matching share (a nickel a day) and in return received comprehensive medical care. "Workers, contractors, the doctors, and the insurance companies were happy with this plan, operated without charity or financial hardship on anyone," Greer Williams wrote later. "The key advantages of the scheme lay in predictability—in steady income for the medical group and in a ready source of care at low cost for the workers."[11]

Henry J. Kaiser, whose construction company did some of the work on the aqueduct system, liked the arrangement so much that when he contracted to build the Grand Coulee Dam in the state of Washington five years later, he took Dr. Garfield with him. Later on, he transplanted the program again to his wartime shipyard industry and opened it to other employee groups, first as the Kaiser Foundation Health Plan and later as the Kaiser Permanente Health Plan. In its early years, the Kaiser plan was plagued by problems recruiting physicians, who knew they faced ostracism from their local medical societies if they went to work for a plan that violated the AMA's rules by practicing in an enterprise not under the express control of organized medicine. But the Kaiser Permanente plan survived and prospered.

A more bruising struggle occurred in the nation's capital, where a group of employees of the Federal Home Loan Bank organized a nonprofit cooperative in 1937 to provide hospital and medical care with a staff of salaried doctors under the control of a board elected by the cooperative's membership. The AMA responded with a campaign that, according to subsequent judicial proceedings, included efforts to deny participating doctors consultations and referrals and to pressure hospitals in the District of Columbia into the denial of

BCBSA00292692

admitting privileges to the co-op's doctors. In December 1938, the U.S. Department of Justice obtained an indictment against Fishbein, the AMA, and its Washington affiliate for conspiring in restraint of trade. The doctors' organizations did not deny that they had acted against the co-op. Fishbein described the case as a test of organized medicine's right to control forms of contract practice that it deemed unsuitable. The legal defense was that medicine was a profession, not a trade, and therefore exempt from antitrust laws. Although the U.S. Supreme Court ruled against the AMA in 1943 and fined the defendants, twenty-six states would later pass laws restricting consumer-controlled medical plans during the 1940s.[12]

Working within the system could be just as difficult as going it alone. Inspired by the final CCMC report in 1932, the president of the Milwaukee County Medical Society of Wisconsin proposed that the society create its own plan of coverage. Dr. James Sargent's plan would have provided full family medical service coverage for a fee equal to 5 percent of the subscriber's income, with a $50 annual deductible. Opposition quickly erupted among Sargent's colleagues in the county and state medical societies and from the AMA. Sargent was getting carried away, his peers decided, and the county society vetoed his plan in 1933.

Three years later, a group of doctors "who saw merit in the rejected Milwaukee plan" tried again. Workers from International Harvester Company had approached the doctors, asking if they could buy prepaid medical services for a monthly fee.[13] Undeterred by the county medical society's refusal to endorse their plan, the doctors founded the Milwaukee Medical Service, which offered full medical coverage for workers and their families for $3 a month. The society promptly expelled the doctors, alleging ethical violations including solicitation, engaging in undesirable contract practice, and advertising. The doctors' appeal was rejected by the state medical society and the AMA, and the guilty parties lost their privileges at almost all of the city's hospitals. But the clinic they had organized stayed open another thirteen years.

One of the first successful attempts to launch a prepayment plan within the framework of organized medicine occurred in California. Serious debate about prepayment in the state's medical establishment began when two physicians from Oakland came to the California Medical Association (CMA) in 1933 to ask its blessing for a hospital plan they wished to create in Alameda County. The two men—George Reinle and Earl Mitchell—were trustees at the financially troubled Merritt Hospital in Oakland who became interested in prepayment after hearing a talk by Rufus Rorem. After the state medical society voted against the project, Reinle and Mitchell turned to their colleagues in the Alameda County Medical Society for support and received better results. By 1936, they had secured pledges from 180 doctors (at $100 each) and from seven hospitals (at $1,000 each). The state insurance commissioner declared that under existing California law the company would have to operate under insurance regulations and post a $25,000 bond, which would leave

BCBSA00292693

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 53 of 182

the organization without a dollar of start-up capital. Fortunately, the county medical society saw fit to advance a $7,000 loan, and the Insurance Association of Approved Hospitals was incorporated in August 1936.

Despite the shaky beginnings, the project survived. The Alameda County doctors' role in founding it had a germinating effect on the state's medical community as a whole. According to Howard "Hap" Hassard, a young lawyer who went to work for the CMA in 1935, two factions developed in the CMA after the vote in 1933. Opposition to prepayment in any form had waned, and opinion was now divided over compulsory versus voluntary programs. Suspicion of a government-sponsored program remained strong, but the arguments in favor were forceful as well. Hassard said:

> It was a way to avoid starvation. . . . Being a doctor didn't mean you were going to get something to eat, because your patients couldn't pay anything. So the entire thrust for compulsory health insurance in California at that time was money, which meant survival. Do you want to eat or don't you want to eat? There weren't any other arguments of any consequence.[14]

At its annual meeting in 1935, the CMA members voted differently on the issue than they had two years previously: to the dismay of the more conservative members, a majority of the house of delegates approved a plan to propose a compulsory health insurance law to the state legislature. The bill was a defensive ploy full of safeguards for doctors but had little else to recommend it. "Everybody opposed it. It had no supporters except the California Medical Association," said Hassard, who helped draft the measure. "Labor opposed it, business opposed it, the chamber of commerce opposed it, and the press opposed it." The bill failed, but even before the exercise was over, several of the key figures in the effort had begun to discuss strategy for creating a voluntary prepayment plan for doctors that, according to Hassard, "would enable people to pay small premiums and get at least a portion of their health care costs paid for."[15]

The gestation period for medical prepayment in Michigan was also protracted. The first doctors to develop an interest in the movement were faithful to the protocols of organized medicine and loyal to their state and county medical societies and to the AMA. Their ideas ran afoul of AMA rules against business activities by medical societies on the one hand, and against plans not sponsored by doctors, on the other. In mid-1933, the state medical society created a committee on medical economics and asked the group to formulate a design for a health insurance plan that would leave control of medical benefits in the hands of the profession, allow patients a free choice of physicians, and exclude for-profit operators. The reaction of society members to the resulting proposal was mixed, however, and the organization failed to agree on a course of action.

At the end of 1933, the society sent its president, Dr. Henry Luce (not the publisher), and University of Maryland professor Nathan Sinai to Britain to

BCBSA00292694

study the national health insurance system there. The British had not yet created their National Health Service, but since 1911 the government had operated a health insurance program in partnership with private local "friendly societies." The two men returned to report to the society's medical economics committee "that while the British health insurance system was riddled with serious and dangerous shortcomings, it did not follow that these shortcomings were an inescapable part of any insurance system." Within a few weeks, the committee had a concrete proposal ready to present to the members of the state society, which entailed creating a nonprofit organization that would provide comprehensive medical, dental, nursing, and hospital services (there was as yet no hospital prepayment plan in Michigan) both inside and outside the hospitals, for employed persons and their families. The proposal was endorsed by the society's house of delegates in April 1934 by a 61–9 margin. The strategy agreed upon was to begin with experimental pilot projects limited to one company or community.[16]

It was only then that the doctors discovered how much they had to learn. "Actuarial data on hospital and medical insurance were non-existent. None of the doctors knew how to write an insurance contract," stated a 1951 account in the Michigan State Medical Society's *Journal*. The effort bogged down almost immediately, and members of the state medical society just as quickly lost confidence in the project they had endorsed. "The lack of know-how, with the resulting lack of confidence, were the big obstacles," the account suggested. "It was clear that the doctors had in the main undergone the necessary ideological transition."[17]

The Michigan doctors were not alone. In 1935, the AMA's Bureau of Medical Economics issued a report:

> Nearly 200 different experiments are being conducted or considered by county medical societies in the United States. . . . The medical profession has recognized its responsibility and has accepted its position of leadership in providing medical service. . . . There is nothing inherently good or bad, from a medical point of view, in different methods of collection. Insurance, taxation, budgeting, advance financing and all other methods are nothing more than tools with which to conduct an economic transaction. . . . The chief thing to keep in mind is that *all forms of collection should be isolated from any control of service and be kept exclusively in the economic field*.[18] (emphasis in original)

## In Search of a National Policy

The controversy surrounding the final CCMC report in 1932 reverberated on the national political stage as well as in the medical profession. Franklin D. Roosevelt was elected president just a few days after the report was published, and liberal advocates of national health insurance expected their issue to take a prominent place on the administration's social welfare agenda. According to Daniel Hirshfield's partisan but carefully documented study, *The Lost Reform,*

BCBSA00292695

health reformers "felt they had reason to rejoice" at the coming of the New Deal. But Roosevelt was determined to avoid any confrontation with the AMA over health insurance that might jeopardize other New Deal initiatives. A committee of policy specialists headed by Dr. Edgar Sydenstricker was assigned to work (but told to go slow) on a possible health insurance component for the proposed Social Security program. Reformers involved in building a health insurance plan sought to allay the administration's fears by creating a medical advisory board that would demonstrate support for national health insurance in the medical profession. At the same time, a flood of letters, telegrams, and phone calls from doctors poured into the committee's offices, protesting any move in the direction of compulsory insurance.

AMA leaders had little difficulty outmaneuvering Sydenstricker's group (which included Rorem's former colleague in the CCMC, Isadore S. Falk) because of their superior political abilities and a lack of any broad-based public support for sweeping reforms. Despite support for national insurance from presidential intimate Harry Hopkins, Roosevelt was won over ultimately by administration officials "who felt that health insurance should be delayed until after the passage of the Economic Security Bill [including federal unemployment and the Social Security program] so as not to endanger that most important piece of legislation." After the Social Security legislation passed in 1935, Roosevelt told Labor secretary Frances Perkins "that he did not want action on health insurance in Congress until after the 1936 elections."[19]

The duel over compulsory health insurance in 1934–1935 forced the AMA to examine the opposition it had projected through militantly conservative representatives such as Fishbein and the minority group on the CCMC. Following the first assault on the Sydenstricker-Falk committee in 1934, for example, several influential doctors had criticized the "unfair and distasteful tactics" that had been used in the "barrage" of letters and telegrams. The protest forced a pledge from AMA leaders that attacks on the personnel and agenda of the Roosevelt health policy committee would be discontinued. Behind this relatively minor tactical adjustment lay the beginnings of a subtle but significant shift in the attitude of organized medicine toward prepayment. According to Hirshfield, "The more powerful medical leaders realized that a permanent hostility to all reforms would probably alienate the public and make governmental health insurance inevitable."[20]

Sydenstricker and Falk were probably correct in believing that some latent support—or at least tolerance—for reform of the health system could be found among members of the AMA House of Delegates. In 1934, the delegates voted to approve a list of ten principles governing acceptable behavior by medical service plans. The principles stood in clear opposition to the kind of government-sponsored program that Sydenstricker was pointing toward, a program stressing physician control, voluntary participation, and private sponsorship. But the principles also represented a significant departure from the outright rejection of any form of prepayment voiced by the CCMC

BCBSA00292696

minority report. Among the key points were these:

- All features of medical service should be under the control of the medical profession.

- No third party must be permitted to come between the patient and his physician in any medical relation.

- The patient must have absolute freedom to choose a legally qualified doctor of medicine.[21]

Fears about a government-controlled compulsory system revived, however, and grew toward what some doctors considered crisis proportions in 1938, when Roosevelt agreed to call a national health conference to debate an array of health policy issues, including insurance. The agenda was a series of policy proposals including expansion of maternal and child health programs, support for new hospital construction, grants-in-aid to the states for care of the needy, consideration of disability insurance, and a comprehensive program to improve health care for the entire population, which was to be administered through the states with federal standards and subsidies. According to Hirshfield, the latter two proposals were vaguely formulated and unsupported by clear cost estimates or financing schemes. But objections raised to the insurance and disability proposals—by the ubiquitous Fishbein (among others)—were submerged nonetheless beneath the tide of good intentions and general bonhomie generated by the conference. Advocates of compulsory insurance were highly enthusiastic and reported to the president that the conference had demonstrated substantial public support for the program. At first Roosevelt seemed impressed. But his earlier skittishness about health insurance soon reasserted itself, and he became even more distant from the issue as he became more preoccupied with the approaching war in Europe.[22]

Despite little support for the insurance and disability programs endorsed by the national health conference, AMA leadership "became gravely concerned that the government might use the misguided excitement of the conference delegates as an excuse to push for the passage of the entire program." Medical societies from coast to coast again cranked up their political machinery and launched a major public relations campaign against the program. By this time, however, enrollment in hospital prepayment Plans stood at nearly 2 million people, and pressure for medical prepayment was growing apace. In a policy statement released in connection with its campaign against a government-run, compulsory insurance program, the AMA broadened the cautious endorsement of private insurance that it had first advanced in 1934:

> The A.M.A. approves hospitalization service insurance providing all such plans do not incorporate medical services or medical care. The A.M.A. encourages local medical societies to develop plans in accordance with local needs; endorses cash indemnity insurance for the payment of professional bills incurred during a prolonged or emergency illness providing such plans have the approval of the

BCBSA00292697

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 57 of 182

medical society concerned and are under state government supervision; and condemns all forms of compulsory health insurance as bureaucratic, inefficient and potentially harmful to the quality of American medical care.[23]

## Into the New

After a decade of prepayment debates, California doctors' minds were finally made up for them by the appearance of a common enemy. In 1938, to the surprise of conservatives, a left-leaning liberal—Culbert Olson—was elected governor. One plank in Olson's platform was a promise to seek compulsory health insurance legislation, financed by a payroll tax and administered by state-employed doctors. This effort—with the governor's support—was the first to seem likely to succeed. The CMA was in distress as the legislature prepared to meet in January 1939.

The CMA's political leaders judged that Olson's compulsory health insurance proposal could only be defeated with an alternative plan for voluntary private coverage. A committee was appointed to create it, with Hassard and his senior law partner, Hartley Peart, as legal advisors and draftsmen. Their initial concerns were primarily financial. A prepayment plan that looked too much like an insurance business would have to come up with a hefty bond (as the Alameda County hospital Plan had been required to do). But the legislature was to convene in January and there was not enough time to raise the amount of money needed. Inspired by the county medical bureaus of Washington and Oregon, Hassard and Peart reoriented their thinking to the concept of a service organization. A federal district judge had ruled recently that a federal employees' health plan in the District of Columbia could not be classified as an insurance business because it contracted to provide services rather than to pay indemnities. The CMA decided to hang its hat on this decision. In December, the CMA House of Delegates called a special meeting to decide on the resulting proposal. Morris Fishbein sent a deputy to lobby against the measure, but it was approved nonetheless by a resounding 100–4 margin.

Olson's bill was defeated, and on February 2, 1939, California Physicians' Service (CPS)—now operating as Blue Shield of California—was incorporated as the nation's first medical service prepayment Plan. "As a matter of hindsight, it's extremely difficult to weigh the balance between genuine concern for their patients' welfare and fear of government encroachment or government control," Hassard reflected later. "They both played a part."[24] By July 1939, five thousand physicians in fifty-six counties had signed on as participants. Another hundred doctors—who said that for one reason or another they could not accept patients under the Plan—nevertheless made financial contributions. Formation of the organization made banner headlines, and twenty thousand subscribers were enrolled in the first year of operation. With a stroke of luck, the group tapped the eminently suitable Ray Lyman Wilbur—past AMA president and former CCMC chairman—as its first presiding officer.

BCBSA00292698

The Olson administration soon reached an accommodation with the new organization. Initially, the state insurance department objected strenuously to CPS's organization as a nonprofit membership corporation instead of as an insurance company, and Hassard's boss, CMA counsel Hartley Peart, soon received a phone call from California's then-Attorney General Earl Warren to arrange a meeting. Warren was conciliatory (although later as governor he would cross swords in earnest with CPS); he was merely doing his duty as counsel for the state insurance department. He advised Peart and Hassard that the department felt CPS was violating state law by conducting an insurance business without a license or bond and without paying premium taxes: "I have a lot of doctor friends. . . . I don't want to unnecessarily embarrass or interfere with efforts of the doctors in California," Warren pleaded. "How can we do this?" By agreement with the future California governor and U.S. Chief Justice, CPS, joined eventually by several Blue Cross Plans, filed suit a week or so later to seek a declaratory judgment that they were not in the insurance business. The case took seven years to reach the U.S. Supreme Court, where the Plans prevailed. Their recognition under the enabling legislation of 1937 as nonprofit organizations not subject to conventional insurance regulations was upheld.[25]

The legal challenge was nowhere near as great a threat to the fledgling CPS as were the uncharted reefs and shoals of the underwriting profession. As the official history of the organization puts it, "Had the founders expected instant success, they were in for a shock. . . . At first, pricing the program seemed next to impossible. After all, it had never been done before." The state medical society had loaned the Plan $42,000 in start-up capital. Subscribers had a choice of complete coverage for $1.70 a month or a contract for $1.20 a month that did not cover the first two office visits for a given illness. To protect the traditional practice of charging more affluent patients higher fees than those with lesser incomes, enrollment was limited to those who earned $3,000 or less a year. The medical Plan handled enrollment and fee collection jointly with the state's three hospital service Plans. Ten of the Plan's eleven trustees were doctors.[26]

According to Louis Reed, the first few years' of underwriting experience, especially with the comprehensive contract, was "disastrous. The number of services demanded by subscribers far exceeded expectations, with the result that the Plan had to reduce the compensation provided to physicians." Payments to doctors were pegged at $1.75 per "unit," a price that represented the standard fee for an office visit minus a discount. All other services were reimbursed as multiples of the base unit. Because subscription fees fell short of utilization, however, unit reimbursement declined to $1.25 at the beginning of 1940 and to a low of $1.10 eleven months later. For the first few years, participating physicians (many of whom had mixed feelings about the whole idea to begin with) had to choose between subsidizing the Plan out of their own pockets or getting out, which many did. The Plan also had enrollment problems because the doctors—through a combination of inexperience and mis-

BCBSA00292699

placed good will—at first offered a benefit package that was too broad and therefore too expensive. Subscribers who were used to paying from 60 to 80 cents a month for hospital coverage balked at the CPS premium of $2.50. Several other pioneering medical Plans were to repeat this mistake.[27]

In Michigan, too, resolution of the long wrangle over prepaid medical care was also prompted by developments outside the bailiwick of organized medicine. "The key was that [the] Blue Cross [Plan] was there," recalled John Castellucci, an early leader of the Michigan medical Plan, which later became a Blue Shield Plan. The Detroit District Hospital Council had begun organizing a prepayment Plan in 1938 with financial help (among others) from auto magnates Edsel Ford and Ransom Olds. From the outset, the hospital leaders took pains to cultivate the approval of the divided medical profession.[28]

Although minority opposition still ran strong, there was ample support for prepayment among the leadership of the profession. Serious negotiations between the state medical society and the hospital Plan had been under way for months by the time the Michigan Society for Group Hospitalization opened its doors for business in downtown Detroit on March 8, 1939. The doctors argued initially for a combined hospital and medical Plan in which they would have firm control. But trustees of the hospital Plan balked at this, holding out for separate Plans while maintaining a posture of full cooperation. In January, an agreement had been struck that the hospital Plan would not offer coverage of any medical services, including X-rays. According to a history of the Michigan hospital Plan, these assurances "overcame the fear of many in the medical profession that the hospital prepayment program might become an instrument for taking the rules and methods of medical practice out of the hands of the medical profession."[29]

Detroit waited for the other shoe to drop. Early signals from the Ford Motor Company made it clear they wanted a plan that included both hospital and medical services. The hospital Plan was tooling up, with the medical society's blessing, and had lured John Mannix away from the pioneering Cleveland hospital Plan to direct its efforts. A doctors' Plan was expected imminently. The day Mannix arrived in Detroit to start his new job, a front-page headline in the *Detroit Free Press* blared "Michigan Physicians Start Medical Plan." But the *Free Press* report turned out to be premature. Although many doctors—especially in the Detroit area—wanted to proceed, the underlying divisions in the profession militated against action. "Nothing was being done," Mannix groaned.[30]

Without any medical benefits to offer, the hospital Plan struggled lamely through its first year: "We were thrown out of more places than we were invited into," said James R. Foster, an early enrollment representative. Ford was eager for a hospital prepayment Plan, but not without surgical coverage. The company had not yet been organized by the United Automobile Workers (UAW) (it was the last of the Big Three automakers to unionize), but Ford officials were keen to enroll their workers, perhaps because of the company's

BCBSA00292700

experience operating its own Henry Ford Hospital. General Motors had contracted with Metropolitan Life for indemnity health coverage a month before the hospital Plan opened. Ford was a make-it-or-break-it opportunity for the Plan. "In Michigan if you do business with one of the Big Three you are substantial, if you do business with all of the Big Three you are powerful, and if you don't do business with any of them, forget it. You don't amount to anything," observed William McNary, a later leader of Michigan Hospital Service (as the Plan was renamed in 1940).[31]

Realizing the importance of the Ford business, supportive doctors in the Wayne County Medical Society finally got involved, which led to renewed efforts by the state medical society. Enabling legislation was signed in May 1939. The state medical society approved a $10,000 loan to capitalize the Plan, and Michigan Medical Service finally opened in February 1940. About fifty-two thousand Ford employees promptly enrolled in joint hospital and medical contracts. Unionized workers at GM and Chrysler signed with the Plans the next year. The doctors' philosophy was that "they were not going to sell any second-rate Plan," said Mannix.[32] Benefits were comprehensive and rates were cheap—complete medical coverage at $2 a month for individuals and $4.50 for families, minus an annual deductible of $5. The only protection the doctors gave themselves was to set an annual income limit for subscribers of $2,000 for individuals and $2,500 for families. There was a twofold logic to the cap, which was similar to the eligibility ceiling that had been set in California. In the first place, it was lower income workers and their families who were having the hardest time paying their medical bills. Rates set low enough to appeal to those workers would yield only modest reimbursement income for participating doctors. At the same time, more affluent people—white-collar workers, professionals, and managers—were more likely to be able to pay their bills. They could be charged fees high enough to offset the more modest income that prepayment patients would bring to the doctors.

Workers under the income limit considered it a good deal and rushed to buy in. "It was a seller's market. It went like wildfire," Castellucci said. By 1942, enrollment stood at 450,000. There was, however, a residue of spirited opposition from some of Michigan's doctors. The diehard faction—with strongholds in Flint, Lansing, and other smaller cities—organized their own association of nonparticipating physicians. They hung plaques on their waiting-room walls informing patients they would not accept checks from medical service organizations. But the success of the Plan gradually wore down the rearguard resistance. For example, nonparticipating doctors in Flint, overwhelmingly a GM town, found themselves in an awkward position after GM workers began to enroll en masse. They finally avoided the dilemma by accepting payments from the Plan, but only if they were made in cash. Mannix described with wry amusement the unlikely spectacle of Plan staff members driving to Flint on Friday afternoons to "cash very sizable checks, particularly after we enrolled General Motors, and get very, very large sums of money and go into the doctors' offices and pay them in cash." To Castellucci, "it was a

BCBSA00292701

ridiculous situation. They said it was an intrusion on their practice. But it was not an intrusion to take the money."[33]

Some of the resistance came from doctors who simply did not believe that the medical Plan or the hospital Plan could work. Mannix described the amazement expressed by one adamant critic after sending one of his patients with Blue Cross Plan coverage to Harper Hospital in Detroit for treatment:



John Castellucci, president of the National Association of Blue Shield Plans from 1955 to 1971, observed that demand for medical and surgical coverage in Michigan in the early 1940s overwhelmed resistance of physicians who had ideological reservations about prepayment. (Mart Studios)

"'You know what?' the physician told a colleague breathlessly, 'Blue Cross paid the hospital bill.'" Mannix recounted. "He never expected this to happen. He never expected it to work at all." When it did work, even the prickliest of critics were suddenly up on the bandwagon, beating the drum, he recalled:

> I could mention the names of many physicians in the cities that I have been in who had expressed marked opposition to Blue Cross or Blue Shield or both in the early days. Then, later on, I heard the same ones publicly take credit for helping to organize it. This was not unusual at all. I can remember one man in Michigan who was a very prominent physician there. I don't think I did anything right for a couple of years there, according to him. And finally he was put on the board of [the] Blue Shield [Plan] and from that time on he made speeches around the state about how he organized it and how he straightened it out and so forth and so on. It was one of the stages that we went through in the early years.[34]

Some former opponents were mollified when they discovered that prepayment conferred unanticipated benefits, according to Castellucci, who later served as chief executive of the National Association of Blue Shield Plans for nearly seventeen years. A primary argument against the medical Plan had been that it would interfere with the doctor's freedom to set fees in accordance with the patient's ability to pay. But this freedom carried with it a heavy burden of trouble and responsibility. The tradition in private practice was that doctors would accept patients who they knew would never be able to pay, or who would be able to pay only a small fraction of normal fees. To compensate, they would charge their more affluent patients more than the average fee. The doctor somehow had to make a determination of what the patient's resources were, weigh them against those of other patients, and arrive at a decision about what to charge—all the time trying not to disturb either his conscience or the solvency of his practice. The medical service Plan took the burden of setting individualized fees for each patient out of the doctors' hands, while relieving the problem of nonpayment. "They liked it," Castellucci said, because "they didn't have to decide." And since the Plan increased the ability of the working poor to pay, "after it was set up, they [the doctors] did better."[35]

The generous terms of the initial contract came near to sinking the fledgling Plan. "They tried to cover everything and almost went belly up," Castellucci recalled. The early hospital Plans deliberately chose a limited benefit (just twenty-one days of coverage in most cases) to give themselves breathing room while they built up a credible base of actuarial experience for future rate-making. Mannix said he advised the doctors to do the same—to begin with only a surgical benefit, for example, or in-hospital medical services. The unlimited benefit initially offered by Michigan Medical Service opened a floodgate: "We would have mothers in the early days who would come downtown with three, four children and stop in at the pediatrician with all of them," he said. "We couldn't afford this at any reasonable rate at that time."[36]

The Plan salvaged its fortunes by negotiating a different kind of contract with Ford Motor Company for a relatively inexpensive surgical-only benefit to be sold in tandem with hospital coverage. The Ford workers liked this option, and it earned the Plan some surplus income as a hedge against its losses on the carte blanche benefit that had been sold to other employee groups. Nevertheless, the Plan was $439,000 in the red at the end of 1942. Participating physicians shouldered the losses in the form of discounted reimbursements: "The doctors did carry it for quite some time. . . . It took some visionaries to see this thing through. . . . They were in it to do some good," said Castellucci. "We figured we were doing a good thing, the right thing."[37]

The tide gradually turned. By the end of the 1930s, medical service organizations found a new atmosphere of acceptance. In 1939, the establishment of such organizations' enabling legislation was passed in Connecticut, Pennsylvania, and Vermont, as well as in Michigan. Plans launched in two upstate

BCBSA00292703

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 63 of 182

New York communities that year demonstrate the importance of hospital service organizations in stimulating demand for medical coverage. In Utica, leaders of the three-year-old Central New York Hospital Service Corporation played a direct role in founding Medical and Surgical Care (although it was organized under the explicit control of the medical profession). The chief administrator of the hospital organization, under the supervision of a physician president, became general manager of the medical group. Six salesmen employed by the hospital organization became the sales force for its new sister service.[38]

In Buffalo, too, a hospital program that had been established in 1936 bred demand for medical service. According to Louis Reed, the Erie County Medical Society took charge of meeting the need:

> The profession took the lead in the establishment of the two New York Plans with the thought that just as hospital Plans had been mutually advantageous to the public and the hospitals, so prepayment medical Plans would be mutually advantageous to the public and the profession. In both instances the establishment of the Plans was materially aided by the existence of Blue Cross Plans to which responsibility for administration of the medical Plans could be and was delegated. In both Buffalo and Utica the profession was convinced that public demand and need could be met only by the provision of comprehensive service.[39]

Balancing decisions about the extent of coverage, rate structures, and market strategy was still by trial and error. Buffalo began with a program that offered comprehensive coverage for those earning a salary beneath an income cap, whereas Utica offered full coverage with no income limitations.

Neither formula lasted long. Demand exceeded expectations in both cities, which forced payments to participating doctors to be curtailed. Both organizations had problems with physicians who abused the system by making excessive calls on their patients. Within a few years, the upstate New York Plans had effected an adjustment by introducing limited service contracts and payments of indemnities, rather than unlimited service charges. The changes brought the Plans' finances onto a more even keel, and the practice of paying fixed indemnities caught on among other medical programs as it never had with the hospitals.[40]

It was also in Buffalo that the Blue Shield symbol was devised in 1939. Carl Metzger, who had helped launch the Rochester Blue Cross Plan before coming to Buffalo as the first head of the Hospital Service Corporation there, wanted an image that conveyed a distinct identity for the new medical service organization but that also was clearly linked to the companion hospital Plan. What Metzger came up with was inspired by the insignia of the U.S. Army Medical Corps and bore the image of a serpent associated with the archetypal physician in Greek mythology, Aesculapius. To the Greeks, the snake's ability to shed its skin represented the magic of healing and the renewal of life. Metzger encouraged his colleagues to share the design: "He

BCBSA00292704

was a nice guy," Hassard commented, "He generously supplied it [the symbol] to other Plans."[41]

The pursuit of enabling legislation in Pennsylvania in 1939 became a forum for debate not only within the medical community but also between doctors and other interest groups. The Pennsylvania Medical Society approved a proposal in 1938 that followed the emerging pattern of physician control. The proposal included income limits for subscribers, voluntary physician participation, and free choice of doctors for subscribers. A novel feature of the proposal was that it included coverage of dental care, nursing, osteopathic care, and prescription drugs as well as medical services. But members of those allied professions would not accept the strict control of physicians. Their objections meant that multifaceted coverage was dropped from the bill that the society submitted to the legislature in 1939.

The legislative proposal also weathered opposition and counterproposals from both the insurance industry and the Hospital Service Association of Philadelphia before winning passage as modified by the sponsoring doctors. The Medical Service Association of Pennsylvania (MASP) received its state charter under the new law in September, four days after Hitler's invasion of Poland signaled the start of World War II. Along the way, the state society had revised its strategy of providing comprehensive coverage after hearing of the difficulties other medical programs were encountering with so generous an approach. It simply offered coverage of surgical and obstetrical care instead.[42]

Resistance still simmered in local medical societies around the state. One local society defeated, by one vote, a resolution to secede from the state organization. In a speech delivered to local doctors' groups across Pennsylvania, MASP advocate Lester Perry warned:

> The choice is no longer between the traditional type of private practice on the one hand and voluntary health insurance on the other. . . . The alternative in the future lies between some form of nonpolitical voluntary insured medical service, such as the state society is sponsoring, and something which will undoubtedly be a great deal worse regardless of the name by which it is known—state medicine, compulsory health insurance, socialized medicine, or something else.[43]

Relations between the new medical prepayment Plans and their elder siblings, the hospital Plans, were full of contradictions. Medical societies that sponsored Plans were often hard-pressed to come up with the necessary managerial skills. It was natural for them to turn to the hospital Plans for help, and it was natural for the hospital Plans to respond. Both benefited from joint enrollment efforts and other administrative efficiencies. But a primary raison d'être for the medical Plans was to preempt any intrusion by nonprofessionals into the administration of medical services. Medical Plan advocates had to hold their colleagues in the hospital prepayment movement at arm's length just when they were deepening their mutual commitments.

BCBSA00292705

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 65 of 182

As we have noted, the worst clashes frequently involved hospital-based specialists such as radiologists, pathologists, and anesthesiologists. In New York City, for example, a curmudgeonly radiologist named Frederic Estabrook Elliott resorted to a guerrilla-style propaganda war in 1938 to protest perceived encroachments on the autonomy of his profession. A staunch free-enterpriser, Elliott was active in the New York State Medical Society, and in the mid-1930s had successfully campaigned for an amendment to the state's insurance laws that barred the sale of hospital and medical insurance by the same company. A hospital prepayment Plan, Associated Hospital Service (AHS), had been launched in New York City in 1935 and grown rapidly under the leadership of master salesman Frank Van Dyk. Among the benefits covered by the Plan were inpatient X-ray, lab, and anesthesia services.

In 1938, the *New York State Journal of Medicine* reported the results of a study showing that lengths of hospital stay were decreasing dramatically. "Many of these patients must be coming primarily to utilize the diagnostic facilities of the hospital and only incidentally to occupy beds," the journal concluded. This, Elliott insisted, meant that "three important branches of modern medical practice are being exploited to produce hospital revenue." Elliott recognized that many doctors were ordering hospitalization for patients who did not need it, so that those patients could receive diagnostic services not covered in an outpatient setting. The trend was doubly objectionable because it took patients away from specialists (such as Elliott) who practiced outside the hospital. "Hospitals are tax exempt, solicit donations [in the name of charity], advertise for patronage, claim superiority of service, and offer cut rates," Elliott railed in a personal circular to members of the state medical society's house of delegates. "Can any individual physician uphold ethical standards of conduct and meet such competition? Is not the future of our profession endangered?"[44] In another letter to professional colleagues in March 1938, Elliott was similarly heated: "We, who have made considerable investments in the acquisition of medical knowledge and training, and who now rely upon the practice of medicine as a gainful occupation, should not permit the demoralization of our profession by unsound social schemes and by continuance of improper and unfair competitive encroachments."[45]

No mere pamphleteer, the enterprising Elliott banded together later that year with a group of colleagues—primarily from the Kings County (Brooklyn) Medical Society—to form organized medicine's first prepayment program, Associated Medical Service, renamed the Medical Expense Fund the following year. Elliott was hardly a salesman, and the organization failed to find enough subscribers to keep going on its own. Just as the young operation was struggling to get off the ground, it encountered potential competition in the form of a proposal by Dr. S. S. Goldwater, an AHS founder and a charter member of the AHA Committee on Hospital Service. Goldwater had conferred with nearly one hundred AHS group accounts and found an overwhelming demand for the inclusion of medical services in their employees' prepaid coverage. As a leading light in the city's medical community (he was a former commissioner

BCBSA00292706

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 66 of 182

of health), Goldwater had won over enough of the leadership of organized medicine to proceed with his idea without violating the AMA doctrine of physician sponsorship and control. Elliott protested: "If the profession accepts the plan to permit hospital insurance corporations to sell medical service in the wards, there can be no line where such business can be stopped. . . . Under this system the physician is destined to become a mere employee."[46]

But the Brooklyn iconoclast was swimming against the tide. In 1941 AHS launched Community Medical Care. Three years later, Elliott's program merged with its rival to form a new organization called United Medical Service (UMS). He stayed on with the new entity for sixteen years, first as liaison with the medical professions, then in claims review, and finally to write and edit the UMS *Bulletin*. His crusty temperament left him somewhat isolated in this new environment, but he continued as a passionate publicist on medical issues until the end of his life in 1963.

Elsewhere, the relationship between established hospital prepayment organizations and emerging medical programs was less contentious. In Omaha, Nebraska, for example, a hospital Plan that began in 1939 met with little resistance when it approached the local medical society with a request for doctors to organize a complementary enterprise. One of the founders, Dr. Arthur Offerman, recalled:

> They were having difficulties getting under way because they quickly realized they couldn't operate just a hospital care Plan. . . . We had thought about this, [we] who were in practice in the late '30s, who were interested in prepaying medical care, who had come through the 10 years of the Depression. . . . There was opposition. . . . They thought this would lead to state socialized medicine. It wouldn't succeed. They thought that doctors didn't have business ability, executive ability, financial ability.[47]

Gradually, however, resistance dissipated and the Plan won widespread acceptance from Nebraska doctors.

The founder of another Midwestern medical program, Dr. F. L. Feierabend of St. Louis, also spoke of smooth chemistry between the hospital and medical organizations in Missouri. After the first appeal, 250 doctors signed up to participate in the new medical program:

> We had some very sensible people in [the] Blue Cross [Plan] here. They came to me and they said, "We want to start this. We need it." . . . So we got these boys to get started in Blue Shield, and Blue Cross let us use their office and let us use their people, and they let us use their salesmen and paid all the bills, and then the money started coming in and we didn't owe Blue Cross anything in a very short period of time. . . . There are still some of the older men . . . [who] feel that I'm not going to have some fellow come along and tell me what I can charge for taking out an appendix. . . . I can understand that, too. But you have to be realistic. . . . It doesn't make any difference whether I like it, if you like it,

BCBSA00292707

or if anyone else likes it. If the majority of the people like it, that is what we are going to get.[48]

Although he described himself as politically to the right of John Birch, Feierabend eventually developed a philosophy about prepayment that went well beyond acquiescence to the will of the majority:

> Every physician has the obligation to make his special talent available to all the people. . . . He must realize that his knowledge was developed by the collective efforts of the multitude that preceded him and that this knowledge may not be exploited. As a doctor, he serves in the capacity of a steward; he must never forget that some day he will be called on to give an accounting of his stewardship. . . . More and more doctors are now coming to realize that they are social beings and live in a society that is governed by Christian principles. They are beginning to understand that they cannot neglect their duties and retain their principles. . . .
>
> Neglect of social responsibilities invites the state to take over with coercion and regimentation.[49]

BCBSA00292708



# The 1940s

## Challenges of Growth

*Look, fellows, this is big. . . .*
*You have to take that into account.*
—Louis Reed

THE MISSION OF BLUE CROSS AND BLUE SHIELD PLANS became so engrossing during the 1940s that at times Plan leaders seem scarcely to have noticed the political currents swirling around them. In the course of the decade, a sense of national purpose and unity nurtured by the war effort emboldened advocates of a comprehensive, government-guaranteed health program such as the one enacted in England after World War II. Roosevelt recommended compulsory health insurance in his 1942 State of the Union message, though the war effort meant he was unable to give the idea more than passing attention. As the conflict abroad drew to a close, however, one of the ailing leader's top postwar priorities became a national health program.

Following Roosevelt's death in 1946, in the bellwether political arena of California, a compulsory health insurance plan backed by popular Governor Earl Warren failed by only one vote in the state legislature after a colorful and contentious showdown. That same year, a revised bill for comprehensive national insurance was introduced in Congress by Senator Robert Wagner of New York, Senator James Murray of Montana, and Representative John Dingell of Michigan—with the full backing of Roosevelt's successor Harry S. Truman. Two years later, after his surprise reelection, Truman put national health insurance at the top of his agenda, sparking a confrontation

with the AMA that dominated the headlines for months.

The Blues could hardly sit out the debate. Several of the leaders (with E. A. van Steenwyk emerging as first among equals after the departure of Rufus Rorem in 1946) wrote, testified, and spoke extensively during the decade to urge policy makers and the public not to let the gains of the private voluntary prepayment movement be discarded in the quest for a universal solution to the perennial problems of cost and access. According to a health policy analyst who was close to Rorem, Robert Sigmond, politics never became a preoccupation for these leaders: "They didn't have time to worry about it. . . . They were too busy."[1]

Although prepayment originated in response to the exigencies of the Depression, the arrangement proved so serviceable that demand accelerated through the economic recovery of the late 1930s and after the nation went to war. Growth was phenomenal. Although troop mobilizations drained membership ranks in some areas, war industries drew hundreds of thousands of new potential subscribers into the labor force. A combination of emergency economic policies made investment in health coverage an option more attractive than ever for workers and employers. In particular, a set of wartime laws and regulations affecting wages and benefits led employers to provide health care insurance as a "fringe" benefit. The war mobilization created a labor shortage, and in the rapidly expanding economy of the period, industry was flush. Between 1939 and 1944, unemployment dropped from 17.2 to 1.2 percent, while the gross national product rose from $91 to $211 billion and personal income after taxes rose from $70 to $147 billion.[2] Under normal conditions, employees would have attempted to lure workers away from their competitors by increasing wages. But the Office of Economic Stabilization, created in 1942, imposed wage controls that prevented employers from using such inducements. Then, in 1943, the National War Labor Board opened a loophole by approving increases in tax deductible employee benefit programs (including health plans) of up to 5 percent of total payroll costs. Corporate income taxes had been raised to support the war effort, so the new health "fringe" benefit had value to employers as a tax advantage and also as a way to attract and retain workers. Personal income taxes had been raised as well, adding to the attraction of health benefits for workers and unions. George Lucia—then a sales representative and later president of Blue Cross of Northern California in Oakland—described the situation in these vivid terms:

> Think about all the military installations in the San Francisco Bay area in the 1940s. . . . The Naval Air Station used to work around the clock and employed 10,000 civilians. We sent about ten people out there. . . . We climbed into the fuselages of giant aircraft at any time of the day or night to enroll "Rosie the Riveter" and to get her and her co-workers to sign an application. . . . We had our most dramatic growth during this period. And, after the war, the momentum we'd created continued on.[3]

BCBSA00292710



During the rapid growth of enrollment in Blue Cross and Blue Shield Plans during the 1930s and 1940s, processing enrollment and claims data was a labor-intensive activity. (BCBSA archives)

Elsewhere, the Hospital Service Association of Pittsburgh (later operating as Blue Cross of Western Pennsylvania) was so confident of public trust and goodwill that its director, Abe Oseroff, arranged a public relations campaign in the form of a series of cartoons. They were drafted by Cy Hungerford, a popular newspaper caricaturist already known for his posters to rally support for the war effort.[4] In view of Rorem's cautions against undignified promotion and the sensitivities of the medical community on the subject of advertising, Hungerford's cartoons suggest the spirit of innocent virtue about the Plans in those early days. Health care coverage was cheap: if you bought it you were safe, if you didn't you weren't. As van Steenwyk believed, all that was necessary to sell the Plans was to inform the public of how they worked and then wait for the phones to start ringing.

Enrollment in Blue Cross Plans, after expanding geometrically through most of the 1930s, settled into an average growth rate of more than 2 million new subscribers a year during the war and rose even faster after the war was over. At the beginning of 1940, enrollment stood at about 4.4 million. By the start of 1945 there were 15.7 million enrolled, and two years later the number had shot up to 24.2 million, "with members being added at the rate of one nearly every second," as Stuart put it. At the end of 1946 the Blue Shield Plans—about seven years behind the Blue Cross Plans in their inception as a national movement—reached 4.4 million enrollees. A year after the end of World War II, eighty-one hospital Plans and forty-four medical Plans were in operation.[5]

BCBSA00292711

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 71 of 182

In a reversal of Depression-era hospital conditions, hospital beds were suddenly too few. A massive redeployment of the domestic workforce was one factor that taxed hospital capacity. In Detroit, for example, Harper and Henry Ford Hospitals both were forced to close beds because they lost staff to the war mobilization. But the hospitals had a growing population to serve, as converted auto plants signed on new workers to crank up their output of tanks, trucks, and jeeps. According to testimony at a 1944 congressional hearing, care was particularly hard to come by for about five thousand black families who had moved to Detroit to work at the plants. All over the country, local health systems were overwhelmed when new war industries sprang up overnight. An estimated 1.5 million civilians relocated to be near military bases or new plants. The federal government would pump about $120 million into new hospital facilities by 1946.[6]

The bed scarcity was aggravated by a sharp increase in hospital utilization rates that occurred during the war years, and it accelerated at an even greater rate afterward. The federal Office of Scientific Research and Development, established in 1941, helped stimulate "a prolonged explosion of new knowledge in the biomedical sciences," spinning off benefits to the civilian population as it went. Growing control over infection and disease came with the development of sulfa drugs and penicillin, broadening the safety zone for surgical interventions that could best be performed in hospitals. Huge increases in the numbers of women in the workforce and a growing tendency among the Plans and commercial insurers to offer maternity benefits to subscribers also fueled demand for beds. Nationwide, admissions to nonprofit hospitals doubled in a decade, from 2.2 to 4.7 million between 1935 and 1946.[7]

The stunning growth of the nonprofit Blue Plans was not lost on the commercial insurance industry, especially those companies that were already selling life and casualty coverage to employee groups. The for-profit companies, both stock and mutual, did not match the Blues' offering of a "service benefit," which guaranteed full payment for all treatment and services specified in the subscriber's contract. The commercials instead paid a specified amount of cash, or indemnity, in the event a covered illness occurred that might leave patients with unpaid bills after a particularly expensive hospital stay. The for-profit companies had higher sales overheads and greater tax obligations than did the nonprofit tax-exempt Blues. They also did not enjoy the special relations with hospitals that often translated into discounted rates. All this made it difficult to match the value the Blues could deliver for the subscriber's dollar. But the commercial companies could offer one-stop shopping to their life and casualty clients, and the major insurers also could offer uniform rates and benefits to large companies with workers in different areas—conveniences the Blues could not match. Between 1940 and 1946, the number of group and individual hospitalization policies held by commercial companies rose from 3.7 to 14.3 million.[8]

BCBSA00292712

As the market for hospital coverage expanded, demand for surgical and general medical protection grew with it. Many doctors had strong reservations about prepayment, even when the Plans were controlled by their professional peers. The issue of fees remained especially delicate. Various Blue Shield Plans had, from the very beginning, offered some form of indemnity or a mixed service and indemnity contract as a way to overcome the obstacle that a service benefit created for doctors who did not like the prepayment idea. It did not take employers, unions, and other purchasers of care very long to realize they could bargain with their life and casualty agent for a comparable benefit. Between 1940 and 1946, individual and group surgical indemnity coverage by the for-profit companies grew from 2.3 to 10.6 million policies.[9]

Now the Blues began to realize how difficult it was going to be for their loose, decentralized confederation of autonomous companies to compete against the for-profit companies for contracts covering large companies with plants and offices in several locations or nationwide. By offering uniform nationwide contracts, the commercial insurers could spare both employers and unions the nuisance of sorting through all the different rates and benefits offered by the various Blue Plans in their host communities. The increasing mobility of the workforce added to the problems created by a decentralized system. For example, many people left home to get employment in factories that operated only for the duration of the war. When they moved back home after the war, they often had trouble getting answers from their local Blue Cross or Blue Shield Plan representatives about whether they could keep their coverage.

The possibility of arranging reciprocal coverage agreements between the Plans was discussed at a national meeting in 1943, according to Stuart. But the prospect seemed so complex that some people dismissed the notion as a joke. After the meeting, Stuart (then head of the Cincinnati Plan) and the Blue Cross Plan leaders from Cleveland sent letters to all the other Plans asking if they would agree to reciprocity of benefits. The response was tepid:

> Interest ranged from no reply or "Sorry, it can't be done" to [the response of] Roy McCarthy, director of the St. Louis Plan, who replied in effect, "OK, if you regularly provide a baby carriage with each maternity, please give one to our member who happens to be caught at that critical time in your area, and we will gladly pay for it."

A reciprocity proposal spearheaded by Stuart and Van Dyk was drafted in 1944 by the Hospital Service Plan Commission (of the AHA). But according to Odin Anderson it was short on practical details, endorsed by only about half the Plans, and "began to break down almost as soon as it had been adopted."[10] A voluntary inter-Plan transfer agreement also was initiated during the war, with the aim of guaranteeing that memberships were automatically transferable from any Plan to any other Plan. Although it took years to perfect, the transfer program eventually came to work smoothly and surely enough that the Blues could promise a subscriber "once a member, always a member."

BCBSA00292713

Less successful was one attempt at the national level to cope with the disadvantage of Blue Cross Plans when competing with commercial companies in areas where no nonprofit medical service coverage was available. In 1943, James Stuart, J. Douglas Colman of Baltimore, and Frank Deniston of Chicago were drafted to explore the idea of creating an insurance company to offer companion medical-surgical coverage for Blue Cross Plans. Stuart and Deniston pursued the plan by securing a $150,000 credit to set up the American Health Insurance Company. Deniston became executive vice president and, as Stuart put it, "set up a rather extensive office, rented the latest equipment, and waited for the business to flow in from all the Plans, who were so enthusiastic about having it. . . . No business came—none at all."[11] Plan managers apparently declined to steer business to this venture out of a conditioned distrust of conventional insurance and a feeling that the new company was beyond their control. The American Health Insurance Company was later reorganized by its creditors and went on to become an independent, for-profit concern that competed for business with Blue Cross and Blue Shield Plans.

One significant wartime development affecting the Blues' future occurred independently of the Plans, when the federal Children's Bureau implemented the Emergency Maternity and Infant Care program (EMIC) in 1943. By the time it wound down in 1946, EMIC had paid for 190,000 infant-care cases and 1.1 million deliveries, one out of every seven births in the United States in 1946.[12] To guarantee that payments were equitable and adequate despite the baffling variety of accounting practices at the contracting hospitals, the Children's Bureau turned to the AHA for a detailed cost-accounting manual. In wrestling with the difficulties of forging a uniform cost-accounting system for EMIC, the AHA laid a foundation for later efforts at standardizing accounting that would be necessary before the Blues could develop a common financial language for effective inter-Plan agreements.

To some extent, the war masked major challenges that were building behind the revolutionary growth of the prepayment movement. The movement itself, the corollary growth of proprietary health insurance, advances in medical technology, and rising consumer expectations had combined to fuel an enormous per capita increase in the demand for health care during the war years. At the same time, costs of providing care were rising rapidly for some of the same reasons, although the effects of this upward spiral were held in check by wage and price controls. When the war ended, the lid on costs came off "like the release of a coiled spring."[13]

Hospital workers, underpaid before the war and now in great demand, were among the first to benefit from the wage thaw. Thousands of doctors, returning home after years of sacrifice overseas, were eager for a taste of prosperity. The voluntary hospital system, starved of capital during years of depression and war, began to make up for lost time under the 1946 Hill-Burton hospital construction aid program. The budget of the National Institute of Health grew from $180,000 in 1945 to $4 million two years later, an increase

BCBSA00292714

that helped subsidize medical research on all fronts and that eventually contributed to a stunning array of expensive new medications and treatments.

Postwar inflation created a kind of identity crisis for the hospital Plans. During the war, while wage and price controls were in force, many of the Plans tried to stick close to their prewar subscription rates even as hospital costs began to creep upward. In 1945, for example, the Cleveland Hospital Service Association (subsequently called Blue Cross & Blue Shield of Ohio) could look back on twelve straight years without a rate increase. Individuals still paid 60 cents a month for ward service and 75 cents for semiprivate accommodations, as they had in 1934. Family protection rates were $1.50 and $1.75, respectively.

In that same period, however, the average cost per case that the Cleveland Plan was paying hospitals had risen from $37 to $63. The organization had survived because bed shortages held down hospital utilization and because administrative overheads had been cut in half, from 14 to 7 percent of income. When the wartime price freeze came to an end, the accumulated pressures exploded. By 1947, rates for semiprivate service had shot up to $1.25 for individuals and $2.95 for families.[14] In a twelve-month period ending June 1, 1947, fifty-five Plans had been forced to increase hospital reimbursement rates and thirty had raised subscriber rates. In the first half of 1947, the aggregate expenses of all Blue Cross Plans exceeded their aggregate income, creating a net deficit and a dip into reserves of a little less than 1 percent nationally—not a great amount, but certainly an alarming turn of events.[15]

Were the Plans (as some critics have suggested) merely subservient handmaidens of the hospitals, passing increased costs on to consumers without question? How did local Plan executives handle the delicate balance between hospital and subscriber interests? This could be a difficult task when hospital representatives dominated a Plan's board of directors. On one hand, in some communities more than half of all hospital admissions were paid for by Blue Cross Plans and the financial impact of reimbursement rates could make or break member hospitals. On the other hand, it was the natural instinct of everyone associated with the Plans to promote their growth, and "the blind fear of increasing the rates to subscribers, the assumed certainty of loss of membership . . . was overawing to many directors."[16]

Local autonomy had been the cardinal rule governing the development of the Blue Cross and Blue Shield system, so it is not surprising that the Plans' responses to the challenge of increasing costs varied according to a number of local environmental factors. Union strength, employer preferences, market shares, voluntary hospital strength, economic trends, commercial insurance competition, and the status of medical prepayment efforts all helped shape the response of each individual Plan. Their decisions would severely test the prepayment movement's commitment to its first principles of service benefits, community rating, accessible enrollment, and community control.

BCBSA00292715

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 75 of 182

## Nuts and Bolts

In his Pulitzer Prize–winning history of health care in America, Paul Starr concluded, partly on the basis of Louis Reed's 1947 study of the Blues for the U.S. Public Health Service, that the hospital Plans were "provider-controlled . . . an accommodation to provider interests."[17] Starr's superb treatise slips slightly on this point when he misstates Reed's finding, writing that twenty-one of twenty-eight Plans surveyed for the 1947 study had majority hospital representation on their boards, while Reed's actual numbers were twenty-one of thirty-nine. More important, Starr does not follow Reed's rigorously thorough and objective discussion of control through to its conclusion, which is less simplistic than Starr's but more helpful to understanding the realities of the Blue Cross organization's history. Averaging the proportional breakdown of board representation for all the Plans he surveyed, Reed found that 55 percent of the directors were from hospitals and 17 percent from the medical profession, while 28 percent represented the public. Especially in their formative years, when the benefits offered by many Plans were underwritten directly by participating hospitals, hospital representatives tended to exercise the prerogatives conferred by their numerical strength.

When the Plans built up enough reserves to become financially independent of the hospitals, however, the situation changed. Although the typical "public" representatives usually were selected by other board members rather than the subscribing public, Reed found that, for the most part, "provider interests" did not hold unmitigated sway. In general, 60 percent of the hospital representatives were trustees rather than administrators. They were civic leaders who were successful men of affairs in business, banking, or law:

> In any conflict of interest between the two, such as might arise over remuneration, he [the trustee representative] will generally try to weigh the interests and needs of both [hospital and subscriber]. . . . In practice, therefore, the hospital trustee on a Plan board frequently has about the same attitude toward the Plan . . . as public representatives.

In fact, Reed noted, it was a family joke among hospital administrators that a trustee tapped to serve on a Plan was in effect "lost as a hospital trustee. By this they mean that his interest in the hospital becomes subordinate to his interest in the Plan." On such a revised accounting, Reed (by no means an apologist for the Blues) calculated that 57 percent of the Plan directors surveyed might be classified as public representatives.[18]

In Iowa, early Plan executive Fritz Lattner persuaded his board of directors to make all the hospital representatives trustees. "For a good many years we didn't have a hospital administrator on our board," Lattner said. Then administrators complained that the hospitals were not adequately represented in the leadership of the Plan, and one of their number received an appointment. Altruistic motives aside, Lattner said, visible representation of

BCBSA00292716

consumers on the board "is important in selling [to] a group" of potential subscribers.[19] In another view, the intent was to be as impartial as possible when hospital and subscriber interests came into conflict. Tony Singsen, who joined the staff of the Rhode Island Plan in 1939 and was later a national leader in the Blue Cross and Blue Shield organization, said in a 1973 interview:

> We used to use the term . . . "intermediary." In the early days, that is precisely what we called ourselves. . . . In my mind, our objective still is to do what I said 25 years ago, to get the best possible benefits for the subscriber at the least possible cost and give the hospital an adequate income to provide those benefits. . . . We can't exist without a properly financed hospital system and we can't exist if . . . nobody can afford to pay for it. So we have to try to balance these two.[20]

Most of the Plans did not have much luck with subscriber representation. Even when some Plans made arrangements to give each member a vote, the opportunity was rarely exercised. Philadelphia's bylaws called for subscriber elections of public representatives, but after the Plan spent thousands of dollars to advertise one annual meeting, fewer than twenty subscribers attended. Plans in Cincinnati and Kansas formed subscriber councils, but again, participation was hard to generate. A few Plans had representation from church, farm, or women's groups and community agencies, and fifteen had seats for labor union officials.

Reed argues finally that numerical representation had little to do with who actually ran the Plans. Real control, he said, usually lay in the balance of power between the chief executive and a small number of dominant individuals on the board who took the most interest in Plan affairs and had the most influence on their peers. The competent executive officer attuned to his board leaders tended to set the course. Of the thirty-nine Plans surveyed, Reed said, sixteen apparently were controlled by public representatives; six by hospitals; three by hospital and public representatives; three by the chief executive; and the rest (except for a handful Reed said he could not figure out) by a combination of hospital, medical, staff, and board influences.[21]

In the final analysis, what tended to shape the designs of both directors and executives was a desire for the Plan to make its mark. This implied an agenda distinct from any specific constituent interest. "Success is very largely measured by the number of subscribers, and maximum growth is fostered by offering the most attractive possible proposition to the public, i.e., by giving as much as possible in benefits for as little as possible" in rates, Reed wrote. Thus it seems reasonable to conclude that, although they had to be concerned with the financial health of the hospitals serving their members, the Blue Cross Plans, once they were weaned from hospital underwriting, developed a life, purpose, and interests of their own, independent of the hospitals that begat them. Nothing else could explain the increasing difficulty in settling questions about reimbursement of hospitals. Reed concluded:

BCBSA00292717

A new Plan which the hospitals have started and which they underwrite is in a very real sense a creature of the hospitals. However, as the Plan grows it stands more and more on its own feet. . . . After a certain stage it would seem that dominant control should shift to the public. . . . When the children have grown, when they support themselves, then parental control is no longer desirable or possible.[22]

Each Plan had to find its own way through the thicket of difficulties surrounding the issue of hospital remuneration. Plans could negotiate flat rates with all their hospitals, or with groups of hospitals. Or they could peg payments to retail hospital charges, or pay on a cost or cost-plus basis. Prepayment meant hospitals would sometimes collect on patients down the economic ladder who might have received free care before. But it also meant in some cases that more affluent members of the middle class who would have paid full charges would now net for the hospital only the discounted rate guaranteed by a Blue Cross Plan. After having stabilized room reimbursement at $6 a day for six years, for example, Blue Cross of Western Pennsylvania faced a revolt when it attempted to hold the line with only two small 50-cent increases between 1943 and 1947. Six hospitals in the Erie area temporarily withdrew from the Plan in protest but eventually rejoined without winning any concessions in their contract. Hospital officials, as a New York administrator had predicted in the 1930s, lived in "a state of constant worry" about their financial security.[23]

In Detroit, a chain of fourteen Catholic hospitals operated by the Sisters of Mercy stopped dealing with the Blue Cross Plan in 1946 because the Plan had increased benefits for subscribers without changing its flat rate payments to the hospitals, even as hospital costs were going up. The crisis at Michigan Hospital Service (now Blue Cross and Blue Shield of Michigan) was aggravated by discontent among hospitals concerning the differences in costs between rural and urban institutions (all receiving the same reimbursement) that came to light after the Plan began operating statewide in the mid-1940s. According to an official history of the Michigan Plan, the breakdown in relations between the Plan and the hospitals was partly because of the insensitivity of one chief executive whose background was in enrollment and who therefore was more interested in keeping rates down than in keeping hospitals happy.

Difficulties in Michigan began to ease after William McNary, a new leader with a background in hospital administration, became the Plan's general manager in 1947. McNary promptly established a hospital relations committee, increased hospital representation on the Plan's board, and began revisions of rate and reimbursement schedules that brought the Plan back into equilibrium. As McNary was settling in, executives from Ford were negotiating with the Plan to resume coverage, which the automaker had dropped in the early 1940s. At the same time, Ford was helping mediate the Plan's dispute with the Sisters of Mercy chain. The Ford people liked Blue Cross Plan coverage because it "had the best product at the cheapest price," McNary boasted. But without participation from the Mercy group, the coverage was not worth

BCBSA00292718

much to Ford workers who preferred the chain's hospitals. The Mercy walk-out lasted nearly three years and, according to McNary, almost ruined the Plan. Hospital control of the Plans, then, was not a given. But the oft-cited special relationship between hospitals and Plans did give the hospitals recourse when the balance of power and money tilted too far away from them.[24]

In the early days, flat rates had been the most common type of hospital reimbursement. They were relatively easy for the Plans to administer, offered a reward to efficiently run hospitals, and at first blush seemed fundamentally fair. But they created problems for statewide or multicommunity Plans that encompassed both rural and urban hospitals or otherwise included facilities that varied substantially in size, sophistication, and costliness. In areas where half of a hospital's patients were Blue Cross Plan subscribers, a negotiated reimbursement rate less than the hospital's regular charges could create a serious financial drain on the hospital. Some smaller, more modestly equipped hospitals enjoyed an unfair advantage in that they received more from the Plan than what they charged paying patients.

Charge-based payments could be seen as rewarding inefficiency and as imposing on Blue Cross Plan subscribers a disproportionate share of the burden for the hospitals' charity care. They also could put the Plans on a slippery financial slope. In a hopeful spirit, the AHA's House of Delegates in 1946 approved a statement of principles that endorsed a cost-based standard for reimbursement and called for good faith and full financial disclosure in contract negotiations between the Plans and the hospitals. But depreciation, contingency allowances, and bad debts still could make clear-cut cost calculations difficult to make.

Often, the negotiating process boiled down to the blunt realities of bargaining power and economic leverage. As Bruce Taylor, an early colleague of van Steenwyk's in Philadelphia, put it: "The pressure I think a Plan can bring is directly related to the percentage of the population enrolled. It's economic influence."[25] Throughout the 1940s and after, the trend was toward increasing complexity in reimbursement patterns. Fixed daily rates gave way to sliding scales in which reimbursement was greater for the first few days of the patient's stay, when the most diagnostic services would tend to be rendered. The cost accounting manual produced by the AHA for the EMIC program came increasingly into use, and reimbursement began to vary more from hospital to hospital. Clearly, in relations between Plans and hospitals, provider interests did not always hold sway.[26]

Given the regularity of rate increases for health insurance today, it may be difficult to imagine just how squeamish the Plans were about raising rates in the early days. Price competition was one factor. With little financial risk, indemnity insurers could set whatever rates they wished simply by adjusting their benefits as actuarial calculations dictated. Having experienced such overwhelming acceptance, it may be that Plan directors were simply afraid to risk tarnishing their charmed image by creating the unpleasantness of an added ex-

BCBSA00292719

pense for subscribers. It was only when a greater unpleasantness arose, in the form of operating deficits and depletion of reserves, that they steeled themselves to act. The first lesson the Plan directors learned was that, while raising membership fees is not necessarily a bad thing, not raising them when they should be raised is always bad. Likewise, a corollary precept was drummed in only by dint of painful experience: when you have to raise fees, do not be timid about it. Plans that did not learn this lesson had to raise fees twice in a single year and lost public confidence as a result. In Cincinnati, the first increase, "effected with fear and trembling," was a mere 5 cents a month for individuals and 10 cents for families. Stuart concluded that 25- and 50-cent increases would have made more sense, since two or three additional increases were needed shortly afterward. Plan directors had yet to learn that "every rate increase for the next 15 years would bring an increase in memberships . . . because of the campaign of publicity and promotion any increase requires." A popular story told at Blue Cross Plan meetings was the tale of a credulous city person who, on a visit to a mink ranch, asked the proprietor how many times a year he could harvest his animals' fur. "If you skin them more than once a year," the rancher replied, deadpan, "it makes 'em nervous."[27]

The aversion to fee increases was one good reason that Plan leaders began to experiment with cost controls. They tried reducing or capping subscriber benefits, introducing co-insurance and deductibles, and in a few cases abandoned the service benefit in favor of the more predictable indemnity payment. Such expedients, Stuart wrote, "were largely ineffective and temporary. They solved no problem and were decidedly unpopular with the membership who expected service rather than more bills to pay at a time of emergency."[28]

Cincinnati's attempt to tackle the challenge of increasing hospital utilization was somewhat more successful. The hospital could exercise little control over admissions except to refuse admission when no beds were free. Nor could it discharge patients when treatment was completed. Only the doctor made the important decisions as to who would be admitted, what services would be provided, and how long the patient would stay until discharge. Plan officials in Cincinnati decided accordingly to throw themselves upon the mercy of the medical profession, take the doctors into their confidence, explain the situation, and ask for help. Plan representatives sought invitations to make presentations at medical staff meetings at member hospitals, to explain utilization experience and its financial consequences. Their overtures were less than an unqualified success: "Suggestions as to voluntary controls from Blue Cross were not always kindly received," Stuart wrote. In some cases, the review of benefits these briefings offered had the effect of increasing utilization, as doctors took advantage of services they had not known their patients could receive at no extra cost. Suggestions about tinkering with admission and discharge procedures "fell resoundingly flat."[29]

In a neat tactical adjustment, Plan officials switched to a slightly different approach toward the hospitals. Calling attention to the bed shortage that still

BCBSA00292720

prevailed in the Cincinnati area, the Blue Cross Plan people secured the coop-
eration of the hospitals in mounting a campaign to reduce the waste of hospi-
tal resources through unnecessary or overlong admissions. Posters went up in
hospital hallways and doctors' lounges touting the virtues of economy.
Printed stickers on patients' charts asked doctors if expensive services should
be continued. This campaign led to an agreement on automatic cutoffs of ex-
pensive medications after varying periods the doctors approved as reasonable.
Floor supervisors were supplied with stickers to affix discreetly to patient
charts reading, "Doctor, may this patient be discharged today?" The bed
shortage abated.[30]

Plan people had dreamed up and paid for the whole campaign to control
costs, but the Blue Cross name and symbol did not appear on any of the visual
aids. At the same time, the Cincinnati Plan established a medical advisory
committee to consult with its board and enhance communications with the
medical profession. In meetings with the doctors' group, Plan officials ap-
pealed for an understanding of economic realities. They argued that failure to
control utilization would probably lead to some form of compulsory, govern-
ment-sponsored insurance. This line of reasoning proved effective. By the end
of the decade, utilization committees were beginning to catch on here and
there, mandated in some cases by state insurance commissioners.

In general, the spread of hospital prepayment seems to have affected uti-
lization patterns in a way that fulfilled neither nervous hospital administrators'
fears of being overwhelmed by a flood of admissions nor the idealistic hope of
providing coverage for all. As of 1947, Reed wrote, admissions among Plan
members were increasing slightly, but lengths of stay were decreasing. The ad-
mission rate among Blue Cross Plan subscribers was considerably higher (107
per thousand) than that for the rest of the civilian population (97 per thou-
sand). But at 8.1 days, the average Blue Cross Plan length of stay was well be-
low the national average of 12.4 days. The net measure (number of patient
days per person) was 0.86 for Blue Cross Plans and 1.2 nationally. Because of
their coverage, Reed noted, Plan members tended to seek care earlier and at a
less acute point in the course of illness. But the main reason for the lower
overall Blue Cross Plan utilization rate was the composition of their sub-
scriber groups—most were employed and generally included a low propor-
tion of aged and chronically ill members.[31]

The Plans made only gradual progress during the 1940s in developing
sound methods for enrolling small groups and individuals, a goal that often
was pursued as a matter of principle. In the late 1930s, a number of Plans had
tried individual enrollments, but because of the anticipated problem of adverse
selection these were unhappy experiences. There was, however, a persistent
feeling that the Plans should "recognize that their social purpose and public re-
lations require that the opportunity of enrollment should be available to all."
By 1947, one-fourth of the Plans offered direct enrollment at any time, but
they hedged their bets by requiring detailed medical histories from applicants
and reserved the right to reject the chronically ill, exclude maternity benefits,

BCBSA00292721



Representatives of Blue Plan local customer advisory groups, like those pictured here in the late 1940s, helped Plan leaders gauge subscriber satisfaction. As for a problem during that same era of how to overcome adverse selection when enrolling small groups and individuals, many Plans held broad-based community enrollment drives co-sponsored by business and civic groups. (BCBSA archives)

set age limits, and charge increased rates. Predictably, few such contracts were sold. Many subscribers, however, took advantage of the widely available option of converting from group to individual coverage at retirement.[32]

The most effective way to enroll the uninsured—pioneered in Minnesota in 1938–1939 and in wide use nationwide by 1947—was the once-a-year community enrollment campaign. For a specified period, usually one week each year, an enrollment window opened for the general public. This was promoted heavily through the media and civic organizations in the style of a Community Chest or United Way campaign. By limiting the time frame, the Plans got some protection from individuals who knew they were already sick and would soon be seeking treatment. With endorsements enthusiastically projecting the Plan as a public service and the enrollment window as a golden opportunity to take advantage of a good deal, the community drives sometimes signed up half the population of many small, closely knit communities. The approach was successful in cities as well, drawing a wide response and an acceptable distribution of risks. As the 1940s progressed, some Plans began making headway

with rural enrollment. The Plans that included rural areas learned how to work with organizations like Farm Bureaus, the Grange, farmers unions and cooperatives, and the Farmers Home Administration to spread the word and enjoy the safeguards of group enrollment. In Iowa, when the Farm Bureau declined to cooperate, the Plan formed county membership associations as a vehicle for group enrollment.[33]

## The Medical Plans: A Complicated Adolescence

The same forces that propelled the original medical service programs in California and Michigan—consumer demand and the threat of political interference—sharpened during the 1940s and continued to shape the growth of the medical programs. Demand was focused by the spread of prepaid hospital Plans and commercial hospitalization insurance. The commercial companies were free to offer surgical and general medical indemnities as part of their hospitalization coverage, without encountering many complications from the medical profession. Having embraced the concept of physician control, however, the Blue Cross Plans were sometimes caught in conflicting circumstances. Hospital Plan subscribers demanded medical coverage and threatened to take their business elsewhere if they did not get it, whereas the state or local medical society dithered over the alleged unseemliness of prepayment for medical services.

Despite their ambivalence toward the perceived danger of regimentation, doctors recognized the strength of public demand, especially when it took the form of legislative proposals. The first Wagner-Murray-Dingell bill for compulsory national health insurance financed through Social Security was introduced in Congress in 1943, and the bill remained on the table for argument for the rest of the decade. It called for a program of compulsory hospital and medical coverage for all, administered by the surgeon general. Providers would be reimbursed according to a fee schedule, rather than through cash indemnities or cost-based payments. During the mid-1940s, with strong support from labor, at least eight states—including the population centers of New York, Michigan, and California—also debated compulsory insurance bills.[34]

Traditional physicians' fee-setting practices made it difficult for many medical Plans to develop service benefits. Many of the Blue Shield Plans tried to set income limits for service beneficiaries, or to offer a mixture of indemnities and service benefits, or to offer indemnities only. Indeed, a few medical societies simply set up subsidiary mutual insurance companies to meet the demand for medical coverage. Among forty-four medical service Plans catalogued by Reed in 1947, only four offered straight service contracts, whereas twenty-three provided just indemnities and seventeen provided some mixture of the two.[35]

As Blue Cross Plans sought to combine their coverage with the Blue Shield Plan counterparts in their areas, the necessary mixture of service benefits and

cash indemnities was often difficult to explain to prospective members. New conditions created new barriers to sales, barriers that had not been there when the Blue Cross Plans offered a straight service benefit. Where a large percentage of the population was enrolled, subscribers usually had better luck in making their preference for service benefits felt. Smaller Plans had to make more concessions on indemnities and partial benefits. They therefore wound up with a less attractive product and encountered difficulties in expanding their market share.

Consumers were frustrated even in areas such as Michigan, where the Plans had large and concentrated membership. According to testimony on the Wagner-Murray-Dingell bill by a United Auto Workers (UAW) official in 1946, income limits and unpredictable doctors' fees were wreaking havoc with consumer satisfaction. By the end of the war, UAW secretary-treasurer George Addes said that most of his union's members earned more than the $2,500 limit set by Michigan Medical Service for guaranteed service benefits.[36]

In 1946 in Denver, Colorado Medical Service faced mass cancellations among members of the police and fire departments and the state bureau of reclamation, because the supplementary billings by doctors in a combined service-indemnity plan were conceived as gouging. Plan president Dr. Atha Thomas explained to the Colorado Medical Society that postwar inflation had pushed the wages of most of these group members over the income ceiling for full service benefits, even though these workers were less well-off than they had been before the war. In one year, Thomas said, seventeen thousand members canceled their coverage.[37]

Everywhere, the position of hospital-based specialists—pathologists, radiologists, and anesthesiologists—remained nearly impossible to define. Some hospitals included the services of one or more of their specialists in their regular patient billings. But in other cases, the patient received separate billing from the physicians who performed or supervised X-rays, lab work, or anesthesia. Hospitals and specialists made their arrangements as independent entities with distinct and sometimes divergent interests. When third parties such as hospital or medical prepayment Plans (or both) entered the picture, they often upset the delicate balance between the specialists and their hospital hosts.

In one of the most convoluted episodes of the late 1940s, anesthesiologists in Iowa brought suit against the Blue Cross Plan for offering coverage of their services. It seems the matter was settled out of court in a series of painstaking negotiations between the Blue Cross Plan, its fledgling Blue Shield Plan counterpart, hospital representatives, and the medical profession. Meanwhile radiologists and pathologists who had initially been satisfied with the Plan's reimbursement arrangements were now drawn into their colleagues' litigation. The experience so embittered them that they held out against a settlement even after the anesthesiologists resolved their differences with the Plans. Fritz Lattner, who headed the Iowa Plan, recalled:

> I don't think I can overestimate the difficulties that this had created for the Blue
> Cross and Blue Shield Plans over the years. . . . It was bitter, a lot of hard

BCBSA00292724

> feelings. It made the medical and hospital Plans realize there is this eternal con-
> flict [which Lattner regarded as fundamentally between hospitals and doctors].
> Any time you approach anything like this, be aware of what you may be getting
> into. Don't be naive.[38]

In the face of such pressures, several distinct varieties of relationships evolved between Blue Cross and Blue Shield Plans. In some cases, the Blue Shield Plans developed independently of Blue Cross Plans, a turn of events that sometimes resulted in bitter competition. The perceived differences among providers tended to diminish public confidence in these Plans and inhibit their growth.

Elsewhere, Blue Cross and Blue Shield Plans maintained separate boards and staffs but cooperated administratively on enrollment and some of their record keeping. This type of relationship met each organization's need for independence while reducing inefficiencies and duplication. But it required a degree of cooperation and coordination that was sometimes difficult to achieve when leadership of the respective Plans did not agree on strategy or tactics. Stuart observed, "The history of Blue Cross and Blue Shield [Plans] in these areas often has been one of undercover conflict."[39]

In other cases, the Plans maintained separate governing boards but employed an integrated staff, which solved some problems but could put a heavy if not schizophrenic burden on the Plan executive whose masters were not pulling in the same direction. Both Reed and Stuart found much to admire in this simplest of arrangements but acknowledged that it could not paper over real divergences of interest among hospitals, doctors, and subscribers. There was no easy way.

The Blue Shield Plans clashed not only with their Blue Cross Plan brethren, but sometimes with each other. The pace at which state and local medical societies came to grips with the demand for prepayment could vary considerably, for example. When state societies and independent local societies in large urban areas differed in their ideas about how to create a Plan, or when one was in a bigger hurry, the two were liable to proceed separately. And when there was a strong Blue Cross organization in the picture, the intricacies multiplied.

From 1943 onward, despite its reservations about prepayment, the AMA had actively encouraged the formation of physician-controlled plans. In 1946, it established standards and an approval program emphasizing physician control, choice of doctor, preservation of the doctor-patient relationship, and permissibility of income-based payment. State medical societies were effective in their efforts to get enabling legislation passed where it was needed. By 1947, twenty-six state legislatures had recognized the special status of nonprofit medical prepayment plans.[40]

In 1946, the AMA's Council on Medical Service had set up a subsidiary—Associated Medical Care Plans (AMCP)—to administer the approval program and to help coordinate, promote, instruct, and advise the Blue Shield Plans, as

BCBSA00292725

the AHA had done for the Blue Cross organization. Dr. Arthur Offerman, founder of Nebraska's medical service Plan, said: "We realized that local Plans weren't the answer to the problem, that we had to have national development with coordinating agencies, and we saw what the Blue Cross Plans had done in developing their national coordinating agency. . . . We went to the AMA for assistance."[41] The new entity was endowed with $25,000 in seed money from its parent organization, and Dr. Howard Schriver was elected its first president. There were still deep disagreements among AMA leaders about the potential impact of voluntary prepayment. Was it a social and economic necessity better addressed by private enterprise than by government? Or was prepayment a step toward the surrender of professional control of medicine? It is not surprising under the circumstances that Schriver and others involved with AMCP often had a hard time figuring out where they stood with the AMA.[42]

Tensions between the AMA and its new offspring were evident from the beginning. State medical societies in Ohio, Indiana, and the state of Washington had incorporated for-profit companies, which ran afoul of AMA guidelines requiring Plans to be organized on a nonprofit basis. Several medical Plans were already using Carl Metzger's Blue Shield symbol, and the AMCP proposed using the shield as a seal of approval, as the AHA had done with the Blue Cross logo. But AMA leaders were aghast at the idea that the AMCP might infringe on the cherished autonomy of its constituent medical societies. "It is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product," the AMA informed Schriver in a letter in September 1947. Not until 1951 were satisfactory terms worked out for use of the Blue Shield symbol. The AMCP continued to encourage nonprofit organizations but accommodated for-profit programs as long as they were controlled by state and local medical societies.[43]

Other quarrels are revealed by correspondence found in the Blue Cross and Blue Shield Association archives, especially that between Schriver and Frank Smith, who succeeded Shriver as head of AMCP. In a letter of 1947, Schriver refers to his encounters with Dr. A. W. Adson, a member of the Council on Medical Service and one of the original commissioners of the AMCP: "Dr. Adson expressed the fear that we were growing too fast and too big. This to me was most shocking. Instead of being pleased with our accomplishments they are displeased that their child is thriving and healthy." Smith, writing to Schriver in 1948, echoed this assessment:

> Meetings of the Council on Medical Service were never open cordially for my attendance. Frequently when I made inquiry I was given the brushoff, and it was apparent that I was not welcome at Council meetings. . . . I believe it can be said without fear of contradiction that the Council has not once offered a single constructive suggestion or proposal to AMCP. It would appear that the leadership of the AMA doesn't really want the nonprofit Plans to expand too rapidly or grow too big. Dr. [Morris] Fishbein [editor of the AMA Journal] has

BCBSA00292726

been reported to have said on several occasions recently that he did not feel that the doctors had any justification for getting into the insurance business and that the insurance industry ought to be trusted to handle the job.

A year later, Dr. Paul Hawley put the matter in even starker terms. Hawley was at the time involved in a short-lived attempt to merge the Blue Cross and Blue Shield national organizations. In early 1949, Hawley wrote to Schriver:

> It is now completely clear . . . that the intent is first to have the Council on Medical Service gain complete domination of AMCP, and therefore to make it a poor relation of all other insurance companies. In this connection, I am today informed that the AMA (at its national headquarters in Chicago) is now enrolling its employees in Blue Cross [Plan coverage], but that they have turned down Blue Shield [Plan coverage] and are taking commercial coverage for medical care . . . you can see where the heart of the AMA lies.[44]

Nevertheless, doctor support for prepayment was strong in many state and local medical societies, and the issue became increasingly polarized. A rift was growing within the AMA, endangering its ability to act effectively at the very moment that a renewed and apparently serious threat to the profession's sovereignty loomed once again in Washington. Harry Truman's surprise victory in the 1948 presidential election had given sudden new life to the Wagner-Murray-Dingell national health insurance bill, which had been languishing in Congress since 1943. Like John Kennedy and Bill Clinton after him, Truman had run on a strong health care plank and was promising an all-out effort.

Many AMA leaders, especially those involved in the early Blue Shield Plans, believed that Fishbein's extremist stance on any type of physician payment reform (either private or governmental) had become a threat to the profession's best interests. During the mid-1940s, a group of California doctors—led by the first two chairmen of the California Physicians' Service (CPS), Ray Lyman Wilbur and Lowell Goin—waged a sustained fight to remove Fishbein from his post as editor of *JAMA,* or at least muzzle him. According to Frank Campion's candid history of the AMA, their concern was that Fishbein's non-negotiable stance on prepayment would alienate Congress and public opinion and isolate and discredit the AMA. (Leading Fishbein's defense was none other than Justin Ford Kimball's erstwhile dinner companion, the pugnacious E. H. Cary of Dallas.)

During the mid-1940s the emergence of a Blue Shield organization leader like Goin as active spokesman for medical prepayment was a provisional victory for the pragmatic center of the AMA. On one hand, Goin stood against the extremes of Fishbein's rabid partisanship; on the other, he opposed the tradition of a professional scientific and educational organization that was politically aloof. It may be hard to imagine now, when the AMA is so well known as a political force, but in the early 1940s many of the organization's leaders

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 87 of 182

other than Fishbein were timid about political entanglements. Memories of an antitrust judgment against the AMA for trying to block prepayment plans in Washington, Milwaukee, and Elk City were fresh. In a debate on the role of the Council on Medical Service, the executive committee of the AMA board of trustees declared in mid-1945 that "it is not the function of the [Council's] Washington office to influence legislation."[45]

Goin helped lead the counterattack. He told an executive session of the House of Delegates in December 1945:

> When this [Council on Medical Service] was formed, there was considerable talk . . . about the dissemination of information—a rather pleasant and harmless phrase—with an eye cocked on the Department of Internal Revenue. I thought that everyone in this house understood . . . that the intent was to inform legislators and government agencies of the opinions of medicine, of its beliefs, its wishes and desires. . . . To say that this organization [the AMA] has no function except as a scientific assembly is, in my opinion, nonsense. I think 160,000 doctors all over the United States look to this body to defend them from the encroachment of economic planners and keep it free from the chains and fetters of a national socialist state.[46]

To create a middle ground between Fishbein's intransigence and the passivity of ivory tower traditionalists, the doctors needed their own answer to the public demand for better care and access. Voluntary prepayment was it. So, whereas some leaders defiantly promised "the expenditure of the AMA's total funds if need be to oppose the enslavement of the medical profession," others more constructively reaffirmed the organization's commitment to "the principle of medical care insurance on a voluntary basis" and recalled how doctors had "encouraged and assisted the development of voluntary prepayment plans."[47]

To lead the fight against Truman's national health insurance bill, the AMA retained the services of the tough public relations firm of Whitaker and Baxter, which had just helped defeat Governor Earl Warren's proposal for compulsory health insurance in California. Citing one of his own favorite rules, "You can't beat something with nothing," Clem Whitaker became one of the leading promoters of the Blue Plans. "We want everybody in the health insurance field selling insurance as he never sold it before," Whitaker told medical leaders at a kickoff rally for the campaign against Truman's bill in February 1949. Whitaker and Baxter's bruising campaign made enemies for the AMA and was, in Campion's words, "an exercise in overkill." But no one denied its effectiveness. Thousands of civic organizations came out against the bill. There was opposition in the press, and a Gallup poll found public support to be lacking. The bill was never reported out of committee in either the Senate or the House. "The votes for a compulsory health insurance bill were never there," said Dr. Ernest Howard, a top AMA staff member in the campaign.[48]

Behind the scenes, away from the political blustering, even the most ardent supporters of a compulsory federal program—those who were sure that private insurance could never meet the nation's needs—found the ground

BCBSA00292728

beneath their arguments constantly shifting as enrollment in private plans soared. Louis Reed was one of these advocates. Reed became convinced of the need for a national program while working on the CCMC staff, and he later wrote a book entitled *Health Insurance: The Next Step in Social Security.* Reed went on to work in the new Social Security Agency with his former CCMC colleague Isadore Falk in the late 1930s and was involved in continuing efforts to develop and promote national health legislation. In a 1971 interview, he told Odin Anderson, "We thought that compulsory insurance was the only way. . . . I don't think I have ever wavered from that point of view."[49]

As the war wound down, Reed found himself in postwar planning for public health, and he convinced his superiors that he needed to make a survey of the Blue Plans. He knew Rorem from the CCMC and had also visited van Steenwyk in Minnesota in the late 1930s, so he was able to obtain their cooperation for the project. Reed's first visit was to Michigan, where he spent two weeks with Mannix. "I was quite impressed. It seemed to be a very up and coming organization and they were growing very rapidly," he told Anderson.[50]

His favorable impressions were strengthened by the next visit, to Minnesota. "There was an enthusiasm about the people in the early days. It was very catching," Reed explained. "You sort of got the message it was really a thing that had big possibilities." But it turned out this was the last thing Reed's pro-compulsory-insurance colleagues back in the Social Security agency wanted to hear. Reed said:

> In a sense this was sort of unwelcome news to people like Falk who I was working for at Social Security because our whole ploy in pushing compulsory insurance was that voluntary insurance can't do anything. . . . I was saying, "Look, fellows, this is big. These plans are developing and they are going to be a big thing. You have to take that into account." It was unwelcome news. I had problems in getting the report finished, in getting it approved and so on.[51]

The report, *Blue Cross and Medical Service Plans,* was finally published in 1947 by the U.S. Public Health Service. It remains a definitive source on both facts and issues in the early growth of the Blue Plans.

## Searching for Unity

In the watershed year of 1946, when the first step was taken toward a national Blue Shield organization with the formation of the AMCP, the hospital groups passed a different milestone when Rufus Rorem resigned from the Blue Cross Commission (BCC) to head the Philadelphia Hospital Planning Council. Rorem, then fifty years old, left behind an optimistic vision of the future for a unified hospital and medical prepayment movement. "The growth of Blue Cross membership—now at the rate of 27,000 per business day—is limited only by the capacity of the organizations to accept members,

i

BCBSA00292729

collect subscriptions, verify eligibility, authorize benefits, and pay for services," he wrote in 1946. "Each Blue Cross Plan is a powerhouse of social force."[52] But the very strength of the Plans at the local level—and their preoccupation with the manifold challenges of growth—had often led him to frustration in his efforts to weld them into an integrated national force. "In his efforts to seek some uniformity of action, powerful local autonomy and



In the late 1930s, C. Rufus Rorem codified the best practices of the early Plans into standards that enhanced the Plans' legitimacy and stature. His desire a decade and or so later, however, for a more coherent national system, ran afoul of some Plans' strong sense of local autonomy. (BCBSA archives)

parochial pride were his enemies," Stuart commented. Tony Singsen, a BCC pioneer, observed, "They did not want an aggressive leader. . . . They were not prepared to keep on going with Rufus in the direction in which he was taking them."[53]

The most outspoken of Rorem's adversaries was John McNamara, the first director of the Cleveland Hospital Association. McNamara's antagonism seems to echo an earlier philosophical incompatibility between Rorem and McNamara's Cleveland associate, Monsignor Maurice Griffin. Griffin, a charter member of the AHA's Committee on Hospital Service, was the embodiment of a close involvement between Catholic hospitals and the Blue Cross Plan in Cleveland. In 1933, Griffin clashed with Rorem at the AHA convention after Rorem made his first major report on prepayment. The report began by saying, "The function of group hospitalization is not to make easier the problems of the [hospital] superintendent, but to solve the problems of the individual and the public who own the hospitals." Griffin argued that if Plans were not firmly under the control of hospitals, they could become an

BCBSA00292730

entering wedge for government infiltration and takeover of hospital finance and administration.[54] A 1935 photo shows Griffin sitting with McNamara at an Ohio Hospital Association meeting beneath a large banner declaring, "Only Hospitals Can Sell Hospital Service."[55]

McNamara, who had been editor of *The Modern Hospital* magazine before coming to Cleveland, was described even by his friends as being overbearing and difficult. He bristled at Rorem's efforts in Cleveland to rein in management practices that clashed with emerging Blue Cross organization principles. Rorem charged McNamara at one point with violating the AHA standards on advertising. The Cleveland leader also stubbornly refused to allow employer contributions toward subscription fees, on the grounds that they would weaken the subscriber's bond to the Plan. During the war, when fringe benefits were exempted from the emergency wage freeze, such idiosyncrasy was viewed with some alarm by the BCC. Because of the strength of the Cleveland Plan and his own personality, McNamara was a force to be reckoned with on the Commission. After the clash over advertising, in protest he temporarily pulled the Cleveland Plan out of the Commission.[56] "He [McNamara] was in a position of such power in the Commission at the moment that Rufus just didn't want to fight any more," J. Douglas Colman said.[57]

According to John Mannix, McNamara also was the leader of a group of Plan officials who had political doubts about Rorem. Early in the prepayment movement, Rorem was one of several pioneers—van Steenwyk was another—who expressed doubts that the Plans would ever enroll more than a few million people at most. Mannix told interviewers later that Rorem's doubts about the growth potential of private prepayment plans helped fuel suspicions in some quarters that Rorem might be "soft" on government intervention. Those suspicions had been aroused originally by Rorem's work with outspoken advocates of government insurance on the CCMC. According to Maurice Norby, a BCC official, McNamara "had documented according to his satisfaction that Rufus was a Communist." At one point, McNamara called an emergency meeting of Plan directors in Chicago to consider the allegations. Rorem survived the tense two-day inquisition, but it was "touch and go," Norby recalled.[58]

"Rufus suffered to a large extent in this connection, and as a matter of fact Rufus probably was wise to leave [the] Blue Cross [system] when he did and go to Philadelphia," Mannix told Odin Anderson in 1971. In a later interview with hospital historian Lewis Weeks, Mannix elaborated, perhaps a bit disingenuously, "McNamara felt Rufus Rorem's real interest was in a governmental program to finance health care. . . . He believed that Refus' position was that [the] Blue Cross [organization] was a very excellent experiment that demonstrated the soundness of prepayment, but did not feel that this was going to do the job." According to Frank Van Dyk, though, Mannix himself was among Rorem's detractors: "They had it in for Rufus. . . . Mannix and Monsignor Griffin came to me and asked me if I would consider taking Rufus' job if they could remove him. . . . [T]hey plied me with wine and liqueurs and so

BCBSA00292731

forth. They did not like Rufus and they wanted Rufus out of that job."[59]

Despite his covert disenchantment with Rorem, Mannix also was frustrated by the lack of progress toward national unity. He left the Blue Cross organization in 1946, resigning both as head of the Chicago hospital Plan and as BCC chairman. With characteristic foresight, Mannix—while he was in Michigan in 1940—had been the first to articulate the need to deal with national employers. At that time he proposed the formation of a national Blue Cross organization to offer benefits on a nationwide basis. "They nearly threw me out of the Blue Cross field when I first presented that," he told Odin Anderson in 1971.[60]

In 1944, Mannix again proposed an American Blue Cross, a national health plan that would combine hospital and medical benefits, and he again received an underwhelming response. By 1946, he had become disillusioned with the lack of progress toward his goal. Mannix turned his resignation into a statement of protest by joining a for-profit firm—the John Marshall Insurance Company, in West Virginia—to sell national accounts and compete with Blue Cross Plans. The action contributed to his lasting reputation among colleagues as a difficult individualist. The John Marshall venture was short-lived but Mannix continued his career as an advocate of prepayment in and out of the Blue Cross organization, regarded with reverence by some and uneasiness by others. "He really wasn't the best old cooperator we ever had," as Singsen put it. "He won't participate except on his own terms."[61]

"People in the Blue Cross field I think unquestionably avoided me," Mannix said plaintively, years later.[62] But in 1990, Mannix became the sixth recipient of the Blue Cross and Blue Shield Association's highest honor, the C. Rufus Rorem Health Service Award, for his lifetime achievements. "Philosophically he was always so far ahead of his associates that he was often a lonely man," James Stuart wrote in a thoughtful assessment, which concluded:

> He had dreams and visions of what it was possible to do through voluntary action, but few Blue Cross executives could follow him. He was always the philosopher and his pragmatic associates listened, often did not understand and rarely heeded his advice. . . . Had his early recommendations been followed, the course of health insurance in the United States might well have taken a far different course.[63]

At the behest of the Blue Cross Commission, the trustees of the AHA tightened their approval standards periodically in an effort to create a more coherent national entity. But to win approval for such measures, compromises often had to be struck with local interests, and "the opposite effect often resulted because loopholes and escape clauses were added as expediencies to meet problems of the moment."[64] One of the headaches that troubled Rorem the most was a creeping erosion of the concept of service benefit among the hospital plans.[65] The standards of the BCC approval program, revised in 1946, did not allow the kind of unrestrained use of indemnities that was common in the

BCBSA00292732

medical Plans by this time. But in their concern about the financial conse-
quences of rising hospital costs, many of the hospital Plans had hedged their
commitment to the full service benefit with flat-rate room allowances, cover-
age exclusions, and partial benefits for some special services.

At Rorem's insistence and after an intensive discussion of hospital reim-
bursement, in March 1946 the BCC passed a strong resolution reaffirming its
commitment to service benefits. But a mere resolution could not change the
facts for a Plan struggling to hold the line on subscriber rates, maintain its
own financial soundness, and allow for hospitals to receive adequate compen-
sation for their services. The revised approval standards of 1946 show that the
BCC was forced to give ground on the principle of service benefits in order to
accommodate the diverse solutions Plans had devised to meet their needs.
While the original standards state simply that benefits "should be guaranteed
with service contracts . . . as opposed to cash indemnification contracts," the
1946 version said services "should be determined by the practices of the
member hospitals" that were "urged to cooperate with Blue Cross Plans in
providing complete hospital care."[66]

The 1946 standards, on other points as well, reflect the degree to which
the Commission had to allow breathing room for the Plans to meet their
needs. The financial failure of any Plan was a potential threat to the reputation
of all, and the Commission remained flexible about approval requirements re-
lated to reserves and/or hospital underwriting responsibilities. Reed reported
in 1947, "Although an endeavor was made to persuade certain Plans which
were thought to be skating on thin ice to build up larger reserves, the Com-
mission and the [AHA] Board of Trustees in recent years have not withdrawn
approval from any Plan on these grounds." By the end of the decade, the
Commission would have retreated on the prohibition of sales commissions
also, again to reflect the realities of local practice: "The present standards for
reapproval require little of any Plan," Reed concluded, ". . . as if the teeth had
been removed."[67]

Because the smaller Plans were the ones that seemed most often to suffer
financial problems, standards written in 1942 suggested a minimum size of
500,000 members (although some Plans never reached this size). For re-
lated reasons, the same standard also said approval would be denied to any
Plan operating in another Plan's area. Inevitably, however, disputes between
Plans in adjacent areas arose and charges of violation were frequent. In cases
of conflict, the national staff suggested mergers, if that seemed the best
course to better service. But these suggestions were ignored as Plans sought
invariably to enlarge their own areas. Mergers took place only when financial
disaster threatened. The most bitter fights were between intrastate rivals
who lacked even a theoretical definition of where one Plan's territory
stopped and another's started. Bickering over nonexistent boundaries was
perpetual between Pittsburgh and Philadelphia, for example. One ditty at-
tributed to van Steenwyk in Philadelphia went, "Oseroff has a notion / That
Pittsburgh's on the ocean"; to which Oseroff is said to have replied, "Van

BCBSA00292733

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 93 of 182

Steenwyk has a mania / That Philadelphia's Pennsylvania."[68]

In the medium-sized cities of the industrial heartland, the spirit of local autonomy flowered superabundantly. John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans." At one time or another there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown, according to Morgan's recollection of the freewheeling 1940s. By then there were also eight Plans in New York and four in West Virginia. The latter state, with a population of 1.9 million in 1940, could only laugh at the 500,000-member-per-Plan standard.

The diffusion of power in the national Blue Cross organization progressed further in 1947 when the Commission was restructured to give a majority of seats to Plan representatives, not to the AHA, and to spread the Plan votes equally among twelve geographic districts. By this time, it was clear that the most critical test of the national system was going to be meeting the demand of large firms and unions for coordination of benefits from one Plan's jurisdiction to another. By the late 1940s, the Plans were increasingly threatened by their inability to compete with commercial insurance companies, which could guarantee uniform rates and benefits on huge national contracts. Reinforcing policy trends that had begun during the war, the passage of the Taft-Hartley Act in 1947 established health benefits as a "condition of employment" for which labor was entitled to negotiate at the collective bargaining table. By 1948, 3 million workers were receiving health benefits negotiated by their unions and employers, and employers contributed $250 million toward such benefits during that year. Hundreds of commercial insurance companies had entered the field. They all had one formidable advantage over Blue Cross and Blue Shield Plans because they could offer the employer a single contract providing the same benefits to employees, no matter where they were located, at a single price.[69]

Various reciprocity arrangements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them. By 1950 the Commission's standards had been rewritten to say that participation in national programs was obligatory "'unless such participation would materially and inequitably affect (the Plan's) operation.' Here was an escape hatch big enough for any Plan to walk through," Stuart observed.[70]

Paul Webb, director of Associated Hospital Service of Maine, described his view of the problem at the annual Blue Cross Plan conference in 1945. Many of Webb's subscribers wound up receiving care in Boston's costly teaching hospitals. But the cash allowances provided by the Maine Plan—in a state where hospital costs were much lower—were usually not adequate to cover expenses at the Boston hospitals. Webb proposed a national "clearinghouse," although he first referred to it as a bank, "through which each Plan could

BCBSA00292734

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 94 of 182

purchase days of hospital care in other areas at its own average per diem cost—the exact opposite of the reciprocity program through which the local Plan paid on the basis of cost in the area where service was received."[71]

The proposal did not rally much support in its first year. But the following year, the Commission's assistant director, Antone "Tony" Singsen, began to develop plans for an intermediary called the Inter-Plan Service Benefit Bank, through which each Plan could buy days of care for its subscribers anywhere in the country at its own local cost. The benefits provided would be those of the "host" Plan, through its member hospitals, and the bank would reimburse the host its actual cost.[72]

Van Steenwyk gave the issue another push in 1947 with a Philadelphia-based experiment he called a syndicate. In this undertaking, the Plan in the area of a given company's home office negotiated a deal for the desired benefits and price. Plans in other regions or states where the company had branch operations were given details of the arrangement. Those Plans then could choose to participate in the arrangement to whatever extent they chose. The home Plan guaranteed full delivery to the company and accepted all or part of the underwriting risk, depending on how much the cooperating Plans did or did not pick up. As it turned out, the formula had substantial appeal for Plans in the branch areas. And with good reason: they were getting a bundle of new business—signed, sealed, and delivered by the originating Plan—without lifting a finger. The idea caught on, and within five years, some 250 syndicates were providing coverage to about 1.2 million people. The first contract was written with the American Viscose Corporation in Philadelphia. Other early deals won business with major employers including U.S. Steel, Bethlehem Steel, and Jewel Tea Company.

Plans that participated in syndicates made a safety net for themselves by mutualizing the risk. The syndicate withheld a percentage of all subscriber fees to accumulate a reserve fund, which could be used to shore up any Plan that encountered a run of bad financial experience with its branch of the company. Here again, however, a compromise had to be made with traditional practice, since the Plans had to keep detailed records of the claims experience of each company with syndicated coverage in order to justify asking for a payment from the reserve fund. This set a precedent for making exceptions to the practice of community rating by using a method for calculating rates for a limited group of subscribers based on the specific claims experience of that group. The syndicate also required considerable toil, ingenuity, and pluck on the part of the Plan that launched and guaranteed it since, in effect, the Plan was administering a national contract out of what was otherwise designed to be strictly a local service office.

Negotiations for a major steel industry contract in 1949 provide a good example of the faith and fortitude that was needed to make a syndicate work. In Singsen's words, "They put together a syndicate of Plans solely by their

BCBSA00292735

own efforts, really without national leadership by the Commission, but to set up a system which could be sold to the account against terribly strong insurance company competition." Then head of the hospital Plan in Maryland, J. Douglas Colman, whose role it was to guarantee benefits to about 125,000 Bethlehem workers and dependents in Baltimore, described the adventure in a 1971 interview:

> Van Steenwyk was negotiating with the company, Bethlehem Steel, in New York. Oseroff was negotiating with the union in Pittsburgh. They were in collective bargaining and on strike. . . . I was kind of refereeing between the two. . . . The strike was settled, everybody went back to work, and we had to make these benefits available . . . beginning midnight February 1 [1950]. There was not one scratch of pen to paper. It was done by personal commitment. I had paid out something like a quarter of a million dollars in Maryland without a contract.[73]

Serviceable as it was in some cases, the syndicate method left much to be desired. It created a huge burden in cities that were loaded with corporate home offices, such as New York, Pittsburgh, and Chicago. It also involved risks that cooperating Plans had no opportunity to evaluate. And it highlighted fundamental differences that were emerging in how the Plans managed hospital reimbursements. As a bloc, the larger, older, eastern Plans with strong market shares had used their leverage to bargain with hospitals for cost-based reimbursement. A much larger number of smaller Plans "wanted no part of this" approach, according to Tony Singsen.[74] Such an attitude tended to put a distinctly adversarial edge on Plan-hospital relations, which could hurt Plans with limited market clout.

Syndicates worked with companies and unions that felt a loyalty to Blue Cross and Blue Shield Plans for their service benefits and community identification. But the syndicate's ad hoc, improvisational flavor did little to alleviate the impatience of big firms and unions that were in the market for simple, consolidated hospital and medical coverage. Despite the successes of the new invention, large national accounts still were slipping rapidly away from the Blues to commercial competition.

Another approach to the problem was undertaken at a meeting of the Blue Cross Commission in Milwaukee in 1947, on the basis of a suggestion first broached by Louis Pink. Pink was a former New York state insurance superintendent who, in 1933, had suggested that the United Hospital Fund in New York City should seek special enabling legislation to protect its proposed prepayment plan. He then helped draft the law. Pink now was head of the Blue Plan in New York City and a well-regarded BCC member. In Milwaukee, Pink proposed that the Commission form a new corporation to handle national enrollments. Frank Smith, then AMCP director, took Pink's idea a step further

BCBSA00292736



In the 1950s, Bethlehem Steel's employees were loyal Blue Cross subscribers who received coordinated coverage in a multistate area through inter-Plan "syndicates" —a type of arrangement that eventually helped open the door for experience-rated premiums. (BCBSA archives)

and suggested that the Commission make a formal request to AMCP to participate in the proposed corporation as well. William McNary, who had just become director of the Blue Cross Plan in Michigan, was selected to chair a study group on the proposal. Five months later the group produced its formal recommendation for formation of a national enrollment corporation including both hospital and medical Plans.

The Commission endorsed McNary's proposal unanimously in September, and a summit conference of the Blue Cross Commission and the AMCP was convened soon after. Dr. F. L. Feierabend, a member of the AMCP board, presided. Odin Anderson wrote, "It was a portentous meeting. The brass on both the hospital and medical sides were out in full force. The atmosphere was strained but negotiable."[75] Van Dyk rose to remind the gathering of the difficulties they faced. Inclusion of medical benefits—as progressive a step as it was— would compound the challenge of forming a new corporation for national accounts because of the variability of medical coverage and because the existing Blue Shield Plans (which at that time covered only about 5% of the nation's pop-

BCBSA00292737

ulation) hardly could promise employers and unions coast-to-coast protection.

Nevertheless, the project moved ahead. Staff from both sides gathered the data the corporation would need to prepare a viable outline of rating, coverage, and reimbursement policies. By this time, moreover, BCC members had learned enough about how medical societies and individual physicians looked at the world to understand that any leader of the combined Blue Cross and Blue Shield organization had better be a doctor of medicine as well as a skilled and strong-minded executive. Happily, there appeared to be a man who met all the desired qualifications and might be available for the job. This was Major General Paul R. Hawley, M.D., former chief surgeon of the European theater of operations in World War II. He was medical director of the federal Veterans Bureau but was known to be restless and tiring of government service. When Hawley accepted the invitation and went to work in January 1948 as the chief executive of an as-yet-unnamed national joint venture of Blue Cross and Blue Shield Plans, the sense of relief and hope among prepayment supporters was palpable.[76]

The goal of the project was, as Stuart put it, "not only to act as a national enrollment office but as an underwriter to fill the gaps, level out the peaks and valleys in benefits, and supplement and complement the service Plans by providing coverage which they could not or would not provide." Smith and Richard Jones, Rorem's low-profile successor at the Blue Cross Commission, welcomed Hawley's arrival. Both Blue Cross and Blue Shield Plan groups decided it was time to start meeting, to mingle, discuss, and decide together on the details of the new program. The Blue Cross Plans were assured that the new corporation would not increase their dues, disrupt their organization, or infringe on their autonomy.[77]

Difficulties surfaced at the first joint meeting of Blue Cross and Blue Shield Plan representatives in March 1948 in Los Angeles. Participants seemed unable to agree on any detail of the national program. Concern about another antitrust action was clearly on many of the doctors' minds. More than that, mutual distrust was in the air. Feierabend commented, "The Blue Cross group was saying, 'I'm not going to let any doctors tell us how to run a hospital.' The Blue Shield group was saying, 'I'm not going to let any guy who doesn't know anything about medicine tell me how to practice.' So there you were; there was the clash."[78] Then, in November 1948, the AMA House of Delegates buried the stillborn joint venture with a formal vote rejecting the hospital Plan's proposal for the formation of a Blue Cross and Blue Shield Health Service. Stuart wrote:

> Everyone expected too much of Dr. Hawley. . . . Chronic problems did not disappear, and the good doctor found that he had two patients who required, but would not agree to undergo, a necessary course of treatment, some of which might involve major surgery. The patients liked Dr. Hawley. His bedside manner was smooth, his diagnosis was sure and prompt, but the patients declined to follow his advice.[79]

The Blue Cross Commission, for its part, emerged from the experience with a substantial residue of interest in pursuing the idea of forming a national enrollment company. Planning for the enrollment company continued through 1949 under Hawley's direction. And in January 1950, Health Services Inc. (HSI) opened for business as a mutual insurance company chartered in Illinois. Its mission was to

> meet the demand of firms operating in more than one Blue Cross area for uniform benefits, uniform enrollment and administrative regulations, and a central agency to regulate uniformity of coverage, provide additional benefits which cannot be offered by the local Plan, and furnish protection for employees living in those few areas not served by Blue Cross Plans.[80]

The new corporation did not undertake any sales operation. That was to be left to the Plans, which had the option of underwriting HSI's risks, or not, as they chose. Stock in the new company was owned entirely by the Plans. But for legal reasons, a nonprofit holding company had to be set up to exercise the legal responsibility of stock ownership on their behalf. This was the Blue Cross Association (BCA), a relatively insignificant entity at birth. Hawley was the first president of HSI, and the board included a future secretary of the Navy, Thomas S. Gates, who was then president of the Philadelphia Plan, as well as UAW president Walter Reuther.

It took eleven months for the company to land its first contract with 820 employees of United Press, scattered across the territories of forty-two Plans. Several other groups with company headquarters in New York, including the Johns Manville Corporation, were signed later. HSI went on to underwrite supplemental benefits in contracts with the major auto producers and the UAW. HSI was a disappointment but not a defeat. Within a few years the Blue Shield organization would pay the notion a belated compliment by forming a national insurance company of its own, Medical Indemnity of America (MIA), which entered into a joint operating agreement with HSI in 1953.[81]

More fruitful for the Blue Cross organization was the work that Tony Singsen had done in developing an inter-Plan bank. Singsen had gone to work with a committee headed by Paul Webb of Maine and came up with a new program called the Inter-Plan Service Benefit Bank, which went into operation in mid-1949. When subscribers were hospitalized away from home, the bank would pay the host Plan according to its usual local costs and bill the subscriber's home Plan according to its usual local reimbursement rate, plus a $3 charge for administration.

A pilot project conducted in 1947 had demonstrated that payments to and from Plans in high- and low-cost areas would tend to balance out and allow the bank to operate on a break-even basis. Within a short time, all but two of the Plans joined the bank. Business became so brisk that the Bank eventually stopped using telegrams and leased a wire service to handle inter-Plan com-

munications, later to be replaced by massive computer networks. Helping to get the bank up and running was widely viewed as Hawley's greatest achievement as the joint chief executive for the Blue Cross and Blue Shield organization. But the failure of the two groups to forge a working relationship was a disappointment to all. Hawley left after three years to become director of the American College of Surgeons. No one attempted to fill his position. The Blue Cross and Blue Shield organizations drifted into a cool and sometimes competitive relationship in the years to come.

BCBSA00292740

# The 1950s

## Burdens of Leadership

*In the '30s and '40s there was a supply problem. There were too few hospital beds and there wasn't enough capital to get at that problem, let alone modernize . . . so that Blue Cross's role [was as] an uncritical generator of that capital. . . . Now we come to this '50s, '60s problem with demand economy where we have too many beds in too many places and the trick is to spend the money more wisely. . . . We have to play a balancing role.*

—Walter J. McNerney, 1973

MIDCENTURY MARKED THE BEGINNING OF AN ERA of conspicuous consumption. The 1950s would be a period of rising demand throughout the economy, and no sector expanded faster than health care. The consumer's growing appetite for health services was driven by heightened expectations and an increase in buying power, buttressed by the widening availability of insurance. From the supply side, potent government subsidies for hospital construction, research, and medical education added another dimension to the growth spiral. At the same time, the cost of care was rising faster than the general rate of inflation, driving the nation's total spending on health to increase at a breakneck pace.[1]

Positioned at the hub of a growth enterprise that soon would rival automobiles and steel in magnitude, Blue Cross and Blue Shield Plans—fresh from their essentially modest and homegrown beginnings—suddenly found them-

BCBSA00292741

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 101 of 182

selves living in the world of big business. Although local diversity had periodically shaken the coherence of the prepayment movement, the movement had throughout its first two decades maintained a kind of bedrock simplicity based on local control, standard benefit packages, and homogenous rates.

Such certainties would soon go the way of the nickel cigar. As J. Douglas Colman put it in a 1971 interview when he was president of the New York City Blue Cross Plan (later known as Empire Blue Cross and Blue Shield), "Nobody ever dreamed it was going to go to the size that it did." An unsigned essay in Colman's papers explains: "This whole movement generated from local inspirations, spontaneously here and there, inheriting local concepts without any conscious planning by anyone of a pattern for the whole, for the long haul. 'We just grew, like Topsy.'"[2] Big-power status challenged the business skills of Plan managers and rippled from top to bottom through the corporate culture of the nonprofit enterprise. In earlier days, enrollment representatives had acted as the emissaries of what resembled a social agency. Their primary job was to inform and facilitate: the service sold itself. High-torque salesmanship was not expected, and Plan representatives often worked for the kind of pay that social workers received—the assumption being that they would settle for less because of the satisfaction that went with their work. As the competition stepped up its efforts, however, the soft sell was not always good enough any more. The pitch had to be tighter and brighter, and Plans that did not pay competitive salaries to executives and enrollment representatives ran the risk of falling behind.

The biggest changes in the marketplace began after the U.S. Supreme Court put the finishing touches on the Taft-Hartley Act in 1949. Passed two years earlier, the act protected labor's right to bargain collectively over terms of employment. In 1948, in a dispute between the United Steelworkers of America (USW) and Inland Steel Company, the National Labor Relations Board had ruled that health and pension benefits were covered by the ruling. The U.S. Supreme Court upheld the decision a year later, at about the same time that Plan pioneers van Steenwyk, Oseroff, and Colman were hammering out a syndicated contract with the USW at Bethlehem Steel Company.

Big accounts were not new to the Plans, nor were their leaders unfamiliar with the bargaining power that industrial-strength purchasers of health insurance in places like Detroit, New York, or Pittsburgh could bring to bear in negotiating for coverage. As early as 1941, for example, Michigan Hospital Service had declared a "payment holiday" for workers at Ford Motor Company. The action came after Ford demanded a rebate on its payments to the Plan because outlays for benefits in the previous year had fallen short of what the employees had paid in subscription fees. But it was not until Taft-Hartley institutionalized collective bargaining over health benefits that large-scale buyers—both unions and employers—realized the extent to which they could use their purchasing power systematically to get the rate and benefit packages they wanted from the competing Blue Cross and Blue Shield Plans and commercial insurance companies. It was a sea change that eclipsed the previous

BCBSA00292742

decade's somewhat formalistic discussion of who controlled the Blues (or who sat on their boards). Now, control could be wielded from the outside as well, through the medium of the marketplace.

The old order would be severely tested also by the rapid escalation of hospital costs during the 1950s. In place of the vintage hospital administrators who had learned their trade as nurses or in the hospital accounting or business office, postwar administrators had been trained at the new university graduate programs in hospital administration. These administrators had never known what things were like during the Depression, when many patients could not pay their bills and Blue Cross Plans seemed a miracle cure for the threat of hospital bankruptcies. The new administrators were asked to accept payments at something less than normal billings. They were expected to pledge allegiance to a nonprofit entity that was much more difficult to understand than a traditional insurance company, which merely helped patients pay the bills. They were asked to provide something called a service benefit, which they often did not quite comprehend. Costs were going up at nearly 10 percent a year, and occasionally it looked as if—far from helping hospitals, as people kept saying the Blue Cross Plans were doing—the Plans were in fact contributing to the hospitals' financial woes. Old-timers in the field saw the Blue Cross organization as a friend and an ally; but the old-timers were retiring, and their replacements sometimes were not so sure.

The initial surge in health care costs and total spending in the latter half of the 1940s had been readily identifiable as a rebound from wartime wage and price controls. When the trend continued to accelerate into the following decade, medical economists and policy makers were at pains to sort out the many contributing causes and find a satisfactory order of importance to put them in. The spread of insurance coverage—from less than 10 percent of the population having hospital coverage in 1940 to nearly 70 percent in 1955—contributed to the total bill. But the degree to which benefits triggered increased utilization of health services is unclear. Consumers were demanding ever more comprehensive benefit packages, and the Blues and commercial insurers vied to outdo each other in obliging them. Subsidized handsomely by the federal government, a huge investment was pouring into hospital construction and medical education that soon would begin showing up in the complex equations of hospital cost accounting and insurance reimbursement. Research and technology were expanding the reach of medicine into new modes of treatment with dazzling success. But the cost of drugs, equipment, and the skilled personnel now needed to support the bedside labors of doctors and nurses added considerably to the nation's health expense. In short, the 1950s saw the dawn of the current era of health care, with its promise and its problems: a flood of rising expectations coupled with an enormous burden of expense. Much of the responsibility for managing this volatile matrix of supply and demand fell on the shoulders of the thriving young Blue Cross and Blue Shield prepayment Plans.

BCBSA00292743

## Rising Expectations

Of all the factors that contributed to the increased cost of care, the most dramatic were, indeed, the hospital rates. Between 1948 and 1958 the nation's total spending on health went from $7.6 to $16.4 billion. During those same ten years, spending on hospital services increased from $1.9 billion (or 25% of the total) to $5.1 billion (31%). From 1945 to 1960, rates for room, board, and general nursing care more than tripled, rising at an average of 9 percent a year—four times as fast as doctors' and dentists' fees, six times the rate of the price of drugs, and three times as fast as all health services combined.[3]

Technological advances accounted for a major part of the new costs. Life-saving innovations such as the heart-lung machine and radiation equipment for treating cancer were expensive to buy. The need for trained personnel to operate the new equipment added to hospital payrolls, although the tradition-ally low wages in the health field were not yet going up any faster than were



In the growth economy of the 1950s, consumer demand increased for a cornucopia of goods and services, sustaining continued growth of health insurance coverage to new markets across the country, including rural areas. (BCBSA archives)

BCBSA00292744

wages in other industries. Hospitals were also playing an ever-widening role as education and research centers, and although these activities brought in new revenues, they inevitably entailed unfunded costs and immeasurable administrative complications.

The federal Hill-Burton hospital construction program enacted in 1946 had a major impact on costs. Federal spending under the program began at about $75 million a year in 1948 and rose to $186 million by 1961. Every government dollar entailed a local obligation to come up with an additional $2 in matching funds. Between 1946 and 1960, the number of voluntary and state and local government general hospitals had increased by 1,182. The building program sought to remedy a lack of investment in hospital construction during the Depression and World War II. It also broadened access to hospital services in underserved rural and poor communities, although the matching-fund requirement undercut this latter objective somewhat. While the grant program increased hospital assets, debt service on the local matching funds became a significant new expenditure. An unforeseen side effect of Hill-Burton was the creation in many areas of an excess bed capacity. Competition among hospitals for prestige and doctors tended to produce redundant technological expenditures in some larger communities, which also added to the per capita cost of inpatient hospitalization.[4]

The pernicious effect that excess capacity has on costs shows up in the way empty beds affect hospital administration practices. According to Herman and Anne Somers's 1961 study of health care costs, "When a hospital is under severe economic pressure to keep up the occupancy rate, it lacks the financial incentive to regulate admissions, or to press for shorter stays, or to tighten discharge procedure." An oversupply of beds combined with the ready availability of health insurance naturally prompted the average hospital administrator "to try, consciously or unconsciously, to maintain in his institution the highest possible occupancy." Analysts would argue endlessly about what caused increased utilization and whether it was good or bad. But increased hospital utilization was a fact, and it helped drive up total spending. Between 1946 and 1958 the average number of annual admissions to all hospitals other than mental institutions and tuberculosis sanitariums rose from 105 to 134 per thousand population.[5]

As the Eisenhower years rolled along, spiraling health costs attracted increasing attention from public officials and policy makers. Blue Cross and Blue Shield Plans came under ever-increasing scrutiny from state insurance officials. Eventually the cost spiral would lead to renewed discussion of government intervention. But long before the larger debate began, Blue Cross Plans were experiencing the rising costs in a direct and threatening way. In the short run, at least, commercial insurers that offered indemnity coverage were insulated from the effects of hospital cost increases by the cash benefit limits stated explicitly in their policies. Subscribers would be unhappy if hospital room rate increases added to the amount they owed in excess of the charges covered by

BCBSA00292745

the indemnity payment they received. But the insurers were not financially threatened by unmanageable losses.

For Blue Plans, however, the tradition of service benefits made matters more difficult. The traditional benefit promised full payment for standard hospital services—usually including room, board, and nursing and ancillary services not performed by a doctor. The more these services cost to deliver, the more hospitals demanded for reimbursement. But Plan managers were sensitive about increasing subscribers' rates and were concerned about the impact increased rates would have on enrollment. An inevitable conflict arose as the Plans tried to hold the line on rates while they maintained an unmistakable obligation to be reasonable in compensating the hospitals.

By 1950, only a few Plans were still reimbursing hospitals on a flat-rate basis. Most paid according to a cost- or charge-based formula. But determining costs and the relation of charges to costs was difficult. "Costs are what you can agree they are," Rorem was fond of saying, but that was little comfort in reimbursement negotiations that could in short order make or break the Plans or the hospitals. The AHA had begun to lay a foundation for uniform cost accounting for the wartime EMIC program. In 1953, the AHA's board of trustees tackled the issue again by drawing up a list of principles to govern the fair calculation of reimbursable hospital costs. The resulting standards, according to Stuart, "represented a compromise between the views and arguments of the hospitals, Blue Cross Plans, organized labor, and representatives of government." Excluded as allowable cost factors in the AHA's new code were bad debts and charity care, medical research beyond what was necessary for patient care, and education programs also funded by fees and grants. Allowable cost factors included reasonable medical and nursing education expenses, routine maintenance and remodeling costs, reasonable interest on debt, and clearly identified depreciation costs.[6]

These AHA cost accounting principles would provide a helpful framework for negotiating reimbursement arrangements both in the prepayment business and later on in public policy development and in the Plans' dealings with state insurance commissioners. Locally, however, reimbursement formulas continued to vary, from simple percentages to complex methods that took pages to explain. Often, temerity about raising subscriber rates—or a determined sense of subscriber advocacy, such as van Steenwyk was known for in Philadelphia—tended to make some Plans very frugal about reimbursement, which put a strain on hospital-Plan relations.

Other Plans took a second look at their commitment to service benefits when caught in a bind between runaway hospital costs and hard bargaining on rates by purchasers. Many of the Blue Shield Plans had, from the first, chosen to offer only indemnity benefits to patients with enough income to pay part of their bills themselves. It was a way of avoiding the open-ended obligation of promising surgical and other in-hospital services on a paid-in-full basis.

BCBSA00292746

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 106 of 182

The hospital Plans, however, remained strongly committed to service benefits and had nourished a powerful preference for them among subscribers. In 1945, according to the Somerses, only 4 percent of the Blue Cross Plans offered indemnity benefits. But the relentless pressure of rising costs eventually began to erode the Plans' determination. By 1952, 24 percent of the hospital Plans were making at least some use of indemnity benefits. By 1958, there were twenty-eight Blue Cross Plans that paid only indemnity allowances for basic room and board benefits—usually pegged to hospital charges for semi-private or ward accommodations. Hospitals sometimes defeated this tactic by holding room rates down to the amount of the Blue Cross Plan allowance and shifting their general cost increases into rates for ancillary services, which the Plans paid in full.[7]

The commercial companies were unquestionably gaining ground. Many large employers and some major unions (the Teamsters Union, for example) liked the stable rates that went hand in hand with indemnity benefits. But while cost pressures pushed the Blue Plans toward experimentation with indemnities and with a growing variety of benefit packages, the service benefit showed formidable staying power. Subscribers demanded it, and they had the clout to enforce their preference at the collective bargaining table. A bevy of large unions—including the USW and the United Auto Workers (UAW)—developed strong loyalties to the Blues precisely because of the "peace of mind" factor conferred by the service benefit.[8] "Cash indemnity plans for hospitalization and medical care are not satisfactory to us," said Harry Becker, director of the UAW's employee benefits program, in 1948. Indemnity plans could work for the family with average medical expenses, Becker said, but the UAW also intended to stick up for

> the worker who has to mortgage his home, the worker who has to sell some of his property to meet family living expenses. We're concerned about the 10 percent of the workers who, we found in our public opinion poll that we made in Detroit last spring, had to go on relief in order to meet family living expenses during periods of illness.[9]

The commercial companies, too, were hearing the call for more comprehensive coverage, and they responded aggressively. The most important development in benefits during the decade was the creation of a new product referred to as "major medical," which answered the demand for catastrophic coverage articulated by Becker. Offered either as a supplement to basic coverage or as part of a comprehensive package, major medical furnished coverage of up to $10,000 (and sometimes more) and was not restricted to specific categories of hospital or physician expense. At a 1957 Blue Shield system conference, general manager of Oregon Physicians' Service Joseph Harvey said, "The insurance people may have detected a growing public dissatisfaction with the limited scope of existing basic coverages—surgical and in-hospital medical—and sensed what they considered an opportunity to pre-empt the

BCBSA00292747

health insurance field." Unlike most basic coverage, major medical could be used to pay for drugs, outpatient care, diagnostic and lab tests, visiting nurses, convalescent care, and in some cases mental health and dental expense. Primarily designed as a product for the upper-income end of the market, major medical was an important factor in the commercial companies' ability to take market share away from the Blues during the decade. By 1959, 22 million people were covered by some form of major medical insurance.[10]

Outflanked, many Blue Shield and Blue Cross Plans that had turned to indemnity or combined service-indemnity coverage responded with their own experiments with extended benefits. There was a steady trend toward increasing the maximum length of stay covered in basic contracts. The Plans also developed a growing variety of optional coverages either tailored to a large group's preference or available to individuals through optional riders on basic contracts. "[Major medical] is creating some real problems for us," said Carl Metzger, then executive vice president of the Blue Shield Plan in Buffalo, N.Y. "Commercial companies are using the presentation of extended benefit coverage as a door-opener in accounts which we have held for years." But extended benefits also were seen as a door-opener for increased costs. And the Plans—especially on the Blue Shield Plan side, where the challenge of major medical was felt more acutely—approached the concept cautiously. Major medical, Oregon's Harvey argued, "offers the purveyors of services . . . the opportunity of gradually increasing unit prices without encountering substantial consumer, buyer, or, for that matter, insurance company resistance."[11]

Meanwhile, overtones of the preceding decade's political wrangle over government-mandated health coverage continued to reverberate, with a chorus of voices calling for increased coverage. Labor continued its earlier demands for a national program, sometimes as a way of exerting leverage in its quest for comprehensive benefits. Then, unexpectedly, the White House raised the question of how to bring the hard-to-cover elderly and poor populations under the spreading insurance umbrella. The 1952 election of Dwight D. Eisenhower as president and his appointment of Oveta Culp Hobby as secretary of Health, Education, and Welfare (HEW) were seen as diminishing the threat of action for a national health insurance program that would relieve the burden of illness for those unable to acquire private coverage—chiefly the aged and the unemployed. As it turned out, Mrs. Hobby's appointment made her more aware of this population, and more interested in doing something about it, than she had been before. Administration officials seized on the idea of creating a government-sponsored reinsurance mechanism that could protect private insurers against undue losses "if they ventured into more complete protection for the aged and other economically disadvantaged groups." Hobby convened a consulting committee of insurance company and Blue Cross and Blue Shield Plan leaders to advise her staff in developing legislation. According to Stuart, who served on the committee, "Strangely enough, the proposed bill was agreed to by all with some reservations on the part of two of the insurance vice-presidents."[12]

BCBSA00292748

When hearings on the bill were called in 1954, both the AMA and the AHA dug in their heels in opposition. One witness after another testified that no such legislation was needed because the problem was being handled adequately by private means. The commercial insurance industry, too, was adamant in its opposition, despite the earlier actions of its representatives on Hobby's committee. Once again, there was fear that any step toward government involvement would be a foot in the door for socialized medicine. In Stuart's view, Hobby was a friend who actually was seeking "to protect the status quo." By misinterpreting her motives, he observed, "voluntary health insurance lost an opportunity to work out an arrangement . . . through which the government would supplement rather than supplant voluntary effort and private initiative."[13]

The proposal died, but it had renewed concern in some Blue Shield organization circles about consumer dissatisfaction with the limits on available medical coverage. New Jersey Blue Shield Plan administrator Dr. James Bryan in 1954 wrote:

> Having committed ourselves irrevocably to voluntary health insurance, it is clearly up to the medical profession to provide a truly satisfactory medical security program. It would be fatal to fall too far short of this goal. If we succeed merely in giving everyone a partial and inadequate coverage, we will only aggravate the demand for a comprehensive governmental system.

By creating too many restrictions in their contracts, Bryan argued, some Blue Shield Plans seemed "to imitate the worst commercial insurance company practices." In 1955, Bryan noted, thirty medical Plans paid maximum surgical benefits of $200, an amount far below typical surgeons' fees at the time. If the effect was to concede the field to the commercial companies, doctors would lose their means of controlling the primary instrument of financing care, Bryan argued.[14] Some voices in organized labor offered similar criticism. In a 1957 speech to Blue Shield Plan leaders, labor spokesman John Tomayko pointed out that his union had signed national contracts with the Blue Shield organization in the early 1950s because

> Blue Shield alone held out the possibility to us that through its official relations with physicians it could provide a means whereby the surgical and other costly medical bills could be paid in full. [However,] virtually no progress toward the promised goal has been made. . . . The overwhelming majority of steelworkers still work in areas in which service benefits are not available. . . . We discovered a tremendous ground swell of resentment as to the effectiveness of our Blue Shield programs. . . . The Steelworkers believe that Blue Shield has lost sight of its original purpose and has deteriorated to a collection agency for the medical profession.[15]

On the other hand, the defense of indemnity benefits included astute arguments that went to the heart of the developing concern about overutilization

BCBSA00292749

of health services and the inflationary influence of increased consumer expectations and demands. In a criticism directed primarily at the independent group plan Kaiser-Permanente in California, Dr. Francis Hodges of California Physicians' Service (CPS), speaking before Blue Shield Plan executives in 1954, suggested that carte blanche coverage could be too much of a good thing. Both the Blue Plans and their commercial competitors were a device "for cushioning the shock of sudden and disastrous illness," Hodges argued, but not "a means of avoiding the costs." The California doctor went on to blast the Kaiser-Permanente plan's service benefits for their potential invitation to hyperutilization:

> Such plans are almost always presented as the answer to the patient whose finances have forced him to deprive himself of medical care. You can now see your doctor whenever, and as often as, you wish. You are even urged to visit him often. Get that blood pressure checked. Get a vaginal smear. Have a blood sugar. Come in and have a chest X-ray, an EKG. . . . Uncontrolled, continued furnishing of all these services is as sound as belief in a self-sustaining cat-and-rat farm.[16]

In the debate over how to control rising costs, some typical features of indemnity coverage were viewed in respectable quarters as having a salutary, restraining effect, which was sometimes overlooked by champions of the service benefit and representatives of organized labor. The practice of making the patient responsible for some of his own medical expenses—with the deductibles, co-insurance, and coverage limits—might occasionally irritate consumers. But it also might deter subscribers from overindulging in insured services and in the process driving costs off the deep end.

The net effect of competition and spiraling demand during this period was continued growth of the health insurance business on all sides, with the commercial companies enjoying the lion's share of this growth. The number of people with hospital insurance grew from 77 to 132 million during the 1950s, while the number with surgical coverage grew from 54 to 121 million and those with regular medical coverage went from 22 to 87 million. The total income of all private insurers grew from $1.3 to $5.8 billion between 1950 and 1960. Blue Cross Plan enrollment grew from 30 to 52 million between 1948 and 1958, but in approximately the same period its market share fell slightly, from 51 to 50 percent. Enrollment in Blue Shield Plans jumped from 8 to 40 million during the decade, but their total market share fell from 49 to 44 percent. These trends reflect both the success of major medical benefits in making inroads on the Blues' market share and the overall appeal that combined hospital and medical coverage continued to hold for consumers during the boom.[17]

## Retreat from Community Rating

While an essential commitment to service benefits did weather the seismic shifts of the 1950s, another hallmark of the Blues' tradition—uniform, communitywide subscriber rates—did not fare so well. Before it became a

BCBSA00292750

routine to negotiate health benefit agreements at the collective bargaining table, the decision to buy a given benefit at a given price was made by the individual subscriber, who had no idea how closely the insurers' receipts matched their disbursements. The difference of a nickel or a dime a week in the premium that the healthy paid to subsidize the sick in community-rated insurance did not mean much to an individual subscriber. However, when labor unions began purchasing coverage for hundreds of thousands of members at a time, or employers at one crack were spending millions on a benefits contract, or the federal government began shopping for all its employees, those nickels and dimes turned into real money—five- and six-figure differentials that hardly could be ignored.

The practice of tailoring rates to the claims experience of employee groups was foreshadowed in 1940 when Ford Motor Company was able to win for its employees a one-month "payment holiday" from Michigan Hospital Service, after Ford accountants figured that the company's relatively young and healthy workforce had not used as much coverage as it had paid for. And we have seen that, in the late 1940s, a few large Blue Cross Plans won national accounts by forming underwriting syndicates with cooperating Plans in other areas. The home Plan wrote a master contract with the multistate employer's head office and arranged for Plans in other areas to provide similar coverage to the company's branch operations. The syndicates had to keep track of the loss "experience" on these large companies' accounts so that the different Plans participating in syndicate arrangements would not be assessed more or less than their fair share of the underwriting load. Up to this point, the Blues' system of community rating—in contrast to the insurance industry's more stratified rate-classification practices—had used "the magic of averages" to subsidize losses on high-risk groups with gains on groups whose members got sick relatively less often.

The commercial competition realized that they were in a position to steal the Blues' best accounts by matching their benefits and charging low-risk groups rates that were below what they had been paying but high enough to guarantee a profit. This practice—sometimes referred to as "cherry picking"—had profound implications. Unless the Blues followed suit, they risked getting left with only high-risk groups, which would drive rates ever upward. But if the Blue Cross and Blue Shield Plans also began to tailor rates to the loss experience of a given group, the higher risks would become ever more isolated from the pooling principle that kept the cost of health insurance within their reach.

One form of experience rating had in fact crept into the Blue Cross and Blue Shield system several years before the practice emerged as a major issue in the early 1950s. During World War II, when business was booming but office help was hard to find, overworked Blue Cross Plan managers in Chicago had come up with the idea of letting some employers handle the administration of their own prepayment contracts. To save work for the Plan, the task of billing subscribers was delegated to the companies' accounting departments,

BCBSA00292751

and agreements were reached to determine subscription rates on a "cost-plus" basis, "simply by totaling the group's claims and adding an administrative charge." The companies advanced lump sums to the Plan, which handled hospital reimbursement.[18]

Additional cost-plus contracts were written in the late 1940s by Plans in New York City, Milwaukee, and North Carolina. Then came the new syndicate agreements, and with them, disagreements about experience rating developed within the Blue family. In the view of Michigan Blue Cross Plan executive William McNary, the 1950 national steel contract was the pivotal event: "Van [Steenwyk] was the one to break, he and Abe [Oseroff], when they signed steel." At the annual conference of Blue Cross Plans in 1952, leaders from Ohio, Indiana, Illinois, and Michigan proposed a resolution against the practice: "Experience rating is in direct contravention of basic enrollment principles of Blue Cross, and contrary to the community service ideal. . . . It is believed that such violation of principles will eventually destroy the voluntary, nonprofit Plans throughout the United States."[19]

During the conference, Blue Cross organization leaders appointed a study committee to plumb the issue. Late in 1952, this committee polled eighty-seven Blue Cross Plans with a total of 43 million subscribers and found that thirteen were selling cost-plus or experience-rated contracts, affecting 818 employee groups with 1.6 million members. Momentum was beginning to swing toward greater use of experience rating, despite stout opposition not only from traditionalists in the Blue family but also from some employers.[20] According to Philo Nelson, the first director of the Blue Cross Plan in Alameda County, California:

> We happened to be one of the early Plans that started deviating from [community rating] . . . to keep our accounts. . . . In our meetings [with other Blue Cross Plan leaders] we used to have great arguments about it. This is said in all friendliness. We would have men like John Mannix argue against it. Bill McNary argued against us, and people of that belief. And they were very strong in their belief. . . . I would argue against them on the basis that we have got to be self-sustaining and we have got to do this in order to stay in existence.

Some of the larger Plans in the East were able to hold out longer, Nelson explained, because they had stronger support for community rating from community leaders, unions, and employers:

> When we could get a sizable group that had good experience, they would insist [on experience rating]. . . . They made demands on us and we could not quite see losing the cream, so to speak, because we had no subsidy from any source. . . . We had no margin between charges and what their reimbursement formula was. . . . Not one red cent difference.[21]

Even where the Plans were in a strong market position, there was overwhelming pressure to tailor rates to the actual claims experience of large

BCBSA00292752

employee groups. "We fought it tooth and nail. To the last gasp," said Michigan's McNary, describing the attitude of Blue Cross Plan leaders who dreaded the consequences of carving up the risk pool in such a way as to maroon high-risk individuals and small employee groups. "But when you get to the point where unions are pulling out because they know damn well their experience is better" than other groups, he said, the Plans found themselves in a position where they had to change or die. McNary recalled, "We would have lost the telephone company. We would have lost the gas company. We would have lost—we did lose—the state employees, 30,000 of them, because we were not experience rating."[22]

Among the auto companies, differences in claims experience also would give a competitive price advantage to the company with the healthiest workforce. As a result, some of the strongest opposition in Michigan came from General Motors and the UAW (although such large purchasers of care in heavy industry were usually the first to see the potential advantage of experience rating). Business and labor support for community rating was usually a matter of enlightened self-interest. The exclusion of high-risk groups from the insurance pool would show up eventually as an increased burden on charity care at local hospitals and other expanded social costs. Dominant companies and their employees helped pay those costs through taxes, charity, and pension funds. "We had the opposition [to experience rating] of General Motors and the UAW bitterly the whole way," said McNary, noting that management people he knew at General Motors "threw back at me all of the things that we had been saying for years. . . . And they argued and the UAW argued that, hell, if we want merit [experience] rating we will go to an insurance company."[23]

In the end, the best that the Blue Cross organization rating committee could do was offer a recommendation in 1953 that Plans not yet engaged in experience rating make an effort to resist the practice. By 1958, sixteen out of seventy-seven hospital Plans relied heavily on experience rating, and twenty-six others used it in conjunction with community rating. Even some others that were generally "without sin," as one wag put it, tended to dabble in experience rating when national accounts were at stake. Only twenty-two eschewed the practice, and their firmness would erode in the years ahead.

Competitive pressure was not the only force to strain the community-rating principle. The trend toward more comprehensive benefits also wreaked havoc with traditional rate-setting practices, especially for the Blue Shield Plans. The Blue Shield Plans' move into extended benefits—after the advent of major medical coverage—placed them in a minefield of actuarial hazards. Major medical itself, as Duncan McIntyre's 1962 study of rating practices put it, "requires extremely careful rating and underwriting," because of the risk groups to which it appeals and the size of potential benefits. The commercial insurance companies responded by applying standard risk-classification factors (such as age, marital status, and income level) in rating their major medical policies. But Blue Shield Plans could not do this without changing their

BCBSA00292753

whole way of doing business. MacIntyre wrote, "Simple class and community rates were inadequate for the new coverage."[24]

A Blue Shield Plan executive from New York City described the new difficulties in vivid terms at the Plans' national conference in 1957. This was James Coleman, then president of United Medical Service in New York City. "It is difficult to find a field which is more subject to the whims and fancies of the human equation than this very field of Blue Shield rate making," he said. "Insurance, classically, should deal only with those contingencies which do not lie within the control of the insured," he went on, reviewing for his colleagues a fundamental precept of actuarial science. Those contingencies that Blue Shield Plans initially concentrated on—major surgery and hospitalization due to serious illness—fit the definition of uncontrollable events. But extended benefits that cover routine office visits, X-ray and lab exams, and other forms of diagnostic and preventive care were "clearly within the control of the individual insured," Coleman explained, creating what is known in the insurance business as moral hazard. "The very introduction of certain benefits throws out of whack the assumptions made as to the probability of payment." Although he avoided implying that subscribers will deliberately abuse their insurance by seeking unneeded services, Coleman said that deviating from underwriting rules makes losses "most difficult" to predict accurately and is likely to result in frequent rate changes. When extended benefits are offered to small groups and individuals, the result can be "vicious selection against the Plan."[25]

Coleman added to his litany of concerns the increasing numbers of subscribers who were reaching retirement age and exercising their option to convert their group contract to individual coverage. He declared ominously:

> Blue Shield Plan administrators realize that basically the total [loss] experience rises year by year. Part of this is due to the aging of our subscribers. Our system has within it the seeds of destruction that was once found in the old community rate. . . . I do ask you to consider what happens if the average is pushed high enough so that the young refuse to pay for the old . . . then the tempo of our troubles will rapidly increase.

It was Coleman's advice, and the inclination of most of the Plans that had begun to engage in experience rating, to temporize with their dilemma. They could add a surcharge to the rates of the preferred groups, out of which a contribution could be taken to help hold down their broader community rate. But experience rating had come to stay and would leave a permanent imprint on the future course of Blue Cross and Blue Shield organization history.

## Utilization Upsurge: Too Much of a Good Thing?

It did not take an auditor to figure out that one of the reasons health care spending was heading to new heights was that people were using hospitals more than ever before. But it did take some special know-how to fathom

BCBSA00292754

exactly what had caused the upsurge. A number of factors contributed to the trend, but their relative importance was difficult to sort out. Many doctors had come to prefer the hospital over a private office. And it was the doctor who decided when a hospital admission was required. Once a house of dread where people went primarily to die or disappear, the modern hospital had reversed its image and now appealed to patients as a reassuring and comfortable retreat in their time of need. After the effects of the Hill-Burton building binge set in, administrators encouraged liberal admission policies as a way to offset the cost of empty beds. Proliferating new technologies and surgical techniques increased occasions for treatment. Increasing longevity in the general population boosted hospitalization rates among older people, who tended to survive their illnesses for longer periods of time but require more care in the process. In addition, hospitalization for childbirth was now the rule rather than the exception.

All of these factors leading to increased hospital use depended on the patient's ability to pay, however. Without the growing availability of insurance, the emerging needs and proclivities of doctors, patients, and administrators would never have had the effect they did. Although changes in demographics and medical practice made overall increases in utilization rates difficult to measure, there was no question but that insurance coverage played a pronounced role in causing the increases. Major studies in 1953 and 1956 found that yearly hospital admissions were at or near 9 percent among the uninsured and 14 percent among the insured. Although some evidence—including Louis Reed's 1948 survey—pointed to shorter stays for insured patients, other data indicated the opposite. One study of hospital utilization during 1953 found that, despite their shorter stays, insured persons averaged a hundred days of hospitalization per hundred people per year (or a ten-day episode for one person out of ten), whereas the uninsured averaged only seventy days.[26]

All these data merely beg the question that mattered most: did the numbers mean that insurance was motivating pampered hypochondriacs and greedy, technology-struck doctors to abuse the abundance of coverage, overutilize hospital facilities, and irresponsibly help drive up the cost of care for all? Or was the new system of financing care finally making adequate service available to more people who needed it, failing only inasmuch as it left the remaining uninsured population without the access to health care they deserved?

In a series of studies on the effects of insurance on utilization of hospital and medical services, Odin Anderson warned against equating increased utilization of services with abuse. He wrote in 1957, "In the absence of tangible standards of equitable utilization, concepts of 'over-use' and 'abuse' are equally intangible." In retrospect, Anderson's viewpoint seems quaintly colored by the optimism of the 1950s, which painted rosy horizons for any consumer with a steady job. When it came to health care, the consumer was entitled to anything he or she could afford. Only an occasional alarmist voiced any concern that the overall cost of care might ultimately be driven so high

BCBSA00292755

that a worker at the low end of the income scale would be unable to afford essential services. Anderson's comments on utilization in 1956 indeed helped recreate the mood of a demand economy that saw its destiny as unlimited growth:

> In the face of mounting utilization and concurrent costs during the past 20 years, it is tempting to attribute them to abuse and overuse. It should be recalled, however, that there exist no definite criteria of when a person should or should not be hospitalized. *Hospital care is as much a function of a going standard of living as it is of medical judgment* [emphasis added]. Criteria for hospital admissions emerge from the patterns of practice of many physicians in the community and from the desires and needs of their patients.[27]

Nevertheless, there was some recognition that flagrant admissions abuses were a potential threat to all and that some effort had to be made to identify and control them. Egregious excesses surfaced early and helped focus attention on the problem. In 1952, *Medical Economics* reported the case of a Detroit businessman hospitalized for an acute ulcer, which was described as an "odious overstay." A review of the patient's records disclosed the telltale progression from use to abuse. "Complete bed rest" and "No visitors," read the attending physician's orders shortly after the episode began. As the days went on, however, a different variety of instructions crept into the record: "Install telephone for business purposes. . . . Allow secretary to visit for dictation purposes (up to four hours daily). . . . Allow patient to be absent from hospital two hours Thursday to go downtown for business purposes."[28]

The Blue Plans were among the first concerned parties to monitor and analyze utilization trends, because of their impact on rates. In 1954, Michigan Blue Cross and the Michigan State Medical Society undertook one of the most ambitious studies yet, based on a survey of twelve thousand cases at twenty-five Michigan general hospitals. Study findings published by the AHA in its magazine *Hospitals* showed that "over 28 percent of all hospital admissions contained some element of faulty use," and "Blue Cross members misused their hospital stays in nearly 36 percent of the cases." The rate was somewhat lower (30%) among commercially insured patients not covered by a full service benefit, and drastically less (14%) among the uninsured. The abuse showed up in unnecessary admissions and overlong stays. "One out of eight Blue Cross patients entered the hospital for laboratory or X-ray examinations, although hospital outpatient departments were performing similar examinations on similar patients every day." Outpatient diagnosis would have been cheaper, but it would not have been covered by the patients' hospitalization benefit. The patient in most cases—and the doctor in all cases—would have understood this. Excess stays tabulated in the study added up to 5,231 days and cost nearly $5 million in wasted dollars.[29]

Where service benefits prevailed, increased utilization forced the Blues to seek rate increases. Many states had already included rate approval by state insurance departments as a condition of enabling legislation. As cost problems

BCBSA00292756

became more acute and rate increases more noticeable, conscientious insurance commissioners in many states began to look more critically at the rate requests they received. When flagrant cases of abuse surfaced, those commissioners began to turn their attention to the issue of utilization.

Sometimes the result of this scrutiny was not a gratifying victory of good over evil, but a heightening of everyone's awareness of how inscrutable the boundary between use and abuse could be. One entertaining illustration comes from a series of hearings held by Pennsylvania insurance commissioner Francis Smith, after the Blue Cross Plans in Philadelphia, Harrisburg, and Western Pennsylvania filed for a rate increase in 1957. Commissioner Smith was on the trail of the truth: as he saw it, too many unnecessary hospital admissions. And he never refrained from quizzing physicians about their hospitalization practices. After a whole series of witnesses during the Blue Cross Plans' rate hearings had produced the usual denials that insurance prompted unnecessary hospital stays, the commissioner called as his final witness one of the nation's most famous and most respected physicians, Dr. I. S. Ravdin. At the time, Ravdin was chairman of the Department of Surgery at the University of Pennsylvania medical center in Philadelphia, chairman of the Board of Regents of the American College of Surgeons, and President Dwight D. Eisenhower's personal friend and physician:

> "Now, Dr. Ravdin, I'd like to ask you: Have you ever in your practice admitted a patient to a hospital not because you are convinced the patient's condition is such that hospital care is indicated for satisfactory treatment, but chiefly because you know the patient is insured and hospitalization will not cost him anything and it will be more convenient for you to conduct your examination there than it would be in your offices or at the patient's home?"
>
> "Of course," Ravdin replied. "Doesn't everybody?"[30]

Commissioner Smith admired the Blue Cross Plans, especially because they spent, at that time in his state, 93 percent of their subscriber income on benefits. It was not the Plans' inefficiency but rising costs and utilization that were driving rates up. Nevertheless, he rejected the Western Pennsylvania Blue Cross Plan's request for a 21.4 percent increase in 1957 and allowed a smaller increase averaging about 15 percent instead. Smith was, historian Margaret Albert observed, "using [the] Blue Cross [Plan] as a lever against mounting costs and utilization abuse."[31] Part of the solution lay outside the Plans' control: better hospital planning to prevent overbuilding, and alternatives to inpatient care when possible.

But since physicians were responsible for the crucial decisions regarding admissions, length of stay, and the use of hospital apparatus and personnel, review procedures such as those that had been established in Cincinnati and elsewhere during the previous decade now would begin to grow in importance. "New proof is piling up for the old accusation that physicians are endangering Blue Cross by permitting too-lavish use of its hospitalization benefits," *Medical Economics* editorialized. And in the bulletin of the Allegheny

BCBSA00292757

(Pa.) County Medical Society, Dr. George Spencer urged that doctors who "have no compunction in abusing the Blue Shield [organization] program . . . be brought into line. It is about time that the medical profession stops ignoring these wrongdoers and starts to get tough with them."[32]

While abuse of the hospital service benefit generally entailed unnecessary admissions or overlong stays, the most frequently alleged abuse of indemnities was manipulation of fees by doctors who increased what they charged insured patients so that they received both the indemnity and whatever fee they judged the patient able to pay out of his or her own pocket. Spencer wrote in 1955:

> The physician who is incorruptible in every other way frequently feels no guilt in defrauding an insurance company, or one of the pre-paid medical Plans. . . . They constitute a small number in contrast to the great mass of honest physicians, but they give us all a black eye. . . . Blue Shield is too valuable a service to both patient and physician to be bankrupted by the unscrupulous few.

Dr. James Bryan, administrator of the New Jersey Blue Shield Plan, sounded a similar chord: "No longer will the profession tolerate exploitation of the Plan by certain physicians in such a way as to pyramid their collections from insured patients." It was up to Blue Cross and Blue Shield Plans to convince doctors "that the Plans do not have a pipeline to the U.S. Mint," Bryan wrote.[33]

Some control mechanisms were aimed at the consumer. Indemnities, although they also could be abused, were conceived as a form of disincentive against overindulgence by patients. Co-insurance and deductibles were meant to have the same effect. Limited benefit packages could curtail coverage and thereby discourage overuse. Claim audit procedures, another way to discourage abuse, were also in use in many Plans by now.

In practice, controls were a sensitive matter and raised again the specter of bureaucratic intrusion into the sacrosanct relationship between patient and physician. New Jersey's Bryan, for example, after warning against "profligate tendencies" toward overgenerous and inflationary benefits, in the next breath observed that exclusions and limitations attached to extended benefit packages could be odious as well. In May 1955, he wrote in *Medical Economics:*

> Too many Blue Shield Plans now are writing complicated restrictions into their contracts and loading them with legalistic gobbledygook. . . . In a laudable but misguided effort to conserve funds, some Blue Shield [Plan] directors are beginning to treat all doctors and subscribers like potential crooks—merely to trap the occasional sharpie. I've seen instances where Plans have made extensive claim audits costing many times the value of the few overpayments that were eventually turned up.[34]

By the end of the decade, experimentation with controls was spreading, especially in relatively highly regulated states. In Maryland, for example, insurance commissioner Douglas Sears concluded that if hospitals, doctors, and

BCBSA00292758

the state's Blue Cross organization could get together on utilization controls it would save subscribers $1 million a year. Sears trimmed a Blue Cross Plan rate request after seeing the results of a poll of 222 doctors. Of these doctors, 75 percent agreed that "hospital facilities sometimes are used in an unnecessary or uneconomical manner"; 80 percent said they had patients who asked for hospitalization when it was not necessary; and 11 percent confessed that they had admitted patients for diagnostic procedures that could have been performed in their offices or in a hospital outpatient department.[35]

A 1960 study of eight New York State Blue Cross Plans by a team from Columbia University found that some admissions clearly could have been avoided, and that length of stay for the same types of illness varied greatly from one hospital to another. Ray Trussell, who headed the study team, wrote, "Every hospital needs a committee to review utilization." Trussell was concerned also that use of too many services by some patients might mean too little care for others. "There is considerable scientific evidence to show that many among the public need more care than they are now receiving. Thus the efficient use of the prepayment dollar becomes even more important."[36]

In 1958, the Philadelphia County Medical Society had formed a physicians' review board with thirty-four members—including the candid Dr. Ravdin—to study admissions, length of stay, and use of ancillary services. The board's efforts were, according to Herman and Anne Somers, "conspicuous exceptions to the general policy of laissez-faire." In 1959, a group of hospitals in Philadelphia rebelled against an effort by the Blue Cross Plan to build incentives for hospital discipline into the complex reimbursement formulas developed originally by van Steenwyk. Half the affiliated hospitals refused to renew their existing contracts, and eight Catholic hospitals threatened to withdraw from participation in the Plan the following year.[37]

Meanwhile, Commissioner Smith felt his views on utilization review procedures were confirmed by an apparently exemplary review committee at Sacred Heart Hospital in Allentown. The committee pioneered the use of measures that eventually were adopted widely and known as preadmission testing and discharge planning. In 1959, Smith declared that he would grant no further rate increases until Blue Cross Plan officials could assure him they had studied the Allentown model and taken steps to encourage similar efforts at their member hospitals.[38] A decade or so ahead of the official announcement, the battle for cost containment was on.

## Metamorphosis

The successive resignations of Rufus Rorem and Dr. Paul Hawley from the hot seat of national leadership were symptoms of the intractable difficulties of coordination between Blue Plans. Creating uniform rates and benefits—not to mention consistent hospital reimbursement—for a large employee group spread out across five or ten or forty-eight states had been a problem from the beginning. Hospital facilities and medical practices varied from area to area.

BCBSA00292759

The distinctive local fabric of business and professional relationships among hospitals, doctors, employers, and consumers shaped the development of each Plan as a unique entity.

After Hawley's departure in 1952, local Blue Plan leaders became, if anything, more acutely preoccupied with the survival of their business. The health insurance market was changing at a dizzy pace. So was the organization of hospitals and the practice of medicine. And the competition was growing tougher every day. It is a tribute to the pragmatism and flexibility of the Blues that they did survive, notwithstanding the anguish that some traditionalists felt over the compromises struck on community rating, service benefits, and other time-honored practices. But when it came to the matter of national accounts, the myriad of local approaches to benefits, rating, and provider reimbursement made life more difficult than ever.

No one knew this difficulty better than Tony Singsen, architect and manager of the Blue Cross Commission's Inter-Plan Service Benefit Bank, a coordinating mechanism set up in 1949 to provide coverage for subscribers who were hospitalized away from home, without imposing inequitable financial burdens on either the subscriber's home Plan or the Plan that served the area where he or she was treated. No one was in a better position to catalog the obstacles to inter-Plan coordination—or what was called "the national account problem"—than Singsen:

> Essentially, it involved unequal benefits among the Plans; inability or unwillingness to vary local practices . . . ; different medical practices from area to area, getting us into conflicts between Blue Cross and Blue Shield as to who should handle X-rays, anesthesia, etc.; firm notions that maternity should be limited to indemnity, while the account wanted service, or vice versa; unwillingness to try to figure out how to pay hospitals for slightly different benefits than were written locally; uneven and bad claims administration, or other aberrant administrative performance; untrustworthy rates filed by . . . Plans who were to participate in a particular account—too high, or too low, or unsupported by data. . . . Over all were ordinary problems of control and trust, or lack of it.[39]

Singsen's litany focuses on what we might call a lack of motivation on the part of many Blue Plans, usually the small ones located away from the urban centers of economic power in the industrial Northeast and Midwest. These Plans were often reluctant to make adjustments to conform to a uniform national contract for a large employee group. In contrast, leaders of Blue Plans in the power centers were highly motivated to get something done about the "national account problem." Those accounts brought in huge employee groups, typically from industries with a high proportion of relatively young and healthy workers. Even if their employers or their unions demanded reduced rates because these workers were better-than-average risks, the big accounts helped spread overhead costs, and they sometimes contributed rate surcharges that subsidized the community rate charged to less favored accounts. Conversely, if these big

BCBSA00292760

accounts were lost to the competition, the Plans in areas where such accounts were dominant companies would be left with smaller groups, poorer risks, and higher rates in an ever-descending spiral.

It was in 1956 that efforts to build a stronger national organization began to coalesce around the Blue Cross Association (BCA). Originally formed in 1949 merely to hold stock in Health Services Inc. (HSI), a mutual insurance company formed by the Blues to attempt direct national enrollments, the BCA had occasionally been delegated additional responsibilities by the Blue Cross Commission, usually because of legal complications created by the Commission's corporate relationship to the AHA.[40] According to Stuart, AHA leaders were "disturbed about the future of their protégé" and held deep discussions about the "validity and desirability of the close tie-up," especially with hospital costs steeply on the rise. Notwithstanding the tough bargaining over reimbursement that went on at the local level, the appearance of an arm's-length relationship between hospitals and Plans was not guaranteed. In simpler, more ingenuous times, it would have seemed cynical to raise doubts that the Blue Cross Plans could have a "special relationship" with the hospitals and still remain the subscriber's friend. The more engaged the Plans became in competitive jockeying for position with the commercial insurance companies, the easier it was for rivals to stir up such doubts. Nevertheless, Commission members continued to feel that "without the hospital relationships [the] Blue Cross [system] would lose its essential character and its capacity to serve the public."[41]

While the Blue Cross Commission and the BCA pursued inconclusive discussions about their relationship, high-quality national accounts continued to slip away from the big Plans. A dozen such Plans had enrollments of a million or more members, accounting for half of all Plan subscribers, and all but two of the millionaire Plans were in the Northeast or the Midwest. With a growing sense of alarm concerning their ability to compete for national accounts, the leaders of these twelve Plans began a series of confidential discussions about the possibility of setting up the BCA as an operating arm for the group. As Singsen put it:

> The big Plans [were] saying, we will do it or else, making the small Plans come along. . . . There was no democracy in the Blue Cross Association when we reorganized in 1956. It was managed by the big Plans who put the money into it and said, "We don't care if you folks come in or not. If you don't we'll figure out another way . . . to put you out of business or to get our accounts handled."[42]

When their proposal was unveiled at a national conference, the reaction was better than expected. Stuart wrote afterward:

> To our pleasant surprise, many of the important Plan directors not among the original twelve spoke in favor of the proposal. . . . The need was so great, and

the situation so compelling, that before the conference was over, substantial agreement had been reached, and implementation by the Blue Cross Association as a national operating organization was assured.

The next step was to amend the BCA's bylaws to provide for a board of governors of eighteen members elected by weighted vote (according to numbers of subscriber contracts) by the Plans. Dues were fixed at $100 a month per block of twenty-five thousand subscriber contracts. For each $100 of dues paid by a Plan, one vote was allowed. Thus, no Plan was denied the vote, but the large Plans clearly dominated the decisions of the BCA board of governors.[43]

The board designated E. A. van Steenwyk of Philadelphia and William McNary of Michigan to choose a president and other officers. Their choice for the top position was Dr. Basil MacLean, then serving as New York City's hospitals commissioner, who was a past president of the AHA and a charter member of the Blue Cross Commission. Although his health was failing, MacLean agreed to serve as chairman on one condition. Given that the BCA's main function was to promote national sales, he argued, its headquarters should be moved from Chicago to the business hub of the nation, New York City (also MacLean's hometown). Despite the inconveniences (and, some said, inefficiencies) that the changes entailed, MacLean was accommodated. The operations of the Inter-Plan Service Benefit Bank, the National Transfer Agreement, and leased wire operations had to be relocated to New York, along with Singsen, who headed these functions and who was named vice president and treasurer of the association. The Commission, meanwhile, would remain in Chicago, as an AHA operation. J. Douglas Colman, who had left the Baltimore Plan to be vice president of Johns Hopkins University, became vice president and secretary of the BCA, resuming his position as one of the national leaders of the Blue Cross organization movement.

Experience rating for multistate employers still created a serious barrier to the enrollment of national accounts. The Plans—including some that had been instrumental in setting up the national office—were unwilling to give up the community rating that was seen as a bedrock principle of Blue Cross organization character. Stuart related:

> It began to appear that even the largest Plans that had determined to set up a national instrument for promoting Blue Cross could not agree on the basic consideration of policy or details of the method of operation. . . . Frequent and almost interminable meetings of the Association Board of Governors and the Executive Committee of the Association seemed to leave the Board with a deeper sense of frustration.

Now, too, it appeared that the initial acquiescence of the smaller Plans to the bold move of the Big Twelve masked an underlying discontent, as several threatened to pull out of the reconstituted BCA. Although MacLean's appointment had helped win broad support for the initiative, ill health

BCBSA00292762

prevented him from taking up his duties with full vigor. According to Stuart, "a new feeling of despair" about creating an effective national organization began to well up.[44]

In an effort to shore up MacLean's sagging leadership, James Stuart was drafted in late 1957 to become BCA executive vice president. Stuart's hand was strengthened by the success of a new project that had been launched the year before—a contract with the Department of Defense to furnish coverage



J. Douglas Colman, a leader of the 1950s who at various intervals headed the New Jersey, Maryland, and New York City Plans—with time out for a stint as a vice president of Johns Hopkins University—was a consummate statesman of prepayment and one of the principal architects of the Federal Employees Health Benefits Program, a model that reformers continued to admire throughout the policy debate of the 1990s. (BCBSA archives)

for military families, referred to as the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS). Originally negotiated by the Blue Cross Commission, CHAMPUS had been transferred to the BCA for reasons of convenience when, to accommodate MacLean, the junior organization had moved its offices to New York City.

There was an important difference between CHAMPUS and the syndicates that had been invented by van Steenwyk and Abe Oseroff ten years earlier. In the case of the syndicates, a large home (or "control") Plan wrote a master contract with a multistate employer, through the company's main office in the home Plan's territory, and secured voluntary agreement to honor the contract from other Plans where the company had branch operations. In CHAMPUS, the Defense Department's contract was with the national entity, the BCA, which in turn subcontracted with Plans in the vicinity of military

BCBSA00292763

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 123 of 182

bases where the dependents lived. Local Blue Shield Plans contracted directly with the Defense Department for companion medical benefits. No underwriting by the hospital Plans was involved. The Defense Department paid the full cost plus an administrative fee for participating Blue Cross Plans, using some of the same hospital accounting standards that had been developed earlier by the AHA for the wartime EMIC program. CHAMPUS, originally known as "Medicare," softened resistance among Plan leaders to the idea of participating in a national contract with a national Blue Cross organization. According to Singsen, CHAMPUS "really demonstrated it was possible for this kind of a thing to work, because it did work pretty well."[45]

More proof soon came that a stronger national organization was worth its weight in the marketplace. Since the mid-1950s, the Plans had been frustrated in their attempts to sell group coverage to employees of the federal government. Led by Group Hospitalization in Washington, D.C., the Plans had managed to enroll about half of the federal workforce by the mid-1950s. But Congress—described by Singsen as "the most recalcitrant employer in the country"—had stubbornly refused to authorize premium contributions or even payroll deductions, thus necessitating cumbersome group collection procedures that inhibited enrollment. In 1954, at the end of her unsuccessful negotiations with insurers on a proposed reinsurance pool for the aged and poor, HEW secretary Oveta Culp Hobby had put out a feeler about group life and health coverage for federal employees. With its relatively straightforward arithmetic and predictable risks, the group life program turned out to be an easy sell. Within a year, Congress authorized both payroll deductions and a "very substantial" federal contribution. A syndicate headed by Metropolitan Life Insurance Company had enrolled almost all the federal government's employees.[46]

The group life program whetted government-employed labor's appetite for health coverage. Unions representing federal workers continued to pressure Congress for an improved benefit package. But the Blues and the bureaucrats from the Civil Service Commission and the Treasury Department with whom they were negotiating remained at stalemate for a full two years after the group life program was launched.[47] Designing health coverage for the far-flung and kaleidoscopically diverse federal workforce turned out to be an actuarial nightmare, as government negotiators may have anticipated. Moreover, during this period (about 1955–1957), the Blue Plans were experiencing conspicuous difficulties. They continued to suffer in their private account business because of the ragged disparities between rates and benefits that occurred from one Plan service area to another. This worried some members of Congress who wanted to be sure that rates and benefits would be equitable for federal workers in different parts of the country.

Just as the big Blue Cross Plans began moving to create a stronger Blue Cross Association, events in Washington quickened the pace of negotiations

BCBSA00292764

over a group health plan for the federal employees. In 1957, a group of commercial insurance companies proposed a program of major medical indemnity coverage for federal employees. It was to be financed partly by dividends from the invested premiums from the group life insurance program— "a veritable Santa Claus coming down the chimney," as Stuart described it.[48] The House Post Office and Civil Service Committee called a hearing on the proposal.

Stuart represented Blue Cross Plans. Described by colleagues as a forceful debater with a quick wit, a bulldog temperament, and a talent for snowing an audience, Stuart attacked the proposal in uncompromising terms.[49] A firm believer in the traditional Blue Cross organization service benefit, he told the committee that the proposed major medical indemnity "was the wrong kind of coverage. It was not in the interest of the employee."[50] Support for the indemnity program withered under Stuart's attack, and negotiations between the Blues and the Civil Service Commission and HEW suddenly picked up steam. At the same time, Singsen, McNary, and others struggled to convince the federal controller general that the telecommunications system created by the BCC to support the Inter-Plan Service Benefits Bank could also handle payroll deductions for federal health benefits. The national enrollment companies that had been set up by the Blue Cross and Blue Shield Plans nearly a decade earlier—Health Services Inc. and Medical Indemnity of America (usually referred to as HSI-MIA), respectively—also would have a role.[51]

From 1957 to 1959, negotiators for the Plans were held in suspense—like bridge players who have to make contracts and play on without knowing what cards their partners hold and without a chance of finding out before the game passes the point of no return. The stakes were higher than anyone had ever seen before: there were nearly 2 million federal employees to be insured, and more than 3 million of their dependents.[52] Edwin Werner, then marketing chief of the National Association of Blue Shield Plans (NABSP), called it "the biggest health risk that was ever put together in the world . . . the most spectacular thing that has ever happened in the history of this business."[53]

The two Blues Associations put together a joint negotiating committee to work with the Civil Service Commission on legislation to create a framework for the program. The team was headed on the Blue Shield organization side by two men—John Castellucci, director of the NASBP, and Dr. Donald Stubbs, president of the Washington, D.C., Blue Shield Plan and a longtime leader in national Blue Shield organization affairs.[54] Their Blue Cross organization counterparts were James Stuart and J. Douglas Colman of the New York City Blue Cross Plan. Barron K. Grier, a Washington attorney who represented both groups, also earned a place in institutional legend for his role in this drama.

Members of the negotiating team were experienced enough to know that windows of opportunity open and close quickly in the legislative process. When the chance came to push through a program they thought a good one,

BCBSA00292765

members of the team had to make decisions and commitments on the spot. But they carried a large burden of accountability to the Plans, which would have to live with the legislative arrangements made for them by the negotiators. According to Stuart:

> This joint committee often found itself in a position where it had to take the responsibility of speaking for all the Plans without specific authority. . . . The group had the courage to commit the member plans with the Civil Service Commission to courses of action to which it fervently hoped the Plans would accede and was greatly relieved when most of them eventually did so.[55]

As negotiations dragged through their second year, according to Colman's account, a burst of impatience and congressional competitiveness brought a tense denouement. The origination of federal employee benefit legislation was traditionally the prerogative of the House Post Office and Civil Service Committee, Colman explained in a 1971 interview with Odin Anderson. But "there was great unhappiness on the part of many people" that the process had been dragging on for so long. Early in 1959 some members of the corresponding committee in the Senate decided to seize the initiative. Colman received an evening call at home in New York from the staff director of the Senate Post Office and Civil Service Committee who asked if he could attend a meeting the next morning in Washington to help write a bill. Colman recalled:

> There were about six of us that went into a conference room. . . . We started out to draft that legislation. We finally did and it was introduced. Then when it got over in the House, they were a little annoyed that the Senate had taken the leadership. They knew that I had something to do with working on it, and so when I went down to testify on behalf of Blue Cross [in the House of Representatives] they started to work on me. They vented some of their spleen. I was on the stand for two and a half days. It was rough.[56]

President Dwight Eisenhower signed the Federal Employees Health Benefits Program (FEHBP) into law at the end of summer 1959, with the program to become effective July 1, 1960. The program was built around a framework of options that Colman described as "controlled competition." Federal employees were to be offered a choice between Blue Cross and Blue Shield Plan coverage, commercial indemnity insurance from a syndicate headed by Aetna, and whatever other prepaid group plans were available in their area, such as Kaiser in the West and the Health Insurance Plan (HIP) of Greater New York. In some areas, the federal workers would have as many as eight or ten health plans to choose from. To steer a course between federal budget constraints and the upwardly elastic demand among federal workers for deluxe coverage levels, the program also called for providers of coverage to offer two benefit tiers—including basic and enhanced packages, referred to as low and high options. In case of hospitalization coverage, for example, the low option would cover ward

BCBSA00292766

accommodations and the high option would pay for a semiprivate room (or "semipublic," as some preferred to call them). A third tier—major medical coverage for catastrophic hospital and medical costs—was allowed in the program also.

The government agreed to pay half the premium charged for low option coverage. Employees who wanted the high option had to pay the difference in premium out of their own pockets. The federal budget bureau set a limit on how much it could spend on the entire program, so it was up to the insurers to figure out how much coverage they could afford to provide under the basic option. "Just as a political fact of life, you could not exclude anybody," Colman explained. "So you had to give them the option. They—we—tried to make the options manageable. I think that we have succeeded. But that was an exciting period!"[57]

Once the legislation was signed, it was up to the insurers to work out rate and benefit packages that would provide attractive coverages, be competitively priced, and be actuarially sound. The BCA and the NABSP were bidding for the federal business as prime contractors, who would then subcontract with Plans. The Associations thus had the challenge of working out a package that they could sell to the Plans and that the Plans were capable of delivering at the agreed price. Colman and Grier now were joined in Washington by Ed Werner, representing the NABSP, to work out the nuts and bolts of the program. "Never before had three people sat down and undertaken to speak for 131 Plans," Werner recalled during his speech at the Federal Employee Program's thirtieth anniversary celebration in 1990. "It was new. . . . It was scary."[58]

Although it was a time when the Blue Cross Association was finally beginning to gel as a national organization, it had hardly put all its internal differences behind, and the federal employees program would demand a greater degree of conformity than had as yet been known. But relations among Blue Shield Plans, between Blue Cross and Blue Shield Plans, and between the national Blue Cross and Blue Shield organizations suggested that the requisite cohesion would be difficult to achieve. According to Werner:

> The Blues in the 1950s: There were for all intents and purposes no joint Plans. Blue Cross was separate; Blue Shield was separate. Two boards; two sets of managements. Rivalries, animosities, some days—and I'm ashamed to say this to you—pure, unadulterated hatred of each other. National accounts? We didn't know what that meant. I mean, we had some Blue Shield business, the auto business. But we had it on a basis of what was no more than we call the local benefit agreement, where the local employer agreed to contribute to whatever the individual Plan had to offer for whatever local employees they had in that area. A very informal, very loose confederation of Plans.[59]

Against this background, the Blue Cross and Blue Shield organizations' Federal Employee Program (FEP) represented a huge leap of faith, Werner

BCBSA00292767

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 127 of 182

suggested, especially for the medical Plans.[60] The experience of putting together syndicates for the steel and auto industries made the Blue Cross Plans more inclined to go along with what was needed than the often headstrong Blue Shield Plans.

The optional nature of the program made it particularly tricky from an actuarial point of view. The Blue Plans would have to set rate and benefit packages without even the most fundamental information: how many people would enroll; how many of those who did enroll would be old; how many young; how many men; how many women; how many from areas of the country where health costs were high; how many from places where costs were low. The Civil Service Commission representatives casually mentioned at one point that there would be other enrollees whose identities could not even



The enhanced inter-Plan telecommunications system, developed in the 1960s under guidance of Anthony "Tony" Singsen, laid the foundation that won for Blue Plans much of the business of the new Federal Employees Health Benefits Program (launched in 1960) and, later, the Plans' major role as fiscal intermediaries in the Medicare program. (Moffett Studio)

be divulged. Some of these unidentified employees, whose work was classified, might easily prove poor risks. In the end, a combination of peer pressure and patriotism produced almost complete participation in FEP among the Blue Plans. "It's bigger than both of us. We don't dare tell the government we can't respond," Werner argued at one meeting. "There were some Plans that would have preferred not to play but didn't want to be the ones to say, 'We can't do it,'" he reflected later. "It's a very big moment in the history of [the] Blue Cross and Blue Shield [system]."[61]

BCBSA00292768

The Blues enrolled a million workers plus their dependents, the largest single group ever enrolled by any insurance carrier. The effort to strengthen BCA had clearly been vindicated. According to Singsen, Congress and the Civil Service Commission would not have considered the Blue Cross and Blue Shield Plans' promises to be credible if the reconstitution of the Blue Cross Association had not already been well under way. The telecommunications system that had been set up for the Inter-Plan Service Benefits Bank was providential in keeping the centralized records that the FEP required. Winning a piece of business this big achieved a new level of maturity and prestige for the Blue Cross and Blue Shield organizations and improved coordination and cooperation between them. Only one hospital Plan (Cleveland) declined to offer the FEP a national benefit and rating package, servicing federal employees instead with a local contract underwritten by the Cincinnati Plan.[62]

While the outcome of the FEP negotiations was still in doubt, the AHA and the BCC had renewed efforts to clarify their relationship and address the need for a strong national prepayment organization that reflected the hospital perspective. In a series of private meetings beginning in 1958, the leadership of the two organizations concluded that an "effective partnership" between hospitals and Plans hinged on the creation of a single, strong, national Blue Cross organization. In a summary of the reasons for undertaking a change of course, Russell Nelson, M.D., president of the AHA, said:

> Today, thanks to rate hearings in one state after another . . . what we do or don't do is, sooner or later, likely to receive a great deal of public attention. . . . We, in Plans and hospitals, who have always considered ourselves fully qualified to interpret and act in the public interest, now find ourselves miscast in an unwelcome role as, somehow, having special interests not consonant with the welfare of the whole community.[63]

With the Commission's scope of action limited by the corporate confines of the AHA, and the BCA apparently primed for a bigger role, the conferees concluded that the Commission should be eliminated and its functions divided between the BCA and the AHA. It simply made no sense to continue with two national organizations (or three, if HSI was included). Stuart sprang this proposal at a 1959 meeting of the Commission. "Several members . . . were not only surprised but outraged. For a few moments consternation reigned quietly and then the fireworks began." BCC members who had not helped create the new plan saw it as an attempted power play by the BCA. "They were only half right," said Stuart. To the proponents of the idea, the Commission had clearly outlived its usefulness. "But such organizations, . . . once created die slowly except in catastrophe," Stuart observed, "no matter how ill and infirm they may be."[64]

What followed, however, was a remarkably graceful exit. In six months' time, a planning group—skillfully chaired by former AHA president Frank

BCBSA00292769

Groner—put aside hard feelings and came up with a new division of labor. A prepayment council of the AHA would continue to administer the standards and licensing program and monitor hospital reimbursement practices. The BCA took over the administration of national accounts, the Inter-Plan Service Benefit Bank, the National Transfer Agreement, and other national and inter-Plan affairs. At a joint national meeting of the Commission and the BCA in April 1960, the Groner committee's proposal was approved by seventy-five of the seventy-seven Plans present and voting. As BCC chairman Charles Abbott put it, "The relationship can and will continue on a more business-like basis with the proposed changes." The hospitals' weanlings, having long since outgrown the house they were raised in, had finally moved out on their own.[65]

BCBSA00292770



# The Double Bind

## Health Care for the Elderly

*Democrat can accuse Republican of not caring what hap-
pens to Grandma, and everybody knows this isn't really
true; Republican in turn can charge that Democrat is
hiding under Grandma's shawl his evil intent to sell the
nation down the river into socialism, and everybody knows
this isn't true either. . . . Gunfire and bloodshed abound; as
in a TV western, however, the viewers understand that
nobody is really getting killed.*
—Editorial, *The Modern Hospital*, 1960

THE MORE THE RANKS OF THE INSURED GREW, the more conspicu-
ous became the plight of those left out by reason of age or economic status.
The indigent and unemployed were locked out of the group market for pri-
vate health insurance. Their well-being hinged on the adequacy of free care
from hospitals and doctors, private charity, and safety nets such as workers'
compensation, disability insurance, and welfare. Even more intractable were
the problems faced by the elderly, who were likely to be caught in an actuarial
double bind when they reached retirement age, whether they previously had
enjoyed a decent income or not. It had been obvious from the earliest days of
the prepayment movement that the combination of diminished income and
augmented vulnerability to illness would make the aged very difficult, if not
impossible, to insure.

The Blue Plans tried to do their part. Retiring members of covered groups

BCBSA00292771

typically were guaranteed an opportunity to convert their membership to individual coverage, usually at an increased rate. In the 1950s, some unions bargained stubbornly to hold these increases down as much as possible. But unless younger union members were willing to help subsidize the older ones, there was not much that the Plans could do to control post-retirement premium rates. "Workers would pay 'X' dollars today to avoid paying 'Y' dollars after age 65," said Chicago Blue Cross Plan director Robert Evans in a speech to employee benefits specialists in 1956, when Evans also was chairman of the Blue Cross Commission. "The idea suggests that 'Every son should support a father, not necessarily his own,'" Evans explained.[1]

Similarly, where the Blue Plans were strong enough to rate their individual contracts on a communitywide basis, and where low-risk groups paying discount rates contributed a surcharge to help hold down the community rate, some individual coverage would remain affordable for some retirees and other older people who wanted to take advantage of the Blues' open enrollment policies. Such beneficence had a price, however. Stuart commented in his history:

> In many Plans, which had held strictly to the community rating principle, for every dollar paid in by the old folks, more than two dollars in benefits and administration costs had been paid out on their behalf. . . . Had it not been for the high utilization of the senior citizen, many Blue Cross Plans could have avoided one out of every three rate increases.[2]

And protection for the elderly was inadequate, unavailable, or astronomically expensive from commercial insurers and from those Blue Plans that set their rates according to the specific risk characteristics of each subscriber group.

To be sure, older people without enough income or savings to pay cash for health care were not left to die in the streets. Indeed, some were in better shape than some younger—but essentially poorer—segments of the population. Those who had enjoyed productive working lives could draw on pensions and savings. Others had younger family members who watched out for their needs. When such resources failed, they could look to churches, private charities, benevolent private hospitals and doctors, state and local welfare departments, and public hospitals for military veterans and the needy. But as the cost of care began its monumental climb in the aftermath of World War II and was accompanied by increasingly frequent rate hikes even from those Blue Plans that continued to practice community rating, the inadequacy of these ad hoc measures became ever more obvious.

The first major attempt to focus attention on the need for a nationwide solution to the special problems of the aged is generally credited to Oscar Ewing, head of the Federal Security Administration (FSA)—later renamed the Department of Health, Education, and Welfare (HEW)—in the Truman administration. A few dedicated civil servants in Ewing's department and in the Social Security Administration (SSA) had continued to cherish a belief that

BCBSA00292772

the federal government had a role to play in health care, even after the notion failed to fly as part of the Social Security program in the mid-1930s and after the legislative battles of the late 1940s. Foremost among these believers were Isadore S. Falk (one of Rufus Rorem's colleagues on the CCMC in the 1930s) and future HEW secretary Wilbur Cohen. Both Cohen and Falk had helped write Roosevelt's Social Security legislation in 1935 and, in the following decade, contributed also to the drafting of a succession of national health insurance bills sponsored by Senators Robert Wagner (D-N.Y.) and James Murray (D-Mont.) and Representative John Dingell (D-Mich.).

In June 1951, Ewing held a press conference to announce a legislative proposal crafted by Cohen and Falk to use funds collected under the SSA's Old Age and Survivors Insurance program (OASI) to purchase prepaid hospitalization coverage for Social Security recipients. Authors Theodore Marmor and Frank Campion—who flank Ewing politically from the left and right, respectively—suggest that Falk and Cohen regarded a program for the aged as an alternate, incremental path to the kind of universal and national health insurance they believed in but had failed to win in the 1930s or the 1940s. Ewing did his best to tiptoe through what was obviously a political minefield by projecting a commonsense rationale for his proposal:

> The proposed benefits would give [the aged], through their own contributory insurance system, badly needed and valuable hospitalization insurance. It would protect them against having to ask for private charity or public aid with which to pay hospital costs, and would reduce federal, state and local expenditures for public assistance. It also would reduce the deficits of hospitals that have to furnish free or part-pay services.[3]

Although they recognized the problem of providing health insurance for the elderly and were themselves suffering economically because of it, leaders of the Blue Plans had serious reservations about government's ability to solve the problem, or its ability to act without doing more harm than good. Even so, E. A. van Steenwyk had become so concerned about the problems of the aged that in 1943 he had broached the idea of public subsidies to help the elderly buy private coverage. But nothing came of the suggestion. Van Steenwyk and his colleagues were too deeply imbued with the spirit of private enterprise. Ewing's call for direct federal involvement through the Social Security system created uneasiness among them.

Nevertheless, the Blue Cross Commission's government relations committee, chaired by van Steenwyk, had good contacts in Washington and received advance notice of Ewing's proposal. Before Ewing made his announcement, the committee had recommended to Commission trustees and the AHA "that the bill not be opposed on the grounds that it constitutes an entering wedge for socialized medicine," wrote William McNary in a letter to a concerned John Mannix two days after Ewing's press conference. However, McNary added, "It is true that the adoption of this legislation would get the camel's nose a little further into the tent."[4]

BCBSA00292773

The misgivings of the Blues' leaders were expressed privately to Ewing in a letter written several months later by Louis Pink, the former New York state insurance commissioner who had become chairman of Associated Hospital Service of New York (now known as Empire Blue Cross and Blue Shield) and who was now a leading member of the Blue Cross Commission. Pink wrote: "Apparently there is sufficient money in the till of Social Security to cover the cost of such insurance at the present time." But, he added prophetically, "We should face the fact that although funds are adequate now, after a few years the expense of coverage for persons over 65 will increase and will require larger payments from the insured and from taxpayers." Pink conceded that Ewing's alarm about the plight of the elderly was legitimate:

> I admit that our present voluntary efforts, while showing rapid growth and large accomplishment, are as yet not sufficiently inclusive. And in view of the increasing cost of hospital and medical care I agree that greater effort and wider aid is necessary to provide adequate care for older people.

But the potential cost of the proposals apparently was not Pink's foremost worry. "As a matter of sound principle," he counseled Ewing, "it seems preferable to me for the states to handle the financial details of the program as a local or state problem, so that control may remain close to the people." What Pink had in mind was the formula that had been worked out for the Hill-Burton hospital construction program begun in 1946, which put federal funds in the hands of local leaders through grants-in-aid to the states. Pink proposed:

> With such grants, the states could then arrange assistance to old people through existing Blue Cross and Blue Shield Plans, insurance carriers, and other approved agencies. I wonder if such a solution would not be practicable and obviate the danger of drifting into the British system [of a national health service], which your proposal might eventually lead to.[5]

Several members of Congress soon introduced legislation based on the Ewing proposal—most notably companion bills filed in 1952 by Montana's Murray and Hubert Humphrey (D-Minn.) in the Senate, and Michigan's Dingell and Emmanuel Celler (D-N.Y.) in the House. But with the nation adjusting to its first Republican administration in twenty years, the proposals received scant attention in Congress and never came to a vote. Two years later, a commission appointed by President Dwight D. Eisenhower again recommended an OASI-based health insurance program for the aged. But Eisenhower ignored the commission's proposal, and it died in the House of Representatives in 1954. The administration's suggestion that private coverage for the aged be supported by a reinsurance pool, a suggestion advocated by HEW secretary Oveta Culp Hobby, also failed to gain substantial legislative support.

Even so, during a conservative decade in which compulsory national health insurance was regarded as a dead issue by friend and foe alike, the problem of the uninsured elderly refused to go away. The proposals raised by Ewing,

BCBSA00292774

Hobby, and Eisenhower's commission did not result in concrete action. But Ewing's gambit succeeded in stirring up interest in the idea of using the federal Social Security system to help provide assistance for the aged in place of the existing patchwork of inadequate state and local public assistance programs. The difference between the two approaches was not only one of financing mechanisms. The Social Security approach implied that everyone who paid taxes during his or her working years was entitled categorically to health insurance aid upon retirement—and that he or she needed at least some such assistance. Under the more tightfisted welfare approach, older people qualified for aid on the basis of being poor, a much different and less dignified standard. Here was a heady brew of issues. The alternative solutions came with different price tags attached and sharply contrasting levels of federal involvement. The debate activated a formidable political constituency of older citizens. It hit at deeply held assumptions and beliefs about the moral dimensions of affluence and need. And it tested the nation's sense of devotion to its elders. Ewing lit only a low flame under this pot of passions, but the flame never went out and eventually the soup started to get hot.

A clear sign of the Ewing proposal's political weakness was the muted response of the AMA. Whitaker and Baxter, the AMA's tough political consultants, circulated a memo to member medical societies a week after Ewing's announcement, which voiced an uncharacteristic recommendation that the doctors' groups should hold their fire. "As this legislation directly affects the hospitals, the Blue Cross and other hospital insurance plans," the memo advised, "first public discussion of it probably should come from these sources, rather than from the AMA or medical societies."[6] The Blue Cross Commission reacted to the Ewing proposal by turning to its members for better information on the dimensions of the problem. A questionnaire on enrollment and hospitalization experience of the aged was sent to all eighty-eight hospital Plans, but the results were disappointing. Of the fifty-nine Plans that responded, only eight had kept records that enabled them to give detailed information about subscribers aged sixty-five and older. The data, although inadequate, tended to confirm the obvious. The sixty-five-and-over group made up just 5 percent of the eight Plans' enrollment but accounted for 10 percent of their days of care provided and 9 percent of their total payments to hospitals.[7]

The need to establish an adequate actuarial database for quantifying the problems of the aged became more acute as congressional interest in the issue evolved. In 1954, Senator Lister Hill—the Alabama Democrat who had helped to frame the 1946 hospital construction bill that bore his name— asked the AHA for an estimate of how much it would cost to subsidize a prepayment plan for retirees that would allow them to continue receiving the same coverage at the same rates that they had received while they were working. The AHA and the Blue Cross Commission responded by forming a group called the Joint Committee to Draft Legislation for the Aged, Indigent, and Unemployed, with McNary and van Steenwyk representing the

BCBSA00292775

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 135 of 182



As coverage expanded in the 1950s and 1960s to most of the employed population and their dependents, the actuarial difficulties of covering the aged, poor, and low-wage workers challenged the private sector and led to calls for government programs. The Blue Plans stepped up their efforts during this period to reach the elderly and others, such as these migrant workers in Virginia. Eventually, however, the Plans acknowledged the need for public subsidies. (BCBSA archives)

Commission. The group began its work with a new survey in which detailed information was collected from fourteen Blue Plans. The findings were stark. The survey found that the cost of hospital care for persons aged sixty-five and over was three or four times as high as the cost for adults aged between twenty and sixty-four, excluding obstetrical care.[8]

As the name of this committee suggests, Commission leaders understood the problems of the aged and the indigent to be related. In 1952, the Blue

Cross Commission had taken a survey of the Plans' programs for extending prepayment coverage to welfare recipients and found almost nothing but good intentions. Only in Cincinnati—where Plan director James Stuart was a former executive of the city's Social Services Department—did the welfare program buy Blue Cross Plan hospitalization coverage for its clients. Twenty-nine other Plans said legislation had been discussed or enacted to make such programs possible in their area, but Cincinnati was the only community making a tangible effort.[9]

After reviewing the information they had collected and debating the matter, the Blue Cross Commission and the AHA in 1955 drafted a legislative proposal to create, as Pink had suggested, a federal program for the aged and indigent modeled after the Hill-Burton Act. The proposal called for federal grants-in-aid to state and local welfare programs that would subsidize prepaid health care for the needy aged, dependent children, the dependent disabled, and other indigent persons. Participation by the states would be voluntary, and federal dollars would be given in proportion to state and local matching contributions. The proposal resurrected some provisions of a similar bill that Hill and several Republican congressmen—including Representative Richard M. Nixon of California and Senator Robert Taft of Ohio—had argued for unsuccessfully during the late 1940s.[10] Thus the proposal itself was not especially noteworthy. What was instructive about the episode was the evolution of roles and relationships it represented: the increasingly intimate interaction between the Blue Cross Commission and members of Congress and the administration; the Commission's increasingly sophisticated sense of strategy; a dawning awareness of the vast knowledge possessed by the Plans—in the aggregate—about problems being addressed by Congress; and the concomitant sense that from such knowledge could flow the power to influence events.

The Plans' emerging role as important players in the realm of public policy sometimes seemed more a burden than a blessing. In particular, as interest in the matter of providing health insurance for the aged increased, requests for information such as Senator Hill's came with growing frequency. Time and effort were required to answer these queries. And the effort to be good citizens occasionally threatened to put the Plans at a competitive disadvantage. A Blue Cross Commission request to Plan directors for utilization data in 1955, for example, prompted an indignant response from Harold Maybee, director of the Blue Cross Plan in Delaware: "How can we contemplate a project which would make available to any competitor the most confidential information concerning the operation and practices of each Plan throughout the country?"[11]

The potential danger of releasing proprietary information was not all that was troubling Maybee. In conjunction with growing concern about the cost of high hospitalization rates among the aged and other groups, Walter Reuther of the UAW had recently begun an exploratory effort in Michigan aimed at getting the Blue Cross organization to use its influence to help curtail unnecessary or overlong hospital stays. Maybee's ruminations on this sub-

ject provide an illuminating glimpse of the potential conflicts between the business and service aspects of the Blues' mission:

> During the past several years there has been an increasing disposition on the part of many individuals, unions, management people, doctors, and even hospitals, to look upon Blue Cross and Blue Shield as something over and beyond a fiscal agency which represents a means of channeling funds from the subscriber to the various purveyors of service, and to think of it as an organization basically responsible for the ethical behavior of doctors, public and hospitals alike. More and more we seem to be hearing from our members questions such as "Why don't you do something about physicians' overcharges?" Or, "It's time you put a stop to these increases in hospital rates." I feel that for us to conduct surveys on our part [on hospital utilization by the aged and other groups] which will end up by demonstrating conclusively what we all already know might result in our winding up with only further demand on the part of our public to do something about it.[12]

This is the same Harold Maybee who later in his career would reflect with great admiration and warmth on the missionary zeal and dedication of the Blue Plan trailblazers. Here we see him as a man with his hands full running a big business in a tough environment. Like the reluctant Roman leader Cincinnatus, who preferred plowing his own fields to serving as head of state, Maybee was comfortable tending to the Delaware Plan's business but was uneasy about taking the weight of the world on his shoulders. As it turned out, there would be no escaping the public's demand that the Blue Cross and Blue Shield Plans help take responsibility for shaping and controlling the nation's health care system. Despite a sincere concern for the welfare of their fellow human beings, Maybee and many like-minded colleagues would find this an awkward and trying role.

Through its Old Age Assistance program (OAA), the Social Security Administration already was making small contributions to the care of the needy aged through state and local welfare programs. Some elements of the 1955 Blue Cross organization and AHA legislative proposal were included in a 1956 amendment to the Social Security Act. Prior to that time, the states could use federal OAA funds for welfare recipients to pay for medical care provided by doctors, hospitals, and clinics. But the amount of these payments could not exceed the maximum monthly allowance to which the recipient was entitled. At that time, only eleven states were experimenting with such payments for indigent medical care. The 1956 amendment provided small amounts of federal aid for care above and beyond the regular monthly limit, setting a precedent for federal welfare funds earmarked for health.[13]

This small step seemed merely to provoke advocates of a more sweeping program of aid for the old and the poor. Nelson Cruikshank, head of the AFL-CIO's social security (benefits) department and a leading spokesman for labor on this issue, blasted the modest 1956 increases in federal support for

BCBSA00292778

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 138 of 182

welfare programs as "pathetically inadequate" in testimony before the House Ways and Means Committee that same year. Cruikshank explained to the committee that the AFL-CIO had now fully committed itself to a legislative program of financing health care for the aged with a categorical entitlement program administered through the Old Age, Survivors', and Disability Insurance program (formerly OASI, an adjunct to OAA), along the lines that had been advocated by Ewing.[14] The eight-year-long battle over Medicare was about to begin.

By the end of 1957, Cruikshank had collaborated with Falk and Cohen—both of whom now were out of government—and had come up with a new legislative proposal that sharply intensified the debate. Their proposal was built around the OASDI program but included a 0.5 percent increase in the employer-employee Social Security tax to fund it (Ewing considered a tax increase unnecessary for his proposal) and added surgical and nursing home services to the benefit package (Ewing's bill had included hospitalization only). Cruikshank proceeded to shop the bill around the Ways and Means Committee for a sponsor. Committee chairman Jere Cooper of Tennessee turned him down, as did Wilbur Mills of Arkansas, the next ranking member of the majority party. Finally, Cruikshank found a taker in Rhode Island Democrat Aimé Forand. Although he said he would not have time to read the bill in the waning hours of the current congressional session, Forand agreed to sponsor it anyway, earning himself a footnote in history for his goodwill.[15]

Including surgical insurance in the proposal provoked the AMA. Hearings on the Forand bill before the Ways and Means Committee in 1958 and 1959 produced the most heated rhetoric about the dangers of socialized medicine since the 1948 battle over the Wagner-Murray-Dingell compulsory health insurance bill. But with the focus now narrowed to the aged, the AMA and the Forand bill's other opponents were aiming at a smaller target and had to be careful not to appear heartless. At one point Forand even thanked the doctors' group for drawing so much public attention to his bill.

The Forand bill never had a chance. The Ways and Means Committee laid it to rest in 1959 by a lopsided 17–8 margin. But the publicity created by the hearings had gone a long way toward increasing public awareness of the health needs of the aged. According to Rashi Fein of Harvard University, "The hearings, witnesses, and testimony helped strengthen the emerging consensus that a significant proportion of the aged faced severe difficulties."[16] The subject had blossomed into a compelling campaign issue for the upcoming presidential election. "National political leaders were forced to take a stand," according to Fein. "All who saw themselves as possible presidential nominees tried to position themselves as supporters of some kind of health insurance for the elderly." Fein suggests that Vice President Richard Nixon "felt threatened by the [Eisenhower] administration's continuing delay in offering an alternative to the Forand bill."[17] John F. Kennedy's embrace of the relatively radical and sweeping Ewing-Forand concept would lead eventually to a high-profile confrontation with the AMA. But in the meantime, health pro-

BCBSA00292779

grams for the aged and needy continued to make incremental progress through more modest initiatives at the local, state, and federal levels.

## Congressional and BCA Debates: "We Can't Evade This Issue"

Influential leaders in the Blue Plans were beginning to acquiesce to the idea that some tinkering by the federal government might be needed to meet the nation's aspiration to equity for the aged and needy. But at the time the Forand bill began attracting attention, expanding the government's role in health care was still largely a foreign notion to the medical profession, the government, the commercial insurance industry, and to a majority of Plan executives and trustees. The Blue Cross Commission, in the throes of reorganization, leadership changes, and two relocations of its national headquarters in quick succession, was also preoccupied with the problem of national accounts.[18] Its research and government-relations arms were engaged discreetly in the developing national discussion of the issue, but the organization as a whole was not focused on it.

In 1958, Dr. Edwin L. Crosby, the well-liked and respected executive director of the AHA, called a meeting of executives from Blue Plans and commercial companies that sold hospitalization insurance. Care of the aged was becoming a growing financial burden on hospitals, Crosby told them. Nursing home beds were in short supply, and those that were available often were in for-profit establishments "with a relatively low standard of care." As a result, acute care hospitals were finding their beds filled with older people who really needed nursing home care and could not afford the hospital. Crosby wanted "to determine what, if anything, the insurance companies were planning or were willing to do about providing adequate coverage for the aged."[19]

By this time, about 5 five million people over age sixty-five had Blue Cross Plan coverage. The commercial companies "provided some benefits on a wide variety of generally inadequate, usually cancelable, indemnities to less than one-third the number covered by Blue Cross." After a day-long discussion of the situation hosted by the AHA in New York, "exactly nothing had been accomplished," James Stuart declared.[20] The respected chairman of the board of one of the big commercials stated that, in his opinion, private enterprise was doing the job and should be left alone to carry out existing programs. Crosby's initiative was thought-provoking, but failed to overcome the prevailing inertia.

Characteristically, the Blue Plans looked for their own answers at the local level, mapping strategies to fit the familiar terrain of their own service areas. Each had to contend with a different blend of demographic factors, economic conditions, systems of care, and political climate. The difficulty encountered by the Blue Cross Commission in obtaining coherent national data about the precise dimensions of the problem reflected the bewildering varieties of local experience. From 1957 to 1965, the struggle to finance and deliver adequate

BCBSA00292780

care for both the poor and the aged was waged from town to town and from
state to state. Here the Blue Plans were in their element, and several of them
had significant involvement in local programs to expand access to care—although these experiments often were fraught with headaches. As the Blue
Cross Commission's 1952 survey found, more than twenty Plans—with the
Cincinnati Plan foremost among them—had made efforts to work with
county and municipal welfare departments to help make care available to the
indigent. The 1956 amendment to the Social Security Act that provided limited federal aid for medical expense benefits to welfare recipients (under the
OAA program) triggered the first attempts by the Plans to get involved in indigent care on a larger scale. In 1957, the California legislature ceded to the
state's fifty-eight counties the prerogative of choosing their own method of
administering the new OAA medical assistance program, and twenty-three of
those counties selected California Physicians' Service (CPS) for the task. "It
was the first time the state had given and done anything to help out the counties who had previously borne the entire burden of caring for the poor," recalled CPS counsel Howard Hassard.[21]

Unfortunately, the partnership with state and county governments served
merely to aggravate the problem of underpayment to physicians, which had
plagued CPS since it was incorporated. "CPS had been so economically bad
in its first ten years of operation that there was a tremendous hostility. I cannot overstate it," Hassard said of the doctors' negative feelings toward the
Plan. Despite the modest increases in federal matching funds for the state's
OAA program, the twenty-three county contracts to help administer indigent
care were funded inadequately. "The state adopted a fee schedule for the reimbursement of physicians' services which the medical profession considered
too low. There was much unhappiness with it," Hassard said later.[22] Indeed,
this precursor of the Medicaid program foreshadowed the problems that
would continue to plague Medicaid thirty years after its enactment in 1965.

An impressive experiment in expanding coverage for the aged during the
late 1950s occurred in Colorado, where rapid economic growth and an unusual piece of state legislation created a windfall for older people. In the mid-
1930s, the Colorado legislature created an old age pension plan that committed 85 percent of the state's excise tax revenues to fund a minimum monthly
income plan for those over sixty-five. The constitutional amendment that set
up the program provided that the funds were to be used for no other purpose,
and if a surplus in excise tax revenues was realized, it would be disbursed to
the pensioners in a year-end "jackpot" payment.

An economic boom after World War II had swollen the fund until the pension payments passed the $100-a-month mark, with an annual jackpot of
twice that much. In 1957, Colorado voters approved a new constitutional
amendment to do away with the jackpot and use the excise tax surplus to fund
a health care program for the aged. The Blue Cross and Blue Shield Plans
were chosen to administer the program, which offered benefits modeled
closely on the Plans' hospital and surgical coverage. That made the Colorado

BCBSA00292781

Plans the first of the Blues to enter into a partnership with state government that would help provide subsidized hospital and surgical coverage for the aged. The program was a coup for Colorado Blue Cross Plan director Thomas Tierney, an articulate and personable World War II veteran who had inherited William McNary's job as head of the Plan in Denver. "We have been absolutely free of any criticism in our administration to date," Tierney wrote, with pardonable pride, in 1961.[23]

Apart from publicly subsidized programs, Blue Plans had in some areas followed enrollment and rating policies that by the end of the 1950s made coverage available and affordable for large numbers of older people. This was the model that political conservatives in Congress and the AMA were seeking as an antidote to federal health insurance schemes, in order to show that the private sector could do the job on its own. But the Plans that provided such coverage groaned under the burden of doing so. For example, by 1959 the Blue Cross Plan in Rhode Island had enrolled 94 percent of the state's population aged sixty-five and over (not including those in institutions or receiving old age assistance) by dint of its liberal open enrollment and community rating practices. "As a result," Plan director Stanley Saunders said, "we find ourselves on the horns of a dilemma." High hospital utilization rates by older subscribers had driven the community rate up so high that the Plan was losing younger members. "The problem of the aged was forcing our younger age groups to pay a premium that was pricing them out of the market," Saunders said at a 1961 meeting of Blue Cross organization leaders. Candidly, Saunders confessed that the experience had affected his philosophical outlook and given him a new slant on the political opinions of his peers about government aid for the aged. He continued:

> If you are connected with a Plan where you have an age limit of 65 and you don't take these people in, obviously you don't have the same problem we do. . . . If [Plan CEOs] do not have a problem, I think they are more inclined to feel "We want to keep it voluntary." But I do not see how you can sustain that approach if you are not already attempting to do the job for these people.[24]

As Saunders's comments suggest, sharp differences among Plan leaders mirrored the broader political debate. The internal differences grew more pressurized as the 1960 presidential race approached. Late in 1959, the Blue Cross Commission and the AHA had jointly approved a cautious statement that called for expanding private efforts to provide coverage for the aged, developing more cost-effective extended care facilities, and providing more fully funded care for welfare recipients and other indigents.

Between the lines, however, the statement was read primarily as opposition to the Forand bill or similar proposals for a broad, federally funded entitlement program. But some leading members of both the Commission and the AHA were concerned that if their organizations took too conservative a position, they would be perceived—like the AMA—as obstructionists who were

BCBSA00292782

opposed to any significant change in the status quo. As BCC director, James Stuart had been in Washington often enough to know that such an image could be counterproductive. "We should be for something," Stuart told Plan executives at one meeting, "and not against something."[25]

Stuart's comment came in the midst of a heated debate at the annual conference of Blue Cross Plans in April 1960. It was a colloquy that revealed just how touchy the subject of the aged had become. A group of Plan and BCC



J.E.B. Stuart was a social worker who changed careers and wound up as an early leader of the Blue Cross Association—a strengthened national organization formed on the initiative of big Plans looking for more efficient coordination of their large, multistate accounts. In the 1960s, Stuart wrote an unpublished history of the Blue Cross system. (Arthur Leipzig Photo)

leaders—including Robert Evans of Chicago and Tom Tierney of Colorado—proposed strengthening the 1959 position statement. They suggested new language in support of "adequate financing of the health care of the indigent and medically indigent with funds from all levels of government." This, said several of their colleagues, was going too far. Carl Metzger of Buffalo characterized the new stance as "completely changing the whole philosophy upon which we had acted in the past." Tierney rose with an impassioned plea for vision:

> The facts are that the federal government, undoubtedly, has set upon a course of providing some kind of health care for the aged. Mr. Eisenhower is now for it. Mr. Nixon is now for it. Mr. Kennedy is now for it. I don't know anybody in government who is against it, and I don't see how the nation's largest single health prepayment agency can quietly sit here and pretend no problem exists.... We can't evade this issue.[26]

BCBSA00292783

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 143 of 182

But Tierney's effort to move his colleagues fell short, and conference participants voted by a 220–190 margin not to adopt the amended statement of position.

During the following summer, a congressional deadlock developed over competing proposals by Republican and Democratic leaders. Then in the House Ways and Means Committee, the skillful new chairman from Arkansas, Wilbur Mills, succeeded in forging consensus on a compromise measure, which had been initiated in the Senate by Democrat Robert Kerr of Oklahoma. Mills proposed a bill to increase medical assistance for welfare recipients under the OAA program, with grants-in-aid to be matched by participating states. To this he added a further provision meant to answer critics of OAA who said the bill did not help deserving older people who were not on welfare but who would be reduced to poverty by any serious medical bill—the so-called medically indigent. The additional form of aid was to be called Medical Assistance to the Aged (MAA) and would be available to people sixty-five and older who were of low or moderate income and ineligible for public assistance. Mills's proposal was firmly supported by the AMA and the NABSP, among others. The means test in the MAA program made it palatable to doctors, just as income limits had made Blue Shield Plan service benefits and fee schedules palatable to them a generation earlier. The Kerr-Mills bill passed handily in September 1960.[27]

Kerr-Mills increased the possibilities for local initiative and led eventually to significant improvements in care in some areas. But the measure was contingent on the states' ability to supply matching funds, and many states simply did not have the money—or were unwilling to commit it to health services. Organized labor rapped Kerr-Mills as inadequate. John F. Kennedy, soon after his election as president in November, announced his intention to press for legislation along the lines laid out by Forand. The pressure was still on.

It was under these volatile circumstances that the newly hatched Blue Cross Association, weaned at last from the AHA, faced the task of finding a new president. The aging James Stuart had accepted the job on the condition that a replacement be found for him within two years. A search committee had gone dutifully to work but met with frustration. The committee's first impulse, naturally, was to seek Stuart's successor from among the ranks of successful Plan executives—leaders with standing among their peers and with hands-on experience in the prepayment business and the politics of the Association. However, as Stuart himself put it, "the old-timers in the field knew from heartbreaking experience the difficulties involved in any attempt to weld together seventy-seven autonomous organizations."[28] Tierney, who had not been around long enough to take such a jaded view, was considered bright enough for the job and ranked highly in leadership ability. He was slightly handicapped, Stuart tells us, by the general perception that he was too willing to work with government on the financing of care for the aged. Even so, he had a viable chance at the job. A leave of absence from the Colorado Plan was arranged so that Tierney could

BCBSA00292784

learn the ropes in Chicago. But after sitting in on a couple of contentious meetings of the BCA board, Stuart said, Tierney learned what more seasoned executives already knew—and lost interest in the job.

Outside Blue Cross Plan circles, there seemed to be few candidates who could possibly meet the board's demanding requirements. However, there was one—a university leader with management experience in the hospital field—who seemed worth investigating. This was Walter J. McNerney, a Yale University graduate who at an early age had made a name for himself teaching hospital administration at the University of Pittsburgh and running one of the university's hospitals. From there McNerney had gone on to found and direct a conspicuously successful program in hospital administration at the University of Michigan.

The thirty-five-year-old professor was unusually knowledgeable about Blue Cross and Blue Shield organization affairs. In 1957, he had directed a massive study of Michigan's health care costs and its Blue Cross and Blue Shield Plans. The results were published in a report of 1,492 pages, which included detailed demographic research, utilization studies, a multifaceted analysis of hospital economics, and an exhaustive discussion of prepayment that dealt with rating, benefits, enrollment, and most of the other significant technical details of the business.

Blue Cross Association leaders involved in the search knew that McNerney or any other outside candidates would need extensive exposure to the Association's members to win acceptance. Even before Stuart had succeeded MacLean as president, McNerney found himself accepting a steady stream of invitations to speak at Blue Cross Plan functions, unaware that his hosts were using these occasions to measure him for a new job. McNerney recalled later:

> I would get up and talk big language and be full of mission, full of zeal. . . . One day I remember, at the Mid-Atlantic Hospital Assembly, getting up to speak. There sitting in the front row were van Steenwyk, Rorem and Colman. This was in advance of the telephone call . . . [offering him the job] say by six months. Why would Rorem, van Steenwyk and Colman be sitting there? I thought it was strange. I was conceited enough by then to think I was such a good speaker that almost anybody would show up, and enjoy it. Later it occurred to me that they may have been tracking me.

The get-acquainted campaign was a success. McNerney was an accomplished speaker with a politician's knack for remembering names and faces. Most important, he seemed to possess the insider's knowledge and executive skills that Plan managers would demand. "Even the most pragmatic Blue Cross Plan leaders began to have a friendly response to the young professor from Michigan," Stuart wrote.[29]

There was one hitch. As the time approached for the BCA to pick its new leader, release of the Michigan study's final recommendations was still pending. As president of the candidate's host Blue Cross Plan, William McNary would have to approve the selection of McNerney. But McNary was report-

edly "nervous about the outcome" of the study—afraid that the somewhat brash and outspoken young professor would step too hard on his colleagues' toes—and was unwilling to sign off on a final decision about the new Association president.[30]

As it turned out, his concerns had some merit. The study was critical of hospitals, doctors, and Blue Cross and Blue Shield Plans. The Plans' cost-based reimbursement practices were subject to manipulation by hospitals and ought to be reformulated, the study recommended. Hospitalization benefits offered scant incentives "for hospitals to reduce services or hold the line on costs." The failure of Michigan Medical Service (a Blue Shield Plan) to cover more outpatient medical care encouraged inappropriate hospitalization. Blue Shield Plan finances were flatly declared to be shaky. McNerney recalled later:

> It called for a more aggressive buying posture on the part of the Blue Cross Plans [that is, more effort by the Plans to use market leverage to impose spending discipline on hospitals and doctors] and gave some other pointed suggestions. . . . It also called for a more enlightened state regulation of the industry and took a fairly hefty swipe at hospitals and doctors.[31]

To his credit, McNary did not take offense. In McNerney's opinion, the crux of the report was that all its conclusions were based on carefully documented empirical findings. It was not an ideological diatribe, and this prevented a backlash against it among Blue Cross system leaders. In fact, some Blue Cross Plan executives were pleased to have the study's mother lode of data—data that might help them win some of their arguments with hospitals and doctors about reimbursement. "The point is that Bill McNary got a study that did not come off the wall," McNerney said thirty years later. "He conceded that a fair amount of points were valid."[32]

In February 1961, McNerney got the nod. When McNary called to offer him the job, McNerney said he "thought about it for about ten seconds. Up to that point I hadn't even thought about the possibility of it. I had no inkling of what was going on. But I said yes," McNerney recalled. McNary, caught off guard by the snap decision, spent another two or three minutes delivering an apparently prepared speech about why it would be a good idea to accept. After waiting patiently for McNary to finish, McNerney quietly repeated his reply. "I said, 'Bill, I said yes.'"[33]

## Getting to Yes

McNerney was set to go to work in the summer of 1961, but the Association had business at hand that would not wait until then. In February 1961, the newly elected John F. Kennedy went before Congress to decry the cautious approach to health care for the aged embodied in the Kerr-Mills welfare subsidy program. Kennedy called for an expansion of Social Security benefits to include hospital and nursing home coverage for all of the 14 million Americans

aged sixty-five and older. His financing formula was a 0.25 percent increase in Social Security taxes. Unlike the Forand bill, the proposal did not include surgical benefits. Kennedy's program was introduced in legislative form a few days later by Senator Clinton Anderson of New Mexico and Representative Cecil King of California, high-ranking Democrats on the Senate Finance Committee and the House Ways and Means Committee, respectively.[34]

The heating up of the political battle created a deepening dilemma for the BCA. Its members were by no means as unified in their support for the Kerr-Mills approach as were their confreres in the NABSP. Long, arduous meetings of the BCA executive committee had begun on the heels of the presidential election, to try to move the organization beyond the position it had held to since 1959. As soon as the new administration moved in, representatives of the executive committee had descended on Washington, D.C., to hold exploratory discussions with HEW secretary Abraham Ribicoff and Kennedy's other top health policy advisor, Wilbur Cohen. By April 1961, when the BCA's annual meeting took place, the group was prepared to propose a new stance.[35]

As Tom Tierney described it, the Blue Cross organization's dilemma lay in its internal disagreements about the choices at hand. As he had pointed out the year before, it would be unseemly for such an important institution to sit out the growing debate. Taking a neutral position would deprive the Blue Cross organization of any opportunity to influence the outcome of the debate. Already, the AHA under Ed Crosby's leadership was moving carefully toward a position tolerant of Social Security funding—provided any new program for the aged was administered through existing private institutions. But an outright endorsement of either the Kerr-Mills approach or the new King-Anderson bill threatened to split the BCA and fracture relations with one or another of its most valued partners—the NABSP and AMA on one side, and organized labor on the other. There was, as van Steenwyk put it, "fear that we will rupture ourselves." The executive committee's proposed solution, which had been endorsed by the BCA board of governors, was to say that "the question of how the revenue should be raised . . . is outside the realm of our competence." But whatever source it came from, any program of aid should utilize the expertise of the Blue Cross organization and its existing system of hospital agreements and payment procedures.

Despite the caution and diplomacy with which it was framed, the offer to cooperate—even if a Forand-style measure were enacted—was perceived by some Plan leaders as "giving aid and comfort to our enemies," as Lane Tynes of Kentucky put it during the cathartic debate. Prestigious Plan leaders, including Robert Evans, Harold Maybee, and John Mannix, drew applause with strong statements against any acquiescence to the King-Anderson Social Security formula. King-Anderson represented creeping socialism, they insisted. Their ideological appeals seemed to collapse, however, in the face of persistent appeals for common sense from pragmatists in the group. "Your political phi-

BCBSA00292787

losophy is coloring your thinking," warned the Rev. J. Q. Harrington of the Montana Plan.

A sketchy consensus eventually formed around the position that the private sector should make its best effort to demonstrate it could deal with the issue without an intrusive new federal system. But if it turned out to be the will of Congress to create a Social Security–based system, the BCA would lend its full cooperation. The intransigent mood faded with the realization that life would have to go on even if the dreaded King-Anderson bill became a reality. "The position of Blue Cross between government and voluntary hospitals is essential in the event that this Social Security approach is used," McNary said, as the discussion wound to a close.

McNerney wasted no time confirming the expectation that he would be a bold actor. Within a few months, he had the BCA taking a more aggressive stance on care for the aged. Coordinating his strategy with AHA executive vice president Crosby, McNerney called a special meeting of the Blue Cross Plans in September 1961 to develop a proactive position on the issue. The first step was speedy preparation of a joint study of the problems of the aged by the AHA and the BCA, "to provide a factual basis for policy decisions."[36] By the end of the year, the 291-page "Report on Health Care of the Aged" was ready, accompanied by an ambitious proposal.

The proposal, endorsed jointly by the Plans and the AHA on January 3, 1962, was for the Blue Cross organization to launch a national hospitalization and long-term care program for the aged with uniform rates and benefits and no public subsidy. In a detailed statement accompanying the proposal and the release of the report, the two organizations called also for strengthening the Kerr-Mills program for the poor and medically indigent. Moreover, the two groups said they had reached the conclusion that the needs of the aged could not be met entirely by private financing and that some measures beyond Kerr-Mills would be necessary. The Blue Cross organization stood ready to lend its skills and experience to administer any such effort. It caused a mild and not unexpected scandal in AMA circles by adding, "the tax source of the funds is of secondary importance to us." But at McNerney's urging, the Plans had come to the conclusion that the failure of public officials to act decisively on the issue would not stand in the way of action by the Blues. "When the debate dragged out and it wasn't clear what was going to happen, I particularly took the point of view that since we don't know when this is going to be resolved, how about Blue Cross Plans making a special effort," McNerney said later.[37]

Despite the flap over the Blue Cross Plans and the AHA taking a soft line on "the tax source of the funds" (which the groups had hedged with a statement of opposition to the King-Anderson bill), the Blue Shield Plans and the AMA were moving on a parallel track. A year earlier, the four organizations (AMA, AHA, BCA, and NABSP) had formed a Joint Commission for the Promotion of Voluntary Nonprofit Prepayment Plans and kept in close contact about each other's strategies and activities. Two weeks after the BCA-AHA announcement, the AMA and NABSP announced a similar plan to

BCBSA00292788

create a uniform, unsubsidized national program of medical and surgical coverage for the aged.[38]

Like the Blue Cross Plans, Blue Shield Plans traditionally had guaranteed subscribers in employee groups the opportunity to convert to individual coverage on retirement. After the introduction of the Forand bill in 1957, NABSP had stepped up efforts to enroll older people by pressing its member Plans to allow those aged sixty-five and older to join as individuals even if they were not converting from pre-retirement group membership. When the drive started in 1958, only four Blue Shield Plans had offered such an opportunity. By 1961, fifty-one of the sixty-nine Blue Shield Plans allowed nongroup coverage of people aged sixty-five and older, according to congressional testimony by Dr. Donald Stubbs, a physician in Washington, D.C., who was chairman of the NABSP's board of directors. During a series of appearances before congressional committees in the summer of 1961, Stubbs pointed out that labor and management were leaning increasingly toward arrangements providing for employer contributions to post-retirement coverage, with the Blue Cross and Blue Shield Plans' program for federal employees a prominent example of this practice, and one that the committee members were familiar with.

The overburdening of general hospitals with inappropriate long-term care cases among its older patients had driven the Blue Cross organization and the AHA to an increasing candor about the inadequacies of private coverage for the aged. Without this stimulus, the NABSP slanted its definition of the problem in a different direction. Stubbs told Wilbur Mills's committee:

> A significant portion of this segment of the population can and will provide for their medical needs through programs of their own choice. . . . This fact, coupled with the trend in industry and government to continue retired employees as part of the covered group, leads us to the conclusion that the problem of providing health care for the aged is a diminishing one.

Stubbs acknowledged that "there are and always will be" those who cannot afford to pay for their own care, and that welfare-oriented programs are appropriate for the unfortunate few. But a proposal such as the King-Anderson bill, he warned, would "inhibit the further growth and development of the voluntary plans. The trend by industry to provide health care coverage for retired employees could be stopped dead in its tracks if employers and employees are required to pay a tax to support a mandatory health program for those same retired employees."[39]

Stubbs's faith in voluntary prepayment was resolutely sincere. But convictions alone would not obviate the difficulties of creating a nationwide Blue Cross and Blue Shield program strong enough to make federal action seem unnecessary. By the middle of 1962, many hospital and medical Plans had conveyed the message to the BCA and the NABSP that the promised national

BCBSA00292789

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 149 of 182

program of uniform rates and benefits seemed a sheer impossibility because of local variations in hospital costs and physician fees. In various areas, Blue Shield Plans that always had paid indemnity benefits said they could not participate in a program that promised paid-in-full coverage of medical and surgical services. Here and there, some Plans were ready and willing to go along with the new program, but state insurance regulators denied or delayed their approval.

Questions of positioning and timing were proving politically difficult as well. Congressional conservatives were eager to exploit the Blue Cross and Blue Shield Plans' initiative. Representative Edgar Hiestand of California wrote to John Castellucci of the NABSP in February 1962:

> May I suggest that you immediately use all possible pressure to expedite the completion and publication of those plans [for a national program for the aged], even if there remain some slight imperfections and even if actuarial estimates are on the optimistic side. I'm sure you realize the urgency of developing a weapon with which to fight the imminent threat of medical aid tied to the Social Security system.[40]

In April 1962, however, when close committee votes on King-Anderson were believed to be at hand, McNerney judged that the Blue Plans might "cloud the waters" and perhaps prompt a backlash by launching the new program right away. He believed it would have appeared presumptuous for BCA and NABSP to proceed unilaterally while Congress was still in the process of making up its mind about a major presidential initiative. Washington representatives of the Blue Cross and Blue Shield Plans were instructed to maintain a position of maximum flexibility, and Plans were asked to prepare for a significant intermediary role in any new federal program. The Washington representatives continued a close watch on the shifting political fortunes of King-Anderson, and to provide advice to members of Congress and their staffs on compromise proposals that arose in the course of public and private debate on the bill. The right opportunity to seize center stage with a dramatic initiative from the private sector would not occur until, and unless, the legislative process reached stalemate, McNerney reasoned.[41]

It was at about this time that an unexpected contretemps stalled the progress of the King-Anderson bill and began to make such a stalemate appear more likely. Since taking office, President Kennedy had sponsored a series of regional conferences on care of the aged to demonstrate his commitment to getting something done. With elections coming in the fall of 1962, Kennedy wanted to push the King-Anderson bill through to prove that his administration could indeed "get this country moving again." In the spring of 1962, the Democrats scheduled 5,000 speeches by 250 speakers nationwide to push the president's health agenda. A series of rallies had been organized, to culminate on May 20, 1962, with a nationally televised speech by Kennedy in Madison Square Garden to 20,000 members of the National Council of

BCBSA00292790

Senior Citizens for Health Care through Social Security.

The president stumbled. Dissatisfied with the speech that had been prepared for him, Kennedy decided to ad-lib and delivered what one observer described as "one of the worst speeches of his career." The oration, although it roused the partisan crowd in Madison Square Garden, failed to stir a national television audience, according to Kennedy advisor Theodore Sorenson. An anguished AFL-CIO official lamented that "instead of steam for the Medicare piston we got a pail of cold water." The AMA compounded the defeat with an inspired counterstroke. The organization rented the Madison Square Garden the same night, before the debris of the Kennedy rally had been cleaned up, and put its most talented speaker, Dr. Edward Annis, at the podium before the empty, littered hall. Annis's performance, taped and shown the following night on network television (with time purchased by the AMA), was a triumph. "The public is in danger of being blitzed, brainwashed and bandwagoned into swallowing the idea that the King-Anderson bill is the only program that offers medical care for the aged," Annis proclaimed. Headlines the next day trumpeted his accusation that Kennedy's Medicare program—as it had come to be known—was "a cruel hoax."[42]

In July 1962, the Senate defeated an attempt to slip King-Anderson through as a rider on another bill. Wilbur Mills, disinclined toward the bill himself and doubting its chances against Republicans and the Southern Democrats on the House Ways and Means Committee, bottled the measure up without allowing it to come to a vote. But obstacles and delays that had attended the development of a national Blue Cross and Blue Shield program for the aged kept the stalemate from becoming quite the opportunity McNerney had hoped for. In fact, their inability to deliver what had been promised at the beginning of the year put BCA and NABSP on the defensive. In October, Democratic Senator Pat McNamara of Michigan accused the Plans of misleading Congress and the public and of raising false hopes among the elderly: "Phone calls to several local plans resulted in information that some planned no new program; others were merely reopening enrollment; others had not received official approval of program content or rates," McNamara charged.[43]

Backing away from the idea of a uniform program, McNerney nevertheless urged the Plans to do whatever they could to increase enrollment and broaden coverage of the aged. The national advertising effort that had been planned was retooled to reflect a more localized approach. But ads did not seem to clarify the Blue Plans' position, according to Stuart, and a few hostile pundits and politicians accused McNerney of disingenuousness. Discounting the suggestion that he had misled himself or others, McNerney reflected later:

> I don't think I was dumb enough to think this effort would solve the problem. On the other hand, I was a bit naive in the timing and in the encouragement of this effort. . . . The shot from the press in Washington was much less searing than the realization that not all the Plans could crank up and get out there as fast as they should have.[44]

BCBSA00292791

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 151 of 182

When the smoke cleared, it was apparent that some Blue Cross and Blue Shield Plans were making progress in their efforts to enroll the aged and offer them expanded benefits, especially for nursing home and outpatient care. The most dramatic results occurred in states that opted into the increased Kerr-Mills welfare subsidy by appropriating required matching funds and that retained Blue Plans to implement their programs. By April 1963, six or seven states were working with Blue Cross Plans to administer their Old Age Assistance (OAA) program.

The largest undertaking was in Texas, where 10 percent of the nation's total OAA recipients (221,000) lived. From the beginning, the program worked more smoothly than anyone had expected, according to Walter McBee, then director of Texas Blue Cross (now known as Blue Cross and Blue Shield of Texas).[45] Perhaps because they were completely united in opposition to a Social Security–based program, the state's doctors, hospitals, welfare department, and Blue Cross Plan worked in full cooperation. Certain that public opinion would not permit them to earn anything for their own reserves, the Plan underbid its commercial competitors with a promise to administer the program with overhead costs of no more than 3 percent. "Quite a gamble, a little fearsome sort of an activity," said Tom Beauchamp, a subordinate who later succeeded McBee.[46] But the program performed so well financially that benefits were expanded and a surplus of $100,000 was turned back to the state within two years. Nor was the consumer shortchanged. The program offered fifteen days of full hospital coverage per episode of illness, and records indicate that it paid an average of 92 percent of all its patients' hospital charges to that point, as well as 82 percent of charges incurred after fifteen days. Hospitals reported no problems in collecting the balance from generally grateful patients or their families. The program—funded 25 percent by Texas and 75 percent by Kerr-Mills—paid $8.68 per person per month to the Blue Cross Plan.

Beneath the financial results lay an actuarial surprise, McBee told his fellow Blue Cross Plan executives at their 1963 annual meeting. The Texas Plan had enrolled only five thousand new individual subscribers under the special Blue Cross organization initiative that McNerney had pushed in 1962. Losses had been high. "Why? Because you take them at the time they choose to enroll," McBee said, answering his own rhetorical question about the evils of adverse selection. But when the Plan entered into a partnership with the state under Kerr-Mills, it enrolled the state's entire OAA population at the same time, satisfying the insurance principle of random selection. Here, then, was a relatively clean test of the insurability of the aged, and the results were encouraging. The incidence of illness was low enough that the cost could be kept within reason, if spread widely enough. And in Texas the per capita costs of caring for the elderly appeared to be less than the average for all ages. McBee reported that only 20 percent of those hospitalized under the OAA program in Texas required surgery, compared to 50 percent among the Plan's subscribers overall. The average stay under the program was 9.2 days, compared

BCBSA00292792

to an overall average of 16 days. "If every state could do what Texas has done, we wouldn't have any problem about the aged," McBee said. "It can be done. . . . You can insure sick folks if you can get them all at one time."[47]

In the spring of 1963, the NABSP stepped up its efforts to encourage participation in Kerr-Mills and set up an information service to advise member Plans on program regulations, finances, and the status of legislative efforts in their states. By early 1964, NABSP reported that Blue Shield Plans had a role in OAA and MAA programs in six states, all west of the Mississippi, and that other Plans were actively pursuing involvement in twelve other states from coast to coast. In response to a query late in 1963 from Social Security Commissioner Robert Ball, the NABSP reported that 4 million of its 48 million subscribers were over sixty-five years of age. The figures for the Blue Cross Plans were 5 million elderly of their 58 million total enrollment.[48]

As a national solution to the problems of the aged, Kerr-Mills was flawed by the predictable unevenness of state participation. Although thirty-two of the fifty states had programs in operation in 1963, 90 percent of the federal funds were going to the five most populous, industrial states—California, New York, Massachusetts, Pennsylvania, and Michigan.[49] There were embarrassing differences in the quality of care offered (ward versus semiprivate room accommodations, for example), and the quantity of care also, as measured in limits on the duration of a covered hospital stay. Increasing sensitivity about differences in social class made the means test ever less attractive politically. Hospitals were uneasy about the extreme variations in reimbursement formulas from state to state.[50] McNerney commented forgivingly that "the administrative initiative and effectiveness of state government . . . takes longer to express itself than some people seem to be willing to wait for." By the time of President Kennedy's assassination, Kerr-Mills was perceived as "vulnerable," McNerney noted, and the search for a different solution "stepped up again in 1963 and in 1964, and the thrust became charged by symbolism. This is something that Mr. Kennedy stood for."[51] In 1964, with diligent cooperation from the Blue Shield Plans, the AMA continued to push for expanded state and local welfare programs under the rubric of its Eldercare program.

Meanwhile, McNerney and other Blue Cross Plan and AHA spokesmen were drawn deeply into the legislative byplay in Washington that followed the ascent of Lyndon Johnson to the presidency. The tide was turning. By mid-1964, "very few on either side were taking seriously the AMA's cry of 'socialized medicine.'"[52] The new president, with his New Deal roots and Great Society agenda, set his sights early on a major Medicare bill. As a Southerner, a protégé of former House Speaker Sam Rayburn, and a legislative professional of prodigious skills himself, Johnson stood a much better chance than Kennedy of getting what he wanted. In the summer of 1964, the Senate passed a modified version of the King-Anderson bill. But House Ways and Means chairman Wilbur Mills—an authority on taxes who took great pride in the Social Security program—did not want to lose control of the issue.

BCBSA00292793

Promising pro-Medicare Democrats on his committee that a bill for the aged would be his top priority in 1965, he gained their support for quashing the Senate proposal in a conference committee. Johnson's landslide election victory over Barry Goldwater in 1964 helped deliver thirty-two new seats in the House to the president's party and sent home three anti-Medicare Democrats on the Ways and Means Committee. By this time, McNerney—having begged and browbeaten most of the Plans into accepting the possibility of a partnership with government—was living out of a suitcase in Washington.

## Inventing Medicare

In a show of loyalty to his martyred predecessor, President Johnson threw his support behind the King-Anderson bill, offering hospital and nursing home coverage for everyone aged sixty-five and older, to be financed by an increase in the Social Security tax. But the air was filled with counterproposals. One bill called for indemnity coverage and tax credits. Another wanted a social insurance program administered through the U.S. Public Health Service. In 1965, Republican leadership lined up behind a proposal from Representative John W. Byrnes of Wisconsin. The Byrnes bill sought to outflank the administration by offering some coverage for drugs and doctors' services, both inside and outside hospitals, in addition to the hospital and nursing home care to which the King-Anderson bill was limited. Participation in the Byrnes program would be voluntary and subsidized through OAA and MAA, with the enrollee's share of the cost scaled to income. The AMA continued to push its Eldercare program, essentially a further expansion of the existing Kerr-Mills approach to indigent care. This effort contrasted with a resolution, passed in the House late in 1964, to expand Kerr-Mills in conjunction with a hospital program for the aged. Both Byrnes and the AMA sought to rally support for their proposals by criticizing the limited coverage offered in the administration's bill for hospital and nursing home care only. The result of these tactics, however, was not what King-Anderson's opponents expected.[53]

Every legislative option carried complex and highly technical ramifications in terms of costs, benefits, controls, and administration. The expertise of the Blues was in heavy demand. "We became a very integral part of the discussion in Congress," McNerney recalled. "We were fairly well known at that point. We had a good relationship with Wilbur Mills and [then HEW assistant secretary] Wilbur Cohen." Blue Cross Plan leaders spent long hours testifying before Mills's committee, the Senate Finance Committee, and the Special Committee on Aging headed by Senator Pat McNamara (D-Mich.). Behind the scenes, they conferred continuously with legislators and their staffs about the nuts and bolts of the various proposals. When Congress wanted information, queries went out to the Plans, and reports were assembled. "Our course has not been . . . to romance political parties," McNerney said, "but rather . . . through a process of continual negotiations [to] get close to people who are

BCBSA00292794

making the decisions on the basis, hopefully, of mutual respect." And at every opportunity, the Blues' representatives urged that the skills and mechanisms of the existing, private prepayment system be utilized—rather than duplicated—in whatever program Congress devised.[54]

Washington folklore has it that Medicare and Medicaid were finally enacted by virtue of a dazzling legislative démarche by Wilbur Mills—the celebrated "three-layer cake," an amalgamation of hospital, medical, and indigent care. Mills certainly deserves credit for his unique role as a broker. But it probably is more accurate to describe the outcome as the cumulative product of what Odin Anderson called "the riotously pluralistic policy-making system of the United States." Medicare was the result of more than a decade of bargaining, negotiating, and maneuvering by government officials, doctors, hospital people, labor leaders, business executives, the commercial insurance industry, and the Blues. Herman and Anne Somers observe, "Path-breaking programs are usually a generation in the making in the conservative and deliberate American legislative process." Kennedy, the Somerses say, was fond of repeating Thomas Jefferson's comment that "great innovations should not be forced on slender majorities."[55]

McNerney, very much in the center of the action, discovered that a pragmatic political philosophy cut across the partisan boundaries separating participants in the debate. The final product of the debate itself would, accordingly, not be a magic formula that solved everyone's problems, or a winner-take-all victory for a single faction. Rather, the outcome of the process was a bundle of compromises, in McNerney's words:

> inversely related to who had the power. . . . It was a time for serious and responsible negotiations rather than a falsely masculine test of wills where there could be only victory. . . . After the extreme liberals had their kicks, and the ultra conservatives theirs, shortly and quickly came the business of . . . ironing out the resolution.[56]

For the first two months of 1965, the BCA and the NABSP were still operating on different wave lengths. The AMA was in the process of pumping $1.6 million into a renewed promotional campaign for Eldercare and pressuring Wilbur Mills for greater coverage of doctors' services than was provided in the King-Anderson bill. Mills was worried that King-Anderson had been oversold, that the voters did not understand the limited hospital benefits in the bill, and that they would be outraged when they learned the truth. He was determined to avoid a messy confrontation with the AMA. In February 1965, Mills and the HEW officials he was working with floated a new proposal to expand the benefits under the Medicare bill to include doctors' services, outpatient care, drugs, diagnostic tests, ambulance transport, and other nonhospital services such as those included in the AMA and Byrnes bills. Half the funds would come from an added Social Security tax and the other half

BCBSA00292795

from the federal government's general revenues. To control the cost, patients would be responsible for a $50 deductible charge and a 20 percent co-payment factor beyond that.[57]

According to McNerney's account of the negotiations, the new proposal from Mills led to counterproposals that helped define the unique, bifurcated structure of Medicare as it eventually was enacted. The nation's seven thousand hospitals had experience dealing with relatively uniform, cost-based reimbursement formulas. The AHA had promised to help implement Medicare and was making a pitch for the Blue Cross organization to serve as an administrative intermediary. But there were between 200,000 and 250,000 practicing physicians to deal with, and they had nothing approaching a unified fee system, as Blue Shield Plan officials knew only too well. Not only was the AMA fighting Medicare with its proposals for a voluntary program, but some doctors were threatening a boycott if the kind of program Mills was endorsing passed. Mills was acutely aware of these difficulties and was receptive to the suggestion that medical benefits should be administered differently from benefits on the hospital side of the program. The Blue Shield Plans stood out as unmistakable models for an alternative approach—a flexible system that engaged the medical profession as partners rather than as adversaries.

On March 2, 1965, Mills stunned Cohen by asking if it would be possible to amalgamate a compulsory hospitalization program, a voluntary medical insurance program, and an expansion of coverage for the indigent. Cohen reportedly at first suspected a trick, a backdoor effort to create a bill that would sink under its own weight. A closer look revealed an ingenious strategy to disarm Republican opposition by co-opting their argument that benefits under King-Anderson were too skimpy.[58] When he presented the idea to Johnson, Cohen wrote later, "the President did not bat an eye. . . . Mills had scored a coup. Johnson immediately realized it."[59]

The Medicare-Medicaid bill, adding new Titles 18 and 19 to the Social Security Act, was ready to be put to the test. Part A of Title 18 was substantially the King-Anderson bill, offering hospital, nursing home, and home health services in a program financed by compulsory contributions of employers and employees through the Social Security system, with a separately earmarked payroll tax and trust fund. Part B of Title 18, modeled substantially after the Byrnes bill, created a supplementary medical insurance program on a voluntary basis, financed in equal amounts from premiums paid by the insured and a contribution from general federal revenues (first estimated at $500 million). Title 19 provided a third layer, encompassing the AMA Eldercare plan. It was an enlargement of Kerr-Mills, not only broadening the scope of benefits but extending protection beyond the aged to needy recipients of other federal-state public assistance programs—including the blind, the disabled, and dependent children—and ultimately to all the medically indigent.[60]

The Ways and Means Committee sent the bill to the House floor with a

BCBSA00292796

17–8 straight party vote. A motion by Wisconsin's Representative Byrnes to send it back to committee failed by forty-five votes, and the House passed the measure in April by a powerful 315–115 margin. Hearings began at once in the Senate Finance Committee, which added 75 amendments comprising 513 changes, most of them minimal. Thus satisfied, the Senate passed the measure by a 68–21 margin in early July. It took a conference committee only nine days to work out the remaining differences, which were ratified swiftly in both chambers. On July 30, 1965, Lyndon Johnson flew to Independence, Missouri, to sign the historic bill, recorded as Public Law 89-97, in former President Harry Truman's library.

BCBSA00292797

# The
## Intermediaries
6

*President Johnson said that the preparations for the pro-
gram constituted the largest management effort this na-
tion had undertaken since the Normandy invasion.*
—Herman M. Somers and Anne R. Somers, 1967

WITHIN A FEW DAYS after Congress enacted Public Law 89–97, hospital
representatives and physicians from every state in the union met in Washing-
ton at the invitation of the AHA to hear from federal officials how the law was
expected to work.[1] "The voluntary hospital system and the federal govern-
ment started going steady last month," quipped one observer, "and they both
seemed pleased about the whole thing, if a little nervous at times." HEW un-
dersecretary Wilbur Cohen executed a 360-degree turn at his lectern to
demonstrate his lack of tail and horns. The law is complex, Cohen explained,
as it had to be to preserve and protect the relationship between public and pri-
vate sectors of the health care economy. "If you want a simple law, you can get
it," he said, "but only in a totalitarian country."[2]

Cohen said it had been necessary to separate Parts A and B of the law—to
deal separately with hospital and medical services—because although it was
relatively easy to understand the hospital services, understanding of the med-
ical services was "still in the evolutionary stage, with a great deal of tenseness
on the part of 200,000 practitioners." "Tenseness" was not the word hospital
administrators would have chosen, thinking of the fury in the staff room
whenever Medicare was mentioned. Responding to a significant stir in the au-
dience after this remark, Cohen moved quickly to call attention to Sections
1801 and 1802 of the law, which declared that there must be no federal

BCBSA00292798

supervision or control over the practice of medicine or over the administration of any institution, agency, or person providing health services. Nor would any beneficiary be denied the free choice of physician or service agency. "We shall adhere scrupulously to this Congressional intent," the undersecretary vowed.[3]

During several hours of discussion at the AHA meeting, Social Security commissioner Robert Ball emphasized that there would be no compromise with the quality of services in the effort to conform to the letter of the law. "We are very conscious of the impact of this program . . . and the need to support professional efforts to maintain and improve quality," Ball asserted. "The intent is to meet actual costs however widely they may vary from institution to institution," he went on, after the discussion had turned to the question of potential trade-offs between quality and cost. "The legislation directs us to pay full reasonable costs as delivered by hospitals and the intent is to meet actual costs," he pointed out. AHA president Clarence Wonnacott was struck by the short but meaningful modifier that Ball had added to the language of the law: "The bill does not say 'full,'" Wonnacott remarked. "The spirit expressed here is reassuring."[4]

It was indeed no accident that, when the provider community began going over the fine print, they found abundant evidence that their needs had been taken into account. Walter McNerney and other BCA leaders were just a few of the players participating in a monumental collaboration, which had begun long before the bill was passed and merely intensified when the time came to write the program's administrative rules and tool up for implementation. "Special pleading, pressure, and negotiations now moved into a new arena, circumscribed by the boundaries of the law but just as intensive," wrote Herman and Anne Somers in their 1967 report on Medicare for the Brookings Institution:

> Unlike the systems and data-processing job, where SSA's own expertise and experience were formidable, in the substantive field of health the SSA needed and actively sought expert guidance and counsel from many sources. Moreover, the launching of so influential a program required widespread understanding of the issues inherent in its administration if misconception and suspicion were not to impede its early implementation. It was at least wise, and probably necessary, to involve intimately as many affected group-interests as possible . . . Congress, in several parts of the law, stated explicitly that this was intended.[5]

A top-level advisory group was formed to make broad policy and administrative recommendations to the HEW secretary. The AMA and AHA both formed their own advisory councils to represent their respective viewpoints. And, according to the Somerses, they were listened to. Nine technical committees were formed to deal with the details of reimbursement, training, psychiatric services, the role of intermediaries (such as the Blue Cross organization and the insurance carriers), the special problems of hospital-based specialists, and other particulars. Representatives of all the interested provider groups participated on the technical committees and argued their differences

while SSA officials sat back and listened; the meetings were often refereed by outside consultants. All of the multifarious special interests involved were given opportunities to be heard—municipal hospitals, state agencies, group practice organizations, labor-run clinics, nursing homes, paramedics, and hospital accountants, to name a few. "A listing of the groups that stalked the corridors and attended the hundreds of meetings at SSA headquarters and in the field would comprise a sizable directory," the Somerses wrote. "Fifty-eight national organizations were represented at one meeting in February 1966."[6]

At the hub of the enterprise was the gear that made the machinery of the federal government mesh with that of the health system: the carriers and intermediaries, who held the responsibility for reviewing bills from providers and making payments. The carriers and intermediaries bore no underwriting risk and were to be reimbursed by the government only for the actual costs of administration. The intermediary concept was based on a simple analogy. As purchaser of care for the elderly and indigent, the government had the same need as industry and labor for a skilled, savvy broker who could negotiate for quality care for large groups at a fair price in the complex, technical, sensitive health care market. The experience of legislating, funding, and monitoring health programs for federal employees and military dependents had familiarized many members of Congress with the capabilities of the Blue Plans and the commercial health insurance industry. Interposing the two types of intermediaries was politically convenient because it insulated providers from direct contact with, and the threat of control by, the dreaded federal bureaucracy.

Congress attempted to mollify the hospitals further by giving them the power to nominate the intermediaries that would service them under Medicare Part A. Through a combination of nominations by state hospital associations and the AHA, Blue Cross Plans were chosen as intermediaries in thirty-one states, which represented 90 percent of the beds in all participating hospitals. The BCA acted as a prime contractor, subcontracting with the Plans that had been nominated. The intermediaries under Medicare Part B were called "carriers," a designation meant to reassure doctors by suggesting a role somewhat more independent of government than that of the "fiscal intermediaries" in Part A, although the carriers did no underwriting. The carriers were appointed by the HEW secretary without benefit of provider nominations. Of the forty-nine carriers chosen to administer Part B, thirty-three were Blue Shield Plans, covering about 60 percent of eligible beneficiaries. The use of intermediaries under Medicaid was left to the option of the states, as it had been under Kerr-Mills, and a variety of arrangements evolved over a period of several years.

Both prior to the passage of the Medicare bill and in the eleven months of administrative rule-making that followed, several lively discussions went on between government officials and Blues negotiators concerning how much control the intermediaries would have over the new programs. Despite the hands-off posture set forth in the legislation and reaffirmed by Cohen, the federal government was investing billions of dollars and had an inalienable responsibility to see that the money was well spent. The first inclination of the

BCBSA00292800

government's leading negotiators—SSA commissioner Ball and Arthur Hess, who was head of the newly created Bureau of Health Insurance in the Social Security Administration—was to treat the intermediaries as mere bankers, or "traders of money," as McNerney liked to say.

Federal officials—and to some extent the states—wanted to reserve for themselves many critical functions associated with accountability. These functions fell into several categories. Cost accounting, the fixing of reimbursement levels, and the monitoring of the customary doctors' fees allowed by the law were all sensitive matters on which federal officials wanted to call the shots. Performance standards had been established for participating hospitals and extended care facilities, and someone had to certify that the standards were being met. Hospital planning agencies would have to be created or improved to make sure that the reimbursement-at-cost mechanism did not turn into a perpetual life-support system for terminally ill hospitals that were no longer needed.

Even more delicate was the issue of utilization review (UR), the administrative function most likely to impinge on the process of delivering care. The law had tried to sidestep potential conflicts by calling on hospitals to set up their own panels for monitoring admissions against specified criteria of "medical necessity." The Blues themselves had delved into this area over the years, but utilization review was still a developing art, and there was an obvious danger of letting the hospitals out on too long a leash. In general, as a result of its own growing concern about costs, the private health insurance industry was already moving toward a variety of increased controls and was, in McNerney's words, "beginning to shift gears from a passive financing system to a more active financing system." Medicare accelerated this process. "The polite language for the sake of the health establishment, that things wouldn't be touched, was a front piece," McNerney said later. "There was already concern about how to shape things so this program wouldn't get out of hand." But the utilization review controls created by Medicare would be widely criticized as inadequate even before they went into effect.[7]

Knowing that they, too, would be held accountable, the intermediaries were unwilling to entrust sole responsibility for controls to the health care neophytes at SSA. As McNerney put it:

> The Social Security Administration . . . envisioned itself as the administrator. . . . We at Blue Cross Association as intermediaries thought of ourselves in a little grander terms than that. Because we were nominated by the hospitals, for example, we felt we had a dual accountability, that we could be quite useful in shaping the destiny and the goals of the program as well as carrying out its administrative provisions.[8]

Ball and Hess were candid enough to admit, at least at the outset, that they needed Blue Cross and Blue Shield Plans and the other carriers to help teach them the business.

BCBSA00292801

It is not surprising, then, that the role of the intermediaries turned out to be substantial. HEW's contract with the Blue Cross Association dictated that BCA would receive and process claims and eligibility inquiries, pay the providers, and communicate with the providers. The HEW secretary would choose either the intermediary or a state health agency to help the providers establish effective utilization review and cost accounting procedures, and to help them qualify as program participants. State health agencies would perform the actual inspections of facilities and certify their eligibility. By defining the intermediaries as "helpers" in the areas of utilization review and the quali-



Walter J. McNerney (left), then president of the Blue Cross Association, and Robert Ball of the Social Security Administration in July 1966 after negotiating the first Blue Cross Association contract as Medicare intermediary. (BCBSA archives)

fication of providers, a compromise mechanism was created that gave the intermediaries an opportunity to keep close tabs on performance and cost while not exercising outright control over the review process or appearing overly intrusive from the viewpoint of the providers. The helper role also meant for the Blues that the tooling up period would be especially intense. Not only would they have to set up their own shop to handle the enormous volume of claims administration entailed by Medicare, but they would have to help the providers get ready, too.

The hospitals did not need much guidance to prepare for visits from the state inspectors who would certify their compliance with Medicare's standards for quality of care and adequacy of facilities. Existing accreditation programs

BCBSA00292802

and state regulation had thoroughly familiarized the hospitals with drills of this sort. But the complicated and controversial reimbursement formulas hit the hospitals where they were weakest—in the accounting department. Medicare promised reimbursement for "reasonable costs" but demanded that the costs of serving Medicare beneficiaries be clearly distinguished from the costs of serving other patients, so that neither class would be forced to subsidize the other. Documenting the differences would require sophisticated and credible accounting.

But most hospitals—shielded from the rigors of the business mainstream by their nonprofit mode of operation and philanthropic support—had not developed accounting departments equal to this task. Prior to the implementation of Medicare, only 25 percent of the nation's hospitals routinely made detailed determinations of their costs, and only 15 percent of the rest kept the records necessary to make such findings. This meant that 60 percent of the nation's seven-thousand-odd hospitals would have to set up new accounting and record-keeping capabilities to document their claims for elderly patients. The other 40 percent would have to learn how to apply Medicare's vexing rules for differentiating the costs of serving the elderly. And Ball did not release the SSA's final formulation of the new rules until May 2, 1966—just eight weeks before what was now being referred to, somewhat portentiously, as M-Day, July 1, 1966.[9]

The Blue Cross Plans were perhaps the only organizations that knew enough to help the hospitals meet their new accounting burden. About two-thirds of the Plans reimbursed hospitals using formulas based on cost and had extensive audit data from those hospitals on which to base the cost calculations required by the new law. The concept of reimbursable cost, however, was highly elastic and had been stretched in some significant new directions during the "riotously pluralistic" and politicized process of administrative rule-making for Medicare.[10] Traditionally, for example, many Blue Plans allowed participating hospitals to augment their reimbursable costs (to the extent that these could be precisely determined) with a plus factor of 1 or 2 percent that had no equivalent in standard business accounting. It was a legitimate allowance, from the Plans' viewpoint, to compensate the hospitals for the extraordinary expenses they incurred trying to keep up with advances in medical science and technology. It also took into account that the Blue Plans did not reimburse hospitals for capital construction costs or for uncompensated care.

But such a prospective cost is not recognized under the retrospective accounting principle of depreciation, and the hospitals were rebuffed in their attempts to get the government to allow these prospective capital needs in the formula for reimbursable costs under Medicare. Negotiators for the AHA—with at least tacit support from Blue Cross representatives—fought hard to justify their claim to such an allowance. They contorted the rules of accounting in all directions in hopes of hitting on a formula that would be acceptable to the government negotiators. The AHA's struggle was hindered by the

BCBSA00292803

shortcomings of its own members' collective accounting skills (which irritated government and Blue Cross organization officials alike) and by federal officials' fears of runaway costs (which permeated the negotiations over reimbursement). In the end, despite angry opposition, the hospitals won a 2 percent plus factor, although it was to be rescinded in 1969. With or without the plus factor, the idea of reimbursement at cost—with its obvious potential for rewarding inefficiency—remained suspect and soon became the focus of renewed debate and criticism.[11]

An equally agonizing affair involved hashing out acceptable methods for differentiating between the cost of care for Medicare patients and all other patients. The details of the debate over the concept of "ratio of charges to costs" (an expression that did not even mean what it said) are too arcane to resurrect. But the underlying problem of cross-subsidies, or cost-shifting, would have great relevance in the future and needs explaining at this point. Title 18 (Medicare) stipulated that "the costs with respect to individuals covered by the insurance programs . . . will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs." The question was whether treatment of patients aged sixty-five and older would cost hospitals more or less than treatment of other patients. Statistics seemed to indicate that older people with chronic illnesses tended to have longer hospital stays than other patients, but without any more initial diagnostic and other ancillary services. That meant that the per diem cost of the expensive ancillary services usually provided in the first few days of hospitalization would be spread out over a longer period, and the overall per diem cost for older patients would be lower than the average. Eventually, the hospitals would have some success in demonstrating that older patients were in fact more expensive to treat because they required more nursing care. Either way, the average hospital was going to have to start watching its dollars more closely than usual, and the Blue Cross Plans were charged with the responsibility for helping the hospitals set up acceptable ways of doing so.

Prior to enactment of the Medicare law, questions about reimbursement of doctors under the proposed Part B had been the most explosive threat to the grand compromise on which the law was founded. Sensitized by their own thorny history of trying to deliver uniform medical rates and benefits for their national accounts, Blue Cross and Blue Shield Plan leaders could well understand both the needs and the difficulties faced by government officials as they tried to come up with a nationwide program to deliver uniform medical benefits at a "reasonable" cost, as the law required. The easiest way to achieve this would be with some kind of negotiated national fee schedule. But according to McNerney's account, negotiators from HEW were circumspect in raising the possibility of such an approach, realizing that a proposal for fee schedules would trigger just the kind of confrontation with the AMA that Mills was determined to avoid.[12] But the alternatives were not appealing, either. Payment

BCBSA00292804

on an indemnity basis could result in out-of-pocket expenses for beneficiaries that would tend to irritate the voting public and discredit the program. If doctors were simply reimbursed for whatever they charged, program costs could go out of control.

A provisional resolution of the issue involved lifting a page from the medical Plans' book. For the most part, doctors had acquiesced only grudgingly to the fee regimentation that Blue Shield Plans traditionally had forced on them for low-income subscribers, and which the Plans in 1964 began to expand with what they called a "usual and customary" fee program. Doctors clung jealously to their prerogative to set fees as they saw fit. According to John Castellucci, then NABSP executive vice president, the Blue Shield Plans had been frustrated in trying to gather enough data to make sound judgments about reasonable fees. "The thing that bothered me was we couldn't figure out what a doctor charged. Specialists would charge differently for the same procedure from a G.P.," Castellucci said in a 1990 interview. "We didn't know what fees were, what charges were. Nobody really knew."[13]

For Blue Shield Plans, the pressure to solve the problem came from national accounts, who were increasingly demanding "paid-in-full" benefits at predictable rates. Typically, most Blue Shield Plans offered service benefits to low-income consumers, and doctors generally agreed—usually without much enthusiasm—to accepting payments for these patients based on a fee schedule. But a messy means test and a two-tiered system of coverage were the last thing a sleek, high-powered Fortune 500 company wanted in 1965. Blue Shield Plans could not set rates for service-benefit coverage unless they had some inkling of how much doctors would charge.

In 1964, NABSP adapted an idea first tested by the Blue Shield Plans in Wisconsin and California. The national organization sought to solve its problem by establishing the concept of "prevailing fees" based on an analysis of 470,000 claims from fifty-four Plan areas throughout the United States. The idea was to pay doctors their "usual and customary" charges for a given procedure, even though those charges varied from doctor to doctor and area to area, but to limit the payments with ceilings based on the prevailing charges in a given area. The NABSP analysis found that only about 10 percent of the doctors usually had charges above the prevailing norms. So in implementing the program, Plans were asked to survey physicians in their area and to establish a schedule of prevailing fees. Doctors whose charges exceeded the schedule were advised that they would have to scale down their charges if they wanted to participate under Blue Shield Plans' reimbursement programs.

For example, one of the first Blue Shield Plans to implement the prevailing fees program was in Louisville, Kentucky. One of the Louisville Plan's largest accounts—Ford Motor Company and the UAW—was demanding paid-in-full (or "service") medical benefits from a Plan that had always in the past paid indemnity benefits. The local medical society had twice voted down service benefits for the Ford account, in 1963 and in 1964. The company and the union announced intentions to leave the Blue Shield Plan if their demands

were not met by mid-1965. Plan officials finally broke down the resistance of the medical society by showing physicians the prevailing fee schedules that had been worked out using data collected in a survey of Louisville area doctors. Specialist physicians in particular were reassured that their fees would not be lowered by those of general practitioners; the fees for the latter were calibrated separately. Also in 1964, Ford used similar leverage to force the issue of service benefits and usual and customary fees for workers at its Sheffield, Alabama, plant. Elsewhere, too, the usual and customary fee concept caught on quickly with other Blue Shield Plans.[14]

This, then, was as far as the Blue Plans had gone toward rationalizing their system of payment to physicians, and this rationalization was the pattern from which the principles of reimbursement under Medicare Part B were cut. The reasonable charges required by law were defined administratively as those that did not exceed the doctors' own customary charges or the prevailing charges for a given service in their communities. Carriers were responsible for determining what the limits were, and they were not to pay charges for Medicare beneficiaries that exceeded what the carriers paid to doctors for the patients they themselves insured.

The prevailing fees program was a new wrinkle for even the Blue Shield Plans, however, and it is not hard to imagine that the new system was difficult to implement, resented by many doctors, and vulnerable to abuse. Once again, the ambiguous status of hospital-based specialists—radiologists, pathologists, anesthesiologists, and physical therapists—led to tedious arguments, hairsplitting, and in the end, costly concessions by federal officials. But a boycott threatened by militant conservatives in the AMA failed to materialize; and the terms established were so generous that within a few years the medical profession's rejectionist stance toward prepayment by government was only a memory.

## The Jolly Blue Giant

The Medicare and Medicaid programs were the stuff oxymorons are made of. Their considerable impact on health care policy and medical economics quickly became problematic. But the benefits conferred on millions of aged and needy people by Title 18 (Medicare) and Title 19 (Medicaid) constituted a humanitarian triumph of major proportions. Most of the 19 million potential beneficiaries of Medicare had been located and furnished with their red, white, and blue ID card by M-Day, July 1, 1966. At one point, the Somerses reported, forms were being mailed out by the SSA "at the astounding rate of two million a week." In the first year of the program, about 5 million people were admitted to U.S. hospitals as Medicare patients. These comprised 20 percent more admissions for persons aged sixty-five and older than in a comparable previous period. In that same first year, 25 million claims for physicians' services were filed, more than 125,000 admissions to extended care facilities were recorded, and more than 250,000 orders for home health services were issued.

BCBSA00292806

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 166 of 182

As the first year neared an end, hospital admissions under the program were approaching a rate of one thousand per hour, around the clock, and physicians' visits were occurring at a rate of about three thousand per hour. Some patients—a number impossible to determine—would have received services with or without the new program. But the aggregate increase in services delivered after the launch of Medicare makes it obvious that many would otherwise have received little or no care, and that many others would have been cared for at considerable sacrifice and hardship to themselves and their families.[15]

Behind every one of those individual admissions and doctor visits lay a trail of paperwork and electronic data processing that led from the patient to the provider to the intermediary to the federal government, and back again. The entire system had gone on-line overnight, and the effort involved in setting it up and making it work as smoothly as it did was prodigious. "Administrative arrangements for the opening of the program were in order at all levels, far beyond most people's expectations," the Somerses concluded. It was a moment of pride for the Blues. "Not that everything went totally well, but my God, it was impressive!" McNerney declared later.[16]

The SSA kept the master file, the eligibility records of every enrollee; 15 million people were already in SSA's computers as Social Security and Railroad Retirement Board beneficiaries. The other 4 million eligibles had to be tracked down before M-Day with the help of local government and private agencies. Every beneficiary under Medicare Part A had to be asked if he or she wanted to participate in the voluntary Medicare Part B program (about 93% of first-year enrollees did).[17] Other details were listed by the Somerses:

> Procedures had to be formulated and tested for review, authorization, and auditing of reimbursement from providers and individual patients. The intermediaries had to be selected, contracts signed, budgets negotiated, and banking and financial arrangements agreed to. State agency contracts, budgets, and staffing arrangements also had to be completed. Numerous forms and record-keeping devices had to be designed, negotiated with appropriate organizations, and distributed to hospitals, physicians, laboratories, and intermediaries.
>
> Some 17 different detailed manuals of standards, rules and procedures were developed and distributed [and information for beneficiaries translated into twenty-two languages for different ethnic groups in the United States].[18]

Under Medicare Part A, providers furnished the local intermediary with a copy of each patient's admission form, which then was relayed via the BCA's eighteen-thousand-mile telecommunications network to the prime contractor's headquarters in Chicago, and from there through a new system of high-speed transmission lines to the SSA's record center in Baltimore, where SSA confirmed the patient's eligibility and computed his or her benefits on the basis of applicable deductibles, co-insurance, and previous payments. In the first ten months, 92 percent of the eligibility inquiries were turned around in Baltimore and sent back to the intermediary within twenty-four hours, and

BCBSA00292807

three-fourths of the remainder were processed within five days. The hospitals—typically hamstrung by their scanty cash flow—received bulk payments at least once a month. The system for Medicare Part B claims worked differently. The physician could choose either to bill Medicare directly or to bill the patients and leave it to them to seek reimbursement from the program.[19]

Whether by providence, intuition, political savvy, or plain luck, the Blue Plans and the two Associations (NABSP and BCA) embarked on this mammoth administrative undertaking with a healthy head start. The private telecommunications system that the BCA had set up for the Inter-Plan Service Benefits Bank in 1957 had been expanded substantially and upgraded for the Federal Employees Health Benefits Program (FEHBP). It was now readily adaptable for the data processing needs of Medicare. The fourteen circuits that had connected seventy-six Blue Cross and seventy-two Blue Shield Plans to Chicago were now enlarged to forty low-speed circuits and two high-speed lines tied into BCA's new Univac 418 computer and the SSA's computers in Baltimore. "We invested quite a lot of money in some new equipment," BCA vice president Tony Singsen commented. "If Medicare had never happened we would have been in way over our heads. But it did happen, so when July 1, 1966 came along and Medicare started we had a system in place to handle it."[20]

The debut of Medicare's companion program was less spectacular. In the long run, the new program for poor and medically indigent people would have as great an impact on the cost of care and the shape of the nation's health system as Medicare had. But several factors combined to render the Title 19 program an obvious poor relation to the more celebrated companion measures for the elderly. Because details of the program varied greatly from state to state, Medicaid's fundamental character was difficult to grasp. It was lacking in focus in the national media, in the public's understanding, and to some extent in the minds of those in Congress and the executive branch. The program's constituents lacked political clout. Their stepchild status was attested to in strong terms by Rashi Fein, a university professor who advised the Johnson administration on health care. Fein later wrote that he had, in the middle 1960s, "observed firsthand the enormous disparity in federal interest, commitment, planning, monitoring, and administrative resources devoted to the two programs [Medicare and Medicaid], and this despite the fact in many important respects Medicaid was a much more complex program needing more, rather than less, attention."[21]

Title 19 required only that the program be administered "efficiently," remaining silent on the question of intermediaries and carriers. In states such as Texas, Colorado, and California, which already were contracting with Blue Cross and Blue Shield Plans to administer their Kerr-Mills program, the natural tendency was to continue such arrangements. Otherwise, participation by the Blue Plans as intermediaries in the Medicaid program was as uneven—and, in some cases, as desultory—as state and federal efforts under the Title 19 program as a whole. McNerney and other leaders urged the Blue Plans to

get involved in Title 19. It had the potential of funding physician and hospital services that had been provided free in the past, and thus of invigorating and broadening the nation's delivery system as a whole. But involvement in Medicaid meant a daunting administrative burden and potentially messy entanglements in government and politics, a set of circumstances that fostered inertia in some Plans.

When fully exploited, it was a formidable and expensive program. In California, for example, with a Democratic majority in the state legislature and liberal Democrat Edmund "Pat" Brown in the governor's mansion, there was strong political support for a generous plan that would cover both welfare recipients and the medically indigent—those who would be brought below the poverty line by their medical expenses. Providers liked Title 19, too. Howard Hassard of California recalled:

> It was likewise attractive to both physicians and hospitals because what it meant was that the care of these people who had been the burden of the county hospitals—where physicians worked for free—was being transferred to the community at large. . . . For the first time, private hospitals were going to be able to have these patients, and physicians were going to get paid for their services.[22]

The net result, known as Medi-Cal, was "the largest piece of social legislation ever passed" in California, according to Dr. Carl Anderson, chairman of the state's medical society.[23] With about 1.25 million eligible beneficiaries, the program had an "enormous" impact on the Blues, Anderson said. For example, California Physicians' Service (CPS) had to hire and train four hundred new workers and by October 1966 was receiving sixty thousand claims a day under Medi-Cal. With a large population of the retired elderly, the state had seven-digit Medicare enrollment as well. The number of Californians served statewide by the two Blue Cross Plans (in the northern and southern halves of the state) increased from 2.6 million before Medicare and Medicaid to 5.4 million in 1967. Total annual payments to hospitals and doctors rose from $200 million before the federal programs to more than $800 million in 1967.[24]

Here, too, was a foretaste of the public controversy and confusion that would gather around the Blue Plans as a result of their involvement in such a costly, taxpayer-financed program. "We are operating completely in the goldfish bowl," Tony Singsen had warned Blue Cross Plan executives at their April 1966 meeting.[25] In the fall of 1967, news reports beginning to appear in California claimed that twelve hundred doctors had received an average of $70,000 each from Medi-Cal in its first eighteen months of operation. The sources for the story had misread printout codes, however, and had identified clinics, dental and optometric chains, ambulance services, and drugstores as individual doctors. The twelve hundred doctors who earned the most from Medi-Cal in the first eighteen months actually received average payments of $14,000 during that period, and the average for all the state's doctors was $3,000.

BCBSA00292809

With the cooperation of the state medical society, the usual and customary fee program developed by Blue Shield Plans was doing a reasonably good job. But the public perception was that Medi-Cal was "simply a giveaway program for California doctors," as CPS chairman Dr. Richard Wilbur put it. Wilbur was the grandson of the California Blue Shield Plan's distinguished first president, Ray Lyman Wilbur, and a future AMA president himself. But he had his hands full defending the honesty of the average doctor during most of the next decade. Wilbur's efforts went nowhere with Ronald Reagan, the photogenic new conservative who became California's governor in 1967. Undaunted by adverse court decisions, Reagan lashed out at the state's Medicaid program at every opportunity during his eight-year tenure.[26]

The reluctance of many states to get involved in Medicaid may be explained by the political firestorms some of the more liberal programs provoked. In New York, for example, the Democratic and Republican parties—the latter under the liberal leadership of Governor Nelson Rockefeller—found themselves in a rivalry over who would be more generous with the program. The result was that "in many of the smaller towns and rural areas the established income eligibility limits under Medicaid were actually higher than most workers with families were earning."[27] The resulting protest from working people was so strong that one state senator who had helped manage passage of the law was afraid to return to his home district for Memorial Day in 1966. "The story was that there was a steady stream of people driving in front of his house blowing their horns and pointing menacing fingers," reported Joseph Boochever, a legal consultant to the Blue Shield Plans in New York state. The angry crowds were blue-collar workers who earned a little too much to be eligible, paid out-of-pocket premiums for their own health coverage, and received less comprehensive benefits than did Medicaid beneficiaries. The original income limits for Medicaid eligibility under the New York law was $7,700 for a family of six, which included an estimated 40–50 percent of the state's population. The irate workers also were paying the state and federal taxes that would underwrite the $2-billion-a-year program. Hastily devised amendments adding deductibles and other controls soon were enacted to pacify the electorate, and income eligibility limits were lowered in 1968. But the program remained an extremely costly and controversial one. In its first years, it brought several upstate New York counties to the brink of bankruptcy, because the state had the power to require a local matching contribution in addition to its own. An assertive New York welfare department rebuffed most of the overtures made by the state's seven Blue Plans in pursuit of intermediary roles, although the Plans did provide state officials with data, actuarial estimates, administrative services, and other technical resources.[28]

States that proceeded more cautiously had an easier time. Welfare officials in South Dakota, for example, took no steps toward implementing Title 19 until prompted by a liaison group representing the state's hospital and medical associations and the Blue Plans at the end of 1965. The Blues had been administering a Kerr-Mills program in the state and were able to bring forth

BCBSA00292810

data showing that, for the same amount of money the state was spending on Kerr-Mills, it could provide Medicaid coverage to welfare recipients, blind people, and the disabled, "and even possibly have a little money left over," Blue Cross Plan director Don Happe recounted. The welfare officials responded with a bill in the state legislature just three weeks later. "Title 19 has just been another step in the progression" that began with Kerr-Mills, Happe concluded.[29]

A similar experience was reported in Texas, also based on the good working relationship that hospital and medical association representatives and the Blues had developed with state officials under Kerr-Mills. "It was actually a mild transition from [Kerr-Mills] into Title 19," recalled Tom Beauchamp of the Texas Blue Shield Plan. Distrust between the public and private sectors was the biggest obstacle to making Medicaid work, Beauchamp cautioned his peers at the 1967 NABSP conference:

> I would say if you do not already have any kind of working relationship with your [state agency], take a good hard look at what kind of animal it is. It may come as a surprise that they are real flesh-and-blood, human folks. They are paying on a mortgage, same as you and me. . . . They have the same kind of interest in their department's doing a good job that you have in your Plan's doing a good job.[30]

Nevertheless, overall interest in Medicaid among the Plans was tepid. A frustrated Walter McNerney reported to the BCA in 1968 that the Blues were serving as intermediaries in only thirteen states. At that time, twelve states had no Title 19 program, twenty-five others were administering the program themselves, and commercial insurance companies were vying for the public business in several states where it was up for grabs. The states were asking for effective UR programs and other cost controls, which many of the Blue Plans still were not able to deliver. McNerney was dismayed by the Plans' collective lack of enthusiasm in pursuing a role in Medicaid:

> When it is government, it is dirty. Now this is absurd. . . . The people running [Medicare and Medicaid] are conservative. They invite participation. They have explicitly said that an intermediary can and should be used. . . . They are asking us how it should be done. And there is an opportunity here of ranking second to none, of really performing on something that is growing.

But many of the Plans, swamped by the enormous volume of new Medicare business, evidently were wary of biting off more than they could chew.[31]

When the dust settled and the nearly 20 million people now serviced by Blue Plans under the new programs had been added to 63 million regular subscribers and assorted federal employees and state and local welfare clients, the Blue Plans touched the lives of 82 million Americans, or 43 percent of the entire population. If an unduplicated count of additional Blue Shield Plan subscribers had been possible, the number would have been larger. "Social Se-

BCBSA00292811

curity referred to us as the 'jolly blue giant,'" said BCA vice president Doc Pearce. "I don't know who else can fill a pair of shoes that big."[32]

## After the Deluge

Stress and strain were inevitable, not only from the heavy workload but also from vestiges of the ambivalence with which staunch free-enterprisers had always viewed the new partnership with government. "There are many of our Plan presidents who have literally regretted the day we became involved with Medicare," commented Eugene Sibery, who was to join the BCA as an executive vice president in 1969. But even for those Plan leaders who had serious ideological misgivings about Medicare, accommodation was the rule. For example, Walter McBee—the courtly, silver-haired president of Blue Cross of Texas—was "unalterably opposed to the concept of Medicare, until after it became the law," according to McBee's subordinate Tom Beauchamp. "Then [his] attitude was: All right, it is the law. We lost that battle. Now, we can stand off and continue to spit at it or we can say, since this is going to be done . . . we want to get in on the action."[33]

The problem that seemed to concern the Plans' leaders the most was how to find enough people with sufficient brains and talent to staff their burgeoning organizations. The Blue Cross Plan in the retirement haven of Florida, to cite one example, increased its workforce from one hundred to five hundred in order to cope with the volume of claims by the elderly that had been generated under Medicare. High-level skills in both management and technology were in acute demand. Unemployment stood at 4 percent in 1966. The Vietnam War was claiming the services of many who would otherwise have been entering the civilian labor force. Rapid expansion in the health and computer science fields created fierce competition for available talent and made recruitment especially difficult. "We haven't got enough young minds at key spots to invent the future," McNerney warned in 1967.[34]

The intermediary contracts with government provided for reimbursement at cost only, with no gains or losses to accrue to the contractor. But the reimbursement formula was evenhanded enough to enable the Plans and the BCA "to spread our overhead and attract a lot of new people into the business who might not otherwise have been attracted," said Bernard R. Tresnowski, a future president of the Blue Cross and Blue Shield Association (BCBSA) who was recruited to the organization during this period. "Many people . . . came because of the opportunity presented by the government programs. I am one example of that."[35]

The effort to make Medicare work hurt the Blue Plans in their business in the private market. Reliability and efficiency—symbolized by the passport-like Blue Cross Plan ID card and the paid-in-full service benefit—had become their trademark. "It gets down to the fact that when you go to the hospital, bills are paid without a lot of nonsense," as McNerney put it. When 15 million Medicare beneficiaries were put on the Blues' new computer system

BCBSA00292812

160                    THE   BLUES

overnight, however, "we ruptured that situation [of uniformly smooth and ef-
ficient service] pretty badly in a lot of the larger Plans," McNerney confessed.
Complaints about the quality of service—the promptness of payments and of
responses to subscribers' questions and appeals—became more frequent. The
slippage in performance hurt the Plans' pride and their business, too. Tres-
nowski observed later:

> We lost some market share because we dedicated our resources to the govern-
> ment. . . . It had a profound effect on the private business. The demands of the
> Medicare program distracted us for a period of [from] five to eight years. As I
> said, we took our best talent and put it in the Medicare program. We concen-
> trated all our energies in that direction. And we suffered.[36]



William McNary of the Michi-
gan Plan (left) and Guy Spring
of Indiana review Medicare
documents in 1966. The federal
program's launch was an epic
success that required extraordi-
nary effort. But the administra-
tive burdens of the intermediary
role swamped some Plans, hurt-
ing their private business.
(BCBSA archives)

Administrative overload hit participating Blue Shield Plans particularly
hard. While the prevailing fee concept had shown some promise at the local
level, Medicare's "usual, customary, and reasonable" (UCR) fee reimburse-
ment program led to breakaway fee escalation by many doctors. Fearing that
Medicare officials were about to impose strict limits, doctors were tempted to
push fees up for all their patients so that determinations of what was usual and
customary would be generous. The SSA reacted with an almost frantic out-
pouring of new reporting and procedural requirements for Medicare Part B
carriers. "Regulations were changing faster than the weather," recalled David

Stewart, then president of the Blue Cross and Blue Shield Plans in Rochester, N.Y. "This UCR system, which could be escalated at will, was an incredible and inexcusable blunder," Stewart said. "It destroyed the controls . . . that had taken Blue Shield [Plans] a decade to construct."[37]

According to William Ryan, who was on the staff of the NABSP and later became its president, SSA sent out 320 bulletins promulgating new regulations during the first fifteen months of the program. According to Stewart, the Rochester Plans doubled their staff in the first year to keep up with the paperwork. For better or worse, the necessary computer technology to cope with SSA's demands was changing just as fast as the Medicare Part B administrative regulations. Keeping abreast of the changes taxed the ingenuity of the most sophisticated Plan managers. A number of Blue Shield Plans turned to outside computer systems specialists to handle their data processing needs. In Texas, the Blue Cross and Blue Shield Plan already had been contracting for technological services from computer pioneer Ross Perot. According to Ryan, several other Blue Shield Plans began contracting with Perot's Electronic Data Systems (EDS) and other firms in the late 1960s, stirring some fears that those Plans would lose control of their own business.[38] Indeed, Perot's fortune was built on the money he made servicing the historic Dallas Plan. The profits he earned were questioned—especially later when he ran for president in 1992—as exceeding Medicare's 3 percent administrative cost limit. But Perot's computers could process claims efficiently enough that the Plans contracting with him could meet their 3 percent limit and still pay him enough to make him rich.

In many cases, where local Blue Cross and Blue Shield Plans handled claims administration jointly, the Blue Shield Plans were dependent on their sister Blue Cross organizations for data processing. But Medicare often swamped the Blue Cross Plans, monopolizing the time and attention of their technicians. When this occurred, the companion Blue Shield Plan usually would suffer in its claims administration efficiency, in its private business market share, and in its ability to comply with SSA requirements. According to Stewart, over a period of years the strain often was sufficient to break up joint management arrangements between some Blue Cross and Blue Shield Plans, thus increasing the difficulties of coordinated action. "The task of administering Medicare resulted in an explosion of complexity for which the Plans were ill-prepared," Stewart declared.[39]

For a sense of how the advent of Medicare threw one emergency after another at the Blue Plans, consider the experience of Blue Cross and Blue Shield of Alabama, as described in the 1978 history by the Plan's executive vice president Joseph Vance. The Alabama Plan had spruced up seven thousand square feet of previously unused space in its Birmingham headquarters and had assigned nineteen staff members to process Medicare claims. These preparations—based on prior experience of processing claims for their private business and the federal employees program—proved woefully inadequate. Vance wrote:

> The inevitable result of this miscalculation was the accumulation of backlogs of both hospital and physician claims. . . . The small department struggled with the mountains of paper that accumulated in the first six months of the program, which began July 1966. It was difficult for management to grasp the significance of the understaffing.[40]

The miscalculation was corrected in January 1967, when the Alabama Plan's Medicare staff was increased to sixty. The adjustment was made only after a visit from a regional SSA official from Atlanta, who verified that a tripling of the number of employees was justified as a reimbursable operating cost. Although the outcome of the visit was welcome, it created a troublesome precedent. As prime contractor for Medicare Part A, the BCA was struggling earnestly against direct SSA intervention in the affairs of subcontracting Blue Cross Plans. The BCA's ability to enforce its prime contract responsibilities and manage the Medicare Part A program was usurped and undercut by SSA's meddling, McNerney often protested. By 1969, SSA would be sending on-site representatives to monitor the daily operations of carriers and intermediaries. "Some Plans considered the representatives intruders and spies," Vance wrote. Although some Plans appreciated the help they received from the representatives, the SSA presence could sometimes create a tense and delicate situation—one more knotty complication for the Blue Plans' Medicare administrators to worry about.[41]

Meanwhile, the Medicare program was also adding to strains that had begun to develop in the intermediaries' relations with their participating hospitals. Reimbursements were not keeping pace with hospital cost increases, the hospitals complained, and Medicare reimbursement guidelines were aggravating the problem. Limits on hospital plant depreciation payments by the Medicare program were a particularly sore spot, according to Vance. Hospital administrators claimed that the formula for computing per diem costs for Medicare patients required costly and time-consuming calculations. Administrators were upset also about SSA's plans to reduce their allowance for unoccupied beds, and about the lack of compensation for staff physicians who were required to devote time to UR committees.

The inflationary effects of Medicare's hospital reimbursement formula came in for heavy criticism as the 1960s neared their end. Federal officials were obliged to present as parsimonious an image as possible. Notwithstanding any defects in the way hospitals were reimbursed, however, their real costs of doing business, driven by outlays for labor and technology, tended to rise faster than the general inflation rate. Medicare's efforts at cost controls simply increased the pressure on the hospitals, which tried to recoup operating losses from private payers whenever possible.

Not all of the Blue Cross and Blue Shield Plans' problems in the late 1960s were attributable to Medicare. Nor were the federal programs regarded simplistically as an onerous burden imposed from outside. Alabama Plan presi-

BCBSA00292815

dent Herbert Singleton described Medicare as "an excellent opportunity . . . to perform a highly important service to the elderly of our State." But, as Vance put it, "It is fair to say that Medicare . . . affected literally every part of the operation." In Alabama and elsewhere, the new programs created extraordinary burdens, strained weak spots in the Plans' existing operational capabilities to the limit, and changed forever the way health care was paid for and delivered. Years later, Rochester's Dave Stewart reflected with wonder:

> Isn't it amazing that with all these Plans struggling with a whole new world for which their management was not particularly prepared, premiums changing, community rating disintegrating, costs out of sight, groups leaving or insisting on standard nationwide benefits, and Walter [McNerney] saying it was an incomparable opportunity—isn't it amazing the Plans survived and came back time and again? Maybe the religion part works.[42]

## The Public's Money

According to scholar Rashi Fein, "Congress feared the medical establishment" and went to great lengths to frame Medicare and Medicaid as programs that would minimize governmental intrusion and do as little as possible to disturb or reshape the private health care system.[43] Realists like BCA's Walter McNerney, however, dismissed this claim as disingenuous. By their size alone, the new programs were bound to have an impact. Their emphasis on comprehensive benefits, including ambulatory and nursing home care, and their reimbursement formulas, which encouraged hospital growth, were hardly neutral in their effects on the system. Also, the landmark legislation of 1965 created planning mechanisms and utilization controls to contain costs that had a clear potential for affecting the practice of medicine and the financing and administration of hospitals.

Debate about the impact of Medicare and Medicaid on the health care system intensified as huge expenditures of the public's money put the problem of rising costs increasingly in the national spotlight. In 1967, at the direction of President Johnson, HEW secretary John Gardner convened three national conferences on health care costs. Between 1950 and 1965, consumer spending on health had risen from $8.5 to $28.1 billion, conference participants were reminded. In the decade preceding the enactment of Medicare, health care costs had risen 42 percent, more than twice the 19 percent increase of the overall consumer price index. In its first year, the Medicare program paid about $3.9 billion in total benefits, or about 10 percent of the nation's health bill. Perhaps the most alarming statistics of all referred to 1966 alone: hospital charges rose 16.5 percent and physician fees rose 7.8 percent, both increases more than double what they had been in previous years. Similar increases were posted in Medicare's second year.[44]

Critics said the new programs had encouraged rising costs by making out a

BCBSA00292816

blank check to providers. Social Security commissioner Robert Ball, however, defended his department at one of the 1967 conferences, insisting that the government should not be blamed:

> The approach taken in the development of the Medicare program was essentially to apply the Blue Cross approach to the hospital insurance part, the commercial indemnity insurance approach to the medical insurance part and then to add provisions aimed at the promotion of quality, the control of costs and the prevention of overutilization. . . . It follows that the problems of cost for Medicare are in large part the problems of insurers in the private sector.[45]

To a significant degree, the leaders of the Blue Plans—both as Medicare intermediaries and carriers and as the largest health insurers in the private market—accepted the responsibility that Ball laid at their door. Because of the Plans' historical commitment to service benefits, for example, their leaders could not quibble about Medicare's success in setting new standards for comprehensiveness. "In many instances the Medicare program as it stands today offers benefits superior to programs held by some active employees. Such a situation will not last long, as unions and management, through collective bargaining, will bring pressure to eliminate these differences," said California Physicians' Service president Thomas C. Paton in 1966. The demand for coverage of outpatient and extended care, drugs, ambulance service, dental care, home health, mental health services, and private duty nursing all contributed mightily to increased health spending from 1966 onward. Medicare was the benchmark, as Paton put it, but in the long run it was the way the private market responded to the new standard that accounted for the greater part of the additional spending on more comprehensive benefits. The trend toward greater comprehensiveness also sharply increased the pressure for greater coordination between Blue Cross and Blue Shield Plans, without which a smooth blending of inpatient and outpatient care was impossible.[46]

Another inflationary factor associated with Medicare and Medicaid was rooted in federal officials' decision to model the new programs on the private sector's way of doing business. The dangers of reimbursing hospitals at cost, or cost-plus, had been noted periodically in a variety of contexts. The massive University of Michigan study of hospital costs, conducted under McNerney's direction, warned of the potential for abuse. Pennsylvania insurance commissioner Francis Smith and other state regulators also had raised questions about the practice. Furthermore, Blue Plans often drove hard bargains with hospitals about reimbursable expenses. But the Plans generally recognized the hospitals' fundamental need for periodic upgrading and acquiesced to reimbursement at cost-plus as a way of making this possible. Following suit—and again not wanting to meddle in established practices—the federal government adopted the private sector's cost-based approach to reimbursement.

Latent problems with this method immediately fell under increased scrutiny when public funds were involved. Obsolete, inefficient, and under-

BCBSA00292817

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 177 of 182

utilized facilities would be subsidized at the wasteful expense of taxpayer dollars. Beneficially, the recognition of these dangers had prompted companion legislation to Medicare and Medicaid that strengthened areawide planning of health services. But the impact of the planning measures was uneven and slow to take hold. The conspicuous increases in the average of physicians' UCR charges in the first two years of Medicare exacerbated public suspicion that doctors were using the program as a gravy train.

The Blue Plans—under perennial pressure in the marketplace, especially from large companies and from some state insurance regulators—had by now been grappling with the problem of rising costs for more than two decades; and they had encountered intractable difficulties. The advance of medical science indisputably justified much of the long-term increase in the cost of care. Traditionally underpaid hospital workers fully deserved the pay increases they were demanding. More problematic was the fact that the mechanism of group insurance coverage and the absence of competitive pricing among providers had insulated the health economy from disciplines normally imposed by a free market. In a similar vein, the crucial decisions that determined the cost of care—those governing hospitalization, diagnosis, and treatment—were entirely in the hands of physicians, who had few (if any) incentives to economize. At the 1967 HEW conference on costs, for example, Douglas Colman noted that labor cost increases had been a noticeable factor in rising hospital costs in New York City but were still not his dominant worry:

> Almost all medical care costs are generated either by a professional decision or by professional acquiescence with a patient's demand. . . . At the root of the medical care cost problem is the fact that most of these decisions are made outside of any organizational framework which holds the physician accountable for or even makes him aware, in any orderly fashion, of the economic consequences of the totality of these individual decisions.[47]

Nevertheless, commercial insurers and the Blue Plans had developed an array of approaches to cost control. And it was to these private sector models that Congress, HEW, and SSA turned when they structured the initial system of built-in cost controls for Medicare and Medicaid. However, questions about the effectiveness of these measures were difficult to answer because their impact usually could not be measured precisely. Research suggested, for example, that under some circumstances deductibles and co-insurance had little or no effect on how often people utilized covered services. In other cases, they led to the unwanted effect of underutilization.[48] Limiting benefits was another obvious way to control costs. But consumers were increasingly expressing a strong preference for the convenience and security of comprehensive benefits, even if these turned out to be more expensive than some of the alternatives. Congress and HEW had wrestled with the co-pay and benefit data provided by private insurers and the Blues before coming up with the formulas for Medicare Parts A and B. The states did likewise for Medicaid,

BCBSA00292818

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 178 of 182

and they added areawide planning, accreditation, and certification procedures governing providers as further checks on the efficiency and effectiveness of the programs.

Additional mechanisms were available to them within this broad framework. Claims administration—a traditional insurance function—vouchsafed the eligibility of the patient for services rendered. Re-certification, which had developed into a regular feature of Blue Plans' cost watching and was required by thirty-one Plans prior to Medicare, called for a doctor's review of the medical necessity of a prolonged hospital stay, in most cases within two or three weeks of a patient's admission. The Blues traditionally had audited providers in connection with cost-based reimbursement, and HEW audited Medicare intermediaries as well and set limits on their overhead, or cost of administration.

The most controversial and difficult of the controls written into the new program was utilization review. It required that each hospital and extended care facility set up a panel, including at least two physicians, to review claims and identify and investigate irregularities. Doctors who frequently hospitalized patients for procedures that most other doctors performed on an outpatient basis, for example, could be called up before UR committees and reined in. Similarly, under the prevailing fee rules of Medicare Part B, doctors whose fees were seriously out of line with their peers could lose their eligibility to receive federal reimbursement or be required to refund overpayments. The intermediaries could check the hospitals' work by using statistical data to look for anomalous practices. State health agencies, however, retained primary responsibility for certifying the adequacy and effectiveness of the hospitals' UR committees.[49]

Physicians strongly resisted being second-guessed by review panels, and implementation of effective UR programs proved as difficult under Medicare as it had been for the Blue Plans before 1966. In recognition of the potential difficulties, the program's administrative rules were "highly flexible regarding the particular plan or type of procedure. The approach is educational and promotional, rather than legalistic or authoritarian," the Somerses wrote. SSA's administrative rules noted that "intermediaries will be relied upon heavily" to implement UR. Given the growing public scrutiny of costs and the lackluster performance of some Plans in fostering effective UR programs, this responsibility was sometimes agonizing. "We are constantly presented with the most rigorous tests of performance" by HEW, SSA, the federal Government Accounting Office (GAO), and state agencies, Bernard Tresnowski said in a speech at the Blue Cross Association's annual meeting in 1968. Utilization review, he went on, "is the area of greatest challenge. . . . The Congress has placed a lot of weight on UR."[50]

Under the pressure of public and congressional opinion, federal officials gradually sought to take greater control of the Medicare program. In 1967, for example, the Blues' old friend and critic, Walter Reuther of the UAW, told the House Ways and Means Committee that SSA ought to take over the ad-

BCBSA00292819

ministration of Medicare from the intermediaries. Adequate accountability was impossible if private agencies were administering public funds, Reuther argued. With a few years' experience under its belt, the SSA began to shed its diffidence about laying hands on the private health care system. McNerney said later:

> You could guess what would happen. . . . As they became increasingly informed, they felt they should have more and more to say over the program, that the intermediary role should be lessened. . . . In recent years we even hear: "Thank you so much for helping us get this started, but now that we have got it established in Washington and in regional offices around the country, outside of a few inconveniences, we can handle it."[51]

Still concerned about being able to control matters for which they would be held accountable, the Blue Plans struggled to hold onto their power to interpret policies affecting benefits, reimbursement, controls, and other features of the program. "They keep trying to narrow down our freedom of operation and we keep trying to preserve it," BCA vice president Doc Pearce said later. As Bernard Tresnowski put it, "a tug of war took place. It went on for a period of about two years, I would say from about 1967 to 1969, the time it took the government to staff up and understand their responsibilities."[52] In 1969, for example, the SSA hit the intermediaries with a series of demands designed to tighten reimbursement procedures for physicians. The Blue Plans and private carriers were sent computer data from SSA identifying those doctors who were receiving the largest reimbursement payments. Agency officials also "issued stricter standards governing the use of physical therapy, increased their investigations of fraud allegations . . . and began to submit apparently questionable practices to medical societies for review." The combined effect of these measures during the 1969–1970 fiscal year was to reduce or deny 40 percent of the physician bills submitted, paring the net reimbursement to 90 percent of the total claims submitted.[53]

The belt-tightening had some painful consequences for patients. For example, another 1969 edict from SSA laid down strict new rules for administering reimbursement to extended care facilities (ECFs). From the outset, extended care had been one of the fuzziest areas in the Medicare program. The nursing home industry itself was in a fledgling condition. It had no national accreditation program or other system of standards until the creation of certification criteria under Medicare. Extended care was a new type of benefit that the intermediaries were unfamiliar with. And there was a fine line between covered and uncovered care under Title 18. Even the term "extended care" (roughly synonymous with "skilled nursing care") was new. It denoted a distinction under Medicare that excluded coverage of stays in merely "custodial" or "domiciliary" nursing homes. The latter offered housekeeping, dietary, social, recreational, and minor nursing and rehabilitative services and were essentially an alternative for older persons whose families were unwilling or unable to take

BCBSA00292820

Case 2:13-cv-20000-RDP   Document 1353-7   Filed 07/17/17   Page 180 of 182

them in. Congress had not assumed the burden for this type of care.

The Medicare program, however, had taken responsibility for covering the long recuperative and rehabilitative institutionalization in ECFs that often was medically necessary for older persons recovering from serious illness or surgery. A skilled nursing facility could provide such care at lower expense than a hospital. The intent of the Medicare legislation was to reduce overall program costs by covering extended care and thus avoiding long and inappropriate hospital stays. Here lay the logic behind the provision that such convalescent care would be covered only after a hospital stay of at least three days—a wrinkle in Title 18 that was itself sometimes criticized as inflationary. Doctors' care in extended care facilities was covered under Medicare Part B.[54]

Because of the blurred boundary between skilled and custodial care, however, in the first few years reimbursement was paid for many cases that SSA eventually decided did not meet the intent of the law, and the cost of the ECF component of Title 18 rose considerably higher than the Medicare trust fund could afford. After SSA promulgated new level-of-care guidelines, early in 1969, "the number of claims approved by the intermediaries for payment of care in ECFs declined by 12 percent in 1969 and by 38 percent in 1970." Doctors who had seen similar claims approved in previous years were confused. Patients whose claims were denied retroactively were often financially crushed and were always enraged. ECFs began turning patients away because "retroactive denial often meant unpaid bills." At the behest of SSA, the intermediaries waged an educational campaign with patients and the ECFs in 1969 and 1970, urging them to familiarize themselves with covered services before admission: "The problem of retroactive denials cannot be downplayed," BCA vice president Tony Singsen admitted later.[55]

By this time, however, it was becoming apparent that programmatic cost controls, although a sine qua non for the integrity of both public and private financing systems, could not alone counteract the effects of larger factors fueling cost increases. These factors—the advance of technology, the aging of the population, market demand for comprehensive benefits, and political pressure for universal access—simply dwarfed whatever savings that controls could achieve. The sense of alarm about Medicare and Medicaid costs was compounded by increased federal spending on other health programs for medical research and education, hospital construction (under the Hill-Burton Act), and a plethora of public health programs.

In mid-1969, newly elected president Richard M. Nixon announced that "a massive crisis" faced the nation's health programs. Nixon warned of "a crippling inflation in medical costs causing vast increases in government health expenditures for little return, raising private health insurance premiums, and reducing the purchasing power of the health dollar of our citizens." To make matters worse, a flood of social programs—their funding sapped by the Vietnam War—had overwhelmed HEW. Even before Nixon's election, according to McNerney, outgoing HEW secretary John Gardner acknowledged "the crisis of organization in regard to almost every domestic program."[56]

BCBSA00292821

The success of Medicare in relieving the elderly of the expense of most of their acute care needs gave the program a degree of shelter in the gathering storm. But Medicaid enjoyed no such protection. Six months after taking office, Nixon ordered an investigation of the Title 19 program from Gardner's successor, Robert Finch. The new HEW secretary appointed McNerney to chair a twenty-seven-member blue-ribbon task force, which made front-page headlines in June 1970 with its unsparing report on Medicaid's deficiencies and its call for sweeping changes in the nation's entire health services system.

By this time, a kaleidoscopic variety of Medicaid programs had been established in fifty-two jurisdictions, including forty-eight states (Arizona and Alaska had not opted in), the District of Columbia, Puerto Rico, Guam, and the Virgin Islands. "The promise of Medicaid that some care, at least, would be available to all who needed it has vanished into the obscurity of State determinations of eligibility and the limitations of State resources and priorities," the report's introduction said. Robert and Rosemary Stevens wrote, "Only about one-third of the 30 to 40 million indigent and medically indigent who could potentially be covered . . . will, in fact, receive services," and yet the program had exceeded estimates of what it would cost to serve the entire eligible population. From 1968 to 1970, for example, federal spending on Medicaid jumped 57 percent, from $3.5 to $5.5 billion, while the number of people enrolled had increased only 19 percent, from 8.6 to 10.2 million.[57]

McNerney, a leading spokesman for the private sector during the negotiations over Medicare and Medicaid, had by now entirely abandoned the notion that if the federal government would help, the private health care system could meet the nation's needs without any fundamental restructuring of the system. According to McNerney, the boldness of the report's conclusions made Finch noticeably uncomfortable, even though the group's members held eminently respectable credentials, hailing from the corporate establishment as well as many of the nation's most prestigious hospitals, universities, foundations, and public agencies. Their conclusions, however, were radical, as this excerpt from the report demonstrates:

> The Task Force is strongly convinced that the current health system has serious organizational, financing, productivity and access problems and that bolder moves than have characterized the past few years are needed to achieve measurable improvement. Appreciable investment of funds will be needed; but, importantly, significant changes in our delivery system are required.[58]

Planning, preventive care, checks on provider self-interest, the encouragement of group practice, and the empowerment of consumers were among the measures touched upon in the report. Despite its widely advertised state of disarray, HEW was identified as the appropriate agency to manage reforms. Task force members stated their conclusion in these terms:

> The Task Force believes that the day is past when doctors and hospital administrators and trustees and their associates may rely only on their own judgments of

BCBSA00292822

> how they can best distribute all the skills and resources at their disposal. . . . The resources today in substantial part are public or community resources, not excluding physicians trained largely at public expense; and their allocation and conditions of use are thus a public concern.[59]

Notwithstanding the task force's call for leadership from HEW, McNerney clearly hoped the Blue Plans would rouse themselves to take leadership in the effort to reshape the health care delivery system. At a minimum, he told his colleagues, they would need to get involved in this effort or risk extinction. "We should be visualizing ourselves as an innovative force in the total delivery system. In fact, at times we seem to be backsliding," he warned bluntly, describing himself at one point as a "hair shirt" for the Blue Cross system (adding puckishly, "which I assume was the reason you hired me").[60]

A number of Plans already were getting involved in expanding benefits and experimenting with innovative approaches to delivery, McNerney noted. "We have made prodigious efforts, you and we, to work according to our present system and I am sure that there has been no greater example of voluntarism and outright faith expressed so valiantly so long in any movement in any country in the world." But in 1969 alone, twenty-three Plans had been forced to seek rate increases, "some of them whoppers." Providers, McNerney said, had not been responsive enough to the need for change. "There is no question that the delivery system lacks thrust, it's ossified, that it's arthritic." The result, McNerney proclaimed, was that "a rumbling of subscriber discontent" was getting louder. "There is obviously a great pressure on the part of the public, the consumer, for reform."[61] The Blue Plans had managed to land on their feet after the administrative whirlwind of implementing Medicare, only to find that a flood of even more difficult challenges was still awaiting.

BCBSA00292823