

# The 1970s

## Accountability and Discontent

*Although many of us probably have thought from time to time that nothing could be more difficult than the decade we have just left behind, it appears that the future will be equally, if not more, difficult.*

—John Castellucci, 1970

HERBERT S. DENENBERG, appointed as Pennsylvania's insurance commissioner on the recommendation of his friend Ralph Nader, had been in office only a few weeks when Blue Cross of Greater Philadelphia (now known as Independence Blue Cross) filed an emergency request for a 20 percent rate increase in February 1971. Given a mandate by reformist Governor Milton Shapp to rein in runaway health care costs, Denenberg responded to the rate request with an unprecedented display of regulatory zeal. "While it may be unwarranted to blame Blue Cross entirely for increased hospital costs," he proclaimed, "it is clear that Blue Cross has not really tapped its potential for influencing hospitals to take a much harder look at the factors within their own operations which contribute to this intolerable escalation of health care costs."[1]

The idea that Blue Cross and Blue Shield Plans could use their market power to hold hospital and medical cost increases in check was not a new one. The Plans themselves had recognized and wielded this power, albeit gingerly, from their inception. Now Denenberg was challenging the Blue Cross Plan in Philadelphia to shed its diffidence and join him in confronting the city's hospitals as an adversarial representative of the consumer. Denenberg had put aside the unquestioning reverence for hospitals and doctors that the public and its elected and appointed representatives traditionally displayed. Could the Plans do the same?

BCBSA00292824

Under the leadership of E. A. van Steenwyk, Blue Cross of Greater Philadelphia had for many years enjoyed the reputation of being a friend of the consumer, able to drive a hard bargain with hospitals over reimbursement rates. Certainly neither the Plan nor the city's hospitals were immune from the inflationary pressures of the 1950s and 1960s. An extraordinary concentration of medical schools and teaching hospitals in the Philadelphia area added considerably to these pressures. According to the Blue Cross Plan's executive vice president Bruce Taylor, the city's six medical schools—and the more than twenty hospitals either controlled by or affiliated with the schools—added anywhere from $1 to $10 to the average daily cost of each patient's care. But most of the increases in per diem hospital costs between 1965 and 1970 were attributable to wage increases for traditionally underpaid hospital workers.[2]

Since the days of Denenberg's predecessor Francis Smith, Pennsylvania's Blue Plans had labored to restrain excessive utilization of hospital beds and services. With the help of the Medicare program, which took many elderly people off the rolls of regular subscribers, the Plans' utilization rates had held steady from 1965 to 1970 and had helped to restrain cost increases. But at the beginning of 1970 the state insurance commission had mandated an increase in Blue Cross of Greater Philadelphia's coverage of outpatient benefits and of maximum length of stay (from thirty to seventy days), with the result that utilization rates for that city's Plan shot up. The volume of claims paid out in 1970 ($156 million) represented a 56 percent increase over that of the preceding year. The state insurance commissioner granted a 25 percent rate increase in August 1970. But by the end of that year, the Philadelphia Plan's reserves ($22 million in 1966) had fallen to $4 million. Each month the Plan was paying out between $1 and $2 million more in claims than it was receiving in premiums. Had it not been for the mandated increase in benefits, Taylor insisted, the emergency rate request of February 1971 would not have been needed.[3]

Utilization rates had long been a concern, and Plans felt they had only limited authority to interfere in operational decisions made by doctors and hospitals. These decisions were the business of health professionals, not of the financers of care. Over time, however, data amassed in the process of claims administration pointed inescapably toward correctable anomalies in hospital and physician practices. Staff-to-patient ratios varied by as much as three or four to one, even among hospitals of similar size and character. Lengths of stay associated with specific diagnoses could also vary unaccountably. Although medicine is not an exact science, the logical inference to be drawn from these observations was that some hospital stays were either unnecessary or too long. But deeply held beliefs stood in the way of the corollary inference that mere actuaries might have something to tell doctors and hospitals about how to care for the sick. Length of stay was a vexing issue that the most enlightened and public-spirited Blue Plan leaders approached with great circumspection.

The University of Michigan study undertaken in the late 1950s under Wal-

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 3 of 138

ter McNerney's direction had used Blue Cross Plan claims data to outline treatment norms for eighteen different diagnoses. The McNerney study concluded that such data could be used to establish benchmarks of appropriate and effective practice. But Michigan doctors were adamantly opposed to any system for standardizing care, and the study's recommendations ended up largely ignored. A continuing consensus that the payers should keep their hands off provider practices was reflected in the disclaimers in the Medicare legislation of any intent on the part of Congress to reshape the health care delivery system.

The Medicare intermediaryship, however, substantially increased the Blues' presence in the marketplace. Relations between Plans and hospitals in some areas were strained by the implicit threat that the Plans would take advantage of their increased leverage to force miserly reimbursement rates on hospitals. Buyers of care—employers and unions—were becoming ever more intrigued by the same possibilities the hospitals feared, as were some of the nation's more aggressive state regulators. At the time the Denenberg episode erupted in Philadelphia, Blue Cross Plans were being challenged to help control costs by insurance commissions in Michigan, Virginia, North Dakota, New York, New Jersey, Missouri, and elsewhere.[4]

More clearly than some of his counterparts in other states, however, Denenberg saw an opportunity to use the tools of his office to muster public opinion. Soon after the rate request, he denounced the lack of consumer representation on the board of directors of the Philadelphia Blue Cross Plan and submitted a list of fifty-five questions to the five Blue Cross Plans in Pennsylvania, asking how they could possibly control costs. Denenberg advertised his campaign with a barrage of peppery press releases, and by March 17, 1971, when a public hearing began on the request, the media were out in force. Educational television gave gavel-to-gavel coverage to the first three days of the five-day hearing, including opening day testimony by Governor Shapp and Philadelphia mayor James Tate. Denenberg's quotable oratory and combative cross-examination of several of the 132 witnesses played prominently in daily newspaper and television news coverage.[5]

Taylor and other Blue Cross Plan officials responded by describing in detail the efforts they had already made. Pending at the time was the settlement of $5 million in hospital reimbursement claims that the Greater Philadelphia Plan had rejected because cost calculations were out of line with comparable billings from other hospitals in the Plan's service area. To discourage excessive stays, the Plan since 1958 had reimbursed hospitals at a daily rate that went down as the length of a patient's stay went up. The Plan required hospitals to conduct utilization review for those patients whom it covered as well as for those covered by Medicare. It had encouraged preadmission testing to reduce admissions for diagnostic testing only. It levied penalties on hospitals that added new facilities without approval from a planning agency, and it paid incentive bonuses to hospitals that brought down their average lengths of stay. But according to a Harvard University monograph on the Philadelphia

BCBSA00292826

hospital situation, "it was clear by the time of the hearing that any positive effects the incentive provisions might be having were being dwarfed by the magnitude of the countervailing forces pushing up hospital costs."[6]

In his testimony, Bruce Taylor summed up the Plan's frustrations, saying, "Our past experience makes it clear that hospitals simply won't agree to such changes on a voluntary basis." Any effort to impose compulsory changes on hospital practices would exceed the Plan's legal authority, Taylor argued. Instead, he proposed a list of legislative measures that stressed public control of hospital construction and expansion to prevent costly duplication and overcapacity.[7] Before the first day's testimony was over, however, Denenberg brusquely ordered Blue Cross of Greater Philadelphia to renegotiate its contract with its eighty participating hospitals.

Denenberg and Blue Cross of Greater Philadelphia eventually made a kind of peace. The Plan continued to negotiate for a new contract with the Philadelphia hospitals, while Denenberg softened and granted a $9.6 million rate increase (a fraction of the original request). His directives led to the closing of two deficit-financed hospitals in the Philadelphia area and the consolidation of the community's seventeen costly open-heart-surgery units into four units. In testimony before a Senate committee in 1972, Denenberg excoriated the commercial insurance industry for its high overhead costs and suggested that the public interest "might best be served by the federal government's granting a health insurance monopoly to Blue Cross and Blue Shield and other similar nonprofit insurers."[8] Taylor concluded that the effect of Denenberg's campaign was to strengthen the Plan's hand with the hospitals and to reduce some of the frustrations it experienced trying to bring down costs. He later said:

> I think there has been an influence for good, because [Denenberg] was able to add the force of regulatory authority and the marshalling of the press and public opinion to our own efforts to bring about improvements and changes in the delivery system. There is no question that the rate of acceleration of cost has greatly modified in the Philadelphia area, far more than in the rest of the nation.[9]

The double-edged relationship between Denenberg and the Pennsylvania Plans was a consequence of the Plans' position as brokers mediating between providers and public for the organized purchase of care. To the public the Plans were sellers, perceived as being responsible for oppressive cost increases. To providers they were buyers, who seemed sometimes to abuse their formidable market power with stingy reimbursement terms. When the battle over cost containment heated up during the 1970s, Blue Plans were caught in the cross fire. As the largest institution in the nation's health care financing system, the Plans were a laboratory for every conceivable containment strategy. But the discontent that festered when these strategies fell short was invariably laid at their door. "We're the biggest, we're the best, and we're the target,"

BCBSA00292827

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 5 of 138

McNerney warned Blue Cross organization executives in April 1971, a month after the Denenberg hearings in Philadelphia.[10]

Both the successes and the shortcomings of Medicare and Medicaid added to these pressures. Increasingly comprehensive coverage of services such as long-term and outpatient care under the new government programs stimulated demand for similar protection in the private insurance market. Differences among state-supported Medicaid programs provoked militant demands for better coverage of the poor in areas where Title 19 was underfunded. Even where the private market did not create effective demand for expanded benefits, state regulatory agencies now began to mandate minimum benefits with increasing frequency. And the expansion of coverage by government programs also created a need for more doctors, nurses, and technicians, forcing greatly increased expenditures on medical education. "We rolled into the '70s with all these complications and enormous financial growth," said Dave Stewart, then president of the Rochester, New York, Blue Cross Plan. "We were going bonkers."[11]

According to Stewart, the greatest preoccupation for most Plans was to keep up with the Medicare program. The initial expectation had been that the Plans would administer the new program much as they administered their traditional private book of business. The congressional framers of the legislation "wanted a minimum of change," Stewart said, and if minimum change had been the reality, the increased customer volume alone would not have been overwhelming. "Most of the Plans in the Northeast had a majority of those over age 65 enrolled" before Medicare started, Stewart noted. "We anticipated we would pick up 15,000 or 20,000 people by enrolling 100 percent of those 65 and older. Hell, we were growing that much every year anyhow." But a sense of crisis about rising costs made the Social Security Administration (SSA) nervous, and it reacted by cranking out a steady stream of new regulations. Compiling the data and filing the reports required by SSA multiplied the administrative tasks required for each claim. Just keeping track of the new regulations was a major headache, and developing computer software to organize the data wanted by the SSA became a major new subindustry within the Blue Cross and Blue Shield System. "This caught every Plan in the nation with their pants down," Stewart declared. "Regulations were changing faster than the weather."[12]

As the Philadelphia story demonstrates, financial pressures from the Plans' private business were also a pervasive concern. The proliferation of new hospital-based, technology-intensive forms of diagnosis and treatment continued to drive up hospital costs at a rate well ahead of general inflation. Expensive operations such as open heart surgery and coronary artery bypass grafts were becoming commonplace, for example. In many cases computerized axial tomography (CAT) scanning was replacing X-rays as the radiologists' diagnostic procedure of choice; the scanners cost between $350,000 and $700,000 to buy and $300,000 a year to operate. Obstetricians were opting with increasing frequency for Caesarean sections over vaginal delivery. Hip replacement,

BCBSA00292828

radiation therapy, fetal monitoring, intensive care for infants, and renal dialysis were just a few relatively new procedures in flourishing use. In industry, such technological innovations and high-volume applications usually led to reduced labor costs and lower prices. In health, new technologies tended to require new support personnel and higher skill levels. New techniques created new opportunities for medical intervention so that the volume of services rendered increased along with the cost.

Without frequent and substantial rate increases, runaway hospital reimbursement claims could quickly make a Plan insolvent. In 1969, for example, twenty-three Blue Cross Plans had requested approval of increases as high as 43 percent in New York, 28 percent in New Jersey, and 36 percent in Connecticut.[13] When rate requests were denied or reduced, financial pressures became acute. And the drumbeat of criticism from public officials gradually drained off an appreciable amount of the goodwill that Plans had traditionally enjoyed. As time went by, some state insurance officials saw an opportunity to bolster their careers through public hearings. While these proceedings often were conducted responsibly, more than a few turned into media circuses.

The Plans' commercial rivals were on the attack, too, now challenging the Blues on legal and political grounds as well as through price, benefit, and service competition. In 1968, the Travelers Insurance Company sued Blue Cross of Western Pennsylvania in federal district court, alleging that the Pittsburgh-based Plan used "boycott, coercion, and intimidation" to obtain discounted rates from Pittsburgh-area hospitals and thereby to undersell its competition. Plan president Howard Gindele speculated that the action was prompted by a successful Blue Cross Plan effort a few months earlier to win several accounts away from Travelers. After hearing testimony on behalf of the Pittsburgh Plan from Herbert Denenberg, among others, a federal judge ruled in favor of the Plan in 1972, a decision that was subsequently upheld by a federal appeals court and denied review by the U.S. Supreme Court. But legal challenges were to multiply in the years to come, testing every facet of the Blue Plans' unique status as nonprofit entities with large market shares in many areas, close ties to hospitals and doctors, and a special relationship to the federal government through their role as Medicare intermediaries.[14]

The Plans' tax-exempt status—which, like hospital discounts, gave them a pricing edge against commercial companies—also was challenged with increasing frequency. For-profit insurers tried to arouse the interest of state legislatures and insurance commissions in taxing the Blues. By the early 1970s, the commercial insurance industry did its best to undercut the Blue Plans' claim to special status by advertising their own efforts at controlling costs. The Blue Plans, for their part, could point to their low administrative costs and liberal enrollment policies for high-risk individuals and groups that the commercial companies would not insure. But for some state insurance commissions concerned about appearing partial to the Blue Plans, these arguments were sometimes not good enough. In 1969–1970 alone, Utah,

BCBSA00292829

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 7 of 138

Wyoming, and Alabama imposed premium taxes on the Blues.[15]

Some critics accused Plans of abusing their position as Medicare intermediaries to better their private business. According to this argument, since Plans often had to help hospitals meet Medicare's accounting specifications, they could

> influence the allocation of costs between private and public payers. . . . The more hospital overhead costs public payers absorb, the less Blue Cross has to pay for each of its subscribers. . . . The smaller the Blue Cross share, the lower its premiums and the greater its competitive advantage in the private insurance market. Thus Blue Cross Plans have an incentive to allow hospitals to shift costs from private to public patients.[16]

The intermediary role certainly increased the Plans' leverage in negotiations with hospitals over reimbursement rates. But this critique does not explain why a Blue Cross Plan would benefit more than other insurers if a hospital were to shift some of its private overhead costs onto Medicare. To be sure, the Plans could spread their own overhead as long as they stayed within the 3 percent administrative cost limit; but in view of their own history with cost-based reimbursement, and the bargaining for reimbursement "differentials" that they typically engaged in with the hospitals, the spreading of Medicare overhead, balanced against the real administrative burdens the program imposed, may or may not have added significantly to the Plans' pricing edge.

The burden of administering Medicare eroded the Plans' traditional capacity for providing prompt, trouble-free service to their customers. Rising costs, too, fueled increasing customer dissatisfaction, and the burgeoning consumer movement of the late 1960s and early 1970s made increasing demands for more public representation on Plan boards. By 1972, thirty-five Blue Cross Plans claimed consumer majorities on their boards. But that was not enough for some of the more combative voices of the consumer movement, who tended to view health care costs as an us-against-them issue.

One of the harshest assaults on the Blue Cross Plans came from an experimental legal program at the University of Pennsylvania called the Health Law Project. Funded by a $235,000 grant from the U.S. Office of Economic Opportunity, the group launched an investigation of Blue Cross Plans in 1971, which culminated three years later with the publication by Yale University Press of an unforgiving 820,000-word jeremiad entitled *Blue Cross: What Went Wrong?* The study, whose principal author was Sylvia A. Law, concluded that "examination of Blue Cross reveals not so much a system out of control as a system that is quite effectively designed to meet needs and interests that are not the needs and interest of those who use and pay for health services."[17]

The authors accused the Blue Cross Plans and the nation's hospitals of having pervasively self-serving policies and of remorselessly milking the public to enrich and aggrandize their own domains. The authors were equally hard

BCBSA00292830

on Congress, HEW, and most state government officials (Denenberg excluded) for acquiescing to what they saw as a conspiracy by the Blues against the consumer. No way out of the intractable conflict of interest—between patients on one side and payers and providers on the other—appeared on the book's horizons. *Blue Cross: What Went Wrong?* proposed complete consumer control of the health care system, building its case on excerpts taken from regulatory action, trade publications, government documents, and litigation involving Blue Plans. The evidence was woven together into an indictment with little room for acknowledgment that the existing system might have any virtues. A response entitled "What Went Wrong With 'Blue Cross: What Went Wrong?'" was prepared by BCA vice president Tony Singsen soon after publication of Law's book. Singsen charged the authors with selective reporting, factual and interpretive errors, self-contradictory statements, and misstatements about the fundamental workings of government and health care finance. The BCA eventually chose not to publish the rebuttal, however, to avoid calling further attention to Law's indictment.[18]

The Blues also were coming under attack in the nation's capital, where attitudes about the health care system had changed radically since the enactment of Medicare and Medicaid. In 1965, an old-fashioned sense of deference toward doctors and hospitals—combined with respect for their political clout—prompted Congress to promise a program of aid for the aged and needy that would keep hands strictly off the workings of the delivery system. By the end of the 1960s, the massive weight of cost overruns in Medicare and Medicaid and inflation throughout the health system had crushed the protective shell of esteem that sheltered the old system. "The doctors, hospitals, and insurance companies were now completely on the defensive, trying to hold back the tide of disaffection. . . . Medicine had overdrawn its credit," wrote Paul Starr.[19]

By 1971, forgetting that they once had trembled at the disapproval of the medical profession, Congress and HEW were eager to clip the providers' wings. Cost-based reimbursement was no longer viewed as the logical centerpiece of a trustworthy system. Now it was seen as a giveaway program for the hospitals. Usual and customary fees invited price-gouging by doctors, at the taxpayers' expense. Once regarded as reliable stewards of private health care funds, Blue Cross and Blue Shield organization representatives in Washington were now accused by prominent politicians of being undeserving of the trust placed in them as partners in the design of the Medicare program.[20]

Critics charged that allowing hospital trustees to dominate the board of directors of some Blue Cross Plans was like letting the fox guard the chickens. Michigan Senator Philip D. Hart pounded on the conflict-of-interest theme during three days of high-profile hearings in 1971: he alleged that the Blue Plans had been unable to control runaway hospital spending because Blue Cross boards were loaded with hospital representatives. A parade of witnesses before the Hart committee called for hospital people to be excluded from Blue Cross Plan boards. The hearings raised the issue of accountability with testimony about lavish spending by the Blue Cross Plan in Richmond,

BCBSA00292831

Virginia, whose officials admitted to having driven leased cars to a meeting in Georgia while billing the Plan for first-class airfares. More than $1 million in furnishings for the Richmond Plan's new $8 million headquarters were purchased from a company whose sales manager was on the Plan's board. And the Plan invested $200,000 in a data processing corporation created by eight hospitals with Blue Cross reimbursement contracts. Hart inveighed against the BCA for not enforcing tighter discipline among its Medicare subcontractors. A few months later, Senator Edward Kennedy (D.-Mass.) questioned McNerney during a Senate hearing on proposals for a national health insurance program:

> Kennedy: You have the greatest number of policyholders of any carrier in the business. We have a health care crisis in the country of enormous magnitude and I for one do not see how you and your organization can escape a major responsibility for our lack of controls of cost and quality. . . .
>
> McNerney: The rising costs situation in this country is . . . a problem we must all share. It has a lot to do with whether there is good planning or not, or whether there is good leadership or not. . . .
>
> Kennedy: There has been woefully little done by Blue Cross to hold these costs down or drive quality up. . . .
>
> McNerney: I think I can say, "Who has done better?"[21]

The weight of public scrutiny on the traditionally close relationship between hospitals and Blue Plans upset the delicate balance that had been struck between the BCA and the AHA. The BCA was created in 1948 essentially as a holding company for Health Services Inc., the mutual firm whose purpose was to market to national accounts. In 1956–1957, the BCA began to assume many of the other Plan support functions of the old Blue Cross Commission, which was still a part of the AHA. The Blue Cross Association proved its worth during this period—in conjunction with the NABSP—by helping Congress to craft the Federal Employees Health Benefits Program (FEHBP) and by winning a major piece of the FEHBP business for the Blue Plans.

Blue Cross Association leaders had long recognized the need to counterbalance the traditionally intimate relationship between the Plans and the hospitals with mechanisms that would assure consumers of arm's-length bargaining over reimbursement, and thus rates. BCA vice president Tony Singsen wrote in 1974:

> The question of whether Blue Cross Plans should, indeed, be affiliated with the AHA has been very controversial for 35 years. . . . The initial relationship in the '30s was traumatic, the composition of the [Blue Cross] Commission changed in the '40s because of it [to include more nonhospital representatives], the BCA itself was incorporated in the first place as part of the debate, the transfer of functions to BCA accomplished in the '50s was a result of the ferment.[22]

The stronger the BCA became, the less sense it made for the Blue Cross Commission to exist, and in 1960 the Commission was abolished. Not all the

Plans, however, were altogether comfortable being members of a national organization with unlimited power. The aegis of the AHA had created image problems for the Blue Cross Plans, but the hospital association had often served as a benevolent parent that could mediate disputes between the Plans and protect the weak from the strong. So at the time the Commission was abolished, a compromise was negotiated accordingly, which left ownership of the Blue Cross name and service marks with the AHA, along with the approval program under which Plans were required to meet certain standards—including nonprofit status, accessible enrollment practices, financial soundness, and low administrative costs—to use the name and marks (the Blue Shield name and marks were owned by NABSP). The compromise also put two BCA representatives on the AHA board and made three AHA officers directors of BCA. "The Plans didn't trust each other as much as [they trusted] the AHA," recalled George Heitler, then general counsel for BCA.[23]

Now, in the early 1970s, the board overlap and the AHA ownership of the Blue Cross names and marks and approval program grew as uncomfortable as other connections had become in the past. In March 1971, BCA directors approved a resolution calling for majority public representation on all Plan boards. In the same month, Walter McNerney told a hearing of a Senate health and welfare committee that twenty-two Plans representing more than half of all Blue Cross Plan enrollment already had such majorities. "There is quite a shift under way," McNerney commented, responding to a series of questions from Senator Kennedy.[24]

By this time, the logic of disengagement required nothing less than the severing of any remaining ties with the AHA. After a long series of negotiations, the two organizations agreed to an elimination of the board overlap and to transfer ownership of the names, marks, and approval program to BCA, effective in 1972. The AHA insignia was removed from the Blue Cross symbol and replaced with a stylized human figure modeled on a celebrated drawing by Leonardo da Vinci. As it turned out, this action ushered in a period of serious tensions between hospitals and Blue Cross Plans, tensions driven by an ever-escalating demand for stronger cost controls. "All one has to do is look to Massachusetts or look to Pennsylvania or look to several other areas of the country where hospitals are sullen, if not mutinous, with regard to the Blue Cross Plan," McNerney told another congressional committee in 1974, "and the public seems pleased."[25]

## Struggling with Costs

Late in the 1960s, McNerney brought before a plenary session of his organization a resolution that endorsed experimentation with the rediscovered notion of health maintenance organizations (HMOs). HMOs entailed prepaid group practice with comprehensive benefits and tight control on utilization. The buyer's payment to the HMO of a preset price for care rewarded

BCBSA00292833

providers for cost efficient care and punished them for waste and overuse. The prototype was the Kaiser-Permanente system, based in California, which was an outgrowth of Dr. Sidney Garfield's 1933 experiment caring for aqueduct workers in the desert outside Los Angeles. Traditionally, doctors had condemned prepaid group practice as commercialism. But by the early 1970s, HMOs were beginning to take hold in a myriad of variations. The Kaiser-Permanente group was flourishing and other prepaid group practice experiments were blooming from coast to coast.

McNerney's resolution passed by a scant six out of two thousand weighted votes (allotted to the Plans on the basis of enrollment). The medical community was scandalized. The vote "sent the AMA right up the wall," McNerney recalled, "and many of the Blue Shield Plans, too. [NABSP executive vice president John] Castellucci thought I had gone mad." The AMA House of Delegates soon voted to censure McNerney for the HMO resolution. Dr. Edward Annis, the orator who had outdueled John F. Kennedy in Madison Square Garden in 1962 and was now president of the AMA, further chastised McNerney while speaking on the same program as the BCA president at an AMA meeting. But after the tirade, McNerney recalled, many physicians in the audience approached him privately and apologized not only for Annis's bad manners but also for his misrepresentation of their point of view.[26]

Leaning heavily on outpatient and preventive care, the HMO militated against the unnecessary hospitalizations that had been the Achilles' heel of the Blue Plans. By rewarding efficiency, HMOs promised a market-based solution to the problem of cost, which might forestall an ominous drift toward increasing regulatory controls. As early as 1969, the Nixon administration had begun looking at HMOs as the centerpiece of its health reform package. Dr. Paul Ellwood, a Minnesota physician who was leading the renewed effort to promote HMOs, had attracted the attention of senior officials in the HEW and was helping them formulate legislation to foster the growth of this better mousetrap. "Now the world is beating a path to [Kaiser] Permanente's door," McNerney remarked in 1971.[27]

It was not simply McNerney's exhortations that prompted Plans to experiment with the Kaiser model. In some cases, consumers demanded it. In Rochester, New York, for example, a citizens' committee on health care costs issued a report in 1970 calling on the city's Blue Cross and Blue Shield Plans to come up with alternatives to their traditional coverage. By 1972, three HMOs had been created by the Rochester Plans.

Blue Cross of Massachusetts also was involved in the new wave of HMOs. In Boston, the Harvard Community Health Plan, when it was launched in 1970, contracted with the local Blue Cross Plan to market and underwrite ten thousand memberships. In the long run, the Harvard Plan was a success. The Blue Cross Plan's marketing effort was not. "The guys who had been selling Blue Cross and Blue Shield Plan coverage all their lives couldn't sell [the HMO]," according to McNerney. "They'd come to the point of sale . . . and

BCBSA00292834

the buyer saying, 'Hey, tell me about it.' They [the salesmen] didn't—[pursue] aggressively—because it was unfamiliar." Eventually, the marketing partnership was quietly abandoned.[28]

In 1975, McNerney reported that twenty-eight Plans had relationships with alternative delivery programs (in most cases, this expression then denoted some form of health maintenance organization). But the Plans in general were not having any better success than anyone else in fostering the rapid



During the 1970s, rising discontent with the nation's health care system put increasing pressure on Blue Plans to control costs. Walter J. McNerney, president of the Blue Cross Association from 1961 to 1978 (and later of the Blue Cross Association and Blue Shield Association, 1978 to 1981), was frequently on the hot seat before congressional committees during debate of legislative proposals for national health insurance. In the decade of the 1970s, McNerney's efforts to enforce performance standards of Plans met with resistance, but the Plans' experimentation with cost containment gradually gained momentum. (Fabian Bachrach)

development of high-caliber HMOs. "Everybody loves HMOs except for two groups," one commentator quipped a few years later. "The two groups are doctors and patients. Doctors don't want to practice that way, and patients don't know what you're talking about."[29]

McNerney later expressed frustration with the slow pace at which HMOs took off among the Plans. "It didn't catch on as fast as it should have. It was a perfect opportunity to beat the hell out of the competition had the Blues taken on HMOs in the early '70s," he reflected in a 1991 interview. But reorganizing the delivery system was no easy task. The HMO concept faced institutional inertia among the Plans and the hospitals, and straight hostility from doctors. The market itself was slow to respond, even after enactment of a program of federal subsidies in 1973. The federal HMO legislation authorized grants to help with start-up costs but set rigid eligibility standards requiring comprehensive benefits, open enrollment, and community rating. Because of

BCBSA00292835

the difficulty applicants had in qualifying, the program spent just $22.5 million of the $40 million it had been appropriated in fiscal years 1974 and 1975. Of 158 applicants funded in 1975, only 35 had developed fully operational HMOs by 1978.[30]

In the absence of any simple solution, experimentation with cost controls developed across a broad front during the 1970s. Ideas bounced back and forth between public and private sectors. A relatively new concept that received a good deal of attention was the idea of replacing retroactive cost-based hospital reimbursement with prospective payment systems, which would set hospital rates in advance. As an outgrowth of their activities in regulating Blue Plan and Medicaid reimbursement rates, many states began to assume authority for reviewing hospital rates as well. Hand in hand went increasing financial disclosure obligations for hospitals and other providers, as well as increased scrutiny and control of expenditures for new beds and equipment.

The idea of rate-setting—or prospective payment—had a history. It had been tested in the early 1960s in Indiana by that state's Blue Cross Plan and the Indiana Hospital Association. The agreement between the Plan and the hospital association called for the creation of a fifteen-member rate review committee made up of hospital administrators, doctors, and representatives of large consumer groups including Indiana University, General Motors, and labor unions. The committee was staffed and administered, however, by the Blue Cross Plan. According to a study conducted for the AHA in 1968, the program held cost increases in Indiana hospitals to 25 percent less than the national average between 1958 and 1968. A second study done in 1977 found that from 1968 to 1973, Indiana hospitals spent about $62 less per admission than did comparable hospitals in nearby states. The total saving for the six-year period was estimated at $278 million.[31]

Elsewhere, fourteen states had implemented some form of hospital rate or budget review by the late 1970s; and voluntary programs under the aegis of local Blue Cross Plans, local Blue Shield Plans, or state hospital associations were under way in a dozen others. But some rate review programs mandated by the states in the early 1970s led to bitter battles between hospitals and state agencies. A pioneering effort in New York—launched almost in desperation in the face of runaway inflation—imposed a strict hospital rate formula for Medicaid and Blue Cross Plan patients, which made scant allowance for legitimate differences in operating costs among hospitals of different sizes and characters. Rates were set on the basis of average lengths of stay, occupancy rates, and operating costs for groups of hospitals of comparable size and circumstances. Hospitals that spent more to provide services, kept patients longer, or had more empty beds than the average went in the hole for the excess.

When disputes between hospitals and state rate regulators broke out, Blue Plans inevitably were caught in the middle. The example of Rhode Island aptly illustrates how programs were forged in an overheated atmosphere of ploy and counterploy, as state officials, hospital leaders, and Plan people

BCBSA00292836

reacted to each other's strategies. The Rhode Island episode began in 1969 with the filing of a request for a 24 percent rate increase by the state's Blue Cross Plan. The Rhode Island director of business regulation concluded that cost-based reimbursement was to blame for rising costs and gave Blue Cross Plan and state hospital association leaders one year to come up with a new cost-cutting system. If they failed, the director would push for a formula system like that in New York.

In a pilot program, the state hospital association organized peer review panels—made up of hospital administrators and trustees—to scrutinize proposed budgets and recommend economies that had been overlooked. Blue Cross Plan officials reviewed the proposals and asked detailed questions but negotiated rates on the basis of bottom-line costs. Thus the hospitals made the ultimate decisions about line-item spending, and the Plan stayed out of the business of hospital management.

Blue Plan officials estimated that in the first fiscal year of the Rhode Island program (1971–1972) the state's hospitals saved about $5 million through rate negotiations. As the decade progressed the program was revised, stopped, restarted, and revised anew under a variety of pressures. Despite the uneven results, all concerned agreed that at worst the process was educational. The hospitals sharpened their cost-finding skills and learned a lot about cutting the fat out of their budgets. Trustees became more knowledgeable about the finances of the institutions they served. Blue Plan officials found out more about the problems of hospital budgeting. Hospital administrators became more aware of how difficult it was for a Plan to understand hospital budgets that were haphazardly developed and presented. And administrators' sense of their public accountability, which had long been insulated by the presence of the Blue Plans, now became more acute.[32]

Finally, in the same way that pressure from state regulators strengthened the Blue Plans' position in dealing with hospitals, prospective reimbursement contracts gave greater leverage to hospital administrators in dealing with their own medical staffs. Wanting the best of everything for their patients, doctors had become accustomed to providing it under the cost-based reimbursement system. When they asked administrators for funds to set up new clinical programs made possible by technological advances, the doctors were used to getting what they wanted. Citing experiences at hospitals in the New York City area after state-mandated controls governing Blue Cross Plans and Medicaid were implemented, New York City Blue Cross Plan vice president James Ingram pointed to a dramatic change in that pattern. In 1973, describing the reaction at many hospitals, Ingram said:

You wouldn't believe the shock . . . when it went into effect. Absolute disbelief! "You can't do this to me! You've got to pay me my cost!" . . . Do you know what we found out? At least in the New York area, the administrator of a hospital is not that hospital's chief executive officer. The administrator is a coordinator, and he is caught between the attending staff and department heads and us. After

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 15 of 138

three years, we are beginning to notice something: We have strengthened their hand. They can now go to the attending staff and say that some things can't be done because the Blue Cross or Medicaid rates won't cover them.

According to McNerney's 1975 annual report to the Plans, thirty-nine Plans had begun experimentation with prospective payment or other reimbursement systems that entailed incentives for efficient providers or penalties for those who wasted resources. "Simple cost or charge reimbursement has fallen into disrepute with payors and providers alike," he said. "We need desperately to find better ways of encouraging health administrators to manage while giving the carrier some predictability to rates."[33]

Meanwhile, progress in refining the science of utilization review (UR) also was agonizingly slow. The hospital panels mandated by Medicare in 1966 were widely regarded as ineffective. As McNerney put it in 1969, "The assumption . . . that introduction of Medicare review requirements would control such things as unnecessary hospital admissions, long or extended patient stays that were unjustified, and overutilization of diagnostic procedures has proven to be a pipedream." Part of the problem was that until the development of relatively sophisticated computer software, utilization review put many doctors in an impossible position. Hospital staff physicians had neither the time nor the proper perspective to construe and apply meaningful standards for admissions or recertification of extended stays at their own hospitals. "It is simply disgraceful to have doctors in a hospital doing claims administration, such as is suggested under Medicare, looking at long reams of paper, and worrying about use [utilization]," McNerney argued in 1971, two years after the program went into action.[34]

Change was under way, however. Both to satisfy the Medicare requirement and to strengthen their own capabilities in utilization review, many Blue Plans had been working to develop data processing programs that could establish valid norms and identify anomalies in utilization. By 1975, McNerney reported, twelve Blue Cross Plans were using a relatively sophisticated system that had been developed by the BCA. In 1967, efforts at utilization review had been made a standard of membership in the NABSP. By 1975, fourteen Blue Shield Plans had viable systems in place. The BCA was working with the NABSP to create a more advanced system for use by both Blue Cross and Blue Shield Plans. Every aspect of the health care system was examined for cost-saving opportunities. In 1974, renewed state planning and certificate-of-need programs were called for in federal health planning legislation to reduce some of the expenses generated by excess hospital capacity. By the following year, thirty-one Blue Plans were including compliance with planning programs as a condition of reimbursement for hospital capital expenditures. Leaders in business, government, and commercial insurance pushed for increased use of deductibles and co-payments to inhibit excessive consumer demand for health services, although this tactic generally was resisted by the Plans and excoriated by organized labor. Policy theorists also advocated

BCBSA00292838

expanding coverage of outpatient services to reduce expensive hospital admissions, which prompted some cautious experimentation.[35]

The net results of all these efforts were disappointing, however. The Nixon administration's wage and price controls in health services were lifted in April 1974. In the following year, hospital charges increased by 16 percent, physician fees went up 14 percent, while the consumer price index (CPI) as a whole rose only about 10 percent. By early 1975, hospital price increases were going up at twice the rate of the index. Whatever HEW, state agencies, the Blue Plans, hospitals, and doctors were doing about cost control, it was not enough. In 1973, the BCA board of governors passed a resolution urging action by all Plans to make the organization work more efficiently. The recommended areas of effort included utilization review, alternative delivery systems, area wide planning, and reimbursement reform. McNerney's 1975 report to Plan executives on the progress of the initiative was bittersweet. While some efforts had been encouraging, he declared, the Plans as a whole were not performing up to capacity: "In the life of every corporation, there is an essential function that tends to get abused. . . . For the Blue Cross organization, cost containment fills this bill."[36]

## Mirage

In the early 1970s, all the kaleidoscopic discontents and experiments brought on by the post-Medicare inflation surge temporarily coalesced as a single issue. In previous incarnations, the notion of a national health program had always appeared an impossible long shot. During almost every decade since before World War I, leftists, liberals, and labor had brought forth new proposals without ever coming close to success. But Medicare, Medicaid, and the cost crunch of the 1970s changed the order of the health care universe. Despite the success of the federal programs in broadening coverage, cost overruns in both Title 18 and Title 19—along with unevenness in Medicaid eligibility and benefits from state to state—triggered widespread concern about equity and the need for a more balanced and inclusive formula. Congress had learned its health ABCs and had shed much of its former timidity and deference in dealing with professionals from the health care field.

Moreover, the formidable alliance of business, the AMA, and the Republican party no longer stood shoulder to shoulder against renewed calls for a national health insurance (NHI) program. In a briefing paper for the House Ways and Means Committee, Chicago urbanologist Pierre de Vise noted that even such arch-capitalists as IBM's Thomas J. Watson had by now taken up the NHI cause. "Up to 1965, the National Association of Manufacturers, the U.S. Chamber of Commerce, and the Republican leadership were generally allies of the AMA," de Vise observed. "But concern over escalating costs . . . made cost containment the major new political strategy in health care, and the Federal Administration and the business community its principle propo-

BCBSA00292839

nents." As Paul Starr put it, "the socialized medicine of one era had become the corporate reform of the next."[37]

An evocative ballet of political positioning had begun in the late 1960s, primarily in response to burgeoning criticisms of Medicaid. In January 1969, a liberal coalition led by the UAW's Walter Reuther and Senator Edward Kennedy issued a call for a full-scale overhaul of the health care system. The coalition proposed compulsory coverage for all, comprehensive benefits, tax financing, and federal administration. Two weeks after the call was issued, Governor Nelson Rockefeller of New York—during a visit to the White House—outlined a proposal for mandatory purchase of coverage by employers. President Nixon's speech declaring a health care crisis came in July 1969, shortly after the Medicaid task force—to be chaired by McNerney—was named. According to participants, the task force became an ad hoc policy committee for the administration.[38] In 1970, the administration issued proposals for a Medicare Part C, to provide preventive care through encouragement of HMOs. The proposals also advocated a Family Health Insurance Plan, which would broaden and federalize Medicaid to complement the private insurance system.

Overtones of the debate over Medicare reverberated through the new discussion of NHI. Many of the questions were the same: what was the best mix of federal, state, and private financing and administration? Should a means test be involved? How big a burden should consumers bear through co-payments and deductibles? The Kennedy and Nixon proposals—constantly being revised—were just two of many offered during the early 1970s. But most of those proposals overlapped broadly in their encouragement of alternative delivery systems such as HMOs and other cost control measures. With the great compromise that led to Medicare and Medicaid fresh in lawmakers' memories, the prospects seemed good for forging a centrist consensus out of these common ingredients. Indeed, the biggest difference between the atmosphere of health care politics in the early 1960s and that of the early 1970s was that, in the former case, consummation remained uncertain until the very last minute. In contrast, during the early bargaining over NHI, the eventual enactment of major legislation was regarded widely as a foregone conclusion.

It is not surprising, then, that the leadership of the Blue Plans took NHI seriously and adopted assumptions and strategies that had proved serviceable during the Medicare debate. Three key tenets had emerged at that time. The first rule was to refrain from endorsing specific legislation. The idea was to free the Plans' representatives in Washington from having to make commitments that might encumber them as debate shifted or that might alienate potential allies who were identified with competing proposals.[39]

The next rule was to be available. Collectively, the Blue Plans in the early 1960s owned the largest body of data on health care finance in the country;

BCBSA00292840

they could also boast a data processing capability that was relatively advanced for its time. Also, among their leaders, managers, and technicians they possessed an inestimable store of skills and experience. They had an organizational network with strong local roots and a broad reach. Congress needed all the human, organizational, and informational resources it could find. So lawmakers were grateful when those resources were made available by the Blues. The legislators were more amenable to being influenced in their judgments and interpretations once a foundation of communication and cooperation had been established.

Finally, although not without a struggle, the Plans had resolved to set aside ideological biases and to make the best of whatever program Congress eventually saw fit to enact. Many of their leaders were dismayed to see government drive an entering wedge so deeply into the realm of the financing, regulating, and administering of health services. But the better part of valor, they ultimately agreed, was not to walk away, but to do their best to stay in position to guide government toward the best possible implementation.

These same themes permeated the discussion of NHI that went on within the BCA and the NABSP from 1971 to 1974. "It's highly likely that in 1972, or at the latest 1973, a national health insurance bill will be passed comprised of more than a modification of Medicaid and involving significant changes in the financing and delivery of health services," McNerney advised the BCA in April 1971. By August there were five major health insurance bills pending in Congress. A *New York Times* poll found that at least 57 senators and 243 representatives backed one or another of these bills. By the following spring, McNerney reported to the BCA, "we are on a course of preparation more sophisticated than '64–'65, based on concrete assumptions, targets and programs."[40]

The NABSP was slower to commit itself. In 1971 NABSP president John Castellucci described the organization's position as supporting efforts to aid "all Americans whose access to needed medical care is substantially impaired." However, Castellucci added, "we do not embrace one schematic method of delivery and financing as the ultimate solution." Castellucci's successor, Ned Parish, barely mentioned NHI in his report to the 1972 NABSP annual business meeting.[41]

In 1973, as a shakeout of competing legislative proposals continued in Washington, NABSP moved into closer alignment with the BCA on a readiness strategy. The two Associations held a joint meeting in May, at which McNerney reported that Kennedy and Wilbur Mills were at work on a compromise that might form the basis for a broadly supported consensus bill. The Nixon administration—despite its preoccupation with a widening investigation of the Watergate break-in—had held meetings on its legislative goals with the two Associations. The emphasis was on catastrophic coverage, greater protection for low and moderate income families, and maximum utilization of existing, private sector financing mechanisms.

In the spring of 1973, Parish outlined a Blue Shield organization strategy

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 19 of 138

based on preparing for NHI. The BCA and the NABSP were working together on an extensive NHI planning manual. A joint program to develop an ambitious data processing system—Long Range Systems Planning (LRSP)—was being geared for potential use in implementing a Nixon-style family health insurance plan and other potential NHI programs. The two Associations now agreed they would proceed together to prepare for NHI without making any legislative endorsements. "We think the wisdom of this has been borne out. If we had written a bill, we would have been the subject of more criticism," McNerney explained at the joint meeting in May 1973. Parish concurred. He told the joint gathering:

> It would have made us appear self-serving. It would have polarized us, and in the process would have diminished our effectiveness as consultants and our ability to prepare for, and respond to, the programs still to be formulated. . . . Our objective observer approach to NHI has been a successful operational strategy. . . . We will continue the effective cooperative effort between the two Associations.[42]

As anticipated, in 1974 a centrist consensus began to take shape around the basic features Congress wanted for NHI. On August 12, 1974, in his inaugural address, President Gerald Ford urged Congress, before it adjourned, to work out a compromise on NHI. Two days later, in a packed session of the House Ways and Means Committee, chairman Mills asked HEW secretary Caspar Weinberger if the administration would support a bill comprising mandatory insurance (to be financed by employers and employees), a catastrophic care program, and the federalization of Medicaid. Weinberger said yes, with the stipulation that only catastrophic care be financed by Social Security. According to AMA historian Frank Campion, Mills then went to lunch with Kennedy and was assured of the liberal senator's willingness to support the compromise on financing. As the rest of the week went by, however, the AMA lobbied hard with Mills and other committee members against any Social Security funding.

The denouement came the following week. A series of close votes on financing measures on August 20, 1974, revealed a stubborn lack of basic agreement. Mills was seething; he adjourned the session abruptly. The next morning, just half an hour into the day's agenda, he was again enraged and put an end to the debate. "I've never tried harder on anything in my life than to bring about a consensus on this bill," he said, throwing up his hands. "But we don't have it. I'm not going to go before the House with a national health insurance bill approved by any 13–12 vote."[43]

It was not immediately apparent at the time that this was as far as NHI (as it was then conceived) was ever going to go. The prevailing assumption that its passage was inevitable ought to have been tempered by the recognition of a sharp contrast between the circumstances producing the unsuccessful NHI proposals and those that had led to the passage of Medicare. Most important were the economic conditions. A long period of economic expansion was still in full

BCBSA00292842

swing when Medicare was enacted, although the budget surpluses it produced were to be devoured by demands of the Vietnam War and the Great Society. As the 1970s progressed, growth slowed to a crawl and government was hard-pressed to meet its existing commitments, much less take on new ones.

Leadership was another changed variable. Gerald Ford—and Jimmy Carter after him—turned out to be tepid advocates for NHI. Even before his admin-istration crumbled, and despite his effort to present a bold stand on health care, Nixon had been cautious and ambivalent. All were in stark contrast to the leadership Lyndon Johnson had given Medicare, with his unflagging zeal for the Great Society and with the Senate in his hip pocket.[44] Under Nixon, Ford, and Carter, HEW suffered from a revolving-door leadership and noto-riously fragmented organization. The HEW of the mid-1960s, although over-burdened and disorganized, had leaders like Wilbur Cohen who, for three decades, had been seeking a health care program for the aged and poor.

Finally, there was Wilbur Mills, the maestro of Medicare. Already, Mills had been robbed of some of his magic by the post-Watergate, post-Vietnam Con-gress. The discipline and coherence that master politicos such as he and John-son had once been able to impose were giving way to a growing mistrust of national leaders and a growing tendency for different constituencies to go their own sectional, ideological, and single-issue ways. Imagine, then, the re-action of the NHI coordinators at the Blue Cross and Blue Shield Plans on October 7, 1974, when in the mail they received copies of the two Associa-tions' big new guide to getting ready for NHI. The package probably arrived on the same day that the news broke that Mills had been among the occupants of a car stopped under disreputable circumstances near Washington's Tidal Basin by police from the National Park Service. Mills succeeded in extending his political career for a while after the scandal, but he had to give up the chair of the Ways and Means Committee and could never again operate from the summit of effectiveness from which he had managed the coup of 1965.

National Health Insurance did not simply vanish from the scene, however. It is only through hindsight that August 1974 can be seen as the high-water mark. From that point on, the political ground continued to shift, bedeviling the Blue Plans' efforts to stay relevant and prepared. "It has been exasperat-ing," McNerney admitted at the BCA annual meeting in May 1975. Worries about a recession and "runaway costs on existing entitlement programs," as McNerney put it, were daunting to even those members of Congress who felt a strong new national health program was needed. In April 1976, Illinois De-mocrat Daniel Rostenkowski—emerging as the new House leader on the is-sue—still believed that "enactment of some form of national health insurance is both necessary and inevitable." But George Kelley, head of BCA's Washing-ton office, reported that same spring that "despite the rhetoric of political fig-ures supporting NHI, the Washington mood regarding domestic social policy is one of caution, seasoned with insistent demands for greater cost effective-ness in existing programs." Georgia governor Jimmy Carter would pay lip ser-vice to the idea of NHI during his 1976 presidential campaign and afterward.

BCBSA00292843

But, warning of inflation, he broke with Kennedy on plans for a comprehensive proposal in 1978 and thenceforth devoted his attention almost exclusively to the issue of cost containment.[45]

In the Blue Cross and Blue Shield organizations, the continuing emphasis on national policy questions rankled some senior Plan leaders who were dedicated to the unique needs of their own Plans. William Ford—who joined the Blue Cross Plan in Pittsburgh in 1945 and became its president eleven years later—questioned the assumption that a "power base" was needed in Washington to protect the interests of the local Plans. In a 1973 interview with Odin Anderson, Ford asked rhetorically:

> What do you try to sell Washington? What are you trying to put across? . . . I think the money and energy [should go] into trying to convince Congress that there is a value in these local organizations and what we need is standards—which the government can set as far as I'm concerned—standards of performance. But don't throw away all of the great value we have in these [local] Blue Cross organizations.[46]

In another 1973 interview with Anderson, similar feelings were expressed by the retired Southern California Blue Cross Plan president, Charles Abbott, who had joined that Plan in 1938. Abbott was no stranger to national affairs. He had served as the last chairman of the old Blue Cross Commission and "was going to Chicago about once a week," during the period when the larger and smaller Plans were negotiating how power would be shared in the new Blue Cross Association. At that time, Abbott said, the Plan directors themselves (rather than the BCA staff) conducted the Association's business. The early national account syndicates—put together by local leaders like van Steenwyk and Oseroff—exemplified that process. "We had no . . . staff of so-called experts in Chicago," Abbott said. But Medicare and a continuing preoccupation with NHI had changed all that. He told Anderson:

> The Plans are turning to one focal point instead of doing a lot of thinking and working for themselves. They're waiting to be told rather than muddling through as we used to have to. The muddling through process was a great educational process, much better for people than waiting for the next directive and trying to implement that. . . . You can have too strong, too dominant a national organization.[47]

McNerney presented the prolonged NHI episode of the 1970s in a different light; his view of the BCA's powers differed substantially from Ford's and Abbott's. Whether NHI was likely to pass or not, he told the authors of this book, it provided a useful tool for motivating the Plans to improve their service to consumers, to shake loose from cozy relations with providers, and to redouble their efforts at cost containment:

> Because we had so little power delegated to the Association, I used to have to look to outside events to get the Plans to do things. I loved Teddy Kennedy,

because his threat of national health insurance gave me leverage that I otherwise wouldn't have had. I tried to get certain things done to respond to this threat. You always use these outside hooks, and the less internal power you have the more you have to. And if you're really desperate, you use this abstract external reference called "they." You make it up: "They're going to get you if you don't watch out." That is a tough way to do business. It worked for a while because there were some legitimate threats [that NHI would pass].[48]

One example of McNerney's efforts to use this kind of leverage was the BCA's attempt to press more sophisticated and effective UR systems on the Plans. Social Security amendments that were passed in 1972 had upgraded the UR requirements of the original Medicare law with a new concept called Professional Standards Review Organizations (PSROs), which were clearly marked out as the ultimate arbiters of appropriate hospital utilization and medical treatment. Where existing utilization review programs substantially met the data collection and analysis criteria for PSROs, HEW could waive the requirement that a new review organization had to be formed over and above existing ones. Moreover, NHI was expected to entail similar PSRO rules. During a 1973 meeting of Plan executives, BCA vice president Howard Berman urged Plan leaders to adopt the Association's new utilization review program, partly to avoid future subjugation to PSROs minted by HEW in Washington.[49]

More far-reaching and controversial were the BCA's and the NABSP's overall Plan performance review activities. The authority of the Associations to monitor and judge the quality of individual Plan management was understandably a sensitive point, in view of the tradition of local autonomy. The Federal Employees Health Benefits Program (FEHBP) was particularly important because, ever since 1960, the federal government had contracted directly with the BCA and the NABSP for coverage of its workers; the Associations then subcontracted to individual Plans for the administration of benefits. The Associations were accountable to the government for the Plans' performance, which meant the Plans had to be accountable to the Associations. Plan performance reviews were administered as much as possible in the manner of technical assistance missions, with a minimum of punitive weight. "It is highly unlikely that improvements will be achieved with strong-arm methods," McNerney noted.[50] But the reviews were resented nonetheless.

A primary purpose of the reviews, according to the chairman of one of the BCA subcommittees that oversaw the program, was to "guard against the loss of business because of customer dissatisfaction with service."[51] Reviewers examined Plan records to check for timely and correct claims processing, prompt response to consumers' questions, diligent enrollment efforts, low administrative costs, intelligent planning, and other sound business practices. They also monitored how well Plans participating in syndicates, FEHBP, and national accounts lived up to their commitments to deliver specified rates, benefits, and service. McNerney explained, "Forty-seven performance standards plus several cost comparisons have been promulgated." When Plans did

BCBSA00292845

not measure up to the standards, they were asked to produce an action plan for upgrading performance. "Some Plan Presidents act aggressively on recommendations, some do not. Some say they will act and don't. . . . A handful of Plans hold the [Blue Cross] Association suspect."[52] By 1976 the Plan performance review program was being coordinated increasingly with NHI preparedness activities.

"Nobody likes to be told that they are not doing a great job," BCA executive Eugene Sibery reflected, but "they desperately needed to be told. . . . We were trying to do total Plan performance reviews as objectively as we could. I think that was a great service, but it was resented very, very much." In view of McNerney's assertion that he deliberately used NHI as a lever to get better performance out of the Plans, it would not be surprising if some of the resentment had not rubbed off on him personally. "I have heard the leadership of the movement say that Walt was too far ahead of them, leading them in ways that they didn't want to go," Sibery said, echoing similar comments made about Rufus Rorem at the time of Rorem's departure from the Blue Cross organization. "The thing of it is, Walt was right."[53]

## Bowing to Necessity

Despite their preoccupation with government programs and the increasing sophistication of their competitors, the Plans' enrollment continued to grow until the nation's economic expansion groaned to a halt in the mid-1970s. By this time, the market for health insurance was largely saturated, and little virgin territory remained. In all, 90 percent of the population was insured. The only gains left for the carriers to make were at each other's expense. Although the hospital utilization rates of Blues subscribers had begun to decline, the demand for comprehensive benefits and continuing inflation kept pushing premiums up. When business was growing, employers had been able to keep up with the cost of their health insurance fringe benefits. When growth stopped, those fringes cut directly into profits. Large buyers of care were increasingly testy and demanding.

Nationwide, the Plans' enrollment peaked in 1975 at about 84 million people in Blue Cross Plans and 73 million in Blue Shield Plans. Over the next five years, small but alarming annual declines—somewhat larger in Blue Shield Plans than in Blue Cross Plans—became the rule. The market was bustling with change. By 1975, nearly 15 percent of the nation's one thousand largest employers were self-insuring, and the commercial insurance companies had become adept at tailoring "administrative service only" contracts to meet their needs. Medical care foundations—set up by state and local medical societies or other physician groups—were offering utilization and claims review services to employers that had once been an almost exclusive province of the Blue Plans. State regulators and the Federal Trade Commission, prodded by the commercial companies, were challenging the discounts that Blue Cross Plans traditionally negotiated with member hospitals with

BCBSA00292846

allegations of price-fixing and restraint of trade. Some Plans were slow to meet the competition in new benefit areas such as prescription and dental care coverage. Local accounts were being lost because of rate increases and slippages in the quality of customer service.

Central to the problem of keeping up with the competition was the variable quality of Blue Cross and Blue Shield Plan relations at the local level and a lack of uniform medical benefits for national accounts. The demand for comprehensive benefits, outpatient benefits, preadmission testing, and other relatively new forms of coverage could not be met readily without coordination and cooperation between Blue Cross and Blue Shield Plans. "As time went on, the [old] distinction between professional benefits under the Blue Shield marks and institutional benefits under the Blue Cross marks didn't make any sense," Tresnowski said later, "because benefit design had changed so dramatically—the move to out-of-hospital coverages, outpatient ambulatory surgery, and on and on."[54]

Criticism of the dual structure came from other directions as well. Some leaders in the Blue Shield system said bifurcated coverage interfered with continuity of care and stable doctor-patient relationships. Members of Congress criticized the Plans for failing to deliver uniform and efficient claims administration in the FEHBP and the Civilian Health and Medical Program for the Uniformed Services (CHAMPUS) for military dependents. Among increasingly cost-conscious Blue Cross and Blue Shield Plan officials, the duplications and inefficiencies of the dual structure were becoming ever more obvious at both the local and the national levels.

A few relatively small Plans in the South and West reacted to pressure for unification early in the decade, as mergers between Blue Cross and Blue Shield Plans were effected in Kansas City, New Mexico, South Carolina, and Oklahoma in 1972–1973. Not until the merger of the Plans in New York City the following year, however, did it become apparent that a major change in the Blue Cross and Blue Shield system might be in the offing. The New York City Plans were among the largest and most influential in the system. Whereas unique local conditions played a part in precipitating their merger, the event also highlighted problems faced by many of the Plans and foreshadowed the possibility of a common solution.

In the early 1970s the Blue Shield Plan in New York City—United Medical Service—was experiencing both financial and operational difficulties. According to Edwin Werner, the president of Associated Hospital Service in New York (the city's Blue Cross Plan), the root of the Plan's financial problems was an unwillingness to raise its rates fast enough to keep up with increasing expenses. The Blue Cross Plan had been through a series of steep rate increases that had prompted lawsuits by state officials, adverse publicity, and other headaches that the Blue Shield Plan hoped it could avoid, Werner said. But the result was mounting losses for United Medical Service. The Blue Shield Plan also was in trouble with its customers over its product, Werner recalled.

BCBSA00292847

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 25 of 138

For the most part, United Medical Service offered indemnity coverage. But because of its desire to avoid the trauma of severe rate increases, it had not increased its benefits to keep pace with medical cost increases. For example, a subscriber might have coverage that would pay $125 for removal of an appendix. In 1950, that would have paid for 80 percent of the operation. But twenty years later, it covered only a small fraction of the cost. The subscriber did not keep close tabs on the cost of care. He or she assumed their operation was covered, Werner explained. "Now they go and get their appendix jerked and they get $125 against a bill for $500 from the doctor. They say, 'Well what the hell kind of insurance is this?'"[55]

The Plan's problems snowballed as an overburdened and demoralized staff struggled to cope. Phones went unanswered. Claims were processed too slowly. State insurance officials cited the Plan for failing to fulfill its fiduciary responsibilities. Management was in disarray. It evidently was felt as a relief, rather than a threat, when Werner approached members of the Blue Shield Plan's board of directors to discuss a possible merger. As a former NABSP officer, Werner was relatively well known and trusted, and a merger was successfully consummated in June 1974. The following year, additional Blue Cross and Blue Shield Plan mergers took place in Michigan, Nebraska, and Illinois.

At the same time, efforts were increasing to improve Blue Cross and Blue Shield organization coordination at the national level. By 1975, the executive committees of the two Associations were meeting together four times a year. A joint system had been established for development and testing of data processing systems that would be needed if a national health insurance program were enacted.

Proposals to merge the Blue Cross and the Blue Shield organizations had been coming up every few years ever since the first attempt in the late 1940s, when Dr. Paul Hawley was asked to help. Yet every attempt had met with the same fate. Both the aggregate enrollment and the dollar volume of claims were larger in the Blue Cross Plans than in the Blue Shield Plans, said William Ryan, who became NABSP president in 1976. The fear among the Blue Shield Plans was that the Blue Cross Plans' preponderant bulk would translate into preponderant power in a merged Association.[56]

It became increasingly apparent to members of both Associations that mutual distrust was a luxury they could no longer afford. The dual Association structure was unwieldy for members and confusing to the public. The market was impatient with disjunctions between Blue Cross Plans and Blue Shield Plans. As long as the possibility remained that a national health insurance program might be enacted, the Plans knew they needed a clear and coherent voice to represent their views. According to John Ed McConnell, the president of Blue Cross and Blue Shield of Kentucky, Blue Cross and Blue Shield Plan leaders who favored merger used the threat of NHI as a weapon in arguing with their colleagues: "We kept waving the flag of government intervention,"

BCBSA00292848

as McConnell recalled the merger debate years later, "The big issue was fear of government."[57]

The desire for effective public representation was another asset for merger advocates. "The Blue Cross Association was envied by the Blue Shield organization because it had this spokesman [McNerney] who was particularly talented," Werner said. "The idea of putting the two staffs together under McNerney's single leadership had some attraction to the Blue Shield Plans. One thing they would get out of putting the two staffs together was McNerney as their spokesman."[58]

In May 1976 the two Associations set up a committee, with McConnell as chair, to study the possibility of a reorganization. A survey of attitudes and opinions about a merger found Plan leaders in seeming agreement that a change was needed; but doubts and fears about combining the two organizations still ran deep. "We fear it would be a Blue Cross Association takeover at the national level and we would no longer be adequately represented," wrote Thomas Paton, president of Blue Shield of California. Paton warned that a merger might "cause a serious rupture in the longtime physician support and participation in Blue Shield Plan affairs." Even Martin Hickman, president of the recently merged Illinois Plans, warned McConnell and the study committee against merging the national organizations. "I believe very strongly that there should be two separate and distinct National Associations, with strong separate Presidents and senior management staffs," he advised. The influential Hickman was one of several Plan leaders who agreed that some of the two Associations' administrative and technical functions could be performed more efficiently on a joint basis. Policy and planning functions, however, should remain strictly separate and independent, Hickman and others insisted.[59]

Although the two Associations had many similar functions, they were organized in very different ways. The contrast was particularly stark on the crucial question of how much authority the member Plans delegated to the Associations and their staffs. The McConnell Committee's May 1977 report assessed this sensitive issue forthrightly. Both Associations naturally derived their powers from membership, the report noted. But as the prime contractor for Medicare Part A, subcontracting to the Plans, the BCA was widely believed to consider itself "a moving and leading force frequently ahead of member Plan positions."[60]

In contrast, the report found that the distinguishing feature of the NABSP was "a willingness and dedication to be responsive to and support the member Plans." The result was a management style that was flexible and accommodating to a fault, the report observed. "The general perception of NABSP is that of providing support to—rather than leading—the Plans." As if to underscore the point, the report appended a comparison of 1977 budgets to the discussion of organizational structure. Expenses on the BCA side totaled $32 million, while NABSP's outlays totaled just $9 million.[61]

The McConnell Report spelled out an agenda for change that went well

BCBSA00292849

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 27 of 138

beyond the question of organizational structure. The concerns outlined in the report continued to occupy the Blue Cross and Blue Shield system for years after the issue of merger had been decided:

- Government was now purchasing 40 percent of the nation's health care. It wanted regional administration and unified packaging of hospital and medical services. The Blues were not organized to respond adequately.

- Neither Association was able to move effectively to help Plans with financial or management problems. "Poor performance carries the potential to weaken the system. The dangers are many and the safeguards are few," the report warned prophetically.

- The Plans were failing to satisfy buyers' demands for cost containment and efficient service.

- The role of the Associations was poorly defined: "As the level of knowledge and sophistication of buyers increases, the demands for uniform benefits, comparable levels of performance, rational administrative cost comparisons between Plans and uniform cost containment are becoming more important and, in some cases, vital. The failure of an individual Plan in one of these areas threatens the continuation of the account with other Plans. . . . The authority of the Associations to criticize effectively the poor performance of Plans (and especially the poor performance of Plan chief executive officers) is uncertain."[62]

McConnell's committee recommended retaining two separate national Associations to hold power and make policy while creating a third entity, a "national service center," to perform joint functions such as national marketing and Plan performance review. But the troika structure seemed to satisfy almost no one, and the Associations' two executive committees were told to come up with a better scheme.[63] "We referred to it as the 'long, hot summer of 1977,'" Tresnowski recalled:

> Even though there was a lot of political infighting around leverage, and how it would be done, merger was now an idea whose time had arrived. There was a lot of momentum behind it to get it accomplished. . . . The two events that caused it to take place and caused the idea to ripen were the merger of the Blue Cross and Blue Shield Plans in New York City and the merger of the Blue Cross and Blue Shield Plans in Michigan. [Doctors still felt threatened.] But die-hard obstructionism was no longer an effective tactic. A series of backfires was created by selected individuals. . . . But when it came down to the eleventh hour, a couple of Blue Shield Plans, very large ones—Massachusetts and Pennsylvania, with strong doctor influence—agreed that [consolidation] was essential, and they carried the day.[64]

The union was consummated on October 17, 1977. The recommendation of the joint executive committee called for the two boards to be preserved,

BCBSA00292850

but for a single executive officer and management staff, and no third organi-
zation. Implementation would begin immediately, with the selection of a
chief executive by the end of the year. The proposal to consolidate staffs
passed with 64 percent of the votes from the Blue Shield Plans and 96 percent
from the Blue Cross Plans. Tresnowski referred to the period during which
the union was planned and implemented as "the most difficult that I ever
lived through." McNerney, selected to head the new organization, named Bill
Ryan of the Blue Shield Association as senior executive vice president and
Tresnowski as executive vice president. These three men made the hard
choices about whose careers would suffer and whose would improve as a re-
sult of staff consolidation.[65] Morale in the consolidated organization healed
only by degrees, but some beneficial results were not long in emerging. Hos-
pitals, health professionals, and subscribers responded positively to the notion
that the Blues had gotten their acts together. Advantages were gained from
"speaking more effectively to our publics with one voice," McNerney af-
firmed at the end of 1978, referring collectively to government, employers,
labor, competitors, the press, and consumers.[66]

There was no instant magic to ward off the pressures of the market, how-
ever. The administration of government programs continued to be rigorously
demanding and, to some Plans, seemed barely worth the effort. In the private
market, enrollment continued to decline. Complementary private coverage
for the Medicare population grew, but not enough to offset other losses of lo-
cal and national business. "Each year, more competitors are attempting to
achieve economies through influencing the delivery of care," McNerney ex-
plained in December 1978. "Several carriers or software houses, in search of
economy of scale, are making imaginative use of national and regional pro-
cessing schemes." Economic and demographic changes also seemed to favor
the competition. The population was leaving the northeast and central states
where the Blues' market penetration was highest, and moving to the southern
and western states where the Plans were weaker. The industrial sector was los-
ing workers to service industries, again moving out of a strong suit and into a
weak one for the Blue Plans. "Market losses have been galling and unsettling.
For some, it's been hard to accept the fact that the biggest kid on the block
can be had," McNerney noted in 1979.[67]

Nor did the consolidation of the Associations magically erase all obstacles
to Plan coordination at the local level, or guarantee more sophisticated re-
gional strategies, or lead automatically to flawless harmony on national ac-
counts. As Victor Brian—president of the Blue Shield Plan in Washington,
D.C.—had warned in 1977, "the really hard sledding was at the Plan level
and not at the national level."[68] Plans of different sizes sometimes bickered
among themselves about which were most efficient and which contributed
more effort and value to national accounts. The commitment to protecting
service benefits and squeezing the delivery system for cost savings varied from
Plan to Plan. Finally, there was a lingering temptation for many Plans to adopt
a "go-it-alone" attitude, "the notion that survival should be determined by

BCBSA00292851

according victory to the strong and defeat to the weak," as McNerney put it. "Often discouraged by regional efforts or participation under a national account, there is sometimes a strong tendency to turn inward."[69]

The effort to knit the Plans into a more efficient and effective network was unstinting. The Plans pumped about $20 million into efforts to develop new data processing systems to meet the needs of government programs, the private market, and any potential new program of national health insurance. In 1978, the consolidated Associations signed a lease to occupy office space under one roof in downtown Chicago, combining operations that had been spread out over six separate locations. A new national advertising strategy was developed. The Associations increased their efforts in market research and conducted an ambitious "product study" to analyze the usefulness of various new packages of benefits and cost controls. In conjunction with the AHA, the Plans participated in a private sector cost-containment program called the Voluntary Effort that sought to curb hospital expansion and to cap annual cost increases.

In key areas (particularly systems development and the NHI readiness strategy), the Associations' reach exceeded their grasp. "I don't know whether it was so much a matter of overextending or whether we set a process in motion that was not achievable," observed Tresnowski. "We were not a lean organization. . . . The chickens came home to roost in the late 1970s," he said. "We spread ourselves too thin." The failure to create a satisfactory all-purpose national data system was particularly painful, Tresnowski said:

> We were trying to develop a membership system, a claims system, and the various supporting systems to satisfy the needs of all the Plans. It became cumbersome. It took a lot of time in development and had enormous implementation costs associated with it. People began to lose confidence in its objectives and in its products. It was a source of significant controversy and disappointment, broadly, throughout the system.[70]

In short, consolidation had cleared away some of the excess baggage the Blue Cross Association and Blue Shield Association had been carrying, and not a moment too soon. A major change in the health policy environment was under way. An era of regulation was giving way to an era of free market solutions. For-profit hospitals were beginning to spring up and challenge the assumptions on which the voluntary hospital system had operated, and on which the Blue Plans had been founded.

The Plans were no longer the precocious and irrepressible institutions they once had been. Their business had matured. Some of the stiffness and excess weight of middle age was apparent in their movements and appearance. They would have to work harder to stay fit and trim. Where Plans were still market leaders, they would be looking over their shoulders more often to see who was gaining ground. Elsewhere, they would be straining to catch up with the competition. Where conditions were especially harsh and the Plans' health was not robust, survival itself might become a struggle.

BCBSA00292852



# The 1980s

### Swimming with the Sharks

*The biggest and first hurdle to get over*
*is the grip of bureaucracy.*
—Walter J. McNerney, 1996

THE DEFEAT OF JIMMY CARTER'S EFFORT to legislate caps on health care spending came in the waning hours of his presidency, epitomizing the failure of a decade-long quest for governmental solutions to the problem of cost.[1] Liberals who had supported calls for a strong national health insurance program in the early 1970s scoffed at the Carter proposals, which merely sought to limit hospitals' annual cost increases and capital spending as well as physician reimbursement under Medicare and Medicaid. In the face of stiffening conservative opposition and tepid Democratic party support, the Carter proposals withered and died in congressional committees and in the HEW in 1979 and 1980. Ronald Reagan's decisive victory in the 1980 presidential election gave a mandate to apostles of a procompetitive, antiregulatory strategy for controlling health care costs.

The fundamentals of the free marketeers' argument were by now familiar. Conventional health insurance and fee-for-service medicine (their indictment charged) created perverse incentives that rewarded hospitals and doctors for profligate behavior. Insurance insulated both doctor and patient from the economic consequences of their actions. Reimbursement at cost encouraged hospitals to spend as much as possible on every patient. Fee-for-service practice enriched doctors who performed as many services for their patients as they could justify.

The most widely heralded strategies to foster a more competitive market-

BCBSA00292853

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 31 of 138

place focused on health maintenance organizations (HMOs) and other forms of prospective payment that rewarded providers for minimizing costs. Several research studies had suggested that HMOs could reduce the incidence of hospitalization (the most expensive component of health care) by roughly 50 percent without doing observable damage to the health care of their enrollees. Pro-competitive theoreticians did not insist that all health care be provided by HMOs. They merely argued that if all consumers were offered a choice of health plans, with at least one HMO among them, price competition would force other providers and financers of care to become equally efficient.

Despite the elegance of their arguments, the free marketeers had a long, hard climb. The HMO idea had won favor with the Nixon administration, and legislation providing subsidies and an encouraging legal environment for them passed in 1973. But in most areas, HMOs were slow to catch on with doctors and patients. Ironically, Paul Ellwood—the nation's leading HMO advocate for three decades—maintained that the federal government had not been forceful enough in its efforts to guarantee a free market.

By the end of the decade, however, the tide had begun to turn. Federal aid to medical education—enacted to correct a shortage of physicians that had arisen after the passage of Medicare—had in ten years doubled the annual output of the nation's medical schools. The resulting oversupply of doctors made it easier for HMOs to recruit physicians. Consumers were getting more familiar and comfortable with the HMO concept. Perhaps most significant, hospital costs and insurance premiums had continued to shoot up as the economy slid toward a major recession in the early 1980s. For employers, this meant that health care fringe benefits were eating up an increasingly large (and, finally, unacceptable) share of corporate profits. The net result of all these developments was that HMOs—and their effect in the marketplace— were taken much more seriously by corporate decision makers.

In 1980, a Stanford economist who had been an assistant secretary of defense under Robert S. McNamara published a treatise on pro-competitive reform of the health care market, which for the next decade became something of a corporate bible. Alain C. Enthoven's *Health Plan: The Only Practical Solution to the Soaring Cost of Health Care* proposed a system modeled on the Federal Employees Health Benefits Program (FEHBP). That program had been designed by Congress in the late 1950s with significant assistance from Blue Cross and Blue Shield system leaders. The FEHBP, which J. Douglas Colman described as "controlled competition," guaranteed each employee— during a regular open enrollment period—a choice among comprehensive Blue Cross and Blue Shield Plan service benefits, indemnity coverage from commercial carriers, and HMOs, where they were available. Premium increases in the program were consistently lower than national averages, and consumer satisfaction ratings were high. Now, in Enthoven's consumer-choice formula, the FEHBP model was recommended as a mechanism to stimulate greater competition among providers and insurers in order to offer more cost-efficient benefit programs.[2]

BCBSA00292854

The Blue Plans—having pursued cost containment for three decades in a spirit that was trusting and respectful of providers' good faith—now found themselves in an environment where no one's good intentions were taken for granted. Vigorous price competition, once considered inappropriate in the health care field, had been enshrined as a primary value. New competitive wrinkles came at an accelerating pace as the next decade unfolded, and the pressure to respond was unrelenting.

As had been the case a decade earlier, when regulators and consumer advocates began to swarm around the issue of health care costs, the Blues were seen as a big, convenient target. The Plans faced "the special vulnerabilities of the high market share competitor," Walter McNerney warned in his annual report to Plan executives in 1980, delivered the day after the election of Ronald Reagan. "Any competitor seeking large gains usually considers taking business from the biggest competitor," McNerney went on, drawing an analogy between the Blues and the embattled American Telephone and Telegraph Company: "There is no place to hide. . . . The most tempting and dangerous attitude is to continue to view the market as homogenous and to believe that a single strategy will be sufficient."[3] It was not hard for the Plan executives to understand what McNerney was saying. In the years from 1975 to 1981, enrollment in Blue Cross Plans fell from 84 million to 82.6 million. Blue Shield Plan membership fell from 73.4 million to 66.9 million. Collectively, the Plans lost nearly half a billion dollars in 1980, and a like amount the following year. "A particularly dark period," Bernard Tresnowski reflected later.[4]

Although he had championed HMO development and aggressive cost containment (steps that he thought might have made the Blue Plans more competitive and less susceptible to loss of market share during the 1970s), McNerney's star had now begun to fade among key leaders in the consolidated Blue Cross and Blue Shield Associations. The bold leadership style that the Blues had needed so badly when McNerney was hired was wearing thin. He had perhaps expended too much political capital playing on the threat of national health insurance to browbeat recalcitrant Plans into forcing stronger cost control measures on hospitals and doctors. Overspending on the national data-processing system budget had irked Plans that had scant cash surpluses to contribute to the data processing effort or who received little benefit from it. Other cost overruns in the Associations' budgets conveyed to the directors of some Plans a sense that McNerney did not consider himself bound by their decisions.

This was perilous ground for any corporate CEO to tread: McNerney was perceived as having moved too far ahead of the governing body that paid his salary and that set the policies he was charged with implementing. "The system never had a more articulate, more resourceful spokesman," said Edwin Werner, president of Empire Blue Cross and Blue Shield in New York City and BCA chairman at the time of the 1978 consolidation. But, Werner said,

BCBSA00292855

"McNerney had been in the job 20 years. . . . I think there were those who felt that Walt had maybe been in the job too long, that it had now taken on the characteristic of a one-man show."[5]

Once the handwriting was on the wall, Tresnowski said, he pleaded with McNerney to "make his peace" with the Associations' leaders who had decided it was time for a change. His recollection suggests that the eventual departure of the Plans' leader during the most eventful twenty years in their history was dramatically painful and poignant. "Your reputation, your status in history will be better served if you leave on a high note," Tresnowski recalled telling his boss. "Also for the organization, I think it's harmful for the organization to have one of its critical leaders leave under a cloud." But in retrospect, Tresnowski said, the reconciliation he hoped for "was not doable. Walt . . . was not the kind of personality who could do that. He was a fighter."[6]

McNerney resigned before the year was out and Tresnowski replaced him in December 1981. It was within the new president's power to trim the Associations down and to steer clear of power struggles with the many strong personalities who made up its membership and governing board and committee structure. But the change of leadership in itself did little when it came to the critical issue of imposing discipline, coordination, and efficiency on a crazy-quilt network of 110 autonomous Blue Cross and Blue Shield Plans, each with its own unique local roots, leaders, and market circumstances. It was evident—from the continuing loss of business with multistate employers and from the dissatisfaction of smaller companies with the disjointed service they often received from the Blue Plans—that competitive survival hinged on improved inter-Plan coordination. McNerney ultimately had come to grief because he tried too hard to weld the Plans into a homogeneous whole.

But disaster might just as easily await any leader who failed to forge a more coherent system. As Tresnowski had predicted, the awkward conclusion of the McNerney era left the Associations in disarray. Tresnowski said later:

> I spent a good two years trying to re-establish the credibility of this organization, the Association, in the minds of the constituency, to get them to believe again in the virtues of working together as a confederation. In fact, it went beyond two years. . . . The whole notion of trust is so fundamental to an organization, and it was so lacking.[7]

It is ironic that the reshaping of the newly consolidated Associations, in order to be more responsive to the Plans and less threatening to their autonomy, resulted in a tighter national organization. The Plans wanted more budget discipline in Chicago, which led to a staff shakeout. To minimize the trauma of the 1978 consolidation, the jobs of many senior Association staff people had been preserved even if they were redundant. "We made a number of political compromises, kept a lot of people on in jobs, gave out a bunch of titles," Tresnowski said later. "When the financial situation turned sour, we began to get into layoffs."[8]

It soon became clear that the decision to preserve two national governing boards did not make sense in practice. The Plans were burdened with paying for two organizations. Some leaders found themselves attending twice as many national meetings as they had wanted. The manifold duplications of effort were illogical. The logic of the union would not be satisfied until the Associations and their boards, too, were merged.

Mindful of the agonizing machinations that preceded the consolidation of the staffs in 1978, Tresnowski steeled himself for another epic struggle. The proper documents were prepared, the relevant committee motions introduced and passed. A special board meeting was called in June 1982 in Chicago. Detailed packets of information on the proposed merger were mailed out in advance. The result, happily and unexpectedly, was a resounding anticlimax. As Tresnowski put it:

> The chairman asked if there was discussion, but there was none. The vote was taken. It all happened within a period of twenty minutes. . . . I look back at all the controversy in the previous eight years around the topic of the merger of Blue Cross and Blue Shield, and the emotions and all that went with it, and the personalities. Yet here we were in June of 1982, and it took twenty minutes for it to be effected.[9]

Despite the backlash against McNerney's efforts to impose unity, enough trust and understanding remained among the Plans to continue moving in the direction of greater coordination and efficiency. It was a tradition, in both Blue Cross and Blue Shield confederations, that when the authority of the central organization was weakened, a nucleus of strong individual Plan leaders would mediate between the centripetal and the centrifugal forces that had always held the two systems in their grip.

In September 1982, a work group of Plan leaders presented to the BCBSA's board of directors a series of proposals referred to as the Long-Term Business Strategy (LTBS). The key provisions of the business plan, backed by the influence of the leadership group that had put it together, turned out to have a profound impact on the future of the Blue Plans. Along the way, the business plan also brought about considerable controversy and more than a little pain: "It really tore the Association up," according to Marvin Reiter, a longtime mainstay of the organization's legal department.[10]

The tone of the document, which echoed many of the findings of the pre-consolidation McConnell report, was far from cheerful. On the heels of nearly a billion dollars in losses during 1980 and 1981, several Plans were in a weakened financial condition. In many areas, one of the Blues' biggest marketplace advantages—the "differential," or discounted reimbursements that hospitals accepted from the Plans in exchange for volume of business and prompt payment—was under attack from competitors, regulators, and politicians. Rapid changes in computer technology and the health care delivery system were opening doors for new players in the financing and administrative arenas—such as software houses and financial service companies—and threatening

Blue Plans that were strongly bound by traditional concepts. "Plans cannot solve strategic problems on a business-as-usual basis," concluded the introduction to the LTBS report. "Doing the same things in the same way, only with a degree more efficiency, may only provide a temporary respite but not a long-term solution," it warned.[11]

The report concluded with twelve "propositions," which in effect constituted a plan of action. Some were broad, commonsense recommendations that did not require great daring or imagination to embrace. Most of the propositions recommended strategies that had been discussed before and in some cases were being implemented already. The difference was that the business plan called for more decisive implementation of some strategies that thus far had been pursued only tentatively. It also articulated them with increased specificity and set deadlines for action. By far the most explosive recommendations were the first two on the list, designated Propositions 1.1 and 1.2. The first called for merger of all existing Blue Cross and Blue Shield Plans at the local level, to be accomplished by the end of 1984. The second proposition was for additional mergers in states that had more than one Plan, with the goal of having only one Plan per state by the end of 1985, except when there were good business reasons not to.[12]

Propositions 1.1 and 1.2 were a direct challenge to Plan autonomy and provoked heated debate when presented at the BCBSA board of directors meeting in September 1982. Three respected and senior Plan presidents—Leroy Mann of Pennsylvania Blue Shield, Thomas Paton of California Blue Shield, and William Flaherty of Florida Blue Cross—raised questions about the potential financial impact of the proposals. According to the minutes of the meeting, Paton said the recommendations "apparently made no accommodation or allowance for business judgment and local situations." Flaherty questioned how the proposed mergers would help with the losses of local group enrollment that many Plans were suffering. How would mergers help stop the losses, he asked, when there was still a "lack of adequate progress in the field of cost containment?" Mann, with statesmanship and circumspection, hit upon perhaps the greatest fear struck in the hearts of many of his peers by the proposed mergers. Citing a concept he attributed to economist Peter Drucker, Mann advanced the theory that a "merger seems to have beneficial results only when two strong groups come together. Conversely, where one strong group and one weak group come together in a merger, the result seems to be one larger and weaker unit." John McCabe, the influential leader of the already-merged Blue Cross and Blue Shield Plans of Michigan, acknowledged that the two propositions certainly could not be regarded as a panacea. But then McCabe—representing what turned out to be the majority view—pointed out that the Plans had already agreed their greatest weakness was in management and governance structures. "The propositions under discussion would not solve all the problems," McCabe's remarks are paraphrased in the minutes, "[but] without adoption of the propositions, few of the problems would be solved."[13]

A binding decision on the recommendations in the Long-Term Business

BCBSA00292858

Strategy was left to a vote of all the Plans at the upcoming annual meeting in November 1982 in Chicago. According to Werner—who made an afternoon presentation of the LTBS document to the assembled Plan executives—the outcome of the vote was in doubt up until the last minute. "There were bets going on as late as lunch that day," he said. "But we did it. Got the Plans almost unanimously to adopt all those propositions."[14] It would be years before the full impact of the vote became apparent.

## The Road to Managed Care

Pervasive anxiety about the rising cost of care was indeed prompting modifications of traditional incentive patterns based on fee-for-service medicine and cost-based reimbursement for hospitals. But implementation of the pure pro-competitive model would have meant dismantling an existing system that millions of Americans were strongly attached to. Moreover, heavy-handed governmental intervention would be necessary to achieve a reconstruction of the system, and this did not quite comport with the underlying ideology of the free marketeers.

So the march toward a new, more disciplined approach to the finance and delivery of health services had to proceed without benefit of a grand, unifying theory. But, in practice, there was a common denominator linking many of the diverse developments of the 1980s. The balance of power between payers and providers was shifting. Payers had finally lost patience with the failure of the old system to control costs. The mystique that had shielded doctors and hospitals from public criticism was eroding: "Doctors' decisions are giving way," Tresnowski said in 1986, "not completely, of course, but increasingly over the past two or three years, to government and employer decisions about where and under what conditions services will be paid for, and at what prices."[15]

As the largest single purchaser of health services (by 1980, it was paying 40% of the nation's $250 billion health bill), government was the logical candidate to take the biggest step yet in the field of cost containment: the adoption, in 1983, of a prospective payment system by the Medicare program. In 1982, hospital costs had risen at three times the overall rate of inflation, and the Medicare trust fund was faced with the possibility of bankruptcy within a few years. The Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) had called for development of a prospective payment system for Medicare, and a trial of the concept that began in New Jersey in 1980 seemed to demonstrate that it could work. During the 1970s, researchers at Yale University had developed a classification system for hospital treatments in the form of 470 "diagnosis related groups" (DRGs). The Health Care Financing Administration (HCFA) now adapted this system for its rate-setting program. Reagan signed the Medicare prospective payment legislation in April 1983. A phase-in of the program began the following July and was largely complete within a year.[16]

The new system created twenty-three major diagnostic categories, which were further sorted according to the patient's age and sex, whether surgery

was needed, and whether complications or secondary illnesses figured into the patient's treatment. The allowable reimbursement for each DRG was adjusted also for variations in hospital operating costs based on geography, size, labor costs, urban or rural location, teaching activity, typical patient loads (case mix), and several other factors. Thus a large, unionized, urban, teaching hospital in the Northeast with a high proportion of acute-care cases would be reimbursed $6,200 (in 1984) for performing brain surgery on a patient over the age of seventeen years suffering from a traumatic injury but without complications (DRG 2). In contrast, a small, nonunion, rural hospital in the South that specialized in delivering babies and setting fractures might receive only $4,900 for the same surgery. Reimbursement also could be adjusted when abnormally long hospital stays or costly treatment was justified. There were ninety-six data entries on the claim form that hospitals submitted to receive payment from HCFA. Annual adjustments for inflation also were provided for in the legislation, which was designated Public Law 98-31.[17]

As might be surmised from this cursory description, prospective payment was a complicated system for hospitals, doctors, and the federal government to adopt. Certainly, it was so for the intermediaries. According to Tresnowski, the Blue Plans that administered Medicare experienced "unprecedented workloads" during 1983, despite which the Plans "earned consistent praise from government officials for a job well done under extraordinarily difficult circumstances."[18]

It was soon evident that DRGs were having a significant impact on hospital efficiency and the cost of the Medicare program. In one study of more than 650,596 discharges at 729 nonfederal hospitals, the number of Medicare patients fell by 5.4 percent during 1983 and 1984. Studies showed that average lengths of stay for Medicare patients decreased by one and a half to two days across the country from 1982 to 1984. Some critics charged that the DRGs fostered premature discharges, that patients were suffering as a result of being sent home "quicker and sicker." But these concerns, sometimes based on anecdotal evidence, were balanced by empirical studies that showed no discernible impact on aggregate patient outcomes from the new system.[19]

Prospective payment had some other unintended and largely unforeseen side effects that were troublesome. Concerns about quality of care persisted, and some of the savings being realized by the new system began to turn up as added costs for other payers, including the Medicaid program, private insurance carriers, and patients. For a time, however, the negative fallout was overshadowed by good news on the bottom line. The Medicare program still faced long-range financial dangers, as demographic trends promised an ever-growing burden. At the same time, Medicare recipients found that the coverage it offered was inadequate for many needs, especially long-term care and prescription drugs. In the first five years following the implementation of the DRG system, however, the annual rate of increase in Medicare expenditures was halved, decreasing from an average annual growth of about 16 percent during 1970–1984 to an average of 8 percent during 1985–1989.[20] The

BCBSA00292860

change was not entirely due to DRGs, as the program became an increasingly popular target in the war on the federal deficit. A slowdown in the overall rate of inflation also helped curb increases. Through hindsight, it may appear that prospective payment only accomplished a one-time savings as hospitals were forced into adopting new ways of handling admissions and lengths of stay. But it was a badly needed change, and it was accomplished with dispatch. "Government is well pleased with the way the fixed price system is working," Tresnowski announced in 1986.[21]

In the private sector, the growing assertiveness of payers was reflected in increasingly aggressive cost-control strategies. Prospective payment in Medicare had a bellwether effect. Tresnowski reported in 1985 that six Blue Cross and Blue Shield Plans were using DRGs for non-Medicare reimbursement. Most of them were in southern and western states where the Plans' market share was low and where they had not previously had enough bargaining power to obtain significant hospital discounts. By the end of 1986, according to one study by health care analyst Allen Dobson, provider compensation rates for Blue Cross and Blue Shield Plan or Medicaid patients were set on a per case, prospective basis in seventeen states. By 1987, according to another analyst, Michael Rosko, hospital reimbursement under Medicaid was set on a prospective basis in thirty-four states. "Prospective pricing. . . . is becoming the norm," wrote Dobson in 1987.[22]

Public and private payers moved side by side also to refine their approach to reviewing the appropriateness of treatment decisions. The Health Care Financing Administration (HCFA)—created in the mid-1970s to administer Medicare and Medicaid—continued to retool the federal government's peer-review program and monitored the medical necessity, appropriateness, quality, and cost effectiveness of hospital care provided to Medicare patients. For-profit insurance companies and large self-insured companies were turning increasingly to private UR firms to provide the same kind of monitoring for the care their employees received. The Blue Plans used a variety of review techniques as part of their cost-control efforts, including preadmission certification, concurrent review, second surgical opinion, recertification for extended stays, and retrospective review. The development of all these techniques had been long, slow, and painstaking. "Telling doctors what they can and can't do for their patients without touching off fireworks is a fine art," Tresnowski observed.[23]

An effort to finesse their way past some of the awkwardness of meddling with medical decisions had been started by the Blue Shield Plans in 1976 with a new "medical necessity" program. The purpose was to deal categorically—rather than on a case-by-case basis—with outmoded, unproved, redundant, or unnecessary medical procedures. The key to the program was physician participation. Working with the American College of Physicians, the American College of Surgeons, and the American College of Radiology, the program had by 1977 identified a list of forty procedures of questionable usefulness and then began working through local Blue Plans to phase out

BCBSA00292861

reimbursement for them. According to a 1982 report on the program, "One study indicates that from 1975 through 1978, the number of paid claims for the surgical and diagnostic procedures listed as 'not generally useful' declined 26 percent and 84 percent respectively."[24]

In 1979, the newly consolidated BCA and BSA staff announced that, on the recommendation of the American College of Physicians (ACP), they had added twenty-six more diagnostic laboratory procedures to the list. The Blues turned again to the ACP for help in evaluating standard batteries of up to fifteen laboratory, radiology, and other tests that were performed routinely as a part of almost all hospital admissions. The ACP came to the conclusion that excessive use of the standard diagnostic tests was driving up costs and that they should not be routinely required. The American College of Surgeons followed suit with a similar statement on routine testing for surgical admissions. A 1981 announcement by the Blue Plans that they would not pay for some such tests made front-page news, and by the end of that year, more than three thousand hospitals had eliminated or reduced their requirements for routine admissions testing. As the 1980s progressed, the medical necessity program continued to grow as a bulwark of cost containment, and it was imitated widely.

It was difficult to sort out the impact of these new measures, when so many changes were happening at the same time. A flattening out of cost trends that coincided with the advent of Medicare DRGs caused an unusual ripple of optimism through the health insurance community. From 1970 to 1980, according to HCFA, the average annual increase in all spending on health care—including Medicare, Medicaid, other government programs, private insurance, and out-of-pocket spending by consumers—was an overheated 12.3 to 13.4 percent. In the first five years of the 1980s, the increase moderated slightly, to an annual rate that averaged just 11 percent. Then in 1986 it dropped to 7.7 percent.[25] In the private insurance market—where annual increases had been in the 20 percent range in the early 1980s and dropped as low as 4 percent at mid-decade—the turnaround was particularly dramatic.

Had the tide finally turned in the war on costs? It was tempting to think so. "The present state is very good," Tresnowski declared in an August 1986 interview. "If by costs you mean the combination of price and utilization, then costs have come down very dramatically over the last 18 months, driven largely by the drop in hospital utilization. . . . That's very good news indeed." For more than a decade, the Blues and their for-profit competitors had labored in vain to put the brakes on cost escalation. Now their efforts finally seemed to be bearing fruit. It was a moment to savor.[26]

As buyer leverage increased and new cost-control strategies proliferated, it was becoming more evident that a sea change was under way. Making the health care system over in the image of an HMO had been too radical an idea to accept categorically when first proposed by Paul Ellwood during the Nixon administration. But the resulting piecemeal, incremental cost disciplines of the 1970s and 1980s had steadily eroded the traditional sovereignty of hospitals

BCBSA00292862

and doctors and created widening opportunities to apply in new ways the principles underlying the HMO, collectively referred to as "managed care."

During the 1970s, many groups of physicians had developed a related form of organization to meet the competitive challenge of HMOs without abandoning their private practices to salaried employment. This system was the individual practice association (IPA) pioneered in California by the San Joaquin Foundation for Medical Care, which was founded in 1954. In the IPA, networks of physicians enrolled group or individual members who received comprehensive benefits for a fixed monthly fee. The participating doctors continued to operate out of their own offices and continued to practice traditional fee-for-service medicine in tandem. A foundation or other fiscal entity was created to collect premiums and to reimburse the doctors, sometimes contracting with Plans or other insurers for underwriting. Utilization controls were applied to contain costs and make the IPA competitive in price with HMOs offering comparable benefits. Like the Blue Plans and every other delivery and financing system in the American medical pantheon, the IPA concept has been subject to almost unlimited local variations.[27]

IPAs modified the HMO model of managed care to meet the needs of physicians. Another variation on the theme, not developed until the 1980s, was responsive to consumers' desire for a wider choice of hospitals and doctors than HMOs allowed. Preferred provider organizations (PPOs) constituted networks of hospitals and doctors that contracted with buyers (employers) or insurers to provide a negotiated mix of price, benefits, and locations. PPOs could price their services competitively by negotiating discounted payments to providers and incorporating gatekeeper functions to control utilization. Financial risk could be borne by the PPO, the providers, or the employer—again a combination of ingredients that lent itself to abundant local variation. The Blue Plans had launched fifty PPOs by the middle of the decade.[28]

This new species of managed care also made a useful addition to the menu of options that could be offered in consumer choice plans, à la Enthoven. The PPO idea gained a substantial measure of acceptance when General Motors Corporation and the UAW included a PPO in an options program offered nationally through the Blue Cross and Blue Shield organization to 800,000 auto workers in 1985. Within a few years, a new wrinkle was added to the HMO/PPO concept with the development of "point of service" plans. This innovation offered a further element of consumer choice by allowing enrollees to go outside the specified provider network for care. But they had to pay the difference between what the outside provider charged and what providers inside the network accepted as payment in full for contract benefits.

In most cases, HMOs and PPOs obtained hospital services for their members by contracting with selected, cost-efficient institutions to provide care at discounted rates. The managed care organization controlled utilization by acting as gatekeeper, and the hospitals benefited despite the discounts because of the volume of patients steered their way. For the Blue Plans, managed care meant a return to their roots. The original Blue Cross Plans, after all, had

BCBSA00292863

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 41 of 138

been built on the foundation of contracts with participating hospitals that agreed to treat the Blue Cross Plans' patients for a negotiated and usually favorable rate. In exchange, hospitals received a reliable system of relatively prompt payment and the promise of increased volume. "Selective contracting is the history of Blue Cross [Plans]," Tresnowski noted. "It's our product. It's our negotiation with hospitals and doctors, it's our payment methods to extract differentials. It's our expertise in utilization controls."[29]

Over the years, however, hospitals that for one reason or another had not been included in the Blue Cross Plan networks sometimes had been successful in exerting political pressure to outlaw the selective contract and force the Blues to cover their patients. Now, with state legislatures and regulatory agencies crying out for cost controls, the old laws against selective contracts had become anachronistic. "Selectivity affords the carrier the opportunity to negotiate price and require utilization constraints," Tresnowski pointed out in 1985. "All this is justified on the basis of effective cost containment. The irony is that we have now come full circle. We are back where we started from. State laws are now being amended to allow that to happen."[30]

However, the readjustment was not trouble-free. Nor was selective contracting the only issue that touched off legal controversy. Innovations in cost containment as well as changes in law and regulation could bestow or eradicate competitive advantages overnight. Whoever got the jump on an effective new product or cost-control strategy stood to reap benefits measured in millions, if not billions, of dollars. Given the intense jockeying for position that was now characteristic of the marketplace, the 1980s quickly became a period as notable for litigation and political logrolling as it was for innovation and change in the financing and delivery of care.

Lawsuits over selective contracting broke out all over the country during the 1980s. In most cases, state regulatory agencies or competing providers and insurers alleged price-fixing and other antitrust violations against PPOs or other managed care plans. Medical necessity and UR programs also were challenged by patients and providers protesting excluded modes of treatment. In *Zuckerberg versus Blue Cross and Blue Shield of Greater New York,* for example, a state court held that the Plan could not deny benefits for nutritional therapy for cancer. In Ohio, one hospital sued a Blue Cross and Blue Shield Plan because it was not included in a PPO, whereas other institutions went to court to limit the discounting of their reimbursement under another selective contracting arrangement.[31]

The Plans generally fared well in these contests, except when they were found to have preponderant doctors' or hospitals' representation on their boards. Courts generally recognized the legitimacy of efforts to contain costs but took a dim view of pricing or cost-control schemes influenced by those who received payments for care. But the pro-competitive spirit of the decade put the Blue Cross and Blue Shield Plans on the defensive when competitors attacked two traditional advantages they enjoyed—tax exemption and hospital

BCBSA00292864

"differentials" (or discounts)—notwithstanding the effect these unique arrangements had on holding down consumer premiums.

Like selective contracting, hospital differentials dated back to the early days of the Blue Cross Plans. Generally, they were a measure of the difference between cost-based reimbursement that traditionally the Plans paid and the charges that were billed to most other payers. Plans and hospitals negotiated to determine what costs were reimbursable. Thus the differential could be quite substantial when a Plan's bargaining position (read "market share") was strong. Competitors who indemnified their customers for hospital charges had reason to be jealous of the differential. During the 1980s, the pro-competitive atmosphere breathed new life into their long-standing complaints to legislators and regulators. Moreover, Medicare and Medicaid now also paid hospitals on the basis of costs, at rates on a par with the Blue Plans in many states. To the extent that the Blues and federal officials drove a hard bargain in negotiating cost-based reimbursement schedules, for-profit insurers suspected and accused hospitals of padding their patients' charges to compensate.

One of the most unusual debates over the differential took place in the state of New York. A generous Medicaid program had created serious problems for the treasury of the Empire State, and in the early 1970s the legislature attempted to get a handle on the problem by fixing a ceiling on hospital reimbursement rates for both Medicaid and Blue Plans. Ed Werner described the consequences:

> This put the squeeze on hospital revenues. So the hospitals turned, as you might expect, to the only part of their customer base that wasn't controlled by the state, those who were private pay or were paid by other than Blue Cross and Medicaid. Now that's the insurance industry, which was paying charges. So the hospitals jacked their charges, which made the differential so much bigger. We're paying cost. Cost was A and charge was B. Now A stays the same, but the hospitals are free to do what they want with B. So they drive B up, and drive it up again, and drive it up again. Now the differential is the difference between A and B. Well, every time B went up the differential got bigger. Now the insurance industry is saying, "Wait a minute. Now we've got differences of 30 percent, 40 percent. . . . a higher case of 60 percent."

Because New York state hospitals were regulated extensively by state government, the controversy was referred eventually to the New York General Assembly, early in the 1980s. Realizing that legislators could not, in good conscience, countenance such a discrepancy (and that the differential had in fact grown too large), Werner said he voluntarily acquiesced to a unique arrangement by which the Blue Plans' and Medicaid differential was cast in law at a maximum of 15 percent.[32]

Elsewhere, however, the differential continued to be the target of attacks. In 1982, Tresnowski reported to Plan executives that the Health Insurance Association of America—a trade association of commercial health insurers—

BCBSA00292865

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 43 of 138

had launched a campaign to have the differential outlawed. He also pointed out that rate-setting legislation, which would strike differentials down, was under consideration in Michigan, Ohio, Pennsylvania, Alabama, South Dakota, and West Virginia. As the decade progressed, regulatory pressure continued to shrink Blue Plan hospital differentials and thus helped to drive premium rates up.[33]

Traditionally, the Plans had argued that the differential was justified by their prompt payment, comprehensive benefits, and open enrollment policies. All these practices helped hospitals serve their communities by averting financially crippling cash-flow problems and the burden of uncompensated care. These were some of the same arguments used to justify the Plans' federal tax exemption. Although about twenty states, mostly in the South and the West, taxed the Blue Plans, most others followed the lead of the Internal Revenue Service (IRS) in evaluating the tax status of businesses under their jurisdiction. Thus the IRS exemption was an important factor in protecting the Plans from state premium, property, and sales taxes, which would inevitably find their way into consumer rates. Enabling legislation in the states buttressed the Plans' special status. But without the blessing of the IRS, this protection, too, would be in jeopardy. Naturally, the Plans' commercial competitors howled whenever the subject of the Blues' tax status came up. "The private insurers . . . constantly goaded the [Internal Revenue] Service, saying, 'Hey, these Blue Cross and Blue Shield Plans, they're competing with us, they're operating like us, they look like us, and yet they don't pay any taxes,'" said Marvin C. Reiter, the Blue Cross and Blue Shield Association's general counsel during the early 1980s. In fact, the IRS often found itself perplexed by some of the more imaginative and complex business arrangements the Plans had contrived over the years. One example was HSI-MIA, the for-profit mutual insurance companies that the Blue Cross and Blue Shield Associations had spun off back in the Truman era to help sell coverage to employers with nationwide operations. "The individual IRS agent always had a problem trying to understand the purpose of the income tax exemption of Plans and how it would fit in with these two profit-making insurance companies," Reiter commented.[34]

Further confusion stemmed from the fact that eight Plans were incorporated as mutual companies in the early 1980s. Others had created subsidiaries or affiliated with for-profit companies to market services related to health coverage, such as life, disability, and accidental death and dismemberment insurance. This was a convenience for employers who wanted one-stop shopping for their employee benefit programs. For those who did not understand the local autonomy of the Plans and their innate heterogeneity, these wrinkles were all but incomprehensible. Fundamentally, however, most Plans were protected by an IRS rule of thumb that said once a corporation's nonprofit status has been approved, revenue agents are not empowered to call that exemption into question unless there is a basic change in the way the corporation does business. So no matter how loudly for-profit insurers complained,

BCBSA00292866

Case 2:13-cv-20000-RDP Document 1353-8 Filed 07/17/17 Page 44 of 138

or how hungry the government was for new revenues, the Plans for decades had been successful in protecting their special status.

Chinks in their legal armor started to develop, Reiter said, when some Plans began to write major medical insurance (supplementary policies to cover extraordinarily expensive illness or injury) and to experience-rate some large employee groups (that is, charge reduced premiums based on the claims volume of that group alone). The justification for the federal tax exemption, after all, was the special community service the Plans performed by making coverage available to all at an affordable rate. Experience-rating and selective coverage such as major medical undercut that principle. But through the early 1980s, the exemption held up because the Plans still accepted risks that other insurers refused to cover, particularly individuals and small employee groups. "Their mission was still to provide as broad a coverage as they could to as many people as they could under the best of circumstances," Reiter said. By the mid-1980s, new pressures began to threaten the tax exemption more seriously than ever before. A combination of factors was responsible. The mushrooming HMO movement was one of them. Many of the new HMOs applied for tax exemptions. "Some were granted and some weren't," Reiter said, "and there was always the sense from the HMO people that they never were treated quite fairly, because they couldn't quite understand why they couldn't get an exemption when the Blues had one."[35]

Another problem arose in the aftermath of the Federal Trade Commission's (FTC) investigation of the Blue Shield Plans during the 1970s. The FTC was suspicious of potential conflicts of interest on the part of physicians who served on Blue Shield Plan boards. Nothing came of these investigations. As guardians of competition in the marketplace, however, FTC officials also harbored suspicions that the Plans might attempt to block the development of HMOs and thus restrain free trade. Once again, no evidence of wrongdoing could be found. But the net effect of all the complaints and the suspicion was to create pressure on the IRS to modify the tax status of Blue Cross and Blue Shield Plans.

To assist Congress in reconsidering the Plans' tax status, the U.S. General Accounting Office (GAO) prepared a report in 1986 comparing the public service functions performed by the Blue Plans and by commercial insurers. At issue were rating and underwriting practices and the price and availability of coverage for large groups, small groups, and individuals, especially those at high risk. Among other differences, the report found that Blue Plans in fifteen states still offered year-round open enrollment to individuals, regardless of health status, which no for-profit insurer did. But because the Plans generally experience-rated their large group business, just as commercial companies did, they often could not generate a subsidy large enough to keep rates affordable for their small group, individual, and high-risk business. "We observed more similarities than differences [between Blue Plans and commercials] with regard to high-risk individuals," the GAO study's authors concluded. IRS officials advised the GAO "that the significant differences

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 45 of 138

between nonprofit and for-profit insurers that may have justified the initial tax exemptions have been eroded by competitive developments."[36]

The report brought to light IRS documents dating back to 1976 that questioned the continuing validity of the federal tax exemption. Rather than take steps to revoke it, however, IRS officials had opted to wait for Congress to act. "These Plans are so big, they affect so many people, they're now involved in Medicare, they have a large number of our federal employees," explained Reiter, recapitulating the IRS position. "For [the IRS] to try to lift this thing administratively . . . is simply going to cause a tremendous amount of political grief."[37]

The mounting federal deficit finally led Congress to address the issue in the Tax Reform Act of 1986. Hard-pressed for new revenue sources, the tax architects on the House Ways and Means Committee saw the Blues as a ready target. Characteristically, Plan leaders did not agree about how to respond. According to Tresnowski, the result was a "big debate on what policy position we ought to take on the tax reform matter, our tax position. There were strong feelings that we were a social organization with a social mission. There were other people who said, 'No, we're a business organization with a business mission and we should be taxpayers.'" Ultimately, Tresnowski and other BCBSA representatives adopted a carefully balanced stance in negotiating with legislators. They acknowledged that the Plans had evolved into more businesslike corporations since the early days when their nonprofit status was initially determined. At the same time, BCBSA representatives argued—gently but firmly—that the Blues still provided unique community service, especially as insurers of last resort in many areas of the country. This, they contended, resulted in protection for millions of high-risk individuals who might otherwise wind up on Medicaid or be treated free by hospitals and doctors; in turn, they pointed out, the providers would probably write the loss off their taxes or add it onto their charges for paying patients.[38]

These arguments, backed by a letter-writing campaign by thousands of Blue Cross and Blue Shield Plan subscribers, resulted in a split decision. The 1986 tax reform bill created a special niche for Blue Cross and Blue Shield Plans under the new Section 501(m) of the IRS code. The section created a tailor-made deduction for those Plans with reserves worth less than three months of premium income. It taxed net income sheltered by the deduction at 20 percent, rather than at the 34 percent corporate rate. To remain eligible for the deduction, Plans were barred from making substantial changes in the way they handled their high-risk, individual, and small group business. The Plans also paid the full rate on income not sheltered by the deduction. The House Ways and Means Committee estimated that the new tax would earn $1.7 billion during the first five years.

According to one commentator, the new tax was "not likely to affect the competitiveness of the Blues." Rough estimates were that the levy would consume between 0.15 and 0.25 percent of the Plans' premium income and cost subscribers from $1 to $1.50 a year. According to a report in the trade journal

BCBSA00292868

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 46 of 138

*Business and Health,* "This is less than one-fifth of the taxes paid by one large commercial insurer." Many states continued to exempt the Blue Plans from premium taxes. However, Tresnowski expressed disappointment about the action by Congress, especially a last-minute change, which doubled the special rate for Plans with less than three months' reserves, made in a House-Senate conference committee. "The conference members came under extraordinary pressure to produce revenue," Tresnowski noted in a diplomatically worded protest, which emphasized the burden the new tax would impose on subscribers.[39]

In its compromise on the Blues' tax status, Congress recognized the Plans as a breed apart. Tresnowski said:

> We remain special, and thus essentially different from our competitors—as we always have been. . . . The task now becomes one of converting this new circumstance to our competitive advantage by emphasizing the characteristics that distinguish Blue Cross and Blue Shield Plans from all the others—community origins, community ties, small group recognition, unique hospital and physician relationships—along with strong name recognition.[40]

Nevertheless, the Plans had lost part of their special status with the government. Before long it would become apparent, also, that the change in tax status would have other effects more significant than its direct financial impact.

## A Call to Order

By the middle 1980s, some of the dark clouds that had been hanging over the Blue Cross and Blue Shield system when the decade began seemed to be scattering. The heavy losses of 1980 and 1981 had given way to three profitable years from 1983 through 1985. The Plans were making substantial progress in starting up the HMOs and PPOs their customers wanted. As Medicare intermediaries, they had weathered the adjustment to the new prospective payment system. Disturbing upward trends in the cost of care seemed to be leveling off. The painful but necessary merger of the Blue Cross and Blue Shield Associations, and the organizational streamlining that followed, were now past. Communications and trust between the Plans and the Blue Cross and Blue Shield Association were building back up. The local consolidations and mergers called for in the Long-Term Business Strategy of 1982 were proceeding apace. By mid-1985, twenty had taken place and the system had slimmed down to eighty-six Plans from more than a hundred before the strategy was adopted, with more local mergers in the works. "All those things taken together added up to a much better performance by the organization," Tresnowski reflected in 1985. "We've been fortunate."[41]

Competitive pressure and the economic vagaries of the health insurance business continued to create formidable challenges, however. For two decades, year-to-year financial results for health insurance companies had

BCBSA00292869

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 47 of 138

been subject to a surprisingly regular pattern of three years of gains followed by three years of losses. The six-year "underwriting cycle" occurred as insurers held prices down to gain a competitive advantage during good times and then suffered losses when upward movement of cost and utilization trends overtook premium income. Thus after eleven consecutive quarterly gains, the Blue Plans in the aggregate were again in a loss position by mid-1986. Declines in utilization that had rippled through the nation's health care system with the advent of DRGs had slowed as patients and providers learned to make greater use of ambulatory care facilities. And managed care, with all its efficiencies, inevitably brought increases in administrative costs for both providers and insurers.

Through the mid-1980s, the decade-long erosion of the Plans' share of the health insurance market continued. Those losses were countered, to some extent, by successes in developing new kinds of coverage. In 1986, for example, Blue Cross Plans had a combined enrollment of 74 million members, 30 percent of the market. Blue Shield Plans had 60 million members, a 24 percent market share. Those figures represented a loss of about 1 percent a year since 1981. In the fiscal year ending June 30, 1986, both Blue Cross Plans and Blue Shield Plans had lost enrollment in their traditional business—service benefits for hospital, medical, and surgical care. But the losses were almost completely offset by gains in nontraditional products such as HMOs and PPOs. More than fifty Plans were offering HMO and PPO coverage, according to the BCBSA's 1986 annual report. Taken together, the HMOs now had about 3 million subscribers and the PPOs had a membership of 5.7 million. "We still protect more people than the largest half-dozen of our major competitors combined, and we shouldn't ever let anybody forget it!" declared Tresnowski, with a flash of combativeness that contrasted with his usual low-key demeanor.[42]

It was the unforeseen side effects of an obscure clause in the Employee Retirement Income and Security Act of 1974 (ERISA) that had the most unsettling influence on the private health insurance market of the 1980s. In response to a series of pension fund abuses, Congress created with ERISA a set of federal standards for self-funded employee benefit programs that preempted state regulation. Only after the fact did the courts decide that self-funded health plans (that is, plans in which the employers bore the financial risk for the health care claims of their workers) were covered by the act. The potential advantages of self-insurance were slow to dawn on employers. "Back in the early '80s, ERISA wasn't even an issue. No one was paying attention to it," observed Donald Cohodes in a 1992 interview, when he was BCBSA vice president for federal programs and head of the BCBSA Center for Health Economics and Policy Research.[43]

At the same time, the rising cost of care was driving some employers and insurers to strip down coverages to bare essentials, which prompted a backlash when many state legislatures retaliated by enacting minimum benefit laws. Not only did ERISA exempt self-insured employers from these mandates, it

BCBSA00292870

also freed them from insurance premium taxes, reserve requirements, state risk-pool contributions, and other insurance regulations that were traditionally the province of the states. In addition to the other advantages conferred by ERISA, self-insuring employers could pay claims after they were incurred, rather than prepaying through insurance. That difference gave the employer an opportunity to increase its investment income and to take greater control over its own cash flow. As the 1980s progressed, insurance companies began to recognize the attraction of self-insurance to many employers and responded by offering to provide administrative services only, further smoothing the path for those who chose to self-insure. "[Self-insuring] became very attractive for those who wanted to control their own destiny," Cohodes noted. By the end of the decade, estimates suggested that 80 percent of all firms with more than five thousand employees were self-insured. Those big companies "used to be a principal market for Blue Cross and Blue Shield [Plans]," Cohodes went on. "So we lost a ton of business to that."[44]

The Plans and the Blue Cross and Blue Shield Association continued to wrestle with the manifold problems created by their diversity. The Association struggled to facilitate inter-Plan coordination and cooperation on large, multistate accounts without creating a cumbersome and intrusive bureaucracy. Propositions 1.1 and 1.2 of the Long-Term Business Strategy (urging Plan mergers and one Plan per state, respectively) helped streamline operations in many areas and to foster a less cluttered environment. Because of the merger of the Associations—and Blue Cross and Blue Shield Plan consolidations in bellwether states such as New York and Michigan—some momentum was already at work reinforcing the goal of Proposition 1.1. The market demand for a continuum of comprehensive inpatient and outpatient benefits rendered the traditional distinction between hospital and medical Plans increasingly irrelevant. Sometimes the long-standing, original differences between Blue Cross and Blue Shield Plans remained difficult to resolve. But Proposition 1.1, for the most part, was clearly an innovation for which the time had come.[45]

Proposition 1.2, however, carried an explosive potential for disputes and triggered some of the nastiest and most difficult episodes in the history of the Blue Cross and Blue Shield system. "When you start . . . telling two Plans that they ought to wipe out the line between them and become one, you're dealing with some very delicate matters," commented New York City's Ed Werner. "You're dealing with two boards that might think they're autonomous. You're dealing with two chief executives who think that they 'own' the company that they're running."[46] For example, the Blue Cross and Blue Shield Plans of Northeastern New York, headquartered in the state capital of Albany, had always been separate corporations but had periodically shared board members as well as offices and staff for some administrative functions, such as enrollment and billing. As the older and larger partner, the Blue Cross Plan had been in a dominant position, according to Walter Owens, then president of the Blue Shield Plan.[47]

BCBSA00292871

Complaining that the Blue Cross Plan set its charges to the Blue Shield Plan for administrative services unilaterally, the Blue Shield Plan in 1980 had begun to pull out of the shared offices and to disengage itself from the joint operating arrangements. In 1982, the Blue Cross Plan began selling medical/surgical coverage in the Albany area, in direct competition with its former sister Plan. The Blue Shield Plan countered by offering hospitalization coverage. By 1984, the conflict was amplified by two lawsuits roughly equivalent in tone and substance to divorce pleadings.

Proposition 1.1 prompted a protest from Owens, because of the threat that his Plan would wind up under the thumb of an unfriendly partner. The Blue Cross Plan was experiencing financial difficulties and service problems that would drag the Blue Shield Plan down, he charged. The threat only increased when Empire Blue Cross and Blue Shield (the New York City Plan headed by Ed Werner) absorbed the Albany Blue Cross Plan in 1985. Even after Owens left in mid-1985, distrust ran so deep that the Albany Blue Shield Plan finally merged instead with Blue Shield of Western New York, in Buffalo. It is ironic that the state that produced one of the most influential Blue Cross and Blue Shield Plan mergers (the Empire Plan in New York City) and one of the chief architects of the merger of the Blue Cross and Blue Shield Associations, as well as of the Long-Term Business Strategy itself (Empire's Ed Werner), still wound up with a patchwork of Plans. The jumble included a Buffalo-Albany Blue Shield Plan; a Buffalo Blue Cross Plan; an Albany–New York City Plan that was a Blue Cross Plan in certain areas and a Blue Cross and Blue Shield Plan in others; and three more independent Blue Cross and Blue Shield Plans in Rochester, Syracuse, and Watertown-Utica. "And I was the lead monkey on this," said Werner, shaking his head.[48]

The Albany imbroglio was an extreme case, but it illustrates the kinds of stresses and strains to be overcome in the drive to consolidate. On the whole, Propositions 1.1 and 1.2 successfully achieved their objective of streamlining the Blues system. From 1980 through 1989, the number of Plans dropped from 110 to 75. "The wrong set of signals or the wrong set of pressures could have ruptured the system," Tresnowski reflected. "It didn't happen that way because people kept their cool."[49] The only states with more than two Plans at the end of the decade were New York (six), Pennsylvania (five), Ohio (three), and Washington (six).

It is a hallmark of the history of the Blue Cross and Blue Shield organization that progress in solving one set of difficulties is usually overtaken by the emergence of new problems before the old ones are settled. Plan leaders disagreed among themselves about what stance to take during negotiations with Congress about the Plans' tax status in 1986. For some, the primary mission of the organization was social welfare. For others, it was strictly business. When Congress took away the tax exemption, the context of the debate changed radically. Previously, IRS rules had inhibited the Plans from forming for-profit subsidiaries so they could compete on equal terms with the other

BCBSA00292872

players in the insurance field. The old enabling laws—passed by the states for hospital and medical service associations—often restricted Plans' freedom of action and put them at a disadvantage in setting up HMOs and PPOs or offering customers the financial services and insurance options they wanted. Before 1986, a Plan that went into a new line of business risked a reevaluation of its tax status by the IRS. After the exemption was lost, that restraint was lifted. The Plans had nothing to lose by diversifying. "There's no doubt that changed the behavior of the Plans," said BCBSA counsel Marv Reiter in 1991. "That opened up the door. Where you had a limited number of subsidiaries before, clearly they mushroomed like missiles. . . . We went from 50 or 60 nationally to where there's now 400 and some." Moreover, Reiter said, once the IRS stopped viewing the Plans as social welfare organizations, many of them stopped viewing themselves that way as well.[50]

The subsidiaries kept running into each other—and each other's parent Blue Plans—in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market. New forms of competition were springing up at every turn, and market share was slipping year by year. Survival was at stake. The stronger business pressures became, the stronger the temptation was to breach the service area boundaries for which Plans were licensed. "It was a very messy situation," Tresnowski commented. BCBSA lawyers warned that if the invasions continued unchecked, the Blue Cross and Blue Shield service marks could lose their protected legal status and become generic terms that any competitor could co-opt. "That scared the hell out of me," said Tresnowski. And the longer the confusion continued, the more it seemed the BCBSA, as matters then stood, was powerless to stop it. As Tresnowski put it:

> The Long-Term Business Strategy did a lot of good things, but what it did more than anything else was to highlight the lack of discipline. . . . Behind it all, if people didn't want to do it, they didn't have to do anything. The record will show that we used smoke and mirrors to convince people to do things. . . . And then it became clear that you can't manage a confederation with smoke and mirrors.[51]

John Larkin Thompson—president of Blue Cross and Blue Shield of Massachusetts and a leader of BCBSA—was struck by the parallels between the Blue Plans' organizational system and the balance of power between the federal government and the states in U.S. history and in the Constitution. Extending the analogy, Thompson reasoned that the Plans might benefit from attempting to redefine their organization, just as the Constitutional Convention of 1787 had redefined the United States. Tresnowski liked the idea and proposed a systemwide convocation, to be dubbed the Assembly of Plans. To prepare for the deliberations, CEOs were canvassed to identify salient issues and areas of agreement and disagreement.[52]

Foremost among the points of agreement was that the Blue Cross and Blue Shield service marks were vitally important and needed to be protected

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 51 of 138

at almost any cost. There also was almost unanimous agreement that the Plans must strengthen their ability to compete for national accounts; that the BCBSA had an important role to play in representing the Plans and providing support services for inter-Plan activities; and that "the exclusive service area concept of the license agreements needs to be examined." A strong, but less than unanimous, majority agreed that the exclusive service area concept was necessary; that the change in tax status "can have a major impact on Plan practice and culture"; and that difficult problems existed in balancing the interests of lead (or control) Plans in national account syndicates and the participating (or par) Plans that provided benefits to branch offices of national companies headquartered in the control Plan's service area.[53]

Strong minority views reflected some of the more difficult contradictions in the Blues system, and the issues on which it would be hardest to reach agreement. Several Plans indicated that the BCBSA's role should be limited to that of a traditional trade association—that its functions as a leader of the member Plans and as a powerful operating entity in its own right were inappropriate and were resented in certain quarters. Fallout from the business strategy was evident in this objection, particularly in reaction to the aggressiveness with which the BCBSA had pushed for mergers of Plans. Many CEOs expressed apprehension about the Association's role in business planning and in enforcement of service mark rules, which were incorporated into the licensing agreements by which the Association authorized use of the Blue Cross and Blue Shield service marks. A significant minority of CEOs also questioned the degree of influence exerted by the large Plans in the Association under the weighted vote system and, conversely, asked questions about the adequacy of the representation of small Plans.

The first of the meetings of the Assembly of Plans was held in April 1987, and the process of working through the issues took three years to complete. The threat of anarchy had finally forced the issue of the authority of the central organization. To Tresnowski and many influential leaders among Plan CEOs, it was becoming obvious how the pieces of the puzzle fit together. Since the AHA had ceded ownership of the names and service marks to BCA in the early 1970s, the BCBSA held the legal rights to the use of all the names and marks. The BCBSA was charged with administering membership standards, which were incorporated into its bylaws and which covered matters such as nonprofit status, financial integrity, and participation in national accounts. The membership standards had for the most part been originally formulated during the first few decades of Blue Cross and Blue Shield Plan history and, Tresnowski said, were clearly anachronistic in the mid-1980s. Moreover, they never had been tied explicitly to the licensing agreement by which the BCBSA authorized Plans to continue use of the Blue Cross and Blue Shield names and service marks. As Tresnowski put it:

> I became absolutely convinced that if you wanted to get Blue Cross and Blue Shield Plans to act as a system, to manage itself. . . . you weren't going to get there unless you took the one thing that they valued the most, and that was

BCBSA00292874

> their name, and put the disciplines behind it. In other words, if you were going to be a Blue Cross and Blue Shield Plan, you had to behave in the following way—everybody. . . . If you want to have a license, then you've got to do these kinds of things.

On the crucial matter of exclusive service areas, the Assembly gradually developed an intermediate position. Plans and subsidiaries operating under the Blue Cross and Blue Shield name would be bound to honor the limits of their service areas and to refrain from invading each other's territory. The agreement "does not restrict the corporation from doing anything it wanted to do in [unbranded] subsidiaries," Tresnowski explained. "Everybody sort of nodded their heads and said 'Well, that makes sense.' Little did they realize what kind of problem they were opening up for themselves."[54]

The new membership standards and licensing agreement that eventually were adopted also clarified the BCBSA's ability to enforce requirements for financial soundness, to arbitrate inter-Plan disagreements, and to strengthen inter-Plan discipline in national accounts and the growing HMO and PPO networks. Once the Plans began to accept the premise that the Association's licensing authority was clearly linked to a new canon of demanding standards, it became apparent to them also that a significant shift in the balance of power would take place. "That is an awesome power they were giving the Association," Tresnowski acknowledged—a degree of centralized power the Plans had consistently withheld for the previous fifty years.[55]

## The Limits of Competition

The intrepid attempt to reinvent their confederation did little to protect the Blue Plans from the rigors of an ever-changing environment. During 1987, as the Assembly of Plans began its work, the key trends and assumptions that had governed health policy planning in the first half of the decade suddenly began to unravel. The flattening out of cost increases—observed after the Medicare prospective payment system was implemented—failed to hold. It was beginning to look as if pro-competitive policies were no more effective in controlling costs than the regulatory policies they had replaced. Disturbing new trends were surfacing. The incentives for cost-effective treatment created by DRGs and private sector fixed-payment schemes were having a worrisome effect on the quality of care. A lack of adequate public or private insurance coverage for long-term care was bankrupting families as the population aged. Belt-tightening in the Medicare and Medicaid programs was forcing hospitals and doctors to raise their prices for privately financed care, driving the cost of insurance out of reach for many working people of modest means.

Tresnowski expressed embarrassment at having been fooled into thinking just a few years earlier that the problem of costs was under control. "We neglected to consider that the health care business is unlike most others," he confessed in the BCBSA's 1987 annual report. "When volume falls, for whatever

reason, most businesses lower prices to get the customers back. But when volume was curtailed in hospitals and doctors' offices, prices were increased."[56] Governmental efforts to increase efficiency by decree also had met with only limited success. In the mid-1980s, for example, the HEW had issued a directive that hospitals with average annual occupancy rates below 60 percent, as well as any hospital obstetric department that delivered fewer than five hundred babies a year, should be closed. Within weeks, HEW had received sev-



Bernard R. Tresnowski's tenure as head of the Blues' national organization (1981 through 1994) began with the difficult task of overseeing the merger of the Blue Cross Association and the Blue Shield Association. His job became even more difficult after that when the Blue Plans were challenged to reinvent themselves—individually and collectively—when the marketplace turned to managed care in the 1980s and 1990s. (Fabian Bachrach)

enty thousand letters of protest. Small hospitals might be inefficient, but small communities could be very effective in fighting to prevent their babies from being delivered or their elderly from being cared for in large, high-volume institutions that were a two- or three-hour drive away. The HEW directive disappeared.[57]

Resurgent cost escalation reflected a dynamic—often seen before by old hands in the health field—that was frequently compared to the bulging of a balloon at one end when pressure was applied to the other. Over the years, many forms of cost containment met with success at first and then gave way as inflationary pressures found new outlets. When admissions were restricted by UR programs, for example, lengths of stay might go up instead. When admissions and lengths of stay were controlled, an upsurge in the use of ancillary procedures might be observed after a while.

In the post-DRG era, cost savings realized by tighter controls on hospital

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 54 of 138

reimbursement led to increased spending elsewhere. With the blossoming of outpatient surgery centers and urgent care clinics ("docs-in-a-box," as some wags called them), utilization of outpatient care services shot up. For the Blue Plans, outpatient visits per thousand members went from 270 to nearly 510 between 1978 and 1988. One commercial insurer, Northwestern National Life, reported a 70 percent increase in expenditures for outpatient services from 1983 through 1989. The trend affected HMOs as well. According to Paul Ellwood's InterStudy research organization, physician visits by HMO members increased by nearly 18 percent between 1982 and 1987. "There is a lot of imagination running rampant on how to beat the system," Tresnowski observed dryly in 1985.[58]

The new cost bubbles were not all reactions to prospective payment systems. State planning agencies that sought to control hospital spending by requiring certificates of need (CONs) for new hospital construction and equipment also stimulated the resourcefulness of revenue-hungry providers. Ed Werner described a typical scenario:

> [The CON board would] say to a hospital, "No you can't have a CAT scanner because there's a CAT scanner down the road." So a bunch of radiologists from the hospital walked out of the hospital, went across the street, rented a building, went to the bank, borrowed some money, and bought a CAT scan. Now they were operating a CAT scan across the street as entrepreneurs, charging more for it than the hospital would have charged if it had it. So CON broke down because of that.[59]

It was widely suspected that doctors also referred patients to diagnostic labs and clinics more often when they had a financial stake in the facilities than when they did not. A study done in the mid-1980s by Blue Cross and Blue Shield of Michigan compared the price and number of tests provided at doctor-owned labs and independently owned facilities. The study found that the average test prices were 75 percent higher at the doctor-owned labs, and the average number of tests 50 percent higher.[60]

Some of the most troubling side effects of Medicare's prospective payment system were the costs it passed on to the program's elderly beneficiaries themselves, which were shifted in turn to insurers when the beneficiaries' deductibles and copayments were covered by supplementary private coverage. The stated goal of the Medicare prospective payment system (PPS) was to encourage cost control with new incentives, not to save money for the government. In the words of one commentator, the program "was never designed or intended to solve the much larger budget crisis of the federal government that simultaneously began to emerge in the spring and summer of 1983. . . . Nevertheless, PPS almost immediately became a tool for achieving larger budget goals." Periodic rate adjustments in the program quickly became "targets of opportunity" for administration budgeteers.[61]

The hospital deductible under Medicare Part A was pegged to the average cost of the first day of hospital stay. Since DRGs prompted shorter stays, the

BCBSA00292877

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 55 of 138

average cost of that first day tended to increase. From 1976 to 1981, the inpatient deductible for Medicare rose from $104 to $204 (an average of $20 a year). From 1981 to 1986, it rose from $204 to $492, an average of $57.60 a year. Since DRGs tended to shift the locus of care from the hospital to the doctor's office, the elderly also were liable for an increased burden under Medicare Part B, which required a higher level of copayments and deductibles for physician care than did Part A for hospital care.[62]

Although their out-of-pocket liabilities were going up, the elderly still had the basic Medicare entitlement, which gave them a guaranteed measure of protection against the hammer and anvil of rising costs and shrinking governmental budgets—at least as far as acute care was concerned. Others were not so lucky. By 1986, the number of Americans with no health insurance at some time during the year had grown to an estimated 37 million, an increase of between 25 and 30 percent since the beginning of the decade. The growth of the uninsured population was becoming the key barometer of the health care system's shortcomings, albeit many other measures were available. To illustrate, policy leaders for years had watched worriedly as the percentage of the gross national product (GNP) being spent on health care crept upward. But when the percent-of-GNP measure cracked the 10 percent barrier in the mid-1980s, the sky did not fall. No one could say for sure if a catastrophe had occurred. After all, spending money on health care is not necessarily a bad thing. The problem of the uninsured, however, was inherently explosive. The numbers of people involved were politically significant. And the consequences of inaction were literally life-threatening.

The growth of the problem was partly due to the limits of the Medicaid program. Federal budget constraints made it impossible for program spending to keep pace with health care cost increases, regardless of the limited successes of cost containment. State budgets were similarly strained, and statehouse decisions on eligibility and benefit limits were frequently Draconian. From 1977 through 1987, the number of people living below the federal poverty level increased from 22.9 to 33.7 million, while the number of Medicaid recipients dropped from 22 to 21 million.[63]

Most of the uninsured, however, were working people. Some could be found in small businesses that could not afford to pay their employees' health coverage. A changing economy had aggravated this trend, as employment growth was concentrated in smaller businesses. One study estimated that 88 percent of all new jobs created from 1985 through 1989 were in companies with fewer than twenty employees.[64] Private insurers—including many Blue Plans after the loss of their tax exemption—were increasingly tough about rating small companies according to their employees' health status and group loss experience. This made insurance prohibitively expensive for many small companies, even when their owners did try to buy it for their workers. Rising insurance costs also prompted large companies to make their employees pay a growing share of their own premiums. The generous, paid-in-full health

BCBSA00292878

benefits that major industries had begun providing for their workers in the 1950s were now just a memory. Low-wage workers who could not afford the hefty copayments had to give up their coverage.

It was not hard to see the impact that a lack of coverage could have on individuals and families. Uninsured people who suffered a serious injury or illness likely would go through their life savings with breathtaking speed, until they spent their way into poverty and became eligible for Medicaid. Diabetics, hypertensives, and others with chronic illnesses would be more likely to go without monitoring and medication and, inevitably, to become sicker. Children—a large segment of the uninsured—likewise would go without preventive care and thus increase their risk of being debilitated by treatable conditions. In one sixteen-year longitudinal study, the death rate among uninsured patients was found to be twice that of the insured.

The economic effects of the uninsured on the health care system were debilitating as well. The bill for uncompensated care in the nation's hospitals was rising by as much as 10 percent a year in the late 1980s. As they always had done, hospitals and doctors found ways of tacking their losses onto the bills of paying customers, who were in most cases privately insured. This in turn drove premiums out of reach for low-wage workers.

In short, the inexorable march of health care spending increases distributed pain in all directions. Even the insurance industry, although it surely received less sympathy than any other affected party, could be counted among the wounded. Tresnowski had not been alone when he surmised in 1985 that cost containment was working and the inflationary curve was flattening out. "Many insurers overestimated the savings from cost containment programs and therefore underestimated expenses," BCBSA analysts concluded in a 1989 report.[65] Because of the usual six-year underwriting cycle, losses were not unexpected from 1986 through 1988. But industry losses continued to run high in 1988, when they should have begun to taper off.

The result was a round of premium increases that sent shock waves through the corporate community. Cigna, after suffering losses of about $130 million in its health insurance business in 1988, increased premiums for large groups by 20–30 percent in 1989, rather than the 15–20 percent it had planned. Prudential raised premiums by 30–40 percent; Aetna Life and Casualty by 20–25 percent; and Travelers by 25–30 percent. Several other large insurance companies began to divest themselves of much of their health insurance business and to raise rates dramatically for groups they continued to cover. Aggregate Blue Cross and Blue Shield Plan losses in 1988 were 3.4 percent of premium income—not as bad as the average among the top ten commercial companies of 4.6 percent, but bad enough to prompt painful rate increases by many Plans. Price increases began to take their toll. From 1985 through 1989, the Plans lost a total of 10 million subscribers, and their share of the private health insurance fell to 28.6 percent, from a high-water mark of 37.6 percent in 1975. For some Blue Plans, the three-year loss cycle of the late 1980s was devastating.[66]

The most traumatic episode of the period was the collapse in 1990 of Blue

Cross and Blue Shield of West Virginia, located in Charleston. Cost shifting was a major factor in the demise of the Charleston Plan, according to BCBSA officials and news reports. An impoverished state treasury had underfunded both West Virginia's Medicaid program and the state's 120,000-member Public Employees Insurance Agency. The two programs had run up a combined total of about $100 million in unpaid bills to West Virginia hospitals, which, to compensate for the debt, raised the rates they charged the Blue Cross and Blue Shield Plan and other insurers by 40 percent over a four-year period. Unlike the other insurers, the Blue Plan's rates were regulated by the state, and the rate regulating agency was slow to respond to the Plan's request for increases to keep up with the higher hospital payments.

While other Plans were pulling out of the 1986–1988 underwriting loss cycle, the Charleston Plan kept losing money and fell months behind on its reimbursements to hospitals and doctors. The Plan's problems were compounded by the large numbers of high-risk subscribers it had enrolled, particularly coal miners with occupation-related ailments. When the state finally allowed a rate hike, the Plan increased premiums by as much as 95 percent in an effort to recoup its losses. The result was that subscribers were driven away, which further eroded the Plan's financial base. A long obituary in the *Wall Street Journal* after the Plan's demise blamed some of its problems on mismanagement, and ten hospitals later sued the BCBSA for not providing adequate supervision. But BCBSA counsel Marv Reiter said the Plan was beyond help. "I don't think an absolute genius [managing the Plan] and doing everything right would have made a bit of difference, except maybe [delaying the bankruptcy] by a month or two. That place absolutely was on its death spiral and was going into a black hole."[67]

In June 1990, the BCBSA board of directors voted to renew the Charleston Plan's membership, on the condition it submit "an acceptable rehabilitation program, including an affiliation agreement with another Plan, which will enable the West Virginia Plan to obtain adequate financial resources." Charleston Plan leaders, along with West Virginia state officials, tried all summer to negotiate a merger with the Cleveland Plan, but they could not reach agreement. On October 4, the BCBSA board voted to revoke the Charleston Plan's licenses despite a plea for mercy from West Virginia governor Gaston Caperton. On October 12, 1990, the state insurance commissioner announced that the Plan was insolvent and going out of business. It was the first Blue Plan ever to go under.[68]

Blue Cross & Blue Shield of Ohio, in Cleveland, quickly took over a second West Virginia Plan headquartered in Parkersburg and arranged for the Parkersburg Plan—renamed Mountain State Blue Cross and Blue Shield—to assume coverage of the Charleston Plan's subscribers. While the allied Cleveland and Mountain State Plans guaranteed coverage for former Charleston subscribers, they did not assume immediately the defunct Plan's $30 million in outstanding debts to physicians and hospitals. Some of the providers agreed to forgive the balances owed by patients stranded by the liquidation,

but others continued to demand payment, turned the unpaid bills over to collection agencies, or sued.[69] Eventually, BCBSA helped broker a plan to reimburse subscribers for money owed them by the defunct Charleston Plan and to stop providers from trying to collect from subscribers what was owed to them by the Plan.

Financial problems that beset other Plans in the tightly regulated states of the Northeast were distressingly similar to Charleston's. Several Plans were caught in the same spiral of adverse selection, rising costs, and regulatory constraints. At times their problems were aggravated because management was wedded to traditional ways of doing business and was therefore slow to adapt to the changing demands of the marketplace. But the regulatory environment tended to be the decisive factor.

In New Jersey, for example, a web of legal mandates held the Plan in a virtual straitjacket as it sought to respond to the cost pressures of the late 1980s. The New Jersey Plan was by law an insurer of last resort and was required to accept all applicants. Not only were its rates controlled by the state insurance commission, but—as in New York—the discount or differential it received from hospitals was also set by regulators. During the downswing of the underwriting cycle, the Plan had fallen more than $200 million in the red. Because of its unstable financial position, the BCBSA Plan performance committee in 1988 recommended not renewing the New Jersey Plan's license to use the organization's name and mark. As in West Virginia, New Jersey's insurance commission was slow to allow premium rate hikes or an increase in the mandated hospital discount. "If they're the carrier of last resort, the state has an obligation to keep them going," Reiter commented. But instead, "The states always say, 'They'll find a way to keep it going. They can work it out. They can live on air.'" The license revocation was held in abeyance, however, while the Plan made an effort to negotiate for regulatory relief. In 1991, the state finally granted additional rate increases and doubled the Plan's allowable hospital discount.[70]

Many of the weaker Plans were in states that also set a limit on their reserves. Douglas McIntosh, president of the Rhode Island Plan, said reserve limits prevent Plans from setting aside the gains they make during the good years in the underwriting cycle to cover losses during the lean years. "As the insurer of last resort," McIntosh said, "we're out there selling fire insurance at the scene of the blaze. We want to continue serving, but the state legislature has to understand that we can't unless we're properly capitalized."[71]

The West Virginia crisis, accentuated by the problems of other Plans in the Northeast, revealed the persistence of two myths about the Blues that were somewhat flattering but also outdated and misleading. The first myth— founded on the Blues' venerable status as the nation's oldest and largest organization of independent health insurers—intimated that the Plans enjoyed a godlike invulnerability. "There are some institutions people see as perpetual, and Blue Cross was one of them," said a Charleston attorney who represented

BCBSA00292881

local hospitals during the liquidation proceedings. "I don't think the idea that Blue Cross could be liquidated had occurred to any of them."[72]

A health care specialist at an accounting and insurance consulting firm remarked that the same mistaken attitude was common among both providers and consumers outside West Virginia as well. "To blindly assume that because they're dealing with Blue Cross and Blue Shield God won't let the Plan fail is just crazy," said Glenn Shively, of Coopers and Lybrand. BCBSA's Reiter concurred. "I think it came as a complete shock in West Virginia that the Association and the Plans did not bail out West Virginia in terms of paying all past claims," Reiter said.[73] According to Douglas S. Peters, then a BCBSA senior vice president, the misconception was based on past experiences in which financially troubled Plans had received ad hoc assistance, either through the negotiation of mergers or other patchwork arrangements:

> When a Plan's in financial trouble, it can draw on the expertise of other Plans. And there's a general concern because we all share the trademark[s] of Blue Cross and Blue Shield. . . . But we [the Association] are just a licensing organization. There's no fund here for the individual Plans to tap.[7]

The second myth, an insubstantial and treacherous shadow of the first, was that the Blue Cross and Blue Shield organization—the Plans and the BCBSA—constituted a monolithic whole, and that the failure of the West Virginia Plan meant the entire system was on the brink of collapse. The business press had a field day speculating about the implications of the West Virginia story. For the system's insiders (who were excruciatingly aware of the Plans' autonomy, diversity, and intermittent bouts of internecine warfare), the false premise underlying much of the speculation was simultaneously laughable and insidious. As Peters suggested, the inference of systemwide instability did not have to be well founded to have an impact. When it came to public confidence in financial institutions, perception was reality. Many of the Plans, especially in the West and the South, had in fact come out of the 1986–1988 loss cycle with flying colors. The system as a whole posted a net gain of $1.2 billion in 1989 and increased that to $1.9 billion the following year. As one trade journal observed, "These are the best and worst of times for the Blues."[75]

Earlier in the history of the Blue Cross and Blue Shield organization, the most successful Plans tended to be those in the industrial Northeast. They boasted large market shares and the long-standing loyalty of unions and employers to the traditional Blues' benefit package. Now it was the younger Plans with smaller market shares that seemed to thrive. These Plans, Marv Reiter observed, "are more innovative. They respond. They have all kinds of pieces for the marketplace. The South and the West tend to be healthier than the Northeast."[76]

HMOs and other managed care programs led the business upsurge at the turn of the decade. Start-up costs for HMOs were generally high and they often took time to catch on in their markets, which meant that initial investments

could be slow in producing results. But the numbers put on the board at the end of 1990 showed that the HMOs were taking off. Collectively, the Blues' health maintenance organizations improved their financial performance in 1990 by 300 percent over the previous year, accumulating $200 million in reserves on a total income of $5.3 billion. They achieved their success with painstaking efforts to build up provider networks and control utilization. The gains also reflected a businesslike mentality that emphasized careful underwriting, lean benefits, and selective enrollment.[77]

Between the extremes of rich and poor, a majority of the Plans lived in a universe of mixed results and adaptive change. Blue Cross and Blue Shield of Massachusetts, for example, suffered several years of enrollment and financial losses in the latter half of the 1980s because it moved too slowly toward managed care. President John Larkin Thompson said, "The model we have used for the last 50 years does not fit anymore. . . . Like many Blue Cross and Blue Shield Plans, we were enamored of the traditional product. We did not stay out in front. Sometimes that's a penalty paid by organizations that are the leaders." He cited General Motors as another example of the trend. "There are many examples of it in industry and none of us are proud of it."[78]

From 1987 through 1990, the Massachusetts Plan's enrollment dropped from 3.1 to 2.5 million. Competition from sophisticated HMOs such as the Harvard Community Health Plan was ready and able to win away dissatisfied Blue Plan subscribers. In an effort to come to grips with its losses, the Massachusetts Plan hired a consulting firm that rebuked management early in 1990 for passivity, waste, and a corporate culture "that is too risk-averse, hierarchical, and bureaucratic."[79] The adjustment was painful. In the wake of the consultant's report, four senior vice presidents left the Plan; operating costs were cut by $45 million over two years; and parts of an expensive new computer system had to be revamped. The Plan threw its energies wholeheartedly into development of new managed care programs and gradually has begun to turn its fortunes around.

Though long a leader among the Plans and a pillar of strength, Blue Cross and Blue Shield of Michigan struggled to survive, too. The Michigan Plan lost $66 million in 1988. And even with a rate increase in the fall of that difficult year, it had little more than a week's worth of reserves on hand by the end of December. Plan officials said the cost of caring for uninsured patients had forced providers to demand increased compensation from those who could pay. It took three years of double-digit rate increases to put the Plan back on solid financial ground.

Another factor that aggravated cost problems in Michigan was an uncongenial malpractice climate, which prompted doctors to protect themselves from allegations of undercare by performing medical and surgical procedures more frequently than in many other states. To compensate, the Plan attempted to ratchet down its schedule of maximum physician payments, known as screens. A furor erupted among Michigan doctors when a 1987

BCBSA00292883

consultant's study of maximum payments for 459 procedures found that the Michigan Plan's allowances were 40 percent lower than average payments in Illinois, Indiana, Pennsylvania, Ohio, and Wisconsin. The Plan's medical director, Fred Severyn, countered that, although the Plan's screens were set at a relatively low level, its actual average payments to doctors were only a few percentage points below those in other states.[80] But malpractice suits and defensive medicine had become alarming new factors in physician-fee and volume-of-service increases all over the country.

The Michigan Plan's move into managed care also proved contentious. As part of a contract with auto workers at General Motors, the Plan organized a network of diagnostic laboratories in a preferred provider arrangement in 1991. Five labs and a doctor that were not included in the network promptly sued the Plan, testing anew the double-edged legal environment for cost control. The Michigan Plan was the target of a test lawsuit in 1989 by the federal government over the apportionment of coverage for persons who were eligible for Medicare or Medicaid but also had private insurance through an employer. The suit claimed that the Plan, which served as the intermediary for both Medicare and Medicaid in Michigan, had charged the federal government for about $2 million in claims that should have been paid by it. The Plan countered that, in administering the federal programs, it actually had helped the Medicare program recover $10 million in private insurance payments that had been charged initially to Medicare. The lawsuit entailed a staggering amount of paperwork and electronic data processing as the two parties attempted to sort through a Medicare caseload comprising millions of claims. The upshot of all its battles was that, by mid-1991, the Michigan Plan was gaining enrollment for the first time in almost a decade and had boosted its reserves to a comfortable level of $427 million.[81]

In another turnaround, Blue Cross and Blue Shield of Kentucky tackled its problems with a two-front strategy that involved both an in-house shakeup and a series of changes in the way the Plan operated with providers and in the marketplace. The Kentucky Plan's losses of 1987–1988 totaled $100 million. In some markets it was beginning to lose its traditionally dominant position to an aggressive competitor, Humana, a large for-profit hospital chain headquartered in Louisville that was moving into the health insurance business. The Kentucky Plan attempted to recover from its losses by refusing to renew several unprofitable accounts and raising rates sharply. But these tactics simply drove customers away and prompted harsh criticism from state officials and consumers. After a change of chief executives, the Plan cut 359 people from its workforce and began to work harder at managed care.

As their counterparts in Michigan had done, Kentucky Plan leaders recognized that an increasing volume of physician services was offsetting the gains made in cost control by the movement toward prospective payment to hospitals. The Plan sought to counter the trend by persuading physicians in its preferred provider network and independent practice association to cut down on certain procedures that tended to be overused. The Plan disseminated a set of

BCBSA00292884

treatment protocols to seven hundred doctors. Targeting a list of fifteen procedures, including Cesarean sections and coronary artery bypass grafts, the Plan asked doctors to reduce use of those treatments by 25–30 percent and promised to share the resulting savings with the doctors. "At this point we're relying on peer pressure," said Plan vice president John Bird. "If that's ineffective, our contingency plan is to use DRGs for physicians."[82]

The Kentucky Plan also found a creative way to tackle a thorny issue that was creating cost problems for insurers all over the nation. In well-intentioned efforts to safeguard the health of their residents, many states during the 1970s and 1980s had passed legislation setting minimum benefit levels for health insurance coverage. The mandates might set minimum lengths of stay for hospital coverage or require the inclusion of treatments that might otherwise have been excluded. A 1991 report on mandated benefits, for example, showed that forty-five states required chiropractic treatment to be included in health insurance contracts, forty states required dental coverage, forty-six required optometry, and thirty-seven required podiatry. Forty states mandated coverage of alcoholism treatment, thirty-nine required mammography screening, and twenty-nine required mental health care.[83]

Public policy was at war with itself when it came to balancing the need to protect the public's health with the need to protect its purse. Mandated benefits now were seen also as a factor in driving insurance premiums out of reach for low-income people and small business employees and in swelling the ranks of the uninsured. The Kentucky legislature had recognized the problem and early in 1990 passed a law allowing insurers to offer a bare-bones benefit package that covered only fourteen days of hospitalization, emergency room treatment, and half of any in-hospital physician charges. The law also conferred a tax credit on small businesses that purchased such coverage for their employees. By the end of the year, the Kentucky Plan was offering the basic coverage at rates well below that included in the benefit package formerly required by law. A woman in her early forties could buy protection for herself and her children for about $125 a month, while a single male under thirty would pay just $31, the Plan announced. But the market for bare-bones benefits proved sluggish, both in Kentucky and in other states that attempted similar experiments.

By the end of 1990, results of the Kentucky Plan's efforts to trim down and meet the demands of the market were beginning to show. Enrollment was growing, and reserves on hand were enough to meet 2.5 months of claims. Administrative overhead had fallen to 10 percent of premium income, compared to 12 percent in 1989, although the staff cuts had been a severe blow to employee morale. No letup in the intensity of the competition with Humana could be foreseen, either. "Blue Cross has gone from being an elephant to being a gazelle," quipped Louisville health care consultant William Davenhall. "But they are still in the same jungle."[84]

To adapt a line from Tolstoy, every community had to face the problem of cost, but each had to solve it in its own way. Nowhere was the unique effect of

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 63 of 138

local conditions more evident than in Rochester, New York. Although it was situated in the economically troubled industrial Northeast, in one of the most tightly regulated states in the nation (a combination of circumstances that was nightmarish for other Plans), the Rochester Blue Cross and Blue Shield Plans seemed to live a charmed life. The Plans' cushion of reserves—the measure most often used to gauge an insurer's financial health—was low. But the low reserve position was cited as an indication of the Plans' confidence and stability. Rochester preferred to let subscribers keep the money in their pockets rather than increase premiums to pad the Plans' reserves, senior vice president Raymond Savage said. "New York is one of the most highly regulated states in the nation," Savage pointed out. "If they thought there was a problem here they'd force us to raise our rates. And they haven't."[85]

Rochester's unique advantages were rooted in the Depression era, in what former Plan president David Stewart called "the interweaving of the community's highly organized and participatory power structure" under the leadership of Marion Folsom, a social scientist from MIT who was to become Eisenhower's second HEW secretary and who had a strong interest in social welfare and community action. When he became president of Eastman Kodak Company, the city's largest employer, he turned Rochester into a laboratory for corporate social engineering. One of the main results was that the city had a strong health planning agency, which held hospital growth in check. The city was not overbedded, as so many others were. Nor did the hospitals compete with each other as much as they did elsewhere by building up expensive and duplicated specialty departments.[86]

The Blue Cross and Blue Shield Plans were in on the ground floor of the Rochester experiment, and they remained an integral part of the planning process as the health system grew in complexity. The result was that the Plans still had 75 percent of the Rochester health insurance market in 1990. The powerful leverage with providers combined with the effects of planning to hold cost inflation down to a remarkable degree. In 1990, the yearly cost of coverage in Rochester was $1,200, less than half the national average at that time.

Furthermore, with their dominant market share and the cooperation of employers like Kodak, the Plans had been able to resist the trend toward charging employee groups rates that reflected their actual use of health services. In other words, the Rochester Blues had been able to hold fast to the old Blues tradition of community rating. "Community rating is only one component of the answer for efficient and manageable health care," Savage said. "But it is important because it allows those people who are not employed to buy affordable insurance and allows small employers to have the same coverage for the same price as large employers."[87]

Critics charged that the community rate increased the price of insurance for members of relatively large, young, healthy employee groups. But when individuals and small groups are priced out of the market, the costs of caring for the uninsured—the uncompensated care losses of doctors and hospitals— eventually are shifted to paying patients and reflected in premium increases

BCBSA00292886

for groups with low or average losses. The stability that community rating lent to the Rochester health care system as a whole was a contributing factor in holding costs down. A prestigious and high-profile congressional committee on health care, the Pepper Commission, hailed community rating in a 1990 report as a model for the nation to look to in its search for an equitable and affordable system of care.[88]

The city's experience seemed to support J. Douglas Colman's earlier hypothesis that an overall system of management was the missing ingredient in the nation's search for an answer to the perennial problems of cost and access. "We don't have anyone . . . who is really responsible . . . for the delivery of a comprehensive set of health care benefits to a defined population," the former New York Plan president had said in his 1971 testimony before a Senate committee chaired by Senator Edward Kennedy. "Everybody has a little piece of it, and one of the problems is that people fall down through the chinks." Twenty years later, Colman's prescription still seemed relevant:

> The artful thing is to do it [manage the system] in such a way that the development of manpower, the development of facilities, the development of management, and the development of financing comes in an orderly fashion so that it really improves the care of people. Nobody has learned to do this on a mass basis that I have ever known of. And it is a tough job. But we sure have to keep trying.[89]



# Old Wine, New Bottles

*Washington is right now a sideshow in health care. In the main tent, and much more worth watching, is a boisterous, cost-reducing, free-market affair.*
—*Fortune,* July 1994

UNCONTAINED COSTS AND DETERIORATING ACCESS brought pressures on the status quo in health care to an intolerable level in the early 1990s. The comfortable incrementalism of earlier decades tended to relocate cost and access problems without solving them. If those who wanted to build on the existing system did not put forward a broad plan for coping with the shortcomings of the system, the demand for intervention by government would gain legitimacy and appeal.

The quest for solutions kept returning to ideas that were imbedded in the history of the finance and delivery system. Thomas Kinser, then chief operating officer of the BCBSA, described the symptoms of revived interest in traditional wisdom in a 1992 interview:

> We're getting these 30-year-old Washington people—it's really kind of funny sometimes—they're discovering community rating, . . . They're understanding spreading insurance risk, provider contracting, and managed care. A lot of the ingredients in some of the solutions are stuff that Blue Cross and Blue Shield Plans originated, pioneered, used for forty years to protect communities, and got driven off of [that is, were forced to abandon because of competitive pressure].[1]

Community rating was one of several early practices in the history of health insurance that made a comeback in the reform movement of the early 1990s.

Open enrollment, another hallmark of the traditional Blue Plan, was repackaged as "guaranteed issue" in the insurance reform proposals of the early 1990s. New managed care networks were built on the principle of selective contracting, echoing the "special relationship" that the early Plans cultivated with providers. The comprehensive benefits and per capita premiums that characterized the booming HMO market mimicked the service benefit that had distinguished early Blue Plans from indemnity insurers.

But, at times, many of the Blue Plans lagged behind the competition in rediscovering the utility of their own traditions. Many Plans had come to rely increasingly on indemnity insurance products during the 1970s and 1980s and were slow to get started in the HMO field. The repeal of the Plans' federal tax exemption in 1986 reduced some of their motivation to continue the traditional practices of community rating and open enrollment—although in 1995 they were still required to act as insurer of last resort in about twenty states. The tax changes also removed a significant obstacle to diversification into new lines of business, including for-profit subsidiaries.

Traditionalist attitudes in the managerial ranks evanesced with the emergence of a new breed of executive, recruited from other businesses and supplanting an older generation of retiring leaders who had learned the business at the feet of the founding fathers. BCBSA vice president Donald Cohodes explained in 1992:

> They're from finance, they're from retail and insurance. Their instincts and their training—coming out of the 1970s and 1980s—are to work toward diversification, work for new ventures, entrepreneurial ventures. They view insurance for the Blues as a core line of business from which they could develop a whole series of other opportunities. The loss of tax status for some was a blessing, not a penalty.[2]

Critics accused the Plans of abandoning their mission, but survival was at stake and the appeal of new business strategies was irresistible. Some states were host to six hundred or more different insurers by the end of the decade—"pluralism gone mad," as Kinser put it. He commented:

> With modern EDP technology and new rating methods, these cherry-picking companies can—under the current rules [and] with full blessing of insurance commissioners—find good risks, raise rates enormously if they get claims at the end of the first year, and have a pool of business that they [profit from]. . . . But they are not looking for stability of relationships with customers, predictable financing, and good community health systems.[3]

Compounding the effects of cherry picking, traditional enrollment practices left the Blue Plans in most cases with a disproportionate share of the worst risks in the market. The cyclical ups and downs of the health insurance business became increasingly harrowing, and diversification presented itself as a strategy to maintain revenues during the downswings.

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 67 of 138

Also, in states where enabling legislation for the Blue Plans included prohibitions against selective contracting—which required the Plans to do business with any doctor or hospital their subscribers chose—Plans that wanted to create HMOs or other limited managed care networks needed to incorporate subsidiaries under those states' HMO laws. Some Plans created life insurance companies and other lines of business in response to customer demand for one-stop shopping for employee benefits. Plans that provided administrative services to self-insuring employers sometimes found it convenient to create separate corporate entities to handle this business as well.

Some Plans were careless about their new freedom to diversify and lost money by going into lines of business they did not understand—computer consulting; financial services; even, in one case, a credit card company. The more successful subsidiaries were in areas such as administrative services, utilization review, life insurance, and HMOs. "It's not a matter of whether subsidiaries are good or bad per se," Kinser said. "It's whether the details of the strategy are intelligent."[4]

By the early 1990s, most of the Plans that had branched out too far from their core line of business were pulling back into ventures that better fitted their capabilities. In 1991, a committee of the BCBSA board of directors surveyed more than two hundred subsidiary companies not operating under the Blue Cross and Blue Shield names and marks. The subsidiary companies had experienced aggregate losses of $250 million in 1988, then turned profits of $72 million in 1989 and $166 million in 1990. The committee recommended that the Association not attempt to increase its regulation of the unbranded companies, unless they were undermining the financial health of their parent Blue Plans.[5]

In essence, the committee's recommendations reaffirmed the compromise that had been struck by the Assembly of Plans in the late 1980s. That compromise strengthened the BCBSA's authority to regulate business conducted under the Blue Cross and Blue Shield names and marks but left the back door open for Plans that wanted to operate unbranded subsidiaries without interference from Chicago. Despite broad agreement between traditionalists and the "new breed" of CEOs that subsidiaries were not "good or bad per se," as Kinser put it, the potential for competition between branded and unbranded companies created a worrisome fault line under the already sprawling and disparate confederation of Blue Plans. "The tent is really big, and stretched," Kinser said. "We have Plans that go all the way from enormous commercial subsidiaries selling stock, to Plans that are open-enrollment, community-rating. That is a really wide range of points of view on the role of Blue Cross and Blue Shield."[6]

Turn-of-the-decade market pressures tested the judgment of Plan leaders as well as their business acumen. In several widely publicized cases, business blunders were compounded by executive extravagance and waste, resulting in

BCBSA00292890

one of the most painful chapters in the family history. The Senate Permanent Subcommittee on Investigations had begun looking into allegations of mismanagement in several Plans in the wake of the 1990 failure in West Virginia. Hearings involving Blue Cross and Blue Shield of Maryland were held in September 1992, with the spotlight on allegations of questionable business decisions, high executive salaries, and lavish entertainment of state officials and business clients at sporting events. As part of its diversification strategy, the Plan had created a credit card company designed to make payment of medical bills more convenient. After getting off to a shaky start, the company broadened its services to include diet, fitness, and even martial arts programs. By the time of the Senate hearings, this and other Plan subsidiaries had chalked up a reported $120 million in losses. CEO Carl Sardegna was forced to resign a few months after the hearings.[7]

The next Plan to be investigated by the Senate subcommittee, chaired by Georgia Democrat Sam Nunn, was Blue Cross and Blue Shield of the National Capital Area, in Washington, D.C. (the trade name for Group Hospitalization and Medical Services Inc. [GHMSI]). Again, criticism focused on executive perks and a losing diversification strategy. During the 1980s, GHMSI had set up a raft of overseas subsidiaries and had run up extravagant travel bills in the process. Plan officials defended entertainment expenses as a normal cost of doing business. But the entertainment and travel expenses were considered unseemly at a time when subscribers were facing stiff premium increases.

The *Washington Post* found that the Plan's financial difficulties were rooted primarily in the health care system's runaway cost problems rather than in mismanagement alone, which was some comfort. But the Plan still responded with alacrity to the allegations of improper conduct. Several top officials stepped aside; CEO Joseph Gamble retired, after claiming Fifth Amendment rights before the Senate subcommittee; executive salaries were cut by 25 percent; and travel perks were sharply curtailed.[8]

A high-flying executive lifestyle was again egregiously inappropriate in light of staggering business problems at Empire Blue Cross and Blue Shield, based in New York City. Like the West Virginia Plan, Empire was an insurer of last resort with a severe adverse selection problem, in a state that regulated Plan premiums and hospital reimbursement. With commercial insurers plucking healthy groups one after another from Empire's book of business, the Plan lost more than $250 million in 1991 and 1992 and was on the brink of running out of reserves. It was granted a 14 percent rate increase for individuals and small groups in April 1992 but came back to state officials later in the year with a request for an additional 12 percent raise in October and hopes for a further increase of 21 percent the following April. The state's political leaders were caught in a dilemma, because Governor Mario Cuomo had promised there would be no more increases in 1992. But if the Plan were to fail, the consequences would be disastrous for the 8 million people it insured.[9]

It was under these tense circumstances that the Senate investigations sub-

BCBSA00292891

committee turned its attention to the management practices of the Empire Plan. Data system problems that the Plan had inherited from the former United Medical Services had persisted. Now, however, Senate investigators and the media linked expensive data processing snafus to a questionable contract with a computer firm headed by a former Empire board member. In an attempt to outmaneuver competitors who were winning healthier groups away from the Plan, Empire launched an HMO in the mid-1980s, but the new company failed to catch on and lost more than $100 million.[10]

Like his peers in Maryland and Washington, D.C., Empire CEO Al Cardone was criticized for his high salary ($600,000), perks, and expenses. Cardone defended his compensation and other outlays as par for the big business world, but the contrast between executive luxury and the plight of the average subscriber was at best unflattering. The most damaging revelation was the Plan's admission that misleading data had been submitted to the state insurance department to help win approval for rate increases. Empire's chief financial officer was fired and later indicted. Cardone resigned under pressure.[11]

The Senate investigation began by questioning the financial integrity of the Blue Plans. The early 1990s were years of robust financial gains, but there was a very real threat that the Plans' collective image might be tainted by a few high-profile problems. Nunn seemed to understand that the BCBSA's power to regulate the sixty-nine Plans was limited. But he challenged the Association to do a better job of policing its members. He also called for stronger efforts to oversee Blue Plans by state insurance regulators, noting that special enabling laws governing the Blue Plans often exempted them from requirements imposed on commercial insurance companies. At the same time, in late 1992, the National Association of Insurance Commissioners (NAIC) joined the call for stronger state oversight of the Plans and stricter financial standards.[12]

For BCBSA leaders, the surge of public criticism presented both danger and opportunity. Concern that the behavior of a few might tarnish the reputation of many was enough to offset somewhat the powerful inclination on the part of most Plan CEOs to resist infringement on their independence. "A lot of people in our organization . . . are feeling very badly and they are not going to tolerate it any more," BCBSA president and CEO Bernard Tresnowski told the *Washington Post* early in 1993 at the height of the media uproar inspired by the Senate investigations.[13]

BCBSA's Don Cohodes saw a parallel between the public pressure created by the Senate hearings and the pressure created in the early 1970s by the possibility that a national health insurance program might be enacted by Congress. Such external threats gave the BCBSA leverage to impose tighter operating rules on the Plans. In a 1992 interview Cohodes said:

> [Walter] McNerney used external threats as a tool to bring Plans into line and to achieve certain objectives. I think Barney [Tresnowski] has the same kind of opportunity with the Nunn committee investigations. . . . [There is] a real

BCBSA00292892

opportunity to change conduct standards for Plans as a result of this external threat, and to clean things up.[14]

The framework for strengthening management and financial standards had been established through the Assembly of Plans in the late 1980s when the CEOs had agreed to give the BCBSA authority to incorporate a stricter standards program into the licensing of Plans to use the Blue Cross and Blue Shield names and service marks. The public investigations of 1992–1993 helped steel the leadership echelon—who were not enthusiastic about the latest infringements on their autonomy—to greater acceptance of a discipline that was potentially rigorous and demanding. Approved by BCBSA directors in November 1992 and made public three months later, the new licensing standards addressed both financial measures and executive conduct. Plans were now required to:

- Participate in state guaranty funds or other backup financial arrangements to protect subscribers in case of insufficient reserves.

- Meet new capital and liquidity standards based on risks undertaken in their insurance business and investments.

- Conform to NAIC's model holding company act, which requires subsidiaries to report fully to regulators and parent companies on their activities.

- Disclose all Plan activities and finances to their trustees.

- Limit subsidiaries to ventures related to the core business of health insurance.

- Establish executive codes of conduct addressing conflict of interest, compensation, gratuities and entertainment, and conformity to legal and ethical standards.[15]

Nunn's reaction to the new standards was reserved. He told reporters,

> These proposals are, in my view, a good first step in responding to the problems the subcommittee has already identified. . . . These tougher financial and ethical standards must, however, be coupled with an equally tough enforcement policy to ensure that they are not ignored as some of the current standards of the national organization have been in the past.[16]

Apart from the question of enforcement, one more crucial set of issues remained: how and whether to regulate unbranded Plan subsidiaries, a question that had been deferred during the Assembly of Plans. The licensing standards applied only to Plans and subsidiaries that carried the Blue Cross and Blue Shield names and marks. The BCBSA had few effective tools to regulate the conduct of unbranded subsidiaries, which in many cases competed with licensed Plans. Association leaders still feared that the issue could create de-

structive divisions among the Plans and indirectly undermine public confidence in the Blue Cross and Blue Shield organization. "Failure to resolve that issue is going to just tear us apart," Cohodes warned.[17]

But away from Chicago and the BCBSA's inevitable concern with cohesion, many Plan leaders were more interested in the bold business moves of their entrepreneurial colleagues than they were in a tightly knit national organization. When the Associated Insurance Companies of Indianapolis—a holding company that later did business as Anthem Blue Cross and Blue Shield—bought the giant Dallas-based American General Insurance Company in 1990, for example, it was "a Sputnik event" for the rest of the Plans, according to M. Edward Sellers, a former BCBSA vice president who became president and CEO of Blue Cross and Blue Shield of South Carolina in 1987. Soon the Indiana Plan was competing under another brand name in many other Plans' home markets. Some viewed the coup by Associated's Ben Lytle with alarm, whereas others were struck with admiration: "That set the tone," Sellers said. "From Ben's point of view, he was protecting his interests."[18]

However, Tresnowski and retiring Massachusetts leader John Larkin Thompson echoed Cohodes's admonition at the BCBSA November 1992 annual meeting. Thompson criticized the "disturbing diversity" of pursuits that had developed among the Plans and appealed to his fellow CEOs to pull together. He stated, "That diversity has resulted in a perpetual identity crisis that is sapping the organization's energy and encouraging those Plan officials who want to advance their own independent agendas."[19]

Tresnowski went one step further. In a surprisingly blunt challenge, he pointed out that the Assembly of Plans had stopped short of addressing the biggest issue that faced the Association. The BCBSA president told the Plan executives:

> We deferred on agreeing to a common mission, a deferral that has come back to haunt us. . . . We can no longer avoid the issue of what it means to be a Blue Cross and Blue Shield Plan. . . . If you wish to be a Blue Cross and Blue Shield Plan and give your best effort to strengthen the goodwill associated with those service marks then let's not be timid about that commitment. For those who would choose an alternative course or hedge their bets against future developments, let's wish them well and on their way.[20]

A confrontation was brewing that would resolve the identity crisis, at least provisionally, in a startling fashion.

## Sea Change

A sense of crisis about out-of-control costs and growing numbers of uninsured people began to translate into a new set of political realities after the surprise victory in the 1991 Pennsylvania Senate race for Harris Wofford, who ran on a health care reform platform. In the presidential election year of 1992, Bill Clinton followed Wofford's lead and also made health care reform

BCBSA00292894

a centerpiece of his campaign. The result was a huge outpouring of media coverage, polls, political rhetoric, lobbying, expert analysis, and unsuccessful efforts on all sides to capture the public's imagination. The action continued to escalate after Clinton was elected and the process of shaping a potentially sweeping piece of federal legislation began. The ensuing shakeout of legislative proposals produced a canon of ideas that generally followed the outlines of the managed competition model first propounded as a comprehensive theory by Alain Enthoven. The earlier roots of the theory lay in the FEHBP, designed by Congress in 1959 in collaboration with Blue Cross and Blue Shield Plan leaders and a few other private sector strategists. By 1994, when the hour of decision on national health care reform seemed to be approaching, the apostles of the managed competition model were legion, and the components of the model had become numbingly familiar—in name at least, even if the underlying ideas were not always fully understood.

With or without a universal insurance mandate imposed on employers or individuals, the model entailed a reform of the small group and individual insurance market to prohibit risk selection and discriminatory pricing practices by insurers. Purchasing cooperatives were to be formed for these small buyers of coverage to give them an equal voice in the marketplace. Individuals in employee groups or purchasing co-ops would be offered choices as individual shoppers. Integrated care systems would offer standardized, comprehensive benefit packages at a prepaid, per person price. These integrated health plans would also be required to furnish uniform data on patient outcomes and satisfaction, so that consumers could shop for value and so that high-performing plans could prevail in the marketplace.

By the time Congress prepared to act, however, many of the changes it was contemplating were already well under way. For example, the Employee Benefit Research Institute reported in 1994 that the number of people covered under various managed care arrangements in the private health insurance market increased from 27.4 to 61.9 percent between 1988 and 1993.[21] After a decade of heightened tension between insurers and hospitals over increasingly stringent and intrusive reimbursement policies, hospitals, physician groups, and insurers began to bow to the inevitability of partnership. The growth of large, integrated health plans like those envisaged by reformers proceeded ahead of the legislative process.

Some observers attributed the feverish pace of consolidation during the early 1990s primarily to the insurers' and providers' need to position themselves for the new competitive environment that would be created by reform. But independent of the congressional decision to enact major changes, the marketplace was unequivocal in demanding the cost disciplines that only managed care and integrated service networks seemed capable of delivering. In 1993, Enthoven observed, "The traditional indemnity health insurance industry is biologically extinct."[22]

The Blue Plans—many of which had focused on indemnity insurance during the 1970s and 1980s—lagged behind the competition in developing managed care products in many markets. But by the early 1990s, they were

BCBSA00292895

fully committed to yet again reinventing their system. In Philadelphia, for example, Independence Blue Cross agreed to a merger with Graduate Hospital System, a chain of seven hospitals, early in 1994. "People who control all of the pieces that make up the cost of the health-care dollar are going to be the winners because they are going to be able to control their own destiny," said Plan CEO G. Fred DiBona Jr.[23]

At the same time, Blue Cross and Blue Shield of New Jersey was announcing plans to develop a statewide system of ten primary care family health centers, to complement a network of fifty-six acute care hospitals the Plan had organized in an HMO a year earlier. It would be the first time a Blue Plan had actually created its own facilities for providing care, and this was seen as a potential stepping-stone toward further arrangements to own and operate hospitals directly. On a parallel track, in May 1994 Blue Cross and Blue Shield of Massachusetts announced plans to begin a series of acquisitions of physician practices. "This is part of our strategic transformation from traditional insurer to a full-service health care company that effectively integrates both the financing and [the] delivery of care," a Plan spokesperson said.[24]

While the ownership of hospitals, clinics, and physician practices was a distinctly new wrinkle for Blue Plans, the formation of HMOs and other networking arrangements with providers were rapidly becoming commonplace. By the end of 1994, about thirty joint ventures with providers had been launched by Plans across the nation. Partnerships with providers were developed side by side with the ongoing trend toward consolidation among the Blue Plans, as called for in the Long Term Business Strategy adopted in the early 1980s. By 1995, the total number of Plans was down to sixty-seven. In addition to the regional marketing alliances that had formed during the 1980s, some Plans now were experimenting also with consolidation of technological services, both inside and outside the Blue family. Blue Cross and Blue Shield of Minnesota, for example, set up a joint claims clearinghouse with six other non-Blue Minnesota insurers. BCBSA and Kaiser Permanente established a common database to analyze the effectiveness of new medical technologies.[25]

The new arrangements with providers were not achieved without pain. Hospitals and doctors resented and resisted exclusion from the new networks or acceptance of reduced payments and utilization controls. "There is a great deal of suspicion about [physicians'] motivation and their behavior," BCBSA's Donald Cohodes had commented in 1992. "We've been driven to this micromanagement of physician practices . . . because, frankly, we're concerned that the physicians are not always acting in the interest of the patient, but are acting in their [own] self-interest."[26] But for advocates of managed care, integration of the finance and delivery system promised a solution to the festering conflict over micromanagement. Providers would have to share responsibility for financial discipline but, in doing so, would be in a better position to control how that responsibility was exercised than if controls were foisted on them by others.

Just as the unenacted policy doctrine prescribed, the private market brought

BCBSA00292896

forth a crowded field of vigorously competing HMOs and managed care hybrids. Success depended increasingly on access to capital. Some companies would seek capital to buy up other HMOs and PPOs, to buy or build hospitals and clinics, or to acquire physician practices. Others would choose to build primarily from within by extending their own hospital and physician networks. But this approach was costly, too, because of the time and effort involved in recruiting and negotiating with new partners, in setting up data systems to make the network operate efficiently, and in marketing the new product.

To consolidate their market position and squeeze out competitors, the new managed care heavyweights also might want capital to form branches or affiliates to sell life and casualty coverage, administrative services, workers' compensation coverage, or specialized lines of health coverage for mental health, dental, or pharmaceutical services. If a Plan were successful in winning new business from a competitor, a business coalition, or a public or nonprofit purchasing alliance, it also might need a significant infusion of capital to cover the underwriting risk entailed by the new business. Winning such business meant bidding at a competitive price. But if the group was new, insurance rules were changing, and the market was in a state of turbulence, actuaries would find it difficult to predict precisely the amount of losses that might incur. Without adequate contingency reserves, a health plan could go under quickly if it had a bad year or two.

Without access to the equity financing of their investor-owned competitors, the nonprofit Blue Plans were at a disadvantage. Their unbranded subsidiaries were not bound by the nonprofit licensure standard adopted by BCBSA in 1990 and were free to operate on a for-profit basis. But to bring investors in as co-owners with a stock offering meant sharing control of that subsidiary outside the family. Ceding any measure of control of any kind to investors with no allegiance to the Blue Cross and Blue Shield organization— or to traditional operating practices or the general well-being of the Plans— was an extremely sensitive matter to the members of the BCBSA, which owned the marks. If such subsidiaries were competing with other Plans, the tension created within the Association by investor ownership could be all but unbearable.

The first Plan to test the issue of equity financing against BCBSA's nonprofit license standard was Associated Insurance Companies of Indianapolis, a holding company that, in 1992, operated as Blue Cross and Blue Shield of Indiana. Acordia, a subsidiary of Associated with a $200-million-a-year insurance brokerage and claims administration business, went public in 1992 with an offering of $50 million on the New York Stock Exchange. In a report to the Association, BCBSA staff responded by accusing Acordia of transferring goodwill built up under the name of Blue Cross and Blue Shield of Indiana to another company, Acordia, to the benefit of outside investors who now owned 35 percent of Acordia's stock. Associated replied that, since it had voted against the 1990 license standards, it was not bound by them—particularly by provisions requiring financial disclosure by its unbranded subsidiaries.[27]

Although Associated insisted it wanted to stay in the Blue family, by the end of 1992 the strains were so great that Tresnowski had hinted publicly that Plans that did not want to comply with the rules of the BCBSA member majority would be better off to go their own way. With other Plans also actively pursuing the option of equity financing, the danger loomed large that BCBSA could rupture over the issue of investor ownership. Some of the Plans considering public offerings were among the strongest in the Blues system. Associated—which in 1993 merged with Blue Cross and Blue Shield of Kentucky—was a robust, diversified, national health insurance conglomerate. The two companies had combined revenues of $3 billion, and a surplus of $800 million. On the basis of premium income, the Associated Group (as the merged entity was called at that time) ranked as the nation's eighteenth-largest health insurer.[28]

Equally impressive was the booming financial success of WellPoint Health Networks, a for-profit managed care subsidiary of Blue Cross of California. Under the leadership of former Health Care Financing Administration chief Leonard Schaeffer, Blue Cross of California had turned its fortunes around in the late 1980s by committing itself to managed care, and by 1993 it had moved 2 million HMO and PPO members into WellPoint. The company built a growth market for itself by selling to small groups and individuals that other companies avoided, banking on volume to spread risk and make coverage affordable. "We really hope to be able to demonstrate that a nongovernment based purchasing pool can work . . . at a lower cost than the state-administered purchasing pool that we'll be competing with," said a WellPoint spokesman. The company offered a variety of managed care products built on its HMO network of 35,000 doctors and 300 hospitals, and a PPO network of 14,700 doctors and 250 hospitals.[29]

To strengthen its position further in anticipation of reform, WellPoint went public in 1993 by selling stock worth 17.5 percent of its total value. Initial plans called for selling 15 million shares at $22–24 each, but demand for a piece of the new company was so strong that the offering ended up at 17 million shares at $28 dollars each (or $476 million).[30] The fresh capital would help WellPoint build up its specialty coverages for mental health, dental, and pharmaceutical services. And a few months after the stock offering, WellPoint announced plans to acquire a workers' compensation company that would enable it to offer twenty-four-hour coverage, combining workers' comp with regular insurance on a managed care basis.[31]

As an additional benefit, public ownership moved WellPoint from the regulatory domain of the California insurance department to the jurisdiction of the state's corporations department, allowing it to begin operating outside the state. Increased operational flexibility and freedom from the regulatory restrictions affecting nonprofits was an attraction for other Blue Plans considering equity financing as well. Other Plan subsidiaries in Wisconsin and Missouri also had been created primarily to carry managed care business. Another ten or fifteen Plans were considering the option.

The tradition of nonprofit ownership was deeply ingrained in the Blue family, but so was business sense. Was the nonprofit licensure standard still relevant, still appropriate? It was an emotional and divisive debate that continued to simmer while the dispute between BCBSA and the Indiana Plan remained unresolved. Nonprofit hospitals faced similar issues after investor-owned hospital chains began to flourish in the 1980s. These revered institutions still fulfilled an essential social purpose by taking care of uninsured patients. They plowed their earnings back into facilities and patient care, rather than into investors' pockets. They remained the premier centers of teaching and research. But nonprofits also increasingly sought to maximize revenues, accumulate capital, combine into chains, load up on technology, and pursue cash-conscious management strategies. "The question that remains," observed a 1986 study of the issue by the Institute of Medicine, "is whether their type of ownership and control of institutions makes a difference."[32]

Shifting definitions and blurred distinctions had an unsettling influence on deliberations about the future of the nonprofit ideal. Even well-schooled observers had trouble remembering that nonprofit status did not mean the Blue Plans were charities. They had to earn all their money by selling services, Tresnowski noted: "Nobody comes along and gives us anything."[33] Nor did nonprofit organization mean a company could not earn money. The ability to raise working capital was an essential element for success. Nonprofit hospitals and health plans worked hard to make more than they spent, although they called the difference "earnings," or "surplus," rather than "profit." The real difference was that the earnings of a nonprofit could not accrue to the benefit of directors or stockholders but had to be reinvested in operations or reserves. And even this ironclad principle fogged over at times, as large, aggressive nonprofits beefed up their executive compensation packages to attract high-powered management talent. Blue Cross of California's Schaeffer said later: "I don't think that not-for-profit health plans, when they reach any size, are as socially motivated as people would like to believe. My observation is that some Blues plans—some hospitals, too—hide behind the claim that they are driven by a social ethic. . . . I think that has been overpainted."[34]

Finally, since 1986, the Blue Plans had been taxpayers, albeit with preferred status. They paid $2.3 billion in federal income taxes between 1987 and 1994. In the managed care field, a jumbled patchwork of tax policies mirrored the prevailing confusion about the significance of ownership modes. Nonprofit HMOs such as Kaiser-Permanente, or nonprofit hospitals that created their own health plans, remained tax-exempt. Commercial insurers that organized managed care plans paid the full corporate income tax rate of 35 percent. Blue Plans could shelter a portion of their earnings as reserves and paid a preferred rate of 20 percent on the rest, until total reserves reached the equivalent of three months of claims payments. By 1993, BCBSA representatives in Washington were arguing that managed competition would not work as it was designed to unless the various exemptions were eliminated and all health plans were taxed alike.

Meanwhile, BCBSA and the Indiana Plan had submitted their dispute to mediation by William Webster, the former federal judge and FBI and CIA director. Webster, as Tresnowski put it, "split the baby," ruling in late 1993 that the Indiana Plan had not intentionally transferred goodwill associated with the Blue Cross and Blue Shield name to its Acordia subsidiary. But the Indiana Plan was bound by the 1990 licensing agreement, Webster determined.[35]

The decision removed a major distraction, but more important, it helped focus the attention of all the Plans interested in for-profit diversification on the value of their brand identity. The question for these Plans now became whether the brands were worth the burdens of licensure. The question for BCBSA was whether it wanted to restrict the Plans' access to capital, and their freedom to use it creatively, by continuing to insist on nonprofit ownership. "We really didn't want to kick them out," Tresnowski commented. In the course of weighing their options, several Plans conducted surveys and focus groups to get a more objective sense of the value of the brands. The Wisconsin Plan test-marketed two identical products, one with the Blue Cross and Blue Shield names and marks and one without. They found consumer acceptance of the branded product ten times higher than of the other product. BCBSA commissioned an analysis by Arthur Anderson and Company that determined the cash value of the Blue Cross and Blue Shield brand names to be "multi-billions of dollars," according to Tresnowski.[36]

Further market research found that the Senate subcommittee's investigations of the several Plans that had been careless with their legacy had not had effects that were fatal to the collective image. "These studies showed that long-standing comfort and familiarity with the Blue Cross and Blue Shield organizations made the public forgiving," Tresnowski said. "We did some consumer surveys, and what they all said was, 'Well if they fixed it, fine. We're not going to hold mistakes against people.'"[37]

A survey of Plan CEOs in late 1993 found that 73 percent now believed that BCBSA should drop the nonprofit license standard.[38] The trade-off that would be necessary to protect the value of the brands was the incorporation of new safeguards into the licensing agreements concerning for-profit Plans. BCBSA staff studies also suggested that a vigorous program of brand name promotion would create better name recognition for nontraditional Blue Cross and Blue Shield products such as HMOs, PPOs, administrative service companies, and life companies.

The new licensing standards—without the nonprofit requirement—included safeguards such as control of branded subsidiaries by the parent Plans, accreditation for managed care companies, codes of conduct for officers, disclosure of records, agreement to mandatory dispute resolution, and financial standards and guarantees. The new standards were beefed-up versions of the standards developed after the failure of the West Virginia Plan and the Senate committee hearings. But by dropping the nonprofit standard and encouraging wider use of the brands, Tresnowski warned, BCBSA could be "opening up another door for abuses." He cited dangers such as executive inurement in

the form of stock options, and capture of Plans by outside investors who might "enter into products and services that are inconsistent with the tradition of Blue Cross and Blue Shield." The trick was to let the genie out of the bottle, but to make it behave.[39]

There was another caution, Tresnowski pointed out. Equity capital was no free lunch. Stockholders would demand that their money grow, and they would have to be served. The ability to price competitively and deliver high quality health services would have to be achieved against the pressure to realize attractive profits. Schaeffer acknowledged:

> Market pressures are extremely short term. Stock analysts who follow companies want them to perform to their calculated profit estimates every quarter. . . . When we [WellPoint Health Networks] became publicly held, and listed on the stock exchange, for the first time ever, there were incredible pressures for quarterly earnings.[40]

The experience of some Plans was that they could outperform for-profit competitors who had better access to capital but less knowledge of local markets and less well-developed relationships with their hospital and doctor networks. "You cannot beat a Blue Cross and Blue Shield Plan when they stay home and pay attention to their knitting," Tresnowski said. "That's where I think these entrepreneur types are going to learn some lessons."[41]

## Like a Bishop Dancing

Certainly the drive for reform in the early 1990s was motivated by forces outside the orbit of the health care establishment. Business, government, and consumers rose up in chorus to protest the most serious shortcomings—rising costs, fragmentation of the insurance market, and worsening problems of access to coverage and care. But the primary strategies that emerged during the grand policy debate of 1992–1994 were largely the creations of the institutions in which the problems were rooted. Some critics of the health care system ascribed its shortcomings to selfish behavior by hospitals, doctors, and insurance companies and concluded that to protect the public interest it would be appropriate for government to take control of the health care financing system. But the leaders of the provider and insurance communities were as well acquainted with the system's shortcomings as anyone. Some of them had been arguing for change long before reform became politically respectable, albeit they felt at times like voices in the wilderness—"I feel more and more kind of like an actor in the theater of the absurd," HMO champion Paul Ellwood had complained at a conference during the 1970s.[42] The leadership in the private sector could be faulted for not taking the initiative on reform sooner, but ultimately they responded with vigor. As a pharmaceuticals executive quipped, "When we feel the heat, we see the light."[43]

The Blue Cross and Blue Shield organization had been in the public policy fishbowl since the early days of the Medicare debate. Its leaders were condi-

BCBSA00292901

tioned to assume that government needed them to implement its strategies, and that if they met policy makers halfway, they could maintain maximum feasible control of their destiny. Let other health care lobbies go negative, the thinking went. It is better to be for something than against everything. "Under any kind of health care reform, both we and the government will reach out toward each other and work to strike a balance," BCBSA's Donald Cohodes predicted. "When the Blues are faced with the inevitable, they don't fight to the death. They join the change, become part of the change . . . because we believe ultimately that we can do the job. We can make a difference."[44]

So it was not surprising that most of the reform ideas put forward by the Clinton administration and congressional leaders in 1993 and 1994 dovetailed with the managed competition model propounded by private sector leaders. In contrast to incremental policy making such as the Medicare DRG system, the theory of managed competition called for changes to be made on several fronts at once. The balance and interdependence of these components was the most elegant feature of the reform design. But it was an oversized and unwieldy package to sell. Images of complex bureaucratic machinery dominated the rhetorical arena. Never mind that the private health care system was already reaching new heights of bureaucratic complexity, or that the reform model was largely a codification of changes that were already well under way in the health care finance and delivery systems. Reform was dead once it was tarred with the brush of big government. The mandate that had appeared on the horizon after the Wofford election proved soft, indeed, as a long tradition of public ambivalence and equivocation on health policy reasserted itself. "We misjudged the health care politics of 1993 as a change in the climate when it was only a change in the weather," admitted Paul Starr, a prominent advisor of the Clintons.[45]

In political terms, what would be remembered about the reform movement was that it lost big. In terms of the evolution of the health care delivery and finance system, however, the great debate over reform sharply accelerated the fundamental realignment that was under way, pushing it in roughly the same direction as the failed policy proposals. The concept of the health purchasing alliance, for example, gained the force of virtual reality long before its eventual demise as an article of national policy. Business coalitions, voluntary state-sponsored alliances, and other buyer amalgamations were up and running in markets across the country, while the Clinton administration and other universal coverage advocates agonized over giving up the goal of mandatory alliances.

The national debate clearly accelerated insurance reform in the states. Public officials as well as the electorate grew knowledgeable about formerly arcane subjects such as (modified) community rating, guaranteed issue, and medical underwriting, and for the most part bought the logic of leveling the playing field. Model legislation from the National Association of Insurance Commissioners

(NAIC) facilitated insurance reform experimentation by the states.

Major stakeholders realigned to increase their leverage in shaping policy and, in the process, defined new terms for doing business that outlived the policy debate. Starting in 1993, for example, the five largest commercial insurers dropped out of the Health Insurance Association of America (HIAA) to form the Alliance for Managed Competition, and in 1994 these five insurers joined with BCBSA and a large HMO trade association to endorse standards for "accountable health plans" (AHPs) that incorporated most of the principles of insurance reform shared by various national reform proposals. Even HIAA, which represented smaller companies, felt obliged to sign on to the accord, although it entered dissents on many of the particulars. The managed competition coalition called for standards for themselves that struck at the central problem of risk avoidance, which policy makers were struggling with as well. The first rule recommended in the document said, "An AHP may not deny, limit, condition, or refuse to renew coverage made under any Health Benefit Plan it offers based on claims experience, prior use of health services, or health status."[46]

In the crucial congressional committees, representatives of the Blue Plans found again, as they had during the Medicare debate, that the dizzying complexity of the issue gave them a role of indispensability. "They are looking for expertise, analytical help. We'll be doing an awful lot of that. . . . This is a legitimate approach on our part," Tresnowski explained. "That's been our style for many years."[47]

In Tresnowski's view, a series of genuine ideological questions were addressed and largely resolved as the private sector stakeholders had hoped they would be. A Canadian-style system was rejected because of widespread misgivings about transferring so large a piece of the economy into the public sector. An approach to cost control based on provider or insurer rate controls was discredited because it would perpetuate waste and inefficiency in the existing system. Finally, the Clinton administration's move to create huge, mandatory purchasing alliances lost support because it, too, was seen as moving too large a piece of the health care economy into the public domain, with the proposed alliances assuming quasi-regulatory functions. "We, and others in a large coalition of insurers and employers, can claim success in educating what early on was a generally anti-managed care Congress about the cost effectiveness of, and consumer support for, selective network products," Tresnowski wrote in a president's letter to BCBSA CEOs, after the demise of reform in the 103d Congress. But Tresnowski warned his colleagues not to expect a return to business as usual, despite their success in channeling the policy debate and despite the subsequent legislative stalemate. He wrote:

> The good old days, when nobody really paid a lot of attention, are gone. We're now front and center in the public policy sphere. . . . What our future holds depends in many ways on our ability to continue to control the rate of increase of health care costs. . . . It will be a real test over the next five to eight years as to

BCBSA00292903

whether the private sector indeed can produce the kind of results that would make health care more affordable.

If not, the interventionists would be back, with a vengeance.[48]

But Tresnowski remained troubled about the fraying bonds that held the Plans together. "A major gap remains in our ability to define exactly who we are," he told colleagues before his retirement in 1994, restating the problem that the Assembly of Plans had failed to resolve in the late 1980s. "I continue to regret the fact that we have been unable to agree upon a common mission." An apparently viable compromise had been reached over the nonprofit versus for-profit issue, but "only after two years and three failed votes." Strengthened licensing standards promised to protect the integrity of the Blue Cross and Blue Shield brand names and service marks. But potential competition between branded products and unbranded subsidiaries was still a "major point of tension."[49]

Apart from the sometimes chimerical issues related to ownership, the Plans had undercut themselves by abandoning some traditional business practices, with ironic results, Tresnowski said. After the gradual retreat from community rating that began in the 1950s, the Plans sought to mimic their competition further with increased offerings of indemnity coverage.

> We said, let the subscribers find their own way. We will ignore the provider relationship—we'll set them at arm's length. And painfully we learned that those were values of other institutions that didn't fit either our own ethic or our own core capabilities. Evidence of this included massive and painful losses of enrollment . . . and an erratic, basically downward trend in our finances.

The rise of HMOs and other forms of managed care in the 1980s was the wake-up call. "We came back around to realizing that the marketplace was returning to a focus on the community and the importance of linking delivery and financing."[50]

The adjustment was arduous. "In a rapidly changing market environment, size works against an enterprise. Typically, the bigger you are, the less agile and less innovative you are," observed Leonard Schaeffer, who joined Blue Cross of California in 1986, when the company was near insolvency. "Most Blues plans are very big; thus, most Blues plans have not reacted quickly to marketplace changes. The managed care revolution, if you will, has gone by many of them."[51] Collectively, the Blue Plans hit the 8 million mark in HMO enrollment in 1995 and passed Kaiser Permanente as the industry's largest purveyor of the archetypal managed care product. Hybrids such as PPOs and point-of-service (POS) plans were now the fastest-growing products in the industry, and the Plans claimed 22 million members in such coverage at the end of 1995.

In 1995 Tresnowski was succeeded by Patrick Hays, who was fresh from building Sutter Health into one of California's largest health systems with a business strategy focused on integration and managed care. Sutter Health was the descendent of the first multihospital plan to model itself on the Kimball

experiment in Dallas, created in Sacramento in 1931–1932 but exiled from the
Blue Cross family a few years later for giving sales commissions. In Hays's vi-
sion, capital was primarily a tool for putting together powerful new data systems
to manage financial transactions, provider network relationships, and care itself:

> You need [capital] for information technology, you need it for startups, for link-
> ing with integrated delivery systems—physicians and hospitals. You also need it
> for research and development. One of the things we're doing here at the [Blue
> Cross and Blue Shield] Association is R and D [research and development]
> management: What's the best way to manage congestive heart disease? Are
> there more humane and cost-effective ways to manage Alzheimer's disease?[52]

Events following Hays's arrival showed how influential and well-positioned
the emerging heavyweights in the managed care field were in the wake of the
failed Clinton plan. The new Republican majority in Congress in 1995
premised its entire strategy for downsizing Medicare and Medicaid on as-
sumed savings from managed care. Even though these savings remained hy-
pothetical, the public programs were partially redesigned to maximize oppor-
tunities for capitated risk plans. Even the AMA—after many bitter fights with
the managed care industry—acquiesced to the Republican plan for converting
Medicare to a managed care program once Congress gave its approval to spe-
cial provisions for plans sponsored by doctors.

For all the sound and the fury, then, policy was virtually a sideshow. The
clash between expanding demands and decreasing resources for health care
was playing itself out in the consolidation of large integrated provider net-
works, the winnowing out of excess capacity, and competition of Darwinian
fierceness in the private health insurance market. But health systems them-
selves, and consumer constituencies, continued to be defined more at the lo-
cal and regional levels than nationally. The Blue Cross and Blue Shield Plans,
as they became fewer in number and larger in size, became relatively more dis-
tinct as individual entities and less definable as a national group. "It is going
to be difficult for the Blues system to function as a system," Schaeffer told the
journal *Health Affairs* in 1995. "In the future, instead of sixty-nine plans, I
envision that there will be thirty, perhaps even just twenty, organized on a re-
gional basis. There is no economic reason for the association to continue as it
has in the past." For-profit plans would dominate the market of the future,
Schaeffer predicted, but the profit motive would not necessarily dominate
those plans. "In health care, I think it is rare that large, well-known compa-
nies can fail to meet the legitimate health care needs of their enrolled mem-
bers just to bolster profits. There are bad actors in every sector, but a com-
pany can't survive over time if high profits are its sole operating goal."[53]

The seismic shift from a manufacturing to a service economy was hard on all
of the old giants—in health care as in the automobile industry and in commu-
nications. As Schaeffer put it, "The Blues were very successful for a long time,
and their traditional operations got embedded. So many plans said, in essence:

BCBSA00292905

Why should we change?" But health insurance had always been a business for optimists. The post-reform devolution of initiative to local markets and regulatory environments gave a potential edge to the Blue Plans with their long-standing local provider and customer relationships. The Plans had had their share of disasters with information technology, but they also had a long history with assessment of medical technology, which stood to give them a head start on the effectiveness-based payment systems the future was sure to bring.

Health insurance was a business for optimists because it had the affirmative mission of pumping dollars into care for the sick. That was why it had come as such a shock to discover the system had to have limits. As one observer of early cost containment efforts put it:

> It is the disposition of the culture to equate more and better—no less for hospitals and doctors than for stores and states. Thus their voluntary effort to suppress expenditures is in a way an unnatural act, like a bishop dancing, and their willingness to engage in it and suffer for it must be respected. . . . So it is also for Blue Cross and Blue Shield, surely the most generous of insurers.[54]

The Blue Plans, then, happily epitomized health insurance in its founding, development, and maturation and less happily came to represent the health care system's shortcomings during a cycle of overproduction and disarray. As the enterprise of caregiving shucked off outmoded organizational and financial structures, opportunity would favor adaptive institutions that grew not bigger but smarter. If the eponyms of health insurance could understand their own past, they might find a future to match it.

BCBSA00292906

# Glossary

**actuarials**   The calculations used in insurance to estimate risks (and, thereby, premiums) for a given population purchasing life, accident, health, or other benefits, based on the past loss experience of comparable populations.

**adverse selection**   In insurance, the acquisition of business with a higher-than-anticipated level of risk, when opportunities are created for high-risk individuals to enroll for coverage in higher-than-average numbers, resulting in financial losses for the insurer.

**AHA (American Hospital Association)**   Known initially as the Association of Hospital Superintendents and founded in 1899, the AHA functions as a forum for the exchange of information and the promulgation of standards, and as the hospitals' major voice on public policy.

**all payer**   Health reform proposals that would continue to use multiple sources of payment for care (that is, a combination of government, employers, insurers, and consumers), but that would mandate standardized rates for provider reimbursement.

**AMA (American Medical Association)**   Founded in 1847 primarily as a scientific and educational organization, the AMA since World War II has engaged also in lobbying.

**AMCP (Associated Medical Care Plans)**   The first national organization of Blue Shield Plans, formed in 1946 as an offshoot of the AMA, the AMCP later became independent (1949) and went through several name changes, from Blue Shield Medical Care Plans (1950) to the National Association of Blue Shield Plans (1960) to the Blue Shield Association (1976). It consolidated with the Blue Cross Association in 1978, as the Blue Cross and Blue Shield Associations, and finally merged into a single Blue Cross and Blue Shield Association (BCBSA) in 1982.

**Assembly of Plans**    A series of deliberative meetings of Blue Cross and Blue Shield Plans from 1987 to 1990, which resulted in strengthening the BCBSA's licensing powers.

**Baylor Plan**    Name often used to refer to the prototype Blue Cross hospital prepayment Plan; begun in 1929 at Baylor University Hospital in Dallas, Texas, under the leadership of Justin Ford Kimball.

**BCA (Blue Cross Association)**    National organization of Blue Cross Plans, formed in 1948 as an offshoot of the AHA's Blue Cross Commission; assumed most of the functions of the Commission in 1956–1957; severed its remaining ties with the AHA in 1972; and finally consolidated (1978) and merged with the Blue Shield Association (1982) to become the Blue Cross and Blue Shield Association.

**BCC (Blue Cross Commission)**    The principal early national organization of Blue Cross Plans, created in 1946 as successor to the AHA's Committee on Hospital Service (which had been formed in 1936 and became the Hospital Service Plan Commission in 1941); abolished by the AHA in 1960 after gradually ceding its functions to the independent Blue Cross Association.

**BSA (Blue Shield Association)**    National organization of Blue Shield medical prepayment Plans, as renamed in 1976; see Associated Medical Care Plans (AMCP).

**capitation**    A form of group prepayment in which prospectively determined, per person payments are made to a provider or health plan in exchange for coverage for a specified package of benefits, as in a health maintenance organization (HMO), creating a financial incentive for providers to deliver cost-efficient services.

**CCMC (Committee on the Costs of Medical Care)**    A group formed in 1927 under the sponsorship of eight large private foundations to study the health economy, it completed its work in 1932 after publishing twenty-six influential studies, some written by Blue Cross Plan pioneer Rufus Rorem.

**CHAMPUS (Civilian Health and Medical Program of the Uniformed Services)**    A health plan for military dependents, begun in 1956.

**cherry picking**    In insurance, the practice of targeting relatively low-priced coverage packages for relatively low-risk employee groups, usually as a way of winning good risks away from another insurer that has included them in a larger pool with other relatively high-risk insureds at higher premium rates than the cherry picker offers (also known as "skimming").

**closed panel**    A multispecialty doctors' group that contracts to provide prepaid services only to insured patients who use doctors in the group (as

BCBSA00292908

some HMOs do); in contrast to open-panel or network arrangements, such as preferred provider organizations (PPOs) or point-of-service plans (POSs), in which patients may be covered for services provided by doctors outside a core group of doctors or other providers, at an additional charge.

**Committee of 100**   Also referred to as Committee for National Health Insurance (NHI). Formed in 1969 under leadership of UAW leader Walter Reuther, also including Senator Edward Kennedy, Dr. Michael De-Bakey, Whitney Young, Mary Lasker, and other liberals and labor leaders to lead the fight for NHI.

**Committee on Hospital Service**   *See* BCC.

**community rating**   In health insurance, the practice of pooling all insureds in a given service area into a single group and dividing the risk equally among all members of the group by means of a single rate, with those aged sixty-five and over and individual enrollees usually forming a separate pool and rate; usually cross-subsidized by surcharges on rates paid by large employee groups; contrasted to experience or merit rating, when subgroups within a service area are charged rates commensurate with their own specific loss experience.

**compulsory health insurance**   This term refers to a series of state and national health insurance reform proposals, beginning in the 1880s in Europe and in about 1912 in the United States. It also denotes a government requirement of universal coverage and is used to describe reform proposals in the 1930s and 1940s as well.

**concurrent review**   Usually performed at the behest of an insurer or other payer, this is a process for double-checking doctors' decisions about patient admissions, treatment, and hospital stays to avoid overutilization of facilities; contrasted with retrospective review, which is performed after care is given but may still result in limiting reimbursement; compare to generic concept of "second opinion."

**contract practice**   The employment of a physician or group of physicians by employers to provide health services to their workforce; a widespread phenomenon in isolated outposts of the railroad, mining, and timber industries in the late nineteenth and early twentieth centuries.

**control Plan**   In the Blues system, a Plan that contracts with the home office of a multistate employer to cover employees in its own and in other Plans' service areas through reciprocal coverage and reimbursement agreements with other participating (or "par") Plans.

**conversion**   The exercise of an option to purchase individual coverage at a negotiated rate by a person who is leaving an employee group, typically at retirement. Historically guaranteed to Blue Plan subscribers.

**copayment, co-insurance**   The assignment of financial responsibility to an individual for a portion of the cost of services covered primarily by a group insurance plan. This is designed to relieve employers of part of their benefit expense and to make individuals more cost conscious when they seek care.

**cost finding**   In hospital accounting, the determination of the real costs of providing a given service—historically a difficult task because of the interdependence of different hospital functions and often the root of controversy under reimbursement systems based on cost.

**CPS (California Physicians' Service)**   The first Blue Shield Plan, organized in 1939 by the California Medical Association.

**deductible**   Payment by a subscriber of the first agreed-upon amount spent on care, typically on a yearly basis.

**differential**   In the Blues system, refers to preferential rates charged by hospitals to Plans as compared to other insurers, in consideration of the benefits hospitals receive from Blue Plan coverage in terms of patient volume, comprehensiveness of coverage, and promptness and reliability of payment.

**DRGs (diagnosis related groups)**   In the Medicare program, a system of prospective reimbursement of providers initiated in 1983, which classified illnesses into 470 categories according to primary and secondary diagnoses, age, and complications. DRGs ended Medicare reimbursement to hospitals on the basis of cost-plus reimbursement, which had been widely criticized as inflationary and inefficient.

**EDS (Electronic Data Systems)**   The Texas-based computer company, founded by Ross Perot, that contracted with several Blue Shield Plans to provide data-processing services after the enactment of Medicare.

**experience rating**   The practice of setting insurance premiums on the basis of the actual loss experience of a given employee group. *See also* community rating.

**FEHBP (Federal Employees Health Benefits Program)**   A program of health coverage for federal workers enacted by Congress in 1959, which created structured rate-benefit options that could be offered to federal workers by the Blues, commercial insurers, or other health plans. This is the original model for the concept of "managed competition."

**FEP (Federal Employee Program)**   The coverage programs offered to federal workers by the Blues system, which captured the lion's share of the FEHBP market.

**first dollar**   Full coverage for services, without deductibles.

BCBSA00292910

**Forand bill**   An early proposal for insuring persons over sixty-five through Social Security taxes, introduced in the House Ways and Means Committee in 1957 by Aimé Forand (D-R.I.). It was the forerunner of Medicare.

**HCFA (Health Care Financing Administration)**   A federal agency that was created to administer Medicare and Medicaid (previously run by the Social Security Administration) in the mid-1970s.

**HIAA (Health Insurance Association of America)**   A trade organization for private for-profit stock and mutual insurance companies.

**HSI-MIA (Health Services, Inc. and Medical Indemnity of America)**   Mutual insurance companies established by the Blue Cross and Blue Shield organizations, respectively, in 1949 and 1952 to help the Plans market coverage for large, national employee groups, referred to as "national accounts."

**HMO (health maintenance organization)**   An arrangement for providing comprehensive health services (outpatient, inpatient, and preventive care) through a single organization or network, financed by members' per capita prepayment, with an emphasis on primary care, utilization controls, and financial risk for inefficient providers.

**indemnity**   Insurance coverage in the form of a specified cash benefit. Contrast this with "service benefit," which is coverage in the form of a specified service or group of services—for example, a $100,000 hospitalization benefit versus a ninety-day hospitalization benefit.

**Inter-Plan Service Benefits Bank**   An internal clearing mechanism created by the BCC in 1949 to help process transactions to equalize income and expenses among Blue Plans participating together in syndicated coverage of multiarea employee groups.

**IPA (independent practice association)**   An autonomous physician group or network providing prepaid group services.

**LRSP (Long Range Systems Planning)**   A joint effort of Blue Cross and Blue Shield Plans during the 1970s to develop a common system of electronic data processing, which was later regarded as overly ambitious and was scaled down.

**LTBS (Long-Term Business Strategy)**   A strategic plan adopted by the newly merged BCBSA in 1982, which called for the merging of local Blue Cross and Blue Shield Plans and further consolidation toward a goal of one Plan per state.

**major medical**   A type of coverage that was developed by commercial insurance companies during the 1950s, and sold as an alternative or supplement to basic indemnity or service benefits, to cover the cost of prolonged

hospitalization and intensive services associated with the most serious types of illness and injury. It is also known as "catastrophic coverage."

**managed care**   Controlled delivery of services in various forms, including HMOs, PPOs, and POS health plans, all featuring gatekeeper functions to control utilization and monitor physician decision making.

**managed competition**   A system in which an employer or other sponsor of coverage offers employees a menu of several types of health plans to choose from: an indemnity plan, a traditional Blue service benefit, and an HMO, for example. It was a model pioneered in the FEHBP in 1960 and was championed as a solution to corporate cost control in Alain Enthoven, *Health Plan: The Only Practical Solution to the Soaring Cost of Health Care.*

**McConnell Committee**   A joint committee of the Blues Associations formed in 1976 under the chairmanship of John McConnell of Kentucky to study the question of consolidating the two organizations.

**M-Day**   The day the Medicare program began operation, July 1, 1966.

**Medicaid**   Title XIX (19) of the Social Security Act of 1965, which created a combined state-federal program of medical assistance for the poor.

**medical necessity**   A criterion or criteria of appropriate care, developed during the drive for cost containment in the 1970s and 1980s, this includes pioneering efforts by the Blues in conjunction with the American College of Physicians and other professional groups to identify obsolete and ineffective procedures and to terminate insurance coverage for them. It later became a staple of managed care programs.

**medical underwriting**   In insurance, the practice of using the medical history of an applicant as a basis for establishing premiums or denying coverage. This is prohibited in most insurance reform proposals of the 1990s.

**Medicare**   Title XVIII (18) of the Social Security Act of 1965, which established a program of insurance coverage for persons aged sixty-five and older, funded through the Social Security system, divided into Part A for hospital insurance and Part B for medical coverage.

**merit rating**   *See* experience rating.

**NABSP (National Association of Blue Shield Plans)**   *See* BSA and AMCP.

**NAIC (National Association of Insurance Commissioners)**   Policy and professional organization for state insurance regulators.

**national account**   In the Blues system, a contract to provide coverage for a large employee group with operations in several different service areas

BCBSA00292912

(an area of perennial difficulty for the Blues Plans because of the conflict between the national account's typical demand for uniform rates and benefits, as against the local autonomy and diversity of participating Blue Plans).

**NHI (national health insurance)**   Term given to proposals for universal, government-mandated coverage programs during the 1970s.

**par Plan**   Short for participating Plan, a subordinate member of a Blue Cross and Blue Shield national account syndicate. *See also* control Plan.

**POS (point of service)**   A form of managed care sometimes called the open-ended HMO, this offers subscribers services at reduced cost from doctors, hospitals, and other providers within a network that practices prescribed cost controls and allows the subscriber the option of going outside the network for services at an added cost.

**PPO (preferred provider organization)**   A form of managed care in which an insurer typically organizes doctors, hospitals, and other providers into a network that agrees to prescribed cost controls and offers services to subscribers at less than usual charges to the insurer.

**practice standards, guidelines, or parameters**   Norms (usually computer generated) that outline the diagnostic and treatment procedures used by most doctors in a given area for a given diagnosis. These are viewed with suspicion by many doctors and are often derided as "cookbook medicine," but they nevertheless were gaining adherents during the reform debate of the early 1990s as a way of identifying doctors whose deviation from the norm might indicate quality or cost-consciousness problems.

**precertification, preadmission review**   In managed care, the practice of reviewing a doctor's decision to order a patient's admission to a hospital (before the admission takes place), either by an insurer, a utilization review agency, or an internal review procedure within an integrated insurer-provider organization such as an HMO.

**prospective payment**   Reimbursement of hospitals, doctors, or other providers on the basis of predetermined rates (rather than on costs), typically on a per diagnosis basis. Use in hospital reimbursement expanded rapidly after Medicare adopted its prospective payment system based on DRGs in 1983.

**PSROs (professional standards review organizations)**   Panels of doctors created in a 1972 Social Security Act amendment to monitor and evaluate care of patients under Medicare and Medicaid. These panels were replaced by peer review organizations (PROs) ten years later, which allowed greater flexibility than PSROs in the way reviews were conducted, because PSROs had been widely criticized as ineffective in checking inflation in the Medicare and Medicaid programs.

BCBSA00292913

**rating**   Insurance term referring to the process of setting premium rates, and involving the actuarial analysis of demographic factors and other predictors of health risk for an insured group or population.

**rationing**   In the health care reform debate of the 1980s and 1990s, this term refers to strategies for curtailing the provision of certain insured benefits deemed less vital or beneficial than others, in order to assure coverage of essential services for all. The practice was first tested in a controversial experiment by Oregon's Medicaid program.

**recertification**   Review of a doctor's decision to extend the hospitalization of a patient for longer than a minimum or average stay.

**reinsurance**   The purchase of insurance by an insurer as protection against extraordinary losses, this is often a feature of small-group, market-reform plans that require all insurers to accept all risks.

**reserves**   In insurance, excess revenues held against future losses, with minimum allowable reserves often fixed by state law for protection of policyholders.

**selective contracting**   In health insurance, the practice of contracting with certain doctors and hospitals to provide services at an agreed price.

**service benefit**   A health insurance benefit expressed in terms of a service that is provided, rather than a cash benefit (that is, an indemnity); regarded as a hallmark of most Blue Plans because it differentiated them from commercial indemnity insurers.

**service mark**   A trademark for services, where the distinctive name or logo of a single provider identifies its services and may not be used by others.

**single payer**   Used to describe a system of health insurance in which all benefits are paid by one agency, typically government (as in Canada, for example). This is advocated by many as a model for reform in the United States.

**syndicate**   In Blue Plan history, a group of Plans that cooperate to provide coverage to a single employee with work sites in more than one Plan's service area.

**technology assessment**   A program of the BCBSA to conduct continuous evaluations and reevaluations of medical technologies to assess their effectiveness, appropriateness, and value.

**Title XVIII (18), Title XIX (19)**   *See* Medicare, Medicaid.

**UCR (usual, customary, and reasonable)**   This term is used by the Medicare program to describe its original criteria for determining reasonable physician reimbursement rates, loosely based on the Blue Shield system's prevailing fees program.

BCBSA00292914

**underwriting cycle**   In health insurance, the tendency toward a regular alternation between three-year periods of gains and losses, usually considered the result of periods of price competition in profitable years followed by losses that occur as rising costs outstrip insurers' premium income.

**UR (utilization review)**   This is a broad term for any one of a number of methods for third-party review of doctors' decisions to order diagnostic and treatment procedures and hospitalization.

**Wagner-Murray-Dingell**   Shorthand for national health insurance legislation that was proposed in the 1940s by Senator Robert Wagner (D-N.Y.), Senator James Murray (D-Mont.), and Representative John Dingell (D-Mich.).

BCBSA00292915

# Notes

IN MOST CASES, transcripts of the BCA annual meetings are not paginated sequentially from beginning to end, so unambiguous page references cannot be given. Source material can best be located by identifying the speakers. Usually the transcripts include an annual report from the BCA president. In some years, the annual report of Walter McNerney (president, 1961–1978) was mimeographed as a separate, sequentially paginated document for which page references are given. After 1982, the Blue Cross and Blue Shield Association printed an annual report that included the president's message. These documents are identified in the notes, with page references, but are not included separately in the works cited list. Minutes of meetings, press statements, and internal communications are identified only in these notes.

Among the sources for this history, we have used texts of presentations made at the NABSP's Annual Program Conference from 1961 to 1973, which were printed in booklet form, usually with thematic titles. These presentations are listed in the bibliography by author. The booklets are not listed individually. Mimeographed minutes and routine reports made at NABSP annual business meetings are identified fully in note references but not separately in the bibliography. All these documents are to be found in the BCBSA archives in Chicago.

## Foreword

1. John A. Lapp, "The Findings of Official Health Insurance Commissions," p. 27.

2. For background on American hospitals in the 1920s, see Rosemary Stevens, *In Sickness and in Wealth: American Hospitals in the Twentieth Century,* especially chapter 5.

3. Louis S. Reed, "Private Health Insurance: Coverage and Financial Experience, 1940–1966," pp. 12–13.

4. In 1993 (the year of the most recent official figures at the time of writing), private health insurance for personal health expenditures represented $258 billion, out

BCBSA00292916

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 94 of 138

of total personal health expenditures of $783 billion. Katharine R. Levit et al., "National Health Expenditures, 1993," p. 285, table 16.

5. Mary Ross, "Crisis in the Hospitals," p. 365.

6. CCMC, *Medical Care for the American People: Final Report,* p. 129.

7. C. Rufus Rorem, "Policies and Procedures for Group Hospitalization," pp. 9–12.

## Chapter 1: Prepayment Pioneers

1. The epigraph is taken from Margaret Albert, *A Practical Vision: The Story of Blue Cross of Western Pennsylvania, 1937–1987,* facing p. 1. See Stevens, *In Sickness and in Wealth;* also James E. Stuart, "The Blue Cross Story: An Informal Biography of the Voluntary Nonprofit Prepayment Plan for Hospital Care."

2. Justin F. Kimball, interview with Melvin Munn. The observer is cited in Lana Henderson, *Baylor University Medical Center: Yesterday, Today, and Tomorrow,* p. 71.

3. Bryce Twitty, interview with Melvin Munn, p. 4.

4. Kimball, interview with Munn, p. 5.

5. Kimball cited in Stuart, "Blue Cross Story," p. 18.

6. Ibid., p. 19.

7. Kimball and brochure both cited in Blue Cross and Blue Shield of Texas, *Advance,* June 1989, p. 6.

8. Kimball, interview with Munn, pp. 13–14.

9. Kimball cited in *Advance,* p. 6.

10. Twitty interview, pp. 6–7.

11. Kimball cited in *Advance,* p. 7.

12. Frank D. Campion, *The AMA and U.S. Health Policy Since 1940,* p. 136. Founded in 1847, the American Medical Association (AMA) began primarily as a scientific and educational organization concerned with disseminating knowledge and developing professional standards.

13. The standard early survey of prepayment is Pierce Williams, "The Purchase of Medical Care Through Fixed Periodic Payment."

14. Drydan cited in Paul Starr, *The Social Transformation of American Medicine,* p. 242.

15. Williams, "Purchase of Medical Care," pp. 252–65.

16. Known initially as the Association of Hospital Superintendents, the American Hospital Association (AHA) was founded in 1899. It functions as a forum for the exchange of information and the promulgation of standards, and as the hospitals' voice on public policy.

17. Fritz Lattner, interview with Odin Anderson, p. 4.

18. Mannix cited in George E. Condon, *Fifty Years of Community Service,* p. 8.

19. Both quotations are from Louis S. Reed, *Blue Cross and Medical Service Plans,* p. 10.

20. Stuart, "Blue Cross Story," pp. 24–25.

21. Frank Van Dyk, interview with Odin Anderson, p. 2.

22. Ibid., p. 5.

23. Stuart, "Blue Cross Story," pp. 26–27.

24. Information about the early career of E. A. van Steenwyk is taken from Stuart, "Blue Cross Story"; Odin Anderson, *Blue Cross Since 1929: Accountability and the Public Trust;* E. A. van Steenwyk, interview with Donald Fairbairn; Abbott Lee Fletcher, *History of Minnesota Blue Cross.*

BCBSA00292917

25. Van Steenwyk, interview with Fairbairn, p. 3.

26. Stuart, "Blue Cross Story," p. 34.

27. Van Dyk cited in David J. Rothman, "The Public Presentation of Blue Cross, 1935–1965," *Journal of Health Politics, Policy, and Law* 16, no. 4 (Winter 1991), p. 673.

28. Van Steenwyk cited in Stuart, "Blue Cross Story," p. 36.

29. Ibid., pp. 29–30.

30. All quotes in this paragraph are from E. J. Henryson, *My Story of Group Hospitalization, Inc.,* pp. 7–21.

31. All quotations in this paragraph are from Condon, *Fifty Years,* pp. 10–13.

32. Stuart, "Blue Cross Story," p. 70.

33. Information about the early career of John Mannix is taken from Stuart, "Blue Cross Story"; Condon, *Fifty Years;* Anderson, *Blue Cross Since 1929;* Blue Cross and Blue Shield of Michigan, *Highlights,* May 1972.

34. Mannix, letter to Robert Cunningham Jr., March 7, 1988 (in author's possession).

35. Mannix cited in Condon, *Fifty Years,* p. 7.

36. Mannix, AHA, *Transactions of the American Hospital Association, 1929,* p. 409.

37. Anderson, *Blue Cross Since 1929,* p. 30; Committee on the Costs of Medical Care (CCMC), *Medical Care for the American People: The Final Report,* pp. 7, 41.

38. Fishbein and Cohen both cited in Campion, *AMA and U.S. Health Policy,"* p. 117.

39. Starr, *Social Transformation,* p. 266.

40. Daniel S. Hirshfield, *The Lost Reform: The Campaign for Compulsory Health Insurance in the United States from 1932 to 1943,* p. 52.

41. All three quotes in this paragraph are from Blue Cross and Blue Shield of Michigan, *Highlights,* p. 9.

42. Reed, *Blue Cross,* p. 12.

43. Rorem cited in Anderson, *Blue Cross Since 1929,* p. 37.

44. Rorem cited from ibid., p. 31, and from Albert, *Practical Vision,* p. vii.

45. C. Rufus Rorem, "Origins of Blue Cross" (early documents collected later in 1971 and 1982), p. H2.

46. Starr, *Social Transformation,* p. 297.

47. Stuart, "Blue Cross Story," p. 22.

48. Both quotations from ibid., p. 62.

49. J. Douglas Colman, interview with Odin Anderson, p. 7.

50. The study is cited in Albert, *Practical Vision,* pp. 1–7.

51. Medical society leader cited in ibid., p. 22.

52. Ibid., p. 33.

53. Stuart, "Blue Cross Story," pp. 53–54.

54. Both van Steenwyk quotes from ibid., p. 46.

55. All three quotations from Albert, *Practical Vision,* p. 66.

56. Ibid., p. 42.

57. Van Dyk, interview with Anderson, pp. 8–10; see also Colman, interview with Anderson, p. 20, on damage to Van Dyk's reputation.

58. Van Steenwyk cited in Stuart, "Blue Cross Story," p. 44.

59. Ibid., p. 45.

60. Colman, interview with Anderson, pp. 3–4 (both quotes).

61. Van Steenwyk cited in Stuart, "Blue Cross Story," p. 48.

62. Ibid, p. 50.

63. Ibid., p. 51.

64. Rorem, "Origins," pp. F1–H2.

65. Ibid., p. J2.

66. Van Steenwyk, interview with Fairbairn, pp. 8–9. See also Anderson, *Blue Cross Since 1929,* p. 39.

67. Rorem, "Origins," pp. F3, G1.

68. The 1932 study is cited in C. Rufus Rorem, *A Quest for Certainty,* p. 6.

69. C. Rufus Rorem, interview with Lewis Weeks, p. 66.

70. Reed, *Blue Cross,* p. 12.

71. In accounting, "unearned income" is money that has been paid in relation to a future period. Income moves from the unearned column to the earned column as the period for which payment has been made passes.

72. Stuart, "Blue Cross Story," pp. 76–78.

73. Rorem cited in ibid., p. 63.

74. Anderson, *Blue Cross Since 1929,* p. 40.

75. Stuart, "Blue Cross Story," pp. 79–80.

76. Stevens, *In Sickness and in Wealth,* p. 160.

77. Stuart, "Blue Cross Story," p. 65.

78. Ibid., pp. 69, 3.

79. Rorem cited in Albert, *Practical Vision,* p. vii; Anderson, *Blue Cross Since 1929,* pp. 29–30; Harold Maybee, interview with Odin Anderson, p. 10. See also Lawrence D. Brown, "Capture and Culture: Organizational Identity in New York Blue Cross," a fascinating but somewhat speculative interpretation of motives and mores in nonprofit health insurance, describing Blue Cross Plan philosophy as both "pragmatic humanitarianism" and "dogmatic privatism." In *Journal of Health Politics, Policy, and Law* 16, no. 4 (Winter 1991), pp. 654, 658.

80. First two quotations this paragraph from Starr, *Social Transformation,* p. 276; both Stuart quotes from "Blue Cross Story," p. 86.

## Chapter 2: The Doctors' Dilemma

1. Feierabend is cited from Anderson, *Blue Cross Since 1929,* p. 58 n. 10. Dr. Carl Vohs is cited in AHA, *Transactions, 1937,* p. 329.

2. Ronald Numbers, *Almost Persuaded: American Physicians and Compulsory Health Insurance, 1912–1920,* pp. 10–12, 30–32 (31–32).

3. *JAMA* quotations of 1913, 1916, and direct quote from 1920 all cited in James Burrow, *AMA: Voice of American Medicine,* pp. 144–45. This is a relatively un-critical history of the AMA.

4. Both quotations from ibid., pp. 171–72.

5. Reed, *Blue Cross,* p. 136.

6. Burrow, *AMA,* pp. 173–75.

7. William A. MacColl, *Group Practice and Prepayment of Medical Care,* p. 12.

8. Dr. Shadid's experiment is discussed in Williams, "Purchase of Medical Care," MacColl, *Group Practice,* and Starr, *Social Transformation.*

9. Frank Dickinson, *A Brief History of the Attitude of the American Medical As-sociation Toward Voluntary Health Insurance,* pp. 15–19.

10. Rorem, "Origins of Blue Cross," p. F2.

11. Greer Williams, "Kaiser Plan: The Prepaid Group Practice Model and How It Grew," pp. 69–70.

12. Starr, *Social Transformation,* p. 306.

13. Frank Sinclair, *Blue Cross in Wisconsin,* p. 9.

14. Howard Hassard, *Fifty Years in Law and Medicine—Reminiscences: Interview with Miriam Stein,* p. 21.

15. Ibid., pp. 22–29 (24, both quotes).

16. "With Firm and Regular Step," *Journal of the Michigan State Medical Society,* pp. 4–12 (10).

17. Ibid., p. 12 (both quotes).

18. Dickinson, *Attitude of the AMA,* pp. 23–24.

19. All quotes this paragraph from Hirshfield, *The Lost Reform,* pp. 44–46.

20. All quotes this paragraph from ibid., pp. 50–66.

21. Frank Smith, "The Blue Shield Medical Care Plans," p. 1.

22. Hirshfield, *The Lost Reform,* pp. 104–15.

23. Ibid, pp. 124, 51.

24. Blue Shield of California, *Fifty Years of Caring for Californians,* pp. 2–4; Hassard, *Fifty Years,* p. 35.

25. Warren cited in LACMA, "Who Wrote the Book on Health Care Law?" *LACMA Physician,* p. 24.

26. Blue Shield of California, *Fifty Years,* p. 10.

27. Reed, *Blue Cross,* pp. 137–38; John Mannix, "Voluntary Health Plans in California," *California and Western Medicine,* pp. 260–61. In 1943 Mannix, who was then director of Michigan Hospital Service, was commissioned by the CMA to do a study of hospital and medical Plans in California. There were three different hospital Plans in the state, and physician support was patchy. Mannix, the ultimate apostle of unity, naturally told the four Plans they would do better if they got together. But the final consolidation of the state's Blue Cross Plans did not take place until 1982. The Blue Cross Plan and Blue Shield Plan remain unmerged.

28. John Castellucci, interview with author; Lawrence Drake and Sallie Hanna, *The History of Michigan Hospital Service 1938–1951,* p. 21.

29. Castellucci, interview with author; Drake and Hanna, *History of Michigan Hospital Service,* pp. 20–21.

30. John Mannix, interview with Lewis Weeks, p. 67.

31. Foster cited in Drake and Hanna, *History of Michigan Hospital Service,* p. 23; William McNary, interview with Odin Anderson, p. 9.

32. Mannix, interview with Weeks, p. 29.

33. Castellucci, interview with author; Mannix, interview with Weeks, pp. 27–29; Castellucci, interview with author.

34. Mannix, interview with Weeks, pp. 27–29.

35. Castellucci, interview with author.

36. Ibid.

37. Ibid.

38. *New York Times,* November 24, 1939; *New York Herald Tribune,* November 24, 1939.

39. Reed, *Blue Cross,* p. 141.

40. Ibid., p. 142.

41. Howard "Hap" Hassard, interview with author.

42. William Angelos, "A Legacy of Value," pp. 16–21; Leroy Mann, "Pennsylvania Blue Shield History," pp. 1–3.

43. Perry cited in Angelos, "Legacy," p. 21.

BCBSA00292920

44. *New York State Journal of Medicine,* April 1938, p. 593, cited by Frederic Estabrook Elliott in a "personal communication" to members of the New York State Society of Medicine, April 27, 1938, titled "Are We Afraid to Face Facts?" (all quotes from Elliott).

45. Elliott, unaddressed letter "to selected keymen," dated March 18, 1938.

46. Quote is from Elliott, typescript, "The So-Called Goldwater Ward Plan," p. 2. See also Empire Blue Cross and Blue Shield, "Finding Aid: Papers of Frederic Estabrook Elliott."

47. Arthur Offerman, interview with Odin Anderson, pp. 1–2.

48. Frank L. Feierabend, interview with Odin Anderson, p. 9.

49. Frank L. Feierabend, M.D., "Philosophy of a Medical Service Plan," *JAMA,* pp. 3–4.

## Chapter 3: The 1940s

1. Robert Sigmond, interview with author, while he was a scholar-in-residence at Temple University's School of Business Administration in Philadelphia in 1990.

2. Rashi Fein, *Medical Care, Medical Costs: The Search for a Health Insurance Policy,* p. 21.

3. Lucia cited in Blue Cross of California, *The First Fifty Years,* p. 23.

4. Albert, *Practical Vision,* p. 54.

5. Stuart, "Blue Cross Story," p. 143 (quote); Reed, *Blue Cross,* pp. 12, 246.

6. Stevens, *In Sickness and in Wealth,* pp. 208–9.

7. Campion, *AMA and U.S. Health Policy,* p. 10 (quote); Stevens, *In Sickness and in Wealth,* p. 204.

8. Herman Somers and Anne Somers, *Doctors, Patients, and Health Insurance,* p. 548.

9. Ibid.

10. Stuart. "Blue Cross Story," pp. 101–4 (both quotes); Anderson, *Blue Cross Since 1929,* p. 47.

11. Stuart, "Blue Cross Story," p. 106.

12. Ibid., p. 43; Stevens, *In Sickness and in Wealth,* p. 211.

13. Blue Cross of Northeast Ohio, *Better Health Through Better Care,* p. 34.

14. Ibid., pp. 34–35.

15. Stuart, "Blue Cross Story," pp. 153–54.

16. Ibid., p. 155.

17. Starr, *Social Transformation,* pp. 308–9. See also Reed, *Blue Cross,* chap. 8, esp. pp. 83–86.

18. Reed, *Blue Cross,* pp. 83–86 (85, both quotes). Another comment along the same line as the "family joke" was made by William McNary, longtime head of Blue Cross in Michigan and a mainstay of the Blue Cross Commission and later the Blue Cross Association. McNary told Odin Anderson in a 1971 interview that, "We told people in the hospital field who wanted to get into Blue Cross that they would find immediately they made the change that they lost caste with the hospitals" (McNary, interview with Anderson, p. 12).

19. Lattner, interview with Odin Anderson, p. 12.

20. Antone "Tony" Singsen, interview with Odin Anderson, pp. 1–4.

21. Reed, *Blue Cross,* p. 91.

22. Reed, *Blue Cross,* pp. 86–91 (89, 91).

23. New York administrator cited in Albert, *Practical Vision,* p. 56.

24. McNary, interview with Anderson, pp. 4–5, 10 (10); Drake and Hanna,

*History of Michigan Hospital Service,* pp. 36–50.

    25. Bruce Taylor, interview with Odin Anderson, pp. 5–6.

    26. Tony Singsen, letter to Odin Anderson, p. 2.

    27. Stuart, "Blue Cross Story," pp. 97–99 (98, all quotes).

    28. Ibid., p. 156.

    29. Ibid., p. 162.

    30. Ibid., pp. 160–64 (163–64).

    31. Reed, *Blue Cross,* pp. 112–19.

    32. Ibid., pp. 61–62.

    33. Ibid., pp. 61–63. Information for Iowa comes from Lattner, interview with Anderson, pp. 6–7.

    34. Campion, *AMA and U.S. Health Policy,* p. 139.

    35. Reed, *Blue Cross,* p. 163.

    36. Addes cited in ibid., pp. 206–7.

    37. Thomas cited in ibid., pp. 213–15.

    38. Lattner, interview with Anderson, pp. 8–9.

    39. Stuart, "Blue Cross Story," p. 128.

    40. Reed, *Blue Cross,* p. 182.

    41. Offerman, interview with Anderson, p. 1.

    42. Genevieve Dougan, "History of the Role of American Medical Association in Establishment of Associated Medical Care Plans," p. 1.

    43. AMA letter cited in ibid., pp. 2–4.

    44. Letters on 1947, 1948, 1949, all cited in ibid., pp. 12–14.

    45. Campion, *AMA and U.S. Health Policy,* pp. 134–37 (135).

    46. Ibid., 134–35.

    47. Ibid., p. 154.

    48. Whitaker cited from ibid., p. 162; Campion and Howard cited from ibid., p. 164.

    49. The story of Louis Reed's project is taken entirely from his interview with Odin Anderson, pp. 1–6. See also Anderson, *Blue Cross Since 1929,* pp. 64–65.

    50. Reed, interview with Anderson, p. 3.

    51. Ibid., p. 4.

    52. The report is quoted at length in Stuart, "Blue Cross Story," pp. 135–36, 147–48 (135).

    53. Ibid., p. 99; Singsen, interview with Anderson, p. 9.

    54. Rorem, "Origins of Blue Cross," pp. F1–F3.

    55. Condon, *Fifty Years,* p. 1.

    56. Tony Singsen, letter to Anderson, February 12, 1974, p. 3.

    57. Colman, interview with Anderson, p. 21.

    58. Mannix, interviews with Anderson and Weeks; Maurice Norby, interview with Lewis Weeks, pp. 37–38. Norby worked with Rorem from 1935 to 1937 and then spent twenty-five years at the AHA.

    59. Mannix, interview with Anderson, p. 23; Mannix, interview with Weeks, pp. 32–33; Van Dyk, interview with Anderson, p. 13.

    60. Odin Anderson, *Blue Cross Since 1929,* p. 50; Mannix, interview with Anderson, p. 15.

    61. Tony Singsen, letter to Anderson, February 12, 1974, p. 3.

    62. Mannix, interview with Anderson, p. 19.

    63. Stuart, "Blue Cross Story," pp. 117–19.

    64. Ibid., p. 169.

BCBSA00292922

65. Anderson, *Blue Cross Since 1929,* p. 53.

66. Standards cited in both Stuart, "Blue Cross Story," p. 77, and Reed, *Blue Cross,* p. 124.

67. Reed, *Blue Cross,* pp. 128–33 (129, 133).

68. Taylor, interview with Anderson, p. 17.

69. See Martin E. Segal, "Significance of Union Health and Welfare Funds," p. 1.

70. Stuart, "Blue Cross Story," pp. 167–75 (175).

71. Webb's proposal cited in ibid., p. 208.

72. Anderson, *Blue Cross Since 1929,* p. 47.

73. Singsen, letter to Anderson, p. 3; Colman, interview with Anderson, pp. 26–27.

74. Singsen, interview with Anderson, p. 10.

75. Anderson, *Blue Cross Since 1929,* p. 56.

76. Ibid., pp. 57–58; Stuart, "Blue Cross Story," p. 185.

77. Stuart, "Blue Cross Story," pp. 184–85, 194 (194).

78. Feierabend, interview with Anderson, p. 8.

79. Dougan, "History," pp. 6–7; Stuart, "Blue Cross Story," p. 186 (quote).

80. Blue Cross Commission, Press release, January 1950, BCBS archives, Chicago.

81. Stuart, "Blue Cross Story," pp. 194–205.

## Chapter 4: The 1950s

1. Epigraph from Walter McNerney, interview with Odin Anderson, p. 6.

2. Colman, interview with Anderson, p. 5; unsigned mimeographed essay in Colman's Papers, "The Lady or the Tiger? (Or, 'Little Man, What Now?'): The Organization of Blue Cross," December 1958. This paper is headed "An Analysis by Blue Cross Association." Colman may or may not have written or helped write it, but the paper is an argument for a stronger Blue Cross Association, a position that he was prominently associated with.

3. Somers and Somers, *Doctors, Patients,* pp. 193–95, 543.

4. Seymour Harris, *The Economics of American Medicine,* pp. 170–72; Somers and Somers, *Doctors, Patients,* pp. 57–58; Stevens, *In Sickness and in Wealth,* pp. 216–19; Starr, *Social Transformation,* pp. 348–51, 375–76.

5. Somers and Somers, *Doctors, Patients,* pp. 199 (quote), 176 (quote), 544.

6. Rorem cited in Stuart, "Blue Cross Story," p. 227; ibid., pp. 224, 235–38 (235).

7. Somers and Somers, *Doctors, Patients,* p. 304; Stuart, "Blue Cross Story," p. 238.

8. Bruce Taylor uses this expression in his 1973 interview with Odin Anderson, p. 3.

9. Harry Becker, "Social Security Aims of the UAW-CIO," pp. 2–3.

10. Joseph Harvey, "Major Medical Coverage and Its Product Implications to Blue Shield," p. 12 (quote); Somers and Somers, *Doctors, Patients,* pp. 281–82.

11. Carl Metzger, "Extended Benefits," p. 45; Harvey, "Major Medical," p. 14.

12. Both quotes from Stuart, "Blue Cross Story," pp. 261–62.

13. Ibid., p. 264.

14. James E. Bryan, "Blue Shield Faces Its Hour of Decision," pp. 4–5; "The Role of Blue Shield in the Future of Medical Practice," p. 96.

15. John F. Tomayko, "Trends and Attitudes in Labor Toward Health Care Coverage," p. 10. The senior author of this book, then editor of *The Modern Hospital,* joined in the chorus of boos that met these remarks. "Some doctors see Blue Shield as a means of improving their collections, rather than as a means of serving their patients," he wrote in a 1955 editorial. "Unless its insidious attrition can be checked, no

BCBSA00292923

amount of scientific or economic wizardry can save the doctors and hospitals from a calamitous loss of public confidence. The patient expects them to think first of his needs, not theirs." See also Bryan, "Hour of Decision," pp. 3–4.

16. Francis T. Hodges, M.D., "Supermarket Medicine," p. 106.

17. Harris, *Economics of American Medicine,* pp. 355, 393; Somers and Somers, *Doctors, Patients,* p. 548.

18. Duncan McIntyre, *Voluntary Health Insurance and Rate Making,* p. 158.

19. McNary, interview with Anderson, p. 8; resolution cited in McIntyre, *Voluntary Health Insurance,* p. 159.

20. McIntyre, *Voluntary Health Insurance,* pp. 159–65.

21. Philo Nelson, interview with Odin Anderson, pp. 7, 5.

22. McNary, interview with Anderson, pp. 8–9.

23. Ibid.

24. McIntyre, *Voluntary Health Insurance,* pp. 165–67.

25. All quotations in this paragraph and the next are from James F. Coleman, "Some Principles of Rating and Their Effect on Blue Shield Product Development," pp. 22–25.

26. Odin Anderson, with Jacob Feldman, *Family Medical Costs and Voluntary Health Insurance,* p. 63.

27. Odin Anderson, from a 1957 study, "Voluntary Health Insurance in Two Cities," cited in Somers and Somers, *Doctors, Patients,* p. 167; Anderson and Feldman, *Family Medical Costs,* pp. 87–88 (block quotation).

28. Cited in Albert, *Practical Vision,* p. 89.

29. All quotes this paragraph from Michigan Blue Cross and the Michigan State Medical Society study cited in Joseph W. Garbarino, *Health Plans and Collective Bargaining,* pp. 57–60.

30. Robert M. Cunningham Jr., interview with Lewis Weeks, pp. 27–28.

31. Albert, *Practical Vision,* p. 84.

32. *Medical Economics* and Spencer both cited in ibid., pp. 87–90.

33. Spencer cited in ibid., p. 90; James E. Bryan, "Blue Shield's Role in the Future of Medicine," p. 6.

34. Bryan, "Hour of Decision," p. 4.

35. Robert Eilers, *Regulation of Blue Cross and Blue Shield Plans,* pp. 288–90.

36. Ray E. Trussell et al., "Prepayment for Medical and Dental Care in New York State," Introduction.

37. Herman Somers and Anne Somers, *Health and Health Care: Policies in Perspective,* pp. 128–29.

38. Smith cited in Albert, *Practical Vision,* pp. 86–87.

39. Tony Singsen, letter to Odin Anderson, pp. 2–3.

40. Ibid., p. 4.

41. All quotes this paragraph from Stuart, "Blue Cross Story," p. 270.

42. Singsen, interview with Anderson, p. 12.

43. Stuart, "Blue Cross Story," pp. 274–75.

44. This account of the restructuring of the Blue Cross Association follows Stuart, "Blue Cross Story," pp. 275–81, with supporting material from Anderson's interviews with Singsen, Colman, and George Heitler.

45. Singsen, interview with Anderson, p. 12.

46. Ibid., p. 11; Stuart, "Blue Cross Story," pp. 266–67.

47. Edwin Werner, speech at the thirtieth anniversary celebration of Blue Cross

BCBSA00292924

and Blue Shield Federal Employee Program (FEP) in October 1990, p. 1; Odin Anderson, *Blue Cross Since 1929,* p. 74.

48. Stuart, "Blue Cross Story," p. 267.

49. Earl Kammer and Marvin Walker, joint interview with Odin Anderson, p. 15.

50. Stuart paraphrased by Singsen, interview with Anderson, p. 11.

51. Ibid., p. 12; Werner, speech, p. 3.

52. Andrew Ruddock, "The Federal Employee Health Benefits Program: Its Implications and Importance," p. 30.

53. Edwin Werner, interview with author; Werner, speech, p. 2 (quote).

54. Associated Medical Care Plans changed its name to the National Association of Blue Shield Plans (NABSP) in 1960.

55. Stuart, "Blue Cross Story," p. 284.

56. Colman, interview with Anderson, pp. 27–28.

57. Ibid., p. 28.

58. Werner, speech, p. 4.

59. Ibid., p. 1.

60. The Federal Employee Program (FEP) was the benefit package offered to federal employees by the Blue Cross and Blue Shield organizations and should not be confused with the Federal Employees Health Benefits Program (FEHBP), as the overall federal program enacted in 1959 is called.

61. Werner, interview with author.

62. Stuart, "Blue Cross Story," pp. 286–87.

63. Russell Nelson, *Summary of Workshop Conference on New National Blue Cross Organization,* p. 3.

64. Stuart, "Blue Cross Story," pp. 293–94.

65. Ibid., pp. 295–97; H. Charles Abbott, *Summary of Workshop Conference on New National Blue Cross Organization,* p. 12.

## Chapter 5: The Double Bind

1. Robert Evans, "The Blue Cross Approach to Your Retirement Program," p. 2.

2. Stuart, "Blue Cross Story," p. 288.

3. Oscar Ewing, press statement (Federal Security Agency, Washington, D.C., June 25, 1951), p. 1 (quote). See also Campion, *AMA and U.S. Health Policy,* and Theodore Marmor, *The Politics of Medicare.* Marmor was an aide to Cohen in 1966; Campion was an AMA public relations representative for a decade.

4. William McNary, letter to John Mannix, June 27, 1951. Mannix, after his brief and unsuccessful foray into the commercial insurance field, was back in the fold as director of the Cleveland Hospital Service Association (subsequently called Blue Cross & Blue Shield of Ohio). But he no longer was part of the inner circle of national leaders.

5. Louis Pink, letter to Oscar Ewing, October 26, 1951, pp. 1–3.

6. AMA public relations firm Whitaker and Baxter, memo to local medical societies, July 2, 1951.

7. Blue Cross Commission, "Report on Enrollment of Persons Age Sixty-Five and Over, December 1951."

8. Blue Cross Commission, "Report on Survey on Utilization by Age, October 1956."

9. Blue Cross Commission, "Survey of Legislation Permitting the Payment of Blue Cross Dues from Governmental Funds for Indigent Care, Old Age Pensioners, and Aid to Dependents, December 1952."

BCBSA00292925

10. Robert J. Myers, *Medicare,* pp. 24–25.

11. Harold V. Maybee, letter to Courtney Taber, December 30, 1955.

12. Ibid.

13. BCA and AHA, "A Report on Health Care of the Aged, December 1961," p. 211.

14. Cruikshank cited in AMA, "Washington Letter, April 20, 1956."

15. This account of the origins of the Forand bill draws on Campion, *AMA and U.S. Health Policy;* Marmor, *Politics of Medicare;* and Myers, *Medicare.*

16. Marmor, *Politics of Medicare,* p. 33; Fein, *Medical Care,* p. 56 (quote).

17. All quotes from Fein, *Medical Care,* pp. 52–56.

18. Shortly after he succeeded Basil MacLean as BCA president in 1960, James Stuart moved the Association's headquarters back to Chicago from New York—reversing the move MacLean had insisted on just three years earlier. The Midwestern location was more suitable for the BCA's coast-to-coast responsibilities.

19. Stuart, "Blue Cross Story," pp. 289, 290.

20. Ibid., 290.

21. Hassard, *Fifty Years,* p. 50.

22. Ibid., pp. 50, 56.

23. Thomas Tierney, letter of October 23, 1961, cited in BCA and AHA, "Health Care of the Aged," pp. 236–38, Appendix 6.

24. Stanley Saunders, in BCA annual meeting, 1961.

25. James Stuart, in BCA annual meeting, 1960.

26. Evans, Tierney, and Metzger, all cited in BCA annual meeting, 1960.

27. See Marmor, *Politics of Medicare,* pp. 37–41; Myers, *Medicare,* pp. 39–44.

28. Stuart, "Blue Cross Story," pp. 299–302 (299).

29. McNerney, interview with Weeks, pp. 26–27; Stuart, "Blue Cross Story," p. 306.

30. Stuart, "Blue Cross Story," p. 306.

31. Walter McNerney et al., *Hospital and Medical Economics: A Study of Population, Services, Costs, Methods of Payment, and Controls,* p. 1298; McNerney, interview with author, 1991.

32. McNerney, interview with author, 1991.

33. McNerney, interview with Weeks.

34. Somers and Somers, *Medicare and the Hospitals,* p. 9; Marmor, *Politics of Medicare,* pp. 42–43.

35. The following account of discussions in Washington and the April 1961 BCA debate is taken entirely from the BCA annual meeting, 1961. The transcript is not sequentially paginated, and potentially confusing page references are omitted here. Those whose remarks are referred to include Paul Drescher, Robert Evans, Rev. J. Q. Harrington, John Mannix, Dr. Jack Masur, Harold Maybee, William McNary, William Sandow, H. A. Schroder, Guy Spring, Thomas Tierney, Lane Tynes, and E. A. van Steenwyk. All were Blue Cross Plan executives except Masur, the AHA representative at the meeting.

36. McNerney, preface in BCA and AHA, "Health Care of the Aged," p. 2.

37. Blue Cross Plans and the AHA, "Financing Health Care for the Aged: A Proposed Statement of Policy, January 3, 1962," p. 15; McNerney, interview with Weeks, p. 31.

38. James Z. Appel et al., "Promoting the Interests and Progress of Voluntary Health Care Prepayment"; AMA, press release, January 18, 1962.

39. Dr. Donald Stubbs, statement before Mills Committee, titled "Statement of the National Association of Blue Shield Plans on H.R. 4222, August 3, 1962," pp. 2–3.

BCBSA00292926

Case 2:13-cv-20000-RDP   Document 1353-8   Filed 07/17/17   Page 104 of 138

40. Edgar Hiestand, letter to John Castellucci, February 1962.

41. McNerney, in BCA annual meeting, 1962.

42. All quotes this paragraph from Campion, *AMA and U.S. Health Policy,* pp. 260–64.

43. Sen. Pat McNamara (D.-Mich.), letter to Edward Groner, August 2, 1962.

44. Stuart, "Blue Cross Story," p. 314; McNerney, interview with Weeks, pp. 31, 124.

45. Statistics and this overview of the OAA program are based on Tony Singsen's characteristically astute and encyclopedic report to Plan officials, in BCA annual meeting, 1963.

46. Tom Beauchamp, interview with Odin Anderson, p. 13.

47. Walter McBee's description of the OAA program in Texas followed Singsen's report, in BCA annual meeting, 1963.

48. William Miller of the NABSP, letter to Robert M. Ball of the Social Security Administration, November 6, 1963, with attachments.

49. Marmor, *Politics of Medicare,* p. 39.

50. Stevens, *In Sickness and in Wealth,* p. 273.

51. McNerney, in BCA annual meeting, 1965.

52. Somers and Somers, *Medicare,* pp. 10–12 (10).

53. This summary is based on Somers and Somers, *Medicare,* pp. 9–15; Myers, *Medicare,* pp. 45–57; and Marmor, *Politics of Medicare,* pp. 62–69.

54. McNerney, interview with Weeks, pp. 31–32; McNerney, report on the progress of Medicare negotiations as of March 30, 1965, in BCA annual meeting, 1965. The latter is a tour de force, full of improvisational turns of phrase, an excellent example of McNerney's gift for distinctive and inventive language. An idiosyncratic eloquence was part of McNerney's style, although listeners occasionally complained that he taxed their comprehension. During adversarial cross examination at a congressional hearing in 1971, Senator Thomas Eagleton accused him of being "heavy on semantics, circumlocution, and artful use of sometimes obscure phraseology." McNerney made a good-humored apology. Senate Committee on Labor and Public Welfare, *Examination of the Health Care Crisis in America, March 23 to April 6, 1971,* p. 882.

55. Odin Anderson, *Health Services as a Growth Enterprise in the United States Since 1875,* p. 175; Somers and Somers, *Medicare,* p. 16 (both quotes).

56. McNerney, speech at BCA annual meeting, 1965.

57. Somers and Somers, *Medicare,* pp. 14–15.

58. Marmor, *Politics of Medicare,* p. 73.

59. Cohen cited in Anderson, *Health Services,* p. 175.

60. Somers and Somers, *Medicare,* pp. 15–16.


## Chapter 6: The Intermediaries

1. The epigraph is taken from Herman M. Somers and Anne R. Somers, *Medicare and the Hospitals,* p. 28. This is by far the most useful account of how the Medicare program was initially put together and run. We have relied on the Somerses' work—in conjunction with other sources—throughout this chapter and the preceding one, not only for factual matters but also for their good judgment and eminently knowledgeable approach to the differentiation between substantive issues and technical ephemera.

2. Cohen cited in Robert M. Cunningham Jr., *The Third World of Medicine,* p. 98.

3. Both quotes from ibid., p. 99.

BCBSA00292927

4. Ball and Wonnacott cited in ibid., pp. 99–100.

5. Somers and Somers, *Medicare,* pp. 35–36.

6. Ibid., p. 39.

7. McNerney, interview with Weeks, pp. 36–37.

8. Ibid., p. 38.

9. BCA, *Blue Cross and Medicare: A Report to the Nation,* pp. 10–13.

10. This colorful expression is from Anderson, *Health Services,* p. 175.

11. See Somers and Somers, *Medicare,* chap. 8; BCA annual meeting, 1966.

12. McNerney, interview with Weeks, p. 35–37.

13. Castellucci, interview with author. Information in the next two paragraphs is taken from Castellucci, "Concept and Progress," pp. 96–101.

14. Avil McKinney, "The Prevailing Fees Program: Professional Relations," pp. 102–6; Clarence Joseph Vance, *The History of Blue Cross and Blue Shield in Alabama,* p. 148.

15. Cunningham, *Third World,* pp. 61–69; Somers and Somers, *Medicare,* p. 27.

16. Somers and Somers, *Medicare,* p. 42; McNerney, interview with Weeks, p. 38.

17. Thomas Tierney, "Medicare—Its Future: Blue Shield's Growing Involvement in Government Programs," pp. 84–90.

18. Somers and Somers, *Medicare,* p. 27–28.

19. Cunningham, *Third World,* pp. 68–69; BCA, *Blue Cross and Medicare,* p. 26.

20. Singsen, interview with Anderson, p. 13. See also BCA, *Blue Cross and Medicare,* p. 26.

21. Fein, *Medical Care,* p. 115.

22. Hassard, *Fifty Years,* p. 108.

23. Dr. Carl Anderson, "Impact of Titles 18 and 19: Title 19, the California Story," p. 88.

24. Ibid., p. 92; Blue Cross of California, *First Fifty Years,* pp. 35–41.

25. Singsen, in BCA annual meeting, 1966.

26. Dr. Richard S. Wilbur, "Usual and Customary Fee Programs," pp. 64–65.

27. Myers, *Medicare,* p. 291.

28. Joseph Boochever, "The Impact of Titles 18 and 19: Title 19, the New York Story," pp. 81–87 (81); Myers, *Medicare,* p. 288–94.

29. Donald Happe, in BCA annual meeting, 1966.

30. Tom Beauchamp in NABSP conference, 1967, in "Viewpoints on Title 19—Blue Shield Plan," p. 109.

31. McNerney, in BCA annual meeting, 1968.

32. Harold "Doc" Pearce, interview with Odin Anderson, p. 9.

33. Eugene Sibery, interview with Odin Anderson, p. 8; Beauchamp, interview with Anderson, p. 14.

34. McNerney, in BCA annual meetings, 1966, 1967; Bernard Tresnowski, interview with Lewis Weeks, pp. 11–12.

35. Tresnowski, interview with Weeks, p. 40.

36. McNerney, interview with Anderson, pp. 7–8; Tresnowski, interview with Weeks, p. 45.

37. David Stewart, interview with Lewis Weeks, p. 36, and interview with author.

38. William Ryan, interview with author; Stewart, interview with author.

39. Stewart, interview with Weeks, p. 56.

40. This account of the Alabama experience is taken from Vance, *History,* pp. 156–59 (158).

41. Ibid., p. 171.

BCBSA00292928

42. Ibid., pp. 152 (Singleton), 157 (Vance); Stewart, interview with Weeks, p. 57.

43. Fein, *Medical Care,* p. 84.

44. Robert M. Ball, "Problems of Cost—As Experienced in Medicare," and other authors in HEW, *Report of the National Conference on Medical Costs, June 27–28, 1967;* Myers, *Medicare,* chap. 11.

45. Ball, "Problems of Cost," p. 59.

46. Thomas Paton, "The Impact of Titles 18 and 19: Title 18, Blue Shield Plans," pp. 67–72 (68).

47. Douglas Colman, "An Analysis of the Components of Rising Costs," in HEW, *National Conference on Medical Costs,* pp. 91–98 (95), and p. 22 tables. Wilbur Mills spoke of "an almost complete absence of private competition" (ibid., p. 51).

48. In *The Patient as Consumer: Health Care Financing in the United States,* published in 1974, John Krizay and Andrew Wilson cite two research reports and a BCA survey of Plans in support of their assertion that "research has turned up no conclusive evidence that copayment provisions curtail utilization of medical services" (p. 22 and notes). Five years later, free marketeer Alain Enthoven wrote, "Most of our public and private insurance now has some deductibles and/or coinsurance . . . and that hasn't prevented inflation" (*Health Plan: The Only Practical Solution to the Soaring Cost of Health Care,* p. 33).

49. See Antone Singsen, "What Went Wrong with 'Blue Cross: What Went Wrong?'" sec. 5. Utilization review in Medicare has been analyzed and criticized ad nauseam. This explication by Singsen is not wholly disinterested, but it is thorough, knowledgeable, and helpful on many subjects, partly because it is abundant with factual detail in order to drive home Singsen's contention that Sylvia Law's book attacking the Blue Cross system was ill-informed.

50. Somers and Somers, *Medicare,* pp. 69–70 (SSA administrative rules cited on p. 70); Tresnowski, BCA annual meeting, 1968.

51. McNerney, interview with Weeks, p. 39.

52. Pearce, interview with Anderson, p. 9; Tresnowski, interview with Weeks, p. 36.

53. Krizay and Wilson, *Patient as Consumer,* p. 76.

54. Ibid., pp. 74–77.

55. All quotes from Singsen, "What Went Wrong," sec. 5, p. 7.

56. Nixon cited in Anderson, *Health Services,* p. 211; Gardner paraphrased by McNerney, "Annual Report of the President, Blue Cross Association, April 19, 1967," p. 4.

57. HEW, *Report of the Task Force on Medicaid and Related Programs,* p. 2; Robert Stevens and Rosemary A. Stevens, *Welfare Medicine in America: A Case Study of Medicaid,* p. 183.

58. HEW, *Task Force on Medicaid,* p. 2.

59. Ibid., pp. 4–5.

60. McNerney, BCA annual meeting, 1970.

61. Ibid.

## Chapter 7: The 1970s

1. Castellucci, Annual report to NABSP CEOs, 1970, BCBS archives, Chicago; Denenberg cited in John Diffenbach, *The Philadelphia Blue Cross 1971 Contract Negotiations,* pp. 1–6 (6).

2. Bruce Taylor, "Statement of Executive Vice President, Blue Cross of Greater Philadelphia: [Pennsylvania] Insurance Department Public Hearings, March 17, 1971," pp. 3, 7–8.

BCBSA00292929

3. Ibid., p. 2. See also Diffenbach, *Contract Negotiations*.

4. BCA annual meeting, 1971.

5. Diffenbach, *Contract Negotiations,* pp. 9, 15–16.

6. Harvard University monograph cited in ibid., pp. 13–14.

7. Taylor, "Statement," pp. 5–7.

8. Denenberg cited in Daniel Grotta, "The Ralph Nader of Insurance," *Saturday Review,* July 1, 1972.

9. Taylor, interview with Anderson, p. 9.

10. McNerney, BCA annual meeting, 1971.

11. Stewart, interview with author.

12. Ibid.

13. BCA annual meeting, 1970.

14. Albert, *Practical Vision,* pp. 124–26.

15. BCA annual meeting, 1970.

16. Judith Feder and John Holahan, quoted in Theodore Marmor, "New York's Blue Cross and Blue Shield, 1934–1990: The Complicated Politics of Nonprofit Regulation," *Journal of Health Politics, Policy, and Law* 16, no. 4 (Winter 1991), p. 782.

17. Sylvia Law et al., *Blue Cross: What Went Wrong?* p. 160.

18. Singsen, "What Went Wrong."

19. Starr, *Social Transformation,* p. 383.

20. At the BCA annual meeting in April 1971, Walter McNerney reported to Plan executives that at the time the Blue system was under or soon to come under critical scrutiny from nine congressional committees. A typical view was expressed by Senator Thomas Eagleton, who told McNerney in April 1971 that "the present system is all together too cozy a quasi-incestuous relationship" between insurers and providers (Senate Labor Committee, *Health Care Crisis,* p. 883).

21. Senate Labor Committee, *Health Care Crisis,* pp. 892–93.

22. Singsen, "What Went Wrong," sec. 2, p. 14.

23. George Heitler, interview with author, November 1991.

24. Senate Labor Committee, *Health Care Crisis,* p. 874.

25. McNerney cited from House Committee on Ways and Means, *National Health Insurance: Hearings, May 3–17, 1974,* p. 1052.

26. McNerney, interviews with authors, 1989, 1991.

27. Joseph L. Falkson, *HMOs and the Politics of Health System Reform,* describes in detail Dr. Ellwood's dealings with the Nixon administration. McNerney, Annual report to Plan CEOs, 1971, BCBSA archives, Chicago.

28. McNerney, interview with author, 1991.

29. Robert M. Cunningham Jr., *The Healing Mission and the Business Ethic,* p. 109.

30. McNerney, interview with author, 1991; Falkson, *HMOs and Health System Reform,* p. 172.

31. Everett Johnson, "An Alternative System," p. 77.

32. This account of the Rhode Island episode is based on Harvey Zimmerman et al., "Prospective Reimbursement in Rhode Island," *Inquiry* (March 1977), pp. 302–5. See also BCA annual meeting, 1972.

33. Ingram, BCA annual meeting, 1973; McNerney, "Annual Report, 1975," p. 79. Other useful sources on prospective payment are Fred Hellinger, "An Empirical Analysis of Several Prospective Reimbursement Systems," William L. Dowling, "Hospital Reimbursement," and Dowling, "Prospective Reimbursement of Hospitals."

34. McNerney, BCA annual meetings, 1969, 1971.

BCBSA00292930

35. These summary data have been culled primarily from McNerney's annual "State of the Plans" speeches at BCA annual meetings and from minutes of the NABSP annual meetings, 1967–1975.

36. McNerney, "Annual Report, 1975," p. 71.

37. Pierre de Vise, "The Sixty-Year Debate over National Health Insurance," p. 37; Starr, *Social Transformation*, p. 396.

38. Beverlee A. Myers, "The Formulation of Federal Health Policy: Lessons from the Task Force on Medicaid and Related Programs"; McNerney, interview with author, 1991, p. 41.

39. McNerney expounds on this principle in his interview with Weeks, pp. 74–75.

40. McNerney, BCA annual meeting, 1971; *New York Times Index,* 1971, p. 991; McNerney, BCA annual meeting, 1972.

41. John Castellucci, "Report of the President," at the NABSP annual business meeting, 1971; Ned Parish, "Report of the President," at the 1972 business meeting.

42. Minutes, joint session of Blue Cross and Blue Shield member Plans, May 11, 1973 (prepared by Antone Singsen), pp. 1–12.

43. Mills cited in Campion, *AMA and U.S. Health Policy,* pp. 320–21.

44. A story told by Joseph Califano will illustrate Johnson's gusto. During Senate committee hearings on the Medicare legislation, White House lobbyists Wilbur Cohen and Lawrence O'Brien warned Johnson about the cost of proposed changes in the reimbursement formula. "It'll cost a half-billion dollars to make the changes in reimbursement standards to get the bill out of the Senate Finance Committee," Cohen said. "'Five hundred million. Is that all?' Johnson exclaimed with a wave of his big hand. 'Do it. Move that damn bill out now, before we lose it'" (quoted in Duncan Yaggy, *Health Care for the Poor and Elderly: Meeting the Challenge,* p. 48).

45. McNerney, "Annual Report, 1975," pp. 47–48. Rostenkowski cited in "The National Leadership Conference on America's Health Policy," *National Journal,* p. 20. Kelley's comments are summarized in the minutes (prepared by George Heitler) of the annual BCA member Plan meeting, May 12–14, 1976, p. 8. The Carter administration's forays into hospital cost containment are carefully described in David Abernathy and David Pearson, *Regulating Hospital Costs: The Development of Public Policy.*

46. William Ford, interview with Odin Anderson, p. 9.

47. Charles Abbott, interview with Odin Anderson, pp. 8–9.

48. McNerney, interview with author, 1989.

49. Minutes, "PSRO Development and Implementation" workshop, BCA annual meeting, 1973.

50. McNerney, "Annual Report, 1975," p. 19.

51. Bauer, BCA annual meeting, 1976 (minutes prepared by George Heitler).

52. McNerney, "Annual Report, 1975," pp. 15–18.

53. Eugene Sibery, interview with Lewis Weeks, pp. 34–37.

54. Tresnowski, interview with Weeks, p. 7.

55. Werner, interview with author.

56. Ryan, interview with author.

57. John Ed McConnell, interview with author.

58. Werner, interview with author.

59. Thomas Paton, letter to John Ed McConnell; Martin Hickman, letter to John Ed McConnell.

BCBSA00292931

60. "Report of the Joint BCA/NABSP Coordination Committee," May 1977, p. 14.

61. Ibid., pp. 20–21, and Exhibit 3.

62. Ibid., pp. 39–48.

63. BCA annual meeting, May 1977.

64. Tresnowski, interview with Weeks, p. 9.

65. Tresnowski, comment cited in Weeks, p. 9; vote tallies are from minutes of the special joint meeting of BCA and BSA, October 17, 1977.

66. McNerney, "President's Report" at the BCA and BSA special meeting, December 11, 1978, p. 5.

67. Ibid., p. 9; McNerney, "Annual Report of the President," BCBSA, December 13, 1979, p. 15.

68. Victor Brian, BCA annual meeting, May 1977.

69. McNerney, "Annual Report, 1979," p. 13.

70. Tresnowski, interview with Weeks, pp. 51–52.

## Chapter 8: The 1980s

1. Walter McNerney, "C. Rufus Rorem Award Lecture: 'Big Question for the Blues: Where To from Here?'" *Inquiry* (Summer 1996), p. 115.

2. Colman, interview with Anderson, p. 28; Enthoven, *Health Plan,* pp. xxii–xxiii, 79–84.

3. Walter McNerney, "Market Strategies: Annual Report, 1980," pp. 8–12.

4. BCA and BSA, "Systemwide Environment for the Blue Cross and Blue Shield System: 1983–1985, November 1982," pp. 21–23; Tresnowski, interview with Weeks, p. 60.

5. Werner, interview with author.

6. Tresnowski, interview with author, December 1992.

7. Ibid.

8. Tresnowski, interview with Weeks, p. 63.

9. Ibid., pp. 10–11.

10. Marvin Reiter, interview with author.

11. BCBSA, "Long-Term Business Strategy: A Program of Change for Growth, 1983–1990. September 1982," p. 5.

12. Ibid., chap. 4.

13. All quotes from Minutes, BCBSA board of directors (prepared by Marvin Reiter), September 24–25, 1982, p. 6.

14. Werner, interview with author.

15. Tresnowski, speech at University of Michigan, School of Public Health, April 8, 1986, pp. 1–3 (2).

16. Sources from which this broad description of the DRG system is drawn include Stevens, *In Sickness and in Wealth;* Lewis Weeks et al., *Financing of Health Care;* Paul Grimaldi and Julie A. Micheletti, *Medicare's Prospective Payment Plan: DRG Update.*

17. Grimaldi and Micheletti, *Prospective Payment Plan,* pp. 13–39.

18. Tresnowski, "Report to the Plans, 1983" (draft version), p. 19a.

19. Susan DesHarnais et al., "The Early Effects of the Prospective Payment System on Inpatient Utilization and Quality of Care," pp. 10–13.

20. Helen C. Lazenby and Suzanne W. Letsch, "National Health Expenditures, 1989," p. 12.

21. Tresnowski, speech at University of Michigan, p. 2.

BCBSA00292932

22. Tresnowski, interview with Weeks, p. 75; Michael D. Rosko, "A Comparison of Hospital Performance Under the Partial-Payer Medicare PPS and State All-Payer Rate-Setting Systems," p. 48; Allen Dobson, "Medicare's Prospective Payment System: The Impact on the U.S. Health Care System," p. 181 (quote). See also Ralph Regula, "National Policy and the Medically Uninsured," p. 50.

23. Tresnowski, speech at University of Michigan, p. 13.

24. Minutes, joint meeting of BCA and BSA boards of directors, July 2, 1982, pp. 3–4.

25. Lazenby and Letsch, "National Health Expenditures," p. 14.

26. Tresnowski, interview with Weeks, p. 90.

27. Background on IPAs comes from Carolynn Steinwald, *An Introduction to Foundations for Medical Care.*

28. Tresnowski, "Report to the Plans, 1986," p. 11.

29. Tresnowski, interview with Weeks, pp. 16, 99.

30. Ibid., p. 100.

31. Examples are from "Counsel's Report" at BCBSA board meetings, September 1983, September 1988 (presented by Marvin Reiter and Roger Wilson, respectively).

32. Werner, interview with author.

33. Minutes, joint BCA and BSA boards, July 1982, p. 27.

34. Reiter, interview with author.

35. Ibid.

36. U.S. General Accounting Office, *Health Insurance: Comparing Blue Cross and Blue Shield Plans with Commercial Insurers,* esp. pp. 2–3.

37. Reiter, interview with author.

38. Tresnowski, interview with author, December 1992.

39. Keith Stevenson, "Blue Cross and Blue Shield Plans Lose Tax-Exempt Status," p. 49 (both quotes); Tresnowski, Press statement, September 23, 1986.

40. Tresnowski, "Report to the Plans, 1986," p. 7.

41. Tresnowski, interview with Weeks, p. 61.

42. Tresnowski, "Report to the Plans, 1986," pp. 7–11.

43. Donald R. Cohodes, interview with author, 1992.

44. Ibid. See also John Iglehart, "The American Health Care System: Private Insurance," and Gail Jensen and Jon Gabel, "The Erosion of Purchased Health Insurance."

45. Werner and Reiter, interviews with author.

46. Werner, interview with author.

47. Walter Owens, "Memo to BCBSA ad hoc committee on Propositions 1.1 and 1.2, April 23, 1985."

48. Werner, interview with author.

49. Tresnowski, interview with Weeks, p. 19.

50. Reiter, interview with author.

51. BCBSA, "White Paper on the Blue Cross and Blue Shield Assembly of Plans, February 20, 1987," p. 65; Tresnowski, interview with author.

52. John Larkin Thompson, interview with author.

53. BCBSA, "White Paper," pp. 6–7 (all quotes).

54. Tresnowski, interview with author, 1992.

55. Ibid.

56. Tresnowski, "Report to the Plans, 1987," p. 4.

57. See Paul Danaceau, *The Health Planning Guidelines Controversy: A Report from Iowa and Texas, October 1989.*

BCBSA00292933

58. BCBSA, *Environmental Analysis, 1989,* p. 7; Tresnowski, interview with Weeks, p. 74.

59. Werner, interview with author.

60. BCBSA, *Environmental Analysis, 1989,* p. 7.

61. Glenn R. Markus, "Medicare's Prospective Payment System: The First Three Years," p. 175 (all quotes).

62. Frank E. Samuel Jr., "The Challenge of Paying for Medicare," p. 307; Lazenby and Letsch, "National Health Expenditures," p. 12.

63. Regula, "National Policy," p. 53.

64. BCBSA, *Environmental Analysis, 1989,* p. 53.

65. Ibid., p. 9.

66. Ibid., pp. 8–9; minutes, BCBSA board of directors, June 28–29, 1990, p. 4.

67. *Wall Street Journal,* March 8, 1991; Reiter, interview with author. Among countless news articles about the Charleston plan, see also Carol Stevens, "Will More Blue Plans Break Down?" *Medical Economics,* June 17, 1991; Janice Somerville, "Blues Plan Failure Staggers West Virginia," *American Medical News,* November 2, 1990; Paul Kenkel, "High Costs, Risks Cited in Blue Plan's Demise," *Modern Health-care,* October 29, 1990.

68. Minutes, BCBSA board of directors, June 28–29, 1990, p. 8, and October 4–5, 1990, pp. 9–10.

69. *Wall Street Journal,* March 8, 1991.

70. Reiter, interview with author.

71. McIntosh cited in Stevens, "Will More Blue Plans Break Down?" pp. 130–32.

72. Charleston attorney cited in *Wall Street Journal,* March 8, 1991.

73. Shively cited in Stevens, "Will More Blue Plans Break Down?" p. 127; Reiter, interview with author.

74. Peters cited in Stevens, "Will More Blue Plans Break Down?" p. 129.

75. Ibid., pp. 128–29.

76. Reiter, interview with author.

77. *National Underwriter,* June 10, 1991, p. 3; *Health Week,* December 17, 1990, p. 1.

78. Thompson, interview with author.

79. *Boston Globe,* October 5, 1990.

80. *Detroit Free Press,* July 1, 1991; Stevens, "Will More Blue Plans Break Down?" p. 137.

81. *Detroit Free Press,* July 1, 1991.

82. Bird cited in *Louisville Courier-Journal,* February 24, 1991.

83. *Health Benefits Letter,* August 29, 1991.

84. Davenhall cited in *Louisville Courier-Journal,* October 9, 1990.

85. Savage cited in Stevens, "Will More Blue Plans Break Down?" pp. 132–33.

86. Stewart, interview with Weeks, pp. 5–10, 18–20 (5).

87. Savage cited in *AHA News,* October 1, 1990.

88. U.S. Bipartisan Commission on Comprehensive Health Care, *A Call for Action,* pp. 59–60.

89. A copy of the transcript of Douglas Colman's testimony before Senator Kennedy's Committee on Labor and Public Welfare is in the Colman Papers in Empire BCBS archives.

BCBSA00292934

## Chapter 9: Old Wine, New Bottles

1. Thomas Kinser, interview with author.

2. Cohodes, interview with author.

3. Kinser, interview with author.

4. Ibid.

5. BCBSA, "Report of Subcommittee on Plan Organization and Structure," December 13, 1991.

6. Kinser, interview with author.

7. *Washington Post,* December 5, August 22, September 28, 1992.

8. Ibid., October 30, November 19, 1992, January 28, 1993; *Washington Times,* January 28, 1993; BCBSA press release, July 23, 1993; *Medical Economics,* August 9, 1993, p. 41.

9. *New York Times,* March 31, 1993, and July 30, 1992.

10. Ibid., March 30, 1993, and July 30, 1992.

11. Ibid., June 17, 7, 1993.

12. *Medicine and Health* (Faulkner and Gray newsletter), August 31, 1992; *Chicago Tribune,* August 10, 1993; *Washington Times,* December 6, 1992.

13. *Washington Post,* February 12, 1993.

14. Cohodes, interview with author.

15. Bernard Tresnowski, memo to BCBSA directors, September 18, 1992.

16. Nunn cited in *Business Insurance,* February 15, 1993.

17. Cohodes, interview with author.

18. M. Edward Sellers, interview with author.

19. Thompson cited in BCBSA, *Daily Digest* (news summary), November 19, 1992.

20. Tresnowski, "Annual Report to the Plans, 1992," pp. 23–24.

21. Statistics from *New York Times,* September 6, 1994.

22. Enthoven cited in ibid., May 10, 1993.

23. DiBona cited in *Philadelphia Inquirer,* February 6, 1994.

24. *American Medical News,* May 9, 1994 (quote). See also *New York Times,* May 20, 1994.

25. *Health Benefits Letter,* April 5, 1994; Blue Cross Blue Shield Blue Plus of Minnesota, press release, June 6, 1994; BCBSA, *Daily Digest,* June 30, 1992.

26. Cohodes, interview with author.

27. *Modern Healthcare,* November 16, 1992; BCBSA general counsel Roger Wilson, memo to BCBSA directors, September 30, 1993.

28. Tresnowski, President's report, 1994, p. 28; BCBSA, *Daily Digest,* July 20, 1993.

29. Spokesman cited in *Health Systems Review,* May–June 1993, p. 14.

30. *Wall Street Journal,* January 28, 1993.

31. Ibid., October 19, 1993; *Health Systems Review,* May–June 1993.

32. Institute of Medicine, "Non-Profit Enterprise in Health Care" (Washington, D.C.: National Academy Press, 1986), p. 11.

33. Bernard Tresnowski, interview with author, July 1994.

34. John Iglehart, "Inside California's HMO Market: A Conversation with Leonard D. Schaeffer," p. 135.

35. Tresnowski, interview with author, July 1994.

36. Ibid.

37. Ibid.

38. Tresnowski, memo to BCBSA directors, January 24, 1994.

39. Ibid.

40. Tresnowski, interview with author, 1994; Iglehart, "Inside California's HMO Market," p. 135 (quote).

41. Tresnowski, interview with author, 1994.

42. Ellwood cited in *National Journal,* "National Leadership Conference on American Health Policy, 1976" (transcript of proceedings), p. 46

43. Quoted in *New York Times,* April 8, 1991.

44. Cohodes, interview with author.

45. Paul Starr, "What Happened to Health Care Reform?" *American Prospect,* no. 20 (Winter 1995).

46. "Consensus Standards for Accountable Health Plans: June 9, 1994," p. 9 (quote), submitted to Congress by four groups named in text (Aetna, CIGNA, MetLife, Prudential, Travelers).

47. Tresnowski cited in *White House Bulletin* (Washington newsletter), January 27, 1994.

48. Tresnowski, "President's Letter" to BCBSA Plan CEOs, June 30, 1994.

49. Ibid., pp. 14–16 (all quotes).

50. Tresnowski, C. Rufus Rorem Health Service Award acceptance speech, November 16, 1994, at the BCBSA annual meeting, p. 10.

51. Schaeffer cited in Iglehart, "Inside California's HMO Market," p. 136.

52. Hays cited in *Chicago Tribune,* June 18, 1995.

53. Schaeffer cited in Iglehart, "Inside California's HMO Market," p. 136.

54. Robert M. Cunningham Jr., *The Healing Mission,* p. 58.

BCBSA00292936

# Works Cited

| | |
|---|---|
| AHA | American Hospital Association |
| AMA | American Medical Association |
| BCA | Blue Cross Association |
| BCBSA | Blue Cross and Blue Shield Association |
| GAO | U.S. General Accounting Office |
| GPO | U.S. Government Printing Office |
| HEW | U.S. Department of Health, Education, and Welfare |
| *JAMA* | *Journal of the American Medical Association* |
| NABSP | National Association of Blue Shield Plans |
| *NEJM* | *New England Journal of Medicine* |

Abbott, H. Charles. Interview with Odin Anderson, April 25, 1973. Chicago: BCBSA archives.

———. "Statement." In *Summary of Workshop Conference on New National Blue Cross Organization.* Chicago: AHA, 1960. Printed proceedings.

Abernathy, David S., and David A. Pearson. *Regulating Hospital Costs: The Development of Public Policy.* Ann Arbor, Mich.: AUPHA Press, 1979.

*Advance.* See Blue Cross and Blue Shield of Texas.

Albert, Margaret C. *A Practical Vision: The Story of Blue Cross of Western Pennsylvania, 1937–1987.* Pittsburgh: Blue Cross of Western Pennsylvania, 1987.

American Hospital Association (AHA). *Transactions of the American Hospital Association.* Chicago: AHA, 1929–1939. Printed proceedings.

American Medical Association (AMA). *Caring for the Uninsured and Underinsured: A Compendium from the Specialty Journals.* Chicago: AMA, 1991.

———. "News Release, February 18, 1962." Chicago: BCBSA archives.

———. "Washington Letter, April 20, 1956." Chicago: BCBSA archives. Internal newsletter.

BCBSA00292937

Anderson, Carl, M.D. "Impact of Titles 18 and 19: Title 19, the California Story." In *Blue Shield Annual Program Conference, 1966.* Chicago: BCBSA archives.

Anderson, Odin. *Blue Cross Since 1929: Accountability and the Public Trust.* Cambridge, Mass.: Ballinger, 1974.

———. *Health Services as a Growth Enterprise in the United States Since 1875.* 2d ed. Ann Arbor, Mich.: Health Administration Press, 1990.

———. *The Uneasy Equilibrium: Private and Public Financing of Health Services in the United States, 1875–1965.* New Haven, Conn.: College and University Press, 1968.

———. Various interviews with Blue Cross and Blue Shield officials, 1971–1974. Collection of tapes and transcripts. Chicago: BCBSA archives.

Anderson, Odin, with Jacob Feldman. *Family Medical Costs and Voluntary Health Insurance: A Nationwide Survey.* New York: McGraw-Hill, 1956.

Anderson, Ronald, and Odin Anderson. *A Decade of Health Services: Social Survey Trends in Use and Expenditure.* Chicago: University of Chicago Press, 1967.

Angelos, William M. "A Legacy of Value." Camp Hill, Pa.: Pennsylvania Blue Shield, 1989.

Appel, James Z., et al. "Promoting the Interests and Progress of Voluntary Health Care Prepayment." In *Proceedings of Annual Program Conference of Blue Shield Plans, October 23–24, 1961.* Chicago: NABSP. Printed proceedings.

Ball, Robert M. "Problems of Cost—As Experienced in Medicare." In *Report of the National Conference on Medical Costs, June 27–28, 1967.* Washington, D.C.: HEW, 1967.

Beauchamp, Thomas L., Jr. Interview with Odin Anderson, May 3, 1972. Chicago: BCBSA archives.

———. "Viewpoints on Title 19—Blue Shield Plan." In *Blue Shield Annual Program Conference, 1967: The Widening World of Blue Shield.* Chicago: BCBSA archives. Printed proceedings.

Becker, Harry, "Social Security Aims of the UAW-CIO." In "Addresses Presented at Blue Cross–Blue Shield Annual Conference, 1948." Chicago: BCBSA archives. Mimeographed proceedings.

Blendon, Robert, and Karen Donelan. "The Public and the Emerging Debate over National Health Insurance." *NEJM,* September 19, 1990.

Blue Cross Association (BCA). Annual meetings, 1960–1980. Transcripts of proceedings. Chicago: BCBSA archives.

———. *Blue Cross and Medicare: A Report to the Nation.* Chicago: BCA, 1966.

———. *Health Care and the American Economy: Issues and Forecasts.* Chicago: Health Services Foundation, 1977. Published proceedings.

———. "The Lady or the Tiger? (Or, 'Little Man, What Now?'): The Organization of Blue Cross." New York: Colman Papers, Empire BCBS archives. Internal memo, mimeograph.

Blue Cross Association and American Hospital Association (BCA and AHA). "A Report on Health Care of the Aged, December 1961." Chicago: BCBSA archives. Mimeograph.

Blue Cross Association and National Association of Blue Shield Plans (BCA and NABSP). "Report and Recommendations on the Relationship Between BCA and BSA: Final Report of the Joint Executive Committee, September 6, 1977." Chicago: BCBSA archives. Photocopy.

———. "Report of the Joint BCA/NABSP Coordination Committee (McConnell

BCBSA00292938

Committee), May 1977." Chicago: BCBSA archives.

————. "Systemwide Environment for the Blue Cross and Blue Shield System, 1983–1985. November 1982." Chicago: BCBSA archives. Photocopy.

Blue Cross and Blue Shield Association (BCBSA). *Environmental Analysis, 1984–1991.* Chicago: BCBSA archives. Annual publication.

——— ——. *Health Care in America: Promoting Access and Pursuing Value, June 28, 1990.* Chicago: BCBSA archives. Published statement.

————. "Long-Term Business Strategy: A Program of Change for Growth, 1983–1990. September 1982." Chicago: BCBSA archives. Photocopy.

————. "Second Opinions: America's Voices and Views on Health Care." Comprehensive and summary reports. Chicago: BCBSA (with Gallup Organization), 1990. Poll results.

————. "White Paper on the Blue Cross and Blue Shield Assembly of Plans, February 20, 1987." Document prepared by a nine-member committee of Blue Cross and Blue Shield Plan presidents chaired by John Larkin Thompson. Chicago: BCBSA archives. Draft.

Blue Cross and Blue Shield of Central New York. *History, 1936–1986.* Syracuse, N.Y.: BCBS of Central New York, 1986.

Blue Cross and Blue Shield of Michigan. *Highlights.* Detroit, May 1972. Corporate periodical.

Blue Cross and Blue Shield of Texas. *Advance,* June 1989. Corporate periodical.

Blue Cross Commission (BCC). "Report on Enrollment of Persons Age Sixty-Five and Over, December 1951." Chicago: BCBSA archives. Mimeograph.

————. "Report on Survey on Utilization by Age, October 1956." Chicago: BCBSA archives. Mimeograph.

————. "Survey of Legislation Permitting the Payment of Blue Cross Dues from Governmental Funds for Indigent Care, Old Age Pensioners, and Aid to Dependents, December 1952." Chicago: BCBSA archives. Carbon.

Blue Cross of California. *The First Fifty Years.* Woodland Hills, Calif.: Blue Cross of California, 1987.

Blue Cross of Massachusetts. *Our Unique Role in Health Care.* Boston: Blue Cross of Massachusetts, 1972.

Blue Cross of Northeast Ohio. *Better Health Through Better Care.* Cleveland: Blue Cross of Northeast Ohio, 1959.

Blue Cross Plans and the American Hospital Association. "Financing Health Care for the Aged: A Proposed Statement of Policy, January 3, 1962." Chicago: BCBSA archives. Mimeograph.

Blue Shield of California. *Fifty Years of Caring for Californians.* San Francisco: Blue Shield of California, 1989.

Boochever, Joseph. "The Impact of Titles 18 and 19: Title 19, the New York Story." In *Blue Shield Annual Program Conference, 1966.* Chicago: BCBSA archives. Printed proceedings.

Brown, Lawrence D., "Capture and Culture: Organizational Identity in New York Blue Cross," *Journal of Health Politics, Policy, and Law* 16, no. 4 (Winter 1991), pp. 654, 658.

Broyles, Wendell. Letter to John Ed McConnell, November 22, 1976. Chicago: BCBSA archives.

Bryan, James E. "Blue Shield Faces Its Hour of Decision." *Medical Economics,* May 1955.

BCBSA00292939

———. "Blue Shield's Role in the Future of Medicine." *Medical Economics,* July 1954.

———. "The Role of Blue Shield in the Future of Medical Practice." In "1954 Annual Conference: Blue Shield Plans: Program Sessions, April 4–8, 1954." Chicago: BCBSA archives. Mimeographed proceedings.

Burrow, James G. *AMA: Voice of American Medicine.* Baltimore: Johns Hopkins Press, 1963.

Campion, Frank D. *The AMA and U.S. Health Policy Since 1940.* Chicago: Chicago Review Press, 1984.

Castellucci, John W. "Concept and Progress." In *1965 Blue Shield Annual Program Conference.* Chicago: BCBSA archives. Printed proceedings.

———. Interview with Odin Anderson, March 23, 1973. Chicago: BCBSA archives.

———. Interview with Robert M. Cunningham III, November 1990 (notes and audiotape transcription). Cunningham Papers, Gaithersburg, Md.

Cohodes, Donald R. Interview with Robert M. Cunningham III, September 1992. Cunningham Papers, Gaithersburg, Md.

Coleman, James F. "Some Principles of Rating and Their Effect on Blue Shield Product Development." In "1957 Annual Conference of Blue Shield Plans: Program Sessions, March 24–28, 1957." Chicago: BCBSA archives. Mimeographed proceedings.

Colman, J. Douglas. Interview with Odin Anderson, January 9, 1971. Chicago: BCBSA archives.

Committee on the Costs of Medical Care (CCMC). *Medical Care for the American People: The Final Report.* Chicago: University of Chicago Press, 1932.

Condon, George E. *Fifty Years of Community Service.* Cleveland: BCBS of Northern Ohio, 1984.

Cunningham, Robert M., Jr. *The Healing Mission and the Business Ethic.* Chicago: Pluribus Press, 1982.

———. *Hospitals, Doctors, and Dollars.* New York: F. W. Dodge Corporation, 1961.

———. Interview with Lewis Weeks, March 25, 1980. In *Hospital Administration Oral History Collection, Lewis E. Weeks Series,* ed. Lewis E. Weeks.

———. *The Third World of Medicine.* New York: McGraw-Hill, 1968.

Danaceau, Paul. *The Health Planning Guidelines Controversy: A Report from Iowa and Texas, October 1989.* Report for HEW, reprinted by the Iowa Hospital Association. Cunningham Papers, Gaithersburg, Md.

Denenberg, Herbert S. "How to Save the Consumers over $3 Billion in Pennsylvania." Speech to Continental National American Conference, Chicago, September 16, 1971. Chicago: BCBSA archives. Prepared text.

DesHarnais, Susan, et al. "The Early Effects of the Prospective Payment System on Inpatient Utilization and Quality of Care." *Inquiry* (Spring 1987).

de Vise, Pierre. "The Sixty-Year Debate over National Health Insurance." In *National Health Insurance: Public Documents Series,* ed. Tyrus G. Fain. New York: R. R. Bowker, 1977.

Dickinson, Frank G. *A Brief History of the Attitude of the American Medical Association Toward Voluntary Health Insurance.* Bulletin no. 70 of the AMA Bureau of Medical Economic Research. Chicago: AMA, 1949.

Diffenbach, John. *The Philadelphia Blue Cross 1971 Contract Negotiations.* Cambridge, Mass.: Harvard College, 1972.

Dobson, Allen. "Medicare's Prospective Payment System: The Impact on the U.S. Health Care System." *Inquiry* (Summer 1987).

BCBSA00292940

Dougan, Genevieve. "History of the Role of American Medical Association in Establishment of Associated Medical Care Plans." Internal report for NABSP, August 15, 1960. Chicago: BCBSA archives.

Dowling, William L. "Hospital Reimbursement." In *Health Care in the American Economy: Issues and Forecasts.* Chicago: Health Services Foundation, 1977. Published proceedings.

———. "Prospective Reimbursement of Hospitals." In *Financing of Health Care,* ed. Lewis Weeks et al. Ann Arbor, Mich.: Health Administration Press, 1979.

Drake, Lawrence, and Sallie Hanna. *The History of Michigan Hospital Service, 1938–1951.* Detroit: Michigan Hospital Service, circa 1952.

Eilers, Robert D. *Regulation of Blue Cross and Blue Shield Plans.* Published for the S. S. Huebner Foundation for Insurance Education. Homewood, Ill.: Richard D. Irwin, 1963.

Elliott, Frederic Estabrook. Collected Papers, 1906–1963. New York: Empire BCBS archives.

Elnicki, Richard A. "Substitution of Outpatient for Inpatient Hospital Care: A Cost Analysis." In *Financing of Health Care,* ed. Lewis Weeks et al. Ann Arbor, Mich.: Health Administration Press, 1979.

Empire Blue Cross and Blue Shield. "Finding Aid: Papers of Frederic Estabrook Elliott." Biographical sketch prepared by Empire BCBS archives staff. New York: Empire BCBS archives. Photocopy.

———. *Health Care Financing: The Next Fifty Years.* New York: Empire BCBS, 1986.

Enthoven, Alain C. *Health Plan: The Only Practical Solution to the Soaring Cost of Health Care.* Reading, Mass.: Addison-Wesley Publishing Company, 1980.

Evans, Robert T. "The Blue Cross Approach to Your Retirement Program." Speech given to the Council on Employee Benefit Plans in New York City, October 26, 1956. Chicago: BCBSA archives. Mimeograph.

Ewing, Oscar R. Press statement at Federal Security Agency, Washington, D.C., June 25, 1951. Chicago: BCBSA archives.

Fain, Tyrus G., ed. *National Health Insurance: Public Documents Series.* New York: R. R. Bowker, 1977.

Falkson, Joseph L. *HMOs and the Politics of Health System Reform.* Chicago: AHA, 1980.

Feierabend, Frank L., M.D. Interview with Odin Anderson, August 31, 1971. Chicago: BCBSA archives.

———. "Philosophy of a Medical Service Plan." *JAMA,* January 3, 1948.

Fein, Rashi. *Medical Care, Medical Costs: The Search for a Health Insurance Policy.* Cambridge, Mass.: Harvard University Press, 1986.

Fishbein, Morris. *Morris Fishbein, M.D.: An Autobiography.* Garden City, N.J.: Doubleday, 1969.

Fletcher, Abbott Lee. *History of Minnesota Blue Cross.* Privately published, 1970.

Ford, William. Interview with Odin Anderson, March 28, 1973. Chicago: BCBSA archives.

Fuchs, Victor, ed. *Essays in the Economics of Health and Medical Care.* New York: National Bureau of Economic Research, 1972.

Garbarino, Joseph. *Health Plans and Collective Bargaining.* Berkeley and Los Angeles: University of California Press, 1960.

Gardner, Harold H. "HMOs: The View from the Plans." In *Blue Shield Annual Program Conference, 1972.* Chicago: BCBSA archives. Printed proceedings.

BCBSA00292941

Grimaldi, Paul L., and Julie A. Micheletti. *DRGs: Diagnosis Related Groups.* 2d ed. Chicago: Pluribus Press, 1983.

———. *Medicare's Prospective Payment Plan: DRG Update.* Chicago: Pluribus Press, 1983.

Grotta, Daniel. "The Ralph Nader of Insurance." *Saturday Review,* July 1, 1972.

Hall, Mark. "The Political Economics of Health Insurance Market Reform." *Health Affairs* (Summer 1992).

Happe, Donald. Letter to Bernard Tresnowski, April 24, 1985. Chicago: BCBSA archives.

Harris, Seymour E. *The Economics of American Medicine.* New York: MacMillan, 1964.

Harvey, Joseph E. "Major Medical Coverage and Its Product Implications to Blue Shield." In "1957 Annual Conference of Blue Shield Plans." Chicago: BCBSA archives. Mimeograph.

Hassard, Howard. *Fifty Years in Law and Medicine—Reminiscences: Interview with Miriam Stein.* San Francisco: Hassard, Bonnington, Rogers, and Huber, 1985.

———. Interview with Robert M. Cunningham III, November 1990. Cunningham Papers, Gaithersburg, Md.

Havighurst, Clark C. *Deregulating the Health Care Industry: Planning for Competition.* Cambridge, Mass.: Ballinger, 1982.

Hawley, Paul R., M.D. "The Challenge." In "Addresses Presented at Blue Cross–Blue Shield Annual Conference, 1948." Chicago: BCBSA archives. Mimeographed proceedings.

———. *Non-Profit Health Service Plans.* Chicago: Blue Cross Commission, 1949.

Health Insurance Association of America (HIAA). *HIAA Looks at the Blue Cross' Unique Role.* HIAA, 1973.

Heitler, George. Interview with Odin Anderson, July 12, 1973. Chicago: BCBSA archives.

———. Interview with Robert M. Cunningham III, November 5, 1991. Cunningham Papers, Gaithersburg, Md.

Hellinger, Fred J. "An Empirical Analysis of Several Prospective Reimbursement Systems." In *Hospital Cost Containment: Selected Notes for Future Policy,* ed. Michael Zubkoff et al. New York: Milbank Memorial Fund, 1978.

Henderson, Lana. *Baylor University Medical Center: Yesterday, Today, and Tomorrow.* Waco, Tex.: Baylor University Press, 1978.

Henryson, E. J. *My Story of Group Hospitalization, Inc.* Washington, D.C.: Kaufmann/Graphics, 1971.

Hickman, Martin S. Letter to John Ed McConnell, December 30, 1976. Chicago: BCBSA archives.

Hiestand, Edgar. Letter to John Castellucci, February 13, 1962. Chicago: BCBSA archives.

*Highlights.* See Blue Cross and Blue Shield of Michigan.

Hirshfield, Daniel S. *The Lost Reform: The Campaign for Compulsory Health Insurance in the United States from 1932 to 1943.* Cambridge, Mass.: Harvard University Press, 1970.

Hodges, Francis T., M.D. "Supermarket Medicine." In "Annual Conference: Blue Shield Plans Program Sessions, April 4–8, 1954." Chicago: BCBSA archives. Mimeographed proceedings.

Iglehart, John K. "The American Health Care System: Private Insurance." *NEJM,* June 18, 1992.

BCBSA00292942

————. "Inside California's HMO Market: A Conversation with Leonard D. Schaeffer." *Health Affairs* (Winter 1995).

Institute of Medicine. *Controls on Health Care.* Washington, D.C.: National Academy of Sciences, 1975.

Iowa Leadership Consortium on Health Care. *Health Care Reform: A Proposal for Discussion by Iowans.* Des Moines: Iowa Leadership Consortium on Health Care (care of BCBS of Iowa), 1992.

Jensen, Gail A., and Jon R. Gabel. "The Erosion of Purchased Health Insurance." *Inquiry* (Fall 1988).

Johnson, Everett A. "An Alternative System." In *Hospital Regulation Through State Rate Review: Mandated Interference or a Noble Intrusion?* Chicago: Teach'em, Inc., 1978. Published seminar proceedings.

Judy, James S. "Profile of Kentucky Blue Cross." MBA thesis, Xavier University, Cincinnati, 1965.

Kammer, Earl. Interview with Odin Anderson (interviewed jointly with Marvin Walker), November 30, 1972. Chicago: BCBSA archives.

Kellogg Foundation. *Private Initiative in Professional Standards Review Organizations (PSRO).* Ann Arbor, Mich.: Health Administration Press, 1978.

Kenkel, Paul. "High Costs, Risks Cited in Blue Plan's Demise." *Modern Healthcare,* October 29, 1990.

Kimball, Justin F. Interview with Melvin Munn, August 6, 1954. Chicago: BCBSA archives.

"King County Medical Blue Shield, History." Circa 1982. Chicago: BCBSA archives. Photocopied draft.

Kinser, Thomas. Interview with Robert M. Cunningham III, September 1992. Cunningham Papers, Gaithersburg, Md.

Krizay, John, and Andrew Wilson. *The Patient as Consumer: Health Care Financing in the United States.* Lexington, Mass.: Lexington Books, 1974.

Lapp, John A. "The Findings of Official Health Insurance Commissions," *American Labor Legislation Review* 10 (March 1920).

————. "Health Insurance and the Hospitals." In *Transactions of the American Hospital Association: Twentieth Annual Conference.* Chicago: Modern Hospital Publishing, 1918.

Lattner, Fritz. Interview with Odin Anderson, December 6, 1972. Chicago: BCBSA archives.

Law, Sylvia, et al. *Blue Cross: What Went Wrong?* 2d ed. New Haven: Yale University Press, 1976.

Lazenby, Helen C., and Suzanne W. Letsch. "National Health Expenditures, 1989." *Health Care Financing Review* (Winter 1990).

Levit, Katharine R., Arthur L. Sensenig, Cathy A. Cowan, Helen C. Lazenby, Patricia A. McDonnell, Darleen K. Won, Lekha Sivarajan, Jean M. Stiller, Carolyn S. Donham, and Madie S. Stewart. "National Health Expenditures, 1993." *Health Care Financing Review* 16 (Fall 1994).

Los Angeles County Medical Association (LACMA). "Who Wrote the Book on Health Care Law?" *LACMA Physician,* June 16, 1986.

MacColl, William A. *Group Practice and Prepayment of Medical Care.* Washington, D.C.: Public Affairs Press, 1966.

Mann, Leroy. "Pennsylvania Blue Shield History." Internal corporate history, circa 1989. Chicago: BCBSA archives. Photocopied typescript.

Mannix, John R. Interview with Lewis Weeks, 1984. In *Hospital Administration Oral*

BCBSA00292943

*History Collection, Lewis E. Weeks Series,* ed. Lewis E. Weeks.

————. Interview with Odin Anderson, February 24, 1971. Chicago: BCBSA archives.

————. Interview with Robert M. Cunnningham Jr., 1988. Cunningham Papers, Gaithersburg, Md.

————. Letter to Robert M. Cunningham Jr., March 7, 1988. Cunningham Papers, Gaithersburg, Md.

————. "Voluntary Health Plans in California." *California and Western Medicine,* November 1943.

Markus, Glenn R. "Medicare's Prospective Payment System: The First Three Years." *Inquiry* (Summer 1987).

Marmor, Theodore R. *The Politics of Medicare.* London: Routledge and Kegan Paul, 1970.

————. "New York's Blue Cross and Blue Shield, 1934–1990: The Complicated Politics of Nonprofit Regulation." *Journal of Health Politics, Policy, and Law* 16, no. 4 (Winter 1991), p. 782.

Maybee, Harold V. Interview with Odin Anderson, November 14, 1972. Chicago: BCBSA archives.

————. Letter to Courtney Taber, December 30, 1955. Chicago: BCBSA archives.

McConnell, John Ed. Interview with Robert M. Cunningham III, June 1991. Cunningham Papers, Gaithersburg, Md.

McIntyre, Duncan M. *Voluntary Health Insurance and Rate Making.* Ithaca, N.Y.: Cornell University Press, 1962.

McKinlay, John B., ed. *Politics and Law in Health Care Policy.* New York: Prodist, 1973.

McKinney, Avil. "The Prevailing Fees Program: Professional Relations." In *1965 Blue Shield Annual Program Conference.* Chicago: BCBSA archives. Printed proceedings.

McNamara, Pat. Letter to Edward Groner, August 2, 1962. Chicago: BCBSA archives.

McNary, William. Interview with Odin Anderson, July 30, 1971. Chicago: BCBSA archives.

————. Letter to John Mannix, June 27, 1951. Chicago: BCBSA archives.

McNerney, Walter. "C. Rufus Rorem Award Lecture: 'Big Question for the Blues: Where To from Here?'" *Inquiry* (Summer 1996), pp. 110–17.

————. Interview with Lewis E. Weeks, 1983. In *Hospital Administration Oral History Collection, Lewis E. Weeks Series,* ed. Lewis E. Weeks.

————. Interview with Odin Anderson, June 13, 1973. Chicago: BCBSA archives.

————. Interview with Robert M. Cunningham Jr., 1989. Cunningham Papers, Gaithersburg, Md.

————. Interview with Robert M. Cunningham III, May 28, 1991. Cunningham Papers, Gaithersburg, Md.

McNerney, Walter, et al. *For-Profit Enterprise in Health Care.* Washington, D.C.: National Academy Press, 1986.

————. *Hospital and Medical Economics: A Study of Population, Services, Costs, Methods of Payment, and Controls.* 2 vols. Chicago: Hospital Research and Educational Trust, 1962.

"Medical Cure and Medical Care." *Milbank Memorial Fund Quarterly,* special issue. Sun Valley, Idaho: Sun Valley Forum on National Health, 1972. Published conference proceedings.

BCBSA00292944

Metzger, Carl M., et al. "Extended Benefits." In "1955 Annual Conference: Blue Cross and Blue Shield Plans, Joint Program Sessions, March 20–24, 1955." Chicago: BCBSA archives. Mimeographed proceedings.

Michigan State Medical Society. "With Firm and Regular Step." *Journal of the Michigan State Medical Society.* Detroit, June 1951.

Miller, William E., Jr. (NABSP), letter to Robert M. Ball (SSA) dated November 6, 1963, and attachments. Chicago: BCBSA archives.

Morgan, John. Letter to *Renews,* August 1987. Rochester, N.Y.: BCBS of the Rochester Area.

Munn, Melvin. Interview with Justin F. Kimball, August 6, 1954. Chicago: BCBSA archives.

———. Interview with Bryce Twitty, August 12, 1954. Chicago: BCBSA archives.

Myers, Beverlee A. "The Formulation of Federal Health Policy: Lessons from the Task Force on Medicaid and Related Programs." In *Medicaid: Lessons for National Health Insurance,* ed. Allen D. Spiegel and Simon Podair. Rockville, Md.: Aspen Systems, 1975.

Myers, Robert J. *Medicare.* Bryn Mawr, Pa.: McCahan Foundation, 1970.

National Journal. *The National Leadership Conference on America's Health Policy.* 2 vols. Washington, D.C.: National Journal, 1976. Published proceedings.

Nelson, J. Philo. Interview with Odin Anderson, April 7, 1971. Chicago: BCBSA archives.

Nelson, Russell. Introduction to *Summary of Workshop Conference on New National Blue Cross Organization.* Chicago: AHA, 1960. Printed proceedings.

Neuhauser, Duncan, ed. *Competition, Cooperation, and Regulation: The Quest for Excellence in Health Care.* Ann Arbor, Mich.: AUPHA Press, 1981.

Norby, Maurice. Interview with Lewis E. Weeks, 1983. In *Hospital Administration Oral History Collection, Lewis E. Weeks Series,* ed. Lewis E. Weeks.

Numbers, Ronald L. *Almost Persuaded: American Physicians and Compulsory Health Insurance, 1912–1920.* Baltimore: Johns Hopkins University Press, 1978.

Offerman, Dr. Arthur J. Interview with Odin Anderson, March 26, 1971. Chicago: BCBSA archives.

Olson, Mancur, ed. *A New Approach to the Economics of Health Care.* Washington, D.C.: American Enterprise Institute, 1981.

Owens, Walter. "Memo to BCBSA ad hoc committee on Propositions 1.1 and 1.2, April 23, 1985." Chicago: BCBSA archives.

Paton, Thomas. "The Impact of Titles 18 and 19: Title 18, Blue Shield Plans." In *Blue Shield Annual Program Conference, 1966.* Chicago: BCBSA archives. Printed proceedings.

———. Letter to John McConnell, January 18, 1977. Chicago: BCBSA archives.

Pearce, Harold ("Doc"). Interview with Odin Anderson, June 11, 1973. Chicago: BCBSA archives.

Peat, Marwick, Mitchell, and Company. *Long-Range Systems Planning: A Financial and Accounting Study.* Chicago: BCBSA archives. Consultant's report.

Pepper Commission. See U.S. Bipartisan Commission on Comprehensive Health Care.

Physician Payment Review Commission. *Annual Report to Congress.* Washington, D.C.: 1988.

Pink, Louis H. Letter to Oscar Ewing, October 26, 1951. Chicago: BCBSA archives.

Reed, Louis S. *Blue Cross and Medical Service Plans.* Washington, D.C.: U.S. Public Health Service, 1947.

BCBSA00292945

————. Interview with Odin Anderson, February 7, 1971. Chicago: BCBSA archives.

————. "Private Health Insurance: Coverage and Financial Experience, 1940–1966." *Social Security Bulletin* 38 (November 1967).

Regula, Ralph. "National Policy and the Medically Uninsured." *Inquiry* (Spring 1987).

Reiter, Marvin C. Interview with Robert M. Cunningham III, July 8, 1991. Cunningham Papers, Gaithersburg, Md.

Rorem, C. Rufus. Interview with Lewis E. Weeks, 1983. In *Hospital Administration Oral History Collection, Lewis E. Weeks Series,* ed. Lewis E. Weeks.

————. "Origins of Blue Cross." Collection of early documents (1933) gathered into a compendium (1971, 1982). Chicago: BCBSA archives. Mimeograph.

————. "Policies and Procedures for Group Hospitalization." *Bulletin of the American Hospital Association* 8 (May 1934).

————. *A Quest for Certainty.* Ann Arbor, Mich.: Health Administration Press, 1982.

Rosko, Michael D. "A Comparison of Hospital Performance Under the Partial-Payer Medicare PPS and State All-Payer Rate-Setting Systems." *Inquiry* (Spring 1989).

Ross, Mary. "Crisis in the Hospitals." *Survey Graphic* 22 (July 1933).

Rothman, David J. "The Public Presentation of Blue Cross, 1935–1965," *Journal of Health Politics, Policy, and Law* 16, no. 4 (Winter 1991), p. 673.

Ruddock, Andrew. "The Federal Employee Health Benefits Program: Its Implications and Importance." In *Proceedings of Annual Program Conference of Blue Shield Plans, October 23–24, 1961.* Chicago: NABSP. Printed proceedings.

Ryan, William. Interview with Robert M. Cunningham III, July 1991. Cunningham Papers, Gaithersburg, Md.

Samuel, Frank E., Jr. "The Challenge of Paying for Medicare." *Inquiry* (Winter 1987).

Schramm, Carl J., ed. *Health Care and Its Costs: Can the U.S. Afford Adequate Health Care?* New York: W. W. Norton, 1987.

Segal, Martin E. "Significance of Union Health and Welfare Funds." In "Addresses Presented at Blue Cross–Blue Shield Annual Conference, 1948." Chicago: BCBSA archives. Mimeographed proceedings.

Sellers, M. Edward. Interview with Robert M. Cunningham III, April 1995. Cunningham Papers, Gaithersburg, Md.

Sibery, Eugene D. Interview with Lewis E. Weeks, 1983. In *Hospital Administration Oral History Collection, Lewis E. Weeks Series,* ed. Lewis E. Weeks.

————. Interview with Odin Anderson, June 12, 1973. Chicago: BCBSA archives.

Sigmond, Robert. Interview with Robert M. Cunningham III, November 1990. Cunningham Papers, Gaithersburg, Md.

Sigmond, Robert, and Thomas Kinser. *The Hospital–Blue Cross Plan Relationship.* Chicago: BCA, 1976.

Sinclair, Frank. *Blue Cross in Wisconsin.* Racine, Wis.: Western Printing and Lithographing, 1965.

Singsen, Antone G. ("Tony"). Interview with Odin Anderson, June 28, 1973. Chicago: BCBSA archives.

————. Letter to Odin Anderson, February 12, 1974. Chicago: BCBSA archives.

————. "What Went Wrong With 'Blue Cross: What Went Wrong?'" Unpublished response to book by Sylvia Law, written circa 1974–1975. Chicago: BCBSA archives. Undated typescript.

BCBSA00292946

Smith, Frank. "The Blue Shield Medical Care Plans." Internal paper, 1952. Chicago: BCBSA archives. Mimeograph.

Smith, Mark D., Drew E. Altman, Robert Leitman, Thomas W. Moloney, and Humphrey Taylor. "Taking the Public's Pulse on Health System Reform." *Health Affairs* (Summer 1992).

Snoke, Albert W., M.D. *Hospitals, Health, and People.* New Haven: Yale University Press, 1987.

Somers, Herman M., and Anne R. Somers. *Doctors, Patients, and Health Insurance.* Washington, D.C.: The Brookings Institution, 1961.

———. *Health and Health Care: Policies in Perspective.* Germantown, Md.: Aspen Systems, 1977.

———. *Medicare and the Hospitals.* Washington, D.C.: The Brookings Institution, 1967.

Somerville, Janice, "Blues Plan Failure Staggers West Virginia." *American Medical News,* November 2, 1990.

Spiegel, Allen D., and Simon Podair, eds. *Medicaid: Lessons for National Health Insurance.* Rockville, Md.: Aspen Systems, 1975.

Starr, Paul. *The Social Transformation of American Medicine.* New York: Basic Books, 1982.

———. "What Happened to Health Care Reform?" *American Prospect,* no. 20 (Winter 1995).

Steinwald, Carolynn. *An Introduction to Foundations for Medical Care.* Chicago: BCBSA, 1971.

Stevens, Carol. "Will More Blue Plans Break Down?" *Medical Economics,* June 17, 1991.

Stevens, Robert, and Rosemary A. Stevens. *Welfare Medicine in America: A Case Study of Medicaid.* New York: The Free Press, 1974.

Stevens, Rosemary A. *In Sickness and in Wealth: American Hospitals in the Twentieth Century.* New York: Basic Books, 1989.

Stevenson, Keith. "Blue Cross and Blue Shield Plans Lose Tax-Exempt Status." *Business and Health,* November 1986.

Stewart, David. Interview with Lewis E. Weeks, 1983. In *Hospital Administration Oral History Collection, Lewis E. Weeks Series,* ed. Lewis E. Weeks.

———. Interview with Robert M. Cunningham III, June 13, 1991. Cunningham Papers, Gaithersburg, Md.

Stuart, James E. "The Blue Cross Story: An Informal Biography of the Voluntary Nonprofit Prepayment Plan for Hospital Care." Chicago: BCBSA archives. Photocopied typescript, circa 1966.

Stubbs, Donald, M.D. "Statement of the National Association of Blue Shield Plans on H.R. 4222, August 3, 1962." Chicago: BCBSA archives. Mimeographed transcript.

Taylor, Bruce. Interview with Odin Anderson, June 11, 1973. Chicago: BCBSA archives.

———. "Statement of Executive Vice President, Blue Cross of Greater Philadelphia: [Pennsylvania] Insurance Department Public Hearings, March 17, 1971." Chicago: BCBSA archives. Photocopied transcript.

Thompson, John Larkin. Interview with Robert M. Cunningham III, September 11, 1991. Cunningham Papers, Gaithersburg, Md.

Tierney, Thomas. "Medicare—Its Future: Blue Shield's Growing Involvement in

BCBSA00292947

Government Programs." In *Blue Shield Annual Program Conference, 1967: The Widening World of Blue Shield*. Chicago: BCBSA archives. Printed proceedings.

Tomayko, John F. "Trends and Attitudes in Labor Toward Health Care Coverage." In "1957 Annual Conference of Blue Shield Plans." Chicago: BCBSA archives. Mimeographed proceedings.

Tresnowski, Bernard. "Higher Prices and Dropping Utilization Defy Classic Economic Theory." Speech at North Carolina Memorial Hospital, May 4, 1987. Cunningham Papers, Gaithersburg, Md.

———. "Improving Health Insurance Coverage and Containing Health Care Costs." Testimony to House Ways and Means Committee, October 9, 1991. Chicago: BCBSA archives.

———. Interview with Lewis E. Weeks, 1986. In *Hospital Administration Oral History Collection, Lewis E. Weeks Series,* ed. Lewis E. Weeks.

———. Interviews with Robert M. Cunningham III, August 1991, December 1992, and July 1994. Cunningham Papers, Gaithersburg, Md.

———. Speech at University of Michigan, School of Public Health, April 8, 1986. Edited version. Cunningham Papers, Gaithersburg, Md.

Trussell, Ray E., et al. "Prepayment for Medical and Dental Care in New York State." Report to the state health commissioner and insurance superintendent by the Columbia University School of Public Health and Administrative Medicine, October 1962. Chicago: BCBSA archives.

Twitty, Bryce. Interview with Melvin Munn, August 12, 1954. Chicago: BCBSA archives.

Udow, Marianne. "The Caring Program for Children: The Michigan Experience." In *Caring for the Uninsured and Underinsured*. Chicago: AMA, 1991.

U.S. Bipartisan Commission on Comprehensive Health Care (Pepper Commission). *A Call for Action*. Washington, D.C.: GPO, 1990.

U.S. Department of Health, Education, and Welfare (HEW). *Report of the National Conference on Medical Costs, June 27–28, 1967*. Washington, D.C.: HEW, 1967.

———. *Report of the Task Force on Medicaid and Related Programs*. Washington, D.C.: HEW, 1970.

U.S. General Accounting Office. *Health Insurance: Comparing Blue Cross and Blue Shield Plans with Commercial Insurers*. Washington, D.C.: GAO, 1986.

U.S. House of Representatives, Committee on Ways and Means. *National Health Insurance: Hearings, May 3–17, 1974*. Washington, D.C.: GPO, 1974.

U.S. Senate, Committee on Labor and Public Welfare. *Examination of the Health Care Crisis in America, March 23 to April 6, 1971*. Washington, D.C.: GPO, 1971.

Vance, Clarence Joseph. *The History of Blue Cross and Blue Shield in Alabama*. Birmingham, Ala.: Birmingham Publishing, 1978.

Van Dyk, Frank. Interview with Odin Anderson, May 11, 1971. Chicago: BCBSA archives.

van Steenwyk, E. A. Interview with Donald Fairbairn, July 28, 1954. Chicago: BCBSA archives.

van Steenwyk, John. "Trends in Benefit Coverages." In *Health Care in the American Economy: Issues and Forecasts*. Chicago: Health Services Foundation, 1977. Published proceedings.

Walker, Marvin. Interview with Odin Anderson (interviewed jointly with Earl Kammer), November 30, 1972. Chicago: BCBSA archives.

Webb, Paul. *Blue Cross and Blue Shield of Maine: A History.* Portland, Me.: Blue Cross and Blue Shield of Maine, 1982.

Weeks, Lewis E., ed. *Hospital Administration Oral History Collection, Lewis E. Weeks Series.* Sponsored by the AHA and the Hospital Research and Educational Trust. Chicago: AHA Library. Interviews published separately, from 1979–1989.

Weeks, Lewis, Howard Berman, and Gerald E. Bisbee Jr., eds. *Financing of Health Care.* Ann Arbor, Mich.: Health Administration Press, 1979.

Werner, Edwin. Interview with Robert M. Cunningham III, September 1991. Cunningham Papers, Gaithersburg, Md.

———. Speech at the thirtieth anniversary celebration of Blue Cross and Blue Shield Federal Employee Program (FEP) in October 1990. Chicago: BCBSA archives. Author's transcript of audiotape.

Whitaker and Baxter. "Memo to Local Medical Societies, July 2, 1951." Chicago: BCBSA archives.

Wilbur, Richard S., M.D. "Usual and Customary Fee Programs." In *Blue Shield Annual Program Conference, 1967: The Widening World of Blue Shield.* Chicago: BCBSA archives. Printed proceedings.

Williams, Greer. "Kaiser Plan: The Prepaid Group Practice Model and How It Grew." *The Modern Hospital,* February 1971.

Williams, Pierce. *The Purchase of Medical Care Through Fixed Periodic Payment.* New York: National Bureau of Economic Research, 1932.

Wilmot, Irvin G. "The New York Experience from the Hospital's Viewpoint." In *Hospital Regulation Through State Rate Review: Mandated Interference or a Noble Intrusion?* Chicago: Teach'em, Inc., 1978. Published seminar proceedings.

Woolhandler, Steffie, M.D., and David U. Himmelstein, M.D. "The Deteriorating Administrative Efficiency of the U.S. Health Care System." *NEJM,* May 2, 1991.

Yaggy, Duncan, ed. *Health Care for the Poor and Elderly: Meeting the Challenge.* Durham, N.C.: Duke University Press, 1984.

Zimmerman, Harvey, et al. "Prospective Reimbursement in Rhode Island." *Inquiry* (March 1977).

Zink, Victor. "Private Industry's View of Health Cost." Transcript of a presentation to the Hospital Financial Management Association, Las Vegas, Nevada, March 22, 1978. Photocopy. Cunningham Papers, Gaithersburg, Md.

Zubkoff, Michael, Ira E. Raskin, and Ruth S. Hanft, eds. *Hospital Cost Containment: Selected Notes for Future Policy.* New York: Milbank Memorial Fund, 1978.

BCBSA00292949

# Index

Abbott, Charles, 117, 191
Ability to pay and hospital utilization, 102
Accountable health plans (AHPs), 250
Addes, George, 71
Adson, A. W., 73–74
Aetna Life and Casualty, 226
Alabama Plan, 161–63
Alameda County Hospital Plan, 45
Alameda County Medical Society, 40–41
Albany Blue Cross Plan, 219
Albert, Margaret, 23, 104
Alliance for Managed Competition, 250
Ambulance service, coverage of, 26
American Blue Cross, 79
American College of Physicians (ACP), 208, 209
American College of Radiology (ACR), 208
American College of Surgeons (ACS), 19, 87, 208, 209
American General Insurance Company, 241
American Health Insurance Company, 61
American Hospital Association (AHA): approval of group hospitalization plans by, 19; Committee on the Costs of Medical Care, x; Committee on Hospital Service, x, 20–21, 27, 53; on compulsory state health insurance, 9; on cost accounting

principles, 93; on Medicare rule making, 146–47; prepayment standards adopted by, 28–30; relations with Blue Cross, 180; and supervision of hospital prepayment plans, x
American Hospital Service (AHS) of New York, 54
American Medical Association (AMA): code of ethics of, 37; Council on Medical Service, 72–73; under E. H. Cary, 7; Eldercare plan of, 140, 142, 143; encouragement for formation of physician-controlled Plans, 72–73; on Medicare, 143, 146–47; nonprofit basis guidelines, 73; Sydenstricker-Falk committee of, 43
American Viscose Corporation, 82
Anderson, Carl, 156
Anderson, Clinton, 134
Anderson, Odin, 17, 19, 30, 32, 60, 76, 84, 102–3, 113, 142, 191
Anesthesiologists: and Blue Cross coverage of services, 71; status of, in prepayment plans, 38–39
Annis, Edward, 138, 181
Anthem Blue Cross, 241
Arthur Anderson and Company, 247
Associated Hospital Service (AHS), 194; of Maine, 81; of New York (now known as Empire Blue Cross and

Blue Shield), 22–23, 53, 121
Associated Insurance Companies of Indi-
    anapolis, 241, 244, 245
Associated Medical Care Plans (AMCP),
    72–73, 84

Ball, Robert, 140, 146, 148, 164
Baxter, 122
Baylor Plan, viii, 11; essential features of,
    5; success of, 10–11
Beauchamp, Tom, 139, 158, 159
Becker, Harry, 94
Berman, Howard, 192
Bethlehem Steel Company, 82, 89
Bird, John, 232
Blue Cross and Blue Shield of Indiana,
    244, 247
Blue Cross and Blue Shield of Kentucky,
    231–32, 245
Blue Cross and Blue Shield of Maryland,
    238
Blue Cross and Blue Shield of Massachu-
    setts, 220, 230, 243
Blue Cross and Blue Shield of Michigan,
    224, 230–31
Blue Cross and Blue Shield of Minnesota,
    243
Blue Cross and Blue Shield of National
    Capital Area, 238
Blue Cross and Blue Shield of New Jer-
    sey, 243
Blue Cross and Blue Shield of Ohio, 227
Blue Cross and Blue Shield of South Car-
    olina, 241
Blue Cross and Blue Shield of Texas,
    139–40
Blue Cross and Blue Shield of West Vir-
    ginia: failure of, 226–27, 247
Blue Cross and Medical Service Plans (re-
    port), 76
Blue Cross Commission (BCC), 76,
    83–86; abolishment of, 179–80
Blue Cross of California, 245, 246, 251
Blue Cross of Greater Philadelphia,
    171–72
Blue Cross of Northern California, 57
Blue Cross of Western Pennsylvania, 65
Blue Cross/Blue Shield, 86, 108–10,
    221; and allegations of mismanage-
ment, 238–39; and alternative deliv-
ery programs, 182–83; and antitrust
violations, 193–94; Assembly of
Plans, 220–22, 237, 240, 241; bar-
gaining position of, 212; burdens of
administering Medicare, 177; Cen-
ter for Health Economics and
Health Research, 217; commercial
rivals of, 176–77; and community
rating, 235–36; concern with cohe-
sion, 241; consolidation of, 198–99,
219, 252–53; cost and access prob-
lems for, 235; cost-control efforts
of, 208; coverage of elderly by,
127–33; coverage of outpatient ser-
vices, 224; and development of
managed care products, 242–43;
diffusion of power in national, 81;
and diversification, 236; enrollment
in, 58, 68–70, 193–94, 202, 217,
226; formation of, 85; framework
for strengthening management and
financial standards, 240–41; growth
of, 76–77; health care finance data
of, 187–88; and health care reform,
249–50; historical observations on,
vii–viii; HMOs coverage by,
228–29, 236; identity crisis in, 241;
impact of competition on, 222–34;
interplan competition in, 220; and
joint ventures with providers,
243–44; length of stay, 68; licensing
standards of, 240; local autonomy
of, 62; location of headquarters in
Chicago, 199; Long Term Business
Strategy of, 243; and managed care,
245, 246, 249; market share of,
217, 226; merger of, 195–96, 216;
mission of, 56; monitoring of uti-
lization trends by, 103–4; need for
coordination of, 194; new licensing
standards of, 247–48; in 1970s,
171–99; in 1980s, 200–34; non-
profit license standards for, 244,
247; nonprofit status of, 59; offer-
ing of HMOs and PPOs by, 216,
217; and open enrollment, 236; pol-
icy debate in, 248–51; problems of
subsidiary companies, 237; reciproc-

BCBSA00292951

ity arrangements between, 81; regulatory authority of, 237, 239–40; relations with American Hospital Association (AHA), 180; relationship to service providers, ix; retreat from community rating, 97–101; rising expectations, 91–97; and selective contracting, 237; service marks of, 220–21; struggles with costs, 180–86; tax status of, 176–77, 215–16, 219–20, 225, 236, 246; and unbranded subsidiaries, 240–41, 244; utilization rate of, 68

Blue Shield Plan of Washington, D. C., 198

Blue Shield Plan of Western New York, 219

Blue Shield Plans: indemnity benefits offered by, 93–94; medical necessity program and, 208–9; merger of, with Blue Cross Association, 195–96, 216; move into extended benefits, 100–1; need for coordination of, 194; relationship between Blue Cross Plans and, 72; symbol for, 51–52, 73

Boochever, Joseph, 157

Brian, Victor, 198

British health insurance program, 42

Brown, Edmund "Pat," 156

Bryan, James, 96, 105

Buerki, Robin C., 27

Bundled payments for hospital services, 32

Bureau of Health Insurance in the Social Security Administration, 148

Burrow, James G., 35

Burton, Harold, 15

Byrnes, John W., 141, 144

California Medical Association (CMA), 40

California Physicians' Service (CPS), x, 45, 74, 97, 128, 156

Calvin, Arthur, 13

Campion, Frank, 74, 120, 189

Canadian-style system, 250

Caperton, Gaston, 227

Cardone, Al, 239

Carter, Jimmy: and health care costs, 200; on national health insurance (NHI) program, 190–91

Cary, E. H., 7, 74

Castellucci, John, 47, 48–49, 50–51, 112, 137, 152, 171, 181, 188

Celler, Emmanuel, 121

Central New York Hospital Service Corporation, 51

Certificates of need (CONs), 224

Chapel Hill Plan, 24–25

Charge-based payments, 66

Cherry picking, 98, 236

Chicago hospital Plan, 79

Children's Bureau, 61

Cigna, 226

Cincinnati Plan, 60, 68

Cincinnatus, 125

Civil Service Commission and group coverage for federal workers, 112–13

Civilian Health and Medical Program for the Uniformed Services (CHAMPUS), 110–11, 194

Claim audit procedures, 105

Claims administration, 166

Cleveland Hospital Council and study of prepayment plans, 16

Cleveland Hospital Service Association, 14, 62, 77

Cleveland Plans, 14–15, 26, 47; average cost per case, 62; growth of, 15

Clinton, Bill, 74, 241–42, 249, 250, 252

Cohen, Wilbur, 18, 120, 126, 134, 141, 143, 145, 147, 190

Cohodes, Donald, 217, 218, 236, 239–40, 243, 249

Co-insurance, 105

Coleman, James, 101

Colman, J. Douglas, 21, 25, 61, 83, 89, 109, 110, 112, 114, 165, 201, 234

Colorado Medical Service, 71

Commercial insurance companies: accident and health policies of, 9; and growth of nonprofit Blue Plans, 59; and offering of health coverage, 8

Committee on the Costs of Medical Care (CCMC), ix, 17–19

Committee on Economic Security, 18

Community rating, xi, 31, 119, 235–36;

BCBSA00292952

and indemnity, 251; and managed
    care, 251–52
Company doctor approach, 4
Compulsory health insurance movement,
    death of, 35–36
Condon, George, 15
Consumer and control of health care
    costs, 105
Contract medicine, 4
Contract practice, 35
Cooper, Jere, 126
Cost accounting, 148
Cost containment, 186, 202
Cost controls, experimentation with, 67
Cost escalation, resurgent, 223
Cost-based reimbursement, 133, 178,
    184, 206
Cost-plus contracts, 99
Council on Medical Service, role of, 75
Crosby, Edwin L., 127, 134, 135
Cruikshank, Nelson, 125–26
Cunningham, Robert, III, xii
Cunningham, Robert, Jr., xii
Cuomo, Mario, 238

Dallas Plan, 13
Davenhall, William, 232
de Vise, Pierre, 186
Deductibles, 105
Denenberg, Herbert S., 171, 173, 174,
    176
Deniston, Frank, 61
Depression, impact of, ix, x
Detroit District Hospital Council, pre-
    payment Plan, 47
Diagnosis related groups (DRGs), 16,
    32, 206–7, 208, 222, 224–25
DiBona, G. Fred, Jr., 243
Dickson, Alma, 5
Dingell, John, 56, 120
Discharge planning, 106
Dobson, Allen, 208
Doctor plans, 34
Drucker, Peter, 205
Dryden, John, 8
Durham Plan, 24, 25

Economic Security Bill, 18, 43
Effectiveness-based payment systems, 253

Eisenhower, Dwight D., 92, 95, 104,
    113, 121–22, 126
Elderly, health care for, 118–44
Electronic Data Systems (EDS), 161
Elliott, Frederic Estabrook, 53–54
Ellwood, Paul, 181, 201, 209–10, 224,
    248
Emergency Maternity and Infant Care
    program (EMIC), 61
Empire Blue Cross and Blue Shield, 89,
    202–3, 219, 238–39
Employee Benefit Research Institute,
    242
Employment Retirement Income and Se-
    curity Act (1974) (ERISA), 217–18
Enthoven, Alain C., 201, 242
Essex County Hospital Council: and de-
    velopment of multihospital prepay-
    ment plan, 11–12; growth of pre-
    payment plan, 12
Evans, Robert, 119, 130, 134
Ewing, Oscar, 119–20, 126
Excess bed capacity, creation of, and ef-
    fect of Hill-Burton, 92
Experience-rating, 99, 101, 214
Extended care facilities (ECFs), 167–68

Falk, Isadore S., 43, 76, 120, 126
Family Health Insurance Plan, 187
Farmers Home Administration, 70
Federal Employees Health Benefits Pro-
    gram (FEHBP), 113, 155, 179,
    194, 201, 242
Federal Employees Program (FEP),
    114–15, 192
Federal Home Loan Bank, nonprofit co-
    operative of, 39–40
Federal Security Administration (FSA), 119
Federal Trade Commission (FTC), inves-
    tigation of Blue Shield Plans, 214
Federal workforce, group coverage for,
    111–17
Fee-for-service medicine, 200, 206; alter-
    natives to, 35
Feierabend, F. L., 34, 54–55, 84
Fein, Rashi, 126, 155, 163
Finch, Robert, 169
Fishbein, Morris, 18, 21, 30, 43, 44, 45,
    74, 75

BCBSA00292953

Flaherty, William, 205
Folsom, Marion, 233
Forand, Aimé, 126
Forand bill, 126
Ford, Edsel, 47
Ford, Gerald, 189, 190
Ford, William, 191
Ford Motor Company, 98
Foster, James R., 47

Gamble, Joseph, 238
Gardner, John, 163, 168, 169
Garfield, Sidney, 39, 181
Gates, Thomas S., 86
General Accounting Office (GAO), 214
Gindele, Howard, 176
Goin, Lowell, 74–75
Goldwater, Barry, 141
Goldwater, Sigismund S., 27, 53–54
Government as purchaser of health ser-
  vices, 206
Graduate Hospital System, 243
Great Depression, impact on health care,
  34
Great Society, 190
Greater Philadelphia Plan, 173–74
Grier, Barron, 112, 114
Griffin, Maurice F., 27–28, 77–78
Groner, Frank, 116–17
Group Hospitalization, 14, 111
Group Hospitalization and Medical Ser-
  vices Inc. (GHMSI), 238
Group prepayment, development of, ix
Guaranteed issue, 236

Happe, Don, 158
Harrington, J. Q., 135
Hart, Philip D., 178–79
Harvard Community Health Plan,
  181–82, 230
Harvey, Joseph, 94–95
Hassard, Howard "Hap," 41, 45, 128,
  156
Hawley, Paul R., 74, 85, 106–7, 195
Hays, Patrick, 251–52
Health, Education, and Welfare (HEW),
  U.S. Department of, 119, 190
Health care costs: growth of, 91; initial
  surge in, 90; spiral of, 92–93; and

technological advances, 91–92; and
  utilization upsurge, 101–6
Health Care Financing Administration
  (HCFA), 206–7, 208, 245
Health care for elderly, 118–44
Health care reform, 241–42
Health care system, impact of Medicare
  and Medicaid on, 163–64
*Health Insurance: The Next Step in Social
  Security,* 76
Health Insurance Association of America
  (HIAA), 212–13, 250
Health Insurance Plan (HIP), 113
Health Law Project, 177–78
Health maintenance organizations
  (HMOs), 180–83, 187, 201, 210,
  224, 229–30, 236, 237, 251; devel-
  opment of, 202; as model of man-
  aged care, 210; offering of, by Blue
  Cross, 216, 217. *See also* Managed
  care
Health Services Inc. (HSI), 86, 108; and
  Medical Indemnity of America
  (HSI-MIA), 112, 213
Heitler, George, 180
Henry Ford Hospital, 48
Henryson, E. J., 14, 17, 25
Hess, Arthur, 148
Hickman, Martin, 196
Hiestand, Edgar, 137
Hill, Lister, 122, 124
Hill-Burton Act, 124, 168; effects of,
  102; hospital construction aid pro-
  gram under, 61; impact on costs, 92
Hirshfield, Daniel, 18, 42–43, 44
Hobby, Oveta Culp, 95, 96, 111, 121–22
Hodges, Francis, 97
Hoover, Herbert, 17
Hopkins, Harry, 18, 43
Hospital Care Association (Durham), 24
Hospital Care Association (Minneapolis),
  14
Hospital Care Corporation (Cincinnati),
  31
Hospital Cooperative Association, 37
Hospital cost accounting and insurance
  reimbursement, 90
Hospital coverage, expansion of market
  for, 60

BCBSA00292954

Hospital differentials, 212–13

Hospital efficiency, impact of diagnosis related groups on, 206–7

Hospital insurance: effects of, on utilization, 102–3; spread of coverage, 90

Hospital Plans, relation between medical prepayment Plans and, 52

Hospital prepayment: relationship between medical programs and, 54; spread of, 68

Hospital remuneration, issue of, 65

Hospital Savings Association (Chapel Hill), 24–25

Hospital Service Association (Pittsburgh), 22, 58

Hospital Service Association (St. Paul), 13, 14

Hospital Service Plan Commission, 60

Hospital utilization, challenge of increasing, 67–68

Hospital-based specialists, 71

Howard, Ernest, 75

Humana, 231

Humphrey, Hubert, 121

Hungerford, Cy, 58

Inclusive rate method, 16

Indemnity benefits, 137; coverage of, 195; defense of, 96–97; insurance products for, 236

Independence Blue Cross, 171–72, 243. See also Blue Cross of Greater Philadelphia

Indiana Hospital Association, 183

Individual practice association (IPA), 210

Ingram, James, 184–85

Inland Steel Company, 89

Insurance Association of Approved Hospitals, 41

Integrated care systems, 242

Inter-Plan Service Benefit Bank, 82, 86–87, 107, 109, 112, 116, 117, 155

InterStudy research organization, 224

Investigation of Blue Shield Plans by Federal Trade Commission (FTC), 214

Iowa Plan, 71–72

Jefferson, Thomas, 142

Jewel Tea Company, 82

John Marshall Insurance Company, 79

Johns Hopkins University, 109

Johns Manville Corporation, 86

Johnson, Lyndon B., 140–41, 143, 144, 145, 163, 190

Joint Commission for the Promotion of Voluntary Nonprofit Prepayment Plans, 135–36

Joint Committee to Draft Legislation for the Aged, Indigent, and Unemployed, 122–23

Jones, Richard, 85

*Journal of the American Medical Association (JAMA),* progress of European experiments in, 35

Kaiser, Henry J., 39, 113

Kaiser Foundation Health Plan, 39

Kaiser Permanente Health Plan, 39, 181, 243, 246, 251

Kelley, George, 190

Kennedy, Edward, 179, 187, 234

Kennedy, John F., 74, 126, 131, 133–34, 137–38, 181, 188, 191; assassination of, 140

Kerr, Robert, 131

Kerr-Mills welfare subsidy program, 131, 133, 135, 139, 140, 157–58

Kimball, Justin Ford, viii, 3–8, 10, 74

King, Cecil, 134

King County Medical Blue Shield, 36

King-Anderson bill, 134–35, 136, 137–38, 140–41; and Social Security formula, 134

Kinser, Thomas, 235, 236, 237

Labor unions, insurance demands of, 89, 95

Lattner, Fritz, 9–10, 63–64, 71–72

Law, Sylvia A., 177

Long Range Systems Planning (LRSP), 189

Long-Term Business Strategy (LTBS), 204–6, 216, 218, 219

Loos, Clifford, 37

Louisville Plan, 152–53

Low option coverage, 114

BCBSA00292955

Luce, Henry, 41–42
Lucia, George, 57
Lytle, Ben, 241

MacLean, Basil C., 27, 109–10
Major medical, creation of, 94–95
Managed care, 210; and Blue
    Cross/Blue Shield, 245, 246, 249;
    and community rating, 251–52; de-
    velopment of, 206–16; development
    of products in, 242–43; HMOs as
    model of, 210; and private health in-
    surance, 242. *See also* Health main-
    tenance organizations (HMOs)
Mann, Leroy, 205
Mannix, John Robert, ix, 10, 15–17, 18,
    32, 47, 48, 49–50, 76, 78, 79, 120,
    134
Marmor, Theodore, 120
Maryland Plan, 25
Maternity care, coverage of hospitalized,
    25
Maybee, Harold, 32, 124–25, 134
McBee, Walter, 139–40, 159
McCabe, John, 205
McConnell, John Ed, 195, 196
McConnell Report, 196–97, 204–5
McIntosh, Douglas, 228
McIntyre, Duncan, 100
McNamara, John, 77–78
McNamara, Pat, 138, 141
McNary, William, 65–66, 84, 99–100,
    109, 112, 120, 122–23, 129,
    132–33
McNerney, Walter J., xi, 88, 132–33,
    138, 139, 141–42, 143, 146, 148,
    155–56, 158, 159–60, 162, 163,
    167, 168, 169–70, 172–73, 175,
    180–82, 185–86, 188, 190, 191,
    192–93, 196, 198, 202–3
Medicaid program, 158, 175; administra-
    tion of, 155–56; impact on health
    care policy and medical economics,
    153; inflationary factors associated
    with, 164–65
Medi-Cal, 156–57
Medical Assistance to the Aged (MAA),
    131
Medical care foundations, 193

Medical Expense Fund, 53
Medical Indemnity of America (MIA),
    86
Medical necessity, 211
Medical Plans: effect of consumer de-
    mand and threat of political interfer-
    ence on, 70–76; and search for
    unity, 76–87
Medical Prepayment Plans: origin of,
    37–42; relation between hospital
    Plans and, 52
Medical programs, relationship between
    hospital prepayment and, 54
Medical Service Association of Pennsyl-
    vania (MASP), 52
Medical Service Plans, development of
    standards for, 43–44
Medicare program. *See also* Public Law
    89-97: administrative rule making
    following passage of, 145–48; Diag-
    nosis related groups (DRGs) system,
    249; expenditures by, 207–8; finan-
    cial problems of trust fund, 206;
    hospital admissions clause under,
    153–54; impact of, on health care
    system, 163–64; impact of diagnosis
    related groups on, 206–7; impact on
    health care policy and medical eco-
    nomics, 153; inflationary factors as-
    sociated with, 162, 164–65; invent-
    ing, 141–44; Part A, 145, 147,
    154–55, 162, 165–66, 196,
    224–25; Part B, 145–46, 147, 151,
    153, 154, 155, 160–61, 165–66,
    168; Part C, 187; prospective pay-
    ment  system in, 207–8, 224; role of
    Blue Cross in, 159–60
Medicare-Medicaid bill, 143–44
Metropolitan Life Insurance Company, 111
Metzger, Carl, 51–52, 73, 95, 130
Michigan, University of, study of hospital
    costs, 164, 172–73
Michigan Blue Cross Plan, 18–19, 99,
    103; development of, 18–19
Michigan Hospital Service (now Blue
    Cross and Blue Shield of Michigan),
    65, 89–90, 98
Michigan Medical Service, 48; failure of,
    133

Michigan Society for Group Hospitalization, 47

Michigan State Medical Society, 103

Mills, Wilbur, 126, 131, 136, 138, 140–41, 142, 188, 189, 190

Milwaukee Medical Service, 40

Milwaukee Plan, 40

Mitchell, Earl, 40

*Modern Hospital, The* (magazine), 78

Moral hazard, 101

Morgan, John, 81

Mount Sinai Hospital (Cleveland), 16

Mountain State Blue Cross and Blue Shield, 227

Multihospital Service Plans, 11, 14, 20

Murray, James, 56, 120, 121

Nader, Ralph, 171

National account problem, 107–8

National Association of Blue Shield Plans (NABSP), 49, 50, 112, 114, 134, 136–37, 140, 152, 179, 180, 185, 188, 196

National Association of Insurance Commissioners (NAIC), 239, 250

National Association of Manufacturers, 186

National Council of Senior Citizens for Health Care through Social Security, 137–38

National Health Insurance (NHI) program, 186, 187, 190–92, 202

National Institute of Health, budget of, 61–62

National Labor Relations Board (NLRB), 89

National Transfer Agreement, 109, 117

National War Labor Board, 57

Nelson, Philo, 99

Nelson, Russell, 116

New Jersey Blue Shield Plan, 105, 228

New York City Blue Cross Plan, 89

Newark Plan, 12

Nixon, Richard M., 124, 126, 168, 169, 187, 201

Northwestern National Life, 224

Numbers, Ronald, 35

Nunn, Sam, 238, 239, 240

Offerman, Arthur, 54, 73

Office of Economic Stabilization, 57

Office of Scientific Research and Development, 59

Old Age, Survivors', and Disability Insurance program, 125, 126, 131, 139

Old Age and Survivors Insurance program (OASI), 120

Olds, Ransom, 47

Olson, Culbert, 45–46

Open enrollment, 236

Organized medicine at national level, 36–37

Oseroff, Abe, 22, 58, 80, 89, 99, 110, 191

Outpatient surgery centers, 224

Owens, Walter, 217–18

Parish, Ned, 188–89

Pathologists, status of, in prepayment plans, 38–39

Paton, Thomas C., 164, 196, 205

Pearce, Doc, 159, 167

Peart, Hartley, 45, 46

Peer review panels, 184

Pennsylvania Medical Society, 52

Pepper Commission, 234

Perkins, Frances, 43

Perot, Ross, 161

Perry, Lester, 52

Peters, Douglas S., 229

Philadelphia County Medical Society, 106

Philadelphia Hospital Planning Council, 76

Physician-Controlled Plans, formation of, 72–73

Pink, Louis H., 22, 83–84, 121, 124

Pittsburgh Plan, 176

Point-of-service (POS) plans, 210, 251

Preadmission testing, 106

Preferred provider organizations (PPOs), 210, 216, 217, 251

Prepayment plans: concept of joint, 10–11; development problems in, 34; early forms of, 7–17; multihospital, 11; as national phenomenon, 17–21; and problem solving, 21–26; rate structure of early, 31; successes of, 32–33

BCBSA00292957

Prevailing fees, 152–53
Price competition, 66–67
Private health insurance: American Medical Association (AMA) endorsement of, 44–45; as broker of health care in, viii–ix; managed care arrangements in, 242
Professional Standards Review Organizations (PSROs), 192
Progressive movement, 9
Prospective payments systems, 183, 201, 207–8
Prudential Insurance Company, 8
Public Health Service, report on group hospitalization for, 10
Public Law 89-97, 145–46. *See also* Medicare
Purchasing cooperatives, 242

Radiologists, status of, in prepayment plans, 38–39
Rate-setting, state involvement in, 183–86
Ratio of charges to costs, 151
Ravdin, I. S., 104, 106
Reagan, Ronald, 200; election of, 202; on Medicaid, 157
Re-certification, 166
Reed, Louis S., 10, 36, 46–47, 51, 56, 63, 64–65, 68, 72, 76, 80, 102
Reimbursable cost, 150
Reimbursement at cost, 200
Reinle, George, 40
Reiter, Marvin C., 204, 213–15, 220, 228, 229
Republican majority in Congress, 252
Resurgent cost escalation, 223
Reuther, Walter, 86, 124, 166–67, 187
Rhode Island Plan, 64, 184, 228
Ribicoff, Abraham, 134
Richmond Plan, 179
Rochester Blue Cross and Blue Shield Plans, 26, 233–34
Rockefeller, Nelson, 157, 187
Roosevelt, Franklin D.: and compulsory health insurance, 56; death of, 56; interest in prepayment, 18, 42–45; National Health Conference called by, 44; and national health programs, 33; and New Deal initiatives, 43
Roosevelt, Theodore, 9
Rorem, C. Rufus, x, xi, 19–21, 27–28, 32, 38, 40, 57, 76–77, 78–79, 85, 93, 106–7
Rorem, C. Rufus, Health Service Award, 79
Rosenwald, Julius, Fund, 19
Rosenwald Fund, 27
Rosko, Michael, 208
Ross, Donald, 37
Ross-Loos clinic, flourish of, 37
Rostenkowski, Daniel, 190
Ryan, William, 161, 195, 198

Sacred Heart Hospital, 106
St. Mary's Hospital, prepayment plan at, 8
St. Paul Union Stockyards Company, prepayment plan offered by, 13
San Joaquin Foundation for Medical Care, 210
Sardegna, Carl, 238
Sargent, James, 40
Saunders, Stanley, 129
Savage, Raymond, 233
Schaeffer, Leonard, 245, 246, 248, 251, 252
Schriver, Howard, 73
Screens, 230–31
Sears, Douglas, 105–6
Selective contracting, 211–12, 214, 236, 237
Self-insurance, 237; attraction of, 217–18
Sellers, Edward, 241
Senate Permanent Subcommittee on Investigation, 238–39, 247
Service benefit, 90
Severyn, Fred, 231
Shadid, Michael, 37
Shapp, Milton, 171, 173
Shively, Glenn, 229
Sibery, Eugene, 159, 193
Sickness insurance as poor risk, 8
Sigmond, Robert, 57
Sinai, Nathan, 41–42
Singleton, Herbert, 163

BCBSA00292958

Singsen, Antone "Tony," 64, 77, 82–83, 86, 107, 108, 109, 111, 112, 115, 116, 156, 168, 178, 179
Skilled nursing facility, 168
Smith, Francis, 104, 106, 164, 172
Smith, Frank, 73–74, 83–84
Snyder, Marion, 7
Social Security Act (1935), ix
Social Security Administration, 119–20
Somers, Anne R., 92, 94, 106, 142, 145, 146–47, 153, 154
Somers, Herman M., 92, 94, 106, 142, 145, 146–47, 153, 154
Sorenson, Theodore, 138
Southern California Blue Cross, 191
Spencer, George, 104–5
Starr, Paul, 8, 20, 63, 178, 187, 249
Stevens, Robert, 169
Stevens, Rosemary, 169
Stewart, David, 160–61, 163, 175, 233
Stuart, James E., 5, 15, 20, 30–31, 33, 60, 61, 67, 72, 85–86, 95, 108–9, 110, 112, 116, 119, 124, 127, 130, 131, 132
Stubbs, Donald, 112, 136
Subscriber councils, formation of, 64
Sutter Health, 251–52
Sutter Hospital, joint prepayment plan at, 11
Sydenstricker, Edgar, 43
Syndicate, 82

Taft, Robert, 124
Taft-Hartley Act, 81, 89
Tate, James, 173
Tax Equity and Fiscal Responsibility Act (1982) (TEFRA), 206
Tax Reform Act (1986), 215
Tax status, 236
Taylor, Bruce, 66, 172, 174
Teamsters Union, 94
Technological advances and health care costs, 91–92
Texas Blue Cross, 139–40
Thomas, Atha, 71
Thompson, John Larkin, 220, 230, 241
Tierney, Thomas, 129, 130–32, 134
Tomayko, John, 96
Touro Infirmary, prepayment plan at, 13

Travelers Insurance Company, 176
Tresnowski, Bernard R., xi, 159, 166, 167, 197, 198, 199, 202, 203, 206, 207, 208, 209, 211, 212, 215, 216, 219, 220, 221–23, 226, 239, 241, 245, 246, 247, 248, 250–51
Truman, Harry S., 56–57, 74, 75
Trussell, Ray, 106
Twitty, Bryce, viii, 4, 5, 6–7
Tynes, Lane, 134

Uniform cost accounting, 93
Uninsured: economic effects of, on health care system, 226; effective methods of enrolling, 69; growth in members of, 225–26
United Auto Workers (UAW), 47–48, 94
United Hospital Fund, 22, 83
United Medical Services (UMS), 54, 101, 194–95, 239
United Steelworkers of America (USW), 89, 94
U.S. Steel, 82
University Hospital, 3–4
Urgent care clinics, 224
Usual, customary, and reasonable (UCR) fee reimbursement program, 152, 160, 178
Utilization review (UR), 148, 166, 185–86, 211
Utilization upsurge, 101–6

Van Dyk, Frank, ix, 11–12, 13, 19, 22, 23, 32, 53, 60, 78, 84
Van Steenwyk, E. A., ix, 12, 14, 22, 23–26, 32, 57, 66, 76, 78, 80, 82–83, 89, 99, 106, 109, 110, 120, 122–23, 132, 172, 191
Vance, Joseph, 161–62
Vohs, Carl, 34
Voluntary prepayment, 75

Wagner, Robert, 56, 120
Wagner-Murray-Dingell compulsory health insurance bill, 70, 71, 74, 126
Ward, Peter, 13
Warren, Earl, 46, 56, 75
Watson, Thomas J., 186

BCBSA00292959

Wayne County Medical Society, 48
Webb, Paul, 81–82, 86
Webster, William, 247
Weeks, Lewis, 78
Weinberger, Caspar, 189
WellPoint Health Networks, 245
Werner, Edwin, 112, 114–15, 194–95,
    196, 202, 203, 206, 212, 218, 219
West Virginia Blue Cross and Blue Shield
    Plan, failure of, xii, 228–29, 238
Western Pennsylvania Blue Cross Plan,
    104
Whitaker, Clem, 75, 122
Wilbur, Ray Lyman, 17, 45, 74, 157
Wilbur, Richard, 157
Williams, Greer, 39
Williams, Pierce, 9
Wofford, Harris, 241–42
Wonnacott, Clarence, 146
Woodard, Ann, 14

Zuckerberg v. Blue Cross and Blue Shield
    of Greater New York, 211

BCBSA00292960

About the Authors

**Robert Cunningham III** (1944– ) is the editor of *Medicine & Health Perspectives,* a Washington newsletter on health care and health policy. He was formerly a reporter and editor at three Kentucky newspapers, *The Hazard Herald-Voice, The Louisville Times,* and *The Courier-Journal,* also in Louisville. *The Herald-Voice* received the Kentucky Press Association's editorial page award during his tenure, and Cunningham received the Dime Award for health reporting from the March of Dimes in 1996.

**Robert M. Cunningham Jr.** (1909–1992) was editor of *The Modern Hospital* (now *Modern Healthcare*) from 1945–1973 and is the author of six previous books, including *The Third World of Medicine* (1968) and *The Healing Mission and the Business Ethic* (1982). He received the American Hospital Association's Justin Ford Kimball Award in 1979 and the American College of Hospital Administrators' Silver Medal in 1983 and was named to *Modern Healthcare*'s Health Care Hall of Fame in 1991. He worked briefly for the early Illinois Blue Cross Plan in the late 1930s and served as a consultant to the Blue Cross and Blue Shield Association during the 1970s–'80s after his retirement from *The Modern Hospital.*

BCBSA00292961