FILED

2017 Aug-18  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |
|---|---|
| IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406) | ) **Master File** ) **No. 2:13-CV-20000-RDP** ) ) This document relates to all cases. ) |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

**PUBLICLY FILED REDACTED VERSION**

Dated: August 18, 2017

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 3

I.      Defendants' Response To Providers' Statement of Facts ("PSF") ...................................... 3

II.     Defendants' Response To Subscribers' Statement of Facts ("SSF") ................................... 9

III.    Defendants' Statement Of Additional Undisputed Relevant Material Facts .................... 14

LEGAL STANDARD ............................................................................................................... 18

ARGUMENT .......................................................................................................................... 18

I.      Plaintiffs' Motions Fail Because The Challenged Rules Are Not Governed By § 1
        Of The Sherman Act. ..................................................................................................... 18

        A.      The Blue System Operates As A Single Entity With Respect To
                Governance Of The Use Of The Blue Brands. ..................................................... 19

        B.      Service Areas Derive From Common-Law Trademark Rights, Not An
                Unlawful Agreement To Allocate Markets ........................................................... 20

II.     Plaintiffs Have Not Carried Their Burden Of Demonstrating Through Undisputed
        Facts That The Challenged Rules Are Subject To The Per Se Rule ................................ 23

        A.      Plaintiffs Have Not Proven Through Undisputed Evidence That The
                Blue System Has No Plausible Procompetitive Benefits ....................................... 24

                1.      Plaintiffs must disprove any plausible procompetitive benefits to
                        sustain a per se claim. ............................................................................. 24

                2.      The rule of reason is not limited to restraints that are "essential" to
                        "new products." ...................................................................................... 31

                3.      Although not required, Defendants have created a "new product,"
                        and the challenged restraints are "essential" to that product. .................. 33

                4.      Plaintiffs have not disproved that the challenged rules plausibly
                        facilitate enterprise and productivity. ...................................................... 36

        B.      Plaintiffs Have Not Demonstrated Through Undisputed Evidence Purely
                Horizontal Agreements Between Competitors. ..................................................... 39

**Page**

C.   Judicial Experience Has Not Shown The Challenged Rules To Be Manifestly Anticompetitive. .................................................................. 42

D.   Plaintiffs Have Not Shown That The Best Efforts And Uncoupling Rules Are Per Se Illegal Market Allocations Or Output Restrictions............................ 44

   1.   The Best Efforts rules are not per se illegal. ................................ 44

   2.   The uncoupling rules are not per se illegal. ................................ 46

E.   Providers Have Not Shown Through Undisputed Evidence That BlueCard Is Naked Price-Fixing. ........................................................................ 47

III.   Providers Have Not Carried Their Burden Of Demonstrating Through Undisputed Facts That The Challenged Rules Are Subject To The Quick Look Rule......................... 50

CONCLUSION ...................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abadir & Co. v. First Mississippi Corp.*,
651 F.2d 422 (5th Cir. Unit A July 1981) ............................................................ 27, 40, 41

*All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc.*,
135 F.3d 740 (11th Cir. 1998) ............................................................ 23, 47, 48

*Allard Enterprises, Inc. v. Adv. Programming Resources, Inc.*,
249 F.3d 564 (6th Cir. 2001) ............................................................ 21

*American Needle, Inc. v. National Football League*,
560 U.S. 183 (2010)............................................................ 19, 20, 26, 45

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................ 18

*Arizona v. Maricopa County Medical Society*,
457 U.S. 332 (1982)............................................................ 32

*Augusta News Co. v. Hudson News Co.*,
269 F.3d 41 (2001)............................................................ 49

*Babbitt Electronics, Inc. v. Dynascan Corp.*,
38 F.3d 1161 (11th Cir. 1994) ............................................................ 22

*Blue Cross & Blue Shield Ass'n v. Group Hospitalization &*
*Medical Services, Inc.*,
744 F. Supp. 700 (E.D. Va.), *aff'd*, 911 F.2d 720 (4th Cir. 1990)............................ 29, 43

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
441 U.S. 1 (1979)............................................................ 25, 34, 37, 49

*California Dental Ass'n v. F.T.C.*,
526 U.S. 756 (1999)............................................................ 23, 50

*Castro v. Sanofi Pasteur Inc.*,
2012 WL 12516573 (D.N.J. Dec. 20, 2012)............................................................ 48, 49

*Central Benefits Mutual Insurance Co. v. Blue Cross & Blue Shield Ass'n*,
711 F. Supp. 1423 (S.D. Ohio 1989) ............................................................ 43

*Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*,
95 F.3d 593 (7th Cir. 1996) ............................................................ 19

**Page(s)**

*Computer Currents Publishing Corp. v. Jaye Communications, Inc.,*
968 F. Supp. 684 (N.D. Ga. 1997) ...................................................................... 47

*Continental Airlines, Inc. v. United Airlines, Inc.,*
277 F.3d 499 (4th Cir. 2002) .............................................................................. 45

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
433 U.S. 36 (1977)....................................................................................... 25, 29

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752 (1984)............................................................................................ 19

*Deutscher Tennis Bund v. ATP Tour, Inc.,*
610 F.3d 820 (3d Cir. 2010)........................................................................ 24, 45

*Emergency One, Inc. v. American Fire Eagle Engine Co., Inc.,*
332 F.3d 264 (4th Cir. 2003) .............................................................................. 21

*F.T.C. v. Actavis, Inc.,*
133 S. Ct. 2223 (2013) .............................................................. 25, 27, 36, 50

*General Leaseways v. National Truck Leasing Ass'n,*
744 F.2d 588 (7th Cir. 1984) ...................................................................... passim

*Group Hospitalization & Medical Services, Inc. v.*
*Blue Cross & Blue Shield of National Capital Area, Inc.,*
819 F.2d 1138 (4th Cir. 1987) ........................................................................... 43

*Group Hospitalization & Medical Services, Inc. v.*
*Blue Cross & Blue Shield of Virginia,*
No. 85–1123–A (E.D. Va. Apr. 8, 1986) .......................................................... 43

*Gulf States Reorganization Group, Inc. v. Nucor Corp.,*
822 F. Supp. 2d 1201 (N.D. Ala. 2011),
*aff'd* 721 F.3d 1281 (11th Cir. 2013).............................................................. 18

*Hanover Star Milling Co. v. D. D. Metcalf,*
240 U.S. 403 (1916)............................................................................................ 21

*In re Ciprofloxacin Hydrochloride Antitrust Litigation,*
261 F. Supp. 2d 188 (E.D.N.Y. 2003) .............................................................. 25

*In re Sulfuric Acid Antitrust Litigation,*
703 F.3d 1004 (7th Cir. 2012) .................................................................... passim

*Kestenbaum v. Falstaff Brewing Corp.,*
575 F.2d 564 (5th Cir. 1978) ............................................................................. 46

iv

**Page(s)**

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ................................................................................ 23

*Levine v. Central Florida Medical Affiliates, Inc.*,
    72 F.3d 1538 (11th Cir. 1996) .............................................................. 24

*Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*,
    106 F.3d 355 (11th Cir. 1997) .............................................................. 20

*Mueller v. Wellmark, Inc.*,
    861 N.W.2d 563 (Iowa 2015), *reh'g denied* (Apr. 22, 2015) ................... 33, 43

*Nat'l Collegiate Athletic Ass'n (NCAA) v. Bd. of Regents of the Univ. of Okla.*,
    468 U.S. 85 (1984) ................................................................................ 32, 45

*National Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
    779 F.2d 592 (11th Cir. 1986) .................................................. 24, 32, 37, 49

*North Jackson Pharmacy, Inc. v. Caremark RX, Inc.*,
    385 F. Supp. 2d 740 (N.D. Ill. 2005) ..................................................... 47

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
    472 U.S. 284 (1985) .............................................................................. 45, 48

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990) ................................................................................ 29, 49

*Polk Bros., Inc. v. Forest City Enterprises, Inc.*,
    776 F.2d 185 (7th Cir. 1985) ................................................................ passim

*Powderly v. Blue Cross & Blue Shield of North Carolina*,
    No. 3:08-cv-00109 (W.D.N.C. July 21, 2009) ......................................... 33, 43

*Princo Corp. v. International Trade Commission*,
    616 F.3d 1318 (Fed. Cir. 2010) ............................................................ 45

*Procaps S.A. v. Patheon, Inc.*,
    845 F.3d 1072 (2016) ............................................................................ passim

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) .................................................. 30, 37, 45

*Safeway Stores, Inc. v. Safeway Disccount Drugs, Inc.*,
    675 F.2d 1160 (11th Cir. 1982) ............................................................ 22

*Spinelli v. National Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) ........................................................ 20

**Page(s)**

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) .................................................................................................. 24

*SunAmerica Corp. v. Sun Life Assurance Co. of Canada*,
    77 F.3d 1325 (11th Cir. 1996) .......................................................................... 21

*Tally-Ho, Inc. v. Coast Community College District*,
    889 F.2d 1018 (11th Cir. 1989) ........................................................................ 21

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ........................................................................ 20, 23, 34, 45

*Timken Roller Bearing Co. v. United States*,
    341 U.S. 593 (1951) .......................................................................................... 29

*TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*,
    102 F. Supp. 3d 1321 (S.D. Fla. Apr. 27, 2015) ............................................ 46

*United Drug Co. v. Theodore Rectanus Co.*,
    248 U.S. 90 (1918) .......................................................................................... 21

*United States v. Anthem, Inc.*,
    2017 WL 685563 (D.D.C. Feb. 21, 2017) ...................................................... 43

*United States v. Anthem, Inc.*,
    855 F.3d 345 (D.C. Cir. 2017),
    *cert. dismissed*, 2017 WL 1807377 (U.S. June 12, 2017) .............................. 43

*United States v. Sealy, Inc.*,
    1964 WL 8089 (N.D. Ill. Oct. 6, 1964) ............................................................ 28

*United States v. Sealy, Inc.*,
    388 U.S. 350 (1967) ................................................................................ 27, 28, 29

*United States v. Topco Associates, Inc.*,
    319 F. Supp. 1031 (N.D. Ill. 1970), *rev'd*, 405 U.S. 596 (1972) .................... 28

*United States v. Topco Associates, Inc.*,
    405 U.S. 596 (1972) .................................................................................... 27, 28

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
    344 F.3d 1294 (11th Cir. 2003) ................................................................ passim

*VMG Enterprises, Inc. v. F. Quesada & Franco, Inc.*,
    788 F. Supp. 648 (D.P.R. 1992) ............................................ 20, 21, 28, 41

**Page(s)**

*Washington v. National Football League,*
    880 F. Supp. 2d 1004 (D. Minn. 2012) ............................................................................. 20

**Statutes**

15 U.S.C. § 15(b) ........................................................................................................................... 21

**Other Authorities**

K.F. O'Malley, *et al.,*
    Federal Jury Practice & Instructions (6th ed. 2012) ........................................................ 24

McCarthy on Trademarks (4th ed., June 2017 Update) ................................................................. 47

**Rules**

Fed. R. Civ. P. 56(c) ...................................................................................................................... 18

## INTRODUCTION

Plaintiffs argue the Court should strike down as per se unlawful a System that has existed for over eighty years, provides health insurance to nearly one in three Americans, and strengthens interbrand competition. They do not seriously contend that the Blue System lacks robust procompetitive benefits. Instead, Plaintiffs' fundamental argument is that the Court must ignore all those benefits—and declare the System illegal as a matter of law—simply because Plaintiffs insist the label "horizontal market allocation" applies. That is wrong as a matter of law and fact.

Plaintiffs' argument depends on a static reading of *Sealy* and *Topco* that ignores recent and more analogous cases. Subscribers ignore—and Providers relegate to a short footnote—the Eleventh Circuit's unambiguous holding in *Procaps*: "Our precedent makes clear that just because an agreement is capable of being characterized as a market allocation agreement does not mean that the per se rule applies." Plaintiffs also ignore the repeated decisions applying the rule of reason to horizontal market allocations in the decades since *Sealy* and *Topco*. These decisions—including *Actavis*, *American Needle*, *Procaps*, and *Valley Drug*—demonstrate even purely horizontal market allocations with plausible pro-competitive justifications must be analyzed under the rule of reason.

Plaintiffs also ignore critical facts, which make clear the restraints challenged here are the precise sort of conduct to which the rule of reason applies; the evidence is certainly not *undisputed* that the per se rule is appropriate. ***First,*** the evidence fails to demonstrate any "agreement" that is properly policed by Section 1 of the Sherman Act, both because Defendants act as a single entity with respect to governance of the use of the Blue Marks, and because exclusive service areas evolved from common law trademark rights, not concerted agreements among competitors.

***Second***, the Blue System has real, plausible, and unrefuted procompetitive benefits. Through collaboration, the Blue System stitches together local Plans' networks to create coast-to-coast coverage with a local focus and dedication. Even the largest Plans could not do that alone,

and no competitor does that today. Plaintiffs do not seriously dispute these procompetitive benefits. Instead, they return to labels, insisting that such benefits can be considered only if a restraint is "necessary" for a "new product" to exist at all. This position is legally incorrect (as shown by their own case law) and factually irrelevant (as Defendants meet this standard in any event).

*Third*, Plaintiffs fail to contend with the unique history of the Blue System, which confirms the challenged services areas are not the result of purely horizontal agreements.

*Fourth,* Plaintiffs have not—and cannot—point to a single case where a Court has applied the per se rule to anything resembling the kind of economic and procompetitive integration that defines the Blue System. This also, alone, defeats application of the per se rule.

Plaintiffs' arguments with respect to the best efforts and uncoupling rules are even less plausible. These other rules do not fall into any potential per se category, and so Plaintiffs attempt to bootstrap them to their service area arguments. But because service areas are subject to the rule of reason, these other rules necessarily are as well. In fact, none of Plaintiffs' numerous complaints even mentions, much less challenges, the uncoupling rules.

Providers' BlueCard arguments likewise fail. BlueCard is a key embodiment of the Blue System's productive cooperation. It offers enormous benefits to subscribers and providers. The notion that undisputed evidence establishes that BlueCard constitutes naked price-fixing with no plausible redeeming virtues is baseless—particularly in light of Subscribers' clear statement that they "are ***not*** challenging" that program. (Sub. Br. at 37 (emphasis in original).)

There is no basis in law, fact, or economics for the Court to summarily condemn a System that has been operating in the open without challenge by the DOJ or FTC for decades. To condemn the Blue System as per se unlawful—without the need for any detailed economic analysis—would be unprecedented in judicial history. Plaintiffs' motions should be denied.

## STATEMENT OF FACTS

Defendants do not dispute Paragraphs 1–6, 8, 10, 18, 26, 28, 30, 32, 36, 39, 40, 43, and 44 of Providers' statement of facts, and Paragraphs 2–6, 9, 15, 16, and 17 of Subscribers' statement of facts. Defendants dispute the balance of Plaintiffs' proposed facts, as set forth below.

**I.      Defendants' Response To Providers' Statement of Facts ("PSF")**

7.      **Disputed.** In certain limited circumstances, primarily ceded National Accounts and Government Programs, as specified in the License Agreements, a Plan may sell insurance outside of its service area using the Blue Marks. (*See* Sub. Ex. 121, BCBSA03877386 at 7393; *see also*, *e.g.*, Prov. Ex. 7, BCBSA-CID-020329 at 0496–0501.)

9.      **Disputed.** Providers' statement that "no more than one Plan can bid for any given National Account using the Blue marks" is inaccurate. As reflected in Providers' cited exhibit, in the limited instances of overlapping service areas, more than one Plan may bid for the business of a National Account. (*See* Prov. Ex. 7, BCBSA-CID-020329 at 0493.)

11.      **Disputed.** Providers' characterization of the Best Efforts rules as requiring a certain percentage of Blue-branded "annual revenue" from a Plan and its "subsidiaries" is inaccurate. Providers' Exhibit 9 makes clear that the Membership Standard applies only to "Health Revenue" (as defined in Membership Standard 10 and its related Guideline), not total revenue. (Prov. Ex. 9, BCBSA-CID-013850 at 3883.) ███████████████████████████████████████

█████████████████████████████████████████████████████████████ (*Id.*)

12.      **Disputed.** ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (*See* Def. Ex. 128, BCBSA-CID-020329 at 0394.) This policy prohibits price discrimination by providers. (Prov. Ex. B, 5/23/2017 D. Strachan Dep. Tr. at 37:12–17.) Contrary to Providers' assertion that "Plans

have agreed" to reimburse a provider at the rate contained in the provider's contract with the local Plan, the BlueCard Program policies were implemented by vote of the BCBSA Board of Directors ("BCBSA Board"). (*See* Def. Ex. 47, BCBSA00228287 at 8296.)

13.     **Disputed.** Defendants do not dispute that participation in BlueCard is a requirement of the License Agreement between BCBSA and each individual Plan. However, Providers' assertion that all contracted providers must participate in the BlueCard Program is incorrect. Inter-Plan Program Policies explicitly contemplate a Plan creating provider networks that are not made available to BlueCard-eligible Members. (Def. Ex. 128, BCBSA-CID-020329 at 0512.)

14 & 15.     **Disputed.** PSF ¶¶ 14 and 15 are not demonstrated by the cited exhibits. Providers' Exhibit C lists areas in which more than one Plan was licensed to use the Blue Cross or Blue Shield names and marks, and does not state that those Plans "competed against each other." Some Plans licensed to use the same Mark in the same area and which appear on this list did not compete against each other, such as the Maryland and National Capital Area Plans in the case of the Blue Cross. (Sub. Ex. 159, 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 110:11–111:9.) For the identified Blue Shield Plans, one example is Lewistown Blue Shield/Blue Shield of Idaho and Blue Cross of Idaho, the latter of which surrendered its license to use the Blue Shield in Idaho because it was not using the mark. (Def. Ex. 129, 4/12/2017 M. Rotunno 30(b)(6) Dep. Tr. at 233:3–233:13.)

16.     **Disputed.** PSF ¶ 16 is not demonstrated by the cited exhibits. BCBSA's Answer admits only that "more than one Blue Plan is licensed to use the Blue Cross and/or Blue Shield Marks" in the states Providers list, not that this constitutes "overlapping service areas." (BCBSA Answer ¶ 302.) In California, Idaho, and Pennsylvania, the Plans have licenses to use different Marks— one Plan has a Blue Cross license, and the other has a Blue Shield license. (Prov. Ex. 6, BCBSA03879017 at 9018, 9031–32.) In Washington, the Plans have licenses to use different

Marks, with the exception of one county, in which two Plans have a Blue Shield license. (*Id.* at 9034.) In New York, there are fourteen counties with multiple Licensees, and in half of those counties Plans have the right to different Marks. (*Id.* at 9026–9027.) In Georgia and Ohio, one Plan has a statewide license to use the Blue Marks, while another has a license in a small number of counties but does not operate there. (*Id.* at 9028; Def. Ex. 130, NAIC enrollment data excerpts.)

17.     **Disputed**. Providers' statement that "[w]ithout exclusive service areas, the Plans are potential competitors" is inaccurate. The only evidence cited in support is a statement in Professor Murphy's report, which he subsequently clarified that he does not know whether Plans would have a legal right to use the Blue marks nationally if exclusive service areas were eliminated:

> [W]hen I talk about eliminating service areas as an economic analysis, I'm saying switching to a world where Blue Cross-Blue Shield plans from elsewhere would . . . have the right to use the Blue Cross-Blue Shield marks in a given area. So, in my report, when I talked about eliminating ESAs and the impact that eliminating the ESAs would have, I'm presuming they would allow the plans to come in because, obviously, if there are other reasons legally that they couldn't use the marks, then eliminating the ESAs wouldn't have the same economic effect because it wouldn't change the behavior that firms can engage in.

(Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. 135:3–15.)

19.     **Disputed.** There is no support for the statement that "Plans refer to unauthorized competition among Plans as 'Blue Sharking.'" Providers misleadingly cite a pleading filed decades ago by a party to litigation adverse to BCBSA as a pronouncement of "undisputed fact" as to how "Plans" currently "refer to unauthorized competition." (*See* Prov. Ex. 10, BCBSA00124434.)

20.     **Disputed.** Providers' statement regarding what "Anthem" would like to do is contrary to the cited testimony, which referred to activities under the Cigna brand pursuant to an Anthem/Cigna merger that did not come to fruition. (*See* Prov. Exs. G–H.)

21.     **Disputed.** Providers' statement that BCBS of Alabama "has identified gaining National Accounts in other states as key to its future growth" is inaccurate. Providers' Exhibit 11 merely

shows that ten years ago, one employee identified what she believed to be one "growth opportunit[y]" for that Plan at that time. (Prov. Ex. 11, BCBSAL_0000286752 at 6752.)

22.     **Disputed.** Providers' statement that BCBS of Alabama "terminated" twenty-nine contiguous county hospital "contracts because it could obtain lower reimbursement rates through the BlueCard program" is inaccurate. The exhibit does not support the characterization that the contracts were "terminated" or that any decision was made "because" Alabama "could obtain lower reimbursement rates through the BlueCard program." In fact, Providers' cited exhibit directly refutes their assertion. (Prov. Ex. I, 2/23/2017 A. Baker Dep. Tr. at 258:10–12 ("[W]e ha[d] no idea what those payments in those states [were] going to look like.").) Moreover, the exhibit explains the reason Alabama began contracting with contiguous county hospitals in the first place was because, prior to BlueCard, to provide subscribers access to the closest care, it "had to direct-contract with them." (Def. Ex. 132, 2/23/2017 A. Baker Dep. Tr. at 251:17–252:10.)

23.     **Disputed.** Providers' statement that "[a] Home Plan that pays a provider through the BlueCard program must pay the Host Plan an 'access fee'" is contradicted by the cited exhibit.

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ (Def. Ex. 128,

BCBSA-CID-020329 at 0409; *see also* Def. Ex. 149, BCBSA01684414 at slide 3 ███████████

███████████████████████████████████

24.     **Disputed.** Prior to the adoption of the approval standards promulgated by Associated Medical Care Plans, local Plans used a simple design of a blue shield in their local areas. (Def. Ex. 29, BCBSA00364277 at 4277; Def. Ex. 129, 4/12/2017 M. Rotunno 30(b)(6) Dep. Tr. at 118:6–119:20.) Starting in 1950, local Plans that met the approval standards of the Associated

Medical Care Plans used the words "Blue Shield" and the "symbol consisting of a shield colored blue, with or without a caduceus superimposed thereon." (Def. Ex. 29, BCBSA00364277 at 4278.)

25.     **Disputed.** Providers' statement that the Blue Shield Medical Care Plans' applications for the Blue Shield marks "did not identify any concurrent users of the marks" is not accurate. For the federal service mark applications cited in PSF ¶ 25, BSMCP submitted declarations and letters prior to registration explaining that the marks were used by "Blue Shield member organizations" or the "70-odd members" of BSMCP "which are authorized by the applicant to use the Blue Shield mark" with BSMCP's consent and control. (Def. Ex. 24, Trademark Application 71/616,543 at 14; Def. Ex. 28, Trademark Application 71/606,403 at 14.)

27.     **Disputed.** PSF ¶ 27 is not demonstrated by the cited exhibit. Rather, BSMCP Member Plans were nonprofit medical care plans that met BSCMP's standards and identified themselves by the Blue Shield mark and name. (Prov. Ex. O; *see also* Def. Ex. 29, BCBSA00364277 at 4277.)

29.     **Disputed.** Providers' statement that the American Hospital Association's applications for the Blue Cross marks "did not identify any concurrent users of the marks" is not accurate. For each federal service mark application cited in PSF ¶ 29, the AHA submitted letters and declarations prior to registration stating that the AHA "permits other concerns to use the mark subject to control" and that the marks were used by "related companies who are controlled by the applicant in respect to the nature and quality of the services in connection with which the mark is used . . . ." (Def. Ex. 20, Trademark Application 71/531,753 at 21; Def. Ex. 22, Trademark Application 71/536,214 at 29; Def. Ex. 23, Trademark Application 71/549,601 at 30.)

31.     **Disputed.** Membership in the Blue Cross Association consisted of non-profit hospital service plans that met the approval standards of the AHA and used the Blue Cross marks and name owned by the AHA. (Def. Ex. 133, BCBSA02720970 at 0977; Def. Ex. 118, BCBSA02909429

at 9429.) The cited exhibits do not state that the BCA derived its authority from member plans; the BCA was managed by a Board of Governors, which included non-Plan representatives from the AHA. (Def. Ex. 133, BCBSA02720970 at 0981–0982.)

33.   **Disputed.** . (Prov. Ex. 15, BCBSA00149422 at 9426.)

34 & 35.   **Disputed.** The versions of the Propositions cited in PSF ¶ 34 were not implemented completely, and the versions ultimately adopted through BCBSA governance contained an exception that applied in certain circumstances ███████████████████████ ███████████████████████████████ (Prov. Ex. 17, BCBSA00068913 at 8915.)

37.   **Disputed.** Providers' Exhibit U does not allege that the license agreements constitute a per se violation or that the use of service areas specifically violates the Sherman Act. (Prov. Ex. U, BCBSA00124500 at 4505.) In addition, while the settlement was in effect, the Ohio Plans suffered a "serious degradation of overall condition," including "steady decline in the collective enrollment, service and financial conditions." (Def. Ex. 134, BCBSA01133010 at 3013, 3012.) Overlapping use of the Blue Marks by the Ohio Plans also caused consumer confusion. (*Id.* at 3014.)

38.     **Disputed.** Providers' Exhibit 20 does not allege exclusive service areas are a per se violation of the Sherman Act. (Prov. Ex. 20, BCBSA02722338 at 2338–2339.) Moreover, the settlement was of limited duration. (*Id.* at 2342.)

41.     **Disputed.** The cited exhibits suggest United, Aetna, and Cigna offer some form of healthcare financing "plans and services nationwide" (Prov. Ex. EE at 2), a "broad range of . . . health insurance products and related services, many of which are available nationwide" (Prov. Ex. FF at 9), or "some or all of [their] products in all 50 states" (Prov. Ex. GG at 4). The exhibits do not show those insurers offer products in all parts of all 50 states, nor that their products are the same as or similar to those offered by Defendants.

42.     **Disputed.** The cited documents support the statements in PSF ¶ 42 for the year 2015 only. The cited documents do not support Providers' statements for any other year.

**II.     Defendants' Response To Subscribers' Statement of Facts ("SSF")**

1.     **Disputed.** ██████████████████████████████████████████████ (Sub. Ex. 5, BCBSA-CID-013038 at 3043 (emphasis added).) The cited exhibit does not show, however, that Plans are "fully" autonomous, as they are not. (*See, e.g.*, Def. Ex. 135, 7/25/2017 S. Serota Dep. Tr. at 104:20–105:12.) As just one example, Subscribers acknowledge that "BCBSA owns the Blue Cross and Blue Shield names and marks" and that each Plan has signed License Agreements with BCBSA to use the Blue Marks. (SSF ¶¶ 16, 17.) The License Agreements set forth terms and conditions to which Plans using the Blue Marks must adhere. (Def. Ex. 135, 7/25/2017 S. Serota Dep. Tr. at 104:20–105:12; *see also* Sub. Exs. 121, 122.)

7.     **Disputed.** Subscribers' characterization of the BCBSA Board in SSF ¶ 7 is inaccurate. In fact, Subscribers' Exhibit 35 establishes the opposite. (Sub. Ex. 35, 7/11/2017 K. Hedges 30(b)(6) Dep. Tr. at 24:19–23; 35:13–16.) It clearly states, BCBSA "is led by a CEO and president of the

Association, who has day-to-day accountabilities for the operations for Blue Cross Blue Shield Association as well as an executive team, much similar to any other corporation." (*Id.* at 25:1–10.)

8. **Disputed.** The Member Plans do not "control" the BCBSA Board. (*See, e.g.*, Sub. Ex. 35, 7/11/2017 K. Hedges 30(b)(6) Dep. Tr. at 56:4–57:9, 85:5–19; *see also* Def. Ex. 135, 7/25/2017 S. Serota Dep. Tr. at 99:18–100:6.) ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ (Sub. Ex. 5, BCBSA-CID-013038 at 3043.) The BCBSA Board consists of BCBSA's CEO and the Member Plan CEOs, each of whom acts in his or her fiduciary capacity to BCBSA when he or she sits on the Board. (Def. Ex. 135, 7/25/2017 S. Serota Dep. Tr. at 24:24–25:18; Sub. Ex. 37, BCBSA-CID-013360 at 3387–3388.)

10. **Disputed.** ███████████████████████████████████████████

████████████████████████████████████████ (Sub. Ex. 5, BCBSA-CID-013038 at 3060.)

11. **Disputed.** Subscribers' only support for the statement that the "Member Plans control the BCBSA" is SSF ¶¶ 5–10. Subscribers' cited exhibits refute that Member Plans "control" the BCBSA Board and the BCBSA Board "controls" BCBSA. (*See* Resp. SSF ¶¶ 7, 8, 10.) When acting as representatives of BCBSA Member Plans, Plan CEOs have fiduciary duties to BCBSA. (Def. Ex. 135, 7/25/2017 S. Serota Dep. Tr. at 24:24–25:18, 87:6–10, 99:18–100:6; Sub. Ex. 37, BCBSA-CID-013360 at 3387–3388; Sub. Ex. 35, 7/11/2017 K. Hedges 30(b)(6) Dep. Tr. at 38:15–19, 40:17–41:1, 56:4–12.) Thus, the assertion that Member Plans "control" BCBSA is not demonstrated by the cited paragraphs and is inaccurate. (*See also* Resp. SSF ¶¶ 5–10.)

12. **Disputed**. Subscribers' cited exhibits refute that Member Plans "control" the BCBSA Board and that the BCBSA Board "controls" BCBSA. (*See* Resp. SSF ¶¶ 7, 8, 10, 11.) In fact,

Subscribers admit that "[t]he Board of Directors of BCBSA governs BCBSA." (SSF ¶ 5; *see also* Sub. Ex. 35, 7/11/2017 K. Hedges 30(b)(6) Dep. Tr. at 36:15–22; Def. Ex. 135, 7/25/2017 S. Serota Dep. Tr. at 171:13–18.) Plan CEOs have a role in Blue governance. When acting in their capacity as BCBSA Board Members, however, Plan CEOs have fiduciary duties to BCBSA. (Resp. SSF ¶ 11.) In addition, the "President and all other officers at BCBSA" do not "serve at the pleasure of the Board of Directors." The cited provision only applies to Elective Officers, namely the President, Treasurer, and Secretary. (Sub. Ex. 5, BCBSA-CID-013038 at 3058–3060; Sub. Ex. 35, 7/11/2017 K. Hedges 30(b)(6) Dep. Tr. at 26:6–26:22.) The BCBSA Board does not have the power to fire other BCBSA officers. (Sub. Ex. 35, 7/11/2017 K. Hedges 30(b)(6) Dep. Tr. at 26:6–26:22.) Finally, in addition to the Member Plan CEOs, BCBSA's CEO sits on the BCBSA Board.

13.    **Disputed.** The Membership Standards are adopted and amended by an affirmative vote of three-fourths of Plans and an affirmative vote of three-fourths of the total then current weighted vote of all Plans (a "double-three-quarters vote"). (Sub. Ex. 121, BCBSA03877386 at 7395; Def. Ex. 122, BCBSA0387551 at 7559.) When Member Plans take part in a double-three-quarters vote, they are voting in their capacity as "fiduciaries for the Association and the Association's business." (Def. Ex. 135, 7/25/2017 S. Serota Dep. Tr. at 25:7–25:9; *see also* Sub. Ex. 37, BCBSA-CID-013360 at 3397; Sub. Ex. 5, BCBSA-CID-013038 at 3043.)

14.    **Disputed.** Board committees do not "govern" BCBSA. Rather, Subscribers acknowledge that the BCBSA Board, not Board committees, governs BCBSA. (*See* SSF ¶ 5.) ██████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ (Sub. Ex. 5, BCBSA-CID-013038 at 3054.)

18.    **Disputed.** The License Agreements do not establish service areas, but rather preserve and carry forward each Plan's pre-existing service area. (Sub. Ex. 121 at BCBSA03877392; Sub.

Ex. 122 at BCBA03877556.) ████████████████████████

████████████████████████████████████████

████████████████████████      (*Id.*)

19.    **Disputed.** Service areas arose not through agreement among Plans, but rather through the independent acquisition of common-law trademark rights and vertical licensing agreements, which permitted Plans to continue using the marks within the areas each Plan was already using them. (Def. Ex. 31, BCBSA00026888 at 6890; URMF ¶¶ 4, 14.) The subsequent iterations of the license agreements in 1972 and 1991 continued to recognize Plans' same, pre-existing service areas. (Def. Ex. 118, BCBSA02909429 at 9429; Def. Ex. 44, BCBSA0000001 at 0003; Def. Ex. 45, BCBSA00000054 at 0056; Defs. Ex. 4 & 150, 6/30/2017 R. Wilson 30(b)(6) Tr. at 116:8–11, 241:10–242:21, 244:1–245:20, 252:20–23, 253:24–254:5.) The Map Book "memorializes the defined service areas." (Sub. Ex. 9, 6/20/2017 R. Leahey Dep. Tr. at 170:5–8.)

20.    **Disputed.** The term "supermajority" is ambiguous and does not appear in any of the cited exhibits. Modification or termination of a license agreement requires a double-three-quarters vote. (Sub. Ex. 121, BCBSA03877386 at 7395.)

21.    **Disputed.** SSF ¶ 21 quotes only part of a sentence from the License Agreements. The full sentence provides exceptions pursuant to which Plans may use the Blue marks and names outside their service areas. (Sub. Ex. 121, BCBSA03877386 at 7393; *see* Resp. PSF ¶ 7.)

22.    **Disputed.** Subscribers' summary of the Best Efforts rules is incorrect, as explained in Response to PSF ¶ 11. (*See also* Sub. Ex. 176, BCBSA03879143 at 9176.)

23.    **Disputed.** The Best Efforts rules are not a "revenue cap." Nor do the cited exhibits establish that Plans "agreed" to these rules. BCBSA adopted the Local Best Efforts rules by a double-three-quarters vote to incentivize Plans to focus on Blue-branded business and build the value of the

Blue Marks in their service areas, and requires a Plan to derive at least 80% of its in-area health insurance revenue under the Blue brands. (Def. Ex. 49, BCBSA00260341 at 0358; Def. Ex. 50, BCBSA03879143 at 9176; URMF ¶ 23.) National Best Efforts was adopted by BCBSA through a double-three-quarters vote to ensure that Plans continued supporting national account activities and cooperating to compete successfully against national competitors, and requires a Plan to derive at least 66-2/3% of its national health insurance revenue under the Blue brands. (Def. Ex. 50, BCBSA03879143 at 9176; Def. Ex. 112, BCBSA00206094 at 6101–6102, 6132; URMF ¶ 25.)

24 & 25. **Disputed.** ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ (Def. Ex. 136, BCBSA03517981 at 7982.) Upon recommendation from the BCBSA Board, the Member Plans voted to adopt the Brand Regulations in 1999. (Def. Ex. 137, BCBSA00198947 at 8960–8966; Sub. Ex. 1, BCBSA-CID-013136 at 3225.) The exhibit cited in support of SSF ¶ 25 fails to even reference "uncoupling" or the 1999 vote to adopt uncoupling regulations. (Sub. Ex. 34, BCBSA's Response to June 2, 2016 Interrogatories (response to Interrogatory No. 5).)

26.     **Disputed**. The License Agreement states that BCBSA may impose monetary fines on a Plan that uses the Blue Marks outside its service area, and that BCBSA may proceed to mediation and mandatory dispute resolution if the Plan fails to cure such a violation within 30 days. (Sub. Ex. 122, BCBSA03877551 at 7557–7558.) Only after 30 days' written notice and an opportunity to be heard can a Plan's license be terminated by a double-three-quarters vote. (*Id*. at 7573.)

27.     **Disputed**. Service areas could not be eliminated by a double-three-quarters vote, because service areas derive from independently acquired common-law trademark rights. If all license agreements were terminated by a double-three-quarters vote, Blue trademark rights could revert back to the individual Plans that first held common-law rights. (URMF ¶¶ 4, 64; Def. Ex. 8, 4/12/2017 M. Rotunno 30(b)(6) Dep. Tr. at 36:1–9.)

28.     **Disputed.** None of the cited exhibits establish that Plans "agreed" to rules limiting acquisition of a Blue Plan by a non-Blue. BCBSA's License Agreement Standard 11, adopted by a double-three-quarters vote in 1994, and its associated Guidelines provide certain requirements that a Plan must meet to transfer its license to a non-Blue entity, and provides for termination of the license if those standards are not met. (Def. Ex. 50, BCBSA03879143 at 9185–9187.)

### III.     Defendants' Statement Of Additional Undisputed Relevant Material Facts

Defendants incorporate the Undisputed Relevant Material Facts, Paragraphs 1 through 52, from their July 17, 2017 Brief in Support of their Motion for Summary Judgment on Plaintiffs' Section 1, Per Se, and Quick Look Claims ("URMF"). Defendants further state as follows:

53.     In 1947, the United States Public Health Service ("USPHS") recorded the local area served by each Plan. (Def. Ex. 1, BCBSA00289695 at 9720–24, 9853–54, 9951–54.) For example, the USPHS recorded that with respect to the Blue Cross Plan in Alabama, the date of first enrollment was April 1936, the enrollment by January 1, 1947 was 174,822, and the area served by the Plan was the entire state of Alabama. (*Id.* at 9722.) On the Shield side, the USPHS recorded that the date of first enrollment was 1945, the enrollment as of January 1, 1947 was 45,791, and the area served by the Plan was the entire state of Alabama. (*Id.* at 9853.) The Alabama Plan extensively used the Blue Cross and Blue Shield names and symbols. (Def. Ex. 7, BCBSAL_0001466350.)

54.     Beginning in the 1950s, the AHA and BSMCP began recording the local areas served by each Plan. (Def. Ex. 150, 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 241:10–246:3.) For example,

the 1952 manual created by the Blue Cross Commission (a division of the AHA) notes that the area served by Blue Cross of Alabama was the entire state of Alabama. (Def. Ex. 138, BCBSA00035009 at 5016.) The Blue Cross Association (at the time a subsidiary of AHA) updated this document again in 1960, and every year thereafter through at least 1977. (Def. Ex. 139, BCBSA00291289 at 1291.) The 1977 version, for example, again notes that the area served by the Blue Cross Plan in Alabama was the entire state of Alabama. (*Id*. at 1300.)

55.     On the Shield side, in 1950, BSMCP recorded the local area served by each Plan. (Def. Ex. 140, BCBSA00021277 & BCBSA00021335.) This document was updated every year through 1970, and then continued to be updated to at least 1982. (*Id.*; Def. Ex. 141, BCBSA00039220.) The 1976 version, for example, again notes that the area served by the Blue Shield Plan in Alabama was the entire state of Alabama. (Def. Ex. 142, BCBSA00027584.) BCBSA continues to maintain and update this manual. (*See* Prov. Ex. 6, BCBSA03879017; Def. Ex. 150, 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 51:5–53:5; 241:10–246:3.)

56.     Instances of multiple Plans using the same Mark in the same area were generally sporadic, temporary, and limited to a small number of counties within a state. (Ex. 8, 4/12/2017 M. Rotunno 30(b)(6) Dep. Tr. at 47:18–48:17; Ex. 16, Rotunno Dep. Ex. 002-A; Ex. 4, 6/30/2017 R. Wilson 30(b)(6) Dep. Tr. at 63:21–64:11.)

57.     Plan mergers did not reallocate service areas; the merged Plan had the combined area. (*See* Def. Ex. 143, BCBSAS00717856–7857; Def. Ex. 144, [1970 Blue Shield Service Areas]; Def. Ex. 142, BCBSA00027584; *see also*, *e.g.*, Def. Ex. 151, BCBSA00125452.)

58.     Plans adopted and used the Blue Cross and Blue Shield trademarks in their service areas prior to the creation of the 1950s license agreements. *See, e.g.*, Def. Exs. 7 (Alabama); 26 (California); 152 (Florida); 23 (Georgia); 23 (Illinois); 153 (Louisiana); 20 (Maryland); 6, 22,

154 (Massachusetts); 26 (Michigan); 20, 155 (Minnesota); 26 (New York); 156 (North Carolina),

20 (Ohio); 22–23 (Pennsylvania); 157 (South Carolina); 22 (Tennessee); 23 (Utah).

59.     BCBSA Board Members have fiduciary duties to BCBSA. (Def. Ex. 135, 7/25/2017

S. Serota Dep. Tr. at 24:24–25:18; Sub. Ex. 37, BCBSA-CID-013360 at 3387–88.) Plan CEOs

must and do act in the best interest of BCBSA and the Blue System when acting as BCBSA Board

Members, even if doing so may conflict with the interest of their individual Plans. (*See, e.g.*, Def.

Ex. 145, BCBSA01188694 at 8696 ███████████████████████████████████

███████████████████████████████████ Def. Ex. 146, BCBSA00199003

at 9015–16, 9035–36 ██████████████████████████████████████████████

██████████ *see also* Sub. Ex. 35, 7/11/2017 K. Hedges 30(b)(6) Dep. Tr. at 58:1–61:12.)

60.     As owner of the Blue Marks, it is critical that BCBSA prevent transfer of goodwill to other

names and marks. (*See* Def. Ex. 136, BCBSA03517981 at 7982; Def. Ex. 147, BCBSA01174918

at 4920.) BCBSA adopted the uncoupling rules for this purpose. (*See* Resp. SSF ¶¶ 24–25.)

61.     ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████ (Def. Ex. 136, BCBSA03517981

at 7997.) ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████ (Def. Ex. 147, BCBSA01174918 at 4920.)

62.     Rather than categorically prohibit Licensees from using the Blue Marks in connection with

other names, BCBSA adopted a less restrictive alternative. (*See, e.g.*, Sub. Ex. 1, BCBSA-

16

CID-013136 at 3225; *see also* Def. Ex. 136, BCBSA03517981 at 7988.) A Plan may choose to use a name in connection with the Blue Marks, but, for the above-stated reasons, the Plan may not later uncouple that same name from the Blue Marks. (Sub. Ex. 1, BCBSA-CID-013136 at 3225.)

63.     Through BlueCard, Plans are able to harness their strong local focus, while providing seamless national delivery. (Def. Ex. 32, K. Murphy Rep. at ¶ 49; Def. Ex. 135, S. Serota 7/25/2017 Dep. Tr. at 223:21–224:23.) As Defendants recognized decades ago, effectively competing with national commercial insurers requires Plans to act as a "cohesive national unit[]." (Def. Ex. 40, BCBSA00144148 at 4148.) The challenged rules allow "the Blue system to meet the needs of national employers and to operate efficiently for all customers," while incentivizing each Plan to "focus its competitive efforts under the Blue Marks in a defined geographic area." (Def. Ex. 32, Murphy Rpt. ¶¶ 58–62; Def. Ex. 135, S. Serota 7/25/2017 Dep. Tr. at 63:10–64:4, 221:21– 225:9.) This local focus has long been a hallmark of Plans, differentiating them from national competitors. (Def. Ex. 40, BCBSA0014418 at 4148; Def. Ex. 42, BCBSA00031942 at 1955; *see also* Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. at 54:22–56:23; Def. Ex. 32, Murphy Rpt. ¶ 58.)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ (Def. Ex. 159, 8/9/2017 N. Dusang Dep. Tr. at 218:5–24.)

64.     Unlike their competitors, Plans generally do not limit their provider network as a way of negotiating lower provider reimbursement rates, but instead tend to include the vast majority of providers in their networks. (Def. Ex. 32, Murphy Rpt. ¶ 45.)

65.     A single Blue Plan (even a large Plan), could not compete for national accounts with the Blue Brand because, if all License Agreements were terminated, Plans' independently acquired common-law trademark rights could preclude them from building networks or marketing to

subscribers outside their areas with the Blue Brand. (Def. Ex. 8, 4/12/2017 M. Rotunno 30(b)(6) Dep. Tr. at 36:1–9; Def. Ex. 4, R. Wilson 6/30/2017 Dep Tr. at 263:2–20.) And even if a single Plan did gain the right to use the Blue Marks nationwide, Plans could not compete for national accounts nearly as efficiently on their own, and would likely lose the local focus characteristic of Plans today. (Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. at 193:3–194:23; Def. Ex. 32, Murphy Rpt. ¶¶ 70–71, 109, 111, 113; Def. Ex. 135, S. Serota 7/25/2017 Dep. Tr. at 224:24–225:9; Def. Ex. 159, 8/9/2017 N. Dusang Dep. Tr. at 109:19–116:7.) Professor Murphy explained, "[i]t would be wrong to assume that, without the challenged rules, BlueCard and other integrated products would continue to exist in their current form (or at all)." (Def. Ex. 32, Murphy Rpt. ¶ 111.)

## LEGAL STANDARD

As the moving party, Plaintiffs have the burden to demonstrate, through undisputed evidence, that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering Plaintiffs' motions, the Court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1209 (N.D. Ala. 2011) (Proctor, J.), *aff'd* 721 F.3d 1281 (11th Cir. 2013). If there is any disputed material fact, summary judgment must be denied and the court should apply the rule of reason at trial. *Id.*

## ARGUMENT

### I.    Plaintiffs' Motions Fail Because The Challenged Rules Are Not Governed By § 1 Of The Sherman Act.

Plaintiffs' arguments initially fail for the simple reason that § 1 (whether under the per se rule or the rule of reason) does not apply here because there is no concerted action. First, with respect to Plaintiffs' main challenge—governance of the use of the Blue Marks—Defendants function as a single entity incapable of concerted action under § 1. Second, service areas derive

from independently acquired common-law trademark rights, and not an unlawful agreement subject to § 1. Accordingly, the only potentially applicable section of the Sherman Act is § 2.

### A.    The Blue System Operates As A Single Entity With Respect To Governance Of The Use Of The Blue Brands.

As explained in Defendants' opening brief, joint conduct by formally separate entities is treated as the conduct of a single entity for a particular function, where the function is "controlled by a single center of decisionmaking . . . [and] a single aggregation of economic power" such that the conduct does not "deprive[] the marketplace of . . . independent centers of decisionmaking." (Def. Br. at 20 (quoting *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 194 (2010); *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768–69 (1984).) To make this determination, courts first define the particular function at issue, and second ask whether the affiliated entities have integrated the assets essential to perform that function. (Def. Br. at 20 (citing *Am. Needle*, 560 U.S. at 198, 200–01); *see also Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 600 (7th Cir. 1996) (explaining that it is essential to "ask *Copperweld*'s functional question one league at a time—and perhaps one facet of a league at a time . . . [so as not to] rule out the possibility that an organization such as the NBA is best understood as one firm when selling broadcast rights to a network in competition with a thousand other producers of entertainment, but is best understood as a joint venture when curtailing competition for players who have few other market opportunities.").)

Plaintiffs' briefs make clear that the function at the core of their case is the governance of the use of the Blue Marks. Plaintiffs' own proposed facts establish the Blue System's single-entity status with respect to this function. Plaintiffs admit that BCBSA "owns the Blue Cross and Blue Shield names and marks," that no Plan has ever owned the assets necessary to govern the use of the Blue Marks nationwide, and that Plans integrated their separate common law or state law

19

intellectual property assets into national organizations, which also held federal registrations.[1] (PSF ¶¶ 4, 25–26, 29–30; SSF ¶¶ 16–17; *see also* URMF ¶¶ 12–14.) These undisputed facts distinguish Defendants from the defendant-teams in *American Needle*, which retained separate ownership of their IP rights. (Def. Br. at 21–22 (citing *Am. Needle*, 560 U.S. at 200–01).) The Blue System's pooling of separately held assets to create a bundled IP asset owned by a "single aggregation of economic power," *Am. Needle*, 560 U.S. at 194, places this case squarely within post-*American Needle* decisions such as *Washington* and *Spinelli*, both of which held that the NFL and its teams constitute a single economic entity when selling products that reflect bundled IP rights. (Def. Br. at 22–23 (citing *Washington*, 880 F. Supp. 2d at 1006; *Spinelli*, 96 F. Supp. 3d at 114).) Defendants are thus incapable of conspiring in violation of § 1 with respect to the nationwide governance of the use of the Blue Marks.

### B. Service Areas Derive From Common-Law Trademark Rights, Not An Unlawful Agreement To Allocate Markets.

Plaintiffs' claims are not governed by § 1 for the additional reason that Plan service areas stem from pre-existing common-law trademark rights, not an unlawful agreement to allocate markets. (Def. Br. at 24–25 (citing *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 365–66 (11th Cir. 1997); *VMG Enters., Inc. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648, 657 (D.P.R. 1992).) Plaintiffs baldly assert that "there can be no dispute that exclusive service areas were allotted to the Blue Members." (Sub. Br. at 26.) Yet Plaintiffs cite no evidence—let alone undisputed evidence—that exclusive service areas were created by the

---

[1] Plaintiffs point to individual Plans' "independent and autonomous businesses" with separate Boards and their "own senior management," seemingly to suggest that the Blue System cannot be a single entity for any antitrust purposes. (Sub. Br. at 22.) But this is not the law. If it were, only consolidated businesses would fall within the single-entity doctrine—defeating the very purpose of the doctrine. *E.g.*, *Am. Needle*, 560 U.S. 183, 192–96; *Texaco Inc. v. Dagher*, 547 U.S. 1, 5–8 (2006); *Washington v. Nat'l Football League*, 880 F. Supp. 2d 1004, 1006 (D. Minn. 2012); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 114 (S.D.N.Y. 2015).

BCBSA license agreements. Quite the opposite, exclusive service areas derive from pre-existing common-law trademark rights that date back to the 1930s.

Common-law trademark rights are acquired through *use* in a geographic area. *E.g.*, *Allard Enters., Inc. v. Adv. Programming Res., Inc.*, 249 F.3d 564, 572 (6th Cir. 2001). And the undisputed evidence shows that Defendants used the Blue Marks continuously in their service areas since long before the challenged license agreements came into existence.[2] (URMF ¶¶ 4, 56.)

Plaintiffs' contrary arguments have no basis. **First**, Subscribers assert that a "trademark license may not be used to avoid Sherman Act liability." (Sub. Br. at 39 (internal quotation marks omitted).) But Defendants do not seek to avoid the Sherman Act; Defendants simply assert that Plaintiffs' claims are at most governed by § 2 rather than § 1.

**Second**, Plaintiffs argue that the mere fact that the licenses recognize pre-existing service areas somehow converts *lawful* trademark rights into an *unlawful* conspiracy. (Sub. Br. at 41–42.) But an agreement that does not "create a trademark territorial division [but] merely recognized it" does not violate § 1. *VMG Enters.*, 788 F. Supp. at 657. And, the license agreements that BCBSA's predecessors entered into with Plans (including predecessors AHA and AMA/AMCP) were vertical and indisputably lawful. (Prov. Br. at 16; *infra* at 41–42.) *Procaps* squarely holds that a lawful agreement does not constitute concerted action within the scope of § 1. *See Procaps S.A. v.*

---

[2] Plaintiffs' argument that Defendants must prove each Plan had no intent to benefit from the goodwill of prior users or to expand is wrong. (Sub. Br. at 39 & n.43.) First, only senior users of a mark may challenge the priority of junior users, *Emergency One, Inc. v. Am. Fire Eagle Engine Co., Inc.*, 332 F.3d 264, 272 (4th Cir. 2003), and such a dispute would be time-barred because Blue Plans have openly used the marks for 80 years. 15 U.S.C. § 15(b); *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1347 (11th Cir. 1996) (laches elements); *see generally* 3/6/14 Def. Reply ISO Mot. to Dismiss, Dkt. 178. Second, senior users can only exclude remote junior users that adopted the mark in order to "cause confusion" and deprive the senior user of his established "good will and reputation." *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1026 (11th Cir. 1989); *see also Hanover Star Milling Co. v. D. D. Metcalf*, 240 U.S. 403, 415 (1916) (requiring "design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like"); *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 101 (1918) (requiring "sinister purpose"). There is no evidence here, much less undisputed evidence, that Plans sought to appropriate other Plans' goodwill with a "sinister purpose."

*Patheon, Inc.*, 845 F.3d 1072, 1081 (2016) ("Therefore, although Section 1 specifically references contracts, we have held that a contract can serve as the basis for a Section 1 claim only if it embodies an agreement to unlawfully restrain trade.").) Rather, Plans independently acquired common law trademark rights in their respective service areas through use of the Blue Marks. (URMF ¶ 4.) Those rights enabled a Plan to exclude others from using the Marks in its area. (*Id.*)

**Third**, the reference in the current license agreement to the areas in use as of 1972, as opposed to the 1950s, is of no moment. (Prov. Br. at 18.) When Plans transferred their rights to the national organizations in the 1950s, those organizations licensed each Plan to use the Marks in the same, pre-existing area the Plan was already serving. (URMF ¶ 14.) Subsequent iterations of the license agreements in 1972 and 1991 continued to acknowledge these same areas. (Resp. SSF ¶ 19; URMF ¶ 14.) Any mergers simply combined the merging Plans' pre-existing areas. (URMF ¶ 57.) Thus, the areas served by the Plans in the 1950s and in 1972 are one and the same.

**Finally**, Providers suggest that using the brands when contracting with providers "bear[s] no relation to [Plans'] pre-existing rights." (Prov. Br. at 20.) Unsurprisingly, Providers fail to cite any facts or cases supporting this assertion; trademark rights apply equally to purchasing inputs as to selling outputs. *See, e.g.*, *Babbitt Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1174–75 (11th Cir. 1994) (holding licensee who bypassed licensor and directly ordered goods from licensor's manufacturer liable for trademark infringement); *Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982) (reversing bench trial verdict and holding that defendant violated the Lanham Act where use of similar trademark confused defendant's supplier).

Because the undisputed evidence shows exclusive service areas derived from Plans' pre-existing, exclusive common-law trademark rights, not any unlawful agreement, the per se rule does not apply. Plaintiffs' motions for summary judgment should be denied.

## II.  Plaintiffs Have Not Carried Their Burden Of Demonstrating Through Undisputed Facts That The Challenged Rules Are Subject To The Per Se Rule.

Plaintiffs do not seriously dispute that the Blue System has substantial procompetitive benefits. Instead, they argue that the Court must ignore such benefits because they affixed the label "horizontal market allocation" and "price fixing" to describe Defendants' conduct. (Sub. Br. at 2; Prov. Br. at 11.) This is wrong as a matter of law and fact.

Binding precedent provides that, "a presumption exists that the circumstances of a case will be looked at in the light of the rule of reason standard and will not be deemed per se unreasonable." *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 746 (11th Cir. 1998); *see also Dagher*, 547 U.S. at 5 ("[T]his Court presumptively applies rule of reason analysis."). To escape this presumption, Plaintiffs must show—*through undisputed evidence*—an agreement that (1) is purely horizontal, (2) has no plausible procompetitive benefit, and (3) has had its anticompetitive character confirmed by lengthy judicial experience. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007); *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 771–73 (1999); *Procaps*, 845 F.3d at 1083. Plaintiffs have not established through undisputed evidence the prerequisites for application of the per se rule. Their motions for summary judgment should be denied and the rule of reason applied at trial.[3]

Similarly, this is not a ruling that can be deferred to trial. Because the per se rule is limited to the narrow class of restraints that meet all three requirements above, the existence of *any* factual dispute on *any* of those issues necessitates that the presumptive rule of reason apply. *See, e.g., id.* at 1079, 1084 (denying summary judgment on per se claim, and granting defendant's cross-motion, where "some procompetitive efficiencies . . . might flow from" horizontal market

---

[3] Indeed, the fact that Plaintiffs needed 78 pages of briefing and 281 exhibits to argue that these elements are undisputed alone shows they are not.

allocation); *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1549–51 (11th Cir. 1996) (affirming summary judgment *for defendant* where plaintiff "has not proven" an agreement warranting per se treatment). Plaintiffs have previously and correctly acknowledged that the Court should decide this issue on summary judgment (Dkt. 398, 8/19/2016 Hr'g Tr. at 36:25–38:7), and this Court has recognized "the mode of analysis is certainly a question of law" (Dkt. 204 at 12). Indeed, the law so requires. *See, e.g.*, *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) ("*Per se* treatment is appropriate [o]nce experience with a particular kind of restraint enables *the Court* to predict with confidence that the rule of reason will condemn it.") (emphasis added) (internal quotation marks omitted); *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 833 (3d Cir. 2010) (holding applicability of quick look is a question for the court with "no application to jury inquiry"); *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 596 (11th Cir. 1986) ("Whether to apply a per se or rule of reason analysis is a question of law. . . ."); K.F. O'Malley, *et al.*, 3A Fed. Jury Prac. & Instr. § 150:22 (6th ed. 2012) ("[W]hether a particular restraint is properly analyzed under the rule of reason or a per se rule is a question of law for the court to decide.") (citing *Khan*, 522 U.S. at 10).

### A.    Plaintiffs Have Not Proven Through Undisputed Evidence That The Blue System Has No Plausible Procompetitive Benefits.

#### 1.    Plaintiffs must disprove any plausible procompetitive benefits to sustain a per se claim.

Plaintiffs' core argument is that the per se rule must apply simply because they invoke the "horizontal market allocation" label. According to Plaintiffs, affixing this label prevents the Court from considering the Blue System's numerous procompetitive benefits (which Plaintiffs hardly dispute). This view flatly contradicts established Supreme Court and Eleventh Circuit law.

| Plaintiffs | Supreme Court | Eleventh Circuit |
|---|---|---|
| "[T]he *per se* rule applies to market allocation and price fixing whether or not it is procompetitive." (Prov. Br. at 1.)<br><br>"As noted, in the isolated case where the Eleventh Circuit strayed from using a *per se* standard for a market allocation scheme, the Supreme Court unanimously and summarily reversed that decision." (Sub. Br. at 21.) | The rule of reason governs a horizontal market allocation where "anticompetitive consequences will at least sometimes prove unjustified" and "offsetting or redeeming virtues are sometimes present." *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2236–37 (2013).<br><br>"[D]eparture from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58–59 (1977).<br><br>"[E]asy labels do not always supply ready answers." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8 (1979) ("*BMI*"). | "Our precedent makes clear that just because an agreement is capable of being characterized as a market allocation agreement does not mean that the per se rule applies." *Procaps*, 845 F.3d at 1083.<br><br>"[A]llocation of territories is not always the kind of territorial market allocation that triggers antitrust liability." *Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F.3d 1294, 1305 (11th Cir. 2003). |

This disconnect is not surprising; Plaintiffs largely ignore the Supreme Court's and Eleventh Circuit's most recent horizontal market allocation cases.

First, both briefs completely ignore the Supreme Court's most recent horizontal market allocation case. *Actavis* involved a temporal market allocation: a branded drug manufacturer and potential generic competitors agreed the generics would not enter the market until 2015 in exchange for the branded manufacturer paying tens of millions of dollars and dropping its patent-infringement suit.[4] 133 S. Ct. at 2229. Nevertheless, the Court recognized the possibility of "offsetting or redeeming virtues" and therefore held the rule of reason governed. *Id*. at 2236.

---

[4] The Eleventh Circuit and other courts have recognized the agreements at issue in cases such as *Actavis* and *Valley Drug* are market allocations. *See, e.g.*, *Procaps*, 845 F.3d at 1083 ("*Valley Drug* involved what could reasonably be described as a series of market allocation agreements . . . ."); *In re Ciprofloxacin Hydrochloride Antitrust Litig*., 261 F. Supp. 2d 188, 255 (E.D.N.Y. 2003) ("All patent license agreements are market allocation agreements. . . .").

Similarly, in *Valley Drug* (which Subscribers cite affirmatively (Sub. Br. at 21) but Providers ignore), the Eleventh Circuit *reversed* a district court's application of the per se rule to a similar agreement—even though the underlying patent had been declared invalid. 344 F.3d at 1303–09. Ignoring potential "offsetting or redeeming virtues" in a horizontal market allocation case cannot be reconciled with *Actavis* and *Valley Drug*.

Both briefs also fail to acknowledge *American Needle* as a horizontal market allocation case. There, the defendant-teams were potentially competing suppliers of intellectual property. Rather than compete for potential customers (licensees), the teams allocated those customers to NFL Properties, which then licensed exclusively to Reebok. 560 U.S. at 187. The teams agreed not to compete for other potential licensees, such as American Needle. *Id.* Thus, the teams collectively agreed to restrain the extent to which they could compete outside the exclusive license, and placed an absolute limit on the ability to generate licensing revenue outside of the exclusive license. *Id.* at 196–97. This is exactly how Subscribers define a market allocation in their brief. (Sub. Br. at 28–29.) Despite this horizontal customer allocation, the Court applied the rule of reason because the teams' cooperative nature gave them "a perfectly sensible justification for making a host of collective decisions." 560 U.S. at 202.

Last but not least, Subscribers ignore (and Providers relegate to a two-sentence footnote) the Eleventh Circuit's most recent market allocation case—*Procaps S.A. v. Patheon, Inc. Procaps* involved a market allocation agreement between two actual or potential competitors. (*See* Def. Br. at 27–28.) One of those competitors further reinforced the market allocation by purchasing a third competitor. Yet, on summary judgment, the Court rejected the application of the per se rule at *any stage* of the arrangement's development. *Procaps*, 845 F.3d at 1083–84. The Court reaffirmed, "[o]ur precedent makes clear that just because an agreement is capable of being characterized as a

market allocation agreement does not mean that the per se rule applies." *Id.* at 1083; *see also Abadir & Co. v. First Miss. Corp.*, 651 F.2d 422, 426 (5th Cir. Unit A July 1981) (cited affirmatively by Plaintiffs) ("[C]ourts must be careful not to extend the per se treatment to a type of restraint literally falling within a per se category where the rationale of the generalization is not applicable."). Contrary to Subscribers' claim that "in the isolated case where the Eleventh Circuit strayed from using a *per se* standard for a market allocation scheme, the Supreme Court unanimously and summarily reversed that decision" (Sub. Br. at 21 (citing *Palmer*)), *Procaps* and *Valley Drug* are the controlling law in the Eleventh Circuit.

Providers try to distinguish *Procaps* because it involved a formal joint venture. (Prov. Br. at 31 n.8.) But, as Judge Posner explained in *Sulfuric Acid*, that distinction "is a non sequitur. If there were no joint venture, there would still be no per se violation for there would still be the legitimate business reasons for the defendants to have cooperated with DuPont—indeed nothing bearing on the economic consequences of the arrangement would be altered." *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1013 (7th Cir. 2012).

*Actavis*, *Valley Drug*, and *Polk Brothers* are further examples—none involved a formal joint venture. *Actavis*, 133 S. Ct. at 2236; *Valley Drug*, 344 F. 3d at 1303–09; *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 190 (7th Cir. 1985).

Ignoring these controlling cases, Plaintiffs fall back on *Sealy* and *Topco*. *United States v. Sealy, Inc.*, 388 U.S. 350 (1967); *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972). But in light of the many binding Supreme Court and Eleventh Circuit cases affirming that the rule of reason applies to horizontal market allocations with plausible procompetitive benefits, *Sealy* and *Topco* cannot control. Moreover, as explained in Defendants' opening brief, *Sealy* and *Topco* arose in different factual patterns. (Def. Br. at 39–41.) Subscribers' attempt to analogize this case

to *Sealy*, including their reference to Sugar Land Industries, fails for at least four reasons (Sub. Br. at 40–41), three of which also distinguish *Topco*.[5]

1.  **Prior Independent Trademark Rights**: Unlike Blue Plans, the *Topco* and *Sealy* licensees *never* possessed exclusive trademark rights in their own territories, let alone prior to the challenged agreement. (URMF ¶¶ 13–14.) *Sealy*, 388 U.S. at 352–54; *Topco*, 405 U.S. at 598–600, 601–02; *United States v. Sealy, Inc.*, No. 60 C 844, 1964 WL 8089, at *4–6, 17–18 (N.D. Ill. Oct. 6, 1964). Whether Sugar Land, the prior Sealy *licensor*, had trademark rights before the agreement among the *licensees*, is beside the point. Sugar Land was not part of the alleged conspiracy, and none of the alleged co-conspirators held prior trademark rights. This mismatch between the trademark owner on the one hand, and the alleged co-conspirators on the other hand, makes *Sealy* fundamentally different from the situation here, where the alleged conspirators *themselves* had prior common-law rights in their respective areas and thus had a pre-existing right to exclude others. This distinction is crucial because territorial agreements that recognize alleged co-conspirators' respective pre-existing trademark rights are governed by the rule of reason. *See VMG Enters.*, 788 F. Supp. at 657 (holding that defendants' "agreement for a territorial trademark division" was lawful because it "did not 'create' a trademark territorial division . . . it merely recognized it").

2.  **Reallocation of Territories**: Although Sugar Land might have owned the Sealy trademarks at some point, the restrictions at issue were *not* adopted during Sugar Land's ownership. Instead, the Sealy licensees obtained the trademarks from Sugar Land, *then* re-allocated territories, and continued to do so throughout the conspiracy. *Sealy*, 1964 WL 8089, at *17 (*Sealy* "shifted territory among licensees"). Thus, Plaintiffs' assertion that Sealy "continued to license [the trademarks] subject to the same territorial restrictions" that existed during the Sugar Land period (Sub. Br. at 40) is incorrect. The *Topco* licensees likewise reallocated territories throughout the conspiracy. *United States v. Topco Assocs., Inc.*, 319 F. Supp. 1031, 1037 (N.D. Ill. 1970), *rev'd*, 405 U.S. 596 (1972). Here, the BCBSA license agreements merely codified service areas as they already existed based on Plans' common-law rights and agreements that Providers largely admit were vertical. (URMF ¶¶ 4, 14, 21, 53–55; Resp. SSF ¶ 19; Prov. Br. at 16.)

3.  **Creation of an Integrated Product and Other Procompetitive Justifications:** There was no new product created in either *Sealy* or *Topco*. Rather, the defendants sold exactly the same products before and after the challenged arrangement. By contrast, new joint products—including BlueCard, which provides nationwide, but locally focused, Blue System healthcare financing to individuals, small groups and large groups—are at the heart of the Blue System and could not exist but for the operation of the Blue System as it has evolved. These otherwise unavailable products and

---

[5] This list is by no means exhaustive. The vast disparity between the complexity of the health insurance industry and the markets for mattresses and groceries and a host of other differences fundamentally separate the facts of this case from those in *Sealy* and *Topco*.

services depend on the challenged rules, the integration of Plan assets and operations, and each Plan's strength, focus, and quality. (URMF ¶¶ 9–27, 62, 64.)

4. **Price-Fixing:** When the licensees in *Sealy* adopted new territories, they also implemented a pervasive price-fixing scheme. Among other things, the conspirators agreed and set the specific retail prices at which Sealy products could be sold and advertised. 388 U.S. at 355. The Court's decision was laced with price-fixing facts, none of which are present in this case. As discussed below, Plans do not agree on fees charged to customers or specific discounts accepted from providers.

Indeed, one district court has already held that "[t]he facts of *Sealy* are clearly distinguishable" from Blue Plan service areas. *BCBSA v. Grp. Hosp. & Med. Servs., Inc.*, 744 F. Supp. 700, 719–20 n.7 (E.D. Va.), *aff'd*, 911 F.2d 720 (4th Cir. 1990). To the extent *Sealy* and *Topco* have any continued viability, they (like *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) are limited to naked market allocation or price-fixing agreements among competitors that have no potential benefits to competition or consumers.[6]

Plaintiffs' reliance on *General Leaseways v. National Truck Leasing Ass'n*, 744 F.2d 588 (7th Cir. 1984), hurts rather than helps their position. (Sub. Br. at 37; Prov. Br. at 33–34.) The Seventh Circuit explicitly recognized that *Sealy* and *Topco* are in "tension" with the Supreme Court's later decision in *GTE Sylvania*, which held preventing free-riding precludes application of the per se rule to a territorial restriction.[7] It did not need to reconcile those opinions because the defendants "ha[d] not yet made a plausible free-rider argument." 744 F.2d at 593. Although the trucking association owned a trademark, "neither the [trucking] Association nor its members

---

[6] *Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951) is likewise inapposite. Like *Sealy* and *Palmer*, *Timken* was a naked price-fixing arrangement, compounded by a panoply of efforts to limit any form of competition between the alleged conspirators. *Id.* at 595–98. *Timken* did not involve the creation of any new product or service whatsoever. The arrangement was nothing more than a device to facilitate price-fixing and the exclusion of rivals to the greatest extent practicable. *Id.*

[7] *GTE Sylvania* demonstrates the falsity of Plaintiffs' assertion that "[t]he ability of a Member Plan to sell branded service in the territory of another Member Plan is part of the essence of competition." (Sub. Br. at 26.) *GTE Sylvania* held *interbrand* competition is "the primary concern of antitrust law" and that using exclusive territories to prevent intrabrand competition and free-riding furthers this interbrand competition. 433 U.S. at 52 n.19, 55–56.

advertise[d] or otherwise promote[d] the trademark extensively, and most members d[id] not even use the mark in their business names." *Id.* at 589–90. That is the absolute inverse of this case. Moreover, *General Leaseways* was a preliminary-injunction decision that turned on the balance of harms, not on likelihood of success. *Id.* at 591 ("Since the balance of harms strongly favors the grant of the preliminary injunction, it is not necessary for us to decide whether [plaintiff] is certain or even highly likely to prevail at trial; it is enough that it has raised a substantial question on the merits."). This is a starkly different standard than that imposed on Plaintiffs by Rule 56.

*General Leaseways* was decided 33 years ago, at a time when—as the opinion makes clear—the Supreme Court was shifting away from the per se rule to the rule of reason.[8] Indeed, just one year later, the Seventh Circuit reconciled the "tension" it had recognized in *General Leaseways* and explained that per se treatment was not warranted where there were free-riding justifications for the conduct at issue. In *Polk Brothers*, the court squarely held that preventing free-riding *is* a procompetitive justification sufficient to defeat a per se claim in a horizontal market allocation case.[9] *Polk Bros.*, 776 F.2d at 188; *see also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1010–11 (7th Cir. 2012) (Posner, J.) (reaffirming that horizontal market allocations "are governed by the rule of reason, rather than being per se illegal, if the challenged practice when adopted could reasonably have been believed to promote 'enterprise and productivity'") (quoting *Polk Brothers*, 776 F.2d at 189); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 228 (D.C. Cir. 1986) (explaining that, in *NCAA*, "[b]y applying *GTE Sylvania* in a horizontal

---

[8] In fact, the Seventh Circuit recognized that it may be "wrong in holding that this case is governed by the per se rule," 744 F.2d at 596, and that its conclusions were "based on the incomplete record made in the preliminary-injunction proceeding." *Id.* at 597. It thus also went on to conduct a full rule of reason analysis. *Id.* at 596–97.

[9] Plaintiffs argue that *Polk Brothers* cited *General Leaseways* "with approval." (Prov. Br. at 33.) But *Polk Brothers* did so only for propositions that "[t]he Supreme Court has recognized that the control of free riding is a legitimate objective of a system of distribution" and that "[t]he first step in any Rule of Reason case is an assessment of market power." 776 F.2d at 190, 191. Both citations are consistent with application of the rule of reason here.

case as requir[ing] consideration of the NCAA's justifications for the restraints, the Supreme Court made it clear that elimination of the free ride is an efficiency justification available to horizontal restraints that are ancillary to a contract integration") (internal quotation and citation omitted).

Subscribers also cherry-pick from the FTC and DOJ Collaboration Guidelines. According to Subscribers, the Guidelines say that procompetitive benefits are irrelevant to the applicability of the per se rule. (Sub. Br. at 17 n.22.) But Subscribers omit the more applicable and directly contrary statement just two sentences later:

> If, however, participants in an efficiency-enhancing integration of economic activity enter into an agreement that is reasonably related to the integration and reasonably necessary to achieve its procompetitive benefits, the Agencies analyze the agreement under the rule of reason, even if it is of a type that might otherwise be considered per se illegal.

(Sub. Ex. 201, DOJ/FTC 2000 Guidelines on Collaborations Among Competitors § 3.2.)

### 2. The rule of reason is not limited to restraints that are "essential" to "new products."

Faced with the clear procompetitive benefits in this case and the great weight of Supreme Court and Eleventh Circuit authority, Plaintiffs again resort to labels, arguing that the rule of reason only applies to "new products" and restraints that are "essential" for such "new products" to exist at all. (Prov. Br. at 27; Sub. Br. at 34.) Plaintiffs are wrong.

First, creation of a new product is sufficient, but not necessary, to foreclose application of the per se rule. All that is necessary is that "the challenged practice when adopted could reasonably have been believed to promote 'enterprise and productivity.'" *Sulfuric Acid*, 703 F.3d at 1011 (*quoting Polk Bros.*, 776 F.2d at 189). Courts in numerous cases—including *Actavis* and *Procaps*—reject per se challenges to restraints that support efficiency-enhancing cooperation, even if no new products result, which is not the case here. (Def. Br. at 31–32.) Unsurprisingly, Plaintiffs avoid mentioning *Actavis* and *Procaps* in their argument on this issue.

Plaintiffs' own authority also undercuts their position. (*See* Prov. Br. at 1, 11, 21, 23, 27–29; Sub. Br. at 21, 34–35, 41.) In *NaBanco*, the Eleventh Circuit recognized the defendants could potentially each create and sell credit cards independently without the restraint. 779 F.2d at 602. However, because each defendant's independent product "could not be guaranteed" to achieve the intended efficiency—universality of acceptance—the restraint (a uniform fee) was subject to the rule of reason. *Id.* Similarly, in *Maricopa County*, the Supreme Court stated that an arrangement among medical specialists to offer "complete medical coverage for a flat fee" would be "*perfectly proper*" even though the services provided by each individual specialist before and after the arrangement would be *exactly the same. Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 356–57 (1982) (emphasis added). And in *Valley Drug*, the horizontal market allocation eliminated a product from the market, the opposite of Plaintiffs' proposed rule. 344 F.3d at 1303–09.

Indeed, Plaintiffs' assertion that *NCAA* requires creation of a new product ignores their own authority. (*See* Sub. Br. at 34–35; Prov. Br. at 28–29.) As *General Leaseways* explained, "the Court in *NCAA did not* condition the applicability of the Rule of Reason on proof that the particular restriction that had been challenged was necessary if the product was to be brought to market at all." 744 F.2d at 595 (emphasis added) (citing *Nat'l Collegiate Athletic Ass'n (NCAA) v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 101 (1984)). Judge Posner later wryly explained why Plaintiffs' myopic focus on new products is wrong: "[a]nyway 'product' talk is an unnecessary and distracting embellishment of the rule of reason. The blanket licenses in *BMI* were not a product, new or old, but a contractual instrument for marketing music, which was the product." *Sulfuric Acid*, 703 F.3d at 1011.

Second, a restraint need not be "essential" to a new product's existence. As demonstrated by *American Needle*, *NCAA*, *Procaps*, *Sulfuric Acid*, *Polk Brothers*, and many others, a restraint

need only *facilitate* productive cooperation or integration to preclude a per se claim. (*See also* Def. Br. at 26–28, 30–32.) Rather than "foreclose" Defendants' argument (Prov. Br. at 27), *American Needle* is perhaps the best case *demonstrating* it—an exclusive trademark licensing arrangement for hats and t-shirts cannot possibly be necessary to create football.

Lacking authority in case law, Plaintiff resort to the policy argument that applying the rule of reason outside of restraints that are "essential" to "new products" would give "carte blanche to a subset of companies in a market to form cartels in order to compete against others in the market." (Sub. Br. at 36.) But Defendants do not seek carte blanche or immunity of any kind. The question is what standard the Court should apply to assess the legality of a decades-old System that provides affordable, high-quality healthcare to more than 100 million Americans. Should the Court summarily condemn it without analysis? Or should the Court conduct a careful assessment of the System's justifications and competitive impact? Under the facts and law, the answer is obvious.

### 3.    Although not required, Defendants have created a "new product," and the challenged restraints are "essential" to that product.

In any event, the challenged Blue rules easily meet Plaintiffs' purported "new product" requirement. (URMF ¶¶ 9–27, 62.) In fact, the Supreme Court of Iowa already so held. *Mueller v. Wellmark, Inc.*, 861 N.W.2d 563, 573 (Iowa 2015), *reh'g denied* (Apr. 22, 2015) (holding that the Blue System has created a "new product" sufficient to preclude a per se claim); *see also Powderly v. Blue Cross & Blue Shield of N.C.*, No. 3:08-cv-00109 (W.D.N.C. July 21, 2009) (rejecting per se challenge to BlueCard). Plaintiffs ignore both *Mueller* and *Powderly*.

Even if a "new product" were required to apply the rule of reason, this at most would mean something different from or better than the products offered by defendants independently, even if other firms can already offer a similar product. (*See* Def. Br. at 31; *Procaps*, 845 F.3d at 1077 (competitors "pool[ed] their complementary attributes to create a new, more effective competitor

in the American softgel market"—the same market in which defendants already competed); *Dagher*, 547 U.S. at 6 n.1 (defendants both independently produced petroleum products before agreement); *Sulfuric Acid*, 703 F.3d at 1011 ("Canadian smelter acid" qualifies as a "new product"); *BMI*, 441 U.S. at 22–24 (applying the rule of reason even though a single company could license numerous artists (or purchase their copyrights)); *Polk Bros.*, 776 F.2d at 190 (defendants manufactured nothing, but rather offered overlapping selections of the other companies' products).)

Undisputed facts demonstrate that the challenged rules facilitate a different product than any Plan can produce on its own—a nationwide, Blue System health insurance product. (URMF ¶ 62; Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. at 52:15–54:21, 177:1–7, 189:19–190:10, 282:5–283:6.) When each Plan goes to market, it does not sell only its own local product, but rather an integrated national system of local products and the administrative services organized by the BCBSA to facilitate that integration. (Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. at 52:15–54:21, 57:12–21, 109:8–19; Def. Ex. 135, 7/25/2017 S. Serota Dep. Tr. at 223:21–224:23, 231:11–232:25.) Each Plan relies on every other Plan's commitment and incentive to build and maintain high-quality, efficient provider networks and services in their local areas. (Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. at 52:15–54:21, 95:11–24, 97:14–98:7; Def. Ex. 135, 7/25/2017 S. Serota Dep. Tr. at 223:21–224:23, 231:11–232:25.) The result is superior local focus, deeper and stronger networks, and broad coverage for all types of subscribers, even when margins are thin or negative. (URMF ¶¶ 30, 62–63.) Defendants' joint products thus increase output, promote interbrand competition, and provide greater choice for consumers—the fundamental goals of antitrust law.[10] (Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. at 54:22–56:23, 57:22–58:7, 210:5–21.)

---

[10] Plaintiffs' claim that Defendants' joint products are "just like its competitors" also gets them nowhere. (Prov. Br. at 28.) First, it is irrelevant. What matters is whether Defendants, not competitors with an entirely different structure,

These joint products, including BlueCard, are possible only because of the structure and rules BCBSA has put in place to facilitate and incentivize cooperation and investment, and to prevent the transfer of goodwill. (URMF ¶¶ 9–11, 14–15, 17–25, 59–62, 64; Def. Ex. 131, 7/22/2017 K. Murphy Dep. at 62:4–66:10, 151:6–152:23; Def. Ex. 135, 7/25/2017 S. Serota Dep. Tr. at 231:11–232:25.) If all license agreements were terminated, Blue trademark rights could revert back to individual Plans, which first held the common-law right to exclude others from their territories. (URMF ¶¶ 4, 64; Resp. SSF ¶ 27.) Geographic exclusivity would continue, but without joint products and other productive cooperation that serve 100 million Americans.

In addition, even if Plans could expand nationally under their confusingly similar Blue Marks, their individual offerings would deteriorate. First, efficiencies would be dramatically reduced. (URMF ¶ 64; Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. at 193:3–194:23; Def. Ex. 32, Murphy Rpt. ¶¶ 70–71, 109.) As just a few examples, each Plan would need to build its own national provider network and claims processing systems—with all the individual contracting associated with such activities—or rent networks from third-parties whose discounts would likely be smaller, costs larger and networks narrower. (Def. Ex. 32, Murphy Rpt. ¶¶ 70–71; *see also* Def. Ex. 159, 8/9/2017 N. Dusang Dep. Tr. at 109:19–116:7 ████████████████████████ ██████████████████████████ Second, each (now-national) Plan would likely lose the local focus fundamental to the Blue System, and behave more like national competitors that selectively enter only the most profitable areas and demographic types and focus on large accounts rather than

---

could offer the same product independently. And in any event, Plaintiffs cannot demonstrate through undisputed evidence that Defendants' joint products are the same as competitor products. No competitor offers a similar combination of local focus, dedication, and stability on the one hand, and comprehensive, high-quality, efficient national capabilities and service on the other hand. United, Cigna, Aetna and Humana have an inherently centralized national scope. (Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. at 54:22–56:23.) Those structures have both advantages and disadvantages. A key disadvantage is the difficulty in "maintaining that local focus," as evidenced by the national competitors' lack of success in individual and small markets and their absence from less desirable geographic areas and demographic populations. (*Id.*; Def. Ex. 32, Murphy Rpt. ¶¶ 41–45; URMF ¶¶ 31, 63.)

individuals and small groups. (Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. at 140:15–141:9; Def. Ex. 32, Murphy Rpt. ¶¶ 109, 113.) Third, Blue-branded entry would likely result in free-riding on the goodwill the incumbent Plan developed over decades, which in turn would reduce incentives to invest in the Brand at all. (Def. Ex. 32, Murphy Rpt. ¶ 108.) All of this would devastate the Blue Brand and harm interbrand competition. (*Id.* ¶¶ 108–114; URMF ¶ 64.) Fourth, Plans would be forced to resort to litigation to prevent free-riding and trademark infringement, which would be distracting, costly, and time-consuming. (*Id.* ¶ 59; *see also Actavis*, 133. S. Ct. at 2236.)

As Professor Murphy succinctly explained "[i]f you're going to have a system that tries to take advantage of the local focus that these plans have, and at the same time, meet the needs of people who want a broader network, you're going to need rules to make that happen efficiently." (Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. at 210:5–10.) Plaintiffs cannot show through undisputed evidence that Plans could provide the same nationwide services—with all their efficiencies and benefits—absent the challenged rules. Since that is all Plaintiffs' proposed "new product" standard requires, their per se claims must be denied.

### 4. Plaintiffs have not disproved that the challenged rules plausibly facilitate enterprise and productivity.

Under controlling precedent, a restraint need only plausibly facilitate productive cooperation or economic integration at the time the rule was adopted to warrant a full rule of reason analysis. (*See* Def. Br. at 27–28, 31–32.) Plaintiffs have not shown through undisputed evidence that *none* of the potential procompetitive benefits recognized in these and Plaintiffs' own cases is potentially present here. Instead, the rules facilitate productive cooperation and integration in at least the following ways:

1. **Creating Joint Products**: The "new products" created by the Blue System, discussed above, eliminate any possibility that the per se rule applies.

36

2. **Joining Complementary Assets**: As in *Procaps*, Blue Plans combined their complementary assets to overcome collective weaknesses and create "a more effective competitor." (URMF ¶¶ 11–12, 62; Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. at 52:15–54:21, 177:1–7, 189:19–190:10, 282:5–283:6; *see also* Def. Br. at 27–32.)

3. **Recognizing and Protecting Prior Intellectual Property Rights**: *Actavis*, *Valley Drug*, and *VMG* hold that restrictions related to pre-existing intellectual property rights should be analyzed under the rule of reason, even when they go beyond the scope of those rights. Here, the license agreements codify Plans' pre-existing common-law trademark rights, and the other challenged rules are ancillary agreements designed to protect the value of the intellectual property rights. (URMF ¶¶ 14, 19, 21, 23–25, 59–60; *see also* Def. Br. at 37–38.)

4. **Preventing Free-Riding**: Preventing free-riding is a legitimate, procompetitive justification for horizontal market allocations. *See, e.g.*, *General Leaseways*, 744 F.2d at 593 (recognizing "plausible free-rider argument" could be dispositive); *Rothery*, 792 F.2d at 229; *Polk Bros.*, 776 F.2d at 190. The rules challenged in this case are designed to do exactly that. For example, exclusive service areas prevent a Plan from free-riding on the assets and investments of the incumbent Plan, including the goodwill associated with the Blue Marks in that area. (Def. Ex. 32, Murphy Rpt. ¶¶ 59–60, 112; *see also* Def. Br. at 34.)

5. **Facilitating Convenient Contracting**: In *BMI*, the Court noted that the joint blanket license was "truly greater than the sum of its parts" because it provided many benefits to music sellers and purchasers—including one stop shopping and lower costs. 441 U.S. at 21–22; *see also* Def. Br. at 29. The same is true here. BlueCard affords a single point of contact for providers and subscribers across the Blue System, and nationwide in-network rates for subscribers. (URMF ¶¶ 33, 39.) Without BlueCard, providers and regional and national employers would be forced to contract with multiple Plans, causing inefficiency and inconsistent benefits for employees of the same employer. (Def. Ex. 148, 5/17/2017 K. Wright Dep. Tr. at 102:8–18.)

6. **Ensuring Universality of Acceptance**: In *NaBanco*, the Eleventh Circuit accepted the convenience of "universality of acceptance" as a reason to reject a per se claim. 779 F.2d at 602; *see also* Def. Br. at 30. Universality was precisely the reason that BlueCard was created—to provide Blue subscribers consistent access wherever they go in the United States. (URMF ¶¶ 11–12, 14–15, 22.)

7. **Expanding Output**: The Collaboration Guidelines cited by Plaintiffs observe that a procompetitive collaboration may "allow its participants to better use existing assets, or may provide incentives for them to make output-enhancing investments that would not occur absent the collaboration." (Sub. Ex. 201 § 2.1.) Here, Defendants' collaboration allows them to integrate local assets to create broader and more efficient products than any Plan could produce alone. Examples include BlueCard, the Federal Employee Program, and Blue Distinction. (URMF ¶ 34.) Plans' local focus also results in broad and deep coverage for local groups and individuals, which also have access to BlueCard. (URMF ¶¶ 28–43.) Without the restraints at issue here, no local Plan

would have the capability to build and maintain these national programs, and would likely behave more like national competitors in selectively exiting within even their current service areas. (Def. Ex. 32, Murphy Rpt. ¶¶ 109, 113.)

8. **Improving Quality and Service**: The DOJ/FTC Guidelines also explain that "[e]fficiencies generated through competitor collaboration can enhance the ability . . . to compete, which may result in lower prices, improved quality, enhanced service, or new products." (Sub. Ex. 201 § 3.36.) Here, the Blue System produces high quality insurance products with exceptional service for subscribers and providers. (URMF ¶¶ 28–43; *see also* Def. Br. at 33–36.) The Blue System benefits subscribers by providing one point of contact for nationwide coverage, offering a broad range of products to all subscriber types, providing high-quality service that results in high consumer satisfaction, and offering competitive premiums and pricing. (URMF ¶¶ 36–37, 40–43.) Providers receive high patient volume, improved claims submissions processes, prompt and fair payment, and inclusiveness. (URMF ¶¶ 39–40.)

9. **Lower production costs and more efficient operations**. As in *Procaps*, the challenged rules enable 36 Blue Plans to provide more efficient nationwide products and services than each individual Plan could offer operating on its own, including dramatically reduced contracting and administrative costs. (Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. at 193:3–194:23; Def. Ex. 32, Murphy Rpt. ¶¶ 70–71, 109.)

Any one of these redeeming virtues, if plausible, is sufficient to require rule of reason analysis. Here they are more than plausible; they therefore preclude any per se claim.

While the presence of plausible procompetitive justifications ends the analysis, it is noteworthy that Plaintiffs make minimal effort to demonstrate the anticompetitive effects they say are so clear. Neither Plaintiff track supports its motion with an expert report or undisputed evidence of harm to consumers. Lacking such evidence, Plaintiffs cherry-pick a handful of statements from individual Plan CEOs dispersed across decades. (Sub. Br. at 26 n.34, 30, 32, 40–42; Prov. Br. at 6, 13.) But these same documents also reflect the important procompetitive justifications for the challenged rules. (*See, e.g.*, Sub. Ex. 210, BCBSA00189651 at 9746–47 ████████████████████████████; Sub. Ex. 212, BCBSA03833584 at 3585 ████████████████████████████ Sub. Ex. 215, BCBSA00282346

at 2354–62 ███████████████████████████████████████████████

███████████████████████████████████████ Sub. Ex. 222, BCBSA00083662

at 3664 (noting the need for Plans "to establish and maintain a strong local presence").) And while

one Anthem sales executive testified he would like to compete outside Anthem's Blue service area

using the Cigna brand should an Anthem/Cigna merger receive approval (PSF ¶ 20), the

challenged rules already permit that. In any event, the quoted portions simply represent select

viewpoints by a few individuals. And even if the documentary evidence were as one-sided as

Plaintiffs might hope, *General Leaseways* made clear that courts "attach rather little weight to

internal company documents used to show anticompetitive intent, because, though they sometimes

dazzle a jury, they cast only a dim light on what ought to be the central question in an antitrust

case: actual or probable anticompetitive effect." 744 F.2d at 595–96.

Providers' reference to Plans' relative size is likewise not reflective of actual

anticompetitive effects. (Prov. Br. at 35–36.) Indeed, market share is irrelevant to whether the

per se rule applies. *See, e.g.*, *Sulfuric Acid*, 703 F.3d at 1007 (market power "is not a part of the

prima facie case of illegal per se price fixing").

Given the evidence of such extensive and obvious procompetitive benefits, applying the

per se rule would contradict established law and risk significant harm to subscribers, providers,

and the national healthcare system as a whole.

### B.   Plaintiffs Have Not Demonstrated Through Undisputed Evidence Purely Horizontal Agreements Between Competitors.

The existence of plausible procompetitive benefits alone ends Plaintiffs' per se quest. But

Plaintiffs also have not established that the challenged rules are purely horizontal agreements

among competitors. Importantly, under Eleventh Circuit law, a restraint is evaluated at the time it

was adopted. *Valley Drug*, 344 F.3d at 1306 ("[T]he reasonableness of agreements under the antitrust laws are to be judged at the time the agreements are entered into.").

Plaintiffs' own cases recognize that, when at least some non-horizontal characteristics are present in an agreement, courts apply the rule of reason. In *Abadir*, a manufacturer sold chemicals to a distributor, but limited resale to certain geographic areas. 651 F.2d at 424. The distributor challenged the agreement as a horizontal market allocation because the manufacturer also sold chemicals. *Id*. at 424–25. The Fifth Circuit rejected that argument, holding that "[b]ecause the potential economic advantages which might have motivated [the defendants] are those characteristic of a vertical rather than a horizontal market-distributing agreement, the per se horizontal rule does not apply." *Id*. at 426.

As discussed above and in Defendants' opening brief, service areas arose from local trademark rights acquired by each Plan, which included the right to exclude others from using similar marks in the Plan's area. Thus, at the time exclusive service areas arose, Plans could not have competed with the Blue Marks in each other's territories, nor could they today even absent the License Agreements. (URMF ¶¶ 4, 14, 21 54, 64; Resp. PSF ¶ 14; Resp. SSF ¶ 27.)[11]

But even ignoring Plans' local trademark rights, Plaintiffs admit that service areas arose from vertical requirements imposed by AHA, AMA, and successor licensors. (Prov. Br. at 15–17; Sub. Br. at 38.) Indeed, Providers' theory is that service areas arose from vertical license agreements that later became horizontal. (Prov. Br. at 16 ("Thus, by 1972, the Blue Cross plans had completed the process of taking vertical licenses that allocated markets and turning them into

---

[11] Plaintiffs argue that there were "massive and undisputed changes" (Sub. Br. at 38) and "vast changes" (Prov. Br. at 18) to Plan service areas over time. Not only is this irrelevant under *Valley Drug*, it is not undisputed—indeed, it is wrong. Each iteration of the license agreement carried forward each Plan's pre-existing service area. Plan mergers did not reallocate service areas; they merely combined the merging Plans' pre-existing service areas. (URMF ¶ 55.) And any challenge to changes that resulted from mergers is time-barred.

horizontal ones under their own control.").)[12] That alone is enough to require application of the rule of reason, especially since later license agreements simply carried forward the pre-existing service areas. (URMF ¶¶ 14, 21.) *See Valley Drug*, 344 F.3d at 1306 (agreements must be reviewed under the antitrust laws "at the time [they] are entered into"); *Sulfuric Acid*, 703 F.3d at 1010 (similar); *Polk Bros.*, 776 F.2d at 189 (similar); *VMG Enters.*, 788 F. Supp. at 657 (rule of reason applies to agreements that do not "create a trademark territorial division [but] merely recognize[] it"). The same is true for the AMA, which incorporated the AMCP, which in turn "formalized a set of requirements its members were required to follow in order to use the Blue Shield marks." (Prov. Br. at 16.)[13] Subsequent license agreements, which codified Plans' existing service areas, were entered into between each Plan and the relevant national licensing entity—BCA, BSA, and ultimately BCBSA. (URMF ¶¶ 14, 19, 21.) Later, the other challenged rules were adopted by BCBSA as successor licensor. (URMF ¶¶ 22–25, 59–60; *see* Def. Br. at 44–45.)[14]

In short, the early license agreements were undisputedly vertical, and the "economic advantages" and other purposes that motivated the AHA, AMA, and their successors to adopt the challenged rules are "those characteristic of a vertical rather than a horizontal" agreement. *See Abadir*, 651 F.2d at 426; *see also* Def. Ex. 131, 7/22/2017 K. Murphy Dep. at 151:25–152:23 ("I can tell you when you look at the actual behavior, the kinds of rules that are adopted, they make a lot of economic sense from the point of view of somebody trying to create a valuable product that's

---

[12] In addition, Providers admit "[t]o the extent that hospitalization plans were using the Blue Cross marks, they did so only with the AHA's consent." (Prov. Br. at 15.) And neither Providers nor Subscribers assert that Plans owned or controlled the AHA; in fact, it was controlled by healthcare providers themselves. (URMF ¶ 5.)

[13] Providers' assertion that medical care plans incorporated the AMCP is wrong. (Prov. Br. at 16.) It was incorporated by the AMA. (URMF at ¶ 6.)

[14] Plaintiffs' attempt to characterize Plans as governing or controlling BCBSA is irrelevant since exclusive service areas were developed long before the Association. But in any event, it is not supported by undisputed evidence. The BCBSA Board governs the Association, and BCBSA's CEO and President controls it. (Resp. SSF ¶ 7.) Member Plans and/or CEOs who sit on the BCBSA Board do so in their fiduciary capacity to the Board, and are required to place the Association's interests above their own Plan's. (URMF ¶ 58.)

going to be successful for the system as whole."). Under these circumstances, Plaintiffs have not shown through undisputed evidence that the challenged restraints arose purely horizontally. For this reason as well, the per se rule cannot apply.

### C. Judicial Experience Has Not Shown The Challenged Rules To Be Manifestly Anticompetitive.

The per se rule is also limited to restraints that have been confirmed by judicial experience as manifestly anticompetitive. The Eleventh Circuit has repeatedly held that, even if courts have plenty of general experience with market allocations or price-fixing, if they have not examined such restraints arising in the particular fact pattern at issue, the per se rule cannot apply. *Procaps*, 845 F.3d at 1083 (per se rule can apply "only when history and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally results in a finding of liability"); *Valley Drug*, 344 F.3d at 1304; *see also Sulfuric Acid*, 703 F.3d at 1011 (per se rule inapplicable to "a novel way of doing business (or an old way in a new and previously unexamined context)").

Plaintiffs have not identified a single factually analogous case where a Court has applied the per se rule to strike down a system anything like the Blue System. That is because no such case exists: the Blue System and the challenged restraints developed in an entirely unique context. The fact that service areas have a basis in pre-existing, pre-Lanham Act common-law trademark rights is a unique fact absent from any case cited by Plaintiffs. So too is the fact that the principle of one Plan per area was adopted to guarantee subscribers freedom of choice among providers during times of illness (URMF ¶ 7); the involvement of the AHA and AMA in establishing one Plan per area (URMF ¶ 14); the approval of the Blue System concept—including service areas specifically—by the USPHS (URMF ¶¶ 44, 53–55); and the havoc a per se ruling would wreak on one-third of all Americans (URMF ¶ 32). Moreover, none of Plaintiffs' cases involved a similar

pooling of complementary assets (*e.g.*, networks, pre-existing intellectual property rights) to provide complex nationwide products.

Moreover, the judicial experience that does exist with respect to the unique Blue System demonstrates that it is *not* manifestly anticompetitive. Three courts have enforced ESAs, and one of those explicitly distinguished *Sealy. Grp. Hosp.*, 744 F. Supp. at 719–20 n.7; Def. Ex. 115, BCBSA00159470 at 9472, 9479; *Grp. Hosp. & Med. Servs., Inc. v. Blue Cross & Blue Shield of Va.*, No. 85–1123–A (E.D. Va. Apr. 8, 1986); *Grp. Hosp. & Med. Servs., Inc. v. Blue Cross & Blue Shield of Nat'l Capital Area, Inc.*, 819 F.2d 1138 (4th Cir. 1987); *Cent. Benefits Mut. Ins. Co. v. BCBSA*, 711 F. Supp. 1423, 1425 (S.D. Ohio 1989). In the Anthem/Cigna litigation, both the district court and court of appeals discussed the Blue System, including exclusive service areas and Best Effort rules, without ever suggesting that they were anti-competitive, much less per se illegal. *United States v. Anthem, Inc.*, No. CV 16–1493, 2017 WL 685563, at *6–10, 53 (D.D.C. Feb. 21, 2017); *United States v. Anthem, Inc.*, 855 F.3d 345, 350 (D.C. Cir. 2017), *cert. dismissed*, No. 16-1342, 2017 WL 1807377 (U.S. June 12, 2017). And two other cases rejected per se challenges to BlueCard. *Mueller*, 861 N.W.2d at 573; *Powderly*, No. 3:08-cv-00109. This is hardly the kind of judicial experience that would warrant a departure from the presumptive rule of reason.

The Blue System has been operating in the open for decades, and not once has the DOJ challenged it as anticompetitive. The DOJ, FTC, and Congress have repeatedly reviewed the Blue System without condemning it. (URMF ¶¶ 45–51.) In fact, the DOJ recently conducted a lengthy and detailed analysis in connection with the potential Anthem/Cigna merger, and recognized the importance of the Blue System as one of only four national competitors. (URMF ¶ 51.)

Plaintiffs do not—because they cannot—even attempt to contend with these facts. For this reason as well, Plaintiffs' per se claims must be denied.

43

**D.      Plaintiffs Have Not Shown That The Best Efforts And Uncoupling Rules Are Per Se Illegal Market Allocations Or Output Restrictions.**

Subscribers also seek to affix their "horizontal market allocation" label to the Best Efforts and uncoupling rules by attempting to bootstrap their exclusive service area arguments. (Sub. Br. at 3, 28.) Since service areas must be analyzed under the rule of reason, their attempted bootstrap fails. And, regardless of the status of exclusive service areas, Subscribers' characterization is factually incorrect and certainly not supported by undisputed record evidence.

**1.      The Best Efforts rules are not per se illegal.**

The Best Efforts rules are not per se illegal for four basic reasons. ***First***, the rules are not a market allocation. They do not restrict the geographic area in which a Plan can compete (neither do service areas for that matter, as they only govern where a Plan can use the Blue brands). Nor do the Best Efforts rules impose a "hard cap" or "absolute limit" on the size of a Plan's unbranded business, as Plaintiffs claim. (Sub. Br. at 27.) The Best Efforts rules simply require a Plan to derive a certain percentage of its revenue from Blue-branded activities. (URMF ¶ 25.) By *definition*, the threshold is relative, not absolute, and grows along with a Plan's Blue revenue.[15]

***Second***, Subscribers have not proven through undisputed evidence that the Best Efforts rules were adopted for the *sole purpose* of allocating markets or restricting output. In fact, Subscribers' own brief and exhibits make clear that the rules were adopted in part to preserve the "alignment of interests among the Blue Plans" that results in the cohesion and cooperation at the heart of the Blue System. (Sub. Br. at 32 n.38 (quoting Sub. Ex. 210).) The rules were adopted to ensure commitment to the Blue Brand, prevent the transfer of goodwill, and bolster national programs. (*See* URMF ¶¶ 23–25; Def. Ex. 32, Murphy Rpt. ¶¶ 36–37, 83–88; Def. Ex. 135,

---

[15] Notably, Plaintiffs do not assert that the acquisition rule is per se illegal or that it is a market allocation, even though under Plaintiffs' view the rule limits a Plan's revenue or output from out-of-area sources (*e.g.*, a potential acquirer).

7/25/2017 S. Serota Dep. Tr. at 139:25–141:20, 153:9–154:6, 203:12–206:19.) As discussed previously, the cherry-picked snippets from the few documents Subscribers cite are incomplete, out of context, uninformative and cannot constitute undisputed evidence of a naked restraint.

In any event, courts—including in cases cited by Plaintiffs—have rejected an inflexible per se rule in cases involving *complete* output restraints with plausible procompetitive benefits. *See Am. Needle*, 560 U.S. at 202–04 (rule of reason governs total ban on earning *any* licensing revenue outside of exclusive license); *NCAA*, 468 U.S. at 91–94, 101 (rule of reason applies to ban on selling rights to televise college football games outside of agreement meant to limit number of televised games); *Deutscher Tennis*, 610 F.3d at 831 (rejecting per se claim against a "output-limiting horizontal restraint" that governs which tournaments top tennis players participate in); *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 512–14 (4th Cir. 2002) (rejecting per se rule for horizontal restraint on output of airplane overhead space).

Courts also routinely reject per se treatment of agreements that bar a party from competing with a collaborative offering, even if the agreement is horizontal. As the Seventh Circuit explained, "[i]t is not per se illegal to insist that a distributor agree not to carry a competing line of goods to the supplier's; what difference should it make that the competing line is produced by the distributor himself?" *Sulfuric Acid*, 703 F.3d at 1010 (internal citations omitted); *see also* Def. Br. at 43–44 (citing *Dagher*, 547 U.S. at 5–8 & n.1; *Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 298 (1985); *Princo Corp. v. Int'l Trade Com'n*, 616 F.3d 1318, 1334–37 (Fed. Cir. 2010); *Rothery*, 792 F.2d at 221–22, 228–29).

*Third*, Subscribers have not shown that judicial experience confirms the Best Efforts rules are manifestly anticompetitive. Indeed, Subscribers conveniently ignore the fact that the DOJ questioned why BCBSA had *not* adopted a National Best Efforts rule for existing Blue Plans, and

suggested 66-2/3% as the national threshold. (URMF ¶ 25.) Defendants are aware of no authority, and Plaintiffs point to none, applying the per se rule to any restraint akin to the Best Efforts rules.

**Finally**, Plaintiffs make little effort to argue that the Local Best Efforts rules are per se illegal. In fact, Subscribers selectively quote *Kestenbaum v. Falstaff Brewing Corp.* (Sub. Br. at 29), omitting the sentence immediately following their quoted passage: "Requiring a dealer to provide adequate service inside a territory does not injure competition. If anything, it increases competition by stepping up interbrand rivalry within the territory." 575 F.2d 564, 572–73 (5th Cir. 1978). This is precisely why Local Best Efforts rules were adopted. (URMF ¶ 23.) Plaintiffs cannot show otherwise through undisputed evidence.

### 2. The uncoupling rules are not per se illegal.

Tellingly, Subscribers' brief was the *first time* any party in this five-year-old case has asserted that BCBSA's uncoupling rules are unlawful, let alone per se illegal. The time for amending the complaints has long passed, meaning Subscribers' challenge to the uncoupling rules is barred. In any event, Subscribers' per se challenge fails on the merits for three reasons.

**First**, the uncoupling rules are not a geographic market allocation. If a Plan chooses to link a name to the Blue Marks, the rules prevent the Plan from uncoupling that name anywhere in the country, *including within the Plan's service area*. (URMF ¶ 61.) Unsurprisingly, Subscribers fail to cite a single case in support of their assertion that the uncoupling rules "constitutes a horizontal market allocation that is unlawful *per se*." (Sub. Br. at 31.) **Second**, Subscribers do not attempt to show that the rules were adopted for the sole purpose of stifling competition. As a matter of fact, the record shows that the rule was adopted to prevent free-riding and the transfer of goodwill. (URMF ¶¶ 59–61.) **Third**, as trademark owner, BCBSA could entirely prohibit Plans from coupling their own names to the Blue Marks. *See, e.g.*, *TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*, 102 F. Supp. 3d 1321, 1334 (S.D. Fla. Apr. 27, 2015) (granting preliminary

46

injunction against licensee that used licensed marks in its internet domain names without permission) (*citing* 4 McCarthy on Trademarks § 25:30 (4th ed., June 2017 Update) ("The licensee's use of the mark in a composite or format appearance other than that permitted by the license constitutes an infringement.")); *Computer Currents Publ'g Corp. v. Jaye Commc'ns, Inc.*, 968 F. Supp. 684, 688 (N.D. Ga. 1997) (holding violation of clause prohibiting use of licensed mark "in association with any product or services, as part of any corporate or trading name or in any other manner anywhere in the world at any time" was cause for termination of license). Instead, BCBSA adopted a less restrictive rule that permits Plans to couple, with the knowledge that they cannot uncouple a name after it has benefited from the immense goodwill associated with the Blue Marks. (URMF ¶ 61.) This alone precludes per se treatment.

### E. Providers Have Not Shown Through Undisputed Evidence That BlueCard Is Naked Price-Fixing.

Despite pages of briefing on whether BlueCard constitutes price-fixing, Providers completely ignore *All Care Nursing*, the controlling Eleventh Circuit case on this issue.[16] 135 F.3d 740. As discussed in Defendants' opening brief, *All Care Nursing* dispatched the same argument Providers make here—that because a joint purchasing arrangement results in all buyers paying the same price, it amounts to price-fixing. *Id*. at 747–48. Rather, price-fixing is limited to situations where the parties "preset" prices. *Id*. at 748 ("[W]e do not have an agreement to fix prices in this case: no prices were preset."). When, as here, buyers jointly negotiate, but do not agree *ex ante* on

---

[16] Providers also ignore *North Jackson Pharmacy, Inc. v. Caremark RX, Inc.*, in which North Jackson—a named Plaintiff in this case that was represented by Providers' counsel here—made exceedingly similar claims to those advanced here. North Jackson alleged that insurers' use of a common agent to negotiate with North Jackson and other providers on their behalf constituted naked price-fixing, because all payers paid the same resulting rate. 385 F. Supp. 2d 740, 745–46 (N.D. Ill. 2005). The court rejected this claim, hold that such "unthinking adherence to the tyranny of labels [that] may exist in North Jackson's corporate mind and the minds of its counsel . . . does not exist in the real world of antitrust jurisprudence." *Id.* at 751. Rather, because group negotiation might increase efficiency and lower costs for consumers, the per se rule could not apply. *Id.* at 748–50.

the price they pay to sellers, there is no price-fixing. *Id.*; *see Castro v. Sanofi Pasteur Inc.*, No. 11-CV-7178, 2012 WL 12516573, *5 (D.N.J. Dec. 20, 2012) ("Groups of buyers that seek [discounts based on volume] by negotiation, rather than by restricting purchases or pre-setting prices or a fixed price range, are subject to the 'rule of reason' analysis") (citing *All Care Nursing*, 135 F.3d at 747). For this reason, *All Care Nursing* distinguished the same cases relied on by Providers—*Socony-Vacuum* and *Mandeville Farms*. *Id.* at 747. Unlike those cases, which involved garden-variety, *ex ante* price-fixing, joint purchasing is not the kind of conduct "that can only be anticompetitive." *Id.* at 748. Here, Providers never assert that prices were preset, let alone prove as much through undisputed evidence. Providers' other characterizations of BlueCard as price-fixing are wrong as well. For example, Providers assert that an arrangement is price-fixing if it "completely eliminates the possibility of price competition" among Defendants. (Prov. Br. at 23.) That is not the law. Providers' proposed rule would prohibit joint purchasing of *precisely* the type that was expressly permitted by *Northwest Wholesale* and *All Care Nursing*, among others. 472 U.S. at 298; 135 F.3d at 147–48. *Dagher*, *BMI*, and *Sulfuric Acid* (among many others) also applied the rule of reason to agreements that effectively "eliminate[d] the possibility of price competition" among competitors.[17] (Prov. Br. at 23; *see also* Def. Br. at 41–43.)

Providers' argument regarding access fees—that "[w]hat the Blues have done is akin to the 'revenue sharing' at issue in *Palmer*"—is similarly misguided. (Prov. Br. at 26.) First, access fees are not revenue-sharing; they are a partial compensation to the Plan supporting network access and claims-processing for the particular member receiving out-of-area care. (Resp. PSF ¶ 23.) Second, *Palmer* never suggested that revenue sharing constitutes price-fixing; rather, the "revenue-sharing

---

[17] ███████████████████████████████████████████████████████████████ (Def. Ex. 159, 8/9/2017 N. Dusang Dep. Tr. at 100:25–101:25, 126:22–127:23.)

formula in the 1980 agreement . . . *coupled with the price increase that took place immediately*" after the agreement suggested naked price-fixing. 498 U.S. at 49 (emphasis added). Here, there is no allegation of any immediate price increase, much less any evidence of it. Finally, the arrangement in *Palmer* has repeatedly been confirmed as a sham. *See, e.g.*, *Procaps*, 845 F.3d at 1083; *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 48 (2001). Plaintiffs cannot and have not made a similar showing here, let alone through undisputed evidence.

In any event, BlueCard could not be naked price-fixing devoid of any plausible procompetitive benefits. *See, e.g.*, *BMI*, 441 U.S. at 8–9 (rejecting the per se claim because "this is not a question simply of determining whether two or more potential competitors 'fixed' a 'price,'" but whether "this particular practice is . . . plainly anticompetitive and very likely without redeeming virtue") (internal quotations omitted); *NaBanco*, 779 F.2d at 599 ("[C]ourts should look to whether the restraint at issue potentially could create an efficiency enhancing integration to which the restraint is ancillary. In other words, the issue is whether the price fixing *achieve[s] purposes unrelated to price formation.*" (internal quotations omitted); *Augusta News*, 269 F.3d at 47 (price-fixing that is "part of a larger, legitimate economic venture" is not per se illegal); *Castro*, 2012 WL 12516573 at *6 (even if group negotiation by physicians for supplies was price-fixing, its "efficiency enhancing integration" triggered the rule of reason). It is no surprise that Subscribers emphatically "are *not* challenging" BlueCard. (Sub. Br. at 37.) They too recognize BlueCard's significant benefits.[18] Accordingly, all of the plausible procompetitive benefits discussed above and in Defendants' opening brief equally foreclose any per se price-fixing claim. (Def. Br. at 27–36; URMF ¶¶ 15, 22, 28, 32–34; Def. Ex. 32, Murphy Rpt. ¶¶ 30–35, 60, 81.)

---

[18] Ironically, Subscribers fail to appreciate the alleged restraints they challenge are the building blocks of the BlueCard Program. Subscribers cannot have it both ways: they cannot preserve BlueCard, while knocking down the very foundation on which that program is built. Indeed, that these challenged restraints enable BlueCard is yet another procompetitive justification for them. (URMF ¶ 64.)

### III.   Providers Have Not Carried Their Burden Of Demonstrating Through Undisputed Facts That The Challenged Rules Are Subject To The Quick Look Rule.

Providers' request that the Court analyze the challenged rules under the "quick look" test if not the per se rule—a request relegated to a footnote and not made by Subscribers at all—must also be denied. (Prov. Br. at 35 n.11.) Quick look applies only where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect." *Actavis*, 133 S. Ct. at 2237 (quoting *Cal. Dental*, 526 U.S. at 770). Providers have not seriously attempted to make this showing. In fact, neither Plaintiff brief seriously disputed that the rules have plausible procompetitive benefits, or attempted to support their argument that the rules are plainly anticompetitive with a report or affidavit from an economist, let alone "an observer with even a rudimentary understanding of economics." *Id.*

Here, the complexity of the restraints alone renders their effects "far from readily apparent" and quick look inappropriate. *Procaps*, 845 F.3d at 1084 n.3. *Actavis* is instructive. There, the Supreme Court rejected quick look because "the likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs . . . and the lack of any other convincing justification." 133 S. Ct. at 2237. That logic applies doubly here. The challenged rules are complex and intertwined, are intended to achieve well-recognized procompetitive benefits, and impact subscribers, providers, and each Plan differently. Any change is sure to cascade throughout the Blue System, carrying with it the potential to harm the healthcare of over 100 million people. There is no way to understand the effects of altering a system of such complexity and magnitude with a "quick look."

### CONCLUSION

For the forgoing reasons, the Court should deny Subscribers' and Providers' motions for summary judgment in their entirety and apply the rule of reason to the challenged rules.

Dated:  August 18, 2017                    Respectfully submitted,

                                           */s David J. Zott*_____
                                           David J. Zott, P.C.
                                           Daniel E. Laytin, P.C.
                                           Sarah J. Donnell
                                           Christa C. Cottrell
                                           Zachary D. Holmstead
                                           KIRKLAND & ELLIS LLP
                                           300 North LaSalle
                                           Chicago, IL 60654
                                           Tel:  (312) 862-2000
                                           Fax:  (312) 862-2200
                                           david.zott@kirkland.com
                                           daniel.laytin@kirkland.com
                                           sarah.donnell@kirkland.com
                                           christa.cottrell@kirkland.com
                                           zachary.holmstead.kirkland.com

                                           *Counsel for Defendant*
                                           *Blue Cross Blue Shield Association*

Craig A. Hoover
E. Desmond Hogan
J. Robert Robertson
Justin Bernick
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
robby.robertson@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com

Emily M. Yinger
N. Thomas Connally, III
HOGAN LOVELLS US LLP
Park Place II
7930 Jones Branch Drive, 9th Floor
McLean, VA 22102
Tel: (703) 610-6100
Fax: (703) 610-6200
emily.yinger@hoganlovells.com
tom.connally@hoganlovells.com

*Co-Coordinating Counsel for the Defendants*

Cavender C. Kimble
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

John Martin
Lucile H. Cohen
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255-9421
Fax: (803) 255-9054
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com

Daniel E. Laytin, P.C.
David J. Zott, P.C.
Sarah J. Donnell
Christa C. Cottrell
Zachary Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
daniel.laytin@kirkland.com
david.zott@kirkland.com
sdonnell@kirkland.com
ccottrell@kirkland.com
zachary.holmstead@kirkland.com
jessica.staiger@kirkland.com

*Co-Coordinating Counsel*
*for the Defendants*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE JORDAN RATLIFF &
BRANDT LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Defendants' Liaison Counsel*

*With Kirkland & Ellis, counsel for*
*Defendants, Blue Cross and Blue Shield*
*Association; National Account Service*
*LLC; Consortium Health Plans, Inc.*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
Misti Jones
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza

*With Hogan Lovells, counsel for Anthem, Inc.,*
*f/k/a WellPoint, Inc., and all of its named*
*subsidiaries in this consolidated action;*
*Blue Cross and Blue Shield of North Carolina,*
*Inc.; Blue Cross and Blue Shield of Florida, Inc.;*
*Louisiana Health Service & Indemnity Company*
*(Blue Cross and Blue Shield of Louisiana);*
*Blue Cross and Blue Shield of Massachusetts,*
*Inc.; BCBSM, Inc. (Blue Cross and Blue Shield of*
*Minnesota); Blue Cross and Blue Shield of*
*South Carolina; Hawaii Medical Service*
*Association (Blue Cross and Blue Shield of*
*Hawaii); Horizon Healthcare Services, Inc.*
*(Horizon Blue Cross and Blue Shield of New*
*Jersey); Blue Cross & Blue Shield of Rhode*
*Island; Blue Cross and Blue Shield of Vermont;*
*Cambia Health Solutions, Inc.; Regence*
*Blue Shield of Idaho; Regence Blue Cross*
*Blue Shield of Utah; Regence Blue Shield (of*
*Washington); Regence Blue Cross Blue Shield of*
*Oregon*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON
LLP
1420 Fifth Ave, Suite 3700
Seattle, WA 98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

J. Bentley Owens, III
WALLACE, ELLIS, FOWLER, HEAD
& JUSTICE
113 North Main Street
Columbiana, AL 35051-0587
Tel: (205) 669-6783
Fax: (205) 669-4932
bowens@wefhlaw.com

*Counsel for Defendants, Premera Blue Cross*
*d/b/a Premera Blue Cross Blue Shield of Alaska;*
*Premera Blue Cross of Washington*

Birmingham, AL 35203
Tel: (205) 254-1000
Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com
mjones@maynardcooper.com

Pamela B. Slate
HILL HILL CARTER FRANCO COLE &
BLACK, P.C.
425 South Perry Street
Montgomery, AL 36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*Counsel for Defendant,*
*Blue Cross Blue Shield of Alabama*

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
Erica B. Zolner
Casey R. Fronk
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
hwitt@kirkland.com
jzeiger@kirkland.com
ezolner@kirkland.com
cfronk@kirkland.com

Kimberly R. West (*Liaison Counsel*)
Mark H. Hogewood
WALLACE JORDAN RATLIFF &
BRANDT LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35253
Tel: (205) 870-0555
Fax: (205) 871-753
kwest@wallacejordan.com
mhogewood@wallacejordan.com

53

Brian K. Norman
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX 75234
Tel: (214) 987-1745
Fax: (214) 521-9033
bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
63 South Royal Street, 13th Floor
Riverview Plaza
Mobile, AL 36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

*Counsel for Defendants, Carefirst, Inc.; Carefirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.*

Rafael Escalera Rodríguez
Sylmarie Arizmendi
Gustavo A. Pabón Rico
REICHARD & ESCALERA
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, PR 00917-1913
Tel.: (787) 777-8888
Fax: (787) 765-4225
escalera@reichardescalera.com
arizmendis@reichardescalera.com
pabong@reichardescalera.com

*Counsel for Defendant, Triple-S Salud, Inc.*

R. David Kaufman
M. Patrick McDowell
BRUNINI, GRANTHAM, GROWER
& HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS 39201
Tel: (601) 948-3101
Fax: (601) 960-6902

*Counsel for Defendants, Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.; Counsel for Defendant, Blue Cross of Northeastern Pennsylvania*

Jonathan M. Redgrave
Victoria A. Redgrave
REDGRAVE, LLP
14555 Avion Parkway, Suite 275
Chantilly, VA 20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com
vredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark Defendants*

Andy P. Campbell
Stephen D. Wadsworth
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL, GUIN, WILLIAMS, GUY
& GIDIERE LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Tel: (205) 224-0750
Fax: (205) 224-8622
andrew.campbell@campbellguin.com
stephen.wadsworth@campbellguin.com
todd.campbell@campbellguin.com
yawanna.mcdonald@campbellguin.com

54

dkaufman@brunini.com
pmcdowell@brunini.com

Cheri D. Green
BLUE CROSS BLUE SHIELD OF MISSISSIPPI
P. O. Box 1043
Jackson, MS 39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

John Martin
Lucile H. Cohen
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255-9421
Fax: (803) 255-9054
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com

*Counsel for Defendant, Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company*

Michael A. Naranjo
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA 94104-1520
Tel: (415) 984-9847
Fax: (415) 434-4507
mnaranjo@foley.com

Alan D. Rutenberg
Benjamin R. Dryden
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Tel: (202) 672-5300
Fax: (202) 672-5399
arutenberg@foley.com
bdryden@foley.com

*Counsel for Defendant, USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue Shield*

Jason R. Gourley
Sarah L. Cylkowski
BODMAN PLC
201 South Division Street, Suite 400
Ann Arbor, MI 48104
Tel: (734) 761-3780
Fax: (734) 930-2494
aharris@bodmanlaw.com
jgourley@bodmanlaw.com
scylkowski@bodmanlaw.com

Todd Stenerson
Timothy J. Slattery
SHEARMAN & STERLING LLP
401 9th Street, NW
Suite 800
Washington, DC 20004-2128
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com
timothy.slattery@shearman.com

*Counsel for Defendant, Blue Cross and Blue Shield of Michigan*

John Briggs
Rachel Adcox
AXINN, VELTROP & HARKRIDER, LLP
950 F Street, N.W.
Washington, DC 20004
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
radcox@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5000
Fax: (205) 250-5034
steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

Charles L. Sweeris
Law Department
BLUE SHIELD OF CALIFORNIA
50 Beale Street
San Francisco, CA 94105
Tel: (415) 229-5107
Fax: (415) 229-5343
charles.sweeris@blueshieldca.com

*Counsel for California Physicians' Service d/b/a Blue Shield of California*

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Mary G. Menge
Morgan B. Franz
SPOTSWOOD SANSOM & SANSBURY LLC
One Federal Place
1819 5th Avenue North, Suite 1050
Birmingham, AL 35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
mmenge@spotswoodllc.com
mfranz@spotswoodllc.com

*Counsel for Defendant Capital BlueCross*

Christine Varney
Evan Chesler
Karin DeMasi
Lauren Kennedy
CRAVATH SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Tel: (212) 474-1000
Fax: (212) 474-3700
cvarney@cravath.com
echesler@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com

*Counsel for Defendant, Independence Blue Cross*

Edward S. Bloomberg
John G. Schmidt
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY 14203
Tel: (716) 847-7096
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com

Stephen A. Walsh
ADAMS and REESE LLP
1901 Sixth Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5000
Fax: (205) 250-5091
Stephen.walsh@arlaw.com

*Counsel for Defendant, Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield, incorrectly sued as Excellus BlueCross BlueShield of New York*

Kathleen Taylor Sooy
Tracy A. Roman
April N. Ross
Michael W. Lieberman
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com
aross@crowell.com
mlieberman@crowell.com

John M. Johnson
Brian P. Kappel

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL 35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendant Blue Cross and*
*Blue Shield of Tennessee, Inc.*

LIGHTFOOT FRANKLIN & WHITE
LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
Tel: (205) 581-0716
Fax: (205) 380-9116
jjohnson@lightfootlaw.com

*Counsel for Defendants, Blue Cross of*
*Idaho Health Service, Inc.; Blue Cross and*
*Blue Shield of Kansas, Inc.; Blue Cross*
*and Blue Shield of Kansas City;*
*Blue Cross and Blue Shield of Nebraska;*
*Blue Cross Blue Shield of Arizona;*
*Blue Cross Blue Shield of North Dakota;*
*Blue Cross Blue Shield of Wyoming;*
*HealthNow New York Inc.; BlueShield of*
*Northeastern New York; BlueCross*
*BlueShield of Western New York*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
Anne I. Salomon
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com
anne.salomon@kirkland.com

*Counsel for Defendants Wellmark of South*
*Dakota, Inc. (Wellmark Blue Cross and*
*Blue Shield of South Dakota); Wellmark,*
*Inc. (Wellmark Blue Cross and Blue Shield*
*of Iowa)*

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on August 18, 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.


                                                */s/* David Zott
                                                David J. Zott