

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406) | ) **Master File** <br> ) **No. 2:13-CV-20000-RDP** <br> ) <br> ) This document relates to all cases. <br> ) |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECTION 1, PER SE, AND QUICK LOOK CLAIMS**

**PUBLICLY FILED REDACTED VERSION**

Dated: September 15, 2017

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 3

I.     Defendants' Response To Subscribers' Statement Of Additional Facts ("SASF") ............ 3

II.    Defendants' Response To Providers' Statement Of Additional Facts ("PASF") .............. 6

ARGUMENT ...................................................................................................................... 7

I.     The Challenged Rules Are Not Governed By § 1 Of The Sherman Act. .......................... 7

      A.    Plaintiffs do not dispute the facts establishing that Defendants operate as a single entity with respect to governance of the Blue Brands. ............................ 7

      B.    Plaintiffs admit facts demonstrating that service areas were not established by any unlawful agreement. ................................................................................. 12

II.    Plaintiffs Have Not Demonstrated That The Challenged Rules Are Subject To The Per Se Rule. .......................................................................................................... 15

      A.    All relevant authority shows that the per se rule cannot apply. ........................... 15

            1.    Binding Supreme Court Precedent ........................................................... 15

            2.    Binding Eleventh Circuit Precedent ......................................................... 19

            3.    *Sealy* and *Topco* do not dictate a different result. ..................................... 21

      B.    Plaintiffs admit facts establishing plausible procompetitive benefits. ................. 24

      C.    Plaintiffs admit facts demonstrating that the challenged restraints are not purely horizontal. ................................................................................................. 32

      D.    Judicial experience does not show the rules to be obviously anticompetitive. ................................................................................................................ 32

      E.    Plaintiffs have not shown that the Best Efforts rules or uncoupling rules are per se illegal. ...................................................................................................... 34

      F.    Providers have not shown that BlueCard is naked price-fixing ............................ 36

III.   Plaintiffs' Invocation Of Quick Look Is An Invitation To Clear Legal Error. ................. 37

CONCLUSION .................................................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc.*,
  135 F.3d 740 (11th Cir. 1998) ................................................. 36, 37

*Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*,
  249 F.3d 564 (6th Cir. 2001) ................................................. 12, 14

*American Needle, Inc. v. National Football League*,
  560 U.S. 183 (2010) ................................................................ passim

*Arizona v. Maricopa County Medical Society*,
  457 U.S. 332 (1982) ................................................................. 18

*Augusta News Co. v. Hudson News Co.*,
  269 F.3d 41 (1st Cir. 2001) ..................................................... 23

*Blue Cross & Blue Shield Ass'n v. Group Hospitalization &*
  *Medical Services, Inc.*,
  744 F. Supp. 700 (E.D. Va.), *aff'd* 911 F.2d 720 (4th Cir. 1990) .............................. 30, 33

*Broadcast Music, Inc. (BMI) v. Columbia Broadcasting System, Inc.*,
  441 U.S. 1 (1979) ................................................................ 18, 19, 22

*California Dental Ass'n v. Federal Trade Commission*,
  526 U.S. 756 (1999) ................................................................. 24

*Castro v. Sanofi Pasteur Inc.*,
  2012 WL 12516573 (D.N.J. Dec. 20, 2012) ..................................... 36

*Catalano v. Target Sales, Inc.*,
  446 U.S. 643 (1980) ................................................................. 18

*Central Benefits Mutual Insurance Co. v. Blue Cross & Blue Shield Ass'n*,
  711 F. Supp. 1423 (S.D. Ohio 1989) .......................................... 30, 33

*Chicago Professional Sports Limited Partnership v. National Basketball Ass'n*,
  95 F.3d 593 (7th Cir. 1996) ..................................................... 9

*Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) .................................... 21, 32, 38

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ................................................................ 7, 9

**Page(s)**

*Cumulus Media, Inc. v. Clear Channel Communications, Inc.*,
    304 F.3d 1167 (11th Cir. 2002) ................................................................. 14

*Fashion Originators' Guild v. Federal Trade Commission*, 312 U.S. 457 (1941)...................... 13

*Federal Trade Commision v. Actavis, Inc.*,
    133 S. Ct. 2223 (2013)................................................................ passim

*Garot Anderson Agencies, Inc. v. BCBS United of Wisconsin*,
    1993 WL 78756 (N.D. Ill. Feb. 26, 1993) ....................................................... 34

*General Leaseways v. National Truck Leasing Ass'n*,
    744 F. 2d 588 (7th Cir. 1984) ...................................................... 16, 21, 25, 31

*Group Hospitalization & Medical Services, Inc. v. Blue Cross & Blue Shield of Virginia*,
    No. 85–1123–A (E.D. Va. Apr. 8, 1986) ......................................................... 33

*In re Sulfuric Acid Antitrust Litigation*,
    703 F.3d 1004 (7th Cir. 2012) ................................................................ passim

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)................................................................... 24, 38

*Levine v. Central Florida Medical Affiliates, Inc.*,
    72 F. 3d 1538 (11th Cir. 1996) .................................................................. 25

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)..................................................................... 23

*Meijer, Inc. v. Barr Pharmaceuticals, Inc.*,
    572 F. Supp. 2d 38 (D.D.C. Aug. 11, 2008) ...................................................... 23

*Mueller v. Wellmark, Inc.*,
    861 N.W.2d 563 (Iowa 2015) .......................................................... 18, 33, 37

*National Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
    779 F.2d 592 (11th Cir. 1986) ................................................................ 23, 28

*National Collegiate Athletic Ass'n (NCAA) v.*
*Board of Regents of the University of Oklahoma*,
    468 U.S. 85 (1984)................................................................... 17, 22, 35

*North Jackson Pharmacy v. Caremark RX, Inc.*,
    385 F. Supp. 2d 740 (N.D. Ill. 2005) ............................................................ 25

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
    472 U.S. 284 (1985)............................................................................ 35

**Page(s)**

*Polk Bros., Inc. v. Forest City Enterprises, Inc.*,
   776 F.2d 185 (7th Cir. 1985) .......................................................................... 20, 21, 29, 32

*Polygram Holding, Inc. v. Federal Trade Commission*,
   416 F.3d 29 (D.C. Cir. 2005) ......................................................................... 35

*Powderly v. Blue Cross & Blue Shield of North Carolina*,
   No. 3:08-cv-00109 (W.D.N.C. Aug. 21, 2008) ............................................... 33

*Princo Corp. v. International Trade Commission*,
   616 F.3d 1318 (Fed. Cir. 2010) ...................................................................... 35

*Procaps S.A. v. Patheon, Inc.*,
   845 F.3d 1072 (11th Cir. 2016) ...................................................................... passim

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) ....................................................................... 22, 35

*Spinelli v. National Football League*,
   96 F. Supp. 3d 81 (S.D.N.Y. 2015) ................................................................ 9, 10

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006) ............................................................................................ 10, 35

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
   959 F.2d 468 (3d Cir. 1992) ........................................................................... 25

*United States v. Anthem, Inc.*,
   236 F. Supp. 3d 171 (D.D.C. 2017) ................................................................ 33, 36

*United States v. Anthem, Inc.*,
   855 F.3d 345 (D.C. Cir. 2017),
   *cert. dismissed*, 2017 WL 1807377 (U.S. June 12, 2017) ............................... 33

*United States v. Arnold, Schwinn & Co.*,
   388 U.S. 365 (1967) ........................................................................................ 32

*United States v. Cadillac Overall Supply Co.*,
   568 F.2d 1078 (5th Cir. 1978) ........................................................................ 16

*United States v. Consolidated Laundries Corp.*,
   291 F.2d 563 (2d Cir. 1961) ........................................................................... 16

*United States v. Sealy, Inc.*,
   388 U.S. 350 (1967) ........................................................................................ passim

*United States v. Sealy, Inc.*,
   1964 WL 8089 (N.D. Ill. Oct. 6, 1964) .......................................................... 11, 24

**Page(s)**

*United States v. Topco Associates, Inc.*,
405 U.S. 596 (1972)................................................................................... passim

*United States v. Topco Associates. Inc.*,
319 F. Supp. 1031 (N.D. Ill. 1970), *rev'd*, 405 U.S. 596 (1972).............................. 11, 24

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
344 F.3d 1294 (11th Cir. 2003) ........................................................................ passim

*VMG Enterprises, Inc. v. F. Quesada & Franco, Inc.*,
788 F. Supp. 648 (D.P.R. 1992)........................................................................... 13

*Washington v. National Football League*,
880 F. Supp. 2d 1004 (D. Minn. 2012)............................................................... 7, 9, 10

*Wounded Warrior Project, Inc. v. Lotsa Helping Hands, Inc.*,
2015 WL 12938935 (M.D. Fla. Apr. 16, 2015),
*aff'd* 649 F. App'x 732 (11th Cir. 2016).................................................................. 3

## Statutes

15 U.S.C. § 1 .................................................................................................. 2, 38

15 U.S.C. § 2 .................................................................................................. 2, 38

## Other Authorities

Areeda, Phillip E. & Herbert Hovenkamp, Antitrust Law (3d ed. 2011) ........................ 13, 21, 22

FTC, DOJ Antitrust Guidelines for Collaborations Among Competitors § 3.2 (2000) ............... 25

Herbert Hovenkamp & Christopher Leslie, The Firm as Cartel Manager,
64 Vand. L. Rev. 813 (2011) ............................................................................. 9, 11, 22

Herbert Hovenkamp, The Rule of Reason (Sept. 15, 2017),
http://scholarship.law.upenn.edu/faculty_scholarship/1778/............................................. 23

6 McCarthy on Trademarks and Unfair Competition § 31:107 (4th ed. 2017).....................12

## INTRODUCTION

The question before the Court is straightforward: whether a System that provides health insurance to more than 106 million Americans, that has been operating out in the open for decades, and that has been examined by the DOJ and FTC without repercussion is illegal as a matter of law. The answer is plainly no. Seeking to avoid this inevitable conclusion, Plaintiffs throw a barrage of immaterial facts at the Court and attempt to confuse clear legal principles. Their effort fails.

None of the facts Plaintiffs cite refutes one core truth: through the challenged rules, Defendants offer joint products and services—including nationwide healthcare coverage with a strong local focus—that no Plan could offer on its own. This alone is a substantial procompetitive benefit and Plaintiffs do not establish otherwise.

In an attempt to avoid what they concede is the presumptive standard of review, Plaintiffs ask the Court to enter a thicket of legal errors. *First,* Plaintiffs argue the Court must ignore procompetitive benefits simply because they invoke a "horizontal market allocation" label. That is wrong. The Eleventh Circuit has clearly held: "that just because an agreement is capable of being characterized as a market allocation agreement does not mean that the per se rule applies." *Procaps*. This Court is bound by that pronouncement, which is consistent with Supreme Court precedent over the last 30 years, including *Actavis*, *BMI*, *American Needle*, *Maricopa County*, and *NCAA*. Decades-old *Sealy* and *Topco* are distinguishable and do not justify a different result.

*Second,* Plaintiffs next ask the Court to err by limiting the rule of reason to restraints that are "essential" to the existence of a "new product." Once again, binding Supreme Court and Circuit Court authority (and Subscribers' expert witness testimony) is to the contrary. *Actavis*, *Procaps*,

*Valley Drug*, *Sulfuric Acid*, and *Polk Brothers* apply the rule of reason to agreements that, far from being necessary to create new products, *eliminated* products and services from the market.

**Third,** Plaintiffs ask the Court to reject, today, the substantial procompetitive justifications offered by Defendants as not "compelling." That is not the standard, nor is it true. The relevant question for standard of review is whether such justifications are plausible. If a reasonable juror could find they are, the rule of reason applies. Substantial evidence, including Professor Murphy's report, establishes the procompetitive benefits of the challenged rules, including how service areas and Best Efforts facilitate those benefits. Given this evidence—and Plaintiffs' inability to dispute most of it—the presumptive rule of reason applies here, as it does in most modern antitrust cases.

The Court need not go any farther to rule in favor of Defendants. But there is more. Plaintiffs also concede facts establishing exclusive service areas are not the product of a naked horizontal agreement among competitors; they instead arose from common-law trademark rights or vertical licenses from the AHA and AMA where there was no prior use. Plaintiffs also fail to cite a single case that applied the per se rule in a factually similar context. The absence of a naked horizontal agreement and judicial experience condemning a comparable system as anticompetitive are yet two other independent and legally irrefutable reasons why the per se rule cannot govern.

Moreover, under the law and the undisputed evidence, Defendants' conduct should be assessed under § 2 of the Sherman Act, not § 1. First, Defendants act as a single entity with respect to the function at the core of Plaintiffs' claims—the governance of the use of the Marks. Second, because the challenged restraints were not the product of any unlawful agreement, they do not constitute concerted action within the meaning of § 1.

For these reasons and those in Defendants' opening brief, Defendants respectfully request that the Court grant their motion and dismiss Plaintiffs' § 1, per se, and quick-look claims.

## STATEMENT OF FACTS

Defendants' opening brief sets forth the undisputed, material facts relevant to their motion. Plaintiffs have responded with certain "additional facts" that Defendants dispute and that are also immaterial. Since "[d]isputes over immaterial facts do not preclude summary judgment," Plaintiffs' additional "facts" cannot overcome Defendants' motion; indeed, the Court need not even consider them at this time. *See, e.g., Wounded Warrior Project, Inc. v. Lotsa Helping Hands, Inc.*, 2015 WL 12938935, at *2 (M.D. Fla. Apr. 16, 2015), *aff'd* 649 F. App'x 732 (11th Cir. 2016). Nevertheless, for the avoidance of doubt, Defendants address each of these additional facts below.

## I.     Defendants' Response To Subscribers' Statement Of Additional Facts ("SASF")

1.     **Disputed**. Defendants do not dispute that the 36 Plans are independent companies. As the quoted language makes clear, however, the BCBSA Bylaws recognize that Plans are autonomous ███ ███████████ (Sub. Ex. 5 at 3043 (emphasis added); *see also* Def. Resp. SSF ¶ 1.)

3.     **Disputed**. The cited exhibits do not support the assertion that "Defendants freely admit that they are not a single entity" as that term is used in antitrust law. Defendants do not dispute that they are not a single company, or that Blue Plans are financially independent.

4.     **Disputed**. The cited exhibits do not support the assertion that "Nor are the Plans a single entity with respect to the names and marks" as the term "single entity" is used in antitrust law. Defendants do not dispute that BCBSA is not a franchisor and the Plans are not franchisees.

5.     **Disputed**. Defendants do not dispute that one Plan's 30(b)(6) deponent testified ███████ ████████████████████████████████████████████ ██████ (Sub. Ex. 204, 6/28/2017 T. Carter Dep. Tr. at 44:21–23.) Professor Murphy did not admit that "without ESAs, every Plan would be a potential competitor of other Plans." Professor Murphy testified that he does not know whether Plans would have a right to use the

3

Blue Marks nationally if exclusive service areas were eliminated. (*See* Def. Resp. PSF ¶ 17 (citing Def. Ex. 131, 7/22/2017 K. Murphy Dep. Tr. at 135:3–15).) Defendants also dispute that "[t]hrough the BCBSA, the Blues have an agreement in which one Blue will not enter another Blue's territory without permission from that Blue." Service areas arose not through agreement among Plans, but rather through independently acquired common-law trademark rights and vertical licensing arrangements that permitted Plans to continue using the Marks within the areas each Plan was already using them. (*See* Def. Resp. SSF ¶ 19.) The current license agreements are between BCBSA and each individual Plan, and carry forward this grant of rights from earlier licenses. Moreover, Plans do not own the Marks and cannot authorize others to use the Marks in their service areas. (*See*, *e.g.*, Prov. Ex. 27; Prov. Ex. 28.)

6.    **Disputed**. SASF ¶ 6 is not demonstrated by the cited exhibits. Subscribers fail to cite any support for the assertion that "competition among the Blues has been a fact of life for decades, and yet the Blue System has persisted." Plans developed as complements, not competitors, and instances of Plans using the same Mark in the same area were sporadic, temporary, and narrow. (Def. URMF ¶¶ 7–8; Def. Resp. PASF ¶ 56.) Moreover, competition between Blue Plans results in documented harm (Def. Resp. SASF ¶ 7), and with the exception of limited counties in New York and one county in Washington, no Plans have the right to use the same Mark in the same area (*see* Def. Resp. PSF ¶ 16).

7.    **Disputed**. Competition among Blue Plans has caused consumer confusion and "a serious degradation of overall condition," including "steady decline in the collective enrollment, service and financial conditions." (Def. Resp. PSF ¶ 37.) Competition among Plans would also inhibit the cooperation fundamental to Defendants' ability to function as an integrated national Blue System. (Def. URMF ¶¶ 28–35, 61–65; Ex. 4, 6/30/2017 R. Wilson Dep. Tr. at 338:21–340:14.)

8.    **Disputed**. Subscribers' assertion that "[n]umerous Defendants have admitted that intra-Blue competition is good for the Blue System" is not demonstrated by the three cited exhibits and is inaccurate. Rather, as described above, competition between Blue Plans results in documented harm. (*See* Def. Resp. SASF ¶¶ 6–7.)

9.    **Disputed**. SASF ¶ 9 is not demonstrated by the cited exhibits. SX312 is talking points of one Plan's sales department and includes only generic statements, without any factual data or underlying support. SX299 is another Plan's comments in opposition to a proposed merger, expressing the self-interested opinions of it and its experts.

10.    **Disputed**. SASF ¶ 10 is not demonstrated by the cited exhibits. SX300 and SX301 have nothing to do with service areas. They are simply antitrust compliance trainings and certifications developed by BCBS of Massachusetts and America's Health Insurance Plans, a non-Blue trade association, respectively. SX302 has nothing to do with service areas and is the Kansas City Plan's assessment of other Plans' mergers. SX228 evidences BCBSA's commitment to antitrust compliance, including ongoing antitrust analyses and a panel of outside antitrust experts. SX212 is a letter from a business executive pointing out that service areas are the subject of antitrust scrutiny, which Defendants described at length in their opening brief. (Def. URMF ¶¶ 44–52.) SX211 is from a non-lawyer, and the quoted excerpt is unrelated to the legality of exclusive service areas. SX207 is a summary of a 1986 interview of a non-lawyer in his personal capacity.

11.    **Disputed**. SASF ¶ 11 is not demonstrated by the cited exhibits. In fact, not one of the cited exhibits even references LBE or NBE, and many of the exhibits predate those rules by years. (*See*, *e.g.*, SX211 (written two years before LBE, and thirteen years before NBE); SX227 (same); SX303 (written six years before NBE); SX304 (same).)

## II.    Defendants' Response To Providers' Statement Of Additional Facts ("PASF")

53.    **Disputed**. Blue Cross Blue Shield of West Virginia, Inc., and Blue Cross Blue Shield of West Central Virginia, Inc., were licensed to use the Blue Marks in mutually exclusive areas of West Virginia. (Prov. Ex. 27.) These Plans violated the terms of their License Agreements by using the Marks outside of their respective service areas. (*Id*.) BCBSA considered various options for regaining compliance, including a merger between the Plans. (Prov. Ex. 28.)

55.    **Disputed**. PASF ¶ 55 is not supported by the cited exhibit. Neither individual on the cited email "expressed [his] belief that the Association's limits on non-Blue revenue were anticompetitive," and one subsequently testified that he had no opinion on the issue. (Sub. Ex. 291, 7/28/2017 J. Swedish Dep. Tr. at 164:15–166:12.)

56.    **Disputed**. The cited document argues that removal of the Plan, not merger, would result in erosion of provider participation. (Prov. Ex. 44 at 7921.) Moreover, the Long-Term Business Strategy encouraged multiple Plans within one state to merge or otherwise consolidate complementary assets where it made sense to do so to eliminate administrative costs, increase efficiencies, and increase the System's coherence and ability to service national accounts. (Def. URMF ¶ 20; Ex. 4, 6/30/2017 R. Wilson Dep. Tr. at 81:8–87:13.) The Long-Term Business Strategy did not require Plans to merge, and Plans did not merge when they chose not to. (Ex. 4, 6/30/2017 R. Wilson Dep. Tr. at 81:8–87:13, 201:18–207:22.)

58.    **Disputed**. The statement that "BlueCard is not a product on its own" is inaccurate. The cited exhibit merely states that ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████. (Prov. Ex. UUUU, 6/28/17 T. Carter Dep. Tr. at 89:23–90:6.)

**ARGUMENT**

I.      **The Challenged Rules Are Not Governed By § 1 Of The Sherman Act.**

A.      **Plaintiffs do not dispute the facts establishing that Defendants operate as a single entity with respect to governance of the Blue Brands.**

Plaintiffs address the governing legal principles of single-entity analysis by denying their very existence. Subscribers in particular assert that the single-entity analysis pronounced in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), and *American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010), is "fiction," notwithstanding that one of their counsel litigated a post-*American Needle* case applying that very legal analysis to analogous facts. *Washington v. Nat'l Football League*, 880 F. Supp. 2d 1004, 1006 (D. Minn. 2012) (holding that the NFL and its constituent teams *are* a single entity with respect to certain functions relating to the governance and use of the NFL's intellectual property, despite *not* being a single entity for other functions). The single-entity doctrine is not a fiction—it is the law.

Plaintiffs do not genuinely dispute the few facts material to Defendants' single-entity argument. Indeed, they concede the most important fact, by itself nearly dispositive: no individual Plan has ever owned the right to govern the use of the Blue Marks nationwide. Rather than logically attempt to dissuade the Court from properly applying the law to the conceded facts, Plaintiffs seek to distract from those facts by pointing to ways in which Defendants *do not* operate as a single entity, as if those had any relevance to where Defendants *do* operate as a single entity. And while the single-entity argument may not dispose of each and every one of Plaintiffs' claims, it does defenestrate most; it goes to the very heart of Plaintiffs' case; it goes to the jugular and lets the rest go.

Analysis of whether defendants operate as a single entity, and therefore are not legally capable of concerted action under Section 1 of the Sherman Act, must proceed on a function-by-

7

function basis in two steps: (1) definition of the relevant function and (2) analysis of whether the separate actors individually own the assets necessary to undertake the function (*i.e.*, whether defendants' execution of that function deprives the marketplace of independent centers of decisionmaking). *Am. Needle*, 560 U.S. at 194, 198. Here, Plaintiffs do not even *attempt* to rebut Defendants' definition of the function at issue—nationwide governance of the use of the Blue Marks. Nor do they dispute that this function can *only* be performed by the sole owner of the Blue Marks. Instead, Plaintiffs raise four baseless arguments.

**First**, rather than looking beyond "formalistic distinctions" as required by the Supreme Court, Subscribers argue that Defendants' corporate *form* is dispositive.[1] But whether Defendants are "separate [legal] entities" is immaterial to the single-entity analysis. The Court has "long held that concerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities. Instead, [the Court has] eschewed such formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." *Am. Needle*, 560 U.S. at 191.

**Second**, Subscribers (again without Providers) incorrectly argue that *American Needle* rejected a function-by-function analysis.[2] This is wrong. The Supreme Court did not examine whether the NFL and individual teams were a single entity in *all* respects. Instead, it evaluated single-entity status *only* with respect to the pertinent function—licensing of trademarks owned by individual teams. *E.g.*, *id.* at 200 (holding that defendants were not a single entity "at least with regards to its marketing of property owned by the separate teams"), 201 ("decisions by the NFLP

---

[1] Apparently recognizing that elevating form over substance in single entity analysis is wrong as a matter of law, Providers do not advance this argument.

[2] According to Providers, the Supreme Court never even passed on this question. (Prov. Resp. at 18.). This is also wrong.

regarding the teams' separately owned intellectual property constitute concerted action"), 204 (declining to treat the teams as a single entity "when it comes to the marketing of the teams' individually owned intellectual property").[3] Both post-*American Needle* district court opinions applied a function-by-function analysis based on *American Needle*. *Washington v. NFL*, 880 F. Supp. 2d 1004, 1006 (D. Minn. 2012); *Spinelli v. NFL*, 96 F. Supp. 3d 81, 114–17 (S.D.N.Y. 2015). Although Plaintiffs criticize these decisions, they do not cite a *single* contrary post-*American Needle* case. In fact, their own cited article recognizes the function-by-function analysis: "Treating the NFL as a single entity . . . might be appropriate *for purposes of licensing the NFL logo*[.]" Herbert Hovenkamp & Christopher Leslie, The Firm as Cartel Manager, 64 Vand. L. Rev. 813, 823 (2011) (emphasis added).

**Third**, while Providers correctly state that the "touchstone" question is whether an activity deprives the marketplace of independent centers of decisionmaking, their handling of that question is wrong. (Prov. Resp. at 17–18.) Contrary to Providers' assertion, *American Needle*, *Washington*, and *Spinelli* did not turn on whether teams competed for team marks. Rather, each case turned on whether licensing decisions could be made individually by the teams. In *American Needle*, each team could individually make licensing decisions because, even after NFL Properties was created, the individual team trademarks were still separately owned by each individual team. The Court distinguished the teams from "a single enterprise that owns several pieces of intellectual property and licenses them jointly." 560 U.S. at 198; *see also id.* at 202 n.9 ("[T]he teams still own their own trademarks" and "could decide to license their own trademarks."). While individual NFL

---

[3] In *American Needle*, the Supreme Court kept to the analytical framework it established in *Copperweld Corp. v. Independent Tube Corp*., 467 U.S. 752, 768–71 (1984), which the Seventh Circuit followed in *American Needle* and *Chicago Professional Sports Limited Partnership v. National Basketball Ass'n*, 95 F.3d 593, 600 (7th Cir. 1996). In *American Needle*, the Supreme Court and Seventh Circuit diverged only in the definition of the function at issue, not the applicability of the functional analysis altogether.

teams shared broad common interests, such as promotion of the NFL brand, their interests in licensing *individually owned* team trademarks were not necessarily aligned. *Am. Needle*, 560 U.S. at 198. Precisely **because** the teams retained ownership of their intellectual property—and could therefore act upon their independent interests with respect to that intellectual property—the Supreme Court held that the aggregation of licensing authority resulted in the joining of independent centers of decisionmaking.

Conversely, in *Washington* and *Spinelli*, licensing decisions could only be made collectively. In *Washington*, the footage reflected the combined IP assets of multiple teams as well as the NFL itself. The court held that, because multiple parties contributed the component parts of that joint IP asset, decisions regarding its licensing could not be made by any individual team, and thus were made by a single entity. 880 F. Supp. 2d at 1006. Thus, "[t]he NFL and its teams *can* conspire to market each teams' individually owned property, but *not* property the teams and the NFL can only collectively own." *Id.* (emphasis added); *see also Spinelli*, 96 F. Supp. 3d at 113–15. Subscribers admit that the teams in *Washington* never separately owned game footage (Sub. Resp. at 33–34 n.24), and that is precisely the point. Had the teams separately owned the footage, they could have made independent decisions regarding licensing of that footage. But because the licensed asset incorporated the assets of multiple parties, licensing decisions could *only* be made collectively. Thus, such group decisions (even if made by multiple formal legal entities that could compete in other respects) did not deprive the marketplace of independent decisionmakers.[4]

The same is true here. Plaintiffs concede that no individual Plan owns—or has ever owned—the assets necessary to govern use of the Blue Marks nationwide. (PSF ¶¶ 4, 25–26, 29–

---

[4] Ongoing "control" of the venture/enterprise by separate legal entities is irrelevant. By definition, all joint ventures and enterprises are "controlled" by the collaborating actors, yet they are still eligible for single-entity treatment. *See, e.g.*, *Texaco Inc. v. Dagher*, 547 U.S. 1, 4–6 (2006).

31; SSF ¶¶ 16–17; *see also* Def. URMF ¶¶ 12–14.) Plaintiffs further concede that at least some Plans integrated their IP assets through ownership, and that only BCBSA has ever held the federal registration. These admissions alone are fatal to their § 1 claims.

**Fourth,** Plaintiffs argue that Defendants integrated their assets less than the defendants in *Sealy* and *Topco*. *United States v. Sealy, Inc.*, 388 U.S. 350 (1967); *United States v. Topco Assocs., Inc.*, 450, U.S. 596 (1972). But Plaintiffs do not dispute that at least some Plans held common-law trademarks, something no Sealy or Topco licensee could claim. The contribution of these separately owned IP assets, coupled with BCBSA's ownership of the nationwide federal marks, makes this case analogous to *Washington* and *Spinelli*. There was no such contribution by the Sealy and Topco licensees. *United States v. Sealy, Inc.*, 1964 WL 8089, at *5 (N.D. Ill. 1964); *United States v. Topco Assocs.*, 319 F. Supp. 1031, 1033 (N.D. Ill. 1970). Moreover, *Sealy* and *Topco* were decided before *Copperweld*. At the time, even parent companies and their subsidiaries didn't qualify for single-entity status, and thus the question of whether the defendants in Sealy and Topco were single entities was not raised or decided.

As noted above, Providers' own cited article recognizes that the NFL could be treated as a single entity with respect to licensing the NFL logo. Hovenkamp, 64 Vand. L. Rev. at 823. But Plaintiffs omit that the NFL establishes exclusive territorial rights for each team and restricts teams' ability to own non-NFL football clubs or teams.[5] Under Plaintiffs' remedial demands, the NFL would be required to license the NFL logo to all 32 teams, thereby allowing each of those teams to compete against the NFL *using the NFL's own logo*. In the meantime, those teams would continue to benefit from the hard-built reputation associated with the NFL brand, and from a

---

[5] Def. Ex. 165, Constitution and Bylaws of the Nat'l Football League, Art. IV, Art. IX, § 9.1(C)(7), (15), (2006), *also available at* http://static.nfl.com/static/content//public/static/html/careers/pdf/co_.pdf.

continuing operational association with the NFL. And all of this would occur while the value of the NFL brand and product would be degraded day by day. Unsurprisingly, such demands to curtail the rights normally attendant to trademark ownership have no basis in law. *See, e.g.*, 6 McCarthy on Trademarks and Unfair Competition § 31:107 (4th ed. 2017) ("[I]n no reported private antitrust litigation has a plaintiff received the sanction of compulsory trademark licensing.").

Plaintiffs' view of the law would likely blow up the Blue System, destroy or diminish one of four national competitors (injuring interbrand competition), and impair the entire U.S. healthcare system. That would be quite a remarkable and sobering achievement. Single-entity analysis has been established by the Supreme Court and applied by the lower courts, and guards against such an extreme result. The Court should reject Plaintiffs' distorted logic and hold that the Blue System is a single entity with respect to nationwide governance of the use of the Blue Marks.

> **B.    Plaintiffs admit facts demonstrating that service areas were not established by any unlawful agreement.**

Plaintiffs do not dispute that Plans used the Blue trademarks in their service areas before entering the challenged license agreements. Such use conferred *exclusive* common-law trademark rights on these individual Plans that prevented other Plans from using those same trademarks in the Plan's service area.[6] *Allard Enters., Inc. v. Adv. Programming Res., Inc*., 249 F.3d 564, 571-72 (6th Cir. 2001) ("At common law, ownership of trademark or service mark rights is obtained by actual use. The first to use a mark in the sale of goods or services is the 'senior user' of the mark and gains common law rights to the mark in the geographic area in which the mark is used.")

---

[6] As to Plaintiffs' claim that Defendants have not traced their Service Areas back to original common-law rights or vertical agreements (Sub. Resp. at 45), this is done explicitly by the License Agreements themselves. Each iteration from 1952 to 1972 to 1991 expressly incorporates and codifies Plans' existing rights. (Def. URMF ¶¶ 14, 21; Resp. SSF ¶ 19.) In addition, Defendants provided specific examples of Plans' preexisting use and Plaintiffs have not disputed this evidence. (Def. URMF ¶¶ 4, 53–55, 58.) In any event, Defendants do not have the burden to trace the common law trademark rights of "each and every [Defendant]." (Sub. Resp. at 45.) It is Plaintiffs' burden to demonstrate facts showing a dispute of material fact, and they have not done so.

(citation omitted). Put simply, service areas arose from these pre-existing common-law trademark rights, not any unlawful agreement.[7] This simple fact alone puts them outside the scope of § 1 and therefore outside the scope of the per se rule. *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1081 (11th Cir. 2016) ("[A] contract can serve as the basis for a Section 1 claim only if it embodies an agreement to unlawfully restrain trade."). Plaintiffs' arguments rely on immaterial facts and inapposite legal principles, and otherwise demonstrate that the rule-of-reason analysis is required.

**First**, Plaintiffs are wrong that Defendants' trademark rights are "irrelevant." (Prov. Resp. at 22.) Trademarks are relevant because an agreement that merely recognizes territorial exclusivity stemming from preexisting trademark rights does not violate the Sherman Act. *VMG Enters., Inc. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648, 657 (D.P.R. 1992). The situation here and in *VMG* is different from those discussed in the Areeda & Hovenkamp treatise and *Fashion Originators' Guild v. F.T.C.* (and *Sealy*, *Topco*, and *Timken* for that matter), which do not address pre-existing separate, concurrent trademark rights. In *Fashion Originators' Guild*, the defendants "admit[ted] that their 'original creations' are neither copyrighted nor patented, and indeed assert[ed] that existing legislation affords them no protection against copyists." 312 U.S. 457, 461 (1941); *see also* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1907 (3d ed. 2011). A case that did not involve the protection of any cognizable IP rights cannot foreclose the consideration of such rights here.

**Second**, Plaintiffs argue that Plans' service areas were reallocated and therefore are the result of a horizontal agreement, but they cite no evidence for this proposition because there is none. (Sub. Resp. at 45–46.) While it is true that mergers consolidated previously separate service

---

[7] In any limited instances where Plans did *not* use the trademarks prior to the challenged license agreements and acquire common law trademark rights, Plaintiffs apparently argue that the service areas arose through a vertical license agreement with the predecessors of BCBSA—not through a horizontal agreement among Plans. (Prov. Resp. at 25-26.) Plaintiffs cannot seriously contend that the per se rule applies to such vertical agreements.

areas within a single company, those service areas (combined or not) remain the same as they existed prior to the challenged license agreements. (Def. URMF ¶ 57.)

**Third,** Plaintiffs suggest that Plans had no common-law trademark rights because they were not "senior user[s]" of the trademarks in their service area. (Prov. Resp. at 23–25.) But they present no evidence that any Plan previously used the marks nationwide (or claimed such rights), or that there was widespread overlap among Plans. (*See* Def. Ex. 163, 4/12/17 M. Rotunno Dep. Tr. at 36:1–39:12.) All Plans were senior users of the trademarks in the particular territories in which they used those marks. *Allard Enters.*, 249 F.3d at 571–72 (common-law rights exist "in the geographic area in which the mark is used"). Moreover, even if Plans were somehow "junior users" of the trademarks, Plaintiffs do not present any evidence that Plans sought to appropriate a senior user's goodwill with a "sinister purpose," as is necessary to invalidate a remote junior user's rights. Indeed, the evidence is the opposite. (*See* Def. Br. 24–25; Def. Resp. 20–22.)[8] Accordingly, Plaintiffs cannot force the application of § 1 by attacking the validity of Defendants' trademarks.[9]

**Fourth,** Plaintiffs suggest that Plans could not have acquired common-law trademark rights because such rights were owned by the predecessors of BCBSA. (Prov. Resp. at 25–26.) Contrary to Plaintiffs' argument, Defendants *do not* assert that these predecessor entities owned the common-law rights that Plans acquired through use. (*See* Def. URMF ¶¶ 4, 58; *see also* Def. Ex. 163, 4/12/17 M. Rotunno Dep. Tr. at 73:24–74:1 ("The Plans that began using the Blue Cross marks established common-law rights in the respective local areas.").) Plaintiffs' argument also

---

[8] Nor would Plaintiffs even have standing to challenge a junior user's rights and the statute of limitations to bring such a challenge expired decades ago. (Def. Resp. at 21 n.2.)

[9] Plaintiffs also argue that even if Plans had common law trademark rights, they "abandoned" those rights. (Prov. Resp. at 24 n.5.) Plaintiffs cite no evidence for this proposition. Plans did not abandon their rights; they assigned them to the predecessors of BCBSA and received exclusive licenses to their pre-existing service areas. *Cf. Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1173–74 (11th Cir. 2002) (abandonment requires "that the plaintiff has ceased using the mark in dispute, and that he has done so with an intent not to resume its use") (footnote omitted).

proves too much. If a Plan used the trademarks pursuant to a license from the predecessors of BCBSA, the Plan's service area arose from a *vertical* agreement, and not a horizontal agreement that could be subject to the per se rule.

**Finally,** Plaintiffs continue to mischaracterize Defendants as seeking to "escap[e] antitrust scrutiny." (Prov. Resp. at 22.) But Defendants could not have been clearer: prevailing on this argument simply means that the challenged rules are governed by § 2 instead of § 1.

## II.    Plaintiffs Have Not Demonstrated That The Challenged Rules Are Subject To The Per Se Rule.

### A.    All relevant authority shows that the per se rule cannot apply.

Plaintiffs insist that, if Defendants' conduct can be characterized as a horizontal market allocation, this Court must apply the per se rule and may not consider any plausible procompetitive justifications. (*See*, *e.g.*, Prov. Resp. at 1; Sub. Resp. at 2–3.) That is contrary to decades of binding precedent rejecting application of the per se rule to horizontal market allocations, price-fixing agreements, and other agreements of the "type" that can be subject to the per se rule, because the challenged conduct generated plausible benefits. ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ (Def.

Ex. 160, 9/1/17 D. Rubinfeld Dep. Tr. ("Rubinfeld Tr.") at 73:19–74:1.)

#### 1.    Binding Supreme Court Precedent

Supreme Court precedent demonstrates that horizontal agreements must be examined under the rule of reason if they have plausible procompetitive benefits. In *F.T.C. v. Actavis, Inc.*, the Supreme Court held that the rule of reason governs a horizontal agreement between drug companies to keep a generic drug off the market for a period of time in exchange for payment and dismissal of a patent-infringement suit against the generic. 133 S. Ct. 2223, 2229 (2013). Despite

this horizontal market allocation the Court mandated rule-of-reason analysis and specifically rejected "quick look," emphasizing that "redeeming virtues are sometimes present." *Id.* at 2236.[10]

Plaintiffs offer two responses to *Actavis*. Providers argue that *Actavis* "w[as] not even about the *per se* rule." (Prov. Resp. at 28.) This is true only in the sense that even the FTC lacked the temerity to bring a per se claim against a horizontal market allocation with potential redeeming virtues. Instead, the FTC requested quick look. The Supreme Court rejected even quick look, holding that the only appropriate standard of review was the rule of reason. 133 S. Ct. at 2237–38.

Plaintiffs also suggest that *Actavis* (and nearly every other market allocation case cited by Defendants) is irrelevant because it did not involve a *territorial* market allocation. (Prov. Resp. 28–29, 33 & n.11; Sub. Resp. at 36.) This purported distinction, apart from being contradicted by Plaintiffs' own complaint and expert testimony,[11] is contradicted by their authorities. In *United States v. Cadillac Overall Supply Co.*, for example, the former Fifth Circuit considered a customer allocation agreement among garment suppliers. 568 F.2d 1078 (5th Cir. 1978). The court recognized it as a "horizontal market division," and rejected the defendant's argument that the restraint, "while of a horizontal nature, is not a territorial one" as a "distinction without substance." *Id.* at 1088 (citing *United States v. Consol. Laundries Corp.*, 291 F.2d 563, 574–75 (2d Cir. 1961) ("We fail to see any significant difference between an allocation of customers and an allocation of territory."); *see also Gen. Leaseways v. Nat'l Truck Leasing Ass'n*, 744 F. 2d 588, 594–95 (7th Cir.

---

[10] Any notion that *Actavis* did not involve a horizontal market allocation is contrary to Eleventh Circuit law. *Procaps*, 845 F.3d at 1083 (reverse payment settlements "could reasonably be described as . . . market allocation agreements"). In addition, Plaintiffs assert that territorial and output restraints are subject to the same analysis. (Prov. Resp. at 35–36; Sub. Resp. at 2–3.) *Actavis* surely qualifies as an output restriction, which independently mandates consideration of potential redeeming virtues here.

[11] *See, e.g.*, Sub. Compl. ¶ 3 (defining "market division or allocation" as including division of customers, products, or territories); ██████████████████████████████████████████████████████████████

And it contradicts Plaintiffs' expansive interpretation of market allocation (and its interchangeability with output restrictions) when trying to bootstrap the Best Efforts and other rules as per se violations.

1984) ("[W]ith exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects."). Also, *In re Sulfuric Acid Antitrust Litigation* addressed a horizontal territorial allocation. 703 F.3d 1004, 1012 (7th Cir. 2012); *see* Prov. Resp. at 33 & n.11. Yet the court rejected any per se claim, as "[t]he rule of reason directs an assessment of the total economic effects of a restrictive practice that is plausibly argued to increase competition or other economic values on balance." *Id.* at 1011.

The Supreme Court's decisions in *American Needle* and *NCAA* further debunk the notion that any restraint that can be characterized as a horizontal customer allocation or output restraint requires per se treatment regardless of plausible procompetitive benefits. In *American Needle*, the teams agreed not to compete with each other for potential licensees (*i.e.*, customers), and not to sell licenses outside of the exclusive license to Reebok despite the presence of willing potential licensees (*i.e.*, output). 560 U.S. at 187. Providers assert this decision "w[as] not even about the *per se* rule." (Prov. Resp. at 28.) Providers are wrong: the Supreme Court explicitly held that the restraint was governed by the rule of reason, and directed the lower courts to "apply[] the Rule of Reason to the allegations in this case . . . on remand." 560 U.S. at 204.

In *NCAA*, the Supreme Court applied the rule of reason to a horizontal agreement to limit output. *Nat'l Collegiate Athletic Ass'n (NCAA) v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 101 (1984). Plaintiffs' sole response to this case is that the rule of reason can only apply to restraints essential for a new product to exist at all. (Prov. Resp. at 29; Sub. Resp. at 40.) But as explained in Defendants' prior briefs, *American Needle*, *Actavis*, and a host of other cases demonstrate otherwise. (Def. Br. 30–33; Def. Resp. 31–33.) Obviously, team logo licensing arrangements are not necessary to create football. And the agreement in *Actavis* eliminated a product (the generic drug) from the market.

Moreover, *Arizona v. Maricopa County Medical Society* and *BMI* mandate consideration of procompetitive benefits even for horizontal price-fixing. In *Maricopa County*—which Plaintiffs cite affirmatively—the Court held that physicians' *ex ante* price-fixing was per se illegal. 457 U.S. 332 (1982). However, "[i]f a clinic offered complete medical coverage for a flat fee, the cooperating doctors would have the type of partnership arrangement in which a price-fixing arrangement among the doctors would be perfectly proper." *Id. at* 357. That package of complete multi-party coverage is precisely the type of new, joint product Defendants have created here.

In *BMI*, the Court applied the rule of reason to horizontal price-fixing because the parties created a blanket license to their individual copyrights. Because the license "accompanie[d] the integration of sales, monitoring, and enforcement against unauthorized copyright use," it was not a "naked restraint of trade with no purpose except stifling of competition." *Broad. Music, Inc. (BMI) v. Columbia Broad., Sys., Inc.*, 441 U.S. 1, 20 (1979). The same is true here. Plans integrated their individual trademark rights, networks, and other assets to create a joint nationwide product. (Def. URMF ¶ 34.) Again, Plaintiffs' only response is that the restraint must be *essential* for a new product to exist at all. (Prov. Resp. at 32; Sub. Resp. at 40.) As discussed above, that's the wrong standard. And the Supreme Court of Iowa held that the Blue System fits comfortably within *BMI*: "Wellmark's health care provider network is analogous to the blanket license in *BMI*. . . . Similar efficiency-related observations can be made about Wellmark's reciprocal arrangements with out-of-state BCBS licensees." *Mueller v. Wellmark, Inc.*, 861 N.W.2d 563, 570 (2015). For this same reason, the court distinguished *Maricopa County*: "[t]here was no joint product or service being developed or sold."[12] *Id.* at 574. This Court should make the same distinction here.

---

[12] Plaintiffs also rely on *Catalano v. Target Sales, Inc.*, 446 U.S. 643 (1980). But there the Court applied the per se rule only after noting that defendants had failed to offer *any* procompetitive justification. *Id.* at 646 n.8 ("Respondents nowhere suggest a procompetitive justification for a horizontal agreement to fix credit.").

## 2.    Binding Eleventh Circuit Precedent

On top of forty years of Supreme Court precedent, every relevant Eleventh Circuit case cuts in favor of application of the rule of reason here. *Procaps*, decided last December, is the most recent example. 845 F.3d at 1081. There, two horizontal competitors entered into an agreement that pooled complementary assets and allocated customers and markets. One of the parties later acquired a third competitor. The court barred application of the per se rule to this agreement at any point in time because "some procompetitive efficiencies . . . might flow from the Collaboration Agreement, even post-acquisition." *Id.* at 1084. Plaintiffs ignore this crucial holding, arguing instead that the "principal holding in that case was that the challenged conduct was unilateral." (Sub. Resp. at 37.) That is wrong.

The Court could not have been clearer that it was *reaffirming* the *general rule* for horizontal market allocations. Procaps argued that "simply because the post-acquisition agreement was a horizontal market allocation agreement between competitors, [the court is] required to apply the per se rule." 845 F.3d at 1083. The court categorically rejected that approach, explaining, "Our precedent makes clear that ***just because an agreement is capable of being characterized as a market allocation agreement does not mean that the per se rule applies***." *Id.* (emphasis added). The mandate to consider plausible procompetitive benefits, even for horizontal market allocations, is why the court discussed *Valley Drug* at length (not to mention *BMI* and *Sulfuric Acid*); it is why it emphasized the evidence of "some procompetitive efficiencies that might flow" from the allocation; and it is why it explicitly distinguished *Palmer* as involving a sham, "uncoupled from any legitimate joint venture."[13] *Id.* at 1083–84. *Procaps* takes head-on the applicability of the per se rule to horizontal market allocations and rejects Plaintiffs' view outright.

---

[13] Plaintiffs also try to distinguish *Procaps* because it involved a formal joint venture. (*See*, *e.g.*, Sub. Resp. at 37–38.) This has been rejected before. *See*, *e.g.*, *Sulfuric Acid*, 703 F.3d at 1013 ("If there were no joint venture, there would

*Procaps* also dispels Plaintiffs' argument that the collaboration be "necessary" for the creation of a "new product," since the defendants both offered softgel products before their collaboration. 845 F.3d at 1077. In support, the Eleventh Circuit cited *Sulfuric Acid* (among many other cases). *Id.* at 1084. There, the Seventh Circuit required rule-of-reason treatment for a horizontal territorial allocation because the agreement when adopted could reasonably have been believed to promote "enterprise and productivity." *Sulfuric Acid*, 703 F.3d at 1011 (quoting *Polk Bros.*). Subscribers assert that *Sulfuric Acid* involved a vertical agreement, but the arrangement only became vertical because the American companies agreed to *shut down* their (competing) production capacity as part of the agreement. *Id.* at 1009. Thus, *Sulfuric Acid* applied the rule of reason to a horizontal territorial market allocation because it was "plausibly argued to increase competition or other economic values on balance." *Id.* at 1011. The court explicitly rejected Plaintiffs' argument that a "new product" is required for the rule of reason to apply. *Id.* ("Anyway 'product' talk is an unnecessary and distracting embellishment of the rule of reason.").

*Polk Bros., Inc. v. Forest City Enterprises, Inc.* (cited by the Eleventh Circuit in *Valley Drug*, discussed below) similarly rejects the notion that a "new product" is required. 776 F.2d 185 (7th Cir. 1985). There, competing retailers agreed to establish a side-by-side storefront and allocate products between themselves. Despite this horizontal market allocation, the court rejected any *per se* claim because the arrangement "arguably" "promoted enterprise and productivity at the time it was adopted." *Id.* at 189. Subscribers' meek response that *Polk Bros.* involved an agreement "to co-locate in a *single building*" is without merit. (Sub. Resp. at 38 & n.26.) Plaintiffs do not even try to argue the market allocation was *essential* to the creation of a

_____

still be no *per se* violation for there would still be the legitimate business reasons for the defendants to have cooperated.").

20

*new product*. Indeed, the allocation created no new products, eliminated existing products, and was not necessary for a side-by-side storefront. It was sufficient that the allocation "played an important role in inducing the two retailers to cooperate." 776 F.2d at 190. The record here establishes this and more.[14]

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.* also rejected application of the per se rule to a horizontal market allocation. 344 F.3d 1294, 1311 (11th Cir. 2003). First, the Eleventh Circuit explicitly held that the reasonableness of a restraint is evaluated at the time it is created, even if circumstances later change. *Id*. at 1306. The court required rule-of-reason analysis even though the patent was subsequently invalidated. *Id*. at 1306–07. Providers try to distinguish *Valley Drug* because it involved patents, not trademarks. (Prov. Resp. at 38 & n.13.) But Providers' own cited treatise rejects this distinction: "Of course, an agreement protecting intellectual property rights may be ancillary to other productive activity and thus qualify for rule of reason treatment." Areeda ¶ 1907b n.13. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

### 3.    *Sealy* and *Topco* do not dictate a different result.

Arrayed against the body of modern Supreme Court, Eleventh Circuit and other leading cases, Plaintiffs rely on decades-old *Sealy* and *Topco*. They claim that *Sealy* and *Topco* entirely

---

[14] Plaintiffs continue to argue that *General Leaseways* is analogous. (Prov. Resp. at 41 n.15.) But there the defendants "ha[d] not yet made a plausible free rider argument" because they made practically no use of their shared trademark (the absolute opposite of the Blue System); the Court noted the tension between *Topco/Sealy* and *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) (which was later resolved in *Polk Bros.* and *Sulfuric Acid*); and the decision turned on the legal standard for a preliminary injunction where the balance of harms strongly favored granting an injunction. 744 F.2d at 596–97.

preclude the Court from considering any procompetitive justifications in all horizontal market allocation or output restriction cases. (Prov. Resp. at 1; Sub. Resp. at 3.) This is simply not true. If *Sealy* and *Topco* preclude the Court from considering pro-competitive justifications in a horizontal market allocation or output restriction case, then each of the leading Supreme Court and Eleventh Circuit cases discussed above would have come out differently. But they did not. Each applied the rule of reason, and those cases dictate the same use of the rule of reason here.

Indeed, Plaintiffs' own sources recognize the applicability of the rule of reason. Providers selectively quote from a law review article by Herbert Hovenkamp (Prov. Resp. at 21–22), but omit Hovenkamp's subsequent statements—that the "proper analysis" of restraints like those in *Sealy* and *Topco* would be to "analyze the restraints at issue as ancillary to the activities of a joint venture. Both the Seventh and D.C. Circuits have taken this approach, and nothing in the *American Needle* opinion suggests that the Supreme Court would treat them any differently." 64 Vand. L. Rev. 813, 865 (citing *Polk Bros.* and *Rothery*).[15] Likewise, Providers rely extensively on Areeda and Hovenkamp's treatise, but omit the key language:

> Naked territorial agreements—those not accompanied by any joint production or distribution activity—are readily classifiable as unlawful per se; indeed, such arrangements often enable cartel members to accomplish what a simple price-fixing agreement could not. Nevertheless, ***there remains a legitimate class of horizontal market divisions that are reasonable because they are legitimately ancillary to procompetitive joint activity***. Areeda ¶ 1509a (emphasis added).

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[15] *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.* addressed a horizontal restraint that prevented participants from free-riding on the jointly used brand and services. 792 F.2d 210 (D.C. Cir. 1986). Plaintiffs try to pigeonhole *Rothery* as "deal[ing] with the issue of group boycotts and a concerted refusal to deal." (Prov. Resp. at 35.) But *Rothery* itself held the challenged arrangement "very closely resemble[d]" the arrangement in *Topco*. 792 F.2d at 225. Citing cases such as *BMI* and *NCAA*, the court applied the rule of reason because the horizontal restraint was "part of an integration of the economic activities of the parties and appears capable of enhancing the group's efficiency." *Id.* at 229.

████████████████████████████████████████████████████

████████████████████████████████████████████████ (Sub. Ex. 316, Rubinfeld Rpt.

¶ 28 (some emphasis added); *see* Rubinfeld Tr. at 115:5–18, 73:19–74:1.)[16]

Providers raise the false alarm that Defendants' arguments regarding *Sealy* and *Topco* "would essentially eliminate the *per se* rule from antitrust law." (Prov. Resp. at 42 & n. 16.) That is far from correct. Defendants simply request that the Court apply the current rule "commonly understood" among courts nationwide: "that per se condemnation is limited to 'naked' market division agreements, that is, to those that are not part of a larger pro-competitive joint venture." *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 48 (1st Cir. 2001).

This case is factually distinct from *Sealy* and *Topco*, which at most must be strictly limited to their facts. **First**, *Sealy* and *Topco* did not involve a new product. The defendants sold the same products before and after the agreements; the only thing that changed was the label. Plaintiffs' contention that the same is true here reflects a misunderstanding of Plans' products. On its own, the Alabama Plan offered coverage for healthcare services provided in Alabama, but never offered a nationwide product (no individual Plan did). (Def. URMF ¶¶ 13, 15, 63.) It is undisputed that the Plans jointly created the first Blue nationwide product by stitching together their local offerings to form one nationwide network. (*Id.* ¶¶ 15, 28, 32–34.) The notion that a multi-state employer

---

[16] Providers are wrong that expert testimony is irrelevant to the Court's analysis. Ironically, *National Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, which Providers cite in support of their argument that experts are irrelevant, itself relied on expert testimony in determining the applicability of the per se rule. 779 F.2d 592, 600 & n.13 (11th Cir. 1986) (discussing testimony of Professor Baxter and his research, which provided an "excellent explanation of the economic arguments favoring an interchange fee of some sort"). As Herbert Hovenkamp (on whom Providers rely extensively) explained, "[e]xpert testimony on facts can certainly aid the court in determining" whether to apply the per se rule as it might, for example, "provide and support efficiency explanations that, if accepted, would take the case out of the *per se* rule." Herbert J. Hovenkamp, The Rule of Reason 7–8 (Sept. 15, 2017), http://scholarship.law.upenn.edu/faculty_scholarship/1778/; *see also, e.g., Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 332–34 (2d Cir. 2008) (relying on opinions of experts in affirming application of rule of reason); *Meijer, Inc. v. Barr Pharm., Inc.*, 572 F. Supp. 2d 38, 51 & n.15 (D.D.C. Aug. 11, 2008) (rejecting per se claim in part based on expert testimony and noting that "analysis concerning the economic effects of delayed generic entry is an appropriate area for expert testimony and is a relevant consideration in the Court's analysis").

would not consider the Plans' joint network a different product from Plans' individual local networks defies common sense.

**Second**, unlike the allocations in *Sealy* and *Topco*, Blue Plans' service areas derive from trademark rights held by Plans themselves. (*Id.* ¶¶ 1–8, 12–14, 21.) Providers say that the Sealy *licensor* had trademark rights when it assigned territories. (Prov. Resp. at 38.) But Plaintiffs do not and cannot assert that any of the Sealy *licensees* held rights to exclude other users of the Sealy mark. This mismatch between the trademark *owner* and the alleged horizontal *competitors* is not present here, where Plans themselves held prior trademark rights. (*Id.* ¶¶ 4, 13–14.)

**Third**, after the Sealy licensees obtained the trademarks, they extensively reallocated territories. Unlike the wholesale reallocations in *Sealy*, however, Blue Plans never reallocated their territories. Blue Plan mergers simply combined the merging parties' pre-existing areas into a single company. (URMF ¶ 57.) Service areas writ large were not redrawn as they were in *Sealy* (and *Topco*). *Sealy*, 1964 WL 8089, at *17 (Sealy "shifted territory among licensees"); *Topco*, 319 F. Supp. at 1037, *rev'd*, 405 U.S. 596 (1972). Instead, service areas derived from local trademark rights to provide subscribers in a community with free choice among hospitals. They could not be reallocated. (Def. URMF ¶ 3.) The geographic exclusivity in *Sealy* and *Topco* can make no claim to this unique, procompetitive provenance.

### B.   Plaintiffs admit facts establishing plausible procompetitive benefits.

Plaintiffs do not dispute that the rule of reason is the presumptive mode of analysis. (*See* Rubinfeld Tr. at 69:9–17.) In deciding the standard of review, this Court need not determine, and Defendants need not prove, the validity of procompetitive justifications, only whether they plausibly exist. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007); *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 771–73 (1999); *Procaps*, 845 F.3d at 1083. If there is a genuine factual dispute regarding the existence of procompetitive justifications then the default

24

mode of analysis (rule of reason) must apply.[17] *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F. 3d 1538, 1549–51 (11th Cir. 1996) (affirming summary judgment where plaintiff "has not proven" agreement warranting per se treatment); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479 n.12 (3d Cir. 1992) ("[T]he [nonmoving] plaintiffs, not [defendant], shoulder the burden" of establishing their per se claim.).

For this reason, courts routinely grant summary judgment and/or dismissal against per se claims where procompetitive benefits are *plausible. See, e.g., Actavis*, 133 S. Ct. at 2235–36 (granting motion to dismiss where "offsetting or redeeming virtues are *sometimes* present" and "[t]here *may be* other justifications"); *Procaps*, 845 F.3d at 1084 (granting summary judgment where "*some* procompetitive efficiencies . . . *might flow*"); *N. Jackson Pharmacy v. Caremark RX, Inc.*, 385 F. Supp. 2d 740, 749 (N.D. Ill. 2005) (granting Rule 16 motion to preclude per se claim because arrangement had "efficiency-enhancing *potential*"); *see generally Sulfuric Acid*, 703 F.3d at 1011 (rule of reason governs horizontal territorial market allocation "*plausibly* argued to increase competition or other economic values on balance"); *cf. General Leaseways*, 744 F.2d at 593 (noting defendants had not "made a *plausible* free-rider argument") (all emphases added). In fact, Plaintiffs admit that, if the Court begins with a quick-look analysis, Defendants can *satisfy* that analysis and proceed to the full rule of reason "if a court finds the defendant's evidence of its justification *plausible*." (Prov. Resp. at 50 (emphasis added).) The burden here can be no higher.

Because Defendants have offered substantial (and undisputed) evidence of plausible procompetitive benefits, the rule of reason applies. The chart below summarizes some of these

---

[17] Subscribers argued that Defendants have not presented "compelling" evidence of procompetitive benefits. (Sub. Resp. at 49.) But the question for this motion is only whether the proffered procompetitive justifications are *plausible* enough to warrant further analysis; the Court need not decide the ultimate merits of those justifications at this stage. ███████████████████████████████████████████████████████████ (Rubinfeld Tr. at 109:5–110:11; FTC, DOJ Antitrust Guidelines for Collaborations Among Competitors § 3.2 (2000).)

undisputed facts—which Plaintiffs either admit or do not contradict with evidence, and thus concede. Moreover, even if these facts were disputed, they are supported by substantial evidence and thus create an issue of fact that must be resolved through rule-of-reason analysis.

| Development of Exclusive Service Areas |
| --- |
| • Local hospitals and medical societies developed prepaid plans to serve Americans' needs in local areas. (Def. URMF ¶ 2.) To provide subscribers with free choice of hospitals or physicians, AHA and AMA approved only one plan per area. (Def. URMF ¶ 3.) |
| • The AHA and AMA approved the concept of prepayment plans, and promulgated approval standards for such plans. (Def. URMF ¶ 5.) Hospital plans that satisfied the approval standards could "identify the plan by using the seal of the [AHA] superimposed upon a blue cross." (Def. URMF ¶ 6.) Medical-care plans that met the AMA/AMCP's standards likewise could use a blue shield emblazoned with a caduceus. (*Id.*) |
| • The United States Public Health Service stated: "The basic formula of the hospital plans— non-profit status, *one plan per area*, free choice of hospital and the right of all qualified hospitals to participate, the provision of benefits on a service basis—*is sound and mutually beneficial for patients and hospitals*. The prevailing pattern of the medical plans—non-profit status, *one plan per area*, free choice of physician, and the right of all qualified physicians in the area to participate—*is also good.*" (Def. Ex. 1 at 9934 (emphasis added).) |
| • Plans began using the Blue Cross and Blue Shield trademarks in their local service areas. Plans subsequently transferred any rights they had to the predecessors of BCBSA, and received licenses from those same organizations. (Def. URMF ¶¶ 4, 14.) |
| Integration of Assets to Create New, Joint Products and Services |
| • Plans pooled their local assets to begin creating a nationwide product. By pooling their assets, Plans were able to combine their complementary offerings to service national accounts, including the Federal Employees Health Benefit Program. (Def. URMF ¶ 15.)*[18] |
| • Plans' early joint programs were highly manual, ad hoc, and costly to set up and administer for accounts. Providers experienced bad debt, and inaccurate and untimely payments. (Def. URMF ¶ 16.)* |
| • BlueCard is a key element of Defendants' cooperative joint product; BlueCard incorporates and relies on joint operational assets. (Def. URMF ¶ 32.) |
| • Through collaboration, the Plans create new products by combining offers to service multi-state accounts and travelers. (Def. URMF ¶ 28.)**[19] |

---

[18] * indicates a statement of fact that Plaintiffs purport to dispute, but fail to offer any contradictory evidence.

[19] ** indicates a statement of fact undisputed by Subscribers only.

- Plans have jointly operated programs, including the Federal Employees Program, Blue Distinction, and Blue365. (Def. URMF ¶ 34.)

### Robust Procompetitive Benefits to Subscribers and Providers

- Plans maintain strong local focus in their respective service areas. (Def. URMF ¶ 30.)

- Plans' national competitors selectively enter and exit; the ACA exchanges are a prime example where competitors entered narrowly then exited quickly. Without Blue Plans, some consumers might have no insurance options. (Def. URMF ¶ 31.)*

- Plans operate efficiently. (Def. URMF ¶ 37.)

- The challenged rules increase interbrand competition. (Def. URMF ¶ 35.)**

- BlueCard enhances efficiencies. (Def. URMF ¶ 33.)

- BlueCard provides subscribers with a single point of contact for education, contracting, claims payment, and issue resolution. (Def. URMF ¶ 33.)**

- Plans provide nationwide volume to providers. (Def. URMF ¶ 37.)

- The Blue System delivers broad and deep networks and provides choice and inclusiveness; subscribers prefer the BlueCard network to competitors' offerings. (Def. URMF ¶ 40.)*

- Given Plans' local dedication, high quality, and competitive prices, subscribers often prefer and trust Blue Plans over other insurers; Blue Plans provide healthcare insurance for over 106 million Americans. (Def. URMF ¶ 41.)*

These undisputed facts establish the factual predicate for why service areas were adopted in distinct geographic areas; the benefits of service areas to subscribers and providers; the reality and robustness of Defendants' integration to offer joint products and services; the efficiencies resulting from Defendants' integration and collaboration; Plans' unparalleled dedication to local areas; and other procompetitive benefits that only Blue Plans offer providers and subscribers.

Defendants also proffered substantial evidence of additional procompetitive benefits, including prevention of free-riding and consumer confusion, and promotion of interbrand competition. (*See* Def. Br. at 28–36; Def. Resp. 36–38.) For brevity, that evidence is not recounted again here.

27

Against this weight of evidence, Plaintiffs offer three unsuccessful arguments. ***First***, Plaintiffs assert that Defendants have not proven the restraints are *necessary* to achieve these benefits. (Sub. Resp. at 14, 21; Prov. Resp. at 6–7, 10.) But a restraint need not be *essential* to the benefit; it only has to *facilitate or support* the parties' procompetitive integration. (*See* Def. Br. at 30–32; Def. Resp. at 31–33; *see also* Rubinfeld Tr. at 103:17–104:19 ███████████████ ████████████████████████████████████████████████████████████████[20]

Even if Plaintiffs' proposed requirements were correct, Defendants easily meet that test in light of the substantial evidence that Plans have economically integrated their assets to create new nationwide products, and that the challenged rules are necessary for those products to exist. (*See* Def. Resp. at 33–36.) Plaintiffs and their experts do not refute this evidence.

Indeed, there is no evidence that any individual Plan offered nationwide coverage before the Plans integrated their separate local assets. To the contrary, Professor Murphy explained that Plans economically integrated in order to offer new collaborative products and services. (Def. Ex. 32, Murphy Rpt. ¶¶ 40–49, 63–74.) ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████ (Rubinfeld Tr. at 180:19–181:6, 183:5–16.)

Assessing the Blue System and its history as a whole—███████████████████████████ █████████████—Professor Murphy concluded that eliminating exclusive service areas and the

---

[20] Similarly baseless is the notion that, if a competitor offers a similar product, the rule of reason cannot apply. *NaBanco* is illustrative. Subscribers admit that the product at issue was VISA's "national payment system." (Sub. Resp. at 40 n.27.) Of course, American Express and Discover, which are both standalone companies, offer national payment systems too. But that did not stop the court from rejecting plaintiffs' per se claim. 779 F.2d at 602. The question is not what competitors do, it is whether defendants have productively collaborated rather than only agreeing not to compete. *See also Sulfuric Acid*, 703 F.3d at 1011 (Canadian smelter acid can qualify as a new product even though American competitors already offered smelter acid).

Best Efforts rules would "undermine the Blue System in fundamental ways" and is "unlikely to leave the core collaborative product untouched."[21] (Def. Ex. 32, Murphy Rpt. ¶¶ 110–11 ("It would be wrong to assume that, without the challenged rules, BlueCard and other integrated products would continue to exist in the current form (or at all).").) Plaintiffs do not refute this core opinion. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ (*Id.* at 135:19–136:4.) Providers cannot seriously dispute that BlueCard is procompetitive—indeed, Subscribers do not even try—and neither Plaintiff track presented credible evidence that BlueCard or other joint products and services would exist without the challenged rules. Indeed, the U.S. Public Health Service recognized service areas are a key component of the "basic formula" of the Blue System. (Def. Ex. 1 at 9934.) This gaping hole in Plaintiffs' record is fatal to their per se claims.

**Second**, Plaintiffs' claim that service areas are not necessary because Defendants have not shown dire harms in current overlap areas is both factually incorrect and irrelevant. (Sub. Resp. at 49; Sub. Ex. 316, Rubinfeld Rpt. ¶¶ 62, 68–74.) At the threshold, Defendants did present evidence of significant problems in overlap areas. (*E.g.*, Def. Ex. 1 at 9941 ("In North Carolina the competition between the two State-wide plans result in high administrative costs, dissipates the support of the public, the hospitals and the medical profession, and retards growth."); Def.

---

[21] As this Court has explained, "[t]o decide upon 'the true test of legality . . . the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable.'" (6/18/14 Mem. Op. at 12, Dkt. 204.) ████████████████ ████████████████████████████████████████████████████████████████████████████████████████████████████████ (*Id.*) These deficiencies render his entire report largely irrelevant. *Cf. Valley Drug*, 344 F.3d at 1302; *Sulfuric Acid*, 703 F.3d at 1011; *Polk Bros.*, 776 F.2d at 189.

Exs. 71–73 (documenting consumer confusion in overlap areas despite those Plans' use of different marks); *Cent. Benefits Mut. Ins. Co. v. BCBSA*, 711 F. Supp. 1423, 1433 (S.D. Ohio 1989) ("The evidence clearly established that [an Ohio Plan's use of Blue Marks outside its service area] have resulted in actual confusion in the marketplace."); *BCBSA v. Grp. Hosp. & Med. Servs., Inc.*, 744 F. Supp. 700, 716 (E.D. Va.), *aff'd* 911 F.2d 720 (4th Cir. 1990) ("It is beyond cavil that there has been actual confusion and such confusion was intentional.").) At most, Plaintiffs have shown a factual dispute regarding these issues, which precludes any per se claim.[22]

Moreover, Plaintiffs raise a false construct. As Professor Murphy explained in detail, the few, current overlap areas bear little resemblance to a world without exclusive service areas:

- Plans in current overlap areas still have brand-use exclusivity as to all non-overlapping Plans. It is far more than plausible that going from one Blue-branded competitor to thirty-five will undermine any Plan's willingness to collaborate or incentive to invest in and develop the Marks. (Def. Ex. 32, Murphy Rpt. ¶¶ 60, 111.)

- Plans in current overlap areas are still bound by their service area for use of the brands. The fact that they cannot use the brands outside that area provides an incentive to fully develop the brands *throughout* that area. It is plausible that, given the opportunity, a Plan would divert attention away from rural areas in its own state in favor of more profitable metro areas in other states. (*Id.* ¶¶ 61, 109, 113.)

- Plans in current overlap areas almost exclusively use different Marks. (Def. URMF ¶ 56; Def. Resp. PSF ¶ 16.) Differentiating one Blue Cross Plan from one Blue Shield Plan is completely different from making sense of multiple Plans all using both Marks simultaneously in the same area. (Def. Ex. 32, Murphy Rpt. ¶¶ 59, 112; *see also* Rubinfeld Tr. at 189:10–22 (██████████████████████████████

---

[22] Plaintiffs raise two other arguments regarding the necessity of service areas. First, Providers argue that Plans could replace BlueCard with a rental network. (Prov. Resp. at 10.) But rental networks are fundamentally different from BlueCard. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (Def. Ex. 162, 8/22/17 D. Hubbard Dep. Tr. at 128:1–10, 165:13–24, 166:20, 168:21–169:2, 169:13–19; Def. Ex. 164, 9/11/17 D. White Dep. Tr. at 129:1–131:3.) Second, Plaintiffs argue that non-Blue competitors do not have exclusive service areas. (Prov. Resp. at 10.) But non-Blue competitors are not appropriate comparisons. Aetna and other competitors arose as and remain single companies. Moreover, Plaintiffs have presented zero evidence of collaboration between two non-Blue insurers that compete against each other using the same trademark, much less that such collaboration has yielded a new product.

- Consumers' ability to grow accustomed over the course of decades to having two Plans (using different Marks) in an area is not probative of the harms that could result if numerous Plans suddenly had the ability to enter (and exit). (Def. Ex. 131, 7/22/17 K. Murphy Dep. Tr. at 235:24–237:5.)

*Third*, Plaintiffs cite various documents Fwhere Plans raised questions regarding antitrust laws and whether proposed rule changes would comply. But as *General Leaseways* (on which Plaintiffs rely extensively) explained, courts "attach rather little weight to internal company documents used to show anticompetitive intent, because, though they sometimes dazzle a jury, they cast only a dim light on what ought to be the central question in an antitrust case: actual or probable anticompetitive effect." 744 F.2d at 595–96. Moreover, it is not surprising that the Association and Plans consider and discuss the potential legal implications of proposed rule changes. Far from evidencing lawlessness, that is exactly what any responsible system would do. That Association and Plan counsel critically considered the implications of proposed rule changes underscores the need for the Court and jury to do likewise by applying the rule of reason.

At bottom, Plaintiffs have failed to show that Defendants entered into a naked market allocation agreement with no plausible procompetitive benefits.[23] Accordingly, summary judgment should be granted against their per se claims.

---

[23] Plaintiffs also fail to identify any actual anticompetitive effects, which should be effortless if their claims had any merit.

**C.     Plaintiffs admit facts demonstrating that the challenged restraints are not purely horizontal.**

Plaintiffs do not dispute that the per se rule can only apply to market allocation agreements that are purely horizontal. Nor could they. *GTE Sylvania Inc.*, 433 U.S. at 58–59. The Eleventh Circuit has been clear that a restraint is evaluated at the time it is adopted, even if circumstances later change. *Valley Drug*, 344 F.3d at 1306 ("[T]he reasonableness of agreements under the antitrust laws are to be judged at the time the agreements are entered into.") (citing *Polk Bros.*, 776 F.2d at 189).

Plaintiffs' only response is that the defendants in *Sealy* operated under vertical licenses at one point in time. (Prov. Resp. at 49.) But the *Sealy* Court had no occasion to rule on this issue, because, at the time *Sealy* was decided, even vertical territorial allocations were subject to the per se rule. *See United States v. Arnold, Schwinn & Co.*, 388 U.S. 365 (1967). This provides no basis to disregard the Eleventh Circuit's unambiguous holding in *Valley Drug*. And if there were any doubt, *Procaps* also applied the rule of reason to an alleged transformation of a lawful agreement into a per se unlawful one. 845 F.3d at 1084. Plaintiffs do not dispute that Plans used the Blue Marks in their service areas prior to the challenged agreements, and Providers even affirmatively detail how earlier license agreements were *vertical*. (*See e.g.*, Prov. Resp. at 24 (BCBS-AL predecessor "used the Blue marks only with permission, subject to requirements designed by the American Hospital Association and the American Medical Association."), *id. at* 38 ("[T]he Blues are former vertical licensees . . . .").) This alone forecloses Plaintiffs' per se claims.

**D.     Judicial experience does not show the rules to be obviously anticompetitive.**

*Procaps*, *Valley Drug*, and many other cases emphasize that the per se rule should not be applied to restraints arising "in a new factual context" with which the court lacks experience.

845 F.3d at 1083; 344 F.3d at 1307. In response, Plaintiffs resort to a level of generality that would write this directive out of the law—that the court need only be familiar with the "type of practice." (Sub. Resp. at 40.) To the contrary, *Procaps* recognized that the restraint at issue was properly characterized as "a market allocation agreement," and the Eleventh Circuit has certainly had plenty of experience with those. But because that market allocation agreement arose "in a new factual context," the court mandated rule-of-reason analysis. 845 F.3d at 1083.

That is equally true here. Plaintiffs have not cited a single case that applied the per se rule to any of the challenged restraints or a comparable factual context. Rather, the courts that have considered the very challenged restraints at issue here, enforced them, and rejected antitrust challenges to them. *See, e.g.*, *Mueller*, 861 N.W.2d at 573; Def. Ex. 116, *Powderly v. Blue Cross & Blue Shield of N.C.*, No. 3:08-cv-00109 (W.D.N.C. Aug. 21, 2008); *Grp. Hosp.*, 744 F. Supp. at 719–20 n.7 (rejecting antitrust challenge and distinguishing *Sealy*); *Cent. Benefits*, 711 F. Supp. at 1425 (enjoining Plan subsidiary from using Marks outside the Plan's exclusive service area, and rejecting antitrust defense); Def. Ex. 115, *Grp. Hosp. & Med. Servs., Inc. v. Blue Cross & Blue Shield of Va.*, No. 85–1123–A (E.D. Va. Apr. 8, 1986) (affirmatively drawing boundary between the Maryland and D.C. Plans).[24] Similarly, the DOJ and FTC have analyzed the Blue System in detail on multiple occasions—most recently in connection with the Anthem/Cigna merger—yet have never concluded that service areas might violate the Sherman Act, let alone be per se illegal. *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 185–89, 240 (D.D.C. 2017); *United States v. Anthem, Inc.*, 855 F.3d 345, 350 (D.C. Cir. 2017), *cert. dismissed*,

---

[24] Subscribers attempt to dismiss *Group Hospitalization* as a "*trademark*" suit (Sub. Resp. at 43), but even Providers recognize the court addressed *Sealy* in the context of an antitrust counterclaim for violation of § 1. (Prov. Resp. at 39.) The Court also held that the Plan's use of the Marks outside its service area caused actual consumer confusion, and that "[g]ood faith efforts to enforce trademark rights do not violate the Sherman Act." 744 F. Supp. at 719.

2017 WL 1807377 (U.S. June 12, 2017); *see also* Rubinfeld Tr. at 172:14–173:1 ███████

████████████████████████████████████████████████████████████████████████████

Plaintiffs try to minimize the views of the country's chief antitrust enforcement agencies because they belong to the executive branch, not the judiciary. (Prov. Resp. at 41.) But they then turn around and rely on *allegations* by members of state executive branches. (*Id.* at 40.) Moreover, the judiciary did not apply the per se rule in any of the cases Plaintiffs cite. The *most* Plaintiffs can say is that the Ohio case "cit[ed] the *possibility* that [BCBSA's] market allocation would be found unlawful." (*Id.* (emphasis added).) Both the Ohio and Maryland cases were resolved through settlements that allowed the existing two or three in-state Plans to use the Marks statewide for a limited time. (Def. Resp. PSF ¶¶ 37–38.) No out-of-state Plans were allowed to enter using the Marks, and no state re-engaged in litigation when "Blue-on-Blue" competition in those states ceased a few years later. And *Garot Anderson Agencies, Inc. v. BCBS United of Wisconsin* did not even involve a challenge to service areas, but rather to an alleged agreement between two Plans to discontinue one Plan's product. 1993 WL 78756, at *13 (N.D. Ill. Feb. 26, 1993) ("[T]his court is merely stating that [the Wisconsin and Illinois Plans] cannot enter an agreement to terminate the Program for the purpose of eliminating competition between the two parties.").[25] These cases are a far cry from judicial experience establishing that services areas are manifestly anticompetitive and lacking any redeeming virtue.

### E.    Plaintiffs have not shown that the Best Efforts rules or uncoupling rules are per se illegal.

Plaintiffs make little effort to defend their per se challenges to the Best Efforts and uncoupling rules. Providers do not challenge the uncoupling rules at all, and devote just two

---

[25] Moreover, as Providers admit, the court recognized that subsequent Supreme Court precedent has thrown *Topco* "into doubt." (Prov. Resp. at 41 n.14.)

paragraphs to the Best Efforts rules. (Prov. Resp. at 36, 48–49.) Similarly, Subscribers mention the uncoupling rules in a single passing sentence, and aside from that sentence only discuss the Best Efforts rules in the context of their quick-look claim. (Sub. Resp. at 42, 48.)

This is unsurprising. Plaintiffs do not dispute that the National Best Efforts and uncoupling rules are geographically agnostic. ████████████████████████████████ ████████████████████████████████████████████ And Plaintiffs make no effort to distinguish the cases holding that limits (or even outright bans) on collaborators competing against cooperative joint products are not per se illegal. (*See* Def. Resp. at 45 (*citing Dagher*, 547 U.S. at 5–8; *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985); *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1334–37 (Fed. Cir. 2010); *Rothery*, 792 F.2d at 221–22, 228–29).)

In any event, the Best Efforts and uncoupling rules must be analyzed under the rule of reason in light of the undisputed evidence that they generate plausible procompetitive benefits. Indeed, Plaintiffs affirmatively rely on *NCAA*, which applied the rule of reason to a horizontal output limitation. 468 U.S. at 91–94, 101. Providers also cite *Polygram Holding, Inc. v. F.T.C.*, but this case hurts rather than helps their position. 416 F.3d 29, 38 (D.C. Cir. 2005). There, the court explicitly refused to "locate the appropriate analysis . . . by reference to the vestigial line separating *per se* analysis from the rule of reason." *Id*. at 36. Rather, the court evaluated economic learning, experience of the market, reasons the restraint might be unlikely to harm consumers, and any "competitive benefit that plausibly offsets the apparent or anticipated harm." *Id*.; *see also* Rubinfeld Tr. at 85:14–86:24 ████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████

Defendants presented significant evidence that these rules promote collaboration among Plans, encourage Plans to invest in the Blue Marks, and prevent transfer of the immense goodwill associated with the Blue Marks to other brands. (Def. Resp. at 16–17, 46–47.) As the district court in *United States v. Anthem* recognized, the National Best Effort rule was "designed to strengthen and protect the Blue brand." 236 F. Supp. 3d at 240. In fact, before the National Best Efforts rule was adopted, the DOJ repeatedly questioned why BCBSA did *not* apply a 66-2/3% Blue revenue requirement to existing Plans. (Def. URMF ¶ 47.) In addition, Plaintiffs, through experts or otherwise, presented no evidence that the best efforts or uncoupling rules would in fact reduce output.[26] (*See* Rubinfeld Tr. at 126:5–128:25, 161:8–162:22, 168:25–171:6.) Plaintiffs have not remotely carried their burden with respect to any of these rules.

### F.    Providers have not shown that BlueCard is naked price-fixing.

As explained previously, Providers' challenge to BlueCard fails for at least three separate reasons. (Def. Br. at 41–43; Def. Resp. at 47–49.) ***First***, BlueCard is not price-fixing because it does not involve pre-set prices. *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 748 (11th Cir. 1998) ("[W]e do not have an agreement to fix prices in this case: no prices were preset. . . ."); *Castro v. Sanofi Pasteur Inc.*, 2012 WL 12516573, at *5 (D.N.J. Dec. 20, 2012) ("Groups of buyers that seek [discounts based on volume] by negotiation, rather than by restricting purchases or pre-setting prices or a fixed price range, are subject to the 'rule of reason' analysis.").

Plaintiffs identified no evidence that Plans pre-set prices. Rather, they try to distinguish *All Care* based on the "escape clause." But *Castro* involved no such clause, yet still relied on

---

[26] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████. (Rubinfeld Tr. at 41:4–42:13, 151:4–16, 161–62:22, 217:16–219:21.) As explained above, cherry-picked internal documents are not reliable evidence of alleged anticompetitive effects.

*All Care* to reject any per se claim as prices were not pre-set. And *Mueller*, which addressed BlueCard, also relied on *Mueller*. 861 N.W.2d at 571. Moreover, although the "escape clause" in *All Care* allowed a nursing agency to terminate its contract and *charge* any price it chose, no hospital was bound to pay that price. 135 F.3d at 744. In fact, the hospitals mutually agreed to use Preferred Provider Programs "before going to nonpreferred agencies for nurses on each occasion." *Id*. at 744–47. Similarly, providers can choose not to participate in BlueCard and charge any price they like, but no Plan is bound to pay that price. (Def. Resp. PSF ¶ 13.)

**Second**, judicial experience shows BlueCard is lawful. In fact, Providers admit, as they must, that "[t]here are two cases in which a court held that BlueCard does not violate the Sherman Act." (Prov. Resp. 47.) In both cases, healthcare providers asserted that BlueCard is per se illegal. In both cases, the Court rejected those claims, citing BlueCard's plausible procompetitive benefits. *Mueller*, 861 N.W.2d at 573; Def. Ex. 116, *Powderly*, Hr'g Tr. at 70–71.

**Third**, BlueCard is at the heart of the Blue System's procompetitive integration, making the per se rule inapplicable. Professor Murphy demonstrated in detail how BlueCard benefits subscribers and providers, and enables Plans to compete against national competitors. (Def. Ex. 32, Murphy Rpt. ¶¶ 63–71; *see also* Def. URMF ¶¶ 32–34, 39–40.) ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

## III.   Plaintiffs' Invocation Of Quick Look Is An Invitation To Clear Legal Error.

Plaintiffs once again invite this Court to commit plain legal error by applying quick-look analysis. By this, Plaintiffs suggest the Court take a "quick look" at the summary judgment briefs and record, and then apply the per se rule. The Supreme Court in *Actavis* rejected this approach

when suggested by the FTC (which did not even argue that the horizontal agreement there was per se illegal). 133 S. Ct. at 2237. This Court should do the same.

The existence of plausible pro-competitive justifications, the indisputably vertical origins of service areas and the Blue System, and the lack of judicial experience condemning any of the restraints each independently require a full rule-of-reason analysis. As Plaintiffs note, quick look "applies when 'an observer with even a rudimentary understanding of economics could conclude that the agreements in question would have an anticompetitive effect on customers and markets.'" (Sub. Resp. at 46 (citing *Procaps*, 845 F.3d at 1084 n.3).) The mere fact that well-credentialed economists with far more than "a rudimentary understanding of economics" differ on the existence and magnitude of procompetitive justifications and anticompetitive effects underscores the need for full rule-of-reason analysis. (Rubinfeld Tr. at 48:24–49:1 ███████████████████████ ████████████████████████████

Plaintiffs argue repeatedly that per se/quick look should be applied because it reduces litigation costs. In effect, Plaintiffs request that the Court dispense with a full analysis and put at risk an eighty-year-old System that insures 106 million Americans and is vital to the U.S. economy, in order to save them some money. But the Supreme Court has repeatedly warned that overbroad application of the per se rule can chill procompetitive conduct, injuring consumers and competition. *Leegin*, 551 U.S. at 894–95; *GTE Sylvania*, 433 U.S. at 50 n.16. That is why there is a strong presumption in favor of the rule of reason, and why it applies here.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' motion for summary judgment and hold that Plaintiffs' claims must be analyzed under the monopolization or attempted monopolization standards of § 2 of the Sherman Act, or in the alternative, that Plaintiffs' § 1 claims must be analyzed under the rule of reason.

Dated: September 15, 2017                    Respectfully submitted,

                                             */s David J. Zott*⸻⸻
                                             David J. Zott, P.C.
                                             Daniel E. Laytin, P.C.
                                             Sarah J. Donnell
                                             Christa C. Cottrell
                                             Zachary D. Holmstead
                                             KIRKLAND & ELLIS LLP
                                             300 North LaSalle
                                             Chicago, IL 60654
                                             Tel:  (312) 862-2000
                                             Fax:  (312) 862-2200
                                             david.zott@kirkland.com
                                             daniel.laytin@kirkland.com
                                             sarah.donnell@kirkland.com
                                             christa.cottrell@kirkland.com
                                             zachary.holmstead@kirkland.com

                                             *Counsel for Defendant*
                                             *Blue Cross Blue Shield Association*

Craig A. Hoover
E. Desmond Hogan
J. Robert Robertson
Justin Bernick
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
robby.robertson@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com

Emily M. Yinger
N. Thomas Connally, III
HOGAN LOVELLS US LLP
Park Place II
7930 Jones Branch Drive, 9th Floor
McLean, VA 22102
Tel: (703) 610-6100
Fax: (703) 610-6200
emily.yinger@hoganlovells.com
tom.connally@hoganlovells.com

*Co-Coordinating Counsel for the Defendants*

Cavender C. Kimble
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

John Martin
Lucile H. Cohen
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255-9421
Fax: (803) 255-9054
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com

Daniel E. Laytin, P.C.
David J. Zott, P.C.
Sarah J. Donnell
Christa C. Cottrell
Zachary Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
daniel.laytin@kirkland.com
david.zott@kirkland.com
sdonnell@kirkland.com
ccottrell@kirkland.com
zachary.holmstead@kirkland.com

*Co-Coordinating Counsel*
*for the Defendants*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE JORDAN RATLIFF &
BRANDT LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Defendants' Liaison Counsel*

*With Kirkland & Ellis, counsel for*
*Defendants, Blue Cross and Blue Shield*
*Association*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
Misti Jones
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL 35203
Tel: (205) 254-1000

*With Hogan Lovells, counsel for Anthem, Inc.,
f/k/a WellPoint, Inc., and all of its named
subsidiaries in this consolidated action;
Blue Cross and Blue Shield of North Carolina,
Inc.; Blue Cross and Blue Shield of Florida, Inc.;
Louisiana Health Service & Indemnity Company
(Blue Cross and Blue Shield of Louisiana);
Blue Cross and Blue Shield of Massachusetts,
Inc.; BCBSM, Inc. (Blue Cross and Blue Shield of
Minnesota); Blue Cross and Blue Shield of
South Carolina; Hawaii Medical Service
Association (Blue Cross and Blue Shield of
Hawaii); Horizon Healthcare Services, Inc.
(Horizon Blue Cross and Blue Shield of New
Jersey); Blue Cross & Blue Shield of Rhode
Island; Blue Cross and Blue Shield of Vermont;
Cambia Health Solutions, Inc.; Regence
Blue Shield of Idaho; Regence Blue Cross
Blue Shield of Utah; Regence Blue Shield (of
Washington); Regence Blue Cross Blue Shield of
Oregon*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON
LLP
1420 Fifth Ave, Suite 3700
Seattle, WA 98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

J. Bentley Owens, III
WALLACE, ELLIS, FOWLER, HEAD
& JUSTICE
113 North Main Street
Columbiana, AL 35051-0587
Tel: (205) 669-6783
Fax: (205) 669-4932
bowens@wefhlaw.com

*Counsel for Defendants, Premera Blue Cross
d/b/a Premera Blue Cross Blue Shield of Alaska;
Premera Blue Cross of Washington*

Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com
mjones@maynardcooper.com

Pamela B. Slate
HILL HILL CARTER FRANCO COLE &
BLACK, P.C.
425 South Perry Street
Montgomery, AL 36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*Counsel for Defendant,
Blue Cross Blue Shield of Alabama*

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
Erica B. Zolner
Casey R. Fronk
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
hwitt@kirkland.com
jzeiger@kirkland.com
ezolner@kirkland.com
cfronk@kirkland.com

Kimberly R. West (*Liaison Counsel*)
Mark H. Hogewood
WALLACE JORDAN RATLIFF &
BRANDT LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35253
Tel: (205) 870-0555
Fax: (205) 871-753
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants, Health Care
Service Corporation, an Illinois Mutual*

Brian K. Norman
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX 75234
Tel: (214) 987-1745
Fax: (214) 521-9033
bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
63 South Royal Street, 13th Floor
Riverview Plaza
Mobile, AL 36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

*Counsel for Defendants, Carefirst, Inc.; Carefirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.*

Rafael Escalera Rodríguez
Sylmarie Arizmendi
Gustavo A. Pabón Rico
REICHARD & ESCALERA
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, PR 00917-1913
Tel.: (787) 777-8888
Fax: (787) 765-4225
escalera@reichardescalera.com
arizmendis@reichardescalera.com
pabong@reichardescalera.com

*Counsel for Defendant, Triple-S Salud, Inc.*

R. David Kaufman
M. Patrick McDowell
BRUNINI, GRANTHAM, GROWER
& HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS 39201
Tel: (601) 948-3101
Fax: (601) 960-6902

*Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.*

Jonathan M. Redgrave
Victoria A. Redgrave
REDGRAVE, LLP
14555 Avion Parkway, Suite 275
Chantilly, VA 20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com
vredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark Defendants*

Andy P. Campbell
Stephen D. Wadsworth
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL, GUIN, WILLIAMS, GUY
& GIDIERE LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Tel: (205) 224-0750
Fax: (205) 224-8622
andrew.campbell@campbellguin.com
stephen.wadsworth@campbellguin.com
todd.campbell@campbellguin.com
yawanna.mcdonald@campbellguin.com

Jason R. Gourley
Sarah L. Cylkowski
BODMAN PLC
201 South Division Street, Suite 400
Ann Arbor, MI 48104

dkaufman@brunini.com
pmcdowell@brunini.com

Cheri D. Green
BLUE CROSS BLUE SHIELD OF MISSISSIPPI
P. O. Box 1043
Jackson, MS 39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

John Martin
Lucile H. Cohen
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255-9421
Fax: (803) 255-9054
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com

*Counsel for Defendant, Blue Cross Blue Shield of
Mississippi, a Mutual Insurance Company*

Michael A. Naranjo
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA 94104-1520
Tel: (415) 984-9847
Fax: (415) 434-4507
mnaranjo@foley.com

Alan D. Rutenberg
Benjamin R. Dryden
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Tel: (202) 672-5300
Fax: (202) 672-5399
arutenberg@foley.com
bdryden@foley.com

*Counsel for Defendant, USAble Mutual Insurance
Company, d/b/a Arkansas Blue Cross and
Blue Shield*

Tel: (734) 761-3780
Fax: (734) 930-2494
aharris@bodmanlaw.com
jgourley@bodmanlaw.com
scylkowski@bodmanlaw.com

Todd Stenerson
Timothy J. Slattery
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004-2128
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com
timothy.slattery@shearman.com

*Counsel for Defendant, Blue Cross and
Blue Shield of Michigan*

John Briggs
Rachel Adcox
AXINN, VELTROP &
HARKRIDER, LLP
950 F Street, N.W.
Washington, DC 20004
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
radcox@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5000
Fax: (205) 250-5034
steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendant,
Independence Hospital Indemnity Plan,
Inc.*

Edward S. Bloomberg

Charles L. Sweeris
Law Department
BLUE SHIELD OF CALIFORNIA
50 Beale Street
San Francisco, CA 94105
Tel: (415) 229-5107
Fax: (415) 229-5343
charles.sweeris@blueshieldca.com

*Counsel for California Physicians' Service d/b/a
Blue Shield of California*

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Mary G. Menge
Morgan B. Franz
SPOTSWOOD SANSOM & SANSBURY LLC
One Federal Place
1819 5th Avenue North, Suite 1050
Birmingham, AL 35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
mmenge@spotswoodllc.com
mfranz@spotswoodllc.com

*Counsel for Defendant Capital BlueCross*

Christine Varney
Evan Chesler
Karin DeMasi
Lauren Kennedy
CRAVATH SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Tel: (212) 474-1000
Fax: (212) 474-3700
cvarney@cravath.com
echesler@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com

John G. Schmidt
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY 14203
Tel: (716) 847-7096
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com

Stephen A. Walsh
ADAMS and REESE LLP
1901 Sixth Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5000
Fax: (205) 250-5091
Stephen.walsh@arlaw.com

*Counsel for Defendant, Excellus Health
Plan, Inc., d/b/a Excellus BlueCross
BlueShield, incorrectly sued as Excellus
BlueCross BlueShield of New York*

Kathleen Taylor Sooy
Tracy A. Roman
April N. Ross
Michael W. Lieberman
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com
aross@crowell.com
mlieberman@crowell.com

John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN &
WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL 35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendant Blue Cross and*
*Blue Shield of Tennessee, Inc.*

Tel: (205) 581-0716
Fax: (205) 380-9116
jjohnson@lightfootlaw.com

*Counsel for Defendants, Blue Cross of*
*Idaho Health Service, Inc.; Blue Cross and*
*Blue Shield of Kansas, Inc.; Blue Cross*
*and Blue Shield of Kansas City;*
*Blue Cross and Blue Shield of Nebraska;*
*Blue Cross Blue Shield of Arizona;*
*Blue Cross Blue Shield of North Dakota;*
*Blue Cross Blue Shield of Wyoming;*
*HealthNow New York Inc.; BlueShield of*
*Northeastern New York; BlueCross*
*BlueShield of Western New York*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
Anne I. Salomon
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com
anne.salomon@kirkland.com

*Counsel for Defendants Wellmark of South*
*Dakota, Inc. (Wellmark Blue Cross and*
*Blue Shield of South Dakota); Wellmark,*
*Inc. (Wellmark Blue Cross and Blue Shield*
*of Iowa)*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 15, 2017, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/* David Zott

_____

David J. Zott