**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION**<br><br>**MDL NO. 2406** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This document relates to:**<br>**Subscriber Track cases**<br><br>**[REDACTED AND FILED UNDER SEAL]** |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN FURTHER SUPPORT OF SUBSCRIBER PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
ON THE APPLICATION OF THE *PER SE* RULE**

## TABLE OF CONTENTS

I.   INTRODUCTION ...........................................................................................................1

II.  STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................3

III. LEGAL ARGUMENT .....................................................................................................6

    A.  The Anticompetitive Restraints Are Subject to Section 1 of the Sherman Act...................7

        1.  The BCBSA and the 36 Member Plans Are Not a "Single Entity."................................7

            a.  Defendants Have Repeatedly Disclaimed Being a Single Entity. .............................7

            b.  Defendants Are Not a Single Entity for Their Asserted "Function." ........................9

        2.  Even Assuming, *Arguendo*, That the Plans' Service Areas Stemmed From Common-Law Trademark Rights, That Would Not Excuse Subsequent Antitrust Violations. ...................12

    B.  Defendants' Agreements Are Not Exempt From – And Properly Should Be Addressed Under – The Rule of *Per Se* Liability Made Clear in *Sealy* and *Topco*. ..............................14

        1.  The Restraints Are Anticompetitive On Their Face and Not "Unique."......................14

        2.  At Most, Defendants' Conduct Can Be Addressed By a "Quick Look" Analysis .........18

IV.  CONCLUSION ..............................................................................................................20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agostini v. Felton,*
    521 U.S. 203 (1997) ............................................................................................ 15

*Am. Needle, Inc. v. Nat'l Football League,*
    560 U.S.183 (2010) .............................................................................. 9, 10, 11, 12

*Arizona v. Maricopa Cnty. Med. Soc'y,*
    457 U.S. 332 (1982) ............................................................................................ 10

*Associated Press v. United States,*
    326 U.S. 1 (1945) ............................................................................................... 10

*Bd. of Trade v. United States,*
    246 U.S. 231 (1918) ............................................................................................ 10

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................ 12

*Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,*
    441 U.S. 1 (1979) ............................................................................................... 16

*California Dental Ass'n v. FTC,*
    526 U.S. 756 (1999) ............................................................................................ 10

*In re Cardizem CD Antitrust Litig.,*
    332 F.3d 896 (6th Cir. 2003) .............................................................................. 14

*Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*
    95 F.3d 593 (7th Cir. 1996) ................................................................................ 10

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
    433 U.S. 36 (1977) ............................................................................................. 15

*Copperweld Corp. v. Independence Tube Corp.,*
    467 U.S. 752 (1984) ............................................................................................. 2

*Dr. Miles Medical Co. v. John D. Park & Sons Co.,*
    220 U.S. 373 (1911) ............................................................................................ 15

*Fashion Originators' Guild of Am. v. FTC,*
    312 U.S. 457 (1941) ............................................................................................ 10

ii

*FTC v. Actavis, Inc.*,
  133 S. Ct. 2223 (2013).........................................................................................16

*FTC v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986) ...........................................................................................10

*General Leaseways v. National Truck Leasing Ass'n*,
  744 F.2d 588 (7th Cir. 1984) ...............................................................................2

*Goldfarb v. Virginia State Bar*,
  421 U.S. 773 (1975) ...........................................................................................10

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ...........................................................................................15

*Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*,
  106 F.3d 355 (11th Cir. 1997) ............................................................................14

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
  435 U.S. 679 (1978) ...........................................................................................10

*NCAA v. Bd. Of Regents*,
  468 U.S. 85 (1984) .......................................................................................10, 16

*Palmer v. BRG of Georgia, Inc.*,
  498 U.S. 46 (1990) .............................................................................................17

*Phi Delta Theta Fraternity v. J.A. Buchroeder & Co.*,
  251 F. Supp. 968 (W.D. Mo. 1966) ....................................................................13

*Polk Bros., Inc. v. Forest City Enterprises, Inc.*,
  776 F.2d 185 (7th Cir. 1985) ..............................................................................17

*Procaps S.A. v. Patheon, Inc.*,
  845 F.3d 1072 (11th Cir. 2016) .....................................................................16, 17

*Spinelli v. NFL*,
  96 F. Supp. 3d 81 (S.D.N.Y. 2015) .....................................................................12

*In re Sulfuric Acid Antitrust Litig.*,
  703 F.3d 1004 (7th Cir. 2012) ............................................................................17

*In re Terazosin Hydrochloride Antitrust Litig.*,
  352 F. Supp. 2d 1279 (S.D. Fla. 2005)...........................................14, 18, 19, 20

*Texaco, Inc. v. Dagher*,
  547 U.S. 1 (2006) . ..............................................................................................11

*United States v. Sealy, Inc.*,
    388 U.S. 350 (1967) .................................................................................*passim*

*United States v. Topco Associates, Inc.*,
    405 U.S. 596 (1972) .................................................................................*passim*

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
    344 F.3d 1294 (11th Cir. 2003) ........................................................... 16

*VMG Enterprises, Inc. v. F. Quesada & Franko, Inc.*,
    788 F. Supp. 648 (D.P.R. 1992) ........................................................... 13

*Washington v. NFL*,
    880 F. Supp. 2d 1004 (D. Minn. 2012).................................................. 12

**Statutes**

15 U.S.C. § 1115(b)(7) ........................................................................... 13

Lanham Act ......................................................................................... 13, 14

Section 2(d) of the Lanham Act, 15 U.S.C. § 1052.................................. 13

Section 1 of the Sherman Act, 15 U.S.C. § 1 .......................................*passim*

## I.   INTRODUCTION

Defendants cannot reasonably dispute what was stated plainly in the first sentence of Subscriber Plaintiffs' moving brief: that "through a vehicle they control, potential competitors [Defendants] have agreed not to compete at all on one another's assigned turf when using particular trademarks and brand names, and have also agreed to put significant limits on their ability to compete on one another's assigned turf even when using any other trademark or brand name." ECF No. 1352 at 1 ("Subs.' Br."). Instead, Defendants focus principally on two disingenuous assertions:

(1)      that they are *immune* from Section 1 of the Sherman Act, 15 U.S.C. § 1, because the 36 independently owned and controlled Member Plans and the BCBSA all constitute a ***single entity*** that cannot conspire as to matters that may relate to the "governance of the marks";[1] and

(2)      that each of their restraints on competition – territorial market divisions (ESAs) as well as restraints on output (the so-called "best efforts" rules), instituted by potential horizontal competitors – must be evaluated under a full-blown rule of reason if, Defendants say, they can offer *any* plausible procompetitive justification for their "Blue System" generally.

Defendants' arguments are not only contrary to the facts and the law, but constitute a marked departure from their unguarded thoughts outside of summary judgment briefing. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

----

[1]  Defendants also assert that their continuing allocation of and abidance by exclusive service areas ("ESAs") among themselves should not be considered an agreement subject to Section 1 because it "evolved from" purported common law trademark rights.  ECF No. 1432 at 1 ("Defs.' Opp.").

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ That is exactly what happened here, and this Court should condemn such blatant horizontal agreements. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

Defendants cannot shelter an anticompetitive restraint from *per se* condemnation by surrounding it with *other* restraints, labeling their practices generally a "Blue System," and claiming that they may be able to assert a procompetitive justification for the scheme.  As discussed herein,

---

[2] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████

Defendants concocted this standard – a perverse incentive that plainly would eviscerate the categories of *per se* restraints established by the Supreme Court – from cases that the individual courts expressly conceded involved unique *types* of restraints not present here.

This Court has the authority to evaluate each of the challenged restraints under Section 1, and as to each of them, it should hold the restraint to be unlawful *per se*. In the alternative, it should find these restraints unlawful under a "quick look" rule of reason.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants concede that ¶¶ 2-6, 9, 15, 16, and 17 of Subscribers' Statement of Undisputed Material Facts are indeed undisputed.  Together with the paragraphs that remain undisputed in any material respect (¶¶ 11, 13, 18, 20, 21, and 26), they are more than sufficient for the adjudication sought by Subscriber Plaintiffs.  That showing is unaltered in any material way by Defendants' assertion of purported "Additional Undisputed Relevant Material Facts" for the reasons stated herein.[3]  Nonetheless, Subscriber Plaintiffs respond to Defendants' assertion of "Additional Undisputed Relevant Material Facts" as follows:

---

[3] Subscriber Plaintiffs have sought to provide the Court with a comprehensive picture of the challenged restraints.  It is not necessary, of course, for the Court to find all of the proffered facts to be undisputed to rule in Subscriber Plaintiffs' favor.  And contrary to Defendants' implication (*see* Defs.' Opp. at 23 n.3), summary judgment is not determined or precluded by the length of briefing or number of exhibits.

4

## III.   LEGAL ARGUMENT

Defendants alternatively argue that: (i) this Court cannot subject their conduct to scrutiny under Section 1 of the Sherman Act and (ii) if it can, it would be "unprecedented in judicial history", Defs.' Opp. at 2, for the Court to evaluate any of the restraints under anything short of a full-blown rule of reason analysis.  Neither of these contentions has merit.

6

**A.  The Anticompetitive Restraints Are Subject to Section 1 of the Sherman Act.**

   **1.  The BCBSA and the 36 Member Plans Are Not a "Single Entity."**

   **a.  Defendants Have Repeatedly Disclaimed Being a Single Entity.**

Defendants cannot deny that they are actual or potential competitors, that they have entered into a geographical allocation of the market for the provision of health insurance, and that they have otherwise agreed to limit competition among them through the NBEs and LBEs.  So instead, Defendants have promoted a footnote in their dismissal papers to their lead argument here – contending that Section 1 of the Sherman Act does not apply at all because the 36 Member Plans and the BCBSA should be treated as a "single entity" with respect to the challenged conduct.  Defs.' Opp. at 19.

Defendants' single entity argument finds no support in the law, as discussed below, or in the facts. [4]  As Mark Twain observed, "If you tell the truth, you don't have to remember anything."  The truth is that Defendants' executives have freely admitted—indeed *insisted*—in testimony here, and in documents over the decades, that they are *not* a single entity. ███████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

---

[4] For the same reasons, the Court should grant Subscriber Plaintiffs' cross-motion for summary judgment on the single entity defense.

7

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

Moreover, Defendants have recognized for decades the potential illegality of the challenged conduct under Section 1 of the Sherman Act. ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████

And Defendants' counsel also have been notably silent on any single entity assertion in circumstances in which it would have been notably relevant – were it at all credible. ████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████  ████████  The argument simply was concocted for this litigation.

**b.  Defendants Are Not a Single Entity for Their Asserted "Function."**

Defendants contend that the "Blue System" is entitled to single entity immunity from Section 1 with respect to the "function" of "governance of the use of the Blue Marks."  Defs.' Opp. at 19. Relying on selectively edited portions of a sentence in the Supreme Court's decision in *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S.183, 194 (2010) (quoting *Copperweld*, 467 U.S. at 768-69), they contend that the Supreme Court has held that joint conduct by formally separate entities is treated as the conduct of a single entity with respect to a "function" that is "controlled by a single center of decisionmaking . . . [and] a single aggregation of economic power such that the conduct does not 'deprive[]the marketplace of . . . independent centers of decisionmaking.'" Defs.' Opp. at 19.

That argument is an editorial sleight-of-hand.  Even if Defendants could satisfy such a test for a "function" (which they could not), the test does not exist.  The critical word – "***function***" – does not appear in the quoted passage from *American Needle*, and indeed, that passage has nothing to do with "formally separate entities" at all. To the contrary, it solely refers to the reasons a parent and its wholly owned subsidiary were previously held to be a single entity:

We explained that although a parent corporation and its wholly owned subsidiary are

9

separate for the purposes of incorporation or formal title, they are controlled by a single center of decisionmaking and they control a single aggregation of economic power. Joint conduct by two such entities does not deprive the marketplace of independent centers of decisionmaking.

*American Needle,* 560 U.S. at 194 (internal quotations omitted).

Thus, the foundation of Defendants' argument – a function-by-function toggle switch for single entity status – lacks support.[5]   Indeed, for nearly a century, the Supreme Court has treated joint ventures, trade associations, and similar organizations' rules or bylaws imposing duties and restrictions on the conduct of their members' separate business as agreements among those members subject to scrutiny under Section 1, regardless of the function involved.[6]

Furthermore, the basic holdings of *American Needle* make clear that the challenged conduct here is subject to Section 1.   In *American Needle*, the Supreme Court declared that the relevant inquiry in making the single entity determination is "whether there is a 'contract, combination . . . . or conspiracy' among separate economic actors pursuing separate economic interests."   560 U.S. at

---

[5] Defendants also rely on *Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n,* 95 F.3d 593, 600 (7th Cir. 1996), as support for their function-by-function argument. However, the court in that case merely hypothesized about the possibility of such a test for the conduct of a sports league, *id.* – a hypothesis never adopted in *American Needle.*

[6] *See, e.g., California Dental Ass'n v. FTC,* 526 U.S. 756, 759-60 (1999) (dental association rule limiting members' advertising); *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 451 (1986) (dental association rule forbidding members from submitting x-rays to insurers); *NCAA v. Bd. Of Regents,* 468 U.S. 85, 99 (1984) (association plan restricting members' licensing of television rights); *Arizona v. Maricopa Cnty. Med. Soc'y,* 457 U.S. 332, 357 (1982) (medical society's schedule of maximum prices); *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 681 (1978) (engineering society's ethical canon barring competitive bidding); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 781-83 (1975) (bar association's fee schedules); *Topco,* 405 U.S. at 602-03 (joint-venture bylaws setting exclusive territories for members); *United States v. Sealy, Inc.,* 388 U.S. 350, 352-54 (1967) (same); *Associated Press v. United States,* 326 U.S. 1, 4, 8 (1945) (news service bylaws prohibiting members from selling news to nonmembers); *Fashion Originators' Guild of Am. v. FTC,* 312 U.S. 457, 461-63 (1941) (apparel guild rules prohibiting sales to certain retailers); *Bd. of Trade v. United States,* 246 U.S. 231, 238 (1918) (commodities exchange rule governing members' off-exchange transactions).

10

195.  It added that an agreement is concerted action if it "deprives the marketplace of independent centers of decisionmaking . . . and thus of actual or potential competition."  *Id*.  As in *American Needle*, each Member Plan "is a substantial, independently owned, and independently managed business" with distinct and potentially competing interests.  *Id*. at 196.[7]   And as in *American Needle*, the Plans are separately controlled, potential competitors with economic interests that are distinct from BCBSA's financial well-being.  *See id*. at 201.  Here too, but for the collective decisions made through BCBSA, "there would be nothing to prevent each of the [Plans] from making its own market decisions" as to where it determined to do business.  *See id*. at 200.[8]

Indeed,  the Supreme Court stressed in *American Needle* that  it had "repeatedly found instances in which members of a legally single entity violate § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity." *Id*. at 191 (citing *Sealy*, 388 U.S. at 352-56).  *See also American Needle*, 350 at 192 (reaffirming that the licensor in *Sealy* was "an instrumentality of the individual manufacturers," and that it had previously "found other formally distinct business organizations covered by § 1" and citing, *inter alia*, *Topco*, 405 U.S. at 609).

---

[7] Defendants argue in a footnote that this fact does not establish concerted conduct, relying in part on *Texaco, Inc. v. Dagher,* 547 U.S. 1, 5-8 (2006).  (Defs.' Opp. at 26 n.1) They fail to note that the defendants in that case had exited the market, leaving only the joint venture to operate going forward.

[8] Defendants attempt to distinguish *American Needle* on the ground that the NFL teams separately owned the trademarks involved, arguing that here "no Plan has ever owned the assets necessary to govern the use of the Blue Marks nationwide" but instead integrated their previously individually owned trademarks into the BCBSA, which holds the applicable federal registrations. Defs.' Opp. at 19-20.  Notably, however, in both *Topco* and *Sealy* (both of which were relied upon in *American Needle*), formal ownership of the trademarks was vested in the licensor. *See Sealy*, 388 U.S. at 351-52; *Topco*, 405 U.S. at 596.  Nevertheless, the territorial divisions involved were subjected to analysis under Section 1.

11

Finally, Defendants' reliance on *Washington v. NFL*, 880 F. Supp. 2d 1004 (D. Minn. 2012), and *Spinelli v. NFL*, 96 F. Supp. 3d 81 (S.D.N.Y. 2015), for their single entity theory is misplaced. Both of those cases involved the licensing of historic game footage and photos – *i.e.*, the intellectual property involved had always been owned in whole or part by the NFL itself – and thus the product *could not* be produced by any one entity.   *See Spinelli*, 96 F. Supp. 3d at 114; *Washington*, 880 F. Supp. 2d at 1006.   Furthermore, as the Supreme Court explained in *American Needle*, "[t]he justification for cooperation is not relevant to whether the cooperation is concerted or independent action," as indeed, "[m]embers of any cartel could insist that their cooperation is necessary to produce the 'cartel product' and compete with other products." 560 U.S. at 199 & n.7.

## 2. Even Assuming, *Arguendo*, That the Plans' Service Areas Stemmed From Common-Law Trademark Rights, That Would Not Excuse Subsequent Antitrust Violations.

Defendants also claim their conduct cannot be scrutinized under Section 1 because, they assert, "Plan service areas stem from pre-existing common-law trademark rights, not an unlawful agreement to allocate markets."  Defs.' Opp. at 20.  Regardless of whether there were service areas prior to Defendants' allocation of ESAs, that does not insulate a subsequent agreement and adherence to an unlawful territorial market division.   ECF No. 1352 at 38-42.   That is the fundamental difference between this case and the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).   In *Twombly*, the Supreme Court found insufficient factual allegations to support a ruling that the defendant telephone companies plausibly may have entered into an agreement to divide their geographic markets, as distinguished from a unilateral determination of each to continue to act as in the past.  *Id*. at 566-69.  No such uncertainty of a subsequent agreement exists here.   Thus, what may once have been lawful unilateral conduct pursuant to any claim the Plans had to geographic exclusivity through concurrent geographic trademark registrations permitted

12

under the Lanham Act (a claim we dispute), nonetheless became subject to analysis under Section 1 of the Sherman Act once they admittedly agreed to the ESAs.

Relying on *VMG Enterprises, Inc. v. F. Quesada & Franko, Inc.*, 788 F. Supp. 648, 657 (D.P.R. 1992), Defendants contend that "an agreement that does not 'create a trademark territorial division [but] merely recognized it' does not violate § 1." Defs.' Opp. at 21.  The district court's (questionable) decision in *VMG* did not so hold. The parties in that case had obtained concurrent use trademark registrations containing territorial limitations, as permitted under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052.  However, parties may not use such trademarks to violate the antitrust laws. 15 U.S.C. § 1115(b)(7).[9]  The defendant counterclaimed that the parties had entered into a subsequent agreement to divide geographic markets in violation of Section 1 of the Sherman Act. *VMG*, 788 F. Supp. at 653.

The district court dismissed the counterclaim for a number of reasons: (i) no specific facts had been alleged to support the conclusory market allocation contention in the counterclaim; (ii) the defendant had alleged no facts required to state a valid claim under Section 2 of the Sherman Act; and (iii) antitrust policy had not been violated because the parties had continued to compete, albeit with the defendant using a different trademark.  *Id*. at 657-58.  The court did not explain why it evaluated the claim under Section 2, rather than Section 1, pursuant to which the claim had been made.  And the district court did not hold that the trademark laws permit parties to enter into agreements dividing geographic markets – indeed, 15 U.S.C. § 1115(b)(7) prohibits such

---

[9] *See Phi Delta Theta Fraternity v. J.A. Buchroeder & Co.,* 251 F. Supp. 968 (W.D. Mo. 1966), sending to trial a claim that the owner of a concurrent use registration had used it to violate the antitrust laws.

agreements.[10]

### B. Defendants' Agreements Are Not Exempt From – And Properly Should Be Addressed Under – The Rule of *Per Se* Liability Made Clear in *Sealy* and *Topco*.

### 1. The Restraints Are Anticompetitive On Their Face and Not "Unique."

Each of Defendants' practices challenged by Subscriber Plaintiffs falls into a category of restraints of trade long recognized by the Supreme Court as *per se* unlawful – allocation of geographic markets among potential competitors and horizontal agreements to restrain output.[11]  The fact that Defendants' collusion is taking place in the health insurance business or that Defendants label their restraints euphemistically cannot change the nature of those restraints.  And contrary to Defendants' assertion, it is not the law that unless the courts have "examined such restraints arising in the particular fact pattern at issue, the *per se* rule cannot apply." Defs.' Opp. at 42.  "The Supreme Court has held that it is the court's experience with the type of restraint that is relevant in applying the per se rule, not the industry or the precise factual circumstances of the case."  *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1312 n.32 (S.D. Fla. 2005) (citing *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 357 (1982)); *see also In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 900 (6th Cir. 2003).

Also contrary to Defendants' argument (*see* Defs.' Opp. at 23), these defined categories of *per se* unlawful restraints have not been revisited by the Supreme Court or the Eleventh Circuit so

---

[10] *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.,* 106 F.3d 355, 365-66 (11th Cir. 1997), the other decision relied on by defendants, Defs.' Opp. at 20, merely stands for the proposition that concurrent use trademarks are permitted under the Lanham Act.

[11] ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████

14

that they must be presumed to be subject solely to evaluation under a full-blown rule of reason *unless* plaintiffs can demonstrate the absence of any "plausible" procompetitive justification for the specific restraint at issue.  Such a case-specific, burden-shifting articulation is not found in the cases cited by Defendants – and for good reason: it would defeat the purpose of the long-established selection of *per se* categories. [12]  The Supreme Court has made clear that the lower courts should follow its precedent *even if* it "appears to rest on reasons rejected in some other line of decisions." *see Agostini v. Felton*, 521 U.S. 203, 237 (1997).  An example is the much-criticized *per se* rule against resale price maintenance (vertical price fixing) set forth in *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911), overruled by the Supreme Court 96 years later in *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007).

Moreover, here Defendants have offered *no* persuasive authority to find the application of the *per se* rule in *Sealy* and *Topco* to have been effectively overturned.  To the contrary, each of the handful of cases relied upon by Defendants for their *ipse dixit* that "*Sealy* and *Topco* cannot control", Defs.' Opp. at 27, instead demonstrates that departures from the *per se* standard for agreements in those families of classic horizontal restraints[13] have been rare and occurred only when courts found

---

[12] The fact that most types of conduct are evaluated under the rule of reason rather than treated as *per se* unlawful (*see* Defs. Opp. at 23) only underscores the importance of adherence to the *per se* rule for select categories of horizontal restraints. ██████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

[13] Notably, Defendants include *Leegin* and *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977), as support for their argument that the *per se* rule should not be applied to the horizontal market divisions and output restraints challenged here.  *See* Defs.' Opp. at 23, 25. Both of those cases, however, involved *vertical* restraints.  The nature of the *challenged* agreements here, not of

themselves in truly *uncharted territory* such that *stare decisis* did not apply:

- *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013), and *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 344 F.3d 1294 (11th Cir. 2003), involved temporal (not territorial) market divisions through the 180-day exclusivity period established *by Congress* – what the Supreme Court called "Hatch-Waxman's unique regulatory framework." *Actavis*, 133 S. Ct. at 2235.  And the *Actavis* Court's decision to analyze the patent settlement agreement under the rule of reason turned on the unique legal context in which such agreements are made, including (1) the interplay between the exclusionary rights granted under patent law and the procompetitive principles of antitrust law, *id*. at 2231, (2) a background of Supreme Court precedents holding that some patent settlement agreements do not violate the antitrust laws, *id*. at 2231-33, and (3) the "general legal policy favoring the settlement of disputes," *id*. at 2234.  None of these unique considerations is present here.

- *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1 (1979) ("*BMI*"), and *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984), as the Court knows well at this point, were cases in which the restraint was "essential if the product is to be available at all." *NCAA*, 468 U.S. at 86.  Unlike a blanket license for millions of compositions that no entity could offer in *BMI* and collegiate sports in *NCAA*, the product here is a familiar one, as conceded by Defendants' proffered expert Dr. Murphy – simply "medical insurance" that not only is offered by other insurers, but concededly could be offered in tandem by Blues together using transfer fees. SX232, Murphy Dep. 22:15-20, 65:18-21.

- *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016) did not involve a classic category of restraint.  Indeed, the Eleventh Circuit panel expressly observed that there was "not [] a

---

other understandings or other relationships between or among parties, is what is at issue – and it is plainly horizontal.

great deal of experience with the kind of case [] here" (*id.* at 1084)-- *unilateral* action by one party (and thus not subject to Section 1 at all) relative to a lawful joint venture that subsequently *resulted* in what *might be called* a market division.   The appellate panel expressly noted that distinguished *Procaps* from *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990), and indeed found the case to really be a breach of contract case masquerading as an alleged antitrust violation.   *See Procaps*, 845 F.3d at 1087.   That could hardly be more different than the *expressly agreed-upon restraints of trade* at issue in this litigation.

- Defendants also rely heavily on two decisions by Judge Posner in the Seventh Circuit: *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir. 1985), and *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004 (7th Cir. 2012).   The extraordinary factual distinguishability of *Polk Bros.* (an ancillary restraint emanating from a joint venture by two retailers in the construction of a single building) and the express language of *Sulfuric Acid* ("we have never seen or heard of an antitrust case quite like this, combining such elements as involuntary production and potential antidumping exposure," 703 F.3d at 1011) underscore that those *sui generis* cases neither alter the applicable *per se* categories nor have any relevance here.

Defendants proffer purported factual distinctions between their conduct and that at issue in *Topco* and *Sealy*, none of which have merit, for reasons already well-articulated to the Court.   ECF No. 1435 at 40-42 ("Subs.' Opp."); *see also* ECF No. 1431 at 41-44 ("Provs.' Opp.").   Defendants' long-winded claims of purported procompetitive justifications, like Topco's assertion that its exclusive territorial divisions were necessary to compete with larger regional and national chains, do not spare the restraints from *per se* treatment.   At bottom, Defendants' principal argument is that *Topco* and *Sealy* "cannot control" in light of newer law, but such a rejection of precedent is inappropriate, both legally as well as factually.

17

### 2. At Most, Defendants' Conduct Can Be Addressed By a "Quick Look" Analysis

Subscriber Plaintiffs submit that *per se* condemnation of each of the challenged restraints properly should be the end of the inquiry here, and have moved for partial summary judgment accordingly. Regardless, the challenged restraints are inherently suspect. In the event that the Court were to determine that any of them merits a "quick look," or very limited factual review, to assess whether Defendants can shoulder the burden that shifts to them to rebut the *per se* presumption, *see Terazosin Hydrochloride*, 352 F. Supp. 2d at 1310-11, Subscriber Plaintiffs respectfully submit that it is clear the restraints would not survive such an examination.[14] The advantages of either application of a *per se* rule or a quick look analysis are speed and efficiency. Both are important here because Defendants' conduct is impeding the availability of lower prices to subscribers, artificially restraining output, and limiting subscriber choices.

The Court need not look to argument by Subscriber Plaintiffs or conclusions by economists in this litigation for that evidence. The anticompetitive effects of the Blue System restraints challenged here are manifest, apparent, and real – as articulated in studies of the Blues by the American Hospital Association ("AHA") and a worldwide consulting firm, Law and Economics Consulting Group ("LECG"), in unrelated merger contexts. In a copiously-annotated February 29, 2016 letter brief to the DOJ, challenging the contemplated merger between Anthem and CIGNA,[15] the AHA pointed out that "Blue plans currently dominate the health insurance market in most states"

---

[14] These are not restraints that are merely "ancillary" to lawful exploitation of trademarks ███
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████

[15] The AHA, of course, is the same organization cited by Defendants as setting the standards governing the use of the Blue marks back in the 1940s.

and control 105 million lives. SX200 at 2. Collectively, the Blues are three times bigger than any other health plan, *id.* at 7, and they had $244 billion in revenue in 2013, making them larger than all Fortune 500 companies other than Wal-Mart and Exxon Mobil. *Id.* In many states, they are "many times larger than their largest competitor." *Id.* at 3. With respect to commercial fully insured health care coverage, the Blues command the largest share in 45 states and the District of Columbia, holding above a 50% market share in 35 states and 85% in others. *See id.* at 7-8.

The AHA observed that the BCBSA rules prevented Anthem from negotiating discounts with providers for its non-Blue business outside its assigned territory; it gave the example of Anthem buying the insurance units of John Hancock and Massachusetts Mutual in 1996 and Methodist Health Care in 2002, and operating them under the UniCare (non-Blue) label. Anthem tried to negotiate discounts with providers for UniCare outside of its ESAs but the BCBSA rules prevented that. Anthem transferred the UniCare business to HCSC in 2009. *Id.* The reason, according to both AHA and Anthem, was that "it could not compete effectively outside its assigned territories against another Blue." *Id.* The result was loss of output, consumer choice and competition.  The AHA concluded therefore that the BCBSA rules actively prevent Blue-on-Blue competition, including even unbranded competition. As it stated, "[t]he majority of Blue plans do not compete in the sale of their products" and have little financial incentive to do so outside their respective ESAs. *Id.* at 12.  The AHA noted that:

> The absence of sales opportunities is a product of both the Association's rules and the terms of the Blue licensing agreements. The rules restrict each Blue plan to sales within a specific geographic territory. The license agreement prevents a Blue from selling or advertising Blue products and from contracting with providers outside of its assigned territories, called a Service Area. While Blue plans may own non-blue subsidiaries, Association rules prevent those subsidiaries from growing large enough to pose a competitive threat to another Blue plan.

*Id.* (footnote omitted).  Blue plans also dominate public health exchanges. *Id.* at 7. This leads to

19

higher prices for subscribers, as explained by the AHA:

> A recent study looking at pricing changes on 34 state exchanges found that the "largest insurance company in each state on average increased their rates 75 percent more than smaller insurers in the same state," and increases did not appear to be related to higher medical costs. "In most states insurers with large market share [overwhelmingly Blue plans] have proposed rate increases in excess of 20 percent for next year." These studies seem to suggest that Blue premiums are higher in states where they are dominant and any network efficiencies they enjoy as a result do not translate into lower premiums for consumers.

*Id*. at 18 (footnote omitted). The contemplated increases ranged from 21 to 52 percent. *Id*. at 18-19.

These kinds of tactics once again limit output, restrict consumer choice and cause consumers to pay higher rates for health insurance.

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

## IV.   CONCLUSION

For the foregoing reasons, each of the challenged restraints is subject to a *per se* rule, and none requires the undertaking of a full-blown rule of reason analysis to find it anticompetitive.

This the 15th day of September, 2017

Charles J. Cooper – **Co-Chair, Written**
**Submissions Committee**
COOPER & KIRK, PLLC
1523 New Hampshire Avenue NW
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

David Boies – **Co-Lead Counsel**
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749-8200
dboies@bsfllp.com

David Guin – **Co-Chair, Written**
**Submissions Committee**
Tammy Stokes – **Damages Committee**
GUIN, STOKES & EVANS, LLC
The Financial Center
505 20th Street North, Suite 1000
Birmingham, AL 35203
Tel: (205) 226-2282
Fax: (205) 226-2357
davidg@gseattorneys.com
tammys@gseattorneys.com

*/s/ Chris T. Hellums*
Christopher T. Hellums – **Local Facilitating**
**Counsel**
PITTMAN, DUTTON & HELLUMS, P.C.
2001 Park Place N, 1100 Park Place Tower
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
chrish@pittmandutton.com

Michael Hausfeld – **Co-Lead Counsel**
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeldllp.com

William A. Isaacson – **Settlement Committee &**
**PSC Member**
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW
Washington, DC 20015
Tel: (202) 237-2727
Fax: (202) 237-6131
wisaacson@bsfllp.com

Gregory Davis – ***Settlement Committee & PSC Member***
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Tel: (334) 832-9080
Fax: (334) 409-7001
gldavis@knology.net

Megan Jones – ***Settlement Committee & PSC Member***
Arthur Bailey – ***Discovery Committee***
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
mjones@hausfeldllp.com
abailey@hausfeldllp.com

Kathleen Chavez – ***Settlement Committee & PSC Member***
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
kcc@fmcolaw.com

Cyril V. Smith – ***Settlement Committee & PSC Member***
ZUCKERMAN SPAEDER, LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Tel: (410) 949-1145
Fax: (410) 659-0436
csmith@zuckerman.com

Eric L. Cramer – ***Expert Committee***
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: 1-800-424-6690
Fax: (215) 875-4604
ecramer@bm.net

Richard Feinstein – ***Expert Committee***
Karen Dyer – ***Expert Committee***
Hamish P.M. Hume – ***Discovery Committee***
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW
Washington, DC 20015
Tel: (202) 237-2727
Fax: (202) 237-6131
tchutkan@bsfllp.com
kdyer@bsfllp.com
hhume@bsfllp.com

Patrick Cafferty – ***Discovery Committee***
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
101 North Main Street, Suite 565
Ann Arbor, MI 48104
Tel: (734) 769-2144
Fax: (734) 769-1207
pcafferty@caffertyclobes.com

Bryan Clobes – ***Litigation Committee***
Ellen Meriwether – ***Written Submissions Committee***
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
1101 Market Street, Suite 2650
Philadelphia, PA 19107
Tel: (215) 864-2800
Fax: (215) 864-2810
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

22

Douglas Dellaccio – *Litigation Committee*

CORY WATSON CROWDER & DEGARIS, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 32505
Tel: (205) 328-2200
Fax: (205) 324-7896
ddellaccio@cwcd.com

Edwin J. Kilpela, Jr.
Benjamin Sweet – *Litigation Committee*
CARLSON LYNCH SWEET KILPELA & CARPENTER LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA  15222
Tel: 412-322-9243
Fax: 412-231-0246
ekilpela@carlsonlynch.com
bsweet@carlsonlynch.com

Charles T. Caliendo – *Class Certification Committee*
GRANT & EISENHOFER
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
ccaliendo@gelaw.com

Daniel Gustafson – *Litigation Committee*
Daniel C. Hedlund – *Damages Committee*
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

Chris Cowan – *Damages Committee*
THE COWAN LAW FIRM
209 Henry Street
Dallas, TX 74226-1819
Tel: (214) 826-1900
Fax: (214) 826-8900
chris@cowanlaw.net

Robert M. Foote – *Damages Committee*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
rmf@fmcolaw.com

Robert Eisler – *Discovery Committee*
GRANT & EISENHOFER
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
reisler@gelaw.com

Brent Hazzard – *Litigation Committee*
HAZZARD LAW, LLC
447 Northpark Drive
Ridgeland, MS 39157
Tel: (601) 977-5253
Fax: (601) 977-5236
brenthazzard@yahoo.com

23

John Saxon – *Litigation Committee*
JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203-3314
Tel: (205) 324-0223
Fax: (205) 323-1583
jsaxon@saxonattorneys.com

Andrew Lemmon – *Chair, Discovery Committee*
LEMMON LAW FIRM
650 Poydras Street, Suite 2335
New Orleans, LA 70130
Tel: (504) 581-5644
Fax: (504) 581-2156
andrew@lemmonlawfirm.com

Robert Methvin – *Chair, Settlement Committee*
James M. Terrell – *Class Certification Committee*
MCCALLUM, METHVIN & TERRELL, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, AL 35205
Tel: (205) 939-0199
Fax: (205) 939-0399
rgm@mmlaw.net
jterrell@mmlaw.net

H. Lewis Gillis – *Co-Head Chair, Litigation Committee*
MEANS GILLIS LAW, LLC
3121 Zelda Court
Montgomery, AL 36106
Tel: 1-800-626-9684
hlgillis@tmgslaw.com

Lawrence Jones – *Damages Committee*
JONES WARD PLC
312 South Fourth Street, Sixth Floor
Louisville, KY 40202
Tel: (502) 882-6000
larry@jonesward.com

Virginia Buchanan – *Chair, Class Certification Committee*
LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7000
Fax: (850) 435-7020
vbuchanan@levinlaw.com

Michael McGartland – *Class Certification Committee*
MCGARTLAND & BORCHARDT LLP
1300 South University Drive, Suite 500
Fort Worth, TX 76107
Tel: (817) 332-9300
Fax: (817) 332-9301
mike@attorneysmb.com

David J. Hodge – *Chair, Settlement Committee*
MORRIS, KING & HODGE
200 Pratt Avenue NE
Huntsville, AL 35801
Tel: (256) 536-0588
Fax: (256) 533-1504
lstewart@alinjurylaw.com

24

Dianne M. Nast – *Class Certification Committee*
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com

Patrick W. Pendley – *Chair, Damages Committee*
Christopher Coffin – *State Liaison Committee*
PENDLEY, BAUDIN & COFFIN, LLP
Post Office Drawer 71
Plaquemine, LA 70765
Tel: (225) 687-6369
pwpendley@pbclawfirm.com
ccoffin@pbclawfirm.com

Edgar D. Gankendorff – *Co-Head Chair, Litigation Committee*
Eric R.G. Belin – *Damages Committee*
PROVOSTY & GANKENDORFF, LLC
650 Poydras Street, Suite 2700
New Orleans, LA 70130
Tel: (504) 410-2795
Fax: (504) 410-2796
egankendorff@provostylaw.com
ebelin@provostylaw.com

Richard Rouco – *Written Submissions Committee*
QUINN, CONNOR, WEAVER, DAVIES & ROUCO LLP
2700 Highway 280 East, Suite 380
Birmingham, AL 35223
Tel: (205) 870-9989
Fax: (205) 870-9989
rrouco@qcwdr.com

Garrett Blanchfield – *Written Submissions Committee*
REINHARDT, WENDORF & BLANCHFIELD
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com

Jason Thompson – *Damages Committee*
SOMMERS SCHWARTZ
One Towne Square, 17th Floor
Southfield, MI 48076
Tel: (248) 355-0300
jthompson@sommerspc.com

Larry McDevitt – *Chair, Class Certification Committee*
David Wilkerson – *Discovery Committee*
VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Tel: (828) 258-2991
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Carl S. Kravitz – *Expert Committee*
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: (202) 778-1800
Fax: (202) 822-8106
ckravitz@zuckerman.com

*Subscriber Plaintiff Co-Lead Counsel and Committee Chairs and Members*

25

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2017, the foregoing was served on all counsel of record via CM/ECF.  An unredacted version of the foregoing was manually filed under seal with the Clerk of Court, and was served via electronic mail on the following counsel for other Defendants who have been designated to receive service through agreement of the parties:

| | |
|---|---|
| Carl S. Burkhalter<br>Jim Priester<br>John Thomas A. Malatesta, III<br>Misti Jones<br>MAYNARD COOPER & GALE PC<br>1901 Sixth Avenue North<br>2400 Regions Harbert Plaza<br>Birmingham, AL 35203<br>Telephone: (205) 254-1000<br>cburkhalter@maynardcooper.com<br>jpriester@maynardcooper.com<br>jmalatesta@maynardcooper.com<br>mjones@maynardcooper.com | Kimberly R. West<br>Mark H. Hogewood<br>WALLACE JORDAN RATLIFF &<br>BRANDT LLC<br>First Commercial Bank Building<br>800 Shades Creek Parkway, Suite 400<br>PO Box 530910<br>Birmingham, AL 35253<br>Telephone: (205) 870-0555<br>kwest@wallacejordan.com<br>mhogewood@wallacejordan.com |
| Craig A. Hoover<br>Elizabeth Jose<br>HOGAN LOVELLS US LLP<br>Columbia Square<br>555 Thirteenth Street, NW<br>Washington, DC 20004<br>Telephone: (202) 637-5600<br>craig.hoover@hoganlovells.com<br>elizabeth.jose@hoganlovells.com | Daniel E. Laytin<br>Sarah Donnell<br>Jessica Staiger<br>Jeff Zeiger<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle<br>Chicago, IL 60654<br>Telephone: (312) 862-2000<br>daniel.laytin@kirkland.com<br>sdonnell@kirkland.com |

26

| | |
|---|---|
| Emily M. Yinger<br>HOGAN LOVELLS US LLP<br>Park Place II<br>7930 Jones Branch Drive, Ninth Floor<br>McLean, VA 22102<br>Telephone: (703) 610-6100<br>emily.yinger@hoganlovells.com | jessica.staiger@kirkland.com<br>jeffrey.zeiger@kirkland.com |
| Rachel Adcox<br>AXINN, VELTROP & HARKRIDER,<br>LLP<br>950 F Street, N.W.<br>Washington, DC 20004<br>Telephone: (202) 912-4700<br> radcox@axinn.com | Kathleen Taylor Sooy<br>Tracy A. Roman<br>CROWELL & MORING LLP<br>1001 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004<br>Telephone: (202) 624-2500<br>ksooy@crowell.com<br>troman@crowell.com |

       */s/ Chris T. Hellums*
       Chris T. Hellums
       ***Local Facilitating Counsel for Subscriber***
       ***Plaintiffs***