*1*   FILED
2017 Oct-11  AM 09:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

IN RE:                              *

                                    *      2:13-cv-20000-RDP

BLUE CROSS BLUE SHIELD ANTITRUST    *      October 4, 2017

LITIGATION MDL 2406                        1:00 p.m.
                                    *
                                           Birmingham, Alabama
                                    *

                                    *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE R. DAVID PROCTOR**
**UNITED STATES DISTRICT JUDGE**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *:

```
 1   Present:            Andrew Hammond
                         Annesley H. DeGaris
 2                       Barry A. Ragsdale
                         Carl S. Burkhalter
 3                       Cavender C. Kimble
                         Charles L. Sweeris
 4                       Cheri D. Green
                         Christopher T. Hellums
 5                       Christopher W. Weller
                         Courtney Gipson
 6                       Craig A. Hoover
                         Cyril V. Smith, III
 7                       Daniel E. Laytin
                         David Boies
 8                       David J. Guin
                         Dennis G. Pantazis
 9                       Douglas Dellaccio, Jr.
                         E. Kirk Wood, Jr.
10                       Edith M. Kallas
                         Edward S. Bloomberg
11                       Elizabeth Chavez
                         Emily M. Yinger
12                       Eric B. Scartz
                         Gregory L. Davis
13                       Helen E. Witt
                         Henry C. Quillen
14                       James L. Priester
                         Jenny Maier
15                       Joe R. Whatley, Jr.
                         John D. Briggs
16                       John M. Johnson
                         Jonathan S. Mann
17                       Joshua K. Payne
                         Katherine R. Brown
18                       Kathleen C. Chavez
                         Kathleen Taylor Sooy
19                       Kimberly R. West
                         Lauren Kennedy
20                       Luther M. Darr, Jr.
                         Mark Gray
21                       Matthew G. White
                         Megan Jones
22                       Michael D. Hausfeld
                         Michael E. Gurley, Jr.
23                       Nicholas B. Roth
                         Peter Bisio
24                       Patrick J. Sheehan
                         Patrick McDowell
25                       Robert K. Spotswood
                         Samuel C. Leifer
```

```
 1                        Scott Brown
                         Stephen A. Rowe
 2                        Stephen DiPrim
                         Stephen D. Wadsworth
 3                        Swathi Bojedla
                         Tammy McClendon Stokes
 4                        Todd M. Stenerson
                         Tracy A. Roman
 5                        U.W. Clemon
                         W. Tucker Brown
 6                        W. Daniel Miles
                         William A. Isaacson
 7                        Zach Holmstead

 8   Present            Virginia Buchanan
     via telephone:     Andrew Stone
 9                        Sylmarie Arizmendi
                         Gustavo Pabon
10                        Myron Penn
                         Kitty Rogers Brown
11                        John McBride
                         Carmen Snell
12                        Raymond Redd
                         Elaine Nichenko
13                        Deanna Salazar
                         Joe Bial
14                        Michelle Kallen
                         Ed Bloomberg
15                        Brian Norman
                         Tim Slattery
16                        Gwendolyn Payton
                         Michael Zipfel
17                        Michele Druker
                         John Schmidt
18                        Lucie Cohen
                         John Martin
19                        Ami Swank
                         Andrew Lemmon
20                        Erik Benny
                         Glenn Kurtz
21                        Anna Clark

22
     Also Present:      Honorable T. Michael Putnam
23                        Ed Gentle

24
     Court Reporter:    Leah S. Turner
25
```

```
 1              This cause came to be heard and was heard on the
      4th day of October 2017, before the Honorable R. David
 2    Proctor, United States District Judge, holding court for
      United States District Court, Northern District of Alabama,
 3    Southern Division, in Birmingham, Alabama.

 4              Proceedings continued as follows:

 5                     P R O C E E D I N G S

 6         THE COURT:  Good afternoon, everyone.  I have a few

 7    people here today.  Tomorrow we are also going to have the

 8    overflow room available for anybody who doesn't want to sit in

 9    here and witness it personally.  We are in the media age where

10    you channel your teenage children or grandchildren and you can

11    sit downstairs and watch a monitor.

12         All right.  So the agenda for today has largely been

13    set.  This afternoon we're going to take up four items.  I

14    might add a fifth item about the seal team onto it that I've

15    asked the parties to give me a report about.  We're going to

16    talk about the provider motion for judgment based on

17    collateral estoppel, subscriber motion for protective order

18    regarding contacts of putative class members, start talking

19    about the privilege log and how we might need to handle that

20    and seal team issue perhaps or the seal master issue, and then

21    finally I want to tackle the stipulation or lack thereof

22    between Cigna and the Blues regarding preservation of

23    mediation privilege.

24         Any reason to take those out of order as it relates

25    to any of these matters?
```

1          MR. WHATLEY:  No, Your Honor.

2          MS. WEST:  No, Your Honor.

3          THE COURT:  Then we will just follow the order that

4     we have set.  Anybody want to add to the agenda, anything that

5     has popped up that I'm not aware of?

6          All right.  Well, then, we will start off with the

7     collateral estoppel issue and the provider's motion for

8     judgment based on collateral estoppel as to Anthem.

9          Correct, Mr. Whatley?

10          MR. WHATLEY:  Yes, sir.

11          THE COURT:  And it's Anthem and only Anthem?

12          MR. WHATLEY:  Anthem and only Anthem, Your Honor.

13          THE COURT:  So am I to instruct the jury you should

14     consider the following facts established as to Anthem but no

15     one else sitting over there?

16          MR. WHATLEY:  Sure.  And by the way, the way we've

17     divided the argument, Your Honor, Henry is going to address

18     much of the substance.  But that's absolutely right.  And we

19     fully believe, contrary to what -- while we agreed with

20     practically everything else that the other defendants said in

21     their brief, we disagree that a jury can't follow

22     instructions.  A jury can and does follow instructions all the

23     time and you can tell them that.

24          But I also think it's important to understand why

25     we're bringing this motion and why we're bringing this motion

1    now.  We view this motion as a building block for a summary

2    judgment motion that we intend to file against Anthem and at

3    least for this purpose Anthem only.

4            You see, Anthem, as you are going to hear tomorrow,

5    has 150,000-plus members residing in Alabama.  That's more

6    than Cigna, which I will also comment on in a second.  It's

7    more than Aetna.  And what we're going to ask for with these

8    facts and others that we will present in a subsequent motion

9    is to ask that Anthem be enjoined from continuing their market

10   allocation scheme where they refuse to contract with providers

11   in Alabama to serve those 150,000-plus members.

12           That's what we're doing.  That's where we're headed

13   with this motion.  You won't have the jury issue in a summary

14   judgment proceeding.  And if it does come to a jury issue,

15   then instructions will easily take care of it.

16           I must say, Your Honor, that after reading the Cigna

17   papers last night and then rereading the Anthem papers, after

18   learning that Anthem gave Cigna a veto right over any

19   settlement proposal it might make here, we find it hard to

20   understand how Anthem can be arguing that this case is so

21   distinct from their other cases when they themselves in their

22   agreement with Cigna tied them together.  But Henry will

23   address the other substantive issues, Your Honor.

24           THE COURT:  All right.  Thank you.

25           MR. QUILLEN:  Good afternoon, Your Honor.

1          THE COURT:  Good afternoon.

2          MR. QUILLEN:  I would like to pick up on the point

3    Joe was just making and then get into the substance, and it

4    goes back to some disputes that the defendants and the

5    plaintiffs have had dating back to late last year about the

6    extent to which the defendants would be able to take discovery

7    from named plaintiffs, both subscriber plaintiffs and provider

8    plaintiffs, who are located outside of Alabama.

9          The defendants were adamant that they be able to

10   take this discovery, and they said things -- and when I say

11   "they," I'm including Anthem in this -- said things like the

12   parties and experts will look to similar scenarios outside of

13   Alabama to prove their case.  While providers propose the

14   third amended complaint, attempts to limit the class

15   definitions in the accelerated action in Alabama, discovery

16   from the nonAlabama providers is equally relevant and

17   important to this action.  They also said the nonaccelerated

18   cases have not been stayed and cannot be brushed under the

19   rug.

20         To the extent they have said what is the purpose of

21   collateral estoppel here for Anthem's service area when this

22   is an Alabama case, I think it contradicts the position they

23   took when they wanted more discovery from outside of Alabama

24   and actually won on those motions.  There may even be an issue

25   of judicial estoppel there.

```
1          But getting into the substance of the motion, I
2     think it's important to be clear about what we are trying to
3     accomplish here and what we are not trying to accomplish here.
4          This is not a motion for summary judgment that
5     Anthem has violated the Sherman Act.  We are trying to
6     establish some principles of market definition that are going
7     to be important as this case goes on, including in the summary
8     judgment motion that Joe mentioned, and --
9          THE COURT:  How can I instruct the jury -- and I
10    realize juries can follow instructions.  I tend to agree with
11    Mr. Whatley's assessment of that.  But how can I instruct the
12    jury that Anthem has litigated a case and lost that cabins it
13    in to certain markets and tell the jury, For claims against
14    Anthem, you can consider this market; for claims against the
15    other Blues, you have to decide the appropriate market?
16         MR. QUILLEN:  Well, it's a little hard in the
17    abstract since we don't have the jury instructions in front of
18    us.  I think it also depends on the way that Anthem and the
19    other defendants choose to offer their defense at trial.  But
20    if the jury instructions were to be so specific that they
21    actually ask the jury to make findings about multiple service
22    areas in Alabama and areas outside of Alabama, then it seems
23    like it's a matter of saying that you should consider this --
24    you know, as to this service area, if the jury instructions
25    are that specific, you should consider this issue to be proven
```

1   against Anthem and only Anthem.

2          THE COURT:  But, again, I don't know how that works

3   when we're dealing with markets.

4          MR. QUILLEN:  Like I said, it's hard in the abstract

5   because you can imagine verdict forms in this case that run

6   the gambit from a general verdict form all the way down to

7   very, very specific findings about markets.  If we were just

8   going element by element --

9          THE COURT:  Thank you for keeping that in the

10  abstract.  I don't want to think about verdict forms.  So the

11  equity issues are on the back end of the inquiry, generally,

12  right?

13         MR. QUILLEN:  Yes.

14         THE COURT:  We only get to the equity issues if you

15  make a showing that as a matter of law you're entitled

16  to claim some collateral estoppel affect of previous

17  fact-finding.  So let's start off with whether or not you can

18  make that finding or whether you can make such a showing.

19         How do the different standards of review that apply

20  in a Section 7 merger case under the Clayton Act and a

21  Section 1 Sherman Act violation claim play into this, in your

22  view?

23         MR. QUILLEN:  They differ in an area in which we are

24  not seeking collateral estoppel.  At the risk of

25  over-simplifying how a Section 7 case works, the government

1    seems to have two basic burdens.  They have to establish what

2    the relevant product and geographic markets are.

3            THE COURT:  And that's generally a forward-looking

4    market because we don't have the actors in the market.  That's

5    the whole point of examining the merger, is trying to

6    determine how the merger would affect the market.

7            MR. QUILLEN:  Well, I would actually push back on

8    that a little bit because the second part of the inquiry is

9    once you have defined the relevant markets, what is the

10   potential affect on competition of the --

11           THE COURT:  That's a better way to state it.

12           MR. QUILLEN:  That is definitely forward-looking.

13   In this case, once you have the relevant markets, the district

14   court had to decide what is going to happen in those markets

15   in the future if Anthem were to merge with Cigna.  But the

16   process of defining those markets in the first place is not

17   inherently forward-looking.  It's what is laid out in the

18   horizontal merger guidelines, that you ask whether a

19   monopolist in your proposed market could impose a small but

20   significant nontransitory increase in price and maintain it,

21   and whether that is true for the market you've proposed

22   doesn't really depend on the future affects of the potential

23   merger.  It's a question of what substitutes are available for

24   your proposed product in your proposed geography.

25           So in this case, when the government said that

1    Anthem's service area was a relevant market, one of the things

2    the government had to prove was that the buyers in that market

3    would not be able to purchase services outside that market so

4    easily that it could defeat a hypothetical monopolist price

5    increase.

6         That is the same sort of analysis that is done in

7    Section 1 and Section 2 cases.  And there's a line that

8    several courts like to quote from a Supreme Court case called

9    Times Picayune about how the boundaries of geographic market

10   need not be described by metes and bounds, and that was

11   actually a Section 1 and Section 2 case, but it gets quoted

12   all the time in Section 7 cases because --

13        THE COURT:  Were there two markets involved in

14   Anthem-one?

15        MR. QUILLEN:  In the merger case?

16        THE COURT:  Yes.

17        MR. QUILLEN:  The government had alleged a

18   nationwide market for national accounts --

19        THE COURT:  -- national accounts --

20        MR. QUILLEN:  -- and in a market of Anthem's service

21   area for national accounts.  The court only reached the issue

22   of the service area market for national accounts.

23        And then for large groups that the government had

24   alleged that it was the CBSAs as the relevant geographic

25   market, the Court held that that was a proper geographic

1   market in general and then applied that finding to when it

2   looked at what the likely affect on competition of the

3   proposed merger would be in the Richmond market.

4           So what we are arguing here is the first part, how

5   do you properly define and measure markets.  The affect of any

6   given transaction on those markets once you've defined them is

7   beyond the scope of what we are trying to do here.

8           THE COURT:  Let me ask you this.  In Anthem-one in

9   dealing with this proposed Anthem/Cigna merger, wasn't the

10  standard of the test whether such a merger would substantially

11  lessen competition?

12          MR. QUILLEN:  That's the second part of what had to

13  be decided in Anthem-one, yes.

14          THE COURT:  How much litigation goes into the first

15  part, the geographic market?  Isn't that going to be defined

16  by the parties' respective positions more so than any, for

17  want of a better term, universal fact-finding by the trier of

18  fact?

19          MR. QUILLEN:  No.  It has to be -- I think the idea

20  behind the horizontal merger guidelines is that regardless of

21  what a party alleges in the first instance, you should be able

22  to come up with a pretty good standard definition of what the

23  market is, because it's the smallest market that meets certain

24  criteria.

25          The issue of what the market is was extensively

1  litigated with expert testimony and fact witnesses in

2  Anthem-one.  It was not just a situation where it was the

3  prelude to the real action.  It was a very important part of

4  the first litigation.

5       So with all of that in mind, there's really not a

6  difference between what the government was trying to

7  accomplish in the first part of Anthem-one and what we are

8  trying to accomplish here.

9       THE COURT:  Well, the actual market that the

10 Anthem-one court found and proved the relevant product market

11 was the sale of commercial health insurance to national

12 account customers defined as employers with more than 5,000

13 employees, correct?

14      MR. QUILLEN:  That's right.

15      THE COURT:  That's different than the product market

16 allegation you have made in the fourth amended complaint,

17 isn't it?

18      MR. QUILLEN:  No.  Let me see if I have the relevant

19 pages.

20      THE COURT:  You said in paragraph 342 of document

21 1083 national accounts are defined as those with 5,000

22 employees or more who are spread over more than one state.

23      MR. QUILLEN:  Well, I think we as much as possible

24 tried to match what the holding was in the opinion.  And if

25 you would like, I will find the relevant language.

1          THE COURT:  Yes, take a moment and find that for me

2    and help me understand if you believe there's a difference;

3    and if not, why.

4          MR. QUILLEN:  Okay.  The language from the Anthem

5    opinion defines the product market as the market for the sale

6    of health insurance to national accounts, customers with more

7    than 5,000 employees, usually spread over at least two states.

8    And then 342 is the sale of commercial health insurance to

9    national accounts with 5,000 employees or more who are spread

10   over more than one state.

11          I'm not sure that there's a substantive difference

12   between those two.  The order of the words is a little bit

13   different, but they are getting at exactly the same thing.

14          THE COURT:  But the thrust of your claim is that

15   this conspiracy involved an agreement or included an agreement

16   at least to divide and allocate geographic markets where

17   provider reimbursement rates could be determined, right?

18          MR. QUILLEN:  Yes.

19          THE COURT:  What's the most natural product market

20   for that claim, then?

21          MR. QUILLEN:  That's a good point, because another

22   thing we are not trying to do here is establish the product

23   market for the purchase of goods and services from healthcare

24   providers, but part of our complaint is the other side of the

25   market, the side in which health insurance and administrative

1    services are sold.

2              THE COURT:  ASOs?

3              MR. QUILLEN:  Yes, ASOs.  And it's relevant to our

4    claims because the power that --

5              THE COURT:  Let me stop you and just ask this.  So

6    your collateral estoppel argument targets in particular the

7    ASO side of your claims?

8              MR. QUILLEN:  Yes, it does.  We are not asking for

9    collateral estoppel on the definition of any markets relating

10   to the purchase of healthcare services by insurers.  But it's

11   still important for us on the other side because the

12   agreements and the activities that the defendants, including

13   Anthem, have undertaken to exclude competition from the

14   insurance side of the market or the ASO side of the market

15   affect their ability to use their market power to reduce

16   reimbursement rates for providers.

17             THE COURT:  But, still, the market definition and

18   the second part of the inquiry necessarily looks at future

19   conduct, the likelihood of decreasing competition in the

20   future, which seems to me to be a different inquiry from the

21   one the Court is being asked to decide here, and that is

22   whether the ongoing relationship and deals, combinations,

23   agreements, between the defendants input limitations or

24   decrease competition in current markets.

25             I'm struggling with understanding how that

 1    inquiry -- and this may be a question for the Blues to answer

 2    as well -- but how that inquiry is similar to, dissimilar to,

 3    or a little of both to each other.

 4            MR. QUILLEN:  What the Blues are doing with each

 5    other, it's certainly relevant to what was going on in Cigna,

 6    as we found out last night in Cigna's filing.  Cigna had a

 7    veto right over settlement in this case.  But --

 8            THE COURT:  To your knowledge, was that built in to

 9    the agreement or was that a side agreement that so far you

10    haven't found documentation for?

11            MR. QUILLEN:  I believe that was built into the

12    agreement between Cigna and Anthem, but --

13            THE COURT:  As part of the proposed merger?

14            MR. QUILLEN:  Yes.

15            THE COURT:  Is that surprising?

16            MR. QUILLEN:  It does --

17            THE COURT:  This thinking about merging and one side

18    has this pretty large contingent liability on its books, that

19    there would be some agreement about how that would be handled

20    in the future?

21            MR. QUILLEN:  It does seem interesting that Anthem

22    would essentially allow Cigna, one of the largest competitors

23    to the entire Blue system, to decide whether -- to essentially

24    decide whether all of the Blues can settle because --

25            THE COURT:  Well --

```
 1            MR. QUILLEN:  It would be hard to imagine a

 2    settlement in this case that doesn't --

 3            THE COURT:  The reason it's not -- it's surprising

 4    in that context, but you have to understand they were engaged

 5    at this point.  So they're talking about what's going to occur

 6    after the ceremony.  I'm not sure I'm altogether surprised by

 7    that.  I'm not sure that's -- that's a little bit of a red

 8    herring for purposes of your argument, perhaps.

 9            MR. QUILLEN:  It's not the centerpiece of our

10    argument.  It reinforces why these two litigations are not

11    completely dissimilar the way Anthem claims they are.  But to

12    answer your previous question --

13            THE COURT:  I think Mr. Whatley was driving that

14    point home in introducing your remarks, but the mere fact that

15    they have an agreement about how they're going to handle this

16    litigation doesn't mean this litigation is similar to the

17    other litigation.  That just means that they have linked some

18    aspects of this case with the proposed merger?

19            MR. QUILLEN:  Right.  That in and of itself

20    does not --

21            THE COURT:  That doesn't define the market or help

22    with your collateral estoppel argument, in my view.

23            MR. QUILLEN:  In standing alone it doesn't, although

24    obviously the Cigna/Anthem litigation that's ongoing right now

25    in Delaware has a lot to do with the best efforts rules that
```

```
 1   are being challenged and whether they ended up torpedoing the

 2   merger.

 3              THE COURT:  That's not to say that there won't be

 4   relevant aspects of that to the case.  I'm just not sure

 5   that's relevant to collateral estoppel on the instant motion.

 6              MR. QUILLEN:  But you had asked earlier about the

 7   forward-looking aspect of the market definition, and the

 8   answer is that from our perspective, we have a number of

 9   obligations in this case.  We have to define markets.  We have

10   to show what the -- if we are not in the per se world, which I

11   will leave for tomorrow, we will have to talk about the

12   competitive affects of the Blues' activities on those markets,

13   and those are two different inquiries.

14              Defining the markets does not require us to prove

15   that what the Blues are doing is anticompetitive.  The Blues'

16   agreements may certainly be relevant to the definition of

17   those markets the way they were relevant to the definition of

18   those markets in Anthem-one, but the forward-looking parts of

19   the merger analysis really are not what this collateral

20   estoppel motion is about.  What this motion is about is how do

21   you define and measure the markets that you're going to allege

22   to be relevant product markets and relevant geographic

23   markets.  Then when you go on to try to prove -- when we go on

24   to try to prove that what the Blues are doing in those markets

25   harms competition there, that is not something that there was
```

1    a finding in Anthem-one that we are relying on.  We would be

2    proving that separately.

3         THE COURT:  Just returning -- and I know I have

4    asked this question different ways, but I'm still trying to

5    get my hands around it.

6         In Anthem-one, it seemed that the D.C. district

7    court had to determine the geographic area in which the

8    Anthem/Cigna merger would cause a direct and immediate affect

9    on competition.

10         Here, the trier of fact needs to determine the

11   geographic markets in which anticompetitive affects occurred.

12   Again, I know you have tried to answer this, but I'm still

13   struggling with it.  Why aren't those different inquiries?

14         MR. QUILLEN:  Because the market definition is

15   really about what are the substitutes for the products and the

16   geographic areas in which competition is happening, and that

17   is a question that can be answered without respect to what

18   someone is doing that is allegedly anticompetitive.  You do

19   have to look at business conditions and other things that help

20   you understand what someone's best substitute may be, but if

21   you are asking whether a national account in an Anthem state

22   can -- what its options are outside of commercial health

23   insurance or outside of Anthem's service area, that is an

24   inquiry that does not necessarily depend on what Anthem is

25   doing outside those areas, what the Blues are doing outside

1    those areas.  It's about the state of the market as it exists.

2          And so, certainly, in this case if we're not under

3    the per se rule, we would have to prove anticompetitive

4    affects, but that is a separate inquiry from the market

5    definition, which is fairly agnostic to the type of

6    anticompetitive affects that are being alleged.

7          THE COURT:  Just let me pick off a few specific

8    issues here.  Fact three, as I read the Anthem-one opinion,

9    appears in a footnote and the district court seems to say, if

10   not expressly says, that it's related to an issue the court

11   need not consider.  You're on thinner ice on fact three,

12   right?

13         MR. QUILLEN:  I think it's fair to say that we are

14   on thinner ice on fact three, although fact seven does talk

15   about how the Association's rules are significant to how

16   geographic markets get determined.

17         THE COURT:  Facts, one, two, and four are in the

18   overview section of the opinion.  I don't really see that the

19   court wrestles with those other than background and I'm not

20   sure that it was essential to its rulings.

21         MR. QUILLEN:  I would disagree with that in that

22   when you're looking at the alternatives for, say, a national

23   account that's looking for administrative services, you know,

24   they cannot -- absent cede, they cannot go, if they're in

25   Anthem's service area, contract with another Blue.  And the

1    district court said that the Blues' rules, including the

2    ceding rules, mean everything in terms of geographic market

3    definition.

4         So even though these were introduced in a background

5    section, the district court seemed to make clear that it did

6    consider them important in how one determines the relevant

7    markets, especially the relevant geographic markets.

8         THE COURT:  The fact six addresses the market for

9    selling commercial health insurance to national accounts,

10   including sales of fully insured plans and ASO products only.

11        Why is that necessary to the Anthem-one ruling?  It

12   seems like the Anthem-one opinion explained the dispute over

13   that issue had little practical bearing on the market share

14   calculations that flowed from the market definition since

15   virtually all national accounts have ASO plans.  That was at

16   236 F.Supp.3d 202.

17        MR. QUILLEN:  It's the second part of that sentence.

18   It said it had little bearing on the market share calculations

19   that flowed from the market definition, but it's not -- I

20   would say it's not true that it had little bearing on the

21   market definition itself because --

22        THE COURT:  So you're distinguishing market share

23   calculations from the market as found by the district court?

24        MR. QUILLEN:  Yes, how you define the market versus

25   how you calculate what a particular company share in that

1    market is.

2          THE COURT:  How do you square your argument with the

3    alternative holdings in Anthem; and in particular, where the

4    D.C. circuit affirmed both rationales for the injunction

5    against the merger?  You run into a little bit of a problem

6    there in that if there were alternative rulings, were they

7    really necessary to the findings the Court made to reach the

8    injunction.

9          MR. QUILLEN:  Right.  Anthem's argument is that the

10   only ones that were critical were the product market

11   definition and the geographic market definition for national

12   accounts, and I think that there's obviously some debate about

13   whether the large group market was dicta or was not.  We have

14   the D.C. circuit affirming on that alternative ground, and I'm

15   sure that Anthem will have something to say about their

16   incentive to litigate the various aspects of the district

17   court opinion, which I would like to talk about before I get

18   down.

19          I think the grounds on which the D.C. circuit

20   affirmed are less relevant than the grounds on which the

21   district court based its decision and had no adverse ruling.

22          Going back to what I was saying a second ago, Anthem

23   says we only had a certain amount of time before the merger

24   agreement would expire and so we had to pick our battles when

25   we went to the D.C. circuit.

```
 1              I think the first issue is that's a disputed issue

 2    of fact, is whether Anthem really had until April 30 of 2017

 3    or whether the date was January 31st, but I would say it's not

 4    true that you can just look at someone's motivations for

 5    picking particular arguments as the ones they would emphasize

 6    on appeal.  There is definitely a lot of law that says that if

 7    you didn't have the chance to appeal a decision for some

 8    reason, that that should weigh against a finding of collateral

 9    estoppel on the trial court's decisions.

10         THE COURT:  Are you aware of any other case where a

11    Section 7 challenged under the Clayton Act and findings made

12    therein were applied in a Sherman Act case against a party of

13    that merger?

14         MR. QUILLEN:  I am not.

15         THE COURT:  We're in kind of unique ground here.

16    You're saying -- I understand your position, it's controlled

17    by well-established elements that we just simply apply to the

18    unique facts.  But this is a unique situation, correct?

19         MR. QUILLEN:  It is a unique situation.  I think

20    it's not every day that you have an antitrust case that's

21    ongoing and then right in the middle of it one of the

22    parties --

23         THE COURT:  One of the defendants decides let's go

24    merge with a competitor.

25         MR. QUILLEN:  I'm going to merge with a competitor,
```

1    and not only am I going to merge with a competitor, but I'm

2    going to justify my merger on the grounds that we can beat

3    down the reimbursement rates on hospitals and physicians even

4    more because we're going to get so big.

5            THE COURT:  So what efficiencies would be gained if

6    I gave you the relief you're seeking?

7            MR. QUILLEN:  As Joe said, we see this as a building

8    block toward a motion for an injunction.

9            THE COURT:  I understand how it fits into your

10   strategy.  I'm questioning what efficiencies there would be.

11           MR. QUILLEN:  That motion for summary judgment is

12   going to require us to prove a number of things, and if some

13   of them are already proven, then that is evidence that's not

14   going to have to be presented to the Court, is not going to

15   have to be argued before the Court.  So it is more efficient

16   in that way.

17           THE COURT:  But it's going to have to be reargued

18   before the Court by everybody else who is not tagged with the

19   collateral estoppel label, correct?  I'm going to have to

20   still litigate all these market issues and could conceivably,

21   at least, reach different results on markets as to every

22   defendant but Anthem?

23           MR. QUILLEN:  It is conceivable that you could have

24   inconsistent results, but it's interesting here because unless

25   Anthem is willing to come up here and represent that they are

```
 1    not going to argue for wildly different ways of defining the
 2    markets in this case, then Anthem will be the one asking you
 3    to enter a result that's inconsistent with the D.C. district
 4    court.  We are not asking anyone to enter --
 5         THE COURT:  Well, except for this.  The D.C.
 6    district court said there were two different reasons for
 7    rejecting the merger.  The first is the one you're addressing
 8    and that is that its findings with respect to the market for
 9    sale of insurance to national accounts in 14 Anthem states
10    suggested after making the appropriate market findings, market
11    definitions, that there would be a reduction of competition in
12    those markets, but the second one was based upon the sale of
13    insurance products in Richmond, Virginia, right?
14         MR. QUILLEN:  That's correct.
15         THE COURT:  If, for example, the United States had
16    failed to establish the relevant market or failed to show that
17    there was going to be some anticompetitive affect on the
18    proposed market of national accounts in the 14 states, but the
19    United States had been successful in its argument that the
20    Richmond, Virginia, market would be affected adversely by the
21    merger, that would have been enough to deny the parties'
22    request or right to go forward with the merger, correct?
23         MR. QUILLEN:  Right.  Presumably it would have --
24         THE COURT:  And I realize that only got about a
25    handful of pages from the D.C. circuit opinion, but they did
```

 1   affirm on that ground as well?

 2           MR. QUILLEN:  Yes.  The D.C. circuit said that even

 3   if you credited the efficiencies that Anthem claimed it would

 4   be producing, that it would be outweighed by the harmed

 5   competition in that market.

 6           THE COURT:  And that's another unique feature of

 7   whether it was necessarily decided in order for the relief to

 8   be sought.  I don't know the answer to that.  I'm just raising

 9   the question.  I guess we will have to tackle that.

10           MR. QUILLEN:  I think, again, it would be --

11   Richmond was a single example that the Court went into more

12   depth on after it found that CBSAs are permissible geographic

13   market.

14           THE COURT:  I'm probably portraying to some degree

15   the notion that I'm a little concerned about DeWeese versus

16   Town of Palm Beach.  I don't know where your argument lines up

17   with DeWeese based upon the alternative findings there.  I can

18   think of a few reasons that you could possibly distinguish

19   DeWeese, but we will just have to dig into it.  All right.

20           MR. QUILLEN:  Thank you.

21           MS. WEST:  Your Honor, I would like to introduce

22   Mr. Peter Bisio.  He will be arguing for Anthem.  He is a

23   partner of Hogan Lovells.  He argued before Judge Moreno in

24   the Musselman case and before the Eleventh Circuit.

25           THE COURT:  All right.  Thank you.

```
1              MR. BISIO:  Good afternoon, Your Honor.  I would
2    like to start with one of the points that Your Honor raised at
3    the end of plaintiffs' presentation and that's the complete
4    absence of any authority, of any case that's like this.
5              The plaintiffs are really asking you to do something
6    that's remarkable here.  They're asking you to take a Clayton
7    Act case concerning the Anthem/Cigna merger that had nothing
8    to do with the alleged conspiracy in this case.  They're
9    asking you to take certain statements or plaintiffs'
10   characterizations of certain statements from the decision in
11   that case and then apply them into this completely different
12   case.  And as the plaintiffs admitted, they're not aware of
13   any case in which any court has done that.
14             In fact, what I find remarkable is they haven't
15   cited to Your Honor one case involving the application of
16   collateral estoppel in an antitrust action.  Forget about
17   Clayton Act versus Sherman Act.  They haven't given you a
18   Sherman Act case in which a court applied collateral estoppel
19   from one Sherman Act case in another case.  We cited the Pool
20   Water Products case --
21             THE COURT:  Well, that's an easier argument than the
22   one they're making, you would concede?
23             MR. BISIO:  I would agree that it's an easier
24   argument, Your Honor.  And, in fact, there are cases out there
25   in which you have two antitrust cases that are on all fours --
```

```
1              THE COURT:  You're representing Anthem here?

2         MR. BISIO:  Yes.

3         THE COURT:  I think the answer to your point may be

4    as simple as this.  There's not a whole lot of entities out

5    there that litigate back-to-back antitrust cases or antitrust

6    cases contemporaneously with each other.

7              MR. BISIO:  Well, there are, though, Your Honor --

8    that's absolutely true, Your Honor, but there are cases --

9    there's the one case that we cited to you which involves

10   actually the Clayton Act case followed by a Sherman Act case

11   where the court said these are very different and listed all

12   the differences between two.  And unlike this case, in that

13   case the plaintiffs in the Sherman Act case were complaining

14   about the exact same competitive situation created by the

15   merger.  That's not what the plaintiffs in this Sherman Act

16   case are doing.  There are cases --

17             THE COURT:  Let me see if we can dispose of one

18   issue right off the bat, and it was something raised by your

19   opponent.  Four months of discovery and a trial in the D.C.

20   district court was not a full and fair opportunity to litigate

21   these issues?

22             MR. BISIO:  Your Honor, two points on that.  That is

23   one certainly where we have not cited Your Honor a case that

24   is on point, but I think there is no question --

25             THE COURT:  Who asked for the expedited --
```

1        MR. BISIO:  Well, under the way the injunction works

2   and the way the proceedings work with respect to the merger,

3   that was only way the litigation could be conducted, and

4   certainly, Your Honor --

5        THE COURT:  Based upon the timing of when it was

6   filed?

7        MR. BISIO:  Absolutely, Your Honor.  The main point

8   there is that Anthem's opportunity to develop the facts in

9   that case, which was conducted on an expedited basis after the

10  government had a year of prefiling discovery, is very

11  different than the opportunity that Anthem had here.  The

12  other point, Your Honor --

13       THE COURT:  They were all hands on deck in that

14  case, though, right?

15       MR. BISIO:  Absolutely, Your Honor.  But the other

16  point that's --

17       THE COURT:  How many lawyers represented Anthem in

18  that case?

19       MR. BISIO:  Your Honor, I don't know, but I'm

20  willing to agree with you it was a lot.

21       THE COURT:  They probably could have conquered Chad.

22       MR. BISIO:  Although apparently not the United

23  States government in that case.  But, Your Honor, the other

24  point on the full and fair opportunity, of course, is the

25  appeal point, and I think counsel said something very

1   interesting there.  He said, well, there's a disputed issue of

2   fact regarding the appeal and the termination date.

3          Well, this is a motion for partial summary judgment,

4   so if there's disputed issues of fact, then the motion should

5   be denied on that basis.

6          In fact, however, what's interesting is that the

7   Anthem decision that the plaintiffs want the Court to apply

8   collateral estoppel to holds in the decision that the

9   termination date was April 30.  So if the plaintiffs love the

10  Anthem decision so much, then it seems to me there really

11  isn't a dispute that April 30 was the termination date, and

12  the plaintiffs have not disputed that the appeal was limited

13  to the efficiencies defense and that all of the market issues

14  that they're raising here were not litigated at the appellate

15  court and that Anthem did not as a practical matter, as a real

16  world matter, have the ability to appeal those issues.

17         And so, Your Honor, in evaluating full and fair

18  opportunity, we think that's something you need to consider.

19  It also goes to the equitable issue, which as Your Honor

20  pointed out only comes at the end if Your Honor were to

21  conclude that collateral estoppel is even available.

22         THE COURT:  So your argument is a little more

23  nuanced than we only had four months?

24         MR. BISIO:  Yes, Your Honor.  So there's no

25  authority here, Your Honor.  There's no antitrust cases that

 1   the plaintiffs have cited in which collateral estoppel has

 2   been applied.

 3        The other point, before I dig into some of the

 4   particular issues, is as Your Honor made clear and as I think

 5   plaintiffs haven't disputed, the burden here is on the

 6   plaintiffs' first to show that collateral estoppel is even

 7   available by showing that the issues at stake in this case and

 8   Anthem are identical, that all of the issues were necessary

 9   and critical to the Anthem decision, and that Anthem had the

10   full opportunity to litigate; and then, secondarily, they have

11   to show that it would be equitable and promote judicial

12   efficiency because they're trying to apply offensive

13   collateral estoppel.

14        THE COURT:  Before we leave this other subject,

15   though, a one-year delay between the announcement of a merger

16   and the inception of a Section 7 challenge, is that unique?

17        MR. BISIO:  I can't speak specifically to a year,

18   but a delay is not unusual because the government frequently,

19   before commencing litigation, will have an investigation

20   period in which they are conducting discovery using the

21   government's powers while the merging parties are waiting to

22   see whether or not an action is filed.  So what happened here

23   wasn't unusual.  It may not always be a year, Your Honor.  It

24   may be a different period of time.

25        THE COURT:  How does 15 U.S.C., Section 16 play into

1   this issue?

2       MR. BISIO:  I don't know, Your Honor, because I'm

3   not recalling that statute, standing here right now.

4       THE COURT:  That a final judgment or decree in a

5   civil antitrust proceeding brought by the United States is

6   prima facie evidence in another action or proceeding against

7   the defendant under the antitrust laws for a matter subject to

8   estoppel?

9       MR. BISIO:  Well, I think here collateral estoppel,

10  if they were to meet everything, would apply, but even under

11  that statute, Your Honor, it ends up being the same test.  So

12  you come back around to the same issues of have they met

13  collateral estoppel.

14      On the issue of whether it would only be prima facia

15  evidence with respect to markets or other issues as opposed to

16  collateral estoppel, I would have to take a look at that

17  statute, Your Honor, and whether it applies here.

18      You know, you spent some time with opposing counsel

19  asking about whether the issues are identical and the

20  difference between the Anthem case and this case, and I think

21  as Your Honor's questions made clear, in fact, it's not

22  identical.  And the reason is that as the Anthem court made

23  clear, because it was dealing with a merger case, the court's

24  focus in defining the market was on where do Anthem and Cigna

25  compete.  And so it found that the area of competition was at

1    least those 14 states, recognized that maybe it could be more

2    than that, but said it was at least those 14 states, and it

3    said that's where Anthem competes directly against Cigna for

4    national accounts, 14 states at the very least.

5           Well, the geographic market in which Anthem and

6    Cigna compete obviously is irrelevant to this case.  In

7    defining the geographic market in this case, the inquiry is

8    what is the relevant market for purposes of deciding

9    plaintiffs' allegations in this case.  That's a completely

10   different inquiry.

11          And interestingly, if you look at plaintiffs'

12   complaint, they don't allege that the 14 Anthem states

13   collectively are one geographic market, which is what the

14   Anthem court found for purposes of its decision in evaluating

15   the merger.  They allege that each state is a separate

16   geographic market.  And I refer Your Honor to paragraphs 345,

17   351, and 560 of the plaintiffs' complaint.

18          So even if you're just comparing the plaintiffs'

19   complaint in this case with what the Anthem court found,

20   you've got a material difference in terms of defining the

21   geographic market.

22          The same thing happens when you look at the product

23   market, Your Honor.  Again, the Court was focused on where do

24   Anthem and Cigna compete.  And it ended up defining a product

25   market for national accounts of 5,000 or more employees.  Why

did it do that?  It made it very clear.  It said that's how
Anthem defines it.  That's how Cigna defines it.  I'm
interested in how they compete.  That's the definition I'm
going to use.

        And it did that even though it noted that other
participants in the industry define national accounts
differently, but it didn't care about that because it was
focused on competition.

        Well, this case isn't about Anthem and Cigna
competing, and so you're not going to sit there and say that's
how Anthem and Cigna define it; therefore, that's what the
definition is.  The Court might find in this case that the
Association's definition of national accounts is the more
relevant one.  That one doesn't have a size limit to it.  It
might find that because of the Alabama focus in this case,
that Alabama's definition is the more relevant one.  Based on
the deposition testimony in this case, that seems to start at
about 200 employees.  It may also find some other definitions
appropriate.  But the whole point is that the inquiry in this
case on what is the relevant product market is a completely
different inquiry than the inquiry that was undertaken in the
Anthem/Cigna case.

        And the Eleventh Circuit has made clear that in
evaluating, is it same -- are the issues at stake identical?
That is a high test.  If the opposing party can point to one

 1   material differentiating fact that would alter the legal

 2   inquiry, then the plaintiffs haven't satisfied their burden.

 3   And I think, Your Honor, we pointed to a few already.  The

 4   temporal focus of the case, which Your Honor noted, is another

 5   one that's directly relevant.  The entire inquiry in the

 6   Anthem case is to look at the present and project into the

 7   future; what's going to happen if Anthem and Cigna merge;

 8   what's going to be the impact on the market.  That's obviously

 9   not the inquiry in this case.

10          Now, the plaintiffs' whole argument is, well, that's

11   irrelevant because we're just asking the Court to establish

12   certain principles for measuring market concentration and so

13   on, and those aren't inherently forward-looking or

14   backward-looking.  But of course the very portion of the

15   court's opinion that they're citing showing that the court was

16   really focused on potential entrants in the future.  It wasn't

17   talking about what were the markets in 2008 or 2010 or 2012,

18   what was the competitive landscape.

19          And the plaintiffs' allegations in this case are

20   interesting because they define the dividing line between

21   small group and large group based on the Affordable Care Act,

22   and that's something that the Anthem court took into account

23   as well.

24          THE COURT:  Let me ask you this.  Have other courts

25   over the course of litigation history involving Anthem or the

1    Blues, generally, found other product markets different than

2    the one alleged here and/or the one found in the District of

3    Columbia district court?

4            MR. BISIO:  Neither side has cited cases on that

5    point one way or the other, Your Honor.  I would be happy to

6    check and file something supplemental on that if there are any

7    cases.  I don't know standing here offhand whether there are.

8            But certainly this temporal focus, the market

9    inquiry is not static, what the market might have been in 2008

10   versus what a court is predicting it's going to be in 2018 if

11   there's a merger of two entirely different inquiries.

12           Then, of course, Your Honor, there's the issue of

13   Alabama.  This case is very focused on Alabama.  Alabama had

14   nothing to do with the Anthem/Cigna merger.  The fact that

15   Anthem has members in Alabama is irrelevant.  It's certainly

16   not a fact that the Anthem court noted.

17           THE COURT:  What about national accounts that are

18   being administratively serviced in Alabama?

19           MR. BISIO:  Certainly, Your Honor, there are

20   national accounts that are being serviced throughout the

21   country.  Anthem has members in Alabama.  But the issue here

22   is are the issues at stake identical, and that issue of

23   national accounts serviced in Alabama was not an issue that

24   the Anthem court was focusing.

25           THE COURT:  Was it news to you when counsel said

1   that the market they're arguing for is limited to the ASO

2   claim?

3           MR. BISIO:  Well, I understood --

4           THE COURT:  You understood that already?

5           MR. BISIO:  Well, I understood counsel to mean that

6   they were focusing on what I would call the subscriber side of

7   the equation.  If they're truly limiting it to just the ASO

8   subscriber side of the equation, then obviously that's an

9   inconsistency with what they're asking the Court to find,

10  which is they're asking the Court to find that a national

11  accounts market would have both insured and ASO accounts.  And

12  if their focus is only on national markets with just ASO

13  accounts, then that would be yet another difference between

14  this case and the Anthem case, Your Honor.

15          So, Your Honor, we would submit that just on that

16  first ground about the issues at stake not being identical,

17  there are more than ample grounds for the Court to deny

18  plaintiffs' motion.

19          We then get to the second standard or the second and

20  third inquiry which is were these issues fully litigated and

21  were they necessary to the Anthem court's decision.  Your

22  Honor addressed with opposing counsel a number of the

23  statements.  I'm happy to address any ones that Your Honor may

24  have questions about.  I'll certainly flag two.  With respect

25  to that footnote, Your Honor, you could excise that footnote

1   which goes with statement three from the opinion and you could

2   read the opinion just fine without it.  So, clearly, it isn't

3   necessary to the Anthem court's decision.

4          And then second, I would like to draw your attention

5   to statement 12, which is plaintiffs' assertion that it's

6   permissible to use a buildup approach and focus on major

7   competitors when calculating market concentration.  The

8   plaintiffs would say this is just an example of a finding that

9   we want to use and how you show market concentration.

10          The statement is paraphrasing something that the

11   Anthem court said in responding to Anthem's criticisms of the

12   buildup approach, and it noted that under the merger

13   guidelines, the merger guidelines permit market concentration

14   to be measured using only the significant competitors in the

15   market, page 211, but the statement wasn't critical and

16   necessary because, in fact, the government didn't limit its

17   analysis to the major competitors.  The court said there's

18   four major competitors, but the government ended up analyzing

19   26 competitors.

20          So its statement about you can limit it to the major

21   competitors isn't necessary to its decision because that's not

22   at all what the government did and that's not what the Anthem

23   court rested its decision on.

24          And, Your Honor, I'm happy to address any of the

25   others, but as you walk through each of them, with the

1    exception of the two that we didn't challenge on this one

2    basis, none of them are critical and necessary.

3            I've already addressed, Your Honor, the third or the

4    last requirement, which is the full and fair opportunity.  Let

5    me turn to the inequity point.  You know, the plaintiffs'

6    efficiencies argument seems to come down that at some point in

7    the future, they're going to file some summary judgment motion

8    that no one has ever seen and that this is going to somehow be

9    relevant to it.  It's interesting that in most of the

10   collateral estoppel or many of the collateral estoppel cases

11   that both sides have cited to the Court, the collateral

12   estoppel argument is made as part of the summary judgment

13   motion on the merits so that one can evaluate the collateral

14   estoppel motion in light of what the substantive motion on the

15   merits is.  And the plaintiffs have chosen not to do that

16   here, and I would submit, Your Honor, that you can't say, oh,

17   well, okay, I'm going to conclude that this is part of the

18   case and it is relevant and it would advance judicial economy

19   when you haven't seen the other motion.  But I would go

20   further.

21           They're just focusing on an injunction.  Their case

22   is far more than just about an injunction against Anthem

23   limited to some narrow market to be defined.  They're seeking

24   damages based on an antitrust conspiracy, and we're going to

25   end up in front of a jury, and you're going to deal with all

1    of the issues that Your Honor was raising.  And the plaintiffs
2    say, well, that's not a problem; a jury can deal with that; we
3    can deal with it in the instructions.

4            Interestingly, they did not cite any case to Your
5    Honor in which a court said that isn't the problem and applied
6    federal collateral estoppel law.  They cited two cases to Your
7    Honor in which they found courts which had applied collateral
8    estoppel against one defendant and not other codefendants.
9    One was the Amader v. Johns-Manville case and the second was
10   the United States versus Tropic Seas case.

11           Well, the first, Your Honor, applied Pennsylvania
12   state law.  The second applied Hawaii state law.  And neither
13   of those cases grappled with the issue that the defendants
14   have raised here about the lack of judicial economy, the
15   prejudice and confusion that would ensue, which are clearly
16   things that under the Supreme Court authority in Parklane
17   Hosiery and Lytle v. Household Manufacturing is something this
18   Court is supposed to take into account.  It wasn't something
19   that was taken into account by those courts applying state
20   law.

21           The plaintiffs have also made an argument that
22   somehow collateral estoppel is needed to avoid an inconsistent
23   decision between this case and the Anthem case, and that
24   obviously makes no sense, Your Honor, because they are two
25   completely different cases.  So there isn't going to be

1   inconsistencies.  There may be different market definitions,

2   there may be different rulings, but that's going to be because

3   of the particular facts of this case.  It's not going to be

4   because of an inconsistency.

5          The inconsistency is the one that plaintiffs

6   acknowledged what they want to do creates, which is that you

7   have one set of rulings against Anthem based on collateral

8   estoppel from the Cigna merger litigation and you have a

9   completely different set of rulings against the nonAnthem

10  defendants based on the evidence that has actually been put

11  together in connection with this case.  That's exactly the

12  sort of inconsistency that we would submit is inappropriate

13  and not consistent with judicial economy and efficiency.

14         And then last, Your Honor -- I made the point

15  before, but I think it is worth making again, and that is

16  there is no dispute here that these market issues were not the

17  subject of Anthem's appeal and couldn't be, for good reason.

18  And in that situation, Your Honor, even if you find that

19  Anthem had a full and fair opportunity to litigate, it is not

20  fair, it is not equitable to say, well, you're stuck with

21  those rulings from the district court even though you couldn't

22  appeal them because had you done that, you couldn't have had a

23  reasonable expectation that you would have gotten a decision

24  out of the D.C. circuit.

25         So, Your Honor, we don't think the plaintiffs have

1    carried any portion of their burden.  Again, they are the

2    moving party, so they have to meet every element.  They

3    haven't met any of them, and the Court should deny their

4    motion.  Thank you.

5          THE COURT:  Thank you.

6          MR. HOLMSTEAD:  Good afternoon, Your Honor.  Zach

7    Holmstead on behalf of Blue Cross Blue Shield Association.

8    Anthem is correct that the providers haven't met the

9    fundamental requirements to apply collateral estoppel here,

10   and the Court could stop there and deny the motion on those

11   grounds alone.  But even if providers were right on all the

12   issues that pertain only to Anthem, the motion should still be

13   denied for three reasons, which Your Honor already hit on.

14         The first is that it would prejudice the other

15   defendants.  And here, the providers concede the critical

16   point that collateral estoppel cannot be applied in a way that

17   would prejudice the defendants other than Anthem.  That's from

18   page 13 of the reply brief.  And prejudice need not be

19   established with certainty.  Your Honor raised the DeWeese

20   case in which the Eleventh Circuit reversed the application of

21   collateral estoppel as an abuse of discretion where there was

22   a significant likelihood of substantial infairness.  And

23   that's right in line with the statement which says that

24   collateral estoppel cannot be applied where there is a

25   potential adverse impact on parties not involved in the

1    initial action.

2          And as Mr. Bisio discussed, the providers haven't

3    cited a single case that even tried to apply the type of

4    instructions they say was so obvious to cure the prejudice

5    here.  They cite two cases applying state law, each of which

6    is more than 20 years old and doesn't even grapple with the

7    issues that we're talking about here.

8          We cited multiple cases applying federal law on this

9    issue that held that applying collateral estoppel against

10   defendants that weren't involved in the prior action could

11   cause the jury to make improper inferences, that it would

12   violate those defendant's due process rights, and that at a

13   minimum the Court would have to bifurcate the trial and might

14   have to go even further, and those include the Rodriguez-

15   Garcia case, which is from the First Circuit in 2010, and

16   McCarty against Johns-Manville, which is from the southern

17   district of Mississippi.

18          The second reason that the motion should be denied

19   is that there's a significant risk of inconsistent results.

20   And, again, the providers concede that a key purpose of this

21   doctrine is preventing inconsistent decisions.  That's also on

22   page 13 of their reply.  But applying collateral estoppel here

23   would mean that the exact same facts and the exact same

24   evidence could result in different outcomes in the very same

25   case.

```
1              And the third reason is that there are zero savings
2     in judicial economy.  The providers don't try to convince the
3     Court that granting this motion will save any trial time.  In
4     fact, they admit that the nonAnthem defendants will not be
5     precluded from presenting any evidence at trial.  That's from
6     page 14 of the reply brief.
7              And in Rodriguez and McCarty, the Courts noted that
8     the parties would have to put on much of the same evidence and
9     that that was a ground to deny collateral estoppel.
10             We also cite the Acevedo case, which is from the
11    First Circuit, and the Center case, which is from the Eighth
12    Circuit, where applying collateral estoppel would save little
13    court time.  Here, the parties would have to put on more than
14    much of the same evidence.  As Your Honor noted, they would
15    have to put on the full case and all of the evidence against
16    the other defendants.  This motion will cause far more
17    problems than it will solve and should be denied.
18             THE COURT:  Thank you.
19             MR. QUILLEN:  I would like to clear up something
20    that apparently I may have given the Court the wrong
21    impression on and that is whether the product market that
22    we're talking about is administrative services only.  The
23    product market, as we put it in the brief, the market for
24    national accounts, as a practical matter those are virtually
25    all administrative services only, but we didn't limit it that
```

1    way in the class definition.

2             THE COURT:  Fair enough.

3             MR. QUILLEN:  A couple of points I would like to

4    respond to.  When we're talking about cutting off the

5    definition of national accounts as the relevant product market

6    at 5,000 people, it's not like Anthem and Cigna both said it

7    was 5,000 and so the court said it was 5,000.  The court took

8    testimony on this from people who work in the industry,

9    insurance brokers and consultants, who actually help large

10   companies find coverage for their employees.

11            THE COURT:  As I read the Anthem opinion, I wondered

12   about this, and this may be over-reading it.  The court said

13   that the market found was a relevant market.  And I understand

14   we're looking for the smallest market possible for purposes of

15   finding.

16            That's another question in the back of my mind, is

17   it's not the relevant product market; it's a relevant product

18   market.  It's the market that would be affected by the merger,

19   though.  And there are probably other markets the United

20   States could have put on evidence about, right?

21            MR. QUILLEN:  Yes, they could have.

22            THE COURT:  They chose to limit it to a 14-state

23   market and the Richmond market.  I guess the trial would have

24   lasted longer if they had to get all the markets.  So dealing

25   only with the national services market, is there any

1   uniqueness to the "a relevant market"?

2           MR. QUILLEN:  I would have to have that specific

3   page in front of me for context, but I can say that if the

4   holding in the case in the D.C. district court was that that

5   is a --

6           THE COURT:  Well, I'm going to refer you to page 193

7   of the opinion:  The sale of health insurance to national

8   accounts with more than 5,000 employees is a relevant product

9   market.

10          MR. QUILLEN:  You're talking about the heading of

11  that section of the whole opinion, correct?  It's true there

12  was another relevant product in that case.

13          THE COURT:  The sale of the medical health coverage

14  to national accounts within the 14 Anthem states is a relevant

15  product market.

16          MR. QUILLEN:  Right, that is a relevant product

17  market.  The large group market was another relevant product

18  market.  The government had alleged the provider markets that

19  the court ultimately didn't pass on.  I'm not sure how much

20  you can read into the word "a" given that there were other

21  product markets.

22          THE COURT:  That's an elements question.  I was just

23  trying to maybe read too much into it.

24          MR. QUILLEN:  One of the other things I wanted to

25  talk on was the avoiding inconsistent results, and I think

1    that to say that we are creating the possibility of

2    inconsistent results, we're creating the possibility of

3    inconsistent results where the cases are totally different

4    kind of assumes the conclusion because if these cases truly

5    are totally different, then we don't qualify for collateral

6    estoppel and you don't have to look at the equitable affects

7    and the judicial efficiencies involved in granting it.  You

8    just would say that the elements haven't been satisfied.  So I

9    think that argument is kind of neither here nor there.

10          And the last thing I wanted to mention was the

11   argument that since nobody has seen the summary judgment

12   motion, then it would be inappropriate to go ahead and rule on

13   this now.  Obviously, we would prefer a ruling in our favor

14   versus a ruling right now, so if that were a consideration of

15   the Court --

16          THE COURT:  You would rather win later than lose

17   now?

18          MR. QUILLEN:  Yes, would rather win later than lose

19   now.

20          THE COURT:  Let me ask you this.  Why isn't it as

21   simple as that, then?  Why wouldn't I say -- and I don't want

22   to kick the can down the curb and give you false hope, but if

23   I was of the view that I don't think this is collateral

24   estoppel, I don't think this is a proper application of

25   collateral estoppel, wouldn't it make sense to tell you that

```
 1   now as opposed to say, well, let's take another look at it
 2   when the actual motion that seeks to implement collateral
 3   estoppel principles is filed?
 4          MR. QUILLEN:  If you go back to your chambers this
 5   afternoon and say there is no way that the plaintiffs qualify
 6   for collateral estoppel, then, yes, I think we would want to
 7   know that in a timely way, but --
 8          THE COURT:  Or if I thought, regardless of the legal
 9   issues, there were equitable reasons that it doesn't make
10   sense.
11          MR. QUILLEN:  For whatever reason.
12          THE COURT:  Let me ask you this.  I take it there
13   would not be a reason to find a market for any litigation
14   purpose as opposed to a trial purpose.  They're going to need
15   to be the same market.
16          MR. QUILLEN:  You mean there's no reason to have two
17   different markets for --
18          THE COURT:  Yes.  You wouldn't want a market for
19   Rule 56 purposes that's different than the market for joining
20   the issues at trial and having a trier of fact determine.
21          MR. QUILLEN:  I think we certainly intend to be as
22   consistent as possible throughout this entire litigation.  I
23   have not thought about whether there's a circumstance under
24   which a Rule 56 motion would have different information or
25   would have a different definition of the market than there
```

1    would be at trial.  But in general, I agree that we are doing

2    our best to be consistent about what we say about markets.

3         But what I was getting at earlier was that if what's

4    holding up a decision about whether to apply collateral

5    estoppel is that you're not sure whether it would serve any

6    efficiencies in the context of a future summary judgment

7    motion, then --

8         THE COURT:  You're saying that could be better

9    judged later?

10        MR. QUILLEN:  -- then that could be judged later.

11        THE COURT:  I think I've got your argument there.

12        MR. QUILLEN:  Thank you.

13        THE COURT:  I will take it under advisement.

14        I'm glad to hear things haven't changed much in the

15   litigation world in that you would rather win later than lose

16   now.  That was always one of my views when I litigated.  Thank

17   you for that.

18        I think next we're taking up the subscriber's motion

19   for protective order seeking relief based upon class member

20   communications.

21        MR. SMITH:  Good afternoon, Your Honor.

22        THE COURT:  Speaking of deciding things now versus

23   later, the Eleventh Circuit and other courts have said -- and

24   I think the Eleventh Circuit would agree -- that before we

25   restrict or penalize communications, we need to do so based

1    upon a clear record and specific findings.  Right?

2            MR. SMITH:  I agree with that.

3            THE COURT:  And with a clear record and making

4    specific findings, the Court should weigh the need for limits

5    on communications or the penalties that should apply with

6    respect to communications versus potential interference with

7    rights of parties to communicate.  That's the balancing test.

8            MR. SMITH:  I agree with that also.  That's Gulf Oil

9    versus Bernard.

10           THE COURT:  That's black letter Supreme Court

11   precedence for 30-something years now?

12           MR. SMITH:  And for the record, Cy Smith for the

13   provider plaintiffs.

14           THE COURT:  Based on all that, I've got information

15   about some 1400 letters that went out.  Maybe four or five

16   hundred direct communications, is what has been suggested.

17   And I've got one affidavit that describes in any detail what

18   one of those face-to-face communications or direct

19   communications looked like.  How is that a clear record on

20   which I can make specific findings here at this point?

21           MR. SMITH:  Well, a couple of things.  First of all,

22   I think the Court needs to -- I think it has a sufficient

23   record.  It also needs to look down the road.  The decisions

24   made today are going to have precedential affect in this

25   proceeding.  There's more of the proceeding to go.  I think

1    the Court needs to lay out some rules of the road.

2          THE COURT:  Or at least expectations.

3          MR. SMITH:  Expectations.  And one of the hallmarks

4    of this case had been the level of judicial oversight and

5    control over the proceeding, because, as the Eleventh Circuit

6    said in Kleiner, and it was actually quoting a Supreme Court

7    decision from 1980 called Deposit Guarantee National Bank,

8    1980, it said that the court has a duty to protect both the

9    absent class and the integrity of the judicial process by

10   monitoring the actions before it.

11         And so the Court has discretion here.  It has to

12   make findings.

13         THE COURT:  Make no mistake.  My antennae are up.

14   But it seems to me what we need to do -- and I'm not trying to

15   pretermit your argument, but I'm trying to streamline it a

16   little bit here.  It seems to me that what you ought to be

17   asking me for are some of the things you asked as part of

18   Section 4 of your request for relief, and that is, Judge, we

19   want to look into this a little bit and find out exactly what

20   happened and make a determination about whether we want to

21   present a clear record of that.

22         MR. SMITH:  I can certainly understand if that's how

23   the Court wants to do it.  Maybe if I spend just a little time

24   talking about the undisputed facts that are in front of the

25   Court, then you can make a judgment about whether that's

```
 1    sufficient.
 2              THE COURT:  Give me the executive summary.
 3              MR. SMITH:  Okay, the executive summary.  And I
 4    think these facts are undisputed.  As you said, 1400-something
 5    refund letters, up to 500 --
 6              THE COURT:  That's not surprising a letter goes out
 7    accompanying it, right?
 8              MR. SMITH:  No, but, you know, it's funny, though.
 9    The way --
10              THE COURT:  Now, what's in the letter may make a
11    difference, but the fact that a letter is sent with a check
12    only makes business sense.  If somebody opens up a check from
13    Blue Cross Blue Shield and it's for a certain amount without
14    any indication of what it's for --
15              MR. SMITH:  Actually, the best case to show the
16    distinction between what Blue Cross did and the way you're
17    supposed to do it is one of their cases.  It's called Craft v.
18    North Seattle.  I think it's from the middle district of
19    Georgia in 2009.
20              THE COURT:  You're saying one of their cases.  One
21    of the cases they cited to me?
22              MR. SMITH:  That's right.  It's cited at opposition,
23    page 9.  And in that case, the plaintiffs objection to the
24    communication was overruled because the communication was
25    simply a refund check.  It wasn't even described as a refund.
```

 1   They simply sent a check to the customer for the overpayment

 2   or the underpayment, whatever it was.  That's what should have

 3   happened here.  Of course, first there should have been a

 4   heads-up to this Court with some notice to us to say, Here is

 5   what we plan to do.  There's going to be a refund.  That had

 6   been forecast.  The rest of it had not been forecast.

 7          So the existence of a transmittal letter that says,

 8   Enclosed please find a check, I don't think we would have

 9   objected to that.  But that's not what happened here.  And I

10   think the juxtaposition, the comparison between what happened

11   in that case is significant.

12          The second thing, I think, is significant is the

13   fact that there have been as many as 500 in-person

14   communications.  That's not a disputed fact.  And the Eleventh

15   Circuit, I think, has been very clear in Kleiner in talking

16   about the risks that underlie that.

17          THE COURT:  Now, Kleiner is a little different in

18   that the court had made a specific direction and order to the

19   parties about communications, and a lawyer for the bank and

20   the bank officers simply violated the Court's instructions.

21          MR. SMITH:  That is absolutely right.  The cases

22   come in all shapes and descriptions.  Gulf Oil was a plaintiff

23   communication.  Kleiner was an absolutely outrageous defense

24   communication where the attorneys were held in contempt.  They

25   immediately settled the case after those rulings in the

1    district court.  We're not at that stage, and I hope we never

2    get to that point.  But my --

3         THE COURT:  You wouldn't mind a settlement that

4    moots everything though, right?

5         MR. SMITH:  Your Honor, I wouldn't mind.  Either the

6    settlement would be great, if appropriate for the class, a

7    finding of contempt if justified by that would be fine, too.

8    But in Kleiner, the court --

9         THE COURT:  That's rich.  I would rather have the

10   finding of contempt that a settlement.

11        MR. SMITH:  No, no, no.  Settlement first.  In terms

12   of the hierarchy of needs, it was just enunciated by my

13   brother counsel.  We would much prefer to advance the classes'

14   interest by an appropriate settlement.

15        But if I may be more serious about Kleiner, at page

16   1408 -- because Kleiner did more than just decide that case.

17   It set out the rules of the road.  And it said at page 1408 to

18   compound matters, Kirby -- he was the defense lawyer --

19   advised the bank to use the telephone in lieu of letters

20   because it would be more effective.  They went on to say at

21   1206 unsupervised oral solicitations by their very nature are

22   wont to produce distorted statements on the one hand and a

23   coercion of susceptible individuals on the other.

24        THE COURT:  Let me see if I can get an agreement

25   between the two sides as to how we got here.  It seems to

```
 1   me -- and, again, both sides correct me where I misstep with

 2   this chronology.  Fair?

 3              MR. BURKHALTER:  Yes, Your Honor.  Carl Burkhalter.

 4              THE COURT:  Thank you, Mr. Burkhalter.

 5              So the issue of it first arose, it seems, in

 6   discovery in this case?

 7              MR. SMITH:  Yes.

 8              THE COURT:  I'm not going to characterize how it

 9   arose.  It just did arise.  And at some point Blue Cross Blue

10   Shield then self-reported the issue to the Department of

11   Insurance?

12              MR. BURKHALTER:  Correct, Your Honor.

13              MR. SMITH:  I would say correct in the sense that

14   when a public official gets a call from the newspaper that

15   says we've got some evidence about your relationship with a

16   certain someone in the public official, self-reports at that

17   point and says I've committed a sin --

18              THE COURT:  My whole point was I'm not

19   characterizing what happens between step one and step two, but

20   there was a self-report.  The Department of Insurance

21   investigates it and, among other things, orders a refund.  Is

22   that correct?

23              MR. BURKHALTER:  Correct, Your Honor.

24              THE COURT:  That was pursuant to a DOI directive to

25   your client?
```

1          MR. BURKHALTER:  A consent order, Your Honor, but

2    yes.

3          THE COURT:  Now, a consent order necessarily means

4    that your client had some input into the order?

5          MR. BURKHALTER:  That's correct.

6          THE COURT:  Who else had input besides the DOI?

7          MR. BURKHALTER:  I think that's it.

8          THE COURT:  That's what I would suspect.  You and

9    DOI work out a consent agreement, if you will, about how we're

10   going to resolve this potential violation, and you're ordered

11   to give refund checks.

12          Your position is all we did was give the refund

13   checks and summarize what the DOI said about the purpose of

14   the refund and the circumstances of the refund.

15          You're not so sure?

16          MR. SMITH:  Yes, that's correct.

17          THE COURT:  But that's how the issue arrived at my

18   doorstep, and on top of the letter being sent, there were

19   people at Blue cross Blue Shield who wanted to go out and

20   deliver the check personally, at least as indicated in the

21   affidavit.  I think the affiant said just mail me the check,

22   and the response was I would prefer to come out and meet with

23   you on Wednesday and deliver it to you.  Okay?

24          MR. BURKHALTER:  Yes, sir.

25          THE COURT:  It seems to me we need more information

1    about the things that aren't agreed on about this.  And I

2    don't know that you are going to get a ruling from me one way

3    or the other until I have that additional information.  I

4    don't think a single affidavit from one person of the four or

5    five hundred who received a direct contact along with just

6    understanding that four or five hundred people got a direct

7    contact and 1400 people got the letter is enough for there to

8    be a clear record to make specific findings.

9          This does have my attention.  Having my attention

10   doesn't mean that I think there was any ill motive.  It

11   doesn't mean I think there wasn't any ill motive.  But it has

12   my attention.

13         So what's the best way to get to the bottom of it,

14   instead of dealing with your requests for written

15   communications being cleared by the court and you, corrective

16   correspondence at this point, prohibition of communications

17   other than writing?  We're not going to get into any of that

18   today.

19         The question is going to be how do we get a clear

20   record of what happened, and it may be something innocent that

21   we can simply resolve, or it may be something less innocent

22   that we have to dig into.

23         And I'm going to get your input in a moment, too, to

24   that question, but let's start with Cy.

25         MR. SMITH:  Your Honor, a couple of things.  First

1    of all, we described in our papers the missing documents,

2    documents that need to be produced forthwith on this.

3              THE COURT:  The massive data file?

4              MR. SMITH:  The massive data file is taken care of.

5    What is missing are two major categories.  The first are

6    notes, talking points, scripts, things of that nature used

7    with the meetings, the face-to-face meetings with the

8    individual customers.  So that may or may not shed some

9    additional light.

10             THE COURT:  You assume those exist, you believe

11   those exist, or you know those exist?

12             MR. SMITH:  I think from Mr. Davis's deposition, we

13   know that there were some manner of talking points.  I don't

14   think he recalled exactly what they looked like.

15             So that's one category.  The second thing that we

16   need -- and this is, I think, explained in our status report

17   and also in the reply -- is that Blue Cross has withheld from

18   us a number of documents -- they say it's fewer than 20 --

19   that are communications with the Department of Insurance that

20   led up to the consent order.  So they were affirmatively

21   disclosed to the Department of Insurance.  We think that under

22   the rulings that the Court made last year on the issue of

23   attorney/client privilege and work product, the things that

24   are actually disclosed really need to be produced.  Because

25   then we would know how this came to be, how this consent order

1   came to be.  So that's the second thing.

2        The third thing, obviously, is we will probably need

3   to take a couple of additional targeted depositions.  They

4   might have to be 30(b)(6)s because some of the witnesses said,

5   well, I'm not sure who was involved, it might have been

6   marketing, it might have been communications, might have been

7   something like that.  So it seems to me that unless my fellow

8   counsel have any additional ideas, I think that those --

9        THE COURT:  I take it you also would like any

10   documentation about how the refund customers were selected?

11   Or do you just understand it was all those who were entitled

12   to the refund and DOI had substantial input into that?

13        MR. SMITH:  We do have a significant amount of data

14   on that and I would have to check with our consultants who

15   have gone through it to see if there's anything more that they

16   need on that.

17        I will tell the Court, for example, that we have

18   some questions about whether this is a complete list or

19   whether there should be some additional people that are owed

20   refunds.  I can't pinpoint that right now standing in front of

21   you, but we might need something more on that.  I can't rule

22   that out.

23        MS. JONES:  Your Honor, just to be clear for the

24   record -- Megan Jones for the subscribers.  Blue Cross Blue

25   Shield of Alabama established a telephonic hotline, and

```
 1   typically with those kind of hotlines we do them for class
 2   notice.  There's a script provided to the employees, and we
 3   would want to make sure we could --
 4            THE COURT:  Well, that would fall into talking
 5   points, right?
 6            MR. SMITH:  Right, yes.
 7            THE COURT:  Talking points not only for personal
 8   visits but for phone calls or phone solicitations -- phone
 9   communications.
10            MR. SMITH:  I'm okay with "solicitations." But, yes.
11            THE COURT:  All right.  Mr. Burkhalter?
12            MR. BURKHALTER:  Yes, Your Honor.
13            THE COURT:  Any problem with any of those
14   categories?
15            MR. BURKHALTER:  Yes, I do.  First of all, as to
16   talking points, we produced talking points.  They have them.
17            THE COURT:  You produced all talking points?
18            MR. BURKHALTER:  To my understanding, yes, Your
19   Honor, we have.
20            THE COURT:  Okay.
21            MR. BURKHALTER:  Further, we have produced a log of
22   telephonic inquiries.  Of course, we had a phone number that
23   folks could call if they have questions.
24            THE COURT:  Let me stop you there for a second.
25            Any reason to believe you don't have all the talking
```

```
 1    points other than those that they contend are privileged?

 2          MR. SMITH:  I am not certain about that.

 3          THE COURT:  Any reason to believe you don't?  I'm

 4    not asking if you're uncertain.  I'm asking if you have a

 5    reason to believe you don't have them.

 6          MR. SMITH:  No, I can't say that.  But I will check

 7    and we will have a conversation with Mr. Burkhalter --

 8          THE COURT:  Let me know if you have an articulable

 9    suspicion that you don't.

10          MR. BURKHALTER:  Your Honor, if I may, I will go

11    back.  We will go back again and redouble our efforts and make

12    absolutely positive.

13          THE COURT:  I think that would be a great idea.

14          MR. BURKHALTER:  I don't believe there are any other

15    talking points that --

16          THE COURT:  Measure twice, cut once.

17          MR. BURKHALTER:  You've said that to me before in a

18    case that I was involved in, Your Honor.  Yes.

19          THE COURT:  Then on to the -- I cut you off, but go

20    to your next category, the logs.  You were about to mention

21    telephone logs?

22          MR. BURKHALTER:  Right.  We have produced a log, or

23    telephone logs, indicating whom we had contact with about

24    these issues.  So that has also been produced.

25          THE COURT:  And that would be a complete -- there
```

1    were instructions to complete a separate stand-alone log with

2    respect to communications on the hotline?

3              MR. BURKHALTER:  Yes.

4              THE COURT:  Is that a hotline log or is that also

5    going to include personal visit logs?

6              MR. BURKHALTER:  We asked -- a hotline log.  We

7    asked representatives who made personal visits to make a note

8    of that and to let us know.  But, no, there is no log, no

9    formal log as to --

10             THE COURT:  Was there any documentation created

11   about the personal visits like a memo to the file; I visited

12   so and so, delivered the check, these are the questions

13   so-and-so asked?

14             MR. BURKHALTER:  Yes, Your Honor, there is.

15             THE COURT:  And has that been produced?

16             MR. BURKHALTER:  It has not been produced.

17             THE COURT:  Any problem with producing that?  That

18   would go to what was communicated.

19             MR. BURKHALTER:  Your Honor, provided those notes

20   don't reflect privileged communications.

21             THE COURT:  Of course.

22             MR. BURKHALTER:  Then certainly.  If there isn't a

23   privilege issue, then yes.

24             THE COURT:  I'm asking about internal communications

25   within Blue Cross Blue Shield, not any call the lawyer and

1  say, hey, this came up; I wasn't sure how to answer this; I'm

2  seeking legal advice on how I ought to answer this in the

3  future.  We're not getting into that.  I'm talking about

4  reporting what occurred back to the organization.

5      MR. BURKHALTER:  Yes, sir.  To be clear, the logs

6  that apparently we kept reflecting the results of an in-person

7  visit, if those are not privileged for some reason, then, yes,

8  we will produce --

9      THE COURT:  And any memos.  Not just the log, but if

10  there's a separate document that reflects the communication,

11  it seems like that ought to be produced as well, as long as

12  it's not privileged.

13      MR. BURKHALTER:  Same principle applies.

14      THE COURT:  How about documents regarding setting up

15  or administering the hotline, same response?  Is that going to

16  be the same category I've just asked you about?

17      MR. BURKHALTER:  Yes, Your Honor, I believe so.

18      THE COURT:  Okay.  It seems like you all, in light

19  of that, would produce that information.  Anything else that

20  you think you are due that's not privileged?  And we will deal

21  with privilege in a moment.

22      MR. SMITH:  I think the answer is no.  We may have

23  some issues about privilege.  I would be happy to address them

24  when we get there.  They're pointed out by the letter itself,

25  but I can explain that when you would like to address it.

```
1              THE COURT:  Well, what I'm going to suggest to you
2    is rather than deal with privilege issues now in an abstract
3    setting, that you meet and confer and if you have a
4    disagreement, then it gets submitted in camera.
5              MR. SMITH:  That's fine.  And so are we talking --
6    to be clear, there's 20-something documents that were withheld
7    on the grounds that they were subject to a so-called Rule 408
8    settlement privilege.
9              THE COURT:  Those would be included in the in-camera
10   submission I would expect.  Not just attorney/client
11   privilege, work product, 408, privilege I've never heard of,
12   whatever privilege is asserted --
13             MR. SMITH:  That could happen.
14             MR. BURKHALTER:  One point on that.  Certainly as to
15   the fewer than 20 documents that we're talking about -- and by
16   the way, case law in the Eleventh Circuit and elsewhere is
17   very clear.  It requires a heightened specific showing before
18   those --
19             THE COURT:  I'm not saying they're getting them.
20   I'm just saying you might have to submit them in camera so
21   I know what we're dealing with.
22             MR. BURKHALTER:  Yes, Your Honor.  I just want to
23   make it clear that --
24             THE COURT:  And I'm not going to farm this one off
25   to Judge Putnam.  He has enough to do.
```

1          MR. BURKHALTER:  But my point simply is there is

2    indeed a legitimate reason for our position.

3          THE COURT:  That's fine.  I'm not asking you to

4    argue that.  You can give me a cover letter with the

5    submission.

6          MR. BURKHALTER:  Yes, Your Honor.  The other point I

7    want to raise is under discovery order 33, affirmed by this

8    Court, there is a ruling, again, affirmed by this Court, that

9    the Carden analysis that was undertaken to prepare our

10   bearings analysis and report, that that is all attorney work

11   product and is opinion work product and it is not to be

12   discovered in this case.  That is an order that's out there.

13   I certainly wouldn't anticipate the Court wanting us to go

14   back and log all of that information.

15         THE COURT:  We're not worrying about any of that.

16   We're worrying about these communications for right now.

17   Believe me, I've got to talk to you all about privilege logs

18   and seals in a moment and probably going to enjoy that even

19   less.

20         MR. BURKHALTER:  That's not my argument, Your Honor.

21         I would say this, Your Honor.  We have two

22   grounds -- I have two grounds for arguing that independent of

23   a lack of a record, that this motion should be denied out of

24   hand.

25         MR. SMITH:  Your Honor --

```
 1              MR. BURKHALTER:  The legal reasons --

 2         THE COURT:  It is being denied out of hand, but I am

 3    exercising my discretion to allow them to look into it.

 4              MR. BURKHALTER:  Very good, Your Honor.

 5         THE COURT:  I'm denying it in part, granting it in

 6    part.  I'm going to allow them to request information

 7    informally or to conduct formal discovery if that's what you

 8    are going to require.  I would probably frown if you stand

 9    behind procedural matters to slow down the case, but that's

10    your choice.

11              MR. BURKHALTER:  I understand.

12         THE COURT:  But I'm going to allow them to do some

13    informal and/or formal discovery to find out what happened.

14    And look, Mr. Burkhalter, please hear me.  This may be

15    completely innocent.  They may be overreacting.

16              MR. BURKHALTER:  It is and they are.

17         THE COURT:  That's your position.  Just like I'm not

18    making a finding of any wrongdoing without a clear record, I'm

19    not going to make a finding that you're insulated without a

20    clear record.  Okay?

21              MR. BURKHALTER:  I read you loud and clear.

22         THE COURT:  All I'm saying is they have raised

23    enough with the affidavit and the information they provided

24    for me to have like the bubble above my head that has a

25    question mark in it; wonder what's going on there, and we're
```

1    going to find out.

2            MR. BURKHALTER:  Very good.

3            MR. SMITH:  Your Honor, can I respond briefly to one

4    thing Mr. Burkhalter said and then simply ask you what would

5    be economical from your perspective.  Mr. Burkhalter raised

6    the question of the discovery order No. 33 by Judge Putnam

7    that was affirmed by you in October of 2016 that had to do

8    with the internal work done by Mr. Carden after he discovered

9    the thing that he had been doing for a decade or so, and the

10   ruling at the time was that that was opinion work product.

11           We forecast this in our papers.  We just haven't

12   been able to get it on file yet.  But we think that the new

13   revelation of the presentation of a new Carden report, these

14   interactions with the Department of Insurance, et cetera, that

15   that's a new fact that would justify reconsideration.  You may

16   disagree.  I understand that.  We do intend to file that

17   motion.  My question to you is:  Would it make sense --

18           THE COURT:  It would make sense for you to meet and

19   confer about that with them and probably give me a joint

20   report, as opposed to a bunch of motions, as to what your

21   proposal is, their proposal is, and what you have agreed to.

22           MR. SMITH:  Great.  And we will do that.  And the

23   results of that -- it would probably make sense to combine

24   this whole thing because they are related to one another.

25           THE COURT:  If you want to revisit the Carden

```
 1   rulings because there's more information, you can always ask.
 2              MR. SMITH:  Okay.  That's fine.
 3              THE COURT:  I'm not promising either side anything
 4   other than the fact that we've made rulings based upon what we
 5   understood.  Our intention is to stick with those unless
 6   there's a good reason not to.
 7              MR. SMITH:  I understand.
 8              THE COURT:  And contrary to what you've said out of
 9   the box, nothing I do is precedential, all interlocutory.
10              MR. SMITH:  Message received.  Thank you, Your
11   Honor.
12              THE COURT:  Anything else, Mr. Burkhalter, on how to
13   handle that?
14              MR. SMITH:  No, sir.
15              THE COURT:  Again, I don't want anybody to be
16   alarmed or excited or disturbed.  I just don't know.  And I've
17   got enough question marks where I want to know.  That's where
18   we are.
19              MR. BURKHALTER:  Yes, sir.  Thank you.
20              MR. SMITH:  Thank you, Your Honor.
21              THE COURT:  On to our third item, and that is
22   privilege log, and I'm going to tack on seal master.  To be
23   clear, we're not looking at appointing a special master.  We
24   only have one special-special master.  We're looking at
25   appointing a seal master.  Let's take that up first.
```

1          The guidance I gave both of you, all three sides,

2    last time we were together was that in my view if the

3    defendants are going to pay for it, absent some reasonable

4    basis for objecting to their choice, the defendants probably

5    ought to have substantial input into who it is, understanding

6    that they work for the Court, not the defendants.  Isn't that

7    what we talked about previously?

8          MR. HOGEWOOD:  It is, Your Honor.

9          THE COURT:  With that said, Pratt, Cook & Segal I'm

10   sure would do awesome.  I know all three of them.  I respect

11   all three of them.  I still have to apologize to Justice Cook

12   about the fact that I got him reversed at the Alabama Supreme

13   Court when he was a member of the court.  He granted summary

14   judgment to me, then thereafter got the gubernatorial

15   appointment to the court.  The appeal went up in the interim.

16   He had to recuse himself, obviously, and his colleagues

17   reversed him on the summary judgment.  So I had some

18   explaining to do.

19          And I think Adams, Denaburg, and Harwood would do

20   well.  I think we have six excellent choices.  My inclination

21   is Harwood, just because I've worked with him on a number of

22   things before.  Would there be any real concern from the

23   plaintiffs' side with Retired Justice Harwood handling this?

24          MR. BOIES:  Not from us, Your Honor.

25          MR. RAGSDALE:  Only based on the length of his

1    opinions when he was on the court.  If we could admonish him

2    to keep it short, that would be fine with us.

3         THE COURT:  Great story.  Coogler is on the trial

4    court, calls Harwood and says, Hey, I've got this issue; I've

5    written it up this way, deciding X; and I'm about to the enter

6    it, but I thought I would run it by you.

7         Harwood says, No, Scott, you've got it all wrong;

8    it's Y, and here is why.  So Harwood gives Coogler advice.

9         Coogler goes back to the well, redrafts the opinion

10   the way Harwood says.  An appeal is taken, and about 9, 10

11   months later he gets a fax from the Alabama Supreme Court; he

12   has been reversed.  Harwood has written the opinion and he has

13   decided X.  That's one of those unique things.

14        But anyway, I'm going to appoint him unless --

15   anybody want to be heard on that?  I don't usually do things

16   that quickly by fiat.  Let me ask you this:  Has he indicated

17   he is ready, willing, and able to take on the assignment?

18        MR. HOGEWOOD:  He has, Your Honor.

19        THE COURT:  That was my only question.  And I'm sure

20   the others would have done a spectacular job, but I'm going to

21   let us go forward with Justice Harwood.

22        Okay.  Privilege log.  How many items are currently

23   on the privilege log?

24        MS. JONES:  506,184, Your Honor.

25        THE COURT:  506,184?

1        MS. JONES:  If you look at the screen, Your Honor, I
2   have a chart for you.  And I also have handouts, if I may
3   approach.
4        THE COURT:  Well, I don't want to get into that, but
5   I do want to talk about this.  How in the world are we going
6   to manage the privilege log without me getting fired by the
7   court for running off Judge Putnam?
8        MS. JONES:  I'm happy to be heard on that, Your
9   Honor, if you would like to hear what we have to propose.
10       THE COURT:  Well, it's her privilege log, so let's
11  start there, but let me tell you a couple things I have in
12  mind, and this may help.  I've got two different issues, or
13  two different ideas, I should say.  One is that before Judge
14  Putnam and/or I look at one item on a privilege log, there
15  will be a certification from the party asserting the privilege
16  that everything on that privilege log is actually privileged
17  and that they've put their eyes on it and that it is
18  privileged, because if you're asking us to look at 506,184
19  things, then I think you all can do that on the front end.
20       MS. YINGER:  You mean as far as documents that are
21  in dispute, there needs to be a certification in advance that
22  everybody has looked at them?
23       THE COURT:  That's a good modification, only on
24  documents that are in dispute.  How many of these are actually
25  going to be in dispute, I don't think anybody knows that.

```
 1              MS. YINGER:  We don't know that at this point, Your

 2    Honor.

 3              THE COURT:  506,184?

 4              MS. JONES:  We have an entire law firm who just

 5    works on this issue and we have sent hundreds of emails and

 6    letters back and forth.  So at this point it's entirely

 7    premature to be able to categorize how many of these are going

 8    to be in dispute, but I don't think it's going to be --

 9              THE COURT:  Even though discovery cut off last week,

10    technically?

11              MS. JONES:  Fact discovery closes December 1st under

12    the order.

13              THE COURT:  Even though it's around the corner.  My

14    point is, though, we are late in the ball game to be saying we

15    have no idea what is on the log and how we're going to respond

16    to it.  That's my second idea, is it seems to me that we ought

17    to start sampling pretty quickly.

18              MS. JONES:  Correct.

19              THE COURT:  Taking some swaths out of it, having a

20    meet and confer, presenting disputed issues to either Judge

21    Putnam or I.  Now, one of the main reasons -- at least this is

22    my recollection.  One of the main reasons that we had Judge

23    Putnam get involved in this case was because there was a

24    concern and I think it was a legitimate concern and maybe I

25    even raised it as to the judge who would be ruling on Daubert,
```

```
 1    class cert, and/or Rule 56 motions to be seeing

 2    behind-the-curtain things that weren't supposed to be seen.

 3    Does that sound familiar?

 4         MS. YINGER:  That's right, Your Honor.  Yes, I

 5    remember that.

 6         THE COURT:  I believe that's still a legitimate

 7    concern.  Having said that, I don't want to have Judge Putnam

 8    on an island.  So what I'm wondering also, if we start

 9    sampling some of these things and there's disputes, are there

10    categories of documents that I can look at that don't violate

11    that principle?

12         MS. JONES:  I would think there are, Your Honor.

13         THE COURT:  And that's not even a question that we

14    can answer today.  It's just a question for in the future when

15    we start building this procedure.

16         MS. JONES:  That's certainly something that we could

17    work together with defendants to try to identify undisputed

18    categories of documents that would be permissible for you to

19    look at.

20         MS. YINGER:  I agree, Your Honor.  This is all very

21    abstract, because there is no particular dispute at issue

22    before the Court.

23         THE COURT:  But what I'm trying to do is get a plan

24    so that we're not deciding the plan in the middle of a

25    dispute.
```

1    MS. YINGER:  Understood, Your Honor.  And I think

2    what's key is that the parties -- the plaintiffs need to

3    identify disputes, the parties need to meet and confer, there

4    needs to be a specific set of documents at issue, everybody

5    needs to be clear about what's at issue.

6          THE COURT:  I agree.

7          MS. YINGER:  And that brings me to one issue, which

8    we have met and conferred with the plaintiffs about, which is

9    the process that we are currently undertaking on the defense

10   side to reevaluate our common interest designations in light

11   of your Court's rulings, and that process is ongoing.

12         THE COURT:  Fair enough.

13         MS. YINGER:  And we have talked to the plaintiffs

14   about that and --

15         THE COURT:  Were your designations largely

16   vendor-driven?

17         MS. YINGER:  No, Your Honor.

18         THE COURT:  These are actually lawyers in this case

19   putting eyes on things?

20         MS. YINGER:  There may be different approaches by

21   different defendants, but, yes, particularly for -- I can

22   speak directly about our 12 clients and Hogan Lovells' client

23   group, and there are lawyers putting eyes on documents, yes.

24         THE COURT:  And they understand that if a lawyer

25   gets cc'd on an email, that does not necessarily mean -- that

1    does not in and of itself mean that that's privileged?

2            MS. YINGER:  They are very experienced in making

3    these calls and they've gone through the process of justifying

4    privileged designations.  So, yes, Your Honor.

5            THE COURT:  And I understand that if something sits

6    at equipoise and it could fall either way, you will take the

7    position it's privileged rather than it's not privileged.

8    You're going to err on the side of protecting your client's

9    interest.  Nothing wrong with that except when that swath is

10   larger than their razor blade.

11           MS. YINGER:  Let's also put that number in context,

12   Your Honor.  Yes, there are 500,000 privilege designations,

13   but the defendants have actually produced more than 14 million

14   documents.

15           THE COURT:  I get that.

16           MS. YINGER:  When you compare those two numbers,

17   it's understandable.

18           THE COURT:  Do you have people that brief you

19   whenever you come before me on what the number is now?

20           MS. YINGER:  I do.  I do.

21           THE COURT:  I need to know the number because I want

22   to say it again.

23           MS. YINGER:  And in addition, Your Honor, it's

24   important to remember that that number is spread across 36

25   defendants.

```
 1                 THE COURT:  I understand that, too.

 2                 MS. YINGER:  But I agree with Your Honor.  We should

 3      not delay.  We've talked to the plaintiffs about informing

 4      them about this reevaluation that we've undertaken.  We're

 5      doing that expeditiously.  We've agreed on a date.  And we're

 6      moving forward.

 7                 THE COURT:  Fair enough.

 8                 MS. JONES:  Your Honor, Megan Jones for subscribers.

 9      We are really concerned.  This is a matter of urgency to us

10      about what is in the privileged documents.

11                 THE COURT:  Aren't you glad I raised it all on my

12      own?

13                 MS. JONES:  I am.  Thank you, Your Honor.  As an

14      example, the map books were designated as privileged for two

15      years.  We asked for them the right way.  We issued an RFP.

16      They said we couldn't have them.  We met and conferred.  They

17      said we couldn't have them.  And the direct result of that,

18      which is -- we had two economics days without the map books,

19      and then we took a deposition a week later and they said, oh,

20      yes, there's the map books.  And we didn't even have to come

21      to you; they just produced them.  But for two years, those

22      documents were designated as privileged.  And so we're fine to

23      work it out with defendants, but what we really want is

24      deadlines about when this process is going to be concluded

25      because what we don't want is to have to file a class cert
```

1    brief on January 15 and have this process still be

2    outstanding.

3            THE COURT:  Fair enough.

4            MS. YINGER:  Your Honor, if I may be heard?

5            THE COURT:  I'm not going to get into the weeds on

6    the map books right now.  What I am going to do, though, is

7    say that those are the kind of categories you all need to be

8    sitting down and communicating about and making decisions so I

9    don't have to.  Things that are clearly fair or foul.  One of

10   the things that I have reserved the right to do in light of

11   the fact that Judge Putnam may be on an island on this, at

12   least a lot of it, is maybe down the road this seal master

13   might be called upon to help with some of the privilege

14   matters and we might have a rule that loser pays.  Okay?

15   Fair?

16           MS. YINGER:  I understand, Your Honor.

17           THE COURT:  Or maybe we can just say thousand

18   dollars a document, Judge Putnam reviews them; loser pays, and

19   he gets the thousand.

20           MS. YINGER:  Honestly, Your Honor, again this is all

21   very abstract because there has been no motion brought

22   contesting any privilege with respect to any document.  So I

23   understand the need -- I think we get the message very

24   clearly.

25           THE COURT:  I am trying to have a process where we

```
1   don't get to the end of the day and it's not the end of the

2   day.

3            MS. YINGER:  We get that.  We get that.

4            THE COURT:  So there's nothing substantive we are

5   deciding here.  There's no motion to decide.  It is what is

6   the process.  What process are we going to use to work through

7   these issues that at least at this point appear fairly

8   gargantuan.  That's all I'm interested in.  I'm not interested

9   in who wins or loses on these issues.  I'm interested in what

10  is the right process to get to the determinations, and it

11  seems like we have three aspects of it.  One, the parties work

12  a little harder to work out their disagreements; two, we

13  sample and see perhaps on some expedited rulings on some

14  sampling how Judge Putnam or Judge Proctor or even maybe the

15  seal master might come out on those things with an R&R

16  opportunity so that you can start saying, okay, well, now that

17  we know, we're going to readjust our privilege designations or

18  our challenges to privilege designations accordingly.  Okay?

19           MS. YINGER:  Your Honor, to me, I have no idea what

20  we would be sampling right now because there are no ripe

21  disputes.  So I don't think we can at this stage say we are

22  going to do sampling.  It doesn't make sense.  We need to

23  narrow the universe --

24           THE COURT:  Look into a crystal ball and the way

25  this case has been conducted for the last five years and tell
```

1  me if you reasonably believe there will be no disputes.

2          MS. YINGER:  I believe there will be disputes but I

3  would like to know more about them before we can --

4          THE COURT:  Well, that's the meet and confer part.

5          MS. YINGER:  I think what we understand is that we

6  need to get it done, we need to hurry up and get it done and

7  crystallize what disputes there are, and then I do understand

8  at that point when we crystallize what the disputes are, there

9  may be a need for a sampling.

10          MS. JONES:  Your Honor, perhaps what the parties can

11  do is meet and confer in the next seven days and then propose

12  a schedule to Your Honor with deadlines, because what we are

13  very concerned about is this dragging on past January 15th,

14  and in our initial meet and confer with defendants, they

15  didn't tell us until today that they were going to review

16  their privilege log by November 1st.  And if we wait until

17  November 1st to set a process, we've blown the January 15th

18  deadline to actually resolve the issues.  And so we are very

19  concerned, and this is a very time sensitive matter.

20          THE COURT:  So I'll say I want the initial meet and

21  confer to occur by next Friday.

22          MS. YINGER:  We are absolutely willing to meet and

23  confer.  We need to understand --

24          THE COURT:  You all can start at the reception

25  tonight.

1          MS. YINGER:  We need to understand what the

2    plaintiffs are disputing, because we don't.

3          THE COURT:  And they probably need to understand

4    what you're claiming.

5          MS. YINGER:  That's right.  And that's why we agree

6    to undertake that reevaluation in light of the Court's order.

7          MS. JONES:  And it would be helpful if the

8    defendants could represent to the Court that they're not

9    producing privilege logs.  We got 100,000 in the last four

10   weeks.

11         MS. YINGER:  I have no idea, Your Honor.  I can't

12   speak on behalf of --

13         THE COURT:  I don't think you can speak to that

14   today, but I think you can figure that out by next week,

15   whether there's more designations to occur.

16         MS. YINGER:  We can figure that out by next week.

17         THE COURT:  Again, I'm not trying to put the thumb

18   on either side of the scale.  I'm just trying to make sure

19   that we have a process.  And then we will -- anybody want to

20   fill in the blank?  Alabama fans?  -- trust the process.  Fair

21   enough?

22         MS. YINGER:  Thank you, Your Honor.

23         THE COURT:  Fair enough?

24         MS. JONES:  Thank you, Your Honor.

25         THE COURT:  Let's take a short break and then we

```
1    will take up the Anthem/Cigna issues.

2              (Recess.)

3              (Back in open court.)

4         THE COURT:  Ready to take up Anthem's motion to

5    enter its proposed order regarding the Court's show cause

6    order which was dated April 21, 2017.  The other defendants

7    joined in the motion.  Nonparty Cigna has filed an opposition.

8    Is someone from Cigna here?

9         MR. DiPRIMA:  Yes, Your Honor.

10        THE COURT:  Come on over.  Make room for this fine

11   lawyer.

12             Let's start with Anthem.  Your motion.

13        MR. HAMMOND:  Thank you, Your Honor.  Andrew Hammond

14   from White & Case on behalf of Anthem.  And I appreciate you

15   indulging us today.  Your Honor, we came in with a pretty

16   simple, straightforward motion based on the directive that

17   Your Honor provided at the May 11th conference.  You indicated

18   that you wanted the parties to resolve the issues raised in

19   your show cause order by agreeing to a stipulation identifying

20   four --

21        THE COURT:  And as I recall, both parties seemed

22   fairly confident they that would be able to do that during the

23   phone conference on May 11?

24        MR. HAMMOND:  We did, Your Honor.  We reached an

25   impasse.  And that's why we are here seeking Your Honor's
```

1  guidance.

2       THE COURT:  So let me -- I've been cutting to the

3  chase a lot today.  Have you noticed?

4       MR. HAMMOND:  I have, Your Honor.

5       THE COURT:  Let's cut to the chase.  I have two

6  issues with you people.  And "you people" means both of you.

7  One, I get the sense that you or your client or the litigation

8  counsel in the Delaware chancery court is using the mediation

9  privilege as a camouflage to tuck a lot of documents that may

10 or may not have to do with the mediation into the privilege.

11 So I've got a concern about that.

12      And when it comes to Cigna, I get the impression

13 that you all are still hanging over Anthem's head related to

14 an adverse inference for an assertion of what is clearly and

15 what I think both sides have agreed is at least applied to

16 some of the discovery, a straightforward mediation settlement

17 privilege that I have an interest in enforcing.  Now, I can't

18 make the ruling on such a motion if it's filed.  That's the

19 Vice Chancellor's job.  I think under the All Writs Act, I can

20 have a lot to say about whether that ought to get filed or

21 not; and if it gets filed, address it.

22      So right now what I'm inclined to do is simply enter

23 an order which is an All Writs order that says two things.

24 First, I better not find out you are taking the position that

25 documents that are not covered by the mediation privilege are

```
 1   protected by the mediation privilege.

 2            And I better not find out that you all have moved

 3   for an adverse inference with respect to a legitimate

 4   assertion of the mediation privilege.  What's wrong with that?

 5            MR. HAMMOND:  Well, Your Honor, I think the solution

 6   that you had proposed at the last hearing --

 7            THE COURT:  I'm not asking about the solution I

 8   proposed at the last hearing.  Obviously the solution I

 9   proposed at the last hearing didn't work because you guys

10   couldn't get together, and to be honest with you I think it's

11   for those two reasons.

12            MR. HAMMOND:  Your Honor, I think I --

13            THE COURT:  I may be reading too much in between the

14   lines.  Tell me if I am.

15            MR. HAMMOND:  We disagree with that, Your Honor.  We

16   believe the assertions that have been made in Delaware --

17            THE COURT:  Well, I'm being informed by a little bit

18   of history in my case.  500-some-odd thousand documents on a

19   privilege log, overuse of the sealing procedures that we have

20   had to address.  I am putting down -- as you can tell today,

21   I'm putting down the stamp that we're not going to have any

22   more of that.  So I'm not going to farm off those issues onto

23   the Vice Chancellor in Delaware either.

24            MR. HAMMOND:  Your Honor, I think as we understand

25   it or we understood it that those issues were going to be
```

1    presented in the Delaware court.  Are you now indicating that

2    you don't want those issues presented?

3            THE COURT:  No, that's not what I'm saying.  What

4    I'm saying is that they tell me you're too broadly asserting

5    the privilege.  And it will be for the Delaware court to

6    decide on perhaps a case-by-case basis whether or not

7    something is privileged.  But if I find out that you have used

8    my mediation privilege, my case, my litigation mediation

9    privilege, overbroadly to protect things that are otherwise

10   discoverable in Delaware, then you might have to deal with him

11   and me.

12           Having said that, if they move for an adverse

13   inference based on your legitimate assertion of mediation

14   privilege based upon my mediation, you might have to deal with

15   him and me.

16           MR. HAMMOND:  Well, Your Honor --

17           THE COURT:  I'm upping the ante because you all

18   should have been able to work this out and there's some

19   nonsense going on perhaps on both sides as to why it's not

20   being worked out.

21           MR. HAMMOND:  Your Honor, certainly we don't believe

22   there's any nonsense going on on our side with respect to the

23   assertions of privilege that have been made.

24           THE COURT:  What date did I ask you all to enter a

25   stipulation?

1          MR. HAMMOND:  May 11th, Your Honor.

2          THE COURT:  And this is November 4th?

3          MR. HAMMOND:  September.

4          THE COURT:  September 4th?

5          MR. HAMMOND:  October 4th; I'm sorry.

6          THE COURT:  October 4th.  We're coming up on the

7   five month anniversary.  Something is going on.  What?

8   Mr. Laytin, are you really wanting to put your head on

9   the guillotine?

10          MR. LAYTIN:  I will give it a shot, Your Honor.

11   First of all, Dan Laytin on behalf of the Association.  I have

12   absolutely no problem with either of the guideposts that you

13   just set forth.  I do believe that we would benefit from a

14   little additional clarity from Your Honor, and if you will

15   indulge me, I would like to explain why.

16          THE COURT:  I would be glad to hear you.

17          MR. LAYTIN:  I would like to focus just on really

18   the one dispute that affects the Association and the rest of

19   the Blues and that is whether documents have to be for the

20   purpose of mediation or the sole purpose, and I appreciate

21   that perhaps we're back to talking about indefinite articles.

22          THE COURT:  How about specifically for purpose as

23   opposed to solely for the purpose?

24          MR. LAYTIN:  Not what I would prefer, and I will

25   tell you why, Your Honor.  It comes back to a truth that I

1   believe we can all agree with and that is that nothing in this

2   case is ever easy.  And the plaintiffs --

3         THE COURT:  Now, your position has been -- I have

4   been a little more informed about your position with what I

5   heard this morning from Mr. Whatley, and that is that if

6   Anthem agreed, one, to go out and use the mediation as a

7   vehicle to change the mind of other Blues, to loosen up the

8   reigns on competition matters, consistent with what Cigna

9   wanted to do as far as competition and multiple markets -- and

10  I'm not saying these things are true, but if Anthem gave Cigna

11  some veto power as to what the deal would or would not be in

12  the mediation, that's interesting to me.  And I don't know how

13  that plays into this.

14        But it seems to me that if there are documents

15  created for purposes other than mediation, those aren't going

16  to be covered by the mediation privilege even though they may

17  be consistent with the mediation position taken by a party.

18        MR. LAYTIN:  May I respond, Your Honor?

19        THE COURT:  You may.

20        MR. LAYTIN:  I appreciate what you are saying, which

21  is that if there are documents that reflect both information

22  that's mediation privileged and not mediation privileged, that

23  your question relates to that.

24        The context here is that there were three things

25  going on at the same time.  First of all, there were

1    plaintiffs' claims that obviously challenge the structure of

2    the Blue system, its brand rules and regulations that govern

3    the brand and national program, and there were discussions and

4    need to be discussions among the Association and their

5    business people and their counsel about those claims.

6           Second, even more complex, potentially settling

7    plaintiffs' claims, which not only relate at a very general

8    level, because obviously I don't want to talk about the

9    substance, but at a general level changing those structure and

10   guidelines but also changing the structure could create other

11   issues for the system that would have to be resolved by the

12   system for purposes of brand protection.  Interaction among

13   rules, if they're changed, could result in group goldberg-like

14   results that have to be resolved.

15          The third is that the business of the Blues

16   continues in the real world and in the present day.  And

17   there's continued governance of the Blue marks by the

18   Association that makes the Blue system faster, stronger,

19   sleeker, more competitive and, yes, more legally defensible.

20   And those potential governance issues relate to some of the

21   same structure, rules and regulations at the same time.

22          So it's no surprise that mediating -- and I use air

23   quotes around mediating, because when the Blues are meeting

24   with their lawyers to talk about mediating, they have to

25   consider all those things.  So that when there is a meeting

 1    among board members with counsel present, talking about these

 2    potential business changes to the Blue system, it is possible

 3    that while those documents may not discuss plaintiffs' claims

 4    specifically and they may not talk about the he-said/she-said

 5    of the mediation specifically, when they're talking about

 6    those potential business changes they are through the lens of

 7    the litigation claims, their affect on the litigation, their

 8    affect on the mediation, and both of those -- and so you could

 9    have litigation, mediation, and governance issues all at the

10    same time, and I think that's why --

11              THE COURT:  Let me ask you this.  I understand your

12    three categories.  Why am I concerned about one and three?

13    The only thing that was brought to me, as I understand it, was

14    that you were being asked to do something in Delaware either

15    by a party or perhaps the court that would have violated my

16    order in this MDL and that is that what occurs in a mediation

17    is sacrosanct and is not to be disclosed.  My mediation order

18    has nothing whatsoever to do with any discussions about claims

19    outside the mediation process and has nothing to do with your

20    continuing concerns about protection of brands and how any

21    litigation would affect it.  It is what is related to the

22    mediation.  Okay?  So let's start with that premise.

23              If that's the case, Vice Chancellor Laster is

24    perfectly capable of figuring out what's privileged in

25    category one, what's proprietary or otherwise protected under

1    category three.  That's of no moment to me.

2         What is of moment to me is if you're getting

3    whipsawed by Cigna in that litigation in that they are

4    proposing that if you withhold mediation documents that I have

5    ordered you to withhold, you're looking at an adverse

6    inference in the Delaware chancery court or at least the

7    request for one.  That's the first concern.

8         The second concern is I want to make sure that

9    you're not trying to tuck in categories one and three and any

10   other categories into category two.  And I have an informed,

11   sneaky suspicion that that may be a concern.

12        MR. LAYTIN:  Yes, sir.  First of all, two points.

13   First, Vice Chancellor Laster is, of course, able to do --

14   call balls and strikes, and we have no question about that.

15        The second point is this.  With respect to my three

16   categories, the purpose of the meeting and, therefore, the

17   documents at issue was generated by all three, and my point is

18   the fact that one and three are also present doesn't mean it's

19   not two.  That's my point.  The fact that one and three are

20   present doesn't negate two.  That's my point.

21        THE COURT:  Well, but, again, you all can go have

22   all sorts of discussions about resolving this case directly

23   outside the mediation process, what you're strategy is going

24   to be, discussion of plaintiffs' claims, that don't have any

25   bearing or have limited bearing on the mediation that's

1    occurring here.  It seems to me that what you do to prepare

2    for and conduct the mediation should be a fairly simple thing

3    to figure out.

4           MR. LAYTIN:  I guess that's my point, Your Honor, is

5    that this is the unusual case.  I think it's simple to figure

6    out, too.  There's a dispute about what it is.  I'm not saying

7    it's difficult to figure out, but the law is that documents in

8    connection with the mediation, in conjunction with the

9    mediation are privileged, and that's for a good reason.  It's

10   not the narrowed mediation, capital M.  While the Northern

11   District of Alabama ADR plan captures mediation with a capital

12   M, the case law captures documents in connection with

13   mediation little M.  And because the mediation in this case is

14   a complicated set of circumstances where there are other

15   things going on at the same time, including the underlying

16   litigation, which, of course, is always the case --

17          THE COURT:  That's fine.  But that doesn't mean it's

18   going to be subject to a mediation privilege.  It's going to

19   be subject maybe to an attorney/client privilege.  It's going

20   to be subject to maybe a work product privilege.  But I'm not

21   going to give any direction to the Vice Chancellor, the

22   parties in the state litigation, or anyone about how to

23   conduct an analysis of those.

24          Where you get my attention and where I think my

25   attention is quite properly focused is when there is a

1   position taken by a party or a ruling by a court that says

2   ignore what Proctor said, produce it anyway or face an adverse

3   inference.  I'm concerned about that.  But I'm also concerned

4   about the overly expansive interpretation of that mediation

5   privilege.

6          So what's the best way to hit the road on this?  I

7   know what the best way to hit the road is on the first issue,

8   and I say you do that, and you will pay.  That's easy, right?

9   And I think I have authority to do that.  I think if you walk

10  into a court and ask another judge to disregard my order, then

11  I think that's exactly -- and particularly in an MDL that is a

12  separate res or a mediation which is something that I have

13  jurisdiction over; that's easy.

14         The more difficult issue is the one you're

15  describing, but it seems to me that you're going to have to

16  let Vice Chancellor Laster figure out what's wheat and chaff

17  there because I can't.  It's not my case.

18         But what I'm going to say is if you go up there --

19  and I want to be what's good for the goose is good for the

20  gander.  If you go up there and misrepresent my order or

21  misrepresent the interpretation or context of my order, you

22  are going to have to answer to me about that.

23         MR. LAYTIN:  I have no problem with that.  I have no

24  problem with your guidepost, and I absolutely agree with your

25  observation that categories one and three could be protected

1    by work product and attorney/client privilege.

2              THE COURT:  But that's not my call.

3              MR. LAYTIN:  I understand that.  I understand that.

4    My only point is that an order that says that documents have

5    to be for the sole purpose of mediation is not -- in our view,

6    is not an accurate representation of the law.

7              THE COURT:  How about created for the purpose of

8    mediation and not some other purpose.

9              MR. LAYTIN:  How about just the first phrase?

10             THE COURT:  You don't understand.  I live in a state

11   that has a workers' comp retaliation statute that says

12   "solely" in the statute and the Alabama Supreme Court said it

13   doesn't really mean solely.  So solely doesn't mean a lot to

14   me.  I think "solely" could limit you too much, but I think

15   some looser language that I think you're proposing gives you

16   too much wiggle room.  So the question is where is the happy

17   medium?

18             MR. LAYTIN:  What did you just say before?  I'm

19   sorry.  That you said for the purpose of --

20             THE COURT:  For the purpose of mediation and for no

21   other purpose.

22             MR. LAYTIN:  Isn't that worse than "solely"?

23   Because it means there is nothing else out there.

24             THE COURT:  Maybe.

25             MR. LAYTIN:  But replacing --

 1          THE COURT:  You get paid a lot more an hour to

 2    figure out stuff like this than me.  And I'm not trying to

 3    pass the buck, but I'm just telling you that there has got to

 4    be some language that you two can sit down if you're really

 5    serious about it and agree to that defines -- maybe it's kind

 6    of like Potter Stewart's definition of pornography.  I can't

 7    tell you exactly what it is, but I know it when I see it.

 8          My suggestion to you is that while "solely" doesn't

 9    work, your language probably is too broad, too.  So what is

10    the happy medium?  And we haven't heard from our friend from

11    Cigna yet.  He hasn't even told me whether he likes my idea of

12    the adverse inference ruling, which he may not.

13          But why don't you just come up and join them and

14    we'll make it all one happy group.

15          MR. BOIES:  Your Honor, can I join, too?

16          THE COURT:  I would love to hear your input, because

17    you're the only disinterested party in this whole thing,

18    right?  Please let the record reflect that the Court's tongue

19    was firmly implanted in its cheek when it said that.

20          MR. BOIES:  Your Honor, I think the Court was

21    exactly right when the Court started out with respect to the

22    two principles that the Court articulated.  And I think that I

23    would urge the Court not to get swayed to move away from those

24    principles, because I think those are really the right

25    principles.  The mediation privilege that the Court ordered

1    was the mediation privilege as my friend says with a capital

2    M.  It was to protect what was said at the mediation.  What

3    was being protected was the communications that we all made

4    back and forth to each other during the mediation.  And that

5    is what the Court has ordered to be protected and that is what

6    we actually have an interest in protecting as well.

7          THE COURT:  What about a document that was created

8    to be presented in the mediation, that would be protected,

9    too, right?

10         MR. BOIES:  If it's not presented to the mediation,

11   it may be work product, it may be attorney/client, but it is

12   not protected by your court's order.

13         Now, with respect to privileges, mediation privilege

14   with a small M, different courts are going to rule different

15   ways as to what is privileged in terms of preparation.  But

16   that is something that Vice Chancellor Laster or any court

17   that's considering the issue can decide.

18         What this Court has an interest in is being sure

19   that what is said at the mediation is not going to be

20   repeated.  And I think if the Court talked about documents for

21   the purpose of mediation, for no other purpose, I think that's

22   probably going to be protected under some other privilege

23   anyway, but I think what is really important is to keep the

24   focus on the two principles that the Court articulated at the

25   beginning, and that is the Court has an interest in protecting

1   the mediation, what is said at the mediation so that everybody

2   can be confident when we're talking in the mediation that

3   nobody is going to use that against us.

4          And I think it is entirely fair that there be no

5   adverse inference, with one caveat and that's whether if they

6   agreed -- and I have no reason to believe they did, but if

7   they agreed that they would do something in the mediation and

8   then didn't do it, I'm not sure that the mediation privilege

9   protects them in that particular context.

10         But leaving that solely aside, the mediation

11  privilege protects what is said there.  That ought to be

12  absolutely protected.  This court has an interest in that.  We

13  all have an interest in that.  But if it goes beyond that, if

14  what they're trying to do is to pull into the mediation

15  privilege some of the documents that were described this

16  afternoon, which are documents that are designed to figure out

17  what they do for brand protection going forward, that it seems

18  to me clearly takes it far too far.

19         THE COURT:  Okay.  Yes, please?

20         MR. DiPRIMA:  Thank you, Your Honor.  Stephen

21  DiPrima from Wachtell, Lipton, Rosen & Katz on behalf of

22  Cigna.  Your Honor, interestingly here, we're not talking

23  about documents on a privilege log.  We're not guessing as to

24  what's behind a log entry on a half a million privilege log.

25  We're talking about documents that Anthem produced to Cigna in

1   Delaware.  Anthem clawed back something like 7,000 documents

2   in Delaware.  These weren't among them.  We took the documents

3   that were produced to us in discovery in Delaware and we used

4   them, some of them, in an amended complaint that we proposed

5   to file earlier in September.

6          We've seen the documents.  We know what's in them.

7   We've been able to evaluate whether we think there's any valid

8   mediation privilege to be claimed over those documents.  And

9   after we made our motion, we waited for a response from Anthem

10  and the Blues as to whether they would consent to the motion.

11  It's a routine motion.  In Delaware, like many places, it's

12  routinely unobjected to by the opposition.  And after two

13  weeks we got a response that portions of our complaint that

14  relied on these documents were mediation privileged.  No

15  clawback had issued at that point, but we were told that a

16  clawback was coming.  And we responded to Vice Chancellor

17  Laster, put a filing before the court, attaching the documents

18  and making the point to the court that none of these documents

19  were remotely mediation privileged.

20         Maybe Mr. Laytin could argue that they are

21  litigation-related, but they didn't mention mediation.  They

22  didn't mention settlement.  They were board-level documents,

23  and we felt entitled to rely on them and we made that argument

24  to the Court.

25         In Delaware the response we got was, well, things

1    are happening down here in Alabama, you should hold the phone,

2    we're not quite ready to go forward, we're going to be talking

3    to Judge Proctor about all of this.  We got that motion on

4    Friday night, a couple days before this hearing, and we

5    immediately put the question to them, well, let us show Judge

6    Proctor the documents we're talking about and he can decide

7    for himself whether these are mediation documents or not.  We

8    were told, no, there's a protective order in Delaware.  That

9    isn't exactly what they said but that was the basis for the

10   objection.

11          And so from our vantage point, we need a venue to

12   raise these challenges.  To the extent they are still claiming

13   that these are mediation documents, we need to be able to talk

14   to Vice Chancellor Laster in Delaware or Your Honor here or

15   both courts if necessary.  We're prepared to do any of the

16   above.  We take the guidance from Your Honor that that's Vice

17   Chancellor Laster's call.  We agree with that.  And we are

18   prepared to proceed.

19          THE COURT:  What about the adverse inference?

20          MR. DiPRIMA:  On that, Your Honor, and you asked

21   what my view was.  I disagree with the Court on that.

22          THE COURT:  Let me ask you this, before you disagree

23   with me.  Can you do indirectly as an officer of the court or

24   can your client as a nonparty do indirectly what is not

25   permitted to do directly that would offend my jurisdiction?

1          MR. DiPRIMA:  On that, Your Honor, my fundamental

2     point is I don't think it would offend your jurisdiction.

3          THE COURT:  So if I said you may not request

4     mediation documents and we have a proper definition of what a

5     mediation document is, and your client was bound and

6     determined to get those, I think under the All Writs Act, I

7     could order no, you won't get those.

8          MR. DiPRIMA:  Perhaps, Your Honor, but --

9          THE COURT:  Fair?

10         MR. DiPRIMA:  Perhaps.

11         THE COURT:  Fair so far?

12         MR. DiPRIMA:  I think that under the All Writs Act,

13    the way it should work in the federal system of government, we

14    have a state court system, is the way we've approached it in

15    our proposed stipulation, which is we lay out the contours of

16    the privilege and what we agreed to, and if there's a

17    challenge, that gets resolved in the state court.

18         THE COURT:  Well, what happens to your All Writs

19    argument -- and I'm not saying this.  Please, be clear on the

20    record.  I have no reason to doubt Vice Chancellor Laster's

21    approach to the litigation and handling of my mediation

22    privilege.  And that's why in the initial conference call

23    after hearing argument back and forth, I said I think he is

24    the one that ought to be making the determination of what is

25    wheat and chaff, but it's my mediation order, and it can't be

1    violated by any party or nonparty.  Good so far?

2             MR. DiPRIMA:  Good so far.

3             THE COURT:  All right.  What happens if you go in

4    and say to Judge Laster -- and this has actually happened to

5    me in California litigation before -- Judge, that's an Alabama

6    judge.  He doesn't know what he's doing.  I'm not getting

7    treated fair in Alabama.  You do want you want.

8             MR. DiPRIMA:  And if I could just sort of lay out

9    how I think it would play out in Delaware.  Let's say -- we

10   don't have a trial date set, so our trial is in early 2018.

11   We've gone through an expedited phase, preliminary injunction

12   phase, their motion was denied, Anthem's motion, the merger is

13   now terminated.  Over the summer discovery wasn't exactly hot

14   and heavy, but we're starting to move into it.

15            Let's say that on the eve of trial we make a motion

16   and this is something that's going to happen months and months

17   and months from now, and so the idea that some kind of federal

18   injunction has to issue forthwith I don't think is

19   well-founded.  But let's say that we make that motion in

20   Delaware.  Delaware, the Delaware Rules of Evidence, provide

21   that if a privilege is validly asserted, there shouldn't be an

22   adverse inference.

23            THE COURT:  Not shouldn't be; shall not be.

24            MR. DiPRIMA:  Shall not.

25            THE COURT:  Big difference.

```
1              MR. DiPRIMA:  Correct, Your Honor.

2              THE COURT:  Do I need to read the statute to you?

3              MR. DiPRIMA:  No, no, I'm not quibbling.  But my

4   point is that Anthem, as a litigant in Delaware, can invoke

5   that rule and cite it to the court and this Court as a federal

6   court I think should presume that the state court is going to

7   follow its own rules and that in and of itself would protect

8   whatever federal interest there is in not seeing Anthem suffer

9   unduly in Delaware.

10             THE COURT:  But what if -- big what if -- it comes

11  to my attention that that's not what you did, that you went in

12  and said, Judge, yes, we understand that these are documents

13  that were shown to the mediator; we still think they ought to

14  be produced; and if they are not produced, we want you to

15  infer and tell the trier of fact that it may infer an adverse

16  inference.

17             MR. DiPRIMA:  Your Honor, again --

18             THE COURT:  Then you're doing indirectly what you

19  can't do directly.

20             MR. DiPRIMA:  One, I don't think that's going to

21  happen.

22             THE COURT:  I'm sure it won't if I enter my order.

23             MR. DiPRIMA:  Well, that's for sure.  We don't like

24  to violate federal orders and we don't like to upset federal

25  judges either, and to the extent that happens --
```

1      THE COURT:  Well, I'm not playing the federal judge

2  card.  This is my MDL and my mediation card.

3      MR. DiPRIMA:  Correct, Your Honor.  And I am in the

4  unenviable position of arguing limits of federal judicial

5  power, but I think here the way the anti-injunction act should

6  work is that any argument over what inferences can or can't be

7  drawn in Delaware ought to be resolved by the state court

8  under the state court's rule, which as we just discussed I

9  think protects exactly what Your Honor is concerned about

10 protecting.

11     On the adverse inference point, if I could add, it's

12 not as simple as just was a document withheld or not.  Now, we

13 did request an adverse inference at the preliminary injunction

14 phase and we discussed this in May.  At the time we were

15 confronted with not just withholding of documents and the

16 invocation of a privilege, but missed court deadlines for

17 document production, serial missed deadlines, late privilege

18 logs, that backed up against a hearing deadline.  And so when

19 we --

20     THE COURT:  Those are all Vice Chancellor Laster

21 issues, not my issues.

22     MR. DiPRIMA:  Precisely.  And so 12 months from now,

23 14 months from now, we're going to have a new set of facts,

24 partly things that have happened up to date but partly things

25 that are going to happen over the next 14 months.  My simple

1    point is we haven't made that motion.  There's no motion

2    pending for an adverse inference in front of this Court.  If

3    there ever is one, and we don't know that there will be, it's

4    going to based on things that have happened perhaps to date

5    but also perhaps things that happened over the next 12 months.

6          THE COURT:  Well, look, on page 22 of the transcript

7    back on May 11 I asked this question, because you made a

8    similar argument then.  And I said, well, unless it is a claim

9    of privilege based on a previous court order that you are

10   inviting someone to ignore or violate.  And you said, well,

11   Your Honor, I would submit that we're not.  We're certainly

12   not doing that.  And my only point is what if you do?  Because

13   I think that Mr. Laytin properly described these two

14   components of the order that I'm contemplating as guide rails

15   or guardrails.

16         I'm just telling you what's going to happen if you

17   go into Delaware court and say screw him, we want the

18   documents or else they get an adverse inference.  And you're

19   saying you're not going to doing that, so what's the problem?

20         MR. DiPRIMA:  Your Honor, if that happens, there

21   would be a factual predicate for them to come here and request

22   an injunction.  I don't know whether that would be a valid

23   request or not.  But the idea that we speculate on something

24   that we might do in the future and enter a federal injunction

25   today affecting a state court proceeding where trial hasn't

1   even been set --

2        THE COURT:  Well, would you rather me tell you don't

3   and I mean it and then you don't and don't get in trouble, or

4   would you rather me give you guidance today and then you

5   disregard that guidance and I bring down the full weight of

6   the beast upon you?

7        MR. DiPRIMA:  Your Honor, we certainly understand

8   the tenor of the conversation.  My only point is we're talking

9   about a federal order impacting a state court proceeding

10  potentially --

11       THE COURT:  No, that's not what I'm talking about.

12  I'm talking about a federal order that governs your conduct

13  now that you know of the order, and I'm saying you better not

14  go in and your client better not go in and invite a state

15  court judge who has valid jurisdiction to make balls and

16  strikes calls, fully acknowledge that, to disregard my order.

17       MR. DiPRIMA:  Right.  And we haven't done that and

18  we won't do that.

19       THE COURT:  I'm not sure Anthem would agree with

20  that.  I think they represented to me that essentially --

21  that's exactly what you have done.

22       MR. DiPRIMA:  And if there's some detail around

23  that, I would love to hear it, and we are standing here.

24       THE COURT:  Is there detail around that?

25       MR. HAMMOND:  Sure, Your Honor.  During the

1  preliminary injunction phase of the litigation they did seek a

2  preclusion order for failure to produce mediation materials

3  and they sought to seek a preclusion order on the basis that

4  Anthem failed to produce information concerning potential

5  changes among other things, potential changes to the NBE rule,

6  which was certainly mediation materials.  And those are the

7  issues that Cigna raised to Vice Chancellor Laster.  Now, Vice

8  Chancellor Laster didn't rule on that preclusion order, but

9  that was certainly something that they sought and asked for

10  and requested while the show cause order was pending.

11       MR. DiPRIMA:  And as we discussed last May, part of

12  our basis of our request was, one, we thought the mediation

13  privilege was being over-asserted and that would be a basis

14  for seeking an adverse inference; and, two, because of the

15  discovery abuses that had happened in Delaware, leading up to

16  the motions --

17       THE COURT:  But, in part, you wanted production of

18  the mediation documents because either you said they were

19  belatedly placed upon a privilege log --

20       MR. DiPRIMA:  No.  We had hearing after hearing on

21  this in front of Vice Chancellor Laster.  He made very

22  clear -- I was in the courtroom -- that he wasn't going to

23  touch the mediation.  There was a point where we had --

24       THE COURT:  So why can't you all just work out a

25  stipulation?  Where are you?

```
 1              MR. LAYTIN:  I have a suggestion, Your Honor.

 2              THE COURT:  I've got a suggestion, too.  But let me

 3    hear yours first.

 4              MR. LAYTIN:  That mediation is the central purpose

 5    for the creation of the document.

 6              THE COURT:  How about --

 7              MR. BOIES:  Your Honor, could I be heard on that.

 8    What that does is that not only takes it beyond solely or for

 9    the only purpose, but that says that they are entitled to

10    claim the mediation privilege for documents that they prepared

11    that were never shown in mediation, never communicated to us

12    in mediation.  The mediation privilege with a capital M under

13    your Court's order is designed to protect what's said at the

14    mediation.  Once they start getting beyond that, that's when

15    they start to sweep in things that they're trying to protect

16    from discovery.

17              THE COURT:  How about this.  Communications or

18    documents created by the parties to the MDL or their counsel

19    that were, one, for the purpose of the mediation of the MDL

20    and, two, that were or are provided or shown to the mediator

21    or a party to the mediation.

22              MR. LAYTIN:  Is that an "and" or an "or"?

23              THE COURT:  And/or.

24              MR. BOIES:  No, not --

25              THE COURT:  Hold on.  You don't have to -- if Judge
```

1  Phillips didn't see it but in the mediation Anthem provided it

2  directly to you --

3          MR. BOIES:  Oh, absolutely.

4          THE COURT:  That's the "and/or."

5          MR. BOIES:  Okay.  There, it clearly is "and/or."  I

6  thought that counsel's question was whether the "and" that

7  connected "prepared for the mediation" and then it said "and

8  shown" to X, Y, or Z, whether that first "and" could be an

9  "or."

10          THE COURT:  It's an "and."  It's a conjunctive.

11  It's both.

12          MR. BOIES:  It has to be both.

13          MR. LAYTIN:  Your Honor, we disagree that's the law

14  for the reasons cited in our papers, the RDM case, the

15  bankruptcy court in the northern district of Georgia, in

16  preparation for the mediation.  But this is also not new

17  ground --

18          THE COURT:  Wait.  What was the basis?  Did they

19  apply this would violate the Court's order if this is

20  disclosed?

21          MR. LAYTIN:  No.  To be clear, I'm talking -- sorry;

22  I'm talking lower case M.

23          THE COURT:  Lower case M, though, is essentially a

24  different way of describing attorney/client privilege or work

25  product doctrine privilege, isn't it?

1          MR. LAYTIN:  No.  No, I don't believe that.  I

2    believe this Court has an interest in both capital M and lower

3    case M mediations.  I think that that is the law.  I

4    understand that --

5          THE COURT:  Go back to my order, because that's what

6    defines the basis for me being involved.  It's not the law

7    generally.  The law can be perfectly applied by Vice

8    Chancellor Laster.  He has been on the bench longer than me,

9    as best I can tell, and he deals with all sorts of high level

10   litigation involving corporate entities.  Right?  He is

11   competent.

12         MR. LAYTIN:  Beyond competent.

13         THE COURT:  Probably much more than competent to

14   determine what was attorney/client privilege or work product

15   even in advance of a small M mediation.

16         My order deals with what occurs in the mediation,

17   the mediation, definite article, and not in advance of the

18   mediation, not what might be parallel to the mediation.  Not

19   what might be consistent with the mediation.  It deals with

20   what occurred in the mediation itself.  That's to me the res

21   that I'm protecting.

22         MR. LAYTIN:  In May you said this to me.  Actually

23   you said it to Mr. DiPrima.

24         THE COURT:  What page?

25         MR. LAYTIN:  26 to 27.

```
 1              THE COURT:  Okay.

 2              MR. LAYTIN:  I will put the question to Cigna.

 3    There's a discussion regarding mediation and settlement

 4    strategy specifically for the purpose of addressing Judge

 5    Phillips and/or plaintiffs' counsel in my case and mediation

 6    that's memorialized so everybody understands what the position

 7    will be when they get to mediation.  Does Cigna take the

 8    position that it is not subject to the mediation privilege in

 9    my case?

10              THE COURT:  And they say --

11              MR. LAYTIN:  They say, No, Your Honor.  That is a

12    mediation document, as far as we are concerned.  That's the

13    concept we are trying to memorialize except that our view of

14    the law is that Cigna's counsel, although I understand why he

15    did it, went a little too far in the adjective --

16              THE COURT:  Well, let me ask Mr. Boies, because I

17    think you have introduced this conjunction, and I tend to

18    agree with you.  It doesn't just have to be a document that

19    was shown to the mediator.  It can be a document that was

20    utilized or if it's a talking points for the mediation itself,

21    which is what I think we're addressing here on pages 26 and

22    27.

23              MR. BOIES:  I think that's right, Your Honor.  It

24    doesn't have to be a document that was shown to the mediator

25    or --
```

1              THE COURT:  How about shown or used in the

2    mediation?

3              MR. BOIES:  What it has to be -- it even could be,

4    for example, a document that reports and says at the

5    mediation, this is what people say.

6              THE COURT:  That memorializes?

7              MR. BOIES:  Memorializes.  So it's broader than

8    simply what is shown or used in the mediation, but it has to

9    be something --

10             THE COURT:  Okay.  And that's my fourth category,

11   communications and/or documents discussing or memorialized

12   discussions or analysis of communications during the mediation

13   and/or mediation proposals which were made at the mediation.

14             MR. BOIES:  I think that's exactly right, Your

15   Honor.

16             MR. LAYTIN:  We disagree that the scope of the

17   mediation privilege is that narrow.

18             THE COURT:  No, no.  That's the category that I

19   think he is addressing there.  Four categories.  Let me just

20   give them to you.  Well, let me just do a wordsmith on one

21   aspect of this.

22             Let me read this to you.  Communications and/or

23   documents created by the parties to the MDL or their counsel

24   that were, one, created for the purpose of the mediation of

25   the MDL; and/or, two, provided, used, or shown to a party in

1    the mediation or the mediator and/or used at the mediation,

2    period.

3            MR. LAYTIN:  Because those are or's, we think that

4    that accurately is --

5            THE COURT:  In other words, here is the category.

6    Maybe you all are going to do a better job with more time

7    wordsmithing this than I will.  But it seems like we have the

8    following categories.  If a document was created for the

9    purpose of mediation, it was used in the mediation, even if it

10   wasn't disclosed, it just may be this is my internal mediation

11   document, this is what my client and I have decided my

12   position will be on this issue or these issues of the

13   mediation, I think that's clearly a mediation document.  It's

14   a talking points memo, essentially.  It's what I prepared for

15   the mediation.  Not for some board discussion.  For the

16   mediation.

17           Documents that I submit to the mediator or share

18   with a party of the mediation in the context of the mediation

19   is clearly a mediation document.  Not documents that were

20   shared about the subject of the mediation in advance of the

21   mediation or after the mediation.  It has got to be in the

22   mediation.

23           And then documents that either memorialize or

24   analyze what occurred in the mediation are the third category.

25   Any other documents you can think of that fit within the

mediation privilege?

MR. LAYTIN:  Your Honor, our view of the world and of the law is that because of the governance that we have to go through as a system to discuss potential proposals for mediation, we have concerns that -- we are concerned that the categories that Your Honor laid out do not accurately reflect the scope of the mediation privilege as applied to this case, which is a different type of case -- I can't read that -- which is a different kind of case than a case between -- this is not GM, Ford, or Chrysler accused of price fixing where there is no interaction between GM, Ford, or Chrysler in the world.  This is Blue plans in an association that have to work together and therefore there is a governance process.

THE COURT:  Give me a fourth category of something that would be covered in your view of world that I haven't included.

MR. LAYTIN:  I would like to answer that question.

MR. DiPRIMA:  Your Honor --

THE COURT:  Let me hear from him first.

MR. LAYTIN:  The answer to the question is what I posed before, which is board members with -- Association board members with Association counsel present talking about potential changes to the very rules that are subject of the mediation.

THE COURT:  That's something that's attorney/client

privileged.  Vice Chancellor Laster can get into that without
offending my order.

MR. LAYTIN:  I appreciate and accept and agree with
the fact that it's attorney/client privileged, but I think it
is also mediation privileged and that this court has an
interest in implementing the full scope of the privilege lest
we chill mediation privilege.

MR. BOIES:  Can I make a simple suggestion?

THE COURT:  I'm just going to go down the line.
Mr. Boies and then I'll get to you.

MR. BOIES:  Could I ask if everybody would agree to
let the Court look at the proposed complaint and then the
Court decide whether this is something that is in the Court's
conception subject to the mediation privilege?

THE COURT:  That would certainly meet efficiency
objectives, unlike what we've been doing for the last 20
minutes.  I'm perfectly happy to do that.  But what I'm trying
to do now is make sure that I look at the Rubix cube in as
many directions as I can before I start drafting.

MR. BOIES:  Yes, sir.

MR. DiPRIMA:  Your Honor, I think what you are
hearing from Mr. Laytin is exactly our problem with all this,
in that he is basically trying to stretch this privilege, this
impenetrable privilege, over all kind of board level
communications concerning our merger that weren't truly part

of the mediation.  We've seen these documents.  They're not
mediation documents.  They are not draft statements to the
mediator.  They're not talking points.  They're not
communication points.  These are board level documents where
independent and coming together and discussing a major
business event.

THE COURT:  Or gives input to Mr. Laytin at a board
meeting about the position that the board wants him to take in
mediation, he distills that down to a memo that he takes to
the -- the board communications may be separately privileged.
The document that he takes to the mediation utilized in the
mediation would be subject to the mediation privilege.  Agree
with that?

MR. DiPRIMA:  Yes.

THE COURT:  Do you disagree with that?

MR. LAYTIN:  Can I make one small change?  With
respect to the first document, it's not me.  It's in-house
counsel for the Association.

THE COURT:  If you got the document at the mediation
or utilizing it, we're not going to -- that document is not
discoverable.  Vice Chancellor Laster has to decide whether or
not the discussion at the board level was discoverable and you
have to convince him it wasn't, since you're asserting the
privilege.  That's all I'm saying.  I'm not going to get in
the middle of that.  I feel like -- of course, my friends from

1  Cigna would tell me, Judge, you've weighed in way too far

2  already.  You don't need to be defining for Vice Chancellor

3  Laster what attorney/client privilege and work product looks

4  like in advance of a mediation.  And the fact that -- look,

5  you have acknowledged yourself there were all sorts of

6  purposes for these communications.  Your client is trying to

7  figure out -- Anthem is trying to figure out, well, what is

8  our position at the mediation based upon our negotiations with

9  Cigna.  What is your position at the mediation based upon the

10  claims that are being asserted against us.  What is our

11  position at the mediation in terms of protecting our brands.

12  Those are three categories you laid out at the beginning.

13         And what I'm suggesting to you is the mediation

14  privilege deals with what occurs at the mediation, documents

15  that are prepared and utilized in the mediation, documents

16  created based upon what occurs in the mediation, and

17  communications that take place during the mediation.  I'm not

18  sure it covers much else.  But if you can give me a category

19  other than the one you've suggested, I will consider it.

20         MR. LAYTIN:  The --

21         THE COURT:  But, look, you're not naked on this.

22  You can still go in and say in advance of the mediation my

23  client had discussions with counsel about, among other things,

24  strategy at the mediation.  That's not a mediation privilege

25  but it is an attorney/client privilege because it deals with

1  legal advice given for a particular purpose and that is how

2  we're going to go prepare for a mediation.

3          MR. LAYTIN:  I understand the Court's position and

4  guidance.  The one last thing I would say to try to convince

5  you otherwise on the scope of the mediation privilege is that

6  in addition to the cases that we cite in our papers, we also

7  cite the agreement that we all signed with Judge Phillips,

8  which protects any material generated for purpose of the

9  mediation, full stop.

10         THE COURT:  Do you have that document in front of

11 you?

12         MR. LAYTIN:  I have the language in front of me.  I

13 know we submitted it to the Court, Your Honor, and we would be

14 happy to submit it again.

15         THE COURT:  I don't have it in front of me.

16         MR. LAYTIN:  I apologize.  I should.  It was any

17 material generated for purpose of mediation.  It is Exhibit 5

18 to our defendants' filing on May 3, 2017.  And I apologize

19 that I don't have the exhibit in front of me.

20         THE COURT:  May 3rd?

21         MR. LAYTIN:  Correct.

22         THE COURT:  I just have this stuff related to the

23 instant motion.

24         Mr. Boies, your position on that, if that's what

25 Judge Phillips' mediation agreement provides?

1          MR. BOIES:  Your Honor, I think if we signed that,

2     we are all bound by that.  I think that is a different issue

3     from what the Court order says.  I think this is in between

4     what we've been talking about.  I think if we signed that, we

5     are clearly bound by it.  And while I think that is different

6     than what the Court's interest is in its own order, I think it

7     is something that is much closer than the other things we were

8     talking about.

9          THE COURT:  So maybe the better question is ask

10    Mr. DiPrima what he thinks of that.

11         MR. DiPRIMA:  I haven't seen that.

12         THE COURT:  Let's hypothetically assume that Judge

13    Phillips did require them to sign that as part of the

14    mediation and that would also preclude them from producing as

15    part of the mediation any documents produced for the purpose

16    of the mediation, which may be where -- it may or may not be

17    where Anthem got its proposed language for the purpose of the

18    mediation.

19         MR. DiPRIMA:  I'm not sure exactly.  It was similar

20    to the language we used in May.  My concern is that what then

21    gets cloaked in privilege are the types of things that

22    Mr. Laytin is talking about where --

23         THE COURT:  That --

24         MR. DiPRIMA:  -- where someone is able to say, well,

25    one of the many purposes we have at these board meetings --

1           THE COURT:  If, in fact, it says documents for the
2   purpose of mediation as opposed to some more generalized
3   communications about in advance of the mediation, that's
4   easier because if it was prepared for the purpose of the
5   mediation, it pretty clearly at least falls under that
6   category, but that doesn't mean I weigh in on just generalized
7   communications in advance of a mediation between whoever.
8           MR. DiPRIMA:  So things like mediation statement,
9   draft of mediation statement, that seems to be encompassed by
10  Judge Phillips' language, we would have an issue --
11          THE COURT:  So that would mean variations of the
12  mediation statement --
13          MR. DiPRIMA:  Our concern would be --
14          THE COURT:  -- may be covered as opposed to what was
15  actually presented to the mediator as the mediation position
16  statement?
17          MR. DiPRIMA:  The question is how far it extends.
18  We know what we're talking about in terms of --
19          THE COURT:  We're back to Potter Stewart.
20          MR. HAUSFELD:  Your Honor, if I may, as another
21  disinterested party to Mr. Boies.  Your Honor had it perfectly
22  correct an hour ago.
23          THE COURT:  Not quite an hour ago.
24          MR. HAUSFELD:  Listening to the discussion, the
25  first issue up is what is the mediation privilege.  And Your

1   Honor has been very patient in setting forth Your Honor's

2   thoughts about what that mediation privilege is and that Judge

3   Laster is very capable of calling the balls and strikes on

4   that.  And I think everyone here understands exactly what is

5   in your mind and what would be your order with regard to what

6   that mediation privilege is as Mr. Boies said with a

7   capital M.

8           Mediator Judge Phillips likewise when he asked the

9   parties to sign that agreement wanted to make sure that

10  everyone in the room was going to abide by the principle of

11  confidentiality as to what was said and presented in that

12  room.  That was all that was being asked.

13          There's a further issue with that given some of the

14  disclosures in terms of what Anthem relayed to others to those

15  who were not signatories, but that is not an issue encompassed

16  by what is Your Honor's concept of the mediation privilege.

17          And I think Your Honor had it, again, correctly in

18  terms of this issue really is two stages, one that may not

19  necessarily involve the second stage.  And Your Honor has been

20  very focused on the fact that rather than dealing in the

21  abstract, it makes more sense to deal with the concrete.

22          And the first stage would be a determination of

23  whether specific documents are encompassed within Your Honor's

24  concept of guidance on privilege.  Based on the determination

25  of that, it would then be the burden on Cigna if a particular

```
 1   document was ruled under the mediation privilege as to whether

 2   or not they wanted to pursue further production.  They may

 3   not.  So that could be taken up, as counsel for Cigna said, at

 4   a time when you have a record as to which documents are or are

 5   not in dispute.

 6          But the first issue, possibly, as Mr. Boies has

 7   suggested, would be to take a look at these documents in the

 8   complaint, in the proposed amended complaint, and that could

 9   further elucidate Your Honor's principles with regard to the

10   mediation principle as you have enunciated this morning, or

11   this afternoon.

12          THE COURT:  Do you know which exhibit number to the

13   May 3 filing?

14          MR. LAYTIN:  Five.  We disagree with Mr. Hausfeld.

15          MR. DiPRIMA:  Your Honor, if I might just add one

16   point.  Delaware has a rule that articulates all this as to

17   what is covered and not covered by the mediation privilege.

18   And to some degree I think you're sort of seeing some of the

19   difficulties we've had negotiating this.  But there's a

20   starting point for the state court, and I think it comports

21   with exactly what Your Honor is talking about as to what is in

22   and not within the privilege, and I can hand it up, if that

23   would be helpful to the Court.

24          THE COURT:  I would be glad to see that.  Are you

25   talking about page 5 of Exhibit 5 as far as the language,
```

1    Mr. Laytin?

2            MR. LAYTIN:  Unfortunately what I see on page 10 of

3    our brief, which we may have to file a corrected version of,

4    says, In those agreements, talking about the mediation

5    confidentiality agreement with Judge Phillips, the parties

6    agreed that no statement made during the course of the

7    mediation or any materials generated for the purpose of the

8    mediation may be offered in evidence, disseminated, published

9    in any way, or otherwise publicly disclosed, and the cite I

10   have is Exhibit 5, mediation confidentiality agreement.  And

11   it very well may be that it's wrong, and for which we

12   profoundly apologize.

13           THE COURT:  I'm looking at the document.  And it

14   looks like even though it's a multipage document, it is the

15   mediation confidentiality agreement with separate signatures

16   on each page.  So in other words, there's so many people

17   attending the mediation, what a surprise, that they couldn't

18   get their signatures on one page.  Doesn't look like it's a

19   very extensive --

20           MR. LAYTIN:  But it's at the top of that page.

21           THE COURT:  So here's the way it reads.  The parties

22   have agreed to mediate the Blue Cross Blue Shield MDL matter

23   and hereby enter into the following agreement with regard to

24   confidentiality.  Is that what you're --

25           MR. LAYTIN:  Yes, sir.

```
 1              THE COURT:  The parties hereby agree that all
 2    statements of the parties, counsel, and mediators as well as
 3    the materials generated solely for the purposes of the
 4    mediation shall constitute conduct or statements made in
 5    compromised negotiations and shall, therefore, not be
 6    admissible pursuant to Rule 408 of the Federal Rules of
 7    Evidence and shall not be disseminated or published in any
 8    way.  In short, no statement made during the course of the
 9    mediation or any materials generated for the purpose of the
10    mediation may be offered into evidence, disseminated,
11    published in any, or otherwise publicly disclosed.
12              MR. LAYTIN:  Yes, sir.
13              THE COURT:  In the first sentence, it's solely for
14    the purpose of mediation.  In the second, it's for the purpose
15    of mediation.
16              MR. LAYTIN:  Yes, sir.
17              THE COURT:  That's a contractual agreement, not an
18    order, unless my mediation order incorporates it in some way.
19    And I just don't know -- I have to go back and refresh myself
20    on what my mediation order says.
21              Having said that, I think this captures the essence
22    that all of you should be able to take this language and agree
23    to something that is a stipulation.
24              MR. LAYTIN:  We already have agreed to it, so we
25    would agree to it again for the purpose of your stipulation.
```

1          THE COURT:  Hold on.  You have agreed to it but you

2     didn't like "solely," I thought.

3          MR. LAYTIN:  I don't, but --

4          THE COURT:  Well, it's in there.

5          MR. LAYTIN:  Okay.

6          THE COURT:  So you haven't agreed to that?

7          MR. LAYTIN:  Our view is that the law protects

8     mediation privilege consistent with the second, although we

9     have agreed to both, and I don't think there's anything

10    inconsistent about that.

11         In addition -- I had the same thought.  I need to go

12    back and look at Your Honor's order.  But regardless whether

13    there's an order or not, we believe that this Court has an

14    interest in the --

15         THE COURT:  You're preaching to the choir.  I have

16    an interest.

17         MR. LAYTIN:  -- in the small M mediation and not

18    allowing --

19         THE COURT:  No, you're not preaching to the choir

20    because I'm not sure I agree with that.  It's, The parties

21    hereby agree that all statements of the parties, counsel, and

22    mediators as well as the materials generated solely for the

23    purpose of mediation shall constitute conduct or statements

24    made and compromised -- that's Rule 408 language -- and shall,

25    therefore, not be admissible under 408 and shall -- now, this

1   is the key language -- and shall not be disseminated or

2   published in any way.

3        In short -- so this seems like a summary of what we

4   just said -- no statement made during the course of the

5   mediation or any materials generated for the purpose of the

6   mediation may be offered into evidence, disseminated,

7   published in any way, or otherwise publicly disclosed.

8        It seems to me that if a material was generated for

9   the purpose of the mediation, that means it was necessarily

10  used in the mediation or was at least available to counsel

11  during the mediation.  Are you going to prepare something for

12  the purpose of the mediation and leave it in your locker?

13        MR. LAYTIN:  No, but we could do the following.  We

14  could sit down with a bunch of board members and get their

15  reactions to potential rule changes.  That could be

16  memorialized in a document.  That could be further turned into

17  an oral presentation to the lawyers at the mediation, hey,

18  board said this, do this.  But the document itself was

19  produced for the purpose of the mediation.  That's why it was

20  produced.  It doesn't have to be in the room.  I don't believe

21  that that says substance -- form over substance view, in my

22  view.

23        MR. DiPRIMA:  Your Honor, I think that's where

24  things are getting very attenuated.

25        MR. HAUSFELD:  For purposes of a contractual

1    obligation, there has got to be a meeting of the minds, and it

2    was clear when Judge Phillips asked us to sign this.

3           THE COURT:  Well, the meeting of the minds is what

4    the language says.  Let's not go into subjective world here.

5           MR. HAUSFELD:  I wasn't attempting to go into a

6    subjective world.  It was the fact that "solely for the

7    purpose" came first and foremost.  It was to place that bell

8    jar around what happened at the mediation and was used

9    specifically during the mediation.

10          MR. LAYTIN:  The bottom line is because of the way

11    we're put together, there can't be a mediation proposal on

12    behalf of the Blue system without going through -- mediation

13    without it going through the governance because of the way

14    that we are structured.

15          THE COURT:  Let me ask you this.  Rule 174(h) of the

16    Delaware chancery court rules, 174(h)(2), the mediator and any

17    participant in the mediation may not be compelled to testify

18    in any judicial administrative proceeding concerning any

19    matter relating to the mediation.  That's even broader than

20    Judge Phillips' language.

21          MR. LAYTIN:  But consistent with the law.

22    Consistent with the case law on the mediation privilege that

23    we cited to Your Honor.  We believe that is the law.

24          MR. DiPRIMA:  Your Honor, the point of my ante'g

25    that up is there's a rule on the books in Delaware where we

1   are litigating our case that deals precisely with what we are

2   sort of agonizing here.

3             THE COURT:  Two rules that deal with it.

4             MR. DiPRIMA:  Correct.  Correct.  And my point --

5             THE COURT:  512(a) and 174(h).

6             MR. DiPRIMA:  -- let the state court handle its

7   case.  It has rules on the books that deal with these issues.

8   You have an experienced judge who knows how to apply those

9   rules and knows a mediation document when he sees one and a

10  document that is not a mediation document when he doesn't, has

11  an express rule dealing with inferences and when they can be

12  drawn and when they can't.  We, as litigants, are going to

13  operate under the force of those rules, and under the Anti-

14  Injunction Act, it's the policy of federal courts and the

15  federal government to let the state courts operate.  And here,

16  I submit you can.

17            MR. HAMMOND:  Your Honor, our view is I think that's

18  wrong.  I think the mediation is here.  The corpus is in front

19  of this court.  This court should set the parameters for any

20  order that should be followed in Delaware.

21            MR. DiPRIMA:  And, Your Honor, on that, we have

22  committed to this court, and commit again, that if there's an

23  issue that comes up in Delaware where something is going

24  sideways --

25            THE COURT:  Let's take Mr. Laytin's example.   The

board meets and meets with in-house counsel and they say these
are the things that are the pots of gold and what we are
willing to do at the mediation.  Corporate counsel sends a
memo to Mr. Laytin and says this is the direction we have from
the board.  Corporate counsel walks in with that memo and
never discloses it to anyone.  Is that memo prepared in
relation to the mediation?

             MR. DiPRIMA:  I think it would be.

             THE COURT:  Could be or would be?

             MR. DiPRIMA:  I think it would be.  I think if the
board is coming together to give direction to its counsel in a
mediation, we are not entitled to that.  And whether it's
because of attorney/client privilege or mediation privilege,
you're awfully close.  You're talking about giving directions
to your lawyer.

             THE COURT:  Well, then, it seems like materials
generated for the purpose of the mediation would not be -- why
don't we just track the language that's in the mediation
confidentiality agreement is the stipulation?

             MR. DiPRIMA:  Or you can let the Delaware rule
operate.

             THE COURT:  Well, no.  I don't stand as a
disinterested bystander on this issue.  This is my MDL.  This
is my mediation.  And I'm going to make sure that we don't do
anything indirectly that you can't do directly.  The parties

```
 1    have vacillated back and forth between what they're asking me
 2    to do.  And I'm not saying one side has vacillated.  I'm
 3    saying the parties collectively vacillated.  Sometimes you
 4    said give us some guidance.  Sometimes you said let Judge
 5    Laster decide it.  Sometimes you said enter an order.  What is
 6    the best option?
 7              MR. DiPRIMA:  I think --
 8              THE COURT:  I understand your position.  I'm asking
 9    them.
10              MR. LAYTIN:  Our view is entering a stipulation that
11    sets forth the rules of the game with respect to your
12    mediation --
13              THE COURT:  Why shouldn't I hold both of you to what
14    you agreed to me to do, and that is dadgummit, get a
15    stipulation.  And I've just pointed some language to you that
16    could certainly serve the purpose of the stipulation.  And
17    that way I don't have to get involved in a collision sport.
18              MR. LAYTIN:  We will agree to that right now, Your
19    Honor, to that language that Judge Proctor just read.
20              THE COURT:  This language in the stipulation.
21              MR. DiPRIMA:  You read it to me.  I would love to
22    sit down and look at it and talk to my client.
23              THE COURT:  Come up here.
24              MR. BOIES:  While he is doing that, Your Honor --
25              THE COURT:  Please come up here.  You can bring your
```

1    partner with you if you need to.  I will step away so you can

2    whisper, but I want you to look at this.  Because all we are

3    talking about right now is a stipulation.  This is the

4    language in the agreement.  And that is under seal, so I'm

5    letting you see it for your eyes only.

6            MR. BOIES:  Your Honor, I have one piece of

7    information the Court might want to add.

8            THE COURT:  Before you do that, I just want to get

9    his position first.  I'm going to be laser focused on this

10   issue for right now and then we will hear you.

11           MR. DiPRIMA:  Your Honor, I think we're generally

12   okay with that language but with one caveat.  My concern is

13   that the documents we're talking about in Delaware, I would

14   like to know whether they think those documents are covered by

15   that language concerning their special task force, because if

16   the answer is they think they are --

17           THE COURT:  Why isn't that a Judge Laster ruling?

18   You agreed to this language.  Judge Laster takes the

19   stipulation, applies it to the documents, and then you argue

20   why the special task force documents are not covered in this

21   language, they might or might not argue why it is, and Judge

22   Laster makes the call.  That means that my interests are

23   protected because we now have the parties agreeing that they

24   are going to comply with my order.

25           MR. LAYTIN:  Yes, sir, that's what we think is

right.

      MR. DiPRIMA:  Correct, Your Honor, with the caveat.
This is a stipulation.  We are trying to come to a meeting of
the minds with the Blues --

      THE COURT:  That may be too large a task for me
since we have a reception in one hour.  I have given you
almost five months to get a stipulation.  Lord forbid that we
take the time to get a meeting of the minds.

      MR. LAYTIN:  We may not have a meeting of the minds
on how balls and strikes should be called, but at least we
should be able to agree on what the strike zone is.

      THE COURT:  Define the strike zone, and Judge
Laster -- if it's two feet outside and he calls it a strike,
then I don't want anybody coming back and say, Judge, Judge
Laster didn't get it right, or Vice Chancellor Laster didn't
get it right.  That's not my job.  But my job is to make sure
that they are not using my order in an inappropriate way and
that you're not putting them to the Hobson's choice of
complying with my order or else, doing something like getting
an adverse inference or some other sanction in the Delaware
chancery court.  I'm not going to put up with either one of
those things.

      MR. LAYTIN:  We understand, Your Honor.

      THE COURT:  Think you can get a stipulation to me by
tomorrow using this language?

```
1              MR. LAYTIN:  We think that's it.  Yes.

2              MR. DiPRIMA:  We are going to have a disagreement on

3   the adverse inference.  That's covered by --

4              THE COURT:  Well, then I will enter an order, then.

5   You're saying if a document falls within the definition of

6   that and you ask for an adverse inference for failure to

7   produce that document, I should stand by and whistle Dixie?

8              MR. DiPRIMA:  No.  I'm saying we will lose easily on

9   that motion in Delaware and that under --

10             THE COURT:  I'm just telling you don't even try it.

11             MR. DiPRIMA:  We will endeavor to get a stipulation.

12             THE COURT:  But if you are telling me that you're

13  not -- all bets are off on whether you're going to try it.

14  I'm not asking you if you tried it whether you would lose.

15  I'm just saying don't even try it.  And I've told them don't

16  even try to tuck something into this that's not properly

17  there.  Look, I'm being hard on both sides here, because I'm

18  not going to put up with that kind of nonsense.

19             Yes, Mr. Boies?

20             MR. BOIES:  And just in support of that, we looked

21  up the Court's order on mediation, and one of the things the

22  Court orders us to do is to comply with all of the directions

23  from the mediator.  So I think that that incorporates that

24  into your order.

25             THE COURT:  You're contractually and arguably by
```

1  order prohibited from producing documents that fall within

2  that, and I'm just saying that you can't make them go up there

3  and violate my order based upon a request of Vice Chancellor

4  Laster.

5      MR. DiPRIMA:  Not going to.

6      THE COURT:  Whether or not he let you get away with

7  it or not.  Look, I'm not policing him.  I'm policing you and

8  your client.  And there will be an aluminum bat involved.  I'm

9  serious.

10     MR. LAYTIN:  Thank you, Your Honor.

11     MR. BOIES:  There's one thing that has come up that

12 I think actually relates to our litigation and that is this

13 amended complaint that has various documents in it that were

14 produced in Delaware that we apparently don't have.

15     THE COURT:  I'm not following you.  I'm sorry.

16 Maybe I'm too focused on this.

17     MR. BOIES:  It sort of came up today.  As I

18 understand what counsel is saying is that they produced in

19 Delaware documents that we don't have that now, they're

20 claiming, we don't get because they are protected by the

21 mediation privilege.  That is something that we would like

22 Your Honor or whoever Your Honor directs to --

23     THE COURT:  Tell me about that, Mr. Laytin.

24     MR. LAYTIN:  Here is it what I know.  Cigna has

25 sought leave to file an amended complaint.  It's a complaint,

1    so there are documents; it has allegations in it.  The

2    Association and the Blues, Anthem, contend that some small

3    number of allegations in that complaint reflect privileged

4    material.  There is a dispute, and --

5               THE COURT:  And that's part of the clawback

6    documents?

7               MR. LAYTIN:  Yes.  And if Anthem were talking and

8    not me, they would love to rebut Mr. DiPrima on the speed and

9    the size and clawback issue.  I'm sure that he would do a

10   wonderful job if you would give him the opportunity, but here

11   we are.

12              THE COURT:  Well, that's not the play we're

13   watching.

14              MR. LAYTIN:  So the first thing is there is an

15   amended complaint that Cigna seeks leave to file that we

16   believe includes privileged material.  Mr. DiPrima disagrees

17   with that.  That dispute is in front of Vice Chancellor

18   Laster.  That will be resolved.  That's the first thing.

19   There's another thing, but that the first thing.

20              The second thing is in the briefing related to

21   whether Cigna should be able to file the complaint, Cigna has

22   attached to their briefing a whole lot of documents.  Some of

23   those documents are the types of documents that we will have

24   to put through the strike zone one way or another.  I think we

25   all agree with that.  Another set of those documents is

intraCigna communications that reflect conversations that

Anthem and Cigna apparently had during -- in Your Honor's

words, when they were engaged.

Let me be really clear about this, Your Honor.  The

Association does not have access to Anthem's or Cigna's

productions in Anthem against Cigna or Cigna against Anthem,

whatever it is.  We see all this stuff for the first time when

it gets filed.  It would be disastrous for some of those

documents which reflect the Blues' internal views of the

mediation to be allowed to come into the parties' possession

in this Court and we will do whatever it takes to prevent that

from happening.

MR. DiPRIMA:  And, Your Honor, if I could add to

what Mr. Laytin said, during the pendency of the merger before

the litigation started in the Delaware court chancery, Anthem

informed Cigna about the mediation, and so that's part of the

factual record in our case.

MR. LAYTIN:  And that is what it is, and sitting

here today I haven't evaluated that one way or the other.  I'm

sure there was a common interest agreement between the two,

but put that aside.  Whether it was proper, improper to do

that, not my issue.  My issue is that those communications

reflect core views of one side of the mediation.

THE COURT:  How did they get produced?

MR. HAMMOND:  Your Honor --

1             MR. DiPRIMA:  They're our documents.

2             THE COURT:  Wait a minute.  Let me make sure.  Who

3    created the documents?  You're all talking at one time.  It's

4    not helping me.  Cigna created the documents at issue?

5             MR. DiPRIMA:  With respect to the disclosures by

6    Anthem to Cigna about the mediation, those are contemporaneous

7    documents that were in our files reflecting conversations with

8    Anthem.

9             THE COURT:  So that raises this question.  Anthem

10   was not authorized to make that disclosure, right?

11            MR. DiPRIMA:  From the language of that, I would

12   agree with Your Honor.

13            THE COURT:  Does Anthem have the right to waive the

14   mediation privilege that is enjoyed by all the other parties?

15            MR. DiPRIMA:  Well, on this particular score, Your

16   honor, these are facts that are part of a historical gathering

17   in our case, things told to our principals, our executives,

18   and so --

19            THE COURT:  Put that aside.  That's not the issue.

20   The issue is Anthem is not permitted to violate the Court's

21   order or the mediation agreement incorporated into the Court's

22   order perhaps, period.  Right?

23            MR. DiPRIMA:  Correct, Your Honor.

24            THE COURT:  So what happens when a violation by

25   Anthem enures to the detriment of everybody who played by the

```
 1   rules or gives an advantage to those who played by the rules
 2   but would love to see what is in that document?
 3           MR. DiPRIMA:  And here, Your Honor, I think you're
 4   talking about --
 5           THE COURT:  So it may be a waiver in Delaware but
 6   not a waiver here.  I don't know.
 7           MR. DiPRIMA:  Yes, sir.
 8           THE COURT:  I need much more information on that
 9   issue.  I can't decide that issue today.
10           MR. LAYTIN:  At a minimum, Your Honor, the answer to
11   your question, which we both know is that it doesn't waive
12   with respect to anybody else, and I know that Anthem has more
13   to say, period.
14           MR. HAMMOND:  Your Honor, our position on that is,
15   first, there were discussions that were done pursuant to NBEs,
16   common interest agreements that were in place at the time
17   pursuant to the merger and that --
18           THE COURT:  But that didn't give you the right to
19   enter into those agreements.  You signed this, didn't you?  Or
20   not you but your client signed this, through its agent in
21   fact, attorney in fact, right?
22           MR. HAMMOND:  Your Honor --
23           THE COURT:  It's a yes or no question.
24           MR. HAMMOND:  I think the answer is yes.
25           THE COURT:  If I dig into the record, I'm going to
```

```
 1   find one with Anthem's name on it?

 2            MR. HAMMOND:  I believe so, Your Honor.

 3            THE COURT:  So what gives you the right to go

 4   violate my order in that agreement by entering into this side

 5   deal with Cigna that wink-wink, nod-nod, we'll tell you how

 6   it's going?  You guys are creating more problems for me and

 7   everybody else in this case than I can shake a stick at.  It's

 8   unbelievably -- if what I'm understanding happened, I can't

 9   believe you did that.  When I'm saying you, I'm talking about

10   the collective you, your client.

11            MR. HAUSFELD:  Your Honor, that's the problem that

12   we've had.

13            THE COURT:  That doesn't mean you get to take

14   advantage of it.

15            MR. HAUSFELD:  Although I might like to, but --

16            THE COURT:  I don't want to hear it right now.  I'm

17   beyond ticked off right now.  Don't step into this circle.

18            MR. DiPRIMA:  Your Honor, I'm stepping in the

19   circle, but part of our --

20            THE COURT:  Well, you are in the circle.  He's not.

21            MR. DiPRIMA:  Part of our concern was --

22            THE COURT:  There's the circle of trust and then

23   there's the circle of collision.  You are in the circle of

24   collision.

25            MR. DiPRIMA:  Why we are arguing for a restraint on
```

1    that is this is a complex situation, however, and we put in

2    our briefs there has been --

3           THE COURT:  Let me give you some comfort, and this

4    is my response.  This is not a ruling.  But if Anthem screwed

5    itself in your case by doing something stupid like that, then

6    they have to live with whatever Vice Chancellor Laster says

7    about that.

8           I'm dealing with whether or not it gets disclosed

9    for purposes of my case and my litigation.  It was obviously

10   an unauthorized breach of my order, if it happened.  It sounds

11   like it happened.  I didn't give permission for Anthem to

12   produce that to you, your client.  It affects -- there are

13   other people in the world besides Anthem, and their conduct

14   may affect others.  I don't know that they have figured that

15   out all the time yet, at least in this context.  We will take

16   this up some more tomorrow.

17          Here is what I want.  I want both of you to get

18   together a chronology of how this happened and let me hear it

19   tomorrow.  And I will be thinking overnight as to how we are

20   going to deal with this.  There may be an evidentiary hearing

21   involved.  And there may be sanctions involved.  If what I'm

22   hearing is right, not prejudging it, but if your client signed

23   this agreement and then went off and disclosed the material to

24   a third party anyway, really comes to mind.

25          Now, you two don't get too excited.  I'm not sure

1    you're going to get the benefit of it.

2           MR. BOIES:  All I'm trying to do is stay out of the

3    way.

4           THE COURT:  And I notice you steered him out of the

5    way.  Don't get too distraught.  You may not get the detriment

6    of it.  But your client has got some explaining to do.

7    Understand where I'm coming from?

8           MR. HAMMOND:  I understand, Your Honor.  We will

9    prepare the chronology for Your Honor.

10          THE COURT:  Does Judge Phillips know about this?

11          MR. HAMMOND:  I do not know.

12          THE COURT:  I imagine he would be scraped off the

13   ceiling right now if he knew that occurred.  Maybe I will talk

14   to him tonight about it, see if he knows.  Any problem if I do

15   that?

16          MR. BOIES:  Not from us, Your Honor.

17          THE COURT:  Mr. Laytin?

18          MR. LAYTIN:  No, sir.

19          THE COURT:  I'm just trying to get to the bottom of

20   it.  This is a curve ball into what I thought we were dealing

21   with on these issues.  It didn't occur to me.  Maybe it should

22   have with the preface that I got earlier today about the right

23   to have input and/or reject any potential resolution or

24   proposal.  Maybe it should have occurred to me then.  The

25   light bulb did not go on until just now.

```
1              MR. LAYTIN:  Thank you, Your Honor.

2              THE COURT:  With that, everybody enjoy the

3     reception.  I will see you there.  Let me just say this,

4     though.  It figures that as soon as we solve one problem,

5     another one pops up.  I think we've solved the stipulation

6     problem.  I will look for some report from you all tomorrow

7     about your progress, and tomorrow if you don't have a

8     stipulation I will give you a deadline for getting me one.

9              (End of proceedings.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>C E R T I F I C A T I O N</u>

    I hereby certify that the foregoing transcript
in the above-styled cause is true and accurate.

**Leah S. Turner, RMR, CRR**
**Federal Official Court Reporter**