**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| | } | |
| IN RE: BLUE CROSS BLUE SHIELD | } | **Master File No.: 2:13-CV-20000-RDP** |
| ANTITRUST LITIGATION | } | **This document relates to all cases.** |
| (MDL NO.: 2406) | } | |
| | } | |

**MEMORANDUM OPINION**
**SECTION 1 STANDARD OF REVIEW AND SINGLE ENTITY DEFENSE**

I. **Introduction**

As the Supreme Court has observed, "the 'central evil addressed by Sherman Act § 1' is the 'elimin[ation of] competition that would otherwise exist.'" *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (quoting Areeda & Hovenkamp ¶ 1462b, at 193-194).

Currently before the court are (1) the parties' respective motions for partial summary judgment on the standard of review applicable to Plaintiffs' claims under Section 1 of the Sherman Act, 15 U.S.C. § 1 (Docs. # 1348, 1350, 1353), and (2) Subscriber Plaintiffs' motion for partial summary judgment on Defendants' "single entity" defense. (Doc. # 1434).[1] The motions have been fully briefed. (Docs. # 1431, 1432, 1435, 1551, 1552, and 1554). And, the parties have conducted discovery that the court found necessary before deciding the appropriate standard of review for the Sherman Act claims. *See In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1186-87 (N.D. Ala. 2014). *See also Nat'l Bancard Corp. v. VISA U.S.A., Inc.*, 779 F.2d 592, 596 (11th Cir. 1986).

---

[1] Defendants address their single entity defense within their "omnibus" Brief in Support of Defendants' Motion for Summary Judgment on Plaintiffs' Section 1, Per Se, and Quick Look Claims. (Doc. # 1353-1 at 28-32).

## II.     Relevant Undisputed Facts

The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Admr. U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). Some familiarity with the Blue Cross and Blue Shield organizations is presumed.

### A.     The History of Blue Cross and Blue Shield Organization

Nearly one hundred years ago, Justice Holmes reminded us that a "page of history is worth volumes of logic." *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921). In order to properly assess Plaintiffs' claims and Defendants' arguments, the court begins with a discussion of the history of the Blue Cross and Blue Shield organization and the trademarks (the "Blue Marks").[2]

During the Great Depression, the majority of the population was medically underserved because most people simply could not afford hospital and medical care. (Docs. # 1349 at 11; 1431 at 14; 1435 at 10, n. 4).[3] In response, local hospitals and medical societies developed prepaid plans to serve Americans' healthcare needs in local areas. (Docs. # 1349 at 11; 1431 at 14; 1435 at 10). On occasion, a subscriber prepaid at one hospital but desired services from a

---

[2] As will be explained more fully below, the Blue Cross and Blue Shield trademarks play a central role in the business strategy employed by the Defendants in this case. For example, defending the strength of the Blue Marks is ostensibly the justification for many of the alleged restraints challenged by Plaintiffs.

[3] Due to (1) the volume of exhibits filed in support of the parties' respective motions for partial summary judgment, and (2) the parties' inability to cite to CM/ECF page numbers because of the volume of sealed exhibits in this case, in some instances, the court has relied on the parties' respective responses to an opponent's asserted undisputed facts in compiling the relevant undisputed facts referenced in this opinion. That is, where appropriate, if a party has not disputed an asserted undisputed fact, the court has relied on that failure to dispute the asserted undisputed fact as establishing that fact as undisputed for purposes of the instant motions.

different hospital at the time of illness. To remedy this problem, multi-hospital plans became the norm. (Docs. # 1349 at 11; 1431 at 15; 1435 at 11).

By 1939, the American Hospital Association ("AHA") issued "Standards for Non-Profit Hospital Service Plans." (Doc. # 1350-13). Under these standards, approval by the AHA's Commission on Hospital Service gave a Plan "permission to identify the plan by using the seal of the American Hospital Association superimposed upon a blue cross." (Docs. # 1350-13 at 5-6; Doc. # 1353-19 at 6). The approval program for Blue Cross Plans was controlled by the Blue Cross Commission. (Doc. # 1353-5 at 11-12). The AHA standards discouraged the establishment of new Plans where the community was already being "adequately served by existing Blue Cross Plans." (Doc. # 1353-5 at 14). The Blue Cross Commission promoted one Plan per service area to reduce administrative costs through economies of scale, as well as to reduce health care costs by obtaining participation of hospitals on more favorable terms to the Plans. (Doc. # 1431-29 at 13-15).

The American Medical Association ("AMA") also approved the concept of prepayment plans, and promulgated approval standards for such plans. (Docs. # 1349 at 12; 1431 at 15; 1435 at 13). The AMA set up the Associated Medical Care Plans ("AMCP") "to administer the approval program" for Blue Shield Plans. (Doc. # 1353-7 at 84-85). Medical care plans that met the AMA/AMCP's standards likewise could use a blue shield emblazoned with a caduceus. (Docs. # 1353-20 at 16; 1431 at 15; 1435 at 13).

The taxation of excess profits and the freezing of wage rates during World War II stimulated employer participation in paying the cost of hospitalization and other medical protection for employees. This change enabled employers to give a small wage increase to their employees at very little net cost to themselves by paying part or all of the cost of group health

insurance. (Doc. # 1353-4 at 76). After the war, the Taft-Hartley Act established health benefits as a condition of employment (Doc. # 1353-7 at 93), and the National Labor Relations Board ruled that health insurance was "a mandatory subject of collective bargaining." *Cross, W.W., & Co.*, 77 N.L.R.B. 1162 (1948).

In 1947, in an effort to better compete with commercial insurance companies for employer-sponsored plans, Plans started experimenting with syndicates. (Doc. # 1353-7 at 94). Under these arrangements, a Plan in a state where a company's home office was located negotiated benefits at a certain price. (*Id.*). Plans in other regions or states where the company had operations were given the details of the arrangement, and those Plans could choose to participate in the arrangement. (*Id.*). The "Home" Plan guaranteed full delivery to the company and accepted all or part of the underwriting risk, depending on the cooperating Plans' agreed participation. (*Id.*). "Within five years, some 250 syndicates were providing coverage to about 1.2 million people." (Doc. # 1353-7 at 94). By working together, Plans were able to service national accounts, including the Federal Employees Health Benefit Program. (Doc. # 1353-1 at 16; 1431 at 18; 1435 at 17).

In 1972, the AHA transferred ownership of the Blue Cross Marks to the Blue Cross Association. (Doc. # 1349-1 at 32). On a separate track, the AMA-sponsored AMCP changed its name to the Blue Shield Medical Care Plans, then it became the National Association of Blue Shield Plans, and then later the Blue Shield Association. (Doc. # 1349-1 at 32-33).

At some point in the 1970s, the Blue Cross and Blue Shield Associations concluded that the Blue System needed cohesive national unity, which they believed could be achieved by working together. (Doc. # 1353-55 at 2). The staffs of the two associations began to consolidate in 1977 or 1978 (Doc. # 1349-1 at 33), but the associations did not legally merge until 1981 or

1982. (*Id.*). The associations merged in order to reduce duplication, increase efficiency, reduce administrative costs, enjoy economies of scale, and achieve greater coherence in the Blue Cross and Blue Shield system. (Doc. # 1353-10 at 80). At that time, the Blue Cross and Blue Shield names and Marks were brought under the control of one organization, the Blue Cross and Blue Shield Association ("the Association"), which was governed by its Member Plans. (Doc. # 1352-43 at 3).

By the early 1980s, the Blue System was suffering from declining reserves, increasing financial instability, decreasing customer satisfaction, and declining business volume. (Doc. # 1349-7 at 9-24). According to the 1982 Long-Term Business Strategy, the Blue Plans viewed "collective strength" as their "only real defense" against business declines. (Doc. # 1349-7 at 23-24).

**B.      History of the Blue Cross and Blue Shield Marks**

In 1934, the St. Paul hospital Plan began using a blue cross symbol. (Docs. # 1349 at 11; 1431 at 15; 1435 at 11). The first use of the Blue Shield Service Mark was by the Western New York Plan, located in Buffalo, New York, in 1939. (Doc. # 1350-35 at 2). Other Plans began using these same symbols as well. (*Id.*; Docs. # 1349 at 11; 1431 at 15; 1435 at 12).

Both the St. Paul and Buffalo Plans acquiesced in, and even encouraged, other Plans to use the Cross and Shield Marks during this time period. (Docs. # 1349 at 11; 1431 at 15; 1435 at 12). The St. Paul Plan allowed Plans in every bordering state (North Dakota, South Dakota, Wisconsin, and Iowa) to use the Blue Cross Marks. (Doc. # 1353-4 at 29-30). The Buffalo Plan

allowed Plans in Syracuse and Rochester (locations close to Buffalo) as well as other Plans in New York to use the Blue Shield Mark. (Doc. # 1353-5 at 38).[4]

Between 1939 and 1947, the Shield Mark was used by various organizations for intrastate non-profit prepaid medical plans. (*Id.*). In 1946, the Commission of Associated Medical Care Plans was formed by certain medical plans. (Doc. # 1350-35 at 2). The Blue Shield Medical Care Plans is the successor to AMCP. (Doc. # 1432 at 15). On December 13, 1947, the Blue Shield Medical Care Plans (the "National Organization") formally adopted the Shield Mark as the official service mark for the Organization. (Docs. # 1350-35 at 2; 1353-48). Thereafter, in 1950, Blue Shield Medical Care Plans applied for federal registration of the Blue Shield Marks. (Docs. # 1353-46; Doc. # 1353-48). The Blue Shield Medical Plans had permission from the first user, the Buffalo Plan, to apply for registration. (Docs. # 1353-101; 1436-11 at 135-40). After the application for federal registration, on December 1, 1952, the users of the Shield Mark entered into an Agreement (the "1952 Agreement") relating to the Collective Service Mark "Blue Shield." (*Id.*; Doc. # 1352-227 at 24). Although the Plans "recogni[zed] that the words 'Blue Shield' and the identifying symbol *are* the property of the National Organization," the 1952 Agreement is silent as to the assignment of any rights in the Shield Mark to the National Organization. (Doc. # 1353-48 at 3) (emphasis added). It is also silent as to the creation and/or existence of any exclusive service areas. (*Id.*). Under the 1952 Agreement, the Blue Shield Plans were granted "permission" to use the Blue Shield Marks in interstate and foreign commerce. (*Id.*).

---

[4] The February 20, 1987 Draft of the White Paper on the Blue Cross and Blue Shield Assembly of Plans recognized that unlicensed and unauthorized use of trademarks can result in abandonment. (Doc. # 1352-227 at 55-56).

Previously, in 1947 and 1948, the AHA applied for and received federal registrations for the Blue Cross Marks, stating that it had adopted and was using the Marks. (Docs. # 1350-40, 1530-41, and 1530-42). However, at that time, the AHA did not have an assignment from the first user, the St. Paul Plan, and did not receive a formal assignment of the rights to the Blue Cross Mark until 1954. (Doc. # 1436-11 at 56-57). After registering the Blue Cross Mark, the AHA had existing Plans sign License Agreements. (Doc. # 1353-11 at 7-8).[5] The License Agreements for four Plans -- Connecticut, Minnesota, Wisconsin, and Rockford, Illinois -- were subject to exceptions. (Docs. # 1353-11 at 8; 1353-101). Those Plans retained the right to their state registrations of the Blue Cross name and Mark. (*Id.*).

Hospital Service Corporation of Alabama, the predecessor to Blue Cross Blue Shield of Alabama, first used the Blue Cross Mark in 1939. (Doc. # 1431-91 at 98). It first used the Blue Shield Mark in 1947. (*Id.*).

## C.     The Structure of Blue Cross and Blue Shield Organization

At present, the Blue Plans are 36 independent companies and each company sells health insurance. (Docs. # 1351 at 10; 1432 at 17). The Blue Cross and Blue Shield Association itself does not underwrite any insurance policies. (Docs. # 1351 at 11; 1432 at 17; 1556 at 9). The governance structure of the Association is set out in its bylaws, which were approved by a vote of the Member Plans. (Docs. # 1351 at 11; 1432 at 17; 1556 at 9; 1532-6). The Plans are governing members of the Association. (Docs. # 1352-39 at 46-47; 1352-6 at 12-14). The Plans may amend or repeal the bylaws and adopt new bylaws. (*Id.*). Each Member Plan has also agreed to be bound by the Association Rules. (Docs. # 1350 at 12; 1432 at 11).

---

[5] There was not a Plan in every state at this time. (Docs. # 1429-11 at 4-5; 1429-14). For example, there were no Plans in Alaska, Nevada, and Vermont. (*Id.*).

The Association's bylaws recognize that each of its Member Plans is autonomous in its operations. (Docs. # 1351 at 10; 1432 at 17; 1556 at 9; 1532-6). The Plans are financially independent entities. (Docs. # 1556 at 9; 1352-6 at 7). The Blue Cross and Blue Shield License Agreements provide, "Nothing herein contained shall be construed to constitute the parties hereto as partners or joint venturers . . . ." (Doc. # 1350-4 at 6).

The Association is led by a Chief Executive Officer and President who, together with an executive team, are responsible for the day-to-day operations of the Association. (Docs. # 1352-39 at 46-47; 1352-6). The Association's Board of Directors is comprised of the CEO of each of the Member Plans plus the CEO of the Association. (Docs. # 1432 at 18; 1352-6). By majority vote, the Association Board of Directors elects the President of the Association on an annual basis. (*Id*.). The Association Board may also remove the President of the Association by majority vote. (*Id*.). The Blue Plan CEOs have fiduciary responsibilities to both their individual Plan and the Association. (Docs. # 1352-41 at 29-30; 1436-75 at 29).

The Membership Standards of the Association are adopted and amended by an affirmative vote of three-fourths of Plans and an affirmative vote of three-fourths of the total then current weighted vote of all Plans (a "double-three-quarters" vote). (Docs. # 1432 at 11, 19; 1352-127 at 11). The Member Plans may also amend the Association bylaws (*id.*), and the Association's Rules can be eliminated, by a double-three-quarters vote of the Plans. (Doc. # 1432 at 22).

In 1972, the AHA transferred ownership of the Blue Cross Marks to the Blue Cross Association. (Docs. # 1353-57 at 2; 1432 at 15-16). Blue Cross Plans then signed a license agreement with the Blue Cross Association. (Doc. # 1353-11 at 8). Those 1972 license agreements provided:

The rights hereby granted are exclusive to Plan within the geographical area served by the Plan on the effective date of this License Agreement, except that BCA itself reserves the right to use the Licensed Marks and Licensed Name in said area, and except to the extent that said area may overlap the area or areas served by one or more other licensed Blue Cross Plans on the effective date of this License Agreement, as to which overlapping areas the rights hereby granted are non-exclusive as to such other Plan or Plans only.

(Doc. # 1353-100 at 2).

In 1982, the Blue Shield Association (the successor to Blue Shield Medical Care Plans) and the Blue Cross Association merged into the Blue Cross and Blue Shield Association. (Doc. # 1432 at 16). As a result of the merger, the Association now owns the Blue Cross and Blue Shield names and Marks (the "Blue Marks"), and it in turn grants licenses to the Member Plans to use the Blue Marks. (Doc. # 1352-41 at 7).

Today, each Plan has signed a License Agreement with the Association. (Docs. # 1352-49 through 1352-128). Each of these License Agreements identifies an exclusive "service area" where a Member Plan may use the Blue Marks. (Docs. # 1352-49 through 1352-128; 1432 at 11, 19-20). The Association has a "Map Book" which memorializes the Plans' defined service areas. (Docs. # 1432 at 20; 1352-164 at 52-53, 241-46, 270). Under the License Agreements, subject to certain exceptions related to National Accounts and Government Programs, the Plans agreed that a "Plan may not use the Licensed Marks and Name outside the Service Area … ." (Docs. # 1432 at 11, 20; 1352-127; 1352-49 through 1352-128).

Under the License Agreements, the Association may impose monetary fines on a Plan that uses the Blue Marks outside its service area. (Docs. # 1351 at 19; 1432 at 21). After thirty days' written notice and an opportunity to be heard, on a double-three-quarters vote, a Plan's License Agreement may be terminated for continued use of the Marks outside the Plan's service

area. (*Id*.). The License Agreements themselves can be modified or terminated by a "double-three-quarters" vote of the Plans. (Docs. # 1352-49 through 1352-128).

Also under the License Agreements, the Association's rules, or both, a Plan generally may not develop a provider network or contract with a healthcare provider outside its service area for services to be provided under the Blue Marks. (Docs. # 1350 at 12; 1432 at 11). However, a Plan may contract with a healthcare provider in a county contiguous to the Plan's service area under certain defined conditions and for limited purposes. (*Id.*). A Plan may also contract with certain types of providers nationwide, such as laboratories, durable medical equipment providers, and specialty pharmacies, but medical professionals, hospitals, and outpatient facilities are not among these types. (*Id.*).

D.      **History of Service Areas**

There have been efforts to enforce exclusivity of the Plans' service areas, but some competition between Plans has been a fact of life from the earliest days of the Blues' organization. (Doc. # 1353-4 at 50).

Since in the 1940s, the service areas of each Plan have been recorded, initially in three-ring binders called service manuals. (Doc. # 1352-164 at 52-53, 241-46, 270). The three-ring service manuals have been replaced by Map Books. (*Id.*). The 1976 version of the Map Book, for example, notes that the area served by the Blue Shield Plan in Alabama was the entire state of Alabama. (Doc. # 1433-7 at 2). These Map Books are not public record. They are considered by the Association to be "highly sensitive," are not distributed to the Plans, and are distributed only to a limited number of employees. (Doc. # 1553-3 at 2).

The majority of the Plans' service areas are exclusive, *i.e.*, they do not overlap with another Plan's service area. (Doc. # 1432 at 11). In some cases, however, Blue Plans have overlapping service areas. For example, the following overlaps exist:

- Anthem Blue Cross offers Commercial Health Insurance Coverage across California, in the same geographic region as Blue Shield of California. (Docs. # 1436-79 at 8; 1436-81 at 11).

- Regence BlueShield of Idaho and Blue Cross of Idaho both offer Blue branded Commercial Health Insurance Coverage in Idaho. (Docs. # 1436-79 at 8; 1436-81 at 11)

- WellPoint, Inc. (Empire Blue Cross) offers Commercial Health Insurance Coverage in eight counties in upstate New York, where Blue Shield of Western New York (whose parent company is HealthNow) also offers coverage. Lifetime HealthCare, Inc. was also an overlapping Plan in New York. (Docs. # 1436-79 at 8; 1436-81 at 11).[6]

- In Pennsylvania, Highmark BCBS, Capital Blue Cross, Blue Cross of NE Pennsylvania, and Independence Blue Cross are overlapping Plans. (Docs. # 1436-80 at 7; 1436-81 at 11).[7]

- Three Cambia Plans (Regence BlueShield (in Washington), Regence BlueCross BlueShield of Oregon, and Regence BlueShield of Idaho) offer Blue branded Commercial Health Insurance Coverage in all but seven counties of Washington (Ferry, Stevens, Pend Oreille, Spokane, Lincoln, Adams, and Douglas) and Premera offers Commercial Health Insurance (under Blue Cross and/or Blue Shield licenses) in overlapping Washington counties. (Docs. # 1436-79 at 8; 1436-81 at 11).

There have been other instances of overlapping service areas for the Blue Cross Mark (at least for some periods of time) in Illinois, Kentucky, Maryland, New York, North Carolina, Ohio, and Virginia. (Docs. # 1350-27 & 1350-28). There have been other instances of

---

[6] In a letter dated January 16, 2001, Thomas Hartnett, President and CEO of Blue Cross and Blue Shield of Western New York, acknowledged that there had been overlapping service areas for sixty (60) years. (Doc. # 1436-77 at 4). In fact, he expressed the opinion that the Blue brands "are strengthened in overlapping service areas where two Plans are able to compete freely" and they "have done so for many years." (*Id.*).

[7] Whereas Highmark has apparently espoused the idea of a single Blue Plan in Pennsylvania, Capital BlueCross's President and CEO has indicated he has seen an "increase in Blue business overall" in its own overlapping service area. (Doc. # 1436-63 at 2).

overlapping service areas for the Blue Shield Mark (again, at least for some periods of time) in Illinois, Ohio, and Wisconsin. (Docs. # 1350-27 & 1350-28). Currently, in California, Idaho, and Pennsylvania, different Plans have the right to use different Marks, one the Cross and the other the Shield. In Washington, Plans have licenses to use different Marks, except in one county where two Plans have licenses to use the Shield Mark. In New York, there are fourteen counties with multiple licensees, but in half of those counties, the rights are to different Marks. In Georgia and Ohio, one Plan has a statewide license to use the Blue Marks, and another has a license in a small number of counties. (Doc. # 1432 at 12-13).

In September 1985, Community Mutual Insurance Company ("CMIC") began marketing and selling health insurance under the Blue Cross and Blue Shield Marks in Ohio. (Doc. # 1429-9 at 21). The Association filed a Complaint against CMIC seeking to enjoin CMIC's marketing and sales outside of its exclusive service area ("ESA"). (*Id.*). Although a temporary restraining order was issued, after an evidentiary hearing, the Association's request for a preliminary injunction against CMIC was denied. (*Id.*). The Ohio Attorney General intervened in the lawsuit and asserted a counterclaim alleging that the Association's system of allocating ESAs violated antitrust laws. (*Id.*). The Association agreed to dismiss its claims against CMIC if the counterclaim against it was dismissed. (*Id.*). As a condition of that settlement, the Association agreed, for a period of time, not to pursue litigation seeking to enforce the ESAs against any of the Ohio Plans. (Doc. # 1429-9 at 22).

In the 1980s, the Attorney General of Maryland also sued the Association, alleging that its use of ESAs violated federal and state antitrust laws. (Doc. # 1350-21 at 2). The Association agreed to a settlement that allowed two Plans to compete using the Blue Marks throughout the

State of Maryland until "completion of the Assembly of Blue Cross and Blue Shield Plans" or January 1, 1991, whichever was later. (Doc. # 1350-21 at 6).

Prior to January 1988, West Virginia had two Blue Plans which were licensed in mutually exclusive service areas in West Virginia. (Doc. # 1551 at 12). These Plans violated the terms of their License Agreements by competing in each other's service areas. (*Id*.) Neither Plan objected to the competition. (Doc. # 1431-4 at 2). Nevertheless, the Association considered various options to address the situation, including a merger between the Plans. (Doc. # 1431-4 at 2).

CEOs of the various Blues have had occasion to address ESAs. For example, a summary of conversations with four Blue CEOs in 1986 recognized that "[t]he major advantage of an exclusive franchise area was seen in the lessening of competition as well as the opportunity to discuss plans and proposals with companies in the same industry knowing that those ideas would not be used against you." (Doc. # 1436-12). And in interviews conducted by the Association in which questions about ESAs were asked, Plan CEOs stated that ESAs create "[l]arger market share because other Blues stay out and do not fragment the market" (Doc. # 1350-22 at 3), and allow for aggressive bargaining. (Doc. # 1350-23 at 3). "In turn, national accounts enjoy local discounts." (*Id.*). One CEO reported that "Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans" and that without service areas, "there would be open warfare." (Doc. # 1350-24 at 2).

The discovery to this point in the case, while broad, has focused particularly on Alabama. As of 2016, nine Plans, other than Blue Cross and Blue Shield of Alabama ("BCBSA"), had at least 10,000 members who resided in Alabama: Anthem (150,912); HCSC (97,497); Highmark (45,234); BlueCross BlueShield of Tennessee (37,111); Blue Cross Blue Shield of Michigan

13

(29,579); USAble Mutual Insurance Company (Arkansas) (22,705); BCBSM (Minnesota) (16,834); Horizon Healthcare Services (New Jersey) (11,357); and Blue Cross and Blue Shield of North Carolina (10,192). In total, these Plans had in excess of 400,000 members residing in Alabama. (Docs. # 1350 at 17-18; 1432 at 17).

### E. History of Blue Rules

Over the past three decades, the Blue Plans and the Association have adopted several strategies and Association rules that are relevant to the Sherman Act claims at issue in this MDL. The court discusses certain of these strategies below.

### i. 1982 Long-Term Business Strategy

At the Association's 1982 annual meeting, a "Long-Term Business Strategy" was presented to the Plans. (Docs. # 1350-15 at 3; 1352-164 at 80-84). In his presentation at the meeting, the Chairman of the Joint Executive Committee, who was appointed to work on an integrated business strategy, reported that "he would try to persuade members that they could not sustain the status quo and that fundamental change is the only realistic option." (Doc. # 1350-15 at 3). The Plans adopted several recommendations contained in the Long-Term Business Strategy, including requiring consolidation and allowing only one Plan per state. (Docs. # 1350-15 at 3; 1352-164 at 80-84). Proposition 1.1 of the Strategy was approved in November 1984 and provided that "[a]ll Plans to be joint Blue Cross and Blue Shield Plans, except when needs dictate otherwise, by the end of 1985." (Docs. # 1350-15 at 3; 1350-18 at 3; 1352-164 at 80-84). Proposition 1.2 of the Strategy, which was also adopted, stated that there should be "[o]nly one Plan per State, except when the Association Board of Directors agrees that business needs dictate otherwise, by the end of 1985." (*Id.*).

### ii.      1985 Assembly of Plans

The Assembly of Plans sought to examine and redefine the relationship among the various Plans as well as between the Plans and the Association. (Doc. # 1349-10 at 11-12). In 1990, the Assembly of Plans made recommendations to the Blue Plans regarding Service Marks and ESAs. (Doc. # 1349-8 at 3). Those recommendations included the proposal that the Blue Cross License Agreements and the Blue Shield License Agreements be revised to be essentially identical. (*Id.*). The proposal would involve supplementation of the Blue Cross License Agreement. (Doc. # 1349-8 at 31). But the Blue Shield Agreement was to be essentially replaced with the Blue Cross Agreement, rather than supplemented, as the earlier Shield version "was prepared at a stage when licensing was in its infancy." (Docs. # 1349-8 at 31-32; 1353-48).

The revised 1991 Blue Cross License Agreements resulting from the Assembly of Plans contain the following provision regarding service areas:

> The rights hereby granted are exclusive to Plan within the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been so granted a subsequent license, which is hereby defined as the "Service Area," except that BCBSA reserves the right to use the Licensed Marks and Licensed Name in said Service Area, and except to the extent that said Service Area may overlap the area or areas served by one or more other licensed Blue Cross Plans as of said date or subsequent license, as to which overlapping areas the rights hereby granted are nonexclusive as to such other Plan or Plans only.

(Docs. # 1349-8 at 7, 1349-11 at 5). The new Blue Shield License Agreement resulting from the Assembly of Plans contains a virtually identical provision. (Doc. # 1349-8 at 54).

After the advent of the LTBS and AOP, the number of Blue Plans decreased from 114 in 1980, to 77 in 1990, and stands at 36 today. (Doc. # 1350-19 at 3).

### iii.      The Development of the BlueCard Program

In 1992, the BlueCard program was developed to, at least in part, address inefficiencies in the cooperative methods employed by the Blue Plans, including the lack of a uniform process,

dissatisfaction of providers with their receivables, and customer confusion. (Docs. # 1348-6 at 20-21; 1353-53 at 156-68). Under BlueCard, Plans were required to make their local provider discounts available to all Blue Members, even if they lived in another Plan's service area. (Doc. # 1352-44 at 56).

In 1995, Member Plans adopted a license standard requiring all Plans to participate in BlueCard. (Doc. # 1352-44 at 56). Following the adoption of BlueCard, Blue enrollment ceased declining and started increasing. (Doc. # 1353-68 at 12). BlueCard allowed the Blue Plans to provide subscribers a single point of contact like insureds enjoyed with the national insurers. (Doc. # 1353-61 at 2). BlueCard was another avenue that allowed the Plans to offer nationwide coverage. (Doc. # 1431-66 at 226-27).

Through the BlueCard program, the Plans have agreed that when a contracted provider treats a patient covered by a Home Plan, *i.e.*, a Plan outside the service area in which the provider is located, the Home Plan will reimburse the provider at a rate which equals (at a minimum) the levels received for providers under the provider's contract with its Host Plan, *i.e.*, the local Plan. (Docs. 1350 at 13; 1432 at 11). That is, "[i]n all cases, the [Host Plan] must pass the full amount of the discount/differential received from the provider to the [Home Plan]." (Doc. # 1433-1 at 3). Under BlueCard Rules, an access fee may be charged in connection with processing BlueCard claims, but that fee can be, and is frequently, negotiated or waived. (Docs. # 1433-1 at 8; 1433-12 at 5).

BlueCard is not a "product" which is sold on its own. (Doc. # 1556 at 12). A customer cannot buy access to the BlueCard network without buying a health product. (*Id.*). Further, participation in the BlueCard program is a requirement of the License Agreement between the Association and each individual Plan. (Doc. # 1432 at 12). However, under the Association

Rules, a Plan could create a provider network that is not made available to BlueCard-eligible Members or Subscribers. (*Id.*).

There is specific evidence in the Rule 56 record about BlueCard's effect in Alabama. In the 1980s, prior to the adoption of the BlueCard program, BCBS-AL contracted with twenty-nine providers in counties contiguous to Alabama. (Doc. # 1350-33 at 3-5). At some point, BCBS-AL stopped directly contracting with those providers. (*Id.*). The cessation of direct contracting provided savings for customers for the snapshot in time which was examined. (*Id.*).

### iv.    1993 License Agreement Standard 11

In 1993, License Agreement Standard 11 was adopted by a double-three-quarters vote. (Docs. # 1351 at 20; 1352-183 at 46; 1432 at 22). Standard 11 is titled "Transactions Which May Impair the Value of the Marks and Name." (Doc. # 1352-183 at 44). That Standard provides that "[n]either a Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a Plan or a Licensed Controlled Affiliate thereof to obtain control of the Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." (*Id.*). Standard 11 also sets forth certain requirements a Blue Plan must meet to transfer its license to a non-Blue entity. (Docs. # 1351 at 20; 1352-183 at 46; 1432 at 22). When Standard 11 applies, Blue rules provide that a Plan's license may be terminated if the requirements of the Standard are not met. (*Id.*).

### v.    1994 Local Best Efforts

In 1994, the Association and the Plans adopted the Local Best Efforts Rule. (Docs. # 1349-15 at 20-21; 1349-16 at 7). Under the Local Best Efforts Rule, at least eighty percent of a

Plan's annual health[8] revenue from within its designated service area must be derived from services offered under the Blue Marks. (*Id.*).

### vi.     1996 Acquisition Rules

In 1996, the Association and the Plans adopted acquisition rules to restrict the circumstances under which an adverse party could acquire a Plan. (Docs. # 1349-17 at 17; 1349-18 at 4). These rules prevent a Plan from transferring its license to a non-Blue entity without meeting certain standards. (Doc. # 1349-16 at 16-18).

### vii.     1999 Uncoupling Regulations

In 1999, the Association and the Plans adopted Uncoupling Regulations. (Doc. # 1352-1 at 91). Under these Regulations, a Plan may choose to use a name in connection with the Blue Marks; however, if it does so, it may not thereafter "uncouple" that name from the Blue Marks. (*Id.*). For example, a Plan may call itself Acme Blue Cross and Blue Shield, but it may not later use the trade name Acme Health Insurance – it must keep the "Blue" in the trade name. (*Id.*).

### viii.     2005 National Best Efforts

In 2005, a National Best Efforts rule was adopted. (Doc. # 1349-21 at 5). This rule requires a Plan to derive at least sixty-six and two-thirds percent of its national health insurance revenue under its Blue brands. (Doc. # 1349-16 at 7). Thus, under the National Best Efforts rule, any health revenue a Blue Plan may generate from services offered under any non-Blue brand is limited in relation to its Blue brand health revenue. (Doc. # 1432 at 20-21). Nonetheless, many Plans have had significant unbranded business. (Docs. # 1349-23 at 5; 1349-25 at 5-6).

---

[8] The Local Best Efforts Rule applies only to health revenue "attributable to health care plans and related services and hospital services . . . offered within the designated Service Area." (Doc. # 1350-10 at 4).

### ix. National Accounts

Under the License Agreements, the Association's rules, or both, a Plan may not bid on a National Account headquartered outside its service area using the Blue Marks unless the Plan in whose service area the National Account is headquartered agrees to "cede" the right to bid. (Docs. # 1350 at 11; 1432 at 11). In the limited instances of overlapping service areas, more than one Plan may bid for the business of a National Account. (*Id.*). Plans, including Blue Cross and Blue Shield of Alabama, have requested cedes from each other. (Docs. # 1350 at 11; 1432 at 12). Some of these requests have been granted and some have been denied. (*Id.*). On occasion, a Blue Plan will pay another Plan to cede the right to bid for a national account. (Docs. # 1431-1 at 28; 1551 at 12). Blue Cross and Blue Shield of Alabama has done so multiple times. (*Id.*).

Through collaboration, Plans compete with national insurers for national accounts. (Doc. # 1353-60 at 2). In 2011, the Blue share of the national account market was estimated at forty-six percent. (*Id.*). The top three national insurers -- Aetna, Cigna and United -- which offer healthcare financing plans and/or health insurance and related services in all fifty states (Docs. # 1350 at 18; 1432 at 17), had a combined share of forty-one percent.[9] (Doc. # 1353-60 at 2). Plans also compete with regional insurers. (Doc. # 1353-102 at 54).

### F. Present Day Blue Plans

In 2015, fifteen of the Blue Plans were within the top twenty-five insurers in the United States as measured by total membership. (Docs. # 1350 at 18; 1432 at 17). Anthem was the second largest insurer in the country by membership and held Blue Cross and/or Blue Shield licenses in fourteen different states. (*Id.*). HCSC was the fourth or fifth largest insurer in the country by membership and held Blue Cross and Blue Shield licenses in five states. (*Id.*). Other

---

[9] Unlike the Blue Plans, who are dedicated to their local markets, the national insurers have demonstrated a willingness to pull out of markets and leave populations uninsured. (Doc. # 1353-102 at 56).

Blue Plans are among the top ten insurers by membership. (*Id.*). Blue Cross and Blue Shield of Alabama is the largest insurer in Alabama, and the sixteenth largest insurer in the nation by membership. (*Id.*).

One of BCBS-AL's corporate representatives, Tony Carter, testified that he defined BCBS-AL's competitors as follows: "in the broadest of sense, a competitor is anybody that sells a similar product." (Doc. # 1352-211 at 14, 44). When speaking about Anthem's proposed merger with Cigna, and in relation to the prospect of competing for national accounts outside of its fourteen-Blue service area, a representative of Anthem testified as follows:

> [O]ur current market is confined to the 14 states. We have the Blue Cross/Blue Shield license, and we have any number of customers and consultants that express an interest in working with us, and we're prohibited from doing that. To be able to go from – I know we're a national plan. We're a national plan that operates in 14 states. To be an [sic] national plan that operates in 50 states and have unfettered access, without asking permission to have a conversation with a prospect, would be – I don't know – exhilarating, I would say.

(Doc. # 945-1 at 3).

Nationwide, 96 percent of hospitals and 92 percent of physicians are in-network with the Blue Plans. (Docs. # 1353-82 at 6; 1435 at 27). Some subscribers have chosen to contract with the Blues and have favorable comments about the experience (Docs. # 1353-85 at 76-77; 1353-73 at 83), while others have complaints (Docs. # 1431-77 at 182-83; 1431-83 at 97, 258-59). Still others have expressed an interest in additional options and/or more competition for their health insurance needs. (Docs. # 1436-69 at 177-79; 1436-56 at 99).

Over the years, certain Plan executives have expressed a concern that the ESAs violate antitrust laws. (Docs. # 1352-214 at 3; 1352-218 at 2; 1352-219 at 3; 1431-12 at 2; 1431-25 at 3; 1436-6 at 2). They have also expressed similar concerns about the Best Efforts Rules. (Docs. # 1352-219 at 3, 1436-8 at 2; 1336-5 at 24; 1436-87 at 3; 1436-87 at 3).

### III. Summary Judgment Standard

The Rule 56 summary judgment standard applies to an antitrust suit, just as it applies to any other suit. *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1208-09 (N.D. Ala. 2011) (discussing the Supreme Court's disavowal of cases disfavoring summary judgment in antitrust suits), *aff'd*, 721 F.3d 1281 (11th Cir. 2013). Summary judgment is appropriate when the pleadings, depositions, affidavits, and exhibits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen*, 121 F.3d at 646. When evaluating a summary judgment motion, a court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party and determine whether the evidence could reasonably sustain a jury verdict for the non-movant. *Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.

The appropriate standard for evaluating the conduct challenged under the Sherman Act -- rule of reason or *per se* -- is a question of law for the court to decide. *Food Lion, LLC v. Dean Foods Co., (In re Milk Antitrust Litig.)*, 739 F.3d 262, 271 (6th Cir. 2014) ("The district court's decision to use the rule of reason is a question of law ..., which we review de novo."). This legal issue, though, "is predicated on a factual inquiry into the restraint's competitive effect," *Nat'l Bancard Corp.*, 779 F.2d at 596, which had previously led this court to defer its ruling on the standard of review at the motion-to-dismiss stage. *Blue Cross Blue Shield*, 26 F. Supp. 3d at

1186-87. While the selection of a mode of analysis (*per se* or rule of reason) is a question of law, sometimes "underpinning that purely legal decision are numerous factual questions." *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 733-34 (8th Cir. 2014).

## IV.  Analysis

The court begins its analysis with a discussion of relevant antitrust principles and cases and then proceeds to apply those principles to the Rule 56 facts presented by the parties. The court emphasizes that it analyzes the Blues' agreement as a whole to determine the appropriate standard of review. In other words, the court declines to examine the Blues' ESAs, best efforts rules, or brand restrictions in isolation where the Rule 56 evidence reveals that the Blues, through the Association, enacted new and unique aggregate competitive restrictions on top of the ESAs during the 1990s and 2000s.  *Cf. Sealy*, 388 U.S. at 357 (emphasizing that the horizontal territorial allocations were "part of 'an aggregation of trade restraints'"). The court expresses no view about whether the ESAs alone qualify as a *per se* Sherman Act violation. The court separately analyzes the BlueCard program and the trademark uncoupling rules.

### A.  Antitrust Principles

Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trades or commerce among the several States . . . ." 15 U.S.C. § 1. *See also Procaps, S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1079-80 (11th Cir. 2016) (describing the interchangeability of use for the terms contract, combination, and conspiracy). The antitrust laws are designed to protect competition, not competitors.  *See, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (discussing Section 7 of the Clayton Act, 15 U.S.C. § 18); *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1262 (11th Cir. 1998) (discussing Section 1 of the Sherman Act). "[T]o establish a Section 1 violation,

the plaintiff must first show that there was concerted action between two or more persons -- a 'conscious commitment to a common scheme designed to achieve an unlawful objective'-- in restraint of trade." *Procaps*, 845 F.3d at 1080 (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)).

Of course, it is well-settled that Section 1 only prohibits concerted action that "unreasonably restrain[s] trade." *See, e.g., id.* at 1081 (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984)); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). "The rule of reason is the [presumptive] standard for testing whether a practice restrains trade in violation of § 1." *Leegin*, 551 U.S. at 885; *see also Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006). A rule of reason analysis requires the court to weigh all of the circumstances surrounding the practice to determine whether it unreasonably restrains competition. *Leegin*, 551 U.S. at 885. Among other factors, the court can consider the relevant business, the history, nature, and effect of the challenged restraint, and the market power of the business or businesses imposing the restraint. *Id.* at 885-86.

Some types of concerted action, however, are deemed unlawful *per se* and are not analyzed under the wide-ranging rule of reason. *Id.* at 886. "The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work . . . ." *Id.* (citing *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988)). The Supreme Court has deemed certain types of activity to be *per se* violations of Section 1 of the Sherman Act because "experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (quoting *Arizona v. Maricopa*

*Cty. Med. Soc'y*, 457 U.S. 332, 344 (1982)). "Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices . . . or to divide markets . . . ." *Leegin*, 551 U.S. at 886 (internal citations omitted). In particular, horizontal market allocations between competitors lower output and raise prices because "[a] firm that is free from effective competition will reduce its output below the competitive level (whether directly or . . . indirectly by raising price)." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984). As the *Leegin* opinion indicates, the Supreme Court has affirmed the force of the *per se* rule, even in opinions where it has overturned particular applications of that doctrine. *Id.* at 886-87 (describing *per se* rules for horizontal agreements in an opinion that overruled the *per se* antitrust standard for vertical resale price maintenance agreements). *See also State Oil*, 522 U.S. at 10 (describing the basis for *per se* rules in an opinion that overruled the *per se* unlawfulness of vertical maximum price fixing); *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indemnity Co.*, 870 F.3d 1262, 1271 (11th Cir. 2017) ("Certain classes of conduct . . . are deemed 'per se' violations, which are 'conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'") (citation omitted).

The *per se* rule applies to certain forms of business relationships and concerted activity in all industries. Indeed, the Supreme Court has expressly rejected the argument that the *per se* standard should not apply to cases involving the health care industry due to the judiciary's lack of antitrust experience with that industry. *Maricopa Cty.*, 457 U.S. at 349-51. As the *Maricopa County* opinion explains, otherwise *per se* anticompetitive conduct need not be reexamined under the rule of reason merely because it appears in a new industry. *Id.* at 350-51. This is true

because a rule of reason inquiry into that type of anticompetitive conduct, even in the health care industry, is highly likely to be fruitless. *Id.*

Defendants claim that, to receive the benefit of the *per se* rule, Plaintiffs must show an agreement with no plausible procompetitive benefits, an anticompetitive character confirmed by judicial experience, and a purely horizontal character. (Doc. # 1349 at 34-35). But while there are undoubtedly agreements that have been found to be *per se* violations that meet all those elements, that assertion does not square with Eleventh Circuit precedent. As our court of appeals has explained, an antitrust plaintiff's ability to proceed on a *per se* theory depends on "whether there was an agreement" to commit conduct that the Supreme Court has held to be unreasonable [*per se*] "because the unreasonableness of the restraint is presumed." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545-46 (11th Cir. 1996) (citing *Maricopa Cty.*, 457 U.S. at 344-45, and *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397-98 (1927)).

### B.     *United States v. Sealy, Inc.* **and** *United States v. Topco Associates, Inc.*

All of the parties agree that *United States v. Sealy, Inc.*, 388 U.S. 350 (1967) ("*Sealy*"), and *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) ("*Topco*"), are central authorities to consider in determining the appropriate standard of review for the alleged anticompetitive conduct by the Blue Plans and the Association. Plaintiffs contend that *Sealy* and *Topco* are full-force, binding Supreme Court precedents that establish the *per se* illegality of the scheme at the heart of their cases. (Doc. # 1350 at 26, 28) (contending that "this case is on all fours with *Sealy*" and that "the Blues' agreements are even more anticompetitive than the ones found to [be] unlawful *per se* in *Sealy* and *Topco*"); (Doc. # 1351 at 7) (citing *Sealy* and *Topco* for the argument that the trademark licensing conducted by the Association "is unlawful *per se* because it is another way for the competitors to divide and allocate territories, and thereby to

agree not to compete"). Defendants, of course, disagree. They assert that *Sealy* and *Topco* present examples of market allocation that cannot be compared to the trademark licenses issued by the Association. (Doc. # 1349 at 47-49). Moreover, Defendants insist that *Sealy* and *Topco* "should be limited to their precise facts" because they are "inconsistent with modern antitrust jurisprudence." (*Id.* at 47 n. 7). Thus, a threshold issue in determining the proper standard of review here revolves around the proper application of *Sealy* and *Topco*.

In *Sealy*, the licensor, Sealy, agreed to allot exclusive territories to its licensees, a group of mattress manufacturers. 388 U.S. at 352. The licensees agreed to not sell Sealy-branded products outside of their allotted geographic areas. *Id.* Nevertheless, the licensees could sell private label (*i.e.*, non-Sealy) products in any geographic market they chose. *Id.* Sealy's licensees owned "substantially all of its stock," and each director on Sealy's board of trustees had to "be a stockholder or a stockholder-licensee's nominee." *Id.* That board of trustees managed and controlled Sealy's affairs. *Id.* at 352-53. Through the board of trustees and the executive committee, the Sealy licensees controlled "the grant, assignment, reassignment, and termination of exclusive territorial licenses." *Id.* at 353.

As an initial matter, the Supreme Court concluded that Sealy, Inc. was "an instrumentality of the licensees for purposes of the horizontal territorial allocation." *Id.* at 354. It emphasized that the substance of the territorial restraint was horizontal because the actors who controlled the licenses were employees of the manufacturers and the license arrangements were designed to promote the interests of the manufacturers. *Id.* at 352-54. It rejected Sealy's argument that its board members and stockholders acted in a distinct role when making decisions on behalf of Sealy. *Id.* at 353.

The Supreme Court also observed that Sealy instituted an "aggregation of trade restraints" that included price fixing and territorial allocation. *Id.* at 354-55. Sealy's stockholders implemented price fixing protocols by using Sealy's mechanisms. *Id.* at 355-56. The Supreme Court determined that the stockholders' use of price fixing was evidence that Sealy functioned as an instrumentality, not a separate entity. *Id.* at 356. And, it explained that the territorial allocations enabled the manufacturers' price fixing by providing any Sealy manufacturer "an enclave in which it could and did zealously and effectively maintain resale prices, free from the danger of outside incursions." *Id.* Therefore, the Supreme Court held that the horizontal territorial restraints presented in *Sealy* were unlawful *per se*, "without the necessity for an inquiry in each particular case as to their business or economic justification, their impact in the marketplace, or their reasonableness." *Id.* at 357-58.

In *Topco*, a group of small and medium-sized supermarket chains associated together to sell private-label goods under Topco's brand names. 405 U.S. at 598. The grocery chains formed Topco "to obtain high quality merchandise under private labels in order to compete more effectively with larger national and regional chains." *Id.* at 599. None of the supermarkets associated with Topco held a majority share of its geographic market: the supermarkets held between 1.5% to 16% market share within their respective geographic areas, and the average market share for Topco members was approximately 6%. *Id.* at 600. The Supreme Court noted that the combined sales of Topco's members were "exceeded by only three national grocery chains." *Id.* The supermarkets owned all of Topco's stock and equally distributed the association's voting rights. *Id.* at 598. Topco's directors were employees of the member supermarkets and usually executive officers in those companies. *Id.* The board of directors selected Topco's officers, and Topco's principal executive officers were required to be directors

on the board. *Id.* at 598-99. As such, Topco's members possessed "complete and unfettered control over the operations of the association." *Id.* at 599.

Topco's bylaws allowed for three types of territorial marketing licenses, which included both exclusive and non-exclusive licenses. *Id.* at 601-02. But, as the Court concluded, even non-exclusive territorial licenses "prove[d] to be de facto exclusive." *Id.* at 602. Exclusive territories often were distributed to supermarkets that did not yet operate in those areas. *Id.* A supermarket chain seeking to join Topco had to receive approval from Topco's board of directors and 75% of Topco's members. *Id.* And, if the Topco member closest to the applicant or one who operated within 100 miles of the applicant voted against the applicant, the applicant then needed to receive 85% approval from the membership. *Id.* Topco's high membership thresholds provided a de facto veto for Topco members "in the territorial areas in which they [were] concerned." *Id.*

The Supreme Court held that the territorial restraints instituted by Topco were horizontal restraints, and, thus, *per se* violations of the Sherman Act. *Id.* at 608. It concluded that Topco's territorial allocations were entirely analogous to those in *Sealy* because (1) the licensees owned almost all of the licensor's stock, elected its board of directors, and controlled its business, and (2) the licensor agreed to not allow other competitors to sell branded products in a designated territory in exchange for the licensee's promise to not expand its sales beyond that area. *Id.* The Supreme Court declined to address whether it would have found Topco's conduct to be anticompetitive under the rule of reason because the rigid *per se* standard does not allow antitrust defendants to justify naked restraints of trade with good intentions or alleged procompetitive benefits. *Id.* at 609-10. Specifically, the Supreme Court rejected the district court's finding that Topco's restrictions on intrabrand competition were justified by the benefits provided to interbrand competition. *Id.* at 610-11.

The holdings in both *Sealy* and *Topco* have remained viable. In 1990, the Supreme Court relied on *Topco* to summarily reverse a judgment by the Eleventh Circuit regarding a horizontal market allocation by bar exam review companies. *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) (*per curiam*). In *Palmer*, two bar review companies sold bar review courses in Georgia for approximately four years. *Id.* at 47. One of those companies agreed to exclusively license its brand name to the other and not compete with the licensee in Georgia in exchange for (1) a portion of the student fees paid, and (2) an agreement by the licensee to not compete with the licensor outside of Georgia. *Id.* Thereafter, the licensee substantially increased the price of its course from $150 to over $400. *Id.*

The Supreme Court reiterated its holding in *Topco* that "agreements between competitors to allocate territories to minimize competition are illegal." *Id.* at 49 ("[H]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling competition."). It concluded that the bar companies had entered into an unlawful market allocation since they (1) previously competed in Georgia, (2) agreed to allocate the Georgia market to the licensee, and (3) agreed that the licensor would compete in the remainder of the United States and the licensee would not do so. *Id.* at 49. "Such agreements are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[10] *Id.* at 49-50. They are unlawful on their face. *Id.*

Since *Palmer*, the Supreme Court has cited *Topco* as authority to support the *per se* standard applied against certain horizontal restraints. *See Leegin*, 551 U.S. at 909 (citing *Topco* to support the proposition that "sometimes [the Supreme] Court has imposed a rule of *per se*

---

[10] Notably, one of the alleged conspirators in *Palmer*, BRG of Georgia, had never sold bar review courses outside of Georgia and had no apparent intent to do so. 12 Philip R. Areeda & Herbert Hovenkamp, *Antitrust Law* § 2030b at 220 n. 7 (3d ed. 2012).

unlawfulness—a rule that instructs courts to find the practice unlawful all (or nearly all) the time"). The Supreme Court also has cited *Palmer* as authority for the application of the *per se* rule to horizontal market allocations. *F.T.C. v. Actavis, Inc.*, 133 S.Ct. 2223, 2230 (2013); *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 552-53 (2013) (explaining that antitrust law "ordinarily forbid[s] market divisions"); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133-34 (1998). Additionally, in 2010, the Supreme Court discussed the horizontal agreements at issue in *Sealy* and *Topco* without in any way indicating that either case had been overruled or abrogated by later developments in antitrust law. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 200-01 (2010).

With these antitrust principles and Supreme Court decisions in mind, the court turns to an analysis of the issues in this case.

### C.     There are Genuine Issues of Fact as to Whether Defendants Are a Single Entity

To state a claim under Section 1, a plaintiff must plead two elements: (1) that the defendant was involved in an agreement; and (2) that the agreement unreasonably restrained interstate or foreign trade. *Am. Needle*, 560 U.S. at 186. "The question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade." *Id.* "The meaning of the term 'contract, combination . . . or conspiracy' is informed by the 'basic distinction' in the Sherman Act 'between concerted and independent action' that distinguishes § 1 of the Sherman Act from § 2." *Id.* at 190 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984)) (internal quotation marks omitted). Under *Copperweld*, in certain circumstances, distinct legal entities are incapable of concerted action for the purposes of Section 1 and must be viewed as a single entity. 467 U.S. at 771.

"Section 1 is only concerned with concerted conduct among separate economic actors rather than their independent or merely parallel action;" therefore, it generally does not apply to the actions of single entities. *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir. 2015); *see also Am. Needle*, 560 U.S. at 195. However, the Supreme Court has "repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity." *Am. Needle*, 560 U.S. at 195. The "key" consideration is whether the agreement "joins together 'separate decisionmakers,' *i.e.*, 'separate economic actors pursuing separate economic interests.'" *Abraham & Veneklasen Joint Venture*, 776 F.3d at 327-28 (quoting *Am. Needle*, 560 U.S. at 195). "If so, then the agreement may 'deprive[ ] the marketplace of independent centers of decisionmaking[.]'" *Id*. at 328 (quoting *Am. Needle*, 560 U.S. at 195).

It is undisputed that when Defendants merged the Blue Cross and Blue Shield Associations, they formed a single entity to license the Blue Marks. But this undisputed fact is not dispositive because "competitors are not allowed to make an otherwise horizontal agreement vertical by merely setting up a licensing corporation to 'impose' market-dividing agreements on its licensee-stockholders. 'We seek the central substance of the situation, not its periphery; and in this pursuit, we are moved by the identity of the persons who act, rather than the label of their hats.'" *Abadir & Co. v. First Miss. Corp.*, 651 F.2d 422, 426 (5th Cir. 1981) (quoting *Sealy*, 388 U.S. at 353); *see also N.C. State Bd. Of Dental Examiners v. F.T.C.*, 717 F.3d 359, 372 (4th Cir. 2013), *aff'd*, 135 S. Ct. 1101 (2015) ("[T]he Board's status as a single entity is not dispositive because '[c]ompetitors "cannot simply get around" antitrust liability by acting "through a third-party intermediary or joint venture.'"") (internal quotation marks omitted) (quoting *Am. Needle*,

560 U.S. at 202) (in turn quoting *Major League Baseball Properties, Inc. v. Salvino, Inc*., 542 F.3d 290, 336 (2d Cir. 2008) (Sotomayor, J., concurring in judgment))).

Defendants argue that Plaintiffs' Section 1 claims fail as a matter of law because Defendants operate as a single entity with respect to the governance of the Blue Marks. (Doc. # 1349 at 28). Defendants argue that, although the Plans are separate entities for operational purposes, the court must employ a functional approach to the inquiry. As to trademark enforcement, Defendants argue, they are a single entity because the Association now owns the Blue Marks and is responsible for licensing and protecting those Marks.

Plaintiffs argue that the facts show as a matter of law that Defendants are not a single entity. (Doc. # 1435 at 35-36). They argue that the Supreme Court in *American Needle reversed* the Seventh Circuit's decision, which had found that "single entity" status could be applied on a function-by-function basis.[11] (*Id*. at 36). Moreover, they contend that the facts here are "conspicuously *incompatible* with the notion that the BCBSA and its members are incapable of conspiring." (*Id*.) (emphasis in original).

In *American Needle*, the National Football League formed a corporate joint venture, National Football League Properties ("NFLP"), to manage its intellectual property. The NFLP initially granted nonexclusive licenses to several vendors to sell apparel with team insignias. Later, it granted an exclusive license to Reebok, thus excluding the plaintiff. *Am. Needle*, 560 U.S. at 187. The excluded plaintiff sued alleging antitrust violations. *Id.* The Court held that the licensing activities of the NFLP with regard to the team marks constituted concerted action within the meaning of Section 1 of the Sherman Act. The Court concluded that "[a]lthough NFL

---

[11] In *Abraham & Veneklasen Joint Venture*, the Fifth Circuit acknowledged that a functional approach is appropriate under *American Needle*. *Abraham & Veneklasen Joint Venture*, 776 F.3d at 328. But, the "key" inquiry underlying even a functional analysis remains the same: are independent centers of decisionmaking being removed from the market? *Id.* (citing *Am. Needle*, 560 U.S. at 195).

teams have common interests such as promoting the NFL brand, they are still separate, profit-maximizing entities, and their interests in licensing team trademarks are not necessarily aligned." *Id*. at 198. The Court found that the NFL and its teams were legally capable of conspiring, because they did "not possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action," but rather "compete[d] with one another...to attract fans, for gate receipts and for contracts with managerial and playing personnel." *Id*. at 196-97. The fact that the teams were operating independently through a single corporation did not protect their agreement from Section 1 scrutiny: "Competitors 'cannot simply get around' antitrust liability by acting 'through a third-party intermediary or joint venture.'" *Id*. at 202 (quoting *Salvino*, 542 F.3d at 336).

But *American Needle* does not win the day for Plaintiffs on summary judgment either. Here, the Marks at issue are more analogous to licensing of the league's joint NFL mark, rather than the individual teams' marks which were at issue in the case. *American Needle* left open the question of how the case would have been decided if decisions by the NFLP regarding the jointly owned NFL trademarks had been at issue. 560 U.S. at 201.

The Rule 56 evidence here shows that certain Plans initially developed "individual" trademark rights. Then, the Plans purposefully integrated those "individual" assets into the separate Cross and Shield predecessors. (Doc. # 1349 at 31). Later, those entities applied for and received nationwide, federal trademark registrations and "licensed" the Marks back to the Plans employing ESAs based on the areas where the Plans previously used the Marks.[12]

---

[12] Perhaps it may be more precise to say that this activity is what happened on the Blue Cross side. The parties have not drawn the court's attention to Rule 56 evidence that indicates what occurred with Blue Shield License Agreements prior to the 1991 License Agreements which were developed after the Assembly of Plans. (Docs. # 1349-8 at 31-32; 1353-48). And, on the Blue Cross side, four Plans (Connecticut, Minnesota, Wisconsin, and Rockford, Illinois) retained the right to their state law trademark rights in their Blue Cross License Agreements. (Docs. # 1353-11 at 8; 1353-101).

Only in 1982, with the merger of the Blue Cross and Blue Shield Associations, did the Marks even arguably come under the control of a single entity. (Doc. # 1349-1 at 33). Around that time, Defendants formed a single entity and deliberately consolidated undisputedly separate Marks into that entity. However, as the court reasoned in *American Needle*:

> [It] is not dispositive that the teams have organized and own a legally separate entity that centralizes the management of their intellectual property. An ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label. "Perhaps every agreement and combination in restraint of trade could be so labeled."

*Am. Needle*, 560 U.S. at 197 (quoting *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598 (1951)).

Plaintiffs have also presented sufficient evidence to create a genuine issue of material fact as to the validity and/or enforceability of the Marks, and it is the licensing of these Marks that constitutes the "function" for which Defendants claim single entity status. There is also evidence that, among the Plans, even with respect to this particular "function," there are deep disagreements about whether service areas based on the Marks should be exclusive. Defendants' own documents show that certain Blue Plan CEOs believed that they could have protected the Marks without the ESAs. (Doc. # 1352-227 at 69). And, not all common law marks were exclusive. The License Agreements themselves recognize that a "Service Area may overlap areas served by one or more other licensed Blue [] Plans . . . as to which overlapping areas the rights hereby granted are nonexclusive as to such other Plan or Plans only." (Docs. # 1349-8 at 7; 1349-11 at 5).

---

Moreover, it is not entirely clear on the present record that the Blue Cross and Blue Shield bodies who applied for the respective federal trademarks had the authority to do so at the time the applications were submitted. Both entities represented that they made those applications with permission from the original users, and there is documentary evidence supporting the idea that permission from other concurrent users was given. But the parties have not drawn the court's attention to documents establishing actual assignments of the individual rights to those entities.

There is also evidence in the record that, apart from the Blue Plans' ESAs (which are ostensibly based on the Marks), the Blues would be competitors under the Blue brand in the health insurance market. That is, it is genuinely disputed whether even related to this applicable function -- enforcing trademarks -- Defendants are acting as a single entity. A trier of fact could determine that Defendants remain "'separately controlled, potential competitors with economic interests that [are] distinct from [the Association's] financial well-being.'" *Robertson v. Sea Pines Real Estate Companies, Inc*., 679 F.3d 278, 286 (4th Cir. 2012) (quoting *Am. Needle*, 560 U.S. at 201). "[Courts] have repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity." *Am. Needle*, 560 U.S. at 191 (citing, *inter alia*, *Sealy* and *Topco*).

Under these facts, the court cannot say, as a matter of law, whether Defendants' conduct can be shielded by the single entity defense. Because there remain genuine issues of material fact as to whether Defendants operate as a single entity as to the enforcement of the Blue Marks, the parties' respective motions for summary judgment on the single entity defense are due to be denied.

### D.    The Blues' Geographic Market Allocations

Plaintiffs' first Section 1 theory is that the Defendant Blue Plans committed a *per se* violation of the Sherman Act when they agreed to allocate geographic markets for the sale of commercial health insurance and/or commercial healthcare financing services.[13] (Docs. # 1082 at ¶ 815; 1083 at ¶¶ 340, 469). Provider Plaintiffs also claim that the Blue Plans allocated

---

[13]    Provider Plaintiffs describe one facet of the alleged anticompetitive conspiracy as an agreement concerning healthcare financing services because the agreement allegedly concerns fully insured plans and Administrative Service Only ("ASO") plans. (Doc. # 1083 at ¶ 340). In contrast, Subscriber Plaintiffs indicate that ASO plans are not available substitutes for all Subscribers because they are not viable options unless the Subscriber (or his/her group plan) can afford to self-insure.  (Doc. # 1082 at ¶ 553).

geographic markets for the purpose of contracting with health care service providers. (*See* Doc. # 1083 at ¶¶ 323, 469). Both Provider and Subscriber Plaintiffs argue that the geographic market allocations constitute *per se* anticompetitive conduct under *Sealy* and *Topco*. (*See* Docs. # 1350 at 22-29; 1351 at 24-32).

Defendants, in turn, advance five arguments in support of their position that the geographic market distributions should be analyzed under the rule of reason. First, they insist that the Association's rules, including the ESAs, have plausible procompetitive benefits because they have facilitated the creation of new and unique products. (Doc. # 1349 at 35-41). Second, Defendants claim that the ESAs are procompetitive because they "incentivize Plans to focus on local needs of their members and providers." (*Id.* at 41-42). Third, they argue that courts lack experience with the types of service areas at issue in this case because the service areas "arose organically" from the predecessors to the current Plans use of common law trademarks. (*Id.* at 45-47). Fourth, Defendants contend *Topco* and *Sealy* are distinguishable from the service areas at issue here because (1) the Blue Plans productively cooperate, (2) the Plans owned common law trademark rights in their service areas before the challenged agreement was formed, (3) the Plans have never entered into a naked price fixing agreement like the one in *Sealy*, (4) the commercial health insurance industry is more complex than the industries at issue in *Sealy* or *Topco*, and (5) the defendants in *Sealy* and *Topco* "actively modified territories throughout the conspiracy." (*Id.* at 47-49). Finally, Defendants assert that the challenged restraints are not purely horizontal because some restraints are historically the product of vertical arrangements between insurance plans and the AHA or AMA. (*See id.* at 52-53).

Plaintiffs insist that the Blue Plans' ESAs qualify as *per se* anticompetitive conduct under *Topco* and *Sealy*. While, to be sure, several similarities exist between the market allocations here

and those presented in *Topco* and *Sealy*, the court need not decide whether the Blue Plans' service area allocations alone constitute a *per se* violation of Section 1. This is the case because, like *Sealy*, Plaintiffs have presented evidence of an aggregation of competitive restraints -- namely, the adoption of ESAs *and*, among other things, best efforts rules -- which, considered together, constitute a *per se* violation of the Sherman Act. The court explains the reasoning behind this conclusion below.

### 1. The Association is a Licensee-Controlled Entity, Not a Vertical Licensor

The Blues contend that the Association is a vertical licensor and therefore the court is presented with vertical restraints, not horizontal ones. But that argument is off the mark. The Association's own bylaws demonstrate that the Association is funded and controlled by the Blue Plans, who receive licenses to use the Blue Marks. The licensees are deemed regular members of the Association and pay monthly dues to the Association that are set by a three-quarters licensee vote. (Doc. # 1352-6 at 7, 9). The Association's Board of Directors consists of the CEOs of all licensee Plans and the president of the Association. (*Id.* at 12-13). *Cf. Sealy*, 388 U.S. at 352 (explaining that Sealy's directors had to either be a stockholder or a stockholder's nominee). A director can only be removed by a three-quarters vote of the other licensees and a three-quarters weighted vote of the licensees based on dues paid. (Doc. # 1352-6 at 13). Amendments to the Association's bylaws require approval by a three-quarters vote of the licensees and a three-quarters weighted vote of the licensees. (*Id.* at 26). Indeed, the Association describes itself as an organization controlled by the Blue Plans; the Association's training materials for directors state that "Member Plans have the authority to establish or change the constitutional framework or matters that affect fundamental aspects of the Blue System." (Doc. # 1352-48 at 3). *Cf. Sealy*, 388 U.S. at 353 (explaining that Sealy's licensees were directly in control of its operations

"without even the semblance of insulation"). For these reasons, the court finds the Association is comparable to the licensee-controlled entities in *Sealy* and *Topco*. Thus, the ESAs established by the Association must be examined as horizontal allocations, not vertical ones.

In addition, the undisputed record evidence also reveals that the Blue Plans control the terms of each Blue's License Agreement. The Blue Plans must act collectively "to alter the License Agreement's basic brand principles," but the Board of Directors -- comprised of Blue Plan executives -- possess the authority to amend or add regulations to use of the trademarks. (Doc. # 1352-48 at 5). Indeed, the Blue Plans vote on and approve amendments to the licensing agreements. (Doc. # 1352-164 at 138-39).

At oral argument, Defendants insisted that the Supreme Court's *American Needle* opinion limited the application of *Topco* and *Sealy* to licensor entities that are formalistic shells or sham entities. (Doc. # 1613 at 83-84). The court disagrees. In *American Needle*, the Supreme Court explained that the licensees in *Sealy* and *Topco* had conducted concerted action through agreements made with the licensor firm because the licensees acted based upon interests separate from those of the licensor firm. 560 U.S. at 200. The Court further explained that such conduct implicates Section 1 of the Sherman Act because "intrafirm agreements may simply be a formalistic shell for ongoing concerted activity." *Id.* at 200-01. *American Needle* discussed *Sealy* and *Topco* in relation to the single entity defense, not in the context of the *per se* rule established in those cases. And, while *American Needle* explained the policy rationale for holding parties within an entity liable for conduct committed for their separate interests, it did not expressly limit the scope of *Sealy*'s and *Topco*'s development of the *per se* rule in market allocation cases to instances where the licensor firm merely acts as a formalistic shell. *See id.* at 200-01.

Defendants claim that the service areas arose from either common law trademark rights or plan requirements imposed vertically by the AHA and AMA. (Doc. # 1349 at 52). The court is not persuaded. First, at best, it is disputed whether the AHA or AMA required ESAs as a condition of insurance plan certification in the 1930s and 1940s. Indeed, the AHA's 1946 standards for approval of new Blue Plans only provided that new Blue Cross Plans should not be established in markets that were already served adequately by existing Plans. (Doc. # 1353-5 at 14). Moreover, the AMA's 1947 preliminary standards merely provided that the Plan was required to obtain the approval of the appropriate local or state medical association. (Doc. # 1353-6 at 82). Overlapping service areas existed at the time the AHA and AMA exercised ultimate control over certification. (*See* Doc. # 1353-5 at 19) (discussing the Blue Cross Commission's reluctance to enforce exclusive area requirements and observing "a number of [ ] instances of plans serving the same areas"). (*See also* Docs. # 1353-4 at 27, 32; 1353-5 at 27) (discussing areas where Blue Cross Plans and Blue Shield Plans competed in 1947). Thus, Defendants' insistence that the ESAs were a vertically-imposed condition of AHA or AMA certification is misplaced.

Second, Defendants' focus on the alleged vertical restraints imposed in the 1940s and 1950s disregards the effects wrought by the Long-Term Business Strategy and the Assembly of Plans in the 1980s. The Long-Term Business Strategy provided that all Blue Cross Plans and Blue Shield Plans in a geographic area would merge into one entity by the end of 1985. (Doc. # 1352-164 at 81-82). To facilitate this, the Association directed the chief executive officers of certain Plans to produce a merger table by no later than July 1983. (Doc. # 1352-164 at 81). The Association's representative has acknowledged that the Long-Term Business Strategy factored

into the consolidation of Blue Cross and Blue Shield Plans,[14] which also constituted a consolidation of the service areas for those respective Plans. (Doc. # 1352-164 at 85). Likewise, during the Assembly of Plans, the Blue Plans approved amendments to the licensing agreements between the Association and each Plan. (Doc. # 1352-164 at 138-39). For these reasons, the court cannot conclude that the allocation of ESAs reflects conduct by a vertical licensor. Rather, the Rule 56 evidence in the record supports the proposition that the allocation of areas was the result of the Association's plan to (1) consolidate Blue Cross and Blue Shield Plans and (2) issue new licensing agreements reflecting the competitive restraints agreed to by a majority of the Blue Plans.

> **2.** **The ESAs in Which Blue Plans May Sell Blue-Branded Insurance are At Least as Anticompetitive as the Exclusive Sales Areas at Issue in *Sealy* and *Topco***

As in *Sealy* and *Topco*, the Blue Plans entered into licensing agreements whereby they agreed to only sell branded health insurance plans and related products within a certain geographic region. (*See, e.g.*, Doc. # 1352-49 at 3-4) (1991 Blue Cross license agreement for BCBS-AL). As a condition of these licenses, the Blue Plans explicitly agreed to not sell health insurance plans and services with the Blue Marks outside of their respective geographic service areas. (*E.g.*, *id.* at 5). These license conditions between the Association and the individual Blue Plans are directly comparable to the license conditions enacted by the defendants in *Sealy* and *Topco*. *Topco*, 405 U.S. at 602; *Sealy*, 388 U.S. at 352.

Furthermore, as in *Sealy*, the Blue Plans have instituted at least two additional restraints of trade along with the ESAs: they have limited the output of non-branded health insurance and

---

[14] Indeed, the Association sent its executives to states with separate Blue Cross and Blue Shield insurance Plans to confer with their executives about the Long-Term Business Strategy. (Doc. # 1352-164 at 86-87). And, Association employees "may have served as mediators" that resolved issues arising during the mergers. (*Id.*). The Association's representative testified that its employees assisted in Plan mergers before the Long-Term Business Plan went into effect. (*Id.* at 87).

related health financing products by the licensees within the licensee's service area(s), and they have limited the output of non-branded health insurance and related health financing products by the licensees nationwide. (*See* Docs. # 1349-15 at 20-21; 1349-16 at 7; 1349-21 at 5). *See also Sealy*, 388 U.S. at 354-55 (discussing the aggregation of territorial and price fixing restraints conducted by Sealy). In this respect, the restraints of trade created by the Licensing Agreements and the Association's rules appear even more restrictive than those at issue in *Topco* and *Sealy* because the licensees in those cases remained free to sell any amount of non-branded products. *United States v. Topco Assocs., Inc.*, 319 F. Supp. 1031, 1037 (N.D. Ill. 1970) (stating that Topco's licensees could expand by using another source of private brands and that the market allocations did not "have an appreciable influence on the decision of Topco members as to whether or not to expand"), *rev'd*, *Topco*, 405 U.S. at 612; *Sealy*, 388 U.S. at 352 (noting that Sealy's licensees could sell private label products wherever they chose to do so). In contrast, here, there are strict limits placed on the volume of non-branded health insurance products the Blue Plans may sell both inside and outside their service areas. The record reveals that, before the Association enacted the National Best Efforts rule, an attorney representing Anthem's predecessors expressed "significant doubt whether, under the antitrust laws, an association like BCBSA *could* lawfully bar members from engaging in unbranded business outside their exclusive territories." (Doc. # 1555-1 at 7). In light of *Sealy* and *Topco*, that attorney's doubts were well founded.

### 3. Defendants' Attempts to Distinguish Their Licensing Agreements from Those in *Sealy* and *Topco* are Unavailing.

Defendants argue that there are several reasons why the ESAs created by the Licensing Agreements should not be subjected to *per se* review under *Topco* and *Sealy*. But none of these arguments are availing.

### i.      Unique Product

Defendants contend that the ESAs, along with other rules at issue in this case, facilitate the creation of new health insurance products. (*See* Doc. # 1352 at 36-41). In particular, Defendants claim that the Blue System provides "nationwide healthcare products available to all Blue subscribers and providers, including BlueCard, the Federal Employee Program, Blue Distinction and Blue365." (*Id.* at 37). According to Defendants, the Blue Plans require integrative mechanisms to produce a product for large national employee groups. (*Id.* at 38). They insist that a "new product exception" to the *per se* horizontal market allocation standard applies even in cases where cooperation is not necessary to create the product. (*Id.* at 39). Thus, they say, "[i]f the parties are doing more than just allocating markets for the sole purpose of stifling competition, the rule of reason governs." (*Id.* at 40).

Defendants compare the nationwide health insurance they offer to the joint licenses created in *Broadcast Music, Inc. v. Columbia Broadcasting System*, 441 U.S. 1 (1979) ("*BMI*"), but in doing so they seek to stretch that case far past its moorings. In *BMI*, the antitrust plaintiffs mounted a challenge to blanket music licenses. The Supreme Court recognized that the long history of antitrust cases concerning blanket licenses counseled against *per se* treatment of them. 441 U.S. at 10-16 (describing a consent decree entered into by the Government and one blanket license issuer in 1941, modifications to that consent decree, antitrust suits brought against the blanket licenses, and Congress's approval of similar blanket licenses in the Copyright Act). The Court also explained that the market for copyrighted music only existed because of copyright legislation and expressed doubt that those measures granted by Congress which were "reasonably necessary to effectuate the [copyright] rights" could be deemed *per se* violations of the Sherman Act. *Id.* at 18-19. The Court determined that the blanket license sellers provided a

different product than the individual copyright holders could offer for at least three reasons: (1) the product included an aggregating service; (2) the license purchaser could immediately use all products covered by the license without conducting individual negotiations; and (3) the license purchaser had greater flexibility in music choices than a purchaser who obtained licenses for individual songs. *Id.* at 21-23. Ultimately, the Supreme Court held that "[j]oint ventures and other cooperative arrangements are not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all." *Id.* at 23.

But here, *BMI* does not provide the assistance Defendants covet because, simply stated, they cannot claim they produce a unique product. The market allocations at issue are not necessary to market, sell, or produce health insurance. Insurers offered health insurance benefits on a nationwide scale in the 1940s and 1950s, although at that time they only offered indemnity benefits, not service benefits.  (*See* Doc. # 1353-7 at 71) (discussing insurers' ability to offer uniform rates, uniform benefits, and one-stop shopping through indemnity plans). By the 1980s, the Blue Plans' market share, including their share of national health insurance accounts, had decreased because other insurers were able to provide health insurance services to those accounts. (Docs. # 1349-7 at 9-24; 1352-164 at 80-84). The plan to go to ESAs constituted a new marketing/sales strategy, not a new product. The products remain exactly the same – commercial insurance and insurance services. Thus, Defendants cannot rely on *BMI*'s unique product defense to foreclose application of the *per se* rule.

Defendants contend that, because the Rule 56 record does not indicate that the national insurers offer products in all areas of all fifty states, other national insurers do not offer the same products as they do (or even similar ones). (Doc. # 1432 at 17). This argument fails to account for the Blues' sale of health insurance policies on a national scale well before the market

allocations were implemented in the 1980s. The Blues offered a similar health insurance product -- through syndicates and with open provider networks -- both before and after the alleged allocations of markets; therefore, it cannot be said that the market allocations were *necessary* to market the Blues' health insurance product at all. *Cf. BMI*, 441 U.S. at 23. At most, Defendants' argument indicates that the Blues' agreement has permitted them to offer a product (and, to be clear, it is precisely the same product – health insurance) in a more attractive manner. That argument does not establish, though, that the ESAs are necessary to provide health insurance or health insurance services.[15]

### ii.    Cooperative Ventures

Defendants next seek to compare their collaboration through the Association and the accompanying geographic market allocations to the market allocations analyzed under the rule of reason by the Supreme Court in *F.T.C. v. Actavis*, 133 S. Ct. 2223 (2013), and by the Eleventh Circuit in *Procaps*. Neither analogy convinces the court to depart from the Supreme Court's on-point precedents in *Sealy* and *Topco*. As an initial matter, the *Actavis* opinion addressed a monopolization claim under the Federal Trade Commission Act, not a market allocation claim under Section 1 of the Sherman Act.   133 S. Ct. at 2229-30. Moreover, the Supreme Court recognized that the value of patent settlements and patent litigation problems counseled in favor of allowing reverse payment patent settlements. *Id.* at 2234. In rejecting the FTC's requested quick look standard, the Court determined that reverse payment settlements are sufficiently

---

[15] Defendants' reliance on *American Needle* and *NCAA* is also unavailing with regard to the ESAs at issue here. Both *American Needle* and *NCAA* recognized that rule of reason analysis was appropriate in those cases because they concerned sports leagues, in which collaboration between competitors is essential to creating any product at all. *American Needle*, 560 U.S. at 202-03; *NCAA*, 468 U.S. at 101-02. The very existence of the national health insurers against whom the Blue Plans compete shows that collusion between competitors is not essential to the sale of health insurance.

complex to warrant analysis under the rule of reason. *Id.* at 2237-38. Thus, while a reverse payment patent settlement can technically be construed as a market allocation in favor of one settling party, nothing in *Actavis* hints that horizontal geographic market allocations, such as those at issue here, are to be analyzed under the rule of reason.

Admittedly, unlike *Actavis*, the *Procaps* opinion addressed a complaint attacking an actual market allocation scheme. *Procaps*, 845 F.3d at 1079. Yet, *Procaps* involved allegations about a unique, unorthodox allocation. Procaps and Patheon were each involved in the market for softgel services and entered into a joint venture. *Id.* at 1077-78. Thereafter, Procaps filed suit under the Sherman Act against its former joint venture partner, Patheon, alleging that Patheon's acquisition of another player in the softgel industry, Banner, violated Section 1 of the Act. *Id.* at 1078-79. Procaps specifically alleged that Patheon's acquisition of Banner placed Patheon in direct competition with Procaps, thus transforming the parties' legitimate joint venture into a *per se* illegal horizontal restraint. *Id.* at 1079. The Eleventh Circuit held that the scheme presented by the plaintiff did not reflect any concerted action proscribed by Section 1. *Id.* at 1081-82. Alternatively, it upheld the summary judgment entered against Procaps on the ground that there was no proof of anticompetitive effects of the alleged market restraint. *Id.* at 1082. The Eleventh Circuit declined to apply the *per se* market allocation rule reiterated in the Supreme Court's *Palmer* decision because the agreement at issue involved an alleged procompetitive joint venture that the plaintiff claimed became anticompetitive in light of the defendant's subsequent unilateral conduct. *Id.* at 1082-84. That limited distinction of the *per se* rule's application in *Topco*, *Sealy*, and *Palmer* does not apply here.

### E.     National Best Efforts

The alleged scheme at issue here is not limited to Defendants' use of ESAs standing alone. As Subscribers point out, "there is more." (Doc. # 1351 at 32). In addition to allocating geographic markets through their use of ESAs, Defendants have developed additional rules which place added restraints on the Plans' ability to compete, and not only with each other.

The National Best Efforts rule, implemented in 2005, requires a Plan to derive at least sixty-six and two-thirds percent (66 2/3%) of its national health insurance revenue from its Blue brand. (Doc. # 1349-16 at 7). Thus, any health revenue a Blue Plan may generate from services offered under any non-Blue brand is limited in relation to its Blue branded health revenue. (Doc. # 1432 at 20-21). The National Best Efforts rule, therefore, operates as an output restriction on a Plan's non-Blue brand business.

"An agreement which has the purpose and effect of reducing output is illegal under § 1 of the Sherman Act." *A.D. Bedell Wholesale Co. v. Philip Morris Inc*., 263 F.3d 239, 247 (3d Cir. 2001) (collecting cases). "Horizontal price fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anticompetitive is so high; a per se rule is applied when 'the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.'" *NCAA*, 468 U.S. at 100 (quoting *BMI*, 441 U.S. at 19-20).

Defendants have largely defended their ESAs as incidental to trademark rights. But there is nothing in the Rule 56 record which indicates that there is any valid connection between trademark rights and the National Best Efforts rule. The rule specifically restrains the Plans' ability to compete under *non-Blue* brands. This output limitation is separate from the limits

related to ESAs, which prohibit the Blue Plans from competing, and thus earning revenue, outside of their area under their Blue brands.

Defendants argue that the National Best Efforts rule is not properly viewed as an output restriction because the rule leaves Plans plenty of "headroom" to compete under non-Blue brands. (Doc. # 1349 at 44). They also argue that the National Best Efforts restriction on competition under non-Blue brands generates plausible procompetitive benefits, such as "promot[ing] collaboration among Plans, encourag[ing] Plans to invest in the Blue Marks, and prevent[ing] transfer of the immense goodwill associated with the Blue Marks to other brands." (Doc. # 1556 at 41-42). The fact remains, however, that the rule places a limit on the revenue a Plan can earn under a non-Blue brand. The fact that the National Best Efforts rule imposes a relative limit, rather than an absolute limit (Doc. # 1432 at 52), is of no moment. It constitutes a limit or a restriction on the volume (output) of a Plan's non-Blue business. Thus, there is little question that, properly analyzed, the National Best Efforts rule is an output restriction.

Output restrictions have been called one of the "most important per se categories," along with naked horizontal price-fixing and market allocation. *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004) (citing *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 593 (1st Cir. 1993)); *see also Xcaliber Int'l Ltd. LLC v. Atty. Gen. State of La.*, 612 F.3d 368, 375 (5th Cir. 2010) (monopolization, price fixing, territorial divisions, output restrictions, group boycotts, and refusals to deal are considered pernicious to competition and, with the exception of monopolization, are generally considered *per se* violations of the antitrust laws). In this case, a number of these "most important" *per se* categories of restrictions have been aggregated.

The court acknowledges that, in *NCAA* and *BMI,* the *per se* rule was not applied to the particular output restrictions presented under the unique facts of those cases. Indeed, the restraints in those cases were "essential if the product was to be available at all." *NCAA*, 468 U.S. at 100; *see also BMI*, 441 U.S. at 24. But that is not the situation here. The National Best Efforts restrictions on non-Blue brand business clearly are not necessary for the product to be "available at all." Health insurance is regularly made available to consumers without such restraints. And, similarly, it is made available in a national market by the National Insurers without any such restrictions. Importantly, it was available from Defendants without the National Best Efforts rule until 2005. (Doc. # 1349-21 at 5).

The undisputed evidence before the court establishes that, in 2005, Defendants adopted the National Best Efforts rule placing an output restriction on a Plan's non-Blue business. Defendants' National Best Efforts rule limits the extent to which the Plans can compete with Blue branded business under non-Blue marks. Whether the National Best Efforts rule benefitted the Plans' Blue branded business "is irrelevant. ... [Defendants have] no authority under the Sherman Act to determine the respective values of competition in various sectors of the market." *Garot Anderson Agencies, Inc. v. Blue Cross & Blue Shield United of Wis.*, 1993 WL 78756, at *12 (N.D. Ill. Feb. 26, 1993) (citing *Topco*, 405 U.S. at 610–11). Here, the National Best Efforts rule constitutes a *per se* violation of the Sherman Act, particularly when layered on top of other restrictions Defendants have placed on competition.[16]

---

[16] While Plaintiffs have not pressed the issue in this set of motions, the court notes the existence of the Local Best Efforts rule but does not address whether it is part of the aggregation of trade restraints addressed in this opinion, including the ESAs and the National Best Efforts rule. The court reserves that question of whether the Local Best Efforts rule is a *per se* Sherman Act violation in isolation.

### F.  BlueCard

Provider Plaintiffs (but not Subscribers) have also mounted a challenge to Defendants' BlueCard program. In particular, Providers assert that the BlueCard program constitutes a horizontal price fixing agreement and a group boycott. The court analyzes the standard of review that applies to each of these claims, in turn.

### 1.  BlueCard as Price Fixing

Provider Plaintiffs argue that the BlueCard program constitutes horizontal price fixing and base that assertion on the following contentions: (1) BlueCard requires a health care provider who desires to enter the BlueCard network (and serve as an in-network provider for a Blue Plan) to agree to accept certain provider rates from each Blue Plan (note: this limits a provider's ability to negotiate different rates with various Blue Plans); (2) the Blue Plan Defendants have agreed that they will not pay any provider a different rate than the rate negotiated by the in-area Blue Plan; and (3) the Blue Plans are prohibited from negotiating separate contracting agreements with providers outside of their licensed area(s) for provision of health care services to Blue Cross and Blue Shield subscribers. (Doc. # 1350 at 30-31). According to Provider Plaintiffs, this set of agreements "completely eliminate[ ] the possibility of price competition among the Blues for providers' services."[17] (*Id.* at 31).

In response, Defendants insist that application of the *per se* price fixing rule is limited to situations where conspirators preset prices between themselves. (Doc. # 1432 at 55). According

---

[17]  At oral argument, the court noted that the BlueCard program consists of two sets of agreements: (1) agreements between Providers and their in-state Blue Plans to enter the Blue provider network for health care services at a particular price; and (2) agreements between the Blue Plans, through the Association, which establish the rules and procedures for BlueCard and set a fixed price for Provider services based on the rate negotiated by an in-state Blue Plan. Provider Plaintiffs agreed that they are challenging the latter category of agreements, not the former. To be sure, if they had challenged the former category of agreements between providers and Blue Plans, those agreements clearly would not constitute "price fixing" for purposes of the Sherman Act. *See Levine*, 72 F.3d at 1548 (holding that a buyer network does not engage in price fixing prohibited by the Sherman Act if it agrees on a maximum price it is willing to pay for a product and sellers decide whether to accept that price).

to Defendants, the BlueCard program should be analyzed as a joint purchasing agreement. (*Id.* at 56). Defendants also insist that the court should not analyze the BlueCard program under a *per se* price fixing rule because the program offers significant procompetitive benefits. (*Id.* at 57). These claimed procompetitive benefits include: (1) access to high-quality insurance products with a local focus, broad provider networks, and competitive premiums; (2) access to a nationwide patient volume for health care providers; and (3) "prompt payments, ease of claims processing[,] and lower administrative costs." (Doc. # 1349 at 43).

In reply, Provider Plaintiffs argue that price fixing does not require the conspirators to agree on a specific price. (Doc. # 1557 at 25). They distinguish the agreements forming the BlueCard program from joint-purchasing agreements because (1) the agreements are related to the ESAs established by the Licensing Agreements, (2) the Blue Plans use the ESAs to create local monopolies, and (3) the lower provider prices obtained through the Blues' alleged monopolistic conduct are shared with other Plans. (*Id.*).

It is axiomatic that horizontal price-fixing schemes are *per se* violations of the Sherman Act. *See All Care Nursing Serv., Inc. v. High Tech Staffing Servs.*, 135 F.3d 740, 746 (11th Cir. 1998); *Dagher*, 547 U.S. at 5. Price fixing schemes violate the Sherman Act whether committed by sellers or buyers of goods and services. *All Care Nursing*, 135 F.3d at 747 (citing *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 233-37 (1948)). And, the Supreme Court has broadly defined price fixing to include any "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).

At the same time, the court recognizes that not all agreements between competitors that affect prices may be deemed price fixing. *All Care Nursing*, 135 F.3d at 747 (quoting *BMI*, 441 U.S. at 23). For example, in *All Care Nursing*, the Eleventh Circuit held that a preferred provider network of contract nurses did not qualify as a *per se* price fixing scheme because (1) all contract nursing agencies in the geographic area could submit bids to the provider network, (2) the nursing agencies could provide services to the hospitals in the preferred provider network if preferred agencies could not meet the hospitals' demand, and (3) the nursing agencies in the provider network could leave the network if market conditions favored doing so.[18] *Id.* at 747-48.

Pricing decisions within a legitimate joint venture between competitors also do not constitute *per se* violations of the Sherman Act. *Dagher*, 547 U.S. at 8. Such a joint venture is considered a single firm for purposes of making pricing decisions if "persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit." *Id.* at 6 (quoting *Maricopa County*, 457 U.S. at 356). This is so even if the joint venture sets prices and sells products under multiple brands used by the competitors that established the joint venture. *Id.* at 6-7 (explaining that such pricing decisions should be challenged under the rule of reason, not the *per se* standard).

Cooperative purchasing arrangements also do "not necessarily stifle competition," as they can be used by purchasers to "exploit[ ] the productive efficiencies that result from conducting business on a larger scale." *N. Jackson Pharmacy, Inc. v. Caremark RX, Inc.*, 385 F. Supp. 2d 740, 747 (N.D. Ill. 2005) (quoting Roger D. Blair & Jeffrey L. Harrison, *Monopsony: Antitrust Law and Economics* 93-94 (1993)). Of course, such agreements also can allow competitors to

---

[18] Providers have maintained throughout these actions that it is not feasible for Alabama Providers to forgo entering the BlueCard Provider network due to the Blues' overwhelming market share in Alabama. (*See, e.g.*, Doc. # 1613 at 34-35).

exploit their monopsony power by driving prices below competitive levels. *Id.* (quoting Blair & Harrison, *Monopsony* at 93-94). In *North Jackson Pharmacy*, the court determined the type of cooperative purchasing conducted by the defendant, a pharmacy benefits manager, by analyzing whether the cooperative purchasing agreement was an ancillary restraint to a larger productive enterprise or a mere naked restraint between competitors. *Id.* It determined that the cooperative purchasing conducted by the pharmacy benefits manager must be analyzed under the rule of reason, not a *per se* standard, because (1) the benefits manager likely was able to lower prices through economies of scale, (2) the Federal Trade Commission had analyzed a merger conducted by the benefit manager and had found a low likelihood of monopsony in the relevant market, and (3) the agreement at issue was one likely to produce lower consumer prices in the short term.[19] *Id.* at 749-50.

Here, Provider Plaintiffs do not present a classic price fixing scheme in which the competitors preset prices for purchasing goods between themselves. *Cf. Maricopa Cty.*, 457 U.S. at 335-36 (addressing a maximum fee schedule set by physicians for health services). Rather, they challenge an agreed set of rules whereby prices for healthcare services paid by the entire group of Blue Cross and Blue Shield insurers -- all 36 separate Blue entities -- are set by

---

[19] In *North Jackson Pharmacy*, the court also noted a judicial hesitancy to interfere with cooperative arrangements in the health care industry and this concern served as its final rationale for applying the rule of reason to the Sherman Act claims against the pharmacy benefits manager. 385 F. Supp. 2d at 750 (quoting *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 931 (1st Cir. 1984) (Breyer, J.)). Several Eleventh Circuit opinions have expressed a similar reluctance to apply *per se* antitrust standards to restrictive practices performed in the health care industry. *See All Care Nursing*, 135 F.3d at 748 (declining to apply the *per se* group boycott rule against a preferred provider network because a recognized history of anticompetitive effect did not exist "for health-care preferred-provider programs"); *Levine*, 72 F.3d at 1550-51 (declining to apply the *per se* group boycott rule to multiprovider networks, in part because the Department of Justice had determined that it lacked sufficient experience with such networks to provide a formal policy regarding them). But, in *Maricopa County*, the Supreme Court expressly rejected the argument that the *per se* price fixing rule should not be applied to the price list at issue because of the judiciary's lack of experience with the health care industry. 457 U.S. at 349-51. Likewise, the Court rejected the assertion "that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation." *Id.* at 351. In accordance with *Maricopa County*, this court does not believe that any quirks unique to the health care industry, standing alone, justify application of the rule of reason to the alleged price fixing agreements challenged in Provider Plaintiffs' claims regarding BlueCard.

negotiations between a provider and its in-state Blue Plan. Moreover, the Blue Plans have agreed to not negotiate with health care providers unless they operate within a Blue Plan's ESA or in a contiguous county. While the court recognizes that concerted activity can qualify as *per se* price fixing in the absence of preset prices, *see Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980) (applying *per se* horizontal price fixing standard to horizontal agreement to not provide credit to purchasers), the cooperative integration at the heart of the BlueCard program requires more detailed review.

Like a joint venture, the Blue Plans have integrated certain assets to create the BlueCard program. They have agreed to integrate their best provider networks into BlueCard and to allow other Blue Plans access to their best provider discounts. (*See* Docs. # 1431-30 at 4; 1431-32 at 4). Moreover, like a joint venture, the Blue Plans share a significant degree of opportunities for profit and risks of loss by relying on the BlueCard program, rather than independent negotiations, to obtain discounted provider rates. *Cf. Dagher*, 547 U.S. at 6. If a Blue Plan in a particular area negotiates particularly well with the health care providers in that area and obtains above-average discounts, then the other Blue Plans also receive the benefit of those discounts. But, if a Blue Plan in another area performs poorly in its provider negotiations and secures below-average discounts, then the other Blue Plans pay the higher-than-average costs for health care services. The similarities between the integrative aspects of the BlueCard program and a traditional joint venture weigh in favor of applying the rule of reason to Provider Plaintiffs' price fixing claims based on that program.

Finally, as *North Jackson Pharmacy* explains, cooperative purchasing arrangements between competitors can have procompetitive and anticompetitive effects. 385 F. Supp. 2d at 747. They can allow purchasers to obtain the benefits of economies of scale, or they can allow

purchasers to coerce suppliers into offering below-competitive prices for products. Given the plausible procompetitive benefits of the BlueCard program, Provider Plaintiffs' price fixing claims are due to be analyzed under the rule of reason, even though the Blue Plans arguably have pegged prices for services provided to out-of-state Blue Plans to those negotiated by the in-state Blue Plan.[20]

## 2. BlueCard as Group Boycott

At oral argument, Provider Plaintiffs asserted that the BlueCard program constitutes a group boycott because the Blue Plans "all agreed [ ] that as a Blue they will not contract with providers outside their service area." (Doc. # 1613 at 29). Although the group boycott claim is not discussed at depth in the parties' summary judgment briefs, the court will address it here. After careful review, the court determines that more evidentiary submissions will be required to determine the appropriate standard of review for the group boycott claims.

The Eleventh Circuit has recognized that certain group boycotts constitute *per se* violations of the Sherman Act. *All Care Nursing*, 135 F.3d at 746. Yet, the Eleventh Circuit has also echoed the Supreme Court's caution against expanding the group boycott *per se* rule, as "[n]ot all concerted refusals to deal are predominantly anticompetitive." *Id.* at 748 (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985)). Group boycotts generally are only subjected to a *per se* analysis if (1) the boycott blocks access to a necessary product, facility, or market for competition, or (2) if the boycotting firms possess

---

[20] Again, it is noteworthy that Subscriber Plaintiffs do not challenge BlueCard as an antitrust violation. This *may* prove significant. Recently, the Supreme Court granted *certiorari* to review the application of the Sherman Act to two-sided platforms that unite distinct yet interrelated groups of customers. *Ohio v. American Express Co.*, No. 16-1454 (S. Ct. argued Feb. 26, 2018). The *American Express* case concerns the credit card market, not the health insurance market. The Second Circuit held -- based in part on the parties' agreement -- that the Section 1 Sherman Act claims in *American Express* are to be analyzed under the rule of reason. *United States v. Am. Express Co.*, 838 F.3d 179, 195-96 (2d Cir. 2016), *cert. granted sub. nom, Ohio v. Am. Express Co.*, 138 S. Ct. 355 (2017). The court does not address here whether any market at issue in this case can be characterized as a two-sided market, nor does the court discuss whether that characterization would affect a determination of whether to apply a *per se* or rule of reason standard. But it will be worth seeing what the Supreme Court has to say in its *American Express* decision.

market power within the relevant market. *Id.* (quoting *Nw. Wholesale Stationers*, 472 U.S. at 294). Thus, "[u]nless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted." *Nw. Wholesale Stationers*, 472 U.S. at 296.

At this stage, neither Provider Plaintiffs nor Subscriber Plaintiffs (in connection with any other claim) have established Defendants' market power over a particular market which is the subject of the alleged group boycott against health care providers. *Cf. Nw. Wholesale Stationers*, 472 U.S. at 296. Nor have Plaintiffs pointed to an element of the market that the Blue Plans exclusively control. *Cf. id.* Because Plaintiffs have not shown that the undisputed evidence establishes at least one of these two predicate facts, the court must review the alleged boycott of health care providers and services outside of a particular Blue Plan's service area under the rule of reason.[21] *All Care Nursing*, 135 F.3d at 748-49; *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1381 (11th Cir. 1997); *Levine*, 72 F.3d at 1550; *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986).

### G.     Trademark Uncoupling Rules

In their summary judgment papers, Subscriber Plaintiffs briefly argue that the Association's restrictions on the use of trade names that have been used in conjunction with a Blue Mark are *per se* violations of the Sherman Act. (Doc. # 1351 at 36-38). Subscriber Plaintiffs insist that the trade name restriction is analogous to a horizontal market allocation because (1) the trade name restraint was instituted in 1999, and (2) the Blue Plans would commit

---

[21] The court also may need to consider plausible procompetitive benefits of the type of boycott alleged in this action before determining whether the group boycott is subject to *per se* review. *See Levine*, 72 F.3d at 1550-51 (declining to apply a *per se* boycott standard to a multiprovider network because the Department of Justice had decided that it lacked sufficient experience with such entities to promulgate a formal antitrust policy); *Diaz v. Farley*, 215 F.3d 1175, 1183-84 (10th Cir. 2000) (discussing the possible procompetitive benefits of an alleged boycott against anesthesiologists at a particular hospital and the need for caution in antitrust analysis of professional health care).

a *per se* violation of the Sherman Act if they agreed to not compete with each other in certain areas using their individualized trade names. (*Id.* at 37).

Defendants respond that the "uncoupling rules" are not analogous to geographic market allocations because they prevent a Blue Plan from independently using any trade name that has been associated with the Blue Marks nationwide. (Doc. # 1432 at 54). Moreover, Defendants claim that the rule was adopted for a procompetitive purpose and that it falls within the Association's rights as the trademark holder and licensor. (*Id.* at 54-55). Although this issue may have been under-briefed, the court is inclined to find, upon its initial review, that the uncoupling rules are subject to a rule of reason analysis.

In 1999, the Association's Board of Directors voted to recommend the uncoupling rules for distinguishing words and symbols used alongside the Blue Marks.[22] (Doc. # 1433-5 at 15-21). In their simplest application, the uncoupling rules prevent a Blue Plan from using a trade name with the Blue Marks and then using the same trade name to sell another health care service product without the Blue Marks. (Doc. # 1433-5 at 16, 18-19). They also prohibit the Blue Plans from using unique words and symbols associated with products sold under the Blue Marks to sell non-branded health care service products. (*Id.* at 17-18). The rules do not apply to certain tag lines approved in advance by the Association, joint advertising ventures with non-Blue entities approved by the Association, or the sale, marketing, and administration of products other than core health care products and services. (*Id.* at 18-19).

Subscriber Plaintiffs refer to the uncoupling rules as agreements not to compete, but they are actually more similar in substance to trademark agreements between competitors. Thus, the Second Circuit's analysis of restrictive trademark agreements in *Clorox Company v. Sterling*

---

[22] During that same meeting, the Board of Directors endorsed a monetary sanctions program for violations of the Licensing Agreements. (Doc. # 1433-5 at 33-35).

*Winthrop, Inc.*, 117 F.3d 50 (2d Cir. 1997) is instructive. There, the producers of Pine-Sol branded products and Lysol branded products had entered into a series of agreements that restricted the products to be sold under the Pine-Sol trademark and limited when they could be promoted as disinfectants. 117 F.3d at 53-54. After the parties entered into their trademark agreement, Clorox purchased the Pine-Sol assets and challenged the limitations on use of the Pine-Sol trademark under Sections 1 and 2 of the Sherman Act. *Id.* at 54. The Second Circuit held that the trademark agreement between Lysol's and Pine-Sol's producers was to be examined under the rule of reason because (1) trademark agreements are favored by courts, (2) trademark agreements that regulate use of competing trademarks are distinguishable from trademark agreements "that in reality serve to divide markets," and (3) the agreement presented there did not create a *per se* antitrust violation, such as price fixing, market division, or a group boycott. *Id.* at 55-56.

The trademark restrictions created by the uncoupling rules in this litigation are substantially similar to those analyzed under the rule of reason in *Clorox*. As the *Clorox* court noted, the uncoupling rules restrain independent competitors from using trademarks for particular products, but they do not restrain competitors from selling products under other brands or trademarks. (Those restrictions were put in place by other Assocation rules, as discussed above.) Subscriber Plaintiffs characterize the trade name uncoupling rule as an "absolute prohibition on the use of individualized trade names that have previously been used in conjunction with the Blue Marks" (Doc. # 1351 at 37), but a review of the uncoupling rules reveals that the Blue Plans are only prohibited from using the trade names for the sale of certain core health insurance products and services. Thus, the trade name uncoupling rule is analogous to the trademark agreement in *Clorox*, which restricted Pine-Sol's owner from using that name in

connection with certain cleaning and disinfecting products. *Cf.* 117 F.3d at 53-54. These rules are not "naked" agreements between competitors (*i.e.*, the Blue Plans). That is, the rules are not simply reciprocal agreements between the Blues to not use their trade names associated with the trademarks. Rather, the Rule 56 evidence shows that the rules are intended to protect the strength of the Blue Marks by preventing the transfer of goodwill in the Blue Marks to other unique marks created by an individual Blue Plan. (Doc. # 1436-27 at 248-49). Because the record does not show that the uncoupling rules were used to effectuate a *per se* antitrust violation, and the uncoupling rules have potential procompetitive benefits (*i.e.*, preventing the transfer of goodwill), the uncoupling rules do not fall within a category of *per se* restraints under the Sherman Act.[23]

## IV.    Conclusion

The Supreme Court jealously guards the precedential effect of its opinions.  This is even true in antitrust law, where the economic principles of competition policy are subject to continual evolution. The Supreme Court has specifically cautioned district courts and appellate courts against reading the tea leaves and predicting which antitrust precedents are now disfavored. *See State Oil*, 522 U.S. at 20 (commending the court of appeals for applying the precedential opinion at issue because "it is [the Supreme Court's] prerogative alone to overrule one of its precedents"). And the Eleventh Circuit has abided by that guidance in antitrust cases. *See, e.g.*, *Major League Baseball v. Crist*, 331 F.3d 1177, 1188-89 (11th Cir. 2003) (holding that the "business-of-baseball exemption" preempted a state-law antitrust action against Major League Baseball and baseball clubs, and commenting that the court had no choice but to apply the

---

[23]    In light of the parties' sparse briefing on the uncoupling rules, the court need not decide -- and does not decide -- whether the uncoupling rules are part of the aggregate of restraints of trade connected to the Blues' ESAs. *Cf. Sealy*, 388 U.S. at 354-56.

exemption "[a]s an intermediate appellate court"); *Prof'l Baseball Sch. & Clubs, Inc. v. Kuhn*, 693 F.2d 1085, 1085-86 (11th Cir. 1982) (affirming the dismissal of an antitrust suit concerning the business of minor league baseball, but describing the business-of-baseball exemption as "anomalous"). Today, the court faithfully applies *Sealy* and *Topco* to the Rule 56 record before it and determines that, in navigating the antitrust landscape in this case, those decisions and their progeny remain polestars. Thus, the court concludes that Defendants' aggregation of a market allocation scheme together with certain other output restrictions is due to be analyzed under the *per se* standard of review. Having said that, BlueCard and other alleged Section 1 violations are due to be analyzed under the Rule of Reason. An Order consistent with this Memorandum Opinion will be entered.

      **DONE** and **ORDERED** this April 5, 2018.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE