**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| IN RE: BLUE CROSS BLUE SHIELD | ) | Master File No. 2:13-CV-20000-RDP |
| ANTITRUST LITIGATION | ) | |
| (MDL No. 2406) | ) | This document relates to Provider Track Cases |

**MEMORANDUM OPINION**

This case is before the court on Provider Plaintiffs' Motion for Partial Summary Judgment Regarding Issues Decided in *United States v. Anthem.* (Doc. # 1392). In this summary judgment motion, Provider Plaintiffs seek judgment as a matter of law against Defendant Anthem, Inc. as to fifteen facts that concern (1) the relationship between the Blue Cross Blue Shield Plans and the Blue Cross Blue Shield Association (the "Association"), (2) the appropriate market definitions for an antitrust analysis, (3) factors that may be considered in determining market concentration, and (4) factors that may be considered in determining anticompetitive effects. (Doc. # 1392 at 5, 9-10). The motion has been fully briefed (*see* Docs. # 1481, 1482, 1569), and the court held oral argument on this motion on October 4, 2017. (*See* Doc. # 1607). At the Special Master's request, the court held the motion during the pendency of the parties' mediation sessions. The motion is now ripe for decision. After careful review, and for the reasons explained below, the court concludes that Provider Plaintiffs' motion (Doc. # 1392) is due to be denied.

## I.    Background

In July 2016, the United States, eleven states, and the District of Columbia (collectively referred to as the "United States") sued to enjoin a proposed merger between Anthem and Cigna Health and Life Insurance Company ("Cigna"). *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 186 (D.D.C.), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017) ("*Anthem I*"). The United States sought

to enjoin the proposed Anthem-Cigna merger under Section 7 of the Clayton Act because the merger would "harm competition in the sale of commercial healthcare" to national accounts and large group employers. *Id.* at 186-87. The *Anthem I* bench trial began in November 2016 and ended in January 2017. *Id.* at 187.

The D.C. District analyzed the proposed Anthem-Cigna merger under a three-part test provided in *United States v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C. Cir. 1990). *Anthem I*, 236 F. Supp. 3d at 191-92. Ultimately, the court concluded that (1) the United States had established a prima facie case of a presumptively anticompetitive merger, (2) Anthem and Cigna had introduced evidence to rebut the presumption, and (3) the United States had ultimately showed that the effect of the merger would be to lessen competition "in the market for sales to national accounts within [ ] fourteen states." *Id.* at 192. First, the district court applied the *Baker Hughes* test to analyze the effect of the proposed merger on the market for sale of health insurance to national accounts within the fourteen states where Anthem holds a Blue license. *See id.* at 193-253. Second, the district court addressed the effect of the proposed merger on the sale of health insurance to large group employer accounts in the Richmond, Virginia Core-Based Statistical Area ("CBSA"). *Id.* at 253-59. The district court enjoined the proposed Anthem-Cigna merger because of its effect on competition in the national account market *and* its effect on competition in the Richmond large group market. *Id.* at 259.

Anthem sought an expedited appeal in the D.C. Circuit Court of Appeals. (Doc. # 1482-1 at 3-12). The D.C. Circuit agreed to hear the appeal on an expedited basis. (*United States v. Anthem, Inc.*, Case No. 17-5024, Doc. # 1662008 (D.C. Cir. Feb. 17, 2017)). Anthem challenged the district court's judgment "on the principal ground that the court improperly declined to consider the claimed billions of dollars in medical savings." *United States v. Anthem, Inc.*, 855

F.3d 345, 348 (D.C. Cir.), *petition for cert. dismissed*, 137 S. Ct. 2250 (2017) ("*Anthem II*"). In April 2017, the D.C. Circuit affirmed both grounds for the district court's injunction of the proposed Anthem-Cigna merger. *See Anthem II*, 855 F.3d at 349, 364 (affirming the district court's national-account market ruling); *id.* at 349, 368 (affirming the district court's ruling with regard to Richmond's large-group market). Anthem filed a petition for writ of *certiorari* with the Supreme Court, but withdrew that petition in June 2017. *Anthem, Inc. v. United States*, 137 S. Ct. 2250 (2017).

Shortly thereafter, in August 2017, Provider Plaintiffs asked the court to enter partial summary judgment on collateral estoppel grounds, finding the following fifteen facts to be undisputed for purposes of Plaintiff's claims against Anthem:

1. "No two Blue companies will ever bid on the same large group or national account, and no Blue licensee may bid on an account headquartered in another licensee's state without receiving a 'cede' from that carrier." [*Anthem I*, 236 F. Supp. 3d at 189].

2. "Access to a network of medical care providers is an essential component of any commercial health insurance plan….Anthem gains access to a national network for its customers by virtue of its membership in the Blue Cross Blue Shield Association." [*Anthem I*, 236 F. Supp. 3d at 189].

3. "There are important aspects of Blue Cross Blue Shield Association membership—in particular, the mutuality and cooperation involved in the cedes, the potential for Blue Card revenue, and the best efforts rules—that redound to the benefit of the Association as a whole." [*Anthem I*, 236 F. Supp. 3d at 220 n. 22].

4. "Like all other members of the Blue Cross Blue Shield Association, Anthem receives Blue Card fees for network access and administrative services when it 'hosts' a member of another Blue plan." [*Anthem I*, 236 F. Supp. 3d at 189].

5. The "market for the sale of health insurance to 'national accounts' – customers with more than 5000 employees, usually spread over at least two states" is a relevant product market. [*Anthem I*, 236 F. Supp. 3d at 179, 193-202].

6. The market for national accounts includes both insured and Administrative Service Only (ASO) business. [*Anthem I*, 236 F. Supp. 3d at 201].

7. The Association rules are significant to the determination of the relevant geographic market for the sale of medical coverage to National Accounts. [*Anthem I*, 236 F. Supp. 3d at 179, 203].

8. Anthem's service area is a relevant geographic market for the sale of medical coverage to National Accounts. [*Anthem I*, 236 F. Supp. 3d at 179, 206].

9. The sale of commercial insurance to "large group" employers of more than 100 employees is a relevant product market. [*Anthem I*, 236 F. Supp. 3d at 254].

10. Core-Based Statistical Areas are relevant geographic markets for the sale of health insurance to "large group" employers of more than 100 employees. [*Anthem I*, 236 F. Supp. 3d at 255-56].

11. It is appropriate to aggregate all members of Blue plans within a service area when calculating market concentration. [*Anthem I*, 236 F. Supp. 3d at 208-10].

12. It is permissible to use a "build-up approach" and focus on major competitors when calculating market concentration. [*Anthem I*, 236 F. Supp. 3d at 211].

13. It is permissible not to account for slicing when calculating market concentration. [*Anthem I*, 236 F. Supp. 3d at 211-12].

14. Regional firms and niche companies that lack a national network are not viable options for the vast majority of national accounts. [*Anthem I*, 236 F. Supp. 3d at 180, 224].

15. Slicing, TPAs, private exchanges, or other alternative vehicles cannot replace competition. [*Anthem I*, 236 F. Supp. 3d at 180-81 224-29].

(Doc. # 1392 at 9-10) (alterations adopted).[1]

## II.    Standard of Review

Collateral estoppel, now more commonly referred to as issue preclusion, is available when: "(1) the issue at stake is identical to the one involved in the prior litigation; (2) the issue was actually litigated in the prior suit; (3) the determination of the issue in the prior litigation was a

---

[1]    Provider Plaintiffs' motion cited the slip opinion pages for *Anthem I* to support these proposed facts. For ease of reference, the court has examined the *Anthem I* opinion and included the page numbers to the Federal Supplement, Third Series.

critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding." *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1318 (11th Cir. 2012). "The initial question of whether collateral estoppel is available . . . is a legal question," not a discretionary one. *Matter of McWhorter*, 887 F.2d 1564, 1566 (11th Cir. 1989).

The court has broad discretion to determine whether offensive collateral estoppel is appropriate in a particular action. *Cotton States Mut. Ins. Co. v. Anderson*, 749 F.2d 663, 666 (11th Cir. 1984). Fairness to both parties is a primary consideration, *id.* (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)), and the Eleventh Circuit has advised district courts to "cautiously" apply offensive collateral estoppel. *Ray v. Birmingham City Bd. of Educ.*, 845 F.2d 281, 283 (11th Cir. 1988). Generally, nonmutual offensive collateral estoppel should not be applied if a plaintiff easily could have joined in the earlier action or if its application would be unfair to a defendant. *See Parklane Hosiery*, 439 U.S. at 331. Here, Defendant Anthem has not argued that Provider Plaintiffs could have joined the earlier action, so the court need not consider that *Parklane* factor.

## III. Analysis

Anthem argues that none of the four elements of issue preclusion are met here. At least one of these elements presents an apparent issue of first impression: whether, in a Sherman Act suit against multiple parties, unrelated to the merger, market-definition-related findings from a Section 7 Clayton Act suit to enjoin a merger are entitled to collateral estoppel effect against one of the merging entities.[2] Anthem's challenges to some of the elements are stronger than others.[3]

---

[2] At oral argument, Provider Plaintiffs' counsel conceded that he was unaware of a case presenting a similar collateral estoppel issue. (Doc. # 1607 at 23).

Nevertheless, because the court concludes that equitable considerations *decisively* weigh against Provider Plaintiffs' motion for collateral estoppel, it is unnecessary to discuss all the factors at length. *See Shaffer v. R.J. Reynolds Tobacco Co.*, 860 F. Supp. 2d 991, 999 n. 3 (D. Ariz. 2012) (declining to discuss all collateral estoppel factors where inconsistent verdicts, plaintiffs' failure to show the necessity of all 749 factual findings to the prior judgment, and the lack of a jury trial in the prior action weighed against the exercise of collateral estoppel); *Grisham v. Philip Morris, Inc.*, 670 F. Supp. 2d 1014, 1037 (C.D. Ca. 2009) (concluding that "procedural fairness considerations" weighed against applying issue preclusion, even if plaintiffs showed that the four factors for issue preclusion were met).

Here, the court concludes that applying nonmutual collateral estoppel is unwarranted for at least two reasons. First, doing so would greatly prejudice the interests of the Defendants other than Anthem who did not participate in *Anthem I* or *Anthem II*. This concern is illustrated by *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1078-79 (E.D.N.Y. 2006), *rev'd on other grounds sub nom.*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008). In that opinion, the court explained that the factual issues for which the plaintiffs sought estoppel likely met the four factors required for collateral estoppel. *Schwab*, 449 F. Supp. 2d at 1078-79. Notably, the court found that the tobacco company defendants (like Anthem) had a fair opportunity to litigate the issues during the earlier nine-month bench trial where at least 84 witnesses testified, the

---

[3] For example, the court is inclined to agree with Defendant Anthem that proposed finding number 3 -- which was discussed in a footnote in *Anthem I* --was not a critical or necessary part of the market determinations in *Anthem I*. And, the court notes that some of Provider Plaintiffs' proposed findings -- such as proposed finding number 7 -- are summations or simplifications of the findings made by the district court in *Anthem I*. (*See* Doc. # 1392 at 9) (proposing a finding that "Association rules are significant to the determination of the relevant geographic market"). *See also Anthem I*, 236 F. Supp. 3d at 179, 203 (concluding that the Association's rules impacted the determination of the geographic market directly and immediately affected by the proposed Anthem-Cigna merger because those rules limited Anthem-Cigna competition for national accounts to a fourteen-state market, absent cedes). On the other hand, the court is inclined to agree with Provider Plaintiffs that Anthem had a full and fair opportunity to litigate the issues in the bench trial in *Anthem I* and the appeal in *Anthem II*.

tobacco companies had a strong interest in ensuring their ability to use certain brands, competent and experienced defense counsel represented the companies, and some of the litigated issues were necessary for the verdict. *Id.* at 1078-79. Nevertheless, the *Schwab* court declined to employ collateral estoppel on fairness grounds for three reasons. *Id.* at 1079. First, collateral estoppel could not be used against one defendant who had prevailed in the earlier action. *Id.* The court expressly recognized that "[a]pplication of estoppel to all but one of many defendants would confuse the jury, making administration of the case more difficult." *Id.* Second, the defendants had prevailed in other suits that raised the factual issues for which the plaintiffs sought issue preclusion. *Id.* Third, the court found that "little efficiency would be gained" by applying offensive collateral estoppel because "plaintiffs' proof of reliance and damages would almost certainly—as a matter of legal burden and persuasive strategy—require presentation of all evidence available to them of defendants' alleged scheme." *Id.* At least one other court has declined to apply nonmutual collateral estoppel in a situation where it would not be applied against all defendants. *See In re Light Cigarettes Marketing Sales Practices Litig.*, 691 F. Supp. 2d 239, 251 (D. Me. 2010) (declining to apply collateral estoppel where "a significant question" existed as to whether it could be applied against one of the two defendants).[4]

In one crucial respect, even stronger equities weigh against applying offensive collateral estoppel here than in *Schwab*. The *Schwab* opinion questioned the utility of offensive collateral estoppel where it could be used against all but one of the defendants. *Cf. Schwab*, 449 F. Supp. 2d at 1079. Here, Provider Plaintiffs would only be able to apply offensive collateral estoppel

___

[4] Similarly, the Restatement (Second) of Judgments states that a court may decline to apply collateral estoppel if "[t]reating the issue as conclusively determined may complicate determination of issues in the subsequent action or prejudice the interests of another party." Restatement (Second) of Judgments § 29(6). The Restatement explains that "little is gained by way of economy in foreclosing retrial of the issue, because substantial recanvassing of the evidence will in any event be necessary." *Id.* § 29, comment h.

against the substantial majority of the Blue Defendants currently in this MDL.[5]   It would likely be confusing if the court instructed the jury to apply certain market-related findings against Anthem while also instructing the jury to make its own trial evidence-based, independent findings on similar issues when deliberating over the claims against the other Defendants.   Provider Plaintiffs asserted during oral argument that the findings could be implemented to advance a set of pretrial motions against Defendant Anthem alone.   (Doc. # 1607 at 24).   But, Provider Plaintiffs have not filed those motions at this time, and Provider Plaintiffs have not sought to limit their requested summary judgment to pretrial matters.   (*See* Doc. # 1392 at 23) ("The Court should grant summary judgment with regard to the findings of fact and conclusions of law in the DOJ Action that are set forth above.").   Accordingly, the court concludes that the inapplicability of collateral estoppel to the vast majority of Defendants strongly weighs against applying it against Anthem with regard to the fifteen facts presented by Provider Plaintiffs.

Second, nonmutual offensive collateral estoppel is not warranted here because Provider Plaintiffs seek to incorporate findings from a bench trial to a jury trial.   Several courts have concluded that the fact that an initial proceeding was a bench trial can weigh against applying nonmutual collateral estoppel in the subsequent action, even though standing alone it cannot justify a refusal to apply collateral estoppel.   *See, e.g.*, *Shaffer*, 860 F. Supp. 2d at 998; *In re Light Cigarettes*, 691 F. Supp. 2d at 251; *Grisham*, 670 F. Supp. 2d at 1036.   Consistent with those opinions, the court concludes that the non-jury nature of *Anthem I* is a sub-factor that weighs against applying collateral estoppel here.

---

[5]   The accelerated Alabama actions include Provider actions against Defendant Anthem, other Blue Plan Defendants, and the Association.   (*See, e.g.*, *Conway v. Blue Cross Blue Shield of Ala.*, No. 2:12-cv-02532-RDP, Docket Sheet).

## IV.     Conclusion

For the reasons explained above, even if Provider Plaintiffs were able to show that issue preclusion is permissible under the four elements described in *Miller's Ale House* for some or all of the proposed findings, the court concludes that procedural fairness considerations decisively weigh against allowing the nonmutual offensive collateral estoppel requested by Provider Plaintiffs.   Accordingly, the court exercises its discretion to deny Provider Plaintiffs' Motion for Partial Summary Judgment Regarding Issues Decided in *United States v. Anthem.*   (Doc. # 1392). An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this April 16, 2018.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE