*1* FILED
2018 May-03  PM 04:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

1                    UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ALABAMA
2                       SOUTHERN DIVISION

3

4

   IN RE:                              *
5
                                       *        2:13-cv-20000-RDP
6  BLUE CROSS BLUE SHIELD ANTITRUST    *
                                       *        November 13, 2017
7  LITIGATION MDL 2406                          10:00 a.m.
                                       *
8                                               Birmingham, Alabama
                                       *
9

10  * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11          **R E D A C T E D    T R A N S C R I P T**

12            **TRANSCRIPT OF TELEPHONE CONFERENCE**
            **BEFORE THE HONORABLE R. DAVID PROCTOR**
13               **UNITED STATES DISTRICT JUDGE**

14  * * * * * * * * * * * * * * * * * * * * * * * * * * * *:

15

16

17

18

19

20

21

22

23

24

25

```
 1
     Present:          Steve DiPrima
 2   (VIA TELEPHONE)   Sam Leifer
                       Chris Weller
 3                     Glenn Kurtz
                       Craig Hoover
 4                     Dan Laytin
                       Sarah Donnell
 5                     Chris Kimble

 6

 7   Also Present:     Honorable T. Michael Putnam
                       Ed Gentle
 8

 9
     Court Reporter:   Leah S. Turner
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              This cause came to be heard and was heard on the
   13th day of November 2017, before the Honorable R. David
2  Proctor, United States District Judge, holding court for
   United States District Court, Northern District of Alabama,
3  Southern Division, in Birmingham, Alabama.

4              Proceedings continued as follows:

5                 P R O C E E D I N G S

6          THE COURT:  Good morning.  Who do I have on with me?

7          MR. DiPRIMA:  This is Steve DiPrima and Sam Leifer

8  from Wachtell, Lipton, Rosen & Katz for Cigna.

9          MR. WELLER:  Chris Weller from Capell & Howard for

10 Cigna.

11         MR. KURTZ:  Good morning, Your Honor.  Glenn Kurtz

12 from White & Case on behalf of Anthem.

13         MR. HOOVER:  Good morning, Your Honor.  Craig Hoover

14 for Anthem.

15         MR. LAYTIN:  Good morning, Judge.  Dan Laytin and

16 Sarah Donnell from Kirkland & Ellis for the Association.

17         MR. KIMBLE:  Chris Kimble for Anthem.

18         THE COURT:  Thank you.  I think that's everybody,

19 right?

20         (UNIDENTIFIED MALE):  I believe it is, Your Honor.

21         THE COURT:  I understand you all have hit a little

22 bit of a log jam on my assignment I gave you.  Why don't you

23 give me a report on where we are up to the moment.  And if you

24 wouldn't mind, indicate your name before you speak so my court

25 reporter can accurately record your remarks.
```

1          MR. KURTZ:  Glenn Kurtz for Anthem.  I will take the

2   first crack at it.  We have made quite a bit of effort leading

3   up to the submission to come up with a joint chronology in

4   accordance with Your Honor's wishes, and it's not that we have

5   problems with a particular language or format or anything like

6   that.  We did have a fundamental disagreement with Cigna as to

7   what was supposed to be included.  We had understood that Your

8   Honor wanted to evaluate potential violations of the mediation

9   order or the agreement, and although the Court left it to Vice

10  Chancellor Laster to deal with the specific request, Your

11  Honor did make a number of remarks at the hearing as to what

12  you considered to be covered by the mediation privilege which

13  we took as guidance for the chronology exercise.

14         And so in accordance with that, we tried to identify

15  potential disclosures of what happened in the mediation, and

16  those are the documents that ultimately we logged in the

17  submission that we provided to the plaintiffs, although even

18  that, I should note, included some inadvertent litigation

19  productions which may or may not have been part of what Your

20  Honor would have wanted to view.

21         The version of the chronology that we then provided

22  to Your Honor is much broader than the log.  The reason for

23  that is we were pretty concerned about maybe having a narrow

24  interpretation of the order so we thought we would be over-

25  inclusive, and in that regard we included a number of

1  documents relating to XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7  THE COURT:  Hello?  He dropped.  We might have to

8  have him call back in.

9  MR. KIMBLE:  Yes, we should.  We will send a note.

10  THE COURT:  Thank you.

11  Chris?

12  MR. KIMBLE:  Yes, Your Honor.

13  THE COURT:  Do you have a separate line you can just

14  call him and say hey -- that may be him.  Mr. Kurtz?

15  MR. KURTZ:  I apologize.  Glenn Kurtz.  I wondered

16  what the long silence was when I was done.  I apologize.  I

17  have no idea how we left the line.

18  THE COURT:  Okay.  Well, we were somewhere along the

19  lines of you understood that you were supposed to reveal only

20  discussions that occurred in the actual mediation or

21  communications related to the actual mediation and what

22  occurred in the mediation, I should say, not predictions or

23  personal views, and about that time you left off.

24  MR. KURTZ:  Okay.  Thank you, Your Honor.  So the

25  last remarks I was making is:  We thought we were, therefore,

1   over-inclusive.  We did that because we were concerned that we

2   didn't want to leave anything off that Your Honor might have

3   wanted to see.  But as broad as we were, we weren't broad

4   enough for Cigna, and we took the position that the ADR order

5   states the entire mediation process is confidential, so we had

6   to include even the possibility of a mention of a mediation in

7   the future.  That's why their chronology includes things that

8   predate the mediation by months, documents that mention the

9   fact of mediation and administrative communications that talk

10  about law firm conference room availability.

11        We thought that broad approach was a little

12  inconsistent with Your Honor's remarks.  We thought it was a

13  lot inconsistent with Cigna's approach, in this court and in

14  Delaware, and so we couldn't get to an agreement, not for a

15  lack of trying; and, hence, you've got two chronologies.

16  Maybe with some guidance as to who interpreted Your Honor

17  correctly, we could go back to the drawing board.

18        But as I said at the outset, if we understand it

19  correctly now, I think that the privilege log in affect, the

20  redaction, that we supplied to the plaintiffs is probably the

21  right body of documents.

22        THE COURT:  All right.  Let me hear from Cigna.

23        MR. DiPRIMA:  Sure, Your Honor.  So, our approach to

24  this was basically to look at any document, any piece of

25  testimony that touched on mediation, mentioned mediation, and

1   put it on the chronology for Your Honor.  We didn't try to

2   apply a filter of what was privileged or not privileged.  We

3   didn't get into whether something was someone's personal views

4   or something else.  On that it seemed to us and still seems to

5   us that if a lawyer with instant knowledge of the mediation is

6   expressing his personal views as to what is happening or

7   likely to happen in the mediation, that that divulges the

8   plaintiffs' position, the defendants' position, and that that

9   was information that Your Honor would want to see or we assume

10  so, and so we logged it on our chronology.

11          With regard to the log that went over to the

12  plaintiffs, we prepared a log.  We haven't supplied it yet to

13  them.  We weren't on the conference with the Court, I believe,

14  the Friday before last, but for what it's worth, our view on

15  the one that Anthem supplied is that it's incomplete.  It

16  omits, for example, the testimony from Anthem's 30(b)(6)

17  witness to the DOJ, among other things.  Also, it omits

18  disclosures by Anthem's outside counsel in the case to the

19  Maryland attorney general's office.  And so on that, that's

20  our view, but we will await for directions from the Court on

21  how to proceed on that.

22          THE COURT:  All right.  And identify yourself,

23  please, for the court reporter.

24          MR. DiPRIMA:  I'm sorry, Your Honor.  This is Steve

25  DiPrima.

1          THE COURT:  That's what I thought, but I didn't want

2     to speak for you.

3          All right.  Let me give you a couple of thoughts.

4     First, anybody else want to weigh in on the issue before I

5     provide some thoughts?

6          Okay.  A few thoughts.  I am really concerned about

7     conduct that could be violative of my order and Judge

8     Phillips' mediation agreement.  I don't think there's any way

9     conduct that occurred before the mediation commenced could be

10    so characterized, so Cigna's inclusion of all the information

11    prior to the mediation is off the mark.

12         What I'm interested in is actual disclosures about

13    what occurred or was discussed in the mediation, and that

14    would be all sources, even if some of those disclosures and

15    sources duplicate each other.  For completeness, I want all

16    sources and what was said or done or communicated about the

17    actual mediation meetings.

18         I don't think at this point we're looking at any

19    information about predictions or views on the mediation.

20    There's nothing in my order or Judge Phillips' agreement that

21    I can see that would prohibit anyone from saying this is what

22    we hope to gain from the mediation or this is what we hope

23    will occur in the mediation.

24         So you're not required -- and for that same reason,

25    we are not looking -- there's no requirement to disclose

1    discussions with other Blues in preparation for the mediation.

2    And I think right at the end of our discussion at the last

3    status conference, particularly if you go back and look at my

4    discussion with Mr. Boies, I think he was -- and I agreed with

5    him -- he was dead on that we're looking at conduct during the

6    mediation, not strategy about the mediation, not discussions

7    between the Blues about the mediation, but communications that

8    Anthem made to others about what occurred in the mediation.

9            Now, I will say this.  I think that in some ways the

10   chronologies are over-inclusive; in some ways they are

11   under-inclusive.  For example, there was deposition testimony

12   where -- I think it was Zelinsky testified about

13   communications he had about what occurred in the mediation,

14   and I don't see those anywhere in the chronology.  I see a

15   reference to the fact that he had the communication.  I don't

16   see anything in the chronology about Zelinsky telling me what

17   he said.  For example, that would be communications between

18   Zelinsky and Nicole Jones, for example.

19           So I think you've got to go back to the drawing

20   board and I think Cigna has to become less aggressive on what

21   they're insisting get put in this, but to be honest with you I

22   think Anthem is going to have to be more inclusive about what

23   goes in it.  And Cigna may not have all the information.

24   Maybe Nicole Jones has information about what Zelinsky told

25   her.  That's not in here either.  So the fact that Cigna is so

1  insistent that we get everything down, then I think you have

2  to tell me what Nicole Jones' position was about what

3  specifically Zelinsky told her about the mediation.  Not

4  predictions, not views, not goals, not hopes, dreams, or

5  aspirations; but what occurred.

6           Similarly, it looks like there was communications

7  between Anthem and some investigators.  Those may be less

8  problematic.  I'm not making a judgment because there may have

9  been some compulsion to reveal the information.  I don't know.

10  But there was also communications -- and I don't think I have

11  the true substance of what those communications were -- about

12  what occurred in the mediation.  Any questions about anything

13  I've said so far?

14           MR. KURTZ:  Your Honor, Glenn Kurtz.  Maybe a

15  clarification or two.  We will go back and look, but it may

16  be -- I don't recall Tom Zelinsky's deposition having

17  testimony about what he did or did not say to Nicole Jones.

18           THE COURT:  It may not have.  Look, it doesn't

19  because I think you asserted a privilege there.  You're

20  missing my point.  My point is he had the communication, and

21  Anthem objected -- tell me if I'm wrong.  Anthem objected in

22  the deposition to him revealing what was discussed, right?

23           MR. KURTZ:  Correct.  Correct, Your Honor.

24           THE COURT:  You're telling me what was discussed,

25  though, as I assess whether or not it's privileged.

1      MR. KURTZ:  Okay.  I see.

2      THE COURT:  You have left that out.  You didn't

3  include that in your chronology.  That's exactly what I was

4  trying to figure out.

5      So I think both sides have kind of missed the target

6  of what I really want to know and gotten into these side

7  scrimmages about things I don't care about.

8      MR. KURTZ:  Understood, Your Honor.  I have one

9  other question.

10      THE COURT:  Okay.

11      MR. KURTZ:  We have a few entries that concern

12  inadvertent productions by litigation e-counsel.  So that

13  would have been part of a 19 million page production and

14  attorneys got some material out.  We have had club act notices

15  when we discovered it for the first time, frankly, when we

16  noted it for the first time in connection with these

17  exercises.  That's something Your Honor wants to have included

18  in the chronology?

19      MR. DiPRIMA:  Just for a point of clarification,

20  Your Honor, those are disclosures or productions to DOJ.

21      MR. LAYTIN:  Your Honor, Dan Laytin for the

22  Association.  We would be happy to speak on that subject as

23  well.

24      THE COURT:  All right.  Go ahead.

25      MR. LAYTIN:  As Your Honor knows, we're operating in

1 the dark.  We just got Anthem's paper about an hour ago.  We

2 haven't seen Cigna's.  But with respect to the inadvertent

3 production, my understanding is, you know, these are not

4 affirmative disclosures by Anthem as part of any -- you know,

5 trying to get the transaction through.  This is simply among

6 the millions and millions of documents that Anthem produced in

7 somewhere, Delaware or D.C.  These were inadvertently

8 produced.  And our view, as we understand Your Honor's point

9 of view, is that these wouldn't be the kind of affirmatively

10 disclosed communications.

11     THE COURT:  Let me ask you this.  Are you trying to

12 get them back?

13     MR. LAYTIN:  Absolutely.  And when Anthem realized

14 that -- and Glenn can speak to this -- Anthem clawed them back

15 immediately.

16     MR. KURTZ:  We did, Your Honor.

17     THE COURT:  Let me ask you this.  Do these documents

18 reveal or reflect any communications that occurred about the

19 mediation?

20     MR. DiPRIMA:  Yes, Your Honor.

21     MR. LAYTIN:  Your Honor, it would be at the time --

22 for example, an email from my client's general counsel, the

23 Association general's counsel, to various CEOs saying here is

24 where we are, talking about the mediation, but that was only

25 two other Blues.  Anthem was a recipient to that email,

1    obviously, because its CEO received it, and that email just

2    happened to be collected for the investigation or the

3    challenge to the merger.  I'm not sure which.  And whatever

4    filter Anthem applied missed that particular document, so it

5    went out.  But having realized that, they clawed that back.

6              MR. DiPRIMA:  Your Honor, the document -- I'm sorry.

7              THE COURT:  Go ahead.

8              MR. DiPRIMA:  The documents at issue --

9              THE COURT:  Wait a minute.  Who are you?

10             MR. DiPRIMA:  This is Steve DiPrima for Cigna.  The

11   documents at issue would have been produced in the DOJ

12   litigation sometime before the trial in 2016.  They were, as

13   we understand it, clawed back after we alerted Anthem to them

14   in the course of preparing the chronology, so a year later.

15   At least one of them is heavily redacted for privilege.  So

16   the notion that it was an inadvertent production is -- well,

17   that is the story with those documents.

18             THE COURT:  Let me make sure I understand what we're

19   dealing with here on these clawed back or attempted clawed

20   back documents.  There was a communication at some point in

21   time about the mediation.  Subsequent to that, there was an

22   email which at least in part memorializes that communication

23   about the mediation process?

24             MR. LAYTIN:  Your Honor, it's Dan Laytin.  One and

25   two are one and the same.  It's an email to a subset of the

1   board saying here is what we intend to do about the mediation,

2   so the act is the memorialization.

3        THE COURT:  Okay.  I've got you.  So there's nothing

4   wrong with Anthem or others communicating with the board about

5   what occurred in the mediation, so why is this even something

6   I'm concerned about?

7        MR. LAYTIN:  That's exactly our view, Your Honor.

8        MR. DiPRIMA:  Because the document was produced to

9   Cigna and to the regulators.

10        THE COURT:  And then later was produced to Cigna and

11   the DOJ as part of some regulatory investigation?

12        MR. DiPRIMA:  As part of the litigation leading up

13   to the -- correct.

14        THE COURT:  Was that pre-litigation or

15   post-litigation?

16        MR. DiPRIMA:  Well, it would have been

17   post-complaint.

18        THE COURT:  Post-complaint, okay.  Because what I

19   understand is -- and maybe I'm off the mark.  My understanding

20   is DOJ came in and started asking some questions and then

21   filed suit related to the merger.

22        MR. KURTZ:  Glenn Kurtz.  That's correct, Your

23   Honor.

24        THE COURT:  So if all of this, though, relates to an

25   email that was simply in the Blue family, not to any third

party, about what occurred in the mediation, then clawback all
you want, but I don't think that involves my inquiry about
communications that occurred outside.  I'm not really trying
to dig into what got produced in litigation.  I'm trying to
figure out whether Anthem during the course of the mediation
was violating the agreement that Judge Phillips had them sign
and violating my order.  If they produced something that was
an internal email, whether that was a knowing disclosure,
inadvertent disclosure, that's not really what I'm concerned
about.  That's in that litigation.

I'm worried about whether they were intentionally
letting people know what was going on during the mediation
after coming to me and complaining about you not clawing back
these type of documents or allowing a clawback of these type
of documents.  Mr. DiPrima, do you understand that?

MR. DiPRIMA:  I do, Your Honor.

THE COURT:  So, remember the context of this.  I get
dragged in by at least Anthem and maybe other Blues trying to
look over the Vice Chancellor's shoulder in the state
litigation in Delaware about documents that are being produced
related to the mediation.  I am led to understand -- and maybe
it was my misunderstanding, but I think the record will speak
for itself -- that Cigna was trying to take advantage of
production in the state litigation to get information about
the mediation and that was unfair and there was a suggestion

1    that I weigh in and stop that practice.  And we had a round of

2    what I would say curative steps that I took because I was not

3    very interested in issuing an all writs order and stepping on

4    Vice Chancellor Laster's toes.

5              I also believed, based upon the feedback I had, that

6    he was certainly cognizant of the fact that I had an MDL and

7    needed to protect certain information and he was committed to

8    doing that to the extent he could.  So I thought we were

9    having kind of informal efforts to resolve these issues rather

10   than any formal issuance of a writ by this court.

11             In the midst of that, I find out, at least

12   potentially, that Anthem has been disclosing information about

13   the mediation on its own and for its own purposes outside of

14   the litigation production in Delaware.  That's what got my

15   interest.

16             So what I'm mostly interested in this hearing is

17   what Anthem disclosed and who they disclosed it to during the

18   course of the mediation, not before the mediation, and I want

19   to know what they disclosed about the actual mediation, not

20   any predictions or hopes or dreams or aspirations about what

21   they hoped might occur in the mediation.  I want to know what

22   was said.

23             So I think Cigna is overbroad in its approach, but I

24   think, quite frankly, as I go through what you have presented

25   to me, the two chronologies, there are several areas where I

1    think Anthem has not told me what was discussed.  They have

2    just told me that there was a discussion.  And I noticed in

3    the litigation, either the DOJ litigation or the Delaware

4    litigation, several times where they instructed a witness not

5    to answer the very question I'm asking now.  That may be

6    appropriate in that case.  It's not appropriate here.

7            All right?  So we are going to take another stab at

8    the chronology with those instructions and I'm going to give

9    you until next Friday to get it to me.

10           MR. KURTZ:  Thank you, Your Honor.  Glenn Kurtz.  If

11   I could just try to make sure.  I want to make sure that

12   there's no misunderstanding on the inadvertent production by

13   e-counsel.

14           I understand what Your Honor said.  I do want to be

15   clear there are -- there's, for instance, an agenda, a

16   tentative agenda, for a mediation.  There's a communication

17   with the mediator, and there is even a draft of a mediation

18   statement.  And so in some respects, they do relate to the

19   mediation, but the issue I guess I was inquiring about is

20   there was a 19 million page document production to the

21   government in connection with their investigation and review

22   of a 54 billion dollar merger and these documents got through

23   inadvertently.  It wasn't Anthem involved in the process.  It

24   would have been outside counsel that was involved in the

25   process.

1          Mr. DiPrima points out there's some redactions.  I

2     think those were spotted through some filter for

3     attorney/client or work product, but the same filter

4     apparently didn't work from outside e-counsel for mediation

5     documents, and so we clawed them back.  I don't know that --

6     this doesn't seem to be what Your Honor was looking for to the

7     extent -- looking for mistakes by outside counsel as much as

8     something that sort of happened in connection with the merger.

9     But I don't want to get it wrong either.

10          THE COURT:  Mr. Kurtz, let me ask you this.  Do

11     these documents reflect disclosures or communications about

12     what occurred during the mediation process?

13          MR. KURTZ:  No, not -- I don't think they do unless

14     they -- unless what they say got repeated at mediation because

15     there would have been drafts of things before and I think it

16     was all preparatory.  It wasn't in the mediation.

17          THE COURT:  Well, if that's the case, why are we

18     worrying about it, if it falls outside the definition I just

19     gave you?

20          MR. KURTZ:  Okay.  Great.  I just wanted to --

21          THE COURT:  Now, Cigna may disagree with you.  I

22     think you guys can't agree whether the sun comes up in the

23     East and sets in the West, at times.

24          MR. DiPRIMA:  Your Honor, to be clear, I believe

25     those documents do reflect things that happened --

1      THE COURT:  You're proving my point.  All right.

2 And that was Mr. DiPrima?

3      MR. DiPRIMA:  Yes.

4      THE COURT:  My point, though, is that if you have --

5 let's just say this.  If there's a dispute about documents,

6 then you prepare a chronology that you agree to, and then you

7 give me a second category of things that are disputed.

8      Now, that's the best way I can do it because I just

9 don't trust you all to come to an agreement about even the

10 parameters I just laid out for you.

11      MR. LAYTIN:  Your Honor, it's Dan Laytin.  Can we be

12 provided access to those when they are prepared so that we can

13 assess those as well?

14      THE COURT:  Yeah, so how are you going to assess

15 them?  What do you mean by "assess" them?

16      MR. LAYTIN:  I'm sorry?

17      THE COURT:  For example, Mr. Laytin, you said

18 earlier that certain documents are privileged and therefore

19 they shouldn't be produced.  My point, though, is if there was

20 a communication about the mediation, I think I'm entitled to

21 know about that even if there's an assertion of privilege

22 because all this is is in camera at this point.  It's not

23 going to any other party.  The privilege can be preserved.

24      So, yes, you can know about it, you can continue to

25 assert a privilege about it, but that doesn't preclude me from

```
 1    getting it.
 2              MR. LAYTIN:  Yes.  To be clear, Your Honor, I wasn't
 3    saying that as before it got to you.  I'm just saying when
 4    it's provided to you, can counsel for Cigna and Anthem provide
 5    the same to us as well.
 6              THE COURT:  All right.  But your letter --
 7              MR. LAYTIN:  And the other defendants -- privilege
 8    as well --
 9              THE COURT:  Your letter of October 23 was somewhat
10    confusing to me, to Mr. DiPrima, because it seemed to be
11    suggesting that if a document is privileged, you should not
12    include it in the chronology, not that it should remain
13    privileged despite being included in the chronology.
14              MR. LAYTIN:  We did not object to -- as we
15    understood Your Honor's directive, it was please tell me, the
16    Court, what Anthem affirmatively disclosed to Cigna or anybody
17    else about the mediation as Your Honor has defined the
18    mediation to be capital M, to go back to our previous
19    discussions.  We have -- of course, we're not trying to get in
20    the way at all of the disclosure of anything that falls within
21    that set to Your Honor.  We believe that Cigna was including
22    documents on their chronology that were significantly far
23    afield of that directive; and the substance of those
24    communications if presented to Your Honor, the trial judge
25    overseeing our case, could prejudice defendants.
```

```
 1              So that's how -- and we were trying to do this -- to
 2    say it was the 11th hour doesn't begin to describe the time
 3    left on the clock.  So I'm sure that our letter was confusing
 4    and imprecise and I appreciate the opportunity to explain it
 5    to Your Honor because we were trying to just move with what we
 6    had and we had very limited information.
 7              So that's what we were trying to do there.  I think
 8    that Your Honor describing the -- again, to the parties that
 9    what you're looking for in this chronology will hopefully
10    prevent any gameplay like that with Your Honor on this next
11    one, and so that helps.  So all we're asking for is the
12    ability to understand what's being disclosed to Your Honor of
13    information that was confidential, joint defense privilege,
14    that's now being provided to our trial judge.  I know that the
15    Association and I know that the other defendants would
16    appreciate understanding the extent of that.
17              THE COURT:  I'm only receiving this information for
18    assessment of whether my order was violated.  I'm not reading
19    anything into any negotiation strategy.  I practiced law once,
20    too.  I realize all sorts of things go into the vetting
21    process of how we're going to present our case to the
22    mediator, how we're going to present our case to the other
23    side, what we are going to give on, what we are going to take
24    on, what we are going to feign on.  I'm not looking at any of
25    these issues as helping me on the merits to decide anything.
```

```
1            All I'm interested in is seeing if, as was suggested
2    at the status hearing, Anthem came in here seeking the
3    protection of the Court to get back documents it claims was --
4    that were inadvertently disclosed at the same time that they
5    were knowingly violating the order and disclosing information
6    about the mediation in violation of my order and in breach of
7    Judge Phillips' mediation agreement.  Make sense?
8            MR. LAYTIN:  Yes, sir.
9            THE COURT:  In other words, I am particularly
10   interested in this because I felt like Anthem might have been
11   playing me a little bit.  At the same time that they were
12   telling me how upset they were about Cigna's conduct in trying
13   to wrench away these documents in the Delaware litigation and
14   asking me to weigh in and tell Vice Chancellor Laster how to
15   conduct his discovery process, they were at the same time all
16   the way to their general counsel making improper
17   disclosures -- and I'm not saying this happened, but this is
18   my concern -- making improper disclosures about the very
19   things they said Cigna was trying to discover, to Cigna.
20           MR. KURTZ:  Your Honor, Glenn Kurtz.  I would like
21   to make a remark or two, because I know Your Honor expressed
22   that concern at the hearing in October as well.  I do want to
23   let you know that I'm representing Anthem in Delaware.  We
24   actually tried to get an agreement between Cigna and the
25   Blues.  Eventually we would have had to have gone to the
```

1    plaintiffs, maybe Your Honor and Judge Phillips as well at

2    some point to try to find some common ground.  We weren't

3    trying to conceal any documents.  We, in fact -- we're more

4    than happy with the positions that we have had and our

5    interests, and what we have said to Cigna in the past,

6    predictions and the like, is consistent with our behavior.  We

7    didn't actually make a line of scope argument.  The

8    Association intervened in Delaware and raised the arguments as

9    to scope.  We're subject to agreements.  We're trying to

10   facilitate people as we can, but it's not our fight.  We have

11   been deferring really to the Association to protect what it

12   thinks it needs to protect and what it thinks the scope is.

13   We don't have a strong view on scope, and we haven't actually

14   argued, I think, scope really to Your Honor as well.  I think

15   we tried to document the assurances that you were successful

16   in obtaining from Cigna at the hearing and explaining why we

17   thought our stipulation was what you were looking for.

18          But, frankly, from our standpoint, at least in

19   Delaware, we saw a transcript, we saw some language from Your

20   Honor that certainly made us concerned.  Then we saw an order

21   to show cause and at that point we certainly tried to protect

22   our res that Your Honor was trying to protect and we wanted

23   Your Honor to define it.  But we haven't -- there is

24   definitely not a leverage between Delaware and Alabama as far

25   as we're concerned.  Whatever the proper scope of privilege is

1  is exactly where -- we're happy to participate in discovery

2  and we're not looking actually to conceal anything other than

3  what is subject to your mediation and then facilitating

4  mediation parties and making any arguments they want to make

5  about how wide a scope that should be, but we haven't actually

6  made an argument that that's a wide scope.

7          THE COURT:  Well, let me give you a couple of

8  examples of some areas that you want might want to focus on,

9  Mr. Kurtz.  In Shlagle's deposition in the DOJ litigation --

10 am I pronouncing his name correctly?

11         MR. KURTZ:  You are.  You are, Your Honor.

12         THE COURT:  It's referenced on page 10 of what I

13 think is Cigna's summary or chronology.

14             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20             Well, first of all, Mr. Shlagle didn't listen to you

21 when you told him don't volunteer information beyond the scope

22 of the question, because he volunteered information beyond the

23 scope of the question, and what he volunteered has my

24 attention, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4            MR. KURTZ:  I understand that, Your Honor.

5            THE COURT:  That's prime example.  I could give you

6   others, but I don't think I need to, do I?

7            MR. KURTZ:  No, you don't, Your Honor, and I get

8   that.  My only remarks were intended to communicate that we

9   are not -- I understand this inquiry and what we're supposed

10  to do with respect to mediation, and factually Shlagle was

11  repeating what Tom Zelinsky told him, so it's sort of another

12  source of whatever Tom Zelinsky said.

13           But I was just trying to be clear with Your Honor so

14  you understood that we are not trying to use it as a shield

15  and a sword.  We know we have to deal with whatever

16  disclosures have been made and I would be remiss in not

17  communicating our regret that we have anything to deal with

18  here and that we're taking so much of the Court's time on this

19  exercise, but I do want to be clear we're not trying to

20  overprotect on scope or anything else.

21           We have been trying to facilitate an agreement so

22  that everybody gets what they want subject only to what's

23  properly protected by mediation.  We don't want to be

24  over-aggressive in the invocation of that privilege.  We just

25  don't want to be under-aggressive given Your Honor's order to

1    show cause.

2              So we're not playing the cases against each other.

3    We have some disclosures that happened under common interest

4    in connection with the merger that we have to deal with.

5    We're taking it very seriously and we apologize, but we

6    definitely aren't gaming this.

7              THE COURT:  Okay.  Is Friday enough time for

8    everybody to complete the mission?

9              MR. KURTZ:  Absolutely.

10             MR. LAYTIN:  And, Your Honor, can Cigna and Anthem

11   provide the joint and unjoint chronologies to the defendants

12   as well?

13             THE COURT:  Any objection to that?

14             MR. KURTZ:  Glenn Kurtz.  We don't have an

15   objection.  We don't even have an objection to including the

16   Association in the exercise if it's another set of opinions

17   that could help us get us to the right spot.

18             THE COURT:  I will leave that up to you all.

19             MR. DiPRIMA:  I think that's going to slow things

20   down.

21             THE COURT:  Is that Mr. DiPrima?

22             MR. DiPRIMA:  Yes, Your Honor.

23             THE COURT:  You think that might slow things down to

24   include the Association?

25             MR. DiPRIMA:  I do.

```
 1              THE COURT:  Well, if things slow down and still get
 2   done by Friday, that's okay, Friday of next week.
 3              MR. KURTZ:  That's plenty of time.  Thank you, Your
 4   Honor.
 5              THE COURT:  Wait a minute.  Is Friday of next week
 6   Thanksgiving Friday?
 7              MR. KURTZ:  It is.
 8              THE COURT:  How about the following Monday, then.
 9   I'm not going to expect anybody to be in the office on Friday
10   sending out -- so we will say Monday the 27th by 4 p.m.
11   Central time.
12              MR. KURTZ:  Thank you very much, Your Honor.
13              THE COURT:  Sorry.  I got excited and forgot next
14   week is Thanksgiving.
15              MR. KURTZ:  We were aware of it, but we thought we
16   would get it done for you anyway.
17              THE COURT:  I will probably enjoy the Iron Bowl
18   without thinking about you all until the following Monday
19   anyway.
20              All right.  What else do we need to take up for now?
21              UNIDENTIFIED MALE:  You might want to explain to
22   those Yankees, Your Honor, what the Iron Bowl is.
23              THE COURT:  Alabama/Auburn.
24              MR. KURTZ:  We are aware of football.
25              Thank you very much Your Honor.  We appreciate all
```

1    the guidance and we will do our best to get something that's

2    joint and then have it filed for you on that Monday.

3              THE COURT:  All right.  Sounds good.  Take care.

4              (End of proceedings.)

C E R T I F I C A T I O N

    I hereby certify that the foregoing transcript in the above-styled cause is true and accurate.

**Leah S. Turner, RMR, CRR**
**Federal Official Court Reporter**