FILED

2019 Apr-15  PM 03:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|  |  |
|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION**<br><br>**MDL. NO. 2406** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This document relates to:**<br>**Subscriber Track cases**<br><br>**[REDACTED VERSION OF SEALED FILING]** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUBSCRIBER
PLAINTIFFS' MOTION FOR CERTIFICATION OF NATIONWIDE INJUNCTIVE
CLASS OR, IN THE ALTERNATIVE, ALABAMA INJUNCTIVE CLASS**

# TABLE OF CONTENTS

I.    **INTRODUCTION** .......................................................................................................... 1

II.   **CLASS ALLEGATIONS** ............................................................................................ 2

  A.   Evidence Common to the Nationwide Injunctive Class Establishes the Member Plans' Agreement to Limit Competition. ............................................................................... 3

  B.   Evidence Common to the Class Demonstrates the Threat of Antitrust Injury as a Result of Defendants' Uniform Implementation of Territorial Restrictions. ............................... 6

     1.    ESAs ............................................................................................................... 6

     2.    NBE ............................................................................................................... 8

  C.   The Restraints Threaten Antitrust Injury to All Class Members through Higher Premiums and Reduced Consumer Choice, Efficiency and Innovation. ................................... 11

     1.    Common Evidence Shows that Competition Lowers Premiums, and Lack of Competition Raises Them. .......................................................................... 11

     2.    Common Evidence Shows that the Restraints Limit Consumer Choice. .................. 13

     3.    Common Evidence Shows that Lack of Competition Stifles Innovation and Prevents Increases in Efficiencies. .............................................................. 14

III.  **ARGUMENT** .......................................................................................................... 15

  A.   The Proposed Class Representatives Have Antitrust Standing ........................................ 16

  B.   The Requirements of Rule 23(a) Are Satisfied ............................................................. 19

     1.    The Class is so Numerous that Joinder Would be Impracticable. ............................ 19

     2.    There Are Questions of Law and Fact Common to the Class. ................................. 19

     3.    The Claims of the Class Representatives Are Typical of the Class. ......................... 21

     4.    The Named Subscribers Are Adequate Class Representatives. ............................... 22

  C.   The Class Satisfies the Requirements of Rule 23(b)(2). ............................................... 24

  D.   The Proposed Class Is Ascertainable. .......................................................................... 27

  E.   Certification of a Nationwide Injunctive Class Is Appropriate. ..................................... 27

IV.  **CONCLUSION** ...................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alderman v. GC Services Limited Partnership*,
  2018 WL 542455 (S.D. Fla. Jan. 19, 2018) .............................................................. 27

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ............................................................................ 19, 23, 24

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ............................................................................... 18

*Beacon Theatres, Inc. v. Westover*,
  359 U.S. 500 (1959) ............................................................................... 28

*Blue Shield of Virginia v. McCready*,
  457 U.S. 465 (1982) ............................................................................... 18

*Braggs v. Dunn*,
  317 F.R.D. 634 (M.D. Ala. 2016) ............................................................... 24

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ............................................................................... 17

*Bussey v. Macon Cty. Greyhound Park, Inc.*,
  562 F. App'x 782 (11th Cir. 2014) ............................................................. 27

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ............................................................................... 17

*Cole v. City of Memphis*,
  839 F.3d 530 (6th Cir. 2016) ................................................................... 16

*Coleman v. Cannon Oil Co.*,
  141 F.R.D. 516 (M.D. Ala. 1992) ........................................................... 16, 19

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
  258 F.R.D. 545 (N.D. Ga. 2007) ............................................................... 24

*Cooper v. Federal Reserve Bank of Richmond*,
  467 U.S. 867 (1984) ............................................................................... 30

*Cooper v. Southern Co.*,
  390 F.3d 695 (11th Cir. 2004) ................................................................. 28

*Davis v. S. Bell Tel. & Tel. Co.*,
  1993 WL 593999 (S.D. Fla. Dec. 23, 1993) ............................................................... 29

*Federal Trade Comm'n v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986) ....................................................................................................... 18

*Fortner v. Thomas*,
  983 F.2d 1024 (11th Cir. 1993) ................................................................................... 29

*Gooch v. Life Investors Ins. Co. of Am.*,
  672 F.3d 402 (6th Cir. 2012) ....................................................................................... 30

*Griffin v. Carlin*, 755 F.2d,
  755 F.2d 1516 (11th Cir. 1985) ................................................................................... 23

*Hawaii v. Standard Oil Co. of Cal.*,
  405 U.S. 251 (1972) ................................................................................................. 15, 16

*HealthSouth Corp. Secs. Litig.*,
  213 F.R.D. 447 (N.D. Ala. 2003) ................................................................................. 22

*Herron v. Beck*,
  693 F.2d 125 (11th Cir. 1982) ..................................................................................... 29

*Hiser v. Franklin*,
  94 F.3d 1287 (9th Cir. 1996) ....................................................................................... 30

*Holmes v. Cont'l Can Co.*,
  706 F.2d 1144 (11th Cir. 1983) ................................................................................... 29

*In re Blue Cross Blue Shield Antitrust Litig.*,
  308 F. Supp. 3d 1241 (N.D. Ala.) ........................................................................*passim*

*In re Carbon Dioxide Antitrust Litig.*,
  149 F.R.D. 229 (M.D. Fla. 1993) ................................................................................. 20

*In re Checking Account Overdraft Litig.*,
  275 F.R.D. 666 (S.D. Fla. 2011) ................................................................................. 27

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
  317 F.R.D. 675 (N.D. Ga. 2016) ................................................................................. 20

*In re Domestic Air Transp. Antitrust Litig.*,
  137 F.R.D. 677 (N.D. Ga. 1991) ............................................................................ 19, 25

*In re HealthSouth Corp. Sec. Litig.*,
 257 F.R.D. 260 (N.D. Ala. 2009) ............................................................. 19

*In re HealthSouth Corp. Sec. Litig.*,
 261 F.R.D. 616 (N.D. Ala. 2009) ............................................................. 21

*In re Infant Formula Antitrust Litig.*,
 1992 WL 503465 (N.D. Fla. Jan.13, 1992) .............................................. 20

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
 169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................. 29

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ........................................... 18

*In re Processed Egg Prods. Antitrust Litig.*,
 312 F.R.D. 124 (E.D. Pa. 2015) ........................................................ 28, 29

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
 299 F.R.D. 555 (E.D. Tenn. 2014) .................................................... 28, 29

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
 264 F.R.D. 603 (N.D. Cal. 2009) ...................................................... 25, 27

*In re Terazosin Hydrochloride*,
 220 F.R.D. 672 (S.D. Fla. 2004) ............................................................. 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
 267 F.R.D. 583 (N.D. Cal. 2010) ...................................................... 24, 26

*In re Visa Check/MasterMoney Antitrust Litig.*,
 192 F.R.D. 68 (E.D. N.Y. 2000) ............................................................. 29

*In re Vitamin C Antitrust Litig.*,
 279 F.R.D. 90 (E.D.N.Y. 2012) ........................................................ 28, 30

*In re Welding Fume Prods. Liab. Litig.*,
 2010 WL 7699456 (N.D. Ohio June 4, 2010) .......................................... 30

*Karhu v. Vital Pharms., Inc.*,
 621 F. App'x 945 (11th Cir. 2015) ......................................................... 16

*Kennedy v. Tallant*,
 710 F.2d 711 (11th Cir. 1983) ............................................................... 21

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004).................................................................................. 16, 29

*Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*,
  763 F.3d 1280 (11th Cir. 2014)......................................................................................... 24

*Laumann v. Nat'l Hockey League*,
  105 F. Supp. 3d 384 (S.D.N.Y. 2015)................................................................................ 18

*Little Caesar Enterprises, Inc. v. Smith*,
  172 F.R.D. 236 (E.D. Mich. 1997)..................................................................................... 18

*Martin v. Blessing*,
  571 U.S. 1040 (2013) ........................................................................................................ 22

*Murray v. Auslander*,
  244 F.3d 807 (11th Cir. 2001)........................................................................................... 20

*Nat'l Soc'y of Prof'l Engineers v. United States*,
  435 U.S. 679 (1978) .......................................................................................................... 18

*New Motor Vehicles Canadian Exp.*, MDL No. 1532,
  2006 WL 623591 (D. Me. Mar. 10, 2006) ....................................................................... 18

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985) ............................................................................................................ 1

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*,
  604 F.3d 1291 (11th Cir. 2010).......................................................................................... 17

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014).............................................................................................. 24

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) .......................................................................................................... 16

*Scott v. City of Anniston, Ala.*,
  682 F.2d 1353 (11th Cir. 1982).......................................................................................... 26

*Shelton v. Bledsoe*,
  775 F.3d 554 (3d Cir. 2015).............................................................................................. 16

*Shook v. El Paso Cty.*,
  386 F.3d 963 (10th Cir. 2004)........................................................................................... 16

*Spears v. Johnson*,
  859 F.2d 853 (11th Cir.1985) ............................................................ 29

*State of Ala. v. Blue Bird Body Co.*,
  573 F.2d 309 (5th Cir. 1978) ....................................................... 18, 28

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011) .............................................................. 27

*Todorov v. DCH Healthcare Auth.*,
  921 F.2d 1438 (11th Cir. 1991) .................................................... 17, 18

*United States v. Anthem, Inc.*,
  236 F. Supp. 3d 171 (D.D.C. 2017) ....................................... 10, 13, 15
  *Aff'd* 855 F.3d 345 (D.C. Cir. 2017) ........................................... 10, 15

*United States v. Oregon State Med. Soc.*,
  343 U.S. 326 (1952) ............................................................... 1, 17, 30

*VAE Nortrak N. Am., Inc. v. Progress Rail Servs. Corp.*,
  459 F. Supp. 2d 1142 (N.D. Ala. 2006) ............................................ 17

*Valley Drug Co. v. Geneva Pharm., Inc.*,
  350 F.3d 1181 (11th Cir. 2003) ........................................................ 22

*Vega v. T-Mobile U.S.A., Inc.*,
  564 F.3d 1256 (11th Cir. 2009) ....................................................... 20

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .................................................................. 20, 25

*Weiss v. York Hosp.*,
  745 F.2d 786 (3d Cir. 1984) ............................................................ 25

*Williams v. Mohawk Indus., Inc.*,
  568 F.3d 1350 (11th Cir. 2009) ............................................. 20, 21, 29

*Yaffe v. Powers*,
  454 F.2d 1362 (1st Cir. 1972) ......................................................... 16

*Zenith Radio Corp. v. Hazeltine Research*,
  395 U.S. 100 (1969) ................................................................... 1, 17

**Statutes**

Sherman Act, 15 U.S.C. §1 ........................................................... 20, 21

Clayton Act, 15 U.S.C. § 26 ........................................................................................ 17

**Rules**

Fed. R. Civ. P. 23(a) ........................................................................................... *passim*

Fed. R. Civ. P. 23(a)(2) ......................................................................................... 19, 20

Fed. R. Civ. P. 23(a)(3) ............................................................................................... 21

Fed. R. Civ. P. 23(a)(4) ............................................................................................... 22

Fed. R. Civ. P. 23(b)(1) ............................................................................................... 24

Fed. R. Civ. P. 23(b)(2) ...................................................................................... *passim*

Fed. R. Civ. P. 23(b)(3) ...................................................................................... *passim*

Fed. R. Civ. P. 23(c)(1)(C) .......................................................................................... 30

**Other Authorities**

Herbert Newberg & Alba Conte, *Newberg on Class Actions* (5th ed.) ....................... 21

Restatement (Second) of Judgments (1982) ................................................................ 30

## I.   INTRODUCTION

The Subscriber Plaintiffs ("Subscribers") seek certification of a Nationwide Injunctive Relief Class (or in the alternative, an Alabama Injunctive Relief Class) (the "Class") under Fed. R. Civ. P. 23(b)(2). Certification standards for such a Class are easily satisfied here. Defendants *admit* that they have entered into an agreement to allocate geographic territories; in fact, they have codified that agreement and produced it in this litigation. They admit that they have entered into an agreement to impose revenue caps on certain types of revenue. Direct evidence from the Defendants themselves shows that the very purpose of the restraints is to reduce or eliminate competition amongst themselves. And they admit that the restraints apply across the board to all customers with no exceptions during the class period.

This Court is already well familiar with these facts, having ruled that the restraints are properly viewed under a *per se* standard. *In re Blue Cross Blue Shield Antitrust Litig*., 308 F. Supp. 3d 1241 (N.D. Ala.), *permission to appeal denied*, 2018 WL 7152887 (11th Cir. Dec. 12, 2018) ("*BCBS*"). The Court's ruling simplifies this case, making it uniquely suitable for class treatment. As *per se* violations, the challenged restraints are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,* 472 U.S. 284, 289 (1985). Thus, against this background, in determining whether to certify an injunctive class, the Court must decide whether Defendants, in implementing these restraints, acted or refused to act on grounds generally applicable to the class, threatening anticompetitive injury. *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952) ("All it takes to [support an antitrust] injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur."); *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 130 (1969) ("*Zenith*") (same). That is clearly the situation here: the proposed nationwide injunctive class is

1

threatened with the consequences of non-competitive health insurance markets including, among other items, increased premiums and decreased consumer choice, innovation, and efficiencies. These elements of an antitrust claim can be proven by classwide evidence.

## II.   CLASS ALLEGATIONS

Defendants are 36 independent companies—35 Defendants licensed to sell health insurance under the Blue Cross and Blue Shield names and marks, and the Defendant Blue Cross Blue Shield Association ("BCBSA"), the entity created and controlled by the Blues to issue those licenses (together, "Member Plans"). *BCBS,* 308 F. Supp. 3d at 1250; Subscriber MSJ (Doc. 1351) UMF ¶¶1-2, 16; SX1[1] (Doc. 1352-1 and 2) at '41, '65-66; SX5 (Doc. 1352-6) at '46-'48; SX37 (Doc. 1352-41) at '65; Subscriber Pls.' MSJ Opp. (Doc. 1435) AUF ¶¶1-4. Each Member Plan is a potential competitor of every other Member Plan, as this Court has found and as Defendants' own expert, Dr. Murphy, admits. Doc. 1485 at 9; *BCBS,* 308 F. Supp. 3d at 1257; DX32 (Doc. 1349-3), Expert Report of Dr. Kevin M. Murphy ¶60.

In addition to and independently from seeking certification of an Alabama damages class under Fed. R. Civ. P. 23(b)(3)[2], Subscribers seek certification under Fed. R. Civ. P. 23(a) and (b)(2) of the following Nationwide Injunctive Class:

> All persons or entities in the United States of America and Puerto Rico who are currently subscribers to any health insurance plan that is offered by any Defendant or any subsidiary, affiliate, or successor-in-interest thereof whose ability to do business in any geographically defined area is limited by a license agreement with BCBSA. Excluded from the Class are subscribers to Administrative Services Only or Administrative Service Contracts, the Defendants themselves and any parent, subsidiary or affiliate of any Defendant.

---

[1] Exhibits from the parties' summary judgment briefing will be cited using the abbreviations "SX" for Subscriber Plaintiffs' Exhibits (*see* Doc. 1352, 1436, and 1555) and "DX" for Defendants' Exhibits (*see* Doc. 1349, 1429, and 1551) as well as to the existing docket number for clarity. Subscribers incorporate by reference their exhibits SX1-329 from that briefing.

[2] Subscribers incorporate by reference their Memorandum in Support of Motion to Certify an Alabama Damages Class.

In the alternative, Subscribers move to certify the following Alabama Injunctive Class:

> All persons or entities in Alabama who are currently subscribers to any health insurance plan that is offered by any Defendant or any subsidiary, affiliate, or successor-in-interest thereof whose ability to do business in any geographically defined area is limited by a license agreement with BCBSA. Excluded from the Class are subscribers to Administrative Services Only or Administrative Service Contracts, the Defendants themselves and any parent, subsidiary or affiliate of any Defendant.

Subscribers Consumer Financial Education Foundation of America, Inc. ("CFEFA"), Pearce Bevill Leesburg Moore, PC ("Pearce Bevill"), Rolison Trucking ("Rolison"), Fort McClellan Credit Union ("FMCU"), Conrad Watson Air Conditioning ("CWAC"), American Electric Motor Services ("AEMS"), CB Roofing, and Pettus Plumbing & Piping, Inc. ("Pettus") seek appointment as class representatives for the Class.

## A. Evidence Common to the Nationwide Injunctive Class Establishes the Member Plans' Agreement to Limit Competition.

Rather than competing in a free market, Member Plans have entered into license agreements that explicitly allocate the geographic areas, also called exclusive service areas or "ESAs," in which each Member Plan is allowed to compete. *See* SX44-122 (Doc. 1352-49 through Doc. 1352-128) (license agreements for each Member Plan). Pursuant to the ESAs, Member Plans may not sell insurance outside of their ESAs using the Blue Marks. *Id.* at '04 ("[T]he Plan may not use the Licensed Marks and Name outside the Service Area or in connection with other goods and services . . . ."). While there are some areas in which ESAs overlap, those Member Plans with overlapping ESAs still agree to sell insurance only in the ESA defined by the license agreement.

All Member Plans have all agreed to be bound by the license agreements and the ESAs delineated therein. *BCBS,* 308 F. Supp. 3d at 1268-69; SX223 (Doc. 1352-230), BCBSA 30(b)(6) Dep. (6/16/2017) 142:6-18. The Member Plans freely admit that the license agreements constitute an agreement not to compete for class members. SX204 (Doc. 1352-211), BCBS-AL 30(b)(6) Dep.

(6/28/2017) 46:4-18 (Q: "So through the Association, you have an agreement not to compete in each other's geographic territories; is that correct?" A: "Without permission from that plan, that's correct."). Common evidence shows that the purpose of the ESAs is to prevent competition among the Blues. SX240 (Doc. 1436-19) at '38 ("Plans benefit from the exclusive areas because it eliminates competition from other Blue Plans. Otherwise there would be open warfare."); SX234 (Doc. 1436-12) at '31 (purpose of ESAs is the "lessening of competition").

ESAs alone were not historically a foolproof means of eliminating competition. Even with the license agreements in place, some Member Plans began to compete with other Member Plans through the development and sale of unbranded, or "Green", business. SX414, Report of Dr. Daniel Rubinfeld ("Rubinfeld Rep.") ¶81. In this way, Member Plans were able to circumvent the ESAs and offer Green health insurance in other Member Plans' ESAs. As a direct response to this potential competition, and for the express purpose of limiting it, the Member Plans developed the National "Best Efforts" rule ("NBE") codified in the BCBSA's Membership Standards. *Id*. ¶¶50-59; SX330, BCBS-AZ_MDL000851089 at slide 15 ████████████████████████ ██████████████████████████████████████. The "Best Efforts" label is false one, as there are no best efforts requirements to protect the Blue marks in NBE, only restrictions on revenue and competition. SX210 (Doc. 1352-217) at '754 ████████████████████████ ████████████████████████████████████████████████████████████ ██████████████; SX331, *In re Anthem/Cigna Merger Litig*., C.A. No. 2017-0114-JTL (Del. Ch.) ("*C/A*"), Tr. 295:16-19 ("The limitation on non-Blue revenue caused by the national best efforts rule only protects and enhances the Blue brand by restricting competition against the Blue brand.").

Under these restrictions on Green competition, Member Plans may only achieve up to 33 1/3% of health-insurance revenue nationally through Green business, creating a hard revenue cap

on their ability to compete with other Member Plans on a Green basis. SX177 (Doc. 1352-184) at '61. Every Member Plan agreed to be bound by NBE revenue caps. *BCBS*, 308 F. Supp. 3d at 1272; SX123-157 (Doc. 1352-129 through Doc. 1352-163), Defs.' Responses to May 5, 2017 RFAs. Restrictions on Green competition are a predominating common issue.

BCBSA monitors and enforces the ESAs and NBE.  To monitor ESAs, BCBSA published a "Map Book" listing exactly where each Member Plan can sell Blue-branded insurance. *See, e.g.*, SX160 (Doc. 1352-165); SX159 (Doc. 1352-164), BCBSA 30(b)(6) Dep. (6/30/17), at 52:22-53:5, 270:13-15. To monitor NBE, BCBSA required Member Plans to regularly report compliance with all Membership Standards, including NBE. *See, e.g.,* SX332-366 ███████████████████ █████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████. To ensure compliance with ESAs and NBE, the Member Plans' agreement is enforced by BCBSA, through its Brand Enhancement and Protection Committee. SX223 (Doc. 1352-230), BCBSA 30(b)(6) Dep. (6/16/2017) 71:4-72:24. To enforce the ESAs, the BEPC developed a ████████████████ ████████ SX367, BCBSA02796848 at '48. Member Plans who violate the ESAs ███████████ ██████████████████████ *Id.* at '50. Prior to the Class Period, monetary sanctions had been levied against Member Plans for ESA violations. SX159 (Doc. 1352-164), BCBSA 30(b)(6) Dep. (6/30/17) 159:8-160:9 ████████████████████. For NBE, BCBSA meticulously documents each Member Plan's Green revenue to ensure enforcement of revenue caps. *See* SX368, BCBSA-CID-015465 ████████████████████████ ██████████████████████████████████████████████████████. Member Plans found to be in violation of NBE face the harsh sanction of license termination. SX223 (Doc. 1352-230), BCBSA 30(b)(6) Dep. (6/16/2017) 75:1-14.

Not surprisingly, given rigorous policing and enforcement of ESAs and NBE, throughout the class period, the Member Plans have adhered to these rules. SX10-33 (Doc. 1352-14 through Doc. 1352-37), Defs.' Responses to June 5, 2017 RFAs (responses to Request No. 7 (ESAs) and Request No. 11 (NBE)). In this way, the Member Plans ensured uniform application of the restraints across the nation in a manner that has adversely affected and will continue to affect all putative class members. Monitoring and enforcement are predominantly common facts.

### B. Evidence Common to the Class Demonstrates the Threat of Antitrust Injury as a Result of Defendants' Uniform Implementation of Territorial Restrictions.

#### 1. ESAs

Evidence common to the class shows that, absent the restraints, Member Plans would seek to sell insurance outside of their ESAs on a Blue or Green basis, competing with each other for subscribers. SX267 (Doc. 1436-47) at '17 █████████████████████████████████ ██████████████████████████████████████████████; SX175 (Doc. 1352-182), *United States v. Anthem, Inc.*, No. 16-CV-1493 (D.D.C. Nov. 23, 2016), Tr. 655:25-656:16 (Anthem national accounts representative describing Anthem as "a national plan that operates in 14 states" because of ESAs and noting that "we have any number of customers and consultants that express an interest in working with us, and we're prohibited from doing that," but that being able to do so would be "exhilarating"); SX369, BCBSMA-R-00092335.0001 ████████████ ████████████████████████████████████████████████████ ███████████████████; SX370, HCSC-E005824076 at '76 ████████████ █████████████████████████████████████████████████████████; SX371, BCBSAL_0000315714 ███████████████████████████████████ ████████████████████; SX372, BCBSAL_0001462154, at '54 ████████████ ████████████████████████████████████████████████.

Currently, Member Plans may seek Blue-branded business outside of their ESAs for national accounts. Under the ceding policies, which constitute a naked customer allocation agreement for national accounts, a Member Plan can only enter the ESA of another Member Plan if that Member Plan grants permission. Rubinfeld Rep. ¶107; *see also* SX412, WLP-00198358 at '65 ████████████████████████████████; SX373, BCBS-ND_MDL000247026 at '28 ████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████. Ceding fixes the right to bid for national accounts in the ESA in which the account is headquartered, unless the Member Plan in that ESA agrees to cede that right to a different Member Plan in a different ESA. That rule not only forecloses competition among Member Plans for national accounts, depriving those accounts of the benefits of competitive bidding, but also prevents the national account itself from requesting and receiving a competitive bid from a Member Plan of its choice.

For many Blues, ceding is their only way to grow their business, given the limitations within their own ESAs. SX268 (Doc. 1436-48) at '52 (because BCBS-AL has the "unique problem" of "very high market share," its "biggest growth opportunities lies [*sic*] in the national Accounts arena with accounts that are headquartered out side [*sic*] the state."). For this reason, Member Plans compete vigorously over who gets the right to bid on a national account. *See, e.g.,* SX374, BCBSAL_0000952957 ██████████████████████████████ ███████████████████████████████████████; SX375, BCBSAL_0000074582 at '82 ████████████████████████████████████████████████; SX376, BCBSAL-0000074616 at '16 ███████████████████████████████████ ████████████████████████████████████████████████; SX377,

WLP-00561466 at '66 ████████████████████████████████████████████

████████. And Member Plans attempt to bid on accounts all over the country, not just those that are

geographically close. *See, e.g.,* SX378, BCBSF-R-00139774 at '74 ██████████████████

█████████████████████████████████████████████████████; SX379, WLP-

01797520 at '20 ████████████████████████████████████████; SX380,

BCBSAL_0000822300 █████████████████████████.

 The Member Plans' policies on ceding reveal the extent to which they wish to compete

outside of their service areas but cannot do so because of the challenged restraints. Further

evidencing the Member Plans' largely frustrated desire to compete is the fact that Member Plans

take advantage of the limited marketing opportunity available to them under the ceding policies

whenever they can; with the exception of Triple-S Salud (the Puerto Rico BCBSA Member Plan),

every single Member Plan has sought and achieved Blue-branded business outside of its ESA

through cedes. SX10-33 (Doc. 1352-14 through Doc. 1352-37) (Response to Request No. 3). The

Member Plans' own stated desires to grow outside of their ESAs, along with evidence that Member

Plans already seek business outside of their ESAs through cedes, demonstrate on a common basis

that the ESAs deprive the class of the benefits of competition.

  2.  **NBE**

 The NBE limits competition in Green business. Absent the NBE restriction on Green

competition, Member Plans would seek to grow across ESAs on a Green basis, competing with

other Member Plans. SX254 (Doc. 1436-34) at '77 ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████. Capping revenue for Green business creates

a disincentive for a Member Plan to devote resources to a Green entity, thereby reducing

competition in the market for health insurance to the detriment of subscribers. *Id.* at '79 (purpose

of NBE is to prevent a situation where ███████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████; SX210 (Doc. 1352-217) at '751 █████████

████████████████████████████████████████████████████████████████████████

████████████████████████.

      The proposed Cigna/Anthem merger illustrates the anti-competitive nature of these revenue caps. By way of background, Defendant Anthem had long complained that NBE would limit its ability to "grow organically or through an acquisition." SX261 (Doc. 1436-41) at '23. And yet Anthem was "landlocked" by its 14-state ESA and needed to find a new growth strategy. SX331, *C/A* Tr. 18:24-19:8. In May 2014, Anthem approached Cigna Corporation, a national health insurer, to begin merger discussions. Rubinfeld Rep. ¶86. Under a merger, Anthem would have been able to market health insurance nationwide under the Cigna brand, in direct competition with other Member Plans. *Id.* ¶¶86, 93. However, the National Best Efforts would have constrained the growth of the merged entity; as Anthem noted in an internal presentation, "[i]n order to maintain compliance, the combined entity can only grow $1 outside [of the 14] Blue states [Anthem's ESA] for every $2 growth inside Blue states." SX262 (Doc. 1436-42) at '85. In this way, the NBE rule was working exactly as intended—to prevent a Member Plan from developing Green business with a proposed "50-state footprint" that would compete with other Member Plans. SX331, *C/A* Tr. 19:4-8, 156:21-157:7. As Anthem acknowledged internally, "The limitation on non-Blue revenue caused by the national best efforts rule only protects and enhances the Blue brand by restricting competition against the Blue brand… This is an anti-competitive consequence which is the desire purposed of the national best efforts rule." *Id.* 295:16-296:5.

      Without NBE, the proposed merger had the opportunity to increase innovation and

consumer choice for class members. Rubinfeld Rep. ¶¶151, 160-61. Given the anti-competitive effects of NBE on the proposed merger, Anthem deployed its General Counsel to "look if there's ways to either modify or eliminate the NBE." SX331, *C/A* Tr. 156:21-157:7. Anthem was so desperate to eliminate NBE that it considered "work[ing] with the plaintiffs in Alabama [in this MDL]. As opposed to being the defendant, [Anthem] would go on the plaintiff's side, to help facilitate the plaintiff's case and drive change to the Blues rules. . . ." *Id.* 1757:10-15; 1757:16-20 (Anthem would "fight the enforcement of the Blues rules as being anticompetitive"); 173:7-13. Ultimately, they were unable to effect such a change. To meet NBE, Anthem would have to rebrand accounts within its ESA away from Cigna's innovative, value-based model and towards Anthem's discount-based model. Rubinfeld Rep. ¶¶95-97 (describing differences between the two models).

The merger was challenged by the U.S. Department of Justice and ruled anticompetitive by the District Court for the District of Columbia, a decision that was affirmed on appeal. *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, *aff'd*, 855 F.3d 345 (D.C. Cir. 2017) ("*Anthem*"). In its ruling, the Court confirmed that the Best Efforts rules would "restrict[] growth post compliance" and that the merged entity "must manage total revenue growth to not outpace Blue revenue growth." 236 F. Supp. 3d at 240 n.42. The failed Anthem/Cigna merger provides a real-world example of the pernicious effects of NBE, effects that will continue unabated unless halted by a nationwide injunction. SX331, *C/A* Tr. 1284:1-9 (Anthem's General Counsel: "Our transaction demonstrates the anticompetitive impact of the National Best Efforts Rule."). In that case, NBE worked exactly as intended—it prevented a Blue from developing a viable Green competitor that could compete in other Blues' ESAs. *Id.* 290:22-291:1 (Anthem General Counsel: "Thus, is factually accurate that the national best efforts rule does limit a Blue licensee's incentive to invest

in non-Blue brands that would compete against other Blue licensees in their service areas."). Denial of such competition threatens antitrust harm to class members.

### C. The Restraints Threaten Antitrust Injury to All Class Members through Higher Premiums and Reduced Consumer Choice, Efficiency and Innovation.

#### 1. Common Evidence Shows that Competition Lowers Premiums, and Lack of Competition Raises Them.

Subscribers' experts Dr. Ariel Pakes, a pioneer and one of the leading authorities in the field of health insurance economics, and Dr. Daniel Rubinfeld, a leading economist and expert on industrial organizations, have examined the peer-reviewed literature and find the consensus of economists in this field recognizes that competitor entry into a market is a price reducing force, disciplining prices and preventing firms from earning long run economic profits above a normal rate of return. SX415, Expert Report of Dr. Ariel Pales ("Pakes Report") ¶7; Rubinfeld Rep. ¶143. This literature is clear that "increased insurer concentration tends to lead to higher subscriber premiums." Pakes Report ¶150; *see also* Rubinfeld Rep. ¶142 ("It is well understood among industrial organization economists that decreased competition leads to higher prices…."). In one study, the authors found that premiums would have been 5.4% lower on average with entry of one additional insurer in a market. Pakes Report ¶152. Another study found that increased concentration in a marketplace led to a 13.7% increase in premiums. Rubinfeld Rep. ¶143.

This price-inflating effect was in fact confirmed by economic reports developed during the 2008 proposed merger of Pennsylvania Member Plans Highmark and Independence Blue Cross ("IBC"). Pennsylvania is one the few states in the country in which Member Plans are allowed to compete in limited areas. The proposed merger was analyzed by the Pennsylvania Insurance Department ("PID"), with an objection from Capital Blue Cross ("CBC"), another Member Plan operating in the state. PID retained an expert economics consulting firm, LECG, Inc. ("LECG"), to issue a report examining, among other things, the value of potential Blue-on-Blue competition

between Highmark and IBC.

As a part of their analysis, LECG examined the historical impact of Blue-on-Blue competition between Highmark and Capital BC in portions of Central Pennsylvania:



SX381, HMK00034306 at '411; *see also* SX324 (Doc. 1555-8) at '45 (LECG found that reducing competition would "create the risk that health care customers will pay higher nominal premiums [and] likely suffer from a reduction in the quantity and quality of provider care.").

LECG also reviewed the prospect of Blue-on-Blue competition between Highmark and IBC in the Philadelphia area. In modeling Highmark entry into IBC's market, LECG concluded that ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████. SX381 at '392-93. Other experts reached similar conclusions. Lawton Burns, Ph.D. of the Wharton School testified in a U.S. Senate hearing on the proposed merger that ████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████. SX382, IBC-02128542 at '45.

Not only did outside economists make these points, but CBC, a defendant in this litigation, agreed that competition reduces prices. CBC's expert noted that competition gives "both customers and providers additional choices and more leverage in negotiating with health insurers." SX299

(Doc. 1436-83) at '230. CBC cited documentary evidence that "competition among health insurers has been shown to result in relatively lower premiums, by some estimates, 12% lower." *Id*. CBC adopted LECG's findings that Blue-on-Blue competition benefits Subscribers in the form of lower premiums. *Id.* at '231. CBC concluded that eliminating Blue-on-Blue competition would "negatively impact the price and quality of care available to all Pennsylvanians." *Id.* at '233.

Member Plans' internal documents bear out the reality of these economics. SX383, BCBSAL_0000282979 at '79



; SX213 (Doc. 1352-220) at '49

; SX378 at '74-74.002

; SX384, BCBS-KC_MDL000298840 at '60

### 2.    Common Evidence Shows that the Restraints Limit Consumer Choice.

Consumer choice is an important non-price benefit of competition. Pakes Report ¶85; Rubinfeld Rep. ¶¶15, 17. Lack of competition decreases consumer choice in numerous ways, including by decreasing the number of product options available to class members. Pakes Report ¶¶64-78, 85. Defendant CBC made this exact point in the context of the proposed Highmark/IBC merger; its expert noted that competition gives "both customers and providers additional choices and more leverage in negotiating with health insurers" and warned that eliminating Blue-on-Blue competition would "effectively eliminat[e] consumer choice." SX299 (Doc. 1436-83) at '230, '233.

Again, the economics are corroborated by common evidence. Class representatives have testified about the limited options they face. *See, e.g.,* SX385, CFEFA 30(b)(6) Dep. (9/14/2017) 117:14-17 ("Q. And then when you came to CFEFA, you felt that Blue Cross Blue Shield was the right choice for your company? A. It was the only game in town."); SX386, FMCU 30(b)(6) Dep. (9/26/2017) 57:7-16 (testifying that they would like to, but cannot, get health insurance quotes from other Blue Cross entities outside of Alabama); SX387, CB Roofing 30(b)(6) Dep. (3/27/2017) 108:15-109:8 (testifying that they want the opportunity to purchase BCBS insurance from BCBS entities other than BCBS-AL). Documentary evidence reveals many instances in which a subscriber wanted a bid from a different Member Plan but was stuck with the Member Plan in its ESA. *See, e.g.*, SX383 at '81 ███████████████████████████ ███████████████████████; *id.* at '79 ██████████████████████████ ██████████; SX209 (Doc. 1352-216) at '81 (IBC explaining that while brokers in the tri-state area and Maryland have approached IBC about quoting Blue business, IBC has declined due to the ESA rules). And the recent Anthem/Cigna trial underscored the real-world example of denial of consumer choice. Had the merger gone through, Anthem would have been forced to effectively eliminate Cigna's presence in its 14-state ESA market in order to meet NBE, denying class members a choice of different product offerings. Rubinfeld Rep. ¶¶98-101.

Common evidence thus demonstrates that the challenged restraints limit consumer choice, both by limiting the number of insurers from which a subscriber may choose and limiting the types of products available to the class.

### 3. Common Evidence Shows that Lack of Competition Stifles Innovation and Prevents Increases in Efficiencies.

Competition also promotes efficiencies and innovation in the market. Member Plans' refusal to compete deprives class members of these benefits. Rubinfeld Rep. ¶155-61. As

Defendant CBC's economic expert explained, ███████████████████
███████████████████████████████████████████████████████ SX388,
CBC00066309 at '23. An industry group also testified that ████████████
███████████████████████████████████████████████████████████████
SX389, HMK00033835 at '45. And internal documents further acknowledge that competition
promotes efficiency. SX328 (Doc. 1555-11) at '71 ("Competition is good for consumer and forces
efficiencies on Plans.").

During the government case on the Anthem/Cigna proposed merger, the Court made
factual findings about the lack of innovation inherent in the Blue system's approach to health care.
Member Plans rely on deep provider discounts to control costs, and so do not focus on innovative
ways to manage care to reduce costs in the same way as its competitors do. *Anthem*, 236 F. Supp.
3d at 230-231; *see also United States v. Anthem, Inc.*, 855 F.3d 345, 350 (D.C. Cir. 2017) (noting
competitor offered "different means of lowering health care costs than the traditional model relying
heavily on provider discounts."). ████████████████████████████████████
███████████████████████████████ SX390, BCBS-AZ_MDL000883104 at '05;
*see also* SX391, BCBS-AZ_MDL000853830 at slide 11 ██████████████████
██████████████████████████████████████████████; *id.* at slide 14
███████████████████████████████████████████████████; SX413,
BCBS-KC_MDL001270940 at slides 8, 16. Depriving subscribers of competition nationwide
reduces innovation and efficiencies across all class members.

## III.   ARGUMENT

"Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by
Congress. . . This system depends on strong competition for its health and vigor, and strong
competition depends, in turn, on compliance with antitrust legislation." *Hawaii v. Standard Oil*

*Co. of Cal.*, 405 U.S. 251, 262 (1972). The Supreme Court has long recognized the vital role of private antitrust class actions in enforcing the antitrust laws. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Standard Oil*, 405 U.S. at 266. As one Alabama court has found, "[i]t may be that a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers." *Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 520 (M.D. Ala. 1992) ("*Coleman*").

"For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004) ("*Klay*"). Subscribers must also satisfy an "implicit ascertainability requirement." *Karhu v. Vital Pharms.*, Inc., 621 F. App'x 945, 946 (11th Cir. 2015) ("*Karhu*").[3] Under Rule 23(a), the putative class must satisfy the prerequisites of numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). Under Rule 23(b)(2), the putative class must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ." Fed. R. Civ. P. 23(b)(2). Subscribers and their antitrust claims readily satisfy each of the necessary requirements to certify either of these classes.

### A.  The Proposed Class Representatives Have Antitrust Standing.

The showing required to establish antitrust standing for equitable relief under Section 16 of

---

[3] Although the class certification motion in *Karhu* requested certification under both Rule 23(b)(3) and (b)(2), the Eleventh Circuit did not clearly address the necessity of establishing ascertainability in a (b)(2) class. The four circuits that have done so uniformly have rejected any ascertainability requirement for Rule 23(b)(2) actions. *See Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972); *Shelton v. Bledsoe*, 775 F.3d 554, 561 (3d Cir. 2015); *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016); *Shook v. El Paso Cty.*, 386 F.3d 963, 972 (10th Cir. 2004). In any event, as shown below, the requested classes here are readily ascertainable.

the Clayton Act is "less demanding" than for a damages claim. *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1452 (11th Cir. 1991) ("*Todorov*"); s*ee also Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299, 1306-07 (11th Cir. 2010); *VAE Nortrak N. Am., Inc. v. Progress Rail Servs. Corp.*, 459 F. Supp. 2d 1142, 1165 (N.D. Ala. 2006). "All it takes to [support an antitrust] injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur." *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952); *Zenith*, 395 U.S. at 130 (same). When seeking injunctive relief under the antitrust laws, "a private plaintiff must allege ***threatened*** loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986) (emphasis added) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see also* Clayton Act § 16, 15 U.S.C. § 26 ("Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief … against threatened loss or damage by a violation of the antitrust laws…."). Proof of present, actual injury is not required. *Cargill,* 479 U.S. at 111 (1986); *Zenith*, 395 U.S. at 130; *Todorov*, 921 F.2d at 1452.

The class representatives amply satisfy the antitrust standing requirement. They have demonstrated through common evidence that due to Member Plans' restraints on competition among themselves, the class representatives—like all other members of the proposed class—have experienced or are threatened with anticompetitive effects, such as reduced consumer choice, less innovation and efficiencies, and/or higher premiums. Rubinfeld Rep. ¶¶165-167; Pakes Report ¶¶81-85.

Each class representative has only a single Blue option for insurance. SX392, AEMS Decl. ¶ 11; SX393, CB Roofing Decl. ¶ 11; SX394, Pettus Decl. ¶ 12; SX395, Pearce Bevill Decl. ¶ 12;

SX396, CFEFA Decl. ¶ 12; SX397, FMCU Decl. ¶ 12; SX398, Rolison Decl. ¶ 12; SX399, CWAC Decl. ¶ 12. Thus, given that Dr. Pakes concludes entry would have occurred absent the challenged restraints, each class representative suffers and will continue to suffer from a loss of consumer choice. Pakes Report ¶5. The challenged restraints also restrict the product depth and diversity offered to the class representatives. *Id.* ¶85. The Supreme Court repeatedly has recognized that such actions restricting consumer choice give rise to the sorts of injury the antitrust laws were intended to prohibit. *See, e.g.*, *Federal Trade Comm'n v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) ("*IFD*") ("refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 604-06 (1985) (consumers injured by denial of choice to ski on all four mountains at ski resort). The Supreme Court has recognized that horizontal agreements to restrict competition "limit[] consumer choice by impeding the 'ordinary give and take of the market place.'" *IFD*, 476 U.S. at 459 (quoting *Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 692 (1978)). A party engages in injurious conduct when it "pre-empt[s] the working of the market by deciding for itself that its consumers do not need that which they demand." *IFD*, 476 U.S. at 462.[4] This leaves consumers with a "Hobson's choice"—or in reality, no choice at all. *Blue*

---

[4] Notably, courts recognize the loss of consumer choice as the very type of antitrust injury that injunctive relief can appropriately address even in situations where a court may decline to certify a damages class. *See, e.g.*, *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 400 (S.D.N.Y. 2015) (after denying certification of a Rule 23(b)(3) class, court certified a Rule 23(b)(2) class, saying that "there is no question that here, a common injury exists in the form of diminished consumer choice"); *In re New Motor Vehicles Canadian Exp.*, MDL No. 1532, 2006 WL 623591, at *5 (D. Me. Mar. 10, 2006) (granting class certification under Rule 23(b)(2) for injunctive relief after previously dismissing federal damages claims because injunction requires proof only of "threatened" future injury, not past or current damages); *see also Little Caesar Enterprises, Inc. v. Smith*, 172 F.R.D. 236, 268 (E.D. Mich. 1997) (courts "should consider certifying a declaratory and injunctive class even if it determines the case should not be certified under Rule 23(b)(3) for the damages claim" in the antitrust context); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) (certifying injunctive relief class under Rule 23(b)(2) but declining to certify damages class under Rule 23(b)(3)). *Cf. State of Ala. v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th Cir. 1978) ("*Blue Bird*") (finding it unnecessary "to show an actual effect on prices in order to show a violation.").

*Shield of Virginia v. McCready*, 457 U.S. 465, 483-84 (1982).

## B.  The Requirements of Rule 23(a) Are Satisfied.

Rule 23(a) lists four threshold requirements that all class actions must satisfy: (1) numerosity, *i.e.*, the class must be "so numerous that joinder of all members is impracticable"; (2) commonality, *i.e.*, there must be "questions of law or fact common to the class"; (3) typicality, *i.e.*, the "claims or defenses of the representative parties [must be] typical of the claims or defenses of the class"; and (4) adequacy of representation, *i.e.*, the representatives must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) ("*Amchem*"). The proposed Nationwide Injunctive Class (and, in the alternative, the Alabama Injunctive Class) satisfies each of these four prerequisites.

### 1.   The Class is so Numerous that Joinder Would be Impracticable.

Rule 23(a) requires that a class be so numerous that joinder is rendered "impracticable." *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 273–74 (N.D. Ala. 2009) ("*HealthSouth*") (*quoting In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 698 (N.D. Ga. 1991) ("*Domestic Air*")). The proposed Nationwide Class easily satisfies this requirement. The BCBSA Member Plans provide health insurance coverage to more than 100 million Americans across all 50 states and its territories.[5] BCBS-AL alone covers approximately three million individuals.[6] Joinder of millions of individuals would be impracticable. *Coleman*, 141 F.R.D. at 521 (joinder of 54,000 plaintiffs impracticable).

### 2.    There Are Questions of Law and Fact Common to the Class.

Rule 23(a)(2) requires that there be at least one legal or factual issue common to the class. Under this "commonality requirement, a class action must involve issues that are susceptible to

---

[5] https://www.bcbs.com/about-us/blue-cross-blue-shield-system.

[6] https://www.bcbsal.org/web/about/index.html.

class-wide proof." *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001). It is not necessary that all questions of fact or law be common or even that common questions predominate. *See Vega v. T-Mobile U.S.A., Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009). Rather, "for purposes of Rule 23(a)(2), '[e]ven a single [common] question' will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) ("*Dukes*") (alterations in original) (internal citations omitted); *see also Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009). Commonality is thus a "low hurdle" to clear. *Id.* at 1356.

"[I]n the antitrust context, courts in this Circuit have consistently held that allegations of price-fixing, monopolization, and conspiracy by their very nature involve common questions of law or fact." *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 686 (S.D. Fla. 2004); *see In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 694 (N.D. Ga. 2016); *In re Infant Formula Antitrust Litig.*, MDL No. 878, 1992 WL 503465, at *4 (N.D. Fla. Jan.13, 1992); *In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229, 232 (M.D. Fla. 1993) ("By their nature, antitrust conspiracy actions such as this one involve common questions of law or fact").

Defendants have engaged in a horizontal conspiracy to allocate exclusive territorial markets spanning the entirety of the nation, in violation of Section 1 of the Sherman Act. This is precisely the sort of conspiratorial conduct that satisfies the commonality requirement of Rule 23(a)(2). There are numerous questions of law and fact that are common to the class, including: (1) whether Member Plans have entered into license agreements allocating geographic territories; (2) whether Member Plans have entered into an agreement to cap revenue for Green health insurance; (3) whether the challenged restraints have resulted in foreclosure of entry and reduced consumer choice; and (4) whether Member Plans constitute a single entity for purposes of managing their trademark. Thus, Subscribers satisfy this element.

20

### 3. The Claims of the Class Representatives Are Typical of the Class.

The typicality requirement of Rule 23(a)(3) is satisfied if "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Williams*, 568 F.3d at 1357. Typicality can be satisfied even where there are substantial factual differences, provided that there is a strong similarity between the underlying legal theories. *Id.*; *see also* Herbert Newberg & Alba Conte, *Newberg on Class Actions,* § 20.39 & nn.12 & 13 (5th ed.) ("[I]ndividual factual differences will not by themselves preclude satisfaction of Rule 23(a)(3) typicality, particularly as the typicality inquiry focuses on the nature of the class representative's claim or defense and not on the specific facts from which that claim or defense arose.") (citing cases). "As long as defendants 'committed the same unlawful acts in the same method against the entire class[,]' a plaintiff establishes the necessary typicality." *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 627 (N.D. Ala. 2009) (quoting *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983)).

The class representatives' claims are typical of the claims of the members of the proposed Class. By their voluntary execution of the BCBSA license agreements and by their adherence to the BCBSA Membership Standards and Guidelines year after year, Member Plans have illegally allocated the market for commercial health insurance among themselves nationwide in violation of Section 1 of the Sherman Act. As a result of Member Plans' illegal behavior, each of the class representatives and each of the unnamed members of the Class seeking injunctive relief has suffered, and continues to suffer, from the unduly restricted consumer choice and the threatened harm of high premiums, low innovation, and failure to implement efficiencies. While the degree of past injury may vary regionally, the ***threat*** of continued, future antitrust injury is uniform nationwide. The claims of the class members, both those who are absent and those who are serving as class representatives, are based on the same illegal conduct of Member Plans; typicality is thus

21

readily satisfied.

**4.      The Named Subscribers Are Adequate Class Representatives.**

Rule 23(a)(4) requires that the representative party in a class action "adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). As the Eleventh Circuit set forth in *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (quoting *HealthSouth Corp. Secs. Litig.,* 213 F.R.D. 447, 460–61 (N.D. Ala. 2003)), the adequacy requirement has two different prongs: "'(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action.'" Included as well is an evaluation of the adequacy of counsel who are acting on behalf of the putative class. *See Martin v. Blessing*, 571 U.S. 1040 (2013).

No substantial conflicts exist between the class representatives and the Class, and the class representatives have, for the last seven years, adequately prosecuted this action and will continue to do so until conclusion. *See* SX392, AEMS Decl. ¶7; SX393, CB Roofing Decl. ¶¶8, 10; SX394, Pettus Decl. ¶¶8, 10; SX395, Pearce Bevill Decl. ¶¶8, 10; SX396, CFEFA Decl. ¶¶8, 10; SX397, FMCU Decl. ¶¶8, 10; SX398, Rolison Decl. ¶¶8, 10; SX399, CWAC Decl. ¶¶8, 10; SX385, CFEFA 30(b)(6) Dep. (9/14/2017) 119:6-120:10 (rejecting conflict between rural and urban subscribers, groups versus individuals, or large versus small groups); SX282 (Doc. 1436-65), AEMS 30(b)(6) Dep. (3/8/2017) 134:13-135:10, 138:8-12 (class representative believes Member Plans have limited its options and brought litigation to increase options); *id.* 143:3-25, 145:14-22 (even though small, AEMS will represent small and large subscribers to the best of its ability); SX400, Rolison 30(b)(6) Dep. (9/19/2017) 148:8-9 ("I mean, if you had a free open market, it would benefit everybody."); SX387, CB Roofing 30(b)(6) Dep. (3/27/2017) 111:22-112:1 (purpose of litigation is to create more options for all subscribers); SX401, Pearce Bevill 30(b)(6) Dep. (3/7/2017) 210:1-9 (seeking to allow Member Plans to cross state borders and compete).

22

While the class representatives are located in Alabama, all Nationwide Injunctive Class members have been subject to and injured by a common course of wrongful conduct regardless of their location; therefore, it is in the class representatives' interest to vigorously prosecute claims on behalf of the Class. *Amchem*, 521 U.S. at 594-95 (adequacy satisfied where representative plaintiffs "possess[ed] the same interest and suffer[ed] the same injury as the class members"). Accordingly, class representatives and the Nationwide Injunctive Class share a common interest in establishing liability and enjoining future anticompetitive conduct. [7]

Subscribers' Co-Lead Counsel and Committee Chairs, previously selected on an interim basis by this Court after thorough vetting by the Special Master, have the requisite qualifications and experience to vigorously and effectively prosecute this action. *See Griffin v. Carlin*, 755 F.2d 755 F.2d 1516, 1532 (11th Cir. 1985). They all have significant experience in antitrust and other complex class actions, have been appointed by courts across the nation to spearhead antitrust and other complex class actions, and have successfully prosecuted numerous such actions on behalf of injured parties across the United States and internationally. *See* SX402, Hausfeld Decl.; SX403, BSF Decl. (attaching resumes of Subscribers' counsel).

Since being appointed Interim Co-Lead Counsel (Doc. No. 61), Subscribers' counsel have filed an initial and three amended complaints, successfully briefed and defended numerous motions to dismiss, successfully briefed and argued a summary judgment motion establishing that the *per se* rule will govern much of this case, and have engaged in extensive discovery and other motion practice. They have reviewed millions of documents, hired economic experts to analyze

---

[7] Prior to 2017, the Court prioritized Alabama class certification proceedings. Doc. 469 and 575; *see also* Doc. 584 (listing *Pearce, Bevill, Leesburg, Moore P.C. et al. v. BCBS-AL et al.*, Case No. 2:16-cv-00464-RDP as additional prioritized action). In November 2017, the Subscribers filed a Third Consolidated Amended Complaint ("TCAC") including the Alabama Plaintiffs along with 55 Plaintiffs residing in states other than Alabama. Doc. 1074-1. If the Court wishes to have as class representatives for the Nationwide Injunctive Relief Class some or all of these additional Plaintiffs, it can certify a Class with the prioritized Plaintiffs as class representatives and advise the parties on the timing and procedures it wishes to utilize in adding more class representatives identified in the TCAC.

data, have represented the class in depositions, have conducted depositions, and have made substantial out-of-pocket expenditures on behalf of the class. *See Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 556 (N.D. Ga. 2007) (identifying similar activities and expenditures to justify adequacy of counsel). Most importantly, this Court can make an informed determination regarding counsels' advocacy based upon its firsthand knowledge gained through seven years of overseeing this multidistrict litigation.

### C.  The Class Satisfies the Requirements of Rule 23(b)(2).

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem*, 521 U.S. at 614. Subscribers seek certification of the Nationwide Injunctive Class (or alternatively the Alabama Injunctive Class) pursuant to Rule 23(b)(2), which provides that: "a class can be certified for purposes of seeking injunctive or declaratory relief if the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*, 763 F.3d 1280, 1291 (11th Cir. 2014) (internal citations omitted). *See also Braggs v. Dunn*, 317 F.R.D. 634, 668 (M.D. Ala. 2016) (stating "Rule 23(b)(2) … does not require that the class-wide relief benefit each class member in precisely the same way"). Rule 23(b)(2)'s requirements are "unquestionably satisfied" where, as here, "members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014).

The requirements of Rule 23(b)(2) almost always are satisfied when plaintiffs allege a violation of the antitrust laws that has had and continues to have a common antitrust impact on the market, *i.e.*, when the challenged conduct's impact is "market-wide and not specific to individual customers." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 596 (N.D. Cal. 2010),

*amended in part,* No. M 07-1827 SI, 2011 WL 3268649 (July 28, 2011) ("*TFT-LCD*"); *see also Domestic Air*, 137 F.R.D. at 696; *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 610 (N.D. Cal. 2009) ("*SRAM*"). As explained in *Dukes*: "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" 564 U.S. at 360–61 (internal citations omitted); *see Weiss v. York Hosp.*, 745 F.2d 786, 811 (3d Cir. 1984) ("When a suit seeks to define the relationship between the defendant(s) and the world at large, as in this case, (b)(2) certification is appropriate.").

Here, it is indisputable that Member Plans have adopted a common, nationwide course of conduct, to all class members. ***Every*** Member Plan agreed to ESAs limiting where ***every*** Member Plan may compete and have further agreed to revenue caps that limit their competition on a Green basis. These restraints impact ***every*** class member nationwide, regardless of the level of monetary damages they may have incurred, by foreclosing Blue-on-Blue competition and reducing Blue-on-Green competition. Further, Subscribers have suffered and will continue to suffer anticompetitive effects on a class-wide basis as a result of Member Plans' restraints. Removal of the restraints would prove relief to the benefits of competition to the class as a whole. Rubinfeld Rep. ¶167.

Equitable relief barring Member Plans' challenged conduct would prevent Defendants from violating the law in the future, restore competition and thus provide a prospective remedy for the common injury threatened against all members of the proposed Nationwide Injunctive Class. Because all class members live in areas where Defendants have agreed to restrict competition, Defendants have treated all class members the same. And because a single, common injunction or declaration will stop the ongoing antitrust violations caused by Defendants' common actions, the proposed class satisfies the requirement that Defendants "acted or refused to act on grounds that

apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

The proposed Class readily satisfies this standard because Subscribers challenge the horizontal market allocation scheme under which Defendants do business across the class, not any individualized practices or variable contract provisions. This market allocation scheme is, by definition, "market-wide and not specific to individual customers"; it would not work otherwise. *See TFT-LCD*, 267 F.R.D. at 596. Its terms define how the Member Plans do business nationwide; every single market is treated the same for purposes of application of the restraints. Because the horizontal market allocation scheme governs how Member Plans do business on a nationwide basis, the nationwide class thus "share[s] the common characteristic of being subjected to the same [anticompetitive] practice and, therefore, presumably ha[s] the cohesiveness typical of 23(b)(2) actions." *Scott v. City of Anniston, Ala.*, 682 F.2d 1353, 1358 (11th Cir. 1982).

Subscribers have also adequately defined the relief they seek and explained how that relief will remedy the injuries suffered by all members of the proposed class. Specifically, Subscribers seek: (1) a declaration that the restraints imposed on competition by Defendants—specifically, the assignment of ESAs contained in the individual BCBS license agreements and related membership standards and guidelines of BCBSA governing those exclusive service areas, including NBE— violate the Sherman Act; (2) that Defendants' be estopped from employing or enforcing the ESAs and NBE; and (3) an order enjoining BCBSA and each of the Member Plans from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any Member Plan may compete (or, in the alternative, an order enjoining BCBSA and each of the Member Plans from entering into, or from honoring or enforcing, any agreements that restrict competition on a Blue or Green basis in Alabama). By eliminating these restraints, the

26

injunction would open competition in the insurance marketplace to the benefit of class members.

Finally, certification of a Rule 23(b)(2) class is particularly appropriate here because, by barring Member Plans from continuing to violate the antitrust laws, equitable relief is far more likely to provide long-lasting relief than continual annual awards of damages. *See, e.g.*, *SRAM*, 264 F.R.D. at 610 ("the long-lasting effect of an injunction would likely be greater than a damages award"); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 316 (3d Cir. 2011) (affirming class action decision where "in the absence of injunctive relief, De Beers's anticompetitive conduct would continue to cause the entire membership of all classes to pay artificially inflated prices"). Affordable, meaningful health insurance is a critical need for every family in America. An injunction opening the markets to free and open competition is essential to fulfilling that need.

### D.  The Proposed Class Is Ascertainable.

Subscribers' proposed Nationwide Injunctive Class (or alternative Alabama Injunctive Class) is easily ascertainable through the Member Plans' own records identifying their customers. Pakes Report ¶22. *See Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 788 (11th Cir. 2014) ("objective criteria for identifying members of the defined class could 'be analyzed in a manageable and administratively feasible way, namely, by reference to [Defendant's] records'"); *Alderman v. GC Services Limited Partnership*, No. 2:16-CV-14508, 2018 WL 542455 (S.D. Fla. Jan. 19, 2018) (finding that proposed class "based on objective criteria that can be determined from Defendant's business records" was "adequately defined and sufficiently ascertainable"); *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 672 (S.D. Fla. 2011) (finding that the mining of defendant's business records to identify class members was administratively feasible) (citing cases). Thus, the proposed Class satisfies Rule 23(a).

### E.  Certification of a Nationwide Injunctive Class Is Appropriate.

The Court has asked the parties to address: (1) the propriety of a Rule 23(b)(2) injunctive

class in this litigation, citing *Blue Bird* and *Klay*, and (2) any claim preclusion issues potentially resulting from (b)(2) class certification, citing *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124 (E.D. Pa. 2015) ("*Eggs*"); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555 (E.D. Tenn. 2014) ("*Skelaxin*"), and *In re Vitamin C Antitrust Litig.,* 279 F.R.D. 90 (E.D.N.Y. 2012) ("*Vitamin C*"). Doc. 2392 at 2 n.1. Plaintiffs have considered these matters carefully.

First, certification of a nationwide injunctive class is appropriate under *Blue Bird* and *Klay*. Although neither *Blue Bird* nor *Klay* involved a 23(b)(2) class, the former Fifth Circuit in *Blue Bird* concluded that certification of a nationwide liability/issues class was inappropriate because plaintiffs had failed to provide evidence of a single, "common" nationwide conspiracy; instead, they "plan[ned] to proceed state by state and prove by varying evidence fifty different price-fixing conspiracies." 573 F.2d at 322-23. The concerns that led to denial of a national class in *Blue Bird* are absent from this case. Here, Subscribers have alleged, and adduced overwhelming evidence of, a single nationwide conspiracy across all of the Member Plans, with universal effect across the country. Indeed, one of the challenged restraints is even titled "National" Best Efforts – a restriction on nationwide revenue from unbranded business.

The court in *Blue Bird* also expressed concern with the trial court's plan to bifurcate trial of the national class between liability and damages, because bifurcating a single claim into separate trials potentially can create Seventh Amendment issues if the bifurcation permits separate factfinders to determine the same issue. 573 F.2d at 318. But that is not what Plaintiffs propose. They propose that the jury hear and decide the entire damages claim; only thereafter will the Court fashion equitable relief. Such an approach fully comports with the Seventh Amendment. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959); *Cooper v. Southern Co.*, 390 F.3d 695, 722 (11th Cir. 2004).

This case is more akin to *Klay*, in which the court found that a nationwide class *was*

appropriate where the defendants operated nationwide and conspired to underpay the plaintiffs across the country. 382 F.3d 1256. And it is consistent with Eleventh Circuit cases permitting the simultaneous certification of claims for equitable relief under Rule 23(b)(2) and claims for damages under Rule 23(b)(3). *See, e.g., Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1158 n.10 (11th Cir. 1983); *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1359-60 (11th Cir. 2009).[8] As in *Klay*, the conspiracy here has a nationwide reach, with each Member Plan agreeing not to enter every other part of the country outside of its ESA on a Blue-branded basis, or to limit its national Green revenue, to the detriment of subscribers nationwide. Given the nationwide reach of the restraints and the importance of injunctive relief to open the health insurance markets to competition, a nationwide injunctive class, as opposed to state-by-state injunctive classes, is appropriate.

Second, some of the cases referenced in the Court's footnote declined to certify a 23(b)(2) class based on a concern that plaintiffs' counsel had not sufficiently weighed the possibility that taking such a claim to judgment might later preclude damages claims for members of the class. *See, e.g., Eggs*, 312 F.R.D. at 165-68; *Skelaxin*, 299 F.R.D. at 577-79. The Eleventh Circuit, however, repeatedly has held that participation in a Rule 23(b)(2) injunctive class does not bar separate damages claims for the same alleged misconduct. *Fortner v. Thomas*, 983 F.2d 1024, 1031-32 (11th Cir. 1993); *Spears v. Johnson,* 859 F.2d 853, 854 (11th Cir.1985), *opinion vacated in part on other grounds,* 876 F.2d 1485 (11th Cir.1989); *Herron v. Beck,* 693 F.2d 125, 127 (11th Cir. 1982). Indeed, "every federal court of appeals that has considered the question has held that a class

---

[8] Such an approach is particularly appropriate in antitrust litigation. *See, e.g., Domestic Air,* (antitrust class action certified under Rule 23(b)(3) was suitable for certification under Rule 23(b)(2)); *Davis v. S. Bell Tel. & Tel. Co.*, No. 89-2839-CIV-NESBITT, 1993 WL 593999 at *7 (S.D. Fla. Dec. 23, 1993) (certifying antitrust class action pursuant to Rules 23(b)(2) and 23(b)(3)); *Vitamin C* (certifying both damages class and injunction class)*; In re Visa Check/MasterMoney Antitrust Litig*., 192 F.R.D. 68, 88–89 (E.D. N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001) (the injunctive relief sought was "as important as the damages claimed"); *In re NASDAQ Mkt.-Makers Antitrust Litig*., 169 F.R.D. 493 (S.D.N.Y. 1996) (granting motion for class certification pursuant to Rules 23(b)(2) and 23(b)(3)).

action seeking *only declaratory or injunctive relief* does not bar subsequent individual suits for damages." *Vitamin C,* 279 F.R.D. at 114 (quoting *Hiser v. Franklin,* 94 F.3d 1287, 1291 (9th Cir. 1996), adding emphasis, and collecting cases); *see Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 428 n.16 (6th Cir. 2012).[9]

Additionally, Plaintiffs request that the Court include in its certification order and in any judgment awarding equitable relief a relatively "standard" protective measure that is set forth in Restatement (Second) of Judgments § 26(1)(b) (1982), which allows a court to expressly reserve related claims (such as damages) from any judgment that might otherwise risk having preclusive effect. The *Vitamin C* court, citing the endorsement of several circuit courts, "expressly reserve[d] the right of the indirect purchasers to maintain their damages claims in subsequent proceedings notwithstanding their participation in the Injunction Class." 279 F.R.D. at 116. Although the *Vitamin C* court demurred that subsequent courts might not be bound by its reservation of damages claims, *id.*, such a ruling by the MDL transferee court should be binding on transferor courts as "law of the case." *See generally In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 7699456, at *app. 6(II) (N.D. Ohio June 4, 2010) (discussing doctrine and collecting cases). Subscribers ask this Court for a similar reservation of damages for the non-Alabama damages claims in any class certification order and in any judgment awarding equitable relief.[10]

## IV.   CONCLUSION

Subscribers respectfully request the Court certify the proposed Nationwide Injunctive

---

[9] *See also United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952), (Because "[t]he sole function of an action for injunction [under § 16 of the Clayton Act] is to forestall future violations… its pendency or decision does not prevent concurrent or later remedy … for damages by those injured."); *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984) (Any judgment in a class action extinguishes class members' claims only "on any issue actually litigated and determined.")

[10] A final protection for absent class members is contained in Rule 23(c)(1)(C), which provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment."

Class, or alternatively the Alabama Injunctive Class, pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

This the 15th day of April, 2019

/s/ Chris T. Hellums

Charles J. Cooper – *Co-Chair, Written Submissions Committee*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue NW
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

Chris T. Hellums – *Local Facilitating Counsel*
PITTMAN, DUTTON & HELLUMS, P.C.
2001 Park Place N, 1100 Park Place Tower
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
chrish@pittmandutton.com

David Boies – *Co-Lead Counsel*
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749-8300
dboies@bsfllp.com

Michael Hausfeld – *Co-Lead Counsel*
Swathi Bojedla
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeldllp.com
sbojedla@hausfeldllp.com

David Guin – *Co-Chair, Written Submissions Committee*
Tammy Stokes – *Damages Committee*
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. North
Suite 600/Title Building
Birmingham, AL 35203
Tel: (205) 226-2282
Fax: (205) 226-2357
davidg@gseattorneys.com
tammys@gseattorneys.com

William A. Isaacson – *Settlement Committee & PSC Member*
BOIES, SCHILLER & FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
wisaacson@bsfllp.com

Gregory Davis – *Settlement Committee & PSC Member*
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Tel: (334) 832-9080
Fax: (334) 409-7001
gldavis@knology.net

Megan Jones – *Settlement Committee & PSC Member*
Arthur Bailey – *Discovery Committee*
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
mjones@hausfeldllp.com
abailey@hausfeldllp.com

Kathleen Chavez – *Settlement Committee & PSC Member*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
kcc@fmcolaw.com

Cyril V. Smith – *Settlement Committee & PSC Member*
ZUCKERMAN SPAEDER, LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Tel: (410) 949-1145
Fax: (410) 659-0436
csmith@zuckerman.com

Eric L. Cramer – *Expert Committee*
BERGER & MONTAGUE, P.C.
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 1-800-424-6690
Fax: (215) 875-4604
ecramer@bm.net

Richard Feinstein – *Expert Committee*
Hamish P.M. Hume – *Discovery Committee*
BOIES, SCHILLER & FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
rfeinstein@bsfllp.com
hhume@bsfllp.com

Patrick Cafferty – *Discovery Committee*
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
220 Collingwood, Suite 130
Ann Arbor, MI 48104
Tel: (734) 769-2144
Fax: (734) 769-1207
pcafferty@caffertyclobes.com

Bryan Clobes – *Litigation Committee*
Ellen Meriwether – *Written Submissions Committee*
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
205 N. Monroe St.
Media, PA 19063
Tel: (215) 864-2800
Fax: (215) 864-2810
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

Douglas Dellaccio – *Litigation Committee*
CORY WATSON, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 32505
Tel: (205) 328-2200
Fax: (205) 324-7896
ddellaccio@cwcd.com

Edwin J. Kilpela, Jr.
Benjamin Sweet – *Litigation Committee*
CARLSON LYNCH SWEET KILPELA &
CARPENTER LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA  15222
Tel: 412-322-9243
Fax: 412-231-0246
ekilpela@carlsonlynch.com
bsweet@carlsonlynch.com

Charles T. Caliendo – *Class Certification Committee*
GRANT & EISENHOFER
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
ccaliendo@gelaw.com

Daniel Gustafson – *Litigation Committee*
Daniel C. Hedlund – *Damages Committee*
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

John Saxon – *Litigation Committee*
JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203-3314
Tel: (205) 324-0223
Fax: (205) 323-1583
jsaxon@saxonattorneys.com

Chris Cowan – *Damages Committee*
THE COWAN LAW FIRM
4500 N Versailles Ave
Dallas, TX 75205-3015
Tel: (214) 826-1900
Fax: (214) 826-8900
chris@cowanlaw.net

Robert M. Foote – *Damages Committee*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
rmf@fmcolaw.com

Robert Eisler – *Discovery Committee*
GRANT & EISENHOFER
123 Justison Street, 17th Floor
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
reisler@gelaw.com

Brent Hazzard – *Litigation Committee*
HAZZARD LAW, LLC
447 Northpark Drive
Ridgeland, MS 39157
Tel: (601) 977-5253
Fax: (601) 977-5236
brenthazzard@yahoo.com

Lawrence Jones – *Damages Committee*
JONES WARD PLC
1205 E. Washington St., Suite 111
Louisville, KY 40202
Tel: (502) 882-6000
larry@jonesward.com

Andrew Lemmon – ***Chair, Discovery Committee***
LEMMON LAW FIRM
15058 River Road
PO Box 904
Hahnville, LA 70057
Tel: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Robert Methvin – ***Chair, Settlement Committee***
James M. Terrell – ***Class Certification Committee***
METHVIN, TERRELL, YANCEY, STEPHENS & MILLER, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, AL 35205
Tel: (205) 939-0199
Fax: (205) 939-0399
rgm@mmlaw.net
jterrell@mmlaw.net

H. Lewis Gillis – ***Co-Head Chair, Litigation Committee***
MEANS GILLIS LAW, PC
60 Commerce Street, Suite 200
Montgomery, AL 36104
Tel: 1-800-626-9684
hlgillis@tmgslaw.com

Dianne M. Nast – ***Class Certification Committee***
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com

Virginia Buchanan – ***Chair, Class Certification Committee***
LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7000
Fax: (850) 435-7020
vbuchanan@levinlaw.com

Michael McGartland – ***Class Certification Committee***
MCGARTLAND LAW FIRM, PLLC
1300 South University Drive, Suite 500
Fort Worth, TX 76107
Tel: (817) 332-9300
Fax: (817) 332-9301
mike@mcgartland.com

David J. Hodge – ***Chair, Settlement Committee***
MORRIS, KING & HODGE
200 Pratt Avenue NE
Huntsville, AL 35801
Tel: (256) 536-0588
Fax: (256) 533-1504
dhodge@mkhlawyers.com

Patrick W. Pendley – ***Chair, Damages Committee***
Christopher Coffin – ***State Liaison Committee***
PENDLEY, BAUDIN & COFFIN, LLP
Post Office Drawer 71
Plaquemine, LA 70765
Tel: (225) 687-6369
Fax: (225 687-6398
pwpendley@pbclawfirm.com
ccoffin@pbclawfirm.com

Edgar D. Gankendorff – ***Co-Head Chair, Litigation Committee***
Eric R.G. Belin – ***Damages Committee***
PROVOSTY & GANKENDORFF, LLC
650 Poydras Street, Suite 2700
New Orleans, LA 70130
Tel: (504) 410-2795
Fax: (504) 410-2796
egankendorff@provostylaw.com
ebelin@provostylaw.com

Richard Rouco – ***Written Submissions Committee***
QUINN, CONNOR, WEAVER, DAVIES & ROUCO LLP
2 20th Street North, Suite 930
Birmingham, Alabama 35203
Tel: (205) 870-9989
Fax: (205) 803-4143
rrouco@qcwdr.com

Garrett Blanchfield – ***Written Submissions Committee***
REINHARDT, WENDORF & BLANCHFIELD
W-1050 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com

Jason Thompson – ***Damages Committee***
SOMMERS SCHWARTZ
One Towne Square, 17th Floor
Southfield, MI 48076
Tel: (248) 355-0300
jthompson@sommerspc.com

Larry McDevitt – ***Chair, Class Certification Committee***
David Wilkerson – ***Discovery Committee***
VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Tel: (828) 258-2991
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Carl S. Kravitz – ***Expert Committee***
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: (202) 778-1800
Fax: (202) 822-8106
ckravitz@zuckerman.com

*Subscriber Plaintiff Co-Lead Counsel and Committee Chairs and Members*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2019, the foregoing was served on all counsel of record via CM/ECF. An unredacted version of the foregoing was manually filed under seal with the Clerk of Court, and was served via electronic mail on the following counsel for other Defendants who have been designated to receive service through agreement of the parties.

| | |
|---|---|
| Carl S. Burkhalter<br>MAYNARD COOPER & GALE PC<br>1901 Sixth Avenue North<br>2400 Regions Harbert Plaza<br>Birmingham, AL 35203<br>Telephone: (205) 254-1000<br>cburkhalter@maynardcooper.com | Kimberly R. West<br>Mark H. Hogewood<br>WALLACE JORDAN RATLIFF &<br>BRANDT LLC<br>First Commercial Bank Building<br>800 Shades Creek Parkway, Suite 400<br>PO Box 530910<br>Birmingham, AL 35253<br>Telephone: (205) 870-0555<br>kwest@wallacejordan.com<br>mhogewood@wallacejordan.com |
| Craig A. Hoover<br>E. Desmond Hogan<br>HOGAN LOVELLS US LLP<br>Columbia Square<br>555 Thirteenth Street, NW<br>Washington, DC 20004<br>Telephone: (202) 637-5600<br>craig.hoover@hoganlovells.com<br>desmond.hogan@hoganlovells.com | Daniel E. Laytin<br>David Zott<br>Helen Witt<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle<br>Chicago, IL 60654<br>Telephone: (312) 862-2000<br>daniel.laytin@kirkland.com<br>dzott@kitkland.com<br>hwitt@kirkland.com |
| Evan Chesler<br>Karen Demasi<br>CRAVATH, SWAINE & MOORE LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019-7475<br>Telephone: (212) 474-1000<br>echesler@cravath.com<br>kdemasi@cravath.com | Kathleen Taylor Sooy<br>CROWELL & MORING LLP<br>1001 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004<br>Telephone: (202) 624-2500<br>ksooy@crowell.com |
| John M. Johnson<br>LIGHTFOOT, FRANKLIN, & WHITE LLC<br>400 20th Street North | |

| Birmingham, Alabama 35203<br>Telephone: (205) 581-0700<br>jjohnson@lightfootlaw.com | |

_/s/ Chris T. Hellums_____

Chris T. Hellums
***Local Facilitating Counsel for Subscriber Plaintiffs***