**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

|  |  |
|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION**<br><br>**MDL. NO. 2406** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This document relates to:**<br>**Subscriber Track cases**<br><br>**[REDACTED VERSION OF SEALED FILING]** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**SUBSCRIBER PLAINTIFFS' MOTION FOR CERTIFICATION OF ALABAMA**
**DAMAGES CLASS**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     STANDARD OF REVIEW .................................................................................. 4

III.    CLASS ALLEGATIONS ..................................................................................... 5

  A.    Evidence Common to the Class Establishes the Member Plans' Agreement to Limit Competition. .......................................................................................................... 5

    1.  Common Evidence Relating to BCBSA and Its Members. ............................. 5

    2.  Common Evidence Relating To BCBS-AL in Particular. ............................... 8

  B.    Evidence Common to the Class Demonstrates that, Absent the Agreements Not to Compete, Other Member Plans Would Have Entered Alabama. ................................... 9

  C.    Evidence Common to the Class Demonstrates that the Agreement Not to Compete Impacted All or Virtually all Class Members in the Form of Higher Prices. ............... 12

  D.    Evidence Common to the Class Demonstrates that the Agreement Not to Compete Impacted All or Virtually all Class Members in the Form of Non-Price Anticompetitive Effects. ........................................................................................................................ 14

  E.    Common Evidence Demonstrates Class Members' Aggregate Damages. ................. 15

IV.     ARGUMENT ....................................................................................................... 17

  A.    The Proposed Class Satisfies the Requirements of Rule 23(a). ................................. 17

    1.  The Proposed Class Is Ascertainable. ............................................................. 17

    2.  The Damages Class Members Are Sufficiently Numerous. ........................... 18

    3.  Common Questions of Law and Fact Exist. ................................................... 18

    4.  The Class Representatives' Claims Are Typical of the Damages Class. ......... 19

    5.  The Class Representatives and Class Counsel Will Adequately Protect the Damages Class. ......................................................................................................................... 20

  B.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3). ............................ 22

    1.  The Section 1 Claims Asserted by the Proposed Class Present Common Questions of Law and Fact That Predominate Over Any Issues Requiring Individualized Proof. ........... 22

      a.    Defendants' Anticompetitive Restraints Present a Predominant Common Issue. ..... 22

      b.    The Antitrust Impact of Defendants' Anticompetitive Behavior Presents a Predominant Common Issue. ............................................................................................ 24

      c.    Damages Suffered by Members of the Proposed Class Are Reasonably Ascertainable Using a Common, Class-Wide Methodology. ................................................................. 27

    2.  Class Certification is Superior to Other Available Methods to Address Defendants' Anticompetitive Behavior. ............................................................................................. 29

V.      CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abdeljalil v. Gen. Elec. Capital Corp.*,
   306 F.R.D. 303 (S.D. Cal. 2015)......................................................................... 2

*Alderman v. GC Services Limited Partnership*,
   2018 WL 542455 (S.D. Fla. Jan. 19, 2018) ...................................................... 17

*Allen v. Dairy Farmers of Am., Inc.*,
   2012 WL 5844871 (D. Vt. Nov. 19, 2012) ....................................................... 26

*Amchem Prods., Inc. v. Windsor*,
   521 US. 591 (1997)............................................................................... 21, 22, 23

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
   568 U.S. 455 (2013)........................................................................................ 4, 5

*Bridge v. Phoenix Bond and Indem. Co.*,
   553 U.S. 639 (2008).......................................................................................... 4

*Bussey v. Macon Cty. Greyhound Park, Inc.*,
   562 F. App'x 782 (11th Cir. 2014)............................................................... 17, 18

*Charron v. Pinnacle Grp. N.Y. LLC*,
   269 F.R.D. 221 (S.D.N.Y. 2010).................................................................... 29

*Coleman v. Cannon Oil Co.*,
   141 F.R.D. 516 (M.D. Ala. 1992) ............................................................... 23, 24

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
   258 F.R.D. 545 (N.D. Ga. 2007)................................................................... 21

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
   2009 WL 856306 (N.D. Ga. Feb. 9, 2009).................................................... 2

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ......................................................................................... 26

*Cox v. Am. Cast Iron Pipe Co.*,
   784 F.2d 1546 (11th Cir. 1986)..................................................................... 18

*Davis v. Southern Bell Tel. & Tel. Co.*,
   1993 WL 593999 (S.D. Fla. Dec. 23, 1993) ........................................ 25, 26, 28

*Dujanovic v. MortgageAmerica, Inc.*,
  185 F.R.D. 660 (N.D. Ala. 1999) ........................................................................ 18

*Evans v. U.S. Pipe & Foundry Co.*,
  696 F.2d 925 (11th Cir. 1983) ........................................................................... 18

*Graphic Prods. Distribs., Inc. v. Itek Corp.*,
  717 F.2d 1560 (11th Cir. 1983) ......................................................................... 28

*Griffin v. Carlin*,
  755 F.2d 1516 (11th Cir. 1985) ......................................................................... 21

*Hawaii v. Standard Oil Co. of Cal.*,
  405 U.S. 251 (1972) ............................................................................................ 4

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) .................................................... 24

*In re Blue Cross Blue Shield Antitrust Litig.*,
  308 F. Supp. 3d 1241 (N.D. Ala.) ............................................................... *passim*

*In re Catfish Antitrust Litig.*,
  826 F. Supp. 1019 (N.D. Miss 1993) ................................................................. 27

*In re Checking Account Overdraft Litig.*,
  275 F.R.D. 666 (S.D. Fla. 2011) ....................................................................... 17

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
  317 F.R.D. 675 (N.D. Ga. 2016) ....................................................................... 19

*In re Disposable Contact Lens Antitrust Litig.*,
  170 F.R.D. 524 (M.D. Fla. 1996) ...................................................................... 30

*In re Disposable Contact Lens Antitrust*,
  215 F. Supp. 3d 1272 (M.D. Fla. 2016) ............................................................ 24

*In re Domestic Air Transp. Antitrust Litig.*,
  137 F.R.D. 677 (N.D. Ga. 1991) ................................................................... 2, 30

*In re HealthSouth Corp. Sec. Litig.*,
  257 F.R.D. 260 (N.D. Ala. 2009) ........................................................... 18, 19, 20

*In re High-Tech Employee Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ............................................................ 27

*In re Motor Fuel Temperature Sales Practices Litig.*,
   292 F.R.D. 652 (D. Kan. 2013) ................................................................. 29

*In re Nifedipine Antitrust Litig.*,
   246 F.R.D. 365 (D.D.C. 2007) ................................................................. 26

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 914 (9th Cir. 2015) ................................................................. 24

*In re Plywood Antitrust Litig.*,
   655 F.2d 627 (5th Cir. 1981) ................................................................. 28

*In re Polyester Staple Antitrust Litig.*,
   2007 WL 2111380 (W.D.N.C. 2007) ................................................................. 23

*In re Polypropylene Antitrust Litig.*,
   996 F. Supp. 18 (N.D. Ga. 1997) ................................................................. 24

*In re Polyurethane Foam Antitrust Litig.*,
   314 F.R.D. 226 (N.D. Ohio 2014) ................................................................. 27

*In re Potash Antitrust Litig.*,
   159 F.R.D. 682 (D. Minn. 1995) ................................................................. 29, 30

*In re Processed Egg Prod. Antitrust Litig.*,
   312 F.R.D. 171 (E.D. Pa. 2015) ................................................................. 24

*In re Terazosin Hydrochloride Antitrust Litig.*,
   220 F.R.D. 672 (S.D. Fla. 2004) ................................................................. 19

*In re Vitamins Antitrust Litig.*,
   209 F.R.D. 251 (D.D.C. 2002) ................................................................. 29

*In re Workers' Comp.*,
   130 F.R.D. 99 (D. Minn. 1990) ................................................................. 28

*InfoSpan, Inc. v. Emirates NBD Bank PJSC*,
   2016 WL 8849699 (C.D. Cal. June 8, 2016) ................................................................. 26

*Kennedy v. Tallant*,
   710 F.2d 711 (11th Cir. 1983) ................................................................. 20

*Kerr v. City of W. Palm Beach*,
   875 F.2d 1546 (11th Cir. 1989) ................................................................. 22

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) ................................................................................. 4

*Kleen Prod. LLC v. Int'l Paper Co.*,
831 F.3d 919 (7th Cir. 2016) .................................................................................... 27

*Malcolm v. Marathon Oil Co.*,
642 F.2d 845 (5th Cir. 1981) .................................................................................... 28

*Martin v. Blessing*,
571 U.S. 1040, 134 S. Ct. 402 (2013) ...................................................................... 20

*McDonough v. Toys "R" Us, Inc.*,
638 F. Supp. 2d 461 (E.D. Pa. 2009) ....................................................................... 26

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*,
246 F.R.D. 293 (D.D.C. 2007) ................................................................................. 26

*Nichols v. Mobile Bd. of Realtors, Inc.*,
675 F.2d 671 (5th Cir. Unit B 1982) ........................................................................ 22

*Prado-Steiman v. Bush*,
221 F.3d 1266 (11th Cir. 2000) ................................................................................ 19

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ................................................................................................... 4

*Rutstein v. Avis Rent-A-Car Sys.*,
211 F.3d 1228 (11th Cir. 2000) ................................................................................ 22

*Tillman v. Ally Fin. Inc.*,
2017 WL 7194275 (M.D. Fla. Sept. 29, 2017) .......................................................... 2

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016) ........................................................................................... 4, 5

*Valley Drug Co. v. Geneva Pharms., Inc.*,
350 F.3d 1181 (11th Cir. 2003) ................................................................................ 20

*Vega v. T-Mobile USA, Inc.*,
564 F.3d 1256 (11th Cir. 2009) ............................................................................ 4, 18

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ................................................................................................... 4

*Williams v. Mohawk Indus., Inc.*,
  568 F.3d 1350 (11th Cir. 2009) ........................................................................ 18, 19

**Statutes**

Sherman Act, 15 U.S.C. §1 ........................................................................................ 1

**Rules**

Fed. R. Civ. P. 23(a) .......................................................................................*passim*

Fed. R. Civ. P. 23(a)(1) ......................................................................................... 18

Fed. R. Civ. P. 23(a)(2) ......................................................................................... 18

Fed. R. Civ. P. 23(a)(4) ......................................................................................... 20

Fed. R. Civ. P. 23(b)(2) ........................................................................................... 1

Fed. R. Civ. P.  23(b)(3) ....................................................................................*passim*

**Other Authorities**

Herbert Newberg & Alba Conte, *Newberg on Class Actions* (5th ed.) .................................. 23, 28

C. Wright & A. Miller, Federal Practice & Procedure (3d ed. 2017) ........................................... 29

## I.    INTRODUCTION

As the Court is aware, the Subscriber Plaintiffs ("Subscribers") are individual and business purchasers of health insurance from Blue Cross Blue Shield of Alabama ("BCBS-AL"). They have sued BCBS-AL and 34 other plans that are members of the Defendant Blue Cross Blue Shield Association ("BCBSA") (collectively, "Member Plans"), alleging that the Member Plans and BCBSA have conspired to allocate markets for the purposes of charging higher premiums to Alabama subscribers than would prevail in a competitive market, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

In a separately-filed motion, the Subscribers have moved for certification of a nationwide class for injunctive relief under Fed. R. Civ. P. 23(a) and 23(b)(2).[1] In this motion, they seek certification under Fed. R. Civ. P. 23(a) and 23(b)(3) of an Alabama Damages Class (the "Class") defined as follows:

> All persons or entities who, during the period from April 17, 2008 to December 31, 2013 (the "Class Period"), were subscribers to Blue Cross Blue Shield of Alabama ("BCBS-AL") for individual, small group (up to 50 employees), or medium group (51 to 199 employees) full-service commercial health insurance (as opposed to Administrative Services Only or Administrative Contract services) (the "Class"). This Class includes two subclasses: (1) entities who were subscribers to BCBS-AL for medium group full-service commercial health insurance (51 to 199 employees); and (2) entities who, at any time during the Class Period, pursuant to BCBS-AL's cap and hold program, were charged a premium rate by BCBS-AL that exceeded the rate filed by BCBS-AL with the Alabama Department of Insurance (the "Subclasses"). Excluded from the Class and Subclasses are individual subscribers who are 65 or over or who obtain health insurance through Medicare (including Medicare Supplemental/Gap insurance and Medicare Advantage products), subscribers to Administrative Services Only or Administrative Service Contracts, national accounts, Defendants themselves and any parent, subsidiary or affiliate of any Defendant.[2]

---

[1] Subscribers incorporate by reference their Memorandum of Law in Support of Motion to Certify a Nationwide Injunctive Class.

[2] Subscriber Plaintiffs Consumer Financial Education Foundation of America, Inc. ("CFEFA"), Pearce Bevill Leesburg Moore, PC ("Pearce Bevill"), Rolison Trucking ("Rolison"), Fort McClellan Credit Union ("FMCU"), Conrad Watson Air Conditioning ("CWAC"), American Electric Motor Services ("AEMS"), CB Roofing and Pettus

This proposed Class is narrower than the one set forth in the Third Consolidated Amended Complaint; Subscribers seek damages through 2013 instead of the present due to limitation of damages discovery.[3] Courts permit such a narrowing to conform to the evidence. *See, e.g.*, *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 1:04-CV-3066-JEC, 2009 WL 856306, at *20 (N.D. Ga. Feb. 9, 2009) ("[I]t is well-recognized that '[t]he act of refining a class definition is a natural outcome of federal class action practice.'") (quoting *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 683 n.5 (N.D. Ga. 1991) ("*Domestic Air*")); *Tillman v. Ally Fin. Inc.*, No. 2:16-CV-313-FTM-99CM, 2017 WL 7194275, at *2 (M.D. Fla. Sept. 29, 2017); *Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 306 (S.D. Cal. 2015).

This motion is supported by the accompanying expert reports of Dr. Daniel Rubinfeld and

---

Plumbing & Piping, Inc. ("Pettus") seek appointment as Class Representatives for the overall Class. Plaintiffs Pettus and Pearce Bevill seek appointment as Class Representatives for the first Subclass. Plaintiffs CFEFA, Conrad Watson, Rolison, and FMCU seek appointment as Class Representatives of the second Subclass.

AEMS and CB Roofing seek damages only from the Defendants other than BCBS-AL. Although the Court's initial filed rate ruling would bar their damages claims against both BCBS-AL and the out-of-state Defendants (Doc. 998), the Alabama Plaintiffs (in addition to reserving all rights as to the initial ruling) have sought reconsideration of the portion of that ruling applying the filed-rate doctrine to bar damages claims by plaintiffs AEMS and CB Roofing against BCBSA and the out-of-state Blue plans (who did not file rates in Alabama), and the Court has indicated its intention to take up this issue at a later point. Doc. 1098.

Should the Court's initial ruling stand, AEMS and CB Roofing will withdraw as proposed representative plaintiffs for the Alabama Damages Class, although they will continue to seek to represent the proposed nationwide class for injunctive relief. Pettus and Pearce Bevill have more than 50 employees and, as a result, Alabama Insurance Regulation 482-116 does not require that BCBS-AL file rates as to them, so even if the Court's initial ruling stands, their damage claims, and the claims of the Subclass they represent, can go forward. Plaintiffs CFEFA, Conrad Watson, Rolison, and FMCU were each overcharged through the cap and hold program at least once over the Class Period, so their damage claims, and the claims of the Subclass they represent, can also go forward. Furthermore, the Court's filed rate ruling left open the question of whether charged rates that fell below the filed rate were nevertheless barred by the filed-rate doctrine. Doc. 997 at 28.

[3] Both the Court and Defendants have indicated a desire to proceed to class certification at this time based on the existing record. SX404, 8/30/18 Judge Proctor conference Tr: 42:18-43:23; 46:8-21. As the Court has ordered class certification and a damages report before production of post-2013 structured data (Doc. 2392), Subscribers intend to seek certification for damages for Alabama subscribers from January 1, 2014 onward once post-2013 structured data essential to such a motion has been produced. Subscribers will either: (1) after receiving the data, file a supplemental motion for class certification in this litigation seeking damages for an Alabama subscriber class for the period from January 1, 2014 forward; or (2) file a new complaint for a class consisting solely of Alabama subscribers from January 1, 2014 forward and seek to consolidate and relate back that case with this one. Subscribers will be prepared to discuss these possibilities at the May 23, 2019 status conference. *See also infra* n.11.

Dr. Ariel Pakes. Dr. Daniel Rubinfeld is a Professor of Economics Emeritus at the University of California, Berkeley and Professor of Law at NYU and a leading expert on industrial organization. He explains that there is common economic proof that the challenged restraints limit competition and that, absent the restraints, other Blue-branded business and non-Blue branded business owned by Blues ("Green" business) would have entered Alabama.

Dr. Pakes is a Professor of Economics at Harvard University and one of the leading scholars in healthcare economics. Dr. Pakes finds that common evidence is consistent with the conclusion that, in the absence of the Exclusive Service Areas ("ESAs") or National Best Efforts ("NBE") revenue restriction, Member Plans outside of Alabama (particularly those in contiguous states) would have entered Alabama and disrupted BCBS-AL's substantial market share. This entry resulting from the absence of either set of restrictions would have led to increased competition and resulted in lower health insurance premiums and increased choice for all or virtually all class members. Thus, Class members have been deprived of the opportunity to purchase health insurance in a competitive free market and have been forced to pay premiums higher than would have prevailed in a competitive market. Dr. Pakes has created reduced form and structural models based on the prevailing, peer-reviewed economic literature, to measure the impact of foreclosure of entry of non-Alabama Defendants, and he finds that the Class has suffered over ███████ in antitrust injury during the Class Period.

This Court is already well familiar with the evidence surrounding the challenged restraints, having ruled that the restraints are properly viewed under a *per se* standard. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241 (N.D. Ala.), *permission to appeal denied*, 2018 WL 7152887 (11th Cir. Dec. 17, 2018) ("*BCBS*"). The remaining questions on certification of the Class are whether evidence of these *per se* restraints is common to the Class, whether all or virtually all

Class members were impacted, and whether damages can be shown on a classwide basis.

## II.   STANDARD OF REVIEW

As the Supreme Court has recognized, class actions play an important role in the private enforcement of antitrust laws. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972). In moving for class certification under Federal Rule of Civil Procedure 23, the class representatives must satisfy the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and show that the class action fits within at least one of the three types of class actions described in Rule 23(b). *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009) ("*Vega*") (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004) (abrogated in part on other grounds by *Bridge v. Phoenix Bond and Indem. Co.*, 553 U.S. 639 (2008)). While courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) ("*Wal-Mart*")), Rule 23 is not a "license to engage in free-ranging merits inquiries at the [class] certification stage." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 466 (2013) ("*Amgen*"). "Merits questions may be considered to the extent––but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*[4]

The "predominance" inquiry of Rule 23(b)(3) requires a court to determine whether common, aggregation-enabling issues in the case are more prevalent than uncommon, aggregation defeating ones. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("*Tyson*") (internal

---

[4] Subscribers have ample evidence from Defendants' own documents demonstrating Defendants' knowledge that their conduct violates the antitrust laws. *See, e.g.,* SX207 (Doc. 1352-214), SX211-12 (Doc. 1352-218 to -219), SX227-28 (Doc. 1436-5 to -6), SX230 (Doc. 1436-8), SX300-04 (Doc. 1436-84 to -88) (Exhibits from the Subscribers' Summary Judgment briefing will be cited using the abbreviation "SX" (*see* Doc. 1352, 1436, and 1555) as well as to the existing docket number for clarity. Subscribers incorporate by reference their exhibits SX1-329 from that briefing.)

citations omitted). Critically, Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each element of its claim is susceptible to classwide proof." *Amgen*, 568 U.S. at 469 (alterations and internal quotations omitted). Rather, it requires only that common questions "*predominate* over any questions affecting only individual class members." *Tyson*, 136 S. Ct. at 1045 (internal quotations omitted) (emphasis added). Therefore, "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* (internal citations and quotations omitted).

## III.  CLASS ALLEGATIONS

### A.  Evidence Common to the Class Establishes the Member Plans' Agreement to Limit Competition.

#### 1.  Common Evidence Relating to BCBSA and Its Members.

It is undisputed that Member Plans have entered into license agreements with BCBSA that explicitly allocate ESAs in which each Member Plan is allowed to do business. *See* SX44-122 (Doc. 1352-49 through Doc. 1352-128) (license agreements for each Member Plan). BCBSA's license so provides. SX44 (Doc 1352-49) at '03 (BCBS-AL license agreement). Pursuant to BCBS-AL's license agreement, it has the exclusive right to market and sell Blue-branded health insurance in the state of Alabama. SX160 (Doc. 1352-165) at '832 (Map Book delineating ESAs). The rest of the Member Plans are forbidden from entering Alabama and selling insurance to the Damages Class. *See, e.g.*, SX44 (Doc 1352-49) at '04 ("[T]he Plan may not use the Licensed Marks and Name outside the Service Area or in connection with other goods and services . . . .").

All Member Plans have agreed to be bound by the license agreements and the ESAs delineated therein. *BCBS,* 308 F. Supp. 3d at 1269; SX223 (Doc. 1352-230), BCBSA 30(b)(6)

Dep. (6/16/17) 142:6-18. By virtue of that agreement, the Member Plans have agreed not to compete in the state of Alabama or any part thereof, for subscribers. The Member Plans freely *admit* that the license agreements constitute an agreement not to compete for subscribers. SX204 (Doc. 1352-211), BCBS-AL 30(b)(6) Dep. (6/28/17) 46:4-18 (Q: "So through the Association, you have an agreement not to compete in each other's geographic territories; is that correct?" A: "Without permission from that plan, that's correct."). Common evidence shows that the purpose and effect of the ESAs is to prevent competition among the Blues in their ESAs. SX240 (Doc. 1436-19) at '38 ("Plans benefit from the exclusive areas because it eliminates competition from other Blue Plans. Otherwise there would be open warfare."); SX234 (Doc. 1436-12) at '31 (purpose of ESAs is the "lessening of competition"). The purpose and effect of ESAs is a common predominant fact.

ESAs alone were not historically a foolproof means of eliminating competition. Even with the license agreements in place, some Member Plans began to compete with other Member Plans through the development and sale of unbranded, or "Green," business. SX414, Expert Report of Dr. Daniel Rubinfeld ("Rubinfeld Rep.") ¶81. In this way, Member Plans were able to circumvent the ESAs and offer Green health insurance in other Member Plans' ESAs. As a direct response to this potential competition, and for the express purpose of reinforcing the ESAs, the Member Plans developed restrictions on Green competition codified in the BCBSA's Membership Standards titled as National "Best Efforts". *Id.* ¶¶50-59; SX330, BCBS-AZ_MDL000851089 at slide 15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮. The "Best Efforts" label is false one, as there are no best efforts requirements to protect the Blue marks in NBE, only restrictions on revenue and competition. SX210 (Doc. 1352-217) at '754 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████; SX331, *In re Anthem/Cigna Merger Litig.*, C.A. No. 2017-0114-JTL (Del. Ch.) ("*C/A*"), Tr. 295:16-19 ("The limitation on non-Blue revenue caused by the national best efforts rule only protects and enhances the Blue brand by restricting competition against the Blue brand.").

Under these restrictions on Green competition, Member Plans may only achieve up to 33 1/3% of health-insurance revenue nationally through Green business, creating a hard revenue cap on their ability to compete with other Member Plans on an unbranded basis. SX177 (Doc. 1352-184) at '61. Every Member Plan agreed to be bound by NBE revenue caps. *BCBS*, *308 F. Supp. 3d* at 1272; SX123-157 (Doc. 1352-129 through Doc. 1352-163), Defs.' Responses to May 5, 2017 RFAs. Restrictions on Green competition are another predominating common issue for purposes of Rule 23(b)(3).

BCBSA monitors and enforces the ESAs and NBE. To monitor ESAs, BCBSA published a "Map Book" listing exactly where each Member Plan can sell Blue-branded insurance. *See, e.g.*, SX160 (Doc. 1352-165); SX159 (Doc. 1352-164), BCBSA 30(b)(6) Dep. (6/30/17), at 52:22-53:5, 270:13-15. To monitor NBE, BCBSA required Member Plans to regularly report compliance with all Membership Standards, including NBE. *See, e.g.,* SX332-366 ████████████████

████████████████████████████████████████████████████

████████████████████████████████████. To ensure compliance with ESAs and NBE, the Member Plans' agreement is enforced by BCBSA, through its Brand Enhancement and Protection Committee. SX223 (Doc. 1352-230), BCBSA 30(b)(6) Dep. (6/16/17) 71:4-72:24. To enforce the ESAs, the BEPC developed a "████████████████ ████████." SX367, BCBSA02796848 at '48. ██████████████████████

██████████████████████████. *Id.* at '50. Prior to the Class Period, monetary sanctions

had been levied against Member Plans for ESA violations. SX159 (Doc. 1352-164), BCBSA 30(b)(6) Dep. (6/30/17) 159:8-160:9 ███████████████████████████. For NBE, BCBSA meticulously documents each Member Plan's Green revenue to ensure enforcement of revenue caps. *See* SX368, BCBSA-CID-015465 ██████████████████████████████ ███████████████████████████████████████████████████████████. Member Plans found to be in violation of NBE face the harsh sanction of license termination. SX223 (Doc. 1352-230), BCBSA 30(b)(6) Dep. (6/16/17) 75:1-14.

Not surprisingly, given rigorous policing and enforcement of ESAs and NBE, throughout the class period, the Member Plans have adhered to these rules. SX10-33 (Doc. 1352-14 through Doc. 1352-37), Defs.' Responses to June 5, 2017 RFAs (responses to Request No. 7 (ESAs) and Request No. 11 (NBE)). No Member Plan has entered BCBS-AL's exclusive market to compete with BCBS-AL on a Blue basis. *See, e.g.,* SX204 (Doc. 1352-211), BCBS-AL 30(b)(6) Dep. (6/28/17) 50:11-15, 52:6-10. Monitoring and enforcement are also predominantly common facts.

## 2.      Common Evidence Relating To BCBS-AL in Particular.

The foregoing analysis of common issues relating to Member Plans applies with equal force to BCBS-AL. Plaintiffs can show through common evidence that, at all times, BCBS-AL accepted and followed ESA and NBE requirements in conducting its business during the relevant period. *See* SX10 (Doc. 1352-14), BCBS-AL's Responses to June 5, 2017 RFAs (responses to Request No. 7); *id.* (responses to Request No. 11 (NBE)); SX44 (Doc. 1352-49) at '03 (BCBS-AL license agreement); SX405, Patterson BCBS-AL 30(b)(6) Dep. (9/22/17) 267:6-20 ████████ ███████████████████████████; SX406, Vines Dep. (9/20/17) 113:13-17 ████████ ███████████████████; SX281 (Doc. 1436-64) at '00 (2010 email from BCBS-AL to Alabama Department of Insurance, in response to request to set up multistate exchange: "Currently the BCBS Association would not allow us to market out of state absent some agreement by the

8

affected plans and approval from the Association."); SX407, BCBSAL_0001939885 at '85 ███

████████████████████████████████████████████████████████████████████████████████████████

██████████████ .

A related common predominating issue concerns whether the challenged restraints have contributed to BCBS-AL's dominance in Alabama, to the detriment of Alabama subscribers. Subscribers will present common evidence through their expert Dr. Pakes that BCBS-AL accounts for upwards of 86 percent in each of the individual, small group, and large group segments. Expert Report of Dr. Ariel Pakes ("Pakes Rep.") ¶¶34-37. Dr. Pakes further finds that BCBS-AL's "dominance is not restricted to any particular region of the state, but rather is found in all regions of the state." *Id.* Dr. Pakes' findings are confirmed by third parties studying Alabama. An AMA report relying on 2012 data named Alabama the least competitive health insurance market in the country.[5] Similarly, the Kaiser Family Foundation stated in a 2011 report that BCBS-AL had 86% of the statewide individual market and 96% of the small group market.[6]

### B. Evidence Common to the Class Demonstrates that, Absent the Agreements Not to Compete, Other Member Plans Would Have Entered Alabama.

In addition to the documentary evidence outlined in Subscribers' Memorandum in Support of Motion to Certify a Nationwide Injunctive Class, Dr. Rubinfeld finds that evidence common to the class indicates that Member Plans would have entered Alabama absent the challenged restraints, either as Blues or as Greens. Rubinfeld Rep. ¶¶126-35. Dr. Pakes' analysis supports Dr. Rubinfeld's findings. Dr. Pakes notes that BCBS-AL has managed to increase policyholder surplus from approximately $700 million to over $1.2 billion, even while total covered lives remained flat.

---

[5] *AMA: 10 states with the strongest insurance monopolies* (Oct. 7, 2014), https://www.advisory.com/daily-briefing/2014/10/14/10-states-with-the-strongest-insurance-monopolies.

[6] Kaiser Family Foundation, *How Competitive Are State Insurance Markets?* (October 2011), https://kaiserfamilyfoundation.files.wordpress.com/2013/01/8242.pdf.

Pakes Rep. ¶48. Dr. Pakes concludes that these excess surpluses represent potential statewide profits that are large enough to capture the interest of potential competitors. *Id.*[7] Further, Pakes finds that BCBS-AL's costs are higher than its competitors, likely due to inefficient cost management, indicating a profit opportunity for a potential entrant. ¶¶49, 61. All of this evidence, common to the class, signals to potential market entrants that Alabama is an attractive market for competitive entry. *Id.* ¶41. As a result, Dr. Pakes finds that, but for the challenged restraints, other Member Plans would have entered Alabama on a Blue and/or Green basis. *Id.* ¶5.

Documentary evidence relating to cedes reinforces the existence of the predominating common issue of Member Plan entry into Alabama to offer products to the Damages Class. Currently, ceding (whereby the local Member Plan "cedes" to another Member Plan its exclusive right to market to a particular large group customer in its home state) is the only way that Member Plans are allowed to enter Alabama on a Blue-branded basis. Rubinfeld Rep. ¶106; SX412, WLP-00198358 at '65 ███████████████████████████████████████████. And Member Plans take advantage of this opportunity; through ceding, Member Plans regularly attempt to gain national account subscribers headquartered in Alabama. SX407, BCBSAL_0002313282 at '82-83 ████████████████████████████████████████████████████████

████████████████████████; SX408, WLP-03336437 ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████. SX409, BCBSAL_0002260274. This evidence supports Dr.

---

[7] Although nominally a "non-profit" company, BCBS-AL accrues substantial profits each year, which it stores as surplus. Moreover, these excess surpluses/profits accrue even *after* BCBS-AL pays exorbitant salaries to its top management, along with lobbying fees and unnecessary advertising costs (for a firm with already-dominant market share). John Archibald, *Blue Cross Clout Pays Off – for Millionaire Blue Cross Execs*, AL.com (September 30, 2015), http://www.al.com/opinion/index.ssf/2015/09/blue_cross_clout_pays_off_--_f.html.

Rubinfeld and Dr. Pakes' findings that, but for the restraints, Member Plans would have entered Alabama and competed with BCBS-AL for subscribers within the Damages Class.

The NBE restrictions on Green competition are another predominating common issue by which Member Plans are prevented from developing Green business that could compete with other Blue plans. This anticompetitive effect was reinforced by facts that emerged in the lawsuit relating to the recent failed Anthem/Cigna merger. There, Anthem's internal documents admitted that it was "landlocked" by the ESAs and wanted to merge with Cigna as part of its growth strategy to "expand into a 50-state footprint." SX331, *C/A* Tr. 19:4-8, 156:21-157:7. However, the merger would have immediately placed Anthem in violation of NBE, and "[i]n order to maintain compliance, [the] combined entity can only grow $1 outside Blue states for every $2 growth inside Blue states." *Id.* 811:17-22; SX262, WLP00194278 at '85. NBE was viewed as an "insurmountable barrier to doing the transaction." SX331, *C/A* Tr. 9:13-14. Anthem, while defending NBE in this litigation, began "look[ing] if there's ways to either modify or eliminate the NBE." *Id.* 156:20-157:7. It was so desperate to rid itself of what it acknowledged as an "anticompetitive" restraint that Anthem even considered the "nuclear option" of joining the Plaintiffs in this litigation and challenging NBE as "illegal and unenforceable because it violates the antitrust laws." *Id.* 173:7-13; 196:12-16.

The evidence unveiled as a result of the proposed Anthem/Cigna merger demonstrates the intended effect of NBE. As Anthem admits in its own internal documents, "The limitation on non-Blue revenue caused by the national best efforts rule only protects and enhances the Blue brand by restricting competition against the Blue brand… This is an anti-competitive consequence which is the desired purpose of the national best efforts rule." *Id.* 295:16-296:5; *see also id.* 296:11-13 ("[R]estricting competition was a desired purpose of the national best efforts rule . . . ."); SX254

(Doc. 1436-34) at '79 ███████████████████████████████████████

███████████████████████████████████. In this way, NBE limits growth

and disincentivizes Blues from investing in Green business that could compete nationwide,

including in Alabama. SX331, *C/A* Tr. 290:22-291:1 (Anthem General Counsel: "Thus, [it] is

factually accurate that the national best efforts rule does limit a Blue licensee's incentive to invest

in non-Blue brands that would compete against other Blue licensees in their service areas.").

### C. Evidence Common to the Class Demonstrates that the Agreement Not to Compete Impacted All or Virtually all Class Members in the Form of Higher Prices.

The expert reports of Drs. Pakes and Rubinfeld also address the predominating common

issue of whether members of the Damages Class would have benefitted from increased Blue-on-

Blue or Green-on-Blue competition. Dr. Pakes and Dr. Rubinfeld have both examined the peer-

reviewed literature and find the consensus of economists in this field recognizes that competitor

entry into a market is a price reducing force, disciplining prices and preventing firms from earning

long run economic profits above a normal rate of return. Pakes Rep. ¶7; Rubinfeld Rep. ¶143. This

literature is clear that "increased insurer concentration tends to lead to higher subscriber

premiums." Pakes Rep. ¶150; *see also* Rubinfeld Rep. ¶142 ("It is well understood among

industrial organization economists that decreased competition leads to higher prices . . . ."). In one

study, the authors found that premiums would have been 5.4% lower on average with entry of one

additional insurer in a market. Pakes Rep. ¶152. Another study found that increased concentration

in a marketplace led to a 13.7% increase in premiums. Rubinfeld Rep. ¶143.

Here, BCBS-AL holds substantial market power over the entire Alabama health insurance

market; it accounts for upwards of 86% in each of the individual, small group, and large group

segments. Pakes Rep. ¶¶34-37. ████████████████████████████████

████████████████████████████████████████████████████████

███████████ *Id.* ¶¶34-38. Dr. Pakes finds that BCBS-AL's market dominance and the lack of competition engendered by the challenged restraints has foreclosed competitive entry of non-Alabama Member Plans, which would have lowered premiums to the Damages Class. *Id.* ¶¶81, 102, 106. This analysis is confirmed by Dr. Pakes' reduced form model, which shows that, absent the restraints, premiums would fall in the range of ███████ *Id.* ¶163. Dr. Pakes concludes on the basis of common evidence that all or virtually all Class members were injured by the challenged restraints by being denied the ability to pay lower premiums, through either Blue or Green entry, than those that prevailed because of the restraints. *Id.* ¶¶10-12. Dr. Rubinfeld's economic analysis supports this finding. Rubinfeld Rep. ¶142-154.

Member Plans' own documents produced in this litigation support Dr. Pakes' findings that competition would lower premiums and that the absence of competition increases premiums. *See* SX324 (Doc. 1555-8) at '45 (Pennsylvania Insurance Department economist found that reducing competition among Member Plans in Pennsylvania would "create the risk that health care customers will pay higher nominal premiums [and] likely suffer from a reduction in the quantity and quality of provider care."); SX382, IBC-02128542 at '45 ███████████

██████████████████████████████████

████████████████████████; SX383, BCBSAL_0000282979 at '79 ████████████████████

██████████████████████████████████

███████████████████████; SX213 (Doc. 1352-220) at '49

██████████████████████████████████

██████████████████████████; SX378, BCBSF-R-00139774 at '74-75 ████████████████

13

████████████████████████████████████████████████.

Common evidence will show that the real-world result in Alabama has been higher premiums for all or virtually all Class members. Pakes Rep. ¶¶10-11.

**D. Evidence Common to the Class Demonstrates that the Agreement Not to Compete Impacted All or Virtually all Class Members in the Form of Non-Price Anticompetitive Effects.**

In addition to these price effects, there are predominating common issues of whether the challenged restraints have had injurious non-price effects on members of the Class. Both Dr. Pakes and Dr. Rubinfeld identify numerous non-price effects on the Class caused by the Member Plans' geographic allocation agreement. Pakes Rep. ¶82 ("Higher premiums may only be a small part of the harm caused by the entry restraints . . . ."); Rubinfeld Rep. ¶¶21, 139, 141. Other anticompetitive effects include denial of consumer choice (through fewer competitors in the market and less diverse product offerings), lack of innovation, and fewer efficiencies.

With respect to consumer choice, Dr. Pakes finds that, in sharp contrast to the variety of products offered in other parts of the country, BCBS-AL only offered one type of product to the Class in Alabama—Preferred Provider Organization, or PPO, plans. Pakes Rep. ¶62. Dr. Pakes concludes that the challenged restraints "have limited the choices available to all or virtually all the Subscriber Class that otherwise would have been available following entry by an out-of-state Blue or Green," and that absent the restraints, "entry would increase the plan options available to Alabama consumers." *Id.* ¶85. The lack of options in Alabama hurts consumers. SX410, BCBSA01610897 at '97 ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

Dr. Pakes also notes that, outside of Alabama, "there has been substantial innovation in both controlling costs and the nature of the plans offered." Pakes Rep. ¶83. However, BCBS-AL

███████████████████████████████████████ SX411, United

Health Care 30(b)(6) ("UHC") Dep. (12/15/17) 250:7-11. For example, some plans nationally offer

narrow network products, which offer "narrow networks of hospitals with lower premiums" and

"have been effective in reducing costs [that] can be passed on to consumers through lower

premiums." Pakes Rep. ¶83. But BCBS-AL does not offer such a product; it relies solely on a

broad network. Rubinfeld Rep. ¶97; SX411, UHC Dep. (12/15/17) 255:7-18. Given that BCBS-

AL has a near monopoly in Alabama, this means that Alabama subscribers are deprived of access

to this kind of innovative offering. Dr. Rubinfeld also notes how lack of competition in Alabama

disincentivizes innovation in the marketplace. Rubinfeld Rep. ¶155-61.

Alabama subscribers are also deprived of the increased efficiencies available in a

competitive market. SX227 (Doc. 1436-5) at '409 (internal BCBSA document pointing out that

competition "may help to make other Plans more efficient competitors in the marketplace, thereby

benefiting . . . the public"); SX299 (Doc. 1436-83) at '235 (in central Pennsylvania, where BCBSA

rules allow Capital and Highmark to compete, Capital has "been driven to be better, more efficient,

more customer-focused, and more innovative"). Dr. Rubinfeld concludes that, absent the restraints,

subscribers "would have benefited from [their insurer's] ability to grow . . . and to achieve

efficiencies such as economics of scale and scope." Rubinfeld Rep. ¶141.

### E.  Common Evidence Demonstrates Class Members' Aggregate Damages.

The aggregate damages amount sought by the proposed Class is also a common

predominating issue. Those damages are based on the premiums that subscribers would have paid

"but for" the existence of BCBSA's anticompetitive rules, if Member Plans were allowed to fully

compete with BCBS-AL. Dr. Pakes has calculated damages on a classwide basis for both Blue

entry and Green entry, based on a simulation of BCBS-GA entering Alabama on a Blue or Green

basis.

In undertaking this analysis, Dr. Pakes considered a reduced form model that analyzed the relationship between lack of competition for health insurance in Alabama and the levels of subscriber premiums. This model was based on recent economic literature. Dr. Pakes also utilized a structural model in his analysis, explaining:

> I assess the effect of entry into the Alabama marketplace by constructing a structural model that is based on what I regard as the most rigorous published structural model of the health insurance market in the economic literature: that of Ho and Lee. The structural model analyzes the relationships among consumers, insurers, and hospitals in Alabama. It uses data on the behavior and costs of these participants to estimate the preferences of Alabama consumers, the costs of Alabama hospitals, and the way in which insurers and hospitals set prices in Alabama. It uses this information to analyze a but-for world where a Blue or Green entrant had been active in the Alabama market.

Pakes Rep. ¶99.

Here, the damages sought are readily ascertainable and provable on a classwide basis. As noted by Dr. Pakes: "Prices that BCBSAL charges to individuals and small groups are expressly formulaic, which means that any injury from the entry restraints can be calculated by simply adjusting the formulas to account for the impacts of entry and re-calculating premiums for each member of the class." *Id.* ¶196. With respect to medium group premiums, BCBS-AL uses a merit-rating system to determine pricing; however, these premiums are also formulaic in nature, based on inputs available to Dr. Pakes and used in his regression model. *Id.* ¶202.

Dr. Pakes' damages model calculates how premiums for individual, small group, and medium group class members would have been affected by entry of a Blue or Green competitor in Alabama. *Id.* ¶¶99, 102. Dr. Pakes separately models damages for individuals, small groups, and medium groups and finds aggregate damages for each set of Class members, based on "the difference in premiums that the subscriber paid and the premiums that would have been paid in the counterfactual world with entry . . . ." *Id.* ¶264. Dr. Pakes concludes that, during the Class Period, total classwide damages would be ████████████████. *Id.* Table 29. Dr. Pakes also

explains that the model can be run in the same manner for each year of the Class Period. *Id.* ¶266.[8]

Thus, Subscribers have provided evidence common to the Class to show classwide damages.

## IV.    ARGUMENT

Class Representatives have standing to bring the asserted claims,[9] the Damages Class is readily ascertainable, and the Class satisfies the elements of Rule 23(a) and (b)(3). Accordingly, certification should be granted as the proposed Class readily satisfies all of the foregoing conditions and requirements of Rule 23(a) and (b)(3).

### A.    The Proposed Class Satisfies the Requirements of Rule 23(a).

#### 1.    The Proposed Class Is Ascertainable.

The proposed Class is readily ascertainable through BCBS-AL's own records. Pakes Rep. ¶22; s*ee Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 788 (11th Cir. 2014) (agreeing with district court finding "that the objective criteria for identifying members of the defined class could 'be analyzed in a manageable and administratively feasible way, namely, by reference to [Defendant's] records'"); *Alderman v. GC Services Limited Partnership*, No. 2:16-CV-14508, 2018 WL 542455, at *4 (S.D. Fla. Jan. 19, 2018) (finding that proposed class "based on objective criteria that can be determined from Defendant's business records" was "adequately defined and sufficiently ascertainable"); *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 672 (S.D. Fla. 2011) (finding that the mining of defendant's business records to identify class members was administratively feasible) (internal citations omitted). Further, because the proposed

---

[8] For purpose of class certification, Dr. Pakes has limited his analysis to 2010 and extrapolated the resulting premium difference to the rest of the Class Period. The fact that all or virtually all class members were injured in 2010 is sufficient to show that there is a method to ascertain classwide injury for purposes of class certification. For his damages merits report, Dr. Pakes will model each year of the Class Period, from 2008 through 2013.

[9] Each Alabama Plaintiff purchased BCBS-AL health insurance during the relevant class period. SX392, AEMS Decl. ¶11; SX393, CB Roofing Decl. ¶11; SX394, Pettus Decl. ¶12; SX395, Pearce Bevill Decl. ¶12; SX396, CFEFA Decl. ¶12; SX397, FMCU Decl. ¶12; SX398, Rolison Decl. ¶12; SX399, CWAC Decl. ¶12. Thus, each Alabama Plaintiff has suffered both Article III injury and antitrust injury.

17

Class is precisely defined to include those persons or entities in the United States of America who were insured during the Class Period by BCBS-AL for individual, small group, and medium group products, the members of the class can readily "be ascertained by reference to objective criteria." *Bussey*, 562 F. App'x at 787 (internal quotations omitted). Thus, the proposed Damages Class satisfied Rule 23(a).

### 2.    The Damages Class Members Are Sufficiently Numerous.

The numerosity requirement of Rule 23(a) is satisfied where joinder of all class members is "impracticable." *See In re HealthSouth Corp. Sec. Litig.,* 257 F.R.D. 260, 273 (N.D. Ala. 2009) ("*HealthSouth*") (citing Fed. R. Civ. P. 23(a)(1)). Plaintiffs need not pinpoint the exact number of members in the class to satisfy numerosity. *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983). The Eleventh Circuit's general rule is that "less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (internal quotations omitted). Here, there can be no reasonable dispute that numerosity is satisfied. Pakes Rep. Table 27 (during class period, over 100,000 subscribers during each year of Class Period).

### 3.    Common Questions of Law and Fact Exist.

The commonality requirement of Rule 23(a)(2) is a "relatively light burden" that does not require that all questions of fact or law be common, or that the common questions predominate over individual issues. *Vega*, 564 F.3d at 1268. Rather, it requires only "that there be at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009) ("*Williams*") (finding "low hurdle of Rule 23(a)(2)" easily satisfied); *Dujanovic v. MortgageAmerica, Inc.*, 185 F.R.D. 660, 667 (N.D. Ala. 1999) (finding it "well established that the commonality requirement of Rule 23(a) is not high"). In the antitrust context, "'courts in [the Eleventh Circuit] have consistently held that

18

allegations of price-fixing, monopolization, and conspiracy by their very nature involve common questions of law or fact.'" *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 694 (N.D. Ga. 2016) (quoting *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 686 (S.D. Fla. 2004)).

Not only have the Class Representatives alleged Defendants participated in the type of concerted anticompetitive conduct that has consistently been held to satisfy commonality, this specific case raises additional questions of law and fact that are common to each Damages Class member. By way of example:

- Whether Defendants acted in concert to violate Section 1 of the Sherman Act;
- Whether the restrictions set forth in the BCBSA license agreements and membership standards are prohibited under Section 1 of the Sherman Act;
- Whether Defendants' concerted anticompetitive conduct caused health insurance premiums in Alabama to be higher than they would have been had there not been foreclosed entry by ESA and NBE licensing restraints;
- To what extent would health insurance premiums paid by Damages Class members have been lower in the absence of Defendants' anticompetitive restraints; and
- To what extent would there have been additional competition among health insurers, on a Blue and/or Green basis, for the business of Damages Class members but for Defendants' anticompetitive restraints.

Given that these numerous issues will be resolved in a manner that applies to the entire Class, the commonality requirement is satisfied.

### 4. The Class Representatives' Claims Are Typical of the Damages Class

The threshold for typicality, like commonality, is not demanding and is satisfied here. *See HealthSouth*, 261 F.R.D. at 627. It is meant to ensure that there is a "sufficient nexus" between the legal claims of the named class representatives and the class as a whole. *See Prado-Steiman v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000). The typicality requirement is satisfied if "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Williams*, 568 F.3d at 1357 (internal citations and

quotations omitted). Identical claims and defenses are not required because "[a]s long as defendants 'committed the same unlawful acts in the same method against an entire class,' a plaintiff establishes the necessary typicality." *HealthSouth*, 261 F.R.D. at 627 (quoting *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983)).

The proposed class representatives' claims are typical of the claims of the Class. All of their claims arise out of a common antitrust conspiracy by Defendants. Defendants, through their execution and enforcement of BCBSA license agreements and membership standards, perpetuated an illegal market allocation scheme for commercial health insurance to eliminate competition and prevent the entry of non-Alabama Member Plans into Alabama. This market foreclosure deprived the Class of competitive premiums and more product offerings. Pakes Rep. ¶¶7-8. Because the Class will be required to prove the same elements and will rely on the same legal theories and supporting facts as the class representatives, the typicality requirement is satisfied.

### 5. The Class Representatives and Class Counsel Will Adequately Protect the Damages Class.

Rule 23(a)(4) requires that the representative party in a class action "adequately protect the interests of those [it] purports to represent." Fed. R. Civ. P. 23(a)(4). The adequacy requirement has two independent inquiries: "'(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action.'" *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (quoting *Healthsouth*, 213 F.R.D. at 460–61). Included as well is an evaluation of the adequacy of counsel who are acting on behalf of the putative class. *See Martin v. Blessing*, 571 U.S. 1040, 134 S. Ct. 402, 402 (2013).

No substantial conflicts exist between the Class Representatives, and the Class members and the Class Representatives have, for the last seven years, effectively prosecuted this action and

will continue to do so. *See* SX392, AEMS Decl. ¶7; SX393, CB Roofing Decl. ¶¶8, 10; SX394, Pettus Decl. ¶¶8, 10; SX395, Pearce Bevill Decl. ¶¶8, 10; SX396, CFEFA Decl. ¶¶8, 10; SX397, FMCU Decl. ¶¶8, 10; SX398, Rolison Decl. ¶¶8, 10; SX399, CWAC Decl. ¶¶8, 10. As discussed above, each Class Representative was injured by the same wrongful course of conduct as the proposed Class members and, therefore, it is in the class representatives' interest to prosecute claims vigorously on behalf of the Class. *Amchem Prods., Inc. v. Windsor*, 521 US. 591, 594-95 (1997) (*"Amchem"*) (adequacy satisfied where representative plaintiffs "possess[ed] the same interest and suffer[ed] the same injury as the class members").

Subscribers' Co-Lead Counsel and Committee Chairs, previously selected on an interim basis by this Court after thorough vetting by the Special Master, have the requisite qualifications and experience to vigorously and effectively prosecute this action and have done so since the case's inception. *See Griffin v. Carlin*, 755 F.2d 1516, 1532 (11th Cir. 1985). They all have significant experience in antitrust and other complex class actions, have been appointed by courts across the nation to spearhead antitrust and other complex class actions, and have successfully prosecuted numerous such actions on behalf of injured parties across the United States and internationally. *See* SX402, Hausfeld LLP Firm Resume; SX403, Boies Schiller Flexner LLP Firm Resume.

Since being appointed Interim Co-Lead Counsel (Doc. 61), Subscribers' counsel have filed an initial and three amended complaints, successfully briefed and defended numerous motions to dismiss, successfully briefed and argued a summary judgment motion establishing that the *per se* rule will govern much of this case, and have engaged in extensive discovery and other motion practice. They have reviewed millions of documents, hired economic experts to analyze data, have represented the class in depositions, have conducted depositions, and have made substantial out-of-pocket expenditures on behalf of the class. *See Columbus Drywall & Insulation, Inc. v. Masco*

21

*Corp.*, 258 F.R.D. 545, 556 (N.D. Ga. 2007) (identifying activities that justify adequacy of counsel). Most importantly, this Court can make an informed determination regarding counsels' advocacy based upon its firsthand knowledge gained through seven years of overseeing this multidistrict litigation.

**B.      The Proposed Class Satisfies the Requirements of Rule 23(b)(3).**

"To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must predominate over any questions affecting only individual members; and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem*, 521 U.S. at 592-93 (internal quotations omitted). Both requirements are met here.

**1.      The Section 1 Claims Asserted by the Proposed Class Present Common Questions of Law and Fact That Predominate Over Any Issues Requiring Individualized Proof.**

The proposed Class satisfies the predominance requirement of Rule 23(b)(3) because the essential elements of the Section 1 claims asserted by the Class Representatives and the proposed Class "are subject to generalized proof and thus applicable to the class as a whole" and because these common issues will "'predominate over [any] issues that are subject only to individualized proof.'" *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989) (quoting *Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. Unit B 1982)); *see also Rutstein v. Avis Rent-A-Car Sys.*, 211 F.3d 1228, 1233 (11th Cir. 2000).

**a.      Defendants' Anticompetitive Restraints Present a Predominant Common Issue.**

Proving the existence of an agreement in restraint of trade is a predominant common issue in any action under Section 1 of the Sherman Act. "Predominance," under Rule 23(b)(3), "is a test readily met in certain cases alleging . . . violations of the antitrust laws" involving an agreement

and conspiracy among competitors. *Amchem*, 521 U.S. at 625. Here, the existence of the Member Plans' agreements is undisputed. Because class representatives' claims all arise out of the alleged conspiracy among Defendants based on these agreements, they share a common nucleus of operative facts that predominate over any issues that may be specific to any individual proposed class member. *See In re Polyester Staple Antitrust Litig.*, MDL No. 3:03CV1516, 2007 WL 2111380, at *14 (W.D.N.C. 2007) ("[T]he exact nature of the antitrust violation, particularly the scope of the alleged conspiracy, is the predominant common issue for trial."); *Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 525 (M.D. Ala. 1992) ("The court has studied the cases and concludes on the basis of this study that conspiracy does suffice to meet the predominance requirement."). Here, the "generalized proof" needed to establish the illegality of Defendants conduct is "applicable to the class as a whole." *See* SX44–122 (Doc. 1352-49 through Doc. 1352-128) (license agreements, applicable to all Defendants and all class members).

Class treatment is particularly appropriate given the acknowledged type of agreement challenged here—a geographic division and output restrictions among horizontal competitors. As a leading treatise explains:

> Market-division cases, like price-fixing cases, are generally well-suited for class action adjudication. The legal violation is established *per se*. Moreover, because price-fixing conspiracies often injure all purchasers that were subject to the alleged overcharge and in a similar fashion, courts generally find that impact can be established on a class-wide basis and thus that common questions of law or fact predominate over individual issues. Because of the predictable economic consequences that result from the creation of artificial barriers of entry, the presumption of common impact is appropriate even though market divisions may have a less direct effect on prices than price-fixing agreements. Damages, even if individualized in nature, will not generally scuttle class certification.

*See* 6 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 20.24 (5th ed.). "In sum, market-allocation actions are an attractive vehicle for class litigation because distributional agreements are an unquestioned *per se* antitrust violation, and because predominance concerns are

eased by a focus on the defendants' conduct." *Id.*

This principle applies in full force here. The existence and nature of Member Plans' horizontal division of the nation into ESAs, reinforced by NBE revenue caps, is a predominant issue that, warrants class treatment.

> **b.    The Antitrust Impact of Defendants' Anticompetitive Behavior Presents a Predominant Common Issue.**

To prevail on the merits, Subscribers must show that all or virtually all members of the Damages Class suffered an antitrust injury as a result of Defendants' actions. *See In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 171, 183 (E.D. Pa. 2015) ("common issues predominate as to antitrust impact" where "structured analysis is capable of proving that all or virtually all class members suffered an injury by Defendants' alleged anticompetitive conduct"); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 JG VVP, 2014 WL 7882100, at *44 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted,* No. 06-MD-1775 JG VVP, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) (at certification, plaintiffs must "show that the conspiracy impacted 'all or virtually all' class members").

Proving antitrust injury does not require proof of the amount of damages but only of the fact of injury. Antitrust injury "'can be established by showing that consumers paid higher prices for a product due to anticompetitive actions of a defendant, such as a horizontal market allocation scheme.'" *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1307 (M.D. Fla. 2016) (quoting *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 922 (9th Cir. 2015)); *In re Polypropylene Antitrust Litig.*, 996 F. Supp. 18, 22 (N.D. Ga. 1997) ("Antitrust impact is established in this type of case if Defendants' activities had the effect of stabilizing prices above competitive levels."). Thus, if Plaintiffs demonstrate that the challenged restraints enabled BCBS-AL to charge prices higher than those that would prevail in a competitive market, "then Plaintiffs

will have demonstrated that [BCBS-AL] violated the antitrust laws and that anyone who purchased [insurance] from [BCBS-AL] during the period over which [BCBS-AL] charged such prices was injured." *Davis v. Southern Bell Tel. & Tel. Co.*, No. 89-2839-CIV-NESBITT, 1993 WL 593999, at * 7 (S.D. Fla. Dec. 23, 1993) ("*Davis*").

Here, common evidence demonstrates that all or virtually all members of the Damages Class suffered antitrust injury by being deprived of lower premiums as a result of Defendants' illegal market foreclosure. Pakes Rep. ¶¶10-12. Plaintiffs' expert Dr. Pakes used two interrelated approaches to measure how the Defendants' restraints have injured competition and caused impact and quantifiable injury to Damages Class Members: (1) a structural model; and (2) a reduced-form regression analysis. *Id.*

Dr. Pakes' structural model accounts for market participants all pursuing their objectives simultaneously; to wit, subscribers balancing the benefits of an insurance policy against the cost of those benefits in the form of premiums and out-of-pocket deductibles/copays/coinsurance, and the objectives of both insurers and providers in maximizing their respective profits. His structural model demonstrates that entry into Alabama (or any portion thereof) would have resulted in more choices for lower-cost comparable health insurance products and services to the Class. Dr. Pakes' structural model is highly detailed and incorporates all meaningful inputs concerning the Alabama health insurance market, including the pricing methodology of BCBS-AL. *Id.* ¶¶170-267. Dr. Pakes' structural model "predicts that entry would have lowered premiums for all or virtually all Subscriber Class members in the Alabama health insurance market." *Id.* ¶270.

Dr. Pakes additionally tested the robustness of his model by cross-checking his structural model with reduced-form regression analyses, which examine higher-level correlations between market features and market outcomes, such as the relationship between health insurance premiums

25

and market concentration of insurers. *Id.* ¶¶147-169. Dr. Pakes' reduced form regression analysis was consistent with and supports the conclusions reached in his structural model: "premiums to all or virtually all Subscriber Class members would have been lower absent the entry restraints." *Id.* ¶157.

Notably, both of the methods employed by Dr. Pakes are widely accepted and commonly used by economists for determining the expected impacts on prices due to changes in the number of market competitors. *See, e.g., Allen v. Dairy Farmers of Am., Inc.,* No. 5:09-cv-230, 2012 WL 5844871, at *16 (D. Vt. Nov. 19, 2012) (plaintiffs demonstrated a means of "establishing antitrust impact through a common body of admissible proof" by relying on expert opinion supported by multiple regression analyses). Moreover, it is common in antitrust cases to rely on the type of modeling and regression analyses that Dr. Pakes has employed here.[10] *See In re Nifedipine Antitrust Litig.,* 246 F.R.D. 365, 371 (D.D.C. 2007) (predominance in price-fixing action on issue of damages based on modeled but-for world); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 310–13 (D.D.C. 2007) (same); *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461, 491 (E.D. Pa. 2009) (same). Thus, Dr. Pakes' expert analysis is reliable.

Furthermore, in demonstrating common impact among putative class members, the damages model proffered by plaintiffs must prove capable of determining damages resulting from the particular injury on which liability is premised. *Comcast Corp. v. Behrend*, 569 U.S. 27, 36 (2013). Here, Dr. Pakes has conducted a separate analysis for both Blue and Green entry into Alabama (each of which involves a separate theory of liability). Thus, Plaintiffs have satisfied the *Comcast* standard.

---

[10] *See generally InfoSpan, Inc. v. Emirates NBD Bank PJSC*, No. SACV11-1062JVS(ANx), 2016 WL 8849699, at *15 (C.D. Cal. June 8, 2016) ("At bottom, the Court finds that Dr. Pakes' opinions are sufficiently reliable and helpful to warrant submission to the jury.").

In addition to Dr. Pakes' regression analysis, "courts have long noted that statistical and anecdotal evidence must be considered in tandem." *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1217 (N.D. Cal. 2013); *see also id.* ("[C]lass certification requires a holistic, qualitative assessment."); *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 922 (7th Cir. 2016) (noting that courts must "take a careful look at the evidence"); *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 284 (N.D. Ohio 2014) (Plaintiffs' expert's "regression model fits [their] broader conception of the conspiracy"). Defendants' own documents confirm and corroborate Dr. Pakes' conclusion that the Defendants' unlawful restraints have had the effect of restricting competition and eliminating ████████████████████████ SX 213 (Doc. 1352-220) at '249; *see also* SX384, BCBS-KC_MDL000298840 at '60 ██████████████████ ████████████████████████████████████████████ ; SX383, BCBSAL_0000282979 at '79 ████████████████ ████████████████████████████████████████████████████ ; SX299 (Doc. 1436-83) at '230 ("[C]ompetition among health insurers has been shown to result in relatively lower premiums, by some estimates, 12% lower."). Dr. Pakes' findings are in perfect accord with this record evidence, and thus his regression analysis fits the facts of the case.

Accordingly, this factual and economic showing reliably demonstrates impact on a class-wide basis. The question of antitrust injury thus presents a predominant issue common to all members of the proposed Class.

### c. Damages Suffered by Members of the Proposed Class Are Reasonably Ascertainable Using a Common, Class-Wide Methodology.

The determination of individual damages is a "frail obstacl[e] to certification when measured against the substantial benefits of judicial economy achieved by class treatment of the predominating, common issues." *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1043 (N.D. Miss

1993); *see also In re Workers' Comp.*, 130 F.R.D. 99, 110 (D. Minn. 1990) ("Although damage amounts may vary among plaintiffs, this fact alone, particularly in antitrust actions, will not defeat certification."); *Newberg on Class Actions* § 20.24 ("Damages, even if individualized in nature, will not generally scuttle class certification" in "[m]arket-division cases . . . ."). In addition, in this circuit, "[o]nce an antitrust violation and its causal relation to plaintiff's injury have been established, the burden of proving the amount of damages is much less severe." *Graphic Prods. Distribs., Inc. v. Itek Corp.*, 717 F.2d 1560, 1579 (11th Cir. 1983); *see also In re Plywood Antitrust Litig.*, 655 F.2d 627, 635 (5th Cir. 1981) (recognizing "once anti-trust plaintiffs have proved the fact of damage, their burden on proving the measure of damages becomes lighter"); *Malcolm v. Marathon Oil Co*., 642 F.2d 845, 858 (5th Cir. 1981) ("The antitrust plaintiff's burden of proving the amount of damages is lighter than the burden of proving injury in fact.").

The damages suffered by the Damages Class in this case are readily ascertainable, because once an antitrust injury is established, the "[c]alculation of damages becomes mechanical." *Davis,* 1993 WL 593999, at *8. The damages in this case are subject to proof on a class-wide basis due, in large part, to the base rate methodology used by BCBS-AL to calculate premiums for Class members. Because BCBS-AL sets its premiums in a formulaic manner, Dr. Pakes can input that pricing control into his structural model to calculate what BCBS-AL's premiums would be in the absence of Defendants' illegal restraints. "Thus, the only issues requiring individual proof concern whether, and over what time period, each individual plaintiff purchased service." *Id.* at * 8. And, as Dr. Pakes explains, even these variables have been included in his structural model, allowing the calculation of damages for any individual Class member. Pakes Rep. ¶¶264-65. BCBS-AL's use of base rates to set premiums also ensures that individual issues will not predominate over common ones. Given BCBS-AL's use of base rates to set premiums, the damages to Class

members are readily ascertainable on a common class-wide basis.[11]

### 2. Class Certification is Superior to Other Available Methods to Address Defendants' Anticompetitive Behavior.

The predominance of common questions of law and fact, the sheer number of potential class members, and the high costs of litigating an antitrust action of this scope all weigh strongly in favor of class treatment as the most fair, efficient, and cost-effective means of resolving this case. It is generally accepted that the class action, by permitting "allegedly injured claimants to come together in one representative action to present their grievances and share the economic burden of prosecuting these typically complicated and lengthy proceedings," provides the superior vehicle for resolving large antitrust actions in which "hundreds, thousands, or even millions of persons may be alleged to have been harmed by defendant's conduct." C. Wright & A. Miller, Federal Practice & Procedure § 1781 (3d ed. 2017). Here, the proposed Class comprises hundreds of thousands of BCBS-AL customers. Given the large number of individuals injured by Defendants' antitrust violations, joinder is plainly impractical, and "[s]eparate proceedings would produce duplicate efforts, unnecessarily increase the costs of litigation, impose an unwarranted burden on this Court and other courts throughout the country, and create the risk of inconsistent results for similarly situated parties." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 699 (D. Minn. 1995); *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 270 (D.D.C. 2002) (class certification "is appropriate in cases in which a class action would promote judicial efficiency and uniformity of decisions as to persons similarly situated").

---

[11] The Court could also consider certifying a Rule 23(c)(4) issue class as to liability, as Subscribers previously proposed in their Memorandum of Law in Support of Motion to Set Case Schedule. Doc. 2381 at 8-10, 16-24. *See also Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 242 (S.D.N.Y. 2010) (certification of liability appropriate "where Defendants' liability can be determined once, on a class-wide basis, through common evidence"); *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 666 (D. Kan. 2013) (certifying class on "the 'liability' aspects of plaintiffs' claims include all substantive elements of the claims, including causation and injury. 'Liability' does not include questions of remedy, e.g. damages, injunctive relief and restitution").

Class treatment is also appropriate given the high costs of litigating a multidistrict antitrust suit of this nature. Absent class treatment, litigating this action would most certainly be economically prohibitive for most of the individuals and small and medium-group companies harmed by Defendants' conduct. "[I]n cases such as this one, in which there exist a large number of small or medium-sized claims against Defendants which would make individual litigation economically infeasible, a class action is a superior method of litigation." *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 533 (M.D. Fla. 1996). If class certification were denied, "the cost associated with individual claims may require claimants with potentially small claim amounts to abandon otherwise valid claims simply because pursuing those claims would not be economical." *Potash*, 159 F.R.D. at 699; *see also Domestic Air*, 137 F.R.D. at 694 (recognizing that "if this case is not certified as a class action, a majority of class members would likely abandon their claims even if it can be proven that defendants have conspired to fix prices"). "This in turn would result in unjustly enriching the Defendants; precisely the result antitrust laws are designed to remedy." *Potash*, 159 F.R.D. at 699.

## V.   CONCLUSION

Subscribers respectfully request the Court certify the proposed Alabama Damages Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3) or, in the alternative, certify a liability issue class pursuant to Fed. R. Civ. P (c)(4).

This the 15th day of April, 2019

|  | /s/ Chris T. Hellums |
| --- | --- |

Charles J. Cooper – ***Co-Chair, Written Submissions Committee***
COOPER & KIRK, PLLC
1523 New Hampshire Avenue NW
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

Chris T. Hellums – ***Local Facilitating Counsel***
PITTMAN, DUTTON & HELLUMS, P.C.
2001 Park Place N, 1100 Park Place Tower
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
chrish@pittmandutton.com

David Boies – ***Co-Lead Counsel***
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749-8300
dboies@bsfllp.com

Michael Hausfeld – ***Co-Lead Counsel***
Swathi Bojedla
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeldllp.com
sbojedla@hausfeldllp.com

David Guin – ***Co-Chair, Written Submissions Committee***
Tammy Stokes – ***Damages Committee***
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. North
Suite 600/Title Building
Birmingham, AL 35203
Tel: (205) 226-2282
Fax: (205) 226-2357
davidg@gseattorneys.com
tammys@gseattorneys.com

William A. Isaacson – ***Settlement Committee & PSC Member***
BOIES, SCHILLER & FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
wisaacson@bsfllp.com

Gregory Davis – ***Settlement Committee & PSC Member***
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Tel: (334) 832-9080
Fax: (334) 409-7001
gldavis@knology.net

Megan Jones – ***Settlement Committee & PSC Member***
Arthur Bailey – ***Discovery Committee***
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
mjones@hausfeldllp.com
abailey@hausfeldllp.com

31

Kathleen Chavez – ***Settlement Committee & PSC Member***
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
kcc@fmcolaw.com

Cyril V. Smith – ***Settlement Committee & PSC Member***
ZUCKERMAN SPAEDER, LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Tel: (410) 949-1145
Fax: (410) 659-0436
csmith@zuckerman.com

Eric L. Cramer – ***Expert Committee***
BERGER & MONTAGUE, P.C.
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 1-800-424-6690
Fax: (215) 875-4604
ecramer@bm.net

Richard Feinstein – ***Expert Committee***
Hamish P.M. Hume – ***Discovery Committee***
BOIES, SCHILLER & FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
rfeinstein@bsfllp.com
hhume@bsfllp.com

Patrick Cafferty – ***Discovery Committee***
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
220 Collingwood, Suite 130
Ann Arbor, MI 48104
Tel: (734) 769-2144
Fax: (734) 769-1207
pcafferty@caffertyclobes.com

Bryan Clobes – ***Litigation Committee***
Ellen Meriwether – ***Written Submissions Committee***
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
205 N. Monroe St.
Media, PA 19063
Tel: (215) 864-2800
Fax: (215) 864-2810
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

Douglas Dellaccio – ***Litigation Committee***
CORY WATSON, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 32505
Tel: (205) 328-2200
Fax: (205) 324-7896
ddellaccio@cwcd.com

Chris Cowan – ***Damages Committee***
THE COWAN LAW FIRM
4500 N Versailles Ave
Dallas, TX 75205-3015
Tel: (214) 826-1900
Fax: (214) 826-8900
chris@cowanlaw.net

Edwin J. Kilpela, Jr.
Benjamin Sweet – *Litigation Committee*
CARLSON LYNCH SWEET KILPELA &
CARPENTER LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA  15222
Tel: 412-322-9243
Fax: 412-231-0246
ekilpela@carlsonlynch.com
bsweet@carlsonlynch.com

Robert M. Foote – *Damages Committee*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
rmf@fmcolaw.com

Charles T. Caliendo – *Class Certification Committee*
GRANT & EISENHOFER
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
ccaliendo@gelaw.com

Robert Eisler – *Discovery Committee*
GRANT & EISENHOFER
123 Justison Street, 17th Floor
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
reisler@gelaw.com

Daniel Gustafson – *Litigation Committee*
Daniel C. Hedlund – *Damages Committee*
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

Brent Hazzard – *Litigation Committee*
HAZZARD LAW, LLC
447 Northpark Drive
Ridgeland, MS 39157
Tel: (601) 977-5253
Fax: (601) 977-5236
brenthazzard@yahoo.com

John Saxon – *Litigation Committee*
JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203-3314
Tel: (205) 324-0223
Fax: (205) 323-1583
jsaxon@saxonattorneys.com

Lawrence Jones – *Damages Committee*
JONES WARD PLC
1205 E. Washington St., Suite 111
Louisville, KY 40202
Tel: (502) 882-6000
larry@jonesward.com

Andrew Lemmon – ***Chair, Discovery Committee***
LEMMON LAW FIRM
15058 River Road
PO Box 904
Hahnville, LA 70057
Tel: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Robert Methvin – ***Chair, Settlement Committee***
James M. Terrell – ***Class Certification Committee***
METHVIN, TERRELL, YANCEY, STEPHENS & MILLER, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, AL 35205
Tel: (205) 939-0199
Fax: (205) 939-0399
rgm@mmlaw.net
jterrell@mmlaw.net

H. Lewis Gillis – ***Co-Head Chair, Litigation Committee***
MEANS GILLIS LAW, PC
60 Commerce Street, Suite 200
Montgomery, AL 36104
Tel: 1-800-626-9684
hlgillis@tmgslaw.com

Dianne M. Nast – ***Class Certification Committee***
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com

Virginia Buchanan – ***Chair, Class Certification Committee***
LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7000
Fax: (850) 435-7020
vbuchanan@levinlaw.com

Michael McGartland – ***Class Certification Committee***
MCGARTLAND LAW FIRM, PLLC
1300 South University Drive, Suite 500
Fort Worth, TX 76107
Tel: (817) 332-9300
Fax: (817) 332-9301
mike@mcgartland.com

David J. Hodge – ***Chair, Settlement Committee***
MORRIS, KING & HODGE
200 Pratt Avenue NE
Huntsville, AL 35801
Tel: (256) 536-0588
Fax: (256) 533-1504
dhodge@mkhlawyers.com

Patrick W. Pendley – ***Chair, Damages Committee***
Christopher Coffin – ***State Liaison Committee***
PENDLEY, BAUDIN & COFFIN, LLP
Post Office Drawer 71
Plaquemine, LA 70765
Tel: (225) 687-6369
Fax: (225 687-6398
pwpendley@pbclawfirm.com
ccoffin@pbclawfirm.com

Edgar D. Gankendorff – *Co-Head Chair, Litigation Committee*
Eric R.G. Belin – *Damages Committee*
PROVOSTY & GANKENDORFF, LLC
650 Poydras Street, Suite 2700
New Orleans, LA 70130
Tel: (504) 410-2795
Fax: (504) 410-2796
egankendorff@provostylaw.com
ebelin@provostylaw.com

Garrett Blanchfield – *Written Submissions Committee*
REINHARDT, WENDORF & BLANCHFIELD
W-1050 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com

Larry McDevitt – *Chair, Class Certification Committee*
David Wilkerson – *Discovery Committee*
VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Tel: (828) 258-2991
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Richard Rouco – *Written Submissions Committee*
QUINN, CONNOR, WEAVER, DAVIES & ROUCO LLP
2 20th Street North, Suite 930
Birmingham, Alabama 35203
Tel: (205) 870-9989
Fax: (205) 803-4143
rrouco@qcwdr.com

Jason Thompson – *Damages Committee*
SOMMERS SCHWARTZ
One Towne Square, 17th Floor
Southfield, MI 48076
Tel: (248) 355-0300
jthompson@sommerspc.com

Carl S. Kravitz – *Expert Committee*
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: (202) 778-1800
Fax: (202) 822-8106
ckravitz@zuckerman.com

*Subscriber Plaintiff Co-Lead Counsel and Committee Chairs and Members*

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2019, the foregoing was served on all counsel of record via CM/ECF.  An unredacted version of the foregoing was manually filed under seal with the Clerk of Court, and was served via electronic mail on the following counsel for other Defendants who have been designated to receive service through agreement of the parties.

| | |
|---|---|
| Carl S. Burkhalter<br>MAYNARD COOPER & GALE PC<br>1901 Sixth Avenue North<br>2400 Regions Harbert Plaza<br>Birmingham, AL 35203<br>Telephone: (205) 254-1000<br>cburkhalter@maynardcooper.com | Kimberly R. West<br>Mark H. Hogewood<br>WALLACE JORDAN RATLIFF &<br>BRANDT LLC<br>First Commercial Bank Building<br>800 Shades Creek Parkway, Suite 400<br>PO Box 530910<br>Birmingham, AL 35253<br>Telephone: (205) 870-0555<br>kwest@wallacejordan.com<br>mhogewood@wallacejordan.com |
| Craig A. Hoover<br>E. Desmond Hogan<br>HOGAN LOVELLS US LLP<br>Columbia Square<br>555 Thirteenth Street, NW<br>Washington, DC 20004<br>Telephone: (202) 637-5600<br>craig.hoover@hoganlovells.com<br>desmond.hogan@hoganlovells.com | Daniel E. Laytin<br>David Zott<br>Helen Witt<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle<br>Chicago, IL 60654<br>Telephone: (312) 862-2000<br>daniel.laytin@kirkland.com<br>dzott@kitkland.com<br>hwitt@kirkland.com |
| Evan Chesler<br>Karen Demasi<br>CRAVATH, SWAINE & MOORE LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019-7475<br>Telephone: (212) 474-1000<br>echesler@cravath.com<br>kdemasi@cravath.com | Kathleen Taylor Sooy<br>CROWELL & MORING LLP<br>1001 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004<br>Telephone: (202) 624-2500<br>ksooy@crowell.com |
| John M. Johnson<br>LIGHTFOOT, FRANKLIN, & WHITE LLC<br>400 20th Street North | |

| | |
|---|---|
| Birmingham, Alabama 35203<br>Telephone: (205) 581-0700<br>jjohnson@lightfootlaw.com | |

_/s/ Chris T. Hellums_

Chris T. Hellums
**_Local Facilitating Counsel for Subscriber Plaintiffs_**