FILED
2019 Apr-15 PM 04:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP** |
| | **This document relates to all cases.** |
| | **Document Filed Under Seal.** |

**PROVIDER PLAINTIFFS' EXECUTIVE SUMMARY OF EXPERT REPORT OF DEBORAH HAAS-WILSON, PH.D.**

Professor Deborah Haas-Wilson is one of the leading healthcare economists with antitrust expertise. Her report convincingly demonstrates that all members of the Classes Provider Plaintiffs present for certification have been injured by Defendants' antitrust violations. She also defines relevant markets, demonstrates that the Defendants have market power in everyone of those markets, and presents a reliable methodology to show that all members of Provider Plaintiffs' proposed Acute Care Hospital Provider 23(b)(3) Class have been harmed as a result of Defendants' antitrust violations. She has also used that methodology to quantify their harm.

**<u>Professor Haas-Wilson's Qualifications</u>**

Professor Haas-Wilson is the Marilyn Carlson Nelson Professor of Economics at Smith College in Northampton, Massachusetts. Her research specialty is health economics and competition policies in healthcare markets.

Much of Professor Haas-Wilson's career has focused on economic and antitrust issues in healthcare markets. She has written numerous articles on these issues that have appeared in economics journals, including the *Journal of Political Economy*, the *Journal of Economic Perspectives*, the *Journal of Law and Economics*, the *Review of Economics and Statistics*, and the *Journal of Health Economics*. She is the author of *Managed Care and Monopoly Power:*

*The Antitrust Challenge* (Harvard University Press, 2003) in which she discusses, among other things, the benefits of competition for consumers; the exercise of market power by insurers, physician groups, and hospitals; and the economic concepts that are essential to enforcement of antitrust laws in healthcare markets. In addition, she co-edited *Uncertain Times: Kenneth Arrow and the Changing Economics of Health Care* (Duke University Press, 2003), and a special issue of *Health Economics* on competition and antitrust policy in healthcare markets.

Professor Haas-Wilson currently sits on the Editorial Board of the *American Journal of Health Economics* and the Board of Directors of the Nicholas Petris Center on Health Care Markets and Consumer Welfare at the University of California, Berkeley. She has also served as a member of the Health Services Research Study Section of the Agency for Health Care Policy Research and the Executive Committee of the Health Economics Committee of the American Public Health Association. She is also a recipient of the Robert Wood Johnson Foundation's *Investigator Awards in Health Policy Research*.

In addition to her scholarly work, Professor Haas-Wilson has served as a consultant on antitrust issues in healthcare to the Federal Trade Commission, the Massachusetts Attorney General, the California Department of Corporations, and numerous private entities.

**Overview of Professor Haas-Wilson's Report**

In her report, after summarizing her qualifications, assignment and opinions (Sections I and II)(Pages 1-11; ¶¶ 1-22), Professor Haas-Wilson provides an overview of the healthcare financing and healthcare provider industries (*see* Section III) (Pages 11-47; ¶¶ 23-64) as well as Defendants and their agreements that are at issue in this matter from an economic perspective (*see* Section IV) (Pages 47-99; ¶¶ 65-133) and renders several opinions about the effect of those agreements on competition.

As part of her analysis, Professor Haas-Wilson identifies the antitrust markets relevant to this litigation, including the relevant product markets and submarkets in which the Defendants have agreed to restrain trade and which BCBS-AL has monopsonized, attempted to monopsonize, or conspired to monopsonize. These relevant product markets include (i) the purchase of services from healthcare *facilities* by commercial buyers in Alabama CBSAs or counties not part of these CBSAs; and (ii) the purchase of services from healthcare *professionals* by commercial buyers in Alabama CBSAs or counties not part of these CBSAs. *See* Section V (Pages 99-173; ¶¶ 134-259).

Based on both her examination of market data as well as documentary evidence and deposition testimony, Professor Haas-Wilson then concludes that BCBS-AL possessed and continues to possess market power in each of the relevant markets for the purchase of healthcare providers' services by commercial buyers in Alabama, and observes that BCBS-AL controls a large share of these markets. *See* Section VI (Pages 173-202; ¶¶ 260-308).

Against this backdrop, Professor Haas-Wilson concludes that the Blues' market allocation agreements on provider contracting, market allocation agreements on selling health insurance and administrative services, and price fixing agreements (the "At-Issue Agreements") have limited the number of commercial buyers in Alabama, and, therefore, have harmed providers in Alabama, both by suppressing the prices paid to providers for healthcare services delivered to Blue Plan enrollees and by limiting the number and variety of choices available to providers. She also opines that the Blues' so-called "Best Efforts" rules likely have reduced the number of commercial buyers of healthcare provider services in Alabama and therefore are also likely to have harmed providers in Alabama. Professor Haas-Wilson further opines that by increasing the contracting leverage that BCBS-AL has in its interactions with providers, the At-

Issue Agreements have allowed BCBS-AL to obtain lower contracted prices with providers. She also concludes that, by limiting choice, these agreements have limited providers' ability to benefit from contracting with commercial buyers that experiment and innovate with the provision of healthcare financing services, provider collaboration, and other aspects of the provision of care. *See* Section VII (Pages 202-254; ¶¶ 309-397).

Using an econometric model, Professor Haas-Wilson also quantifies harm to general acute care hospitals in Alabama based on data produced in this matter, finding that the At-Issue Agreements separately and in combination have harmed all general acute care hospitals in Alabama that had a participation agreement with BCBS-AL each year between 2008 and 2014 by suppressing the prices paid to those facilities. Importantly, her methodology for quantifying harm can be applied to all general acute care hospitals in the proposed class, allows one to quantify harm from the At-Issue Agreements separately and in combination, and is sufficiently flexible to be applied under numerous possible outcomes of this litigation. *See* Sections VIII (Pages 254-309; ¶¶ 398-466) and IX (Pages 309-358-; ¶¶ 467-554).

**Summary of Professor Haas-Wilson's Econometric Model**

In her report, Professor Haas-Wilson presents a theoretical framework for the "bargaining" that can occur between commercial health insurers ("commercial buyers") that purchase services from healthcare providers on behalf of their members ("enrollees"), and healthcare providers regarding the prices for healthcare providers' services.[1] Professor Haas-Wilson observes that commercial buyers pay lower prices when their share of enrollees with

[1] Haas-Wilson Report, Section VII.A (Pages 206-210, ¶¶ 316-321).

which they can credibly contract with healthcare providers (*i.e.*, their "contracting share") is higher, all else equal.[2]

Professor Haas-Wilson demonstrates that a commercial buyer's contracting share is the mechanism through which the At-Issue Agreements impact the prices for healthcare providers' services. Professor Haas-Wilson concludes that the At-Issue Agreements increased BCBS-AL's contracting share because BCBS-AL faced no competition from other Blues and that BCBS-AL's increased contracting share enabled BCBS-AL to pay lower prices to putative Class members.[3]

Professor Haas-Wilson further demonstrates that, in the absence of the At-Issue Agreements, BCBS-AL's contracting share would have been lower because it is expected that BCBS-AL would have faced competition from other Blues and that BCBS-AL's lower contracting share would have enabled putative Class members to receive higher prices for their healthcare services.[4]

Professor Haas-Wilson specifies an econometric model to empirically test the validity of her opinions.[5] First, Professor Haas-Wilson develops a regression equation to model the relationship between a commercial buyer's enrollee share (at the CBSA/county level) and the prices[6] for general acute care hospitals' services in the United States ("GAC Hospital Pricing Model"). Professor Haas-Wilson relates the average annual price for services at each general

---

2 Haas-Wilson Report, Pages 197, 208-210, ¶¶ 302, 318-320; Sections VIII.A.1 and VIII.A.2 (Pages 255-273, ¶¶ 399-418).

3 Haas-Wilson Report, Section VI.B.1, VI.B.2, and VI.B.3 (Pages 178-195, ¶¶ 271-297).

4 Haas-Wilson Report, Pages 211-21, ¶¶ 324-325, 337; Section IX.C (Pages 316-350, ¶¶ 487-542).

5 Haas-Wilson Report, Sections VIII.A.3 and VIII.B (Pages 273-307, ¶¶ 419-466).

6 Price is the hospital-specific average allowed amount per All Patient Refined Diagnosis Related Group ("APR-DRG") weight for inpatient services. Price is the hospital-specific average allowed amount per Ambulatory Payment Classification ("APC") weight for outpatient services. There is a separate price for each hospital, year, and commercial buyer combination for inpatient and outpatient services, respectively. (Haas-Wilson Report, Pages 262-264, ¶ 411.

acute care hospital in each year for each commercial buyer to that commercial buyer's enrollee share (at the CBSA/county level), the hospital or hospital system's share of hospital services provided in the area (at the CBSA/county level), and other economic factors.[7] Professor Haas-Wilson's Report has descriptions of the variables that Professor Haas-Wilson uses in her GAC Hospital Pricing Model.[8]

Second, because more than one Blue is licensed in certain geographic areas of the United States, some Blues have overlapping Service Areas. Professor Haas-Wilson uses these circumstances to compare Blue homed enrollee shares in overlapping Service Areas that have limited Blue-on-Blue competition to Blue homed enrollee shares in non-overlapping Service Areas that have no Blue-on-Blue competition. The geographic areas with overlapping Service Areas primarily include:

- The state of California, with Anthem Blue Cross of California and Blue Shield of California (hereafter "Anthem BC-CA" and "BS-CA," respectively);
- The state of Idaho, with Blue Cross of Idaho and Regence Blue Shield of Idaho; The central area of Pennsylvania, with Highmark Blue Shield and Capital Blue Cross;
- Some areas in the state of New York, with up to three Blue Plans, Excellus BlueCross BlueShield, Empire BlueCross BlueShield (Anthem), and Blue Shield of Northeastern New York (HealthNow); and

7 The impact on prices of a change in commercial buyer enrollee share is calculated using the natural logarithm of price per APR-DRG weight for inpatient services or price per APC weight for outpatient services, commercial buyer enrollee share, and an interaction term between commercial buyer enrollee share and hospital or hospital system share. Thus, the impact on prices of a change in commercial buyer share can vary from hospital to hospital. (Haas-Wilson Report, Pages 262-264, 282, 313-314; ¶¶ 410-411, 427-428, 482).

8 Haas-Wilson Report, Pages 274-28, ¶¶ 421-426; Appendix E.

- Some counties in the state of Washington, with Regence Blue Shield and Premera Blue Cross. [9]

Professor Haas-Wilson develops a second regression equation to model the relationship between the existence of limited Blue-on-Blue competition in CBSAs/counties and Blues' homed enrollee shares in CBSAs/counties in the United States ("Homed Share Model"). Professor Haas-Wilson relates the Blues' homed enrollee shares in CBSAs/counties to an indicator variable that is equal to zero if there is limited Blue-on-Blue competition in a CBSA/county (and equal to one otherwise) and other economic factors. Professor Haas-Wilson's Report has descriptions of the variables that Professor Haas-Wilson uses in her Homed Share Model.[10]

The empirical results from Professor Haas-Wilson's Homed Share Model can be used to calculate the decrease in commercial buyer enrollee share caused by the entry of additional commercial buyers. In the context of this litigation, the empirical results from Professor Haas-Wilson's Homed Share Model can be used to calculate the decrease in BCBS-AL's homed enrollee share caused by the entry of one additional Blue in CBSAs/counties in Alabama. The empirical results from Professor Haas-Wilson's Homed Share Model show that the entry of one additional Blue in CBSAs/counties has a statistically significant and negative effect on Blue homed enrollee share in CBSAs/counties where there is only one Blue.[11] Thus, a commercial buyer's entry in CBSAs/counties in Alabama reduces BCBS-AL's homed enrollee share in CBSAs/counties in Alabama by a certain amount, all else equal.

---

9 Haas-Wilson Report, Pages 62-65, ¶ 84.

10 Haas-Wilson Report, Pages 302-303, ¶¶ 455-457, Appendix F (Section II).

11 Haas-Wilson Report, Pages 304-307, ¶¶ 461-465.

Professor Haas-Wilson assesses the impact of the At-Issue Agreements on the prices for putative Class members' services, using three elements: (1) contracting share;[12] (2) the magnitude of the relationship between commercial buyer enrollee share and prices paid to healthcare providers from the empirical results of the GAC Hospital Pricing Model;[13] and (3) the magnitude of the relationship between the existence of limited Blue-on-Blue competition and Blue homed enrollee share from the empirical results of the Homed Share Model.[14] Professor Haas-Wilson expects that, but for the At-Issue Agreements, the following competitive outcomes would have existed in Alabama:

a. BCBS-AL's contracting share in each Alabama CBSA/county no longer includes all its own enrollees (*i.e.*, BCBS-AL's "homed" enrollees) plus all other Blues' enrollees (*i.e.*, BCBS-AL's "hosted" enrollees) in each Alabama CBSA/county. BCBS-AL's contracting share in each Alabama CBSA/county includes its homed enrollees in each Alabama CBSA/county.[15]

b. A second Blue would have sold health insurance in each Alabama CBSA/county. This second local Blue's enrollee share in a particular Alabama CBSA/county in a given year would have been equal to (1) the enrollee share of the "out-of-Service Area"[16] Blue with the largest enrollee share (*i.e.*, the largest out-of-Service Area Blue) in that Alabama CBSA/county in that year, plus (2) the amount of enrollee share that it would have taken from BCBS-AL, which is calculated from the empirical results of Professor

[12] Haas-Wilson Report, Pages 311-312, ¶¶ 477-479.

[13] Haas-Wilson Report, Pages 311, 314-315, ¶¶ 477, 483.

[14] Haas-Wilson Report, Pages 311, 316, ¶¶ 477, 486.

[15] Haas-Wilson Report, Page 314, ¶ 483, Footnote 654 and Page 321, ¶ 496.

[16] An "out-of-Service Area" Blue is a Blue that is not licensed in a Service Area. In Alabama, for example, non-BCBS-AL Blues with members in Alabama are considered "out-of-Service Area" Blues.

Haas-Wilson's Homed Share Model. Thus, BCBS-AL's enrollee share in each Alabama CBSA/county in each year is reduced by the amount of enrollee share that the second local Blue takes from BCBS-AL in each Alabama CBSA/county.[17]

c. The second local Blue's enrollee share in each Alabama CBSA/county includes its enrollees hosted by BCBS-AL plus the homed enrollees it takes from BCBS-AL from competition for the sale of health insurance in each Alabama CBSA/county.[18]

d. The remaining out-of-Service Area Blues with enrollees in each Alabama CBSA/county contract jointly and directly with putative Class members using the bargaining leverage created by their combined enrollee share in each Alabama CBSA/county. The combined enrollee share of the remaining out-of-Service Area Blues in each Alabama CBSA/county includes BCBS-AL's total hosted enrollees in each Alabama CBSA/county minus the second local Blue's enrollees hosted by BCBS-AL in each Alabama CBSA/county.[19]

e. The aggregate enrollee share of non-Blue commercial buyers in each Alabama CBSA/county is unchanged.[20]

With the At-Issue Agreements in existence, there is only one Blue that can credibly contract with putative Class members in each Alabama CBSA/county, BCBS-AL, meaning that it can use all its homed and hosted enrollees to create bargaining leverage in contracting situations in each Alabama CBSA/county. However, Professor Haas-Wilson expects that there would have been three Blue entities competing in each Alabama CBSA/county absent the At-

---

17 Haas-Wilson Report, Pages 319-320, 322, ¶¶ 493, 498.

18 *Id.*

19 Haas-Wilson Report, Pages 321-322, ¶¶ 497-498.

20 Haas-Wilson Report, Page 321, ¶ 496, Footnote 665.

Issue Agreements: (1) BCBS-AL, (2) the second local Blue, and (3) the remaining out-of-Service Area Blues would have been left to contract jointly and directly with putative Class members. The competition between the Blues in the but-for world is reflected in the Blues' reduced Alabama CBSA/county-level contracting shares in the absence of the At-Issue Agreements.

The empirical results from Professor Haas-Wilson's GAC Hospital Pricing Model show that a commercial buyer's enrollee share has a statistically significant and negative effect on the prices for healthcare providers' services.[21] As a commercial buyer's enrollee share decreases, the prices for healthcare providers' services increase, all else equal. Professor Haas-Wilson shows that the empirical results are robust to different econometric modeling choices and are consistent with: (1) the standard Nash bargaining framework, (2) findings of empirical studies in the academic literature, (3) deposition testimony from representatives of healthcare providers, (4) information in the Defendants' own documents, (5) the opinions of antitrust authorities, and (6) descriptive statistics using the data produced in this litigation.[22]

The empirical results from Professor Haas-Wilson's GAC Hospital Pricing Model demonstrate  that the At-Issue Agreements reduced the prices for putative Class members' services because BCBS-AL's contracting share would have been lower because BCBS-AL would have faced competition from other Blues in the absence of the At-Issue Agreements.[23] These results are used by Daniel J. Slottje, Ph.D to calculate individual damages to each GAC Hospital in the Acute Care Hospital Provider 23(b)(3) Class.

---

[21] Haas-Wilson Report, Pages 283-289, ¶¶ 431-439.

[22] Haas-Wilson Report, Pages 207-210, 256-273, 275, 290-293, ¶¶ 317-320, 402-418, 422, Footnote 617, 440-443.

[23] Haas-Wilson Report, Pages 211-212, ¶¶ 324-325, 337; Section IX.C. (Pages 316-350, ¶¶ 487-542).

Respectfully submitted the 15th day of April, 2019.

*/s/ Edith M. Kallas*
Edith M. Kallas – ***Co-Lead Counsel***
WHATLEY KALLAS, LLP
1180 Avenue of the Americas, 20th Floor
New York, NY 10036
Tel: (212) 447-7060
Fax: (800) 922-4851
Email: ekallas@whatleykallas.com

*/s/ Joe R. Whatley, Jr.*
Joe R. Whatley, Jr. – ***Co-Lead Counsel***
W. Tucker Brown
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel: (205) 488-1200
Fax: (800) 922-4851
Email: jwhatley@whatleykallas.com
tbrown@whatleykallas.com

Patrick J. Sheehan
WHATLEY KALLAS, LLP
60 State Street, 7th Floor
Boston, MA 02109
Tel: (617) 573-5118
Fax: (617) 371-2950
Email: psheehan@whatleykallas.com

Deborah J. Winegard
WHATLEY KALLAS, LLP
1068 Virginia Avenue, NE
Atlanta, GA 30306
Tel: (404) 607-8222
Fax: (404) 607-8451
Email: dwinegard@whatleykallas.com

Henry C. Quillen
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH 03801
Tel: (603) 294-1591
Fax: (800) 922-4851
Email: hquillen@whatleykallas.com

E. Kirk Wood, Jr. – ***Local Facilitating Counsel***
WOOD LAW FIRM LLC
P. O. Box 382434
Birmingham, AL 35238
Tel: (205) 612-0243
Fax: (205) 705-1223
Email: ekirkwood1@bellsouth.net

Charles Clinton Hunter
HAYES HUNTER PC
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel: (281) 768-4731
Fax: (713) 583-7047
Email: chunter@hayeshunterlaw.com

Aaron S. Podhurst – ***Plaintiffs' Steering Committee***
Peter Prieto – ***Chair, Expert Committee***
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue
Suite 2300
Miami, FL 33131
Tel: (305) 358-2800
Fax: (305) 358-2382
Email: apodhurst@podhurst.com
pprieto@podhurst.com

Dennis Pantazis – ***Plaintiffs' Steering Committee***
Brian Clark – ***Discovery Committee***
WIGGINS CHILDS PANTAZIS FISHER GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel: (205) 314-0500
Fax: (205) 254-1500
Email: dgp@wcqp.com
bclark@wcqp.com

U.W. Clemon – ***Plaintiffs' Steering Committee***
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL 35222
Tel: (205) 837-2898
Email: clemonu@bellsouth.net

Dennis C. Reich – ***Chair, Damages Committee***
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel: (713) 622-7271
Fax: (713) 623-8724
Email: dreich@rbfirm.net

J. Mark White – ***Litigation Committee***
Augusta S. Dowd – ***Chair, Litigation Committee***
Linda G. Flippo – ***Discovery Committee***
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel: (205) 323-1888
Fax: (205) 323-8907
Email: mwhite@whitearnolddowd.com
adowd@whitearnolddowd.com
lflippo@whitearnolddowd.com

Nicholas B. Roth – ***Chair, Discovery Committee***
Julia Smeds Roth – ***Discovery Committee***
EYSTER KEY TUBB ROTH MIDDLETON & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel: (256) 353-6761
Fax: (256) 353-6767
Email: nbroth@eysterkey.com
jroth@eysterkey.com

Van Bunch – ***Chair, Class Certification Committee***
BONNETT FAIRBOURN FRIEDMAN & BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel: (602) 274-1100
Fax: (602) 274-1199
Email: vbunch@bffb.com

David A. Balto – ***Expert Committee***
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel: (202) 789-5424
Fax: (202) 589-1819
Email: david.balto@dcantitrustlaw.com

Robert J. Axelrod – ***Chair, Written Submissions Committee***
AXELROD & DEAN LLP
830 Third Avenue, 5th Floor
New York, NY 10022
Tel: (646) 448-5263
Fax: (212) 840-8560
Email: rjaxelrod@axelroddean.com

Joey K. James – ***Litigation Committee***
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel: (256) 764-0095
Fax: (256) 767-5705
Email: joey@bunchandjames.com

W. Daniel Miles, III – ***Written Submissions Committee***
BEASLEY ALLEN CROW METHVIN PORTIS
& MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel: (800) 898-2034
Fax: (334) 954-7555
Email: dee.miles@beasleyallen.com

Richard S. Frankowski – ***Discovery Committee***
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL 35233
Tel: (205) 390-0399
Fax: (205) 390-1001
Email: richard@frankowskifirm.com

Michael C. Dodge – ***Expert Committee***
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel: (972) 419-7172
Email: mdodge@gpm-law.com

John C. Davis – ***Written Submissions Committee***
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel: (850) 222-4770
Email: john@johndavislaw.net

Michael E. Gurley, Jr. – ***Discovery Committee***
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel: (205) 908-6512
Email: mgurleyjr@yahoo.com

Mark K. Gray – ***Discovery Committee***
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel: (502) 805-1800
Fax: (502) 618-4059
Email: mgray@grayandwhitelaw.com

Lynn W. Jinks, III – ***Expert Committee***
Christina D. Crow – ***Discovery Committee***
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel: (334) 738-4225
Fax: (334) 738-4229
Email: ljinks@jinkslaw.com
ccrow@jinkslaw.com

Stephen M. Hansen – ***Class Certification Committee***
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel: (253) 302-5955
Fax: (253) 301-1147
Email: steve@stephenmhansenlaw.com

Myron C. Penn – ***Discovery Committee***
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel: (334) 738-4486
Fax: (334) 738-4432
Email: myronpenn28@hotmail.com

Harley S. Tropin – ***Damages Committee***
Javier A. Lopez – ***Discovery Committee***
KOZYAK TROPIN &
THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
Email: hst@kttlaw.com
jal@kttlaw.com

J. Preston Strom, Jr. – ***Litigation Committee***
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel: (803) 252-4800
Fax: (803) 252-4801
Email: petestrom@stromlaw.com

C. Wes Pittman – ***Settlement Committee***
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel: (850) 784-9000
Fax: (850) 763-6787
Email: wes@pittmanfirm.com

Thomas V. Bender – ***Discovery Committee***
Dirk L. Hubbard
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Tel: (816) 421-0700
Email: tbender@hab-law.com
dhubbard@hab-law.com

Robert B. Roden – ***Litigation Committee***
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel: (205) 933-8383
Fax: (205) 933-8386
Email: rroden@shelbyroden.com

Gregory S. Cusimano – ***Litigation Committee***
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL 35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email: greg@alalawyers.net

Gary E. Mason – ***Class Certification Committee***
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel: (202) 429-2290
Fax: (202) 640-1160
Email: gmason@wbmllp.com

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel: (320) 289-2363
Fax: (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Michael L. Murphy – ***Discovery Committee***
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC 20006
Tel: (202) 463-2101
Fax: (202) 463-2103
Email: mmurphy@baileyglasser.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
Email: alamb@archielamb.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel: (719) 471-1984
Fax: (719) 577-4356
Email: lance@searsassociates.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA 51101
Tel: (712) 234-3030
Fax: (712) 234-3034
Email: paul@lundberglawfirm.com

Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK 99501
Tel: (907) 277-5400
Fax: (907) 277-9896
Email: Jessica@dillonfindley.com
Ray@dillonfindley.com
Molly@dillonfindley.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com

Cynthia C. Moser
HEIDMAN LAW FIRM
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA 51101
Tel: (712) 255-8838
Fax (712) 258-6714
Email: Cynthia.Moser@heidmanlaw.com