FILED
2019 Jul-15  PM 08:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406) | ) ) ) ) ) ) | **Master File No. 2:13-CV-20000-RDP**<br><br>This document relates to all cases.<br>**[REDACTED VERSION OF SEALED FILING]** |

## DEFENDANTS' OPPOSITION TO SUBSCRIBERS' AND PROVIDERS' MOTIONS <u>FOR CLASS CERTIFICATION</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ..............................................................................5

I.     THE IMPACT OF ENTRY ON PRICE .................................................5

II.    PROVIDER REIMBURSEMENTS VARY WIDELY AND ARE BASED ON A RANGE OF FACTORS ..............................................................8

     A.     Some Providers Have Bargaining Power ..................................9

         1.     "Must Have" Providers' Bargaining Power ...................9

         2.     Sole Community Providers ...........................................10

         3.     Hospital Systems ...........................................................11

     B.     Other Factors That Affect Provider Negotiations And Reimbursement ........12

III.   THE RECORD EVIDENCE ON ENTRY ............................................14

     A.     Entry Decision—Factors Considered ......................................14

     B.     Alabama Is Not An Attractive Or Likely Market For Entry ..........16

         1.     Demographics And Population Health ..........................16

         2.     Provider Concentration And Market ............................17

         3.     Likelihood Of Winning New Subscribers And Insurer Competition ...........................................18

     C.     Insurers Choose Not To Enter Alabama ...................................21

         1.     Purples ..........................................................................21

         2.     No Green Entry .............................................................24

IV.   NEW ENTRANTS TARGET ATTRACTIVE MARKETS AND HAVE VARYING EFFECTS ON SUBSCRIBERS AND PROVIDERS ...............25

     A.     New Entrants Target Limited Geographic Areas ......................25

     B.     New Entrants Target Healthy Subscribers ...............................28

     C.     New Entrants Target Subsets Of Providers ..............................30

V.     PLAINTIFFS' EXPERT MODELS .....................................................34

     A.     Providers' Experts ....................................................................34

     B.     Subscribers' Experts .................................................................36

LEGAL STANDARD FOR CLASS CERTIFICATION ...............................37

i

SUMMARY OF THE ARGUMENT .................................................................38

ARGUMENT...............................................................................................40

I.      PLAINTIFFS FAIL TO SATISFY RULE 23(B)(3) BECAUSE THEY CANNOT SHOW CLASSWIDE IMPACT WITH COMMON EVIDENCE.............................40

      A.     Plaintiffs' Impact Models Are Unreliable Because They Are Built On Unfounded Assumptions, Without Which There Is No Common Impact......42

           1.    Plaintiffs' Experts Did Not Actually Model The Material Aspects Of Entry But Instead Assumed Them................................................43

           2.    Without Plaintiffs' Unreliable Entry Assumptions, Common Impact Disappears ................................................................................44

               a.    Without Plaintiffs' unreliable assumption that a Blue or Green would enter every county and CBSA and capture substantial share, common impact disappears ........................46

               b.    Without Providers' unreliable assumption that an entrant would contract with every hospital, common impact disappears................................................................................51

               c.    Without Subscribers' unreliable assumption that an entrant would offer the same products as BCBSAL, with the same provider network, common impact disappears ......53

               d.    Without Plaintiffs' unreliable assumption that BCBSAL would continue to operate in the same way after entry, common impact disappears .......................................................56

      B.     Even Using Plaintiffs' Flawed Entry Assumptions, Their Own Models Mask Winners And Losers In Other Ways ......................................................59

           1.    Providers' Model Masks Winners And Losers With Averages...........60

           2.    Dr. Pakes' Regression Model Masks Winners And Losers By Incorrectly Applying Trish And Herring ............................................63

      C.     Plaintiffs' Models Are Unreliable For Additional Reasons .............................65

           1.    Providers' Model Proves Nothing About Hospital Prices In The But-For World......................................................................................65

           2.    Subscribers' Model Is Unreliable For Multiple Additional Reasons..69

               a.    Dr. Pakes' model is unreliable because its pre-entry predictions are entirely detached from observed data............69

               b.    Dr. Pakes' model is based on a false assertion about the effect of entry on non-inpatient medical costs .........................73

               c.    Dr. Pakes failed to model impact to medium groups................74

         d.     Dr. Pakes' model is based on flawed estimates of brand strength ...................................................................................... 75

**D.** Plaintiffs' Models Are In Fundamental Conflict, Confirming That They Are Deeply Flawed ......................................................................... 76

    1.    PLAINTIFFS' MODELS ARE INCONSISTENT ON THEIR FACE ........................................................................................ 76

    2.    If Dr. Haas-Wilson's Model Is Correct, Subscribers Would Be Harmed By Entry .......................................................................... 78

    3.    If Dr. Pakes' Model Is Correct, Providers Would Be Harmed By Entry .......................................................................................... 79

**E.** Providers Present No Basis For Finding Classwide Impact To The Non-Acute Care Hospital Provider Class ............................................. 80

**F.** Plaintiffs Fail To Show Classwide Impact For Additional Reasons ............... 82

    1.    Providers Do Not Show That Their BlueCard Claim Is Subject To Classwide Treatment ............................................................... 82

    2.    Plaintiffs Cannot Rely On Supposed "Non-Price Harms" To Satisfy Their Burden Of Showing Classwide Impact With Common Evidence ............................................................. 85

        a.    Plaintiffs' alleged non-price harms are not antitrust injury and cannot support a non-speculative calculation of damages ................................................................................. 85

        b.    The supposed non-price harm is an individualized issue ......... 88

    3.    Whether A Subscriber Class Member's Damages Claim Is Barred By The Filed-Rate Doctrine Is An Individualized Issue ....................... 90

    4.    Whether A Non-Acute Care Hospital Provider Class Member's Claim Is Barred By The *Love* Settlements Is An Individualized Issue ........................................................................................... 92

**G.** Providers Fail To Show The Acute Care Hospital Provider Class Is Superior To Other Forms Of Adjudication .......................................... 93

**II.** PLAINTIFFS FAIL TO MEET THE REQUIREMENTS FOR CERTIFICATION OF AN INJUNCTION CLASS ........................................ 94

**A.** Plaintiffs Have Failed To Show The Proposed Injunctive Classes Are Cohesive ................................................................................... 94

    1.    The Proposed Injunction Would Harm Many Subscribers ................. 95

    2.    The Proposed Injunction Would Harm Many Providers. .................. 97

**B.** Monetary Relief Is Not Incidental To Injunctive Relief ............................... 98

C.     The Proposed Injunction Classes Would Be Prejudicial To Absent Class Members ........................................................................................... 102

D.     Subscribers Have No Evidence Of Impact Outside Of Alabama To Support A Nationwide Injunction Class ............................................... 105

E.     Subscribers Have Failed To Establish Threatened Injury Even For The Alternative Alabama Injunction Class ............................................ 107

III.   CONFLICTING INTERESTS PREVENT PLAINTIFFS FROM ESTABLISHING ADEQUACY AND TYPICALITY UNDER RULE 23(A) .......... 108

A.     Plaintiffs Have Not Met Their Burden Of Showing That They Would Adequately Represent The Proposed Classes .................................... 108

B.     Plaintiffs Have Not Met Their Burden Of Showing That They Are Typical Of Putative Class Members .............................................. 110

1.     Subscriber Plaintiffs Are Not Typical Of The Proposed Classes ...... 111

2.     Provider Plaintiffs Are Not Typical Of The Proposed Classes .......... 113

IV.   THE COURT SHOULD NOT CERTIFY A RULE 23(C)(4) ISSUES CLASS ....... 115

A.     Providers Have Failed To Satisfy The Requirements Of Rule 23(a) ........... 115

B.     Providers Have Failed To Satisfy The Requirements Of Rule 23(b)(3) ....... 116

C.     The Issues Plaintiffs Identify For Rule 23(c)(4) Are Not Common .............. 117

CONCLUSION .......................................................................................... 119

iv

# TABLE OF AUTHORITIES

**Cases**

*Ash v. Tyson Foods, Inc.,*
  546 U.S. 454 (2006)........................................................................................94

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985)........................................................................................88

*Associated Gen. Contractors of California, Inc. v. California State Council of*
  *Carpenters,*
  459 U.S. 519 (1983)........................................................................................85

*Atl. Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990)...........................................................................41, 88, 118

*Auto Ventures, Inc. v. Moran,*
  No. 92-426-CIV-KEHOE, 1997 WL 306895 (S.D. Fla. 1997) .....................111, 113

*Avritt v. Reliastar Life Ins. Co.,*
  615 F.3d 1023 (8th Cir. 2010) .......................................................................100

*Barnes v. Am. Tobacco Co.,*
  161 F.3d 127 (3d Cir. 1998)............................................................................94

*Blades v. Monsanto Co.,*
  400 F.3d 562 (8th Cir. 2005) ......................................................................41, 51

*Borrero v. United Healthcare of New York, Inc.,*
  610 F.3d 1296 (11th Cir. 2010) .....................................................................117

*Brown Shoe Co. v. U.S.,*
  370 U.S. 294 (1962)........................................................................................83

*Brown v. Electrolux Home Prods., Inc.,*
  817 F.3d 1225 (11th Cir. 2016) ................................................................ *passim*

*Bussey v. Macon County Greyhound Park, Inc.,*
  562 F. App'x 782 (11th Cir. 2014) ..................................................................49

*Cargill, Inc. v. Monfort of Colorado, Inc.,*
  479 U.S. 104 (1986)........................................................................................97

*Carriuolo v. Gen. Motors Co.,*
  823 F.3d 977 (11th Cir. 2016) ........................................................................81

*Castano v. American Tobacco Co.*
  84 F.3d 734 (5th Cir. 1996) ..........................................................................116

*Catron v. City of St. Petersburg,*
No. 8:09-CV-923-T-23EAJ, 2010 WL 917609 (M.D. Fla. Mar. 11, 2010) ...................94, 98

*CBS Broad., Inc. v. EchoStar Commc'ns Corp.,*
265 F.3d 1193 (11th Cir. 2001) ....................................................................................105

*Central Wesleyan College v. W.R. Grace & Co.,*
6 F.3d 177 (4th Cir. 1993) ..............................................................................................115

*City of St. Petersburg v. Total Containment, Inc.,*
265 F.R.D. 630 (S.D. Fla. 2010) ....................................................................................116

*City of Tuscaloosa v. Harcros Chems., Inc.,*
158 F.3d 548 (11th Cir. 1998) ..........................................................................................66

*Cole's Wexford Hotel, Inc. v. UPMC,*
127 F. Supp. 3d 387 (W.D. Pa. 2015) ...............................................................................91

*Cooper v. S. Co.,*
390 F.3d 695 (11th Cir. 2004) ....................................................................................94, 99

*Deiter v. Microsoft Corp.,*
436 F.3d 461 (4th Cir. 2006) ...........................................................................111, 112, 115

*DWFII Corp. v. State Farm Mut. Auto. Ins. Co.,*
469 F. App'x 762 (11th Cir. 2012) .........................................................................*passim*

*Eastland v. Tennessee Valley Auth.,*
704 F.2d 613 (11th Cir. 1983) ..........................................................................................67

*F.T.C. v. Indiana Fed'n of Dentists,*
476 U.S. 447 (1986)............................................................................................................88

*Fisher v. Ciba Specialty Chems. Corp.,*
238 F.R.D. 273 (S.D. Ala. 2006) ...................................................................116, 117, 118

*Fla. Seed Co., Inc. v. Monsanto Co.,*
105 F.3d 1372 (11th Cir. 1997) ........................................................................................87

*Funeral Consumers All. Inc. v. Serv. Corp. Int'l,*
695 F.3d 330, 350 (5th Cir. 2012) ....................................................................................84

*Grimes v. Fairfield Resorts, Inc.,*
331 F. App'x 630 (11th Cir. 2007) ..........................................................................108, 109

*Hammett v. Am. Bankers Ins. Co.,*
203 F.R.D. 690 (S.D. Fla. 2001)......................................................................................101

*Holmes v. Continental Can Co.*,
    706 F.2d 1144 (11th Cir. 1983) ............................................................................94, 100, 101

*In re Actiq Sales & Mktg. Practices Litig.*,
    307 F.R.D. 150 (E.D. Pa. 2015)............................................................................................93

*In re Agric. Chems. Antitrust Litig.*,
    No. 94-40216-MMP, 1995 WL 787538 (N.D. Fla. Oct. 23, 1995) ................................ *passim*

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018).............................................................................................40, 56

*In re Atlas Roofing Corp. Chalet Shingle Prod. Liab. Litig.*,
    321 F.R.D. 430 (N.D. Ga. 2017).............................................................................116, 117, 118

*In re Blue Cross Blue Shield Antitrust Litig.*,
    308 F. Supp. 3d 1241, 1276 (N.D. Ala. 2018) .........................................................................82

*In re Blue Cross of Blue Shield Antitrust Litig.*,
    No. 2:13-CV-20000-RDP, 2018 WL 3326850 (N.D. Ala. June 12, 2018) ............................82

*In re Blue Cross Blue Shield Antitrust Litig.*,
    No. 2:13-CV-20000-RDP, 2017 WL 2797267 (N.D. Ala. June 28, 2017) ............................82

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*,
    140 F. Supp. 3d 339 (D. Del. 2015)........................................................................................75

*In re Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*,
    No. 09-ML-2048-C, 2011 WL 6826813 (W.D. Okla. Dec. 28, 2011) ....................................83

*In re Currency Conversion Fee Antitrust Litig.*,
    No. 05 Civ. 5116, 2009 WL 151168 (S.D.N.Y. Jan. 21, 2009)................................................87

*In re Disposable Contact Lens Antitrust Litig.*,
    329 F.R.D. 336 (M.D. Fla. 2018)..........................................................................................101

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008)..............................................................................60, 81, 86

*In re Fla. Cement & Concrete Antitrust Litig.*,
    278 F.R.D. 674 (S.D. Fla. 2012).......................................................................................41, 52

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008).............................................................................................41, 118

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    No. CV 05-485-LPS, 2014 WL 6601941 (D. Del. Aug. 6, 2014) ..........................96, 112, 115

*In re Milk Products Antitrust Litig.,*
     195 F.3d 430 (8th Cir. 1999) .................................................................................113, 115

*In re MTBE Products Liab. Litig.,*
     209 F.R.D. 323 (S.D.N.Y. 2002) .......................................................................................102

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.,*
     522 F.3d 6 (1st Cir. 2008) ...................................................................................................44

*In re Photochromic Lens Antitrust Litig.,*
     2014 WL 1338605 (M.D. Fla. Apr. 3, 2014) ................................................... *passim*

*In re Processed Egg Prods. Antitrust Litig.,*
     312 F.R.D. 124 (E.D. Pa. 2015).......................................................................... *passim*

*In re Processed Egg Prods. Antitrust Litig.,*
     321 F.R.D 555 (E.D. Pa. 2017)..............................................................105, 106, 107, 108

*In re Prograf Antitrust Litig.,*
     1:11-MD-02242-RWZ, 2014 WL 4745954 (D. Mass. June 10, 2014)................................118

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
     725 F.3d 244 (D.C. Cir. 2013) .....................................................................................40, 41

*In re Skelaxin (Metaxalone) Antitrust Litig.,*
     299 F.R.D. 555 (E.D. Tenn. 2014)...............................................................................103, 111

*In re Tri-State Crematory Litig.,*
     215 F.R.D. 660 (N.D. Ga. 2003).................................................................................116, 117

*Karhu v. Vital Pharm., Inc.,*
     No. 13-60768-CIV, 2014 WL 815253 (S.D. Fla. Mar. 3, 2014) ...........................................99

*Kennedy v. Tallant,*
     710 F.2d 711 (11th Cir. 1983) ...........................................................................................113

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons,*
     340 U.S. 211 (1951)................................................................................................................85

*Klay v. Humana, Inc.,*
     382 F.3d 1241 (11th Cir. 2004) .....................................................................................81, 106

*Kloth v. Microsoft Corp.,*
     444 F.3d 312 (4th Cir. 2006) ........................................................................................86, 87

*Krukever v. TD Ameritrade, Futures & Forex LLC,*
     328 F.R.D. 649 (S.D. Fla. 2018)...........................................................................................93

*Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC,*
   763 F.3d 1280 (11th Cir. 2014) ...................................................................................94, 105

*Laumann v. Nat'l Hockey League,*
   105 F. Supp. 3d 384 (S.D.N.Y. 2015)........................................................................................88

*Liberty Mut. Ins. Co. v. Tribco Const. Co.,*
   185 F.R.D. 533 (N.D. Ill. 1999)...............................................................................................93

*Malaney v. UAL Corp.,*
   434 F. App'x 620 (9th Cir. 2011) .............................................................................................84

*Marko v. Benjamin & Bros.,* LLC,
   No. 6:17-CV-1725-ORL-41GJK, 2018 WL 3650117 (M.D. Fla. May 11, 2018)................116

*Murray v. Auslander,*
   244 F.3d 807 (11th Cir. 2001) ...........................................................................................98, 99

*Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.,*
   850 F.2d 1286 (8th Cir. 1988) .................................................................................................69

*Palmyra Park Hosp. v. Pho,*
   604 F.3d 1294 (11th Cir. 2010) ........................................................................................5, 11, 12

*Pickett v. Iowa Beef Processors,*
   209 F.3d 1276 (11th Cir. 2000) ..................................................................................... *passim*

*Prado-Steinmen ex rel. Prado v. Bush,*
   221 F.3d 1266 (11th Cir. 2000) .............................................................................................110

*Q Club Resort & Residences Condo. Ass'n, Inc. v. Q Club Hotel, LLC,*
   No. 09-CV-60911, 2010 WL 11454483 (S.D. Fla. Jan. 6, 2010).............................................83

*Randolph v. J.M. Smucker Co.,*
   303 F.R.D. 679 (S.D. Fla. 2014).....................................................................................100, 116

*Reed Constr. Data, Inc. v. McGraw-Hill Cos., Inc.,*
   49 F. Supp. 3d 385 (S.D.N.Y. 2014)........................................................................................68

*Reed v. Advocate Health Care,*
   268 F.R.D. 573 (N.D. Ill. 2009)...............................................................................................60

*Response of Carolina, Inc. v. Leasco Response, Inc.,*
   537 F.2d 1307 (5th Cir. 1976) ...............................................................................................118

*Rodney v. Nw. Airlines, Inc.,*
   146 F. App'x 783 (6th Cir. 2005) .......................................................................................51, 53

*Ross v. Bank of Am., N.A.*,
    524 F.3d 217 (2d Cir. 2008) ................................................................................87

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
    601 F.3d 1159 (11th Cir. 2010) .............................................................81, 92, 117

*Scott v. First Am. Title Ins. Co.*,
    276 F.R.D. 471 (E.D. Ky. 2011) ...........................................................................90

*Shamblin v. Obama for Am.*,
    No. 8:13-cv-2428-T-33TBM, 2015 WL 1909765 (M.D. Fla. Apr. 27, 2015) ......101

*State of Ala. v. Blue Bird Body Co., Inc.*,
    573 F.2d 309 (5th Cir. 1978) ........................................................................86, 105

*Teggerdine v. Speedway, LLC*,
    No. 8:16-CV-03280-T-27TGW, 2018 WL 2451248 (M.D. Fla. May 31, 2018) ..........116, 117

*Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*,
    815 F.2d 1407 (11th Cir. 1987) .............................................................................85

*U.S. v. Anthem, Inc.*,
    236 F. Supp. 3d 171, 216 (D.D.C. 2017) ..............................................................42

*U.S. v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) (en banc) .............................................................49

*U.S. v. Gen. Motors Corp.*,
    384 U.S. 127 (1966) ..............................................................................................85

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ......................................................................*passim*

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) .................................................................51, 56, 59

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .......................................................................................*passim*

*Ward v. Apple, Inc.*,
    No. 12-CV-05404-YGR, 2018 WL 934544 (N.D. Cal. Feb. 16, 2018) ..................41

*Williams v. Mohawk Indus., Inc.*,
    568 F.3d 1350 (11th Cir. 2009) ....................................................62, 100, 101, 111

*Wilmington Sav. Fund Soc'y, FSB v. Bus. Law Grp., P.A.*,
    319 F.R.D. 386 (M.D. Fla. 2017) ..........................................................................93

x

*Zachery v. Texaco Expl. & Prod., Inc.*,
  185 F.R.D. 230 (W.D. Tex. 1999) ..........................................................................103

**Rules**

Advisory Committee Notes to Rule 23
  39 F.R.D. 69 (1966) ...............................................................................................98

Fed. R. Civ. P. 23 .....................................................................................................37

Fed. R. Civ. P. 23(a) ..............................................................................4, 37, 108, 116

Fed. R. Civ. P. 23(a)(3) ...................................................................................*passim*

Fed. R. Civ. P. 23(a)(4) .....................................................................................40, 108

Fed. R. Civ. P. 23(b) ...............................................................................................37

Fed. R. Civ. P. 23(b)(2) ....................................................................................*passim*

Fed. R. Civ. P. 23(b)(3) ....................................................................................*passim*

Fed. R. Civ. P. 23(c)(4) ....................................................................................*passim*

**Other Authorities**

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*
(2017).....................................................................................................................69

Areeda & Hovenkamp, Antitrust Law (1989 Supp.) ..........................................41, 118

Guardado, Jose R., Emmons, David W. and Kane, Carol K., "The Price Effects of a Large
Merger of Health Insurers: A Case Study of UnitedHealth-Sierra," *Health Management, Policy
and Innovation*, (2013) .............................................................................................8

Hanming Fang & Ami Ko, "*Partial Rating Area Offering In the ACA Marketplaces: Facts,
Theory, and Evidence*," (October 2018) ....................................................................48

Kate Ho & Robin S. Lee, *Equilibrium Provider Networks: Bargaining and Exclusion in Health
Care Markets*, 109(2) Am. Econ. Rev. 473 (2019) ...............................................29, 31

Letter to CMS from FTC, Re: Contract Year 2015 Policy & Technical Changes to the Medicare
Advantage and the Medicare Prescription Drug Benefit Programs at 1 (Mar. 7, 2014) ..............31

## Defendants' Exhibit List

| Exhibit* | Description | Bates No. |
|---|---|---|
| DX165 | 8/2/2011 email from Ramzy ElGomayel to Carl King re ████████████████ | AETNA-0000007631 |
| DX166 | 12/2009 ████████████████████ | AMREP00000076 |
| DX167 | 8/14/1996 BCBSMD Site Visit Summary (excerpt) | BCBSA00556334 |
| DX168 | BCBSNC Competitive Analysis (excerpts) | BCBSA01278504 |
| DX169 | 10/06/2005 Blue Plan Provider Network Initiatives Benchmarking Report (excerpts) | BCBSA02329800 |
| DX170 | 03/2010 Urban Institute, Cross-State Risk Pooling Under Health Care Reform: An Analytic Review of the Provisions in the House and Senate Bills (excerpts) | BCBSA02966091 |
| DX171 | 12/6/2006 Review and Outlook 2006-2007 U.S. Health Insurance/Managed Care (excerpts) | BCBSA02983147 |
| DX172 | 9/04/2002 Testimony of Blue Cross of Northeastern Pennsylvania Origin and Appropriateness of Financial Reserves of Blue Cross of Northeastern Pennsylvania in a Volatile Health Care Environment (excerpts) | BCBSA03519055 |
| DX173 | 5/10/2010 Facility Value Based Reimbursement Strategy Discussion (excerpts) | BCBSAL_0000246720 |
| DX174 | 9/28/2012 letter from Edward Harris to Russ Tyner re Prattville Baptist Medical Center | BCBSAL_0000277633 |
| DX175 | Specialty Society Meeting Neurosurgery (excerpts) | BCBSAL_0000277995 |
| DX176 | 2/15/2012 Letter from Edward Harris to Michael Burgess re Children's Hospital of Alabama and BCBSAL | BCBSAL_0000407507 |
| DX177 | 3/18/2011 email from Doug McIntyre to Dorinda Cale re BCBSAL Plan Profile | BCBSAL_0000510129 |
| DX178 | 4/5/2010 BCBSAL Steering Committee Meeting PMD Fee Schedule Recommendations (excerpts) | BCBSAL_0000512240 |
| DX179 | 5/2012 2012 Member Health Plan Study Results (excerpts) | BCBSAL_0001369509 |
| DX180 | Value Based Payment Design, Primary Care | BCBSAL_0001448202 |
| DX181 | 11/4/2015 email from Jeff Ingrum to Joseph Oaks re Contract Meeting Information | BCBSAL_0001815790 |

| Exhibit* | Description | Bates No. |
|---|---|---|
| DX182 | 5/13/2014 Narrow Networks on Public Exchanges (excerpts) | BCBSAL_0001916996 |
| DX183 | 4/2016 Market Information (excerpts) | BCBSAL_0001967317 |
| DX184 | 11/12/2013 NLO Board Meeting (excerpts) | BCBSF-00054126 |
| DX185 | 12/03/2013 Public Exchange Market Intelligence (excerpts) | BCBSF-00146355 |
| DX186 | 4/20/2011 United Health Group Research Webinar (excerpts) | BCBSNC-00076394 |
| DX187 | 1/30/2012 Growth Strategy: Limited/Tiered Network (excerpts) | BCBSNC-00099945 |
| DX188 | 6/8/2011 Network Executive Forum: Network Strategies (excerpts) | BCBSSC-00205779 |
| DX189 | 1/9/2012 Washington AHS Provider Strategy, slide 3 Current Landscape (excerpts) | CAMBIA-00184080 |
| DX190 | 2/22/2010 Individual LOB Assessment (excerpts) | CAMBIA-00242688 |
| DX191 | 6/02/2016 Email from Armen Akopyan to Bill Bradley, Karin Swenson-Moore, and Chris Blanton re Updated CLT Slides | CAMBIA-01227915 |
| DX192 | 12/31/2013 email from Brian Cheney to Randy McDaniel re 2014 Off Exchange Individual Product Components | HCSC-E000445677 |
| DX193 | 5/09/2014 Market and Competitor Context for Texas Business Plan Development (excerpts) | HCSC-E006192047 |
| DX194 | 1/19/2012 ██████████████████ (excerpt) | HUMANA_BCBS_AL-0279188 |
| DX195 | 7/29/2014 ██████████████████ (excerpts) | HUMANA_BCBS_AL-0304841 |
| DX196 | 10/22/2012 ████████ (excerpts) | HUMANA_BCBS_AL-0309887 |
| DX197 | ████████████████████ (excerpts) | HUMANA_BCBS_AL-0310040 |
| DX198 | 8/27/2014 email from Mark Matzke to Praveen Thadani re Any Interest Rick? | HUMANA_BCBS_AL-0326128 |
| DX199 | 9/14/2017 30(b)(1) Deposition Transcript of Linda Jordan (Clay County Hospital) (excerpts) | |

| Exhibit* | Description | Bates No. |
|---|---|---|
| DX200 | 12/10/2003 LifeWise Health Plan of Arizona Update (excerpts) | PRE_CON02996828 |
| DX201 | 4/03/2008 ███████████ Pre-Read Materials (excerpts) | TAHP(MDL)000044 |
| DX202 | 8/2013 ███████████ (excerpts) | UHG-BCBS000116800 |
| DX203 | 1/06/2010 Charter and Governance Approval Document | WLP-00337825 |
| DX204 | 1/25/2005 email from Monye Connolly to Burke King re Questions on Individual Rating | WLP-03425215 |
| DX205 | 9/11/2015 Monthly Report- West Region, Labor, and Specialty, Pam Kehaly (excerpts) | WLP-04432382 |
| DX206 | Commercial 2009-2011 Three Year Plan Questionnaire (excerpts) | WLP-06352209 |
| DX207 | Competitive Environment notes | WLP-06884097 |
| DX208 | 9/10/2008 Small Group/Key Accounts Deep Dive Pricing Project - Wave 2 New York Plan Officer Interview Notes (excerpt) | WLP-07237759 |
| DX209 | 9/2007 Project Banner National Expansion Development (excerpts) | WLP-08203199 |
| DX210 | 11/2/2017 30(b)(6) Deposition Transcript of Aetna through Ramzy ElGomayel (excerpts) | |
| DX211 | 9/12/2017 30(b)(6) Deposition Transcript of Alternative Insurance Resources through William V. Cable  (excerpts) | |
| DX212 | 5/16/2017 30(b)(6) Deposition Transcript of Alliant Health Plans through Joseph Caldwell (excerpts) | |
| DX213 | 9/19/2017 30(b)(6) Deposition Transcript of Andrews Sports Medicine through Lisa Warren (excerpts) | |
| DX213.5 | 9/18/2017 30(b)(6) Deposition Transcript of Anesthesia Services of Birmingham, P.C. through Abraham Schuster (excerpts) | |
| DX214 | 10/19/2017 30(b)(1) Deposition Transcript of Tucker Sharp (Aon Hewitt) (excerpts) | |
| DX215 | 6/8/2017 30(b)(6) Deposition Transcripts of John Alden Life Insurance Co. and Time Insurance Co. (Assurant) through Raymond Brouillette (excerpts) | |

| Exhibit* | Description | Bates No. |
|---|---|---|
| DX216 | 12/21/2017 30(b)(6) Deposition Transcript of AvMed, Inc. through Bradford Bentley (excerpts) | |
| DX217 | 12/4/2017 30(b)(6) Deposition Transcript of Centene Corporation through Jesse Hunter (excerpts) | |
| DX218 | 12/6/2017 30(b)(6) Deposition Transcript of Cigna Insurance Company through Karen Litle (excerpts) | |
| DX219 | 12/6/2017 30(b)(6) Deposition Transcript of Cigna Insurance Company through Karen Litle, Ex. 13, ███████████████ (Cigna Dep. Ex. 13) | CIGBLU-0000192 |
| DX220 | 12/6/2017 30(b)(6) Deposition Transcript of Community Health Systems through Richard Willis (excerpts) | |
| DX221 | 9/22/2017 30(b)(1) Deposition Transcript of John Farley (Birmingham Internal Medicine Associates) (excerpts) | |
| DX222 | 9/18/2017 30(b)(1) Deposition Transcript of Keith Granger (Grandview Medical Center) (excerpts) | |
| DX223 | 9/19/2017 30(b)(6) Deposition Transcripts of Harvard Pilgrim Health Care through Beth-Ann Roberts (excerpts) | |
| DX224 | 1/5/2018 30(b)(6) Deposition Transcript of Humana, Inc. through Deborah Findlay (excerpts) | |
| DX225 | 10/3/2017 30(b)(6) Deposition Transcript of Huntsville Hospital Health System through Caroyln Fair (excerpts) | |
| DX226 | 2/14/2017 30(b)(6) Deposition Transcript of Intermark Group through Lisa Timmons (excerpts) | |
| DX227 | 11/30/2017 30(b)(6) Deposition Transcript of Moda Health, Inc. through Kraig E. Anderson (excerpts) | |
| DX228 | 9/8/2017 30(b)(6) Deposition Transcript of Molina Healthcare, Inc. through Kamran Hashim (excerpts) | |
| DX229 | 12/13/2016 30(b)(6) Deposition Transcript of Mostellar Medical Center through James Holland (excerpts) | |
| DX230 | 8/22/2017 30(b)(6) Deposition Transcript of MultiPlan Inc. through Dan Hubbard (excerpts) | |

| Exhibit* | Description | Bates No. |
|---|---|---|
| DX231 | 5/17/2017 30(b)(6) Deposition Transcript of Neurological Surgery Associates (Swaid Clinic) through Kelly Wright (excerpts) | |
| DX232 | 11/30/2017 30(b)(6) Deposition Transcript of Oscar Insurance Corporation through Brian West (excerpts) | |
| DX233 | 12/15/2016 30(b)(6) Deposition Transcript of Perdido Beach Resort through Penny C. Groux (excerpts) | |
| DX234 | 7/18/2017 30(b)(6) Deposition Transcript of Research Solutions through Douglas L. Miller (excerpts) | |
| DX235 | 7/19/2017 30(b)(6) Deposition Transcript of Saginaw Pipe through Mary Laird (excerpts) | |
| DX236 | 09/29/2017 30(b)(6) Deposition Transcript of SelectHealth, Inc. through Sean Dunroe (excerpts) | |
| DX237 | 11/28/2017 30(b)(6) Deposition Transcript of SelectHealth, Inc. through Thomas Wahlen (excerpts) | |
| DX238 | 12/16/2016 30(b)(6) Deposition Transcript of Sister Schubert's through Ray M. Roshek (excerpts) | |
| DX239 | 9/20/2017 30(b)(6) Deposition Transcript of Stanford Healthcare through Gary May (excerpts) | |
| DX240 | 12/12/2017 30(b)(1) Depositon Transcript of Marc Spooner (Tufts Health Plan) (excerpt) | |
| DX241 | 9/21/2017 30(b)(1) Deposition Transcript of Mary Beth Briscoe (UAB Hospital) (excerpts) | |
| DX242 | 12/15/2017 30(b)(6) Deposition Transcript of UnitedHealth Group Inc. through Jeffrey T. Wedin (excerpts) | |
| DX243 | 8/15/2017 30(b)(6) Deposition Transcript of Viva Health through Elizabeth C. Yates (excerpts) | |
| DX244 | 8/15/2017 30(b)(6) Deposition of Viva Health through Elizabeth C. Yates, Ex. 11, ███████ ██████████ (VIVA Dep. Ex. 11) | VIVA002044 |
| DX245 | 8/15/2017 30(b)(6) Deposition of Viva Health through Elizabeth C. Yates, Ex. 23, 10/15/2014 email re ████████████ (VIVA Dep. Ex. 23) | VIVA04832 |
| DX246 | 12/8/2016 30(b)(6) Deposition Transcript of Samford University through Charles Frederick Rogan | |

| Exhibit* | Description | Bates No. |
|---|---|---|
| | (excerpts) | |
| DX247 | 9/27/2017 30(b)(1) Deposition Transcript of Robert Burnell (Conduent) (excerpts) | |
| DX248 | 6/22/2017 30(b)(6) Deposition Transcript of Casa Blanca, LLC through Beatrice Dollar (excerpts) | |
| DX249 | 9/21/2017 30(b)(6) Deposition Transcript of Conrad Watson Air Conditioning, Inc. through Nick Tatum (excerpts) | |
| DX250 | 9/14/2017 30(b)(6) Deposition Transcript of Consumer Financial Education Foundation of America through Richard Mauk (excerpts) | |
| DX251 | 9/26/2017 30(b)(6) Deposition Transcript of Fort McClellan Credit Union through Lynda Davis (excerpts) | |
| DX252 | 9/29/2017 30(b)(6) Deposition Transcript of Galactic Funk Touring, Inc. through Rebecca Moehnke (excerpts) | |
| DX253 | 3/7/2017 30(b)(6) Deposition Transcript of Pearce, Bevill, Leesburg, Moore, P.C. through Joseph Lassiter (excerpts) | |
| DX254 | 3/9/2017 30(b)(6) Deposition Transcript of Pettus Plumbing and Piping through Grover Johnson (excerpts) | |
| DX255 | 9/19/2017 30(b)(6) Deposition Transcript of Rolison Trucking through G. Wade Rolison (excerpts) | |
| DX256 | 8/3/2017 30(b)(6) Deposition Transcript of Gaspar Physical Therapy through Paul Gaspar (excerpts) | |
| DX257 | 6/28/2019 30(b)(1) Deposition Transcript of Dr. Matthew Caldwell (excerpts) | |
| DX258 | 5/4/2017 30(b)(6) Deposition Transcript of Bullock County Hospital through Sharon Lee (excerpts) | |
| DX259 | 5/3/2017 30(b)(6) Deposition Transcript of Crenshaw Community Hospital through Bradley E. Eisemann (excerpts) | |
| DX260 | 6/14/2017 30(b)(6) Deposition Transcript of Ivy Creek of Elmore, LLC; Ivy Creek of Butler, LLC and Ivy Creek of Tallapoosa through Michael D. Bruce | |

| Exhibit* | Description | Bates No. |
|---|---|---|
| | (excerpts) | |
| DX260.5 | 5/11/2017 30(b)(1) Deposition Transcript of Janine Nesin, P.T. (excerpts) | |
| DX261 | 5/2/2019 Deposition Transcript of Professor Daniel Rubinfeld (class cert) (excerpts) | |
| DX262 | 5/10/2019 Deposition Transcript of Ariel Pakes Ph.D. (class cert) (excerpts) ("Pakes Dep.") | |
| DX263 | 6/14/2019 Deposition Transcript of Ariel Pakes Ph.D. (merits) (excerpts) ("Pakes Merits Dep.") | |
| DX264 | 5/10/2019 Deposition Transcript of Deborah Haas-Wilson Ph.D. (excerpts) | |
| DX265 | 5/7/2019 Deposition Transcript of H.E. Frech, III, Ph.D. (excerpts) | |
| DX266 | 5/9/2019 Deposition Transcript of Daniel J. Slottje, Ph.D. (excerpts) | |
| DX267 | 1/15/2019 Hearing Transcript (Proctor, J.) (excerpt) | |
| DX268 | 4/19/2018 Hearing Transcript (Proctor, J.) (excerpt) | |
| DX269 | Ed Beeson, *Smaller Firms Self-Fund Insurance,* Star Ledger (April 29, 2012) | |
| DX270 | 2008 Aetna 10-K (excerpt) | |
| DX271 | 2017 Aetna 10-K (excerpt) | |
| DX272 | 2008 Cigna 10-K (excerpt) | |
| DX273 | 2017 Cigna 10-K (excerpt) | |
| DX274 | 2008 Humana 10-K (excerpt) | |
| DX275 | 2017 Humana 10-K (excerpt) | |
| DX276 | 2008 United 10-K (excerpt) | |
| DX277 | 2017 United 10-K (excerpt) | |
| DX278 | 7/15/2019 Expert report of Defendants' expert Januz Ordover | |
| DX279 | 7/15/2019 Expert report of Defendants' expert Kevin Murphy | |
| DX280 | 7/15/2019 Expert report of Defendants' expert Erin Trish | |

| Exhibit* | Description | Bates No. |
|---|---|---|
| DX281 | 7/15/2019 Expert report of Defendants' expert Lawrence Wu | |
| DX282 | 7/15/2019 Expert report of Defendants' expert David Evans | |

*Defendants' exhibits numbered 1-164 were filed with the Standard of Review summary judgment briefing.

# INTRODUCTION

Providers and Subscribers' motions for class certification both suffer from the same fatal defect: their experts' analyses are based on assumptions about entry that are contradicted by a mountain of record evidence and flatly *rejected* by one of the very economists on which they rely. And even if one accepts their faulty assumptions, Plaintiffs' conclusions about impact and damages are unreliable and irreconcilable. To certify both sets of Plaintiffs' classes would require the Court to make fundamentally inconsistent findings—something no court should do.

Plaintiffs have a high burden. They must prove—not merely plead or assert—that classwide treatment is appropriate. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016). This includes showing with common evidence that all class members would be better off absent the challenged restraints. They cannot meet that burden here.

*First*, Plaintiffs' claim of common impact hinges on the unsupportable assertion that but for exclusive service areas ("ESAs") and the national best efforts ("NBE") rule, a Blue Plan or a Green (*i.e.*, a Blue Plan selling insurance on an unbranded basis) would enter Alabama and obtain a 20-45% market share in every county in the State. Plaintiffs' experts also assume that (1) the entrant would create a provider network as broad as Blue Cross and Blue Shield of Alabama's ("BCBSAL"), instead of a narrower network; (2) the entrant would offer the same products as BCBSAL, instead of products designed to attract healthier subscribers; and (3) BCBSAL would do nothing in response other than adjust its prices. Based on these sweeping assumptions, Plaintiffs conclude there is "common" evidence of classwide impact.

Plaintiffs' say-so cannot survive the "rigorous analysis" the Court must conduct. *Brown*, 817 F.3d at 1234. Their entry assumptions are flatly contradicted by the evidence: *no* competitor has *ever* entered every Alabama county and taken 20-45% market share, and the entry that has

occurred has targeted *specific* geographic areas and subscribers with *limited* products and *narrow* provider networks. Nor would it make sense for a new entrant to operate in counties with unattractive demographics and competitive landscapes. When confronted with the fact that no competitor has entered and expanded in Alabama in the way Plaintiffs contend Blues would, Subscribers' expert testified "I don't know why" that is. DX262, Pakes Dep. at 113:2-8.

Plaintiffs rely on these baseless entry assumptions because they know that real world entry—limited to select areas or featuring networks and products that target only some class members—would affirmatively harm many members of the proposed classes, resulting in an impermissible mix of "winners" and "losers" in the same class. Further, determining who would be impacted and how would require individualized inquiries. For example, a new entrant that successfully offered products to attract the healthiest subscribers in urban areas—a common entry strategy in health insurance markets—would *harm* less healthy subscribers in rural areas because BCBSAL would be left with a higher risk pool, forcing it to increase premiums for its remaining subscribers. And entry with a narrow network—another common strategy—would harm the providers excluded from the narrow networks by shifting patient volume to the providers in those networks, resulting in fewer payments to the excluded providers. In short, Plaintiffs' class models are fundamentally flawed, unreliable, and do not satisfy Plaintiffs' burden of showing that they can use common evidence to prove injury to all class members.

*Second*, even accepting Plaintiffs' unrealistic assumption of uniform, statewide entry, Plaintiffs cannot carry their burden of showing that entry means better rates for all. Healthcare markets are highly complex, and entry does not consistently lead to better rates. Indeed, Plaintiffs' experts agree that entry can result in *higher* premiums in some local markets if the increased reimbursement rates Providers demand are passed through to subscribers. They also

agree that the lower premiums Subscribers seek may cause provider reimbursements to go *down* in some local markets as each individual insurer has less premium revenue over which to bargain. Whether prices go up or down depends on the specific conditions of the market at issue and requires individualized inquiry to determine. As Subscribers' expert put it, "it's not clear that entry will make everyone better off. There are possible scenarios in which at least some people will be made worse off." DX261, Rubinfeld Dep. at 218:18-21.

Plaintiffs' ***own models*** demonstrate that entry would have both positive and negative effects on premiums and reimbursements. For Providers, Dr. Haas-Wilson's model purports to show common impact by relying on *average* effects on reimbursements. But the underlying data reveals that the average effects mask that entry would *decrease* reimbursements for many providers. Dr. Pakes' analysis for Subscribers relies in part on an academic analysis he calls "the best one in the business," which was published by economists Erin Trish and Bradley Herring. DX262, Pakes Dep. at 279:23-281:6. Using that analysis, he purports to show that entry would lower premiums for all class members. But Dr. Trish concludes in her rebuttal report that Dr. Pakes' results were "based on a deeply flawed assumption" that an entrant "would not compete for or capture any self-insured business." DX280, Trish Report ¶ 11 (hereafter "Trish"). When corrected, Dr. Pakes' model shows entry would *raise* premiums for many class members.

***Third***, Providers' and Subscribers' conclusions about impact and damages are in fundamental conflict. Providers contend that in the but-for world, BCBSAL would have paid Alabama hospitals over $1.5 billion *more* for medical services from 2008-2013, while Subscribers contend they would have paid BCBSAL approximately $500 million *less* in premiums in the same years. These results are irreconcilable and would result in BCBSAL suffering unsustainable, quarter-billion dollar average annual losses. If Providers' model is

3

correct regarding increased reimbursement rates from entry, then Subscribers' model shows that subscribers would be **harmed** by entry with premiums ***increasing by more than 10% in some instances***. Similarly, if Subscribers model is correct regarding decreased premiums from entry, it says that hospitals would be **harmed** by entry with reimbursement rates **decreasing** in multiple years of the class period. This conflict further demonstrates that Plaintiffs' expert opinions about classwide impact are unrealistic and unreliable. It also means that the Court cannot certify *both* a Subscriber class *and* a Provider class without making dramatically inconsistent factual findings.

**Further**, Plaintiffs cannot avoid these problems through Rule 23(b)(2) certification because the record evidence shows that some class members would be injured by the injunctive relief Plaintiffs seek, creating winners and losers. Class members therefore have conflicting interests, and the proposed injunction classes are not cohesive and cannot be certified as a matter of black letter law. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).

Because Plaintiffs fail to demonstrate that classwide impact can be proven through common evidence, and analyzing impact instead requires individualized inquiries that Plaintiffs' models cannot accommodate, Plaintiffs have not shown the predominance of common issues required to certify damages classes under Rule 23(b)(3). And because the record evidence shows that Plaintiffs' proposed injunctive relief would create significant numbers of losers within the proposed classes, Plaintiffs have not shown the cohesiveness of interests required to certify an injunctive relief class under Rule 23(b)(2). These same issues—and others described below— also defeat the adequacy and typicality requirements of Rule 23(a). None of these problems can be cured by certifying an issues class under Rule 23(c)(4). Accordingly, Subscribers' and Providers' motions for class certification should be denied.[1]

---

[1] This memorandum addresses class certification in light of the Court's standard of review ruling. Defendants would have additional arguments against class certification if the standard of review were different.

# FACTUAL BACKGROUND

## I.     THE IMPACT OF ENTRY ON PRICE

Adding insurers in healthcare markets does not always lead to lower premiums for subscribers and higher reimbursements for providers.  Plaintiffs' own experts agree that new entrants have an ambiguous effect on premiums and reimbursements, which can vary significantly depending on local market conditions.    Entry results in *lower* provider reimbursements and *higher* subscriber premiums under certain market conditions.

Plaintiffs' experts concede that health insurers "act both as buyers and as sellers in the relevant healthcare markets."  PX23 (Dkt. 2454-6) Haas-Wilson Report ¶ 24 (hereafter "Haas-Wilson").  As Dr. David Evans (who the Supreme Court recently relied on in *Amex)* describes it, health insurers are "two-sided transaction platforms" that "facilitate simultaneous transactions between patients who want medical services and hospitals and physicians who provide those services."  DX282, Evans Report ¶ 45 (hereafter "Evans").   In that role, insurers negotiate reimbursement rates with providers and pay for subscribers' covered services in exchange for premiums.   Because an insurer's premium revenue must cover "expected payments . . . to providers," Haas-Wilson ¶ 63, increases in provider reimbursement rates are passed through to subscribers in the form of higher premiums.   DX278, Ordover Report ¶¶ 41, 48, 333-35 (hereafter "Ordover").[2] As Providers' expert recognizes, "[t]he largest component of total costs for healthcare financing services are the costs of healthcare providers' services."  Haas-Wilson ¶ 288.  In BCBSAL's case, medical costs were 92% of the total costs BCBSAL incurred between

---

[2] The Purple (*i.e.*, non-Blue Plan) insurers deposed in this case acknowledged this uncontroversial relationship between reimbursement rates and premiums.  *See, e.g.,* ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████

███████████████.  The Eleventh Circuit has recognized this relationship as well.  *Palmyra Park Hosp. v Pho*, 604 F.3d 1294, 1302 (11th Cir. 2010) (insurers ultimately "pass much of the cost of the marginally higher reimbursement rates directly to their policy holders in the form of higher premiums").

2008 and 2012.  Ordover ¶ 47 n.86; *see also* DX279, Murphy Report ¶¶ 184-85, Exhibit 35 (hereafter "Murphy") (finding 97% and 104% pass through in individual and small group segment).  As one third-party insurer testified, ██████████████████████████ ████████████████████    ████████████████████  ████.  Thus, premiums and reimbursement rates are interconnected.  With all else equal, lower provider reimbursements result in lower premiums, and higher provider reimbursements result in higher premiums.  *See* Evans ¶¶ 76-81; Dkt. 2467-3, Haas-Wilson Dep. Ex. 6 ¶ 19 ("Higher prices for general acute care inpatient hospital services and adult primary care physician services would most likely be passed on to consumers in the form of higher health insurance premiums and/or lower wages.").  This means that if premiums go down, insurers have less revenue to pay providers and often results in lower average provider rates as insurers attempt to lower their costs.  *See* DX263, Pakes Merits Dep. at 76:19-77:9; Dkt. 2469-5, Ho and Lee (2017) at 411; SX415 (Dkt. 2453-24) Pakes Report ¶ 53 (hereafter "Pakes") (more competition "force[s]" an insurer to "re-examine its reimbursement and other policies that affect its costs").

   Given this interconnectedness, adding insurers to a healthcare market can have opposite and offsetting effects on the prices for both providers and subscribers.  As Dr. Trish explains in her expert report, "[b]oth theoretical and empirical economics demonstrate that one cannot assume increased insurer competition would uniformly result in lower premiums."  Trish ¶ 5. This is not a standard case where more competition necessarily means better prices.  Under Subscribers' theory, new entrants can reduce insurers' bargaining power with subscribers, driving premiums ***down*** on average.  This puts pressure on insurers to reduce provider reimbursement rates.  Under Providers' theory, new entrants can reduce insurers' bargaining power with providers, leading to ***higher*** reimbursement rates on average.  But this puts pressure

on insurers to raise subscriber premiums.  Because of these conflicting forces, the overall effect of entry on prices is—as Subscribers' expert conceded—"theoretically ambiguous."  DX262, Pakes Dep. at 250:13-252:20; Pakes ¶ 218.  Instead, "you actually have to do the analysis and determine which way it goes out."  *Id.*

Subscribers rely on academic literature confirming that entry does ***not*** always lead to lower premiums and whether it does depends on local market characteristics:

- **Trish and Herring (2015)**:  "However, the ultimate effect of the level of health insurance concentration on health insurance premiums is not straightforward, because there are potentially offsetting effects of the level of insurer competition on premiums." Dkt. 2469-4 at 104.

- **Ho and Lee (2017)**:  "The impact of insurer competition on welfare, negotiated provider prices, and premiums in the U.S. private health care industry is theoretically ambiguous." Dkt. 2469-5 at 379.

Trish and Herring (2015), which Subscribers' expert Dr. Pakes called "the best [reduced-form regression] in the business," DX262, Pakes Dep. at 279:23-281:6, evaluate the relationship between insurer concentration and premiums by isolating the provider and subscriber sides of the market.  Dkt. 2469-4, Trish and Herring (2015) at 105.  They found almost perfectly offsetting effects and estimated that increased concentration had almost a net-zero impact on premiums.  *Id.* at 109-12.  They also found that "the effects of the levels of concentration in healthcare markets on premiums vary with the overall market characteristics."  *Id.* at 112 (emphasis added).

Ho and Lee (2017)—the "state-of-the art published material in the academic literature," according to Subscribers' expert, DX262, Pakes Dep. 292:25-293:15—had similar results.  They acknowledged that the effect of insurer concentration on premiums is "***theoretically ambiguous***" because increased concentration "may increase the premiums charged by insurers" but "also strengthen insurers' bargaining leverage when negotiating with hospitals, thereby generating offsetting cost decreases."  Dkt. 2469-5, Ho and Lee (2017) at 379.  They then modeled how

removing different insurers in California would affect premiums.  When removing Kaiser, they found an average premium increase of 14-17% for the remaining insurers.  *Id.* at 406.  But when removing Blue Cross of California (eliminating Blue-on-Blue competition), they found that the remaining insurers' premiums decreased between 1.4% and 3.4%.  *Id.* at 411.  They concluded that the effect of increased competition on premiums is ambiguous and ***depends on market-specific parameters***.  *Id.* at 410.[3]

Ho and Lee also found similar results on the provider side of the market.  When they modeled the removal of Kaiser, rates stayed the same on average. Dkt. 2469-5, Ho & Lee (2017) at 408-10.  They also found that "the reported averages conceal substantial heterogeneity in price changes across providers and markets," such that some providers receive decreased reimbursement as the result of increased insurer competition even if, on average, provider reimbursement increases.  *Id.* at 383.  In fact, while Blue Shield's reimbursement rates stayed the same *on average* when removing Kaiser from the market, Ho and Lee found that "negotiated hospital prices can increase or decrease by as much as 10% across markets." *Id.*

In short, whether entry increases, decreases, or has no impact at all on premiums and reimbursement rates depends on facts specific to individual markets, subscribers, and providers.

## II.   PROVIDER REIMBURSEMENTS VARY WIDELY AND ARE BASED ON A RANGE OF FACTORS

Provider reimbursement rates vary widely depending on numerous factors and, as Plaintiffs' experts acknowledge, are often individually negotiated.  *See, e.g.*, Pakes ¶ 214; Haas-

---

[3] Subscribers' experts agree.  *See* SX415 (Dkt. 2453-24) Pakes ¶ 218 ("As shown by Ho and Lee, the net effect of these two forces on negotiated rates cannot be determined a priori—even simply whether they move premiums higher or lower—and depends on market-specific parameters that I estimate."); *see also* DX261, Rubinfeld Dep. at 98:4-9 (agreeing that extent of pass through to premiums depends on relative market conditions); Guardado, Jose R., Emmons, David W. and Kane, Carol K., "The Price Effects of a Large Merger of Health Insurers: A Case Study of UnitedHealth-Sierra," *Health Management, Policy and Innovation*, 2 (2013) ("[T]he effect of higher market concentration on premiums is an empirical question.").

Wilson ¶ 316.  The actual impact on reimbursements (positive or negative) that a provider will experience as a result of increased insurer competition—as opposed to the *average* impact on providers as a group—will be affected by these factors in complex, individualized ways.

### A.    Some Providers Have Bargaining Power

One of the factors influencing reimbursement rates is provider bargaining power, which varies widely across providers.  *See, e.g.,* ███████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████.  As Providers' expert testified, certain acute care hospitals in Alabama have "monopoly power" and "market power."  DX265, Frech Dep. at 90:7-11.  And as Subscribers' expert confirms, "highly preferred hospitals will have more power" whereas "hospitals that are easily substitutable by others within an insurer's network" will have less.  Pakes ¶ 187.  Whether a particular provider is "easily substitutable by others"—and thus the extent to which it has bargaining power—depends on a variety of factors.  *See* Ordover ¶ 87, 218; DX281, Wu Report ¶¶ 46-47 (hereafter "Wu").

### 1.    "Must Have" Providers' Bargaining Power

Providers with "must-have" status have higher bargaining power.  *See* Ordover ¶ 88.  A "must have" hospital is one that is "important to insurers" because the insurer would "have a competitive disadvantage" if the hospital were not in its network.  DX265, Frech Dep. at 89:13-19.  Whether a provider achieves "must-have" status depends on a number of individualized factors, including the reputation of the hospital, the services offered, and whether hospitals in the same area offer similar services.[4]

---

[4] *See, e.g.,* ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

"Must-have" providers can extract higher prices from insurers. In *Saint Alphonsus Medical Center v. St. Luke's Health System*, Dr. Haas-Wilson explained:

> ***Payers are in a weak bargaining position with a "must-have" hospital*** or "must-have" physician organization because withdrawal of this hospital or physician organization from the network may substantially decrease individuals' willingness to pay for insured access to the remaining hospitals and physicians in a health plan's network. When a hospital or physician organization has ***no or few close substitutes***, it may be able to ***negotiate significantly higher prices***. Empirical studies have confirmed that ***hospitals are able to negotiate higher prices*** where there is a lack of substitutes.

Dkt. 2467-3, Haas-Wilson Dep. Ex. 6 at ¶ 33 (emphases added).

The record evidence in this case is consistent with this view.



. Similarly,

. Alabama regional insurer,

### 2. Sole Community Providers

A hospital that is the only hospital in a given area—a "sole community provider"—often has relatively high bargaining power. "If a hospital is the only provider of services that an

insurer considers indispensable . . . insurers will be captive to that hospital and at a significant disadvantage during reimbursement-rate negotiations." *Palmyra Park Hosp.*, 604 F.3d at 1301. This is in part because an insurer must have adequate options for in-network providers, both to satisfy network adequacy regulatory requirements and offer its subscribers accessible medical care. *See, e.g.,* ████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████. Such a hospital "can leverage its position to increase profits beyond those it would otherwise earn in a competitive market . . . ." *Palmyra Park Hosp.*, 604 F.3d at 1301.

████████████████████████████████████████████████

███████████████████████████. ████████████ agreed:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████

████████████████████████████. Conversely, when multiple providers compete in a given geographic area, provider leverage is reduced. *See* ████████████████████

████████████████████████████████████████.[5]

### 3.      Hospital Systems

Hospitals within a multi-hospital "system" tend to have greater bargaining strength than

---

[5] *See also, e.g.,* ████████
████████████████████████████████████████████████████. Ultimately, the extent of competition faced by a particular provider depends not only on geographic location, but also on the services provided. *See, e.g.,* ████████
████████████████████████████████████████.

independent hospitals.  *See* Pakes ¶ 190, n.163 (where hospitals negotiate "collectively as a system" it "can increase the leverage of hospitals relative to considering each hospital as a separate entity"); *see also* ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████.

### B.      Other Factors That Affect Provider Negotiations And Reimbursement

Numerous other factors influence negotiations between providers and insurers, leading to idiosyncratic variation in provider reimbursements.  For example, an insurer's share of enrollees in the market can affect negotiations.  As the Eleventh Circuit has recognized, "a hospital can increase its revenues (and thus its profits) either by increasing the number of patients it serves or by increasing the reimbursements it receives from insurers."  *Palmyra Park Hosp.*, 604 F.3d at 1300.  So, a provider may agree to lower rates in exchange for the higher patient volume that an insurer offers.  *See, e.g.* ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████.  However, the level of discount a provider is willing to offer "differs in each situation based on how much that additional volume or membership plays into what that hospital or physician group already has." ████████████████████████████████.  Thus, a provider's "capacity constraints" will affect its discount, and Alabama hospitals vary widely in their available capacity.  Ordover ¶ 219.

Other factors that affect provider-insurer negotiations and thus provider reimbursement include (but are not limited to):

- The administrative burden of working with a particular insurer and the insurer's

perceived commitment to the area;[6]

- A provider's interest in diversifying its suite of payors;[7]
- Whether a multi-hospital system decides to "trade off" lower rates at one location for higher rates at another hospital location;[8]
- The history between the parties;[9]
- Whether the provider and the insurer decide to negotiate different prices for different types of products, different types of networks, or different types of business;[10] and
- Whether the provider and the insurer engage in "value-based contracting" designed to "reduce costs of health care while improving the quality of services" by linking the level of payment to "the quality of care or improvements in measurable outcomes, such as low costs, utilization or hospital readmissions."[11]

Because provider reimbursements are determined by a complex confluence of unique factors, reimbursements for the same services vary widely across providers. For example, from July of 2012 through June of 2013, BCBSAL paid Prattville Baptist Medical Center an inpatient



---

[6] See e.g.,

[7] See, e.g.,         DX171, BCBSA02983147 at '153 (indicating that insurer with largest market share does not always have the highest discounts because some providers may want to maintain a certain level of insurer competition).

[8] See, e.g.,   ; DX181, BCBSAL_0001815790 at '790-92 (differing proposed payment rates for hospitals within the ▮▮▮ system); id. at '795-96 (differing proposed payment rates between hospitals within the ▮▮▮ system).

[9] See, e.g., DX188, BCBSSC-00205779 at '806 (in provider negotiations, "[p]ersonalities matter: egos and history of participants inevitably have substantive impact on negotiations, as can venue.").

[10] See, e.g.,

[11] PX18 (Dkt. 2454-3) Frech ¶ 99. BCBSAL has engaged in value-based contracting with Alabama hospitals since at least 2010 and with other professionals since at least 2011. See DX177, BCBSAL_0000510129 ("Over the past several years, value based reimbursement has been introduced to our payment methodologies. This effort began with our hospitals, where all or a portion of per diem increases are based on meeting agreed upon quality criteria."); DX180, BCBSAL_0001448202 (describing value-based program for primary care physicians beginning in 2011).

per diem of ████. *See* DX174, BCBSAL_0000277633.  Yet, throughout 2012, BCBSAL paid

Children's Hospital an inpatient per diem of ████████ *more* than what it paid Prattville

Baptist Medical Center.  DX176, BCBSAL_0000407507 at '507.  Indeed, BCBSAL's average

inpatient reimbursement rate ranged from about ████████████████████████ to

almost ████████████████████.  Ordover ¶ 108 & Figure 7.[12]

## III.  THE RECORD EVIDENCE ON ENTRY

Critical to Plaintiffs' common impact models is their assertion that but for the challenged

restraints, new insurers would enter every county in Alabama and obtain substantial market share

across the state.  This assertion is based on speculation that the record evidence contradicts.

### A.    Entry Decision—Factors Considered

Insurers acknowledge that *de novo* entry (*i.e.*, without an acquisition) requires significant

start-up costs and carries substantial risk.  *See, e.g.,* ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████.[13]  One of the primary costs of entering a new market is the cost of

building a provider network.  *See, e.g.,* ████████████████████████

████████████████████████. ████████████████████████

████████████████████

---

[12] Similar variation is seen for outpatient reimbursement and non-hospital providers.  Ordover ¶ 109 & Figure 8 (outpatient rates ranging from ███ to ███ depending on the hospital); *id.* ¶ 112 & Figure 9 (professional reimbursement for 15-minute visit ranging from ███ to over ███); DX178, BCBSAL_0000512240 at 6 (showing that BCBSAL's physician reimbursements range from 95% to 195% of Medicare, depending on the specialty); *id.* at 7 (showing similar information for top 300 procedure codes, with several codes over 200% of Medicare; also showing many codes over 150% of market benchmark).

[13] For a new entrant, ████████████████████████████████████████████████████

████████████████████████████████████████; *see also* DX170, BCBSA02966091 at '102 ("[T]he start-up costs associated with entering a new insurance market are substantial, and insurers doing so may need to internalize significant losses in the early years in order to offer competitive premiums.").

███████████████████████████████████████████████████.

To be successful, an insurer has to contract with enough providers to have a network that is attractive to subscribers, and it must obtain competitive provider rates so it can offer products at competitive premiums. *See, e.g.*, DX200, PRE_CON02996828 at '832 ("[O]ne of the key challenges to entry for a new plan is establishing a marketable and cost competitive network.");

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

███████████████████. This creates a "chicken-and-egg" problem of entry: the entrant has to have enough subscribers to negotiate competitive provider rates, but it has to negotiate competitive provider rates to attract subscribers. *See* Evans ¶ 93; Ordover ¶ 45; DX264, Haas-Wilson Dep. at 83:12-22. Providers' expert acknowledges this is a "real-world" market dynamic. DX264, Haas-Wilson Dep. at 111:16-19.

These challenges have two important implications. *First*, most insurer entry is not *de novo* and instead occurs through acquisition. Murphy ¶¶ 86-88; Ordover ¶¶ 150-51. As Dr. Haas-Wilson acknowledges, "[s]hort of entry by acquisition or merger, it may take years to enter markets" because it "takes time to establish a credible reputation with providers and build provider networks." Haas-Wilson ¶ 292. As a result, to the extent entry does occur, it usually changes the identity of the competitors already in the market, not the total number of insurers.

*Second*, because entry is difficult, insurers pick and choose which markets to enter—and prioritize some over others—after carefully analyzing the upside and downside potential of entry. *See, e.g.*, ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████. Insurers consider a number of factors when selecting markets to enter, including:

- **Demographics and Health.** Insurers consider the overall health of the subscriber pool in the market and population density. *See* █████████████████████████████████████████████████████████████████████████████; DX209, WLP-08203199 at 8 ("Market Size" and "Demographics"); DX200, PRE_CON02996828, at '831 ("[p]opulation growth and mix").

- **Provider Concentration and Market.** Insurers consider the provider market, including potential provider networks and reimbursement rates. *See* █████████████████████████████████████████████████████████████████████; DX200, PRE_CON02996828 at '831 ("Provider Market Characteristics" one of the reasons Arizona selected for entry).

- **Likelihood of Winning New Subscribers.** Insurers consider "how likely [a subscriber] would be to move from their current carrier." ████████████████████████████████████.

- **Insurer Competition.** Insurers consider the insurer "competition in a particular market." █████████████████████████████████████████████████; DX209, WLP-08203199 at 8 ("Competitive Intensity"); ███████████.

- **Regulatory Environment.** Insurers also look to the regulatory environment in evaluating "market attractiveness." DX209, WLP-08203199 at 8; *see also* ████████████████████████████████████.

As these factors demonstrate, entry decisions are "market-specific," ██████████████████████████████, and "will vary by market." █████████████████████████████.

## B.    Alabama Is Not An Attractive Or Likely Market For Entry

These entry factors reveal the reason new insurers are not entering Alabama.

### 1.    Demographics And Population Health

Insurers typically consider rural areas "less attractive" for entry than urban areas, and Alabama is one of the most rural states in the country. ██████████████████████████; *see* Ordover ¶ 185 & Figure 22. Insurers' expansion efforts typically "focus . . . on major cities or metropolitan areas" with denser populations. █████████████████████████████████



; Ordover ¶ 163.  More densely populated areas provide a larger subscriber base to draw on and the presence of substitute providers in metropolitan areas that allow the insurer to negotiate more favorable rates than in rural areas.  *See, e.g.,* ███████

███████.  With at least 40% of Alabama's population living outside of urban areas, Alabama lacks this attractive market characteristic.  *See* Ordover ¶ 185.

Areas with healthier populations also are more attractive for entry than areas with less healthy and, therefore, higher cost populations.  Insurers typically view healthier populations as "appealing market[s]" because "a heathier population will lower medical costs and enable you to put a more competitive premium price on the table in the market." ███████

███.  Alabama is not attractive for insurance entry because it has the fourth highest share of population with poor health.  *See* Ordover ¶ 191, Figure 27 (also noting that "a 2016 report found that three of the top 25 'Least Healthy Cities in America'" were in Alabama).  In fact, the 2008 American Hospital Association survey ranked Alabama with the third highest rate of inpatient admissions nationwide.  *See* DX173, BCBSAL_0000246720 at 41.

### 2.    Provider Concentration And Market

Provider markets are highly concentrated in many areas of Alabama, meaning there is little if any competition among providers.  *See* Ordover ¶ 187.  Many counties in Alabama have just a *single* hospital.  *Id.* ¶ 188.  Providers' expert concedes such market conditions are not favorable to an insurer: "[i]n rural areas you often get a hospital with no competitor in the county or even no competitor in that county and some contiguous counties, so they can have a lot of market power."  DX265, Frech Dep. at 90:12-24. ███████

17

████████████████████████████████████████████████

████████████████████████. Moreover, powerful providers can effectively block an

insurer from entering a given area by refusing to give the insurer a competitive rate.  *See, e.g.,*

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████.

### 3.   Likelihood Of Winning New Subscribers And Insurer Competition

BCBSAL is a strong competitor.  It had the highest Medical Loss Ratios ("MLR") among

Alabama insurers in 2012, for example, and consistently maintains MLRs over 90%.  *See*

Ordover ¶ 193.  BCBSAL's MLR averaged nearly 92% from 2010-2017, meaning that 92 cents

of every premium dollar went to paying subscribers claims, as follows:



**BCBS-AL Premium Breakdown**
2010-2018

Payments to Providers 91.8%

Underwriting Gain: **2.6%**

Administrative Expenses: **3.4%**

Claims Adjustment Expenses and Investments to Improve Healthcare: **2.2%**

Notes:
[1] Analysis is based on all commercial fully insured business subject to MLR regulation reported to NAIC.
[2] Premiums are based on net adjusted premiums earned after reinsurance.  Payments to providers are based on net incurred claims after reinsurance.
Source: BCBS-AL NAIC Supplemental Health Care Exhibit.

Murphy ¶¶ 65-66 & Ex. 3.  Competitors recognize that an efficient MLR this high makes it difficult to take substantial market share from BCBSAL and make a profit.  *See* ███████████ ████████████████ ; *see also* Ordover ¶ 193.  They also recognize that BCBSAL offers low premiums to subscribers, such that other insurers cannot match these rates and be profitable.



.  Third party administrator ██████████████████████ agrees that BCBSAL's prices are ████████████████████████████████████████████████████████ ████████████████ ████████████████████████████████ ████████████████████████████ .

BCBSAL also has high customer satisfaction, making it more difficult for an entrant to win subscribers.  *See* Ordover ¶ 195-96; Murphy ¶¶ 72-73.  JD Power & Associates ranked BCBSAL first in the East South Central region for overall members' experience in 2012.  *See* DX179, BCBSAL_0001369509 at 9-10.  Its customer satisfaction is higher than its competitors:





Murphy Exhibit 6.   This was repeatedly borne out in deposition testimony.   *See* ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████.[14]   The

depositions made clear that subscriber plaintiffs routinely choose BCBSAL over its competitors

because of BCBSAL's superior product offerings.   *See* ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████.

    BCBSAL also has received high marks for provider satisfaction.  For example, until 2011,

the  BCBSA  surveyed  provider  office  staff  about  their  satisfaction  with  the  Blue  Plan's

---

[14] *See also, e.g.,* ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████.

processing of both local and BlueCard claims.  Alabama providers reported high satisfaction with processing of both local and BlueCard claims, with over 90% of providers in 2011 reporting being satisfied with local claims processing across five different metrics.  Murphy ¶¶ 74-75.  As Dr. Murphy notes, "Providers that are so satisfied with BCBSAL might be reluctant to offer a new entrant the same discounts as they currently accept from BCBSAL."  *Id.* ¶ 75; *see also id.* ¶ 76 (showing that BCBSAL processes data much faster than other insurers).

In short, █████████████████████████████████████████

███████████████████████████████████████████████.

Even BCBSAL's competitors agree that BCBSAL ███████████ making it a ████ ████████ to compete against. ████████████████████████████.

### C.    Insurers Choose Not To Enter Alabama

Plaintiffs' claim that a Blue or Green would choose to enter all 67 counties in Alabama and make substantial market share gains cannot be reconciled with one key fact: for years there has been no meaningful Alabama entry or expansion by Purples (*i.e.*, non-Blue plans) *or* Greens.

### 1.    Purples

There are several non-Blue insurers operating in neighboring states that have chosen not to enter Alabama.  For example, Kaiser—one of the nation's largest and most successful insurers—operates in nearby Atlanta, Georgia but has ignored Alabama altogether:



## Large Insurers That Provide Fully Insured Comprehensive Health  Coverage in Neighboring States but Not in Alabama
### Experience of 2011 to 2017

| Insurer | Florida | Georgia | Mississippi | Tennessee | Average Annual Lives |
|---|---|---|---|---|---|
| Kaiser Foundation | | X | | | 230,756 |
| AvMed | X | | | | 116,814 |
| Molina | X | | | | 93,820 |
| Coventry | X | X | X | X | 93,492 |
| Tennessee Rural Health | | | | X | 71,721 |
| Preferred Medical Plan | X | | | | 30,042 |
| Health First | X | | | | 25,532 |
| Alliant Health Plans | | X | | | 23,502 |
| Medical Mutual of Ohio | | X | | | 10,268 |

Note: List of insurers is limited to those with an annual average of at least 10,000 fully insured commercial lives in the states surrounding Alabama from 2011 to 2017.

Source: CMS CIIO Medical Loss Ratio Data.

Murphy ¶ 254, Ex. 49; *see also* ███████████████████████████████████
███████████████████████████████████████████████████████████████████.

The evidence on existing competitors in Alabama also undermines Plaintiffs' theory that out-of-area Blues are eager to enter Alabama.  National insurers like United, Aetna, Cigna, and Humana have had great success selling health insurance across the country, doubling their revenues during the class period.[15]  Yet, none of these Purples won a significant share of the Alabama market.   Pakes ¶¶ 33-40. ████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████.  Rather than expanding within Alabama, many of these Purples *exited* Alabama markets during the class period. ██████████████████

---

[15] *See* DX276, 2008 United 10-K at 37 ($75.9 billion in revenues in 2008); DX277, 2017 United 10-K at 28 ($201.2 billion in revenues in 2017); DX270, 2008 Aetna 10-K at Annual Report Page 5 ($28.8 billion in healthcare revenues in 2008); DX271, 2017 Aetna 10-K at 56 ($58.3 billion in healthcare revenues in 2017); DX272, 2008 Cigna 10-K at 55 ($11.6 billion in healthcare revenues in 2008); DX273, 2017 Cigna 10-K  at 36 ($32.6 billion in healthcare revenues in 2017); DX274, 2008 Humana 10-K at 33 ($28.9 billion in revenues in 2008); DX275, 2017 Humana 10-K at 37 ($53.8 billion in revenues in 2017).

██████████████████. ████████████████████████ ████

███████████████████████████████████████████. *See*

██████████████████████████. In fact, ████████████████

████████████████████.[16]

The lack of Purple entry post-ACA further demonstrates the lack of interest in Alabama. As Dr. Ordover observes, "[e]ven on the ACA Exchanges, *which were designed to encourage insurer entry*, there has been very limited and only temporary entry into Alabama." Ordover ¶ 177 (emphasis added). Alabama is one of the lowest-ranked states with respect to the number of insurers participating on the ACA exchange. *Id.* ¶ 78. Indeed, BCBSAL currently is the *only* insurer offering products statewide on the exchange. ██████████████████████████████████████████████████████████

*See, e.g.,* ████████████████████████████. And ███████████████████████████████████████████████████████████████████████████████████.

Humana's brief stint in the Alabama ACA market further undercuts the assumption of successful statewide entry. Humana cherry-picked three counties in which to offer health insurance for 2014-15. It then expanded to seven counties in 2016 before ***fully exiting*** the market in 2017. United is the only other insurer besides BCBSAL to have offered statewide coverage on the Alabama exchanges. After two years, United also ***exited the exchange.*** *See* Ordover ¶ 177. For the last two years, Bright Health has been the only other insurer on the

---

[16] Other Purples did not exit segments because they never entered them. ██████████████████████████████████████

Alabama exchange besides BCBSAL, and it only operates in the Birmingham area.  *See* Dkt. 2469-10, https://www.healthinsurance.org/alabama-state-health-insurance-exchange/.

### 2.    No Green Entry

No out-of-area Blue has entered all of Alabama on a Green basis even though all but two Blues have had the ability to do so under the Blue System rules.  *See* Ordover ¶ 154; Murphy ¶¶ 255-60.  Dr. Pakes assumes that but for the challenged restraints, Anthem would enter Alabama. As Plaintiffs' expert concedes, however, Anthem has enough headroom under NBE to enter Alabama and be the ***largest insurer*** in Alabama.  *See* DX261, Rubinfeld Dep. at 182:6-184:16; *see also* Murphy ¶¶ 255-60.  In fact, using the estimated revenue that Dr. Pakes believes a Green could earn by entering Alabama, almost every single Blue Plan would have enough headroom under NBE to enter Alabama and comply with the rule.  *See* Murphy ¶¶ 126-29.  For many, the headroom consists of billions and billions of dollars of potential business:



Murphy Exhibit 33.  Yet none have found that business attractive enough to prompt entry.

The record shows that some Green insurers considered entering Alabama, but decided

against it.  For example, nearly a decade *before* NBE was adopted, Independence Blue Cross's unbranded subsidiary, AmeriHealth, considered entering Alabama through acquisition and competing narrowly in Birmingham and surrounding areas.  *See* Ordover ¶¶ 179-81.  It ultimately abandoned the transaction and never entered Alabama, finding it not profitable to do so.  *See id.*  Similarly, in 2007—two years *after* NBE was adopted—Anthem's unbranded subsidiary UniCare modeled the "market attractiveness" of each state across the entire country and rated Alabama one of just nine "unattractive" markets in the country.  DX209, WLP-08203199 at 4; *see also* Ordover ¶ 200.  Anthem's President of National Accounts and former President of Anthem's Blue Cross Blue Shield of Georgia plan agrees: "I can't see [entry into Alabama] as an opportunity that would be of material interest to the business."  Dkt. 2467-12, Kendrick Dep. at 122:25-123:17.[17]

## IV.   NEW ENTRANTS TARGET ATTRACTIVE MARKETS AND HAVE VARYING EFFECTS ON SUBSCRIBERS AND PROVIDERS

Plaintiffs assume that if a Blue Plan were to enter Alabama it would enter statewide—*in every city and county*.  Plaintiffs also assume an entrant would seek to contract with every BCBSAL provider and sell insurance to every BCBSAL subscriber using the same products as BCBSAL.  The record evidence is to the contrary.  Insurers considering entry know that many factors affect pricing for subscribers and providers, and they design strategies to target desirable subscribers and providers.

### A.    New Entrants Target Limited Geographic Areas

There is no evidence to suggest that any entry would be on a statewide basis.  The record

---

[17] The fact that Subscribers have identified a handful of one-offs in which a Blue asked BCBSAL for a cede says nothing about whether a Blue or Green would enter Alabama statewide in the absence of ESAs and NBE.  Seeking a cede and servicing an Alabama account on a one-off basis involves none of the challenges associated with de novo entry—including the substantial risk, ramp-up costs, and chicken-and-egg problem—in part because the out-of-area Plan knows the ceded subscriber will have access to BCBSAL's provider network through the BlueCard program.  Thus, one-off requests for cedes are inapposite to the issue of entry in the but-for world.

evidence instead shows that real-world entry is limited to economically attractive localities.

████████████████████████████████████████████████████████████████████

████████████████████████████. Regional and national insurers agree that entry decisions

"are all very local decisions" that involve a series of "market specific" assessments. ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████. As discussed

above, insurers consider various factors when making entry decisions, and these factors vary at

the local level. *See* Section III.A, *supra*; Ordover ¶¶ 166-71.

Therefore, when an insurer is evaluating where to enter, ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████. ████████████████████████

████████████████████████████████. ████████████████

████████████████████████████████████. And as one insurer testified█

████████████████████████████████████████████████████████████████████

Rural areas are not as attractive for entry because of low population density and challenges

associated with building a provider network. *See* Fact Section III.B, *supra*.

The record evidence shows that when *de novo* entry does occur, it targets certain areas,

such as metropolitan areas. *See* Ordover ¶ 159 ("Due to the significant effort and investment

needed for an insurer to launch a plan in an area, new entrants generally find it makes business

sense to target the most attractive areas."). In Alabama, for example, ████████████████

████████████████████████████████████████. Bright Health entered

Alabama's ACA exchange in 2018 but only in the Birmingham area. Dkt. 2469-10,

26

https://www.healthinsurance.org/alabama-state-health-insurance-exchange/.   And in the late 1990s when AmeriHealth considered entering Alabama, it planned to enter Birmingham and surrounding counties only.  Ordover ¶ 181.[18]

The same pattern exists in other states.   When LifeWise—a Green subsidiary of Premera—entered Arizona in 2003, it entered the Phoenix metropolitan area.   DX200, PRE_CON02996828 at '828, 834-835.  And when U.S. Healthcare entered Georgia, it did so through the "primary market" of Atlanta.  *See* DX168, BCBSA01278504 at 14.   There are also multiple examples from ACA exchanges across the country.  For example:

- Aetna strategically decided to enter 4 of 13 rating areas in Illinois, 2 of 5 rating in Oklahoma, and 7 of 26 rating areas in Texas.  *See* DX192, HCSC-E000445677 at '679 (discussing Aetna's practice of "cherry picking" areas).

- ███████████████████████████████████████████████████████████████████████████████████████.

As one Blue Plan explained:  "Few carriers took full coverage approach; many competitors employed county-level participation strategies, cherry picking rating areas and counties that compliment their network strategies."  DX193, HCSC-E006192047 at '084.[19]

No record evidence suggests that a Blue Plan deciding whether to enter Alabama would proceed any differently.   The lack of successful statewide entry on the Alabama exchanges suggests any entrant is likely to cherry-pick limited geographic areas like metropolitan areas and surrounding counties.  As ██████ testified when asked whether an entrant could compete with BCBSAL for small groups:  "████████████████████████████████████████████████

---

[18] *See also, e.g.,* ████████████████████████████████████████████████████████
████████████████████████████.

[19] *See also, e.g.,* DX184, BCBSF-00054126 at '157 (stating that "[w]hen the option is available, competitors are highly selective of the counties in which they operate yet still tend to cover the majority of the population."); DX185, BCBSF-00146355 at '363 ("Humana clearly targets [more densely populated] Tier 1 markets" within states); DX191, CAMBIA-01227915 at '916 ("Our competitors are choosing to selectively participate in certain service areas and not in others, which creates an unfair disadvantage.").

██████████████████████████████████

████████████████████.

## B.    New Entrants Target Healthy Subscribers

There is no reason to believe an entrant would target all of BCBSAL's subscribers. Rather, as Subscribers' expert concedes, new insurers often try to "cherry pick" or "cream skim" the healthiest and most profitable subscribers in the areas they enter.  DX261, Rubinfeld Dep. at 214:10-21; *see also* Ordover ¶ 63 ("As a result of adverse selection, each insurer has an economic incentive to attract a healthier (and less costly) pool of subscribers by designing policies that appeal to such subscribers.").[20]  To cream skim healthier subscribers, insurers use marketing strategies targeted at healthier populations and at times decline to quote prospective groups with higher health costs.  *See, e.g.*, DX167, BCBSA00556334 at'334 ("the main focus of USHC marketing campaigns is geared toward '*che[r]ry picking' [Blue plan's] members,*" including "young healthy people").[21]  This cherry picking of healthier subscribers happens in Alabama, too.  For example, in response to a quote request from a group with a child receiving brain tumor treatments, ████████████████████████████████

████████████████████████████████████████████████.

Insurers also cream skim by offering limited benefit products targeted to healthier populations at lower price points.  Products with limited benefits and a narrower provider network typically appeal to healthier subscribers who do not expect to require medical care.  *See*

---

[20] *See also* DX190, CAMBIA-00242688 at 3 ("'New' entrants enter into individual market cherry picking the healthiest risk . . . while [the Blue Plan] offers full portfolio to serve all . . . ."); DX186, BCBSNC-00076394 at '410 (indicating that United was using Ingenix for "Strategically Targeting Populations," including "select demographic groups with healthier habits"); DX204, WLP-03425215 at '216 ("Our major competitors, with the exception of Kaiser (in Atlanta only), come and go and are generally those companies that cherry pick and churn the business.").

[21] *See also* DX186, BCBSNC-00076394 at '410 (United described as "[t]argeting marketing at younger, more profitable populations."); DX205, WLP-04432382 at '393 ("Humana also refuses to even issue a quote on groups who are getting a 50% or higher increase from Anthem.  They are cherry picking our profitable KEY business."); DX206, WLP-06352209 at '209 ("Aetna is aggressively pricing 26+ business.  In the 26 to 50 size market, they tend to write the healthier groups ('cherry picking').").

Ordover ¶ 63.[22] █████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████. These efforts were

aimed at "████████████████████████████████████████████████████

████████████████████.

Cream skimming has different effects on different subscribers. While it can benefit healthy subscribers who are willing to switch to plans with narrower networks or less benefits, it also can lead to "adverse selection" and leave the incumbent plan with a less healthy—and more costly—risk pool, forcing the incumbent to raise premiums to cover its increased medical costs. *See* Ordover ¶ 342. For example, Cigna cherry-picked BCBS-Vermont's favorable risk pool by offering a limited benefit product, thereby forcing BCBS-Vermont to raise premiums about 40% for nearly 7,000 subscribers. *See* Dkt. 2469-15, BCBSVT-00076853 at '863. Similarly, in Pennsylvania:

> [W]e've seen a parade of competitors come and go, causing a tremendous amount of disruption and hardship for our providers and our customers. **Their approach to the market is to typically "cherry pick"** . . . As they become successful, it has the [e]ffect of **leaving us with a higher risk pool, driving our prices higher**, and draining our financial position.

DX172, BCBSA03519055 at '064.[23] Dr. Ordover shows how this can happen:

---

[22] *See also* Dkt. 2469-17, Mark Shepard, *Hospital Network Competition and Adverse Selection: Evidence from the Massachusetts Health Insurance Exchange*, Nat'l Bureau of Eco. Res. (2016) at 5-6 (concluding that "limiting provider networks may be a powerful tool for insurers to avoid unprofitable consumers"); Kate Ho & Robin S. Lee, *Equilibrium Provider Networks: Bargaining and Exclusion in Health Care Markets*, 109(2) Am. Econ. Rev. 473 at 473-74 (2019) (Ho and Lee (2019)) (noting "concerns that restrictive insurer networks . . . maybe used to 'cream skim' healthier patients."); █████████████████████████████████████████████████████████████████████████████████.

[23] *See also* Dkt. 2469-16, EXCELLUS0205274 at '275 (Preferred Care "is 'cherry-picking' the good healthy risks through brokers and product positioning leaving the Blue Choice pool with the 'sicker' population utilizing more services and driving up the premium."); DX269, Ed Beeson, *Smaller Firms Self-Fund Insurance*, Star Ledger (April 29, 2012) (regulator issued bulletin barring stop-loss insurers from "cherry-picking" healthier groups because of the



Notes: Average for each group represents total allowed amount divided by total subscribers and total months for the entire year.
Sources: Blue licensee non-claims production; NDW claims data.

Ordover ¶ 344 & Figure 47. Thus, insurer entry can increase premiums for some subscribers, even if it decreases premiums for others. *See id.* ¶¶ 342-44. Plaintiffs' experts do not dispute this. Dr. Rubinfeld admits that when an entrant cream skims, it may lead to higher premiums for the incumbent's remaining customers. *See* DX261, Rubinfeld Dep. at 215:3-21.

## C.     New Entrants Target Subsets Of Providers

The assumption that a Blue entrant would contract with nearly every provider in Alabama also is not supported by the record evidence. No Purple in Alabama has a network as broad as BCBSAL's network. *See* DX183, BCBSAL_0001967317 at '332. According to one insurer, it is "█████████████████████████████████████████████████████████████████

---

risk that "the fully insured market would become increasingly concentrated with sicker companies, thus pressuring cost of premiums to rise even higher.").

██████████████████████████████████████████████████████████████.

Instead, entrants almost always decide to contract with less than all providers in a given area when building networks. For example, when LifeWise entered Phoenix in 2003, it targeted "2400 out of 3395 available physicians." DX200, PRE_CON02996828, at '828, '834-35. This is sometimes referred to as "selective contracting." Letter to CMS from FTC, Re: *Contract Year 2015 Policy & Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs* at 1 (Mar. 7, 2014). "Selective contracting by insurers, in which only particular providers are accessible, is not a new phenomenon." Ho and Lee (2019) at 473.

Entrants choose to selectively contract because building a new, statewide provider network "would be an enormous cost." ████████████████████. Instead they contract with enough providers to reach adequacy standards and attract enough subscribers. *See*

████████████████████████████████████████████████████████████████
████████████████████████████████████████████.[24]  Selective contracting also can reduce provider reimbursement costs because providers typically are willing to accept lower reimbursement rates in exchange for the increased patient volume that comes from being included in-network.[25] *See* Ordover ¶ 58.

The result of selective contracting is sometimes referred to as a "narrow network" or

---

[24] *See also* ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████.

[25] *See, e.g.,* ████████████████████████████████████████████████████████
████████████████████████████████████████████████ DX200, PRE_CON02996828 at '835 ("We traded deeper discounts for limited contract[ing] with some hospitals"). The Federal Trade Commission has noted that "[t]he ability of health plans to construct networks that include some, but not all, providers . . . has long been seen as an important tool to enhance competition and lower costs in markets for health care goods and services." Letter to CMS from FTC, Re: *Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs* at 1 (Mar. 7, 2014).

"limited network," which is simply a network designed to include only a small subset of providers in a given geographic area. *See, e.g.,* ███████████████████. In many cases, entrants use narrow networks because the intended provider cost savings help the entrant overcome the incumbent's cost advantage (*i.e.*, the chicken-and-egg problem). Ordover ¶ 273.[26] While Blue Plans typically offer broad PPO networks favored by consumers *in their own ESAs*, several Blues, including Anthem, have utilized narrow networks in recent years. *See* DX203, WLP-00337825 (memorializing narrow network strategy).[27]

Significantly, entry with a more limited network than the incumbent's network can affect providers very differently. A hospital that is in the incumbent's provider network but excluded from an entrant's narrow network likely will suffer a decrease in patient volume—and thus a decrease in reimbursements—as it loses patients to hospitals who are in the entrant's network. *See* Ordover ¶¶ 286-90 (providing an illustration of patient volume shifting).[28] Narrow networks also can drive down provider prices because providers who agree to join narrow networks often agree to more discounted prices because they expect it to deliver increased patient volume. As one third-party insurer testified, "███████████████████████████
████████████████████████████████████

---

[26] *See also* DX169, BCBSA02329800 at 11 ("Competitors are narrowing their networks to compete against the Blue discount advantages."); ████████████████████████████
██████████████████.

[27] *See also* DX182, BCBSAL_0001916996 at '008 ("For the Blues, offering narrow networks is not a new strategy."); DX189, CAMBIA-00184080 at '082 ("Regence has created a limited network around efficient health systems for an individual product targeted at a limited market.").

[28] *See also* ████████████
██████████████.

███████████████████ [29] Entry with a limited network therefore affects both prices and patient volume in disparate ways. "Determining which providers would 'win' and which would 'lose'" as a result of a narrow network would be a highly individualized exercise. *See* Ordover ¶ 291.

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████   ████████████████████████████

██████████████████████. In 2013, however, ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████. The strategy involved two prongs.  First, ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████. That is, entry was dependent on ███████████████████████████████████████

███████████████. Second, █████████████████████████████████████

█████████████████████. Ultimately, ███████████████████████████.  █████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

─────────────────────

[29] *See also* ███████████████████████████████████████████████████
█████████████████████████████████.

[30] The rate was on par with ███████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████.



. Three years after entry, ███████████

███████████████████████████████████████████████

████████████.

## V.    PLAINTIFFS' EXPERT MODELS

Plaintiffs' motions hinge on the claim that but for the alleged restraints, out-of-area Blues would enter Alabama and that this would decrease premiums for all subscriber class members and increase reimbursements for all provider class members. Ignoring the record evidence discussed above, Plaintiffs' experts adopted sweeping (and sometimes conflicting) assumptions about the nature of entry and then modeled the impact of that assumed entry rather than analyze what entry into Alabama would actually look like.

### A.    Providers' Experts

Providers offer the opinions of three experts: **Dr. Haas-Wilson** opines that all general acute care hospitals in Alabama would have received higher reimbursement rates, absent the challenged restraints. Her analysis primarily consists of two steps. *First*, she compares average Blue Plan market shares in areas where multiple Blue Plans operate with areas where there is a single Plan. She finds that Blue Plans' market shares are about 32% lower on average in markets with Blue-on-Blue competition. *See* Haas-Wilson ¶ 452. After adjusting for issues such as Core-Based Statistical Areas ("CBSAs") that are only partially included in two or more Blue service areas, *id.* ¶ 453, Dr. Haas-Wilson calculates that "the average homed share of Blue Plans is 34.2% lower in markets with limited Blue-on-Blue competition compared to the average homed share of Blue Plans in markets without Blue-on-Blue competition[.]" *Id.* ¶ 459. Based on that average and without any further analysis, Dr. Haas-Wilson assumes an entrant would take

at least 34.2% of BCBSAL's market share in every single county and CBSA in Alabama. DX264, Haas-Wilson Dep. at 190:12-18. Dr. Haas-Wilson does not analyze what entry would look like, what historical conditions would have been for entry, or whether insurers in Alabama compete so successfully statewide. *See, e.g., id.* at 319:22-320:3 ("At this point in my assignment, I have not been asked to model the entry decision.").

*Second*, Dr. Haas-Wilson runs a general nationwide regression and finds that, given lower insurer market concentrations, acute care hospitals would have had higher reimbursement rates. *See* Haas-Wilson ¶¶ 436, 439, 444, Exhibits VIII.9 & VIII.11. She admits she does not model impact to the physicians and other providers in the Non-Acute Care Hospital Provider Class. *See* DX264, Haas-Wilson Dep. at 64:5-73:5. Using this regression analysis and her assumption that an entrant would take at least 34.2% of BCBSAL's market share, she builds a model to calculate that entry would result in increases in acute care hospitals' outpatient and inpatient rates. Haas-Wilson ¶ 547 & Ex. IX.10.

Providers' other experts also do not conduct independent economic or empirical analysis of what entry by another Blue Plan in Alabama would look like. *See* DX266, Slottje Dep. at 124:10-25; DX265, Frech Dep. at 76:18-22, 77:15-78:17. The opinion of **Dr. Slottje** consists entirely of basic math; he simply assumes that all 106 Alabama hospitals would contract with the entrant and all other out-of-area Blue Plans, DX266, Slottje Dep. at 244:4-245:13; Slottje ¶ 74 & Figure 3, and takes the output percentages from Dr. Haas-Wilson's model and multiplies them by BCBSAL's payments to each. DX266, Slottje Dep. at 124:20-24. **Dr. Frech** primarily provides a "history" of the Blue system and a description of the health insurance market generally. *See generally* PX18 (Dkt. 2454-3) Frech ¶¶ 41-115, 116-239.

### B.        Subscribers' Experts

Subscribers offer the opinions of two experts:  **Dr. Pakes** contends that, but for the challenged rules, a Blue or Green Plan would enter Alabama and drive premiums down for all or nearly all subscribers.  His opinion rests on two analyses.  *First,* he uses a regression model based on a paper by Drs. Trish and Herring.  Based on the assumption that an entrant would enter the entire state and acquire a 20-45% market share within three years but would *not* compete for self-insured business, Dr. Pakes concludes that all subscribers would have lower premiums but for the challenged rules.  Pakes ¶¶ 160-163 & Table 17.

*Second*, Dr. Pakes uses a structural model to predict the effect of entry on premiums. That model is based on a number of assumptions, including that (1) an entrant enters every county in Alabama; (2) an entrant contracts with every hospital in Alabama and has the same provider network as BCBSAL; (3) an entrant offers only a broad-network PPO product; (4) provider rates stay the same for 75% of claims costs post-entry; and (5) BCBSAL and other insurers in the market only respond to the entrant via changes in price and provider rates for 25% of claims.  Pakes ¶¶ 185, 232, 235, App'x C at 53; DX262, Pakes Dep. at 292:12-20, 317:4-7. Based on those assumptions, Dr. Pakes concludes that entry would be profitable and decrease premiums for all class members.  Pakes ¶ 170.

Subscribers' other expert, **Dr. Rubinfeld**, opines that ESAs and NBE "prevent lower insurance premiums to all or virtually all subscribers, by virtue of foreclosure of market entry of Blue and Green competition."  SX414 (Dkt. 2457-41) Rubinfeld ¶ 140.  This opinion is not supported by any independent empirical analysis even though Dr. Rubinfeld concedes that empirical analysis is necessary to determine the effect of entry on premiums.  DX261, Rubinfeld Dep. at 81:25-82:8.  Rather than conducting his own empirical analysis, Dr. Rubinfeld relies on

the empirical work conducted by Dr. Pakes.  DX261, Rubinfeld Dep. at 37:10-40:2.

## LEGAL STANDARD FOR CLASS CERTIFICATION

A class action "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Dukes*, 564 U.S. at 348 (quotation marks omitted). Class certification "is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites" of Rule 23 are satisfied. *Id.* at 350 (quotation marks omitted).  Rule 23(a) sets forth four prerequisites for certification: (1) numerosity, (2) commonality, (3) adequacy, and (4) typicality.  Fed. R. Civ. P. 23(a).  Injunctive relief classes also must satisfy the requirements of Rule 23(b)(2), and damages classes also must satisfy the requirements of Rule 23(b)(3).  "Failure to establish any one of [Rule 23(a)'s] four factors and at least one of the alternative requirements of Rule 23(b) precludes class certification." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003).

"Rule 23 does not set forth a mere pleading standard"; instead, a "party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350 (emphasis in original).  As the Eleventh Circuit stated:

> The party seeking class certification has a burden of *proof*, not a burden of pleading.  He must affirmatively demonstrate his compliance with Rule 23 by proving that the requirements are *in fact* satisfied.  And the district court must conduct a rigorous analysis to determine whether the movant carried his burden, which will frequently entail overlap with the merits of the plaintiff's underlying claim.

*Brown*, 817 F.3d at 1234 (internal quotation marks and citations omitted) (emphasis in original). To conduct a "rigorous analysis," the district court must decide all questions of fact or law that are relevant to the determination of whether to certify a class, not merely accept them as true. *Id.*

## SUMMARY OF THE ARGUMENT

As summarized below, Plaintiffs' motions fail for the following reasons.

- **Rule 23(b)(3) Predominance**

  - *First***, Plaintiffs fail to show that common evidence is capable of proving classwide impact because their models are premised on assumptions that are at odds with the record.**  Plaintiffs assert that entry would occur everywhere and involve everyone, but entry as it occurs in the real world takes place in urban, wealthier areas, often with narrow networks and limited products.  Thus, how entry would impact class members (*e.g.*, who wins, who loses) is an individualized inquiry.  Because the question of entry is not subject to common evidence, no class can be certified.  (*See infra*, **Argument Section I.A**)

  - *Second***, even accepting Plaintiffs' faulty entry assumptions, their models fail because they impermissibly mask winners and losers**.  Plaintiffs' experts admit that entry does not automatically lead to better pricing.  Rather, it can cause premiums to go both up and down and reimbursement rates to both rise and fall depending on local market conditions.  Providers try to mask these winners and losers by using averages, but that is not allowed as a matter of law.  Subscribers rig their model by using the Trish & Herring model, but with a flawed assumption as explained by Dr. Trish herself.  Thus, Plaintiffs cannot reliably show that *all* class members are better off, and no class can be certified.  (*See infra*, **Argument Section I.B**)

  - *Third***, Plaintiffs' models are fundamentally flawed for other reasons**.  Providers ignore the subscriber side of the healthcare market altogether.  And Subscribers' structural model is based on a hypothetical Alabama market that is inconsistent with observable data and therefore cannot reliably predict the likelihood of entry or impact to the proposed class.  Subscribers' structural model also fails to model impact to the "medium group" subclass by erroneously extrapolating from small groups.  (*See infra*, **Argument Section I.C**)

  - *Fourth***, Plaintiffs' models of impact are in fundamental conflict**.  Providers claim that BCBSAL should have paid Alabama hospitals $1.5 billion more during the class period, while Subscribers claim BCBSAL should have charged Alabama subscribers about $500 million less.  These visions of the but-for world are incompatible and would have resulted in BCBSAL losing hundreds of millions of dollars annually, confirming that Plaintiffs' models are not reliable.  Moreover, Subscribers and Providers' separate models showing that entry would *benefit* their class are predicated on entry *harming* the other class.  These conflicts are irreconcilable and preclude certification of both Provider and Subscriber classes.  (*See infra*, **Argument Section I.D**)

  - *Fifth***, Providers fail to present any model demonstrating that impact to the Non-Acute Care Hospital Provider Class is capable of common proof.**  Providers admit their claim of classwide impact for this class is based on nothing but "theory," and their failure to present any model whatsoever precludes a finding of predominance.  (*See infra*,

38

Argument Section I.E).

- *Sixth,* **predominance is not satisfied for other reasons.** Providers have not adequately defined the market for their BlueCard rule of reason claim. Plaintiffs also cannot rely on speculative "non-price" harms as a matter of law and the record evidence shows that such harms are not common across the proposed classes. Defendants' filed rate defense also raises individualized issues. And determining which providers are barred from bringing claims by the *Love* settlements also raises individualized issues. (*See infra,* **Argument Section I.F**)

- *Seventh,* **certification of the Acute Care Hospital Provider Class is not superior to other means of adjudicating the controversy.** The members of that class are sophisticated entities who seek substantial damages and can pursue their claims without certification. (*See infra,* **Argument Section I.G**)

- **Rule 23(b)(2) Injunction Classes**

  - *First,* **Plaintiffs cannot meet Rule 23(b)(2)'s "common injury" requirement.** The requested injunctions would harm some class members, including (i) subscribers in local markets that would see increased premiums with entry; (ii) providers in local markets that would see decreased reimbursement with entry; (iii) providers and subscribers left out of entry into select areas or entry with limited networks or products; and (iv) class members that rely on BlueCard for in-network coverage (subscribers) or patient volume (providers). Because Plaintiffs have conflicting interests, no Rule 23(b)(2) class can be certified. (*See infra,* **Argument Section II.A**)

  - *Second,* **no injunction class can be certified because Plaintiffs primarily seek monetary damages.** A Rule 23(b)(2) class is only appropriate if monetary relief is incidental to injunctive relief. Plaintiffs do not even attempt to suggest the billions of dollars in damages they seek are incidental, and Subscribers' co-lead counsel confirmed the damages class "is obviously the thing that's most important to the class certification stage." DX268, April 19, 2018 Hearing Tr. at 68:7-16. Accordingly, no 23(b)(2) class can be certified as a matter of law. (*See infra,* **Argument Section II.B**)

  - *Third,* **no injunction class can be certified because of issue preclusion risks.** This Court recognized that Plaintiffs' proposed injunction classes create preclusion risks for class members who are in the injunction classes but not the damages classes. (Dkt. 2392.) Providers fail to address the Court's concerns at all, while Subscribers pay lip service to, but fail to meaningfully distinguish, the cases the Court identified that deny certification because of the claim preclusion risks associated with injunction-only class actions. (*See infra,* **Argument Section II.C**)

  - *Fourth,* **Subscribers' proposed injunction classes cannot be certified because Subscribers have provided no evidence of prospective impact.** Subscribers' Nationwide Injunction Class includes subscribers throughout the United States, but Subscribers have offered no empirical evidence of injury outside of Alabama. They also have offered no evidence of injury to the Alabama subscribers of other Blue Plans and

39

large group plans who are members of Subscribers' Alabama Injunction Class. Further, Dr. Pakes' analysis only relates to the 2008 to 2013 period and cannot be extrapolated to 2014 or later, after the ACA was implemented. (*See infra*, **Argument Section II.D, E**)

- **Rule 23(a)(3) Typicality/23(a)(4) Adequacy**

  - **The proposed classes fail Rule 23(a)(4)'s adequacy requirement because there are winners and losers within the same class.** As discussed above, entry in any form creates winners and losers. (*See infra*, **Argument Section III.A**)

  - **The proposed classes fail Rule 23(a)(3)'s typicality requirement because the named Plaintiffs' claims are not "typical" of the classes they seek to represent.** The named Plaintiffs are subject to different defenses and also do not reflect the classes they seek to represent. (*See infra*, **Argument Section III.B**)

- **Rule 23(c)(4) Issues Classes**

  - **Rule 23(c)(4) does not excuse Plaintiffs from satisfying Rule 23(b)(3)'s requirements**. Plaintiffs propose that this Court certify a series of 23(c)(4) issues classes in the event the Court finds Plaintiffs have not met predominance. This proposal fails because courts are clear that a Rule 23(c)(4) class still must satisfy the predominance requirement of 23(b)(3). (*See infra*, **Argument Section IV**)

## ARGUMENT

**I.     PLAINTIFFS FAIL TO SATISFY RULE 23(B)(3) BECAUSE THEY CANNOT SHOW CLASSWIDE IMPACT WITH COMMON EVIDENCE**

A court cannot certify a Rule 23(b)(3) damages class unless "questions of law or fact common to class members *predominate* over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3) (emphasis added). To satisfy the predominance requirement, Plaintiffs must "present common, generalized proof capable of proving antitrust impact on all members of the putative class." *In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *20 (M.D. Fla. Apr. 3, 2014) (reviewing Eleventh Circuit authority and holding antitrust plaintiffs must be able to demonstrate impact to "all" class members).[31] Impact is "an essential element" of

---

[31] Subscribers contend that they need only show "nearly all" class members were injured, Subscribers' Damages Br. at 24, but that view is contrary to the in-depth analysis of Eleventh Circuit case law in *In re Photochromic Lens*, as well as the holdings of other courts of appeals. *See, e.g.*, *In re Asacol Antitrust Litig.*, 907 F.3d 42, 56-57 (1st Cir. 2018) (collecting cases and noting the requirement of injury to all class members is the "majority view"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (reversing class certification because

Plaintiffs' claims and "requires proof that [class members] suffered some injury that was caused by Defendants' antitrust violations." *In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 682 (S.D. Fla. 2012) (internal quotation marks and citations omitted).

If determining predominance requires "a fact-intensive inquiry unique to each potential class member" requiring "individualized, not common, evidence," class certification fails. *Blades v. Monsanto Co.,* 400 F.3d 562, 570, 575 (8th Cir. 2005). Likewise, if the record shows that some "class members appear to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs because their net economic situation is better off" with the conduct in place, "[c]lass certification under these circumstances would be inappropriate." *Valley Drug*, 350 F.3d at 1191.[32]

Determining whether Plaintiffs have shown common impact "calls for the district court's ***rigorous assessment*** of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008), as amended (Jan. 16, 2009) (emphasis added). This rigorous assessment requires the Court to take "a hard look at the soundness of statistical models that purport to show predominance." *In re Rail Freight*, 725 F.3d at 255. If Plaintiffs cannot demonstrate their models are "reliable" and "workable," class certification must be denied. *Id.* at 252-53; *see also Ward v. Apple, Inc.*, No. 12-CV-05404-YGR, 2018 WL 934544, *3 (N.D. Cal. Feb. 16, 2018) ("dazz[ling] the courtroom with graphs and tables" did not amount to a "data-driven model" capable of "demonstrating class-wide antitrust injury based on common proof").

---

plaintiffs had failed to "show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy."). In any event, neither Subscribers nor Providers can prove impact for "nearly all" class members, and classes thus cannot be certified under either standard.

[32] This is true regardless of the antitrust standard of review. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("[P]roof of a per se violation and of antitrust injury are distinct matters that must be shown independently.") (quoting Areeda & Hovenkamp, Antitrust Law ¶ 334.2c (1989 Supp.)).

For the reasons discussed below, Plaintiffs cannot prove with common evidence that entry would result in higher reimbursements for all Providers or lower premiums for all Subscribers, and class certification should be denied.[33]

### A.  Plaintiffs' Impact Models Are Unreliable Because They Are Built On Unfounded Assumptions, Without Which There Is No Common Impact

A class cannot be certified based on expert analysis that assumes—rather than finds—the factors necessary to show classwide antitrust impact. *In re Agric. Chems. Antitrust Litig.*, 1995 WL 787538, at *4 (N.D. Fla. Oct. 23, 1995). Expert analysis based on unsupported assumptions that does not "stop[ ] to consider numerous critical facts suggesting the contrary" is invalid and cannot demonstrate predominance. *Id.* at *4-5; *see also In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 160–61 (E.D. Pa. 2015) (concluding that individual issues predominate where plaintiffs' "model fails to analyze what appear to be significant individualized differences in pricing across different retailers and regions"). Here, ***none*** of Plaintiffs' experts modeled what entry would look like based on the record evidence, as they themselves admit. Instead, they made assumptions about what entry would look like that not only are unsupported by the record, but are refuted by it. Taking out even one of Plaintiffs' unfounded assumptions destroys common impact and reveals the need for individualized inquiries.

---

[33] Plaintiffs cannot carry their burden of showing classwide impact by citing to a variety of theoretical or anecdotal material, much of which has nothing to do with the Alabama market. *See, e.g.*, Subscribers' Damages Br. at 13 (arguing that "Member Plans' own documents produced in this litigation support Dr. Pakes' findings that competition would lower premiums and that the absence of competition increases premiums"); Providers' Br. at 23 (arguing that "Defendants' own documents and testimony demonstrate that Defendants' antitrust violations cause injury to healthcare providers"). None of that material is capable of proving that all members of the proposed classes were injured, particularly given Plaintiffs' experts' acknowledgement that the effects of increased insurer competition are an *empirical* question. *See* Fact Section I, *supra*.

Moreover, much of the material Plaintiffs cite is related to the *merits*, not class certification. For example Plaintiffs' repeatedly refer to information from the Anthem-Cigna litigation, but Plaintiffs' takeaways from that litigation are without basis. The rules at issue in this case did not prevent the Anthem-Cigna merger. *See U.S. v. Anthem, Inc.*, 236 F. Supp. 3d 171, 216 (D.D.C. 2017) (enjoining merger because court found it would "eliminat[e] direct competition between the two firms, reduc[e] the number of national carriers from four to three, and diminish[] innovation"). And the Anthem-Cigna litigation has nothing to do with the key question of whether entry into Alabama would cause premiums to go down for all Subscribers and reimbursements to go up for all Providers.

### 1. Plaintiffs' Experts Did Not Actually Model The Material Aspects Of Entry But Instead Assumed Them

Despite the importance of entry to showing impact to all class members, Plaintiffs' experts did not attempt to model or otherwise analyze what entry into Alabama actually would look like. For example, Dr. Haas-Wilson explained at her deposition that she was not asked by Providers' counsel to model or analyze whether or how entry would occur: "I have not been asked to model the entry decision." DX264, Haas-Wilson Dep. at 319:22-320:3. She also admitted that she did not use any "empirical modeling to estimate the probability of entry into a specific CBSA or county." *Id.* at 77:8-21. Rather, she assumes another Blue Plan would *enter every single county* in Alabama and take at least *34.2% of BCBSAL's market share*. *Id.* at 190:12-18 (agreeing that her model "assumes that the second Blue would take the same percentage of market share in every CBSA"). Dr. Haas-Wilson made this assumption even though she admits that she does not even know if such broad and successful entry has ever happened in any state. *Id.* at 188:8-189:12.

Dr. Pakes similarly did not model what entry actually would look like for Subscribers. Instead, in applying the Trish and Herring regression, he assumed that an entrant would enter the entire state and acquire a 20-45% market share within three years but would *not* compete for self-insured business. *See* Pakes ¶¶ 160-61. And for his structural model he assumed that an entrant would enter every county in Alabama and have the same provider network and products as BCBSAL and that BCBSAL would not respond to entry other than by changing its pricing.

Accordingly, neither expert employed any economic expertise or used the factual record to determine *where* an entrant likely would sell insurance, *what* kinds of products it would sell, *which* subscribers it would target, with *which* providers it would seek to contract, or *how* BCBSAL would respond to entry on dimensions other than price. Instead, they made a series of

key entry assumptions upon which their models rest. These assumptions were not driven by an economic analysis of the facts on the ground in Alabama; instead they were needed to reach Plaintiffs' desired conclusions. But Plaintiffs cannot meet their burden of showing common impact by citing sweeping conclusions without record support. Expert analysis based on unsupported conclusions that do not "stop[ ] to consider numerous critical facts suggesting the contrary" is invalid and cannot demonstrate predominance. *In re Agric. Chems. Antitrust Litig.*, 1995 WL 787538, at *4. And a district court must "engage in a searching inquiry into the viability of [plaintiffs' impact] theory and the *existence of the facts necessary for the theory to succeed.*" *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 26 (1st Cir. 2008) (emphasis added). As demonstrated below, a comparison of Plaintiffs' assumptions to the record evidence demonstrates that Plaintiffs' theories fail.

## 2. Without Plaintiffs' Unreliable Entry Assumptions, Common Impact Disappears

Plaintiffs' experts admit that the nature of entry may vary across the state depending on a variety of factors:

- Dr. Frech explained an entrant may "not enter in the whole state," and "may go into urban areas first." DX265, Frech Dep. at 98:18-21. He also testified that large group ASOs would be the "easiest" segment to enter. *Id.* at 139:18-140:16.

- Dr. Pakes testified that some counties in Alabama may only "ha[ve] room for . . . one firm." DX262, Pakes Dep. at 304:11-305:5.

- Dr. Rubinfeld testified that entrants may favor "a narrower market so they could achieve scale easily." DX261, Rubinfeld Dep. at 158:1-23. He further acknowledged, the "cost of reaching rural markets can be higher," and "if the rural insureds . . . happen to be very poor or happen to have more health issues, that can also create a problem." *Id.* at 163:5-13, 174:18-175:6. Dr. Rubinfeld also admitted that a Blue plan might not enter the individual or small group segments at all. *See id.* at 207:18-208:5.

- Dr. Haas Wilson recognized that insurers use narrow networks to "channel" subscribers to particular providers in exchange for discounts. *See* Haas-Wilson ¶ 422.

This raises the question of why they adopted a set of assumptions about entry rather than analyzing the record evidence to determine what entry would look like. The answer is simple. As illustrated in the chart below and discussed in detail *infra*, without Plaintiffs' assumptions it is clear that entry would not affect—and would even harm—some class members:

| Plaintiffs' Assumption | Record Evidence | Effect on Purported Common Impact |
|---|---|---|
| Entry occurs and entrant captures significant market share in every county and CBSA | No Green entry; limited Purple entry into particular geographic areas, typically urban | Without entry and an entrant that captures significant market share statewide, Plaintiffs cannot show classwide impact. Class members in areas that are not entered are unaffected or harmed as BCBSAL raises premiums or lowers rates to respond to changing risk pools or competition. |
| Entry occurs with provider network that includes nearly every provider in the state | Entry with narrow provider network | Provider class members excluded from narrow network are unaffected, or harmed as patient volume shifts to providers included in network. Subscriber class members that used excluded provider are also harmed. |
| Entry occurs with same products as BCBSAL | Entry with limited products designed to attract healthier subscribers | Subscriber class members not eligible for or interested in entrants' products are unaffected, or harmed as BCBSAL is left with an unhealthy risk pool and forced to raise premiums. |
| BCBSAL does not respond to entry other than by changing price | BCBSAL could respond by exiting certain areas, changing products, and/or narrowing networks | Subscriber class members in areas where BCBSAL exits and who prefer BCBSAL's current networks and products are harmed. Provider class members in areas where BCBSAL exits or who are excluded from BCBSAL's network are harmed. |

Because entry would not make every class member better off, class certification is inappropriate. *See Valley Drug*, 350 F.3d at 1191. And because determining how entry would impact any particular class member would require individualized inquiry, class certification is inappropriate for this reason as well. *See, e.g.*, *Electrolux*, 817 F.3d at 1237-37.

45

a.   **Without Plaintiffs' unreliable assumption that a Blue or Green would enter every county and CBSA and capture substantial share, common impact disappears**

Plaintiffs' models depend on the assumption that an entrant would go into each and every Alabama county and take significant market share. *See* Pakes ¶ 101 (assuming BCBSGA would sell insurance statewide by 2007); DX264, Haas-Wilson Dep. at 190:12-17; PX55 (Dkt. 2545-14) Slottje ¶ 58(b) (assuming "[a] second Blue would have sold health insurance in each Alabama CBSA/county").   But that extraordinary assumption cannot be reconciled with the paucity of Purple entry into and expansion in Alabama, the complete lack of Green entry, and the limited, sporadic "entry" on the Alabama exchange.   Rather than entering and expanding, multiple Purples have *exited* Alabama markets in recent years.   *See* Fact Section III.C.1, *supra*.

In fact, no Purple has ever competed anywhere near as successfully as Plaintiffs claim a hypothetical entrant would.   This is true even though none of the Purples are bound by the alleged restraints.   United, for example, has never achieved even 10% market share in Alabama—and it is BCBSAL's most successful competitor.   *See* Pakes ¶¶ 34-38.   Other national companies have fared even worse.[34]   Thus, the actual experience of companies operating in Alabama contradicts Plaintiffs' conclusory assertion that other Blues would enter Alabama in the but-for world and take and hold significant market share in every single area during every single day of the class period.   This is significant, as Dr. Murphy explains:

> If the challenged rules protected [BCBSAL] from competition and allowed it to earn supracompetitive profits, then I would expect that non-Blue insurers would have entered and competed aggressively for such profits.   Yet, non-Blue insurers have not done so; instead they have . . . reduced their presence in Alabama.

[34] ████████████████████████████████████

Murphy ¶ 10.  Plaintiffs' experts' lack of analysis on this point is telling.  As Dr. Pakes admitted:

> Q.  [W]hy is it that United, Humana, Cigna, Aetna, why have they not entered and expanded in Alabama in the same way you predict for the entrant here?
>
> A.  You know, there are two reasons.  *The real reason is I don't know why, okay.*  They—you know, they have their own business models, they have their own business plans.  It is true, however, that Blue Cross-Blue Shield of Georgia, you know, has certain advantages in Alabama.  You know, they—they have—they contract already with hospitals in Alabama, various other advantages.  Some of their national networks people use the hospitals in Alabama. . . . So they—they are familiar with the Alabama market.  That is true.  *But that's not the—my real reason is I don't know why.*

DX262, Pakes Dep. 113:3-20 (emphasis added).

Plaintiffs' assumptions also cannot be reconciled with the fact that no Plan has *ever* entered Alabama on a Green basis, either before or after NBE, despite ample "headroom" to do so.  Any and all of the Blues in contiguous states of Florida, Georgia (Anthem), Mississippi, and Tennessee could have entered and done substantial business in Alabama in 2005, and could still do so today.  Murphy ¶¶ 126-129 & Ex. 33.  Yet *none* has entered.  Moreover, there was no NBE rule on Green business until 2005, and any Blue licensee could thus have entered Alabama on an unbranded basis until then.  Yet no Plan did so.

Plaintiffs cannot explain why—if Alabama was so attractive for entry during the class period—no Plan entered on a Green basis before NBE was adopted in 2005.  When confronted with this fact, Plaintiffs' experts could not explain it.  Dr. Haas-Wilson said that she "would rely on Professor Frech to help me understand what those markets looked like in earlier years."  DX264, Haas-Wilson Dep. at 305:2-306:11.  But when Professor Frech was asked whether he had done "any analysis to determine whether National Best Efforts has in fact restrained output of any Blue Plan" he said he was "not sure how you would do that."  DX265, Frech Dep. at 266:5-11.  Dr. Pakes similarly "d[id]n't know if there's a reason or if there isn't" for lack of

entry before the NBE rules came to be.  DX262, Pakes Dep. at 232:18-19.

Plaintiffs' assumptions are also inconsistent with the fact that entry typically is a county-by-county decision.  When insurers enter new geographies, they do so selectively.  *See* Fact Section IV.A *supra*.  Insurers tend to "avoid entering counties with unfavorable market conditions," and "are less likely to enter counties with worse health measures, smaller market size, and lower urban population share."  Hanming Fang & Ami Ko, *Partial Rating Area Offering In the ACA Marketplaces: Facts, Theory, and Evidence*, 3, 30 (October 2018).  Instead, they tend to target healthy areas so they can target less-costly subscribers, who will generate fewer bills and help the insurer maintain a profit.  Similar dynamics lead insurers to prefer urban and suburban areas over rural ones.  As Professor Rubinfeld acknowledged, the "cost of reaching rural markets can be higher," and "if the rural insureds . . . happen to be very poor or happen to have more health issues, that can also create a problem."  DX261, Rubinfeld Dep. at 163:5-13, 174:18-175:6.  Thus, as Dr. Frech explained, an entrant may "not enter in the whole state," and "may go into urban areas first."  DX265, Frech Dep. at 98:18-21.

The record is filled with examples of narrow geographic entry, both inside and outside of Alabama.  *See* Fact Section IV.A, *supra*.  Yet both Dr. Haas-Wilson and Dr. Pakes assume entry everywhere without any analysis of Alabama geographies.[35]  *See* DX262, Pakes Dep. at 88:25-

---

[35] To the extent Dr. Pakes relies on Highmark's so-called "entry" into central Pennsylvania in 2002 to support the assumption that an Alabama entrant would operate statewide by 2007, that reliance is misplaced.  First, Highmark's entry was limited to 21 of 67 counties in Pennsylvania so was not statewide.  Pakes ¶ 278 & Table 30.  Second, prior to "entry" in 2002, "Highmark sold health insurance in central Pennsylvania through a joint operating agreement with Capital Blue Cross, which provided Highmark access to Capital's provider network."  *Id.* ¶ 167.  Thus, as Pakes conceded, Highmark's decision to compete in central Pennsylvania "wouldn't be de novo entry."  DX262, Pakes Dep. at 162:10-166:23; Murphy ¶ 284 (explaining that Highmark "had already been servicing customers [in central Pennsylvania] for decades and had staff and relationships to facilitate becoming an independent competitor").  Subscribers also point to the Highmark "entry" to argue that entry in Alabama would lower premiums for the class.  *See, e.g.*, Subscribers' Damages Br. at 13.  But Subscribers' experts admit that the effect of entry on premiums depends on local market conditions, so the effect of Highmark's entry in Pennsylvania says nothing about the effect of any entry in Alabama.  Moreover, Subscribers provide no evidence that lower premiums in central Pennsylvania persisted, and in fact the evidence indicates they did not.  *See* Murphy ¶ 281 (quoting testimony to

48

89:5, 292:12-20 (admitting to not having analyzed geographic scope, and to having no opinion on "how an entrant would enter"); DX264, Haas-Wilson Dep. at 77:18-21, 131:21-132:2 (admitting she did not "not use[ ] empirical modeling to estimate the probability of entry into a specific CBSA or county," or "do an empirical analysis of whether one of these likely Blue entrants in the but-for world operating in the whole state of Alabama would have been profitable").[36]

For the reasons explained in Fact Section III.B, *supra*, Alabama is simply not attractive for entrants. Given these factors and the lack of actual entry, Plaintiffs' extraordinary claim— that heretofore uninterested companies would suddenly decide to enter and seize broad market share in every Alabama county—defies reality. Because Plaintiffs simply ignore all of this critical evidence, their models are indisputably unreliable. A Blue or Green entering Alabama in search of profits would behave as other profit-maximizing insurers behave, which is completely different than what Plaintiffs assume. *See* Murphy ¶¶ 98-103. With no evidence to support their claim of successful statewide entry, there is no reliable way to show classwide impact with common evidence, and no basis for class certification. *See Bussey v. Macon County Greyhound Park, Inc.*, 562 F. App'x 782, 790 (11th Cir. 2014) (reversing class certification where trial court did not conduct the required "rigorous analysis" and overlooked "shortcomings in the data [that] are significant and bear directly on the issue of predominance") (internal quotation marks omitted); *U.S. v. Frazier*, 387 F.3d 1244, 1295-96 (11th Cir. 2004) (en banc) (faulting expert whose opinions rested on "ipse dixit," rather than "existing data" and "what is known").

---

Congress in 2008 that "premiums in [the overlap area] have risen faster in that market than the other markets we operate in. So it has been a disaster *for customers*[.]") (emphasis in original).

[36] In her deposition, Dr. Haas-Wilson claimed she reached a "judgment" that a second Blue Plan would enter all CBSAs and counties in Alabama but-for the agreements at issue. DX264, Haas-Wilson Dep. at 106:7-15. Yet she ignored factors she admitted would be relevant to an insurer's decision to enter. For example, she recognized that "[t]here are so many different things that a firm would look at before making a decision to enter or not into a specific product or geographic market," including profitability of entry. *Id.* at 130:25-131:19.

Moreover, without the unfounded assumption of entry in every county or local market, classwide impact disappears. Indeed, an evidence-based approach concerning the geographic scope of entry demonstrates that not all class members were injured. For Providers, the proposed Acute Care Hospital Provider Class includes *all* acute care hospitals across the *entire* state of Alabama. Providers' model rests on the theory that entry would give *every* hospital another "outside option" with which to contract, thereby increasing their leverage vis-à-vis insurers and increasing the rates paid by BCBSAL and the new entrant. *See* Haas-Wilson ¶¶ 331-32. But if an entrant only contracted with providers in certain areas, then hospitals *outside* of those areas would not gain the additional "outside option" that Providers claim would make all putative class members better off.

The same goes for Subscribers. The proposed Subscriber class includes all individual, small group, and medium group subscribers across the entire state of Alabama. Subscribers' theory of impact is that entry would increase competition for all class members. But if an entrant only entered certain areas of the state and certain segments of the market within those areas, then impact to the entire class disappears. Subscribers *outside* of the areas and segments of entry likely would not experience the increased competition Subscribers say would make class members better off. And if the entrant focused on relatively healthier areas within Alabama, then the remaining subscribers could actually be worse off, as remaining less healthy subscribers forced premiums up. *See* Ordover ¶ 399; *see also* Fact Section IV.B, *supra*.

Given the record evidence that entry is a "city-by-city" analysis and the scope of entry is relevant to impact, a fact finder would need to inquire where entry would occur and how it would impact individual class members. Because "[s]orting out and proving the claims, if any, of these class members . . . would require substantial individualized evidence" class certification is

inappropriate.  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009); *see also Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783, 790–91 (6th Cir. 2005) (affirming denial of certification because, among other things, analyzing market entry would introduce individualized issues that would predominate); *Blades*, 400 F.3d at 574 (affirming denial of certification where "[t]he evidence showed the presence of individualized market conditions, which would require . . . individualized, not common, evidence").  Plaintiffs cannot simply assume the answer to this critical issue.  *In re Agric. Chems. Antitrust Litig.*, 1995 WL 787538, at *5 (plaintiffs failed to show common impact where expert "assumed the answer" to "critical issue").

> **b.  Without Providers' unreliable assumption that an entrant would contract with every hospital, common impact disappears**

Providers' model of impact assumes their hypothetical entrant would contract with all of the same providers as BCBSAL, but this assumption is unrealistic.  No *existing* insurer in Alabama has a network as broad as BCBSAL's network, and the record evidence shows that new entrants typically engage in "selective contracting," meaning they contract with fewer than all providers in a given area.  *See* Fact Section IV.C, *supra*.  Entrants build these "limited" or "narrow" networks because (1) building a broad network across an entire state is "an enormous cost," and (2) by directing subscribers to fewer providers, they can negotiate better provider discounts in an attempt to offer competitive premiums.  *Id.*  The record is full of examples of insurers selectively contracting and offering narrow networks.  *See, e.g.*, ███████████████

████████████████████████████████████████████████████

█████████████████████.  And Plaintiffs' experts concede that narrow entry is a real possibility.

- **Dr. Pakes'** report states that "[a]n entrant could offer a low-cost, limited provider network PPO plan *by selectively contracting with hospitals in Alabama*," and that such a product would be competitive with other products in the Alabama market.  Pakes ¶¶ 75, 78 (emphasis added).  His report also states that a "narrow network

51

might be preferable for both consumers . . . *and the entrant.*" *Id.* ¶ 235 (emphasis added). And his report notes that BCBSGA—the Blue Plan he assumes would enter Alabama—actually offers a narrow network in Georgia. *Id.*

- **Dr. Rubinfeld** conceded that "[b]uilding a narrow network is probably not going to be as costly and probably not as risky" as building a broad network, DX261, Rubinfeld Dep. at 211:3-13, and that to compete against BCBSAL "you could enter and . . . have more of a niche player and maybe have a narrower provider market and still be successful." *Id.* at 179:8-18.

- **Dr. Frech** testified that he would be "surprised" if an entrant contracted with all providers, DX265, Frech Dep. at 98:2-12, and admitted that an entrant could enter with a narrow network that excluded some providers. *Id.* at 100:20-101:5.

In the face of these admissions and the record evidence, Providers' assumption that an entrant would contract with all the same providers in BCBSAL's network makes no sense and fails to account for the economic realities of healthcare markets. This is no harmless error because the assumption drives Providers' experts' conclusion that all class members were impacted. Thus, Providers' model is unreliable. *See, e.g., In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. at 685 (impact not capable of common proof where expert's assumption "simply disregard[ed]" certain "very real possibilities" affecting impact).

When a realistic assumption is used, there is no classwide impact. As explained in Fact Section, IV.C, selective contracting has different effects on different providers. Providers *included* in the entrant's limited network may agree to accept lower reimbursements in exchange for an expected increase in patient volume steered in their direction. *See id.* Providers *excluded* from the entrant's network may see a reduction in patient volume—and therefore a reduction in reimbursements—as patients are steered to rival providers in the entrant's network. *See id.* Dr. Ordover's empirical analysis confirms that providers left out of narrow networks are made worse off. Ordover ¶¶ 293-301. Likewise, patients of those excluded providers are also made worse off as they are forced to change providers or pay out-of-pocket costs. Accordingly, stripped of

Providers' idealized, broad-network assumption, entry likely would harm some class members.[37]

Further, whether entry would benefit or harm any particular provider is a complicated, individualized inquiry because building a provider network is a "highly localized exercise." ████████████████████████████. Whether to include a particular provider in a limited network depends on provider-specific facts, such as the provider's performance, quality, costs, and the extent to which the provider is must-have.[38] Thus, the impact of entry on the hospital class is a complex inquiry that turns on evidence specific to each class member, which is exactly the kind of individualized inquiry that precludes a showing of predominance. *See Rodney*, 146 F. App'x at 790-91 (analyzing market entry would introduce individualized issues that would predominate). Accordingly, Providers have failed to meet their burden of showing they can prove injury to all class members through common proof.

**c.    Without Subscribers' unreliable assumption that an entrant would offer the same products as BCBSAL, with the same provider network, common impact disappears**

Dr. Pakes' structural model rests on critical assumptions unsupported by the record evidence. He assumes an entrant would offer a product with a provider network equally as broad as BCBSAL's network and that the entrant would "offer the same number of plans as BCBSAL

---

[37] The same analysis applies to out-of-area Blue Plans that do not enter Alabama to sell health insurance. Providers assume that in the but-for world out-of-area Blue Plans would contract directly with every hospital in every single county in Alabama. *See, e.g.*, Haas-Wilson ¶ 498 ("I assume these out-of-Service Area Blue Plans instead would have contracted jointly and in good faith with Jackson Medical Center (and other providers)"); Slottje ¶¶ 74, 77 (calculating damages for Jackson Medical Center as an "example" and stating "I could have selected any of the putative Class members."). In the unlikely event that a Blue plan chooses not to sell health insurance in Alabama but nevertheless contract with Alabama providers, there is no reason to assume the Blue plan would contract with every single hospital in the entire state, and Providers offer none. Instead, such Plans likely would contract with a limited number of hospitals, leading to the sort of volume shifting that has different effects on different providers. Ordover ¶ 328.

[38] *See, e.g.*, ██████████████████████████████████████████████████████████████████ ; DX187, BCBSNC-00099945 at '947 (proposing limited network product that would include "the best discount[s]" in network and "[p]otentially exclude some low-performing facilities"); ████████████████████████████████████████ .

53

and will only offer PPO plans, as BCBSAL does," and that these PPO plans would have "deductibles and out-of-pocket maximums that are within or close to the bounds of those observed for BCBSAL plans." Pakes ¶¶ 232, 235. Dr. Pakes claims these assumptions are "conservative." *Id.* ¶ 235. They are not conservative; they are unsupported by any analysis or record evidence, and they lead Dr. Pakes to a false conclusion about classwide impact.

An entrant offering a limited-benefit product, like the ones Dr. Pakes recognizes elsewhere in his report, leads to "adverse selection" against incumbent insurers. *See* Fact Section IV.B., *supra*. Adverse selection occurs when healthier (often younger) subscribers who are more willing to accept restricted products in exchange for lower premiums switch to the entrant. Ordover ¶ 63. This leaves the incumbent with a sicker, more expensive risk pool, forcing it to *raise* premiums for its remaining subscribers. *Id.* ¶¶ 63-65. As Dr. Pakes himself concluded, based on an analysis of cost data in Massachusetts, "switchers from HMO to PPO tend to be high-cost and switchers from PPO tend to be low-cost."[39] DX262, Pakes Dep. at 77:20-78:5. Dr. Rubinfeld admitted that BCBSAL's "costs might go up" if a plan entered narrowly, and if BCBSAL's costs go up, subscribers "could be . . . worse off." DX261, Rubinfeld Dep. at 218:6-8. And the record evidence reflects actual instances where entry caused premiums to go up for this very reason. *See* Fact Section IV.B, *supra.*

Remarkably, the assumptions Dr. Pakes relied on for his model run counter to the analysis he offers elsewhere in his own report, where he opines:

- "An entrant would have the opportunity to specialize in a product that is different from BCBSAL or to offer a range of products that could cater to different tastes of consumers." Pakes ¶ 71.

---

[39] Even in *this case*, Dr. Pakes finds that "[t]here is some evidence that patients with HMO products are somewhat less 'sick' than BCBS patients when demographic factors and hospital factors are considered." Pakes, App'x C at 12. The only reason Dr. Pakes concludes that "there is no adverse selection concern" in the individual segment is because "[a]ll parties in the individual segment offer PPO products." *Id.* Thus, he assumes away any adverse selection by wrongly assuming, after entry, all parties in the individual segment *will continue* to offer PPO products.

- The "range of products" that could be offered includes more restrictive "HMO products," "high deductible" health plans, and products with "[l]imited provider networks." *Id.* ¶¶ 64-67, 71-72.

- "[A] narrow network might be preferable for both consumers . . . and the entrant" and would be "a more profitable opportunity for an entrant." *Id.* ¶ 235.

- "An entrant could offer a low-cost, limited provider network PPO plan" and such a product would be "competitive *vis-à-vis* BCBSAL's PPO plans on cost and differentiated from Viva and UnitedHealth's HMO plans by brand." *Id.* ¶ 78.

- Based on "standard economic principles," "absent the entry restraints, Blue entry into Alabama would increase the plan options available to Alabama consumers." *Id.* ¶ 85.

The notion that the entrant would offer a limited-scope product is also consistent with the fact that BCBSGA—*the Blue Plan Dr. Pakes assumed would enter Alabama in the but-for world*—offers both HMO products and narrow network products in Georgia. *Id.* ¶ 76, Table 11 (one-third of BCBSGA's small group membership is in HMO plans), ¶ 235 ("BCBSGA manages narrow network plans in Georgia."). And it is consistent with the evidence on entry. *See* Fact Section IV, *supra.* Thus, Dr. Pakes' assumptions are contrary to the evidence and his own statements, rendering his model unreliable. *See, e.g., In re Agric. Chems. Antitrust Litig.*, 1995 WL 787538, at *4.

Further, entry with limited products could make many class members worse off through the process of adverse selection—eliminating classwide impact. *See* Fact Section IV.B, *supra*; *see also* Ordover ¶ 399. This possibility is not in dispute. Dr. Pakes admitted that entry into Alabama with either an HMO or narrow network product *could cause premiums to decrease or increase*, and his model cannot determine which result is more likely. For example, when asked about an entrant offering an HMO, he agreed that he did not know "whether the premiums would go up or down in that situation." DX262, Pakes Dep. at 82:21-84:12. And on narrow networks, he testified that he would "need a whole big analysis" to determine whether entry might benefit

some subscribers, but not others and that he had not done it.  *Id.* at 92:23-93:4.  Certification of the Subscriber class should be denied for the simple reason that Dr. Pakes *admits* that his model cannot determine whether Subscribers are harmed by entry under entry conditions that he concedes are plausible.  *See also* Ordover ¶ 65 ("[A]ny empirical work that aims to test the predictions regarding entry must account for these specific features of the healthcare markets.").

Because Dr. Pakes' model does not account for the likelihood of adverse selection, determining the *actual* impact that entry would have on specific Subscriber class members would require complex individualized inquiry.  This inquiry would require, among other things, looking at evidence of each class member's insurance preferences and health status, which would vary from class member to class member, and determining for each class member what insurance they would purchase in the but-for world.  *See* Ordover ¶ 63 (explaining that consumers with high health risks "are more likely to purchase plans with richer benefits" whereas healthier consumers "are more likely to purchase plans with leaner benefits").  Only after making such a determination could a fact-finder determine the net effect of entry on BCBSAL's premiums. Thus, Subscribers cannot prove with common evidence that all class members suffered injury. *See, e.g.*, *In re Asacol Antitrust Litig.*, 907 F.3d at 53 (reversing class certification where "any class member may be uninjured" and the "need to identify those individuals will predominate"); *Vega*, 564 F.3d at 1274 (reversing class certification where "[s]orting out and proving the claims, if any, of these class members . . . would require substantial individualized evidence").

        **d.**      **Without Plaintiffs' unreliable assumption that BCBSAL would continue to operate in the same way after entry, common impact disappears**

Finally, Plaintiffs' models unrealistically assume little reaction from BCBSAL.  Dr. Pakes testified, for example, that he "assum[es] that BCBSAL and the other actors do not change," and that "[t]here's no repositioning."  DX262, Pakes Dep. at 100:20-23.  But these

assumptions also lack any basis in the record.

Blue Plans act as they do in part because they are Blues. They have ESAs and so remain in those areas even in times of low or negative margins. Murphy ¶¶ 98-103. They invest in the Blue brand, because there is no threat that an entering Blue Plan could free-ride on that investment. *Id.* And they cooperate in innovation, and in sharing the BlueCard system for customers nationwide, because that cooperation is never used against them. *Id.* ¶¶ 104-12.

In Alabama, for example, BCBS AL maximizes its ESA on both sides of the healthcare market. It contracts with nearly every provider in the state, excluding few from its network. And it similarly offers insurance products in every local area, even those areas other insurers find unattractive. A comparison of offerings on the ACA exchanges is telling. Blue ACA offerings are fairly prevalent in the southeastern United States, and exist in every county in Alabama:

### ACA Exchange:  Blue Plan Offerings



Murphy Ex. 21. In contrast, large national insurance companies have largely abandoned ACA subscribers.

**ACA Exchange:  Non-Blue National Insurer Offerings**



*Id.* at Ex. 22.

Without the Blue cooperation facilitated by the challenged rules and facing new competition, BCBSAL likely would be forced to change and become much more like a national insurer. *See* Murphy ¶¶ 98-112.  Plaintiffs' experts acknowledged this.  Dr. Rubinfeld admitted that BCBSAL could say "wait a minute, there's certain groups that I don't want to cover." DX261, Rubinfeld Dep. at 233:20-234:6.  Likewise, eliminating ESAs could change BCBSAL's incentive to serve individuals and small groups in rural areas. *Id.* at 232:8-15.  And BCBSAL could narrow its provider network, excluding some provider class members as a means of reducing costs. *Id.* at 235:2-15; *see also* Pakes ¶¶ 64-78, 86 (predicting that entry would force BCBSAL to create narrow networks); DX261, Rubinfeld Dep. at 218:4-5 (BCBSAL could respond to narrow network entrant by "changing the offerings they give").  Plaintiffs' models of impact are unreliable because they unrealistically assume that BCBSAL would continue to operate in the same way after entry, and thus fail to account for important factors relevant to impact. *See, e.g., In re Agricultural Chems. Antitrust Litig.*, 1995 WL 787538, at *4 (failing to show common impact where expert "never considered" numerous factors related to impact).

* * * * *

In sum, Subscribers' and Providers' models of classwide impact conflict with the evidence, the realities of the healthcare marketplace, and their experts' own statements about how an entrant might behave in Alabama. Because Plaintiffs have not shown that classwide impact can be proved through common evidence, class certification should be denied. *Vega*, 564 F.3d at 1272-74. Moreover, entry resembling that reflected in the record evidence would benefit some class members, harm some, and have no effect on others. Class certification should be denied for this reason as well. *Valley Drug*, 350 F.3d at 1191.

## B.    Even Using Plaintiffs' Flawed Entry Assumptions, Their Own Models Mask Winners And Losers In Other Ways

Even accepting Plaintiffs' unrealistic entry assumptions, Plaintiffs cannot prove classwide impact with common evidence. As explained in Fact Section I, the underlying premise of their theory—that more competition always means better rates—is incorrect. A new entrant can reduce insurers' bargaining power with subscribers, driving premiums down and in turn putting pressure on insurers to *reduce* provider reimbursement rates. But a new entrant can also reduce insurers' bargaining power with providers, resulting in higher reimbursement rates that put pressure on insurers to *raise* subscriber premiums. Which direction premiums and reimbursements ultimately go depends on local market characteristics. Thus, the effect of entry on premiums and reimbursements is not a question that can be answered with common evidence.

Plaintiffs experts' analyses impermissibly gloss over the individualized variation—and the losers—associated with entry. Providers' expert masks these zig-zag effects by using averages, which is impermissible as a matter of law. As for Subscribers, Dr. Pakes misapplies Trish and Herring's results by assuming an entrant does not compete for self-insured business. But Dr. Trish herself explains how this manipulates their analysis in Subscribers' favor, and

59

defies common sense, rational economic theory, and insurers' actual practice. When Trish and Herring's results are properly applied, they disprove Dr. Pakes' hypothesis and demonstrate that even broad entry would *increase premiums* for large portions of the proposed Subscriber class. In short, Plaintiffs' own models disprove their claim of classwide impact.

### 1.   Providers' Model Masks Winners And Losers With Averages

"Averaging masks the differences and by definition glides over what may be important differences" among class members. *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 494 (N.D. Cal. 2008). Accordingly, it is a "fundamental flaw" for an expert to rely on averages to show adverse impact: "[e]ven if one assumes the average [price] was reduced by the alleged conspiracy, that would not mean that all members of the proposed class suffered a reduced [price]." *Reed v. Advocate Health Care*, 268 F.R.D. 573, 591 (N.D. Ill. 2009). Yet this is exactly what Dr. Haas-Wilson did here. She admits her analyses "illustrate the relationship between the *average* [insurer market share] and the *average* . . . hospital prices paid by [insurers]." Haas-Wilson ¶ 414 (emphasis added). For the reasons discussed below, Dr. Haas-Wilson's *averages* do not reliably show entry would increase rates for all or nearly all providers.

*First*, Dr. Haas-Wilson assumes that entry would benefit Providers because entry would supposedly lower BCBSAL's market share and thereby allow Providers to negotiate higher reimbursement rates. However, looking behind Dr. Haas-Wilson's averages reveals that in 15 states—including Alabama—*lower Blue share is associated with lower inpatient reimbursement rates*. Ordover ¶ 250. The chart below shows the significant state-to-state variation in the relationship between share and reimbursement rates (solid bars represent statistically significant values; positive values indicate that lower Blue share is associated with lower inpatient rates):

**Haas-Wilson Hospital Pricing Model—Effect of Blue Share on Inpatient Reimbursement Rates Unpooled by State**



Source: Haas-Wilson Report production.

Ordover ¶ 250, Figure 38.  The results for Alabama suggest that, for the median hospital in Alabama, inpatient reimbursement rates would decrease by about 0.4% for every 10% drop in BCBSAL's market share.[40]  *Id.* ¶ 250.  In other words, according to Dr. Haas-Wilson's own model, entry that reduces BCBSAL's share would result in providers being *harmed* by reimbursements going *down* not up.  This is precisely why courts reject the use of sweeping averages like Dr. Haas-Wilson's:  they mask substantial variation.

*Second*, even these state-wide estimates conceal significant variation across hospitals within each state.  When Dr. Haas-Wilson's regression results are applied to each hospital in Alabama, they indicate that *60.4% of Alabama hospitals would receive lower inpatient*

---

[40] For outpatient services, there is no statistically-significant relationship between BCBSAL's share and Alabama general acute care hospital reimbursement rates.  Ordover ¶ 250.

*reimbursements if BCBSAL had a lower market share*:



Source: Haas-Wilson Report production.

Ordover ¶ 255, Figure 40.  Thus, Dr. Haas-Wilson's own model shows that more than half of the proposed hospital class would be *worse off* upon entry by a Blue or Green Plan.

Dr. Haas-Wilson's model use of "averages and aggregations" improperly masks substantial variation and individualized issues that predominate.  *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. at 159.  It does not support her conclusion that Alabama entry would cause hospital prices to rise for all or almost all hospitals in Alabama.  Class certification should be denied, therefore, because entry would result in winners and losers, and identifying which hospitals were in which category would require an individualized inquiry.  *See, e.g., Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009) (no predominance where liability determinations "turn upon highly individualized facts").

62

### 2.    Dr. Pakes' Regression Model Masks Winners And Losers By Incorrectly Applying Trish And Herring

Dr. Pakes' analysis of entry's effect on premiums relies in part on Trish and Herring's reduced form regression, which according to Dr. Pakes is "the best one in the business." DX262, Pakes Dep. at 279:23-281:6. As Dr. Trish explains, however, Dr. Pakes used "deeply flawed assumptions" when applying their results, Trish ¶ 46, which renders his analysis unreliable. When these flawed assumptions are corrected, running the Trish and Herring regression shows that entry would cause premiums to increase for huge swaths of the proposed class.

Trish and Herring's reduced form regression evaluates the effect of increased insurer concentration on the subscriber and provider sides of the market. On the subscriber side, increased insurer concentration in the fully-insured segment can theoretically increase premiums on average. *See id.* ¶¶ 5, 15. When analyzing the relationship between insurer concentration and premiums on the subscriber side of the market, Trish and Herring considered only insurer concentration in the fully-insured segment because only fully-insured accounts pay traditional premiums. *Id.* ¶¶ 24-27.

On the provider side, however, increased concentration may improve an insurer's bargaining position with providers, which can lead to lower average provider rates that are then passed through to consumers in the form of lower average premiums. *See id.* ¶¶ 6, 18, 20. Importantly, on the provider side, an insurer's entire book of business—both fully-insured and self-insured accounts—affect reimbursement rates. *See id.* ¶¶ 28-29, 44, 47. This is because providers value access to potential patients regardless of whether it is the insurer or patient's employer that would pay the final bill. *See id.* ¶ 28.

Empirically, Trish and Herring found that these competing effects offset almost perfectly. *Id.* ¶ 33. Dr. Pakes failed to properly apply Trish and Herring's analysis, however, because he

assumed that an entrant would compete for fully-insured business *only*.  DX263, Pakes Merits Dep. at 85:5-87:22.  In reality, insurers compete for both fully-insured and self-insured business simultaneously.  Trish ¶ 52.  For example, of the five neighboring Blues that Dr. Pakes describes as likely entrants, four have a majority of their membership in self-insured accounts.  The fifth, BCBS-FL, has nearly half.  *Id.* ¶ 57 & Ex. 8.  According to Dr. Trish, Dr. Pakes' unsupported assumption "suppresses the effect that increased insurer competition has on provider rates and the associated premium increases."  *Id.* ¶ 48.

Correcting Dr. Pakes' error and assuming the entrant competes for both insured and ASO business flips his conclusion.  The chart below shows the percent of geographic areas and subscribers that would see *increased* premiums if an entrant acquired 20 percent of *both* the fully-insured *and* self-insured segment.  *See* Ordover ¶ 355-56.  By 2011, more than 8% of subscribers would see increased premiums.  By 2013, *half* of the CBSAs and more than 37% of subscribers would see higher premiums.

| Year | BCBSGA Captures Subscribers from All Insurers | | BCBSGA Captures Subscribers from BCBSAL Only | |
|------|------------------|---------------------|------------------|---------------------|
|      | Share of CBSAs | Share of Subscribers | Share of CBSAs | Share of Subscribers |
| 2009 | 0.0% | 0.0% | 0.0% | 0.0% |
| 2010 | 0.0% | 0.0% | 0.0% | 0.0% |
| 2011 | 16.7% | 8.3% | 16.7% | 8.3% |
| 2012 | 25.0% | 19.7% | 16.7% | 8.4% |
| 2013 | 50.0% | 37.6% | 25.0% | 20.1% |

Source:  Pakes Class Report production.

*Id.* ¶ 356 & Table 19.  These numbers skyrocket even further when Dr. Ordover incorporates Providers' assumption that, in the but-for world, BCBSAL would not use its hosted subscribers in bargaining with providers.  With that assumption, the Trish and Herring regression shows that

100% of subscribers would experience premium increases in 2013:

| Year | BCBSGA Captures Subscribers from All Insurers | | BCBSGA Captures Subscribers from BCBSAL Only | |
|---|---|---|---|---|
| | Share of CBSAs | Share of Subscribers | Share of CBSAs | Share of Subscribers |
| 2009 | 66.7% | 80.8% | 75.0% | 84.0% |
| 2010 | 75.0% | 84.0% | 75.0% | 84.0% |
| 2011 | 91.7% | 95.4% | 91.7% | 95.4% |
| 2012 | 91.7% | 95.4% | 91.7% | 99.6% |
| 2013 | 100.0% | 100.0% | 100.0% | 100.0% |

Source: Pakes Class Report production.

*Id.* ¶ 357 & Table 20.

Put another way, properly applying Trish and Herring indicates that large portions of the Subscriber class would be *harmed* by entry. *Id.* ¶ 359 ("All in all, the empirical evidence demonstrates that competitive entry would lead to diverse effects on members of the putative Subscriber Class and would produce winners and losers."). Thus, Dr. Pakes' model does not show that all class members were injured, and class certification must be denied. *See In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *23.

**C.     Plaintiffs' Models Are Unreliable For Additional Reasons**

In addition to the fundamental flaws discussed above, Dr. Haas-Wilson and Dr. Pakes' models both are unreliable models of classwide impact for multiple other reasons.[41]

**1.     Providers' Model Proves Nothing About Hospital Prices In The But-For World**

Providers' expert Dr. Haas-Wilson does not reliably analyze what hospital prices would

---

[41] The expert reports of Dr. Haas-Wilson and Dr. Pakes, along with the expert reports of Plaintiffs' other experts, should be excluded pursuant to Defendants' *Daubert* motions. *See* Dkts. 2465 (Dr. Rubinfeld); Dkt. 2475 (Dr. Pakes); Dkt. 2476 (Dr. Haas-Wilson); Dkt. 2478 (Dr. Frech); Dkt. 2480 (Dr. Slottje). Regardless of whether they are excluded, however, the expert reports of Dr. Haas-Wilson and Dr. Pakes are too unreliable to support class certification for the additional reasons set forth in this section, which includes arguments in Defendants' *Daubert* motions as well as other arguments.

have looked like in any realistic but-for world. Her analysis primarily consists of two steps. First, her "Homed Share Model" purportedly finds that a Blue Plan's market share is about 32% lower in markets with Blue-on-Blue competition. *See* Haas-Wilson ¶ 452. Based on this model, she assumes that an entrant would take at least 34.2% of BCBSAL's market share. DX264, Haas-Wilson Dep. at 190:12-18. Second, her "Hospital Pricing Model" purportedly finds that lower insurer market share leads to higher acute care hospital reimbursement rates. *See* Haas-Wilson ¶¶ 436, 439, 444, Exhibits VIII.9 and VIII.11. In addition to the problems described in the preceding sections, this methodology fails for several additional reasons.

*First*, Dr. Haas-Wilson's methodology fails to address the relevant question: whether every member of the hospital Provider class has been injured by a lack of Blue or Green entry. Instead, Dr. Haas-Wilson estimates: (1) a general relationship between insurer share and reimbursement rates across both Blue *and third-party* commercial insurers across the entire United States; and (2) the extent to which average Blue share in areas with two incumbent Blue Plans is lower than other areas. But these general estimates are inapposite to the question of whether *de novo* entry by a Blue (or Green) in Alabama would benefit all Alabama providers.[42]

*Second*, the Hospital Pricing Model does not even attempt to account for the ways in which entry on the subscriber side of the market would affect provider reimbursement rates. As Dr. Evans explains, this failure to account for indirect network effects and "powerful feedback loops" between providers and subscribers renders plaintiffs' models unreliable for evaluating impact and damages. Evans ¶¶ 96-108. As Subscribers' experts acknowledge—and the

---

[42] Applying the Hospital Pricing Model to just Blue Plan data leads to substantially lower estimates of impact of insurer share on hospital prices, and the differences suggest it is statistically inappropriate to "pool" together Blue Plans and other insurers. *See* Ordover ¶¶ 241-42. Thus, the inclusion of third-party insurer data skews Dr. Haas-Wilson's results and renders her model unreliable. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 567 (11th Cir. 1998) ("Including data regarding transactions that were not part of the alleged conspiracy in the database skews any cumulative measurements, such as percentages or frequencies, that depend on the size and characteristics of the database as a whole and that are intended to describe the alleged conspiracy.").

literature confirms—there is an "interplay" and "interdependence" between the provider and subscriber sides of the healthcare market. *See* DX261, Rubinfeld Dep. at 103:4-13; DX262, Pakes Dep. at 254:5-10. Increased insurer competition has "countervailing effects" on the negotiated prices for hospital services. Pakes ¶ 218. While increased insurer competition tends to increase a hospital's negotiating leverage, it also can put downward pressure on reimbursements as insurers lower premiums and have less premium revenue to split with hospitals. *Id.*; *see also* DX262, Pakes Dep. at 251:2-252:4. Dr. Haas-Wilson, however, ignores these two-sided interrelationships and the downward pressure entry can thus place on reimbursements.

*Third*, Dr. Haas-Wilson fails to control for variables that fundamentally alter the results of her model. A regression's "probative value . . . depends in part upon the inclusion of all major variables." *Eastland v. Tennessee Valley Auth.*, 704 F.2d 613, 623 (11th Cir. 1983). This is because "[f]ailure to control for such factors leads to the well-known econometric problem of 'omitted variable bias.'" Ordover ¶ 257 (quoting ECONOMETRICS: LEGAL, PRACTICAL, AND TECHNICAL ISSUES (2nd ed. ABA Section of Antitrust Law, 2014) at 406-407). Here, for example, Dr. Haas-Wilson fails to control for hospital wages, a "key driver" of hospital costs that varies considerably across the country. *Id.* ¶ 258. Taking this one variable into account, the share of Alabama hospitals that would be worse off in the but-for world increases from 60.4 percent to 73.3 percent. *Id.* ¶ 260 (emphasis added). A model that fails to control for such obvious variables is inherently unreliable as evidence of common impact.

*Fourth*, with respect to the Homed Share Model, Dr. Haas-Wilson offers no economic basis for extrapolating from areas with historical, longstanding Blue-on-Blue competition—as well as different geographic characteristics and competitive dynamics—to model the impact of

Blue entry into Alabama. "Extrapolating from areas that have had historical Blue-on-Blue competition for decades to model the impact of potential Blue entry into Alabama but for the challenged rules is inherently unreliable." Ordover ¶ 265. Dr. Pakes agrees, testifying that he would not consider areas of historical Blue-on-Blue competition as "examples of what share a Blue entrant would likely capture upon entry." DX262, Pakes Dep. at 246:9-16. And for good reason: only one example of Blue-on-Blue competition involves entry by an out-of-area Blue, all but one example involve Cross on Shield competition (meaning both insurers existed in those areas before competing[43]), and all but one example involve competition that began over 24 years ago.[44] Ordover ¶ 265.

*Fifth*, the Homed Share Model conceals substantial variation across areas. *Id.* ¶ 267. In many areas with Blue-on-Blue competition, Blues have *higher* share than the average share in areas without such competition. *Id.* ¶ 268. Conversely, there are many areas with no Blue-on-Blue competition with *lower* Blue shares than the average share in areas with Blue-on-Blue competition. *Id.* & Figure 43. Haas-Wilson's use of an average is particularly inadequate because she fails to properly control for differences across areas that might affect share, like population. Ordover ¶¶ 269-70. Because the model attempts to explain all differences in Blue share across areas based on whether there is Blue-on-Blue competition, it is not a valid tool for assessing what BCBSAL's homed share would look like in the but-for world. *See Reed Constr. Data, Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014) ("[A] regression analysis must control for the 'major factors' that might influence the dependent variable.").

---

[43] In the earlier years of the Blue system, Blue Cross plans offered policies that covered hospital services, whereas Blue Shield plans offered policies that covered physician services. *See* Dkt.1353-1, Defs.' Memo. ISO Mot. for Summ. J. on Pls.' Section 1, Per Se, and Quick Look Claims ¶ 6.

[44] Notably, Dr. Haas-Wilson did not create any similar model with respect to Blue-on-Green competition. In fact, her report admits that she did not measure any impact stemming from NBE. Haas-Wilson ¶ 550.

### 2. Subscribers' Model Is Unreliable For Multiple Additional Reasons

Dr. Pakes' structural model also is unreliable for multiple additional reasons, including that (a) its pre-entry predictions are entirely detached from observed data, (b) it is based on false assumptions about non-inpatient services, (c) it fails to model impact to medium groups; and (d) it is based on flawed estimates of an entrant's brand strength.

#### a. Dr. Pakes' model is unreliable because its pre-entry predictions are entirely detached from observed data

Antitrust impact is the difference between the prices plaintiffs actually paid and the price they would have paid but for the challenged restraints. *See Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1306 (8th Cir. 1988); ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 243 (2017) ("[M]onopoly overcharge damages can be calculated . . . by determining a hypothetical competitive price, subtracting it from the actual price, and multiplying the resulting price differential by the quantity purchased."). Yet Dr. Pakes does not compare the prices BCBSAL subscribers *actually* paid with the but-for prices his model generates. Instead, he compares the prices his model *predicts* should have been charged in the absence of entry to the prices he predicts would be charged after entry. *See* Pakes ¶ 248. In other words, he compares hypothetical real-world prices to hypothetical but-for world prices. Ordover ¶ 372. This does not properly measure impact as a matter of law. *See, e.g.*, *In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *25 ("Dr. Singer's failure to account for the actual price paid, a critical factor in determining antitrust impact, renders his regressions legally deficient.").

Moreover, as a matter of economics, a structural model is only useful if its predictions actually fit observed data. Murphy ¶¶ 288-96; Ordover ¶¶ 374. Dr. Pakes concedes that, "to assess the accuracy of a structural model, the model's predictions are compared to actual market

outcomes." Pakes ¶ 213.  But Dr. Pakes' model fails this comparison, because his modeling of what prices BCBSAL (and other insurers) charged without entry are wildly inaccurate.  *See* Ordover ¶ 377-80.  Indeed, his model predicts premiums for BCBSAL that are *significantly greater* than BCBSAL's actual premiums.  For example, in the individual segment in 2010, Dr. Pakes' backup files indicate that BCBSAL's actual monthly premiums ranged from $133-$178, depending on the region.  *Id.* ¶ 378.  Yet his model predicts that BCBSAL charged much higher premiums pre-entry, in the range of $259-$281:

**Difference between Actual Premiums and Dr. Pakes' Estimated Equilibrium Premiums Without Entry (Individual)**

| Insurer | Rating Area | Actual | Predicted | % Difference |
|---|---|---|---|---|
| BCBSAL | 1 | $133 | $281 | 111% |
| | 2 | $151 | $259 | 71% |
| | 3 | $178 | $272 | 53% |
| Humana | 1 | $112 | $274 | 144% |
| | 2 | $130 | $250 | 92% |
| | 3 | $116 | $330 | 185% |
| | 4 | $138 | $294 | 114% |
| | 5 | $153 | $202 | 32% |
| UnitedHealth | AL | $157 | $115 | -26% |

Notes: Calculates premiums per member per month by dividing total monthly premiums by total members across all subscriber-plan choice combinations in Prof. Pakes' 2010 full simulation model. "Predicted" values are for Prof. Pakes' estimated pre-entry baseline equilibrium.
Source: Pakes Amended Merits Report production.

*Id.* ¶ 378 & Table 22.[45]  As Dr. Ordover concludes, the pre-entry premiums that Dr. Pakes' model calculates "bear no resemblance to actual premiums."  *Id.* ¶ 377.

[45] The small group segment was similar.  Dr. Pakes calculates BCBSAL to be the low-premium insurer in the state, with its actual premiums to range from $322-$348.  Ordover ¶ 377 & Table 21.  In contrast, Dr. Pakes' model indicates that BCBSAL should price higher, and higher than its competitors, in the range of $363-$392.  *Id.*

In addition, because the pre-entry premiums in Dr. Pakes' hypothetical marketplace differ considerably from actual premiums, the insurer shares that his model predicts also differ considerably from actual shares. *Id.* ¶ 381. For example, in Dr. Pakes' hypothetical individual segment (pre-entry), BCBSAL's share of insureds is 30.7%, almost 60 percentage points lower than BCBSAL's actual share (90.4%). *Id.* ¶ 382. And United's share in this hypothetical world is 67.3%. *Id.* That is ten times higher than United's actual share (6.6%), and twice the share of BCBSAL's hypothetical share (30.7%), when in reality BCBSAL's share is more than ten times higher than United's share:

**Actual Shares and Dr. Pakes' Estimated No-Entry Equilibrium Shares of Insureds**

| Segment | Insurer | Actual | Predicted |
|---------|---------|--------|-----------|
| Individual | BCBSAL | 90.4% | 30.7% |
| | Humana | 3.0% | 2.0% |
| | UnitedHealth | 6.6% | 67.3% |
| Small Group | BCBSAL (15-50) | 6.7% | 9.1% |
| | BCBSAL (<15) | 89.8% | 57.1% |
| | UnitedHealth | 2.7% | 26.2% |
| | Viva | 0.9% | 7.6% |

*Id.* & Table 23 (notes omitted).[46] "In sum, Dr. Pakes' hypothesized marketplace does not resemble the reality of the health insurance marketplace in Alabama, and the hypothetical BCBSAL does not resemble the actual BCBSAL." *Id.* ¶ 384.

As Dr. Ordover concludes, because Dr. Pakes' structural model is merely a "highly abstract model of a hypothetical insurance market" that "does not resemble reality," it is incapable of reliably predicting the likelihood of entry or the impact of such entry on subscribers in the real world. *Id.* ¶ 385; *see also* Murphy ¶ 294 ("large differences" between actual

---

[46] Dr. Pakes claims that his model matches observed market shares well. Pakes ¶ 213. But his test just proves the point, because the model only matches observed shares when using *actual* (as opposed to the hypothetical) premiums. *See* Ordover ¶ 383.

marketplace and the marketplace Dr. Pakes models for entry "doom any potential use of his structural model to predict the but-for world."). As Dr. Murphy explains, Dr. Pakes' "approach is equivalent to concluding that it would be profitable to open a gasoline station across the street from another gasoline station based on an assumption that the existing gas station sells gas at $2.00 per gallon, a 60 percent markup over $1.25 per gallon cost, and serves 2,000 cars per day, when in reality the existing gasoline station sells gas at $1.30 per gallon (a four percent markup) and serves 150 cars daily." Murphy ¶ 246 ("Decisions based on such a hypothetical 'actual' competitor will not help a potential entrant make a profitable decision."). Moreover, Dr. Pakes' model of a *hypothetical* BCBSAL (with high premiums and low share) says nothing about how the *actual* BCBSAL (with low premiums and high share) would respond to entry. *See* Ordover ¶ 386. Indeed, BCBSAL's *actual* response to entry may be similar to the model's prediction that United would *increase* premiums for at least some subscribers in response to entry. *Id.* Put simply, the inability of Dr. Pakes' model to accurately model observed premiums and shares means that it cannot serve as a reliable method to assess the impact of the challenged rules on members of the putative Subscriber class. *Id.* ¶ 374.

Finally, Dr. Pakes' model fails to match observed reality in one other critical respect: it predicts profitable entry though such entry has not occurred. Indeed, the significant profit opportunity that Dr. Pakes' model predicts is inconsistent with the lack of entry by Purples and Greens, and the fact that national competitors already competing in Alabama have actually *exited* the market in many cases. *See* Fact Section III.C, *supra.* This "demonstrates that Professor Pakes's model of entry is wrong. His model cannot explain actual equilibrium entry and market structures for health insurance plans and therefore cannot be a reliable basis for predicting entry and changes in market structures. That is fatal to his estimate of damages which depends on his

being able to predict reliably that profitable entry would occur absent the challenged conduct."
Evans ¶ 130; Ordover ¶ 407-411 (explaining "the model's inability reliably to predict entry.").

### b. Dr. Pakes' model is based on a false assertion about the effect of entry on non-inpatient medical costs

Dr. Pakes concedes that entry may increase premiums: if provider rates increase, so too will premiums. *See* DX262, Pakes Dep. at 250:13-18 (agreeing that "to understand the impact of the conduct on subscribers also requires understanding the impact of the conduct on providers"). However, his structural model assumes that non-inpatient hospital prices—75% of BCBSAL's claims costs—stay ***exactly the same*** after entry. *See* Pakes ¶ 176 (non-hospital provider rates are set "outside of the model and do not change in the counterfactual"). Had Dr. Pakes allowed those claims costs to increase with entry (as Providers claim they would), this would have put tremendous upward pressure on premiums. Thus, Dr. Pakes effectively manipulates the offsetting and premium increasing effect of entry—just as he did when applying Trish and Herring. *See* Evans ¶ 113 ("Since higher reimbursements result in higher premiums, all else equal, his assumptions tend to inflate his estimate of the reduction in premiums."); Ordover ¶ 403 (explaining that Dr. Pakes "artificially limits the scope of provider rate adjustments").

Dr. Pakes provides no justification for assuming that the prices BCBSAL pays for non-inpatient services would remain the same following entry other than the fact that Ho and Lee modeled non-acute care hospital providers as "lacking bargaining power." Pakes ¶ 176. The record evidence shows, however, that non-acute care hospitals may have bargaining power. *See, e.g.*, DX175, BCBSAL_0000277995 at 8 (showing that neurosurgeons collectively negotiated a smaller rate reduction than what had been proposed by BCBSAL). Moreover, Provider Plaintiffs claim that at least some professionals were harmed "through lower prices," *i.e.*, that they would be paid more in the but-for world. Providers' Br. at 25-26; *see also* Frech ¶ 33 ("[R]educed

competition has harmed . . . Non-Acute Care Hospital Providers in price and non-price ways.").

By simply assuming that all non-hospital providers are "lacking bargaining power" and holding BCBSAL non-inpatient prices constant, Dr. Pakes ignores a potential source of increased costs that would lead to increased premiums. And because Dr. Pakes' model cannot reliably predict (and does not even attempt to predict) 75% of BCBSAL's claims costs in the but-for world, it cannot reliably predict BCBSAL's premiums in the but-for world. [47]

### c. Dr. Pakes failed to model impact to medium groups

Dr. Pakes' model is unreliable because he did not model the ***medium group*** segment. Instead, he modeled the ***individual*** and ***small group*** segments in Alabama, and then extrapolated those results to the ***medium group*** segment. Pakes ¶¶ 247, 251-55. But the foundation of Dr. Pakes' structural model is his "demand model" and that demand model is expressly based on characteristics *specific to the individual and small group segments*. *Id.* ¶¶ 206, 256. Dr. Pakes asserts that his extrapolation was nevertheless appropriate because (1) important market characteristics are similar for larger small groups and medium groups, and (2) the Trish and Herring study yields similar results for small and medium groups, but neither assertion survives scrutiny. *Id.* ¶¶ 257-62.

*First*, the segments differ in a fundamental aspect of Pakes' demand model:

- **Premiums.** Medium and small group premiums are calculated differently. While small group premiums are based on the entire small group risk pool, medium group premiums are based on each group's unique claims experience. *See* Pakes ¶¶ 199-200, 202-03 (explaining that medium groups are "merit rated"); Dkt. 735, Ex. 3 to Decl. of Noel Carden, Ex. A to Defs.' Joint Br. in Supp. of Am. and Restated Mot. for Partial S.J. on Filed Rate Doctrine (filed under seal). Moreover, unlike small groups, medium group are able to negotiate premiums with insurers. *See, e.g.,* ███████

---

[47] As Dr. Ordover explains, Dr. Pakes further dilutes the possible effect of entry on reimbursements by using a weighted average of his "conditional" model, which assumes no change in reimbursements costs on entry, and his "full" model, which allows 25% of reimbursement costs to be negotiated. Ordover ¶ 404. Without any reasonable basis, he assigns the "conditional" model 80% of the weight, which combined with the assumption on non-inpatient costs means he limits the effect of entry on reimbursements to roughly 5% of their potential impact on BCBSAL's claim costs. *Id.*

Given this wide, individualized variation in premiums, Dr. Pakes' assumption that the demand model for medium groups is comparable to that of small groups is unfounded.

*Second*, Dr. Pakes contends that applying Trish and Herring's model to Alabama shows similar impact for small and medium groups. *See* Pakes ¶ 261. But Dr. Pakes misapplied the Trish and Herring study according to Dr. Trish herself. *See* Argument Section I.B.2, *supra*. Correctly applying their study shows that entry would likely have heterogeneous effects across the proposed class. *Id.* Thus, Dr. Pakes' unreliable use of Trish and Herring's model cannot show that entry would have the same effect on small and medium groups.

Dr. Pakes concedes that his extrapolation must be of sufficient "quality" to hold up. It does not and certification of the medium group subclass should be denied for this additional reason. *In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 140 F. Supp. 3d 339, 353 (D. Del. 2015), *aff'd in part, vacated in part*, 679 F. App'x 135 (3d Cir. 2017) (finding that plaintiffs could not show classwide impact where expert analysis "utilize[d] assumptions based on a modicum of data not fully representative of [the challenged] sales during the Class Period").

### d.  Dr. Pakes' model is based on flawed estimates of brand strength

Dr. Pakes improperly assigns a "brand parameter" to his hypothetical entrant that supposedly captures subscriber preferences for the entrant relative to other insurers in Alabama. Ordover ¶ 392. However, he implausibly assumes a brand strength for the entrant that is inconsistent with the survey on which he relies, and is *far* greater than other well-known insurers like Humana and United who are already operating in Alabama. *Id.* ¶ 393-94; *see also id.* ¶ 396 (noting that unreasonable brand parameter results in hypothetical entrant gaining 60% market

share in individual segment despite no real-world example of entrant having such success). If one makes a single, simple adjustment and assumes instead that the new entrant's brand strength is consistent with other Alabama insurers, the results of Dr. Pakes' model flip completely. Instead of being profitable, the net present value of entry becomes a *negative* $26 million. *Id.* ¶ 395 & Table 24. Thus, with more realistic assumptions, Dr. Pakes' model demonstrates that entry would be unprofitable. Because Dr. Pakes' model is highly sensitive to this unreasonable input, it cannot reliably measure either the profitability of entry or impact to the class.

### D. Plaintiffs' Models Are In Fundamental Conflict, Confirming That They Are Deeply Flawed

In addition to all of the problems with Plaintiffs' economic models discussed above, the models are in fundamental conflict with one another. This irreconcilable conflict confirms that the models are flawed and cannot serve as reliable evidence of classwide impact. At a minimum, it means the Court cannot certify *both* a Subscriber damages class *and* a Provider damages class because that would require the Court to make inconsistent factual findings, contrary to the Court's duty to conduct a "rigorous analysis" of Plaintiffs' models. *Electrolux*, 817 F.3d at 1234.

### 1. Plaintiffs' Models Are Inconsistent On Their Face

Subscribers' model purports to show that in the but-for world BCBSAL would have charged subscribers $505 million *less* in premiums from 2008-2013. Pakes ¶ 266, Table 28. Providers' models purport to show that in the but-for world BCBSAL would have paid hospitals approximately $1.5 billion *more* during the same time period. Ordover ¶ 52. Plaintiffs' conclusions cannot be reconciled as a matter of simple arithmetic. If one assumes that both Providers and Subscribers are correct, then BCBSAL would have operated at a massive loss for every year of the putative Class period, with average yearly losses of $265 million between 2008 and 2013, demonstrated by the pink bars in the figure below. *Id.* ¶ 53. The losses are even

greater (demonstrated by the red bars in the figure below) if one assumes that provider reimbursement increases for *both* the Acute Care Hospital Provider Class and the Non-Acute Care Hospital Provider Class, as Providers claim:



*Id.* & Figure 1 (notes omitted). BCBSAL's reserves would not come close to making up the difference, as they would run out by 2010:



77

Murphy ¶ 366, Ex. 66.  If *both* Providers and Subscribers are right, entry would have driven BCBSAL into bankruptcy and left it completely unable to pay its subscribers' medical claims.

Providers and Subscribers cannot both win.  Increasing provider payments by billions of dollars would require BCBSAL to charge higher premiums, and decreasing premiums would require BCBSAL to pay less to providers.  *See* Dkt. 2467-3, Haas-Wilson Dep. Ex. 6 at ¶ 139; Pakes ¶ 53; ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████.  "It is *not possible* to have a market equilibrium in which BCBSAL and the entrant are viable, charge lower premiums, and pay higher reimbursement rates at the levels asserted by these experts." Evans ¶ 124 (emphasis added).  The reason is simple:  the premiums collected from subscribers are used to cover payments to providers, which are passed through to subscribers at a rate of near 100%.  Ordover ¶ 335.  Plaintiffs' models are in obvious conflict, and neither supports certification of any class.[48]  At a minimum, Providers and Subscribers cannot both be right, and the Court cannot possibly certify both damages classes.

### 2. If Dr. Haas-Wilson's Model Is Correct, Subscribers Would Be Harmed By Entry

Dr. Haas-Wilson's model, which purportedly shows entry *benefitting* providers, is predicated on entry *harming* subscribers.  Indeed, inserting Dr. Haas-Wilson's predicted hospital rate increases into Dr. Pakes' structural model yields substantial premium *increases* for BCBSAL's subscribers following Blue or Green entry.  Ordover ¶ 416.  In particular, individual premiums would increase following entry by 11-12% while premiums for groups of up to 15 would increase by 18%:

---

[48] As Dr. Evans explains, Plaintiffs' models conflict because their assumptions on the impact of the challenged conduct on reimbursement rates "stand in stark contrast" to each other.  Evans ¶ 115.  "These differences arise mainly because each expert has made contradictory assumptions regarding cross-side interdependencies that result in inflating the alleged price effects in ways that benefit their side of the platform [.]" *Id.* ¶ 117.

**Premium Impacts under Dr. Haas-Wilson's Predicted Hospital Reimbursement Rates in Dr. Pakes Conditional Simulation Model in 2010**

| Segment | Insurer | Rating Area | Blue Entry | | Green Entry | |
|---|---|---|---|---|---|---|
| | | | Dr. Pakes' Model | Dr. Haas-Wilson's Price Increases | Dr. Pakes' Model | Dr. Haas-Wilson's Price Increases |
| Individual | BCBSAL | 1 | -6% | 12% | -6% | 12% |
| | | 2 | -6% | 12% | -5% | 12% |
| | | 3 | -6% | 11% | -6% | 11% |
| Small Group | BCBSAL (15-50) | 1 | -7% | 4% | -7% | 4% |
| | | 2 | -8% | 4% | -7% | 4% |
| | | 3 | -5% | 6% | -5% | 6% |
| | BCBSAL (< 15) | State | -1% | 18% | -1% | 18% |

Notes: Dr. Pakes' model results are taken directly from Dr. Pakes' 2010 conditional simulation results. "Dr. Haas-Wilson's Price Increases" apply Dr. Haas-Wilson's average price increases across hospitals for in-patient and out-patient costs to BCBSAL's actual costs in the post-entry world calculated in Dr. Pakes' 2010 conditional simulation runs. BCBSAL results in the small group segment are split for groups with less than 15 subscribers and groups with 15-50 subscribers as in Dr. Pakes' model.
Sources: Pakes Merits Report production, Haas-Wilson Report production.

*Id.* ¶ 416 & Table 27; *see also* Evans ¶ 121 (Dr. Haas-Wilson's rate increases would force BCBSAL "to make changes that would adversely affect subscribers by, for example, increasing premiums and/or raising deductibles."). Put simply, if Dr. Haas-Wilson's model is correct, then subscribers would be significantly *harmed* by Blue and Green entry, demonstrating the fundamental flaws in Plaintiffs' inconsistent economic models.

> **3.    If Dr. Pakes' Model Is Correct, Providers Would Be Harmed By Entry**

Dr. Pakes' model, which purportedly shows entry *benefitting* subscribers, is similarly predicated on entry *harming* providers. For example, his structural model predicts that entry would cause reimbursement to hospitals to *decrease* in 2009, 2011, 2012, and 2013:

**Summary of Dr. Pakes' and Dr. Haas-Wilson's Predicted Changes in Inpatient Reimbursement Rates at GAC Hospitals in BCBSAL's Network**

| Year | Dr. Pakes | | | Dr. Haas-Wilson | | |
|---|---|---|---|---|---|---|
| | Mean | Minimum | Maximum | Mean | Minimum | Maximum |
| 2008 | 0.4% | 0.0% | 0.9% | 13.0% | 9.4% | 19.3% |
| 2009 | -1.1% | -1.6% | -0.7% | 13.0% | 8.9% | 20.2% |
| 2010 | 1.0% | 0.5% | 2.0% | 13.0% | 9.5% | 20.5% |
| 2011 | -2.0% | -2.4% | -1.5% | 12.6% | 9.3% | 18.7% |
| 2012 | -1.4% | -2.6% | -1.0% | 12.7% | 9.2% | 18.2% |
| 2013 | -1.0% | -2.0% | -0.6% | 13.0% | 9.2% | 18.0% |

Notes: Dr. Pakes' predicted change in hospital prices are calculated by subtracting baseline no-entry inpatient reimbursement rates from those upon blue and green entry under Dr. Pakes' full simulation model. Dr. Haas-Wilson's predicted change in reimbursement rates are summarized across inpatient services reimbursement rates predicted in her analysis.
Sources: Pakes Merits Report production; Haas-Wilson Report production.

Ordover ¶ 414 & Table 26; *see also* Pakes ¶ 53; DX262, Pakes Dep. at 45:9-19, 46:16-21 (If BCBSAL reduced premiums in response to entry, this "would be expected to force it to re-examine its reimbursement and other policies that affect its costs."). In other words, if Dr. Pakes' model is correct, then providers would be *harmed* by Blue and Green entry, showing yet again the fundamental flaws in Plaintiffs' inconsistent economic models.

### E.    Providers Present No Basis For Finding Classwide Impact To The Non-Acute Care Hospital Provider Class

Providers' request to certify a damages class of Non-Acute Care Hospital Providers should be denied for the additional reason that Providers do not even attempt to show that all members of that proposed class were paid less because of the challenged rules. Dr. Haas-Wilson's analysis applies only to members of the Acute Care Hospital Provider Class. *See* Haas-Wilson ¶ 398. Providers admit that they have no empirical evidence that all members of the Non-Acute Care Hospital Provider Class suffered impact. *See* DX265, Frech Dep. at 113:7-17 (testifying that "[f]or the nonhospitals, we don't really have an empirical analysis to see how" they were impacted; it is just "based on . . . theory."); DX264, Haas-Wilson Dep. at 64:5-73:5 (testifying that she could not identify data sets that would allow her to apply her model to

professionals or facilities other than general acute care hospitals).  This omission in and of itself precludes Rule 23(b)(3) certification.  *See In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *23 ("Equally fatal to certification is that Direct Purchasers offer no methodology for demonstrating antitrust impact on members of Group C of the putative class."); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. at 496 ("Dr. Teece may not meet his burden by simply stating that 'economic theory' dictates that prices for retail and wholesale purchases generally go up together.").

Citing non-antitrust cases,[49] Providers argue that "individual damage calculations generally do not defeat a finding that common issues predominate."  Providers' Br. at 34 (quoting *Brown*, 817 F.3d at 1239).  But this is not just a damages problem.  Impact is an essential element of antitrust liability, and Providers must establish at the class certification stage that common evidence can be used to show it classwide.  For the Non-Acute Care Hospital Provider Class, Providers have no more than "theoretical assertion[s]," which are "insufficient" to establish predominance.  *In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *23.  Further, Providers' theoretical assertions of classwide impact to the Non-Acute Care Hospital Provider Class are demonstrably wrong for the same reasons discussed above with respect to the hospital class—entry would result in winners and losers among Alabama non-hospital providers.  *See* Argument Sections I.A and I.B, *supra*.[50]  Certification should be denied for all these reasons.

---

[49] *See, e.g., Brown,* 817 F.3d at 1231 (consumer fraud and warranty claims); *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 981 (11th Cir. 2016) (consumer fraud claims); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1246 (11th Cir. 2004) (RICO and ERISA claims).

[50] Providers also cannot establish predominance as to the Non-Acute Care Hospital Provider Class because the class lumps together hundreds of non-interchangeable types of providers from ambulatory surgical centers to psychiatrists to skilled nursing facilities spanning all parts of the state. Wu ¶ 28; *see also* Ordover ¶¶ 84-87.  Providers are wrong in their cursory assertion that this lack of homogeneity can be cured through the use of subclasses and additional class representatives.  Providers' Br. at 2 n.5.  As the Eleventh Circuit held in *Sacred Heart Health Sys, Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159 (11th Cir. 2010), the use of subclasses cannot establish predominance where, as here, the variations among class members would require a large number of subclasses.  *Id.* at 1176 ("Common sense tells us that the necessity of a large number of subclasses may indicate that common

**F.      Plaintiffs Fail To Show Classwide Impact For Additional Reasons**

      **1.      Providers Do Not Show That Their BlueCard Claim Is Subject To Classwide Treatment**

Providers fail to show that their BlueCard claims are capable of common proof.  The Court explained that "[t]he cooperative integration at the heart of the Bluecard program" is subject to the rule of reason.  *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1276 (N.D. Ala. 2018).  Providers must therefore present evidence relating to "(1) properly defined product and geographic markets; (2) actual or potential harm to competition in each of those properly defined markets; and (3) a balancing of procompetitive benefits against that purported anticompetitive harm," and "address, at the class certification phase, whether these rule of reason issues are capable of common proof."  *In re Blue Cross of Blue Shield Antitrust Litig.*, 2018 WL 3326850, at *5 (N.D. Ala. June 12, 2018).  They have not done so.

As discussed below, Providers provide only cursory analysis on the first two points, and *entirely* fail to analyze whether BlueCard's procompetitive balancing is subject to common proof.  *See* DX264, Haas-Wilson Dep. at 231:2-10 ("analysis of the list of potential procompetitive benefits" was not part of her assignment).

*First*, even though the Court previously noted that "the broad markets and sub-markets alleged by Providers place additional burdens on them at [] class certification," *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2017 WL 2797267, at *9 n.5 (N.D. Ala. June 28, 2017), Providers do not provide a reliable methodology for showing that relevant product and geographic markets are provable with common evidence.  Their suggested product market, for example—"the purchase of goods and services from healthcare professionals and facilities by commercial buyers," (Providers' Br. at 19-20, citing Haas-Wilson ¶¶ 236-238)—

---

questions do not predominate.") (internal quotation marks and brackets omitted).

lumps all manner of healthcare facilities, doctors, and services together into a single market. But as Dr. Wu explains, "[t]he product dimension . . . focuses on the product characteristics that render two products substitutable from a buyer's perspective." Wu ¶ 18. If buyers cannot substitute between two products, e.g., between family practice services and healthcare services provided by oncologists, then these products are in separate markets. *Id.* ¶ 34; *see also Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."). Dr. Haas-Wilson provides no basis for ignoring these concepts— her inclusion of "hundreds of different groupings of products" is seemingly arbitrary, and her testing "is not useful in distinguishing which healthcare services are viewed as substitutable and therefore ought to be included in the same market." Wu ¶ 38.

Providers also fail to provide support for their suggestion that the geographic market here could be simply "Alabama," (Providers' Br. at 19-20), and their alternative reliance on counties or CBSAs, *id.* at 20 (citing Haas-Wilson ¶ 248) ignores market realities showing that many healthcare providers do not draw patients largely from zip codes in only their own county or CBSA. Wu ¶¶ 61-65; *see also id.* ¶ 65 (noting that reliance on geopolitical boundaries like CBSAs and counties is "handy, but probably economically meaningless").[51] Geographic markets, while generally local, vary by provider type and would likely need to be determined on a provider by provider basis. *Id.* ¶ 55. For example, patients usually seek out "the closest emergency room," even though they may "travel great distances to get non-routine healthcare

---

[51] *See also, e.g., Q Club Resort & Residences Condo. Ass'n, Inc. v. Q Club Hotel, LLC*, No. 09-CV-60911, 2010 WL 11454483, at *2 (S.D. Fla. Jan. 6, 2010) ("The geographic market must both correspond to the commercial realities of the industry and be economically significant, ... and include the area in which consumers can practically seek alternative sources of the product.") (internal quotations and citations omitted); *In re Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*, No. 09-ML-2048-C, 2011 WL 6826813, at *12 (W.D. Okla. Dec. 28, 2011) (rejecting plaintiffs' proposed market definition because it required the court to "ignore the economic reality that Cox customers fact different options depending on where they live").

services like a complex surgery." *Id.* ¶ 56. Thus, "markets for specialists tend to be larger than those for primary care." *Id.* ¶ 67. Put simply, people travel different distances for different types of healthcare services—but Dr. Haas Wilson ignored this basic reality altogether in her simplistic "market" analysis. Accordingly, her model fails to establish that the relevant geographic market(s) is provable with common evidence. *See Malaney v. UAL Corp.*, 434 F. App'x 620, 621 (9th Cir. 2011) (rejecting proposed "national market in air travel" where "a flight from San Francisco to Newark is not interchangeable with a flight from Seattle to Miami"); *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 350 (5th Cir. 2012) (denying certification of nationwide class because "the correct geographic market is localized and not nationwide.").[52]

*Second*, balancing BlueCard's pro-competitive benefits in the relevant markets would inject additional issues into the rule of reason analyses that require individualized analysis and are not capable of classwide proof. BlueCard has procompetitive benefits—to subscribers and the Blues, who benefit from having a competitive option satisfying out-of-area coverage needs— and also to Providers themselves. Murphy ¶¶ 136-45. Most notably, BlueCard "increase[s] the prospect of higher patient volume for providers," *id.* ¶ 143, ***allowing providers to do business with more patients.* See, e.g.** ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████. The potential loss of volume—which would vary by provider—was *not* considered or even acknowledged by Dr. Haas-Wilson.

BlueCard also dramatically reduces providers' administrative burdens. *See* ███████████

---

[52] Market power also varies by provider and would need to be considered on an individualized basis. For example, Agency guidelines would classify the market for cardiologists in Albertsville as "highly concentrated," but "chiropractors in the same CBSA have an HHI of just above 1,500 (moderately concentrated according to the Agencies)." Wu ¶ 49. The same is true of different health facilities: UAB is not the same as and exercises different market power than a smaller county hospital. *See* Fact Section II.A, *supra.*



. Rather, the record shows that the value of administrative efficiency would inevitably vary across the putative class, and may for example be especially critical to smaller putative class members. *See, e.g.,* ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████. Losing that efficiency thus gives rise to winners and losers in the proposed class, making class treatment inappropriate. *See, e.g., Valley Drug,* 350 F.3d at 1189.

### 2. Plaintiffs Cannot Rely On Supposed "Non-Price Harms" To Satisfy Their Burden Of Showing Classwide Impact With Common Evidence

Recognizing the fatal flaws in their economic models, Plaintiffs argue that various "non-price harms" also show common impact and satisfy the predominance requirement. *See, e.g.,* Providers' Br. at 31 (providers have been denied the opportunity to use "different and innovative contracting methods"); Subscribers' Damages Br. at 14 ("anti-competitive effects" include "denial of consumer choice" and "lack of innovation"); *see also* Subscribers' Injunctive Br. at 16-18. This argument fails for multiple reasons.

#### a. Plaintiffs' alleged non-price harms are not antitrust injury and cannot support a non-speculative calculation of damages

Plaintiffs are wrong that "[r]estrictions on choice resulting from an antitrust violation constitute both Article III and antitrust injury." Providers' Br. at 32. The cases they rely on make clear that they confuse the question of antitrust *violation* with the question of antitrust *injury.*[53] "Proof of a violation of the Sherman Act standing alone does not establish civil liability

---

[53] *See Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 528 (1983) (quoted portion on "free choices" comes from Court's analysis of whether defendant committed an antitrust violation); *U.S. v. Gen. Motors Corp.,* 384 U.S. 127, 144 (1966) (same); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons,* 340 U.S. 211, 213 (1951) (same); *Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia,* 815 F.2d 1407, 1417 (11th Cir. 1987) (same).

under [§] 4 of the Clayton Act.  There must under [§] 4 be proof of 'injury to business or property' before a Sherman Act violation becomes cognizable as a private civil remedy." *State of Ala. v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 317 (5th Cir. 1978).  Multiple courts have rejected the notion that amorphous claims of reduction in choice constitute antitrust injury.

For example, in *In re Graphics Processing Units Antitrust Litig.*, a district court rejected a nearly identical claim that "lower quality, less choice, and reduced innovation" constituted "cognizable antitrust injury." 253 F.R.D. at 507.  To satisfy Section 4 of the Clayton Act, the court held, plaintiffs "must demonstrate that they paid a higher price . . . than they otherwise would have paid . . . ." *Id.*  Here, for example, Providers must demonstrate that they received less reimbursement and Subscribers must show they paid too much for their policy in order to satisfy the injury requirement.  They cannot rely on allegations of reduced choice alone.

Similarly, in *Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006), the Fourth Circuit rejected claims based on non-price harms similar to those Providers and Subscribers allege here. The *Kloth* plaintiffs alleged that Microsoft had engaged in anticompetitive conduct that caused them injury by "denying them the benefit of new and superior technologies." *Id.* at 318.  The Fourth Circuit held that such alleged injuries did not constitute the "direct antitrust-type injury" sufficient to confer standing under Section 4 of the Clayton Act.  In particular, the Court observed that:

> It would be entirely speculative and beyond the competence of a judicial proceeding to create in hindsight a technological universe that never came into existence. . . . It would be even more speculative to determine the relevant benefits and detriments that non-Microsoft products would have brought to the market and the relative monetary value . . . to a diffuse population of end users.

*Id.* at 324 (internal quotation marks and citations omitted).

The *Kloth* plaintiffs' claim that Microsoft denied them "the benefit of new and superior technologies" is the same as Providers' assertion that Defendants have denied them

86

"opportunities to practice medicine using different and innovative contracting methods." Providers' Br. at 31. The Fourth Circuit's rationale for rejecting that type of claim applies equally well here. It would be "entirely speculative and beyond the competence of a judicial proceeding" to determine what sort of "different and innovative contracting methods" supposedly would have been available to Provider class members in the but-for world. *Kloth*, 444 F.3d at 324. And it would be "even more speculative to determine the relevant benefits and detriments" that any entrant would have brought to the market or their "relative monetary value" to the "diffuse population" of Alabama providers. *Id.* Providers' purported harms amount to nothing more than "generalized or abstract societal harms" because, at least as to the non-price harms, Providers "occupy a position no different from any other" provider who has not "practice[d] medicine using different and innovative contracting methods."

None of the cases Providers cite stands for the proposition that reduced choice—without some ascertainable financial injury—is sufficient to constitute antitrust injury. Providers' lead case on this issue is *Ross v. Bank of Am., N.A.*, 524 F.3d 217 (2d Cir. 2008), in which the Second Circuit held that plaintiffs had sufficiently alleged *Article III injury* based on the allegation that the plaintiffs had received "objectively less valuable cards than would otherwise have been the case." *Id.* at 224. *Ross* is inapposite for two reasons. First, "[a]ntitrust standing requires more than the 'injury in fact' and the 'case or controversy' required by Article III of the Constitution." *Fla. Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997). Second, Providers do not argue, let alone show, they can prove on a classwide basis that they were forced to take contracts "objectively less valuable" than would otherwise have been available.[54]

---

[54] *In re Currency Conversion Fee Antitrust Litig.*, No. 05 Civ. 5116, 2009 WL 151168 (S.D.N.Y. Jan. 21, 2009), the district court opinion on remand from *Ross* that Providers also cite, is similarly distinguishable. *See id.* at *4 (finding antitrust standing where mandatory arbitration provision in credit card agreement reduced "both Plaintiffs' choice *and the quality* of credit cards they received." (emphasis added)). Although the district court found on

Subscribers' cases are equally unpersuasive. For instance, Subscribers primarily cite to an FTC enforcement action (*F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986)) for the proposition that loss of "consumer choice" bestows antitrust standing (*see* Subscribers' Injunctive Br. at 18), yet fail to acknowledge that enforcement actions *do not require a showing of antitrust impact.* Subscribers also support this contention with reference to *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). Subscribers' Injunctive Br. at 18. But "impact [to the plaintiff]" in the form of "pecuniary injury" was "not disputed" in that case. *Id.* at 607. *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384 (S.D.N.Y. 2015) also is distinguishable because the court specifically recognized that class certification would have been inappropriate if the putative class included members that "either (1) saw no effect or (2) received a benefit without any downside" from the challenged conduct. *Id.* at 401. Those conditions exist here. *Laumann* also is incompatible with the law in this Circuit, in-so-far as it rejects the reasoning of *Valley Drug* (and other courts) regarding the propriety of certifying a class that includes both winners and losers. *Id.* at 402 n.67, 405 (addressing *Valley Drug*, among other cases, and concluding that "even if this case were indistinguishable from others where courts have embraced the winners and losers logic, there is still good reason to reject that logic").

For all these reasons, Plaintiffs' purported non-price harms do not satisfy the antitrust standing requirement and cannot establish classwide impact. *See Atl. Richfield Co.*, 495 U.S. at 339 n.8 (antitrust injury requirement not shown by "broad allegations of harm to the 'market' as an abstract entity" because "not every loss stemming from a violation counts as antitrust injury").

### b. The supposed non-price harm is an individualized issue

Plaintiffs' non-price harm arguments also fail because whether any specific provider or

---

remand that the plaintiffs did have antitrust standing, it did so in part based on the fact that the plaintiffs requested only injunctive relief, so damages calculations were not an issue. *Id.* at *3-4. That is not the case here.

subscriber would see non-price benefits from entry is an individualized issue, not a common one, for all of the same reasons discussed above relating to price effects. *See* Argument Section I.A, *supra.* This is amply demonstrated by . *See* Fact Section IV.C, *supra.*

. They are clear losers in Plaintiffs' but-for world.

An entrant that is only interested in "cream skimming" the healthiest subscribers likewise does not create more choice for less healthy subscribers. Rather, less healthy subscribers receive (at most) an option to purchase a product they have no interest in and higher prices for the product they actually want—assuming that product remains available.

Plaintiffs have not analyzed whether non-price effects would be realized classwide. Providers' expert testified that he had not concluded that all of the hospitals in Alabama have suffered a reduction in choice, admitting "that would be quite an analysis that would get you to all." DX265, Frech Dep. at 78:25-79:25; *see also id.* (admitting he could not rule out the possibility that some class members were not injured in non-price ways because his analysis was only "qualitative."). And Subscribers' expert admitted that supposed "innovations" could impact different subscribers in different ways. DX262, Pakes Dep. at 87:17-21 (agreeing that "the effect of those innovations on subscribers could vary, depending on a variety of circumstances that [he] didn't evaluate"). He did no formal analysis of whether the Blue rules have actually caused non-price harms in Alabama and would need additional information even to attempt such an analysis.

*See* DX262, Pakes Dep. at 85:16-86:8.

Plaintiffs also have not explained how the Court could begin to quantify the damages resulting from the alleged non-price harms, either individually or across the class. Attempting to calculate damages based on alleged non-price harms would devolve into a complex and individualized set of mini-trials, which precludes a finding of predominance. *See Brown*, 817 F.3d at 1240 (individual damages "defeat predominance if computing them 'will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable'").

### 3. Whether A Subscriber Class Member's Damages Claim Is Barred By The Filed-Rate Doctrine Is An Individualized Issue

Individualized issues also predominate for the Subscriber class because whether a member of the proposed class has a cognizable injury cannot be determined without addressing the filed rate doctrine. In its February 23, 2017 ruling, the Court held that "Defendants are entitled to judgment as a matter of law on the antitrust damages claims of those Plaintiffs who paid rates that were actually filed with the DOI and approved by the DOI." Dkt. 997 at 18. Conversely, the filed rate doctrine would not apply to policyholders charged "a rate higher than that approved." *Id.* at 22. Determining whether an individual or small group subscriber can assert a damages claim will require an individualized inquiry to show that (i) the applicable filed rate for that subscriber for each year of the class period is less than (ii) the premium the subscriber actually paid in each of those years. Thus, common issues do not predominate. *See, e.g., Scott v. First Am. Title Ins. Co.*, 276 F.R.D. 471, 483 (E.D. Ky. 2011) (denying certification because determining whether class members "paid a premium that 'exceeded' filed rates necessitates an intensive fact-finding mission").

Further, despite the Court's prior ruling, Subscribers seek to certify a class asserting damages claims on behalf of all class members against Blue Plans other than BCBSAL based on

the difference between (a) the premiums they actually paid to BCBSAL and (b) the lower rates they allegedly would have paid to the other Blue Plan(s) they claim would have entered and sold insurance in Alabama absent the challenged licensing restrictions.   *See, e.g.,* Subscribers' Damages Br. at 16 (stating that damages for class members are "based on 'the difference in premiums that the subscriber paid and the premiums that would have been paid in the counterfactual world with entry'" (citing SX415 (Dkt. 2453-24) Pakes ¶ 264)).   This damages theory is barred by the February 23 Order, and for the reasons previously articulated (see Dkt. 1061), the Subscribers' effort to revisit this issue on class certification should be rejected.

Regardless, Subscribers cannot certify a class on this alternative damages theory.  Under the filed rate doctrine, "a consumer is not injured when it pays a legally filed rate."  *Cole's Wexford Hotel, Inc. v. UPMC*, 127 F. Supp. 3d 387, 409 (W.D. Pa. 2015).  Subscribers' theory therefore requires common proof that (i) the entrant would not be subject to the DOI's rate filing requirements; (ii) the entrant would have offered health care coverage to the subscriber at a reduced rate; (iii) and the subscriber would have switched from BCBSAL to the entering Plan.

Determining who would have switched from BCBSAL to a hypothetical new entrant raises individualized issues that predominate over any common ones.  The district court in *Cole's Wexford Hotel* rejected an almost identical attempt by subscriber plaintiffs to certify a damages class that similarly tried to avoid the impact of the filed rate doctrine.  127 F. Supp. 3d at 411. The court recognized that determining whether class members would have switched to another option but for the alleged conspiracy would introduce an "individualized inquiry of antitrust impact for each class member [that] would inevitably overwhelm the common questions of law and fact in this case."  *Id.*  Class certification should be denied for the same reasons here.

### 4.   Whether A Non-Acute Care Hospital Provider Class Member's Claim Is Barred By The *Love* Settlements Is An Individualized Issue

Individualized issues also predominate for the Non-Acute Care Hospital Provider Class because it includes putative class members whose damages claims are subject to varying, fact-intensive affirmative defenses arising from the prior *Love* litigation.[55] Establishing whether any individual provider's claims are released requires an analysis of that provider's claims history because membership in a particular *Love* settlement class depends on whether individual "Physicians, Physician Groups and Physician Organizations provided Covered Services to Plan Members" of different Defendants during different periods of time.[56] This individualized factual inquiry would predominate over common issues, thus precluding certification of the Non-Acute Care Hospital Provider Class. *See Brown*, 817 F.3d at 1241 (predominance may be defeated where "the affirmative defenses could apply to the vast majority of class members and raise complex, individual questions"); *Sacred Heart Health Sys.*, 601 F.3d at 1183 ("[T]he trial court would be required to evaluate significant quantities of individualized extrinsic evidence associated with Humana's affirmative defenses, and the hospitals' response to those defenses would implicate even more such individualized evidence").[57]

---

[55] Providers who fall within the settlement classes in the *Love* Settlement Agreements are barred from pursuing claims in this action against any Defendant who was a party to any of those agreements. *See, e.g.*, October 17, 2018 Memorandum Opinion and Order (Dkt. 2324) (the "Release Decision") ("Providers' claims in this MDL fall squarely within the scope of the Love releases[.]"). In its Release Decision, the Court also refused to strike affirmative defenses (including release and res judicata) asserted by Defendants who were not parties to the *Love* Settlement Agreements. In denying Providers' motion for partial summary judgment on this issue, the Court held that the *Love* Releases "'clearly prohibit[] Class members from initiating claims against any party, both 'Released' and 'Non-Released,' which 'arise from, or are based on, conduct by any of the 'Released Parties.'" Release Decision at 11. As a result of the Release Decision, the "Non-Released" Defendants have a variety of viable affirmative defenses and require the same fact intensive individual inquiries described above.

[56] *See e.g.*, Certain Defendants' Opposition to Provider Plaintiffs' Motion for Partial Summary Judgment (Dkt. 2221) at 3-5 (describing contours of settlement class in *Love* Blues Settlement Agreement).

[57] The fact that Providers purport to identify a single non-hospital provider who falls outside of any *Love* settlement class, Providers' Br. at 13, n.23, does not solve their predominance issues. Providers do not even attempt to articulate how the parties or the Court could identify "a subclass of medical doctors who are not subject to the *Love* release[s]" without conducting an individualized inquiry. *Id.*

## G.   Providers Fail To Show The Acute Care Hospital Provider Class Is Superior To Other Forms Of Adjudication

Providers fail to show that certification of the Acute Care Hospital Provider Class is "superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3).   Courts find superiority lacking where the proposed class consists of "sophisticated commercial parties with ready access to the resources needed to resolve disputes," *Wilmington Sav. Fund Soc'y, FSB v. Bus. Law Grp., P.A.*, 319 F.R.D. 386, 402-03 (M.D. Fla. 2017), and where "relatively large amounts of money are at stake," *In re Actiq Sales & Mktg. Practices Litig.*, 307 F.R.D. 150, 172-73 (E.D. Pa. 2015); *see also Liberty Mut. Ins. Co. v. Tribco Const. Co.*, 185 F.R.D. 533, 541 (N.D. Ill. 1999).

Both apply here:   the 106 members of the Acute Care Hospital Provider class are sophisticated commercial entities with significant resources, and Providers claim that class members are each entitled to damages ranging from $311,694 to $439,130,551 *before trebling*.[58] Thus, "[t]his is not a case where the cost associated with individual claims may require claimants with potentially small claim amounts to abandon otherwise valid claims simply because pursuing those claims would not be economical." *Krukever v. TD Ameritrade, Futures & Forex LLC*, 328 F.R.D. 649, 663 (S.D. Fla. 2018) (internal quotation marks omitted).   As a result, a class action is not superior and class certification should be denied. *Id.* (finding that the "enormous losses" of $2.2 million, $750,000, and $100,000 claimed by plaintiffs weighed against superiority).[59]

---

[58] *See* Slottje Rep., Ex. 4.   Ninety-four class members claim total damages over $1 million, fifty-one class members claim damages over $10 million, and twelve claim damages over $100 million before trebling.   *See id.*

[59] Courts also consider whether individual suits have been brought asserting similar claims at issue in the class action.   *See, e.g., In re Actiq Sales & Mktg. Practices Litig.*, 307 F.R.D. at 172–73.   As the Court knows, at least one hospital has sued a Blue Plan making the same claims that Providers press in this action.   *See* Memorandum Opinion Denying UPMC Mot. to Intervene, *Conway v. Blue Cross and Blue Shield of Alabama*, No. 2:12-cv-02532-RDP, Dkt. 604 at 2 (noting that "UPMC filed a lawsuit against Highmark and West Penn in federal court in Pennsylvania challenging, in part, the Blues' exclusive services areas and License Agreements.").

## II.   PLAINTIFFS FAIL TO MEET THE REQUIREMENTS FOR CERTIFICATION OF AN INJUNCTION CLASS

Plaintiffs also seek certification of injunctive relief classes pursuant to Rule 23(b)(2). Plaintiffs fail to meet the requirements for certification for multiple reasons.

### A.   Plaintiffs Have Failed To Show The Proposed Injunctive Classes Are Cohesive

The Court should deny Plaintiffs' request for certification of injunction classes because Plaintiffs' proposed classes are not cohesive.  The "basic premise" of Rule 23(b)(2) is that "class members suffer a common injury properly addressed by class-wide equitable relief."  *Cooper v. S. Co.*, 390 F.3d 695, 720 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006).  Thus, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to *each member of the class*."  *Dukes*, 564 U.S. at 360 (emphasis added); *see also Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*, 763 F.3d 1280, 1291 (11th Cir. 2014) (same).  And "[a]lthough Rule 23(b)(2) contains no predominance or superiority requirement, . . . 'the class claims must be cohesive.'"  *Catron v. City of St. Petersburg*, No. 8:09-CV-923-T-23EAJ, 2010 WL 917609, at *3 (M.D. Fla. Mar. 11, 2010) (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 & n.18 (3d Cir. 1998)).  A class is not cohesive if there are "conflicting interests between the members of the class."  *Catron*, 2010 WL 917609, at *3 (quoting *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983)).

Subscribers' and Providers' proposed injunction classes suffer from the same defects as their damages classes:  Plaintiffs cannot show common injury (or a threat of future injury) to all class members; to the contrary, many proposed class members would be *harmed* by the proposed injunctive relief.   Accordingly, certification should be denied because there are conflicting interests between members of the class and injunctive relief would fail to "provide relief to each member of the class."  *Lakeland*, 763 F.3d at 1291; *see also Valley Drug*, 350 F.3d at 1189, 1196

94

(reversing class certification where there were conflicts among class members).

### 1.    The Proposed Injunction Would Harm Many Subscribers

The proposed Subscriber class is not cohesive because Subscribers' desired injunctive relief would *harm* some members of the proposed class even if it would benefit others, creating obvious conflicts among class members.

*First*, the record evidence shows that if enjoining ESAs and NBE led to entry, it would cause many Alabama subscribers to pay more for their insurance.  As explained above, properly applying the Trish and Herring regression shows how even the broad entry Subscribers posit would have heterogeneous effects on members of Subscribers' proposed class—lowering premiums for some, but *increasing* premiums for many others.  *See* Argument Section I.B.2, *supra*.  And limited-scope entry with differentiated products and/or narrow networks (which Subscribers' own expert says is likely) would lead to adverse selection and higher premiums for subscribers who remain with BCBSAL.  These conflicts destroy the cohesion required for Rule 23(b)(2) certification.  *See Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) ("[A] class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class.").

*Second*, enjoining ESAs and NBE likely would lead to *fewer* insurance choices and narrower provider networks for many members of the proposed class.  ESAs and NBE incentivize Blue Plans to serve their entire service area with broad and deep provider networks and to remain in their service areas at times of low or negative margins instead of moving to more profitable areas.  *See* Argument Section I.A.2.d, *supra*.  Indeed, BCBSAL is the only insurer offering coverage on Alabama's ACA exchange outside of Birmingham, and has been the only one to do so for the last several years.  *See* Fact Section III.C.1, *supra*.  Enjoining ESAs and

NBE changes these incentives, harming subscribers who depend on BCBSAL as their only insurance option and/or prefer the exceptionally broad networks that BCBSAL is able to offer.[60] *See* Murphy ¶¶ 98-112.

*Third*, enjoining ESAs and NBE likely would adversely affect class members who rely on BlueCard. Subscribers' proposed injunction class includes *all* fully-insured subscribers to Blue Plan products, including large groups and non-ASO national accounts. These groups benefit from BlueCard because it enables their out-of-state members to access in-network coverage wherever they are. *See, e.g.,* ███████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████. Subscribers have never challenged BlueCard, but ESAs and NBE enable the kind of cooperation that makes BlueCard possible. Murphy ¶¶ 104-12. Enjoining these rules would discourage Blue plans from cooperating with one another on the BlueCard program, and harm subscribers that benefit from enhanced interbrand competition in the national account market and depend on BlueCard for provider access across multiple states.

Because the injunctive relief Subscribers seek would lead to losers within the proposed class, class certification should be denied. *See, e.g., Pickett,* 209 F.3d at 1280; *In re Intel Corp. Microprocessor Antitrust Litig.,* No. CV 05-485-LPS, 2014 WL 6601941, at *20 (D. Del. Aug. 6, 2014) (denying Rule (b)(2) certification where "a single injunction would **harm** some class

---

[60] Several named Subscriber plaintiffs testified that they chose Blue Plans over competitors because of their broad provider networks, which increase subscriber choice. *See, e.g.,* ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

members") (emphasis in original).[61]

## 2. The Proposed Injunction Would Harm Many Providers

The proposed Provider injunction classes also are not cohesive because the injunctive relief Providers seek would *harm* many proposed class members even if it would benefit others.

*First*, the record evidence shows that if enjoining ESAs and NBE led to the entry that Providers claim would occur, large portions of the proposed Acute Care Hospital Provider Class would be harmed. As explained above, properly disaggregating Providers' own hospital pricing model demonstrates that more insurer competition has varying effects on hospitals both inside and outside of Alabama. *See* Argument Section I.B.1, *supra*. Moreover, according to Dr. Pakes' structural model, Blue or Green entry would actually decrease reimbursements for hospital class members, further demonstrating that even the statewide entry Providers posit would leave many providers worse off. *See* Argument Section I.D.3, *supra*; Ordover ¶¶ 414-15.

*Second*, as explained in Fact Section IV, new entrants frequently target specific geographies and providers to contract with, rather than entering all geographies and contracting with all providers. A Blue or Green entrant in Alabama would have the same incentives. *See* Fact Section III, *supra*. While hospitals and non-hospitals included in a narrow network may benefit from volume shifting, providers excluded from the network *lose* patient volume and see their revenues decline. *See* Fact Section IV.C, *supra*. Accordingly, Providers' proposed (b)(2)

---

[61] Subscribers' efforts to rely on non-price harms to bolster their motion to certify an injunction class fall short. *See* Subscribers' Injunctive Br. at 16-18. As explained in Argument Section I.F.2.a, Subscribers cannot establish past antitrust injury based on alleged non-price harms. It follows that they also cannot pursue an injunction based on a "threat of future harm" arising out of the same alleged harms. *See, e.g., Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986) ("[I]n order to seek injunctive relief under § 16, a private plaintiff must allege threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.") (internal quotations omitted). Further, Subscribers also have not satisfied their burden of showing a classwide threat of future impact in the form of "reduced consumer choice, less innovation and efficiencies, and/or higher premiums" (Subscribers' Injunctive Br. at 17) as a result of the challenged conduct. To the contrary, because the evidence shows that an injunction would lead to fewer choices and higher prices for at least some subscribers, it would not "provide relief to each member of the class." *Dukes*, 564 U.S. at 360.

classes contain class members who would be worse off if the proposed relief were granted and are not cohesive.

*Third,* allowing providers to "opt out" of BlueCard and contract with out-of-area Blue Plans—the other form of injunctive relief sought by Providers—also would make some class members worse off by leaving "holes" in the national BlueCard network. Ordover ¶ 320. These holes would make Blue Plans less competitive vis-à-vis Purples, causing some of the Blue Plan patient volume that BlueCard currently funnels to in-network providers shifting to Purples, which in many cases have narrower networks than the Blues. *See* Fact Section IV.C, *supra.* As a result, providers who are in-network with the Blues but out-of-network with a Purple likely would end up losing patient volume. Ordover ¶ 322. Further, Purple insurers pay in-network providers at lower reimbursement rates than Blues in many cases, so even providers who are in a Purple's network could see their reimbursements decline as they treat former Blue Plan patients at the Purple's lower rates. *Id.* ¶ 323-25. Thus, allowing providers to "opt out" of BlueCard would create losers within both of Providers' proposed (b)(2) classes.

For all these reasons, the proposed injunctive relief classes contain "members who benefit from the same acts alleged to be harmful to other members of the class," and certification should be denied. *See Pickett,* 209 F.3d at 1280; *Catron,* 2010 WL 917609, at *3.

## B.    Monetary Relief Is Not Incidental To Injunctive Relief

Plaintiffs' request for certification of injunction classes also should be denied because "the monetary relief is not incidental to the injunctive or declaratory relief." *Dukes,* 564 U.S. at 360; *see also Murray v. Auslander,* 244 F.3d 807, 812 (11th Cir. 2001); Adv. Comm. Notes, 39 F.R.D. 69, 102 (1966) (Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.").

Where, as here, a plaintiff seeks *both* monetary relief and equitable relief, monetary relief

predominates "unless it is incidental to the requested injunctive or declaratory relief." *DWFII Corp. v. State Farm Mut. Auto. Ins. Co.*, 469 F. App'x 762, 765 (11th Cir. 2012); *see also Karhu v. Vital Pharm., Inc.*, No. 13-60768-CIV, 2014 WL 815253, at *11 (S.D. Fla. Mar. 3, 2014), *aff'd*, 621 F. App'x 945 (11th Cir. 2015) ("[W]hen a plaintiff seeks both monetary and injunctive or declaratory relief, a Rule 23(b)(2) class is only appropriate if the monetary relief is merely incidental to the other relief."). Monetary relief is incidental when it takes the form of a "group remedy," meaning that the "class members automatically would be entitled [to damages] once liability to the class . . . as a whole is established . . . ." *DWFII*, 469 F. App'x at 765 (quoting *Murray*, 244 F.3d at 812). However, Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 564 U.S. at 360–61; *see also Cooper*, 390 F.3d at 721 ("The 'complex, individualized determinations' necessary to fix the appropriate level of individual damage awards in this case are exactly the type that *Murray* and *Allison* make clear should not be considered 'incidental' to the claims for injunctive and declaratory relief.").

In *DWFII*, the Eleventh Circuit considered whether to certify an injunction class of healthcare providers where the providers challenged an allegedly improper practice of claims reimbursement under Florida's no fault insurance statute and sought damages. 469 F. App'x at 765. Like Plaintiffs here, the plaintiffs in *DWFII* sought certification under both Rules 23(b)(2) and 23(b)(3). *Id.* The Eleventh Circuit held that certification under Rule 23(b)(2) was improper because the damages sought were individualized:

> [I]f the class was able to prevail on its claim, each medical service provider in the class would have to establish individual facts regarding the type of services performed, the amounts billed, and the amount of reimbursement received from State Farm in order to determine its appropriate monetary recovery.

*Id.* Certification under Rule 23(b)(2) is improper here for the same reason. Plaintiffs' respective

damages models and materials submitted in support of their class certification motions make clear that Plaintiffs' alleged damages predominate and are not "incidental" to the injunctive relief they seek. And any attempt to prove damages at trial would require individualized proof just like in *DWFII*. *See* Argument Section I.A.

Further, Subscribers' co-lead counsel admitted that monetary relief is not merely incidental, stating that Subscribers would seek primarily a "damages class, which is obviously the thing that's most important to the class certification stage," whereas the injunction class, "for class certification purposes, that's much less significant." DX268, April 19, 2018 Hearing Tr. at 68:7-16; *see also Avritt v. Reliastar Life Ins. Co.,* 615 F.3d 1023, 1035-36 (8th Cir. 2010) (affirming denial of certification under Rule 23(b)(2) where "plaintiffs' counsel conceded that the case was primarily about money damages, not injunctive relief."). Similarly, Providers devoted a mere two pages of their 45-page class certification brief to their request for Rule 23(b)(2) certification, *see* Providers' Br. at 37–39, while serving a separate expert report from Dr. Slottje exclusively about damages. *See In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. at 165 ("[T]he volume of paper and amount of discovery dedicated to the monetary damages classes as opposed to the injunctive class belie any argument that injunctive relief is the primary relief sought in this litigation."). Given these facts, Plaintiffs cannot deny that monetary damages predominate and are not incidental to the injunctive relief.[62]

Subscribers assert that the Eleventh Circuit permits the "simultaneous certification of claims for equitable relief under Rule 23(b)(2) and claims for damages under Rule 23(b)(3)." Subscribers' Injunctive Br. at 29 (citing *Holmes*, 706 F.2d at 1158 n.10 and *Williams*, 568 F.3d at

---

[62] Notably, neither Subscribers nor Providers address how their requested damages are incidental to the proposed injunctive relief. *See Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 700 (S.D. Fla. 2014) (denying certification of Rule 23(b)(2) class where "Plaintiff has made no effort to demonstrate that the money damages, which appear to be the primary remedy sought, are merely incidental to the injunctive relief" and "Plaintiff dedicates a single page of her twenty-eight page motion to asserting that an injunctive class is warranted").

1359-60).  This argument fails at the threshold because Subscribers (and Providers) have failed to establish that class certification is appropriate under Rule 23(b)(3) for all of the reasons set forth above.  *See, e.g., Williams,* 568 F.3d at 1360 (directing district court to consider Rule 23(b)(2) hybrid certification only if it also certifies a class for damages under subsection (b)(3)).

Further, Subscribers' reliance on case law decided pre-*Dukes* regarding the propriety of simultaneous certification of equitable claims under Rule 23(b)(2) and damages claims under Rule 23(b)(3) is misplaced, and the cases they cite are inapposite.  To the extent the Rule 23(b)(2) discussion in *Holmes* is still valid law after *Dukes,* the *Holmes* court instructs that "the policies underlying the requirements of (b)(3) should not be subverted by recasting and bifurcating every class suit for damage as one for final declaratory relief of liability under (b)(2), followed by a class suit for damages under (b)(3)."  *Holmes,* 706 F.2d at 1158 n.10.  The Eleventh Circuit likewise warned in *Williams* that "certification under section (b)(2) is not proper in cases in which the appropriate final relief relates exclusively or predominately to money damages."  568 F.3d at 1359 (internal quotation marks omitted).  Consistent with this guidance, courts within the Eleventh Circuit have refused to certify Rule (b)(2) classes where monetary relief was not incidental to, or predominated over, the equitable relief sought.  *See In re Disposable Contact Lens Antitrust Litig.,* 329 F.R.D. 336, 410 (M.D. Fla. 2018) ("A hybrid or Rule 23(b)(2) class action is not available where the appropriate relief relates exclusively or predominantly to monetary damages.") (internal quotations and citations omitted).[63]

Because Plaintiffs' claims for monetary damages clearly predominate here, the injunction classes cannot be certified as a matter of law.

---

[63] *See also, e.g., Shamblin v. Obama for Am.,* No. 8:13-cv-2428-T-33TBM, 2015 WL 1909765, at *9 (M.D. Fla. Apr. 27, 2015) (same); *Hammett v. Am. Bankers Ins. Co.,* 203 F.R.D. 690, 695 (S.D. Fla. 2001) ("It is well-settled that declaratory or injunctive relief must be the predominant remedy requested for the class.  Rule 23(b)(2) certification is not warranted where, notwithstanding a request for injunctive or declaratory relief, the predominant relief requested is monetary.") (citation omitted).

### C. The Proposed Injunction Classes Would Be Prejudicial To Absent Class Members

Plaintiffs' request to certify injunction classes also should be denied because the proposed injunction classes are broader than their putative damages classes, risking significant prejudice to absent class members.[64] For example, while the Subscribers' damages class is limited to BCBSAL individual subscribers and groups of 2 to 199 employees, their putative nationwide injunction class includes subscribers of every other Blue Plan, as well as groups with more than 199 employees.[65] *See* Subscribers' Injunctive Br. at 2. Similarly, Providers' damages classes include only those Alabama providers who have participation agreements with BCBSAL, but their injunction classes include all Alabama providers. *See* Providers' Br. at 1, 2. Because certifying the broader injunction classes would subject absent class members to the risk their damages claims will be precluded by this litigation, Plaintiffs' request to certify injunction classes should be denied.

Subscribers dismiss the potential prejudice from preclusion, arguing that courts, including the Eleventh Circuit, have held "that participation in a Rule 23(b)(2) injunction class does not bar separate damages claims for the same alleged misconduct." Subscribers' Injunctive Br. at 29. But the Eleventh Circuit cases cited by Subscribers are inapplicable,[66] and numerous courts have

---

[64] The Court directed the parties to address this important issue. *See* Fourth Am. Sched. Order (Dkt. 2392) at 2 n.1. Providers do not even attempt to address it, simply stating in conclusory fashion that "even if the Court should, for any reason, deny certification under Rule 23(b)(3), certification of the Injunctive Relief Classes pursuant to Rule 23(b)(2) would nonetheless be warranted." Providers' Br. at 37-38.

[65] Subscribers' proposed fallback injunction class of Alabama subscribers also is broader than the proposed Alabama damages class. It similarly includes Alabama subscribers of every other Blue Plan and groups with more than 199 employees. *See* Subscribers' Injunctive Br. at 3.

[66] These cases all involved civil rights claims, and at least one court denied Rule 23(b)(2) certification based in part on expressed doubt as to whether the same principles would apply more broadly to all Rule 23(b)(2) actions. *See In re MTBE Products Liab. Litig.*, 209 F.R.D. 323, 339-40 (S.D.N.Y. 2002) (discussing *Fortner* and *Herron* and stating that "[w]hile most courts would probably extend the general rule developed in civil rights cases to tort classes, several courts have nevertheless held that the waiver or abandonment of personal injury and other claims by named plaintiffs render them inadequate as class representatives"); *see also Dukes*, 564 U.S. at 361 ("'[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant

102

denied class certification based on the risks of preclusion. *See In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 578 (E.D. Tenn. 2014) (declining to certify class; "[m]any courts have acknowledged the claim preclusive difficulties associated with injunction-only class actions").[67]

Further, even if this issue were settled in the Eleventh Circuit, there still would be a risk that a judgment by this Court on Plaintiffs' injunction claims would be given preclusive effect by a court in another circuit overseeing a follow-on damages claim. As Subscribers concede, *see* Subscribers' Injunctive Br. at 29, this risk cannot be solved with a so-called "reservation of damages," *id.* at 30, because "no court can determine the preclusive effect of its judgment in a separate, subsequent action." *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. at 578.

Finally, Plaintiffs do not address issue preclusion and the very real risk that absent class members could be prevented from re-litigating certain issues decided in the Rule 23(b)(2) action that are central to those claims. *See In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. at 579 ("Even if claim-splitting is not implicated by class actions, absent class members may be collaterally estopped from relitigating some issues in a damages action, as the *Dukes* court feared."). This mirrors a principle concern articulated by the Supreme Court in *Dukes*. In that case, the plaintiffs sought injunctive and declaratory relief, punitive damages, and backpay, while selectively omitting claims for compensatory damages. 564 U.S. at 345. Concluding that the lower court improperly certified a 23(b)(2) class, the Court highlighted the need to protect absent class members from the risk that their individual "compensatory-damages claims would

---

to capture." (internal citation omitted)).

[67] *See also, e.g., In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. at 167 (denying Rule 23(b)(2) certification after recognizing that "[t]he perils of claim preclusion when certifying a Rule 23(b)(2) class alongside Rule 23(b)(3) classes has troubled many courts, as it does this one"); *Zachery v. Texaco Expl. & Prod., Inc.*, 185 F.R.D. 230, 243–44 (W.D. Tex. 1999) ("the preclusive effect of the class action would seem to pose a very real danger that the individual class members could not then seek these damages in another lawsuit").

be *precluded* by litigation they had no power to hold themselves apart from." *Id.* at 364 (emphasis in original). The Court explained:

> If it were determined, for example, that a particular class member is not entitled to backpay because her denial of increased pay or a promotion was *not* the product of discrimination, that employee might be collaterally estopped from independently seeking compensatory damages based on that same denial. That possibility underscores the need for plaintiffs with individual monetary claims to decide *for themselves* whether to tie their fates to the class representatives' or go it alone—a choice Rule 23(b)(2) does not ensure that they have.

*Id.* (emphases in original).

Here, Plaintiffs trigger this same risk by selectively pursuing the damages claims of only a subset of the proposed injunction class. The issues on which absent class members may be bound in subsequent litigation might include, among other things:

- whether other Blue Plans would enter states other than Alabama but for the alleged conspiracy;

- whether such entry would impact reimbursement rates and/or premiums;

- whether (for the restrictions not subject to the *per se* standard of review) any effects of the alleged conspiracy are offset by procompetitive benefits; and

- whether any subsets of the putative class are unaffected by or otherwise benefit from the alleged conspiracy.

For all these reasons, the Court should not certify Plaintiffs' proposed injunction classes due to the risk that members of those classes would be subject to potential preclusion from "litigation they had no power to hold themselves apart from." *Dukes*, 564 U.S. at 364.[68]

---

[68] Subscribers' request to certify a nationwide injunction class also raises Seventh Amendment issues. Subscribers contend that their proposed approach "fully comports with the Seventh Amendment" because "[t]hey propose that the jury hear and decide the entire damages claim; only thereafter will the Court fashion equitable relief." Subscribers' Injunctive Br. at 28. But this only protects the right to a jury trial for the members of the Alabama damages class. All other members of the putative injunction class risk having issues to which they would otherwise have a right to a jury trial decided by the court in the first action. *See In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. at 167 n.33 (in addition to the risks of preclusion, "[t]he Court also observes the potential for prejudice to the class members' rights to a jury trial on their damages claims").

### D. Subscribers Have No Evidence Of Impact Outside Of Alabama To Support A Nationwide Injunction Class

Subscribers' request to certify a nationwide injunction class also should be denied because they fail to offer any evidence of injury or even threatened injury to any proposed class members outside of Alabama. "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to *each member of the class*." *Dukes*, 564 U.S. at 360 (emphasis added); *see also Lakeland*, 763 F.3d at 1291. Here, Subscribers' model of injury is expressly limited to individual and small group subscribers *in Alabama*. Subscribers offer no reason to believe their model of injury would apply to large BCBSAL groups in Alabama (which are part of the proposed injunctive class), let alone to subscribers that reside outside Alabama. Thus, they have not met their burden of showing that common proof can be used to demonstrate a threat of future injury to the entire class. *See In re Processed Egg Prods. Antitrust Litig.*, 321 F.R.D. 555, 559 (E.D. Pa. 2017) (plaintiffs' burden to establish cohesiveness requires them "to demonstrate at least a threat of future injury and to do so through common proof").[69]

A nationwide injunction is a "drastic remedy" that must be based on strong evidence in the record. *See CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 265 F.3d 1193, 1203-04, 1207 (11th Cir. 2001). Plaintiffs may not claim nationwide injury simply by "extrapolat[ing]" from one state to "draw conclusions about" countless markets nationwide. *Id.* at 1203-04 (holding that the lower court abused its discretion by issuing a nationwide injunction because the "court's extrapolation from [ ] five markets to draw conclusions about satellite subscribers in two-hundred and thirty nationwide markets [was] not supported by the record").[70] Indeed,

---

[69] For similar reasons, Providers motion to certify a Rule (b)(2) class of Non-Acute Care Hospital Providers should be denied because they have failed to provide any empirical support showing antitrust impact (or the threat of future harm) across this putative class. *See* Argument Section I.E, *supra*.

[70] Subscribers' reliance on *State of Ala. v. Blue Bird Body Co.* is misplaced because the *Blue Bird* court **refused** to certify a nationwide class where plaintiffs could not prove a conspiracy without examining the relevant market

extrapolating from Alabama to draw conclusions about injury in every other state is particularly inappropriate here given that Subscribers' experts agree that the effect of more insurer competition on premiums is theoretically ambiguous, varies depending on local market conditions, and must be determined empirically. *See* Fact Section I, *supra*. In fact, Subscribers' co-lead counsel recognized that market conditions vary across the country, admitting: "Different markets, different market shares, and to some extent different competitive alignments. And I think that – for example, California is obviously a very different situation than Alabama in terms of market structure." DX267, Jan. 15, 2019 Hearing Tr. at 13:18-22. The record evidence also makes clear that market-specific conditions vary widely nationwide.[71]

Given these differences, whether a particular Alabama subscriber can show injury says nothing about whether a subscriber to another Blue Plan in Florida, Hawaii, a state with existing Blue-on-Blue competition, or any other state can do so. Subscribers do not even attempt to grapple with these differences or conduct any empirical analysis outside of Alabama. Thus, they fail to show a common threat of future harm to the proposed nationwide class. *See, e.g., In re*

---

where each individual plaintiff was located. 573 F.2d at 322-23. While the primary issue in *Blue Bird* was the absence of evidence showing a nationwide conspiracy, the same problem arises here with respect to the evidence of antitrust impact, another required element of plaintiff's liability claim. *Id.* at 317 (liability under the Clayton Act requires "a showing of both an antitrust violation and fact of damage"). Subscribers' reliance on *Klay v. Humana* is similarly misplaced. The *Klay* court recognized that "[i]t is primarily when there are significant individualized questions going to liability that the need for individualized assessments of damages is enough to preclude 23(b)(3) certification." *Klay*, 382 F.3d at 1260. Class treatment under Rule 23(b)(2) fares no better where, as here, establishing a future threat of antitrust impact would require the very same type of individualized inquiries because some members of the proposed class benefit from the challenged restraints.

[71] *See, e.g.,* ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Indeed, the record evidence demonstrates that market conditions not only vary between states but also within states, depending on who is competing, what consumers' preferences are, and local provider dynamics. *See, e.g.,* DX207, WLP-06884097 at '097 (California "contains multiple, unique geocentric markets with distinct consumer, product, competitor, provider and distribution dynamics.); DX208, WLP-07237759 at '759 ("Upstate is a very different competitive environment than Downstate. It is largely an HMO market and competitors are typically not-for-profit HMOs.").

*Processed Egg Prod. Antitrust Litig.*, 321 F.R.D. at 559 (denying certification of nationwide class where "none of the econometric evidence presented" accounted for the dynamic markets across the country).

### E.   Subscribers Have Failed To Establish Threatened Injury Even For The Alternative Alabama Injunction Class

Subscribers' fallback request to certify an Alabama-only injunction class also fails for two additional reasons.

*First*, Subscribers' Alabama Injunction Class includes "[a]ll persons or entities in Alabama who are currently subscribers to *any* health insurance plan that is offered by *any* Defendant[.]"   Subscribers' Injunctive Mot. at 1-2 (emphasis added).   Thus, it includes subscribers of Blue Plans other than BCBSAL, who purchase insurance outside of Alabama, as well as subscribers to large group employer plans that cover more than 199 employees.   Dr. Pakes' opinion, which was limited to antitrust impact and damages relating to members of the Alabama Damages Class, does not address alleged injury to subscribers of another Blue Plan or large group employer plans.   Thus, Subscribers have not shown the Alabama Injunction Class members share a "common injury" or otherwise meet Rule 23(b)(2)'s cohesiveness requirement. *See, e.g., In re Processed Egg Prods. Antitrust Litig.*, 321 F.R.D. at 559.

*Second*, Subscribers' expert admitted that his model only relates to the 2008 to 2013 period and cannot be extrapolated to 2014 or later.   He conceded that *an entirely new model* would need to be developed to analyze the post-2014 time period because of the impact of the ACA.   *See* DX262, Pakes Dep. at 227:9-17 (Q. "So the Affordable Care Act changed the landscape so much that you might have to have an entirely different model?   A. Certainly.   I'd have a different -- the basis of the model is the demand system.   I would need a new demand system.   Q. Yeah.   A. I would have to reestimate all of that stuff.   It is just not relevant

107

anymore.").[72]   Thus, Subscribers' economic model cannot serve as a proxy for showing a classwide threat of future impact on the Alabama Injunction Class—much less the Nationwide Injunction Class—and their motion to certify an injunction class should be denied for this reason as well. *See, e.g., In re Processed Egg Prods. Antitrust Litig.*, 321 F.R.D. at 559.

## III.   CONFLICTING INTERESTS PREVENT PLAINTIFFS FROM ESTABLISHING ADEQUACY AND TYPICALITY UNDER RULE 23(A)

The same problems that prevent Plaintiffs from satisfying the requirements of Rules 23(b)(2) and 23(b)(3) also prevent Plaintiffs from establishing that they meet the Rule 23(a) requirements of adequacy and typicality.

### A.   Plaintiffs Have Not Met Their Burden Of Showing That They Would Adequately Represent The Proposed Classes

Plaintiffs cannot satisfy the Rule 23(a)(4) adequacy requirement, which requires Plaintiffs to show that the class representatives will adequately represent the interests of proposed class members.  Where "substantial" or "fundamental" conflicts exist among the class, adequacy is not satisfied and class certification is inappropriate.  *Valley Drug*, 350 F.3d at 1189; *see also Grimes v. Fairfield Resorts, Inc.*, 331 F. App'x 630, 632-34 (11th Cir. 2007); *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000).

"A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug*, 350 F.3d at 1189;

---

[72] Subscribers deliberately limit their proposed damages class to the period 2008-2013 and say this is because of alleged "limitations in damages discovery."  They also say they "intend to seek certification for damages for Alabama subscribers from January 1, 2014 onward once post-2013 structured data essential to such a motion has been produced." Subscribers' Damages Br. at 1-2 & n.3.  This is a red-herring: *Subscribers already have the exact same data for 2014-15 that they have for 2008-2013*.  Dr. Pakes' deposition revealed the *real* reason they limited their proposed class to 2008-2013 is because the Affordable Care Act created a "whole different market" such that any post-2013 analysis would require an entirely different demand model—one that he has not even attempted to create. DX262, Pakes Dep. at 225:9-227:17.  When Subscribers' counsel prompted Dr. Pakes to agree that there was some unspecified "absence of records" and Dr. Pakes was asked what data he needed that he did not have, he admitted that he had not even looked at the post-2013 data that had been produced. *Id.* at 225:22-227:1.  Subscribers had every opportunity to model the post-2013 market by the class certification deadline, have waived the opportunity to seek certification of any other class, and should not be given a second bite at the apple to cure a problem of their own making.

*see also Grimes*, 331 F. App'x at 633-34 ("[T]he focus of the inquiry is on whether some party members claim to have been *harmed* by the same conduct that *benefitted* other members of the class, and thus whether class members' interests are actually or potentially in conflict with the interests and objectives of other class members.") (emphasis in original). In such a situation, "the potential for economic winners and losers to emerge from the same putative class precludes class certification." *In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605 at *14. Defendants do not need to show actual fundamental conflict; "the potentiality is enough." *Valley Drug*, 350 F.3d at 1194.

Subscribers fail the adequacy test because Alabama entry has, at the very least, the potential to create "winners and losers" and thus actual or potential conflicts within the proposed classes. For example, as discussed in Fact Section IV.B, *supra*, entry could make some proposed class members worse off by leading to adverse selection and causing increased premiums. Eliminating ESAs also could leave some class members worse off to the extent BCBSAL decided to exit less profitable areas of Alabama or if BCBSAL changed its products, narrowed its networks, or ceased participating in BlueCard as a result of new competitive pressures. Even Subscribers' unrealistic assumptions of uniform, statewide entry would create winners and losers because such entry would cause premiums to increase in some local markets where providers are able to negotiate for higher rates, which are passed through to subscribers as higher premiums.

Similarly, for Providers, as discussed in Fact Section IV.C, *supra,* entry could shift patient volume towards providers included in the entrant's network and away from providers excluded from that network, making those providers worse off. Eliminating ESAs could also leave some providers worse off to the extent BCBSAL decided to exit rural areas, narrow its network in the remaining areas, cease participating in BlueCard, or change its reimbursement

methodologies. Further, to the extent eliminating ESAs weakened BlueCard and the Blue Plans' ability to compete with Purple insurers, some providers could be harmed by subscribers shifting to Purples, which generally utilize narrower networks than BCBSAL and reimburse at lower rates (at least for some class members). And even Providers' assumptions of uniform, statewide entry would create winners and losers because such entry would cause rates to decrease in local markets in which more competition drove subscriber premiums down.

Class members who benefit from the current Blue system "derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives." *In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *14 (internal quotation marks omitted). Thus, "the economic reality of the situation leads some class members to have economic interests that are significantly different from—and potentially antagonistic to—the named representatives purporting to represent them." *Valley Drug*, 350 F.3d at 1195. Because these class members would be harmed in the but-for world, their interests are "actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members." *Id.* at 1189; *see also* DX261, Rubinfeld Dep. at 31:7-32:21. Plaintiffs have not met their burden of proving adequacy, and class certification must be denied. *See Pickett*, 209 F.3d at 1280-81 (reversing class certification on adequacy grounds where class included "those who claim harm from the very same acts from which other members of the class have benefitted").

**B.      Plaintiffs Have Not Met Their Burden Of Showing That They Are Typical Of Putative Class Members**

Plaintiffs also have not satisfied the typicality requirement of Rule 23(a)(3). Typicality is only satisfied where the claims or defenses of the named plaintiffs are typical of those of the class such that the incentives of the class representatives "align with those of absent class members so as to assure that the absentees' interest will be fairly represented." *Prado-Steinmen*

110

*ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). Thus, the class representative "must possess the same interest and suffer the same injury as the class members . . . ." *Williams*, 568 F.3d at 1357. Where "each claim would require the establishment of different facts and would be subject to different defenses," typicality is not met and class certification is "improper." *DWFII*, 469 F. App'x at 765.

### 1.   Subscriber Plaintiffs Are Not Typical Of The Proposed Classes

Subscribers do not satisfy the typicality requirement for three reasons. *First*, as discussed in Argument Sections I.A and I.B, Subscribers' proposed classes include winners and losers because entry would harm some while benefitting others. Typicality is not satisfied in such circumstances. *See, e.g., Auto Ventures, Inc. v. Moran*, No. 92-426-CIV-KEHOE, 1997 WL 306895, *5 (S.D. Fla. 1997); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. at 576.

*Second*, members of the Subscriber classes are subject to different defenses. As discussed in Argument Sections I.A and I.B, *supra*, some putative class members were not impacted and suffered no antitrust injury as a result of the Blue rules Subscribers challenge. Other class members consciously elected to purchase more expensive plans over cheaper plans, and there is no reason to believe they would purchase less expensive plans in the but-for world. *See, e.g.,* ███████████████████████████████████████████████████████████████ ████████████████████████████████████. And some putative class members' claims are barred by the filed rate doctrine. *See* Argument Section I.F.3, *supra*. Because each of these defenses must be individually determined, typicality is not satisfied. *See, e.g., DWFII*, 469 F. App'x at 765 (typicality not satisfied where "each claim would require the establishment of different facts and would be subject to different defenses"); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 468 (4th Cir. 2006) (where certain class members negotiated their prices but named plaintiffs did not, plaintiffs were not typical because "proof that Microsoft

overcharged them would hardly prove that Microsoft overcharged" class members).

*Third*, the class representatives do not reflect all of the markets in which the members of the putative classes participate. The named Subscriber plaintiffs are all small or medium groups, but Subscribers' proposed damages class also includes subscribers in the individual segment. The named plaintiffs' claims are not typical of the claims of individual subscribers because the individual and group markets have different premiums, products and competitors. *See* Ordover ¶¶ 120-21 (describing differences in premiums and premium calculations across segments); Pakes, Appendix C at 12 (HMO products are offered in the small group segment, not individual segment); Fact Section III.C.1, *supra* (█████████████ do not sell insurance in Alabama's individual segment). The participants in those markets also have different interests. For example, the interests of individuals will vary based on their family situations, while groups must ████████████████████████████ and make a decision on behalf of the majority. *See* ████████████████████████████. Thus, the claims of the named plaintiffs are not typical of the members of the damages class. *See In re Intel Corp. Microprocessor Antitrust Litig.*, 2014 WL 6601941, at *11 (named plaintiffs not typical of class members who "had different motivations and concerns" or purchased "different types" of products); *Deiter*, 436 F.3d at 468 (named plaintiffs not typical where prices were negotiated in "different competitive context[s]" and there were "factual dissimilarities as to market").

Subscribers' injunction class exacerbates the problem. That class includes large groups and non-ASO national accounts of all sizes throughout the United States and Puerto Rico. Such groups participate in different markets and have different interests and greater purchasing power than the named plaintiffs. *See* Ordover ¶ 71 (noting that, for example, larger groups may have more employees out of state and may have greater ability to self-insure). In addition,

Subscribers' proposed injunction class includes subscribers all over the country. Whether a particular Alabama subscriber can establish the requisite "threatened injury" says nothing about whether a class member in Florida, Rhode Island, or California can. Thus, the Alabama named Subscriber plaintiffs are not typical of the proposed class. *See, e.g., In re Milk Products Antitrust Litig.*, 195 F.3d 430, 436 (8th Cir. 1999) (typicality not satisfied where, among other things, class representative purchased milk in one regional market and proposed class included members who purchased milk in at least two other regional markets).[73]

## 2.    Provider Plaintiffs Are Not Typical Of The Proposed Classes

Providers fail to satisfy typicality for the same three reasons. *First*, as discussed in Argument Sections I.A and I.B, *supra*, Providers' proposed classes include winners, losers, and persons who were not injured. *See, e.g., Auto Ventures*, 1997 WL 306895, *5.

*Second*, the Provider class representatives and putative class members are subject to different, individualized defenses including lack of antitrust injury and standing. *See* Argument Section I, *supra*. In addition, Providers concede that all but one of the Alabama Class Representatives for the Non-Acute Care Hospital Classes released their claims in the *Love* Settlements.[74] Typicality cannot be established for both these reasons. *See, e.g., DWFII*, 469 F.

---

[73] Subscribers cite *Kennedy v. Tallant*, 710 F.2d 711 (11th Cir. 1983), for the proposition that typicality is established wherever the defendants "committed the same unlawful acts in the same method against the entire class." *See* Subscribers' Injunctive Br. at 21; Subscribers' Damages Br. at 20. That case is inapposite because it involved materially false statements that were relied upon to different degrees by investors with varying levels of sophistication. Because the degree of reliance was "not a controlling element of the action," the Court found that it alone did not defeat typicality where the defendants conduct remained the same toward each putative class member. *Kennedy*, 710 F.2d at 717. Here, the "controlling element[s] of the action," such as antitrust impact, do vary among the putative class members.

[74] Providers argue that Dr. Caldwell, who filed a complaint on the same day Providers moved to certify a class, could serve as the representative to a "subclass of medical doctors who are not subject to the *Love* release." Dr. Caldwell is the only named Provider who asserts that he "was not a settlement class member and did not participate in the *In re Managed Care* or various *Love* Settlements in the Southern District of Florida." Dkt. 2455-34, Ex. 34 to P. Br., ¶ 3. Providers make no attempt to define the parameters of such a subclass or explain why Dr. Caldwell's claims are typical of it. Dr. Caldwell is a family medical doctor, but the non-acute care hospital class he seeks to represent includes specialized, multidisciplinary providers beyond the scope of generalized family medicine. And the differences go deeper: ████████████████████████████████████████████████████████████

App'x at 764-65.

*Third*, the class representatives' claims are not typical of the class members they seek to represent because class members operate in different markets and have different interests.  For example, the class representatives for the proposed Acute Care Hospital Classes are rural hospitals, *see, e.g.,* ██████████████████████████████████, but the classes they propose to represent include hospitals of varying sizes offering varying services in a wide range of geographic markets subject to different competitive conditions, with different patient mixes, and with different levels of bargaining power.[75]  As one Provider Plaintiff testified, comparing small rural hospitals with large hospitals is like comparing "apples to oranges." ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████.

These variances lead to differences in bargaining power and reimbursement rates.  *See* Fact Section II, *supra*.  It also means the proposed class representatives have very different interests than class members.

Similarly, the claims of the representatives for the Non-Acute Care Hospital Classes are not typical of the members of those classes.  As discussed above, those classes include hundreds of non-interchangeable providers (such as primary care doctors, pediatricians, cardiologists, neurosurgeons, radiologists, and mental health providers) across hundreds of geographic markets (from local markets for PCPs to potentially state-wide markets for neurosurgeons).  *See*

████████████████████████████████████████████████████.  To the extent he is considered as the sole representative of a subclass to whom *Love* does not apply, those problems are only intensified.

[75] *Compare, e.g.,* ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████.

Argument Section I.F.1, *supra*. The majority of providers and their markets are not represented by any named plaintiff (for example, none of the named plaintiffs practice dermatology, nephrology, obstetrics, pediatrics, or cardiology), and each of those markets is subject to very different competitive conditions. *See* Ordover ¶ 87; Wu ¶ 47. Further, the competitive dynamics for these providers' services vary, which affects their bargaining power.[76] Ordover ¶¶ 87-88.

These differences, individually and collectively, defeat typicality. *See, e.g., Deiter*, 436 F.3d at 468; *In re Milk Products Antitrust Litig.*, 195 F.3d at 436; *In re Intel Corp. Microprocessor Antitrust Litig.*, 2014 WL 6601941, at *11.

## IV.    THE COURT SHOULD NOT CERTIFY A RULE 23(C)(4) ISSUES CLASS

Providers' request that the Court certify issues classes pursuant to Rule 23(c)(4) should be denied for multiple reasons.[77]

### A.    Providers Have Failed To Satisfy The Requirements Of Rule 23(a)

Providers do not dispute that a court cannot certify an "issues" class under Rule 23(c)(4) if the requirements of Rule 23(a) are not met. *See* Providers' Br. at 45 (arguing that "[b]ecause 23(a) is satisfied," the Court should certify an issues class); *see also, e.g., Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir. 1993) (while "district courts may separate and certify certain issues for class treatment, the subclass on each issue still must

---

[76] *Compare, e.g.,* ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ .

[77] Subscribers did not move for certification under Rule 23(c)(4). *See* Subscribers' Injunction Mot. (Dkt. 2407) (requesting certification under Rule 23(b)(2) without any reference to Rule 23(c)(4)); Subscribers' Damages Mot. (Dkt. 2409) (requesting certification under Rule 23(b)(3) without any reference to Rule 23(c)(4)). Their only reference to Rule 23(c)(4) is in a footnote to their damages brief in which they say "[t]he Court could also consider certifying a Rule 23(c)(4) issue class as to liability, as Subscribers previously proposed in their Memorandum of Law in Support of Motion to Set Case Schedule." Subscribers' Damages Br. at 29 n. 11. Subscribers' passing reference to (c)(4) certification is insufficient to preserve the argument, and that should end the inquiry. To the extent the Court considers (c)(4) certification for Subscribers, however, it should deny certification for the same reasons it should deny Providers' request for (c)(4) certification.

independently meet all the requirements of" Rule 23(a)) (internal quotation marks omitted). Because Providers do not satisfy Rule 23(a)'s adequacy and typicality requirements as discussed in Argument Section III, *supra*, the Court should not certify issue classes under Rule 23(c)(4).

### B.      Providers Have Failed To Satisfy The Requirements Of Rule 23(b)(3)

Providers cannot use Rule 23(c)(4) to evade Rule 23(b)(3)'s predominance requirements. As the Fifth Circuit explained in *Castano v. American Tobacco Co.* 84 F.3d 734, 745 n.21 (5th Cir. 1996), Rule 23(c)(4) is a "housekeeping" rule that does not obviate the predominance requirement in Rule 23(b)(3).  "A district court cannot manufacture predominance through the nimble use of subdivision (c)(4).   The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3)." *Id.*

That should end providers' request for Rule 23(c)(4) certification because district courts within the Eleventh Circuit have uniformly followed *Castano* and "emphatically rejected attempts to use the (c)(4) process for certifying individual issues as a means for achieving an end run around the (b)(3) predominance requirement." *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 316 (S.D. Ala. 2006); *see also, e.g., Teggerdine v. Speedway, LLC*, No. 8:16-CV-03280-T-27TGW, 2018 WL 2451248, at *8 (M.D. Fla. May 31, 2018); *Marko v. Benjamin & Bros.*, LLC, No. 6:17-CV-1725-ORL-41GJK, 2018 WL 3650117, at *9 (M.D. Fla. May 11, 2018); *In re Atlas Roofing Corp. Chalet Shingle Prod. Liab. Litig.*, 321 F.R.D. 430, 447 (N.D. Ga. 2017); *Randolph*, 303 F.R.D. at 700; *City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 646 (S.D. Fla. 2010).[78]

---

[78] In tacit acknowledgement that Eleventh Circuit courts have unanimously rejected their argument, Providers rely almost exclusively on precedent from other Circuits.  Providers cite only a single case from this Circuit for the proposition that issue certification is permitted and appropriate without predominance being satisfied. *See* Providers' Br. at 42 (citing *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 694 (N.D. Ga. 2003)).  But that case is not inconsistent with *Castano*, however, because the court certified issue classes *after* it found that the predominance

Plaintiffs argue that *Castano* "renders 23(c)(4) a nullity," Providers' Br. at 44, but courts in this Circuit have explained "the proper interplay between Rules 23(b)(3) and 23(c)(4) is that a class action as a whole must satisfy the Rule 23(b)(3) predominance requirement" and if the predominance requirement is satisfied, "then Rule 23(c)(4) may apply as simply a housekeeping rule that allows courts to sever the common issues for a class trial." *Fisher*, 238 F.R.D. at 316 (internal quotation marks omitted); *accord, e.g., Teggerdine*, 2018 WL 2451248, at \*8; *In re Atlas Roofing*, 321 F.R.D. at 447.

And the Eleventh Circuit itself has similarly rejected attempts to circumvent predominance merely by certifying many subclasses. Although not directly addressing Rule 23(c)(4), the Court made clear that parties cannot use procedural stratagems to "mask a staggering contractual variety" in order to create an "the illusion of uniformity." *Sacred Heart Health Sys.*, 601 F.3d at 1176. That underlying reasoning is consistent with the Fifth Circuit's approach to this Rule in *Castano*.[79] This Court therefore should join the other district courts in the Eleventh Circuit and hold that Rule 23(c)(4) certification is not available here where "a cause of action, as a whole" does not satisfy the predominance requirement.

## C.     The Issues Plaintiffs Identify For Rule 23(c)(4) Are Not Common

Providers' request for certification of Rule 23(c)(4) issue classes also fails because the issues for which Providers have requested (c)(4) certification are not capable of a classwide answer. For example, Providers seek certification "with respect to Defendants' liability." Providers' Br. at 39. But "'liability' for antitrust purposes means a showing of both an antitrust

---

requirement was satisfied. *See In re Tri-State Crematory Litig.*, 215 F.R.D. at 694-97.

[79] Providers also argue that the decision in *Sacred Heart* cannot be taken as indicating support for *Castano* because, in a case decided four months after *Sacred Heart*, the Eleventh Circuit cited *Castano* and declared that it "had not 'directly address[ed] the propriety of such partial certification. . . .'" Providers' Br. at 44 (quoting *Borrero v. United Healthcare of New York, Inc.*, 610 F.3d 1296, 1310 n.5 (11th Cir. 2010)). This argument is misleading because the text Providers omitted in their brief and replaced with ellipses makes clear that the Eleventh Circuit was simply stating that it had not addressed the issue in a prior decision.

violation and fact of damage." *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1320 (5th Cir. 1976).[80]  Impact cannot be established through common evidence in this case, *see* Section I *supra*, and an issues class on liability therefore cannot be certified.  *See, e.g.*, *Fisher*, 238 F.R.D. at 315 (rejecting liability issue class because "such a maneuver would not overcome the Rule 23(b)(3) predominance problems because many of the individual-specific issues discussed above go to liability, not damages.").[81]

Providers also suggest certifying issues relating to Defendants' "conduct."  Providers' Br. at 39-40.  But "[t]o the extent [Providers] are asking the Court to bifurcate the issues of [Defendants'] conduct from all other issues . . . [s]uch an approach would be terribly inefficient (or worse) because the second jury would invariably have to reexamine the common evidence of wrongdoing by [Defendants] to determine whether any of that wrongdoing aggrieved a particular plaintiff in a manner entitling him to damages."  *Fisher*, 238 F.R.D. at 315-16; *see also In re Atlas Roofing*, 321 F.R.D. at 447 (denying certification of issues class where certification "will not dispose of a single case or eliminate the need for a single trial" because individual issues "like causation, notice, and statute of limitations" predominated).  Providers' attempt to "sever issues" until common issues predominate should be rejected because "the result would be chaotic, inefficient and at odds with the principles animating bifurcation in the first place."  *Fisher*, 238 F.R.D. at 315-16.  Thus, Providers' requests for Rule 23(c)(4) certification would not advance the litigation and should be denied.

---

[80] *See also, Atl. Richfield Co.*, 495 U.S. at 344 ("[P]roof of a per se violation and of antitrust injury are distinct matters that must be shown independently.") (quoting Areeda & Hovenkamp, Antitrust Law ¶ 334.2c (1989 Supp.)); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311 (impact is an element of liability).

[81] Providers quote extensively from the decision in *In re Prograf Antitrust Litig.*, 1:11-MD-02242-RWZ, 2014 WL 4745954, at *2 (D. Mass. June 10, 2014), in support of their argument for an antitrust conduct issues class, but the language they quote specifically acknowledges that the broader category of liability (for which Providers also seek issue certification) cannot be established on common grounds where there are variant issues in impact, as there are here.  *See* Providers' Br. at 41.

## **CONCLUSION**

For all these reasons, the Court should deny Plaintiffs' motions for class certification.


Dated: July 15, 2019

Respectfully submitted,

/s/ Craig A. Hoover
Craig A. Hoover
E. Desmond Hogan
Justin Bernick
Peter Bisio
Elizabeth Jose
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637 5600
Fax: (202) 637 5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com
peter.bisio@hoganlovells.com
elizabeth.jose@hoganlovells.com
*Co-Coordinating Counsel for the Defendants*


Cavender C. Kimble
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

*With Hogan Lovells, counsel for Blue Cross and Blue Shield of North Carolina, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross &*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
Sarah J. Donnell
Christa C. Cottrell, P.C.
Zachary Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com
sdonnell@kirkland.com
ccottrell@kirkland.com
zachary.holmstead@kirkland.com

*Co-Coordinating Counsel for the Defendants*

*Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon; Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255-9421
Fax: (803) 255-9054
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Blue Cross and Blue Shield of North Carolina, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon; Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action.*

Christine Varney
Evan Chesler
Karin DeMasi
Lauren Kennedy
CRAVATH SWAINE & MOORE LLP
825 Eighth Avenue

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE JORDAN RATLIFF &
BRANDT LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Defendants' Liaison Counsel*

*With Kirkland & Ellis, counsel for Defendant, Blue Cross and Blue Shield Association*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL 35203
Tel: (205) 254-1000
Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com

Pamela B. Slate
HILL HILL CARTER FRANCO COLE &
BLACK, P.C.
425 South Perry Street
Montgomery, AL 36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*Counsel for Defendant, Blue Cross Blue Shield of Alabama*

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
Erica B. Zolner

120

New York, NY 10019
Tel: (212) 474-1000
Fax: (212) 474-3700
cvarney@cravath.com
echesler@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com

*Counsel for Defendants Blue Cross and*
*Blue Shield of Tennessee, Inc.;*
*Blue Cross Blue Shield of Alabama;*
*Blue Cross and Blue Shield of Florida, Inc.;*
*Blue Cross and Blue Shield of Massachusetts,*
*Inc.*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255 9421
Fax: (803) 255 9054
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Defendants Blue Cross and Blue*
*Shield of Tennessee, Inc.; Blue Cross and Blue*
*Shield of Florida, Inc.; Blue Cross and*
*Blue Shield of Massachusetts, Inc.*

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL 35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendants Blue Cross and*
*Blue Shield of Tennessee, Inc.; Blue Cross and*
*Blue Shield of Florida, Inc.; Blue Cross and*
*Blue Shield of Massachusetts, Inc.*

Casey R. Fronk
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
hwitt@kirkland.com
jzeiger@kirkland.com
ezolner@kirkland.com
cfronk@kirkland.com

Kimberly R. West (*Liaison Counsel*)
Mark H. Hogewood
WALLACE JORDAN RATLIFF &
BRANDT LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35253
Tel: (205) 870-0555
Fax: (205) 871-753
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants, Health Care Service*
*Corporation, an Illinois Mutual Legal Reserve*
*Company, including its divisions Blue Cross*
*and Blue Shield of Illinois, Blue Cross and*
*Blue Shield of Texas, Blue Cross and*
*Blue Shield of New Mexico, Blue Cross and*
*Blue Shield of Oklahoma, and Blue Cross and*
*Blue Shield of Montana; Caring for*
*Montanans, Inc., f/k/a Blue Cross and*
*Blue Shield of Montana, Inc.; Highmark Inc.,*
*f/k/a Highmark Health Services; Highmark*
*West Virginia Inc.; Highmark Blue Cross*
*Blue Shield Delaware Inc.; California*
*Physicians' Service d/b/a Blue Shield of*
*California*

Jonathan M. Redgrave
Victoria A. Redgrave
REDGRAVE, LLP
14555 Avion Parkway, Suite 275
Chantilly, VA 20151
Tel: (703) 592-1155
Fax: (612) 332-8915

121

Brian K. Norman
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX 75234
Tel: (214) 987-1745
Fax: (214) 521-9033
bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
63 South Royal Street, 13th Floor
Riverview Plaza
Mobile, AL 36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

*Counsel for Defendants, Carefirst, Inc.;
Carefirst of Maryland, Inc.; Group
Hospitalization and Medical Services, Inc.;
CareFirst BlueChoice, Inc.*

R. David Kaufman
M. Patrick McDowell
BRUNINI, GRANTHAM, GROWER
& HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS 39201
Tel: (601) 948-3101
Fax: (601) 960-6902
dkaufman@brunini.com
pmcdowell@brunini.com

Cheri D. Green
BLUE CROSS BLUE SHIELD OF
MISSISSIPPI
P. O. Box 1043
Jackson, MS 39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY &

jredgrave@redgravellp.com
vredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark
Defendants*

Andy P. Campbell
Stephen D. Wadsworth
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL, GUIN, WILLIAMS, GUY
& GIDIERE LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Tel: (205) 224-0750
Fax: (205) 224-8622
andrew.campbell@campbellguin.com
stephen.wadsworth@campbellguin.com
todd.campbell@campbellguin.com
yawanna.mcdonald@campbellguin.com

Sarah L. Cylkowski
Thomas J. Rheaume, Jr.
BODMAN PLC
201 South Division Street, Suite 400
Ann Arbor, MI 48104
Tel: (734) 761-3780
Fax: (734) 930-2494
scylkowski@bodmanlaw.com
trheaume@bodmanlaw.com

Todd Stenerson
SHEARMAN & STERLING LLP
401 9th Street, NW
Suite 800
Washington, DC 20004-2128
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com

*Counsel for Defendant, Blue Cross and
Blue Shield of Michigan*

John Briggs
Rachel Adcox
AXINN, VELTROP & HARKRIDER, LLP

122

SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255-9421
Fax: (803) 255-9054
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Defendant, Blue Cross Blue Shield*
*of Mississippi, a Mutual Insurance Company*

Michael A. Naranjo
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA 94104-1520
Tel: (415) 984-9847
Fax: (415) 434-4507
mnaranjo@foley.com

Alan D. Rutenberg
Benjamin R. Dryden
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Tel: (202) 672-5300
Fax: (202) 672-5399
arutenberg@foley.com
bdryden@foley.com

*Counsel for Defendant, USAble Mutual*
*Insurance Company, d/b/a Arkansas*
*Blue Cross and Blue Shield*

Charles L. Sweeris
Law Department
BLUE SHIELD OF CALIFORNIA
50 Beale Street
San Francisco, CA 94105
Tel: (415) 229-5107
Fax: (415) 229-5343
charles.sweeris@blueshieldca.com

*Counsel for California Physicians' Service*
*d/b/a Blue Shield of California*

950 F Street, N.W.
Washington, DC 20004
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
radcox@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5000
Fax: (205) 250-5034
steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendant,*
*Independence Blue Cross*

Edward S. Bloomberg
John G. Schmidt
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY 14203
Tel: (716) 847-7096
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com

Stephen A. Walsh
ADAMS and REESE LLP
1901 Sixth Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5000
Fax: (205) 250-5091
Stephen.walsh@arlaw.com

*Counsel for Defendant, Excellus Health Plan,*
*Inc., d/b/a Excellus BlueCross BlueShield,*
*incorrectly sued as Excellus BlueCross*
*BlueShield of New York*

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Mary G. Menge
Morgan B. Franz
Jess R. Nix
SPOTSWOOD SANSOM & SANSBURY
LLC
One Federal Place
1819 5th Avenue North, Suite 1050
Birmingham, AL 35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
mmenge@spotswoodllc.com
mfranz@spotswoodllc.com
jnix@spotswoodllc.com
*Counsel for Defendant Capital BlueCross*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON
LLP
1420 Fifth Ave, Suite 3700
Seattle, WA 98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

J. Bentley Owens, III
WALLACE, ELLIS, FOWLER, HEAD
& JUSTICE
113 North Main Street
Columbiana, AL 35051-0587
Tel: (205) 669-6783
Fax: (205) 669-4932
bowens@wefhlaw.com

*Counsel for Defendants, Premera Blue Cross
d/b/a Premera Blue Cross Blue Shield of
Alaska*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
KIRKLAND & ELLIS LLP

Kathleen Taylor Sooy
Tracy A. Roman
April N. Ross
Michael W. Lieberman
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com
aross@crowell.com
mlieberman@crowell.com

John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
Tel: (205) 581-0716
Fax: (205) 380-9116
jjohnson@lightfootlaw.com

*Counsel for Defendants, Blue Cross of Idaho
Health Service, Inc.; Blue Cross and
Blue Shield of Kansas, Inc.; Blue Cross and
Blue Shield of Kansas City; Blue Cross and
Blue Shield of Nebraska; Blue Cross
Blue Shield of Arizona; Blue Cross Blue Shield
of North Dakota; Blue Cross Blue Shield of
Wyoming; HealthNow New York Inc.;
BlueShield of Northeastern New York;
BlueCross BlueShield of Western New York*

300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com

*Counsel for Defendants Wellmark of South
Dakota, Inc. (Wellmark Blue Cross and
Blue Shield of South Dakota); Wellmark, Inc.
(Wellmark Blue Cross and Blue Shield of
Iowa); Hawaii Medical Service Association
(Blue Cross and Blue Shield of Hawaii);
Triple-S Salud, Inc.*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants Wellmark of South
Dakota, Inc. (Wellmark Blue Cross and Blue
Shield of South Dakota); Wellmark, Inc.
(Wellmark Blue Cross and Blue Shield of
Iowa); Hawaii Medical Service Association
(Blue Cross and Blue Shield of Hawaii)*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255 9421
Fax: (803) 255 9054
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

125

*Counsel for Defendants Wellmark of South
Dakota, Inc. (Wellmark Blue Cross and Blue
Shield of South Dakota); Wellmark, Inc.
(Wellmark Blue Cross and Blue Shield of
Iowa); Hawaii Medical Service Association
(Blue Cross and Blue Shield of Hawaii); Triple
S Salud, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2019, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Craig A. Hoover
Craig A. Hoover