FILED
2020 Apr-24 PM 12:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406) | ) | **Master File No. 2:13-CV-20000-RDP**<br><br>This document relates to:<br>Subscriber Track Cases<br><br>**[REDACTED VERSION OF SEALED FILING]** |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE OR STRIKE THE EXPERT TESTIMONY, OPINIONS, AND ANALYSIS OF DR. ARIEL PAKES

# TABLE OF CONTENTS

**Page(s)**


INTRODUCTION ....................1

BACKGROUND ....................4

LEGAL STANDARD ....................6

ARGUMENT ....................7

I. DR. PAKES'S MODEL IS BASED ON INCORRECT ASSUMPTIONS ABOUT ENTRY AND CANNOT MODEL REALISTIC ENTRY SCENARIOS OR REAL-WORLD REALITIES OF THE HEALTHCARE MARKET. .................... 7

A. DR. PAKES'S ENTRY ASSUMPTIONS ARE CONTRADICTED BY BOTH THE RECORD AND HIS OWN STATEMENTS. .................... 8

B. DR. PAKES'S MODEL CANNOT MODEL ENTRY ASSUMPTIONS CONSISTENT WITH THE EVIDENCE AND WITH THE REAL-WORLD REALITIES OF THE HEALTHCARE MARKET .................... 14

II. THE COURT SHOULD EXCLUDE DR. PAKES'S STRUCTURAL MODEL ANALYSIS BECAUSE THE RESULTS DO NOT FIT THE EVIDENCE.................... 18

III. THE COURT SHOULD EXCLUDE DR. PAKES'S REGRESSION ANALYSIS BECAUSE IT WOULD NOT ASSIST A TRIER OF FACT. .................... 22

CONCLUSION....................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aluminum Phosphide Antitrust Litig.*,
893 F. Supp. 1497 (D. Kan. 1995)....................15

*Am. Booksellers Ass'n v. Barnes & Noble, Inc.*,
135 F. Supp. 2d 1031 (N.D. Cal. 2001)....................8

*In re Blood Reagents Antitrust Litig.*,
783 F.3d 183 (3d Cir. 2015)....................7

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)....................8, 12

*City of Tuscaloosa v. Harcros Chems., Inc.*,
158 F.3d 548 (11th Cir. 1998)....................7

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000)....................15, 18

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)....................6, 7, 18, 24

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....................18

*Hall v. Thomas*,
753 F. Supp. 2d 1113 (N.D. Ala. 2010)....................8

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997)....................11

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................6, 18

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012)....................16

*McGlinchy v. Shell Chem. Co.*,
845 F.2d 802 (9th Cir. 1988)....................8

*Moore v. Int'l Paint, LLC*,
547 F. App'x 513 (5th Cir. 2013) (per curiam)....................8

*In re Photochromic Lens Antitrust Litig.*,
2014 WL 1338605 (M.D. Fla., April 3, 2014)....................19

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013)....................22

*Rink v. Cheminova, Inc.*,
400 F.3d 1286 (11th Cir. 2005)....................7

*Rojas v. Marko Zaninovich, Inc.*,
No. CIV-F-09-0705 AWI JLT, 2011 WL 6671737 (E.D. Cal. Dec. 21, 2011)....................20, 21

*Sher v. Raytheon Co.*,
419 F. App'x 887 (11th Cir. 2011)....................7

*United States v. Frazier*,
387 F.3d 1244 (11th Cir. 2004) (en banc)....................7

*Walker v. Blitz USA, Inc.*,
663 F. Supp. 2d 1344 (N.D. Ga. 2009)....................9

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,
862 F. Supp. 2d 1322 (S.D. Fla. 2012)....................14

**Rules**

Federal Rule of Civil Procedure 23....................

Federal Rule of Civil Procedure Rule 23(a)....................6

Federal Rule of Civil Procedure Rule 23(b)....................7

Federal Rule of Evidence 702....................6, 7

**Other Authorities**

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* (2017)....................18, 19

Erin E. Trish & Bradley J. Herring in *How Do Health Insurer Market Concentration and Bargaining Power with Hospitals Affect Health Insurance Premiums?*, 42 J. of Health Econ. 104 (2015)....................3, 5

Kate Ho & Robin S. Lee, *Insurer Competition in Health Care Markets*, 5(2) Econometrica 379 (2017)....................5

Kate Ho, Ariel Pakes & Mark Shepard, *The Evolution of Health Insurer Costs in Massachusetts, 2010-12*, 53(1) Rev. of Indus. Org. 117 (2018)....................17

Louise Norris, *Alabama health insurance marketplace: history and news of the state's exchange* (Mar. 25, 2019), https://www.healthinsurance.org/alabama-state-health-insurance-exchange/ ........................................................................................10

Mark Shepard, *Hospital Network Competition and Adverse Selection: Evidence from the Massachusetts Health Insurance Exchange*, Nat'l Bureau of Econ. Res. (2016) ..........................................................................................................14

# INTRODUCTION

The Subscriber Plaintiffs offer Dr. Ariel Pakes's economic models as their sole evidence of economic harm to all members of the Subscriber Class—an essential requirement for class certification. But his testimony, opinions, and analysis are inadmissible under controlling Supreme Court and Eleventh Circuit precedent for multiple, independent reasons.

***First***, the assumptions underlying Dr. Pakes's "structural" economic model are implausible and inconsistent with record evidence and statements made by Dr. Pakes himself. Dr. Pakes makes a litany of assumptions about a Blue or Green Plan entering Alabama in the but-for world. Not only is his assumption that there would be entry *at all* unsupported by any evidence, but the assumptions that underlie his model are divorced from the reality of entry reflected in the fact record. For example, Dr. Pakes makes the critical assumption that an entrant would compete throughout the entire state of Alabama like Blue Cross Blue Shield of Alabama ("BCBSAL"), with a provider network as broad as that of BCBSAL, and with PPO products nearly identical to those offered by BCBSAL. Amended Class Certification Expert Report of Professor Ariel Pakes, SX415 (Dkt. 2453-24) ¶¶ 232-33, 235 (hereinafter "Pakes"). But the record evidence reveals that an entrant would do exactly the opposite—enter a targeted geographic region, with a narrower provider network, and differentiated products. Dr. Pakes's assumptions even contradict his *own* opinions: Dr. Pakes's report explains how an entrant would have an incentive to engage in opportunistic entry with a narrow network and HMO products. *Id.* ¶¶ 71, 78

When pressed at his deposition to explain the inconsistency between his structural model and reality, he admitted that his model cannot accommodate his own views about what entry would look like. Ex. 1, Pakes Dep. at 89:13-14 (hereinafter "Pakes Dep.") ("I put in only PPOs,

I put in products that I thought my data could evaluate.”). As a result, his analyses (and therefore Subscriber Plaintiffs) cannot accurately determine whether premiums or reimbursement rates would go up or down for particular subscribers or providers upon entry. Even if Dr. Pakes had accurately modeled impact using his chosen assumptions (he did not), an accurate model of an unrealistic scenario would not assist the trier of fact in deciding the question of impact. The fact that Dr. Pakes's model does not—and cannot—model realistic entry scenarios (and is therefore incapable of demonstrating impact or injury to all putative class members using common evidence) means that the model is useless to the trier of fact in answering this fundamental question for class certification and therefore should be excluded.

***Second***, Dr. Pakes's structural model does not "fit" the evidence. Dr. Pakes ignores the facts about the premiums BCBSAL actually charged in the real world. Instead, he measures alleged impact and damages by comparing premiums in the "but for" world without the alleged restrictions to premiums his model *predicts* would occur in the actual world—not the actual premiums charged by BCBSAL.

Not only is this methodology inconsistent with the law on how antitrust impact is calculated, it also means Dr. Pakes's model is only reliable to the extent it can accurately predict real world BCBSAL premiums. But it does not—and it is not even close. As the attached declaration of Defendants' expert demonstrates, Dr. Pakes's backup files show that his model predicts average premiums for BCBSAL that are in some cases *two* or *three times more* than BCBSAL's actual premiums. *See* Ex. 2, Decl. of Janusz A. Ordover ¶¶ 7-12 ("Ordover Decl.").[1] Dr. Pakes's structural model is therefore inherently unreliable, cannot calculate impact or

---

[1] Defendants will submit an expert report from Dr. Janusz Ordover in support of its opposition to Plaintiffs' class certification motions. For purposes of this motion, Defendants submit a focused declaration from Dr. Ordover.

damages, and cannot accurately model the profitability of an entry decision. Dr. Pakes testified that such deviations should be excused because his model is the "best available," even if it is wrong: "[T]he question is not whether it is right or not. The question is, is there something better to use?" Ex. 3, Pakes Merits Dep. at 141:21-23 (hereinafter "Pakes Merits Dep."); *see also* Pakes Dep. at 281:9. But this is not horseshoes, darts, or perhaps even academia where the closest model wins the prize even when it is off base. In this court of law, Dr. Pakes's flawed model is simply not reliable.

***Third***, Dr. Pakes's "reduced form" regression analysis, which he employs to validate his structural model results, is equally flawed. Dr. Pakes's regression analysis rests on unsupported assumptions that manipulate his findings. Indeed, while the model is based entirely on a regression put forward by Erin E. Trish & Bradley J. Herring in *How Do Health Insurer Market Concentration and Bargaining Power with Hospitals Affect Health Insurance Premiums?*, 42 J. of Health Econ. 104 (2015) (Ex. 4), Dr. Pakes assumes that the entrant does not compete for self-insured business, allowing him to avoid Trish and Herring's conclusion that increased insurer competition can lead to higher provider rates (and thus higher premiums), contrary to his results. With realistic entry assumptions, the regression results vary widely and show that entry would cause premiums to *increase* for numerous putative class members. Ex. 2, Ordover Decl. ¶¶ 16-23.

For all of these reasons, the Court should exclude or strike Dr. Pakes's testimony, opinions, and analysis as speculative and unreliable.

## BACKGROUND

In his Report, Dr. Pakes concludes that, absent ESAs and NBE, Blue or Green entry would have been profitable in Alabama and would have reduced premiums for all or nearly all Subscriber Class members. Pakes ¶¶ 5, 10-12.

Dr. Pakes starts by analyzing the conditions in Alabama that supposedly make entry likely. Dr. Pakes determines that there were certain "signals" that told other insurers that it would be profitable to enter Alabama. *Id.* ¶ 15. These "signals" include that BCBSAL only offered a PPO plan with a broad network (¶¶ 62, 78), BCBSAL's policyholder surplus increased between 2008 and 2013 (¶ 48), and BCBSAL paid higher medical claims costs per member per month than competitors in 2010 (¶¶ 53-53). Dr. Pakes also purports to show that entry would be profitable by calculating the net present value of entry using revenue estimates generated by his structural model and costs he assumes based on the experience of Highmark in central Pennsylvania. *Id.* ¶¶ 271-72.

Yet Dr. Pakes could not explain why non-Blue insurers like United, Aetna, or Cigna have not entered or been more successful despite facing the same competitive conditions a hypothetical Blue or Green entrant would have faced. Pakes Dep. at 59:23-60:15. When asked why non-Blue insurers have not entered or expanded, Dr. Pakes responded: "*The real reason is I don't know why*, okay." *Id.* at 113:7-21 (emphasis added). Moreover, Dr. Pakes does not opine that entry actually would occur, just that entry would be profitable. *Id.* at 173:15-20 ("Q. Neither of those analyses evaluates whether entry would occur, they just evaluate the impact of entry? A. They tell you is there an incentive to enter. And the answer is yes."). Indeed, he admits that business considerations outside of his model could very well lead an insurer not to enter Alabama at all: "It may be that there's also an incentive for [Anthem] to [enter] forty other

states, okay, or as a Green everywhere and then they don't have the money to do Alabama at the same time." *Id.* at 103:4-10.

Dr. Pakes next applies regression coefficients from an academic study by Erin E. Trish and Brad J. Herring that measures the relationship between health insurer concentration and premium prices to data from Alabama. Pakes ¶ 153; Ex. 4. Trish and Herring examined the relationship between premiums and (a) market concentration among insurers in the sale of insurance (subscriber side of the market) and (b) market concentration among insurers when bargaining with hospitals (provider side of the market). Pakes ¶ 154. Applying Trish and Herring's model, Dr. Pakes concludes that BCBSAL premiums would have fallen by between 3.4 and 5.5 percent upon Blue or Green entry. *Id.* ¶ 163. Dr. Pakes's conclusions rest on two key assumptions. First, Dr. Pakes assumes, without the support of any record evidence, that an entrant would enter *all* of Alabama would *not* compete for Administrative Services Only ("ASO") or self-insured customers. *Id.* ¶ 160. Second, Dr. Pakes assumes, again without the support of any record evidence, that the entrant would capture between 20 and 45 percent market share. *Id.* ¶ 161.

Dr. Pakes then uses a "structural" model to conclude that Blue or Green entry would reduce premiums for putative class members. Dr. Pakes modifies the structural model put forward by Kate Ho and Robin S. Lee. *Id.* ¶ 173; Ex. 5, Kate Ho & Robin S. Lee, *Insurer Competition in Health Care Markets*, 5(2) Econometrica 379 (2017). To use the structural model to assess the effects of hypothetical entry, he assumed the entrant—Anthem Blue Cross Blue Shield of Georgia ("BCBSGA")—would: (i) offer PPO products similar to BCBSAL's, with the same number of plans as BCBSAL; (ii) use a broad provider network with the same hospitals as BCBSAL; (iii) have the same cost structure as BCBSAL's; (iv) have the same brand

preference relative to BCBSAL as the preference for Blue Cross of California (Anthem) relative to Blue Shield of California; (v) have the same brand preference for a Green entrant relative to BCBSAL as the preference for Cigna compared to Blues in Florida and Tennessee; (vi) have bargaining strength measured by the ratio of bargaining strength of Blue Cross of California (Anthem) relative to Blue Shield of California multiplied by the bargaining strength of BCBSAL; (vii) enter the entire state; (viii) not negotiate with providers other than for inpatient services at general acute care hospitals; and (ix) incur costs to enter Alabama proportional to Highmark's entry costs in central Pennsylvania. Pakes ¶¶ 176, 232, 235, 237, 243-44, 246, 276; Pakes Dep. at 179:25-180:2.

To calculate damages, Dr. Pakes takes his model's prediction of but-for prices and compares them to what his model predicts BCBSAL's premiums were in the real world. He did not compare his model's but-for prices with BCBSAL's actual premiums. Using his methodology, Dr. Pakes concludes that the Subscriber Class incurred damages of $505.9 million assuming Blue entry and $490.7 million assuming Green entry. In his subsequent merits report, which considers data outside 2010, these numbers drop to $344.1 million under Blue entry and $332.6 million under Green entry. Pakes Merits Dep. at 46: 12-21.

**<u>LEGAL STANDARD</u>**

Under both *Daubert* and Federal Rule of Evidence 702, a district court functions as a "gatekeeper" of expert scientific and technical evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). In its role as gatekeeper, a district court must "ensur[e] the reliability and relevancy of expert testimony." *Kumho Tire*, 526 U.S. at 152. It is widely recognized that expert testimony that is "insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a)

prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187-88 (3d Cir. 2015); *see also Sher v. Raytheon Co.*, 419 F. App'x 887, 890 (11th Cir. 2011) (requiring district court to "resolve any challenge to the reliability of information provided by an expert if that information is relevant to establishing any of the Rule 23 requirements for class certification" (citation omitted)).

To determine whether expert evidence is admissible, a district court conducts an "exacting analysis of the *foundations* of expert opinions." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (internal quotation mark omitted). In the Eleventh Circuit, this analysis takes the form of a "rigorous three-part inquiry." A district court examines whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
>
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
>
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted) (citing *Daubert*, 509 U.S. at 589). The proponent of expert testimony—whether plaintiff or defendant—bears "the burden of satisfying each of these three elements by a preponderance of the evidence." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005); *Frazier*, 387 F.3d at 1260.

## ARGUMENT

### I. DR. PAKES'S MODEL IS BASED ON INCORRECT ASSUMPTIONS ABOUT ENTRY AND CANNOT MODEL REALISTIC ENTRY SCENARIOS OR REAL-WORLD REALITIES OF THE HEALTHCARE MARKET.

Under Rule 702, an expert witness may not offer an opinion that has no basis in the record. Dr. Pakes violates that rule because he bases his structural model on assumptions that lack factual support, are contradicted by the record, or are inconsistent with his own testimony. He relies on these flawed assumptions because the limitations of his model prevent it from operating with assumptions consistent with the evidence and with how the healthcare market operates in the real world. For these reasons, Dr. Pakes's structural model analysis cannot assist a trier of fact.

#### A. Dr. Pakes's Entry Assumptions Are Contradicted by Both the Record and His Own Statements.

As the Supreme Court has recognized, "[e]xpert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them," and an expert cannot hold sway "when indisputable record facts contradict or otherwise render the opinion unreasonable." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). Courts consistently reject expert testimony where the expert's assumptions lack a basis in the record. For example, in *Hall v. Thomas*, 753 F. Supp. 2d 1113 (N.D. Ala. 2010), the Northern District of Alabama rejected expert testimony where the expert's opinions "could only derive from an analytical leap that disregards either the data in front of him, or the conditions antecedent he sets forth." *Id.* at 1142; *see also McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (excluding damages assessment that had "no basis in the record" and "rest[ed] on unsupported assumptions"); *Moore v. Int'l Paint, LLC*, 547 F. App'x 513, 516 (5th Cir. 2013) (per curiam) (affirming exclusion of expert testimony where "the universe of facts assumed by the expert

differs frequently and substantially from the undisputed record evidence"); *Am. Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001) (rejecting a model that contained "too many assumptions and simplifications that are not supported by real-world evidence").

Because Dr. Pakes's entry assumptions are completely devoid of factual support from the record, his opinions cannot assist the Court in determining whether class certification is appropriate. To create his structural model and evaluate his "counterfactual" entry scenario, Dr. Pakes makes a series of assumptions about the characteristics of the entrant and the market. These assumptions are material; different assumptions would result in different outcomes, including outcomes with no harm to putative class members. *See* Pakes Dep. at 295:18-20 ("If you changed the assumptions, then there would probably be a different—how big the difference in outcome would be, I don't know."). Dr. Pakes makes numerous assumptions about entry: BCBSGA would enter Alabama; BCBSGA would enter every county in Alabama; BCBSGA's entry would be complete in three years, between 2005 and 2008; BCBSGA would contract with all the providers that BCBSAL contracts with; BCBSGA would offer only PPO plans; BCBSGA would negotiate provider reimbursement rates only with acute-care hospitals; and BCBSGA would sell plans only to individuals and small groups, not large groups, national accounts, or ASOs. *See* Pakes ¶¶ 222-32, 235, 237, 252, 267; *see also* Pakes Dep. at 179-80.

For his structural model to even have a chance at generating accurate predictions, Dr. Pakes's assumptions must be rooted in fact. They are not. For example, Dr. Pakes ignores the evidence in the record that contradicts these assumptions about entry. For example, he assumes BCBSGA would sell products throughout the entire state of Alabama, Pakes ¶ 233, without performing any independent analysis to confirm this. Pakes Dep. at 292:16-18 ("I thought it was

a reasonable assumption, if they were going to enter, they would enter a whole market."). Dr. Pakes's failure to verify this assumption—or provide any grounds whatsoever to support it—despite his belief that it is "reasonable," makes it pure speculation. *See Walker v. Blitz USA, Inc.*, 663 F. Supp. 2d 1344, 1355-56 (N.D. Ga. 2009) (excluding expert testimony that "would not be helpful to a trier of fact" where the expert's conclusions were "just speculation" and not based on tests actually performed).

It is not "reasonable" to simply assume that BCBSGA would enter the entire state of Alabama, as Dr. Pakes contends. Pakes Dep. at 292:12-20. There is no basis for such an assumption. The record demonstrates that in reality, "[redacted]." Ex. 6, United Dep. at 42:8-18 (emphasis added). For example, third-party insurers testified that population centers are more attractive for entry than rural areas. *See, e.g.*, Ex. 7, SelectHealth Dep. at 132:21-22 ("[redacted]"); Ex. 8, Moda Dep. at 64:7-10 (testifying that [redacted]); Ex. 9, Humana Dep. at 66:20-22 (rural areas are typically considered "less attractive" than urban areas). This is consistent with how commercial health insurers actually compete in Alabama. Indeed, BCBSAL is the *only* insurer on the Affordable Care Act exchanges in Alabama that offers products in every county. *See* Ex. 10, Louise Norris, *Alabama health insurance marketplace: history and news of the state's exchange* (Mar. 25, 2019), https://www.healthinsurance.org/alabama-state-health-insurance-exchange/. The only other insurer currently selling on the exchange in Alabama (Bright Health) sells in Birmingham only. *Id.* When Humana entered the Alabama exchanges, it did so in Huntsville and Birmingham only, and then expanded to seven Alabama counties before

exiting the exchanges altogether. *See* Ex. 11, BCBSAL_0001966627 (excerpt). And although Viva is a provider-owned plan that has been selling commercial health insurance in Alabama since the 1990s, as of 2010 it was only licensed to sell insurance in 27 of 67 Alabama counties. *See* Ex. 12, BCBSAL-0001849319 & BCBSAL-0001849320. Aetna's corporate representative said it best. When asked whether a new entrant could compete with BCBSAL for small groups, he testified: "[redacted]." Ex. 13, Aetna Dep. at 306:6-9. When asked about the individual segment, he said it would be "[redacted]" *Id.* at 306:12. Given this evidence, Dr. Pakes's assumption of statewide entry by 2008 is not only unsupported by economic reasoning, but it is also completely implausible.

Indeed, Dr. Pakes's assumption that BCBSGA would enter Alabama *at all*, much less specifically in 2005, lacks basis in fact. Dr. Pakes did not choose 2005 for entry based on record evidence; he did not read any documents or fact witness deposition testimony to justify this assumption. Pakes Dep. at 25-26. Instead, Dr. Pakes chose 2005 as his entry date because "that is when the national best efforts requirement was added." Pakes Merits Dep. 150:14-18. But Dr. Pakes does not point to any evidence that any Defendant was planning to enter Alabama in 2005 as a Green or a Blue but was prevented from doing so because of the National Best Efforts rules. Dr. Pakes's assumption that entry would have occurred in 2005 is a crucial one because Dr. Pakes has no opinion on whether entry would have occurred in a different year and no model to determine what the result of such entry might be. For example, he admits that entry occurring during the financial crisis of 2008 and after the Affordable Care Act would require different

analysis that he did not do.[2] *Id.* at 150:19-151:4, 154:1-155:1. In short, Dr. Pakes has no method for calculating impact or damages without assuming that entry *would have occurred in 2005*, but he has no factual basis for this assumption. Lacking a record-based foundation for his assumptions, Dr. Pakes's model can yield only speculative results. Such speculation is insufficient. *See Brooke Grp.*, 509 U.S. at 242-43 ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

Dr. Pakes also assumes for purposes of his structural model, without basis in the record, that BCBSGA as an entrant would look nearly identical to BCBSAL. However, Dr. Pakes himself does not believe that an entrant in the real world would resemble BCBSGA in his structural model. Dr. Pakes believes an entrant would view the signals he describes in the first portion of his report (BCBSAL's high market share, high profits, high costs, and single product (a broad network PPO)) as opportunities to enter and earn a profit by distinguishing themselves from BCBSAL. *See* Pakes Part III; Pakes Dep. at 34:19-20 & 35:10-14. For example, Dr. Pakes opines that an entrant could choose to offer a lower-cost HMO product or use a narrow provider network. Pakes ¶ 78 ("An entrant could offer a low-cost, limited provider network PPO plan by selectively contracting with hospitals in Alabama. This product would be competitive vis-à-vis

[2] Dr. Pakes's opinion also should be excluded because, even if there were proof of blocked entry in 2005 (which there is not), damages based on that blocked entry are not recoverable because they are time-barred. Plaintiffs are only permitted to recover damages for overt acts that occur within the limitations period. *See, e.g., Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997) ("[P]laintiff[s] cannot use an independent, new act as a bootstrap to recover for injuries caused by other predicate acts that took place outside the limitations period."). Here, Dr. Pakes, by building his model on a 2005 blocked entry date, does not even attempt to identify an overt act within the limitations period that might have damaged the named plaintiffs or any class members. Because Dr. Pakes does not measure damages based on any overt act within the limitations period, his model generates speculative and unrecoverable damages and should be excluded for that reason.

BCBSAL's PPO plans on cost and differentiated from Viva and UnitedHealth's HMO plans by brand."). Additionally, an entrant could incur lower costs than BCBSAL by using a different cost structure. Pakes Dep. at 37:14-22.

Yet the BCBSGA entrant that Dr. Pakes constructs in the latter part of his report looks nothing like the entrant he describes in the first part of the report. Dr. Pakes assumes that BCBSGA would not take advantage of perceived weaknesses in BCBSAL's business model and instead would recreate that business model. *See* Pakes ¶¶ 176, 232, 235, 237, 243-44, 246, 276; Pakes Dep. at 179:25-180:2. Rather than offering an HMO or other non-PPO product, he assumes that BCBSGA offers only a PPO product in eight individual plans and six small group plans, just like BCBSAL. Pakes ¶ 232. Despite BCBSAL's alleged "inefficient cost management," *id.* ¶ 49, BCBSGA also would not reduce its costs compared to BCBSAL by changing its cost structure; instead, the entrant's subscribers would have the same medical charges and pharmaceutical costs as if they were BCBSAL subscribers. *Id.* ¶ 237. And although Dr. Pakes acknowledges that an entrant might perceive an advantage in entering with a narrow network product, *id.* ¶ 78, he assumes that BCBSGA would build a network as broad as BCBSAL's network—the broadest network of any insurer in the state. *Id.*, App'x C at 53.

The fact that Dr. Pakes's entry assumptions are flawed is critical because they drive his ultimate conclusion that all Subscriber Class members would benefit from entry. For example, his finding that member premiums throughout Alabama would have been lower post-entry is based in part on his assumption of entry throughout Alabama; by contrast, targeted geographic entry would not increase competition in certain areas and thus would leave huge swaths of the putative Alabama damages unaffected. *See, e.g.*, Ex. 14, Crenshaw Community Hospital Dep. at 117:5-10 (agreeing that "some of the commercial insurers choose not to operate in some of the

rural counties [of Alabama] because they're just not attractive from a financial standpoint"). In addition, Dr. Pakes finds class-wide impact in part because he assumes entry with broad network PPO products; entry with HMO or limited-network products could cause healthier subscribers to switch to the entrant, leaving BCBSAL with a costlier pool of subscribers and forcing it to increase premiums for those who do not switch. *See, e.g.*, Ex. 15, BCBSVT-00076853, at '863 (explaining that Cigna cherry picked BCBSVT's favorable risk pool with a limited benefit product, forcing BCBSVT to raise premiums for 6,875 subscribers by an average of 40 percent); Ex. 16, EXCELLUS0205274, at '275 (Preferred Care "is 'cherry-picking' the good healthy risks through brokers and product positioning leaving the Blue Choice pool with the 'sicker' population utilizing more services and driving up the premium.").[3] Indeed, Dr. Pakes admitted that different entry assumptions could cause premiums to go up or down. Pakes Dep. at 84:8-12 (regarding modeling an entrant offering an HMO, "Q. You'd have to separately analyze it? A. Yes. Q. And you don't know whether the premiums would go up or down in that situation? A. No."); *id.* at 252:15-20 (the effect of entry on premiums is "theoretically ambiguous" and it is necessary to perform the analysis to determine which direction premiums would go). Because Dr. Pakes's structural model is based on incorrect assumptions regarding entry, it is inherently unreliable and should be excluded. *See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 862 F. Supp. 2d 1322, 1330 (S.D. Fla. 2012) (excluding an expert's opinion because his model analyzed

[3] *See also* Ex. 17, Mark Shepard, *Hospital Network Competition and Adverse Selection: Evidence from the Massachusetts Health Insurance Exchange*, Nat'l Bureau of Econ. Res. 5-6 (2016) (concluding that "limiting provider networks may be a powerful tool for insurers to avoid unprofitable consumers"); Pakes Dep. at 79:11-18 (agreeing that his previous study of Massachusetts showed that "high-cost patients tend to switch into PPO plans and the low-cost patients tend to switch into the HMO plans").

"the wrong problem" and thus could not assist the trier of fact), *aff'd,* 746 F.3d 1008 (11th Cir. 2014..

**B. Dr. Pakes's Model Cannot Model Entry Assumptions Consistent with the Evidence and with the Real-World Realities of the Healthcare Market**

Dr. Pakes's model does not follow his own report's conclusion about entry for one simple reason: his model is incapable of doing so. Nor can his model account for the complex realities of the healthcare market. Thus, Dr. Pakes's structural model cannot be fixed by using realistic entry scenarios, and it should be excluded as unreliable.

Courts have recognized that opinions that do "not account for changes in other relevant market conditions . . . would not assist a trier of fact." *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1507 (D. Kan. 1995); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (expert testimony "should not have been admitted because it did not incorporate all aspects of the economic reality of the . . . market"); *Winn-Dixie*, 862 F. Supp. 2d at 1335 (rejecting regression model where expert did not consider the correct market conditions based on the facts of the case). For example, the court in *In re Aluminum Phosphide* excluded expert testimony because the expert's model did "not account for other undisputed market factors, such as increasing competition from foreign manufacturers with lower production costs, which must be considered before a reliable price may be predicted for the conspiracy period." 893 F. Supp. at 1505.

Likewise, Dr. Pakes's model cannot account for "undisputed market factors" and differs from the real world in several key ways. For example, his model does not meaningfully account for how BCBSAL or another incumbent firm would respond to an entrant by either a Blue or a Green. Indeed, Dr. Pakes's model does not allow for incumbent firms to react to entry with anything other than changing premiums and reimbursement rates for general acute care inpatient

treatment. Pakes Dep. at 317:4-7. His assumption is that incumbent insurers, including BCBSAL, would continue to operate in the same areas, with the same products, and the same provider network.

Dr. Pakes conceded that, in reality, incumbent insurers would respond to entry in ways other than simply changing prices. For example, Dr. Pakes acknowledges that if an entrant marketed a profitable narrow network plan, "BCBSAL might respond with a narrow network plan of its own." Pakes ¶ 105 n.193. Additionally, Dr. Pakes testified that a firm would "generally look for options to counteract" pressure from a competitor, perhaps by reducing costs or reimbursement rates, or changing its plan design. Pakes Dep. at 45. Yet his model does not permit modeling of this most basic of economic principles. The failure to take these likely responses into account renders Dr. Pakes's structural model analysis unhelpful to a trier of fact. *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 988-89 (C.D. Cal. 2012) (excluding expert testimony where expert "fail[ed] to analyze, in a meaningful way" the possibility that alternative outcomes could have changed the analysis).

Dr. Pakes's structural model also artificially limits the scope of bargaining with providers. Dr. Pakes recognizes that potential increases in provider costs caused by entry must be accounted for in determining the effect of entry on premiums, Pakes ¶ 218, yet he assumes that BCBSGA would only negotiate reimbursement rates for inpatient services with providers at acute-care hospitals, which represent only a fraction (about 25%) of BCBSAL's claims costs. *Id.* ¶ 185. His model holds non-hospital provider costs—the majority of claims costs for BCBSAL—constant. *Id.* ¶ 176. That is, the structural model assumes—without any basis—that only 25% of BCBSAL's claims costs would be subject to any increase in the but-for world. Moreover, Dr. Pakes's structural model also assumes that BCBSGA would not compete for

ASOs and large groups, even though he "realize[s] that's wrong." Pakes Dep. at 271:11. Although health insurers obviously bargain with providers on behalf of *all* of their subscribers, Dr. Pakes only includes members from the individual and small group segments in his bargaining model. Pakes ¶ 219; *see also* Pakes Dep. at 269:17-18 (acknowledging that an insurer bargaining for all lives, not just individual and small group lives, is "what actually happens upstream"). Thus, Dr. Pakes's model also does not even attempt to account for the effect of BCBSGA's likely competition for ASOs and large groups on hospital prices. Pakes ¶ 252; Pakes Dep. at 275:24-276:1 ("I'm assuming ASOs, medium-sized groups, national accounts don't exist" for the purposes of bargaining).

Nor can Dr. Pakes's structural model take into account adverse selection in modeling entry with an HMO product. Dr. Pakes admitted that he chose to have BCBSGA offer only PPO products rather than an HMO or other product because he could not model entry with those other products. Pakes Dep. at 89:13-14 ("I put in only PPOs, I put in products I thought my data could evaluate."); *id.* at 336:25-337:3 ("It would have been very hard for me to evaluate [other products] . . . [b]ecause it's not in the data"). Perhaps more importantly, however, Dr. Pakes *concedes that his structural model cannot do this analysis*. *See id.* at 84:8-12. To model entry with an HMO, Dr. Pakes would need to consider adverse selection—*i.e.*, the "propensity of certain plans to attract consumers with attributes that make them costly." Ex. 18, Kate Ho, Ariel Pakes & Mark Shepard, *The Evolution of Health Insurer Costs in Massachusetts, 2010-12*, 53(1) Rev. of Indus. Org. 117 (2018) (Pakes Dep., Ex. 2 at 2). Dr. Pakes discusses adverse selection in his paper *The Evolution of Health Insurer Costs in Massachusetts, 2010-12*, where he notes that "[w]hen sicker consumers differentially leave the market or switch into certain plans, this affects the analysis of cost trends and the comparison of those trends across plans." *Id.* at 2. He

explains that "switchers from HMO to PPO plans tend to be high-cost, and switchers from PPO to HMO plans tends to be low-cost." *Id.* at 10. And he recognizes that adverse selection may be an issue if an HMO plan were offered in Alabama. Pakes, App'x C at 12 ("[T]here is some evidence that patients with HMO products are somewhat less 'sick' than BCBSAL patients."). Put simply, if an insurer offers an HMO product, healthier subscribers who switch to the HMO could pay lower premiums, but sicker subscribers who remain with the incumbent PPO product would likely be forced to pay higher premiums as heathier subscribers leave the risk pool. To take into account adverse selection, Dr. Pakes claims that he "would need a demand system that allowed for HMO products in the whole state so [he] could compare [subscribers] and see who [] switches"). Pakes Dep. at 82:21-83:3. That is, Dr. Pakes would need an entirely different model to simulate the realistic choice of BCBSGA to offer an HMO product.

Because Dr. Pakes's structural model analysis does "not incorporate all aspects of the economic reality of the . . . market," it should be excluded. *See Concord Boat Corp.*, 207 F.3d at 1057.

## II. THE COURT SHOULD EXCLUDE DR. PAKES'S STRUCTURAL MODEL ANALYSIS BECAUSE THE RESULTS DO NOT FIT THE EVIDENCE.

An expert's opinion must "fit" the evidence. To measure "*Daubert* fit," the court's "gatekeeping inquiry must be tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150 (quotation marks omitted) (citing *Daubert*, 509 U.S. at 591). "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (citation omitted).

As a threshold matter, Dr. Pakes's structural model should be excluded because it is inconsistent with how antitrust damages are calculated as a matter of law. In antitrust cases, connecting a model of impact and damages to the real world is particularly critical because impact and damages are calculated by measuring the difference between real world prices with the alleged conduct to prices in a "but for" world without the alleged conduct. *See* Ex. 19, ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 243 (2017) ("[M]onopoly overcharge damages can be calculated . . . by determining a hypothetical competitive price, subtracting it from the actual price, and multiplying the resulting price differential by the quantity purchased."); *see also In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *25 (M.D. Fla., April 3, 2014) ("Dr. Singer's failure to account for the actual price paid, a critical factor in determining antitrust impact, renders his regressions legally deficient.").

Dr. Pakes's structural model does not even *attempt* to accurately model the real world. Instead of comparing premiums in the *actual* world to what his model predicts premiums would be in "but for" world, Dr. Pakes compares what his model *predicts* premiums should be in the real world (under Dr. Pakes's contrived equilibrium assumptions) to what his model predicts premiums would be in a "but for" world. Pakes, App'x C at 1 ("I simulate the impacts of entry by a Blue or Green on premiums by comparing the premiums the model predicts for the actual world to those expected in a world with entry."). In other words, his baseline is not the premiums that BCBSAL actually charged. Instead, he compares a prediction to *another prediction*.

Because Dr. Pakes does not compare *real world* prices to the prices he models in the but-for world, the only way for his structural model to be useful is if it can closely predict the actual

prices that occurred in the real world. This is true of all structural models. Structural models are ineffective if they cannot accurately predict real world competitive conditions. Ex. 2, Ordover Decl. ¶ 15. Dr. Pakes apparently agrees with that consensus; he designed the structural model "to reproduce the features of the Alabama health insurance market." Pakes ¶ 183. One way to validate a model, Dr. Pakes notes, is to see if the model can "reproduce the basic facts in the current market." Pakes Dep. at 299:20; *see also* Pakes ¶ 213 ("In order to assess the accuracy of a structural model, the model's predictions are compared to actual market outcomes."). In an attempt to do this, Dr. Pakes ran one test, comparing real-world market shares by segment and geography to the market shares generated by his model. Pakes ¶ 213 (comparing the model's predictions to the observed market shares "is important because the actual and but-for prices are region-specific, so an ability to predict well at a region level is important for the counterfactual results"). But, remarkably, Dr. Pakes ignored whether his model accurately predicts real-world premiums, even though his entire model hinges on whether that prediction was accurate, as the model's whole purpose is to measure how much actual premiums supposedly were inflated because of the challenged agreements.

As it turns out, the prediction is not accurate. As explained in the attached declaration, Dr. Pakes's own backup files reflect his estimate of BCBSAL's *actual* premiums. Comparing those actual premiums to the non-entry premiums produced by his structural model demonstrates that his structural model yields an alternate reality. Indeed, Dr. Pakes's model predicts premiums for BCBSAL that are *far* higher than BCBSAL's actual premiums. For example, with respect to BCBSAL's premiums charged to individual subscribers in 2010, Dr. Pakes's model predicts non-entry premiums to be *more than double* what BCBSAL actually charged—$281 predicted premiums versus $133 actual premiums. Ex. 2, Ordover Decl., Table 1. A similar

pattern holds for small groups. *Id.* Table 2. Because Dr. Pakes's model is based on an inaccurate prediction of BCBSAL's actual premiums, it is inherently unreliable and incapable of estimating impact or damages.

Courts exclude expert testimony where the expert's calculations do not match figures in the real world. For example, in *Rojas v. Marko Zaninovich, Inc.*, No. CIV-F-09-0705 AWI JLT, 2011 WL 6671737 (E.D. Cal. Dec. 21, 2011), the court excluded expert testimony because the expert could not accurately predict payroll numbers. Instead of designing a model in which the results matched the actual amounts that employees were paid, the expert devised his own calculations "based upon his own assumptions regarding how the data should work." *Id.* at *4. The court found the expert's testimony to be unreliable because the expert "neglect[ed] to confirm whether his calculations matched what [the employer] actually paid its employees." *Id.* Likewise, Dr. Pakes's testimony, opinions, and analysis should be excluded because his model predicts figures, such as premiums and profits, that diverge widely from the real world.

This flaw does not just render his calculations of impact and damages unreliable, it also undercuts his conclusion that entry would be profitable. Dr. Pakes's conclusion that entry would be profitable hinges on the "returns" generated by the structural model. Those "returns" are contingent on the entrant competing against predicted premiums that were much *higher* than BCBSAL's actual premiums. If the entrant were competing against BCBSAL's *actual* (lower) premiums, the entrant would have to charge lower premiums to be price competitive. Charging lower premiums means the entrant would have earned lower returns and been less profitable in the model—which, of course is consistent with the record evidence explaining why insurers do not compete in Alabama or compete only narrowly. *See, e.g.*, Ex. 13, Aetna Dep. at 306:6-12. That Dr. Pakes's structural model did not use actual premiums led it to predict dramatically

inflated profits for the entrant. As a result, Dr. Pakes's profitability analysis is incapable of accurately measuring whether entry would occur at all.

Premiums are not the only area in which Dr. Pakes's structural model fails to fit the evidence. It also fails to fit the evidence in predicting entrant market shares. For both Blue and Green entrants, Dr. Pakes predicts that BCBSGA would capture about 1/4 of the market for small groups and 2/3 of the market for individuals. Pakes, App'x C at 56. These predictions are untethered from reality. No real-world examples exist of a *de novo* entrant capturing such large market share in a mere three years. Dr. Pakes was not aware of any entrant that gained such significant market share within three years. Pakes Dep. at 141:12-13 ("Am I aware? I've never studied health insurance."). Even insurers who have offered products in Alabama for years and have sufficient capital to expand have not been able to gain anywhere near the market share predicted by Dr. Pakes. *See* Pakes ¶ 37 (neither UnitedHealthcare nor Humana could achieve more than 8 percent of the individual segment in Alabama between 2010 and 2013); *id.* ¶ 38 (neither UnitedHealthcare nor Viva Health could achieve more than 4 percent of the small group segment in Alabama between 2010 and 2013); *see also* Ex. 20, 2008 United 10-K ($75.9 billion in revenues in 2008); Ex. 21, 2008 Humana 10-K ($28.9 billion in revenues in 2008).

Dr. Pakes's structural model should be excluded because its results do not "fit" the evidence. The model cannot predict real world premiums, generates implausible entrant market shares, and is inherently unreliable.

## III. THE COURT SHOULD EXCLUDE DR. PAKES'S REGRESSION ANALYSIS BECAUSE IT WOULD NOT ASSIST A TRIER OF FACT.

Dr. Pakes uses a reduced form regression model as a check on his structural model, not to reach the core conclusions of his report. Pakes Dep. at 299:12-14. Indeed, Dr. Pakes stated explicitly that "the ability of reduced form models to provide precise quantitative measures of

damages can be limited." Pakes ¶ 91. Because his structural model is unreliable, he has no model for impact or damages. And with "[n]o damages model, no predominance, no class certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013).

Even still, like his structural model, Dr. Pakes's regression analysis also should be excluded because it rests on incorrect assumptions that have no basis in the record. Dr. Pakes's regression analysis is based on the model put forward by Trish and Herring. However, Dr. Pakes misapplies the Trish and Herring study upon which it relies. Dr. Pakes's regression ignores Trish and Herring's crucial contribution to the field: that changes in *either* subscriber or provider concentration can result in a change in premiums. On the subscriber side of the market, increased insurer competition may tend to drive average premiums down. Only insurer entry into the fully-insured segment affects subscriber-side competition because only fully-insured accounts pay traditional premiums. However, on the provider side of the market, increased insurer competition may reduce an insurer's negotiation leverage with providers over reimbursement rates. This leads to increased average provider rates, which are passed through to consumers in the form of higher premiums. Importantly, an insurer's entire book of business—fully-insured and self-insured accounts—affects provider-side competition. Providers value access to subscribers, regardless of whether the insurer or insured's employer pays the final bill. Empirically, Trish and Herring found that these competing effects offset almost perfectly.

Yet Dr. Pakes manipulates Trish and Herring's analysis to fit subscribers' case by assuming—without an iota of support or having even considered whether it was a reasonable assumption—that an entrant competes only for fully-insured business (which tends to drive premiums down on average). Pakes Merits Dep. at 85-87. By assuming an entrant does not

compete for ASO or self-insured business, Dr. Pakes blunts the provider-side effect. Entry into the self-insured segment would increase insurer competition, increase average provider rates, and thus increase premiums. Dr. Pakes recognized that by excluding these lives from his regression, he would artificially decrease the negotiating leverage of providers and subscriber premiums with it. Pakes ¶ 253.

As the attached declaration from Dr. Ordover shows, correcting Dr. Pakes's regression analysis to include more reasonable entry assumptions flips his conclusion. Indeed, many putative class members would see *increased* premiums upon entry; if an entrant took 20 percent of fully insured and ASO subscribers from all insurers, by 2013 *half* of core-based statistical areas would see higher premiums, as would over one-third of BCBSAL subscribers. Ex. 2, Ordover Decl., Table 3. Put another way, a full one-third of the Subscriber Class would be *harmed* by entry. This shows both that that Dr. Pakes's analysis is unreliable and that the model on which he relies does not even support his own conclusions. For these reasons, Dr. Pakes's regression cannot possibly "aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591.

Because his regression analysis ignores the real world, rests on baseless assumptions, and is not considered a precise tool by Dr. Pakes himself, it should be excluded.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court exclude or strike Dr. Pakes's testimony, opinions, and analysis.

Dated: July 1, 2019

Respectfully submitted,

/s/ E. Desmond Hogan
Craig A. Hoover

E. Desmond Hogan
Justin Bernick
Peter Bisio
Elizabeth Jose
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637 5600
Fax: (202) 637 5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com
peter.bisio@hoganlovells.com
elizabeth.jose@hoganlovells.com

*Co-Coordinating Counsel for the Defendants*

Cavender C. Kimble
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

*With Hogan Lovells, counsel for Blue Cross and Blue Shield of North Carolina, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon; Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
Sarah J. Donnell
Christa C. Cottrell, P.C.
Zachary Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com
sdonnell@kirkland.com
ccottrell@kirkland.com
zachary.holmstead@kirkland.com

*Co-Coordinating Counsel for the Defendants*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE JORDAN RATLIFF & BRANDT LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209
Tel: (205) 870-0555

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY & SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255-9421
Fax: (803) 255-9054
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Blue Cross and Blue Shield of North Carolina, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon; Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action.*

Christine Varney
Evan Chesler
Karin DeMasi
Lauren Kennedy
CRAVATH SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Tel: (212) 474-1000
Fax: (212) 474-3700
cvarney@cravath.com
echesler@cravath.com

Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Defendants' Liaison Counsel*

*With Kirkland & Ellis, counsel for Defendant, Blue Cross and Blue Shield Association*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL 35203
Tel: (205) 254-1000
Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com

Pamela B. Slate
HILL HILL CARTER FRANCO COLE & BLACK, P.C.
425 South Perry Street
Montgomery, AL 36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*Counsel for Defendant, Blue Cross Blue Shield of Alabama*

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
Erica B. Zolner
Casey R. Fronk
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000

kdemasi@cravath.com
lkennedy@cravath.com

*Counsel for Defendants Blue Cross and Blue Shield of Tennessee, Inc.; Blue Cross Blue Shield of Alabama; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY & SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255 9421
Fax: (803) 255 9054
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Defendants Blue Cross and Blue Shield of Tennessee, Inc.; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.*

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL 35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendants Blue Cross and Blue Shield of Tennessee, Inc.; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.*

Brian K. Norman
SHAMOUN & NORMAN, LLP

Fax: (312) 862-2200
hwitt@kirkland.com
jzeiger@kirkland.com
ezolner@kirkland.com
cfronk@kirkland.com

Kimberly R. West (*Liaison Counsel*)
Mark H. Hogewood
WALLACE JORDAN RATLIFF & BRANDT LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35253
Tel: (205) 870-0555
Fax: (205) 871-753
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants, Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.; California Physicians' Service d/b/a Blue Shield of California*

Jonathan M. Redgrave
Victoria A. Redgrave
REDGRAVE, LLP
14555 Avion Parkway, Suite 275
Chantilly, VA 20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com

1800 Valley View Lane, Suite 200
Farmers Branch, TX 75234
Tel: (214) 987-1745
Fax: (214) 521-9033
bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
63 South Royal Street, 13th Floor
Riverview Plaza
Mobile, AL 36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

*Counsel for Defendants, Carefirst, Inc.; Carefirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.*

R. David Kaufman
M. Patrick McDowell
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS 39201
Tel: (601) 948-3101
Fax: (601) 960-6902
dkaufman@brunini.com
pmcdowell@brunini.com

Cheri D. Green
BLUE CROSS BLUE SHIELD OF MISSISSIPPI
P. O. Box 1043
Jackson, MS 39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

John D. Martin
Lucile H. Cohen

vredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark Defendants*

Andy P. Campbell
Stephen D. Wadsworth
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL, GUIN, WILLIAMS, GUY & GIDIERE LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Tel: (205) 224-0750
Fax: (205) 224-8622
andrew.campbell@campbellguin.com
stephen.wadsworth@campbellguin.com
todd.campbell@campbellguin.com
yawanna.mcdonald@campbellguin.com

Sarah L. Cylkowski
Thomas J. Rheaume, Jr.
BODMAN PLC
201 South Division Street, Suite 400
Ann Arbor, MI 48104
Tel: (734) 761-3780
Fax: (734) 930-2494
scylkowski@bodmanlaw.com
trheaume@bodmanlaw.com

Todd Stenerson
SHEARMAN & STERLING LLP
401 9th Street, NW
Suite 800
Washington, DC 20004-2128
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com

*Counsel for Defendant, Blue Cross and Blue Shield of Michigan*

Travis A. Bustamante
NELSON MULLINS RILEY & SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255-9421
Fax: (803) 255-9054
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Defendant, Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company*

Michael A. Naranjo
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA 94104-1520
Tel: (415) 984-9847
Fax: (415) 434-4507
mnaranjo@foley.com

Alan D. Rutenberg
Benjamin R. Dryden
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Tel: (202) 672-5300
Fax: (202) 672-5399
arutenberg@foley.com
bdryden@foley.com

*Counsel for Defendant, USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue Shield*

Charles L. Sweeris
Law Department
BLUE SHIELD OF CALIFORNIA
50 Beale Street
San Francisco, CA 94105
Tel: (415) 229-5107

John Briggs
Rachel Adcox
AXINN, VELTROP & HARKRIDER, LLP
950 F Street, N.W.
Washington, DC 20004
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
radcox@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5000
Fax: (205) 250-5034
steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendant, Independence Blue Cross*

Edward S. Bloomberg
John G. Schmidt
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY 14203
Tel: (716) 847-7096
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com

Stephen A. Walsh
ADAMS and REESE LLP
1901 Sixth Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5000

Fax: (415) 229-5343
charles.sweeris@blueshieldca.com

*Counsel for California Physicians' Service d/b/a Blue Shield of California*

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Mary G. Menge
Morgan B. Franz
Jess R. Nix
SPOTSWOOD SANSOM & SANSBURY LLC
One Federal Place
1819 5th Avenue North, Suite 1050
Birmingham, AL 35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
mmenge@spotswoodllc.com
mfranz@spotswoodllc.com
jnix@spotswoodllc.com

*Counsel for Defendant Capital BlueCross*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON LLP
1420 Fifth Ave, Suite 3700
Seattle, WA 98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

J. Bentley Owens, III
WALLACE, ELLIS, FOWLER, HEAD & JUSTICE
113 North Main Street
Columbiana, AL 35051-0587

Fax: (205) 250-5091
Stephen.walsh@arlaw.com

*Counsel for Defendant, Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield, incorrectly sued as Excellus BlueCross BlueShield of New York*

Kathleen Taylor Sooy
Tracy A. Roman
April N. Ross
Michael W. Lieberman
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com
aross@crowell.com
mlieberman@crowell.com

John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
Tel: (205) 581-0716
Fax: (205) 380-9116
jjohnson@lightfootlaw.com

*Counsel for Defendants, Blue Cross of Idaho Health Service, Inc.; Blue Cross and Blue Shield of Kansas, Inc.; Blue Cross and Blue Shield of Kansas City; Blue Cross and Blue Shield of Nebraska; Blue Cross Blue Shield of Arizona; Blue Cross Blue Shield of North Dakota; Blue Cross Blue Shield of Wyoming; HealthNow New York Inc.; BlueShield of Northeastern New York; BlueCross BlueShield of Western New York*

Tel: (205) 669-6783
Fax: (205) 669-4932
bowens@wefhlaw.com

*Counsel for Defendants, Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com

*Counsel for Defendants Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Triple-S Salud, Inc.*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF & BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association*

*(Blue Cross and Blue Shield of Hawaii)*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY & SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255 9421
Fax: (803) 255 9054
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Defendants Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Triple S Salud, Inc.*