FILED
2020 Apr-24 PM 04:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 1

VERITEXT
LEGAL SOLUTIONS

Deposition of:

**CONF. Daniel J. Slottje , Ph.D.**

*May 9, 2019*

In the Matter of:

# Blue Cross Blue Shield Antitrust Litigation/in Re

Freedom Court Reporting
800.808.4958 | calendar-freedom@veritext.com | 205-397-2397

Q. Is Slottje Exhibit 1 the report you're submitting in this matter?
A. Yes.
Q. And before we start talking about it, is there anything about your report you'd like to change?
A. No.
Q. And for what purpose are you submitting Slottje 1?
A. As an expression of my opinions in this matter, with respect to both class certification and merits.
Q. Do you expect to supplement your report on the merits at all?
A. I mean, down the line, I -- if I'm asked to do it, I will do it in rebuttal. But other than that, I'm not aware of any reason to or need to though.
Q. But it's your intention currently that this is also a merits report?
A. Yes.
Q. So in that sense, a report that you would present at some point, if necessary, to the jury?
A. Yes.

opinion on that, actually.
Q. Okay.
A. The way you posited it.
Q. Okay. So you mentioned that you excluded out-of-network claims. Why did you decide to do that?
A. I was told to do that; directed to do that by counsel.
Q. So you didn't make any independent judgment to exclude out-of-network claims; correct?
A. Correct.
Q. That was done at the instruction of Plaintiffs' counsel; correct?
A. And let's be clear on what happens here. You'll -- Again, for clarification, you probably know this, but perhaps others don't, there was significant amount of filtering of the data, and many, many exclusions of things. All of those exclusions were done either under the auspices of guidance by counsel or, in many cases, by advice coming from your side of the case to explain to us that these things were appropriately excluded, given the, quote, unquote, covered charges.

I did not make a determination of that. I followed -- I followed guidance from both correspondence from Defense counsel as well as from Plaintiff counsel.

Q. Okay. So you just used the phrase covered charges.

A. Yes.

Q. What does that mean in the context of your report?

A. This means that someone made a call on what should -- what would be analyzed in here and what would be excluded. I didn't make that call as a statistical economic expert.

Q. You tried to implement the instruction to eliminate certain data?

A. That's fair.

Q. Do you know how many acute care hospitals there are in Alabama?

A. Under the American Hospital Association definition, during the class period there are a hundred and six, that are either acute care hospitals that provide -- that are either general acute care hospitals or they provide acute care services, those are the

conclusions, if I understand your testimony correct, of, for example, Professor Haas-Wilson that you rely on as part of your report?
A. Yes.
Q. But you did not independently come to the judgments that Professor Haas-Wilson came to; correct?
A. That's correct.
Q. And same thing for Dr. Frech?
A. That's correct.
Q. Okay. I want to go back to paragraph ten. And when you say: I do not offer an opinion on this issue, let me reask the question before, that we clarified, to see if we're on the same page.
Professor Slottje, are you offering an opinion in this case that any of the alleged conduct is anticompetitive?
A. I am offering an opinion that it is assumed it is so.
Q. Are you offering, sir, an independent opinion, without assumption, that any of the alleged conduct is anticompetitive?
A. No.
Q. So I'd like to move then to what

fifty-eight on pages twenty-four and twenty-five. So it would probably be helpful if you can just take a minute and read all those paragraphs through 58-E before I ask my questions. And then through the course of my questions, feel free to refer to them at any time you need. Okay?

A. Sure.

(Witness complies.) Okay.

Q. And we'll get into some more detail. But generally what are you describing in paragraph fifty-eight of your report?

A. Basically, Dr. Haas-Wilson describes how she arrives at the theoretical underpinnings of her model to arrive at her empirical model, and there's a series of steps and a series of descriptions of relationships. And then she quantifies those through an econometric model, and this is a descriptor of how she does that.

Q. Okay. And why did you find it necessary to summarize her findings in your report?

A. Because I rely on her ultimate conclusions in Appendix G in her report. Her

harm percentages are a direct component of my analysis for damages.

Q. Okay. And you said her output that's in Appendix G?

A. Yes.

Q. Okay. I've got that here, we'll get to it in a minute.

A. I see it. It's right in front of me.

Q. Perfect. So in paragraph fifty-eight, you again use the capitalized phrase alleged conduct, do you see that?

A. Yes.

Q. Do you -- Do you recall what -- what that alleged conduct entails?

A. Yes.

Q. Could you tell us what it is?

A. If you want it to be a memory test, I'll tell you; if you want me to be explicit, I --

Q. I was looking for the paragraph. I couldn't find it real handy. But I have no problem with you going back to it.

To your point, sir, I do not want this to be a memory test.

into Dr. Haas-Wilson's hospital pricing model?
A. She determined the inputs in her general acute care pricing model.
Q. So what involvement did you have?
A. I was not involved in the specification of her -- she calls it -- referred to it as a GAC model, pricing model.
Q. Were you involved, sir, in any way in specifying Dr. Haas-Wilson's hospital pricing model?
A. I was involved in looking at the reliability of it, which I find to be very reliable and reasonable. I was not involved in the actual specification of the model or the construction of the model.
Q. And you made a clarification there about you looked into the reliability, but you didn't construct it; correct?
A. Yes.
Q. What's the difference?
A. Well, the difference is that I relied on the estimates that came out of it. I am an econometrician, so I want to make sure that the model that she used, that ultimately gave harm estimates that I ultimately rely on

to determine my damage estimates, is a reliable model.

And I looked at this basically as I would look at if I was refereeing a journal article. The quality of the work that was done, and in my opinion it was very high quality work; if this was sent to me as an editor, and I've edited several journals, I would -- and as an applied econometrician, I consider it to be a very robust, well-done, robust stable model. And I would publish it.

Q. What is R squared?

A. R squared in general?

Q. Uh-huh.

A. There's several definitions of it. In general, the R squared of a model is -- Do you want a mathematical definition or lay person definition?

Q. Let's start with a lay person, please.

A. It's the residual that's left after you look at the relationship between the explanatory and the independent variables and the dependent variable.

Q. And what are -- What's the range

next few pages, determines how I calculate damages because of the percentages. So in one sense, you could say yes, it's purely these percentages; but the way that I actually calculate damages, I'm following her analysis, and I'm going to be calculating on some different kind of damages for homed share claims versus participating claims that are the second local Blue versus everyone else; that's following her analysis. But it's not simply relying on numbers, because I have to understand that, what she did here, and we're going to be talking about, to guide how I calculate damages.

Q. Correct. But I think as we established before, for purposes of your portion of the analysis, you're assuming that her analysis is correct?

A. I assume her analysis is correct, and I have already told you that I also believe it is reliable and well done.

Q. We're going to get to that.

A. Yeah, I'm sure.

Q. Okay. So let's go to the next sentence in paragraph fifty-eight where you

write: Dr. Haas-Wilson expects -- I'm going to come back to that word -- that but for the Alleged Conduct, i.e., market allocation selling insurance, market allocation on provider contracting, and price-fixing, the following competitive outcomes would have existed in Alabama.

Do you see that?

A. Yes.

Q. What's your understanding of -- Strike that.

How did you learn about Dr. Haas-Wilson's expectations of the but-for world?

A. Because she expressed them. I'm simply relating here what she expressed.

Q. Okay. And the first thing that she expresses is in paragraph 58-a; is that right?

A. Yes.

Q. And that is, she believes that, quote, BCBS-Alabama's contracting share in each Alabama CBSA/county no longer includes all its own enrollees -- plus all other Blues' enrollees in each Alabama CBSA/county.

that have members that either reside or are passing through and use Alabama providers. It's all of those together.

Q. Okay. Now, back to 58-a. My understanding is 58-a says, Dr. Haas-Wilson expects that, but for the alleged conduct, Blue Cross Blue Shield of Alabama's contracting share would not include all of that; correct?

MR. WHATLEY: Object to the form.

A. And that's what I explained to you before.

Q. So my understanding is correct?

A. Yes.

Q. Okay. And what involvement, sir, if any, did you have in reaching that conclusion in 58-a that but for the alleged conduct, Blue Cross Blue Shield of Alabama's contracting share would be lower?

A. That determination was made by Professor Haas-Wilson.

Q. And what involvement, sir, did you have in it, if any?

A. In the actual construction of the analysis; is that what you're asking me?

Q. Yes.

A. I was not involved in the ultimate model that she is suggesting for the same reasons I talked about earlier.

Q. Okay. So moving to 58-b in your report. And, again, as I understand, this is Dr. Haas-Wilson -- you summarizing her as to what would happen but for the alleged conduct; correct?

A. Yes.

Q. And you write, quote, a second Blue would have sold health insurance in each Alabama CBSA/county.

Do you see that?

A. Yes.

Q. What involvement, sir, if any, did you have in determining, as part of Dr. Haas-Wilson's analysis, that a second Blue would have sold health insurance in each Alabama CBSA or county but for the alleged conduct?

A. That determination was made by Professor Haas-Wilson.

Q. And what involvement did you have in it?

A. I was not involved in the

determination of that relationship. She did.

Q. Okay. And which Blue would have sold health insurance in each Alabama CBSA or county in the but-for world?

A. What she's saying here?

Q. No. Do you have an opinion, sir, as to which Blue would have sold health insurance in each Alabama CBSA or county but for the alleged conduct?

A. My recollection is that Professor Haas-Wilson simply calls that the second local Blue. And it's an empirical guideline in what that would be, it tends to be the Blue with the largest share in that particular CBSA or county. She made that determination.

Q. I understand. Do you know how many Blues there are in the United States?

A. Are you asking me how many different entities?

Q. Yes, sir.

A. Like thirty-six entities. Is that what you're asking me about?

Q. Yeah. Do you know how many Blue licenses there are?

A. There's thirty-six.

Q. Of those thirty-six -- I take it that second Blue refers to one of those other Blues that's not Alabama; correct?

A. Yes.

Q. Is there any other possible source of the second Blue entry, other than those licensees?

A. Not that I'm aware of.

Q. Okay. So my question is very simple. Do you have an opinion, sir, as to which Blue would be the second Blue that would have sold health insurance in each Alabama CBSA or county, but for the alleged conduct?

A. No.

Q. Okay. Did you do any analysis as to whether or not, for example, Mississippi would have entered any county in Alabama, but for the alleged conduct?

A. I've done analysis that I'm aware that there are over a hundred and twenty thousand Anthem members in Alabama; there are over eighty thousand HCSC members in Alabama; there are other fifty thousand Highmark members in Alabama; there are well over four hundred and fifty thousand other Blue members in

reasonable way to do it.

But to answer the question you asked, is that what that means, that I can't answer.

Q. Yeah.

A. Because she may mean something else by it, and I'm not going to put words in her mouth nor -- I don't -- she may have a different concept there, and I don't want to say. So I'll have to defer on that one.

Q. Okay. And, again, I appreciate that. I am trying to clarify between your opinion and hers. As I understand it, you don't have an opinion that you're offering in this case as to who the second local Blue would be; correct?

A. That's a determination that was made by Professor Haas-Wilson.

Q. So you don't have an opinion on that issue; correct?

A. Correct.

Q. Okay. And the two assumptions in 58-b that this hypothetical second Blue would have the share of equal to the current out-of-service area Blue with the largest

share, plus the amount of share taken from Blue Cross Blue Shield of Alabama, those two conditions, what involvement did you have in determining that part of her analysis?

A. Well, the whole point of -- If you want to go through every one of these sections like that, we can short circuit it. These are all her analyses that she determined. And I -- That's explicitly the reason that I cited them, and I did not say: Professor Haas-Wilson and I came up with this amazing model; unfortunately for me, she did it. And that's why I cite to exactly where she did it. She made these determinations, I did not.

Q. Okay. And that's true for every determination in paragraph 58?

A. Yes.

Q. Okay. And that might short circuit it a little bit, but I can't help myself, I'm going to have to go a little bit more --

A. That's okay. It's fun to talk about this stuff.

MR. WHATLEY: It's in his outline, so he's got to cover it --

of products, so I know that. But do I have an opinion on any particular county? No, I don't have an opinion on that.

Q. And when you say you know empirically what the percentage are in Alabama of the different types of products, you mean that are being sold today; correct?

A. Yes.

Q. What are some of those types of products?

A. National accounts, large group insurance, ASOs, little groups, small groups. There's probably somebody in there in between.

Q. Individual?

A. Yeah. Those.

Q. Okay. So it's your understanding that currently in Alabama, Blue Cross Blue Shield of Alabama sells national accounts, large groups, middle groups, ASOs, small groups, and individual insurance?

A. Yes.

Q. So the hypothetical second Blue in Dr. Haas-Wilson's model, what products would each second Blue sell in the Alabama CBSAs and counties, but for the alleged conduct?

A. I would not have an opinion on that.
Q. You have no opinion either way?
A. No.
Q. Would that matter to your model?
A. No.
Q. Would the network design of any product that the second Blue might sell in any Alabama CBSA or county, but for the alleged conduct, have any impact on your model?
MR. WHATLEY: Object to the form.
A. Repeat the question.
Q. Sure. Would the network design of any product that a second Blue would sell in any Alabama CBSA or county, but for the alleged conduct, impact your model in any way?
MR. WHATLEY: Same objection.
A. No. Because historically what's transpired has transpired. So, no, it would not.
Q. What do you mean by, quote, what has historically transpired has transpired?
A. Well, we know what services were sold in various areas, we know what percentage of those were inpatient, we know what

A. Professor Haas-Wilson.
Q. And what opinion are you giving on that?
A. You mean that it -- an opinion -- Okay. My opinion is to a reasonable assumption.
Q. Bad question.
Did you reach your own opinion as to whether or not the remaining out-of-service area Blues with enrollees in each Alabama CBSA or county would contract jointly and directly with putative Class members?
A. The same answer that I do -- you asked me if I reached my opinion, my opinion is it's a reasonable assumption.
Q. But it was not your opinion; correct?
A. That is my -- You said what's my opinion. That is my opinion. It was not my determination.
Q. Maybe that's the way to do it.
A. My job, I know, is not to do your work for you, but I just thought we'd save five minutes.
Q. I will take all the help I can

Haas-Wilson modeled more than one scenario?
A. Yes.
Q. Okay. And Slottje 3 and 4 are scenario one, do you see that on the top of the columns on the right?
A. Yes.
Q. So if I understand, are there also harm percentages in each and every one of Dr. Haas-Wilson's other scenarios?
A. Yes.
Q. And what involvement, if any, did you have in determining the harm percentages in those other scenarios?
A. She determined the harm percentages.
Q. So what involvement did you have?
A. Well, I deemed them to be reasonable, just as I did the analysis that we've talked about prior to this.
You're asking a broad question, what involvement did I have. I was aware of them, and I found them to be reliable, reasonable ways to approach it. I was not the one to determine these things; she created the model, and she did the analysis.

hospital. Okay?
A. Yes.
Q. If a Blue does not enter that county, how is the hospital in that county harmed?
A. Well, they're harmed, because, by definition, in the real world that is not the case, they can't enter. And now -- That's how they are harmed, that answers that question.
Q. How would you calculate -- How would your model work, applied to a hospital in a county in which a second Blue did not enter in the but-for world?
MR. WHATLEY: Object to the form.
A. That's not in my model. My model is to take the underlying shares from her model, and as you've discussed, do the harm estimates. So that's a question -- That question I can't answer.
Q. Right. But your model assumes that there's entry in the county; correct?
A. My model takes the harm estimates from her model and multiplies them by the actual allowed amounts and determines damages. So you're conflating.

It sounds to me like her model and my model. And you've just spent an hour and a half carefully delineating what I did and what she did. And I would suggest -- It sounds like you're asking me about her model.

Q. Let me -- I'm sorry. Go ahead.

A. That's all I have to say about that.

Q. Let me try to clarify: Do you agree with me that a necessary condition of Dr. Haas-Wilson's estimates of harm is that a second Blue enters?

MR. WHATLEY: Object to the form.

A. As a general statement, I don't know that to be so.

Q. You don't agree with that?

A. Not the way you stated the question.

Q. How would I state it where you could agree with it?

MR. WHATLEY: Object to the form.

A. Again, I can't answer that.

(Off-the-Record discussion was held.)

Q. You don't agree with me that a

necessary condition of Dr. Haas-Wilson's estimate of harm for a specific hospital requires the assumption that a second Blue enters the county in which that hospital is located?

MR. WHATLEY: Object to the form. And asked and answered.

A. I don't have an opinion on that.

Q. You don't have an opinion on that?

A. I don't.

Q. If -- If -- Do you agree with me that if a second Blue doesn't enter a county in which a hospital is located, that Alabama's contracting share would not change?

MR. WHATLEY: Object to the form.

A. As the question was posited, I don't -- I can't answer that question. I don't have an opinion on it.

Q. Do you agree with me that if Alabama's contracting share does not change in the but-for world, that your model would not calculate any positive damage?

A. I would agree --

MR. WHATLEY: Object to the form.

do you understand me to be asking?
MR. WHATLEY: Object to the form.
Q. Do you know what I mean? Strike that.
At the beginning of the deposition, I asked you to tell me if you didn't understand my questions. Remember?
A. Yeah. I think I understand your questions.
Q. Okay.
A. I'm listening to them as you posit them, yes.
Q. Okay.
A. And I don't have opinions the way you're positing them, and I do understand. So . . .
Q. So let me try to ask it again, and I apologize if it's the same. If it is, I'll get the same answer.
Do you have an opinion as to whether or not Dr. Haas-Wilson's models require the assumption of entry by a second Blue in a particular county in order to generate a positive estimate of harm?
MR. WHATLEY: Same objection.

A. No.
Q. No opinion either way?
A. I don't.
Q. Can you think of any way that a hospital -- Strike that.
Can you think of any way that -- We'll come back to it later. I'll withdraw.
Okay. So your report, sir, has an Exhibit 3 to it --
A. Okay.
Q. -- which I'm going to refer to. I apologize, there's not an easy way to find it in there. It will come after Exhibit 2 and before Exhibit 4, that's the best I can do.
A. Okay.
Q. But the first page says pleadings and legal filings, is the . . .
A. Is it before my resume?
Q. It is after.
A. I see it. I see parts of it.
Q. Okay.
A. All right.
Q. Just so we're on the same page, it has Exhibit 3, top center?
A. Yes.

Q. Okay. And that's also true for the calculation of damages for any other hospital in Alabama; correct?

A. Yes.

Q. Okay. And under F, there's Bates stamped documents. Do you see that?

A. Yes.

Q. Same types of questions, sir. The Bates stamped documents are numbered 191 through 2711, do you see that, all the way to page thirty-one?

A. Yes.

Q. So that's -- I'll try a little math, over twenty-four hundred or so documents; correct?

A. Yes.

Q. Of those twenty-four hundred documents listed in your reliance materials, what, if any, impact do they have on your economic damages calculation for Jackson Medical Center represented in Figure 3?

A. So I would have to go back and look at Figure 6, just to make sure there's -- none of those Bates stamped documents are cited, and I just -- I can do that quickly in

the back, see, it's in the back.
Q. Sure.
A. I can't read these very well either.
None of them.
Q. Okay. And that's also true for any damage calculation for the other Alabama hospitals; correct?
A. Yes.
Q. Okay. Who selected the documents that are listed under the Bates stamped documents, the twenty-four hundred plus documents?
A. The documents, we were given access to, I think the universe of documents in this case, my team, me, selected the documents to take a look at.
There was a determination made at some point, not to put like a ginormous background section in, because it would be repetitive what the other two experts were doing.
So a lot of these were selected with that in mind, and we ended up ultimately not doing it, because others did it and what

was the point when they did it, and it was repetitive. So we didn't -- But my team and I selected these documents.

Q. Okay. Let me -- Counsel will tell me if I get over the line, I'm not meaning to. But if I understand -- At one point, you thought you might do an opinion that was more factual-based, and then that changed at some point; is that correct?

A. I think my opinion is about as factual-based as it can get. But it's -- I was asked -- I thought I was going to -- Most of my expert reports I would have a pretty lengthy background section, and that's absent here.

MR. WHATLEY: I think you're now getting into --

MR. STENERSON: As you know, Joe, I'm just trying to make sure there's nothing in here that I need to worry about for the opinions that he's giving.

MR. WHATLEY: I think he's answered that question.

Q. And so let me ask it this way: Was there anything specifically that you were looking for in the documents identified from

191 to --

MR. WHATLEY: 2711.

Q. -- 2711, related to your damage calculation?

A. I -- I don't -- I'm loath to say no, because I don't -- didn't memorize all -- you get it, twenty-five hundred documents.

Q. Did you read them all?

A. No.

Q. I did.

A. Good for you. I'm impressed. I did not.

MR. WHATLEY: Notice, he's not under oath.

A. He shook his head, no, he didn't. He was kidding.

Q. Okay. Let's try it this way.

Just a scheduling question, this is going to take a while, half hour, forty-five minutes. Do you-all want to do that and do a late lunch, or do you want to do an early lunch?

A. I'd love to keep going.

MR. WHATLEY: Keep going. We've only been going about thirty minutes.

intent of anything that I was doing.
Q. So your assignment in this case did not include assessing and giving an opinion as to whether or not Dr. Haas-Wilson's assumptions were reasonable; correct?
MR. WHATLEY: Object to the form.
A. Oh, it absolutely did. Because if there was -- As I said in my report, I rely on Dr. Haas-Wilson. If Haas-Wilson did anything in her report that I thought was unreasonable, I would have absolutely said something about it.
Q. Let me ask my question again, then: In light of your answer, sir, did you instruct your team to review your reliance materials in order to determine if there were any facts or evidence that were inconsistent or contrary to Dr. Haas-Wilson's assumptions?
MR. WHATLEY: Doesn't that violate the stipulation? Doesn't that question violate the stipulation?
MR. STENERSON: I don't think so.
MR. WHATLEY: I think it does direct.
MR. STENERSON: I don't think so

it's very clear. I've stated to you, and I stated to you this morning, explain why; you asked me why I thought it was reasonable, and I explained why. But I believe what she did is reasonable; I've relied on what she did. If I thought what she did was not reasonable or reliable, I wouldn't have relied on it.
Q. Okay.
A. And to the extent of I wouldn't give an opinion if that's what's required. But I do believe it was reasonable and reliable, and I did rely on it as I stated in my report. And I believe my opinions are reasonable and reliable. If hers weren't, then mine couldn't be.
Q. My question is very simple.
A. I know and I answered it.
Q. Where in your report, Slottje 1, do you disclose the analysis that you went through to make a determination that Dr. Haas-Wilson's models were reasonable?
A. I explained with great care, step by step, what she did and how I relied on her. I then -- I also explicated that I believe what I did, based on what she did, is reliable and

explained in great detail what she did -- my understanding of what she did. And the reason I did that was because, obviously, I am -- I am relying on her analysis.

I explained -- I could have taken some numbers and multiplied them in there, after doing a significant amount of data analysis, but that's not what I did. I explained in great care my understanding of what she did.

Q. As part of your analysis of determining that you think Dr. Haas-Wilson's assumptions are reasonable, what documents did you rely on?

A. My -- Her expert report. Her expert report, I relied on that. I relied on forty years of experience as an expert; forty years as an academic that's published over a hundred and sixty papers in rigorous journals; forty years as an editor of -- founding editor of journals whose job -- in forty years as a National Science Foundation investigator, whose job was to assess the quality of others' scientific merit, all of that I relied on to come to the conclusion I believe her work is

reasonable.

MR. STENERSON: Move to strike. Nonresponsive.

Q. What documents, sir --

MR. WHATLEY: Denied.

Q. -- do you rely upon as part of your assessment that Dr. Haas-Wilson's models numbers were reasonable?

MR. WHATLEY: Object to the form. Asked and answered.

Q. Besides her report.

A. Her report contains therein, I also looked at Ted Frech's report. But her report contains, in careful detail, everything she did, and underlying documents to what she did. And I cited in my report to that as well.

She talked about Nash bargaining; she gave examples of JPE articles that were written that explicitly discuss what she did; she talks about academic research that looks at the relationship between contracting share and price. All of that are things that -- She cited to other work by others; I'm aware of that work. All of that is stuff that I relied on to arrive at the conclusion that her work is

A. But that's in --
Q. -- about things that aren't in your report.
A. But you asked me, is there anything at all on these Bates stamps. Those are in those Bates stamps, those things. So I did rely on those, again.
Q. Truly, Dr. Slottje, I'm just trying to clarify. Your testimony, as I understand it, is everything in Exhibit 3 is what you considered; correct?
A. Yes.
Q. And that doesn't mean you relied on it; correct?
A. That's true.
Q. And I think what you said is, you only relied on the specific documents that are cited in the text of your reports and the footnotes; correct?
A. Yes.
Q. Nothing else; correct?
A. Well, let's be clear, because there's a number of documents that are cited in -- and it's in paragraph sixty of my report, footnote 73, where I talk explicitly about

places in Professor Haas-Wilson's report, steps she went through, the evidence she looked at, and I cite to that.

Q. Right. It's --

A. So -- Anyway, you get it.

Q. My follow-up question is very simple.

A. Yes.

Q. As part of your investigation into Dr. Haas-Wilson's report, did you seek out and look for any evidence or documents produced in this case from any of the Blues that contradicted any of her assumptions?

A. That question is the first time I've heard that question. And that's -- Did I look for any documents produced by the Blues?

I don't know that I saw it. I'm happy to look for them if you want.

Q. I'm going to show you some, maybe.

Did you look at any documents produced from any third-party insurers in this case for evidence that contradicted any assumptions of Dr. Haas-Wilson?

A. There is third-party evidence

A. Nothing else, because you have to go through significant analysis to determine what's in there and what's out of there.
Q. Did you do any analysis as to what business strategy any hypothetically second Blue would use in entering any Alabama CBSA or county but for the alleged conduct?
MR. WHATLEY: Object to the form.
A. I have no opinion on that.
Q. Did you do any analysis on that issue?
A. No.
Q. Would it affect your model?
A. No.
Q. If you could turn on Slottje Number 7, sir, to Bates number 649.
A. (Witness complies.)
Q. Do you see where the top of that page says: Our top large group competitors?
A. Yes.
Q. And you see below it says network comparisons; do you see that?
A. Yes.
Q. And under that it says number of network hospitals in Alabama, do you see that?

A. Yes.

Q. And the source is Market Quest Network Compare from December 2012; correct?

A. Yes.

Q. And do you see Aetna only, at that time, had seventy-nine hospitals in network in Alabama?

A. That's what it says.

Q. And Cigna had eighty-five; correct?

A. That's what it says.

Q. And United had ninety-five; correct?

A. That's what it says.

Q. And Viva had sixty-nine; correct?

A. That's what it states.

Q. How many hospitals in network would a hypothetically second Blue have if it entered any Alabama CBSAs or counties but for the alleged conduct?

MR. WHATLEY: Object to the form.

A. I have no opinion on that.

Q. Would whether or not an Alabama hospital was in the hypothetical second Blue's network have any impact on your calculations?

on the left, Birmingham on the right. Let's make sure we're on --

A. Yeah. We can actually say that here, can't we?

Q. Yeah.

A. So it's Huntsville and Birmingham. I'm with you.

Q. And the bottom bullet is: Explore Mobile and Montgomery options.

A. Yes.

Q. Okay. So I'd like to focus on Birmingham.

Do you know how many hospitals there are in Birmingham?

A. I know you want me to guess. I think there are four, but I'm not sure.

Q. Do you know how many hospitals there are in the Birmingham CBSA?

A. I don't know. I don't recall.

Q. You're fairly certain there's more than one though; correct?

A. Yes.

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

Q. If the hypothetical Blue who entered Birmingham did not have all the hospitals in its network, how would that impact, if at all, the results of your model?

MR. WHATLEY: Object to the form.

A. I don't have an opinion on that.

Q. You don't have an opinion?

A. Correct.

Q. Would it affect it at all?

A. I don't know.

Q. If the jury were to find in this case that a particular hospital in Birmingham was not in the insurance network of the second hypothetical Blue entrant, how would your model be impacted?

MR. WHATLEY: Object to the form.

A. I don't know that my model would be impacted, and I don't have an opinion on that.

Q. All right. Is your testimony is that your model would not be impacted?

A. No. My -- My opinion is I don't

share may be higher in Alabama than other Blues' market shares outside of Alabama; correct?
A. That's correct.
Q. Do you have -- Are you giving any opinions in this case as to why Blue Cross Blue Shield of Alabama's market shares are higher than the market shares of other Blues outside of Alabama?
A. No.
Q. Earlier we talked about your damage model starts on July 24, 2008; correct?
A. Yes.
Q. Did you do any analysis as to how long it would take the second Blue to enter an Alabama CBSA or county to take the predictive share away from Alabama?
A. Well, I thought about it certainly.
Q. Do you have an opinion on it?
A. Yeah. My understanding is that the alleged conduct goes back to the '40s or '30s. Therefore, in a but-for world, the assumption would not be that this would just happen instantaneously, but this market would

have been mature by then. So, yes, I've thought about it conceptually.

Q. Do you have an opinion as to when that hypothetical entry would have occurred?

A. Well, yes, that it would have occurred at the damage date or earlier for the reasons I just said, because you're talking about events that go back to the '40s.

Q. Do you agree with me that your damage calculation requires that such hypothetical entry would have actually occurred prior to January 24, 2008 (sic)?

A. In some scenarios it does, but not in all scenarios, for the reasons I just laid out with you before.

Q. So you believe that a Blue entering on July 24, 2008, could immediately take thirty-four percent market share from Alabama in one day?

MR. WHATLEY: Object to the form.

A. There's already Blues in Alabama that have significant shares. So beyond that, I don't have an opinion on that as you cite it -- state it.

Q. You don't have an opinion, if I

understand correctly, as to when any hypothetical second Blue would have entered; correct?

MR. WHATLEY: Object to the form.

A. I have an opinion that it would have been reason to expect they would have come in well before that. In fact, empirically we know they did come in well before that, because those hundred thousand Anthem people didn't jump in there July 24, 2008, and the eighty thousand HCSC people didn't jump in there on July 24, 2008; we can go on and on with the same argument.

Q. That's fine. I'm really just trying to understand the scope of your opinions --

A. That's my opinion, that it's not unreasonable to assume that.

Q. I --

A. You asked me --

Q. I'm not here to tell you whether I think it's reasonable or unreasonable. I'm just trying to figure out when, prior to July 24, 2008, is your opinion that such entry would have occurred?

A. That it's reasonable to assume -- You asked me that. I don't have anything else to add.
Q. Years before?
A. Sure.
Q. Many years before?
A. I have no opinion beyond what I've already stated.
Q. Do you have an opinion as to how long it would take for any second Blue to enter any Alabama CBSA and county to reach the share numbers required by the Haas-Wilson model?
MR. WHATLEY: I'm sorry. Couldn't hear the last part of your question.
Q. Do you have any opinion as to how long it would take any hypothetical second Blue to enter any Alabama CBSA or county and reach the share volume predicted by the Haas-Wilson model?
MR. WHATLEY: Object to the form.
A. The Haas-Wilson model is based on those that are already there, I believe.
Q. Well, but there's a switch; right?
A. The switch is that somebody

scenarios that you're adopting from Professor Haas-Wilson --
A. Yes.
Q. -- her different scenarios produce different estimates of harm; correct?
A. Yes.
Q. And your model is simply taking those estimates of harm and putting them into your mechanical formula; correct?
A. Simply, and that after doing this -- all the other adjustments --
Q. After you did a really long math problem?
A. You can characterize it however you wish.
Q. I will. You did a long addition problem; right?
A. I don't agree with that. But anyway . . .
Q. Well, do you do any -- You just take the estimates of harm as a given; correct?
A. I take a database that has tens of millions of claims in it and put it in a form that it can be analyzed and make a lot of analyses with respect to what's covered and

what's not covered. And then you take those numbers and put them in a form that are then cogently divided up by these various scenarios and calculate all that. And if you want to characterize that as just doing long math, that's fine. That's not my view of long math, and I do a lot of math.

Q. Okay. I can't do fourth grade math, although I'm trying to do it with my daughter. It's harder than I remember.

But as -- Regard to the estimate of harm, you do nothing with that except plug it into your formula; correct?

A. I put it into my formula.

Q. Right. Do you do anything else to the estimate of harm?

A. No.

Q. And do you -- And you made no decisions about the assumptions to make in the scenarios that led to the output of the estimates of harm; correct?

A. That's not quite true. Because I also have to -- There's a -- There's a Figure 7. And in Figure 7, Professor Haas-Wilson has -- because of the way she has decided to

A. What I just said is that the reason that they wouldn't be piggybacking on their prices, which is price-fixing, is because they would now be competitors.
Q. And they're not, currently, in your view?
A. They're absolutely not. They're not allowed to compete.
Q. Okay. And so under that --
A. Otherwise, we wouldn't be sitting here.
Q. Okay. So under that scenario, would the second Blue hypothetical entrant have to build its own network in Alabama?
A. I've already told you the second Blue is already in Alabama. And I have nothing to add beyond what I've already said.
Q. But they don't have a network in Alabama; correct?
A. I have nothing else to add beyond what I've already said.
Q. Does the second Blue that's currently in Alabama have an independent network from Alabama Blue?
A. They're not allowed to.

Q. So what's the answer to my question?
A. They're not allowed to.
Q. But they don't have a network; right?
A. Because they're not allowed to, yes.
Q. That's fine. But they don't have one; right?
A. Right.
Q. So if they now are competing with Alabama in a but-for world, does the second Blue have to build its own network in Alabama?
A. It doesn't have to build one in 2010, an instant in time, because they would have been there a long time ago and already had one.
Q. As part of entering, would it have had to build a network?
A. At some point.
Q. Okay.
A. But you keep suggesting it would have happened -- it couldn't have happened in 2008 or 2010; they wouldn't have been doing it in 2008 or 2010.

Q. When would they have been doing it?
A. Long before that.
Q. Long before 2008; right?
A. Yes.
Q. Decades before?
A. Probably.
Q. And you've done no analysis as to what that network would look like; correct?
A. To do a but-for world -- Given the reality of what's going on in the real world, I have not done that. Right.
Q. What would happen if one of the hundred and six hospitals in your model was not in that second Blue's network, would they have any harm under your calculations?
A. Where the -- They all have a contract with Blue Cross Blue Shield of Alabama, that's an empirical reality. So you're saying let's assume they don't have one? They wouldn't be in my model to begin with.
Q. No. If they're not in the second Blue's network.
A. I don't have an opinion on that.
Q. How would your model account for

damages data set?

A. No.

Q. Do you have any understanding about whether members who are employed by government entities should or should not be included in the damages data set?

MR. WHATLEY: Object to the form.

A. If members of the government entities were in any of the categories that we've taken into account, they would have been excluded; if they weren't, they wouldn't have been excluded. And I can't answer beyond that.

Q. So, for example, you don't have any independent judgment on whether it would be appropriate to include in the damages data set employees of the State of Alabama?

A. I don't recall one way or the other.

Q. You don't have an opinion one way or the other?

A. Well, I know -- I don't.

Q. Okay.

A. Literally every exclusion I'm doing, I've told you, was based on guidance. I didn't make an independent assessment of

chipped out of network; all of the things that I excluded were things that I was instructed to exclude.

Those are beyond the purview of an economist, so . . .

Q. And you also excluded claims paid to professional providers; is that right?

A. Yes. That's not in the -- That's not in the cross-data set, so I didn't do an analysis of those.

Q. That's exactly what I was going to ask you. The way that you excluded claims paid to professional providers was that you only looked at the cross-set of tables within the Blue Cross Blue Shield of Alabama's ACSIS database; right?

A. Yes.

Q. Did you make any effort to remove professional claims from the cross table?

A. I think where you're going is down deep into the roots of hospital charges and where a professional would have been embedded in that. And where those charges would have been for a professional, they were taken out. If they were embedded in a claim

A. That I did not?
Q. Correct.
A. I never said I did, so, yes, I would agree, that's correct.
Q. And would you also agree that Dr. Haas-Wilson did not analyze the economic positions that the plaintiffs would have been in if ESAs had never been adopted?
A. No. I don't agree with that, and I don't have an opinion on it.
Q. And would the same be true with respect to BlueCard, that you did not analyze the economic position plaintiffs would have been in if BlueCard had never been adopted?
A. Correct.
Q. And you don't have an opinion on whether Dr. Haas-Wilson analyzed that?
A. Correct.
Q. Would you agree that when analyzing the but-for world price and quantity, adjustments can be very important?
A. It can be, yes. Not always, but they can be.
Q. And the basics of supply and demand indicate that when price changes,

has additional insurers, a member that belongs to a different insurer might go to a hospital other than the one that they went to in the actual world?

A. It's true. I don't have an opinion on that.

Q. Did you conduct any analysis of the impact of your calculated provider price increases on utilization?

A. No.

Q. Do you agree that there's a relationship between provider prices and utilization?

A. I don't have an opinion on that.

Q. Not something you've analyzed?

A. It is not something I analyzed.

Q. Are you aware whether Dr. Haas-Wilson analyzed the impact of hypothetical -- of the calculated provider price increases on utilization?

A. I have no opinion on that.

Q. Do you know whether she did it or not?

A. I don't.

Q. You don't know?

A. I don't know.
Q. Okay. So in the Haas-Wilson scenario number one, hospitals stand to gain eleven point five to thirty-two point two percent higher reimbursement rates; right?
A. Yes.
Q. Now, just assume that in the but-for world that a hospital lost a patient because the patient went to another hospital. Just assume that for a second. Okay?
A. I am listening.
Q. Okay. Assuming that a hospital lost -- In a but-for world, the hospital lost a patient that it had in the real world, the hospital would lose a hundred percent of the revenue that it received for that patient in the real world; right?
A. Could that happen?
Q. Right.
A. Sure.
Q. And so assuming a hypothetical rate increase of thirty-two point two percent, a hospital would need to maintain a certain percentage of its patients in order to be better off in the but-for world than it was in

Do you remember anything specific -- any specific criticisms that the Court had?

A. My recollection was that the -- I was on the stand -- it was like a six-week trial, and I was on the stand for thirty minutes. And after being forced by the time constraints of being on the stand -- you can look it up, but being on the stand for thirty minutes, we were suing for three hundred million, the other side said zero; the jury came back at two hundred and seventy-four million. And the Judge said that there was not sufficient ground laid in the analysis in front of the jury, that was my understanding from the -- working for Quinn Emanuel to render an opinion like that. She overturned the jury; so the jury agreed with that and she overturned it.

Q. Is there any other time that a court limited or disagreed with your damages calculation, similar to what we're talking about?

A. I don't -- I'm not aware of any.

Q. I just wanted to confirm that your report -- your April 15, 2019, report

contains all of your opinions for the class and merits phases of this litigation. Is that true?

A. Yes.

Q. And to the extent you did or said something in connection with another part of the case that's not included in your April report, you're not offering that opinion in connection with the class and merits phases of this case; right?

A. Correct.

MR. WHATLEY: You mean all the irrelevant stuff y'all ask, he's not trying to offer?

MR. HOLMSTEAD: Excuse me?

MR. WHATLEY: You mean all the irrelevant things that you and Todd asked, he's not trying to offer as opinions?

MR. STENERSON: I did not ask anything irrelevant, Joe.

Q. And to the extent that you did, or something in connection with another part of the case that is not included in your April 2019 report, you're not relying on that to support any of the opinions that you're