FILED
2020 Apr-30  AM 10:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 264

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF ALABAMA

3           SOUTHERN DIVISION

4

5  IN RE: BLUE CROSS BLUE SHIELD

6  Master File No. 2:13 CV 20000 RDP

7  ANTITRUST LITIGATION

8  MDL NO. 2406

9

10           VIDEO DEPOSITION OF

11        DEBORAH HAAS-WILSON, PH.D.

12        Cravath, Swaine & Moore

13          825 8th Avenue

14       New York, New York  10019

15          May 10, 2019

16

17       * * * CONFIDENTIAL * * *

18    * * OUTSIDE ATTORNEYS' EYES ONLY  * *

19

20  REPORTED BY:

21     Angela Smith McGalliard,

22     Registered Professional Reporter,

23     Certified Realtime Reporter,

24     Certified Shorthand Reporter

25        and Notary Public.

1    as nonprice harm.

2        Q.      Okay.  So your nonprice harm

3    section of your report applies to exactly whom?

4        A.      To healthcare providers in

5    Alabama that are part of the class.

6        Q.      Okay.  Let's talk -- Let's talk

7    only about price harm then, okay?  Put the

8    nonprice harm aside for these questions.  Do

9    you understand what I'm saying?

10       A.      I understand what you're saying.

11       Q.      You didn't empirically analyze

12   and reach no conclusion about whether Alabama

13   non-GAC facilities suffered an antitrust injury

14   that is a price injury; correct?

15              MR. WHATLEY:  Object to the form.

16       A.      At this point in time, I have

17   used my empirical model and harm methodology to

18   calculate harm to general acute care hospitals

19   in Alabama.  That's what I've done to date.

20       Q.      I understand.  So you did not do

21   it, for example, for skilled nursing facilities

22   in Alabama; correct?

23       A.      To date, I have not done it for

24   skilled nursing facilities in Alabama, that is

25   correct.

1      Q.      And you have not done it for

2   skilled nursing facilities anywhere in the

3   country; correct?

4      A.      To date, I have not used my

5   econometric models and harm methodology to

6   estimate price harm to skilled nursing

7   facilities anywhere in the country.

8      Q.      And the same goes for every

9   nonacute facility in the country; right?

10             MR. WHATLEY:  Object to the form.

11     A.      At this point in time, I have

12  applied the methodologies of my report to

13  calculate harm to general acute care hospitals

14  in Alabama.  So general acute care hospitals

15  outside of Alabama, I have not applied

16  methodology to that at this point in time.

17     Q.      And the same for any other type

18  of facility; correct?

19     A.      What do you mean by any other

20  type of facility?

21     Q.      ASC, skilled nursing facility.

22  You just talked about acute care hospitals.  I

23  want to make sure that I'm understanding, you

24  haven't done this empirical analysis outside

25  the state of Alabama for any type of facility

```
 1   whatsoever; correct?
 2        A.      I have not applied my methodology
 3   to facilities outside of Alabama, that is
 4   correct.
 5        Q.      And you did not empirically
 6   analyze and then reach no conclusions on
 7   antitrust price injury for any type of provider
 8   that is a professional provider; correct?
 9                MR. WHATLEY:  Object to the form.
10        A.      At this point in time, I have not
11   used the methodologies to estimate -- to
12   quantify harm to professionals at this point in
13   time.
14        Q.      You keep saying at this point in
15   time, and I take it every question I have is
16   about this point in time, so I -- I understand.
17   So you don't have to repeat that every time, is
18   all I'm saying.
19                So why not?  Why didn't you do
20   that?
21        A.      Can you be more specific:  Why
22   did I not do what?
23        Q.      Why didn't you apply your model
24   to do an empirical analysis of whether
25   physicians in the state of Alabama were --
```

1    suffered a price harm?

2         A.    So a couple of things I'll

3    mention about that.  The attorneys asked me to

4    start with hospitals; and, second, when I

5    started thinking about applying the model to

6    professionals, there were data limitations.  I

7    was able to use the American Hospital

8    Association data to group hospitals into

9    hospital systems.

10         Q.    Okay.  The attorneys asked you to

11    start with hospitals, is what you said first.

12              I -- I'm just trying to

13    understand it.  Does that mean that you got an

14    instruction not to go beyond hospitals?

15         A.    Oh, no.  I did not mean to imply

16    that at all.

17         Q.    Okay.  And that's why I asked a

18    follow-up.

19              So what you're saying is, that

20    there were data limitations that prevented you

21    from applying your model to professional

22    providers; did I understand that correctly?

23         A.    Given the way the model is

24    specified, there were data limitations, as I

25    didn't -- the American Hospital Association

1    doesn't -- doesn't collect data on

2    professionals.

3            Q.      So in the six years that you've

4    been working on this case, did you attempt to

5    gather data that would allow you to run your

6    model to assess harm to physicians?

7            A.      Yes.  During that time period, I

8    did, with the assistance of my team, look for

9    available data sets for professionals.

10           Q.      But in the six years that you've

11   been working on the case, you weren't able to

12   gather sufficient data sets to allow you to run

13   the model for physicians; correct?

14                   MR. WHATLEY:  Object to the form.

15           A.      To run the model in its specific

16   form that I am using for general acute care

17   hospitals, I did not find a data set that would

18   allow me to implement that exact same empirical

19   model.

20           Q.      Did you find a data set that

21   would allow you to run an empirical model for

22   physicians?

23           A.      There are data sets out there

24   that -- that are collected on professionals,

25   particularly physicians.  They are not -- They

```
 1    don't collect all the same information that the
 2    American Hospital Association does for
 3    hospitals.  So I -- I am familiar with the data
 4    available out there for physicians.
 5         Q.        And you assessed, working on the
 6    data available in the six years you've been
 7    working on the case, that you were not able to
 8    put together a model that would be reliable to
 9    assess the harm to physicians -- alleged harm
10    to physicians; is that right?
11              MR. WHATLEY:  Object to the form.
12    And I'm going to instruct her not to answer
13    that question.
14              MR. HOGAN:  On what basis?
15              MR. WHATLEY:  The stipulation.
16              If you want to ask her about the
17    data issues, feel free.  But you're now asking
18    her about other possible models that are not in
19    her report, and that's off -- that's off
20    limits.
21         Q.        Okay.  So there were data
22    limitations -- you assessed that there were
23    data limitations in the available data that --
24    that would make it challenging to create a
25    model to assess price harm to physicians; is
```

1   that correct?

2        A.      What I'm trying to share with you

3   is that due to data limitations, it was not

4   possible to measure some of the independent,

5   explanatory variables in the empirical model

6   that I used for general acute care hospitals.

7        Q.      And with regard to facilities

8   that are not general acute care hospitals, were

9   there similar data limitations that prevented

10  you from creating a reliable model?

11               MR. WHATLEY:  Object to the form.

12       A.      At this point in time, if you are

13  asking whether or not there was data for, say,

14  ambulatory surgery centers, the American

15  Hospital Association does not include

16  ambulatory surgery centers.

17       Q.      So you're not aware of a complete

18  data set for non-GAC hospitals that would allow

19  you to do an empirical analysis to determine

20  price harm to --

21       A.      That is --

22       Q.      -- those types of providers; is

23  that correct?

24       A.      That is not what I said.

25       Q.      I'll just -- Let me finish my

1    question before you answer.

2            A.      Fair enough.

3            Q.      I couldn't hear you, we were

4    talking at the same time.  Could you say your

5    answer again?

6            A.      Yes.  I said that you're using

7    different words than what I said.  That is --

8    That is not what I said.  What I said is, given

9    the data that I am aware of at this point in

10   time, I was not able to calculate some of the

11   same independent, explanatory variables that I

12   use in the empirical model.  The same variables

13   for ambulatory surgery centers, for example,

14   that I was able to calculate for general acute

15   care hospitals.

16           Q.      And this is something you

17   attempted to do?

18           A.      So I asked my team to search for

19   data sets, and again what they reported back

20   was that the American Hospital Association does

21   not include data on ambulatory surgery centers.

22   And I'm not aware of any data source like the

23   American Hospital Association for ambulatory

24   surgery centers.

25           Q.      But do you have -- Are you done?

1         A.        Yes.

2         Q.        Are you -- Do you have the same

3    data limitations with regard to skilled nursing

4    facilities?

5         A.        At this point in time, I haven't

6    -- I haven't focused on skilled nursing

7    facilities.

8         Q.        Are the same -- You have defined

9    very clearly what you did look at, which is the

10   general acute care hospitals?

11        A.        Yes.

12        Q.        And I appreciate you focusing on

13   that.

14                  With regard to facilities that

15   don't fall into that category, are there data

16   limitations with regard to all of those other

17   types of facilities?

18        A.        I am aware of some data

19   limitations for a subset of those facilities.

20        Q.        Which are they?

21        A.        For example, I mentioned

22   ambulatory surgery centers.  I have not done a

23   similar search for alternative data sources for

24   some of the other facilities.

25        Q.        So sitting here, you're not aware

1    of data available that would allow you to run

2    your model for those other types of facilities;

3    correct?

4         A.      For some of those other types of

5    facilities, I have not done a search for

6    available data sets.

7         Q.      I understand.  So that means

8    you're not aware of available data because you

9    haven't looked for it; correct?

10        A.      At this point in time, I am not

11   aware of -- of a similar data set for skilled

12   nursing facilities, similar to the kinds of

13   data that the American Hospital Association

14   collects on general acute care hospitals.

15        Q.      And I'm not just asking about

16   skilled nursing facilities.  I'm asking about

17   all facilities that are not general acute care

18   hospitals.

19        A.      And what specifically are you

20   asking about all other facilities, other than

21   general acute care hospitals?

22        Q.      You're not aware of a data set

23   that would allow you to run your empirical

24   model to determine alleged price harm with

25   regard to those other facilities; correct?

1          A.        Those are not my words.

2          Q.        I understand they're not your

3     words.  I'm just trying to get the concept.

4          A.        I'm talking about not the

5     feasibility of estimating quantifying harm in

6     general, I'm talking about construction of

7     specific, explanatory, independent variables in

8     the model that I currently run for general

9     acute care hospitals.  I'm not making any

10    comments about the -- my ability to do, in

11    general, estimates, quantification of harm.

12         Q.        And you don't know whether you

13    can one way or the other, because you didn't

14    have the available data to even try to do it;

15    is that right?

16                   MR. WHATLEY:  Object to the form.

17         A.        Again, that's -- that's not what

18    I'm saying.  I'm talking about construction of

19    specific explanatory variables in the model

20    that I used to quantify harm for general acute

21    care hospitals.

22         Q.        You don't have data available for

23    those explanatory variables for the other types

24    of facilities; is that fair?

25         A.        I'm not saying data doesn't

```
 1   exist.  I'm saying at this current point in
 2   time, I do not have those data --
 3          Q.      And you --
 4          A.      -- to construct those specific
 5   explanatory variables.
 6          Q.      And when did you ask your
 7   staff -- what year did you ask your staff to
 8   look for the data sets for these other types of
 9   facilities?
10              MR. WHATLEY:  I don't think you
11   can ask that question.
12              MR. HOGAN:  What year?
13              MR. WHATLEY:  Yes.  You've asked
14   for a specific -- You've incorporated a
15   specific communication in that question.
16          Q.      How many years have you been
17   interested in whether data sets exist for the
18   other types of facilities?
19          A.      I've been working on this case
20   since 2013, and I don't recall at what point
21   during that period I started searching for data
22   sets.
23          Q.      Okay.  You haven't provided an
24   analysis -- Strike that.
25              You have not provided an analysis
```

1      A.      What do you mean by analysis?

2      Q.      You've done no empirical modeling

3  of where it is likely a Green would enter the

4  state of Alabama; correct?

5              MR. WHATLEY:  Object to the form.

6      A.      Empirical modeling, are you

7  referring to running a regression model?

8      Q.      I'm talking about any type of

9  empirical model that would be used by

10  economists to determine the likelihood of entry

11  into a CBSA or county.

12      A.      At this point in time, I have

13  done some back-of-the-envelope type

14  calculations of the maximum number of, say,

15  enrollees, a out-of-service-area Blue could --

16  could operate with, based on the output

17  restrictions.

18              At this point in time, I have not

19  used empirical modeling to estimate the

20  probability of entry into a specific CBSA or

21  county.

22      Q.      By either a Blue or a Green?

23              MR. WHATLEY:  Object to the form.

24      A.      You've asked me about Green, what

25  I call nonbranded.

```
 1        A.        Are you speaking in general, in
 2   economic terms, or are you speaking
 3   specifically in this case?
 4        Q.        I'm speaking in this case.  You
 5   refer incumbent costs to -- incumbent cost
 6   advantages at page one ninety of your report.
 7   I'm just wondering if you can explain for the
 8   Record what you mean when you use the phrase
 9   incumbent cost advantages.
10        A.        Let me just look at that in
11   context.
12             So in this case, the incumbents'
13   cost advantage refers to that Blue Cross Blue
14   Shield of Alabama as the incumbent would have
15   lower costs as a result of -- it's sometimes
16   called the chicken-and-the-egg problem, where
17   if you have more commercial buyer share, you
18   tend to be able to contract based on lower
19   prices, and that would give a incumbent,
20   particularly one with as large a market share
21   as Blue Cross Blue Shield of Alabama, a cost
22   advantage, relative to potential entrants.
23        Q.        Any insurer attempting to enter
24   the Alabama market would face a barrier of
25   entry of an incumbent cost advantage; is that
```

1    was not necessary for me to reach my opinions

2    in this case.  And at this point in time, I

3    have not done that.

4        Q.    So you're not offering opinion

5    that a new entrant would contract with every

6    GAC Alabama provider; correct?

7        A.    It is my judgment that absent the

8    at-issue agreement, specifically absent the

9    market allocation on selling agreements for

10   Blue-branded products, that there would be a

11   second Blue in all markets, by that I mean all

12   CBSAs and counties not part of CBSAs, there

13   would be a second Blue.  There would have been

14   a second Blue, but for that set of at-issue

15   agreements.

16       Q.    How does that have anything to do

17   with whether a new entrant would contract with

18   every GAC Alabama provider?

19            I asked the question:  You're not

20   offering an opinion that a new entrant would

21   contract with every GAC Alabama provider in the

22   but-for world; correct?

23       A.    So there -- As I said, there was

24   a second Blue there.  Every general acute care

25   hospital in each of those markets would have

1        A.        The whole suite, to enter.

2        Q.        Yes.  Do you understand what I'm

3    saying?

4        A.        I understand now you're talking

5    about all healthcare financing services.

6        Q.        Yes.

7        A.        So entering to sell all of them

8    simultaneously?

9        Q.        Yeah.  A new commercial insurer

10   entrant selling the full suite of health

11   financing service would enter the marketplace,

12   would generally need to offer lower premiums on

13   its insured business to gain market share;

14   right?

15       A.        Premium is just one -- one thing

16   that a potential buyer might look at.  I mean,

17   buyers also are interested in other nonprice

18   variables.

19       Q.        So in paragraph two eighty-nine

20   of your report -- Can you look at that?

21                 You quote Dafny, where he says:

22   Providers are generally willing to offer the

23   most competitive rate to insurers with large

24   market share; however, to gain market share an

25   insurer needs to offer low premiums, and to do

1    so sustainably must have competitive provider

2    rates.  Do you see that?

3                    MR. WHATLEY:  Just for the

4    Record, it's a she.

5         Q.      I'm sorry, she.  Do you see that?

6         A.      Leemore is a she.

7         Q.      Do you see that?

8         A.      I do see the quote from Leemore

9    Dafny, yes.

10        Q.      Do you agree with what you --

11   this quote that you quoted in your expert

12   report?

13        A.      Yes.  She's explaining in, I

14   think, really clear words, this

15   chicken-and-the-egg problem.

16        Q.      And this chicken-and-egg problem

17   is a real world barrier to entry; correct?

18        A.      This chicken-and-egg problem can

19   be -- can be a real-world entry barrier, yes.

20        Q.      And that's because of the

21   relationship between provider rates and

22   premiums; is that right?

23        A.      Well, you have to remember that

24   -- you know, when you're talking about

25   premiums, you're talking about prices in the

1      Q.      The -- As we've talked about

2  previously, in the but-for world the entry

3  would predate that period of the second Blue.

4  It would -- It would be at the time that the

5  at-issue agreements that you talk about in your

6  report didn't exist.

7              And so what I'm saying is, you

8  didn't look at the data of what Anthem's

9  profile in Georgia was in the year 2000 or in

10 1995 or some earlier time; right?

11             MR. WHATLEY:  Object to the form.

12     A.      The data that I looked at, as

13 we've talked about quite a bit already, is the

14 data during the period 2008 to 2014.  At some

15 point in time I may have looked at earlier

16 commercial buyer shares, I, at this point,

17 can't recall.

18     Q.      But that's not what you modeled

19 in your report; correct?

20     A.      That's -- I think you were asking

21 me about which Blue was likely to be the one

22 that entered, would be the second Blue, and

23 that was based on the commercial buyer shares

24 at some point 2008 to 2014.

25     Q.      Okay.  Would an insurer

```
 1    considering entry, these insurers that we're
 2    talking about, the likely insurers, would it
 3    have done an analysis of profitability before
 4    making a decision to enter, in the but-for
 5    world?
 6         A.      Well, in general, companies tend
 7    to think about many variables when deciding
 8    whether or which markets to enter.  And as we
 9    discussed previously, you know, what would be
10    the likely profit, whether they could break
11    even, whether they could earn a positive
12    profit, what are the risks of maybe not making
13    a positive profit, positive economic profit or
14    breaking even, and therefore having to exit,
15    which then you get involved with to what extent
16    are there fixed costs.  There are so many
17    different things that a firm would look at
18    before making a decision to enter or not into a
19    specific product or geographic market.
20         Q.      And so you -- But in your -- in
21    your report, you didn't do an empirical
22    analysis of whether one of these likely Blue
23    entrants in the but-for world operating in the
24    whole state of Alabama would have been
25    profitable, did you?
```

1          A.        For my opinion, it was not

2    necessary to estimate profits.

3          Q.        That is a -- That is a economic

4    analysis, it could be done, right, you just

5    have not done it?

6                    MR. WHATLEY:   Object to form.

7          A.        Again, I wouldn't want to

8    speculate.  I haven't thought about what

9    methods, what data are available to do that

10   sort of analysis.  I would have to give that

11   some thought in terms of --

12         Q.        Don't economists, all the time,

13   look at but-for worlds and make determinations

14   about whether entry is likely on a full

15   spectrum of factors, including potential

16   profitability for the entrant?

17                   MR. WHATLEY:   Just for the

18   Record, it's obvious she was right in the

19   middle of a prior answer when you started the

20   question.  She was in the middle of a sentence

21   even.

22         Q.        Were you?

23                   MR. WHATLEY:   when you started

24   your next question, she was -- she had just

25   said:  I would have to give that some thought

1    the state offering a specific suite of products

2    at reimbursement rates negotiated with specific

3    providers; correct?

4              MR. WHATLEY:  Object to the form.

5        A.       So for my opinion, I didn't have

6    to specify, for example, the suite of products.

7    The -- Those kind of assumptions were not

8    necessary for the analysis that I did.

9        Q.       Your analysis does not determine

10   which providers actually would have contracted

11   with a Blue in the but -- second Blue in the

12   but-for world in which providers would not have

13   contracted with a second Blue; correct?

14             MR. WHATLEY:  Object to the form.

15       A.       So I think we discussed this this

16   morning, and my answer hasn't changed, that if

17   there's a second Blue operating in Alabama,

18   that changes each and every healthcare

19   provider's outside option when it comes to

20   contracting.  So it's not necessary in my model

21   for each and every healthcare provider to have

22   a specific contract with a specific Blue.

23       Q.       We can disagree about whether it

24   was necessary or not.  I'm just interested in

25   what the model does.  And I think I understand

1    what you're saying:  That your model does not

2    necessarily -- does not determine which of the

3    hundred and six hospitals actually would have a

4    contract with a new Blue and which ones would

5    not have a contract with a new Blue; correct?

6                   MR. WHATLEY:  Object to the form.

7          A.        Like specifying the suite of

8    products or specifying specific contracts?

9    That was not necessary for the modeling that I

10   did, upon which my opinion is based.

11         Q.        You keep answering it was not

12   necessary.  That leaves open the possibility

13   that you did do it, but it wasn't necessary.

14                   I'm just asking:  Is there

15   something in your modeling that tells us which

16   hospital has a contract with the second Blue

17   and which hospital does not have a contract

18   with the second Blue?

19                   MR. WHATLEY:  Object to the form.

20         A.        Let me use a different word.

21   Which hospital had a contract with which Blue

22   was not relevant for the model that I used to

23   base my opinion on the but-for prices.

24         Q.        Why was it not relevant?

25         A.        Why was it not relevant?

1    enters the market and does not offer a contract

2    to one of the hospitals because it is entering

3    on a narrow network basis where not all of the

4    hospitals are in the network, that provider

5    does not have a second option, does it?

6                 MR. WHATLEY:  Object to the form.

7         A.       The provider has the option to --

8    to compete, to obtain the position of being

9    part of the network.

10        Q.       And if -- If they're not offered

11   a contract by the second Blue that has entered

12   on a narrow network basis, they could not have

13   a second option; right?

14                MR. WHATLEY:  Object to the form.

15        A.       Well, now, they still have the

16   second option.  They have that option to -- to

17   approach the second Blue as a way to obtain

18   access to the out-of-service-area Blue

19   commercial enrollees.

20        Q.       When a Blue enters -- When any

21   insurer enters on a narrow network basis,

22   including this second Blue that we're talking

23   about, that necessarily means some providers

24   are not in the network; correct?

25                MR. WHATLEY:  Object to the form.

1        A.        The specific network, what it

2    looks like, is not relevant for my analysis.

3    What I'm looking at is how healthcare

4    providers' outside options change, and that

5    affects when they sit down to try to contract

6    with Blue Cross Blue Shield of Alabama.

7                If there is a second Blue, then

8    when Blue Cross Blue Shield of Alabama is

9    working to achieve a contract with that

10   healthcare provider, a healthcare provider

11   knows that if it doesn't reach a contract with

12   Blue Cross Blue Shield of Alabama, the only

13   enrollees it would be at risk for losing would

14   be those that are homed by Blue Cross Blue

15   Shield of Alabama and not the other members

16   that are hosted -- that had been hosted.

17        Q.        In a narrow network plan,

18   normally a subset of providers in a given

19   geographic are included in the network; right?

20                MR. WHATLEY:  Object to the form.

21        A.        In general, my understanding of

22   narrow network products include some providers

23   and not others.

24        Q.        Any provider that is not included

25   in the Blue entrant's narrow network would not

1      Q.      I'm sorry.  Were you done?

2      A.      Not really.

3      Q.      My question was:  Did you study

4  something.  It's a yes or no question.  So I'm

5  going to try it again, and I'll get -- let you

6  get your whole answer out.  If I cut you off,

7  I'm sorry.

8              Can you identify a single de novo

9  entrant in the entire country who entered a new

10  state, statewide, and took thirty percent

11  market share in every county in the state?

12      A.      What I'm saying is, that if I was

13  asked to do so, of course I would implement a

14  study to do so.  It was not part of my

15  assignment in this case.  So sitting here at

16  this point in time, I have not done that study.

17      Q.      Do you -- So I'm asking the

18  question whether you've done this study or

19  whether you know it from reading an article or

20  from any other source.  If there is a de novo

21  entrant who entered a new state, statewide, and

22  took thirty percent market share in every

23  county of the state, do you have any knowledge

24  of that ever happening in the real world?

25      A.      And what I'm telling you is, I

```
 1   have very little basis to answer that question
 2   because I have not studied it.  It's an
 3   interesting question.  And in the future, if it
 4   became relevant for my analysis, of course I
 5   would study it.
 6          Q.     I have every confidence --
 7                 MR. WHATLEY:  I don't think she
 8   finished her answer.
 9          A.     But given that it was not
10   relevant for the work I needed to do to rely on
11   to reach the opinions I described in my report,
12   to date, I have not done so.
13                 MR. HOGAN:  Joe, she had finished
14   her answer.  She hadn't finished her speech.
15   Her answer was no, she hasn't, she knows of
16   none.  And then there were about seven
17   paragraphs of other words.  So let's be clear
18   about what's going on here.
19                 MR. WHATLEY:  All right.  Then
20   note my objection to your speech.
21          Q.     Are you aware of any instance in
22   the history of health insurance where an
23   entering insurer has taken market share only
24   from one single competitor?
25          A.     Again, I have not done a
```

```
 1    literature review, I have not done a review of

 2    news articles on this specific topic, so for me

 3    to -- you know, to say I'm not aware of it, I

 4    am.  As an economist, I usually like to do my

 5    homework, my studies, review the literature,

 6    review any industry publications like Modern

 7    Healthcare, which will often have articles

 8    about this kind of thing.  But because that was

 9    not a question I needed to address in order to

10    reach my opinions in this report, at this point

11    in time I haven't done it.

12          Q.      Your model assumes that the

13    second Blue would take the same percentage of

14    market share in every CBSA, in every county

15    outside of CBSA in the state of Alabama;

16    correct?

17          A.      That is correct.  It would be

18    thirty-four, I think it's point two percent.

19          Q.      We agree.  And your testimony as

20    an economist is that the market share that the

21    second Blue entering would be uniform in every

22    CBSA, in every county outside of the CBSA, in

23    the entire state of Alabama; correct?

24          A.      That is not correct.

25          Q.      Okay.  A thirty-four point two
```

```
 1   price-fixing aspects of the BlueCard Program.
 2        Q.      But you did not do an analysis of
 3   the list of potential procompetitive benefits
 4   and determine that the -- the -- in an
 5   analytical way, that the anticompetitive
 6   effects outweigh the procompetitive benefits;
 7   correct?
 8                MR. WHATLEY:  Object to the form.
 9        A.      At this point, that was not part
10   of my assignment.  I am sure, almost -- I
11   shouldn't say sure, ninety-nine percent likely
12   that that might be something that I will do in
13   the future as part of this case.  And at that
14   point, I will carefully consider all the
15   evidence on that point.
16                MR. HOGAN:  I'm going to take a
17   break so I can organize my outline.
18                     (Off-the-Record discussion
19                      was held.)
20                VIDEOGRAPHER:  The time is 3:57
21   p.m. We're off the Record.
22                     (Recess taken.)
23                VIDEOGRAPHER:  The time is 4:12
24   p.m.  We're back on the Record.
25        Q.      Okay.  We're going to talk a
```

Page 278

```
1    must-have hospital or a must-have physician

2    organization, because withdrawal of this

3    hospital or physician organization from the

4    network may substantially decrease individuals'

5    willingness to pay for insured access to the

6    remaining hospital.

7                   Do you see that sentence?

8         A.       I do see that sentence.

9         Q.       Here's my question.  What's a

10   must-have hospital, as you define it?

11        A.       I don't think there is a clear

12   line between one hospital being a must-have and

13   another one not being a must-have.  I think

14   many things go into determining that

15   must-havedness, let me put it that way, because

16   I view it as a variable not an either/or.

17        Q.       Uh-huh.

18        A.       Many things would go into

19   determining that.  The other hospitals with

20   which the hospital of interest competes with;

21   the range of services that that hospital

22   offers; the prices; the number of commercial

23   buyers; the -- Should I keep going?

24        Q.       Uh-huh.

25        A.       Okay.  Consumers' tastes and
```

```
 1    Okay?
 2                So here's my question:  Why, if
 3    there were no restrictions on unbranded entry,
 4    at least restrictions from the Blue rules, why
 5    wasn't there unbranded entry before 2005?
 6                MR. WHATLEY:  Object to the form.
 7                MS. JONES:  Calls for
 8    speculation.
 9         A.     Are you speaking about entry into
10    Alabama?
11         Q.     Yeah.
12         A.     Well, you're speaking about a
13    situation where, in 2005, these at-issue
14    agreements were in effect, not yet the output
15    restriction on unbranded business but the other
16    at-issue agreements were in effect, which led
17    to the markets we've been discussing to be less
18    competitive than they would have been
19    otherwise.  So -- I mean --
20         Q.     So I guess, here's my question
21    again, I'm focusing on -- let's call like 1930s
22    all the way up through when that rule went into
23    place in 2005.  Fair to say, you're not
24    offering an expert opinion about why there
25    wasn't unbranded entry into Alabama during that
```

1    time period?

2         A.         From the 1930s?

3         Q.         All the way to 2005, yeah.

4         A.         Ted Frech is our expert in terms

5    of history and what those markets looked like

6    way back in the '30s and the '40s and the --

7         Q.         '50s, '60s, '70s, '80s, '90s,

8    early 2000s, that's what I'm talking about.

9         A.         I would rely on Professor Frech

10   to help me understand what those markets looked

11   like in earlier years.

12        Q.         But my question is a little

13   different.  Are you off- -- you, not Professor

14   Frech, you, are you offering any expert opinion

15   about why there wasn't unbranded entry, by any

16   Blue, for decades before National Best Efforts

17   went into place on an unbranded business into

18   Alabama; are you offering that opinion?

19             MR. WHATLEY:  Object to the form.

20        A.         So I have been asked, as part of

21   my assignment, to look at the effect of the

22   output restrictions on unbranded business, both

23   national and local, and evaluate the extent to

24   which there has been harm to providers as a

25   result during the class period.

```
 1              At this point in time, I have not
 2   quantified damage based on the output
 3   restriction on branded competition --
 4        Q.      Unbranded.
 5        A.        -- unbranded business, it's
 6   getting late in the day.  Thank you.
 7        Q.      I totally understand.
 8        A.      But I have offered an opinion
 9   that because of the output restrictions on
10   unbranded business, that healthcare providers
11   in Alabama have had less choice and have been
12   harmed accordingly.
13        Q.      You, in your report, at paragraph
14   three forty-three note that the national output
15   restrictions do not prohibit Anthem from
16   establishing a substantial unbranded business
17   in Alabama.
18              Do you see that?  Second
19   sentence.
20        A.      Yes, I see that.
21        Q.      Why hasn't Anthem tried to enter
22   Alabama on an unbranded business basis for the
23   last, you know, ninety years?
24              MS. JONES:  Object to the form.
25   Calls for speculation.
```

Page 308

1      Q.     Do you know, or no?

2      A.     I think you'd have to ask the

3 executives at Anthem.

4      Q.     Okay.  You, yourself, are not

5 answering that question here today; right?

6      A.     I have not had a conversation

7 with the executives at Anthem, so . . .

8      Q.     Okay.  Sitting here today, can

9 you identify any Blue Plan that absent the

10 restraints is ready, willing, and able to enter

11 Alabama?

12      MS. JONES:  Object to the form.

13      A.     If at some point in the future

14 attorneys ask me to do some sort of survey of,

15 you know, executives at the different Blue

16 Plans and they're -- they're thinking about

17 entering Alabama, or any other specific market,

18 of course I would do that.  I haven't done that

19 to date, so I don't have any --

20      Q.     -- specific plan in mind?

21      A.     A specific plan.  It has not been

22 part of my assignment to date.

23      Q.     I know I'm jumping around a

24 little bit, but I want to talk about your

25 model.  And what I want to understand is if a

```
 1    agreements on selling Blue-branded commercial
 2    healthcare financing services, and then the
 3    price-fixing agreements that are part of the
 4    BlueCard.
 5         Q.     Got it.  All right.  Let's go to
 6    -- I don't remember the exact -- Exhibit 4.  It
 7    looks like this (indicating).
 8         A.     In my report?
 9         Q.     No.  No.  I'm so sorry.  It's a
10    separate exhibit in your stack.
11         A.     I didn't remember that in my
12    report.  Which page?
13         Q.     Page eight.
14                So I think earlier today --
15         A.     Hang on.  Just for
16    clarification --
17         Q.     Oh, sure.
18         A.     -- I don't -- I see slide
19    eight --
20         Q.     Slide eight, yeah.
21         A.     Uh-huh.
22         Q.     I think earlier today, you talked
23    about how you were not asked to specifically
24    derive, like, a model for entry.  Do you
25    remember giving that testimony?
```

1      A.      At this point in my assignment, I
2  have not been asked to model the entry
3  decision.
4      Q.      If you were going to, if you were
5  asked to model entry, would you look at the
6  factors, the attractiveness criteria, that are
7  included on slide eight, is that one of the
8  things you'd look at?
9              And take a minute to look it
10 over.
11     A.      So I certainly don't want to
12 speculate.  If I was asked to estimate a model
13 on entry, I would do lots of reading of the
14 literature, familiarize myself with entry
15 models in theory, entry models in the empirical
16 literature.  I haven't done that to date, so I
17 really don't want to speculate.
18     Q.      Would you also --
19     A.      Are you asking me what factors
20 might impact -- that's -- I'm a little more
21 comfortable there.
22     Q.      Sure.
23     A.      What factors in general --
24     Q.      Would you look at the regulatory
25 environment if you were going to model entry