FILED

2020 Oct-09  AM 10:12
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This document relates to all cases** |

## PROVIDER PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AND SUPPORTING MEMORANDUM

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

LIST OF CITATIONS AND ABBREVIATIONS ...................................................................... vii

INTRODUCTION AND OVERVIEW ......................................................................................... 3

ARGUMENT ................................................................................................................................ 8

I.      THE CLASSES EASILY SATISFY THE REQUIREMENTS OF RULE 23(a)....9

      A.    Each Class is Sufficiently Numerous to Be Treated As A Class ................ 9

      B.    There Are Common Questions of Law and Fact ...................................... 10

      C.    The Named Plaintiffs' Claims are Typical of the Claims of
Class Members ......................................................................................... 12

      D.    Provider Plaintiffs and Plaintiffs' Counsel Are Adequate ...................... 14

II.      EACH CLASS ALSO SATISFIES RULE 23(b) ................................................. 15

      A.    The Acute Hospital Provider Class and the Non-Acute Care Hospital
Provider Class Satisfy the Elements of 23(b)(3) ..................................... 15

      B.    Provider Plaintiffs' Injunctive Relief Claims Should Be Certified
Pursuant to Rule 23(b)(2) ........................................................................ 37

III.    Certain Issues Should Be Certified Under Rule 23(c)(4) Including Whether
Defendants' Conduct Violates the Antitrust Laws ................................................ 39

CONCLUSION ........................................................................................................................... 46

# TABLE OF AUTHORITIES

## Cases

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*,
    459 U.S. 519 (1983)................................................................................................ 31

*Behr Dayton Thermal Products LLC v. Martin*,
    18-472, 2019 WL 1231762 (U.S. Mar. 18, 2019)............................................ 44

*Behrend v. Comcast Corp.*,
    655 F.3d 182 (3d Cir. 2011), *rev'd on other grounds,* 569 U.S. 27 (2013)..................... 20

*Bhasker v. Kemper Cas. Ins. Co.*,
    361 F. Supp. 3d 1045 (D.N.M. 2019) ................................................................ 43

*Borrero v. United Healthcare of New York, Inc.*,
    610 F.3d 1296 (11th Cir. 2010) ......................................................................... 43

*Braggs v. Dunn,*
    317 F.R.D. 634 (M.D. Ala. 2016)...................................................................... 13

*Brown v. Electrolux Home Products, Inc.*,
    817 F.3d 1225 (11th Cir. 2016) ......................................................................... 33

*Carriuolo v. Gen. Motors Co.,*
    823 F.3d 977 (11th Cir. 2016) ........................................................................... 33

*Carriuolo v. General Motors Co*.,
    823 F.3d 977 (11th Cir. 2016) ........................................................................... 14

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ........................................................................ 42, 43

*Comcast Corp. v. Behrend,*
    133 S. Ct. 1426 (2013)....................................................................................... 32

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013)............................................................................................. 30

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984)........................................................................................... 17

*Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007)................................................................................ 39

*Cox v. Am. Cast Iron Pipe Co.*,
    784 F.2d 1546 (11th Cir.1986) ............................................................................ 9

*Gates v. Rohm & Haas Co.*,
    655 F.3d 255 (3d Cir. 2011) ............................................................................ 42

*Griffin v. Carlin*,
    755 F.2d 1516 (11th Cir. 1985) ...................................................................... 14

*Gunnells v. Healthplan Servs., Inc.*,
    348 F.3d 417 (4th Cir. 2003) .......................................................................... 41

*In re Atlas Roofing Corp. Chalet Shingle Products Liab. Litig.*,
    321 F.R.D. 430 (N.D. Ga. 2017) .................................................................... 43

*In re Checking Account Overdraft Litig.*,
    307 F.R.D. 630 (S.D. Fla. 2015), *reconsideration denied*,
    1:09-CV-23186-JLK, 2015 WL 12642011 (S.D. Fla. Aug. 21, 2015) ............ 15

*In re Conagra Peanut Butter Prods. Liab. Litig.*,
    251 F.R.D. 689 (N.D.Ga.2008) ...................................................................... 34

*In re Currency Conversion Fee Antitrust Litig.*,
    05 CIV7116 (WHP), 2009 WL 151168 (S.D.N.Y. Jan. 21, 2009) ................. 31

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
    317 F.R.D. 675 (N.D. Ga. 2016) ........................................................ 10, 17, 34

*In re Elec. Books Antitrust Litig.*,
    11 MD 2293 DLC, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ................. 22

*In re Fla. Cement & Concrete Antitrust Litig.*,
    278 F.R.D. 674 (S.D. Fla. 2012) ...................................................................... 9

*In re HealthSouth Corp. Securities Litig.*,
    213 F.R.D. 447 (N.D. Ala. 2003) .................................................................... 13

*In re High-Tech Employee Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) .......................................................... 17

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    319 F.R.D. 158 (E.D. Pa. 2016), *reconsideration denied*,
    06-0620, 2017 WL 6966983 (E.D. Pa. Feb. 22, 2017) .................................. 20

*In re Nassau Cty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) ............................................................................ 41

*In re Prograf Antitrust Litig.*,
    1:11-MD-02242-RWZ, 2014 WL 4745954 (D. Mass. June 10, 2014) ............ 40

*In re St. Jude Med., Inc.*,
  522 F.3d 836 (8th Cir. 2008) ........................................................ 42

*In re Terazosin Hydrochloride*,
  220 F.R.D. 672 (S.D. Fla. 2004) .................................................. 21

*In re Theragenics Corp Secs. Litig.*,
  205 F.R.D. 687 (N.D. Ga. 2002) .................................................. 16

*In re Tri-State Crematory Litig.*,
  215 F.R.D. 660 (N.D. Ga. 2003) .................................................. 41

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) ........................................................ 33

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004) ........................................................ 35

*Johnson v. Ga. Highway Express, Inc.*,
  417 F.2d 1122 (5th Cir. 1969) ..................................................... 14

*Kamakahi v. Am. Socy. for Reprod. Med.*,
  305 F.R.D. 164 (N.D. Cal. 2015), *leave to appeal denied* (May 12, 2015) ...................... 40

*Karhu v. Vital Pharm., Inc.*,
  621 F. App'x 945 (11th Cir. 2015) (unpublished) ........................... 15

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*,
  340 U.S. 211 (1951), *overruled on other grounds by*
  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) ........................................ 32

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) ........................................ 16, 33, 35, 45

*Kornberg v. Carnival Cruise Lines, Inc.*,
  741 F.2d 1332 (11th Cir. 1984) .......................................... 11, 12

*Krehl v. Baskin Robbins Ice Cream Co.*,
  78 F.R.D. 108 (C.D. Cal. 1978) ..................................................... 17

*Laumann v. Natl. Hockey League*,
  105 F. Supp. 3d 384 (S.D.N.Y. 2015) ........................................... 22

*Martin v. Behr Dayton Thermal Products LLC*,
  896 F.3d 405 (6th Cir. 2018), 18-472, 2019 WL 1231762 (U.S. Mar. 18, 2019) ...... 41, 42

*McDonough v. Toys R Us, Inc.*,
  638 F. Supp. 2d 461 (E.D. Pa. 2009) ............................................ 22

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    672 F.3d 482 (7th Cir. 2012) ...................................... 42

*Merenda v. VHS of Mich., Inc.*,
    296 F.R.D. 528 (E.D. Mich. 2013), *opinion reinstated on reconsideration sub nom.*
    *Cason-Merenda v. VHS of Michigan, Inc.*, 06-15601, 2014 WL 905828
    (E.D. Mich. Mar. 7, 2014) ........................................ 21

*Murray v. Auslander*,
    244 F.3d 807 (11th Cir. 2001) ................................... 12

*Pickett v. Iowa Beef Processors*,
    209 F.3d 1276 (11th Cir.2000) .................................. 14

*Quality Auto Painting Ctr. of Roselle, Inc, v. State Farm Indemnity Co.*,
    870 F.3d 1262 (11th Cir. 2017) ................................. 17

*Ross v. Bank of Am., N.A.*,
    524 F.3d 217 (2d Cir. 2008)...................................... 31

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
    601 F.3d 1159 (11th Cir. 2010) ................................. 43

*State of Ala. v. Blue Bird Body Co.*,
    573 F.2d 309 (5th Cir. 1978) .................................... 34

*Steering Comm. v. Exxon Mobil Corp.*,
    461 F.3d 598 (5th Cir. 2006) .................................... 42

*Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*,
    815 F.2d 1407 (11th Cir. 1987), *holding modified by*
    *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991) ........................... 32

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016).......................................... 16

*U.S. v. Gen. Motors Corp.*,
    384 U.S. 127 (1966)............................................. 31

*United States v. Anthem, Inc.*,
    236 F. Supp. 3d 171 (D.D.C. 2017) ............................. 20

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) .................................... 42

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ................................. 13

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ............................................................................... 10, 37

*White v. Natl. Collegiate Athletic Ass'n*,
    CV 06-0999-RGK MANX, 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006) ..................... 22

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 3
    95 U.S. 100 (1969) ........................................................................................... 22

**Statutes**

15 U.S.C. § 1 ...................................................................................................... 10

15 U.S.C. § 26 .................................................................................................... 11

**Other Authorities**

2 *Newberg on Class Actions* § 4:66 (5th ed.) ............................................................ 35

2 *Newberg on Class Actions* § 4:67 (5th ed.) ............................................................ 35

2 *Newberg on Class Actions* § 4:91 (5th ed. 2018) .................................................... 43

2 W. Rubenstein, *Newberg on Class Actions* § 4.50, pp. 196-97 (5th ed. 2012) .......................... 16

7AA C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1778,
    pp. 123-124 (3d ed. 2005) ................................................................................ 16

Advisory Committee Note to 1966 Amendments, 39 F.R.D. 69 (1966) ...................... 35

Manual for Complex Litigation § 21.24 (4th ed) ...................................................... 38

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*,
    84 N.Y.U. L. Rev. 97 (2009) ........................................................................... 37

**Rules**

Fed. R. Civ. P.p. 23 .............................................................................................. 8

Fed. R. Civ. P. 23(a) ........................................................................................... 11

Fed. R. Civ. P. 23(a)(4) ....................................................................................... 13

Fed. R. Civ. P. 23(b)(2) .................................................................................... 1, 37

Fed. R. Civ. P. 23(b)(3) ............................................................................. 1, 16, 34

Fed. R. Civ. P. 23(c)(4) ............................................................................... 1, 38

## LIST OF CITATIONS AND ABBREVIATIONS

| Dkt # | Ex | Document | Citation |
|---|---|---|---|
| 2455-1 | 1. | WTB Declaration | Declaration of W. Tucker Brown dated April 15, 2019 |
| 2454-1 | 2. | Kellogg | Deposition of Terry Kellogg (31:11-32:23; 81:10-16; 82:10-18; 121:3-5; 143:25-144:1; 144:5-20; 188:6-20) |
| 2455-3 | 3. | Leahey | Deposition of Robert Leahey (75:21-76:9; 131:22-132:5; 163:4-164:1) |
| 2455-4 | 4. | Presentation to CEO Workgroup entitled "Consumer Market: *Strategic Brand and Marketing Plan*" dated February 15, 2012 | BCBSA00719423, 429 |
| 2455-5 | 5. | Cullen | Deposition of Richard Cullen (130:15-17, 20-22; 141:22-24; 142:10-15; 152:19-21; 153:16-25; 189:12-14) |
| 2455-6 | 6. | Putziger I | 30(b)(6) Deposition of Steve Putziger (25:12-13; 38:12-15; 139:6-20) |
| 2455-7 | 7. | Putziger II | 30(b)(1) Deposition of Steve Putziger (79:3-7; 100:24-101:18) |
| 2455-8 | 8. | Collection of Interviews with Plan Presidents | BCBSA00115424-428, 425 |
| 2455-9 | 9. | Interview with Ralph Rhoades | BCBSA00083761, 64 |
| 2455-10 | 10. | Carter | Deposition of Tony Carter (46:4-18; 92:5-12; 128:11-12) |
| 2455-11 | 11. | INTENTIONALLY LEFT BLANK | |
| 2455-12 | 12. | Strachan | Deposition of David Strachan (37:2-22; 37:15-17; 123:19-25; 124:1-126:20) |
| 2455-13 | 13. | Email string discussing contracting outside of Exclusive Service Area | BCBSA00690706 |
| 2455-14 | 14. | Email String discussing contracting outside of Exclusive Service Area | BCBSA-CID-031178 |
| 2454-2 | 15. | Bolen | Deposition of Joseph Bolen (100:24-101:18; 150:11-19) |

| 2455-16 | 16. | Interview with Robert Bulla | BCBSA00083725, 727 |
|---|---|---|---|
| 2455-17 | 17. | Interview with Lloyd Banks | BCBSA00083749, 751 |
| 2454-3 | 18. | Frech | Expert Report of H.E. Frech, III, Ph.D. |
| 2454-4 | 19. | Harris | Deposition of Eddie Harris (260:13-16) |
| 2454-5 | 20. | Ingrum I | June 21, 2017, 30(b)(6) Deposition of Jeffrey Ingrum (43:20-44:1; 114:4-11) |
| 2455-21 | 21. | December 16-18, 2015 presentation entitled "BlueCard® Overview" for Arkansas BlueCross BlueShield | Ark BCBSe-0422135, at p. 1, 5 |
| 2455-22 | 22. | *Independence Blue Cross v. Blue Cross and Blue Shield Association*, Mandatory Dispute Resolution Pursuant to Agreement Regarding Arbitration, Proposed Findings and Conclusions of Law of Complainant Independence Blue Cross | BCBSA00188705, 751, 813, 822 |
| 2454-6 | 23. | Haas-Wilson | Expert Report of Professor Deborah Haas-Wilson |
| 2455-24 | 24. | Bruce Decl. | Declaration of Michael Bruce |
| 2455-25 | 25. | Eisemann Decl. | Declaration of Bradley Eisemann |
| 2455-26 | 26. | Lee Decl. | Declaration of Sharon Lee |
| 2455-27 | 27. | McLendon Decl. | Declaration of Tom McLendon |
| 2455-28 | 28. | Ackerson Decl. | Declaration of Joseph Ackerson |
| 2455-29 | 29. | Clark Decl. | Declaration of Charles H. Clark, M.D. |
| 2455-30 | 30. | Conway Decl. | Declaration of Jerry L. Conway, D.C. |
| 2455-31 | 31. | Nesbitt Decl. | Declaration of Robert W. Nesbitt, M.D. |
| 2455-32 | 32. | Nesin Decl. | Declaration of Janine Nesin |
| 2455-33 | 33. | Pernia Decl. | Declaration of Luis Pernia, M.D. |
| 2455-34 | 34. | Caldwell Decl. | Declaration of Matthew Caldwell, M.D. |
| 2455-35 – 2455-37 | 35. | Joint Declaration | Joint Declaration of Joe R. Whatley, Jr. and Edith M. Kallas |
| 2455-38 | 36. | Macoice | Deposition of Darren Macoice (63:21-64:6) |
| 2455-39 | 37. | November 11, 1982 presentation by Edwin R. | BCBSA00011505, 524, 528 |

| | | Werner to the Blue Cross Blue Shield Association regarding Long-Term Business Strategy | |
|---|---|---|---|
| 2455-40 | 38. | Harris Feldick Interview regarding White Paper | BCBSA00083738 |
| 2455-41 | 39. | Serota Testimony | *Anthem v. Cigna*, Trial Tr., March 7, 2019, Testimony of Blue Cross Blue Shield Association Chief Executive Officer, Scott Serota (2874:17-24) |
| 2455-42 | 40. | Summary of Interviews | BCBSA00083786, 790 |
| 2455-43 | 41. | U.S. v. Anthem Trial Tr. | *United States v. Anthem, Inc.*, No. 16-CV-1493 (D.D.C.), Trial Tr. (656:13-16) |
| 2455-44 | 42. | Swedish Tr. | WLP-07174415 (238:21-239:4) |
| 2454-7 | 43. | April 30, 2001 Memo regarding Arguments against a National Best Efforts Standard | BCBSA00189751-755 |
| 2455-46 | 44. | Volume V of the transcript of the Mediation between Blue Cross and Blue Shield Association and Independence Blue Cross, July 2, 1999 | BCBSA04217365, 407-08 |
| 2454-8 | 45. | Ingrum II | September 25, 2017, 30(b)(6) Deposition of Jeffrey Ingrum (23:17-24:18, 25:18-29:19, 32:9-34:12; 42:18-43:14) |
| 2454-9 | 46. | Ex. 3 to Ingrum II | Ex. 3 to September 25, 2017, 30(b)(6) Deposition of Jeffrey Ingrum, BCBSAL_0000775033 |
| 2454-10 | 47. | Brownlow | Deposition of John Brownlow (116:23-117:18) |
| 2455-50 | 48. | 2015 Blue Cross License Agreement | BCBSA03877386, 513 |
| 2455-51 | 49. | 2015 Blue Shield License Agreement | BCBSA03877551, 676 |
| 2454-11 | 50. | September 18, 2015 Guidelines to Administer Membership Standards Applicable to Regular Members | BCBSA-CID-013850, 875 |
| 2454-12 | 51. | October 2015 Inter-Plan Programs Policies and Provisions | BCBSA-CID-020329, 413 |

| 2455-54 | 52. | January 7, 1987 Report of CEO Interviews | BCBSA00083662, 667 |
|---------|-----|------------------------------------------|--------------------|
| 2455-55 | 53. | Mediation of Blue Cross Blue Shield Association and Independence Blue Cross, Association Opening Memorandum | BCBSA00188522, 540 |
| 2454-13 | 54. | July 13, 2010 Dynamic Planning Session regarding Healthcare Costs – Facility Contracting | BCBSAL_0000109829, 841 |
| 2454-14 | 55. | Slottje | Expert Report of Daniel J. Slottje, Ph.D. |

Provider Plaintiffs seek certification of classes[1] of healthcare providers in Alabama pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).[2]  First, Provider Plaintiffs seek certification of both of the following classes of acute care hospitals in Alabama (collectively "the Acute Care Hospital Provider Classes"):

*Acute Care Hospital Provider 23(b)(2) Class:*

> All acute care hospitals in the State of Alabama, not owned in whole or in part by any Defendant, that currently provide healthcare services, equipment or supplies.

Provider Plaintiffs seek certification pursuant to Rule 23(b)(2) with regard to all injunctive relief claims.

*Acute Care Hospital Provider 23(b)(3) Class:*

> All acute care hospitals in the State of Alabama, not owned in whole or in part by any Defendant, that had a participation agreement with Blue Cross and Blue Shield of Alabama, that provided covered services, equipment or supplies to any patient who was insured by, or who was a member or beneficiary of any plan administered by a Defendant, and that submitted a claim to Blue Cross and Blue Shield of Alabama within four years prior to the date of the filing of this action.

Provider Plaintiffs seek certification pursuant to Rule 23(b)(3) with regard to both *per se* and rule of reason claims under both Section 1 and Section 2 of the Sherman Act.[3]  Plaintiffs are

---

[1] Provider Plaintiffs have proposed separate classes as opposed to subclasses at this point in the litigation. In response to the comment by the Court about subclasses in the latest scheduling order, Doc. 2392, the use of separate classes serves the same function that subclasses could satisfy in other circumstances.

[2] In this motion, Provider Plaintiffs seek class certification only with regard to the prioritized proceedings. Provider Plaintiffs, accordingly, reserve the right to bring any appropriate motion with regard to the remainder of this action.

[3] Plaintiffs are not necessarily saying that the *per se* and rule of reasons claims should be tried together. The Court may find separate trials of the *per se* and rule of reason claims to be more efficient and the Court could accordingly bifurcate the trials of those claims.

proposing that this class proceed to a class-wide trial for liability and damages.[4] Alternatively, should the Court decline to certify the Acute Care Hospital Provider Class under Rule 23(b)(3), Provider Plaintiffs request certification of an issues class pursuant to Rule 23(c)(4).

Provider Plaintiffs also seek certification of all of the following classes of healthcare providers other than acute care hospitals in Alabama (collectively "the Non-Acute Care Hospital Provider Classes"):

*Non-Acute Care Hospital Provider 23(b)(2) Class*

> All healthcare providers other than acute care hospitals in the State of Alabama, not employed by or owned in whole or in part by any Defendant, who currently provide any healthcare service, equipment or supplies other than (1) those covered by standalone dental or vision insurance, (2) prescription drugs, (3) durable medical equipment, (4) medical devices, or (5) supplies or services provided in an independent clinical laboratory.

Provider Plaintiffs seek certification pursuant to 23(b)(2) with regard to all injunctive relief claims.

*Non-Acute Care Hospital Provider 23(b)(3) and 23(c)(4) Class*[5]

> All healthcare providers other than acute care hospitals in the State of Alabama, not employed by or owned in whole or in part by any Defendant, who had a participation agreement with Blue Cross and Blue Shield of Alabama, who provided any covered services, equipment, or supplies (other than (1) those provided to members of or participants in Medicare, Medicaid or the Federal Employee Health Benefits Programs; (2) those covered by standalone dental or vision insurance; (3) prescription drugs; (4) durable medical equipment; (5) medical devices, or (6) supplies or services provided in an independent clinical laboratory) to any patient who was insured by, or who was a member or beneficiary of any plan administered by a Defendant, and who submitted a claim

---

[4] Professor Haas-Wilson has calculated the extent of the injury for each acute care hospital, and Professor Slottje has calculated the damage for each acute care hospital, with the total for the Alabama class of acute care hospitals being $4,364,277,953.  Dkt. 2454-14, Slottje ¶ 80.

[5] Provider Plaintiffs believe the Non-Acute Care Hospital Provider 23(b)(3) and 23(c)(4) class is a properly defined, homogenous class. However, should the Court determine that subclasses are necessary, Provider Plaintiffs respectfully request the opportunity to add class representatives.

to Blue Cross and Blue Shield of Alabama within four years prior to the date of
the filing of this action.

Provider Plaintiffs seek certification pursuant to 23(b)(3) with regard to the Non-Acute Care

Hospital Providers' *per se* Section 1 claims.[6] For this class Provider Plaintiffs are proposing that

the issue of damages be bifurcated for this case and handled through separate proceedings.

Alternatively, should the Court decline to certify the Non-Acute Care Hospital Provider's

Section 1 *per se* claims under 23(b)(3), Provider Plaintiffs request certification of an issues class

pursuant to Rule 23(c)(4). Additionally, Provider Plaintiffs seek certification of the Non-Acute

Care Hospital Provider's Section 2 claims under 23(c)(4) with regard to particular issues.

## INTRODUCTION AND OVERVIEW

Class certification is merited in this case because the predominant facts are not only

common to all class members, but are also largely undisputed. Questions regarding the legality

of Defendants' across-the-board conduct are necessarily common to each and every class

member.

First, while the Blues acknowledge that they are independent legal entities[7], they do not

dispute that they operate in geographic areas referred to as Exclusive Service Areas.[8] The Blues

---

[6] Provider Plaintiffs are proposing to structure the class in this manner based upon the existing
interpretation of the *per se* claims in the case. If that interpretation were to change, then the
Provider Plaintiffs reserve the right to structure the claims a different way and present one or
more classes of Non-Acute Care Hospital Plaintiffs with rule of reason claims.

[7] Bates numbered documents are addressed by the Declaration of W. Tucker Brown dated April
15, 2019, attached here as Dkt. 2455-1; 2454-1, Kellogg, 143:25-144:1; 144:5-20 (Blue system is
not a single entity); Dkt. 2455-3, Leahey, 163:4-164:1 (all the Blue Plans are independent
companies); Dkt. 2455-4 at 3 ("But the single entity model is not a good analogy for the Blue
system.")

[8] Dkt. 2455-5, Cullen, 152:19-21 ("Plans have exclusive service areas"); Dkt. 2455-6, Putziger I,
25:12-13 (testifying that "the service areas are exclusive"); 2455-7, Putziger II, 79:3-7
(identifying "service area maps of the ...Blue Plan exclusive service areas"); Dkt. 2455-3,

concede that within each Exclusive Service Area, only one Blue can sell insurance, administer

employee benefit plans or contract with healthcare providers.[9] Accordingly, healthcare providers

in the State of Alabama cannot contract with any Blue Plan in the country other than BCBS-AL.

As one Association witness testified, the Exclusive Service Areas help the Blues obtain discounts

from providers.[10] *See* Dkt. 2454-3, Frech ¶¶ 306, 312, 393. As the Court recognized in its

---

Leahey, 169:14-17 (defining "Exclusive Service Areas" as "the defined service area of an independent licensee to use the Blue Cross and/or Blue Shield marks); Dkt. 2454-1, Kellogg, 31:11-32:23 (testifying that Alabama is the exclusive service area of BCBS of Alabama). *See also* Dkt. 2455-8 at 2 ("[P]lans benefit from the exclusive service areas because it eliminates competition from other Blue Plans. Otherwise there would be open warfare"); Dkt. 2455-9 at 5 (Plans "benefit from the exclusive service areas" through "larger market share because other Blues stay out and do not fragment the market").

[9] Dkt. 2455-6, Putziger I, 139:6-20 (testifying that other than provisions related to contiguous counties, a Blue Plan is prohibited from contracting with providers outside its exclusive service area); Dkt. 2455-10, Carter, 46:4-18 (testifying that BCBS-AL has an agreement with the other Blues not to compete within each other's territories without permission); Dkt. 2455-5, Cullen 130:15-17; 20-22 (testifying that "more than one Blue Plan [is never] allowed to bid the same account" and explaining that this goes back to the exclusive service areas); Dkt. 2454-1, Kellogg, 39:13-39:23; Dkt. 2455-3, Leahey, 75:21-76:9; 131:22-132:5 (explaining restrictions on branded and non-branded business); Dkt. 2455-6, Putziger I30(b)(6), 38:12-15 ("So nationally...two-thirds or more [of a Blue Plan's] business must be Blue"); Dkt. 2455-12, Strachan, 123:19-25 (testifying that Blue Plans do not compete for National Accounts); Dkt. 2454-1, Kellogg, 121:3-5 ("There is not another Blue-branded or Blue-cobranded choice for consumers in Alabama other than Blue Cross and Blue Shield of Alabama"); Dkt. 2455-12, Strachan, 124:1-126:20 (testifying that the rule is that you contract with providers within your service area with very limited enumerated exceptions); Dkt. 2455-13 at 2 (The rules "only allow a Plan to contract with certain providers outside of their Exclusive Service Area, for a few limited circumstances"); Dkt. 2455-5, Cullen, 142:10-15 (testifying that when a Plan is negotiating with providers in their exclusive area "they're really negotiating on behalf of other Plans' Blue members as well"); Dkt. 2455-5, Cullen, 189:12-14 (testifying that the rule is that Blues "cannot contract with providers outside their service area"); Dkt. 2455-14 at 2 ("Plans can only contract with providers in their service area"); Dkt. 2454-2, Bolen, 100:24-101:18 (testifying that BCBS-AL could not contract with doctors and hospitals in Panama City, Florida); Dkt. 2455-6, Putziger I, 100:24-101:18 (testifying that violation of the rules regarding exclusive service areas would result in monetary sanctions).

[10] Dkt. 2455-5, Cullen, 153:16-25. *See also* Dkt. 2455-16 at 4 ("[B]y enjoying exclusive territories, Plans can bargain aggressively with providers. In turn, national accounts enjoy local discounts"); Dkt. 2455-17 at 4 ("Plans individually benefit from [Exclusive Service Areas] to the

Opinion regarding Standard of Review, "In addition to allocating geographic markets through their use of ESAs, Defendants have developed additional rules which place restraints on the Plans' ability to compete, and not only with each other." Opinion, Doc. No. 2063 at 46. These rules include the National Best Efforts rule:

> The National Best Efforts rule, implemented in 2005, requires a Plan to derive at least sixty-six and two-thirds percent (66 2/3%) of its national health insurance revenue from its Blue brand. Thus, any health revenue a Blue Plan may generate from services offered under any non-Blue brand is limited in related to is Blue branded health revenue. The National Best Efforts rule, therefore, operates as an output restriction on a Plan's non-Blue brand business.

*Id.* (citations omitted). As the Court has determined, the Defendants' "adoption of ESAs" and "best efforts rules" constitute a *per se* violation of the Sherman Act. Doc. No. 2063 at 37.[11] The Local Best Efforts Rule likewise operates as an output restriction. "Under the Local Best efforts Rule, at least eighty percent of a Plan's annual health revenue from within its designated service area must be derived from services offered under the Blue Marks." *Id.* at 16-17.

Defendants likewise do not dispute that when a healthcare provider in Alabama treats a member of any other Blue plan, the provider will be paid the same rate he would have been paid had the patient been a member of the BCBS-AL plan.[12] This is required because of the ESAs and

---

degree they can derive provider discounts large enough to influence accounts"); Dkt. 2455-9 at 5 (Plans benefit through "strong provider agreements" due to "large market share because other Blues stay out and do not fragment the market").

[11] The Court found "the National Best Efforts rule constitutes a *per se* violation of the Sherman Act…." Doc. No. 2063 at 48. However, the Court "reserve[d] the question of whether the Local Best efforts rule is a *per se* Sherman Act violation in isolation." *Id.* at 48 n. 16.

[12] Dkt. 2455-12, Strachan, 37:15-17 ("[T]he same rate is applied to all Blue members"); Strachan, 37:18-22 (testifying that the provider would be getting the same in-network rate whether or not it is being processed through BlueCard or whether or not it is a local member); Dkt. 2454-4, Harris, 261:3-5 ("the provider is paid based on the contract with that local Blue Cross Plan"); Dkt. 2454-5, Ingrum I, 114:4-11 (testifying that when Alabama providers treat members of out-of-state Blues, they are reimbursed at BCBS-AL rates); Dkt. 2455-10, Carter,

accomplished through the BlueCard program, which enables the Blues to utilize providers in other service areas without negotiating or contracting with those providers.[13] One Defendant has characterized the BlueCard Program as a "price setting scheme."[14] Whether, in fact, the Blues' agreement constitutes price fixing or an illegal boycott in violation of Section 1 is also obviously a predominating common question.

Finally, by its own admission, BCBS-AL is the largest commercial insurer in Alabama.[15] In 2014, 68 percent of the commercially insured population was insured by BCBS-AL.[16] Another 17 percent was insured by another Blue Plan.[17] Therefore, in 2014, Blue Plans insured

---

92:5-12 (testifying that the host plan passes on its rates). However, the provider is subject to the medical policies, preauthorization requirements, and coverage rules of the Home Plan. Dkt. 2455-10, Carter, 128:11-129:3(same); Dkt. 2454-1, Kellogg, 69:12-15 (testifying that the home plan adjudicates the claim); Dkt. 2455-12, Strachan 37:2-22. Providers who contract with a Blue have no choice but to participate in the BlueCard program. Dkt. 2454-5, Ingrum I, 43:20-44:1 (testifying that participation in BlueCard is a component of a provider's contract); Dkt. 2455-12, Strachan, 37:2-11 (testifying the Blue will apply BlueCard program to all in-network physicians). About 30 percent of Blue Cross Blue Shield of Alabama's business is derived from National Accounts that are processed through BlueCard. Dkt. 2454-1, Kellogg, 81:10-16.

[13] Dkt. 2454-4, Harris, 260:13-16 ("BlueCard program is a mechanism whereby Blue Cross and Blue Shield Plans make their networks available to their sister Plans"); Dkt. 2455-5, Cullen, 141:22-24 (testifying that the Blue within its Exclusive Service Area is negotiating with "providers on behalf of all of our...hundred-plus-million members"); 2454-1, Kellogg, 82:10-18 ("[T]he BlueCard system, I think, is dependent on the exclusive service areas"); Dkt. 2455-21 at 4 (BlueCard was "created in response to BCBS Plans' exclusive service areas" because "Plans may only use the BCBS brand in their exclusive service areas").

[14] Dkt. 2455-22 at 3-5, *Independence Blue Cross v. Blue Cross and Blue Shield Association*, Mandatory Dispute Resolution Pursuant to Agreement Regarding Arbitration, Proposed Findings and Conclusions of Law of Complainant Independence Blue Cross.

[15] www.bcbsal.org ("We are the largest provider of healthcare benefits in Alabama."); Blue Cross and Blue Shield Interrogatory Response.

[16] Dkt. 2454-6, Haas-Wilson Report, ¶ 41.

[17] *Id.*

85 percent of the commercially insured population in Alabama.[18] All acute care hospitals and 95 percent of healthcare professionals in Alabama have a participation agreement with BCBS-AL.[19]

The question of whether BCBS-AL has monopsony power, has attempted to achieve monopsony power or has conspired with other Blues to achieve or maintain monopsony power will focus entirely on the conduct and characteristics of Defendants and, accordingly, should be answered only once for all class members. Common factual and legal questions regarding Defendants' antitrust violations predominate over any conceivable individualized issues.

In support of class certification, Provider Plaintiffs submit the expert report of Professor H. E. Frech, III to provide a more in-depth historical background and analysis regarding health insurance generally, competition in health insurance, and the Blues including BCBS-AL. Professor Frech also provides an in-depth analysis of the anticompetitive mechanisms utilized by the Blues, competition among the Blues over time, and market conditions that would exist but-for Defendants' conduct. Finally, Professor Frech provides analysis and support with regard to the Rule 23 requirements.

Moreover, Provider Plaintiffs can establish common impact with regard to the 23(b)(3) Classes and the threat of future injury to the 23(b)(2) Classes utilizing class-wide proof. In support of class certification, Plaintiffs submit the expert report of Professor Deborah Haas-Wilson to demonstrate that a reliable methodology exists to show that all members of the Acute Care Hospital Providers Class have been injured by Defendants' antitrust violations with regard to the prices they are paid for their services and the extent of that injury. She has also shown that

---

[18] *Id.*

[19] Dkt. 2454-1, Kellogg, 188:6-20 (testifying that 100 percent of acute care hospitals in Alabama are participating); Dkt. 2454-2, Bolen, 150:11-19 (testifying that ninety-five percent of physicians, podiatrists, optometrists and pathologists have participating contracts).

all providers have suffered non-price harms. *See also* Dkt. 2454-3, Frech ¶¶ 33, 368, 393, 408, 411, 414. Provider Plaintiffs also submit the expert report of Professor Daniel J. Slottje to demonstrate that damages for members of the Acute Care Hospital Provider Class can be established using a common methodology and common evidence. Dkt. 2454-14.

As set forth below, Provider Plaintiffs satisfy every element of Rule 23(a) and (b)(3). Accordingly, the Damages Classes should be certified under Rule 23(b)(3). In addition, because class members continue to be subjected to a threat of serious harm, the Injunctive Relief Classes should also be certified under Rule 23(b)(2). The Section 2 claims of the Non-Acute Care Hospital Providers Class should likewise be certified pursuant to 23(c)(4).

## ARGUMENT

Rule 23 of the Federal Rules of Civil Procedure sets forth a two-part test for class certification. The first part, subsection (a), states the threshold requirements for all class actions. All of the proposed classes easily satisfy the requirements of Rule 23(a). The second part of the test is set forth in subsection (b). Because common issues predominate and a class action is superior to any other conceivable mechanism for resolving Class members' claims, the damages claims should be certified pursuant to 23(b)(3).[20] The injunctive relief classes seeking to end Defendants' across-the-board antitrust violations that threaten all Class members with loss or damage should be certified under Rule 23(b)(2).

## I.    THE CLASSES EASILY SATISFY THE REQUIREMENTS OF RULE 23(a).

In order to certify a class, the Court must first find the class satisfies the following Rule 23(a) requirements:

(1)    the class is so numerous that joinder of all members is impracticable;

---

[20] Alternatively, certification under 23(c)(4) is appropriate for resolution of overarching common questions.

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These prerequisites to class certification are often referred to as numerosity, commonality, typicality and adequacy of representation.

A.    **Each Class is Sufficiently Numerous to Be Treated As A Class**

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1). The plaintiffs "need not prove the exact size of the proposed class"; rather, they "need demonstrate only that the number is exceedingly large, and joinder impracticable." *In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 679 (S.D. Fla. 2012). In the Eleventh Circuit, a prospective class with more than forty members is generally deemed to satisfy the numerosity requirement. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir.1986).

The Acute Care Hospital Providers 23(b)(3) Class includes 106 members. Dkt. 2454-14, Slottje ¶ 72; Dkt. 2454-3, Frech ¶ 399. The Non-Acute Care Hospital Providers 23(b)(3) class includes thousands of members. The number of acute care hospital providers and non-acute care hospital providers in the (b)(2) classes are generally the same as the number of providers in the (b)(3) classes.[21] *Id*. The numerosity requirement is clearly satisfied.

B.    **There Are Common Questions of Law and Fact**

---

[21] Unfortunately, some acute care hospitals have closed during the class period, but that class continues to be numerous.

Rule 23(a)(2) requires that there be questions of law or fact that are common to the class. In order to satisfy the commonality requirement, class members' "claims must depend upon a common contention of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2545 (2011). Courts in the Eleventh Circuit "have consistently held that allegations of price-fixing, monopolization, and conspiracy by their very nature involve common questions of law or fact." *In re Delta/AirTran Baggage Fee Antitrust Litig.,* 317 F.R.D. 675, 694 (N.D. Ga. 2016) (citations omitted).

### 1. Common Questions of Law and Fact Exist Regarding *Per Se* Section 1 Claims

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal." 15 U.S.C. § 1. Resolution of the common question of whether Defendants conspired to allocate markets and agreed to output restrictions will resolve a core question regarding the validity of each and every class member's claim in one stroke. In addition, common questions exist with regard to Defendants' purported defenses including whether Defendants constitute a single entity.

### 2. Common Questions of Law and Fact Exist Regarding the Rule of Reason Claims

Common questions related to the Acute Care Hospital Providers' rule of reason claims include whether Defendants agreed to fix prices and whether Defendants agreed to a group boycott. Questions related to Plaintiffs' Section 2 claims include whether BCBS-AL has market power in a particular market, whether Defendants conspired to monopsonize the relevant markets, whether BCBS-AL attempted to monopsonize the relevant markets and whether BCBS-

AL has monopsonized the relevant market. Additional questions include whether there is direct evidence of anticompetitive conduct, whether Defendants can proffer any potential procompetitive justifications, whether those justifications outweigh the harm to competition caused by the conduct, and whether Defendants constitute a single entity. Each and every class member's claim with regard to these questions will be established through common evidence.

### 3. Common Questions Regarding Injunctive Relief

Proof with regard to Plaintiffs' Section 16 claim for injunctive relief likewise involves common questions. Section 16 provides injunctive relief "against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. Therefore, in addition to common questions regarding whether Defendants' conduct violates the antitrust laws, Plaintiffs' Section 16 claim requires proof that Defendants' conduct is continuing and, accordingly, that Provider Plaintiffs and members of the injunctive relief classes remain at risk for loss or damage. These are common, overarching questions.

All classes satisfy the commonality requirement of Rule 23(a)(2).[22]

### C. The Named Plaintiffs' Claims Are Typical of the Claims of Class Members

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a). In order to establish typicality, plaintiffs must show that some nexus exists between the class representative's claims or defenses and the common questions of fact or law that unite the class. *See Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). A sufficient nexus is established if the claims or defenses of the class and class representatives arise from the same

---

[22] Obviously, the 23(c)(4) issues classes seek certification solely with regard to common questions.

event or pattern and are based on the same legal theory. *Id.* "The typicality requirement may be satisfied despite substantial factual differences...when there is a 'strong similarity of legal theories.'" *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001). Likewise, the fact that the challenged conduct harmed class members to different degrees does not make a class representative's claims atypical. *Kornberg*, 741 at 1337.

In the antitrust context, typicality is generally not a difficult requirement to satisfy because of the nature of such claims. Typicality in this case is readily apparent. Because the named plaintiffs provided services subject to a participation agreement with BCBS-AL, the claims of the named plaintiffs arise from the same course of conduct by Defendants that gives rise to the claims of absent class members. *See* Dkt. 2455-24 at 3, Bruce Decl. ¶ 6, Dkt. 2455-25 at 2, Eisemann Decl. ¶ 4, Dkt. 2455-26 at 2, Lee Decl. ¶ 4, Dkt. 2455-27 at 2-3, McLendon Decl. ¶ 5, Dkt. 2455-28 at 2, Ackerson Decl. ¶ 3, Dkt. 2455-29 at 2, Clark. Decl. ¶ 3, Dkt. 2455-30 at 2, Conway Decl. ¶ 3, Dkt. 2455-31 at 2, Nesbitt Decl. ¶ 3, Dkt. 2455-32 at 2, Nesin Decl. ¶ 3, Dkt. 2455-33 at 2, Pernia Decl. ¶ 3, Dkt. 2455-34 at 2, Caldwell Decl. ¶ 3.[23] Moreover, all named plaintiffs' claims are based on the same legal theories that Defendants allocated service areas and agreed to output restrictions for the express purpose of constraining competition and depressing payments to healthcare providers. In addition, the Acute Care Hospital Providers' Section 1 rule of reason claims are based on the same legal theories as all other acute care hospital providers that Defendants fixed prices and boycotted providers. Finally, all Section 2

---

[23] Dr. Matthew Caldwell is a plaintiff in a case recently filed in this court and is proceeding as a class representative for the non-acute care hospital provider class. Moreover, if for any reason the Court should determine that a subclass of medical doctors who are not subject to the *Love* release is necessary, Dr. Caldwell can serve as the representative for such a subclass of providers.

claims are based on the legal theories of conspiracy to monoposonize, monopsonization and attempted monopsonization.

Moreover, the named plaintiffs that are currently providing services are subject to the same substantial risk of future harm as absent Class members.[24] Accordingly, typicality is satisfied with regard to Plaintiffs' Section 16 claim for injunctive relief. *See Braggs v. Dunn*, 317 F.R.D. 634, 664 (M.D. Ala. 2016) ("For purposes of typicality, plaintiffs need to show that there are named plaintiffs who have been exposed to the policies or practices that create the substantial risk of serious harm they challenge, <u>not</u> that they have actually suffered the harm in the past") (emphasis in original).

If brought and prosecuted individually, the claims of Plaintiffs and each member of the Class would require proof of the same material and substantive facts and would seek the same relief. Accordingly, the typicality requirement is satisfied.

## D.    Provider Plaintiffs and Plaintiffs' Counsel are Adequate

Rule 23(a) also requires that the representative class members "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy analysis has two components: "'(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1189 (11th Cir. 2003) (quoting *In re*

---

[24]  Almost all of the Named Plaintiffs continue to provide healthcare services. *See* Dkt. 2455-24 at 3, Bruce Decl. ¶ 5, Dkt. 2455-25 at 2, Eisemann Decl. ¶ 3, Dkt. 2455-26 at 2, Lee Decl. ¶ 3, Dkt. 2455-27 at 2, McLendon Decl. ¶ 4, Dkt. 2455-28 at 2, Ackerson Decl. ¶ 2, Dkt. 2455-29 at 2, Clark Decl. ¶ 2, Dkt. 2455-31 at 2, Nesbitt Decl. ¶ 2, Dkt. 2455-32 at 2, Nesin Decl. ¶ 2, Dkt. 2455-33at 2, Pernia Decl. ¶ 2, Dkt. 2455-34 at 2, Caldwell Decl. ¶ 2. However, Georgiana Medical Center was forced to close and ceased operations on March 31, 2019. Dkt. 2455-24 at 3, Bruce Decl. ¶ 5. In addition, Dr. Jerry L. Conway is retired. Dkt. 2455-30 at 2, Conway Decl. ¶ 2.

*HealthSouth Corp. Securities Litig.*, 213 F.R.D. 447, 460-61 (N.D. Ala. 2003)). While "'a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class ... a party's claim to representative status is defeated only if the conflict between the representative and the class is a fundamental one, going to the specific issues in controversy.'" *Carriuolo v. General Motors Co*., 823 F.3d 977, 989 (11th Cir. 2016) (quoting *Pickett v. Iowa Beef Processors,* 209 F.3d 1276, 1280 (11th Cir.2000)). The named plaintiffs possess no antagonistic interests or conflicts with absent Class members. Dkt. 2455-24 at 3, Bruce, Decl., ¶ 8, Dkt. 2455-25 at 3, Eisemann Decl. ¶ 6, Dkt. 2455-26 at 3, Lee Decl. ¶ 6, Dkt. 2455-27 at 3, McLendon Decl. ¶ 7, Dkt. 2455-28 at 2, Ackerson Decl. ¶ 5, Dkt. 2455-29 at 2, Clark Decl. ¶ 5, Dkt. 2455-30 at 2, Conway Decl. ¶ 5, Dkt. 2455-31 at 2, Nesbitt Decl. ¶ 5, Dkt. 2455-32 at 2, Nesin Decl. ¶ 5, Dkt. 2455-33 at 2, Pernia Decl. ¶ 5, Dkt. 2455-34 at 3, Caldwell Decl. ¶ 5. Plaintiffs will fairly and adequately represent the Class members' interests.

Plaintiffs' counsel will likewise adequately represent the classes. If "plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation," and the named Plaintiffs do not "have interests antagonistic to the rest of the class," Rule 23(a)(4) is satisfied. *Griffin v. Carlin*, 755 F.2d 1516, 1532-33 (11th Cir. 1985) (citing *Johnson v. Ga. Highway Express, Inc.*, 417 F.2d 1122, 1125 (5th Cir. 1969)). Proposed class counsel are experienced in complex litigation generally and antitrust actions specifically and have been found to be adequate counsel in complex class action litigation involving allegations of antitrust conspiracies and other complex litigation.  Dkt. 2455-35 at 1-11, Joint Declaration, ¶¶ 2-4, 7-37. Provider Plaintiffs' counsel have no conflicts that will compromise counsels' loyalty to the unnamed Class members. *Id.* ¶¶ 5, 7. Provider Plaintiffs' counsel have endeavored to conduct this

litigation to the highest professional standards of competency and forthrightness to this point, and will continue to do so following the decision of this Court to certify the case as a class action. *Id.* ¶ 1. Counsel, therefore, are adequate and satisfy Rule 23(a)(4).

## II.   EACH CLASS ALSO SATISFIES RULE 23(b).

The classes not only satisfy the prerequisites of Rule 23(a) but also satisfy the requirements of Rule 23(b).

### A.   THE ACUTE HOSPITAL PROVIDER CLASS AND THE NON-ACUTE CARE HOSPITAL PROVIDER CLASS SATISFY THE ELEMENTS OF 23(b)(3).

The Court may certify a class under Rule 23(b)(3) if class members are ascertainable, if the class satisfies Rule 23(a) and, if (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The classes satisfy each of these requirements.

1.      **The Members of the Class Can Be Easily Ascertained in An Administratively Feasible Manner**

Certification pursuant to Rule 23(b)(3) requires that the class definition must "contain[] objective criteria that allow for class members to be identified in an administratively feasible way." *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015) (unpublished). A proposal to have an expert mine the defendants' data to identify class members is an acceptable means of establishing ascertainability. *See In re Checking Account Overdraft Litig.,* 307 F.R.D. 630, 637–38 (S.D. Fla. 2015), *reconsideration denied,* 1:09-CV-23186-JLK, 2015 WL 12642011 (S.D. Fla. Aug. 21, 2015). Defendants' data contains the identity of each and every member of the 23(b)(3) classes. 2454-3, Frech ¶¶ 372, 374-76. Members of the classes, therefore, can be readily ascertained.

2.      **Common Questions of Law and Fact Predominate Over Any Individual Questions**

"Federal Rule of Civil Procedure 23(b)(3) requires that, before a class is certified under that subsection, a district court must find that 'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting Fed. R. Civ. P. 23(b)(3)). "Under 23(b)(3), '[i]t is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions.'" *Klay v. Humana*, 382 F.3d 1241, 1254 (11th Cir. 2004) (quoting *In re Theragenics Corp Secs. Litig.*, 205 F.R.D. 687, 697 (N.D. Ga. 2002)). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized class wide proof.'" *Tyson Foods*, 136 S. Ct. at 1045 (quoting 2 W.

Rubenstein, *Newberg on Class Actions* § 4.50, pp. 196-97 (5th ed. 2012)). "When 'one of more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1778, pp. 123-124 (3d ed. 2005)).

### a. Plaintiffs Will Establish Defendants' Liability Utilizing Common Evidence

### (1) Common Questions Predominate With Regard to Providers Plaintiffs' Claims that Defendants Violated Section 1 Under the *Per Se* Standard

The question of whether Defendants participated in a conspiracy to allocate markets and agreed to restrict output will be proven through common rather than individualized evidence. Courts routinely find that questions regarding the existence of a conspiracy predominate over any individual questions regarding liability. *Klay,* 382 F.3d at 1255-59 (11th Cir. 2004) (finding predominance because facts regarding the conspiracy "constitute essential elements of each plaintiff's RICO claims" and "the very heart of the plaintiffs' RICO claims" and would "tend to predominate over all but the most complex individualized issues."). *See also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 697 (N.D. Ga. 2016) ("The evidence pertaining to the existence of the price-fixing conspiracy will inevitably focus on Defendants' conduct and communications and will not vary among class members …."); *Krehl v. Baskin Robbins Ice Cream Co.*, 78 F.R.D. 108, 123 (C.D. Cal. 1978) (finding the "only possible individual issue with reference to the horizontal territorial restriction claim is fact of damage").

Because the Court has held the Blues' agreements to allocate markets and to restrict output are subject to the *per se* rule, then establishing that the Blues have violated the Sherman Act will not require proof that the Blues have harmed competition in a particular market.

17

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (*per se* rule applies "without inquiry into the harm [the restraint] has actually caused," while the rule of reason requires "an inquiry into market power and market structure"). *See also Quality Auto Painting Ctr. of Roselle, Inc, v. State Farm Indemnity Co.*, 870 F.3d 1262, 1271 (11th Cir. 2017) (Defendants' conduct is "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.") Therefore, the evidence of the Blues' violations will be common to all class members. *See In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1191 (N.D. Cal. 2013) (finding that common questions predominated based on evidence of the defendants' *per se* violation).

**(2) Common Questions Also Predominate with Regard to the Acute Care Hospital Providers' Claims that Defendants Violated Section 1 and Section 2 Under the Rule of Reason Standard**

Certification of the Acute Care Hospital Providers' rule of reason claims pursuant to 23(b)(3) is likewise appropriate. Actual detrimental effects will be shown utilizing common evidence. Dkt. 2455-38, Macoice, 63:21-64:6 (Blue on Blue competition ended in higher provider reimbursement rates); Dkt. 2455-39 at 5, (in a presentation regarding the Blues Long Term Business Plan at the Blue Cross and Blue Shield Annual Meeting in 1982 statement that, "[w]hat is being suggested is a concentration of power…."); Dkt. 2455-40 at 2, ("Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans. Otherwise there would be open warfare"); Dkt. 2455-9 at 5, (discussing the benefits of exclusive service areas: "Larger market share because other Blues stay out and do not fragment the market" and "Stronger provider agreements for the same reason"); Dkt. 2455-41 at 4, *Anthem v. Cigna*, Trial Tr., March 7, 2019, Testimony of Blue Cross Blue Shield Association Chief Executive Officer, Scott Serota, 2874:17-24 (video clip stating the "plans don't want to hear that

18

a member of the Association is going to compete aggressively against them"); Dkt. 2455-42 at 6, ("failure to protect territorial exclusivity will lead to other Plans coming into [the market] to compete…."); Dkt. 2455-43 at 4, *United States v. Anthem, Inc.*, No. 16-CV-1493 (D.D.C.), Trial Tr., 656:13-16 (Anthem Executive, Gerald Kertesz, testifying under oath that Anthem would like to compete for National Accounts in all fifty states and that being able to do so would be "exhilarating"); Dkt. 2455-44 at 4-5, *United States v. Anthem, Inc.*, Swedish Tr., 238:21-239:4 (WLP-07174415) (Anthem CEO Joseph Swedish testifying that the Cigna deal would "strengthen… [Anthem's] ability to compete nationally amongst or for all 50 states."); Dkt. 2454-7, BCBSA00189751-755 (discussing the limitations on competition necessitated by National Best Efforts Standards); Dkt. 2455-46 at 3-4 (indicating the Blues ceased contracting with providers in contiguous counties because plans could achieve more significant discounts through BlueCard than through contracting with providers); 2454-8, Ingrum II, 42:18-43:14; Dkt. 2454-9, Ex. 3, BCBSAL_0000775033 (BCBS-MS forced BCBS-AL to cancel its contract with Mississippi hospital because BCBS-AL's contract with the hospital was undercutting BCBS-MS's leverage in negotiating lower rates with the Mississippi hospital); Dkt. 2454-10, Brownlow 116:23-117:18 (providers would like to contract with Blue Plans other than the Blue Plans in their states even when the out-of-state Blue Plan's reimbursement rates are lower than their state's rates because if they couldn't negotiate a reasonable reimbursement rate they could choose to go non-Par).

In addition, Professor Haas-Wilson's expert report identifies relevant product markets and submarkets in which the Defendants have agreed to restrain trade and which BCBS-AL has monopsonized, attempted to monopsonize, or conspired to monopsonize. These relevant product markets include the purchase of goods and services from healthcare professionals and facilities

by commercial buyers (i.e., excluding patients who pay out of pocket or through government programs). Dkt. 2454-6, Haas-Wilson ¶¶ 236-238. The relevant geographic market definition for these product markets is either 1) Alabama or 2) Alabama Core-Based Statistical Areas or counties where CBSAs are not defined. *Id.* ¶ 248.

The Defendants may claim that these product markets are drawn too broadly to justify class certification, as they contain disparate types of healthcare providers and facilities. This Court has already held that the Provider Plaintiffs' alleged product markets are plausible because "all providers face the same basic set of options for selling their goods and services: commercial payers, government payers, and patients who pay out of pocket." Doc. No. 1306 at 16. For a similar reason, different types of providers can prove injury by common evidence because the Blues' share of the market for commercial purchases of goods and services from healthcare professionals and facilities is extraordinarily high. In 2014, 85% of the commercially insured population in Alabama was insured by the Blues.[25]  Given the relatively small number of commercially insured patients who are not covered by one of the Blues, the conduct of BCBS-AL and the other Blues affects all providers statewide, regardless of their type. There is no other commercial insurer to whom any provider can turn to obtain even a sizable fraction of the patients covered by the Blues. Without any major competitors to check its power, BCBS-AL is able to dictate below competitive rates to all providers statewide. Because the Blues' conduct affects all providers the same way, class certification is appropriate. *See* Doc. No. 1306 at 19–21 (noting that "Providers allege similar injuries regardless of the geographic market"). *See also*

---

[25] It is appropriate to aggregate the market share of all of the Blues in Alabama because the only way a healthcare provider can treat a Blue Plan's members on an in-network basis is to sign a contract with BCBS-AL. *See United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 210 (D.D.C. 2017) (counting enrollees of all Blues when determining Anthem's share of the market for national accounts).

Dkt. 2454-6, Haas-Wilson ¶¶ 172, 238-43. Therefore, no matter how broadly or narrowly the product market is ultimately defined, certification should be granted.

By definition, questions regarding the relevant market and BCBS-AL's market power within the relevant market cannot be based on individualized facts but must instead be common to all class members. *See Behrend v. Comcast Corp.*, 655 F.3d 182, 192 (3d Cir. 2011), *rev'd on other grounds,* 569 U.S. 27 (2013) (affirming the district court's determination that the relevant geographic market is "'susceptible to proof at trial through available evidence common to the class'"); *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 190 (E.D. Pa. 2016), *reconsideration denied*, 06-0620, 2017 WL 6966983 (E.D. Pa. Feb. 22, 2017) (finding the plaintiffs had shown "that evidence common to the class is capable of answering the question of whether the relevant geographic market is the non-Western United States"); *Merenda v. VHS of Mich., Inc.*, 296 F.R.D. 528, 546–47 (E.D. Mich. 2013), *opinion reinstated on reconsideration sub nom. Cason-Merenda v. VHS of Michigan, Inc.*, 06-15601, 2014 WL 905828 (E.D. Mich. Mar. 7, 2014) (agreeing with the plaintiffs that "'[d]efining a relevant market cannot, by definition, *ever* be an individual question—there is not one relevant market for Ms. Cason–Merenda, another for Mr. Suhre, and yet another for a third nurse'") (citations omitted); *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 695–96 (S.D. Fla. 2004) (finding in a Section 2 monopoly case that both "the definition of the relevant market for determining market power" and whether the defendant, in fact, possessed monopoly power in the relevant markets were common issues).

Whether Defendants agreed to fix prices, agreed to engage in a group boycott, or agreed to other restrictions are predominating questions. Moreover, each element establishing the monopsonization and attempted monopsonization claims focuses solely on the conduct and

market power of BCBS-AL, which are common questions for each class member. In 2014, approximately 68 percent of the commercially insured population in Alabama was insured by BCBS-AL. Dkt. 2454-6, Haas-Wilson ¶ 41. Another 17 percent was insured by another Blue Plan. *Id.* Accordingly, BCBS-AL's effective market share in 2014 was 85 percent. *Id.* Establishing BCBS-AL's violation of Section 2 will not require proof of individualized issues. *See In re Terazosin Hydrochloride*, 220 F.R.D. 672, 695–96 (S.D. Fla. 2004) (finding in a monopolization case, that the defendant's market power "is a question common to all members of each [class], and the resolution of this common issue will affect all members of the classes without regard to individualized inquiries").

Finally, any alleged procompetitive justifications will present common questions with regard to all class members, as the evidence will relate solely to Defendants' purported justifications. As the Court in *Laumann v. National Hockey League*, 105 F. Supp. 3d 384, 403 (S.D.N.Y. 2015) explained, the questions of whether procompetitive benefits exist and whether, on balance, the conduct is anticompetitive present common questions:

> Defendants believe that the complained-of restraints, though anticompetitive to the extent that they preclude the existence of a la carte channels, are also procompetitive to the extent that they facilitate the existence of a well-priced OMP. If defendants can convince the trier-of-fact of this point, they will have a strong defense against antitrust liability – a strong argument for why the restraints satisfy the Rule of Reason and may continue to exist. If this is true, it is true across the class.

*See also In re Elec. Books Antitrust Litig.*, 11 MD 2293 DLC, 2014 WL 1282293, at *16 (S.D.N.Y. Mar. 28, 2014) ("But, even if Apple were entitled to litigate these issues at trial and if it also had sufficient evidence to suggest that these purported benefits existed and could be attributed to the price-fixing conspiracy, the existence or non-existence of each of these offsetting benefits would constitute a common issue for the class to litigate"); *McDonough v.*

*Toys R Us, Inc.*, 638 F. Supp. 2d 461, 482 (E.D. Pa. 2009) (finding that proof of procompetitive

or anticompetitive effects would not require individual evidence); *White v. Nat'l Collegiate*

*Athletic Ass'n*, CV 06-0999-RGK MANX, 2006 WL 8066803, at *6 (C.D. Cal. Oct. 19, 2006)

(recognizing that questions regarding unreasonable restraint and pro-competitive benefits are

common questions).

### b.    Antitrust Impact Will Be Proven Using Common Evidence

Plaintiffs can also establish the fact of injury or antitrust impact utilizing class-wide

evidence. "[Plaintiffs'] burden of proving the fact of damage...is satisfied by its proof of some

damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to

the amount and not the fact of damage." *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395

U.S. 100, 114 n.9 (1969). Plaintiffs easily satisfy this standard.

First, Defendants' own documents and testimony demonstrate that Defendants' antitrust

violations cause injury to healthcare providers. There is no dispute that, as a result of

Defendants' agreements, each and every provider has been stripped of the choice to contract with

any Blue Plan other than the Plan that has been allotted the exclusive service area where the

provider offers healthcare services. Dkt. 2455-50 at 3; Dkt. 2455-51 at 3. *See* Opinion,

Undisputed Facts, Doc. No. 2063 at 10 ("[A] plan generally may not develop a provider network

or contract with a healthcare provider outside its service area for services to be provided under

the Blue Marks.") Even the provider's freedom not to contract for the services provided to

patients of out-of-area Blues is foreclosed if the provider contracts with the local Blue.

Association Answer, Doc. 1321, ¶ 201; Dkt. 2455-12, Strachan Tr., 37:12-37:22; Dkt. 2454-11,

BCBSA-CID-013850, 875; Dkt. 2454-12, BCBSA-CID-020329, 413; Dkt. 2454-10,

Brownlow,116:23-117:18 (testifying that providers would like to contract with Blue Plans other

than the Blue Plans in their states even when the out-of-state Blue Plan's reimbursement rates are lower than their state's rates because if they couldn't negotiate a reasonable reimbursement rate they could choose to go non-Par). *See* Opinion, Undisputed Facts, Doc. No. 2063 at 16 ("Through the BlueCard programs, the Plans have agreed that when a contracted provider treats a patient covered by a Home Plan, *i.e.*, a Plan outside the service area in which the provider is located, the Home Plan will reimburse the provider at a rate which equals (at a minimum) the levels received for providers under the provider's contract with the Host Plan, *i.e.*, the local plan."). Finally, each provider's ability to contract with Plans for unbranded business is also circumscribed. Dkt. 2454-11, BCBSA-CID-013850, 883. *See* Opinion, Undisputed Facts, Doc. 2063 at 18 ("[U]nder the Best Efforts rule, any health revenue a Blue Plan may generate from services offered under any non-Blue brand is limited in relation to its Blue brand health revenue.")

The Blues' severe limitations on provider choice are not surprising. Choice would result in competition. Dkt. 2455-42 at 6 ("failure to protect territorial exclusivity will lead to other Plans coming into [the market] to compete…."); Dkt. 2455-40 at 2, ("Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans. Otherwise there would be open warfare"); Dkt. 2455-54 at 3, ("Most regard the maintenance of exclusive service areas as a must in order to avoid chaos within the system"); Dkt. 2455-9 at 5 (benefits of exclusive service areas include "[l]arger market share because other Blues stay out and do not fragment the market"); Dkt. 2455-39 at 4-5 (presentation at the Blue Cross and Blue Shield Annual Meeting in 1982 assured members that the suggestion was not that the plans cease operating independently but instead "[w]hat is being suggested is a concentration of power").

Competition would result in, *inter alia*, higher provider reimbursement rates and weaker provider agreements. Dkt. 2455-38, Macoice, 63:21-64:6 (acknowledging that Blue on Blue competition resulted in higher provider reimbursement rates); Dkt. 2455-55 at 3 ("Because of their market presence in each of the exclusive services areas in which they operate, the [Blues] have typically been able to negotiate the highest discounts from the health care providers in the service areas"); Dkt. 2455-16 at 4, ("By enjoying exclusive territories, Plans can bargain aggressively.  In turn, national accounts enjoy local discounts"); Dkt. 2454-13, BCBSAL_0000109829, 841; Dkt. 2454-8, Ingrum II, 23:17-24:18, 25:18-29:19, 32:9-34:12 (BCBSAL achieved significant savings by canceling contracts with providers in contiguous counties and instead relying on BlueCard discounts); Dkt. 2455-46 at 3-4 (indicating the Blues ceased contracting with providers in contiguous counties because plans could achieve more significant discounts through BlueCard than through contracting with providers); Dkt. 2454-8, Ingrum II, 42:18-43:14; Dkt. 2454-9, Ex. 3 to Ingrum II, BCBSAL_0000775033 (BCBS-MS forced BCBS-AL to cancel its contract with Mississippi hospital because BCBS-AL's contract with the hospital was undercutting BCBS-MS's leverage in negotiating lower rates with the Mississippi hospital); Dkt. 2455-9 at 5 (indicating that one of the benefits of exclusive service areas is "[s]tronger provider agreements").

The Expert Report of Professor Haas-Wilson further demonstrates that all class members have been impacted by Defendants' conduct. As set forth in Professor Haas-Wilson's report, the Defendants' agreements restrict the number of competitors in the markets for the purchase of healthcare providers' services by commercial buyers in Alabama, increase BCBS-AL's leverage and harm providers in Alabama while benefitting BCBS-AL and out-of-Service Area Blue Plans. Dkt. 2454-6, Haas-Wilson ¶ 309. *See also Id.* at ¶ 21. Defendants' agreements harm providers in

two ways: (a) through lower prices for the services they have provided; and (b) through various non-price dimensions relevant to the provision of healthcare services. *Id.* at ¶ 310. *See also* Dkt. 2454-3, Frech ¶ 33 ("[R]educed competition has harmed both Acute Care Hospital Providers and Non-Acute Care Hospital Providers in price and non-price ways.").

       1)  Class-Wide Price Impact

Professor Haas-Wilson methodically explains how each of the Defendants' agreements negatively impact the prices paid to providers in Alabama:

**<u>Market Allocation Agreements on Selling</u>**

> [T]hat the Market Allocation Agreements on Selling have benefited *both* BCBS-AL *and* the out-of-Service Area Blues at the expense of providers in Alabama. … BCBS-AL has benefited from greater contracting leverage, and therefore lower provider prices in Alabama. Likewise, out-of-Service Area Blue Plans have benefited from the lower prices paid to providers in Alabama because they have been able to "piggyback" on BCBS-AL's contracted prices through the BlueCard program. As shown in Section VII.A BCBS-AL's contracted prices were lower than the prices the out-of-Service Area Blue Plans would have been able to obtain had they not been able to piggyback on BCBS-AL's contracting process.

Dkt. 2454-6, Haas-Wilson ¶ 332. *See also Id.* at ¶ ¶ 323-331.

**<u>Price Fixing Agreements</u>**

> Because each out-of-Service Area Blue has individually a relatively small number/share of enrollees (each out-of-Service Area Blue Plan's *hosted* enrollees in Alabama) than BCBS-AL' number/share of enrollees (BCBS-AL's *homed* enrollees) in CBSAs and counties not part of CBSAs in Alabama, economic theory predicts that BCBS-AL has been able to contract with providers as lower prices than what each of the out-of-Service Area Blue Plans could have achieved on its own. As shown in Section VII.A the price fixing Agreements have harmed providers in Alabama by allowing the out-of-Service Area Blue Plans to piggyback on BCBS-AL's lower prices (the out-of-Services Blue Plans have also paid Alabama providers BCBS-AL's lower prices).

*Id.* at ¶ 335.  *See also Id.* at ¶ ¶ 333-334.

**Market Allocation Agreements on Contracting**

> The Market Allocation Agreements on Contracting have benefited *both* BCBS-AL *and* the out-of-Service Area Blues at the expense of Alabama providers. BCBS-AL has had greater contracting leverage, as it has been contracting for both homes and hosted enrollees, instead of just its homed enrollees. As shown in Section VII.A BCBS-AL has been able to contract with Alabama providers at lower prices. Moreover, out-of-Service Area Blue Plans have also benefited because they have been able to "piggyback" on BCBS-AL's contracted prices through the Price Fixing Agreements. BCBS-AL's contracted prices with providers in Alabama were lower than the prices the out-of-Service Area Blues would have been able to obtain had they not been able to piggyback on BCBS-AL's contracting process. Therefore, Alabama providers were harmed, as a result of the BCBS-AL's MAA-Contracting-inflated number and share of enrollees (the additional enrollees for whom BCBS-AL contracted due to the Market Allocation Agreements on Contracting) and the Price Fixing Agreements that allowed Out-of-Service Blue Plans to reimburse Alabama providers at BCBS-AL's contracted prices.

*Id.* at ¶ 339. *See also Id.* at ¶¶ 336-338.

**Output Restrictions on Unbranded Business**

> [T]he national output restrictions on unbranded business have restricted the extent to which Out-of-Service Area Blue Plans can develop a business to sell unbranded healthcare financing services in Alabama, and thus have likely reduced the number of commercial buyers of healthcare provider services in Alabama. Further, by restricting the extent to which Out-of-Service Area Blue Plans can develop businesses to sell unbranded healthcare financing services in Alabama, the national Output Restrictions on Unbranded Business likely have increased the number of homed enrollees of BCBS-AL, and thus inflated BCBS-AL's homed share. As a result, the national output restrictions likely have harmed providers in Alabama, benefited BCBS-AL (by inflating its contracting leverage in its interactions with providers and thereby reducing the contracted prices), and benefited out-of-Service Area Blues (who have been able, under Price Fixing, to piggyback on BCBS's AL's contract process and prices).

*Id.* at ¶ 348. *See also Id.* at ¶¶ 340-347.

> Defendants' local output restrictions also restrict Blue parent companies' unbranded businesses. Specifically, the local output restrictions have restricted the amount of unbranded business each Blue parent company can offer within its Service Area(s). Whether the local Blue selling unbranded healthcare financing services within its own Service Area (in this case, BCBS-AL within Alabama) would have impacted the prices paid to providers is theoretically ambiguous. On the one hand, a local Blue Plan's unbranded business could reduce the Blue-

branded business's share and increase the Blue-branded business's contracted prices. On the other hand, the local Blue could manage its Blue-branded and unbranded businesses in a way to ensure that the Blue-branded business maintains its share, with no effect on provider prices. Despite the theoretically ambiguous effect on prices, nonetheless the local output restrictions likely have harmed providers on dimensions other than price.

*Id.* at ¶ 349.

### Summary of Price Effects

Professor Haas-Wilson summarizes the price effects of the Agreements:

Two of the agreements, the Market Allocation Agreements on Selling and the Output Restrictions on Unbranded Business, have affected or potentially affected the number of sellers of commercial healthcare financing services in Alabama. The Market Allocation Agreements on Selling have prevented out-of-Service Area Blue Plans from selling Blue-branded commercial healthcare financing services in Alabama. In the absence of the Market Allocation Agreements on Selling, at least one other Blue Plan would have been selling commercial healthcare financing services in Alabama in the but-for world. The Output Restrictions on Unbranded Business have restricted the amount of unbranded business Blue Plans could operate in Alabama. In the absence of the Output Restrictions on Unbranded Business, it is likely that the number of commercial buyers of health provider services in Alabama would have been greater.

*Id.* at ¶ 351.

The other two agreements, the Price Fixing Agreements and the Market Allocation Agreements on Contracting, have directly impacted providers' outside options when contracting with BCBS-AL and have increased BCBS-AL's leverage in those interactions. Specifically, the Price Fixing Agreements and the Market Allocation Agreements on Contracting have allowed BCBS-AL to either provide or block access to *all* Blue Plan enrollees in Alabama in their contracting with providers. My analysis indicates these agreements have harmed providers in Alabama.

*Id.* at ¶ 352.

Professor Haas-Wilson also explains her methodology for quantifying the effects of the Market Allocation Agreements on Selling, the Market Allocation Agreements on Contracting, and the Price Fixing Agreements on Acute Care Hospitals in Alabama. First, Professor Haas-

Wilson develops a regression equation to model the relationship between a commercial buyer's enrollee share (at the CBSA/county level) and the prices for general acute care hospitals' services in the United States ("GAC Hospital Pricing Model"). *Id.* at ¶ 419. Professor Haas-Wilson relates the average annual price for services at each general acute care hospital in each year for each commercial buyer to that commercial buyer's enrollees share (at the CBSA/county level), the hospital or hospital system's share of hospital services provided in the area (at the CBSA/county level), and other economic factors. *Id.* at ¶¶ 419-29. Utilizing the GAC Hospital Pricing Model, Professor Haas-Wilson concludes that, all else equal, higher commercial buyer share is associated with lower prices paid to *all GAC hospitals* in Alabama, for both their inpatient facility services and outpatient facility services. *Id.* at ¶ 444.

Second, because more than one Blue is licensed in certain geographic areas of the United States, some Blues have overlapping Service Areas. Professor Haas-Wilson uses these circumstances to compare Blue homed enrollee shares in overlapping Service Areas that have limited Blue-on-Blue competition to Blue homed enrollee shares in non-overlapping Service Areas that have no Blue-on-Blue competition. Professor Haas-Wilson develops a second regression equation to model the relationship between the existence of limited Blue-on-Blue competition in CBSA/counties and Blues' homed enrollee shares in CBSAs/counties in the United States ("Homed Share Model"). *Id.* at ¶¶ 419-29. Professor Haas-Wilson relates the Blues' homes enrollee shares in CBSAs/counties to an indicator variable that is equal to zero if there is limited Blue-on-Blue competition in a CBSA/county (and equal to one otherwise) and other economic factors. *Id.* at ¶¶ 455-64. Based on the Homed Share Model, Professor Haas-Wilson concludes that, all else equal, the average home share of the Blue Plans are about 31 to

34 percent lower in markets with limited Blue-on-Blue competition that the average homed shares of the Blue Plans in markets with no Blue-on-Blue competition. *Id.* at ¶ 465.

Professor Haas-Wilson then demonstrates how harm to acute care hospitals can be quantified. *Id.* at ¶¶ 467-551.  Based on her analysis, Professor Haas-Wilson finds that all acute care hospitals in Alabama in the putative Acute Care Hospital Provider 23(b)(3) Class have been harmed, in each year 2008 to 2014 inclusive. *Id.* at ¶ 554.

Professor Haas-Wilson's opinion is reliable. Courts have routinely held that multiple regression analysis is an acceptable method for establishing antitrust impact. *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 566 (11th Cir. 1998) (indicating in an antitrust action that multiple regression analysis is "a methodology that is well-established as reliable").  *See also In the Matter of the Oil Spill by Amoco Cadiz*, 954 F.2d 1279, 1320 (7th Cir. 1992) ("If done right, regression analysis permits an inference of causation and of the size of the effect.")

Based on the results of her regression analysis, Professor Haas-Wilson has opined that class-wide impact can be proven at trial with regard to each type of illegal agreement:

> I quantify harm to General Acute Care hospitals in Alabama based on data produced in this matter. I find that the Market Allocation Agreements on Selling, the Market Allocation Agreements on Contracting, and the Price Fixing Agreements separately and in combination have harmed all General Acute Care hospitals in Alabama in the putative Acute Care Hospital Provider 23(b)(3) Class each year between 2008 and 2014 by suppressing the prices paid to those facilities. My methodology for quantifying harm can be applied to all General Acute Care hospitals in the proposed class, allows one to quantify harm from Defendants' Market Allocation Agreements on Selling, Market Allocation Agreements on Contracting, and Price Fixing Agreements separately and in combination, and is sufficiently flexible to be applied under numerous possible outcomes of the litigation.

Dkt. 2454-6, Haas-Wilson ¶ 21(e).

Professor Haas-Wilson's report reliably demonstrates that antitrust impact with regard to prices paid to Acute Care Hospitals can be proven at trial using common evidence. *See also* Dkt.

2454-3, Frech ¶¶ 31, 382, 388, 406, 411. Moreover, because Professor Haas-Wilson addresses

each of the agreements for which Defendants may be liable, Dr, Haas-Wilson's report satisfies

the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27, 36 (2013).

2)   <strong>Class-Wide Non-Price Impact</strong>

Defendants' agreements have imposed non-price harms on providers in Alabama in

addition to lowered prices. Dkt. 2454-6, Haas-Wilson ¶ 376. Professor Haas-Wilson discusses at

length the non-price harm caused by a reduction in the number of choices. *Id.* The economics

literature establishes clear benefits of choice. *Id.* at ¶¶ 378-83. Moreover, the literature shows

that product variety in the market increases with the level of competition. *Id.* at ¶ 380. As

Professor Haas-Wilson explains, commercial insurers differ on several non-price dimensions

including contracting provisions, informational and educational services, payment approaches,

value-based care, and accountable care organizations. *Id.* at ¶¶ 389-95.

Defendants' agreements reduce each and every provider's choices by eliminating each

provider's ability to contract with Blue Plans other than BCBSAL. *Id.* at ¶¶ 384, 387. *See* also

Dkt. 2454-3, Frech ¶¶ 308, 393, 408. Because Defendants' agreements limit all providers'

contracting choices, they limit all providers' ability to benefit from contacting with commercial

buyers that experiment and innovate with the provision of healthcare financing services, provider

collaborations, and other aspects of the delivery of care. Dkt. 2454-6, Haas-Wilson ¶ 396. *See*

*also* Dkt. 2454-3, Frech ¶¶ 17, 33, 368, 393, 408. As Professor Frech explains, if providers could

contract with Blue plans other than BCBS-AL, Alabama providers would gain opportunities to

practice medicine using different and innovative contracting methods, medical management

arrangements, reimbursement practices, or integration of claims with electronic medical records,

advancement that could improve quality and decrease overall costs of health care. Dkt. 2454-3,

Frech ¶¶ 17, 393, 395. Providers' freedom to contract, to innovate, and to develop new health care management practices that favor efficiency and quality of care is stifled and restricted because of the anticompetitive restriction on contracting. Dkt. 2454-3, Frech ¶¶ 17, 393. All class members have been impacted by these non-price limitations. Dkt. 2454-3, Frech ¶¶ 33, 368, 393, 408, 411, 414.

Restrictions on choice resulting from an antitrust violation constitute both Article III and antitrust injury. *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 223-24 (2d Cir. 2008) (holding that allegations regarding reduced choice and diminished quality sufficiently alleged Article III injury); *In re Currency Conversion Fee Antitrust Litig.*, 05 CIV7116 (WHP), 2009 WL 151168, at *3-4 (S.D.N.Y. Jan. 21, 2009) (finding the plaintiffs' allegations regarding reduced choice and diminished quality to be sufficient to establish antitrust standing). *See also Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528 (1983) ("Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions and may be condemned even without proof of its actual market effect); *U.S. v. Gen. Motors Corp.*, 384 U.S. 127, 144 (1966) ("What resulted was a fabric interwoven by many strands of joint action to eliminate the discounters from participation in the market, to inhibit the free choice of franchised dealers to select their own methods of trade and to provide multilateral surveillance and enforcement"); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 213 (1951), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) (holding maximum resale prices violate the Sherman Act because they "cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment"); *Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407, 1417 (11th Cir. 1987), *holding modified*

*by Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991) ("[E]ven if some of the promoters would have selected SEATS regardless of the tying arrangement, the arrangement prevented them from making that choice freely.").

      **c.**    **Damages**

          **(1) Because Accepted Methodologies Allow For The Calculation of Aggregate Damages Regarding the Acute Care Hospital Providers Class, Individual Damages Issues Do Not Predominate.**

Finally, the element of damages can also be proven using common evidence. "Calculations need not be exact" but need only be consistent with Plaintiffs' theory of liability. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1430-35 (2013). As Professor Daniel J. Slottje's Expert Report demonstrates, the damages suffered by Acute Care Hospital Provider Class members due to Defendants' alleged acts can be calculated on a class-wide basis using a common methodology and common evidence. Dkt. 2454-14, Slottje, ¶¶ 12, 31, 79, 80, 89. Moreover, the common methodology and common evidence used to calculate individual Class members' damages allow for the calculation of damages attributable to each of the alleged acts separately in accordance with Plaintiff's theories of liability. *Id.*, ¶ 12, 83-88. As Professor Slottje's report indicates, damages can be established on a class-wide basis for the Acute Care Hospital Provider Class. *See also* Dkt. 2454-3, Frech ¶¶ 32, 385-86, 388, 407, 411.

          **(2) Subsequent Determinations Regarding Damages for Non-Acute Care Hospital Providers Do Not Preclude Certification**

As set forth in Section II.A.2., common questions predominate with regard to Defendants' liability for *per se* violations of the antitrust laws. Even if individual damage calculations should ultimately be necessary, this would not preclude a finding of predominance given the overpowering nature of the common issues related to Defendants' antitrust violations. As the Eleventh Circuit has stressed, "It is primarily when there are significant individualized

33

questions going to liability that the need for individualized assessment of damages is enough to preclude 23(b)(3) certification." *Klay*, 382 F.3d at 1260. The Eleventh Circuit in *Carriuolo v. Gen. Motors Co.,* 823 F.3d 977, 988 (11th Cir. 2016) recently reiterated that "individualized damages calculations are insufficient to foreclose the possibility of class certification," rejecting defendant's argument that *Comcast* requires proof that "damages [must be] capable of measurement on a classwide basis." "The 'black letter rule' recognized in every circuit is that "individual damage calculations generally do not defeat a finding that common issues predominate…" *Brown v. Electrolux Home Products, Inc.,* 817 F.3d 1225, 1239 (11th Cir. 2016). The Court in *Brown* indicated that "tools to decide individual damages" in a class action include the following alternatives: "'(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.'" *Id.* (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001)). *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1273 (11th Cir. 2004) (quoting *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 699 n. 28 (quoting *In re Visa*, 280 F.3d at 141)) (same).

Clearly, several mechanisms exist for addressing any individual damage issues for the Non-Acute Care Hospital Provider class in this case. For example, the Court may bifurcate, holding a trial with regard to liability and then trying damages in a subsequent proceeding.[26] The

---

[26] This approach, which was authorized in *Klay* and subsequent cases, does not run afoul of *State of Ala. v. Blue Bird Body Co.*, 573 F.2d 309, 319 (5th Cir. 1978) because liability including injury would be established in the class trial and damages for individual class members or subclasses of class members would be established in a later proceeding.

Court may also decertify the class after the liability trial and provide notice to class members regarding proving damages. Other mechanisms also exist in this case such as permitting the magistrate or a special master to supervise damage proceedings. As the Eleventh Circuit has indicated, the Court has several mechanisms for addressing any individual damages issues that may arise. Because such mechanisms exist and could easily and effectively be utilized in this case, the Court need not decide the most appropriate method at this point in order to certify the class. Certification of the Non-Acute Care Hospital Provider's claims pursuant to 23(b)(3) is appropriate.[27]

### 3. Class Certification of Provider Plaintiffs' Antitrust Claims is the Superior Method of Adjudication.

Rule 23(b)(3) also requires that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In order to establish a lack of superiority, Defendants must show that there are other alternative "superior" methods of resolving the claims of class members. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 699-700 (N.D. Ga. 2016) (quoting *In re Conagra Peanut Butter Prods. Liab. Litig.*, 251 F.R.D. 689, 699 (N.D.Ga.2008)) ("'[T]he focus is on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs'").

As the Eleventh Circuit has observed, "[T]he more common issues predominate over individual issues, the more desirable a class action lawsuit will be for adjudicating the plaintiffs' claims." *Klay*, 382 F.3d at 1269. As demonstrated in Section II.A.2., common issues

---

[27] As set forth in Section III, even if the Court determined that 23(b)(3) certification would not be appropriate, the Court could nonetheless certify the Non-Acute Care Hospital Providers' claims pursuant to 23(c)(4).

predominate, by a wide margin, over individual issues in this action. Accordingly, it would be difficult for Defendants to argue that any alternative means of adjudicating Class members' claims, if any were available, would be a more desirable method than a class action.[28]

Moreover, this case is manageable. As the Eleventh Circuit noted in *Klay*, the relevant inquiry is not "whether the class action will create significant management problems" but instead the question is "whether it will create relatively more management problems than any of the alternatives." *Klay*, 382 F.3d at 1273. "[W]here a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions." *Id.* In *Klay*, the Eleventh Circuit found "the district court acted well within its discretion in concluding that it would be better to handle this case as a class action instead of clogging the federal courts with innumerable individual suits litigating the same issues repeatedly." *Id.* No difficulties are likely to be encountered in the

---

[28] The fact that many of the acute care hospitals have large damages does not prevent class certification. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004) (finding the district court did not abuse its discretion in finding a class action superior where some of the third party payor members of the class had "significant individual claims" but had the option to opt out "if it was in their interest to bring their claims separately"). *See also* 2 *Newberg on Class Actions* § 4:67 (5th ed.) ("[E]ven in large claim situations, class actions will be a superior form of litigation if aggregation serves efficiency goals and/or pretermits inconsistent outcomes."). Obviously, trying a case once instead of a hundred times is far superior. This is especially true in antitrust litigation of this magnitude where all claims have been consolidated in one forum. *See* 2 *Newberg on Class Actions* § 4:66 (5th ed.) (indicating that in antitrust actions, "courts regularly invoke the importance of class actions in enforcing the substantive law as one of the reasons that a class action is a superior method of adjudication"); Advisory Committee Note to 1966 Amendments, 39 F.R.D. 69, 104 (1966) ("Also pertinent is the question of the desirability of concentrating the trial of the claims in the particular forum by means of a class action, in contrast to allowing the claims to be litigated separately in forums to which they would ordinarily be brought.) Any trial of the claims in this case will be expensive and time consuming. Taking hospital administrators and staff including doctors away from providing healthcare time after time would obviously not be in the public interest. Litigation on a class-wide basis is far superior to individual litigation. *See also* Dkt. 2454-3, Frech ¶¶ 399-401.

management of this case that cannot be resolved or that outweigh the clear benefit of maintaining this case as a class action.

Antitrust proceedings are notoriously complicated, lengthy and expensive and this case is certainly no exception. Neither the parties nor the judicial system would benefit from duplicative litigation. Individual prosecution of the claims in this case would require both the judiciary and the parties to utilize enormous resources, litigating the same issues again and again. Certifying Plaintiffs' antitrust claims will conserve substantial and important resources for this Court and the parties.

### B.  PROVIDER PLAINTIFFS' INJUNCTIVE RELIEF CLAIMS SHOULD BE CERTIFIED PURSUANT TO RULE 23(B)(2)

Provider Plaintiffs seek to enjoin Defendants from entering into, or from honoring, or enforcing any agreements that restrict the territories or geographic area in which any Blue or Blue-affiliated entity may compete with regard to insurance, ASO business, or National Accounts. Plaintiffs also seek to enjoin the National Best Efforts Rule and the Local Best Efforts Rule. Moreover, Plaintiffs seek appropriate injunctive relief with regard to BlueCard or any other efforts by Defendants to fix prices or to boycott providers as well as Defendants' conspiracy to monopsonize and BCBS-AL's attempted monopsonization and monopsonization of the relevant markets.  Provider Plaintiffs also seek appropriate injunctive relief to cure the effects of Defendants' anticompetitive conduct.

Section 16 requires a showing of a "significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith*, 395 U.S. at 130. Provider Plaintiffs' damages claims should be certified pursuant to Rule 23(b)(3) and Plaintiffs' Section 16 claims should be certified pursuant to Rule 23(b)(2). However, even if the Court should, for any reason, deny certification under Rule 23(b)(3),

certification of the Injunctive Relief Classes pursuant to Rule 23(b)(2) would nonetheless be warranted.

Rule 23(b)(2) allows maintenance of a class action where the action satisfies the requirements of Rule 23(a) and, in addition, "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 564 U.S. at 360–61(emphasis in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Provider Plaintiffs' claims are based entirely on the premise that Defendants have acted on grounds generally applicable to the Classes by conspiring to allocate markets and agreeing to output restrictions. *See* Dkt. 2454-3, Frech ¶¶ 34, 390. Moreover, Defendants have acted on grounds generally applicable to the Classes by agreeing to fix prices, to boycott healthcare providers, and by conspiring to monopsonize, monopsonizing and attempting to monopsonize. The requested relief – an injunction preventing Defendants from engaging in future anticompetitive practices – is a crucial component of the relief sought by the Classes as a whole. *See* Dkt. 2454-3, Frech ¶¶ 393-397. Defendants have provided no indication that they intend to voluntarily cease their illegal activities.

As set forth in Section II.A.2.b., all Plaintiffs and Class members have been injured. Class members are threatened with continuing restrictions on choice and the loss of the opportunities inherent in greater choice such as increased innovation in addition to reduced

prices. Accordingly, a real threat of future injury resulting from Defendants' anticompetitive conduct exists and will continue absent the imposition of meaningful injunctive relief. Such order would provide relief not only to Plaintiffs but to each and every Class member. Therefore, the requirements for certification under Rule 23(b)(2) are satisfied.

## III.   CERTAIN ISSUES SHOULD BE CERTIFIED UNDER RULE 23(c)(4) INCLUDING WHETHER DEFENDANTS' CONDUCT VIOLATES THE ANTITRUST LAWS.

Under Rule 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Certification of particular issues under Rule 23(c)(4) "may enable a court to achieve the economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action." Manual for Complex Litigation § 21.24 (4th ed). In this litigation, issue certification pursuant to Rule 23(c)(4) is appropriate in two respects. First, the Court should certify the Non-Acute Care Hospital Providers' Section 2 claims pursuant to 23(c)(4) with regard to the issue of whether Defendants violates Section 2. Second, in the unlikely event the Court should, for any reason, decline to grant 23(b)(3) certification of the Non-Acute Care Hospital Providers' *per se* claims under Section 1 or the Acute-Care Hospital Providers' Section 1 or Section 2 claims, Plaintiffs alternatively seek certification with respect to Defendants' liability or with respect to whether Defendants' conduct violates Section 1 and/or Section 2. Issue certification in this action satisfies all the requirements of Rule 23, would materially advance the litigation, and is far superior to repetitive proceedings to address the same common core issues.

As an initial matter, should the Court decline to grant certification of the Non-Acute Care Hospital Class's *per se* claims or the Acute Care Hospital Class's Section 1 or Section 2 claims under Rule 23(b)(3), the Court may certify a class with regard to Defendants' liability pursuant

to Rule 23(c)(4). Issues regarding liability are common to all class members and a determination related to liability would materially advance the claims of all class members.

Moreover, the Court should certify the issue of whether Defendants' conduct violates the antitrust laws. First with regard to the Non-Acute Care Hospital Class's Section 2 claims, the Court should certify the issue of whether Defendants' conduct violates Section 2. In addition, should the Court decline to grant 23(b)(3) certification of the Non-Acute Care Hospitals' *per se* claims and/or the Acute Care Hospital Provider's Section 1 and Section 2 claims, the Court may certify key issues related to whether Defendants' conduct violates either Section. Questions regarding whether Defendants' conduct violates the antitrust laws will focus entirely on the conduct and characteristics of Defendants and, accordingly, should be answered only once for all class members. A determination with regard to Defendants' violation of the antitrust laws is obviously essential to each and every class member's claim and will, therefore, necessarily advance every class member's claim. Resolution of these issues on a class-wide basis will be far more efficient than numerous individual trials and will prevent inconsistent results.

Certifying the issue of Defendants' antitrust violations pursuant to 23(c)(4) is warranted. *See Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 109 (2d Cir. 2007) ("On remand, if the district court concludes that the action ought not to be certified in its entirety because it does not meet the predominance requirement of Rule 23(b)(3), Cordes and Creditors Trust may seek certification of a class to litigate the first element of their antitrust claim—the existence of a Sherman Act violation—pursuant to Rule 23(c)(4)(A)").

The Court in *In re Prograf Antitrust Litig.*, 1:11-MD-02242-RWZ, 2014 WL 4745954, at *2 (D. Mass. June 10, 2014) granted certification pursuant to 23(c)(4) with regard to the

40

defendants' violation of the antitrust laws after denying 23(b)(3) certification because the

plaintiffs could not establish antitrust impact on a class-wide basis:

> IPPs assert that partial certification is appropriate here because common issues
> clearly predominate with respect to the first element of an antitrust claim,
> violation of antitrust law. As noted in the decision denying certification, "[t]he
> showing necessary to prove a violation in this case—the possession of monopoly
> power in the relevant market and the willful maintenance of that power through
> anti-competitive or exclusionary means—focuses entirely on Astellas's alleged
> conduct rather than that of individual class members and can be proven through
> evidence common to the class." Docket # 350 at 21. Thus, all IPP class members,
> as well as the certified class of direct purchaser plaintiffs, present the same
> allegations and proof of misconduct by Astellas.

> Partial certification offers several legal and practical advantages in this case.
> Many individual indirect purchaser plaintiffs are unlikely to have the resources or
> incentive to litigate an entire antitrust case against Astellas on their own; proving
> antitrust conduct by Astellas, as evidenced by the parties' efforts to date, is a
> complex and costly endeavor. Even if such separate legal actions are pursued,
> they are likely to require duplicative discovery and redundant litigation, and may
> result in inconsistent adjudications regarding Astellas's conduct. In contrast,
> certifying an issue-specific class here would allow the parties to resolve the
> question of antitrust violation in one efficient and economical stroke. While a
> favorable judgment for plaintiffs on antitrust conduct would not, without more,
> establish Astellas's liability, it would significantly advance each class member's
> claims; with a violation of antitrust law already determined, class members could
> then choose to proceed with their claims individually to prove impact and
> damages. Conversely, a judgment in Astellas's favor would be binding on all
> class members and foreclose any liability on their claims. *See Payton,* 83 F.R.D.
> at 387 ("Victory for the defendants in this action will guarantee them freedom
> from harassing or repetitive litigation asserting theories and claims that have been
> disposed of. Victory for the plaintiffs will go far towards bringing them
> recovery.")

Likewise, the Court in *Kamakahi v. Am. Socy. for Reprod. Med.,* 305 F.R.D. 164, 193

(N.D. Cal. 2015), *leave to appeal denied* (May 12, 2015) found 23(c)(4) certification appropriate

with regard to whether the guidelines violated the Sherman Act where plaintiffs could not

demonstrate that damages and injury could be shown using common proof and where injunctive

relief was not available to a class of past donors. The Court acknowledged that a determination

that the guidelines violate the antitrust laws "alone would not resolve Plaintiffs' claims, but

resolving that issue through a single adjudication would be far more efficient than duplicative litigation by class members who may number in the thousands" and would prevent inconsistent results. *Id.* at 187. *See also In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 696–97 (N.D. Ga. 2003) (certifying issues related to the defendants' duty and breach of duty).

Because issues regarding Defendants' liability or Defendants' violation of the antitrust laws will be the only certified issue, common issues will obviously predominate. The Sixth Circuit in *Martin v. Behr Dayton Thermal Products LLC*, 896 F.3d 405 (6th Cir. 2018), 18-472, 2019 WL 1231762, at *1 (U.S. Mar. 18, 2019) recently affirmed a district court's order certifying seven issues pursuant to 23(c)(4) arising from defendants' purported contamination of class members' groundwater. As the Court concluded, "Rule 23(c)(4) contemplates using issue certification to retain a case's class character where class treatment of those issues is the superior method of resolution." *Martin*, 896 F.3d at 413. The Court adopted the view that "permits utilizing 23(c)(4) even where predominance has not been satisfied for the cause of action as a whole." *Id.* at 411. This is clearly the majority view, having been adopted by the Second, Fourth, Seventh, and Ninth Circuits. *See In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006) (23(c)(4) certification appropriate "regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement"); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 439 (4th Cir. 2003) (stating the argument that a claim as a whole must meet the predominance requirement as whole in order to certify an issues class under 23(c)(4) "finds no support in the law – not in Rule 23 itself nor in any case or treatise"); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) (affirming certification because the case involved "a pair of issues that can most efficiently be determined on a class-wide basis" and that a determination of "whether the challenged practices were unlawful" would

not be necessary in subsequent proceedings); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court inappropriate cases to isolate the common issues under Rule 23(c)(4) and proceed with class treatment of these particular issues.").

The only outlier is the Fifth Circuit's decision in *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996), where the Court indicated in a footnote that "[t]he proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and the (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial." As the Sixth Circuit noted, "*Castano*'s issue-class footnote has not been adopted by any other circuit, and subsequent caselaw from within the Fifth Circuit itself indicates that any potency the narrower view once held there has dwindled." *Martin*, 896 F.3d at 412 (citing *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006)).[29]

In an aside, the Court suggested the *Castano* view "has been referenced with tenuous support by the Eleventh Circuit." *Id.* (citing *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1176 (11th Cir. 2010)). However, the Court clearly erred in its reference to the Eleventh Circuit. Notably, the *Martin* opinion is the only authority to conclude the Eleventh Circuit has made a determination regarding the interplay between (c)(4) and (b)(3). Moreover, the decision in *Sacred Heart* addresses neither issues classes nor *Castano*.

---

[29] The Sixth Circuit noted that "[t]wo circuit court decisions have relied on a functional, superiority-like analysis instead of adopting either the broad or the narrow view." *Martin*, 896 F.3d at 412 (citing *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 273 (3d Cir. 2011) and *In re St. Jude Med., Inc.*, 522 F.3d 836, 841 (8th Cir. 2008)).

Instead, as the Sixth Circuit acknowledges, *Sacred Heart* discusses only the use of subclasses and rejected "a district court's certification of a class of hospitals suing a health maintenance organization for underpayment but nevertheless recognizing 'the long and venerated practice of creating subclasses as a device to manage complex class actions.'" *Martin*, 896 F.3d at 412 (quoting *Sacred Heart*, 601 F.3d at 1176).

Most significantly, the Sixth Circuit's suggestion is negated by the Eleventh Circuit's own decision in *Borrero v. United Healthcare of New York, Inc.*, 610 F.3d 1296 (11th Cir. 2010), decided approximately four months after *Sacred Heart*. In *Borrero*, the Eleventh Circuit expressly acknowledges the *Castano* decision related to 23(c)(4) but notes the Eleventh Circuit had not "directly address[ed] the propriety of such partial certification…." *Borrero*, 610 F.3d at 1310 n. 5. As the Court in *In re Atlas Roofing Corp. Chalet Shingle Products Liab. Litig.*, 321 F.R.D. 430, 447 (N.D. Ga. 2017) concluded, the Eleventh Circuit "has not provided clear guidance as to whether predominance must be found for the cause of action as a whole when certifying a Rule(c)(4) class." *See also* 2 *Newberg on Class Actions* § 4:91 (5th ed. 2018) (indicating the Eleventh Circuit has not taken a position regarding the interplay between (b)(3) and (c)(4), citing *Borrero*); *Bhasker v. Kemper Cas. Ins. Co.*, 361 F. Supp. 3d 1045 (D.N.M. 2019) (citing *Borrero*) ("The Eleventh Circuit has refrained from taking a side on this question.")

The Sixth Circuit ultimately rejected *Castano* and instead adopted the broad majority approach. First, the Court recognized the *Castano* interpretation renders 23(c)(4) a nullity:

> [T]he broad approach respects each provision's contribution to class determinations by maintaining 23(b)(3)'s rigor without rendering Rule 23(c)(4) superfluous. The broad approach retains the predominance factor, but instructs courts to engage in the predominance inquiry *after* identifying issues suitable for class treatment. Accordingly, the broad view does not risk undermining the predominance requirement. By contrast, the narrow view would virtually nullify Rule 23(c)(4).

*Martin*, 896 F.3d at 413. Next, the Court found the broad view to be supported by the text of Rule 23 and the Advisory Committee's refusal to modify 23(c)(4) to reflect the Fifth Circuit's interpretation in *Castano*. *Id.* Finally, the Court recognized the superiority requirement "functions as a backstop against inefficient use of Rule 23(c)(4)." *Id.* The rationale of the Circuit Courts concluding that a claim as a whole does not have to satisfy the predominance requirement in order to certify a claim pursuant to 23(c)(4) respects the plain language of Rule 23 and is the only interpretation that gives meaning to all provisions of the rule. Notably, the Supreme Court denied the defendants' petition for a writ of certiorari in March 2019. *Behr Dayton Thermal Products LLC v. Martin*, 18-472, 2019 WL 1231762, at *1 (U.S. Mar. 18, 2019). However, even if *Castano*'s extreme minority view is accepted, 23(c)(4) certification would be appropriate because the issues regarding Defendants' violations of the antitrust laws predominate over all other issues. *Klay*, 382 F.3d at 1258-59 (holding that issues regarding a nationwide conspiracy would "tend to predominate over all but the most complex individualized issues").

Because 23(a) is satisfied, because common issues predominate with regard to the issues to be certified, and because a class-wide determination would be superior to a multitude of trials to determine these common issues, the issue of whether Defendants' conduct violates Section 2 should be certified pursuant to 23(c)(4) with regard to the Non-Acute Care Hospital Providers' Section 2 claims. In addition, should the Court decline to certify either the Non-Acute Care Hospital Providers' *per se* claims or the Acute Care Hospital Providers' Section 1 or Section 2 claims under 23(b)(3), the Court should grant 23(c)(4) certification with regard to either the issue of Defendants' liability or the issue of whether Defendants' conduct violates the antitrust laws.

## <u>CONCLUSION</u>

The Court should grant Provider Plaintiffs' Motion for Class Certification for the reasons set forth herein and based on the expert reports of Professor H. E. Frech, Professor Deborah Haas-Wilson, and Professor Daniel J. Slottje. and the declarations submitted in support of class certification.

Respectfully submitted the 9th day of October, 2020.

<table>
<tr>
<td>

*/s/ Edith M. Kallas*

Edith M. Kallas – ***Co-Lead Counsel***
WHATLEY KALLAS, LLP
1180 Avenue of the Americas, 20th Floor
New York, NY 10036
Tel:  (212) 447-7060
Fax:  (800) 922-4851
Email: ekallas@whatleykallas.com

</td>
<td>

*/s/ Joe R. Whatley, Jr.*

Joe R. Whatley, Jr. – ***Co-Lead Counsel***
W. Tucker Brown
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel:  (205) 488-1200
Fax:  (800) 922-4851
Email: jwhatley@whatleykallas.com
            tbrown@whatleykallas.com

</td>
</tr>
<tr>
<td>

Patrick J. Sheehan
WHATLEY KALLAS, LLP
60 State Street, 7th Floor
Boston, MA 02109
Tel:  (617) 573-5118
Fax:  (617) 371-2950
Email: psheehan@whatleykallas.com

</td>
<td>

Deborah J. Winegard
WHATLEY KALLAS, LLP
1068 Virginia Avenue, NE
Atlanta, GA 30306
Tel:  (404) 607-8222
Fax:  (404) 607-8451
Email: dwinegard@whatleykallas.com

</td>
</tr>
<tr>
<td>

Henry C. Quillen
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH  03801
Tel:  (603) 294-1591
Fax:  (800) 922-4851
Email: hquillen@whatleykallas.com

</td>
<td>

E. Kirk Wood, Jr. – ***Local Facilitating Counsel***
WOOD LAW FIRM LLC
P. O. Box 382434
Birmingham, AL 35238
Tel:  (205) 612-0243
Fax:  (205) 705-1223
Email: ekirkwood1@bellsouth.net

</td>
</tr>
</table>

Charles Clinton Hunter
HAYES HUNTER PC
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (281) 768-4731
Fax: (713) 583-7047
Email: chunter@hayeshunterlaw.com

Aaron S. Podhurst – ***Plaintiffs' Steering Committee***
Peter Prieto – ***Chair, Expert Committee***
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue
Suite 2300
Miami, FL  33131
Tel:  (305) 358-2800
Fax:  (305) 358-2382
Email: apodhurst@podhurst.com
        pprieto@podhurst.com

Dennis Pantazis – ***Plaintiffs' Steering Committee***
Brian Clark – ***Discovery Committee***
WIGGINS CHILDS PANTAZIS FISHER
  GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel:  (205) 314-0500
Fax:  (205) 254-1500
Email: dgp@wcqp.com
        bclark@wcqp.com

U.W. Clemon – ***Plaintiffs' Steering Committee***
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL  35222
Tel: (205) 837-2898
Email: clemonu@bellsouth.net

Dennis C. Reich – ***Chair, Damages Committee***
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (713) 622-7271
Fax:  (713) 623-8724
Email:  dreich@rbfirm.net

J. Mark White – ***Litigation Committee***
Augusta S. Dowd – ***Chair, Litigation Committee***
Linda G. Flippo – ***Discovery Committee***
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel:  (205) 323-1888
Fax:  (205) 323-8907
Email: mwhite@whitearnolddowd.com
        adowd@whitearnolddowd.com
        lflippo@whitearnolddowd.com

Nicholas B. Roth – *Chair, Discovery Committee*
Julia Smeds Roth – *Discovery Committee*
EYSTER KEY TUBB ROTH MIDDLETON
  & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email: nbroth@eysterkey.com
         jroth@eysterkey.com

David A. Balto – *Expert Committee*
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email: david.balto@dcantitrustlaw.com

Joey K. James – *Litigation Committee*
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel:  (256) 764-0095
Fax:  (256) 767-5705
Email: joey@bunchandjames.com

Richard S. Frankowski – *Discovery Committee*
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL  35233
Tel:  (205) 390-0399
Fax: (205) 390-1001
Email: richard@frankowskifirm.com

John C. Davis – *Written Submissions Committee*
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel:  (850) 222-4770
Email: john@johndavislaw.net

Van Bunch – *Chair, Class Certification Committee*
BONNETT FAIRBOURN FRIEDMAN &
  BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel:  (602) 274-1100
Fax:  (602) 274-1199
Email: vbunch@bffb.com

Robert J. Axelrod – *Chair, Written Submissions Committee*
AXELROD & DEAN LLP
830 Third Avenue, 5th Floor
New York, NY 10022
Tel:  (646) 448-5263
Fax:  (212) 840-8560
Email: rjaxelrod@axelroddean.com

W. Daniel Miles, III – *Written Submissions Committee*
BEASLEY ALLEN CROW METHVIN
PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel:  (800) 898-2034
Fax:  (334) 954-7555
Email: dee.miles@beasleyallen.com

Michael C. Dodge – *Expert Committee*
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel:  (972) 419-7172
Email: mdodge@gpm-law.com

Michael E. Gurley, Jr. – *Discovery Committee*
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel:  (205) 908-6512
Email: mgurleyjr@yahoo.com

Mark K. Gray – *Discovery Committee*
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel:  (502) 805-1800
Fax:  (502) 618-4059
Email: mgray@grayandwhitelaw.com

Lynn W. Jinks, III – *Expert Committee*
Christina D. Crow – *Discovery Committee*
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel:  (334) 738-4225
Fax:  (334) 738-4229
Email: ljinks@jinkslaw.com
          ccrow@jinkslaw.com

Stephen M. Hansen – *Class Certification Committee*
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel:  (253) 302-5955
Fax:  (253) 301-1147
Email: steve@stephenmhansenlaw.com

Myron C. Penn – *Discovery Committee*
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel:  (334) 738-4486
Fax:  (334) 738-4432
Email: myronpenn28@hotmail.com

Harley S. Tropin – *Damages Committee*
Javier A. Lopez – *Discovery Committee*
KOZYAK TROPIN &
  THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email: hst@kttlaw.com
          jal@kttlaw.com

J. Preston Strom, Jr. – *Litigation Committee*
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel:  (803) 252-4800
Fax:  (803) 252-4801
Email: petestrom@stromlaw.com

C. Wes Pittman – *Settlement Committee*
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel:  (850) 784-9000
Fax:  (850) 763-6787
Email: wes@pittmanfirm.com

Thomas V. Bender – *Discovery Committee*
Dirk L. Hubbard
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Tel:  (816) 421-0700
Email:  tbender@hab-law.com
          dhubbard@hab-law.com

Robert B. Roden – *Litigation Committee*
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel:  (205) 933-8383
Fax: (205) 933-8386
Email: rroden@shelbyroden.com

Gregory S. Cusimano – *Litigation Committee*
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL  35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email:  greg@alalawyers.net

Gary E. Mason – *Class Certification Committee*
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel:  (202) 429-2290
Fax:  (202) 640-1160
Email: gmason@wbmllp.com

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel:  (320) 289-2363
Fax:  (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Michael L. Murphy – *Discovery Committee*
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC  20006
Tel:  (202) 463-2101
Fax: (202) 463-2103
Email: mmurphy@baileyglasser.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
Email: alamb@archielamb.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel:  (719) 471-1984
Fax: (719) 577-4356
Email: lance@searsassociates.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA  51101
Tel:  (712) 234-3030
Fax: (712) 234-3034
Email:  paul@lundberglawfirm.com

Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK  99501
Tel:  (907) 277-5400
Fax:  (907) 277-9896
Email:  Jessica@dillonfindley.com
          Ray@dillonfindley.com
          Molly@dillonfindley.com


Cynthia C. Moser
HEIDMAN LAW FIRM
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA  51101
Tel:  (712) 255-8838
Fax  (712) 258-6714
Email:  Cynthia.Moser@heidmanlaw.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com