FILED

2020 Oct-30  PM 09:55
U.S. DISTRICT COURT
N.D. OF ALABAMA


# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **IN RE BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION MDL 2406** | : : : : : : : | **Master File 2:13-cv-20000-RDP** |
| | | **This document relates to Subscriber Track cases** |

## SUBSCRIBER PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT

7498466.2

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................... 2

II.    OVERVIEW OF THE LITIGATION AND SETTLEMENT ......................................... 5

   A.    Factual and Procedural Background .......................................................................... 5

   B.    The Settlement............................................................................................................ 9

      1.    The Settlement Class Members ...................................................................... 11

         a.    The Damages Class ............................................................................. 11

         b.    The Injunctive Relief Class ................................................................ 12

      2.    Relief for the Benefit of the Settlement Class Members.................................. 13

         a.    The Settlement Fund ........................................................................... 13

         b.    Injunctive Relief................................................................................. 14

            i.    The Elimination of the National Revenue Cap on Non-Blue Competition 15

            ii.    Opening the Door to Expanded Blue Bids and Competition ................... 15

            iii.    Local "Best Efforts"................................................................................ 16

            iv.    Acquisitions ............................................................................................ 16

            v.    Non-Provider Contracting for Self-Funded Accounts ............................. 16

            vi.    Most Favored Nation Clauses ................................................................. 16

            vii.    Monitoring Committee............................................................................. 17

         c.    Settlement Class Release .................................................................... 18

         d.    Notice Plan......................................................................................... 19

         e.    Settlement Rescission ........................................................................ 19

         f.    Attorneys' Fees and Costs .................................................................. 21

   C.    Plan of Distribution................................................................................................. 21

III.    LEGAL STANDARD ................................................................................................ 26

IV.    THE PROPOSED SETTLEMENT SATISFIES RULE 23 AND WILL LIKELY EARN FINAL APPROVAL ...................................................................................... 29

   A.    Class Representatives and Lead Counsel Have More than Adequately Represented the Settlement Class. ...................................................................................................... 29

   B.    The Proposed Settlement Is the Result of Arm's-Length Negotiations..................... 30

   C.    The Relief Provided to the Settlement Classes Is Far More than Adequate, Taking into Account the Considerations Set Forth in Rule 23(e)(2)(C). .............................. 32

      1.    The Costs, Risks, and Delay of Trial and Appeal................................................ 32

i

  2. The Effectiveness of Any Proposed Method of Distributing Relief to the Class, Including the Method of Processing Class Member Claims ...............................36

 D. The Terms of Any Proposed Award of Attorneys' Fees and Expenses, Including Timing of Payment ............................................................37

 E. The Proposed Settlement Treats Class Members Equitably Relative to One Another 38

 F. The Remaining Non-Duplicative *Bennett* Factors Are Satisfied. .............................40

  1. The Settlement Is Well Within the Range of Reasonableness Considering the Range of Possible Alternatives. ...............................................40

  2. The Stage of Proceedings at which Settlement Was Achieved Strongly Supports Preliminary Approval. ..............................................................42

**V. CERTIFICATION OF THE SETTLEMENT CLASSES IS LIKELY. ...................42**

 A. The Proposed Classes Will Satisfy Rule 23(a). .......................................................43

  1. Numerosity—Rule 23(a)(1) ....................................................................44

  2. Commonality—Rule 23(a)(2) .................................................................44

  3. Typicality—Rule 23(a)(3) .......................................................................45

  4. Adequacy—Rule 23(a)(4) .......................................................................47

 B. The Proposed Classes Will Also Satisfy Rules 23(b)(2) and (b)(3). .........................48

  1. Because the Blues Have Acted on Grounds Generally Applicable to the Injunctive Relief Class, Certification Will Likely Be Appropriate under Rule 23(b)(2). .......48

  2. Certification of a Settlement Damages Class and a Self-Funded Sub-Class Is Likely Appropriate under Rule 23(b)(3). ...............................................50

   a. Common Issues Predominate.........................................................50

   b. A Class Action Is Superior to Other Methods of Adjudication. ....................51

**VI. THE PROPOSED PLAN OF DISTRIBUTION WARRANTS PRELIMINARY APPROVAL.................................................................................53**

**VII. CONCLUSION ............................................................................................58**

## TABLE OF AUTHORITIES

**CASES**

*AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*,
   938 F.3d 1170 (11th Cir. 2019) ............................................................................48

*Amchem Prods. Inc. v. Windsor*,
   521 U.S. 591 (1997) .............................................................................................43, 47

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   568 U.S. 455 (2013) ..............................................................................................50

*Babineau v. Fed. Express Corp.*,
   576 F.3d 1183 (11th Cir. 2009) ............................................................................50

*Bellocco v. Curd*,
   2006 WL 4693490 (M.D.Fla. Apr. 6, 2006) ........................................................53

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) ................................................................ 28, 40, 41, 42

*Bennett v. Boyd Biloxi, LLC*,
   2016 WL 6668926 (S.D. Ala. Nov. 8, 2016) ........................................................43

*Borcea v. Carnival Corp.*,
   238 F.R.D. 664 (S.D. Fla. 2006) ..........................................................................43

*Burrows v. Purchasing Power, LLC*,
   2013 WL 10167232 (S.D. Fla. Oct. 7, 2013) .......................................................32

*Busby v. JRHBW Realty, Inc.*,
   513 F.3d 1314 (11th Cir. 2008) ............................................................................47

*Camp v. City of Pelham*,
　2014 WL 1764919 (N.D. Ala., May 1, 2014)...........................................................40

*Carnegie v. Mut. Sav. Life Ins. Co.*,
　2004 WL 3715446 (N.D. Ala. Nov. 23, 2004) .......................................................41

*Carriuolo v. Gen. Motors Co.*,
　823 F.3d 977 (11th Cir. 2016) ...............................................................................44

*Carroll v. Macy's, Inc.*,
　2020 WL 3037067 (N.D. Ala. June 5, 2020)..........................................................28

*Cifuentes v. Regions Bank*,
　2014 WL 1153772 (S.D. Fla. Mar. 20, 2014)..........................................................40

*City of Livonia Emp. Ret. Sys. v. Wyeth*, No. 07 Civ. 10329(RJS),
　2013 WL 4399015 (S.D.N.Y. Aug. 7, 2013)...........................................................58

*Cotton v. Hinton*,
　559 F.2d 1326 (5th Cir. 1977) ...............................................................................26

*Danieli v. Int'l Bus. Mach. Corp.*,
　2009 WL 6583144 (S.D.N.Y. Nov. 16, 2009).........................................................54

*Deas v. Russell Stover Candies, Inc.*,
　2005 WL 8158201 (N.D. Ala. Dec. 22, 2005) .......................................................40

*DeBoer v. Mellon Mortg. Co.*,
　64 F.3d 1171 (8th Cir. 1995) .................................................................................46

*Dubin v. Miller*,
　132 F.R.D. 269 (D. Colo. 1990) ............................................................................46

*Dujanovic v. MortgageAmerica, Inc.*,
　185 F.R.D. 660 (N.D. Ala. 1999)...........................................................................44

*Fabricant v. Sears Roebuck*,
　202 F.R.D. 310 (S.D. Fla. 2001)............................................................................48

*Faught v. Am. Home Shield Corp.*,
　668 F.3d 1233 (11th Cir. 2011) .............................................................................37

*Fitzgerald v. P.L. Mktg., Inc.*,
　2020 WL 3621250 (W.D. Tenn. July 2, 2020)............................................36, 39

*Georgine v. Amchem Products, Inc.*,
　83 F.3d 610 (3rd Cir. 1996)...................................................................................44

*Granger v. Sears Roebuck & Co.*,
  2008 WL 11424140 (N.D. Ala., Aug. 4, 2008) ....................................................................48

*Hill v. State Street Corp.*,
  2015 WL 127728 (D. Mass. 2015) .......................................................................................57

*Holmes v. Cont'l Can Co.*,
  706 F.2d 1144 (11th Cir. 1983) ...........................................................................................53

*In re Advanced Battery Technologies, Inc., Sec. Litig.*,
  298 F.R.D. 171 (S.D.N.Y. 2014) .........................................................................................57

*In re Blue Cross Blue Shield Antitrust Litig.*,
  26 F. Supp. 3d 1172 (N.D. Ala. 2014) ...................................................................................6

*In re Blue Cross Blue Shield Antitrust Litig.*,
  2018 WL 7152887 (11th Cir. Dec. 12, 2018)........................................................................3

*In re Blue Cross Blue Shield Antitrust Litig.*,
  238 F. Supp. 3d 1313 (N.D. Ala. 2017) ..........................................................................8, 35

*In re Blue Cross Blue Shield Antitrust Litig.*,
  308 F. Supp. 3d 1241 (N.D. Ala. 2018) ......................................................................3, 6, 9

*In re Blue Cross Blue Shield Antitrust Litig.*,
  908 F. Supp. 2d 1373 (J.P.M.L. 2012) ................................................................................53

*In re Checking Account Overdraft Litig.*,
  830 F. Supp. 2d 1330 (S.D. Fla. 2011).................................................................41, 50, 51

*In re Checking Account Overdraft Litig.*,
  275 F.R.D. 654 (S.D. Fla. 2011)..........................................................................................30

*In re Chicken Antitrust Litig. Am. Poultry*,
  669 F.2d 228 (5th Cir. 1982) .........................................................................................53, 55

*In re Credit Default Swaps Antitrust Litig.*,
  2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) ......................................................................54

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
  317 F.R.D. 675 (N.D. Ga. 2016)..........................................................................................44

*In re Domestic Air Transp. Antitrust Litig.*,
  137 F.R.D. 677 (N.D. Ga. 1991)..........................................................................................51

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
  2020 WL 256132 (N.D. Ga. Mar. 17, 2020) ..................................................................29, 36

*In re Ford Motor Co. Spark Plug & Three Valve Engine Prods. Liab. Litig.*,
  2016 WL 6909078 (N.D.Ohio Jan. 26, 2016) ........................................................57

*In re Gilat Satellite Networks, Ltd.*,
  2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ......................................................57

*In re GSE Bonds Antitrust Litig.*,
  414 F. Supp. 3d 686 (S.D.N.Y. 2019) ............................................................39, 55

*In re Ins. Brokerage Antitrust Litig.*,
  297 F.R.D.136 (D.N.J. 2013).......................................................................52

*In re Liberty Nat'l Ins. Cases*, No.
  2006 WL 8436814 (N.D. Ala. Mar. 31, 2006) ...................................................26

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  327 F.R.D. 483 (S.D.N.Y. 2018) ....................................................................57

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  2007 WL 4526593 (S.D.N.Y. Dec. 20, 2007) ..................................................57

*In re Motorsports Merch. Antitrust Litig.*,
  112 F. Supp. 2d 1329 (N.D. Ga. 2000) ...........................................................26

*In re Mut. Funds Inv. Litig.*,
  2011 WL 1102999 (D.Md. 2011) ....................................................................57

*In re Packaged Ice Antitrust Litig.*,
  322 F.R.D. 276 (E.D. Mich. 2017) ..................................................................50

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y. 1997) .....................................................................54

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  330 F.R.D. 11 (E.D.N.Y. 2019) ..........................................................27, 38, 39

*In re Pool Prod. Distrib. Mkt. Antitrust Litig.*,
  2015 WL 4528880 (E.D. La. July 27, 2015) ....................................................41

*In re Spring Corp. ERISA Litig.*,
  443 F. Supp. 2d 1249 (D. Kan. 2006) .............................................................58

*In re Sunbeam Sec. Litig.*,
  176 F. Supp. 2d 1323 (S.D. Fla. 2001)............................................................53

*In re Tremont Sec. Law, State Law and Ins. Litig.*,
  2015 WL 5333494 (S.D.N.Y. Sept. 14, 2015) .................................................55

*In re U.S. Oil & Gas Litig.*,
   967 F.2d 489 (11th Cir. 1992) ...................................................................26

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981) ...................................................................................54

*Johnson v. NPAS Solutions, LLC*,
   975 F.3d 1244 (11th Cir. 2020) .................................................................21

*Johnson v. Rausch, Sturm, Israel, Enerson & Hornik, LLP*
   333 F.R.D. 314 (S.D.N.Y. 2019) ...............................................................28

*Kennedy v. Tallant*,
   710 F.2d 711 (11th Cir. 1983) ...................................................................47

*Kerr v. City of W. Palm Beach*,
   875 F.2d 1546 (11th Cir. 1989) .................................................................50

*Kornberg v. Carnival Cruise Lines, Inc.*,
   741 F.2d 1332 (11th Cir. 1984) .................................................................46

*Kreuzfeld A.G. v. Carnehammar*,
   138 F.R.D. 594 (S.D. Fla. 1991) ...............................................................44

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
   2016 WL 4401148 (S.D.N.Y. June 22, 2016) ...........................................54

*Lazy Oil Co. v. Wotco Corp.*,
   95 F. Supp. 2d 290 (W.D. Pa. 1997) .........................................................41

*Leverso v. SouthTrust Bank of AL., Nat. Assoc.*,
   18 F.3d 1527 (11th Cir. 1994) ...................................................................53

*McAnaney v. Astoria Fin. Corp.*,
   2006 WL 2689621 (E.D.N.Y. Sept. 19, 2006) ..........................................46

*McWhorter v. Ocwen Loan Servicing, LLC*,
   2019 WL 9171207 (N.D. Ala. Aug. 1, 2019) ............................................26

Miller v. Republic Nat'l Life Ins. Co.,
   559 F.2d 426 (5th Cir. 1977) .....................................................................26

*Nichols v. SmithKline Beecham Corp.*,
   2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ...............................................41

*O'Toole v. Pitney Bowes, Inc.*,
   2009 WL 10672311 (N.D. Ga. Aug. 3, 2009) ...........................................43

*Parsons v. Brighthouse Networks*, LLC,
  2015 WL 13629647 (N.D. Ala. Feb. 5, 2015) ...............................................33, 34

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) .................................................................41

*Saccoccio v. JP Morgan Chase Bank, N.A.*,
  297 F.R.D. 683 (S.D. Fla. 2014) .............................................................31

*Schorr v. Countrywide Home Loans, Inc.*,
  2015 WL 13402606 (M.D. Ga. Apr. 1, 2015) ...................................................43

*Schwartz v. TXU Corp.*,
  2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) ...................................................53

*Singer v. AT&T Corp.*,
  185 F.R.D. 681 (S.D. Fla. 1998) .............................................................44

*Smith v. Floor and Decor Outlets of Am., Inc.*,
  2017 WL 11495273 (N.D. Ga. Jan. 10, 2017) ..................................................53

*Strube v. Am. Equity Inv. Life Ins. Co.*,
  226 F.R.D. 688 (M.D. Fla. 2005) .............................................................32

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir.2011) ..................................................................57

*Swaney v. Regions Bank*,
  2020 WL 3064945 (N.D. Ala. June 9, 2020)...........................................33, 37, 42

*Swinton v. SquareTrade, Inc.*,
  2019 WL 617791 (S.D. Iowa, Feb. 14, 2019) ..................................................28

*Trauth v. Spearmint Rhino Cos. Worldwide, Inc.*,
  2011 WL 13134046 (C.D. Cal. Apr. 4, 2011) ..................................................55

Wade v. Kroger Co.,
  2008 WL 4999171 (W.D. Ky. Nov. 20, 2008) ..................................................57

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .........................................................................44

*Williams v. Mohawk Indus., Inc.*,
  568 F.3d 1350 (11th Cir. 2009) .........................................................45, 46

*Winston v. Jefferson Cty.*,
  2006 WL 6916381 (N.D. Ala., June 26, 2006)..................................................49

*Wolin v. Jaguar Land Rover N. Am., LLC,*
617 F.3d 1168 (9th Cir. 2010) ..............................................................52

**RULES**

Fed. R. Civ. P. 23 ............................................................................27, 31, 38

Fed. R. Civ. P. 23(a)(1) ..........................................................................44

Fed. R. Civ. P. 23(a)(2) ..........................................................................44

Fed. R. Civ. P. 23(b)(2) ..........................................................................48

Fed. R. Civ. P. 23(b)(3) ..........................................................................52

Fed. R. Civ. P. 23(e) ............................................................................4, 27

Fed. R. Civ. P. 23(e)(2) ..........................................................................28

Fed. R. Civ. P. 23(e)(2)(C) ......................................................................34

Fed. R. Civ. P. 23(e)(2)(C)(i) ..................................................................32

Fed. R. Civ. P. 23(e)(2) ............................................................................1

**REGULATIONS**

15 U.S.C. §§ 1-3 .....................................................................................2

**OTHER AUTHORITIES**

McLaughlin on Class Actions,
§ 6.23 (17th ed. 2020) .........................................................................53

Newberg on Class Actions
§ 12:15 (5th ed.) ...................................................................................54

Subscriber Class Representatives[1] ("Subscriber Plaintiffs") submit this memorandum in support of Subscriber Plaintiffs' Motion for Preliminary Approval of Proposed Class Settlement. The Settlement Agreement is attached as Exhibit A.[2] Consistent with Fed. R. Civ. P. 23(e)(2), the Settlement is fair, reasonable, adequate, and likely to warrant final approval.[3] In addition, the proposed Settlement Classes are certifiable under Rule 23. Thus, Subscriber Plaintiffs request that the Court: (1) grant preliminary approval of the settlement; (2) find that the Settlement Classes are likely to be certified at final approval; (3) preliminarily approve the Plan of Distribution; and (4) set a Final Approval Hearing.

Proposed orders granting preliminary and final approval are attached to this memorandum as Exhibits B and C, respectively. The proposed Plan of Distribution is attached as Exhibit D. This memorandum is also supported by the Joint Declaration of Settlement Class Counsel as Exhibit E; the Declaration of Self-Funded Sub-Class Settlement Class Counsel, Exhibit F; the Declaration of Kenneth Feinberg, Exhibit G; the Declaration of Darrell Chodorow, Exhibit H; the Declaration of

---

[1] Galactic Funk Touring, Inc.; American Electric Motor Services, Inc.; CB Roofing, LLC; Pearce, Bevill, Leesburg, Moore, P.C.; Pettus Plumbing & Piping, Inc.; Consumer Financial Education Foundation of America, Inc.; Fort McClellan Credit Union; Rolison Trucking Co., LLC; Conrad Watson Air Conditioning, Inc.; Linda Mills; Frank Curtis; Jennifer Ray Davidson; Pete Moore Chevrolet, Inc.; Jewelers Trade Shop; Saccoccio & Lopez; Angel Foster (fka Angel Vardas); Monika Bhuta; Michael E. Stark; G&S Trailer Repair Incorporated; Chelsea L. Horner; Montis, Inc.; Renee E. Allie; John G. Thompson; Avantgarde Aviation, Inc.; Hess, Hess & Daniel, P.C.; Betsy Jane Belzer; Bartlett, Inc., d/b/a Energy Savers; Matthew Allan Boyd; Gaston CPA Firm; Rochelle and Brian McGill; Sadler Electric; Jeffrey S. Garner; Amy MacRae; Vaughan Pools, Inc.; Casa Blanca, LLC; Jennifer D. Childress; Clint Johnston; Janeen Goodin and Marla S. Sharp; Erik Barstow; GC/AAA Fences, Inc.; Keith O. Cerven; Teresa M. Cerven; Sirocco, Inc.; Kathryn Scheller; Iron Gate Technology, Inc.; Nancy Thomas; Pioneer Farm Equipment, Inc.; Scott A. Morris; Tony Forsythe; Joel Jameson; Ross Hill; Angie Hill; Kevin Bradberry; Christy Bradberry; Tom Aschenbrenner; Juanita Aschenbrenner; Free State Growers, Inc.; Tom A. Goodman; Jason Goodman; Comet Capital, LLC; Barr, Sternberg, Moss, Lawrence, Silver & Munson, P.C.; Mark Krieger; Deborah Piercy; and Lisa Tomazzoli. This memorandum is also supported by the Self-Funded Sub-Class Representative Hibbett Sports, Inc.

[2] Capitalized terms not otherwise defined herein shall have the meaning given them in the attached Settlement Agreement.

[3] Along with this Motion for Preliminary Approval, Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel are submitting to the Court a separate Notice Motion, including a proposed form of, method for, and date of dissemination of Class Notice.

Daniel Rubinfeld, Exhibit I; the Declaration of Ariel Pakes, Exhibit J; and the Declaration of Special Master Edgar C. Gentle, Exhibit K.

## I. INTRODUCTION

This litigation began more than eight years ago and involves the consolidation of more than 40 actions by Subscriber Plaintiffs against the Blue Cross and Blue Shield Association ("BCBSA") and its member plans (the "Member Plans" or the "Blues") (collectively, "Defendants"). Subscriber Plaintiffs have achieved a historic settlement with far-reaching competitive benefits. The proposed settlement secures substantial injunctive relief that will reshape competition in the health insurance industry and offer increased choice to millions of Americans, coupled with one of the largest monetary recoveries ever achieved in an antitrust class action settlement.

At the heart of this litigation, Subscriber Plaintiffs allege, *inter alia*, that BCBSA and the Member Plans violated Sections 1, 2, and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-3, by entering into an unlawful agreement that restrained competition among and between them in the markets for health insurance and for the administration of Commercial Health Benefit Products in the United States and its territories by: (1) allocating geographic territories; (2) limiting the Member Plans from competing against each other, even when they are not using a Blue name, by mandating a minimum percentage of business that each Member Plan must do under that name, both inside and outside each Member Plan's territory; (3) restricting the right of any Member Plan to be sold to a company that is not a member of BCBSA; and (4) agreeing to other ancillary restraints on competition. ECF No. 1082. Subscriber Plaintiffs sought actual damages, treble damages, and injunctive relief to prevent future loss or damage resulting from BCBSA and the Member Plans' conduct.

This litigation has been extraordinarily hard-fought over the past eight years, as reflected by the over 2,000 docket entries. Defendants filed, and Subscriber Plaintiffs overcame, over a dozen motions to dismiss. The parties spent months negotiating production of terabytes of structured health insurance data from 37 separate defendants, many with different data management systems. Ex. E, Settlement Class Counsel Decl. ¶ 14. With the assistance of Magistrate Judge Michael T. Putnam, the parties briefed over 150 discovery motions, leading to 91 discovery orders. Subscriber Plaintiffs obtained and analyzed over 15 million pages of documents, conducted over 120 depositions of Defendants and third-party witnesses, and defended over 20 depositions of class representatives and experts. *Id.* ¶¶ 14-15. Subscriber Plaintiffs reviewed and challenged hundreds of thousands of privilege log entries, resulting in 45 Reports & Recommendations by Special Master R. Bernard Harwood, Jr. and the full or partial de-designation of over 450,000 documents. *Id.* ¶ 16.

The parties briefed several rounds of summary judgment motions, including Defendants' motion seeking application of the filed rate doctrine to Alabama subscribers and Subscriber Plaintiffs' successful motion seeking application of a *per se* standard to the alleged "aggregation of competitive restraints" including the restrictions on non-Blue business (subject to defeating Defendants' argument that it operated as a single entity for purposes of trademarks), a landmark decision that the Eleventh Circuit declined to review on an interlocutory basis. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1267 (N.D. Ala. 2018); *In re Blue Cross Blue Shield Antitrust Litig.*, No. 18-90020-E, 2018 WL 7152887 (11th Cir. Dec. 12, 2018) ("*BCBS Litig.*"). And most recently, the parties briefed potential certification of a nationwide injunctive relief class and an Alabama damages class, each side supporting its claims with expert reports totaling hundreds of pages.

Now, after nearly five years of good faith, arm's-length negotiations conducted by experienced class counsel with the assistance of Special Master Edgar C. Gentle and other mediators, the parties have agreed to the proposed Settlement with a monetary value of $2.67 billion and historic injunctive relief with significant, tangible value to the class. The features of the Settlement include:

- **Monetary Relief.** Defendants will pay $2.67 billion to the Settlement Fund, which will include distributions to the Damages Class and the Self-Funded Sub-Class, Notice and Administration costs, and any Fee and Expense Award.

- **Injunctive Relief.** The Settlement provides historic injunctive relief to enhance competition in the market for health insurance, to the benefit of all Settlement Class Members. This hard-won non-monetary relief includes:

  o elimination of the Blues' national revenue cap on competition when they are not using the Blue names and marks—that cap, which the Blues call the "National Best Efforts" provision, requires that two-thirds of each Member Plan's national healthcare-related revenue come from Blue-branded products as opposed to non-Blue (i.e. "Green") business—and limits on a corresponding local revenue cap known as the "Local Best Efforts" provision;

  o the ability for certain Qualified National Accounts who could only seek one Blue bid, to now seek bids from two Blue Plans;

  o limits on BCBSA's restraints on acquisitions;

  o guidelines to permit direct contracting between Non-Provider Vendors and Self-Funded Accounts; and

  o limits on use of Most Favored Nations ("MFN") Clauses and Differentials.

- **Five-Year Monitoring Period.** For a period of five years from the Court's entry of Final Judgment and Order of Dismissal, a Monitoring Committee comprised of members appointed by the Settling Defendants, Settlement Class Counsel, Self-Funded Sub-Class Counsel, and the Court shall review new rules or regulations proposed by BCBSA and submitted to the Monitoring Committee, and shall mediate disputes related to the Injunctive Relief.

Under Fed. R. Civ. P. 23(e), the Settlement merits preliminary approval. It represents a historic, monumental achievement for the Settlement Class Members, especially in light of the

litigation risks involved, and is likely to receive final approval under Rule 23(e)(2). Moreover, the Settlement Classes will satisfy all the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) for certification. Additionally, as will be explained in greater detail in the corresponding Notice Motion, the proposed custom Notice Plan exceeds applicable requirements and has been designed to achieve the best practicable notice to the Settlement Class Members.

## II.    OVERVIEW OF THE LITIGATION AND SETTLEMENT

### A.    Factual and Procedural Background

The Court is intimately familiar with the facts giving rise to the parties' claims and defenses; they have been set forth in multiple briefings over the course of the past eight years. The facts below are referenced to the extent that they relate to this Motion.

In 2012, Subscriber Plaintiffs filed actions against BCBSA and the Member Plans, alleging that they had agreed to carve the United States into geographic Exclusive Service Areas in which the other Member Plans could not compete using the Blue Cross and Blue Shield names and marks. The complaints further alleged that BCBSA and the Member Plans' rules concerning Green business also operated as limitations on competition as they restricted the Member Plans from maximizing profits on non-Blue business. These complaints were the result of independent and exhaustive research conducted by Subscriber Plaintiffs' counsel and were not the result of any government investigation into BCBSA rules and regulations.

Subscriber Plaintiffs alleged that the market allocation conspiracy was achieved through BCBSA's imposition of, and the Member Plans' agreement and adherence to, a series of rules and regulations. BCBSA adopted: (a) a National "Best Efforts" revenue cap that limits the revenue that each Member Plan can generate from Green business relative to its Blue-branded business; (b) licensing agreement restrictions that limit the circumstances under which a Member Plan may bid on national accounts that are headquartered outside its allocated territorial market using the Blue

Marks; (c) license agreement standards that restrict the ability of each Member Plan to transfer its license to a non-Blue entity; (d) acquisition rules that limit the circumstances under which Member Plans may be acquired; and (e) a Local "Best Efforts" revenue cap that requires that each Member Plan receive at least 80% of its annual health revenue from services offered under the Blue Marks within its Service Area. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1256 (N.D. Ala. 2018), *motion to certify appeal granted*, No. 2:13-CV-20000-RDP, 2018 WL 3326850 (N.D. Ala. June 12, 2018), *and leave to appeal denied sub nom. BCBS Litig.*, 2018 WL 7152887 (11th Cir. Dec. 12, 2018). Subscriber Plaintiffs have argued that these rules and regulations and other allegedly improper conduct reduced competition for each of the Member Plans while resulting in increased premiums and prices that could be and were charged to subscribers.

Subscriber Plaintiffs alleged that they paid inflated premiums charged as a result of these rules and sought damages "consisting of the difference between the supra-competitive premiums that the [Member Plans] have charged and lower competitive premiums that the noncompeting [Member Plans] have not charged as a result of this illegal conspiracy." *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1180 (N.D. Ala. 2014). Subscriber Plaintiffs also sought injunctive relief.[4]

In 2014, the parties litigated motions to dismiss that addressed the following legal issues:

- whether the market allocation agreements were justified in order to protect the Blues' pre-existing trademarks;

- what standard of review applied to Subscriber Plaintiffs' claims;

---

[4] A separate set of lawsuits was filed on behalf of Provider Plaintiffs, alleging that Defendants' restraints resulted in lower payments to health care providers. ECF No. 86 (Amended Complaint *for Consolidated Provider Track* against All Defendants). Those cases were consolidated with Subscriber Plaintiffs' cases by the JPML. The Provider litigation is ongoing, ECF No. 2603 (Seventh Amended Scheduling Order (Exclusive to Provider Track)), and has not been resolved through this Settlement Agreement.

- whether the filed rate doctrine applied;

- whether the claims were barred by the McCarran-Ferguson Act's antitrust exemption; and

- whether personal jurisdiction and venue were proper in the Northern District of Alabama.

*Id.* at 1181. The Court denied in part Defendants' consolidated motion to dismiss on the filed rate doctrine and other issues; the Court also denied Defendants' other motions to dismiss without prejudice, including motions to dismiss for lack of personal jurisdiction and improper venue. However, the Court identified the appropriate rule of law through which to determine venue, and allowed the parties to further brief the issue of whether personal jurisdiction and venue were proper for all suits in the Northern District of Alabama. *Id.* at 1196-97.

In July and August 2015, as discovery was ongoing, the Court entertained briefing and held a status conference to determine how best to streamline the consolidated cases within the MDL process. On October 30, 2015, the Court entered its streamlining order, which accelerated consideration of class certification motions, *Daubert* motions, dispositive motions, and trial as to the Alabama actions. ECF No. 469. The parties then focused their efforts on the Alabama actions, developing class certification and expert damages analysis relating to the Alabama damages class.

In 2016 and 2017, the parties engaged in extensive discovery concerning Defendants' argument that the filed rate doctrine, which provides that premium rates filed and approved by state regulators are deemed reasonable, applies to BCBS Alabama's ("BCBS-AL") premium rates in Alabama and to those of the Blues across the country. Under Magistrate Judge Putnam's guidance, Subscriber Plaintiffs negotiated the production of BCBS-AL's structured data relevant to the filed rate defense, sought and reviewed thousands of documents from BCBS-AL and the

Alabama Department of Insurance ("AL DOI"), deposed BCBS-AL and AL DOI fact witnesses, and took 30(b)(6) testimony from BCBS-AL on its filed rate program. After multiple rounds of briefing and oral argument on both this discovery and the substantive motions, the Court determined that the filed rate defense asserted by BCBS-AL applied to a segment of the monetary damages class (those where the charged premiums were in accordance with the filed rates), but did not apply where charged premiums were greater than the filed rate. *In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d 1313, 1332 (N.D. Ala. 2017).

The Court left open the question of whether the filed rate doctrine affects any subscribers who paid less than the legal rate and if not, whether monetary damages are available for those claims. *Id.* at 1329. With respect to the doctrine's possible application to other Defendants, on a motion for reconsideration, the Court noted that there were "questions about the conclusion [the Court] reached as it relates to some of these other potential . . . Blues or Blue-related entrance into the Alabama market" and allowed for the parties to brief the issue closer to the determination of final dispositive motions or trial before making a final determination on the issue. ECF No. 1098; ECF No. 1109 (Transcript of April 21, 2017 hearing) at 69–70. No decision has been reached on the application of the filed rate doctrine to claims in any state other than Alabama.

The Court also held two separate day-long "Economics Day" events, in December 2016 and June 2017, at which the parties' experts discussed the economic and legal issues in the case with the Court to preview the issues that it would face at class certification and summary judgment. *See* ECF No. 906; ECF No. 1117. In 2017, both parties moved for summary judgment on two issues: (1) whether a *per se* or Rule of Reason standard should apply to the alleged territorial allocation agreement and (2) whether BCBSA and the Member Plans are a single entity for purposes of the Sherman Act. ECF Nos. 1348-1353. The summary judgment process involved six

briefs with over 500 exhibits between Subscriber Plaintiffs and Defendants, along with three expert reports, three expert depositions, and a full day hearing. The Court ruled that "in navigating the antitrust landscape in this case, . . . Defendants' aggregation of a market allocation scheme together with certain other output restrictions [National Best Efforts] is due to be analyzed under the *per se* standard of review." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1279 (N.D. Ala. 2018). After this Court certified for interlocutory appeal several questions relating to the standard of review decision, the Eleventh Circuit declined to accept an interlocutory appeal from the Court's ruling. *See BCBS Litig.*, 2018 WL 7152887 (11th Cir. Dec. 12, 2018). This Court denied both sides' motions related to the single-entity doctrine, which is still an open issue in the litigation.

### B.     The Settlement

Beginning in 2015 and culminating in October 2020, the parties, with the assistance of three separate mediators, engaged in over five years of mediation. Starting in 2015, the parties conducted several mediation sessions over two years with Judge Layn Phillips[5] and Judge Gary Feess[6]. Although discussions progressed, the parties remained at an impasse and enlisted the services of Special Master Gentle[7] to continue the mediation process. Over the course of the next two and a half years, Special Master Gentle conducted dozens of mediation sessions, caucuses, phone calls, and meetings with the parties, both individually and separately, resulting in a signed term sheet in November 2019. Ex. K, Gentle Decl. ¶ 26. Settlement Class Counsel and Self-Funded

---

[5] The Honorable Layn Phillips is a former Judge in the U.S. District Court for the Western District of Oklahoma who has been recognized by Chambers and Partners as one of the top seven mediators in the United States. Phillips ADR, http://www.phillipsadr.com/bios/layn-phillips.

[6] The Honorable Gary A. Feess is a former Judge in the U.S. District Court for the Central District of California who, during his time on the bench, presided over multiple MDL proceedings. http://www.phillipsadr.com/bios/gary-feess.

[7] Special Master Gentle is the Founding Partner of Gentle, Turner, Sexton & Harbison, LLC. "He has helped create and administer over $2 billion in Settlements during the past 25 years." *Speaker Bio*, Mass Torts Made Perfect, https://mtmp.com/speaker/edgar-c-gentle.

Sub-Class Settlement Counsel then separately engaged a fourth mediator—Kenneth Feinberg[8]—to assist them in determining an equitable allocation of the Net Settlement Fund between fully-insured and self-funded Damages Class Members. Ex. E, Settlement Class Counsel Decl. ¶ 33. The parties continued to negotiate the final Settlement Agreement with the assistance of Special Master Gentle, and the Agreement was signed by all parties in October 2020, with an Execution Date of October 16, 2020. Ex. A ¶ 1(cc). Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel further engaged Mr. Feinberg to review the allocation of premium payments between employers and employees for purposes of distributing the Net Settlement Fund, as detailed below. Ex. G, Feinberg Decl. ¶¶ 6-7.

At all times throughout the process, counsel for the parties engaged in vigorous, adversarial, arm's-length settlement negotiations, and it was only with the help of three highly-qualified mediators that the Settlement was achieved. Ex. E, Settlement Class Counsel Decl. ¶ 36; Ex. F, Self-Funded Sub-Class Settlement Counsel ¶ 12; Ex. K, Gentle Decl. ¶ 33. The Parties did not negotiate attorneys' fees, costs or expenses prior to agreeing to the essential terms of the Settlement. Ex. K, Gentle Decl. ¶ 37.

The Settlement's terms are detailed in the Agreement attached as Exhibit A. The following is a summary of the material terms.[9]

---

[8] Kenneth Feinberg is "among the best-known figures in the field of dispute resolution," https://www.mediate.com/author/Kenneth-Feinberg/228, and has "led mediation talks over" numerous major lawsuits such as "the September 11th Victim Compensation Fund, the BP Deepwater Horizon oil spill, Volkswagen's diesel emissions scandal and General Motors ignition switch litigation." *Roundup Weed Killer Litigation Is Kenneth Feinberg's Next Challenge as Mediator*, The New York Times, https://www.nytimes.com/2019/05/22/business/bayer-roundup-kenneth-feinberg.html (May 22, 2019).

[9] All descriptions of the Settlement Agreement's terms in this brief are for summary descriptive and illustrative purposes only, and are not intended to, and shall not be deemed to, modify the Settlement Agreement in any way, or have any bearing on the meaning or interpretation of the Settlement Agreement. The Settlement Agreement should be consulted for its actual terms and conditions.

### 1.      The Settlement Class Members

The Settlement Classes include a damages class under Rule 23(b)(3), as well as an injunctive relief class under Rule 23(b)(2). The Settlement Classes include any person or entity within the Injunctive Relief Class or the Damages Class, excluding Government Accounts and Opt-Outs. Ex. A ¶ 1(llll). The Settlement Class Period is February 7, 2008 through October 16, 2020 ("FI Class Period"), except for Self-Funded Accounts for whom the Settlement Class Period is September 1, 2015 through October 16, 2020 ("Self-Funded Class Period"), Ex. A ¶ 1(nnnn).

The Settlement Classes are defined as follows:

### a.      The Damages Class

The Damages Class includes "all Individual Members (excluding dependents and beneficiaries), Insured Groups (including employees, but excluding non-employee Members), and Self-Funded Accounts (including employees, but excluding non-employee Members) that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product[10] (unless the person or entity's only Blue-Branded Commercial Health Benefit Product during the Settlement Class Period was a stand-alone vision or dental product) sold, underwritten, insured, administered, or issued by any member plan during the Settlement Class Period." Ex. A ¶ A(1)(v).

The Damages Class thus includes employees[11] of Insured Groups and Self-Funded Accounts during the Settlement Class Period applicable to each who were covered by a Blue-

---

[10] Commercial Health Benefit Products means "any product or plan providing for the payment or administration of health care services," including but not limited to medical, pharmacy, dental, and vision services. Ex. A ¶¶ 1(o), 1(v). However, if a person or entity's only Blue-Branded Commercial Health Benefit Product during the Settlement Class Period was a stand-alone vision or dental product, that person or entity is not included in the Damages Class. Ex. A ¶¶ 1(o), 1(v).

[11] Employees "means any current or former employee, officer, director, partner, or proprietor of an entity." Ex. A ¶ 1(v).

Branded Commercial Health Benefit Product, whether or not they contributed towards their premiums or the cost of that Product, but it does not include their beneficiaries and dependents. The Damages Class also excludes "Government Accounts,[12] Medicare Accounts of any kind, Settling Defendants themselves, and any parent or subsidiary of any Settling Defendant (and their covered or enrolled employees)" as well as any Opt-Outs, "the judge presiding over this matter, and any members of his judicial staff, to the extent such staff were covered by a Commercial Health Benefit Product not purchased by a Government Account during the Settlement Class Period." *Id.*

Subscriber Plaintiffs are also seeking certification of a "Self-Funded Sub-Class" consisting of Self-Funded Accounts and their employees during the applicable Settlement Class Period, September 1, 2015 through October 16, 2020, as contemplated by the Settlement. The Self-Funded Sub-Class is represented by Self-Funded Sub-Class Settlement Counsel and the Self-Funded Sub-Class Representative. Ex. A ¶¶ 1(dddd), 1(eeee).

### b.    The Injunctive Relief Class

The Injunctive Relief Class includes "all Individual Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Settlement Class Period." Ex. A ¶ 1(pp). Unlike

---

[12] Government Accounts are defined in the Settlement as "only a state, a county, a municipality, an unincorporated association performing municipal functions, a Native American tribe, or the federal government (including the Federal Employee Program). Government Account includes all Members of the Government Account.  No other entity that is not a state, county, municipality, unincorporated association performing municipal functions, Native American tribe or the federal government is a Government Account, unless it is required by law to provide any health care coverage it makes available to Members only under, or as a participant in, a Commercial Health Benefit Product approved, selected, procured, sponsored or purchased by a Government Account.  Entities that are not Government Accounts (e.g., utility companies, school districts, government-funded hospitals, public retiree benefit plans, public libraries, port authorities, transportation authorities, waste disposal districts, police departments, fire departments) will receive notice and an opportunity to submit a claim form to the extent they are otherwise within the definition of the Damages Class." *Id.* ¶ A(1)(hh).

the Damages Class, the Injunctive Relief Class includes beneficiaries and dependents of employees (including minors).

### 2. Relief for the Benefit of the Settlement Class Members

The Settlement consists of two main components: (a) a $2.67 billion settlement fund; and (b) significant changes to Defendants' practices, to be closely monitored for compliance with the antitrust laws and the injunctive terms of the Settlement by the Monitoring Committee for a period of five years following the entry of judgment.

### a. The Settlement Fund

The Settlement requires Defendants to establish a Settlement Fund of $2.67 billion, to be deposited into an Escrow Account for ultimate distribution. The Settlement Fund includes the Notice and Administration Fund and Fee and Expense Award(s). Ex. A ¶ 1(oooo). Settling Defendants have agreed to transfer into the Escrow Account, within thirty calendar days of a preliminary approval order, the $100 million Notice and Administration Fund and an advance of $300 million of the remaining Settlement Amount. Ex. A ¶ 23(a). Within thirty calendar days of the Court's entry of the Final Judgment and Order of Dismissal, Settling Defendants will transfer the remaining portion of the Settlement Amount into the Escrow Account. Ex. A ¶ 23(b).

The Settlement Fund will be used: (1) to pay all Settlement Class Members who are entitled to a distribution from the Net Settlement Fund ("Authorized Claimants") in accordance with a Court-approved Plan of Distribution, Ex. A ¶ 27; (2) to fund a $100 million Notice and Administration Fund to pay Notice and Administration Costs to the Claims Administrator and Settlement Administrator, Ex. A ¶ 29, as well as up to $7 million to "reimburse plaintiffs' counsel's actual and reasonable fees and expenses incurred for Notice and Administration," Ex. A ¶ 28 and costs of monitoring, Ex. A ¶ 21; and (3) to pay Court-awarded attorneys' fees and expenses, up to a combined total of 25% of the Settlement Amount, Ex. A ¶ 28.

If there is any balance remaining in the $100 million Notice and Administration Fund, it will be returned to Settling Defendants after the completion of the administration and monitoring during the Monitoring Period. Ex. A ¶ 30. Defendants have no other reversionary interest in the Settlement Fund, and if after distributions to Authorized Claimants, the Fee and Expense Award, and any Court-awarded Service Awards, any money remains in the Settlement Fund (apart from any remainder of the $100 million Notice and Administration Fund), the Claims Administrator will, subject to Court approval, allocate the remaining Escrow Account balance to Settlement Class Members. *Id.* Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel may petition the Court for replenishment by Defendants of the Notice and Administration Fund upon a showing of a necessity for such replenishment. *Id.* ¶ 1(ggg).

### b.    Injunctive Relief

In addition to the $2.67 billion in monetary recovery, Class Representatives, Settlement Class Counsel, and Self-Funded Sub-Class Settlement Counsel secured substantial injunctive relief on behalf of the Settlement Class. That relief includes significant, unprecedented, and far-reaching changes to BCBSA's rules and regulations, and the establishment of a Monitoring Committee. As explained by Dr. Daniel Rubinfeld, each of these hard-won changes to Defendants' rules provides significant additional relief to the Class, allowing for opportunities for more competition in the market for health insurance and providing the potential for Class Members to achieve greater consumer choice, better product availability, and increased innovation. *See* Ex. I, Rubinfeld Decl.

Key provisions of the injunctive relief include the following.

### i.         The Elimination of the National Revenue Cap on Non-Blue Competition

BCBSA's current license agreements with the Member Plans limits Plans' ability to generate revenue using non-Blue brands, both from inside and outside the Member Plan's assigned territorial service area; these restrictions are identified as "Best Efforts" clauses. Ex. I, Rubinfeld Decl. ¶ 8. Settling Defendants have agreed to "eliminate and no longer enforce the National Best Efforts Requirement," and to "not adopt or implement any equivalent requirement or any rule in any future License Agreement or Membership Standard that imposes a cap, ratio, or other quantitative limit on a Settling Individual Blue Plan's non-Blue Branded healthcare business outside of its Service Area." Ex. A ¶ 10.

### ii.         Opening the Door to Expanded Blue Bids and Competition

Class Representatives also secured valuable injunctive relief to pave the way for increased competition among Member Plans for National Accounts in three important ways. *First*, certain Qualified National Accounts (those with more than 5,000 employees and which also meet certain dispersion criteria) will be able to obtain a second member plan bid. Ex. A ¶ 15. This provision covers at least 33 million members in the aggregate. Ex. A ¶ 1(u).[13] *Second*, for Qualified National Accounts with Independent Health Benefit Decision Locations in more than one Service Area, each Independent Health Benefit Decision Location may request a bid from the Member Plan in its Service Area to cover employees working at that Location. Ex. A ¶ 14(b). *Third,* when multi-Service Area National Accounts (those with more than 250 total Members and Headquarters in the bidding Member Plan's Service Area) seek bids, and the Member Plan for that Service Area

---

[13] This figure includes accounts that already have the right to request a bid from more than one Blue Plan, which will not receive the right to request additional bids. Ex. A ¶ 15.

decides to bid the Account under a non-Blue brand, the right to bid the Account under the Blue brands must be "ceded" to another Member Plan, thereby allowing increased choice for that Account. Ex. A ¶ 14(a).

### iii.      Local "Best Efforts"

The Local "Best Efforts" requirement places a revenue cap on a Member Plan's healthcare-related revenue, requiring that 80% of all such revenue within the Member Plan's Service Area must come from Blue-branded business. The Settlement caps this requirement at 80% and limits the measurement of revenue for purposes of compliance with this requirement to no larger than the state level.

### iv.      Acquisitions

BCBSA currently controls—through Member Plan voting – whether any individual Blue Plan may be acquired by another Blue Plan. Under the Settlement Agreement, Settling Defendants are only permitted to impose "legal and reasonable conditions on the acquisition of a member plan, but only to the extent that those conditions are reasonably necessary to prevent impairment of (1) the value of the Blue Marks, or (2) the competitiveness or efficiency of the Blue Branded business or of the Blue Marks," and any condition must provide that the potential acquirer may challenge any rejection by BCBSA before the Monitoring Committee, followed by binding arbitration. Ex. A ¶ 17.

### v.      Non-Provider Contracting for Self-Funded Accounts

The Settlement permits direct contracting between Non-Provider Vendors and Self-Funded Accounts, including direct contracting with Specialty Service Provider Vendors. Ex. A ¶ 12(a)

### vi.      Most Favored Nation Clauses

Member Plans must abide by state laws, regulations, and consent decrees regarding the use of Most Favored Nations ("MFN") clauses or differentials in provider contracts, but if there is no

governing state law, regulation, or agreement applicable, the Member Plan entering into a MFN Differential[14] must demonstrate to the Monitoring Committee that the provision does not violate the terms of the Settlement. Ex. A ¶ 18.

### vii. Monitoring Committee

The Settlement establishes a Monitoring Committee "made up of (1) two members appointed collectively by Settling Defendants, (2) one member appointed collectively by Settlement Class Counsel, (3) one member appointed by Self-Funded Sub-Class Settlement Counsel, and (4) one member appointed by the Court" that will oversee compliance with the Settlement for a period of five years from the Court's entry of Final Judgment and Order of Dismissal.[15] Ex. A ¶¶ 1(xx), 1(zz). Additionally, the Monitoring Committee will mediate any reported disputes related to the Settlement. Ex. A ¶ 20.

BCBSA may report any proposed new rules or measures contemplated under paragraphs 10-18 of the Settlement to the Monitoring Committee. *Id.* If the proposed rule or measure is not reported to the Monitoring Committee, or if an arbitrator finds that the proposed rule or measure does not comply with the terms of the Settlement, the rule or measure will not constitute a Released Claim and will not be covered under the Settlement. *Id.* As a result, the inclusion of the Monitoring Committee in the Settlement affords the Settlement Classes substantial assurance of the Settling Defendants' compliance with the Agreement.

---

[14] An MFN Differential is "an MFN which requires that the Provider offer a health plan financial terms that are more favorable by a specified rate than those it offers any comparable health plan during the performance period of the contract." Ex. A ¶ 1(bbb).

[15] Any reporting obligation and the authority of the Monitoring Committee shall cease at the conclusion of the Monitoring Period. Ex. A ¶ 20. The Monitoring Committee's fees and expenses reasonably incurred will be paid from the Notice and Administration Fund upon approval by the Court. Ex. A ¶ 21.

### c.      Settlement Class Release

In return for the monetary and injunctive relief provided in the Settlement, upon the effective date of the Settlement, Releasors (Class Representatives and Settlement Class Members) who do not timely and validly exclude themselves will have fully released all claims against the Releasees ((i) Individual Blue Plans, (ii) BCBSA, (iii) NASCO,[16] and (iv) Consortium Health Plans, Inc.,[17] as well as related entities). Ex. A ¶¶ 32, 1(vvv), 1(www). The releases apply to Releasors and their related persons and entities, such as dependents and beneficiaries under their insurance policies.

The Releasors agree to release any and all known and unknown claims "based upon, arising from, or relating in any way to: (i) the factual predicates of the Subscriber Actions (including but not limited to the Consolidated Amended Class Action Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) any issue raised in any of the Subscriber Actions by pleading or motion; or (iii) mechanisms, rules, or regulations by the Settling Individual Member Plans and BCBSA within the scope of Paragraphs 10 through 18 approved through the Monitoring Committee Process during the Monitoring Period." Ex. A ¶ 1(uuu). Thus, the Released Claims in certain circumstances, will include those "mechanisms, rules or regulations" enacted *after* the Effective Date that are also approved by the Monitoring Committee during the Monitoring Period.

The Releasors have retained their right to assert certain claims relating to coverage, benefits and administration of claims that arise in the ordinary course of business and are not "based in

---

[16] NASCO is a healthcare technology company owned by several Member Plans and is involved in processing claims.

[17] Consortium Health Plans, Inc. is a marketing company owned by several Member Plans and provides marketing assistance regarding national accounts to BCBSA and the Member Plans.

whole or in part on the factual predicates of the Subscriber Actions or any other component of the Released Claims discussed in this Paragraph." *Id.* Additionally, Providers who are Settlement Class Members retain the right to assert any claims arising from their sale or provision of health care products or services, and Settling Defendants have agreed not to raise Providers' releases under this Settlement as a defense to Providers' claims brought in their capacity as Providers of health care products or services in MDL No. 2406. *Id.*

### d.     Notice Plan[18]

After a competitive bidding process, Settlement Class Counsel has retained JND to serve as the Notice and Claims Administrator for the Settlement, and seeks Court approval of JND to act in that role. JND has handled billion-dollar settlements, including the $10+ billion *Deep Water Horizon* settlement and the *Equifax Data Breach* settlement, valued at over $1.3 billion with over 18 million claims. JND is a nationally recognized leader in the industry, with extensive experience in large complex matters involving the security and management of HIPAA-protected data, and has prepared a customized notice plan with a considerable focus on data security. Settlement Class Counsel has worked closely with Settling Defendants and JND to ensure the highest privacy and data security standards.

As set forth in detail in the Notice Motion, the Notice Plan developed by JND provides notice in full compliance with Rule 23.

### e.     Settlement Rescission

Either side may rescind the Settlement if any of the following events occurs:

---

[18] The Notice Plan will be set forth in greater detail in the Notice Motion, which is being submitted contemporaneously with this motion.

- the Court refuses to approve the Settlement or any part thereof, including if the Court does not certify the Settlement Classes in accordance with the specific Settlement Class definitions set forth in the Settlement;

- the Court's approval is modified or set aside on appeal;

- the Court does not enter the Final Judgment and Order of Dismissal as provided for by the Agreement;

- the Court enters the Final Judgment and Order of Dismissal and appellate review is sought, and on such review, such Final Judgment and Order of Dismissal is not affirmed in its entirety; or

- the Final Judgment and Order of Dismissal is modified by any court in a material way (*i.e.*, not to include any modification to the Plan of Distribution, Notice Plan, and/or Fee and Expense Application that does not have the effect of increasing Settling Defendants' financial obligation under this Agreement).

Ex. A ¶¶ 8(d), 43.

The Settling Defendants may also rescind the Settlement if the Fee and Expense Award exceeds 25% of $2.67 billion. Ex. A ¶¶ 8, 28. Additionally, the Settlement Class Members may rescind the Settlement if the Settling Defendants fail to timely transfer the Settlement Amount to the Escrow Account, provided that Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel have notified counsel for Settling Defendants in writing of their intention to rescind the Agreement, and Settlement Defendants have not paid the transferred the entire Settlement Amount to the Escrow Account within 30 business days of such notice. Ex. A ¶ 24.

Finally, with the assistance of the mediator, the parties have agreed to an *In Camera* Supplement to the Settlement Agreement relating to Settling Defendants' ability to terminate the

Settlement Agreement based on a certain threshold of opt-outs. Ex. A ¶ 1(kk). This Supplement is confidential and will be submitted for the Court's review.

### f.    Attorneys' Fees and Costs

Settlement Class Counsel will submit an application(s) to the Court for: (i) an award of attorneys' fees, plus (ii) reimbursement of expenses and costs reasonably and actually incurred in connection with prosecuting the Subscriber Actions, up to a combined total of 25% of the Settlement Amount. Ex. A ¶ 28. The parties' agreement with respect to attorneys' fees was reached only after the parties had resolved the other substantive terms of the Settlement. *See also* Ex. A ¶ 28(d) (allowing payment of a partial award of $75 million for attorneys' fees and reimbursement of costs and expenses after Preliminary Approval and subject to protections that insure the repayment of all or part of the partial award in the event the Fee and Expense Award is reduced, rejected, or reversed on appeal).[19]

### C.    Plan of Distribution

JND will make all valid distributions for Authorized Claimants in accordance with the terms of the Settlement and the proposed Plan of Distribution, which is being submitted for preliminary approval. Ex. D. The Settlement Agreement contemplates Court appointment of a Settlement Administrator to assist in the implementation of the Plan of Distribution and to resolve any disputes concerning the claims process. Upon preliminary approval of the proposed Plan of Distribution, Subscriber Plaintiffs will seek Court appointment of a Settlement Administrator.

---

[19] The Settlement Agreement contemplated that Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel would seek Service Awards for Class Representatives as part of their Fee and Expense Application. Ex. A ¶ 28. Service awards are often appropriate to compensate plaintiffs for the time and effort they expend during litigation and the risk they take in prosecuting class actions on behalf of absent class members. Here, many of the Class Representatives have diligently prosecuted this case for seven years, producing documents and written discovery responses, preparing and producing witnesses for depositions, and reviewing briefing and settlement materials in order to represent the interests of the Damages Class and the Self-Funded Sub-Class. The Eleventh Circuit's decision in *Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244 (11th Cir. 2020), which calls into question the availability of such awards, is currently pending *en banc* review, and as such no service awards are being requested at this point.

The Net Settlement Fund is allocated between Individual Members and Insured Groups on the one hand ("Fully Insured Claimants") and the Self-Funded Sub-Class on the other hand. Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel (together, "Class Counsel") sought the assistance of Mr. Feinberg as Allocation Mediator to facilitate the determination of an appropriate allocation of the Net Settlement Fund between Fully Insured Claimants and the Self-Funded Sub-Class. Ex. E, Settlement Class Counsel Decl. ¶ 33; Ex. F, Self-Funded Sub-Class Settlement Counsel ¶ 9; Ex. G, Feinberg Decl. ¶ 6. The parties presented evidence concerning the relative volume of payments and differing strengths of claims for Self-Funded Accounts and Fully Insured Claimants. Ex. E, Settlement Class Counsel Decl. ¶ 33; Ex. F, Self-Funded Sub-Class Settlement Counsel Decl. ¶ 10; Ex. G, Feinberg Decl. ¶ 12. The parties ultimately agreed upon an allocation, which was presented to Mr. Feinberg for his review. Ex. E, Settlement Class Counsel Decl. ¶ 33; Ex. F, Self-Funded Sub-Class Settlement Counsel Decl. ¶ 10; Ex. G, Feinberg Decl. ¶ 13. Mr. Feinberg reviewed the allocation recommendation and determined that it was reasonable. Ex. G, Feinberg Decl. ¶ 14. The allocation is based on numerous factors including the strengths of the respective claims, the shorter Self-Funded Class Period, and the large difference in premiums paid for fully-insured coverage as opposed to administrative fees charged for self-insured coverage. Ex. E, Settlement Class Counsel Decl. ¶ 33; Ex. F, Self-Funded Sub-Class Settlement Counsel Decl. ¶ 10; Ex. G, Feinberg Decl. ¶ 14. Under this allocation, the Self-Funded Sub-Class (including Self-Funded Account employees) will receive 6.5% of the Net Settlement Fund ("Self-Funded Net Settlement Fund"), with the remainder allocated to Fully Insured Claimants (and their employees) ("FI Net Settlement Fund"). Ex. D, Plan of Distribution ¶ 3.

In order to develop an equitable distribution of the Self-Funded Net Settlement Fund and the FI Net Settlement Fund among Authorized Claimants for each fund, Class Counsel retained The Brattle Group to assist with designing a Plan of Distribution, which will be administered by JND. Ex. E, Settlement Class Counsel Decl. ¶ 34. All distributions to Authorized Claimants are subject to a $5 minimum payment threshold to ensure that the resources to process a claim are not out of proportion to the value of the individual claim. Ex. D, Plan of Distribution ¶ 28.

For the FI Net Settlement Fund, JND will first calculate the actual premiums paid by Individual Members and Insured Groups, using data produced by Settling Defendants. Ex. D, Plan of Distribution ¶ 12. Those premiums will be used to calculate the *pro rata* share of the FI Net Settlement Fund available to each claiming Individual Member and Insured Group. *Id.* ¶ 13. For Individual Members, no further calculation is required, and a claiming Individual Member will receive his or her full *pro rata* share of the FI Net Settlement Fund. *Id.* ¶¶ 13, 16. For any Insured Group where only the employer makes a claim, and no employees do, the employer will be eligible for 100% of the Insured Group's *pro rata* distribution. *Id.* ¶ 18. If any employees make a claim, Insured Group's *pro rata* share must be appropriately allocated between the employer and any claiming employees.

Typically, both employers and employees bear a portion of the burden of the premiums paid by Insured Groups. Ex. H, Chodorow Decl. ¶ 11. Based on this economic reality, Class Counsel propose a "Default" option for apportioning premiums between employers and employees. Ex. D, Plan of Distribution ¶ 19(f). Given the difference in contribution percentages for single and family coverage, the Plan of Distribution utilizes a Default option setting contribution percentages for Insured Group employees with single coverage at 15% and for family coverage at 34%. Ex. G, Feinberg Decl. ¶ 18; Ex. H, Chodorow Decl. ¶ 31 (discussing the

23

economic reasonableness of setting different Default contribution percentages for single and family coverage based on employers' historically sharing more of the burden for single coverage than family coverage).

The Default option was chosen by Class Counsel after consideration of several factors including: (a) Defendants' lack of data showing how much, if anything, each employee directly or indirectly contributed toward the payment of the premiums paid by the employer, and the inability to access such data from any other readily available source; (b) the information provided from national data gathered by Kaiser (which shows, for example, that the average employee contribution rate for Insured Groups during the FI Class Period ranged from 33% to 39% for family coverage and from 14% to 19% for single coverage); (c) that some employees do not contribute anything out-of-pocket towards their employer-sponsored health insurance; (d) the economic literature relating to a potential contention that, regardless of out-of-pocket contributions by employees, employees may indirectly contribute by receiving lower wages than they would absent employer-provided health insurance; (f) the legal authorities as to the relative strengths and weakness of antitrust claims brought by employers versus those brought by employees; and (g) the fact that unclaimed employee premium amounts or employee claims valued at less than the $5 minimum will revert to employers. Ex. D, Plan of Distribution ¶ 19(f)(i-vi); Ex. H, Chodorow Decl. ¶ 18 (finding use of Default option to be economically reasonable based on these factors). Any Authorized Claimant will automatically be assigned the Default option on their Claim Form, at which point they will not be required to provide further evidence of their premium payments, and their claims will be administered using Settling Defendants' data to the extent possible.

Where both the employer and any employees make a claim, the first step in calculating the employer and employees' portion of the Insured Group's *pro rata* distribution is to estimate the

amount of the Insured Group's premiums attributable to each claiming employee. Ex. D, Plan of Distribution ¶ 19(a). JND will use Defendants' data to calculate the "Unallocated Employee Premium" for each claiming employee. *Id*. Then, the appropriate Default contribution percentage (based on the type of coverage for the claiming employee during any period for which a claim is made) will be applied to the Unallocated Employee Premium to determine which portion of the Unallocated Employee Premium is deemed to have been paid by the employee as opposed to the employer. *Id.* ¶ 19(e). The employee will only receive credit for the portion of his or her Unallocated Employee Premium as reduced by the Default contribution percentage. *Id.* ¶ 19(f). So, for example, if an employee has an Unallocated Employee Premium of $100 for family coverage, with the Default option of 34% applied, they will receive credit for $34 of the premium. *Id.* Once these calculations have been made for the entire FI Class Period, the employer and any claiming employees will receive a payment from the Insured Group's *pro rata* distribution of the FI Net Settlement Fund in proportion to their share of the total premiums paid by the group. To the extent any employee has a payment calculated to be below the $5 minimum threshold, they will not receive a check, and those funds will revert to the employer. *Id.* ¶¶ 19(f)(vi), 27.

Rather than accepting the Default option on the Claim Form, any employer or employee believing that they paid a higher contribution percentage than the Default may select the "Alternative" option and can provide materials to the Settlement Administrator to support that contribution percentage. *Id.* at ¶ 19(h). If sufficient data or records are submitted by either the employer or the employee(s), then the Settlement Administrator, in his or her exercise of sound discretion, shall determine the appropriate amount by which to increase or decrease the allocation between the employer and the employees, taking into account the same factors considered in setting the Default option as well as the reliability of the data presented by the claimant selecting

this Alternative option. *Id.* at ¶ 19(i). Finally, if an employee files a claim and his or her employer does not, the employee will only receive credit for their portion of the Unallocated Employee Premium as determined by the allocation methodology described above. *Id.* at ¶ 20.

Similarly, for the Self-Funded Sub-Class, payments will be allocated from the Self-Funded Net Settlement Fund by the same method based on an employee's estimated share of the employer's administrative fees, with slightly different set contribution percentages for the Default option (18% for employees with single coverage and 25% for employees with family coverage)[20] and the same ability to select an Alternative option with presentation of data. Ex. D, Plan of Distribution at ¶¶ 22-26; Ex. H, Chodorow Decl. ¶ 51.

## III.    LEGAL STANDARD

"[S]ettlements are 'highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits.'" *McWhorter v. Ocwen Loan Servicing, LLC*, No. 2:15-CV-01831-MHH, 2019 WL 9171207, at *8 (N.D. Ala. Aug. 1, 2019) (quoting *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977)). This is especially true for class actions. *See In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); *In re Liberty Nat'l Ins. Cases*, No. 1:02-CV-2741-UWC, 2006 WL 8436814, at *9 (N.D. Ala. Mar. 31, 2006) ("The policy of federal courts, favoring voluntary resolution of litigation through settlement, is particularly strong in the context of class

---

[20] The Default option for the Self-Funded Sub-Class was similarly determined by Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel, and determined to be reasonable by the Allocation Mediator, and through consideration of the same factors discussed above; however, employee contributions for the Self-Funded Sub-Class during the Self-Funded Class Period were on average higher for single coverage (18% to 19% compared to 14% to 19% for fully insured) and lower for family coverage (24% to 26% compared to 33% to 39% for fully insured), which is reflected in the Default percentages of 18% and 25%. Ex. D, Plan of Distribution at ¶¶ 22-26; Ex. G, Feinberg Decl. ¶ 18; Ex. H, Chodorow Decl. ¶ 51.

actions."). "Settlements conserve judicial resources by avoiding the expense of a complicated and protracted litigation process . . . ." *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000). The Court has broad discretion in approving a settlement. *In re Liberty Nat'l Ins. Cases*, 2006 WL 8436814, at *9.

Court approval is required for any class action settlement that releases the claims of absent class members. Fed. R. Civ. P. 23(e). Federal Rule of Civil Procedure 23(e)(2) requires the Court to determine whether the Settlement Agreement is "fair, reasonable, and adequate." The recent Rule 23 amendments charge this Court to conduct an enhanced analysis at the preliminary approval stage to determine whether "giving notice is justified by the parties' showing that the court *will likely be able to*: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(i)–(ii) (emphasis added). The comments to the 2018 amendment note that preliminary approval requires "a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. Courts have interpreted this to be a "more exacting standard" than the previous framework. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 28 (E.D.N.Y. 2019).

Per these amendments, Rule 23(e)(2) requires courts to consider whether:

    A.  the class representatives and class counsel have adequately represented the class;

    B.  the proposal was negotiated at arm's length;

    C.  the relief provided for the class is adequate, taking into account:

        i.  the costs, risks, and delay of trial and appeal;

        ii.  the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims;

       iii.    the terms of any proposed award of attorney's fees, including timing of payment;

       iv.    any agreement required to be identified under Rule 23(e)(3)[21]; and

   D.  the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

These factors are not intended to "displace" any factor previously adopted by courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Rule 23(e)(2) advisory committee's note to 2018 amendment; *see also Swinton v. SquareTrade, Inc.*, No. 4:18-CV-00144-SMR-SBJ, 2019 WL 617791, at *5 (S.D. Iowa, Feb. 14, 2019) (holding that the 2018 amendments to Rule 23 "were not intended to displace the various factors that courts have developed in assessing the fairness of a settlement").

Thus, these factors must be viewed in tandem with the Eleventh Circuit's guidelines for approval of a settlement. *See, e.g., Johnson v. Rausch, Sturm, Israel, Enerson & Hornik, LLP*, 333 F.R.D. 314, 320 (S.D.N.Y. 2019) (holding that the Rule 23(e)(2) factors must be considered in conjunction with factors that courts used prior to the 2018 amendments). Courts in the Eleventh Circuit have long considered the following six factors when assessing the fairness of a settlement:

   1)  The likelihood of success at trial;

   2)  The range of possible recovery;

   3)  The point on or below the range of recovery at which a settlement is fair, adequate, and reasonable;

   4)  The complexity, expense, and duration of the litigation;

---

[21] The parties are submitting to the Court *in camera* the specific terms of the provisions allowing termination of the settlement at a certain opt-out threshold. Other than that agreement, there are no other agreements to disclose.

    5)  The substance and amount of opposition to the settlement; and,

    6)  The stage of proceedings at which settlement was achieved.

*Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *see also Carroll v. Macy's, Inc.*, No. 2:18-CV-01060-RDP, 2020 WL 3037067, at *5 (N.D. Ala. June 5, 2020). Evaluation of each of these factors here demonstrates that preliminary approval of the Settlement is warranted.

## IV.    THE PROPOSED SETTLEMENT SATISFIES RULE 23 AND WILL LIKELY EARN FINAL APPROVAL

### A.    Class Representatives and Lead Counsel Have More than Adequately Represented the Settlement Class.

Subscriber Class Representatives "share the same interests as absent class members, assert claims stemming from the same event that are the same or substantially similar to the rest of the class, and share the same types of alleged injuries as the rest of the class." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No, 1:17-md-2800-TWT, 2020 WL 256132, at *5 (N.D. Ga. Mar. 17, 2020). In furtherance of those shared interests, Subscriber Class Representatives have demonstrated their adequacy by selecting well-qualified counsel, who are highly experienced and capable in the field of class-action and antitrust litigation. Settlement Class Counsel have litigated scores of such cases to resolution and are recognized as top authorities in their field.

Moreover, this Court has previously considered Settlement Class Counsel's qualifications when appointing Michael D. Hausfeld and David Boies as interim co-lead counsel for the Subscriber Plaintiffs, as well as Megan Jones, Greg Davis, William Isaacson, Cyril Smith and Kathleen Chavez as the Subscriber Plaintiffs' Steering Committee. *See* ECF No. 62. Settlement Class Counsel have demonstrated particular success in antitrust class actions. Settlement Class Counsel have invested vast resources to prosecute Subscriber Plaintiffs' claims against 37 well-funded Defendants over more than eight years of litigation, including through dispositive motions and an extensive discovery period. With respect to discovery, Subscriber Plaintiffs obtained and

analyzed over 15 million pages of documents and took over 100 depositions of Defendants and third parties. Ex. E, Settlement Class Counsel Decl. ¶¶ 13-17. Subscriber Plaintiffs also defended 16 class representatives depositions and 9 expert depositions. Ex. E, Settlement Class Counsel Decl. ¶ 15. Through those efforts, Subscriber Plaintiffs and Settlement Class Counsel were able to gain a thorough understanding of the facts and legal theories applicable to their claims before agreeing to a Settlement. Ex. E, Settlement Class Counsel Decl. ¶ 37. Subscriber Plaintiffs and Settlement Class Counsel have more than adequately represented the interests of the Settlement Classes throughout the extended duration of this case.

In addition, Self-Funded Sub-Class Settlement Counsel has vigorously represented the interests of the Self-Funded Sub-Class since joining the settlement process.[22] Ex. K, Gentle Decl. ¶ 35. Self-Funded Sub-Class Settlement Counsel has decades of experience representing plaintiffs in class actions. Ex. F, Self-Funded Sub-Class Settlement Counsel Decl. In order to ensure a fair outcome for the Self-Funded Sub-Class, Self-Funded Sub-Class Settlement Counsel retained its own experts and conducted its own analysis of the claims and defenses in this case. *Id.* Those efforts resulted in significant injunctive and monetary relief for the Self-Funded Sub-Class. *Id.*

### B.   The Proposed Settlement Is the Result of Arm's-Length Negotiations.

Rule 23(e)(2)(B) requires the court to determine whether a proposed settlement "was negotiated at arm's length." "Settlement negotiations that involve arm's length, informed bargaining with the aid of experienced counsel support a preliminary finding of fairness." *In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 661-62 (S.D. Fla. 2011). Courts often view class settlements that have been reached as the result of extensive mediation favorably in this

---

[22] Self-Funded Sub-Class Settlement Counsel joined the settlement process before negotiations were completed and the term sheet executed. Ex. K, Gentle Decl. ¶ 35.

regard. *See, e.g., id.* (approving settlement that was "the product of informed, good faith, arm's-length negotiations between the parties and their capable and experienced counsel, and [which] was reached with the assistance of a well-qualified and experienced mediator"). The 2018 amendments to Rule 23 also make clear that use of a neutral mediator should be considered in determining "whether [negotiations] were conducted in a manner that would protect and further the class interests." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

The proposed Settlement was reached after five years of negotiations with the assistance of three experienced and well-respected mediators. Ex. K, Gentle Decl. ¶ 36; Ex. E, Settlement Class Counsel Decl. ¶ 36. At various times, counsel for Subscriber Plaintiffs, Self-Funded Accounts, Defendants, and Defendants' insurers were involved in the mediation. Ex. E, Settlement Class Counsel Decl. ¶ 30. It was negotiated at arm's length between Settlement Class Counsel and Defendants, without collusion. Ex. K, Gentle Decl. ¶ 35; Ex. E, Settlement Class Counsel Decl. ¶ 36. As part of the mediation process, Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel made use of economic analysis, too account of the relative strengths and weakness of the parties claims, and aggressively advocated for the interests of the class. Ex. K, Gentle Decl. ¶ 35; Ex. E, Settlement Class Counsel Decl. ¶ 37. There can be no doubt that Settlement was reached as the result of arm's-length negotiations by experienced counsel who were acutely aware of the strengths and weaknesses of their case. *See, e.g., Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014) (holding that "[i]t is clear that the negotiations between the parties proceeded at arms' length" after the parties "worked extensively with a mediator" and after the defendants "filed numerous dispositive motions that could have completely absolved themselves of liability").

**C.      The Relief Provided to the Settlement Classes Is Far More than Adequate, Taking into Account the Considerations Set Forth in Rule 23(e)(2)(C).**

Rule 23(e)(2)(C) asks courts to consider whether the "relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." A review of those factors at this stage shows that the Settlement warrants preliminary approval.

**1.      The Costs, Risks, and Delay of Trial and Appeal**

In evaluating the fairness, reasonableness, and adequacy of a proposed settlement, a court "can limit its inquiry to determining whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of settlement." *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 697-98 (M.D. Fla. 2005); *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014). This factor weighs in favor of approval where "success at trial is not certain for Plaintiff[s]." *Burrows v. Purchasing Power, LLC*, No. 1:12-CV-22800, 2013 WL 10167232, at *6 (S.D. Fla. Oct. 7, 2013). Here, the "costs, risks, and delay of trial and appeal," Fed. R. Civ. P. 23(e)(2)(C)(i), strongly support preliminary approval. The history of this litigation in Alabama demonstrates that continued litigation of this matter in Alabama and in other jurisdictions would be costly, risky, and protracted.

In the accelerated Alabama actions, Subscriber Plaintiffs have put forward a sophisticated damages model estimating, for purposes of their class certification motion, impact and damages based on entry by Blue and Green competitors into Alabama. The but-for world constructed by Subscriber Plaintiffs' experts involved a complex modeling of factors estimating the impact of the entry of significant competition within the market, including estimated profitability of entry,

timing of entry, type of entry, strength of entry, progression of entry, and competitive response to entry. Based upon these elements, Plaintiffs' expert then modeled an estimate of damages. Defendants' experts aggressively challenged Subscriber Plaintiffs' damages model and vigorously attacked Subscriber Plaintiffs' findings and experts' calculations. Subscriber Plaintiffs faced a significant risk that a damages and/or injunctive class for purposes of litigation would not be certified, and, even if an Alabama damages class was certified, certification of similar classes in other states would necessitate a protracted nationwide process of uncertain outcome. *Swaney v. Regions Bank*, No. 2:13-CV-00544-RDP, 2020 WL 3064945, at *4 (N.D. Ala. June 9, 2020) (Proctor, J.) ("Because 'the outcome on class certification and the ultimate outcome on the merits was uncertain for both parties,' a settlement was reached and here that is appropriate.") (quoting *Parsons v. Brighthouse Networks*, LLC, No. 2:09-cv- 267-AKK, 2015 WL 13629647, *2 (N.D. Ala. Feb. 5, 2015)). While confident in the structure of the proffered model, Subscriber Plaintiffs faced a risk of losing at class certification. Additionally, if Subscriber Plaintiffs succeeded in certifying a class, they faced a risk that class certification would be reversed on appeal. These risks support the appropriateness of a decision to settle.

Even if Subscriber Plaintiffs succeed in certifying damages and injunctive classes, they must still *prove* their claims at trial. This would involve yet more contested issues, including but not limited to: (1) whether the BCBSA and the Member Plans constitute a single entity for purposes of managing their trademark; (2) whether Member Plans have entered into license agreements allocating geographic territories; (3) whether Member Plans have entered into an agreement to cap revenue for Green health insurance; (4) whether, absent the restraints, any other insurance company (Blue or Green) would in fact enter the Alabama market; (5) the amount of (and how to calculate) damages; and (6) as to the filed rate defense, whether the out-of-state Blues qualify as

"health care service corporations," and if so, whether they are protected by the application of the filed rate doctrine in Alabama. *See* ECF No. 2408, at 20. And not only would Subscriber Plaintiffs need to prevail on these issues (and others) at trial, they would need to successfully defend these rulings—as well as the Court's prior rulings, including on standard of review—in any appeals that would undoubtedly follow a judgment in their favor. The subsequent appeals would further prolong the case for years and underscore the ultimate outcome's uncertainty.[23]

All of the risks identified above relate just to the accelerated Alabama actions—Subscriber Plaintiffs would then have to still seek class certification in all of the non-accelerated actions. This would not occur until those cases were remanded after trial in the accelerated Alabama actions. Given that it has taken eight years to get to this point for the Alabama actions alone, it is difficult to estimate how many more years of hard-fought litigation it will take to complete the class certification process, trial, and appeal with respect to the remaining actions pending in this multidistrict litigation. To conduct a single trial for the Alabama actions poses substantial risk— to conduct several dozen trials would be exorbitantly expensive and risky, and the threat of inconsistent decisions alone weighs heavily in favor of approval of the Settlement. Likewise, if the parties continue to litigate these cases, they would need to devote significant time and potentially enormous resources to preparing complex damages models nationwide. Extrapolating from the parties' experience with respect to the Alabama example, the time and expense associated with these efforts would be staggering. Accordingly, settlement at this stage in the case represents a clear victory for Settlement Class Members.

---

[23] *See Parsons*, 2015 WL 13629647, at *4 ("[C]ontinued litigation would have risked delaying the class's potential recovery for years, further reducing the value of any such recovery. The Settlement resolves the case without any further delay and will, if finally approved, offer the Settlement Class an immediate and certain recovery, as well as correcting the practices complained of in the Complaint. Thus, this factor also speaks strongly in favor of final approval of the proposed Settlement.").

Continued litigation also carries other significant risks to all parties because rulings have gone in both directions on key issues. Fed. R. Civ. P. 23(e)(2)(C). For example, while Subscriber Plaintiffs prevailed in this Court on application of a *per se* standard to the aggregation of the National Best Efforts rule and Service Areas, they face the risk of appellate reversal after trial. If this reversal occurred—given that class certification was based on a *per se* framework—the parties would likely need to return to the class certification stage and conduct a detailed, Rule of Reason standard of review analysis for the Alabama actions before even having the opportunity to re-try the case. And, again, this might have to be repeated across the entire country.

On the other hand, Defendants prevailed on their partial summary judgment motion regarding whether the filed rate doctrine precluded certain claims by Alabama Subscriber Plaintiffs concerning rates approved by AL DOI. *In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d 1313 (N.D. Ala. 2017).[24] This has narrowed damages for the putative Alabama damages class, and has the potential to similarly narrow damages classes in non-accelerated cases. While Subscriber Plaintiffs are optimistic about their chances of defeating this defense in other jurisdictions, the risk of losing all or any significant percentage of such challenges also weighs in favor of the Settlement here. Many of these risks apply similarly to the Self-Funded Sub-Class.

Under no circumstances is there a guarantee that Subscriber Plaintiffs would recover a final judgment greater than the considerable $2.67 billion in monetary relief secured by the Subscriber Plaintiffs in the Settlement. In contrast, the Settlement provides immediate tangible benefits to the Settlement Classes and eliminates the risk, delay, and expense associated with continued litigation. Rule 23(e)(2)(B) therefore weighs heavily in favor of preliminary approval.

---

[24] The Court also held, however, that "BCBSAL's conduct in charging rates which were neither filed with [AL] DOI, nor disclosed to [AL] DOI, is *not* insulated by the Filed Rate Doctrine." *In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d at 1328.

2.      **The Effectiveness of Any Proposed Method of Distributing Relief to the
Class, Including the Method of Processing Class Member Claims**

The proposed method of processing the Settlement Class Members' claims and distributing

relief to eligible claimants is efficient and effective. The Plan of Distribution will efficiently

calculate the value of millions of potential claimants based on data available from the Settling

Defendants rather than requiring every Authorized Claimant to provide years of information about

their premium amounts and actual contribution percentages.

Class Counsel has retained JND to process claims. JND has a proven track record and has

been chosen as the administrator in a number of large, complex, and high-profile class action

settlements. As just one example, JND administered the settlement in *In re Equifax, Inc. Customer

Data Security Breach Litigation*, valued by plaintiffs' counsel in excess of $1.3 billion.[25] Class

Counsel will also seek appointment of a Settlement Administrator upon preliminary approval of

the proposed Plan of Distribution.

"The goal of any distribution method is to get as much of the available damages remedy to

class members as possible and in as simple and expedient a manner as possible." *Fitzgerald v. P.L.

Mktg., Inc.*, No. 2:17-cv- 02251-SHM-cgc, 2020 WL 3621250, at *9 (W.D. Tenn. July 2, 2020)).

The Plan of Distribution will use the available data to calculate each Authorized Claimant's

premium payment (and, in the case of employers and employees, their estimated contribution to

their estimate premium payment) and distribute the Net Settlement Fund accordingly.

The Plan of Distribution does not require Authorized Claimants to provide years of plan

and premium data and specific contribution percentages, which may be virtually impossible to

track down and produce and which would create a cumbersome process that would likely reduce

---

[25] *Class Action Administration Cases*, JND Legal Admin., https://www.jndla.com/cases/class-action-administration
(last accessed Aug. 4, 2020).

claims submission rates, but rather allows for an automated process to identify valid claims and provide payment in a quick and efficient manner. Ex. H, Chodorow Decl. ¶¶ 24-26. Payments falling below a $5 minimum threshold will not be paid but rather will be redistributed as described in the Plan of Distribution. Ex. D, Plan of Distribution ¶ 27. The Plan of Distribution also allows JND and the Settlement Administrator to focus their claims processing efforts on those Settlement Class Members who seek to use something other than the estimated employer-employee contribution rates. Every Damages Class Member will have an opportunity to make a claim, and if an employee or employer claimant does not agree with the Default option, that claimant can provide additional information in support of an Alternative option, to be reviewed and adjudicated by the Settlement Administrator.

Thus, the Settlement and the Plan of Distribution allow for efficient processing of claims while giving those Settlement Class Members who wish to provide additional data the opportunity to seek more than their default distribution.

### D. The Terms of Any Proposed Award of Attorneys' Fees and Expenses, Including Timing of Payment

Settlement Class Counsel will be applying for a combined fee and expenses award from the $2.67 billion-dollar common fund not to exceed 25%, plus up to $7 million from the Notice and Administration Fund to "reimburse plaintiffs' counsel's actual and reasonable fees and expenses incurred for Notice and Administration."[26] Ex. A ¶ 28(h). This is in line with benchmarks set by District Courts in the Eleventh Circuit, including this Court, for fees alone. *See Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1243 (11th Cir. 2011) (noting "well-settled law from this court that 25% is generally recognized as a reasonable fee award in common fund cases"); *Swaney*,

---

[26] Of any fees awarded by the Court, "[a] partial award of seventy-five million ($75,000,000) of the total attorneys' fees, expenses, and interest" shall be paid within 31 days of preliminary approval. Ex. A ¶ 28(d).

2020 WL 3064945, at *7 (Proctor, J.) ("In determining an award of attorney's fees in a percentage-of-fund class settlement case, the 'benchmark' percentage is 25%, which is the dead center of the 20-30% range.").[27] Settlement Class Members will receive notice of the proposed fee and expense request and will have an opportunity to object to any such award prior to Final Approval. Accordingly, Rule 23(e)(2)(C) is satisfied.[28]

### E.    The Proposed Settlement Treats Class Members Equitably Relative to One Another

The Court's analysis under this Rule 23(e)(2) factor includes "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment; *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05MD1720MKBJO, 2019 WL 6875472, at *27 (E.D.N.Y. Dec. 16, 2019). Here, the Plan of Distribution takes into account a number of factors that bear on the differences among class member claims and therefore ensures, to the greatest reasonably practicable extent, that class members are treated equitably.

First, the Allocation Mediator Mr. Feinberg assessed the proposed allocation based on the differences in the strength of claims as between Fully Insured Claimants and the Self-Funded Sub-Class. In doing so, he considered the factors outlined in his declaration. Ex. G, Feinberg Decl. ¶ 14. Based on his review and his experience mediating the allocation, he determined that an allocation between those members of the Damages Class consisting of 93.5% of the Net Settlement

---

[27] Subscriber Plaintiffs will address the basis for a fee and expense award at greater length in a separate brief before final approval. For now, it is sufficient to show that a maximum award of 25% is comfortably within the range permitting preliminary approval.

[28] As to Rules 23(e)(2)(C)(iv) and (e)(2)(D), requiring that "any agreement made in connection with the [settlement] proposal" be identified, the attached Settlement Class Counsel Declaration makes clear that all such agreements are set forth in the Settlement itself, plus the *in camera* supplement which addresses only rescission matters.

Fund for Fully Insured Claimants and 6.5% for the Self-Funded Sub-Class was reasonable. *Id.* Next, Mr. Feinberg considered Class Counsel's proposed Plan of Distribution, including a recommended allocation as between employers and employees within Insured Groups and within Self-Funded Accounts. *Id.* Based on presentation by Class Counsel and review of materials relating to employer and employee contributions to premiums and administrative fees, he concluded that Class Counsel's proposed Plan of Distribution, including the recommended allocation between employers and employees, was reasonable. *Id.*

Thus, the Plan of Distribution incorporates and accounts for the differing risks and claim strengths for different class members and makes distribution decisions accordingly. *See Fitzgerald*, 2020 WL 3621250, at *9 (finding this Rule 23(e)(2) factor to favor approval where distribution took into account the greater risks some class members faced).

Further, the scope of the release does not affect apportionment of the Net Settlement Fund to class members. Every class member is subject to the same release, and the release does not affect the apportionment of relief to other class members. *See In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 699 (S.D.N.Y. 2019) (finding this element satisfied when all settlement class members sign the same release and where the release "does not appear to affect the apportionment of relief to other class members"); *In re Payment Card Litig.*, 330 F.R.D. at 47 ("Further, the scope of the release applies uniformly to putative class members, and does not appear to affect the apportionment of the relief to class members, apart from securing the opportunity to participate in the (b)(2) action. Accordingly, the Court finds that this factor will likely weigh in favor of granting final approval."). As such, this factor also supports approval of the Settlement.

F.     **The Remaining Non-Duplicative *Bennett* Factors Are Satisfied.**[29]

1.     **The Settlement Is Well Within the Range of Reasonableness Considering the Range of Possible Alternatives.**

The second and third factors in the Eleventh Circuit's *Bennett* analysis call for the Court to determine "the possible range of recovery" and then ascertain where within that range "fair, adequate, and reasonable settlements lie." *Deas v. Russell Stover Candies, Inc.*, No. CV-04-C-0491-S, 2005 WL 8158201, at *11 (N.D. Ala. Dec. 22, 2005) (internal quotations omitted). "These two range of recovery factors are 'easily combined and normally considered in concert.'" *Camp v. City of Pelham*, No. 2:10-cv-01270-MHH, 2014 WL 1764919, at *3 (N.D. Ala., May 1, 2014) (quoting *Cifuentes v. Regions Bank*, No. 11-cv-023455-FAM, 2014 WL 1153772, at *5 (S.D. Fla. Mar. 20, 2014)). The relief secured by the Subscriber Plaintiffs with this Settlement—both monetary and non-monetary—reflects an excellent result for the Settlement Classes and plainly falls within the range of reasonableness contemplated by these two factors.

With respect to the monetary relief, at $2.67 billion, the Settlement represents one of the largest antitrust class settlements in history. Subscriber Plaintiffs have achieved a historic settlement value, especially in light of the time and expense of continuing the litigation and the risk of failing to prove damages in dozens of separate trials. Subscriber Plaintiffs only developed a damages estimate for the Alabama damages class due to the acceleration of the Alabama actions ahead of the remaining actions, and Subscriber Plaintiffs' expert Ariel Pakes calculated an overcharge ranging from 3.4% to 5.5% for Alabama class members. ECF No. 2411-1 ¶ 10 (Executive Summary of Dr. Pakes' Class Certification Expert Report). In extrapolating the Alabama damages model nationwide through 2019, Dr. Pakes has estimated a potential maximum

---

[29] The first and fourth *Bennett* factors—the likelihood of success at trial and the complexity, expense and duration of the litigation—are effectively addressed in Subscriber Plaintiffs' analysis of Rule 23(e)(2) factors.

single damages recovery ranging from $18.6 billion to $36.1 billion. Ex. J, Pakes Decl. ¶ 10. A recovery of $2.67 billion represents 7.3% to 14.3% of that estimated maximum full recovery, which falls within the range of reasonable recoveries. *Bennett v. Behring Corp.*, 737 F.2d 982, 986-87 & n.9 (11th Cir. 1984) (approving $675,000 settlement representing 5.6% of claims with maximum potential recovery of $12,000,000); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) ("[S]tanding alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims."); *Nichols v. SmithKline Beecham Corp.*, No. CIV.A.00-6222, 2005 WL 950616, at *16 (E.D. Pa. Apr. 22, 2005) ("The Settlement Fund is $65 million, or between 9.3% and 13.9% of damages. This percentage is consistent with those approved in other complex class action cases."); *Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 318-19 (W.D. Pa. 1997) (approving settlement award representing 5.35% of expected recovery).[30] As discussed above, the likelihood of such a recovery through continued litigation is extremely risky, adding to the appropriateness of the results achieved. *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880, at *14 (E.D. La. July 27, 2015) (finding recovery of 8.5% of best case damages scenario appropriate, especially as weighed against "substantial risks of nonrecovery").

And the injunctive aspects of the Settlement significantly increase the value of the Settlement. The business practice changes established in the Settlement, including the abolition of

---

[30] *See also Carnegie v. Mut. Sav. Life Ins. Co.*, 2004 WL 3715446, at *21 (N.D. Ala. Nov. 23, 2004) (refusing to consider potential punitive damages award when determining the adequacy of settlement); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009) ("It is our impression that courts generally determine fairness of an antitrust class action settlement based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages.").

the National Best Efforts revenue cap and the establishment of the Second Blue Bid for Qualified

National Accounts, will enhance competition going forward. Ex. I, Rubinfeld Decl. ¶ 37.[31]

### 2. The Stage of Proceedings at which Settlement Was Achieved Strongly Supports Preliminary Approval.

In assessing the final *Bennett* factor, the Court should consider whether the "the case settled

at a stage of the proceedings where class counsel had sufficient knowledge of the law and facts to

fairly weigh the benefits of the settlement against the potential risk of continued litigation."

*Equifax*, 2020 WL 256132, at *10. As explained above regarding Rule 23(e)(2)(A), Settlement

Class Counsel have exhaustively researched and analyzed the applicable law and have engaged in

substantial motion practice and discovery throughout more than eight years of hard-fought

litigation. *See Swaney*, 2020 WL 3064945, at *5 (holding that settlement was appropriate where

the parties "have litigated this case for over seven years, through dispositive motions," and "have

had the opportunity to investigate the facts and law, review substantive evidence relating to the

claims and defenses, and brief the relevant legal issues"); Ex. E, Settlement Class Counsel Decl. ¶

37. Accordingly, this *Bennett* factor strongly supports preliminary approval of the Settlement.

## V. CERTIFICATION OF THE SETTLEMENT CLASSES IS LIKELY.

Under Rule 23(e)(1), at the preliminary approval stage, this Court must determine whether

it is likely to be able to certify the class for settlement purposes at final approval. As set forth in

the Settlement Agreement, the parties have agreed that the Settlement Classes consist of "any

person or entity within the definition of the Injunctive Relief Class or Damages Class, excluding

---

[31] The Court's Standard of Review Order was based on the aggregation of restraints imposed by the Blue System existing at the time of the decision. Subscriber Plaintiffs believe that the Settlement Agreement remedies the most significant of those restraints and will provide for materially greater competition in the critical field of health care financing. Accordingly, if the remedies provided for in the Settlement Agreement are implemented, Subscriber Plaintiffs believe that the Court's Standard of Review Order would no longer apply to the Blue System.

Government Accounts and Opt-Outs." Ex. A ¶ A(1)(llll). The Injunctive Relief and Damages Classes are defined in greater detail above, *supra* Section II.B.1.

Courts may ultimately certify a class "solely for purposes of settlement [if] a settlement is reached before a litigated determination of the class certification issue." *Borcea v. Carnival Corp.*, 238 F.R.D. 664, 671 (S.D. Fla. 2006). As the Supreme Court has made clear, while a settlement class should satisfy the requirements of Rule 23(a) and the relevant provision(s) of Rule 23(b), the Court "need not inquire whether the case, if tried, would present intractable management problems [under Rule 23(b)(3)], for the proposal is that there be no trial." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also Schorr v. Countrywide Home Loans, Inc.*, 2015 WL 13402606, at *3 (M.D. Ga. Apr. 1, 2015) (quoting *Amchem*). Applying this standard, courts in this Circuit have certified classes for settlement purposes only. *See Bennett v. Boyd Biloxi, LLC*, No. CV 14-00330-WS-M, 2016 WL 6668926, at *2 (S.D. Ala. Nov. 8, 2016) ("[F]or purposes of approving and effectuating the Settlement embodied in the Amended Settlement Agreement, and only for such purposes, the prerequisites for certifying this Action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) have been met."); *O'Toole v. Pitney Bowes, Inc.*, No. 1:08-CV-01645-RLV, 2009 WL 10672311, at *2 (N.D. Ga. Aug. 3, 2009) (noting that, "[f]or settlement purposes only," Rule 23 elements had been met).

Here, Subscriber Plaintiffs will seek certification, for settlement purposes only, of both the Damages Class and the Injunctive Relief Class, which means that each class should meet the tests established under both Rule 23(a) and Rules 23(b)(2) and (b)(3). These Settlement Classes are likely to be certified at final approval for the reasons outlined below.

### A.    The Proposed Classes Will Satisfy Rule 23(a).

Under Rule 23(a), certification is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the

claims or defenses of the representative parties are typical of the claims or defenses of the class:
and (4) the representative parties will fairly and adequately protect the interests of the class." As
demonstrated below, the Settlement Classes satisfy each of the Rule 23(a) requirements.

### 1. Numerosity—Rule 23(a)(1)

The numerosity requirement is satisfied when the class is "so numerous that joinder of all
class members would be impracticable." Fed. R. Civ. P. 23(a)(1). Here, the Damages Class, the
Self-Funded Sub-Class, and the Injunctive Relief Class each consist of tens of millions of
members, a number that easily meets this standard. Thus, this element is likely to be satisfied at
final approval.

### 2. Commonality—Rule 23(a)(2)

To demonstrate commonality under Rule 23(a)(2), a putative class must prove that there
are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). It is "well established"
that the commonality threshold "is not high." *Dujanovic v. MortgageAmerica, Inc.*, 185 F.R.D.
660, 667 (N.D. Ala. 1999); *see also Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 627 (3rd
Cir. 1996) (recognizing "very low threshold for commonality"). The legal claims among the class
members do not need to be exactly the same, *Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594,
599 (S.D. Fla. 1991), and not all questions of law or fact must be common, *Singer v. AT&T Corp.*,
185 F.R.D. 681, 687 (S.D. Fla. 1998). Indeed, "'even a single common question' will do." *Wal-
Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011); *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977,
984 (11th Cir. 2016). Courts in the Eleventh Circuit "have consistently held that allegations of
price-fixing, monopolization, and conspiracy by their very nature involve common questions of
law or fact." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 694 (N.D. Ga.
2016) (citations omitted).

Here, Subscriber Plaintiffs allege that the Settling Defendants engaged in a common conspiracy to horizontally allocate geographic markets by agreeing with each other to split the country into defined "service areas" in which only one designated Blue Plan is permitted to operate. Subscriber Plaintiffs also allege that Settling Defendants implemented their "National Best Efforts" revenue cap to limit competition from Green business. The effect of the conspiracy was nationwide, and the alleged restraints were applied uniformly throughout the entire country. This conspiracy implicates several common questions of law or fact, including but not limited to: (1) whether Settling Defendants' national market allocation agreements violated the Sherman Act; (2) whether the Settling Defendants charged anti-competitive premiums as a result of these agreements; (3) whether the challenged restraints have resulted in foreclosure of entry and reduced consumer choice across the country; and (4) whether BCBSA and the Member Plans constitute a nationwide single entity for purposes of managing their trademark. Accordingly, the classes will readily be shown to satisfy Rule 23(a)(2).

### 3.     Typicality—Rule 23(a)(3)

Rule 23(a)(3) provides that the "claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." With respect to this requirement, the Eleventh Circuit has explained:

> The claim of a class representative is typical if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3).

*Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009) (internal quotations and citations omitted).

This burden "is fairly easily met so long as other [C]lass [M]embers have claims similar to the named plaintiff." *McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101, 2006 WL 2689621, at *4

(E.D.N.Y. Sept. 19, 2006) (quoting *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995)). And typicality will not be destroyed by factual variations between the class representatives and the unnamed class members. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1357 (11th Cir. 1984); *see also Williams*, 568 F.3d at 1357 ("The typicality requirement may be satisfied despite substantial factual differences when there is a strong similarity of legal theories."). The class representatives simply must, "in pursuing and defending [their] own self[-]interest in the litigation, be concomitantly advancing or defending the interest of the class." *Dubin v. Miller*, 132 F.R.D. 269, 274 (D. Colo. 1990).

The Subscriber Class Representatives consist of 66 individuals or employers that purchased fully-insured plans from Member Plans, and the Self-Funded Sub-Class Representative is Hibbett Sports, Inc. ("Hibbett"), which purchased "administrative services only" contracts or accounts from Blue Plans. Ex. A ¶¶ 1(n), 1(dddd), 1(vvvv). With respect to the Damages Class, these 67 Class Representatives' claims are typical of the class because they arise from the same alleged conduct of the Settling Defendants: illegally entering into geographic market allocation and output restricting agreements prohibiting competition in the market for health insurance and administration of Commercial Health Benefit Products in the United States and its territories, and agreeing to other restrictions on competition in the market for health insurance and administration of Commercial Health Benefit Products. With respect to the Self-Funded Sub-Class, the Self-Funded Sub-Class Representative's claims are typical of the Sub-Class because they arise from certain alleged conduct specific to other members of that Sub-Class such as agreements restraining competition in the market for national accounts.

Therefore, the Class Representatives together seek the same relief sought by absent Class Members, and the proof that Subscriber Plaintiffs would present to support their claims directly

46

supports the claims of the Class. Because the Class Representatives seek to prove that the Settling Defendants "committed the same unlawful acts in the same method against an entire class[,] . . . all members of this class have identical claims," and the typicality requirement will be satisfied at final approval. *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983).

### 4.    Adequacy—Rule 23(a)(4)

The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S at 594. To determine whether the Class Representatives can adequately represent the interests of the Settlement Classes, the Court must determine: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008). Both inquiries are satisfied here. As set forth above, the Class Representatives are fully aligned with the rest of the class because they allege the same harms and seek the same relief as the Settlement Classes. With respect to the Self-Funded Sub-Class, to the extent that Self-Funded Accounts have divergent interests from Individual Members and Insured Groups, Hibbett has represented the interest of the Sub-Class through settlement negotiations and through the allocation process. Hibbett's interests are aligned with absent class members within the Self-Funded Sub-Class, and Hibbett has the same incentives as those absent class members to seek an equitable share of the Net Settlement Fund. All of the Class Representatives have reviewed the Settlement Agreement and approved of its terms.

Furthermore, as demonstrated in their declarations, Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel have adequately represented the Settlement Classes given their qualifications and experience in this field of litigation, as well as the efforts expended on this case to date. Accordingly, class certification will be shown to be appropriate under Rule 23(a)(4).

**B.**           **The Proposed Classes Will Also Satisfy Rules 23(b)(2) and (b)(3).**

As the Eleventh Circuit has held, "[i]njunction classes can go forward under Rule 23(b)(2); damages classes must satisfy Rule 23(b)(3)." *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1174 (11th Cir. 2019). And it is well-settled that a "court . . . may certify multiple classes: a class for injunctive relief under Rule 23(b)(2) and a damages class under Rule 23 (b)(3)." *Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 315 (S.D. Fla. 2001). Both subsections will be shown to be satisfied here for settlement purposes.

**1.**        **Because the Blues Have Acted on Grounds Generally Applicable to the Injunctive Relief Class, Certification Will Likely Be Appropriate under Rule 23(b)(2).**

"For an injunction class under Rule 23(b)(2), the plaintiff must show that 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Suncoast*, 938 F.3d at 1174 (quoting Fed. R. Civ. P. 23(b)(2)). As this Court has explained, "[c]lass certification under Rule 23(b)(2) requires: (1) class members must have been harmed in essentially the same way by the defendant's acts; and (2) the common injury may properly be addressed by class-wide injunctive or equitable remedies." *Granger v. Sears Roebuck & Co.*, No. 2:05-cv-1696-RDP, 2008 WL 11424140, at *10 (N.D. Ala., Aug. 4, 2008) (Proctor, J.). Moreover, "an injunction must be geared toward preventing *future* harm." *Suncoast*, 938 F. 3d at 1175. That is precisely the case here.

*First*, as demonstrated above with respect to Rule 23(a)(2), Subscriber Plaintiffs allege that the Settling Defendants engaged in a nationwide conspiracy involving several common questions of law or fact. That conspiracy affected each of the Injunctive Relief Class members in similar ways. In other words, the class members "have been harmed in essentially the same way by the defendants['] acts." *Granger*, 2008 WL 11424140, at *10.

*Second*, as described in greater detail above, *supra* Section II.B.2.ii., the Settlement provides significant relief to all members of the Injunctive Relief Class. The key provisions of the injunctive relief include: (1) the abolition of the National "Best Efforts" clause in BCBSA's past and future license agreements for the Member Plans, which currently restricts their ability to generate revenue using Green brands; (2) the ability for certain Qualified National Accounts to obtain a second Member Plan bid, which will create increased choice for such accounts (and has the potential to result in two Blue bids for Qualified National Accounts covering at least 33 million individuals); (3) the ability for all Qualified National Accounts with multiple headquarters with independent decision-making authority to request a bid from the Member Plan in each headquarters' Service Area for employees working at that location; (4) restrictions on BCBSA's ability to control—through Member Plan voting—whether any individual Blue Plan may be acquired by another Blue Plan; (5) the ability for Self-Funded Accounts to directly contract with Non-Provider Vendors and Specialty Service Provider Vendors; and (6) the establishment of a Monitoring Committee, which will oversee compliance with the Settlement and consider new rules or measures proposed by BCBSA for the Monitoring Committee's review. Ex. A. ¶¶ 10–18.[32]

The injunctive relief described above is exactly the sort of far-reaching, forward-looking relief contemplated by Rule 23(b)(2). Such relief is "directed against a specific class . . . and is uniform in its application." *Winston v. Jefferson Cty.*, No. 2:05-cv-0497-RDP, 2006 WL 6916381, at *9 (N.D. Ala., June 26, 2006) (Proctor, J.). Thus, certification of the Injunctive Relief Class will be shown to be appropriate under Rule 23(b)(2).

---

[32] Some elements of the Settlement's injunctive relief may make more of a practical difference to the sub-class of Self-Funded Accounts. But that is fully consistent with Rule 23(c)(5), which provides that "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule."

2.       **Certification of a Settlement Damages Class and a Self-Funded Sub-Class Is Likely Appropriate under Rule 23(b)(3).**

Certification of the Damages Class and the Self-Funded Sub-Class is likely to be found appropriate under Rule 23(b)(3), because "the common legal and factual issues here predominate over individualized issues, and resolution of the common issues for millions of Settlement Class Members in a single, coordinated proceedings is superior to millions of individual lawsuits addressing the same legal and factual issues." *In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 660 (S.D. Fla. 2011). Both the predominance and superiority requirements will be shown to be satisfied here. *See In re Packaged Ice Antitrust Litig.*, 322 F.R.D. 276, 287 (E.D. Mich. 2017) (certifying a damages class in a case involving, *inter alia*, claims of territorial market allocations).

a.       **Common Issues Predominate.**

To satisfy the predominance requirement, "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1557-58 (11th Cir. 1989) (internal quotation marks omitted). "Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009) (internal citations and quotations omitted). That said, the predominance inquiry "does *not* require a plaintiff seeking class certification to prove that each element of its claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 469 (2013).

A preliminary analysis here indicates that the predominance element will be satisfied. The Subscriber Complaint alleges a nationwide conspiracy in which Defendants applied the alleged restraints in the same way in every state in which Class Members reside. *See* ECF No. 1082. Each

Settlement Class Member—including the Class Representatives—must establish the exact same facts to prove that the Settling Defendants violated the Sherman Act. Moreover, as a result of the nationwide reach of the alleged conspiracy, Subscriber Plaintiffs allege that virtually every member of the Damages Class suffered antitrust injury through higher premiums, depressed competition, lessened innovation, and loss of consumer choice. ECF No. 2411-1 ¶ 4 (Executive Summary of Dr. Rubinfeld's Class Certification Expert Report.) Within the Self-Funded Sub-Class, predominance is also satisfied; in addition to the above, members of the Self-Funded Sub-Class also face common questions concerning the impact of the alleged conduct on administrative fees and the market for national accounts. Thus, "the predominance requirement is satisfied here because common questions present a significant aspect of the case and can be resolved for all Settlement Class Members in a single adjudication." *In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 660 (S.D. Fla. 2011) (finding predominance satisfied for settlement certification purposes where "each Settlement Class Member's claims arise from the same or similar alleged BofA policies and practices and the same legal theories" and "the relationship between Settlement Class Members and BofA is governed by substantially uniform or similar account agreement"). *Id.*

### b.   A Class Action Is Superior to Other Methods of Adjudication.

"In addition to finding that common questions predominate over individual inquiries . . . the Court must find that the class action vehicle is superior to other available methods for adjudication." *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 693 (N.D. Ga. 1991). Rule 23(b)(3) identifies four factors relevant to the superiority requirement: "(A) the Class Members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against Class Members; (C) the desirability or undesirability of concentrating the litigation of the claims

in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). As noted *supra* p. 42, factor (D), manageability of the class action, is of much less relevance when it comes to certification of a settlement class. Subscriber Plaintiffs therefore limit their analysis to the first three factors.

With respect to factor (A), there are tens of millions of Settlement Class Members, making a class action the only feasible method of resolving the claims against the Settling Defendants. Once again, each Settlement Class Member's potential claim rests on the predominant question of whether the Settling Defendants' conduct violated the Sherman Act. As a practical matter, that issue cannot be resolved through individual trials or settlement negotiations: the amount at stake for individual Settlement Class Members is too small relative to the risks and expenses that would result if each class member chose to seek relief individually. *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification."). That is particularly true in light of the enormous cost of demonstrating antitrust injury and damages in cases like this. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D.136, 155 (D.N.J. 2013) (reporting that class counsel in a nationwide class action related to insurance brokerage spent over 444,110 hours over eight years on the matter and incurred nearly $10 million in litigation expenses). Thus, the resolution of these claims in one action is far superior to individual lawsuits. *See* Fed. R. Civ. P. 23(b)(3).

As for factor (B), as the Judicial Panel on Multidistrict Litigation ("JPML") has explained, the actions "involve substantial common questions of fact relating to the state BCBS entities' relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity to exclusive service areas, among other restrictions." *In re Blue Cross Blue Shield*

*Antitrust Litig.*, 908 F. Supp. 2d 1373, 1376 (J.P.M.L. 2012). The JPML has since transferred dozens of actions to this Court for consolidated pretrial proceedings. Subscriber Plaintiffs are aware of no other similar actions that are currently pending in other state or federal courts around the country. Accordingly, factor (B) supports the certification of the Damages Class.

Finally, with respect to factor (C), the JPML chose this Court as a transferee court because it would "serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation" since it is "familiar with the contours of the litigation and has taken preliminary steps to organize the litigation." *Id*. Since then, this Court has overseen nearly eight years of substantial pretrial litigation. This Court's familiarity with the issues involved in this case make it the most desirable forum to evaluate the proposed Settlement.

In sum, the Damages Class will satisfy the relevant requirements of Rule 23(b)(3).

## VI.   THE PROPOSED PLAN OF DISTRIBUTION WARRANTS PRELIMINARY APPROVAL

A plan of distribution should be approved when it allocates relief in a way that is "fair, adequate, and reasonable." *See In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 241 (5th Cir. 1982). *See also Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983); *Leverso v. SouthTrust Bank of AL., Nat. Assoc.*, 18 F.3d 1527, 1530 (11th Cir. 1994); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1328 n. 2 (S.D. Fla. 2001); *Bellocco v. Curd*, 2006 WL 4693490, at *2 (M.D.Fla. Apr. 6, 2006); *Smith v. Floor and Decor Outlets of Am., Inc.*, 2017 WL 11495273, at *5 (N.D. Ga. Jan. 10, 2017). A plan of distribution will pass muster so long as "it has a 'reasonable, rational basis,' particularly if 'experienced and competent' class counsel support it." McLaughlin on Class Actions, § 6.23 (17th ed. 2020). *See also Schwartz v. TXU Corp.*, 2005 WL 3148350, at *21 (N.D. Tex. Nov. 8, 2005) (approving a plan of allocation that "resulted in a settlement agreement that fairly and rationally allocates the proceeds of the settlement"). At the

preliminary approval stage, a court need determine only that the proposed plan is sufficiently "within the range of reasonableness, fairness, and adequacy" so that it may be sent to the members of the class. *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 12-cv-3419 (GBD), 2016 WL 4401148, at *2 (S.D.N.Y. June 22, 2016); *Danieli v. Int'l Bus. Mach. Corp.*, No. 08-cv-3688(SHS), 2009 WL 6583144, at *5 (S.D.N.Y. Nov. 16, 2009) (finding that distribution plan was "within the range of possible approval such that notice to the Class is appropriate").

The [Proposed] Plan of Distribution allocates the Net Settlement Fund in an eminently fair, reasonable, and adequate manner. "The goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." NEWBERG ON CLASS ACTIONS § 12:15 (5th ed.). Significantly, a perfectly-tailored plan of allocation, even if theoretically possible to construct, is not required, especially when implementation of such a plan would run counter to the need to ensure that the plan is administered, and relief distributed, in an efficient and timely manner. Thus, particularly in a large and complex class action such as this one, "the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd*, *In re PaineWebber Inc. Ltd. P'ships Litig.*, 117 F.3d 721 (2d Cir. 1997). Moreover, "[t]he challenge of precisely apportioning damages to victims, is often magnified in antitrust cases, as 'damage issues in antitrust cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.'" *In re Credit Default Swaps Antitrust Litig.*, No. 13md2476, 2016 WL 2731524, at *9 (S.D.N.Y. Apr. 26, 2016) (*quoting J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981)). Assisted by expert analysis performed by the Brattle Group, Class Counsel have devised a Plan of Distribution that is economically reasonable and will allocate compensation between and among the members of the

Class and the Self-Funded Sub-Class in a manner that is fair, reasonable, and adequate. *See In re Chicken Antitrust Lit.*, 669 F.2d at 241 (plan of distribution properly approved where counsel negotiated allocation formula based upon available economic data); *In re GSE Bonds Antitrust Litigation*, 414 F. Supp. 3d 686, 694-95 (S.D.N.Y. 2019) (approving plan of distribution where experienced class counsel, working in consultation with industry and economic consultants, produced method of ensuring equitable and timely distribution of fund).

The Plan first distinguishes between Fully Insured Claimants, who purchased insurance from Defendants, and the members of Self-Funded Sub-Class, who purchased administrative services only. After scrutinizing the evidence, presiding over arm's-length negotiations, and considering the arguments presented to him by Class Counsel, Mr. Feinberg found reasonable Class Counsel's recommendation allocating 6.5% of the Net Settlement Fund to the Self-Funded Sub-Class, with the remainder allocated to the Fully Insured Claimants. Ex. G, Feinberg Decl. ¶¶ 13-14. This allocation reflects each group's aggregate payments, their different settlement class periods, and the relative strengths of their respective legal claims. This allocation is thus the product of arm's-length negotiations, *In re Tremont Sec. Law, State Law and Ins. Litig.*, 2015 WL 5333494, at *5 (S.D.N.Y. Sept. 14, 2015), *aff'd in relevant part*, *vacated in part on other grounds*, 699 Fed. App'x. 8 (2nd Cir. 2017), and it seeks to account for genuine differences between the classes and the claims they have asserted. *See, e.g., Trauth v. Spearmint Rhino Cos. Worldwide, Inc.*, No. 09-1316-VAP (DTBx), 2011 WL 13134046, at *16 (C.D. Cal. Apr. 4, 2011) (finding proposed plan that reflected both the distribution of unpaid wages and the relative strength of claims was "within the range of possible approval").

Once the allocation of the Net Settlement Fund between Fully Insured Claimants and the Self-Funded Sub-Class had been determined, Class Counsel, with the assistance of the Brattle

Group, devised the mechanism by which the Plan of Distribution would provide compensation to each of the members of the Damages Class who submit claims. The overarching aim of the Plan is to efficiently allocate to each member of the Damages Class a *pro rata* share of the Net Settlement Fund that reflects that portion of the total premiums or administrative fees collected by Settling Defendants that can reasonably be attributed to that class member. This requires a determination of the amount of premiums or administrative fees paid to Member Plans that can be attributed to each Authorized Claimant. In determining, as reasonably as possible, the amount that was paid in premiums or fees on behalf of each individual claimant, the Plan relies on data provided by Settling Defendants; this relieves the class members of the onerous, and perhaps impossible for some, task of attempting to collect and submit years of employment and insurance records. For Individual Policyholders who purchased their own policies, the amount of premiums that they paid is the amount from which their *pro rata* share will be determined. For employers and employees within Insured Groups and Self-Funded Accounts (both Fully-Insured Claimants and members of the Self-Funded Sub-Class), using available data from Settling Defendants, the Plan of Distribution estimates the amount of overall premiums or administrative fees attributable to each individual employee. Then, the Plan apportions those payments between the employer and the employee using a Default contribution percentage derived by Class Counsel, in consideration of numerous factors. *See supra* Section II(C).

Mr. Feinberg was provided with the Plan of Distribution, as well as the underlying analysis and factors used to determine the Default allocation ratios employed by that Plan. As reflected in his declaration, Mr. Feinberg has reviewed the Plan and agrees that it presents a fair, reasonable, and adequate basis upon which to allocate funds. Ex. G, Feinberg Decl. ¶ 20. Further, Class Counsel relied on the expert analysis of Mr. Chodorow and the Brattle Group to assist in

developing and evaluating the economic reasonableness of the Default option. Ex. E, Settlement Class Counsel Decl. ¶ 34. Class Counsel's decisions to rely upon expert analysis of the data provided by Settling Defendants and to use a Default allocation methodology strikes a reasonable balance "between precision and efficiency," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 496 (S.D.N.Y. 2018), and ensures that the distribution of monetary relief will be fair and equitable. Any Authorized Claimant who nevertheless believes that they contributed more than the Default can pursue an Alternative option, under which they may submit data, records, and other materials supporting the use of a different contribution percentage. The Settlement Administrator, in the exercise of sound discretion, will then analyze the available data and determine the appropriate allocation ratio to use in the individual case. *Id.* This Alternative option ensures that any Authorized Claimant who believes their case deviates significantly from the norm has the opportunity to make their case for more precisely tailored relief, and goes above and beyond the requirements for equitable distribution of the Net Settlement Fund.

Finally, Class Counsel recognized that there is an irreducible minimum cost of administering each individual class member's claim and that the claims of some Damages Class Members would be too low to justify the cost of administering them. Accordingly, Class Counsel, consistent with the caselaw applying the standards for approving class action settlements, set a *de minimis* claim threshold of $5.00, an amount well below that which has been found justified in order to avoid unreasonable administrative costs in other class action settlements.[33]

---

[33] *See In re Ford Motor Co. Spark Plug & Three Valve Engine Prods. Liab. Litig.*, No. 1:17-md-2800-TWT, 2016 WL 6909078, at *6 (N.D.Ohio Jan. 26, 2016) (approving $300 threshold); *Hill v. State Street Corp.*, 2015 WL 127728, at *12 (D. Mass. 2015) ($10 threshold); *In re Advanced Battery Technologies, Inc., Sec. Litig.*, 298 F.R.D. 171, 180 (S.D.N.Y. 2014) ($100); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 328–29 (3d Cir.2011) ($10); *In re Mut. Funds Inv. Litig.*, 2011 WL 1102999, at *3 (D.Md. 2011) ($10); Wade v. Kroger Co., No. 3:01CV–699–R, 2008 WL 4999171, at *2 (W.D. Ky. Nov. 20, 2008) ($50); *In re Gilat Satellite Networks, Ltd.*, No. CV–02–1510 CPS, 2007 WL 1191048, at *9 (E.D.N.Y. Apr. 19, 2007) ($10); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484(JFK), 2007 WL 4526593, at *12 (S.D.N.Y. Dec. 20, 2007) ($50); *In re Spring Corp. ERISA Litig.*, 443 F. Supp.

For these reasons, the proposed Plan of Distribution allocates the monetary relief provided under the Settlement Agreement on a fair, adequate, and reasonable basis, and thus easily satisfies the standard for preliminary approval. But if any Settlement Class Member should disagree, they will have a chance to explain why in advance of the Final Approval hearing, when the fairness and adequacy of the Plan of Distribution can be fully evaluated.

## VII.    CONCLUSION

For all the foregoing reasons, Settlement Class Members request that the Court enter the proposed Preliminary Approval Order and set a Final Approval Hearing.

Date: October 30, 2020                                 Respectfully submitted,

  /s/ David Boies                                          /s/ Michael D. Hausfeld
David Boies – **Co-Lead Counsel**              Michael D. Hausfeld – **Co-Lead Counsel**
BOIES, SCHILLER & FLEXNER LLP          Swathi Bojedla – **Discovery Committee**
333 Main Street                                        HAUSFELD LLP
Armonk, NY 10504                                   1700 K Street NW, Suite 650
Tel: (914) 749-8200                                  Washington, DC 20006
Fax: (914) 749-8200                                 Tel: (202) 540-7200
dboies@bsfllp.com                                   Fax: (202) 540-7201
                                                             mhausfeld@hausfeld.com
                                                             sbojedla@hausfeld.com


Charles J. Cooper – **Co-Chair, Written**      Megan Jones – **Settlement Committee & PSC**
**Submissions Committee**                         **Member**
COOPER & KIRK, PLLC                          Arthur Bailey – **Discovery Committee**
1523 New Hampshire Avenue NW           HAUSFELD LLP
Washington, DC 20036                           600 Montgomery Street, Suite 3200
Tel: (202) 220-9600                                 San Francisco, CA 94111
Fax: (202) 220-9601                                Tel: (415) 633-1908
ccooper@cooperkirk.com                        Fax: (415) 358-4980
                                                             mjones@hausfeld.com
                                                             abailey@hausfeld.com

---

2d 1249, 1268 (D. Kan. 2006) ($25); *City of Livonia Emp. Ret. Sys. v. Wyeth*, No. 07 Civ. 10329(RJS), 2013 WL 4399015, at *3 (S.D.N.Y. Aug. 7, 2013) ($10).

Chris T. Hellums – *Local Facilitating Counsel*
PITTMAN, DUTTON & HELLUMS, P.C.
2001 Park Place N, 1100 Park Place Tower
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
chrish@pittmandutton.com

William A. Isaacson – *Settlement Committee & PSC Member*
PAUL WEISS
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7313
Fax: (202) 379-4937
wisaacson@paulweiss.com

Gregory Davis – *Settlement Committee & PSC Member*
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Tel: (334) 832-9080
Fax: (334) 409-7001
gldavis@knology.net

Cyril V. Smith – *Settlement Committee & PSC Member*
ZUCKERMAN SPAEDER, LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Tel: (410) 949-1145
Fax: (410) 659-0436
csmith@zuckerman.com

Kathleen Chavez – *Settlement Committee & PSC Member*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
kcc@fmcolaw.com

David Guin – *Co-Chair, Written Submissions Committee*
Tammy Stokes – *Damages Committee*
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. North
Suite 600/Title Building
Birmingham, AL 35203
Tel: (205) 226-2282
Fax: (205) 226-2357
davidg@gseattorneys.com
tammys@gseattorneys.com

Carl S. Kravitz – *Expert Committee*
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: (202) 778-1800
Fax: (202) 822-8106
ckravitz@zuckerman.com

Richard Feinstein – *Expert Committee*
Karen Dyer – *Expert Committee*
Hamish P.M. Hume – *Discovery Committee*
BOIES, SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
rfeinstein@bsfllp.com
kdyer@bsfllp.com
hhume@bsfllp.com

Mindee Reuben
Lite DePalma Greenberg
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Tel:  (267) 314-7980
Fax: (973) 623-0858
mreuben@litedepalma.com

Nate Cihlar
Joshua Callister
Srauss & Boies
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel:  (703) 764-8700
Fax:  (703) 764-8704
ncihlar@straus-boies.com
jcallister@straus-boies.com

Patrick Cafferty – *Discovery Committee*
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
150 S. Wacker Drive, Suite 300
Chicago, IL 60606
Tel: (312) 782-4880
pcafferty@caffertyclobes.com

Bryan Clobes – *Litigation Committee*
Ellen Meriwether – *Written Submissions
Committee*
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
2005 North Monroe Street
Media, PA 19063
Tel: (215) 864-2800
Fax: (215) 864-2810
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

Andrew Lemmon – Chair, Discovery
Committee
LEMMON LAW FIRM
15058 River Road
PO Box 904
Hahnville, LA 70057
Tel: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Virginia Buchanan – Chair, Class Certification
Committee
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7000
Fax: (850) 435-7020
vbuchanan@levinlaw.com

Douglas Dellaccio – *Litigation Committee*
CORY WATSON CROWDER & DEGARIS,
P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 32505
Tel: (205) 328-2200
Fax: (205) 324-7896
ddellaccio@cwcd.com

Larry McDevitt – *Chair, Class Certification
Committee*
David Wilkerson – *Discovery Committee*
VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Tel: (828) 258-2991
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Edwin J. Kilpela, Jr.
Benjamin Sweet – *Litigation Committee*
DEL SOLE CAVANAUGH STROYD LLC
200 First Avenue, Suite 300
Pittsburgh, PA 15222
Tel: (412) 261-2393
Fax: (412) 261-2110
ekilpela@dsclaw.com
bsweet@dsclaw.com

Charles T. Caliendo – *Class Certification Committee*
GRANT & EISENHOFER
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
ccaliendo@gelaw.com

Daniel Gustafson – *Litigation Committee*
Daniel C. Hedlund – *Damages Committee*
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

John Saxon – *Litigation Committee*
JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203-3314
Tel: (205) 324-0223
Fax: (205) 323-1583
jsaxon@saxonattorneys.com

Robert M. Foote – *Damages Committee*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
rmf@fmcolaw.com

Robert Eisler – *Discovery Committee*
GRANT & EISENHOFER
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
reisler@gelaw.com

Brent Hazzard – *Litigation Committee*
HAZZARD LAW, LLC
447 Northpark Drive
Ridgeland, MS 39157
Tel: (601) 977-5253
Fax: (601) 977-5236
brenthazzard@yahoo.com

Lawrence Jones – *Damages Committee*
JONES WARD PLC
The Pointe
1205 East Washington Street, Suite 111
Louisville, Kentucky 40206
Tel:  (502) 882-6000
Fax: (502) 587-2007
larry@jonesward.com

Robert Methvin – ***Chair, Settlement Committee***
James M. Terrell – ***Class Certification Committee***
MCCALLUM, METHVIN & TERRELL, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, AL 35205
Tel: (205) 939-0199
Fax: (205) 939-0399
rgm@mmlaw.net
jterrell@mmlaw.net

Michael McGartland – ***Class Certification Committee***
MCGARTLAND & BORCHARDT LLP
1300 South University Drive, Suite 500
Fort Worth, TX 76107
Tel: (817) 332-9300
Fax: (817) 332-9301
mike@attorneysmb.com

H. Lewis Gillis – ***Co-Head Chair, Litigation Committee***
MEANS GILLIS LAW, LLC
3121 Zelda Court
Montgomery, AL 36106
Tel: 1-800-626-9684
hlgillis@tmgslaw.com

David J. Hodge – ***Chair, Settlement Committee***
MORRIS, KING & HODGE
200 Pratt Avenue NE
Huntsville, AL 35801
Tel: (256) 536-0588
Fax: (256) 533-1504
lstewart@alinjurylaw.com

*Counsel for Subscriber Plaintiffs*

*/s/ Warren T. Burns*
Warren T. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
wburns@burnscharest.com

*Counsel for the Self-Funded Sub-Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 30, 2020, the foregoing Memorandum of Law in Support of Subscriber Plaintiffs' Motion for Preliminary Approval of Proposed Class Settlement was filed with the Clerk of the Court and served on counsel of record via ECF.

<u>    /s/ Michael D. Hausfeld</u>
Michael D. Hausfeld