FILED

2020 Oct-30  PM 09:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT

# H

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **IN RE BLUE CROSS BLUE SHIELD** | : | |
| **ANTITRUST LITIGATION** | : | **Master File 2:13-cv-20000-RDP** |
| **MDL 2406** | : | |
| | : | |
| | : | |
| | : | |
| | : | **This document relates to** |
| | : | **Subscriber Track cases** |

## DECLARATION OF DARRELL CHODOROW

**Table of Contents**

I.   Introduction ................................................................................................................1

II.  *Pro-Rata* Compensation Based on Estimated Premiums Paid Is Economically
     Reasonable. ................................................................................................................2

III. The Approach to Allocating FI Group Premiums between Sponsors and Employees Is
     Economically Reasonable. .........................................................................................5

     A.  An Allocation of Estimated Premiums between an FI Group and Its FI Employees Is
         Economically Reasonable. ................................................................................... 5

     B.  Treating the FI Group as the Residual Claimant on FI Group Premiums Is
         Economically Reasonable. ................................................................................... 9

     C.  The Provision of a Default Allocation Option and an Alternative Is Economically
         Reasonable. ......................................................................................................... 11

         1.  Data on Employee Contributions towards ESHI Premiums Is Limited. .............. 11

         2.  A Default Allocation Relying on Kaiser Data for Employee Contributions Is
             Economically Reasonable. ................................................................................. 14

         3.  The Alternative Option Allows Improvement over the Default Where Evidence Is
             Available. ........................................................................................................... 15

     D.  The Proposed Default Percentages Are Economically Reasonable. ........................... 16

     E.  The Approach to Estimating Employee-Specific Premiums Is Economically
         Reasonable. ......................................................................................................... 21

     F.  The Plan Provides the Flexibility to Address Atypical FI Groups. ........................... 23

IV.  The Same Approach Is Economically Reasonable for Distributing the Self-Funded Net
     Settlement Fund. ......................................................................................................23

## I.    INTRODUCTION

1.    My name is Darrell B. Chodorow. I am a Principal in the Washington, DC office of The Brattle Group, an economic consulting firm.

2.    I have over 25 years of experience conducting damages analyses. I have testified as an expert on damages and valuation issues in US Federal Court, US Tax Court, the Delaware Court of Chancery, and the District Court of Cyprus, as well as in arbitrations before tribunals for the American Arbitration Association, the International Chamber of Commerce, and the Permanent Court of Arbitration. I have also served as a damages expert for disputes in US state courts and before tribunals of the World Bank's International Centre for the Settlement of Investment Disputes, the London Court of International Arbitration, and the Brazil-Canada Chamber of Commerce. *Who's Who Legal* has identified me as a global leader in the quantification of damages. A list of my expert appointments, publications, and presentations is contained in my resume, attached as Appendix A.

3.    Allocation is a fundamental aspect of damages analysis in many instances. Estimating damages often requires the allocation of revenues and costs, and identification of the appropriate allocation mechanism is essential. Therefore, allocation is a central part of my expertise. I also have experience in the allocation of damages in class action disputes.

4.    I have an MBA from the Yale University School of Management and a BA in Economics from Brandeis University.

5.    I have been provided with a copy of the proposed Plan of Distribution ("Plan") being submitted with this declaration in the above-captioned matter. I have been asked by Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel (together, "Class Counsel") to provide an opinion to this Court on whether the Plan will distribute fairly the

Fully Insured ("FI") Net Settlement Fund and the Self-Funded Net Settlement Fund among the Authorized Claimants for each fund.[1]  For purposes of this declaration and unless otherwise noted, capitalized terms take the meaning set forth in the Plan.

6.      As I discuss herein, I find that the allocation approach described in the Plan is reasonable from an economic perspective. In particular, I conclude that the *pro-rata* allocation of the FI Net Settlement Fund among claimants on the basis of estimated premiums paid is fair from an economic perspective, as is the *pro-rata* allocation of the Self-Funded Net Settlement Fund on the basis of estimated administrative fees paid. Determining the estimated amounts paid by each claimant requires an allocation of FI Group premiums and Self-Funded Group administrative fees between employers and employees. I find that the methodology for performing the allocation between employers and employees is reasonable.

## II.    *PRO-RATA* COMPENSATION BASED ON ESTIMATED PREMIUMS PAID IS ECONOMICALLY REASONABLE.

7.      The Plan proposes to allocate the FI Net Settlement Fund on a *pro-rata* basis among all eligible FI Authorized Claimants based on estimated premiums paid. To be eligible for a distribution, an FI Authorized Claimant must submit a claim and have sufficient premiums to surpass the minimum distribution threshold set forth in the Plan. The *pro-rata* allocation factor will be a fixed percentage (X%) calculated as the amount of the FI Net Settlement Fund divided by the Total FI Premiums Paid during the FI Class Period by all FI Authorized Claimants eligible to receive a payment. The distribution for each eligible FI Authorized Claimant is equal to that claimant's Total FI Premiums Paid during the FI Class

---

[1]   I have not been asked to evaluate the division of the Net Settlement Fund between the FI Class and Self-Funded Sub-Class, which I understand has been reviewed and determined to be reasonable by the Allocation Mediator, Kenneth J. Feinberg.

Period multiplied by X%. This approach will distribute the FI Net Settlement Fund across all eligible FI Authorized Claimants in proportion to the estimated total premiums paid by each claimant.

8. The X% cannot be determined at present because it will depend upon a variety of factors that are currently unknown, including:

    a. The number of potential FI Authorized Claimants, which I expect could be in the tens of millions;

    b. The Total Premiums Paid for FI coverage by those claimants during the FI Class Period, which cannot be estimated prior to the receipt of data from the Settling Defendants;

    c. The ultimate claims submission rate among FI Authorized Claimants; and

    d. The percentage of FI Authorized Claimants with Claim Values sufficient to meet the minimum distribution threshold.[2]

9. I find the application of this *pro-rata* approach to be reasonable based on a number of factors:

    a. It is both common and reasonable to measure potential overcharges for health insurance as a percentage of price paid by customers.[3]  In the case of the FI

---

[2]   I have not been asked to opine on the reasonableness of the minimum distribution threshold.

[3]   In the context of competition and health insurance prices, see, *e.g.*: Dafny, Leemore, Mark Duggan, and Subramaniam Ramanarayanan. 2012. "Paying a Premium on Your Premium? Consolidation in the US Health Insurance Industry." *American Economic Review*, 102 (2): 1161-1185; Dafny, Leemore, Jonathan Gruber, and Christopher Ody. 2015. "More Insurers Lower Premiums: Evidence from Initial Pricing in the Health Insurance Marketplaces." *American Journal of Health Economics.* 1(1): 53-81; Gowrisankaran, Gautam, Aviv Nevo, and Robert Town. 2015. "Mergers When Prices Are Negotiated: Evidence from the Hospital Industry." *American Economic Review*, 105 (1): 172-203; and Trish, Erin and Bradley Herring. 2015, "How do health insurer market concentration and bargaining power with hospitals affect health insurance premiums?" *Journal of Health Economics*: 42: 104-114.

Damages Class, the relevant price is the estimated premiums paid to the Settling Defendants for FI coverage during the FI Class Period.

b.  The premiums paid for FI coverage can vary significantly based on a number of factors including the claimant type (employer or person), geographic market (insurance is more expensive in some markets than others), the benefits covered by the insurance plan, the plan type (HMO, PPO), coverage type (family plans are generally more expensive than single plans), and the market segment (individual or group coverage). A *pro-rata* allocation will capture the variation in premiums paid arising from these and other potential factors that vary across claimants.

c.  The FI Class Period covers more nearly 13 years, and claimants will have different tenures in the FI Damages Class as they move onto or off of Settling Defendants' policies or change their type of coverage.

d.  The *pro-rata* approach will provide all FI Authorized Claimants eligible to receive a distribution with the same compensation for each dollar of estimated premiums paid by that claimant for FI coverage during the FI Class Period, whether that claimant is an FI Group or a person that paid premiums as an Individual Policyholder and/or FI Employee.

10.  The impact of variations in product characteristics and class tenure is implicitly reflected in each claimant's premiums paid, which embed any overcharges as a result of alleged anticompetitive activity. Because the *pro-rata* approach applied to estimated premiums captures this variation across claimants and will compensate all eligible claimants in an

equivalent manner for each dollar of estimated premiums paid, I find the approach to be a reasonable allocation method for the FI Net Settlement Fund.

## III.   THE APPROACH TO ALLOCATING FI GROUP PREMIUMS BETWEEN SPONSORS AND EMPLOYEES IS ECONOMICALLY REASONABLE.

11.     Where an FI Group submits a claim, the Claim Value for that FI Group will be determined based on the total FI premiums paid during the FI Class Period. Data from the Settling Defendants is expected to provide a reasonable estimate of the premiums paid for a particular FI Group's coverage without requiring every FI Group to submit years of premium data. As explained below, an FI Employee typically bears a portion of the economic burden of premiums paid by the FI Group for that employee's coverage. In recognition of this burden, the Plan allows for an allocation of the FI Group premium paid for an employee's coverage between the FI Group and the FI Employee. As discussed below, I find the proposed allocation method, including the Default allocation percentages, to be reasonable.

### A.   AN ALLOCATION OF ESTIMATED PREMIUMS BETWEEN AN FI GROUP AND ITS FI EMPLOYEES IS ECONOMICALLY REASONABLE.

12.     FI Employees often share the economic burden of paying employer-sponsored health insurance ("ESHI") premiums through out-of-pocket contributions and/or reductions in other compensation. To the extent that the alleged anticompetitive activities have increased premiums, this shared incidence of premiums between an FI Group and its FI Employees means that both would have been harmed. It is therefore economically fair to allocate an FI Group's premiums between the employer and its employees, thereby allowing employees the opportunity to receive compensation from the FI Net Settlement Fund.

13.     The vast majority of employees have made meaningful out-of-pocket contributions towards their ESHI premiums. The Kaiser Family Foundation ("Kaiser")

conducts annual surveys of employer health benefits (the "Kaiser Study"), each of which includes an analysis of out-of-pocket contributions. Figure 1 shows the percentage of employees who were required to make contributions towards their health insurance for both single and family coverage. The survey results show that the vast majority of employees were required to make contributions in 2008 and that the percentage was increasing over the FI Class Period.

**Figure 1: Percent of Employees Making an Out-of-Pocket Contribution[4]**



14.     Figure 2 compares the cumulative annual growth rate for ESHI premiums and employee contributions from the Kaiser Study during the FI Class Period and the full 1999 to 2020 period covered by the study. As ESHI premiums increased, employers have passed along part of this increase in the form of higher average out-of-pocket contributions, as confirmed

---

4       2020 Kaiser Study, Figures 6.11 and 6.12.

by the similar growth rates of contributions and premiums. Thus, to the extent there was any increase in premiums arising from alleged anticompetitive actions by the Settling Defendants, the economic burden of that increase would have been borne in part by employees through higher out-of-pocket contributions.

**Figure 2: Annual Growth Rate of Premiums and Contributions[5]**



15.     Employees are compensated in many ways, including wages, health benefits (excluding those funded by the employee's out-of-pocket contribution), and non-health benefits such as vacation and contributions towards retirement savings. The economic literature finds that employees bear part of the increase in ESHI premiums through higher out-of-pocket contributions and potentially through reduced wages. In particular, three academic studies from the last ten years have considered the extent to which wages may be reduced to account for the cost of providing ESHI:

---

[5]     Calculations based on the 2020 Kaiser Study, Figures 6.4 and 6.5.

a.  Anand (2017) attempts to focus on changes in the cost of ESHI over time and finds that about $0.52 for every $1 increase in premiums is passed on to workers.[6]  The Anand analysis finds this increased burden on workers primarily manifests through higher employee contributions to their coverage (*i.e.*, the component directly measured by the Kaiser Study), with little impact on wages.

b.  Lubotsky and Olson (2015) find a similar pattern for teachers in Illinois, where only $0.17 for singles and $0.46 for families of each $1 increase in premiums is passed on to employees.[7]  This indicates the relationship between premium increases and employee contributions may be weaker for government employees or for highly unionized workforces.

c.   Kolstad and Kowalski (2016) consider data from Massachusetts following the state's implementation of an employer mandate.[8]  They find that wages are approximately $6,000 per year lower when ESHI is offered than when it is not and that this approximately equals the average cost to the employer of providing ESHI. Thus, they conclude that employees pay nearly the entire cost of insurance through lower wages or out-of-pocket contributions.

16.    All three of these articles appear in reputable publications and follow standard methodologies in academic research, yet they reach somewhat different conclusions. Lubotsky

---

[6]   Anand, Priyanka. 2017. "Health Insurance Costs and Employee Compensation: Evidence from the National Compensation Survey." *Health Economics*. 26(12): 1601-1616.

[7]   Lubotsky, Darren and Craig A. Olson. 2015. "Premium copayments and the trade-off between wages and employer-provided health insurance." *Journal of Health Economics*. 44: 63-79.

[8]   Kolstad, Jonathan T. and Amanda E. Kowalski. 2016. "Mandate-based health reform and the labor market: Evidence from the Massachusetts reform." *Journal of Health Economics*. 47: 81-106.

and Olson and Kolstad and Kowalski each analyze a relatively small population of workers and their results may not apply to the entire class in the present matter. For these reasons, based on these papers I conclude that workers bear some economic burden of the cost of ESHI, but that this academic research does not provide sufficient evidence to establish a reliable, class-wide measure of the share of the burden borne by workers.

17.     In recognition of the fact that employees would have shared any harm from the Settling Defendants' alleged anticompetitive actions, it is therefore economically reasonable for the FI Group and its associated FI Employees to share any compensation from the FI Net Settlement Fund.

### B.   TREATING THE FI GROUP AS THE RESIDUAL CLAIMANT ON FI GROUP PREMIUMS IS ECONOMICALLY REASONABLE.

18.     As explained, the Plan dictates a process for allocating premiums between the FI Group and eligible FI Employees. To the extent that an FI Employee fails to submit a claim or has a Claim Value that falls below the $5.00 minimum distribution threshold, the premiums associated with that FI Employee are allocated entirely to their FI Group, as illustrated in Figure 3 below.[9]  As a result, the compensation associated with such an FI Employee's premiums is retained by their FI Group rather than returned to the FI Net Settlement Fund.

---

[9]   The exception would be if the FI Group fails to meet the minimum distribution threshold. In this instance, all eligible FI claimants would receive a higher percentage distribution.

**Figure 3: Illustrative Allocation of an FI Group's
Premiums between the Employer and Its Employees**



19.    I find that treating the FI Group as the residual claimant on any FI Group premiums is economically fair for at least two reasons. First, as long as an FI Group submits a claim, the appropriate claims for that FI Group and its employees from the FI Net Settlement Fund depend upon the total premiums associated with that FI Group. The division of group premiums is a zero sum exercise with each dollar assigned to either the FI Group or one of its FI Employees. The resulting allocation between the FI Group and its FI Employees does not affect the total premiums paid by any other claimant that is unaffiliated with that FI Group and it is reasonable that those claimants have no opportunity to make a claim on those premiums.

20.    Second, I understand that claims by FI Employees face potential standing challenges compared to those of FI Groups. If the FI Employee claims were to fail, I understand

that the FI Groups have the opportunity to seek compensation based on the entire FI Group Premium. This is economically consistent with treating the FI Group as the residual claimant.

## C. THE PROVISION OF A DEFAULT ALLOCATION OPTION AND AN ALTERNATIVE IS ECONOMICALLY REASONABLE.

21.     While the economic evidence is clear that employees share the economic burden of ESHI premiums, the incidence can vary across employers. Determining the specific allocation of the burden for a particular FI Employee's premium (the Unallocated Employee Premium defined in the Plan) within an FI Group is difficult because of data limitations. As discussed below, the Settling Defendants, employers, and/or employees may not be able to provide the necessary documentation or may bear a high cost in doing so. Therefore, the Plan provides a Default option to allocate the Unallocated Employee Premium. Where a claimant believes it should be credited with a higher premium than would result from the Default option, they are able to elect the Alternative option, under which documentation may be used to establish an allocation different from the Default. As discussed below, a Default option that avoids penalizing claimants facing data limitations and that allows for efficient processing of claims, along with the opportunity to revert to a more precise allocation where data exists, results in an economically reasonable outcome.

### 1.     Data on Employee Contributions towards ESHI Premiums Is Limited.

22.     As discussed in the Plan, an employee's out-of-pocket contribution towards ESHI premiums is an important consideration in the Default option. However, data on specific employee contributions may be limited from both the claimants and the Settling Defendants.

23.     *Settling Defendants do not have this data on a system-wide basis.* I participated in discussions with Settling Defendants' counsel about the types of data maintained in the

11

regular course of business that would be available on a system-wide basis to create a reasonable distribution plan. Based on these conversations, I understand that the Settling Defendants do not systematically collect data on out-of-pocket contributions made by individual FI Employees in the regular course of business.

24.     *Significant barriers prevent collection of this data from FI Group sponsors.* Some FI Group sponsors may possess data on out-of-pocket contributions by their FI Employees. I understand that seeking this data directly from all members of the Damages Class over the course of the 13-year FI Class Period would not likely be found to be a reasonable method for implementing the Plan of Distribution. Moreover, I would anticipate that many FI Groups would be unable to provide reliable data. Many of the FI Groups may not exist anymore. For example, data from the U.S. Bureau of Labor Statistics suggests that, even among private businesses that survive beyond their risky early years, approximately 5% to 10% fail in any year.[10]  Thus, one would anticipate that only about 30% of businesses started at the beginning of the FI Class Period would still exist today.[11]  I would anticipate the number of business failures among potential FI Groups would be particularly high as a result of the economic implications of COVID-19. Even among those companies that remain, practical limitations may inhibit the ability to collect reliable information. Based on my experience requesting and analyzing data from businesses over 25 years in litigation support, I would expect that many FI Groups may have made changes in systems or software over the FI Class

---

[10]  U.S. Bureau of Labor Statistics, Survival of Private Sector Establishments by Opening Year, https://www.bls.gov/bdm/us_age_naics_00_table7.txt.

[11]  Approximately 31.7% of business started in the year ending March 2008 continued to exist as of March 2019. U.S. Bureau of Labor Statistics, Survival of Private Sector Establishments by Opening Year, https://www.bls.gov/bdm/us_age_naics_00_table7.txt.

Period. Such changes can make collecting reliable information over long periods difficult and costly. I also note that any physical workplace restrictions arising form COVID-19 could complicate the ability to collect electronic or physical data from FI Groups. Given the cost and effort that could be required for many FI Groups to provide this type of data, requiring submissions of this information is likely to reduce claims submission rates, particularly for small employers.

25.     *Most FI Employees are unlikely to have reliable data.* Collecting records from a class that includes tens of millions of people creates a practical challenge. I am aware of no surveys of the types of records that individuals keep on their pay histories, which may contain information on employee contributions. I would expect that many FI Employees would not have access to the records needed to prove their contributions over the course of the FI Class Period. Even IRS guidance suggests that most individuals retain pay-related records for tax purposes for 7 years or less,[12] far less than the 13-year FI Class Period. Where employees do maintain these records, gathering and submitting this information may prove costly for employees, with the likely impact of reducing claim submission rates.

26.     *Relying on data collected from FI Groups and FI Employees would likely be very costly and time-consuming for the claims administration and settlement process.* I anticipate that a large-scale effort to collect and analyze records maintained by FI Groups and FI Employees would be extremely burdensome given issues of data quality and the large number of potential claimants. Data from each submitting FI Group or FI Employee would have to be assessed for reliability. Even if reliable, the information from the records would

---

[12]   U.S. Internal Revenue Service, Topic No. 305 Recordkeeping, https://www.irs.gov/taxtopics/tc305.

have to be translated into a very large database using information provided in many different formats, making it a costly, time-consuming, and error-prone process.

### 2. A Default Allocation Relying on Kaiser Data for Employee Contributions Is Economically Reasonable.

27.     Absent data on a specific employee's contribution, the Plan provides a Default option for using a fixed allocation proposed by Class Counsel and determined to be reasonable by the Allocation Mediator based, in part, on the evidence of typical employee contributions from the Kaiser Study. The Kaiser Study is well-regarded and to my knowledge reflects the best publicly available data on employee contributions. In naming Kaiser the "Think Tank of the Year," the *Washington Post* described the non-profit as "offer[ing] the most up-to-date and accurate information on health policy" and as "a leading voice and vast repository for facts and figures on health-care issues."[13] The information presented in the 2020 Kaiser Study is based on surveys of human resource and benefits managers at 1,765 firms across the country.[14]

28.     Given my expectation that a large proportion of claimants will be unwilling or unable to provide reliable evidence of actual contributions by individual employees, it is economically reasonable to provide a Default option that considers evidence of the average employee's contributions according to the Kaiser Study, in addition to the other factors identified by counsel in the Plan of Distribution. Without a Default option, claimants would be penalized for lack of documentation. Such an outcome would be economically unreasonable.

---

[13] See, *e.g.*, Presenting the Third Annual Wonky Awards, December 31, 2013, https://www.washingtonpost.com/news/wonk/wp/2013/12/31/presenting-the-third-annual-wonky-awards/; Health Care? He's Got It Covered, November 2, 2009, https://www.washingtonpost.com/wp-dyn/content/story/2009/11/01/ST2009110102616.html?sid=ST2009110102616.

[14] 2020 Kaiser Study, p. 17.

### 3. The Alternative Option Allows Improvement over the Default Where Evidence Is Available.

29.     As shown in Figure 4, the Kaiser Study demonstrates that there is variation in the percentage of total premiums contributed by employees across employer health plans. For this reason, the Default percentage would over- or under-compensate some claimants. Employers that required smaller contributions than average, or even no contributions from their employees, would be undercompensated by the Default and *vice versa*. Similarly, employees who were required to make above-average contributions would be undercompensated by the Default and *vice versa*. Therefore, where claimants do have evidence that demonstrates that they are entitled to something more than the Default option, it is economically appropriate to permit the submission of that evidence to arrive at a more reasonable outcome.

**Figure 4: Employee Contribution as a Percentage of Premium[15]**



---

[15]  2020 Kaiser Study, Figures 6.11 and 6.12 for 2019. Note that the data in this figure are for both Fully Insured and Self-Funded Groups.

30.     It is possible that permitting class members to decide whether or not to elect the Alternative and submit evidence may lead to some adverse selection. That is, less generous employers will tend to accept the Default option despite having evidence available on precise employee contributions. Similarly, employees with smaller than average contributions will tend to accept the Default. This is an inevitable outcome in situations where a party is permitted the option to submit evidence of actual contributions or accept a default option. Where records exist, claimants can attempt to limit adverse selection. The allocation of an FI Group's premiums is a zero sum game between the employer and its employees. Thus, in instances when an employer might be expected to exercise adverse selection, employees can, and are more likely to, limit this possibility by submitting their own evidence where available. Adverse selection by employees is similarly limited by the ability of employers to submit evidence. Thus, the ability for employees to submit their own evidence serves as a check on the ability of employers to engage in adverse selection and *vice versa*.

### D.     THE PROPOSED DEFAULT PERCENTAGES ARE ECONOMICALLY REASONABLE.

31.     I understand that Class Counsel has recommended that the Default allocation for FI Employees be 15% for those with single coverage and 34% for those with family coverage. This recommendation was based on a number of factors including: (1) Kaiser Study statistics on employee out-of-pocket contributions; (2) the fact that some employees make no out-of-pocket contribution; (3) evidence suggesting that even employees who make no out-of-pocket contribution may bear some of the economic burden of premiums through reductions in wages and other forms of compensation; (4) the potential standing challenges that could be faced by FI Employees relative to FI Groups; and (5) the fact that the FI Group will retain

100% of the value of any premiums from FI Employees who are not eligible for compensation.[16] The proposed Default percentages by their nature must reflect judgment for factors that cannot be readily quantified, but I find the resulting percentages reasonable as discussed below. Furthermore, I understand that the Allocation Mediator has also concluded that these proposed Default percentages are reasonable.

32.     *Kaiser Study data are an economically important consideration in determining the appropriate Default allocation.* The out-of-pocket contribution is a clear economic cost of ESHI to an employee and relieves the employer of part of the economic burden of providing ESHI. It is therefore an important consideration for the fair allocation of the Unallocated Employee Premium. Where actual data on employee contributions are not available, the average contributions from Kaiser Study data are a reasonable proxy.

33.     It is economically reasonable to assume different Default percentages for single and family coverage. As shown in Figure 5, the Kaiser Study demonstrates that average employee contributions as a percent of an employee's premium are materially higher for family coverage compared to single coverage. This difference persists across the FI Class Period, with an average of contribution of 17% for single coverage and 35% for family coverage.[17] All else equal, it is appropriate to apply a higher Default percentage to allocate premiums for employees with family coverage.

---

[16]  The Plan also considers the lack of data on actual out-of-pocket contributions by FI Employees. This is discussed in Section III.C.1.

[17]  Most of the year-to-year variation lies within the survey's margin of error. The only years in which the Kaiser Study found that variation in employee contributions was statistically different from the prior year were 2010 and 2020. Note that this is for all employer plans, both fully insured and self-funded. 2020 Kaiser Study, Figure 6.1.

**Figure 5: Average FI Employee Contributions as a Percent of Premium[18]**
*Single vs. Family*



34.    *Wage reductions to pay for ESHI premiums suggest a higher employee allocation is appropriate.* As discussed in Section III.C, the economic literature suggests employees may bear a portion of the economic burden of paying ESHI premiums through a reduction in wages or other forms of compensation. For this reason, the out-of-pocket contributions reflected in the Kaiser Study would be expected to understate the typical share of the ESHI premium borne by the employee. All else equal, this suggests that an employee allocation in excess of the average contribution from the Kaiser Study would be economically appropriate for the Default option.

---

[18]    Kaiser Study from 2008 to 2020. See https://www.kff.org/health-costs/report/employer-health-benefits-annual-survey-archives/.

35.     *Employees who made no contribution are not necessarily overcompensated by the inclusion of a Default option.* The Kaiser Study does show that some portion of employees made no out-of-pocket contribution towards their premiums. Figure 6 shows that 20% of employees receiving single coverage and 7% with family coverage made no premium contributions in 2008. Those percentages have decreased over the FI Class Period, with an average share of employees making a no contribution equal to 15% for single coverage and 5% for family coverage.

**Figure 6: Share of Employees with No Contribution to FI Group Premium[19]**



36.     I find the ability of employees to receive the Default option reasonable despite the fact that some made no out-of-pocket contribution. First, as shown above, those making no contribution are a minority. Second, it would be unreasonable to require employees to prove

---

[19]   2020 Kaiser Study, 6.11 and 6.12.

their out-of-pocket contributions when they are unlikely to possess the necessary evidence. Third, employers (who I anticipate are more likely to have access to contribution data) have the opportunity to elect the Alternative option when employees made no (or below-average) contributions. Finally, as discussed in Section III.C, the economic literature supports the proposition that an employee may bear some of the economic burden of ESHI premiums through reduced compensation beyond the out-of-pocket contributions measured by Kaiser. Thus, even those employees with no contributions may have been harmed by alleged overstated premiums through reductions in other aspects of compensation.

37.     *Legal risk suggests a lower Default percentage is appropriate.* As discussed above, I have been instructed that the employees face potential standing issues in bringing a claim relating to out-of-pocket contributions against the Settling Defendants, which weakens their claims relative to those of employers. I am also instructed that there is no legal precedent supporting the ability for employees to make claims for premium overcharges based on reduced compensation and employees would thus face significant legal challenges if they sought to bring such claims. From an economic perspective, greater legal risk reduces the expected value to employees of pursuing a legal claim relative to that of groups and therefore a reduced Default percentage is appropriate, all else equal.

38.     *The FI Group's status as the "residual claimant" on premiums suggests a higher Default percentage for FI Employees is reasonable.* As the residual claimant on group premiums, FI Groups retain the value of any premiums associated with FI Employees that are not eligible for a distribution.  Therefore, all else equal, a higher allocation can be given to FI Employees without necessarily harming FI Groups relatively.

20

39.     *Overall, I find the Default allocation factors to be economically reasonable.* The Kaiser out-of-pocket contribution data are reliable and, absent actual records to demonstrate otherwise, reflect an economically reasonable estimate of employee contributions. The economic literature suggests employees may also bear a further economic burden for premiums through wage reductions. This evidence suggests that the actual incidence of ESHI premiums on employees exceeds the Kaiser contributions, suggesting higher Default percentages, all else equal. However, the higher litigation risk faced by employees, particularly with respect to claims of wage reductions, suggests that the Default percentages should be reduced, all else equal.

40.     FI Groups could benefit from their status as the residual claimant on FI Group premiums. Because part of the economic burden of FI Group premiums was borne by claimants that will not submit claims or that cannot surpass the minimum distribution threshold, the Default percentage to FI Employees can be increased somewhat without necessarily harming FI Groups relative to other claimants. However, increasing the Default percentages could improve both the claims submission rate and the potential for employees to exceed the minimum distribution threshold. This would further the economically reasonable goal of providing broader-based relief to the FI Authorized Claimants.

41.     Based on these factors, taken together, I find that the Default percentages adopted in the Plan are economically reasonable.

**E.     THE APPROACH TO ESTIMATING EMPLOYEE-SPECIFIC PREMIUMS IS ECONOMICALLY REASONABLE.**

42.     Estimating a specific FI Employee's share of premiums paid requires applying the chosen allocation percentage to the Unallocated Employee Premium for that employee.

Based on discussions with Settling Defendants' counsel, I understand that the Settling Defendants do not systematically collect these employee-specific premiums in the regular course of business. This is because the Settling Defendants typically receive a single payment from the employer for coverage of all employees. Therefore it is necessary to estimate the premium paid by an FI Group on behalf of each particular FI Employee. The methodology to derive estimated premiums for an employee's FI Group coverage takes the FI Group's total premiums paid on behalf of all its employees in a particular month and divides it by the number of covered members during that month to get a per-member premium for that month.[20]  That per-member premium is multiplied by the number of members under a particular employee's coverage for that month to estimate that employee's Unallocated Employee Premium. The total premiums paid by the FI Group for that FI Employee is the sum of monthly premiums paid during the FI Class Period.

43.    This approach is a reasonable proxy for employee-specific premiums because total FI Group premiums are typically driven by the number of covered lives as well as the demographic composition of that FI Group (*e.g.*, age, gender, or geographic location). The above methodology accounts for the number of covered lives associated with a particular employee, though it does not reflect the specific demographics of the members on that employee's coverage. However, the result is still reasonable for a particular employee within an FI Group because it is my understanding that companies generally do not require employees

---

[20]  Where premiums are paid less frequently, the same methodology is used after translating that premium into a monthly equivalent.

to make different premium contributions based on their demographic characteristics other than the number of members under their coverage.

### F. THE PLAN PROVIDES THE FLEXIBILITY TO ADDRESS ATYPICAL FI GROUPS.

44.     Some FI Groups are negotiated and operated by other types of organizations, such as Professional Employer Organizations ("PEOs"), which provide employees with insurance, benefits, and other administrative services.[21]  In these structures, the PEO or other organization sits between the Settling Defendant and an employer. The Plan dictates that the allocation between the organization and the employers will be determined on a case-by-case basis. Once the employer allocation is determined, it is reasonable to further divide that allocated premium between the employer and the employee using the same types of principles described above for typical FI Groups.

## IV. THE SAME APPROACH IS ECONOMICALLY REASONABLE FOR DISTRIBUTING THE SELF-FUNDED NET SETTLEMENT FUND.

45.     The Plan proposes to allocate the Self-Funded Net Settlement Fund on a *pro-rata* basis among all eligible Self-Funded Authorized Claimants. To be eligible for a distribution, a Self-Funded Authorized Claimant must submit a claim and have a Claim Value sufficient to surpass the $5.00 minimum distribution threshold set forth in the Plan. The *pro-rata* allocation factor is a fixed percentage (Y%) calculated as the amount of the Self-Funded Net Settlement Fund divided by the Total Administrative Fees Paid by all Self-Funded Authorized Claimants eligible to receive a distribution. The distribution to each eligible claimant will be calculated as its Total Administrative Fees Paid multiplied by Y%. This

---

[21]  Kaiser Study data suggest that approximately 5% of small firms (199 employees or less) offer health benefits through a PEO. 2019 Kaiser Study, p. 234.

approach will distribute the Self-Funded Net Settlement Fund across all eligible Self-Funded Authorized Claimants in proportion to the estimated total administrative fees paid by each claimant.

46.     The Y% cannot be determined at present because it will depend upon a variety of factors that are currently unknown including:

    a.  The number of Self-Funded Authorized Claimants, which could number in the tens of millions;

    b.  The total administrative fees paid by those claimants during the Self-Funded Class Period, which cannot be estimated prior to the receipt of data from the Settling Defendants;

    c.  The ultimate claims submission rate; and

    d.  The percentage of Self-Funded Authorized Claimants with Claim Values sufficient to meet the minimum distribution threshold.

47.     I find the application of a *pro-rata* approach to be reasonable and appropriate. First, as discussed above, it is reasonable to estimate any alleged overcharge as a percentage of the price paid by customers – in this case the administrative fees which I anticipate can be estimated reasonably using data from the Settling Defendants. Second, the fees paid are likely to vary significantly across Self-Funded Authorized Claimants, which include Self-Funded Groups and Self-Funded Employees and which likely include different types of coverage (family *vs*. single), varying levels of benefits covered by the health plan, and different allocations of administrative fees between Self-Funded Group and their employees. Third, claimants will have different tenures in the Self-Funded Sub-Class. Finally, each eligible claimant will receive the same compensation for each dollar of administrative fees paid,

24

whether that claimant is a Self-Funded Group or Self-Funded Employee. The impacts of variations in product characteristics and class tenure are implicitly reflected in the administrative fees paid. Therefore, I find the *pro-rata* approach applied to estimated administrative fees paid to be a reasonable allocation method for the Self-Funded Net Settlement Fund.

48.     For Self-Funded Groups, amounts paid to cover medical and other health claims are passed through to the group, so to the extent there was any overcharge, it would have materialized in the administrative fees paid. The distribution of the Self-Funded Net Settlement Fund is therefore based on administrative fees rather than premiums. Because the size of the Self-Funded Net Settlement Fund has been determined separately and the distribution is based on a different metric (fees, not full insurance premiums), the Y% allocation factor used to distribute the Self-Funded Net Settlement Fund would not be expected to equal the X% allocation factor used for FI Net Settlement Fund.

49.     The same issue of allocation between employers and employees arises with respect to Self-Funded Groups. From the perspective of a sponsor of a Self-Funded Group, the economic burden of providing health coverage to employees reflects the total cost of providing that health coverage – both the cost of paying claims and the cost of administering the program. It is reasonable to assume that any cost burden borne by employees from health coverage provided by Self-Funded Groups defrays the cost of paying medical and other health claims as well as administration fees. Therefore, it is reasonable to allocate the Self-Funded Group administrative fees between employers and their employees in a manner similar to the allocation used for FI Groups, including the use of Default and Alternative options.

50. Class Counsel has proposed and the Allocation Mediator has accepted Default percentages for allocating administrative fees between employers and employees for Self-Funded Groups based on the same factors discussed above with respect to FI Groups.

51. These Default percentages are different from those for FI Groups: 18% for single coverage (*vs*. 15% for FI Group) and 25% for family coverage (*vs*. 34% for FI Group). For the same reasons outlined above concerning the FI Group Default percentages, I find the use of these Default percentages for Self-Funded Groups to be economically reasonable. Further, data from the Kaiser Study show that employee contributions for single coverage are slightly higher for Self-Funded Group coverage driven in part by the shorter Self-Funded Class Period. For family coverage, typical employee contributions have been significantly lower for Self-Funded Groups than for FI Groups since at least 2008. Therefore, it is economically reasonable to have different Default contribution percentages for Self-Funded Groups than for FI Groups.

52. I declare under penalty of perjury that the foregoing is true and correct.


Darrell B. Chodorow
October 30, 2020
Washington, DC

26

Appendix A: Resume

## DARRELL B. CHODOROW
Principal

Washington, DC                    +1.202.955.5050                    Darrell.Chodorow@brattle.com

---

**Mr. Darrell Chodorow** is a principal in the Washington, DC office of The Brattle Group. He has twenty-five years of consulting experience in commercial damages, valuation, and tax matters with The Brattle Group. His work has covered a broad array of industries including oil, natural gas, and electricity; biotechnology, pharmaceuticals, and chemicals; commodities and financial services; gaming; consumer products; high technology and media; and transportation.

His expertise includes developing practical insights from detailed analyses of complex business and financial contracts in the context of damages quantification, asset valuation, and the evaluation of economic substance underlying transactions. Mr. Chodorow has been identified as a leading expert witness in arbitration, in quantum of damages, and in construction quantum and delay by the Who's Who Legal Consulting Experts Guide.

*Commercial Damages:* Mr. Chodorow provides testimonial and non-testimonial consulting on damages in breach of contract, intellectual property, antitrust, and other matters. He has acted as an expert in cases before U.S. state and federal courts, the U.S. Tax Court, and the District Court of Cyprus, as well as arbitrations before AAA, ICSID, ICC, LCIA, PCA, BCCC and ad hoc tribunals.

*Business and Asset Valuation:* Mr. Chodorow has valued businesses, financial assets, and business assets in litigation and non-litigation matters. He has valued assets in a variety of sectors including agricultural products, cement, chemicals, financial products, gaming, mining, oil & gas, and electricity.

*Tax Disputes:* Mr. Chodorow has advised the Internal Revenue Service, the U.S. Department of Justice, and taxpayers on matters related to economic substance, research tax credits, transfer pricing, and asset valuation. Cases related to economic substance include BLIPS, Son of Boss, CARDS, DAD, STARS, short-sale, and leasing transactions.

In addition to authoring expert reports and testifying, Mr. Chodorow has worked closely with a number of leading economic and finance academics. They include University of California at Berkeley Professor Daniel McFadden, winner of the 2000 Nobel Prize in Economic Sciences; Massachusetts Institute of Technology Professor Stewart Myers, author of the world's leading corporate finance textbook; and Ohio State University Professor René Stulz, former president of the American Finance Association.

Prior to joining Brattle, Mr. Chodorow was an associate in the Energy, Chemicals and Pharmaceuticals group of Booz Allen & Hamilton and at Global Petroleum clearing trades in the futures trading room. He received a B.A. in economics from Brandeis University and an M.B.A. from the Yale School of Management, where he was invited to be a teaching assistant for courses in financial accounting, decision making, and economics.



1

## REPRESENTATIVE EXPERIENCE

### Commercial Damages – Court Proceedings

- In a lawsuit brought by the City of Ontario, CA against Los Angeles World Airports, Mr. Chodorow submitted an expert report evaluating the reliability of plaintiff's claim for damages in excess of $3 billion for alleged mismanagement of the Ontario airport.

- Mr. Chodorow provided expert testimony assessing the damages analysis underlying the request for a $50 million bond in a Lanham Act matter.

- In a lawsuit alleging predatory conduct by a market research provider, Mr. Chodorow submitted an expert report in federal court estimating damages to the plaintiff.

- Mr. Chodorow submitted an expert report on damages in a case involving alleged patent infringement in the biotechnology industry.

- On behalf of a pest control company, he submitted an expert report estimating damages arising from the alleged breach of a distribution agreement and advised counsel on patent infringement damages.

- For an industrial products company, Mr. Chodorow submitted an expert report on damages in a dispute over a distribution agreement and the accompanying option to purchase the supplier.

- In a lawsuit over an exclusive pharmaceutical distribution agreement for the Former Soviet Union, Mr. Chodorow testified on the reliability of a damages claim in excess of $300 million arising from the supplier's alleged breach of contract.

### Commercial Damages – Arbitration Proceedings

- *Permanent Court of Arbitration in The Hague:* On behalf of a minority shareholder in a major financial institution, Mr. Chodorow worked with Professor Stewart Myers to critique the valuation methodologies used to determine the price applied in a mandatory share repurchase.

- *International Centre for the Settlement of Investment Disputes:* Mr. Chodorow estimated damages to foreign investors relating to alleged violations of Chapter 11 of NAFTA by the United Mexican States through the imposition of a tax on high-fructose corn syrup.

- *Arbitration Institute of the Stockholm Chamber of Commerce:* He estimated damages arising from an alleged violation of a license agreement granted to a Chinese chemical manufacturer.



- *London Court of International Arbitration:* Mr. Chodorow evaluated the economic factors surrounding the alleged breach of a crude oil supply agreement between a large buyer and a state-owned oil company.

- *ICC International Court of Arbitration:* He conducted an assessment of the implementation of a valuation clause in a cross-border joint venture agreement involving the beverage industry.

- *American Arbitration Association*: Mr. Chodorow provided expert testimony on issues relating to market timing, directed brokerage, and damages in the mutual fund industry.

## Valuation Matters

- In the oil & gas industry, Mr. Chodorow has:

  - Advised a board of directors on the valuation impact of a proposed refinery upgrade.

  - Evaluated the reliability of the methodology and conclusions reached in an appraisal of a multi-billion dollar petroleum refining and marketing business.

  - Valued crude oil reserves and assessing the impact of changes in prices on reserve values.

  - Assessed the loss in value arising from a proposed injunction on the start of production for a coalbed methane project.

  - Valued lease interests in the Marcellus shale.

  - Analyzed the value of liquefied natural gas (LNG) sale and purchase agreements.

- In a dispute over a gaming license in an Asian market, he valued the gaming business resulting from a multi-billion dollar investment program relying on the license.

- Mr. Chodorow advised on the fair market value of the assets during negotiations over the sale of a controlling stake in a large cement, aggregates, and ready-mix concrete business.

- For an entrepreneur considering the purchase of hydroelectric generating assets, Mr. Chodorow estimated the fair market value of the target assets.

- Mr. Chodorow advised a client on the valuation of online gaming assets that generated net gaming revenues of nearly $1 billion per year.

- On behalf of a potential acquirer, he assisted in the valuation of transmission assets being offered for sale by a vertically-integrated electric utility.

- Mr. Chodorow has valued a wide variety of financial instruments.



**Tax Matters**

- In *Roy E. Hahn and Linda G. Montgomery v. Commissioner of Internal Revenue*, Mr. Chodorow testified on the potential for economic profit and non-tax business purpose of the CARDS transaction.

- For both the U.S. Government and taxpayers, Mr. Chodorow has evaluated issues related to economic substance and business purpose for transactions including: BLIPS (*Klamath Strategic Investment Fund LLC v. U.S.*); "Son of Boss" (United States v. Woods); CARDS (*Country Pine Finance, LLC v. Commissioner of Internal Revenue);* Distressed Asset/Debt (*Southgate Master Fund LLC. W. United States*); STARS *(Salem Financial Inc. v. United States)*; corporate restructurings; and sale-leaseback transactions.

- In a variety of matters, Mr. Chodorow advised clients on transfer pricing issues both for advance pricing agreements and in the course of litigation. Industries analyzed include liquefied natural gas, mining, commodities trading, insurance, and pharmaceuticals.

- In multiple cases, Mr. Chodorow assessed the reasonableness of claimed valuations of performing and non-performing debt instruments.

- Mr. Chodorow submitted an expert report valuing crude oil reserves worth nearly $1 billion in a tax basis dispute and presented before an IRS Appeals panel.

- On behalf of a taxpayer, Mr. Chodorow evaluated whether a company bore the economic benefits and burdens of research costs for which it claimed research tax credits.

- In multiple cases, Mr. Chodorow has evaluated the economic reasonableness of a taxpayers' claimed tax treatment of hedging transactions conducted using exotic derivatives.

- Mr. Chodorow advised a promoter of alleged abusive tax shelters on potential damages in a class action lawsuit by its customers.

## PUBLICATIONS AND PRESENTATIONS

"Valuing Natural Resources Investments," in Contemporary and Emerging Issues on the Law of Damages and Valuation in International Investment Arbitration, (with R. Caldwell and F. Dorobantu), May 2018.

"An Economic Evaluation of 'Funding' for Research Tax Credits," (with S. Ledgerwood). *Tax Notes,* Volume 144, Number 13 (September 29, 2014): 1593.



"Credit, Where Credit is Due: An Economic Approach to Evaluating the Issue of 'Funding' in Research Tax Credit Claims," (with S. Ledgerwood), February 2014.

"The BP Royalty Trust: Warning of Impending Price Declines or a Failing Economic Indicator," Notes at the Margin, (with P. Verleger), September 2012.

"The Economic Implications of the Texas Waiver on Petroleum Markets and the Broader Economy," (with P. Verleger), June 2008.

University of Virginia School of Law, Guest Lecturer in Regulation and Deregulation of U.S. Industries, February 2008.

"Standards for Consulting Firms Working with Academic Experts," presented at Law Seminars International's Expert Testimony in Litigation Conference, Reston, VA, December 2004.

"The FERC, Stranded Cost Recovery, and Municipalization," *Energy Law Journal,* Vol. 19 (2), pp. 351-386. (with others).

"Stages of Power Plant Development – A Survey," (with F. Graves), presented at *"Boom-Bust" in the Electric Power Industry*, Cambridge, MA, August 2000.

"What's in the Cards for Distribution Companies," (with P. Hanser and J. Pfeifenberger), presented at *The Electricity Distribution Conference*, Denver, CO, April 1998.

"Distributed Generation: Threats and Opportunities," (with P. Hanser and J. Pfeifenberger), presented at *The Electricity Distribution Conference*, Denver, CO, April 1998.


## TESTIMONY AND EXPERT REPORTS

*Agrizap, Inc. v. Woodstream Corp., et al.,* U.S. District Court, Eastern District of Pennsylvania.  Civil Action No. 04-3925.  Expert Report.

*AMG Vanadium LLC v. Mitchell E. Kidd, et al.,* U.S. District Court, Eastern District of Pennsylvania. Civil Action No. 18-cv-4301 (JLS).  Expert Report.

*Bilcon of Delaware Inc. et al v. Government of Canada*, Permanent Court of Arbitration CA Case No. 2009-04.  Expert Report, Reply Report and Hearing Testimony.

*City of Ontario v. City of Los Angeles, Los Angeles World Airport, and Los Angeles Board of Airport Commissioners,* Superior Court of California.  Case No. RIC 1306498.  Expert Report and Deposition Testimony.



*Confidential AAA arbitration involving the mutual fund industry (New York).*  Expert Report, Deposition Testimony, and Hearing Testimony.

*Confidential Brazil-Canada Chamber of Commerce arbitration over economic losses in an insurance dispute involving assets in the pulp and paper industry.*  Expert Report.

*Confidential ICC arbitration of alleged misrepresentations in a cosmetics industry acquisition (Singapore).*  Expert Report and Hearing Testimony.

*Confidential ICC arbitration relating to the alleged breach of a share purchase agreement in the pulp industry.*  Expert Report.

*Confidential ICC arbitration relating to the construction contract for a hydroelectric dam in Central America (New York).*  Expert Report, Rebuttal Report, and Hearing Testimony.

*Confidential ICDR arbitration involving a claim on an insurance policy covering the alleged breach of representations and warranties in an energy industry acquisition (New York).*  Expert Report, Hearing Testimony.

*Confidential LCIA arbitration regarding the delivery of allegedly defective solar modules (Singapore).*  Expert Report.

*Confidential tax dispute over the value of crude oil reserves.*  Expert Report and Presentation to IRS Appeals Panel.

*Coverings Space NJ, Inc. v. Adele, et al.,* Superior Court of New Jersey. Civil Action HUD-L-3730-06. Expert Report and Deposition Testimony.

*Embrex, Inc. v. Avitech, L.L.C.*  U.S. District Court, Middle District of North Carolina. Civil Action No. 1:04CV00693.  Expert Report.

*Enel Green Power S.p.A. v. Republic of El Salvador,* International Centre for Settlement of Investment Disputes, Case No. ARB/13/18.  Expert Report.

*ErinMedia, LLC v. Nielsen Media Research, Inc.,* U.S. District Court, Middle District of Florida.  Civil Action No. 8:05-CV-1123-T24-EAJ.  Expert Report and Deposition Testimony.

*Hydro-Fraser Inc., Société d'energie Columbus Inc., Ayers Ltée v. Hydro Québec,* ad hoc arbitration. Expert Report, Rebuttal Report, and Hearing Testimony.

*IC Power Asia Development Ltd. v. Republic of Guatemala,* UNCITRAL arbitration.  Expert Reports and Hearing Testimony.

*Kayat Trading Ltd. v. Genzyme Corporation,* Cyprus District Court, Nicosia District.  Expert Report and Court Testimony.



*Laboratorios Haymann S.A. v. Ivax Pharmaceuticals, Inc. and Teva Pharmaceuticals USA, Inc.*, International Chamber of Commerce International Court of Arbitration, Case No. ICC 18589/CA. Expert Report, Deposition Testimony, and Hearing Testimony.

*Norfolk Southern Railway Company v. Drummond Coal Sales, Inc.*, U.S. District Court, Western District of Virginia.  Civil Action No. 7:08CV00340.  Expert Report.

*Perfetti Van Melle USA and Perfetti Van Melle Benelux v. Cadbury Adams USA LLC*, U.S. District Court for the Eastern District of Kentucky, Civil Action No. 2:10-CV-35-DLB.  Expert Declaration and Court Testimony.

*Petroplast Petrofisa Plasticos S.A. and Petrofisa Do Brazil, Ltda v. Ameron International Corp.*, Delaware Court of Chancery, Civil Action No. 4304-VCP.  Expert Report, Deposition Testimony, and Court Testimony.

*Robert Rockwood and Roxanna Marchosky v. SKF USA, Inc.*  U.S. District Court for the District of New Hampshire, Civil Action No. 1:08-CV-00168.  Expert Report.

*Roy E. Hahn and Linda G. Montgomery v. Commissioner of Internal Revenue*, U.S. Tax Court, Docket No. 1910-14.  Expert Report and Court Testimony.

*SCS Interactive, Inc. and Whitewater West Industries Ltd v. Vortex Aquatic Structures International Inc.*, U.S. District Court of Colorado, Civil Action No. 09-cv-01732-REB-KLM.  Expert Report.

*SoBe Entertainment International, LLC v. Paul Wight a/k/a "The Big Show," Bess Wight f/k/a Bess Katramados, and World Wrestling Entertainment, Inc., Circuit Court for Miami-Data County, Case No. 09-45461 CA 09.*  Expert Declaration.

*The Northern Cheyenne Tribe v. Gale A Norton, Secretary of the Interior and Fidelity Exploration and Production Company*, U.S. District Court, District of Montana, Billings, Civil Action No. CV-03-00078-RWA.  Expert Declaration.

