FILED

2020 Oct-30  PM 09:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT

# I

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| IN RE BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION MDL 2406 | : : : : : : : : | Master File 2:13-cv-20000-RDP This document relates to Subscriber Track cases |
|---|---|---|

## DECLARATION OF DR. DANIEL RUBINFELD

**I, Daniel Rubinfeld, declare**:

1.      I am the Robert L. Bridges Professor of Law and Professor of Economics Emeritus at the University of California, Berkeley and Professor of Law at NYU.

2.      I served as Deputy Assistant Attorney General at the Antitrust Division of the U.S. Department of Justice from June 1997 through December 1998. In that position, I was responsible for supervising a staff of approximately 70 Ph.D. economists, financial analysts, and research assistants with respect to a wide range of antitrust matters, including monopolization, price fixing, and other restraints of trade. While at the Department of Justice, I played an active role in the drafting of the Antitrust Guidelines for Collaborations Among Competitors.

3.      I received my A.B. degree in mathematics from Princeton in 1967 and my Ph.D. in economics from M.I.T. in 1972. I have previously taught at the University of Michigan and have been a Visiting Professor at the law schools of Stanford University, the University of Geneva, the University of Hamburg (on several occasions), the University of Virginia, Catholica University of Lisbon, the University of Bergen (on several occasions), and New York University (on numerous occasions). I am the author of two textbooks, Microeconomics and Econometric Models and Economic Forecasts (both with Robert Pindyck). I have received fellowships from the National Bureau of Economic Research, the John M. Guggenheim Foundation, and the Center for Advanced Studies in the Behavioral Sciences. I am a past President of the American Law and Economics Association. I am currently a Fellow of the American Academy of Arts and Sciences and a Fellow of the National Bureau of Economic Research.

4.      My research interests have spanned a range of subject matters, including industrial organization and antitrust policy, the economics of legal rules and institutions, public economics, and law and statistics. I have published or edited seven books and over 100 articles. I have consulted and testified extensively on antitrust, intellectual property, public regulation, and

damages issues, for private parties and for the U.S. Department of Justice, the Federal Trade Commission, the U.S. Treasury, the Competition Directorate of the European Union, and various State Attorneys General.

5.     My recent teaching includes Antitrust Law and Economics and Quantitative Methods in Law (co-taught with Katherine Forrest, commencing during her tenure as a United States District Judge for the Southern District of New York).

6.     I have served on a number of occasions as a lecturer for the Federal Judicial Center concerning the use of statistical methods by the courts.

7.     A current copy of my curriculum vitae is included as Attachment 1.

**I.     Assignment**

8.     I have been asked by Settlement Class Counsel[1] to evaluate the potential economic impact of structural and other injunctive relief set forth in their proposed Settlement Agreement. In particular, I have been asked to evaluate the settlement in light of the opinions that I have offered concerning the nature of rules currently imposed by the Blue Cross Blue Shield Association ("BCBSA") with respect to the designation of Exclusive Service Areas ("ESAs") and the so-called "best efforts" clauses contained in the BCBSA license agreements.

9.     I have not been asked to model or evaluate past economic damages or the monetary relief obtained in the proposed settlement.

10.     I have previously offered a report at the class certification stage of this proceeding concerning whether economic evidence and methods used to prove liability and anticompetitive impact are common to members of proposed litigation classes.   ECF No. 2568-1 ("Class

---

[1] Capitalized terms used in my report that are not otherwise defined take the meaning given to them in the Settlement Agreement.

Report"). I have also offered a merits experts report concerning liability and anticompetitive impact.

11.     In my Class Report, dated April 15, 2019, I discussed the impact of the restraints at issue in the litigation, including the ESAs, national best efforts clauses, ceding in the national account market, and rules concerning acquisitions. I examined the language of the restraints themselves, and I concluded, based initially on that language and confirmed by economic analysis of their effects, that the restraints are anticompetitive. I identified no compelling procompetitive justification for the restrictions.

## II.     Overview of Report

12.     In the course of that earlier assignment, I reviewed substantial case materials, documents produced in the litigation, public documents, deposition testimony, and other materials requested by me. For details, see Appendix C to Class Report.

13.     In that report I explained why (based on an economic analysis) the so-called "National Best Efforts" provisions are restraints on competition that have recognized anticompetitive economic effects. Furthermore, with respect to competition for local accounts, these national best efforts restrictions are harmful to the competitive process.

14.     Finally, I explained that the aggregated challenged restraints do not have clear competitive benefits and that the removal or easing of those restraints is likely to increase economic efficiency.

15.     My review of the proposed settlement convinces me that the injunctive relief directly addresses the competitive restraints discussed in my earlier report.

16.     The injunctive relief is likely to generate significant pro-competitive effects in the marketplace in the forms of increased competition among Blues, unbranded ("Green") growth

and competition, scale economies that may result in increased output, higher quality service, increased innovation, and lower insurance premiums (prices) to subscribers (consumers).

17.     This forward-looking relief, opening up competition among substantial entities in the enormous health insurance market, stands as economically significant by itself, in addition to the $2.67 billion monetary recovery provided for in the proposed settlement.

## III.     Background – the BCBS Competitive Restaints

18.     The individual Blue Cross Blue Shield licensees do not compete under the Blue brand outside of their respective designated ESA, "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."[2]

19.     In 1994, member plans adopted a license standard that required plans to exercise "Local Best Efforts" to promote the Brands in their service areas. Each Defendant Plan agreed in the BCBSA Guidelines that at least 80% of the annual revenue or customers that it or its subsidiary generates from within its Service Area must come from services it offers as a BCBS Plan. In essence, the local best efforts restriction requires that at least 80% of each Plan's health revenue is Blue-branded within its exclusive service area.

20.     Historically, a Blue licensee was permitted to operate as a non-Blue, within and outside the Blue's designated exclusive territory.

21.     In 2005, the Association adopted a "National Best Efforts" or NBE standard (*i.e.*, the unbranded restriction), which required a Blue licensee operating as a non-Blue to have 2/3 of national net health revenues come from Blue-branded business.

---

[2] The evidence upon which I rely for this report can be found in my Class Report, where I discuss the restraints in more detail with additional citation to record evidence.

## IV. Analysis of the Proposed Settlement's Injunctive Relief

### A.     Elimination of the NBE

22.     The NBE standard is a clear competitive restraint. It provides that at least 66-2/3% of the annual combined national net revenue or annual combined national enrollment of a Blue Plan and its licensable controlled affiliates attributable to health care plans and related services must be sold, marketed, administered, or underwritten under the Blue Marks.

23.     The NBE limits non-Blue or "Green" competition among the Plans, whether inside or outside of the allocated ESA.

24.     The NBE limits Blue licensees' incentive and ability to compete against other Blue Plans on an unbranded basis, as it can limit the size of, or can prevent altogether, a subsidiary's expansion into another Plan's ESA. The larger the share of a market that a subsidiary contemplating entry would need to achieve to rationalize the fixed costs of entry, the more likely it is that the NBE restriction would prevent entry that would otherwise occur. In other words, if profitable expansion by an unbranded subsidiary depends on the ability of the subsidiary to achieve a significant scale or capture a sufficiently large share of the market, then the unbranded restriction is more likely to be a binding constraint to unbranded expansion. The prospect of having to limit growth or revenue from a non-Blue branded or "Green" business creates a disincentive for Blue Plans to develop such a business, since the ability to reap rewards would always be capped and monitorited to ensure it does not exceed the cap.

25.     The NBE restriction on Green competition does not, in fact, require any Blue to actually use any effort to promote the Blue brand. Instead, unlike the type of best efforts requirement one might find in a contract or agreement, which requires an entity to use its best effort to meet a standard, the NBE restraint is a pure revenue cap untethered to any specific actions to promote the Blue brand.

26.     The effect of the Best Efforts requirements is to limit Blue Plans' ability to grow outside of their ESAs. This is a problem for Plans that, like BCBS-AL for example, have very high market shares within their ESAs, but are restricted from expanding outside their ESAs, which they might otherwise be well-positioned to do.

27.     Blues that may have considered expanding their Green business have been stymied by the NBE restriction on Green competition. In addition, there is a real-world test case that illustrates the predominant anticompetitive effects of the restraints: the failed Anthem/Cigna merger.

28.     Through a potential merger with Cigna, Anthem saw an opportunity to grow its Green business into a national competitor. However, in my opinion an impediment to any merger was the NBE restriction on Green competition, which inhibited any Blue from developing a Green business that could become a national competitor.

29.     The merger was challenged by the DOJ and found to be anticompetitive. The existence of Best Efforts rules was noted as one of the significant concerns. The DOJ's expert opined that the Best Efforts rules would "restrict[] growth post compliance" and that the merged entity "must manage total revenue growth to not outpace Blue revenue growth."[3] The court further found that Anthem's proposed strategy for the merger—shifting Cigna accounts to Anthem's network—would have a negative impact on innovation.[4]

30.     I note that in Paragraph 10 of the proposed Settlement Agreement, Defendants have agreed not only to "eliminate and no longer enforce the National Best Efforts Requirement," but also to "not adopt or implement any equivalent requirement or any rule in any

---

[3] *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 241 n.42 (D.D.C. 2017).

[4] *Id.* at 230-31.

future License Agreement or Membership Standard that imposes a cap, ratio, or other quantitative limit on a Settling Individual Blue Blue Branded healthcare business outside of its Service Area."

31.     With respect to prospective enforcement of that provision, I also note that Paragraph 20 of the Settlement Agreement provides that, "[d]uring the Monitoring Period," "the Settling Defendants will report drafts of new rules or measures for approval under Paragraphs 10 through 18 to the extent Settling Defendants advise of such potential rules or measures and disputes related to obligations created by this Agreement.".

32.     In my opinion, this provision of the proposed Settlement Agreement eliminating the NBE as the critical enforcement mechanism for restraining competition outside of a Blue's ESA, and further proscribing any future equivalent provision, is clearly pro-competitive; it is in the interest of the members of the Settlement Classes.

**B.      Increased Competition Among Blue Plans for National Accounts**

33.     In addition to the ESAs and NBE, I have examined BCBSA's ceding policies.

34.     Under BCBSA's current ceding policies, if a Blue wishes to bid on a national account located outside of its ESA, that Plan (referred to as the "Alternative Control Licensee" or "ACL") must seek permission from the Member Plan that controls the ESA (referred to as the "Initial Control Licensee" or "ICL") before reaching out to that national account. Without permission, a potential ACL cannot even make contact with a company headquartered outside its ESA. Furthermore, multistate customers do not have the right to request a bid from their preferred Blue, where that Blue has a different ESA than the one in which the account is headquartered.

7

35.     If permission is granted, then only the ACL may submit a bid for the national account's business—in such a scenario, the ICL agrees not to submit a competing bid.[5] Thus, even under ceding of a national account, the Blues still agree not to compete against each other for customers. A Blue can deny a cede even when that Blue does not itself wish to bid on the account.

36.     These rules in existence prior to the proposed settlement tended to foreclose competition.

37.     The proposed settlement offers relief that will provide increased opportunity for competition in the market for national accounts:

   a.  Qualified National Accounts (those with more than 5,000 employees and meeting certain dispersion criteria who do not currently have a right to request a bid from more than one Blue Plan) will now be able to obtain a second Individual Blue Plan bid (see Settlement Agreement, ¶ 15).

   b.  For Qualified National Accounts with Independent Health Benefit Decision Locations in more than one Service Area, each Independent Health Benefit Decision Location may request a bid from the Member Plan in its Service Area to cover employees working at that Location (see Settlement Agreement, ¶ 14(b)).

   c.  When multi-Service Area National Accounts (those with more than 250 total Members and  Headquarters in the bidding Individual Blue Plan's Service Area) seek bids, the Individual Blue Plan for that Service Area may bid the Account as a non-Blue brand, provided the right to bid as a Blue brand is afforded to another Individual Blue Plan (see Settlement Agreement, ¶ 14(a)).

---

[5] BC-IDAHO_MDL001236529 at '537.

## C.   Acquisitions

38.     Through member plan voting, BCBSA controls whether any individual Blue Plan may be acquired by an entity other than another Blue Plan. Currently, each Blue Plan agrees to abide by the rule on acquisitions, which states:

> Neither a Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a Plan or a Licensed Controlled Affiliate thereof to obtain control of the Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services.[6]

39.     Under the acquisition rule, if a non-Blue wishes to acquire a Blue Plan, it must ensure that after the acquisition, 66-2/3% of its revenues come from Blue-branded products, or else the acquisition will result in the acquired Blue Plan violating the NBE rules, potentially causing it to lose its license to the Blue Marks. In passing the rule, the Blue Plans "decided that a Plan shall lose its License if it is taken over by another company and the combined health care business is less than 66% Blue."[7]

40.     The purpose of the acquisition rule was to "assure that a Plan's predominant brand remained Blue."[8] As a result, the acquisition rule severely limits the ability of a non-Blue to acquire a Blue Plan.

41.     The acquisition rule and the NBE restriction reinforce each other, ensuring that whatever the form a Blue takes, it must follow a strict revenue cap that prevents its growth into a national competitor.

42.     The proposed settlement relief in this respect, too, is pro-competitive and in the interests of the Settlement Classes. Under Settlement Agreement, ¶ 17, BCBSA and the Plans

---

[6] SX176 (Doc. 1352-183) at BCBSA03879185.

[7] SX254 (Doc. 1436-34) at BCBSA00199980.

[8] *Id.*

would be permitted to impose "legal and reasonable conditions on the acquisition of a Settling Individual Blue Plan, but only to the extent that those conditions are reasonably necessary to prevent impairment of (1) the value of the Blue Marks, or (2) the competitiveness or efficiency of the Blue Branded business or of the Blue Marks."

43.     Further, any condition on acquisitions must provide that the potential acquirer may challenge any rejection by BCBSA before the Settlement Agreement's Monitoring Committee, followed by binding arbitration.

44.     The provisions of the Settlement Agreement discussed above address the serious anticompetitive restraints discussed in my Class Report. However, I note that there are additional procompetitive injunctive relief provisions in the proposed settlement, such as a requirement in Paragraph 18 of the Settlement Agreement that if there is no governing state law, regulation or agreement applicable to the use of a Most Favored Nation (MFN) clause or differential in provider contracts, the Individual Blue Plan seeking that MFN differential must provide proof to the Monitoring Committee that the MFN differential complies wih the terms of the Settlement Agreement.

45.     In my view, the proposed settlement enables plans to respond to consumers/market with innovative products and to achieve efficiencies even to the extent that predominant brand may no longer be Blue – thus also directly confronting one of the key Anthem/Cigna problems in the future.

I declare under penalty of perjury the foregoing is true and correct.

Daniel Rubinfeld
October 30, 2020
Berkeley, CA

**Attachment 1: Curriculum Vitae**

August 2020

Curriculum Vitae

# DANIEL L. RUBINFELD

**PRESENT POSITIONS**:

Robert L. Bridges Professor of Law, Professor of Economics, Emeritus
University of California, Berkeley, Room 453,
Berkeley, California 94720
Phone: (510) 642-1959
Fax: Office (510) 642-3767
e-mail: drubinfeld@law.berkeley.edu

Professor, NYU Law School, Fall Semester, 427 Vanderbilt Hall
40 Washington Square West, New York, NY 10012, Phone: (212) 992 8834
drubinfeld@nyu.edu, Fax: (212) 995-4590
Current teaching (2017): Antitrust Law & Economics, Quantitative Methods in Law
          (with Katherine Forrest)

**ACADEMIC STUDIES**:          Princeton, Mathematics, B.A., June 1967
                              M.I.T., Economics, M.S., September 1968
                              M.I.T., Economics, Ph.D., June 1972

**TEACHING EXPERIENCE**:

Suffolk University, Boston, Massachusetts
          Full-time Economics Instructor, 1968-70
Wellesley College, Wellesley, Massachusetts
          Full-time Economics Instructor, 1970-71
University of Michigan, Ann Arbor, Michigan
          Assistant Professor of Economics, 1972-77
          Associate Professor of Economics and Law, 1977-82
          Professor of Economics and Law, 1982-83
          Research Associate, Institute of Public Policy Studies, 1972-82
University of California, Berkeley, 1983 - present
          Robert L. Bridges Professor of Law and Professor of Economics, 1983-Present
Stanford University
          Visiting Professor of Law, Spring 1989 (Economics and Public Policy)
University of Geneva
          Visiting Professor, May 1991 (Antitrust Law and Economics)
Swiss National Bank, Studienzentrum Gerzensee (one week for each visit)
          Visiting Professor of Law and Economics, Spring 1995-97 (Economics of Private Law), 2002
          (Political Economy of Federalism), 2004, 2007 (Competition Law and Economics), 2009,
          2011 (Competition Law and Economics)
New York University

       Visiting Professor, Professor of Law, Spring 1999, Fall 2000, 2003, 2005-2006, 2008-2012
       (Quantitative Methods in Law, Antitrust Law and Economics)
University of Virginia
       Visiting Professor of Law, January 2004 (Antitrust Law and Economics)
University of Hamburg
       Visiting Professor of Law, May 1999, 2002 (Quantitative Methods), June, 2008 (Antitrust
       Law and Economics)
University of Bergen
       Visiting Professor of Law, August 2006, August 2007, August 2008, August 2010 (Antitrust
       Law and Economics)
Catholic University of Portugal, Lisbon
       Visiting Professor of Law, April 2009, April 2010 (Antitrust Law and Economics)
Kiev School of Economics
       Visiting Professor, April 2010

## GOVERNMENT POSITIONS

       Economist, Staff of President's Council of Economic Advisers, Summer, 1969
       Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, June 1997-Dec
       1998

## GOVERNMENT CONSULTING

       Member, Ann Arbor Rent Control Study Commission, 1973
       Consultant, Urban Institute, 1973
       Consultant, U.S. Treasury, Program in State and Local Finance, 1984-85
       Consultant, National Academy of Sciences, Panel on Taxpayer Compliance, 1985-86
       Consultant, U.S. Consumer Product Safety Commission, Safety of
       All-Terrain Vehicles, 1987-88
       Consultant and Lecturer, Federal Judicial Center, 1993-present, Use of Statistical
       Analysis by the Courts
       Consultant, World Bank (South Africa Mission), 1995-1997
       Consultant, Antitrust Division, 1999, *U.S. v. Microsoft*
       Consultant, Competition Directorate, European Union, 2003-2004, Merger Simulation
       Lecturer, Federal Trade Commission, June-July, 2003, Antitrust Economics
       Consultant, Federal Trade Commission, Antitrust Division, Dept. of Justice, various State Attorneys
       General

## OTHER POSITIONS HELD:

       Research Assistant, William G. Bowen, 1966-67
       Research Assistant, Paul A. Samuelson, 1971
       Consultant, M.I.T.- Harvard, Joint Center for Urban Studies, Spring and Summer, 1972
       Consultant, Urban Institute, 1973
       Consultant, National Academy of Sciences, Committee on the Costs of Automobile
       Emission Control, Summer 1974
       Consultant, National Academy of Sciences, Panel on Statistical Assessments as
       Evidence in the Courts, 1984
       Consultant, National Academy of Sciences, Panel on Taxpayer Compliance, 1985-86

Chair, Program in Law and Economics, UC Berkeley, 1986-97, Co-Chair, 2000-
Member, National Academy of Sciences, Working Panel on Field Experimentation in Criminal
     Justice, 1986-87
Chair, Program in Jurisprudence and Social Policy, U.C. Berkeley, 1987-1990, 1998-1999
Member, Board of Directors, American Law and Economics Association, 1994-1996, 2001-2003
Secretary-Treasurer, American Law and Economics Association, 2003-2004
Vice President, American Law and Economics Association, 2004-2005
President, American Law and Economics Association, 2005-2006
Vice Chair, ABA Section on Antitrust, Committee on Economics, 1997-1999
Member, National Academy of Sciences, NSF Blue Ribbon Commission on Digital Preservation,
     2007-2010


**ACTIVITIES AND HONORS**:
Princeton University, 1967, Magna Cum Laude, Phi Beta Kappa
Woodrow Wilson Fellow, 1967
National Science Foundation Fellowship, 1968-69
National Science Foundation Dissertation Fellowship, 1971-72
Winner, National Tax Association, Outstanding Doctoral Dissertation Award, 1972
Research Fellow, National Bureau of Economic Research, Cambridge, Massachusetts, 1975-76
Editorial Board, Public Finance Quarterly, 1980-2003
Editorial Board, Law and Society Review, 1982-1985, 1989-1999
Advisory Panel, NSF, Program in Law and Social Science, 1982-84
Editorial Board, Evaluation Review, 1985-1987
Faculty Advisory Board, U.C. Berkeley, Center for Real Estate and Urban Economics, 1983-97,
     2000-
Co-Editor, International Review of Law and Economics, 1987-2003
Lecturer, California Continuing Judicial Studies Program, 1988-1989
Oversight Panel, NSF Program in Law & Social Science, 1988
Board of Directors, LECG, 1995-1997
Board of Directors, Atlas Assets, Inc., 1989-1997, 1999-2008
Member, Correspondent Comm., Interuniversity Consortium for Political & Social Research, 1991-
Editorial Board, Law and Social Inquiry, 1992-1999, 2002-2004
Fellow, Center for Advanced Study in the Behavioral Sciences, 1992-93
Ida Beam Distinguished Lecturer in Law and Economics, University of Iowa, Spring 1995
John Simon Guggenheim Fellowship, 1995
Faculty Advisory Board, UC Berkeley, Burch Ctr. for Tax Policy & Public Finance, 1994-97, 1999-
Elected to American Academy of Arts and Sciences, 2001
Advisory Council, Master Program on Law & Economics, Universidad de Buenos Aires, 2003-
Research Associate, Law School, Australian National University, 2003-
Editorial Board, Journal of Australian Economic Education, 2003-
Editorial Board, The Review of Law and Economics, 2004-
Fellow, National Bureau of Economic Research, 2004-
Member, International Academic Council, U. of St. Gallen, Masters in Law & Economics, 2005-
Honorary Doctorate, U. of Basel, November 2008.
Co-Editor, Journal of Legal Analysis, 2008-2015, Editorial Board, 2015-
Concurrence, 2015:  Antitrust Writing Awards:  Dominance Category (with Jim Ratliff)
Editorial Board, Asia-Pacific Journal of Regional Science, 2016-2021
Concurrence, 2017 Antitrust Writing Awards:  Unilateral Conduct Category (with Michal Gal)
American Antitrust Institute: Jerry S. Cohen Memorial Fund Writing Award, 2017 –
     Best Antitrust and Platform Markets Article (with Michal Gal)

Recent Keynote Lectures:
>    Asian Law and Economics Association, Bangkok, (Antitrust and Big Data), Fall, 2018,
>    French Law and Economics Association, Nancy, France (Data Standardization
>         Spring, 2018.
>    OECD (Common ownership), Spring, 2018

## PUBLICATIONS:

Books

1.   STATISTICAL ANALYSIS OF ECONOMIC AND FINANCIAL DATA, Dynamics Associates, Cambridge, 1971, Revised Edition, 1974.

2.   ECONOMETRIC MODELS AND ECONOMIC FORECASTS (with Robert S. Pindyck), McGraw-Hill, January 1976.  Second Edition, 1981, Spanish, Japanese, and Chinese versions available; Third Edition, 1990; Fourth Edition, 1998.

3.   ESSAYS ON THE LAW AND ECONOMICS OF LOCAL GOVERNMENTS (Editor), COUPE Papers on Public Economics, Urban Institute, December 1979.

4.   AMERICAN DOMESTIC PRIORITIES: AN ECONOMIC APPRAISAL (Co-editor with John M. Quigley), University of California Press, 1985.

5.   MICROECONOMICS (with Robert S. Pindyck), MacMillan, 1989, Second Edition, 1992, Italian, Spanish, and Russian editions, Third Edition, 1995, Portuguese edition; Fourth edition, 1998, Japanese, Chinese editions; Fifth Edition, 2000, Uzbek, Indonesian, German, Korean editions, Sixth Edition, 2005, Seventh Edition, 2009, Croatian, French, Taiwanese, and Basque editions, Eighth Edition, 2013, Ninth Edition, 2018.

6.   DID MICROSOFT HARM CONSUMERS: TWO OPPOSING VIEWS (with David S. Evans, Franklin M. Fisher, and Richard L. Schmalensee), AEI-Brookings Joint Center for Regulatory Studies, 2000.

7.   ECONOMETRICS: LEGAL, PRACTICAL, AND TECHNICAL ISSUES (Co-editor with John Harkrider), ABA Antitrust Section, 2005.

8.   DEMOCRATIC FEDERALISM:  THE ECONOMICS, POLITICS, AND LAW OF FEDERAL GOVERNANCE (with Robert Inman), Princeton University Press, 2020.

Journal Articles

1.   "Credit Ratings and the Market for General Obligation Municipal Bonds," National Tax Journal, March 1973, pp. 17-27.

2.   "The Determination of Equalized Valuation: A Massachusetts Case Study," Public Finance Quarterly, April 1975, pp. 153-161.

3.   "Voting in a Local School Election: A Micro Analysis," Review of Economics and Statistics, February 1977, pp. 30-42.

4.      "Suburban Employment and Zoning: A General Equilibrium Analysis," <u>Journal of Regional Science</u>, March 1978, pp. 33-44.

5.      "Hedonic Housing Prices and the Demand for Clean Air" (with David Harrison, Jr.), <u>Journal of Environmental Economics and Management</u>, March 1978, pp. 81-102, in Joseph Herriges and Cathy Kling, eds., REVEALED PREFERENCE APPROACHES TO ENVIRONMENTAL VALUATION: Volume II, Ashgate Publishing Limited, 2008.

6.      "The Long-Run Effects of a Residential Property Tax and Local Public Services" (with A. Mitchell Polinsky), <u>Journal of Urban Economics</u>, April 1978, pp. 24l-262, reprinted in John M Quigley, ed., THE ECONOMICS OF HOUSING, Edward Elgar, 1997.

7.      "On the Measurement of Benefits in an Urban Context:  Some General Equilibrium Issues" (with Paul N. Courant), <u>Journal of Urban Economics</u>, June 1978, pp. 346-356.

8.      "The Air Pollution and Property Value Debate: Some Empirical Evidence" (with David Harrison, Jr.), <u>Review of Economics and Statistics</u>, November 1978, pp. 635-638.

9.      "The Distribution of Benefits from Improvements in Urban Air Quality" (with David Harrison, Jr.), <u>Journal of Environmental Economics and Management</u>, December 1978, pp. 313-332.

10.     "Tax Limitation and the Demand for Public Services in Michigan" (with Paul N. Courant and Edward M. Gramlich), <u>National Tax Journal</u>, Supplement, June 1979, pp. 147-157.

11.     "Public Employee Market Power and the Level of Government Spending" (with Paul N. Courant and Edward M. Gramlich), <u>American Economic Review</u>, December 1979, pp. 806-817.  Reprinted in W. Patrick Beaton (ed.) MUNICIPAL EXPENDITURES REVENUES AND SERVICES (New Brunswick: Rutgers University, 1983), pp. l80-202.

12.     "Why Voters Support Tax Limitation Amendments: The Michigan Case" (with Paul N. Courant and Edward M. Gramlich), <u>National Tax Journal</u>, March 1980, pp. l-20.  Also in TAX AND EXPENDITURE LIMITATIONS  (H. Ladd and N. Tideman, editors), COUPE Papers on Public Economics, Urban Institute, 198l, pp. 37-72.

13.     "On the Economics of Voter Turnout in Local School Elections," <u>Public Choice</u>, Fall 1980, pp. 315-331.

14.     "Why Voters Turn Out for Tax Limitation Votes" (with Edward M. Gramlich and Deborah Swift), <u>National Tax Journal</u>, March 1981, pp. 115-124.

15.     "On the Welfare Effects of Tax Limitation" (with Paul N. Courant), <u>Journal of Public Economics</u>, December 1981, pp. 289-316.

16.     "Multiple Regression with a Qualitative Dependent Variable," <u>Journal of Economics and Business</u>, January 1982, pp. 67-78.

17.     "Micro Estimates of Public Spending Demand Functions and Tests of the Tiebout and Median Voter Hypotheses" (with Edward M. Gramlich), <u>Journal of Political Economy</u>, June 1982, pp. 536-560.

18.     "The Dynamics of the Legal Process" (with Lawrence Blume), <u>Journal of Legal Studies</u>, June 1982, pp. 405-421.

19.     "Voting on Public Spending: Differences between Public Employees, Transfer Recipients, and
        Private Workers" (with Edward M. Gramlich), Journal of Policy Analysis and Management, Summer
        1982, pp. 516-533.  Reprinted in PROBLEMI DI AMMINISTRAZIONE PUBBLICA, No. 2/1983,
        pp. 55-88.

20.     "Micro-Based Estimates of Demand Functions for Local School Expenditures" (with Theodore C.
        Bergstrom and Perry Shapiro), Econometrica, November 1982, pp. 1183-1205.

21.     "The Distributional Impact of Statewide Property Tax Relief: The Michigan Case" (with Michael
        Wolkoff), Public Finance Quarterly, April 1983, pp. 131-153.

22.     "The Taking of Land: When Should Compensation Be Paid?" (with Lawrence Blume and Perry
        Shapiro), Quarterly Journal of Economics, February 1984, pp. 71-92.

23.     "On Determining the Optimal Magnitude and Length of Liability In Torts," Journal of Legal Studies,
        August 1984, pp. 551-563.

24.     "Budget Reform and the Theory of Federalism" (with John Quigley), American Economic Review,
        May 1986, pp. 132-137.

25.     "The Efficiency of Comparative Negligence," Journal of Legal Studies, June 1987, pp. 375-394.

26.     "Tax Reform: Implications for the State-Local Public Sector" (with Paul Courant), Journal of
        Economic Perspectives, Summer, 1987, pp. 87-100.  Reprinted in Samuel Baker and Catherine Elliot
        (eds.) READINGS IN PUBLIC SECTOR ECONOMICS (Lexington, Massachusetts:  D.C. Heath and
        Company, 1990) pp. 585-507.

27.     "Efficient Awards and Standards of Proof in Judicial Proceedings (with David Sappington), Rand
        Journal, Summer 1987, pp. 308-315.

28.     "Tiebout Bias and the Demand for Local Public Schooling" (with Perry Shapiro and Judith Roberts),
        Review of Economics and Statistics, August 1987, pp. 426-437.

29.     "The Welfare Implications of Costly Litigation for the Level of Liability" (with A. Mitchell
        Polinsky), Journal of Legal Studies, January 1988, pp. 151-164, in Alan O. Sykes (ed.) ECONOMICS
        OF TORT LAW, Elgar, 2007, and in Chris William Sanchirico (ed.), ECONOMICS OF EVIDENCE,
        PROCEDURE, AND LITIGATION, Elgar, 2007, Chapter 19.

30.     "A Test for Efficiency in the Supply of Public Education" (with Theodore Bergstrom, Perry Shapiro
        and Judith Roberts), Journal of Public Economics, April 1988, pp. 289-307.

31.     "Robbing Peter to Pay Peter:  The Economics of Local Public Residency Requirements" (with Paul
        N. Courant), Journal of Urban Economics, May 1988, pp. 291-306.

32.     "The Deterrent Effect of Settlements and Trials" (with A. Mitchell Polinsky), International Review of
        Law and Economics, June 1988, pp. 109-117.

33.     "Micro-Estimation of the Demand for Schooling: Evidence from Michigan and Massachusetts" (with
        Perry Shapiro), Regional Science and Urban Economics, January 1989, pp. 381-398.

34.    "Unobservables in Consumer Choice: Residential Energy and the Demand for Comfort" (with John Quigley), <u>Review of Economics and Statistics</u>, August 1989, pp. 416-425.

35.    "Economic Analysis of Legal Disputes and their Resolution" (with Robert Cooter), <u>Journal of Economic Literature</u>, September, 1989, pp. 1067-1097. Reprinted in Richard Posner and Francesco Parisi, eds., ECONOMIC FOUNDATIONS OF PRIVATE LAW, Edward Elgar Publishing, 2002, reprinted in Eric B. Rasmusen (ed.), GAME THEORY AND THE LAW, Edward Elgar Publishing, 2008.

36.    "A Note on Optimal Public Enforcement with Settlements and Litigation Costs" (with A.M. Polinsky), <u>Research in Law and Economics</u>, 1989, pp. 1-8.

37.    "Trial Courts:  An Economic Perspective" (with Robert D. Cooter), <u>Law and Society Review</u>, 1990, pp. 2501-2514.

38.    "A Model of Optimal Fines for Repeat Offenders" (with A. Mitchell Polinsky), <u>Journal of Public Economics</u>, September, 1991, pp. 291-306.  Reprinted in Peder Andersen, Vibeke Jensen and Jorgen Birk Mortensen, eds., GOVERNANCE BY LEGAL AND ECONOMIC MEASURES, Copenhagen, G-E-C Gad Publishers, 1993, pp. 33-52.

39.    "Statistical and Demographic Issues Underlying Voting Rights Cases," <u>Evaluation Review</u>, December, 1991, pp. 659-672.

40.    "Private Guarantees for Municipal Bonds: Evidence from the Aftermarket" (with John M. Quigley), <u>National Tax Journal</u>, December 1991, pp. 29-39.

41.    "Fiscal Federalism in Europe:  Lessons from the American Experience" (with Robert P. Inman), <u>European Economic Review</u>, 1992, pp. 654-660.

42.    "Evaluating the Injury Risk Associated with All-Terrain Vehicles:  An Application of Bayes' Rule" (with Gregory B. Rodgers), <u>Journal of Risk and Uncertainty</u>, May 1992, pp. 145-158.

43.    "Contingent Fees for Attorneys:  An Economic Analysis," (with Suzanne Scotchmer), <u>Rand Journal</u>, Autumn, 1993, pp. 343-356.

44.    "An Economic Model of Legal Discovery" (with Robert Cooter), <u>Journal of Legal Studies</u>, January, 1994, pp. 435-463, reprinted in Chris William Sanchirico (ed.), ECONOMICS OF EVIDENCE, PROCEDURE, AND LITIGATION, Elgar, 2007, Chapter 14..

45.    "The EMU and Fiscal Policy in the New European Community:  An Issue for Economic Federalism" (with Robert Inman), <u>International Review of Law and Economics</u>, June, 1994, pp. 147-161 (Reprinted in ECONOMICS OF EUROPEAN LAW, Paul Stephan and Lewis Powell (eds.)).

46.    "Designing Tax Policy in Federalist Economies: An Overview," (with Robert P. Inman), <u>Journal of Public Economics</u>, 60, 1996, pp. 307-334. (Reprinted in ECONOMICS OF FEDERALISM, Bruce Kobayashi, Larry Ribstein, and Marie Corman, (eds.)).

47.    "Antitrust Settlements and Trial Outcomes," (with Jeffrey M. Perloff and Paul Ruud), <u>Review of Economics and Statistics</u>, 1996, pp. 401-409.

48.    "Optimal Awards and Penalties when the Probability of Prevailing Varies Among Plaintiffs," (with A.

Mitchell Polinsky), Rand Journal, 27, 1996, pp. 269-280.

49.    "Federalism and Reductions in the Federal Budget," (with John M. Quigley), National Tax Journal, 49, 1996, pp. 289-302.

50.    "Rethinking Federalism," (with Robert P. Inman), Journal of Economic Perspectives, 11 (Fall 1997), pp. 43-64, reprinted in John Kincaid ed., HISTORICAL AND THEORETICAL FOUNDATIONS OF FEDERALISM, Sage, 2001.

51.    "Does the English Rule Discourage Low-Probability-of-Prevailing Plaintiffs?" (with A. Mitchell Polinsky), Journal of Legal Studies, June 1998, pp. 519-534.

52.    "Antitrust Enforcement in Dynamic Network Industries," The Antitrust Bulletin, Fall-Winter 1998, pp. 859-882.  (Translated as "Wettbewerb, Innovation und die Durchsetzung des Kartellrechts in dynamischen, vernetzeten Industrien," in GRUR International Gewerblicher Rechtsschutz und Urheberrecht Internationaler Teil, Heft 6, 1999).

53.    "Empirical Methods in Antitrust: Review and Evidence," (with Jonathan B. Baker), American Law and Economics Review, Fall 1999, pp. 386-435.

54.    "The Primestar Acquisition of the News Corp./MCI Direct Broadcast Satellite Assets," Review of Industrial Organization, Vol. 16, No. 2, March, 2000, pp. 191-209.

55.    "Market Definition with Differentiated Products: The Post-Nabisco Cereal Merger," Antitrust Law Journal, Vol. 68, No. 1, 2000, pp. 163-185.  (Reprinted in GLOBAL COMPETITION POLICY: ECONOMICS ISSUES AND IMPACTS, David S. Evans and A. Jorge Padilla, eds., LECG, 2004; also available in Peking University, International and Comparative Law Review, Vol.5:8, July 2007, pp. 94-111.)

56.    "Structuring Intergovernmental Grants to Local Governments: Lessons from South Africa," Constitutional Political Economy, Vol. 12, 2001, pp. 173-187.

57.    "Can We Decentralize Our Unemployment Policies?  Evidence from the United States" (with Robert Inman), Kyklos, March 2001, Vol. 54, pp. 287-308.

58.    "U.S. v. Microsoft - An Economic Analysis" (with Franklin M. Fisher), The Antitrust Bulletin, Spring, 2001, pp. 1-69.

59.    "Vertical Foreclosure in Broadband Access" (with Hal J. Singer) Journal of Industrial Economics, September, 2001, Vol. 49, pp. 299-318.

60.    "Merger Simulation: A Simplified Approach with New Applications" (with Roy Epstein), Antitrust Law Journal, Volume 69, No. 3, December 2001, pp. 883-919, reprinted in Stefan Vogt, Max Albert, and Dieter Schmidtchen (eds.), THE MORE ECONOMIC APPROACH TO EUROPEAN COMPETITION LAW, (Conferences on the New Political Economy), Tubingen, 2007.

61.    "A Note on Settlements under the Contingent Fee Method of Compensating Lawyers" (with A. Mitchell Polinsky), International Review of Law and Economics, Volume 22, No. 2, September 2002, pp. 217-225.

62.    "Aligning the Interests of Lawyers and Clients" (with A. Mitchell Polinsky), American Law and

Economics Review, Volume 5, No. 1, Spring, 2003, pp. 165-188.

63. "Merger Simulation with Brand-Level Margin Data: Extending PCAIDS with Nests" (with Roy Epstein), Advances in Economic Analysis & Policy: Vol. 4: No. 1, Article 2, Berkeley Electronic Press, March 2004.

64. "Exclusion or Efficient Pricing? The "Big Deal" Bundling of Academic Journals" (with Aaron S. Edlin), Antitrust Law Journal, Volume 72, No. 1, August 2004, pp. 128-159.

65. "Federalism and the Democratic Transition: Lessons from South Africa" (with Robert P. Inman), American Economic Review, Vol. 95, No. 2, May 2005, pp. 39-43, reprinted in ECONOMIC APPROACHES TO LAW: DESIGN OF CONSTITUTIONS, Richard Posner and Franceco Parisi, (eds.).

66. "The Bundling of Academic Journals" (with Aaron S. Edlin), American Economic Review, Vol. 95, No. 2, May 2005, pp. 441-446.

67. "Academic Journal Pricing and the Demand of Libraries" (with Aviv Nevo and Mark McCabe), American Economic Review, Vol. 95, No. 2, May 2005, pp. 447-452.

68. "A Damage-Revelation Rationale for Coupon Remedies (with A. Mitchell Polinsky), Journal of Law, Economics & Organization, Vol. 23, No. 3, October 2007, pp. 653-661.

69. "The Deadweight Loss of Coupon Remedies for Price Overcharges" (with A. Mitchell Polinsky), Journal of Industrial Economics, Vol. LVI, No. 2, June 2008, pp. 402-417.

70. "Econometric Issues in Antitrust Analysis," Journal of Institutional and Theoretical Economics, Vol. 166(1), 2010, pp. 62-77.

71. "Understanding UPP" (with Roy J. Epstein), B.E. Journal of Theoretical Economics: Policies and Perspectives." Vol. 10, Issue 1, 2010, Article 21.

72. "Online Advertising:  Defining Relevant Markets" (with James Ratliff), Journal of Competition Law and Economics, September, 2010, 6(3), pp. 653-686.

73. "On the Pretrial Use of Economists," The Antitrust Bulletin, Vol. 55, No. 3, Fall 2010, pp. 679-687.

74. "Federal Institutions and the Democratic Transition: Learning from South Africa, Journal of Law, Economics, and Institutions, Vol. 28, Issue 4, October, 2012, pp. 783-817.

75. "Would the Per Se Illegal Treatment of Reverse Payment Settlements Inhibit Generic Drug Investment?" (with Bret M. Dickey), Journal of Competition Law and Economics, Vol.8, No. 3, 2012, pp. 615-625.

76. "The Use and Threat of Injunctions in the RAND Context," (With James Ratliff), Journal of Competition Law and Economics, March 2013, 9(1), 1-22.

77. "Understanding the Democratic Transition in South Africa," (with Robert Inman), American Law and Economics Review, January 2013, 2-23.

78. "Airline Network Effects and Consumer Welfare," (with Mark Israel, Bryan Keating, and Bobby Willig," Review of Network Economics, November 2013, 1-36.

79.   "Measuring Benchmark Damages in Antitrust," (with Justin McCrary), <u>Journal of Econometric Methods</u>, Vol. 3, January 2014, 63-74.

80.   "Is There a Market for Organic Search Engine Results and Can Their Manipulation Give Rise to Antitrust Liability" (with James Ratliff), <u>Journal of Competition Law and Economics</u>, 10(3), September, 2014, 517-541.

81.   "The Hidden Costs of Free Goods:  Implications for Antitrust Enforcement," (with Michal Gal), <u>Antitrust Law Journal</u>, Volume 80, Issue 3, 2016, 521-562.

82.   "Antitrust for Institutional Investors," (with Edward B. Rock), <u>Antitrust Law Journal</u>, Vol. 82, Issue 1, 2018, pp. 221-278.

83.   "Scientists as Experts Serving the Court" (with Joe S. Cecil), <u>Daedalus</u>, Vol. 147, Issue 4, Fall 2018, pp. 152-163.

84.   "Pharmaceutical Product Hopping:  Is There a Role for Antitrust Scrutiny?" (with Bret Dickey and Kun Huang), <u>Antitrust Law Journal</u>, Vol. 82, 2018, pp. 601-621.

85.   "Common Ownership and Coordinated Effects" (with Edward B. Rock), <u>Antitrust Law Journal</u>, Vol. 83, Issue 1, 2020, pp. 201-251.

86.   "A Retrospective on <i>U.S. v. Microsoft</i>: Why Does It Resonate Today?" <u>Antitrust Bulletin</u>, 2020, p. 1-8.


<u>Law Review Articles</u>

1.   "The Judicial Pursuit of Local Fiscal Equity" (with Robert P. Inman), <u>Harvard Law Review</u>, June 1978, Vol. 92, pp. 1662-1750 (reprinted in Ellickson and Tarlock, Land-Use Controls: Case and Materials, Little-Brown).

2.   "Quantitative Analysis in Antitrust Litigation" (with Peter O. Steiner), <u>Law and Contemporary Problems</u>, Autumn 1983, pp. 69-141.

3.   "Compensation for Takings:  An Economic Analysis" (with Lawrence Blume), <u>California Law Review</u>, July, 1984, pp. 569-628.  Also in Austin Jaffe (ed.) RESEARCH IN LAW AND ECONOMICS, Volume 10, 1987, pp. 53-103 as well as Kenneth G. Dau-Schmidt and Thomas S. Ulen (eds.), LAW AND ECONOMICS ANTHOLOGY, 1988, PP. 226-234.

4.   "Econometrics in the Courtroom," <u>Columbia Law Review</u>, Volume 85, June 1985, pp. 1048-1097.

5.   "The Assignment of Temporary Justices in the California Supreme Court" (with Stephen Barnett), <u>Pacific Law Journal</u>, July 1986, pp. 1045-1197.

6.   "Regulatory Takings:  The Case of Mobile Home Rent Control," <u>Chicago Kent Law Review</u>, Vol. 67, No. 3, Fall 1992, pp. 923-929.

7.   "Sanctioning Frivolous Suits:  An Economic Analysis" (with A. Mitchell Polinsky), <u>Georgetown Law Journal</u>, Vol. 82, No. 2, December 1993, pp. 397-435. (translated as "Liti Temerarie E Sanzioni Giudiziarie: Un'Analisi Economica", 14 <u>Rivista Critica del Diritto Privato</u> (1996)).

8.      "Reforming the New Discovery Rules" (with Robert Cooter), <u>Georgetown Law Journal</u>, Vol. 84, No. 1, November 1995, pp. 61-89.

9.      "Making Sense of the Antitrust State Action Doctrine:  Balancing Political Participation and Economics Efficiency in Regulatory Federalism" (with Robert Inman), <u>Texas Law Review</u>, Vol. 75, May 1997, pp. 1203-1299.

10.     "On Federalism and Economic Development," <u>Virginia Law Review</u>, Vol. 83, No. 7, October 1997, pp. 1581-1592.

11.     "Open Access to Broadband Networks: A Case Study of the AOL-Time Warner Merger" (with Hal J. Singer), <u>Berkeley Technology Law Journal</u>, Vol. 16, No. 2, Spring 2001, pp. 631-675.

12.     "3M's Bundled Rebates: An Economic Perspective," <u>Chicago Law Review</u>, Vol. 72, 2005, pp. 243-264.

13.     "Antitrust Class Certification:  Towards an Economic Framework" (with Bret M. Dickey), <u>N.Y.U. Annual Survey of American Law,</u> Vol. 66, No. 3, 2011, pp. 459-486.

14.     "Access Barriers to Big Data" (with Michal Gal), <u>Arizona Law Review</u>, Vol. 59, Summer 2017, pp. 339-381.

15.     "IP Privateering in the Markets for Desktop and Smartphone Operating Systems," <u>Berkeley Technology Law Review</u>, Vol. 33, 2018, pp. 89-134.

16.     "Data Standardization," <u>NYU Law Review</u>, Vol, 94, October, 2019, pp.737-770.


<u>Articles in Books</u>

1.      "Credit Ratings, Bond Defaults, and Municipal Borrowing Costs:  A New England Study," 1972 PROCEEDINGS OF THE SIXTY-FIFTH ANNUAL CONFERENCE ON TAXATION, National Tax Association, 1972, pp. 331-350.

2.      "Property Taxation, Full Valuation, and the Reform of Educational Finance in Massachusetts," in PROPERTY TAXATION AND THE FINANCE OF EDUCATION, Committee on Taxation, Resources and Economic Development (University of Wisconsin Press), 1974, pp.189-201.

3.      "Property Values and the Benefits of Environmental Improvements:  Theory and Measurement" (with A. Mitchell Polinsky), in Wingo and Evans, eds., PUBLIC POLICY AND THE QUALITY OF LIFE IN CITIES (Johns Hopkins Press for Resources for the Future), 1977, pp. l54-l80.

4.      "Market Approaches to the Measurement of the Benefits of Air Pollution Abatement," in Ann Friedlaender, ed., APPROACHES TO CONTROLLING AIR POLLUTION (M.I.T. Press), 1978, pp. 240-279.

5.      "Judicial Approaches to Local Public-Sector Equity: An Economic Analysis," in Peter Mieszkowski and Mahlon Straszheim, eds., CURRENT ISSUES IN URBAN ECONOMICS (Johns Hopkins Press), 1979, pp. 542-576.

6.    "The Stimulative Effects of Intergovernmental Grants: Or Why Money Sticks Where it Hits" (with Paul N. Courant and Edward M. Gramlich), in Peter Miezkowski and William Oakland, eds., FISCAL FEDERALISM AND GRANTS-IN-AID, COUPE Papers on Public Economics, Urban Institute, 1979, pp. 5-21.

7.    "On Super-rationality and the School Voting Process," in Clifford Russell, ed., COLLECTIVE DECISION-MAKING (Johns Hopkins Press), 1979, pp. 75-82.

8.    "Property Tax Reduction in Michigan" (with Robert Vishny) in H. Brazer and D. Laren, eds., MICHIGAN'S FISCAL AND ECONOMIC STRUCTURE (University of Michigan Press), 1982, pp. 530-560.

9.    "Tax Assignment and Revenue Sharing in the United States," in R. Mathews and C. McLure, eds., TAX ASSIGNMENT IN FEDERAL COUNTRIES, (Australian National Univ. Press), 1983, pp. 205-33.

10.    "Residential Choice and the Demand for Public Education:  Estimation Using Survey Data" (with Perry Shapiro and Judith Roberts), in H. Timmermans and R. Golledge, eds., BEHAVIOR MODELLING APPROACHES IN GEOGRAPHY AND PLANNING, (Croom Helm), 1986, pp. 179-197.

11.    "The Economics of the Local Public Sector," in A. Auerbach and M. Feldstein, eds., HANDBOOK OF PUBLIC ECONOMICS, Volume II, 1987, pp. 87-161.

12.    "Settlements in Private Antitrust Litigation" (with Jeffrey Perloff) in L. White (ed.), PRIVATE ANTITRUST LITIGATION, M.I.T. Press, 1988, pp. 149-184.

13.    "A Federalist Fiscal Constitution for an Imperfect World: Lessons  from the United States," in H. N. Scheiber (ed.) FEDERALISM,  STUDIES IN HISTORY, LAW, AND POLICY, Institute of Governmental Studies, U.C. Berkeley, 1988, pp. 76-92.

14.    "Public Choices in Public Higher Education," (with John Quigley) in Charles Clotfelter and Michael Rothschild, eds. THE EC+ONOMICS OF HIGHER EDUCATION, National Bureau of Economic Research, 1993, pp. 243-283.

15.    "European Labor Markets:  The Eastern Dimension" (with Jasminka Sohinger) in W. Dickens, B. Eichengreen, and L. Ulman (eds.) LABOR RESPONSES TO EUROPEAN INTEGRATION, Brookings Institution, 1993, pp. 271-286.

16.    "Reference Guide on Multiple Regression," in Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 1994, pp. 415-470, Second Edition, 2000, pp.179-227 (available at http://www.fjc.gov/public/pdf.nsf/lookup/11.mult_reg.pdf/$File/11.mult_reg.pdf), Third Edition, 2011.

17.    "California Fiscal Federalism: A School Finance Perspective," in B. Cain and R. Noll (eds.), CONSTITUTIONAL REFORM IN CALIFORNIA, Institute of Governmental Studies, UC Berkeley, 1995, pp. 431-453.

18.    "The Political Economy of Federalism," (with Robert Inman), in D. Mueller (ed.), PERSPECTIVES ON PUBLIC CHOICE, Cambridge University Press, New York, 1997, pp. 73-105.

19.   "Federalism as a Device for Reducing the Budget of the Central Government,"(with John M. Quigley), in FISCAL POLICY: LESSONS FROM ECONOMIC RESEARCH, Alan Auerbach (ed.), M.I.T. Press, 1997.

20.   "Guide to Multiple Regression," in Faigman, Kaye, Saks, and Sanders (ed.), MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY, West Publishing Co., St. Paul, Minn., 1997, Vol. 1, pp. 147-183, Second edition, 2000.

21.   "Discovery", in THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND THE LAW, Peter Newman (ed.), MacMillian Reference Ltd. 1998, pp. 609-615.

22.   "Contingent Fees" (with Suzanne Scotchmer), in THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND THE LAW, Peter Newman (ed.), MacMillian Reference, Ltd., 1998, pp. 415-420.

23.   "Federalism," (with Robert Inman), in THE ENCYCLOPEDIA OF LAW AND ECONOMICS, Boudewijn Bouchaert and Gerrit DeGeest, editors, 2000, Volume V, pp. 661-691, available on-line at http://encyclo.findlaw.com, reprinted in Francesco Parisi, ed., PRODUCTION OF LEGAL RULES, Chapter 18, Edward Elgar, 2011, pp. 339-365.

24.   "Subsidiarity and the European Union" (with Robert Inman), in THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND LAW, Peter Newman (ed.), MacMillan Reference Ltd., 1998, pp. 545-551.

25.   "United States v. Microsoft: An Economic Analysis" (with Franklin M. Fisher), pp. 1-44, and "Misconceptions, Misdirections, and Mistakes," pp. 87-96, in Evans, Fisher, Rubinfeld, and Schmalensee, DID MICROSOFT HARM CONSUMERS?  TWO OPPOSING VIEWS, AEI-Brookings Joint Center for Regulatory Studies, 2000.  An updated and revised version appears in Antitrust Bulletin, Spring, 2001.

26.   "Ensuring Fair and Efficient Access to the Telecommunications 'Bottleneck',"(with Robert Majure), in Claus-Dieter Ehlermann and Louisa Gosling (eds.), THIRD COMPETITION LAW ANNUAL 1998: Regulating Telecommunications (Hart Publishing: Oxford).

28.   "Innovation and Antitrust Enforcement" (with John Hoven), in Jerry Ellig, ed., DYNAMIC COMPETITION AND PUBLIC POLICY: TECHNOLOGY, INNOVATION, AND ANTITRUST ISSUES, (New York: Cambridge), 2001, pp. 65-94.

29.   "Access Remedies in High Technology Antitrust Cases," in Francois Leveque and Howard Shelanski, eds., MERGER REMEDIES IN AMERICAN AND EUROPEAN COMPETITION LAW, 2003 (Cheltenham, U.K.: Edward Elgar), pp. 137-171.

30.   "Maintenance of Monopoly: U. S. v. Microsoft," in John E. Kwoka. Jr. and Lawrence J. White, eds., THE ANTITRUST REVOLUTION, 5th Edition, 2008 (New York: Oxford University Press), pp. 530-557,  6th Edition, 2013, 7th Edition, 2018.

31.   "The Strategic Use of Patents: Implications for Antitrust" (with Robert Maness), in Francois Leveque and Howard Shelanski, eds., ANTITRUST, PATENTS AND COPYRIGHT: EU AND US PERSPECTIVES, 2005 (Cheltenham, U.K.: Edward Elgar), pp. 85-102.

32.   "An Empirical Perspective on Legal Process: Should Europe Introduce Private Antitrust

Enforcement?" in Peter Nobel and Marina Gets, eds., NEW FRONTIERS OF LAW AND ECONOMICS, 2006 (Zurich, Switz.: Schulthess), pp. 141-148.

33.   "Empirical Study of the Civil Justice System" (with Daniel P. Kessler), 2007, in Polinsky and Shavell (eds.), HANDBOOK OF LAW AND ECONOMICS, Chapter 5, pp, 343-402.

34.   "*U.S. v. Microsoft*:  Lessons Learned and Issues Raised" (with A. Douglas Melamed), in Eleanor M. Fox and Daniel A. Crane, eds., Antitrust Stories (Foundation Press: New York), 2007, pp.287-310.

35.   "Quantitative Methods in Antitrust," Chapter 30 in Wayne D. Collins (ed.), ISSUES IN COMPETITION LAW AND POLICY, ABA Antitrust Section, 2008.

36.   "On the Foundations of Antitrust Law and Economics," in Robert Pitofsky, ed., WHERE THE CHICAGO SCHOOL OVERSHOT THE MARK: EFFECT OF CONSERVATIVE ECONOMIC ANALYSIS ON U.S. ANTITRUST), Oxford University Press, 2008, pp. 51-74.

37.   "Evaluating Antitrust Enforcement:  Economic Foundations," Chapter 19 in Barry Hawk, ed., INTERNATIONAL ANTITRUST LAW & POLICY, Fordham University School of Law, 2008, pp. 457-469.

38.   "Settlements in Antitrust Enforcement:  A U.S. Economic Perspective," in Claus-Dieter Ehlermann and Mel Marquis (eds.), EUROPEAN COMPETITION LAW ANNUAL 2008: ANTITRUST SETTLEMENTS UNDER EC COMPETITION LAW, Hart Publishing, Oxford and Portland, 2009, pp, 85-92.

39.   "Alternative Economic Designs for Academic Publishing," (with Theodore C. Bergstrom), in Rachelle Dreyfuss, Harry First, and Diane Zimmerman, eds., WORKING WITHIN THE BOUNDARIES OF INTELLECTUAL PROPERTY, Oxford University Press, 2010, pp. 137-148.

40.   "Revising the Horizontal Merger Guidelines:  Lessons from the U.S. and the E.U. (with Richard Gilbert), in Faure, M. and Zhang, X. (eds.), COMPETITION POLICY AND REGULATION: RECENT DEVELOPMENTS IN CHINA, EUROPE AND THE US, Cheltenham, Edward Elgar, 2011, pp. 262-277.

41.   "Antitrust Damages," Chapter 14, in Einer Elhauge, ed., RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW, Edward Elgar, 2012, pp. 377-393.

42.   "Current Issues in Antitrust Analysis," in Josef  Drexl, Wolfgang Kerber, and Rupprecht Podszun, eds., COMPETITION POLICY AND THE ECONOMIC APPROACH: FOUNDATIONS AND LIMITATIONS, UK: Edward Elgar, 2011, pp. 81-93.

43.   "Delta-Northwest: Merger Approval Driven by Consumer Benefits from Airline Network Effects," (with Mark Israel, Bryan Keating, and Robert Willig), in John Kwoka and Lawrence White, eds., THE ANTITRUST REVOLUTION, 2013.

44.   "Why Was the Democratic Transition in South Africa Viable?  (with Robert Inman), in Yun-Chien Chang, ed., EMPIRICAL LEGAL ANALYSIS: ASSESSING THE IMPORTANCE OF LEGAL INSTITUTIONS, 2013.

45.   "Antitrust Settlements," in Roger Blair and Danny Sokol (ed.), OXFORD HANDBOOK ON INTERNATIONAL ANTITRUST, 2014, Chapter 7, pp. 172-184.

46.    "Antitrust Policy:  Lessons from the U.S.," in James D. Wright (ed.), 2015, INTERNATIONAL ENCYCLOPEDIA OF THE SOCIAL AND BEHAVIORAL SCIENCES, 2nd Edition, Volume 1, Oxford: Elsevier, pp. 796-803.

47.    "Improving Antitrust Sanctions," in Douglas H. Ginsburg and Joshua D. Wright (eds.), GLOBAL ANTITRUST ECONOMICS: CURRENT ISSUES IN ANTITRUST AND LAW & ECONOMICS, Concurrences Review, 2016, pp. 97-101.

48.    "Economics of Federalism," (with Robert Inman), OXFORD HANDBOOK OF LAW AND ECONOMICS, 2017, Volume III: PUBLIC LAW AND LEGAL INSTITUTIONS, pp. 84-105.

49.    "The Antitrust Treatment of Standard Essential Patents:  The EU vs. the US," in Nicolas Charbit and Sonia Ahmad, eds., FEDERIC JENNY: STANDING UP FOR CONVERGENCE AND RELEVANCE IN ANTITRUST, 2018, Volume 1, pp. 121-130.

50.    "Antitrust Enforcement in the U.S. and the EU: A Comparison of the Two Federal Systems," in RECONCILING EFFICIENCY AND EQUITY:  A GLOBAL CHALLENGE FOR COMPETITION POLICY, Damien Gerard and Ioannis Lianos.(eds.) Cambridge University Press, 2019, Chapter 18, pp. 355-364.

51.    "Merger policy for developing countries:  Is there a special role for the BRICS countries? In ANTITRUST IN DEVELOPING AND MERGING ECONOMIES, Concurrences, Competition Law Review, 2020, pp. 31-33.


<u>Other</u>

1.    "Urban Land Values:  Theoretical and Empirical Essays," Joint Center of Urban Studies, M.I.T./Harvard, September 1972, pp. 1-71.

2.    "What Do Tax Limitation Votes Mean" (with Paul N. Courant and Edward M. Gramlich), in <u>Law Quadrangle Notes</u>, University of Michigan Law School, Spring 1982, pp. 24-28.

3.    Book Review, "Studies in State-Local Public Finance," (Harvey Rosen, ed.), <u>Journal of Economic Literature</u>, December 1987, pp. 1882-1883.

4.    Book Review, "America's Ailing Cities:  Fiscal Health and the Design of Urban Policy," (Helen F. Ladd and John Yinger, <u>Journal of Economic Literature</u>, December 1990, pp. 30-32.

5.    Comments on Scotchmer, "Public Goods and the Invisible Hand," in John M. Quigley and Eugene Smolensky (eds.), MODERN PUBLIC FINANCE (Harvard University Press) 1994, pp. 120-125.

6.    "Mergers and Other Competition Policy Issues in Banking," (with George Rozanski), Appendix to "Enhancing the Role of Competition in the Regulation of Banks -- United States," a note submitted to the Directorate for Financial, Fiscal and Enterprise Affairs, Committee on Competition Law and Policy, Organization for Economic Cooperation and Development, February, 1998.

7.    Comment, "Product and Stock Market Responses to Automotive Product Liability Verdicts," by Steven Garber and John Adams, *Brookings Papers on Economic Activity / Microeconomics 1998*, Washington DC: Brookings Institution.

8.      Declaration before the FCC in the Matter of Applications for Consent to the Transfer of Control of Licenses MediaOne Group, Inc., Transferor to AT&T Corp., Transferee (with J. Gregory Sidak), August 23, 1999 (re: broadband internet access).

9.      Affidavit to FCC In re Consolidated Application of EchoStar Communications Corporation, General Motors Corporation, Hughes Electronics Corporation, Transferors, and EchoStar Communications Corporation, Transferee, for Authority to Transfer Control, February 4, 2002 (re: direct broadcast satellite competition and the market for multi-channel video distribution).

10.     *State of New York, et. al. v. Microsoft*, Amicus Brief (with Timothy Bresnahan, Richard J. Gilbert, George Hay, Bruce Owen, and Lawrence J. White), June 2002.

11.     "Subsidiarity, Governance, and EU Economic Policy," (with Robert P. Inman), CESifoForum, Volume 3, No. 4, Winter 2002, pp. 3-11, www.cesifo.de.

12.     Amici Curiae Submission to the U.S. Supreme Court in Support of Petition for Certiorari in *Conwood Co. v. U.S. Tobacco, Co.* concerning the admissibility of statistical evidence (with Stephen Fienberg, Franklin Fisher, and Daniel McFadden), Nov. 20, 2002.

13.     "The State of Antitrust Enforcement - 2004" (co-authored)," ABA Antitrust Section Task Force.

14.     "Effects of Mergers with Differentiated Products (with Roy J. Epstein)," EU Competition Directorate, October 7, 2004, available at http://europa.eu.int/comm/competition/mergers/others/.

15.     "The American Law and Economics Association," in David Clark (ed.) *Encyclopedia of Law and Society,* Sage Publications, 2007.

16.     "Empirical Methods in Antitrust: New Developments in Merger Simulation," in Stefan Vogt, Max Albert and Dieter Schmidtchen (eds.), THE MORE ECONOMIC APPROACH TO EUROPEAN COMPETITION LAW, (Conferences on the New Political Economy), Tubingen, 2007, pp. 277-280.

17.     "Why Federalism Matters:  Implications for Tax Policy," (with Robert Inman), "Proceedings of the March 9-10, 2009 Sho Sato Conference on Tax Law, Social Policy, and the Economy."

18.     "Sustainable Economics for a Digital Planet:  Ensuring Long-term Access to Digital Information (various co-authors), Feb. 2010:  Report of the Blue Ribbon Task Force on Digital Preservation and Access, available at http://brtf.sdsc.edu/biblio/BRTF_Final_Report.pdf.

19.     Book Review:  Harry First and Andrew I. Gavil, "The Microsoft Antitrust Cases" Journal of Economic Literature, Volume 53, Issue 2, 2014, pp. 374-75.

20.     Amicus Curiae Submission to the U.S. Supreme Court in *Teladoc, Inc., Teladoc Physicians, et. al., v. Texas Medical Board et. al.* (with 54 other antitrust and competition policy scholars) in support of Plaintiffs-Appellees, September, 2016.

21.     "Some Thoughts on Cartel Sanctions," (with multiple co-authors), *Antitrust Source,* June 2019, available at antitrustsource.com.

22.      OPED (with Robert Inman), "Time to Act on the Founding Fathers' Vision for Managing the Pandemic," The Hill, April 27, 2020, available at https://thehill.com/opinion/finance/494816-time-to-

act-on-the-founding-fathers-vision-for-managing-the-pandemic.

23.   Amicus Curiae Submission to the U.S. Supreme Court in *FTC v. Qualcomm Incorporated*, 10/05/20, in petition for rehearing en banc (along with 46 law and economics scholars).