FILED
2020 Oct-30 PM 09:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT K

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No.: 2406)** | ) ) ) ) ) ) ) ) ) | **Master File No.: 2:13-CV-20000-RDP**<br><br>This document relates to the Subscriber Track cases. |

## MEDIATOR'S AFFIDAVIT

**STATE OF ALABAMA**

**SHELBY COUNTY**

Before me, the undersigned authority personally came and appeared, Edgar C. Gentle, III, who is known to me to be the person so described, who, after being duly sworn on oath, says that the following information is true and correct according to Affiant's best knowledge and belief:

I am sui juris, competent to testify, and have personal knowledge of the facts herein.

I am the founding partner of the law firm of Gentle, Turner, Sexton & Harbison, LLC, and was appointed as the Mediator for the disputes between the Subscribers and the Defendants (the "mediating Parties") in this case. I have extensive experience acting as a mediator and Special Master in multi-district litigations and have helped create and administer over $2 billion in settlements during the past 20 years.[1]

I am making this Affidavit to summarize the services I provided up to the proposed settlement

---

[1] For example, I served as Special Master and Escrow Agent for the Global Breast Implant Settlement (MDL 926), which involved settling over $1.1 billion in claims. I also served as Special Master and Settlement Administrator in the Total Body Litigation (MDL 1985), for which I facilitated the settlement of 222 of the 245 cases and determined the value of each of the settled cases.

1

between the Subscribers and the Defendants, and to describe the hard-fought, arms-length negotiations among the mediating Parties that led to the settlement. In short, it is my view as the long-standing mediator in the Subscriber litigation that the settlement is fair and reasonable.

**Mediation History**

1. Beginning in November 2017, I served as the Mediator for the Subscribers and the Defendants. Since January 9, 2013, I have also served as the Special Master in the above-captioned matter. ECF No. 7. My functions as Special Master have included developing an organizational and operational structure for Plaintiffs' counsel, establishment and maintenance of a Plaintiffs' counsel common litigation fund, and determining what disbursements should be made from the common litigation fund as reimbursement and payment to "common benefit attorneys." *Id.*

2. As part of my service, my staff, including attorneys and non-attorneys, often assisted in this matter. When billing for our services, I did not bill for any time provided by non-attorneys, and I would often discount our bill.

3. From November 2017 until August 2020, my staff and I have participated in approximately 158 in-person meetings with either the Defendant Blues, Subscriber Settlement Class Counsel or all of the mediating Parties at once or separately, in an effort to resolve this matter.[2] Some of these in-person meetings lasted one hour or less, and others lasted up to 10 hours. During this time, my staff and I have participated in approximately 282 telephone conferences, including Zoom conferences, with some or all of the mediating Parties at once or separately, in an effort to resolve this matter. My partner, Katherine A. Benson, Esq., and I have participated in out-of-state, in-person meetings in Chicago, New York and Washington, D.C., approximately 14 times, in an effort to resolve this matter. During this time, our Firm billed a total of 1,389.80 hours, which equates to almost 175

---

[2] To streamline the mediation process and best position the dispute for settlement, I limited from time to time attendance/participation in certain of these sessions to a small subscriber negotiating group and a small defendant negotiating group.

2

business days (8-hour days).

4. From November 2017 until May 2018, and again from January 2019 until the present, our Firm has been heavily and directly involved in facilitating settlement negotiations; traveling to and participating in meetings; participating in telephone conferences; and drafting, reviewing and revising documents in connection with this Mediation.

5. In November 2017, I prepared for and met with the mediating Parties on a number of occasions to discuss the status of the case and to attempt to resolve the matter. Such preparation included telephone calls, emails and texts with the mediating Parties regarding substantive issues and scheduling, as well as traveling to New York, on November 7-8, 2017, for case status discussions with the Defendants and Settlement Class Counsel. I was also tasked with and completed a set of draft compromise proposals for vetting by the mediating Parties.

6. I held a mediation session with Settlement Class Counsel and the Blues on December 6, 2017 in Washington, D.C., and I prepared a draft collaborative term sheet in connection therewith for review by the mediating Parties. Telephone conferences were held throughout the month of December 2017, in order to discuss the status of the case and to provide an orientation with Settlement Class Counsel and the Blues regarding the structure of the mediation and the questions that would be sent to the groups in advance for responses. I drafted, revised and finalized the questions to the mediating Parties as part of the mediation. I then made plans and had discussions with the mediating Parties and staff regarding a January 8, 2018 mediation.

7. In January 2018, I participated in email discussions and telephone conferences with the mediating Parties in preparation for the January 8, 2018 mediation. I reviewed the answers to my questions provided by Settlement Class Counsel and the Blues in preparation for the mediation. I traveled to Washington, D.C., where I prepared for and conducted a mediation and held meetings and telephone conferences with the mediating Parties. After returning to Alabama, I held telephone

3

conferences with the Blues and Settlement Class Counsel regarding mediation status. On January 30, 2018, I conducted and participated in a mediation in the Federal Courthouse in Birmingham, Alabama. Following the January 30, 2018 mediation session, I participated in telephone conferences with Settlement Class Counsel and the Blues regarding negotiations.

8. In February 2018, I participated in emails and telephone conferences with the mediating Parties regarding the status of the mediation.

9. In March 2018, another mediation was held in New York City. In preparation for that mediation, I participated in status discussions with some of the mediating Parties. I traveled to New York City, in order to attend meetings with the mediating Parties regarding the resolution of the case.

10. In April 2018 and May 2018, I had telephone conferences and emails with the mediating Parties regarding mediation matters as well as pre-mediation conference calls with the mediating Parties. We held a number of telephone conferences and staff meetings to discuss the status of mediation.

11. In January 2019, I participated in emails and telephone conferences with the mediating Parties regarding the status of the case.

12. In February 2019, my services included emails with the Blues and Settlement Class Counsel regarding a potential mediation as well as participating in telephone conferences with the Blues and Settlement Class Counsel regarding mediation planning and case status. My staff performed legal research related to settlement. My Firm also worked with the Blues and the Settlement Class Counsel in an attempt to set an April 9, 2019 mediation.

13. In March 2019, my services included emails and discussions with the mediating Parties regarding mediation updates, and telephone conferences with the mediating Parties in preparation for mediation. My Firm and I prepared and submitted follow-up mediation questions to Settlement Class Counsel and the Blues to be answered prior to the next mediation session. I reviewed the answers of Settlement Class Counsel and the Blues in connection with the upcoming mediation. My staff and I

4

reviewed the Blues' rules and other materials in preparation for mediation. I drafted terms that may help resolve mediation, and I reviewed the mediation file.

14. In April 2019, my services included emails with Settlement Class Counsel and the Blues in preparation for the April 9, 2019 mediation. My staff and I reviewed materials in preparation for a Subscriber meeting and met with Settlement Class Counsel, after traveling to Washington, D.C. We participated in telephone conferences with the Blues regarding mediation matters. We traveled to Chicago, where we conducted a mediation with the mediating Parties and held meetings on April 7, 8, 9, 2019. After returning from Chicago, we had update calls with the mediating Parties in connection with the early-April 2019 mediation session. We traveled to and from Chicago again on April 22 and 23, 2019, where we held a meeting with the Blues. Thereafter, we had a status telephone conference with Settlement Class Counsel, and we then prepared and revised a summary of the status of the negotiations.

15. In May 2019, I had office discussions with my staff regarding mediation matters. I participated in update calls with the Blues. My staff and I traveled to New York City, where we met with Settlement Class Counsel on May 8, 2019. After an update call with Settlement Class Counsel, I held a telephone conference with the Blues. Throughout the month of May, I participated in telephone conferences and emails with the mediating Parties regarding mediation matters. We prepared for and met with the Blues and Settlement Class Counsel regarding mediation on May 22, 2019 in Birmingham.

16. In June 2019, I drafted a Collaborative Term Sheet and participated in status calls with Settlement Class Counsel and the Blues. In preparation for mediation, I participated in emails, telephone conferences and office conferences regarding mediation logistics, and reviewed notes from prior mediation sessions. My staff and I traveled to Washington, D.C., on June 11 and 12, 2019, where we attended a mediation session, and the Parties made substantial progress toward resolution. Thereafter, I participated in emails and telephone conferences with the mediating Parties regarding case

status.

17. In July 2019, my staff and I participated in follow-up discussions with the Blues and Settlement Class Counsel, after developing an outline for such discussions. We participated in email discussions with the Blues and Settlement Class Counsel. We participated in update telephone conferences with the Blues and Settlement Class Counsel and reviewed their responses to our mediation data requests. There were numerous email exchanges and telephone conferences with the Mediating Parties throughout the month of July 2019 regarding the status of mediation. We drafted a summary of the status of mediation.

18. We traveled to Chicago for meetings on August 4 and 5, 2019, for a meeting with certain Defendants. Following the meeting, we participated in discussions with the Blues and Settlement Class Counsel regarding the status of the case. Throughout the month of August 2019, there were numerous emails and telephone conferences with the mediating Parties regarding the status of settlement. We emailed the mediating Parties regarding the next Mediation session and provided them with some tasks and questions for the same.

19. In September 2019, my services included a status telephone conference with Settlement Class Counsel as well as reviewing the Blues' responses to my questions. I participated in email correspondence and telephone conferences with the mediating Parties. My staff conducted legal research related to issues that had arisen during the mediation. My staff and I traveled to Chicago for meetings on September 5 through 8, 2019, where we attended an additional mediation with Settlement Class Counsel and the Blues, along with counsel for Self-Funded Sub-Class Settlement Counsel and a putative Self-Funded Subclass member. From this point forward, Self-Funded Sub-Class Settlement Counsel was involved in all relevant settlement negotiations.

20. In October 2019, my services included preparing for and participating in a call with the Blues and a call with Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel. My

staff and I attended conference calls with the mediating Parties regarding the mediation status. Throughout the month of October 2019, there were numerous emails, telephone conferences and texts with the mediating Parties regarding the status and scheduling of mediation. We attended a mediation in Chicago on October 16, 2019. We performed additional settlement research.

21. In November 2019, my services included emails, texts and telephone conferences with the mediating Parties regarding the status of the case and providing updates to the mediating Parties. My staff and I participated in update telephone conferences and email discussions with Settlement Class Counsel, Self-Funded Sub-Class Settlement Counsel, and the Blues. Mediation was held with the mediating Parties at the Federal Courthouse on November 7, 2019 in Birmingham, Alabama. We prepared a draft Term Sheet with both monetary and non-monetary terms, which we shared with the mediating Parties. The monetary amount contained in that Term Sheet was our Mediator's Recommendation. The Term Sheet was signed by representatives of the mediating Parties on November 14, 2019. By signing the Term Sheet, the spokesperson representatives for the mediating Parties were not agreeing to any of the provisions contained therein. Instead, the spokesperson representatives for each side agreed only to proceed with negotiating and drafting a settlement agreement that would be submitted to the mediating Parties, including each individual Blue Plan, for consideration and potential approval.

22. In December 2019, my services included contacting the mediating Parties to remind them of status calls and follow-up items. During the month of December 2019, my staff and I participated in numerous telephone conferences, texts, and email discussions with the mediating Parties regarding the status of the case. We performed detailed research into legal issues related to the settlement.

23. In January 2020, my staff and I continued doing research. I prepared for and participated in update calls with the Blues, Settlement Class Counsel, and Self-Funded Sub-Class Settlement Counsel. I reviewed a draft Settlement Agreement and Term Sheet, comparing them and

7

making a list of issues.

24.     In February 2020, my services included compiling suggested edits to the Settlement Agreement based upon the Term Sheet.  I participated in telephone conferences and emails with the mediating Parties regarding a proposed Settlement Agreement.  I held discussions with Settlement Class Counsel, Self-Funded Sub-Class Settlement Counsel, and the Blues regarding specific technical aspects of the Settlement Agreement.  I reviewed drafts of the Settlement Agreement and participated in update calls with the mediating Parties regarding the status of drafting the Settlement Agreement.

25.     In March 2020, my services included telephone conference calls with the Blues, Settlement Class Counsel, and Self-Funded Sub-Class Settlement Counsel regarding deal points, as well as emails with the mediating Parties regarding an update call.  My staff and I participated in an update telephone conference with the mediating Parties.  We exchanged emails with the Blues, Settlement Class Counsel, and Self-Funded Sub-Class Settlement Counsel regarding scheduling an update call in April 2020.

26.     In the month of April 2020, my staff and I participated in an update telephone conference with the Blues, Settlement Class Counsel, Self-Funded Sub-Class Settlement Counsel.  We received and reviewed a draft Settlement Agreement.  We drafted emails regarding issues raised in the negotiations.  After reviewing the latest draft of the Settlement Agreement, I had status calls with Settlement Class Counsel, Self-Funded Sub-Class Settlement Counsel, and the Blues.  I exchanged emails with the mediating Parties regarding a drafting workshop.  After reviewing the November 2019 term sheet and the latest Settlement Agreement draft, I drafted and revised a deal points list.  Along with numerous emails and telephone conferences with the mediating Parties, my staff and I participated in a call with Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel as well as a call with the Blues.

27.     In May 2020, I prepared for and participated in an update call with Settlement Class

8

Counsel and Self-Funded Sub-Class Settlement Counsel regarding core issues. I exchanged emails with the mediating Parties regarding the next steps. I prepared for and attended Zoom Mediations and calls with the Blues, Settlement Class Counsel, and Self-Funded Sub-Class Settlement Counsel. I reviewed background materials for a Settlement Agreement drafting workshop. My staff and I participated in a Zoom drafting workshop, and we researched legal issues related to the settlement. I participated in calls with the Blues, Settlement Class Counsel, and Self-Funded Sub-Class Settlement Counsel and exchanged follow-up emails with the mediating Parties regarding the status of matters. I participated in a "key items" telephone conference with the Settlement Class Counsel, Self-Funded Sub-Class Settlement Counsel, and the Blues and exchanged multiple emails regarding the status of negotiations.

28.  In June 2020, my staff and I prepared for and participated in a call with the Blues, Settlement Class Counsel, and Self-Funded Sub-Class Settlement Counsel regarding the upcoming mediation session. We drafted key questions and a resolution schedule for the mediating Parties. We participated in Zoom conferences with the mediating Parties, and calls with Settlement Class Counsel, Self-Funded Sub-Class Settlement Counsel, and the Blues. We continued our research into legal issues raised by the draft Settlement Agreement. I had email exchanges with some of the mediating Parties regarding details of two mediation sessions and confirmed the June mediation schedule with the mediating Parties. My staff and I drafted and revised a proposed middle ground on the outstanding key issues and shared it with the mediating Parties. My staff and I participated in a call with the Blues, and updated Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel via email. We scheduled a mediation with Settlement Class Counsel, Self-Funded Sub-Class Settlement Counsel, and the Blues. We prepared for and participated in a Settlement Agreement mediation. Throughout the month of June, we had numerous email exchanges and telephone conferences regarding settlement issues and drafting of the Settlement Agreement. We performed additional legal research related to

the Settlement Agreement. We proposed substantive and non-substantive edits to the Settlement Agreement draft and participated in update calls with the mediating Parties. We prepared documents for the mediating Parties in preparation for the upcoming mediation. We participated in an update Zoom call with the mediating Parties. We reviewed the latest draft of the Settlement Agreement and attended Zoom and in-person mediation sessions with the Blues, Settlement Class Counsel, and Self-Funded Sub-Class Settlement Counsel.

29. In July 2020, my services included telephone conferences, emails and texts with the mediating Parties regarding the case status as well as reviewing the latest draft of the Settlement Agreement and attending a Zoom status conference with the mediating Parties. My staff and I exchanged emails with the mediating Parties regarding a procedure to be followed in order to facilitate my preparation of a Mediator's recommendation for the Settlement Agreement, and we participated in telephone conferences with the Blues, Settlement Class Counsel, and Self-Funded Sub-Class Settlement Counsel on the status of negotiations and remaining deal points. My staff and I prepared for and participated in calls with the mediating Parties regarding the status of the case and the next steps. We reviewed the latest draft of the Settlement Agreement and drafted an errata sheet. We prepared and revised the errata sheet, Mediator's Recommendation, and mediating Party acknowledgments. We conducted another workshop and sent additional follow-up tasks and requests to the mediating Parties before the workshop. We participated in a Zoom call with the mediating Parties and had follow-up discussions and emails regarding the same. We completed final edits to the Mediator's draft of the Settlement Agreement in light of the mediating Parties' positions. We participated in a status conference with the mediating Parties as well as calls with the mediating Parties for Subscriber mediation. We participated in calls with the Blues, Settlement Class Counsel, and Self-Funded Sub-Class Settlement Counsel and exchanged emails with the mediating Parties.

30. Another Zoom mediation was held on July 20, 2020, with follow-up telephone

conferences. My staff and I drafted an acknowledgment by the mediating Parties that a final draft Settlement Agreement will be submitted to their constituents, including each individual Blue Plan, for review. On July 22 and 23, 2020, my staff and I participated in Zoom calls with the Blues, Settlement Class Counsel, and Self-Funded Sub-Class Settlement Counsel and separate calls with the each. My staff and I finalized the Mediator's working draft of the Settlement Agreement and provided it to the mediating Parties on July 23, 2020. On July 28 and 29, 2020, my staff and I participated in telephone conferences, Zoom meetings, texts and emails with the mediating Parties to finalize the proposed Settlement Agreement, subject to all mediating Parties' final approval. On July 30, 2020, the representatives for the mediating Parties agreed to submit the Settlement Agreement to each group, including each of the individual Blue Plans, for review and possible approval and to report their decisions to the Mediator on or before September 30, 2020.

31. In August 2020, my staff and I had an update Zoom meeting with the mediating Parties regarding the next steps in the settlement process. We prepared for these meetings, which were held on August 3, 2020. We participated in a number of email exchanges and update telephone conferences regarding the settlement process.

32. As evidenced hereinabove, my staff and I have worked tirelessly in our efforts to resolve this matter. From November 2017 through July 31, 2020, we have billed a total of 1,389.80 hours. These numbers reflect the diligent work put forth to settle this matter.

**The Settlement Is Fair And Reasonable**

33. The Settlement Agreement that has been reached is a result of arms-length negotiations based upon my Mediator's Recommendation and is fair and reasonable. The proposed settlement creates a Settlement Fund of $2.67 billion. Given my extensive experience mediating these claims with experienced and competent counsel on both sides, and my knowledge of this case through more than eight years of litigation, I believe that this settlement amount represents a significant result for both

the Subscriber Class and the Defendants. I believe that Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel negotiated the best deal for the class that could reasonably have been obtained.

34.     The proposed settlement also provides for transformative injunctive relief designed to foster competition in the national health insurance marketplace. This relief will redound to the benefit of all of the members of the Settlement Classes. The significant breadth and depth of this relief are spelled out in great detail in the Parties' Settlement Agreement, but the most important features can be briefly summarized as follows: (1) eliminating the "National Best Efforts" rule which required that two-thirds of each Member Plan's national healthcare-related revenue come from Blue-branded products as opposed to non-Blue business; (2) allowing certain Qualified National Accounts (essentially, employers with at least 5,000 employees and meeting certain other criteria) to request a bid from a second Blue-branded plan; (3) requiring Blue Plans that bid on certain large accounts under non-Blue brands to cede the right to bid those accounts under the Blue brands to another Blue Plan; (4) limiting the ability of the BCBSA to impose conditions on the acquisition of Blue Plans; and (5) limitations on the use by Blue Plans of so-called "most favored nations differentials" that require health care providers to offer the Plans financial terms that are more favorable than those offered to comparable health plans. The Settlement Agreement further provides for a five-year monitoring period, to mediate disputes arising under the Settlement Agreement and an orderly process for resolving any disputes regarding settlement implementation and good faith compliance with its requirements.

35.     The settlement negotiation process was conducted at arms' length and in good faith, and was often extremely contentious, with counsel for each side tenaciously and vigorously advocating for their clients. Counsel consistently exhibited the highest degree of professionalism. Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel made able use of the economic analyses provided by their experts, took account of the full range of the potential claims that were held by

members of the class when negotiating, and aggressively advocated for all of the interests of all of the class members in order to maximize the relief obtained for the class. The resumption of litigation remained a realistic possibility throughout the mediation; indeed, it frequently seemed to me that the mediation process was at risk of irrevocably breaking down, with the result that negotiations would come to an end and the Parties would return to the courtroom. Settlement was by no means a foregone conclusion and, on numerous occasions, required Mediators' recommendations to break the logjam.

36. In sum, the settlement was "the result of vigorous arm's length negotiations, which were undertaken in good faith by counsel with extensive experience . . . ." Encarnacion v. J.W. Lee, Inc., 2015 WL 6437686, *4 (US D. Ct. SD FL 2015). (See also In re: U.S. Oil & Gas Litig., 967 F2d 489, 493 (11th Cir. 1992) ("public policy strongly favors the pretrial settlement of class action lawsuits.").

37. I can attest that counsel on both sides of the negotiations expended extraordinary time and effort to obtain the best possible result for their clients in this settlement: the legal, factual, and administrative questions that they had to address and resolve during the settlement process were novel, complex, and difficult; and the nearly five years of negotiations, including some years before I was formally involved, that resulted in the final Settlement Agreement required the continuous and unfailing exercise of patience, persistence, and consummate legal skill. Finally, I can attest, having participated in most, if not all, formal mediation sessions over the last three years, that the mediating Parties agreed to present the Mediator's recommended amount of monetary payments to be made to Damages Class Members, the amount of notice and administration costs, and the principal terms of the non-monetary injunctive relief to their constituents before any discussion of attorneys' fees commenced.

38. Having served as the principal Mediator as well as the Special Master in this case, I am well-informed about the nature of the allegations, the risks on both sides, and the procedural posture of the case. Given the complexity of the case, the large number of Defendants, and the nationwide scope of the allegations, it was and would continue to be necessary to expend significant resources to continue

litigating this case with an uncertain outcome, and based on this additional measure, it is my opinion that the settlement provides an excellent result for the class.

39.     In conclusion, based upon my extensive work on this matter, there should be a presumption of reasonableness.   See In re Schering-Plough Corp. Securities Litigation, 2009 WL 5218066, *3 (US D Ct., D NJ 2009) (in a large securities class action case involving claims of security fraud and actionable misstatement, "Mediation sessions began years before the ultimate settlement, foundered, recovered, gained traction, and were successful – a pattern that demonstrates arms-length negotiating."). See also Nelson v. Mead Johnson & Johnson Co., 484 F. App'x 429, 435 (11th Cir. 2012) (affirming approval of settlement that was "the result of extensive arms-length negotiations moderated by a court-appointed mediator").   Furthermore, it has been said that "[t]he involvement of professional mediators for a substantial number of days over a substantial number of months is strong evidence of arms-length, non-collusive, non-tortious, and therefore by definition, good faith settlement negotiations and of a good faith settlement agreement."   Gray v. Derderian, 2009 WL 1575189, *6 (US D Ct, D. RI 2009). That is certainly the case here.

FURTHER AFFIANT SAITH NOT.

_____
Edgar C. Gentle, III

STATE OF ALABAMA
COUNTY OF SHELBY

BEFORE ME, the undersigned, a notary public in and for said County and State, personally appeared Edgar C. Gentle, III, and acknowledges that he signed the foregoing Affidavit, and that said Affidavit is true and correct to the best of his knowledge and belief.

SWORN TO AND SUBSCRIBED before me this 28th day of October, 2020.

_____
Notary Public
My Commission Expires:

My Commission Expires:     [SEAL]
March 13, 2022



14