FILED

2020 Nov-17  PM 01:58
U.S. DISTRICT COURT
N.D. OF ALABAMA



*In Re Blue Cross And Blue Shield Antitrust Litigation*

MDL No. 2406

# Demonstrative Slides for Subscriber Plaintiffs

Hearing on Preliminary Approval of
Subscriber Track Settlement

November 16, 2020

**A.  HISTORY OF CASE**

**B.  OVERVIEW OF SETTLEMENT TERMS**

**C.  PRELIMINARY APPROVAL STANDARDS IN THE 11TH CIRCUIT**

    1.  Legal Standard Under Rule 23(e)(2)

    2.  Legal Standard In The 11th Circuit

    3.  The Settlement Is Fair, Reasonable, and Adequate Under All Applicable Standards

    4.  The Court Should Rule That It Is Likely To Certify The Settlement Classes

**D.  THE COURT SHOULD APPROVE THE PLAN OF DISTRIBUTION**

**E.  THE NOTICE PLAN SHOULD BE APPROVED**

    1.  Settlement Agreement Notice Requirements

    2.  Selection of Claims Administrator

    3.  Legal Standards for Notice

    4.  The Blue Cross Blue Shield Notice Plan

    5.  Forms of Notice and Claims Form

    6.  Claims Processing

    7.  Proposed Notice Timeline

# HISTORY OF CASE

# LITIGATION TIMELINE – KEY EVENTS

★ = Court hearing/conference

| 2012 | 2013 | 2014 |
| --- | --- | --- |

**Feb. 2012**
First case (*Cerven*) filed in W.D. North Carolina

**Sep. 2012**
MDL Motion to Consolidate and Transfer to N.D. Alabama filed.

By this time, 9 new complaints had been filed.

**Feb. 2013** ★
First Status Conference

Over 100 conferences and hearings were held over the next seven years

**July 2013**
Subscriber Plaintiffs' Consolidated Class Action Complaint filed

**Sep. 2013**
First set of MTDs filed

**Starting in 2014**
**DISCOVERY**
Parties begin meeting and conferring over 400 structured data systems

**June 2014**
First set of MTDs denied

**Oct. 2014** ★
Discovery Order No. 1 issued

(Total of 91 Discovery Orders issued over next 4 years)

**Dec. 2014**
Subscriber Plaintiffs' First Amended Complaint filed

Second set of MTDs filed



# LITIGATION TIMELINE – KEY EVENTS

 = Court hearing/conference



**April 2015**
Defendants serve document requests

**March 2015**
Parties serve structured data requests

**Jan. 2015**
Plaintiffs serve document requests

**May 2015**
Second set of MTDs denied

**Oct. 2015**
Third set of MTDs filed (denied without prejudice same month)

**Aug. 2016**
Defendants file MSJ on filed rate

**Dec. 2016**
Subscriber Plaintiffs' Second Amended Complaint filed

**Dec. 2016**
Economics Day I

**Starting in 2015**
Parties begin mediating with Judge Layn Phillips and Judge Gary Fees (These discussions continued through 2017)

5

# Litigation Timeline – Key Events



★ = Court hearing/conference

**2017**

**Feb. 2017**
Depositions begin

From 2017-2018,
Subscriber Plaintiffs
deposed over 120
Defendant witnesses

**Feb. 2017**
Filed Rate
MSJs
decided

**Apr. 2017**
Subscriber
Plaintiffs'
Third
Amended
Complaint
filed

**June 2017**
Economics
Day II

**July 2017**
Parties file
MSJs on
Standard
of Review

**July 2017**
*Per se*
Rule
MSJs filed

**Oct. 2017**
Hearing on
Standard of
Review
MSJs

**Nov. 2017**
Privilege sampling
process begins

**Nov. 2017**
Special Master
Ed Gentle began
mediating
settlement
discussions
(Mediator Gentle
oversaw 158 in-
person meetings and
282 telephone/Zoom
meetings. Ex. K ¶3)

6

# LITIGATION TIMELINE – KEY EVENTS

 = Court hearing/conference



**2018** | **2019**

**Jan. 2018**
First privilege sampling R&R issued

44 more R&Rs were issued over next 9 months

**Apr. 2018**
Subscriber Plaintiffs' MSJ on Standard of Review granted in part

**Oct. 2018**
Motions to compel documents from privilege logs

**June 2018**
Defendants' 11th Cir. Petition for Interlocutory Appeal of Standard of Review Order filed

**Apr. 2019**
Subscriber Plaintiffs' Class Certification Motion filed

**Dec. 2018**
Defendants' Eleventh Circuit Petition denied

**July 2019**
Motion for Class Certification opposed

**May 2019**
Subscriber Plaintiffs' merits expert reports filed

**Sept. 2019**
Litigation stayed

**Nov. 2019**
After two years of mediation with Special Master Gentle (and almost five years of total mediation), the parties sign a term sheet

7

# LITIGATION TIMELINE – KEY EVENTS

 = Court hearing/conference



## 2020

**Oct. 2020**
After another year of virtually constant mediation sessions and settlement negotiations to reduce the term sheet to an agreement, the parties sign the Settlement Agreement

**Nov. 16 2020**
Preliminary approval hearing

8

Offensive Depositions: 120                Reviewed over 100 terabytes of data

Defensive Depositions: 16                Discovery Conferences: >100

Pages Produced: >75,000,000            Discovery Orders: 91

Privilege Challenges 2017-2019:            >700,000

Privilege Reports & Recommendations:            45

Privilege De-designations:            >450,000

This settlement is the result of private enforcement: Subscriber Plaintiffs investigated and developed the record in order to achieve this result.

# OVERVIEW OF SETTLEMENT TERMS

# OVERVIEW OF SETTLEMENT

1. Financial Relief is **$2.67 billion**

2. Structural relief

    A. Eliminates "National Best Efforts" restraint

    B. Right to Request Second Blue Bids

    C. Limits use of "MFN-Differentials"

    D. Limits acquisition restrictions and other new rules

    E. Requires monitoring & reporting for five years

# FINANCIAL RELIEF IS $2.67 BILLION

- Subscriber Plaintiffs' estimate of damage was based on an economic model, was the result of five years of mediation, and took into account settlement risk, class certification risk, and risk and expense of trial.

- In extrapolating the Alabama damages model **nationwide** through 2019, Dr. Pakes has estimated a potential maximum single damages recovery ranging from $18.6 billion to $36.1 billion resulting from the foreclosure of competition imposed by the aggregated restraints. Ex. J, Pakes Decl. ¶ 10.

- Financial relief will be available to all class members: fully insured groups and their employees, self-funded plans and their employees, and individual policyholders.

# FINANCIAL RELIEF IS $2.67 BILLION

- A recovery **of $2.67 billion represents 7.3% to 14.3% of that estimated maximum full recovery**, which falls within the **range of reasonable recoveries in this Circuit.**

  - *Bennett v. Behring Corp.*, 737 F.2d 982, 986-87 & n.9 (11th Cir. 1984) (5.6% of claims);

  - *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) (9% of claims);

  - *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880, at *14 (E.D. La. July 27, 2015) (8.5% of claims).

13

# ELIMINATION OF "NATIONAL BEST EFFORTS"

Current system: For each plan, at least 66.66% of national revenue from healthcare plans and related services has to come from business using the "Blue Marks"

Effect:
- Restrained ability of Plans to compete with one another using Non-Blue marks

- Disincentive to develop and use non-Blue marks

- Thwarted acquisitions of, or by, non-Blue branded health insurers (e.g. Cigna)

Settlement: Elimination of NBE and that no similar rule will be enacted in the future

Effect: *More Green on Blue competition*

14

# NATIONAL ACCOUNTS: SECOND BLUE BIDS

Current system:    Large national accounts generally get only one bid from a Blue Plan—either from local Plan for its HQ, or another Plan if the right to bid is "ceded"

Effect:    Account receives single Blue bid

Settlement:    Guarantees that eligible Qualified National Accounts can request a second bid from the Blue Plan of its choice

15

Settlement:    For Qualified National Accounts with Independent Health Benefit Decision Locations in more than one Service Area, each Independent Health Benefit Decision Location may request a bid from the Member Plan in its Service Area to cover employees working at that Location.

Settlement:    When Multi-Service Area National Accounts seek bids, the Individual Blue Plan for that Service Area may bid the Account as a non-Blue brand, provided the right to bid as a Blue brand is afforded to another Individual Blue Plan.

Effects:    *More Blue on Blue and Green on Blue competition*

# DEFINITION OF "QUALIFIED NATIONAL ACCOUNTS"

- More than 5,000 employees

- Satisfies the "D&B Analysis" in Settlement Agreement such that all Qualified National Accounts together must --

    - Have 33 million members in aggregate

    - Constitute at least half of employers that have 5,000 or more employees and offer self-funded plans

    - Constitute at least 31% of members of self-funded accounts

- Appendix C to Settlement Agreement lists 1,042 entities that are Qualified National Accounts, and other employers have the right to appeal to Monitoring Committee to be added

17

# MFNs

Current system:    Blue Plans can use "MFN-Differentials"—requiring providers to give Plan a better price than charged to any competing insurer.

Effect:    Raises prices for competitors and limits competition

Settlement:    No MFN Differentials when Blue Plan has > 40% market share, *unless* (a) provider offers same deal to another payer, (b) provider itself offers a competing health plan, (c) Plan has invested at least $100,000 in provider, and (d) Plan has agreed to accountable care org., narrow network, cost sharing, capitation, or value-based arrangement with provider.

Effect:    *Opens competition*

18

# MONITORING AND REPORTING

During the five-year Monitoring Period, the Monitoring Committee shall:

- Resolve any disputes related to the Settlement Agreement, subject to an appeal to arbitration

- Resolve any disputes related to any new rules proposed by Defendants, subject to an appeal to arbitration

- File an annual report with the Court identifying the actions taken by the Committee during the prior calendar year

"Notwithstanding any other provision of this Agreement, **a Provider** who is a Settlement Class Member as defined in this Agreement **does not release any claims arising from his, her or its sale or provision of health care products or services** (as opposed to the purchase of a Commercial Health Benefit Product). Settling Defendants agree not to raise Providers' releases under this Agreement as a defense to Providers' claims brought in their capacity as Providers of health care products or services in MDL No. 2406."

Ex. A at ¶ 1(uuu)

# THE COURT SHOULD GRANT PRELIMINARY APPROVAL

1.    LEGAL STANDARD UNDER RULE 23(E)(2)

The recent Rule 23 amendments charge this Court to conduct a careful analysis at the preliminary approval stage to determine whether "giving notice is justified by the parties' showing that the court **will likely be able to**: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." FRCP 23(e)(1)(B)

Preliminary approval requires "**a solid record** supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object." FRCP 23 advisory committee's note to 2018 amendment.

Courts have interpreted this to be a "more exacting standard" than the previous framework. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 28 (E.D.N.Y. 2019).

23

Under FRCP 23(e)(2), the Court should grant final approval of a class action settlement if it finds the settlement to be "**fair, reasonable, and adequate**."

FRCP 23(e)(2)

Review and approval of a class action settlement under FRCP 23(e)(2) "is committed to the sound discretion of the district court.".

*Swaney v. Regions* Bank, 2020 WL 3064945, at *3 (N.D. Ala. June 9, 2020); *see also In re Liberty Nat'l Ins. Cases*, 2006 WL 8436814, at *9 (N.D. Ala. Mar. 31, 2006)

24

# THE RULE 23(e)(2) FACTORS

To determine if the settlement is "**fair, reasonable, and adequate**," the Court considers the following four factors under Rule 23(e)(2):

A.  The class representatives and class counsel have adequately represented the class;

B.  The proposal was negotiated at arm's length;

C.  The relief provided for the class is adequate, taking into account:

    i.    the costs, risks, and delay of trial and appeal;

    ii.    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims;

    iii.    the terms of any proposed award of attorney's fees, including timing of payment;

    iv.    any agreement required to be identified under Rule 23(e)(3)

D.  The proposal treats class members equitably relative to each other.

FRCP 23(e)(2)

# THE 2018 AMENDMENTS WERE NOT INTENDED TO DISPLACE PRIOR STANDARDS

The goal of the 2018 amendments was **"not to displace"** any factor previously adopted by courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."

Rule 23(e)(2) advisory committee's note to 2018 amendment. *Johnson v. Rausch, Sturm, Israel, Enerson & Hornik, LLP*, 333 F.R.D. 314, 320 (S.D.N.Y. 2019) (holding that the Rule 23(e)(2) factors must be considered in conjunction with factors that courts used prior to the 2018 amendments)

## 2.     Legal Standard In The Eleventh Circuit

"**Public policy strongly favors the pretrial settlement of class action lawsuits**."

*Swaney v. Regions Bank,* 2020 WL 3064945, at *3 (N.D. Al. June 9, 2020) (quoting *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992))

"Settlements are '**highly favored in the law and will be upheld whenever possible** because they are a means of amicably resolving doubts and preventing lawsuits.'"

*McWhorter v. Ocwen Loan Servicing, LLC*, 2019 WL 9171207, at *8 (N.D. Ala. Aug. 1, 2019) (quoting *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977))

"The policy of federal courts, favoring voluntary resolution of litigation through settlement, is **particularly strong in the context of class actions.**"

*In re Liberty Nat'l Ins. Cases*, 2006 WL 8436814, at *9

To assess the fairness of a settlement, courts in the Eleventh Circuit have long considered the **six *Bennett* factors**.

*Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)

These standards have continued to be applied after the adoption of the 2018 amendments to Rule 23(e)(2).

*Carroll v. Macy's, Inc.*, 2020 WL 3037067, at *5 (N.D. Ala. June 5, 2020)

29

# The six *Bennett* factors:

1) The likelihood of success at trial;

2) The range of possible recovery;

3) The point on or below the range of recovery at which a settlement is fair, adequate, and reasonable;

4) The complexity, expense, and duration of the litigation;

5) The substance and amount of opposition to the settlement; and

6) The stage of proceedings at which settlement was achieved.

*Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *Carroll v. Macy's, Inc.*, 2020 WL 3037067, at *5 (N.D. Ala. June 5, 2020)

# 3. The Settlement Is Fair, Reasonable, and Adequate Under All Applicable Standards

# Rule 23(e)(2)(A): The Settlement Class Has Been Adequately Represented

**The Settlement Class has been adequately represented**:

**Class representatives**:  There are 67 different class representatives, both fully insured class representatives and a sub-class representative for self-funded class members.  No question can been raised regarding their dedication to representing the class, let alone about their adequacy. ECF No. 2616 (Fourth Am. Cons. Complaint) at ¶¶ 17-78.

**Class Counsel**:  The Court and Special Master have already recognized the qualifications of **Co-Lead Counsel**, Michael D. Hausfeld and David Boies, and those of the other highly credentialed lawyers on the **Plaintiffs' Steering Committee** (William Isaacson, Megan Jones, Greg Davis, Cy Smith and Kathleen Chavez). This is in addition to the talent of those attorneys appointed to the Committees. ECF No. 62.

Both Michael D. Hausfeld and David Boies have extensive and relevant experience. Self-Funded Sub-Class Settlement Counsel also broad experience representing plaintiffs in class actions. Resume of Hausfeld and Michael D. Hausfeld, Ex. E, pgs. 15-35; Resume of Boies Schiller Flexner, Ex. E, pgs. 62-64; Ex. F, Self-Funded Sub-Class Settlement Counsel Decl., pgs. 8-17.

# Rule 23(e)(2)(A): The Settlement Class Has Been Adequately Represented

In discovery, Subscriber counsel obtained and analyzed over **75 million pages** of documents and took **over 100 depositions** of Defendants and third parties. Ex. E, Settlement Class Counsel Decl. ¶¶ 13-17.

Subscriber counsel also defended 16 class representative depositions and 9 expert depositions. Ex. E, Settlement Class Counsel Decl. ¶ 15.

Settlement Class Counsel have litigated this case aggressively **for over eight years**, engaging in voluminous document and deposition discovery, as well as extensive motions practice. Through these efforts, Subscriber Plaintiffs and Settlement Class Counsel were **"fully informed about the nature of the claims and defenses and the risk and expense of continued litigation."** Ex. E, Settlement Class Counsel Decl. ¶ 37.

The Special Master found that "The settlement negotiation process was conducted at arms' length and in good faith, and was often extremely contentious, with **counsel for each for each side tenaciously and vigorously advocating for their clients**." Ex. K, Special Master Decl. at ¶ 35.

33

# THERE ARE 67 CLASS REPRESENTATIVES WHO HAVE APPROVED THE SETTLEMENT

1. Galactic Funk Touring, Inc.
2. American Electric Motor Services, Inc.
3. CB Roofing, LLC
4. Pearce, Bevill, Leesburg, Moore, P.C.
5. Pettus Plumbing & Piping, Inc.
6. Consumer Financial Education Foundation of America, Inc.
7. Fort McClellan Credit Union
8. Rolison Trucking Co., LLC
9. Conrad Watson Air Conditioning, Inc.
10. Linda Mills
11. Frank Curtis
12. Jennifer Ray Davidson
13. Pete Moore Chevrolet, Inc.
14. Jewelers Trade Shop
15. Saccoccio & Lopez
16. Angel Foster (fka Angel Vardas)
17. Monika Bhuta
18. Michael E. Stark
19. G&S Trailer Repair Incorporated
20. Chelsea L. Horner
21. Montis, Inc.
22. Renee E. Allie
23. John G. Thompson
24. Avantgarde Aviation, Inc.
25. Hess, Hess & Daniel, P.C.
26. Betsy Jane Belzer
27. Bartlett, Inc. d/b/a Energy Savers
28. Matthew Allan Boyd
29. Gaston CPA Firm
30. Rochelle McGill
31. Brian McGill
32. Sadler Electric
33. Jeffrey S. Garner
34. Amy MacRae
35. Vaughan Pools, Inc.
36. Casa Blanca, LLC
37. Jennifer D. Childress
38. Clint Johnston
39. Janeen Goodin
40. Marla S. Sharp
41. Erik Barstow
42. GC/AAA Fences, Inc.
43. Keith O. Cerven
44. Teresa M. Cerven
45. Sirocco, Inc.
46. Kathryn Scheller
47. Iron Gate Technology, Inc.
48. Nancy Thomas
49. Pioneer Farm Equipment, Inc.
50. Scott A. Morris
51. Tony Forsythe
52. Joel Jameson
53. Ross Hill
54. Angie Hill
55. Kevin Bradberry
56. Christy Bradberry
57. Tom Aschenbrenner
58. Juanita Aschenbrenner
59. Free State Growers, Inc.
60. Tom A. Goodman
61. Jason Goodman
62. Comet Capital, LLC
63. Barr, Sternberg, Moss, Lawrence, Silver & Munson, P .C.
64. Mark Krieger
65. Deborah Piercy
66. Lisa Tomazzoli
67. Hibbett Sports, Inc. (Self-Funded)

34

**The Self-Funded Sub-Class has been adequately represented**:

Hibbett Sports, Inc. began participating in the settlement negotiations in September 2019. Ex. E, Settlement Class Counsel Jt. Decl. at ¶ 32.

Self-Funded Sub-Class Settlement Counsel joined the settlement process before negotiations were completed and the term sheet was executed. Ex. K, Gentle Decl. ¶ 35; Ex. F, Self-Funded Sub-Class Settlement Counsel Decl. ¶¶ 1-8; Ex. E, Settlement Class Counsel Jt. Decl. ¶¶ 31-32.

Self-Funded Sub-Class Settlement Counsel accessed discovery and briefing, engaged independent experts, and participated in mediation. Ex. F, Self-Funded Sub-Class Settlement Counsel Decl. ¶¶ 3,5, 6; Ex. E, Settlement Class Counsel Jt. Decl. ¶¶ 31-32.

Self-Funded Sub-Class Settlement Counsel asked for additional discovery during mediation, which allowed counsel and the Sub-Class Representative to "negotiate favorable terms for the Sub-Class and to assess the impact of the settlement on the Self-Funded Sub-Class." Ex. F, Self-Funded Sub-Class Settlement Counsel Decl. ¶ 7.

Special Master Gentle found that the Self-Funded Sub-Class Settlement Counsel "aggressively advocated" in order to maximize relief. Ex. K, Gentle Decl. ¶ 35.

# EVERY ASO BENEFITS FROM THE SETTLEMENT

- Every ASO has the potential to get 2nd Blue bid if they meet the dispersion criteria.

  - The list is refreshed every 2 years.

- All ASOs get monetary relief.

- All ASOs get benefit of elimination of NBE.

# Rule 23(e)(2)(B):  The Settlement Has Been "Negotiated at Arm's Length"

The Court should find that negotiations "proceeded at arm's length" and settlement was "not the product of collusion" when:

- The parties worked extensively with a "**highly experienced mediator**," participating in multiple in-person sessions and numerous communications.

  *Faught v. Am. Home Shield Corp.,* 2010 WL 10959223, at *19 (N.D. Ala. Apr. 27, 2010), *aff'd,* 668 F.3d 1233 (11th Cir. 2011) (finding that a settlement was a result of arm's length negotiations when the parties had engaged in "marathon mediation efforts" to negotiate and "were supervised by a highly experienced mediator"); *Poertner v. Gillette Co.*, 618 F. App'x 624, 630 (11th Cir. 2015) (finding that an objector's argument that class counsel had engaged in self-dealing was "bellied by the record" when "the parties settled only after engaging in extensive arms-length negotiations moderated by an experienced, court-appointed mediator"); *Waters v. Cook's Pest Control, Inc.*, 2012 WL 2923542, at *14 (N.D. Ala. July 17, 2012) (finding a lack of collusion when the settlement was reached "after extensive, difficult, and lengthy negotiations involving a skilled mediator. The mediation process, itself, took nearly ten months").

- Particularly when the case "**was intensively litigated**. Defendants filed numerous dispositive motions that could have completely absolved themselves of liability throughout the time that this case has been active."

  *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014).

37

# Rule 23(e)(2)(B): This Settlement was reached after Five Years Of Intensive Arms' Length Mediation With Well-Qualified Mediators.

- The parties worked extensively with **three experienced and well-respected mediators**:

  - Former U.S. District Court Judge Hon. Layne R. Philips

  - Former U.S. District Court Judge Hon. Gary A. Feess

  - Special Master Edgar C. Gentle III

- The parties engaged in mediations over a period of **five years**.

- With Special Master Gentle alone, the parties engaged in **dozens** of mediation sessions, caucuses, phone calls, and meetings with the parties, both individually and separately.

  Ex. K, Gentle Decl. ¶ 26.

- As part of the mediation process, Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel made use of economic analysis, took account of the relative strengths and weakness of the parties' claims, and aggressively advocated for the interests of the class and sub-class.

  Ex. K, Gentle Decl. ¶ 35; Ex. E, Settlement Class Counsel Decl. ¶ 37.

38

In 2014, the parties litigated almost a dozen motions to dismiss filed by Defendants on key legal issues – including McCarron Ferguson, whether territorial restrictions were needed to protect trademarks, standard of review, filed rate doctrine, and personal jurisdiction.

*In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172 (N.D. Ala. 2014)

After defeating the motions to dismiss, Subscribers took extensive discovery, obtaining and reviewing over 75 million pages of documents, over 100 terabytes of data, taking over 100 depositions, and working with experts on liability and damages analyses.

In 2017, the parties litigated numerous summary judgment motions, including regarding the Filed Rate Doctrine, the "standard of review," and Defendants "single entity" defense.

*In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d 1313 (N.D. Ala. 2017); ECF 2063.

Under Rule 23(e)(2)(C), the Court considers whether "relief provided for the class is adequate, taking into account:"

   i.   the costs, risks, and delay of trial and appeal;

   ii.   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

   iii.   the terms of any proposed award of attorney's fees, including timing of payment; and

   iv.   any agreement required to be identified under Rule 23(e)(3).

FRCP 23(e)(2)(C).

A review of those factors shows that the Settlement warrants preliminary approval.

# RULE 23(e)(2)(C)(I):  "COSTS, RISKS, AND DELAY OF TRIAL AND APPEAL"

This litigation has already been enormously costly, risky, and protracted.  Plaintiffs have incurred over $35 million in out-of-pocket costs, and approximately $200 million in lodestar.  The litigation has already lasted close to 9 years before the first trial.  If the case were to proceed to trial, the costs and time required would increase greatly.

When "the outcome on class certification and the ultimate outcome on the merits [is] uncertain," settlement is appropriate.

*Swaney v. Regions Bank*, 2020 WL 3064945, at *4 (N.D. Ala. June 9, 2020) (Proctor, J.) (internal quotation marks omitted) (quoting *Parsons v. Brighthouse Networks, LLC*, 2015 WL 13629647, *2 (N.D. Ala. Feb. 5, 2015))

Here, Subscribers face substantial uncertainty as to:

- Class certification
- Liability
- Damages
- Injunctive relief
- The potential risk of added uncertainty, expense, and delay in litigating as many as 51 non-accelerated actions.

41

# ABSENT A SETTLEMENT, SUBSCRIBERS WOULD FACE SUBSTANTIAL DELAY

- Getting to this point with one accelerated case has taken over 8 years – if every case had to be tried, it would take many years.

- It is difficult to estimate how many more years of litigation it will take to complete the remaining actions.

- Each individual trial would come with its own risks.

- There is also a threat of inconsistent decisions.

- In addition to time and expense on each trial, the parties would have to prepare complex damages models nationwide.

- After each trial, there would be long, complicated appeals.

If Subscribers did not settle, they would face:

- The risk that Defendants would prevail at trial in showing that they operate as a single economic enterprise with respect to the Blue Marks

- The risk that Defendants could prevail on appeal in reversing the "standard of review" order, including by asking the 11th Circuit to distinguish, or the Supreme Court to overrule, *Topco* and *Sealy*, or to harmonize them with more recent antitrust rulings (such as *NCAA*, *BMI*, and similar decisions allowing joint ventures among competitors)

If Subscribers did not settle, they would face:

- Risk of not certifying a class or classes for trial purposes, which is more difficult than certifying a class for settlement purposes

  - Subscribers would potentially have to certify state-specific damages classes in 52 jurisdictions, and then proceed to litigate 52 trials all over the country.

  - Disputes over the damages model presented by Subscribers' expert and whether it showed "common impact" and damage

  - The risk of reversal on appeal under FRCP 23(f)

*=> Enormous costs, risks, and potential delays to reach final resolution.*

If Subscribers did not settle, they would face:

- Major risks in proving damages, including

  - Risks on the Filed Rate Doctrine

  - Risk of proving entry by other Defendant Plans "but for" the restraints

  - Risk of proving lower prices would have resulted from that entry, established with reasonable certainty

*=> Enormous costs, risks, and potential delays to reach final resolution.*

- The achievement of substantial injunctive relief in a private antitrust case is unprecedented.

- The injunctive relief included in the Proposed Settlement is historic and will greatly increase competition in critical health insurance markets.

The proposed method of processing claims and distributing relief is efficient and effective:

> "The goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible."

> *Fitzgerald v. P.L. Mktg., Inc.*, 2020 WL 3621250, at *9 (W.D. Tenn. July 2, 2020)).

Here, the Settlement and the Plan of Distribution allow for efficient processing of claims while giving those Settlement Class Members who wish to provide additional data the opportunity to seek more than their default distribution (*see* Slides on Plan of Distribution).

47

- The combined fee and expenses award will not exceed 25% of the $2.67 billion common fund, plus up to $7 million from the Notice and Administration Fund to "reimburse plaintiffs' counsel's actual and reasonable fees and expenses incurred for Notice and Administration."

  > This Court has stated that "[i]n determining an award of attorney's fees in a percentage-of-fund class settlement case, the 'benchmark' percentage is 25%, which is the dead center of the 20-30% range."

  > *Swaney v. Regions Bank*, 2020 WL 3064945, at *7 (N.D. Ala. June 9, 2020) (Proctor, J.); *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1243 (11th Cir. 2011) ("25% is generally recognized as a reasonable fee award in common fund cases").

- Settlement Class Counsel anticipate seeking attorney fees amounting to slightly less than 25% benchmark percentage, and to support that request with expert analysis.

- Settlement Class Members will receive notice of the proposed fee and expense request and will have an opportunity to object to any such award prior to Final Approval.

- Within 31 days of preliminary approval, a partial award of $75,000,000 of the total attorneys fees, expenses, and interest shall be paid, subject to security and repayment obligations.

  > Courts routinely permit payment of attorney fees prior to final judicial resolution of settlement approval.

  > *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2011 WL 7575004, *1 (N.D. Cal. 2011) (finding that settlements that provide for payment of attorneys' fees prior to final disposition are "routinely" approved and collecting cases in support).

48

Rule 27(e)(2)(C)(iv) asks the court to consider "any agreement required to be identified under Rule 23(e)(3)."

All agreements are set forth in the Settlement agreement, plus the *in camera* supplement addressing only rescission matters relating to the opt out threshold.

The proposed settlement treats class members equitably relative to one another:

The allocation between Fully Insured class members and Self-Funded class members was prepared with the assistance of economic experts and negotiated at arm's length under the auspices of the Allocation Mediator – Ken Feinberg, the country's leading mediator over allocations of large settlements and compensation funds – who confirmed its reasonableness.

The Plan of Distribution within the Fully Insured and Self-Funded groups provides for class members to recover on a *pro rata* basis, which is widely recognized as an appropriate and equitable approach in complex antitrust class action settlements, notwithstanding potential different circumstances of class member cohorts. *In re Credit Default Swaps Antitrust Litig.,* 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016)*; In re Polyurethane Foam Antitrust Litig.*, 135 F. Supp. 3d 679 (N.D. Ohio 2015); *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136 (D.N.J. 2013); *In re Visa Check/ Mastermoney Antitrust Litig.,* 297 F. Supp. 2d 503 (E.D.N.Y. 2003).

The Plan's approach for determining the employer/employee shares, as well as other aspects of the Plan, were prepared with the assistance of an economics expert and have been assessed as reasonable by the Allocation Mediator. Ex. H at pages 11-26; Ex. G ¶¶ 16-20.

*Further discussion of this factor is in the Plan of Distribution discussion.*

50

# THE FIRST AND FOURTH *BENNETT* FACTOR SUPPORT APPROVAL OF THE SETTLEMENT.

The first and fourth *Bennett* factors—the likelihood of success at trial and the complexity, expense and duration of the litigation—were already addressed by analysis under the Rule 23(e)(2) factors.  Both support approval.

# THE SECOND AND THIRD *BENNETT* FACTORS SUPPORT APPROVAL OF THE SETTLEMENT.

The second and third *Bennett* factors are 'easily combined and normally considered in concert.'"

*Camp v. City of Pelham*, 2014 WL 1764919, at *3 (N.D. Ala., May 1, 2014) (quoting *Cifuentes v. Regions Bank*, 2014 WL 1153772, at *5 (S.D. Fla. Mar. 20, 2014)).

The Court first determines "the possible range of recovery" and then ascertains where within that range "fair, adequate, and reasonable settlements lie."

*Deas v. Russell Stover Candies, Inc.*, 2005 WL 8158201, at *11 (N.D. Ala. Dec. 22, 2005) (internal quotations omitted).

Here, both the monetary and non-monetary relief secured by the Subscriber Plaintiffs with this Settlement falls within the range of reasonableness contemplated by the two factors.

When, as here, the likelihood of recovery is risky, that likelihood also weighs in favor of approval.

*In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, 2015 WL 4528880, at *14 (E.D. La. July 27, 2015) (finding recovery of 8.5% of best case damages scenario appropriate, especially as weighed against "substantial risks of nonrecovery").

52

# THE MONETARY RELIEF IS IN THE RANGE OF REASONABLENESS

Subscriber Plaintiffs' expert Dr. Ariel Pakes has estimated a potential maximum single damages recovery ranging from $18.6 billion to $36.1 billion. Ex. J, Pakes Decl. ¶ 10.

Our estimate of damage is based on an economic model, and is not tethered to "how much a company has."

- Our settlement amount was the result of five years of mediation, and took into account settlement risk, class certification risk, and risk and expense of trial.

- In extrapolating the Alabama damages model nationwide through 2019, Dr. Pakes has estimated a potential maximum single damages recovery ranging from $18.6 billion to $36.1 billion. Ex. J, Pakes Decl. ¶ 10.

- A recovery **of $2.67 billion represents 7.3% to 14.3% of that estimated maximum full recovery**, which falls within the **range of reasonable recoveries in this Circuit.**

  - *Bennett v. Behring Corp.*, 737 F.2d 982, 986-87 & n.9 (11th Cir. 1984) (5.6% of claims);

  - *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) (9% of claims);

  - *Lazy Oil Co. v. Wotco Corp.*, 95 F.Supp.2d 290, 318-19 (W.D.Pa. 1997) (5.35%)

  - *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880, at *14 (E.D. La. July 27, 2015) (8.5% of claims)

  - *Carnegie v. Mut. Sav. Life Ins. Co.*, 2004 WL 3715446, at *21 (N.D. Ala. Nov. 23, 2004) (refusing to consider potential punitive damages award when determining the adequacy of settlement)

- Even the "best case damages scenario" must be weighed against "substantial risks of nonrecovery." *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, 2015 WL 4528880, at *14 (E.D. La. July 27, 2015) .

53

# THE NON-MONETARY RELIEF IS PRO-COMPETITIVE AND VALUABLE

The injunctive aspects of the Settlement are pro-competitive and significantly increase the value of the Settlement:

"The rules in existence prior to the proposed settlement tended to foreclose competition."
Ex. I, Rubinfeld Decl. ¶ 36.

The Settlement's elimination of the National Best Efforts (NBE) requirements, under which at least two thirds of each Blue's national revenue from healthcare plans and related services has to come from business using the Blue Marks, will foster competition.

- "The NBE standard is a clear competitive restraint." Ex. I, Rubinfeld Decl. ¶22.

- The "provision of the proposed Settlement Agreement eliminating the NBE as the critical enforcement mechanism for restraining competition outside of a Blue's ESA, and further proscribing any future equivalent provision, is clearly pro-competitive." Ex. I, Rubinfeld Decl. ¶32.

- "[T]he proposed settlement enables [Blue] plans to respond to consumers/market with innovative products and to achieve efficiencies even to the extent that predominant brand may no longer be Blue." Ex. I, Rubinfeld Decl. ¶45.

54

# THE NON-MONETARY RELIEF IS PRO-COMPETITIVE AND VALUABLE

Professor Daniel Rubinfeld:

"The injunctive relief is likely to generate significant pro-competitive effects in the marketplace in the forms of increased competition among Blues, unbranded ("Green") growth and competition, scale economies that may result in increased output, higher quality services, increased innovation, and lower insurance premiums (prices) to subscribers (consumers)."

"This forward-looking relief, opening up competition among substantial entities in the enormous health insurance market, stands as economically significant by itself, in addition to the $2.67 billion monetary recovery provided for in the proposed settlement."

Ex. I, Rubinfeld Decl. ¶¶ 16-17.

It is significant – and indeed virtually unprecedented – that such meaningful injunctive relief was obtained in a **private** antitrust action.

# THE NON-MONETARY RELIEF IS PRO-COMPETITIVE AND VALUABLE

"The proposed settlement offers relief that **will provide increased opportunity for competition in the market for national accounts**:"

- "Qualified National Accounts . . . will now be able to obtain a second Individual Blue Plan bid."

- "For Qualified National Accounts with Independent Health Benefit Decisions Locations in more than one Service Area, each [Location] may request a bid from the Member Plan in its Service Area to cover employees working at that Location."

- "When multi-Service Area National Accounts . . . seek bids, the Individual Blue Plan for that Service Area may bid the Account as a non-Blue brand, provided the right to bid  as a Blue is afforded to another Individual Blue Plan."

Ex. I, Rubinfeld Decl. ¶ 37.

56

"**This settlement should increase competition**, which is great news," Kreidler said. "Fortunately, we've had a robust health insurance market for years in Washington. **The settlement should put all companies on notice that they need to do right by consumers**. Hopefully, it will also lead to more transparency throughout the health care market."

https://www.bigcountrynewsconnection.com/news/blue-cross-blue-shield-enrollees-can-expect-small-payments-from-2-67-billion-settlement/article_8b1e5c88-1d5d-11eb-ae21-3f508afafcfa.html

"While the money that will be paid under the proposed settlement, if approved, is substantial – even when shared among the 36 member Blues – **the injunctive relief terms are even more significant, as they have the potential to re-shape the state of competition in health insurance markets going forward**."

James Burns, Healthcare Antitrust practice head at Ackerman LLP, "'Historic' Settlement of Blue Cross Blue Shield Association Antitrust Action May Significantly Boost Competition", *Lexology*  (Nov. 9, 2020), https://www.lexology.com/library/detail.aspx?g=b0e9ce57-3e42-4020-aa3e-8a64489162f3&utm_source=Lexology+Daily+Newsfeed&utm_medium=HT

"Accordingly, in the end, what are the likely implications of the settlement for health insurance markets, and consumers, going forward?  **What seems quite clear is that there will be greater competition among the various Blues going forward**.  However, no less clear is the fact that added competition from the Blues will likely require a competitive response from the other national and regional health insurers as well.  And, **with more health insurer options to choose from, consumers should benefit, with such added competition likely resulting in consumers receiving higher quality services at lower prices – which, of course, is precisely the objective of antitrust laws in the first place**."

*Id.*

"**[T]he impact that the injunctive relief will have on the health insurance market should be monumental**."

Joe Patrice, "Blue Cross Blue Shield Plans to Settle for $2.7B… and That's Not the Most Important Relief", *Above the Law* (Sept. 24, 2020), https://abovethelaw.com/2020/09/blue-cross-blue-shield-plans-to-settle-for-2-7b-and-thats-not-the-most-important-relief/amp/

# THE HEALTH CARE MARKET AFTER IMPLEMENTATION OF THE SETTLEMENT

1.  The agreed injunctive relief will enable some of the largest health insurers in the country to now compete nationally.

    a.  The additional competition resulting from new entry will offer consumers both new products and lower prices on existing products

    b.  Even if there were no new entry in certain markets, the realistic threat of new entry will require incumbent firms to improve their products and prices.

2.  By enabling a large number of national accounts to receive two bids from Defendants using the Blue trademark and networks, the agreed injunctive relief will increase competition not only for the business of those national accounts but for all accounts whose procurements are affected by market prices and product offerings.

3.  By limiting the ability of Plans with greater than 40% market share to enter into "MFN-Differential" contracts with providers, the agreed injunctive relief will open up markets that have long been dominated by incumbent Blue Plans that have developed "cozy" relationships with providers, thereby raising the costs that competing health insurers of all kinds must pay to enter the markets where Blue Plans have dominant market shares.

# THE FIFTH *BENNETT* FACTOR: "THE SUBSTANCE AND AMOUNT OF ANY OPPOSITION"

- While no actual objections have been lodged, counsel for 3 former class representatives has filed a response to the Motion for Preliminary Approval explaining that his clients would not provide their consent to the settlement without more information. ECF No. 2623.

- The other **67** class representatives all agreed to the settlement.

Case 2:13-cv-20000-RDP   Document 2929   Filed 05/18/20   Page 61 of 169

- One of the factors considered under Rule 23(e)(2) is whether the "proposal treats class members equitably relative to each other." FRCP 23(E)(2)(D)

- The basic fact for liability and damages purposes is the Blues' uniform nationwide agreement to restrict competition.

  - That agreement restricts competition through identical means in each state.

- It is the job of experienced class counsel to determine whether any variations among states in market conditions, filed rate doctrine, etc., are so substantial that different plans of allocation, or subclasses, are required.

  - Class counsel concluded that a subclass was appropriate for self-funded groups, but not otherwise.

- Rule 23(e)(5) provides that a court "may" use subclasses to accomplish its goals

# THE BIG PICTURE, CONT'D

- Subclasses are required only when there is an actual and fundamental conflict within the class.

- Mere differences in the strength of claims among class members do not require a subclass.

- Uniform class settlements with *pro rata* distributions are commonly approved.

## The Legal Standard Regarding Plan of Distribution and Possible Subclasses

**Rule 23 requires only reasonable accuracy in allocating settlement damages:**

- "[I]n the case of a large class action the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997) (*per curiam*).

- Accordingly, "a plan of allocation need not be perfect." *Hart v. RCI Hosp. Holdings, Inc.*, No. 09 Civ. 3043 (PAE), 2015 WL 5577713, at *12 (S.D.N.Y. Sept. 22, 2015). Rather, "[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re Am. Bank Note Holographics, Inc.*, 127 F.Supp.2d 418, 429–30 (S.D.N.Y. 2001) (quotation marks omitted).

Case 1:19-cv-10463 Document 123-3 Filed 11/17/20 Page 34 of 89

Notwithstanding potential differences with particular cohorts, "**Courts frequently approve plans involving *pro rata* distribution**." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 2019 WL 6875472 (S.D.N.Y. Dec. 16, 2019).

**Examples**:

- *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136 (D.N.J. 2013)

- *In re Polyurethane Foam Antitrust Litig.*, 135 F. Supp. 3d 679 (N.D. Ohio 2015)

- *In re Visa Check/ Mastermoney Antitrust Litig.,* 297 F. Supp. 2d 503 (E.D.N.Y. 2003)

- *In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188 (E.D. Mich. Dec. 13, 2011)

- *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 2016 WL 235781 (E.D. La. Jan. 20, 2016)

- *In re LIBOR-Based Fin. Instruments Antitrust Litig.,* 327 F.R.D. 483 (S.D.N.Y. 2018)

- *In re Credit Default Swaps Antitrust Litig.,* 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016)

64

Case 2:16-cv-10040 Document 2398 Filed 11/17/16 Page 65 of 169

In *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009), the Third Circuit affirmed the trial court's *pro rata* allocation scheme, dismissing claims that subclasses should have been required:

- "Even if some potential benefits may have been realized from utilizing subclasses, it is not at all clear that the advantages would have outweighed the disadvantages, and therefore it is difficult to say that the District Court abused its discretion by not taking this step." *Id.* at 273.

As the same court later explained:

- "Such differences in settlement value do not, without more, demonstrate conflicting or antagonistic interests within the class." *In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333, 346 (3d Cir. 2010) (citing *In re Ins. Brokerage*).

65

## *Newberg* sums up the general rule:

"[M]inor conflicts or conflicts that are merely speculative or hypothetical will not render a representative so inadequate as to require subclassing.  Rather, there should be no affirmative antagonism between class members.  For a representative to fail Rule 23(a)(4)'s adequacy requirement, the conflict must be fundamental such that the conflict concerns "the specific issues in controversy.  A conflict is "fundamental" when, for example, some class members claim to have been harmed by the same conduct that benefitted other class members.  In such a situation, the named representative cannot vigorously prosecute the interests of the class … because their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members.  But when class members' interests are not actually divergent, providing separate representation for all possible interests is unnecessary."  *Newberg on Class Actions* § 7:31 at 2.

- "Significantly, the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a fundamental one going to the specific issues in controversy." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).

- Which is why the Eleventh Circuit reserves its criticism for cases where such a "fundamental" conflict exists.

  - *Valley Drug*:  anti-competitive conduct hurt some class members, helped others.

  - *Klay v. Humana, Inc.*, 382 F.3d 1241, 1265 (11th Cir. 2004):  defendant insurers used multiple algorithms to lower provider reimbursements; "numerous plaintiffs suffer varying types of injury . . . through different causal mechanisms."

  - *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983):  reversing class settlement where named plaintiffs received half the lump sum back pay award because of unexplained "explicit . . . preferential treatment."

67

# BOTTOM LINE RE: POTENTIAL DIFFERENCES

- The bottom line is that pointing out potential differences in the strength of various class members' claims is insufficient.

  - "It is not enough for objectors to point to differences in claims, allocation amounts, or state laws without identifying how such differences demonstrate a conflict of interest." *In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010).

- Because demanding subclasses has real costs that should be weighed as well.

  - "[I]f subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened. Subclassing incurs other transaction costs as well, threatening the efficiency of the class suit." *Newberg*, § 7:31 at 2.

  - In *Ortiz,* the Supreme Court stated that "at some point there must be an end to reclassification with separate counsel." 527 U.S. at 857.

  - In the sound judgement of counsel, it would have been extremely costly and time consuming to attempt to calculate differences among class members. The disadvantages would have outweighed any benefit in trying to do so.

68

Case 2:15-cv-20000-JAF   Document 1225-1   Filed 11/17/16   Page 00 of 69

Rule 23(c)(5) uses the word "may," so it's not surprising that the District Court has exceptionally broad discretion in deciding whether to use the subclass mechanism.

- *In re Pet Food Products Liab. Litig.*, 629 F.3d 333, 343 (3d Cir. 2010) ("substantial deference" is owed by appellate court to trial court, which exercises "considerable discretion" over subclass issues).

- *Prado-Staiman v. Bush*, 221 F.3d 1266, 1282 (11th Cir. 2000) ("We must leave the ultimate decision as to what kinds of appropriate subclasses to create to the sound discretion of the district court.").

69

- The filed rate defense was never fully adjudicated, even in Alabama.

  - The Court recognized that the doctrine may well not apply to the non-Alabama Plans because they never filed any rates in Alabama, and also could have entered the Alabama market without filing rates – the Court directed that this issue be resolved closer to trial.  ECF 1098, ECF 1109 (4/21/17 Hrg. Tr.  69-70)

  - The Court also recognized that the doctrine did not apply if the Blue charged rates higher than the filed rate, and reserved judgment on whether it applied if the Blue charged rates lower than the filed rate (both of which occurred). *In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d 1313, 1327-29 (N.D. Ala. 2017).

  - The Court recognized that the doctrine did not apply to groups larger than 50. *In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d 1313, 1332 (N.D. Ala. 2017).

  - The defense does not apply to self-funded groups.

- The filed rate defense does not apply to claims for injunctive relief.

  - That claim was common across the entire national injunctive class.

  - Because that injunctive claim was plainly susceptible to uniform class treatment and was readily certifiable, it was appropriate not to focus on any variations among states as to the filed rate doctrine.

70

- The fundamental claim in this case is that there was a single nationwide agreement to prevent competition.

  - The foreclosure rules of the Blues prohibited the entry of any Defendant into another Blue's territory nationally.  If the aggregated restraints did not exist, any Defendant could have entered another Blue's territory and offered competitive services at competitively lower rates.  **That is true in every state for a Blue subscriber**.  There is no conflict.

- The settlement's injunctive relief and damages recovery are based on the foreclosure of entry and reduced consumer choice across the country.

- A key defense of Defendants is that BCBSA and the Member Plans constitute a single nationwide entity with respect to their use of the Blue Marks.

- The Subscribers' economic analysis was that the effect of Defendants' anticompetitive conduct was nationwide.

- Individual state damages calculations would require substantial additional time and data and would be very costly.

71

The sixth factor says the court should consider if "the case settled at a stage of the proceedings where class counsel had sufficient knowledge of the law and facts to fairly weigh the benefits of the settlement against the potential risk of continued litigation."

*Equifax,* 2020 WL 256132, at *10.

Settlement Class Counsel have researched and analyzed the applicable law and have engaged in extensive motion practice and discovery throughout more than eight years of litigation.

Ex. E, Settlement Class Counsel Decl. ¶ 37.

This district recently found that settlement is appropriate when the parties had litigated "over seven years, through dispositive motions," and when the parties "have had the opportunity to investigate the facts and law, review substantive evidence relating to the claims and defenses, and brief the relevant legal issues."

*Swaney v. Regions Bank*, Case No. 2:13-CV-00544-RDP, 2020 WL 3064945 at *5 (N.D. Ala. June 9, 2020).

The Rule 23(e)(2)(A) factor also supports approval under this analysis.

# 4. The Court Should Rule That It Is Likely To Certify The Settlement Classes

# SUBSCRIBERS SEEK CERTIFICATION OF THREE SETTLEMENT CLASSES

Subscribers seek to certify three settlement classes:

- **Nationwide Injunctive Relief Class**

- **Nationwide Damages Class**

- **Self-Funded Sub-Class**

# NATIONWIDE INJUNCTIVE RELIEF CLASS

Pursuant to Rules 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, Subscribers seek to certify a **Nationwide Injunctive Relief Class**, defined as follows:

> "All Individual Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Class Period."

Subscriber Track Fourth Amended Consolidated Class Action Complaint ¶ 317

The "Class Period" is February 7, 2008 through October 16, 2020, except for Self-Funded Accounts for whom the class period is September 1, 2015 through October 16, 2020.

*Id.* ¶ 316

Pursuant to Rules 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, Subscribers seek to certify a **Nationwide Damages Class**, defined as follows:

"All Individual Members (excluding dependents and beneficiaries), Insured Groups (including employees, but excluding non-employee Members), and Self-Funded Accounts (including employees, but excluding non-employee Members) that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product (unless the person or entity's only Blue-Branded Commercial Health Benefit Product during the Class Period was a stand-alone vision or dental product) sold, underwritten, insured, administered, or issued by any Individual Blue Plan during the Class Period of February 7, 2008 through October 16, 2020 (in the case of all Damages Class members other than the Self-Funded Sub-Class, for whom the Class Period is September 1, 2015 through October 16, 2020)."

Subscriber Track Fourth Amended Consolidated Class Action Complaint ¶ 318

The term "employee" as used in that definition means "any current or former employee, officer, director, partner, or proprietor of an entity."

*Id.* ¶ 321

76

Pursuant to Rules 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, Subscribers seek to certify a **Self-Funded Sub-Class**, defined as follows:

> "All Self-Funded Accounts (including employees, but excluding nonemployee Members) that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product (unless the person or entity's only Blue-Branded Commercial Health Benefit Product during the Settlement Class Period was a stand-alone vision or dental product) sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan from September 1, 2015 through October 16, 2020."

Subscriber Track Fourth Amended Consolidated Class Action Complaint ¶ 319

> The term "employee" as used in that definition means "any current or former employee, officer, director, partner, or proprietor of an entity."

*Id.* ¶ 321

The following entities are excluded from both the **Nationwide Damages Class** and the **Self-Funded Sub-Class**:

> "Government Accounts, Medicare Accounts of any kind, Settling Defendants themselves, and any parent or subsidiary of any Settling Defendant (and their covered or enrolled employees), along with Opt-Outs, the judge presiding over this matter, and any members of his judicial staff, to the extent such staff were covered by a Commercial Health Benefit Product not purchased by a Government Account during the Class Period."

Subscriber Track Fourth Amended Consolidated Class Action Complaint ¶ 320

Rule 23(e)(1)(B) provides that at the preliminary approval stage, the Court:

"must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing **that the court will likely be able to**:

(i)  approve the proposal under Rule 23(e)(2); and

**(ii) certify the class for purposes of judgment on the proposal."**

FRCP 23(e)(1)(B)(i)–(ii) (emphasis added)

79

# THE STANDARD FOR CERTIFYING A SETTLEMENT CLASS

A "class may be certified solely for purposes of settlement where a settlement is reached before a litigated determination of the class certification issue."

*Diakos v. HSS Sys., LLC*, 137 F. Supp. 3d 1300, 1306 (S.D. Fla. 2015) (quotation and citations omitted)

Such class certification determinations are "left to the sound discretion of the district court."

*Cooper v. S. Co.*, 390 F.3d 695, 711 (11th Cir. 2004) (citations omitted), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457-58 (2006)

"As long as the district court's reasoning stays within the parameters of Rule 23's requirements for the certification of a class, the district court decision will not be disturbed."

*Hines v. Widnall*, 334 F.3d 1253, 1255 (11th Cir. 2003) (citations omitted)

# THE STANDARD FOR CERTIFYING A SETTLEMENT CLASS

"To certify a settlement class, the Court must find that (1) the named plaintiff has standing, (2) all four prerequisites for class certification under Rule 23(a) are satisfied—namely, numerosity, commonality, typicality, and adequacy of representation; and (3) at least one of the requirements of Rule 23(b) is met."

*Bryant v. Realogy Grp., LLC,* No. 8: 18-cv-2572-T-60CPT, ECF No. 38 (M.D. Fla. Mar. 16, 2020) (citations omitted).

While a settlement class should satisfy the requirements of Rule 23(a) and the relevant provision(s) of Rule 23(b), the Court "need not inquire whether the case, if tried, would present intractable management problems [under Rule 23(b)(3)], for the proposal is that there be no trial."

*Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 620 (1997); *Schorr v. Countrywide Home Loans, Inc.*, 2015 WL 13402606, at *3 (M.D. Ga. Apr. 1, 2015) (quoting *Amchem*).

# EACH NAMED PLAINTIFF HAS STANDING

The Article III standing requirement is readily satisfied here, as each named class representative has suffered concrete injury in fact in the form of inflated premiums or ASO fees and reduced consumer choice resulting from the defendants' anti-competitive conduct, which the proposed settlement directly redresses.

Subscriber Track Fourth Amended Consolidated Class Action Complaint at ¶¶ 500, 538, 545-46, and 549.

Economic injuries like this "have long been recognized as sufficient to lay the basis for [Article III] standing."

*Blanton v. Domino's Pizza Franchising LLC,* No. 18-13207, 2019 WL 2247731, at *3 (E.D. Mich. May 24, 2019) (citing *Sierra Club v. Morton,* 405 U.S. 727, 733 (1972)); *Milwaukee Police Ass'n v. Flynn,* 863 F.3d 636, 639 (7th Cir. 2017) ("concrete financial injuries . . . are prototypical of injuries for the purposes of Article III standing.").

In this Circuit, forty or more members satisfies numerosity.

*Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009)

Here, each of the three proposed classes comprises millions of members.

To demonstrate commonality under Rule 23(a)(2), a putative class must prove that there are "questions of law or fact common to the class."

*FRCP 23(a)(2)*

It is "well established" that the commonality threshold "is not high."

*Dujanovic v. MortgageAmerica, Inc.*, 185 F.R.D. 660, 667 (N.D. Ala. 1999); *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 627 (3rd Cir. 1996) (recognizing "very low threshold for commonality")

The legal claims among the class members do not need to be exactly the same, and not all questions of law or fact must be common. Indeed, "**even a single common question will do**."

*Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594, 599 (S.D. Fla. 1991); *Singer v. AT&T Corp.*, 185 F.R.D. 681, 687 (S.D. Fla. 1998*); Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011); *Carriuolo v. Gen. Motors Co*., 823 F.3d 977, 984 (11th Cir. 2016)

Courts in the Eleventh Circuit "have consistently held that allegations of price-fixing, monopolization, and conspiracy by their very nature involve common questions of law or fact."

*In re Delta/AirTran Baggage Fee Antitrust Litig*., 317 F.R.D. 675, 694 (N.D. Ga. 2016) (citations omitted)

84

This conspiracy thus implicates multiple common questions of law or fact, including but not limited to:

1. whether the challenged restraints were imposed nationwide;

2. whether the challenged restraints have resulted in foreclosure of entry and reduced consumer choice across the country;

3. whether the BCBSA and the Member Plans constitute a nationwide single entity for purposes of managing their Blue trademarks

85

# EACH OF THE THREE PROPOSED SETTLEMENT CLASSES SATISFIES RULE 23(A)'S TYPICALITY REQUIREMENT.

 "The claim of a class representative is typical if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3)."

*Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009) (internal quotations and citations omitted)

Typicality will be presumed if the named plaintiff and the proposed class share claims that "stem from the same event, practice or course of conduct and are based upon the same legal or remedial theory."

*Ault v. Walt Disney World Co.*, 254 F.R.D. 680, 687 (M.D. Fla. 2009); *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985); *Williams*, 568 F.3d at 1357 ("The typicality requirement may be satisfied despite substantial factual differences when there is a strong similarity of legal theories.")

# Each of the Three Proposed Settlement Classes Satisfies Rule 23(a)'s Typicality Requirement.

The claims of the named class and sub-class representatives are typical of the classes and sub-class that they seek to represent because they:

- Arise from the same alleged conduct by defendants —the contested BCBSA rules and regulations—that affected competition in the market for health insurance and administration of Commercial Health Benefit Products and

- Seek redress for the same injuries—artificially inflated premiums (or in the case of the Self-Funded Sub-Class, administrative fees) and diminished consumer choice

Because the Class Representatives seek to prove that the Settling Defendants "committed the same unlawful acts in the same method against an entire class[,] . . . all members of this class have identical claims," and the typicality requirement will be satisfied at final approval.

*Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983).

87

Case 2:15-cv-02092-RDP   Document 235-4   Filed 10/14/16   Page 88 of 169

To determine whether the Class Representatives can adequately represent the interests of the Settlement Classes, the Court must determine: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action."

*Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008).

Both prongs of that test are satisfied here:

1. The interests of the named class representatives are aligned with those of the rest of the proposed classes because they allege the same harms and seek the same relief as the classes they seek to represent. To the extent that the members of the Self-Funded Sub-Class have differing interests, those interests are protected by separate named class representatives and separate counsel.

2. The Classes and the Sub-Class have been vigorously and adequately represented by experienced counsel, who have invested tens of thousands of hours and tens of millions of dollars prosecuting their claims.

88

Certification of a settlement damages class is appropriate under Rule 23(b)(3) upon showing that (a) common issues **predominate** over individualized issues and (b) proceeding via a class action is **superior** to the prospect of millions of individual lawsuits addressing the same legal and factual issues.

*In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 660 (S.D. Fla. 2011) (finding 23(b)(3) satisfied because "the common legal and factual issues here predominate over individualized issues, and resolution of the common issues for millions of Settlement Class Members in a single, coordinated proceedings is superior to millions of individual lawsuits addressing the same legal and factual issues.")

When analyzing certification of a settlement class under Rule 23(b)(3), however, the Court "need not inquire whether the case, if tried, would present intractable management problems [under Rule 23(b)(3)], for the proposal is that there be no trial."

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Schorr v. Countrywide Home Loans, Inc.*, 2015 WL 13402606, at *3 (M.D. Ga. Apr. 1, 2015) (quoting *Amchem*).

Case 1:22-cv-00645-RJD Document 262-5 Filed 12/20 Page 90 of 169

To satisfy the predominance requirement, "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof."

*Kerr v. City of W. Palm B*each, 875 F.2d 1546, 1557-58 (11th Cir. 1989) (internal quotation marks omitted).

But the predominance inquiry "does not require a plaintiff seeking class certification to prove that each element of its claim is susceptible to classwide proof."

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 469 (2013).

Because all class members, including the named representatives, must establish their claims through proof going to the same liability, causation, and damages issues, Rule 23(b)(3)'s predominance test is satisfied here.

*In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 660 (S.D. Fla. 2011) (finding predominance satisfied for settlement certification purposes where "each Settlement Class Member's claims arise from the same or similar alleged BofA policies and practices and the same legal theories" and "the relationship between Settlement Class Members and BofA is governed by substantially uniform or similar account agreement").

"In addition to finding that common questions predominate over individual inquiries . . . the Court must find that the class action vehicle is superior to other available methods for adjudication."

*In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 693 (N.D. Ga. 1991).

In the context of a settlement class, where manageability is of little relevance, three factors guide the superiority analysis: "(A) the Class Members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against Class Members; [and] (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum…."

FRCP 23(b)(3).

Case 1:13-cv-07104-PAE Document 2262-51 Filed 10/13/23 Page 93 of 169

A. Given the tens of millions of class members and the relatively small size of their individual claims considered in the context of the enormous expense of litigating an antitrust claim like this, as a practical matter a class action is the only way to resolve these claims.

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification.").

B. This factor supports a finding of superiority as the Judicial Panel on Multidistrict Litigation (JPML) has transferred all cases raising related claims of which Subscribers are aware to this Court for consolidated pretrial proceedings.

C. This factor also favors a finding of superiority, as this Court's lengthy history with these cases and resulting familiarity with the legal and factual issues that the present make this Court uniquely qualified to evaluate the proposed settlement.

93

# The Nationwide Injunctive Relief Class Satisfies the Requirements for Certification under Rule 23(b)(2)

"For an injunction class under Rule 23(b)(2), the plaintiff must show that 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'"

*AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.,* 938 F.3d 1170, 1174 (11th Cir. 2019) (quoting FRCP 23(b)(2)).

"Class certification under Rule 23(b)(2) requires: (1) class members must have been harmed in essentially the same way by the defendant's acts; and (2) the common injury may properly be addressed by class-wide injunctive or equitable remedies."

*Granger v. Sears Roebuck & Co.*, No. 2:05-cv-1696-RDP, 2008 WL 11424140, at *10 (N.D. Ala., Aug. 4, 2008) (Proctor, J.).

These requirements are met here, where (1) all members of the proposed injunctive class allege that the same course of anticompetitive conduct caused them the same sorts of injuries—e.g., supracompetitive premiums and/or administrative fees, and diminished consumer choice, and (2) the structural relief agreed to in the proposed settlement would address the anticompetitive conduct that has caused, and if unabated, would continue to cause those injuries.

94

- Rule 23(c)(5) provides:

  - *Subclasses.* When appropriate, a class *may* be divided into subclasses that are each treated as a class under this rule.  (Emphasis added.)

- Subclasses are a tool to deal with divergent interests between subgroups within the overall class:

  - 1966 Advisory Committee Notes:  "Where a class is found to include subclasses divergent in interest, the class may be divided correspondingly, and each subclass treated as a class."

- They provide a mechanism for the appointment of independent counsel for the sub-class:

  - 2003 Advisory committee Notes:  "*Paragraph [g](1)(A)* requires that the court appoint class counsel to represent the class. Class counsel must be appointed for all classes, including each subclass that the court certifies to represent divergent interests."

Case 2:13-cv-20000-RDP   Document 2477   Filed 11/12/21   Page 96 of 169

The Eleventh Circuit has repeatedly recognized that something short of creating multiple subclasses can be sufficient to address divergent interests.

- *Prado-Staiman v. Bush*, 221 F.3d 1266, 1277 (11th Cir. 2000) ("[W]hile we agree with Defendants that the district court would have been wiser to certify several subclasses rather than one wide class. . . Defendants do not demonstrate any *substantial* weakness or profound error of law in the class certification decision.")  (emphasis in original)

96

A good example is *Juris v. Inamed Corp.*, 685 F.3d 1294 (11th Cir. 2012), which reviewed this Court's decisions in connection with the breast-implant actions.

- *Juris v. Inamed Corp.*, 685 F.3d at 1324 ("The cases describe a requirement that there be structural assurances of adequate representation that protect against the conflicting goals of present and future injury class members. These protections must ensure that class representatives understand that their role is representing solely members of their respective constituency, not the whole class. Although we need not rule definitively, *Amchem* and *Ortiz* appear to hold that Rule 23(a)(4) calls for *some type* of adequate structural protection, which would include, but may not necessarily require, formally designated subclasses.").

- *Juris v. Inamed Corp.*, 685 F.3d at 1323 n.25 ( "We are not the first court to suggest that *Amchem* and *Ortiz* impose a requirement of adequate structural assurances, as opposed to a per se requirement of formally designated subclasses.") (citing authorities).

97

Case 2:24-cv-00480-DR   Document 225-2   Filed 06/17/10   Page 98 of 169

- Bottom line, it's enough to appoint separate counsel for the subclass with potentially divergent interests—as here with Self-Funded Accounts.

  - *Juris v. Inamed*, 685 F.3d at 1324:

    Judge Pointer and class counsel put in place procedures to protect against antagonistic alignment within the class and avoid the fatal flaw in *Amchem.* Judge Pointer appointed six Inamed breast implant recipients as class representatives, among them, a representative with no manifested injury, one with minor to moderate injuries, and one who was totally disabled. He appointed five attorneys with extensive breast implant trial experience as class counsel. **Most significantly, and anticipating an *Amchem* problem, separate counsel, Ernest Hornsby, was specifically brought in for the sole purpose of representing those plaintiffs with only potential, future injuries. Thus, even prior to provisional certification of the class, the interests of those claimants with unmanifested injuries were represented and given a separate seat at the negotiation table through qualified and independent counsel.**

Case 2:14-cv-00869-DR   Document 2623-2   Filed 01/17/16   Page 95 of 164

- The Eleventh Circuit also said this in *Juris,* crediting a declaration of class counsel:

  To assure that all interests and perspectives were represented, Ernest Hornsby, a plaintiffs' attorney with extensive *Breast Implants* trial experience, who represents Inamed implant recipients with potential future claims, was added as class counsel in this action, and participated in the final round of discussions and negotiations that led up to the instant settlement.

  685 F.3d at 1326

Case 2:24-cv-00168-... Document 1425-1 Filed 05/22/25 Page 101 of 169

This is because the real problem is when there is no exclusive representation of *either* sub-group:

- *Juris v. Inamed*, 685 F.3d at 1324-25 (quoting *In re Literary Works in Elec. Databases Copyright Litig.,* 654 F.3d 242, 250 (2d Cir. 2011)).

The negotiation process here did not resemble that in *Amchem* and *Ortiz* where there were no structural assurances whatsoever and where nobody "exclusively advanced the particular interests of either subgroup."

100

# OVERVIEW OF THE PLAN OF DISTRIBUTION

At the preliminary approval stage, a court need determine only that the proposed plan is sufficiently "**within the range of reasonableness, fairness, and adequacy**" so that it may be sent to the members of the class.

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 12-cv-3419 (GBD), 2016 WL 4401148, at *2 (S.D.N.Y. June 22, 2016); *Danieli v. Int'l Bus. Mach. Corp.*, No. 08-cv-3688(SHS), 2009 WL 6583144, at *5 (S.D.N.Y. Nov. 16, 2009)

A plan of distribution should receive final approval so long as "it has a '**reasonable, rational basis**,' particularly if 'experienced and competent' class counsel support it."

MCLAUGHLIN ON CLASS ACTIONS, § 6.23 (17th ed. 2020)

102

# MATHEMATICAL PRECISION IS NOT REQUIRED

"[T]he apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision."

*In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd, In re PaineWebber Inc. Ltd. P'ships Litig.*, 117 F.3d 721 (2d Cir. 1997)

"The challenge of precisely apportioning damages to victims, is often magnified in antitrust cases, as 'damage issues in antitrust cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.'"

*In re Credit Default Swaps Antitrust Litig.*, No. 13md2476, 2016 WL 2731524, at *9 (S.D.N.Y. Apr. 26, 2016) (quoting *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981)).

Case 1:13-cv-01000-MERTY Document 000-ED Filed 13/22/23 Page 000 of 000

## The Plan of Distribution:

1. Reflects the judgment of "experienced and competent" class counsel.

2. Contains allocation judgments that have been approved by Ken Feinberg, the country's foremost expert in determining fair distributions from large settlement funds.
   Ex. G, Feinberg Decl. ¶ 20

3. Has been deemed to be "economically reasonable" by an independent economics expert, Darrell Chodorow, of The Brattle Group.
   Ex. H,. Chodorow Decl. at ¶ 51

104

The Plan of Distribution strikes a reasonable balance "between precision and efficiency" and ensures that the distribution of monetary relief will be fair and equitable.

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 496 (S.D.N.Y. 2018)

Thus, the Plan of Distribution should be preliminarily approved so notice can issue to the Class.

105

## The Plan of Distribution:

Gives **every** Damages Class Member an **opportunity to make a claim**.

Allows for an automated process to identify valid claims and provide payment.

➡ This would allow for the **quick and efficient processing** of claims.

➡ The alternative would be to require claimants to provide years of plan premium data and contribution percentages, which would be virtually impossible to track down and produce. It would also create a process that would reduce submission rates.

Allows for employee or employer claimants that do not agree with the Default option to provide additional information in support of an Alternative option, to be reviewed and adjudicated by the Settlement Administrator.

➡ This would allow for efficient processing while also giving those Settlement Class Members who wish to provide additional data the **opportunity to seek more than their default distribution**.

Creates a *de minimis* threshold so that payments falling below $5 are redistributed.

➡ This would **protect against unreasonable administrative costs**, as established in dozens of other class action settlements.

106

# THE COMPANY RETAINED TO HANDLE PROCESSING HAS A PROVEN TRACK-RECORD

Class Counsel has retained JND to process claims. JND has a proven track record and has been chosen as the administrator in a number of large, complex, and high-profile class action settlements.

For example, JND administered the settlement in the Equifax Customer Data Security Breach Litigation, which was valued by plaintiffs' counsel in excess of $1.3 billion.

Class Action Administration Cases, JND Legal Admin., https://www.jndla.com/cases/class-action-administration (last accessed Aug. 4, 2020).

# THE KEY FEATURES OF THE PLAN OF DISTRIBUTION

1.  Allocation of the Net Settlement Fund between Fully Insured class members and Self-Funded class members.

2.  *Pro rata* distributions from each of the two Net Settlement Funds.

3.  Methodology for valuing employer claims and employee claims.

Gross Settlement Fund $2.67 billion

**−**

Attorney's Fees and Expenses (up to $667.5 million)

Notice & Admin ($100 million)

**=**

Net Settlement Fund $1.9 billion

# THE PLAN OF DISTRIBUTION – ALLOCATION BETWEEN FULLY INSURED AND SELF-FUNDED

- To determine an appropriate allocation of the Net Settlement Fund to the Self-Funded sub-class, Settlement Class Counsel David Boies and Michael Hausfeld negotiated at arm's length with Warren Burns from Burns Charest, Self-Funded Sub-Class Settlement Counsel, who independently represented Self-Funded class representative Hibbett Sports, Inc.

  Exhibit G to the Preliminary Approval Motion, Feinberg Declaration ¶ 11

- Settlement Class Counsel proposed a range of 3.4% - 6.8%.

  Exhibit G to the Preliminary Approval Motion, Feinberg Declaration ¶ 12

- Self-Funded Sub-Class Settlement Counsel proposed a range of 7.6% -16%.

  Exhibit G to the Preliminary Approval Motion, Feinberg Declaration ¶ 12

- After back-and-forth negotiations, the parties settled at an allocation of **6.5%** of the Net Settlement Fund to the Self-funded sub-class.

  Exhibit G to the Preliminary Approval Motion, Feinberg Declaration ¶ 13

- The Allocation Mediator (Ken Feinberg) agreed that this was a reasonable allocation.

  Exhibit G to the Preliminary Approval Motion, Feinberg Declaration ¶ 20

110

Mr. Feinberg determined that the allocation met the standard for 23(e)(2)(D).

Ex. G, Feinberg Decl. ¶ 14.

He assessed the proposed allocation based on the differences in the strength of claims as between Fully Insured Claimants and the Self-Funded Sub-Class, finding:

- "[T]he negotiated number falls towards the low end of Self-Funded Sub-Class Settlement Counsel's estimate, and the high end of Settlement Class Counsel's estimate . . . one would expect an outcome in that range"

- "The relative size of the Self-Funded Claimants' share makes sense given the statute of limitations and premiums vs. administrative fees issues"

- "The fact that the division resulted from protracted negotiations between sophisticated counsel also supports its reasonableness."

*Id.*

111

# THE PLAN OF DISTRIBUTION THEREFORE CREATES TWO DISTINCT "NET SETTLEMENT FUNDS"



"Total Premiums Paid" (as defined below by this Plan) during FI Class Period by FI Claimant A

*Divided by*

Total Premiums Paid during FI Class Period by all FI Authorized Claimants who submit claims

*Multiplied by*

Total dollars in FI Net Settlement Fund

= *FI Claimant A's claim payment*

113

"Total Administrative Fees Paid" (as defined below by this Plan) during Self-Funded Period by Self-Funded Claimant B

### *Divided by*

Total Administrative Fees Paid during Self-Funded Class Period by all Self-Funded Authorized Claimants who submit claims

### *Multiplied by*

Total dollars in Self-Funded Net Settlement Fund

## = *Self-Funded Claimant B's claim payment*

114

- "[I]n the case of a large class action the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision."

*In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y.), *aff'd,* 117 F.3d 721 (2d Cir. 1997) (per curiam).

- "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."

*In re Am. Bank Note Holographics, Inc.*, 127 F.Supp.2d 418, 429–30 (S.D.N.Y. 2001) (quotation marks omitted).

- Whether the allocation plan is equitable is "squarely within the discretion of the district court."

*In re PaineWebber*, 171 F.R.D. at 132.

115

# COURTS REGULARLY APPROVE *PRO RATA* ALLOCATION PLANS IN COMPLEX ANTITRUST CASES

- "Courts frequently approve plans involving *pro rata* distribution" in complex antitrust class actions.  *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 2019 WL 6875472 (S.D.N.Y. Dec. 16, 2019).

  - *Ins. Brokerage Antitrust Litig.,* 297 F.R.D. 136 (D.N.J. 2013) (approving allocation "pro rata, based on the premiums the Settlement Class members paid");

  - *In re Polyurethane Foam Antitrust Litig.*, 135 F. Supp. 3d 679 (N.D. Ohio 2015) ("Direct Purchasers' proposal to allocate net settlement funds on a pro rata basis is both reasonable and rational");

  - *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 519 (E.D.N.Y. 2003) (approving allocation plan where "[c]lass members will receive an award of money from the [settlement funds] directly proportional to their debit and credit purchase volume (as well as online debit transactions) during the [c]lass period" in an antitrust action);

  - *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 496 (S.D.N.Y. 2018) (approving distribution plans where they "provide for pro rata distributions of the respective settlement funds" in an antitrust action);

  - *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *4 (approving distribution plan that "calculate[es] each claimant's recovery based on its pro rata share of the available [s]ettlement [f]unds in relation to the recoveries to which all claimants who have submitted a valid claim are entitled" in an antitrust action with substantive objections to the plan).

116

- *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483 (S.D.N.Y. 2018) (approving *pro rata* allocation plan that "**ensure[d] a reasonable relationship** between the magnitude of a class member's alleged loss due to suppression and the recovery that the class member will receive, **while requiring only mathematically straightforward calculations that are easily performed**. While greater precision could be achieved by taking into account, for example, the issues of netting and absorption that we have repeatedly emphasized, . . . **the Plans of Distribution and the pro rata means of allocation they contemplate strike a reasonable balance between precision and efficiency**.").

- Given the complexity of antitrust cases and the inherent lack of certainty—absent completion of the entire litigation process that the settlement is intended to pretermit—about all of the possible factors that might possibly be taken into account in seeking perfect precision, this is what one court termed a "concession to the shortness of life."

*Reeve v. Dennett*, 145 Mass. 23, 11 N.E. 938, 944 (1887), quoted in *ACLU of Ga. v. Barnes*, 168 F.3d 423, 432 (11th Cir. 1999).

# THE PLAN OF DISTRIBUTION – DISTRIBUTION OF FI NET SETTLEMENT FUND

FI Authorized Claimants include

- Individual Members – individuals who purchased a fully insured health plan directly from Defendants
- Insured Groups – employers who purchased a fully insured health plan directly from Defendants (including unions and Professional Employer Organizations)
  - Insured Groups included both employers and employees



# THE PLAN OF DISTRIBUTION – DISTRIBUTION OF FI NET SETTLEMENT FUND

- Individual Members – Total Premiums Paid simply calculated from premiums paid directly to Defendants during Settlement Class Period

- Insured Groups – Total Premiums Paid also calculated from premiums paid directly to Defendants during Settlement Class Period

  - However, the cost of premiums is shared between employers and employees within the Insured Group

  - Therefore, the share of Total Premiums Paid attributable to the employer vs. each of its employees must be calculated to determine each claimant's *pro rata* share



# THE FACTORS CONSIDERED IN DETERMINING EMPLOYER AND EMPLOYEE CLAIMS

Settlement Class Counsel considered the following factors in determining a "Default" percentage for allocating employer premiums partly to employees who submit claims:

1.  No systematically available data, including from Defendants or from employers, to show actual employee contribution levels.  Kaiser data is the best "market wide" proxy.

2.  Some employees contribute $0 towards their premiums, and their employers contribute 100%

3.  However, there is economic literature suggesting that all employees indirectly contribute to the cost of premiums through wage effects

4.  The legal authorities as to whether employees have standing to bring antitrust claims versus the standing held by employers

5.  The fact that unclaimed employee premium amounts or employee claims valued at less than the $5 minimum payment will revert back to employers

# UNAVAILABILITY OF DATA SHOWING EMPLOYEE CONTRIBUTIONS

- ## Employer/Employee Allocation for Insured Groups

  - Defendants do not systematically collect data that would show what portion of a premium is paid by employers vs. the portion paid by employees.

  - This data is not systematically maintained anywhere.

  - Employers may not maintain this data for the entire class period, and employees are unlikely to retain such records.

  - Even if such data was collected from employers, it would be extremely costly to standardize and audit the data for reliability and create a database, which would be likely to introduce lengthy delays in the claims process.

  - But, in order to calculate Total Premiums Paid for employers and employees, a contribution percentage is needed to determine what portion of the Insured Group's premiums should be credited to each.

# Data from Kaiser can be used to approximate contribution percentages for Insured Groups

- Kaiser is well-regarded in the health policy field and, according to Mr. Chodorow, reflects the best publicly available data on employee contributions.

- In 2020, Kaiser Study was based on surveys of human resource and benefits managers at 1,765 firms across the country.

- Kaiser data is broken down by insured vs. self-funded and by single vs. family coverage, providing the ability to tailor distribution to different class members.

- What Kaiser Study shows for Insured Groups from 2008 to 2020:

  - For single coverage, average employee contribution rate ranged from 14% to 19% (averaging out to 17%)

  - For family coverage, the average employee contribution rate ranged from 33% to 39% (averaging out to 35%)

# The "Default" Option for Determining Premiums Paid By Claiming Employees

Settlement Class Counsel developed a "Default" option to calculate "Total Premiums Paid" by employees who submit claims:

- For single coverage: 15% of the premium for a claiming employee with single coverage is considered paid by the employee and 85% by the employer

- For family coverage: 34% of the premium for a claiming employee with family coverage is considered paid by the employee and 66% by the employer

- When an employee does not submit a claim, 100% of the premium paid for that employee's coverage is allocated solely to that employer.

# ILLUSTRATION OF EMPLOYER – EMPLOYEE SPLIT

<u>Example</u>: Insured Group pays $100,000 per month in premiums for its 100 employees. Using data from Defendants, the premium for Employee B's family coverage is calculated to be $1,000.

Using the Default option, $340 of that premium is considered paid by Employee B, and $660 is considered paid by the employer

Total Premiums paid by Employee B = $340

Total Premiums paid by Employer = $660



124

# DEFAULT OPTION VS. ALTERNATIVE OPTION

- Claimants who accept the Default option do not have to provide any further data or documents in support of their claim

- Default option allows for efficient claims processing

- Claimant who believes they paid more than the Default can elect the "Alternative" option and provide data or documents supporting something higher than the contribution percentage

- If sufficient materials in support of a higher contribution percentage are provided with the claim form, the Settlement Administrator will address the claim and determine appropriate contribution percentages, taking into account the same factors used by Settlement Class Counsel in determining the Default option

- Self-Funded Authorized Claimants consist of Self-Funded Accounts (employers and employees)

- Distribution operates in the same way as for Insured Groups, except with different Default contribution percentages based on Kaiser data showing that Self-Funded Account employees contribute slightly more for individual coverage and less for family coverage

  - For Self-Funded single coverage: the average employee contribution rate ranged from 18% to 19%.

  - For Self-Funded family coverage: the average employee contribution rate ranged from 24% to 26%.

- Self-Funded Default option: 18% for employees with single coverage and 25% for employees with family coverage

# THE NOTICE PLAN SHOULD BE APPROVED

# NOTICE PLAN OVERVIEW

1. Settlement Agreement Notice Requirements

2. Selection of Claims Administrator

3. Legal Standard For Notice

4. The Blue Cross and Blue Shield Notice Plan

5. Forms of Notice and Claims Form

6. Claims Processing

7. Proposed Notice Timeline

1. SETTLEMENT AGREEMENT NOTICE REQUIREMENTS

# SETTLEMENT AGREEMENT NOTICE REQUIREMENTS

- The Settlement Agreement requires that Subscriber Plaintiffs' Notice Plan include notice forms, a plan for disseminating notice to Class Members, and the proposed timing for implementing the Notice Plan.

  Ex. A ¶ 5

- The Settlement Agreement also requires that the Notice Plan meet the due process and Rule 23 requirements of apprising Class Members of the pendency of the Subscriber Actions, the Settlement, and their opportunity to be heard and (for Damages Class members) to opt out.

  Ex. A ¶¶ 5(a), 38

- Settling Defendants have agreed to provide the reasonably accessible data in their possession and kept in the ordinary course of business that is necessary to effectuate the Notice Program and Claims Administration.

  Ex. A ¶ 5(b)

130

# SETTLEMENT AGREEMENT NOTICE REQUIREMENTS

"At their own expense, Settling Defendants agree to, within the later of 5 days after Court approval of the Notice Plan or 45 days after agreement between the Parties regarding the scope and methodology of Class Notice, supply to the Claims Administrator in electronic format data in their possession and kept in the ordinary course of business regarding the last known contact information of Class Members ("Class Member Data").

The Class Member Data will cover the entire Settlement Class Period and with respect to each Class Member will at least include:

- a to-be-agreed upon personal identifier (that can be cross referenced with a Member's first name, last name, and date of birth),

- last-known phone number (if any),

- last-known mailing address, and, if ordered by the Court,

- last-known email address (if any).

The Claims Administrator may request any other data reasonably necessary to effectuate the Notice and Claims Administration ordered by the Court, and Settling Defendants will not unreasonably deny any such additional requests or fail to timely produce such data."

Ex. A ¶ B(5)(b)

# 2. Selection of Claims Administrator

Case 2:13-cv-20000-RDP    Document 2625-1    Filed 11/17/20    Page 133 of 169



- JND's notice programs are routinely approved by courts across the country and, when executed, have been found to satisfy the requirements of Federal Rule of Civil Procedure 23 and the requirements of constitutional due process. *See* ECF No. 2611-2 at 4 (listing 51 cases).

- JND is SOC2 compliant, which is third-party verification that JND securely manages its data.

- JND was appointed settlement administrator in *In re Equifax Inc. Customer Data Sec. Breach Litig.*, a complex data breach settlement valued at **$1.3 billion** with a **class of 147 million individuals** nationwide.

- In the **$10 billion+** BP Deepwater Horizon Settlement, Ms. Keough worked with the court-appointed claims administrator in overseeing all inbound and outbound mail activities, all call center operations, all claim intake, scanning and data entry, and all check distributions for the program.

- Ms. Keough oversaw the entire administration process in the **$3.4 billion** Cobell Indian Trust Settlement (the largest U.S. government class action settlement ever).

133



# *IN RE EQUIFAX INC. CUSTOMER DATA SEC. BREACH LITIG.*

"JND transmitted the initial **email notice to 104,815,404 million class members** beginning on August 7, 2019.

The claims administrator, JND, is **highly experienced in administering large class action settlements and judgments**, and it has detailed the efforts it has made in administering the settlement, facilitating claims, and ensuring those claims are properly and efficiently handled.

Among other things, JND has developed protocols and a database to assist in processing claims, calculating payments, and assisting class members in curing any deficient claims.

Additionally, **JND has the capacity to handle class member inquiries and claims of this magnitude.**. This factor, therefore, supports approving the relief provided by this settlement."

*In re Equifax Inc. Customer Data Sec. Breach Litig.*, 17-MD-2800-TWT (N.D. Ga.)  (internal citations omitted)



JND's class action division is able to provide all services necessary to effectively implement class action settlements, including:

(1)    all facets of legal notice, such as outbound mailing, email notification, and the design and implementation of media programs, including through digital and social media platforms;

(2)    website design and deployment, including online claim filing capabilities;

(3)    call center and other contact support;

(4)    secure class member data management;

(5)    paper and electronic claims processing;

(6)    calculation design and programming;

(7)    payment disbursements through check, wire, PayPal, merchandise credits, and other means;

(8)    qualified settlement fund tax reporting;

(9)    banking services and reporting; and

(10)    all other functions related to the secure and accurate administration of class action settlements.
        Keough Decl. ¶ 4.

# SELECTION OF CLAIMS ADMINISTRATOR



    

JND is an approved vendor for the **United States Securities and Exchange Commission** as well as for the **Federal Trade Commission.** JND also works with other government agencies, including the **U.S. Equal Employment Opportunity Commission**, the **Office of the Comptroller of the Currency**, the **Consumer Financial Protection Bureau**, the **Federal Deposit Insurance Corporation**, the **Federal Communications Commission**, the **Department of Justice** and the **Department of Labor**.

   

136

# 3. Legal Standard for Notice

"The standard for adequacy of a settlement notice in a class action is measured by reasonableness."

*Faught v. American Home Shield Corp.*, 668 F.3d 1233 (2011).

In this Circuit, Rule 23 has been interpreted "to require that class members be given 'information reasonably necessary to make a decision [whether] to remain a class member and be bound by the final judgment or opt-out of the action,' though the notice need not include 'every material fact' or be 'overly detailed.'"

*Id.*; Greco *v. Ginn Dev. Co., LLC*, 635 F. App'x. 628, 633 (11th Cir. 2015) (citing *Faught*, 668 F.3d at 1239).

"In reviewing the class notice to determine whether it satisfies the [ ] requirements [of due process], 'we look solely to the language of the notices and the manner of their distribution.'"

*Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1286 (11th Cir. 2007) (quoting *Twigg v. Sears & Roebuck & Co.*, 153 F.3d 1222, 1226 (11th Cir. 1998)).

# THE PROPOSED NOTICE PLAN MEETS THE REQUIREMENTS OF RULE 23 AND OF CONSTITUTIONAL DUE PROCESS.

The proposed Notice Plan provides for direct notice to the Members of the Damages Class (email or postcard) which will include:

- the nature of the action;

- the composition of the Settlement Classes;

- the right of a Class Member to obtain counsel;

- the right of a Class Member to object to the Settlement, or (for Damages Class Members) to opt out of the Settlement; and

- the binding effect of the Settlement on Class Members who do not opt out.
  FRCP 23(c)(2)(B).

It further provides notice for Members of both Settlement Classes via a robust media campaign, designed to reach more than 85% of the Settlement Classes.
FRCP 23(c)(2)(A).

139

# 4. The Blue Cross and Blue Shield Settlement Notice Plan

# THE BLUE CROSS AND BLUE SHIELD SETTLEMENT NOTICE PLAN

Subscriber Plaintiffs' proposed Notice Plan will provide **direct notice** to Damages Class Members through email and/or postcard, dependent on whether an email address for the Damages Class Member was provided to Settling Defendants in the ordinary course of business with Damages Class Members.

In order to ensure broad awareness of the Settlement, the Notice Plan also includes:

    (1)    media notice;

    (2)    an internet campaign to raise awareness of the Settlement;

    (3)    an industry digital media campaign;

    (4)    a Settlement website;

    (5)    a toll-free help line;

    (6)    a QR code for mobile access to the Settlement website; and

    (7)    a robust claims stimulation plan.

141

| DIRECT NOTICE EFFORT | DETAILS |
|---|---|
| Email Notice<br><br>@ | Send email notice to Damages Class Members where the Settling Defendants have been provided email addresses in the ordinary course of business |
| Postcard Notice<br> | Send postcard notice to Damages Class Members for whom an email address is not in the data produced by the Settling Defendants or for whom email notice is returned as undeliverable. |

142

# JND USES INDUSTRY-LEADING EMAIL SOLUTIONS TO DESIGN THE MOST EFFICIENT EMAIL NOTIFICATION CAMPAIGNS

- JND's team is staffed with email experts and software solution teams to conform the Email Notice program to the particulars of the Settlement.
  Keough Decl. ¶ 34.

- JND will utilize a verification program to eliminate invalid email and spam traps that would otherwise negatively impact deliverability.
  Keough Decl. ¶ 36.

- Additional details regarding the best practices that JND is implementing in the Email Notice program—e.g., monitoring, spam testing, improving deliverability, avoiding the use of attachments, and readability—are contained in the Keough Decl. ¶¶ 35-40.

- Of note, BCBSA has agreed to post a link to the Settlement website on its own website at or around the time the Email Notice is issued by JND, strengthening the reliability of the email that JND will send to BCBS customers.

143

Prior to sending postcard notice, JND will run the mailing addresses through the United States Postal Service ("USPS") National Change of Address ("NCOA") database.

- The NCOA database is the official USPS technology product which makes change of address information available to mailers to help reduce undeliverable mail pieces before mail enters the mail stream. This product is an effective tool to update address changes when a person has completed a change of address form with the USPS. The address information is maintained on the database for 48 months.
  Keough Decl. ¶ 41 n.5.

- JND will further track all postcard notices returned undeliverable by the USPS and will promptly re-mail postcard notices that are returned with a forwarding address.

- JND will also take reasonable efforts to research and determine if it is possible to reach a Damages Class Member for whom the postcard notice is returned without a forwarding address by mailing to a more recent mailing address at which the potential Damages Class Members might be reached.
  Keough Decl. ¶ 41.

# EMAIL + POSTCARD NOTICE SHOULD BE APPROVED

District courts within the Eleventh Circuit have approved of Email Notice campaigns when Email Notice is supplemented by U.S. mail for class members who do not have an email address or when an email is returned as undeliverable.

- *Carroll v. Macy's, Inc.,* No. 2:18-cv-1060, 2020 WL 3037067 (N.D. Ala. June 5, 2020) (Email Notice to the members of the settlement class, with postcard notice only sent to class members with no email addresses or in the event of Email Notice "bounce back.");

- *Aboltin v. Jeunesse, LLC*, No. 17-1624, 2018 WL 6576464, at *2 (M.D. Fla. Sept. 13, 2018) (granting preliminary approval of a notice plan providing for Email Notice to all class members, and postcard notice by U.S. mail if the defendant did not have an email address for a certain class member, or if two email attempts proved unsuccessful for a certain class member);

- *West v. ExamSoft Worldwide, Inc.*, No. 14-22950, 2015 WL 11233141, at *3 (S.D. Fla. May 12, 2015) (granting preliminary approval of a notice plan in which the settlement administrator would send notice via email);

- *Kertesz v. Rick's Cabaret Int'l, Inc.*, No. 11-61289, 2012 WL 13005979, at *1 (S.D. Fla. Aug. 22, 2012) (finding notice sent via text message, email, and website publication satisfied Rule 23 and due process);

- *Mahoney v. TT of Pine Ridge, Inc.*, No. 17-80029, 2017 WL 9472860, at *3 (S.D. Fla. Nov. 20, 2017) (approving Email Notice program in case involving a local car dealership in which class members without an identifiable email address were sent a postcard via U.S. mail and notice was supplemented by a settlement website, a toll-free number, and publication in two regional newspapers).

145

To: [Class Member Email Address]
From: Blue Cross Blue Shield Claims Administrator (Notice@BCBSsettlement.com)
Subject: Blue Cross Blue Shield Settlement Notice

Dear [Class Member Name]:



**If you purchased or were enrolled in a Blue Cross or Blue Shield health insurance or administrative services plan between 2008 and 2020, a $2.67 billion Settlement may affect your rights.**

**YOUR UNIQUE ID:**

**PLEASE SAVE THIS NUMBER TO FILE A CLAIM**

*Para una notificación en español, visite www.BCBSsettlement.com/espanol*

You are not being sued. A federal court authorized this notice to you. It affects your rights. Please read it carefully.

On DATE, 2020, the Honorable R. David Proctor of the U.S. District Court for the Northern District of Alabama granted preliminary approval of this class action Settlement. The Court directed the parties to send this notice. Blue Cross and/or Blue Shield's records show that you may be a Settlement Class Member. You may be eligible to receive **a payment** from the Settlement in the *In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406*, N.D. Ala. Master File No. 2:13-cv-20000-RDP.

Please visit www.BCBSsettlement.com for more information.

To unsubscribe from this list, please click on the following link: Unsubscribe

---

### What is the lawsuit about?

Plaintiffs claim that the Blue Cross Blue Shield Association and Settling Individual Blue Plans (collectively, "Settling Defendants") violated antitrust laws by entering into an agreement not to compete with each other and to limit competition among themselves in selling health insurance and administrative services for health insurance. Settling Defendants deny all claims. The Settling Defendants have asserted that their conduct results in lower healthcare costs and greater access to care for their customers. The Court has not decided who is right.

### Who is affected?

You may be eligible to receive payment if you are an **Individual, Insured Group** (and their employees) or **Self-Funded Account** (and their employees) that purchased or were enrolled in a Blue Cross or Blue Shield health insurance or administrative services plan during one of the two Settlement Class Periods. Government accounts are excluded from the Class.

The Settlement Class Period for **Individuals** and **Insured Groups** is from February 7, 2008, through October 16, 2020. The Settlement Class Period for **Self-Funded Accounts** is from September 1, 2015 through October 16, 2020. Dependents, beneficiaries (including minors), and non-employees are **NOT** eligible to receive payment.

All **Individuals, Insured Groups,** and **Self-Funded Accounts** that purchased or were enrolled in a Blue Cross or Blue Shield health insurance or administrative services plan during the applicable Class Period will also benefit from the parts of the Settlement requiring Settling Defendants to change certain of their practices that were alleged to be anticompetitive. Dependents, beneficiaries (including minors), and non-employees will benefit from this part of the Settlement.

For more details about who is affected visit www.BCBSsettlement.com

### What can you get from the Settlement?

Class Members who submit valid claims may receive a cash payment from the Net Settlement Fund. The Net Settlement Fund is estimated to be approximately $1.9 billion. This is after deducting attorneys' fees, administration expenses and other costs from the $2.67 billion Settlement Fund. For more details on the Plan of Distribution, read the Long Form Notice available at www.BCBSsettlement.com. You can also call (888) 681-1142. Settling Defendants also agreed to make changes in the way they do business to increase the opportunities for competition in the market for health insurance.

To unsubscribe from this list, please click on the following link: Unsubscribe

---

### How do you get a payment?

You must submit a valid claim online at www.BCBSsettlement.com or postmarked by mail no later than [Month Day, Year]. Claim Forms are available at www.BCBSsettlement.com or may be requested by calling (888) 681-1142.

**FILE A CLAIM**

### What are your other options?

If you do not want to be legally bound by the Settlement, you may send a request for exclusion ("opt out"). You will receive no money, but you will keep your right to sue Settling Defendants for the claims in this case. If you do not exclude yourself, you may object to the Settlement. You will still be bound by the Settlement if your objection is rejected. For details on how to opt out or object, read the Long Form Notice available at www.BCBSsettlement.com. You can also call (888) 681-1142.

Opt outs and objections must be postmarked by [Month x, 202x]. The Court will hold a Fairness Hearing on [Month Day, Year] at [Time], to consider whether the Settlement is fair, reasonable, and adequate. The Court will also decide whether to approve attorneys' fees and expenses up to $667.5 million and $101 million for additional costs and service awards, which will be deducted from the $2.67 billion Settlement Fund. You may ask to appear at the Fairness Hearing, on your own behalf or through counsel, but you don't have to do so.

**Please Do Not Contact The Court Regarding This Notice.**

### Questions?

 Visit www.BCBSsettlement.com, or email info@BCBSsettlement.com,

 call (888) 681-1142, or

 write *Blue Cross Blue Shield Settlement c/o* JND Legal Administration, P.O. Box 91390, Seattle, WA 98111.

To unsubscribe from this list, please click on the following link: Unsubscribe

**Postcard 1 (top left):**

*A federal court authorized this Notice.*
*This is not a solicitation from a lawyer.*



If you purchased or were enrolled in a Blue Cross or Blue Shield health insurance or administrative services plan between 2008 and 2020, a $2.67 billion Settlement may affect your rights.

*Para una notificación en español, visite www.BCBSsettlement.com/espanol*

Questions? Call (888) 681-1142 or Visit www.BCBSsettlement.com

Blue Cross Blue Shield Settlement
c/o JND Legal Administration
P.O. BOX 91390
Seattle, WA 98111

Class Member Name
Class Member Address
Class Member City/State/Zip

**Postcard 2 (top right):**

**What can you get from the Settlement?**

Class Members who submit valid claims may receive a cash payment from the Net Settlement Fund. The Net Settlement Fund is estimated to be approximately $1.9 billion. This is after deducting attorneys' fees, administration expenses and other costs from the $2.67 billion Settlement Fund. For more details on the Plan of Distribution, read the Long Form Notice available at www.BCBSsettlement.com. You can also call (888) 681-1142. Settling Defendants also agreed to make changes in the way they do business to increase the opportunities for competition in the market for health insurance.

**How do you get a payment?**

You must submit a valid claim online at www.BCBSsettlement.com or postmarked by mail no later than [Month Day, Year]. Claim Forms are available at www.BCBSsettlement.com or may be requested by calling (888) 681-1142.

**What are your other options?**

If you do not want to be legally bound by the Settlement, you may send a request for exclusion ("opt out"). You will not receive any money, but you will keep your right to sue Settling Defendants for the claims in this case. If you do not exclude yourself, you may object to the Settlement. You will still be bound by the Settlement if your objection is rejected. For details on how to opt out or object, read the Long Form Notice available at www.BCBSsettlement.com.

Opt outs and objections must be postmarked by Month x, 202x. The Court will hold a Fairness Hearing to consider whether the Settlement is fair, reasonable, and adequate. The Fairness Hearing is on [Month Day, Year] at [Time]. The Court will also decide whether to approve attorneys' fees and expenses up to $667.5 million and $101 million for additional costs and service awards. These amounts will be deducted from the $2.67 billion Settlement Fund. You may ask to attend the Fairness Hearing, on your own or through counsel, but you do not have to do so.

**Please Do Not Contact The Court Regarding This Notice.**

**QUESTIONS?** Visit **www.BCBSsettlement.com**, email **info@BCBSettlement.com**, call (888) 681-1142, or write *Blue Cross Blue Shield Settlement* c/o JND Legal Administration, P.O. Box 91390, Seattle, WA 98111.

**Postcard 3 (bottom left):**

YOUR UNIQUE ID:
PLEASE SAVE THIS NUMBER TO FILE A CLAIM

**What is this notice?**

On DATE, 2020, the Honorable R. David Proctor of the U.S. District Court for the Northern District of Alabama granted preliminary approval of this class action Settlement. The Court directed the parties to send this notice. Blue Cross and/or Blue Shield's records show that you may be a Settlement Class Member. You may be eligible to receive **a payment** from the Settlement in the *In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406*, N.D. Ala. Master File No. 2:13-cv-20000-RDP.

**What is the lawsuit about?**

Plaintiffs claim that the Blue Cross Blue Shield Association and Settling Individual Blue Plans (collectively, "Settling Defendants") violated antitrust laws by entering into an agreement not to compete with each other and to limit competition among themselves in selling health insurance and administrative services for health insurance. Settling Defendants deny all claims. The Settling Defendants have asserted that their conduct results in lower healthcare costs and greater access to care for their customers. The Court has not decided who is right.

**Who is affected?**

You may be eligible to receive payment if you are an **Individual**, **Insured Group** (and their employees) or **Self-Funded Account** (and their employees) that purchased or were enrolled in a Blue Cross or Blue Shield health insurance or administrative services plan during one of the two Settlement Class Periods. Government accounts are excluded from the Class.

The Settlement Class Period for **Individuals** and **Insured Groups** is from February 7, 2008, through October 16, 2020. The Settlement Class Period for **Self-Funded Accounts** is from September 1, 2015 through October 16, 2020. Dependents, beneficiaries (including minors), and non-employees are **NOT** eligible to receive payment.

All **Individuals**, **Insured Groups**, and **Self-Funded Accounts** that purchased or were enrolled in a Blue Cross or Blue Shield health insurance or administrative services plan during the applicable Class Period will also benefit from the parts of the Settlement requiring Settling Defendants to change certain of their practices that were alleged to be anticompetitive. Dependents, beneficiaries (including minors), and non-employees will benefit from this part of the Settlement.

**Postcard 4 (bottom right):**

Carefully separate this Address Change Form at the perforation

Name: _____

Current Address: _____


Place Stamp Here

**Address Change Form**
To make sure your information remains up-to-date in our records, please confirm your address by filling in the above information and depositing this postcard in the U.S. Mail.

JND Legal Administration
Attn: Blue Cross Blue Shield Settlement
P.O. BOX 91390
Seattle, WA 98111

An extensive **media campaign** has been designed to reach 85% of all Settlement Class Members on its own.



- **Print**: Notice will be published in color once each in two popular consumer magazines (*People* and *Better Homes & Gardens*).

- **Radio**: ~9,700 30-second radio spots will broadcast through Sirius XM satellite radio, two premiere radio networks (iHeart Radio – Scope and Spectrum networks), highly rated syndicated programming in the top ten African American markets (e.g., Rickey Smiley, Steve Harvey), and two leading Spanish providers (Spanish Broadcasting System "SBS" and Univision Radio) in the top ten Hispanic markets. Additional audio streaming will be placed through Pandora and Spotify.

- **Television**: ~969 30-second television spots will broadcast on a variety of cable and syndicated networks, as well as network morning news programming.

*Keough Declaration* at ¶¶ 44-50 (explaining JND's use of advertising media research tools to ensure selection of the media that will reach the widest practicable share of a class; *id.* at ¶¶ 51-55 (explaining JND's use of demographics and media usage analysis to target appropriate audiences).

**LEGAL NOTICE**



# If you purchased or were enrolled in a Blue Cross or Blue Shield health insurance or administrative services plan between 2008 and 2020, a $2.67 billion Settlement may affect your rights.

*Para una notificación en español, visite www.BCBSsettlement.com/espanol*

On [DATE], 2020, the Honorable R. David Proctor of the U.S. District Court for the Northern District of Alabama granted preliminary approval of the Settlement in the *In re. Blue Cross Blue Shield Antitrust Litigation MDL 2406*, N.D. Ala., Master File No. 2:13-cv-20000-RDP.

Please visit www.BCBSsettlement.com for more information.

## What is the lawsuit about?

Plaintiffs claim that the Blue Cross Blue Shield Association and Settling Individual Blue Plans (collectively, "Settling Defendants") violated antitrust laws by entering into an agreement not to compete with each other and to limit competition among themselves in selling health insurance and administrative services for health insurance. Settling Defendants deny all claims. The Settling Defendants have asserted that their conduct results in lower healthcare costs and greater access to care for their customers. The Court has not decided who is right.

## Who is affected?

You may be eligible to receive payment if you are an **Individual, Insured Group** (and their employees) or **Self-Funded Account** (and their employees) that purchased or were enrolled in a Blue Cross or Blue Shield health insurance or administrative services plan during one of the two Settlement Class Periods. Government accounts are excluded from the Class.

The Settlement Class Period for **Individuals** and **Insured Groups** is from February 7, 2008, through October 16, 2020. The Settlement Class Period for **Self-Funded Accounts** is from September 1, 2015 through October 16, 2020. Dependents, beneficiaries (including minors), and non-employees are **NOT** eligible to receive payment.

All **Individuals, Insured Groups,** and **Self-Funded Accounts** that purchased or were enrolled in a Blue Cross or Blue Shield health insurance or administrative services plan during the applicable Class Period will also benefit from the parts of the Settlement requiring Settling Defendants to change certain of their practices that were alleged to be anticompetitive. Dependents, beneficiaries (including minors), and non-employees will benefit from this part of the Settlement.

For more details about who is affected visit www.BCBSsettlement.com.

## What can you get from the Settlement?

Class Members who submit valid claims may receive a cash payment from the Net Settlement Fund. The Net Settlement Fund is estimated to be approximately $1.9 billion. This is after deducting attorneys' fees, administration expenses and other costs from the $2.67 billion Settlement Fund. For more details on the Plan of Distribution, read the Long Form Notice available at www.BCBSsettlement.com. You can also call (888) 681-1142. Settling Defendants also agreed to make changes in the way they do business to increase the opportunities for competition in the market for health insurance.

## How do you get a payment?

You must submit a valid claim online at www.BCBSsettlement.com or postmarked by mail no later than [Month Day, Year]. Claim Forms are available at www.BCBSsettlement.com or may be requested by calling (888) 681-1142.

## What are your other options?

If you do not want to be legally bound by the Settlement, you may send a request for exclusion ("opt out"). You will not receive any money, but you will keep your right to sue Settling Defendants for the claims in this case. If you do not exclude yourself, you may object to the Settlement. You will still be bound by the Settlement if your objection is rejected. For details on how to opt out or object, read the Long Form Notice available at www.BCBSsettlement.com.

Opt outs and objections must be postmarked by Month x, 202x. The Court will hold a Fairness Hearing to consider whether the Settlement is fair, reasonable, and adequate. The Fairness Hearing is on [Month Day, Year] at [Time]. The Court will also decide whether to approve attorneys' fees and expenses up to $667.5 million and $101 million for additional costs and service awards. These amounts will be deducted from the $2.67 billion Settlement Fund. You may ask to attend the Fairness Hearing, on your own or through counsel, but you do not have to do so.

■ **Please Do Not Contact The Court Regarding This Notice.** ■

## Questions?

 Visit www.BCBSsettlement.com, email info@BCBSsettlement.com.

 call (888) 681-1142, or

 write **Blue Cross Blue Shield Settlement** c/o JND Legal Administration, P.O. Box 91390, Seattle, WA 98111.



www.BCBSsettlement.com
(888) 681-1142

149

# DIGITAL EFFORT

- The Digital Effort consists of digital ads which will be placed on the Google Display Network ("GDN"), the leading digital network, and Facebook, the top social media platform.

- The Digital Effort will target Adults 18+, and approximately 10% will be allocated to Spanish sites (GDN) and Spanish-language accounts (Facebook).

- Digital ads will be served across all types of devices—desktops, laptops, tablets and mobile—with an emphasis on mobile devices.

- The Digital Effort will generate over **428 million impressions** over a 10-week period.
  Keough Decl. ¶ 56, Exhibit G.





150

- An informational, interactive Settlement website (www.BCBSsettlement.com) will be developed by JND for Class Members to obtain information about the Settlement.

- The Settlement website will explain Class Members' rights and options and will be the primary source for the submission of claims.

- The Settlement website will have an easy-to-navigate design and will contain, among other things, information about the Settlement, a frequently asked questions section, a list of important dates and documents, links to key case documents related to the Settlement, the ability to download a Long Form Notice and Claim Form, a report of Monitoring Committee Activities, and information about the toll-free telephone hotline.

- In addition, the Settlement website will provide a streamlined approach for submitting claims electronically through a user-friendly and secure portal.

- The Settlement website will also be translated into Spanish.

Keough Decl. ¶80

151

# SUPPLEMENTAL INDUSTRY MEDIA CAMPAIGN

- A **supplemental industry media campaign** will extend reach beyond the 85% media reach plan, particularly among entity Class Members.

- The proposed industry media includes:

  o Placing notice on the leading professional social media platform (LinkedIn);

  o Digital ads served with top business websites and two leading Human Resource websites; and

  o Multiple placements in e-Newsletters targeting both business owners and the Human Resource industry.














**Blue Cross Blue Shield® $2.67 Billion Settlement**

Health insurance and administrative plans are affected by a class action settlement. File a claim.

Read More

## Blue Cross Blue Shield® $2.67 Billion Settlement

Health insurance and administrative plans are affected by a Class Action Settlement. File a claim.

Submit a Claim



**Blue Cross Blue Shield® $2.67 Billion Settlement**
Blue Cross Blue Shield® health insurance and administrative plans are affected by a $2.67 billion class action settlement. File a claim.

Learn More



**Blue Cross Blue Shield® $2.67 Billion Settlement**
Blue Cross Blue Shield® health insurance and administrative plans are affected by a $2.67 billion class action settlement. File a claim.



BLUE CROSS BLUE SHIELD® $2.67 BILLION SUBSCRIBER SETTLEMENT

FILE YOUR CLAIM TODAY

www.BCBSsettlement.com



Blue Cross Blue Shield® $2.67 billion settlement

File a claim

LEARN MORE

# TOLL-FREE NUMBER AND CONTACT CENTER

- JND will establish and maintain a dedicated toll-free telephone number with an automated Interactive Voice Recording ("IVR"), available 24 hours a day, seven days a week.

  Keough Decl. ¶ 82.

- Class Members will also have the option to speak with customer service representatives five days a week during certain business hours. JND has multiple call center sites that can handle any volume of calls received on this matter.

  Keough Decl. ¶ 83.

Additional notice efforts include:

- A third-party outreach effort;
  - Purchase list of companies (main headquarters) that employ individuals with an HR/Employee Benefit title (150K postal addresses, 55K emails)
  - Purchase list of companies (main headquarters) that employ individuals with Health and Accident Insurance Broker related titles (396 postal addresses, 904 emails)
- An internet search campaign;
- A multichannel news release;
  - Distributed into newsrooms and online syndication,
  - PR Newswire for Journalists, an exclusive members-only community of more than 41,000 influential journalists and bloggers, and
  - Encourages journalists to visit a microsite and review the press release, television spot, radio spot and other information about the Settlement.
- A link to the Settlement website will be placed on BCBSA.com.

- The claims stimulation effort is designed to remind Damages Class Members of the approaching claims deadline. Prior to the claims deadline, JND's team will initiate a wide-ranging media effort to encourage Damages Class Members to submit claims and to remind them of the impending deadline.

- Based on the success of the initial media campaign, television and radio spots may be added and broadcast to key markets with high claims filing results. Additional print insertions may also be published.

- The claims stimulation message will deliver a simple reminder of the approaching claims deadline.











# 5. FORMS OF NOTICE AND CLAIM FORMS

# NOTICES AND CLAIM FORM

- The notices and Claim Form are consistent with the Federal Rules of Civil Procedure and the Due Process Clause.

    - Long Form Notice: posted on the Settlement website and will be available by mail if requested.
      Keough Decl. ¶ 91

    - Short Form Notice

    - Claim Form

- Each contain summaries of the Settlement and the options that are available to Class Members, as well as how to obtain more information about the Settlement.
  Keough Decl. ¶¶ 89-90.

- Class members will be directed to the Claim Form on the Settlement Website by email and postcard notice.  Class members will be also be able to obtain a hard copy of the Claim Form, which can be requested using an automated voicemail feature of the Settlement hotline or a "link" on the Settlement website.

162

- The Long Form Notice provides details regarding the nature of the action; the makeup of the Settlement Classes; general descriptions of the claims asserted by Subscriber Plaintiffs; the monetary and injunctive relief afforded by the Settlement Agreement; the right of a Class Member to obtain counsel, to object to the Settlement or (for Damages Class Members) to opt out of the Settlement; and the binding effect of the Settlement on Class Members.
  Keough Decl. ¶ 91.

- It also provides, *inter alia*, details on when claims and objections are due, the procedures and timing for objecting or opting out, how and where to seek additional information, and how to submit a claim.
  Keough Decl. ¶ 91.

- A copy of the Long Form Notice is attached to the Keough Declaration at Exhibit C.

- The Long Form Notice was used as the basis to create the summary forms of notice: Email Notice, Postcard Notice, and Publication Notice.
  Keough Decl. ¶ 92.

- The short form notices provide, among other things, a summary of what the lawsuit is about, who is affected, what a Class Member may receive from the Settlement, the deadline by which a claim should be submitted, other options (opting out and objecting), and how and where to obtain more information.
  Keough Decl. ¶ 92.

- Copies of the short form notices are attached to the Keough Declaration at Exhibits E, F and H.

# 6.  CLAIMS PROCESSING

- The Claim Form—whether accessed through the secure portal or completed in hard copy—will request the same information from claimants.  Keough Decl. ¶ 95.  The language used in the Claim Form is simplified from the terminology used in the Settlement Agreement to be consistent with the Federal Judicial Center's directive to use plain language.
  Keough Decl. ¶ 89 (notice documents comply with FJC's Class Action Notice and Plain Language Guide).

  o By way of example, Commercial Health Benefit Product is referred to as "health insurance" and administrative services contracts or accounts ("ASC") and jointly administered administrative services contracts or accounts ("JAA") are referred to collectively as "administrative service plans."
  Keough Decl. Exhibit D.

- The Notice Plan is designed to direct claimants to a secure portal on the Settlement website which will use an interactive process for Claim Form submission that will more efficiently allow claimants to file their claims.
  Keough Decl. ¶¶ 97-98.

  o Online claim forms not only save substantial money in postage but are generally favored by claimants since the wizard feature of the process walks them through the form step by step and is very user-friendly.

  o It helps to minimize the number of incomplete claims by preventing a claimant from moving on to the next step until all required information has been entered and can catch errors claimants sometimes make - like forgetting a signature.  For the Claims Administrator, electronic claims eliminate the step of data entry and generally make processing easier and less expensive.
  Keough Decl. ¶ 94.

- The Claim Form is designed The Claim Form is designed to ensure that filing a claim is as simple as possible and will be sent to any individual who requests it.

166

# CLAIM PROCESSING

Review, determine the validity of, and process all Claim Forms

Confirmation Process

Claim Payment Determination

Settlement Payments

# 7. PROPOSED NOTICE TIMELINE

# PROPOSED NOTICE TIMELINE

| Day 1 | Plaintiffs notify the Court that, according to JND, a complete set of Class Member Data has been produced to JND by Settling Defendants. |
|-------|-----------------------------------------------------------------------------------------------------------------------------------------|
| Day 90 | Notice Deadline |
| Day 105 | Deadline for Settlement Class Counsel to file motion for Fee and Expense Award |
| Day 150 | Deadline for objections or exclusions |
| Day 180 | Deadline for Settlement Class Counsel to file motion for Final Approval of Settlement and responses to any timely submitted Settlement Class Member objections |
| Day 230 | Final Approval Hearing |
| Day 250 | Claim filing deadline |