FILED
2020 Nov-19  PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

1  IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
2  SOUTHERN DIVISION

3  IN RE:  BLUE CROSS BLUE SHIELD      CASE NO.:  2:13-cv-20000-RDP
ANTITRUST LITIGATION MDL 2406
4

5  * * * * * * * * * *

6  HEARING ON PRELIMINARY APPROVAL OF

7  SUBSCRIBER TRACK SETTLEMENT

8  * * * * * * * * * *

9  BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES

10  DISTRICT JUDGE, at Birmingham, Alabama, on Monday, November 17,

11  2020, commencing at 9:07 a.m.

12  APPEARANCES:

13  SPECIAL MASTER:          Edgar C. Gentle III
                          Attorney at Law
14                          GENTLE TURNER SEXTON & HARBISON
                          501 Riverchase Parkway East, Suite 100
15                          Hoover, Alabama  35244

16
    FOR THE PLAINTIFFS:      David Boies
17  (via videoconference)    Swathi Bojedla
                          Warren T. Burns
18                          U. W. Clemon
                          Charles J. Cooper
19                          Gregory L. Davis
                          David J. Guin
20                          Michael David Hausfeld
                          Hamish P. M. Hume
21                          William A. Isaacson
                          Megan Jones
22                          Edith M. Kallas
                          Barry A. Ragsdale
23                          Cyril V. Smith III
                          Joe R. Whatley Jr.
24

25

```
 1   APPEARANCES, Continued:

 2   FOR THE DEFENDANTS:      Carl Burkhalter
     (via videoconference)    Evan Chesler
 3                            Karin DeMasi
                              E. Desmond Hogan
 4                            Mark Montgomery Hogewood
                              Zachary D. Holmstead
 5                            Craig A. Hoover
                              John M. Johnson
 6                            Daniel E. Laytin
                              Scott Nehs
 7                            Kathleen Taylor Sooy
                              Kimberly R. West
 8                            Helen E. Witt
                              David J. Zott
 9
     ALSO PRESENT:            David M. Benck
10   (via videoconference)    R. Christopher Cowan
                              Samuel Issacharoff
11                            Jennifer Keough

12   ALSO PRESENT:            Katherine Harbison

13        Proceedings reported stenographically via remote
          videoconference; transcript produced by computer.
14
                      * * * * * * * * * *
15

16      (The following proceedings were heard before the Honorable

17      R. David Proctor, United States District Judge, at

18      Birmingham, Alabama, on Monday, November 17, 2020,

19      commencing at 9:07 a.m.:)

20           THE COURT:  All right.  Good morning, everyone.

21           COUNSEL IN UNISON:  Good morning, Judge.

22           COUNSEL IN UNISON:  Good morning, Your Honor.

23           THE COURT:  We're here in In Re:  Blue Cross Blue

24   Shield Antitrust Litigation, MDL Number 2406.

25           We're here for purposes of a hearing on a motion to
```

1    preliminarily approve a subscriber-Blues settlement.  The Court

2    has received the motion for preliminary approval along with

3    certain filings supporting it and one filing from a -- what I

4    would characterize at this point, maybe, a potential -- three

5    potential objectors.  They may be objecting to the preliminary

6    approval of the settlement.  I want to ask some more questions

7    about that when we get to that point.

8         I think the first thing to do, though, is to allow the

9    parties to the settlement to make their presentation as to why

10   the Court should preliminarily approve the settlement.

11        A few observations I'll make on the front end.  And

12   we've talked about this consistently and a good bit during the

13   lead-up to this.  The 2018 amendments to Rule 23, in the Court's

14   view, require much more scrutiny and heightened analysis of a

15   proposed settlement, the idea being that before the Court gives

16   preliminary approval and authorizes notice to a class, the Court

17   should go through an exacting and rigorous analysis of the

18   potential settlement and get as much front-loaded information as

19   possible about the settlement to inform itself before giving

20   preliminary approval.

21        I do appreciate how the parties have approached that

22   issue.  And I certainly invited and, if not, instructed them to

23   proceed that way.  I have received a good bit of information --

24   a lot of information, actually -- that I've worked through.  I

25   still have a few questions, which will -- and those -- the

1  subject of those -- subject areas of those questions will become

2  readily apparent as we move through the analysis.  All right?

3       So the way we've set this up, we have a number of

4  people that are designated speakers who have been given Zoom

5  credentials, and I'm seeing a lot of you on the screen right

6  now.  We have a number of other people who are attending through

7  a system our Court developed and the AO has approved that are

8  getting an audio feed of the hearing.  So those who have an

9  interest can certainly hear the -- listen to the hearing.  And

10  they won't be able to interact with us, but they certainly have

11  access to the hearing.

12       Obviously, the COVID pandemic has caused us to proceed

13  virtually.  The parties all agreed that was the way to approach

14  this.  Asking parties to travel to Birmingham and appear in

15  large numbers in open court just wasn't feasible.  The Court

16  determined that the best interests of everyone, safety, health,

17  and otherwise, would be to proceed via this Zoom call.

18       Anything else the parties think I need to address as

19  far as introducing the hearing today?

20       MR. BOIES:  Not from us, Your Honor.

21       THE COURT:  All right.

22       MR. ZOTT:  Not from us as well, Your Honor.  Thank you.

23       THE COURT:  Thank you.

24       All right.  In that event, Mr. Boies, are you going to

25  lead us off?

```
1              MR. BOIES:  I am, Your Honor.

2              THE COURT:  I had a feeling that might be the case.

3              MR. BOIES:  Good morning.  And may it please the Court.

4    For the record, my name is David Boies, and I represent the

5    subscriber plaintiffs.

6              We have taken to heart, Your Honor, comments that the

7    Court has made about the importance of the preliminary approval

8    hearing and the presentation, and we recognize that it's

9    important that the Court be in a position to make a rigorous and

10   independent evaluation.  We've tried to assist the Court in the

11   papers that we filed, including declarations of world-class

12   economic experts like Daniel Rubinfeld and Ariel Pakes, Darrell

13   Chodorow.  You also have in front of you declarations from

14   Kenneth Feinberg and Special Master Edgar Gentle as well as a

15   great deal of additional data and materials.

16             What we're going to try to do today is go through both

17   legal requirements and why we believe those legal requirements

18   have been met.  And to just give you a preview of sort of the

19   cast of characters and what our speaking roles are going to be,

20   I'm going to begin with a brief overview of the case.  Michael

21   Hausfeld will then present the terms of the settlement

22   agreement.  Chuck Cooper will then address the standard for

23   preliminary approval, both under Rule 23 and the Eleventh

24   Circuit.

25             I will then discuss how we believe the settlement
```

1   squarely meets those criteria, and Bill Isaacson will add to

2   that discussion.  Michael Hausfeld will then address why the

3   settlement classes merit certification.  And then Swathi Bojedla

4   and Hamish Hume will address the plan of distribution.  And then

5   Megan Jones will summarize the class notice program.

6        I want to just briefly, before going to an overview of

7   the case, acknowledge what I know the Court and everyone in this

8   courtroom understands, which is that litigation is a team sport.

9   You're going to be seeing a few of us today, but this settlement

10  is really a team effort.  The plaintiffs' group, led by the

11  steering committee -- and I want to acknowledge the steering

12  committee because they played an extremely important role in

13  getting us to this place today.  And they, in turn, represent

14  75 -- more than 75 law firms across the country who have been

15  working on this case, most of them for more than eight years.

16  There are over 300 individual lawyers who have played

17  significant roles in the preparation of this case, the

18  litigation of it, and then the settlement.

19        So the steering committee members, Bill Isaacson and

20  Megan Jones, Greg Davis, Cy Smith, and Kathleen Chavez, I know

21  would also say that their work could not have been possible

22  without literally hundreds of lawyers who have devoted their

23  time to this case.

24        I also want to recognize the work of our local

25  facilitating counsel, Chris Hellums, and Barry Ragsdale, liaison

1  counsel, who have made our life -- I was going to say easier,

2  but I probably better say possible under all the things that we

3  had to get accomplished to get to the point where we are.

4       And I think that other than the Court itself, probably

5  the person that we couldn't have gotten here without is our

6  special master, Ed Gentle, who was not always gentle in pushing

7  us along but was always able to get us to rethink positions,

8  work together, and always able to come forward with alternative

9  compromises for us to consider.  Again, I want to express not

10  only to the Court but to him our enormous appreciation for the

11  help in getting us to where we are.

12       And as long as I'm -- as long as I'm talking about

13  people who have been important to this, I don't want to -- I

14  don't want to forget our Special Privilege and Sealing Master

15  Harwood or Judge Putnam, who literally presided over hundreds of

16  discovery disputes, and Sally, of course, without whose

17  participation, much of what we have been trying to do would

18  never have reached fruition.

19       There are many other people who have contributed to

20  this, and I know the Court knows, but I want the record to

21  reflect how grateful Michael and I are for everyone whose help

22  has gotten us here today.

23       With that, let me -- let me turn to the -- just a brief

24  overview of where the case is and begin with a timeline that

25  just reminds everybody where -- where we've come.

```
 1           This case technically started in February of 2012.  The
 2  first case was filed in North Carolina, but it really got
 3  started in the end of 2012, the beginning of 2013, when first
 4  there was a multi-district panel motion to consolidate.  It was
 5  consolidated here in the Northern District of Alabama.  And on
 6  February '13, we held the first status conference, as this
 7  timeline indicates.  And those stars are court hearings and
 8  conferences.
 9           And as you will see, this has been a hotly litigated
10  case.  The defendants deserve a lot of credit for the work that
11  they did, and they were certainly diligent in finding ways to
12  defend their clients.  I almost lost track, until preparing this
13  timeline, of how many motions to dismiss we had to face.  But
14  the very first set of motions to dismiss were filed in September
15  of 2013, and those -- those were denied, and discovery started
16  in earnest in 2014.  And the first discovery order was issued
17  that year, and we had a total of 91 discovery orders over the
18  next four years.
19           I won't go through all of these timeline entries
20  because I know the Court is well familiar with them, but I think
21  looking at 2015 and 2016, you see how rapidly the case began to
22  progress and the number of hearings that were required.
23           At the end of 2016, we, of course, had our Economics
24  Day when -- our first Economics Day when we spent a day in
25  essentially a nonadversarial context of trying to simply set out
```

1   in as organized and as neutral a way as I think both parties

2   could the economic issues that the Court was going to face.  And

3   I think that was an innovative approach and I think one that I

4   hope was as helpful to the Court as I think it -- as I think it

5   was.

6          Proceeding, then in 2017 and 2018, we continued with --

7   continued with (unintelligible).  We had a second Economics Day.

8   We had a decision and then a reconsideration of the filed-rate

9   motion for summary judgment, and we had a filing of the various

10  partial motions for summary judgments that were filed by both

11  the plaintiffs primarily on the standard of review and by the

12  defendants primarily -- and I don't want to speak for them, but

13  I think primarily relating to their single-entity defense.

14         Also, at the beginning of 2017, we had the beginning of

15  the initial mediation sessions with Special Master Ed Gentle.

16  We had had previous efforts at mediation with Judge Layn

17  Phillips that had not been successful, although I do want to

18  express our appreciation for what Judge Phillips contributed.

19  But starting in 2017, we began, in parallel with our continuing

20  litigation of the case and in parallel with our discovery,

21  mediation.  And from essentially the end of 2017 to the end of

22  2019, we had over 150 in-person meetings and over 280 telephonic

23  and Zoom mediation meetings.

24         And then continuing into 2018 and 2019, we made

25  considerable progress in terms of discovery.  We were completing

1    the enormous amount of privilege work and privilege-challenged

2    work that needed to be done.  These were two years of motions to

3    compel in terms of discovery.  And also the defendants filed a

4    motion for interlocutory appeal of the standard of review order

5    that the Court had entered, which was ultimately denied at the

6    end of 2018.  And we filed class certification motions and

7    oppositions in 2019.

8            In September of 2019, we thought we were close enough

9    to a possible resolution that all parties agreed that it made

10   sense to stay the litigation.  And a couple of months later, we

11   were able to sign a term sheet.  It then took us a number of

12   months to convert that term sheet into a definitive document

13   that was finally reduced to writing, signed, and submitted to

14   the Court the fall of this year.

15           I think that if you -- if you look at the next chart,

16   I've tried to give you a sense of some of the work that has gone

17   into getting us here:  over 135 depositions; over 75 million

18   pages of documents produced; as I said earlier, 91 discovery

19   orders; approximately a hundred discovery conferences.  There

20   were well over a million privilege claims.  There were 700,000

21   challenges to those privilege claims.  Over 450,000 privilege

22   claims were de-designated, either voluntarily, as a result of

23   discussions, or as a result of orders from Judge Harwood.

24           The amount of work that goes in to make complicated

25   class actions is large, and I think this was an unusually large

1    amount of work.  It was a -- it was a case that -- obviously, it

2    was brought as a private antitrust case.  It was a case that was

3    brought where we were seeking significant injunctive relief,

4    something rarely achieved in a private antitrust case.

5          It is one in which the dollars alone -- I think we

6    have -- we've said this at the beginning to the Court, and I

7    think the Court has recognized that this was -- this was a case

8    in which the injunctive relief that we were seeking, the

9    structural relief that we were seeking was more important than

10   the dollars; but the dollars involved were still, nonetheless,

11   very substantial.  So it was a case of very significant

12   magnitude for both the plaintiffs and the defendants and, we

13   believe, for the health care system in this country.

14         So I think that we have worked hard to get to the point

15   where we are.  I think we're proud of the settlement that we

16   have gotten ourselves in a position to propose for the Court's

17   consideration.

18         And with the Court's permission, Michael Hausfeld will

19   now go through the basic terms of that proposed settlement.

20         MR. HAUSFELD:  Thank you, David.

21         Good morning, Your Honor.

22         THE COURT:  Good morning.

23         MR. HAUSFELD:  We can continue with slide 11.

24         There are three overriding factors, Your Honor, that

25   distinguish the resolution, you know, of this settlement.

1   First, as Mr. Boies has stated, this case did not fall on any

2   government investigation, indictment, guilty plea, prosecution,

3   or judgment.  It was totally developed by the private bar.

4         It did not -- second, it did not involve a traditional

5   price fix of a homogenous product in a line of distribution from

6   a price fixer to an end user.  And third, it did not involve a

7   defunct conspiracy where the only form of relief was monetary

8   compensation because the cartel had been disbanded, fell apart,

9   or otherwise ended.

10        It was a case which required forward-looking structural

11  changes to a system which, if remained unchanged, would have

12  continued to promote anticompetitive market effects.  It is a

13  settlement here which needed to achieve both, one, significant

14  monetary compensation, as Mr. Boies has said, and, two,

15  effective, procompetitive system reforms.

16        The terms of the settlement provide for financial

17  relief as well as structural relief, which I'll go into now in

18  detail and in terms of how both of these were constructed.

19        If we can go to slide 12, please.

20        The subscriber plaintiffs' estimate of damages was

21  based on an economic model which focused on certain categories

22  of fully funded Blue subscribers in Alabama, which was the

23  priority case at the time, and the economic injury that they

24  sustained by reason of the challenged restraints to Blue and/or

25  Green entry into Alabama.

```
 1          We then took that model to a prominent health care
 2   economist, Ariel Pakes, in extrapolating the Alabama damages
 3   model to all categories of fully insured Blue subscribers and
 4   all self-funded accounts nationwide through 2019.
 5          That estimate demonstrated that the potential maximum
 6   single damages for the full recovery range from 18.6 billion to
 7   36.1 billion to the national classes of both fully funded and
 8   self-insured subscribers and accounts as a result of the
 9   foreclosure and limiting of competition in both -- by both Blue
10   and Green companies.
11          We then overlapped the benefit of the highest
12   settlement possible and achievable as against the risk of class
13   certification, summary judgment, trial, and appeal as well as
14   expense and delay.
15          If we could then turn to slide 13.
16          We believe that under the circumstances, along with the
17   benefits, as Mr. Boies has said, of the injunctive relief, there
18   was an agreement of a recovery of 2.67 billion, representing 7.3
19   percent to 14.3 percent of the estimated maximum full recovery
20   for all classes of fully insured and self-insured, not just by
21   state, but for all states across the nation.
22          We then turned to the structural or system reforms that
23   we felt were necessary in order to bring about the
24   procompetitive benefits.  The terms provide for the elimination
25   of the national best efforts clause, which, in essence, was a
```

 1   disincentive to develop the use of non-Blue marks by Blue

 2   companies that not only thwarted that type of competition but

 3   was an impediment to acquisitions by non-Blue branded health

 4   insurers.  As described by one of plaintiffs' other economists,

 5   Dan Rubinfeld, that was -- the elimination of NBEs was a

 6   critical enforcement mechanism for restraining competition

 7   outside of the Blues' ESAs.  In addition, the term sheet

 8   provides that there will be no similar rule enacted or

 9   promulgated by the Blues in the future to accomplish the same

10   restraint.

11           In addition, we looked at the national accounts and the

12   impact of the rules on those accounts.  Taken together, there

13   are three elements reforming the system in connection with those

14   accounts.  And taken together, Professor Rubinfeld stated that

15   they would provide increased opportunity for competition in the

16   market from national accounts, a market which was specifically

17   recognized, you know, by a federal court in the Cigna-Anthem

18   merger litigation.  What the settlement does is it guarantees,

19   through a qualified national account, which we'll identify in a

20   moment, the ability to request a second bid from a Blue of its

21   choice.  That is critical because the request for the bid comes

22   at the direction of the national account, not the discretion of

23   the Blue system.

24           The national accounts -- if we turn to slide 18 --

25   excuse me -- 17.

1          The national accounts comprise those employers that

2  have over 5,000 employees, which, in the aggregate, will

3  encompass 33 million members, constitutes at least half of the

4  employers that have 5,000 or more employees and that offer

5  self-funded plans, and 31 percent of the members from all

6  self-funded accounts, Blue and/or non-Blue.

7          If we go back to slide 16, please.  But in addition,

8  the reforms allow the qualified national accounts that have

9  independent health benefit decision locations in more than one

10 service area to request a separate bid from a member plan in its

11 service area to cover those employees in that location, adding

12 another layer of competitive opportunity.

13          Likewise, even those national accounts in multi-service

14 areas that have more than 250 employees, the individual Blue

15 plan for that area may bid the account as a non-Blue brand,

16 provided that there is a Blue that is afforded the opportunity

17 to bid for that account but in a specified order, as opposed to

18 at the discretion of the Blue.

19          In addition, the term sheet provides for a change in

20 the Blue system practice with regard to most-favored-nation

21 differentials and essentially limits the use of those

22 differentials in order to, again, promote more competition and

23 opportunities for competition not just among the Blues, but as

24 well as between the Blues and the providers as -- and other

25 non-Blue companies that compete on a national and local basis.

 1          Taken together, all of the structure reforms offer the

 2   following seven significant procompetitive results:  one, there

 3   will be increased competition among the Blues; two, there will

 4   be increased growth and competition by Greens; three, there will

 5   be increased output; higher -- four, higher ancillary services;

 6   five, increased innovation, lower premiums for fully fundeds,

 7   and lower administrative fees for self-fundeds going forward.

 8          We've also provided, as slide 19, that there will be a

 9   five-year monitoring period, Your Honor.  The monitoring

10   committee will be comprised of one member selected by the fully

11   fundeds, one member selected by the self-fundeds, two Blues, and

12   one member selected by the Court.

13          The responsibilities of the monitoring committee will

14   be to resolve disputes related to the settlement agreement

15   subject only to an appeal to arbitration, they will resolve any

16   disputes related to new rules proposed by the defendants which

17   are covered generally by the terms of the agreement, and they

18   will file a report with the Court identifying the actions taken

19   by the committee during the calendar year.  All of this will

20   allow for a five-year post-settlement period by which the Court

21   can judge the post-landscape effects of the settlement terms.

22   All of this was done, you know, while recognizing and preserving

23   the rights and claims of the providers.

24          If we look at slide 20, please.

25          The settlement agreement specifically provides that a

1   provider who is a settlement class member does not release any

2   claims arising from their provision or sale of health care

3   products or services.  And the settling defendants further agree

4   not to raise the providers' releases under the agreement as a

5   defense to any of their claims brought in MDL 2406.

6          Overall, Your Honor, we believe we've achieved both key

7   objectives of the settlement agreement in an extremely unique

8   and complex matter, one where we address both of the necessities

9   of significant monetary relief as well as effective

10  procompetitive system reforms.

11         I'd now like to turn the next portion of our

12  presentation to Mr. Cooper to talk about the standards for

13  granting preliminary approval.  Thank you.

14         MR. COOPER:  Thank you very much, Michael.

15         And good morning again, Your Honor.  May it please the

16  Court.

17         As you have heard, my assignment today is to review the

18  governing standards for preliminary approval of the class action

19  settlement under Rule 23(e) and the Eleventh Circuit *Bennett*

20  decision, but I want to state for the record before I begin that

21  I'm acutely aware that the Court has applied these standards in

22  multiple cases already, including at least two cases since the

23  new enhanced standards were established by the 2018 amendments

24  to Rule 23(e).  And so apart, perhaps, from the courtroom

25  clerk's opening call to order, I suspect that Your Honor is not

1   going to hear anything today with which it is more familiar

2   already than my presentation.  But with that having been said,

3   Your Honor, I think the 2018 amendments is a good place to

4   start.

5          So if we can go to slide number 23.

6          And, Your Honor, the 2018 amendments to Rule 23 charge

7   this Court to conduct a careful analysis at the preliminary

8   approval stage to determine whether -- and I'm quoting now from

9   the rule -- giving notice is justified by the parties showing

10  that the Court will likely be able to, one, approve the proposal

11  under Rule 23(e)(2) and, two, certify the class for purposes of

12  judgment on the proposal.

13         And the advisory committee comments, Your Honor, to the

14  amendments explained that preliminary approval requires -- and

15  I'm quoting from those comments -- a solid record supporting the

16  conclusion that the proposed settlement will likely earn final

17  approval after notice and an opportunity to object.

18         We believe we have placed before you and are now today

19  placing before you a record that amply -- amply satisfies that

20  standard.  As you've heard, this case has been litigated for

21  well over eight years now.  And the Court's own experience with

22  it, I'm sure, is -- and the record that you are carrying around

23  in your head from that experience in closely supervising this

24  case over that period and over 2600 docket entries -- so much of

25  what is placed before you is redundant to that experience.

1        And, Your Honor, as you recognized in your opening

2   remarks and many other courts have emphasized as well, the 2018

3   amendments have established a more exacting standard than the

4   previous framework for approval of a class action settlement.

5        So if we can go to slide 24 now.

6        And, of course, the ultimate standard for approval

7   under 23 is the Court should determine and find that the

8   settlement is fair, reasonable, and adequate.

9        And as this Court noted in the *Swaney* decision -- or

10  Swanny.  I'm not sure -- how do you pronounce that, Your Honor?

11        THE COURT:  I always called it *Swaney*, but I probably

12  mispronounced it.

13        MR. COOPER:  Well, then, I will follow as well,

14  perhaps, in mispronouncing it.  But *Swaney* --

15        THE COURT:  I say *Daubert*.

16        MR. COOPER:  As do I, Your Honor.  As do I.  But as you

17  noted in that case very recently, in applying these standards,

18  review and approval of a class action settlement under Rule

19  23(e)(2) is committed to the sound discretion of the district

20  court.

21        So as we proceed now to the next slide, I'll outline

22  specifically what those 23(e)(2) factors are.  And to determine,

23  again, whether the settlement satisfies the overarching standard

24  of being fair, reasonable, and adequate, the Court, under the

25  amended factors, four factors, is to consider the following.

1         Now, the first two are procedural concerns, as the

2    committee note points out.  And they are the class

3    representatives and class counsel have adequately represented

4    the class and, second, the proposal was negotiated at arm's

5    length.  Obviously, those are very closely intertwined

6    considerations.  If the proposal isn't negotiated at arm's

7    length, you can hardly say that the class has been adequately

8    represented.  But those are two important procedural

9    considerations.

10         And the second two are substantive considerations, Your

11    Honor, for your review.  And those are the relief provided for

12    the class is adequate.  And here the Court is to take into

13    consideration four subfactors:  first, the costs, risks, and

14    delay of trial and appeal; second, the effectiveness of any

15    proposed method of distributing relief to the class, including

16    the method of processing class member claims; third, the terms

17    of any proposed award of attorney's fees, including the timing

18    of the payment of such fees; and then fourth, any agreement

19    required to be identified under Rule 23(e)(3).

20         And the final of the four factors under (e)(2), Your

21    Honor, is the proposal treats class members equitably relative

22    to each other.  So intra-class equity is an important and core

23    concern under the rule.

24         And so proceeding now to the next slide, Your Honor,

25    the advisory committee notes to the 2018 amendments explain that

1   the goal of the 2018 amendments was not to displace any factor

2   that had been adopted previously by the courts of appeals -- and

3   there were -- there were varying standards throughout the

4   country, but they largely overlapped and replicated each other

5   -- but, rather, to focus the Court and the lawyers on the core

6   concerns of both procedure and substance that should guide the

7   decision whether to approve the proposal.

8           And so now, Your Honor, let's go to those concerns and

9   considerations that govern in the Eleventh Circuit.  But first,

10  Your Honor, as this Court said in the *Swaney* decision, public

11  policy strongly favors the pretrial settlement of class action

12  lawsuits.  And in that statement, Your Honor, you were quoting

13  from the Eleventh Circuit in the *U.S. Oil and Gas Litigation*.

14          And countless courts have made this observation in a

15  variety of formulations.  One of my favorites we've listed here

16  at the bottom of that, of slide 28.  And this is from Judge

17  Clemon's thorough decision in the *Liberty National* case:  The

18  policy of federal courts, favoring voluntary resolution and

19  litigation through settlement, is particularly strong in the

20  context of class actions.

21          So proceeding now to slide number 29.

22          Your Honor, I mentioned the *Bennett* case.  I know the

23  Court is intimately familiar with it, but it outlines six

24  factors.  And those standards have continued to be applied,

25  including by this Court in both of the cases with which we have

 1   found reported decisions anyway that you have approved class

 2   actions settlements, the *Swaney* case and the *Carroll against*

 3   *Macy's* case.

 4        And now proceeding to the slide number 30, those six

 5   *Bennett* factors, Your Honor, are the following.  Factor number

 6   one is the likelihood of success at trial.  And in *Swaney*, Your

 7   Honor, you said that -- and I'm going to quote this -- this

 8   factor weighs in favor of approval where there is no guarantee

 9   that the plaintiffs would prevail at trial on their claims.

10        Now, Your Honor, I don't want to be misunderstood as in

11   any way expressing a lack of confidence in the strength of our

12   claims when I say -- and you will hear an elaboration from

13   Mr. Boies shortly -- that to be sure, there is no guarantee that

14   we would prevail on these claims.  There are serious litigation

15   risks both on liability, damages, class certification.  And, of

16   course, there would likely be perhaps multiple appeals before us

17   on the important merits issues and class certification issues

18   that the Court would have to grapple with.

19        I think I would be remiss if I did not offer a tip of

20   our collective hats to our distinguished adversaries on the

21   other side of the field.  If there's one thing we've learned

22   over the course of the last eight years, the defendants are

23   represented by extraordinarily experienced, talented,

24   hard-working, and very well resourced lawyers.  And so the

25   challenges that lay before the plaintiffs certainly are very

1    significant in this case.

2          The second factor and the third factor, Your Honor,

3    *Bennett* factor, are typically considered together.  They're

4    closely interrelated.  The second factor is the range of

5    possible recovery.  The third factor is the point on or below

6    the range of recovery at which a settlement is fair, adequate,

7    and reasonable.

8          The fourth factor, Your Honor, goes hand in hand with

9    the first factor; that is, the factor of likelihood of success

10   at trial.  And the fourth factor is the complexity, expense, and

11   duration of the litigation.  Now, this factor, Your Honor, as

12   you said in the *Swaney* decision, is designed to determine

13   whether the proposed settlement will alleviate the need for

14   judicial exploration of complex subjects, reduce litigation

15   costs, and eliminate the significant risk that individual

16   claimants might recover nothing.

17         Moving to the fifth *Bennett* factor, Your Honor, it's

18   the substance and amount of opposition to the settlement.  That,

19   of course, is -- essentially remains to be seen if the Court

20   grants preliminary approval and permits us to provide notice to

21   the class.

22         And the final and sixth factor under *Bennett*, Your

23   Honor, is the stage of proceedings at which settlement was

24   achieved.  And the Court elaborated -- you elaborated on this

25   factor in the *Swaney* decision as follows:  This factor is

```
 1   designed to ensure that plaintiffs had access to sufficient
 2   information to adequately evaluate the merits of the case and
 3   weigh the benefits of settlement against further litigation.
 4         And so, Your Honor, that's the general survey of the
 5   standards governing your inquiry of this -- and consideration of
 6   our proposal.  And if there are no questions, I'll turn the
 7   virtual podium over to co-lead counsel David Boies.
 8         THE COURT:  I have no questions at this point.  I will
 9   later.
10         MR. COOPER:  Very well, Your Honor.
11         SPECIAL MASTER GENTLE:  He's on mute.
12         THE COURT:  David, you're going to have to unmute.
13         MR. BOIES:  Thank you.  Thank you, Your Honor.
14         And thank you, Chuck.
15         I'm going to begin with the question as to whether the
16   class has been adequately represented or not.  And even taking
17   into account my obvious bias with respect to this issue, I think
18   if you think about the background and experience not only of
19   co-lead counsel but of the plaintiffs' steering committee and
20   the committee chairs and the literally hundreds of other lawyers
21   around the country that have contributed to this, I think you
22   get a sense of the representation that has benefited the class
23   and gotten us to where we are today.
24         There are 67 different class representatives, both
25   fully insured and some class representatives for the self-funded
```

1    class members.  No questions, I think, can be raised about their

2    dedication to representing the class, let alone their adequacy.

3           There has been a question raised as to whether we need

4    to have a class representative for each individual state.  I

5    think that as the Court is aware, particularly in actions that

6    are based on national claims, claims of national anticompetitive

7    conduct, the national effect, that it is often the case that you

8    do not have class representatives from every -- every state.

9    While I think there can be a question raised as to whether we

10   have enough class representatives -- and I think we -- I think

11   we do -- I think there is no question about the adequacy of the

12   particular class representatives that we have.

13          And if you just look at some of what I averred to when

14   we were talking about the overview of the class -- the number of

15   depositions taken, the document production that has been taken,

16   the motions to dismiss, the arguments that have been made, the

17   expert reports that have been filed -- I think all of that fully

18   supports the finding by the special master that the settlement

19   negotiation process was conducted at arm's length, in good

20   faith, and was often extremely contentious -- I can vouch for

21   that -- with counsel for each side tenaciously and vigorously

22   advocating for their clients.  I think we succeeded in doing

23   that.  I know that the other side succeeded in doing that as

24   well.

25          I have a chart here, chart 34, that just shows you who

 1   those 67 class representatives are that have approved the

 2   settlement.  And I think it's obvious from our papers, but I

 3   think it's worth emphasizing that all 67 of these class

 4   representatives have unanimously approved the settlement and

 5   that the settlement was unanimously approved not only by co-lead

 6   counsel, but by the plaintiffs' steering committee.  So this is

 7   a settlement which -- although the Court obviously has to do its

 8   own independent and rigorous analysis, I can assure the Court

 9   that this is a settlement that has been vetted with great

10   diligence by not only the co-lead counsel, but by the

11   plaintiffs' steering committee as well.

12          I think it's also worth emphasizing that the self --

13   that the self-funded subclass, in terms of looking at its

14   interests and allocations, has been very well represented.

15   Counsel for the subclass, Warren Burns, has, as the Court is

16   aware, an extremely long and successful history in representing

17   plaintiffs in class actions.  He was, as I think the special

18   master has noted, very diligent both in understanding the issues

19   that are involved and in being sure that the subclass that he

20   represented was protected.

21          Warren Burns and his client, Hibbett Sports, began

22   participating in the settlement negotiations in September 2019

23   and had an opportunity to access and analyze the discovery and

24   the briefing that had already been engaged in.  They then

25   engaged independent experts themselves who participated in the

1  mediation and, as I say, as the special master found,

2  aggressively advocated for their clients in order to maximize

3  the relief that was granted.

4      I think it's -- it's worth emphasizing that every ASO

5  benefits from the settlement.  Every ASO has the potential to

6  get a second Blue bid if they meet the dispersion criteria.  And

7  the dispersion criteria are objective criteria.  It's not like

8  we or anybody else is selecting out particular ASOs.  The

9  question is which ones meet certain dispersion criteria.  And

10  because this list is refreshed every two years, even people who

11  don't meet the dispersion criteria in the initial phase can meet

12  it in subsequent phases.

13      Moveover, the increased competition that is generated

14  as a result of the second Blue bid opportunity for the ASOs who

15  are on the dispersion list, that increased competition benefits

16  every ASO because every ASO benefits from the increased price

17  competition that affects the market opportunities that are

18  available, the market prices that are available, so that even

19  for the ASOs that are not on the dispersion list, they are

20  benefited by the second Blue bid because that second Blue bid is

21  increasing competition by generating new, innovative products

22  and services that can be then made available to the marketplace

23  generally and lowering the overall prices that are paid.

24      In addition, all ASOs get monetary relief.  And perhaps

25  most important of all, all ASOs get a benefit from the

1  elimination of the so-called national best efforts, the

2  limitation on competition across service area borders.

3  (Unintelligible) trademarks other than the Blue trademark.  So

4  all -- each and every ASO benefits, benefits in significant ways

5  from the settlement.

6         Now, with respect to the issue as to whether the

7  settlement has been negotiated at arm's length, this is

8  something that I think the Court has seen, to some extent,

9  itself in the caucuses that we've had, in the conferences we've

10 had.  This is something that the Court has been informed of by

11 the declaration filed by the special master.  I think it's also,

12 I think, clear from the intensive nature of the litigation.

13 And, you know, courts have recognized that particularly when the

14 case was, quote, intensively litigated, that is a strong

15 indication that negotiations proceeded at arm's length.

16         In addition, when the parties worked extensively with a

17 highly experienced mediator, participated in multiple in-person

18 sessions and communications, that also is a factor that has

19 strongly influenced courts in making a finding that the ultimate

20 result was at arm's length.  And I think that you have all of

21 those factors with respect to the settlement that is being

22 proposed here.

23         For example, we've already covered the five years of

24 intensive mediation that run in parallel with intensive

25 litigation.  I noted that we started with former United States

1  District Court Judge Layn Phillips and former United States

2  District Court Judge Gary Feess and then the last several years

3  with Special Master Edgar Gentle.  And the course of that

4  mediation and settlement discussions I think everybody

5  recognizes -- and I think it's well documented -- represented

6  arm's-length and tough negotiations.  These were issues that

7  were important to both sides, and both sides fought hard for

8  their positions.

9        I think it's also worth considering, Judge, whether the

10  proposed settlement meets the 23(e)(2)(B) criteria.

11    (Videoconference interference)

12        MR. BOIES:  The parties litigated almost a dozen

13  motions to dismiss filed by defendants on key legal issues,

14  including such issues as the implications of the

15  McCarran-Ferguson Act, whether territorial restrictions were

16  needed and justified by trademark protection, what the right

17  standard of review was, over the Filed Rate Doctrine or damages,

18  and even issues of personal jurisdiction.

19        The single-entity defense motion, which was filed but

20  has not yet been finally decided, is obviously a critical part

21  of the defendants' defense, and it fits into their argument that

22  the restrictions that are in place are restrictions that are

23  sensible and, indeed, required to protect their legitimate

24  trademark issues.

25        Turning to 23(e)(2)(C) and the factors there, the first

1  of those factors is costs, risks, and delay of trial and appeal.

2  And as communicated on slide 41, this is a case that has been

3  already enormously costly, risky, and protracted.  The

4  plaintiffs have incurred more than $35 million in just

5  out-of-pocket costs and approximately $200 million in lodestar.

6  If the case were to proceed to trial, the costs and times

7  required would increase, would increase greatly.

8          And I think we all recognize that the result, if we

9  went to trial, is inherently uncertain.  There is no

10  uncertainty, I believe, certainly no uncertainty in our mind,

11  that the elimination of the restrictions that this settlement

12  eliminates will greatly increase competition.

13          The issue, of course, is whether that increase in

14  competition is or is not something that is going to be legally

15  upheld.  And this was, as both Michael Hausfeld and I have

16  earlier said, a case that we brought seeking to change an

17  industry structure in a context where not only had the Justice

18  Department or the Federal Trade Commission not brought a case,

19  but it was a situation in which the antitrust enforcement

20  agencies were aware of the very conduct that we were challenging

21  and had chosen not to take action.

22          THE COURT:  What do you owe that to, Mr. Boies?

23          MR. BOIES:  I think it's -- it was a number of factors.

24  First, these are very complicated legal and economic issues.

25  The -- in a relationship between the competitive restraints,

1   particularly territorial restraints, and use of trademarks is

2   something that the court has struggled with at various times.

3   It is an area in which the law has been evolving.  I think that

4   the antitrust enforcement agencies have not placed as much

5   emphasis on older Supreme Court decisions that question certain

6   conduct in this context as they have more recent decisions that

7   suggest more flexibility in terms of the law.  I think the

8   movement of the antitrust law generally has been not to try to

9   look at every anticompetitive restriction and attack it, but to

10  more rigorously analyze whether there was something illegal in

11  that anticompetitive restriction.

12         I think also the antitrust enforcement agencies, like

13  the law in general, have been increasingly inclined to look at

14  the potential procompetitive benefits that could result.  And

15  here you had a health insurance system that was and is critical

16  to the health care of millions and millions of people across the

17  country, where you have a system that has a record that they are

18  I think justifiably proud of in terms of service to some

19  communities that might otherwise be underserved.  And the

20  question, I think, was would intervention in that system be

21  worth the time, expense, and potential disruption in terms of

22  the possible procompetitive results of eliminating certain kinds

23  of competitive restraints.

24         I think that -- from a personal standpoint, I think the

25  enforcement agencies, over the last couple of decades, have been

 1   too timid in taking on really difficult, complicated antitrust

 2   issues and cases.  So I -- if I -- if I had been there, I think

 3   I might have -- I might have done something; but I understand

 4   why, in the larger context of the approach to antitrust

 5   enforcement, they did not.

 6           THE COURT:  Well, I daresay if you did it with your own

 7   money in this case, you probably would have done it with

 8   taxpayer money in the other one.

 9           MR. BOIES:  I think that's fair, Your Honor.  It would

10   have been an easier decision to use the taxpayers' money than to

11   use ours, our money and our time.  This was a case -- and I

12   think the Court knows -- that I and other lawyers felt very

13   strongly about.  This was -- this was a case that -- you know,

14   we're all private practitioners.  We all take on cases in the

15   hopes of making a fee.  But this was a case in which I think we

16   felt that there was an important public service to be performed,

17   that this was an industry that was really critical to this

18   country, increasingly critical to this country, and that

19   anything that we could do to materially increase competition,

20   output, consumer choice was something that was important.

21           THE COURT:  And for the record --

22           MR. BOIES:  This is our --

23           THE COURT:  I'm sorry.  I didn't mean to interrupt you.

24   For the record, you feel equally strongly about this settlement?

25           MR. BOIES:  I do, Your Honor.  As I think the Court

```
 1   knows, I've tried over the last eight years to be as candid as I
 2   could within the realm of fair advocacy to both talk about what
 3   I thought the strengths and weaknesses of our case were.  And as
 4   I indicated in the very first of our Economic Days, the issue of
 5   what's called national best efforts, the restriction on the
 6   ability of Blue companies to compete outside of their designated
 7   area, even using different trademarks like Anthem and the like,
 8   was something that I felt was not justified and was quite
 9   important in terms of changing the competitive landscape.
10          When you get in -- and I've been candid about this with
11   the Court from the beginning.  When you get into issues of
12   restrictions on where people can use their trademark, it's much
13   more complicated.  There are much, much greater potential
14   justifications for that.  And the heart of what we wanted to
15   accomplish was to eliminate what we thought was a clear and
16   uncompetitive constraint which could be eliminated without any
17   risk or at least any substantial risk.  Defendants may disagree
18   with me on this; but from our perspective, we believed that you
19   could eliminate this anticompetitive restraint and substantially
20   increase competition without any significant chance that you
21   were going to interfere with the ability of the Blue system to
22   continue to perform the public service that it does.
23          So for me personally, that injunctive relief was the
24   heart of what we needed to accomplish.  And given the fact that
25   we have accomplished it or potentially accomplished it, I feel
```

1    very strongly about the settlement.  It's easy from the outside

2    and it's easy for the media to focus on the $2.7 billion figure,

3    but I think -- and that's important.  I mean, that's an

4    accomplishment, and I think that's important, but the real

5    accomplishment here, I think, Your Honor, for the future of

6    health care in this country is the injunctive relief.

7              THE COURT:  Thank you.

8              MR. BOIES:  Now, despite my confidence that the

9    restriction that we're eliminating is anticompetitive, we face a

10   number of real risks here in this case.  One of those risks, you

11   know, is even if we agree -- and with all due respect to

12   defendants, I just don't see how you can disagree -- that this

13   is going to increase competition, there is still a real issue as

14   to whether it's legally compelled or not.  And that is -- that's

15   an issue that we are going to -- that we would have to face in

16   terms of liability.

17             We're also going to have to face the issue of class

18   certification.  And anybody who practices in this area -- and I

19   practice on both the plaintiffs' side and the defense side from

20   time to time -- knows that the difficulty of getting classes

21   certified has only increased over the last several years.  And

22   that's particularly true for very large, complicated national

23   classes like this.  In terms of litigated classes, where the

24   management of those classes is at issue, you know, class

25   certification is becoming a more and more important hurdle to

1  get over.  And, of course, for some years now, you're subject to

2  an appeal, which means not necessarily that you have a greater

3  risk, but you do have a greater delay.

4            And with respect to delay, if you'd go to chart 42.

5            As the Court is aware, even with one accelerated case

6  for Alabama, it has taken us over eight years to get to where we

7  are.  Now, the base that we have developed would obviously help

8  with additional cases that we would have to try, but it's almost

9  impossible -- it's very difficult to estimate how many more

10 years of litigation it would take to complete all of the

11 remaining actions.  Each trial would come with its own risks.

12 And we would have complicated damages models followed by

13 complicated appeals.

14            And we do face the issue of whether the defendants are

15 a single enterprise or not.  The risk that they could prevail on

16 that issue is a risk that we have to recognize.  I personally

17 think that we have a strong argument that even if they were to

18 prevail on the single economic enterprise argument, that that

19 single economic enterprise should not extend to the prohibition

20 of the so-called Green competition.  But, again, that's --

21 that's an issue that I know that we would have to -- would have

22 to litigate.

23            I think we also have a potential appeal -- not

24 potential appeal; if we go forward, it would be a certain

25 appeal -- with respect to the standard of review order and as to

 1   whether *Topco* and *Sealy* can be distinguished, or the Supreme

 2   Court to overrule --

 3        (Computer sounds)

 4        MR. BOIES:  -- and how to harmonize them with more

 5   recent antitrust rulings such as *NCAA* and *BMI* and other

 6   decisions involving joint ventures.

 7        Again, I would say to the Court that I think that

 8   the risk on appeal from the standard of review order is not

 9   great with respect to the issue that we are addressing in the

10   settlement.  I don't see how any of the decisions after *Topco*

11   and *Sealy* could justify the restrictions on so-called Green

12   competition that we're eliminating.

13        However -- and I think this is important in terms of

14   evaluating the settlement.  However, I think those arguments are

15   obviously stronger when it comes to regulating Blue-on-Blue

16   competition.  And so I think that when you -- when you think

17   about the risks we face, I think you have to think about both

18   the risks we face with respect to what we have gotten -- that

19   is, the risk of losing it -- and then the risks of whether we

20   could get any more.  And --

21        THE COURT:  Well, my ruling -- in my standard of review

22   ruling, I was very careful to explain exactly what I concluded

23   on standard of review.

24        MR. BOIES:  Yes.

25        THE COURT:  And that was that it was the combination --

```
 1          MR. BOIES:  Yes.

 2          THE COURT:  -- of the ESAs with other output

 3   restrictions -- namely, national best efforts -- that I thought

 4   moved this from a rule of reason into a per se analysis.  I am

 5   well aware the Blues vehemently disagree with my ruling even as

 6   we sit here today, and I know that some corners of academia and

 7   those who practice in the area explained in some various

 8   commentaries that the Court had applied old Supreme Court cases.

 9   In fact, *Topco* and *Sealy* --

10      (Computer sounds)

11          THE COURT:  -- are 50 years old or so, an average of 50

12   years.

13          I need to get a power source hooked up here.

14          While Joe is doing that, the question I have is why do

15   you think this injunctive relief -- let's say I'm right.  And,

16   you know, we are dealing with the reality that the Supreme --

17   that the Eleventh Circuit was given an opportunity to grade my

18   papers.  And, quite frankly, I spent just as much quality time

19   trying to craft a good interlocutory review order so that the

20   Blues could get that opportunity.  Because I told them straight

21   up at the time I made my ruling that they should not have to

22   take the word of a Northern District of Alabama judge for all

23   this on something so critical to their mission and their

24   business practices, that I wanted there to be review.  And I

25   think, quite frankly, in your heart of hearts, intellectually,
```

1    you knew that review might be good because at that point, you

2    were not on the doorstep of a settlement and you would like to

3    know, perhaps, that you were putting good money after good

4    money, not bad money.

5            All that to say the Eleventh Circuit came back and

6    said, we're not going to review it.  Now, we don't know if that

7    was because it was facially apparent that the ruling was

8    correct.  We don't know if that just simply indicated that they

9    thought we could address this on a much more complete record at

10   the conclusion of litigation, although I will say that I think

11   everybody agrees there was a substantial discovery record and a

12   substantial record about the practices challenged that were in

13   place at the time of the Rule 56 ruling that I made.

14           But the question I have is this.  How does this

15   settlement move these practices, the ESAs and the other output

16   restrictions, from a per se analysis into a rule-of-reason

17   analysis and one, in particular, where the procompetitive

18   benefits outweigh the anticompetitive detriments under a

19   rule-of-reason analysis?

20           MR. BOIES:  Your Honor, I think that under the Court's

21   ruling -- because the Court did focus on the aggregation of all

22   of these aspects and because, as the Court ruled, the aspect

23   that we're addressing in this proposed settlement was an

24   important part of that -- the Court would, at a minimum, have to

25   now look again at this issue and see whether, with the

 1   disaggregation, the Court would still view that there was a --
 2   there was a per se violation.
 3           Now, I do want to emphasize, though, that in the
 4   context of this settlement, the issue is not merely whether the
 5   Court was right in that decision.  I think the Court was right.
 6   I think that would be upheld on appeal and not merely because as
 7   somebody who's been practicing law for 55 years, 50-year-old
 8   decisions don't seem that old to me.  It is because I think that
 9   applied to the facts of this case, the *Topco* and *Sealy*
10   principles that the Court applied were exactly right.
11           And I think that while you can never read everything
12   into a denial of an appeal, I think it is quite likely that if
13   the Eleventh Circuit thought that you were clearly wrong, they
14   would have taken the case.  So whether they would totally affirm
15   or not I don't think anybody can say with confidence, but I
16   think what you can say is that if they thought you were clearly
17   wrong, they would have taken the case.  And they didn't take the
18   case.
19           However, that is not really the issue that we have in
20   terms of the risk analysis, I think, because even if, after
21   trial and appeal, it was held that this was per se lawful --
22   unlawful -- per se unlawful, you would still have the question
23   of what is the appropriate injunctive relief.  Finding --
24   finding that the aggregate of all of this is per se unlawful
25   doesn't mean that in the final injunctive relief that the Court

1    issues, which has to take into account not only issues of

2    increasing competition and remedying the effects of past

3    anticompetitive conduct but also the public interest -- it

4    doesn't necessarily mean that the Court would say that I'm going

5    to eliminate exclusive service areas entirely.  The Court might

6    very well, even after a finding of liability, come out with an

7    injunctive relief that was considerably less than what we might

8    have asked for.

9         So I think that we run -- in terms of the injunctive

10   relief, we run -- and damages as well.  We run sort of two

11   risks.  One risk is that we lose on liability, but the second

12   risk is that when you come to remedy, we don't get as extensive

13   a remedy as we might -- as we might ask for.

14        THE COURT:  Let me ask you this.  This may be putting

15   the hay down where the goats can get it.  If you had -- you said

16   you felt very strongly about this case when you looked at

17   these -- this aggregation of output restrictions and the market

18   allocation aspects of the ESA agreement.  If you had eyed the

19   Blues practices and they looked exactly like the proposed

20   settlement, where there was a continuation of ESAs but an

21   opportunity for particularly large-sized groups to get a second

22   bid and no national best efforts provision, are you saying

23   that's something you would have said, I'm not challenging, that

24   looks Sherman Act kosher to me?

25        MR. BOIES:  I think that -- I think it's likely that

1    if -- if the industry had looked like the industry would look

2    like if this settlement were approved, we would not have brought

3    a challenge.  That's not to say that it's necessarily legal.

4    What it is, is I think looking at that kind of market structure

5    and those kind of practices and looking at how long the case was

6    going to last and the time and expense and risk that was

7    involved and measuring that against what would be a much more

8    marginal and uncertain remedy, if we were to achieve it, my

9    expectation is we would not have brought this lawsuit if -- if

10   the industry had looked like what the industry would look like

11   once we have this settlement.  For one thing, I think damages

12   would be even more difficult to demonstrate.  And I think that

13   the likelihood of additional injunctive relief would have been

14   much more remote.

15          As I say, I don't -- I don't -- I don't mean that to

16   say that if I was in the Justice Department, I might not have

17   done something, probably more in the context of opening an

18   investigation and trying to negotiate a resolution.  But as --

19   in terms of the kind of things that you could, as a practical

20   matter, afford to take on as private lawyers, I -- my judgment

21   is that we probably would have passed.

22          THE COURT:  Well, that raises an interesting question

23   for me.  Don't -- wouldn't I, as the judge supervising this

24   potential settlement and having to give, presumably, final

25   approval to it, necessarily have to make a determination that

 1  what the parties have agreed to going forward is not a Sherman

 2  Act violation?

 3          MR. BOIES:  I think you would have to make the decision

 4  that what was -- what the parties have agreed to going forward

 5  was not a reasonably predictable Sherman Act violation.

 6          THE COURT:  I at least have to make a decision that

 7  it's not a per se violation.

 8          MR. BOIES:  Yeah.  It's not a per se violation.  Not a

 9  per se violation.

10          THE COURT:  And then it seems to me that there would be

11  some -- then the room in the joints is how would someone

12  characterize the procompetitive benefits versus the

13  anticompetitive detriments under a rule-of-reason analysis.  But

14  wouldn't I have to satisfy myself that at least at this stage,

15  it's likely that this would pass muster under the rule-of-reason

16  analysis?

17          MR. BOIES:  I'm not sure -- I know what the Court is

18  saying, and I think the Court is right.  The thing that I'm not

19  sure about is what -- sort of what the standard of review is, if

20  you will.

21          This is, like any settlement, a compromise.  What we're

22  doing is we are compromising in advance of trial where each side

23  is giving up something.  And I don't think it can be that in

24  order to approve the settlement, you would have to, in effect,

25  have a trial to determine that this is the most that we would

1  have achieved if we'd gone to trial and won.

2  I think that you do have to conclude that it's a

3  reasonable compromise.  And part of it being a reasonable

4  compromise is finding that we are not leaving in place something

5  that is obviously anticompetitive or, maybe describing the

6  standard in somewhat different words, is not something where the

7  likelihood of finding that it was anticompetitive is now

8  outweighed by the risks of going to trial.

9  I think that we are in a situation in which the

10  defendant still argues extremely vigorously that there ought to

11  be none of this injunctive relief that we have.  And I think in

12  terms of looking at this settlement, what the Court needs to

13  think about is what is the reasonable balance between trying to

14  get more and risking losing what we've achieved.  And I think

15  that in making that balance, the Court also has to take into

16  account the delay in -- in getting this relief.

17  Right now, assuming that this is approved, this

18  injunctive relief is going to be available -- and the damages

19  too -- is going to be available to consumers immediately.  In

20  the absence of this, whatever injunctive relief we ever got

21  would be years and years and years down the road because -- I

22  mean, one of the things I think we can be quite confident of is

23  that if, after a trial or series of trials, there was injunctive

24  relief that was any greater than what we've achieved here --

25  indeed, if it was even what we have achieved here, probably --

1    the defendants are going to appeal.  And not only is that going

2    to be years in the court of appeals, but it is potentially going

3    to be an additional couple of years in the United States Supreme

4    Court, given the importance of these issues.  And then you also

5    face the realistic risk that the appellate courts do not finally

6    render judgment, but they modify some of the standards or look

7    at things differently and send it back for either

8    reconsideration or perhaps for an entirely new trial.

9          So I think that in terms of balancing going forward and

10   seeking more as opposed to taking what we've achieved, I think

11   you have to look at not only what the likelihood of success is

12   ultimately down the road but also sort of the time value of

13   injunctive relief as well.

14         THE COURT:  All right.  Let's do this.  We've been on

15   for about an hour and 40 minutes or so.  I'm going to take our

16   midmorning break.  I would suggest everyone just keep your Zoom

17   call active.  Maybe stop video or mute at a minimum.  But we'll

18   resume in about ten minutes.  All right?

19         MR. BOIES:  Thank you.  Thank you, Your Honor.

20         THE COURT:  Thank you.

21      (Recess at 10:41 a.m. until 11:11 a.m.)

22         THE COURT:  All right, folks.  I had to take care of

23   one thing in chambers.  Apologize for the delay.  A little

24   longer than I thought it would be on our break.  Looks like we

25   have a few people still out.  We have 17 nonvideo participants,

1   but they're coming back on line now.

2            All right.  Mr. Boies.

3            MR. BOIES:  Yes.

4            THE COURT:  Thank you for letting me break during your

5   presentation.

6            MR. BOIES:  Well, thank you, Your Honor.  And it was a

7   timely break, because it gave me an opportunity to reflect on

8   our conversation and maybe to be in a position to sort of

9   summarize where I think we are in terms of our presentation.

10           I think that the Court was asking, in effect, what does

11  the Court need to find with respect to the continuing

12  post-settlement behavior.  And I don't think it's necessary that

13  the Court make a finding that everything going forward is legal.

14  I think, with one qualification, that the right way to look at

15  it is whether the Court believes that there is anything going

16  forward that is clearly illegal.  I think that where there is a

17  doubt as to legality or illegality, then that favors a

18  settlement as long as the settlement is reasonable in terms of

19  advancing the procompetitive justifications and objectives of

20  the antitrust laws.

21           In this particular context, I think there can be no

22  doubt that the new system, the post-settlement system, is

23  substantially more procompetitive than the old system.  The

24  question is whether there's any anticompetitive aspects of the

25  new system that remain.  And I think that if the Court were to

 1   conclude that there clearly were illegal aspects of the new

 2   system that remained, then that would -- that would complicate

 3   what we would have to demonstrate in order to support the

 4   settlement.

 5          However, I think if the Court concludes that the new

 6   system is substantially more procompetitive and that, at most,

 7   there are doubts about some of the aspects of the new system,

 8   that actually counsels in favor of the settlement so long as the

 9   Court believes that the procompetitive aspects of the settlement

10   outweigh any doubts about the anticompetitive aspects that

11   remain.

12          The one qualification that I would say is that even if

13   the Court were to conclude that there were aspects going forward

14   that the Court believed were clearly illegal, I think the Court

15   would still have to make a judgment as to whether this

16   settlement is or is not in the interests of class.  And what the

17   Court does in a class action settlement context is, in effect,

18   try to substitute for the kinds of judgments that an individual

19   client would be making if this were not a class action.  We do

20   have class representatives, but we also have most of the class

21   members absent.  And what the Court is doing is trying to be

22   sure that the interests of those absent class members are

23   protected.

24          If we were just representing an individual client in an

25   antitrust case, that individual client might very well decide

1    that it was in the client's interest to settle even though some

2    aspect of what was going forward would remain illegal.  It has

3    to do with questions of cost, of delay, of putting off what can

4    now be achieved immediately for something that might not be

5    achieved for many years, as well as all of the risks that are

6    inherent in that.

7         So I think that what the Court needs to look at is are

8    there still aspects that have not been resolved by this

9    settlement that are arguably illegal?  How clear is that

10   illegality?  How is it balanced against what we have -- what we

11   are achieving?  And also, how do you take into account the delay

12   factor?  And for the reasons that I've indicated, I think all

13   those factors favor this settlement, but I think those are all

14   legitimate questions that the Court needs to consider.

15        THE COURT:  All right.  Thank you.

16        MR. COOPER:  David -- David, this is Chuck Cooper.

17   With your permission and the Court's permission, may I offer a

18   very quick supplement to your advice?

19        MR. BOIES:  Yes.

20        MR. COOPER:  Your Honor, I think I would call your

21   attention to the *Swaney* decision, because I think the Court

22   really did capture the governing standard for how you kind of

23   walk the fine line as you both very carefully examine the

24   settlement but, at the same time, don't -- don't succumb to the

25   temptation to make this some kind of minitrial.  And there, Your

 1   Honor, you said, the Court must be exacting and thorough in

 2   analyzing whether the settlement is in the best interests of the

 3   class members.  But you continued, the Court may not resolve

 4   contested issues of fact or law but, instead, is concerned with

 5   the overall fairness, reasonableness, and adequacy of the

 6   proposed settlement as compared to the alternative of

 7   litigation.

 8            That seems to me to capture it, you know, very

 9   concisely and is certainly consistent with what David has been

10   saying.

11            The only other point I would add is that the *Liberty*

12   *National* decision, which we have cited both in the slides here

13   and also in our hard-copy papers before you, the court examines

14   this very question at great length and identifies a number of

15   authorities that essentially support the same proposition

16   outlined in your -- in your *Swaney* decision.

17            Finally, it's worth, I think, recalling that in your

18   decision to certify the per se ruling, the standard of review

19   ruling to the Eleventh Circuit -- and by the way, we did derive

20   a lot of encouragement from the Court's decision not to take

21   that case, perhaps even more encouragement than we're really

22   entitled to.  But you did conclude that the -- that the

23   requirement under 1292(b) that there be substantial ground for

24   difference of opinion was satisfied in that case.

25            So I -- so thank you for that -- for indulging that.  I

1    just wanted to make those additional points.  David, thank you.

2          And thank you, Your Honor.

3          MR. BOIES:  Thank you, Chuck.  I think that was very

4    helpful.

5          The next factor, the 23(e)(2)(C)(ii) factor, is the

6    effectiveness of any proposed method of distribution relief to

7    the class.  That is something that will be dealt with in the

8    presentation of the distribution plan, so I won't spend a lot of

9    time on that issue.

10          The next issue is the Rule 23(e)(2)(C)(iii) issue of

11    the terms -- relating to the terms of the proposed attorney fee

12    award and the timing of payment.  And as the Court is aware, the

13    combined fee and expense award will not exceed 25 percent of

14    common fund plus $7 million from the notice and administration

15    fund to reimburse plaintiffs' counsel's actual and reasonable

16    fees and expenses incurred for notice and administration.

17          As the Court is aware -- in fact, the Court has stated

18    that in determining an award of attorney's fees in a

19    percentage-of-fund class settlement case, a benchmark percentage

20    is 25 percent, which is the dead center of the 20 to 30 percent

21    range.  We anticipate seeking attorney's fees that will amount

22    to slightly less than the 25 percent benchmark percentage and to

23    support that request.  And obviously, the Court will make its

24    decision at that time.

25          THE COURT:  I think the parties have told me

```
1   this during the course of the negotiations and the mediation,

2   but to put it on the record here, it is true that subscribers

3   and the Blues completely negotiated a complete and finite list

4   of terms for the settlement of their clients' claims before

5   turning any attention or having any discussions about attorney's

6   fees going to putative class counsel.  Is that true?

7             MR. BOIES:  Yes.  Yes, Your Honor.  That is true, as is

8   I think confirmed by the special master --

9             THE COURT:  Right.

10            MR. BOIES:  -- who was supervising that.

11            THE COURT:  And I supervised that.  Because I told you

12  as you go through, this is what I expect will occur.

13            MR. BOIES:  Yes, you did.  You -- you did that, and he

14  made sure that we -- we applied that.

15            THE COURT:  All right.  Thank you.

16            MR. BOIES:  And the only other aspect is that within 31

17  days of preliminary approval, there will be a partial award of

18  $75 million to cover attorney's fees and expenses.  And that, in

19  terms of a percentage, is a relatively small percentage of what

20  may be the ultimate settlement award on the attorney's fees and

21  expenses but would remain consistent with what other courts

22  have done.  But again, the Court will make its decision on

23  attorney's fees based on the submissions after those are made.

24            THE COURT:  All right.  Let me -- before we get too

25  far, I want to backtrack just for a second to the injunctive
```

 1  relief.  And I want to make sure I understand a couple of things
 2  about the injunctive relief.
 3        I still wonder if I have to make some determination.
 4  And I realize it's not going to be the determination that would
 5  be made at the conclusion of full-blown litigation, even trial
 6  on the merits.  But I have to satisfy myself, because of the
 7  public interest in making sure that the Court does not approve
 8  something that is illegal going forward, that, first, the
 9  conduct and the structure that's put in place by the settlement
10  would not amount to the type of aggregation of a per se
11  violation of the Sherman Act.  I think that's pretty clear.  I
12  don't think -- I think that's unassailable.  The Court could not
13  approve a settlement that the effect of which would be an
14  aggregation of practices or agreements by the Blues that are per
15  se unreasonable under the Act.  Okay?
16        The second question is under a rule of reason, how does
17  the Court go about factoring in at the settlement stage some
18  satisfaction that enough procompetitive benefits come out of the
19  new structure and the new business practices, the new
20  agreements, as modified by the settlement, such that it would
21  appear that procompetitive benefits outweigh anticompetitive
22  benefits?  I want to steer you back to that question in
23  particular.
24        MR. BOIES:  Sure.  I think the way the Court phrased it
25  at the end is exactly right.  What the Court needs to be

1   satisfied is that the procompetitive benefits outweigh any

2   anticompetitive benefits or results, any anticompetitive

3   results.

4         And let me -- let me distinguish between two things.

5   One is what I think the Court can easily find and, two, what I

6   think the Court needs to find, because I think what -- what the

7   Court needs to find is less than what the Court can easily find.

8         I think the Court can easily find that the new system,

9   the competitive relief --

10      (Videoconference interference)

11        MR. BOIES:  I think the Court can find that it would

12  not have made its per se decision in the face of the

13  procompetitive injunctive relief that has been proposed or, put

14  differently, that if the world that the Court had been

15  confronted with at the time of its decision was the

16  post-settlement world, the Court would not have found that to

17  have been per se unlawful.  I think the Court can also easily

18  find that the procompetitive benefits of the settlement

19  substantially outweigh any remaining anticompetitive elements of

20  the system.

21        I think the Court can also easily find that there are

22  no potentially anticompetitive aspects of the system that are

23  clearly illegal, which I think is the standard.  I think even if

24  the Court thought that there were some aspects, I think the

25  Court could also find that the procompetitive aspects and

1  avoiding the delay of implementing the procompetitive aspects

2  substantially outweighed any continuing anticompetitive element.

3          Now, I think that in terms of what the Court needs to

4  find, I think all the Court needs to find is that the

5  procompetitive aspects of the settlement outweigh any

6  anticompetitive aspects that the Court might find or that

7  somebody might argue exist.

8          I think with respect to the injunctive relief, it's

9  also worth remembering that no one is bound to this injunctive

10  relief if they want to continue to argue that there are

11  anticompetitive aspects that are illegal and ought to be

12  changed.  Everybody is going to be given notice.  Everybody is

13  going to have an opportunity to opt out.  And so anyone who has

14  a view that there are clearly illegal aspects that need to be

15  pursued has an opportunity to do that.

16          That doesn't mean that the Court doesn't have to make

17  the analysis that we've just gone through.  I think the Court

18  does.  But I think part of that analysis is a recognition that

19  if somebody wants to pursue injunctive relief, they have the --

20  they have the opportunity to do so.

21          THE COURT:  And they have the opportunity to object if

22  they disagree with your analysis of that; correct?

23          MR. BOIES:  Yes, sir.  And that -- and they have an

24  opportunity to do that and present it to the Court and the Court

25  can then make a decision, if there are such -- such objections.

1    But --

2            THE COURT:  Of course, what I'd want to do is I want to

3    front-load, as I've indicated, information so that we're not

4    waiting around to see -- that doesn't mean we won't give full --

5    a full ear and full hearing to those who want to come along and

6    disagree with any preliminary approval and/or position you've

7    taken or the Blues have taken or others have taken.

8            MR. BOIES:  Right.

9            THE COURT:  But it does mean that I'd like to make sure

10   that we look at that issue carefully before we send out notice.

11           MR. BOIES:  Right.  And we -- that is exactly what

12   we've been trying to do in the presentation because we believe

13   very strongly that this settlement is very procompetitive, that

14   it will make very substantial changes in the competitive

15   landscape to the benefit of consumers.  And that's something

16   that I think there is agreement on in terms of both the

17   plaintiffs and the defendants here.  Both the plaintiffs and the

18   defendants believe that this is a very big step in terms of

19   changing the competitive landscape.

20           And I think we also are in agreement that whatever

21   remaining issues exist are going to be hotly contested.  They

22   are going to be subject to very substantial litigation risk,

23   they are not going to be susceptible of resolution for years,

24   and that if -- and I emphasize the word "if" -- if there is

25   anything remaining in the system that is illegal, it is not

1  clearly so, and any such effects are overwhelmed by the

2  procompetitive effects of the settlement that has been achieved.

3          THE COURT:  All right.  Well, this is I think maybe an

4  appropriate time to wake up our providers' counsel and maybe

5  some of our Blues.

6          Mr. Boies, what do you say the effect of this

7  settlement would be on the providers' claims?

8          MR. BOIES:  We don't believe that this has any effect

9  on the providers' claims.  The providers are not parties to the

10  settlement.  They did not participate in the settlement.  And

11  our view is that this has no effect on their case.

12          THE COURT:  All right.  How about from the Blues'

13  standpoint?  Mr. Zott or Mr. Laytin, agree with that

14  characterization?

15          MR. ZOTT:  Yes.  Your Honor, David Zott on behalf of

16  the Association.  Yeah.  We agree that it does not impact the

17  provider claims in their capacity as providers.

18          THE COURT:  All right.  Mr. Issacharoff, are you

19  speaking for the providers?

20          MR. ISSACHAROFF:  I believe that Mr. Whatley is

21  speaking first and then I will follow.

22          THE COURT:  All right.  Fair enough.

23          MR. WHATLEY:  Judge, this is Joe Whatley.  And we agree

24  that this settlement -- we're not parties to the settlement.

25  This settlement has no impact at all on our claims, and our

 1  claims are proceeding forward in the litigation process at this

 2  point.  In fact, we had three expert depositions of the

 3  defendants' class certification experts last week, so things are

 4  moving forward consistent with your schedule.

 5          And with that, I'll turn it over to Professor

 6  Issacharoff.

 7          THE COURT:  All right.  Thank you.

 8          MR. ISSACHAROFF:  Your Honor, first of all, let me

 9  apologize that I am a little late to the game.  I was brought in

10  in light of the November 30th filing, so I don't have the

11  extreme familiarity with the case that obviously the Court does

12  and the --

13          THE COURT:  Well, having known you for years, I think

14  you're probably pretty up to speed.

15          MR. ISSACHAROFF:  Okay.  Well, thank you.

16          THE COURT:  That was intended to be a compliment.

17          MR. ISSACHAROFF:  It was taken that way, whether

18  merited or not.

19          So I came in on November 30th, roughly, with the filing

20  of two documents that are of interest to us.  One is the first

21  amended complaint, which brought in a group of employers, some

22  of whom are also providers in this case, so it altered the

23  dynamic within our client population.  I am not going to speak

24  to that.  If the Court has questions about that, I believe

25  Ms. Kallas is in the best position for that.

```
1              But the other problem from our perspective has to do

2     with the relationship of this settlement to the rule of reason

3     versus per se standard of review opinion of this Court.

4              As the Court will remember, the original filing on

5     November 30th included a paragraph 21 called standard of review,

6     which provided that the Court's opinion and the accompanying

7     order are hereby vacated.  The Court finds that its prior

8     opinion and order no longer apply to the Blues system, as

9     revised by the settlement agreement.

10             I appreciate the assurance from Mr. Boies and Mr. Zott

11    that this would have no impact upon the cases of the providers

12    going forward, but that was -- that is inconsistent with any

13    claim that the opinion will be withdrawn.

14             Now, last Thursday --

15             THE COURT:  Well, let me -- let me satisfy you with

16    this.  I'm not withdrawing my standard of review opinion.

17             MR. ISSACHAROFF:  I am aware that -- I was hoping that

18    that would be the position of the Court.  But now the --

19             THE COURT:  Now, having said that, let me also take

20    away with the left hand what I just gave you with the right

21    hand.  I'm not sure my standard of review opinion means anything

22    other than the fact that, again, I determined back in April of

23    2018 that this aggregation of behaviors and agreements

24    constituted a per se violation.  And I was very clear then that

25    I do not speak with any precedential authority, like the
```

1    Eleventh Circuit does.  I certainly don't speak with any type of

2    policy precedential authority like the Supreme Court does.  But

3    having said that, I think the way I look at it is this.  And

4    I -- maybe I'm opening up a can of worms that some people are

5    going to feel uncomfortable with, but I'm just going to put it

6    down where -- as I understand it.

7         There are three buckets of things that the providers

8    are concerned about.  One is proving liability.  The second is

9    getting damages.  And the third is, consistent with what

10   Mr. Boies said in his presentation on the subscribers' side,

11   getting meaningful injunctive relief that will help their

12   clients going forward.

13        I don't see how in the world a settlement on the

14   subscriber side that changes the structure of the Blues going

15   forward affects liability or damages, because if it is

16   implemented after a settlement, then we're -- that will not be

17   any of the issues currently joined in this litigation as relates

18   to liability or damages at the time of trial, anyway.

19        And the providers are going to have to rise or fall on

20   those issues based upon their own merits and should not have

21   to -- I don't think they're going to have to be concerned about

22   any ex post facto settlement by the subscribers and the Blues.

23        As relates to injunctive relief, obviously there is

24   always a possibility of some effect because of changes in a way

25   they would affect the Blues system and the way it functions

 1  post-settlement or markets.  But again, this affects the Blues

 2  system and markets on the subscriber side.  I'm not -- it's

 3  above my pay grade at this point to look into a crystal ball and

 4  say there would not be an effect or there will be an effect on

 5  the injunctive relief the providers might be able to claim going

 6  forward.  But everybody will understand what the new system is

 7  and have an opportunity to address that.  So we'll have the

 8  old-fashioned notice and an opportunity to be heard by the

 9  providers.

10        I don't expect right now that the Blues see this as any

11  type of structural opportunity to say that the system has

12  changed so much that providers, as a matter of logic or law,

13  would be -- have their equitable relief claims affected in any

14  particular way, but the realism is -- the reality is that this

15  is going to bring about some changes in competition among the

16  Blues.  I just don't know enough to say whether that's going to

17  have even a palpable effect on the providers.

18        So Mr. Issacharoff, that might give you a little bit

19  more of a footing at the T box to see how far you want to hit

20  the ball.

21        MR. ISSACHAROFF:  I think that takes care of most of my

22  concerns, Your Honor.  In fact, that is exactly the way I would

23  have framed the issue myself if I had been asked; that is, there

24  is -- on the providers' side, there's the question of liability,

25  and that is based upon past conduct.  And that is unaffected by

1   any kind of structural relief going forward.  On the question of

2   damages, that's, again, backward-looking, and that's not going

3   to be affected here.

4           And the equitable concerns are always subject to

5   revisiting in light of changed circumstances, so it would make

6   no sense for this Court to issue an injunction which doesn't

7   address the structure of the market as it exists post-settlement

8   if the Court approves the settlement that the subscribers are

9   proposing here.

10          So I agree with all of that.  My concern, Your Honor,

11  remains, however, the language of the proposed order that the

12  parties -- proposed settling parties submitted on Thursday.  And

13  although they have taken out the formulation about the

14  withdrawal of the opinion concerning the standard of review,

15  they now say that the Court finds that its memorandum and

16  accompanying order no longer apply to the Blues system, as

17  revised by this settlement agreement.

18          That's a highly ambiguous statement because, in the

19  first instance, it obviously applies to the Blues system,

20  because who else could it apply to?  But more significantly, the

21  modifier after the comma, as revised by the settlement

22  agreement, could be read consistent with what Your Honor just

23  said, which is that there is only an impact regarding potential

24  equitable relief going forward.  But it could also be that it

25  withdraws from us the capacity to continue litigating on the

1   basis of the Court's ruling thus far.

2          And while the Court is clearly correct that this is not

3   the Eleventh Circuit or the Supreme Court, I think the Court is

4   unduly modest, because this opinion sets up the law of the case.

5   And sure, the Court can modify the law of the case -- it has the

6   authority to do that -- but the parties have litigated, prepared

7   their experts, prepared for the various next steps in the

8   proceeding, including the class -- the post class certification

9   on the providers' side based upon that ruling.

10         So it is the ambiguity.  And it almost, to me -- I hate

11  to say this, but it looks like structured ambiguity of the

12  statement in paragraph 21 concerning the Court's proposed order.

13         And if everyone is in agreement with the way Your Honor

14  formulated it, I would just suggest that we will submit to the

15  Court some proposed -- you know, one sentence, two sentences

16  proposed language to modify that to make that clear.  And if

17  that is so, that takes care of our concern at this point.

18         THE COURT:  All right.  I think that's fair.  I'd ask

19  you to share that with Mr. Boies and Mr. Laytin and Zott --

20         MR. ISSACHAROFF:  We will, Your Honor.

21         THE COURT:  -- before you submit it, just to make sure

22  they have -- no reason to protract out responses and replies.

23  Why don't you just give me a joint report from the three sides

24  as to how the Court should address the providers' interests in

25  this preliminary approval order, assuming -- because we're not

1  there yet -- that there is a preliminary approval order.

2          MR. HUME:  Judge, I'm sorry to speak out of turn.  This

3  is Hamish Hume for the subscribers.  I just want to make sure

4  it's clear for the record that the approval order -- the order

5  Professor Issacharoff is referencing is the final approval

6  order, not the preliminary approval order, unless I'm not

7  following the record.  But that's what it appears to me.

8  Paragraph -- he's referring to the paragraph 21 of the proposed

9  final approval order, which, of course, will only be before the

10  Court when we come forward for final approval.

11          THE COURT:  Well, in light of the heightened interest

12  in this issue and I think just to -- because I think everybody

13  is in large agreement about exactly what the effect of

14  preliminary approval would be on the subscribers and the Blues

15  but also the providers, I think it's wise to address it head-on

16  and not have the issue lurking down the road.

17          MR. ISSACHAROFF:  Your Honor, if I may, I -- I stand

18  corrected by Mr. Hume.  He is correct.  That's what I was

19  reading from is the proposed final order.  But I want to

20  reinforce, if I may, what Your Honor just said.  Because of the

21  heightened standards after the 2018 amendments, we would be in a

22  position where we would have to start objecting now if we

23  thought there was any risk at the time of the final order.  And

24  I think it's in the Court's interests and in the interests of

25  the proposed settling parties not to force us into an

 1  oppositional stance prematurely.

 2         THE COURT:  Well, and not only that, but just not to

 3  create -- put the Court in that position prematurely where -- I

 4  think -- again, I don't -- I don't think this is Antitrust 401.

 5  I think it's Antitrust 101 that you can't have an effect on the

 6  system that was challenged and joined by the pleadings and dealt

 7  with by the Court on summary judgment as to liability or any

 8  potential damages claim based upon those pleadings that would go

 9  to trial, based upon any conduct that occurs after the fact,

10  whether it's unilateral conduct like, for example, the Blues

11  voluntarily remit and change their system in some way;

12  legislative conduct, which is clearly on the table with the

13  respective political actors' views on health care going forward;

14  or a settlement between the other track and the defendant.

15  Okay?

16         So this -- everybody else has the ability to unmute.  I

17  think Mr. Issacharoff and I are on the same page, I understand

18  that Mr. Zott and Mr. Laytin and I are on the same page, and I

19  think Mr. Boies and I are on the same page.  Anybody else not on

20  that page?

21         MR. ZOTT:  Your Honor, it's -- let me -- it's David

22  Zott.  Let me jump in just for a second.  And I don't want to

23  create any issues that we don't need to have today.  But when I

24  answered, just to be clear, your earlier question about whether

25  this settlement would impact the provider claims as providers,

 1  I'm thinking about it really in terms of we're not purporting to

 2  release any of their claims, and they've got every ability to

 3  assert those claims and to bring them.  And that's really the

 4  context in which I was addressing it.

 5          You then set up a rubric of, you know, liability

 6  damages and injunctive relief.  Your Honor has also, I think,

 7  correctly noted -- and I don't think there's any dispute -- that

 8  in order to approve -- finally approve the settlement, you would

 9  need to conclude that the system going forward with these

10  changes is not per se unlawful, because otherwise, you couldn't

11  approve it.  I don't think anyone questions that.

12          At that point, I think you're in a rule-of-reason world

13  to address the system going forward.  And I do think that that

14  would have an impact on the injunctive relief, for example, that

15  the providers would seek going forward.  And I think Your Honor

16  said that's not an issue you need to worry about today.  And

17  that's fine.  I think that is an issue we can address down the

18  line, but we wanted it to be clear that we do think, in that

19  respect, there would be an impact.

20          I will also tell Your Honor that we are going to at

21  some point -- and I know you won't be surprised by this.  We're

22  going to ask the Court to take another look at the per se ruling

23  as it applies to the providers and as it applies to their

24  claims, based, for example, on the standing arguments that we

25  think will come up, based on -- you know, we talked about the

 1   *American Express* decision and the two-sided market issue.

 2   That's all going to happen.  And I don't want in any way to be

 3   thought of as waiving, you know, any of those arguments.  My

 4   only point today is we're not --

 5            THE COURT:  I don't think you're waiving any of those

 6   arguments.  But again, I think that's putting the cart before

 7   the horse.  Based upon -- you're -- if you do that, it would not

 8   be based upon the contents of this settlement.  It would be

 9   based upon the essentially de facto decoupling of the two tracks

10   where you would say that the providers' track is distinguishable

11   in some way from the subscribers' in a way that we've not yet

12   addressed or litigated and the Court hasn't spoken to.  So in

13   other words, if the subscribers had voluntarily dismissed their

14   action or there had been legislation or some other action that

15   mooted their action.

16            And that's a weird, absurd hypothetical.  I can't

17   imagine there would be any such action that would moot their

18   action.  But the point is it's not the settlement that you're

19   relying upon, the new structure of the settlement that addresses

20   the per se issue or liability or even damages.  It is your

21   argument on the merits as it relates to the providers that the

22   Court's ruling needs to be revisited because it was not

23   provider-centric; right?

24            MR. ZOTT:  I think -- I think in the main, that's

25   right, Judge, in the sense that once the tracks are uncoupled,

```
1   there could be arguments we have that we never made before that
2   would then be ripe to be made at that point.  And that's not --
3   they're not arguments we're making today.  We're going to think
4   more about them, because we always want to come before Your
5   Honor with, you know, arguments that we think are the best
6   possible arguments.
7           THE COURT:  And something tells me that Ms. Kallas and
8   Mr. Whatley will have a counterpunch for each one of those
9   arguments.
10          MR. ZOTT:  I have no doubt about that, Your Honor.
11          MR. WHATLEY:  Judge, you can guarantee that that will
12  be true.  And I think the point for today, Judge, is, as you
13  stated, this is a subscriber settlement and, approval or not,
14  cannot have any effect on the provider claims, just as I think
15  everybody said.  And so I think that's the key point.
16          And it also applies to the standard of review.  If they
17  want to raise issues about the standard of review based -- at
18  some point for injunctive relief or ask you to revisit
19  something, we'll be -- we'll be glad to respond to that, and we
20  will.  But we don't think anything that they're saying could
21  possibly change things.
22          THE COURT:  All right.  I think we have -- I will ask
23  that the parties provide the Court a joint report which
24  addresses this question in the eventuality there is an order to
25  be entered on the preliminary approval.
```

```
 1              MR. WHATLEY:  Thank you, Judge.

 2              THE COURT:  And I say that not to give anybody a heart

 3    attack, but just because I'm neutral until I can make -- I'm in

 4    a position to make the decision.  And we're not -- I wouldn't

 5    have oral argument just to waste everybody's time.  I want to

 6    hear through and listen to each of you in your presentations --

 7    and some of you we haven't gotten to yet -- before I make a

 8    decision.  Okay?

 9              All right.  I'm not sure.  I think I hijacked

10    somebody's presentation.  We'll head back to that.

11              MR. BOIES:  Okay.

12              We were talking about the fairness and reasonableness

13    of the settlement, and I was going to turn to 23(e)(2)(C)(iv) --

14    and it's at chart 49 -- which asks the Court to consider any

15    agreement required to be identified under Rule 23(e)(3).  And

16    all agreements covered are set forth in the settlement agreement

17    and the in camera supplement, which, as the Court knows,

18    addresses only rescission matters relating to the opt-out

19    threshold.

20              With respect to Rule 23(e)(2)(D), it requires that the

21    proposal treats class members equitably relative to each other.

22    The allocation first between fully insured class members and

23    self-funded class members was prepared by both class counsel and

24    the self-funded subclass counsel.  It was prepared with the

25    assistance of economic experts.  It was negotiated at arm's
```

 1  length under the auspices of the allocation mediator, Ken

 2  Feinberg, who, as the Court knows, is one of the country's

 3  leading mediators and administrators.

 4          THE COURT:  How involved was Mr. Feinberg in the

 5  details of the distribution plan?  Did he -- I realize both

 6  parties probably advocated positions about distribution.  The

 7  plaintiffs, undoubtedly, would have had some ideas about

 8  distribution they presented to him.  But how would you

 9  characterize his involvement in what turned out to be the

10  ultimate proposal on distribution?

11          MR. BOIES:  I think that -- I think his personal

12  involvement was more extensive with respect to the allocation

13  between the fully insured and the self-funded than it was with

14  respect to the other aspects of the plan of distribution.  But

15  he was extensively involved in all aspects of the plan of

16  distribution, including having access to the expert data that

17  had been prepared and the various views of counsel and having an

18  opportunity to make an independent judgment about the

19  reasonableness of it.

20          THE COURT:  Knowing Mr. Feinberg as I think I do, I

21  take it that you understand that if he had an issue with even

22  the general principles of distribution, he would probably speak

23  up.

24          MR. BOIES:  Yes.  I -- I have -- I've also known

25  Mr. Feinberg a number of years, and I've never known him to be

1    anything other than what's charitably described as direct.  He

2    does not filter his -- his views.  So we -- and he did have

3    some -- he did have some views that we -- that we were -- had to

4    take into account in arriving at the final plan.

5         THE COURT:  All right.

6         MR. BOIES:  The --

7         THE COURT:  Well, is this a good -- is this a good time

8    to raise some questions that I might have about the ASOs?

9         MR. BOIES:  Yes.

10        THE COURT:  All right.  So take me through -- again,

11   for the record, I think I understand some of this, but take me

12   through the advent of this additional subclass of ASOs and how

13   those negotiations went.  And then I may have some questions for

14   Mr. Burns, who I think is speaking on behalf of the ASOs.

15        MR. BOIES:  Right.  As the Court will recall, our

16   initial complaint did not include ASOs.  In conjunction with the

17   settlement discussions, there -- there came a time when it

18   became apparent that in order to have a settlement, it would be

19   desirable to include the ASOs, both from the standpoint of

20   defendants in the sense that they would have a greater degree of

21   resolution, but also from the plaintiffs' standpoint because it

22   would involve an opportunity for greater injunctive relief and

23   greater damages, both of which it was clear we could achieve if

24   we included the so-called ASOs.

25        At that point, we expanded the class representation to

1    include a subclass -- a class representative and subclass

2    representative from an ASO.  And Warren Burns was brought in as

3    self-funded subclass settlement counsel and the ASO class

4    representative.  And Mr. Burns and his firm were involved

5    intimately in the negotiations that went forward to arrive at

6    the final injunctive relief and the final settlement amount.

7            They then really were completely involved in the

8    discussions as to the allocation of the settlement amount among

9    the self-funded and fully insured groups.  We had experts,

10   independent experts, who looked at the settlement class amounts

11   and looked at the data with respect to the settlement class

12   participants.  Mr. Burns from Hibbett had independent experts to

13   look at that issue.

14           The -- we had originally proposed a range of allocation

15   of 3.4 percent to 6.8 percent based on our expert's analysis in

16   terms of how much of the settlement fund would be allocated to

17   the ASO clients.  The self-funded subclass settlement counsel,

18   based on their expert analysis, came back with a range of 7.6

19   percent to 16 percent.  All of this was reviewed

20   contemporaneously with Mr. Feinberg, and there were

21   back-and-forth negotiations and a -- including recommendations

22   from Mr. Feinberg, and we ultimately settled at an allocation of

23   6.5 percent of the net settlement fund going to the self-funded

24   subclass.

25           I think, as reflected in what the Court has seen as

1  well as what the special master has seen, self-funded subclass

2  settlement counsel has not -- I would not say adequately because

3  I think adequately understates it -- but has very effectively

4  represented the interests of the ASOs in terms of how the relief

5  is structured, both in terms of injunctive relief and in terms

6  of -- in terms of monetary relief.

7          THE COURT:  All right.  Thank you.

8          Mr. Burns?

9          MR. BURNS:  Good afternoon, Your Honor.

10         THE COURT:  So walk me through your evaluation and

11  analysis of this issue, starting with whether you've had

12  sufficient time and information to evaluate it and agree to this

13  settlement.

14         MR. BURNS:  Absolutely, Your Honor.

15         So I was first invited, if you will, into the case or

16  approached by Mr. Boies and Mr. Hausfeld probably about July of

17  2019.  And given my experience in antitrust cases around the

18  country, this was an area that was of significant interest to me

19  and, having been retained by Hibbett, ultimately, as we entered

20  into the litigation, became apparent that this was an area that

21  we thought we could have an impactful role in and we would be

22  able to devote significant interest and time into.

23         From the beginning, as I think Mr. Boies just

24  explained, we really approached the case from two perspectives.

25  So on the one hand, we took a very significant role in

1   negotiating the final elements of the term sheet and settlement

2   with the Blues on behalf of the ASO class that we sought to

3   represent.  I was very fortunate in this regard to have been

4   retained by Hibbett's and to work closely with its general

5   counsel, who had significant experience as an ASO and

6   significant experience in contracting for these types of

7   services.

8          But I can say -- and I'm very proud of this -- that at

9   several key -- with respect to several key aspects of the

10  settlement, I think we made a meaningful difference in those

11  negotiations.  We were very involved in discussions and

12  negotiations around the relief that would be given to the

13  Appendix C ASOs.  I think we made a meaningful impact there.  We

14  also played a very significant role in negotiations around the

15  broader injunctive relief and how that would look.  And I think

16  that, you know, ultimately, we were successful, along with

17  subscriber counsel, in negotiating a settlement that's going to

18  benefit the ASOs as a whole.

19         At the same time, obviously, when we entered, looming

20  in the background was this issue of how would the settlement be

21  allocated between the two classes.  And so also at the same

22  time, we devoted a lot of resources to looking at this issue.  I

23  think someone referred to this as a bit like drinking water from

24  a fire hose.  This may be overused but somewhat true.

25         We jumped into this.  There was obviously, you know, a

 1  great deal of discovery that had taken place before we entered.

 2  We very quickly, at my firm, devoted significant resources.  At

 3  any given time, I had probably six or seven people working on

 4  this file to get a grasp of that -- of that discovery, what had

 5  been taken so far.  We then negotiated with the Blues for

 6  additional discovery where we thought we needed it, and that was

 7  useful for both our negotiations with respect to the settlement

 8  as a whole and the allocation.

 9        Also, within a couple weeks of becoming involved in

10  these negotiations, I reached out and retained BVA Group, led by

11  Professor Joe Mason -- he's a chaired professor at LSU and a

12  working fellow with significant experience in antitrust and

13  other complex markets -- to help us evaluate not only the issues

14  relating to the settlement, but also as to allocation.

15        I can say -- and Mr. Boies certainly discussed this as

16  well -- that negotiations over the allocation, in particular,

17  were -- "hard fought" is probably not the right term in the

18  sense that it was collegial and we certainly approached it with

19  the interests of our classes at heart.  But that occurred over

20  several months.  We spent a significant amount of time working

21  with our experts to determine what we thought would be an

22  appropriate range to advocate on behalf of the ASO class.  I

23  think that ultimately we arrived at a number that's probably not

24  perfect for either side but, under all the circumstances of the

25  case, is certainly fair and reasonable for the ASO class.

```
 1          We were assisted, obviously, with the help of
 2  Mr. Feinberg, who really dug deep and worked closely with the
 3  parties.  We had in-person mediations as well as Zoom and phone
 4  mediations with him as well over the course of several months
 5  before arriving at that figure.  So in all aspects, we were very
 6  involved.  And I think that the work we've done has made a
 7  meaningful difference in the settlement and for the class we
 8  seek to represent.
 9          And I would conclude, Your Honor, by saying we're proud
10  of it.  We're proud of this work.  And that's very true for the
11  class rep as well.  I think that Hibbett Sports has done a
12  fantastic job of representing the class that we seek to
13  represent, and it's been very meaningfully involved along the
14  way.
15          THE COURT:  Well, I've known your client's general
16  counsel for quite some time and have a lot of regard for
17  Mr. Benck.
18          MR. BURNS:  He has been a great partner in this
19  litigation, Your Honor, probably the closest relationship I've
20  ever had with a class representative in any case I've ever
21  litigated.
22          THE COURT:  All right.  Thank you for that.
23          MR. BURNS:  Thank you, Your Honor.
24          THE COURT:  Last question for you, Mr. Burns, though.
25  You did have -- I realize it was a fire hydrant.  And believe
```

1  me, Judge Putnam and I certainly appreciate that analogy.  But

2  you will represent to the Court that you had sufficient time to

3  work your way through the litigation that occurred before you

4  entered the case, familiarize yourself with how it affected the

5  ASOs, and make reasoned, informed judgments based on all that?

6          MR. BURNS:  Absolutely.  Your Honor, I will actually

7  thank both the Blues and the subscribers for facilitating those

8  efforts.  We had access from day one not only to all the

9  pleadings into the case but to the discovery database, which I'm

10 sure the Court is well aware is extensive.  We very quickly dug

11 into that and were able to draw our own conclusions and, you

12 know, oftentimes spot things that hadn't really been a focus

13 before but pull those out and work with the Blues to develop

14 additional information.

15          THE COURT:  Fair enough.

16          All right.  Anyone else want to be heard on the ASO

17 issue?

18          All right.  Fair enough.

19          MR. BURNS:  Thank you, Your Honor.

20          THE COURT:  Mr. Boies, back to you.

21          MR. BOIES:  Thank you, Your Honor.

22          And we were talking about 23(e)(2)(D).  And with

23 respect to the plan of distribution within the fully insured and

24 self-funded groups -- that is, how do you allocate within those

25 two groups -- that is basically done on a pro rata basis, which

1    is widely recognized as an appropriate and equitable approach

2    (unintelligible) antitrust case settlements.  And it does

3    provide for various opportunities for individuals who believe

4    that, for some reason, that pro rata does not work exactly

5    fairly for them to, you know, seek an adjustment.  So I think

6    that the proposal is extremely equal and equitable to the

7    various -- various participants in terms of employers and

8    employees and how the funds get allocated there.

9         At this point, I would turn briefly to the *Bennett*

10   factors, the first and fourth *Bennett* factors, likelihood of

11   success at trial and the complexity, expense, and duration of

12   the litigation.  We've already addressed those in the 23(e)(2)

13   context.  We think they both support approval, but we've given

14   the Court details on that.

15       (Videoconference interference)

16       MR. BOIES:  Rule 23(d)(2) analysis.

17       The second and third *Bennett* factors, as courts have

18   recognized, are normally considered together because they really

19   are parts of the same coin.  And in this context, what the Court

20   is looking at is what the possible range of recovery is and then

21   where, within that range, does the settlement lie.  And,

22   obviously, the likelihood of recovery is affected by the risk

23   and the delay, those risk factors we've already talked about.

24       As Mr. Hausfeld previously indicated, the plaintiffs'

25   expert estimated a maximum potential single damages at

 1    approximately 18 to $36 billion.  The recovery --

 2        (Videoconference interference)

 3            THE COURT:  If you could pull a little closer to your

 4    mike -- your laptop, Mr. Boies.  You're --

 5            MR. BOIES:  I apologize, Your Honor.  Can you hear me

 6    better now?

 7            THE COURT:  Yes.  Thank you.

 8            MR. BOIES:  I think I put some papers on the laptop,

 9    which I think was interfering a little bit.  I apologize.

10            The recovery that we have achieved is somewhere in

11    between seven and 14 percent of that, which falls well within

12    the range of reasonable recoveries that have been recognized in

13    other cases and would be above a number of those recoveries.

14            And obviously, what we claim as our damages doesn't

15    control what is ultimately found to be the damages.  And there

16    are a number of risks that exist in terms of proof of damages.

17    One of them -- one of the difficulties of calculating damages

18    here is that unlike the usual case where you have -- and chart

19    45 really doesn't have anything to do with what I'm talking

20    about here.

21            The usual case in an antitrust private case is you've

22    got something like price-fixing and the like that directly

23    affects prices.  And in that context, it's hard enough to

24    calculate damages and to -- and to prove damages.  But here the

25    monetary damages are particularly difficult to prove because it

1    requires you to construct a but-for world in which the

2    competitive constraint is eliminated.  The elimination of that

3    competitive constraint then involves entry, and that entry then

4    affects prices.

5            And there are obviously hotly disputed factual and

6    expert issues with respect to each step in that chain.  Even if

7    you assume that the restraints, the territorial restraints, are

8    anticompetitive, there is a question as to if you eliminate

9    those, what is the effect on entry.

10           And second -- and maybe even more of an issue in terms

11   of damages, there is a real question as to how much does the

12   entry of another competitor change the pricing.  It may very

13   well offer alternative products and services, which obviously is

14   a competitive benefit and a benefit to the consumer.  But how

15   much of that is actually -- actually a price change or something

16   that can be quantified in order to achieve a damage recovery is

17   something that, in this context, is certainly going to be

18   subject to a lot of dispute and substantial -- substantial risks

19   at trial so that the -- I think that the recovery, which is --

20   is, in itself, one of the largest recoveries ever in a case that

21   was not a follow-on to or related to a government investigation,

22   I think is particularly remarkable given the issues that had to

23   be addressed in order to achieve any kind of damage result.

24           The -- and I want to talk about -- these factors affect

25   not only monetary relief but affect injunctive relief as well,

1    but I want to leave the injunctive relief until we finish with

2    the damages issue.

3         The fifth *Bennett* factor is the substance and amount of

4    any opposition.  Now, we do not have any formal objection or

5    opposition.  However, as the Court is aware, counsel for three

6    former class representatives has filed a response to our motion

7    for preliminary approval explaining that his -- that their

8    clients would not provide their consent to the settlement

9    without more information.  We're hopeful that as they see the

10   additional information, they will be comfortable with that

11   information.  But in anticipation of what they might say and

12   because we know that the Court needs to, as much as possible,

13   look down the road in terms of deciding a motion for preliminary

14   approval, we want to address, you know, some of those issues

15   now.

16        For example, the big picture with respect to subclasses

17   and plans of allocation, which are the areas that are raised,

18   is -- you know, comes from the fact that there's a requirement

19   that any proposal for settlement treat class members equitably

20   and reasonably.

21        The basic fact for both liability and damages purposes

22   in this case is that the underlying claim here is the Blues'

23   uniform nationwide agreement to restrict competition was

24   unlawful.  That agreement restricted competition through

25   identical means in each state.  Each Blue plan signed

1    essentially an identical agreement.  And that affected every

2    member of our class.  It affected ASOs, it affected

3    self-insureds, it affected all of the people in each of those

4    groups that were affected by it.  So you begin with the fact

5    that this is a uniform nationwide agreement and it is

6    restricting competition nationally through identical means.

7         Now, subclasses are required only when there is an

8    actual and fundamental conflict within the class.  Mere

9    differences in the strength of claims among class members do not

10   require a subclass.  And uniform class settlements with pro rata

11   distributions are commonly approved.  And they're commonly

12   approved in cases where there are obviously differences.  There

13   are, in some senses, differences among every member of the

14   class.  And if those differences predominate, then a class is

15   not appropriate.  But where the uniform and common elements

16   predominate, a class is appropriate even if there are -- even if

17   there are differences.

18        And in terms of how you allocate settlement damages,

19   what courts have repeatedly held is that there's not a

20   requirement for precision.  You know, in a large class action --

21   quoting from the *PaineWebber* case, in the case of a large class

22   action, the apportionment of a settlement can never be tailored

23   to the rights of each plaintiff with mathematical precision.

24   And quoting from *Hart against RCI Hospital Holdings*, a plan of

25   allocation need not be perfect.  Rather an allocation formula

 1  need only to have a reasonable, rational basis, particularly if

 2  recommended by experienced and competent class counsel.

 3        And what experienced and competent class counsel

 4  frequently recommend and courts frequently approve are pro rata

 5  distributions.  As the court in *In Re:  Payment Card Interchange*

 6  *Fee and Merchant Discount Antitrust Litigation* noted, courts

 7  frequently approve plans involving pro rata distribution.

 8        And on chart 64, we provide a list of some examples of

 9  that, which is -- which is what we have done.  *In Re:  Insurance*

10  *Brokerage Antitrust Litigation*, a Third Circuit opinion that I

11  think is worth noting, the Third Circuit there -- and we've got

12  a quote from it on chart 65.  The Third Circuit affirmed the

13  trial court's pro rata allocation scheme, dismissing claims that

14  subclasses should have been required.  And it held, quote, even

15  if some potential benefits may have been realized from utilizing

16  subclasses, it is not at all clear that the advantages would

17  have outweighed the disadvantages.  And, therefore, it is

18  difficult to say that the district court abused its discretion

19  by not taking this step.

20        And the court later went on to say, quote, differences

21  in settlement value do not, without more, demonstrate

22  conflicting or antagonistic interests within the class.  And

23  that's from a Third Circuit's *In Re:  Pet Food Products*

24  *Liability Litigation* decision.

25        And here, of course, the disadvantages of trying to do

1  something other than a basic pro rata allocation would have been

2  enormous.  The cost, the delays, would have been very extensive.

3  And what you would have found is that you would have eaten up a

4  huge portion of the settlement amount just in trying to do all

5  of the analyses and allocations that had to be done.  And even

6  at the end of that, you would still not have had anything that

7  would have been fair or more equitable than a pro rata

8  distribution.

9      THE COURT:  Well, Mr. Boies, you know what comes to

10 mind when I think of Filed Rate Doctrine -- and you probably are

11 too nice to say this.  And that is how -- and I probably

12 shouldn't let anyone peek into the sausage factory here.

13     (Computer sounds)

14     THE COURT:  But Sally had a perfectly good filed-rate

15 opinion prepared for me, and I revised it.  And then I had to go

16 back behind it and say, guys, I think I missed the -- I missed

17 the pitch on that one, so we'll have to revisit that later.

18     It seems to me that one of the points you're making is

19 that there is a lot -- there's still a lot of litigation to

20 occur over filed rate:  to what extent filed rates are actually

21 supervised or examined by the regulators, to what extent they're

22 rubber-stamped, and what the Supreme Court and maybe even the

23 Eleventh Circuit, in the interim, might say about filed rate in

24 a context like this.  Fair?

25     MR. BOIES:  I think that's -- I think that's exactly

1  fair, Your Honor.  And also, as I think the Court recognized,

2  filed rate does not apply to --

3          THE COURT:  Injunctive relief or --

4          MR. BOIES:  -- injunctive relief.

5          THE COURT:  -- liability.

6          MR. BOIES:  It doesn't apply to even groups above 50 in

7  Alabama, for example.  It doesn't apply to ASOs.  It doesn't

8  apply to for-profit entities like a number of the Blues.  And as

9  we argued to the Court, we don't think it applies to the

10 defendants -- the coconspirators who are being kept out of the

11 market because they didn't file the rate.

12          So, you know, for all those reasons as well as the fact

13 that it's very hard to separate out that aspect of the filed

14 rate from the other anticompetitive --

15          THE COURT:  That would involve, if it went to

16 litigation, a lot of hand-by-hand, inch-by-inch combat; right?

17          MR. BOIES:  It would.  It would, Your Honor, and very

18 uncertain.  And the only thing we know at the end of the day is

19 that it would be a very small effect at a very large cost, even

20 if you assumed that the Filed Rate Doctrine turned out to be

21 applicable.

22          THE COURT:  And if you're right on your point that you

23 actually have to file a rate with the appropriate body to take

24 advantage of the Filed Rate Doctrine defense, any coconspirators

25 sued in a particular market, we'd simply have a jury instruction

1 that says, as to the defendant that filed the rate, determine

2 whether or not the Filed Rate Doctrine succeeds; as to the

3 others, disregard the instruction.

4          MR. BOIES:  Exactly, Your Honor.  Exactly, Your Honor.

5          And as the Court is aware, you know, our fundamental

6 argument is that what's happening here is people from outside

7 the exclusive area were agreeing not to come into the exclusive

8 area.  So that those people would have -- would have liability.

9          THE COURT:  And your second argument is they were

10 coerced not to go into certain areas based upon the national

11 best efforts and local best efforts restrictions as well.

12          MR. BOIES:  Yes.  Exactly, Your Honor.  Exactly.

13          THE COURT:  All right.  I think I -- that's the way I

14 was sizing up filed rate.  I just wanted to, again, do the *mea

15 culpa* on the record that -- I think I did some things well in

16 this case.  Addressing your filed-rate issues wasn't one of

17 them, at least at the time.

18          MR. BOIES:  Now, last, I wanted -- I just wanted to

19 return to the issue of the adequacy of the injunctive relief.

20 And in that context, I want to go to chart 54.  And -- actually,

21 I think we covered 54 already.

22          But I do want to go to chart 55, which -- where we have

23 a couple of points from Professor Rubinfeld where he talks about

24 how injunctive relief is likely to generate significant

25 procompetitive effects in the marketplace in the forms of

 1   increased competition and that this can result in increased

 2   output, higher quality services, increased innovation, and lower

 3   insurance premiums, or prices, to subscribers, consumers.

 4          And I think it is significant and, indeed, it's

 5   virtually unprecedented, maybe absolutely unprecedented, that

 6   any such meaningful injunctive relief has been obtained in a

 7   private antitrust action.  And if you look at chart 56, again

 8   Rubinfeld notes that the proposed settlement offers relief that

 9   will provide increased opportunity for competition in the market

10   for national accounts.

11          And if you go to chart 57, this has been recognized by

12   people who have nothing to do with this case, like the insurance

13   commissioner for Washington, who said, this settlement should

14   increase competition, which is great news.  The settlement

15   should put all companies on notice they need to do right by

16   consumers.

17          We also noted at chart 58 a number of other comments by

18   commentators about -- for example, Burns:  While the money that

19   will be paid under the proposed settlement, if approved, is

20   substantial, even when shared among the 36 member Blues, the

21   injunctive relief terms are even more significant, as they have

22   the potential to reshape the state of competition in health

23   insurance markets going forward, closed quote.  That's James

24   Burns, who is the head of the health care antitrust practice at

25   the Ackerman firm and somebody who's not involved in this

1  litigation but is just an outside commentator.  Or Joe Patrice

2  in *Above the Law,* quote, the impact that the injunctive relief

3  will have on the health insurance market should be monumental.

4        If you -- if you look at, just in summary, what the

5  post-settlement market will look like, you see three things.

6  First, the injunctive relief that has been agreed to in the

7  settlement agreement, the proposed settlement agreement, will

8  enable some of the largest health insurance -- insurers in the

9  country to now compete nationally.  That additional competition

10  will offer consumers both new products and lower prices on

11  existing products.  And even if there were no new entry in

12  certain markets, the realistic threat of new entry requires

13  incumbent firms to improve their products and services.

14        Second, by enabling a large number of national accounts

15  to receive two bids from defendants using the Blue trademark and

16  networks, the agreed injunctive relief will increase competition

17  not only for the business of those national accounts, but for

18  all national accounts whose procurements are affected by market

19  prices and product offerings.  So this is benefiting not only

20  the Blues -- the national accounts that get a second Blue bid,

21  it's benefiting everybody.

22        And then third, on something we haven't really talked a

23  lot about today, but one of the injunctive relief provisions

24  prohibits the so-called MFN differentials that have a potential

25  to disadvantage competitors in markets where the Blues really

1   have a controlling share.  And what we've provided in the

2   settlement is that where there is a greater than 45 percent

3   market share, we've limited the ability to enter into MFN

4   differential contracts with providers, which, again, will have,

5   we think, a positive impact in improving competition.

6            I think we have -- we've ordered these three points

7   probably in the order of importance of them.  Certainly, the

8   third one I think is far less important than the first two, but

9   I think they all are something that indicate that this is

10  something that is, you know, potentially going to be of enormous

11  value to consumers.

12           So from our perspective, Your Honor, the settlement is,

13  in the words of the statute, fair and reasonable.  I think in

14  nonstatutory language, we think this is really an historic

15  settlement.  It is historic in terms of the amount of dollars

16  being recovered.  But even more important, it is historic in

17  terms of the injunctive relief that I think we have -- that

18  we've achieved.

19           THE COURT:  All right.  Let me get you to address

20  document 2623, which is Mr. Cowan's response to motion for

21  preliminary approval of proposed class settlement on behalf of

22  Mr. Watts, Ms. Sheridan, and Ms. Dummer.  And I'd like you to

23  address on page 5 the assertion that a lack of standing --

24  there's a lack of standing to dismiss the class claims from

25  states where there is not a class rep who's part of this

1   proposed settlement.

2          MR. BOIES:  Yes.

3          THE COURT:  Can you do that for me?

4          MR. BOIES:  Yes, Your Honor.

5          And as we talked about earlier, this is a national

6   class based on a uniform national agreement to restrict

7   competition implemented in a uniform national way and where the

8   injunctive benefits are going to be national in scope and where

9   the damages are being distributed pro rata.  And under those

10  circumstances, courts have repeatedly held that you don't need

11  to have a representative from each geographical area.

12         And we think that the class representatives, the 67

13  class representatives -- 66 fully insured class representatives

14  that we have are more than adequate to protect the interests of

15  all members of this national class.

16         It's not -- I would respectfully suggest, Mr. Cowan,

17  it's not a question of standing.  It's a question of whether the

18  class representatives are adequate and representative, and we

19  think they are.

20         THE COURT:  All right.

21         MS. JONES:  Your Honor, this is Megan Jones.

22         THE COURT:  Yes.

23         MS. JONES:  If I might add one thing to Mr. Boies's

24  comments?

25         THE COURT:  You may.

```
 1            MS. JONES:  Thank you, Your Honor.

 2            I just wanted to direct the Court's attention, which

 3    absolutely corroborates Mr. Boies's previous comment, to the

 4    Ault v. Walt Disney case -- it's at 692 F.3d 1212 -- which said

 5    that class members' claims do not need to be identical.  I will

 6    also point the Court to the case of Bowe v. Public Storage, 318

 7    F.R.D. 160, where a national claim was asserted on behalf of one

 8    person from one state.

 9            Thank you, Your Honor.

10            THE COURT:  All right.  Thank you.

11            Mr. Cowan, we're going to get to you.  And if you don't

12    mind, I'll do it in an efficient way where I get you to address

13    some other questions I might have.  How does that sound?

14            MR. COWAN:  Yes, Your Honor.  If it may please the

15    Court, thank you, Judge, for allowing me to speak today.

16            I wanted the Court to know the concerns at this time

17    rather than 90 days, 150 days, when the formal objection

18    period process ends, perhaps to make that time smoother.  I know

19    there's been a lot of hard work done in this case by both the

20    Court and counsel.  And, you know, we appreciate that.

21            I also wanted to get this filing before the Court

22    simply because the fourth amended complaint as well as the

23    motion for approval, the Court may not have had the time or the

24    desire to go through and see what differences it had from the

25    third amended complaint.  But I did want the Court to realize
```

1  that as of, oh, 16, 17 days ago, Ms. Sheridan from California

2  and Mr. Watts from Texas were class representatives.  They were

3  participating or wanting to participate.  And when they couldn't

4  get their answers they wanted to satisfy themselves, they were

5  just simply dropped.

6        And, you know, whether it's a standing issue, it is of

7  some concern.  And it certainly raises eyebrows that if class

8  counsel doesn't like what it sees, he can just simply eliminate

9  them.  And that raises some concern on this end.  Certainly

10  that --

11        THE COURT:  Well, let me ask you this, Mr. Cowan.

12  Don't -- class counsel owes duties to the class, not necessarily

13  to a particular representative.  Would you disagree with that?

14        MR. COWAN:  I do not disagree with that.  But to the

15  extent that a class representative also has duties, in their

16  opinion, to the state that they represent, you know, I think

17  that's something that the Court needs to be aware of.

18        THE COURT:  Well, I'm not saying you shouldn't have

19  brought it to my attention, but, you know, speaking in terms of

20  dropped is not necessarily helpful to me.  What would be helpful

21  to me is explaining to me why the current representatives, the

22  96 percent of the representatives that are going forward with

23  this, aren't adequately representing the class that they and

24  counsel owe duties to, not to other class reps.

25        MR. COWAN:  Fair enough.  Your Honor, you know, I was

 1   surprised at the opening remarks by the co-lead counsels.  There

 2   was a lot of thank yous to counsel, help from 75 different

 3   lawyers or so.  I never heard one time an acknowledgment by any

 4   class rep of what they did or how they should be thanked.  And

 5   that is concerning because I think we sometimes see class

 6   actions in these large cases driven by lawyers, and we forget

 7   that the clients want to participate and might be interested in

 8   participating and can add some value.

 9        And I think that's very important that the class -- the

10   class reps are trying to do their job.  They want to.  They are

11   here asking me to get some information for them to make the

12   decisions that they haven't been able to make over the last few

13   months when they were notified of the settlement.  There was 150

14   mediations, we understand, and not once did they get a call or

15   an update, even though we had provided their personal numbers,

16   not my number but their personal phone numbers, about wanting to

17   hear about the updates, even though they couldn't be there in

18   person.

19        Anyway, these particular class reps asked for some

20   information.  We believe -- I believe -- I think it's uniform

21   across the nation that the client's file, even if it's

22   maintained in its lawyer's office, is the client's property.

23   And both the end product documents as well as the work product

24   materials, the creation of which the clients have paid for, is

25   theirs.

1          And they asked for what we thought would be kind of a

2    quick study of the state of the litigation.  And one of the

3    things was the -- what we called the mediation file.  We later

4    learned there was a mediation presentation, I think, given to

5    Mr. Burns to get him up to speed.  And the clients couldn't get

6    that.  And essentially, they were told today, we reviewed a lot

7    of documents, we spent a ton of money, we spent a lot of time,

8    we've hired the best in the nation, and you should agree with

9    the settlement.  And they just kind of had questions.

10          And so that's really what we're here for.  And I

11    notice -- I hope the Court notices the title of the pleading

12    that was filed.  It was just a response.  It wasn't an

13    objection, as has been noted.

14          But these class counsels do have duties.  And Federal

15    Rule 23 gives them duties that the Court needs to appreciate.

16    And I haven't heard anything by the 67 that did consent how

17    quickly they consented or what they needed.  I understand there

18    were some others that were not before the Court or were dropped

19    as well, and I don't know why.  But I think that's something

20    that's -- that's interesting.

21          The -- these clients would like to participate and

22    understand what they're agreeing to and what they're asking

23    their state to agree to.  We understand nationwide class actions

24    exist, but there was some reason that these class reps filed

25    state by state.  There were a few national class action

1  complaints filed, but there were also quite a few individual

2  states.  And I think there was some maneuvering of procedural

3  issues early on in this litigation to have individual states

4  represented by citizens of that state and not just the national

5  cases that were filed.  So I think that's important.

6          THE COURT:  Is it your position that we need to have

7  subclasses for each market?

8          MR. COWAN:  You know, Your Honor, part of the problem

9  is I don't have a lot of information, nor do they, to, you know,

10 say, hey, in detail, Judge, this is what it would take to solve

11 our objections or whatnot.

12         I don't think so.  I don't think we need a

13 state-by-state subclass.  I do think there are questions that

14 have been raised, as the Court predicted, about this filed-rate

15 group of states.  I guess there are 11 of those, and there are

16 16 unregulated.  That raises some concerns, particularly the

17 language that we read in the --

18         THE COURT:  Well, Mr. Boies has staked out a

19 position -- and he's done it consistently throughout the case --

20 that the Filed Rate Doctrine would have limited utility to the

21 defendants because, one, you'd have to make a determination

22 whether the defendants could even assert the Filed Rate Doctrine

23 defense as to those who filed rates, but it certainly would not

24 be a defense that would vicariously transfer over to

25 coconspirators who did not enter a market, who then, thereby --

1  and who agreed to other output restrictions that limited

2  competition in each market.  It would not provide a defense even

3  to damages, much less equitable relief or liability, as to those

4  coconspirators.

5          Do you disagree with his characterization?

6          MR. COWAN:  I don't.  I haven't known about this

7  characterization.  Like I said, we -- this is something we've

8  asked about, both the mediation statements by the plaintiffs as

9  well as the counter positions that the defendants might have

10 shared with cocounsel or, rather, co-lead counsel for the

11 plaintiffs.  They may not have shared it with them; I don't

12 know, but -- maybe they just told the mediators.

13         But these are things, Judge, that -- you know, which

14 we're trying not to come in here, you know, post-settlement bias

15 and just saying, hey, let's be difficult here.  But my clients

16 have done some back-of-the-envelope math.  They've set it forth

17 in the -- in the response.  It may not be accurate.  Actually,

18 Megan Jones was very helpful telling us about the allocation

19 process, and we know it's not a -- just a per-head basis based

20 on number of years.  But it also means that if larger

21 subscribers get a bigger chunk, then some of these individuals

22 get a lesser.

23         And these class reps would just like to get an idea of

24 what's going on, some estimates, projections, whether it's

25 expert reports or whatnot.  And instead, they've kind of been

1  given -- initially were some reassurances over the phone that

2  all is good and this is great, we've got some very talented

3  counsel and experts that have been here, and you should agree.

4  And that just really wasn't enough for them.

5       So the relief that is provided in the release is very

6  broad.  It exceeds the bounds of the three pled counts of the

7  Sherman Act and wipes out state protections, whether it's under

8  RICO or local consumer protection laws state by state.

9       And we understand the defendants need finality.  But,

10  you know, there's also indications that the plaintiffs have --

11  whether it's right or wrong, we don't know, because we haven't

12  been given official information -- that sounds of $40 billion in

13  excess premiums that these defendants are sitting on.  And, you

14  know, I don't know about you, Judge; but if somehow, unlawfully,

15  I got $40, you know, over a course of a couple years and I agree

16  to pay $2.70 back, it's hard for those clients to accept that.

17       And so they -- I need information that I can go to them

18  and perhaps solve their concerns.  I don't have it.  They don't

19  have it, obviously.  And so that -- that was -- the response I

20  filed was very broad and very general just to kind of let you

21  know some of the issues they're having and so they'd have a

22  voice and to let you know that they were willing and able and

23  wanted to participate as of, you know, 16 days ago and they

24  were, you know, not able to because they just felt like, on the

25  record before them, they couldn't (unintelligible).

1          THE COURT:  All right.  How would you characterize

2    where you are right now, Mr. Cowan?  Are you -- and look, I

3    do -- I'm not trying to dissuade you.  I'm glad you did file

4    this.  I'm glad you made yourself available to answer some

5    questions from the Court today.  You're familiar with the

6    front -- need to front-load information so I can make a reasoned

7    judgment on a more developed record than we used to prior to

8    2018 to determine whether or not to give preliminary approval

9    and go through the very expensive and time-consuming process of

10   sending out notice.

11          How would you characterize where you are?  Still

12   working with subscribers' counsel to get the information your

13   client needs, at logger jams, or somewhere in between?

14          MR. COWAN:  A couple of months ago, the -- a request

15   was asked for some deeper information; essentially told, well,

16   no, we can't give it to you.  We did speak to Mr. Gentle.  We

17   did speak to Ms. Jones.  They got with us.  Some information was

18   helpful.  No documents were exchanged.  Again, a lot of just

19   assurances over the phone that all was good.

20          The materials filed by class counsel offered some

21   additional information, some that we were provided over the

22   phone but said, well, you can't really tell anybody because it's

23   super secret.  And that was Dr. Pakes' calculations about what

24   the nationwide damage case would look like.

25          That was helpful, but it's -- you know, it's just like

1   going through -- I've tried to think of a good analogy.  If I

2   went to the class counsel and said, well, you know what, the

3   score of the game -- it was a really tight game and it was, you

4   know, 20 to 21 and so our team won, but didn't tell him how we

5   got there and how hard-fought it was and how -- you know, all

6   the ups and downs of the litigation is a little harder.

7           THE COURT:  Well, Mr. Cowan, you --

8           MR. COWAN:  So they definitely had trouble, I can tell

9   you, with -- you know, 40 billion is listed in the -- in the

10  fourth amended complaint, there are 28 detailed -- of the 62

11  defendants, 28 of them listed how much excess premiums were

12  collected, and it's close to 40 billion.  Like I said, we did

13  some back-of-the-envelope calculations as well.  So they're

14  having trouble with that and --

15          THE COURT:  Well, let me ask you this.  And you

16  probably know this on your own.  If not, all the counsel in this

17  case will readily inform you of it.  I am given to very bad

18  sports analogies.

19          MR. COWAN:  Fair enough.

20          THE COURT:  Okay?  But I find myself --

21          MR. COWAN:  And that was a bad one.

22          THE COURT:  I find myself much like the white hat in a

23  football game.  I look over at the sideline; and in document

24  2623, a coach has thrown a red flag on the field.  And I walk

25  over to the sideline and I say, okay, what's the challenge?  Do

```
 1   you have an objection?  No, I don't have an objection.  All
 2   right.  What's the challenge?  Well, we need more information.
 3         Can -- I need to know a little bit about what you're
 4   challenging here.  If you're asking me to do a review, I'm going
 5   to go over to the camera.  I'm going to replay the video to do a
 6   video review, but I'm not exactly sure what I'm looking at or
 7   for.
 8         MR. COWAN:  Right.
 9         THE COURT:  Is that an unfair analogy?
10         MR. COWAN:  It's not, Your Honor.  And maybe mine was
11   ugly, as I tried to come up with it on the fly.  I think what
12   would help -- and just, you know, lawyer to lawyer, kind of
13   knowing how mediations work, knowing that there were two or
14   three that were brought in, I've always thought that the
15   mediation statements, the pros and cons of this litigation, the
16   highs and the lows, would give a quick study, would be
17   informative without being too technical with case law or with
18   expert reports, that I could share with them and say, guys,
19   here's -- here's the best we can do.  This is very complex
20   stuff.  This is -- involves very smart people and a very
21   extensive, expensive study to calculate what they did with the
22   Alabama damage model, but here's what we have.
23         And I think mediators appreciate a quick study and
24   read, and certainly they might have received from their initial
25   hiring a big stack of stuff.  But my guess is there's an
```

1    executive summary of some sort that's not prepared, you know,

2    for the purposes of getting this settlement through or today's

3    proceedings, but something that I was -- the client -- that

4    counsel worked on together that -- that I can say, hey, listen,

5    two years ago when they were fighting over this thing, they were

6    stuck at $2 billion and here's why they wanted $40 billion and

7    by God, over the next year, they got it up another 600 million.

8            You know, that would help me.  I just -- I was not

9    involved in this litigation.  I was not one that carried a bunch

10   of weight, as far as activities or hours or anything like that,

11   so my knowledge is limited.  You know, I heard there was a --

12           THE COURT:  Well, having said that, you did file, along

13   with other counsel, the Sheridan class action; correct?

14           MR. COWAN:  It was filed initially by California

15   counsel, who I've worked with in the past.  And then once it --

16   so they filed it in California initially and then --

17           THE COURT:  You appeared on May 30, 2013, in that case.

18           MR. COWAN:  I beg your pardon?

19           THE COURT:  You appeared on May 30, 2013, in that case.

20           MR. COWAN:  Right.  Once it got into the federal

21   circuit system, then I entered my appearance.

22           THE COURT:  Right.

23           MR. COWAN:  But I believe it was initially filed in the

24   state courts.

25           THE COURT:  Yes.  They brought in a federal court

 1    lawyer once they got to federal court.

 2              MR. COWAN:  Right.

 3              THE COURT:  So -- and I'm not -- look, and I understand

 4    how this works.  If you're not in leadership, you're getting

 5    notices of things.  And you've been getting notices for seven

 6    and a half years now, I take it.  I guess --

 7              MR. COWAN:  We have.

 8              THE COURT:  -- my question is this.  What, outside of

 9    the court record, do you really need that you have access to

10    already to help you make these decisions?

11              For example, it seems to me on the damages question,

12    whether 2.67 billion is fair, adequate, and reasonable, you've

13    seen, I take it, the submission from a neutral expert who's done

14    a damage model, taken into account all the discovery and

15    information that's in the public record, and pegged that at

16    somewhere between seven and 14 percent of the maximum recovery

17    that the overall nationwide class could expect on a damages

18    model.  And I'm sure you're smart enough to know that on a

19    damages model, if this went into litigation, there would be some

20    trial management issues that would make a nationwide class

21    impracticable and we'd have to have subclasses and more

22    individualized treatment of money damage trials along the way.

23    All that to say that would be terribly expensive and

24    time-consuming.

25              And we have -- I've got an expert telling me that we're

1   looking at seven to 14 percent of what might be maximum recovery

2   depending upon which model we use.  And there's plenty of case

3   law in this circuit saying that that's well within the range of

4   a settlement of this type where the uncertainties, the expense,

5   the delay of litigation kicks in and starts affecting people.  I

6   daresay -- I'll turn 60 next month.  Unless I decided to be

7   Jimmy Hancock and not U. W. Clemon, this case would outlive me.

8           MR. COWAN:  It could.

9           THE COURT:  Yes.

10          MS. JONES:  Eight years and counting, Your Honor.

11          THE COURT:  So I guess that's what I'm -- what do

12   you -- I know you would like to see some mediation position

13   statement.  I'm going to leave it to subscriber counsel to work

14   with you on that.

15          MR. COWAN:  Yes.

16          THE COURT:  But it just seems to me that isn't there

17   enough here, after eight years of litigation, in the public

18   record to help us assess just the difficulty of protracted

19   litigation and the uncertainty of how things might go?

20          MR. COWAN:  There certainly is, Your Honor.  I'm not

21   saying that nobody's worked hard enough and nobody's put in the

22   time and effort.  My clients were asked -- these clients asked

23   for consent.  They weren't able to give it.  I wanted the Court

24   to be aware of that.  They were -- been dropped from -- from the

25   proceedings.  Their individual cases are subject to be dismissed

 1  by class reps who aren't even in those cases.

 2       THE COURT:  Well, not if they opt out.  They'll -- all

 3  their individual cases will have the opportunity to be opted

 4  out; correct?

 5       MR. COWAN:  And opting out, you know, while it sounds

 6  like a nice, you know, litigation excuse, we all know that the

 7  whole reason for a class action is to bring similarly situated

 8  folks together because of -- one reason is because of the

 9  efficiency and the economics.  That one opt-out can't go and

10  collect, you know, her refund for the overpayment for the last

11  ten years that she's paid in California.

12       THE COURT:  No.  I -- look, I'm not saying it's easy,

13  but that's the way the drafters of Rule 23 dealt with your

14  concern.

15       MR. COWAN:  Perhaps.

16       THE COURT:  It's not that they are forever bound to a

17  settlement that they don't approve of.

18       MR. COWAN:  No doubt.

19       THE COURT:  And they also have the opportunity, when

20  they get more information at the -- when we get closer to the

21  eleventh hour, to come in and make their objection.

22       MR. COWAN:  That's really what I'm trying to avoid,

23  Your Honor.  And that's why I said from the beginning I wanted

24  to get this in front of the Court, have an opportunity to let

25  you kind of know where these three folks stand, and perhaps we

1   can -- can get to some information.  There is seven years of --

2   of documents on the Court's docket, no doubt.  I will -- I was

3   always told early on in this case, I believe it was at a meeting

4   in D.C. on doing your hours or doing some discovery work or

5   coding documents, that, listen, you're not -- you're not going

6   to get approved for reviewing every single filing and submitting

7   hours for that kind of thing.  We've got to be efficient here.

8   So to some extent, I tried to keep tabs on the big picture of

9   the case and --

10          THE COURT:  I understand that.  We were -- I wasn't

11   going to approve payment of every lawyer in the country looking

12   at what I was doing and counsel was doing.  So that's a point

13   well taken.

14          MR. COWAN:  Sure.  So --

15          THE COURT:  Let me just say this, though.  It seems

16   like your concerns -- and I realize they're not objections --

17   but your concerns fall into three big buckets.  One is damages

18   calculation.  Another is maybe potential intra-class conflicts

19   as it relates to such things as filed rate, geographic situation

20   of the class members.  And the third is whether it's fair and

21   reasonable to approve a settlement, a nationwide settlement,

22   that there's not a class rep weighing in on from, for example,

23   California, Texas, and Minnesota, I think it is.

24          MR. COWAN:  Your Honor, I'm not making an objection

25   that this Court needs -- must have a rep from each state.  I am

1   aware of those cases where one or fewer -- one or a few class

2   reps can represent the nation.

3           THE COURT:  Right.

4           MR. COWAN:  I do -- I do (inaudible) comfortable.  And

5   I don't like having to explain to a client how they can

6   participate and be willing to participate -- you know, the Texas

7   rep was even one of the 16 class reps that was deposed -- be

8   available and willing to do this -- these reps took their jobs

9   very serious.  We didn't just, you know, go down to the river

10  and find somebody and sign them up.  They -- they are -- they

11  were interested in the case.  They would call with updates.  I

12  would give them updates.  And then when they asked for more

13  information, more details, you know, quizzed cocounsel or the

14  others who they were talking to and not getting answers, and

15  then their response was, okay, well, we don't need you anyway,

16  and drop you, that just doesn't sit well.

17          You know, I understand, Your Honor, if all of the

18  sudden I made an appearance with somebody who hadn't been a part

19  of this litigation and we filed a bunch of objections and tried

20  to hold things up and here we are, you know, just coming in, you

21  know, trying to Monday morning quarterback this thing.  That's

22  not the case here.  These folks were -- you know, they were

23  serious.  And they wanted to listen.  And they spent many phone

24  calls with -- here over the last few months with the folks who

25  were trying to get the consent.  And we just couldn't get the

1  information.  And then to be dropped, I don't -- I don't know if

2  that's justice or not.  That just seems -- seems strange,

3  particularly when -- when all they're asking for is information

4  they can't get.

5          And perhaps with the information, they'll come around.

6  I would like to get them to come around.  Some of the things

7  they've raised I get as a lawyer and the risk of litigation,

8  expense, and the time and that.  And I've tried to explain that

9  to them.  And other things -- I just plumb can't answer the

10 question why are we looking at 2.6 when there's 40 billion.

11 We've got Dr. Pakes' analysis.  It's just not enough to kind of

12 come in and say, well, here's the score at the end of the day,

13 can -- you know, I'm not going to tell you how we got there, but

14 that's it.  So that's why I thought what could I ask -- what is

15 available, hopefully in a quick and easy format, that would

16 explain the highs and lows and the risks and the rewards of this

17 litigation in a --

18         THE COURT:  Well, this may be something to report back

19 to your clients.

20         Mr. Zott, Mr. Laytin, let's change this deal to give

21 them 40 billion instead of 2.67.  What say you?

22         MR. ZOTT:  I think we would have to get with our group

23 on that.

24         THE COURT:  I'm just kidding, Mr. Cowan.  You know

25 that.  I'm just kidding.

 1              MR. ZOTT:  Obviously, that would be a major problem.

 2              THE COURT:  That -- I think that's the answer is you're

 3    never going to get a settlement.

 4              MR. COWAN:  And we -- and they know that, and I know

 5    that.  And I'm not here saying that these guys --

 6              THE COURT:  Well, I'm not sure, based upon what you've

 7    told me, your clients understand that.  But that's a different

 8    issue.

 9              MR. COWAN:  No.

10              THE COURT:  And I must say I'm sure you had a lot of

11    fun explaining to them *Johnson versus NPAS*.

12              MR. COWAN:  Yes.  Because two of them were -- were --

13    it was before *NPAS* came out, and so they -- they were pleased to

14    hear that.  And then when that came out, that didn't endear them

15    any more to why we can't get information, and now they've taken

16    out our expense, so --

17              THE COURT:  I've already had some phenomena.  I had a

18    class action pending in front of me, not anything related to

19    this case.  It was a commercial product liability case.  And

20    counsel called me and asked for a status conference.  So I get

21    on and said, all right, guys, what's going on?  They say, well,

22    Judge, we think we've got this case settled.  I said, that's

23    great.  But we're not settling it in your district.  We're going

24    to Fifth Circuit.  So I was like, oh, well, that probably has to

25    do with *Johnson versus NPAS*.  I think maybe I'm going to be

1  doing a lot less Rule 23 certification motions now if that

2  result holds up.

3           MR. COWAN:  Your Honor, I have to admit we actually had

4  that conversation dealing with what the Eleventh Circuit is and

5  what states that it covers.  My Fifth Circuit Texas client and

6  Ms. Sheridan in California both said, well, that shouldn't

7  affect me.  So fair enough.  Some good strategy, perhaps.

8           THE COURT:  If only the case hadn't been transferred to

9  the Eleventh Circuit.  Right?

10          MR. COWAN:  That's true.  Anyway, Your Honor, I thank

11  you for your time.  I just --

12          THE COURT:  I thank you for your presentation.

13          MR. COWAN:  You're welcome.

14          THE COURT:  All right.  Great.

15          All right.  Mr. Boies, are we back to you?

16          MR. BOIES:  Yes.  And I might just clarify just a

17  couple of things.

18          THE COURT:  I thought you might take that opportunity

19  to do just that.  Let me ask you this.  Before you clarify a few

20  things, should we consider a moderate lunch break?

21          MR. BOIES:  I think that -- that would be helpful.

22          THE COURT:  You know my strategy and motto is if we

23  don't eat today, we can always eat tomorrow, but I don't think

24  my staff shares that philosophy in life.

25          MR. BOIES:  Right.

1          THE COURT:  So why don't we break for 45 minutes.  Will

2   that give everybody time to get some nourishment, return a

3   couple of emails, refocus our thoughts, and come back together?

4          MR. BOIES:  Yes, Your Honor.

5          THE COURT:  I don't think that's going to give me

6   enough time to get my lunchtime run in, but I can always do that

7   later.  All right?

8          MR. BOIES:  Your Honor, I feel the same way about

9   exercise that you do about food.

10         THE COURT:  That's right.  Well, yet you remain

11  amazingly svelte.  Maybe if I looked the way you did, Mr. Boies,

12  I would feel the same way about exercise.

13         All right.  Well, everybody stop your video, mute, but

14  otherwise keep the Zoom call open so we don't have to reconnect

15  and put my folks through a bunch of administrative stuff to do

16  later.  Okay?  Thank y'all.

17         MR. BOIES:  Thank you, Your Honor.

18     (Recess at 1:11 p.m. until 2:01 p.m.)

19         THE COURT:  All right.  Folks, are we ready to resume?

20         MR. BOIES:  Yes, Your Honor.

21         THE COURT:  Mr. Boies, I think the floor is still

22  yours.  You'll have to unmute, of course.

23         MR. BOIES:  I will hopefully occupy it only very --

24  very briefly.

25         And I don't need any charts for this.

1          The -- I just wanted to clarify a few things from

2    Mr. Cowan's presentation.  First, I don't think it's correct, as

3    the record will show, that we were not expressing appreciation

4    to our class representatives.  I talked about their dedication

5    and how I thought that they had very faithfully performed their

6    services and we were very grateful for them.  And I think I even

7    showed a chart where we listed all of them.  So we have enormous

8    gratitude and respect to the role that our class representatives

9    have played, you know, particularly, you know, without any

10   special advantage or consideration here.

11         Second, I don't think it's really quite accurate to say

12   these people were dropped.  What happened was after

13   presentations to them and they declined to participate, we went

14   forward without them.  It did not seem to us to be an

15   appropriate way to proceed, which was with something that we

16   thought was greatly in our clients' interests, greatly in the

17   public interest, to have that held up or, in effect, prevented

18   or stalled because of desire for additional information.

19         Third, the $40 billion figure, I think it's important

20   to keep that in context.  That's not excess premiums in the

21   sense that people are saying these are premiums that were

22   charged that were above competitive levels.  This is reserves

23   that the company keeps for the purposes that reserves are kept

24   by any company, particularly an insurance company.

25         And first, there should not be an implication that that

1    represents monopoly profits, for example.  And even if it did

2    represent returns, under the antitrust laws, we've got to prove

3    our damages.  It's not sufficient to prove that they made money.

4    It's our burden to prove that we were damaged.  And our damage

5    calculations have all of the issues that were described.

6            And then last, I think from our perspective, we were --

7    we tried to be quite forthcoming to all of the class

8    representatives.  And we are (unintelligible) going to continue

9    to work with all of them.

10           There is an issue in the sense that we tried to package

11   the information together.  There is all of the information

12   that's out there in the -- in the public record, and I think

13   what Mr. Cowan was looking for was something in between, and

14   that's -- I think he was really looking for something that

15   really wasn't available.

16           Now, I know that Greg Davis and Megan Jones have dealt

17   with this more directly than I have in terms of what was

18   actually given to Mr. Cowan and his clients, and I don't know if

19   either or both of them have something that would be useful to

20   add at this point.

21           MR. DAVIS:  Yes.  Go ahead, Megan.

22           MS. JONES:  Megan Jones for the subscribers.  Your

23   Honor is acutely aware of the work that the sealed team did in

24   this case.  And we are quite proud of the transparency of our

25   docket.  The class cert brief, the per se briefs, the filed-rate

1   briefs, and the Pakes damage report are all, for the vast

2   majority, not under seal and available to anyone.

3           We also set up a systemic process in order to advise

4   the plaintiffs about this settlement, and Greg Davis is going to

5   give a brief overview of that.

6           THE COURT:  All right.  Thank you.

7           MR. DAVIS:  Afternoon, Judge.  Greg Davis with the

8   subscribers.

9           So David Guin and I were tasked with the responsibility

10  of making sure that all of the named plaintiffs were notified of

11  the settlement.  So David and I basically divided up all of

12  the -- all of the plaintiffs, the 60-plus plaintiffs.  And the

13  first thing that we did was call each of the local counsel,

14  advise them, tell them of the confidentiality of the settlement,

15  and then we set up a separate call with each named plaintiff.

16          During that call, you know, we expressed that it was

17  confidential.  I then went over each of the terms of the

18  settlement, explained both the monetary and the injunctive

19  relief portions of it.  I asked questions, asked if they had any

20  questions.  And I would point out that on each and every single

21  call, I always thanked the named plaintiffs on behalf of lead

22  counsel and everyone involved for serving as a -- a named

23  plaintiff in this case.

24          After -- and I'll be specific with regard to Mr. Cowan.

25  I called Pat Pendley, who was listed as the main plaintiffs'

1  counsel for these three plaintiffs, and he set up a call between

2  himself and Mr. Cowan.  I explained the settlement to Mr. Cowan.

3  Then a separate call was set up to explain it to each of the

4  three plaintiffs that he represents from Texas, Minnesota, and

5  California.  I answered any questions that they had.  I thanked

6  them specifically.  They had no questions.  They seemed very

7  happy with the settlement.

8        After the call, Mr. Cowan did raise some questions.

9  And I, you know, sent him expert reports.  I pointed him to the

10  docket.  I sent him expert summaries.  I sent him a number of

11  documents for him to review.

12        He continued to have questions.  I set up another call

13  between myself and cocounsel Megan Jones and Swathi Bojedla.

14  And at the conclusion of that, I assumed that we had all of his

15  questions answered.  And we felt like we had done everything we

16  could to provide him with what he needed, but still his clients

17  would not consent to the settlement.

18        THE COURT:  All right.  Are there ongoing

19  communications between you and Mr. Cowan or the subscribers'

20  counsel and Mr. Cowan about these things?  Is this something

21  you're still working there?

22        MR. DAVIS:  We'll be glad to, Your Honor.  But, you

23  know, the last communication I think I received from Mr. Cowan

24  was that he was not agreeing for his clients to sign a consent

25  agreement.

```
 1          THE COURT:  Well, I understand that.  But what he's
 2    told me and at least what I understand is that there's some
 3    information that he thinks he needs that he hasn't received.  I
 4    don't know if that's where we stand with that.  That's what I'm
 5    trying to figure out.
 6          MR. DAVIS:  Yes, Your Honor.  So I think specifically,
 7    I tried to provide him with everything that he asked for.  He
 8    asked for mediation statements.  And I told him that I had
 9    signed a mediation agreement that made those statements
10    confidential, and I directed him to the mediator to obtain that
11    information, Special Master Ed Gentle.
12          THE COURT:  Okay.  Mr. Cowan, did you follow up with
13    Mr. Gentle?
14          MR. COWAN:  Your Honor, we did.  And he kind of
15    expressed the same thing that, well, that stuff's confidential,
16    you can't look at it.  So that's kind of where we left it.
17          THE COURT:  Well, let me ask you this.  What -- put
18    aside the mediation paperwork.  What specifically do you need?
19          MR. COWAN:  Well, Your Honor, you know, as cumbersome
20    and complex and as many documents as this case contains, I was
21    trying to, you know, find kind of the -- the thing that would
22    help these plaintiffs to understand what's going on.  And quite
23    honestly, the mediation statements was an educated guess that
24    perhaps that is the best thing that would get them up to speed,
25    simply because mediators are brought in midway through a case
```

1  and they know zero and you want to get them up to speed, you

2  know, quickly and efficiently without just saying, well, here's

3  2600 pleadings, Mr. Mediator, get ready and we'll see you

4  next -- at the next meeting.

5            THE COURT:  Well, but as you probably are aware, this

6  is not the usual case with the usual mediator.

7            MR. COWAN:  And that's why I say I -- maybe it's not

8  helpful.  I just don't know because nobody has told me or

9  anything.  You know, they've said, well, here's an opinion that

10 the Judge wrote and here's an expert report and here's a

11 redacted version of this and here's something else.  And

12 although that was helpful and we went through it and

13 (videoconference interference) in some form very similar to the

14 response that the Court has received, although in a very simple

15 email that just -- you know, we reviewed this stuff, it raised

16 some more questions, can you help us and, you know, kind of --

17 kind of try to get to the bottom of this thing.  So --

18            THE COURT:  Have you ever --

19            MR. COWAN:  So it's hard --

20            THE COURT:  Sorry.  Go ahead.

21            MR. COWAN:  Well, I'm just saying it's hard for me to

22 say, Judge, boy, I need these three items and we'd be satisfied.

23 This isn't a, you know, motion to compel where we know what

24 exists or we have these categories.  I mean, I guess we could do

25 formal discovery to our own counsel, but that seems odd.  So I

```
 1  thought the mediation statements would be kind of the best thing
 2  that kept us going.  And it doesn't necessarily need to be every
 3  letter between the mediator and the parties and that kind of
 4  thing, because I know quite a bit of what was mediated we don't
 5  seem to have a problem with, the form of the notice and the
 6  timing and, you know, all that, the claims administrator and all
 7  the mechanical workings of it.  At some point --
 8          THE COURT:  Would it be fair to say that your concerns
 9  largely boil down to the amount of money that's in the
10  settlement, not so much the structural relief, but the monetary
11  settlement?
12          MR. COWAN:  So the mechanics of it are -- nobody is
13  complaining about, well, they're using the wrong claims
14  administrator or I don't like the 1-800 number they're using or
15  anything like that.
16          So yes, Judge, it seems to boil down to three -- I
17  think you called them buckets earlier.  One certainly is the
18  amount.  I think these claims reps want to get a better idea of
19  what's going on with this amount of money that's been -- in the
20  pleadings, it does say assets in excess of legally required
21  reserves to pay claims of, in California, 2.2 billion.  So my --
22  Ms. Sheridan has a question about that, just California alone.
23  And she has questions about -- while Mr. Boies said we need to
24  prove our damages, our antitrust damages, maybe there are some
25  other damages that are being overlooked here under RICO or state
```

1    law, consumer protection or insurance code violations.

2           And I just need to help them -- these clients get a

3    grasp of what's at play.  At the same time, though, they're

4    having a concern, well, we're giving this very broad release,

5    giving up a lot of stuff, but this case only seems to be about

6    the Sherman Act, according to the three causes of action in the

7    last pleading.

8           So I -- you know, it's hard to say exactly what it is.

9    One of the big things, obviously, is the money.  But I'm not

10   sitting here saying, well, that's not enough.  We've seen the

11   reports that say it is enough, and I have assured them of that.

12   They just would like the play by play, how we got there, like I

13   said, not just the final score.

14          The other thing is what relief is available and why

15   we're giving up RICO or state consumer law protections or

16   insurance code violations.

17          The other thing is the difference between the regulated

18   and nonregulated and how that played out.  And it sounds like it

19   may not be as big of an issue.  And I can share that with them a

20   little bit more, but that is certainly one of the things.

21          THE COURT:  Well, and I know you're somewhat limited --

22          MR. COWAN:  So I --

23          THE COURT:  -- with privilege issues, but I don't think

24   this is an unfair question.  Have your clients raised any

25   concerns about the structural relief?  Put aside the money

 1   damages and whether those are sufficient.  But, for example, the

 2   equitable relief that's been negotiated by class counsel, the

 3   Blues have agreed to, any concern about that, as far as a Blue

 4   business practice model going forward?

 5              MR. COWAN:  Fair to say the injunction elements?

 6              THE COURT:  Yes.  The injunctive relief, structural

 7   relief, however you want to characterize it.

 8              MR. COWAN:  The only one they are -- that has been

 9   raised is I believe there's a provision that allows a second

10   Blue to bid on a national account or something like that.  And

11   kind of the question raised -- and we might even be able to

12   answer this one over the phone, but why just a second one?  Why

13   are we limiting the bidders to just two Blues?  You know, why

14   not open it to some more?  And I'm sure there's some rationality

15   that we just don't know about.  That was raised.

16              But for other elements of the injunction, they see it

17   as valuable.  They understand it.  There was some good work that

18   was done and -- but you've got to understand, Judge, you know,

19   for ten years, these claimants feel like they've been overpaying

20   their premiums.  And so they're a little more looking backwards

21   at what was taken from them as opposed to the very valuable

22   thing, going forward with this case, that that's going to

23   benefit the class.  But so they're -- looking backwards is still

24   very important to them.

25              THE COURT:  Gotcha.

```
 1              MR. COWAN:  Yes, sir.

 2              THE COURT:  All right.  Thank you.

 3              MR. COWAN:  You bet.

 4              THE COURT:  All right.  Mr. Boies?

 5              MR. BOIES:  If you don't have any more questions on

 6  this issue, Your Honor, I think we're basically finished with

 7  it.

 8              THE COURT:  I do not.  I'm going to allow you and the

 9  Blues, at your discretion -- if you'd like to file anything with

10  me in the next -- let's say by the end of the week on this

11  issue, I'll let you take a breath, think about it, and see if

12  there's anything else that you have not said to me that you wish

13  to say.

14              And, Mr. Cowan, same courtesy owed to you.  If, by

15  Friday, there's something else that you have a V8 moment and say

16  I wish I had raised that, please get that to me by Friday.

17              You're too young to know the V8 moment, maybe.

18              MR. COWAN:  I know that one and the Lipton Tea ones as

19  well.

20              THE COURT:  Well, I had a terrible sports analogy

21  earlier, but to carry it another couple steps, I feel like --

22  and this is not a criticism.  This is just me trying to make

23  sense of where we are.  I feel like I'm dealing with a college

24  football team that has 70 players.  And the flags come from the

25  sideline, and three of the players don't like the plays the
```

1   coach is calling and want to see the playbook, which is all well

2   and good, but I've got to make a decision here in the near

3   future about whether to give preliminary approval.  And, you

4   know, generally speaking, it's not enough to just second-guess

5   the tactical decisions that class counsel has made as long as

6   everyone is adequately represented.  It's -- the question is

7   adequate representation.  And that's what I'm looking at.

8           So that might help everybody as they're -- both sides

9   on this question -- actually, maybe all three sides on this

10  question, if I throw the Blues in there, to address that.  Okay?

11  I figured Mr. Ragsdale, in particular, would like the 70 player,

12  three of them don't like the plays.  All right?

13          MR. BOIES:  Thank you, Your Honor.

14          Next I'd like to ask Bill Isaacson to address the

15  Court.

16          THE COURT:  All right.

17          MR. ISAACSON:  Your Honor, good afternoon.

18          THE COURT:  Good afternoon.

19          MR. ISAACSON:  We've been very thorough, so I won't say

20  much.  But I've been here from the beginning along with a group,

21  and all the talk about how long this has taken and how long it

22  still is going to take I think is very important for preliminary

23  approval.  We filed in February 2012, eight and a half years

24  ago.  And we knew at the time, like David and Michael said, that

25  we were taking on an important case in private enforcement

1   because we were challenging a business system.  And we looked at

2   *Topco* and *Sealy,* and we said this Blue system seems contrary to

3   law and this restriction on Green competition is even more

4   unexplainable.

5          But we knew that unlike a case just collecting damages,

6   this was going to be a long haul.  And the fact that after eight

7   and a half years, we have accomplished the achievement of Green

8   competition with some additional Blue competition thrown in

9   that's been explained, I think is very, very important.  And as

10  has been said, we're proud of it.  I mean, in this year where

11  we're talking about blue states and red states, we are every

12  proud that every state can now be a Green state.

13         THE COURT:  All right.  I've got to interrupt you and

14  just tell you a funny story.  I tried a jury case last week,

15  Title VII employment discrimination case.  The allegations were

16  race discrimination in promotion and suspension of the

17  plaintiff.  At closing argument, the defense counsel gets up and

18  tells the jury that the plaintiff wants you to believe that my

19  client sees things in terms of black and white; but actually,

20  the only thing we see when we do business is green.

21         I thought, I don't think I would have said that to this

22  jury.  Go ahead.

23         MR. ISAACSON:  Hopefully, we would not do that either,

24  but we're a long way away from the jury.

25         THE COURT:  Yes.

 1         MR. ISAACSON:  And, you know, there's been a lot of

 2  talk today about your per se decision and the litigation that's

 3  going to happen about that going forward.  But that only

 4  emphasizes how -- the fact that things have changed only

 5  emphasizes how important the structural relief in this case is

 6  because of the fact that now everybody is going to be looking at

 7  it.  And the fact that we achieved it now as opposed to all the

 8  time it's going to take to litigate those issues again

 9  emphasizes the importance of settlement as an outcome.

10         And there's a lot of trial lawyers on this call.  A lot

11  of us take pride in being able to try cases.  But we also

12  understand in something like this, the best outcome, if you can

13  achieve something significant, is to do it now and not let lots

14  of time pass because when time passes -- we've had a -- you

15  mentioned you don't know if you'll be around.  Judge Putnam has

16  retired.  Children have been born.  Some people have changed law

17  firms.  Things have happened.  And they're going to keep

18  happening.  And it's best to achieve something significant now.

19  So I just wanted to say those few words.

20         And then Michael Hausfeld is now going to talk about

21  why a settlement class is likely to be certified.

22         MR. HAUSFELD:  Good afternoon, Your Honor.

23         I'm not sure I will need any -- any slides, Hamish, at

24  this point.

25         I believe given the extensive conversation that has

1    already preceded, Your Honor, I'm not sure that there's any more

2    to be added with regard to why the class certification makes

3    sense with regard to the settlement proposal in particular.  I

4    think, as has already been demonstrated, the common and

5    predominating facts underscoring the liability and damages of

6    both classes, the fully funded and the self-funded, all arise

7    out of the same challenge to anticompetitive restraints imposed

8    by the Blues nationwide which tended to limit Blue and Green

9    competition.

10           With regard to standing, I believe the Supreme Court

11   laid out the standard -- the elements for standing in *Spokeo,*

12   where they talked about an actual particularized and concrete

13   injury or a likelihood, you know, of such an injury.  That

14   responds to both tests of standing for the damages classes as

15   well as the injunctive class where, you know, the Blues have

16   acted on grounds generally applicable to the class as a whole.

17           The claims are all typical, they arise out of the same

18   conduct and the same events, the interests are identical, the --

19   there are no antagonistic conflicts, and class has been

20   adequately represented, particularly as it's now pled on a

21   national level.

22           The one item that has not necessarily been addressed is

23   the manageability or superiority of the class in this instance.

24   And given, again, what has already been stated, that it's taken

25   us eight years to get to this point, if this were to continue to

1    be litigated, even just with the accelerated Alabama case, and

2    then the other cases remanded post-completion of the pretrial

3    and then have to be tried and subject to separate pretrials with

4    regard to any outstanding matters, on top of which there are

5    tens of millions of members in the classes, clearly a single

6    national certified settlement class is superior.

7            Unless there are any questions, I have nothing further

8    to address, Your Honor, with regard to the certification issues.

9            THE COURT:  No.  I have no questions for you.

10           Would this be an appropriate time for me to ask the

11   Blues a question?  And that is how would you square your

12   opposition to class certification at the litigation track stage

13   with your joint proposal with the plaintiffs to certify a

14   settlement class at this stage?

15           MR. ZOTT:  Your Honor, good afternoon.

16           David Zott on behalf of the Association.  As you noted,

17   we have objected to a litigation class, but we're not objecting

18   to a settlement class.  And the way we square that is because

19   while Rule 23 applies in both instances, it's applied in a

20   different way and it's viewed through a different perspective

21   and a different prism.  The starting point for that is the

22   *Amchem* decision.  In *Amchem*, you know, the Court -- the Supreme

23   Court noted that while Rule 23 applies, the Court need not be

24   concerned with issues of manageability and how the case would

25   actually be tried on a classwide basis.

1    And a lot of our -- a number of our objections to class

2    go to that issue, that ultimately, the need for individualized

3    proof would render the case unmanageable.  It would splinter

4    into minitrials.  None of that is a concern for purposes of a

5    settlement class.  There's also, you know, cases since *Amchem*

6    that have taken the law, you know, somewhat further and said

7    that even issues such as commonality and predominance can be

8    viewed differently when you have a settlement rather than a

9    litigation context.

10    Lastly, you know, if you just take a look -- I know

11    Your Honor is focused on the rule 2018 amendments.  And even the

12    language of the rule itself, which says, you know, that the

13    Court has to be satisfied that it can certify the class for

14    purposes of judgment on the settlement proposal.  So the issue

15    is can you certify for purposes of a judgment on the settlement,

16    which is different than certifying for purposes of all of the

17    issues raised in the underlying litigation.

18    So for each of those reasons, Your Honor, I think -- I

19    think our positions are consistent, and there's a lot of law

20    that recognizes you can certify for settlement but not

21    necessarily for litigation.

22    THE COURT:  All right.  Thank you.

23    MR. ZOTT:  Thank you.

24    THE COURT:  Fair question.  I thought that would be the

25    response.

 1            MR. ZOTT:  It's a fair question, Your Honor.

 2            THE COURT:  All right.  Where do we stand now from the

 3   subscribers?

 4            MR. BOIES:  At this point, Your Honor, if Your Honor

 5   would like to address the plan of distribution, that would be

 6   responded to by Ms. Bojedla and Mr. Hume.

 7            THE COURT:  All right.  I do have a question along

 8   those lines.  I'll wait until we give you a chance to make your

 9   presentation before I pose it, but be ready for a question about

10   necessity of a claim form.

11            MR. HUME:  Thank you, Judge Proctor.

12            This is Hamish Hume from Boies Schiller.  I was very

13   excited to say that I was going to be the one to break the 100

14   slide mark today, but Michael Hausfeld seemed to have mercifully

15   exempted you from about 27 slides.

16            THE COURT:  Well, the good news is I looked at all of

17   them over the weekend.

18            MR. HUME:  Okay.  Well, that's why we give you a hard

19   copy too, and we hope they'll be helpful.  I will try be very

20   brief.

21            And Mr. Boies obviously covered some of this when he

22   went through the factor of Rule 23(e)(2)(D), but Ms. Bojedla

23   from Hausfeld and I want to just give you a quick overview of

24   the actual mechanics and also a little bit on the legal

25   standard.

1          So first, the legal standard for approving the plan of

2     distribution at this preliminary approval stage is simply that

3     it be, quote, within the range of reasonableness, fairness, and

4     adequacy.  So similar to preliminary approval of the whole

5     settlement, there's the standard for final approval, and then

6     you back in to the standard of preliminary approval.  It's just

7     a little bit more flexible.  But regardless, of course, we think

8     we meet the standard for full approval even now.

9          And on the standard for full approval, it's also a

10    flexible standard on the plan of distribution.  It's not nearly

11    as involved or searching of a review as it is for the settlement

12    itself.  It simply needs to be that the plan has a reasonable

13    and rational basis, which we certainly think we satisfy.

14         I do want to emphasize something in this second bullet,

15    because it goes on to say that the standard should be -- you

16    should take into account whether, quote, experienced and

17    competent counsel support it.  And we cite to a treatise there,

18    *McLaughlin on Class Actions,* at Section 6.23 of that 2020

19    Edition, which I -- which I would recommend as an excellent

20    resource on that issue.  It's devoted only to the plan of

21    allocation and the case law addressing it.

22         And this point about the role of experienced and

23    competent counsel, at the risk of sounding like I'm aggrandizing

24    our role, I wanted to draw on it for one minute because I think

25    there are a lot of cases that say that.  And I think the

1    reasoning behind it is if you step back for a moment and think

2    about the incentives that we, as class counsel, have, assuming

3    there is no evidence or reason to suspect bad faith and a

4    bad-faith desire to benefit some small cohort or some subclass

5    or subgroup -- you know, our own class representatives, for

6    example -- in a class of this size, it's almost unconceivable

7    how that would arise.  But that was, for example, the problem in

8    the *Ortiz* case that got reversed in the Eleventh Circuit.  They

9    gave a lot more money to the class reps than to the absent class

10   members, and they had no basis for it.

11          But absent something like that, the incentive we have

12   as class counsel is to have as equitable a distribution as

13   possible to the class members, as fair as possible.  We have no

14   reason not to want to do that.  And the only -- and it can't

15   be -- the only other incentive we have is to be as administrable

16   and as efficient as possible, because we don't want a plan

17   that's going to be so complicated or so administratively

18   infeasible that we waste resources that could go to the class

19   trying to administer it.

20          And so, for example, you'll find, if you look at

21   footnotes nine, ten, and 11 in this section of the McLaughlin

22   treatise -- I won't read them all.  There are dozens of cases,

23   but I would like to alert you to two of them.  One is in the *In*

24   *Re:  Netflix Privacy* litigation, 2013 Westlaw 1120801, at page

25   8.  The Northern District of California said -- it's a 2013

1   case -- that in approving such a plan, quote, the

2   recommendations of plaintiffs' counsel should be given a

3   presumption of reasonableness, end quote.

4          Similarly, the Southern District of New York, in a case

5   called *In Re:  EVCI Career Colleges Holding Corp. Securities*

6   *Litigation*, 2007 Westlaw 2230177, at page 11 said, quote, in

7   determining whether a plan of allocation is fair, courts look

8   primarily to the opinion of counsel, end quote.  And there are a

9   couple dozen other cases.

10          Again, I don't want to sound like I'm aggrandizing our

11   role, but I think the reason for that role is because of our

12   incentive.  And obviously, we've worked very, very hard to try

13   to come up with a plan that is fair, that is equitable, but also

14   administratively manageable.

15          Mr. Boies earlier made this point, so I won't dwell on

16   it, but the case law does say you can never tailor the rights of

17   each plaintiff with mathematical precision.  In large class

18   actions like this, you're just never going to be able to do

19   that.  And that's been noted -- it is especially the case in

20   large, complex antitrust cases such as this.

21          Here our plan of distribution has three indicia of

22   reasonableness before you even get to the details.  The first,

23   I've mentioned.  It reflects the judgment of experienced and

24   competent class counsel.  I've spoken to that.

25          Second, as Mr. Boies referenced, it reflects a judgment

 1   by Ken Feinberg, arguably the country's foremost expert on

 2   determining fair distributions from large or massive settlement

 3   funds, that it is equitable and reasonable and meets the

 4   standard of Rule 23(e)(2)(D).  And Mr. Feinberg specifically

 5   reached that conclusion with respect to two things, both the

 6   allocation between the self-funded or ASO group and the fully

 7   insured group, which I'm going to say just a bit more about in a

 8   second.  And secondly, he reached that conclusion with respect

 9   to how we deal with employers and employees, which Ms. Bojedla

10   is going to address.

11          The third line of indicia of reasonableness comes from

12   the fact that we worked with an independent economics expert,

13   Ph.D. expert from The Brattle Group named Darrell Chodorow, who

14   gave an opinion, which is found at Exhibit H to our settlement

15   approval papers, that our plan was economically reasonable.  And

16   he specifically focused on two things, first, the pro rata

17   nature of the distribution, which I'm going to explain and

18   Ms. Bojedla is going to explain a bit more in a second.  He

19   found that to be a reasonable approach, which the pro rata

20   approach is an approach which doesn't seem to discriminate or

21   make complex and highly contentious judgments about plaintiffs

22   based on where they're located but says whatever premiums you

23   paid and you submit, you're going to be treated pro rata based

24   on those actual premiums.  He gave an opinion on the

25   reasonableness of that.  And he, like Mr. Feinberg, gave an

1   opinion on the reasonableness of how we treat the

2   employer-employee issue.

3          The balance, as I said earlier, in addition to being

4   equitable to everyone, is a balance between precision and

5   efficiency.

6          We're getting a little bit of feedback from somebody

7   who's not on mute unless somebody wants to -- is trying to

8   contribute.  Judge, I assume you can still hear me.

9          THE COURT:  I can.

10         MR. HUME:  Okay.  Great.

11         And, Judge, on slide 106, we have some detail giving

12  some of the sort of basic motivating principles behind the plan.

13  First, every damages class member has an opportunity to make a

14  claim.  That is a very important principle that we worked hard

15  to be faithful to.  There is no one given a damages release who

16  cannot make a claim.

17         Second, the way in which we're going to value these

18  claims -- and this relates to the opportunity to make it

19  meaningful -- is we are not requiring everybody to dig out their

20  records and their data to provide the data on how much they paid

21  over the last five years or 12 years or whatever the case may

22  be.  That would be extremely burdensome and might end up making

23  the opportunity to submit a claim illusory.  Rather, we are

24  getting data from the Blues that will allow us, for any

25  claimant, once we have their name, to search, using I think

1   their name and perhaps -- Ms. Jones can explain -- their Social

2   Security number, to -- the administrator -- the claims

3   administrator can find which employer they were part of, if they

4   were affiliated with an employer, how much premiums were paid by

5   that employer during the time period where they were with that

6   employer, and really determine all of the financial information

7   and the premium information from data provided by the Blues, the

8   settling defendants.  And there have been countless calls over

9   the last three or four months between our side and the Blues

10  working on the data we need and the data they're able to

11  provide.  And there are --

12         MS. JONES:  And, Mr. Hume, we will not be getting

13  Social Security numbers.  We will be getting unique identifiers.

14         MR. HUME:  Unique identifiers

15         MS. JONES:  Your concept is correct.  But just for the

16  record, we are not getting Social Security numbers of our class

17  members, Your Honor.

18         THE COURT:  You just gave Megan an intellectual heart

19  attack.

20         MR. HUME:  I know.  I knew I was doing that as I did

21  it.  I wanted to make sure she was listening.

22         In any event, the point is we're not relying on people

23  to come up with their own data.  However, we are allowing

24  people, in circumstances where they think the plan's default

25  option, which we'll explain more in a moment -- if they think it

1  is insufficient or inaccurate, they can, if they have the data,

2  provide it.  Now, just because they provide it doesn't mean

3  they're going to get more.  They're going to need to provide

4  data that actually shows they're entitled to more.  And that's

5  going to be subject to judgment by both the claims administrator

6  and the settlement administrator.  But it does at least allow

7  that, quote-unquote, off ramp or alternative option if the

8  claimant wishes to make it.

9        Finally, Judge, in order to avoid the possibility of

10  administrative resources being consumed with claims that are

11  worth, arguably, less than the total loaded cost of

12  administering -- distributing them, we have a *de minimis*

13  threshold of $5 per claim.  So if a claim turns out to be worth

14  less than that amount, it will not be distributed but will go

15  back into the pool for other claimants.  That is a very well

16  established and routinely approved function and aspect of the

17  plan of distribution.  You can find cases on it at footnote 13

18  of the McLaughlin treatise I cited earlier as well as in our

19  papers.  And as I said, it protects against unreasonable

20  administrative costs that are not worth it.

21        You will hear more about JND I think from Megan Jones,

22  but they are the claims administrator.  They are extremely

23  reputable and experienced.  We say here they've been chosen to

24  administer a number of large class action settlements and give

25  one example.  If you go to their website listed here, you'll see

1    dozens and dozens of examples of extremely large and

2    high-profile cases they have done.  And they have been

3    integrally involved in all the work we've done on the plan of

4    distribution and on the notice plan.

5          In terms of the key decision points and the key

6    features of the plan, there are three things that we want to

7    definitely make sure Your Honor is well aware of and comfortable

8    with.  The first we've already talked about, which is the

9    allocation of the net settlement fund between the fully insured

10   class members and the self-funded class members.  Mr. Boies

11   walked through that earlier.  I'm only going to say one or two

12   things very quickly about it.

13         The second is that the general principle within those

14   two net settlement funds is pro rata distributions for all

15   claimants, no distinctions, not treating people differently

16   based on locations or other things.  In this case, based on all

17   of our experience in dealing with that, it was our judgment that

18   the best way to treat class members equitably under Rule

19   23(e)(2)(D) was to treat them equally.  And that is what this

20   plan attempts to do.

21         The third thing that is important to understand is the

22   methodology used for valuing employer claims and employee

23   claims, because employers and employees often contribute

24   together.  In other words, if an employer pays for insurance,

25   the employer is paying for insurance of the employees.  And many

 1  times the employees make an out-of-pocket contribution.  There

 2  are some arguments they make contributions through lower wages.

 3  And so there needed to be a methodology for determining how to

 4  allocate the value of the premium between the employers and the

 5  employees.  And Ms. Bojedla is going to explain that in a

 6  moment.

 7        Very quickly, on the net settlement fund and the

 8  allocation into two net settlement funds for ASOs and fully

 9  insureds, this chart simply shows that there's a gross

10  settlement fund from which the notice and administration costs

11  are deducted and the award for attorney's fees and expenses,

12  which obviously still has to be presented and approved to the

13  Court, but as you know, it will be no more than 25 percent of

14  the total.  And so this is for illustration purposes.  If the

15  full amount were awarded, the net settlement fund would be

16  almost exactly 1.9 billion, just very slightly over 1.9 billion.

17  That would be the net settlement fund.  And all of the plan of

18  distribution documents and mechanics and allocations apply to

19  that net settlement fund.

20        Mr. Boies walked you through this chart on the

21  allocation negotiations between the self-funded subclass

22  represented by Burns Charest, Warren Burns, and the fully

23  insured group, so I won't belabor it.

24        You've heard about how both sides hired experts.  Just

25  one or two things to supplement.  That expert work underlying

1  those negotiations showed that there are a lot of different ways

2  to look at how to make this allocation, but a few data points

3  might be of interest.

4        The -- if you look at gross revenue for the Blues, it's

5  something on the order of 94 and a half percent from fully

6  insured and five and a half percent from the self-funded

7  because, of course, the self-funded is not paying for the cost

8  of insurance itself.  It's only paying for the cost of

9  administration.  Now, that ratio goes down a little bit or,

10 rather, up for the self-funded if you exclude all of the fully

11 insured government accounts.  But it's still a significant --

12 the vast majority is for fully insured.

13       The experts also looked at the profitability of fully

14 insured, which is generally more profitable.  Dr. Pakes from

15 Harvard looked at the extent to which the data supported

16 findings of excess profitability and found that there was more

17 on the fully insured side.  There was also a factor taken into

18 account that the self-funded subclass -- their class period goes

19 back five years to when they first entered negotiations because

20 they would not have a statute of limitations tolling, and so

21 there -- they would only go back four years from when they first

22 entered, which now is five years.  So their class period is

23 shorter.

24       So those are some data points that help support what we

25 think was a reasonable compromise at 6.5 percent.  As you know,

1  Mr. Feinberg found it to be fair for a number of reasons,

2  including the number was at the low end of what our expert -- at

3  the low end of what their expert thought was fair and at the

4  high end of what our expert thought was fair.  He also looked at

5  the data on the relative size of their revenue and the

6  statute-of-limitations issue and just the extent of the

7  negotiations.

8          So here's what it will look like, Judge, and I will

9  then be handing this off.  I want to explain two mechanics.  So

10 this is -- again, illustratively, if the net settlement fund is

11 1.9 billion, this is now it would be split into two net

12 settlement funds, one for fully insured, one for the

13 self-funded.

14         Two mechanical points just for clarification.  And

15 first of all, let me say and the fully insured includes two

16 different types, individuals who purchased their own policies,

17 individual policyholders, people who might buy them off the

18 Affordable Care Act exchanges or who just buy them through a

19 broker if they're self-employed or simply sole proprietors or

20 people who simply buy it on their own, not through an employer.

21 It also includes all the employer groups or similar groups who

22 buy fully insured insurance and their employees.  On the

23 self-funded side, it's all of the self-funded employers and

24 their employees.  So those are the populations and the class

25 members within each of these two net settlement funds.

1          Now, it is possible, and the plan provides for the
2     possibility that a class member could have claims against both
3     funds because we have, you know, a 12-year period here and a
4     five-year period for the self-funded.  So you could easily have
5     been -- you could be an employer who went from having a fully
6     insured plan to having a self-funded plan.  Or you could be an
7     employee who went from a fully insured plan -- one employer --
8     and then went to work for a much bigger company that was a
9     self-funded plan.  That's all provided for.  And the claim form
10    allows for all that information to be gathered and for the two
11    calculations to be done separately and then combined together
12    for the total value of your claim.
13         The second thing I just wanted to make sure was clear
14    for the record and just for how these different settlement funds
15    work is the value of anyone's claim depends, in part, on the
16    claims rate.  And so the way this works is that to the extent
17    the claims rate is low within one of these two net settlement
18    funds, that will go down to the benefit of the claimants within
19    that net settlement fund.  They will not cross-pollinate the
20    extent to which claims rates are different -- are different.
21    That's just the nature of the beast in terms of having an
22    allocation and a subclass for the self-funded plans.
23         So that is a basic description of how the net
24    settlement funds are created and how they will work.  I will now
25    hand this off to Ms. Bojedla to talk about both the pro rata

 1   distribution and the employer-employee methodology.

 2          Thank you very much, Your Honor.

 3          THE COURT:  Thank you.

 4          MS. BOJEDLA:  Good afternoon, Your Honor, and everybody

 5   else.  I think we're all a little bit sad we couldn't be in the

 6   ceremonial courtroom to do this presentation today, but it's

 7   nice to see everybody.

 8          So going to the next slide, I have been tasked with the

 9   math portion of the afternoon.  And nobody became a lawyer to do

10   math, so I'll try to make this painless, as painless as

11   possible.

12          THE COURT:  I guess it would be too --

13          MS. BOJEDLA:  So this slide here --

14          THE COURT:  I guess it would be too corny if I said I

15   was told there would be no math.  Go ahead.  Sorry.

16          MS. BOJEDLA:  That's not corny.  I made a math joke as

17   well, so, you know, we're on the same page there.

18          So this slide 113 lays out for the fully insured net

19   settlement fund how the pro rata distribution will be done.  So,

20   you know, this looks a little complicated; but really, all we're

21   saying here is that what the claims administrator will do is

22   look at the total premiums paid as defined in the plan -- I'll

23   talk about that in just a moment -- and divide it by the total

24   premiums paid by all claimants to the FI net settlement fund and

25   multiply that by the total dollar in the net settlement fund.

1   And that will give a pro rata payment to each claimant within

2   the fully insured net settlement fund.  So that's laid out in

3   paragraph 13 of the plan of distribution.

4           Total premiums paid is defined in paragraph 15 of the

5   plan of distribution.  And essentially what we will do -- what

6   the claims administrator will do is going to the data we get

7   from the settling defendants, they will go and pull all of the

8   premiums paid by an authorized claimant on the fully insured

9   side and total all those up to get this total premiums paid

10  figure.  And that's premiums paid for medical, vision, dental,

11  pharmaceutical, any sort of premium that relates to the

12  commercial health benefit product identified in the settlement

13  agreement.

14          So to the next slide, this is the same exact equation

15  but for self-funded claimants.  So instead of premiums here, we

16  have administrative fees, but essentially everything is the

17  same.  And I don't need to get into too much more detail there.

18          So on the next slide, Mr. Boies and Mr. Hume have

19  already gone over a lot of this, so I won't take up too much

20  time here.  But one other point I'd add, we cite these legal

21  authorities we have cited throughout our presentation on pro

22  rata allocation.  But we've also put in the declaration of

23  Mr. Chodorow, who is actually an MBA, not a Ph.D.  And he wanted

24  me to make sure I corrected the record, although Hamish gave him

25  an upgrade.

1          You know, Mr. Chodorow's declaration, at

2    paragraph nine, talks in some detail about why a pro rata

3    distribution is economically reasonable here.  And one of the

4    things that he points out is that premiums can vary by

5    geography, by the type of coverage you have, by how many people

6    are covered, by the type of plan you have.  But all that is

7    captured within the premium pricing.  So by doing a pro rata

8    distribution based on how much you paid in premium, we are able

9    to capture some of those things within the distribution and make

10   sure that we're treating class members equitably relative to

11   each other based on those difference in premiums.

12          So to the next slide, again, these are just some cases

13   that talk about the pro rata distribution and how it's been

14   approved.

15          And on the next slide, I just wanted to point out some

16   language from the LIBOR case.  And it's not actually in bold.

17   So in the LIBOR case, the court found while greater precision

18   could be achieved by taking into account, for example, issues of

19   netting and absorption that we have repeatedly emphasized -- and

20   then she went on to approve the plan because it struck a

21   reasonable balance between precision and efficiency.  And in

22   that case, you know, some objectors had come forward with some

23   issues about overcompensation and undercompensation of claims.

24   And, you know, the court clearly pointed out that, of course,

25   there are different things that can be used to determine

 1   differing amounts of damages for different class members, but

 2   that, in and of itself, is not a reason to find that a plan of

 3   distribution is not reasonable, because it is understandable

 4   that in order to put together a plan that can pay class members

 5   efficiently and not take many more years and many more millions

 6   of dollars to develop, there has to be this balance struck.  So

 7   I don't have anything more to say on that slide.

 8          So just to get to the actual mechanics, so Mr. Hume

 9   talked about this a little earlier.  But within the financial --

10   the fully insured net settlement fund, there are essentially two

11   types of claimants:  Individual members.  So those are

12   individual policyholders who go out and they buy a plan directly

13   from one of the defendants.  And then there are insured groups,

14   typically employers, but they can also be unions and

15   professional employer organizations, who go out and purchase a

16   plan directly from the Blues, from the defendants.  And then

17   they have employees that can contribute a portion of the premium

18   towards the cost of that plan.  So insured groups include both

19   employers and employees.  And this chart is just meant to sort

20   of lay that out, to show that individual members are in and of

21   themselves, but insured groups have these two subsets, employers

22   and employees.

23          And so, you know, to the next slide, it is fairly

24   simple to calculate the pro rata share for individual members

25   because we just go into the data, pull the premiums they've paid

1    and do that calculation.  For insured groups, we can also go and

2    pull all those premiums paid for the insured groups, but that

3    cost of the premium is shared between employers and employees.

4            And we put together this chart down here at the bottom

5    to kind of show the flow of money.  So on the left-hand side,

6    you have the plan.  And it's the employer who pays the plan

7    directly for all of the premiums for the employees it's

8    covering.

9            So the defendants and the data that we are getting from

10   defendants does not tell us and does not tell the defendants on

11   any sort of systematic basis how that premium is shared between

12   the employer and employee.  That data doesn't exist in the data

13   set we're getting.  And as I'll talk about in a couple minutes,

14   it doesn't really exist in any form that's useable to us.  So

15   what we needed to do through our plan of distribution is come up

16   with a way to determine the pro rata share for employers and

17   employees in order to do that lovely equation I showed earlier.

18           So we considered a number of factors in trying to

19   determine how to sort of allocate this premium amount between

20   employers and employees, and they're all listed here.

21           So what we did was we came up with what is called a

22   default contribution percentage.  And just to walk you through

23   some of the things we considered in doing that, so first, there

24   is no systematically available data, as I just mentioned, from

25   defendants -- and there isn't an easy way to get it from

 1  employers -- that shows what the actual employee contribution

 2  levels are.  We do have some Kaiser data that I'll talk about in

 3  the next slide that is really the best proxy we could find on a

 4  marketwide basis.

 5       So there are other factors in addition to the fact

 6  that, you know, we just don't have the data.  Some employees

 7  don't contribute anything to their premiums, but they are,

 8  nonetheless, covered and members of the class, and their

 9  employers contribute 100 percent.  So we needed to figure out

10  how to incorporate that into any default contribution

11  percentage.  And there is some economic literature that suggests

12  that all employees, whether they're contributing or

13  noncontributing in their paycheck, nonetheless pay some portion

14  of premiums through a decrease in their wages.

15       The fourth factor we considered is the question of

16  legal standing for antitrust claims relative -- for the

17  employees relative to the employers and how to factor that into

18  a default.

19       And finally, the way the plan of distribution is

20  written and envisioned, any unclaimed employee premium amounts

21  or any employee claims that fall below the $5 minimum payment

22  that Mr. Hume mentioned will revert back to employers.  So

23  employers do retain the value of claims that employees don't

24  claim.

25       So these are all factors that went into trying to come

 1   up with a default contribution percentage between employers and

 2   employees to be able to come up with a total premium amount to

 3   get to that pro rata distribution.

 4        So this unavailability of data is worth just spending

 5   another minute with.  So as I mentioned, the defendants don't

 6   systematically collect this data and it's not, in fact, really

 7   maintained anywhere.  Employers -- you know, even if we wanted

 8   to go out and ask employers to provide this information for us,

 9   the class period goes back to 2008.  It's very unlikely that

10   many of them would have it.  As Mr. Chodorow points out in his

11   declaration at paragraph 24, even the IRS doesn't advise keeping

12   records longer than seven years.  And he estimated that about 30

13   percent of businesses that may have started out in 2008 may not

14   exist anymore.

15        You know, Mr. Chodorow also pointed out -- and I think

16   we all know -- that with COVID and the inability to get back

17   into offices and things like that, we didn't really want to

18   create a situation where we were forcing class members to go and

19   dig through filing cabinets and storage locations around the

20   country to find this information as well.

21        So even if we could collect the data, to try to

22   standardize and create a database of this for millions of class

23   members would have caused an inordinate amount of delay, not to

24   mention the cost.  And that was another factor, you know, that

25   went into deciding how to do this default allocation.  And --

1  but as the last bullet point notes, you know, we did need to

2  come up with some sort of contribution percentage to do this pro

3  rata distribution.

4       So we relied on the Kaiser data, in part, to get a

5  sense of average contribution percentages around the country.

6  And this slide just lays out some of what Kaiser showed us.  And

7  so the Kaiser data is actually a very good source.  Mr. Chodorow

8  pointed us to it.  And, you know, in his declaration, he talked

9  a little about how it reflects, really, the best publicly

10 available data here.  And the Kaiser data is very helpful to us

11 because it's broken down by insured versus self-funded, so, you

12 know, our subclass and our class.  And also, we could even get a

13 little bit more granular into singular versus family coverage.

14 So we can -- you know, with the data we have available, we could

15 do a little bit of tailoring of payments to the members of the

16 class.

17       And so what the Kaiser Study showed us for the class

18 period for insured groups was that for single coverage, the

19 average employee contribution was something between 14 and 19

20 percent.  And for family coverage, it was something like 33 to

21 39 percent.  So taking these numbers into account along with all

22 the other factors I've talked about here, settlement class

23 counsel came up with a default option to calculate this total

24 premiums paid, which is on the next slide.  And so that comes

25 out to 15 percent of the premium for an employee with single

1    coverage would be considered to be paid by the employee versus

2    85 percent to the employer.  And similar for family coverage,

3    the numbers are 34 percent and 66 percent.

4         So what that means is when we're trying to come up with

5    the total premiums paid -- and this is on the next slide.  We

6    have an example here.  So, you know, this, again, shows the flow

7    of money from the employer -- the employee to the employer to

8    the plan.  And, you know, using our default option, say an

9    insured group pays $100,000 a month in premiums for its

10   employees and we determine from the defendants' data -- we

11   calculate the employee B premium to be $1,000.  So we would

12   apply that default option to figure out which portion of that

13   premium gets allocated to the employee to come up with their pro

14   rata distribution and which amount goes to the employer to come

15   up with their pro rata distribution.

16        So that is very quickly and in a nutshell how the

17   default option works.  And as I mentioned earlier, to the extent

18   any employees do not claim, the remainder of the premium that

19   would have gone to them under this default option just remains

20   with the employer.  So the employer is able to collect up to 100

21   percent of the premiums that they have paid.

22        So in addition to the default option, we wanted to

23   ensure that there was a way for class members who felt that they

24   paid something more than the default option to come up and

25   provide evidence and request something more than the default

1  option.  So we think the default option, you know, is really a

2  helpful tool to us because it allows for efficient claims

3  processing.  We use the data the defendants have given us.

4  Class members do not need to -- you know, individuals who are --

5  I mean employees and employers both do not need to go and come

6  up with years of, you know, bills and invoices and things like

7  that to make a claim.  They can just put in their name, their

8  address, their employer, the years they were covered.  And it is

9  our hope that with the data that we get from the defendants,

10  we'll be able to just process that claim.

11        And at the end of the day, you know, after all of these

12  calculations are made, the class members will have an

13  opportunity to see what data was used to determine their claim

14  value, and then they can -- at that point, if they wish to, they

15  can provide more information.  So there is a backstop here to

16  make sure that, for example, if ten years of data were missing

17  for some claimant, they would have an opportunity to provide

18  those ten years of data and they would know that those data were

19  missing.

20        So anybody who doesn't want to accept the default

21  option, which is the -- which is, you know, the standard choice

22  on the claim form, will have an opportunity to select an

23  alternative option.  And that will be very clearly denoted on

24  the claim form.  And Ms. Jones can talk about this a little bit

25  more.  But the claim form very clearly states what the default

1   option is, what the percentages are, and what you need to do to

2   do something different than the default option.

3          And somebody who takes that option can submit

4   additional materials along with their claim form in support of

5   something higher than the default option.  And then there is an

6   opportunity to go to the settlement administrator and seek

7   something else.  The settlement administrator can take into

8   account all the factors that we talked about a little earlier in

9   the presentation to determine what the contribution percentage

10  is there.  So, you know, our plan really provides an efficient

11  way to process claims as well as an alternative option that

12  gives somebody, a class member who doesn't want to accept that

13  efficient process, the ability to provide more information.  So

14  it's really the best of both worlds.

15         And then finally, you know, this process is all exactly

16  the same for self-funded accounts except that the contribution

17  percentages are slightly different.  So under the Kaiser data,

18  we found that the average employee contribution rate for the

19  self-funded class period from 2015 to 2020 ranged from 18 to 19

20  percent.  And for family coverage, it ranged from 24 to 26

21  percent.  And so those contribution percentages for the default

22  option are slightly different, 18 percent and 25 percent, and

23  everything else is essentially the same.  The residual 82

24  percent would be allocated to the employer for single coverage

25  and 75 percent to the employer for family coverage.

1    So that is the plan of distribution mechanics, and I'm

2  happy to answer any questions the Court has about how the plan

3  of distribution will run.

4    THE COURT:  I have no questions.

5    MS. BOJEDLA:  Great.  I guess I was extremely clear and

6  not too boring.

7    MS. JONES:  Just boring enough, Swathi.

8    MS. BOJEDLA:  It's late in the day.  I'm not sure

9  anybody was listening to me.  But that's okay.

10    THE COURT:  Not boring at all.

11    MS. JONES:  All right.  Hamish, if you could just go to

12  chart 133, that would be great.

13    Your Honor, Megan Jones from Hausfeld on behalf of the

14  subscriber plaintiffs.  If Swathi was the math, I am the

15  megaphone.  And I'm going to talk about notice and how we

16  publicize the settlement to meet the standards in this circuit.

17    We have proposed a notice program for the damage

18  classes that we have submitted for preliminary approval to this

19  Court.  It -- the plan itself represents months of work,

20  research, and design.  I'll note for the record that our notice

21  plan is summarized at docket 2611-2.  But put simply, after

22  months of vetting administrators, we selected JND in part

23  because of their size.  In a case of this size, we wanted to

24  make sure that we have this staffed up.  JND has over 175

25  full-time employees on staff with offices in the United States,

1   including a 35,000-square-foot facility in Seattle.  JND is led

2   by industry veterans with 75 years of experience.  And we picked

3   JND to implement the notice plan because in a case of this

4   magnitude, we wanted professionals that have experience handling

5   large settlement claims.  They are the best in class, and they

6   have proven reliable and trustworthy stewards of data, which is

7   important to us.

8            They met all of our requirements.  This will not be

9   JND's first multi-billion-dollar claims administration.  They

10  were instrumental in Equifax, Cobell, and BP Deepwater.

11  Fifty-one courts have approved notice plans designed by JND.

12           Hamish, you can go to chart 136.

13           JND is also a trusted vendor for nine federal agencies,

14  including the Department of Justice and the Office of the

15  Comptroller of the Currency.  JND is SOC 2 certified, which is a

16  third-party certification of data protocols.  Their security

17  systems have been vetted by numerous government agencies and

18  corporate clients.

19           And so for these reasons, we chose JND.  And our -- the

20  CEO of JND is here today, Jennifer Keough.  I'd like to

21  introduce her to the Court.  She is here today as a full partner

22  with us.  And her years of experience will, without question,

23  benefit the class here.

24           MS. KEOUGH:  Good afternoon, Your Honor.

25           THE COURT:  Good afternoon.

```
 1              MS. JONES:  Hamish, if you can go to 138, please.

 2         So we were mindful of the standards in the circuit when

 3    we designed this plan.  In this circuit, reasonableness is the

 4    standard, and it is a commonsense approach.  It has -- Rule 23

 5    has been interpreted to require that class members be given

 6    information reasonably necessary to make a decision whether to

 7    remain a class member and be bound or opt out of the action, but

 8    the notice does not need to include every material fact or be

 9    overly detailed.

10         And the -- in Adams, the Eleventh Circuit has held that

11    in the context of class actions, the most important element of

12    due process is adequate notice.  And the notice plan designed by

13    JND meets, if not exceeds, this criteria in the Eleventh

14    Circuit.

15         If you could go to 141.

16         I'm just going to briefly go over the items in the

17    plan.  We have designed it so that direct notice will be sent to

18    all damages class members for whom contact information is

19    available.  The settling defendants have agreed to provide us

20    with last known addresses and email addresses.  We will send

21    email notice to damages class members when an email has been

22    provided to the settling defendants in the ordinary course of

23    business.  These are not purchased emails.  If there is no email

24    address or the email bounces back, we will, again, provide

25    direct notice by postcard for members who don't have an email
```

1   address.

2          This direct notice plan is very comprehensive, but we

3   also developed a media plan, which is just the cherry on the

4   sundae to make sure that we reach every single class member.  It

5   has an 85 percent media reach, which means we're going to reach

6   85 percent of our class here.

7          We are going to do that by using digital ads on Google

8   and Facebook.  We are going to have print ad.  And while I have

9   not done due diligence, Your Honor, I think it might be the

10  first time your name appears in People magazine.  We are going

11  to have over 900 radio advertising spots purchased, including

12  programing in the top ten African-American markets and two

13  leading Spanish providers.  And we also have purchased 30-second

14  television spots on a variety of cable and syndicated news to

15  meet the class who are not digitally inclined, I would say.

16         We are also going to use LinkedIn and digital ads.

17  Thanks to JND's research, we've also identified several human

18  resource trade associations that we're going to advertise the

19  class on so that people who are making insurance decisions at

20  companies across the United States will be notified about this

21  class and multiple placements in e-newsletters that go to

22  executives across the country similarly situated, who are making

23  insurance decisions.  We are purchasing a list of human resource

24  directors in order to send notice as well.  So in addition to

25  direct notice, we are reaching out to human resource directors

 1   across the country.

 2          Additional efforts include third-party outreach, which

 3   I just explained, an Internet search campaign, so if someone

 4   puts in "Blue Cross settlement," our website comes up.  And an

 5   innovative feature, because we're using email, BCBSA dot com has

 6   agreed to post a notice on their own website.  And that will

 7   enhance the reliability of people who are getting emails from

 8   our notice provider.

 9          Prior to the claims deadline, we're also going to

10   initiate a wide range of media effort for claims stimulation,

11   reminding people get your claim forms in.  This is industry

12   standard, and it is tremendously useful to helping make sure

13   that class members know that the deadline is approaching.  So

14   it's another touch to remind class members in this class to fill

15   in their claim forms.

16          So what are we sending them?  The notice materials, we

17   have spent months making them as plain language and concise as

18   possible.  And that is not an easy job when you have an 87-page

19   settlement agreement.  They have been designed to comply with

20   the requirements of Rule 23, the due process requirements, and

21   the Federal Judicial Center's class action language guide.

22          We have used a combination of graphic design and color

23   and use of BCBS's own trademarks to make the direct notice and

24   emails stand out.  And one thing that we're particularly proud

25   of is there are plenty of methods for the class to reach out and

 1   obtain help.  They can do it by our settlement hot line, they

 2   can do it by email, and they can also do it by the settlement

 3   website.

 4          We have designed the claim filing to be simple and

 5   clear.  We will work to stimulate claims, and we expect to have

 6   about 80 percent of those who do file do so through the on-line

 7   wizard, which is an amazing tool that will walk people through

 8   the claim filing:  What is your name?  Input.  What is your

 9   address?  And it just kind of walks you through rather than a

10   form that just lands in your mailbox.

11          In order to reach those without computers, class

12   members will also be able to obtain a hard copy of the claim

13   form by using an automated voicemail feature of the settlement

14   hot line.  And, of course, we have the settlement website that

15   will provide relevant court documents.  It will answer

16   frequently asked questions, and it will provide updates on the

17   monitoring committee actions for the five years that the

18   monitoring committee is impaneled.

19          We think that this program will provide the best notice

20   practicable.  And it's consistent with, if not more robust than,

21   other court-approved programs.  It meets the due process

22   standards and the Rule 23 standards, and it's really designed to

23   reach as many class members as practicable and provide them with

24   the opportunity to review a plain-language notice with the

25   ability to take steps and learn more about the settlement.

 1          So that's the general overview, and I'm happy to answer

 2   any specific questions.

 3          THE COURT:  I have no questions.

 4          MS. JONES:  Okay.  Thank you, sir.

 5          MR. BOIES:  Your Honor, that concludes our

 6   presentation.  We are happy to respond to any additional

 7   questions the Court may have or that defendants or any other

 8   person present may wish to put to us.

 9          THE COURT:  So I think this is addressed, but let me

10   just be head-on about the question.  Why require a claim form?

11   Will that -- is that an additional hoop through which claimants

12   would have to jump?  Does that assist with robust participation?

13   Having said that, I do recognize that there's no reversion back

14   to the defendant and the money will be rateably applied to other

15   potential claimants, but kind of explain to me -- and you can

16   defer do whoever you want to, Mr. Boies --

17          MR. BOIES:  Sure.

18          THE COURT:  -- the philosophy of requiring a claim

19   form.

20          MS. JONES:  Yes, sir.

21          MR. BOIES:  I think there are a couple of overriding

22   things, and then I think Megan Jones can go into more detail.

23   But one issue is how we would purport to distribute funds in the

24   absence of a claim form.  The -- I don't think that we have the

25   data and the ability to try to do that in the absence of having

1  a claim form.  This is not a situation in which everybody is

2  preidentified and easily accessible.

3         The second thing is that one of the things that we

4  thought was important both for fairness and for efficiency of

5  operation was to have a default pro rata amount that could be

6  easily calculated, but also to allow people to have the option

7  of asking for individual consideration.  Again, we could not do

8  that without having a claim form.  There are other reasons as

9  well, but I think those are two in-line points that -- what's

10 important -- important to me.

11        Megan, do you want to expand on that?

12        MS. JONES:  Sure.  I agree with everything David said.

13        I would add that there's privacy issues involved about

14 sending prepopulated forms to members of the community with

15 health care information.  I think also -- we did consider this,

16 Your Honor.  We thought -- we came from the same end of the

17 telescope as you did.  How can we make this as easy as possible

18 for our class members?  We want to make sure the right person

19 gets a check.  In 2008, I was in D.C.  I was Megan Jones.  In

20 2012, I'm now -- or in 2020, I'm in California.  We don't want

21 checks going to those two addresses when it's actually the same

22 person.

23        Similarly, if we sent out checks, if we considered

24 that, if we just went ahead without a claim form, experience

25 shows that there would be a large percentage that were uncashed

1    and we would have to chase, because they're not going to the

2    right person and they couldn't be cashed.

3            And then we -- for efficiency's sake, we are trying to,

4    in the claim form, offer electronic forms of payment.  Your

5    Honor has been involved in multiple class actions, and you know

6    there's always this problem of uncashed checks.  And the claim

7    form allows people to provide their Venmo or PayPal information,

8    which will greatly reduce the amount of uncashed checks that

9    expire that we then have to redistribute.

10           And lastly, because of what Swathi described as the off

11   ramp, if people want to not use the default percentage, we need

12   to give them an ability to do so.  And we did that through the

13   claim form.  But one of the reasons why our notice plan is so

14   robust is because we understand that we want people to

15   participate in the class.  And so we're going to make sure that

16   they understand how to do that and make it as easy as possible.

17           THE COURT:  Is that all?  I'm just kidding.  All right.

18           MS. JONES:  Yes.

19           THE COURT:  All right.  Fair enough.  What other --

20   Mr. Boies, that concludes your presentation?

21           MR. BOIES:  It does, Your Honor.

22           THE COURT:  All right.  I think it's the Blues' turn.

23   Who wants to speak on behalf of the settlement?

24           MR. ZOTT:  Your Honor, David Zott representing the

25   Association.  We'll start out.  And we're going to try to keep

 1   our comments brief as well.

 2        Your Honor, obviously, we're at the preliminary

 3   approval stage where the question is whether the Court will

 4   likely be able to approve the settlement as fair, reasonable,

 5   and adequate.  Your Honor noted correctly that the 2018

 6   amendments have imposed a somewhat more rigorous inquiry at this

 7   stage.  And we believe that the subscribers, through the papers

 8   that they filed, the briefs, the declarations, the substantial

 9   evidence, that they have made the appropriate showing.

10        In terms of the fairness of the settlement, there are

11   sort of the two components that Mr. Cooper mentioned earlier,

12   procedural and substantive.  On the procedural side, there's no

13   question.  No one disputes that this was a procedurally fair

14   settlement, the product of vigorous arm's-length negotiations.

15   To call it arm's length is almost like, you know, calling World

16   War II a disagreement.  I mean, this was a hard-fought --

17   hard-fought negotiations over five years.  Many times we were at

18   impasse.  Through the good efforts of three mediators, but

19   particularly Special Master Gentle, we were able to come back

20   off the edge and finally reach an agreement.  The agreement was

21   accomplished after substantial -- in fact, we completed fact

22   discovery.  So all the depositions were done.  Both parties know

23   a lot about each other's cases.  We also had, as Mr. Boies

24   noted, extensive motion practice, both multiple rounds of

25   dismissal and summary judgment.

1          In terms of substance, the combination of the monetary

2    relief, the 2.67 billion, plus the injunctive relief we think

3    does provide significant relief and is fair and reasonable when

4    measured against the risks and the costs and the uncertainties

5    of the litigation.  As the Court knows -- and Your Honor

6    acknowledged it at the outset -- we do believe that our system,

7    as currently constituted, is lawful and procompetitive and

8    ultimately would be sustained.  At the same time, there's no

9    question that both sides face very substantial risks and expense

10   and burden and uncertainty.

11         With respect to the subscribers, and just focusing

12   solely on Alabama, they still would need to certify a litigation

13   class.  They would need to get over summary judgment.  They

14   would need to win at trial.  Then they would need to sustain

15   that -- all of those decisions, including class certification

16   and a merits trial on appeal, including challenges to important

17   issues like the standard of review and single entity and so

18   forth.  Assuming they run the gauntlet in Alabama and in the

19   Eleventh Circuit, then they get to do the same thing in multiple

20   other jurisdictions throughout the country, applying potentially

21   different standards and rules.

22         I also note that the two declarations, the substantive

23   declarations that they submitted by Professors Rubinfeld and

24   Pakes, also strongly support the settlement.  Professor

25   Rubinfeld, who has been an expert on both sides, both a defense

1  and a plaintiff expert in his career, concluded that with the

2  go-forward revisions to the system, they, quote, directly

3  address, end quote, what, in his opinion, were the principal

4  competitive issues that he had seen in the earlier reports.

5         Professor Pakes concluded that NBE, according to his

6  calculations -- and this was not for settlement, but this was

7  during the litigation phase -- that NBE accounted for 97 percent

8  of the total damages in the case, which means that without them,

9  it would eliminate that going forward.  As Mr. Boies noted, the

10  monetary recovery, as measured against the plaintiffs' best day,

11  their maximum recovery, is seven to 14 percent, well within the

12  range that the law routinely approves.

13         In terms of the standard of review, Your Honor, there

14  was a lot of discussion about that earlier.  We weren't really

15  involved in that, so let me just make a few comments about that

16  now.

17         First, I think we all agree that if, going forward, the

18  system were clearly illegal, Your Honor could not approve this

19  deal.  The Court must conclude that the go-forward system is not

20  per se unlawful but, instead, is subject to the rule of reason

21  in order to (unintelligible).  Your Honor I think noted that

22  earlier.  There's no question.

23         Your Honor then raised the issue of what about the rule

24  of reason?  I understand, you know, you're not here to try the

25  case, but do you also need to conclude it's more likely that the

1   procompetitive benefits of the future system outweigh any

2   anticompetitive harm.  And it's our view on that, Your Honor,

3   that by the time we get to final approval, you should want to

4   and you should be able to conclude that in all likelihood, the

5   procompetitive benefits of the system outweigh any alleged

6   anticompetitive conduct or any anticompetitive effects.

7           We think that the data that's already in the record

8   assists the Court in a long -- and goes a long way towards

9   making that conclusion, including the opinions of the

10  plaintiffs' two merits experts that I mentioned earlier,

11  Professor Rubinfeld and Professor Pakes.  In addition to that, I

12  think, you know, Your Honor's own standard of review,

13  (unintelligible) the ruling, apart from the aggregation point,

14  you know, the Court's findings on BlueCard, that BlueCard was a

15  cooperative integration with plausible procompetitive benefits,

16  that requires a rule-of-reason analysis.  The point here is that

17  the only reason BlueCard exists is because service areas exist.

18  And without service areas and the kind of cooperation that they

19  facilitate, there would be no BlueCard and there would be no

20  benefits like BlueCard gives to the subscribers.

21          Lastly, Your Honor, the discussion this morning was

22  somewhat far-ranging on standard of review, but we believe that

23  the subscribers agree with us on at least these three things --

24  and we want to make clear on that; and if they don't agree, they

25  should say so now, but I believe they do -- which is, first,

1  going forward, we all agree that the system will not be clearly

2  illegal, we all agree that the rule of reason will apply going

3  forward, and the subscribers agree that there are procompetitive

4  benefits to the system going forward.  I believe that's what

5  they said.  I think that's what their slides said, and I think

6  that's where they are.  So -- but if not, they should speak now.

7  And --

8          THE COURT:  Well, I think Mr. Boies got there.

9          Mr. Hausfeld, you're co-lead counsel for the

10  subscribers.  Probably ought to put the question to you.  Do you

11  agree with each of those points?

12          MR. HAUSFELD:  Totally concur, Your Honor.

13          THE COURT:  All right.  Thank you.

14          MR. ZOTT:  With that, Your Honor, we agree with the

15  subscribers that the settlement is likely to be approved as

16  fair, reasonable, and adequate, and we join them in seeking

17  preliminary approval.

18          THE COURT:  All right.  Thank you.

19          All right.  One of the things that I think we need to

20  address also is just -- and I realize, as Mr. Cowan pointed out,

21  that there are some limits on what can be discussed about the

22  process in the public record.  You know, I reached -- so one

23  thing Mr. Cowan may not -- may be aware of, but I promise you

24  all the other attorneys on our call are aware of -- is that I

25  was very vigilant at one stage in this case protecting the

```
 1   mediation privilege when there were attempts to invade it up in
 2   the chancery court of Delaware.  So I know there are some limits
 3   on what can be discussed here.  But I do think I need to ask,
 4   just to be arm's length and neutral, everyone was satisfied with
 5   the mediation process that we had?
 6           MR. BOIES:  Yes, Your Honor.
 7           MR. HAUSFELD:  Yes, sir.
 8           MR. BOIES:  I think that is an understatement, but yes.
 9           THE COURT:  All right.  Now, again, I don't want to go
10   into too much detail, but all the lawyers are aware that at one
11   point, we were not very satisfied with the mediation process.
12   And I asked Mr. Gentle to assume a more heightened role with
13   that.  I did that realizing that he was also a special master in
14   this case.  The mediation history here, though, is that I think
15   when the parties became the -- the pig rather than the
16   chicken -- and Judge Clemon knows this analogy, being from the
17   South.  But, you know, when it comes to breakfast, the chicken
18   is involved, but the pig is committed.  I think by the time
19   everyone became the pig, we had pretty much stayed the
20   litigation track and there was not as much work for the special
21   master to be doing on that track.
22           And I have a lot of faith in Mr. Gentle, but I feel
23   like I need to make a record of this.  Is everyone satisfied
24   with the way he performed as a mediator, divorcing himself from
25   the special master role?
```

 1          MR. HAUSFELD:  Yes, Your Honor.

 2          MR. BOIES:  Absolutely agree, Your Honor.

 3          MR. ZOTT:  We do as well, Your Honor.

 4          THE COURT:  All right.  Now, I realize when I asked him

 5    to take on the mediator's role, he was, if successful, going to

 6    be ending a much more lucrative part of this case for himself.

 7    That is, he was getting monthly bills out on his special master

 8    work.  I take it -- I think those bills have been decreased

 9    during the mediation, at least overall, maybe not in spurts.

10    But I think his client became the deal, as any good mediator's

11    client becomes at that point.

12          MR. BOIES:  Yes.  Right.

13          THE COURT:  Anything else that -- anything else we need

14    to be discussing about the neutral approach to the mediation and

15    any associated issues?

16          MS. JONES:  Your Honor, the only thing I would raise is

17    the stay issue.  Your Honor had stayed the case and was

18    continually periodically renewing that.  And so I wanted to

19    raise that with the Court about how you wanted to handle that

20    going forward.

21          THE COURT:  Well, I take it that the stay of any

22    litigation efforts will remain in place.  Now, I fully expect

23    that the Blues will continue litigating in this case as it

24    relates to the providers.  And I fully expect that the

25    subscribers will have some role in monitoring that case, that

1   aspect -- that track of the case, as it could potentially affect

2   the proposed settlement.

3        Now, one of the things the Court raised -- and this is

4   a good jumping-off point -- Megan, you're doing a great job of

5   being my segue -- is what do we do with all these 40-some-odd

6   cases that we have on my docket that the chief judge of the

7   circuit calls me about every year and says, why do you have so

8   many cases you're reporting.

9        What I would prefer to do if -- if, big if --

10  preliminary approval is granted, is put those on the escalator,

11  which means that we would administratively terminate them from

12  the Court's docket with the full right to refile them without a

13  filling fee.  And they would return to the exact place they

14  would have been if never having been dismissed if they have to

15  be reinstated to the docket because the settlement does not go

16  forward or does not become final.

17       I've done that in a number of other cases.  It's an

18  administrative vehicle.  That just means that they -- I don't

19  have to purchase so many moth balls for my reporting that I have

20  to do to the Judicial Conference every year -- actually, twice a

21  year.  I would be glad to have the language worked out, if we

22  get to that point, that everyone is satisfied that that's

23  exactly what happens, that these are administratively terminated

24  without prejudice, to be reinstated as if they had never been

25  dismissed, with all the parties having the same rights,

1   defenses, claims, and legal position that they would have had if

2   the case had never been administratively terminated.

3          Now, the special master, slash, mediator, when I

4   proposed this to him and asked him to circulate it to you, there

5   was some pushback.  I don't know how firm it was, but he said

6   it's something we need to probably take up at the hearing.

7          And, Megan, maybe that was part of why you asked the

8   question.

9          MS. JONES:  Your Honor --

10          THE COURT:  So I'll be glad to hear everybody's

11   thoughts at this point on that issue.

12          MS. JONES:  Mr. Gentle did circulate that idea to us.

13   And I think it would be best if the plaintiffs and defendants

14   met and conferred about that and got back to you with a

15   recommendation.  But we will specifically evaluate what you just

16   suggested.

17          THE COURT:  Well, that's fine.  Maybe I'll go Prime

18   Minister Thatcher on you and tell you that I have infinite

19   patience to wait on your report as long as I get my way.

20          MS. JONES:  Understood.

21          THE COURT:  All right.  In case any -- I know you don't

22   want to cross-pollinate too much, but feel free to reach out to

23   my former chief judge on why an Article III judge might be

24   tempted to do it this way.

25          MR. BOIES:  Okay.

```
 1              THE COURT:  I was on a run not too long ago when Bill
 2   Pryor called me and said, what are you doing with your docket?
 3              Actually, I think he kind of knew what was going on
 4   with the docket, but he wanted to confirm it.
 5              MR. BOIES:  Yeah.
 6              THE COURT:  All right.  Anything else we need to take
 7   up for purposes of our hearing today?
 8              SPECIAL MASTER GENTLE:  The other Blues may want to say
 9   something.
10              THE COURT:  Yes.  There are some other Blues that have
11   been great advocates as well.  I think Mr. Laytin and Mr. Zott
12   would completely back me up on that.  You know, I've said often
13   that, you know, this has just been an absolute gem of an
14   experience from the standpoint of having the opportunity to have
15   just great lawyers fighting over something that's really
16   important and significant.
17              Any other Blues that might want to speak up about the
18   preliminary approval issue?
19              MR. HOOVER:  Your Honor, it's Craig Hoover.
20              I certainly second the statements that Mr. Zott made in
21   support of preliminary approval.  It was a hard-fought battle.
22   We had many good times in Birmingham, certainly, hashing it out,
23   whether it be filed rate or standard of review or other things.
24   It's been a long road, but certainly, on behalf of the nine
25   plans that I represent, we echo the statements that Mr. Zott
```

1   made and are glad to be here.

2           THE COURT:  All right.  Thank you.  Any other Blue

3   counsel want to speak?

4       (Brief pause)

5           THE COURT:  All right.  Very well.  I will take your

6   silence as acquiescence in the positions advocated by your

7   peers.

8           All right.  Well, if there's -- any other good and

9   welfare before we sign off?

10          MR. BOIES:  Not from us, Your Honor.

11          THE COURT:  Well, I very much appreciate y'all being

12  available for this lengthy Zoom conference.  I'll take it under

13  submission and look forward to getting any final licks you want

14  to get in no later than Friday, let's say noon.  The five p.m.

15  waiting for the PowerPoint Friday made my staff have to stay

16  here longer than they wanted to on a Friday afternoon.

17          MS. JONES:  We apologize for that, Your Honor, but we

18  needed every hour.

19          THE COURT:  When I got it, I fully appreciated that.

20  I'm not -- I'm not criticizing that.  I'm just saying that I

21  tend to work their rears off during the week and try to reward

22  them a little bit on Friday.

23          SPECIAL MASTER GENTLE:  Should we ask --

24          MR. BOIES:  We will definitely get it in by noon, Your

25  Honor.

```
 1              THE COURT:  All right.

 2              SPECIAL MASTER GENTLE:  Should it be part of the

 3   record, the PowerPoint?

 4              THE COURT:  Yes.  I plan to make the PowerPoint a part

 5   of the record.  Any objection to that?  Just an exhibit to this

 6   hearing?

 7              MR. BOIES:  I think that's appropriate, Your Honor.

 8              THE COURT:  All right.  Very well.  It was an excellent

 9   PowerPoint, by the way.

10              MR. BOIES:  Thank you.

11              THE COURT:  The time was spent wisely developing it.

12              Mr. Cowan, I want to echo my thanks to you for

13   appearing and giving me your thoughts.  You know, from time to

14   time, you're standing alone in the corner.  That does not mean

15   you're underappreciated.

16              MR. COWAN:  Been there before, Judge.  Thank you for

17   your time and consideration and allowing us to just voice some

18   concerns.

19              THE COURT:  And I'm going to encourage you just to keep

20   working with them to see if you can get the information you

21   need.  I'm not putting any pressure on you or any of the other

22   parties, but I'm just asking you to continue talking through

23   these issues and see where we are when -- after -- if I do

24   preliminarily approve it, we'll see where we are when we get to

25   final approval.
```

1          MR. COWAN:  That's the next hurdle I was trying to

2  avoid.  Thank you, Your Honor.

3          THE COURT:  I understand that.  Thank you.  Appreciate

4  you.

5          All right, folks.  Everyone be safe.  Stay healthy.

6  And we're looking for the new year to ring in, aren't we?

7          MR. BOIES:  We are.  In many ways.  In many ways.

8          THE COURT:  You know, this could be door number three

9  on Let's Make a Deal.  You know, you don't like door number two;

10 but door number three, there's no guarantees what it looks like.

11         MR. BOIES:  Right.  Right.

12         THE COURT:  Take care.

13         COUNSEL IN UNISON:  Thank you, Your Honor.

14         COUNSEL IN UNISON:  Thank you, Judge.

15     (Proceedings concluded at 3:43 p.m.)

16                     *  *  *  *  *  *  *  *  *  *

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2            I certify that the foregoing is a correct transcript

 3   from the record of proceedings in the above-entitled matter.

 4            This 19th day of November, 2020.

 5

 6

 7                           Risa L. Entrekin
                             Registered Diplomate Reporter
 8                           Certified Realtime Reporter
                             Official Court Reporter
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```