**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **IN RE BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION MDL 2406** | : : : : : : : | **Master File 2:13-cv-20000-RDP** |
| | | **This document relates to Subscriber Track cases** |

**SUBSCRIBER PLAINTIFFS' REPLY MEMORANDUM
OF LAW IN SUPPORT OF PRELIMINARY APPROVAL**

In response to this Court's invitation, Subscriber Plaintiffs submit this Reply Memorandum in Support of their Motion for Preliminary Approval to further address the November 12, 2020 Response filed by three class members (DOC. 2623, the "Response"; the three class members are the "Respondents").

As the record shows, 67 class representatives from across the country have approved this settlement; only the three former[1] class representatives, each represented by Mr. Cowan, have failed to do so. Mr. Cowan has been provided with as fulsome explanations as practical to the various queries he or his clients raised; Mr. Cowan also has access to all of the publicly filed materials, including submissions summarizing relevant legal and factual issues and information.

**I.      THE PAYMENT OF $2.67 BILLION IS A MORE THAN FAIR,
        REASONABLE, AND ADEQUATE SETTLEMENT PAYMENT.**

Although counsel for Respondents appeared to recognize the futility of this point, the Respondents did suggest in their filing (DOC. 2623) that Subscriber Plaintiffs should perhaps have obtained a larger monetary settlement than the $2.67 billion the Defendants have agreed to pay. DOC. 2623 at 4-5.  Respondents point to the "surplus" amount that BCBS-AL and Blue Plans in

---

[1] Mr. Cowan's clients are not named in the Fourth Amended Complaint and are no longer class representatives.

other states have accumulated.  *Id.*  Respondents then wonder whether it is appropriate to equate the excess surplus each Plan holds with the overpayments Subscribers allege were paid as a result of prices that were inflated by virtue of the provisions in the BCBSA trademark license agreements challenged as anticompetitive in this case.

This inquiry is easily answered.  It is not appropriate to equate excess reserves with alleged overpayments caused by alleged anticompetitive agreements.  First, while the surplus reserves were a topic of discovery to show that various territories – such as the Alabama market – would be attractive markets to enter, and to rebut any insinuation that certain Plans were truly "non-profit" and did not accumulate profits, that does not mean Subscribers could have proved damages simply by pointing to the existence of large reserves.  Any such effort would have been unlikely to survive a *Daubert* challenge or motion *in limine*.  The standard of proof for damages in an antitrust case calls for the plaintiffs to show what price would have been available to them in the "but for" world – i.e., during the time period for which damages are sought, but assuming that the restraints challenged as anticompetitive were not in place.[2]  This standard could not have been met simply by pointing to the level of reserves held by each Plan.

Second, Respondents may be unaware of the fact that BCBS-AL maintained, and submitted expert reports asserting, that it was required by its regulator to hold the excess reserves.[3]  While Subscribers disputed the extent to which these requirements were truly necessary, this fact, at a

---

[2] *See generally Brunswich Corp. v. Pueblo Bowl-O-Mat*, 97 S. Ct. 429 US 477, 489 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent ……The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."); *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 529 (1983) (analyzing standards for proving damages in antitrust claims).

[3] *See* DOC 1349-3 (BCBS-AL Expert Report of Prof. Daniel Murphy, July 3, 2017) at ¶ 100 (opining that BCBS-AL needed to hold surplus reserves).

minimum, certainly casts some doubt on how one should properly interpret what an "excess" reserve means.

Third, it is not only the Blue Plans that hold excess reserves. That is fairly common in the health insurance industry, as regulators encourage – and sometimes require – the holding of excess reserves (or capital reserves held by parent companies) to ensure health plans are prepared to meet unusually high claims.[4]

Respondents have had access to the summary of the damages analysis performed by Dr. Ariel Pakes for the accelerated Alabama action (Doc. No. 2411), as well as the analysis performed by Dr. Pakes for nationwide damages in connection with an assessment of the settlement. Doc. No. 2610-11. Those analyses show that the maximum single damages recovery *nationwide* would have been somewhere in the range of $18.6 - $31.6 billion. *Id.* at ¶ 10. A settlement of $2.67 billion therefore represents between 7.3% and 14.3% of total single damages. This is well within the range of what courts routinely hold to be reasonable in a settlement. *See Bennett v. Behring Corp.*, 737 F.2d 982, 986-87 & n.9 (11th Cir. 1984) (5.6% of claims); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) (9% of claims); *Lazy Oil Co. v. Wotco Corp.*, 95 F.Supp.2d 290, 318-19 (W.D.Pa. 1997) (5.35% of claims); *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880, at *14 (E.D. La. July 27, 2015) (8.5% of claims); *Carnegie v. Mut. Sav. Life Ins. Co.*, 2004 WL 3715446, at *21 (N.D. Ala. Nov. 23, 2004) (refusing to consider potential punitive damages award when determining the adequacy of settlement).

---

[4] *See* DOC 2565-48 (BCBS-AL Expert Report of Professor Janusz Ordover) at page 67 ("It is common for insurers to hold more reserves than the minimum level required by state regulations, to reduce the likelihood that unforeseen expenses could lead to the insurer falling below the minimum required level (which can lead to regulatory intervention).")

To suggest that Subscriber Plaintiffs should have refused to settle for a payment of $2.67 billion ignores (a) the fact that this settlement amount is (to our knowledge) the largest antitrust settlement obtained from health insurers in any case, (b) this is one of the largest antitrust settlements in history that involved no government enforcement action, (c) the risks Subscriber Plaintiffs faced in proving liability, (d) the risks in obtaining class certification for litigation purposes; (e) risks and the complexities that were inherent in trying to prove damages with reasonable certainty, including the challenges of proving that there should have been additional "Blue" entry in the "but for" world, identifying the potential entrants, and measuring the timing and effect of such entry on prices, and (f) the enormous resources that would need to be devoted to, and the significant delay and risks that would be associated with, the litigation of this case to final resolution of all claims. The foregoing were substantial risks, as explained in our preliminary approval motion papers and in our presentation on November 16, 2020[5]; moreover, suggesting that Subscriber Plaintiffs should have refused the $2.67 billion recovery and continued the litigation ignores the fact that this settlement not only obtains a multi-billion dollar financial recovery for class members, but also obtains historic structural relief which will lead to more competition in the health insurance industry in ways that independent public commentators have already recognized to be "monumental" and as having "the potential to re-shape the state of competition in health insurance markets going forward."[6]

---

[5] See Ex. 1 (Excerpts of Transcript of Nov. 16, 2020 hearing) at 101:16-20 ("THE COURT: But it just seems to me that isn't there enough here, after eight years of litigation, in the public record to help us assess just the difficulty of protracted litigation and the uncertainty of how things might go? MR. COWAN: There certainly is, Your Honor.")

[6] *See* Public Comments of Washington Insurance Commissioner Mike Kreidler, https://www.bigcountrynewsconnection.com/news/blue-cross-blue-shield-enrollees-can-expect-small-payments-from-2-67-billion-settlement/article_8b1e5c88-1d5d-11eb-ae21-3f508afafcfa.html ("This settlement should increase competition, which is great news," Kreidler said. "The settlement should put all companies on notice that they need to do right by consumers. Hopefully, it will also lead to more transparency throughout the health care market."); Joe Patrice, *"Blue Cross Blue Shield Plans to Settle for $2.7B… and That's Not the Most Important Relief", Above the Law* (Sept. 24, 2020), https://abovethelaw.com/2020/09/blue-cross-blue-shield-plans-to-settle-for-2-7b-and-thats-not-the-most-important-relief/amp/ ("[T]he impact that the injunctive relief will have on the health insurance market

For all these reasons and the reasons more fully stated in our opening brief in support of preliminary approval and in our presentation on November 16, 2020, Subscribers remain confident that the $2.67 billion financial recovery in this proposed settlement is more than fair, reasonable, and adequate.

## II. THE SUBSCRIBERS DO NOT NEED CLASS REPRESENTATIVES FROM EVERY STATE IN ORDER TO SETTLE THE FEDERAL ANTITRUST LAW CLAIMS ASSERTED HERE, AS WELL AS ANY STATE LAW CLAIMS BASED ON THE SAME FACTS.

Respondents previously suggested that the 67 class representatives "lack standing to dismiss" claims of class members residing in states different from those in which the 67 class representatives reside. DOC. 2623 at 5. This is obviously incorrect as a matter of law, as we believe Mr. Cowan recognized during the November 16 hearing, where he conceded that he was not arguing that a class representative was needed from every state. Ex. 1 (Excerpts of Tr. of November 16, 2020 Hearing) at 93:6-13 ("I don't think we need a state-by-state subclass."). The case law also recognizes that in the context of a motion to certify a nationwide settlement class to settle claims principally brought under federal law, it is not necessary to have class representatives from every state in order to release all related claims that could in theory have been brought under the laws of all fifty states based on the same conduct forming the gravamen of the federal claims.[7]

_____

should be monumental."); James Burns, Healthcare Antitrust practice head at Ackerman LLP, "'Historic' Settlement of Blue Cross Blue Shield Association Antitrust Action May Significantly Boost Competition", *Lexology* (Nov. 9, 2020), https://www.lexology.com/library/detail.aspx?g=b0e9ce57-3e42-4020-aa3e-8a64489162f3&utm_source=Lexology+Daily+Newsfeed&utm_medium=HT ("While the money that will be paid under the proposed settlement, if approved, is substantial – even when shared among the 36 member Blues – the injunctive relief terms are even more significant, as they have the potential to re-shape the state of competition in health insurance markets going forward.").

[7] *See, e.g., Brown v. Wells Fargo Bank, N.A.*, 25 F. Supp. 3d 144, 151 (D.D.C. 2014) ("Indeed, to deny a nationwide class action settlement the ability to release related state law claims, even on behalf of those class members not residing in the states with a named plaintiff, could undermine the efficiency of class actions. Furthermore, the laws of different states in the area of consumer protection will always vary to some degree, but federal policy favors class actions and settlements which resolve issues with as few separate actions as practicable."); *In re Vitamins Antitrust Litig.,* No. 99–197(TFH), 2000 WL 1737867, at *5 (D.D.C. March 31, 2000) ("it is well-settled that 'in order to achieve a comprehensive settlement that would prevent relitigation of settled questions,' in a class action, a court may permit a broad release of claims based on overlapping factual predicates") (quoting *City P'ship Co. v. Atl.*

This principle is illustrated by the decision of the Eleventh Circuit in *Thomas v. Blue Cross and Blue Shield Ass'n*, 333 Fed. Appx. 414 (11th Cir. 2009).  In *Thomas*, a nationwide RICO class action from the Southern District of Florida in which there were four representative plaintiffs, the Eleventh Circuit upheld an injunction against a class member who tried to pursue North Carolina state law claims that had been included in the release, holding that the court had the power to approve a release of any potential state law claims based on an identical factual predicate as the federal claims presented in the case, even if those state law claims could not have been presented by the class representatives.  *Id.* at 420.  This is well-settled law. *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 376-77, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) ("a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.") (quotes and cites omitted); *see also In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) ("even when the court does not have power to adjudicate a claim, it may still approve release of that claim as a condition of settlement of an action before it.").[8]

_____

*Acquisition Ltd. P'ship,* 100 F.3d 1041, 1044 (1st Cir.1996)); *Class of Plaintiffs v. Seattle,* 955 F.2d 1268, 1287 (9th Cir.1992) ("The weight of authority holds that a federal court may release not only those claims alleged in the complaint, but also a claim 'based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.' ") (quoting *TBK Partners, Ltd. v. W. Union Corp.,* 675 F.2d 456, 460 (2d Cir.1982)); *Gjolaj v. Global Concepts Limited, inc.*, Case No. 1:12-cv-23064-MGC  (S.D. Fla.) at DOC. 60 (approving class settlement for "nationwide class of purchasers" represented by two class representatives, one from Florida and one from Michigan, where settlement included release of federal and state claims, including the specific release required by California Civil Code Section 1542).  This follows from the fact that it is not necessary to have a class member from every state to advance a claim under federal law on behalf of a nationwide class. *See generally Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012) ("Class members' claims need not be identical ... rather, there need only exist a sufficient nexus between the legal claims of the named class representatives and those of individual class members to warrant class certification."); *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001) (named plaintiffs are typical of the class where they "possess the same interest and suffer the same injury as the class members"); *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) (typicality satisfied where claims "arise from the same event or pattern or practice and are based on the same legal theory").

[8] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

As the Eleventh Circuit further made clear, for this purpose "an 'identical factual predicate' requires only a common nucleus of operative fact.  In determining whether claims share the 'same operative nucleus of fact,' we consider whether the 'primary right and duty are the same.'" *Thomas*, 414 Fed. App'x at 417 (internal citations omitted).

Accordingly, the Court plainly has the power to approve this nationwide settlement of federal antitrust claims brought by the 67 class representatives (who reside in 25 different states), and to approve the release of any and all state law claims that either were brought or could have been brought based on the same set of facts.

## III.    VARIATIONS AMONG THE STRENGTH OF CLASS MEMBERS' CLAIMS ARE ROUTINE AND DO NOT PRESENT A CONFLICT – LET ALONE A "FUNDAMENTAL CONFLICT" REQUIRING SUB-CLASSES.

Respondents previously suggested that there may be differences in the strength of the claims of class members depending on the state in which those class members are located.  As explained during the November 16 hearing, that suggestion overlooks the fact that the claims brought here are overwhelmingly national in scope.  The central claims in this case were that BCBSA imposes uniform restrictions on every one of its trademark licenses throughout the country, limiting the ability of the Defendant Plans (including when using non-Blue marks) to compete with one another throughout the country.  The geographic scope of the anticompetitive conduct was nationwide, just as is the scope of the principal structural relief.  There is therefore no basis for treating class members differently based on their geographic location.  Respondents' counsel seemed to recognize this during the November 16 hearing.  Ex. 1 (Excerpts of Tr. of November 16, 2020 Hearing) at 92:23-93:13

The Eleventh Circuit has provided the contours necessary for an objector to establish a fundamental conflict that may necessitate subclasses: "A fundamental conflict exists where some

party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug Co. v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1189 (11th Cir. 2003). No such facts exist here. Although the Response repeatedly refers to potential "conflicts" within the national classes created by the Settlement, it never explains what those conflicts might be. "Significantly, the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a *fundamental* one going to the specific issues in controversy." *Valley Drug*, 350 F.3d at 1189 (emphasis added). Respondents have not come close to identifying any such fundamental conflicts. Further, while Respondents baselessly refer to the 67 class representatives who have approved the settlement as having been "handpicked" by Subscribers Counsel, this ignores the fact that these 67 parties represent over 95% of the class representatives in the prior complaint, who have been in this case for the better part of the past decade. There is nothing "handpicked" about over 95% of the class representatives agreeing to this settlement, while three refuse to do so for reasons that have not been clearly stated or well-founded.

In any event, in a class action, it is common for the strength of class members' claims to vary for multiple reasons. Thus, even if and to the extent it could be argued here that differences in market conditions, the likelihood of Blue entry into a state, or various state regulatory regimes could potentially affect the value of a given class member's claim, that is not a basis for finding a need for sub-classes or an allocation plan that departs from a general *pro rata* standard. It is well-settled that these normal variations are simply not intra-class conflicts requiring either sub-classes or particular allocation regimes. "It is not enough for objectors to point to differences in claims, allocation amounts, or state laws without identifying how such differences demonstrate a conflict of interest." *In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010). "Such differences in settlement value do not, without more, demonstrate conflicting or antagonistic interests within

the class." *Id.* at 346 (citing *In re Ins. Brokerage*, 579 F.3d 241 (3d Cir. 2009)).  Rather, the traditional task of experienced class counsel includes determining whether any such differences are so substantial that different plans of allocation, or subclasses, are appropriate.  As this Court has previously explained:

> "The practical effect of creating numerous subclasses represented by competing teams of lawyers would have decreased the overall leverage of the class in settlement discussions and rendered productive negotiations difficult if not impossible. Further, if the case had not settled, the additional subclasses and lawyers likely would have made the litigation process, particularly discovery and trial, much harder to manage and caused needless duplication of effort, inefficiency, and jury confusion."

*In re Equifax Inc. Customer Data Security Breach Litig.*, 2020 WL 256132 at *20 (N.D. Ga. March 17, 2020).

## IV.    THE FILED-RATE DOCTRINE DOES NOT WARRANT EITHER "SUBCLASSES" OR A DIFFERENT ALLOCATION PLAN FROM THE *PRO RATA* PLAN PROPOSED BY SUBSCRIBERS.

Respondents also point to alleged "Filed Rate Doctrine Conflicts," suggesting that class members in certain states would not face the Filed Rate Doctrine defense whereas those in other states would face insurmountable defenses.  DOC. 2363. Neither contention is supported, and neither is correct.

At the November 16, 2020 preliminary approval hearing, counsel for Respondents appeared to be unaware of significant aspects of this Court's multi-year review of filed-rate doctrine issues, including the likelihood that its grant of summary judgment would have to be revised or even vacated in significant part.[9]    *See* DOC. 1046 (Subscribers' motion for

---

[9] The Response cites no decision or motion on filed-rate doctrine issues later than the Court's 2014 ruling on Defendants' motion to dismiss, DOC. 204, which addressed only the Ruler 12(b) motions, not the more extensive analysis contained in the motions made on a fuller factual record at the summary judgment stage.  Courts frequently note the seeming unfamiliarity of objecting counsel with the issues and facts involved in the litigation.  *See, e.g., In re Holocaust Victim Assets Litig,* 311 F. Supp. 2d 363, 369 (E.D.N.Y. 2004), aff'd, 424 F.3d 150 (2d Cir. 2005); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 563 (D.N.J. 1997) (stating that objector counsel

reconsideration of filed-rate order); DOC.1098 (denying motion without prejudice so that issues could be "reassessed . . . at a later date"); DOC. 1109 (4/21/17 Hrg. Tr.  69-70) (noting for the record that the Court would, at class certification or closer to trial, "revisit the issue with more information than I have got right now …").  When all the facts are considered, it is clear that filed-rate regimes do not dictate either subclasses or a different approach to allocation.  There are simply too many variables to conclude that class members from certain states would definitely have a stronger or weaker claim than other class members, much less that such differences would require additional subclasses or allocation on anything but a *pro rata* basis.[10]

As set forth below in Section A, there is some form of regulatory oversight of at least certain health insurance products in all states, thereby giving rise to a basis for invoking the filed rate doctrine in all or virtually all jurisdictions.  In addition, however, as described in Section B, there are numerous arguments for why the filed rate doctrine should not preclude an award of damages to class members in this case, no matter the state in which they reside.  A brief review of these arguments shows that the potential outcomes of each of these legal arguments under the facts of this case are far from clear.  This illustrates the futility, and administrative unworkability, of trying to construct a Plan of Distribution that seeks to make sustainable distinctions between groups of class members based on the supposed outcome of numerous filed rate doctrine disputes.  Attempting to do so would require making a series of contentious judgments that would amount to "picking winners and losers" in variegated situations, even though the doctrine might well never properly apply to preclude the damage claims of any class members.  That would not be a fair,

---

spent only three days in the document depository, where over one million discovery documents were available), aff'd, 148 F.3d 283 (3d Cir. 1998).

[10] While it was not totally clear, counsel for Respondent appeared to recognize this after hearing the presentation at the hearing.  Ex. 1 at 116:17-20 (after seemingly referring to the filed rate doctrine, stating "And it sounds like it may not be as big of an issue.")

reasonable, or adequate way to structure the Plan of Distribution. At a minimum, there is a "reasonable, rational basis" for *not* structuring the Plan of Distribution that way, which is the legal standard applicable for approving the Plan. *See e.g.* MCLAUGHLIN ON CLASS ACTIONS, § 6.23 (17th ed. 2020); *In re Am. Bank Note Holographics, Inc.,* 127 F.Supp.2d 418, 429–30 (S.D.N.Y. 2001) ("[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel").[11]

### A. All or Most States Are Subject to Rate Filing Regimes Of Some Kind.

The Respondents broadly assert at p. 3 that of the 27 states identified in the Third Amended Complaint, only 11 had filed-rate oversight. That is not correct. That assertion is based on Defendants' 2013 motion to dismiss (DOC. 115), which – in an effort to dismiss certain claims at the pleading stage, before any factually contentious points could be made – identified a number of states where rates were subject to ostensibly rigorous oversight and affirmative review. Respondents overlook the fact that Defendants noted that this list was "*without limitation*" and that the states they had identified were "*among other[s]*." *Id.* at 32-33. These caveats show that Defendants were moving to dismiss based on the states they believed had the most clear-cut regulatory review regimes, leaving others for later.

A little digging by Respondents would also have revealed that filed-rate regulations come in a myriad of shapes and sizes, ranging from "file-and-use" rules, to regulations "deeming" rates approved after the passage of time, to regimes that require express, prior approval before a rate may be charged. Few if any states lack any form of regulation whatsoever. Even in states with supposedly lighter regulatory oversight, such as California, the authorities impose detailed

---

[11] Further, to grant preliminary approval to the Plan of Distribution at this stage merely requires a finding that the Plan is "within the range of reasonableness." *Henley v. Tampa Bay Sports & Entertainment, LLC*, No. 8:19-cv-00550-CEH-CPT, 2020 WL 357002, at *1 (M.D. Fla. Jan. 17, 2020); *Eisenband v. Schumacher Automotive, Inc*., No. 18-cv-80911-*BLOOM/Reinhardt*, 2019 WL 1301746, at *1 (S.D. Fla. Feb, 20, 2019).

requirements on insurer rate filings.[12]  Defendants would be certain to argue that this form of regulation – or any form of regulation – was sufficient to protect them from damages claims.

Defendants' motion to dismiss also argued that the Affordable Care Act itself acted as a form of national filed-rate regulation which could have sharply limited the ability of class members *in every state* to recover money damages.  DOC. 115 at 21-22.  Yet the Response ignores this across-the-board threat to money damages in favor of a conclusory assertion of "Filed Rate Doctrine Conflicts."  DOC. 2623 at 3.

### B.  There Are Ample Reasons For Concluding That It Is Not Practicable Or Administratively Feasible To Assign Different Values To The Damage Claims Of Different Class Members Based On The Filed-Rate Doctrine.

Even positing the existence of differences among state regulatory systems, Respondents are wrong to assume that the existence of robust (or any) state regulation would have necessarily limited the right to damages in any meaningful way.  That is a point of serious contention that was never resolved in this case, and the resolution of which would have required extensive legal and factual disputes.

As noted above, Respondents were apparently unaware of the Court's view that filed-rate matters would have to be "reassessed" (DOC. 1098) in light of Subscribers' motion for reconsideration (DOC. 1046).  Review of that motion would have identified additional reasons why state-to-state differences in filed-rate schemes is not a reasonable basis for structuring the Plan of Distribution.  One is the fact that some state laws require rate filing only by certain types of entities.  In Alabama, for example, the Department of Insurance (the ALDOI) lacks authority to approve the rates for commercial "health" insurance.  Ala. Code § 27-13-2. The ALDOI has rate approval authority only for the rates of a "Health Care Service Plan." Ala. Code § 10A-20-6.10.

---

[12] Cal. Ins. Code § 10181.3; Cal. Health & Safety Code § 1385.03.

Blue Cross Blue Shield of Alabama (BCBSAL) is a "Health Care Service Plan," but the out-of-state Blue plans are not. To qualify as a Health Care Service Plan, the underlying corporation must be an Alabama "nonstock nonprofit corporation[.]" Ala. Code § 10A-20-6.01.  But for the restraints being challenged in this case, the non-Alabama Blues could have formed entities in Alabama that would have sold insurance without being subject to the rate filing requirements. Accordingly, the economic harm caused to Alabama subscribers by the foreclosure of those Plans from entering the Alabama market is harm that can be measured and awarded without violating the filed rate doctrine.

A second reason is that the filed rate doctrine does not apply to bar damages in an antitrust case that is based on the foreclosure of closely related but "distinct" products from the product whose rate was actually filed with the regulator.  In *Florida Municipal Power Agency v. Florida Power & Light,* 64 F.3d 614, 615 (11th Cir. 1995), the Eleventh Circuit held that the filed rate doctrine did not apply to bar the recovery of damages in a case where the antitrust claim was that a particular mechanism for delivering electric power was foreclosed from the market, because that different mechanism for delivering electric power would have been a distinct (albeit closely related) product from the one for which rates were filed with the regulator.  Likewise, in this case, competition from out-of-state Plans was foreclosed, and but for that foreclosure, those out-of-State Plans could easily have offered "distinct products" -- insurance products that varied in some way from the BCBSAL policies whose rates were filed.  As such, the holding of *Florida Power* dictates that the filed rate doctrine would not apply.

A third reason is that the out-of-state Plans never filed rates and, therefore, no matter what protection the doctrine might give to the local Blue, it should never protect the out-of-state Plan. The gravamen of the claims here is that but for the restraints, the out-of-state Plans would have

entered the market and offered lower prices than those charged by the local Blue. The Court could accept this claim without in any way second-guessing the rates charged by the incumbent Blue, and hence without in any way second-guessing the rates that were allegedly filed with the regulator. Thus, no matter what protection the local Blue might get from the filed rate doctrine, its 35 sister Plans would receive none – and they would all be jointly and severally liable for the antitrust violation because (under Plaintiffs' view of the case) they were all parties to the anticompetitive horizontal agreement.

In addition, Respondents ignore this Court's holding that the defense did not apply to rates charged in excess of the filed rate, while reserving decision on whether it applied to rates charged that were lower than the filed rate. *In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d 1313, 1327-28, 1332 (N.D. Ala. 2017). It is very common for insurers to file a "base rate" formula, and then to vary from that based on a number of factors, including market conditions and what consumers are willing to pay (which reflects market conditions, and which can therefore be influenced by antitrust violations). Thus, to fully evaluate the extent to which the defense might apply in any given state, it would be necessary to analyze all rates charged to all class members and compare them to the base rates, and then to overlay on top of that the legal assessment of whether any differences from the filed rates would make the filed rate doctrine unlikely to apply.

The rate filing requirements in many states also apply only to certain types of health plans, such as those offered to groups of 50 or fewer members. In Alabama, for example, rate filing did not apply to groups larger than 50 members. *In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d at 1332. Most states similarly limit rate filing to individual and small group policies, and exclude rates charged for medium or large groups. None of them regulates the fees charged for so-called Administrative Services Only (ASO) – i.e., for fees charged to Self-Funded customers.

Likewise, as the Kaiser Family Foundation noted in 2017, many states changed their rate-filing scheme during the Class Period to respond to the Affordable Care Act's requirement that they have in place an "effective" rate review process.[13]  Other states with supposedly robust systems of "prior approval" for rates changed their schemes for other reasons and at other times. Florida, for example, actually suspended all rate review of certain plans during large parts of 2014 and 2015.  Fla. Stat. § 627.410(9) (2015).  In Pennsylvania, from 2010 to 2012, for-profit health insurers did not have to file rates, and therefore Highmark, the local Blue in Western Pennsylvania, created a for-profit company called "HHIC" which sold insurance without doing rate-filing.  These differences both limit any potential applicability of the doctrine, and underscore the extremely granular, complex, and contentious judgments that would have to be made about when the doctrine might apply, when it might not, and how best to handicap its chances for applying or not.

In addition, it can be argued that because the Supreme Court has never held that the doctrine should apply to foreclose damages from a federal statutory claim based on a state regulatory regime, it should not apply to bar damages in any of these cases.  *In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d at 1332.  The Supreme Court has never addressed that question, and assessing the strength of this argument would entail assessing how the Court might rule if confronted with the question.[14]

---

[13] Https://www.kff.org/health-reform/state-indicator/rate-review-program-effectiveness/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (visited 11/18/20).

[14] Likewise, there is also an argument that the filed rate doctrine should at least not apply to federal antitrust claims where the state regulator with whom the rates (or "base rates") were filed does not engage in "meaningful review" or where the agency does not itself even have statutory authority to review questions of anticompetitive conduct.  *See generally In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d at 1324-26; DOC. 905 at 23:12 – 27:1.

**C.  In Assessing Whether The Plan Of Distribution Has A "Reasonable, Rational Basis", The Court Should Place Significant Weight On The Judgments Of Experienced, Competent Counsel.**

As shown above, any effort to allocate the Net Settlement Fund based on an assessment of the relative strengths and weaknesses of the filed rate doctrine defense for various cohorts of class members would be dubious (because the doctrine quite arguably would not apply to any damages claims by any class members), as well as exceptionally complex, granular, contentious, and uncertain.  Such actions would also be administratively infeasible, as they would require dozens of legal and factual judgments, each of which could be contested, and all of which would have to be baked into a Plan of Distribution that would then require countless facts to be gathered and assessed to determine claim values.

This is precisely the type of circumstance in which it is appropriate to recognize that the standard is whether the Plan of Distribution has a "reasonable, rational basis" – rather than whether it strives to attain an (unattainable) level of mathematical and legal perfection.  *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd, In re PaineWebber Inc. Ltd. P'ships Litig.*, 117 F.3d 721 (2d Cir. 1997) ("the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision."); *In re Credit Default Swaps Antitrust Litig.*, No. 13md2476, 2016 WL 2731524, at *9 (S.D.N.Y. Apr. 26, 2016) (quoting *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981)) ("The challenge of precisely apportioning damages to victims, is often magnified in antitrust cases, as 'damage issues in antitrust cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.'").  In circumstances such as these, courts routinely approve distribution plans that provide for *pro rata* distributions.[15]

---

[15] *See generally In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) ("Even if some potential benefits may have been realized from utilizing subclasses, it is not at all clear that the advantages would have outweighed the

Further, as the courts have recognized, in determining whether to approve a Plan of Distribution as reasonable, the Court should take into account whether it is being recommended by "experienced and competent" class counsel. MCLAUGHLIN ON CLASS ACTIONS § 6.23. *See generally In re Netflix Privacy Litig.*, 2013 WL 1120801 at \*8 (N.D.Cal. 2013) ("The recommendations of plaintiffs' counsel should be given a presumption of reasonableness."); *In re EVCI Career College Holding Corp. Securities Litig.*, 2007 WL 2230177, at \*11 (SDNY 2007) ("In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel."); *In re Worldcom, Inc. Securities Litig.*, 2005 WL 2319118, at \*12 (SDNY 2005) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel").

Here, no question has been raised as to whether class counsel is "experienced and competent." Nor has any question been raised about whether class counsel has any incentive other than to distribute the Net Settlement Fund in a manner that is as fair and reasonable as possible, taking into account administrative feasibility and efficiency. This is not a case where class counsel could credibly be accused of favoring some class members over others in order to serve their own interests, or as part of some bad faith arrangement that was not negotiated at arm's length. Rather, it is a case where class counsel negotiated the best recovery for the entire class, and then recommended a Plan of Distribution that seeks to treat all class members equally.

*Holmes v. Cont'l Can Co.*, 706 F.2d 1144 (11th Cir. 1983), is instructive in the circumstances of this case and teaches that it is likely erroneous to engage in any attempt to

---

disadvantages, and therefore it is difficult to say that the District Court abused its discretion by not taking this step."); *In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333, 346 (3d Cir. 2010) ("Such differences in settlement value do not, without more, demonstrate conflicting or antagonistic interests within the class.") (citing *In re Ins. Brokerage*); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016)*; In re Polyurethane Foam Antitrust Litig.*, 135 F. Supp. 3d 679 (N.D. Ohio 2015); *In re Visa Check/ Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003).

discriminate among class members on the basis of difficult, disputable valuation judgments on legally debatable issues—like the filed rate doctrine issues that Mr. Cowan's clients have raised. In that case—in which the Eleventh Circuit reversed an allocation that gave the eight named plaintiffs half of the monetary component of a settlement leaving the remainder to be split among the remaining 118 class members (based upon counsel's subjective views of the relative merits of their claims)—the court recognized that it is often appropriate to accord "great weight" to counsel's views on allocation, *id.* at 1149, but cautioned that such reliance may be inappropriate where class counsel recommends disproportionate allocation to some plaintiffs over others based on counsel's subjective evaluation of highly uncertain merits issues. *Id.* at 1149-51. Among other things, when it comes to such valuation calls, "the conversion of attorneys' opinion into evidence will usually be met in kind with one attorney's opinion being countered by another's." *Id.* at 1150-51.

As applied to this case, *Holmes* warns against embarking on an effort to delve into the contentious and uncertain details of how the filed-rate-doctrine defense might play out in more than 50 jurisdictions, which would require applying debatable and uncertain law to debatable and incomplete facts in each of those jurisdictions, and then using that analysis to assign different weights to the claims of class members hailing from each jurisdiction. That endeavor would be enormously expensive and time consuming, and would invite the kinds of competing arguments about the merits of each judgment call that *Holmes* found to be problematic. Class Counsel should not be asked to undertake such a process, and this Court should not be asked to referee each of the disputes such a process would entail.

Date: November 23, 2020                          Respectfully submitted,

   /s/ David Boies                                  /s/ Michael D. Hausfeld
David Boies – *Co-Lead Counsel*                  Michael D. Hausfeld – *Co-Lead Counsel*
BOIES, SCHILLER & FLEXNER LLP                    Swathi Bojedla – *Discovery Committee*
333 Main Street                                  HAUSFELD LLP
Armonk, NY 10504                                 1700 K Street NW, Suite 650
Tel: (914) 749-8200                              Washington, DC 20006
Fax: (914) 749-8200                              Tel: (202) 540-7200
dboies@bsfllp.com                                Fax: (202) 540-7201
                                                 mhausfeld@hausfeld.com
                                                 sbojedla@hausfeld.com


Charles J. Cooper – *Co-Chair, Written*          Megan Jones – *Settlement Committee & PSC*
*Submissions Committee*                          *Member*
COOPER & KIRK, PLLC                              Arthur Bailey – *Discovery Committee*
1523 New Hampshire Avenue NW                     HAUSFELD LLP
Washington, DC 20036                             600 Montgomery Street, Suite 3200
Tel: (202) 220-9600                              San Francisco, CA 94111
Fax: (202) 220-9601                              Tel: (415) 633-1908
ccooper@cooperkirk.com                           Fax: (415) 358-4980
                                                 mjones@hausfeld.com
                                                 abailey@hausfeld.com


Chris T. Hellums – *Local Facilitating Counsel*  William A. Isaacson – *Settlement Committee*
PITTMAN, DUTTON & HELLUMS, P.C.                  *& PSC Member*
2001 Park Place N, 1100 Park Place Tower         PAUL WEISS
Birmingham, AL 35203                             2001 K Street, NW
Tel: (205) 322-8880                              Washington, DC 20006-1047
Fax: (205) 328-2711                              Tel: (202) 223-7313
chrish@pittmandutton.com                         Fax: (202) 379-4937
                                                 wisaacson@paulweiss.com


Gregory Davis – *Settlement Committee & PSC*     Cyril V. Smith – *Settlement Committee &*
*Member*                                         *PSC Member*
DAVIS & TALIAFERRO, LLC                           ZUCKERMAN SPAEDER, LLP
7031 Halcyon Park Drive                          100 East Pratt Street, Suite 2440
Montgomery, AL 36117                             Baltimore, MD 21202-1031
Tel: (334) 832-9080                              Tel: (410) 949-1145
Fax: (334) 409-7001                              Fax: (410) 659-0436
gldavis@knology.net                              csmith@zuckerman.com

Kathleen Chavez – *Settlement Committee &*
*PSC Member*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
kcc@fmcolaw.com

David Guin – *Co-Chair, Written Submissions*
*Committee*
Tammy Stokes – *Damages Committee*
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. North
Suite 600/Title Building
Birmingham, AL 35203
Tel: (205) 226-2282
Fax: (205) 226-2357
davidg@gseattorneys.com
tammys@gseattorneys.com

Carl S. Kravitz – *Expert Committee*
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: (202) 778-1800
Fax: (202) 822-8106
ckravitz@zuckerman.com

Richard Feinstein – *Expert Committee*
Karen Dyer – *Expert Committee*
Hamish P.M. Hume – *Discovery Committee*
BOIES, SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
rfeinstein@bsfllp.com
kdyer@bsfllp.com
hhume@bsfllp.com

Mindee Reuben
Lite DePalma Greenberg
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Tel:  (267) 314-7980
Fax: (973) 623-0858
mreubin@litedepalma.com

Nate Cihlar
Joshua Callister
Srauss & Boies
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel:  (703) 764-8700
Fax:  (703) 764-8704
ncihlar@straus-boies.com
jcallister@straus-boies.com

Patrick Cafferty – *Discovery Committee*
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
150 S. Wacker Drive, Suite 300
Chicago, IL 60606
Tel: (312) 782-4880
pcafferty@caffertyclobes.com

Bryan Clobes – *Litigation Committee*
Ellen Meriwether – *Written Submissions*
*Committee*
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
2005 North Monroe Street
Media, PA 19063
Tel: (215) 864-2800
Fax: (215) 864-2810
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

Andrew Lemmon – Chair, Discovery
Committee
LEMMON LAW FIRM
15058 River Road
PO Box 904
Hahnville, LA 70057
Tel: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Douglas Dellaccio – *Litigation Committee*
CORY WATSON CROWDER & DEGARIS,
P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 32505
Tel: (205) 328-2200
Fax: (205) 324-7896
ddellaccio@cwcd.com

Edwin J. Kilpela, Jr.
Benjamin Sweet – *Litigation Committee*
DEL SOLE CAVANAUGH STROYD LLC
200 First Avenue, Suite 300
Pittsburgh, PA 15222
Tel: (412) 261-2393
Fax: (412) 261-2110
ekilpela@dsclaw.com
bsweet@dsclaw.com

Charles T. Caliendo – *Class Certification
Committee*
GRANT & EISENHOFER
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
ccaliendo@gelaw.com

Virginia Buchanan – Chair, Class Certification
Committee
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7000
Fax: (850) 435-7020
vbuchanan@levinlaw.com

Larry McDevitt – *Chair, Class Certification
Committee*
David Wilkerson – *Discovery Committee*
VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Tel: (828) 258-2991
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Robert M. Foote – *Damages Committee*
FOOTE, MIELKE, CHAVEZ & O'NEIL,
LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
rmf@fmcolaw.com

Robert Eisler – *Discovery Committee*
GRANT & EISENHOFER
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
reisler@gelaw.com

Daniel Gustafson – *Litigation Committee*
Daniel C. Hedlund – *Damages Committee*
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

Brent Hazzard – *Litigation Committee*
HAZZARD LAW, LLC
447 Northpark Drive
Ridgeland, MS 39157
Tel: (601) 977-5253
Fax: (601) 977-5236
brenthazzard@yahoo.com

John Saxon – *Litigation Committee*
JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203-3314
Tel: (205) 324-0223
Fax: (205) 323-1583
jsaxon@saxonattorneys.com

Lawrence Jones – *Damages Committee*
JONES WARD PLC
The Pointe
1205 East Washington Street, Suite 111
Louisville, Kentucky 40206
Tel:  (502) 882-6000
Fax: (502) 587-2007
larry@jonesward.com

Robert Methvin – *Chair, Settlement Committee*
James M. Terrell – *Class Certification Committee*
MCCALLUM, METHVIN & TERRELL, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, AL 35205
Tel: (205) 939-0199
Fax: (205) 939-0399
rgm@mmlaw.net
jterrell@mmlaw.net

Michael McGartland – *Class Certification Committee*
MCGARTLAND & BORCHARDT LLP
1300 South University Drive, Suite 500
Fort Worth, TX 76107
Tel: (817) 332-9300
Fax: (817) 332-9301
mike@attorneysmb.com

H. Lewis Gillis – *Co-Head Chair, Litigation Committee*
MEANS GILLIS LAW, LLC
3121 Zelda Court
Montgomery, AL 36106
Tel: 1-800-626-9684
hlgillis@tmgslaw.com

David J. Hodge – *Chair, Settlement Committee*
MORRIS, KING & HODGE
200 Pratt Avenue NE
Huntsville, AL 35801
Tel: (256) 536-0588
Fax: (256) 533-1504
lstewart@alinjurylaw.com

*Counsel for Subscriber Plaintiffs*

/s/ Warren T. Burns
Warren T. Burns
BURNS CHAREST LLP

900 Jackson Street, Suite 500
Dallas, Texas 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
wburns@burnscharest.com

*Counsel for the Self-Funded Sub-Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 23, 2020, the foregoing was filed with the Clerk of the

Court and served on counsel of record via ECF.

  /s/ Michael D. Hausfeld
Michael D. Hausfeld
