FILED
2020 Nov-30  PM 04:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD | } | Master File No.:  2:13-CV-20000-RDP |
| | } | |
| ANTITRUST LITIGATION | } | |
| (MDL NO.: 2406) | } | |

## MEMORANDUM OPINION AND ORDER PRELIMINARILY APPROVING SETTLEMENT, PLAN OF DISTRIBUTION, AND NOTICE PLAN, AND DIRECTING NOTICE TO THE CLASS

This matter is before the court on (1) the Motion for Preliminary Approval of Proposed Class Settlement filed by Subscriber Class Representatives in this Action, *In re Blue Cross Blue Shield Antitrust Litigation*, No. 2:13-cv-20000-RDP (Doc. # 2610); and (2) Subscriber Plaintiffs' Motion for Approval of a Plan for Notice and Appointment of Claims Administrator (Doc. # 2611).

The Subscriber Class Representatives and the Self-Funded Sub-Class Representative (on behalf of themselves and the Settlement Classes) ("Subscriber Plaintiffs" or "Class Representatives") and Settling Defendants (together, the "Parties") have entered into and executed a Settlement Agreement, which, if finally approved by the court, would result in the settlement of all of Subscriber Plaintiffs' claims against the Settling Defendants in this Action.[1]

In full and final settlement of the claims asserted against them in this Action, the Settling Defendants have agreed to pay $2.67 billion ($2,670,000,000.00) (the "Settlement Fund") and to

---

[1] Unless otherwise defined in this Preliminary Approval Order, the capitalized terms used herein shall have the same meaning as in the Settlement Agreement. The Settlement Agreement is attached as Exhibit A to Subscriber Plaintiffs' Memorandum of Law in Support of their Motion for Preliminary Approval of the Settlement Agreement. (Doc. # 2610-2). The term "Action" means: lawsuits brought by persons and entities within the Settlement Classes and consolidated in *In re Blue Cross Blue Shield Antitrust Litigation*, 2:13-cv-20000-RDP, MDL No. 2406, including the Consolidated Amended Class Action Complaint, which is currently pending in the court; all actions that may be transferred or consolidated prior to the time Class Notice is mailed; and all actions that are otherwise based, in whole or in part, on the conduct alleged in MDL No. 2406, including *Piercy v. Health Care Service Corp.*, Case No. 124-28, in the Circuit Court for the First Judicial Circuit, Union County, Illinois.

provide certain injunctive relief as set forth in the Settlement Agreement. Pursuant to that Settlement Agreement, Subscriber Plaintiffs have moved the court, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to: (1) grant preliminary approval of the settlement, (2) find that the Settlement Classes are likely to be certified at final approval, (3) preliminarily approve the Plan of Distribution, (4) set a Final Approval Hearing, (5) approve the Notice Plan, and (6) appoint the Claims Administrator.

The court has carefully considered Subscriber Plaintiffs' Motion for Preliminary Approval of Proposed Class Settlement (Doc. # 2610), the Settlement Agreement, and the memoranda of law and exhibits in support thereof submitted by the parties, including the proposed Plan of Distribution. It has also carefully considered Subscriber Plaintiffs' Motion for Approval of Plan of Notice, the Memorandum of Law in Support of Motion for Approval of Plan for Notice, and all exhibits attached to that Memorandum. On November 16, 2020, the court conducted a preliminary approval hearing at which it considered these materials as well as additional arguments made by counsel. It also heard from Providers' Counsel and counsel for three former class representatives who have not yet consented to the Settlement.  For the reasons discussed below, the Motions are due to be granted.

## I.    Procedural History

This litigation began more than eight years ago and involves the consolidation of more than 40 actions filed by Subscriber Plaintiffs against the Blue Cross and Blue Shield Association ("BCBSA") and its Member Plans (the "Member Plans" or the "Blues") (collectively, "Defendants" or "Blues"). Subscriber Plaintiffs allege, among other things, that Defendants violated Sections 1, 2, and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-3, by entering into an unlawful agreement that restrained competition between them in the markets for health insurance

and for the administration of Commercial Health Benefit Products in the United States and its territories. Subscriber Plaintiffs contend that the Blues: (1) allocated geographic territories; (2) limited the Member Plans from competing against each other, even when they are not using a Blue name, by mandating a minimum percentage of business that each Member Plan must do under that name, both inside and outside each Member Plan's territory; (3) restricted the right of any Member Plan to be sold to a company that is not a member of BCBSA; and (4) agreed to other ancillary restraints on competition. (Doc. # 1082). Subscriber Plaintiffs sought actual damages, treble damages, and injunctive relief to prevent future loss or damage resulting from Defendants' conduct. (*Id.*).

This litigation has been extraordinarily complex, protracted, and hard-fought over the past eight years. (Doc. # 2625-1 at 3-8). Defendants filed, and the court addressed, over a dozen motions to dismiss. The parties spent months on production of multiple terabytes of structured health insurance data from 37 separate Defendants, many with different data management systems. (Doc. # 2610-6 ¶ 14). With the tremendous assistance of Magistrate Judge Michael Putnam, the parties briefed over 150 discovery motions, leading to 91 discovery orders. Subscriber Plaintiffs obtained and analyzed over 15 million pages of documents, conducted over 120 depositions of Defendants and third-party witnesses, and defended over 20 depositions of class representatives and experts. (*Id.* ¶¶ 14-15). Subscriber Plaintiffs reviewed and challenged hundreds of thousands of privilege log entries, resulting in 45 Reports & Recommendations by Privilege Special Master R. Bernard Harwood, Jr. and the full or partial dedesignation of over 450,000 documents. (*Id.* ¶ 16).

The parties briefed several rounds of summary judgment motions, including Defendants' motions seeking application of the Filed Rate Doctrine to Alabama subscribers. (Docs. # 107, 110, 112, 113, 114, 116, 119, 121, 122, 125, and 135). Subscriber Plaintiffs also filed a successful

motion seeking application of a per se standard of review to the alleged "aggregation of competitive restraints." *In re Blue Cross Blue Shield Antitrust Litig*., 308 F. Supp. 3d 1241, 1267 (N.D. Ala. 2018). (Docs. # 1348, 1350, 1353, 1434). Although this court certified its order under 28 U.S.C. § 1292(b), the Eleventh Circuit declined to allow an interlocutory appeal. *In re Blue Cross Blue Shield Antitrust Litig*., 2018 WL 7152887 (11th Cir. Dec. 12, 2018). And most recently, the parties briefed motions for class certification of a nationwide injunctive relief class and an Alabama damages class, each side supporting its claims with expert reports totaling hundreds of pages. (Docs. # 2407-2416, 2421, 2422, 2453-2457).

The parties first began settlement discussions in 2015, after nearly three years of litigation. The parties initially hired a mediator and participated in several mediation sessions from 2015 through 2017. Those discussions involved counsel for the Subscriber Plaintiffs, Provider Plaintiffs, Defendants, and Defendants' insurers. (Doc. # 2610-6 ¶ 28-29). When the mediation sessions in 2015, 2016, and 2017 failed to gain traction, in November 2017, Special Master Edgar C. Gentle began assisting in the settlement discussions. Over the course of the next two years, Mr. Gentle held dozens of unilateral, bilateral, and multilateral conferences calls, meetings, and in-person and virtual mediation sessions. At various times, counsel for Subscriber Plaintiffs, Defendants, and Defendants' insurers were involved in various mediation sessions. (*Id.* ¶ 30). There were scores (if not more) of mediation sessions. Mr. Gentle's work proved extremely helpful. The Subscribers and Blues slowly but steadily inched along in their discussions. There were the usual setbacks and breakthroughs. The settling parties began by agreeing to a term sheet that dealt with non-monetary relief. The negotiations over this structured relief were protracted, complicated, and challenging. But, ultimately the parties, with Mr. Gentle's assistance, reached agreement on a term sheet about structural relief. The proposed structural relief is historic and substantial. After agreeing on

structural relief, the parties negotiated a common fund for the monetary benefit of the class. They did so building upon the fact that Subscribers' Counsel had successfully negotiated structural relief that would substantially increase competition in the insurance markets where Blue products and services are sold. Only after the parties agreed on structural relief and the common fund did they start negotiations about attorneys' fees and costs.

During their negotiations in July 2019, as mediation was ongoing, Subscriber Plaintiffs and the Blues recognized the need for a sub-class of Self-Funded Accounts and their employees (together, the "Self-Funded Settlement Sub-Class"), and Subscriber Plaintiffs coordinated the recruitment of separate class counsel for that sub-class and a class representative. (*Id.* ¶ 31).

Self-Funded Settlement Sub-Class Counsel asked for and received access to the discovery record in the litigation, along with relevant briefing on class certification and summary judgment, and they engaged their own independent experts to analyze possible damages claims on behalf of the Self-Funded Sub-Class. In September 2019, Self-Funded Settlement Sub-Class Counsel began attending mediation sessions. Plaintiffs, including the Self-Funded Sub-Class, continued to exchange proposals. It was in November 2019 that they reached agreement on a full term sheet. And, over the next several months, they worked closely with Mr. Gentle to reduce the term sheet to a written settlement agreement, which involved many additional conferences and more intense negotiations between the parties. (*Id.* ¶ 32).

Also in November 2019, along with Self-Funded Settlement Sub-Class Counsel, Subscriber Plaintiffs engaged Kenneth Feinberg[2] as Allocation Mediator to facilitate the determination of an appropriate allocation of the Net Settlement Fund between fully insured Class

---

[2] Mr. Feinberg is a highly respected mediator who is preeminent in the field of settlement allocations. He has worked on such matters as the September 11th Victim Compensation Fund, the Troubled Asset Relief Program, and the BP Deepwater Horizon Disaster Victim Compensation Fund, just to name a few.

Members and the Self-Funded Sub-Class. After presentation of the evidence and an in-person mediation, counsel for the parties along with the guidance of Mr. Gentle and Mr. Feinberg, agreed that an equitable allocation would distribute 93.5% of the Net Settlement Fund among fully insured Class Members and 6.5% of the Net Settlement Fund among the Self-Funded Sub-Class. This proposal was presented to Mr. Feinberg, who reviewed it and determined it to be reasonable in his professional judgment. (*Id.* ¶ 33).

In August 2020, Subscribers' Counsel and Self-Funded Settlement Sub-Class Counsel engaged experts Darrell Chodorow and the Brattle Group to assist with designing a Plan of Distribution. The parties relied on economic analysis conducted by Mr. Chodorow and the Brattle Group, along with an analysis of the data available from Settling Defendants, to design a reasonable and efficient Plan of Distribution that would treat members of the Damages Class equitably and would not overly burden claimants. (*Id.* ¶ 34). Mr. Feinberg was again engaged to review the proposed Plan of Distribution for reasonableness. Mr. Feinberg concluded that the proposed Plan of Distribution was reasonable. (*Id.* ¶ 35).

After these substantial efforts were undertaken, the proposed Settlement Agreement was approved by the respective parties. Notably, the settlement is the result of private enforcement: that is, Subscriber Plaintiffs investigated and developed the record in order to achieve this result.[3] It is the product of over four years of hard-fought, arms-length, and neutral supervised negotiations by counsel who are highly experienced in complex litigation and antitrust law.

## II.    Terms of the Settlement Agreement/Class Definition

The Settlement Classes include a Damages Class under Rule 23(b)(3) as well as an injunctive relief class under Rule 23(b)(2). A summary of the features of the Settlement includes:

---

[3] It is rare for historic structural relief such as that negotiated here to arise out of private enforcement actions.

• **Monetary Relief**. Defendants will pay $2.67 billion to the Settlement Fund, which will include distributions to the Damages Class and the Self-Funded Sub-Class, Notice and Administration Costs, and any Fee and Expenses awarded by the court.

• **Injunctive Relief**. The Settlement provides historic injunctive relief to enhance competition in the market for health insurance, to the benefit of all Settlement Class Members. This hard-won non-monetary relief includes:

  ▪ elimination of the Blues' national revenue cap on competition when they are not using the Blue names and marks—that cap, which the Blues call the "National Best Efforts" provision, requires that two-thirds of each Member Plan's national healthcare-related revenue come from Blue-branded products as opposed to non-Blue (*i.e.*, "Green") business—and limits on a corresponding local revenue cap known as the "Local Best Efforts" provision;

  ▪ the ability for certain Qualified National Accounts that could only seek one Blue bid to now seek bids from two Blue Plans;

  ▪ limits on BCBSA's restraints on acquisitions;

  ▪ guidelines to permit direct contracting between Non-Provider Vendors and Self-Funded Accounts; and

  ▪ limits on use of Most Favored Nations ("MFN") Clauses and Differentials.

• **Five-Year Monitoring Period**. For a period of five years from the court's entry of Final Judgment and Order of Dismissal, a Monitoring Committee comprised of members appointed by the Settling Defendants, Settlement Class Counsel, Self-Funded Sub-Class Counsel, and the court shall review new rules or regulations proposed by BCBSA and submitted to the Monitoring Committee, and shall mediate disputes related to the Injunctive Relief.

(Doc. # 2610-1 at 14).

The Settlement Agreement's proposed Damages Class is defined as:

[A]ll Individual Members (excluding dependents and beneficiaries), Insured Groups (including employees, but excluding non-employee Members), and Self-Funded Accounts (including employees, but excluding non-employee Members) that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product (unless the person or entity's only Blue-Branded Commercial Health Benefit Product during the Settlement Class Period was a stand-alone vision or dental product) sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Settlement Class Period. Excluded from the Damages Class are Government Accounts, Medicare Accounts

> of any kind, Settling Defendants themselves, and any parent or subsidiary of any Settling Defendant (and their covered or enrolled employees. Also excluded from the Damages Class are Opt Outs, the judge presiding over this matter, and any members of his judicial staff, to the extent such staff were covered by a Commercial Health Benefit Product not purchased by a Government Account during the Settlement Class Period. For purposes of this Paragraph 1.v, "employee" means any current or former employee, officer, director, partner, or proprietor of an entity.

(Doc. # 2610-2 ¶ A(1)(v)). Subscriber Plaintiffs also seek certification of a damages Self-Funded Sub-Class consisting of Self-Funded Accounts and their employees during the applicable Settlement Class Period, September 1, 2015 through October 16, 2020. The Self-Funded Sub-Class is represented by separate Self-Funded Settlement Sub-Class Counsel and the Self-Funded Sub-Class Representative. (Doc. # 2610-2 ¶¶ 1(dddd), 1(eeee)).

The Settlement Agreement's proposed Injunctive Relief Class is defined as:

> all Individual Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Settlement Class Period.

(*Id*. ¶ A(1)(pp)).

The Settlement requires Defendants to establish a Settlement Fund of $2.67 billion, to be deposited into an Escrow Account for ultimate distribution. The Settlement Fund will be used: (1) to pay all Settlement Class Members who are entitled to a distribution from the Net Settlement Fund ("Authorized Claimants") in accordance with the proposed Plan of Distribution (Doc. # 2610-2 ¶ 27); (2) to fund a $100 million Notice and Administration Fund to pay Notice and Administration Costs to the Claims Administrator and Settlement Administrator (Doc. # 2610-2 ¶ 29), and up to $7 million to "reimburse plaintiffs' counsel's actual and reasonable fees and expenses incurred for Notice and Administration" and costs of monitoring, (Doc. # 2610-2 ¶ 21, 28); and (3) to pay court-awarded attorneys' fees and expenses, up to a combined total of 25% of the Settlement Amount (*id*. ¶ 28).

In addition to the monetary recovery, the Settlement Agreement provides for substantial injunctive relief on behalf of the Settlement Class, including significant, unprecedented, and far-reaching changes to BCBSA's rules and regulations and the establishment of a Monitoring Committee. As explained by Subscriber Plaintiffs' economics expert, Dr. Daniel Rubinfeld, each of these hard-won, negotiated changes to Defendants' practices provides significant relief to the Class (in addition to the monetary recovery), allowing for opportunities for more competition in the market for health insurance and providing the potential for Class Members to achieve greater consumer choice, better product availability, and increased innovation. (Doc. # 2610-10).

## III. Applicable Legal Standards

The parties have asked the court to preliminarily certify a Settlement Class and preliminarily approve a Settlement. The court briefly reviews the standard for reviewing both requests.

### A. Preliminary Class Certification

As the Supreme Court has explained, when a plaintiff requests class certification for purposes of a settlement-only class, the court:

> need not inquire whether the case, if tried, would present intractable management problems [] for the proposal is that there is to be no trial. But other specifications of the Rule – those designed to protect absentees by blocking unwarranted or overbroad class definitions – demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848-49 (1999) ("When a district court, as here, certifies for class action settlement only, the moment of certification requires heightened attention ... to the justifications for binding the class members.") (internal quote omitted).

"'For a class action to be certified, the named plaintiff must have standing, and the putative class must satisfy both the requirements of Federal Rule of Civil Procedure 23(a), and the requirements found in one of the subsections of Rule 23(b).'" *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1267 (11th Cir. 2019) (citing *City of Hialeah v. Rojas*, 311 F.3d 1096, 1101 (11th Cir. 2002)). The Rule 23(a) requirements for certification of any class action are: "(1) numerosity ('a class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical ... of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." *Amchem*, 521 U.S. at 613; *Vega v. T-Mobile USA, Inc*., 564 F.3d 1256, 1268 (11th Cir. 2009) (same); *Valley Drug Co. v. Geneva Pharms., Inc*., 350 F.3d 1181, 1187-88 (11th Cir. 2003) (same). The Federal Rules provide that a "class action may be maintained if Rule 23(a) is satisfied and if" the provisions of Rule 23(b)(1), (b)(2), or (b)(3) are satisfied. Fed. R. Civ. P. 23(b). Thus, "[i]n addition to establishing the requirements of Rule 23(a), a plaintiff seeking class certification must also establish that the proposed class satisfies at least one of the three requirements listed in Rule 23(b)." *Little v. T-Mobile USA, Inc*., 691 F.3d 1302, 1304 (11th Cir. 2012); *see also Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 698 (S.D. Fla. 2015); *Diamond v. Hastie*, 2019 WL 1994467, at *4 (S.D. Ala. 2019).

In *Vega v. T-Mobile USA, Inc*., 564 F.3d 1256 (11th Cir. 2009), the Eleventh Circuit explained as follows:

Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied. *Valley Drug Co*., 350 F.3d 1181 at 1188 n.15 (citing *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982)); *see Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 & n. 12, 98 S.Ct. 2454, 2458 & n. 12, 57 L.Ed.2d 351 (1978) ("[t]he class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' ... 'The more complex determinations

required in Rule 23(b)(3) class actions entail even greater entanglement with the merits.'") (emphasis and citations omitted); *Huff v. N.D. Cass Co. of Ala.*, 485 F.2d 710, 714 (5th Cir. 1973) (en banc) ("It is inescapable that in some cases there will be overlap between the demands of [Rule] 23(a) and (b) and the question of whether plaintiff can succeed on the merits."); [*Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131 (2008)] ("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.").

*Vega*, 564 F.3d at 1265-66 (footnotes omitted). The "party seeking class certification has the burden of proof." *Brown v. Electrolux Home Products, Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016) (citing *Valley Drug Co.*, 350 F.3d at 1187).

### B.    Preliminary Approval of the Settlement

If preliminary class certification under Rule 23(a) and (b) is appropriate, the court's job is not complete. It "must then examine the propriety of settlement." *Hale*, 2020 WL 3642490, at *2. Rule 23(e) provides that a court may approve a proposed class action settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." *See* Rule 23(e)(2). The 2018 amendments to Rule 23(e)(2) brought forth substantial and needed changes with respect to the early and final evaluation of class settlements.[4] Rule 23(e) now provides that the district court may approve a settlement only after considering whether:

---

[4] The 2018 amendments to Rule 23 imposed a heightened standard on counsel seeking preliminary approval of a proposed settlement. Now, before notice of a proposed settlement is given to a class, counsel must provide the court with "a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object." Committee Notes on Fed. R. Civ P. 23, 2018 Amendment. Specifically, counsel must demonstrate the proposed settlement passes procedural and substantive hurdles. Rule 23(e)(2)(A-B) requires counsel demonstrate the proposed settlement has satisfied certain "'procedural' concerns," and Rule 23(e)(2)(C-D) requires the proposed settlement satisfy a "'substantive' review." *Id.*

The 2018 amendments were promulgated after extensive review by the Advisory Committee on Civil Rules. *See* Advisory Committee on Civil Rules (Apr. 25-26, 2017), available at https://www.uscourts.gov/sites/default/files/2017-04-civil-agenda_book.pdf. Judge John D. Bates of the District of Columbia and Judge Robert M. Dow, Jr. of the Northern District of Illinois ably served as Chair of the Advisory Committee on Civil Rules and as Chair of the Rule 23 Subcommittee, respectively. Academics and practitioners have acknowledged that the 2018 amendments have brought about helpful and necessary changes to class action litigation. *See, e.g.*, Rhonda Wasserman, *The New, Improved Class Action Rule: The December 2018 Amendments to Rule 23*, 90 Pa. Bar Ass'n Q. 182 (2019).

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

> (i) the costs, risks, and delay of trial and appeal;

> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

> (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

*Hale*, 2020 WL 364 2490 at *3 (quoting Fed. R. Civ. P. 23(e)(2)(A)-(D)).

## IV.   Analysis

The motions before the court require the court to address the Rule 23(a) and (b) requirements for class certification and consider the overall fairness, reasonableness, and adequacy of the proposed settlement. Below, the court analyzes the propriety of class certification and the parties' proposed settlement. But first, it is appropriate for the court to consider two preliminary matters.

### A.   Standing

"It is well-settled in the Eleventh Circuit that prior to the certification of a class, and before undertaking an analysis under Rule 23, the district court must determine that at least one named class representative has Article III standing to raise each class claim." *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 679 (S.D. Fla. 2004) (citing *Wolf Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)); *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987) ("[A]ny analysis of class certification must begin with the issue of standing.")). Indeed,

"[o]nly after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others." *Griffin*, 823 F.2d at 1482. "To have standing, a plaintiff must show (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to conduct of the defendant; and (3) it is likely, not just merely speculative, that the injury will be redressed by a favorable decision." *Kelly v. Harris*, 331 F.3d 817, 819-20 (11th Cir. 2003).

Defendants have not challenged Subscriber Plaintiffs' standing in this case – and with good reason. Subscriber Plaintiffs easily satisfy the necessary elements of standing. Plaintiffs have presented evidence that, due to Defendants' alleged anticompetitive agreements, they have suffered injuries in the form of increased healthcare premiums due to the lack of competition in the relevant healthcare markets. Subscriber Plaintiffs have presented evidence from reputable economics experts that their injury is concrete, particularized, and actual, not merely conjectural. And, there is evidence that the injuries are traceable to agreements between Defendants, and that it is likely that the elimination of certain challenged restraints will remedy those injuries. Moreover, as the court has already held, "[Subscriber] Plaintiffs have presented evidence of an aggregation of competitive restraints [] which, considered together, constitute a per se violation of the Sherman Act." (Doc. # 2063 at 37). Accordingly, the court is satisfied the named Subscriber Plaintiffs have standing.

## B.     Ascertainability

In addition to standing, a class plaintiff must show that the proposed class is adequately defined and clearly ascertainable. *Little*, 691 F.3d at 1304. The threshold issue of "ascertainability" relates to whether the putative class can be identified: "[a]n identifiable class exists if its members

can be ascertained by reference to objective criteria." *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014) (citing *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 97 (S.D.N.Y. 2009)). These "objective criteria" should be "administratively feasible," meaning that the identification of class members should be "a manageable process that does not require much, if any, individual inquiries." *Bussey*, 562 F. App'x at 787 (citation omitted) (reversing district court decision finding the ascertainability requirement satisfied where class could not be identified by reference to objective information in the defendant's records). A plaintiff can rely upon a defendant's records to identify class members. *Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 948 (11th Cir. 2015).

In paragraph 5 of the Settlement Agreement, Defendants have represented that they have "in their possession and kept in the ordinary course of business" information covering the entire Settlement Class Period necessary to ascertain the putative Class Members. (Doc. # 2610-2 at 26). That information includes: "a to-be-agreed personal identifier (that can be cross referenced with a Member's first name, last name, and date of birth), last-known phone number (if any), last-known mailing address, and, if ordered by the Court, last-known email address (if any)." (*Id.*). The court is satisfied that the identification of putative Class Members will be administratively feasible.

### C.      The Rule 23(a) Requirements

Before certifying a class, even where a settlement is involved, a district court must analyze the requirements of Rule 23. *Amchem*, 521 U.S. at 619-20. Pursuant to Rule 23, class certification is appropriate if:

> (1) the class is so numerous that joinder of all members would be impracticable; (2) there are questions of fact and law common to the class; (3) the claims or defenses of the representatives are typical of the claims and defenses of the unnamed members; and (4) the named representatives will be able to represent the interests of the class adequately and fairly.

*Valley Drug*, 350 F.3d at 1188; Fed. R. Civ. P. 23(a)(1)-(4).

### 1.      Numerosity

Under Rule 23(a)(1), the plaintiff must show that the settlement class is so numerous that joinder is impracticable. *See* Rule 23(a)(1). The Eleventh Circuit has held that the numerosity requirement is "a generally low hurdle" and "less than twenty-one is inadequate [and] more than forty [is] adequate...." *Vega*, 564 F.3d at 1267. The settling parties estimate that "the Damages Class, the Self-Funded Sub-Class, and the Injunctive Relief Class each consist[s] of tens of millions of members." (Doc. # 2610-1 at 54). Therefore, the proposed classes easily meet the numerosity requirement of Rule 23(a)(1).

### 2.      Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). For commonality to be found, the action "must involve issues that are susceptible to class-wide proof." *Williams v. Mohawk Industries, Inc*., 568 F.3d 1350, 1355 (11th Cir. 2009) (citing *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001)). Also, a plaintiff must "demonstrate that the class members 'have suffered the same injury.'" *Walmart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted). However, Rule 23(a)(2) "demands only that there be questions of law or fact common to the class. This part of the rule does not require that all the questions of law and fact raised by the dispute be common." *Vega*, 564 F.3d at 1268; *see also Carriuolo v. General Motors Co*., 823 F.3d 977, 984 (11th Cir. 2016) ("even a single common question will" satisfy the commonality requirement). Courts in the Eleventh Circuit "have consistently held that allegations of price-fixing, monopolization, and conspiracy by their very nature involve common questions of law or fact." *In re Delta/AirTran Baggage Fee Antitrust Litig*., 317 F.R.D. 675, 694 (N.D. Ga. 2016) (citations omitted).

Here, Subscriber Plaintiffs allege that Defendants engaged in a conspiracy to horizontally allocate geographic markets by agreeing to exclusive service areas where the Blue Plans do not compete with each other in combination with other anticompetitive restraints. For example, Subscriber Plaintiffs also allege that Defendants implemented their "National Best Efforts" policy, which limits the revenue a Blue Plan may earn under non-blue branded ("Green") business. Subscriber Plaintiffs allege that this was a nationwide conspiracy which was applied uniformly throughout the entire country. Subscriber Plaintiffs assert that this conspiracy implicates several common questions of law or fact, including: (1) whether Settling Defendants' national market allocation agreements violated the Sherman Act; (2) whether the Settling Defendants charged anti-competitive premiums as a result of these agreements; (3) whether the challenged restraints have resulted in foreclosure of entry and reduced consumer choice across the country; and (4) whether Defendants constitute a nationwide single entity for purposes of managing their trademarks. (Doc. # 2610-1 at 55). The Blues have denied these allegations but it is clear that there are common issues as to all members of all proposed classes that satisfy the commonality requirement.

### 3.    Typicality

Rule 23(a)(3) provides that class representatives may sue on behalf of the class only if the "claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). "[T]he typicality requirement is permissive; representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *In re Checking Account Overdraft*, 275 F.R.D. 666, 674 (S.D. Fla. 2011) (citing *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 605 (S.D. Fla. 2003)). Whereas commonality looks at whether class members' claims are common to each other (a horizontal comparison between members of the class), typicality is satisfied where the named plaintiffs'

claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class (a vertical comparison between class members and class representatives). *Kornberg v. Carnival Cruise Lines, Inc*., 741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985).

"'Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice.'" *In re Checking Account Overdraft Litig*., 286 F.R.D. at 653 (quoting *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (citation omitted)). Typicality is not destroyed by factual variations between the class representatives and the unnamed class members. *Kornberg,* 741 F.2d at 1357; *see also Williams*, 568 F.3d at 1357.

The Subscriber Class Representatives consist of 67 individuals or employers that purchased fully-insured plans from Member Plans. The Self-Funded Sub-Class Representative is Hibbett Sports, Inc. ("Hibbett"), which purchased "administrative services only" ("ASO") contracts or accounts from Blue Plans. (Doc. # 2610-2 ¶¶ 1(n), 1(dddd), 1(vvvv)). With respect to the Damages Class, the Class Representatives' claims are typical of the class because they arise from the same alleged conduct: Defendants' alleged illegal geographic market allocation and output restrictions, among other restraints, which affected competition in the market for health insurance and administration of Commercial Health Benefit Products. The Self-Funded Sub-Class Representative's claims are similarly typical of the Sub-Class because they arise from certain alleged conduct specific to members of that Sub-Class such as agreements restraining competition in the market for national accounts.

The Class Representatives seek the same relief sought by absent Class Members, and the proof that Subscriber Plaintiffs would present to support their claims directly supports the claims of the Class. Because at least some of the Subscriber Plaintiffs' claims can be established by common proof of Defendants' application of their restrictive policies, and because the Class Representatives and Settlement Class Members appear to have suffered the same injuries and damages, the court finds that typicality is satisfied.

### 4.   Adequacy of Representation

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy-of-representation requirement is satisfied when (i) the class representatives have no interests conflicting with the class; and (ii) the representatives and their attorneys will properly prosecute the case. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Valley Drug Co.*, 350 F.3d at 1189.

"Significantly, the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a fundamental one going to the specific issues in controversy" to preclude certification. *Valley Drug Co.*, 350 F.3d at 1189. "A conflict is 'fundamental' when, for example, some class members claim to have been harmed by the same conduct that benefitted other class members." Newberg on Class Actions § 7:31 at 2.

Here, the Class Representatives' 'interests are fully aligned with the rest of the classes' because they allege the same harms and seek the same relief as the Settlement Classes. To the extent that Self-Funded Accounts have divergent interests from fully-insured Individual Members and Insured Groups, Hibbett's interests are aligned with absent class members within the Self-Funded Sub-Class, and Hibbett has the same incentives as those absent class members it represents to seek an equitable share of the Net Settlement Fund. Separate counsel was appointed to represent

the Self-Funded Class to ensure that the interests of the Sub-Class were adequately represented throughout the negotiation process. *See Juris v. Inamed Corp.*, 685 F.3d 1294 (11th Cir. 2012) ("Most significantly, and anticipating an *Amchem* problem, separate counsel … was specifically brought in for the sole purpose of representing those plaintiffs with only potential, future injuries. Thus, even prior to provisional certification of the class, the interests of those claimants with unmanifested injuries were represented and given a separate seat at the negotiation table through qualified and independent counsel.").

The parties have informed the court that all of the current Class Representatives have reviewed the Settlement Agreement and approve of its terms. (Doc. # 2610-1 at 57). The court finds that neither the named Plaintiffs, nor their counsel, have any interests that are antagonistic to those of the absent class members. Each named Plaintiff, like each absent class member, has a strong interest in proving that Defendants' agreements were unlawful, in demonstrating the impact of that conduct, and obtaining redress. Plaintiffs thus share the interests of the class and will properly and adequately represent the class. "By relying principally on federal substantive law, the representative plaintiffs followed the pattern of antitrust and securities litigation, where nationwide classes are certified routinely even though every state has its own antitrust or securities law, and even though these state laws may differ in ways that could prevent class treatment if they supplied the principal theories of recovery." *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001) (citing *In re Prudential Insurance Co. Sales Practices Litigation*, 148 F.3d 283, 314-15 (3d Cir. 1998)).

The prolonged and contentious nature of this litigation also indicates that Subscriber Plaintiffs have in the past, and will continue in the future, to properly prosecute the case. Subscriber Plaintiffs have invested tens of thousands of hours and tens of millions of dollars prosecuting their

claims. (Doc. # 2625-1 at 88). The law firms and attorneys seeking to represent the class here include numerous highly qualified and experienced lawyers who will continue to prosecute the claims on behalf of the proposed class with diligence and vigor. The court has become very familiar with the lawyers seeking to represent the classes over the last eight years and is fully satisfied that the named Plaintiffs and the lawyers seeking appointment as class counsel will properly and adequately prosecute this case. Therefore, the adequacy-of-representation requirement is satisfied.

### D.     Rule 23(b)

When a party seeking certification has met the requirements of Rule 23(a), that does not end the court's Rule 23 inquiry. A named plaintiff must also show that the putative class meets at least one of the three requirements of Rule 23(b). Subscriber Plaintiffs seek certification of both damages and injunctive relief classes. "Injunction classes can go forward under Rule 23(b)(2); damages classes must satisfy Rule 23(b)(3)." *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1174 (11th Cir. 2019).

### 1.     Rule 23(b)(2) and the Injunctive Relief Class

"For an injunction class under Rule 23(b)(2), the plaintiff must show that 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Suncoast*, 938 F.3d at 1174 (quoting Fed. R. Civ. P. 23(b)(2)). Here, Subscriber Plaintiffs have shown that Defendants had a nationwide agreement and imposed certain output restrictions that place limitations on competition. They further assert that the agreement affected each of the Injunctive Relief Class members in similar ways. For example, Subscriber Plaintiffs contend that these restrictions deprive the market of Blue on Blue competition and result in supra-competitive

premiums. In other words, Subscriber Plaintiffs allege that Class Members have been harmed in essentially the same way by Defendants' conduct and seek to put a halt to the alleged anticompetitive conduct. The proposed Settlement provides significant relief to all members of the Injunctive Relief Class, including (1) the abolition of the National Best Efforts clause in the Blues' license agreements, which will increase the Blue Plans' ability to generate revenue using Green brands; (2) the opportunity for certain Qualified National Accounts to receive of a second Blue bid, which will create increased choice for those accounts (potentially covering 33 million individuals); (3) the ability for all Qualified National Accounts with multiple headquarters and independent decision-making authority to request a bid from the Member Plan in each headquarters' Service Area for employees working at that location; (4) the elimination of certain restrictions on whether an individual Blue Plan may be acquired by another Blue Plan; (5) the ability for Self-Funded Accounts to directly contract with Non-Provider Vendors and Specialty Service Provider Vendors; and (6) the establishment of a Monitoring Committee to oversee compliance with the Settlement and consider whether to approve new rules or measures proposed by BCBSA. (Doc. # 2610-1 at 59).

The court finds that in the final analysis it will likely conclude the proposed injunctive relief will prevent injuries similar to those at issue in this case from recurring, greatly increase competition among the Blues, and substantially benefit all members of the classes. Therefore, the requirements for certification of a class under Rule 23(b)(2) are satisfied.

## 2.      Rule 23(b)(3) and the Damages Class

For a damages class under Rule 23(b)(3), the plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members,

and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Suncoast*, 938 F.3d at 1174 (quoting Fed. R. Civ. P. 23(b)(3)).

### a.  Predominance

"Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Williams*, 568 F.3d at 1357. The predominance standard is similar to the commonality requirement of Rule 23(a), but it is more demanding and mandates particular caution where "individual stakes are high and disparities among class members great." *Amchem*, 521 U.S. at 623; *see Carriuolo*, 823 F.3d at 985. The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Carriuolo*, 823 F.3d at 985 (quoting *Amchem*, 521 U.S. at 623). The Eleventh Circuit has described how the court should analyze the predominance factor as follows:

> To determine whether the requirement of predominance is satisfied, a district court must first identify the parties' claims and defenses and their elements. *See Klay*, 382 F.3d at 1254 & n. 7. The district court should then classify these issues as common questions or individual questions by predicting how the parties will prove them at trial. *See id.* at 1255. Common questions are ones where "the same evidence will suffice for each member," and individual questions are ones where the evidence will "var[y] from member to member." *Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir. 2005).

*Brown*, 817 F.3d at 1234.

A preliminary analysis here indicates that the predominance element ultimately will be satisfied. The Subscribers allege a nationwide conspiracy in which Defendants applied the alleged restraints in the same way in every state in which Class Members reside. (Doc. # 1082). The predominant legal question in this case is whether these practices violated the Sherman Act. (*Id.*). Moreover, Subscriber Plaintiffs allege that virtually every member of the Damages Class suffered antitrust injury through payment of higher premiums, depressed competition, lessened innovation,

and loss of consumer choice. (Doc. # 2411-1 ¶ 4). Common questions also predominate for members of the Self-Funded Sub-Class, who face the impact of the alleged conduct on administrative fees and the market for national accounts. (Doc. # 2616). Thus, "the predominance requirement is satisfied here because common questions present a significant aspect of the case and can be resolved for all Settlement Class Members in a single adjudication." *In re Checking Account Overdraft Litig.*, 275 F.R.D at 660 (finding predominance satisfied for settlement certification purposes where "each Settlement Class Member's claims arise from the same or similar alleged [Bank of America] policies and practices and the same legal theories" and "the relationship between Settlement Class Members and [Bank of America] is governed by substantially uniform or similar account agreement"). Here, each Class Member's claims arise from substantially uniform Blue licensing agreements and uniform policies. Therefore, the court concludes that common issues predominate over any individual issues.

### b.      Superiority

The superiority requirement of Rule 23(b)(3) requires the court to consider "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay*, 382 F.3d at 1269. Rule 23(b)(3) contains a list of factors to consider when making a determination of superiority:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Here, there are tens of millions of Settlement Class Members, so practically speaking a class action is the only feasible method of resolving all claims against the Settling Defendants. The Judicial Panel on Multidistrict Litigation found it appropriate to consolidate these cases in MDL 2406, and the parties have vigorously litigated these claims for eight years. It will continue to be so. And, the potential individual recovery for Settlement Class Members is not large enough to warrant the burden, expense (both temporal and monetary), and risk of prosecuting individual Sherman Act claims. *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification."). Demonstrating antitrust injury is an extremely costly endeavor, generally requiring expert testimony from economists. Plaintiffs have incurred tens of millions of dollars in out-of-pocket costs, without regard to the hundreds of millions of dollars in attorney time spent on these cases. (Doc. # 2625-1 at 41). Thus, the court finds that resolution of these claims in one action is far superior to individual lawsuits.

Having carefully considered the factors set forth above, the court concludes that the Damages Class is substantially likely satisfy the relevant requirements of Rule 23(b)(3).[5]

### E.    Preliminary Approval of Settlement Terms

As noted above, "[i]f preliminary class certification is appropriate, the court must then examine the propriety of settlement." *Hale*, 2020 WL 3642490, at *2. "The [c]ourt may not resolve contested issues of fact or law[] but instead is concerned with the overall fairness, reasonableness, and adequacy of the proposed settlement as compared to the alternative of litigation." *Swaney v.*

---

[5] Although the Blues previously objected to a Litigation Class, they clarified at the preliminary approval hearing that they are not objecting to a Settlement Class because somewhat different standards apply to settlement-only class certification. (Doc. # 2626 at 123-23). *See* Fed. R. Civ. P. 23(e); *see also Amchem*, 521 U.S. at 620 (articulating different standard for settlement-only class certification); *Carrera v. Bayer Corp.*, 727 F.3d 300, 311 (3d Cir. 2013) ("There are different standards for approving a settlement class than for certifying a litigation class.").

*Regions Bank*, 2020 WL 3064945, at *3 (N.D. Ala. June 9, 2020) (quoting *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007)).

Although a court need not make a final determination of the fairness, reasonableness, and adequacy of the proposed settlement at this stage of the proceedings, it must make a preliminary finding that the proposed settlement is sufficiently fair, reasonable, and adequate on its face to warrant presentation to the class members. *See* William B. Rubenstein, Newberg on Class Actions § 11:25 (4th ed.) (citing The Manual for Complex Litigation § 30.41 (3d ed.)) ("If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies ... the court should direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing, at which arguments and evidence may be presented in support of and in opposition to the settlement."). And, in light of the 2018 amendments to Rule 23, the court must gather as much information about the settlement possible, and then carefully and rigorously assess it. This was an extraordinary and needed change to the previous approach to assessing preliminary approval of class settlements. For example, prior to the 2018 amendments, an opinion as lengthy as this one preliminarily approving a class settlement would be unheard of.

The question is "whether [the proposed settlement] is within the range of fair, reasonable and adequate." *Exum v. Nat'l Tire & Battery*, 2020 WL 1670997, at *7 (S.D. Fla. Apr. 6, 2020) (citing Manual for Complex Litig. § 30.41). "Where [] the proposed settlement is the result of serious, arms-length negotiations between the parties, has no obvious deficiencies, falls within the range of possible approval, achieves favorable outcomes for plaintiffs and the class, and does not grant preferential treatment to plaintiffs or other segments of the class, courts generally grant approval." *Id*.

As discussed previously, the Settlement provides two main forms of relief: (a) a $2.67 billion settlement fund; and (b) significant changes to Defendants' business practices, to be closely monitored by the Monitoring Committee for compliance with antitrust laws and the injunctive terms of the Settlement for a period of five years following the entry of judgment. (Doc. # 2610-1 at 23). These changes to the Blues' business practices include: (a) the elimination of the "national best efforts" revenue cap on non-blue competition; (b) the right in certain circumstances to request second blue bids; (c) limits on the use of "MFN-differentials"[6]; (d) reduction of acquisition restrictions and other new rules; and (e) the establishment of a Monitoring Committee "made up of (i) two members appointed collectively by Settling Defendants, (ii) one member appointed collectively by Settlement Class Counsel, (iii) one member appointed by Self-Funded Settlement Sub-Class Counsel, and (iv) one member appointed by the Court" that will oversee compliance with the Settlement for a period of five years. (Docs. # 2610-1 at 24-27, 2625-1 at 11).

The monetary settlement in this case is clearly significant. But the significant injunctive relief provided by the settlement agreement also weighs in favor of preliminary approval. The prospective injunctive relief in this case is wide-reaching and bears greater importance for the class than the monetary relief. Unlike many antitrust cases, this suit does not involve a defunct conspiracy. The settlement terms take this into account by offering forward-thinking, pro-competitive reforms that will change the nature of Defendants' business moving forward. The business practice changes provide significant relief to the Class in addition to the monetary benefit, providing for opportunities for more competition in the market for health insurance and allowing

---

[6] An MFN Differential is "an MFN which requires that the Provider offer a health plan financial terms that are more favorable by a specified rate than those it offers any comparable health plan during the performance period of the contract." (Doc. 2610-2 ¶ 1(bbb)).

the potential for Class Members to achieve greater consumer choice, better product availability, and increased innovation. (Doc. # 2610-10 at 5-6).

### 1.      The Rule 23(e)(2) and *Bennett* Factors

The Eleventh Circuit has set forth six factors that courts are to consider in determining whether a proposed settlement is fair, adequate, and reasonable: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which the settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of the proceedings at which the settlement was achieved." *Parsons v. Brighthouse Networks, LLC*, 2015 WL 13629647, *2 (N.D. Ala. Feb. 5, 2015) (citing *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)). Additionally, effective December 1, 2018, Rule 23(e) was amended to add a mandatory, but not exhaustive, list of similar approval factors. Because these factors overlap, it is appropriate to address them together, in combination. *See In re Checking Account Overdraft Litig.*, 2020 WL 4586398, at *9-10 (S.D. Fla. Aug. 10, 2020).

### a.      Class Representatives and Class Counsel Adequately Represented the Class

For the same reasons discussed above under Rule 23(a)(4)'s adequacy of representation standard, the court finds that the Class Representatives and Class Counsel have adequately represented the class under Rule 23(e)(2)(A). The Class Representatives have selected well-qualified counsel who have vigorously, professionally, and successfully litigated this extremely hard-fought case for eight years.

The Self-Funded Settlement Sub-Class Counsel has also vigorously represented the interests of the Self-Funded Sub-Class since joining the settlement process over one year ago. The Self-Funded Settlement Sub-Class Counsel joined the settlement process before negotiations were

completed and the term sheet was executed. (Doc. # 2610-12). And, to ensure that any potential settlement was fair, the Self-Funded Settlement Sub-Class Counsel obtained significant discovery materials, retained its own experts, and conducted its own analysis of the claims and defenses in this case. (*Id.*).

Class Counsel have litigated scores of antitrust cases to resolution and are recognized as top authorities in their field. The court is well-acquainted with their performance in this case and has no hesitation in concluding that all Class Representatives and all Class Counsel have more than adequately represented the Settlement Class.

> **b.      There Was No Fraud or Collusion and the Settlement Was Negotiated at Arm's Length**

Rule 23(e)(2)(B) requires the court to determine whether a proposed settlement "was negotiated at arm's length." Relatedly, one of the *Bennett* factors requires the court to rule out the possibility of fraud or collusion behind the settlement. *Leverso v. SouthTrust Bank of AL., Nat. Assoc.*, 18 F.3d 1527, 1530 (11th Cir. 1994).

This was not a quick resolution, and there is no suggestion of collusion. Here, there were extensive mediation efforts. The Settlement was negotiated over the course of five years with the assistance of experienced mediators and expert input, during which time there were multiple impasses. Although the court should not delve too deeply into the mediation sessions due to confidentiality issues, the court's Special Master -- Mr. Gentle, the mediator who helped the parties reach the ultimate agreement -- has submitted a declaration attesting to the fact that there was no collusion involved. (Doc. # 2610-12). Therefore, it is clear that the Settlement was negotiated at arm's length, and the court has no reason to suspect collusion.

> **c.     The Settlement Will Avert Years of Highly Complex and Expensive Litigation Involving Significant Costs, Risks and Delay**

This case involves tens of millions of Settlement Class Members. The Settlement provides immediate and substantial benefits to these Class Members. The antitrust claims and defenses before the court are complex. Although this litigation has been pending for eight years, much remains to be done. If there is no resolution, there will be many more years of litigation, in this court, appellate courts, and other courts. And, the majority of the work that has been done so far has related primarily to the accelerated Alabama cases. There are forty-one subscriber cases pending in this court, most of which -- without a settlement -- will need to be remanded to transferor courts for further litigation, which would take many years. *See In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (noting that complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive"); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 317, 325-26 & n.32 (N.D. Ga. 1993) ("[A]djudication of the claims of two million claimants could last half a millennium.").

Although the parties have litigated substantial motions, it could still be some years before the court and the parties are in a position to try even the accelerated Alabama cases. Without a settlement, the court will be required to consider contested class certification motions, and complicated motions regarding the admissibility of the parties' respective experts. One side or the other is likely to appeal whatever decision the court makes on the class certification motions, and eventually the outcome of any trial. The court also understands that Defendants intend to file further dispositive motions before any trial of the accelerated Alabama actions takes place.

Here, the "costs, risks, and delay of trial and appeal," Fed. R. Civ. P. 23(e)(2)(C)(i), strongly support preliminary approval. In the accelerated Alabama actions, in relation to the class certification motion, Subscriber Plaintiffs have presented a sophisticated damages model estimating impact and damages based on entry by Blue and Green competitors into Alabama. The but-for world constructed by Subscriber Plaintiffs' experts involved a complex modeling of factors estimating the impact of the entry of significant competition within the market, including estimated profitability of entry, timing of entry, type of entry, strength of entry, progression of entry, and competitive response to entry. Plaintiffs' experts then modeled an estimate of damages.

Defendants' experts aggressively challenged Subscriber Plaintiffs' damages model and vigorously attacked Subscriber Plaintiffs' findings and experts' calculations. If this case advanced toward trial, Subscriber Plaintiffs faced a significant risk that their models would be rejected and that a damages and/or injunctive class for purposes of litigation would not be certified. Even if an Alabama Damages Class was certified, certification of similar classes in other states would necessitate going through this protracted process on a nationwide basis with uncertain outcomes. *Swaney*, 2020 WL 3064945, at *4 ("Because 'the outcome on class certification and the ultimate outcome on the merits was uncertain for both parties,' a settlement was reached and here that is appropriate.") (quoting *Parsons v. Brighthouse Networks, LLC*, 2015 WL 13629647, *2 (N.D. Ala. Feb. 5, 2015)). While Subscriber Plaintiffs are confident in the structure of their proffered model, there remain substantial risks.

If the parties continue to litigate these cases, they would need to devote significant time and enormous resources to preparing complex damages models nationwide. There is simply no guarantee that Subscriber Plaintiffs would recover a final judgment more favorable than the considerable $2.67 billion in monetary relief and injunctive relief secured by the Subscriber

Plaintiffs in the Settlement. Thus, the costs, risks, and delay of trial and appeal support the appropriateness of a decision to settle.

### d. Stage of the Proceedings/Development of the Factual Record

"The law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992). The *Bennett* factors require a court to consider whether the "the case settled at a stage of the proceedings where class counsel had sufficient knowledge of the law and facts to fairly weigh the benefits of the settlement against the potential risk of continued litigation." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *10 (N.D. Ga. Mar. 17, 2020). Here, Plaintiffs conducted extensive discovery over eight years. They obtained and reviewed over 75 million pages of documents and over 100 terabytes of data, took over 100 depositions, and worked with experts on liability and damages analyses. Plaintiffs have had ample opportunity to investigate the facts and law and to obtain substantive rulings from the court. Thus, it is clear that the factual record in this matter was sufficiently developed to allow Class Counsel to make a reasoned judgment as to merits of the settlement. *See Swaney*, 2020 WL 3064945, at *5 (holding that settlement was appropriate where the parties "have litigated this case for over seven years, through dispositive motions" and "have had the opportunity to investigate the facts and law, review substantive evidence relating to the claims and defenses, and brief the relevant legal issues").

### e. The Benefits Provided by the Settlement Are Fair, Adequate and Reasonable When Compared to the Range of Possible Recovery

The second and third *Bennett* factors are "easily combined and normally considered in concert." *Camp v. City of Pelham*, 2014 WL 1764919, at *3 (N.D. Ala. May 1, 2014). "The

[c]ourt's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation[] but to evaluate the proposed settlement in its totality." *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005). Here, the Settlement provides significant relief to Settlement Class Members. At $2.67 billion, the Settlement represents one of the largest antitrust class settlements in history. Although the monetary benefit when distributed between Settlement Class Members may not be the amount a lay observer would expect, Subscribers counsel notes that the structural relief that the Plaintiffs have obtained is more important that the dollar amount of the settlement. The court agrees. The injunctive aspects of the Settlement significantly alter the Blues' business practices and substantially increase the value of the Settlement to the class members.

More to the point, the structural relief negotiated in this settlement is exceptional. So, this Settlement cannot be evaluated in the vacuum of monetary recovery. Nevertheless, to put the dollar amount of the Settlement in context, Plaintiffs' expert Ariel Pakes calculated an overcharge ranging from 3.4% to 5.5% for Alabama class members. (Doc. # 2411-1 ¶ 10). In extrapolating the Alabama damages model nationwide through 2019, Dr. Pakes, estimated Subscriber damages as ranging from $18.6 billion to $36.1 billion. (Doc. # 2610-11 ¶ 10). A recovery of $2.67 billion represents 7.3% to 14.3% of that estimated damage range, which falls within the range of reasonable recoveries. *Bennett*, 737 F.2d at 986-87 & n.9 (approving $675,000 settlement representing 5.6% of claims with maximum potential recovery of $12,000,000); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) ("[S]tanding alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims.").

Moreover, the business practice changes established in the Settlement are significant and will enhance competition going forward. (Doc. 2610-10 ¶ 37). Subscriber Plaintiffs believe that

the Settlement Agreement remedies the most significant of those restraints (abolition of the National Best Efforts revenue cap and the establishment of the Second Blue Bid for Qualified National Accounts) and will provide for materially greater competition in the field of health care financing. (Doc. # 2610-1 at 52 n.31). To put the effect of the injunctive relief in context, during the litigation phase, Dr. Pakes estimated "that NBE accounted for 97 percent of the total damages in the case." (Doc. # 2626 at 160).

Settlement Class Counsel were well-positioned to evaluate the strengths and weaknesses of Plaintiffs' claims in this case as well as the appropriate basis upon which to settle them. Because of the uncertainties surrounding continued litigation and the fact that settlement provides for certain, significant, and immediate relief, the court concludes that the recovery provided for in the Settlement Agreement is an excellent achievement.

### f.      Opposition to the Settlement

The fifth *Bennett* factor considers the substance and amount of any opposition to the settlement. *Bennett*, 737 F.2d at 986. The court finds that the nearly unanimous approval of the Settlement also indicates preliminary approval is appropriate. There are currently 67 class representatives who have unanimously approved the settlement terms. (Doc. # 2626 at 26). Only three class members, represented by attorney Chris Cowan, have raised concerns. The court addresses those questions below, but notes that they have not objected to the Settlement or even indicated that they intend to object or opt-out in the future. (Doc. # 2623). Rather, they filed a "Response to the Motion for Preliminary Approval of Proposed Class Settlement" (Doc. # 2623) and another submission after the hearing (Doc. # 2627). In their Response, they state that they do not, at this time, consent to the proposed settlement. (Doc. # 2623). Their primary issue, addressed

at the preliminary approval hearing, is that they feel they have not been provided access to sufficient information to properly evaluate the settlement. (*Id.*).

Mr. Cowan's clients have not objected to the proposed settlement at this stage, but they have declined to give their consent to it. (Doc. # 2627). Mr. Cowan has raised several concerns and the court addresses those below. Suffice it to say, however, that after careful review, the court preliminarily concludes the Mr. Cowan's arguments are off the mark.

*First*, Mr. Cowan complains that though he has requested to review confidential mediation materials on behalf of his clients, Subscriber's Counsel have not granted him access to those. He accuses Subscriber Class Counsel of violating duties owed to them regarding the contents of "their" litigation files. This circuit's precedent counsels against applying various state ethical rules applicable to individual actions in the class action context. *See Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1176 (5th Cir. 1978) ("Certainly it is inappropriate to import the traditional understanding of the attorney-client relationship into the class action context by simply substituting the named plaintiffs as the client."). That claim is without merit.

Class Counsel owe fiduciary duties to the class as a whole and those duties involve different considerations than exist in cases in which counsel is actually retained by a client or clients. In *Kincade v. General Tire & Rubber Co.*, 635 F.2d 501 (5th Cir. 1981), the former Fifth Circuit dealt with the ethical quandaries specific to class actions. The *Kincade* court determined that attorney-client relationships in class actions are "unique" because (1) "the 'client' in a class action consists of numerous unnamed class members as well as the class representatives" and (2) "'the class itself often speaks in several voices.'" *Id*. at 508 (quoting *Pettway* 576 F.2d at 1216). Because of this unique attorney-client relationship, the *Kincade* court concluded that cases "holding that an

attorney cannot settle his individual client's case without the authorization of the client are simply inapplicable" to class actions. *Kincade*, 635 F.2d at 508. This teaching is particularly relevant here.

Class Counsel do not owe any unique duty to a particular group of class members. Rather, the duty owed to class members, even current or former class representatives, is indistinct from the duty owed to the class. *See Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982) (holding the duty of counsel in the class-action context "is to the entire class and is not dependent on the special desires of the named plaintiffs"); *see also Pettway*, 576 F.2d at 1176 ("The interests of the named plaintiffs and those of other class members may diverge, and a core requirement for preventing abuse of the class action device is some means of ensuring that the interests and rights of each class member receive consideration by the court.").

As noted above, as a general rule, a federal court is responsible for governing the conduct of the parties before it and can be guided by state ethics rules, but is not bound by them. *See Pettway*, 576 F.2d at 1176. This is all the more true in the context of class action and MDL litigation.

In any event, based on the current record, the court is confident that none of the issues raised by Mr. Cowan raise any serious question about the performance of class counsel. Class Counsel have lived with these cases for nearly ten years. They have undertaken discovery and damages calculations that would more than sufficiently reveal information Mr. Cowan seeks about monetary damages. So, whatever was discussed during the numerous confidential mediation sessions, or included in any numerous mediation position statements, is available through other means. Class Counsel have provided Mr. Cowan with relevant expert analyses, which show that (1) the estimated damages recovery nationwide is somewhere in the range of $18.6 - $31.6 billion (Doc. # 2411 ¶ 10) and (2) a settlement amount of $2.67 billion represents between 7.3% and

14.3% of the expert analysis of a damages range. Without even considering the substantial injunctive relief Class Counsel have secured, this monetary recovery is well within the range of what courts routinely hold to be reasonable in a settlement. *See Bennett*, 737 F.2d at 986-87 & n.9 (5.6% of claims); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1346 (9% of claims); *Lazy Oil Co. v. Wotco Corp.*, 95 F.Supp. 2d 290, 318-19 (W.D. Pa. 1997) (5.35% of claims); *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, 2015 WL 4528880, at *14 (E.D. La. July 27, 2015) (8.5% of claims); *Carnegie v. Mut. Sav. Life Ins. Co*., 2004 WL 3715446, at *21 (N.D. Ala. Nov. 23, 2004) (refusing to consider potential punitive damages award when determining the adequacy of settlement). Mr. Cowan's individual clients' consent to the Settlement, or lack thereof, is not a sufficient ground to call into question Class Counsel's representation of the class as a whole. Moreover, Class Counsel have committed to continuing to discuss these matters with him.

The record indicates that Subscribers Counsel set up a systemic process in order to advise the Class Representatives and each of their counsel about the settlement. (Doc. # 2626 at 110-11). David Guin and Greg Davis, both experienced counsel, called all local counsel individually, and then each named plaintiff. (*Id.*). They went over each of the terms of the settlement and explained both the monetary and the injunctive relief portions. (*Id.* at 111-12). They asked each Plaintiff whether they had any questions and thanked them for being a named party. (*Id.*). Mr. Davis explained the Settlement to counsel and then to the parties themselves. (*Id.* at 112). When he called, the class representatives informed Mr. Davis they did not have any questions for him. (*Id.*). However, Mr. Cowan, who appeared at the Preliminary Approval Hearing and represents three former class representatives, did have questions. In response to those, Mr. Davis provided him with expert reports and summaries of the expert reports that are contained in the court's docket.

36

Mr. Davis also asked co-counsel, Megan Jones and Swathi Bojedla, to participate in a separate call with Mr. Cowan.

It appears the only items that Mr. Cowan requested which were not provided to him are mediation notes and statements. He asked for information he believed "would be kind of a quick study of the state of the litigation," in particular "the mediation file" but that was not provided to him.[7] (Doc. # 2626 at 91-92). At the Preliminary Approval Hearing. Mr. Davis informed the court that he did not provide these documents because he signed a mediation agreement providing that those statements are confidential. (*Id.* at 112-13). Moreover, mediation files are not litigation files. In this court at least, there is a mediation privilege. The court's Alternative Dispute Resolution Plan prohibits the parties and the mediator from disclosing information about the mediation process. United States District Court for the Northern District of Alabama, Alternative Dispute Resolution Plan Sec. IV(9).[8] The court is not aware of any case law (and counsel has not provided any) indicating that named class members are entitled to review confidential, non-public documents from a mediation.

The court notes that 67 out of 70 original class representatives (or 96%) and their counsel have consented to the settlement. A careful review of the current Response withholding consent, based on the inability of some class members (or, in this instance, former class representatives) to obtain confidential mediation information, does not contain a substantive objection to the proposed settlement. (*See* Doc. # 2627). "In assessing the fairness of a proposed compromise, the number of objectors is a factor to be considered but is not controlling." *Cotton v. Hinton,* 559 F.2d 1326,

---

[7] These class members, through their counsel, have access to the court docket. The court is confident there is sufficient information from which they can properly evaluate whether to preliminarily approve this settlement. The docket contains the Complaints, the briefing on various substantive Motions, the court's rulings on those Motions, expert reports, and all of the extensive information filed in support of the Motion for Preliminary Approval and related filings. (Docs. # 2610, 2611, 2612, 2616, 2625).

[8] https://www.alnd.uscourts.gov/sites/alnd/files/forms/ADR%20Plan.pdf.

1331 (5th Cir. 1977). "[A] low percentage of objections [may] point[] to the reasonableness of a proposed settlement and support[] its approval." *Lipuma*, 406 F. Supp. 2d at 1324 (citing *Bennett*, 737 F.2d at 986). And, the fact that there was only one "Response," rather than an objection, in light of nearly seventy approvals, weighs in favor of approving the Settlement.

The court understands that Mr. Cowan and his clients are not objecting to the Settlement. They have made clear that their concerns relate to the amount of financial recovery in the Settlement based upon, what he concedes, is a "back of the envelope" calculation. So, they have not expressed concerns about the structural relief the Settlement achieves. As Subscribers Counsel noted, the structural relief (as opposed to financial recovery) negotiated is the polestar of this Settlement. It is historic and unique in a private enforcement action. Thus, Mr. Cowan's concerns are unrelated to the most crucial aspect of the Settlement.[9]

---

[9] Mr. Cowan argues that, by failing to produce the mediation materials, Subscriber Plaintiffs' Class Counsel have violated ethical obligations to certain class representatives. (Doc. # 2726 at 2-4). He supports this argument by citing California, Texas, New York, Washington, DC, and Minnesota bar association opinions and state court decisions applying state ethical rules. (Doc. # 2627 at 3-4). However, these rules and opinions do not apply in this action because federal courts are permitted to adopt their own ethical standards. *See In re Employment Discrimination Litig. Against Alabama*, 453 F. Supp. 2d 1323, 1331 (M.D. Ala. 2001) (citing *In re Snyder*, 472 U.S. 634, 645 n.6 (1985). The Northern District of Alabama has adopted the "Alabama Rules of Professional Conduct ... and, to the extent not inconsistent [with those rules], the American Bar Association Model Rules of Professional Conduct...." N.D. Ala. L.R. 83.1(f). Therefore, authorities applying state ethical rules from states other than Alabama are not relevant in this action.

Mr. Cowan cites to an opinion by the Alabama Bar Association for the proposition that counsel must produce "a copy of the entire [client] file upon the client's request." (Doc. # 2726 at 3). But, even though this court's local rules have adopted the Alabama Rules of Professional Conduct, this court is not bound by state court application of those rules, let alone the Alabama Bar Association's opinion of the rules. *See In re Employment Discrimination Litig. Against Alabama*, 453 F. Supp. 2d at 1331 (citing *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1316 (3d Cir. 1993)). But, neither the Alabama Rules of Professional Conduct nor the American Bar Association Model Rules of Professional Conduct override circumstances where counsel are not permitted to disclose confidential files. For example, there are instances where litigation documents are designated attorney's eyes only. The court's mediation order and practices are clear. Documents that are exchanged in mediation are confidential.

This does not mean that this court does not regulate the conduct of the lawyers before it. But here, Mr. Cowan down plays the importance of the mediation privilege. Mediation in this litigation spanned over two years, 150 in-person meetings, over 280 remote mediation sessions, and produced this proposed settlement. (*See* Doc. # 2626 at 9). *See Vista Healthplan, Inc. v. Warner Holdings Co. III*, 246 F.R.D. 349, 357 ("[T]here is a long-standing judicial attitude favoring class action settlements, and the Court's discretion is constrained by the principle of preference favoring and encouraging settlement in appropriate cases.") (internal quotation markets omitted). In other words, allowing Mr. Cowan to wedge certain state rules of ethics into this court's mediation order would "interfere with the

*Second*, Mr. Cowan has questioned whether the remaining Class Representatives may have ceded control to Class Counsel. But there is nothing in the record before the court that suggests that to be the case. The court is dealing with experienced class counsel. And, as noted above, the record indicates that each of the 70 original class members (and their counsel) were consulted about the Settlement. Sixty-seven of them (a full 96%) consented to it.

*Third*, at the approval hearing, Mr. Cowan raised two related issues: (1) whether not having a class representative in each state for a national class would fail to adequately represent the interests of the nation-wide class; and (2) the propriety of waiving state law claims as part of the national class. (Doc. # 2626 at 87-93). Even though Mr. Cowan stated at the hearing that his position is not that there must be a class representative from each state (*see* Doc. # 2626 at 103-104), the court will settle this issue. There is no requirement that there be a class representative from each state to certify a national class. *See Bowe v. Pub. Storage*, 318 F.R.D. 160, 176 (S.D. Fla. 2015) (holding that sole class representative's interests were aligned with the national class and his representation was adequate); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 309 (N.D. Cal. 2018) (approving national class where "class representatives comprise persons from *almost* every state") (emphasis added); *In re Cmty. Bank of N. Virginia*, 622 F.3d 275, 310 (3d Cir. 2010) (agreeing with settling parties that a district court did not have to "appoint named class representatives from every state"); *Thomas v. Blue Cross & Blue Shield Ass'n*, 333 F. App'x 414, 416 (11th Cir. 2009) (upholding district court's approval of national class without class representatives from each state). As already discussed, the alleged conduct giving rise to the national class was essentially uniform nationwide. And, Mr. Cowan does not provide any reason

---

national policies that underlie the federal class action device." *Cty. of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1407, 1415 (E.D.N.Y. 1989).

why the consenting class representatives (from 47 states) have any interests adverse to the class representatives or class members in Minnesota, Texas, and California.

*Fourth*, Mr. Cowan has also raised the specter of claim splitting and has questioned whether this may indicate a problem regarding the adequacy of the Class Representatives and Class Counsel. (Doc. # 2627 at 11-12). However, a Class Member's inability to later pursue state law claims arising in other states does not amount to a fundamental conflict that would defeat adequacy. *See Bowe v. Pub. Storage*, 318 F.R.D. 160, 173 (S.D. Fla. 2015) "[T]he rule against claim splitting prohibits a plaintiff from prosecuting its case piecemeal and requires that all claims arising out of a single wrong be presented in one action." *Hearn v. Bd. of Supervisors of Hinds Cty., Miss*., 2013 WL 1305586, *2–*3 (S.D. Miss. Mar. 27, 2013), *aff'd*, (July 8, 2014) (quoting *Ameritox, Ltd. v. Aegis Sciences Corp*., 2009 WL 305874, *4 (N.D. Tex. 2009) (citations omitted)). In a claim splitting scenario, a second suit will be barred if it involves the same parties and same transaction or series of transactions. *Id*.

Some courts have held that the doctrine against claim splitting does not apply to class actions. *See Gooch v. Life Inv'rs Ins. Co. of Am*., 672 F.3d 402, 428 n. 16 (6th Cir. 2012) ("[a] class action, of course, is one of the recognized exceptions to the rule against claim-splitting"); *Gunnells v. Healthplan Servs., Inc*., 348 F.3d 417, 431-32 (4th Cir. 2003) (same); *Makor Issues & Rights, Ltd. v. Tellabs, Inc*., 256 F.R.D. 586, 597 (N.D. Ill. 2009). As Moore's Federal Practice notes, this is because only certain claims may be appropriate and certified for class treatment:

> Generally, the request for certification as a class action and the order approving such certification will determine the nature of the claims subject to class action treatment, and the resultant judgment will be limited to those claims. Thus, a class action can be thought of as an action in a court of limited jurisdiction in which only certain claims and certain forms of relief are available. This type of action, of course, is one of the recognized exceptions to the rule against claim-splitting.

18 Moore's Federal Practice § 131.40[3][e][iii] (2015).

Regardless, the fact that the Settlement provides Class Members with the ability to opt-out of the damages class mitigates any potential concern of claim splitting. *See Slade v. Progressive Sec. Ins. Co*., 856 F.3d 408, 414 (5th Cir. 2017) (noting that the preclusion risk is smaller under a certification under Rule 23(b)(3) due to the opportunity to opt out); *Andren v. Alere, Inc*., 2017 WL 6509550, at *8 (S.D. Cal. Dec. 20, 2017) ("[C]ourts have noted that any risk of preclusion can be mitigated through the opt-out provisions under Rule 23(b)(3)."). Of course, and in any event, "[t]he res judicata effects of a judgment cannot be determined prospectively and can only be determined in a subsequent action." *Bowe*, 318 F.R.D. at 173 (citing Fed. R. Civ. P. 23 Advisory Committee's Notes to the 1996 Amendments). Therefore, these concerns do not render the Class Representative or Class Counsel inadequate.

One more observation about this point is appropriate. Mr. Cowan's concern ignores the reality that a settling class often is required to surrender all of its claims in order to achieve class-wide relief. Waiver of state claims as a part of a national class on federal claims is permissible, especially where all state claims arise from "a common nucleus of operative fact." *Thomas*, 333 F. App'x at 417 (citing *Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1289 (11th Cir. 2007)). Mr. Cowan does not allege any state law claims premised on conduct other than the alleged restraints of trade in violation of the Sherman Act. Further, Mr. Cowan's concerns may be mitigated by the language of the Settlement Agreement, which limits "Released Claims" to claims arising from "the factual predicates of the Subscriber Actions," consistent with the principles in *Thomas*.[10] (Doc. # 2610-2 ¶ uuu). *Thomas*, 333 F. App'x at 417 ("an identical factual predicate" requires only a common nucleus of operative fact") (internal quotation marks omitted); *Matsushita*

---

[10] The same provision of the Settlement Agreement also releases "any issue raised in any of the Subscriber Actions by pleading or motion." (Doc. # 2610-2 ¶ uuu). Interestingly enough, none of the causes of action mentioned in Mr. Cowan's brief were pleaded in this action.

*Elec. Indus. Co. v. Epstein*, 516 U.S. at 376, 376-77 (1994) ("[A] court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action."). This is true even for state claims where there is not a class representative from the state where claims are released. *Brown v. Wells Fargo Bank, N.A.*, 25 F. Supp. 3d 144, 151 (D.D.C. 2014).

The most beneficial aspect of class action litigation is arguably the efficiency of litigating a single question common to the entire class in one action. This benefit (and potentially the ability to litigate class actions generally) would be frustrated if any class member could relitigate the same conduct underlying a national settlement by asserting a state cause of action after a settlement. *See In re Mexico Money Transfer Litig.*, 267 F.3d at 747 ("By relying principally on federal substantive law, the representative plaintiffs followed … antitrust and securities litigation, where nationwide classes are certified routinely even though every state has its own antitrust or securities law, and even though these state laws may differ in ways that could prevent class treatment if they supplied the principal theories of recovery."); *In re Vitamins Antitrust Litig.*, 2000 WL 1737867, at *5 (D.D.C. Mar. 31, 2000) (in granting final approval to a "comprehensive settlement that would prevent prelitigation of settled questions"); *Wells Fargo*, 25 F. Supp. 3d at 151 ("Variations from state-to-state in the form of state law claims would always prevent a nationwide settlement, thereby defeating the efficiencies of the class action settlement mechanism."). Defendants are not willing to provide substantial relief without buying finality and repose. And, particularly where, as here, Defendants have agreed to significant and historic concessions in structural changes to their business practices, it is not unreasonable for those Defendants to demand the surrender of rights and claims from those who stand to substantially benefit from the Settlement.   Mr. Cowan's

citations to cases on this issue do not move the needle. The few opinions he has highlighted indicate that it is a breach of adequate representation when a class settlement releases claims to the detriment of the class or without due consideration of the consequences. The court preliminarily finds neither of those scenarios is in play here.

*Fifth*, Mr. Cowan also asserts that an inherent conflict exists between states where the application of the Filed Rate Doctrine will operate to bar the recovery of money and states where rates are not filed. He asserts these differences should require sub-classes and "questions" why there are none. (Doc. # 2623). In response, Subscriber Class Counsel assert that state-to-state differences in filed-rate schemes are not a reasonable basis for structuring the Plan of Distribution. (Doc. # 2628).

In the antitrust context and in certain other circumstances, the Filed Rate Doctrine operates to bar damages claims that are based upon challenges to rates that have been filed with regulatory agencies. *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156 (1922); *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409 (1986); *Taffet v. Southern Co.*, 967 F.2d 1483 (11th Cir. 1992); *Hill v. BellSouth Telecommunications, Inc.*, 364 F.3d 1308 (11th Cir. 2004). However, it can also be argued that because the Supreme Court has never held that the doctrine should foreclose damages from a federal statutory claim based on a state regulatory regime, the doctrine should not bar damages in these cases. *In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d at 1332. There is also an argument that the Filed Rate Doctrine does not apply to federal antitrust claims where the state regulator with whom the rates were filed does not engage in "meaningful review" or where the agency does not itself even have statutory authority to review questions of anticompetitive conduct. *See, generally, In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d at 1324-26. Moreover, the Filed Rate Doctrine does not appear to apply to co-

conspirators who violated the Sherman Act by agreeing not to compete in a state. After all, none of them filed rates in those states where they did not do business.

Mr. Cowan appears to suggest that notions of fairness require subclasses for those states subject to filed-rate regulations and those that are not. Rate filing regulations come in all shapes and sizes, ranging from "file-and-use" rules, to regulations "deeming" rates approved after the passage of time, to regimes that require express, prior approval before a rate may be charged. Few if any states lack any form of regulation whatsoever. (Doc. # 2628 at 11-12). And, there are state-to-state variations in the Blues' relative market shares that have an impact on Plaintiffs' damages models. For example, although certain rates charged by BCBS-AL are filed with the Department of Insurance, some are not. Although that poses a risk for recovering damages in Alabama, BCBS-AL is also one of the Blues with the largest market share and faces the least competition. Blues in other states face more hearty competition, even from other Blues. But Plaintiffs' expert used the Alabama damages model to extrapolate damages on a nationwide basis, which would appear to benefit states already subject to more competition. There are positives and negatives for all states. And, even in Alabama, this court held that the Filed Rate Doctrine did not apply to rates charged in excess of the filed rate and reserved ruling on whether it applies to rates charged that were lower than the filed rate. *In re Blue Cross Blue Shield Antitrust Litig*., 238 F. Supp. 3d 1313, 1327-28, 1332 (N.D. Ala. 2017).

Any attempt to allocate the Net Settlement Fund based on an assessment of the relative strengths and weaknesses of the Filed Rate Doctrine would be exceptionally complex and likely administratively infeasible. *See In re PaineWebber Ltd. P'ships Litig*., 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd*, *In re PaineWebber Inc. Ltd. P'ships Litig*., 117 F.3d 721 (2d Cir. 1997) ("[T]he apportionment of a settlement can never be tailored to the rights of each plaintiff with

mathematical precision."); *In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333, 346 (3d Cir. 2010) ("Such differences in settlement value do not, without more, demonstrate conflicting or antagonistic interests within the class."). Approval of a plan of distribution for a settlement fund in a class action is governed by the same standards of review applicable to approval of a settlement as a whole, *i.e.*, the distribution plan must be fair, reasonable and adequate. *Hart v. RCI Hosp. Holdings*, 2015 WL 5577713, at *12 (S.D.N.Y. Sep. 22, 2015). "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 40 (E.D.N.Y. 2019) (quoting *In re WorldCom, Inc. Sec. Litig.*, 388 F.Supp. 2d 319, 344 (S.D.N.Y. 2005)). Class Counsel, who have a wealth of experience and are fully competent in complex class actions, prepared the Plan of Distribution. Under its terms, each claimant will receive a pro-rata share of the Settlement Fund. At this stage, the Plan of Distribution appears to be an effective form of relief distribution and weighs in favor of preliminary approval.

## 2. Other Relevant Issues

At the Preliminary Approval Hearing, a number of other issues were addressed. Although they do not fit neatly within the Rule 23(e)(2) and *Bennett* factors, the court finds they are relevant to the fairness, adequacy, and reasonableness of the Settlement and has considered them.

### a. Proposed Attorneys' Fees

Under the Settlement, Settlement Class Counsel will be applying for a combined fee and expenses award from the $2.67 billion common fund not to exceed 25%, plus up to $7 million from the Notice and Administration Fund to "reimburse plaintiffs' counsel's actual and reasonable fees and expenses incurred for Notice and Administration." (Doc. # 2610-2 ¶ 28(h)). Such a request will of course be subject to court approval and will receive intense scrutiny. But, the court notes

that this proposal is in line with benchmarks in the Eleventh Circuit. *See Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1243 (11th Cir. 2011) (noting "well-settled law from this court that 25% is generally recognized as a reasonable fee award in common fund cases"); *Swaney*, 2020 WL 3064945, at *7 ("In determining an award of attorney's fees in a percentage-of-fund class settlement case, the 'benchmark' percentage is 25%, which is the dead center of the 20-30% range."). And, Settlement Class Members will receive notice of the proposed fee and expense request and will have an opportunity to object to any such award prior to final approval.

A final word is appropriate about the parties' quick pay agreement. With respect to attorneys' fees, the Settlement Agreement requires that Defendants deposit $100 million ($100,000,000) into Escrow within thirty (30) calendar days of entry of the Preliminary order. (Doc. # 2610-2 at 40). And, no later than thirty-one (31) days from entry of the Preliminary Approval Order, a "partial award of seventy five million ($75,000,000) … shall be paid" for attorneys' fees, expenses and interests. (Doc. # 2610-2 at 45). This partial payment, however, is subject to the receiving counsel's "irrevocable letter of credit" securing the amount of the partial award against any appeal, reduction in attorneys' fees, or other reason requiring return of the amount into Escrow. (Doc. # 2610-2 at 45). This is the first time the court has been presented with such a "quick pay" agreement but, after careful review, it has no reservation approving it.

Generally, courts have "great latitude in formulating attorney's fees awards subject only the to the [necessity] of explaining [their] reasoning." Faught v. American Home Shield Corp, 668 F.3d 1233, 1244 (11th Cir. 2011) (internal quotation marks omitted). The court finds the parties' agreement for partial payment of attorneys' fees reasonable. The court recognizes the hard-fought, eight-year litigation that counsel has undertaken. Further, the early distribution does not prejudice the class members: counsel still receives the same reasonable percentage of the common fund

ultimately approved by the court if final approval is granted. Thus, the court's normal concerns about equitable distribution between the class and its counsel are not at issue. The security against the partial payments also supports a finding that the partial payments are reasonable, especially where Defendants have agreed to deposit these sums into escrow. For these reasons the court **APPROVES** the parties' quick pay agreement.

### b.    The Court's April 5, 2018 Standard of Review Opinion

At the Preliminary Approval Hearing, the issue of the effect of the court's April 5, 2018 Memorandum Opinion and Order Regarding Section 1 Standard of Review and Single Entity Defense on the Settlement was raised. (Docs. # 2063, 2064). In that Memorandum Opinion and Order, the court held that "Defendants' *aggregation* of a market allocation scheme together with certain other output restrictions is due to be analyzed under the per se standard of review. . . ." (Doc. # 2063 at 59) (emphasis added). The question of whether the Blue System, after the injunctive elements of the Settlement are implemented, will still be subject to the per se standard of review was discussed at the Preliminary Approval Hearing. That is a matter which is not currently before the court. Nevertheless, the court has been crystal clear about how it will approach it.

The court notes that it certified its standard of review decision for interlocutory appeal. (Docs. # 2022, 2023). In doing so, the court was required to find that there is a substantial ground for difference of opinion as to its decision. 28 U.S.C. § 1292(b). As this court noted:

> Since [*United States v. Sealy, Inc*., 388 U.S. 350 (1967)] and [*United States v. Topco Associates., Inc*., 405 U.S. 596 (1972)] were decided, the Supreme Court has held that courts must "presumptively appl[y] rule of reason analysis." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). And, the Court has criticized a "literal approach" of applying the per se standard of review to any practice that can be labeled a per se category. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc*., 441 U.S. 1, 9 (1979).

(Doc. # 2063 at 6). This court's standard of review decision was based in large part on the

application of *Sealy* and *Topco*. But, the court acknowledged that the continued precedential value

of *Sealy* and *Topco* has been called into question:

> In *Rothery Storage & Van Co. v. Atlas Van Lines, Inc*., Judge Bork of the District
> of Columbia Circuit specifically questioned the ongoing precedential value of
> *Topco* and *Sealy*. 792 F.2d 210, 226 (D.C. Cir. 1986) ("An examination of more
> recent Supreme Court decisions, however, demonstrates that, to the extent that
> *Topco* and *Sealy* stand for the proposition that all horizontal restraints are illegal
> per se, they must be regarded as effectively overruled."). The *Rothery* court found
> that, in *Broadcast Music, Inc. v. Columbia Broadcasting System*, 441 U.S. 1 (1979),
> *National Collegiate Athletic Association v. Board of Regents*, 468 U.S. 85 (1984),
> and *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co*., 472
> U.S. 284 (1985), "[t]he Supreme Court reformed the law of horizontal restraints."
> *Rothery*, 792 F.2d at 226; *see also Addamax Corp. v. Open Software Found., Inc*.,
> 152 F.3d 48, 51-52 (1st Cir. 1998) (quoting *U.S. Healthcare, Inc. v. Healthsource,
> Inc*., 986 F.2d 589, 593 (1st Cir. 1993)) (describing the "ever narrowing per se
> niche").
>
> Commentators have also observed, more recently, that the Supreme Court has
> narrowed its application of the per se rule. Herbert Hovenkamp & Christopher R.
> Leslie, *The Firm as Cartel Manager*, 64 Vand. L. Rev. 813, 864-65 (2011)
> (explaining that *Topco* and *Sealy* "have been rightfully criticized for applying an
> overly aggressive per se rule"); Benjamin Klein, *Single Entity Analysis of Joint
> Ventures After American Needle: An Economic Perspective*, 78 Antitrust L.J. 669,
> 684 (2013) ("The territorial market allocation between *Sealy* licensees, which the
> Supreme Court found was per se unlawful in 1967, certainly would not be
> considered a per se offense today.").

(Doc. # 2063 at 6-7).

In any event, however, this court's decision was based on the aggregation of restraints that

existed during the class period. The proposed Settlement currently under consideration alters

Defendants' business model. The Settlement eliminates the National Best Efforts revenue cap,

which, according to Dr. Pakes, accounted for 97% of the total damages in the case. (Doc. # 2626

at 160). Therefore, the elimination of that policy is a significant change that the court preliminarily

finds will drastically alter the forward-looking landscape such that the court's standard of review

opinion would no longer apply. Of course, the Settlement does not change the facts as they existed

during the class period.

Where there are many pro-competitive benefits to a settlement -- such as here where the resolution abolishes National Best Efforts, makes available a second Blue bid in certain circumstances, removes restrictions on acquisitions, and when the "ultimate outcome on the merits [of the legality of the conduct as modified by the settlement is] uncertain" -- undetermined legal issues will not bar a fair and reasonable settlement. *See Swaney*, 2020 WL 3064945, at *3 (quoting *Parsons*, 2015 WL 13629647, at *2). Here, the court believes it has sufficient experience with the practices at issue in this case that were challenged by Subscribers (and Providers) to say, again preliminarily, that these structural changes, when implemented, likely will move the Blues' system from the Per Se category into the Rule of Reason category and that procompetitive benefits will flow from these negotiated changes.

### F.    Plan of Distribution

A plan of distribution should be approved when it allocates relief in a way that is "fair, adequate, and reasonable." *See In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 241 (5th Cir. 1982); *see also Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983); *Leverso*, 18 F.3d at 1530; *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1328 n.2 (S.D. Fla. 2001); *Bellocco v. Curd*, 2006 WL 4693490, at *2 (M.D. Fla. Apr. 6, 2006); *Smith v. Floor and Decor Outlets of Am., Inc.*, 2017 WL 11495273, at *5 (N.D. Ga. Jan. 10, 2017). A plan of distribution will pass muster so long as "it has a 'reasonable, rational basis,' particularly if 'experienced and competent' class counsel support it." MCLAUGHLIN ON CLASS ACTIONS, § 6.23 (17th ed. 2020); *see also Schwartz v. TXU Corp.*, 2005 WL 3148350, at *21 (N.D. Tex. Nov. 8, 2005) (approving a plan of allocation that "resulted in a settlement agreement that fairly and rationally allocates the proceeds of the settlement").

Here, the Plan first distinguishes between Fully Insured Claimants, who purchased insurance from Defendants, and the members of Self-Funded Sub-Class, who purchased administrative services only. "The allocation between Fully Insured class members and Self-Funded class members was prepared with the assistance of economic experts and negotiated at arm's length under the auspices of the Allocation Mediator -- Ken Feinberg, the country's leading mediator over allocations of large settlements and compensation funds -- who confirmed its reasonableness." (Docs. # 2625-1 at 50, 2610-8 ¶ 5). Mr. Feinberg concluded that distributing 93.5% of the Net Settlement Fund among FI Claimants and the remaining 6.5% of the Net Settlement Fund among Self-Funded Claimants constituted a reasonable allocation of the Net Settlement Fund. (*Id.* ¶ 6). In Mr. Feinberg's opinion, the proposed FI/Self-Funded Allocation "treats class members equitably relative to each other" as is required by Fed. R. Civ. P. 23(e)(2)(D). (*Id.* ¶ 13).

Mr. Feinberg also evaluated the Plan of Distribution, which included the allocation between employers who sponsor health insurance plans and the employees who contribute to the cost of that insurance. (*Id.* ¶ 16). Mr. Feinberg was provided not only the Plan of Distribution but also the underlying analysis and factors used to determine the Default allocation ratios employed by that Plan. (Doc. # 2610-1 at 67). The Plan generally provides a proposed pro-rata allocation of the Net Settlement Fund between employers and employees. (Doc. # 2610-8 ¶ 7). The Plan includes a default option that allocates damages between employers and employees as follows: (1) for FI Claimants with single coverage, 85% to employers and 15% to employees; (2) for FI Claimants with family coverage, 66% to employers and 34% to employees; (3) for Self-Funded Claimants with single coverage, 82% to employers and 18% to employees; and (4) for Self-Funded Claimants with family coverage, 75% to employers and 25% to employees (these contribution

percentages together will be referred to as the "Employer/Employee Allocation").[11] The Plan also provides both employers and employees with the option of electing an alternative option, which allows them to present evidence to the Settlement Administrator demonstrating that in their specific case the actual percentages differed or other provable damages were higher. (*Id.* ¶ 18). According to Mr. Feinberg:

> [T]he proposed FI/Self-Funded Allocation meets [the Rule 23(e)(2)(d) standard], for multiple reasons. First, the negotiated number falls towards the low end of Self-Funded Settlement Sub-Class Counsel's estimate, and the high end of Settlement Class Counsel's estimate. In any negotiation, absent unusual factors, one would expect an outcome in that range. Second, the relative size of the Self-Funded Claimants' share makes sense given the statute of limitations and premiums vs. administrative fees issues discussed above. And finally, although not necessary to my decision, the fact that the division resulted from protracted negotiations between sophisticated counsel also supports its reasonableness. I note that some of the injunctive relief in the Settlement Agreement (such as direct contracting with vendors for self-funded accounts, ¶ 12; and the Second Blue Bid, ¶ 15 applies exclusively to Self-Funded Accounts, rather than to Individual Members and Insured Groups. My conclusion that the Settlement's allocation of relief is equitable for Self-Funded Accounts is only strengthened by this additional injunctive relief, which applies solely to those Class Members.

(Doc. # 2610-8 ¶¶ 14-15).

As to the proposed method of processing the Settlement Class Members' claims and distributing relief to eligible claimants, the Plan will efficiently calculate the value of millions of potential claimants based on data available from the Settling Defendants rather than requiring every Authorized Claimant to provide years of information about their premium amounts and actual contribution percentages. Payments under $5 are redistributed depending on the nature of the Authorized Claimant, which protects against unreasonable administrative costs. (Doc. # 2610-5 ¶ 28). *See, e.g., In re Ford Motor Co. Spark Plug & Three Valve Engine Prods. Liab. Litig.*, 2016

---

[11] Further, Class Counsel relied on the expert analysis of Mr. Chodorow and the Brattle Group to assist in developing and evaluating the economic reasonableness of the Default option. (Doc. # 2610-6 ¶ 34).

WL 6909078, at *6 (N.D. Ohio Jan. 26, 2016) (approving $300 threshold); *Hill v. State Street Corp.*, 2015 WL 127728, at *12 (D. Mass. 2015) (approving $10 threshold).

At the Preliminary Approval Hearing, Class Counsel reported that they sought to have as equitable a distribution as possible to the class members. (Doc. # 2626 at 127). This testimony is further supported by the Allocation Mediator's declaration. (Doc. # 2610-8). "Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *8 (N.D. Cal. Mar. 18, 2013) (quoting *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009)). Moreover, "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *In re Omnivision Techns., Inc.*, 559 F.Supp. 2d 1036, 1043 (N.D. Cal. 2009) (quoting *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 622 (N.D. Cal. 1979)); *see also In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007) ("In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel.").

Accordingly, based on the information presently before the court, it appears that the Plan of Distribution should be preliminarily approved as fair, reasonable and adequate.

### G.   Class Notice

Rule 23(e) requires a court to "direct notice in a reasonable manner to all class members who would be bound" by the proposed Settlement. Rule 23(e)(1). Rule 23(c)(2) requires a court to "direct appropriate notice to the class." Rule 23(c)(2)(A). With regard to Rule 23(b)(3) classes, the Rule states that

> the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means. The notice must

> clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). Thus, the Rule requires that "[i]ndividual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort" and that the "notice must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-74 (1974) (quoting *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950)). "In every case, reasonableness is a function of anticipated results, costs, and amount involved." *In re Nissan Motor Corp. Antitrust Litig*., 552 F.2d 1088, 1099 (5th Cir. 1977). Reasonableness also depends on the information available to the parties. *See id.* at 1098.

After a competitive bidding process, Settlement Class Counsel retained JND Legal Administration LLC ("JND") to serve as Notice and Claims Administrator for the settlement. JND has a proven track record and extensive experience in large, complex matters. *See In re Equifax Inc. Customer Data Sec. Breach Litig*., United States District Court for the Northern District of Georgia Case No. 17-md-2800; Class Action Administration Cases, JND Legal Admin., https://www.jndla.com/cases/class-action-administration (last accessed November 18, 2020). JND has prepared a customized Notice Plan in this case. The Notice Plan was designed to provide the best notice practicable, consistent with the latest methods and tools employed in the industry and approved by other courts. (Doc. # 2611-2 ¶ 15).

The form of the Notice Plan describes the nature of the action, the definition of the class, and the class claims, issues, or defenses. It explains that a class member may enter an appearance

through an attorney if the member wishes, that the court will exclude from the class any member who requests exclusion, and the deadline and manner for requesting exclusion. Finally, it explains the binding effect of a class judgment on members. (Doc. # 2611-2 at 95-107). Therefore, the proposed notice satisfies Rule 23(c)(2)(b).

At their own expense, Defendants have agreed to provide the Claims Administrator with respect to each class member: a to-be-agreed upon personal identifier (that can be cross referenced with a Member's first name, last name, and date of birth); last-known phone number (if any); last-known mailing address; and, if ordered by the Court, last-known email address (if any). (Doc. # 2610-2 at 22). The Notice Plan contemplates using this information to reach class members by using a combination of:

- E-mail and postcard direct notice;

- An extensive media notice campaign;

- A supplemental industry digital media campaign;

- Additional efforts such as third-party outreach, a specially designed internet campaign, and a multichannel news release;

- Various mechanisms to stimulate claims; and

- A Settlement website, a dedicated toll-free number and contact center, and a QR code for mobile access to the Settlement website.

(Doc. # 2611-2 ¶¶ 15-20).

E-mail notice campaigns supplemented by U.S. mail for class members who do not have an e-mail address, or when an e-mail is returned as undeliverable, is appropriate. *See, e.g., Carroll v. Macy's, Inc.*, 2020 WL 3037067 (N.D. Ala. June 5, 2020); *Aboltin v. Jeunesse, LLC*, 2018 WL 6576464, at *2 (M.D. Fla. Sept. 13, 2018) (granting preliminary approval of a Notice Plan providing for e-mail notice to all class members and postcard notice by U.S. mail if the defendant did not have an e-mail address for a certain class member or if two e-mail attempts proved

unsuccessful for a certain class member). Here, to supplement the direct notice by e-mail and postcard, the Notice Plan provides for an extensive media campaign which, alone, is designed to reach 85% of all Class Members. That campaign includes digital advertising,[12] print publications, television, radio, industry media, third-party outreach, an internet search campaign, and a multichannel news release. (Doc. # 2611-2 ¶¶ 17, 86; Doc. # 2625-1 at 136, 144). These proposed notice methods provide adequate notice to potential class members and explain, in sufficient detail, their individual rights under the settlement.

The court finds that the proposed Notice Plan is appropriate in both form and content and is due to be approved.

### H.    CAFA Notice

The court recognizes that the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, imposes additional notice requirements on defendants in class action lawsuits. In the Settlement Agreement, the Settling Defendants have agreed to serve or cause to be served a notice of the proposed settlement on appropriate federal and state officials in accordance with the requirements under the CAFA, 28 U.S.C. § 1715(b).

## V.    Conclusion

"Public policy strongly favors the pretrial settlement of class action lawsuits." *Swaney*, 2020 WL 3064945, at *3 (quoting *In re U.S. Oil & Gas Litig.*, 967 F.2d at 493). Having carefully considered the Motion for Preliminary Approval of Proposed Class Settlement Agreement, the Settlement Agreement, the Proposed Plan of Distribution, and Proposed Notice Plan, as well as all

---

[12] The digital effort will include, among other efforts: 915,000 digital impressions on Linkedin, the leading professional social media platform; 1,000,000 digital impressions, to be placed on leading business websites, such as Yahoo Business, CNBC.com, FastCompany.com, Forbes.com, Bloomberg.com, Entrepeneur.com, WSJ.com, BusinessInsider.com, and AllBusiness.com; 100,000 digital impressions to be placed on the Society for Human Resource Management website (shrm.org); 100,000 digital impressions on Human Resource Executive's home page (hrexecutive.com); and 50,000 digital impressions on its benefit category page. (Doc. # 2611-2 ¶ 67-68).

matters of record, the court finds that it is likely to be able to certify the class for settlement purposes at final approval and that there is good cause to approve the proposed settlement, subject to further consideration by the court at a fairness hearing. The court concludes that the proposed Settlement Agreement is sufficiently fair, reasonable, and adequate to warrant submitting the proposed settlement to the Settlement Class and setting a fairness hearing. Therefore:

1.      The Motion for Preliminary Approval of Proposed Class Settlement (Doc. # 2610) is **GRANTED**; and

2.      The Motion for Approval of a Plan for Notice And Appointment Of Claims Administrator (Doc. # 2611) is **GRANTED**.

It is further **ORDERED** as follows:

<b><u>Approval of the Settlement Agreement</u></b>

1.      For the reasons set forth in detail above, the court is likely to be able to finally approve the Settlement Agreement under Rule 23(e)(2). Pursuant to the Settlement Agreement, Settling Defendants have agreed to pay $2.67 Billion to create the Settlement Fund, which will be disbursed to Authorized Claimants of the Damages Class, used to pay Notice and Administration Costs, and for any Fee and Expense Award. The Settlement Agreement also provides significant injunctive relief for the benefit of the Settlement Classes.

2.      The Settlement Agreement is sufficiently within the range of reasonableness such that preliminary approval should be granted. Thus, the terms of the Settlement Agreement are hereby **PRELIMINARILY APPROVED**, including the releases contained therein, as being fair, reasonable, and adequate to the Settlement Classes, subject to the Final Approval Hearing described below.

3.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Subscriber Plaintiffs have shown that the court will likely be able to certify the classes defined in Subscriber Plaintiffs' motion papers for purposes of the Settlement and Final Judgment. The court **PRELIMINARILY CERTIFIES** the following Settlement Classes, for settlement purposes only:

> **Damages Class:** All Individual Members (excluding dependents and beneficiaries), Insured Groups (including employees, but excluding non-employee Members), and Self-Funded Accounts (including employees, but excluding non-employee Members) that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product (unless the person or entity's only Blue-Branded Commercial Health Benefit Product during the Settlement Class Period was a stand-alone vision or dental product) sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan from February 7, 2008 through October 16, 2020 (in the case of all Damages Class members other than the Self-Funded Sub-Class, for whom the Class Period is September 1, 2015 through October 16, 2020).

> **Self-Funded Sub-Class:** All Self-Funded Accounts (including employees, but excluding non-employee Members) that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product (unless the person or entity's only Blue-Branded Commercial Health Benefit Product during the Settlement Class Period was a stand-alone vision or dental product) sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan from September 1, 2015 through October 16, 2020.

> **Injunctive Relief Class:** All Individual Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Settlement Class Period (February 7, 2008 through October 16, 2020, except for Self-Funded Accounts, for whom the Settlement Class Period is September 1, 2015 through October 16, 2020).

4.    Excluded from the Damages Class and the Self-Funded Sub-Class are Government Accounts, Medicare Accounts of any kind, Settling Defendants themselves, and any parent or subsidiary of any Settling Defendant (and their covered or enrolled employees). Also excluded from the Damages Class and the Self-Funded Sub-Class are Opt-Outs, the judge presiding over this matter, and any members of his judicial staff, to the extent such staff were covered by a

Commercial Health Benefit Product not purchased by a Government Account during the Settlement Class Period.

5.     For purposes of the Damages Class and the Self-Funded Sub-Class, the term "employee" means any current or former employee, officer, director, partner, or proprietor of an entity.

6.     Solely for purposes of the Settlement set forth in the Settlement Agreement, the court concludes that it is likely that the requirements of Federal Rule of Civil Procedure 23(a) and 23(b)(3) will be satisfied at final approval, with likely findings as follows: (a) the members of the Settlement Classes are so numerous that joinder of all Class Members in the Action is impracticable; (b) there are questions of law and fact common to the Settlement Classes and these common questions predominate over any individual questions; (c) the claims of Class Representatives are typical of the claims of the Settlement Classes; (d) Class Representatives, Settlement Class Counsel, and Self-Funded Settlement Sub-Class Counsel have fairly and adequately represented and protected the interests of the Settlement Classes; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the controversy, considering (i) the interests of the members of the Settlement Classes in individually controlling the prosecution of separate actions; (ii) the extent and nature of any litigation concerning the controversy already begun by members of the Settlement Classes; (iii) the desirability or undesirability of concentrating the litigation of these claims in this particular forum; and (iv) the likely difficulties in managing this Action as a class action.

7.     If the Effective Date does not occur with respect to the Settlement Agreement because of the failure of a condition of the Settlement Agreement, this assessment of the likelihood of certification of the Settlement Classes shall be deemed null and void, and the Parties shall retain

their rights to seek or to object to certification of this litigation as a class action under Rule 23 of the Federal Rules of Civil Procedure or under any other state or federal rule, statute, law or provision thereof, and to contest and appeal any grant or denial of certification in this litigation or in any other litigation on any other grounds.

## Class Counsel and Class Representatives

8.     Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, and solely for settlement purposes, Co-Lead Counsel and their law firms: (1) Michael Hausfeld of Hausfeld LLP and (2) David Boies of Boies Schiller Flexner LLP are preliminarily designated as Settlement Class Counsel, and (3) Warren Burns of Burns Charest LLP is preliminarily designated as Self-Funded Settlement Sub-Class Counsel.

9.     The court preliminarily appoints the following as class representatives:

a.   **For the Settlement Classes**: Galactic Funk Touring, Inc.; American Electric Motor Services, Inc.; CB Roofing, LLC; Pearce, Bevill, Leesburg, Moore, P.C.; Pettus Plumbing & Piping, Inc.; Consumer Financial Education Foundation of America, Inc.; Fort McClellan Credit Union; Rolison Trucking Co., LLC; Conrad Watson Air Conditioning, Inc.; Linda Mills; Frank Curtis; Jennifer Ray Davidson; Pete Moore Chevrolet, Inc.; Jewelers Trade Shop; Saccoccio & Lopez; Angel Foster (*fka* Angel Vardas); Monika Bhuta; Michael E. Stark; G&S Trailer Repair Incorporated; Chelsea L. Horner; Montis, Inc.; Renee E. Allie; John G. Thompson; Avantgarde Aviation, Inc.; Hess, Hess & Daniel, P.C.; Betsy Jane Belzer; Bartlett, Inc., d/b/a Energy Savers; Matthew Allan Boyd; Gaston CPA Firm; Rochelle and Brian McGill; Sadler Electric; Jeffrey S. Garner; Amy MacRae; Vaughan Pools, Inc.; Casa Blanca, LLC; Jennifer D. Childress; Clint Johnston; Janeen Goodin and Marla

S. Sharp; Erik Barstow; GC/AAA Fences, Inc.; Keith O. Cerven; Teresa M. Cerven; Sirocco, Inc.; Kathryn Scheller; Iron Gate Technology, Inc.; Nancy Thomas; Pioneer Farm Equipment, Inc.; Scott A. Morris; Tony Forsythe; Joel Jameson; Ross Hill; Angie Hill; Kevin Bradberry; Christy Bradberry; Tom Aschenbrenner; Juanita Aschenbrenner; Free State Growers, Inc.; Tom A. Goodman; Jason Goodman; Comet Capital, LLC; Barr, Sternberg, Moss, Lawrence, Silver & Munson, P.C.; Mark Krieger; Deborah Piercy; and Lisa Tomazzoli.

      b.  **For the Self-Funded Sub-Class**: Hibbett Sports, Inc.

### **Administration and CAFA Notice**

10.     JND is **APPOINTED** as the Claims Administrator, with responsibility for claims administration, the Notice Plan, and all other obligations of the Claims Administrator as set forth in the Settlement Agreement and the Notice Motion.

11.     In addition, Subscriber Plaintiffs will move for appointment of, and the court will select, a Settlement Administrator to assist in the implementation of the Plan of Distribution and the resolution of any disputes between Settlement Class Members and the Claims Administrator pursuant to the Plan of Distribution. The Claims Administrator's and the Settlement Administrator's fees, as well as all other costs and expenses associated with notice and administration, will be paid directly from the Notice and Administration Fund.

12.     Within thirty (30) calendar days of entry of this Order, Settling Defendants **SHALL** cause to be transferred into an Escrow Account: (1) the $100 million Notice and Administration Fund, and (2) an advance of $300 million of the remaining Settlement Amount. All Notice and Administration Costs to the Claims Administrator are hereby authorized to be paid from the Notice and Administration Fund, subject to written approval from Settlement Class Counsel, Self-Funded

Settlement Sub-Class Counsel, and the designated representative of the Settling Defendants as provided in the Settlement Agreement.

13.    The Claims Administrator may, as necessary, require Damages Class members and related individuals or entities to provide, through written, electronic, or other means, certain personal information, including (without limitation) full name, address, email address, phone number, insurance and or health care coverage products purchased, premium or premium equivalent information, evidence to support the claimed rate of contribution of employees in group sponsored health plans, the name of the Settling Defendant(s) from whom they received health benefits and Individual and Group Identification numbers assigned by Settling Defendants to BCBS customers, in order to verify an individual's or entity's status as a Class Member and/or eligibility for any benefits under the Settlement Agreement, in addition to any other purposes consistent with the Claims Administrator's responsibilities under the Settlement Agreement.

14.    The Settling Defendants **SHALL** serve or cause to be served a notice of the proposed Settlement on appropriate federal and state officials in accordance with the requirements under CAFA, 28 U.S.C. § 1715(b). Once completed, Settling Defendants **SHALL** file with the court a status report certifying that they have proof of receipt of CAFA mailing to all U.S. states and territories.

### Notice to the Class

15.    The Notice Plan contemplated by the Settlement Agreement and set forth in the Notice Motion, including the forms of notice and Claim Form attached as exhibits to the Notice Motion, satisfy the requirements of Federal Rule of Civil Procedure 23 and due process and thus are **APPROVED**. Non-material modifications to the exhibits may be made without further order of the court, including converting and conforming the exhibits to electronic or digital formats. The

Claims Administrator is **DIRECTED** to carry out the Notice Program pursuant to the Settlement Agreement and to perform all other tasks that the Settlement Agreement requires of the Claims Administrator.

16.     Settling Defendants **SHALL** produce and disclose to the Claims Administrator relevant data for effectuation of the Notice Plan and Claims Administration as agreed upon by the Parties in the Stipulation and Proposed Order Regarding Protected Health Information and Personally Identifiable Information for Subscriber Settlement entered on November 2, 2020 ("Data Production Order"). (Doc. # 2615). Upon receipt of the complete set of Class Member Data from the Settling Defendants under the Data Production Order, Settlement Class Counsel **SHALL** notify the court of the commencement of the Notice Plan in accordance with the timeline approved by the court in Paragraph 29 below.

17.     The Claims Administrator **SHALL** provide direct individual notice to members of the Damages Class via e-mail where the data provided by the Settling Defendants includes an e-mail address, and by postcard sent through United States mail where e-mail is not included in the data or where an e-mail is returned to the Claims Administrator as being undeliverable.

## Exclusions from the Class

18.     Any Class Member who wishes to be excluded from the Damages Class **SHALL** mail a written notification of their intent to be excluded to the Claims Administrator at the address provided in the long-form notice, in the notices published in the media, and on the settlement website, postmarked no later than 150 days after the Claims Administrator receives the complete set of Class Member Data from the Settling Defendants under the Data Production Order and sent via first class postage pre-paid United States mail. The exclusion request **SHALL** include the following: (a) the name of the Class Member, the name of the Class Member's business (if the

Class Member's business purchased health insurance from a Blue Cross Blue Shield entity during the Class Period for employees), address, and telephone; (b) a statement that the Class Member wants to be excluded from the Settlement Class in *In re Blue Cross Blue Shield Antitrust Litigation*; and (c) the Class Member's (or business representative's) personal, physical signature. Electronic signatures, including Docusign, or PDF signatures are not permitted and will not be considered personal signatures, and submissions signed solely by an individual's or business's lawyer are not valid either. If the Settlement Class Member fails to provide all of the required information on or before the Opt-Out Deadline, then the attempt to opt out shall be invalid and have no legal effect, and the Settlement Class Member shall be bound by the Settlement Agreement, including the releases, if finally approved.

19.     The Claims Administrator **SHALL** provide Settlement Class Counsel, Self-Funded Settlement Sub-Class Counsel, and Settling Defendants' Counsel with electronic copies of all opt-out notifications promptly upon receipt. Settlement Class Counsel and Self-Funded Settlement Sub-Class Counsel **SHALL** provide a final list of all who have timely and validly excluded themselves from the Settlement Classes in accordance with the terms of the Settlement Agreement which **SHALL** be filed with the court before the Final Approval Hearing.

20.     All Class Members who submit valid and timely notices of their intent to be excluded from the Damages Class **WILL NOT** be entitled to receive any benefits from the Settlement and **WILL NOT** be bound by the terms of the Settlement Agreement. Any Settlement Class Member that does not timely and validly exclude himself or herself from the Settlement **SHALL** be bound by the terms of the Settlement Agreement and all proceedings, orders, and judgments in this matter, including but not limited to the releases set forth in the Settlement Agreement and any Final Judgment.

## Objections to the Settlement

21.     A Settlement Class Member who complies with the requirements of this Order may object to the Settlement Agreement or Settlement Class Counsel's request for fees and expenses.

22.     No Settlement Class Member will be heard, and no papers, briefs, pleadings, or other documents submitted by any Settlement Class Member will be received and considered by the court, unless the Settlement Class Member presents an objection that is (a) filed with the court by the objection deadline, which will be 150 days after Settling Defendants transfer the complete set of Class Member Data subject to the Data Production Order to JND allowing for the commencement of the Notice Plans; and (b) mailed to the Claims Administrator, Settlement Class Counsel, Self-Funded Settlement Sub-Class Counsel, and Settling Defendants' Counsel at the addresses listed in the long-form notice available on the Settlement website, and postmarked by no later than the objection deadline. For the objection to be considered by the court, the objection **SHALL** be in writing and **SHALL** set forth:

   a.   The name of this Action and a description of the objections, including applicable legal authority and any supporting evidence the objector wishes to introduce;

   b.   The objector's full name, address, email address, telephone number, and the plan name under which Blue Cross Blue Shield coverage was provided and dates of such coverage;[13]

   c.   Whether the objection applies only to the objector, a specific subset of the Settlement Classes, or the Settlement Classes as a whole;

   d.   The identity of all counsel who represent the objector, including former or current counsel, who may be entitled to compensation for any reason related to the

---

[13] At the request of Settlement Class Counsel, the objector **SHALL** also confidentially provide to Settlement Class Counsel the policy number and/or subscriber ID and date(s) of policy.

objection, along with a statement of the number of times (within five years preceding the submission of the objection) that counsel has, on behalf of a client, objected to a class action, the caption of the case for each prior objection, and a copy of any relevant orders addressing the objection;

e.  Any agreements that relate to the objection or the process of objecting between the objector, his or her counsel, and/or any other person or entity;

f.  The objector (and the objector's attorney's) signature on the written objection;

g.  A statement indicating whether the objector intends to appear at the Final Approval Hearing (either personally or through counsel); and

h.  A declaration under penalty of perjury that the information provided by the objector and objector's counsel is true and correct.

### Plan of Distribution and Claims Process

23.  Settlement Class Counsel and Self-Funded Settlement Sub-Class Counsel have submitted to the court for approval the Plan of Distribution for the Damages Class that provides for the distribution of the Net Settlement Fund and the foundation for the requested allocation. The Plan of Distribution is briefly described herein.

24.  In summary, the Plan of Distribution establishes a process for assessing and determining the validity and value of claims and a methodology for paying Damages Class Members that submit a timely, valid Claim Form. The Plan of Distribution allows claimants to request a pro-rata share of the Net Settlement Fund (as allocated between fully insured and self-funded plans) in proportion to their total premiums or administrative fees paid over the Settlement Class Period. Under the Plan of Distribution, the Net Settlement Fund will be allocated with 93.5%

to the fully insured members of the Damages Class ("FI Net Settlement Fund") and 6.5% to the Self-Funded Sub-Class (the "Self-Funded Net Settlement Fund").

25.     For employers that sponsored insurance for their employees and for employees who received insurance through their employers, the Plan of Distribution will determine pro-rata shares by allocating premiums between employer and employee(s) based on default contribution percentages, with an option to seek an alternative contribution percentage. Fully insured members of the Damages Class will receive payment from the FI Net Settlement Fund, and members of the Self-Funded Sub-Class will receive payment from the Self-Funded Net Settlement Fund.

26.     Damages Class Members that qualify for and wish to submit a Claim form **SHALL** do so in accordance with the requirements and procedures specified in the notices and the Claim Form. If the Settlement Agreement is finally approved, any and all Damages Class Members that fail to submit a claim in accordance with the requirements and procedures specific in the notices and Claim Form **SHALL** be forever barred from receiving such benefit, but will in all other respects be subject to and bound by the provisions of the Settlement Agreement, including the releases included in the Settlement Agreement and any Final Judgment.

27.     The court finds that the Proposed Plan of Distribution is within the range of reasonableness, fairness, and adequacy so that it may be sent to the members of the Settlement Classes, and it is hereby **PRELIMINARILY APPROVED**.

### Final Approval Hearing

28.     A Final Approval Hearing is hereby scheduled before the undersigned to be commenced on **Wednesday, October 20, 2021 at 10:00 a.m. Central Time, continuing on Thursday, October 21, 2021, if necessary.** The date of the Final Approval Hearing **SHALL** be set forth in the Notice to the Settlement Classes, but shall be subject to adjournment by the court

without further notice to the members of the Settlement Classes other than that which may be posted at the court and on the settlement website. At or after the Final Approval Hearing, the court will determine whether the Settlement Agreement and the Plan of Distribution should be finally approved.

## Summary of Deadlines

29.     The Settlement Agreement **SHALL** be administered according to its terms pending the Approval Hearing. The court **APPROVES** the following timeline for the Notice Plan:

| | |
|---|---|
| Monday, March 1, 2020 | Date of production under the Data Production Order of a complete set of Class Member Data by Settling Defendants to the Claims Administrator |
| Monday, May 31, 2021 | Notice Deadline |
| Monday, June 14, 2021 | Deadline for Settlement Class Counsel to file motion for Fee and Expense Award |
| Wednesday, July 28, 2021 | Objection Deadline |
| Wednesday, July 28, 2021 | Opt-Out Deadline |
| Friday, August 27, 2021 | Deadline for Settlement Class Counsel to file motion for Final Approval of Settlement and responses to any timely submitted Settlement Class Member objections |
| Wednesday-Thursday, October 20-21, 2021 | Final Approval Hearing |
| Friday, November 5, 2021 | Claims Filing Deadline |

## Other Provisions

30.     In the event the Settlement Agreement does not become final, or is otherwise rescinded or terminated, the Settlement Agreement **SHALL** be of no force or effect and any and all parts of the Settlement Fund caused to be deposited in the Escrow Account (other than Notice and Administration Costs reasonably and actually incurred), along with any income accrued thereon, **SHALL** be returned to the entities that paid such amounts into the Escrow Account, in proportion to those entities' respective contributions to the Settlement Fund within ten (10) calendar days of rescission, termination, or a court's final determination denying final approval of the Agreement and/or any of the Settlement Classes, whichever occurs first.

31.     In the event the Settlement Agreement does not become final, or is otherwise rescinded or terminated, litigation of the Subscriber Actions against Settling Defendants will resume in a reasonable manner to be approved by the court upon application by the parties. The parties expressly reserve all of their rights if this Agreement is rescinded or does not otherwise become final.

**DONE** and **ORDERED** this November 30, 2020.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE