FILED
2020 Dec-16 PM 04:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This document relates to Provider Track Cases** |

# PROVIDER PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT KEVIN M. MURPHY AND MEMORANDUM IN SUPPORT THEREOF

**Confidential – Filed Under Seal**
**Pursuant to Qualified Protecitve Order (Dkt. 550) and**
**the Order Regarding Revised Sealing Procedures (Dkt. 758)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

LIST OF CITATIONS AND ABBREVIATIONS ........ iv

PRELIMINARY STATEMENT ........ 1

LEGAL STANDARD ........ 2

ARGUMENT ........ 3

I. Dr. Murphy's Entry Analysis Suffers From Multiple Fatal Flaws That Prevent His Qualification as an Expert ........ 3

A. Dr. Murphy Failed to Appropriately Consider a But-For World ........ 3

B. Dr. Murphy Ignores Evidence From Other Market Participants As To Entry ........ 8

C. Dr. Murphy Ignores Evidence From Blues As To Entry ........ 14

II. Dr. Murphy's Exhibit 10 Analysis Is Unreliable ........ 18

III. Dr. Murphy Ignores Relevant Contrary Evidence to Support His View That Market Share Is Not Evidence of Lack of Competition ........ 21

IV. Dr. Murphy's Analysis of Central Pennsylvania Premiums Is Unreliable ........ 23

V. Dr. Murphy's Numerous Assertions Without Proof in His Report Should be Stricken From the Record As Lacking a Factual Basis ........ 24

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

## Cases

*Apotex, Inc. v. Cephalon, Inc.*,
321 F.R.D. 220 (E.D. Pa. 2017) .......... 3

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) .......... 3

*Chaudhry v. Provident Life & Accident Ins. Co.*,
No. 12-cv-5838, 2015 WL 1756832 (N.D. Ill. Apr. 15, 2015) .......... 13

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) .......... 3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......... 1, 2, 5

*EEOC v. Freeman*,
778 F.3d 463 (4th Cir. 2015) .......... 9

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) .......... 2, 25

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
822 F. Supp. 2d 1201 (N.D. Ala. 2011) (Proctor, J) .......... 2

*In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*,
524 F. Supp. 2d 1166 (N.D. Cal. 2007) .......... 9

*In re Disposable Contact Lens Antitrust Litig.*,
329 F.R.D. 336 (M.D. Fla. 2018) .......... 3

*In re Electronic Books Antitrust Litig.*,
No. 11 MD 2293(DLC), 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) .......... 5

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No II) MDL 2502*,
892 F.3d 624 (4th Cir. 2018) .......... 9

*Kumho Tire Co., Ltd. v. Patrick Carmichael*,
526 U.S. 137 (1999) .......... 2

*Quiet Tech. DC−8, Inc. v. Hurel-Dubois UK Ltd.*,
326 F.3d 1333 (11th Cir. 2003) .......... 2

*Ray v. Jud. Correction Services, Inc.*,
2:12-CV-02819-RDP, 2017 WL 4180910, (N.D. Ala. Sept. 21, 2017) (Proctor, J.).......... 3

*Southeast Missouri Hospital v. C.R. Bard, Inc.*,
No. 1:07-cv-0031-TCM, 2008 WL 4372741 (E.D. Mo. Sept. 22, 2008) .......................... 3

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,
862 F. Supp. 2d 1322 (S.D. Fla. 2012), *aff'd*, 746 F.3d 1008 (11th Cir. 2014)........... 3, 24

*Zeolla v. Ford Motor Company*,
4:09-cv-40106-FDS D.E. 72 (D. Mass, Jan. 24, 2013)................................................ 9, 10

**Rules**

Fed. R. Evid. 702 ........................................................................................................ 1

## LIST OF CITATIONS AND ABBREVIATIONS

| Dkt # | Ex | Document | Citation |
|---|---|---|---|
| | 1. | Declaration of Daniel J. Slottje In Support of Provider Plaintiffs' Motion to Exclude Defendants' Expert Kevin M. Murphy | Slottje Decl. |
| | 2. | November 9, 2020 Deposition of Kevin M. Murphy | Murphy Depo. |
| | 3. | December 15, 2017 Deposition of Jeffrey Wedin | Wedin Depo. |
| | 4. | November 2, 2017 Deposition of Ramzy El Gomayel | El Gomayel Depo. |
| | 5. | December 6, 2017 Deposition of Karen Litle | Litle Depo. |
| | 6. | August 15, 2017 Deposition of Elizabeth Yates | Yates Depo. |
| | 7. | July 19, 2017 Deposition of Terry Kellogg | Kellogg Depo. |
| | 8. | October 27, 2017 Deposition of Noel Carden | Carden Depo. |
| | 9. | May 19, 2017 Deposition of Janet Campisi | Campisi Depo. |
| | 10. | Complainant Independence Blue Cross' Arbitration Hearing Memorandum | BCBSA00188626 |
| | 11. | Minutes of the Blue Cross Commission, March 29, 1952 | BCBSA00028854 |
| | 12. | September 3, 1986 Memorandum regarding Assembly of Plans | BCBSA00115458 |
| | 13. | October 24, 1986 Memorandum regarding Assembly of Plans – Summary of CEO Interviews | BCBSA00115429 |
| | 14. | June 23, 2017 Deposition of Douglas McIntyre | McIntyre Depo. |
| | 15. | May 3, 2017 Deposition of Bradley Eisemann | Eisemann Depo. |
| | 16. | June 13, 2017 Deposition of Michael Bruce | Bruce Depo. |
| | 17. | September 21, 2017 Deposition of Mary Beth Briscoe | Briscoe Depo. |
| | 18. | August 9, 2017 Deposition of Nina Dusang | Dusang Depo. |
| | 19. | December 6, 2017 Deposition of Keith Parrott | Parrott Depo. |
| | 20. | May 4, 2017 Deposition of Sharon Lee | Lee Depo. |

This Court should exclude the opinions of Defendants' proffered expert, Dr. Kevin M. Murphy, because Dr. Murphy's opinions fail to meet the standards for admissibility of expert testimony set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). For these reasons and as more fully set out in the accompanying Memorandum of Law and its exhibits, Provider Plaintiffs respectfully request this Court grant Provider Plaintiffs' Motion to Exclude all of Dr. Murphy's opinions and testimony in full, including at class certification, trial, and any other proceeding relating to this case.[1]

## PRELIMINARY STATEMENT

Dr. Murphy's opinions on "entry" are the centerpiece of Defendants' Response to Provider Plaintiffs' Motion for Class Certification, even though Plaintiffs do not need to prove entry to prove class-wide antitrust injury[2] Those entry opinions, however, are constructed on inadmissible footing that ultimately causes his full opinion to fail. In forming the basis for his opinions on "entry," Dr. Murphy chooses to ignore the but-for world completely. He conducts no meaningful analysis of what the world would look like without Defendants' anticompetitive restrictions (the Exclusive Service Areas ("ESAs"), Blue Card, and so-called National Best Efforts Rule), choosing instead to leave in place all the effects of the Blues' anticompetitive conduct for purposes of his testimony and analyses. His failure to consider a but-for world—a world which, despite Dr. Murphy's failures, must be taken into account for a well-reasoned, considered opinion that may be of assistance to the trier of fact in this case— a world that would be quite different than the current actual world, is a fatal flaw which infects and ultimately invalidates his entire opinion. For this reason, his opinions and testimony should be excluded, as they are likely to mislead the trier

[1] This Motion relates primarily to the Courts' consideration of Dr. Murphy on class certification. Provider Plaintiffs' reserve the right to further move to exclude Dr. Murphy's testimony, or portions thereof, on the same or different bases for purposes of summary judgment or trial as appropriate.
[2] Dkt. 2606 at pp. 12-18.

of fact. Several of Dr. Murphy's opinions also suffer from more specific issues, including his obvious, intentional ignorance of contrary evidence.[3]

## **LEGAL STANDARD**

The United States Court of Appeals for the Eleventh Circuit applies a "rigorous three-part inquiry" for evaluating the purported qualification of experts, at the class certification stage of a case or otherwise. *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1210 (N.D. Ala. 2011) (Proctor, J). Defendants here must show: (1) "the expert is qualified to testify competently regarding the matters he intends to address"; (2) "the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*"; and, (3) "the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Quiet Tech. DC−8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340−41 (11th Cir. 2003). An expert's opinion must also "fit" the evidence in the case. To measure "*Daubert* fit," the trial court's "gatekeeping inquiry must be tied to the facts of a particular case." *Kumho Tire Co., Ltd. v. Patrick Carmichael*, 526 U.S. 137,150 (1999) (quotation marks omitted) (citing *Daubert*, 509 U.S. at 591). "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (citation omitted); *see also Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 862 F. Supp. 2d 1322, 1330 (S.D. Fla. 2012) (excluding an expert's

---

[3] Unlike Defendants' Motion to Exclude Dr. Frech which is based on vague claims of "bias" in Dr. Frech's research, it is clear that Dr. Murphy has undertaken a search for limited documents and testimony that support his pre-ordained conclusions and ignored significant obvious documents and testimony (often in the same deposition he cites for another purpose).

opinion because his model analyzed "the wrong problem" and thus could not assist the trier of fact), *aff'd*, 746 F.3d 1008 (11th Cir. 2014). Although, as the class certification stage, "the *Daubert* barriers are more relaxed [because] a judge, rather than a jury, serves as a fact finder" *Ray v. Jud. Correction Services, Inc.*, 2:12-CV-02819-RDP, 2017 WL 4180910, at *4 (N.D. Ala. Sept. 21, 2017) (Proctor, J.), because Dr. Murphy testimony fails to consider an appropriate but-for world and suffers from ignorance of substantial contrary evidence, his testimony should be excluded.

## ARGUMENT

### I. Dr. Murphy's Entry Analysis Suffers from Multiple Fatal Flaws that Prevent his Qualification as an Expert

#### A. Dr. Murphy Failed to Appropriately Consider a But-For World

Dr. Murphy's opinions are not admissible because of his failure to properly consider a but-for world free of the effects of the challenged restrictions. Antitrust law is clear that in considering antitrust injury, as Dr. Murphy purports to do, an expert must construct a hypothetical "but-for world" that is "free of the restraints and conduct alleged to be anticompetitive." *Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005) (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000)); *see also Southeast Missouri Hospital v. C.R. Bard, Inc.*, No. 1:07-cv-0031-TCM, 2008 WL 4372741 (E.D. Mo. Sept. 22, 2008) (same); *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 236 (E.D. Pa. 2017) ("[w]hen recreating a but-for world to establish antitrust damages, a plaintiff must create a world "characterized by the absence of the ... challenged practices.")). As the Middle District of Florida recently acknowledged, "[a] properly defined 'but for' world is one in which all aspects of the actual world remain unchanged except for the effects *caused* by the restraint of trade at issue." *In re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336, 419 (M.D. Fla. 2018). Simply put, Dr. Murphy did not construct the required but-for world for his analysis, much less one "characterized by the absence" of

Defendants' alleged restraints on trade: ESAs, Blue Card, and the so-called National Best Efforts Rule. Dr. Murphy fails to find an appropriate but-for "benchmark" and makes no effort to "measure any anticompetitive harm from that benchmark." Instead, he uses the *actual* world as the benchmark, and—unsurprisingly—fails to find anticompetitive injury when comparing the actual world to the actual world. This is not an analysis that meets the legal or accepted standard for determining the existence of antitrust injury, a standard that Dr. Murphy himself acknowledges in his report:

> "[p]roper economic evaluation of whether Plaintiffs have suffered anticompetitive harm must start with an evaluation of what the world would look like today absent the challenged rules, and then measure any anticompetitive harm from that benchmark." [4]

However, despite recognizing the appropriate standard, Dr. Murphy fails to analyze or even take into consideration the but-for world in reaching his opinions. This failure is fatal to his opinion.

> Using Dr. Murphy's approach, non-Blue insurers' actions in Alabama are not informative of whether Alabama is an attractive health insurance market in the absence of ESAs because Dr. Murphy's benchmark is not a true "but for" world benchmark; it is affected by the ESA rule. Dr. Murphy cannot use his benchmark to distinguish between the effects of the ESA rule and other factors on the lack of competition in Alabama. As a result, Dr. Murphy's claim that non-Blue insurers have been exiting Alabama or have achieved little success there entirely for reasons that are unrelated to ESAs is pure speculation and economically invalid.[5]

Dr. Murphy's methodology for considering potential antitrust injury in a but-for world conflates entry *today*, in the present market conditions, with entry in a hypothetical *but-for world* in the past free from Defendants' anticompetitive restrictions. Dr. Haas-Wilson's clear and well-stated but-for world is clear and stands in stark contrast.[6] However, instead of considering and responding in turn to Dr. Haas-Wilson's clear and well-stated but-for world and assessing injury

---

[4] Dkt. Nos. 2565-49 and 2565-50, Report of Kevin M. Murphy, July 15, 2019 (hereinafter "Murphy Report")

[5] Declaration of Daniel J. Slottje In Support of Plaintiffs' Motion to Exclude Defendants' Expert Dr. Kevin Murphy (hereinafter "Slottje Decl.") at 42.

[6] Dkt. 2454-6, Report of Professor Deborah Haas-Wilson at Section IX.

in that world, or even constructing a different but-for world to support his analyses, Dr. Murphy simply ignores her but-for world and continues building his opinions. Simply put, ignoring the but-for world when considering potential antitrust injury does not result in an opinion which the finder of fact can rely upon.

Tellingly, Dr. Murphy fails to take any steps to account for the challenged anticompetitive conduct in his work. He acknowledged this failure in his deposition noting his approach "wasn't an attempt to construct a but-for world."[7] Specifically, in considering entry, Dr. Murphy simply concludes in his report that because entry into Alabama has been limited in the *actual* world, the Blues would not have entered in a *but-for* world without the ESAs or Blue Card.[8] He fails to account for the effects of the challenged conduct with respect to non-Blue entrants in his analysis, simply assuming they are unaffected by the restrictions at issue.[9] Dr. Murphy's approach and resulting opinion fail to meet requirements of Rule 702 and *Daubert.* His opinion is "not informative" of whether other Blues would have entered "because an Alabama benchmark unaffected by the ESAs does not exist historically and has not been hypothesized by Dr. Murphy."[10] When the restraints at issue affect the actual world, as they do here, those conditions are properly disregarded in constructing a but-for world. *See, e.g., In re Electronic Books Antitrust Litig.*, No. 11 MD 2293(DLC), 2014 WL 1282293, *28 (S.D.N.Y. Mar. 28, 2014) (in certifying class and refusing to exclude the plaintiffs' expert under *Daubert* and Rule 702, holding that factors the defendant said the plaintiffs' expert should have considered in constructing a but-for world "lost all relevance once the conspirators raised the prices for e-books"). Dr. Murphy takes no steps to account for the effect of the restrictions in forming a but-for world in his analysis, a failure that

---

[7] 11/9/2020 Deposition of Kevin Murphy, (hereinafter "Murphy Depo."), at 167:16-25, 96:20-97:20

[8] *See, e.g.*, Murphy Report at 61.

[9] Slottje Decl. at ¶ 16-19.

[10] Slottje Decl. at ¶ 15.

cannot be understated.

Instead of appropriately considering a but-for world, Dr. Murphy looks only at the actions of non-Blue participants in the marketplace and concludes, solely from their actions, that entry of by other Blues would be unlikely in a but-for world. In fact, Dr. Murphy makes clear his research is centered on evidence in the actual, present-day Alabama a market which has been heavily affected by the challenged restrictions, rendering it inapposite to a but-for world. Dr. Murphy states in his report, "real world evidence shows that there has been no meaningful entry or expansion by non-Blues in Alabama for years even though non-Blues are not bound by the challenged rules."[11] However, while under oath in his deposition, Dr. Murphy admitted that non-Blue insurers like UHC and Viva are, in fact, affected by the ESAs.[12] Despite that admission, he simply continues to assume that BCBS-AL would maintain its high market share that all evidence in this case suggests deters other entrants, Blue, Green, or purple from entering, if the ESAs, Blue Card or so-called National Best Efforts Rule were removed.[13]

Further, Dr. Murphy's own opinions with respect to entry in the actual world are internally inconsistent when it comes to the effects of the anticompetitive restrictions. Dr. Murphy's opinions regarding the strength of the Blue brand and Blue Card are built entirely upon the very concept that the challenged rules have made the Blues a much more vigorous competitor for national accounts (a market they dominate now and already dominated before Blue Card).[14] On the other hand, his position in considering the conduct of UHC and other national competitors in the actual world seems to be that the ESAs, Blue Card and the so-called National Best Efforts Rule

---

[11] Murphy Report at ¶ 10.

[12] Murphy Depo. at 65-66.

[13] Dr. Murphy's view is that the removal of the so-called National Best Efforts rule would not increase competition in Alabama. Murphy Depo. at 200-202.

[14] *See, e.g.* Murphy Report at ¶ 107-109 and Exhibit 24.

have not affected the ability UHC, Viva, and the like to compete in the present day world of Alabama.[15] This is inconsistent, bordering on inconceivable. In an appropriate but-for world absent ESAs, it is likely that multiple Blues would be bidding on national accounts business. Further, even Dr. Murphy admits this conduct affects UHC and the national competitors' entry decisions in Alabama.[16] Nevertheless, he has taken no steps to adjust the real world for these facts. As a result, his conclusions are essentially of the "heads I win, tails you lose" variety. Dr. Murphy essentially concludes, in the prohibited *ipse dixit* form, that whatever effect the anticompetitive restrictions have in Alabama, they prove his point.[17] Because entry in the real world was limited, he concludes that the restrictions could not be restraining trade. *Id.* This has the methodology exactly backwards. Dr. Murphy could have begun his work with a but-for world free from the anticompetitive restrictions *and then determined* how those restrictions affect the marketplace, including national insurers such as UHC who are not the direct subject of the restrictions. Dr. Murphy never takes any steps to consider what the Blues or these national insurers would have done in a but-for world, leaving his analysis and resulting opinion unreliable.

In his deposition, Dr. Murphy conceded that the analysis he did in this case did not attempt to adjust for any but-for world.[18] In fact, Dr. Murphy makes clear he merely looked at real world evidence of entry and *never once considered* the effects of the anticompetitive restrictions on the marketplace beyond their direct effect on out-of-state Blues.[19] He simply attempted to see if non-Blue insurers were entering or exiting the Alabama market, without adjusting in any way for the effects of the ESAs, Blue Card or so-called National Best Efforts Rule.

---

[15] Murphy Depo. at 106:10-107:8; Murphy Report, ¶ 71.
[16] Murphy Depo. at 65-66.
[17] *Id.* at 66-67.
[18] *Id.* p. 167.
[19] Murphy Report at ¶ 10,24.

But since other insurers' efforts to enter and obtain market share in Alabama would obviously be impaired by Defendants' anticompetitive agreements, those other insurers' failure to successfully enter and gain market share in real-world Alabama does not support his criticisms of Dr. Haas-Wilson's but-for world. To the contrary, these facts strongly support Provider Plaintiffs' position that Defendants' anticompetitive agreements have had negative effects in the real world and demonstrate that Dr. Haas-Wilson's impact model and its utilization of what the world would look like but-for the effects of Defendants' anticompetitive restrictions fits the facts of the case very well. It is the but-for world that must be considered and analyzed to reach a well-reasoned opinion that will survive *Daubert* scrutiny, and Dr. Murphy's failure to do so leaves his opinion unreliable and ultimately fatally flawed.

In each of his analyses, Dr. Murphy failed to make any adjustment for the effects of the anticompetitive restrictions employed by Defendants. Dr. Murphy's failure to adjust for these restrictions is a fundamental methodological error and renders his opinions—particularly those related to entry in the but-for world—unreliable and invalid.[20] Because Dr. Murphy's report does not consider a proper but-for world free from the challenged restrictions as required by antitrust law and as acknowledged as the proper standard in his own report, his methodology is flawed, and his opinions answer the "wrong question". Therefore, Dr. Murphy's opinions should be excluded by this Court as they fail to meet the standards of Rule 702 and *Daubert* and ultimately do not assist the trier of fact. *See, e.g., Winn-Dixie Stores, Inc.*, 862 F. Supp. 2d at 1330.

**B. Dr. Murphy Ignores Evidence from Other Market Participants as to Entry**

Dr. Murphy's entry analysis repeatedly relies on one side of the ledger in order to establish facts central to his conclusions. During his deposition, Dr. Murphy made clear that he and his staff

[20] Slottje Decl. at 13.

undertook a largely results-oriented review of the documents, testimony, and data in this case:

> It depends on what you're trying to get. I mean, if you're trying to represent that that's a census of the information, I think you would -- you would obviously want to consider the -- if you're trying to do a census of something, then you want to do a census. If you're trying to find out a specific fact or find out a specific -- answer a specific question and you can find the answer to that question in a specific spot, that may be where you look. And so it's not that we -- I deliberately didn't try to find information. I tried to find the kind of information that I could be helpful with, and that's information that feeds into my economic analysis.[21]

Dr. Murphy described his staff's search for documents and deposition testimony this way:

> But it was kind of issue-driven: What do we know about this, where do we get data on this? You know, I'm sure counsel was helpful in helping to find that, but I worked directly with my staff on those questions.[22]

This willful ignorance of much of the factual record leaves his conclusions standing in stark contrast to many of the facts he claims are relevant here. Ignoring contradictory evidence in forming scientific expert economic opinion is the "quintessential" example of an unreliable methodology. *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 634 (4th Cir. 2018) (observing "[r]esult-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion" and quoting *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) in support of same). "[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data," *EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (collecting cases), because such an approach "does not reflect scientific knowledge, is not derived by the scientific method, and is not 'good science.'"

> As a general matter, experts are permitted to sift through the available evidence and identify the data that they deem to be significant. They are permitted to make inferences if evidence is missing, if those inferences are scientifically reasonable.

---

[21] Murphy Depo at 44:14-45:2.
[22] *Id*. at 47:18-25

> And they are permitted to discount or explain apparently contradictory evidence, again assuming that it is scientifically appropriate to do so. But experts cannot simply ignore contradictory evidence; they are not allowed to pick and choose the facts they find helpful and to pretend that the others do not exist.

*Zeolla v. Ford Motor Company*, 4:09-cv-40106-FDS D.E. 72, at page 17 (D. Mass, Jan. 24, 2013).

Dr. Murphy claims that non-Blue insurers would not have entered Alabama in the absence of ESAs because BCBS-AL's low margins make Alabama an unattractive health insurance market for entry by non-Blue insurers.[23] Dr. Murphy claims that "insurers like Aetna, UnitedHealthcare, and Humana determined that serving individuals and small groups in Alabama was unattractive and difficult."[24] Further, "…the lack of interest of non-Blues in entering and expanding is the best economic evidence that there is no profitable opportunity for entry into Alabama."[25] Dr. Slottje's review of the documentary record, including in many cases deposition testimony from key witnesses in the case (some of these depositions even cited by Murphy himself) shows that there was other evidence that Dr. Murphy should have considered in forming scientifically valid opinions, as discussed below.

As an initial matter, Dr. Murphy simply pretends that substantial testimony from non-Blue insurer witnesses inconsistent with his claims does not exist.[26] In depositions that Dr. Murphy cites for other purposes, there is direct testimony that contradicts the opinions of Dr. Murphy. He makes no effort to acknowledge or explain this testimony, he simply ignored it. For instance, Jeffrey Wedin of United Healthcare testified that [redacted][27] Other insurers present in Alabama testified that the factors cited by Dr. Murphy were not stopping their

[23] Murphy Report, ¶¶ 60-61. See also, Murphy Report Section V.A.4.
[24] Murphy Report, ¶ 60.
[25] Murphy Report, ¶ 71.
[26] Slottje Decl. at ¶¶17-19.
[27] Slottje Decl. at 17; 12/15/2017 Deposition of Jeffry Wedin, pp. 270-272.

expansion in Alabama.[28] While Dr. Murphy lists these depositions in his reliance materials, he simply ignores portions of the depositions that are contrary to his viewpoint, making his opinions invalid. *Zeolla,* 4:09-cv-40106-FDS D.E. 72, at page 17

In addition, for non-Blue insurers' actions in Alabama to be informative of whether Alabama is an attractive health insurance market in the absence of ESAs, using Dr. Murphy's approach, non-Blue insurers must have been historically and presently unaffected by the Blues' behavior with respect to ESAs. As discussed above with respect to Dr. Murphy's failure to consider an appropriate but-for world, Dr. Murphy admitted that non-Blue insurers *would be* affected by the ESAs.[29] To put it succinctly, "[t]he ESA rule is a driver of BCBS-AL's dominant market share in Alabama."[30] The Blues themselves have acknowledged that ESAs eliminate competition from other Blues and give Blues a larger market share because other Blues stay out and do not "fragment the market."[31] As Dr. Slottje demonstrates, Dr. Murphy ignores relevant testimony from non-Blue insurer witnesses that "shows BCBS-AL's dominant market share—not BCBS-AL's low margins—are what has hampered non-Blue insurers' ability to compete in Alabama"[32]:

- Ramzy El Gomayel in a deposition cited by Dr. Murphy for other points noted that [redacted][33]

- Jeffrey Wedin, United Healthcare's Market President noted in his deposition [redacted][34] [redacted][35] Further, he testified that [redacted]

[28] Slottje Decl. at ¶¶17-19.
[29] Murphy Depo. at 65-66.
[30] Slottje Decl. at 19.
[31] Slottje Decl. at 10.
[32] Slottje Decl. at 19.
[33] Slottje Decl. at 19; 11/02/2017 Deposition of Ramzy El Gomayel, p. 173.
[34] Slottje Decl. at 19; 12/15/2017 Deposition of Jeffry Wedin, pp. 252-254.
[35] Slottje Decl. at 19; 12/15/2017 Deposition of Jeffry Wedin, pp. 330-331.

[redacted][36]

- Karen Litle of Cigna testified that [redacted][38]

- When asked how BCBS-AL having a lower market share would affect competition in Alabama, Elizabeth Yates of Viva testified that, [redacted][39] [redacted].[40]

Dr. Slottje found that witness testimony from Alabama Providers ignored by Dr. Murphy echoed the non-Blue insurer witnesses.[41]

Rather than address or explain how this testimony fits his conclusions in this case, Dr. Murphy ignored it. According to Dr. Murphy's own standard, testimony from non-Blue insurers and Alabama Providers that BCBS-AL's dominant market share is what has hampered non-Blue insurers' ability to compete in Alabama is vastly more reliable than Dr. Murphy's own subjective opinion that the impediment is BCBS-AL's low margins. When asked in his recent deposition if he had looked at Centene's business model to determine if Alabama was a place they were likely to enter or not, Dr. Murphy responded, "I'm not an expert on Centene's business model. You should ask them."[42] When asked how to interpret documentary evidence in this case, Dr. Murphy replied, "I always find it hard to, you know, just sit there and read the tea leaves of what people are thinking. **It's far better to ask them what they're thinking."** [43] Despite this testimony, he ignored the testimony of the key market participant witnesses who were asked for and provided

---

[36] Slottje Decl. at 17; 12/15/2017 Deposition of Jeffry Wedin, pp. 270-272.
[37] Slottje Decl. at 19; 12/6/2017 Deposition of Karen Litle, pp. 294-296.
[38] Slottje Decl. at 19; 12/06/2017 Deposition of Karen Litle, pp. 324-325.
[39] Slottje Decl. at 19; 08/15/2017 Deposition of Elizabeth Yates, p. 349. See also, pp. 295-296.
[40] Slottje Decl. at 19; 08/15/2017 Deposition of Elizabeth Yates, pp. 423-424.
[41] Slottje Decl. at 20.
[42] Murphy Depo. at 64-65; Slottje Decl. at 21-22.
[43] Murphy Depo. at 44:1-4 (emphasis added)

their "thinking" on the market conditions in Alabama. His analysis is divorced from reality and speculative.[44]

Further, Dr. Murphy's claim that "the percentage of Alabama providers that did not participate in BCBS-AL's provider network in 2016 is much smaller than the percentage that did not participate in national insurers' Alabama networks" is misleading and contrary to evidence in the record.[45] His Exhibit 18 which appears as the primary support for his idea that national insurers offer narrower networks in Alabama than BCBS-AL is based upon one internal Consortium Health Plan (a Blues marketing entity) document. He did no independent economic research on the breadth of any of the national competitors' networks in Alabama.[46] Nor did he even review the depositions of the witnesses for these national competitors.[47] Contrary to Dr. Murphy's opinions, UHC's market President Jeffrey Wedin testified that [redacted]. Publicly available information on UHC's provider networks shows that 99% of the Acute Care Hospital 23(b)(3) Class are in UHC's network.[48] Similar participation is true for Aetna and Cigna.[49] Murphy made no effort to evaluate these networks beyond one Consortium Health Plan document. The evidence available does not support the conclusion that these Plans have sought to enter Alabama through narrow networks. All of this undermines Murphy's essentially *ipse dixit* conclusion that the other Blues, if they entered, might enter with narrow networks. All national competitors that have entered Alabama have sought to create broad networks to compete with BCBS-AL and Dr. Murphy's reliance strictly on one contrary document to reach such a dramatic hypothetical conclusion should be

---

[44] Slottje Decl. at 22.
[45] Slottje Decl. at ¶¶ 44-48.
[46] Murphy Depo. at 193:23-194:4.
[47] Murphy Depo. at 193:9-22.
[48] Slottje Decl. at ¶ 45; 12/15/2017 Deposition of Jeffry Wedin, pp. 254-255.
[49] Slottje Decl. at ¶¶ 45-47

excluded as it does not fit the facts of the case.

"An expert is not permitted to simply ignore evidence that is contrary to her opinion in implementing an accepted methodology." *See Chaudhry v. Provident Life & Accident Ins. Co.*, No. 12-cv-5838, 2015 WL 1756832, at *5 (N.D. Ill. Apr. 15, 2015); *see also Barber v. United Airlines, Inc., 17 Fed. Appx. 433, 437* (7th Cir. 2001) ("Because in formulating his opinion Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and Daubert, and it thus fails to 'assist the trier of fact.'") Dr. Murphy's willful ignorance for the totality of the evidence in this case is further cause for this Court to exclude his expert testimony and opinions.

### C. Dr. Murphy Ignores Evidence from Blues as to Entry

As he ignored evidence from other market participants as to entry, Dr. Murphy also ignored evidence from Blues—even BCBS-AL—if it was contrary to his pre-determined conclusions. Dr. Murphy's Report makes his key work in this case clear: "the most critical analysis to evaluate Plaintiffs' claims of anticompetitive injury is whether and where Plans would enter using Blue marks but for ESAs."[50] In his report, Dr. Murphy asserts that "economic analysis" and "real-world evidence" show that "other Blue Plans would not have entered Alabama in the absence of ESAs and thus Plaintiffs have not suffered anticompetitive harm."[51] Once again, Dr. Murphy's opinion that "other Blue Plans would not have entered Alabama in the absence of ESAs" is based on a view of the record that willfully disregards contrary evidence and is inconsistent with Blue executives' testimony and views on ESAs.[52] Blues executives' testimony and contemporaneous

---

[50] Murphy Report, ¶ 24.
[51] Murphy Report, ¶¶ 24, 55.
[52] Slottje Decl. at ¶7.

viewpoints on ESAs are consistent that absent ESAs, the Blues would have faced competition from other Blues. Dr. Murphy ignores this testimony.[53]

According to Dr. Murphy, Blue executives' testimony and views on ESAs are "vastly more reliable" than Dr. Murphy's opinions on ESAs. Dr. Murphy understands the Blues and their business model from the perspective of an economist, not a healthcare executive. When asked how an economist should evaluate the actual actions of healthcare executives, Dr. Murphy testified that "they're very informative about the underlying economic situation." The Murphy Report states: "From an economic perspective, evidence of actual conduct by businesses that risk their own money is vastly more reliable than hypotheticals based on an economist's relatively uninformed assessment of whether there is an attractive business opportunity."[54] In light of these statements, in analyzing the questions of potential entry into Alabama, longtime BCBS-AL's CEO Terry Kellogg's testimony would be a logical place to start. Dr. Murphy did not review or rely upon BCBS-AL's CEO's deposition in forming his opinions; even a brief review of Mr. Kellogg's testimony shows it counter to Dr. Murphy's opinions. When asked about the potential effect of eliminating ESAs, Mr. Kellogg testified that the Blues would have faced more competition particularly from Anthem:

> Q. So I want to understand your testimony about what we called the Anthem rule, that Anthem can't bring its mark into Alabama because that's been marketed in conjunction with the Blue mark. The – that ***Anthem rule***, is it your testimony that ***if that rule were abolished***, you would have to get rid of the BlueCard program?
> A. It's my belief that ***if that rule were abolished***, there would not be the collaboration between Plans that would allow us to use our provider networks in conjunction with our – with our Blue-branded products like we do. ***We would be in direct competition***.[55]
> …
> Q. Okay. And the reason you would withdraw from the BlueCard program on behalf of your company in that circumstance is because a compet- -- ***Anthem would***

[53] Slottje Decl. at ¶¶ 6-12.
[54] Murphy Report, ¶ 11. (emphasis added)
[55] Slottje Decl. at ¶8. 7/19/2017 Deposition of Terry Kellogg, p. 74. (emphasis added)

***be a competitor in Alabama using the Anthem name***?
A. ***Yes***.[56]

Other BCBS-AL witnesses testified they believe BCBS-AL itself would have competed outside of Alabama in the absence of ESAs. BCBS-AL Chief Actuary Noel Carden testified that ESAs prevent BCBS-AL from growing its Blue-branded business outside Alabama.[57] BCBS-AL executive Janet Campisi testified that BCBS-AL could have competed freely but for the Blues' alleged anticompetitive agreements, and that national accounts headquartered outside Alabama are one of BCBSAL's "biggest growth opportunities."[58] Notably, testimony from central figures at BCBS-AL is not included in the information that Dr. Murphy relied on in forming his opinions.

In additional to disregarding relevant testimony, Dr. Murphy also ignored other historical evidence that contradicted his pre-ordained worldview.[59] Dr. Slottje found documents indicating that "BCBSA originally established exclusive service areas for its Member Plans to prevent the Plans from competing with one another using the Blue Marks ('branded competition')."[60] Dr. Slottje's review of documents related to the Assembly of Plans ("AOP") reveals the same. For example, an AOP white paper states that, if the existing exclusive service areas were ignored "the Plans [would] become full competitors on a nationwide basis using the names and marks."[61] Written summaries of the Blue executive interviews show that Blue executives believed, as far back as the 1980s, that the Blues would have faced competition from other Blues in the absence of ESAs.[62] For example, one Blue Cross executive noted "Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans. Otherwise there would be open

---

[56] Slottje Decl. at ¶8. 7/19/2017 Deposition of Terry Kellogg, p. 76, 80; Slottje Decl. at ¶8.
[57] 10/27/2017 Deposition of Noel Carden, pp. 287-291
[58] 05/19/2017 Deposition of Janet Campisi, pp. 140-144
[59] Slottje Decl. at ¶9-12
[60] Slottje Decl. at ¶9; BCBSA00188626-704, at 636
[61] Slottje Decl. at ¶9; BCBSA00028854-9048, at 8920.
[62] Slottje Decl at ¶ 10.

warfare." [63] Another executive made clear that the benefit of Exclusive Service Areas was "[l]arger market share because other Blues stay out and do not fragment the market."[64] Numerous other examples of Blue Cross executives explaining that the Blues would openly compete were ignored by Dr. Murphy.[65]

Blue executives' testimony and views on ESAs are proof of Blue executives' actual consideration of what they believe the competitive landscape would have looked like in the absence of ESAs, both back in the 1980s and more recently, and they confirm that the Blues stated they would have competed against each other in the absence of ESAs. Dr. Murphy mentions *none* of this testimony in his 200+ page report. None of the Blue executives' testimony and views on ESAs shown above appear in the information that Dr. Murphy relied on in forming his opinions in this litigation. Dr. Murphy testified that he did not rely on anything other than the materials he listed in the Murphy Report in forming his opinions.[66] Therefore, Dr. Murphy gives zero weight to the real-world evidence shown above that the Blues, including BCBS-AL, state that they would have faced competition from other Blues in the absence of ESAs. Dr. Murphy also fails to acknowledge that Blues such as Anthem already have large membership presences in Alabama, and that an out-of-state Blue is already serving members in every Alabama county and CBSA in the state.[67] This "action" by the other Blues contradicts Dr. Murphy's entry opinions and confirms additional Blues entry into Alabama would occur absent the challenged restrictions.

Further, Dr. Murphy contradicts himself and his opinion that other Blues would not have entered Alabama in the absence of ESAs elsewhere in the Murphy Report. According to Dr.

---

[63] BCBSA00115458-464, at 462.
[64] BCBSA00115429-433, at 431-432.
[65] Slottje Decl. at ¶ 10.
[66] Murphy Depo. at 40.
[67] Report of Professor Deborah Haas-Wilson at ¶326 and Exhibit VII.2.

Murphy, in the absence of ESAs, "even the potential for entry (and not just actual entry) would threaten the cooperation that enables Blue Plans to provide benefits that subscribers and providers value…because all Plans would be actual or potential competitors for all subscribers and accounts, which would diminish incentives to help each other."[68] In the absence of ESAs, "a Plan like BCBS-AL would not have an incentive to make its provider network available to other Plans if those Plans might choose to enter Alabama and compete with BCBS-AL."[69] These statements in the Murphy Report are more consistent with the real-world evidence of Blue executives' testimony and views on ESAs presented above where they state that other Blues would have chosen to enter Alabama and compete with BCBS-AL in the absence of ESAs. It is nonsensical for Dr. Murphy to make both claims simultaneously that, in the absence of ESAs (1) other Blue Plans would definitively not have entered Alabama, and (2) all Blues would have been actual or potential competitors for all subscribers and accounts in Alabama, which of course could only occur if other Blues entered Alabama.

Using Dr. Murphy's own proclaimed standard, Blue executives' statements that the Blues would have competed against each other in the absence of ESAs, including in Alabama, is "vastly more reliable" than Dr. Murphy's "relatively uninformed assessment" of Blue entry in Alabama in the absence of ESAs. Dr. Murphy's testimony on entry is contrary to the "vastly more reliable" evidence and is simply him acting in place of counsel to put the best spin on the evidence. Dr. Murphy's failure to consider testimony even he deemed reliable is yet another flaw in his opinions.

## II. Dr. Murphy's Exhibit 10 Analysis Is Unreliable

In support of his opinions, Dr. Murphy performs several "empirical" analyses that are limited to the ACA individual and/or small group Exchange. *See, e.g.*, Dkt. No. 2565-49, *Exhibit*

---

[68] Murphy Report, ¶ 108.
[69] Murphy Report, ¶ 146.

*10*, page 42 (studying only competition on the Individual Small Group Exchange). Dr. Murphy's analysis purports to show the relationship between the number of insurers offering health insurance plans on the individual ACA exchanges in a county based on market attractiveness characteristics like median income, population density, hospital concentration and other factors. In his Exhibit 10 and paragraph 79 of his Report, Murphy purports to show that Alabama's market characteristics "are not characteristics that make a state attractive for entry by a commercial health insurer, and certainly not characteristics that would create an incentive for an entrant to serve all parts of the state…"[70]

As an initial point, as with the rest of his opinions Dr. Murphy took no steps to tie this analysis to any but-for world.[71] Because Dr. Murphy takes no steps to adjust this analysis for an appropriate but-for world, his analysis is economically invalid[72] and should not be relied upon.

Second, Dr. Murphy's analysis does not align with the facts of this case, in particular with the Provider classes, because it is limited to an unreasonably small segment of the commercial health insurance market.[73] Dr. Murphy explains that his analysis shows Individual ACA enrollees accounted for less than 4% of total Blue commercial enrollees in Alabama in 2013 and 2014. Slottje Decl. at 35 and Table 1.[74] Provider Plaintiffs' claims are not limited to these Exchange products, and cover providers who provided covered services to any patient with a commercial health insurance plan administered by one of the Defendants. Dr. Murphy's choice to analyze only the incredibly small individual ACA exchange amounts to—once again—willfully ignoring a broader set of market evidence and data to arrive at a desired result and should be excluded.[75] This

---

[70] Murphy Report at ¶79.
[71] Murphy Depo. at 167:18-25.
[72] Slottje Decl. at ¶ 33.
[73] Slottje Decl. at ¶¶32-36.
[74] Dr. Murphy conceded at his deposition that the individual ACA exchange segment accounts for a "small single-digit" percentage of commercial health insurance in Alabama. Murphy Depo. at 155-156.

analysis cannot be generalized and then applied to other segments of the commercial health insurance market. Dr. Murphy concedes that to study other portions of the market that make up the vast majority of the marketplace, he would have to do a different analysis, which he simply chose not to do.[76] In fact, Dr. Murphy concedes the self-funded market has more participants and any analysis of that market would likely have to consider national factors.[77]

Third, Dr. Murphy's analysis suffers from other technical flaws that render it unreliable.[78] Dr. Murphy agrees that his Exhibit 10 analysis is largely driven by what is happening on the exchange in *other states*, not just Alabama.[79] In this regard, Exhibit 10 is probably has more to say about the trends with respect to the individual ACA exchange markets than it does about Alabama as a market or about this case. Nevertheless, Dr. Murphy claims his narrow analysis proves far more than it actually does. In addition, Dr. Murphy's analysis is riddled with data errors which render his results unreliable.[80] Dr. Murphy puts several Alabama hospitals in the wrong county (for instance, putting Shoals Hospital in Jefferson County, and Mobile Infirmary in Washington County). Further, many hospitals outside of Alabama are attributed to the wrong counties.[81] At his deposition, Dr. Murphy could not account for the locations of any of these hospitals.[82] He was forced to concede that these mistakes would affect his results of his analysis.[83]

Finally, and perhaps most importantly, Dr. Murphy's own analysis in Exhibit 10 predicts that there should *more* insurers than there were in the actual world for each year of his study.[84] Taken at face value, Dr. Murphy's results would show that there should be almost 100% more

---

[76] Murphy Depo. at 156:7-159:8; Slottje Decl. at ¶ 37.
[77] Murphy Depo. At 145:2-149:7.
[78] Slottje Decl at 38.
[79] Murphy Depo. At 155:3-17.
[80] Slottje Decl. at 38.
[81] Slottje Decl. at ¶ 38.
[82] Murphy Depo 161:20-162:25.
[83] *Id.* at 165:18-166:6, 167:5-15.
[84] Slottje Decl. at ¶39.

competition on the Alabama exchange given the underlying market conditions. Dr. Murphy did not relate his results to BCBS-AL's market share in considering the effect of the anticompetitive restrictions on this analysis. Of course, such an analysis of market share *vis a vis* participation in the individual ACA exchange may have revealed that there were less competitors in the individual ACA exchange precisely *because of* BCBS-AL's immense market share. Thus, Dr. Murphy's own empirical results show that *something* (likely the Blues anticompetitive conduct)[85] is preventing the level of competition his own model expects in the individual ACA exchange and do not match his conclusions regarding whether the anticompetitive restrictions deter entry.[86] As with the entirety of his entry opinions, Exhibit 10 to Dr. Murphy's report is unreliable and should be excluded by this Court.

## III. Dr. Murphy Ignores Relevant Contrary Evidence to Support His View That Market Share is Not Evidence of Lack of Competition

Dr. Murphy claims that BCBS-AL's market share is not evidence "absence of competition and poor marketplace outcomes that allegedly result in harm to Plaintiffs."[87] Dr. Murphy high market share because: (1) "it is more efficient and better at serving consumers than are its competitors", or "it serves demand that potential competitors choose not to serve".[88] In reaching this conclusion, Dr. Murphy completely failed to consider that the Blues' exclusionary conduct, including the restrictions at issue in this case, caused or accentuated BCBS-AL's high market share.[89] Dr. Slottje found evidence not considered by Dr. Murphy that ESAs are a driver of BCBS-AL's dominant market share; they prevent other Blues from entering Alabama and competing with

[85] Of course, Dr. Murphy did not run a regression of the expected level of competition against the Blues' share in each state. Such a result might have confirmed that the Blues restrictions were the source of the lack of the competition as Plaintiffs have posited.
[86] Slottje Decl. at ¶39.
[87] Murphy Report, ¶ 119. Slottje Decl. at ¶49.
[88] Murphy Report, ¶ 120; Slottje Decl. at ¶49.
[89] Slottje Decl. ¶¶49-50

BCBS-AL.[90] As detailed above, Blue executives' testimony and views on ESAs are consistent that the Blues would have competed against each other, including in Alabama, in the absence of ESAs. As shown in the testimony above from non-Blue insurer witnesses, ESAs also limit non-Blue insurers' ability to compete in Alabama. Thus, Dr. Murphy's claim that BCBS-AL's market share is not evidence of the absence of competition in Alabama is inconsistent with and ignores the real-world evidence above.[91]

The testimony and views of Blue executives and others show the linkage between ESAs and lower prices paid to providers, which suggests that in the absence of ESAs, providers in Alabama would have received higher prices for their healthcare services with more competition between health insurers in Alabama (and a lower BCBS-AL market share). Written summaries of the Blue executive interviews show that Blue executives believed, as far back as the 1980s, that ESAs increase the Blues' leverage in contracting situations with healthcare providers and reduce the rates paid to healthcare providers.[92]

In addition, Dr. Slottje found that testimony from BCBS-AL executives and Alabama Providers show that ESAs, in particular the restriction on contracting outside of a Blues' service area, "reduce the prices paid to healthcare providers."[93] For example:

- BCBS-AL executive Doug McIntyre testified that one of the primary reasons that BCBS-AL terminated direct contracting with hospitals in contiguous counties was that it determined the contracts "were not as favorable in terms of reimbursement…as was available through the BlueCard system."[94]

- Bradley Eisemann of Crenshaw Community Hospital testified that the hospital is "not allowed to contract with any other Blue," and that the hospital's inability "to contract with other carriers…limits [its] ability to maximize [its] reimbursement."[95]

---

[90] Slottje Decl. ¶50.
[91] Slottje Decl. ¶¶ 51-55.
[92] Slottje Decl. at ¶ 51.
[93] Slottje Decl. at ¶52
[94] *Id.;* 06/23/2017 Deposition of Doug McIntyre, pp. 143-144.
[95] Slottje Decl. at ¶52;05/03/2017 Deposition of Bradley Eisemann, p. 263.

- When asked if Blue Cross and Blue Shield of Georgia's ("BCBS-GA") reimbursement rates would differ from BCBS-AL's reimbursement rates if BCBS-GA started selling insurance in Alabama, Michael Bruce of Elmore Community Hospital, Georgiana Medical Center, and Lake Martin Community Hospital testified that it was his belief "[c]ompetition would drive better rates."[96]

- Mary Beth Briscoe of UAB Hospital testified that [redacted][97]

- Nina Dusang of DCH Regional Medical Center testified that, since the hospital is located in a "University town," it has "a lot of out-of-state plans," and that, if the Blues were allowed to contract with DCH they would "negotiate something different with them." When asked if she was aware that the hospital's reimbursement rate for out-of-area Blue members is limited to BCBS-AL's reimbursement rate, Dusang testified, "Yes, I am very aware of that."[98]

- Keith Parrott of Brookwood Baptist testified that in a world without limitations on out of area contracting the hospital could get a better rate contracting with out-of-Service Area Blues. Parrott testified that if allowing the hospital to negotiate with other Blues for reimbursement rates would result in a good outcome for hospitals.[99]

This evidence shows the direct linkage between ESAs and lower prices paid to providers, and suggests that in the absence of ESAs, providers in Alabama would have received higher prices for their healthcare services with more competition between health insurers in Alabama. None of the Blue executives' and putative Class member witnesses' testimony and views on ESAs shown above appear in the information that Dr. Murphy relied on in forming his opinions in this litigation. Thus, Dr. Murphy gives zero weight to the real-world evidence shown above that providers in Alabama would have received higher prices for their healthcare services with more competition between health insurers in Alabama, in the absence of ESAs. The testimony and evidence from healthcare executives is "vastly more reliable" than Dr. Murphy's opinion that BCBS-AL's market

---

[96] Slottje Decl. at ¶52; 06/13/2017; Deposition of Michael Bruce, pp. 41-42.
[97] Slottje Decl. at ¶52; 09/21/2017; Deposition of Mary Beth Briscoe, pp. 222-224, 235-236.
[98] Slottje Decl. at ¶52; 08/09/2017; Deposition of Nina Dusang, p. 212.
[99] Slottje Decl. at ¶5205/04/2017; 12/06/2017 Deposition of Keith Parrott, pp. 188-189.

share is not evidence of the absence of competition in Alabama and poor marketplace outcomes.[100]

## IV. Dr. Murphy's Analysis of Central Pennsylvania Premiums Is Unreliable

Dr. Murphy observes that the Central Pennsylvania ACA premiums are higher than the ACA premiums for the rest of Pennsylvania and also observes Blue-on-Blue competition in Central Pennsylvania and not in the rest of the state.[101] As Dr. Frech notes, "basic economic theory suggests that with more competitors selling a good or service, *ceteris paribus*, the lower the price will be, to the benefit of consumers."[102] In forming his opinions contrary to "basic economic theory," Dr. Murphy ignores that his dataset is incomplete and flawed for the purposes he purports to use it.[103] In particular, Dr. Murphy fails to account for the fact that (a) the rates in the competitive portions of Central Pennsylvania are lower than the rest of Pennsylvania; (b) Highmark pulled out of many of the counties he is studying during the midpoint of his analysis; and (c) the rates were lower in the counties where Highmark and Capital actually competed than they were in the areas where only Capital participated in the exchange.[104] Dr. Murphy's Exhibit 54 analysis does not hold up under close scrutiny[105] and given its ignorance of the underlying facts does not fit the facts the case. *See, e.g., Winn-Dixie Stores, Inc.*, 862 F. Supp. 2d at 1330.

## V. Dr. Murphy's Numerous Assertions Without Proof in His Report Should be Stricken from the Record as Lacking a Factual Basis

Dr. Murphy's report is replete with conclusory factual assertions for which he provides absolutely no support. These *ipse dixit* assertions, unsupported by record evidence or economic theory, are inadmissible. Further, many of these views are not just unsupported by evidence, they are contradicted by evidence in the record. By way of example:

[100] Slottje Decl. at ¶49-54.
[101] Murphy Report Exhibit 54 and ¶ 281.
[102] Frech Decl. at ¶ 42.
[103] Frech Decl. at ¶43.
[104] Frech Decl. at ¶43.
[105] Frech Decl at ¶¶44-45.

- Dr. Murphy's opinions that BCBS-AL's market share is not evidence of the absence of competition in Alabama and that the assumed benefits of eroding the Blue incumbent's market share are "unproven and unlikely" are assertions without proof and are inconsistent with the real-world views of Blue executives and putative Class members.[106]

- Dr. Murphy asserts without proof that providers "might be reluctant to offer a new entrant the same discounts as they currently accept from BCBS-AL" because of their satisfaction with BCBS-AL.[107]

- Dr. Murphy asserts without proof that BlueCard has no anticompetitive effects in two places in the Murphy Report: (1) in the description of his primary opinions in paragraph 17; and (2) in the heading of Section VII. Dr. Murphy not only fails to cite any testimony, documents, or economic analysis to show that BlueCard has no anticompetitive effects, he fails to provide any explanation for his opinion. Putative Class member witnesses testified that they have no choice but to accept BCBS-AL's reimbursement rates for the services they provide to other Blues' members.[108] Dr. Murphy ignores the anticompetitive effects on Provider entirely in his opinions.

Many of Dr. Murphy's "opinions" are simply arguments of counsel posing as expert opinion. These kinds of *ipse dixit* opinions are not based on any reliable methodology and need not be admitted. *Joiner*, 522 U.S. at 146.

## **CONCLUSION**

For the reasons described above, all of Dr. Murphy's report, opinions and testimony should be excluded and not be considered by the Court on class certification.

Respectfully submitted the 23rd day of November 2020.

---

[106] Slottje Decl. at ¶ 4.
[107] Slottje Decl. at ¶¶28-29.
[108] *See, e.g.,*08/09/2017 Deposition of Nina Dusang, p. 212; 05/04/2017 Deposition of Sharon Lee, p. 38; 12/06/2017 Deposition of Keith Parrott, p. 188

*/s/ Edith M. Kallas*
Edith M. Kallas – ***Co-Lead Counsel***
WHATLEY KALLAS, LLP
152 West 57th Street
41st Floor
New York, NY 10019
Tel: (212) 447-7060
Fax: (800) 922-4851
Email: ekallas@whatleykallas.com

Patrick J. Sheehan
WHATLEY KALLAS, LLP
101 Federal Street, 19th Floor
Boston, MA 02110
Tel: (617) 573-5118
Fax: (617) 371-2950
Email: psheehan@whatleykallas.com

Henry C. Quillen
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH 03801
Tel: (603) 294-1591
Fax: (800) 922-4851
Email: hquillen@whatleykallas.com

Charles Clinton Hunter
HAYES HUNTER PC
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel: (281) 768-4731
Fax: (713) 583-7047
Email: chunter@hayeshunterlaw.com

*/s/ Joe R. Whatley, Jr.*
Joe R. Whatley, Jr. – ***Co-Lead Counsel***
W. Tucker Brown
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel: (205) 488-1200
Fax: (800) 922-4851
Email: jwhatley@whatleykallas.com
tbrown@whatleykallas.com

Deborah J. Winegard
WHATLEY KALLAS, LLP
1068 Virginia Avenue, NE
Atlanta, GA 30306
Tel: (404) 607-8222
Fax: (404) 607-8451
Email: dwinegard@whatleykallas.com

E. Kirk Wood, Jr. – ***Local Facilitating Counsel***
WOOD LAW FIRM LLC
P. O. Box 382434
Birmingham, AL 35238
Tel: (205) 612-0243
Fax: (205) 705-1223
Email: ekirkwood1@bellsouth.net

Aaron S. Podhurst – ***Plaintiffs' Steering Committee***
Peter Prieto – ***Chair, Expert Committee***
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue
Suite 2300
Miami, FL 33131
Tel: (305) 358-2800
Fax: (305) 358-2382
Email: apodhurst@podhurst.com
pprieto@podhurst.com

Dennis Pantazis – ***Plaintiffs' Steering Committee***
Brian Clark – ***Discovery Committee***
WIGGINS CHILDS PANTAZIS FISHER
GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel: (205) 314-0500
Fax: (205) 254-1500
Email: dgp@wcqp.com
bclark@wcqp.com

U.W. Clemon – ***Plaintiffs' Steering Committee***
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL 35222
Tel: (205) 837-2898
Email: uwclemon1@gmail.com

Dennis C. Reich – ***Chair, Damages Committee***
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel: (713) 622-7271
Fax: (713) 623-8724
Email: dreich@rbfirm.net

J. Mark White – ***Litigation Committee***
Augusta S. Dowd – ***Chair, Litigation Committee***
Linda G. Flippo – ***Discovery Committee***
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel: (205) 323-1888
Fax: (205) 323-8907
Email: mwhite@whitearnolddowd.com
adowd@whitearnolddowd.com
lflippo@whitearnolddowd.com

Nicholas B. Roth – ***Chair, Discovery Committee***
Julia Smeds Roth – ***Discovery Committee***
EYSTER KEY TUBB ROTH MIDDLETON
& ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel: (256) 353-6761
Fax: (256) 353-6767
Email: nbroth@eysterkey.com
jroth@eysterkey.com

Van Bunch – ***Chair, Class Certification Committee***
BONNETT FAIRBOURN FRIEDMAN &
BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel: (602) 274-1100
Fax: (602) 274-1199
Email: vbunch@bffb.com

David A. Balto – ***Expert Committee***
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel: (202) 789-5424
Fax: (202) 589-1819
Email: david.balto@dcantitrustlaw.com

Robert J. Axelrod – ***Chair, Written Submissions Committee***
AXELROD & DEAN LLP
830 Third Avenue, 5th Floor
New York, NY 10022
Tel: (646) 448-5263
Fax: (212) 840-8560
Email: rjaxelrod@axelroddean.com

Joey K. James – ***Litigation Committee***
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel: (256) 764-0095
Fax: (256) 767-5705
Email: joey@bunchandjames.com

W. Daniel Miles, III – ***Written Submissions Committee***
BEASLEY ALLEN CROW METHVIN PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel: (800) 898-2034
Fax: (334) 954-7555
Email: dee.miles@beasleyallen.com

Richard S. Frankowski – ***Discovery Committee***
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL 35233
Tel: (205) 390-0399
Fax: (205) 390-1001
Email: richard@frankowskifirm.com

Michael C. Dodge – ***Expert Committee***
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel: (972) 419-7172
Email: mdodge@gpm-law.com

John C. Davis – ***Written Submissions Committee***
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel: (850) 222-4770
Email: john@johndavislaw.net

Michael E. Gurley, Jr. – ***Discovery Committee***
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel: (205) 908-6512
Email: mgurleyjr@yahoo.com

Mark K. Gray – ***Discovery Committee***
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel: (502) 805-1800
Fax: (502) 618-4059
Email: mgray@grayandwhitelaw.com

Lynn W. Jinks, III – ***Expert Committee***
Christina D. Crow – ***Discovery Committee***
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel: (334) 738-4225
Fax: (334) 738-4229
Email: ljinks@jinkslaw.com
ccrow@jinkslaw.com

Stephen M. Hansen – ***Class Certification Committee***
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel: (253) 302-5955
Fax: (253) 301-1147
Email: steve@stephenmhansenlaw.com

Myron C. Penn – ***Discovery Committee***
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel: (334) 738-4486
Fax: (334) 738-4432
Email: myronpenn28@hotmail.com

Harley S. Tropin – ***Damages Committee***
Javier A. Lopez – ***Discovery Committee***
KOZYAK TROPIN &
THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
Email: hst@kttlaw.com
jal@kttlaw.com

J. Preston Strom, Jr. – ***Litigation Committee***
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel: (803) 252-4800
Fax: (803) 252-4801
Email: petestrom@stromlaw.com

C. Wes Pittman – ***Settlement Committee***
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel: (850) 784-9000
Fax: (850) 763-6787
Email: wes@pittmanfirm.com

Thomas V. Bender – ***Discovery Committee***
Dirk L. Hubbard
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Tel: (816) 421-0700
Email: tbender@hab-law.com
dhubbard@hab-law.com

Robert B. Roden – ***Litigation Committee***
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel: (205) 933-8383
Fax: (205) 933-8386
Email: rroden@shelbyroden.com

Gregory S. Cusimano – ***Litigation Committee***
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL 35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email: greg@alalawyers.net

Gary E. Mason – ***Class Certification Committee***
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel: (202) 429-2290
Fax: (202) 640-1160
Email: gmason@wbmllp.com

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel: (320) 289-2363
Fax: (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Michael L. Murphy – ***Discovery Committee***
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC 20006
Tel: (202) 463-2101
Fax: (202) 463-2103
Email: mmurphy@baileyglasser.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
Email: alamb@archielamb.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel: (719) 471-1984
Fax: (719) 577-4356
Email: lance@searsassociates.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA 51101
Tel: (712) 234-3030
Fax: (712) 234-3034
Email: paul@lundberglawfirm.com

Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK 99501
Tel: (907) 277-5400
Fax: (907) 277-9896
Email: Jessica@dillonfindley.com
Ray@dillonfindley.com
Molly@dillonfindley.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com

Cynthia C. Moser
HEIDMAN LAW FIRM
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA 51101
Tel: (712) 255-8838
Fax (712) 258-6714
Email: Cynthia.Moser@heidmanlaw.com