FILED
2021 May-21  PM 08:56
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

|  |  |
|---|---|
| **IN RE:  BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This document relates to Provider-Track cases.** |

# DEFENDANTS' OPENING BRIEF ON THE ANTITRUST STANDARD OF REVIEW APPLICABLE TO PROVIDER PLAINTIFFS' SECTION 1 CLAIMS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

INDEX OF EXHIBITS .................................................................................... v

CITATION KEY ......................................................................................... viii

PRELIMINARY STATEMENT .................................................................... 1

STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS ................. 2

    A.    Service Areas, in Alabama and Around the Country, Arose from Common-Law Trademark Rights. ............................................. 2

    B.    National Organizations Supported the Local Plans. ................... 5

    C.    The Lanham Act Offers Federal Protection for Trademark Rights. ............ 6

    D.    The License Agreements Codify Existing Common-Law Trademark Rights. ............................................................... 8

    E.    The Blue System Fosters Exceptionally Broad Provider Networks, Made Available Nationwide Through BlueCard. ....................... 11

    F.    The National Best Efforts Rule Has Been Eliminated. ............... 12

APRIL 2018 STANDARD OF REVIEW DECISION ....................................... 12

ARGUMENT ................................................................................................ 13

    I.    The Rule of Reason Governs Providers' ESA Claims. ...................... 13

        A.    Legal Principles Governing Standard of Review. ..................... 13

        B.    The Rule of Reason Applies to Providers' Claims Based on ESAs Alone. ............................................................ 15

            1.    ESAs Developed Independently Through Existing Trademark Rights. ....................................... 16

            2.    ESAs Enable Procompetitive Efficiencies. ................... 19

        C.    *Sealy* and *Topco* Do Not Mandate a Different Result. ............... 23

    II.    Providers' ESA Claims Do Not Involve NBE. ................................ 25

        A.    The Prior Standard of Review Order Does Not Apply to Claims Brought by Providers, Who Have Never Been Subject to Unbranded Restraints. ................................................ 26

        B.    Providers Do Not Have Claims for NBE. ............................... 26

        C.    Providers Do Not Quantify Damages from NBE. ..................... 27

        D.    NBE Has Not Injured Providers. ....................................... 29

CONCLUSION ............................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amey, Inc. v. Gulf Abstract & Title, Inc.*,
758 F.2d 1486 (11th Cir. 1985) ........................................................................30

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979) ..................................................................................... passim

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717 (1988) .........................................................................................14

*Clorox Co. v. Sterling Winthrop, Inc.*,
117 F.3d 50 (2d Cir. 1997) ...............................................................17, 18, 19

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ...........................................................................................28

*Ex Parte C.B. Donald Co.*,
117 U.S.P.Q. 485 (Comm'r Pat. & Trademarks 1958) .......................................4

*F.T.C. v. Actavis, Inc.*,
570 U.S. 136 (2013) .........................................................................................19

*FN Herstal SA v. Clyde Armory Inc.*,
838 F.3d 1071 (11th Cir. 2016) ...................................................................20, 21

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) ...........................................................................15

*In re Sulfuric Acid Antitrust Litig.*,
703 F.3d 1004 (7th Cir. 2012) .....................................................................20, 21

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ......................................................................13, 14, 16, 21

*McClure v. Undersea Indus., Inc.*,
671 F.2d 1287 (11th Cir. 1982) .....................................................................28, 29

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
922 F.3d 713 (6th Cir. 2019) ...........................................................................15

*Midwestern Waffles, Inc. v. Waffle House, Inc.*,
734 F.2d 705, 723 (11th Cir. 1984) .................................................................28

*N. Pac. R. Co. v. United States*,
356 U.S. 1 (1958) .............................................................................................24

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
    779 F.2d 592 (11th Cir. 1986) ...................................................................14, 22

*Nat'l Coll. Ath. Ass'n v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ...................................................................................22

*Ohio-Sealy Mfg. Co. v. Sealy, Inc.*,
    459 U.S. 943 (1982) .................................................................................25

*Ohio-Sealy Mfg. Co. v. Sealy, Inc.*,
    585 F.2d 821 (7th Cir. 1978) ...................................................................25

*Ohio-Sealy Mfg. Co. v. Sealy, Inc.*,
    669 F.2d 490 (7th Cir. 1982), *cert. denied*, 459 U.S. 943 (1982).............25

*Park 'N Fly, Inc. v. Dollar Park & Fly*, Inc.,
    469 U.S. 189 (1985) ...................................................................................6

*Polk Bros. Inc. v. Forest City Enters., Inc.*,
    776 F.2d 185 (7th Cir. 1985) .......................................................13, 14, 15, 22

*Procaps S.A. v. Patheon, Inc.*,
    845 F.3d 1072 (11th Cir. 2016) ....................................................... passim

*Seagood Trading Corp. v. Jerrico, Inc.*,
    924 F.2d 1555 (11th Cir. 1991) ...........................................................14, 16

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ...................................................................30

*State of Alabama v. Blue Bird Body Co.*,
    573 F.2d 309 (5th Cir. 1978) ...................................................................30

*State Oil Co. v. Kahn*,
    522 U.S. 3 (1997)......................................................................................14

*Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*,
    889 F.2d 1018 (11th Cir. 1989) .................................................................5

*Tana v. Dantanna's*,
    611 F.3d 767 (11th Cir. 2010) .................................................................16

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006)......................................................................................16

*Tower Air, Inc. v. Fed. Express Corp.*,
    956 F. Supp. 270 (E.D.N.Y. 1996) .........................................................15

*United States v. Anthem, Inc.*,
   236 F. Supp. 3d 171 (D.D.C. 2017) ...................................................................22

*United States v. Sealy, Inc.*,
   388 U.S. 350 (1967) ...................................................................23, 24, 25

*United States v. Sealy, Inc.*,
   No. 60 C 844, 1964 WL 8089 (N.D. Ill. Oct. 6, 1964) ...........................................23

*United States v. Topco Assocs.*,
   405 U.S. 596 (1972) ...................................................................23, 24

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   344 F.3d 1294 (11th Cir. 2003) ................................................................. passim

*VMG Enters., Inc. v. F. Quesada & Franco, Inc.*,
   788 F. Supp. 648 (D.P.R. 1992) .....................................................................17, 18

**Statutes & Rules**

Lanham Act, Pub. L. 79-489, 60 Stat. 427 (1946) (codified as amended at 15
   U.S.C. §§ 1051 *et seq.*) ...........................................................6, 7, 16, 19

Sherman Act § 1, 15 U.S.C. § 1 ..............................................................12, 30

**Other Authorities**

S. Rep. No. 1333, 79th Cong. 2d Sess. (1946) ...............................................6

Walter J. Derenberg, *Federal Unfair Competition Law at the End of the First
   Decade of the Lanham Act: Prologue or Epilogue*, 32 N.Y.U. L. Rev. 1029,
   1041–42 (1957) ......................................................................6

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|:---:|:---|
| 283 | Evolution of the Blues – An Emerging Concept (Oct. 1979) |
| 284 | A History of the Development of the Approval Program (Nov. 1951) |
| 285 | List of Plans Approved by AHA (Apr. 1938) |
| 286 | Blue Cross Commission Meeting Minutes (June 1947) |
| 287 | Policy Letter and Report re: Licensing Agreement (Mar. 1952) (excerpts) |
| 288 | AMCP Commission Meeting Minutes (Dec. 1947) |
| 289 | Blue Shield Commission Meeting Minutes (Mar. 1948) |
| 290 | Draft Letter re: Blue Shield Symbol (Dec. 1947) |
| 291 | AHA Journal Article (May 1952) |
| 292 | Blue Shield Commission Meeting Minutes (Apr. 1951) |
| 293 | Hospital Service Corporation of Alabama Meeting Minutes (Feb. 1936) |
| 294 | Alabama Network Comparison Report (Jan. 2008) |
| 295 | Alabama Network Comparison Report (Jan. 2008) |
| 296 | Alabama Network Comparison Report (Jan. 2010) |
| 297 | Alabama Network Comparison Report (Mar. 2008) |
| 298 | Blue Cross and Blue Shield of Alabama Staff Presentation (1975) (excerpts) |
| 299 | National Network Comparison Report (Oct. 2011) |
| 300 | National Network Comparison Report (Dec. 2011) |
| 301 | Alabama Trademark Use |

| Exhibit No. | Description |
|---|---|
| 302 | The History of Blue Cross Blue Shield of Alabama from a Medical Director's Perspective (Jan. 2009) |
| 303 | 9/20/2017 30(b)(1) Deposition Transcript of Paula Taffe (Blue Cross Blue Shield Association) (excerpts) |
| 304 | 7/11/2017 30(b)(6) Deposition Transcript of Blue Cross and Blue Shield of Alabama through Michael Patterson (excerpts) |
| 305 | 4/12/2017 30(b)(6) Deposition Transcript of Blue Cross Blue Shield Association through Melissa Rotunno (excerpts) |
| 306 | 8/29/2017 30(b)(6) Deposition Transcript of Blue Cross Blue Shield Association through Kari Hedges (excerpts) |
| 307 | 9/22/2017 30(b)(6) Deposition Transcript of BlueCross BlueShield of Mississippi through Bryan Lagg (excerpts) |
| 308 | 2/15/2017 Deposition Transcript of George Tickle (Cowin Equipment Company) (excerpts) |
| 309 | 1/11/2021 Deposition Transcript of H.E. Frech III (excerpts) |
| 310 | 5/7/2019 Deposition Transcript of H.E. Frech III (excerpts) |
| 311 | 1/10/2021 Deposition Transcript of Deborah Haas-Wilson (excerpts) |
| 312 | 7/22/2017 Deposition Transcript of Kevin Murphy (excerpts) |
| 313 | 1/7/2021 Deposition Transcript of Daniel Slottje (excerpts) |
| 314 | 3/12/2021 Deposition Transcript of Daniel Slottje (excerpts) |
| 315 | 10/5/2017 Hearing Transcript (Proctor, J.) (excerpt) |
| 316 | 12/2/2020 Expert Rebuttal Report of Providers' Expert H.E. Frech III (excerpts) |
| 317 | Blue Cross and Blue Shield of Alabama Entity Registration Record |
| 318 | Ala. Code § 10A-20-6.01 (Acts 1935) |

| Exhibit No. | Description |
|:---:|:---|
| 319 | Ala. Code § 10A-20-6.01 (Acts 1945) |
| 320 | Alabama Newspaper Samples |
| 321 | 4/27/2021 Blue Cross Blue Shield Association Board Resolution |

**CITATION KEY**

| Citation | Reference |
|---|---|
| Compl. | Citations to the Consolidated Fourth Amended Provider Complaint (Doc. 1083) |
| *Conway* Doc(s). ___ | Citations to Documents filed on the Docket in *Conway v. Blue Cross and Blue Shield of Alabama et al.* (2:12-cv-02532-RDP) |
| Doc(s). ___ | Citations to Documents filed on the Docket in MDL 2406 (2:13-CV-20000-RDP) |
| Ex. ___ | Citations to Defendants' Exhibits identified in the Evidentiary Submission accompanying this Motion |
| Facts | Citations to this Brief's Statement of Undisputed Relevant Material Facts |
| SoR | Citations to the Court's April 5, 2018 Memorandum Opinion re: Section 1 Standard of Review and Single Entity Defense (Doc. 2063) |

## PRELIMINARY STATEMENT

This motion addresses an issue never previously considered in this case:  What is the appropriate antitrust standard of review for Providers' challenges to the Blue Plans' exclusive service areas ("ESAs"), standing alone?  This question arises in the wake of the Subscriber Settlement, which this Court has already found introduces "pro-competitive reforms that will change the nature of Defendants' business moving forward" and "likely will move the Blues' system from the Per Se category into the Rule of Reason category."  (Doc. 2641 (Prelim. App. Decision) at 26, 49.)  The Court was right, and all of Providers' ESA claims should be evaluated under the rule of reason for two critical reasons.

*First*, pursuant to the Subscriber Settlement, the National Best Efforts ("NBE") rule, which the Court previously ruled "operates as an output restriction," has been eliminated and is no longer in effect.  (SoR at 46.)  Without NBE, there is no "aggregation of competitive restraints."  (*Id.* at 37.)  Instead, Providers' claims center on ESAs, which arose from common-law trademark rights in the 1930s and 1940s—and not from any horizontal agreement to divide up territorial markets.  That alone should foreclose application of a *per se* standard.  But beyond that, ESAs today facilitate collaboration among Blue Plans to offer a collective product that no individual Blue Plan, or even a subset of Blue Plans, could offer alone.  The rule of reason should now govern Providers' ESA claims.  (*See infra* Section I.)

*Second*, as a result of the Subscriber Settlement, the Provider case will now be litigated on its own.  (*See* Doc. 2603 at 1.)  With the tracks separated, it is now clear that the "aggregation" at the heart of the Court's prior standard of review ruling does not apply to Providers' case.  Unlike Subscribers' claims, Providers' claims have *never* involved an aggregation of restraints on branded and unbranded business.  Indeed, expert discovery in the Provider track has confirmed that Providers do not have—and have never had—claims, damages

or injuries resulting from NBE.  Thus, Providers' backward-looking damages claims are no

different from their forward-looking claims, and the rule of reason should apply to all of

Providers' claims.[1]  (*See infra* Section II.)

## STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS

**A.     Service Areas, in Alabama and Around the Country, Arose from Common-Law Trademark Rights.**

1.      The Blue Plans' common history began nearly 90 years ago, with the

development of prepaid hospital and medical plans in the 1930s.  Spurred by the poverty

wrought by the Great Depression, such plans were created by local hospitals and medical

societies to ensure access to care in communities where it was previously unaffordable.

(Doc. 1353-4 (U.S. Public Health Service Report on Blue Cross and Medical Service Plans

("USPHS Rep.")) at 21–22, 24; Doc. 1353-10 (Wilson Dep.) at 8–9 (Tr. 45:20–49:9).)

2.      Almost immediately, these local plans began using the blue cross or blue

shield symbol:  the blue cross for prepaid hospital care, first used by the St. Paul, Minnesota Plan

in 1934; and the blue shield for prepaid medical care, first used by the Buffalo, New York Plan

in 1939.  (Doc. 1353-7 (A History of the Blue Cross and Blue Shield System ("*The Blues*"))

at 25–26, 63–64.)  Other plans quickly followed suit, including Hospital Service Corporation of

Alabama, today known as Blue Cross and Blue Shield of Alabama ("BCBS-AL").

3.      Specifically, in 1935, the Alabama Legislature passed enabling legislation

for the creation of non-profit corporations to provide pre-paid hospital services.  (Ex. 318.)

BCBS-AL was created the very next year.  (Ex. 293 at -1071 (1936 Hospital Service Corporation

---

[1] Neither NBE elimination nor the decoupling of the Provider case has any effect on Providers' BlueCard claims, which the Court has already correctly ruled should be analyzed under the rule of reason.  (*See* SoR at 22, 49.)

of Alabama Meeting Minutes); Ex. 317 (Alabama Secretary of State Record).)

4.      BCBS-AL enrolled its first subscribers in April 1936.  (Doc. 1353-4
(USPHS Rep.) at 29.)  By June, it was ready to "sign contracts guaranteeing hospitalization in
any of 27 Alabama hospitals," (Ex. 302 (Newspaper Excerpt) at 12), and was "provid[ing] group
hospitalization on a state-wide scale," (*id.* at 14; *see also* Ex. 318 at 1157).

5.      BCBS-AL used the blue cross mark in connection with these services by
no later than March 1, 1939 (Ex. 301 at -8082 (Alabama News Bulletin)), and used the mark
continuously thereafter (*see, e.g.*, *id.* at -8088, -8091, -8119; Doc. 1353-13 at 17–18 (examples of
use)).  By 1941, BCBS-AL was using the trade name "Blue Cross Plan" to advertise its services.
(Ex. 301 at -8118; Doc. 1353-13 at 2–3.)

6.      In 1945, the Alabama legislature amended BCBS-AL's enabling act to
allow the financing of "medical and/or surgical and/or obstetrical care and benefits."  (Ex. 319
at 52.)  Shortly thereafter—at the request of Alabama physicians—BCBS-AL began offering
medical and surgical benefits, and the "Blue Shield Plan" became a "companion part of the local
Blue Cross hospital plan" in Alabama. (Ex. 298 (BCBS-AL Board of Directors Presentation)
at -5741.)  BCBS-AL was using the blue shield mark in connection with medical benefits by at
least 1947.  (Ex. 304 (Patterson Dep.) at 98:8–19.)

7.      By 1949, BCBS-AL was advertising its "medical-surgical" plan as the
"Blue Cross – Blue Shield" plan, and using both the blue cross and blue shield marks together in
commerce.  (Ex. 320 (newspaper samples); *see also* Doc. 1353-13 at 54–56 (letterhead).)

8.      In this way, BCBS-AL used both marks on a state-wide, exclusive basis
well before there was a written license agreement setting out "exclusive service areas," and well
before the marks were controlled by a single organization.  (Doc. 1353-4 (USPHS Rep.) at 29;

Doc. 1353-5 (USPHS Rep.) at 38; *see also* Ex. 304 (Patterson Dep.) at 94:24–95:22, 98:8–24.)

        9.      The same is true of other Blue Plans, which likewise used the blue cross and/or blue shield marks in the 1930s and 1940s.  (Blue Cross:  Doc. 1353-7 (*The Blues*) at 26 (in the 1930s, "new Plans" were "springing up spontaneously all over the country" bearing the blue cross mark); Doc. 1353-4 (USPHS Rep.) at 23 (listing number of blue cross Plans by year); *id.* at 24 (by 1939, almost all cross plans "started in states, no part of which was previously served by a plan"); Blue Shield:  Doc. 1353-7 (*The Blues*) at 63–64 (the first user of the blue shield mark "generously supplied it . . . to other Plans" operating in different geographies); Doc. 1353-5 (USPHS Rep.) at 35 (listing number of blue shield Plans by year); Ex. 283 (Evolution of the Blues Overview) at -5023 (first blue shield Plans "sponsored by county medical societies" with first "statewide coverage in 1939").)

        10.     In this way, early plans began acquiring common-law rights to the blue cross and/or blue shield marks through actual use in specific geographies.  (*See* Doc. 1353-7 (*The Blues*) at 26–27, 63; Doc. 1353-11 (History of the Blue Cross and Blue Shield System ("System History")) at 2–3, 9; Ex. 287 at -7153 ("many plans now own the rights to use 'Blue Cross' in the area in which they operate because of prior use or registration of the mark"); Ex. 292 at -3772 (noting local registrations of Blue Shield mark); Doc. 1353-15 (Rotunno Dep.) at 5, 7 (Tr. 36:1–9, 73:18–74:1); Ex. 305 (Rotunno Dep.) at 170:15–171:5; Doc. 1353-10 (Wilson Dep.) at 5, 20 (Tr. 30:10–20, 31:1–4, 256:1–9); Ex. 303 (Taffe Dep.) at 47:19–48:21, 155:13–157:3; Ex. 304 (Patterson Dep.) at 94:24–95:22, 98:8–24; *see also, e.g.*, Doc. 1353-12 (examples of use); Doc. 1429-26 at 6 (same); Ex. 290 at -9485 (confirming use); Ex. 307 (Lagg Dep.) at 27:1–24 (same); *Ex Parte C.B. Donald Co.*, 117 U.S.P.Q. 485 (Comm'r Pat. & Trademarks 1958) ("It is well-established . . . that rights in a trademark grow out of its

use . . . .").)  Such common-law rights include the right to prevent others from using the same

mark in the same location.  *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1023

(11th Cir. 1989).

      **B.**     **National Organizations Supported the Local Plans.**

      11.    At the same time that local plans were popping up across the country,

national organizations of hospitals and medical societies were beginning to accept members and

promulgate service standards.

      12.    In 1933, the American Hospital Association ("AHA") adopted a resolution

that "approve[d] the principle of hospital insurance," and published a set of "Essentials of an

Acceptable Plan for Group Hospitalization."  (Doc. 1353-4 (USPHS Rep.) at 25.)  In 1938, AHA

developed a program to grant membership to local prepaid hospital plans, and 40 plans were

approved for membership, including BCBS-AL.  (*See* Doc. 1353-11 (System History) at 7;

Doc. 1353-16 (AHA Standards); Ex. 284 at -9174; Ex. 285 at -0064 (List of AHA Plans).)  By

1939, AHA's "Standards for Non-Profit Hospital Service Plans" provided that member plans

may "identify the plan by using the seal of the [AHA] superimposed upon a blue cross."

(Doc. 1353-19 (AHA Updated Standards) at 6.)

      13.    In parallel, the American Medical Association ("AMA") "endorsed [the]

principle of 'Medical service plans'" in 1938 "and set forth guiding principles" for such plans,

(Ex. 283 (Evolution of the Blues) at -5026), with the goal of establishing a "nation-wide

organization of locally administered prepayment plans sponsored by medical societies"

(Doc. 1353-5 (USPHS Rep.) at 36.  In 1946, an AMA Council "announced tentative standards

of approval for medical plans."  (*Id.*)  According to the Council, member plans were "entitled to

display the Seal of Acceptance of the [AMA] on their contracts and literature," *i.e.*, "a circle

within which is a Blue Shield emblazoned with a caduceus and the letters 'A.M.A.'"  (*Id.*;

*see also* Doc. 1353-6 (USPHS Rep.) at 82–83.)

14.     The AHA and AMA standards did not resolve ownership of the marks. (*See infra* ¶¶ 17, 21.)

C.      **The Lanham Act Offers Federal Protection for Trademark Rights.**

15.     In 1946, Congress enacted the Lanham Act.  This was a watershed moment, offering the possibility of greater protection for the marks than had previously existed at common law, but with significant uncertainty about how to invoke that protection. (*See* Ex. 287 (Blue Cross Commission Report) at -7151–55; S. Rep. No. 1333, 79th Cong. 2d Sess. (1946), *reprinted in* 1946 U.S.C.C.A.N. 1274, 1274–77; Walter J. Derenberg, *Federal Unfair Competition Law at the End of the First Decade of the Lanham Act: Prologue or Epilogue?*, 32 N.Y.U. L. Rev. 1029, 1041–42 (1957).)  Prior to the Lanham Act, trademark legislation "reflected the view that . . . the right to a mark depended solely on the common law," resulting in a world where "rights to trademarks were uncertain and subject to variation in different parts of the country."  *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 193 (1985).  Now, for the very first time, the Lanham Act provided "national protection for trademarks" simply by virtue of federal registration.  *Id.*

16.     Given this change in law, the Plans and the national organizations—at that time, AHA for blue cross, and Blue Shield Medical Care Plans ("BSMCP") for blue shield— discussed how best to protect the marks.  (*See, e.g.*, Ex. 287 at -7152 (Blue Cross Commission Report noting the challenges caused by "imitators" who were misleading patients into purchasing "inadequate coverage" and "confusing the public" into believing "they purchased Blue Cross protection," and "the desirability of protecting the Blue Cross emblem and the words 'Blue Cross' under the provisions of the federal trademark law known as the Lanham Act");  *see also* Ex. 290 at -9485–86 (Blue Shield Letter discussing the desire to "fully develop[] and

protect[]" the Blue Shield marks and noting a "joint[]" meeting with the Blue Cross Commission in an effort to do so); Ex. 288 (Blue Shield Meeting Minutes) at -4329.)

17.     But, in doing so, the Plans faced a practical problem.  Due to their natural development at common law, different entities had different claims to the marks in different parts of the country; the Lanham Act, however, "require[d] ownership of the mark by a single party as a prerequisite to registration."  (Ex. 287 (Blue Cross Commission Report) at -7152.) The Plans determined that "[a] practical problem has to be met with a practical answer"— namely, to clarify ownership by agreeing that the marks should be "nationally owned" by a "central body . . . in order that each [plan] may have a part of something of secure value under the protection afforded by federal law."  (*Id.* at -7154 (blue cross); *see also* Ex. 291 ("For many years the ownership of the Blue Cross insignia and the words 'Blue Cross' themselves have been nebulous" because "[e]arly in the history of the Blue Cross movement, there was no provision for national registration of such symbols and identifying phrases. . . . With the passage of federal legislation permitting national registration, the Association promptly moved toward broadened protection by applying for such national registration and ownership."); Doc. 1353-11 (System History) at 10 (recognizing that local rights to the shield mark existed "under various state registrations . . . and certain common law principles," but contemplating greater protection nationally for "service marks [which] could not be registered until after 1946").)

18.     In 1947 and 1948, the national organizations applied for federal registration of the blue cross and blue shield marks ("Blue Marks").  (Docs. 1353-28–1353-29; Docs. 1353-31–1353-47; *see also* Doc. 1353-48 at 2 and Ex. 289 at -4334 (confirming that BSMCP "formally adopted the words 'Blue Shield' [in 1947] and their accompanying symbol as the[ir] official service mark" and that it had "permission . . . from all [] plans which had used the

symbolism prior to filing the application"; Ex. 286 (1947 Blue Cross Meeting Minutes) at -9267

("[R]egistration should be made by the [AHA] . . . .").)

19.     Federal trademark registrations were issued to the national organizations

in 1952.  (Docs. 1350-36; 1350-37; 1350-38; 1350-40; 1350-41; 1350-42; 1353-30.)

**D.     The License Agreements Codify Existing Common-Law Trademark Rights.**

20.     After the federal trademarks were issued, the local Plans entered into

written license agreements with the national organizations.

21.     These license agreements explicitly recognized the existence of certain

plan-based local rights that predated federal registration and the license agreements themselves.

(Doc. 1353-50 (1954 License Agmt.) at 2–3 ("[A]s a result of their use of the words BLUE

CROSS and the design of a blue cross with respect to prepayment plans for hospital care and

related services, certain INDIVIDUAL PLANS hereto subscribing have developed certain

territorial rights with respect to the words BLUE CROSS and the design of a blue cross in the

particular areas served by such PLANS"); Doc. 1353-48 (1952 License Agmt.) at 2 ("Prior to the

incorporation of the National Organization, several of the medical care plans that are now full

members of the National Organization adopted and used, in both intra-state and interstate

commerce, a service mark, consisting of the words 'Blue Shield,' either used alone or in

conjunction with a symbol in the shape of a shield").)  The license agreements confirmed that the

Plans had centralized these local rights into the national organizations and that the national

organizations, in turn, agreed to license back to each Plan the right to use the federal Blue

Mark(s) in the same geography where the Plan had previously operated.  (Doc. 1353-48 (1952

License Agmt.) at 2–4; Doc. 1353-50 (1954 License Agmt.) at 2–4.)

22.     In this way, the 1950s license agreements granted rights to the federal

marks that *precisely tracked the rights each Plan was already exercising at common law*—no

more, and no less.  (*See* Doc. 1353-50 at 3–4 (1954 License Agreement providing "EACH

INDIVIDUAL PLAN" the right to use the Blue Cross mark "within the area served by the

INDIVIDUAL PLAN as of the dates of these presents"); Doc. 1353-48 at 3–4 (1952 License

Agreement granting "permission to use" the Blue Shield mark "subject to" "local right[s]" and

confirming that the Plan does "not waive, forfeit or relinquish any legal right . . . that may have

been heretofore acquired").)

   23. In areas where a single Blue Cross Plan had historically operated, such use

was "exclusive."  (*See* Doc. 1353-50 (1954 License Agmt.) at 4 ("said right and license shall be

exclusive within the areas served by the individual plan as of the dates of these presents").)  In

areas where multiple Plans had historically operated, the license agreements did not allocate

territories, but rather accepted and codified that reality with respect to those particular Plans.

(*See id.* (granting an exception to exclusivity "to the extent that said area may overlap with the

area or areas served by another or other INDIVIDUAL PLANS licensed hereunder on the date of

these presents, as to which overlapping areas said license shall be nonexclusive as to such other

PLAN or PLANS only").)

   24. The Blue Shield agreements captured this same concept by explicitly

preserving local rights to the mark—which, at common law, included the right to exclude (*see*

*supra* ¶ 10)—while simultaneously protecting the mark "as against third party infringement."

(*See, e.g.*, Doc. 1353-48 (1954 License Agmt.) at 3–4.)  Indeed, by this time (the early 1950s),

many Plans had registered their individual marks with their respective states (Doc. 1353-11

(System History) at 10; Ex. 292 (Blue Shield Commission Meeting Minutes) at -3772),

providing yet another basis for state-based territorial rights that were then codified in the 1952

licensing agreement.  (Doc. 1353-11 (System History) at 10–11.)  Further, at this point, many

Plans were operating as both "Blue Cross" and "Blue Shield," naturally resulting in cross and shield service areas becoming coextensive.  (*See, e.g.*, Docs. 1429-23 at 3, 5–7; 1429-24 at 4; 1353-31 at 9; 1429-27 at 6; 1429-28 at 9; 1429-29 at 4; Ex. 307 (Lagg Dep.) at 27:1–24.)

25.     In 1972, AHA transferred ownership of the Blue Cross Marks to the Blue Cross Association (Doc. 1353-57 (Ownership Agmt.)), and those license agreements were reaffirmed (Doc. 1353-100 (1972 License Agmt.) at 2).  The 1972 agreements again provided each Plan the "exclusive" right to use the Blue Cross mark "within the geographical area served by the Plan on the effective date of this License Agreement," with a carve-out for overlap areas that historically existed.  (Doc. 1353-100 (1972 License Agmt.) at 2.)

26.     In 1982, the Blue Cross Association merged with the Blue Shield Association (formerly BSMCP) to create the Blue Cross and Blue Shield Association. (Doc. 1353-10 (Wilson Dep.) at 6 (Tr. 33:10–24); Doc. 1349-43 (Articles of Incorporation) at 4–6; *see also* Doc. 1349-27 at 44.)  With the "Blue Cross" and "Blue Shield" marks now under one roof, the license agreements were reissued in 1991, to ensure alignment between them.  (*See, e.g.*, Doc. 1349-11 (1991 Blue Cross Agmt.) at 3; Doc. 1349-12 (1991 Blue Shield Agmt.) at 3.)

27.     As before, these 1991 license agreements did not allocate territories, but merely referred back to the same areas Plans had historically served at common law.  (*See, e.g.*, Doc. 1349-11 (Cross Agmt.) at 5 ("The rights hereby granted are exclusive to the Plan within the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been granted a subsequent license . . . .."); Doc. 1349-12 (Shield Agmt.) at 5 (same).)  There was no attempt to redraw the territorial lines or to redistribute trademark rights in these agreements.  (*Id.*)

28.     This same language exists in the license agreements today.

10

(*See* Doc. 1352-127 (Blue Cross Agmt.) at 8; Doc. 1352-128 (Blue Shield Agmt.) at 7.)

29.     Importantly, no Plan has ever held nationwide rights to the Blue Marks, no Plan has ever owned any of the federally registered Blue Marks and no Plan has ever been able to license or govern their use on a national scale.[2]  (Docs. 1353-11 (System History) at 7, 10; 1353-48 (1952 License Agmt.) at 2–3; 1353-50 (1954 License Agmt.) at 2–3; *supra* ¶ 10.)

**E.     The Blue System Fosters Exceptionally Broad Provider Networks, Made Available Nationwide Through BlueCard.**

30.     Consistent with their development at common law, Blue Plans have historically focused on their local service areas.  (*See, e.g.*, Ex. 303 (Taffe Dep.) at 50:23–52:12; Ex. 312 (Murphy Dep.) at 239:10–12.)

31.     Among other things, Blue Plans have reached deep into their respective territories and developed expansive provider networks.  (*See* Docs. 1353-61 at 3; 1353-82 at 6; Ex. 306 (Hedges Dep.) at 29:2–30:11; *see also* Ex. 299; Ex. 300; Doc. 2565-49 (2019 Murphy Rep.) ¶¶ 102–03.)  BCBS-AL, for example, typically has in its network all hospital facilities in the state, including in the most rural parts of the state, while other national insurers often have substantially fewer providers in network and, in some areas, do not contract with any hospitals at all.  (*See, e.g.*, Doc. 2565-49 (2019 Murphy Rep.) at 50–52; Ex. 308 (Tickle Dep.) at 31:19–32:19; Ex. 294; Ex. 295; Ex. 296; Ex. 297.)

32.     These extraordinary local networks that each Plan develops in its service area are then made available to Blue members on a nationwide basis through the BlueCard Program.  (Doc. 1349-44 at -0334.)  Though no single Blue Plan (or group of Blue Plans) could

---

[2] This Court has summarized this complex history concisely:  "[C]ertain Plans initially developed 'individual' trademark rights.  Then, the Plans purposefully integrated those 'individual' assets into the separate Cross and Shield predecessors.  Later, those entities applied for and received nationwide, federal trademark registrations and 'licensed' the Marks back to the Plans employing ESAs based on the areas where the Plans previously used the Marks."  (SoR at 33 (footnote and citation omitted).)

develop comparable networks nationally on its own, BlueCard stitches together each of the individual Blue Plan's local networks to provide subscribers with "a single point of contact for education, contracting, claims payment/adjustments and issue resolution." (Doc. 1353-61 at 2; *see also* Doc. 1353-71 at 39–40; Doc. 1353-99 (Cullen Dep.) at 4–5 (Tr. 152:23–153:1).)

> **F.      The National Best Efforts Rule Has Been Eliminated.**

33.     NBE, adopted in 2005, required each Plan to derive at least 66-2/3% of its national health insurance revenue under the Blue brands. (Doc. 2448-8 (2005 BCBSA minutes) at 10–11, 41; Doc. 2448-1 (Guidelines to Administer Membership Standards) at 7.) Pursuant to the Subscriber Settlement, the NBE rule was eliminated on April 27, 2021, and is no longer in effect. (Ex. 321 (4/27/2021 BCBSA Board Resolution).) The Subscriber Settlement expressly leaves in place the Blue Plans' historic service areas. (Doc. 2610-2 (Settlement Agmt.) ¶ 13.)

> **APRIL 2018 STANDARD OF REVIEW DECISION**

On April 5, 2018, this Court issued its first standard of review decision. That Order governed the Provider and Subscriber Plaintiffs' joint case, in which Subscribers had challenged NBE and argued that the *per se* standard should apply to ESAs and NBE. (*See* Doc. 1351 (Subscribers' SoR Br.) at 26–27.) In that context, the Court agreed that the *aggregation* of ESAs and NBE was unlawful *per se*.[3] (SoR at 59.) Importantly, the Court "emphasize[d] that . . . [it] expresses no view about whether the ESAs alone qualify as a *per se* Sherman Act violation," (*id.* at 22), a view it has reaffirmed, (*Conway* Doc. 604 at 10). Indeed, the Court has subsequently recognized that, without "the National Best Efforts revenue cap," "the court's standard of review opinion would no longer apply." (Doc. 2641 (Prelim. App.

---

[3] While Defendants respectfully disagree with the Court's conclusion that NBE impermissibly restricts output and with the Court's treatment of NBE + ESAs as *per se* unlawful, we of course accept the Court's ruling, while preserving all issues for appeal.

Decision) at 48.)  Now, for the first time, the Court is asked to answer the question of which standard to apply to ESAs.  We now turn to that novel question, and explain why all of Providers' claims should be evaluated under the rule of reason.

## ARGUMENT

I.   **THE RULE OF REASON GOVERNS PROVIDERS' ESA CLAIMS.**

A.   **Legal Principles Governing Standard of Review.**

To determine the appropriate standard of review, "the reasonableness of agreements under the antitrust laws are to be judged at the time the agreements are entered into." *Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294, 1306 (11th Cir. 2003); *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.* ("*BMI*"), 441 U.S. 1, 20–21 (1979) (considering the origins of the challenged restraint when determining the appropriate standard of review); *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1080 (11th Cir. 2016) (observing that the challenged restraint "was lawful at its inception"); *Polk Bros., Inc. v. Forest City Enters.*, 776 F.2d 185, 189 (7th Cir. 1985) ("A court must ask whether an agreement promoted enterprise and productivity at the time it was adopted.").

Focused on the inception of the challenged restraint, the Court must "start with the general assumption that the rule of reason applies."  *Procaps*, 845 F.3d at 1083; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) ("The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1."). Particularly where a restraint is characterized by a unique factual context with which the court lacks substantial experience, "it should be subjected to a more discriminating examination under the rule of reason."  *BMI*, 441 U.S. at 10 (applying the rule of reason where "[w]e have never examined a practice like this one before"); *accord Procaps*, 845 F.3d at 1083–84; *see also infra* at pp. 20–21 (collecting cases).

While rule of reason is the rule, *per se* treatment is the "exception." *Leegin*, 551 U.S. at 895. "The per se rule is reserved only for those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality, or that are naked restraints of trade with no purpose except stifling of competition." *Procaps*, 845 F.3d at 1083 (internal quotation marks and alteration omitted); *accord Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991) ("[T]he per se label should be applied infrequently and with caution."). While naked horizontal market allocation among competitors is often cited as a *per se* restraint, the Eleventh Circuit has repeatedly cautioned that "just because an agreement is capable of being characterized as a market allocation agreement does not mean that the per se rule applies." *Procaps*, 845 F.3d at 1083; *accord Valley Drug*, 344 F.3d at 1304–05. "[E]asy labels do not always supply ready answers." *BMI*, 441 U.S. at 8.

Rather, "in deciding whether a challenged practice is subject to rule of reason or *per se* analysis, the court must inquire into whether the practice, on its face, always or almost always tends to restrict output or instead is likely to assist the creation of economic efficiency." *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 603 (11th Cir. 1986); *accord Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988); *Polk Bros.*, 776 F.2d at 188–89 ("A court must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by new production or products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote."). Where there are "procompetitive efficiencies that might flow from" the challenged conduct, the more exacting rule of reason must apply. *Procaps*, 845 F.3d at 1084; *see also State Oil Co. v. Kahn*, 522 U.S. 3, 10 (1997) ("We have expressed reluctance to adopt *per se* rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices

14

is not immediately obvious." (internal quotation marks omitted)).  "A cooperative venture with prospects for increasing output. . . . should not be condemned *per se*," *Polk Bros.*, 776 F.2d at 190; instead, where "the whole is truly greater than the sum of its parts," any "doubt" should be resolved in favor of applying the rule of reason.  *BMI*, 441 U.S. at 22–23.

Moreover, the existence of material factual questions about the nature of the challenged restraint itself counsels for the rule of reason.  *See, e.g.*, *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 273–74 (6th Cir. 2014) ("Here, when considering the allegations contained in the parties' briefs, it appears that a factual dispute exists as to the exact nature of the conspiracy, and as to whether it was obviously anticompetitive. . . . Therefore, especially at the summary judgment stage, this is not a 'clear cut' case of an obviously anticompetitive trade restraint, and thus the district court was correct to apply the default standard of the rule of reason."); *Tower Air, Inc. v. Fed. Express Corp.*, 956 F. Supp. 270, 285 (E.D.N.Y. 1996) ("Because of the disputed facts, which preclude a finding as a matter of law that the *per se* rule applies, the Court will proceed to analyze the undisputed facts under the rule of reason test.").  "[A]t the summary judgment phase, the right question to ask regarding per se claims is whether the plaintiff has shown that the challenged restraint is so obviously anticompetitive that it should be condemned as per se illegal.  If, in spite of the plaintiff's efforts, the record indicates that the challenged restraint is plausibly procompetitive, then summary judgment for the defendants is appropriate." *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 724 (6th Cir. 2019).

**B.       The Rule of Reason Applies to Providers' Claims Based on ESAs Alone.**

According to Providers, the 36 entities that comprise the Blue System entered into an "explicit agreement . . . to divide the United States into what Defendants term 'Service Areas' and then to allocate those geographic areas among the Blues, free of competition."  (Compl. ¶ 4.) That is the alleged wrong that Plaintiffs claim warrants a *per se* standard.

The unfixable problem for Providers, however, is that ESAs were not conceived as a territorial division scheme among horizontal competitors.  Instead, from their inception, ESAs developed from the acquisition of common-law trademark rights in local areas, years before the Lanham Act provided federal protection of such rights on a national scale.  As contemporaneous documents show, ESAs developed independently of each other, ultimately requiring the Plans to work together to balance two competing concerns:  preserving their rights (*see* Ex. 287 at -7153), and protecting the marks (*see id.* at -7152–53; *see also* Ex. 291; Doc. 1353-11 at 10).  And whether the Court concludes, as we submit it should, that the ESAs' origin is unassailable, or that, at most, some of its details could be subject to debate, the law nevertheless mandates the same outcome:  application of the rule of reason.  That is so because the exception to the rule—the *per se* standard—is necessarily and appropriately reserved only for those cases in which the facts unquestionably call for its application.  *See, e.g.*, *Leegin*, 551 U.S. at 895; *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *Procaps*, 845 F.3d at 1083; *Seagood*, 924 F.2d at 1567.  It cannot credibly be argued that this is such a case—not only because ESAs arose out of independent common-law trademark rights (*infra* Section I.B.1), but also because, today, ESAs enable competitive efficiencies that promote interbrand competition (*infra* Section I.B.2).

### 1.    ESAs Developed Independently Through Existing Trademark Rights.

*First*, ESAs are not a territorial market allocation, but rather derive from historical use of the marks and the resulting development of common-law trademark rights.  Far from creating new rights and dividing up the country to share them (as Providers allege), the license agreements simply memorialize existing geographic rights to the Blue Marks as those rights developed and existed at common law.  *See Tana v. Dantanna's*, 611 F.3d 767, 780 (11th Cir. 2010) ("[I]t is well established that the scope of protection accorded [to a common-law] mark is coextensive only with the territory throughout which it is known and from which it has drawn its

trade.").  Indeed, the license agreements do not allocate territories at all; BCBS-AL's license agreement, for example, does not assign it to Alabama.  Rather, that agreement simply recognizes BCBS-AL's right to use the Blue Marks "within the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been granted a subsequent license"—that is, and has always been, the State of Alabama, even before the 1950s license agreements were executed.  (Docs. 1349-11 at 5; 1349-12 at 5; *see also* Facts ¶¶ 2–8.)  And where there were two users of a mark at common law, the license agreements did not attempt to divide or re-assign territories, but rather recognized such "overlapping areas" and, in those cases, granted "nonexclusive" rights as to the Plans with existing rights to operate in those areas.[4] (Docs. 1349-11 at 5; 1349-12 at 5.)

An agreement that "merely regulates the way a competitor can use a competing mark" is necessarily "non-exclusionary" and falls squarely within the rule of reason.  *See Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 55–56 (2d Cir. 1997) (finding such agreements "are common, and favored, under the law" and do not implicate the *per se* rule); *accord Valley Drug*, 344 F.3d at 1304–05 (recognizing that "[a] patent grants its owner the lawful right to exclude others," including "to grant exclusive territorial licenses").  That is because a "trademark . . . does not confer a legal monopoly on any good or idea; it confers rights to a name only."  *Clorox*, 117 F.3d at 56.  As set forth above, the Blue license agreements merely codify existing rights to use the Blue Marks—and, with NBE gone, there is no restriction on any Plan selling competing products across the country so long as they are not marketed under the Blue brand.  (Facts ¶ 33.)

This case is thus similar to *VMG Enterprises, Inc. v. F. Quesada & Franco, Inc.*,

---

[4] For example, Excellus and Anthem each has the right—exclusive as to the rest of the world, but nonexclusive as to each other—to use the Blue Marks in upstate New York, where each has provided Blue-branded insurance since the 1940s.  (Docs. 1353-23; 1352-176 at 27.)

788 F. Supp. 648 (D.P.R. 1992), where the court refused to apply the *per se* rule to a territorial trademark division.  In *VMG*, two manufacturers of baby diapers (VMG and non-party UCI) separately acquired the right to use the mark "BABY'S CHOICE" in their own geographies.  *Id.* at 651, 654.  Following competing filings to register their respective marks, VMG and UCI entered into a concurrent use agreement in which they agreed that each manufacturer could use the mark in its exclusive territorial region, which for VMG included Puerto Rico.  *Id.* at 651–52, 657.  Shortly thereafter, VMG sued the defendant, who was selling baby diapers in Puerto Rico under the name "BABY'S CHOICE."  *Id.* at 650.  The defendant, in turn, filed a counterclaim alleging that the concurrent use agreement was "an illegal horizontal division of all the territory of the nation" between VMG and UCI.  *Id.* at 653–54 (internal quotation marks omitted).  In rejecting the defendant's characterization, the *VMG* court concluded that "the territorial division in question" did not violate the antitrust laws because the agreement did not "'create' a trademark territorial division," but instead "merely recognized it."  *Id.* at 657.  As the court explained, the parties' "agreement for a territorial trademark division . . . result[ed] not from some illegal, mutually pre-arranged scheme, but [instead] from the recognition . . . that the division was already a reality as a matter of trademark law" and needed to be reduced to writing. *Id.* at 657.  The same is true of the ESAs and license agreements here.

Critically, this analysis does not turn on a final determination of ownership rights—nor does this Court need to make any such determination.  The law expressly permits parties to settle their trademark rights in order to reduce marketplace confusion and minimize disputes.  *See Clorox*, 117 F.3d at 60 ("[T]rademark agreements are favored in the law as a means by which parties agree to market products in a way that reduces the likelihood of consumer confusion and avoids time-consuming litigation.").  "Efforts to protect trademarks,

even aggressive ones," do not violate the antitrust laws because they "serve the competitive purpose of furthering trademark policies." *Id.* at 61.  Here, contemporaneous documents make clear that the license agreements, including ESAs, served to settle potential trademark disputes among the Plans and national organizations "in order that each may have a part of something of secure value under the protection afforded by federal law." (Ex. 287 (Blue Cross Commission Report) at -7154.)  Thus, in the wake of the Lanham Act, license agreements with service areas were a "practical answer" to a "practical problem." (*Id.*)  This is yet another way the Blues' trademark history points decisively to the rule of reason.  *See Clorox*, 117 F.3d at 60; *see also F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 137, 159 (2013) (applying the rule of reason to agreements settling patent disputes because there is "a general legal policy favoring the settlement of disputes" and the potential anticompetitive effects of such agreements are far from clear); *Valley Drug*, 344 F.3d at 1308 (applying the rule of reason to agreements settling patent rights, even though the patent was later deemed invalid).

Finally, although the Court previously recognized that Defendants "largely defended their ESAs as incidental to trademark rights," the Court at the time was considering ESAs together with NBE and found no "valid connection between trademark rights and the National Best Efforts rule." (SoR at 37, 46 ("The [NBE] rule specifically restrains the Plans' ability to compete under *non-Blue* brands.").)  NBE is now gone.  On their own, ESAs do "no more than regulate how the [BCBS] name . . . may be used; it does not in any way restrict [the Blues] from producing and selling products that compete directly with the [Blue] brand, so long as they are marketed under a [different] brand name." *Clorox*, 117 F.3d at 57.  Accordingly, as to ESAs, the rule of reason should be applied. *See id.* at 56.

## 2. ESAs Enable Procompetitive Efficiencies.

*Second*, ESAs should be analyzed under the rule of reason because they arise in a

19

novel factual context and ultimately enable competitive efficiencies.

As discussed above, even if ESAs allocated markets (which they do not), not all agreements that can be characterized as such are *per se* unlawful. *Procaps*, 845 F.3d at 1083. In *Procaps*, the Eleventh Circuit declined to apply the *per se* rule to an alleged market allocation scheme—a Collaboration Agreement between joint venture partners that, unlike here, actually divided geographic territories—because the Court was "not prepared to condemn the Collaboration Agreement out of hand." *Id.* at 1080, 1084. The court deemed *per se* treatment inappropriate because (i) the alleged market allocation scheme was presented in a new factual context (namely, a "legitimate joint venture" that was "lawful at its inception"), *id.* at 1080, 1083; and (ii) there were "procompetitive efficiencies that might flow from the Collaboration Agreement," *id.* at 1084; *see also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1008–13 (7th Cir. 2012) ("But there is another way to look at the exclusive territories . . . . If the coordination is ancillary to (that is, supportive of) the legitimate business purpose of the venture, it may be permissible—a rule of reason question."). The same reasoning applies here.

As set forth above, Plans developed rights to use the Blue Marks in specific geographic territories over time—well before ESAs were codified in the license agreements. (Facts ¶ 10.) The exclusive territories were not only "lawful at [their] inception," *see FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1080–81 (11th Cir. 2016) ("Actual substantive [common-law] rights to a trademark arise based on its use in commerce." (internal quotation marks omitted)), but their evolution from inception to today is unique. Indeed, we are unable to find a single case where an alleged geographic market allocation began and developed over decades as ESAs developed here, beginning nearly 90 years ago. *See Procaps*, 845 F.3d at 1084 ("Neither party could point to a case" identical to the one before the court). That uniqueness

20

alone counsels for the rule of reason. *Id.* (applying the rule of reason where "we do not have a great deal of experience with the kind of case at issue here"); *see also, e.g.*, *BMI*, 441 U.S. at 10 (applying the rule of reason where "[w]e have never examined a practice like th[e] one before us"); *Valley Drug*, 344 F.3d at 1304 (reversing as "premature" application of the *per se* standard to a novel market division agreement predicated on patent rights); *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d at 1011 ("It is relevant that we have never seen or heard of an antitrust case quite like this. . . . It is a bad idea to subject a novel way of doing business . . . to per se treatment under antitrust law.").

   This unique factual context, moreover, is critical to understanding why ESAs promote, rather than impede, competition.  Given this history, there is not a single Blue Plan today that is able to use the Blue Marks throughout the United States—and that has nothing to do with the license agreements.  Indeed, if the license agreements were abolished tomorrow, there would not be 36 Blue Plans each able to use the Blue Marks in all 50 states; instead, the world would either look like it does today—with the Plans using the Blue Marks in distinct geographies pursuant to separate trademark rights—or there would be serial lawsuits around the country to resolve such rights.  *See, e.g.*, *FN Herstal*, 838 F.3d at 1080–81; (*see also* Doc. 1353-7 (*The Blues*) at 92 (before the 1950s licensing agreements, "disputes between Plans in adjacent areas arose and charges of violation were frequent")).

   Against this backdrop, ESAs and the rules governing them offer clarity so that Blue Plans can focus on functions that further the central aim of the antitrust laws:  "[t]he promotion of interbrand competition," *Leegin*, 551 U.S. at 890—that is, competition between Blue and non-Blue brands.  Having centralized their trademark rights into the Association (which then handed back to each Plan precisely what each had given to the Association, albeit in the

form of a common federal mark (Facts ¶¶ 20–28)), the Plans were able to protect those Marks without forfeiting their individual rights and to work together to offer a nationwide Blue product that no single Plan could offer on its own.   The ESA rules thus promote output (by offering another national product for subscribers in competition with other national insurers) and enhance inter-brand competition (by acting as an additional national competitor).  *See, e.g.*, *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 178 (D.D.C. 2017) (recognizing that, collectively, the Blues are one of "only four national carriers still standing").  This is, again, something *no Blue Plan could do on its own using the Blue Marks*.[5]

Thus, ESAs "contribute to the success of a cooperative venture that promises greater productivity and output"—*i.e.*, are "ancillary" to that cooperation—and, therefore, are properly analyzed under the rule of reason.  *See, e.g.*, *Polk Bros.*, 776 F.2d at 189 (citing generally *BMI*, 441 U.S. at 1; *Nat'l Coll. Ath. Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984)) ("If the restraint, viewed at the time it was adopted, may promote the success of this more extensive cooperation, then the court must scrutinize things carefully under the Rule of Reason."); *see also NaBanco*, 779 F.2d at 603 (declining to apply the *per se* rule to an alleged price-fixing scheme because it "was not a naked restraint of competition" but rather "ancillary" to a "procompetitive, efficiency-creating integration").  Indeed, all that is required for the rule of reason to apply is that the agreement have *the potential* to increase output through cooperation— a standard easily met here.  *See, e.g.*, *Polk Bros.*, 776 F.2d at 190 ("[If] the agreement is part of a

---

[5] It is insufficient to dismiss this product merely because other health insurers offer national health insurance without having to reconcile competing trademark rights.  (*See* SoR at 44.)  What matters is that, given the Blues' unique history, ESAs are not "naked" horizontal market allocation—*i.e.*, market allocation for the sake of market allocation—but rather are "part of a larger endeavor whose success they promote."  *Polk Bros.*, 776 F.2d at 188–90 (applying the rule of reason even though the parties to the challenged allocation agreement sold the same products without it); *see also BMI*, 441 U.S. at 24 (applying the rule of reason despite "available alternatives" to the challenged restraint); *Procaps*, 845 F.3d at 1084 (applying the rule of reason even though the parties to the challenged allocation agreement offered softgel services prior to the agreement).

cooperative venture with prospects for increasing output. . . . , it should not be condemned *per se*.").  While the Court's determination that NBE acted as an output restriction may have prevented the application of this precedent to the *combination* of ESAs and NBE, ESAs alone are integrally tethered to the use of the Blue Marks and allow the Blues to work cooperatively together for the benefit of consumers.  Indeed, this is precisely what the Court already correctly concluded in the context of Providers' challenges to the BlueCard program.  (SoR at 53–54 ("While the court recognizes that concerted activity can qualify as *per se* price fixing . . . the cooperative integration at the heart of the BlueCard program requires more detailed review. . . . The similarities between the integrative aspects of the BlueCard program and a traditional joint venture weigh in favor of applying the rule of reason.").)

     **C.**    ***Sealy* and *Topco* Do Not Mandate a Different Result.**

     As an initial matter, we believe the core holdings of *United States v. Sealy, Inc.*, 388 U.S. 350 (1967), and *United States v. Topco Associates*, 405 U.S. 596 (1972), are inconsistent with modern antitrust jurisprudence.  This Court has recognized that "the continued precedential value of *Sealy* and *Topco* has been called into question."  (Doc. 2641 at 47–48.)  We respect the Court's ruling rejecting Defendants' prior argument that those cases no longer govern (SoR at 29–30), but preserve the issue for appeal and do not repeat the argument here.

     But perhaps more important for present purposes, *Sealy* and *Topco* simply do not require application of the *per se* rule to ESAs.  *First*, *Sealy* and *Topco* condemn a fact pattern not present here.  Although the agreements in both cases involved trademark rights, neither involved the centralization and codification of rights that were independently acquired and developed at common law.  Rather, in *Topco*, the defendants' licensing organization was formed *for the very purpose* of allocating a new trademark formed by the licensees.  *Topco*, 405 U.S. at 598–600.  And in *Sealy*, a single entity owned the trademark from the beginning, *United States v. Sealy,*

*Inc.*, No. 60 C 844, 1964 WL 8089, at *3–4 (N.D. Ill. Oct. 6, 1964), and there was "no dispute that exclusive trademark territories were allocated to the manufacturer-licensees," who did not previously have any rights to that mark, *Sealy*, 388 U.S. at 352.  Therefore, unlike here, both *Sealy* and *Topco* involved new, deliberate territorial market allocations that from their very inception limited licensees' ability to sell their products.  In contrast, as discussed above, ESAs merely recognized and codified *pre-existing* trademark rights.  No individual Blue Plan has ever owned broader, nationwide rights to the Blue Marks or allocated such rights.  (Facts ¶ 29.)

   *Second*, *Sealy* and *Topco* concerned territorial allocations that, unlike ESAs, "lack[ed] . . . any redeeming virtue" whatsoever.  *Topco*, 405 U.S. at 607 (quoting *N. Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958)); *see also Sealy*, 388 U.S. at 355–56 (describing the challenged territorial allocations as "part of . . . unlawful price-fixing and policing").  Defendants in those cases were not collaborating to increase output or sell any new or different product (indeed, they sold the exact same products to consumers before and after engaging in the challenged agreements); nor did they engage in any meaningful post-agreement cooperation to enhance efficiency in the marketplace.  *See Sealy*, 388 U.S. at 351–55 (indicating no ongoing interaction among Sealy licensees beyond "flagrant and pervasive price fixing"); *Topco*, 405 U.S. at 599–600 (indicating that Topco members' cooperation was limited to obtaining grocery products from a common source).  The Blue Plans, by contrast, work together for the benefit of consumers—for example, by making available a nationwide Blue offering that no Blue Plan could offer on its own given the Blues' history at common law.  (*See supra* at pp. 19–23.)

   *Third*, the *per se* rule announced in *Sealy* and *Topco* is especially inapplicable to the provider- (or "buy-side") effect of ESAs—a fact that is confirmed by the subsequent history (post-*Topco*) of the *Sealy* system itself.  In *Sealy*, the Supreme Court struck down license

agreements that prevented the sale of Sealy-branded mattresses outside of designated geographic territories.  388 U.S. at 356–57.  Following the Supreme Court's decision, Sealy revised its licensing agreements to eliminate the requirement of strict exclusivity for the sale of mattresses in particular territories.  *Ohio-Sealy Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 824, 826 (7th Cir. 1978).  However, Sealy "maintained the same territories as had been used before," incentivized licensees to sell primarily within those territories, and "promis[ed] not to license anyone else to manufacture Sealy products in a licensee's territory."  *Id.* at 826.  The result was a system with substantially loosened restrictions on mattress *sales*, but the same geographical restrictions on mattress *production* that Sealy had imposed previously.

A new plaintiff argued that these exclusive manufacturing territories were unlawful.  In a decision that followed both *Sealy* and *Topco*, the Seventh Circuit upheld the revised Sealy system's exclusive manufacturing territories, including because they permitted "intrabrand competition among neighboring licensees."  *Ohio-Sealy Mfg. Co. v. Sealy, Inc.*, 669 F.2d 490, 496 (7th Cir. 1982), *cert. denied*, 459 U.S. 943 (1982) ("*Sealy II*").  The Supreme Court declined to disturb the Seventh Circuit's ruling.  *Ohio-Sealy Mfg. Co. v. Sealy, Inc.*, 459 U.S. 943 (1982).  Here, the Blues' buy-side ESAs are even more procompetitive than the exclusive manufacturing territories deemed lawful in *Sealy II*:  ESAs actively promote interbrand competition and facilitate the provision of a deep-network product that no other insurer offers.  (*See* Facts ¶¶ 30–32.)  The rule of reason should apply.

## II.  PROVIDERS' ESA CLAIMS DO NOT INVOLVE NBE.

As set forth in Section I, ESA claims are properly analyzed under the rule of reason.  That is the standard of review that applies to all of Providers' claims, which have never turned on NBE—a subscriber-facing rule that was challenged, litigated, and ultimately removed because of Subscribers.

**A.**    **The Prior Standard of Review Order Does Not Apply to Claims Brought by Providers, Who Have Never Been Subject to Unbranded Restraints.**

The Court's prior standard of review ruling was based on the *aggregation* of rules restricting the sale of Blue-branded business (ESAs) and the sale of "non-Blue brand business" (NBE).  (SoR at 46.)  Providers' claims, however, have *never* involved such an aggregation, a fact that is now readily apparent with the Subscriber and Provider tracks proceeding separately.  Indeed, unlike on the subscriber side of the market, nothing prevents—or has ever prevented—Blue Plans from contracting with out-of-area providers to build non-Blue networks.  The ESA provision says nothing about non-Blue business, and—unlike NBE—the rule specific to provider contracting states only that a "Plan may not use *the Licensed Marks and/or Name . . .* to negotiate directly with providers outside its Service Area."  (Doc. 1352-127 (Guidelines with Respect to Use of Licensed Name and Marks in Connection with Nat'l Accts.) at 129 (emphasis added); *see also* Doc. 1352-128 at 127.)  Now that Providers' claims must stand on their own, it is clear that the Court's prior reasoning based on aggregation does not, cannot and should not apply to those claims.  Instead, all of Providers' claims—from their earliest damages claims to their claims for go-forward injunctive relief—warrant a full rule-of-reason review.

**B.**    **Providers Do Not Have Claims for NBE.**

Providers cannot cling to the Court's prior ruling by manufacturing an aggregation based on NBE.  That is because Providers' case has never been about NBE.  In their 695-paragraph Complaint, Providers mention NBE only a handful of times, and not a single time in the counts seeking injunctive relief and damages.  (Compl. ¶¶ 5, 15, 190–95, 365.)  Likewise, in their "Request for Relief," Providers ask the Court to enjoin Defendants from enforcing "agreements that restrict the territories or geographic areas in which any BCBSA member may compete," their so-called "Market Allocation Conspiracy," but neither seek to enjoin (nor even

26

mention) NBE.[6]  (Compl. ¶¶ 1, 462.)  Providers' prior standard of review briefing similarly focused only on ESAs.  (*See* Doc. 1350.)  Even now, Providers, through their experts, claim their alleged harm arose because ESAs blocked entry from other Blues "historically," decades before the implementation of NBE in 2005.  (Ex. 313 (Slottje Dep.) at 83:13–84:19 (the "but-for world . . . would have happened decades ago because of a situation and rules that went into effect in the 1930s, which is almost now a hundred years ago"); Ex. 311 (Haas-Wilson Dep.) at 108:13–25 (ESAs would have prohibited entry "way back in the 1930s and '40s and '50s").)

The fact that Providers do not complain about NBE is, of course, not surprising. NBE was a subscriber-facing rule that governed solely the percentage of *subscriber-related* revenue that a Plan may earn from non-Blue-branded sales on a nationwide basis.  (Doc. 2449-2 at 4.)  Indeed, prior to this Court's decoupling Order, it was *Subscribers* who complained about NBE (Doc. 1351 at 26–27), *Subscribers* who centered their standard of review argument on NBE (Ex. 315 at 40:25–48:18), and *Subscribers* who negotiated for the elimination of NBE through a settlement (Doc. 2610-2 ¶ 10).  By contrast, NBE does not concern Providers—and now that the tracks are decoupled, it need not concern this Court.

## C.   Providers Do Not Quantify Damages from NBE.

Expert discovery in the decoupled Provider case has further confirmed that NBE is irrelevant to Providers' case.  Providers offer two economic experts, who claim that Providers are entitled to over $5 billion in damages in Alabama alone.  None of these damages calculations, however, purports to measure the effect of NBE on any member of the putative Provider class.  Providers' expert Professor Haas-Wilson conceded that her damages model quantifies only "the effects of three of Defendants' agreements: (1) the Market Allocation

---

[6] Providers also seek an injunction against the Blue Card program.  (Compl. ¶¶ 176–78, 231–33.)

Agreements on Selling; (2) the Price Fixing Agreements; and (3) the Market Allocation Agreements on Contracting." (Doc. 2454-6 (2019 Haas-Wilson Rep.) ¶ 474.) But as Haas-Wilson admits, Providers "have not quantified damage based on the output restriction on . . . unbranded business [NBE]." (Doc. 2564-67 (Haas-Wilson Dep.) at 32–34 (Tr. at 305:2–307:6).)[7] Similarly, Providers' expert Dr. Slottje agreed that the legality of NBE has *no effect whatsoever* on his calculation of Providers' purported damages. (*See* Ex. 314 (Slottje Dep.) at 49:18–50:3 ("[I]n terms of my calculation of damages, [NBE] doesn't affect them.").) In other words, *all of Providers' claimed damages* are the result of either ESAs standing alone or BlueCard.

This is no mere technicality. To establish liability, Providers must demonstrate not only a violation of the antitrust laws, but also "that [they] suffered economic damages which are quantifiable." *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 723 n.3 (11th Cir. 1984) (collecting cases); *see also McClure v. Undersea Indus., Inc.*, 671 F.2d 1287, 1289 (11th Cir. 1982). Moreover, to be valid in a class action, the measure of damages must match the plaintiffs' theory of liability. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35–37 (2013) (reversing class certification where the plaintiffs' damages "model failed to measure damages resulting from the particular antitrust injury on which . . . liability in this action is premised"). Here, because Providers' measure of damages focuses solely on ESAs and BlueCard, so, too, must the standard of review for liability. Just as NBE makes no difference to Providers' damages, it likewise makes no difference to the standard of review on Providers' claims. And without NBE, the rule of reason should apply. (*See supra* Section I.)

---

[7] Providers' industry expert likewise testified that he performed "no empirical analysis to determine whether a provider suffered common harm related the Best Efforts rules." (Ex. 310 (Frech Dep.) at 152:18–23; *see also* Ex. 309 (Frech Dep.) at 214:11–17.)

D.     **NBE Has Not Injured Providers.**

Finally, it is not surprising that Providers claim no damages from NBE:  the rule has not even plausibly injured them.  Tellingly, during the prior standard of review briefing, Providers did not offer a single expert to opine that NBE affected them at all.  (Doc. 1350.)  This is consistent with the way Providers had been litigating their case up to that point (*see supra* Section II.B), and consistent with the Court's discussion of NBE in its April 2018 Order (SoR at 46 ("The alleged scheme at issue here is not limited to Defendants' use of ESAs standing alone.  As *Subscribers* point out, 'there is more.'") (emphasis added).)  This makes sense:  after all, NBE was a subscriber-facing rule.  There is no provider-side rule analogous to NBE, nor any other Blue rule that even arguably "aggregates" buy-side service areas with a prohibition on non-Blue branded provider contracting.  (*See supra* Section II.A.)

Recognizing NBE's import to the Court's April 2018 Order, however, Providers have tried to argue that they, too, have been injured by NBE.  Providers now theorize through an expert that NBE injured them through a tenuous chain of *potential* causal effects—that is, that NBE "likely reduced the number of Blue Plans selling unbranded healthcare financing services in Alabama," which in turn "likely reduced the number of commercial buyers of healthcare provider services in Alabama" and "likely . . . increased the number of homed enrollees of BCBS-AL," which likely "inflated BCBS-AL's homed share," and, as a result, likely "inflat[ed] its contracting leverage in its interactions with providers," which—finally—"likely harmed providers in Alabama" by "reducing the contracted prices."  (Doc. 2454-6 (2019 Haas-Wilson Rep.) ¶¶ 340, 348.)  Even if true—and it is not—this theory of injury is far too attenuated and speculative to satisfy Providers' burden under the antitrust laws.  *See, e.g.*, *McClure*, 671 F.2d at 1289 ("The 'fact of damage' is a sufficiency of the evidence question and cannot be based on mere speculation. . . . [T]he plaintiff must prove . . . as a matter of fact and with a fair degree of

certainty, that the defendant's illegal conduct materially contributed to the[ir] injury."); *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th Cir. 1978) (A showing of "injury . . . may not be based on speculation.").[8]

In fact, any theory of harm based on NBE is at odds with Providers' entire theory of the case, namely that entry in the "but-for" world would have happened "decades ago," long before NBE even existed.  (*See* Doc. 2454-6 (2019 Haas-Wilson Rep.) ¶ 448 ("[T]he Market Allocation Agreements on Selling have been in place everywhere in the United States and thus this ideal but-for world does not exist and has not existed since at least 1942."); Ex. 316 (Frech Rebuttal Rep.) ¶ 233 ("My view, which is consistent with the view of Dr. Haas-Wilson, is that the but-for world is constructed by imagining a world where none of the allegedly anticompetitive agreements would have ever existed, going back to the very beginning of the Blue Cross Blue Shield Plans in the 1930s."); *see also* Ex. 309 (Frech Dep.) at 32:7–33:7.)  NBE therefore did not—and could not—cause Providers' alleged injuries.  Without NBE, Providers' ESA claims stand alone and all of their claims should be evaluated under the rule of reason. (*See supra* Section I.)

## CONCLUSION

For the foregoing reasons, Providers' ESA claims arising under § 1 of the Sherman Act are properly analyzed under the rule of reason.

---

[8] Providers further speculate that NBE "likely reduced the number of Blue Plans selling unbranded healthcare financing services in Alabama, and thus likely limited the potential choices."  (Doc. 2454-6 (2019 Haas-Wilson Rep.) ¶ 340.)  According to Providers, this "likely" reduction in consumer choice means healthcare providers in Alabama have also "had less choice and have been harmed accordingly."  (Doc. 2564-67 (Haas-Wilson Dep.) at 33–34 (Tr. at 306:12–307:11).)  But, without more, such conjecture about "reduction in choice" does not constitute "harm" within the meaning of the antitrust laws.  *See Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1499, 1501 (11th Cir. 1985) (rejecting "lack of choice" as a form of antitrust injury and finding that "[t]he only injury alleged . . . which is cognizable under the antitrust laws is that of the payment of the inflated fee"); *Somers v. Apple, Inc.*, 729 F.3d 953, 966 (9th Cir. 2013) ("[L]imitation of consumer choice, in itself, does not amount to 'antitrust injury.'").

Dated:  May 21, 2021

Respectfully submitted,

/s/ *Evan R. Chesler*

Evan R. Chesler
Christine A. Varney
Karin A. DeMasi
Lauren R. Kennedy
David H. Korn
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
Tel: (212) 474-1000
Fax: (212) 474-3700
echesler@cravath.com
cvarney@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com
dkorn@cravath.com

*Coordinating Counsel for Defendant
Blue Cross and Blue Shield Association;
Counsel for Defendants Blue Cross and
Blue Shield of Alabama; Blue Cross and
Blue Shield of Florida, Inc.; Blue Cross
and Blue Shield of Massachusetts, Inc.;
BlueCross BlueShield of Tennessee,
Inc.; CareFirst, Inc.; CareFirst of
Maryland, Inc.; Group Hospitalization
and Medical Services, Inc.; CareFirst
BlueChoice, Inc.; Health Care Service
Corporation, an Illinois Mutual Legal
Reserve Company, including its
divisions Blue Cross and Blue Shield of
Illinois, Blue Cross and Blue Shield of
Texas, Blue Cross and Blue Shield of
New Mexico, Blue Cross and Blue
Shield of Oklahoma, and Blue Cross and
Blue Shield of Montana; Caring for
Montanans, Inc., f/k/a Blue Cross and
Blue Shield of Montana, Inc.*

Craig A. Hoover
E. Desmond Hogan
Justin Bernick
Peter Bisio
Elizabeth Jose
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC  20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com
peter.bisio@hoganlovells.com
elizabeth.jose@hoganlovells.com

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC  29201
Tel: (803) 255-9421
Fax: (803) 256-7500
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

Cavender C. Kimble
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc.,
and all of its named subsidiaries in this
consolidated action; Blue Cross and Blue Shield of
North Carolina, Inc.; Louisiana Health Service &
Indemnity Company (Blue Cross and Blue Shield
of Louisiana); BCBSM, Inc. (Blue Cross and Blue
Shield of Minnesota); Blue Cross and Blue Shield
of South Carolina; Horizon Healthcare Services,*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
Sarah J. Donnell
Christa C. Cottrell, P.C.
Zachary Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com
sarah.donnell@kirkland.com
christa.cottrell@kirkland.com
zachary.holmstead@kirkland.com

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL  35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Blue Cross Blue Shield
Association*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL  35203
Tel: (205) 254-1000
Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com

Pamela B. Slate

*Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA  98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

J. Bentley Owens, III
ELLIS, HEAD, OWENS & JUSTICE
113 North Main Street
Columbiana, AL  35051-0587
Tel: (205) 669-6783
Fax: (205) 669-4932
bowens@wefhlaw.com

*Counsel for Defendants Premera Blue Cross, d/b/a Premera Blue Cross Blue Shield of Alaska*

Brian K. Norman
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX  75234
Tel: (214) 987-1745
Fax: (214) 521-9033
bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
RSA Tower, 27th Floor
11 North Water Street
Mobile, AL  36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

HILL CARTER FRANCO COLE &
BLACK, P.C.
425 South Perry Street
Montgomery, AL  36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*With Cravath, Swaine & Moore LLP, counsel for Defendant Blue Cross Blue Shield of Alabama*

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
Erica B. Zolner
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
hwitt@kirkland.com
jzeiger@kirkland.com
ezolner@kirkland.com

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL  35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for*

*Counsel for Defendants CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.*

R. David Kaufman
M. Patrick McDowell
BRUNINI, GRANTHAM, GROWER
& HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS  39201
Tel: (601) 948-3101
Fax: (601) 960-6902
dkaufman@brunini.com
pmcdowell@brunini.com

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC  29201
Tel: (803) 255-9421
Fax: (803) 256-7500
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

Cheri D. Green
BLUE CROSS BLUE SHIELD OF MISSISSIPPI
P.O. Box 1043
Jackson, MS  39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

*Counsel for Defendant Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company*

Michael A. Naranjo
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA  94104
Tel: (415) 984-9847

*Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.; California Physicians' Service d/b/a Blue Shield of California*

Jonathan M. Redgrave
REDGRAVE, LLP
14555 Avion Parkway, Suite 275
Chantilly, VA  20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark Defendants*

Todd Stenerson
SHEARMAN & STERLING LLP
401 9th Street, N.W., Suite 800
Washington, DC  20004
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com

Sarah L. Cylkowski
Thomas J. Rheaume, Jr.
BODMAN PLC
1901 Saint Antoine Street
6th Floor at Ford Field
Detroit, MI  48226
Tel: (313) 259-7777
Fax: (734) 930-2494
scylkowski@bodmanlaw.com
trheaume@bodmanlaw.com

Andy P. Campbell
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL PARTNERS LLC
505 North 20th Street, Suite 1600
Birmingham, AL  35203

Fax: (415) 434-4507
mnaranjo@foley.com

Alan D. Rutenberg
Benjamin R. Dryden
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, DC  20007
Tel: (202) 672-5300
Fax: (202) 672-5399
arutenberg@foley.com
bdryden@foley.com

*Counsel for Defendant USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue Shield*

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Jess R. Nix
Morgan B. Franz
SPOTSWOOD SANSOM & SANSBURY LLC
Financial Center
505 20th Street North, Suite 700
Birmingham, AL  35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
jnix@spotswoodllc.com
mfranz@spotswoodllc.com

*Counsel for Defendant Capital BlueCross*

Evan R. Chesler
Christine A. Varney
Karin A. DeMasi
Lauren R. Kennedy
David H. Korn
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue

Tel: (205) 224-0750
Fax: (205) 224-8622
andy@campbellpartnerslaw.com
todd@campbellpartnerslaw.com
yawanna@campbellpartnerslaw.com

*Counsel for Defendant Blue Cross and Blue Shield of Michigan*

John Briggs
Rachel Adcox
Jeny M. Maier
AXINN, VELTROP & HARKRIDER, LLP
1901 L Street, N.W.
Washington, DC  20036
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
radcox@axinn.com
jmaier@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, AL  35203
Tel: (205) 250-5000
Fax: (205) 250-5034
steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendant Independence Blue Cross*

Kathleen Taylor Sooy
Tracy A. Roman
Sarah Gilbert
Honor Costello
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel: (202) 624-2500

New York, NY  10019
Tel: (212) 474-1000
Fax: (212) 474-3700
echesler@cravath.com
cvarney@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com
dkorn@cravath.com

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC  29201
Tel: (803) 255-9421
Fax: (803) 256-7500
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL  35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendants Blue Cross and Blue
Shield of Florida, Inc.; Blue Cross and Blue Shield
of Massachusetts, Inc.; BlueCross BlueShield
of Tennessee, Inc.*

Edward S. Bloomberg
John G. Schmidt
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY  14203
Tel: (716) 847-8400
Fax: (716) 852-6100
ebloomberg@phillipslytle.com

Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com
sgilbert@crowell.com
hcostello@crowell.com

John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN & WHITE
LLC
The Clark Building
400 20th Street North
Birmingham, AL  35203
Tel: (205) 581-0700
Fax: (205) 581-0799
jjohnson@lightfootlaw.com
bkappel@lightfootlaw.com

*Counsel for Defendants Blue Cross of
Idaho Health Service, Inc.; Blue Cross
and Blue Shield of Kansas, Inc.; Blue
Cross and Blue Shield of Kansas City;
Blue Cross and Blue Shield of
Nebraska; Blue Cross Blue Shield of
Arizona; Blue Cross Blue Shield of
North Dakota; Blue Cross Blue Shield
of Wyoming; Highmark Western and
Northeastern New York Inc.*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com

John Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor

jschmidt@phillipslytle.com
aclark@phillipslytle.com

Stephen A. Walsh
WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL
100 Corporate Parkway
One Lake Level
Birmingham, AL 35242
Tel: (205) 572-4107
Fax: (205) 572-4199
swalsh@wwhgd.com

*Counsel for Defendant, Excellus Health Plan, Inc.,
d/b/a Excellus BlueCross BlueShield, incorrectly
sued as Excellus BlueCross BlueShield of
New York*

Columbia, SC  29201
Tel: (803) 255-9421
Fax: (803) 256-7500
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Defendants Wellmark of
South Dakota, Inc. (Wellmark Blue
Cross and Blue Shield of South Dakota);
Wellmark, Inc. (Wellmark Blue Cross
and Blue Shield of Iowa); Hawaii
Medical Service Association (Blue
Cross and Blue Shield of Hawaii);
Triple-S Salud, Inc.*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL  35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants Wellmark of
South Dakota, Inc. (Wellmark Blue
Cross and Blue Shield of South Dakota);
Wellmark, Inc. (Wellmark Blue Cross
and Blue Shield of Iowa); Hawaii
Medical Service Association (Blue
Cross and Blue Shield of Hawaii)*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 21, 2021, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Evan R. Chesler*
Evan R. Chesler