FILED
2021 May-28  PM 06:41
U.S. DISTRICT COURT
N.D. OF ALABAMA


**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| **IN RE BLUE CROSS BLUE SHIELD** | : | **Master File 2:13-cv-20000-RDP** |
| **ANTITRUST LITIGATION** | : | |
| **MDL 2406** | : | |
| | : | |
| | : | **This document relates to** |
| | : | **Subscriber Track cases** |
| | : | |

**SUBSCRIBERS COUNSEL'S MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR APPROVAL
<u>OF THEIR ATTORNEYS' FEES AND EXPENSES APPLICATION</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................6

I.     SUBSCRIBERS COUNSEL DEVOTED ENORMOUS TIME AND RESOURCES
       TO PREPARE THIS CASE AND BORE EXTRAORDINARY RISKS WHEN
       THEY ELECTED TO PROSECUTE THIS ACTION. ......................................................6

II.    SUBSCRIBERS COUNSEL AGGRESSIVELY LITIGATED THIS CASE FOR
       MORE THAN EIGHT YEARS, OBTAINING SIGNIFICANT LEGAL VICTORIES
       BEFORE BOTH THE TRIAL COURT AND THE ELEVENTH CIRCUIT,
       AND SETTLED AFTER PROTRACTED NEGOTIATIONS. .......................................10

       A.     Discovery Was Protracted, Complex, and Contentious. .........................12

       B.     Subscribers Counsel Engaged in Extensive Motion Practice. ...............16

       C.     Subscribers Counsel Engaged in Months of Settlement Negotiations..................20

       D.     Subscribers Counsel Devoted Substantial Time and Resources to Advocating
              for the Subscriber Class. ...................................................................21

III.   THE SETTLEMENT PROVIDES UNPRECEDENTED BENEFITS TO THE
       SUBSCRIBER CLASS MEMBERS AND TO THE MARKET FOR HEALTH
       CARE INSURANCE. ........................................................................................23

       A.     The Settlement Agreement Establishes a Common Fund of $2.67 Billion. ..........23

       B.     The Settlement Agreement Provides for Class Injunctive Relief that Will
              Promote Competition ........................................................................24

ARGUMENT.....................................................................................................29

I.     THE REQUESTED FEE AWARD IS REASONABLE. ...................................................29

       A.     Subscribers Counsel Are Requesting a Presumptively Reasonable Percentage
              of the Common Fund as Attorneys' Fees. ............................................30

       B.     Consideration of the Factors Used by the Courts in this Circuit Confirm the
              Reasonableness of the Requested Fee Award.......................................35

i

1. The substantial monetary award and significant injunctive relief obtained for the class support the reasonableness of the fee award...........37

2. This case presented difficult factual issues and raised novel and complex questions of law.........................................................................45

    a. This case involved substantial discovery to resolve myriad factual issues. ....................................................................46

    b. This case raised novel and complex legal questions.....................49

3. The time and labor expended by Subscribers Counsel were enormous.....52

4. Subscribers Counsel are among the most experienced litigators in the country and pursued the case with extraordinary skill, zeal, and expertise. ..........................................................................................54

5. The requested fee is consistent with the attorneys' fees awarded in similar cases and with Subscribers Counsel's customary fees. ................57

6. The fee in this case was contingent on obtaining relief for the class, and there was a significant risk that Subscribers Counsel would recover nothing. .....................................................................................59

7. Given the enormous commitments of time and resources and the significant risk entailed in developing and litigating this case, few attorneys would have been willing to take it on. ......................................63

8. The preclusion of other employment by Subscribers Counsel due to acceptance of the case. ................................................................................63

C. The Reasonableness of the Requested Fee Is Confirmed by Subscribers Counsel's Lodestar..................................................................................64

D. The Application of a Sliding Scale or Mega-Fund Approach Is Disfavored in this Circuit, But Nevertheless Would Support The Requested Award.............67

E. The Parties Negotiated a Clear Sailing Agreement that Provided Defendants with Certain Knowledge of Their Liability. .........................................71

II. THE COURT SHOULD APPROVE SUBSCRIBERS COUNSEL'S REQUEST FOR REIMBURSEMENT OF COSTS AND EXPENSES. ............................................73

CONCLUSION...........................................................................................................77

## TABLE OF AUTHORITIES

**Cases**  **Page**

*Aamco Automatic Transmission, Inc. v. Tayloe*, 82 F.R.D. 405 (E.D. Pa.1979) ..........................57

*Adams v. Standard Knitting Mills, Inc.*, 1978 WL 1074 (E.D. Tenn. Jan. 6, 1978) ....................57

*Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) ...... 30-32, 58, 67

*Amason v. Pantry, Inc.*, 2014 WL 12600263 (N.D. Ala. July 3, 2014) ........................................31

*American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010) ...................................9, 50

*Atkinson v. Wal–Mart Stores, Inc.*, 2011 WL 6846747 (M.D. Fla. Dec. 29, 2011) .....................57

*Baron v. Commercial & Ind. Bank of Memphis*, 1979 WL 1252 (S.D. N.Y. Oct. 3, 1979) ..........57

*Basile v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 640 F. Supp. 697 (S.D. Ohio 1986) .......49

*Behrens v. Wometco Enter's, Inc.*, 118 F.R.D. 534 (S.D. Fla. 1988) ...........................................37

*Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984) .............................................................39

*Broadcast Music, Inc. v. Columbia Broadcasting System*, 441 U.S. 1 (1979) ........................9, 50

*Cabot East Broward 2 LLC v. Cabot*, 2018 WL 5905415 (S.D. Fla. Nov. 9, 2018) ...................73

*Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th. Cir. 1991) .................. passim

*Carnegie v. Mut. Sav. Life Ins. Co.*, 2004 WL 3715446 (N.D. Ala. Nov. 23, 2004) ....................31

*Carroll v. Macy's Inc.*, 2020 WL 3037067 (N.D. Ala. 2020) ...........................................29, 31, 35

*Carter v. Forjas Taurus, S.A.*, 701 Fed. Appx. 759 (11th Cir. 2017) ...........................................71

*Cerven v. Blue Cross and Blue Shield of North Carolina and Blue Cross and Blue Shield Association*, Case. No. 5:12-cv-17-RLV-DCK (W.D.N.C.) ...................................................6, 8

*Cnty. of Monmouth, New Jersey v. Florida Cancer Specialists, P.L.*, 2019 WL 1487340 (M.D. Fla., Apr. 4, 2019) ...................................................................................73

*Columbus Drywall & Insulation Inc., et al., v. Masco Corporation*, 2012 WL 12540344 (N.D. Ga. October 26, 2012) ..................................................... passim

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir.1977) .........................................................................45

*David v. Am. Suzuki Motor Corp.*, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010) .......................54

*Dear v. Q Club Hotel, LLC*, 2018 WL 1830793 (S.D. Fla. Mar. 14, 2018) ...........................73, 76

*Doria v. Class Action Services, LLC*, 261 F.R.D. 678 (S.D. Fla. 2009) ......................................76

*Drazen v. GoDaddy.Com, LLC,* 2020 WL 4606979 (S.D. Ala. Aug. 11, 2020) ...................76, 77

*Eltman v. Grandma Lee's, Inc.*, 1986 WL 53400 (E.D.N.Y. May 28, 1986) ...............................49

*F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013) .................................................................................9

*Faught v. American Home Shield Corp.*, 2010 WL 10959222 (N.D.Ala. Apr. 27, 2010) ............53

*Faught v. American Home Shield Corp.*, 668 F.3d 1233 (11th Cir. 2011) ........................... passim

*Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622 (E.D.Pa.1986) ............................................49

*Fladell v. Wells Fargo Bank, N.A.*, 2014 WL 5488167 (S.D. Fla. Oct. 29, 2014) ......................72

*Flournoy v. Honeywell Int'l, Inc.*, 2007 WL 1087279 (S.D. Ga. Apr. 6, 2007)...............31, 45, 54

*Friedlander v. Barnes*, 1986 WL 5517 (S.D. N.Y. May 8, 1986) .................................................49

*Gaskill v. Gordon*, 942 F. Supp. 382 (N.D. Ill.1996) ...................................................................57

*General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588 (7th Cir. 1984) ............9

*Gevaerts v. TD Bank*, N.A., 2015 WL 6751061 (S.D. Fla. Nov. 5, 2015) ...................................76

*Grier v. Chase Manhattan Automotive Finance Co.*,
   2000 WL 175126 (E.D. Pa. Feb. 16, 2000) ...............................................................................57

*Harris v. City of Ft. Myers*, 624 F.2d 1321 (5th Cir. 1980)........................................................76

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) .........................................................................37, 43

*Howes v. Atkins*, 668 F. Supp. 1021 (E.D. Ky.1987).................................................................57

*In re Activision Sec. Litigation*, 723 F. Supp. 1373 (N.D. Cal. 1989) .........................................49

*In re AIA Indus., Inc. Sec. Litig.*, 1988 WL 33883 (E.D. Pa. March 31, 1988)............................49

*In re Ampicillin Antitrust Litig.*, 526 F. Supp. 494 (D.D.C. 1981) ..............................................57

*In re Automotive Refinishing Paint Antitrust Litig.*,
   2008 WL 63269 (E.D. Pa. Jan. 3, 2008) .......................................................48, 54, 56, 67

*In re Blue Cross Blue Shield Antitrust Litig.*,
   2018 WL 7152887 (11th Cir. Dec. 12, 2018) ........................................................................3, 19

*In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172 (N.D. Ala. 2014).......17, 18, 50

*In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241 (N.D. Ala. 2018)......... passim

*In re Bluetooth Headset Prod's. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ...............................71

*In re Catfish Antitrust Litigation,* 939 F. Supp. 493 (N.D. Miss. 1996)................................37, 53

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001)..............................................................67

*In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) .................... passim

*In re Checking Acct. Overdraft Litig.*,
   2013 WL 11319391 (S.D. Fla.  Aug. 5, 2013).........................................................32, 41, 58

*In re Checking Acct. Overdraft Litig.*, 2015 WL 12641970 (S.D. Fla. May 22, 2015)...............76

*In re Checking Acct. Overdraft Litig.*,
   2020 WL 4586398 (S.D. Fla. Aug. 10, 2020).........................................................36, 53, 65

*In re Clarus Corp. Sec. Litig.*, 2005 WL 8172269 (N.D. Ga. Jan. 6, 2005) ...............................57

*In re Colonial BancGroup Inc. Sec. Litig.*,
   2012 WL 12871879 (N.D. Ala. Apr. 18, 2012).......................................................31, 35, 58

*In re Combustion Inc.*, 968 F. Supp. 1116 (W.D. La.1997) .............................................57, 78, 67

*In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D. N.Y.1993)..................................57

*In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993).................59, 66, 67

*In re Employee Benefit Plans Securities Litig.*,
    1993 WL 330595 (D. Minn. June 2, 1993)....................................................57

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    586 F. Supp. 2d 732 (S.D. Tex. 2008) ......................................................66

*In re Greenwich Pharm. Sec. Litig.*, 1995 WL 251293 (E.D. Pa. Apr. 26, 1995)........................57

*In re Home Depot Inc.*, 931 F.3d 1065 (11th Cir. 2019) ......................................... passim

*In re Ikon Off. Sol's., Inc. Secs. Litig.*, 194 F.R.D. 166 (E.D. Pa.2000) ...........................68

*In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D. N.Y.2009) ......................58

*In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D. Tex. 1999) ..................................57

*In re Linerboard Antitrust Litig.*,
    2004 WL 1221350 (E.D. Pa June 2, 2004) .............................................56, 57, 58, 61, 66

*In re Magic Marker Securities Litig.*, 1979 WL 1248 (E.D. Pa. Sept. 16, 1979) .......................57

*In re Managed Care Litig.*, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) ...............................58

*In re Medirisk, Inc. Sec. Litig.*, No. 1:98–CV–1922–CAP (N.D. Ga. Mar. 22, 2004) ................58

*In re Motorsports Merchandise Antitrust Litig.,* 112 F. Supp. 2d 1329 (N.D. Ga. 2000) ............45

*In re MTC Electronic Technologies Shareholder Litig.*,
    74 F. Supp. 2d 276 (E.D. N.Y.1999) .......................................................57

*In re NASDAQ Market–Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D. N.Y.1998) ......................................................38, 56, 71

*In re National Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    768 Fed. Appx. 651 (9th Cir. 2019).................................................30, 67, 70

*In re Oil Spill by the Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*,
    2016 WL 6215974 (E.D. La. Oct. 25, 2016) ................................................30

*In re Pediatrics Servs. of Am., Inc. Sec. Litig.*,
    1:99-CV-0670-RLV (N.D. Ga. Mar. 15, 2002) ...............................................57

*In re Profit Recovery Group Int'l, Inc. Sec. Litig.*,
    No. 1:00–CV–1416–CC (N.D. Ga. May 26, 2005) ............................................57

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998)..............................................................72

*In re Rayonier Inc. Sec. Litig.,* 2017 WL 4542852 (M.D. Fla. Oct. 5, 2017)............................34

*In re RJR Nabisco, Inc. Sec. Litig.*, 1992 WL 210138 (S.D. N.Y. Aug. 24, 1992) .....................66

*In re Shopping Carts Antitrust Litig.*, 1983 WL 1950 (S.D. N.Y. Nov. 18, 1983).......................46

*In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323 (S.D. Fla. 2001)...................................32, 56, 67

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) ....................................67, 69

v

*In re Terazosin Hydrochloride Antitrust Litigation,*
   99–1317–MDL–Seitz (S.D. Fla. April 19, 2005) ............................................................57

*In re TFT-LCD (Flat Panel) [Indirect Purchaser] Antitrust Litig.,*
   2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ................................................................62

*In re The Maxim Group, Inc. Sec. Litig.,*
   No. 1:99–CV–1280–CAP (N.D. Ga. July 20, 2004) ....................................................57

*In re Theragenics Corp. Sec. Litig.,* No. 1:99–CV–0141–TWT (N.D. Ga. Sept. 29, 2004) .........57

*In re Tyco Int'l, Ltd. Multidistrict Litig.,* 535 F. Supp. 2d 249 (D.N.H. 2007).............................66

*In re ValueVision Int'l Inc. Sec. Litig.,* 957 F. Supp. 699 (E.D. Pa.1997) ....................................57

*In re Vitamins Antitrust Litig.,* 2001 WL 34312839 (D.D.C. July 16, 2001) ...................57, 58. 62

*In re WorldCom, Inc. Sec. Litig.,* 388 F. Supp. 2d 319 (S.D. N.Y. 2005) ....................................66

*In re Xcel Energy, Inc., Sec's., Derivative & "ERISA" Litig.,*
   364 F. Supp. 2d 980 (D. Minn. 2005) .................................................................36, 37

*Ingram v. The Coca-Cola Co.,* 200 F.R.D. 685 (N.D. Ga. June 7, 2001).....................................31

*James D. Hinson Elec. Contracting Co. v. BellSouth Telecomms. Inc.,*
   2012 WL 12952592 (M.D. Fla. July 30, 2012) ......................................................31

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974)........................5, 35, 36

*Johnson v. NPAS Solutions, LLC,* 975 F.3d 1244 (11th Cir. 2020)..................................................5

*Kirchoff v. Flynn,* 786 F.2d 320 (7th Cir. 1986) ..........................................................................59

*Kogan v. AIMCO Fox Chase, L.P.,* 193 F.R.D. 496 (E.D. Mich. 2000) ......................................57

*Lazy Oil Co. v. Wotco Corp.,* 95 F. Supp. 2d 290 (W.D. Pa. 1997) .............................................39

*Mahoney v. TT of Pine Ridge, Inc.,* 2017 WL 9472860 (S.D. Fla. No. 20, 2017)........................72

*Malchman v. Davis,* 761 F.2d 893 (2d Cir.1985) ........................................................................73

*Martin v. Global Mktg. Rsch. Serv's., Inc.,* 2016 WL 6996118 (M.D. Fla. Nov. 30, 2016).........59

*Marty v. Anheuser-Busch Companies, LLC,* 2015 WL 6391185 (S.D. Fla. Oct. 22, 2015)..........65

*Mashburn v. Nat'l Healthcare, Inc.,* 684 F. Supp. 679 (M.D. Al. 1988) .........................37, 40, 59

*McGaffin v. Argos USA, LLC,* 2020 WL 3491609 (S.D. Ga. Jun. 26, 2020) .........................41, 65

*Meyer v. Citizens & S. Nat'l Bank,* 117 F.R.D. 180 (M.D. Ga. 1987) .........................................58

*Mills by Mills v. Freeman,* 118 F.3d 727 (11th Cir. 1997)............................................................37

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.,* 468 U.S. 85 (1984)..............50

*Nichols v. SmithKline Beecham Corp.,* 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ...................39

*Northern Securities Co. v. United States,* 193 U.S. 197 (1904) .....................................................7

*Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46 (1990).............................................................17, 50

*Parsons v. Brighthouse Networks, LLC,*

2015 WL 13629647 (N.D. Ala. Feb. 5, 2015) ............................................................43, 72, 73

*Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334 (S.D. Fla. 2007) ..............................59

*Poertner v. Gillette Co*., 618 Fed. Appx. 624 (11th Cir. 2015) .....................................................71

*Rabin v. Concord Assets Group*, 1991 WL 275757 (S.D.N.Y. Dec. 19, 1991)...........................66

*Ratner v. Bennett*, 1996 WL 243645 (E.D. Pa. May 8, 1996) ......................................................57

*Ressler v. Jacobson,* 149 F.R.D. 651 (M.D. Fla. 1992).................................................................60

*Ressler v. Jacobson*, 822 F. Supp. 1551 (M.D. Fla. 1992) ...........................................................39

*Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D. N.Y. 1997).......................................................66

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) ...................9

*Sawyer v. Intermex Wire Transfer LLC*, 2020 WL 5259094 (S.D. Fla. Sept. 3, 2020)...........37, 65

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill.2011)................................................57

*Smith v. Casey*, 2013 WL 12064518 (S.D. Fla. Jul. 26, 2013) .....................................................76

*Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911).............................................7

*Swaney v. Regions Bank*, 2020 WL 3064945 (N.D. Ala. Jun. 9, 2020) .............................4, 31, 35

*Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902 (S.D. Fla. October 17, 2016)..............65

*United States v. American Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C.1982) ................................7

*United States v. American Tobacco Co.*, 221 U.S. 106 (1911).......................................................7

*United States v. Sealy, Inc.*, 388 U.S. 350 (1967)...........................................................7, 17, 50

*United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) ...........................................7, 17, 50

*Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849 (10th Cir. 1993) ...................37

*Walco Invs., Inc. v. Thenen*, 975 F. Supp. 1468 (S.D. Fla. 1997)...........................................32, 56

*Wal-Mart Stores, Inc. v. Visa, U.S.A., Inc.*, 396 F.3d 96 (2nd Cir. 2005) ........................45, 67, 70

*Waters v. Cook's Pest Control, Inc.*,
2012 WL 2923542 (N.D. Ala. July 17, 2012) ......................................................41, 58, 61, 63

*Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291 (11th Cir. 1999) ............................. passim

*Wiggins v. Roberts*, 551 F. Supp. 57 (N.D. Ala. 1982).................................................................63

*Wilson v. EverBank*, 2016 WL 457011 (S.D. Fla. Feb. 3, 2016).......................................31, 32, 65

*Yates v. Mobile Cnnty. Pers. Bd.*, 719 F.2d 1530 (11th Cir.1983) ...............................................60

*Zinman v. Avemco Corp.*, 1978 WL 5686 (E.D. Pa. Jan. 18, 1978) .............................................57

## **Statutes and Rules**

15 U.S.C. § 15(a) ...........................................................................................................................43

15 U.S.C. § 22..................................................................................................................................51

28 U.S.C. § 1391 ...................................................................................................51

Fed. R. Civ. P. 23(h) ....................................................................................3, 29, 74, 77

**<u>Other Authorities</u>**

2 M. DERFNER & A. WOLF, COURT ORDERED ATTORNEY FEES (rev. ed. 1990)...........60

Andrew Longstreth, "Blue Cross and Blue Shield antitrust lawsuits pile up,"
 Reuters (Feb. 20, 2013), available at https://reut.rs/2S5zxGc ...............................10

Bork, *The Antitrust Paradox* (1976) ........................................................................9

Hovenkamp, *Federal Antitrust Policy: The Law of Competition and its Practice* § 5.2.................9

James Burns, Healthcare Antitrust practice head at Ackerman LLP, " 'Historic' Settlement
 of Blue Cross Blue Shield Association Antitrust Action May Significantly Boost
 Competition", *Lexology*  (Nov. 9, 2020), available at https://bit.ly/2RkriGe..........................28

Joe Patrice, *"Blue Cross Blue Shield Plans to Settle for $2.7B... and That's Not the Most
 Important Relief,"* *Above the Law* (Sept. 24, 2020), available at https://bit.ly/3hyZjNB........28

NEWBERG ON CLASS ACTIONS (5th ed., 2019) .................................................32, 67, 68

Posner, *Antitrust* (1976) ........................................................................................9

Public Comments of Washington Insurance Commissioner Mike Kreidler, available at
 https://bit.ly/3eUfV0w .......................................................................................27

S. SPEISER, ATTORNEYS' FEES § 8:10 (1973) .......................................................60

Counsel for the Subscriber Plaintiffs ("Subscribers Counsel") respectfully submit this memorandum in support of Subscribers Counsel's Motion for Approval of their Attorneys' Fees and Expenses Application, filed pursuant to the Settlement Agreement between the parties and in accordance with Rules 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure. The Fee and Expense Application is also supported by the Joint Declaration of Co-Lead Counsel in Support of Subscriber Counsel's Motion for Approval of Their Fee and Expense Application ("Lead Counsel Decl.") (attached as Exhibit A), the Declaration of Professor Charles Silver on the Reasonableness of Class Counsel's Request for Attorney's Fees ("Silver Decl.") (attached as Exhibit B), the Declaration of Professor Brian Fitzpatrick ("Fitzpatrick Decl.") (attached as Exhibit C), and the Declaration of Special Master ("Gentle Decl.") (attached as Exhibit D).[1]

## INTRODUCTION

As demonstrated by the voluminous materials submitted in connection with Subscriber Plaintiffs' motion for preliminary approval, the proposed settlement of the Subscriber track of this case secures pathbreaking and transformative injunctive relief that will reshape competition in the health insurance industry and offer increased choice to millions of Americans for years to come, coupled with one of the largest monetary recoveries ($2.67 billion) ever achieved in an antitrust class action settlement. Indeed, in preliminarily approving the proposed settlement, the Court observed that it secured "significant, unprecedented, and far-reaching changes" to the rules and regulations governing Defendants' business that would "provide[] significant relief to the Class" by

---

[1] Subscribers Counsel's Fee and Expense Application is also supported by certain of the materials previously submitted to the Court in connection with Subscriber Plaintiffs' Motion for Preliminary Approval of Proposed Class Settlement (ECF No. 2610), including the following materials cited herein: Settlement Class Counsel Joint Declaration in Support of Motion for Preliminary Approval of Proposed Subscriber Class Settlement ("Lead Counsel PA Decl.") (ECF No. 2610-6); Self-Funded Sub-Class Settlement Counsel Declaration in Support of Motion for Preliminary Approval of Proposed Subscriber Class Settlement ("ASO Counsel PA Decl.") (ECF No. 2610-7); Declaration of Dr. Daniel Rubinfeld ("Rubinfeld Decl.") (ECF No. 2610-10); Declaration of Dr. Ariel Pakes ("Pakes Decl.") (ECF No. 2610-11); and Mediator's Affidavit ("Mediator's Aff.") (ECF No. 2610-12).

"allowing for opportunities for more competition in the market for health insurance and providing the potential for Class Members to achieve greater consumer choice, better product availability, and increased innovation." Mem. Op. and Order Preliminarily Approving Settlement, Plan of Distribution, and Notice Plan, and Directing Notice to the Class at 9, *In re Blue Cross Blue Shield Antitrust Litigation* (N.D. Ala. Nov. 30, 2020) ECF No. 2641 ("PA Order").

But this extraordinary and historic achievement on behalf of the tens of millions of members of the class of Subscriber Plaintiffs was neither foreordained nor easily achieved, as the Court is aware from its own close superintendence of this complex multi-district litigation over the last eight-plus years. Rather, this case has been the litigation equivalent of trench warfare, engaging scores of lawyers on both sides. To cite just a few examples, the parties have briefed and argued over a dozen motions to dismiss. The Subscriber Plaintiffs spent years negotiating, and then reviewing, Defendants' production of terabytes of structured health insurance data from 37 separate Blue entities, many with different data management systems. The parties had numerous contentious discovery disputes, resulting in the exchange of thousands of discovery letters and the filing of dozens of discovery motions, the holding of over 30 discovery hearings, and the issuance of more than 90 discovery orders. Subscriber Plaintiffs obtained and analyzed tens of millions of pages of documents, conducted over 120 depositions of Defendants, and defended numerous depositions of class representatives and experts. *See* PA Order at 31 (describing "extensive discovery" in this case); Lead Counsel Decl. ¶¶ 7, 36-50 (describing discovery effort).

The parties also briefed and argued several rounds of summary judgment motions, including Subscriber Plaintiffs' successful motion seeking application of a *per se* liability standard to Defendants' "aggregation of competitive restraints" (subject to resolution of Defendants' still-pending argument that it operated as a single entity for purposes of trademarks), resulting in a

landmark decision that the Eleventh Circuit declined to review on an interlocutory basis. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1267 (N.D. Ala. 2018); *In re Blue Cross Blue Shield Antitrust Litig.*, No. 18-90020-E, 2018 WL 7152887 (11th Cir. Dec. 12, 2018). And most recently, the parties briefed certification of a nationwide injunctive relief class and an Alabama damages class, each side supporting its claims with expert reports totaling hundreds of pages. As the Court observed in its preliminary approval order, "[t]his litigation has been extraordinarily complex, protracted, and hard-fought over the past eight years." PA Order at 3.

All of that effort not only advanced the litigation on its own terms, but also laid the foundation for the parties' sustained effort to negotiate, and ultimately reach, a comprehensive settlement of the Subscriber track of the litigation. Once again, this was no easy feat. It required years of good faith, arm's length, and often contentious negotiations, negotiations that were greatly facilitated by the close oversight of several mediators (and in particular, Special Master Edgar Gentle). Counsel for the parties met, either in person, telephonically, or virtually, on dozens of occasions, to hammer out solutions to the myriad complex issues that had to be resolved to achieve this comprehensive, fair, reasonable, and adequate settlement. *See* PA Order at 4 (describing settlement and mediation effort); Lead Counsel Decl. ¶¶ 80-93 (same). The results of that massive effort speak for themselves and speak to the enormous value of Subscribers Counsel's work on behalf of the class they represent. *See* PA Order at 6 (the proposed settlement "is the product of over four years of hard-fought, arms-length, and neutral supervised negotiations by counsel who are highly experienced in complex litigation and antitrust law").

Through the present motion, Subscribers Counsel now respectfully seek, pursuant to Rule 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure, and in accordance with the terms of the Settlement Agreement, an award of reasonable attorney's fees and the reimbursement of their

costs and expenses incurred in connection with their successful efforts on behalf of the class.  As discussed in detail in the pages that follow and in the expert declarations and other materials submitted in support of this motion, the $626,583,372 in fees that Subscribers Counsel seek is more than reasonable.  It amounts to less than 23.5 percent of the $2.67 billion Settlement Fund, and thus actually falls below the 25% benchmark percentage fee that, under established precedent in this Circuit, is considered presumptively reasonable.  *See, e.g., Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th. Cir. 1991); *Faught v. American Home Shield Corp.*, 668 F.3d 1233, 1242-43 (11th Cir. 2011); *see also Swaney v. Regions Bank*, 2:13-cv-544-RDP, 2020 WL 3064945, at *7 (N.D. Ala. Jun. 9, 2020) ("In determining an award of attorney's fees in a percentage-of-fund class settlement case, the 'benchmark' percentage is 25%, which is the dead center of the 20-30% range.").  *See also* PA Order at 45-46 (noting that attorney fee provisions of Settlement Agreement were "in line with benchmarks in the Eleventh Circuit").

Thus, even if Subscribers Counsel had obtained for the class *only* $2.67 billion in monetary relief, the fee they now seek would be considered more than fair.  But that unprecedented Settlement Fund is only one feature of the relief that the Settlement Agreement provides.  Once the proposed settlement's pro-competitive and pro-consumer structural changes in the Blue healthcare insurance system—structural relief that this Court characterized as "historic and substantial," PA Order at 4—are factored into the analysis, there can be no doubt that the requested fee award is reasonable.  Indeed, the Court has found, at least on a preliminary basis, that the proposed injunctive relief under the settlement not only "significantly alter[s] the Blues' business practices and substantially increase[s] the value of the Settlement to the class members," but is actually "more important" than the monetary relief. PA Order at 32.  *See also id.* at 26 ("The prospective injunctive relief in this case is wide-ranging and bears greater importance for the class than the monetary

relief."). The injunctive relief that the settlement provides has also won praise from insurance industry regulators, economists, and analysts, who agree it will promote increased competition, consumer choice, and greater transparency in the health care market.

The reasonableness of the requested fee award is further bolstered when it is assessed under the multi-factor framework of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), and its progeny. A review of the "*Johnson*" factors and of other criteria that courts in this circuit have typically used to assess a proposed fee award—*e.g.*, the extraordinary relief obtained for the class, the novelty and difficulty of the factual and legal issues, the enormous resources of both time and expense that counsel committed to their representation of the class, and the very real and substantial risk, freely assumed by Subscribers Counsel, that they would not receive any compensation for their work—amply confirms the reasonableness of the fee requested here.

Finally, Subscriber Plaintiffs request an expense award of $40,916,628. Recovery of these expenses is authorized under the Settlement Agreement. These out-of-pocket expenses have been thoroughly documented and have been subject to monthly scrutiny by the Special Master in accordance with rules and protocols established by the Court in the early days of the litigation. Because these expenses were reasonable and were incurred by Subscribers Counsel for the benefit of the Subscribers Class, the Court should approve their reimbursement to Subscribers Counsel.[2]

---

[2] The Subscriber Class owes a debt of gratitude to 67 class representatives, whose substantial effort contributed significantly to win this relief for the class. From start to finish, they have actively participated in every phase of this 8-year litigation, from aiding in the preparation of the individual and the consolidated class complaints, to responding to discovery requests and aiding counsel in preparing and responding to motions, to performing their duty to review the terms of the settlement agreement. Subscriber Counsel believe that both the duration of this litigation and the class representatives' significant contribution of time and effort would support a significant service award. Nevertheless, in light of the Eleventh Circuit's decision in *Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244, 1264 (11th Cir. 2020), the Subscriber Class has reluctantly elected not to seek awards to compensate the class representatives for their service to the class at this time. *See* Lead Counsel Decl. ¶¶ 119-122 .However, Subscribers Counsel requests that this Court retain "jurisdiction for the limited purpose of revisiting the denial of service awards if the

# **BACKGROUND**

## I.   **SUBSCRIBERS COUNSEL DEVOTED ENORMOUS TIME AND RESOURCES TO PREPARE THIS CASE AND BORE EXTRAORDINARY RISKS WHEN THEY ELECTED TO PROSECUTE THIS ACTION.**

Subscribers Counsel have represented the class of Subscriber Plaintiffs, comprised of cus-tomers of Blue Cross Blue Shield ("BCBS") health insurance companies, in these antitrust actions since they were consolidated and transferred for pretrial management to this Court by the Multi-District Litigation Panel in January 2013.  The Subscriber Plaintiffs' complaints allege that the Member Plans of the BCBS system agreed among themselves to restrain trade unlawfully by im-posing competitive restraints which inflated subscriber prices, limited consumer choice, stifled innovation, and reduced product availability.

Bringing an antitrust class action challenging the lawfulness of the entire BCBS health insurance system was a bold and unprecedented step at the time that the first suit was filed on February 7, 2012.[3]  The suit named as Defendants some of the most familiar and powerful names in the health insurance industry, including Blue Cross, Blue Shield, WellPoint, Anthem, Carefirst, Wellmark, Highmark, Premera, and Empire.  It alleged that the 37 Defendants that make up the BCBS system had divided up the health insurance markets of the United States among themselves by entering into a combination of *per se* unlawful restraints, enforced through a system of internal rules and regulations. Lead Counsel Decl. ¶¶ 10-11.  In terms of its scope, its aims, and the financial and legal resources of the Defendants, the suit thus rivaled some of the historic antitrust actions

---

Eleventh Circuit holds a rehearing en banc in *Johnson v. NPAS Sols., LLC* and reverses its decision," or another decision overrules *NPAS*, and proposes reserving up to $1 million for service awards should that decision be reversed. *See Metzler v. Med. Mgmt. Int'l, Inc.*, No. 8:19-CV-2289-T-33CPT, 2020 WL 5994537, at *3 (M.D. Fla. Oct. 9, 2020).

[3] *Cerven v. Blue Cross and Blue Shield of North Carolina and Blue Cross and Blue Shield Association*, Case. No. 5:12-cv-17-RLV-DCK (W.D.N.C.).

brought against companies such as Northern Securities,[4] Standard Oil,[5] American Tobacco Company,[6] and American Telephone & Telegraph.[7]

But unlike these other historic antitrust actions—and unlike the *Sealy*[8] and *Topco*[9] cases in which the Supreme Court first ruled that horizontal market allocation agreements are *per se* unlawful under Section 1 of the Sherman Act—this action would be brought not by the United States, and not even in conjunction with an action or even an investigation by the United States, but by a group of private plaintiffs represented by counsel who had agreed to undertake this action on a contingent fee basis. "Many antitrust cases that produced recoveries above $100 million were," as Professor Silver explains in his report, "assisted substantially by criminal prosecutions and guilty pleas." Silver Decl., ¶ 65. Not here. In this case, no government investigation preceded the filing of this action. No government agency had laid the groundwork necessary to reveal the facts, or develop the legal theory, upon which this action is based. This was a purely private effort to enforce the antitrust laws. Lead Counsel Decl. ¶¶ 10, 117. And this "lack of a prior or contemporaneous governmental investigation that uncovered wrongdoing matters too. This is so because a parallel government action may reduce the burden on class action lawyers, lend credence to the plaintiffs' allegations, and be a source of valuable information or other assistance." Silver Decl., ¶ 65. *See also* Fitzpatrick Decl., ¶ 31. *See* PA Order at 6 n.3 (noting that it "is rare for historic structural relief such as that negotiated here to arise out of private enforcement actions").

As a result, the enormous time and expenses of investigating, researching, organizing and

---

[4] *Northern Securities Co. v. United States*, 193 U.S. 197 (1904).

[5] *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911).

[6] *United States v. American Tobacco Co.*, 221 U.S. 106 (1911).

[7] *United States v. American Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C.1982)

[8] *United States v. Sealy, Inc.*, 388 U.S. 350 (1967).

[9] *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972).

7

litigating this case were, and have been, borne solely and entirely by Subscribers Counsel. The product of sustained factual investigation and exhaustive legal research, the original 61-page complaint was filed in the Western District of North Carolina on February 7, 2012. Class Action Complaint, *Cerven et al. v. Blue Cross Blue Shield of North Carolina et al.*, No. 5:12-cv-17 (Feb. 7, 2012), ECF No. 1 ("*Cerven* Complaint"). Subscribers Counsel had discovered through their investigation and a substantial research effort that the Member Plans had been created independently and had used the Blue Cross and Blue Shield marks as a cover to facilitate their joint effort to allocate exclusive local market territories and create local monopolies in the growing market for health care coverage, resulting in higher premiums and fewer choices for subscribers of Blue Cross Blue Shield health insurance. Lead Counsel PA Decl. ¶ 8. Subscribers Counsel had also uncovered evidence that the Blue Cross Blue Shield Association ("BCBSA") had been formed by the Blue plans, was entirely controlled by the Plans, and had been used to define and enforce the challenged anticompetitive scheme.[10] Lead Counsel Decl. ¶ 10.

Although Subscribers Counsel were confident that their investigative efforts had uncovered a serious nationwide violation of the antitrust laws and that the Subscriber Class members had suffered substantial injury as a result of diminished competition and stifled innovation in the national health insurance market, they fully understood the massive effort that litigating such a case would entail: a battery of expert consultants and witnesses would have to be engaged, voluminous document and deposition discovery would need to be conducted, and the parties would need to engage in protracted motion practice. And Subscribers Counsel also knew that there was a substantial risk that they might not prevail in the end. Lead Counsel Decl. ¶ 12. The long and complex

---

[10] *See also Cerven* Complaint, ¶¶ 40-64 (discussing historical development of Blue Cross system, Blue Shield system, and BCBSA).

evolution of the BCBS system, the history of the Blue Cross and Blue Shield trademarks and of the relationship between companies operating under those marks, the large number of parties to the anticompetitive agreement, and the numerous restraints that had been adopted over time to enforce that agreement, all contributed to this uncertainty and added to the risk. *Id.*, ¶¶ 12, 15.

Subscribers Counsel also understood that Plaintiffs faced significant risks when it came to establishing the legal merits of their claims. *See generally Id.*, ¶¶ 12, 14-15.  The suit included a challenge concerning a system of restraints that was, in their view, factually indistinguishable from those that the Supreme Court had held *per se* unlawful in *Sealy* and *Topco*.  But those precedents have been under a sustained attack by academics and by some lower courts for nearly fifty years now. *See* Bork, *The Antitrust Paradox* (1976) at 446-449; Posner, *Antitrust* (1976) at 166; Hovenkamp, *Federal Antitrust Policy: The Law of Competition and its Practice* § 5.2; *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) (Bork, J.); *General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588 (7th Cir. 1984) (Posner, J.).

Subscribers Counsel also understood that, while *Sealy* and *Topco* remain the law of the land, the applicability of those precedents to this case was far from pre-ordained, and that Defendants would argue that the Member Plans form a single entity for purposes of licensing common trademark products, *e.g.*, *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010), and that their anticompetitive scheme was justified as necessary to create a unique product, *e.g.*, *Broadcast Music, Inc. v. Columbia Broadcasting System*, 441 U.S. 1 (1979), or to take some other legitimate form of collective action, *F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013). Lead Counsel Decl. ¶¶ 12(ii), (iii), (iv).  And, as was already being reported in the press in 2013, Defendants were also likely to argue that the challenged unlawful conduct was not a product of an agreement,

9

but had evolved alongside common law trademark rights.[11]  This case thus raised complex legal and factual questions that created a significant risk that the suit would not succeed.  *See* PA Order at 29 ("the antitrust claims and defenses before the court are complex.").  *See also* Lead Counsel Decl. ¶¶ 12-18.

Through diligent, extensive discovery and experienced, skilled advocacy, Subscribers Counsel were ultimately able to defeat Defendants' motions to dismiss and for summary judgment. *See* below at 10-22.  And by the time the parties negotiated and finalized their Settlement Agreement, Subscribers Counsel were thoroughly knowledgeable of the facts of their case, as well as the strengths and weaknesses of their economic and legal arguments. Lead Counsel PA Decl., ¶¶ 13-25, 27.  This does not alter the fact, however, that Plaintiffs and their counsel faced significant obstacles and took on substantial risks when they commenced this pathbreaking litigation in 2012.

## II. SUBSCRIBERS COUNSEL AGGRESSIVELY LITIGATED THIS CASE FOR MORE THAN EIGHT YEARS, OBTAINING SIGNIFICANT LEGAL VICTORIES BEFORE BOTH THE TRIAL COURT AND THE ELEVENTH CIRCUIT, AND SETTLED AFTER PROTRACTED NEGOTIATIONS.

To say that this case has been hard fought would be a dramatic understatement. The Court appointed David Boies and Michael Hausfeld as Interim Co-Lead Counsel of the Subscriber Track; Chris Hellums as Local Facilitating Counsel; and Kathleen Chavez, Greg Davis, Bill Isaacson, Megan Jones, and Cy Smith as the Subscriber Plaintiffs' Steering Committee ("PSC"). *See* Case Management Order No. 2 – Order Appointing Interim Co-Lead Counsel, Local Facilitating Counsel, Plaintiffs' Steering Committee, and Discovery Liaison Counsel, ECF No. 61 ("Case Mgmt. Order No. 2").  The Court subsequently appointed Charles Cooper as an additional member of the

---

[11] Andrew Longstreth, "Blue Cross and Blue Shield antitrust lawsuits pile up," Reuters (Feb. 20, 2013) ("The Blue Cross and Blue Shield Association will likely argue that the terms in its licensing agreements are justified in the maintenance and protection of its trademark, said Barak Richman, a professor at Duke University School of Law who specializes in antitrust.") (available at https://reut.rs/2S5zxGc).

PSC. *See* Order, ECF No. 2673.  The Court clearly defined the roles and duties specific to each of these positions. Case Mgmt. Order No. 2.  Under the supervision of the Court and of the Special Master, Subscribers Counsel subsequently created committees to oversee, among other things, litigation, written submissions, class certification, discovery, damages, and experts, and to ensure that resources were properly and efficiently allocated to address each of the myriad issues raised by this litigation, and to liaise with counsel for the Provider Class. Lead Counsel Decl., ¶ 20.

The principal Defendants are among the largest health insurance companies—indeed, the largest companies—in the world.  Defendants have been represented by numerous first-rate firms, including but not limited to Kirkland & Ellis; Hogan Lovells; Balch & Bingham; Crowell & Moring; Foley & Lardner; Shearman & Sterling; Maynard Cooper & Gale; and Cravath, Swaine & Moore. Lead Counsel Decl., ¶ 118.  Plaintiffs were opposed, therefore, by highly experienced antitrust and class action lawyers at some of the nation's top law firms, who had practically unlimited resources at their disposal.  For the first several years of the litigation, Defendants showed little interest in discussing settlement.  Instead, they mounted a formidable and tenacious defense. It was only as a result of the sustained effort of Subscribers Counsel, both in discovery and in the courtroom, that Defendants ultimately agreed to attempt to resolve the case through mediation, while the litigation of the case proceeded apace.  With the diligent assistance of mediators Judge Layn Phillips, Judge Gary Fees, Kenneth Feinberg, and especially Edgar Gentle, the parties negotiated over a period of several years to arrive at this comprehensive settlement addressing the injuries that the members of the Subscriber Class have suffered. *See* Lead Counsel Decl., ¶¶ 80-93.

### A.      Discovery Was Protracted, Complex, and Contentious.

Discovery in this case was extraordinarily complex and contentious. What is more, for many years, it was essentially continuous. Lead Counsel PA Decl., ¶¶ 12-17.  Indeed, from the beginning of November 2014 until relatively recently,[12] Subscribers Counsel actively participated in bi-weekly meet-and-confer calls with the Provider Plaintiffs and the Defendants; each month, a discovery status conference call was held with Magistrate Judge Michael Putnam. *See* ECF No. 229, at D.1 & D.2; Lead Counsel PA Decl., ¶ 13.  During that time, Subscribers Counsel litigated over 50 motions to compel.[13]  A dedicated team of attorneys has also worked tirelessly to address the myriad questions that have arisen under the protective order pertaining to the unsealing of discovery materials and legal pleadings. *See* Lead Counsel Decl., ¶¶ 57-59.  Subscribers Counsel challenged over 700,000 privilege log entries, and ultimately succeeded in de-designating, in whole or in part, over 450,000 documents from Defendants' privilege logs. Lead Counsel PA Decl., ¶ 16; Lead Counsel Decl., ¶¶ 57-59. *See also* PA Order at 3.

Document discovery took place in three stages. *See* Disc. Order No. 1, § III.  The first stage focused on information housed in one of the Defendants' more than 400 structured data systems. *See* Disc. Order No. 1, § III.B. *See also* Lead Counsel PA Decl., ¶ 13.  For more than a year, Subscribers Counsel engaged in extensive meet and confer sessions with each Defendant to gain an understanding of where and how each Defendant stored its structured data, work that had to be undertaken to even begin the process of negotiating structured data requests. Lead Counsel Decl., ¶¶ 37-40; Lead Counsel PA Decl., ¶ 13.  Counsel then devoted much of the next two years to

---

[12] Discovery was originally scheduled to run through September 30, 2017. Discovery Order No. 1, ECF 229, ¶ V.A ("Disc. Order No. 1"). This action was ultimately stayed in September 2019 when the parties entered into the negotiations that ultimately produced the Settlement Agreement. Order, ECF No. 2513.

[13] *See, e.g.,* ECF Nos. 387, 408, 420, 421, 476, 488, 513, 539, 562, 563, 589, 611, 615, 636, 637, 638, 670, 847, 848, 849, 945, 973, 996, 1003, 1028, 1107, 1232, 1241, 1305, 1340, 1341, 1409, 1413, 1422, 1427, 1528, 1531, 1563, 1612, 1661, 1670, 1678, 1681, 1733, 1775, 1795, 1810, 1864, 2080, 2162, 2225, and 2332.

negotiating the scope of such structured data requests and the production of the data. Lead Counsel Decl., ¶ 39; Lead Counsel PA Decl., ¶ 13. *See* PA Order at 3 ("The parties spent months on production of multiple terabytes of structured health insurance data from 37 separate Defendants, many with different data management systems."). Even after the data was produced, multiple rounds of meet and confer sessions were held in order to test, vet, and understand the numerous fields of data that were produced. Lead Counsel PA Decl., ¶ 13; Lead Counsel Decl., ¶ 39.

During the second stage, document discovery focused on records in the possession of each of the 37 defendants. *See* Disc. Order No. 1, § III.C; *see also* Lead Counsel PA Decl., ¶ 14; Lead Counsel Decl., ¶¶ 41-47. This painstaking process included researching and identifying records custodians for each of the Defendants and proposing and negotiating Defendant-specific search terms as well as other protocols governing the document search and review effort. Lead Counsel PA Decl., ¶ 14; Lead Counsel Decl., ¶ 43. Finally, during the third and final stage, Plaintiffs were permitted to seek discovery of additional unstructured data and documents, as well as obtain discovery from an additional number of custodians. *See* ECF No. 229, § III.D.

Over the course of this action, Plaintiffs served over 150 document requests, and identified custodians and agreed upon search terms with each of the 37 Defendants. Lead Counsel Decl., ¶¶ 41-42. Defendants produced over 75 million pages of documents to Subscribers Counsel. *Id.*, ¶ 44. In total, 178 attorneys, working under the direction of the Subscribers Class Discovery Committee, reviewed Defendants' document productions and found the key documents that were used to support Subscriber Plaintiffs' claims in depositions, in expert reports, and in briefing substantive motions. *Id.*, ¶ 45; Lead Counsel PA Decl. ¶ 14. This discovery revealed evidence that, Subscribers Counsel are confident, would have established the existence of an agreement among competitors— entered into, implemented, and monitored by means of a trademark licensing organization that the

13

Member Plans themselves effectively controlled—to suppress competition between them by use of an elaborate system of restraints.[14] *Id.*, ¶ 45 (describing how document review was directed and supervised).

In January of 2015, the parties agreed to the guidelines that would govern depositions in this action. ECF No. 320.  By the time depositions concluded, Subscribers Counsel had noticed and taken over 120 depositions of Defendant witnesses, defended depositions for 16 Subscriber Class Representatives, and prepared for, and participated in, depositions for numerous third-party insurers and absent Subscriber class members. For a partial list of deponents, *see* Subscriber & Provider Plaintiffs' Updated List of Depositions Pursuant to the Court's Sept. 8, 2017 Order, ECF No. 1533; *see also* PA Order  at 3; Lead Counsel PA Decl., ¶ 15; Lead Counsel Decl., ¶¶ 48-50. The depositions covered the waterfront of potentially relevant issues, including the fact that the Member Plans have competed in the past and remain potential competitors today,[15] the degree of control that the Members Plans exercised over the BCBSA,[16] and the Defendants' ultimate agreement to adopt territorial market allocations and other significant restraints that maintained and policed that agreement in order to restrict competition.[17] These restraints included, inter alia, (1) so-called "National Best Efforts" ("NBE") requirements, under which at least two thirds of each Blue's national revenue from healthcare plans and related services had to come from business

---

[14] The 223 documentary exhibits that were marshaled in support of the Subscriber Plaintiffs' motion for partial summary judgment constitute a significant, but by no means exhaustive, sampling of the fruits of this discovery effort. *See* Mem. of Points and Authorities in Support of Subscriber Plaintiffs' Motion for Partial Summary Judgment on the Application of the *Per Se Rule* at 4-14 and *passim*, ECF No. 1351 ("Mem. of Points and Authorities").  The redacted copy of this Memorandum is at ECF No. 2021-1.

[15] *See, e.g.,* Mem. of Points and Authorities at 22 n.25.

[16] For a selection of the deposition testimony tending to establish that the Members Plans exercised control of the BCBSA, *see* Mem. of Points and Authorities at 5-7 (¶¶ 4-6, 8-9, 12-15).

[17] For a selection of the deposition testimony tending to establish these agreements to restrain competition, *see id.* at 8-9, 12-14 (¶¶ 16-17, 19-20, 23, and 26-27).

using the Blue Marks, and which had the purpose and effect of restraining the ability of Blue plans to compete with one another through the use of non-Blue marks, and (2) restrictions on the ability of multiple Blue plans to bid on large national accounts.[18]

In addition to these fact witness depositions, Subscribers Counsel deposed one of Defendants' expert witnesses and defended nine expert witness depositions. Lead Counsel PA Decl., ¶ 26. *See also* Lead Counsel Decl., ¶¶ 48-50, 97.

On two occasions, December 20, 2016 and June 9, 2017, Subscribers Counsel engaged in full-day "Economics Day" presentations. Lead Counsel PA Decl., ¶ 17; Lead Counsel Decl., ¶ 100. These presentations provided the Court with insight into the economic theories that underlay the case. *Id.* For each session, Subscriber Counsel prepared and presented testimony from multiple expert witnesses, along with presentation of evidence and arguments, for the Court to consider and familiarize itself with the economics and liability theories of the Subscriber case. *Id. See also* Lead Counsel Decl., ¶ 100.

The fruits of this discovery were instrumental in leading Subscribers Counsel to make the bold decision to (successfully) seek partial summary judgment on the question of whether the *per se* standard of review applied to their Section 1 claim. *See In re Blue Cross Blue Shield Antitrust Litig.,* 308 F. Supp. 3d 1241, 1247 (N.D. Ala. 2018) (observing that parties had conducted discovery that the court found necessary before deciding the appropriate standard of review for the Sherman Act claims"); *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1186–87 (N.D. Ala. 2014). As discussed below, the Court's decision on that motion resolved a critically important issue in favor of the Subscriber Class. Subscribers Counsel are also confident that the evidence they uncovered during discovery would have proven at trial, among other things, that

---

[18] *See id.* at 26-32.

Defendants were actual and potential competitors who had engaged in concerted conduct prohib-

ited by the antitrust laws, knowing and intending that their anticompetitive actions would stifle

competition.  And, for this reason, Subscribers Counsel's diligent, coordinated, and comprehensive

discovery effort proved an essential aid in the effort to bring this litigation to a successful resolu-

tion.

### B.   Subscribers Counsel Engaged in Extensive Motion Practice.

In addition to extensive motion practice related to discovery, Subscribers Counsel success-

fully defended against several potentially dispositive motions, prevailed on a motion for summary

judgment regarding the applicable standard of antitrust scrutiny, and succeeded in opposing a pe-

tition for interlocutory review under 28 U.S.C. § 1292(b) to the Eleventh Circuit.  *See* PA Order

at 3-4 (summarizing motions practice in this litigation).  Subscribers Counsel were also in the

midst of briefing their motions for class certification when this action was stayed in September

2019 to permit the parties to focus on settlement negotiations. *See* Lead Counsel Decl., ¶ 34.

The Judicial Panel on Multidistrict Litigation transferred these actions to the Northern Dis-

trict of Alabama and assigned them to the Court on December 12, 2012. Transfer Order, ECF No.

1. Over the next six months, the Court established the path forward to resolving the issues common

to these actions and appointed interim leadership. *See*, *e.g.,* Case Management Order No. 1 Re-

garding Initial Status Conference, ECF No. 6 ("Case Mgmt. Order No 1") and Case Mgmt. Order

No. 2, ECF No. 61.  After Subscribers Counsel filed the 310-page Subscriber Track Consolidated

Class Action Complaint on July 1, 2013,[19] *see* ECF No. 85, the extensive and significant motion

---

[19] Subscribers Counsel filed their 319-page Amended Consolidated Class Action Complaint on December 19, 2014, ECF No. 244; their 456-page Second Amended Consolidated Class Action Complaint on December 7, 2016, ECF No. 897; and their 475-page Third Amended Consolidated Class Action Complaint on April 17, 2017, ECF No. 1074-1. Subscribers Counsel have recently filed their Fourth Amended Consolidated Class Action Complaint. *See* Subscriber Track Fourth Amended Consolidated Class Action Complaint against all defendants, ECF No. 2616 (Nov. 2, 2020).

practice addressing merits, procedural, and jurisdictional issues began in earnest, and proceeded in several phases.

The first phase resolved the jurisdictional and the merits arguments that Defendants raised in their motions to dismiss.[20] *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d at 1186–87.  Shortly after these actions were consolidated before this Court, Defendants moved to dismiss, arguing, among other things: (1) that Plaintiffs had not alleged the requisite agreement to restrain trade because Defendants' exclusive service areas simply reflected pre-existing common-law trademark rights; (2) that *United States v. Sealy, Inc.*, 388 U.S. 350, (1967), *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972), and *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990), no longer represent the Supreme Court's mode of analysis for the *per se* rule, and, in any case, were distinguishable from the market allocation agreement entered into by Defendants; (3) that Plaintiffs had not stated a claim under the "Rule of Reason" standard that Defendants claimed was applicable to this case; (4) that Plaintiffs' claims were barred by the now-repealed McCarran Ferguson Act; and (5) that Plaintiffs' claims were barred by the Filed Rate Doctrine.  All of these issues were fully briefed by Subscribers Counsel; the parties' briefing on these issues consumed a combined total of over 35 filings, including 29 briefs running to a total of over 500 pages.[21]  The Court held oral argument in April 2014.  *See generally* Hearing Tr., ECF No. 187.  The Subscriber Plaintiffs substantially prevailed, as the motion to dismiss was denied, though the Court reserved ruling on the key question of the appropriate standard of antitrust review, finding that it was "simply too early to assess which standard of review should be applied to Plaintiffs' allegations."

---

[20] ECF Nos. 107, 108, 110, 112–14, 116, 119, 121, 122, 125, 135, and 136.

[21] ECF Nos. 107-108, 110-117, 119-123, 125, 125-1, 135-136, 148-153, 168-170, 172-179.

*In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d at 1186.  The Court also deferred

ruling on the filed-rate doctrine,[22] *id.* at 1190, and on personal jurisdiction and venue, *id.* at 1196.

In the second phase, after extensive discovery, the parties filed cross motions for summary

judgment to resolve, *inter alia*, the question whether Plaintiffs' antitrust challenges would be ana-

lyzed under the *per se* standard or under the Rule of Reason. *See In re Blue Cross Blue Shield*

*Antitrust Litig.,* 308 F. Supp. 3d at 1247.  Again, Subscribers Counsel fully briefed these motions.[23]

The Court heard a full day of oral argument on October 4, 2017. *See generally* Hearing Tr., ECF

No. 1607.  The Court subsequently granted Subscriber Plaintiffs' motion for partial summary judg-

ment, "faithfully appl[ying] *Sealy* and *Topco* to the Rule 56 record before it and determin[ing] that,

in navigating the antitrust landscape in this case, those decisions and their progeny remain

polestars." 308 F. Supp. 3d at 1279.  "Thus, the court conclude[d] that Defendants' aggregation of

a market allocation scheme together with certain other output restrictions is due to be analyzed

under the *per se* standard of review." *Id.*

On Defendants' application, the Court certified for interlocutory review the question

whether *Topco*, *Sealy*, and *Palmer* require application of the *per se* standard in this case. Order

Regarding Cert. Under 28 U.S.C. § 1292(b) and Amended Order Regarding Section 1 Standard of

Review, *In re Blue Cross Blue Shield Antitrust Litigation,* (N.D. Ala. June 12, 2018) ECF No.

2203.  Defendants filed their petition to the Eleventh Circuit for interlocutory review on June 22,

---

[22] The Court subsequently ruled on summary judgment that the filed-rate doctrine barred some claims for money damages brought by some of the Alabama plaintiffs, Memorandum Opinion, ECF No. 997 & Order, ECF No. 998, but, in response to Subscribers' Motion for Reconsideration, ECF No. 1046, announced that the Court would reassess the issue at a later date, Order, ECF No. 1098 (denying motion without prejudice so that issues could be "reassessed . . . at a later date"); 4/21/17 Hrg. Tr. at 69-70,ECF No. 1109 (noting for the record that the Court would, at class certification or closer to trial, "revisit the issue with more information than I have got right now …").  *See also* Mot. for Leave to File Surreply in Opp. To Mot. for Part. Summ, J. at 10-15, ECF No. 2628 (discussing filed rate doctrine issues raised addressed by this litigation).

[23] ECF Nos. 1348, 1351, 1434, 1435, 1552

2018, and Subscriber Plaintiffs responded on July 2, 2018. *See* Lead Counsel PA Decl. ¶ 23; Lead Counsel Decl., ¶¶ 68-69.  On December 12, 2018, the Court of Appeals denied the petition. *In Re Blue Cross Blue Shield Antitrust Litigation*, 2018 WL 7152887.

In April 2019, Subscriber Plaintiffs filed motions seeking to certify both an Alabama damages class and a nationwide injunctive class.  Subscriber Plaintiffs' motions for class certification were supported by two expert reports and by numerous exhibits. *See* Lead Counsel Decl., ¶ 70**;** Lead Counsel PA Decl. ¶ 24; SX 330-SX413, ECF 2456-1-ECF 2456-44; ECF 2457-1-ECF 2457-40; Opposed Mot. for Cert. of Ala. Damages, ECF No. 2409; Memo. of Points and Authorities, ECF No. 2410.  Ariel Pakes, the Thomas Professor of Economics at Harvard University, and Daniel Rubinfeld, the Robert L. Bridges Professor of Law and Professor of Economics Emeritus at the University of California, Berkeley and Professor of Law at NYU, separately prepared expert reports analyzing, among other things, whether common economic proof could be used to establish antitrust injury and damages. *See* SX 414, ECF 2457-41; SX 415, ECF 2457-42. *See* Lead Counsel Decl., ¶ 70.  At the time the action was stayed in September of 2019, briefing on class certification had not been completed. Lead Counsel Decl., ¶ 34; Lead Counsel PA Decl., ¶ 27.  Subscribers Counsel nevertheless remain confident that they would have prevailed on their motions for class certification.

Finally, in May 2019, the Subscriber Plaintiffs filed merits experts reports from Dr. Pakes and Dr. Rubinfeld, as well as from Professor Christy Chapin, who compared the behavior of Defendants with the behavior of the members of a traditional trade association. *See* Subscriber Plaintiffs' Executive Summary of Merits Expert Reports at 1-2, ECF No. 2428 ("Summary of Merits Experts"); Lead Counsel PA Decl., ¶ 25; Lead Counsel Decl., ¶ 78.  Leslie Strassberg offered the opinion that the level of profitability that BCBS-AL enjoys would, absent the restraints, entice new

entry into the market. Summary of Merits Experts at 4-5.  Louis T. Pirkey, in turn, prepared a report in which he opined that the evidence supported the conclusion that Defendants had abandoned the Blue Cross and Blue Shield trademarks. *Id.* at 2-3.  Had the parties not been able to arrive at a settlement agreement, therefore, Subscribers were well prepared to proceed to trial.

### C.    Subscribers Counsel Engaged in Months of Settlement Negotiations.

The parties had unsuccessfully sought to resolve the case via direct communications before the Court's April 2018 summary judgment ruling. In fact, as the Court noted in its Preliminary Approval decision, the parties "first began settlement discussions in 2015." PA Order  at 4.  These initial negotiations were overseen and facilitated by two mediators, Judge Layn Phillips and Judge Gary Fees. Lead Counsel PA Decl., ¶ 28; Mediator's Aff., ¶ 3; Lead Counsel Decl., ¶¶ 81-82. "When the mediation sessions in 2015, 2016, and 2017 failed to gain traction, in November 2017 Special Master Edgar C. Gentle began assisting in the settlement discussions."  PA Order at 4. In January 2019, the parties entered into another round of negotiations assisted by Special Master Gentle; in September 2019 the Court stayed this action so that the parties' lead counsel might devote their undivided attention to these negotiations. Mediator's Aff., ¶ 11; Sept. 23, 2019 Order, ECF No. 2513. Over the next 20 months, the negotiations continued under the supervision of Mediator Gentle. Mediator's Aff., ¶ 11. These negotiations included multiple individual and joint mediation sessions, as well as at least 158 in-person and virtual meetings with the mediator and 282 telephone conferences. Mediator's Aff., ¶ 3. *See* PA Order at 4.

The parties "slowly but steadily inched along in their discussions," and after "the usual setbacks and breakthroughs," PA Order at 4, they reached an agreement in principle in late 2019. Mediator's Aff., ¶ 21.  In November 2019, the parties asked Kenneth Feinberg to assist them in developing a reasonable allocation of the net settlement fund between Individual Members and

Insured Groups, on the one hand, and Self-Funded Accounts on the other. Declaration of Allocation Mediator Kenneth R. Feinberg, ¶ 6 (ECF No. 2610-8).  They devoted the following months to ironing out the specific terms of the settlement, which was agreed to by the parties on July 30, 2020 (subject to formal approval by each of the Defendants and the Class representatives), Mediator's Aff., ¶ 30, and submitted to the Court for preliminary review and approval on October 30, 2020. The Settlement Agreement is thus the product of vigorous, arm's length settlement negotiations, conducted with the assistance of several respected and highly-skilled mediators. Mediator's Aff., ¶ 37. *See also* PA Order at 4 (noting that the "negotiations over … structured relief were protracted, complicated, and challenging").  As discussed below, the Settlement Agreement that these negotiations produced constitutes a significant victory for the members of the Subscriber Class.

> ### D.  Subscribers Counsel Devoted Substantial Time and Resources to Advocating for the Subscriber Class.

As one might expect given the extensive factual discovery, the numerous complicated and contested legal questions, the vigorously contested dispositive and other motions, and the length and difficulty of the settlement negotiations, Subscribers Counsel had to devote enormous time and resources to this action in order to obtain a favorable settlement for the members of the Subscribers Class.

These efforts were coordinated and well documented and took place under the Court's and Special Master Gentle's close supervision and pursuant to the protocols and procedures developed by the Court with the assistance of the Special Master, who was appointed on January 9, 2013, and who would closely supervise the litigation and the subsequent settlement negotiations. Order Appointing Special Master, ECF No. 7. *See also* Gentle Decl. at 1.

Thus, this case moved forward subject to rules that ensured that the time devoted to this litigation by Subscribers Counsel, as well as the expenses they incurred, were reasonable and properly documented, and that unnecessary duplication of effort was avoided. Pursuant to the Court's Order Regarding Protocols for Plaintiffs' Counsel Time and Expense Submissions ("Billing Protocol"), each of the law firms whose attorneys have represented the Subscriber Class have submitted their hourly billings and expenses to the Local Facilitating Counsel at the end of each month since this action was filed in 2013. ECF No. 80, at I.E. Counsel used 30 different specific task codes to classify their work, and included a detailed description of the work. Lead Counsel Decl., ¶ 131. These time and expense submissions were then provided to the Special Master for his review. ECF No. 80, at I.E. The Special Master regularly audited these billing records. Lead Counsel Decl., ¶ 132; Gentle Decl. at 4-5. This process ensured that Counsel's time and expenses were well-vetted and represent an accurate, and likely conservative, accounting of the time spent and costs of litigating this case. Lead Counsel Decl., ¶ 133; Gentle Decl. at 3-5.

Lead counsel has collected and totaled these billings and calculated the lodestar for the Subscriber Class. Lead Counsel Decl., ¶ 134. The hourly billing records establish that, as of August 15, 2020, Subscribers Counsel had devoted a total of 434,054.6 hours since 2013 to litigating this case on behalf of the class. Lead Counsel Aff., ¶ 134; Gentle Decl., Ex. B. *See also* PA Order at 19 ("Subscriber Plaintiffs have invested tens of thousands of hours and tens of millions of dollars prosecuting their claims."). This total reflects the titanic scale of the effort that Subscribers Counsel made to uncover the facts through discovery and other efforts and to define the contours of the challenged anticompetitive scheme, to litigate the host of complex legal questions presented by this case, and to negotiate over a period of several years a settlement that not only will establish an enormous Settlement Fund for class members but also provide unprecedented and

22

transformative injunctive relief designed to restore and increase competition in health insurance markets throughout the country.

### III.   THE SETTLEMENT PROVIDES UNPRECEDENTED BENEFITS TO THE SUBSCRIBER CLASS MEMBERS AND TO THE MARKET FOR HEALTH CARE INSURANCE.

The full terms of the Settlement Agreement, and the reasons that it should be approved, are set forth in detail in the materials supporting Subscriber Plaintiffs' motion for preliminary approval of the Settlement, but it is worth emphasizing here that the Agreement provides historic monetary relief for the benefit of the Subscribers Class and provides for transformative injunctive relief that will promote competition in the health insurance marketplace. *See* PA Order at 9.

#### A.   The Settlement Agreement Establishes a Common Fund of $2.67 Billion.

The Settling Defendants have agreed to create a Settlement Fund in the amount of $2.67 billion, Settlement Agreement, ¶ 22,[24] with a first payment of $400,000,000 to be made within 30 days of the entry of the preliminary approval order, *id.,* ¶ 22(a), and the remainder within 30 calendar days of the Effective Date,[25] *id.,* ¶ 22(b).  These funds, which represent "one of the largest antitrust class settlements in history," PA Order at 32, are to be distributed to authorized claimants in accordance with a Plan of Distribution that has been submitted to the Court. Settlement Agreement, ¶ 27.  *See* [Proposed] Plan of Distribution, ECF No. 2610-5. Costs, expenses, attorneys' fees, and class representative service awards will also be paid out of the fund.

---

[24] The Settlement Agreement was submitted to the Court as Exhibit A to the preliminary approval motion. ECF No. 2610-2.  In discussing the Agreement in this submission, capitalized terms not otherwise defined herein shall have the meaning given them in the Settlement Agreement.

[25] Paragraph 8 of the Settlement Agreement defines the "Effective Date" by reference to the occurrence of nine specified events, including, for example, the entry of the preliminary approval order, the passage of the deadline to request exclusion from the settlement class, and the expiration of the time for appeal or to seek permission to appeal.

B.     **The Settlement Agreement Provides for Class Injunctive Relief that Will Pro-
mote Competition**

As more fully described in the motion for preliminary approval, the Settlement Agreement

also provides transformative, pro-competitive injunctive relief that will benefit the Subscribers

Class. *See* PA Order at 7 (summarizing injunctive relief).  First, and perhaps most significantly, it

requires the Settling Defendants to eliminate the so-called National Best Efforts ("NBE") require-

ments. Settlement Agreement, ¶¶ 1.ccc; 10. The NBE requirements, which were adopted in 2005,

require each of the Member Plans to derive at least 66.7 percent of its total national health insur-

ance revenue under its Blue brand. *In re Blue Cross Blue Shield Antitrust Litig.,* 308 F. Supp. at

1256  (*citing* ECF Nos. 1349-21 at 5; 1349–16 at 7). By limiting the health insurance revenue that

a Blue Plan could generate from the services it offered under any non–Blue branded insurance plan

to one-third of its total revenue, these restrictions substantially limited the extent to which compe-

tition between the Member Plans could occur even in non-Blue branded businesses. *Id.* (*citing*

ECF No. 1432 at 20–21). The Settlement Agreement will result in the Member Plans being able

to expand their non-Blue business lines and increase the level of competition in the market for

health insurance. This achieves a balance between Defendants' interest in protecting and promot-

ing the value of their marks with Subscriber Plaintiffs' interest in restoring vigorous competition

between the Settling Defendants.  As the Court noted, the elimination of the NBE requirements,

standing alone, is of enormous value to the Class: "[t]o put the effect of the injunctive relief in

context, during the litigation phase, [Plaintiffs' expert] estimated 'that NBE accounted for 97 per-

cent of the total damages in the case.' "  PA Order at 33 (citation omitted).

Second, the Agreement provides for greater inter-Blue competition for "National Ac-

counts," *i.e.*, certain accounts that purchase insurance for more than 250 members located in mul-

tiple Service Areas, Settlement Agreement, ¶¶ 14-15.  Under existing License Agreements and

24

BCBSA rules, a Member Plan may not bid on a National Account headquartered outside its service area using the Blue Marks unless the Plan in whose service area the National Account is headquartered agrees to "cede" the right to bid. *In re Blue Cross Blue Shield Antitrust Litig.,* 308 F. Supp. at 1256 (*citing* ECF Nos. 1350 at 11; 1432 at 11). The Settlement Agreement now permits the Plan in whose service area that National Account is located to bid for that account under one of its non-Blue-branded businesses, provided it cedes the right to bid as a Blue for that account to another Member Plan. Settlement Agreement, ¶ 14(a)(i). It also now permits National Accounts with corporate headquarters in more than one Service Area to request bids from the Individual Blue Plans in both Service Areas. *Id.,* ¶ 14(b). And, Qualified National Accounts (those accounts with more than 5,000 employees that meet certain dispersion criteria) may now also obtain a second Individual Blue Plan bid, *id.,* ¶ 15, an opportunity for increased competition that has the potential to benefit at least 33 million members, *id.,* ¶¶ 1.rrr, 1.u.

Third, BCBSA currently controls—through member plan voting—whether any individual Blue Plan may be acquired by another Blue Plan. Such votes may be cast for good reasons, bad reasons, or no reason at all. Under the Settlement Agreement, the Association and the Settling Individual Blue Plans are permitted to impose "legal and reasonable conditions on the acquisition of a Settling Individual Blue Plan, but only to the extent that those conditions are reasonably necessary to prevent impairment of (1) the value of the Blue Marks, or (2) the competitiveness or efficiency of the Blue Branded business or of the Blue Marks," and any condition must provide that the potential acquirer may challenge any rejection by the BCBSA before the Monitoring Committee, followed by binding arbitration. *Id.,* ¶ 17.

Fourth, the Agreement imposed restrictions on the use of "Most Favored Nations" ("MFN") clauses and differentials. Under the current Blue system, a Blue Plan can use MFN

differentials to effectively require providers to give the Plan better prices than those charged to competing insurers. The Settlement Agreement requires Blue Plans to abide by applicable state laws and regulatory agreements governing the use of MFN clauses and differentials in provider contracts, and, where no such state laws or agreements apply, it limits the ability of Plans to enter into agreements for the use of MFN differentials. *See id.,* ¶ 18. This provision thus also enhances competition between Blue Plans and other insurers.

Fifth, the Agreement significantly limits the existing so-called "local best efforts" rules. These rules, adopted in 1994, require that at least 80 percent of a Member Plan's annual health insurance revenue from within its exclusive service area must be derived from services offered under its Blue Marks. *In re Blue Cross Blue Shield Antitrust Litig.,* 308 F. Supp. at 1256 (*citing* ECF Nos. 1349–15 at 20–21; 1349–16 at 7). Under the Settlement Agreement, a designated exclusive service area may no longer be defined as an area larger than a single state. Settlement Agreement, ¶¶ 1.tt, 11. In addition, the Settlement Agreement provides that compliance with the Local Best Efforts Requirement is to be based on geographic service areas no larger than a state and that the requirement shall not exceed 80%. *Id.* These provisions thus limit the anticompetitive effects of the existing local best effort rules, while also ensuring that the Blues cannot use those rules to impose restrictions that have the same effect on competition as the now-prohibited NBE Rules

Finally, the Settlement establishes a Monitoring Committee, which will include representatives of the Settling Defendants and Subscribers Counsel, as well as an independent member appointed by the Court. Settlement Agreement, ¶¶ 1.xx, 1.zz. In addition to overseeing disputes related to the Agreement, this Committee will, for a period of five years, review any proposed new

rules or measures made by the Settling Defendants, *id.*, ¶ 20, as well as any newly designated service areas, *id.*, ¶ 13.

In support of Subscribers Plaintiffs' motion for preliminary approval, Dr. Daniel Rubinfeld prepared and submitted a report in which he demonstrated that this injunctive relief was itself of meaningful and substantial economic value to the Subscriber Class due to its significant pro-competitive effects on the health insurance market. *See generally* Rubinfeld Decl. Dr. Rubinfeld analyzed the procompetitive benefits that would flow from: (1) the elimination of the National Best Efforts standard, *id.*, ¶¶ 22-32; (2) the changes to the ceding policies that had limited competition for national accounts, *id.*, ¶¶ 33-37; and (3) the removal of certain restrictions on mergers and acquisitions, *id.*, ¶¶ 38-45. He concluded that his review of the proposed settlement had "convince[d]" him "that the injunctive relief directly addresses the competitive restraints" he had analyzed earlier in the litigation, and that the "injunctive relief is likely to generate significant pro-competitive effects in the marketplace in the forms of increased competition among Blues, unbranded ("Green") growth and competition, scale economies that may result in increased output, higher quality service, increased innovation and lower insurance premiums (prices) to subscribers (consumers)." *id.*, ¶¶ 15, 16.

Indeed, since the proposed settlement was made public, other independent analysts have agreed that it will provide historic structural relief that will lead to more competition in the health insurance industry in ways that are not only "monumental" but that have "the potential to re-shape the state of competition in health insurance markets going forward." *See* Public Comments of Washington Insurance Commissioner Mike Kreidler,[26] ("This settlement should increase competition, which is great news," Kreidler said. "The settlement should put all companies on notice that

---

[26] Available at https://bit.ly/3eUfV0w.

they need to do right by consumers. Hopefully, it will also lead to more transparency throughout the health care market."). *See also* Joe Patrice, "*Blue Cross Blue Shield Plans to Settle for $2.7B… and That's Not the Most Important Relief*," *Above the Law* (Sept. 24, 2020),[27] ("[T]he impact that the injunctive relief will have on the health insurance market should be monumental."); James Burns, Healthcare Antitrust practice head at Ackerman LLP, " 'Historic' Settlement of Blue Cross Blue Shield Association Antitrust Action May Significantly Boost Competition," *Lexology* (Nov. 9, 2020),[28] ("While the money that will be paid under the proposed settlement, if approved, is substantial – even when shared among the 36 member Blues – the injunctive relief terms are even more significant, as they have the potential to re-shape the state of competition in health insurance markets going forward.").

Thus, in addition to the $2.67 billion Settlement Fund, the members of the settlement class have received non-monetary relief that carries enormous pro-competitive economic value.  The Court was thus thoroughly justified in finding, at least on a preliminary basis, that the injunctive relief secured under the settlement "substantially increase[s] the value of the Settlement to the class members."  PA Order at 32.  *See also id.* at 21 ("The court finds that in the final analysis it will likely conclude the proposed injunctive relief will prevent injuries similar to those at issue in this case from recurring, greatly increase competition among the Blues, and substantially benefit all members of the classes.").

---

[27] Available at https://bit.ly/3hyZjNB.

[28] Available at https://bit.ly/2RkriGe

## ARGUMENT

## I.      THE REQUESTED FEE AWARD IS REASONABLE.

Class Counsel in a common fund case are entitled to an award of attorneys' fees that represents "a reasonable percentage of the fund established for the benefit of the class." *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th. Cir. 1991); *Faught v. American Home Shield Corp.*, 668 F.3d 1233, 1242 (11th Cir. 2011); *Carroll v. Macy's Inc.*, No. 2:18-cv-01060-RDP, 2020 WL 3037067, at \*8 (N.D. Ala. 2020). *See also* Fed. R. Civ. P. 23(h). And the Eleventh Circuit has consistently opined that a "benchmark range" of 20% to 30% of the common fund is where a reasonable fee should likely fall.

Here, Subscribers Counsel request an award of attorneys' fees that amounts to less than 23.5 percent of the $2.67 billion Settlement Fund their efforts have created for the benefit of the class.[29] Even laying aside the significant value of the wide-ranging injunctive relief secured for class members under the Settlement Agreement, the requested award is thus below the benchmark percentage fee award that the Court of Appeals has declared presumptively reasonable. *Faught*, 668 F.3d at 1243.  And a review of the 12 "*Johnson*" factors and of other criteria that courts in this circuit typically use to assess a proposed fee award amply confirms the reasonableness of the fee requested here, *In re Home Depot Inc.*, 931 F.3d 1065, 1090 (11th Cir. 2019), as does the performance of a lodestar "cross-check," *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1298 (11th Cir. 1999), and the expert testimony of two eminent scholars of class litigation and attorneys' fee awards, Professors Charles Silver and Brian Fitzpatrick.[30]

---

[29] As noted, the fees and expenses requested together amount to 25 percent of the common fund.  Once the $40,916,627 in requested expenses is deducted, the requested fees amount to approximately 23.47 percent of the fund.

[30] Professor Silver holds the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where he has taught since 1987. He is an author of *The Law of Class Actions and*

Finally, this Court should not accept the proposition—which finds little if any support in Eleventh Circuit precedent—that the very fact that Subscribers Counsel were so successful in creating a substantial Settlement Fund for the class somehow requires or justifies a reduction in the fee to which they might otherwise be entitled.  Such a "sliding scale" approach to fees is legally misguided and economically unsound, and would provide the wrong incentives for skilled and experienced counsel to take on risky, complex, and time and resource-intensive class action litigation like this case.  But even were this Court to adopt such a sliding scale approach, it should nonetheless conclude that, in spite of the exceptional size of the common fund created for the class, 23.47 percent remains a reasonable percentage to award Subscribers Counsel in light of both the significant risk that this action entailed, the time, effort, and resources that counsel devoted to its pursuit, and other factors. *See, e.g., In re Nat'l Collegiate Athletic Assoc. Athletic Grant-in-Aid Cap Antitrust Litig.*, 768 Fed. Appx. 651, 654 (9th Cir. 2019).

### A.    Subscribers Counsel Are Requesting a Presumptively Reasonable Percentage of the Common Fund as Attorneys' Fees.

Although "[t]here is no hard and fast rule mandating a certain percentage of a common fund which may reasonably be awarded as a fee," *Camden I*, 946 F.2d at 774, "[i]n this Circuit, courts typically award between 20–30%, known as the benchmark range." *In re Home Depot Inc.*, 931 F.3d at 1076.  Indeed, at the time the Court of Appeals decided *Camden I*, the courts had

---

*Other Aggregate Litigation*, 2nd Edition (2012) (updated annually), as well as of numerous articles on class actions, mass actions, and multi-district litigation.  He has testified as an expert on attorneys' fees on numerous occasions, and his opinions have been relied upon and cited by numerous courts, including in *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006); *In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011). Professor Fitzpatrick joined the Vanderbilt University law faculty in 2007.  He is the author of numerous articles addressing class action litigation issues, and conducted the leading empirical study of attorneys' fees in class actions, *see* B. Fitzpatrick*, An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010).  He too has testified as an expert on attorneys' fees many times, and his opinions have been relied upon and cited by numerous courts, including *In re Oil Spill by the Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, 2016 WL 6215974, at *16 (E.D. La. 2016), and *In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011).

already come "to view the median of this 20% to 30% range, *i.e.*, 25%, as a 'bench mark' percent-age fee award which may be adjusted in accordance with the individual circumstances ...." *Camden I*, 946 F.2d at 775. *See also Waters v. Int'l Precious Metals Corp.*, 190 F.3d at 1294 (majority of common fund fee awards fall between 20% to 30% of the fund).

Today, 25 percent is the standard benchmark against which the reasonableness of an award of attorneys' fees is analyzed in this Circuit. *See, e.g., Faught*, 668 F.3d at 1243; *Swaney*, 2020 WL 3064945, at *7 (observing that "the 'benchmark' percentage is 25%, which is the dead center of the 20-30% range."); *Carroll*, 2020 WL 3037067, at *9; *Wilson v. EverBank*, No. 14-civ-22264, 2016 WL 457011, *18 (S.D. Fla. Feb. 3, 2016) ("[F]ederal district courts across the country have, in the class action settlement context, routinely awarded class counsel fees in excess of the 25 percent 'benchmark,' even in so-called 'mega-fund' cases.") (emphasis in original) (quotation omitted); *Amason v. Pantry, Inc.*, No. 7:09–CV–02117–RDP, 2014 WL 12600263, at *2 (N.D. Ala. July 3, 2014) (" '[T]he majority of common fund fee awards fall between 20% to 30% of the fund,' with 25% of the fund being viewed as a 'benchmark percentage fee award.' ") (quotation omitted); *James D. Hinson Elec. Contracting Co. v. BellSouth Telecomms. Inc.*, No. 3:07–CV–598–TJC–MCR, 2012 WL 12952592, at *2 (M.D. Fla. July 30, 2012); *In re Colonial BancGroup Inc. Securities Litig.*, 2:09-CV-00104-RDP-WC, Slip Op. at 10, 2012 WL 12871879 (N.D. Ala. Apr. 18, 2012); *Flournoy v. Honeywell Int'l, Inc.*, No. cv-205-184, 2007 WL 1087279, at *1 (S.D. Ga. Apr. 6, 2007); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d at 1201 ("[I]n determin-ing [fee] ... awards, the 'bench mark' percentage is 25%, 'which may be adjusted up or down based on the circumstances of each case.' ") (quotation omitted); *Carnegie v. Mut. Sav. Life Ins. Co.*, No. Civ.A.CV–99S3292NE, 2004 WL 3715446, at *36-37 (N.D. Ala. Nov. 23, 2004); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. June 7, 2001) ("[A]ttorneys' fees should be a

reasonable percentage of a common fund created for the benefit of the class[ ] and set a 25% recovery as an appropriate 'benchmark.' ") (quotation omitted); *Walco Invs., Inc. v. Thenen*, 975 F. Supp. 1468, 1470 (S.D. Fla. 1997) (noting that "25% of the common fund is a 'benchmark' "). The district courts have used this "25 percent 'benchmark,' even in so-called 'mega-fund' cases." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d at 1210. *See also Wilson,* 2016 WL 457011, at *18 (same); *In re Checking Acct. Overdraft Litig.*, No. 1:09-MD-2036-JLK, 2013 WL 11319391, at *17 (S.D. Fla.  Aug. 5, 2013) (same); *In re Sunbeam Sec. Litig.,* 176 F. Supp.2d 1323, 1333 (S.D. Fla. 2001). *See also* Fitzpatrick Decl., ¶¶ 19-24.

Setting the benchmark at 25 percent is appropriate because such a percentage reflects (indeed, it may actually underestimate) market rates. As Professor Silver has explained, parties to contracts, including attorney retainer agreements, will negotiate terms that maximize the amount of wealth available for them to share. Silver Decl., ¶¶ 22-24. Private parties bargaining at arms' length in a competitive market will, in other words, tend to negotiate attorneys' fees that produce the optimal wealth-maximizing result. *Id.* It is thus highly instructive that, when sophisticated clients hire lawyers to bring lawsuits on a straight contingency basis, they typically agree to pay fees in the range of 33 percent to 40 percent of the recovery, "even when sophisticated clients hire lawyers to handle complex commercial lawsuits with the potential to generate enormous recoveries." *Id.,* ¶ 24.[31] *See also* Fitzpatrick Decl., ¶¶ 11, 22.

---

[31] In addition, as one of the leading treatises in the area of class action practice has explained, there are several benefits to using the benchmark approach to setting attorneys' fees. NEWBERG ON CLASS ACTIONS (5th ed., 2019), at § 15.95. First, it provides a certain starting point for assessing the reasonableness of any award. *Id.* Second, it provides consistency across cases. *Id.* Third, "it crystallizes the question whether a proposed fee is high or low by providing a reference—this makes application of the accompanying multifactor test more meaningful in that a court now knows whether it is assessing an above—or below—benchmark fee request."  Finally, it makes judicial oversight more efficient. *Id. See also Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 679, 692 (M.D. Al. 1988).

The Settlement Agreement provides for the creation of a Settlement Fund of $2.67 billion. The Settlement Agreement reflects that the parties negotiated a "package deal," authorizing Subscribers Counsel to request attorneys' fees, costs, and expenses in an amount not to exceed $667,500,000, or 25 percent of the Settlement Fund.[32] This amount falls squarely at the center of the range of percentage awards that the Eleventh Circuit has deemed presumptively reasonable, and would result in Subscribers Counsel receiving what the Eleventh Circuit has recognized as the benchmark award of attorneys' fees.

The requested award covers not only attorneys' fees, however, but also the substantial costs and expenses that Subscribers Counsel have incurred advocating for the interests of the class. As of August 15, 2020, the total costs that Subscribers Counsel had incurred over the course of seven years of litigating this action amounted to $40,916,628. The actual attorneys' fee request is thus for $626,583,372, which represents 23.47 percent of the common fund, a figure below the 25 percent benchmark adopted by the Eleventh Circuit. This cost figure reflects the actual costs that Subscribers Counsel historically incurred. The figure has not been adjusted for inflation or the time value of money. Nor has any adjustment been made to account for the very real risk that Subscribers Counsel would ultimately be unable to recover their costs. Taking these factors into account amply confirms the reasonableness of awarding attorneys' fees representing approximately 23.47 percent of the common fund they have created for the benefit of the class.

Furthermore, the award of a fee below the 25 percent benchmark fee is more than reasonable when one takes into account the value not only of the common fund secured for the benefit

---

[32] Because Defendants have "negotiated the payment to the class and the payment to counsel as a 'package deal,' " the case is properly considered a constructive common fund. *In re Home Depot Inc.*, 931 F.3d at 1080; *Carroll*, 2020 WL 3037067 at *9 n.12. *See also Home Depot*, 931 F.3d at 1092 ("In typical common-fund cases, attorney's fees are necessarily included in the class benefit [against which the award percentage is calculated], … because the defendant pays a lump sum of cash, a percentage of which is awarded to class counsel.") (citation omitted).

of the class under the Settlement Agreement, but also the value of the unprecedented injunctive relief secured by the Settlement.  As the Court concluded in its preliminary approval decision, that historic injunctive relief, which restores and increases competition in the marketplace, is itself of enormous value to class members.  Indeed, the Court found that the "wide-reaching" injunctive relief secured under the proposed settlement "bears greater importance for the class than the monetary relief." PA Order at 26; *see also id.* at 32.  *See also* Rubinfeld Decl., ¶ 16;  Fitzpatrick Decl., ¶ 13 (observing that if this injunctive "relief had been quantified, the fee requested by class counsel would have been *far below* the benchmark" fee award) (emphasis in original); Silver Decl., ¶ 63.

Notably, in one case with marked similarities to this one, the Eleventh Circuit approved the use of a higher benchmark for a fee award.  In *Waters v. Int'l Precious Metals Corp.,* a securities class action, the Court of Appeals accepted the district court's use of 30 percent as the initial benchmark, as well as its subsequent adjustment of the award, after applying the *Johnson* factors, to a percentage award of 33 1/3 percent. 190 F.3d 1291, 1295-98 (11th Cir. 1999).  As one district court later explained, there were extraordinary circumstances present in *Waters* that justified using a benchmark significantly higher than 25 percent: "*Waters* involved certain facts that distinguish it from this case, such as seven years of contentious litigation and five months of trial, among others." *In re Rayonier Inc. Sec. Litig.,* No. 3:14-cv-1395-J-32-JBT, 2017 WL 4542852, at *2 (M.D. Fla. Oct. 5, 2017).  The facts of this case—which involved eight years of contentious litigation, two rounds of motions to dismiss, cross motions for summary judgment, numerous contested hearings and oral arguments a petition for interlocutory review, and a gargantuan discovery effort (including, *inter alia*, the production of over 75 million pages of documents and the taking of over 120 depositions)—render the use of a 25 percent benchmark in this case *a fortiori* reasonable.

**B.      Consideration of the Factors Used by the Courts in this Circuit Confirm the Reasonableness of the Requested Fee Award.**

The fee award requested here thus falls well within the range of fee percentages considered reasonable under applicable precedent, and in fact falls below the 25 percent benchmark that has been approved in numerous cases. The Eleventh Circuit has on at least one occasion suggested that it may therefore be unnecessary to conduct a separate analysis of a benchmark fee award using the factors discussed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d at 717–19. *See, e.g., Faught*, 668 F.3d at 1242 & 1243 (observing, in case where district court had analyzed only the amount of the award above 25% using the *Johnson* factors, that "[w]here the requested fee *exceeds* 25%, the court is instructed to apply the twelve *Johnson* factors.") (emphasis added). *See also Swaney*, 2020 WL 3064945, at *7 (observing that "our Circuit has historically encouraged courts to apply the factors set out in *Johnson*" "where a requested fee 'exceeds 25 percent of the claims'") (*quoting Faught*, 668 F.3d at 1242); *Carroll*, 2020 WL 3037067, at *9  ("But, where a requested fee 'exceeds 25 percent of the claims,' the Eleventh Circuit encourages courts to apply the factors set out in *Johnson v. Georgia Highway Express, Inc.*, ... to determine the reasonableness of the requested fees in light of the outcome of the case."); *In re Colonial BancGroup*, Slip Op. at 10, 2012 WL 12871879  ("Because the percentage fee requested is precisely at the benchmark range, the court need not analyze all of the *Johnson* factors.").  *But see In re Home Depot*, 931 F.3d at 1090 ("With the percentage method, courts use the *Johnson* factors to help determine what percentage of the fund to award to counsel.").[33]  In any event, in this case the standard multi-factor *Johnson* analysis not only confirms the reasonableness of the 23.47 percent fee request, but would actually support a larger percentage award.

---

[33] *See also Waters v. Int'l. Precious Metals Corp.*, 190 F.3d at 1294 (observing that in *Camden I* "we directed district courts to view this range as a 'benchmark' which 'may be adjusted in accordance with the individual circumstances of each case,' using the" Johnson factors) (*quoting Camden I*, 946 F.2d at 775).

35

Courts in common fund cases will adjust an award above or below the 25 percent bench-

mark "in accordance with the individual circumstances of each case ...." *Camden I*, 946 F.2d at

775. Although "[t]he factors which will impact upon the appropriate percentage to be awarded as

a fee in any particular case will undoubtedly vary," *Camden I*, 946 F.2d at 775, the courts in this

Circuit nevertheless will generally look to the twelve *Johnson* factors.

The twelve *Johnson* factors are:

> (1) the time and labor required;
> (2) the novelty and the difficulty of the questions involved;
> (3) the skill requisite to perform the legal service properly;
> (4) the preclusion of other employment by the attorney due to ac-
> ceptance of the case;
> (5) the customary fee;
> (6) whether the fee is fixed or contingent;
> (7) time limitations imposed by the client or the circumstances;
> (8) the amount involved and the results obtained;
> (9) the experience, reputation, and ability of the attorneys;
> (10) the 'undesirability' of the case;
> (11) the nature and length of the professional relationship with the cli-
> ent;
> (12) awards in similar cases.

*Camden I*, 946 F.2d at 772 n.3 (*citing Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714).

As the Court emphasized in *Camden I*, these factors are not exclusive:

> Other pertinent factors are the time required to reach a settlement, whether there
> are any substantial objections by class members or other parties to the settlement
> terms or the fees requested by counsel, any non-monetary benefits conferred upon
> the class by the settlement, and the economics involved in prosecuting a class ac-
> tion. In most instances, there will also be additional factors unique to a particular
> case which will be relevant to the district court's consideration.

*Camden I*, 946 F.2d at 775. *See also In re Checking Acct. Overdraft Litig.*, No. 1:09-MD-2036,

2020 WL 4586398, at *17 (S.D. Fla. Aug. 10, 2020) (same); *Swaney,* 2020 WL 3064945, at *7

(same). Nor are all 12 of the *Johnson* factors necessarily applicable "in every case, so the court

has wide discretion as to which factors to apply and the relative weight to assign to each." *In re*

*Xcel Energy,Inc., Sec's., Derivative & "ERISA" Litig.,* 364 F. Supp. 2d 980, 993 (D. Minn. 2005) (*quoting Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 854 (10th Cir.1993) ("[R]arely are all of the *Johnson* factors applicable; this is particularly so in a common fund situation." (citation omitted)); *See also In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 502 (N.D. Miss. 1996).

Here, consideration of the applicable *Johnson* factors and other relevant criteria amply confirms the reasonableness of the requested fee award of less than 25 percent of the common fund.

### 1.     The substantial monetary award and significant injunctive relief obtained for the class support the reasonableness of the fee award.

"The most critical factor in determining the award of attorney's fees is the degree of success that the party obtained." *Mills by Mills v. Freeman*, 118 F.3d 727, 733 (11th Cir. 1997). *See also Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("[T]he most critical factor is the degree of success obtained."); *Behrens v. Wometco Enter's, Inc.*, 118 F.R.D. 534, 547-48 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990) ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained."); *Sawyer v. Intermex Wire Transfer, LLC*, No. 19-cv-22212, 2020 WL 5259094, at *1 (S.D. Fla. Sept. 3, 2020) ("The result achieved by counsel is a major factor to consider in making a fee award."); *Mashburn v. National Healthcare, Inc.*, 684 F. Supp. at 693 ("The critical element in determining the appropriate fee to be awarded class counsel out of a common fund is the result obtained for the class through the efforts of such counsel."). The substantial monetary relief obtained for the Subscriber Class, standing alone, would amply support awarding the 25 percent benchmark fee award. As discussed, Subscribers Counsel have, however, also negotiated a settlement that will promote the restoration of vigorous competition in the health

insurance marketplace.  These historic results achieved for the class thus clearly confirm the rea-

sonableness of the requested fee award.

The $2.67 billion Settlement Fund that Subscribers Counsel negotiated in this case may

represent the largest antitrust class action settlement on record. Silver Decl., ¶ 63. *See also* Fitz-

patrick Decl., ¶ 17 (observing that this "may very well end up as the largest class action settlement

in federal court this entire year"); Mediator's Aff., ¶ 33; PA Order at 32. The Net Settlement Fund

of $1.9 billion (assuming approval of the fee and expense award) will be distributed to the members

of the class from this fund. Settlement Agreement, ¶¶ 26-28. And this money will be distributed

to benefit *the class*; the Agreement specifically provides that "[i]n no event shall any portion of

the Net Settlement Fund be paid to Settling Defendants or Settlement Class Counsel." *Id.*, ¶ 30.[34]

This award is an extraordinary result for the class, particularly when one takes into account

that even successful antitrust actions often result in only modest damages awards. Indeed, "the

history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on

liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re

NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y.1998).

In this antitrust class action—as in every antitrust action— there was a significant risk that

Plaintiffs would not be able to establish the elements of their claim, to prove damages, or to certify

a class. *See supra* at 8-10. *See also* PA Order at 30 (finding that "the 'costs, risks, and delay of

trial and appeal' … strongly support preliminary approval"). *See also* Lead Counsel Decl., ¶ 12;

Subscriber Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Approval at 32-

35 (ECF No. 2610-1).  Moreover, that Subscribers Counsel were able to avoid subjecting the class

---

[34] In any event, the courts are to award a percentage of the fund that counsel established for the class, *not* of
the amount of that fund that is ultimately claimed by individual class members, when it calculates that percentage.
*Waters v. Inter'l Precious Metals Corp.*, 190 F.3d at 1295-1296; *Carter v. Forjas Taurus*, S.A., 701 Fed. Appx. 759,
767 (11th Cir. 2017).

members to the considerable uncertainty that any battle of experts regarding antitrust damages would inevitably have introduced thus further supports the reasonableness of the proposed fee award.[35] *Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992) (observing that, '[i]n the 'battle of experts,' it is impossible to predict with any certainty which arguments would find favor with the jury").

The $2.67 billion Settlement Fund compares favorably, moreover, to the range of potential maximum damages awards to which the Subscriber Class would have been entitled had they prevailed after a trial on the merits. Dr. Ariel Pakes has concluded that the settlement amount represents 7.3% to 14.3% of estimated maximum potential recoveries of $18.6 billion to $36.1 billion resulting from the anti-competitive effect of the challenged restraints as a whole. *See* Pakes Decl. ¶ 10.  As the Court has noted, these percentages fall well "within the range of reasonable recoveries." PA Order  at 32.  *See, e.g., Bennett v. Behring Corp.*, 737 F.2d 982, 986-87 & n.9 (11th Cir. 1984) (approving $675,000 settlement representing 5.6% of claims with maximum potential recovery of $12,000,000); *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d at1346 ("[S]tanding alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims."); *Nichols v. SmithKline Beecham Corp.*, No. CIV.A.00-6222, 2005 WL 950616, at *16 (E.D. Pa. Apr. 22, 2005) ("The Settlement Fund is $65 million, or between 9.3% and 13.9% of damages. This percentage is consistent with those approved in other complex class action cases."); *Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 318-19 (W.D. Pa. 1997) (approving settlement award representing 5.35% of expected recovery).

---

[35] *See also* PA Order at 30 ("If this case advanced toward trial, Subscriber Plaintiffs faced a significant risk that their models would be rejected….").

The reasonableness of the requested fee award is further confirmed by the fact that, in addition to this extraordinary monetary relief, the proposed settlement also provides for transformative injunctive relief that is "wide-reaching" and offers "forward-thinking, pro-competitive reforms that will change the nature of Defendants' business moving forward" and will provide "for opportunities for more competition in the market for health insurance and allow[] the potential for Class Members to achieve greater consumer choice, better product availability, and increased innovation." PA Order at 26-27. *See also* Mediator's Aff., ¶ 34. When conducting the analysis of the *Johnson* factors, "the fact that such additional benefits were achieved for the class ... should be considered in determining what appropriate percentage fee should be awarded out of the settlement fund." *Mashburn*, 684 F. Supp. at 694. Under the terms of the Settlement, as previously noted, the BCBSA and the Settling Blue Plans have agreed to provide substantial additional benefits to the class by agreeing, among other things:

- To eliminate the so-called "national best efforts" standards that had required that at least 66-2/3% of the annual combined national net revenue or of the national enrollment of each Settling Plan and its affiliates be sold under the Blue Marks, Settlement Agreement, ¶¶ 1.ddd; 10 (ECF No. 2610-2);

- To provide for greater competition among Defendants for national accounts, *id.*, ¶¶ 14-15;

- To place limits on BCBSA's ability, through member plan voting, to block the acquisition of Blue Plans, *id.,* ¶ 17;

- To impose restrictions on the use of Most Favored Nations clauses and differentials, *id.*, ¶ 18;

- To limit the so-called "local best efforts" standards that had required each Plan to generate at least 80% of its revenue from customers within its service area, *id.*, ¶¶ 1.vv, 11;

- To submit disputes concerning this agreement to a monitoring committee, and to submit any proposed changes to its rules and policies, as well as any proposal to create new services areas, to that committee, *id.,* ¶¶ 13, 20.

*See also* Mediator's Aff., ¶ 34.

The significant benefits that this historic injunctive relief will provide to the class lend strong support to Subscribers Counsel's request for a fee award below the 25 percent benchmark. *Waters v. Cook's Pest Control, Inc.*, 2012 WL 2923542, at *18 (N.D. Ala. July 17, 2012).  *See also Faught*, 668 F.3d at 1243-44   (court could consider "non-monetary benefits [counsel] achieved for the class — like company-wide policy changes . . ." when assessing compensation for class counsel); *In re Checking Acct. Overdraft Litig.*, 2013 WL 11319391, at *13 (percentage of common fund awarded to be "based on both the monetary and nonmonetary value of the judgment or settlement.") (*quoting* Principles of the Law of Aggregate Litigation, § 3.13(b) (American Law Institute, 2010)); *McGaffin v. Argos USA, LLC*, 2020 WL 3491609, at *9 (S.D. Ga. Jun. 26, 2020) (collecting cases).  The pro-competitive non-monetary benefits secured for the Subscriber Class under the Settlement are historic. As Professor Fitzpatrick has testified, "[m]ost class action settlements do not include any such relief." Fitzpatrick Decl., ¶ 33 (*citing* Fitzpatrick, *Empirical Study,* at 824 (finding that only one quarter of class action settlements included injunctive relief) (attached as Exhibit 2 to Fitzpatrick Decl.).

And these non-monetary benefits have a substantial economic value for the class. As discussed above, *see supra* at 27, Dr. Daniel Rubinfeld analyzed the procompetitive benefits that are likely to result from the Settlement and concluded that the "injunctive relief is likely to generate significant pro-competitive effects in the marketplace in the forms of increased competition among Blues, unbranded ("Green") growth and competition, scale economies that may result in increased output, higher quality service, increased innovation and lower insurance premiums (prices) to subscribers (consumers)." Rubinfeld Decl., ¶ 16.  "This forward-looking relief, opening up competition among substantial entities in the enormous health insurance market, stands as economically

significant by itself, in addition to the $2.67 billion monetary recovery provided for in the proposed settlement." *Id.* ¶ 17.[36]   As the Court found in its Preliminary Approval decision, because these provisions will clearly foster competition in the health insurance markets, they will translate directly into greater choices, and lower premiums, for Subscribers and other consumers of such insurance.  PA Order at 26-27, 32-33.  Unlike the case with many consumer class action settlements, therefore, these benefits are "non-monetary" only in the sense that the provisions creating them do not require the Defendants to directly contribute additional cash to the Settlement Fund.  In virtually every other meaningful sense, these benefits are undeniably economically beneficial.

While it is unnecessary to quantify precisely the value of this historic equitable relief, there can be no doubt that the value to the class of these non-monetary benefits is substantial and that, were that value to be factored into the analysis, the requested fee award would fall well below the Eleventh Circuit's 25 percent benchmark. Again, this Court observed in its preliminary approval order that while the monetary relief obtained for the class is "clearly significant," the injunctive relief bears even "greater importance for the class than the monetary relief." PA Order at 26. *See also id.* at 32 ("Subscribers counsel notes that the structural relief that the Plaintiffs have obtained is more important tha[n] the dollar amount of the settlement.  The court agrees."). It is thus entirely reasonable to conclude that the *value* of that injunctive relief likewise exceeds the value of the class' monetary relief and, accordingly, that Subscribers Counsel are requesting a fee award that is the effective equivalent not of 23.5 percent, but of no more than 12% of the value of the total benefits that their efforts have created for the class.

---

[36] *See also id.* ¶ 32 (The settlement provisions eliminating the National Best Efforts requirement "as the critical enforcement mechanism for restraining competition outside of a Blue's ESA, and further proscribing any future equivalent provision, [are] clearly pro-competitive."); *id.* ¶ 45 ("[T]he proposed settlement enables [Blue] plans to respond to consumers/market with innovative products and to achieve efficiencies even to the extent that predominant bran may no longer be Blue.").

Another way to analyze the support that the proposed settlement's injunctive relief lends to the application of the 25 percent benchmark in this case is to consider the attorneys' fees that would have been awarded had Subscribers Counsel succeeded in obtaining *only* injunctive relief. In this situation, Subscribers Counsel would have been entitled to receive "a reasonable attorney's fee." 15 U.S.C. § 15(a). *See also Parsons v. Brighthouse Networks, LLC*, No. 2:09-cv-267-AKK, 2015 WL 13629647, at *11 (N.D. Ala. Feb. 5, 2015). Since no common fund would have been created, that reasonable fee would have been calculated using the lodestar method. *Parsons*, 2015 WL 13629647, at *11. *See also Hensley*, 461 U.S. at 435 n.11 (plaintiff who fails to recover damages but obtains injunctive relief "may recover a fee award based on all hours reasonably expended if the relief obtained justified that expenditure of attorney time.").

As discussed below, infra at 53, as of mid-August of last year, Subscribers Counsel dedicated almost $195,000,000 of attorney time to bringing this action to a successful conclusion. Had Counsel obtained only the proposed injunctive relief on behalf of the class, an award of reasonable attorneys' fees approaching that total lodestar would have been appropriate, especially given the substantial overlap in the Subscribers Counsel's efforts to obtain damages and injunctive relief for the class.  But even assuming, conservatively, that only three-quarters, or even only half, of the lodestar figure could be attributed to the effort to obtain non-monetary relief, a reasonable award of attorney fees would still amount to at least around $100 million. It can reasonably be assumed, therefore, that obtaining this injunctive relief alone would have justified a fee award of between $100,000,000 and $195,000,000, thus leaving approximately $435 million to $530 million to be supported by the value of the common fund itself. This portion of the award would then represent roughly 16-20%  of the common fund of $2.67 billion, well below the 25% benchmark that the Eleventh Circuit has adopted.  Once again, this exercise simply confirms that the proposed

43

settlement's enormously valuable and transformative non-monetary relief lends substantial support for finding that an award of attorneys' fees representing less than 23.5 percent of the common fund is more than reasonable.

The Eleventh Circuit approved the use of a comparable analysis in *Faught v. Am. Home Shield Corp.*, 668 F.3d at 1243-44. The district court there had approved a fee award with two components: an award of 25% of the common fund that counsel had obtained for the class, and an additional $1.5 million lump sum paid to compensate counsel for "the work done in changing [Defendant's] business practices and in establishing a state of the art center to field class member inquiries regarding the settlement." *Id.* at 1243. In evaluating the fairness of this $1.5 million lump sum, the district court "calculated the hours and the rates of the attorneys and staff working on the claims and determined that the $1.5 million was a very small amount compared to the amount of money invested in the case." *Id.* And the court further found "that the $1.5 million payment is designed to compensate the class counsel for the non-monetary benefits they achieved for the class—like company-wide policy changes and appliance and system replacements and repairs, to which the 25% fee is not applied." *Id.* at 1243-44. Thus, in *Faught*, the work performed by counsel to obtain changes to the defendants' business practices justified an additional fee award *over and above* the 25% benchmark. Here, of course, Subscribers Counsel argue only that the proposed settlement's injunctive relief for the class supplies additional justification for a total fee award that is *below* the 25% benchmark.

In sum, if the value of these benefits, however they are characterized, is factored into the analysis, the requested fee award would fall well below the 25 percent benchmark. At a minimum, these additional benefits further support a fee award that is set slightly below the 25 percent benchmark even when measured *solely* against the size of the Settlement Fund. As Professor Fitzpatrick

44

opines, "such significant injunctive relief is a major reason why class counsel's fee request is reasonable." Fitzpatrick Decl., ¶ 33.

      **2.**      **This case presented difficult factual issues and raised novel and complex questions of law.**

      The Court should consider the complexity and difficulty of the case when assessing the appropriate percentage of a common fund to award as attorneys' fees; the more complex and difficult a case, the more an upward departure from the 25 percent benchmark is warranted. *Johnson*, 488 F.2d at 718. *See also Flournoy v. Honeywell Intern., Inc.*, 2007 WL 1087279, at *1 (awarding 25% benchmark where "claims asserted on behalf of Plaintiffs and the numerous defenses raised over the twelve years by counsel for the Defendant presented numerous novel and unusual questions of law and fact that required diligent and effective legal work by Plaintiffs' counsel throughout this litigation"). "It is common knowledge that class action suits have a well-deserved reputation as being most complex." *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir.1977). And while "'[t]he prosecution and management of a[ny] complex national class action requires unique legal skills and abilities,'" *Columbus Drywall & Insulation v. Masco Corp.,* No. 1:04-cv-3066-JEC, 2012 WL 12540344 at *4 (Oct. 26, 2012) (*quoting Edmonds v. United States*, 658 F. Supp. 1126, 1137 (D.S.C.1987)), "[a]n antitrust class action is arguably the most complex action to prosecute," *In re Motorsports Merchandise Antitrust Litig.,* 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000). "The legal and factual issues involved are always numerous and uncertain in outcome." 12 F. Supp. 2d at 1337. *See also Wal-Mart Stores, Inc. v. Visa, U.S.A., Inc.*, 396 F.3d 96, 118 (2nd Cir. 2005) ("Federal antitrust cases are complicated, lengthy, and bitterly fought."); Silver Decl., ¶ 55 (observing that counsel for the Subscriber Class incurred risks including "challenges to the plaintiffs' damages model, a difficult path to class certification, the prospect of having to certify classes in multiple states, the difficulty of proving damages if their model was accepted, the absence or a

preceding or contemporaneous governmental investigation, and many others"); Fitzpatrick Decl.,

¶¶ 26-31 (discussing risks faced by Subscribers Counsel).

It should come as no surprise, therefore, that antitrust class actions typically result in an award of attorneys' fees in excess of the 25 percent benchmark. Indeed, Professor Fitzpatrick has found that "[n]early 80% of awards in antitrust cases were equal to or greater than 25%." Fitzpatrick Decl., ¶ 16. Another large-scale study found, in 2017, that the mean and median fee awards in antitrust cases were 27% and 30%. *Id., citing Eisenberg-Miller* 2017 at 952.

In terms of its complexity and its difficulty, this antitrust class action was no exception to the rule. *See* PA Order at 3 (noting that this "litigation has been extraordinarily complex, protracted, and hard-fought"); Mediator's Aff., ¶ 37 (attesting that "the legal, factual, and administrative questions that they had to address and resolve during the settlement process were novel, complex, and difficult"). Indeed, it is perhaps the most complex, difficult, time-consuming and costly antitrust class action ever brought. Every factual question and legal issue was hotly contested at every stage of litigation. *See* PA Order at 29 (noting that approval of the settlement would avert years of highly complex litigation involving significant costs, risks, and delay). There can be no doubt, therefore, that an award of attorneys' fees set *below* the 25% benchmark for a standard case, and *well below* the 27% average award for an antitrust case, is reasonable.

### a.   This case involved substantial discovery to resolve myriad factual issues.

Discovery into whether the Member Plans were potential competitors who had entered into an agreement to use their ownership of and control over a central licensing authority to implement and enforce their scheme to restrain competition was no easy task. While antitrust actions are "generally complex, expensive, and lengthy," *In re Shopping Carts Antitrust Litig.*, MDL No. 451, 1983 WL 1950, at *7 (S.D.N.Y. Nov. 18, 1983), factual discovery in this case was particularly

difficult, for at least three separate reasons. *See* PA Order at 3 (summarizing discovery effort); Lead Counsel Decl., ¶¶ 36-52 (same).

First, the challenge to the Blue Plan's anticompetitive scheme was exceptionally complicated, involving allegations that more than three dozen competitors used their ownership and control over a licensing entity to divide the United States into "exclusive service areas."[37] The anticompetitive impact was substantially amplified through a combination of additional restrictions on competition.[38] As the Court itself acknowledged, because of the number of parties to the market allocation scheme, its sheer breadth, and its manifold and varied enforcement mechanisms, discovery into the origins and evolution of that market allocation scheme, its structure, and the Member Plans' reasons for establishing and maintaining it, was necessary for the Court to determine the appropriate standard of review for Plaintiffs' Sherman Act claims. *See In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d at 1186-87.

Second, the challenged market allocation scheme had evolved over the course of almost fifty years, and ultimately traced its roots back to the 1930s.[39] Prosecuting this action required extensive discovery into the historical origins of the Blue network and the question whether the 70-odd plans that had existed in the 1970s had, indeed, entered into an agreement for purposes of Section 1 of the Sherman Act, first, to form the BCBSA and, then, to reduce their numbers and divide up the markets of the United States, confining the individual Blue Plans to limited territorial markets. Plaintiffs had to obtain and review records pertaining to each of the surviving Member Plans, as well as to those Plans that had ceased to operate as the allocation scheme was

---

[37] For a discussion of the history of the service areas allocated in the BCBS network, s*ee In re: Blue Cross Blue Shield Antitrust Litigation,* 308 F. Supp. 3d at 1250-51.

[38] For a discussion of the history of these agreements and of the BCBS rules restraining competition in the Blue system, s*ee id.* at 1253-56.

[39] For a discussion of the history of the BCBS organization, *see* 308 F. Supp. 3d at 1247-49.

implemented.  In order to determine whether the Blue Plans remain potential competitors today, moreover, Plaintiffs conducted extensive discovery to determine those markets in which the individual Blue plans had historically competed and those in which the plans had not competed.[40]

Third, Subscriber Plaintiffs had to take discovery into the long and complicated history of the Blue Cross and Blue Shield trademarks in order to rebut the Defendants' claim that the creation of their anticompetitive scheme was a natural by-product of the evolution of their common law trademarks.[41]  This required Plaintiffs to determine the relationship between the marks and specific allocated territories, and thereby distinguish between Defendants' legitimate interests in protecting their marks and their illicit interest in restraining competition.  With the possible exceptions of the breakup of the Bell System and the years of litigation that followed the dissolution of Standard Oil, we are aware of no case that has raised as many and as complicated a series of questions regarding the relationship between antitrust and trademark as the present case.

While the distinctive features of this case broadened the scope and prolonged the duration of discovery, it is important that the Court not lose sight of the fact that discovery in an even run-of-the-mill antitrust action is exceptionally demanding and will thus support an award of attorney's fees at the benchmark 25 percent level (at least).  Notably, courts have found an upward departure from the 25 percent benchmark warranted where discovery has been extensive, ruling, for example, that an award of 33.33 percent is justified where class counsel "have reviewed and analyzed millions of pages of documents, and their work on this litigation has persisted over six years." *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *5 (E.D. Pa.

---

[40] For a discussion of past and present competition in overlapping service areas, s*ee id.* at 1251-53.

[41] For a discussion of the history of the BCBS trademarks, s*ee id.* at 1249-50.

Jan. 3, 2008).[42] Here, as noted earlier, the parties spent months negotiating the production of over

100 terabytes of structured health insurance data collected from the more than 400 data systems

maintained by the 37 separate defendants. Lead Counsel PA Decl., ¶ 14; Notice of Filing Power-

point Slides from Preliminary Approval Hearing at Slide 9, ECF No. 2625-1("Slide Deck"). *See*

*also* Lead Counsel Decl., ¶ 38**;** PA Order at 3, 31. Defendants produced over 75 million pages of

documents. Subscriber's Counsel took over 120 depositions, including 20 30(b)(6) depositions;

they also defended the depositions of 16 Subscriber Class Representatives and 9 expert witnesses,

and prepared for and participated in the depositions of numerous third-party insurers and absent

class members. Lead Counsel Decl., ¶ 51; Lead Counsel PA Decl., ¶ 15.   Subscriber Plaintiffs

reviewed and challenged over 700,000 assertions of privilege and obtained the de-designation of

over 450,000 documents. Lead Counsel PA Decl., ¶ 16; Lead Counsel Decl., ¶¶ 57-59. In sum,

this consideration overwhelmingly supports a finding that the requested award of attorneys' fees,

representing less than 23.5 percent of the common fund, is reasonable.  In fact, it supports a sig-

nificant upward adjustment from the 25 percent benchmark.

### b.      This case raised novel and complex legal questions.

The Subscriber Plaintiffs claimed that the Blue Plans' horizontal territorial allocation

scheme and its amplification through additional, integrated anti-competitive restrictions, under

---

[42] *See also In re Activision Sec. Litigation*, 723 F. Supp. 1373, 1379 (N.D. Cal. 1989) (approving award where "[a]fter three years of litigation, substantial discovery and motion practice, and on the eve of trial, a settlement was reached from which the attorneys will receive 32.8%"); *In re AIA Indus., Inc. Sec. Litig.*, No. 84-2276, 1988 WL 33883 (E.D. Pa. March 31, 1988) (33% awarded after substantial discovery and lengthy settlement negotiations; case pending approximately 4 years); *Friedlander v. Barnes*, No. 84-CIV-533, 1986 WL 5517 (S.D. N.Y. May 8, 1986) (approximately 30% award in case pending for two years where class certified, motion for summary judgment successfully opposed, substantial discovery and trial preparation completed); *Eltman v. Grandma Lee's, Inc*., No. 82-Civ-1912, 1986 WL 53400, at *3 (E.D.N.Y. May 28, 1986) (33% awarded after four years of "[e]xtensive document discovery and negotiation"); *Basile v. Merrill Lynch, Pierce, Fenner, & Smith, Inc*., 640 F. Supp. 697 (S.D. Ohio 1986) (25% awarded where case litigated over four year period, tens of thousands of documents produced, many depositions taken); *Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622 (E.D.Pa.1986) (33% awarded in case pending for five years, where plaintiffs had survived summary judgment and a number of other motions, and completed significant amount of discovery).

Supreme Court precedent, constituted *per se* violations of Section 1 of the Sherman Act. While the legal case is thus simply summarized, it proved anything but simple to litigate. From start to finish, Subscribers Counsel were called upon to address numerous complex and often novel questions of law. These questions were raised in Defendants' motions to dismiss,[43] in connection with disputes that arose during discovery between the parties, on cross motions for summary judgment,[44] and, of course, during settlement negotiations. A complete list of such issues would run for pages, but a sampling of some of the more significant issues includes:

1.    Whether the alleged market allocation scheme should be evaluated under the per se rule or under the Rule of Reason?[45]

2.    More specifically, regarding the standard of review, whether the Supreme Court decisions in *United States v. Sealy, Inc.*, 388 U.S. 350, (1967), *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972), and *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990), have been limited to their specific facts or, instead, continue to require the application of the *per se* standard of review to similar horizontal territorial market allocation agreements?[46]

3.    Whether the *per se* rule made applicable by *Sealy* and *Topco* to horizontal territorial market allocation schemes applies only when the alleged market allocation scheme has no plausible procompetitive justification?[47]

4.    Whether the ruling in *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010), that the holders of trademarks may form a "single entity" in order to license their trademarks without running afoul of Section 1, could be extended to insulate the conduct of joint holders of a single mark who

---

[43] *See* ECF Nos. 107, 108, 110, 112-14, 116, 119, 121, 122, 125, and 135. *See* also ECF Nos. 148 (Provider Plaintiffs' Opposition); 149 (Joint Opposition to MTD); 150 (Opposition to Motion To Dismiss for Lack of Personal Jurisdiction and Improper Venue); and 153 (Subscriber Plaintiffs' Opposition).

[44] The parties each moved for partial summary judgment on the question of the standard of review that should be applied to Plaintiffs' claims under Section 1. *See* EFC Nos. 1348, 1350, 1353. The Subscriber Plaintiffs also moved for partial summary judgment on Defendants' "single entity" defense. ECF No. 1434. The motions were fully briefed, *see* ECF Nos. 1431, 1432, 1435, 1551, 1552, and 1554, and were decided by the Court. *In re: Blue Cross Blue Shield Antitrust Litigation,* 308 F. Supp. 3d at 1250-51 (N.D. Al. 2018).

[45] *See In re: Blue Cross Blue Shield Antitrust Litigation,* 26 F. Supp. 3d at 1186.

[46] *See In re: Blue Cross Blue Shield Antitrust Litigation,* 308 F. Supp. 3d at 1260-63. *See also* ECF No. 1351 at 16-18.

[47] *Id.*

allegedly used that mark to divide up the national market in health insurance among themselves?[48]

5.  Whether the Settling Defendants' agreement could be analogized to the arrangement analyzed under the rule of reason by the Supreme Court in *F.T.C. v. Actavis*, 570 U.S. 136 (2013).[49]

6.  Whether, under *Broadcast Music, Inc. v. Columbia Broadcasting System*, 441 U.S. 1 (1979), and *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984), the exclusive service areas could be justified as necessary to create a unique product and, by so doing, to promote competition and benefit consumers.[50]

7.  Whether the challenged market allocation scheme actually reflected the natural evolution of common law trademark rights and, thus, was not the product of an "agreement" for purposes of Section 1?

8.  Whether the McCarran-Ferguson Act, which exempts the "business of insurance" from the federal antitrust laws, barred Plaintiffs' claim that Defendants had violated the antitrust laws?[51]

9.  Whether the Filed Rate doctrine, which precludes damages claims based on certain rates that have been filed with state regulators, barred Plaintiffs' damages claims?[52]

10. Whether the second clause of Section 12 of the Clayton Act, 15 U.S.C. § 22, which authorizes nationwide service of process, may be applied in tandem with the traditional venue provision, 28 U.S.C. § 1391, or must be used with the first clause of Section 12, the venue provision of the Clayton Act.[53]

11. Whether the Court had personal jurisdiction over some of the Defendants?[54]

---

[48] *See id.* at 1263-66.

[49] *See id.* at 1271-72.

[50] *See id.* at 1269-71, 1272-73.

[51] *See* ECF No. 120 at 66. *See also In re: Blue Cross Blue Shield Antitrust Litigation*, 26 F. Supp. 3d at 1190-93.

[52] *See id.* at 1187-90.

[53] In addition to Defendants' joint motion to dismiss (ECF No. 108), some of the Defendants filed individual motions to dismiss based upon lack of personal jurisdiction and/or improper venue (ECF Nos. 107, 112, 113, 119, 121, 122, 125, & 135). Although the Court did not rule on these threshold challenges, it did provide guidance to the parties regarding the analysis it would employ in ultimately making such rulings. *See In re: Blue Cross Blue Shield Antitrust Litigation*, 26 F. Supp. 3d at 1193-96.

[54] *Id.*

Many of these questions—most notably, the continuing vitality and the application of *Sealy*, *Topco*, and *Palmer;* the relationship between the evolution of the Blues' common law trademarks and the formation of the Settling Defendants' market allocation scheme; and the availability of the "single entity" defense to the Blues—had to be addressed multiple times, at various stages of the litigation (*e.g.*, on motions to dismiss, on motions for summary judgment, in various discovery disputes, in relation to class certification issues, and even on a motion and a petition to certify an interlocutory appeal). In sum, the legal questions raised by this suit were numerous, complex, and frequently novel.  The successful resolution of each of these questions played a significant and, in the case of several of them, dispositive role in the effort to negotiate a settlement achieving historic relief for the class.  That Subscribers Counsel were able to navigate successfully through these complex and difficult legal issues lends support to the conclusion that the requested fee award is entirely reasonable.  Indeed, as Professor Fitzpatrick concludes, "if one creates a litigation decision tree and multiplies the probability of success on each of the outstanding issues against one another, and then multiplies that number again by the probability of losing on appeal any of the issues class counsel has already won before this Court, it is not difficult to conclude that the cash portion of the settlement is by itself a good outcome for the class." Fitzpatrick Decl., ¶ 29.  And, "in light of the injunctive relief also won by class counsel . . . it is not difficult to conclude that the outcome here is beyond good; it is excellent." *Id.  See also* Silver Decl., ¶ 63 ("The settlement also includes injunctive relief that is worth millions or billions more.").

### 3.    The time and labor expended by Subscribers Counsel were enormous.

As one might expect given the numerous important and complex factual and legal issues presented by this litigation, Subscribers Counsel devoted an enormous amount of time and effort to their representation of the Subscriber Class.  As Special Master Gentle has attested, Subscribers

Counsel expended extraordinary time and effort to obtain the settlement they achieved for their clients:

> I can attest that counsel on both sides of the negotiations expended extraordinary time and effort to obtain the best possible result for their clients in this settlement: the legal, factual, and administrative questions that they had to address and resolve during the settlement process were novel, complex, and difficult; and the nearly five years of negotiations, including some years before I was formally involved, that resulted in the final Settlement Agreement required the continuous and unfailing exercise of patience, persistence, and consummate legal skill.

Mediator's Aff., ¶ 37. Likewise, the Court observed in its Preliminary Approval decision that Subscribers Counsel "invested tens of thousands of hours and tens of millions of dollars" representing Subscriber Plaintiffs. Specifically, through August 15, 2020, Subscribers Counsel dedicated a total of 434,054.6 hours to litigating these complex factual and contested legal questions, which has resulted in a lodestar of $194,226,321.65. Lead Counsel Decl., ¶ 134**.** Lead counsel closely directed this litigation and ensured that any duplicative or unnecessary effort was avoided to the maximum extent possible. Lead Counsel Decl., ¶ 45. *See also In re Checking Acct. Overdraft Litig.*, 2020 WL 4586398, at *17  (fact that "[t]hroughout the pendency of the Action, the organization of Class Counsel ensured that they were engaged in coordinated, productive work to maximize efficiency and minimize duplication of effort" supported fee award representing 35% of common fund).  And "[b]ecause contingent fee lawyers only recoup their expenses when they win, they have every reason to be frugal." Silver Decl., ¶ 61.

Subscribers Counsel's massive commitment of time and labor to litigating and settling this case thus reflects the effort that was actually necessary to resolve this case, and confirms the reasonableness of the proposed fee award. *Faught v. American Home Shield Corp.*, No. 2:07-cv-1928, 2010 WL 10959222, at*4 (N.D. Ala. Apr. 27, 2010), *aff'd in part*, 668 F.3d 1233 (11th Cir. 2011)

(approving award above 25% benchmark where class "Class Counsel spent significant time conducting necessary discovery and conducting settlement negotiations."); *Flournoy, Inc.*, 2007 WL 1087279, at *1 ("large commitment of time and effort" supported award set at 25% benchmark); *In re Automotive Refinishing Paint Antitrust Litig.*, 2008 WL 63269, at *5 (finding that class counsel's expenditure of almost 50,000 hours and significant litigation costs and expenses "demonstrate[d] a significant commitment of resources to this litigation and weigh[ed] in favor of approving" fee award representing 32% of common fund).

> **4.     Subscribers Counsel are among the most experienced litigators in the country and pursued the case with extraordinary skill, zeal, and expertise.**

Both "the skill and acumen required to successfully investigate, file, litigate, and settle a complicated class action lawsuit such as this one," *David v. Am. Suzuki Motor Corp.*, No. 08-CV-22278, 2010 WL 1628362, at *8 n.15 (S.D. Fla. Apr. 15, 2010), and "the experience, reputation and ability of the attorneys" who zealously prosecuted this complex case through years of intense litigation and negotiation, further confirm the reasonableness of the requested fee award. *Camden I*, 946 F.2d at 772 n.3. As discussed above, this complex antitrust matter raised exceptionally difficult factual and legal issues. Settlement Class Counsel litigated this case aggressively for over eight years, engaging in voluminous document and deposition discovery, as well as extensive motions practice. Through these efforts, Subscribers Class Counsel made themselves "fully informed about the nature of the claims and defenses and the risk and expense of continued litigation." Lead Counsel PA Decl., ¶ 37. *See also* PA Order at 31 ("[I]t is clear that the factual record in this matter was sufficiently developed to allow Class Counsel to make a reasoned judgment as to the merits of the settlement.").

Guiding the case through years of intense litigation and complex negotiation to a successful

settlement required the sustained effort of many of the nation's most respected lawyers in the fields of antitrust, consumer protection, appellate, and class action litigation. Dozens of lawyers have been involved in preparing and filing the many complaints consolidated in this multidistrict litigation, and hearings and conferences in this case have routinely been attended by numerous lawyers representing the Subscriber Class members.

Subscribers Counsel "include numerous highly qualified and experienced lawyers" who have "litigated scores of antitrust cases to resolution and are recognized as top authorities in their field," and "who have vigorously, professionally, and successfully litigated this extremely hard fought case" for more than eight years. PA Order at 20, 27-28. Subscribers were represented by some of the nation's top law firms, including Boies Schiller Flexner LLP, Hausfeld LLP, Pittman Dutton Hellums PC, Paul Weiss LLP, Davis & Taliaferro LLC, Zuckerman Spaeder LLP, Foot Mielke Chavez & O'Neil LLC, Cooper & Kirk PLLC, Guin Stokes & Evans LLC, and Burns Charest LLP. Subscribers Class Counsel were ably led by David Boies and Michael Hausfeld, highly experienced attorneys with stellar reputations earned over the course of decades of legal practice. *See* Lead Counsel Decl., Exs. A & B. The Court and Special Master have acknowledged the qualifications not only of Co-Lead Counsel, but also those of the other highly credentialed lawyers on the Plaintiffs' Steering Committee, including William Isaacson, Megan Jones, Greg Davis, Cy Smith, Kathleen Chavez, and Charles Cooper. *See* Special Master's Rule 53 Report Recommending Interim Committee Chairs and Committee Members for the Plaintiff Subscriber and Provider Tracks, ECF No. 62. *See also* Lead Counsel Decl., ¶¶ 106-114 (describing qualifications and background of PSC members). The Self-Funded Sub-Class has been ably represented by Warren T. Burns, of Burns Charest LLP. Self-Funded Sub-Class Settlement Counsel joined the settlement process before negotiations were completed, Mediator's Aff., ¶ 35, and accessed

discovery and briefing, engaged independent experts, and participated actively in the mediation. Self-Funded Sub-Class Settlement Counsel Decl. ¶¶ 3,5, 6, ECF No. 2610-7, Lead Counsel PA Decl. ¶¶ 31-32; Lead Counsel Decl., ¶ 84. And, as the court observed in the *Linerboard Antitrust Litigation*, "[t]he result achieved is the clearest reflection of petitioners' skill and expertise." *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, at *5 (E.D. Pa June 2, 2004). *See also In re Automotive Refinishing Paint Antitrust Litig.*, 2008 WL 63269, at *5 ("The total Settlement Fund of $105,750,000 speaks volumes with regard to Petitioners contribution to this litigation.").

Of course, it was not only the Subscriber Class that was well-represented in the litigation. The "quality of the opposition the plaintiffs' attorneys faced" also lends strong support to the fee award. *Camden I*, 946 F. 2d at 772 n.3. *See also Columbus Drywall & Insulation Inc.*, 2012 WL 12540344 at *4  (fee award justified where defendant was "represented by highly capable attorneys"); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d at 1334; *In re Nasdaq Market–Makers Antitrust Litig.*, 187 F.R.D. at 489 (fee award justified where defendants' counsel included "the nation's biggest and best defense firms operating on a seemingly unlimited budget over a period of four years."); *Walco*, 975 F. Supp. at 1472 (explaining that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results"). Defendants have been vigorously represented throughout this litigation by a who's who of the nation's most experienced antitrust litigators from many of the nation's top law firms, including, but not limited to: Kirkland & Ellis; Hogan Lovells; Balch & Bingham; Crowell & Moring; Foley & Lardner; Shearman & Sterling; Maynard, Cooper & Gale; and Cravath, Swaine & Moore. That Subscribers Counsel were able to obtain such a favorable Settlement against such well-represented defendants, with enormous resources at their disposal, confirms the

quality of the Subscribers Class' representation and, by extension, the reasonableness of the requested fee award.

### 5.   The requested fee is consistent with the attorneys' fees awarded in similar cases and with Subscribers Counsel's customary fee.

An attorney's fee award representing under 23.5 percent of the common fund would be consistent with the fee awards that courts have approved in other comparably complex antitrust matters that have resulted in the creation of a large common fund. Professor Fitzpatrick has collected and analyzed the fee awards in comparably complex cases and has concluded that the request here falls comfortably within the range of percentage awards that the courts have approved. Fitzpatrick Decl., ¶¶ 18-22.  Indeed, as previously discussed, *supra* at 33, the award falls squarely within the range of presumptively reasonable awards that courts have approved in antitrust matters.[55] It is commensurate with awards approved in other complex cases,[56] including in so-called

---

[55] *See, e.g.*, *In re Automotive Refinishing Paint Antitrust Litig.*, 2008 WL 63269, at *5 (observing that it "is not unusual in antitrust class actions for the attorneys to receive awards for fees in the 30% range" and awarding 33.33% of the common fund); *In re Terazosin Hydrochloride Antitrust Litigation*, 99–1317–MDL–Seitz, Slip Op. at 9, ¶ 22 (S.D. Fla. April 19, 2005) (33 1/3%); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (30%); *In re Vitamins Antitrust Litig.*, Misc. 99-197, MDL 1285, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (34.06%); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D. Tex. 1999) (35.1 percent); *In re Catfish Antitrust Litigation,* 939 F. Supp. 493 (25%); *In re Ampicillin Antitrust Litig*., 526 F. Supp. 494 (D.D.C. 1981) (40.4%); *Aamco Automatic Transmission, Inc. v. Tayloe*, 82 F.R.D. 405 (E.D. Pa.1979) (43.87%).

[56] *See Columbus Drywall & Insulation Inc.*, 2012 WL 12540344, at *6 n.6 (*citing Waters v. Cook's Pest Control, Inc.*, 2012 WL 2923542 (N.D. Ala. July 17, 2012) (award of 35%); *Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 503-04 (E.D. Mich. 2000) (33.33%); *In re Clarus Corp. Sec. Litig.*, No. 1:00-CV-2841, 2005 WL 8172269 (N.D. Ga. Jan. 6, 2005) (33.33%); *In re Pediatrics Servs. of Am., Inc. Sec. Litig.*, 1:99-CV-0670-RLV (N.D. Ga. Mar. 15, 2002) (33.33%); *In re Profit Recovery Group Int'l, Inc. Sec. Litig.*, No. 1:00–CV–1416–CC (N.D. Ga. May 26, 2005) (33.33%); *In re Theragenics Corp. Sec. Litig.*, No. 1:99–CV–0141–TWT (N.D. Ga. Sept. 29, 2004) (33.33%); *In re The Maxim Group, Inc. Sec. Litig.*, No. 1:99–CV-1280–CAP (N.D. Ga. July 20, 2004) (33.33%); *In re Medirisk, Inc. Sec. Litig.*, Civil Action No. 1:98–CV–1922–CAP (N.D. Ga. Mar. 22, 2004) (33.33%); *Atkinson v. Wal–Mart Stores, Inc.*, No. 8:08–CV–691–T–30TBM, 2011 WL 6846747 (M.D. Fla. Dec. 29, 2011) (33.33%); *Grier v. Chase Manhattan Automotive Finance Co.*, No. CIV.-A-99-180, 2000 WL 175126, at *16 (E.D. Pa. Feb. 16, 2000) (33.33%); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D. N.Y.1993) (33.85%); *Ratner v. Bennett*, No. 92–4701, 1996 WL 243645, at *9 (E.D. Pa. May 8, 1996) (35%); *Zinman v. Avemco Corp.*, No. 75-1254,1978 WL 5686, at *2 (E.D. Pa. Jan. 18, 1978) (50%); *Howes v. Atkins*, 668 F. Supp. 1021 (E.D. Ky.1987) (40%); *Gaskill v. Gordon*, 942 F. Supp. 382 (N.D. Ill.1996) (38%); *In re Combustion Inc.*, 968 F. Supp. 1116 (W.D. La.1997) (36%); *Baron v. Commercial & Industrial Bank of Memphis*, No. 75 Civ. 1274, 1979 WL 1252 (S.D. N.Y. Oct. 3, 1979) (35.5%); *Adams v. Standard Knitting Mills, Inc.*, No. 8052,1978 WL 1074 (E.D. Tenn. Jan. 6, 1978) (34.7%); *In re ValueVision Int'l Sec. Litig.*, 957 F. Supp. 699, 700 (E.D. Pa.1997) (34.27%); *In re Magic Marker Securities Litig.*, 1979 WL 1248 (E.D. Pa. Sept.

"mega-fund" cases involving funds of over $100 million, *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d at 1367 (S.D. Fla. 2011) (observing that "courts nationwide have repeatedly awarded fees of 30 percent or higher in so-called 'megafund" settlements"),[57] and even in so-called "super-mega" fund cases, in which funds of over $1 billion are created, *Allapattah Servs.,* 454 F. Supp. 2d 1185 (31 1/3% of $1.06 billion).

Moreover, as the expert declarations submitted by Professor Silver and Professor Fitzpatrick confirm, the requested award of approximately 23.47% of the Settlement Fund award is not merely consonant with the fee for which attorneys would negotiate in any comparable contingent antitrust matter, but is actually below what the market would ordinarily provide. Silver Decl., ¶¶ 37-53; Fitzpatrick Decl., ¶ 5. Had Subscribers Counsel negotiated a contingent fee arrangement with the Subscribers Class (assuming that were practicable), they would likely have sought, and likely obtained, a contingent fee in the range of 30 percent to 40 percent, which is typical of contingent fee arrangements in comparable cases. Silver Decl., ¶ 53**.**

The fact that Subscribers Counsel and other firms "customarily enter[] into contingent fee agreements allowing for recovery of 33% in low-risk cases with uncontested or moderately contested liability," and even higher percentages "in higher risk cases with difficult liability issues," supports the proposed fee award. *Waters v. Cook's Pest Control, Inc.*, 2012 WL 2923542, at *17 (N.D. Ala. July 17, 2012). *See also In re Colonial BancGroup*, Slip Op. at 11, 2012 WL 12871879

---

16, 1979) (33.5%); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill.2011) (33.33%); *In re MTC Electronic Technologies Shareholder Litig.*, 74 F. Supp. 2d 276 (E.D. N.Y.1999) (33.33%); *In re Greenwich Pharm. Sec. Litig.*, No. 92-3071, 1995 WL 251293 (E.D. Pa. Apr. 26, 1995) (33.3%); *In re Employee Benefit Plans Securities Litig.*, No. 3-92-708, 1993 WL 330595 (D. Minn. June 2, 1993) (33.3%); *Meyer v. Citizens & S. Nat'l Bank*, 117 F.R.D. 180, 182-83 (M.D. Ga. 1987) (33.3%).

[57] *See, e.g., id.* (30% of $410 million settlement fund); *In re Managed Care Litig. v. Aetna*, MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) (25-30% of $200 million); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D. N.Y.2009) (33.3% of $510 million); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (30% of $202 million); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *10 (34.06% of $365 million); *In re Combustion Inc.*, 968 F. Supp. 1116 (W.D. La.1997) (36 percent of $127 million).

("The most common contingent fee is one third of the recovery, and forty percent fee contracts are common for complex and difficult litigation such as this."); *In re Checking Acct. Overdraft Litig.*, 2013 WL 11319391, at *18 ("Class Counsel's fee request falls within the range of the private marketplace, where contingency fee arrangements often approach or equal 40 percent of any recovery."); *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1341 (S.D. Fla. 2007) ("In private litigation, attorneys regularly contract for contingent fees between 30% and 40% directly with their clients."); *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986) (observing that "40% is the customary fee in tort litigation").

> **6.     The fee in this case was contingent on obtaining relief for the class, and there was a significant risk that Subscribers Counsel would recover nothing.**

The degree of risk associated with the litigation of a complex contingent fee case is among the most significant of the *Johnson* factors. *Martin v. Global Mktg. Rsch. Serv's., Inc.*, No. 6:14-cv-1290, 2016 WL 6996118, at *2 (M.D. Fla. Nov. 30, 2016). When Subscribers Counsel decided to bring suit here,[58] they knew all too well that, no matter how much they believed in the merits of the case or how objectively reasonable their belief may have been, "there would be no fee without a successful result and that such a result would be realized only after lengthy and difficult effort." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 356 (N.D. Ga. 1993).  Counsel thus assumed a very real risk that they would need to devote the better part of a decade to litigating this case, and would incur huge out-of-pocket expenses, without ever receiving *any* compensation for their time and expense. Counsel deserve to be compensated for that risk. For, as the Eleventh Circuit has explained, "[l]awyers who are to be compensated only in the event of victory expect

---

[58] Contingency risk is measured by "the probability or likelihood of success viewed *at the time of filing suit.*" *Mashburn,* 684 F. Supp. at 700 (emphasis added). *See also In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 356.

and are entitled to be paid more when successful than those who are assured of compensation regardless of result." *Yates v. Mobile Cnty. Pers. Bd.*, 719 F.2d 1530, 1533 (11th Cir.1983) (*quoting Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir.1981) (en banc)). *See also Ressler v. Jacobson,* 149 F.R.D. 651, 654-55 (M.D. Fla. 1992) (awarding 30% of common fund where the "fee was entirely contingent, which meant that, had Petitioners recovered nothing for the Class, they would not have been entitled to any fee at all.").[59]

While Subscribers Counsel have always believed in the importance and merit of the antitrust claims advanced in this litigation, and have grown more confident in their cause as the litigation progressed, they had no illusions when they commenced this action that the trail they were blazing would be either short or smooth.  Subscribers Counsel knew that the claim they were asserting—that the Member Plans' anticompetitive scheme was implemented, policed, and enforced by means of an esoteric and complex system of restraints on competition—would be time-consuming and resource-intensive to develop and prove. Lead Counsel Decl., ¶ 14. Subscribers Counsel further knew that the case would require years of discovery, extensive motion practice, a contentious class certification process, and a difficult and lengthy trial on the merits. Lead Counsel Decl., ¶ 13. And Subscribers Counsel also knew from experience that demonstrating the impact of these restraints on competition, on price, and on consumers would require substantial discovery and expert analysis. Lead Counsel Decl., ¶ 15. Counsel were well-aware, moreover, that their claims would have to survive difficult challenges at several different stages of the case—on a

---

[59] *See also* 2 M. DERFNER & A. WOLF, COURT ORDERED ATTORNEY FEES ¶ 15.01[2][c], at 15–16 (rev. ed. 1990) ("Most courts realize that where payment of a fee is contingent on success an attorney should receive a larger overall fee than where payment is guaranteed regardless of outcome....") (footnote omitted); *id.*, ¶ 16.04[4]; S. SPEISER, ATTORNEYS' FEES § 8:10, at 319 (1973) ("The fact that an attorney's employment is undertaken on a contingent basis is a proper factor to be considered in assessing a reasonable compensation for his services, the courts generally taking the view that a larger fee will be authorized where its payment depends upon the attorney's success than where he is to be paid whether or not his efforts are successful.") (footnote omitted).

motion to dismiss, on a motion for summary judgment, at the class certification phase, at trial, or on appeal—and that there was thus "a real possibility that Subscribers Counsel would not recover anything for the Class." *Waters v. Cook's Pest Control, Inc.*, 2012 WL 2923542, at *17. Subscribers Counsel nevertheless devoted the enormous time and resources necessary to obtain historical relief for the class members. *See* PA Order at 29-30.

It is also important to note that Subscribers Counsel decided to litigate this case even though no state or federal enforcement agencies had chosen to initiate an action against any of the Defendants.[60] *See* Lead Counsel Decl., ¶¶ 12(i), 93. Subscribers Counsel thus did not have the significant benefit, in developing a factual record and the legal terrain on which that record would be evaluated, of the fruits of the labor of government investigators. Indeed, "[c]lass counsel had to investigate and prosecute this case pretty much entirely on its own." Fitzpatrick Decl., ¶ 31. The absence of such prior investigative work substantially increased both Subscribers Counsel's workload and the risk they incurred in taking on that work. *See* PA Order at 6 (finding it notable that the proposed settlement here was "the result of private enforcement," as "Subscriber Plaintiffs investigated and developed the record in order to achieve this result"). *See also id.* at 6 n.3 (noting that it "is rare for historic structural relief such as that negotiated here to arise out of private enforcement actions").

"The risk of nonpayment is even higher when a defendants' prima facie liability has not been established by the government in a criminal action." *In re Automotive Refinishing Paint Antitrust Litig.*, 2008 WL 63269, at *5. *See also In re Linerboard Antitrust Litigation*, 2004 WL 1221350, at *11 (observing that risk is greater where "petitioners did not benefit from the fruits of

---

[60] In fact, as Defendants observed in their brief in support of their motion for summary judgment on Plaintiff's section 1, *per se*, and quick look claims, both the FTC, in 1979, and the Department of Justice, in 1985 and again in 2004, investigated the Defendants and, though aware that they were operating in exclusive service areas, on each occasion took no action. ECF No. 1353-1, ¶¶ 45-47.

a prior government investigation or prosecution"). As Professor Silver has reported, the government's involvement in a lawsuit "may reduce the burden on class action lawyers, lend credence to the plaintiffs' allegations, and be a source of valuable information or other assistance." Silver Decl., ¶ 65. And many of the antitrust cases that have produced mega-fund recoveries were assisted substantially by government prosecution of criminal antitrust violations and guilty pleas. *See, e.g., In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *10 ($365 million class recovery and 34.06% fee award in case supported by criminal prosecutions and guilty pleas); *In re TFT-LCD (Flat Panel) [Indirect Purchaser] Antitrust Litig.*, MDL No. 1827, 2013 WL 1365900, at *8 (N.D. Cal. Apr. 3, 2013) (approving $1.08 billion class recovery and 28.6% fee to class counsel and state attorneys general in case supported by sweeping criminal prosecutions and guilty pleas). "If prior or parallel government proceedings make class actions less risky, then (other things being equal) fee awards should be higher in cases like this one, where Class Counsel initiated and, for almost nine year years, conducted the litigation challenging the practices at issue without help from a regulator." Silver Decl., ¶ 65. And, "[h]ere, the lack of an accompanying public investigation was an especially serious problem for Class Counsel because the Defendants argued that prior governmental inquiries had exonerated them.  They asserted, for example, that '[a]ll three branches of government ha[d] approved of the Blue System and rules.'" *Id.*, ¶ 66 (*quoting* Brief in Support of Defendants' Motion for Summary Judgment on Plaintiffs' Section 1, Per se, and Quick Look Claims, Dkt. 1353-1). As Professor Silver observed, "federal judges give considerable weight to past governmental actions and are reluctant to contradict their findings," which would have given this argument "considerable persuasive force." *Id.* Accordingly, this factor supports the approval of the requested amount of attorney's fees.

7.      **Given these enormous commitments of time and resources, and the significant risk entailed in developing and litigating this case, few attorneys would have been willing to take it on.**

"The expense and time involved in prosecuting such litigation on a contingent basis, with no guarantee or high likelihood of recovery, would make this case highly undesirable for many attorneys." *Waters v. Cook's Pest Control, Inc.*, 2012 WL 2923542, at *18. This factor as well thus weighs heavily in support of the reasonableness of the proposed fee award.

8.      **The preclusion of other employment by Subscribers Counsel due to acceptance of the case.**

Finally, a fee award is justified where the engagement had the effect of precluding the attorney from accepting other work. *Camden I*, 946 F.2d at 772. "This guideline involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Johnson*, 488 F.2d at 718. "It is, of course, always true that while an attorney is spending time on one case, he is not spending the same time on another case." *Wiggins v. Roberts*, 551 F. Supp. 57, 61 (N.D. Ala. 1982). But where the case requires an investment of time, resources, and money on the scale that this case has, this factor supports an upward departure from the 25% benchmark.

This factor confirmed the reasonableness of a fee award of 33% in an analogous multi-year antitrust litigation in the Northern District of Georgia:

> This case has required eight years of work, punctuated by extended periods requiring the undivided attention of multiple lawyer and staff members …. Class counsel have devoted tens of thousands of hours to this case that could have been used in the pursuit of other matters that would have paid a guaranteed return by the hour. This factor tends to favor the requested award.

*Columbus Drywall & Insulation*, 2012 WL 12540344 at *4. This action likewise involved years of nearly non-stop document discovery, and scores of depositions, punctuated by numerous

contentious privilege disputes and other discovery disputes. Counsel also expended enormous time and effort on drafting the consolidated complaint, on briefing and arguing the Defendants' motions to dismiss, motions and cross motions for summary judgment, and Defendants' interlocutory appeal to the Eleventh Circuit, as well as on preparing the motions for class certification. In addition, Subscribers Counsel worked tirelessly to negotiate the Settlement Agreement with the numerous Settling Defendants; this effort required Subscribers Counsel to address and resolve dozens of legal, factual, and administrative questions that arose during the course of this often-contentious process. Mediator's Aff., ¶ 37.

For many of the firms—both large and small—representing the Subscriber Class, the significant commitment of time and resources required to litigate this case has of necessity limited their ability to pursue numerous other engagements. This significant opportunity cost has been incurred, for many counsel, for more than eight years, and will continue to be incurred at some level well beyond final approval of the Settlement Agreement, as Subscribers Counsel will remain under an obligation to ensure the proper distribution of the settlement proceeds and to address any issues that arise following final approval, including compliance with the proposed injunctive relief. Lead Counsel Decl., ¶ 127. See also *id.*, ¶ 136 (observing that Subscriber Counsel incurred additional $7,639,195 in lodestar between August 15, 2020 and entry of preliminary approval order).

### C. The Reasonableness of the Requested Fee Is Confirmed by Subscribers Counsel's Lodestar.

As Professor Fitzpatrick explains, the lodestar method has largely fallen out of favor with the courts, and its use is now largely confined to cases involving fee-shifting statutes, both because it is difficult to apply and, more importantly, because it fails to adequately align the interests of the class counsel with the interests of the class. Fitzpatrick Decl., ¶ 10. The Eleventh Circuit thus does not require the use of the lodestar "cross-check" in common fund cases, *In re Home Depot*,

931 F.3d at 1091 n.25,[61] though it has found that the lodestar may nonetheless provide a useful "figure for comparison." *Waters v. Intern. Precious Metals Corp.*, 190 F.3d at 1298.[62] Here, the use of a lodestar cross-check would further support the conclusion that the requested fee award falls well within the range of reasonableness.

As discussed above, *see* above at 22, through August 15, 2020, Subscribers Counsel devoted 434,054.6 hours to advocating on behalf of the Subscriber Class, resulting in a lodestar of $194,226,321 (again, through August 15, 2020). These hour and lodestar figures were subjected to scrutiny by the Special Master under the protocols and procedures adopted by this Court. They have been examined by Professor Silver, Silver Decl., ¶¶ 75-82, who concluded that Subscriber Class Counsel's blended hourly rate "is clearly reasonable, *id.*, ¶ 82.

The effort expended to litigate this matter to a successful conclusion thus results in a lodestar multiplier of 3.23. Fitzpatrick Decl., ¶ 37; Silver Decl., ¶ 83. As Professors Fitzpatrick and Silver have demonstrated, such a multiplier is fully consistent with the multipliers approved even in mega-fund cases and is significantly lower than many of them. Fitzpatrick Decl., ¶¶ 18-22;

---

[61] *See also Sawyer v. Intermex Wire Transfer LLC*, 2020 WL 5259094, at *1 (S.D .Fla. Sept. 3, 2020) ("'Under *Camden I*, courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all.' ") (*quoting In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1363 (S.D. Fla. 2011) (*citing David*, 2010 WL 1628362, at *7-8)); *In re Checking Acct. Overdraft Litig.*, 2020 WL 4586398, at *19 ("In view of the excellent results obtained here, the Court deems it unnecessary to scrutinize Class Counsel's lodestar."); *Thorpe v. Walter Inv. Mgmt. Corp.*, No. 1:14-cv-20880, 2016 WL 10518902, at *11 (S.D. Fla. October 17, 2016) (noting that a lodestar cross-check is not required in the Eleventh Circuit); *Wilson*, 2016 WL 457011, at *19 (same); *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d at 1362  (rejecting objectors' request for the court to scrutinize "voluminous time and task records" in evaluating the fee in a common fund case and noting "[t]he lodestar approach should not be imposed through the back door via a 'cross-check' ").

[62] *See also McGaffin*, 2020 WL 3491609, at *10 ("While not required, this Court finds that a lodestar cross-check of the requested fee further supports its reasonableness."); *Marty v. Anheuser-Busch Companies, LLC*, No. 13-cv-23656-JJO, 2015 WL 6391185, at *2 (S.D. Fla. Oct. 22, 2015) ("In the Eleventh Circuit, a lodestar analysis may be used as a "cross-check" to the percentage-of-the-fund analysis.  But use of the lodestar cross-check is not mandatory.") (citations omitted); *Columbus Drywall & Insulation Inc.,* 2012 WL 12540344 at *5 ("the old lodestar-multiplier method confirms that the requested fee is fair and reasonable.").

Silver Decl., ¶ 83-90.[63] It falls within the range of the multipliers applied in comparably large and complex class actions. *See, e.g.*, *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) (multiplier of 5.2 in $7.2 billion common fund case); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D. N.Y. 2005) (multiplier of 4 in $6.1 billion common fund case); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 271 (D.N.H. 2007) (multiplier 2.7 in $3.2 billion common fund case).

If anything, because the above analysis is based on a lodestar calculated using Subscribers Counsel's *historical* billing rates over the course of this lengthy litigation, it significantly under-states the reasonableness of the requested fee award. As Professor Silver explains, given how long counsel have litigated this case and how much risk they incurred in doing so, a persuasive case can be made that the lodestar cross-check should be performed using counsel's *current* rates. Silver Decl., ¶¶ 84-85. Such an analysis would substantially increase the lodestar and thus substantially reduce the lodestar multiplier to a figure that could not reasonably be characterized as excessive or unreasonable. *See* Lead Counsel Decl., ¶ 136 (estimating that using current rates would increase lodestar by at least $15 million).

The use of the lodestar cross-check thus further supports and confirms the reasonableness of Subscribers Counsel's requested fee award.

---

[63] *See also Columbus Drywall & Insulation Inc., et al., v. Masco Corp.*, 2012 WL 12540344 at *5 ("Here, the requested fee would represent a multiplier of approximately four times lodestar, which is well within the range of approved fees."); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) (recognizing that from 2001 to 2003, the average multiplier approved in common fund cases was 4.35); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 348 (5.25 multiplier); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197–99 (S.D. N.Y. 1997) (5.5 multiplier); *In re RJR Nabisco, Inc. Sec. Litig.*, MDL No. 818, 1992 WL 210138, at *6-*8 (S.D. N.Y. Aug. 24, 1992) (approving multiplier of 6); *Rabin v. Concord Assets Group*, NO. 89-civ-6130-LBS, 1991 WL 275757, at *1-*2 (S.D.N.Y. Dec. 19, 1991) (approving a multiplier of 4.4 and noting that "'multipliers of between 3 and 4.5 have been common'").

**D.      The Application of a Sliding Scale or Mega-Fund Approach Is Disfavored in this Circuit, But Nevertheless Would Support The Requested Award.**

Some courts have applied either the so-called "sliding scale" approach, pursuant to which the benchmark percentage is progressively reduced as the size of the fund created for the class increases,[64] or the so-called mega-fund approach, pursuant to which a reduced benchmark is used, subject to a lodestar cross-check, in cases generating a common fund in excess of a certain threshold, *e.g.*, $100 million.[65]  These approaches represent a distinct minority view under modern attorneys' fee jurisprudence.  Significantly, the Eleventh Circuit has not adopted either approach. Indeed, both approaches are "antithetical to the percentage of the recovery method adopted by the Eleventh Circuit .... By not rewarding class counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for class counsel to settle too early for too little." *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d at 1213. *See also In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d at 1367 (observing that "courts nationwide have repeatedly awarded fees of 30 percent or higher in so-called 'megafund' settlements" and rejecting use of sliding scale); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d at 1335 ("After reviewing the caselaw and the circumstances here, the Court finds that the size of the [$110 million] settlement does not warrant a departure either downward or upward from the benchmark."). *But see In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 350–52  (employing sliding scale approach).  Courts in other circuits have likewise declined to apply a sliding scale in

---

[64] For a discussion of the "sliding scale" approach, *see* Newberg, § 15.80 (5th Ed.). As that treatise observes, while the approach continues to have its proponents, it "has not been widely adopted." *Id.*

[65] For a discussion of the "mega-fund" approach, *see* Newberg, § 15.81 (5th Ed.). The approach has been adopted, albeit subject to a lodestar cross-check, by some decisions from the Second Circuit, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d at 123, and the Ninth Circuit, *In re Nat'l. Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 768 Fed. Appx. at 654.  It has been expressly rejected by the Seventh Circuit. *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001).

mega-fund cases. *See, e.g., In re Ikon Off. Sol's., Inc. Secs. Litig*., 194 F.R.D. 166, 195–97 (E.D. Pa.2000) (declining to adopt sliding scale approach and awarding fees of 33% on $111 million settlement); *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La.1997) (awarding fees of 36% on settlement amount of more than $127 million).

As Professor Fitzpatrick has explained, the practice of decreasing fee percentages as settlement amounts increase has been criticized by both scholars and courts. Fitzpatrick Decl., ¶¶ 19-24. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 284 n. 55 (3d Cir. 2001) ("Th[e] position [that the percentage of a recovery devoted to attorneys fees should decrease as the size of the overall settlement or recovery increases] . . . has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply.") (alteration in original). A leading class action treatise has summarized the three principal arguments against using such an approach:

> First, the sliding scale lacks rigor because it provides no direction to courts about when to start decreasing the percentage award, nor by how much. Second, its suggestion that there is a smooth inverse relationship between the size of the common fund and an appropriate percentage may not be accurate: some high fund cases involve significant risks, require enormous investments of money and time, and may appropriately trigger a healthy percentage award; conversely, a relatively small fund (say $25 million), secured with a few months' work, may not truly entitle class counsel to a mean 25% award. In other words, the sliding scale is more rough proxy than real science. Third, the approach can create perverse incentives: if class counsel receives less of each next dollar that they secure for the class, they may have an incentive to settle when their percentage drops from 25% to 20%, for example, thereby encouraging quick settlements at sub-optimal levels.

Newberg on Class Actions, § 15.80 (5th Ed. 2019).

As Professor Fitzpatrick has further observed, the sliding scale approach makes little economic sense because it creates "terrible incentives for class counsel," and "can actually make class counsel better off by resolving a case for less rather than more." Fitzpatrick Decl., ¶ 22. "This is why," Professor Fitzpatrick concludes, "studies even of sophisticated corporate clients do not

report any such practice among them when they hire lawyers on contingency, even in the biggest cases like patent litigation." *Id. See also* Silver Decl., ¶¶ 34-36.

The sliding scale is also contrary to the public interest, inasmuch as it would create an incentive for class counsel to prefer smaller, less complex, and more-easily proven cases that can be concluded in one or two years, rather than pursue complex schemes affecting large numbers of people that can require a decade to resolve. Professor Fitzpatrick offers the following hypothetical: "if courts award class action attorneys 33⅓% of settlements when they are under $100 million but only 20% of settlements when they are over $100 million, then rational class action attorneys will prefer to settle cases for $90 million (*i.e.*, a $30 million fee award) than for $125 million (*i.e.*, a $25 million fee award)." Fitzpatrick Decl., ¶ 22. In this case, the use of a sliding scale would have created a powerful incentive for counsel to settle early, quickly, and for a substantially lower amount, rather than fight on for nine years in order to win the $2.7 billion settlement fund that they have obtained for the class.  A sliding scale might "save" the class millions in legal fees, but only at a "cost" to the class of billions in recovery. As Judge Easterbrook has observed, "[p]rivate parties would never contract for such an arrangement." *In re Synthroid Mktg. Litig.*, 264 F.3d at 718. *See also* Fitzpatrick Decl., ¶ 23 (discussing Judge Easterbrook's opinion in *In Re Synthroid Mktg.*); Silver Decl., ¶ 19 (same).

Professor Silver agrees that use of a sliding-scale in mega-fund cases results in a fee that will almost inevitably depart from the market rates that courts, in their effort to set fees at the level that will maximize the return for the class, should seek to mimic. Professor Silver observes that, for "sound economic" reasons, declining scales are rarely used in private fee arrangements; in fact, "[f]lat percentages and rising scales reward plaintiffs' attorneys for recovering higher dollars that are harder to obtain because they demand a willingness on the part of counsel to proceed ever

69

closer to trial, thereby increasing their costs and exposing them to greater risk of loss.  Flat percentages and percentages that increase with the recovery encourage plaintiffs' attorneys to shoulder the costs and risks that must be borne when lawyers encourage clients to turn down inadequate settlements." Silver Decl., ¶ 36. Because a sliding scale eliminates counsel's incentive to fight for the absolutely highest reward for the class, private parties would never bargain, *ex ante*, for a sliding-scale fee arrangement. Silver Decl., ¶ 19.  This is because, as Professor Silver explains, "[p]rivate clients want lawyers to maximize the value of their claims, not to settle them cheaply." *Id.*  And "[w]hen fees are capped at low levels, lawyers' incentives are weakened and they may lose any financial interest in holding out for higher dollars, which are harder to recover and require lawyers to bear greater risks." *Id.*

For these reasons, adoption by this Court of either a sliding scale or a mega-fund approach would run counter to the weight of authority, as well as sound legal and economic principles.  But even if the Court were tempted to consider using either the sliding-scale or the mega-fund approach, both the analysis of the *Johnson* factors and the lodestar cross-check discussed above establish that the requested award of approximately 23.47 percent of the common fund remains the appropriate level at which to set the award.  As noted above, performance of the lodestar cross check in this case resulted in a multiplier of 3.2.  This is entirely consistent with the multipliers that those courts using the mega-fund approach were seeking to achieve. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d at 123 (in a case involving a fund of over $3 billion, affirming a fee that reflected a lodestar multiplier of 3.5); *In re National Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 768 Fed. Appx. at 654 (affirming district court's rejection of objector's mega-fund argument and approving award of fee that resulted in a 3.66 multiplier).

As the Ninth Circuit has suggested, it is only "where awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, [that] courts should adjust the benchmark percentage or employ the lodestar method instead." *In re Bluetooth Headset Prod's. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). *See also In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. at 486 (S.D. N.Y. 1998) (*quoting* Third Circuit Report, 108 F.R.D. at 256 and n. 63) (sliding scale may be appropriate where size of the fund "is merely a factor of the size of the class and has no direct relationship to the efforts of counsel"). This is self-evidently not such a case. Rather, as the analysis of each of the *Johnson* factors performed above confirms, an award of less than 23.5 percent of the common fund is an eminently reasonable fee award.

### E.    The Parties Negotiated a Clear Sailing Agreement that Provided Defendants with Certain Knowledge of Their Liability.

The Settlement Agreement reflects the parties' agreement that Subscribers Counsel may seek a fee and expense award "up to a combined total of 25% of $2.67 billion (*i.e.*, $667,500,000.00)." Settlement Agreement ¶ 28.a. *See also id.* ¶ 28.b ("If the Fee and Expense Award exceeds 25% of $2.67 billion, Settling Defendants may rescind the settlement"). These provisions share some features in common with so-called "clear sailing agreements," which "are sometimes included in class action settlements so that defendants have a more definite idea of their total exposure." *Waters v. Intern. Precious Metals Corp.*, 190 F.3d at 1293 n.3. *See also In re Home Depot,* 931 F.3d at 1081 N.14. Provided that there was no collusion between the Defendants and Subscribers Counsel, such an agreement should raise no concern. *Poertner v. Gillette Co*., 618 Fed. Appx. 624, 630 (11th Cir. 2015). Where "the parties settled only after engaging in extensive arms-length negotiations moderated by an experienced, court-appointed mediator," the presence of a clear sailing agreement does not call the requested fee award into question. *Id. See also Carter v. Forjas Taurus, S.A.*, 701 Fed. Appx. 759, 766 (11th Cir. 2017) (affirming approval of settlement

including clear-sailing provision where district court reviewed the settlement process and concluded that the parties reached the settlement after extensive arm's-length negotiations and mediation sessions).

As the Court noted in its Preliminary Approval decision, there was "no suggestion of collusion" in this case.  Indeed, the settlement satisfies the criteria that the courts in this and other circuits consider when assessing whether there has been collusion between Subscribers Counsel and the Defendants.  First, the entire settlement was negotiated under the supervision of several mediators, including the court-appointed special master, Ed Gentle.[66]  Second, as the Court has found, the negotiation of attorney fees began only after the parties had reached an agreement in principle as to the relief, including the amount of compensation, that would be provided to the class.[67]  *See* PA Order at 5.  *See also* Mediator's Aff., ¶ 37 (attesting "that the mediating Parties agreed to present the Mediator's recommended amount of monetary payments to be made to Damages Class Members, the amount of notice and administration costs, and the principal terms of the non-monetary injunctive relief to their constituents before any discussion of attorneys' fees commenced").  Third, the clear-sailing provision is not coupled with a reversion, which would return the residue in the Settlement Fund to the defendant; the Settlement Agreement is clear that any funds remaining in the fund will neither revert to Defendants nor be paid to Subscribers Counsel.

---

[66] *See, e.g.*, *Mahoney v. TT of Pine Ridge, Inc.*, NO. 17-80029-CIV-Middlebrooks, 2017 WL 9472860, at *4 (S.D. Fla. Nov. 20, 2017) (approving negotiated fee award where "the parties settled only after engaging in extensive arms-length negotiations moderated by an experienced ... mediator.") (citations omitted) (alterations in original); *Marty,* 2015 WL 6391185, at *3 (same).

[67] *See Parsons*, 2015 WL 13629647, at *12 (approving negotiated fee award where "attorneys' fees were not negotiated until after the Parties had fully negotiated and agreed upon the relief to the Settlement Class"); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-CV-60721, 2014 WL 5488167, at *4 (S.D. Fla. Oct. 29, 2014) (same); *Ingram*, 200 F.R.D. at 693 (finding no collusion where attorneys' fees were "negotiated separately from the rest of the settlement, and only after substantial components of the class settlement had been resolved")."; *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 335 (3d Cir. 1998) (overruling objection to clear-sailing provision since there was "no indication the parties began to negotiate attorneys' fees until after they had finished negotiating the settlement agreement").

*See Cnty. of Monmouth, New Jersey v. Florida Cancer Specialists, P.L.,* No. 2:18-cv-201, 2019 WL 1487340, at *5 (M.D. Fla., Apr. 4, 2019) ("A 'clear sailing provision' is particularly disfavored if coupled with a reversion, which returns residue in the settlement fund to the defendant."). Finally, the provision was negotiated not as part of any collusive activity between the parties at the expense of the Class, but rather to provide the Defendants with certain knowledge of their total maximum exposure. *Malchman v. Davis*, 761 F.2d 893, 905 n.5 (2d Cir.1985) (a clear-sailing provision "is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged") (citation omitted).

## II.    THE COURT SHOULD APPROVE SUBSCRIBERS COUNSEL'S REQUEST FOR REIMBURSEMENT OF COSTS AND EXPENSES.

Subscribers Counsel also seek to recover $40,916,627.90 in costs and expenses representing $37,088,369.52 of Litigation Fund contributions for "shared costs" and $3,828,258.38 in "held costs," both of which terms are defined below. Gentle Decl. at 3, & Exs. B &C. "Plaintiffs' counsel are entitled to be reimbursed for their reasonable expenses when they create a benefit for all class members." *Parsons,* 2015 WL 13629647, at *15. The courts thus "regularly reimburse class counsel for their out-of-pocket litigation costs when a request for reimbursement is 'supported by adequate documentation, and the Court finds the costs to be reasonable and necessary to the representation of the class.' " *Cabot East Broward 2 LLC v. Cabot*, No. 16-61218, 2018 WL 5905415, at *9 (S.D. Fla. Nov. 9, 2018) (*quoting Dear v. Q Club Hotel, LLC*, 2018 WL 1830793, at *5 (S.D. Fla. Mar. 14, 2018)). Because the recovery of costs and expenses is authorized by the Settlement Agreement, and, furthermore, because those costs and expenses have been adequately documented and were both reasonable and necessary to the representation of the class, the Court should approve Subscribers Counsel's request.

1.      *The Settlement Agreement authorizes the payment of attorneys' costs and expenses.* Rule 23(h) provides that a "court may award reasonable ... nontaxable costs that are authorized ... by the parties' agreement." Fed. R. Civ. Proc. 23(h). The Settlement Agreement provides that Subscribers Counsel "shall be reimbursed and indemnified solely out of the Escrow Account for all attorneys' fees, expenses, and costs, in amounts not to exceed those provided by Court order." Settlement Agreement, ¶ 28. Indeed, the Agreement expressly authorizes Subscribers Counsel to seek "reimbursement of expenses and costs reasonably and actually incurred in connection with prosecuting the Subscriber Actions… ." *Id.,* ¶ 28(a).

2.      *The costs sought herein are supported by adequate documentation.* Subscribers Counsel's costs and expenses have been submitted and audited using the same basic procedures and standards that governed review of their hourly billings. *See supra* at II.D. Pursuant to the Court's Billing Order, each law firm prepared expense reports and submitted them to Local Facilitating Counsel on a monthly basis. ECF No. 80, at I.E.  Local Facilitating Counsel then submitted these reports to the Special Master for his review. *Id.,* I.E. The Special Master audited these submissions, thereby permitting Subscribers Counsel to ensure that they complied with the Court's Billing Protocol. Lead Counsel Decl., ¶ 138**;** Gentle Decl. at 3-5.

The costs and expenses at issue thus have been subject to close scrutiny. The Court's Billing Order permitted Class Counsel to incur both "Shared Costs" and "Held Costs." ECF No. 80, at III.A. Both of these categories include only costs that were incurred to benefit the MDL track as a whole. ECF No. 80, at IV.A; V.B. No individual claimant-related costs are included among the costs that are the subject of this request, as no such costs were submitted to and approved by the special master, *id.,* IV.A; V.B.

Only costs that benefited the MDL track as a whole, that were "of a substantial nature," and that fell under one of a defined set of cost categories are deemed "Shared Costs."[68] Subscribers Counsel were required to obtain prior approval of the Special Master before incurring any "shared costs"; the Special Master would authorize immediate payment of approved "shared costs" out of a "Track Account." ECF No. 80, at I.D.  This Track Account was funded by assessments against the class leadership, ECF No. 80, at I.D. As of March 15, 2021, these law firms have contributed a total of 37,088,369.52 to the Track Account. Lead Counsel Decl., ¶ 138; Gentle Decl. at 3, & Ex. B. Other costs "of a substantial nature" that benefited the MDL track as a whole but that fell under a different set of defined categories were deemed "held costs" and were to be submitted "for consideration by the Special Master and the court for future reimbursement." ECF No. 80, at III.A.[69]  To date, a total of $3,828,258.38 in "held costs" has been submitted to and audited by the Special Master. Gentle Decl., Ex. C.

Subscribers Counsel are thus seeking reimbursement totaling $40,916,627.90 in both "Shared Costs" that have been paid into the "Track Account" and "Held Costs."  Each of the individual law firms have submitted extensive supporting documentation to the Special Master.

---

[68] The cost categories that made up these "shared costs" were: 1) Court, filing and service costs; 2) Depositions and court reporter costs; 3) Document Depository; creation, operation, staffing, equipment and administration; 4) Plaintiffs' Liaison Counsel administrative matters (*e.g.*, expenses for equipment, technology, courier services, long distance, conference calls, telecopier, electronic service, postage, meeting expenses, travel for administrative matters, photocopy and printing, secretarial/temporary staff etc.); 5) Track leadership administration matters such as meetings and conference calls; 6) Legal and accountant fees; 7) Expert witness and consultant fees and expenses; 8) Printing, copying, coding, shipping, scanning (both in and out of house or extraordinary firm cost); 9) Research by outside third-party vendors/ consultants/ attorneys; 10) Common witness expenses including travel; 11) Translation costs; 12) Bank or financial institution charges; 13) Investigative services; 14) Claims Administrator charges; and 15)  Special Master charges. ECF No. 80, at IV.A.

[69] The expense categories that make up these "held costs" include: 1) Telefax charges; 2) Postage, shipping, courier, certified mail; 3) Printing and photocopying (in-house); 4) Computer research - Lexis/Westlaw; 5) Telephone - long distance (actual charges only); and 6) Travel, including a) Airfare; b) Reasonable ground transportation c) Hotel; d) Reasonable meals and entertainment; e) Reasonable other (parking); f) Car rental, cabs, etc.; and g) Secretarial and clerical overtime.  ECF No. 80, at V.A.

Gentle Decl. at 3-4.[70]  These expense reports that Counsel have submitted to the Special Master constitute the sort of "detailed supporting documentation" that is more than sufficient to support the requested award of costs and expenses, *Harris v. City of Ft. Myers*, 624 F.2d 1321, 1323 (5th Cir. 1980). *See also Dear v. Q Club Hotel, LLC*, 2018 WL 1830793, at *5 (S.D. Fla. Mar. 14, 2018) (cost request was "supported by adequate documentation"), and will permit the Court to review their request. *Doria v. Class Action Services, LLC*, 261 F.R.D. 678, 685 (S.D. Fla. 2009). *See generally* Gentle Decl..

3.      *Lead Counsel seek reimbursement of costs and expenses that were reasonable, necessary, and incurred for the benefit of the settlement class.* As noted above, the procedures created by the Court's Billing Order have ensured that only those costs that were incurred for the benefit of the class as a whole have been included among the costs and expenses submitted by Subscribers Counsel. The Court also defined the categories of expenses, set forth above, that could be submitted for reimbursement; these categories reflect the types of costs that would ordinarily be charged to a paying client, and for which the courts routinely approve reimbursement.[71]

These expenses were reasonable.  The $37,088,369.52 contributed to the Litigation Fund were paid out by the Special Master at the Court's directive to cover shared costs incurred for the whole class. Lead Counsel Decl., ¶ 128. In addition to the scrutiny to which these expenses have

---

[70] These capital contributions, costs, and expenses are also summarized for the Court in exhibit to the supporting declaration of the Special Master. *See* Gentle Decl., Exs. B, C, D, & E.

[71] *See, e.g., Drazen v. GoDaddy.Com, LLC,* No. 1:19-00563, 2020 WL 4606979, at *4 (S.D. Ala. Aug. 11, 2020) (approving reimbursement of expenses including costs "related to filing fees, travel expenses, copying, mediation fees, and case administration with the potential of more expenses yet to come"); *Dear v. Q Club Hotel, LLC,* 2018 WL 1830793, at *5 (S.D. Fla. Mar. 14, 2018) (reimbursing class counsel for out-of-pocket costs related to, inter alia, experts, legal research, travel and lodging, the purchase of transcripts, mediation, telephone, class notice, trial support, and postage/delivery); *Gevaerts v. TD Bank,* N.A., No. 11:14-cv-20744,  2015 WL 6751061, at *14 (S.D. Fla. Nov. 5, 2015) (reimbursing counsel for costs related to experts, online research, travel, document review, copying, mediation, etc.); *In re Checking Account Overdraft Litig.*, 1:09-MD-2036-JLK, 2015 WL 12641970, at *18 (S.D. Fla. May 22, 2015) (reimbursing counsel for costs related to experts, the purchase of transcripts, mediation, etc.); *Smith v. Casey,* No. 12-23795, 2013 WL 12064518, at *8 (S.D. Fla. Jul. 26, 2013) (costs "typically charged to a client in the course of providing legal services," include "photocopying, paralegal expenses, travel costs, and telephone costs").

been subjected by the Court, it should be noted that the participating law firms had a powerful incentive to keep litigation costs as low as possible and to ensure that attorneys incurred only those expenses that were reasonable and necessary to the conduct of the litigation; namely, Subscribers Counsel had no guarantee that their held expenses, or their contributions to fund the shared expenses would be reimbursed. Lead Counsel Decl., ¶ 12. Class Leadership and other firms that contributed to the "Track Account," moreover, had a particularly strong incentive to manage costs in this case, because they *alone* would be bearing those "shared costs." Lead Counsel Decl., ¶ 116; *Drazen,* 2020 WL 4606979, at \*4 ("Class Counsel also state they had 'strong incentive[s] not to expend any funds unnecessarily' since Class Counsel was 'responsible for advancing all expenses.'").

In sum, Subscribers Counsel's costs and expenses are well-documented, having been submitted for review by the special master throughout this litigation on a monthly basis, are of the type for which payment is routinely ordered in common fund cases, and were necessary to the successful prosecution and resolution of the Action. The requested expenses should therefore be approved.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should, pursuant to Rule 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure, grant the fee award and costs requested by Subscribers Counsel.

Dated: May 28, 2021

Respectfully Submitted,

_/s/ David Boies_
David Boies – **_Co-Lead Counsel_**
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749-8200
dboies@bsfllp.com

_/s/ Michael D. Hausfeld_
Michael D. Hausfeld – **_Co-Lead Counsel_**
Swathi Bojedla – **_Discovery Committee_**
HAUSFELD LLP
888 16th St NW, Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeld.com
sbojedla@hausfeld.com

Charles J. Cooper – **_Co-Chair, Written Submissions Committee & PSC Member_**
COOPER & KIRK, PLLC
1523 New Hampshire Avenue NW
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

Megan Jones – **_Settlement Committee & PSC Member_**
Arthur Bailey – **_Discovery Committee_**
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
mjones@hausfeld.com
abailey@hausfeld.com

Chris T. Hellums – **_Local Facilitating Counsel_**
PITTMAN, DUTTON & HELLUMS, P.C.
2001 Park Place N, 1100 Park Place Tower
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
chrish@pittmandutton.com

William A. Isaacson – **_Settlement Committee & PSC Member_**
PAUL WEISS
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7313
Fax: (202) 379-4937
wisaacson@bsfllp.com

Gregory Davis – **_Settlement Committee & PSC Member_**
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Tel: (334) 832-9080
Fax: (334) 409-7001
gldavis@knology.net

Cyril V. Smith – **_Settlement Committee & PSC Member_**
ZUCKERMAN SPAEDER, LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Tel: (410) 949-1145
Fax: (410) 659-0436
csmith@zuckerman.com

Kathleen Chavez – ***Settlement Committee & PSC Member***
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
kcc@fmcolaw.com

Carl S. Kravitz – ***Expert Committee***
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: (202) 778-1800
Fax: (202) 822-8106
ckravitz@zuckerman.com

Mindee Reuben
LITE DEPALMA GREENBERG
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Tel:  (267) 314-7980
Fax: (973) 623-0858
mreuben@litedepalma.com

Patrick Cafferty – ***Discovery Committee***
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
150 S. Wacker Drive, Suite 300
Chicago, IL 60606
Tel: (312) 782-4880
pcafferty@caffertyclobes.com

David Guin – ***Co-Chair, Written Submissions Committee***
Tammy Stokes – ***Damages Committee***
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. North
Suite 600/Title Building
Birmingham, AL 35203
Tel: (205) 226-2282
Fax: (205) 226-2357
davidg@gseattorneys.com
tammys@gseattorneys.com

Richard Feinstein – ***Expert Committee***
Karen Dyer – ***Expert Committee***
Hamish P.M. Hume – ***Discovery Committee***
BOIES, SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
rfeinstein@bsfllp.com
kdyer@bsfllp.com
hhume@bsfllp.com

Nate Cihlar
Joshua Callister
STRAUSS & BOIES
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel:  (703) 764-8700
Fax:  (703) 764-8704
ncihlar@straus-boies.com
jcallister@straus-boies.com

Bryan Clobes – ***Litigation Committee***
Ellen Meriwether – ***Written Submissions Committee***
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
2005 North Monroe Street
Media, PA 19063
Tel: (215) 864-2800
Fax: (215) 864-2810
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

79

Andrew Lemmon – *Chair, Discovery Committee*
LEMMON LAW FIRM
15058 River Road
PO Box 904
Hahnville, LA 70057
Tel: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Douglas Dellaccio – *Litigation Committee*
CORY WATSON CROWDER & DEGARIS, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 32505
Tel: (205) 328-2200
Fax: (205) 324-7896
ddellaccio@cwcd.com

Edwin J. Kilpela, Jr.
Benjamin Sweet – *Litigation Committee*
DEL SOLE CAVANAUGH STROYD LLC
200 First Avenue, Suite 300
Pittsburgh, PA 15222
Tel: (412) 261-2393
Fax: (412) 261-2110
ekilpela@dsclaw.com
bsweet@dsclaw.com

Charles T. Caliendo – *Class Certification Committee*
GRANT & EISENHOFER
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
ccaliendo@gelaw.com

Virginia Buchanan – *Chair, Class Certification Committee*
LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7000
Fax: (850) 435-7020
vbuchanan@levinlaw.com

Larry McDevitt – *Chair, Class Certification Committee*
David Wilkerson – *Discovery Committee*
VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Tel: (828) 258-2991
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Robert M. Foote – *Damages Committee*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
rmf@fmcolaw.com

Robert Eisler – *Discovery Committee*
GRANT & EISENHOFER
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
reisler@gelaw.com

Daniel Gustafson – *Litigation Committee*
Daniel C. Hedlund – *Damages Committee*
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

Brent Hazzard – *Litigation Committee*
HAZZARD LAW, LLC
447 Northpark Drive
Ridgeland, MS 39157
Tel: (601) 977-5253
Fax: (601) 977-5236
brenthazzard@yahoo.com

John Saxon – *Litigation Committee*
JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203-3314
Tel: (205) 324-0223
Fax: (205) 323-1583
jsaxon@saxonattorneys.com

Lawrence Jones – *Damages Committee*
JONES WARD PLC
The Pointe
1205 East Washington Street, Suite 111 Louisville, Kentucky 40206
Tel:  (502) 882-6000
Fax: (502) 587-2007
larry@jonesward.com

Robert Methvin – *Chair, Settlement Committee*
James M. Terrell – *Class Certification Committee*
MCCALLUM, METHVIN & TERRELL, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, AL 35205
Tel: (205) 939-0199
Fax: (205) 939-0399
rgm@mmlaw.net
jterrell@mmlaw.net

Michael McGartland – *Class Certification Committee*
MCGARTLAND & BORCHARDT LLP
1300 South University Drive, Suite 500
Fort Worth, TX 76107
Tel: (817) 332-9300
Fax: (817) 332-9301
mike@attorneysmb.com

H. Lewis Gillis – *Co-Head Chair, Litigation Committee*
MEANS GILLIS LAW, LLC
3121 Zelda Court
Montgomery, AL 36106
Tel: 1-800-626-9684
hlgillis@tmgslaw.com

David J. Hodge – *Chair, Settlement Committee*
MORRIS, KING & HODGE
200 Pratt Avenue NE
Huntsville, AL 35801
Tel: (256) 536-0588
Fax: (256) 533-1504
lstewart@alinjurylaw.com

Dianne M. Nast – ***Class Certification Committee***
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com

Patrick W. Pendley – ***Chair, Damages Committee***
Christopher Coffin – ***State Liaison Committee***
PENDLEY, BAUDIN & COFFIN, LLP
Post Office Drawer 71
Plaquemine, LA 70765
Tel: (225) 687-6369
pwpendley@pbclawfirm.com
ccoffin@pbclawfirm.com

Edgar D. Gankendorff – ***Co-Head Chair, Litigation Committee***
Eric R.G. Belin – ***Damages Committee***
PROVOSTY & GANKENDORFF, LLC
650 Poydras Street, Suite 2700
New Orleans, LA 70130
Tel: (504) 410-2795
Fax: (504) 410-2796
egankendorff@provostylaw.com
ebelin@provostylaw.com

Richard Rouco – ***Written Submissions Committee***
QUINN, CONNOR, WEAVER, DAVIES & ROUCO LLP
2 – 20th Street North, Suite 930
Birmingham, AL 35203
Tel: (205) 870-9989
Fax: (205) 870-9989
rrouco@qcwdr.com

Garrett Blanchfield – ***Written Submissions Committee***
REINHARDT, WENDORF & BLANCH-FIELD
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com

Jason Thompson – ***Damages Committee***
SOMMERS SCHWARTZ
One Towne Square, 17th Floor
Southfield, MI 48076
Tel: (248) 355-0300
jthompson@sommerspc.com

Eric L. Cramer – ***Expert Committee***
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: 1-800-424-6690
Fax: (215) 875-4604
ecramer@bm.net

*Counsel for Subscriber Plaintiffs*

   /s/ Warren T. Burns
Warren T. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
wburns@burnscharest.com

*Counsel for Self-Funded Sub-Class*

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2021, the foregoing Subscriber Plaintiffs' Motion for Pre-liminary Approval of Proposed Class Settlement was filed with the Clerk of the Court and served on counsel of record via ECF.

    /s/ Michael D. Hausfeld
Michael D. Hausfeld
