FILED

2021 May-28  PM 06:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

**EXHIBIT B**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL NO. 2406) | ) ) ) ) ) | Master File No. 2:13-CV-20000-RDP |

## DECLARATION OF PROFESSOR CHARLES SILVER ON THE REASONABLENESS OF CLASS COUNSEL'S REQUEST FOR ATTORNEYS' FEES

# TABLE OF CONTENTS

I. Summary of Opinions ........................................................................................................... 4

II. Credentials ........................................................................................................................... 4

III. Documents Reviewed ........................................................................................................ 6

IV. Facts.................................................................................................................................... 7

V. Background Analysis: setting common fund fees according to market rates Maximizes Class Members' Expected Recoveries ....................................................................................... 8

  A. Fee-Setting Is A Positive-Sum Interaction ....................................................................... 9

  B. The Case For Mimicking The Market ............................................................................. 10

VI. Fees Prevailing in the Private Market for Legal Services ............................................... 12

  A. Market Rates Increasingly Dominate the Fee-Setting Process ....................................... 12

  B. In Contingent Fee Litigation, Percentage-Based Compensation Predominates .............. 14

  C. Sophisticated Clients Normally Pay Fees of 30 Percent to 40 Percent When Hiring Lawyers to Handle Commercial Lawsuits on Straight Contingency ........................................ 16

    1. Sophisticated Named Plaintiffs in Class Actions ......................................................... 18

    2. Patent Cases.................................................................................................................. 19

    3. Other Large Commercial Cases ................................................................................... 21

VII. Risk Incurred ................................................................................................................. 24

    1. Duration of Litigation.................................................................................................. 25

    2. Costs Incurred ............................................................................................................. 25

    3. Dollars at Stake ........................................................................................................... 26

    4. No Prior Governmental Investigation Uncovered Wrongdoing ................................... 27

VIII. Fee Awards in Cases With Comparable Monetary Recoveries ....................................... 28

IX. Lodestar Cross-Check ...................................................................................................... 34

X. Compensation .................................................................................................................. 43

XI. Conclusion........................................................................................................................ 43

Appendix I: Resume of Professor Charles Silver ...................................................................... 44

Appendix II: Table of Fee Awards in Direct Purchaser Pharmaceutical Antitrust Class Actions .. ....................................................................................................................................... 56

I, Charles Silver, state as follows:

## I. SUMMARY OF OPINIONS

1. This is a landmark settlement. With a cash component of nearly $2.7 billion and substantial injunctive relief, it is one of the largest antitrust class action recoveries on record. The settlement benefits members of the subscriber class financially as well as by ending anticompetitive practices that dominated the health insurance sector for decades.

2. In return for having served the subscriber class so well, Class Counsel request an award equal to 25 percent of the recovery in payment for services and reimbursement of expenses. In my opinion, the requested amount is reasonable.

3. My opinion is based on my understanding of the economics of class action litigation, prevailing market rates paid by sophisticated clients in large lawsuits—both when suing individually and when serving as representatives of plaintiff classes, the risks Class Counsel incurred, and prevailing hourly rates for lawyers' services. Thus, I believe that the requested fee and cost award is in keeping with what class members rationally should want to pay lawyers engaged with the object of maximizing their recoveries and with what sophisticated clients actually do pay lawyers they hire to undertake the same mission.

## II. CREDENTIALS

4. I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law. I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School. I received tenure in 1991. Since then, I have been a Visiting Professor at University of Michigan School of Law (twice), the Vanderbilt University Law School, and the Harvard Law School.

5. The study of attorneys' fees has been a principal focus of my academic career. I published my first article on the subject shortly after I joined the law faculty at the University of

Texas at Austin. See Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656 (1991). Since then, I have published about a dozen more articles, two of which are empirical studies of fee awards in class actions. Lynn A. Baker, Michael A. Perino, and Charles Silver, *Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment*, 66 Vanderbilt L. Rev. 1677 (2013); and Lynn A. Baker, Michael A. Perino, and Charles Silver*, Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUM. L. REV. 1371 (2015) ("*Is the Price Right?*"). The CORPORATE PRACTICE COMMENTATOR chose *Is the Price Right?* as one of the ten best in the field of corporate and securities law in 2016. In his concurring opinion in in *Laffitte v. Robert Half Internat. Inc.*, 1 Cal. 5th 480, 376 P.3d 672 (2016), Justice Goodwin Liu cited *Is The Price Right?* nine times. He also cited two of my other works.

6.      My writings are also cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996), the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004), the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, and the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT.

7.      From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010). Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court.

8.      I have testified as an expert on attorneys' fees many times. Judges have cited or relied upon my opinions when awarding fees in many class actions, including *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2019 WL 6888488 (E.D.N.Y. 2019), *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008), and *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006), all of which settled for amounts exceeding $1 billion.

9. Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field. I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association. In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

10. I have attached a copy of my resume as Appendix I to this declaration.

## III. DOCUMENTS REVIEWED

11. In preparing this report, I received the items listed below which, unless noted otherwise, were generated in connection with this case:

- Case Management Order No. 2—Order Appointing Interim Co-Lead Class Counsel, Local Facilitating Counsel, Plaintiffs' Steering Committee, and Discovery Liaison Counsel;

- Motion for Preliminary Approval;

- Memorandum of Law in Support of Preliminary Approval;

- Settlement Agreement;

- Proposed Preliminary Approval Order;

- Proposed Final Approval Order;

- Proposed Plan of Distribution;

- Lead Counsel Declaration in Support of Preliminary Approval;

- Sub-Class Counsel Declaration;

- Declaration of Ken Feinberg;

- Declaration of Darrell Chodorow;

- Declaration of Daniel Rubinfeld;

- Declaration of Ariel Pakes;

- Declaration of Special Master (Edgar C. Gentle III);

- Motion for Approval of Notice Plan;

- Memorandum of Law in Support of Notice Plan;

- Declaration of Jennifer M. Keough Regarding Notice Plan;

- Defendants' Motion in Support of Preliminary Approval;

- Twenty-Six Retainer Agreements with Signed Clients;

- PowerPoint Slide Presentation Delivered on November 16, 2020 by Subscriber Plaintiffs in Support of their Motion for Preliminary Approval of Proposed Class Settlement;

- Memorandum Opinion and Order Preliminarily Approving Settlement, Plan of Distribution, and Notice Plan, and Directing Notice to the Class;

- Co-Lead Counsel Declaration in Support of the Fee Petition;

- The Court's Order Regarding Protocols for Plaintiff's Counsel Time and Expense Submissions;

- A Detailed Summary of Subscriber Class Counsel's Hours, Lodestar, and Costs through August 15, 2020; and,

- The Subscriber Class Counsel's Fee Brief.

## IV. FACTS

12. The litigation-related facts upon which my conclusions rest are set out in detail in *Subscriber Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Approval of*

*Proposed Class Settlement*. Dkt. 2610-1 and in the Court's *Memorandum Opinion and Order Preliminarily Approving Settlement, Plan of Distribution, and Notice Plan, and Directing Notice to the Class ("Preliminary Approval Opinion")*.

13.     In brief, litigation began more than 9 years ago.  More than 40 actions filed by Subscriber Plaintiffs are pending in this Court.  The lawsuits allege that the Defendants engaged in anticompetitive activity, in violation of the Sherman Act, by entering into an agreement that restrained competition among member companies.  The litigation was hard-fought and included a dozen motions to dismiss, repeated discovery battles, 75 million pages of documents requiring review and analysis and over 120 depositions of defense and third-party witnesses plus another 20 depositions of plaintiffs and their experts.  Litigation concerning the propriety of certifying a plaintiff class was also greatly advanced.  The proposed settlement is the product of these adversarial efforts and of negotiations conducted over 5 years with the help of a special master and several mediators.

14.     The Court is thoroughly familiar with this litigation and has already made extensive findings regarding its complexity, duration, and intensity.  See *Preliminary Approval Opinion*, pp. 3-4.  The Court also described the efforts that led to the proposed settlement.  *Id*., pp. 4-6.  Finally, and importantly, the Court noted both that "the settlement is the result of private enforcement" and that "it is rare" for private enforcement actions to end in settlements that provide for "historical structural relief."  *Id*., pp. 6 & 6 n.3.  These and numerous other findings of fact are thoroughly detailed in the Court's *Preliminary Approval Opinion*; there is thus no need to recite them in detail here.

## V.     BACKGROUND ANALYSIS: SETTING COMMON FUND FEES ACCORDING TO MARKET RATES MAXIMIZES CLASS MEMBERS' EXPECTED RECOVERIES

15.     Throughout my academic career, I have urged judges to base fee awards from common funds on rates prevailing in the private market for legal services.  Although the view was

not widely shared when I first expressed it, it is now. Today, judges routinely want to know what market rates are and give them weight when deciding how much to award lawyers whose efforts create common funds. In this report, I will show that Class Counsel's request for a fee equal to 23.47 percent of the recovery (plus approximately $40.9 million in expenses) falls below the range of percentages that prevails in the private market, which typically runs from 25 percent to 40 percent even in cases with the potential to generate enormous recoveries.

### A. Fee-Setting Is A Positive-Sum Interaction

16. Many people think that fee-setting is a zero-sum game in which more for a lawyer means less for a client. Because the object of class litigation is to help the victims, they infer that lower fees are always better than higher ones.

17. This belief is mistaken. Fee-setting is a positive-sum interaction in which higher fees can help claimants. To see this, imagine how class members would fare if courts set common fund fee awards at 0 percent. When the fee is zero, the expected recovery is zero too because lawyers will not agree to represent class members (or signed clients) on these terms. From class members' perspective, any fee percentage greater than zero is better than zero because any positive recovery is better than no recovery.

18. When regulating fees, then, the object should ***not*** be to set them as close to zero as possible. ***It should be to maximize class members' net expected recoveries***—the amounts they expect to take home after paying their attorneys. Because a claimant who nets $1 million after paying a 40 percent fee is better off than one who nets $500,000 after paying a 20 percent fee, it is rational for clients to offer higher percentages when doing so is expected to leave them with more money after fees are paid.

19. Judges have known this for years. In 2002, a task force on fees commissioned by the Third Circuit stated: "The goal of appointment [of class counsel] should be to maximize the

net recovery to the class and to provide fair compensation to the lawyer, *not to obtain the lowest attorney fee.* The lawyer who charges a higher fee may earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee." *Third Circuit Task Force Report,* 208 F.R.D. 340, 373 (January 15, 2002) (emphasis added). The Seventh Circuit made a similar point in *In re Synthroid Marketing Litig.*, 264 F.3d 712 (7th Cir. 2001). It rejected the so-called "mega-fund rule," according to which fees must be capped at low percentages when recoveries are very large, noting that "[p]rivate parties would never contract for such an arrangement" because it would encourage cheap settlements. *Id*. at 718. When fees are capped at low levels, lawyers' incentives are weakened and they may lose any financial interest in holding out for higher dollars, which are harder to recover and require lawyers to bear greater risks. Private clients want lawyers to maximize the value of their claims, not to settle them cheaply.

### B. The Case For Mimicking The Market

20. In the market for legal services, claimants negotiate fees when litigation starts, not when it ends. Upfront, they see the risks that lie ahead and appreciate the virtue of paying contingent fee lawyers on terms that encourage them to bear them. As the Seventh Circuit observed,

> The best time to determine [a contingent fee lawyer's] rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers never wait until after recovery is secured to contract for fees. They strike their bargains before work begins.

*In re Synthroid Marketing Litigation*, 264 F.3d at 724.

21. Unfortunately, judges typically set fee terms when class actions settle, not when they begin. Consequently, the hindsight bias may cause them to set fees too low. This can only harm class members in the long-run by weakening lawyers' incentives.

22.     To guard against this, I believe that judges should base fee awards on the amounts that class members would have agreed to pay had they bargained directly with their lawyers when litigation was about to commence.  A general insight from the economics of contracts is that rational parties agree on terms that maximize the amount of wealth available for them to share. *See* Alan Schwartz and Robert E. Scott, *Contract Theory and the Limits of Contract Law*, 113 YALE L. J. 541 (2003) ("[P]arties at the negotiation stage prefer to write contracts that maximize total benefits.").  When markets are competitive, as the market for legal services plainly is, clients and lawyers should settle on the lowest percentages that maximize their joint expected return.  This is the percentage that maximizes clients' net expected recoveries.

23.     The market rate also provides a natural cross check on the reasonableness of a fee request.  When a request falls within the range that sophisticated clients normally pay when hiring lawyers on contingency to handle large cases, there is reason to believe that class members would have agreed to pay it had they been able to bargain with class counsel directly.  The best evidence of the terms of hypothetical bargains are the terms that real clients and lawyers agreed to in similar circumstances.

24.     As discussed in more detail below, the information I have gathered over years of study shows that claimants typically agree to pay contingent fees in the range extending from 33 percent to 40 percent, even when sophisticated clients hire lawyers to handle complex commercial lawsuits with the potential to generate enormous recoveries.  To encourage lawyers to maximize class members' net recoveries, I believe that courts should set fee awards from common funds in this range.

**VI.     FEES PREVAILING IN THE PRIVATE MARKET FOR LEGAL SERVICES**

**A.     Market Rates Increasingly Dominate The Fee-Setting Process**

25.     In both scholarly works and expert reports written over decades, I have urged judges to take guidance from the market for legal services when sizing fee awards.  As mentioned, more and more judges are embracing the "mimic the market" approach.  They increasingly understand "market rates, where available, are the ideal proxy for [class action lawyers'] compensation."  *Goldberger v. Integrated Resources, Inc*., 209 F.3d 43 (2d Cir. 2000).  It is hard to do better than "ideal."

26.     Although only the Seventh Circuit currently mandates the exclusive use of market rates, federal judges across the country recognize the superiority of this approach and use it often.  Examples include *Guevoura Fund Ltd. v. Sillerman*, No. 1:15-CV-07192-CM, 2019 WL 6889901, at *21 (S.D.N.Y. Dec. 18, 2019); *In re TRS Recovery Servs., Inc. & Telecheck Servs., Inc., Fair Debt Collection Practices Act (FDCPA) Litig*., No. 2:13-MD-2426-DBH, 2016 WL 543137, at *9 (D. Me. Feb. 10, 2016); *In re Capital One Tel. Consumer Prot. Act Litig*., 80 F. Supp. 3d 781, 788 (N.D. Ill. 2015); *In re Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig.*, No. 3:10-CV-30163-MAP, 2014 WL 6968424, at *6 (D. Mass. Dec. 9, 2014); *In re New Motor Vehicles Canadian Exp. Antitrust Litig*., 842 F. Supp. 2d 346 (D. Me. 2012); *In re Trans Union Corp. Privacy Litig.*, No. 00 C 4729, 2009 WL 4799954, at *9 (N.D. Ill. Dec. 9, 2009), *order modified and remanded*, 629 F.3d 741 (7th Cir. 2011); *In re Cabletron Sys., Inc. Sec. Litig*., 239 F.R.D. 30, 40 (D.N.H. 2006).

27.     When awarding fees from the enormous settlement in *Allapattah Servs., Inc. v. Exxon Corp*., 454 F. Supp. 2d 1185, 1203 (S.D. Fla. 2006), which exceeded $1 billion, the federal district court judge "conclude[d] that the most appropriate way to establish a bench mark is by reference to the market rate for a contingent fee in private commercial cases tried to judgment and reviewed on appeal."  Anchoring the fee to the market rate avoids arbitrariness by providing an

objective basis for awarding a particular amount and also creates desirable incentives. It also "create[s] incentives for the lawyer to get the most recovery for the class by the most efficient manner (and penalize the lawyer who fails to do so)." *Nilsen v. York Cty.*, 400 F. Supp. 2d 266, 277–78 (D. Me. 2005) . See also *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir.1995) (observing that the percentage-of-fund method eliminates incentive to be inefficient, as inefficiency just reduces the lawyer's own recovery); and *Wal–Mart Stores, Inc. v. Visa U.S.A. Inc.*,396 F.3d 96, 121 (2d Cir.2005) (the percentage method "directly aligns the interests of the class and its counsel" and provides a powerful incentive for efficiency and early resolution).

28.    State court judges see the wisdom of mimicking the market too. For example, in *Laffitte v. Robert Half Internat. Inc.*, 1 Cal. 5th 480, 376 P.3d 672 (2016), the Supreme Court of California cited the desirability of approximating the market as a reason for permitting judges to grant percentage-based fee awards from common funds.

> We join the overwhelming majority of federal and state courts in holding that when class action litigation establishes a monetary fund for the benefit of the class members, and the trial court in its equitable powers awards class counsel a fee out of that fund, the court may determine the amount of a reasonable fee by choosing an appropriate percentage of the fund created. The recognized advantages of the percentage method—including relative ease of calculation, alignment of incentives between counsel and the class, ***a better approximation of market conditions in a contingency case***, and the encouragement it provides counsel to seek an early settlement and avoid unnecessarily prolonging the litigation … convince us the percentage method is a valuable tool that should not be denied our trial courts.

*Laffitte,* 1 Cal. 5th at 503, 376 P.3d at 686*,* (emphasis added) (citations omitted).

29.    Judges use the market-based approach and methods that approximate market conditions because they appreciate the importance of incentivizing lawyers properly and because they want an objective basis for deciding how much lawyers will be paid. The two considerations–

incentives and objectivity–are linked.  By taking guidance from the market, judges constrain their discretion and thereby make lawyers' incentives clearer and more reliable.

30.     Although the Eleventh Circuit has not formally instructed district court judges to base fee awards in class actions on prevailing market rates, it has come close to doing so.  First, it has adopted the percentage method, which dominates the market for contingent fee representations.  Second, it has identified 20 percent to 30 percent of the recovery as the "benchmark" range, while also noting that awards tend to fall at or near 25 percent.  *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 775 (11th Cir. 1991).  See also *In re Home Depot Inc*., 931 F.3d 1065, 1076 (11th Cir. 2019) (same).  As shown below, sophisticated clients typically pay 30 percent to 40 percent of the recovery as fees when they hire lawyers on straight contingency.  Third, the Eleventh Circuit has advised district court to tailor fee percentages by consulting the factors set out in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), the fifth of which is the "customary" or market-based fee.  Because more and more courts have adopted the market-based approach, the twelfth *Johnson* factor—"awards in similar cases"—increasingly pushes in that direction as well.

**B.     In Contingent Fee Litigation, Percentage-Based Compensation Predominates**

31.     Having established that market rates are "ideal" proxies, it remains to consider how the market compensates plaintiffs' attorneys.  In this section and the next, I explain what I know about this issue.

32.     I start by noting that when clients hire lawyers to handle lawsuits on straight contingency, the market sets lawyers' compensation as percentages of claimants' recoveries.  Even sophisticated business clients with complex, high-dollar legal matters use the percentage approach.

33.     Abundant evidence supports this contention.  When two co-authors and I studied hundreds of settled securities fraud class actions specifically looking for terms included in fee

agreements between lawyers and investors seeking to serve as lead plaintiffs, all the agreements we found provided for contingent percentage fees. *Is the Price Right*, *supra*. No lead plaintiff agreed to pay its lawyers by the hour; nor did any retain counsel on a lodestar-multiplier basis. Contracting practices are the same in antitrust cases, as discussed below.

34. The finding that sophisticated businesses use contingent fee arrangements when hiring lawyers to handle securities class actions was expected. Over the course of my academic career, I have studied or participated in hundreds of class actions, many of which were led by sophisticated business clients. To the best of my recollection, I have encountered only one in which a lead plaintiff paid class counsel out of pocket; that case is more than 100 years old and was decided before the common fund doctrine was well established. Even wealthy named plaintiffs like prescription drug wholesalers and public pension funds that, in theory, could pay lawyers by the hour have used contingent, percentage-based compensation arrangements instead. Because percentage-based compensation arrangements dominate the market, courts should also use them when awarding fees from common funds.

35. The market also favors fee percentages that are flat or that rise as recoveries increase. Scales with percentages that decline at the margin are rarely employed. Professor John C. Coffee, Jr., the country's leading authority on class actions, made this point in a report filed in the antitrust litigation relating to high fructose corn syrup.

> I am aware that "declining" percentage of the recovery fee formulas are used by some public pension funds, serving as lead plaintiffs in the securities class action context. However, I have never seen such a fee contract used in the antitrust context; nor, in any context, have I seen a large corporation negotiate such a contract (they have instead typically used straight percentage of the recovery formulas).

*Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust Litigation*, M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), ECF No. 1421, ¶ 22. My experience is similar to

Professor Coffee's. I know of few instances in which large corporations used scales with declining percentages when hiring attorneys.

36. In view of the rarity with which declining scales are used, the "mimic the market" approach suggests that flat percentages and scales with percentages that rise at the margin create better incentives. There is a sound economic rationale for this. Flat percentages and rising scales reward plaintiffs' attorneys for recovering higher dollars that are harder to obtain because they demand a willingness on the part of counsel to proceed ever closer to trial, thereby increasing their costs and exposing them to greater risk of loss. Flat percentages and percentages that increase with the recovery encourage plaintiffs' attorneys to shoulder the costs and risks that must be borne when lawyers encourage clients to turn down inadequate settlements.

**C.**     **Sophisticated Clients Normally Pay Fees Of 30 Percent To 40 Percent When Hiring Lawyers To Handle Commercial Lawsuits On Straight Contingency**

37. Countless plaintiffs have hired lawyers on contingency to handle cases of diverse types. Consequently, the market for legal services is a rich source of information about lawyers' fees. In this section, I survey this evidence.

38. Before doing so, I wish to note that there is broad agreement that in most types of plaintiff representations contingent fees range from 30 percent to 40 percent of the recovery, and that higher fees prevail in litigation areas like medical malpractice and patents where costs and risks are unusually great. *See, e.g.*, *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1382 (N.D. Ga. 2019) ("Plaintiffs request for approval of Class Counsel's 33% fee falls within the range of the private marketplace, where contingency-fee arrangements are often between 30 and 40 percent of any recovery"); and *Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 201 (N.D. Ill. 2018) ("a typical contingency agreement in this circuit might range from 33% to 40% of recovery"). The same range is known to prevail in high-dollar, non-class, commercial cases. *See,*

*e.g., Kapolka v. Anchor Drilling Fluids USA, LLC*, No. 2:18-CV-01007-NR, 2019 WL 5394751, at *10 (W.D. Pa. Oct. 22, 2019); and *Cook v. Rockwell Int'l Corp.*, No. 90-CV-00181-JLK, 2017 WL 5076498, at *2 (D. Colo. Apr. 28, 2017).

39. The point of surveying the evidence, then, is not to establish something new. It is to show that what everyone already knows is correct. The market rate for contingent fee lawyers generally ranges from 30 to 40 percent of clients' recoveries, with 33 percent being especially common.

40. We do not know as much about fees paid in large commercial lawsuits as we might.[1] No publicly available database collects information about this sector of the market, and businesses that sue as plaintiffs rarely reveal their fee agreements. Consequently, most of what is known is drawn from anecdotal reports.[2] That said, the evidence available on the use of contingent fees by sophisticated clients shows that marginal percentages tend to be high.

---

[1] I have studied the costs insurance companies incur when *defending* liability suits. *See* Bernard Black, David A. Hyman, Charles Silver and William M. Sage, *Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004*, 10 Am. L, & Econ, Rev. 185 (2008). Unfortunately, this information sheds no light on the amounts that businesses pay when acting as plaintiffs.

[2] Businesses sometimes use hybrid arrangements that combine guaranteed payments with contingent bonuses. For example, when representing Caldera International, Inc. in a dispute with IBM, Boies, Schiller & Flexner LLP billed two-thirds of its lawyers' standard hourly rates and stood to receive a contingent fee equal to 20 percent of the recovery. Letter from David Boies and Stephen N. Zack to Darl McBride dated Feb. 26, 2003, available at https://www.sec.gov/Archives/edgar/data/1102542/000110465903028046/a03-6084_1ex99d1.htm (visited Aug. 23, 2020). According to Wikipedia, the damages sought in the lawsuit initially totaled $1 billion, but were later increased to $3 billion, and then to $5 billion. Wikipedia, *SCO Group, Inc. v. International Business Machines Corp.*, https://en.wikipedia.org/wiki/SCO_Group,_Inc._v._International_Business_Machines_Corp. (visited Aug. 23 , 2020).

1. <u>Sophisticated Named Plaintiffs In Class Actions</u>

41.     Sophisticated business clients commonly agree to pay fees of 33 percent or greater when serving as lead plaintiffs in class actions.  Here are a few examples.

- In *San Allen, Inc. v. Buehrer*, Case No. CV-07-644950 (Ohio – Court of Common Pleas), which settled for $420 million, seven businesses serving as named plaintiffs signed retainer contracts in which they agreed to pay 33.3 percent of the gross recovery obtained by settlement as fees, with a bump to 35 percent in the event of an appeal.  Expenses were to be reimbursed separately.

- In *In re U.S. Foodservice, Inc. Pricing Litigation*, Case No. 3:07-md-1894 (AWT) (D. Ct.), a RICO class action that produced a $297 million settlement, both of the businesses that served as named plaintiffs were represented by counsel in their fee negotiations and both agreed that the fee award might be as high as 40 percent.

- In *In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 (Court of Common Pleas, Greenville County, South Carolina), which settled in 2013 for relief valued at about $81 million, five sophisticated investors serving as named plaintiffs agreed to pay 35 percent of the gross class-wide recovery as fees, with expenses to be separately reimbursed.  (The fee was initially set at over 40 percent but was later bargained down to 35 percent.)

42.     Similar rates prevail in antitrust class actions in which businesses participate as plaintiffs.  For example, I studied and prepared expert reports in a series of pharmaceutical cases bought against manufacturers that engaged in pay-for-delay settlements to patent challenges. The named plaintiffs in these cases were drug wholesalers.  All were large companies, and several were of Fortune 500 size or bigger.  All also had in-house or outside counsel monitoring the litigations.

The potential damages were enormous. In one case, *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015), the plaintiffs recovered over $500 million. In the series as a whole, they won more than $2 billion. In most of the cases, these sophisticated businesses supported fees equal to one-third of the recovery. In one case, they endorsed a fee of 30 percent and in another of 27.5 percent.

43.    These cases were not exceptional. Professor Brian Fitzpatrick gathered information on an even larger number of pharmaceutical antitrust cases—33 in all—that were resolved between 2003 and 2020. According to his forthcoming article, "the fee requests ranged from a fixed percentage of 27.5% to a fixed percentage of one-third"; "one-third *heavily* dominated" the sample"; and "the average was 32.85%." And "in the vast majority of cases, one or more of these corporate class members—often the biggest class members—came forward to voice affirmative support for the fee request, and not a single one of these corporate class members objected to the fee request in any of the 33 cases." Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 FORDHAM L. REV. 1151 (March 2021). Professor Fitzpatrick's table of cases appears in Appendix II.

44.    In sum, when sophisticated business clients seek to recover money in risky commercial lawsuits involving large stakes, they typically pay contingent fees ranging from 30 percent to 40 percent, with fees of 33 percent or more being promised in most cases. As well, there is little variation in fee percentages across cases of different sizes.

### 2.    Patent Cases

45.    Now consider patent infringement cases, another context in which sophisticated business clients often hire law firms on contingency. There are many anecdotal reports of high percentages in this area. The most famous one relates to the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactures the Blackberry. NTP, the plaintiff,

promised its law firm, Wiley Rein & Fielding ("WRF"), a 33⅓ percent contingent fee. When the case settled for $612.5 million, WRF received more than $200 million in fees. Yuki Noguchi, D.C. *Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, D03.

46.     The fee percentage that WRF received is typical, as Professor David L. Schwartz found when he interviewed 44 experienced patent lawyers and reviewed 42 contingent fee agreements.

> There are two main ways of setting the fees for the contingent fee lawyer [in patent cases]: a graduated rate and a flat rate. Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery. The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates. As the case continued, the lawyer's percentage increased. Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%.

David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALA. L. REV. 335, 360 (2012). In a case like this one that required the lawyers to bear significant litigation and trial preparation hours and expenses with no guarantee of payment or reimbursement, a high fixed percentage would apply.[3]

---

[3] Professor Schwartz's findings are consistent with reports found in patent blogs, one of which stated as follows.

> *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not pay any legal fees for the representation. Instead, the law firm only gets paid from damages obtained in a verdict or settlement. Typically, the law firm will receive between 33-50% of the recovered damages, depending on several factors. This is strictly a results-based system.

Matthew L. Cutler, *Contingent Fee and Other Alternative Fee Arrangements for Patent Litigation*, HARNESS DICKEY, (JUNE 8, 2020), https://www.hdp.com/blog/2020/06/08/contingent-fee-and-other-alternative-fee-arrangements-for-patent-litigation/.

47. Clearly, in the segment of the market where sophisticated business clients hire lawyers to litigate patent cases on contingency, successful lawyers earn sizeable premiums over their normal hourly rates. The reason is obvious. When waging patent cases on contingency, lawyers must incur large risks and high costs, so clients must promise them hefty returns. Patent plaintiffs have the option of paying lawyers to represent them on an hourly basis, but still prefer a contingency arrangement, even at 30-40 percent, to bearing the risks and costs of litigation themselves.

### 3. Other Large Commercial Cases

48. Turning from patent lawsuits to business representations more generally, many examples show that compensation tends to be a significant percentage of the recovery. A famous case from the 1980's involved the Texas law firm of Vinson & Elkins ("V&E"). ETSI Pipeline Project ("EPP") hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline. V&E took the case on contingency, "meaning that if it won, it would receive one-third of the settlement and, if it lost, it would get nothing." David Maraniss, Texas Law firm Passes Out $100 Million in Bonuses, Washington Post, Aug. 22, 1990, https://www.washingtonpost.com/archive/politics/1990/08/22/texas-law-firm-passes-out-100-million-in-bonuses/8714563b-10b8-4f85-b74a-1e918d030144/. After many years of litigation, a series of settlements and a $1 billion judgment against a remaining defendant yielded a gross recovery of $635 million, of which the firm received around $212 million in fees. Patricia M. Hynes, *Plaintiffs' Class Action Attorneys Earn What They Get*, 2 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS, 243, 245 (1991). It bears emphasizing that the clients who made up the plaintiffs' consortium, Panhandle Eastern Corp., the Bechtel Group, Enron Corp., and K N

Energy Inc., were sophisticated businesses with access to the best lawyers in the country. No claim of undue influence by V&E can possibly be made.

49. The National Credit Union Administration's ("NCUA") experience in litigation against securities underwriters provides a more recent example of contingent-fee terms that were used successfully in large, related litigations. After placing 5 corporate credit unions into liquidation in 2010, NCUA filed 26 complaints in federal courts in New York, Kansas, and California against 32 Wall Street securities firms and banks. To prosecute the complaints, which centered on sales of investments in faulty residential mortgage-backed securities, NCUA retained two outside law firms, Korein Tillery LLP and Kellogg, Hansen, Todd, Figel, & Frederick PLLC, on a straight contingency basis. The original contract entitled the firms to 25 percent of the recovery, net of expenses. As of June 30, 2017, the lawsuits had generated more than $5.1 billion in recoveries on which NCUA had paid $1,214,634,208 in fees.[4]

50. When it retained outside counsel on contingency, NCUA knew that billions of dollars were at stake. The failed corporate credit unions had sustained $16 billion in losses, and NCUA's objective was to recover as much of that amount as possible. It also knew that dozens of defendants would be sued and that multiple settlements were possible. Even so, NCUA agreed to pay a straight contingent percentage fee in the standard market range on all the recoveries. It neither reduced the fees that were payable in later settlements in light of fees earned in earlier ones,

---

[4]The following documents provide information about NCUA's fee arrangement and the recoveries obtained in the litigations: Legal Services Agreement dated Sept. 1, 2009, https://www.ncua.gov/services/Pages/freedom-of-information-act/legal-services-agreement.pdf; National Credit Union Administration, Legal Recoveries from the Corporate Crisis, https://www.ncua.gov/regulation-supervision/Pages/corporate-system-resolution/legal-recoveries.aspx; Letter from the Office of the Inspector General, National Credit Union Administration to the Hon. Darrell E. Issa, Feb. 6, 2013, https://www.ncua.gov/About/leadership/CO/OIG/Documents/OIG20130206IssaResponse.pdf.

nor bargained for a percentage that declined as additional dollars flowed in, nor tied the lawyers'
compensation to the number of hours they expended.

51.     In *In re Merry-Go-Round Enterprises, Inc*., 244 B.R. 327 (D. Md. 2000), the
bankruptcy trustee wanted to assert claims against Ernst & Young.  He looked for counsel willing
to accept a declining scale of fee percentages, found no takers, and ultimately agreed to pay a law
firm a straight 40 percent of the recovery.  Ernst & Young subsequently settled for $185 million,
at which point the law firm applied for $71.2 million in fees, 21 times its lodestar.  The bankruptcy
judge granted the request, writing: "[v]iewed at the outset of this representation, with special
counsel advancing expenses on a contingency basis and facing the uncertainties and risks posed
by this representation, the 40% contingent fee was reasonable, necessary, and within a market
range." *Id.* at 335.

52.     Based on what lawyers who write about fee arrangements in business cases have
said, contingent fees of 33⅓ percent or more remain common.  In 2011, The Advocate, a journal
produced by the Litigation Section of the State Bar of Texas, published a symposium entitled
"Commercial Law Developments and Doctrine."   It included an article on alternative fee
arrangements, which reported typical contingent fee rates of 33 percent to 40 percent.

> A pure contingency fee arrangement is the most traditional alternative fee
> arrangement.  In this scenario, a firm receives a fixed or scaled percentage of any
> recoveries in a lawsuit brought on behalf of the client as a plaintiff.  Typically, the
> contingency is approximately 33%, with the client covering litigation expenses;
> however, firms can also share part or all of the expense risk with clients.  Pure
> contingency fees, which are usually negotiated at approximately 40%, can be useful
> structures in cases where the plaintiff is seeking monetary or monetizable damages.
> They are also often appropriate when the client is an individual, start up, or
> corporation with limited resources to finance its litigation.  Even large clients,
> however, appreciate the budget certainty and risk-sharing inherent in a contingent
> fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66
THE ADVOCATE (TEXAS) 20 (2011).

53.     In sum, when seeking to recover money in class actions involving large stakes and in commercial lawsuits, sophisticated business clients typically pay contingent fees ranging from 30 percent to 40 percent, with fees of 33 percent or more being promised in most cases.

## VII.     RISK INCURRED

54.     In the market for legal services, the percentages that contingent fee lawyers charge vary with the risks they incur.  Lawyers who handle medical malpractice cases typically receive higher fees than lawyers who handle personal injury cases of other types because they incur greater costs and face more daunting prospects before judges and juries.  Lawyers who handle commercial airplane crash cases often charge lower fees than others because major carriers often concede liability, leaving only damages to be determined.

55.     My review of the preliminary approval materials convinces me that the risks inherent in this litigation were severe.  They included challenges to the plaintiffs' damages model, a difficult path to class certification, the prospect of having to certify classes in multiple states, the difficulty of proving damages if their model was accepted, the absence or a preceding or contemporaneous governmental investigation, and many others.  Because Class Counsel know these risks better than I do and describe them in detail in *Subscriber Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Approval of Proposed Class Settlement,* Dkt. 2610-1 and in their co-lead counsel declaration submitted in support of their fee application, I will not add to their account of the particulars.  Instead, I will focus on general properties of antitrust class actions that bear on their riskiness.

###### 1. Duration Of Litigation

56.     The duration of litigation is a proxy for risk.  Easier cases tend to resolve more quickly than harder ones; the hours class counsel must expend and the expenses they must incur mount with time; and unpaid interest accumulates on both expenses and time until litigation ends.[5]

57.     This case took longer than usual to resolve.  "From 2009-2019, most antitrust class actions that reached final approval did so within 5-7 years."  Josh Paul Davis and Rose Kohles, *2019 Antitrust Annual Report: Class Action Filings in Federal Court* 2 (Sept. 21, 2020).  At 9 years and counting, this lawsuit is already past the high end of that range.  This fact supports the inference that this case was unusually risky.

###### 2. Costs Incurred

58.     The expenses that lawyers incur when litigating class actions correlate directly with risk.  The greater the outlay on expert witnesses, discovery, and other goods and services, the greater the foregone earnings that would have been received had the money been invested and the greater the downside potential associated with the risk of loss.

59.     Even by comparison with other enormous class actions, the magnitude of the risk associated with litigation expenses that Class Counsel incurred was extreme.  The *2019 Annual Antitrust Report* shows that in antitrust class actions that closed from 2009 to 2019 with recoveries of $1 billion or more, the median case saddled class counsel with expenses equal to 1 percent of the recovery.  *Id.*, p. 25.  Here, plaintiffs incurred over $40 million in litigation costs, about $15 million more than one would expect using the above metric.  This enormous outlay reflects the

---

[5] Unpaid interest accumulates on time because, had class counsel handled an hourly rate matter instead of litigating a class action on contingency, they could have invested their fees and earned a return for the duration of the litigation.

burden of extensive fact discovery, the intensity of the opposition, the need for multiple experts, and other cost drivers.

60.     It takes extraordinary courage to put almost $41 million at risk in a complex lawsuit against well-heeled defendants with a track record of success.  This is so partly because of the sheer magnitude of the outlay and partly because the risk is undiversified.  The gamble is all or nothing, with "nothing" being the possible outcome at many points along the way.  The filing of *Defendants' Motion to Dismiss* in 2013 created one such possibility.  Dkt 108.  The filing of *Defendants' Motion for Summary Judgment on Plaintiffs' Section 1, Per se, and Quick Look Claims* in 2017 created another.  Dkt. 1353.  The Court is aware of many more.

61.     There is no reason to fear that Class Counsel spent any of this money unwisely either.  Because contingent fee lawyers only recoup their expenses when they win, they have every reason to be frugal.  Rationally, their incentive is to incur only expenses that increase class members' expected recoveries by several multiples of the cost.  It makes more sense to worry that contingent fee lawyers may devote too few resources to litigation than to fear that they will spend too much. The expenses incurred in this matter were also reviewed on a monthly basis, and regularly audited by a special master, so they are obviously real costs.

3.     Dollars At Stake

62.     The $2.67 billion recovery is another sign of risk.  Settlement size is a proxy for risk because defendants are willing to litigate more intensively when they have more to lose.  In other words, plaintiffs' attorneys must expect to face more intense opposition in larger cases than smaller ones.  In larger cases, class counsel also usually receive multiple offers to settle for lesser amounts along the way to bigger recoveries.  Each such offer forces class counsel to confront the risk of rejecting it and proceeding versus accepting it and collecting fees and reimbursements.

And, of course, a rejected offer does not put a floor on the recovery; it disappears, leaving class counsel with the prospect of recovering nothing.

63.     According to the *2019 Antitrust Annual Report*, *supra* at p. 20, the proposed settlement is both the largest in the history of antitrust litigation and more than $300 million larger than its closest rival.  The settlement also includes injunctive relief that is worth millions or billions more.  See *Declaration of Dr. Daniel Rubinfeld*, Dkt. 2610-10 (evaluating the potential economic impact of structural and other injunctive relief provided for in the Settlement Agreement).  As the Court observed:

> The prospective injunctive relief in this case is wide-reaching and bears greater importance for the class than the monetary relief. Unlike many antitrust cases, this suit does not involve a defunct conspiracy. The settlement terms take this into account by offering forward-thinking, pro-competitive reforms that will change the nature of Defendants' business moving forward. The business practice changes provide significant relief to the Class in addition to the monetary benefit, providing for opportunities for more competition in the market for health insurance and allowing the potential for Class Members to achieve greater consumer choice, better product availability, and increased innovation.

*Preliminary Approval Opinion*, pp. 26-27.

64.     In view of the financial stakes and the difficulty of reforming business practices that were longstanding and ongoing, the risks that Class Counsel faced were extraordinary.  The length of the litigation, the time the lawyers expended, and the expenses they bore all reflect the strength of the Defendants' desire to avoid liability.

### 4.     No Prior Governmental Investigation Uncovered Wrongdoing

65.     The lack of a prior or contemporaneous governmental investigation that uncovered wrongdoing matters too.  This is so because a government action may reduce the burden on class action lawyers, lend credence to the plaintiffs' allegations, and be a source of valuable information or other assistance.  Many antitrust cases that produced recoveries above $100 million were assisted substantially by criminal prosecutions and guilty pleas.  *See, e.g., In re Vitamins Antitrust*

*Litig.*, No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) ($365 million class recovery and 34.6% fee award in case supported by criminal prosecutions and guilty pleas); *In re TFT-LCD (Flat Panel) [Indirect Purchaser] Antitrust Litig.*, MDL No. 1827, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ($1.08 billion class recovery and approximately 30% fee to class counsel and state attorneys general in case supported by sweeping criminal prosecutions and guilty pleas). If prior or parallel government proceedings make class actions less risky, then (other things being equal) fee awards should be higher in cases like this one, where Class Counsel initiated and, for almost 9 years, conducted the litigation challenging the practices at issue without help from a regulator.

66.     Here, the lack of an accompanying public investigation was an especially serious problem for Class Counsel because the Defendants argued that prior governmental inquiries had exonerated them. They asserted, for example, that "[a]ll three branches of government ha[d] approved of the Blue System and rules." *Brief in Support of Defendants' Motion for Summary Judgment on Plaintiffs' Section 1, Per se, and Quick Look Claims*, Dkt. 1353-1. This argument likely had considerable persuasive force. In my experience, federal judges give considerable weight to past governmental actions and are reluctant to contradict their findings.

## VIII.   FEE AWARDS IN CASES WITH COMPARABLE MONETARY RECOVERIES

67.     In my experience, judges want to know how other judges handled fees in similar cases. Here, the Court has already noted that Class Counsel's request for a 25 percent fee "is in line with benchmarks in the Eleventh Circuit." *Preliminary Approval Opinion*, p. 46 (citing cases). In this section, I provide additional information on this subject.

68.     When a settlement sets a record, the number of comparable cases is necessarily small. That said, two generalizations are both reliable and well-known. The first is that as settlements grow in size, fee percentages often decline. This is known as the "increase/decrease"

rule.  The second is that judges do not adhere to the "increase/decrease" mechanically.  Instead, they award fee percentages that, in their informed judgment, lawyers deserve.

69.     The desire to award fees in amounts that lawyers deserve is reflected in the substantial number of mega-fund cases—cases with recoveries of $100 million or more—with percentages in the normal range.  A list appears in Table 1, below.  The list bottoms out with awards of 23 percent because Class Counsel's request for 25 percent of the recovery includes expenses, which other awards in the table do not.

70.     When reading Table 1, two facts must be kept in mind.  First, the table is exemplary, not exhaustive.  Because no source collects all class action settlements, there may be many more cases than it reports.  Second, the entries have not been adjusted for inflation.  By increasing settlement values to current dollars, an inflation adjustment would both increase the number of qualifying cases and make the older cases in the table seem larger.  For example, the $359 million paid in the Vitamins antitrust case in 2001 equals $523 million in 2020.

| Table 1. Mega-Fund Cases with Fee Awards of 23 Percent or Greater | | | |
|---|---|---|---|
| # | Case Reference | Settlement Amount (in Millions) | Fee |
| 1 | Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., et al., No. 02 C-5893, Dkt. No. 2265 (N.D. Ill. Nov. 10, 2016) | $1,575.00 | 24.68% |
| 2 | In re Syngenta AG MIR 162 Corn Litig., MDL No. 2591, 357 F.Supp.3d 1094 (D. Kansas) 1.51B settlement, one-third fee award | $1,510.00 | 33.33% |
| 3 | In re TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827 SI, 2013 WL 1365900, at *20 (N.D. Cal. Apr. 3, 2013) | $1,080.00 | 28.60% |
| 4 | Allapattah Servs., Inc. v. Exxon Corp., 454 F. Supp. 2d 1185, 1241 (S.D. Fla. 2006) | $1,075.00 | 31.33% |
| 5 | In re Urethane Antitrust Litig., 2016 WL 4060156, at *8 (D. Kan. July 29, 2016) | $835.00 | 33.33% |
| 6 | Dahl v. Bain Capital Partners, LLC, No. 07-CV-12388, ECF No. 1095 (D.Mass. Feb 2, 2015). | $590.50 | 33.00% |
| 7 | In re Initial Pub. Offering Sec. Litig., 671 F. Supp. 2d 467 (S.D.N.Y. 2009) | $586.00 | 33.33% |
| 8 | In re: Cathode Ray Tube (CRT) Antitrust Litig., 2016 WL 4126533, at *1 (N.D. Cal. Aug. 3, 2016) | $576.75 | 27.50% |
| 9 | King Drug Co. of Florence v. Cephalon, Inc., Civil Action No. 06-cv-01797-MSP, Dkt. 870 at 8 (E.D. Pa. Oct. 15, 2015) | $512.00 | 27.50% |
| 10 | Spartanburg Regional Health Servs. District, Inc. v. Hillenbrand Indus., Inc., No. 03-DV-2141, ECF No. 377 (D.S.C. Aug. 15, 2006) | $489.80 | 25.00% |
| 11 | In re Pfizer, Inc. Securities Litig., No. 04-cv-09866, ECF No. 727 (S.D.N.Y. 2016) | $486.00 | 28.00% |
| 12 | In re Checking Account Overdraft Litig., 830 F. Supp. 2d 1330, 1358 (S.D. Fla. 2011) | $410.00 | 30.00% |
| 13 | In re Vitamins Antitrust Litig., No. MDL 1285, 2001 WL 34312839 (D.D.C. July 16, 2001) | $359.00 | 34.00% |
| 14 | New England Carpenters Health Benefits Fund v. First Databank, Inc., No. 05 Civ. 11148, 2009 WL 2408560 (D. Mass. Aug. 3, 2009) | $350.00 | 24.00% |
| 15 | In re Rite Aid Corp. Sec. Litig., 269 F. Supp. 2d 603 (E.D.Pa. 2003) and 146 F. Supp. 2d 706 (E.D.Pa. 2001). | $320.00 | 25.00% |
| 16 | In re Williams Sec. Litig., No. 02-cv-72-SPF, ECF No. 1638 (N.D. Okla. Feb. 12, 2007) | $311.00 | 25.00% |
| 17 | In re Oxford Health Plans, Inc. Sec. Litig., MDL No. 1222 (CLB), 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) | $300.00 | 28.00% |

| Table 1. Mega-Fund Cases with Fee Awards of 23 Percent or Greater | | | |
|---|---|---|---|
| # | Case Reference | Settlement Amount (in Millions) | Fee |
| 18 | Sullivan v. DB Investments, Inc., 667 F.3d 273 (3d Cir. 2011) | $295.00 | 25.00% |
| 19 | In re Tricor Direct Purchaser Antitrust Litig., No. 05-340-SLR, ECF No. 543 (D. Del. 2009) | $250.00 | 33.33% |
| 20 | In re Comverse Tech., Inc., Sec. Litig., No. 06-1825, 2010 WL 2653354 (E.D.N.Y. June 24, 2010) | $225.00 | 25.00% |
| 21 | In re Buspirone Antitrust Litig., MDL No. 1413 (JGK), 2003 U.S. Dist. LEXIS 26538, at *11 (S.D.N.Y. Apr. 11, 2003) | $220.00 | 33.33% |
| 22 | In re Genworth Fin. Inc. Sec. Litig., No. 3:14-cv-00682-JRS, 2016 WL 7187290, at *1-*2 (E.D. Va. Sept. 26, 2016) | $219.00 | 28.00% |
| 23 | Schuh v. HCA Holdings Inc., No. 3:11-cv-01033, ECF No. 563 at 1 (M.D. Tenn. Apr. 14, 2016) | $215.00 | 30.00% |
| 24 | In re: Merck & Co Inc Vytorin/Zetia Securities Litigation, No. 08-CV-02177, ECF No. 352 (D.N.J. Oct. 1, 2013) | $215.00 | 28.00% |
| 25 | In re Wilmington Trust Corporation Securities Litig, No.10-cv-00990, ECF No. 842 (D.Del. 2018) | $210.00 | 28.00% |
| 26 | In re Linerboard Antitrust Litig., No. CIV.A. 98-5055, 2004 WL 1221350, at *19 (E.D. Pa. June 2, 2004), amended, No. CIV.A.98-5055, 2004 WL 1240775 (E.D. Pa. June 4, 2004) | $203.00 | 30.00% |
| 27 | Silverman v. Motorola, Inc., No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012), aff'd sub nom. Silverman v. Motorola Sols., Inc., 739 F.3d 956 (7th Cir. 2013) | $200.00 | 27.50% |
| 28 | In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109 (D.N.J. 2002) | $194.00 | 28.00% |
| 29 | In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. 403 (S.D. Tex. 1999) | $190.00 | 25.00% |
| 30 | In re Bank of New York Mellon Corp. Forex Trans. Litig., 12 MD 2335 (LAK), ECF No. 663 (S.D.N.Y. Dec. 4, 2015) | $180.00 | 25.00% |
| 31 | In re Relafen Antitrust Litig., No. 01-12239, ECF No. 297 (D. Mass. Apr. 9, 2004) | $175.00 | 33.00% |
| 32 | In re Cobalt International Energy, Inc. Securities Litig, No. 14-cv-03428, ECF No. 366 (S.D.Tex. 2019) | $173.80 | 25.00% |
| 33 | Alaska Elec. Pension Fund v. Pharmacia Corp., No. 03-1519 (AET), ECF No. 405 (D.N.J. Jan. 30, 2013) | $164.00 | 27.50% |
| 34 | Standard Iron Works v. Arcelormittal, et al., No. 08-cv-5214, ECF. No. 539 (N.D. Ill. 2014) | $163.90 | 33.00% |

| Table 1. Mega-Fund Cases with Fee Awards of 23 Percent or Greater | | |
|---|---|---|
| # | Case Reference | Settlement Amount (in Millions) | Fee |
| 35 | In re Titanium Dioxide Antitrust Litig., No. 10-CV-00318 RDB, 2013 WL 6577029 (D. Md. Dec. 13, 2013) | $163.50 | 33.33% |
| 36 | City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc. et al., No. 12-cv-05162, ECF No. 458  (W.D.Ark. 2019) | $160.00 | 30.00% |
| 37 | In re Se. Milk Antitrust Litig., No. 2:07-CV 208, 2013 WL 2155387, at *8 (E.D. Tenn. May 17, 2013) | $158.60 | 33.33% |
| 38 | In re Flonase Antitrust Litig., 951 F. Supp. 2d 739 (E.D. Pa. 2013) | $150.00 | 33.33% |
| 39 | In re Broadcom Corp. Sec. Litig., No. 01-CV-00275, ECF No.686 (C.D. Cal. Sept. 12, 2005) | $150.00 | 25.00% |
| 40 | Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A., 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) (Scheindlin, J.) | $150.00 | 25.00% |
| 41 | In re Polyurethane Foam Antitrust Litig., No 1:10 MD 2196, 2015 WL 1639269, at *7 (N.D. Ohio Feb. 26, 2015), appeal dismissed (Dec. 4, 2015) | $147.80 | 30.00% |
| 42 | In re Apollo Grp. Inc. Sec. Litig., No. CV 04-2147-PHX-JAT, 2012 WL 1378677  (D. Ariz. Apr. 20, 2012) | $145.00 | 33.33% |
| 43 | In re: Informix Corp. Sec. Litig. No 97-CV-1289-CRB, ECF No. 471 (N.D.Cal., Nov 23, 1999) | $142.00 | 30.00% |
| 44 | In re Computer Assocs. Class Action Sec. Litig., No. 02-CV-1226 (TCP), 2003 WL 25770761 (E.D.N.Y. Dec. 8, 2003) | $133.50 | 25.30% |
| 45 | In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 246 F.R.D. 156 (S.D.N.Y. 2007) | $133.00 | 24.00% |
| 46 | In re Plasma-Derivative Protein Therapies Antitrust Litig., No. 09-cv-07666, ECF Nos. 693, 697, 697-1 and 701 (N.D. Ill. 2014) | $128.00 | 33.33% |
| 47 | In re Rite Aid Corp. Sec. Litig., MDL No. 1360, 2005 WL 697461 at *2-3 (E.D. Pa. Mar. 24, 2005) | $126.64 | 25.00% |
| 48 | Anwar et al v. Fairfield Greenwich Limited et al, No. 09-cv-0118, ECF No. 1457 (S.D.N.Y. Nov. 20, 2015) | $125.00 | 30.00% |
| 49 | In re Optical Disk Drive Prod. Antitrust Litig., No. 3:10-MD-2143 RS, 2016 WL 7364803, at *6 (N.D. Cal. Dec. 19, 2016) | $124.50 | 25.00% |
| 50 | Kurzweil v. Philip Morris Cos., 1999 U.S. Dist. LEXIS 18378, (S.D.N.Y. Nov 24, 1999) | $123.80 | 30.00% |
| 51 | Norma J Thurber, et al v. Mattel Inc, et al, , No. 99-cv-10368, ECF No. 193 (C.D.Cal., Sep. 29, 2003) | $122.00 | 27.00% |

| # | Case Reference | Settlement Amount (in Millions) | Fee |
|---|---|---|---|
|  | **Table 1. Mega-Fund Cases with Fee Awards of 23 Percent or Greater** | | |
| 52 | In re Deutsche Telekom AG Sec. Litig., 2005 U.S. Dist. LEXIS 45798, *12, 14 | $120.00 | 28.00% |
| 53 | In re Ikon Office Sols., Inc., Sec. Litig., 194 F.R.D. 166 (E.D. Pa. 2000) | $111.00 | 30.00% |
| 54 | In re Morgan Keegan Open-End Mutual Fund Litigation, No. 07-cv-02784, ECF No. 435 (W.D.Tenn. Aug 2, 2016) | $110.00 | 30.00% |
| 55 | New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc., et al., No. 08-cv-05653, ECF No. 277 (S.D.N.Y. May 10, 2016) | $110.00 | 28.00% |
| 56 | In re Prudential Sec. Inc. Ltd. Partnerships Litig., 912 F. Supp. 97, 104 (S.D.N.Y. 1996) | $110.00 | 27.00% |
| 57 | In re CVS Corporation Securities Litigation, No. 01-cv-11464, ECF No. 191 (D.Mass, Sep 7, 2005) | $110.00 | 25.00% |
| 58 | Knurr v. Orbital ATK, Inc. et al., No. 16-cv-01031, ECF No. 462 (E.D.Va 2019) | $108.00 | 28.00% |
| 59 | In re Auto. Refinishing Paint Antitrust Litig., No. MDL NO 1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) | $105.75 | 32.60% |
| 60 | In re Prison Realty Sec. Litig., No. 3:99–0458, 2001 U.S. Dist. LEXIS 21942 (M.D. Tenn. Feb. 9, 2001). | $104.00 | 30.00% |
| 61 | Erica P. John Fund, Inc. v. Halliburton Co., No. 02-xc-01152, ECF No. 844 (N.D.Tex. Apr. 25, 2018) | $100.00 | 33.33% |
| 62 | 8. In re Am. Express Fin. Advisors Sec. Litig., No. 04 Civ. 1773 (DAB), ECF No. 170 at 8 (S.D.N.Y. July 18, 2007) (Batts, J.) | $100.00 | 27.00% |

*Remainder of page intentionally left blank*

71.     As stated, the entries in Table 1 show that judges do not apply the increase/decrease rule mechanically.  They award the fees that, in their informed judgment, lawyers deserve.  In mega-fund cases with settlements north of $100 million, the practice of tailoring fees in light of facts has often led them to grant percentages in the normal range.  If the Court awards the fee that Class Counsel has requested, as I believe it should, the Court will have plenty of company in the mega-fund category.

## IX.     LODESTAR CROSS-CHECK

72.     When awarding fees as a percentage of the settlement, courts often gauge their reasonableness by performing lodestar cross-checks. These cross-checks employ two components: the lodestar calculation, which multiplies hourly rates by time expended; and an imputed multiplier, which is a factor that brings the lodestar calculation into line with the fee request.  I discuss both quantities here.

73.     Before doing so, I wish to note two things.  First, I oppose the use of lodestar cross-checks and have argued against them repeatedly.  By assigning significant weight to hours worked, courts inadvertently encourage lawyers to expend time rather than to conserve it.  In other words, courts unintentionally penalize efficiency and reward delay.  Lodestar cross-checks also weaken the connection between fees and recoveries, the connection that lashes class counsel's interests fast to class members' wellbeing.  To the best of my knowledge, claimants never use the lodestar multiplier when hiring lawyers directly.  I therefore see no reason for courts to rely on it when assessing the reasonableness of class counsel's fees.

74.     Second, the market-based approach that I endorse *is* a cross-check on the reasonableness of Plaintiffs' Counsel's fee request.  It provides an objective and independent standard on the basis of which an assessment can be made.  Unless a cross-check can only be made

in lodestar terms, a question of law on which I take no position, I see no obvious reason for a second cross-check to be made.

75. Turning to the lodestar cross-check itself, I reviewed a summary of Class Counsel's billings that covered time expended through August 15, 2020. It showed that across all timekeepers and all firms, the total lodestar basis was $194,226,322 and the total hours worked by all firms was 434,054.6. Simple division yields a blended hourly rate of $447 for all work done to that point. Considering only lawyers who spent at least 100 hours on the litigation, 20 lawyers' rates were in the $1,000-$1,600 range, 46 fell into the $800-$999 range, and 43 billed from $700 to $799 per hour. Another 545 timekeepers billed at lower rates.

76. Because hourly rates vary widely across the profession, when considering the reasonableness of this request it is important to keep in mind that the lawyers serving as Lead Counsel for the Subscriber Class include some of the country's most outstanding practitioners and the firms they work at are some of the most prestigious as well.

77. The team of lawyers representing the subscribers includes outstanding attorneys from the nation's top firms, with many decades of combined experience in highly complex litigation, including pathbreaking antitrust cases and class actions. The two attorneys appointed by the trial court as co-lead counsel, David Boies and Michael Hausfeld, themselves have extremely impressive credentials and brought to bear their considerable experience litigating antitrust cases and complex class actions to their representation of the subscriber class. Mr. Boies, who was named one of the 100 Most Influential People in the World by *Time Magazine* in 2010, has been named Global International Litigator of the Year by *Who's Who Legal* an unprecedented seven times and has been named Antitrust Lawyer of the Year by the American Bar Association. In the just-over two decades since its founding, and under Mr. Boies' leadership, Boies Schiller

Flexner's attorneys have earned a stellar reputation for winning a broad range of exceedingly complex class action lawsuits. Significantly, Mr. Boies' firm has been recognized for its comprehensive work investigating, uncovering, and filing suits concerning the existence and activities of cartels. *See, e.g.*, *In re Vitamins Antitrust Litig*., 398 F. Supp. 2d 209, 226 (D.D.C. 2005). Mr. Hausfeld is a leader in the field of antitrust, having served as co-lead counsel in cases against manufacturers of genetically engineered foods, managed healthcare companies, bulk vitamin manufacturers, technology companies, and the world's largest banking institutions. *Chamber and Partners* recognized this when reporting that Michael is "one of the best lawyers in America, especially with regard to antitrust cases and other complex litigation." (Chambers US, Antitrust: Plaintiff - Nationwide, 2021). *Global Competition Review*, when awarding Michael Lawyer of the Year, touted him "as one of the best plaintiffs' lawyers in the country" who "consistently brings in the biggest judgments in the history of law" and is "a Washington lawyer determined to change the world – and succeeding." (Global Competition Review Awards, 2019). *Who's Who Legal Competition* has dubbed him "[o]ne of the titans of the competition plaintiff space, and is a perennial selection as a Global Elite Thought Leader." Hausfeld LLP is in a class of its own when it comes to winning damages awards for violations of the competition laws in both the United States and Europe.

78.     Messrs. Hausfeld and Boies led a truly remarkable assemblage of legal talent in the representation of the subscriber class. The steering committee included Paul Weiss's Bill Isaacson, who has tried a number of significant antitrust class actions to verdict and has negotiated a number of notable class action settlements, and of whom the *Global Competition Review* has declared that "arguably no antitrust lawyer in recent memory has had as much success for both plaintiffs and defendants as Bill Isaacson." It also included Hausfeld's Megan Jones,  who designed and led the

discovery strategy that included obtaining 75 million pages of documents, over 100 depositions, and synthesizing the facts to support the legal theories of the case. *Law360* has named Megan Jones as a "Titan of the Plaintiffs' Bar," describing her as "a force of nature." Ms. Jones and Mr. Isaacson worked together to coordinate and direct the litigation, as well as to maintain a consistent strategy over a course of years. The team also included Charles J. Cooper, a founding member and Chairman of Cooper & Kirk, PLLC, recognized as one of the country's leading litigation boutiques, who has represented a wide range of public and private clients in highly complex constitutional, antitrust, health-care, administrative, and commercial matters and has argued numerous cases before the Supreme Court and dozens of other appeals; Cy Smith of Zuckerman Spaeder, whose work the Delaware Court of Chancery has described as "an exemplar of exactly how entrepreneurial plaintiffs' contingent fee litigation ought to work"; accomplished trial attorney Kathleen Chavez, of Chicago's Foot Mielke Chavez & O'Neil LLC; and Greg Davis, of Davis & Taliaferro, a leading member of the Alabama Bar. The Self-Funded Sub-Class was ably represented by Warren T. Burns, of Burns Charest LLP. Lead counsel and the Steering Committee were also ably assisted by a number of other talented and experienced lawyers.

79.     Turning now to the reasonableness of the requested rates directly, there are many relevant sources of information. Fee applications submitted in bankruptcy proceedings are especially helpful because they are sworn to under oath and are reviewed by judges. Studying them, one learns that many lawyers are compensated at rates comparable to those requested here.

- In the Sears bankruptcy proceeding, the fee application submitted in 2019 by Weil, Gotshal & Manges LLP, the debtors' attorneys, included dozens of lawyers whose hourly charges exceed $1,000, with nine lawyers charging $1,500 per hour or more.

- Even higher hourly rates were sought in the Toys R' Us bankruptcy, where Kirkland & Ellis LLP served as debtors' counsel. There, the highest hourly rate was $1,795, the blended rate for all partners, of which there were dozens, was $1,227, and the blended rate for all timekeepers, including paralegals and support staff, was $901.

- The rates sought by the law firm of Davis Polk & Wardwell LLP in the ongoing Purdue Pharma bankruptcy proceeding provide another anecdotal example. In late November of 2019, the firm sought rates that included $1,645 per hour for seven partners, $1,445-$1,585 for four more partners, and $1,225 for six lawyers described as being "of counsel." Davis Polk also sought rates exceeding $1,000 per hour for fifteen associates and rates exceeding $900 per hour for many more.

- Finally, an article covering the bankruptcy proceeding involving Pacific Gas & Electric (PG&E) reported that lawyers from Cravath Swaine & Moore billed at rates of $415 to $1,500 per hour and that lawyers at Weil, Gotshal & Manges charged $560 to $1,600 per hour. Xiumei Dong, *PG&E Legal Bills Already Top $84M in Chapter 11 Case*, THE RECORDER, Apr. 2, 2019, https://www.law.com/therecorder/2019/04/02/pge-legal-bills-already-top-84m-for-chapter-11-case/?slreturn=20200903170457.

80. Focusing on Alabama, the proceeding involving New WEI Inc. shows that rates similar to those discussed above are allowed by local bankruptcy courts. *New WEI, Inc., et al*., Docket No. 2:15-bk-02741 (Bankr. N.D. Ala, Jul 15, 2015). In this proceeding, Paul, Weiss, Rifkind, Wharton & Garrison LLP requested hourly rates of $1,275 for two partners and of $925 for two lawyers listed as Counsel. *Id*., Dkt. 447. Jenner & Block LLP sought rates as high as $1,200 per hour for partners and $695 per hour for associates. *Id*., Dkt. 731. Morrison & Foerster LLP applied for $1,275 for a tax partner, over $1,000 for two bankruptcy partners, and $950 for a

litigation partner. The rates for bankruptcy associates topped out at $760 per hour. *Id*., Dkt. 762. All three applications were approved. See *Id*., Dkt. 656 (authorizing retention of Paul, Weiss, Rifkind, Wharton & Garrison LLP); *Id*., Dkt 861 (authorizing retainer of Jenner & Block LLP); and *Id*., Dkt. 921 (authorizing retention of Morrison & Foerster LLP).

81.     Turning from bankruptcy to antitrust class actions, I gained familiarity with rates charged in the latter proceedings by preparing many expert reports that were submitted in them. I also reviewed several fee applications submitted and fee awards granted in several cases with recoveries exceeding $100 million to determine the rates that were sought and approved. The review led me to conclude that the rates requested in this case are reasonable. Here are two examples from cases that settled recently.

- In the Euribor litigation, which settled in 2019 for $182.5 million, the requested lodestar basis, which the court approved, produced a blended rate for all timekeepers of $468 dollars per hour ($194,977,526 divided by 434,977 hours = $468). *See Memorandum of Law in Support of Class Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses*, *Sullivan et al. v. Barclays plc et al,* 13-cv-2811 (PKC), Dkt. 402 (S.D.N.Y., March 23, 2018); and *Order Granting Class Counsel's Motion for Award of Attorneys' Fees*, *Sullivan et al. v. Barclays plc et al,* 13-cv-2811 (PKC), Dkt. 425 (S.D.N.Y., May 18, 2018).

- In the Forex litigation, 15 settlements produced an aggregate fund of over $2.3 billion. In 2018, the court approved a fee award in the amount of $300,335,750, which equaled a lodestar basis of $174,613,808 times a multiplier of 3.4. Because class counsel expended 330,600 hours, the blended rate for all timekeepers was $528 per hour. *Opinion and*

*Order, In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 1:13-cv-07789-LGS, Dkt. 1140 (S.D.N.Y., November 8, 2018).

82.     In view of the sources I have discussed and my decades of experience reviewing fee applications, it is my opinion that the rates requested by class counsel are clearly reasonable.

83.     I turn now to the multiplier portion of the lodestar.  As explained, Class Counsel have applied for approximately $667 million (25 percent of the recovery) in payment of fees and reimbursement of expenses. To determine the multiplier, which applies only to the hourly-based component of the payment request, Class Counsel's costs (nearly $41 million) must be deducted from this amount.  Dividing the remaining $626.5 million by the lodestar basis of $194,226,321, the multiplier is about 3.2.  The extraordinary recovery won for the class easily justifies a multiplier of this size.

84.     Before discussing multipliers awarded in comparable cases, it bears mentioning that the lodestar basis reflects Class Counsel's historical rates, not their current rates, which are higher.  Consequently, the multiplier must compensate Class Counsel for delay in payment as well as risk.  The cost of delay is more than the difference between historical and current rates as well.  Had Class Counsel been paid on a monthly basis throughout the litigation, the dollars received would have been available for investment in securities, certificates of deposit, or other instruments.  Unless the multiplier offsets these lost earnings, contingent fee work will never be as financially attractive as work done for payment on a regular basis and lawyers will be discouraged from handling class actions.

85.     To put the matter another way, had Class Counsel billed at current rates rather than historical rates, the requested multiplier would be smaller because the lodestar basis would have

been over $15 million higher. The need to compensate Class Counsel for delayed payment would still exist, but it would be addressed by marking up their hourly rates instead of via the multiplier.

86.    A 3.2 multiplier is easily justified in this case. The best-known feature of multipliers is that they increase sharply as settlements become larger. The policy of connecting multipliers to settlement size has solid grounding in the economics of litigation, because the multiplier is the component of the lodestar- method that ties the fee award to the recovery. Neither lawyers' hourly rates nor the time they expend does this more than weakly. Unless the multiplier increases as settlements grow larger, lawyers will be incentivized to settle cheaply because, by doing so, they will protect their fees instead of putting them at risk—which they do whenever they pass up opportunities to settle. Unless the upside potential of securing a larger recovery justifies incurring the downside risk of losing fees, the pressure on lawyers to settle will be strong. Awarding larger multipliers when class actions settle for larger sums provides the upside potential that is needed to encourage lawyers to take significant risks.

87.    Because multipliers increase as settlements grow, judges presiding over mega-fund cases have often awarded multipliers equal to or greater than the one sought here.

- In *In re Buspirone*, 01-md-1410 (S.D.N.Y. Apr. 11, 2003), which settled for $220 million, the court awarded a lodestar multiplier of 8.46.

- In *In re Credit Default Swaps Antitrust Litig*., No. 13MD2476 DLC, ECF No. 554 (S.D.N.Y. April 18, 2016), which settled for $1.86 billion, the multiplier was 6.36.

- In *King Drug Co. of Florence v. Cephalon, Inc*., Civil Action No. 06-cv-01797-MSP, Dkt. 870 at 8 (E.D. Pa. Oct. 15, 2015), the settlement equaled $512 million, and the multiplier was 4.12.

- In *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014), which ended with a whopping $5.7 billion recovery, the multiplier was 3.54.

- In *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998), which settled for slightly more than $1 billion, the multiplier was 3.97.

- In *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 523 (E.D.N.Y. 2003*), aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005), where the settlement had an estimated present value of almost $3.4 billion, the multiplier was 3.5.

- *In Deloach v. Philip Morris Companies*, No. 1:00CV01235, 2003 WL 23094907, at *11 (M.D.N.C. Dec. 19, 2003), which settled for $200 million in cash and other relief, the multiplier was 4.45.

This list could be expanded considerably, especially by including securities fraud class actions and cases of other types.

88. The substantial value of the forward-looking injunctive relief provides additional support for a high multiplier. Most of the mega-fund settlements to which this one might be compared entitled class members to only or mainly monetary relief. When injunctive relief is also considered, the value of the proposed settlement greatly exceeds $2.67 billion. Because class members will derive significant benefits from the injunctive reforms, Class Counsel should be rewarded for securing it. An enhanced multiplier would have this effect.

89. When performing cross-checks, judges do not adhere to simple-minded rules. They award fees that, in their informed judgment, are justified in light of the effort lawyers expended, the risks they incurred, and the results they obtained. In this case, the lawyers worked hard,

incurred great expenses, pursued a novel litigation theory, and secured a terrific settlement for the class. In view of all this, the reasonableness of the requested multiplier is clear.

90.     I conclude that a lodestar cross-check confirms that Plaintiffs' Counsel's fee request is in line with the market and with awards in comparable cases and thus is reasonable.

## X.     COMPENSATION

91.     I received a flat fee of $50,000 for the time I spent preparing this report.

## XI.     CONCLUSION

92.     For the reasons set out above, I believe that Class Counsel's request for a fee and expense award equal to 25 percent of the gross recovery is in line with the market and with awards in comparable cases and thus is reasonable.


I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed this 28th day of May, 2021, at Empire, Michigan.


_____
                    CHARLES SILVER

**APPENDIX I: RESUME OF PROFESSOR CHARLES SILVER**

# CHARLES SILVER

School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705
(512) 232-1337 (voice)
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

## ACADEMIC EMPLOYMENTS

School of Law, University of Texas at Austin, 1987-2015
  Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure
  W. James Kronzer Chair in Trial & Appellate Advocacy
  Cecil D. Redford Professor
  Robert W. Calvert Faculty Fellow
  Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow
  Assistant Professor

University of Michigan Law School, Fall 2018
  Visiting Professor

Harvard Law School, Fall 2011
  Visiting Professor

Vanderbilt University Law School, Fall 2003
  Visiting Professor

University of Michigan Law School, Fall 2018 & Fall 1994
  Visiting Professor

University of Chicago, 1983-1984
  Managing Editor, *Ethics: A Journal of Social, Political and Legal Philosophy*

## EDUCATION

Yale Law School, JD (1987)
University of Chicago, MA (Political Science) (1981)
University of Florida BA (Political Science) 1979

## SPECIAL PROJECTS

PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (with Samuel Issacharoff, Reporter, and Robert Klonoff and Richard Nagareda, Associate Reporters) (American Law Institute 2010).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Class Action Litigation," 25 Rev. Litig. 459 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Mass Tort Litigation," 42 Tort Trial & Insurance Practice Law Journal 105 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Medical Malpractice Litigation," 25 Rev. Litig. 459 (2006).

PRACTICAL GUIDE FOR INSURANCE DEFENSE LAWYERS (2002) (with Ellen S. Pryor and Kent D. Syverud, Co-Reporters); published on the IADC website (2003); revised and distributed to all IADC members as a supplement to the Defense Counsel J. (2004).

## BOOKS

MEDICAL MALPRACTICE LITIGATION: HOW IT WORKS, WHAT IT DOES, AND WHY TORT REFORM HASN'T HELPED (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage) (Cato Institute, 2021).

OVERCHARGED: WHY AMERICANS PAY TOO MUCH FOR HEALTH CARE (with David A. Hyman) (Cato Institute, 2018).

HEALTH LAW AND ECONOMICS, Vols. I and II (coedited with Ronen Avraham and David A. Hyman) (Edward Elgar 2016).

LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION, (coedited with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley) (Foundation Press, 2nd Ed. 2012) (updated annually through 2018).

PROFESSIONAL RESPONSIBILITIES OF INSURANCE DEFENSE COUNSEL (with William T. Barker) (LexisNexis 2012) (updated annually through 2017).

## ARTICLES AND BOOK CHAPTERS BY SUBJECT AREA
## (* INDICATES PEER REVIEWED)

### Health Care Law & Policy

1.      "Paying Beneficiaries, Not Providers," Regulation 34 (2020) (with David A. Hyman).

2.　　　"Pharmaceutical Pricing When Success Has Many Parents," 37 Yale J. Reg. 101 (2020) (with David A. Hyman).

3.　　　"Pricing and Paying for Cancer Drugs: Policy Options for Fixing A Broken System," 26:4 The Cancer Journal 298-303 (2020) (with David A. Hyman).*

4.　　　"Medicare For All: Four Inconvenient Truths," 20 Hous. J. of Health L. & Policy 133 (2020) (with David A. Hyman).

5.　　　"Health Care's Government Bureaucracy: A Comment on *Health Care's Market Bureaucracy*, by Allison K. Hoffman," (unpublished) (with David A. Hyman).

6.　　　"Surprise Medical Bills: How To Protect Patients and Make Care More Affordable," 108 Georgetown L. J. 1655 (2020) (with David A. Hyman and Ben Ippolito).

7.　　　"There is a Better Way: Make Medicaid and Medicare More Like Social Security," 18 Georgetown J. of L. & Pub. Pol'y 149 (2020) (with David A. Hyman).

8.　　　"Why Are We Being Overcharged for Pharmaceuticals? What Should We Do About It?" 39 J. Legal Med. 137 (2019) (with David A. Hyman).

9.　　　"Regulating Pharmaceutical Companies' Financial Largesse," 7:25 Israeli J. Health Policy Res. (2018), https://doi.org/10.1186/s13584-018-0220-5 (with Ronen Avraham).*

10.　　"Medical Malpractice Litigation," (with David A. Hyman) OXFORD RESEARCH ENCYCLOPEDIA OF ECONOMICS AND FINANCE (2019), DOI: 10.1093/acrefore/9780190625979.013.365.*

11.　　"It Was on Fire When I Lay Down on It: Defensive Medicine, Tort Reform, and Healthcare Spending," (with David A. Hyman) OXFORD HANDBOOK OF AMERICAN HEALTH LAW, I. Glenn Cohen, Allison Hoffman, and William M. Sage, eds. (2017).*

12.　　"Compensating Persons Injured by Medical Malpractice and Other Tortious Behavior for Future Medical Expenses Under the Affordable Care Act," (with Maxwell J. Mehlman, Jay Angoff, Patrick A. Malone, and Peter H. Weinberger)25 Annals of Health Law 35 (2016).

13.　　"Double, Double, Toil and Trouble: Justice-Talk and the Future of Medical Malpractice Litigation," (with David A. Hyman) 63 DePaul L. Rev. 574 (2014) (invited symposium).

14.　　"Five Myths of Medical Malpractice," (with David A. Hyman) 143:1 Chest 222-227 (2013).*

15.　　"Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (with David A. Hyman), 46 New England L. Rev. 101 (2012) (invited symposium).

16.　　"Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?" (coauthored with David A. Hyman) MEDICAL MALPRACTICE AND COMPENSATION IN

GLOBAL PERSPECTIVE (Ken Oliphant & Richard W. Wright, eds. 2013)*; originally published in 87 Chicago-Kent L. Rev. 163 (2012).

17. "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press 531-542 (2012) (with David A. Hyman).*

18. "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 Vanderbilt L. Rev. 1085 (2006) (with David A. Hyman) (invited symposium).

19. "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII Widener L. J. 121 (2005) (with David A. Hyman) (invited symposium).

20. "Speak Not of Error, Regulation (Spring 2005) (with David A. Hyman).

21. "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?" 90 Cornell L. Rev. 893 (2005) (with David A. Hyman).

22. "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 Harv. J. L. and Pub. Pol. 107 (2004) (with David A. Hyman) (invited symposium).

23. "You Get What You Pay For: Result-Based Compensation for Health Care," 58 Wash. & Lee L. Rev. 1427 (2001) (with David A. Hyman).

24. "The Case for Result-Based Compensation in Health Care," 29 J. L. Med. & Ethics 170 (2001) (with David A. Hyman).*

## Studies of Medical Malpractice Litigation

25. "Fictions and Facts: Medical Malpractice Litigation, Physician Supply, and Health Care Spending in Texas Before and After HB 4," 51 Tex. Tech L. Rev. 627 (2019). (with David A. Hyman and Bernard Black) (invited symposium on the 15th anniversary of the enactment of HB4).

26. "Insurance Crisis or Liability Crisis? Medical Malpractice Claiming in Illinois, 1980-2010," 13 J. Empirical Legal Stud. 183 (2016) (with Bernard S. Black, David A. Hyman, and Mohammad H. Rahmati).

27. "Policy Limits, Payouts, and Blood Money: Medical Malpractice Settlements in the Shadow of Insurance," 5 U.C. Irvine L. Rev. 559 (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik) (invited symposium).

28. "Does Tort Reform Affect Physician Supply? Evidence from Texas," Int'l Rev. of L. & Econ. (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik), available at http://dx.doi.org/10.1016/j.irle.2015.02.002.*

29. "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage), Amer. L. & Econ. Rev. (2012), doi: 10.1093/aler/ahs017.*

30. "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik), 9 J. Empirical Legal Stud. 173-216 (2012).*

31. "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 J. Empirical Legal Stud. 379 (2010) (with Bernard S. Black and David A. Hyman).*

32. "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 J. Empirical Legal Stud. 723 (2009) (with David A. Hyman and Bernard S. Black).*

33. "Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 J. Legal Analysis 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue).*

34. "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 The Advocate (Texas) 25 (2008) (with Bernard S. Black and David A. Hyman) (invited symposium).

35. "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 3 Geneva Papers on Risk and Insurance: Issues and Practice 177-192 (2008) (with Bernard S. Black, David A. Hyman, William M. Sage and Kathryn Zeiler).*

36. "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 J. Legal Stud. S9 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

37. "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," J. Empirical Legal Stud. 3-68 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

38. "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard S. Black, David A. Hyman, and William S. Sage).*

### Empirical Studies of the Law Firms and Legal Services

39. "Screening Plaintiffs and Selecting Defendants in Medical Malpractice Litigation: Evidence from Illinois and Indiana," 15 J. Empirical Legal Stud. 41-79 (2018) (with Mohammad Rahmati, David A. Hyman, Bernard S. Black, and Jing Liu)*

40. "Medical Malpractice Litigation and the Market for Plaintiff-Side Representation: Evidence from Illinois," 13 J. Empirical Legal Stud. 603-636 (2016) (with David A. Hyman, Mohammad Rahmati, Bernard S. Black).*

41. "The Economics of Plaintiff-Side Personal Injury Practice," U. Ill. L. Rev. 1563 (2015) (with Bernard S. Black and David A. Hyman).

42. "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 Fordham Urb. L. J. 357 (2010) (with David A. Hyman) (invited symposium).

43. "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 Amer. Law & Econ. Rev. 185 (2008) (with Bernard S. Black, David A. Hyman, and William M. Sage).*

   1. Attorneys' Fees—Empirical Studies and Policy Analyses

44. "The Mimic-the-Market Method of Regulating Common Fund Fee Awards: A Status Report on Securities Fraud Class Actions," RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION, Sean Griffith, Jessica Erickson, David H. Webber, and Verity Winship, Eds. (2018).

45. "Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions," 115 Columbia L. Rev. 1371 (2015) (with Lynn A. Baker and Michael A. Perino).

46. "Regulation of Fee Awards in the Fifth Circuit," 67 The Advocate (Texas) 36 (2014) (invited submission).

47. "Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment," 66 Vanderbilt L. Rev. 1677 (2013) (with Lynn A. Baker and Michael A. Perino).

48. "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 Vanderbilt L. Rev. 107 (2010) (with Geoffrey P. Miller).

49. "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 DePaul L. Rev. 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, Ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

50. "Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider," 20 The NAPPA Report 7 (Aug. 2006).

51. "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006).

52. "Due Process and the Lodestar Method: You Can't Get There From Here," 74 Tul. L. Rev. 1809 (2000) (invited symposium).

53. "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 Tex. Rev. of Litig. 301 (1993).

54. "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 Tex. L. Rev. 865 (1992).

55. "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 <u>Cornell L. Rev.</u> 656 (1991).

## Liability Insurance and Insurance Defense Ethics

56. "Liability Insurance and Patient Safety," 68 <u>DePaul L. Rev.</u> 209 (2019) (with Tom Baker) (symposium issue).

57. "The Treatment of Insurers' Defense-Related Responsibilities in the Principles of the Law of Liability Insurance: A Critique," 68 <u>Rutgers U. L. Rev.</u> 83 (2015) (with William T. Barker) (symposium issue).

58. "The Basic Economics of the Duty to Defend," in D. Schwarcz and P. Siegelman, eds., RESEARCH HANDBOOK IN THE LAW & ECONOMICS OF INSURANCE 438-460 (2015).*

59. "Insurer Rights to Limit Costs of Independent Counsel," <u>ABA/TIPS Insurance Coverage Litigation Section Newsletter</u> 1 (Aug. 2014) (with William T. Barker).

60. "Litigation Funding Versus Liability Insurance: What's the Difference?," 63 <u>DePaul L. Rev.</u> 617 (2014) (invited symposium).

61. "Ethical Obligations of Independent Defense Counsel," 22:4 <u>Insurance Coverage</u> (July-August 2012) (with William T. Barker), available at http://apps.americanbar.org/litigation/committees/insurance/articles/julyaug2012-ethical-obligations-defense-counsel2.html.

62. "Settlement at Policy Limits and The Duty to Settle: Evidence from Texas," 8 <u>J. Empirical Leg. Stud.</u> 48-84 (2011) (with Bernard S. Black and David A. Hyman).*

63. "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 <u>Ariz. L. Rev.</u> 787 (2002) (invited symposium).

64. "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 <u>G'town J. Legal Ethics</u> 29 (2001) (with Ellen S. Pryor).

65. "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 <u>Tex. L. Rev.</u> 599 (2000) (with Ellen S. Pryor).

66. "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 <u>Conn. Ins. L. J.</u> 205 (1998) (invited symposium).

67. "The Lost World: Of Politics and Getting the Law Right," 26 <u>Hofstra L. Rev.</u> 773 (1998) (invited symposium).

68. "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 Fordham L. Rev. 233 (1996) (invited symposium).

69. "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6 Coverage 47 (1996) (with Michael Sean Quinn).

70. "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6 Coverage 21 (1996) (with Michael Sean Quinn).

71. "The Professional Responsibilities of Insurance Defense Lawyers," 45 Duke L. J. 255 (1995) (with Kent D. Syverud); reprinted in IX INS. L. ANTHOL. (1996) and 64 Def. L. J. 1 (Spring 1997).

72. "Wrong Turns on the Three Way Street: Dispelling Nonsense about Insurance Defense Lawyers," 5-6 Coverage 1 (Nov./Dec.1995) (with Michael Sean Quinn).

73. "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 Tex. L. Rev. 1203 (1994) (with Ellen Smith Pryor).

74. "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 Tex. L. Rev. 1583 (1994); reprinted in Practicing Law Institute, INSURANCE LAW: WHAT EVERY LAWYER AND BUSINESSPERSON NEEDS TO KNOW (1998).

75. "A Missed Misalignment of Interests: A Comment on Syverud, The Duty to Settle," 77 Va. L. Rev. 1585 (1991); reprinted in VI INS. L. ANTHOL. 857 (1992).

### Class Actions, Mass Actions, and Multi-District Litigations

76. "In Defense of Private Claim Resolution Facilities," J. of L. and Contemporary Problems (forthcoming 2021) (with Lynn A. Baker)*

77. "What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation? A Comment on Williams, Lee, and Borden, Repeat Players in Federal Multidistrict Litigation," 5 J. of Tort L. 181 (2014), DOI: 10.1515/jtl-2014-0010 (invited symposium).

78. "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 Fordham L. Rev. 1985 (2011) (invited symposium).

79. "The Allocation Problem in Multiple-Claimant Representations," 14 S. Ct. Econ. Rev. 95 (2006) (with Paul Edelman and Richard Nagareda).*

80. "A Rejoinder to Lester Brickman, On the Theory Class's Theories of Asbestos Litigation," 32 Pepperdine L. Rev. 765 (2005).

81. "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

82. "We're Scared To Death: Class Certification and Blackmail," 78 <u>N.Y.U. L. Rev.</u> 1357 (2003).

83. "The Aggregate Settlement Rule and Ideals of Client Service," 41 <u>S. Tex. L. Rev.</u> 227 (1999) (with Lynn A. Baker) (invited symposium).

84. "Representative Lawsuits & Class Actions," in B. Bouckaert & G. De Geest, eds., Int'l Ency. Of L. & Econ. (1999).*

85. "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 <u>Va. L. Rev.</u> 1465 (1998) (with Lynn A. Baker) (invited symposium).

86. "Mass Lawsuits and the Aggregate Settlement Rule," 32 <u>Wake Forest L. Rev.</u> 733 (1997) (with Lynn A. Baker) (invited symposium).

87. "Comparing Class Actions and Consolidations," 10 <u>Tex. Rev. of Litig.</u> 496 (1991).

88. "Justice in Settlements," 4 <u>Soc. Phil. & Pol.</u> 102 (1986) (with Jules L. Coleman).*

### General Legal Ethics and Civil Litigation

89. "A Private Law Defense of Zealous Representation" (in progress), available at http://ssrn.com/abstract=2728326.

90. "The DOMA Sideshow" (in progress), available at http://ssrn.com/abstract=2584709.

91. "The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigations," 79 <u>Fordham L. Rev</u>. 1985 (2011).

92. "Fiduciaries and Fees," 79 <u>Fordham L. Rev.</u> 1833 (2011) (with Lynn A. Baker) (invited symposium).

93. "Ethics and Innovation," 79 <u>George Washington L. Rev.</u> 754 (2011) (invited symposium).

94. "In Texas, Life is Cheap," 59 <u>Vanderbilt L. Rev.</u> 1875 (2006) (with Frank Cross) (invited symposium).

95. "Introduction: Civil Justice Fact and Fiction," 80 <u>Tex. L. Rev.</u> 1537 (2002) (with Lynn A. Baker).

96. "Does Civil Justice Cost Too Much?" 80 <u>Tex. L. Rev.</u> 2073 (2002).

97. "A Critique of *Burrow v. Arce*," 26 <u>Wm. & Mary Envir. L. & Policy Rev.</u> 323 (2001) (invited symposium).

98. "What's Not To Like About Being A Lawyer?" 109 <u>Yale L. J.</u> 1443 (2000) (with Frank B. Cross) (review essay).

99. "Preliminary Thoughts on the Economics of Witness Preparation," 30 Tex. Tech L. Rev. 1383 (1999) (invited symposium).

100. "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 G'town J. Legal Ethics 959 (1998) (with David A. Hyman) (invited symposium).

101. "Bargaining Impediments and Settlement Behavior," in D.A. Anderson, ed., DISPUTE RESOLUTION: BRIDGING THE SETTLEMENT GAP (1996) (with Samuel Issacharoff and Kent D. Syverud).

102. "The Legal Establishment Meets the Republican Revolution," 37 S. Tex. L. Rev. 1247 (1996) (invited symposium).

103. "Do We Know Enough about Legal Norms?" in D. Braybrooke, ed., SOCIAL RULES: ORIGIN; CHARACTER; LOGIC: CHANGE (1996) (invited contribution).

104. "Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas," 58 Law and Contemporary Problems 213 (1995) (with Amon Burton, John S. Dzienkowski, and Sanford Levinson,).

105. "Thoughts on Procedural Issues in Insurance Litigation," VII INS. L. ANTHOL. (1994).

### Legal and Moral Philosophy

106. "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 L. & Phil. 381 (1987).*

107. "Negative Positivism and the Hard Facts of Life," 68 The Monist 347 (1985).*

108. "Utilitarian Participation," 23 Soc. Sci. Info. 701 (1984).*

### Practice-Oriented Publications

109. "Your Role in a Law Firm: Responsibilities of Senior, Junior, and Supervisory Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996).

110. "Getting and Keeping Clients," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996) (with James M. McCormack and Mitchel L. Winick).

111. "Advertising and Marketing Legal Services," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

112. "Responsibilities of Senior and Junior Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

113. "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 Clearinghouse Rev. 114 (June 1994) (with Stephen Yelenosky).

**Miscellaneous**

114. "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 <u>Pop. Res. & Pol. Rev.</u> 255 (1984) (with Robert Y. Shapiro).*

## PERSONAL

Married to Cynthia Eppolito, PA; Daughter, Katherine; Step-son, Mabon.

Consults with attorneys and serves as an expert witness on subjects in his areas of expertise.

First generation of family to attend college.

## APPENDIX II:  TABLE OF FEE AWARDS IN DIRECT PURCHASER
PHARMACEUTICAL ANTITRUST CLASS ACTIONS

**Direct-Purchaser Pharmaceutical Antitrust Settlements, April 2003-April 2020**

| Date | Case Name | Settlement Amount | Fee Percentage Requested | Retainer Agree-ment | Class Member Objections | Class Member Support |
|---|---|---|---|---|---|---|
| 11/09/18 | *Hartig Drug Company Inc. v. Senju Pharmaceutical Co. Ltd. et al*, No. 14-00719 (D. Del.) | $9,000,000 | 33.33% | N/A | None | No |
| 10/24/18 | *In Re: Blood Reagents Antitrust Litigation*, No. 09-md-02081 (E.D. Pa.) | $41,500,000 | 33.33% | N/A | None | No |
| 09/20/18 | *In re Lidoderm Antitrust Litigation*, No. 14-md-02521 (N.D. Cal.) | $166,000,000 | 27.11% | 33.33% | None | Yes |
| 07/18/18 | *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, No. 14-md-02503 (D. Mass.) | $72,500,000 | 31.45% | N/A | None | No |
| 04/18/18 | *American Sales Company, LLC v. Pfizer, Inc.*, No. 4-cv-00361 (E.D. Va.) | $94,000,000 | 32.69% | 33.33% | None | Yes |

| Date | Case Name | Settlement Amount | Fee Percentage Requested | Retainer Agree-ment | Class Member Objections | Class Member Support |
|---|---|---|---|---|---|---|
| 12/19/17 | *In re Aggrenox Antitrust Litigation,* No. 14-md-02516 (D. Conn.) | $146,000,000 | 33.33% | 33.33% | None | Yes |
| 12/07/17 | *In re Asacol Antitrust Litigation,* No. 15-cv-12730 (D. Mass.) | $15,000,000 | 33.33% | N/A | None | Yes |
| 10/23/17 | *Castro v. Sanofi Pasteur, Inc.,* No. 11-cv-7178 (D.N.J.) | $61,500,000 | 33.33% | N/A | None | Yes |
| 10/05/17 | *In re K-Dur Antitrust Litigation,* No. 01-cv-01652 (D.N.J.) | $60,200,000 | 33.33% | N/A | None | Yes |
| 10/15/15 | *King Drug Company of Florence, Inc. v. Cephalon, Inc., et al,* No. 06-cv-01797 (E.D. Pa.) | $512,000,000 | 27.50% | N/A | None | Yes |
| 05/20/15 | *In re Prograf Antitrust Litig.,* No. 11-md-2242 (D. Mass.) | $98,000,000 | 33.33% | N/A | None | Yes |
| 01/20/15 | *In re Prandin Direct Purchaser Antitrust Litig.,* No. 10-cv-12141 (E.D. Mich.) | $19,000,000 | 33.33% | N/A | None | Yes |

| Date | Case Name | Settlement Amount | Fee Percentage Requested | Retainer Agreement | Class Member Objections | Class Member Support |
|---|---|---|---|---|---|---|
| 09/16/14 | *Mylan Pharmaceuticals, Inc. v. Warner Chilcott PLC*, No. 12-cv-3824 (E.D. Pa.) | $15,000,000 | 33.33% | N/A | None | No |
| 08/06/14 | *Louisiana Wholesale v. Pfizer, Inc., et al*, No. 02-cv-01830 (D.N.J.) | $190,416,438 | 33.33% | N/A | None | Yes |
| 06/30/14 | *In re Skelaxin (Metaxalone) Antitrust Litigation*, No. 12-md-2343 (E.D. Tenn.) | $73,000,000 | 33.33% | N/A | None | Yes |
| 4/16/14 | *In Re: Plasma-Derivative Protein Therapies Antitrust Litigation*, No. 09-07666 (N.D. Ill.) | $64,000,000 | 33.33% | N/A | None | No |
| 06/14/13 | *American Sales Company, Inc. v. Smithkline Beecham Corporation*, No. 08-cv-03149 (E.D. Pa.) | $150,000,000 | 33.33% | N/A | None | Yes |
| 04/10/13 | *Louisiana Wholesale Drug Company, Inc. v. Becton Dickinson & Company, Inc.*, No. 05-cv-01602 (D.N.J.) | $45,000,000 | 33.33% | N/A | None. | Yes |

| Date | Case Name | Settlement Amount | Fee Percentage Requested | Retainer Agree-ment | Class Member Objections | Class Member Support |
|---|---|---|---|---|---|---|
| 11/07/12 | *In re Wellbutrin XL Antitrust Litigation*, No. 08-cv-2431 (E.D. Pa.) | $37,500,000 | 33.33% | N/A | None | Yes |
| 05/31/12 | *Rochester Drug Co-Operative, Inc., v. Braintree Laboratories, Inc.*, No. 07-cv-142 (D. Del.) | $17,250,000 | 33.33% | N/A | None | Yes |
| 01/12/12 | *In re Metoprolol Succinate Antitrust Litigation*, No. 06-cv-52 (D. Del.) | $20,000,000 | 33.33% | N/A | None | Yes |
| 11/28/11 | *In re DDAVP Direct Purchaser Antitrust Litigation*, No. 05-cv-2237 (S.D.N.Y.) | $20,250,000 | 33.33% | N/A | None | Yes |
| 11/21/11 | *In re Wellbutrin SR Antitrust Litigation*, No. 04-cv-5525 (E.D. Pa.) | $49,000,000 | 33.33% | N/A | None | Yes |
| 08/11/11 | *Meijer, Inc. v. Abbott Laboratories*, No. 07-cv-05985 (N.D. Cal.) | $52,000,000 | 33.33% | N/A | None | Yes |
| 01/31/11 | *In re Nifedipine Antitrust Litigation*, No. 03-mc-223 (D.D.C.) | $35,000,000 | 33.33% | N/A | None | Yes |

| Date | Case Name | Settlement Amount | Fee Percentage Requested | Retainer Agreement | Class Member Objections | Class Member Support |
|---|---|---|---|---|---|---|
| 01/25/11 | *In re Oxycontin Antitrust Litigation*, No. 04-md-1603 (S.D.N.Y.) | $16,000,000 | 33.33% | N/A | None | Yes |
| 04/23/09 | *In re Tricor Direct Purchaser Litigation*, No. 05-340 (D. Del.) | $250,000,000 | 33.33% | N/A | None | Yes |
| 04/20/09 | *Meijer, Inc. v. Barr Pharmaceuticals, Inc.*, No. 05-cv-2195 (D.D.C.) | $22,000,000 | 33.33% | N/A | None | Yes |
| 11/09/05 | *In re Remeron Direct Purchaser Antitrust Litigation*, No. 03-cv-00085 (D.N.J.) | $75,000,000 | 33.33% | N/A | None | Yes |
| 04/19/05 | *In re Terazosin Hydrochloride Antitrust Litigation*, No. 99-md-1317 (S.D. Fla.) | $74,572,327 | 32.41% | N/A | None | Yes |
| 11/30/04 | *North Shore Hematology-Oncology Associates, P.C. v. Bristol-Myers Squibb Co.*, No. 04-cv-248 (D.D.C.) | $50,000,000 | 33.33% | N/A | None | No |
| 04/09/04 | *In re Relafen Antitrust Litigation*, No. 01-cv-12239 (D. Mass.) | $175,000,000 | 33.33% | N/A | None | No |

| Date | Case Name | Settlement Amount | Fee Percentage Requested | Retainer Agree-ment | Class Member Objections | Class Member Support |
|---|---|---|---|---|---|---|
| 04/11/03 | *Louisiana Wholesale Drug Co. v. Bristol-Myers Squibb Co.*, No. 01-cv-7951 (S.D.N.Y.) | $220,000,000 | 32.96% | N/A | None | Yes |
| | | | **N=33**<br><br>**Median= 33.33%**<br><br>**Mean= 32.85%** | **3/33** | **0/33** | **26/33** |