FILED

2021 May-28  PM 06:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

*In re: Blue Cross Blue Shield Antitrust Litigation*

*MDL No. 2406*

## DECLARATION OF BRIAN T. FITZPATRICK

I.  Background and qualifications

1.       I am a Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from the University of Notre Dame in 1997 and Harvard Law School in 2000.  After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP.  My C.V. is attached as Exhibit 1.

2.       My teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, and Complex Litigation courses.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the NYU Journal of Law & Business, and the University of Arizona Law Review.  My work has been cited by numerous courts, scholars, and media outlets such as the New York Times, USA Today, and Wall Street Journal.  I have also been invited to speak at symposia and other events about class action litigation, such as the ABA National Institute on Class Actions in 2011, 2015, 2016, 2017, and 2019, as well as the ABA Annual Meeting in 2012.  Since 2010, I have also served

on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.  In 2015, I was elected to membership in the American Law Institute.

3.        In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study").  This article is still the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published. Unlike other studies of class actions, which have been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period, 2006-2007.  *See id*. at 812-13.  As such, not only is my study an unbiased sample of settlements, but the number of settlements included in my study is several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 54 from the Eleventh Circuit alone.  *See id*. at 817.  I presented the findings of my study at the Conference on Empirical Legal Studies at the University of Southern California School of Law in 2009, the Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in 2009, and before the faculties of many law schools in 2009 and 2010. This study has been relied upon by a number of courts, scholars, and testifying experts.[1]  I will draw upon this study in this declaration and I attached it as Exhibit 2.

---

[1] *See, e.g.*, *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *Shah, v. Zimmer Biomet Holdings, Inc,*  2020 WL 5627171, at *10 (N.D. Ind. Sept. 18, 2020) (same); *In re GSE Bonds Antitrust Litig.*, 2020 WL 3250593, at *5 (S.D.N.Y. June 16, 2020) (same); *In re Equifax Inc. Customer Data Sec. Breach Litig.,* 2020 WL 256132, at *34 (N.D. Ga. Mar. 17, 2020); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2019 WL 6327363, at *4-5 (N.D. Cal. Nov. 26, 2019) (same); *Espinal v. Victor's Cafe 52nd St., Inc.*, 2019 WL 5425475, at *2 (S.D.N.Y. Oct. 23, 2019) (same); *James v. China Grill Mgmt., Inc.*, 2019 WL 1915298, at *2 (S.D.N.Y. Apr. 30, 2019) (same); *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 407 (S.D.N.Y. 2019) (same); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2018 WL 6250657, at *2 (S.D.N.Y. Nov. 29, 2018) (same); *Rodman v. Safeway*

4.      In addition to my empirical works, I have also published many papers on what law-and-economics can tell us about how to create the best incentives for attorneys and others in class action litigation.  *See, e.g.*, Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Ford. L. Rev. (2021) (hereinafter "Fiduciary Judge's Guide"); Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043 (2010) (hereinafter "Class Action Lawyers").  Much of this work is found in a book published in 2019 by the University of Chicago Press entitled THE CONSERVATIVE CASE FOR CLASS ACTIONS.  The thesis of the book is that the so-called "private attorney general" is superior to the public attorney general in enforcing of the rules that free markets need in order to operate effectively and that courts should appropriately incentivize class action lawyers to encourage this private attorney general behavior.  I will also draw upon this work in this declaration.

---

*Inc.*, 2018 WL 4030558, at *5 (N.D. Cal. Aug. 23, 2018) (same); *Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 38 (D.D.C. 2018) (same); *Hillson v. Kelly Servs. Inc.*, 2017 WL 3446596, at *4 (E.D. Mich. Aug. 11, 2017) (same); *Good v. W. Virginia-Am. Water Co.*, 2017 WL 2884535, at *23, *27 (S.D.W. Va. July 6, 2017) (same); *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 385 (S.D.N.Y. 2017) (same); *Brown v. Rita's Water Ice Franchise Co. LLC*, 2017 WL 1021025, at *9 (E.D. Pa. Mar. 16, 2017) (same); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 1629349, at *17 (S.D.N.Y. Apr. 24, 2016) (same); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 236 (N.D. Ill. 2016); *Ramah Navajo Chapter v. Jewell*, 167 F. Supp. 3d 1217, 1246 (D.N.M. 2016); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, 2016 WL 721680, at *42 (N.D. Cal. Jan. 28, 2016) (same); *In re Pool Products Distribution Mkt. Antitrust Litig.*, 2015 WL 4528880, at *19-20 (E.D. La. July 27, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 2147679, at *2-4 (N.D. Ill. May 6, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 1399367, at *3-5 (N.D. Ill. Mar. 23, 2015) (same); *In re Capital One Tel. Consumer Prot. Act Litig.*, 2015 WL 605203, at *12 (N.D. Ill. Feb. 12, 2015) (same); *In re Neurontin Marketing and Sales Practices Litigation*, 2014 WL 5810625, at *3 (D. Mass. Nov. 10, 2014) (same); *Tennille v. W. Union Co.*, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive Co. Erisa Litig.*, 36 F.Supp.3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F.Supp.2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation*, 4 F.Supp.3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Products Liability Litigation*, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litigation*, 953 F.Supp.2d 82, 98-99 (D.D.C. 2013) (same); *In re Southeastern Milk Antitrust Litigation*, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

5.      I have been asked by class counsel to opine on whether the attorneys' fees they have requested here are reasonable in light of the empirical studies and research on economic incentives in class action litigation.  In order to formulate my opinion, I reviewed a number of documents provided to me by class counsel and I have attached a list of these documents in Exhibit 3.  As I explain, based on the empirical studies and research on economic incentives, I believe the request here is reasonable.  My opinions can be summarized as follows:

- The Eleventh Circuit instructs courts to use percentage method when awarding fees in class actions.  Under this method, 25% is the benchmark fee, but this can be adjusted up or down based on several factors.

- The 23.47% fee sought by class counsel here is below the Eleventh Circuit's benchmark as well as the average and median fee awarded by federal courts in class actions in the Eleventh Circuit, nationwide, and in antitrust cases.  In addition, it is supported by almost all of the Eleventh Circuit's factors.  As such, it is reasonable.

- Although some courts award smaller percentages in unusually large settlements like this one, there is no rule to do so in the Eleventh Circuit, I could find no evidence that enough courts in the Eleventh Circuit do so to make any such effect statistically significant here, and the research on economic incentives counsels against it.  Moreover, there are plenty of examples of courts awarding fees at or above those requested by class counsel even in billion-dollar cases when the other factors justify it.

- Indeed, there are two factors in particular that are especially compelling here: the significant injunctive relief included in the settlement and the risks class counsel

incurred of taking this case without any assistance from government antitrust authorities.

## II.  Case background

6.     The plaintiffs here are individuals and businesses that buy or are covered by health insurance from the defendants, the 36 Blue Cross Blue Shield companies all across America.  They allege that the defendants violated the Sherman Antitrust Act by anticompetitively allocating the market for health insurance amongst themselves.  Putative class actions were filed against the defendants beginning on February 7, 2012, and the litigation was transferred before this court in 2013.  Since then, the parties have engaged in years of discovery, litigated over a dozen motions to dismiss, numerous motions for summary judgment, and the first two of what would have been many motions for class certification.  While the motions for class certification were pending, the parties reached a class-wide settlement.  On October 30, the parties moved for certification of two settlement classes—one for damages and one for injunctive relief—and preliminary approval of the settlement.  Class counsel have now moved for an award of fees and expenses.

7.     The damages class includes, with a few exceptions (such as dependents and beneficiaries), "all Individual Members," "Insured Groups," and "Self-Funded Accounts" that "purchased, were covered by, or were enrolled in" one of the defendant's "Blue-Branded Commercial Health Benefit Product[s]."  *See* Settlement Agreement at ¶ A.1.v.  The injunctive relief class includes much the same membership (but includes dependents and beneficiaries).  *See id*. at ¶ A.1.pp.  Pursuant to the settlement agreement, the classes will release the defendants from "any and all known and unknown claims" that, among other things, relate "in any way" to the "factual predicates of the Subscriber Actions."  *Id*. at ¶ A.1.uuu.  In exchange, the defendants will

pay the damages class $2.67 billion, to be distributed pursuant to a plan of allocation that was submitted separately to the Court, and none of which will revert back to the defendants (with the possible exception of unused notice and administration monies). *See id.* at ¶¶ D.22, 30. In addition, the defendants will eliminate or relax a number of their allegedly anticompetitive practices; most notably but by no means exclusively, they will eliminate the National Best Efforts cap on non-Blue-branded revenue generation and permit more than one Blue brand to bid against one another on certain accounts. *See id.* at ¶¶ C.10-C.21.

8.      Class counsel are now moving for an award of fees equal to 23.47% of the cash portion of the settlement. As I explain below, it is my opinion that the request is reasonable.


III. Assessment of the reasonableness of the request for attorneys' fees

9.      When a class action reaches settlement or judgment and no fee shifting statute is triggered and the defendant has not agreed to pay class counsel's fees, class counsel is paid by the class members themselves pursuant to the common law of unjust enrichment. This is sometimes called the "common fund" or "common benefit" doctrine. It requires the court to decide how much of their class action proceeds it is fair to ask class members to pay to class counsel.

10.     At one time, courts that awarded fees in common fund class action cases did so using the familiar "lodestar" approach. *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043, 2051 (2010) (hereinafter "Class Action Lawyers"). Under this approach, courts awarded class counsel a fee equal to the number of hours they worked on the case (to the extent the hours were reasonable), multiplied by a reasonable hourly rate as well as by a discretionary multiplier that courts often based on the risk of non-recovery and other factors. *See id.* Over time, however, the lodestar approach fell out of favor in common fund class actions. It

did so largely for two reasons. First, courts came to dislike the lodestar method because it was difficult to calculate the lodestar; courts had to review voluminous time records and the like. Second—and more importantly—courts came to dislike the lodestar method because it did not align the interests of class counsel with the interests of the class; class counsel's recovery did not depend on how much the class recovered, but, rather, on how many hours could be spent on the case. *See id.* at 2051-52. According to my empirical study, the lodestar method is now used to award fees in only a small percentage of class action cases, usually those involving fee-shifting statutes or those where the relief is entirely or almost entirely injunctive in nature. *See* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding the lodestar method used in only 12% of settlements). The other large-scale academic study of class action fees, authored over time by Geoff Miller and the late Ted Eisenberg, agrees with my findings. *See* Theodore Eisenberg et al., *Attorneys' Fees in Class Action Settlements: 2009-2013*, 92 N.Y.U. L. Rev. 937, 945 (2017) ("Eisenberg-Miller 2017") (finding lodestar method used less than 7% of the time since 2009); Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 267 (2010) ("Eisenberg-Miller 2010") (finding lodestar method used only 13.6% of the time before 2002 and less than 10% of the time thereafter and before 2009).

11.    The more common method of calculating attorneys' fees today is known as the "percentage" method. Under this approach, courts select a percentage of the settlement fund that they believe is fair to class counsel, multiply the settlement amount by that percentage, and then award class counsel the resulting product. The percentage approach has become the preferred method for awarding fees to class counsel in common fund cases precisely because it corrects the deficiencies of the lodestar method: it is less cumbersome to calculate, and, more importantly, it aligns the interests of class counsel with the interests of the class because the more the class

recovers, the more class counsel recovers. *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2052. This is why private parties—including sophisticated corporations—that hire lawyers on contingency almost always use the percentage method over the lodestar method. *See, e.g.,* David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64 Ala. L. Rev. 335, 360 (2012); Herbert M. Kritzer, RISKS, REPUTATIONS, AND REWARDS 39-40 (1998). Reflecting this trend, the Eleventh Circuit held in 1991 that district courts in this Circuit should no longer use the lodestar method in common fund cases, and, instead, should use the percentage method. *See Camden I*, 946 F.2d at 774 ("Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund . . . ."). I will therefore assume that the court will use the percentage method here.

12. Courts usually examine a number of factors when deciding what percentage to award class counsel under the percentage approach. *See* Fitzpatrick, *Empirical Study, supra*, at 832. In the Eleventh Circuit, courts use 25% as the "'bench mark' percentage fee award" and then adjust it upward or downward "in accordance with the individual circumstances of each case." *Camden I*, 946 F.2d at 775. Although "[t]he factors which will impact upon the appropriate percentage . . . in any particular case will undoubtedly vary," the Eleventh Circuit has identified sixteen factors that it has said may be "appropriate[]" or "pertinent" to consider. *Camden I*, 946 F.2d at 775. These factors include "[1] the time required to reach a settlement, [2] whether there are any substantial objections . . ., [3] any non-monetary benefits conferred upon the class . . ., and [4] the economics involved in prosecuting a class action," *id*., as well as the twelve factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974): "[5] the time and labor required; [6] the novelty and difficulty of the questions involved; [7] the skill requisite to perform the legal service properly; [8] the preclusion of other employment by the attorney due

to acceptance of the case; [9] the customary fee; [10] whether the fee is fixed or contingent; [11] time limitations imposed by the client or the circumstances; [12] the amount involved and the results obtained; [13] the experience, reputation, and ability of the attorneys; [14] the 'undesirability' of the case; [15] the nature and length of the professional relationship with the client; [and] [16] awards in similar cases." *Camden I*, 946 F.2d at 772 n.3.

13.     In this case, class counsel are seeking a fee award equal to 23.47% of the cash portion of the settlement. That is, they are seeking a below-benchmark percentage even of the cash portion. But the settlement here also contains "historic and substantial" injunctive relief that has not been quantified. Preliminary Approval Order at 4; *see also* Rubinfeld Declaration at ¶¶ 16-17. If this relief had been quantified, the fee requested by class counsel would have been *far below* the benchmark. *See* Preliminary Approval Order at 32 ("[T]he structural relief that the Plaintiffs have obtained is more important than the dollar amount of the settlement."). In my opinion, no matter how you look at the request here—as a slightly-below-benchmark request or a well-below-benchmark request—the request is reasonable because it is supported by the factors listed by the Eleventh Circuit in *Camden I*.

14.     Consider first the factors that go to the fee awards in other cases: "[9] the customary fee" and "[16] awards in similar cases." In my empirical study, there were 35 class action cases in which district courts in the Eleventh Circuit used the percentage method to award attorneys' fees. *See* Fitzpatrick, *Empirical Study, supra*, at 836. The average fee awarded in these cases was 28.1% and the median fee awarded was 30%. *See id.* That is, the average and median fee percentages in this Circuit are *above* the request here by class counsel. This can be seen graphically in Figure 1, below, which shows the distribution of all of the Eleventh Circuit percentage-method fee awards in my study. In particular, the figure shows what fraction of settlements (y-axis) had

fee awards within each five-point range of fee percentages (x-axis); each bar includes the number on its left edge and excludes the number on its right edge. As the figure shows, *over 80% (i.e., .8) of all settlements resulted in fee awards at or above 25%.* My findings are broadly consistent with the other large-scale studies of class action fees, which suggest that in recent years in the average and median fee percentages in this Circuit may be *even higher still.* *See Eisenberg-Miller 2017*, *supra*, at 951 (finding mean and median of 30% and 33% in the Eleventh Circuit since 2009); *Eisenberg-Miller 2010, supra*, at 260 (finding mean and median in the Eleventh Circuit of 21% and 22% before 2009).

**Figure 1: Percentage-method fee awards in the Eleventh Circuit, 2006-2007**



15.     The conclusions are much the same if the fee request is compared to fee awards outside the Eleventh Circuit as well. According to my empirical study, the mean and median nationwide using the percentage method was 25.4% and 25%, respectively—again above the request here. *See* Fitzpatrick, *Empirical Study,* at 833-34, 838. This can again be seen graphically:

in Figure 2, below, I show the distribution of all of the percentage-method fee awards in my study. *Over 60% of all fee awards were equal to or greater than 25%.* The other large-scale studies of class action fees have again found much the same, including the possibility that the mean and median percentages are even higher in recent years. *See Eisenberg-Miller 2017*, *supra*, at 951 (finding mean and median of 27% and 29% nationwide since 2009); *Eisenberg-Miller 2010*, *supra*, at 260 (finding mean and median of 24% and 25% nationwide before 2009).

**Figure 2: Percentage-method fee awards among all federal courts, 2006-2007**



16.     The conclusions are also much the same if the fee request is compared to fee awards in antitrust cases alone. According to my empirical study, the average and median fee awards in the 23 antitrust cases where the percentage-method was used were much like those for all cases: 25.4% and 25%, respectively. *See* Fitzpatrick, *Empirical Study, supra,* at 835. Again, this can be seen graphically, this time, in Figure 3, below. *Nearly 80% of awards in antitrust cases were equal*

*to or greater than 25%.* Again, the other large-scale studies of class action fees have found much the same, including again the possibility that the mean and median percentages are even higher in recent years. *See Eisenberg-Miller 2017*, *supra*, at 952 (finding antitrust mean and median of 27% and 30%, respectively); *Eisenberg-Miller 2010*, *supra*, at 262 (finding antitrust mean and median of 22% and 23%, respectively).



**Figure 3: Percentage-method fee awards in antitrust cases, 2006-2007**

17.     It should be noted that the settlement here is unusually large. Indeed, it may very well end up as the largest class action settlement in federal court this entire year. This is notable because my empirical study showed that settlement size had a statistically significant but inverse relationship with the fee percentages awarded by federal courts—*i.e.*, that some federal courts awarded lower percentages in cases where settlements were larger. *See id.* at 838, 842-44. For example, in settlements above one-billion dollars, the average and median fee percentages in my study were 13.7% and 9.5%, respectively. *See id.* at 839. This relationship was found in the other

large-scale academic studies as well. *See Eisenberg-Miller 2017, supra*, at 947-48; *Eisenberg-Miller 2010*, *supra*, at 263-65.

18.     Because there are so few billion-dollar settlements every year, in order to give the court as much data as possible, I collected the fee awards in *every* billion-dollar class action recovery in federal court that I could find from any year and listed them below in Table 1.[2]  As the Table shows, the fee request here would still be above average among this expanded dataset of billion-dollar settlements.  As I explain below, however, this fact does not alter my opinion that the request is reasonable.

**Table 1: All federal class action settlements greater than or equal to $1 billion**

| Case | Settlement Amount | Fee Method | Lodestar Multiplier | Fee Percentage | Expenses |
|---|---|---|---|---|---|
| BP Gulf Oil Spill (2012)[3] | $13 billion | Percent | 2.3 | 4.3% | $44.8 million |
| Volkswagen Diesel Engine (Consumer) (2017)[4] | $10 billion | Percent | 2.6 | 1.7% | $8 million |
| Enron Securities Fraud (2008)[5] | $7.2 billion | Percent | 5.2 | 9.52% | $39+ million |
| Diet Drugs Products Liability (2008)[6] | $6.4 billion | Percent | 2.6+ | 6.75% | $24.2 million |
| WorldCom Securities (2005)[7] | $6.1 billion | Percent | 4.0 | 5.5% | $10.7 million |
| Payment Card Interchange Fees Antitrust (2019)[8] | $5.62 billion | Percent | 2.4 | 9.31% | $39.2 million |
| Visa Antitrust (2003)[9] | $3.4 billion | Percent | 3.5 | 6.5% | $18.7 million |
| Indian Trust (2011)[10] | $3.4 billion | Not specified | Not calculated | 2.9% | Included |
| Tyco Securities (2007)[11] | $3.3 billion | Percent | 2.7 | 14.5% | $28.9 million |

[2] The table excludes multi-defendant settlements approved piecemeal over time even if they totaled to more than $1 billion if fees were not awarded on a single piece of at least  $1 billion.

[3] *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 2016 WL 6215974 (E.D.La. Oct. 25, 2016)

[4] *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, MDL No. 2672, 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017).

[5] *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008).

[6] *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008).

[7] *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005).

[8] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6888488 (E.D.N.Y. Dec. 16, 2019).

[9] *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003).

[10] *Cobell v. Salazar*, No. 96-cv-01285 (D.D.C. Jul. 27, 2011).

[11] *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007).

| Case | Settlement Amount | Fee Method | Lodestar Multiplier | Fee Percentage | Expenses |
|---|---|---|---|---|---|
| Cendant Securities (2003)[12] | $3.2 billion | Percent | Not calculated | 1.73% | $14.6 million |
| Petrobras Securities (2018)[13] | $3 billion | Lodestar | 1.8 | 6.2% | $14.5+ million |
| AOL Securities (2006)[14] | $2.65 billion | Percent | 3.7 | 5.9% | $3.4 million |
| Bank of America Securities (2013)[15] | $2.4 billion | Not specified | Not calculated | 6.5% | $8 million |
| Foreign Exchange Antitrust (2018)[16] | $2.31 billion | Percent | 1.72 | 13% | $22.5 million |
| Toshiba Diskette (2000)[17] | $2.1 billion (total) $1 billion (cash) | Both | Not calculated | 7.1% (total) 15% (cash) | $3 million |
| Toyota Unintended Acceleration (2013)[18] | $1.6 billion (est. total) $757 million (cash) | Percent | 2.9 | 12.3% (total) 26.4% (cash) | $27 million |
| Credit Default Swaps Antitrust (2016)[19] | $1.87 billion | Percent | 6.2 | 13.6% | $10.2 million |
| Prudential Insurance (2000)[20] | $1.8 billion | Percent | 2.1 | 4.8% | $5+ million |
| Household Securities (2016)[21] | $1.58 billion | Percent | Not calculated | 24.7% | $33.6 million |
| Syngenta Corn (2018)[22] | $1.51 billion | Percent | 1.4 | 33.33% | $31.3 million |
| Valeant Securities (2021)[23] | $1.21 billion | Percent | 3.6 | 13% | $1.7 million |
| Volkswagen Diesel Engine (Dealer) (2017)[24] | $1.2 billion | Lodestar | 2.0 | 0.25% | $87,000 |
| Black Farmers Discrimination (2013)[25] | $1.2 billion | Percent | <2.0 | 7.4% | $28+ million |
| Tobacco Antitrust (2003)[26] | $1.2 billion | Lodestar | 4.5 | 5.9% | $4.5 million |

[12] *In re Cendant Corp. Litig.*, 243 F. Supp. 166 (D.N.J. 2003).

[13] *In re Petrobras Sec. Litig.*, No. 14-9662 (S.D.N.Y. Jun. 22, 2018).

[14] *In re AOL Time Warner, Inc. Sec.*, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006).

[15] *In re Bank of America Corp. Sec., Derivative, and ERISA Litig.*, No. 09-md-2058 (S.D.N.Y. Apr. 8, 2013).

[16] *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-7789 (S.D.N.Y. Nov. 8, 2018).

[17] *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000).

[18] *In re Toyota Motor. Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liab. Litig.*, No. 10-ml-2151 (C.D. Cal., June 17, 2013).

[19] *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016).

[20] *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 106 F. Supp. 2d 721, 736 (D.N.J. 2000).

[21] *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 2-cv-05893 (N.D.Ill. Nov. 10, 2016).

[22] *In re: Syngenta AG MIR 162 Corn Litigation*, 357 F.Supp.3d 1094 (D. Kan. 2018).

[23] *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2021 WL 358611 (D.N.J. Feb. 1, 2021).

[24] *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, MDL No. 2672, 2017 WL 1352859 (N.D. Cal. Apr. 12, 2017).

[25] *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82 (D.D.C. 2013) (incurred rather than awarded expenses).

[26] *DeLoach v. Phillip Morris Cos.*, 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003).

| Case | Settlement Amount | Fee Method | Lodestar Multiplier | Fee Percentage | Expenses |
|---|---|---|---|---|---|
| Chinese Drywall (2018)[27] | $1.12 billion | Both | 1.0 | 9.18% | $35.3 million |
| TFT-LCD Antitrust (2013)[28] | $1.1 billion | Percent | ≈2.5 | 28.6% | $8.7 million |
| Nortel Securities I (2006)[29] | $1.1 billion | Percent | 2.1 | 3% | $3.7 million |
| Nortel Securities II (2006)[30] | $1.1 billion | Percent | Not calculated | 8% | $3 million |
| Royal Ahold Securities (2006)[31] | $1.1 billion | Percent | 2.6 | 12% | $3.3 million |
| Allapattah Contract (2006)[32] | $1.1 billion | Percent | Not calculated | 31.33% | $4.1 million |
| ARCP Securities (2020)[33] | $1.03 billion | Both | 1.5 | 9.76% | $5.2 million |
| Sulzer Hip (2003)[34] | >$1 billion | Both | 2.4 | 4.8% | $3.7 million |
| Nasdaq Antitrust (1998)[35] | $1 billion | Percent | 4.0 | 14% | $4.4 million |
| NFL Concussion (2018)[36] | ≈ $1 billion | Both | 3.0 | 10.8% | $5.6 million |
| N = 34 | | | Low = 1.0<br>High = 6.2<br>Avg = 2.8<br>Med = 2.6 | Low = 0.25%<br>High = 33.33%<br>Avg = 10.24% (total)<br>10.89% (cash)<br>Med = 7.70% (total)<br>8.59% (cash) | |

19.     First, as I explain in more detail below, many of these cases included no injunctive relief in addition to the cash relief described in Table 1.  *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) (awarding 28.6% in $1.1 billion antitrust settlement that recovered a greater portion of the class's damages than here but without significant injunctive relief).  Indeed, the vast majority of class action settlements include no such

[27] *In re: Chinese Manufactured-Drywall Products Liab. Litig.*, No. 2047 (E.D.La. Jan. 31, 2018).

[28] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013).

[29] *In re Nortel Networks Corp. Sec. Litig.*, No. 01-cv-1855 (S.D.N.Y., Jan. 29, 2007).

[30] *In re Nortel Networks Corp. Sec. Litig.*, No. 04-cv-2115 (S.D.N.Y., Dec. 26, 2006).

[31] *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D. Md. 2006).

[32] *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006); *Allapattah Servs., Inc. v. Exxon Corp.*, No. 91-cv-986 (S.D.Fla. Apr. 16, 2007).

[33] *In re American Realty Capital Properties Litig.*, No. 15-mc-00040 (D.N.J. Jan. 23, 2020).

[34] *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 939 (N.D. Ohio 2003).

[35] *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998).

[36] *In re Nat'l Football League Players' Concussion Injury Litig.*, 2018 WL 1635648 (E.D. Pa. Apr. 5, 2018).

relief. *See* Fitzpatrick, *Empirical Study, supra*, at 824 (finding that only one quarter of class action settlements included injunctive relief). Thus, the average and median fee percentage numbers in Table 1 are not an apples-to-apples comparison to this case; the recovery in this case is superior to many of those in Table 1 of the same dollar value. This court has already noted as much. *See* Preliminary Approval Order at 32 ("[T]he structural relief negotiated in this settlement is exceptional. So, this Settlement cannot be evaluated in the vacuum of monetary recovery.").

20. Second, although enough district courts award lower fee percentages as settlement sizes increase to make the effect statistically significant nationwide, it should be emphasized that this does not mean all courts follow this practice. Many do not. *See, e.g.*, *In re Cendant Corp. Litigation*, 264 F.3d 201, 284 n. 55 (3d Cir. 2001) ("Th[e] position [that the percentage of a recovery devoted to attorneys fees should decrease as the size of the overall settlement or recovery increases] . . . has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply." (alteration in original)); *Allapattah*, 454 F.Supp.2d at 1213 ("While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method adopted by the Eleventh Circuit . . . . . By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little."); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (quoting *Allapattah*); *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, No. 8:10ML-02151-JVS, 2013 WL 12327929, at 17 n. 16 (C.D. Cal., Jun. 17, 2013) ("The Court also agrees with … other courts, e.g., *Allapattah Servs.*, 454 F. Supp. 2d at 1213, which have found that decreasing a fee percentage based only on

the size of the fund would provide a perverse disincentive to counsel to maximize recovery for the class").

21.    Third, I have found no evidence that enough district courts in the Eleventh Circuit in particular are awarding lower fee percentages as settlement sizes increase to make any effect here statistically significant.  There is no rule in the Eleventh Circuit requiring the practice—as I noted, the Eleventh Circuit has said 25% is supposed to be the "benchmark" in all cases—and when I separated the fee awards in other circuits from the 35 percentage-method fee awards in my dataset from district courts in the Eleventh Circuit, I found no statistically significant relationship between settlement size and fee percentage.[37]  As far as I am aware, no study since mine has shown a statistically significant effect in the Eleventh Circuit.

22.    Fourth, in my opinion, it is a mistake to award lower fee percentages for no other reason than the fact that class counsel has recovered more for the class because it creates terrible incentives for class counsel.  In particular, it can actually make class counsel better off by resolving a case for less rather than more.  *See, e.g.*, *In re Synthroid I*, 264 F.3d at 718 (Easterbrook, J.)

---

[37] It is possible that the reason there was no statistically significant relationship in the Eleventh Circuit between settlement size and fee percentage is because there were so few large settlements in the Eleventh Circuit in 2006 and 2007.  Indeed, in my dataset there is only one settlement over $100 million: the $1 billion settlement in *Allapattah Servs. Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185 (S.D.Fla. 2006), where the court awarded 31.33% in fees.  On the other hand, after I collected my data, a district court in the Eleventh Circuit awarded fees in another large ($445 million) class action settlement in my dataset.  *See In re Healthsouth Corporation Securities Litigation*, No. CV-03-BE-1500-S (N.D.Ala., Feb. 12, 2008).  This settlement was included in the portion of my empirical study that described settlements, but, because the fees had not yet been awarded at the time I collected my data, it was excluded from the portion of my study that described fee awards.  *See* Fitzpatrick, *Empirical Study*, *supra*, at 831 (notes to Table 7).  Although it is difficult to calculate the fee percentage actually awarded by the court in *Healthsouth*—because it depended on the number of claims filed by different classes of plaintiffs—some of the filings in the case suggest that the total fee award would have been around 18% of the settlement.  *See In re Healthsouth Corporation Securities Litigation, supra* (awarding 17.5% and another 4% to attorneys for the Stockholder Class and 10% to the attorneys for the Bondholder Class); Bondholder Lead Counsel's Memorandum in Support of Application for An Award of Attorneys' Fees and Litigation Expenses and Reimbursement of Costs to Class Representatives 5 n. 5 (Jan. 24, 2008).  Even when this 18% data point is added to the 35 other Eleventh Circuit settlements, there was still no statistically significant relationship between settlement size and fee percentage.

("This means that counsel for the consumer class could have received $22 million in fees had they settled for $74 million but were limited to $8.2 million in fees because they obtained an extra $14 million for their clients . . . . Why there should be such a notch is a mystery. Markets would not tolerate that effect . . . ."). Consider the following example: if courts award class action attorneys 33⅓% of settlements when they are under $100 million but only 20% of settlements when they are over $100 million, then rational class action attorneys will prefer to settle cases for $90 million (*i.e.*, a $30 million fee award) than for $125 million (*i.e.*, a $25 million fee award). As Judge Easterbrook noted above, no rational client would ever agree to such an arrangement. This is why studies even of sophisticated corporate clients do not report any such practice among them when they hire lawyers on contingency, even in the biggest cases like patent litigation. *See, e.g.,* Schwartz, *supra,* at 360; Fitzpatrick, *Fiduciary Judge's Guide*, *supra*, at 1159-63. In my opinion, courts should not force a fee arrangement on class members that they would never choose for themselves. *See* William B. Rubenstein, Newberg on Class Actions § 13.40 (5th ed. 2020) ( "[T]he law requires the judge to act as a fiduciary" for class members).

23. Some courts attuned to the dysfunctional incentives of awarding lower percentages for bigger recoveries (typically those in the Seventh Circuit) have *tapered* fee percentages downward on a *marginal* basis as the recovery becomes larger (e.g., award 25% of the first $100 million, but 20% thereafter). *See, e.g., In re Synthroid I*, 264 F.3d at 721. Although tapering will not pay lawyers bigger fees for recovering less like applying the lower percentage over the entire recovery can, it still undermines the lawyer's incentives. The lower the percentage the lawyer receives, the more inclined the lawyer is to try to settle a case early for less than the client would prefer. *See id.* ("[D]eclining marginal percentages . . . create declining marginal returns to legal work . . . . This feature exacerbates the agency costs inherent in any percentage-of-recovery system

. . . .").  This is especially true if counsel can redirect their efforts to other cases where the tapering

will not yet apply.  For example, if counsel believed that the court would award them only 20%

once they hit $100 million but 25% before then, then counsel might redirect their time once they

received a $100 million settlement offer to smaller cases where they can still return 25% on their

time.  This effect is quite plausible because the *later dollars* are usually the hardest ones to wring

from defendants.  Defendants are often happy to settle cheaply; it is difficult to get big bucks from

them.  *See* Jill E. Fisch, *Lawyers on the Auction Block: Evaluating the Selection of Class Counsel

by Auction*, 102 COLUM. L. REV. 650, 678 (2002) ("[The] last dollars of recovery are generally the

most costly to produce . . . .").  It is a recipe for inadequate settlements to give lawyers *lesser*

returns when effort is *most* needed.  Indeed, for this reason many scholars prefer *escalating*

marginal percentages.  *See* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The

Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative

Actions*, 86 COLUM. L. REV. 669, 697 (1986) ("[T]he most logical answer to this problem of

premature settlement would be to base fees on a graduated, increasing percentage of the recovery

formula—one that operates, much like the Internal Revenue Code, to award the plaintiff's attorney

a marginally greater percentage of each defined increment of the recovery."); Fisch, *supra*, at 678.

The evidence from sophisticated clients is mixed; some taper downward, *see In re Synthroid I*, 264

F.3d at 721, but some escalate upward, *see, e.g.*, *In re AT & T Corp.*, 455 F.3d 160, 163 (3d Cir.

2006) ("The formula provided attorneys' fees would equal 15% of any settlement amount up to

$25 million, 20% of any settlement amount between $25 million and $50 million, and 25% of any

settlement amount over $50 million.").  But, in class actions, where it is doubtful that class

members and even judges can monitor lawyers and set inflection points as well as sophisticated

clients can, it is my opinion that it is a mistake to run the risk of misaligned incentives by tapering percentages downward. *See* Fitzpatrick, *Fiduciary Judge's Guide*, *supra*, at 1169-70.

24.     Finally, even in Circuits where district courts follow the practicing of awarding lower fee percentages in larger cases, courts still sometimes award benchmark fee percentages in larger cases if the facts and circumstances justify it.  Indeed, as Table 1 shows, there are numerous fee awards above 25% even in billion-dollar settlements.  As I explain further below, it is my opinion that the facts and circumstances justify the *below*-benchmark request here.

25.     Consider the factors that go to the results obtained by class counsel in light of the risks class counsel faced: "[4] the economics involved in prosecuting a class action," "[6] the novelty and difficulty of the questions involved," "[10] whether the fee is fixed or contingent," "[12] the amount involved and the results obtained," and "[14] the 'undesirability' of the case." Here, the cash portion of the settlement represents 7.3-14.3% of the best-case single-damages estimated by class counsel's experts.  This is admittedly a more modest cash recovery than in many antitrust class actions.  *See* John M. Connor & Robert H. Lande, *Not Treble Damages: Cartel Recoveries are Mostly Less Than Single Damages,* 100 Iowa L. Rev. 1997, 2010 (2015) (finding the weighted average of recoveries—the authors' preferred measure—to be 19% of single damages for cartel cases between 1990 to 2014).  But this recovery must be measured in light of the considerable injunctive relief class counsel has also won—which I discuss below—as well as against the formidable risks that class counsel faced here.  These risks were and still are some of the greatest I have ever seen in an antitrust case.  There is no doubt in my mind that the recovery is reasonable in light of these risks:

26.     First, this litigation challenged the very essence of the defendants' business model. It was *literally* bet-the-compan*ies* litigation.  This means that the defendants were never going to

go down easily; they were going to—and did—fight this lawsuit tooth and nail until the bitter end. This no doubt increased the risk of not recovering from the very beginning.

27.    Second, there were a number of novel and uncertain threshold issues that class counsel had to surmount in order to get *any recovery at all* here.  Some of these issues have been resolved before this court (but could be reversed on appeal) and some are still outstanding:

- Whether the defendants should be treated as one entity and therefore immune from antitrust prohibitions on horizontal restraints of trade;

- Whether trademark law protected the defendants' practices from antitrust liability;

- Whether the McCarron-Ferguson Act exempted the defendants from the antitrust laws;

- Whether the court could even exercise venue and personal jurisdiction over some of the defendants.

28.    Third, there were a number of novel and uncertain issues that, although not entirely preclusive of any recovery, greatly affected and can still affect the magnitude of any recovery here. Again, some of these issues have been resolved before this court (but could be reversed on appeal), and some are still outstanding.  All of them are incredibly significant:

- Whether the "per se" rule or the "rule of reason" governs the defendants' antitrust liability;

- Whether the filed-rate doctrine precludes treble damages in various states;

- Whether the plaintiffs' damages models could survive *Daubert*.

29.    In my opinion, if one creates a litigation decision tree and multiplies the probability of success on each of the outstanding issues against one another, and then multiplies that number again by the probability of losing on appeal any of the issues class counsel has already won before

this court, it is not difficult to conclude that the cash portion of the settlement is by itself a good outcome for the class. But in light of the injunctive relief also won by class counsel—a matter to which I turn below—it is not difficult to conclude that the outcome here is beyond good; it is excellent.

30.     Finally, consider two other factors that bore on the economics and risks of this litigation: the upfront expenses class counsel outlaid and whether class counsel was aided by the government. First expenses: class counsel have already committed over $40 million in upfront costs in this litigation. As Table 1 shows, this is more of an upfront investment than *in all but one billion-dollar class action case*. Not only is it obviously a serious hardship for anyone to come up with an amount of money of this magnitude, but class counsel had to do so without any assurance they would get this money back—and, indeed, without any mechanism to receive compensation for the risk they took by putting up this money; as the Court knows, risk multipliers are not awarded on expenses. *See* Morris Ratner & William Rubenstein, *Profit for Costs*, 63 DePaul L. Rev. 587, 588 (2014). Rather, the only way to compensate class counsel for putting this money at risk is through this fee award. *See id*. at 611 ("A fourth approach to rewarding cost investments would be to enable *fees* to be multiplied if a firm could demonstrate a significant investment in *costs*."). In my opinion, this weighs in favor of granting class counsel's fee request. *Compare, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) (awarding 28.6% in $1.1 billion antitrust settlement where class counsel outlaid only $8.7 million in expenses).

31.     The same is true with regard to the role of the government here, which was almost none. That is, this was not an antitrust case where class counsel piggybacked on a government investigation. Class counsel had to investigate and prosecute this case pretty much entirely on

their own.  I do not say this to cast aspersions on the government—the government does not have the resources to bring every case—but to emphasize the importance of properly incentivizing private lawyers to pick up the government's slack.  I go on at great length about the importance of incentivizing the private attorney general in antitrust cases in my book.  SEE FITZPATRICK, SUPRA, AT 23, 30-47.  In my opinion, this is yet another reason why class counsel's fee request is reasonable.  *Compare, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) (awarding 28.6% in $1.1 billion antitrust settlement where the federal government was heavily involved).

32.    Consider next the factor "[3] any non-monetary benefits conferred upon the class." As I noted above, the settlement will reform the defendants' allegedly anticompetitive practices in significant ways.  Most importantly, the settlement will eliminate the National Best Efforts cap on non-Blue-branded revenue generation; this reform will permit the defendants to compete with one another through other health care brands in ways they could not before.  But even within the Blue brand, the settlement forces change: defendants can now bid their Blue brands against each other for certain accounts.  As the court as noted, these reforms are very significant indeed.  *See* Preliminary Approval Order at 4 ("The proposed relief is historic and substantial."); *id*. at 32 ("[T]he structural relief that the Plaintiffs have obtained is more important than the dollar amount of the settlement."); *id*. at 38 ("[T]he structural relief (as opposed to the financial recovery) negotiated is the polestar of this Settlement.").

33.    In my opinion, such significant injunctive relief is a major reason why class counsel's fee request is reasonable.  Most class action settlements do not include any such relief, *see* Fitzpatrick, *Empirical Study, supra*, at 824 (finding that only one quarter of class action settlements included injunctive relief), including many in Table 1.  *See, e.g.*, *In re TFT-LCD (Flat*

*Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) (awarding 28.6% in $1.1 billion antitrust settlement that recovered a greater portion of the class's damages than here but without significant injunctive relief). The entire purpose behind this *Camden I* factor is to compensate class counsel for securing non-monetary relief; if courts did not find some way to do that, class action lawyers would have no incentive to fight for this relief—even when it may be, as here, more significant to the class than money. Because class counsel have not sought a percentage of the value of this injunctive relief in their fee award, the only way they can be compensated for their success in securing this relief is by increasing the percentage they are awarded from the cash portion of the settlement. *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003) ("[W]here the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained[, ] courts [may] include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees. When this is not the case, courts should consider the value of the injunctive relief obtained as a 'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees . . . ."). Thus, if any additional reason is needed to award class counsel the fee requested here, in my opinion the considerable non-cash relief supplies it. As this court has already noted, "this Settlement cannot be evaluated in the vacuum of monetary recovery." *See* Preliminary Approval Order at 32.

34.    Consider next the factors that go to the time it took to litigate and resolve these lawsuits: "[1] the time required to reach a settlement" and "[5] the time and labor required." This litigation has transpired *much* longer than the typical class action case does before it reaches final approval of any settlement. *See* Fitzpatrick, *Empirical Study, supra*, at 820 (finding average and median times to final settlement approval of around three years in all cases and antitrust cases in

particular).  And class counsel have not been idle during that time: they litigated over a dozen motions to dismiss, numerous motions for summary judgment, motions for class certification, and have reviewed over 75 million of pages of documents, deposed and defended depositions of over 100 witnesses, and spent countless hours with their own experts and in settlement negotiations.

35.    Some courts leave it at that on these factors, *see, e.g., Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456 (10th Cir. 1988) ("[I]n awarding attorneys' fees in a common fund case, the 'time and labor involved' factor need not be evaluated using the lodestar formulation."), but others—albeit a minority—"crosscheck" the percentage method with class counsel's lodestar for the purpose of capping the percentage to prevent class counsel from reaping a so-called "windfall." *See* Fitzpatrick, *Empirical Study*, *supra*, at 833 (finding that only 49% of courts consider lodestar when awarding fees with the percentage method); Eisenberg-Miller 2017, *supra*, at 945 (finding percent method with lodestar crosscheck used 38% of the time versus 54% for percent method without lodestar crosscheck).  The lodestar crosscheck is not required in the Eleventh Circuit, *see, e.g., In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1362 ("The lodestar approach should not be imposed through the back door via a 'cross-check.'"), and, in my opinion, it is as unwise as the practice of lowering fee percentages simply because class counsel has recovered more for the class.  *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("The . . . argument . . . that any percentage fee award exceeding a certain lodestar multiplier is excessive . . . echoes the 'megafund' cap we rejected in *Synthroid*.").  The reason is very simple: the lodestar crosscheck reintroduces the very same undesirable incentives of the lodestar method that the percentage method was supposed to correct in the first place.  For this reason, no client— even in the most sophisticated ones in the biggest cases—has ever been observed to use it.  *See,*

*e.g.,* Schwartz, *supra,* at 360; Kritzer, SUPRA, 39-40. Again, in my opinion, the court should not impose upon class members fee practices they would never choose for themselves.

36. Consider the following examples. Suppose a class action lawyer worked on a case for one year and accrued a lodestar of $1 million. If the lawyer believed that a court would award it a fee of 25% or 5 times his lodestar, whichever was lesser, then he would be completely indifferent between accepting a settlement offer at this point of $20 million and $200 million; either way, the lawyer would earn $5 million. Needless to say, the incentive to be indifferent as to the size of the settlement is good neither for the class, which is interested in maximizing its compensation, nor for society, which is interested in fully deterring misconduct. Suppose instead the lawyer had been offered $40 million after one year of work. If the lawyer again believed the court would not award a fee of 25% unless it was no more than 5 times his lodestar, then the lawyer would want to delay accepting the settlement until he could generate another $1 million in lodestar and thereby reap the maximum fee. Again, this is good neither for the class nor for society, both of which have interests in compensating and deterring in the most timely and efficient manner.

37. Nonetheless, if the court wishes to perform the lodestar crosscheck, in my opinion there is nothing about class counsel's lodestar that should give the court any pause. Class counsel have reported a lodestar of approximately $194 million. If the court grants the fee request, this would result in a lodestar multiplier of approximately 3.23. This is higher than the mean and median lodestar multipliers in my empirical study from cases using the percentage method with the lodestar crosscheck. *See* Fitzpatrick, *Empirical Study, supra*, at 834 (finding multipliers ranging from 0.07 to 10.3, with a mean of 1.65 and median of 1.34); *see also Eisenberg-Miller 2017*, *supra*, at 965 (finding mean multiplier of 1.48 for cases between 2009 and 2013); *Eisenberg & Miller 2010*, *supra*, at 273 (finding mean multiplier of 1.81 for cases between 1993 and 2008).

But the relationship between settlement size and lodestar multipliers is the opposite of that between settlement size and fee percentages: as the settlement size increases, the lodestar multiplier class counsel receives often increases as well. *See Eisenberg-Miller 2010, supra,* at 274 ("As the recovery decile increases, the multiplier also tends to increase, with the multiplier in the highest recovery decile more than triple that of the multiplier in the lowest recovery decile."). This can be seen from Table 1, which shows that lodestar multipliers have ranged from 1.0 to 6.2 in billion-dollar settlements, with an average and median of 2.8 and 2.6, respectively. Thus, compared to other billion-dollar settlements, the multiplier that would result here would be only slightly above average and well within the previous range. Moreover, it should be noted again that many of the settlements in the other billion-dollar cases did not include "historic and substantial" injunctive relief like this case. In other words, nothing about the multiplier that would result requires a further reduction from the already-below-benchmark percentage requested here.

38.　　Consider the remaining *Camden* factors. One of these factors is inapplicable at least as of yet—"[2] whether there are any substantial objections"—because the deadline for objections has not yet passed, but the other factors go to the skills of class counsel and their relationship with the plaintiffs: "[7] the skill requisite to perform the legal service properly," "[8] the preclusion of other employment by the attorney due to acceptance of the case," "[11] time limitations imposed by the client or the circumstances," "[13] the experience, reputation, and ability of the attorneys," and "[15] the nature and length of the professional relationship with the client." Although I was not privy to the attorney-client relationships here, class counsel count among their number some of the most experienced and highly regarded lawyers in the United States. These are not mere benchmark lawyers. Yet, they are requesting a below benchmark fee.

39.　　For all these reasons, I believe the fee award requested here is reasonable.

40.      My compensation for this declaration was $950 per hour.

Nashville, TN

May 28, 2021

Brian T. Fitzpatrick

# Exhibit 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Milton R. Underwood Chair in Free Enterprise*, 2020 to present
- *Professor of Law*, 2012 to present
- *FedEx Research Professor*, 2014-2015; *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-2010
- Classes: Civil Procedure, Complex Litigation, Federal Courts
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

**HARVARD LAW SCHOOL**, *Visiting Professor*, Fall 2018
- Classes: Civil Procedure, Litigation Finance

**FORDHAM LAW SCHOOL**, *Visiting Professor*, Fall 2010
- Classes: Civil Procedure

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## BOOKS

THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (Cambridge University Press 2021) (ed., with Randall Thomas)

THE CONSERVATIVE CASE FOR CLASS ACTIONS (University of Chicago Press 2019)

## ACADEMIC ARTICLES

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 FORD. L. REV. 1151 (2021)

*Objector Blackmail Update: What Have the 2018 Amendments Done?*, 89 FORD. L. REV. 437 (2020)

*Why Class Actions are Something* both *Liberals* and *Conservatives Can Love*, 73 VAND. L. REV. 1147 (2020)

*Deregulation and Private Enforcement*, 24 LEWIS & CLARK L. REV. 685 (2020)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, 40 NW. J. INT'L L. & BUS. 203 (2020) (with Randall Thomas)

*Can the Class Action be Made Business Friendly?*, 24 N.Z. BUS. L. & Q. 169 (2018)

*Can and Should the New Third-Party Litigation Financing Come to Class Actions?*, 19 THEORETICAL INQUIRIES IN LAW 109 (2018)

*Scalia in the Casebooks*, 84 U. CHI. L. REV. 2231 (2017)

*The Ideological Consequences of Judicial Selection*, 70 VAND. L. REV. 1729 (2017)

*Judicial Selection and Ideology*, 42 OKLAHOMA CITY UNIV. L. REV. 53 (2017)

*Justice Scalia and Class Actions: A Loving Critique,* 92 NOTRE DAME L. REV. 1977 (2017)

*A Tribute to Justice Scalia: Why Bad Cases Make Bad Methodology,* 69 VAND. L. REV. 991 (2016)

*The Hidden Question in* Fisher, 10 NYU J. L. & LIBERTY 168 (2016)

*An Empirical Look at Compensation in Consumer Class Actions,* 11 NYU J. L. & BUS. 767 (2015) (with Robert Gilbert)

*The End of Class Actions?*, 57 ARIZ. L. REV. 161 (2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)

## BOOK CHAPTERS

*How Many Class Actions are Meritless?,* in THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (ed., with Randall Thomas, Cambridge University Press 2021)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?,* in THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (ed., with Randall Thomas, Cambridge University Press 2021) (with Randall Thomas)

*Do Class Actions Deter Wrongdoing?* in THE CLASS ACTION EFFECT (Catherine Piché, ed., Éditions Yvon Blais, Montreal, 2018)

*Judicial Selection in Illinois* in AN ILLINOIS CONSTITUTION FOR THE TWENTY-FIRST CENTURY (Joseph E. Tabor, ed., Illinois Policy Institute, 2017)

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, 2016)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, 2016)

## ACADEMIC PRESENTATIONS

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, University of California Hastings College of the Law, San Francisco, CA (Nov. 3, 2020)

*A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, The Judicial Role in Professional Regulation, Stein Colloquium, Fordham Law School, New York, NY (Oct. 9, 2020)

*Objector Blackmail Update: What Have the 2018 Amendments Done?,* Institute for Law and Economic Policy, Fordham Law School, New York, NY (Feb. 28, 2020)

*Keynote Debate: The Conservative Case for Class Actions,* Miami Law Class Action & Complex Litigation Forum, University of Miami School of Law, Miami, FL (Jan. 24, 2020)

*The Future of Class Actions,* National Consumer Law Center Class Action Symposium, Boston, MA (Nov. 16, 2019) (panelist)

*The Conservative Case for Class Actions,* Center for Civil Justice, NYU Law School, New York, NY (Nov.11, 2019)

*Deregulation and Private Enforcement*, Class Actions, Mass Torts, and MDLs: The Next 50 Years, Pound Institute Academic Symposium, Lewis & Clark Law School, Portland, OR (Nov. 2, 2019)

*Class Actions and Accountability in Finance,* Investors and the Rule of Law Conference, Institute for Investor Protection, Loyola University Chicago Law School, Chicago, IL (Oct. 25, 2019) (panelist)

*Incentivizing Lawyers as Teams,* University of Texas at Austin Law School, Austin, TX (Oct. 22, 2019)

*"Dueling Pianos": A Debate on the Continuing Need for Class Actions,* Twenty Third Annual National Institute on Class Actions, American Bar Association, Nashville, TN (Oct. 18, 2019) (panelist)

*A Debate on the Utility of Class Actions,* Contemporary Issues in Complex Litigation Conference, Northwestern Law School, Chicago, IL (Oct.16, 2019) (panelist)

*Litigation Funding,* Forty Seventh Annual Meeting, Intellectual Property Owners Association, Washington, DC (Sep. 26, 2019) (panelist)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?,* International Class Actions Conference, Vanderbilt Law School, Nashville, TN (Aug. 24, 2019)

*A New Source of Class Action Data,* Corporate Accountability Conference, Institute for Law and Economic Policy, San Juan, Puerto Rico (April 12, 2019)

*The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, Ninth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 14, 2018)

*MDL: Uniform Rules v. Best Practices*, Miami Law Class Action & Complex Litigation Forum, University of Miami Law School, Miami, FL (Dec. 7, 2018) (panelist)

*Third Party Finance of Attorneys in Traditional and Complex Litigation*, George Washington Law School, Washington, D.C. (Nov. 2, 2018) (panelist)

*MDL at 50 - The 50th Anniversary of Multidistrict Litigation*, New York University Law School, New York, New York (Oct. 10, 2018) (panelist)

*The Discovery Tax*, Law & Economics Seminar, Harvard Law School, Cambridge, Massachusetts (Sep. 11, 2018)

*Empirical Research on Class Actions,* Civil Justice Research Initiative, University of California at Berkeley, Berkeley, California (Apr. 9, 2018)

*A Political Future for Class Actions in the United States?*, The Future of Class Actions Symposium, University of Auckland Law School, Auckland, New Zealand (Mar. 15, 2018)

*The Indian Class Actions: How Effective Will They Be?*, Eighth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 19, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 8, 2017) (panelist)

*Critical Issues in Complex Litigation*, Contemporary Issues in Complex Litigation, Northwestern Law School (Nov. 29, 2017) (panelist)

*The Conservative Case for Class Actions*, Consumer Class Action Symposium, National Consumer Law Center, Washington, DC (Nov. 19, 2017)

*The Conservative Case for Class Actions—A Monumental Debate*, ABA National Institute on Class Actions, Washington, DC (Oct. 26, 2017) (panelist)

*One-Way Fee Shifting after Summary Judgment*, 2017 Meeting of the Midwestern Law and Economics Association, Marquette Law School, Milwaukee, WI (Oct. 20, 2017)

*The Conservative Case for Class Actions*, Pepperdine Law School Malibu, CA (Oct. 17, 2017)

*One-Way Fee Shifting after Summary Judgment*, Vanderbilt Law Review Symposium on The Future of Discovery, Vanderbilt Law School, Nashville, TN (Oct. 13, 2017)

*The Constitution Revision Commission and Florida's Judiciary*, 2017 Annual Florida Bar Convention, Boca Raton, FL (June 22, 2017)

*Class Actions After* Spokeo v. Robins*: Supreme Court Jurisprudence, Article III Standing, and Practical Implications for the Bench and Practitioners*, Northern District of California Judicial Conference, Napa, CA (Apr. 29, 2017) (panelist)

*The Ironic History of Rule 23*, Conference on Secrecy, Institute for Law & Economic Policy, Naples, FL (Apr. 21, 2017)

*Justice Scalia and Class Actions: A Loving Critique*, University of Notre Dame Law School, South Bend, Indiana (Feb. 3, 2017)

*Should Third-Party Litigation Financing Be Permitted in Class Actions?*, Fifty Years of Class Actions—A Global Perspective, Tel Aviv University, Tel Aviv, Israel (Jan. 4, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 2, 2016) (panelist)

*The Ideological Consequences of Judicial Selection,* William J. Brennan Lecture, Oklahoma City University School of Law, Oklahoma, City, Oklahoma (Nov. 10, 2016)

*After Fifty Years, What's Class Action's Future,* ABA National Institute on Class Actions, Las Vegas, Nevada (Oct. 20, 2016) (panelist)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, State University of New York at Stony Brook, Long Island, New York (Sep. 17, 2016)

*The Ironic History of Rule 23,* University of Washington Law School, Seattle, WA (July 14, 2016)

*A Respected Judiciary—Balancing Independence and Accountability*, 2016 Annual Florida Bar Convention, Orlando, FL (June 16, 2016) (panelist)

*What Will and Should Happen to Affirmative Action After Fisher v. Texas*, American Association of Law Schools Annual Meeting, New York, NY (January 7, 2016) (panelist)

*Litigation Funding: The Basics and Beyond,* NYU Center on Civil Justice, NYU Law School, New York, NY (Nov. 20, 2015) (panelist)

*Do Class Actions Offer Meaningful Compensation to Class Members, or Do They Simply Rip Off Consumers Twice?,* ABA National Institute on Class Actions, New Orleans, LA (Oct. 22, 2015) (panelist)

*Arbitration and the End of Class Actions?,* Quinnipiac-Yale Dispute Resolution Workshop, Yale Law School, New Haven, CT (Sep. 8, 2015) (panelist)

*The Next Steps for Discovery Reform: Requester Pays*, Lawyers for Civil Justice Membership Meeting, Washington, DC (May 5, 2015)

*Private Attorney General: Good or Bad?*, 17th Annual Federalist Society Faculty Conference, Washington, DC (Jan. 3, 2015)

*Liberty, Judicial Independence, and Judicial Power*, Liberty Fund Conference, Santa Fe, NM (Nov. 13-16, 2014) (participant)

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, FL (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, NY (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, CA (Apr. 13, 2014) (panelist)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, FL (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law, Columbia, MO (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School, Arlington, VA (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law, Lexington, VA (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School, Ann Arbor, MI (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School, Nashville, TN (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, FL (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School, Ann Arbor, MI (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School, New York, NY (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School, New York, NY (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*,* Fordham Law School Corporate Law Center, New York, NY (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School, St. Louis, MO (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law, Chicago, IL (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School, Palo Alto, CA (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School, Chicago, IL (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School, Iowa City, IA (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School, St. Louis, MO (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School, Cleveland, OH (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School, Washington, DC (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School, St. Louis, MO (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School, Los Angeles, CA (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School, Columbus, OH (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School, South Bend, IN (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School, Palo Alto, CA (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law, Minneapolis, MN (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School, Columbia, MO (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law, Chicago, IL (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law, Ann Arbor, MI (Apr. 3, 2007) (panelist)

## OTHER PUBLICATIONS

*Memo to Mitch: Repeal the Republican Tax Increase*, THE HILL (July 17, 2020)

*The Right Way to End Qualified Immunity*, THE HILL (June 25, 2020)

*I Still Remember*, 133 HARV. L. REV. 2458 (2020)

*Proposed Reforms to Texas Judicial Selection*, 24 TEX. R. L. & POL. 307 (2020)

*The Conservative Case for Class Actions?,* NATIONAL REVIEW (Nov. 13, 2019)

*9th Circuit Split: What's the math say?*, DAILY JOURNAL (Mar. 21, 2017)

*Former clerk on Justice Antonin Scalia and his impact on the Supreme Court*, THE CONVERSATION (Feb. 24, 2016)

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

## OTHER PRESENTATIONS

*Does the Way We Choose our Judges Affect Case Outcomes?*, American Legislative Exchange Council 2018 Annual Meeting, New Orleans, Louisiana (August 10, 2018) (panelist)

*Oversight of the Structure of the Federal Courts*, Subcommittee on Oversight, Agency Action, Federal Rights and Federal Courts, United States Senate, Washington, D.C. (July 31, 2018)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, The Leo Bearman, Sr. American Inn of Court, Memphis, TN (Mar. 21, 2017)

*Bringing Justice Closer to the People: Examining Ideas for Restructuring the 9th Circuit*, Subcommittee on Courts, Intellectual Property, and the Internet, United States House of Representatives, Washington, D.C. (Mar. 16, 2017)

*Supreme Court Review 2016: Current Issues and Cases Update*, Nashville Bar Association, Nashville, TN (Sep. 15, 2016) (panelist)

*A Respected Judiciary—Balancing Independence and Accountability*, Florida Bar Annual Convention, Orlando, FL (June 16, 2016) (panelist)

*Future Amendments in the Pipeline: Rule 23*, Tennessee Bar Association, Nashville, TN (Dec. 2, 2015)

*The New Business of Law: Attorney Outsourcing, Legal Service Companies, and Commercial Litigation Funding*, Tennessee Bar Association, Nashville, TN (Nov. 12, 2014)

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club, Nashville, TN (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)


**PROFESSIONAL ASSOCIATIONS**

Member, American Law Institute
Referee, Journal of Law, Economics and Organization
Referee, Journal of Empirical Legal Studies
Reviewer, Oxford University Press
Reviewer, Supreme Court Economic Review
Member, American Bar Association
Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights
Board of Directors, Tennessee Stonewall Bar Association
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia


**COMMUNITY ACTIVITIES**

Board of Directors, Nashville Ballet, 2011-2017 & 2019-present; Board of Directors, Beacon Center, 2018-present; Nashville Talking Library for the Blind, 2008-2009

# Exhibit 2

# JOURNAL OF
# EMPIRICAL LEGAL STUDIES



*Journal of Empirical Legal Studies*
Volume 7, Issue 4, 811–846, December 2010

# An Empirical Study of Class Action Settlements and Their Fee Awards

*Brian T. Fitzpatrick\**

This article is a comprehensive empirical study of class action settlements in federal court. Although there have been prior empirical studies of federal class action settlements, these studies have either been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as those settlements approved in published opinions). By contrast, in this article, I attempt to study every federal class action settlement from the years 2006 and 2007. As far as I am aware, this study is the first attempt to collect a complete set of federal class action settlements for any given year. I find that district court judges approved 688 class action settlements over this two-year period, involving nearly $33 billion. Of this $33 billion, roughly $5 billion was awarded to class action lawyers, or about 15 percent of the total. Most judges chose to award fees by using the highly discretionary percentage-of-the-settlement method, and the fees awarded according to this method varied over a broad range, with a mean and median around 25 percent. Fee percentages were strongly and inversely associated with the size of the settlement. The age of the case at settlement was positively associated with fee percentages. There was some variation in fee percentages depending on the subject matter of the litigation and the geographic circuit in which the district court was located, with lower percentages in securities cases and in settlements from the Second and Ninth Circuits. There was no evidence that fee percentages were associated with whether the class action was certified as a settlement class or with the political affiliation of the judge who made the award.

## I. INTRODUCTION

Class actions have been the source of great controversy in the United States. Corporations fear them.[1] Policymakers have tried to corral them.[2] Commentators and scholars have

*Vanderbilt Law School, 131 21st Ave. S., Nashville, TN 37203; email: brian.fitzpatrick@vanderbilt.edu.

Research for this article was supported by Vanderbilt's Cecil D. Branstetter Litigation & Dispute Resolution Program and Law & Business Program. I am grateful for comments I received from Dale Collins, Robin Effron, Ted Eisenberg, Deborah Hensler, Richard Nagareda, Randall Thomas, an anonymous referee for this journal, and participants at workshops at Vanderbilt Law School, the University of Minnesota Law School, the 2009 Meeting of the Midwestern Law and Economics Association, and the 2009 Conference on Empirical Legal Studies. I am also grateful for the research assistance of Drew Dorner, David Dunn, James Gottry, Chris Lantz, Gary Peeples, Keith Randall, Andrew Yi, and, especially, Jessica Pan.

[1]See, e.g., Robert W. Wood, Defining Employees and Independent Contractors, Bus. L. Today 45, 48 (May–June 2008).

[2]See Private Securities Litigation Reform Act (PSLRA) of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.); Class Action Fairness Act of 2005, 28 U.S.C. §§ 1453, 1711–1715 (2006).

suggested countless ways to reform them.[3] Despite all the attention showered on class actions, and despite the excellent empirical work on class actions to date, the data that currently exist on how the class action system operates in the United States are limited. We do not know, for example, how much money changes hands in class action litigation every year. We do not know how much of this money goes to class action lawyers rather than class members. Indeed, we do not even know how many class action cases are resolved on an annual basis. To intelligently assess our class action system as well as whether and how it should be reformed, answers to all these questions are important. Answers to these questions are equally important to policymakers in other countries who are currently thinking about adopting U.S.-style class action devices.[4]

This article tries to answer these and other questions by reporting the results of an empirical study that attempted to gather all class action settlements approved by federal judges over a recent two-year period, 2006 and 2007. I use class action settlements as the basis of the study because, even more so than individual litigation, virtually all cases certified as class actions and not dismissed before trial end in settlement.[5] I use federal settlements as the basis of the study for practical reasons: it was easier to identify and collect settlements approved by federal judges than those approved by state judges. Systematic study of class action settlements in state courts must await further study;[6] these future studies are important because there may be more class action settlements in state courts than there are in federal court.[7]

This article attempts to make three contributions to the existing empirical literature on class action settlements. First, virtually all the prior empirical studies of federal class action settlements have either been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as those settlements approved in published opinions). In this article, by contrast, I attempt to collect every federal class action settlement from the years 2006 and 2007. As far as I am aware, this study is the first to attempt to collect a complete set of federal class action settlements for

---

[3]See, e.g., Robert G. Bone, Agreeing to Fair Process: The Problem with Contractarian Theories of Procedural Fairness, 83 B.U.L. Rev. 485, 490–94 (2003); Allan Erbsen, From "Predominance" to "Resolvability": A New Approach to Regulating Class Actions, 58 Vand. L. Rev. 995, 1080–81 (2005).

[4]See, e.g., Samuel Issacharoff & Geoffrey Miller, Will Aggregate Litigation Come to Europe?, 62 Vand. L. Rev. 179 (2009).

[5]See, e.g., Emery Lee & Thomas E. Willing, Impact of the Class Action Fairness Act on the Federal Courts: Preliminary Findings from Phase Two's Pre-CAFA Sample of Diversity Class Actions 11 (Federal Judicial Center 2008); Tom Baker & Sean J. Griffith, How the Merits Matter: D&O Insurance and Securities Settlements, 157 U. Pa. L. Rev. 755 (2009).

[6]Empirical scholars have begun to study state court class actions in certain subject areas and in certain states. See, e.g., Robert B. Thompson & Randall S. Thomas, The Public and Private Faces of Derivative Suits, 57 Vand. L. Rev. 1747 (2004); Robert B. Thompson & Randall S. Thomas, The New Look of Shareholder Litigation: Acquisition-Oriented Class Actions, 57 Vand. L. Rev. 133 (2004); Findings of the Study of California Class Action Litigation (Administrative Office of the Courts) (First Interim Report, 2009).

[7]See Deborah R. Hensler et al., Class Action Dilemmas: Pursuing Public Goals for Private Gain 56 (2000).

any given year.[8] As such, this article allows us to see for the first time a complete picture of the cases that are settled in federal court. This includes aggregate annual statistics, such as how many class actions are settled every year, how much money is approved every year in these settlements, and how much of that money class action lawyers reap every year. It also includes how these settlements are distributed geographically as well as by litigation area, what sort of relief was provided in the settlements, how long the class actions took to reach settlement, and an analysis of what factors were associated with the fees awarded to class counsel by district court judges.

Second, because this article analyzes settlements that were approved in both published and unpublished opinions, it allows us to assess how well the few prior studies that looked beyond securities cases but relied only on published opinions capture the complete picture of class action settlements. To the extent these prior studies adequately capture the complete picture, it may be less imperative for courts, policymakers, and empirical scholars to spend the considerable resources needed to collect unpublished opinions in order to make sound decisions about how to design our class action system.

Third, this article studies factors that may influence district court judges when they award fees to class counsel that have not been studied before. For example, in light of the discretion district court judges have been delegated over fees under Rule 23, as well as the salience the issue of class action litigation has assumed in national politics, realist theories of judicial behavior would predict that Republican judges would award smaller fee percentages than Democratic judges. I study whether the political beliefs of district court judges are associated with the fees they award and, in doing so, contribute to the literature that attempts to assess the extent to which these beliefs influence the decisions of not just appellate judges, but trial judges as well. Moreover, the article contributes to the small but growing literature examining whether the ideological influences found in published judicial decisions persist when unpublished decisions are examined as well.

In Section II of this article, I briefly survey the existing empirical studies of class action settlements. In Section III, I describe the methodology I used to collect the 2006–2007 federal class action settlements and I report my findings regarding these settlements. District court judges approved 688 class action settlements over this two-year period, involving over $33 billion. I report a number of descriptive statistics for these settlements, including the number of plaintiff versus defendant classes, the distribution of settlements by subject matter, the age of the case at settlement, the geographic distribution of settlements, the number of settlement classes, the distribution of relief across settlements, and various statistics on the amount of money involved in the settlements. It should be noted that despite the fact that the few prior studies that looked beyond securities settlements appeared to oversample larger settlements, much of the analysis set forth in this article is consistent with these prior studies. This suggests that scholars may not need to sample unpublished as well as published opinions in order to paint an adequate picture of class action settlements.

_____

[8]Of course, I cannot be certain that I found every one of the class actions that settled in federal court over this period. Nonetheless, I am confident that if I did not find some, the number I did not find is small and would not contribute meaningfully to the data reported in this article.

In Section IV, I perform an analysis of the fees judges awarded to class action lawyers in the 2006–2007 settlements. All told, judges awarded nearly $5 billion over this two-year period in fees and expenses to class action lawyers, or about 15 percent of the total amount of the settlements. Most federal judges chose to award fees by using the highly discretionary percentage-of-the-settlement method and, unsurprisingly, the fees awarded according to this method varied over a broad range, with a mean and median around 25 percent. Using regression analysis, I confirm prior studies and find that fee percentages are strongly and inversely associated with the size of the settlement. Further, I find that the age of the case is positively associated with fee percentages but that the percentages were not associated with whether the class action was certified as a settlement class. There also appeared to be some variation in fee percentages depending on the subject matter of the litigation and the geographic circuit in which the district court was located. Fee percentages in securities cases were lower than the percentages in some but not all other areas, and district courts in some circuits—the Ninth and the Second (in securities cases)—awarded lower fee percentages than courts in many other circuits. Finally, the regression analysis did not confirm the realist hypothesis: there was no association between fee percentage and the political beliefs of the judge in any regression.

## II.  Prior Empirical Studies of Class Action Settlements

There are many existing empirical studies of federal securities class action settlements.[9] Studies of securities settlements have been plentiful because for-profit organizations maintain lists of all federal securities class action settlements for the benefit of institutional investors that are entitled to file claims in these settlements.[10] Using these data, studies have shown that since 2005, for example, there have been roughly 100 securities class action settlements in federal court each year, and these settlements have involved between $7 billion and $17 billion per year.[11] Scholars have used these data to analyze many different aspects of these settlements, including the factors that are associated with the percentage of

––––––––

[9]See, e.g., James D. Cox & Randall S. Thomas, Does the Plaintiff Matter? An Empirical Analysis of Lead Plaintiffs in Securities Class Actions, 106 Colum. L. Rev. 1587 (2006); James D. Cox, Randall S. Thomas & Lynn Bai, There are Plaintiffs and . . . there are Plaintiffs: An Empirical Analysis of Securities Class Action Settlements, 61 Vand. L. Rev. 355 (2008); Theodore Eisenberg, Geoffrey Miller & Michael A. Perino, A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions after *Goldberger v. Integrated Resources, Inc.*, 29 Wash. U.J.L. & Pol'y 5 (2009); Michael A. Perino, Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions (St. John's Legal Studies, Research Paper No. 06-0034, 2006), available at <http://ssrn.com/abstract=870577> [hereinafter Perino, Markets and Monitors]; Michael A. Perino, The Milberg Weiss Prosecution: No Harm, No Foul? (St. John's Legal Studies, Research Paper No. 08-0135, 2008), available at <http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1133995> [hereinafter Perino, Milberg Weiss].

[10]See, e.g., RiskMetrics Group, available at <http://www.riskmetrics.com/scas>.

[11]See Cornerstone Research, Securities Class Action Settlements: 2007 Review and Analysis 1 (2008), available at <http://securities.stanford.edu/Settlements/REVIEW_1995-2007/Settlements_Through_12_2007.pdf>.

the settlements that courts have awarded to class action lawyers.[12] These studies have found that the mean and median fees awarded by district court judges are between 20 percent and 30 percent of the settlement amount.[13] These studies have also found that a number of factors are associated with the percentage of the settlement awarded as fees, including (inversely) the size of the settlement, the age of the case, whether a public pension fund was the lead plaintiff, and whether certain law firms were class counsel.[14] None of these studies has examined whether the political affiliation of the federal district court judge awarding the fees was associated with the size of awards.

There are no comparable organizations that maintain lists of nonsecurities class action settlements. As such, studies of class action settlements beyond the securities area are much rarer and, when they have been done, rely on samples of settlements that were not intended to be representative of the whole. The two largest studies of class action settlements not limited to securities class actions are a 2004 study by Ted Eisenberg and Geoff Miller,[15] which was recently updated to include data through 2008,[16] and a 2003 study by Class Action Reports.[17] The Eisenberg-Miller studies collected data from class action settlements in both state and federal courts found from court opinions published in the Westlaw and Lexis databases and checked against lists maintained by the CCH Federal Securities and Trade Regulation Reporters. Through 2008, their studies have now identified 689 settlements over a 16-year period, or less than 45 settlements per year.[18] Over this 16-year period, their studies found that the mean and median settlement amounts were, respectively, $116 million and $12.5 million (in 2008 dollars), and that the mean and median fees awarded by district courts were 23 percent and 24 percent of the settlement, respectively.[19] Their studies also performed an analysis of fee percentages and fee awards. For the data through 2002, they found that the percentage of the settlement awarded as fees was associated with the size of the settlement (inversely), the age of the case, and whether the

––––––

[12]See, e.g., Eisenberg, Miller & Perino, supra note 9, at 17–24, 28–36; Perino, Markets and Monitors, supra note 9, at 12–28, 39–44; Perino, Milberg Weiss, supra note 9, at 32–33, 39–60.

[13]See, e.g., Eisenberg, Miller & Perino, supra note 9, at 17–18, 22, 28, 33; Perino, Markets and Monitors, supra note 9, at 20–21, 40; Perino, Milberg Weiss, supra note 9, at 32–33, 51–53.

[14]See, e.g., Eisenberg, Miller & Perino, supra note 9, at 14–24, 29–30, 33–34; Perino, Markets and Monitors, supra note 9, at 20–28, 41; Perino, Milberg Weiss, supra note 9, at 39–58.

[15]See Theodore Eisenberg & Geoffrey Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27 (2004).

[16]See Theodore Eisenberg & Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993–2008, 7 J. Empirical Legal Stud. 248 (2010) [hereinafter Eisenberg & Miller II].

[17]See Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Rep. 169 (Mar.–Apr. 2003).

[18]See Eisenberg & Miller II, supra note 16, at 251.

[19]Id. at 258–59.

district court went out of its way to comment on the level of risk that class counsel had assumed in pursuing the case.[20] For the data through 2008, they regressed only fee awards and found that the awards were inversely associated with the size of the settlement, that state courts gave lower awards than federal courts, and that the level of risk was still associated with larger awards.[21] Their studies have not examined whether the political affiliations of the federal district court judges awarding fees were associated with the size of the awards.

The Class Action Reports study collected data on 1,120 state and federal settlements over a 30-year period, or less than 40 settlements per year.[22] Over the same 10-year period analyzed by the Eisenberg-Miller study, the Class Action Reports data found mean and median settlements of $35.4 and $7.6 million (in 2002 dollars), as well as mean and median fee percentages between 25 percent and 30 percent.[23] Professors Eisenberg and Miller performed an analysis of the fee awards in the Class Action Reports study and found the percentage of the settlement awarded as fees was likewise associated with the size of the settlement (inversely) and the age of the case.[24]

## III. Federal Class Action Settlements, 2006 and 2007

As far as I am aware, there has never been an empirical study of all federal class action settlements in a particular year. In this article, I attempt to make such a study for two recent years: 2006 and 2007. To compile a list of all federal class settlements in 2006 and 2007, I started with one of the aforementioned lists of securities settlements, the one maintained by RiskMetrics, and I supplemented this list with settlements that could be found through three other sources: (1) broad searches of district court opinions in the Westlaw and Lexis databases,[25] (2) four reporters of class action settlements—*BNA Class Action Litigation Report*, *Mealey's Jury Verdicts and Settlements*, *Mealey's Litigation Report*, and the *Class Action World* website[26]—and (3) a list from the Administrative Office of Courts of all district court cases

---

[20]See Eisenberg & Miller, supra note 15, at 61–62.

[21]See Eisenberg & Miller II, supra note 16, at 278.

[22]See Eisenberg & Miller, supra note 15, at 34.

[23]Id. at 47, 51.

[24]Id. at 61–62.

[25]The searches consisted of the following terms: ("class action" & (settle! /s approv! /s (2006 2007))); (((counsel attorney) /s fee /s award!) & (settle! /s (2006 2007)) & "class action"); ("class action" /s settle! & da(aft 12/31/2005 & bef 1/1/2008)); ("class action" /s (fair reasonable adequate) & da(aft 12/31/2005 & bef 1/1/2008)).

[26]See <http://classactionworld.com/>.

coded as class actions that terminated by settlement between 2005 and 2008.[27] I then removed any duplicate cases and examined the docket sheets and court orders of each of the remaining cases to determine whether the cases were in fact certified as class actions under either Rule 23, Rule 23.1, or Rule 23.2.[28] For each of the cases verified as such, I gathered the district court's order approving the settlement, the district court's order awarding attorney fees, and, in many cases, the settlement agreements and class counsel's motions for fees, from electronic databases (such as Westlaw or PACER) and, when necessary, from the clerk's offices of the various federal district courts. In this section, I report the characteristics of the settlements themselves; in the next section, I report the characteristics of the attorney fees awarded to class counsel by the district courts that approved the settlements.

## A. Number of Settlements

I found 688 settlements approved by federal district courts during 2006 and 2007 using the methodology described above. This is almost the exact same number the Eisenberg-Miller study found over a *16*-year period in both federal *and* state court. Indeed, the number of annual settlements identified in this study is *several times* the number of annual settlements that have been identified in any prior empirical study of class action settlements. Of the 688 settlements I found, 304 were approved in 2006 and 384 were approved in 2007.[29]

## B. Defendant Versus Plaintiff Classes

Although Rule 23 permits federal judges to certify either a class of plaintiffs or a class of defendants, it is widely assumed that it is extremely rare for courts to certify defendant classes.[30] My findings confirm this widely held assumption. Of the 688 class action settlements approved in 2006 and 2007, 685 involved plaintiff classes and only three involved

———

[27] I examined the AO lists in the year before and after the two-year period under investigation because the termination date recorded by the AO was not necessarily the same date the district court approved the settlement.

[28] See Fed. R. Civ. P. 23, 23.1, 23.2. I excluded from this analysis opt-in collective actions, such as those brought pursuant to the provisions of the Fair Labor Standards Act (see 29 U.S.C. § 216(b)), if such actions did not also include claims certified under the opt-out mechanism in Rule 23.

[29] A settlement was assigned to a particular year if the district court judge's order approving the settlement was dated between January 1 and December 31 of that year. Cases involving multiple defendants sometimes settled over time because defendants would settle separately with the plaintiff class. All such partial settlements approved by the district court on the same date were treated as one settlement. Partial settlements approved by the district court on different dates were treated as different settlements.

[30] See, e.g., Robert H. Klonoff, Edward K.M. Bilich & Suzette M. Malveaux, Class Actions and Other Multi-Party Litigation: Cases and Materials 1061 (2d ed. 2006).

defendant classes. All three of the defendant-class settlements were in employment benefits cases, where companies sued classes of current or former employees.[31]

## C. Settlement Subject Areas

Although courts are free to certify Rule 23 classes in almost any subject area, it is widely assumed that securities settlements dominate the federal class action docket.[32] At least in terms of the number of settlements, my findings reject this conventional wisdom. As Table 1 shows, although securities settlements comprised a large percentage of the 2006 and 2007 settlements, they did not comprise a majority of those settlements. As one would have

Table 1:  The Number of Class Action Settlements Approved by Federal Judges in 2006 and 2007 in Each Subject Area

|  | Number of Settlements | |
| --- | --- | --- |
| Subject Matter | 2006 | 2007 |
| Securities | 122 (40%) | 135 (35%) |
| Labor and employment | 41 (14%) | 53 (14%) |
| Consumer | 40 (13%) | 47 (12%) |
| Employee benefits | 23 (8%) | 38 (10%) |
| Civil rights | 24 (8%) | 37 (10%) |
| Debt collection | 19 (6%) | 23 (6%) |
| Antitrust | 13 (4%) | 17 (4%) |
| Commercial | 4 (1%) | 9 (2%) |
| Other | 18 (6%) | 25 (6%) |
| Total | 304 | 384 |

NOTE:  Securities: cases brought under federal and state securities laws. Labor and employment: workplace claims brought under either federal or state law, with the exception of ERISA cases. Consumer: cases brought under the Fair Credit Reporting Act as well as cases for consumer fraud and the like. Employee benefits: ERISA cases. Civil rights: cases brought under 42 U.S.C. § 1983 or cases brought under the Americans with Disabilities Act seeking nonworkplace accommodations. Debt collection: cases brought under the Fair Debt Collection Practices Act. Antitrust: cases brought under federal or state antitrust laws. Commercial: cases between businesses, excluding antitrust cases. Other: includes, among other things, derivative actions against corporate managers and directors, environmental suits, insurance suits, Medicare and Medicaid suits, product liability suits, and mass tort suits.

SOURCES:  Westlaw, PACER, district court clerks' offices.

---

[31]See Halliburton Co. v. Graves, No. 04-00280 (S.D. Tex., Sept. 28, 2007); Rexam, Inc. v. United Steel Workers of Am., No. 03-2998 (D. Minn. Aug. 29, 2007); Rexam, Inc. v. United Steel Workers of Am., No. 03-2998 (D. Minn. Sept. 17, 2007).

[32]See, e.g., John C. Coffee, Jr., Reforming the Security Class Action: An Essay on Deterrence and its Implementation, 106 Colum. L. Rev. 1534, 1539–40 (2006) (describing securities class actions as "the 800-pound gorilla that dominates and overshadows other forms of class actions").

expected in light of Supreme Court precedent over the last two decades,[33] there were almost no mass tort class actions (included in the "Other" category) settled over the two-year period.

Although the Eisenberg-Miller study through 2008 is not directly comparable on the distribution of settlements across litigation subject areas—because its state and federal court data cannot be separated (more than 10 percent of the settlements were from state court[34]) and because it excludes settlements in fee-shifting cases—their study through 2008 is the best existing point of comparison. Interestingly, despite the fact that state courts were included in their data, their study through 2008 found about the same percentage of securities cases (39 percent) as my 2006–2007 data set shows.[35] However, their study found many more consumer (18 percent) and antitrust (10 percent) cases, while finding many fewer labor and employment (8 percent), employee benefits (6 percent), and civil rights (3 percent) cases.[36] This is not unexpected given their reliance on published opinions and their exclusion of fee-shifting cases.

## D. Settlement Classes

The Federal Rules of Civil Procedure permit parties to seek certification of a suit as a class action for settlement purposes only.[37] When the district court certifies a class in such circumstances, the court need not consider whether it would be manageable to try the litigation as a class.[38] So-called settlement classes have always been more controversial than classes certified for litigation because they raise the prospect that, at least where there are competing class actions filed against the same defendant, the defendant could play class counsel off one another to find the one willing to settle the case for the least amount of money.[39] Prior to the Supreme Court's 1997 opinion in *Amchem Products, Inc. v. Windsor*,[40] it was uncertain whether the Federal Rules even permitted settlement classes. It may therefore be a bit surprising to learn that 68 percent of the federal settlements in 2006 and 2007 were settlement classes. This percentage is higher than the percentage found in the Eisenberg-Miller studies, which found that only 57 percent of class action settlements in

---

[33]See, e.g., Samuel Issacharoff, Private Claims, Aggregate Rights, 2008 Sup. Ct. Rev. 183, 208.

[34]See Eisenberg & Miller II, supra note 16, at 257.

[35]Id. at 262.

[36]Id.

[37]See Martin H. Redish, Settlement Class Actions, The Case-or-Controversy Requirement, and the Nature of the Adjudicatory Process, 73 U. Chi. L. Rev. 545, 553 (2006).

[38]See Amchem Prods., Inc v Windsor, 521 U.S. 591, 620 (1997).

[39]See Redish, supra note 368, at 557–59.

[40]521 U.S. 591 (1997).

state and federal court between 2003 and 2008 were settlement classes.[41] It should be noted that the distribution of litigation subject areas among the settlement classes in my 2006–2007 federal data set did not differ much from the distribution among nonsettlement classes, with two exceptions. One exception was consumer cases, which were nearly three times as prevalent among settlement classes (15.9 percent) as among nonsettlement classes (5.9 percent); the other was civil rights cases, which were four times as prevalent among nonsettlement classes (18.0 percent) as among settlements classes (4.5 percent). In light of the skepticism with which the courts had long treated settlement classes, one might have suspected that courts would award lower fee percentages in such settlements. Nonetheless, as I report in Section III, whether a case was certified as a settlement class was not associated with the fee percentages awarded by federal district court judges.

*E.  The Age at Settlement*

One interesting question is how long class actions were litigated before they reached settlement. Unsurprisingly, cases reached settlement over a wide range of ages.[42] As shown in Table 2, the average time to settlement was a bit more than three years (1,196 days) and the median time was a bit under three years (1,068 days). The average and median ages here are similar to those found in the Eisenberg-Miller study through 2002, which found averages of 3.35 years in fee-shifting cases and 2.86 years in non-fee-shifting cases, and

Table 2:  The Number of Days, 2006–2007, Federal Class Action Cases Took to Reach Settlement in Each Subject Area

| Subject Matter | Average | Median | Minimum | Maximum |
|---|---|---|---|---|
| Securities | 1,438 | 1,327 | 392 | 3,802 |
| Labor and employment | 928 | 786 | 105 | 2,497 |
| Consumer | 963 | 720 | 127 | 4,961 |
| Employee benefits | 1,162 | 1,161 | 164 | 3,157 |
| Civil rights | 1,373 | 1,360 | 181 | 3,354 |
| Debt collection | 738 | 673 | 223 | 1,973 |
| Antitrust | 1,140 | 1,167 | 237 | 2,480 |
| Commercial | 1,267 | 760 | 163 | 5,443 |
| Other | 1,065 | 962 | 185 | 3,620 |
| All | 1,196 | 1,068 | 105 | 5,443 |

Source:  PACER.

---

[41]See Eisenberg & Miller II, supra note 16, at 266.

[42]The age of the case was calculated by subtracting the date the relevant complaint was filed from the date the settlement was approved by the district court judge. The dates were taken from PACER. For consolidated cases, I used the date of the earliest complaint. If the case had been transferred, consolidated, or removed, the date the complaint was filed was not always available from PACER. In such cases, I used the date the case was transferred, consolidated, or removed as the start date.

medians of 4.01 years in fee-shifting cases and 3.0 years in non-fee-shifting cases.[43] Their study through 2008 did not report case ages.

The shortest time to settlement was 105 days in a labor and employment case.[44] The longest time to settlement was nearly 15 years (5,443 days) in a commercial case.[45] The average and median time to settlement varied significantly by litigation subject matter, with securities cases generally taking the longest time and debt collection cases taking the shortest time. Labor and employment cases and consumer cases also settled relatively early.

### F. The Location of Settlements

The 2006–2007 federal class action settlements were not distributed across the country in the same way federal civil litigation is in general. As Figure 1 shows, some of the geographic circuits attracted much more class action attention than we would expect based on their docket size, and others attracted much less. In particular, district courts in the First, Second, Seventh, and Ninth Circuits approved a much larger share of class action settlements than the share of all civil litigation they resolved, with the First, Second, and Seventh Circuits approving nearly double the share and the Ninth Circuit approving one-and-one-half times the share. By contrast, the shares of class action settlements approved by district courts in the Fifth and Eighth Circuits were less than one-half of their share of all civil litigation, with the Third, Fourth, and Eleventh Circuits also exhibiting significant underrepresentation.

With respect to a comparison with the Eisenberg-Miller studies, their federal court data through 2008 can be separated from their state court data on the question of the geographic distribution of settlements, and there are some significant differences between their federal data and the numbers reflected in Figure 1. Their study reported considerably higher proportions of settlements than I found from the Second (23.8 percent), Third (19.7 percent), Eighth (4.8 percent), and D.C. (3.3 percent) Circuits, and considerably lower proportions from the Fourth (1.3 percent), Seventh (6.8 percent), and Ninth (16.6 percent) Circuits.[46]

Figure 2 separates the class action settlement data in Figure 1 into securities and nonsecurities cases. Figure 2 suggests that the overrepresentation of settlements in the First and Second Circuits is largely attributable to securities cases, whereas the overrepresentation in the Seventh Circuit is attributable to nonsecurities cases, and the overrepresentation in the Ninth is attributable to both securities and nonsecurities cases.

It is interesting to ask why some circuits received more class action attention than others. One hypothesis is that class actions are filed in circuits where class action lawyers

---

[43]See Eisenberg & Miller, supra note 15, at 59–60.

[44]See Clemmons v. Rent-a-Center W., Inc., No. 05-6307 (D. Or. Jan. 20, 2006).

[45]See Allapattah Servs. Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006).

[46]See Eisenberg & Miller II, supra note 16, at 260.

*Figure 1:* The percentage of 2006–2007 district court civil terminations and class action settlements in each federal circuit.



Sources: PACER, Statistical Tables for the Federal Judiciary 2006 & 2007 (available at <http://www.uscourts.gov/stats/index.html>).

believe they can find favorable law or favorable judges. Federal class actions often involve class members spread across multiple states and, as such, class action lawyers may have a great deal of discretion over the district in which file suit.[47] One way law or judges may be favorable to class action attorneys is with regard to attorney fees. In Section III, I attempt to test whether district court judges in the circuits with the most over- and undersubscribed class action dockets award attorney fees that would attract or discourage filings there; I find no evidence that they do.

Another hypothesis is that class action suits are settled in jurisdictions where defendants are located. This might be the case because although class action lawyers may have discretion over where to file, venue restrictions might ultimately restrict cases to jurisdic-

---

[47]See Samuel Issacharoff & Richard Nagareda, Class Settlements Under Attack, 156 U. Pa. L. Rev. 1649, 1662 (2008).

*Figure 2:* The percentage of 2006–2007 district court civil terminations and class action settlements in each federal circuit.



SOURCES: PACER, Statistical Tables for the Federal Judiciary 2006 & 2007 (available at <http://www.uscourts.gov/stats/index.html>).

tions in which defendants have their corporate headquarters or other operations.[48] This might explain why the Second Circuit, with the financial industry in New York, sees so many securities suits, and why other circuits with cities with a large corporate presence, such as the First (Boston), Seventh (Chicago), and Ninth (Los Angeles and San Francisco), see more settlements than one would expect based on the size of their civil dockets.

Another hypothesis might be that class action lawyers file cases wherever it is most convenient for them to litigate the cases—that is, in the cities in which their offices are located. This, too, might explain the Second Circuit's overrepresentation in securities settlements, with prominent securities firms located in New York, as well as the

───────

[48]See 28 U.S.C. §§ 1391, 1404, 1406, 1407. See also Foster v. Nationwide Mut. Ins. Co., No. 07-04928, 2007 U.S. Dist. LEXIS 95240 at *2–17 (N.D. Cal. Dec. 14, 2007) (transferring venue to jurisdiction where defendant's corporate headquarters were located). One prior empirical study of securities class action settlements found that 85 percent of such cases are filed in the home circuit of the defendant corporation. See James D. Cox, Randall S. Thomas & Lynn Bai, Do Differences in Pleading Standards Cause Forum Shopping in Securities Class Actions?: Doctrinal and Empirical Analyses, 2009 Wis. L. Rev. 421, 429, 440, 450–51 (2009).

overrepresentation of other settlements in some of the circuits in which major metropolitan areas with prominent plaintiffs' firms are found.

## G.  Type of Relief

Under Rule 23, district court judges can certify class actions for injunctive or declaratory relief, for money damages, or for a combination of the two.[49] In addition, settlements can provide money damages both in the form of cash as well as in the form of in-kind relief, such as coupons to purchase the defendant's products.[50]

As shown in Table 3, the vast majority of class actions settled in 2006 and 2007 provided cash relief to the class (89 percent), but a substantial number also provided in-kind relief (6 percent) or injunctive or declaratory relief (23 percent). As would be

Table 3:   The Percentage of 2006 and 2007 Class Action Settlements Providing Each Type of Relief in Each Subject Area

| Subject Matter | Cash | In-Kind Relief | Injunctive or Declaratory Relief |
|---|---|---|---|
| Securities | 100% | 0% | 2% |
| ($n = 257$) | | | |
| Labor and employment | 95% | 6% | 29% |
| ($n = 94$) | | | |
| Consumer | 74% | 30% | 37% |
| ($n = 87$) | | | |
| Employee benefits | 90% | 0% | 34% |
| ($n = 61$) | | | |
| Civil rights | 49% | 2% | 75% |
| ($n = 61$) | | | |
| Debt collection | 98% | 0% | 12% |
| ($n = 42$) | | | |
| Antitrust | 97% | 13% | 7% |
| ($n = 30$) | | | |
| Commercial | 92% | 0% | 62% |
| ($n = 13$) | | | |
| Other | 77% | 7% | 33% |
| ($n = 43$) | | | |
| All | 89% | 6% | 23% |
| ($n = 688$) | | | |

NOTE: Cash: cash, securities, refunds, charitable contributions, contributions to employee benefit plans, forgiven debt, relinquishment of liens or claims, and liquidated repairs to property. In-kind relief: vouchers, coupons, gift cards, warranty extensions, merchandise, services, and extended insurance policies. Injunctive or declaratory relief: modification of terms of employee benefit plans, modification of compensation practices, changes in business practices, capital improvements, research, and unliquidated repairs to property.

SOURCES: Westlaw, PACER, district court clerks' offices.

———

[49]See Fed. R. Civ. P. 23(b).

[50]These coupon settlements have become very controversial in recent years, and Congress discouraged them in the Class Action Fairness Act of 2005 by tying attorney fees to the value of coupons that were ultimately redeemed by class members as opposed to the value of coupons offered class members. See 28 U.S.C. § 1712.

expected in light of the focus on consumer cases in the debate over the anti-coupon provision in the Class Action Fairness Act of 2005,[51] consumer cases had the greatest percentage of settlements providing for in-kind relief (30 percent). Civil rights cases had the greatest percentage of settlements providing for injunctive or declaratory relief (75 percent), though almost half the civil rights cases also provided some cash relief (49 percent). The securities settlements were quite distinctive from the settlements in other areas in their singular focus on cash relief: every single securities settlement provided cash to the class and almost none provided in-kind, injunctive, or declaratory relief. This is but one example of how the focus on securities settlements in the prior empirical scholarship can lead to a distorted picture of class action litigation.

*H. Settlement Money*

Although securities settlements did not comprise the majority of federal class action settlements in 2006 and 2007, they did comprise the majority of the money—indeed, the *vast majority* of the money—involved in class action settlements. In Table 4, I report the total amount of ascertainable value involved in the 2006 and 2007 settlements. This amount

Table 4:   The Total Amount of Money Involved in Federal Class Action Settlements in 2006 and 2007

|  | *Total Ascertainable Monetary Value in Settlements (and Percentage of Overall Annual Total)* | | | |
|  | *2006 (n = 304)* | | *2007 (n = 384)* | |
| Subject Matter | | | | |
| Securities | $16,728 | 76% | $8,038 | 73% |
| Labor and employment | $266.5 | 1% | $547.7 | 5% |
| Consumer | $517.3 | 2% | $732.8 | 7% |
| Employee benefits | $443.8 | 2% | $280.8 | 3% |
| Civil rights | $265.4 | 1% | $81.7 | 1% |
| Debt collection | $8.9 | <1% | $5.7 | <1% |
| Antitrust | $1,079 | 5% | $660.5 | 6% |
| Commercial | $1,217 | 6% | $124.0 | 1% |
| Other | $1,568 | 7% | $592.5 | 5% |
| Total | $22,093 | 100% | $11,063 | 100% |

NOTE: Dollar amounts are in millions. Includes all determinate payments in cash or cash equivalents (such as marketable securities), including attorney fees and expenses, as well as any in-kind relief (such as coupons) or injunctive relief that was valued by the district court.
SOURCES:  Westlaw, PACER, district court clerks' offices.

———

[51]See, e.g., 151 Cong. Rec. H723 (2005) (statement of Rep. Sensenbrenner) (arguing that consumers are "seeing all of their gains go to attorneys and them just getting coupon settlements from the people who have allegedly done them wrong").

includes all determinate[52] payments in cash or cash equivalents (such as marketable securities), including attorney fees and expenses, as well as any in-kind relief (such as coupons) or injunctive relief that was valued by the district court.[53] I did not attempt to assign a value to any relief that was not valued by the district court (even if it may have been valued by class counsel). It should be noted that district courts did not often value in-kind or injunctive relief—they did so only 18 percent of the time—and very little of Table 4—only $1.3 billion, or 4 percent—is based on these valuations. It should also be noted that the amounts in Table 4 reflect only what defendants *agreed to pay*; they do not reflect the amounts that defendants *actually paid* after the claims administration process concluded. Prior empirical research has found that, depending on how settlements are structured (e.g., whether they awarded a fixed amount of money to each class member who eventually files a valid claim or a pro rata amount of a fixed settlement to each class member), defendants can end up paying much less than they agreed.[54]

Table 4 shows that in both years, around three-quarters of all the money involved in federal class action settlements came from securities cases. Thus, in this sense, the conventional wisdom about the dominance of securities cases in class action litigation is correct. Figure 3 is a graphical representation of the contribution each litigation area made to the total number and total amount of money involved in the 2006–2007 settlements.

Table 4 also shows that, in total, over $33 billion was approved in the 2006–2007 settlements. Over $22 billion was approved in 2006 and over $11 billion in 2007. It should be emphasized again that the totals in Table 4 understate the amount of money defendants agreed to pay in class action settlements in 2006 and 2007 because they exclude the unascertainable value of those settlements. This understatement disproportionately affects litigation areas, such as civil rights, where much of the relief is injunctive because, as I noted, very little of such relief was valued by district courts. Nonetheless, these numbers are, as far as I am aware, the first attempt to calculate how much money is involved in federal class action settlements in a given year.

The significant discrepancy between the two years is largely attributable to the 2006 securities settlement related to the collapse of Enron, which totaled $6.6 billion, as well as to the fact that seven of the eight 2006–2007 settlements for more than $1 billion were approved in 2006.[55] Indeed, it is worth noting that the eight settlements for more than $1

---

[52]For example, I excluded awards of a fixed amount of money to each class member who eventually filed a valid claim (as opposed to settlements that awarded a pro rata amount of a fixed settlement to each class member) if the total amount of money set aside to pay the claims was not set forth in the settlement documents.

[53]In some cases, the district court valued the relief in the settlement over a range. In these cases, I used the middle point in the range.

[54]See Hensler et al., supra note 7, at 427–30.

[55]See In re Enron Corp. Secs. Litig., MDL 1446 (S.D. Tex. May 24, 2006) ($6,600,000,000); In re Tyco Int'l Ltd. Multidistrict Litig., MDL 02-1335 (D.N.H. Dec. 19, 2007) ($3,200,000,000); In re AOL Time Warner, Inc. Secs. & "ERISA" Litig., MDL 1500 (S.D.N.Y. Apr. 6, 2006) ($2,500,000,000); In re: Diet Drugs Prods. Liab. Litig., MDL 1203 (E.D. Pa. May 24, 2006) ($1,275,000,000); In re Nortel Networks Corp. Secs. Litig. (Nortel I), No. 01-1855 (S.D.N.Y. Dec. 26, 2006) ($1,142,780,000); In re Royal Ahold N.V. Secs. & ERISA Litig., 03-1539 (D. Md. Jun. 16, 2006)

*Figure 3:*  The percentage of 2006–2007 federal class action settlements and settlement money from each subject area.



SOURCES:  Westlaw, PACER, district court clerks' offices.

billion accounted for almost $18 billion of the $33 billion that changed hands over the two-year period. That is, a mere 1 percent of the settlements comprised over 50 percent of the value involved in federal class action settlements in 2006 and 2007. To give some sense of the distribution of settlement size in the 2006–2007 data set, Table 5 sets forth the number of settlements with an ascertainable value beyond fee, expense, and class-representative incentive awards (605 out of the 688 settlements). Nearly two-thirds of all settlements fell below $10 million.

Given the disproportionate influence exerted by securities settlements on the total amount of money involved in class actions, it is unsurprising that the average securities settlement involved more money than the average settlement in most of the other subject areas. These numbers are provided in Table 6, which includes, again, only the settlements

---

($1,100,000,000); Allapattah Servs. Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006) ($1,075,000,000); In re Nortel Networks Corp. Secs. Litig. (Nortel II), No. 05-1659 (S.D.N.Y. Dec. 26, 2006) ($1,074,270,000).

Table 5: The Distribution by Size of 2006–2007 Federal Class Action Settlements with Ascertainable Value

| Settlement Size (in Millions) | Number of Settlements |
|---|---|
| [$0 to $1] | 131 |
| | (21.7%) |
| ($1 to $10] | 261 |
| | (43.1%) |
| ($10 to $50] | 139 |
| | (23.0%) |
| ($50 to $100] | 33 |
| | (5.45%) |
| ($100 to $500] | 31 |
| | (5.12%) |
| ($500 to $6,600] | 10 |
| | (1.65%) |
| Total | 605 |

NOTE: Includes only settlements with ascertainable value beyond merely fee, expense, and class-representative incentive awards.
SOURCES: Westlaw, PACER, district court clerks' offices.

Table 6: The Average and Median Settlement Amounts in the 2006–2007 Federal Class Action Settlements with Ascertainable Value to the Class

| Subject Matter | Average | Median |
|---|---|---|
| Securities ($n = 257$) | $96.4 | $8.0 |
| Labor and employment ($n = 88$) | $9.2 | $1.8 |
| Consumer ($n = 65$) | $18.8 | $2.9 |
| Employee benefits ($n = 52$) | $13.9 | $5.3 |
| Civil rights ($n = 34$) | $9.7 | $2.5 |
| Debt collection ($n = 40$) | $0.37 | $0.088 |
| Antitrust ($n = 29$) | $60.0 | $22.0 |
| Commercial ($n = 12$) | $111.7 | $7.1 |
| Other ($n = 28$) | $76.6 | $6.2 |
| All ($N = 605$) | $54.7 | $5.1 |

NOTE: Dollar amounts are in millions. Includes only settlements with ascertainable value beyond merely fee, expense, and class-representative incentive awards.
SOURCES: Westlaw, PACER, district court clerks' offices.

with an ascertainable value beyond fee, expense, and class-representative incentive awards. The average settlement over the entire two-year period for all types of cases was almost $55 million, but the median was only $5.1 million. (With the $6.6 billion Enron settlement excluded, the average settlement for all ascertainable cases dropped to $43.8 million and, for securities cases, dropped to $71.0 million.) The average settlements varied widely by litigation area, with securities and commercial settlements at the high end of around $100

million, but the median settlements for nearly every area were bunched around a few million dollars. It should be noted that the high average for commercial cases is largely due to one settlement above $1 billion;[56] when that settlement is removed, the average for commercial cases was only $24.2 million.

Table 6 permits comparison with the two prior empirical studies of class action settlements that sought to include nonsecurities as well as securities cases in their purview. The Eisenberg-Miller study through 2002, which included both common-fund and fee-shifting cases, found that the mean class action settlement was $112 million and the median was $12.9 million, both in 2006 dollars,[57] more than double the average and median I found for all settlements in 2006 and 2007. The Eisenberg-Miller update through 2008 included only common-fund cases and found mean and median settlements in federal court of $115 million and $11.7 million (both again in 2006 dollars),[58] respectively; this is still more than double the average and median I found. This suggests that the methodology used by the Eisenberg-Miller studies—looking at district court opinions that were published in Westlaw or Lexis—oversampled larger class actions (because opinions approving larger class actions are, presumably, more likely to be published than opinions approving smaller ones). It is also possible that the exclusion of fee-shifting cases from their data through 2008 contributed to this skew, although, given that their data through 2002 included fee-shifting cases and found an almost identical mean and median as their data through 2008, the primary explanation for the much larger mean and median in their study through 2008 is probably their reliance on published opinions. Over the same years examined by Professors Eisenberg and Miller, the Class Action Reports study found a smaller average settlement than I did ($39.5 million in 2006 dollars), but a larger median ($8.48 million in 2006 dollars). It is possible that the Class Action Reports methodology also oversampled larger class actions, explaining its larger median, but that there are more "mega" class actions today than there were before 2003, explaining its smaller mean.[59]

It is interesting to ask how significant the $16 billion that was involved annually in these 350 or so federal class action settlements is in the grand scheme of U.S. litigation. Unfortunately, we do not know how much money is transferred every year in U.S. litigation. The only studies of which I am aware that attempt even a partial answer to this question are the estimates of how much money is transferred in the U.S. "tort" system every year by a financial services consulting firm, Tillinghast-Towers Perrin.[60] These studies are not directly

---

[56]See Allapattah Servs. Inc. v. Exxon Corp., No. 91-0986 (S.D. Fla. Apr. 7, 2006) (approving $1,075,000,000 settlement).

[57]See Eisenberg & Miller, supra note 15, at 47.

[58]See Eisenberg & Miller II, supra note 16, at 262.

[59]There were eight class action settlements during 2006 and 2007 of more than $1 billion. See note 55 supra.

[60]Some commentators have been critical of Tillinghast's reports, typically on the ground that the reports overestimate the cost of the tort system. See M. Martin Boyer, Three Insights from the Canadian D&O Insurance Market: Inertia, Information and Insiders, 14 Conn. Ins. L.J. 75, 84 (2007); John Fabian Witt, Form and Substance in the Law of

comparable to the class action settlement numbers because, again, the number of tort class action settlements in 2006 and 2007 was very small. Nonetheless, as the tort system no doubt constitutes a large percentage of the money transferred in all litigation, these studies provide something of a point of reference to assess the significance of class action settlements. In 2006 and 2007, Tillinghast-Towers Perrin estimated that the U.S. tort system transferred $160 billion and $164 billion, respectively, to claimants and their lawyers.[61] The total amount of money involved in the 2006 and 2007 federal class action settlements reported in Table 4 was, therefore, roughly 10 percent of the Tillinghast-Towers Perrin estimate. This suggests that in merely 350 cases every year, federal class action settlements involve the same amount of wealth as 10 percent of the entire U.S. tort system. It would seem that this is a significant amount of money for so few cases.

## IV. Attorney Fees in Federal Class Action Settlements, 2006 and 2007

### A. Total Amount of Fees and Expenses

As I demonstrated in Section III, federal class action settlements involved a great deal of money in 2006 and 2007, some $16 billion a year. A perennial concern with class action litigation is whether class action lawyers are reaping an outsized portion of this money.[62] The 2006–2007 federal class action data suggest that these concerns may be exaggerated. Although class counsel were awarded some $5 billion in fees and expenses over this period, as shown in Table 7, only 13 percent of the settlement amount in 2006 and 20 percent of the amount in 2007 went to fee and expense awards.[63] The 2006 percentage is lower than the 2007 percentage in large part because the class action lawyers in the Enron securities settlement received less than 10 percent of the $6.6 billion corpus. In any event, the percentages in both 2006 and 2007 are far lower than the portions of settlements that contingency-fee lawyers receive in individual litigation, which are usually at least 33 percent.[64] Lawyers received less than 33 percent of settlements in fees and expenses in virtually every subject area in both years.

———

Counterinsurgency Damages, 41 Loy. L.A.L. Rev. 1455, 1475 n.135 (2008). If these criticisms are valid, then class action settlements would appear even more significant as compared to the tort system.

[61]See Tillinghast-Towers Perrin, U.S. Tort Costs: 2008 Update 5 (2008). The report calculates $252 billion in total tort "costs" in 2007 and $246.9 billion in 2006, id., but only 65 percent of those costs represent payments made to claimants and their lawyers (the remainder represents insurance administration costs and legal costs to defendants). See Tillinghast-Towers Perrin, U.S. Tort Costs: 2003 Update 17 (2003).

[62]See, e.g., Brian T. Fitzpatrick, Do Class Action Lawyers Make Too Little? 158 U. Pa. L. Rev. 2043, 2043–44 (2010).

[63]In some of the partial settlements, see note 29 supra, the district court awarded expenses for all the settlements at once and it was unclear what portion of the expenses was attributable to which settlement. In these instances, I assigned each settlement a pro rata portion of expenses. To the extent possible, all the fee and expense numbers in this article exclude any interest known to be awarded by the courts.

[64]See, e.g., Herbert M. Kritzer, The Wages of Risk: The Returns of Contingency Fee Legal Practice, 47 DePaul L. Rev. 267, 284–86 (1998) (reporting results of a survey of Wisconsin lawyers).

Table 7: The Total Amount of Fees and Expenses Awarded to Class Action Lawyers in Federal Class Action Settlements in 2006 and 2007

| Subject Matter | Total Fees and Expenses Awarded in Settlements (and as Percentage of Total Settlement Amounts) in Each Subject Area | |
| --- | --- | --- |
| | *2006* (n = 292) | *2007* (n = 363) |
| Securities | $1,899 (11%) | $1,467 (20%) |
| Labor and employment | $75.1 (28%) | $144.5 (26%) |
| Consumer | $126.4 (24%) | $65.3 (9%) |
| Employee benefits | $57.1 (13%) | $71.9 (26%) |
| Civil rights | $31.0 (12%) | $32.2 (39%) |
| Debt collection | $2.5 (28%) | $1.1 (19%) |
| Antitrust | $274.6 (26%) | $157.3 (24%) |
| Commercial | $347.3 (29%) | $18.2 (15%) |
| Other | $119.3 (8%) | $103.3 (17%) |
| Total | $2,932 (13%) | $2,063 (20%) |

NOTE: Dollar amounts are in millions. Excludes settlements in which fees were not (or at least not yet) sought (22 settlements), settlements in which fees have not yet been awarded (two settlements), and settlements in which fees could not be ascertained due to indefinite award amounts, missing documents, or nonpublic side agreements (nine settlements).

SOURCES: Westlaw, PACER, district court clerks' offices.

It should be noted that, in some respects, the percentages in Table 7 overstate the portion of settlements that were awarded to class action attorneys because, again, many of these settlements involved indefinite cash relief or noncash relief that could not be valued.[65] If the value of all this relief could have been included, then the percentages in Table 7 would have been even lower. On the other hand, as noted above, not all the money defendants agree to pay in class action settlements is ultimately collected by the class.[66] To the extent leftover money is returned to the defendant, the percentages in Table 7 understate the portion class action lawyers received relative to their clients.

## B. Method of Awarding Fees

District court judges have a great deal of discretion in how they set fee awards in class action cases. Under Rule 23, federal judges are told only that the fees they award to class counsel

---

[65]Indeed, the large year-to-year variation in the percentages in labor, consumer, and employee benefits cases arose because district courts made particularly large valuations of the equitable relief in a few settlements and used the lodestar method to calculate the fees in these settlements (and thereby did not consider their large valuations in calculating the fees).

[66]See Hensler et al., supra note 7, at 427–30.

must be "reasonable."[67] Courts often exercise this discretion by choosing between two approaches: the lodestar approach or the percentage-of-the-settlement approach.[68] The lodestar approach works much the way it does in individual litigation: the court calculates the fee based on the number of hours class counsel actually worked on the case multiplied by a reasonable hourly rate and a discretionary multiplier.[69] The percentage-of-the-settlement approach bases the fee on the size of the settlement rather than on the hours class counsel actually worked: the district court picks a percentage of the settlement it thinks is reasonable based on a number of factors, one of which is often the fee lodestar (sometimes referred to as a "lodestar cross-check").[70] My 2006–2007 data set shows that the percentage-of-the-settlement approach has become much more common than the lodestar approach. In 69 percent of the settlements reported in Table 7, district court judges employed the percentage-of-the-settlement method with or without the lodestar cross-check. They employed the lodestar method in only 12 percent of settlements. In the other 20 percent of settlements, the court did not state the method it used or it used another method altogether.[71] The pure lodestar method was used most often in consumer (29 percent) and debt collection (45 percent) cases. These numbers are fairly consistent with the Eisenberg-Miller data from 2003 to 2008. They found that the lodestar method was used in only 9.6 percent of settlements.[72] Their number is no doubt lower than the 12 percent number found in my 2006–2007 data set because they excluded fee-shifting cases from their study.

*C. Variation in Fees Awarded*

Not only do district courts often have discretion to choose between the lodestar method and the percentage-of-the-settlement method, but each of these methods leaves district courts with a great deal of discretion in how the method is ultimately applied. The courts

---

[67]Fed. R. Civ. P. 23(h).

[68]The discretion to pick between these methods is most pronounced in settlements where the underlying claim was not found in a statute that would shift attorney fees to the defendant. See, e.g., In re Thirteen Appeals Arising out of San Juan DuPont Plaza Hotel Fire Litig., 56 F.3d 295, 307 (1st Cir. 1995) (permitting either percentage or lodestar method in common-fund cases); Goldberger v. Integrated Res. Inc., 209 F.3d 43, 50 (2d Cir. 2000) (same); Rawlings v. Prudential-Bache Props., Inc., 9 F.3d 513, 516 (6th Cir. 1993) (same). By contrast, courts typically used the lodestar approach in settlements arising from fee-shifting cases.

[69]See Eisenberg & Miller, supra note 15, at 31.

[70]Id. at 31–32.

[71]These numbers are based on the fee method described in the district court's order awarding fees, unless the order was silent, in which case the method, if any, described in class counsel's motion for fees (if it could be obtained) was used. If the court explicitly justified the fee award by reference to its percentage of the settlement, I counted it as the percentage method. If the court explicitly justified the award by reference to a lodestar calculation, I counted it as the lodestar method. If the court explicitly justified the award by reference to both, I counted it as the percentage method with a lodestar cross-check. If the court calculated neither a percentage nor the fee lodestar in its order, then I counted it as an "other" method.

[72]See Eisenberg & Miller II, supra note 16, at 267.

that use the percentage-of-the-settlement method usually rely on a multifactor test[73] and, like most multifactor tests, it can plausibly yield many results. It is true that in many of these cases, judges examine the fee percentages that other courts have awarded to guide their discretion.[74] In addition, the Ninth Circuit has adopted a presumption that 25 percent is the proper fee award percentage in class action cases.[75] Moreover, in securities cases, some courts presume that the proper fee award percentage is the one class counsel agreed to when it was hired by the large shareholder that is now usually selected as the lead plaintiff in such cases.[76] Nonetheless, presumptions, of course, can be overcome and, as one court has put it, "[t]here is no hard and fast rule mandating a certain percentage . . . which may reasonably be awarded as a fee because the amount of any fee must be determined upon the facts of each case."[77] The court added: "[i]ndividualization in the exercise of a discretionary power [for fee awards] will alone retain equity as a living system and save it from sterility."[78] It is therefore not surprising that district courts awarded fees over a broad range when they used the percentage-of-the-settlement method. Figure 4 is a graph of the distribution of fee awards as a percentage of the settlement in the 444 cases where district courts used the percentage method with or without a lodestar cross-check and the fee percentages were ascertainable. These fee awards are exclusive of awards for expenses whenever the awards could be separated by examining either the district court's order or counsel's motion for fees and expenses (which was 96 percent of the time). The awards ranged from 3 percent of the settlement to 47 percent of the settlement. The average award was 25.4 percent and the median was 25 percent. Most fee awards were between 25 percent and 35 percent, with almost no awards more than 35 percent. The Eisenberg-Miller study through 2008 found a slightly lower mean (24 percent) but the same median (25 percent) among its federal court settlements.[79]

It should be noted that in 218 of these 444 settlements (49 percent), district courts said they considered the lodestar calculation as a factor in assessing the reasonableness of the fee percentages awarded. In 204 of these settlements, the lodestar multiplier resulting

―――――

[73]The Eleventh Circuit, for example, has identified a nonexclusive list of 15 factors that district courts might consider. See Camden I Condo. Ass'n, Inc. v. Dunkle, 946 F.2d 768, 772 n.3, 775 (11th Cir. 1991). See also In re Tyco Int'l, Ltd. Multidistrict Litig., 535 F. Supp. 2d 249, 265 (D.N.H. 2007) (five factors); Goldberger v. Integrated Res. Inc., 209 F.3d 43, 50 (2d Cir. 2000) (six factors); Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000) (seven factors); In re Royal Ahold N.V. Sec. & ERISA Litig., 461 F. Supp. 2d 383, 385 (D. Md. 2006) (13 factors); Brown v. Phillips Petroleum Co., 838 F.2d 451, 454 (10th Cir. 1988) (12 factors); In re Baan Co. Sec. Litig., 288 F. Supp. 2d 14, 17 (D.D.C. 2003) (seven factors).

[74]See Eisenberg & Miller, supra note 15, at 32.

[75]See Staton v. Boeing Co., 327 F.3d 938, 968 (9th Cir. 2003).

[76]See, e.g., In re Cendant Corp. Litig., 264 F.3d 201, 282 (3d Cir. 2001).

[77]*Camden I Condo. Ass'n*, 946 F.2d at 774.

[78]*Camden I Condo. Ass'n*, 946 F.2d at 774 (alterations in original and internal quotation marks omitted).

[79]See Eisenberg & Miller II, supra note 16, at 259.

*Figure 4:*  The distribution of 2006–2007 federal class action fee awards using the percentage-of-the-settlement method with or without lodestar cross-check.



from the fee award could be ascertained. The lodestar multiplier in these cases ranged from 0.07 to 10.3, with a mean of 1.65 and a median of 1.34. Although there is always the possibility that class counsel are optimistic with their timesheets when they submit them for lodestar consideration, these lodestar numbers—only one multiplier above 6.0, with the bulk of the range not much above 1.0—strike me as fairly parsimonious for the risk that goes into any piece of litigation and cast doubt on the notion that the percentage-of-the-settlement method results in windfalls to class counsel.[80]

Table 8 shows the mean and median fee percentages awarded in each litigation subject area. The fee percentages did not appear to vary greatly across litigation subject areas, with most mean and median awards between 25 percent and 30 percent. As I report later in this section, however, after controlling for other variables, there were statistically significant differences in the fee percentages awarded in some subject areas compared to others. The mean and median percentages for securities cases were 24.7 percent and 25.0 percent, respectively; for all nonsecurities cases, the mean and median were 26.1 percent and 26.0 percent, respectively. The Eisenberg-Miller study through 2008 found mean awards ranging from 21–27 percent and medians from 19–25 percent,[81] a bit lower than the ranges in my

---

[80]It should be emphasized, of course, that these 204 settlements may not be representative of the settlements where the percentage-of-the-settlement method was used without the lodestar cross-check.

[81]See Eisenberg & Miller II, supra note 16, at 262.

Table 8: Fee Awards in 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| | Percentage of Settlement Awarded as Fees | |
| --- | --- | --- |
| Subject Matter | Mean | Median |
| Securities (n = 233) | 24.7 | 25.0 |
| Labor and employment (n = 61) | 28.0 | 29.0 |
| Consumer (n = 39) | 23.5 | 24.6 |
| Employee benefits (n = 37) | 26.0 | 28.0 |
| Civil rights (n = 20) | 29.0 | 30.3 |
| Debt collection (n = 5) | 24.2 | 25.0 |
| Antitrust (n = 23) | 25.4 | 25.0 |
| Commercial (n = 7) | 23.3 | 25.0 |
| Other (n = 19) | 24.9 | 26.0 |
| All (N = 444) | 25.7 | 25.0 |

Sources: Westlaw, PACER, district court clerks' offices.

2006–2007 data set, which again, may be because they oversampled larger settlements (as I show below, district courts awarded smaller fee percentages in larger cases).

In light of the fact that, as I noted above, the distribution of class action settlements among the geographic circuits does not track their civil litigation dockets generally, it is interesting to ask whether one reason for the pattern in class action cases is that circuits oversubscribed with class actions award higher fee percentages. Although this question will be taken up with more sophistication in the regression analysis below, it is worth describing here the mean and median fee percentages in each of the circuits. Those data are presented in Table 9. Contrary to the hypothesis set forth in Section III, two of the circuits most oversubscribed with class actions, the Second and the Ninth, were the only circuits in which the mean fee awards were *under* 25 percent. As I explain below, these differences are statistically significant and remain so after controlling for other variables.

The lodestar method likewise permits district courts to exercise a great deal of leeway through the application of the discretionary multiplier. Figure 5 shows the distribution of lodestar multipliers in the 71 settlements in which district courts used the lodestar method and the multiplier could be ascertained. The average multiplier was 0.98 and the median was 0.92, which suggest that courts were not terribly prone to exercise their discretion to deviate from the amount of money encompassed in the lodestar calculation. These 71

Table 9: Fee Awards in 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| | Percentage of Settlement Awarded as Fees | |
| Circuit | Mean | Median |
| --- | --- | --- |
| First | 27.0 | 25.0 |
| (*n* = 27) | | |
| Second | 23.8 | 24.5 |
| (*n* = 72) | | |
| Third | 25.4 | 29.3 |
| (*n* = 50) | | |
| Fourth | 25.2 | 28.0 |
| (*n* = 19) | | |
| Fifth | 26.4 | 29.0 |
| (*n* = 27) | | |
| Sixth | 26.1 | 28.0 |
| (*n* = 25) | | |
| Seventh | 27.4 | 29.0 |
| (*n* = 39) | | |
| Eighth | 26.1 | 30.0 |
| (*n* = 15) | | |
| Ninth | 23.9 | 25.0 |
| (*n* = 111) | | |
| Tenth | 25.3 | 25.5 |
| (*n* = 18) | | |
| Eleventh | 28.1 | 30.0 |
| (*n* = 35) | | |
| DC | 26.9 | 26.0 |
| (*n* = 6) | | |

SOURCES: Westlaw, PACER, district court clerks' offices.

settlements were heavily concentrated within the consumer (median multiplier 1.13) and debt collection (0.66) subject areas. If cases in which district courts used the percentage-of-the-settlement method with a lodestar cross-check are combined with the lodestar cases, the average and median multipliers (in the 263 cases where the multipliers were ascertainable) were 1.45 and 1.19, respectively. Again—putting to one side the possibility that class counsel are optimistic with their timesheets—these multipliers appear fairly modest in light of the risk involved in any piece of litigation.

### D. Factors Influencing Percentage Awards

Whether district courts are exercising their discretion over fee awards wisely is an important public policy question given the amount of money at stake in class action settlements. As shown above, district court judges awarded class action lawyers nearly $5 billion in fees and expenses in 2006–2007. Based on the comparison to the tort system set forth in Section III, it is not difficult to surmise that in the 350 or so settlements every year, district court judges

*Figure 5:* The distribution of lodestar multipliers in 2006–2007 federal class action fee awards using the lodestar method.



Sources: Westlaw, PACER, district court clerks' offices.

are awarding a significant portion of all the annual compensation received by contingency-fee lawyers in the United States. Moreover, contingency fees are arguably the engine that drives much of the noncriminal regulation in the United States; unlike many other nations, we regulate largely through the ex post, decentralized device of litigation.[82] To the extent district courts could have exercised their discretion to award billions more or billions less to class action lawyers, district courts have been delegated a great deal of leeway over a big chunk of our regulatory horsepower. It is therefore worth examining how district courts exercise their discretion over fees. This examination is particularly important in cases where district courts use the percentage-of-the-settlement method to award fees: not only do such cases comprise the vast majority of settlements, but they comprise the vast majority of the money awarded as fees. As such, the analysis that follows will be confined to the 444 settlements where the district courts used the percentage-of-the-settlement method.

As I noted, prior empirical studies have shown that fee percentages are strongly and inversely related to the size of the settlement both in securities fraud and other cases. As shown in Figure 6, the 2006–2007 data are consistent with prior studies. Regression analysis, set forth in more detail below, confirms that after controlling for other variables, fee percentage is strongly and inversely associated with settlement size among all cases, among securities cases, and among all nonsecurities cases.

--------

[82]See, e.g., Samuel Issacharoff, Regulating after the Fact, 56 DePaul L. Rev. 375, 377 (2007).

*Figure 6:*   Fee awards as a function of settlement size in 2006–2007 class action cases using the percentage-of-the-settlement method with or without lodestar cross-check.



SOURCES:  Westlaw, PACER, district court clerks' offices.

As noted above, courts often look to fee percentages in other cases as one factor they consider in deciding what percentage to award in a settlement at hand. In light of this practice, and in light of the fact that the size of the settlement has such a strong relationship to fee percentages, scholars have tried to help guide the practice by reporting the distribution of fee percentages across different settlement sizes.[83] In Table 10, I follow the Eisenberg-Miller studies and attempt to contribute to this guidance by setting forth the mean and median fee percentages, as well as the standard deviation, for each decile of the 2006–2007 settlements in which courts used the percentage-of-the-settlement method to award fees. The mean percentages ranged from over 28 percent in the first decile to less than 19 percent in the last decile.

It should be noted that the last decile in Table 10 covers an especially wide range of settlements, those from $72.5 million to the Enron settlement of $6.6 billion. To give more meaningful data to courts that must award fees in the largest settlements, Table 11 shows the last decile broken into additional cut points. When both Tables 10 and 11 are examined together, it appears that fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent, and by the time $500 million was reached, they plunged well below 15 percent, with most awards at that level under even 10 percent.

_____

[83]See Eisenberg & Miller II, supra note 16, at 265.

Table 10:   Mean, Median, and Standard Deviation of Fee Awards by Settlement Size in 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| Settlement Size (in Millions) | Mean | Median | SD |
| --- | --- | --- | --- |
| [$0 to $0.75] (*n* = 45) | 28.8% | 29.6% | 6.1% |
| ($0.75 to $1.75] (*n* = 44) | 28.7% | 30.0% | 6.2% |
| ($1.75 to $2.85] (*n* = 45) | 26.5% | 29.3% | 7.9% |
| ($2.85 to $4.45] (*n* = 45) | 26.0% | 27.5% | 6.3% |
| ($4.45 to $7.0] (*n* = 44) | 27.4% | 29.7% | 5.1% |
| ($7.0 to $10.0] (*n* = 43) | 26.4% | 28.0% | 6.6% |
| ($10.0 to $15.2] (*n* = 45) | 24.8% | 25.0% | 6.4% |
| ($15.2 to $30.0] (*n* = 46) | 24.4% | 25.0% | 7.5% |
| ($30.0 to $72.5] (*n* = 42) | 22.3% | 24.9% | 8.4% |
| ($72.5 to $6,600] (*n* = 45) | 18.4% | 19.0% | 7.9% |

Sources: Westlaw, PACER, district court clerks' offices.

Table 11:   Mean, Median, and Standard Deviation of Fee Awards of the Largest 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| Settlement Size (in Millions) | Mean | Median | SD |
| --- | --- | --- | --- |
| ($72.5 to $100] (*n* = 12) | 23.7% | 24.3% | 5.3% |
| ($100 to $250] (*n* = 14) | 17.9% | 16.9% | 5.2% |
| ($250 to $500] (*n* = 8) | 17.8% | 19.5% | 7.9% |
| ($500 to $1,000] (*n* = 2) | 12.9% | 12.9% | 7.2% |
| ($1,000 to $6,600] (*n* = 9) | 13.7% | 9.5% | 11% |

Sources: Westlaw, PACER, district court clerks' offices.

Prior empirical studies have not examined whether fee awards are associated with the political affiliation of the district court judges making the awards. This is surprising because realist theories of judicial court behavior would predict that political affiliation would influence fee decisions.[84] It is true that as a general matter, political affiliation may influence district court judges to a lesser degree than it does appellate judges (who have been the focus of most of the prior empirical studies of realist theories): district court judges decide more routine cases and are subject to greater oversight on appeal than appellate judges. On the other hand, class action settlements are a bit different in these regards than many other decisions made by district court judges. To begin with, class action settlements are almost never appealed, and when they are, the appeals are usually settled before the appellate court hears the case.[85] Thus, district courts have much less reason to worry about the constraint of appellate review in fashioning fee awards. Moreover, one would think the potential for political affiliation to influence judicial decision making is greatest when legal sources lead to indeterminate outcomes and when judicial decisions touch on matters that are salient in national politics. (The more salient a matter is, the more likely presidents will select judges with views on the matter and the more likely those views will diverge between Republicans and Democrats.) Fee award decisions would seem to satisfy both these criteria. The law of fee awards, as explained above, is highly discretionary, and fee award decisions are wrapped up in highly salient political issues such as tort reform and the relative power of plaintiffs' lawyers and corporations. I would expect to find that judges appointed by Democratic presidents awarded higher fees in the 2006–2007 settlements than did judges appointed by Republican presidents.

The data, however, do not appear to bear this out. Of the 444 fee awards using the percentage-of-the-settlement approach, 52 percent were approved by Republican appointees, 45 percent were approved by Democratic appointees, and 4 percent were approved by non-Article III judges (usually magistrate judges). The mean fee percentage approved by Republican appointees (25.6 percent) was slightly *greater* than the mean approved by Democratic appointees (24.9 percent). The medians (25 percent) were the same.

To examine whether the realist hypothesis fared better after controlling for other variables, I performed regression analysis of the fee percentage data for the 427 settlements approved by Article III judges. I used ordinary least squares regression with the dependent variable the percentage of the settlement that was awarded in fees.[86] The independent

---

[84]See generally C.K. Rowland & Robert A. Carp, Politics and Judgment in Federal District Courts (1996). See also Max M. Schanzenbach & Emerson H. Tiller, Reviewing the Sentencing Guidelines: Judicial Politics, Empirical Evidence, and Reform, 75 U. Chi. L. Rev. 715, 724–25 (2008).

[85]See Brian T. Fitzpatrick, The End of Objector Blackmail? 62 Vand. L. Rev. 1623, 1640, 1634–38 (2009) (finding that less than 10 percent of class action settlements approved by federal courts in 2006 were appealed by class members).

[86]Professors Eisenberg and Miller used a square root transformation of the fee percentages in some of their regressions. I ran all the regressions using this transformation as well and it did not appreciably change the results. I also ran the regressions using a natural log transformation of fee percentage and with the dependent variable natural log of the fee amount (as opposed to the fee percentage). None of these models changed the results

variables were the natural log of the amount of the settlement, the natural log of the age of the case (in days), indicator variables for whether the class was certified as a settlement class, for litigation subject areas, and for circuits, as well as indicator variables for whether the judge was appointed by a Republican or Democratic president and for the judge's race and gender.[87]

The results for five regressions are in Table 12. In the first regression (Column 1), only the settlement amount, case age, and judge's political affiliation, gender, and race were included as independent variables. In the second regression (Column 2), all the independent variables were included. In the third regression (Column 3), only securities cases were analyzed, and in the fourth regression (Column 4), only nonsecurities cases were analyzed.

In none of these regressions was the political affiliation of the district court judge associated with fee percentage in a statistically significant manner.[88] One possible explanation for the lack of evidence for the realist hypothesis is that district court judges elevate other preferences above their political and ideological ones. For example, district courts of both political stripes may succumb to docket-clearing pressures and largely rubber stamp whatever fee is requested by class counsel; after all, these requests are rarely challenged by defendants. Moreover, if judges award class counsel whatever they request, class counsel will not appeal and, given that, as noted above, class members rarely appeal settlements (and when they do, often settle them before the appeal is heard),[89] judges can thereby virtually guarantee there will be no appellate review of their settlement decisions. Indeed, scholars have found that in the vast majority of cases, the fees ultimately awarded by federal judges are little different than those sought by class counsel.[90]

Another explanation for the lack of evidence for the realist hypothesis is that my data set includes both unpublished as well as published decisions. It is thought that realist theories of judicial behavior lose force in unpublished judicial decisions. This is the case because the kinds of questions for which realist theories would predict that judges have the most room to let their ideologies run are questions for which the law is ambiguous; it is

──────

appreciably. The regressions were also run with and without the 2006 Enron settlement because it was such an outlier ($6.6 billion); the case did not change the regression results appreciably. For every regression, the data and residuals were inspected to confirm the standard assumptions of linearity, homoscedasticity, and the normal distribution of errors.

[87] Prior studies of judicial behavior have found that the race and sex of the judge can be associated with his or her decisions. See, e.g., Adam B. Cox & Thomas J. Miles, Judging the Voting Rights Act, 108 Colum. L. Rev. 1 (2008); Donald R. Songer et al., A Reappraisal of Diversification in the Federal Courts: Gender Effects in the Courts of Appeals, 56 J. Pol. 425 (1994).

[88] Although these coefficients are not reported in Table 8, the gender of the district court judge was never statistically significant. The race of the judge was only occasionally significant.

[89] See Fitzpatrick, supra note 85, at 1640.

[90] See Eisenberg & Miller II, supra note 16, at 270 (finding that state and federal judges awarded the fees requested by class counsel in 72.5 percent of settlements); Eisenberg, Miller & Perino, supra note 9, at 22 ("judges take a light touch when it comes to reviewing fee requests").

Table 12:   Regression of Fee Percentages in 2006–2007 Settlements Using Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| | Regression Coefficients (and Robust t Statistics) | | | | |
|---|---|---|---|---|---|
| *Independent Variable* | *1* | *2* | *3* | *4* | *5* |
| Settlement amount (natural log) | −1.77 | −1.76 | −1.76 | −1.41 | −1.78 |
| | (−5.43)** | (−8.52)** | (−7.16)** | (−4.00)** | (−8.67)** |
| Age of case (natural log days) | 1.66 | 1.99 | 1.13 | 1.72 | 2.00 |
| | (2.31)** | (2.71)** | (1.21) | (1.47) | (2.69)** |
| Judge's political affiliation (1 = Democrat) | −0.630 | −0.345 | 0.657 | −1.43 | −0.232 |
| | (−0.83) | (−0.49) | (0.76) | (−1.20) | (−0.34) |
| Settlement class | | 0.150 | 0.873 | −1.62 | 0.124 |
| | | (0.19) | (0.84) | (−1.00) | (0.15) |
| 1st Circuit | | 3.30 | 4.41 | 0.031 | 0.579 |
| | | (2.74)** | (3.32)** | (0.01) | (0.51) |
| 2d Circuit | | 0.513 | −0.813 | 2.93 | −2.23 |
| | | (0.44) | (−0.61) | (1.14) | (−1.98)** |
| 3d Circuit | | 2.25 | 4.00 | −1.11 | — |
| | | (1.99)** | (3.85)** | (−0.50) | |
| 4th Circuit | | 2.34 | 0.544 | 3.81 | — |
| | | (1.22) | (0.19) | (1.35) | |
| 5th Circuit | | 2.98 | 1.09 | 6.11 | 0.230 |
| | | (1.90)* | (0.65) | (1.97)** | (0.15) |
| 6th Circuit | | 2.91 | 0.838 | 4.41 | — |
| | | (2.28)** | (0.57) | (2.15)** | |
| 7th Circuit | | 2.55 | 3.22 | 2.90 | −0.227 |
| | | (2.23)** | (2.36)** | (1.46) | (−0.20) |
| 8th Circuit | | 2.12 | −0.759 | 3.73 | −0.586 |
| | | (0.97) | (−0.24) | (1.19) | (−0.28) |
| 9th Circuit | | — | — | — | −2.73 |
| | | | | | (−3.44)** |
| 10th Circuit | | 1.45 | −0.254 | 3.16 | — |
| | | (0.94) | (−0.13) | (1.29) | |
| 11th Circuit | | 4.05 | 3.85 | 4.14 | — |
| | | (3.44)** | (3.07)** | (1.88)* | |
| DC Circuit | | 2.76 | 2.60 | 2.41 | — |
| | | (1.10) | (0.80) | (0.64) | |
| Securities case | | — | | | — |
| Labor and employment case | | 2.93 | | — | 2.85 |
| | | (3.00)** | | | (2.94)** |
| Consumer case | | −1.65 | | −4.39 | −1.62 |
| | | (−0.88) | | (−2.20)** | (−0.88) |
| Employee benefits case | | −0.306 | | −4.23 | −0.325 |
| | | (−0.23) | | (−2.55)** | (−0.26) |
| Civil rights case | | 1.85 | | −2.05 | 1.76 |
| | | (0.99) | | (−0.97) | (0.95) |
| Debt collection case | | −4.93 | | −7.93 | −5.04 |
| | | (−1.71)* | | (−2.49)** | (−1.75)* |
| Antitrust case | | 3.06 | | 0.937 | 2.78 |
| | | (2.11)** | | (0.47) | (1.98)** |

Table 12   *Continued*

| Independent Variable | Regression Coefficients (and Robust t Statistics) | | | | |
|---|---|---|---|---|---|
| | *1* | *2* | *3* | *4* | *5* |
| Commercial case | | −0.028 | | −2.65 | 0.178 |
| | | (−0.01) | | (−0.73) | (0.05) |
| Other case | | −0.340 | | −3.73 | −0.221 |
| | | (−0.17) | | (−1.65) | (−0.11) |
| Constant | 42.1 | 37.2 | 43.0 | 38.2 | 40.1 |
| | (7.29)** | (6.08)** | (6.72)** | (4.14)** | (7.62)** |
| *N* | 427 | 427 | 232 | 195 | 427 |
| $R^2$ | .20 | .26 | .37 | .26 | .26 |
| Root MSE | 6.59 | 6.50 | 5.63 | 7.24 | 6.48 |

NOTE:  **significant at the 5 percent level; *significant at the 10 percent level. Standard errors in Column 1 were clustered by circuit. Indicator variables for race and gender were included in each regression but not reported.

SOURCES:  Westlaw, PACER, district court clerks' offices, Federal Judicial Center.

thought that these kinds of questions are more often answered in published opinions.[91] Indeed, most of the studies finding an association between ideological beliefs and case outcomes were based on data sets that included only published opinions.[92] On the other hand, there is a small but growing number of studies that examine unpublished opinions as well, and some of these studies have shown that ideological effects persisted.[93] Nonetheless, in light of the discretion that judges exercise with respect to fee award decisions, it hard to characterize *any* decision in this area as "unambiguous." Thus, even when unpublished, I would have expected the fee award decisions to exhibit an association with ideological beliefs. Thus, I am more persuaded by the explanation suggesting that judges are more concerned with clearing their dockets or insulating their decisions from appeal in these cases than with furthering their ideological beliefs.

In all the regressions, the size of the settlement was strongly and inversely associated with fee percentages. Whether the case was certified as a settlement class was not associated

---

[91]See, e.g., Ahmed E. Taha, Data and Selection Bias: A Case Study, 75 UMKC L. Rev. 171, 179 (2006).

[92]Id. at 178–79.

[93]See, e.g., David S. Law, Strategic Judicial Lawmaking: Ideology, Publication, and Asylum Law in the Ninth Circuit, 73 U. Cin. L. Rev. 817, 843 (2005); Deborah Jones Merritt & James J. Brudney, Stalking Secret Law: What Predicts Publication in the United States Courts of Appeals, 54 Vand. L. Rev. 71, 109 (2001); Donald R. Songer, Criteria for Publication of Opinions in the U.S. Courts of Appeals: Formal Rules Versus Empirical Reality, 73 Judicature 307, 312 (1990). At the trial court level, however, the studies of civil cases have found no ideological effects. See Laura Beth Nielsen, Robert L. Nelson & Ryon Lancaster, Individual Justice or Collective Legal Mobilization? Employment Discrimination Litigation in the Post Civil Rights United States, 7 J. Empirical Legal Stud. 175, 192–93 (2010); Denise M. Keele et al., An Analysis of Ideological Effects in Published Versus Unpublished Judicial Opinions, 6 J. Empirical Legal Stud. 213, 230 (2009); Orley Ashenfelter, Theodore Eisenberg & Stewart J. Schwab, Politics and the Judiciary: The Influence of Judicial Background on Case Outcomes, 24 J. Legal Stud. 257, 276–77 (1995). With respect to criminal cases, there is at least one study at the trial court level that has found ideological effects. See Schanzenbach & Tiller, supra note 81, at 734.

with fee percentages in any of the regressions. The age of the case at settlement was associated with fee percentages in the first two regressions, and when the settlement class variable was removed in regressions 3 and 4, the age variable became positively associated with fee percentages in nonsecurities cases but remained insignificant in securities cases. Professors Eisenberg and Miller likewise found that the age of the case at settlement was positively associated with fee percentages in their 1993–2002 data set,[94] and that settlement classes were not associated with fee percentages in their 2003–2008 data set.[95]

Although the structure of these regressions did not permit extensive comparisons of fee awards across different litigation subject areas, fee percentages appeared to vary somewhat depending on the type of case that settled. Securities cases were used as the baseline litigation subject area in the second and fifth regressions, permitting a comparison of fee awards in each nonsecurities area with the awards in securities cases. These regressions show that awards in a few areas, including labor/employment and antitrust, were more lucrative than those in securities cases. In the fourth regression, which included only nonsecurities cases, labor and employment cases were used as the baseline litigation subject area, permitting comparison between fee percentages in that area and the other nonsecurities areas. This regression shows that fee percentages in several areas, including consumer and employee benefits cases, were lower than the percentages in labor and employment cases.

In the fifth regression (Column 5 of Table 12), I attempted to discern whether the circuits identified in Section III as those with the most overrepresented (the First, Second, Seventh, and Ninth) and underrepresented (the Fifth and Eighth) class action dockets awarded attorney fees differently than the other circuits. That is, perhaps district court judges in the First, Second, Seventh, and Ninth Circuits award greater percentages of class action settlements as fees than do the other circuits, whereas district court judges in the Fifth and Eighth Circuits award smaller percentages. To test this hypothesis, in the fifth regression, I included indicator variables only for the six circuits with unusual dockets to measure their fee awards against the other six circuits combined. The regression showed statistically significant association with fee percentages for only two of the six unusual circuits: the Second and Ninth Circuits. In both cases, however, the direction of the association (i.e., the Second and Ninth Circuits awarded *smaller* fees than the baseline circuits) was opposite the hypothesized direction.[96]

––––––

[94]See Eisenberg & Miller, supra note 15, at 61.

[95]See Eisenberg & Miller II, supra note 16, at 266.

[96]This relationship persisted when the regressions were rerun among the securities and nonsecurities cases separately. I do not report these results, but, even though the First, Second, and Ninth Circuits were oversubscribed with securities class action settlements and the Fifth, Sixth, and Eighth were undersubscribed, there was no association between fee percentages and any of these unusual circuits except, again, the inverse association with the Second and Ninth Circuits. In nonsecurities cases, even though the Seventh and Ninth Circuits were oversubscribed and the Fifth and the Eighth undersubscribed, there was no association between fee percentages and any of these unusual circuits except again for the inverse association with the Ninth Circuit.

The lack of the expected association with the unusual circuits might be explained by the fact that class action lawyers forum shop along dimensions other than their potential fee awards; they might, for example, put more emphasis on favorable class-certification law because there can be no fee award if the class is not certified. As noted above, it might also be the case that class action lawyers are unable to engage in forum shopping at all because defendants are able to transfer venue to the district in which they are headquartered or another district with a significant connection to the litigation.

It is unclear why the Second and Ninth Circuits were associated with lower fee awards despite their heavy class action dockets. Indeed, it should be noted that the Ninth Circuit was the baseline circuit in the second, third, and fourth regressions and, in all these regressions, district courts in the Ninth Circuit awarded smaller fees than courts in many of the other circuits. The lower fees in the Ninth Circuit may be attributable to the fact that it has adopted a presumption that the proper fee to be awarded in a class action settlement is 25 percent of the settlement.[97] This presumption may make it more difficult for district court judges to award larger fee percentages. The lower awards in the Second Circuit are more difficult to explain, but it should be noted that the difference between the Second Circuit and the baseline circuits went away when the fifth regression was rerun with only nonsecurities cases.[98] This suggests that the awards in the Second Circuit may be lower *only* in securities cases. In any event, it should be noted that the lower fee awards from the Second and Ninth Circuits contrast with the findings in the Eisenberg-Miller studies, which found no intercircuit differences in fee awards in common-fund cases in their data through 2008.[99]

# V. Conclusion

This article has attempted to fill some of the gaps in our knowledge about class action litigation by reporting the results of an empirical study that attempted to collect all class action settlements approved by federal judges in 2006 and 2007. District court judges approved 688 class action settlements over this two-year period, involving more than $33 billion. Of this $33 billion, nearly $5 billion was awarded to class action lawyers, or about 15 percent of the total. District courts typically awarded fees using the highly discretionary percentage-of-the-settlement method, and fee awards varied over a wide range under this method, with a mean and median around 25 percent. Fee awards using this method were strongly and inversely associated with the size of the settlement. Fee percentages were positively associated with the age of the case at settlement. Fee percentages were not associated with whether the class action was certified as a settlement class or with the

---

[97]See note 75 supra. It should be noted that none of the results from the previous regressions were affected when the Ninth Circuit settlements were excluded from the data.

[98]The Ninth Circuit's differences persisted.

[99]See Eisenberg & Miller II, supra note 16, at 260.

political affiliation of the judge who made the award. Finally, there appeared to be some variation in fee percentages depending on subject matter of the litigation and the geographic circuit in which the district court was located. Fee percentages in securities cases were lower than the percentages in some but not all of the other litigation areas, and district courts in the Ninth Circuit and in the Second Circuit (in securities cases) awarded lower fee percentages than district courts in several other circuits. The lower awards in the Ninth Circuit may be attributable to the fact that it is the only circuit that has adopted a presumptive fee percentage of 25 percent.

# Exhibit 3

<u>Documents reviewed:</u>

- Memorandum Opinion (denying motions to dismiss) (document 204, filed 6/18/14)

- Memorandum Opinion (denying motions to dismiss) (document 925, filed 12/21/16)

- Memorandum Opinion (granting in part and denying in part motions for summary judgment) (document 997, filed 2/23/17)

- Memorandum Opinion (denying motion to dismiss) (document 1306, filed 6/28/17)

- Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment on Section 1, Per Se, and Quick Look Claims, and in Support of Subscriber Plaintiffs' Motion for Partial Summary Judgment on Defendants' "Single Entity" Defense (document 2016-1, filed 3/8/18)

- Reply Memorandum of Points and Authorities in Further Support of Subscriber Plaintiffs' Motion for Partial Summary Judgment on the Application of the Per Se Rule (document 2017-1, filed 3/8/18)

- Memorandum of Points and Authorities in Support of Subscriber Plaintiffs' Motion for Partial Summary Judgment on the Application of the Per Se Rule (document 2021-1, filed 3/12/18)

- Memorandum Opinion (on Section 1 standard of review and single entity defense) (document 2063, filed 4/5/18)

- Memorandum Opinion (denying motion for summary judgment) (document 2082, filed 4/16/18)

- Memorandum of Points and Authorities in Support of Subscriber Plaintiffs' Motion for Certification of Nationwide Injunctive Class, or, in the Alternative, Alabama Injunctive Class (document 2408, filed 4/15/19)

- Memorandum of Points and Authorities in Support of Subscriber Plaintiffs' Motion for Certification of Alabama Damages Class (document 2410, filed 4/15/19)

- Memorandum of Law in Support of Motion for Preliminary Approval of Proposed Class Settlement (document 2610-1, filed 10/30/20)

- Settlement Agreement (document 2610-2, filed 10/30/20)

- Declaration of Dr. Daniel Rubinfeld (document 2610-10, filed 10/30/20) ("Rubinfeld Declaration")

- Demonstrative Slides for Subscriber Plaintiffs (document 2625-1, filed 11/17/20)

- Memorandum Opinion and Order Preliminarily Approving Settlement, Plan of Distribution, and Notice Plan, and Directing Notice to the Class (document 2641, filed 11/30/20) ("Preliminary Approval Order")

- Subscribers Counsel's Memorandum of Law in Support of Motion for Approval of Their Fee and Expense Application (filed herewith)

- Settlement Class Counsel Joint Declaration in Support of Motion for Preliminary Approval of Proposed Subscriber Class Settlement (filed herewith)

- Declaration of Special Master (filed herewith)