FILED

2021 Jun-01  PM 04:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 286



CONFIDENTIAL

BCBSA00109260

M I N U T E S

of

BLUE CROSS COMMISSION MEETING

Drake Hotel, Chicago
June 19-20, 1947

- - - - - - - - -

PRESENT:  (During all or part of the sessions)

COMMISSIONERS:  M. Haskins Coleman, Jr., Richmond, Chairman; Abraham
Oseroff*, Pittsburgh, Treasurer; Lewis E. Jarrett, M.D., New Orleans;
F. P. G. Lattner*, Des Moines; Basil C. MacLean, M.D., Rochester;
Joseph G. Norby, Milwaukee.

NEWLY-ELECTED DISTRICT COMMISSIONERS:  Louis H. Pink, New York, District II;
J. Campbell Butler, Syracuse, District III; J. Douglas Colman, Baltimore,
District V; H. A. Schroder, Jacksonville, District VI; R. O. Parker, Canton,
District VII; Edson P. Lichty, Chicago, District VIII; F. Kenneth Helsby,
Kansas City, District IX; Ralph G. Walker, Los Angeles, District XI;
E. Duncan Millican, Montreal, District XII.

COMMISSION HEADQUARTERS STAFF:  Richard M. Jones, Director; Edward Caygill,
Statistician; Eleanor Reith, Secretary to Director.

   NOTE:  * - Messrs. Oseroff and Lattner are also newly-elected
          District Commissioners, representing Districts IV
          and X, respectively.

ABSENT:

COMMISSIONERS:  R. F. Cahalane**, Boston; Rt. Rev. Msgr. R. Marcellus Wagner,
Cincinnati; F. A. Wardenburg, Wilmington.

   NOTE:  ** - Mr. Cahalane is also the newly-elected District
          Commissioner from District I.

---

THURSDAY, JUNE 19, 1947
M O R N I N G

   The Chairman called the meeting to order at 10:15 a.m. and requested the
Secretary to proceed with the reading of the agenda.

   1.  Report of the Director:  The Director read his report to the Commission
(report attached as Exhibit A), and it was moved, seconded and VOTED:

          That it be received, accepted and filed.

086

CONFIDENTIAL

. 2.  Report of the Treasurer:  The Treasurer presented the report of Commission finances through the five months' period ending May 31, 1947 (attached as Exhibit B) and it was moved, seconded and VOTED:

> That the Treasurer's report be accepted and approved.

3.  Commission Headquarters Budget:  It having been pointed out by the Director that submission of a detailed budget at this time was impossible, because of contemplated enlargement of Headquarters activities, it was moved, seconded and VOTED:

> That the Executive Committee be empowered to act for the full Commission in establishing a proper budget in later discussion with the Director, copies of the final budget to be sent all Commissioners.

4.  Organization of National Activities:  The Director reported that 55 Plans had responded to the Commission's request to execute the Agreement indicating support of Commission national activities.  Of this number, 47 had submitted signed agreements, 4 Plans had indicated intention to sign after formal Board action, the 5 Canadian Plans were revising the Agreement to fit their own particular relationship to the Commission 2 Plans (Cleveland and Washington, D.C.) were not sent copies, 4 Plans refused to sign, and 25 Plans had not indicated their attitude one way or the other.  The Director was instructed informally to communicate with those Plans who had not been heard from and determine their reasons for not acting.

The minutes of the Special Committee on National Organization and Functions (attached as Exhibit C) were read by the Secretary and it was moved, seconded and VOTED:

> That the Committee's recommendations be adopted.

5.  Annual Conference of Plans, St. Louis:  After consideration of the American Hospital Association's 1947 convention program, it was moved, seconded and VOTED:

> That the Annual Conference of Blue Cross Plans adjourn from its Monday, September 22, session to attend the Tuesday (morning), September 23, Administrative Practice Session of the American Hospital Association entitled: "Establishing Contract Rates"; and that appropriate notice of Blue Cross attendance at said Session be contained in the A.H.A. Convention Program.

6.  Reciprocity With Unapproved Plans:  Communications from Mr. E. A. van Steenwyk, Philadelphia, and Mr. Louis H. Pink, New York, concerning reciprocity with unapproved non-profit hospital service organizations were discussed at length. Discussion brought out the fact that several Blue Cross Plans are transferring members to unapproved Plans and accepting members from such Plans, particularly with unapproved West Virginia Plans.  It was brought out that one unapproved Plan uses as an argument the statement that they can pay more to hospitals, because they pay nothing to support the Blue Cross Commission.  Confusion to subscribers where a Blue Cross Plan and an unapproved Plan operate in the same area was cited. It was moved, seconded and VOTED:

> That the privilege of accepting and referring transfers as practiced under the Inter-Plan Service Benefit Agreement be restricted by approved Blue Cross Plans to other Blue Cross Plans.

The morning session adjourned at 12 noon.

087

CONFIDENTIAL

THURSDAY, JUNE 19, 1947
A F T E R N O O N

The afternoon session convened at 2 p.m.

7. Assignment to Districts:  Reassignment of the Arizona Blue Cross Plan from District XI to District IX and of Montana Blue Cross from District X to District XI was reported by the Director, it being pointed out that the assent of the District Commissioners concerned had been obtained in both cases, but that the Administrative Regulations (as revised) require approval of such action by the Conference of Plans.

Assignment of the New Jersey Plan to a District was discussed, it being pointed out that that Plan desire to associate itself with New York City in District II.  Objection to such a move is based on the overbalance of enrollment creation of such a District would bring about.  The Chairman informally requested that Mr. Pink consult with the Upper New York Plans (District III) and with the Executive Director of the New Jersey Plan and bring an appropriate recommendation in the matter before the next Commission meeting.

8. Simplification of Commission-Plan Communications:  The Director described a proposed intra-organizational memorandum form (attached as Exhibit D) and a series of proposed "functional service" Letters.  The memorandum would cut down use of costly letterhead stock and increase co-ordination through reference to the printed phrase "Copies To".  The functional service Letters would be routed directly to the Plan staff member to whom a certain function (enrollment, office management, hospital relations, etc.) is assigned, with simultaneous copy to the Plan Director, expediting the handling of the matters concerned in the same way that the present Public Relations Service Letter does.  It was moved, seconded and VOTED:

> That institution of the memorandum and functional
> service Letters be approved and their working out
> left to the discretion of the Director.

9. Applications for First Approval:

(a) Parkersburg Hospital Service, Inc.  Consideration was given to the application for first approval from Parkersburg Hospital Service, Inc., Parkersburg, West Virginia (summary attached as Exhibit E).  It was moved, seconded and VOTED:

> That Parkersburg Hospital Service, Inc. be advised that,
> if they will provide for adequate representation of
> hospitals and the public on their Board, the Commission
> will give further consideration to their application
> at its September meeting.

(b) Mutual Hospital Service, Inc.  The Director reported that no action had been taken by Mutual Hospital Service, Inc., Shreveport, Louisiana, to correct previous deficiencies in member-hospital contract responsibility, rate structure and subscriber benefits, and that this unapproved Plan is concering a merger with the Blue Cross Plans headquartered at Baton Rouge and Alexandria, Louisiana.  It was moved, seconded and VOTED:

> That no further action be taken on the application for
> first approval previously submitted by Mutual Hospital
> Service, Inc.

CONFIDENTIAL

BCBSA00109263

10.  Consideration for Disapproval:

(a) Northern Illinois Hospital Service, Inc.  Information furnished Commission
Headquarters by the Rockford Blue Cross Plan and from other sources indicated
that enrollment figures submitted by said Plan have been over-estimated by from
10% to 38% since inception of operations.  As reported to Commission Headquarters,
Rockford's January 1, 1947 enrollment was 326,992 members, whereas the audit report
of Lybrand, Ross Brothers and Montgomery, certified public accountants retained by
the Plan, gives a December 31, 1946 total enrollment of 238,525, about 37% under
the figure reported to the Commission.

In explanation, the Executive Director of the Rockford Plan stated that he
had been instructed in 1939 by the previous Director of the Commission "that the
number of contracts issued were to be cumulative and cancelled contracts were not
to be deducted".  However, in a letter dated January 31, 1941, the Executive Dir-
ector of the Rockford Plan acknowledged his understanding of the fact that net
enrollment figures were desired by deducting cancelled contracts in reporting 1940
enrollment.  His attention was called to the language of Commission General Letters
which asked for "Contracts in force" and "Persons covered".

The Commission also considered the fact that regular quarterly and semi-annual
financial statements had not been submitted by the Rockford Plan, and that the
financial data provided Commission Headquarters was at variance with premium
income reported to State regulatory bodies.

The Lybrand, Ross Brothers and Montgomery audit report (covering the fiscal
year, April 1, 1946 - March 31, 1947) referred to a "contribution from the Blue
Banner Agency of $6,185."  This referred to the commercial surgical insurance
policy being sold in conjunction with the Rockford hospital service contract.

Referenced audit report also mentioned that "hospital membership at
March 31, 1947 included 102 hospitals serving Illinois, southern Wisconsin, eastern
Iowa and western Indiana".  The Rockford Plan listed only 29 member hospitals, all
in Illinois, in response to a Commission Headquarters request for information for
the "Member Hospital Directory".

After due consideration and discussion of the foregoing information, it was
moved, seconded and VOTED:

> That the president of the Board of Directors of
> Northern Illinois Hospital Service, Inc., Rockford,
> Illinois, be advised by the Commission Director, in
> behalf of the Blue Cross Commission, that evidence
> has been submitted to the Commission indicating:
>
> (1) That Northern Illinois Hospital Service, Inc.
> is not cooperating to the desired degree with
> other Blue Cross Plans; and
>
> (2) That the commercial character of certain of
> the Plan's contracts and activities is not
> consistent with basic Blue Cross principles; and
>
> (3) That financial and statistical information has
> not been furnished the Blue Cross Commission at
> required periods or in correct form; and

089

CONFIDENTIAL

BCBSA00109264

> That, unless these practices are corrected without
> undue delay, the Blue Cross Commission will not
> recommend Northern Illinois Hospital Service, Inc.,
> for reapproval as a Blue Cross Plan for 1948.

(b) __Hospital Service, Inc.__ Further consideration was given to the
position of Hospital Service, Inc., Youngstown, Ohio, insofar as that Plan's
provision of full cash benefits was concerned. The fact that the present
Approval and Reapproval Standards do not specifically prohibit a full cash
allowance contract was discussed. The Director reported that the Plan's co-
operation with Commission Headquarters was good, enrollment information, financial
statements, and other matters being furnished regularly. It was moved, seconded
and VOTED:

> That no action toward recommended disapproval
> be taken at this time; that the Youngstown
> Plan be advised of the Commission's concern
> with their cash allowance contract; and that
> the consultative services of the Commission be
> offered to the Plan's Board.

11. __Blue Cross - Hospital Relations:__

(a) __Joint Committee of Nine.__ A memorandum entitled "Suggested Method for
Strengthening Hospital and Blue Cross Functional Relationships" (attached as Exhibit
F-1) was presented to the Commission by the chairman, it being stated that the Joint
Committee of Nine desired comments thereon from the Commission, the Coordinating
Committee, and the Board of Trustees to guide its further action.

The Chairman stated that Mr. Oseroff, Mr. Cahalane (who was absent) and
himself were the Blue Cross representatives on the Joint Committee of Nine. (Mr.
Norby is also a committee member, but represents the A.H.A.'s Council on Administrative
Practice). The Chairman asked Mr. Oseroff to open the discussion of the Memorandum
and the latter pointed out that, in essence, the "Suggested Method* * *" Memorandum
proposed establishment of a body (a new Council was favored by a majority of the
Committee) within the American Hospital Association which could be looked to by
hospitals as representing their interest in Blue Cross affairs, just as the Blue
Cross Commission is looked to by Plans to maintain their interest in hospital
affairs nationally.

After thorough discussion of the advantages and disadvantages of the
proposal, the Chairman appointed a committee, consisting of Mr. Walker, Chairman,
Mr. MacLean, and Mr. Oseroff, to study the memorandum in detail further and bring
in comments for the Commission's final consideration.

(b) __Release of Information to Hospitals.__ The Director pointed out that
he had been following precedent in not releasing information concerning Plan opera-
tions directly to hospital administrators who requested it, but had been referring
all such inquiries to the Plan Director concerned. It was agreed that this pro-
cedure could be most unsatisfactory from the hospital viewpoint. After discussion,
it was moved, seconded and VOTED:

> That the Director be authorized to release to bona fide
> hospital representatives, at his discretion, any and all
> information concerning Blue Cross Plans in his possession.

CONFIDENTIAL

BCBSA00109265

12. Enrollment Area Controversies:

(a) Southern Idaho. After considering the information that the Idaho and Utah Blue Cross Plans were involved in an enrollment conflict in Southern Idaho, because of the activities of Farm Bureau representatives in Pocatello, Idaho, in behalf of the Utah Plan, it was moved, seconded and VOTED:

> That the Commission Director be requested to express the Commission's concern to the Executive Directors of the Idaho and Utah Plans and offer its services toward an amicable settlement, providing that both Plans agree to abide by the decision reached.

(b) Las Vegas, Nevada. The Commission considered information that, although the Sacramento, California Plan has carried on enrollment in the State of Nevada to date, several apparently representative groups in Las Vegas are desirous of obtaining coverage through the Utah Blue Cross Plan. The Los Angeles Plan also has been approached by interests in Las Vegas regarding acquisition of membership in that city. Neither the Utah nor Los Angeles Plans are eager to enter the Las Vegas area. It was moved, seconded and VOTED:

> That the Commission Director be requested to express the Commission's concern to the Executive Directors of the Sacramento, Utah, and Los Angeles Plans and offer its services toward an amicable settlement, providing that all Plans agree to abide by the decision reached.

13. National Enrollment Corporation: The Secretary read a letter (attached as Exhibit G) from the Chairman of the Special Committee on A National Enrollment Corporation, which reported progress made to date. It was moved, seconded and VOTED:

> That the Committee be commended on its industry and instructed to continue its consideration of the problem assigned to it.

14. Testimony Before Senate Committee: The Director reported that Blue Cross testimony was presented to the Senate Committee on Labor and Public Welfare on May 23, 1947 by Mr. J. Douglas Colman, Chairman of the Government Relations Committee; that it was capably presented and well received; and that the Committee Chairman and others who participated in drafting the testimony should be commended for their efforts. It was moved, seconded and VOTED:

> That the Commission commend the Chairman of its Government Relations Committee and Messrs. M. Haskins Coleman, Jr., C. Rufus Rorem, and E. A. van Steenwyk for their capable services in this regard.

15. Associated Medical Care Plans: The Secretary read a letter from the President, Associated Medical Care Plans, Inc., which expressed appreciation for the cooperation extended to his organization by the Blue Cross Commission, particularly through the medium of the AMCP-Blue Cross Relations Committee. In view of the plans of both Commissions to hold concurrent meetings in St. Louis, it was moved, seconded and VOTED:

> That a joint luncheon and afternoon business session be held on September 20, 1947.

CONFIDENTIAL

BCBSA00109266

16.  Recognition of Baylor University Hospital, Dallas, Texas as birthplace of the Blue Cross program.  It was moved, seconded and VOTED:

> That Baylor University Hospital, Dallas, Texas be
> honored with the presentation of a plaque in appropri-
> ate ceremonies at the St. Louis Conference in September,
> with details of presentation to be assigned to the
> St. Louis Program Committee.

The meeting adjourned at 5:15 p.m.

FRIDAY, JUNE 20, 1947
M O R N I N G

17.  Blue Cross-Labor Relations:  Blue Cross Plan-labor relations and the Commission's arrangement with Mr. Martin E. Segal, labor consultant to the National Enrollment Office, were discussed.  No formal action was taken, it being the con-sensus that these matters were the concern of the Director and that the Plan's attention be called to the availability of the labor consultant's services.

18.  The committee appointed to study the memorandum "Suggested Method for Strengthening Hospital and Blue Cross Functional Relationships" brought in its comments in the form of a resolution (attached as Exhibit F-2).  After considerable discussion, it was moved, seconded and VOTED:

> That this resolution be submitted to the Board of Trustees
> of the American Hospital Association, the Coordinating
> Committee, and the Joint Committee of Nine, as repre-
> senting the Blue Cross Commission's viewpoint concern-
> ing the memorandum under discussion.

(At this point, the Chairman and the Director were notified that their presence was desired at the Coordinating Committee meeting and the Chairman turned the meeting over to Mr. Oseroff, Commission Treasurer, in the absence of the Vice-Chairman).

19.  Uniformity in Use of Blue Cross Emblem:  Despite Commission efforts to achieve uniformity in the use of the correct Blue Cross emblem by all Plans, an incorrect Blue Cross still appears on Plan stationery and literature.  The Commission Office will supply electros to all Plans and the Commission again urges all Plans to use the standard approved Blue Cross emblem on stationery and printed matter.

20.  Canadian Development:  Mr. E. D. Millican, Chairman of the Canadian Development Committee, reported that Canadian Blue Cross Plans were desirous of becoming affiliated with the Canadian Hospital Council and discussions had taken place with the Executive of the Council in this regard and that favorable progress was being made.  Mr. Millican stated further that Canadian Plans were still study-ing the establishment of a Canadian Blue Cross office and it as hoped that this central office would be organized in the not too distant future.

21.  Registration of Blue Cross Emblem and Name:  Following action by the Commission at its Milwaukee meeting, action was taken toward making a search as a preliminary step to registering the Blue Cross emblem and the words "Blue Cross".  The Executive Director of the American Hospital Association informed the Commission Director that under the present Association structure such registration should be made by the American Hospital Association on authority from the Board of Trustees.  The Commission was asked to express itself on this matter to the Board at its June 21-22 meeting.

092

BCBSA00109267

It was moved, seconded and VOTED:

> That the American Hospital Association proceed with
> registration of the words "Blue Cross", "Blue Cross
> Plan", and the Blue Cross symbol.

The meeting adjourned at 12:30 p.m.

093

CONFIDENTIAL

BCBSA00109268

REPORT   OF   THE   DIRECTOR

TO

THE   BLUE   CROSS   COMMISSION

June 19-20,   1947
Drake Hotel
Chicago

- - - - - - - - - - - - - -

The most significant problem confronting Blue Cross today, locally as well as nationally, continues to be efficient organization and management, with hospital relationships having a direct bearing thereon. I have served as permanent Director for almost two months now and I would recall my statement made in a previous report at Milwaukee that Blue Cross nationally needs the following things in a hurry:

(1) a long-range, national program with definite objectives;

(2) an effective well-integrated national organization;

(3) delegation to the national office of sufficient authority to carry out its responsibilities.

I am not excusing things undone when I tell you that the present Commission Headquarters Staff cannot continue to decide which of the score of things that should have been accomplished last week they will undertake today. The Staff is having to perform many activities piece-meal which should be undertaken on a full-time functional basis. Their proper performance requires definition of the scope of Headquarters activities and procurement of additional personnel. The agenda contains specific committee recommendations concerning enlargement of Head-quarters activities, so I will refrain from further discussion at this time.

As many of you know, one of the larger Plans has been undergoing survey during the past six months by Booz, Allen & Hamilton, Chicago management engineers. Commission Headquarters has cooperated with this firm from an information stand-point, but has learned little of what progress has been made. The Executive Director of the Plan concerned informed me this week that it is his intention to bring to the attention of the Commission, for reference to Plans, the beneficial findings of the survey in the hope that the "bad habits" which have been corrected may be of guidance to other Plans. In my opinion, this type of survey service is a function which all Plans should look to Commission Headquarters to perform, but is impossible of accomplishment now, because of limited personnel.

Organization of a non-profit hospital service organization in Mississippi is proceeding favorably, with expectation that it will be incorporated this Fall as a stock company with $10,000 capital stock to be held in trust by a Board of Trustees and turned over to a non-profit corporation when appropriate enabling legislation can be put through the State legislature. It appears that Mr. Richard Williams, Lake Charles area manager for the New Orleans Plan, will be appointed executive director.

094

BCBSA00109269

The Baton Rouge and Alexandria Blue Cross Plans and Mutual Hospital Service, Shreveport, Louisiana, are considering merging into one organization which would cover the entire State of Louisiana outside of the New Orleans Plan area. Board members of these three Plans have met to consider merger problems and will select an executive director acceptable to all concerned, if it is finally decided to effect such a merger.

The National Community Enrollment Committee Chairman has informed me that 40 Plans have agreed to cooperate in the proposed national campaign scheduled for October. I believe, however, that time has run out to a point where the type of promotional campaign required cannot be achieved. This is a reflection on the tardiness of Plan and/or Board response to proposals for national action. The Committee has achieved a great deal in selling the 40 Plans concerned on participation.

The Council on Medical Service, which was called in by the Milwaukee County Medical Society and Wisconsin Medical Association to arbitrate the impasse between the State and county medical groups concerning sponsorship of rival medical plans, has decided that both Surgical Care, Inc. (Blue Cross-affiliated Plan) and Wisconsin Physicians Service are to be dissolved and a new non-profit Plan organized in which both medical groups will be represented. A new executive director, not previously associated with either former Plan is to be employed. It is presumed that Wisconsin Blue Cross will serve the new Plan as it did Surgical Care and Wisconsin Physicians Service.

Recent personal contacts with the United States Chamber of Commerce indicated a great lack of information concerning current Blue Cross activities. Suggestions were made to Mr. H. E. Hilton of the Chamber's Health Advisory Council that local Chambers of Commerce utilize the knowledge of Blue Cross Plan directors and Boards in working toward the solution of community health problems. Also, it was suggested that the new Health Advisory Council committee contemplated by the Chamber include representatives of Blue Cross and the American Hospital Association, as well as representatives of medical Plans and the American Medical Association.

The second annual Blue Cross Public Relations Conference will be held at the Continental Hotel, Chicago, on Thursday, and Friday, July 17 and 18. Lawrence C. Wells, who has been in charge of Commission public relations since other duties have taken my own time away from them so much, has planned an interesting and instructive program which is designed to diagnose public relations ills and prescribe proper treatment. Participants in the Conference include leading public relations personnel from industry and Blue Cross Plans.

The John Marshall Insurance Company has been selected finally as the organization to administer the hospital-medical prepayment program adopted by the Arkansas Medical Society and Arkansas Hospital Association. It is interesting to note that for the first time, this company is offering a straight indemnity contract ($3.00 a day for room and board and $30.00 for extras) in addition to their usual unlimited coverage.

CONFIDENTIAL

BCBSA00109270

### BLUE  CROSS  COMMISSION

### B A L A N C E   S H E E T

#### May 31, 1947

#### A S S E T S

| | | |
|---|---|---|
| **CASH** | | |
| Cash in Bank - Treasurer's Account | $ 57,382.83 | |
| Cash in Bank - Operating Account | 4,477.09 | |
| Cash in Bank - Payroll Account | 500.00 | |
| Petty Cash Fund | 50.00 | $ 62,409.92 |
| | | |
| **RECEIVABLES** | | |
| Type IV Membership Dues | 1,027.00 | |
| Promotional Material | 1,284.40 | |
| Sundry | 1,852.18 | 4,163.58 |
| | | |
| INVENTORY OF PROMOTIONAL MATERIAL | | 10,204.18 |
| | | |
| **FURNITURE & EQUIPMENT** | | |
| At Nominal Cost | | 1.00 |
| | | $ 76,778.68 |

#### L I A B I L I T I E S

| | | |
|---|---|---|
| **ACCOUNTS PAYABLE** | | |
| Operating Expense | $ 8,752.30 | |
| Federal & State Payroll Taxes | 293.70 | |
| Employees' Income Tax Withheld | 631.65 | $ 9,677.65 |
| | | |
| **RESERVE** | | |
| Reserve for Canadian Office | | 3,801.00 |
| | | |
| **SURPLUS** | | |
| January 1, 1947 | $ 39,619.91 | |
| Excess of Income over Expenses | | |
| 5 Months Period Ending 5/31/47 | 23,680.12 | 63,300.03 |
| | | $ 76,778.68 |

CONFIDENTIAL

BCBSA00109271

## S T A T E M E N T   O F   I N C O M E   &   E X P E N S E

### Five Months Period Ending May 31, 1947

|  |  | Month of May | Year to Date |
|---|---|---|---|
| **INCOME** |  |  |  |
| Type IV Membership Dues |  | $ 17,116.00 | $ 84,374.00 |
| Miscellaneous Income |  |  | 7.50 |
| Sales of Promotional Material | $ 15,004.76 |  |  |
| Less:   Cost of Sales | 13,311.45 | 243.77 | 1,693.31 |
| Total Income for Period. . . . . . . . . . . . . . . . | | $ 17,359.77 | $ 86,074.81 |
|  | Monthly Budget |  |  |
| **EXPENSES – GENERAL ACTIVITIES** |  |  |  |
| Salaries | $  5,500.00 | $   4,677.75 | $ 22,719.05 |
| Travel & Expenses – Staff | 1,000.00 | 757.83 | 2,536.70 |
| Commission & Consultants | 300.00 | 344.22 | 1,312.08 |
| Committees | 300.00 | 200.54 | 1,181.72 |
| Conferences & Conventions | 600.00 | 378.09 | 2,523.86 |
| Printing & Publications | 2,000.00 | 2,048.25 | 5,557.02 |
|    Bulletin |  | 948.10 | 3,722.44 |
|    General |  | 1,050.18 | 1,518.84 |
|    Free to Plans |  | 49.97 | 315.74 |
| Supplies & Equipment | 800.00 | 1,069.99 | 3,924.56 |
| Telephone & Telegraph | 400.00 | 573.15 | 1,894.99 |
| Postage & Express | 500.00 | 296.34 | 2,328.46 |
| Social Security Taxes | 100.00 | 73.45 | 418.54 |
| Miscellaneous Expenses | 1,000.00 | 308.38 | 4,514.17 |
|  | $ 12,500.00 | $ 10,727.99 | $ 48,911.15 |
| EXPENSES – NAT'L. ENR. OFFICE | 2,500.00 | 2,265.73 | 13,483.54 |
| Total Budget & Expenses for Period | 15,000.00 | $ 12,993.72 | $ 62,394.69 |
| EXCESS OF INCOME OVER EXPENSES . . . . . . . . . . . | | $   4,366.05 | $ 23,680.12 |

CONFIDENTIAL

BCBSA00109272

EXHIBIT C

## MINUTES OF SPECIAL COMMITTEE ON
## NATIONAL ORGANIZATION AND FUNCTIONS

June 11, 1947
Statler Hotel
Washington, D. C.

PRESENT:  <u>Committee Members</u> - M. Haskins Coleman, Jr., Chairman, Richmond;
J. Douglas Colman, Baltimore; Thomas S. Gates, Jr.
Philadelphia; Abraham Oseroff, Pittsburgh;
John R. Stone, Topeka.
<u>Others</u> - Richard M. Jones, Chicago

ABSENT:  R. F. Cahalane, Boston; Richard O. Parker, Canton

The meeting was called to order by the Chairman at 10:20 a.m.

The Chairman asked Mr. Jones to distribute to the Committee a statement on the organization of Blue Cross national activities (including detailed analyses of the Commission, its Committees, the Headquarters Staff, and the Districts) which had been prepared upon the Chairman's advance request. After distributing this material, Mr. Jones stated that there had not been sufficient time to include material under the heading "WHAT WE LACK", but that possibly such was better left undone as it would not tend to restrict the thinking of the Committee.

Initial discussion centered about the form that national activities should take. Mr. Gates declared that he was not certain in his own mind whether formation of a corporation was a solution, but was keenly interested in knowing what might be accomplished under the present set-up. Mr. Coleman stated that he felt the Commission possessed authority to perform functions as the actual national Board of Trustees for Blue Cross which had not been applied fully in the past. In confirming this thought, Mr. Oseroff said that he felt the Commission could operate on behalf of the Plans in any way it saw fit, provided that such operations were not limited by the Administrative Regulations. Messrs. Colman and Stone concurred with the foregoing expressions.

The Committee adjourned for luncheon at 12:30 p.m. and reconvened at 2 p.m.

After review of the morning's discussion, it was agreed that the Committee's unanimous feeling be expressed as follows:

The Committee believes that the Blue Cross Commission, as presently constituted, possesses the authority to greatly broaden the base of Commission activities for the benefit of all Plans. Attention is invited to the broad and specific language used by the American Hospital Association in defining (in 1941) the objective of Blue Cross nationally:

> "To establish policies and conduct activities which extend
> the application of the principles of group prepayment for
> hospitalized illness, improve the efficiency of non-profit
> hospital service Plans, and promote the cooperation of all
> groups which may influence the scope, development, and
> administration of hospital service Plans."

098

CONFIDENTIAL

The Committee submits these specific recommendations to the Commission and respectfully requests that immediate action be taken to put them into effect:

(1) That the Blue Cross Commission take steps to exercise fully, in behalf of the Plans, the broad powers it possesses.

(2) That the Commission recognize the present Approval and Re-approval Standards as representing the extent to which the Board of Trustees of the American Hospital Association be-lieves it should go in controlling Plan approval; and, there-fore, that the Commission meet its own responsibilities in this matter by establishing more specific standards and directions for their enforcement so that the original basic principles of Blue Cross are observed.

(3) That the objectives and functions of all present Commission Committees be defined, and that Committees appointed in the future have their objectives and functions defined at the time of appointment.

(4) That Commission Headquarters Staff activities, in addition to usual executive functions, include the following: Public Relations; Research and Statistics; Enrollment; Hospital Relations; and that a competent attorney be engaged as legal counsel, and consideration be given to engaging an outstanding public relations consultant (for consultation on policy matters only).

(5) That an evaluation of the program of the National Enrollment Office and its results be undertaken immediately.

Respectfully submitted,

M. Haskins Coleman, Jr., Chairman, Richmond
J. Douglas Colman, Baltimore
Thomas S. Gates, Jr., Philadelphia
Abraham Oseroff, Pittsburgh
John R. Stone, Topeka

099

CONFIDENTIAL

BCBSA00109274

BLUE   CROSS

PLAN – O – GRAM

(For intra-organizational use only)

Date _____

TO:

FROM:

SUBJECT:

COPIES TO:

**EXHIBIT D**

**100**

CONFIDENTIAL

BCBSA00109275

EXHIBIT E

Summary of Application for Approval by the
PARKERSBURG HOSPITAL SERVICE, INC.
202 Union Trust Building
Parkersburg, West Virginia

Mr. Ray A. Wyland, Executive Director


I.    NAME:  Parkersburg Hospital Service, Inc.

II.   ADDRESS:  Union Trust Building, Parkersburg, West Virginia

III.  GENERAL INFORMATION:  The first contracts became effective June 21, 1937
      following incorporation under the corporation laws of the State.  The
      Plan is organized under a special enabling act, Senate Bill No. 3 -
      W. Va. Legislature, passed March, 1946.  Ray A. Wyland is the
      Executive Director.  On December 31, 1939, there were 7,119 members
      and on April 30, 1947, the membership was 24,628.

IV.   THE BOARD OF DIRECTORS is composed of 11 members; nine of the members
      are chosen through the Academy of Medicine and they are all doctors,
      and the remaining two are laymen elected by the doctors.  One of
      the laymen is Secretary of the corporation and is a Director of the
      Union Trust and Deposit Company.  The second layman is the Executive
      Director and Treasurer of the Plan.

V.    ORIGINAL WORKING CAPITAL was obtained entirely from earnings except that
      the cooperation of the hospitals was instrumental in acquiring the
      capital.  No amount is given.  The balance sheet as of April 30, 1947
      shows reserves of $12,919.39.

VI.   THE AREA SERVED is located immediately north of the already existing
      enrollment areas served by approved Blue Cross Plans with head-
      quarters at Charleston and Huntington.  The proposed enrollment
      area has a population of approximately 165,000 and covers 8 counties.
      Two of the counties listed are already served by Blue Cross Plans
      in the State.  There are other non-approved plans within the State
      but a consolidation does not seem possible at this time.

VII.  MEMBER HOSPITALS:  At the present time, there are 4 member hospitals
      with a bed capacity of 300 and 2 non-member hospitals with a bed
      capacity of 50.

VIII. HOSPITAL RESPONSIBILITY is stated in the hospital contract in these
      terms:  "Name of Hospital" will perform and furnish to any subscriber
      of the Parkersburg Hospital Service, Inc. such services as said sub-
      scriber may be entitled to under the terms and conditions of the
      contract issued to said subscriber by said "Service."  (The word
      "Service" refers to the Plan).  The hospital contract may be ter-
      minated at any time by either party, provided that at least two
      months notice of such intention to terminate shall be given to the
      other party.  The hospitals agree to accept pro-rata payment should
      the funds be insufficient to meet the fee schedule.

IX.   RATES are given as follows:  One person $1.00 per month; Husband and Wife
      $2.10; Two Persons or Family $2.10.  The lasttype includes husband
      and wife and all unmarried children under 18 years of age.

**101**

BCBSA00109276

X.   BENEFITS included in the contract are:

     (a) Room accommodations in a semi-private room.  (4 beds).
     (b) General nursing service.
     (c) Operating room as often as needed.
     (d) Delivery room when eligible for maternity care.
     (e) Surgical supplies.*
     (f) Anesthesia supplies.*
     (g) X-ray examinations up to $25.00.*  (No dental X-rays).
     (h) Laboratory examinations up to $25.00.*
     (i) Routine drugs and medicines.
     (j) Plastic cases and dressings.*
     (k) Oxygen, glucose and penicillin.
     (l) Use of cystoscopic room and supplies.
     (m) Use of Emergency Room for accident cases only.  (Services
         listed above under c, e, f, g, h, j.)

Service is available for 30 days during each contract year, plus an
additional 60 days at $1.50 per day immediately following the original
30 days.  Credit for care in more expensive accommodations is allowed
at $3.50 per day.  Non-member hospitals are paid a flat $6.00 per day
for members' care.  Maternity care of 10 days is available to the mother
with nursery care for the infant.  This service is available only under
the family contract and only after the contract has been in effect for
10 continuous months.  Removal of tonsils and adenoids after 6 months
membership, but limited to a 24-hour hospital stay.

EXCLUSIONS:  Rest cures, Workmen's Compensation cases, treatment that
is provided by any governmental agency, dental cases, plastic surgery,
tuberculosis after diagnosis, functional nervous disorders, vaccines,
basal metabolism, electro-cardiogram, intravenous therapy, physio-
therapy, and routine physical examinations.

XI.   ENROLLMENT PROCEDURES:  Minimum group is 5 and must enroll 100%.  Larger
groups not less than 60% participation.  All groups are serviced at
least every 6 months.  With larger groups, provision is made for
enrolling new employees at time of employment.

XII.   METHOD OF PAYING HOSPITALS is on the basis of a fee schedule, approximating
over $6.00 per day.  Non-member hospitals receive a flat $6.00 per day.

XIII.   FINANCES:  The total assets of the Plan were $54,612 as of April 30, 1947.
The total income for the first 4 months of 1947 amounted to $69,105.
Payments to hospitals were $70,506 or 102.03% of income.  Operating
expenses amounted to $7,118 or 10.30% of income.  The Plan lost $8,519
during this period, equal to 12.30% of their income.  No employees are
paid either in full or in part on a commission basis.

XIV.   The Plan is co-ordinated with Medical-Surgical Care, Inc.  There was no
statement attached which would give the corporate relationship.

XV.   The Plan has an enrollment equal to about 50% of the population of the county
in which the headquarters are located (Wood County).  They have groups
enrolled with such national firms as American Viscose, Corning Glass,
Pittsburgh Plate Glass, Libby-Owens-Ford and others, and have entered into
reciprocal transfer arrangements with all Blue Cross Plans enrolling
employees of these firms.

102

CONFIDENTIAL

BCBSA00109277

EXHIBIT F-1

## SUGGESTED METHOD FOR STRENGTHENING

## HOSPITAL AND BLUE CROSS FUNCTIONAL RELATIONSHIPS

A set of basic principles governing the relationships between hospitals and Blue Cross Plans, which were composed by a committee of the Council on Administrative Practice and representatives of Blue Cross Plans and approved by the House of Delegates, stands as the official policy of the American Hospital Association. In essence, these principles prescribe close cooperation between hospitals and Blue Cross Plans as well as the need for complete agreement on both broad policies and operating details by all parties involved.

But principles deteriorate to platitudes unless they are given life. The ultimate extension of prepaid hospital care will come from a determination to extend the cooperation between hospitals and Plans which has been the cornerstone of the Blue Cross movement. Such a policy will be implemented by the activation of the principles of the relationship now established. The responsibility for developing Plan policies and procedures in accordance with the recommended principles rests within the local area, an essential element of Blue Cross. Real strength and accomplishment come through this autonomous action by the hospitals and the Plans making cooperative decisions to meet their own particular needs.

However, a solid national front cannot be established through local efforts alone. Without an effective coordinating activity, such local autonomy would inevitably result in a disjointed program and the potential strength of the Blue Cross Plans would be dissipated in large measure. Also, certain common hospital relationship problems are so complex that repeated local effort to effect their solution would be wasteful of energy and would weaken the national movement.

### Joint Responsibility

Hospitals have responsibility for making benefits of hospital prepayment Plans universally available to all of the people and, also, they have responsibility for providing a high quality of care which can be assured only if adequate finances are available.

The American Hospital Association has endorsed and supports Blue Cross Plans as the most effective medium for protecting the public and for providing the funds necessary for rendering adequate service. The Association recognizes its increased responsibility in the whole prepaid care movement. The membership – and this includes both Plans and hospitals – looks to the Association for direct assistance in working out mutually satisfactory solutions to the problems which confront them.

Promotion of the Blue Cross voluntary prepayment plan is one of the fundamental planks in the three-point program of the Association. The time and the circumstances call for careful thinking and planning and the sincere strengthening of cooperative action between hospitals and Blue Cross Plans. This will not be accomplished separately by either the Plans or the hospitals, but will result only from the manifestation of an intense desire to allow nothing to stand in the way of accomplishment of their common purpose for better distribution of hospital care to the people of this country.

103

CONFIDENTIAL

## Organizational Patterns

The Joint Committee of Nine recognizes that the structural organization of the American Hospital Association has not in the past provided adequately for interesting hospitals or for effectively combining their efforts in the solution of mutual problems with Blue Cross Plans. Also, there appears to be agreement that the Blue Cross Commission cannot deal adequately with the member hospitals of the American Hospital Association in regard to hospital and Plan relationship problems. It therefore appears that some formal arrangement should be created within the American Hospital Association to achieve these purposes. They might be accomplished through:

1. An extension of responsibilities of the Council on Administrative Practice to include hospital and Blue Cross problems;

2. A continuously functioning special committee of the Board of Trustees, including representation of the Blue Cross Commission;

3. A special committee of the Council on Administrative Practice, including representation of the Blue Cross Commission;

4. A new council on hospital prepayment, regularly constituted within the American Hospital Association, and having Blue Cross representation.

## Function of Hospital Prepayment Policy Body

It appears important that the recommendations and deliberations of the body which is given responsibility for hospital and Blue Cross relationship problems should have opportunity for review by the regularly constituted advisory and administrative groups within the Association, including the Blue Cross Commission because of its special interest in these matters. Also, this committee or council should provide liaison between the Trustees and the Blue Cross Commission.

It should have opportunity to review all actions of the Blue Cross Commission, and conversely, it should submit all of its actions to the Blue Cross Commission for review. It should debate and suggest approval or disapproval to the Coordinating Committee of all policies and procedures affecting hospitals which are adopted or recommended by the Blue Cross Commission. It should initiate action on other matters which have not received consideration by that Commission.

Working in this manner, this committee or council would serve to advise the Commission on hospital problems and to interpret Plan and Association policy to member hospitals. It would be a conciliatory as well as a judicial and promotional force. It would serve to bridge the gap nationally between the Blue Cross Commission and the Board of Trustees of the American Hospital Association. It would serve as the sounding board for the wishes and desires of individual hospitals.

## Membership if Hospital Prepayment Policy Body

The special functions of the proposed hospital prepayment committee or council require predominant hospital representation by persons fully informed on hospital administration and competently advised on Blue Cross operations. This body, therefore, might include ex-officio the three hospital representatives who are members of the Blue Cross Commission and in addition at least three other hospital administrators. All members should be regularly appointed for three-year terms. It appears desirable also that the Chairman of the Blue Cross Commission should be an ex-officio member without vote and that the Director of the Blue Cross Commission should be invited to participate in an advisory capacity in all Blue Cross problem discussions.

104

BCBSA00109279

## Scope of Activities

In general, this committee or council should suggest policies and distribute information to member hospitals which will insure the type of Blue Cross operation which is contemplated in the Blue Cross approval standards, particularly those governing relationships between hospitals and Blue Cross Plans.  These would include:

1. Responsibility for recommendations to the Board of Trustees in regard to the approval of specific Plans;

2. Restudy and revision of the basis and method of Plan approval;

3. Research into the bases for reimbursement of hospitals by Plans;

4. Study of the advantages and limitations of Blue Cross financing of hospital care;

5. Stimulation of hospital activities aimed at encouraging Blue Cross enrollment;

6. Assistance with the program to inform the whole people and their governments about Blue Cross Plans;

7. Coordination of Blue Cross interests with all other functions of the Association and its councils and committees, so as to give the full impact of the Association's support to the program;

8. Establishment of joint Association and Commission educational programs to acquaint and inform hospitals concerning Blue Cross Plans, their problems and their efforts, and to make available to Blue Cross Plans all information concerning hospitals which is of mutual concern and importance to their successful operation;

9. Encouragement of physician and hospital cooperation in advancing pre-payment health protection.

— — — — — — — —

It is Recommended to the Board of Trustees that (1. the Council on Administrative Practice; 2. a special committee of the Board; 3. a committee of the Council on Administrative Practice; 4. a new council on hospital prepayment plans) be constituted and instructed in accord with the suggestions of the foregoing discussion.

* * * * * * * *

105

CONFIDENTIAL

BCBSA00109280

COMMENT OF BLUE CROSS COMMISSION ON
"SUGGESTED METHOD FOR STRENGTHENING HOSPITAL AND BLUE CROSS FUNCTIONAL RELATIONSHIP"
AS ADOPTED BY THE COMMISSION ON JUNE 20, 1947

It was unanimously voted that the following statement of the Blue Cross

Commission be submitted in response to the request of the Committee of Nine for

comment on the "Suggested Method for Strengthening Hospital and Blue Cross Func-

tional Relationship":

"The essence of the proposal is the creation of a new council or
committee to act as liaison between hospitals and Blue Cross Plans and
to assume functions which are now responsibilities of the Blue Cross
Commission.

The Blue Cross Commission wishes to emphasize its earnest desire
to tie more closely its activities to those of the American Hospital
Association and all its constituent bodies and to express appreciation
of the past and current assistance of the Board of Trustees, Councils,
and the Committee of Nine. A close working relationship can be con-
tinued and strengthened at national level through the executive officers
of these organizations, and this should be reflected in all official
meetings and publications. A sympathetic understanding by hospitals
and Blue Cross Plans of mutual problems can be stimulated within the
present organization.

It is believed that the difficulties referred to in the proposals
are predominately of local import and are concerned mainly with the pro-
blem of payments to hospitals by Blue Cross Plans. It is felt that these
problems can be resolved more successfully at community, district, or
state levels.

It is submitted, therefore, that the solution of the problems dealt
with in the proposal does not lie in the creation of another council or
committee. Such an action would make more complex an already complicated
organizational structure and would restrict and weaken the activities and
responsibilities now assigned to the Blue Cross Commission.

It is suggested however that, within the existing organization, it
would be helpful if, in addition to the Executive Director, the President
of the American Hospital Association were to be considered as an ex-
officio member of the Blue Cross Commission, and if the Chairman of the
Blue Cross Commission were permitted to attend, as an ex-officio member,
the meetings of the Board of Trustees of the American Hospital Association.
It is suggested also that consideration be given to the wide interest and
activities represented by Type IV Members when nominations of Trustees
are made at the annual meeting of the American Hospital Association."

106

CONFIDENTIAL

BCBSA00109281

C O P Y

BLUE CROSS COMMISSION
of the American Hospital Association
18 East Division Street
Chicago 10, Illinois

June 18, 1947

Mr. M. Haskins Coleman, Jr., Chairman
Blue Cross Commission
18 East Division Street
Chicago 10, Illinois

Dear Mr. Coleman:

As Chairman of the Special Committee appointed at the Milwaukee
Conference to study the feasibility of a corporation for national en-
rollment purposes, I have to report that the committee has had two
meetings, the first in Detroit on May 26 and the second in Pittsburgh
on June 16. All members of the committee as well as the Commission
Director and the Director of the National Enrollment Office attended
both meetings.

Up to date, the following methods of solving the national en-
rollment problem have been discussed: (1) expansion of present
Commission activities; (2) establishment of a national enrollment
membership or insurance corporation; (3) establishment of a corporation
to be known as "Federated Blue Cross and Blue Shield" in which both
Blue Cross Plans and medical plans would participate.

It is the consensus of the committee however, that a proper and
acceptable solution to the problem has not yet been reached and,
therefore, the committee is continuing its deliberations.

The committee will meet again in New York City on July 14 and will
report again at the Commission's September meeting.

Respectfully submitted,

WILLIAM S. McNARY

Chairman, Committee on National
Enrollment Corporation

107

CONFIDENTIAL

BCBSA00109282