FILED
2021 Jun-01  PM 04:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 303

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF ALABAMA

3               SOUTHERN DIVISION

4

5   ------------------------------)

6   IN RE:  BLUE CROSS BLUE SHIELD )

7   ANTITRUST LITIGATION           ) Master File No.

8   (MDL NO. 2406)                 ) 2:13-CV-20000-RDP

9   ------------------------------)

10

11   VIDEOTAPED DEPOSITION OF 30(b)(1) WITNESS:

12                  PAULA TAFFE

13

14   SEPTEMBER 20, 2017

15   10:08 a.m.

16

17

    COURT REPORTER:
18
    JANICE M. KOCEK, CSR, CLR
19

20

21

22

23

24

1      Q.    Are you familiar with the

2  exclusive service area provisions within the

3  licensing agreements?

4      A.    Yes, I am familiar with that.

5      Q.    Would issues dealing with the

6  exclusive service areas fall within your

7  position as chief brand counsel to enforce or

8  oversee those issues?

9      A.    That's a very broad question.

10     Q.    It is.

11     A.    I can -- I can say that one of the

12 ways that a Plan might fall out of compliance

13 with the license agreements would be some

14 activity that extended outside of its service

15 area, in which case that would -- could

16 implicate the license agreements as well.

17 And I would work with Plans on -- I would

18 work on matters such as those.

19     Q.    What is your understanding of what

20 an exclusive service area is as it's defined

21 in the licensing agreement?

22     A.    The Blue Plans for the most part

23 have operated in exclusive service areas for

24 decades going back to the early part of the

1   last century.  The Plans developed -- the --

2   the -- Blue Cross Blue Shield trademarks have

3   their origins in the early part of the last

4   century where -- well, on the Cross side,

5   began in Dallas, Texas.

6       Q.    Yeah, I'm aware of the -- of the

7   history.

8       A.    So there's a -- there is a history

9   where Plans had common law rights to the

10  trademarks in their individual communities.

11  And those geographic areas, you know, over

12  the decades, the evolution of time

13  developed -- they developed their exclusive

14  service areas.

15          The license agreements, which you

16  asked me about, state that -- in general,

17  that a Plan's service area is that area which

18  it served -- since there's such a historical

19  basis to the service areas, that it served as

20  of a date I think in June of 1972 or '70 --

21  it's '70-something.

22      Q.    '70-something, yeah.  I'll -- I'll

23  agree with you on that.

24      A.    Yeah.

1          MR. HOLMSTEAD:  Okay.  We'll go off

2      he record.

3          MR. DAVIS:  Short break.

4          THE VIDEOGRAPHER:  Off the record.

5      The time's 11:01 a.m.

6          (Whereupon, a recess was taken

7          from 11:01 a.m. to 11:21 a.m.)

8          THE VIDEOGRAPHER:  On the record.

9      The time is 11:21 a.m.

10   BY MR. DAVIS:

11      Q.   Before the break we were talking

12   about exclusive service areas.  Do each of

13   the Blue Plans have a set geographic service

14   area, as far as you know, with the exception

15   of the states that have overlapping service

16   areas?

17          MR. HOLMSTEAD:  Object to the form.

18          THE WITNESS:  Each Plan has a

19      service area in which it's licensed to

20      use the Blue Cross and/or the Blue Shield

21      marks.

22   BY MR. DAVIS:

23      Q.    In your opinion, are exclusive

24   service areas necessary to protect the brand?

1        A.    Absolutely, yes.

2        Q.    What do you base that opinion on?

3        A.    My years of experience at the

4    Association and my knowledge and familiarity

5    with trademark law.

6        Q.    Can you give me more detail why

7    you think that exclusive service areas are

8    necessary to protect the brand?

9        A.    If two Plans are operating in the

10   same geographic area, it can be harmful to

11   the brands in a number of ways.  One of which

12   is consumer confusion; another way is

13   dilution of the trademarks.

14       Q.    Anything else?

15       A.    Yeah, a third way is a Plan within

16   its service area invests resources in the

17   development of the brand, in the development

18   of provider networks.

19            And, in fact, the fact that a Plan

20   has an exclusive service area is an

21   incentive -- it's also even as a matter of

22   history having -- the history of having

23   long -- long and deep relationships with the

24   providers.  And as a matter of incentive that

1   since the plan has the exclusive service

2   area, it's inclined to develop its networks

3   deep, broad, you know, even in the rural

4   areas of a -- for example, of a state.  And

5   so it makes for very good provider networks.

6            If other Plans were able to

7   operate in that same service area, the --

8   the -- the Plan would not have the same

9   incentives to invest so many resources.  The

10  other Plan would gain advantages, free ride

11  on what another Plan is doing in the service

12  area.

13       Q.   Anything else?

14       A.   Those three are the top three that

15  come to my mind.

16       Q.   Okay.  Exclusive service areas

17  restrict a Plan to a specific geographic

18  region.  Would you agree with that?

19            MR. HOLMSTEAD:  Object to form.

20            THE WITNESS:  Exclusive -- the --

21       the service areas are a matter of

22       licensing, that a Plan is licensed to use

23       the brands or one of the brands in a

24       particular geographic area.

1  marks because Plans don't own the Blue marks.

2      Q.    What about assignments from Plans

3  to the Association?

4      A.    I am aware of -- although this was

5  before my time, I -- I learned about it and

6  I -- and I recall it.  The DC Plan had

7  registered the Blue marks outside of the

8  United States.  And there was a dispute

9  between the Association and the DC Plan about

10  that.  And that dispute was resolved.  And

11  the DC Plan assigned its rights in those

12  registrations to the Association.

13      Q.    Okay.  Well, what about within the

14  United States and the Plans that are

15  currently licensed to use the marks?

16            Prior to being licensed to use the

17  marks, the Plan owned the mark, was using the

18  mark.  Do they then give a written assignment

19  back to the Association?

20            MR. HOLMSTEAD:  Object to the form.

21      Foundation.

22                Go ahead.

23            THE WITNESS:  Well, the history of

24      the Blue system is that the Plans were

1          the original owners of the marks.  They

2          had common law rights in the marks in

3          their geographic territories, in their

4          communities, going all the way back to

5          the early part of the last century.  And

6          over time there were assignments.

7                      On the Blue Cross side, there

8          came a point in time where the Blue Cross

9          Plans assigned their rights in the Blue

10         Cross marks to the American Hospital

11         Association.

12                     And then I believe at a later

13         point in time through assignments the

14         marks were then owned by the Blue Cross

15         Association.

16                     And then on the Shield side

17         there was a Blue Shield Association that

18         sometime -- over the decade there came a

19         point where the Plans -- the Blue Shield

20         Plans assigned their rights to the Blue

21         Shield marks to the Blue Shield

22         Association, I believe.

23                     And then ultimately the Blue

24         Cross Blue Shield Association was formed

1      and became the assignee of all the rights

2      to all the marks and the owner of the

3      marks.

4  BY MS. MCQUILKIN:

5     Q.   And all those assignments that you

6  just talked about, they're all documented in

7  written form?

8     A.   This is the history of the system.

9  I hadn't ever seen the documents.

10     Q.   You've never seen the assignment

11  documents?

12     A.   No.

13     Q.   Do you know if they're kept

14  anywhere in the Association?

15     A.   I don't know.

16     Q.   You mentioned something about

17  implicit assignment.  What did you mean by

18  that?

19     A.   I don't recall saying that word.

20     Q.   I thought you did.  Would you

21  agree with me that assignments need to be

22  documented in writing?

23       MR. HOLMSTEAD:  Object to the form.

24      Calls for a legal conclusion.