FILED
2021 Jun-01  PM 04:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 309

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION


IN RE: BLUE CROSS BLUE SHIELD

Master File No. 2:13-CV-20000-RDP

ANTITRUST LITIGATION

MDL NO. 2406



CONFIDENTIAL REMOTE VIDEO DEPOSITION OF

H. E. FRECH, III, PH.D.


January 11, 2021






REPORTED BY:    Laura H. Nichols

                Certified Realtime Reporter,

                Registered Professional

                Reporter and Notary Public

 1          Q.      Okay.  So one -- to measure the ideal

 2   but-for world, one must evaluate what might have

 3   occurred absent this first agreement and all

 4   subsequent agreements, correct?

 5                  MR. QUILLEN:  Object to the form.

 6          A.      Correct.  Correct.  And obviously

 7   that is challenging.

 8          Q.      (BY MS. DONNELL:)  And you state in

 9   your report that this but-for world is not directly

10   observable because of defendants' consistent

11   agreements which they enforced over a long period

12   of time starting in the 1930s.  Is that a correct

13   statement of your view?

14                  MR. QUILLEN:  Object to the form.

15          A.      Yes, that is correct.

16          Q.      (BY MS. DONNELL:)  Okay.  And you

17   also state in your report that ESAs or exclusive

18   service areas were anticompetitive from the very

19   beginning.  Is that a correct statement of your

20   view?

21                  MR. QUILLEN:  Object to the form.

22          A.      Yes.

23          Q.      (BY MS. DONNELL:)  Okay.  So --

24          A.      That is my opinion.

25          Q.      Is it your view that service areas

1   have been anticompetitive from the 1930s?

2          A.      Yes, I believe so.  That would be

3   my --

4          Q.      And is it your --

5          A.      That would be my -- that would be my

6   interpretation of the history.

7          Q.      All right.  And is it your view that

8   service areas have been consistently enforced by

9   the Blues since the 1930s?

10         A.      They have certainly tried to enforce

11  them since the 1930s.  They have not always

12  succeeded, which you can actually still see in the

13  markets where there is some limited Blue-on-Blue

14  competition.

15         Q.      So at least as of the 1930s, Blues

16  have tried to consistently enforce service areas,

17  in your view?

18         A.      I would say that is a fair statement.

19         Q.      And is it your opinion that the Blues

20  continue to enforce service areas from the 1930s

21  through the following decades to the present?

22         A.      You mean was it a continuous policy

23  from the '30s right up until now?  Yes, that is my

24  interpretation, my understanding.

25         Q.      Okay.  And is there any period of

Page 33

 1    time that you would say the Blues did not enforce

 2    service areas?

 3            A.      Well, there's a period of time in one

 4    area, in one state.

 5            Q.      And what state was that?

 6            A.      That is Ohio.  But that is only one

 7    state.

 8            Q.      And is that the only example that you

 9    can think of where service areas were not

10    consistently enforced from the 1930s to the

11    present?

12            A.      Well, we would have to unpack that.

13    They were consistently trying to enforce it, but

14    there were lots of areas where competition would

15    break out for a period of time and they couldn't

16    successfully enforce it, they couldn't get the

17    plans to stop competing, in that there were various

18    lengths of time for that.

19                    And that's -- in my first report,

20    that history is brought -- is explained in great

21    detail.  The only place where they -- that I know

22    of from the history where they didn't try to

23    enforce it, didn't try to stop competition was Ohio

24    for a period of years.

25            Q.      All right.  And you are referring to

1    subscribers would have been in the community

2    regardless of whether they contracted with a Green

3    or with another commercial insurer, for example, in

4    Alabama, correct?

5          A.     Yes.   That is what I am saying.

6    Probably -- probably I -- I probably should have

7    said serve a broader variety of insurers.  That is

8    probably what I should have -- what it should say.

9    I think that is very inartful.  I am not surprised

10   that you didn't understand it.

11         Q.     Did you perform any quantitative

12   analysis of Blue plans' ability under the National

13   Best Efforts rule to expand the Green business in

14   Alabama?

15         A.     Quantitatively?

16         Q.     Yes.

17         A.     No, I did not.

18         Q.     Okay.  And your qualitative analysis

19   is based -- your qualitative analysis that certain

20   types of entry by Greens may run against the

21   National Best Efforts rule is just based on your

22   judgment and the rule itself?

23         A.     The rule and my -- my kind of rough

24   knowledge of the size of scale of Anthem and

25   thinking about how the market would evolve.