FILED
2021 Jun-01 PM 04:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 315

```
                    UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ALABAMA
                           SOUTHERN DIVISION


    IN RE:                              *

                                        *      2:13-cv-20000-RDP
    BLUE CROSS BLUE SHIELD ANTITRUST
                                        *      October 5, 2017
    LITIGATION MDL 2406                         9:00 a.m.
                                        *
                                               Birmingham, Alabama
                                        *


    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

                      **TRANSCRIPT OF HEARING**
              **BEFORE THE HONORABLE R. DAVID PROCTOR**
                   **UNITED STATES DISTRICT JUDGE**

    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *:
```

```
1   Blue-on-Blue competition, hospitals were able to have higher
2   profit margins because of the Blue-on-Blue competition, and
3   that's testimony from Capital Blue Cross where they're taking
4   that example and addressing what happens when there's
5   Blue-on-Blue competition.
6           Your Honor, the final point really is to make it
7   clear -- that I want to make on behalf of all plaintiffs is to
8   make it clear that we are not waiving the quick look argument.
9   We think all our claims, the provider claims and the
10  subscriber claims, are covered under the per se rule.  That's
11  our position.  That's what we want to address.  But we are not
12  waiving the alternative quick look argument, and other than
13  what's in our papers, we are prepared to address at whatever
14  point the questions the Court may have about that.
15          Thank you very much.  And now Michael will address
16  the nonBlue competitive restrictions on behalf of subscribers
17  and providers.
18          MR. HAUSFELD:  Good morning, Your Honor.
19          THE COURT:  Good morning.
20          MR. HAUSFELD:  We start with a literally fundamental
21  principle and that is the law with regard to agreements
22  between actual or potential horizontal competitors and what's
23  called output restrictions.
24          As the Supreme Court has made clear and there has
25  been no retraction or diminishment of the force limits of this
```

1   proposition, looking at slide 1, horizontal agreements to
2   limit output are viewed as tantamount to an agreement to fix
3   price and are subject to a per se rule.  That applies with
4   full force, Your Honor, to this case, because on their face,
5   fundamental economics, business awareness, and judicial
6   history has confirmed the inescapable, predictable,
7   anticompetitive consequences of output restrictions.  That's
8   why, without further inquiry, on their face these types of
9   restrictions are considered violative or found to be violative
10  of Section 1 of the Sherman Act.
11          One of the things that needs to be understood here,
12  Your Honor, if we look at slide 4, is exactly what are the
13  relationships here with regard to the best efforts which fix
14  the rules of engagement between the Blue brands and the
15  unbrandeds, or as this chart reflects them or characterizes
16  them, the green brands.
17          ESAs prevent Blue-on-Blue competition within the
18  ESAs, but the best efforts rules prevent green competition
19  with Blues within the ESAs and Blue and green competition
20  outside of the ESAs as well as restricting competition between
21  greens outside of the ESAs.  This is an entanglement, Your
22  Honor, which goes beyond any governance claims.  It goes
23  beyond any brand claims.  It goes beyond any single enterprise
24  claims.
25          The best efforts rules are the rules of engagement

1  for inter-brand competition and they are designed on their
2  face to restrain and restrict that competition.
3        A bit of history here is in order.  Not to look back
4  upon what happened, but whether the Blues understood at the
5  times of crafting and implementing these regulations they knew
6  on their face that they were restricting inter-brand
7  competition.
8        If we look at slide 5, from 1987 through 1994 there
9  was no restriction on unbranded competition both within and
10 outside ESAs.  In 1991 they began to think of whether or not
11 they should because the unbrandeds were beginning to grow and
12 make inroads on the health insurance business of the Blues.
13 In 1992 they resolved not to regulate unbranded activity, but
14 in 1994 they reversed that.  In 2005 they extended that
15 reversal to include a prohibition or a regulation of national
16 best efforts restricting unbranded competition with the Blue
17 brands outside of ESAs.
18       If we go to slide 8, Your Honor, and we offer this,
19 again, not to discuss the history of what was done but the
20 fact of what was known by the Blues in terms of what would
21 happen from a practical business and economic perspective of
22 regulating unbranded competition.  They considered some of
23 them, of the unbrandeds, as traitors and they knew that there
24 were those who were unwilling to participate in the regulation
25 of competition.  This was before the best efforts rules were

1    imposed on the local level.  They knew they were regulating
2    competition in the market illegally.
3            And if we look at slide 9, Your Honor, what kind of
4    competition is it that they knew that they were restraining?
5    To the extent that these stronger, more diverse plans compete
6    on an unbranded basis, the Blue document says before the
7    enactment of the local best efforts with Blue Cross and Blue
8    Shield plans, such additional competition -- and this is the
9    key -- like the competition which the plans are already facing
10   from other commercial companies.  So the unbrandeds of the
11   Blues were no different than any other inter-brand competition
12   that the Blues were facing and they knew it, and yet they also
13   knew that there were public benefits if that competition on an
14   inter-brand basis were not regulated because the public
15   benefits from more and better choices, whether they come from
16   commercial insurance companies, HMOs, or unbranded
17   subsidiaries of the Blue Cross Plan, conflict with the
18   underlying principle of the American free enterprise system
19   that consumers benefit from competition that results in
20   improved products, services, and prices.
21           And if we take a look at slide 10, Your Honor, they
22   knew that the effort to justify this local restraint on
23   unbrandeds was nothing more than a guise, and they knew that
24   the real efforts, as stated in Exhibit 253, that the local
25   best efforts was an important step in protecting the plans

1   from becoming competitors in the same geographic area.
2           Now, let's follow through with that concept.  If we
3   take a look, Your Honor, at slide 12, what happened was these
4   unbrandeds grew in strength.  They became bigger competitors.
5   They became good providers to both doctors and subscribers of
6   competitive offers in the health insurance industry.
7           Today with consolidation, acquisition, mergers, and
8   the expansion of unbranded competition, the competitive
9   landscape is shifting.  We have pure Blue affiliations and we
10  have acquisitions of nonBlue companies by Blue plans.  The
11  historically stable alignment of interests among Blue plans
12  can no longer be taken for granted.  This is looking forward,
13  Your Honor, not backwards.  This is looking at what it is they
14  knew on its face would be the consequences of not regulating
15  unbranded competition from other Blues.  It is quite likely
16  that with no new constraints assuring that our mutual interest
17  remain paramount, we will see a Blue plan faced with a choice
18  where enlightened self-interest will dictate a nonBlue
19  decision.  Code words, if we don't take action to regulate and
20  restrict and restrain this competition, we as Blues are going
21  to lose inter-brand competition to the unbrandeds.
22          And let's take a look, Your Honor, at slide 13.
23  Here is what they knew as opposed to here is what is being
24  expressed in this court with regard to what rights they had or
25  didn't have.  The purpose of trademark enforcement is to avoid

1  public confusion, not to authorize restraints on trade.  And
2  this is what a Blue plan wrote to its other Blue plans under
3  established law, and this was before, Your Honor, those
4  restraints were put into effect.  Under established law,
5  restrictions on unbranded competing models could only be
6  justified by actual proof of confusion, which did not exist at
7  the time they enacted the local best efforts, and the document
8  goes on to say 6 years later, they still can point to no such
9  evidence of actual confusion.
10         So at the time they enacted the national best
11 efforts, there was likewise no evidence of actual confusion.
12 And there was no confusion, Your Honor, by the Blues as to
13 what they were doing.
14         If we look at slide 15, this is an internal memo
15 from Anthem objecting to the enactment or imposition of
16 national best efforts on the Blues as nonBlues.
17         Plans opposing the national best efforts could argue
18 that the purported rationale for such a growth restriction
19 strengthening the brands is really pretext and the real motive
20 for the restriction is anticompetitive.  At the time before
21 the NBEs were agreed to and/or imposed on the Blues, they knew
22 the NBEs would present an increasingly problematic growth
23 constraint.
24         What's equally important is that the national best
25 efforts were meant to decrease the incentives for some plans

1   to grow their own nonBlue brands to compete in the national
2   market.  From an inter-brand competitive point of view, that
3   is critical, because why as a business would you invest in a
4   business opportunity if you know that your profitability or
5   revenue had a ceiling.
6           Of equal importance, Your Honor, if you had an idea
7   for a business that you wanted to grow and enter into, you
8   would want capital for it.  And what bank or financial
9   institution would loan that capital when that bank or
10  financial institution knew that there was no incentive to grow
11  that plan or to grow that business as the market would dictate
12  because there was a rigid ceiling imposed by your inter-brand
13  competitors.
14          If we look at the next slide, number 15, Your Honor
15  this is the practical example that came out in the United
16  States/Anthem trial.  National best efforts rules meaningfully
17  restrict future growth after their transaction if the merger
18  were to be granted.  Why?  Because in order to maintain
19  compliance, the combined entity can only grow $1 outside of
20  the 14 Blue states for every $2 of growth inside the Blue
21  states.  That was an internal Blue Cross assessment of the
22  affects of the implementation of the national best efforts
23  rules on the proposed merger.
24          And the District Court and the Court of Appeals
25  agreed that the national best efforts restricted growth post

1  compliance because the new company would have to manage its
2  total revenue growth to not outpace the Blue revenue growth.
3          If the Court were to so find here, this Court would
4  not, therefore, be alone in finding that the best efforts
5  restraints in the Blue system are output restrictions on
6  inter-brand competition among horizontal competitors.
7          If we could look at the next slide, please.  This is
8  what the Blues knew as well.  It's really a crazy thing they
9  say to themselves.  How can one Blue argue that the rules are
10 not anticompetitive and then turn around and say Blues are
11 worried about a fellow Blue competing in their market and then
12 highlight the license requirements?  They are playing with
13 fire.  And Joe Swedish, CEO of Anthem, says, Great question.
14 We can leave it for the courts to handle.
15         If we look at slide 17, this is what Anthem knew.
16 The national best efforts is an insurmountable barrier to
17 completing the merger with Cigna.  Optimally, the best course
18 of action is to pursue the transaction after the resolution of
19 the Blues' antitrust litigation since it is highly likely that
20 the resolution will substantially modify if not eliminate the
21 national best efforts.  The best course of action is to use
22 the Blues' antitrust litigation as the vehicle to cause and
23 achieve this outcome.
24         But it actually gets worse, Your Honor.  If we look
25 at slide 18, again, Anthem.  In the unlikely scenario that the

1  settlement of the litigation does not modify or eliminate the
2  national best efforts rule, we need to be prepared to
3  challenge the enforcement of the national best efforts rule.
4          When I read that for the first time, I was taken
5  somewhat aback because there's a huge scent of
6  disingenuousness.  The defendants apparently are seeking to
7  have this court declare lawful what they're prepared to
8  challenge as unlawful.
9          THE COURT:  What is the context of that memo or that
10 transcript?
11         MR. HAUSFELD:  That, Your Honor, was taken from --
12         THE COURT:  That's a document from the hearing?
13         MR. HAUSFELD:  That's a document that was quoted in
14 the public hearing on the preliminary injunction motion in the
15 chancery court in Delaware.  We have not seen that memo.  It
16 was never identified in this litigation and, therefore, was
17 not produced in this litigation.
18         If we look at slide 19, Your Honor --
19         THE COURT:  One second.  So the context is the
20 document was referenced and to some degree summarized or
21 quoted in the hearing, but you don't have the document?
22         MR. HAUSFELD:  Correct.  The Blues inquired of one
23 of our class representatives as to his expertise on the
24 competitive affect of the best efforts rules, something you
25 would have thought possibly was not necessarily seeking to

1   elicit a lay opinion, but they did anyway.  They asked the
2   question.  The response is extremely instructive.
3           Can you describe any increased cost or harm to
4   Rolison Trucking, it was asked, as a result of Blue Cross's
5   use of the best efforts rules?  And the witness candidly
6   responded, It don't create free enterprise and competition.
7           Not letting it go, the Blue continued:  You don't
8   have any expertise in competition or economics.  What makes
9   you say that if the relief in that complaint was granted,
10  there would actually be more competition in the health
11  insurance market in the state of Alabama?  And without
12  hesitation, the witness says, I don't have any expertise, but
13  it's common sense.
14          Your Honor, whether it's a matter of common sense,
15  fundamental economics, business predictability or good law,
16  best efforts restraints agreed to by actual or potential
17  horizontal competitors are on their face anticompetitive.
18  Thank you.
19          MS. KALLAS:  Good morning, Your Honor.  I have the
20  fun task of trying to present these facts in an efficient
21  manner.
22          THE COURT:  Well, it looks like my lack of
23  questioning has increased the time you have.
24          MS. KALLAS:  Yes, that's true. But I'm going to try
25  to make it as simple as possible.  I'm going to talk about, as