FILED
2021 Jun-21 PM 02:39
U.S. DISTRICT COURT
N.D. OF ALABAMA


## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| IN RE:<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This Document Relates to**<br>**Provider Track Cases** |

## PROVIDER PLAINTIFFS' RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION REGARDING THE STANDARD OF REVIEW
## APPLICABLE TO PROVIDER PLAINTIFFS' SECTION 1 CLAIMS
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56

**Filed Under Seal Pursuant to Qualified Protective Order (Dkt. 550)**
**and the Order Regarding Revised Sealing Procedures (Dkt. 758)**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED RELEVANT
MATERIAL FACTS ..........................................................................................1

ADDITIONAL UNDISPUTED RELEVANT MATERIAL FACTS ...........................7

ARGUMENT....................................................................................................8

    I.    Controlling Supreme Court Precedent Requires the Application of the *Per Se*
    Rule to the Providers' ESA Claims ......................................................8

        A.    The Standard of Review Does Not Depend on the Effects of the
        Restraints........................................................................................8

        B.    ESAs Did Not "Develop Independently Through Existing Trademark
        Rights," And If They Did, Their Historical Origin Makes No Difference
        to the Standard of Review ..............................................................10

        C.    "Competitive Efficiencies" Are Irrelevant to the Standard of Review......12

        D.    There Is Still No Daylight Between This Case and *Topco* and *Sealy*........14

    II.    The Providers' Claims Have Always Involved NBE ...........................19

        A.    The Providers Have Asked for Relief from NBE from the Beginning
        of This Case And in Their Previous Motion for Summary Judgment.......19

        B.    The Standard of Review Does Not Depend on Proof of Injury or
        Damages........................................................................................22

        C.    In Any Event, the Providers Have Shown Injury from NBE....................23

        D.    It Makes No Difference That the Providers Have Not Yet Quantified
        Their Damages from NBE ..............................................................28

CONCLUSION................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*American Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010) ................................................................................................ 13

*Amey, Inc. v. Gulf Abstract & Title, Inc.*,
  758 F.2d 1486 (11th Cir. 1985) .............................................................................. 27

*Arizona v. Maricopa Cty. Med. Soc.*,
  457 U.S. 332 (1982) ................................................................................................ 17

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ................................................................................................ 26

*Brown v. Electrolux Home Products, Inc.*,
  817 F.3d 1225 (11th Cir. 2016) .............................................................................. 28

*Cardizem CD Anitrust Litig.*,
  105 F. Supp. 2d 682 (E.D. Mich. 2000) ................................................................. 24

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
  479 U.S. 104 (1986) ................................................................................................ 29

*Catch Curve, Inc. v. Venali, Inc.*,
  519 F. Supp. 2d 1028 (C.D. Cal. 2007) .................................................................. 27

*Clorox Co. v. Sterling Winthrop, Inc.*,
  117 F.3d 50 (2d Cir. 1997) ..................................................................................... 12

*CNA Fin. Corp. v. Brown*,
  922 F. Supp. 567, 574 (M.D. Fla. 1996), *aff'd,* 162 F.3d 1334 (11th Cir. 1998) ............ 10

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .................................................................................................. 30

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005) .................................................................................... 23

*Fashion Originators' Guild of Am. v. FTC*,
  312 U.S. 457 (1941) ................................................................................................ 12

*General Leaseways, Inc. v. National Truck Leasing Association*,
  744 F.2d 588 (7th Cir. 1984) (Posner, J.) .......................................................... 13, 14

*Glen Holly Ent., Inc. v. Tektronix Inc.*,
  343 F.3d 1000 (9th Cir. 2003), *opinion amended on denial of reh'g*,
  352 F.3d 367 (9th Cir. 2003) .................................................................................. 27

*In re Cox Enters., Inc.*,
  871 F.3d 1093 (10th Cir. 2017) ...................................................................... 9

*In re Porsche Automobil Holding SE*,
  985 F.3d 115 (1st Cir. 2021) ......................................................................... 21

*Laumann v. Nat'l Hockey League*,
  105 F. Supp. 3d 384 (S.D.N.Y. 2015)........................................................... 27

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
  72 F.3d 1538 (11th Cir. 1996) ................................................................... 9, 22

*Midwestern Waffles, Inc. v. Waffle House, Inc.*,
  734 F.2d 705 (11th Cir. 1984) ................................................................. 28, 29

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
  596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986)........................ 9

*NCAA v. Alston*,
  slip op. at 29 (U.S. June 21, 2021)............................................................... 16

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
  585 F.2d 821 (7th Cir. 1978) ................................................................... 17, 18

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
  669 F.2d 490 (7th Cir. 1982) ....................................................................... 18

*Palmer v. BRG of Georgia, Inc.*,
  498 U.S. 46 (1990)..................................................................................... 21

*Polk Bros., Inc. v. Forest City Enterprises, Inc.*,
  776 F.2d 185 (7th Cir. 1985) ....................................................................... 13

*Procaps S.A. v. Patheon, Inc.*,
  845 F.3d 1072 (11th Cir. 2016) .................................................................... 16

*Ross v. Bank of Am., N.A. (USA)*,
  524 F.3d 217 (2d Cir. 2008)......................................................................... 26

*Timken Roller Bearing Co. v. United States*,
  341 U.S. 593 (1951).................................................................................... 12

*United States v. Sealy, Inc.*,
  1964 WL 8089 (N.D. Ill. Oct. 6, 1964).......................................................... 15

*United States v. Sealy, Inc.*,
  388 U.S. 350 (1967)............................................................................. passim

*United States v. Topco Assocs.*,
    405 U.S. 596 (1972)................................................................................... passim

*Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*,
    549 U.S. 312 (2007).......................................................................................... 18

**Statutes**

15 U.S.C. § 15.............................................................................................................. 29

15 U.S.C. § 15(a) ......................................................................................................... 22

15 U.S.C. § 26.......................................................................................................... 23, 29

**Other Authorities**

2 Rudolf Callmann, *The Law of Unfair Competition and Trade-Marks* (1st ed. 1945) ............... 10

Harry D. Nims, *The Law of Unfair Competition and Trade-Marks* (4th ed. 1947)..................... 10

XI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (3d ed. 2011) ........................... 12, 24

## INTRODUCTION

The Blues seek summary judgment that none of the Providers' claims should be evaluated under the *per se* rule—not even those claims to which this Court has already decided to apply the rule. The sole basis for their motion is one they created shortly before filing their brief (during an extension they requested from the Providers as a courtesy without disclosing their intention to change their rules): they eliminated of the National Best Efforts rule (NBE), while retaining Exclusive Service Areas (ESAs) for their Blue-branded business. Because the Blues do not seek to revisit the Court's ruling that the combination of ESAs and NBE is unlawful *per se*, the change does not affect the standard of review for the Providers' claims from 2008 (the beginning of the limitations period) to April 2021 (when NBE was eliminated). Nor does it affect the standard of review for ESAs going forward, as the Supreme Court has specifically held that exclusive service areas for branded business are *per se* unlawful, even in the absence of restrictions on unbranded business. Moreover, because the Providers still seek injunctive relief to remedy the ongoing effects of the NBE rule, the ESA and NBE rules can still be viewed in tandem for purposes of determining the standard of review. The Blues' attempt to change the standard of review by eliminating just one part of their unlawful rules is too little, too late.

## RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS

The Providers do not dispute the accuracy of Paragraphs 1–2, 5–8, 13, 16, 18–20, 23, and 28 of the Defendants' Statement of Undisputed Relevant Material Facts (Defendants' Facts). The Providers dispute that any of the Defendants' Facts are material to the choice of the standard of review because they are irrelevant as a matter of law, as described below. The Providers respond to the Defendants' Facts as follows:

3.     **Disputed.** Hospital Service Corporation of Alabama, not BCBS-AL, was formed in 1936. Hospital Service Corporation of Alabama did not begin using the Blue Cross mark until 1939 or the Blue Shield mark until 1947.

4.     **Disputed.** Hospital Service Corporation of Alabama, not BCBS-AL, enrolled its first subscribers in 1936.

9.     **Disputed.** Many Blue Plans did not operate statewide, and many Blue Plans did not use the Blue marks on an exclusive basis in the territory they served. "Inter-Plan competition had been a fact of life from the earliest days …." Doc. Nos. 1353-7 and -8. A list of AHA-approved plans from 1938 (the year before the AHA began allowing plans to use the Blue Cross mark) showed multiple plans in California, Connecticut, Illinois, Louisiana, New York (with nine plans), Ohio, Pennsylvania, and Virginia. Doc. No. 2735-3. In 1947, there were twenty-two Blue Shield plans in the State of Washington, five in Oregon, and four in West Virginia. Doc. No. 1353-5 at '851. "Overlapping service areas existed at the time the AHA and AMA exercised ultimate control over certification." Doc. No. 2063 at 39. That same year, the AMA stated that it did not intend to grant exclusivity: "It is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product." Doc. No. 1431-2.  In 1952, when the first Blue Shield agreement was signed, Blue Shield plans competed against each other in Illinois and New York. Doc No. 1350-27. In 1954, when the first Blue Cross agreement was signed, Blue Cross plans competed against each other in Illinois, Kentucky, New York, North Carolina, and Virginia. Doc. No. 1350-27. Even as of 1980, there were 114 Blue Plans in operation, many more than one per state. Doc. No. 1350-9.

10.   **Disputed.** This is a statement of law, not fact. As explained below, the Blue Plans' naked licensing of the Blue marks in the 1930s and 1940s resulted in their abandonment. In the alternative, the Blue Plans' adoption of the Blue marks under conditions controlled by others made them licensees at common law, with no right to enforce territorial exclusivity independent of the license. While some Blue Plans registered the Blue marks locally, registration does not confer ownership; it creates a presumption of validity that can be overcome. Under federal law, two relevant grounds for contesting a trademark are that "the mark has been abandoned by the registrant" and "the mark has been or is being used to violate the antitrust laws of the United States." 15 U.S.C. § 1115(b)(2), (7).

11.   **Disputed.** This paragraph appears to be no more than a summary of Paragraphs 12 and 13. The Providers dispute Paragraph 12 for the reason below.

12.   **Disputed.** Hospital Service Corporation of Alabama, not BCBS-AL, was listed as an approved plan by the AHA in 1938. Doc. No. 2735-3.

14.   **Disputed.** No one owned the Blue marks when the AHA and AMA standards were finalized because the marks had been abandoned through naked licensing.

15.   **Disputed.** This paragraph primarily consists of legal argument, not facts. The Lanham Act could not protect the Blue marks because they had been abandoned.

17.   **Disputed.** No entity had a claim to the Blue marks because they had been abandoned. To the extent that "different entities had different claims to the marks in different parts of the country," their claims were those of licensees, not owners, of the marks.

21.   **Disputed.** The 1954 Blue Cross agreement and the 1952 Blue Shield agreement purport to describe pre-existing rights in the Blue Cross and Blue Shield marks. To the extent those agreements imply that the Blue Plans had independently developed common-law rights in

the marks, they are incorrect because the Blue Plans' rights had been abandoned long before the execution of these agreements, or the Blue Plans were licensees without independent rights. In addition, the 1952 Blue Shield agreement says nothing about territorial limits on the Blue Shield plans' use of the Blue Shield marks; it allows them to use the marks "in commerce among the several states or in foreign commerce." Doc. No. 1353-48 at 2.

22.     **Disputed.** This paragraph is disputed for the same reasons as Paragraph 21.

24.     **Disputed.** The Blue Shield agreement did not explicitly discuss territorial limits at all (*see* ¶ 21 above), and it "limited" any "local right" a plan may have had by asserting that a plan could not assert such a right "in derogation or limitation of any right, privilege or power acquired by" Blue Shield Medical Care Plans. Doc. No. 1353-48 at 3. Thus, the agreements did not merely codify Blue Shield plans' pre-existing rights. Blue Shield plans' registration of marks with their respective states did not change the fact that the Blue Shield marks had been abandoned, or that if they were not abandoned, the Blue Shield plans were licensees.

25.     **Disputed.** The license agreements were not "reaffirmed"; they were substantially changed. Unlike the 1954 Blue Cross agreement, which licensed plans to use the Blue Cross marks in the areas they served in 1954, the 1972 agreement licensed plans to use those marks in the areas they served in 1972. Doc. No. 1353-100 at 1. During that interval, Blue-on-Blue competition had ceased in North Carolina and parts of Kentucky, and had ceased and resumed in part of Illinois. Doc. 2454-3 at Tables 7–9. Moreover, the 1954 Blue Cross agreement provided that upon termination of the agreement, any rights conveyed by the plans to the AHA would revert to those plans, while in the 1972 agreement, all rights would revert to the Blue Cross Association. Doc. No. 1353-50 at 7; Doc. No. 1353-100 at 2–3.

26.    **Disputed.** The Association did more than "reissue" the license agreements; it reworked them substantially. Exclusive service areas expanded to "the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been so granted a subsequent license." Doc. No. 1349-8 at 4; Doc. No. 1349-11 at 3. This change added areas of subsequent licenses for the Blue Cross plans, and was the first explicit statement regarding service areas for Blue Shield plans. For the first time, the new agreements prohibited Blue Plans from contracting with healthcare providers outside their service areas, which was unrelated to any common-law rights the Blues supposedly had. Doc. No. 1349-8 at '681; Doc. No. 1349-11 at '022.

27.    **Disputed.** The license agreements explicitly did not refer to the plans' rights at common law, but to the plans' service areas as of 1972 and subsequent times. (*See* ¶ 26 above.) While the agreements themselves did not redraw any territorial lines, they were issued during the Association's efforts to redraw territorial lines by consolidating plans, and formed the contractual basis for doing so. *See* Doc. No. 2063 at 14–15 (discussing the Long-Term Business Strategy and the Assembly of Plans).

29.    **Disputed.** Had they not abandoned the Blue Cross and Blue Shield marks, the St. Paul and Buffalo plans would have had the right at common law to license or govern their use on a national scale.

30.    **Disputed.** The assertion that focus on service areas is consistent with common law is a legal assertion, not a fact, and it is incorrect for reasons explained in Part I.B of this brief. Service areas also grew out of the plans' desire to eliminate competition in order to consolidate their influence over providers in a given service area and enhance their ability to obtain provider participation in the plans on favorable terms, including lower reimbursement

rates. Doc. No. 1431-29. In interviews conducted by the Association, Plan CEOs stated that service areas create "[l]arger market share because other Blues stay out and do not fragment the market," Doc. No. 1350-22, that "[b]y enjoying exclusive territories, Plans can bargain aggressively. In turn, national accounts enjoy local discounts," Doc. No. 1350-23, and that without service areas, "there would be open warfare," Doc. No. 1350-24.

31.     **Disputed.** The Blues' "Network Compare" reports are a decade or more old and explicitly disclaim that they are reliable. Doc. Nos. 2734-1 to 6 ("Consortium Health Plans makes no warranties on the accuracy of the data …."). Some of these reports show that the Blues do not have significantly broader networks than other commercial insurers nationwide or in Alabama. Doc. No. 2734-6 (showing that BCBS-AL contracts with 3.2% more facilities than United in Alabama, and that the Blues contract with 5.9% more facilities than United nationwide). Using more recent data, the Providers' expert Dr. Slottje found that of the members of the putative Acute Care Hospital Provider 23(b)(3) Class, 99% are in United's network, 95% are in Cigna's, and 87% are in Aetna's. Doc. No. 2632-1 at Ex. 6.

32.     **Disputed.** The Blues do not need BlueCard to give subscribers a single point of contact. Even in the 1940s, a subscriber had a single point of contact: his or her home plan. Doc. No. 1431-6. Cigna, United, and Aetna offer their subscribers a single point of contact, and the Blues could continue to do so, even with competition. The Blues cite no evidence to support the statement that "no single Blue Plan (or group of Blue Plans) could develop comparable networks nationally on its own." To the contrary, Anthem is larger than Aetna and Cigna, which have nationwide networks, and has expressed a desire to compete in all fifty states. Doc. No. 1350-3 at 656:13–16 (*United States v. Anthem, Inc.*, No. 16-cv-1493 (D.D.C.) Trial Tr.); Doc. No. 1350-32

at 83:10–18, 87:3–9, 89:13–16, 238:21–239:4 (*United States v. Anthem, Inc.*, Swedish Tr.). If Anthem cannot develop a broad nationwide network, the reason is the Blues' restraint of trade.

33.  **Disputed.** The Subscriber Settlement does not "expressly leave in place the Blue Plan's historic service areas." It allows the Blues to maintain their service areas "in accordance with the License Agreement(s) and Membership Standards as of the Execution Date." Doc. No. 2610-2 (Subscriber Settlement) ¶ 13. Those service areas are not the Blues' "historic service areas," as explained in the Providers' responses to Defendants' Facts 21, 22, and 24–27.

## ADDITIONAL UNDISPUTED RELEVANT MATERIAL FACTS

1.  "In 1934, the St. Paul hospital Plan began using a blue cross symbol. (Docs. # 1349 at 11; 1431 at 15; 1435 at 11). The first use of the Blue Shield Service Mark was by the Western New York Plan, located in Buffalo, New York, in 1939. (Doc. # 1350-35 at 2). Other Plans began using these same symbols as well (*Id.*; Docs. # 1349 at 11; 1431 at 15; 1435 at 12)." Doc. No. 2063 at 5.

2.  "Both the St. Paul and Buffalo Plans acquiesced in, and even encouraged, other Plans to use the Cross and Shield Marks during this time period. (Docs. # 1349 at 11; 1431 at 15; 1435 at 12). The St. Paul Plan allowed Plans in every bordering state (North Dakota, South Dakota, Wisconsin, and Iowa) to use the Blue Cross Marks. (Doc. # 1353-4 at 29-30). The Buffalo Plan allowed Plans in Syracuse and Rochester (locations close to Buffalo) as well as other Plans in New York to use the Blue Shield Mark. (Doc. # 353-5 at 38)." Doc. No. 2063 at 5–6.

3.  The St. Paul plan never controlled the quality of services provided by other users of the Blue Cross marks. Doc. No. 1350-28 at 42:20–43:1. The Buffalo plan never controlled the quality of services provider by other users of the Blue Shield marks. *Id.* at 124:18–125:1.

4.      "By 1939, the American Hospital Association ('AHA') issued 'Standards for Non-Profit Hospital Service Plans.' (Doc. # 1350-13). Under these standards, approval by the AHA's Commission on Hospital Service gave a Plan 'permission to identify the plan by using the seal of the American Hospital Association superimposed upon a blue cross.' (Docs. # 1350-13 at 5–6; Doc. # 1353-19 at 6)." Doc. No. 2063 at 3.

5.      "The American Medical Association ('AMA') also approved the concept of prepayment plans, and promulgated approval standards for such plans. (Docs. # 1349 at 12; 1431 at 15; 1435 at 13). The AMA set up the Associated Medical Care Plans ('AMCP') 'to administer the approval program' for Blue Shield Plans. (Doc. # 1353-7 at 84-85). Medical care plans that met the AMA/AMCP's standards likewise could use a blue shield emblazoned with a caduceus. (Docs. # 1353-20 at 16; 1431 at 15; 1435 at 13)." Doc. No. 2063 at 3.

6.      Hospital Service Corporation of Alabama, the predecessor to Blue Cross Blue Shield of Alabama, first used the Blue Cross mark in 1939, after the AHA had formalized its requirements for hospital plans. It first used the Blue Shield mark in 1947, after the AMA approved standards for medical plans to use the Blue Shield. Doc. No. 2728 at 3.

7.      Today, Blue Plans compete with each other in California, Idaho, and parts of Pennsylvania, Washington, and New York. Doc. No. 2454-3 at Table 8.

## ARGUMENT

I.      **Controlling Supreme Court Precedent Requires the Application of the *Per Se* Rule to the Providers' ESA Claims.**

A.      **The Standard of Review Does Not Depend on the Effects of the Restraints.**

Taking bits and pieces from various opinions, the Blues imply that potentially procompetitive effects of their restraints—even if they are genuinely disputed—require the Court to apply the rule of reason. Doc. No. 2728 ("MSJ") at 13–15. Essentially, the Blues have

repackaged their argument from their previous motion that "Plaintiffs must demonstrate, with uncontroverted evidence, an agreement that … has **no** plausible procompetitive benefits …." Doc. No. 1349 at 26. The Court has already explained that this argument contradicts Eleventh Circuit precedent. Doc. No. 2063 at 25. In the Eleventh Circuit, "an antitrust plaintiff's ability to proceed on a *per se* theory depends on 'whether there was an agreement' to commit conduct that the Supreme Court has held to be unreasonable [*per se*] 'because the unreasonableness of the restraint is presumed.'" *Id.* (quoting *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545–46 (11th Cir. 1996)). While the Blues cite unspecified "material factual questions about the nature of the challenged restraint itself," MSJ at 15, every restraint the Providers are challenging is written down, in black and white, in the Blues' own documents. Thus, the Court is faced with the same question of law it faced the last time: do the Blues' agreements, whose existence and terms are undisputed, constitute conduct that the Supreme Court has held to be unreasonable *per se*? As it was before, the answer is yes.

The Blues also suggest that if there are genuine disputes of fact, the rule of reason must apply. MSJ at 15. This is incorrect. If genuine disputes of fact preclude the Court from determining the proper standard of review, then the determination must wait until the dispute is resolved. This can occur as late as the end of trial. *See Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984) (making the determination after a nine-week bench trial), *aff'd*, 779 F.2d 592 (11th Cir. 1986); *In re Cox Enters., Inc.*, 871 F.3d 1093 (10th Cir. 2017) (affirming a decision under Rule 50(b) not to apply the *per se* rule based on the evidence presented to the jury).

**B.** **ESAs Did Not "Develop Independently Through Existing Trademark Rights," And If They Did, Their Historical Origin Makes No Difference to the Standard of Review.**

In their motion for summary judgment on the Blues' common-law trademark rights, the Providers explain that based on the undisputed facts, the Blues long ago abandoned their rights in the Blue Cross and Blue Shield marks through "naked licensing," or the Blues lacked independent rights to the marks because they used the marks as licensees. The Blues admit that the original Blue Cross and Blue Shield plans allowed other plans to use those marks without any attempt to control the quality of the services the other plans provided. Providers' Facts 1–3. Allowing someone else to use one's mark without controlling the quality of services provided is known as "naked licensing." "When a service mark owner engages in naked licensing, without any control over the quality of the services rendered by the licensee, such a practice is inherently deceptive and constitutes abandonment of any rights to the service mark by the licensor." *CNA Fin. Corp. v. Brown*, 922 F. Supp. 567, 574 (M.D. Fla. 1996), *aff'd*, 162 F.3d 1334 (11th Cir. 1998). Even if the marks were not abandoned, the Blues have asserted that some of the Blues acquired exclusive service areas through "vertical licenses from the AHA and AMA where there was no prior use." Doc. No. 1551 (Defendants' MSJ Reply) at 2. Blue Cross and Blue Shield of Alabama was one of these licensees, as it never used the Blue Cross or Blue Shield marks before being licensed to do so by the AHA and AMA. Providers' Facts 4–6. At common law, these Blues did not have an "independent" right to the Blue Cross or Blue Shield marks; they had the limited rights granted to a licensee, which were revocable by the licensor. Doc. No. 1431-27, 1 Harry D. Nims, *The Law of Unfair Competition and Trade-Marks*, at 129 (4th ed. 1947) (a licensee loses its right to use the mark when its contract ends); Doc. No. 1431-28, 2 Rudolf Callmann, *The Law of Unfair Competition and Trade-Marks*, at 1067 (1st ed. 1945) ("The licensee only acquires the right to a limited use of the trade-mark, for the title to and reversionary

10

interest in that use remain with the owner."). Therefore, the idea that the *per se* rule should not apply because "ESAs arose out of independent common-law trademark rights," MSJ at 16, rests on a faulty premise. At best, the Blues' rights arose the same way the Sealy manufacturers' rights arose: through licenses.

Even if factual disputes preclude summary judgment for the Providers on this issue, the same factual disputes would preclude summary judgment in favor of the Blues as well. When addressing the standard of review last time, this Court identified several disputes that prevented the Blues from relying on the historical use of their trademarks to avoid the *per se* rule, including extensive evidence that service areas were not necessarily exclusive as a matter of fact or as a matter of contract. Doc. No. 2063 at 39; *see also* Response to Defendants' Fact 9. Additionally, the Court noted that whatever restraints might have existed in the 1940s and 1950s, they are not the same restraints that exist in the aftermath of the Blues' Long-Term Business Strategy and Assembly of Plans. *Id.* at 40. These facts led the Court to conclude that "the Rule 56 evidence in the record supports the proposition that the allocation of areas was the result of the Association's plan to (1) consolidate Blue Cross and Blue Shield Plans and (2) issue new licensing agreements reflecting the competitive restraints agreed to by a majority of the Blue Plans." *Id.* The Blues' history has not changed since this Court last decided the issue, and the Blues have not identified any evidence that would erase the genuine factual disputes that the Court identified before. Therefore, the Blues cannot win summary judgment when their argument depends on exclusive service areas arising from "independent common-law trademark rights."

In addition, using trademark agreements to allocate territories (outside of the narrow doctrine of concurrent use, which does not apply here), is unlawful regardless of how the Blues' trademark rights arose. As a matter of law, a defendant cannot claim "that collusion or market

division is necessary to prevent firms from violating one another's intellectual property rights, or to discipline others who are violating them." XI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1907 (3d ed. 2011) (citing *Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457 (1941)); *United States v. Sealy, Inc.*, 388 U.S. 350, 357 (1967) ("In *Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951), as in the present case, it was argued that the restraints were reasonable steps incident to a valid trademark licensing system. But the Court summarily rejected the argument, as we do here."). If the Blues had enforceable common-law rights to exclude each other from competition in their service areas under the Blue marks, then the common law gave them everything they needed to enforce those rights. They did not need to create an association that not only enforced those rights but also changed them over the years. *See* Doc. No. 2063 at 39–40 (discussing the Long-Term Business Strategy and Assembly of Plans); *id.* at 12–13 (discussing changes in service areas in response to antitrust challenges).[1]

### C.   "Competitive Efficiencies" Are Irrelevant to the Standard of Review.

The Blues' argument that "ESAs should be analyzed under the rule of reason because they arise in a novel factual context and ultimately enable competitive efficiencies," MSJ at 19–20, is the same one they made the last time around. *Compare* MSJ at 19–23 *with* Doc. No. 1349 at 27–41. The Court has already held that this argument fails. Specifically, the supposed "novel factual context" is the Blues' alleged development of independent trademark rights. MSJ at 20–21; Doc. No. 1349 at 37–38 (same argument). The Court was "not persuaded," as described above. Doc. No. 2063 at 39–40. The "competitive efficiencies" amount to the Blue Plans' ability

---

[1] The Second Circuit's opinion in *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50 (2d Cir. 1997), which the Blues cite several times, deals with a completely different issue. There, the parties had agreed to limitations on the types of products they could market under the names LYSOL and PINE–SOL, and the style of their packaging, to avoid confusion between the two marks. The Court distinguished this type of agreement from one "auxiliary to an underlying illegal agreement between competitors—such as the territorial market division condemned in *Timken*." *Id.* at 60.

"to offer a nationwide Blue product that no single Plan could offer on its own." MSJ at 21–23; Doc. No. 1349 at 28–36 (same argument). The Court has noted that this is wrong as a matter of fact: "The Blues offered a similar health insurance product -- through syndicates and with open provider networks -- both before and after the alleged allocations of markets; therefore, it cannot be said that the market allocations were *necessary* to market the Blues' health insurance product at all," Doc. No. 2063 at 44. Moreover, it is incorrect as a matter of law to state that a "nationwide Blue product" must escape *per se* condemnation:

> [D]efining the product as "NFL football" puts the cart before the horse: Of course the NFL produces NFL football; but that does not mean that cooperation amongst NFL teams is immune from § 1 scrutiny. Members of any cartel could insist that their cooperation is necessary to produce the "cartel product" and compete with other products.

*American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 199 n.7 (2010).[2]

As they did in their last brief, the Blues rely heavily on the Seventh Circuit's opinion in *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir. 1985). There, a retailer of home furnishings agreed with a retailer of building materials that they would build a building large enough to accommodate both of their stores, on the condition that they not sell overlapping products. *Id.* at 187. The Seventh Circuit held that this condition must be judged by the rule of reason because it was ancillary to a procompetitive purpose: the construction of a new store. *Id.* at 190. More relevant here is *General Leaseways, Inc. v. National Truck Leasing Association*, 744 F.2d 588 (7th Cir. 1984) (Posner, J.), an opinion *Polk Bros.* cited with approval. In *General Leaseways*, about 130 local companies that leased trucks were members of the National Truck Leasing Association, which allowed them to access each other's service facilities as their leased trucks traveled across the country. *Id.* at 589. That aspect of their association did not violate the

---

[2] The Blues also invoke *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016), without addressing this Court's previous rejection of the Blues' arguments based on the same case. Doc. No. 2063 at 45.

antitrust laws. *Id.* at 590. But the association also designated the location at which each member could operate, limiting the competition among the association's members. *Id.* The Seventh Circuit held that this arrangement was not an ancillary restraint and was unlawful *per se*: "Although some degree of cooperation among members of National Truck Leasing Association in providing reciprocal services may well promote competition in the truck-leasing industry, no reason has been suggested why that cooperation requires that members be forbidden to compete with each other in leasing trucks." *Id.* at 595. Likewise, there is no reason the Blue Plans cannot offer nationwide coverage while competing with each other, just as they already do in California, Idaho, and parts of Pennsylvania, Washington, and New York. Providers' Fact 7.

**D.     There Is Still No Daylight Between This Case and *Topco* and *Sealy*.**

In a section of its previous opinion titled, "The ESAs in Which Blue Plans May Sell Blue-Branded Insurance are At Least as Anticompetitive as the Exclusive Sales Areas at Issue in *Sealy* and *Topco*," the Court stated that the restrictions on Blue-branded competition "are *directly comparable* to the license conditions enacted by the defendants in *Sealy* and *Topco*." Doc. No. 2063 at 40 (citations omitted) (emphasis added). The license conditions in *Sealy* and *Topco* did not limit the defendants' sales of mattresses under brands other than Sealy, or groceries under brands other than *Topco*. *United States v. Sealy, Inc.*, 388 U.S. at 356 n.3; *see United States v. Topco Assocs.*, 405 U.S. 596, 601–02 (1972) (quoting bylaws that applied restrictions to Topco-branded products only). So while this Court did not need to decide last time whether ESAs are *per se* unlawful on their own—without the National Best Efforts rules—its analysis and the holdings of *Sealy* and *Topco* dictate that they are.

The Blues offer three purported distinctions between this case and *Topco* and *Sealy*, two of which the Court has already rejected, and the third of which is misguided.

The first distinction is that the Blues' territorial allocation "merely recognized and codified *pre-existing* trademark rights," while the Topco and Sealy licensees did not have such pre-existing rights. MSJ at 23–24. The Blues made the same argument in their last motion for summary judgment: "[T]he *Topco* and *Sealy* defendants did not possess exclusive trademark rights in their own territories prior to the challenged agreement." Doc. No. 1349 at 39. As described above, this Court disagreed: "Defendants claim that the service areas arose from either common law trademark rights or plan requirements imposed vertically by the AHA and AMA. The court is not persuaded." Doc. No. 2063 at 39 (citation omitted).

Even if the Blues' pre-existing trademark rights were not in dispute, it would still be unlawful *per se* for the Blues to restrain competition by centralizing those rights in an association they control. In *Sealy*, when the defendant manufacturers established a corporation and took ownership of the Sealy trademarks, they continued to license those trademarks with the same territorial restrictions as the previous licensor. *United States v. Sealy, Inc.*, 1964 WL 8089, at *7–8, 14 (N.D. Ill. Oct. 6, 1964). The district court held that these territorial restrictions did not violate Section 1 of the Sherman Act because "there has never been a central conspiratorial purpose on the part of Sealy and its licensees to divide the United States into territories in which competitors would not compete." *Id.* at *17. This is the ruling the Supreme Court reversed, holding that the territorial restrictions "must be classified as horizontal restraints," *Sealy*, 388 U.S. at 352, which were therefore unlawful *per se*, *id.* at 357–58. When the Blues took over the rights to the Blue Cross marks from the AHA in 1972, they were doing exactly what the Sealy manufacturers did. Although the Blues' sloppiness in trademark assignments makes the story murkier for the Blue Shield marks, *see* Doc. No. 2063 at 6, the Blues' control over those marks is similarly a conversion of vertical control (by the AMA) to horizontal control (through Blue

Shield Medical Care Plans (BSMCP)), or possibly even horizontal control from the beginning (through the Commission of Associated Medical Care Plans and its successor BSMCP). Defendants' Facts 13, 16, 18; *see also* Doc. No. 2063 at 6 (describing the role of the Commission of Associated Medical Care Plans). Either way, the arrangement is *per se* unlawful under *Sealy* and *Topco*.

The Blues' second distinction is that the *Topco* and *Sealy* agreements lacked "any redeeming virtue," while the Blues "work together for the benefit of consumers—for example, by making available a nationwide Blue offering that no Blue Plan could offer on its own given the Blues' history at common law." MSJ at 24. The Blues made this same argument last time, Doc. No. 1349 at 39, and the Court rejected it: "The Blues offered a similar health insurance product -- through syndicates and with open provider networks -- both before and after the alleged allocations of markets; therefore, it cannot be said that the market allocations were *necessary* to market the Blues' health insurance product at all," Doc. No. 2063 at 44. There are several other reasons to reject this argument to. It is simply not true that the *Topco* and *Sealy* agreements "lacked any redeeming virtue"; Topco proved at trial that it "was doing a greater good by fostering competition between members and other large supermarket chains," 405 U.S. at 610, and the Supreme Court acknowledged that the existence of private label products "has improved the competitive potential of Topco members with respect to other large and powerful chains," *id.* at 600. Yet Topco's allocation of territories for the sale of branded products was unlawful *per se*. Moreover, by calling the product at issue a "nationwide Blue offering," the Blues are doing exactly what the Supreme Court says they cannot do: "relabel[ing] a restraint as a product feature." *NCAA v. Alston*, slip op. at 29 (U.S. June 21, 2021). Finally, if a defendant could distinguish *Topco* or *Sealy* on the ground that their market allocation allegedly benefits

16

customers, the *per se* rule would cease to exist. *See Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 (1982) ("The respondents' principal argument is that the *per se* rule is inapplicable because their agreements are alleged to have procompetitive justifications. The argument indicates a misunderstanding of the *per se* concept.").

The third and final distinction is not about *Topco* and *Sealy* themselves, which are binding on this court, but subsequent opinions of the Seventh Circuit in a different suit relating to the Sealy corporation. Based on these opinions, the Blues conclude that *Sealy* "is especially inapplicable to the provider- (or "buy-side") effect of ESAs," which the Blues analogize to Sealy's exclusive manufacturing territories. MSJ at 24. The Seventh Circuit's opinions explicitly contradict the Blues' conclusion. Discussing *Sealy*, the Seventh Circuit stated that the Supreme Court had held Sealy's "system of exclusive *manufacturing and sales* territories" unlawful *per se* because it "operated to give each licensee an enclave free from the competition of other Sealy licensees." *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 823–24 (7th Cir. 1978) ("*Ohio-Sealy I*") (emphasis added). Thus, the Seventh Circuit did not question the holding of *Sealy* that maintaining exclusive territories on both the "buy-side" and the "sell-side" (as the Blues admittedly do) is a *per se* violation of the Sherman Act. The Seventh Circuit's discussion makes clear that *Sealy* is directly applicable to the provider-side effect of the ESAs.

The holdings of these later cases do not support the Blues' position by implication either. As the Blues note, after *Sealy* was decided, Sealy relaxed its rules to allow licensees to sell in each other's territories, so long as they paid each other fees to compensate the "invaded" licensee for the costs of advertising and product repairs. *Ohio-Sealy I*, 585 F.2d 821, 826–27 (7th Cir. 1978). But Sealy retained the right to dictate where its licensees could locate their factories, even within their own territories. *Id.* at 828. This rule limited out-of-area sales because "the great

majority of mattress sales are made within 200–300 miles of a manufacturing plant," and the licensees were not free to locate their factories at the periphery of their territory without permission. *Id.* A jury found the new rules, in combination, to be *per se* unlawful as well. *Id.* at 827. After an appeal and remand, the district court enjoined several of Sealy's rules, including the imposition of fees for selling outside of a licensee's territory. *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 669 F.2d 490, 495 (7th Cir. 1982) ("*Ohio-Sealy II*"). Licensees were still limited to manufacturing mattresses in their own territories, but Sealy could not dictate the specific locations. The ability to put factories near other licensees' territories, and the lack of fees for selling into those territories, allowed for "significant intrabrand competition among neighboring licensees." *Id.* at 496. For that reason, the Seventh Circuit held that it was unnecessary to enjoin exclusive manufacturing territories. *Id.*

The facts of *Ohio-Sealy* differ from this case in important ways. First, *Ohio-Sealy* was not even about the effect of Sealy's rules on competition in manufacturing, because the Sealy licensees were the manufacturers *and* the sellers. *Ohio-Sealy II*, 669 F.2d at 823, 828 (with a limited exception, "Ohio[-Sealy] does not attack Sealy's exclusive manufacturing area system"). Here, the Providers do attack the Blues' ESAs as they apply to contracting with providers, which they claim has damaged competition in the market for the purchase of healthcare services.[3] And as explained in Section II.C below, they also have shown that they are harmed by ESAs as they apply to selling insurance, a restriction even the Blues would have to admit is within the scope of *Sealy* and *Ohio-Sealy.* Second, medical services cannot be shipped like mattresses. A mattress

---

[3] If the Seventh Circuit had held that competitors can allocate markets for the purpose of contracting with manufacturers (which it didn't), that holding would no longer be viable after the Supreme Court's decision in *Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.* that "The kinship between monopoly and monopsony suggests that similar legal standards should apply to claims of monopolization and to claims of monopsonization." 549 U.S. 312, 322 (2007).

factory in Birmingham may enhance competition for the sale of mattresses 150 miles away in Atlanta, but a doctor in Birmingham will have little or no effect on competition for the sale of medical services in Atlanta. Third, unlike in *Ohio-Sealy*, the Blues' territorial limits on selling insurance have not been enjoined.[4] In combination with those limits, the Blues' territorial limits on contracting preclude "significant intrabrand competition among neighboring [Blue] licensees." *Id.* at 496. Thus, the Seventh Circuit's reasoning for allowing exclusive manufacturing territories does not apply here. In short, *Ohio-Sealy* supports, not undermines, the Providers' claim that the Blues' "buy-side" territorial allocation is unlawful *per se*.

## II.     The Providers' Claims Have Always Involved NBE.

Because Exclusive Service Areas on their own are unlawful *per se*, the Court need not reach the Blues' argument that the Providers have no *per se* claims left because NBE has been eliminated. In any event, that argument fails because it is based on the frivolous assertion that the Providers have never asserted claims based on NBE, and the Blues' incorrect and irrelevant arguments that the Providers have not been injured by NBE because they have not yet quantified their damages.

### A.     The Providers Have Asked for Relief from NBE from the Beginning of This Case And in Their Previous Motion for Summary Judgment.

When the Providers filed their first complaint in this case nearly nine years ago, they alleged that the NBE rules were unlawful *per se*. *Conway v. Blue Cross & Blue Shield of Ala.*, No. 12-cv-2532-RDP, Doc. No. 1, at ¶¶ 101–02 ("*Conway* Complaint"). In its opinion denying

---

[4] The Blues' settlement with the Subscribers opens up competition slightly, allowing a second Blue plan to bid for national accounts under certain conditions. Doc. No. 2610-2 at 29–30. This provision does not help the Providers, as the local Blue plan is still the only one that will contract with a provider, backed by the collective market share of all the Blues. Ex. 1 (Declaration of H.E. Frech, III, Ph.D.) ¶¶ 10–12. Notably, the settlement continues to allow the Blues to impose Most Favored Nation and Most Favored Nation-Plus clauses on providers, limiting price competition in the market for providers' services. *Id.* ¶¶ 7–9.

the Blues' motions to dismiss, this Court cited that allegation: "Specifically, Plaintiffs allege that Defendants have illegally agreed to place limits on the extent to which Blues can compete under their non-Blue brands …." Doc. No. 204 at 8 (citing the Providers' Amended Complaint). That allegation has carried through to the Providers' Fourth Amended Complaint, Doc. No. 1083, ("Compl."), which specifically describes NBE and its effects on competition, as the Blues acknowledge. MSJ at 26 (citing Compl. ¶¶ 5, 15, 190–95, 365). The Providers incorporated that discussion into the section of the Complaint called "The BCBS Market Allocation Conspiracy": "As described above, Defendants allocate geographic markets for health care financing and health care services by restricting each Defendant's activity outside of a designated geographic Service Area." Compl. ¶ 317. In that same section, the Providers specifically invoked limits on unbranded competition:

> Numerous Blues and non-Blue businesses owned by Defendants could and would compete effectively in other Service Areas but for the territorial restrictions. … In fact, as set forth above, the restrictions did not initially address competition by non-Blue businesses owned by defendants; however, when it became evident that such competition was an "increasing problem" the restrictions were revised to address this as well.

Compl. ¶ 319. The Providers also described the expansions of a few Blues into other service areas on an unbranded basis, noting that "these expansions are currently extremely limited by the restrictions on competition." *Id.* Having made clear that NBE is part of the "Market Allocation Conspiracy" described in the Complaint, the Providers have sought to have it declared unlawful *per se*, Compl. ¶¶ 466–70, Request for Relief part (b), and to have it enjoined, *id.* ¶ 460–65, Request for Relief parts (d) and (e). Only a newcomer to this case who has not bothered to learn its history or read the pleadings carefully could conclude that the "Providers' case has never been about NBE." MSJ at 26.

20

Homing in on the standard of review, the Blues claim that "Providers' prior standard of review briefing similarly focused only on ESAs." MSJ at 27. This argument "resembles the thirteenth chime on a clock: You not only know it is wrong, but it also causes you to wonder about everything else you hear from that clock." *In re Porsche Automobil Holding SE*, 985 F.3d 115, 119 (1st Cir. 2021). As the Court knows, all three of the Providers' briefs on the standard of review prominently discussed NBE. In the paragraph directly under the heading "The Blues' Agreements to Allocate Markets Are Unlawful *Per Se*," the Providers' opening brief stated, "The Association's rules also provide that each plan must derive at least four fifths of its revenue in its service area, and two thirds of its revenue nationwide, from its Blue-branded business." Doc. No. 1350 at 12. That brief also pointed out that NBE made the Blues' agreements more restrictive than the ones condemned in *Topco* and *Sealy*. *Id.* at 20. Nine pages of the Providers' response to the Blues' motion feature discussion of NBE, Doc. No. 1431 at 6–7, 14–15, 19–20, 36, 48–49, including an argument that the Blues deprived the market of independent centers of decisionmaking by limiting non-Blue revenue, *id.* at 18–20. The Providers also contended that NBE is unlawful *per se* and that "a market allocation agreement that covers non-branded competition is not ancillary to the transfer of rights to use a brand," *id.* at 36, and included a section called "The 'Best Efforts' Rules Are Unlawful Limitations on Output," *id.* at 48–49. The Providers' reply brief compared NBE to the *per se* unlawful agreement in *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990), Doc. No. 1553 at 11 n.5, and featured a section called "The 'Best Efforts' Rule Is a Naked Limit on Output," *id.* at 18–19. If it were possible to attach a neon sign saying "NBE is Unlawful *Per Se*" to a brief, it could hardly have made the point more forcefully.

In their own briefing on the standard of review, the Blues never asked the Court to treat the Providers and Subscribers differently when it came to NBE. Moreover, they specifically acknowledged in their reply brief that the Providers had challenged NBE as unlawful *per se*. Doc. No. 1556 at 34–35. And the Court's opinion on the standard of review never implied that NBE was an issue raised only by the Subscribers. Instead, it held that "Plaintiffs [not 'Subscribers'] have presented evidence of an aggregation of competitive restraints -- namely, the adoption of ESAs and, among other things, best efforts rules -- which, considered together, constitute a *per se* violation of the Sherman Act." Doc. No. 2063 at 37. If the Court held *sub silentio* that its ruling did not apply to the Providers, that significant fact somehow escaped everyone's notice for the last three years. The Blues' contention that the "Providers' case has never been about NBE," MSJ at 26, is belated and wrong.

### B.     The Standard of Review Does Not Depend on Proof of Injury or Damages.

The Eighth Amended Scheduling Order sets two deadlines: one for "motions related to the antitrust standard of review," and one for "potentially dispositive motions on issues of liability." Doc. No. 2718. That distinction matters because the standard of review and issues of liability require different proof. As this Court explained, "an antitrust plaintiff's ability to proceed on a *per se* theory depends on 'whether there was an agreement' to commit conduct that the Supreme Court has held to be unreasonable [*per se*] 'because the unreasonableness of the restraint is presumed.'" Doc. No. 2063 at 25 (quoting *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545–46 (11th Cir. 1996)). Application of the *per se* rule automatically leads to the conclusion that the defendant has violated the Sherman Act, but it does not establish liability by itself. For that, a plaintiff must show that he was "injured in his business or property by reason of" the violation (to recover damages), 15 U.S.C. § 15(a), or faces "threatened loss or

22

damage by" the violation (for injunctive relief), *id.* § 26. Thus, determination of the standard of review does not depend on an evaluation of liability. *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 437 (2d Cir. 2005) ("Further, it is useful to distinguish the question of whether an antitrust violation occurred from whether plaintiffs have standing to pursue it.").

The Blues' motion "Regarding the Antitrust Standard of Review" jumps the gun by roping in issues of liability unrelated to the relief the motion seeks, which is "summary judgment for Defendants on Provider Plaintiffs' *per se* Claims" (but not the quick look or rule of reason claims) and "analy[sis of] Provider Plaintiffs' Section 1 claims under the rule of reason." Doc. No. 2727. The Blues' assertions that "Providers Do Not Quantify Damages from NBE" and that "NBE Has Not Injured Providers," MSJ at 27, 29, go to liability, not the standard of review. The Blues recognize as much, arguing that the Providers must demonstrate that they suffered quantifiable economic damages "[t]o establish liability." *Id.* at 28. Nowhere in this part of their brief do the Blues cite any authority that a plaintiff's ability to prove injury or quantify its damages affects whether its claim must be judged under the rule of reason or the *per se* standard. Because the Blues' motion and brief never ask the Court to rule on issues of liability, Sections II.C and II.D of the brief are irrelevant and should be ignored.

### C.   In Any Event, the Providers Have Shown Injury from NBE.

To hear the Blues tell it, not only did the Providers ignore NBE in their previous briefing on the standard of review (which is not true), but they also conceded that they had no injury from NBE because they did not submit expert testimony with that briefing. Of course, the reason the Providers did not submit expert testimony is that they didn't have to; proving antitrust injury was not relevant to the limited issue of the appropriate standard of review for the Blues' rules (and it still isn't). "Because the question of which rule applies is one of law and experts can testify only

about matters of fact, expert testimony on that issue is generally inadmissible." Areeda ¶ 1909b

(citing *Cardizem CD Anitrust Litig.*, 105 F. Supp. 2d 682, 694 (E.D. Mich. 2000)).

When it came time to discuss their injury from NBE during class certification, the

Providers did it in spades. Citing detailed record evidence, the Providers' expert Dr. Haas-

Wilson discussed NBE's origin as a response to BCBSA's concern that Blue Plans were

competing against each other on an unbranded basis. Doc. 2454-6 ¶¶ 126–30. She noted the

resistance of some Blue Plan CEOs to NBE on the grounds that it would inhibit the growth of

plans. *Id.* ¶ 345. Even after NBE was implemented, Anthem, the largest Blue Plan, criticized the

application of NBE to its proposed merger with Cigna because, in Anthem's words, "it might

create a case study for plaintiffs in the MDL," i.e., this very case. *Id.* ¶ 344. Another of the

Providers' experts, Dr. Frech, provided even more evidence that NBE arose from a desire to limit

competition among the Blues, and that it was highly controversial when adopted. Doc. 2454-3

¶¶ 321–30. In 2001, before NBE was applied to all Blue Plans, Anthem wrote to BCBSA that "it

is indeed ironic that the Plans are considering a new BCBSA regulation that would threaten that

resurgence and weaken the very Brands that the Association is supposed to protect." *Id.* ¶ 325.

And NBE ultimately helped sink Anthem's merger with Cigna, which would have allowed

Anthem to compete across state lines. As the CEO of BCBSA testified in litigation relating to

that merger, "plans don't want to hear that a member of the Association is going to compete

aggressively against them." *Id.* ¶ 330. Dr. Frech also directly addressed the Blues' experts'

contentions that NBE did not prevent competition in Alabama because plans had "headroom" to

enter Alabama without violating the NBE rules, pointing out that "[e]ntering as a new competitor

in only one state may not meet the desired scale of entry for a Blue Plan," and that NBE would

constrain multi-state entry. *Id.* ¶ 205.

Dr. Haas-Wilson's report also explained at length how providers are harmed by rules that are nominally "subscriber-facing," MSJ at 27. For example, the rules that generally prohibit the Blues from selling Blue-branded products outside of their exclusive service area are subscriber-facing. Doc. 2454-6 ¶¶ 91–103. Dr. Haas-Wilson explained how these rules, which she calls the "Market Allocation Agreements on Selling," harm providers:

> [T]he Market Allocation Agreements on Selling have limited the number of potential sellers of healthcare financing services in Alabama and therefore the number of potential buyers for Alabama healthcare providers' services. In the absence of competing Blue Plans, the Market Allocation Agreements on Selling have increased BCBS-AL's volume of enrollees and therefore its "homed share" in the relevant antitrust markets in Alabama.

*Id.* ¶ 324. Using her statistical model, she then showed that the subscriber-facing Market Allocation Agreements on Selling injure all General Acute Care Hospitals, *independent* of any provider-facing rules such as the Blues' agreement not to contract with providers outside their ESAs. *Id.* ¶¶ 529–37. Implementing Dr. Haas-Wilson's model, the Providers' expert Dr. Slottje calculated damages to Alabama providers from the subscriber-facing rules to be more than $3.8 billion. Doc. 2454-14 ¶ 88(e). The Blues' claim in their latest motion that the Providers have not been injured by "subscriber-facing" rules does not even begin to address the thorough work by the Providers' experts showing that "subscriber-facing" rules can have significant consequences for healthcare providers, much less prove it beyond a genuine issue of fact.

Dr. Haas-Wilson also explained how NBE injures providers by the same mechanism as the Blues' Market Allocation Agreements on Selling: reducing the number of potential sellers of healthcare financing services, and thus the number of potential buyers of healthcare providers' services. Using data on the Blues' enrollments, Dr. Haas-Wilson also showed that some of the Blues most likely to enter Alabama—the Florida, Tennessee, and Mississippi Blue Plans—are disincentivized from investing in that business because NBE precludes it from becoming more

than a small share of their overall business: as low as ten percent, for Mississippi. Doc. 2454-6 ¶ 343. She explained that the sale of unbranded business in Alabama would have reduced BCBS-AL's "contracting share." *Id.* ¶¶ 548–51. Although Dr. Haas-Wilson did not have the data necessary to calculate the resulting damages on a classwide basis, her statistical model predicts that such a reduction in BCBS-AL's contracting share would lead to higher reimbursements for healthcare providers. *Id.*

Beyond showing injury through lower prices, Dr. Haas-Wilson also explained how the lack of additional non-Blue Plans in Alabama reduces providers' ability to bargain for the types of contract terms they prefer, and to pursue value-based care and other innovative approaches to reimbursement. *Id.* ¶¶ 389–95. In a footnote, the Blues claim that lack of choice is not an antitrust injury, but this Court recently used those same harms—lack of choice and reduced innovation—to justify its preliminary approval of the Subscriber Settlement. Doc. No. 2641 at 16 ("reduced consumer choice" was a classwide issue); *id.* at 21 (second Blue bid will "create increased choice"); *id.* at 22–23 (predominance element satisfied because Subscribers alleged that "virtually every member of the Damages Class suffered antitrust injury through payment of higher premiums, depressed competition, lessened innovation, and loss of consumer choice"); *id.* at 26–27 (business practice changes allow "the potential for Class Members to achieve greater consumer choice, better product availability, and increased innovation"). If reduced innovation and lack of consumer choice are not antitrust injuries, it would have been an odd choice to emphasize them so heavily in the preliminary approval order.[5]

---

[5] Other courts, including the Supreme Court, have also found that a reduction in choice and reduced innovation can result in antitrust injury. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983) ("Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions ...."); *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 223 (2d Cir. 2008)

The Providers' experts' discussion of NBE, its history, its effects, and the way it harms healthcare providers would come as a complete surprise to anyone who had only read the Blues' motion for summary judgment. That motion singles out a mere two paragraphs of Dr. Haas-Wilson's report to create the appearance that she merely speculated on the "likely" effects of NBE, and it ignores Dr. Frech's analysis entirely. MSJ at 29, 30 n.8. The Blues contend that Dr. Haas-Wilson's theory of injury causation is "far too attenuated and speculative," without ever explaining why. *Id.* at 29. As the movants, the Blues have the burden to show that there is no genuine issue as to any material fact bearing on their contention that NBE has not injured providers. Doc. No. 2063 at 21. Yet they cite no evidence that would substantiate their position, or voice any specific disagreement with Dr. Haas-Wilson's or Dr. Frech's analysis.

Lastly, the Blues claim that a theory of injury from NBE is inconsistent with the Providers' construction of the "but-for" world, in which the Blues' various anticompetitive agreements never existed. MSJ at 30. The Providers must confess that they have no idea what this argument means. In the "but-for" world, the Blues never restricted their ability to compete with each other, under the Blue brands or any other brands. In the real world, the Blues restricted

---

(cardholders had "adequately alleged antitrust injuries in fact" where they alleged they had been "deprived of any meaningful choice on a critical term and condition of their general purpose card accounts" and asserted injuries of "reduced choice and diminished quality of credit card services"); *Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1010–11 (9th Cir. 2003), *opinion amended on denial of reh'g*, 352 F.3d 367 (9th Cir. 2003) (finding antitrust injury where defendants' conduct limited choice); *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 396–97 (S.D.N.Y. 2015) (limitations on choice constitute antitrust injuries); *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1035–36 (C.D. Cal. 2007) (finding the plaintiff had sufficiently alleged antitrust injury and denying motion to dismiss injunctive relief claims where the plaintiff alleged "a dangerous probability of 'stifl[ing] innovation' in the market"). The Eleventh Circuit's decision in *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486 (11th Cir. 1985), does not hold otherwise. In the language that the Blues cherry-pick, the Court was applying the statute of limitations to the plaintiff's claim for damages. *Id.* at 1501. As the Providers explain in Section II.D, antitrust injury and damages are two different concepts. Nowhere does *Amey* state that the lack of choice cannot be an antitrust injury.

their ability to compete under the Blue brands for several decades, and under non-Blue brands beginning no later than 2005. Because the statute of limitations cuts off damages prior to 2008, the Providers suffered injury from both restrictions for the entire period at issue. The Providers honestly do not understand why the Blues believe that the Providers cannot have been injured by the NBE rules simply because they were introduced later than ESAs, and can find no explanation in the Blues' brief.

### D.    It Makes No Difference That the Providers Have Not Yet Quantified Their Damages from NBE.

The Providers have offered evidence that they have been injured by NBE as a class, but they have not quantified their damages. To the Blues, this is fatal to the Providers' attempt to establish liability because "Providers must demonstrate not only a violation of the antitrust laws, but also 'that [they] suffered economic damages which are quantifiable.'" MSJ at 28 (quoting *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 723 n.3 (11th Cir. 1984)). Here, the Blues make two fundamental mistakes.

The Blues' first mistake is to misinterpret the lack of quantified *classwide* damages as an admission that no Provider can quantify those damages. While Dr. Haas-Wilson did not have data that would allow her to analyze classwide damages resulting from NBE (as she did for ESAs), she noted that individual Providers may do so. Doc. 2454-6 (Haas-Wilson Report) ¶ 551. Moreover, the Providers' motion for class certification asked for a procedure specifically designed to accommodate proof of damages to individual Providers after the resolution of classwide issues, such as whether the Blues violated the Sherman Act, and whether the Providers were injured by the NBE rules. Doc. No. 2604 at 34–35 (citing procedures sanctioned by the Eleventh Circuit in *Brown v. Electrolux Home Products, Inc.*, 817 F.3d 1225, 1339 (11th Cir. 2016)). Yet the Blues ask the Court to assume, based on nothing, that no Provider will be able to

prove damages from NBE at any stage of this case. Summary judgment requires more than a defendant's own unexplained assertions.

The Blues' second mistake is to assume that a plaintiff must always quantify its damages to establish antitrust liability. Of course, a plaintiff seeking damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, must quantify them. That is the holding of *Midwestern Waffles* and *McClure*, which the Blues cite. MSJ at 28. But a plaintiff seeking an injunction under Section 16 of the Clayton Act, *id.* § 26, faces no such requirement. "It is plain that § 16 and § 4 do differ in various ways. For example, § 4 requires a plaintiff to show actual injury, but § 16 requires a showing only of 'threatened' loss or damage …." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 (1986). Since this case began, the Providers have sought an injunction against the NBE rules under Section 16 of the Clayton Act. *Conway* Complaint ¶¶ 101–02, 132; Compl. ¶¶ 317–19, 464. Even if the NBE rules themselves are no longer in effect, the Providers will continue to seek an injunction whose scope is broad enough to eliminate the consequences of the Blues' long-standing prohibition on unbranded competition. *Nat'l Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679, 697 (1978) ("Having found the Society guilty of a violation of the Sherman Act, the District Court was empowered to fashion appropriate restraints on the Society's future activities both to avoid a recurrence of the violation and to eliminate its consequences."); *id.* at 698 ("The standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct. … While [the injunction] goes beyond a simple proscription against the precise conduct previously pursued that is entirely appropriate."). Even if an injunction is not available, the Providers could still

establish their past injury from NBE on a classwide basis under Rule 23(c)(4).[6] *See* Doc. No. 2604 at 39–43 (requesting such a procedure and explaining its legal basis). Thus, the Providers need not quantify their damages in order to hold the Blues liable for violating Section 1 of the Sherman Act; they only need to show a threat of loss or damage, and they can do so.

Because the Providers have shown injury from NBE (or at least have identified a genuine dispute with respect to injury), they do not have the same problem that sank the plaintiffs in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). There, the Supreme Court held that it was improper to certify a class whose damages model estimated the total damages from four of the defendants' practices, when only one of those practices was unlawful, and the damages from this practice could not be isolated. *Id.* at 36–38. Here, the Providers are not seeking any damages based on a lawful practice.

## CONCLUSION

Under *Sealy* and *Topco*, it is unlawful *per se* to agree not to sell branded products outside of defined territories. The Blues have agreed not to sell branded products outside of defined territories. Therefore, the Blues' conduct is unlawful *per se*. Even if, contrary to *Sealy* and *Topco*, *per se* unlawfulness also requires a restriction on the sale of unbranded products, the Blues had such a restraint, and the Providers have challenged that restraint and shown how it injured them. Thus, there is no need to disturb the Court's previous opinion that the *per se* standard applies to the Blues' territorial restrictions and output limits.

---

[6] Even without NBE, there is nothing to stop BCBS-AL from creating a "Green" network that it requires its contracted providers to join, and then renting that network to Blue plans entering Alabama on an unbranded basis for a fee. Ex. 1 (Frech Decl.) ¶¶ 3–6. In this way, BCBS-AL (and other Blues) could mitigate the benefit to providers that unbranded entry would provide.

Dated: June 21, 2021

/s/ Edith M. Kallas
Edith M. Kallas – **Co-Lead Counsel**
WHATLEY KALLAS, LLP
152 West 57th Street
41st Floor
New York, NY  10019
Tel:  (212) 447-7060
Fax: (800) 922-4851
Email: ekallas@whatleykallas.com


Patrick J. Sheehan
WHATLEY KALLAS, LLP
101 Federal Street
19th Floor
Boston, MA 10019
Tel:  (617) 573-5118
Fax:  (617) 371-2950
Email: psheehan@whatleykallas.com


Henry C. Quillen
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH  03801
Tel:  (603) 294-1591
Fax:  (800) 922-4851
Email: hquillen@whatleykallas.com


Charles Clinton Hunter
HAYES HUNTER PC
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (281) 768-4731
Fax: (713) 583-7047
Email: chunter@hayeshunterlaw.com


Respectfully submitted,

/s/ Joe R. Whatley, Jr.
Joe R. Whatley, Jr. – **Co-Lead Counsel**
W. Tucker Brown
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel:  (205) 488-1200
Fax:  (800) 922-4851
Email: jwhatley@whatleykallas.com
            tbrown@whatleykallas.com


Deborah J. Winegard
WHATLEY KALLAS, LLP
1068 Virginia Avenue, NE
Atlanta, GA 30306
Tel:  (404) 607-8222
Fax:  (404) 607-8451
Email: dwinegard@whatleykallas.com


E. Kirk Wood, Jr. – **Local Facilitating
Counsel**
WOOD LAW FIRM LLC
P. O. Box 382434
Birmingham, AL 35238
Tel:  (205) 612-0243
Fax:  (205) 705-1223
Email: ekirkwood1@bellsouth.net


Aaron S. Podhurst – **Plaintiffs' Steering
Committee**
Peter Prieto – **Chair, Expert Committee**
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue
Suite 2300
Miami, FL  33131
Tel:  (305) 358-2800
Fax:  (305) 358-2382
Email: apodhurst@podhurst.com
            pprieto@podhurst.com

Dennis Pantazis – *Plaintiffs' Steering Committee*
Brian Clark – *Discovery Committee*
WIGGINS CHILDS PANTAZIS FISHER
  GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel:  (205) 314-0500
Fax:  (205) 254-1500
Email: dgp@wcqp.com
        bclark@wcqp.com

U.W. Clemon – *Plaintiffs' Steering
Committee*
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL  35222
Tel: (205) 837-2898
Email: clemonu@bellsouth.net

Dennis C. Reich – *Chair, Damages Committee*
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (713) 622-7271
Fax:  (713) 623-8724
Email:  dreich@rbfirm.net

J. Mark White – *Litigation Committee*
Augusta S. Dowd – *Chair, Litigation
Committee*
Linda G. Flippo – *Discovery Committee*
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel:  (205) 323-1888
Fax:  (205) 323-8907
Email: mwhite@whitearnolddowd.com
        adowd@whitearnolddowd.com
        lflippo@whitearnolddowd.com

Nicholas B. Roth – *Chair, Discovery Committee*
Julia Smeds Roth – *Discovery Committee*
EYSTER KEY TUBB ROTH MIDDLETON
  & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email: nbroth@eysterkey.com
        jroth@eysterkey.com

Van Bunch – *Chair, Class Certification
Committee*
BONNETT FAIRBOURN FRIEDMAN &
  BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel:  (602) 274-1100
Fax:  (602) 274-1199
Email: vbunch@bffb.com

David A. Balto – *Expert Committee*
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email: david.balto@dcantitrustlaw.com

Robert J. Axelrod – *Chair, Written Submissions Committee*
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
Tel: (646) 448-5263
Fax: (212) 840-8560
Email: rjaxelrod@axelrodllp.com

Joey K. James – *Litigation Committee*
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel:  (256) 764-0095
Fax:  (256) 767-5705
Email: joey@bunchandjames.com

W. Daniel Miles, III – *Written Submissions Committee*
BEASLEY ALLEN CROW METHVIN PORTIS
  & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel:  (800) 898-2034
Fax:  (334) 954-7555
Email: dee.miles@beasleyallen.com

Richard S. Frankowski – *Discovery Committee*
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL  35233
Tel:  (205) 390-0399
Fax: (205) 390-1001
Email: richard@frankowskifirm.com

Michael C. Dodge – *Expert Committee*
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel:  (972) 419-7172
Email: mdodge@gpm-law.com

John C. Davis – *Written Submissions Committee*
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel:  (850) 222-4770
Email: john@johndavislaw.net

Michael E. Gurley, Jr. – *Discovery Committee*
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel:  (205) 908-6512
Email: mgurleyjr@yahoo.com

Mark K. Gray – *Discovery Committee*
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel:  (502) 805-1800
Fax:  (502) 618-4059
Email: mgray@grayandwhitelaw.com

Stephen M. Hansen – *Class Certification Committee*
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel:  (253) 302-5955
Fax:  (253) 301-1147
Email: steve@stephenmhansenlaw.com

Harley S. Tropin – *Damages Committee*
Javier A. Lopez – *Discovery Committee*
KOZYAK TROPIN &
  THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email: hst@kttlaw.com
          jal@kttlaw.com

C. Wes Pittman – *Settlement Committee*
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel:  (850) 784-9000
Fax:  (850) 763-6787
Email: wes@pittmanfirm.com

Lynn W. Jinks, III – *Expert Committee*
Christina D. Crow – *Discovery Committee*
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel:  (334) 738-4225
Fax:  (334) 738-4229
Email: ljinks@jinkslaw.com
          ccrow@jinkslaw.com

Myron C. Penn – *Discovery Committee*
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel:  (334) 738-4486
Fax:  (334) 738-4432
Email: myronpenn28@hotmail.com

J. Preston Strom, Jr. – *Litigation Committee*
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel:  (803) 252-4800
Fax:  (803) 252-4801
Email: petestrom@stromlaw.com

Thomas V. Bender – *Discovery Committee*
Dirk L. Hubbard
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Tel:  (816) 421-0700
Email:  tbender@hab-law.com
          dhubbard@hab-law.com

Robert B. Roden – *Litigation Committee*
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel:  (205) 933-8383
Fax: (205) 933-8386
Email: rroden@shelbyroden.com

Gregory S. Cusimano – *Litigation Committee*
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL  35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email:  greg@alalawyers.net

Gary E. Mason – *Class Certification Committee*
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel:  (202) 429-2290
Fax:  (202) 640-1160
Email: gmason@wbmllp.com

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel:  (320) 289-2363
Fax:  (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Michael L. Murphy – *Discovery Committee*
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC  20006
Tel:  (202) 463-2101
Fax: (202) 463-2103
Email: mmurphy@baileyglasser.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
Email: alamb@archielamb.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel:  (719) 471-1984
Fax: (719) 577-4356
Email: lance@searsassociates.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA  51101
Tel:  (712) 234-3030
Fax: (712) 234-3034
Email:  paul@lundberglawfirm.com

Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK  99501
Tel:  (907) 277-5400
Fax:  (907) 277-9896
Email:  Jessica@dillonfindley.com
          Ray@dillonfindley.com
          Molly@dillonfindley.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com

Cynthia C. Moser
HEIDMAN LAW FIRM
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA  51101
Tel:  (712) 255-8838
Fax  (712) 258-6714
Email:  Cynthia.Moser@heidmanlaw.com