FILED

2021 Jun-21  PM 02:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This Document Relates to**<br>**Provider Track Cases** |

**PROVIDER PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR PARTIAL SUMMARY JUDGMENT ON**
**DEFENDANT'S CLAIM TO COMMON-LAW TRADEMARK RIGHTS**


**Filed Under Seal Pursuant to Qualified Protective Order (Dkt. 550)**
**and the Order Regarding Revised Sealing Procedures (Dkt. 758)**

**TABLE OF CONTENTS**

UNDISPUTED RELEVANT MATERIAL FACTS ..................................................................... 1

ARGUMENT .............................................................................................................................. 4

I.   The Original Owners of the Blue Marks Abandoned the Marks Through "Naked Licensing" ........................................................................................................................ 4

II.  In the Alternative, All But Two of the Blues Were No More Than Vertical Licensees Without Any "Independently Acquired Common-Law Trademark Rights." ...................... 7

CONCLUSION .......................................................................................................................... 8

## TABLE OF AUTHORITIES

**Cases**

*CNA Fin. Corp. v. Brown*,
    922 F. Supp. 567 (M.D. Fla. 1996), *aff'd*, 162 F.3d 1334 (11th Cir. 1998) ...................... 4, 5

*Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*,
    304 F.3d 1167 (11th Cir. 2002). .................................................................................. 4

*Hanover Milling Co. v. Metcalf*,
    240 U.S. 403 (1915) .................................................................................................. 7

*Pike v. Ruby Foo's Den, Inc., of Md.*,
    232 F.2d 683 (D.C. Cir. 1956) .................................................................................. 6

*Thomas Pride Mills, Inc. v. Monsanto Co.*,
    155 U.S.P.Q. 205, 1967 WL 7489 (N.D. Ga. June 14, 1967) ........................................ 5, 7

*United Drug Co. v. Theodore Rectanus Co.*,
    248 U.S. 90 (1918) ............................................................................................... 6, 7

*VMG Enterprises, Inc. v. F. Quesada & Franco, Inc.*,
    788 F. Supp. 648 (D.P.R. 1992) .................................................................................. 5

**Other Authorities**

2 Rudolf Callmann,
    *The Law of Unfair Competition and Trade-Marks* (1st ed. 1945) .................................... 7, 8

3 McCarthy on Trademarks and Unfair Competition § 20:84 (5th ed.) ............................................ 6

Harry D. Nims,
    *The Law of Unfair Competition and Trade-Marks* (4th ed. 1947) .................................... 7, 8

McCarthy on Trademarks and Unfair Competition § 3:10 (4th ed. 2001) ........................................ 7

In this litigation, the Blues have repeatedly claimed that they "independently acquired common-law trademark rights" to exclude other plans from their "service areas." Doc. No. 1353 (Defendants' Motion for Summary Judgment) at 1. But they never had such rights. This is because the Blues have admitted that the first plans to use the Blue Cross and Blue Shield marks allowed nearby plans to use those marks without controlling the quality of the services the plans provided. This is known as "naked licensing" at common law, and it resulted in the abandonment of rights in the marks. Therefore, shortly after the marks were created, no Blue plan had the common-law right to exclude others from using those marks wherever they pleased. Even if the marks were not abandoned, the Blues' own account of their history and their admissions in this litigation show that many Blue plans, including the Alabama plan, used the marks under the control of others. The common law treated one who used a trademark under the control of another as a licensee, whose rights to use the mark extended no farther than the license and terminated with the license. Therefore, the Court should enter partial summary judgment that the Blues abandoned their marks, or in the alternative, that only the original users of the Blue Marks, the St. Paul plan and the Buffalo plan, independently acquired common-law trademark rights, with the rest of the Blues being licensees at most.

## UNDISPUTED RELEVANT MATERIAL FACTS

1.      "In 1934, the St. Paul hospital Plan began using a blue cross symbol. (Docs. # 1349 at 11; 1431 at 15; 1435 at 11). The first use of the Blue Shield Service Mark was by the Western New York Plan, located in Buffalo, New York, in 1939. (Doc. #1350-35 at 2). Other Plans began using these same symbols as well (Id.; Docs. # 1349 at 11; 1431 at 15; 1435 at 12)." Doc. No. 2063 at 5.

2.      "Both the St. Paul and Buffalo Plans acquiesced in, and even encouraged, other Plans to use the Cross and Shield Marks during this time period. (Docs. #1349 at 11; 1431 at 15;

1

1435 at 12). The St. Paul Plan allowed Plans in every bordering state (North Dakota, South Dakota, Wisconsin, and Iowa) to use the Blue Cross Marks. (Doc. # 1353-4 at 29-30). The Buffalo Plan allowed Plans in Syracuse and Rochester (locations close to Buffalo) as well as other Plans in New York to use the Blue Shield Mark. (Doc. #353-5 at 38)."  Doc. No. 2063 at 5–6.

3.     The St. Paul plan never controlled the quality of services provided by other users of the Blue Cross Marks. Doc. # 1350-28 (Rotunno Tr.) at 42:20–43:1. The Buffalo plan never controlled the quality of services provider by other users of the Blue Shield Marks. *Id.* at 124:18–125:1.

4.     "By 1939, the American Hospital Association ('AHA') issued 'Standards for Non-Profit Hospital Service Plans.' (Doc. # 1350-13). Under these standards, approval by the AHA's Commission on Hospital Service gave a Plan 'permission to identify the plan by using the seal of the American Hospital Association superimposed upon a blue cross.' (Docs. # 1350-13 at 5–6; Doc. # 1353-19 at 6)." Doc. No. 2063 at 3.

5.     By the beginning of 1938, which is before the AHA allowed approved plans to use the Blue Cross Marks, there were thirty-eight plans using those marks. Doc. No. 1353-4 at 23.

6.     "The American Medical Association ('AMA') also approved the concept of prepayment plans, and promulgated approval standards for such plans. (Docs. # 1349 at 12; 1431 at 15; 1435 at 13). The AMA set up the Associated Medical Care Plans ('AMCP') 'to administer the approval program' for Blue Shield Plans. (Doc. # 1353-7 at 84-85). Medical care plans that met the AMA/AMCP's standards likewise could use a blue shield emblazoned with a caduceus. (Docs. # 1353-20 at 16; 1431 at 15; 1435 at 13)." Doc. No. 2063 at 3.

7.     By the beginning of 1946, the year when the AMA announced standards for medical service plans, thirty-two plans were using the Blue Shield Marks. Doc. No. 1353-5 at 35.

8.     "On December 13, 1947, the Blue Shield Medical Care Plans (the 'National

Organization') formally adopted the Shield Mark as the official service mark for the Organization. (Docs. # 1350-35 at 2; 1353-48). Thereafter, in 1950, Blue Shield Medical Care Plans applied for federal registration of the Blue Shield Marks. (Docs. # 1353-46; Doc. # 1353-48)."  Doc. No. 2063 at 6.

9.      "The Blue Shield Medical Care Plans had permission from the first user, the Buffalo Plan, to apply for registration. (Docs. # 1353-101; 1436-11 at 135-40.)"  Doc. No. 2063 at 6.

10.     "[O]n December 1, 1952, the users of the Shield Mark entered into an Agreement (the '1952 Agreement') relating to the Collective Service Mark 'Blue Shield.'  (*Id.*; Doc. # 1352-227 at 24). Although the Plans 'recogni[zed] that the words "Blue Shield" and the identifying symbol *are* the property of the National Organization,' the 1952 Agreement is silent as to the assignment of any rights in the Shield Mark to the National Organization. (Doc. # 1353-48 at 3) (emphasis added). It is also silent as to the creation and/or existence of any exclusive service areas. (*Id.*). Under the 1952 Agreement, the Blue Shield Plans were granted 'permission' to use the Blue Shield Marks in interstate and foreign commerce. (*Id.*)."  Doc. No. 2063 at 6.

11.     "Previously, in 1947 and 1948, the AHA applied for and received federal registrations for the Blue Cross Marks, stating that it had adopted and was using the Marks. (Docs. # 1350-40, 1530-41, and 1530-42). However, at that time, the AHA did not have an assignment from the first user, the St. Paul Plan, and did not receive a formal assignment of the rights to the Blue Cross Mark until 1954. (Doc. # 1436-11 at 56-57)."  Doc. No. 2063 at 7.

12.     Hospital Service Corporation of Alabama, the predecessor to Blue Cross Blue Shield of Alabama, first used the Blue Cross mark in 1939, after the American Hospital Association had formalized its requirements for hospital plans. It first used the Blue Shield mark in 1947, after the American Medical Association approved standards for medical plans to use the Blue Shield. Doc. No. 2728 at 3.

3

**ARGUMENT**

**I.      The Original Owners of the Blue Marks Abandoned the Marks Through "Naked Licensing."**

In a 1987 draft White Paper, the Blues recognized that "[t]he law imposes a duty on the owner of the marks to control and maintain the quality of services rendered under the marks." Doc. No. 1352-227 at 55. The Blues were correct. Allowing someone else to use one's mark without controlling the quality of services provided is known as "naked licensing." "When a service mark owner engages in naked licensing, without any control over the quality of the services rendered by the licensee, such a practice is inherently deceptive and constitutes abandonment of any rights to the service mark by the licensor." *CNA Fin. Corp. v. Brown*, 922 F. Supp. 567, 574 (M.D. Fla. 1996), *aff'd*, 162 F.3d 1334 (11th Cir. 1998); *see also* Doc. No. 2063 at 6 n.4 (the Blues' draft White Paper "recognized that unlicensed and unauthorized use of trademarks can result in abandonment"). "[A] defendant who successfully shows that a trademark plaintiff has abandoned a mark is free to use the mark without liability to the plaintiff." *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1173 (11th Cir. 2002).

Starting in 1934, the St. Paul Blue Cross plan allowed other plans to use the Blue Cross Marks without controlling the quality of their services. Facts 1–3. By the beginning of 1938, which is before the AHA allowed approved plans to use the Blue Cross Marks, there were thirty-eight such plans. Facts 4–5. Starting in 1939, the Buffalo Blue Shield plan allowed other plans to use the Blue Shield Marks without controlling the quality of their services. Facts 1–3. By the beginning of 1946, when the AMA announced standards for medical service plans, thirty-two plans were using the Blue Shield Marks. Facts 6–7. This is a textbook case of naked licensing, and thus of trademark abandonment.

The Blues may respond that the AHA and AMA (and their successor organizations) eventually controlled the quality of the services marketed under the Blue Cross and Blue Shield

Marks. There are several problems with this argument. First, by the time the AHA began to authorize the use of a blue cross in 1939, and the AMA began to authorize the use of a blue shield in 1946, the trademarks had already been abandoned. Belatedly imposing quality control could not resurrect them. Second, quality control is the responsibility of the mark's "owner." Doc. No. 1352-227 at 55 (Blues' White Paper); *CNA Fin. Corp.*, 922 F. Supp. at 574. The St. Paul plan was the owner of the Blue Cross Marks, and it did not assign them to the AHA until 1954. Facts 10–11. The AMA apparently never owned the Blue Shield Marks, and it is unclear whether the Buffalo plan ever assigned those marks to Blue Shield Medical Care Plans, which registered them in 1950. Facts 8–9. Therefore, the owners of the marks failed to exercise quality control for many years beyond the introduction of the AHA and AMA standards. Third, even if this mismatch in ownership were not a fatal problem, the exercise of quality control over the Blue plans would simply demonstrate that they were vertical licensees, not the first users to whom the common law granted trademark rights. *See* Section II.

The Blues' premise—that dozens of companies can independently develop rights to the same marks—is antithetical to the purpose of trademarks, which is "to indicate a single source of origin of the articles to which it refers." *Thomas Pride Mills, Inc. v. Monsanto Co.*, 155 U.S.P.Q. 205, 1967 WL 7489, at *4 (N.D. Ga. June 14, 1967). At common law, valid trademarks simply do not develop the way the Blues' did, with the owner encouraging others to use the mark without quality control. It speaks volumes that the Blues' starring authority is *VMG Enterprises, Inc. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648 (D.P.R. 1992), a case that involved two companies, one in Washington State and one in Puerto Rico, that had both been using the same mark, apparently without each other's knowledge. Under the Lanham Act, they were thus permitted to enter into a "concurrent use" agreement, which is available to "two or more entities [that] independently and *unknowingly* develop rights to use identical trademarks on the same or similar goods." *Id.* at 654

(emphasis added). A concurrent use agreement under the Lanham Act reflects the common-law principle that if a geographically remote junior user of a mark innocently adopted and used the mark without any knowledge of the senior use, the junior user may establish concurrent common-law rights in its geographically remote territory. *Id.*; *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 103–04 (1918).

The Blues, however, admit that the earliest Blue plans began using the Blue Cross and Blue Shield Marks with knowledge of the St. Paul and Buffalo plans' use, and they were not geographically remote. Blue Cross plans sprang up in every state bordering Minnesota, and Blue Shield plans sprang up in areas of New York close to Buffalo. Fact 2. Therefore, the Blues would not have qualified for concurrent use under the common law or the Lanham Act. *Rectanus*, 248 at 100 (junior use must be "innocent" (i.e., without knowledge) and "remote"); *Pike v. Ruby Foo's Den, Inc., of Md.*, 232 F.2d 683, 686 (D.C. Cir. 1956) ("The Federal cases are virtually unanimous against a knowing junior user."); 3 McCarthy on Trademarks and Unfair Competition § 20:84 (5th ed.) ("A [Lanham Act] § 2(d) 'lawful use' sufficient for concurrent use cannot be one made with actual or constructive notice of the senior user's rights.").[1]

Because the earliest Blue plans knowingly used the senior users' marks with permission and without quality control, the Blue Marks were abandoned before anyone imposed standards for their use. While the Providers are not asking the Court to cancel the Blues' federal registrations, it is abundantly clear that at common law, no Blue plan other than the St. Paul and Buffalo plan ever

---

[1] Arguably, the Fifth Circuit created an exception to this rule when the junior user did not intend to benefit from the senior user's goodwill or reputation, and when there was no likelihood of confusion as to source. *El Chico, Inc. v. El Chico Cafe*, 214 F.2d 721, 726 (5th Cir. 1956). That exception would not apply here, as the entire point of using the Blue Cross and Blue Shield Marks was to benefit from the goodwill associated with them, and a likelihood of confusion as to source is obvious when multiple companies sell the same product using the same names and marks in close proximity to each other. Moreover, Fifth Circuit law would not have applied to the earliest use of the Blue Cross and Blue Shield Marks, which took place in the Second, Seventh, and Eighth Circuits.

6

developed a common-law right that would allow it to exclude others from using the Blue Marks in its territory of use, and that the St. Paul and Buffalo plans promptly abandoned those rights through naked licensing.

### II.    In the Alternative, All But Two of the Blues Were No More Than Vertical Licensees Without Any "Independently Acquired Common-Law Trademark Rights."

A fundamental principle of trademark law is that there can only be a single owner of a mark. "The primary functions of a trademark are to indicate a single source of origin of the articles to which it refers and to offer assurance to ultimate consumers that articles so labeled will conform to quality standards established and, when licensed to others, controlled by the trademark proprietor." *Thomas Pride Mills*, 1967 WL 7489, at *4 (cited in McCarthy on Trademarks and Unfair Competition § 3:10 (4th ed. 2001)). Common-law trademark rights are established by being the first user of a mark in commerce. *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 100 (1918); *Hanover Milling Co. v. Metcalf*, 240 U.S. 403, 413-14 (1915). At one time, as the first user, the St. Paul plan owned common-law rights in the Blue Cross Marks within its territory of use. Likewise, the Buffalo plan at one time owned common-law rights in the Blue Shield Marks within its territory of use.

At common law in the 1930s and 1940s, an entity's use of a trademark under conditions controlled by the trademark's owner was considered a license. Doc. No. 1431-27, 1 Harry D. Nims, *The Law of Unfair Competition and Trade-Marks*, at 128 (4th ed. 1947); *see* Doc. No. 1431-28, 2 Rudolf Callmann, *The Law of Unfair Competition and Trade-Marks*, at 1070–71 (1st ed. 1945). According to the Blues, the use of the Blue Cross Marks was subject to conditions established by the AHA by 1939, and the use of the Blue Shield Marks was subject to conditions established by the AMA by 1946. Doc. No. 2728 at 5. This is consistent with the testimony of the Association's corporate representative, who admitted that before entering into the 1952 Blue

Shield agreement and the 1954 Blue Cross agreement, Blue Cross and Blue Shield plans operated pursuant to a license. Doc. No. 1350-28 at 135:14–140:10. Therefore, the Blue plans were never "senior users" of the Blue marks, entitled to the protection awarded to someone who uses a mark for the first time. Instead, they had the rights of a licensee—the right to use a mark owned by another under certain conditions. They did not have an "independent" right to the Blue Cross or Blue Shield Marks. Doc. No. 1431-27, Nims at 129 (a licensee loses its right to use the mark when its contract ends); Doc. No. 1431-28, Callmann at 1067 ("The licensee only acquires the right to a limited use of the trade-mark, for the title to and reversionary interest in that use remain with the owner.").

The last time this issue came up, the Blues admitted that at least some plans were mere licensees, claiming that exclusive service areas "arose from common-law trademark rights *or vertical licenses from the AHA and AMA where there was no prior use*." Doc. No. 1551 (Defendants' MSJ Reply) at 2 (emphasis added). Hospital Service Corporation of Alabama, the predecessor of Blue Cross Blue Shield of Alabama, was one of these vertical licensees. The Blues have asserted that Hospital Service Corporation of Alabama first used the Blue Cross Mark after the AHA had formalized its requirements for hospital plans, and it first used the Blue Shield mark after the AMA approved its standards for medical plans. Fact 12.

Therefore, the Blues, other than the St. Paul plan and the Buffalo plan, were *at most* vertical licensees, with no "independently acquired common-law trademark rights."

## CONCLUSION

The Court should grant partial summary judgment as follows: "The Blues abandoned their common-law rights in the Blue Marks prior to the execution of the 1952 Blue Shield agreement and the 1954 Blue Cross agreement." In the alternative, the Court should hold, "Only the St. Paul plan and the Buffalo plan ever independently acquired common-law rights in the Blue Marks.

Based on the summary judgment record, all other Blue plans were at most vertical licensees prior

to the execution of the 1952 Blue Shield agreement and the 1954 Blue Cross agreement."

Dated: June 18, 2021                                    Respectfully submitted

*/s/ Edith M. Kallas*                                    */s/ Joe R. Whatley, Jr.*
Edith M. Kallas – *Co-Lead Counsel*                     Joe R. Whatley, Jr. – *Co-Lead Counsel*
WHATLEY KALLAS, LLP                                     W. Tucker Brown
152 West 57th Street                                    WHATLEY KALLAS, LLP
41st Floor                                              2001 Park Place North
New York, NY  10019                                     1000 Park Place Tower
Tel:  (212) 447-7060                                    Birmingham, AL 35203
Fax:  (800) 922-4851                                    Tel:  (205) 488-1200
Email: ekallas@whatleykallas.com                        Fax:  (800) 922-4851
                                                        Email: jwhatley@whatleykallas.com
                                                                 tbrown@whatleykallas.com


Patrick J. Sheehan                                      Deborah J. Winegard
WHATLEY KALLAS, LLP                                     WHATLEY KALLAS, LLP
101 Federal Street                                      1068 Virginia Avenue, NE
19th Floor                                              Atlanta, GA 30306
Boston, MA 10019                                        Tel:  (404) 607-8222
Tel:  (617) 573-5118                                    Fax:  (404) 607-8451
Fax:  (617) 371-2950                                    Email: dwinegard@whatleykallas.com
Email: psheehan@whatleykallas.com


Henry C. Quillen                                        E. Kirk Wood, Jr. – *Local Facilitating*
WHATLEY KALLAS, LLP                                     *Counsel*
159 Middle Street, Suite 2C                             WOOD LAW FIRM LLC
Portsmouth, NH  03801                                   P. O. Box 382434
Tel:  (603) 294-1591                                    Birmingham, AL 35238
Fax:  (800) 922-4851                                    Tel:  (205) 612-0243
Email: hquillen@whatleykallas.com                       Fax:  (205) 705-1223
                                                        Email: ekirkwood1@bellsouth.net


Charles Clinton Hunter                                  Aaron S. Podhurst – *Plaintiffs' Steering*
HAYES HUNTER PC                                         *Committee*
4265 San Felipe, Suite 1000                             Peter Prieto – *Chair, Expert Committee*
Houston, TX 77027                                       PODHURST ORSECK, P.A.
Tel:  (281) 768-4731                                    One S.E. 3rd Avenue
Fax: (713) 583-7047                                     Suite 2300
Email: chunter@hayeshunterlaw.com                       Miami, FL  33131
                                                        Tel:  (305) 358-2800
                                                        Fax:  (305) 358-2382
                                                        Email: apodhurst@podhurst.com
                                                                 pprieto@podhurst.com

Dennis Pantazis – ***Plaintiffs' Steering Committee***
Brian Clark – ***Discovery Committee***
WIGGINS CHILDS PANTAZIS FISHER
  GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel:  (205) 314-0500
Fax:  (205) 254-1500
Email: dgp@wcqp.com
        bclark@wcqp.com

U.W. Clemon – ***Plaintiffs' Steering Committee***
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL  35222
Tel: (205) 837-2898
Email: clemonu@bellsouth.net

Dennis C. Reich – ***Chair, Damages Committee***
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (713) 622-7271
Fax:  (713) 623-8724
Email:  dreich@rbfirm.net

J. Mark White – ***Litigation Committee***
Augusta S. Dowd – ***Chair, Litigation Committee***
Linda G. Flippo – ***Discovery Committee***
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel:  (205) 323-1888
Fax:  (205) 323-8907
Email: mwhite@whitearnolddowd.com
        adowd@whitearnolddowd.com
        lflippo@whitearnolddowd.com

Nicholas B. Roth – ***Chair, Discovery Committee***
Julia Smeds Roth – ***Discovery Committee***
EYSTER KEY TUBB ROTH MIDDLETON
  & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email: nbroth@eysterkey.com
        jroth@eysterkey.com

Van Bunch – ***Chair, Class Certification Committee***
BONNETT FAIRBOURN FRIEDMAN &
  BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel:  (602) 274-1100
Fax:  (602) 274-1199
Email: vbunch@bffb.com

David A. Balto – ***Expert Committee***
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email: david.balto@dcantitrustlaw.com

Robert J. Axelrod – ***Chair, Written Submissions Committee***
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
Tel: (646) 448-5263
Fax: (212) 840-8560
Email: rjaxelrod@axelrodllp.com

Joey K. James – *Litigation Committee*
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel:  (256) 764-0095
Fax:  (256) 767-5705
Email: joey@bunchandjames.com

W. Daniel Miles, III – *Written Submissions Committee*
BEASLEY ALLEN CROW METHVIN PORTIS
   & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel:  (800) 898-2034
Fax:  (334) 954-7555
Email: dee.miles@beasleyallen.com

Richard S. Frankowski – *Discovery Committee*
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL  35233
Tel:  (205) 390-0399
Fax: (205) 390-1001
Email: richard@frankowskifirm.com

Michael C. Dodge – *Expert Committee*
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel:  (972) 419-7172
Email: mdodge@gpm-law.com

John C. Davis – *Written Submissions Committee*
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel:  (850) 222-4770
Email: john@johndavislaw.net

Michael E. Gurley, Jr. – *Discovery Committee*
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel:  (205) 908-6512
Email: mgurleyjr@yahoo.com

Mark K. Gray – *Discovery Committee*
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel:  (502) 805-1800
Fax:  (502) 618-4059
Email: mgray@grayandwhitelaw.com

Lynn W. Jinks, III – *Expert Committee*
Christina D. Crow – *Discovery Committee*
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel:  (334) 738-4225
Fax:  (334) 738-4229
Email: ljinks@jinkslaw.com
          ccrow@jinkslaw.com

Stephen M. Hansen – *Class Certification Committee*
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel:  (253) 302-5955
Fax:  (253) 301-1147
Email: steve@stephenmhansenlaw.com

Myron C. Penn – *Discovery Committee*
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel:  (334) 738-4486
Fax:  (334) 738-4432
Email: myronpenn28@hotmail.com

Harley S. Tropin – ***Damages Committee***
Javier A. Lopez – ***Discovery Committee***
KOZYAK TROPIN &
  THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email: hst@kttlaw.com
      jal@kttlaw.com

J. Preston Strom, Jr. – ***Litigation Committee***
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel:  (803) 252-4800
Fax:  (803) 252-4801
Email: petestrom@stromlaw.com

C. Wes Pittman – ***Settlement Committee***
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel:  (850) 784-9000
Fax:  (850) 763-6787
Email: wes@pittmanfirm.com

Thomas V. Bender – ***Discovery Committee***
Dirk L. Hubbard
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Tel:  (816) 421-0700
Email:  tbender@hab-law.com
      dhubbard@hab-law.com

Robert B. Roden – ***Litigation Committee***
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel:  (205) 933-8383
Fax:  (205) 933-8386
Email: rroden@shelbyroden.com

Gregory S. Cusimano – ***Litigation Committee***
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL  35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email:  greg@alalawyers.net

Gary E. Mason – ***Class Certification Committee***
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel:  (202) 429-2290
Fax:  (202) 640-1160
Email: gmason@wbmllp.com

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel:  (320) 289-2363
Fax:  (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Michael L. Murphy – ***Discovery Committee***
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC  20006
Tel:  (202) 463-2101
Fax: (202) 463-2103
Email: mmurphy@baileyglasser.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
Email: alamb@archielamb.com

12

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel:  (719) 471-1984
Fax:  (719) 577-4356
Email: lance@searsassociates.com


Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK  99501
Tel:  (907) 277-5400
Fax:  (907) 277-9896
Email:  Jessica@dillonfindley.com
          Ray@dillonfindley.com
          Molly@dillonfindley.com


Cynthia C. Moser
HEIDMAN LAW FIRM
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA  51101
Tel:  (712) 255-8838
Fax  (712) 258-6714
Email:  Cynthia.Moser@heidmanlaw.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA  51101
Tel:  (712) 234-3030
Fax:  (712) 234-3034
Email:  paul@lundberglawfirm.com


Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com