

FILED

2021 Jun-21  PM 07:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE:  BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406)** | **Master File No. 2:13-CV-20000-RDP** <br><br> **This document relates to Provider-Track cases.** |

**DEFENDANTS' BRIEF IN OPPOSITION TO PROVIDER PLAINTIFFS' MOTION**
**FOR PARTIAL SUMMARY JUDGMENT REGARDING THE STANDARD OF**
**REVIEW APPLICABLE TO PROVIDERS' GROUP BOYCOTT CLAIMS**

**REDACTED VERSION OF SEALED FILING**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INDEX OF EXHIBITS ...................................................................................................... vi

CITATION KEY .............................................................................................................. viii

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF RELEVANT MATERIAL FACTS.........................................................2

    I.    Defendants' Response to Providers' Purported Statement of Undisputed Facts ..........................................................................................................................2

    II.    Defendants' Statement of Additional Relevant Facts ................................................8

        A.    BlueCard Does Not Restrict Provider Contracting. ...................................8

        B.    BlueCard Has Numerous Procompetitive Benefits.....................................9

        C.    Many Alabama Providers Possess Market Power. ....................................10

APRIL 2018 STANDARD OF REVIEW DECISION .......................................................11

ARGUMENT ....................................................................................................................11

    I.    BlueCard Is Irrelevant to Providers' Group Boycott Claim. .................................14

    II.    Providers Have Not Described a Group Boycott. ...................................................17

    III.    Even If Providers Described a Boycott, It Would Be Analyzed Under the Rule of Reason. .....................................................................................................19

        A.    Providers Have Not Been Cut Off from the Market. ...............................20

        B.    Providers Have Not Proven Market Power.............................................23

            1.    Providers Lack Direct Evidence of Market Power. .....................23

            2.    Providers Lack Circumstantial Evidence of Market Power..........24

        C.    The Challenged Rules Are Plausibly Procompetitive...............................28

CONCLUSION ................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*,
135 F.3d 740 (11th Cir. 1998) ...................................................................... passim

*Bd. of Regents of Univ. of Okla. v. Nat'l Coll. Athletic Ass'n*,
546 F. Supp. 1276 (W.D. Okla. 1982),
*aff'd in part and remanded*, 707 F.2d 1147 (10th Cir. 1983) ................................18

*Cha-Car, Inc. v. Calder Race Course, Inc.*,
752 F.2d 609 (11th Cir. 1985) .................................................................................17

*Clorox Co. v. Sterling Winthrop, Inc.*,
932 F. Supp. 469 (E.D.N.Y. 1996),
*aff'd*, 117 F.3d 50 (2d Cir. 1997) ...............................................................12, 13, 18

*Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*,
720 F.2d 1553 (11th Cir. 1983) ..............................................................................13

*Diaz v. Farley*,
215 F.3d 1175 (10th Cir. 2000) ...............................................................21, 22, 23, 26

*Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*,
2002 WL 31528625 (E.D.N.Y. Aug. 21, 2002)..............................................12, 16

*Duty Free Ams., Inc. v. Estee Lauder Cos.*,
797 F.3d 1248 (11th Cir. 2015) .........................................................................18, 25

*F.T.C. v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986).................................................................................... passim

*F.T.C. v. Super. Ct. Trial Lawyers Ass'n*,
493 U.S. 411 (1990)..................................................................................................18

*Fin-S Tech, LLC v. Surf Hardware Int'l-USA, Inc.*,
2014 WL 12461350 (S.D. Fla. Aug. 27, 2014)......................................................27

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
626 F.3d 1327 (11th Cir. 2010) ..............................................................................24

*Kaufman v. Time Warner*,
836 F.3d 137 (2d Cir. 2016).....................................................................................27

*Lady Deborah's, Inc. v. VT Griffin Servs., Inc.*,
   2007 WL 4468672 (S.D. Ga. Oct. 26, 2007) ........................................................................26

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
   72 F.3d 1538 (11th Cir. 1996) ...............................................................................13, 20, 29

*Little Rock Cardiology Clinic PA v. Baptist Health*,
   591 F.3d 591 (8th Cir. 2009) ................................................................................................25

*Marion Healthcare LLC v. S. Ill. Healthcare*,
   2013 WL 4510168 (S.D. Ill. Aug. 26, 2013) ......................................................................25

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
   302 F.3d 1207 (11th Cir. 2002) ..........................................................................................26

*McWane, Inc. v. F.T.C.*,
   783 F.3d 814 (11th Cir. 2015) ..............................................................................21, 23, 24, 27

*Moecker v. Honeywell Int'l, Inc.*,
   144 F. Supp. 2d 1291 (M.D. Fla. 2001)..............................................................................27

*Nat'l Bancard Corp. v. VISA U.S.A., Inc.*,
   779 F.2d 592 (11th Cir. 1986) ............................................................................................24

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
   472 U.S. 284 (1985)............................................................................................... passim

*NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998)........................................................................................................11, 18

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ........................................................................................................25

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*,
   604 F.3d 1291 (11th Cir. 2010) ..........................................................................................28

*Paramount Famous Lasky Corp. v. United States*,
   282 U.S. 30 (1930)..............................................................................................................18

*Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*,
   836 F.2d 173 (3d Cir. 1988)..........................................................................................12, 19

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
   917 F.3d 1249 (11th Cir. 2019) (en banc) .....................................................................11, 12

*Rep. Tobacco Co. v. N. Atl. Trading Co.*,
   381 F.3d 717 (7th Cir. 2004) ..............................................................................................24

*Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*,
    105 F.3d 1376 (11th Cir. 1997) ................................................................ passim

*Seaboard Supply Co. v. Congoleum Corp.*,
    770 F.2d 367 (3d Cir. 1985) .................................................................... 23

*Sewell Plastics, Inc. v. Coca-Cola Co.*,
    720 F. Supp. 1186 (W.D.N.C. 1988),
    *reaff'd*, 720 F. Supp. 1196 (W.D.N.C. 1989),
    *aff'd*, 912 F.2d 463 (4th Cir. 1990) ................................................. 19, 21, 22

*Shoney's, Inc. v. Schoenbaum*,
    894 F.2d 92 (4th Cir. 1990) .................................................................... 19

*Silver v. N.Y. Stock Exch.*,
    373 U.S. 341 (1963) ........................................................................ 18, 21, 22

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
    373 F.3d 57 (1st Cir. 2004) ............................................................ 14, 20, 30

*Susser v. Carvel Corp.*,
    206 F. Supp. 636 (S.D.N.Y. 1962),
    *aff'd*, 332 F.2d 505 (2d Cir. 1964) ......................................................... 19

*Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*,
    889 F.2d 1018 (11th Cir. 1989) ............................................................... 3

*Thompson v. Metro. Multi-List, Inc.*,
    934 F.2d 1566 (11th Cir. 1991) ......................................................... 18, 30

*Toys "R" Us, Inc. v. F.T.C.*,
    221 F.3d 928 (7th Cir. 2000) ................................................................. 18

*Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*,
    496 F.3d 403 (5th Cir. 2007) ................................................................. 18

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) ................................................................. 27

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) .................................................................... 24

*Valley Drug Co. v. Geneva Pharms., Inc.*,
    344 F.3d 1294 (11th Cir. 2003) ............................................................... 3

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ............................................................................. 18

iv

*VMG Enters. v. F. Quesada & Franco, Inc.*,
   788 F. Supp. 648 (D.P.R. 1992)........................................................................................12, 18

**Other Authorities**

45 C.F.R. § 156.230 ...........................................................................................................10

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of
   Antitrust Principles and Their Application* (2021) ...........................................................14, 27

**INDEX OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 322 | 6/20/2017 Deposition Transcript of Robert Leahey, Jr. (excerpts) |
| 323 | 8/29/2017 30(b)(6) Deposition Transcript of Blue Cross Blue Shield Association through Kari Hedges (excerpts) |
| 324 | 9/25/2017 30(b)(6) Deposition Transcript of Blue Cross and Blue Shield of Alabama through Jeff Ingrum (excerpts) |
| 325 | Cristina Boccuti et al., *Medicare Patients' Access to Physicians: A Synthesis of the Evidence*, The Henry J. Kaiser Family Foundation (Dec. 2013) |
| 326 | 5/4/2017 30(b)(6) Deposition Transcript of Bullock County Hospital through Sharon Lee (excerpts) |
| 327 | 6/15/2017 30(b)(6) Deposition Transcript of Evergreen Medical Center through Tom McLendon (excerpts) |
| 328 | 6/13/2017 30(b)(6) Deposition Transcript of Ivy Creek of Elmore, LLC, Ivy Creek of Butler, LLC and Ivy Creek of Tallapoosa through Michael David Bruce (excerpts) |
| 329 | 8/9/2017 30(b)(6) Deposition Transcript of DCH Healthcare Authority through Nina Dusang (excerpts) |
| 330 | 5/3/2017 30(b)(6) Deposition Transcript of Crenshaw Community Hospital through Bradley D. Eisemann (excerpts) |
| 331 | Blue Cross Blue Shield Association Inter-Plan Programs Policies and Provisions (Oct. 2015) |
| 332 | 6/16/2017 Deposition Transcript of Joseph Bolen, III (excerpts) |
| 333 | 11/9/2020 Deposition Transcript of Kevin Murphy (excerpts) |
| 334 | 9/8/2017 Deposition Transcript of Frank Coyne (excerpts) |
| 335 | 1/5/2018 30(b)(6) Deposition Transcript of Humana, Inc. through Paul Davis (excerpts) |
| 336 | 9/25/2017 Deposition Transcript of Jeff Ingrum (excerpts) |
| 337 | 5/7/2019 Deposition Transcript of H.E. Frech, III (excerpts) |
| 338 | 1/11/2021 Deposition Transcript of H.E. Frech, III (excerpts) |
| 339 | 6/1/2017 Deposition Transcript of Joseph Oaks (excerpts) |
| 340 | 12/2/2020 Expert Report of Defendants' Expert David Evans |

| Exhibit No. | Description |
|:---:|:---|
| 341 | 1/15/2021 Deposition Transcript of David Evans (excerpts) |

**CITATION KEY**

| Citation | Reference |
|---|---|
| Add. Facts | Citations to this Brief's Statement of Additional Relevant Facts |
| Boycott Br. | Citations to Provider Plaintiffs' Motion for Partial Summary Judgment Regarding the Standard of Review for Their Group Boycott Claims (Doc. 2729) |
| Compl. | Citations to the Consolidated Fourth Amended Provider Complaint (Doc. 1083) |
| Defs. Br. | Defendants' Opening Brief on the Antitrust Standard of Review Applicable to Provider Plaintiffs' Section 1 Claims Pursuant to Federal Rule of Civil Procedure 56 (Doc. 2728) |
| Disp. Facts | Citations to this Brief's Response to Providers' Purported Statement of Undisputed Facts |
| Doc(s). ___ | Citations to Documents filed on the Docket in MDL 2406 (2:13-CV-20000-RDP) |
| Ex. ___ | Citations to Defendants' Exhibits identified in the Evidentiary Submission accompanying this Motion |
| SoR | Citations to the Court's April 5, 2018 Memorandum Opinion re: Section 1 Standard of Review and Single Entity Defense (Doc. 2063) |

## PRELIMINARY STATEMENT

In its April 2018 standard of review decision, this Court found that there are "plausible procompetitive benefits of the BlueCard program" and held that Provider Plaintiffs' challenges to that program must be evaluated under the rule of reason, whether BlueCard is labeled "price fixing" or a "group boycott." (SoR at 52–55.) Providers no longer argue that BlueCard constitutes *per se* unlawful price fixing, but make one more attempt to convince the Court that BlueCard amounts to a *per se* group boycott. Providers once again fail.

*First*, Providers' group boycott claim actually has nothing at all to do with BlueCard. Although Providers repeatedly invoke the word "BlueCard," they do not point to a single BlueCard rule that supposedly constitutes the alleged "boycott." That is because there is none. Providers offer no basis to upend the Court's prior ruling, and BlueCard should be analyzed under the rule of reason as the Court previously concluded. (*See infra* Argument I.)

*Second*, what Providers actually challenge in their "group boycott" claim is exclusive service areas ("ESAs"). ESAs are not *per se* unlawful for all the reasons set forth in Defendants' May 21 standard of review brief. (*See* Doc. 2728) And rule of reason likewise applies under Providers' new "boycott" framework because the enforcement of territorially limited trademark rights is not a group boycott as a matter of law. (*See infra* Argument II.)

*Third*, even if Providers have made out a group boycott claim—and they have not—they have certainly not described the rare group boycott that is subject to the *per se* rule. At best, there are significant fact disputes about whether the allegedly boycotting Blues either (i) block access to a product or market necessary to compete or (ii) have market power. And, in any event, the system Providers challenge has plausible procompetitive benefits, which itself precludes application of the *per se* rule to a group boycott claim. (*See infra* Argument III.)

1

## STATEMENT OF RELEVANT MATERIAL FACTS

**I.      DEFENDANTS' RESPONSE TO PROVIDERS' PURPORTED STATEMENT OF UNDISPUTED FACTS**

Defendants do not dispute Paragraphs 3–6 and 9 of Providers' "Statement of Undisputed Facts."  (Boycott Br. at 6–8.)  Defendants dispute the balance of Providers' proposed facts, as set forth below.[1]

1.      **Disputed.**  From their inception, Blue Plans developed as territorially limited hospital and medical service plans that generally complemented one another and did not compete.  (*See, e.g.*, Doc. 1353-11 (History of the Blue Cross and Blue Shield System) at 11; Doc. 1353-5 (U.S. Public Health Service Report on Blue Cross and Medical Service Plans ("USPHS Rep.")) at 37, 41; Doc. 1353-21 (Staff Report to the FTC) at 73; Doc. 1353-10 (Wilson Dep.) at 10 (Tr. at 63:21–64:11); Doc. 1353-15 (Rotunno Dep.) at 6 (Tr. at 47:18–48:17); Doc. 1352-44 (BCBSA Director Handbook) at 49; SoR at 4; Doc. 1353-51 (2017 Murphy Rep.) ¶¶ 31–32; Doc. 1353-7 (History of the Blue Cross and Blue Shield System) at 94, 98–99.)

2.      **Disputed.**  Without exclusive service areas, many Plans would still possess the exclusive right to use the blue cross and/or blue shield mark (the "Blue Marks") in their specific territory, because many Plans acquired rights to use the Blue Mark(s) in their geography at common law—before passage of the Lanham Act, federal registration of the Blue Marks, and execution of the first written license agreements.  (*See, e.g.*, Doc. 2735-5 (Blue Cross Commission Report) at 5 ("[M]any plans now own the rights to use 'Blue Cross' in the area in which they operate because of prior use or registration of the mark and the words 'Blue Cross' or

---

[1] Providers cite to this Court's April 2018 decision in an effort to support a number of their supposed "Undisputed Facts."  However, Providers have plucked many of the Court's prior statements out of context, implying the Court made a finding that it did not.  In any event, the findings of fact the Court did make back in April 2018 correctly led the Court to conclude that Providers' group boycott claim is subject to the rule of reason.  (SoR at 54–55.)  None of Providers' additional facts (*e.g.*, Boycott Br. at 8–10 (¶¶ 12–16)) changes that conclusion.

'Blue Cross Plan' with state authorities under state laws."); Doc. 2735-15 (Taffe Dep.) at 3–4 (Tr. at 47:19–48:14) ("[T]here is a history where Plans had common law rights to the trademarks in their individual communities."); Doc. 2735-17 (Rotunno Dep.) at 5–6 (Tr. at 170:14–171:2); Doc. 2735-16 (Patterson Dep.) at 3–5 (Tr. at 94:24–95:4, 98:8–24); *see also* Defs. Br. at 11–20.) It is black-letter law that these common law trademark rights included the ability to exclude others from using the same mark in the same area, which would have prevented competition under the Blue brands in these territories even without "service areas." *See Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1023 (11th Cir. 1989); (*see also* Defs. Br. at 14, 30).

7.      **Disputed.**  The Blues are a single economic entity for purposes of governing use of the federally registered Blue Marks.  (*See* Doc. 1353-1 (Defs. 7/17/2017 SoR Br.) at 28–32.)  And the Court has already found that this argument presents genuine issues of material fact that must be resolved by a factfinder.[2]  (SoR at 30–35.)

8.      **Disputed.**  Far from creating rights or identifying "service areas" out of whole cloth, the license agreements merely recognize and codify historical uses of the Blue Marks as they existed at common law.  (Defs. Br. at 17–20 (¶¶ 20–28).)  Indeed, the license agreements today provide each Plan "the right to use the Licensed Marks, in the sale, marketing and administration of healthcare plans" and that "[t]he rights hereby granted are exclusive to the Plan within the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the

---

[2] Providers also incorrectly focus on the relationship between the Plans and the Blue Cross Blue Shield Association ("BCBSA") as it exists today, rather than at the time of inception of the challenged restraints. *See Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294, 1306 (11th Cir. 2003) ("[T]he reasonableness of agreements under the antitrust laws are to be judged at the time the agreements are entered into."); (*see also* Defs. Br. at 22).  At a minimum, there is a fact dispute about whether, at the time ESAs were first developed and first codified into written license agreements, the Plans and the national organizations that later became BCBSA were separate entities and not horizontal competitors.  (*See* SoR at 39 (referring to "alleged vertical restraints imposed in the 1940s and 1950s"); Doc. 1350 (Providers 7/17/2017 SoR Br.) at 23–24 (arguing that, "by 1972, the Blue Cross plans had completed the process of taking vertical licenses . . . and turning them into horizontal ones under their own control"); *see also* Doc. 1353-5 (USPHS Rep.) at 11.)

3

Plan has been granted a subsequent license, which is hereby defined as the 'Service Area.'"
(Doc. 1352-127 at 3, 8; *see also* Doc. 1352-128 at 3, 7.)  This is consistent with the way the
license agreements have operated since their very beginning.  (Defs. Br. at 17–19 (¶¶ 20–27).)

          10.     **Disputed.**  Consistent with granting each Plan a geographically limited
right to use the Blue Mark(s) that tracks each Plan's use of the Mark(s) at common law, the
license agreements further specify that, "[e]xcept as expressly provided by BCBSA with respect
to National Accounts, Government Programs and certain other necessary and collateral uses . . . ,
or as expressly provided herein, the Plan may not use the Licensed Marks or Name outside the
Service Area."  (Doc. 1352-127 (Cross) at 9; Doc. 1352-128 (Shield) at 8.)  Among other things,
this provision means that Plans may not contract with providers located outside of their service
area on a Blue-branded basis, absent some exception.  (*See, e.g.*, Doc. 2455-6 (Putziger Dep.)
at 10 (Tr. at 139:6–20); Ex. 322 (Leahey Dep.) at 85:2–86:8.)  One such exception allows Plans
to contract on a Blue-branded basis with Providers located one county into a neighboring Plan's
service area.[3]  (*See* Doc. 2455-6 at 10 (Tr. at 139:6–20); Ex. 322 at 85:2–20; Doc. 1352-127
at 129; Doc. 1352-128 at 127; *see also* Doc. 2454-6 ¶ 82.)  This "contiguous county" exception
was an acknowledgement that subscribers living on service area borders do not adhere to service
area lines when selecting medical care and, therefore, was intended to give Plans the ability to
develop local provider networks that could better serve their members.  (*See* Ex. 323 (BCBSA
Dep.) at 49:10–24.)

          The BlueCard program then allows Plans to integrate their geographically limited
Blue provider networks in order to create a nationwide Blue product for the benefit of

---

[3] There are additional exceptions (*see, e.g.*, SoR at 10); because Providers' motion does not concern these exceptions (Boycott Br. at 8 n.1), Defendants do not address them here.

subscribers that no Plan could create or offer on its own.  (Doc. 1353-56 at 4 (BlueCard was

designed to "ensure that Blue Cross and Blue Shield subscribers . . . receive consistent benefits

outside of their Plans' service areas"); Doc. 1353-53 (Voss Dep.) at 5–6 (Tr. at 24:25–25:5)

("The BlueCard program was . . . developed to address the operational inefficiencies that we had

in working with local providers, as well as ensuring that we had consistency of a product

offering for our consumers."); Doc. 1352-44 at 56 (prior to BlueCard, "the Plans tried various

National Account approaches but found no single silver bullet, as demonstrated by steady

declines in membership for decades," and "BlueCard's success paved the way for a broader

approach in meeting National Accounts' needs"); Defs. Br. at 20–21 (¶¶ 30–32).)  In this way,

BlueCard facilitates in-network interactions between Blue enrollees and providers that otherwise

would not be possible in light of common-law trademark rights, codified through ESAs.

(Ex. 340 (2020 Evans Rep.) ¶¶ 167, 169, 177; Doc. 2565-49–50 (2019 Murphy Rep.) ¶¶ 142–43;

*see also* Doc. 2454-6 (2019 Haas-Wilson Rep.) ¶ 539; Boycott Br. at 8.)

        11.    **Disputed.**  Defendants do not dispute that approximately "400,000

Alabamians are covered by Blues other than BCBS-AL" (Boycott Br. at 8 (¶ 11)); however,

Providers' other proffered statistics are based on an incorrect market definition and, therefore,

are uninformative.  The Blues' expert, Dr. David Evans, who is cited at length in the Supreme

Court's *Ohio v. American Express* decision, has opined that Blue Plans operate a two-sided

transaction platform that connects providers and subscribers to facilitate healthcare transactions

and that both sides of that platform (providers *and* subscribers) must be accounted for when

defining the relevant market.  (*See, e.g.*, Ex. 340 (2020 Evans Rep.) ¶¶ 45–46, 76–81, 97–107;

Ex. 341 (Evans Dep.) at 59:17–60:13.)  Providers' expert has not done that, leading to inherently

faulty results.  (Ex. 340 (2020 Evans Rep.) ¶¶ 108–14, 132–46.)  Even looking at the provider-

side of the market only, the parties' experts disagree about whether (i) payors other than commercial enrollees—such as government- and self-payors—must be included in a relevant product market (*see, e.g.*, Doc. 2565-52 (2019 Wu Rep.) ¶¶ 43, 52–54, 74–76; *see also* Disp. Facts ¶¶ 13, 15–16); and (ii) Core-Based Statistical Areas ("CBSAs") and counties outside of CBSAs are the proper geographic market (*see, e.g.*, Doc. 2565-52 (2019 Wu Rep.) ¶¶ 61–73).

12.     **Disputed.**   Rather than offer physicians contracts on a "take it or leave it" basis, BCBS-AL "publish[es] [its] fee schedule [for physicians] at least ninety days in advance for the purpose of . . . having . . . 'negotiati[ons][.]'"  (Doc. 2740-1 (Ingrum Dep.) at 8 (Tr. at 29:19–24).)  During that 90-day period, BCBS-AL "constantly speak[s] with physicians, individually[] [and] as groups," in order to collect their feedback on the proposed rates.  (*Id.* at 6 (Tr. at 27:7–14).)  BCBS-AL then "quite frequently" changes its reimbursement rates based on that feedback, before circulating a final fee schedule, which physicians are free to reject or accept.  (*Id.* (Tr. at 27:16–17).)  BCBS-AL also negotiates with other types of providers such as hospitals, including for outpatient services.  (*See* Ex. 339 (Oaks Dep.) at 37:18–38:18, 106:25–108:4, 143:3–19; *see also* SoR at 54 (referring to "prices . . . negotiated by the in-state Blue Plan").)  Indeed, there are significant disparities in the average reimbursement rates that BCBS-AL pays to different providers, including for outpatient services.  (*See* Doc. 2565-48 (2019 Ordover Rep.) ¶¶ 104–16 & figs. 7–12.)

13.     **Disputed.**   Although self-payors may pay less on average for healthcare than commercial enrollees, there is significant variation among different provider groups that Providers completely ignore.  Indeed, Providers' own expert has conceded that, for certain types of providers, self-pay patients "may be a viable alternative" to commercial enrollees. (Doc. 2454-6 (2019 Haas-Wilson Rep.) ¶ 240; *see also* Doc. 2565-52 (2019 Wu Rep.) ¶ 53.)

14.     **Disputed.**  When a subscriber receives treatment from an out-of-network provider, BCBS-AL ordinarily pays a reimbursement rate that may be a percentage of what it would have paid for in-network treatment, based on the terms of the subscriber's benefit contract.  (Ex. 324 (BCBS-AL Dep.) at 12:14–23, 13:7–13.)  While BCBS-AL sends this payment to its subscriber who received care rather than to the provider directly, that is because BCBS-AL "do[es]n't have a contract" with the provider.  (*Id.* at 14:24–15:19.)

15.     **Disputed.**  Providers broadly claim that "government programs" have "a fixed number of people" that "do not change doctors frequently;" but the only evidence they cite concerns Medicare beneficiaries specifically.  (Boycott Br. at 10 (¶ 15); *see also* Doc. 2454-6 (2019 Haas-Wilson Rep.) ¶ 241 & nn.387–88.)  And even as to that group, the same survey cited by Providers' expert found that 14% of Medicare seniors sought a new specialist in 2012 alone.  (Ex. 325 at 4.)  In addition, certain subgroups of Medicare enrollees lack a usual source of care at higher rates than the overall Medicare population, meaning that such individuals frequently switch providers.  (*Id.* at 2.)

16.     **Disputed.**  Although government programs may pay less for medical services than commercial insurance in some instances, in Alabama, government programs are an important source of revenue for providers of healthcare services.  For a number of these providers, more than half of their patient population is insured through either Medicare or Medicaid.  (*See* Doc. 2564-61 (Crenshaw Hosp. Dep.) at 4 (Tr. at 38:4–17); ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████) And many providers make a profit on government payors; in fact, in some instances, government reimbursement rates are competitive with the rates paid by commercial insurers.  ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ *see also* Doc. 2565-52 (2019 Wu Rep.) ¶¶ 54, 75.)

17.     **Disputed.**  *See* Disp. Facts ¶ 16.

18.     **Disputed.**  Blue Plans have a unique history at common law that is not shared by other national insurers.  (*See* Disp. Facts ¶¶ 1–2; Defs. Br. at 20–21, 30–32; *see also id.* at 31 n.5.)  While other health insurers may be able to offer a nationwide product without cooperation, the same is not true of the Blues.  Indeed, there is not a single Blue Plan that currently has—or has ever had—the right to use either the Blue Cross or Blue Shield Mark nationwide.  (Defs. Br. at 20 (¶ 29).)

## II.     DEFENDANTS' STATEMENT OF ADDITIONAL RELEVANT FACTS

### A.     BlueCard Does Not Restrict Provider Contracting.

1.     BlueCard is not the source of any prohibition against using the Blue Marks outside a Plan's service area.  (*See generally* Ex. 331 (Inter-Plan Programs Policies ("IPP")).)  Even putting aside common law trademark issues (*see, e.g.*, Disp. Facts ¶¶ 1–2), the license agreements themselves—not BlueCard—codify service areas and prevent out-of-area use of the Blue Marks.  (*See* Doc. 1352-127 (Cross) at 3, 8–9; Doc. 1352-128 (Shield) at 3, 7–8; *see also* Disp. Facts ¶ 10.)  Indeed, if BlueCard were eliminated tomorrow, BCBS-AL would still be the only Plan that has the right to use the Blue Marks in Alabama.  (*See* Disp. Facts ¶ 10; Defs. Br. at 11–14, 26; *compare* Doc. 2454-6 (2019 Haas-Wilson Rep.) ¶¶ 522, 524–25, *with id.* ¶¶ 538–39.)

2.     Furthermore, there is no Blue rule that prohibits any Plan from contracting with any provider on a non-Blue branded basis in any area it chooses.  (*See* Ex. 322 (Leahey Dep.) at 85:2–20 ("Plans are allowed . . . through their enterprise to contract with providers on an unbranded basis, but not with the [Blue] brands."); Doc. 1352-127 at 129 ("Plan[s] may not use *the Licensed Marks and/or Name* . . . to negotiate directly with providers outside its Service

Area." (emphasis added)); Doc. 1352-128 at 127 (same); *see also* Boycott Br. at 8 n.1 ("A Plan

may contract with a provider outside its service area for a non-Blue branded network[.]").)

       3.     And, of course, no Blue rule prevents providers from contracting with any

number of other commercial insurers that have subscribers in Alabama (*see* Doc. 2454-6 (2019

Haas-Wilson Rep.) at ex. III.5), or from treating patients on an out-of-network basis (*see, e.g.*,

*id.* ¶ 64; Ex. 332 (Bolen Dep.) at 131:4–24; *see also* Boycott Br. at 10, 13).

      **B.**     **BlueCard Has Numerous Procompetitive Benefits.**

       4.     BlueCard offers many benefits to subscribers of Blue health coverage,

including greatly expanding the available provider network in a cost-efficient manner and

ensuring that enrollees have access to a single point of contact.  (Ex. 340 (2020 Evans Rep.)

¶¶ 169, 174–75; Doc. 2565-49–50 (2019 Murphy Rep.) ¶ 145; Doc. 1353-51 (2017 Murphy

Rep.) ¶ 67; Doc. 1353-61 at 2.)

       5.     Subscribers plainly value these benefits, as Blue enrollment figures

increased significantly immediately after implementation of BlueCard.  (*See* Doc. 2565-49–50

¶ 107 & ex. 24; Ex. 340 ¶¶ 171–72 & fig. VII-1; Doc. 1353-68 at 12; Ex. 333 at 71:7–73:10; *see

also* Doc. 2454-1 (Kellogg Dep.) at 81:10–82:9.)  Indeed, the Court found it "noteworthy that

Subscriber Plaintiffs do not challenge BlueCard as an antitrust violation."  (*See* SoR at 54 n.20.)

       6.     BlueCard also offers benefits to providers.  For instance, BlueCard

facilitates access to significantly more patients on an in-network basis and reduces transaction

costs.  (Doc. 1353-77 at 9; *see also* Ex. 340 ¶¶ 168, 176–78 & tbl. VII-1; Doc. No. 1353-78 at 5;

Doc. 1353-79 at 13; *see also* Ex. 334 (Coyne Dep.) at 40:11–42:1; Ex. 323 (BCBSA Dep.)

at 117:21–118:16; Ex. 333 (Murphy Dep.) at 139:9–22.)

###### C.     Many Alabama Providers Possess Market Power.

7.     Finally, Providers argue at length that "the Blues" possess market power in Alabama, while ignoring significant record evidence that many Alabama providers themselves possess market power.  (*See, e.g.*, Doc. 2564-68 (Frech Dep.) at 8 (Tr. at 90:7–11) (Providers' expert conceding that some general acute care hospitals in Alabama possess "monopoly power, market power"); Doc. 2454-6 (2019 Haas-Wilson Rep.) ¶¶ 422(a), 464 n.650 ███████████

████████████████████████████████████████████████████████

███████████████████████████████████████ )

8.     Provider market power and negotiating leverage may come from a range of sources:  because the provider supplies such a large share of healthcare services in the state that the provider is deemed "critical" (Doc. 2565-40 (Briscoe Dep.) at 236:3–12; Doc. 2565-45 (Samford Univ. Dep.) at 59:1–60:21; Doc. 2565-42 (Viva Health Dep.) at 170:6–171:24; *id.* at 199:5–15; Doc. 2565-20 (Aetna Dep.) at 78:18–79:7; Doc. 2564-55 (Pearce, Bevill Dep.) at 181:6–182:13); because the provider is the only source of services in a particular community (Doc. 2565-20 (Aetna Dep.) at 79:14–21; Doc. 2565-41 (United Dep.) at 71:19–21; Doc. 2565-21 (Alliant Dep.) at 38:4–14); because of network adequacy regulations, 45 C.F.R. § 156.230; (*see also* Ex. 335 (Humana Dep.) at 46:25–47:9); or because, all else equal, subscribers value having access to a large provider network (*see* Doc. 2454-6 (2019 Haas-Wilson Rep.) ¶ 168; Ex. 340 (2020 Evans Rep.) ¶¶ 58, 175; Doc. 2565-49–50 (2019 Murphy Rep.) ¶ 25).

9.     Notably, BCBS-AL often pays higher reimbursement rates than other health insurers (Doc. 2565-48 (2019 Ordover Rep.) ¶¶ 323–25 & tbl. 16; ██████████████

████████████████ and operates on thin margins (Doc. 2565-49–50 (2019 Murphy Rep.) ¶ 237; Doc. 2565-52 (2019 Wu Rep.) ¶¶ 106–07).

10.     Alabama physicians, in contrast, earn salaries that are higher than the national average.  (Doc. 2565-49–50 (2019 Murphy Rep.) ¶¶ 188–89 & ex. 36.)

### APRIL 2018 STANDARD OF REVIEW DECISION

In its April 2018 decision, the Court held that BlueCard is neither a *per se* unlawful price-fixing scheme nor a *per se* unlawful group boycott.

In the context of price fixing, the Court found that Defendants have "integrated certain assets to create the BlueCard program," "the Blue Plans share a significant degree of opportunities for profit and risks of loss," and there are "plausible procompetitive benefits of the BlueCard program."  (SoR at 53–54.)  Because BlueCard is "like a joint venture" or a "cooperative purchasing arrangement[]" and plausibly procompetitive, the Court applied the rule of reason to Providers' price-fixing claims.  (*Id.* at 53–54.)

With respect to group boycott, the Court recognized that an alleged group boycott is *per se* unlawful only if "the boycott blocks access to a necessary product, facility, or market for competition, or . . . if the boycotting firms possess market power within the relevant market." (*Id.* at 54–55.)  The Court determined that Providers had established neither of those elements by undisputed evidence, again necessitating application of the rule of reason.  (*Id.* at 55.)  Providers' renewed boycott argument still falls short for these same reasons—and others.

### ARGUMENT

A group boycott is an agreement among two or more market participants to withhold business from a third party, either to injure that party, to force it to accede to the group's demands or to secure some other anticompetitive advantage.  *See, e.g.*, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135–36 (1998) (describing "a group boycott in the strongest sense" as "[a] group of competitors threaten[ing] to withhold business from third parties unless those third parties would help them injure their directly competing rivals"); *Quality Auto Painting Ctr.*

11

*of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1271 (11th Cir. 2019) (en banc).

A boycott requires a total refusal to deal—not simply a refusal to offer plaintiffs their most desired terms. *See All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 748 (11th Cir. 1998) ("In this case, no refusal to deal has been shown. All agencies were able to participate in the bidding to become preferred providers, and generally a hospital will still deal with any nursing agency when the preferred agencies . . . fail to meet its needs."); *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 2002 WL 31528625, at *7 & n.12 (E.D.N.Y. Aug. 21, 2002) ("There was no such refusal to engage in any commercial relationship at all with the plaintiffs. There was rather an unwillingness to engage in such a relationship upon terms the plaintiffs desired.").

Enforcement of legally acquired trademark rights is *not* a refusal to deal. *See VMG Enters. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648, 657 (D.P.R. 1992) (rejecting the argument that "enforcement . . . of . . . legally acquired concurrent use rights" was "an illegal event of 'refusal to deal'"); *see also Clorox Co. v. Sterling Winthrop, Inc.*, 932 F. Supp. 469, 471 (E.D.N.Y. 1996) ("CLOROX has totally misconstrued the nature of this case in attempting to squeeze the square trademark peg into the round antitrust hole. From the beginning of the first litigation[,] . . . the matter has been one of use of a trademark. There has been no . . . group boycott[] or concerted refusals to deal with a competitor."), *aff'd*, 117 F.3d 50, 55–56 (2d Cir. 1997) ("[Trademark] agreements are common, and favored, under the law. . . . [T]he agreement does not effect any of the types of restraints that have historically been condemned as illegal *per se*, such as . . . boycotts."); *cf. Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 178 n.1, 183 (3d Cir. 1988) (holding that the protection of statutorily permitted exclusive territories does not constitute a group boycott). This makes sense because "trademarks are by

their nature non-exclusionary;" they do not keep anyone in or out of a market, and do nothing more than regulate use of a name. *Clorox*, 117 F.3d at 56.

But even where a plaintiff identifies a group boycott, the *per se* standard is rarely applied. "[T]he *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1550 (11th Cir. 1996) (emphasis omitted) (quoting *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986)); (*see also* SoR at 54–55). Moreover, "[t]he labeling of a restraint as a group boycott does not eliminate the necessity of determining whether it is a naked restraint of trade with no purpose except stifling competition." *Levine*, 72 F.3d at 1550 (internal quotation marks omitted); *see also All Care Nursing*, 135 F.3d at 748; *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1561 (11th Cir. 1983) (observing that the "characterization" of an arrangement as a "group boycott . . . supplies a label and little else").

To determine whether a boycott is subject to the *per se* standard, courts typically ask whether the boycotting firms (i) "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete," or (ii) "possess[] a dominant position in the relevant market." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985); *accord All Care Nursing*, 135 F.3d at 748; *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1381 (11th Cir. 1997). Even where one of those elements is satisfied, the *per se* rule still does not apply "absent some demonstration that the practice at issue historically leads to anticompetitive effects." *Retina Assocs.*, 105 F.3d at 1381; *see also Ind. Fed'n of Dentists*, 476 U.S. at 458–59 (courts are "slow to . . . extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices

13

is not immediately obvious"); *All Care Nursing*, 135 F.3d at 748 ("*Per se* treatment has been given to those practices which history has shown have only anticompetitive effects.").

Because few boycotts meet this high standard, courts routinely assess boycott claims under the rule of reason.  *See, e.g.*, Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2203a (2021) ("[T]oday[,] most [concerted refusals to deal] are subjected to the rule of reason and subsequently found to be lawful."); *see also Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004) ("Sometimes group boycotts are called per se violations, but the label here is only minimally useful since many arrangements that are literally concerted refusals to deal have potential efficiencies and are judged under the rule of reason.").  Indeed, the Eleventh Circuit has warned that "[t]he recent jurisprudence of the Supreme Court and of the Court of Appeals of this Circuit cautions against the haphazard expansion of the 'group boycott label' and the concomitant imposition of per se liability."  *All Care Nursing*, 135 F.3d at 748 (quoting *Retina Assocs.*, 105 F.3d at 1381); *see also Ind. Fed'n of Dentists*, 476 U.S. at 458–59 ("[T]he category of restraints classed as group boycotts is not to be expanded indiscriminately.").  Providers' boycott claim—to the extent they even make out such a claim—falls squarely under the rule of reason.

I.   **BLUECARD IS IRRELEVANT TO PROVIDERS' GROUP BOYCOTT CLAIM.**

Throughout this litigation, Providers have characterized the BlueCard program as a group boycott.  (*See, e.g.*, Boycott Br. at 12 n.2, 18–19; Compl. ¶ 1.)  But in Providers' first standard of review motion, this argument was "not discussed at depth."  (SoR at 54.)  It is now clear why:  Providers' May 21 motion reveals that their group boycott claim in fact has *nothing to do with BlueCard*, but instead is merely a repackaged attack on ESAs.  Because the BlueCard program is irrelevant to their current motion, Providers have offered no basis to upset the Court's

14

prior decision that BlueCard is subject to the rule of reason.  (SoR at 52–53.)

Providers describe the alleged boycott as follows:  "the Blues have agreed that they will not allow their members to access a healthcare provider on an in-network basis unless that provider has entered into an agreement with the Blue Plan in whose service area the provider is located."  (Boycott Br. at 11.)  Simply put, Providers complain that Alabama-based providers cannot contract directly with any Blue Plan other than BCBS-AL for in-network access to Blue enrollees.  Regardless of whether this is a boycott—and it is not, for the reasons set forth below—it is a consequence of ESAs, not BlueCard.  (Disp. Facts ¶¶ 1–2, 8, 10; Add. Facts ¶ 1.)

Providers themselves confirm that their so-called boycott is an attack on ESAs by the only rule cited in their motion:  a 1991 amendment to the guidelines governing the use of the Blue Marks.  (Boycott Br. at 7–8, 11–12; Doc. 1350 at 11–12; *see also* Doc. 1613 (10/5/2017 Hr'g Tr.) at 29.)  As an initial matter, the cited amendment actually created an *exception* to ESAs by permitting Plans to contract with providers in counties outside of, but adjacent to, their service areas.  (*See* Doc. 1352-127 at 129; *see also* Disp. Facts ¶ 10.)  In other words, far from imposing additional restrictions, this contiguous county exception allows for *more* contracting than was permitted previously, not *less*.  (*See* Disp. Facts ¶ 10; Doc. 2455-6 (Putziger Dep.) at 10 (Tr. at 139:6–20); *see also* Doc. 1352-127 at 9; Ex. 323 (BCBSA Dep.) at 47:7–48:18.)

But even if (contrary to fact) Providers were correct that the 1991 amendment created a novel prohibition on out-of-area contracting, this rule has nothing to do with BlueCard. (*See, e.g.*, Doc. 2454-6 (2019 Haas-Wilson Rep.) ¶ 83 n.179 (opining that Plans can access providers in contiguous counties either by contracting with them directly *or* through the BlueCard program); *see also* SoR at 15–16 (recognizing that the BlueCard Program had not even been implemented in 1991); Doc. 1353-51 (2017 Murphy Rep.) ¶ 68 (same).)  Therefore, even if

15

this provision were exactly what Providers say it is, they have still failed to identify a single component of BlueCard that supports their group boycott claim.

This failure is not surprising.  Far from being a boycott, BlueCard was created to *increase* (not decrease) in-network interactions between providers and Blue enrollees.[4] (*See* Disp. Facts ¶ 10; *see also* Boycott Br. at 8.)  While certain BlueCard provisions may have been added over time to prevent Plans from using that program to circumvent ESAs (*see, e.g.*, Ex. 331 (IPP) § 4.01), BlueCard is not at all responsible for the restrictions that ESAs (and the common-law rights they codify) impose (Add. Facts ¶ 1).  Providers do not contend otherwise— nor could they, since ESAs existed long before BlueCard.  (*See* Doc. 1352-44 at 56 (BlueCard was "implemented . . . in 1995").)  And if BlueCard were eliminated tomorrow, BCBS-AL would remain the only Plan with the right to contract with providers in Alabama on a Blue-branded basis.  (*See* Add. Facts ¶ 1; Disp. Facts ¶¶ 2, 10.)

Providers' own expert, Dr. Deborah Haas-Wilson, further confirms that Providers are in fact complaining about ESAs.  Dr. Haas-Wilson presents a model with seven hypothetical scenarios showing what she believes the economic impact would be on Providers if various combinations of ESAs and BlueCard were eliminated.[5]  (*See* Doc. 2454-6 at ex. IX.1.)  In one hypothetical scenario, Dr. Haas-Wilson assumes that ESAs are lawful as to providers, but that

---

[4] Ironically, Providers' real complaint with BlueCard is not that it works as a boycott to *prevent* dealings between the Blues and Providers—but rather that BlueCard *requires* Plans and Providers to deal with each other on terms Providers do not prefer.  For the benefit of members nationwide, BlueCard requires all Plans to pay providers in Alabama on the same terms that BCBS-AL secures through negotiation.  (SoR at 53.)  Providers are unhappy about this because Providers do not want to have to deal with other Blues on those terms.  (Boycott Br. at 12 n.2 ("The Provider Plaintiffs are seeking the right to opt out of the BlueCard system and contract with Blue Plans directly . . . .").)  But a refusal to deal on the exact terms that Providers want is not a group boycott.  *See All Care Nursing*, 135 F.3d at 748; *Drug Mart*, 2002 WL 31528625, at *7 & n.12.

[5] Rather than use the label "ESAs," Dr. Haas-Wilson refers to "Market Allocation Agreements on Contracting" and "Market Allocation Agreements on Selling."  She acknowledges that those agreements are "enshrined in the Blue License Agreements."  (Doc. 2454-6 (2019 Haas-Wilson Rep.) ¶¶ 78 & n.169, 91 & n.191.)  Likewise, to reference BlueCard, Dr. Haas-Wilson often uses the term "Price Fixing Agreements."  (*Id.* ¶ 77.)

16

BlueCard has been eliminated.  Despite the elimination of BlueCard, she acknowledges that out-of-state Plans would still be unable to contract with Alabama providers on a Blue-branded basis.  (*Id.* ¶¶ 538–39.)  By contrast, in another hypothetical scenario where BlueCard is lawful and ESAs have been outlawed as to providers, Dr. Haas-Wilson concludes that Alabama providers would have the credible option of contracting directly with Plans other than BCBS-AL for access to in-state Blue enrollees.  (*Id.* ¶¶ 522, 524–25.)  In other words, Providers concede through Dr. Haas-Wilson's model that the alleged "boycott" arises from ESAs—*not* BlueCard.

## II.     PROVIDERS HAVE NOT DESCRIBED A GROUP BOYCOTT.

Stripped of its "BlueCard" veneer, Providers' real complaint is that the ESA rules constitute a "group boycott" because they prevent Blues other than BCBS-AL from contracting with Alabama providers on a Blue-branded basis.  (Boycott Br. at 11–12.)  This is nothing more than a repackaged version of Providers' argument that ESAs constitute a *per se* unlawful market allocation.  And for all the reasons set forth in the Blues' May 21 standard of review submission (Doc. 2728), ESAs are not a *per se* unlawful market allocation as a matter of law.

ESAs are likewise not a group boycott.  Indeed, ESAs are not a refusal to deal at all; they are a lawful territorial restriction on the use of a particular tradename only.  Critically, ESAs allow for unfettered provider contracting, *so long as a Plan does not use the Blue Marks* in the process.  (Add. Facts ¶ 2.)  There is no rule preventing out-of-area Plans from entering Alabama and developing a non-Blue branded network that includes every single provider in the state.  (*See id.*; *see also* Defs. Br. at 35.)  Providers even admit as much.[6]  (Boycott Br. at 8 n.1.)

---

[6] Providers suggest that this fact is irrelevant because "no Plan has a significant number of subscribers in Alabama for a non-Blue branded product."  (Boycott Br. at 8 n.1.)  But just because no out-of-area Plan has found it commercially advantageous to enter Alabama on a non-Blue branded basis does not mean that those Plans have categorically refused to deal.  Providers' suggestion to the contrary ignores the distinction between a rational (and lawful) business decision not to contract and an anticompetitive refusal to contract.  *See Cha-Car, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 614 & n.15 (11th Cir. 1985) (explaining that there is no unlawful refusal to deal where a defendant simply chooses not to contract with the plaintiff "based on legitimate business objectives"); *see*

Prohibiting Plans from contracting with Alabama providers *under the Blue name only* is not a "group boycott" as a matter of law. *See, e.g., Clorox*, 117 F.3d at 57; *VMG*, 788 F. Supp. at 657. The *VMG* case is instructive. In that case, the defendant argued that VMG was engaged in a group boycott because VMG used its concurrent trademark right to force another user of the mark to cease dealing with the defendant in VMG's territory. *Id.* at 657. The court rejected that claim, concluding that "VMG's demand [to the other user] for discontinuation of sales to [the defendant] is not an illegal event of 'refusal to deal', but rather one of enforcement by VMG of its legally acquired concurrent use rights." *Id.* The court went on to observe that "Defendant has offered not one citation to statutory or case law to the effect that concurrent trademark use agreements constitute misuse of a trademark for antitrust purposes." *Id.*

The same is true here. Just as in *VMG*, Providers have not identified a single case in which enforcement of geographically limited trademark rights was found to be a group boycott at all, much less one that was deemed unlawful *per se*.[7] This failure is especially

---

*also All Care Nursing*, 135 F.3d at 748. The antitrust laws include no obligation to deal against one's reasonable business judgments. *See Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1265 (11th Cir. 2015) ("[T]he Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004))).

[7] Providers have not offered even one factually analogous case. *See, e.g., NYNEX*, 525 U.S. at 130–31 (defendant switched its purchases of equipment to plaintiff's competitor); *F.T.C. v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 414 (1990) (lawyers refused to represent indigent defendants without increased pay); *Ind. Fed'n of Dentists*, 476 U.S. at 448–49 (dentists withheld x-rays from dental insurers); *Nw. Wholesale Stationers*, 472 U.S. at 285–87 (retailer expelled from a cooperative buying agency without procedural mechanism to challenge the expulsion); *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 342–44 (1963) (stock exchange cut off instantaneous private communication lines between certain broker-dealers and stock exchange members); *Paramount Famous Lasky Corp. v. United States*, 282 U.S. 30, 36–38 (1930) (film distributors required exhibitors to sign a standard exhibition contract); *All Care Nursing*, 135 F.3d at 743–44 (hospitals established centralized bidding process for nursing services); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1569–70 (11th Cir. 1991) (multi-listing service required users to be members of a realtor association); *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 406–07 (5th Cir. 2007) (casinos refused to negotiate with a web domain owner); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 931–32 (7th Cir. 2000) (manufacturers ceased supplying certain products to warehouse clubs); *Bd. of Regents of Univ. of Okla. v. Nat'l Coll. Athletic Ass'n*, 546 F. Supp. 1276, 1295 (W.D. Okla. 1982) (NCAA refused to deal with certain television networks), *aff'd in part and remanded*, 707 F.2d 1147 (10th Cir. 1983).

18

problematic since the Eleventh Circuit has specifically warned against "the haphazard expansion of the 'group boycott label' and the concomitant imposition of per se liability." *All Care Nursing*, 135 F.3d at 748; *see also Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1186, 1192–93 (W.D.N.C. 1988) ("No case cited by plaintiffs in support of their group boycott theory involves a combination between businesses that have substantial selling operations in exclusive territories"), *reaff'd*, 720 F. Supp. 1196 (W.D.N.C. 1989), *aff'd*, 912 F.2d 463 (4th Cir. 1990).

Providers' expansive definition of boycott should give the Court particular pause on these facts. If Providers were correct, all cooperative trademark arrangements would risk running afoul of the antitrust laws because every adherence to the terms of the license could be framed as a refusal to deal with those outside the licensed territory. Such a ruling would turn routine, lawful intellectual property licensing on its head. *See Shoney's, Inc. v. Schoenbaum*, 894 F.2d 92, 96–97 (4th Cir. 1990) (upholding "grant of an exclusive territorial right" in licensing agreement and stating that "nothing . . . legally prohibits an agreement" granting a licensee the right to "use a trade name within a licensed area for a limited purpose"); *Susser v. Carvel Corp.*, 206 F. Supp. 636, 641 (S.D.N.Y. 1962) ("The trade-mark laws, like the patent laws, give the owner a monopoly which neither the Sherman Act nor any other act of Congress forbids. It would be paradox to say that the exercise of a right, expressly granted by law, is unlawful." (citation omitted)), *aff'd*, 332 F.2d 505 (2d Cir. 1964); *cf. Zimmerman*, 836 F.2d at 183. Providers have simply not made out a "group boycott."

## III.   EVEN IF PROVIDERS DESCRIBED A BOYCOTT, IT WOULD BE ANALYZED UNDER THE RULE OF REASON.

Even if ESAs (or, for that matter, BlueCard) were somehow a group boycott, Providers still have not stated a *per se* claim. Notably, this is not the sort of case to which "[t]he *per se* approach has generally been limited"—*i.e.*, one in which "firms with market power

19

boycott suppliers or customers in order to discourage them from doing business with a competitor." *Levine*, 72 F.3d at 1550 (emphasis omitted) (quoting *Ind. Fed'n of Dentists*, 476 U.S. at 458); *Retina Assocs.*, 105 F.3d at 1381; *see also Stop & Shop*, 373 F.3d at 64 ("To the extent the group boycott label is useful at all to describe a per se violation, it is principally a warning against anticompetitive secondary boycotts—*e.g.*, manufacturers who agree not to supply a store that buys from a discounting manufacturer."). Providers' theory is that the Blues are cooperating to reduce competition *among themselves*, not that the Blues are boycotting providers that contract with non-Blue insurers. (*See* Boycott Br. at 11–12.) That is simply not a *per se* group boycott.

In any event, Providers have not established by undisputed facts either of the circumstances necessary to depart from the default rule of reason: that "(1) the boycott blocks access to a necessary product, facility, or market for competition, or (2) . . . the boycotting firms possess market power within the relevant market." (SoR at 54–55.) Without these facts, the *per se* rule cannot apply. *Nw. Wholesale Stationers*, 472 U.S. at 294–96; (*see also* SoR at 55).

### A.     Providers Have Not Been Cut Off from the Market.

Providers argue that they have been blocked from competition because they "cannot compete effectively" in Alabama without "in-network access to commercial patients," and the alleged boycott "cut [them] off from commercial patients." (Boycott Br. at 13–14.) But Providers have not demonstrated that they have been "cut off [from] access[ing] . . . a supply, facility, or market necessary to enable [Providers] to compete" as required by the case law. *Nw. Wholesale Stationers*, 472 U.S. at 294–96.

*First*, stripped of their brief's rhetoric, Providers have not in fact shown that they have been blocked from accessing a "market." Providers' entire argument boils down to a complaint that they cannot contract directly with other Blue Plans to provide services to 400,000

Blue subscribers who live in Alabama but who have coverage through a Blue Plan other than BCBS-AL.  (Boycott Br. at 14 ("Without the group boycott, a provider who does not want to accept BCBS-AL's offered rates might pursue relationships with other Blues, who cover more than 400,000 commercial patients in the state.").)  At most, and even crediting Providers' "facts," these 400,000 Blue subscribers amount to approximately 17% of the commercial enrollees in the state.  (Doc. 2454-6 at ex. III.4.)  This sliver of subscribers cannot carry Providers' burden to establish foreclosure from a "market" as a matter of law.  *See Retina Assocs.*, 105 F.3d at 1382 (the inability to reach 15% of the market was insufficient to make out a *per se* violation); *see also Diaz v. Farley*, 215 F.3d 1175, 1183 (10th Cir. 2000) (foreclosure from some portion of the market is not automatically a *per se* violation); *Sewell Plastics*, 720 F. Supp. at 1192 (a refusal to deal was not *per se* unlawful because the plaintiff failed to prove that the foreclosure percentage was so large as to "den[y] [it] access to 'a market'"); *cf. McWane, Inc. v. F.T.C.*, 783 F.3d 814, 837 (11th Cir. 2015) ("Traditionally a foreclosure percentage of at least 40% has been a threshold for liability in exclusive dealing cases.").

The Eleventh Circuit's decision in *Retina Associates* is particularly on point. There, an ophthalmology practice sued the defendants for refusing to refer it patients.  105 F.3d at 1379–80.  The plaintiff argued that defendants' conduct blocked it from accessing 15% of the referral market.  *Id.* at 1382.  But as the plaintiff failed to offer any "factual or evidentiary justification" to demonstrate that this loss obstructed its competitive standing, the Eleventh Circuit concluded that the boycott could not be labeled as *per se* unlawful.  *Id.* at 1382–83.

The sole case Providers rely upon, *Silver v. New York Stock Exchange* (Boycott Br. at 13–14), only further supports this point.  In *Silver*, the court applied a *per se* standard where the New York Stock Exchange impeded certain broker-dealers' ability to communicate

with every single stock exchange member.  373 U.S. 341, 345, 347–48 (1963).  Such foreclosure

cannot be equated with loss of access to a fraction of the market.  Indeed, the Eleventh Circuit

distinguished *Silver* on this very ground, as have other courts.  *See Retina Assocs.*, 105 F.3d

at 1382; *Sewell Plastics*, 720 F. Supp. at 1192 ("The foreclosure from 80% of the bottler

defendants' business has not been shown to approach the total denial of plaintiff's private

telephone wire access to New York stock exchange members held *per se* illegal in *Silver*.").

       *Second*, Providers are wrong to imply that BCBS-AL is the lone gatekeeper to in-

network commercial patients in the state of Alabama.  (Boycott Br. at 13–14.)  Providers

completely ignore that there are commercial payors in the state other than BCBS-AL.  (Add.

Facts ¶ 3.)  Accordingly, even if "commercial payors" are "necessary" to compete, Providers

have other means of accessing such payors apart from BCBS-AL.  (*Id.*; SoR at 55 ("Nor have

Plaintiffs pointed to an element of the market that the Blue Plans exclusively control.").); *see*

*also Diaz*, 215 F.3d at 1183 (rejecting application of the *per se* rule because, among other

reasons, the plaintiffs could still access the market through non-boycotting entities).

       *Third*, Providers are wrong to suggest they cannot compete effectively without in-

network access to commercial enrollees.  (Boycott Br. at 13–14.)  In support of this position,

Providers argue that (i) out-of-network reimbursement rates are lower than in-network

reimbursement rates (though Providers do not say by how much or explain why that reduction is

significant enough to merit *per se* treatment); (ii) it is difficult to collect payment for out-of-

network services because BCBS-AL sends such payment to the patient, whom the provider must

then pursue (though Providers supply no empirical assessment of how this increase in transaction

costs impedes their ability to compete); and (iii) lower reimbursement rates steer commercial

enrollees away from out-of-network providers (though Providers offer no specifics about how

many patients are actually steered away).  (Boycott Br. at 13.)  Taken together, these assertions

suggest that, at most, in-network terms are preferable to out-of-network terms.  But that does not

show that out-of-network terms are so onerous as to effectively prevent out-of-network providers

from accessing the market—the showing required to justify *per se* treatment.  *See, e.g.*, *Retina*

*Assocs.*, 105 F.3d at 1382; *Diaz*, 215 F.3d at 1183; *Seaboard Supply Co. v. Congoleum Corp.*,

770 F.2d 367, 374–75 (3d Cir. 1985).

> **B.      Providers Have Not Proven Market Power.**

Providers likewise cannot prove that the allegedly boycotting Blue Plans have

market power in Alabama.  (Boycott Br. at 14–18.)  A plaintiff may demonstrate the existence of

market power through either direct or circumstantial evidence.  *See McWane*, 783 F.3d at 830.

Providers fail on both fronts.

> **1.      Providers Lack Direct Evidence of Market Power.**

The only direct evidence of market power that Providers identify is the supposed

fact that "BCBS-AL offers contracts to most providers on a 'take it or leave it' basis" in the form

of a fee schedule to physicians.  (Boycott Br. at 14–15.)  Even if BCBS-AL's market power were

relevant to this analysis—and, as discussed below, it is not—Providers are wrong about what the

record evidence shows.  BCBS-AL engages in a multi-month negotiation process with

physicians, which "quite frequently" results in BCBS-AL changing its fee schedule.  (Disp. Facts

¶ 12.)  BCBS-AL engages in negotiations with other types of providers as well.  (*Id.*)  That

BCBS-AL does not unilaterally dictate contract terms is confirmed by the significant disparities

between the average reimbursement rates BCBS-AL pays to different providers.  (*Id.*)  And even

if Providers were right on the facts, they are wrong on the law:  the mere existence of a fee

schedule is not direct evidence of market power.  *See McWane*, 783 F.3d at 830 (direct evidence

of market power requires proof that defendants can profitably increase prices above, or restrict

output below, competitive levels); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339–40 (11th Cir. 2010) (similar).[8]

### 2. Providers Lack Circumstantial Evidence of Market Power.

Providers likewise fail to prove market power through circumstantial means. Their argument fails for three independent reasons.

*First*, Providers cannot provide undisputed circumstantial evidence of market power because there is a fact dispute at the very first step of the analysis: market definition. To prove market power through circumstantial evidence, a plaintiff must first define the relevant market. *See McWane*, 783 F.3d at 828; *All Care Nursing*, 135 F.3d at 749. This is "a fact question heavily dependent upon the special characteristics of the industry involved." *Nat'l Bancard Corp. v. VISA U.S.A., Inc.*, 779 F.2d 592, 604 (11th Cir. 1986). Here, that "fact question" has not yet been resolved—indeed, there is a battle of the experts (not to mention other contradictory record evidence) that Providers completely ignore. (*See, e.g.*, Disp. Facts ¶ 11.)

For example, the parties' experts disagree about whether the Blue Plans operate a two-sided transaction platform. (*See id.*) If the Blues' expert, Dr. David Evans, is correct that the Blues operate a two-sided transaction platform, Providers have committed the same fatal mistake as plaintiffs in *Ohio v. American Express*: they have not even attempted to define the relevant product market, because they have completely ignored one side of the platform (in this case, subscribers). (*See* Ex. 340 (2020 Evans Rep.) ¶¶ 108–14, 132–46); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019) ("In cases involving two-sided

---

[8] Because Providers have not put forward undisputed direct evidence of market power, the Court need not resolve whether such direct evidence obviates the need for Providers to define a relevant market. (*See* Boycott Br. at 14.) But, to be clear, it does not. *See, e.g.*, *Rep. Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) (even where a plaintiff puts forward direct evidence of market power, it still must show "the rough contours of a relevant market, and show that the defendant commands a substantial share of th[at] market").

transaction platforms, the relevant market must, as a matter of law, include both sides of the

platform." (internal citation and emphasis omitted) (quoting *Ohio v. Am. Express Co.*, 138 S. Ct.

2274, 2287 (2018))).  And even if Providers were correct that the market is one-sided, there are

still significant disagreements between the parties' experts about the product market definition.[9]

   There is also a genuine fact dispute over the appropriate geographic market.

While Providers' expert argues that CBSAs and non-CBSA counties are the right unit of

measurement, Defendants' expert disputes that conclusion.  (*See* Disp. Facts ¶ 11.)  And despite

Providers' unsupported suggestion to the contrary (Boycott Br. at 18), the Court cannot decide

the issue of market power without a properly defined geographic market.  *See Duty Free Ams.*,

797 F.3d at 1263 ("The relevant market has two components, and the plaintiff *must define both*

the geographic market and the product market in which the defendant allegedly possesses

increasing power." (emphasis added)); *All Care Nursing*, 135 F.3d at 749.

   *Second*, Providers' circumstantial evidence of market power erroneously relies on

"the Blues'" allegedly high collective share of in-state commercial enrollees—including BCBS-

AL subscribers, who make up the bulk of that share.  (Boycott Br. at 17.)  But BCBS-AL's

enrollee share is irrelevant to this analysis because BCBS-AL is not one of the allegedly

boycotting firms.  In Providers' alleged boycott, BCBS-AL is the only Blue entity willing to

---

[9] Among other things, Providers insist that government- and self-payors are excluded from the relevant product
market. (Boycott Br. at 15–17.)  This Court previously indicated that determining whether these payors are a
reasonable substitute for commercial enrollees (and, therefore, whether they are properly included within the same
product market) likely requires answering a number of fact-intensive questions, including whether they pay
comparable rates and whether there are sufficient numbers of these patients. (*See* Doc. 1306 (MTD Opinion) at 13–
14.)  Genuine factual disputes exist on each of these issues.  For instance, not only do Defendants' experts opine that
these groups of payors are often interchangeable in the eyes of many providers, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  In light of this evidence, and the precedent supporting that
commercial and non-commercial payors are reasonable substitutes, *see Little Rock Cardiology Clinic PA v. Baptist
Health*, 591 F.3d 591, 597–98 (8th Cir. 2009); *Marion Healthcare LLC v. S. Ill. Healthcare*, 2013 WL 4510168,
at *9–11 (S.D. Ill. Aug. 26, 2013), there is a genuine dispute of material fact as to the appropriate product market
definition, even if the market is only one-sided.

contract with providers, while no *other* Blue Plan will come to the bargaining table on a Blue-branded basis. (*Id.* at 11–12, 14.) BCBS-AL, therefore, is not part of the alleged boycott, but rather contracts with as many in-state providers as possible. (*See, e.g.*, Ex. 336 (Ingrum Dep.) at 30:6–9; Ex. 332 (Bolen Dep.) at 131:25–132:14.) Given that BCBS-AL is not refusing to deal with Providers, its market power (to the extent it has any) is irrelevant. *See All Care Nursing*, 135 F.3d at 748 (recognizing that the market power inquiry is limited to the "the boycotting firms" (quoting *Nw. Wholesale Stationers*, 472 U.S. at 294)); *see also* SoR at 54–55 (stating the standard as whether "*the boycotting firms* possess market power within the relevant market" (emphasis added)).[10] Because Providers do not even attempt to assert that the other Blues have market power in a relevant market, they cannot possibly prove an essential element of a *per se* boycott claim.

*Third*, even if there were a properly defined market (there is not), and even if BCBS-AL's market share mattered to Providers' claim (it does not), Providers are incorrect that an inference of market power can be drawn on these facts from market share alone. (*See* Boycott Br. at 17–18.)

Although an important indicator, market share is just the starting point for assessing market power. *See Lady Deborah's, Inc. v. VT Griffin Servs., Inc.*, 2007 WL 4468672, at *9 (S.D. Ga. Oct. 26, 2007). An inference of power can be drawn from a high market share

---

[10] This conclusion does not change even if BCBS-AL is said to bear some connection to the alleged conspiracy. After all, no matter BCBS-AL's role, if its subscribers are not part of the alleged scheme, then it makes little sense to include those subscribers when calculating the boycott's market share. *See, e.g., Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1218 (11th Cir. 2002) ("[T]he reason for looking at market power is to determine whether the combination or conspiracy . . . has the power to hurt competition in the relevant market." (citation omitted)); *Diaz*, 215 F.3d at 1183 (explaining that the plaintiffs failed to "allege[] market power on the part of the defendants" because, among other reasons, the court had no basis on which to determine "how significantly the agreement between [the alleged conspirators] affects the plaintiffs' or other anesthesiologists' ability to practice ob/gyn anesthesia at Cottonwood Hospital or any other relevant geographic market" (citation omitted)).

only after considering "other characteristics of the . . . market." *Kaufman v. Time Warner*, 836 F.3d 137, 143, 148 (2d Cir. 2016); *see also United States v. Syufy Enters.*, 903 F.2d 659, 664 & n.6 (9th Cir. 1990); *Fin-S Tech, LLC v. Surf Hardware Int'l-USA, Inc.*, 2014 WL 12461350, at *3 (S.D. Fla. Aug. 27, 2014) ("While market share is a measure of gauging monopoly power[,] . . . alone, it is not enough to establish a prima facie show of monopoly power."); *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1305–06 (M.D. Fla. 2001) (recognizing that it was a jury question whether a company with a market share between 70% and 92% possessed market power given the peculiarities of the market in question); *see also* Areeda & Hovenkamp ¶ 532b (explaining that even a market share above 90% does not create an irrebuttable presumption of market power).  Providers' cited authorities concur.  *See, e.g.*, *McWane*, 783 F.3d at 830 (pointing to "other circumstantial factors" in addition to market share that should be consulted when determining whether a firm has market power).

        In this case, there is evidence that BCBS-AL does not have market power to dictate prices paid to providers irrespective of its market share, given the characteristics of the market.  Many providers themselves have market power—either because the provider controls a significant share of healthcare services supplied in the state, because the provider is a "must have" from the perspective of BCBS-AL's subscribers, or because the provider is the only option in a particular geography.  (Add. Facts ¶¶ 7–8.)  Indeed, Providers' own experts have conceded that insurers are often in a weak bargaining position when negotiating with powerful providers because losing those providers would put the insurer at a "competitive disadvantage" when trying to attract subscribers.  (Doc. 2564-68 (Frech Dep.) at 7 (Tr. at 89:7–90:11); Ex. 337 (Frech Dep.) at 86:9–87:24; Doc. 2467-3 (D. Haas-Wilson Decl. in *Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, No. 12-cv-560-BLW (D. Idaho)) ¶ 33 (opining that "[p]ayers

are in a weak bargaining position with a 'must-have' hospital or 'must-have' physician

organization")); *see also Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d

1291, 1300–03 (11th Cir. 2010).  This is true even in the case of smaller providers because, all

else equal, BCBS-AL's subscribers value broad provider networks, and BCBS-AL must take

those preferences into account when negotiating with providers.  (Add. Facts ¶ 8; Doc. 2565-49–

50 (2019 Murphy Rep.) ¶ 25; *see also* Doc. 2454-6 (2019 Haas-Wilson Rep.) ¶ 168; Ex. 340

(2020 Evans Rep.) ¶¶ 57–58.)

> That BCBS-AL is not able to exert market power over providers is confirmed by

real-world evidence.  BCBS-AL pays high reimbursement rates compared to other in-state

insurers and operates on thin margins.  (Add. Facts ¶ 9.)  Alabama physicians, on the other hand,

earn high salaries relative to the national average.  (*Id.* ¶ 10.)  These outcomes are inconsistent

with Providers' assertion that BCBS-AL has market power to dictate terms.  *See Retina Assocs.*,

105 F.3d at 1383 ("The determination that *per se* analysis is inapplicable in this case is

reinforced by [the plaintiff's] remarkable success during the years of the alleged boycott.").

## C.     The Challenged Rules Are Plausibly Procompetitive.

> Providers' *per se* boycott claims fail for the additional and independent reason

that Providers have not demonstrated that ESAs (or, for that matter, BlueCard) are likely to have

only anticompetitive effects.  *See Retina Assocs.*, 105 F.3d at 1381 (in a group boycott case, the

rule of reason applies "absent some demonstration that the practice at issue historically leads to

anticompetitive effects"); *see also Ind. Fed'n of Dentists*, 476 U.S. at 458–59 (courts are

particularly "slow . . . to extend *per se* analysis to restraints imposed in the context of business

relationships where the economic impact of certain practices is not immediately obvious"); *All

Care Nursing*, 135 F.3d at 748 ("Per se treatment has been given to those practices which history

has shown have only anticompetitive effects.").

28

To start, Providers are incorrect that Defendants bear the burden of persuading the Court of the procompetitive possibilities offered by the challenged rules or else the *per se* rule prevails. (Boycott Br. at 18.) The Eleventh Circuit has suggested the exact opposite: "analyzing th[e] case under the *per se* rubric would remain inappropriate [even with proof of market power] absent some demonstration that the practice at issue historically leads to anticompetitive effects in the market." *Retina Assocs.*, 105 F.3d at 1381. This is consistent with the general principle that the rule of reason governs group boycott claims (*see supra* at pp. 13–14), and that courts are "loath to condemn a practice as per se violative of the antitrust laws unless experience has shown that it always leads to anticompetitive effects in the market." *Levine*, 72 F.3d at 1550.

But regardless of who bears the ultimate burden, there is simply no way to conclude that the boycott alleged here is "virtually always likely to have an anticompetitive effect" as required for the *per se* rule to apply. (SoR at 55 (*quoting Nw. Wholesale Stationers*, 472 U.S. at 296).) *First*, ESAs are plausibly procompetitive for all the reasons identified in Defendants' May 21 brief: ESAs offer Blue Plans "clarity so that [they] can focus on" increasing inter-brand competition, promote output and contribute to the success of a procompetitive venture. (Defs. Br. at 28–32.)

*Second*, although Providers' claim is not in fact about BlueCard (*see supra* Argument I), BlueCard itself carries numerous procompetitive possibilities—as the Court has already found (*see* SoR at 53–54).[11] For subscribers, BlueCard greatly expands the available provider network in a cost-efficient manner and ensures that enrollees have access to a single

---

[11] Although the Court credited many of these benefits in the context of price fixing rather than boycott (SoR at 51, 53), that is a distinction without a difference. Regardless of whether BlueCard is framed as a price-fixing scheme or a group boycott, the same plausible efficiencies preclude the application of the *per se* standard. *See All Care Nursing*, 135 F.3d at 748 ("The same principles apply to a consideration of application of the per se rule whether the act complained of is labeled price fixing or a group boycott.").

point of contact.  (Add. Facts ¶¶ 4–5.)  Even Providers' own industry expert admits that these features of BlueCard offer procompetitive efficiencies and represent improvements over prior inter-Plan programs.  (*See* Ex. 337 (Frech Dep.) at 306:1–8, 306:24–307:10; Ex. 338 (Frech Dep.) at 96:13–98:1.)  As for providers, BlueCard grants access to significantly more patients and reduces transaction costs—the latter of which Providers' own expert concedes.  (Add. Facts ¶ 6; *see also* Ex. 337 at 225:25–226:19; Ex. 338 at 99:12–101:3, 105:22–106:21.)

Finally, although Providers contend that "a group boycott [is not] necessary to achieve the efficiencies of integration that the Blues have claimed that the BlueCard program allows" (Boycott Br. at 18), that is irrelevant to determining the standard of review.  All that matters at this stage is whether plausible procompetitive benefits exist; whether there are less restrictive alternatives for achieving those same benefits is a question reserved for the rule-of-reason analysis.  *See Nw. Wholesale Stationers*, 472 U.S. at 295 (requiring only plausible procompetitive justifications, without considering whether less restrictive alternatives exist); *Stop & Shop*, 373 F.3d at 62 ("The arrangement might still be unlawful under the rule of reason depending upon . . . the balance between efficiencies gained and any harm to competition that could be shown, but we are concerned for the moment only with whether per se treatment was warranted." (citation omitted)).  Indeed, the lone authority cited by Providers discussed less restrictive alternatives only *after* determining that the *per se* standard did not apply.  (Boycott Br. at 19); *see also Thompson*, 934 F.2d at 1579–82.  Here, too, the *per se* standard does not apply, and the issue of less restrictive alternatives can be determined during a full rule-of-reason trial.

## CONCLUSION

For the foregoing reasons, the Court should deny Providers' motion for partial summary judgment regarding the standard of review for their group boycott claims.

Dated:  June 21, 2021

Respectfully submitted,

*/s/ Evan R. Chesler*
Evan R. Chesler
Christine A. Varney
Karin A. DeMasi
Lauren R. Kennedy
David H. Korn
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
Tel: (212) 474-1000
Fax: (212) 474-3700
echesler@cravath.com
cvarney@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com
dkorn@cravath.com

*Coordinating Counsel for Defendant*
*Blue Cross and Blue Shield Association;*
*Counsel for Defendants Blue Cross and*
*Blue Shield of Alabama; Blue Cross and*
*Blue Shield of Florida, Inc.; Blue Cross*
*and Blue Shield of Massachusetts, Inc.;*
*Blue Cross and Blue Shield of North*
*Carolina, Inc.; BlueCross BlueShield*
*of Tennessee, Inc.; California*
*Physicians' Service d/b/a Blue Shield of*
*California; CareFirst, Inc.; CareFirst of*
*Maryland, Inc.; Group Hospitalization*
*and Medical Services, Inc.; CareFirst*
*BlueChoice, Inc.; Health Care Service*
*Corporation, an Illinois Mutual Legal*
*Reserve Company, including its*
*divisions Blue Cross and Blue Shield of*
*Illinois, Blue Cross and Blue Shield of*
*Texas, Blue Cross and Blue Shield of*
*New Mexico, Blue Cross and Blue*
*Shield of Oklahoma, and Blue Cross and*
*Blue Shield of Montana; Caring for*
*Montanans, Inc., f/k/a Blue Cross and*
*Blue Shield of Montana, Inc.*

Craig A. Hoover
E. Desmond Hogan
Justin Bernick
Peter Bisio
Elizabeth Jose
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC  20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com
peter.bisio@hoganlovells.com
elizabeth.jose@hoganlovells.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc.,
and all of its named subsidiaries in this
consolidated action; Louisiana Health Service &
Indemnity Company (Blue Cross and Blue Shield
of Louisiana); BCBSM, Inc. (Blue Cross and Blue
Shield of Minnesota); Blue Cross and Blue Shield
of South Carolina; Horizon Healthcare Services,
Inc. (Horizon Blue Cross and Blue Shield of New
Jersey); Blue Cross & Blue Shield of Rhode
Island; Blue Cross and Blue Shield of Vermont;
Cambia Health Solutions, Inc.; Regence Blue
Shield of Idaho; Regence Blue Cross Blue Shield
of Utah; Regence Blue Shield (of Washington);
Regence Blue Cross Blue Shield of Oregon*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC  29201
Tel: (803) 255-9421
Fax: (803) 256-7500
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

David J. Zott, P.C.
Daniel E. Laytin, P.C.
Sarah J. Donnell
Christa C. Cottrell, P.C.
Zachary Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com
sarah.donnell@kirkland.com
christa.cottrell@kirkland.com
zachary.holmstead@kirkland.com

*Counsel for Blue Cross Blue Shield
Association*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL  35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants Blue Cross Blue
Shield Association; Health Care Service
Corporation, an Illinois Mutual Legal
Reserve Company, including its
divisions Blue Cross and Blue Shield of
Illinois, Blue Cross and Blue Shield of
Texas, Blue Cross and Blue Shield of
New Mexico, Blue Cross and Blue
Shield of Oklahoma, and Blue Cross and
Blue Shield of Montana; Caring for
Montanans, Inc., f/k/a Blue Cross and
Blue Shield of Montana, Inc.; Highmark
Inc., f/k/a Highmark Health Services;
Highmark West Virginia Inc.; Highmark*

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its subsidiaries in this consolidated action; Blue Cross and Blue Shield of North Carolina, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon; Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Triple-S Salud, Inc; Defendants Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; BlueCross BlueShield of Tennessee, Inc.*

Cavender C. Kimble
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action; Blue Cross and Blue Shield of North Carolina, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont;*

*Blue Cross Blue Shield Delaware Inc.; California Physicians' Service d/b/a Blue Shield of California; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii)*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL 35203
Tel: (205) 254-1000
Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com

Pamela B. Slate
HILL CARTER FRANCO COLE & BLACK, P.C.
425 South Perry Street
Montgomery, AL 36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*With Cravath, Swaine & Moore LLP, counsel for Defendant Blue Cross Blue Shield of Alabama*

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
Erica B. Zolner
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200

*Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA  98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

*Counsel for Defendants Premera Blue Cross, d/b/a Premera Blue Cross Blue Shield of Alaska*

Brian K. Norman
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX  75234
Tel: (214) 987-1745
Fax: (214) 521-9033
bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
RSA Tower, 27th Floor
11 North Water Street
Mobile, AL  36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

*Counsel for Defendants CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.*

R. David Kaufman
M. Patrick McDowell
BRUNINI, GRANTHAM, GROWER
& HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100

hwitt@kirkland.com
jzeiger@kirkland.com
ezolner@kirkland.com

*Counsel for Defendants Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.*

Jonathan M. Redgrave
REDGRAVE, LLP
14555 Avion Parkway, Suite 275
Chantilly, VA  20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark Defendants*

Todd M. Stenerson
Brian C. Hauser
Edmund Y. Saw
SHEARMAN & STERLING LLP
401 9th Street, N.W., Suite 800
Washington, DC  20004
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com
brian.hauser@shearman.com
edmund.saw@shearman.com

Sarah L. Cylkowski
Thomas J. Rheaume, Jr.

Jackson, MS  39201
Tel: (601) 948-3101
Fax: (601) 960-6902
dkaufman@brunini.com
pmcdowell@brunini.com

Cheri D. Green
BLUE CROSS BLUE SHIELD OF MISSISSIPPI,
A MUTUAL INSURANCE COMPANY
P.O. Box 1043
Jackson, MS  39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

*Counsel for Defendant Blue Cross Blue Shield of
Mississippi, a Mutual Insurance Company*

Michael A. Naranjo
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA  94104
Tel: (415) 984-9847
Fax: (415) 434-4507
mnaranjo@foley.com

Alan D. Rutenberg
Benjamin R. Dryden
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, DC  20007
Tel: (202) 672-5300
Fax: (202) 672-5399
arutenberg@foley.com
bdryden@foley.com

*Counsel for Defendant USAble Mutual Insurance
Company, d/b/a Arkansas Blue Cross and
Blue Shield*

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Jess R. Nix
Morgan B. Franz

BODMAN PLC
1901 Saint Antoine Street
6th Floor at Ford Field
Detroit, MI  48226
Tel: (313) 259-7777
Fax: (734) 930-2494
scylkowski@bodmanlaw.com
trheaume@bodmanlaw.com

Andy P. Campbell
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL PARTNERS LLC
505 North 20th Street, Suite 1600
Birmingham, AL  35203
Tel: (205) 224-0750
Fax: (205) 224-8622
andy@campbellpartnerslaw.com
todd@campbellpartnerslaw.com
yawanna@campbellpartnerslaw.com

*Counsel for Defendant Blue Cross and
Blue Shield of Michigan*

John Briggs
Rachel Adcox
Jeny M. Maier
AXINN, VELTROP & HARKRIDER,
LLP
1901 L Street, N.W.
Washington, DC  20036
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
radcox@axinn.com
jmaier@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, AL  35203
Tel: (205) 250-5000
Fax: (205) 250-5034

SPOTSWOOD SANSOM & SANSBURY LLC
Financial Center
505 20th Street North, Suite 700
Birmingham, AL  35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
jnix@spotswoodllc.com
mfranz@spotswoodllc.com

*Counsel for Defendant Capital BlueCross*

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL  35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendants Blue Cross and Blue
Shield of Florida, Inc.; Blue Cross and Blue Shield
of Massachusetts, Inc.; BlueCross BlueShield
of Tennessee, Inc.*

Edward S. Bloomberg
John G. Schmidt Jr.
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY  14203
Tel: (716) 847-8400
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com
Stephen A. Walsh
WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL
100 Corporate Parkway
One Lake Level

steve.rowe@arlaw.com
aaron.mcleod@arlaw.com
*Counsel for Defendant Independence
Blue Cross*

Kathleen Taylor Sooy
Tracy A. Roman
Sarah Gilbert
Honor Costello
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com
sgilbert@crowell.com
hcostello@crowell.com

John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN & WHITE
LLC
The Clark Building
400 20th Street North
Birmingham, AL  35203
Tel: (205) 581-0700
Fax: (205) 581-0799
jjohnson@lightfootlaw.com
bkappel@lightfootlaw.com

*Counsel for Defendants Blue Cross of
Idaho Health Service, Inc.; Blue Cross
and Blue Shield of Kansas, Inc.; Blue
Cross and Blue Shield of Kansas City;
Blue Cross and Blue Shield of
Nebraska; Blue Cross Blue Shield of
Arizona; Blue Cross Blue Shield of
North Dakota; Blue Cross Blue Shield
of Wyoming; Highmark Western and
Northeastern New York Inc.*

David J. Zott, P.C.
Daniel E. Laytin, P.C.

Birmingham, AL  35242
Tel: (205) 572-4107
Fax: (205) 572-4199
swalsh@wwhgd.com

*Counsel for Defendant, Excellus Health Plan, Inc.,*
*d/b/a Excellus BlueCross BlueShield, incorrectly*
*sued as Excellus BlueCross BlueShield of*
*New York*

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com

*Counsel for Defendants Wellmark of*
*South Dakota, Inc. (Wellmark Blue*
*Cross and Blue Shield of South Dakota);*
*Wellmark, Inc. (Wellmark Blue Cross*
*and Blue Shield of Iowa); Hawaii*
*Medical Service Association (Blue*
*Cross and Blue Shield of Hawaii);*
*Triple-S Salud, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

   I hereby certify that on June 21, 2021, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Evan R. Chesler*  
Evan R. Chesler
