FILED

2021 Jul-12  PM 05:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|  |  |
|---|---|
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This Document Relates to**<br>**Provider Track Cases** |

**PROVIDER PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING
<u>THE STANDARD OF REVIEW FOR THEIR GROUP BOYCOTT CLAIMS</u>**

**Filed Under Seal Pursuant to Qualified Protective Order (Dkt. 550)
and the Order Regarding Revised Sealing Procedures (Dkt. 758)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ..................................................................................................... 1

RESPONSE TO DEFENDANTS' STATEMENT OF ADDITIONAL RELEVANT FACTS ...... 1

ARGUMENT ........................................................................................................... 3

    I.    BlueCard is a Fundamental Part of the Providers' Group Boycott Claim .............. 3

    II.    The Blues' Agreements Constitute a Group Boycott Because They Use BlueCard to Carry It Out .......................................................................... 4

    III.    The Blues' Group Boycott Is Unlawful *Per Se* Under Supreme Court Precedent ................................................................................................ 5

        A.    The Blues Control the Lion's Share of the Market for Commercial Patients ....................................................................................... 6

        B.    The Providers Have Shown Direct and Indirect Evidence of Market Power ......................................................................................... 7

        C.    Under Controlling Precedent, the Blues' "Plausibly Procompetitive" Reasons for Their Group Boycott Cannot Change the Standard of Review .............................................................................. 10

CONCLUSION ...................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

*All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc.*,
    135 F.3d 740 (11th Cir. 1998) .................................................................... 4

*Cha-Car, Inc. v. Calder Race Course, Inc.*,
    752 F.2d 609 (11th Cir. 1985) .................................................................... 5

*Clorox Co. v. Sterling Winthrop, Inc.*,
    117 F.3d 50 (2d Cir. 1997)......................................................................... 5

*Diaz v. Farley*,
    215 F.3d 1175 (10th Cir. 2000) .................................................................. 7

*Duty Free Americas, Inc. v. Estee Lauder Cos.*,
    797 F.3d 1248 (11th Cir. 2015) .................................................................. 5

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
    504 U.S. 451 (1992)................................................................................... 9

*Fin-S Tech, LLC v. Surf Hardware International-USA, Inc.*,
    2014 WL 12461350 (S.D. Fla. Aug. 27, 2014)........................................... 9

*FTC v. Indiana Federation of Dentists*,
    476 U.S. 447 (1986)................................................................................... 5

*FTC v. Superior Court Trial Lawyers Ass'n*,
    493 U.S. 411 (1990)........................................................................ 5, 6, 10

*General Leaseways, Inc. v. National Truck Leasing Ass'n*,
    744 F.2d 588 (7th Cir. 1984) .................................................................... 10

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
    267 F.R.D. 583 (N.D. Cal. 2010)............................................................... 8

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016)....................................................................... 9

*Lady Deborah's, Inc. v. VT Griffin Services, Inc.*,
    2007 WL 4468672 (S.D. Ga. Oct. 26, 2007) ............................................. 9

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) ............................................................... 6, 9

*Moecker v. Honeywell International, Inc.*,
    144 F. Supp. 2d 1291 (M.D. Fla. 2001)..................................................... 9

*Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*,
    836 F.2d 173 (3d Cir. 1988).......................................................................... 5

*Sewell Plastics, Inc. v. Coca-Cola Co.*,
    720 F. Supp. 1186 (W.D.N.C. 1988) ............................................................. 4

*Shoney's, Inc. v. Schoenbaum*,
    894 F.2d 92 (4th Cir. 1990) ........................................................................... 5

*Susser v. Carvel Corp.*,
    206 F. Supp. 636 (S.D.N.Y. 1962) ................................................................ 5

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ......................................................................... 6

*United States v. Syufy Enterprises*,
    903 F.2d 659 (9th Cir. 1990) ......................................................................... 9

*VMG Enterprises, Inc. v. F. Quesada & Franco, Inc.*,
    788 F. Supp. 648 (D.P.R. 1992)..................................................................... 5

## LIST OF CITATIONS AND ABBREVIATIONS

| Ex[1] | Document | Citation |
|---|---|---|
| 8 | Exhibit 6 to the Deposition of Lawrence Van Horn | Van Horn Ex. 6 |
| 9 | Reply Report on Merits of H.E. Frech, III, Ph.D. dated February 1, 2021 | Frech Merits Reply |
| 10 | Deposition of Janusz Ordover, Ph.D. dated November 12, 2020 | Ordover Tr. |
| 11 | Deposition of David Dillon, FSA, MAAA dated January 18, 2021 | Dillon Tr. |
| 12 | Expert Report of Thomas D. Gober, CFE dated May 15, 2019 | Gober Report |
| 13 | Expert Report of Roy Goldman, Ph.D., FSA MAAA CERA dated February 1, 2021 | Goldman Report |
| 14 | Expert Rebuttal Report of Deborah Haas-Wilson, Ph.D. dated February 1, 2021 | Haas-Wilson Rebuttal |

---

[1] For ease of reference, exhibits are numbered sequentially continuing from Provider Plaintiffs' Motion for Summary Judgment Regarding the Standard of Review for Their Group Boycott Claims.

## INTRODUCTION

Because of the market power and the ability of BlueCross BlueShield of Alabama to effectively dictate the prices of hospital services, those prices have been driven down. That is not just the Providers' opinion; it is a near-verbatim quote from one of the Blues' own experts.[2] One reason BCBS-AL can dictate prices is that the Blues have agreed that none of them will contract with a provider who does not agree to contract with all of them. In this way, BCBS-AL brings to the table not only its own subscribers, but also the 400,000 Alabama subscribers of other Blues, increasing its market power. This agreement, which goes above and beyond the Blues' use of Exclusive Service Areas, is unlawful *per se* under controlling Supreme Court precedent.

## RESPONSE TO DEFENDANTS' STATEMENT OF ADDITIONAL RELEVANT FACTS

The Providers do not concede that any of the Blues' "Additional Relevant Facts" are relevant to this motion. The Providers respond to those facts as follows:

1.    **Disputed.** If BlueCard were eliminated tomorrow, other Blues could provide services to their Alabama subscribers through rental networks. Doc. No. 2454-6, ¶ 540. Moreover, BCBS-AL would no longer have increased market power arising from the 400,000 Alabama subscribers of other Blues.

2.    **Disputed.** Through April 2021, the Blues disincentivized investment under non-Blue brands through the National Best Efforts rule, and the effects of that rule persist today. One effect is that the Blues did not establish non-Blue networks in Alabama. Doc. No. 2747 at 25–26.

3.    **Disputed.** BCBS-AL has used explicit and implicit "Most Favored Nation" clauses to disincentivize providers from contracting with other commercial insurers. Doc. No. 2454-3,

---

[2] Ex. 8 (Ex. 6 to Van Horn Deposition) at 7 ("If I would look at the efficiencies of hospitals, because of the market power and the ability of BlueCross BlueShield of Alabama to be able to effectively dictate the prices, they have driven them down. You talk to hospitals in Alabama and they would say, 'I'd love to get Medicare rates. If I was getting Medicare rates, I would be rolling in the dough.'").

¶¶ 340–48. While the Blues' rules do not prevent providers from treating patients on an out-of-network basis, they make it financially unattractive by paying less and making collections difficult. Doc. No. 2729 ("Mot.") at 5.

4.      **Disputed.** The Blues do not need BlueCard to give subscribers a single point of contact. Even in the 1940s, a subscriber had a single point of contact: his or her home plan. Doc. No. 1431-6. Cigna, United, and Aetna offer their subscribers broad networks and a single point of contact, and the Blues could continue to do so, even with competition. Moreover, these alleged benefits of BlueCard are not specifically tied to the Blues' group boycott.

5.      **Disputed.** Following the introduction of BlueCard, the total insured population (a measure of output in the industry) did not increase meaningfully. Ex. 9 (Frech Merits Rebuttal Report) ¶ 73. There is also no indication that the increased Blue enrollment was tied to the group boycott aspect of BlueCard.

6.      **Disputed.** BlueCard often increases the administrative burden on providers and shifts administrative costs to them. Doc. 2454-3, ¶¶ 316–19; Doc. No. 2724-3, ¶ 70; Ex. 9, ¶¶ 56–61, 69–70. To the extent that BlueCard allows access to more in-network subscribers, the Blues are solving a self-inflicted problem created by their restrictions on contracting with providers.

7–8.      **Disputed.** The Providers have not "ignor[ed]" that some hospitals have market power. Provider market power is irrelevant to market definition, as described in Part III.B below, and the Providers' experts took provider market power into account in their damages model.

9.      **Disputed.** Dr. Ordover's analysis does not account for the tradeoff between inpatient and outpatient rates in negotiations between insurer and hospitals. Ex. 10 (Ordover Tr.) 128:14–132:10. Moreover, the Providers' experts have shown that BCBS-AL pays less than it would if it did not combine its market power with the other Blues' via BlueCard. *See infra* Part I.

Dr. Murphy and Dr. Wu used Medical Loss Ratio as a proxy for profitability, which the Blues' own actuarial expert disagrees with. Ex. 11 (Dillon Tr.) at 294:22–295:10. Using more appropriate measures, BCBS-AL is highly profitable. Ex. 12 (Gober Report) at 7–10; Ex. 13 (Goldman Report) at 12–17.

10.     **Disputed.** Salaries are an unreliable measure of output because they do not account for physician productivity. Ex. 14 (Haas-Wilson Merits Rebuttal Report) ¶¶ 260–63. Professor Murphy's analysis of physician salaries is flawed because it omits self-employed physicians, who represent as many as half of physicians nationally. *Id.* ¶ 262.

## ARGUMENT

## I.     BlueCard Is a Fundamental Part of the Providers' Group Boycott Claim.

To set the table for the rest of their arguments, the Blues first mischaracterize the Providers' group boycott claim as merely a recasting of their claim based on Exclusive Service Areas (ESAs). But it is not hard to see how BlueCard is an essential ingredient of the group boycott claim. If ESAs were the only restriction at issue, and BlueCard did not exist, an Alabama healthcare provider's decision whether to contract with BCBS-AL would affect only the provider's ability to access BCBS-AL's own subscribers on an in-network basis. The provider could choose to treat other Blues' Alabama subscribers by joining a rental network.[3] With BlueCard in place, the provider's decision whether to contract with BCBS-AL now affects its ability to access the subscribers of *all* Blues on an in-network basis, making that decision more consequential and increasing BCBS-AL's leverage. This binding together of market power among competitors, and its effect on the parties they deal with, is why the *per se* rule still exists for group boycotts.

The Providers' expert Dr. Haas-Wilson specifically identified the Providers' injury under

---

[3] Rental networks typically contract with providers to create healthcare provider networks in various regions of the country, and then rent those networks to commercial buyers. Doc. 2454-6, ¶ 44.

a scenario in which ESAs are permitted to exist, but BlueCard is eliminated. Doc. No. 2454-6, ¶¶ 538–42. Using a sophisticated econometric model, she showed how BCBS-AL's decreased leverage and providers' use of rental networks would lead to higher reimbursements, by both BCBS-AL and the other Blues. The Providers' expert Dr. Slottje calculated that this injury resulted in nearly $2.5 billion in damages. Doc. 2424-14, ¶ 88(f). It is inexplicable, then, that the Blues take this result—that BlueCard imposes significant costs on providers independent of the Blues' ESAs—as proof that the Providers' group boycott claim is solely about ESAs. Doc. No. 2760 ("Opp.") at 16–17. By combining the Blues' market power in a way that ESAs do not, BlueCard is the glue that holds the group boycott together.

## II. The Blues' Agreements Constitute a Group Boycott Because They Use BlueCard to Carry It Out.

The Blues' next argument rests entirely on their mischaracterization of the Providers' claims as resting solely on ESAs. If the Providers are complaining only about ESAs, the Blues reason, then the non-Alabama Blues are not engaged in a group boycott; at most they have refused to deal with healthcare providers under the Blue marks. Opp. at 17–19. But the Blues have failed to account for the way that the Blues use BlueCard to aggregate their market power. *See supra* Part I. Therefore, it is neither here nor there that ESAs themselves may not be a group boycott.

None of the cases the Blues cite in this section of their brief involved a group of potential competitors giving their suppliers an all-or-nothing choice: contract with all of us or contract with none of us. In *Sewell Plastics, Inc. v. Coca-Cola Co.*, for example, the court held that the defendant soft drink bottlers had not engaged in a *per se* unlawful group boycott because they continued to purchase seventeen percent of their requirements from the plaintiff bottle manufacturer. 720 F. Supp. 1186, 1191 (W.D.N.C. 1988). Likewise, the holding in *All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc.* turned on the defendants' hospitals' freedom to contract

individually with the plaintiff nursing services—a freedom the Blues' rules prohibit. 135 F.3d 740, 748 (11th Cir. 1998).[4] And in *VMG Enterprises, Inc. v. F. Quesada & Franco, Inc.*, the plaintiff was not even colorably being boycotted; it was a competitor of the defendant who had entered into a concurrent use agreement (a type of agreement the Blues have not entered into). 788 F. Supp. 648 (D.P.R. 1992).[5] These cases do nothing to undermine the well-established proposition that all-or-nothing contracting among potential competitors can be unlawful *per se*.

## III.     The Blues' Group Boycott Is Unlawful *Per Se* Under Supreme Court Precedent.

Although the Supreme Court has stated that *per se* boycotts are "generally" ones in which "firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor," *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986), the Court later made clear that this is not the only such category. In *FTC v. Superior Court Trial Lawyers Ass'n*, the Court applied the *per se* rule to an agreement by a group of CJA attorneys not to take further cases until the compensation for all CJA attorneys was increased. 493 U.S. 411 (1990). The purpose of this agreement was not to discourage anyone from doing business with a competitor, but to increase fees that the attorneys perceived as inadequate to ensure effective representation for defendants. *Id.* at 415–16. The Supreme Court, assuming *arguendo* that the "boycott may well have served a cause that was worthwhile and unpopular," that "the preboycott rates were unreasonably low," and that "the increase has produced better legal representation for indigent

---

[4] While the Blues could theoretically contract with Alabama providers on a non-Blue basis, they have implemented other rules to discourage the development of non-Blue business in Alabama, turning their restriction on business under the Blue marks into a complete restriction. *See* Response to Defendants' Fact 2.

[5] The Blues' other authorities are even further afield. *Cha-Car, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 614–15 (11th Cir. 1985) (defendant race course operators were not competitors, and they did not have the physical capacity to accommodate everyone who wanted stall space at their track); *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1265 (11th Cir. 2015) (unilateral refusal to deal); *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 55 (2d Cir. 1997) (no group boycott at issue); *Shoney's, Inc. v. Schoenbaum*, 894 F.2d 92 (4th Cir. 1990) (territorial restriction in a vertical franchise agreement; no group boycott alleged); *Susser v. Carvel Corp.*, 206 F. Supp. 636, 643 (S.D.N.Y. 1962) (defendants were not competitors); *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 183 (3d Cir. 1988) (defendants' conduct was expressly permitted by statute).

defendants," still condemned the boycott as unlawful *per se* because it eliminated price competition among the attorneys. *Id.* at 421–23. Likewise, the Blues' group boycott prohibits them from competing with each other for providers' services. The Blues may not justify their agreement not to compete by asserting that subscribers receive better coverage, any more than the attorneys in *Superior Court Trial Lawyers* could assert that indigent defendants would receive better representation.

### A.      The Blues Control the Lion's Share of the Market for Commercial Patients.

When evaluating market foreclosure due to a group boycott, the relevant measure is the percentage of the market controlled by the boycotting firms. *See Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936–37 (7th Cir. 2000); *McWane, Inc. v. FTC*, 783 F.3d 814, 837 (11th Cir. 2015). The Blues do not dispute that they cover more than 80% of the commercial patients in Alabama. *See* Opp. at 5–6. By focusing only on the 400,000 subscribers of the Blues other than BCBS-AL, the Blues attempt to create a different test: that the largest conspirator's market share must be ignored. Opp. at 20–21. Besides being unsupported by any authority, this idea makes no sense as a matter of economics. BCBS-AL, of course, is a participant in the group boycott, and its market power allows the boycott to function as successfully as it does.

If the relevant market for determining the standard of review is based on commercial patients (the Blues say it's not, but they are wrong for reasons described below), then the Blues' combined market share of more than 80% is more than enough to justify *per se* treatment of their boycott. *See* Mot. at 12–13 (citing cases). The Blues misleadingly cite *Sewell Plastics* for the proposition that a foreclosure level of 80% is insufficient for *per se* treatment, Opp. at 22, but in *Sewell Plastics*, the court stated a boycott covering 80% of the *defendants' business*—not 80% of the total market—was not *per se* unlawful because the plaintiff could still deal with the defendants for the other 20%. 720 F. Supp. at 1191. In Alabama, the Blues' boycott covers 100% of their

business.[6]

The Blues cite no relevant evidence that contradicts the testimony of providers that they need in-network access to commercial patients to compete effectively. *See* Facts 13–17 and the Blues' response. The best they can do is to point to a statement by Dr. Haas-Wilson that there may be some providers, like plastic surgeons, who could shift some business to self-pay patients if a hypothetical monopsonist were to lower its price below competitive levels, without quoting the rest of her statement: that this "likely would not be a viable option for facilities and most healthcare professionals to defeat the hypothetical *monopsonist*'s" price decrease. Doc. No. 2454-6. This is not the same as saying that a plastic surgeon who cannot access commercial patients can compete effectively with one who can. Even if the Blues can prove their group boycott does not harm some providers, that is an issue for class certification, not market definition or the standard of review. Similarly, it doesn't matter if "in some instances, government reimbursement rates are competitive with the rates paid by commercial insurers." Opp. at 7. "In some instances" is not the same as "overall," which is what matters when determining the effect of a group boycott on providers. And the Blues have not shown how providers could increase their Medicare or Medicaid patients if they were to lose access to commercial patients.

### B.      The Providers Have Shown Direct and Indirect Evidence of Market Power.

The Blues do not dispute that BCBS-AL tells all healthcare professionals statewide what it will pay for their services, regardless of their ability or experience, and the professionals can decide to contract at those rates or not at all. And for hospital services, BCBS-AL can "effectively dictate the prices," as their own expert put it. Ex. 8. The fact that BCBS-AL talks to physicians

---

[6] In *Diaz v. Farley*, which the Blues also cite, the plaintiffs did not allege market power, define a relevant market, or compare the defendants' market share to the share of other market participants. 215 F.3d 1175, 1183 (10th Cir. 2000). Here, the Providers have done all three.

before unilaterally setting non-negotiable rates for all professionals statewide does not change the

fact that BCBS-AL sets the same rates for everyone, which is powerful evidence of market power.

Mot. at 9–10. Cartels often review market conditions before making pricing decisions. *E.g.*, *In re*

*TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 588 (N.D. Cal. 2010).

With respect to indirect evidence of market power, there are disputes among the experts

about market definition, but none that affect this motion. As to the product market, while the Blues

have claimed that in some instances, some providers may be paid as much for some services by

self-pay and government-insured patients as commercial patients, they have never tried to show

that enough providers could substitute away from commercial insurance to defeat a price decrease

from competitive levels by a hypothetical monopsonist, which is the test for market definition in

this context. Doc. No. 2631 at 6–10. And for the geographic market, the Providers have shown,

and the Blues have not disputed, that the Blues have a high share of the market—from 62% to

94%—no matter how the state is divided geographically. Mot. at 12–13. The Blues' expert never

defined alternative geographic markets or identified any geographic area in which the Blues do

not have significant market share. *See* Doc. No. 2631 at 13–14.

The Blues' argument that health insurance is a two-sided transaction platform is also not

material to this motion. The Blues have not addressed the Providers' argument that "it makes no

difference whether the market is one for commercial patients, or for healthcare transactions,"

which is the Blues' preferred market definition, "because providers interact with commercial

patients in the context of providing healthcare." Mot. at 11 n.3. Oddly, their criticism on this score

is that the Providers "have completely ignored one side of the platform (in this case, subscribers),"

Opp. at 24, when the Providers' calculations of the Blues' market share are based on the number

of subscribers the Blues cover. The Blues have not explained how, even if the market is two-sided,

they lack a significant share of the market.[7]

The Blues also claim that their overwhelming market share does not necessarily imply that they have market power. Most of their authority analyzes monopoly power under Section 2 of the Sherman Act, not market power under Section 1, and thus does not control the outcome here. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 480 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1.").[8] And the common theme of those cases was that a showing of market power based on market share can be disputed by evidence that the industry has low barriers to entry.[9] The Blues' Opposition, however, includes no assertion, much less evidence, that barriers to entry in the health insurance industry are low. In fact, those barriers are quite high, and the Blues' market share has been durable through the years, as Dr. Haas-Wilson has explained. Doc. No. 2454-6, ¶¶ 284–97. Therefore, the Blues offer no basis to upset the usual inference that high market share indicates market power.

Moreover, the Blues cite no authority that certain providers' market power implies that the Blues themselves lack market power. *See* Opp. at 28. To be sure, the bargaining power of sellers can be relevant in a monopsony case, but it comes into play *after* the market is defined, not before.[10] Accounting for the market power of providers after defining the market is exactly what

---

[7] The Blues do assert that BCBS-AL's subscribers should not be counted toward the boycotters' market share, but they repeat their mischaracterization of the group boycott claim as an ESA claim. *See supra* Parts I and II. It is not correct that "BCBS-AL is the only Blue entity willing to contract with providers, while no other Blue Plan will come to the bargaining table on a Blue-branded basis." Opp. at 25–26. BCBS-AL will not contract with providers *unless* they also agree to provide services at the BCBS-AL price to all the other Blues. This is different from an ESA, in which providers' willingness to contract with other Blues would not affect their ability to contract with BCBS-AL.

[8] Only two opinions in the relevant portion of the Blues' brief involved claims under Section 1. Opp. at 26–27 (citing *Kaufman v. Time Warner*, 836 F.3d 137, 143, 148 (2d Cir. 2016); *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291 (M.D. Fla. 2001)).

[9] *Lady Deborah's, Inc. v. VT Griffin Servs., Inc.*, 2007 WL 4468672, at *9 (S.D. Ga. Oct. 26, 2007); *Kaufman*, 836 F.3d at 143; *United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990); *Fin-S Tech, LLC v. Surf Hardware Int'l-USA, Inc.*, 2014 WL 12461350, at *3 (S.D. Fla. Aug. 27, 2014); *Moecker*, 144 F. Supp. 2d at 1308; *McWane*, 783 F.3d at 831.

[10] "Market Definition" is Chapter 4 of the Horizontal Merger Guidelines (available at https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf). Once a market is defined, one can look at "Powerful Buyers" (Chapter 8). ("Powerful buyers" refers to monopoly cases; here, it would be "Powerful Sellers.")

Dr. Haas-Wilson's model does. Doc. No. 2455-23 ¶ 422. It shows that even with market power, all hospitals are harmed by higher insurer concentration, indicating that the Blues are able to affect prices through their market power. *Id.* ¶ 439.

   **C.   Under Controlling Precedent, the Blues' "Plausibly Procompetitive" Reasons for Their Group Boycott Cannot Change the Standard of Review.**

   There is nothing wrong in principle with a cooperative system that allows companies to deliver services more efficiently. That is why, even though the Providers disagree that BlueCard is as beneficial as the Blues claim, they are not seeking to enjoin the BlueCard program in its entirety. Instead, they want to free themselves of the group boycott aspect of BlueCard by allowing individual providers to choose whether to participate. If BlueCard is such a good deal for providers, as the Blues contend, then the incentives of the market will encourage them to join. What the Blues may not do is take competition off the table in the name of providing better service. That is the holding of *Superior Court Trial Lawyers*: "The social justifications proffered for respondents' restraint of trade thus do not make it any less unlawful." 493 U.S. at 423; *see also Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588 (7th Cir. 1984) (Posner, J.) (holding that a BlueCard-like arrangement for truck repair services was *per se* unlawful when combined with market allocation). The alleged procompetitive benefits of BlueCard, such as a single point of contact for subscribers, and reduced transaction costs for providers, do not flow from the Blues' group boycott; instead, the boycott forces providers to join BlueCard by eliminating competition for their services. That aspect of BlueCard is *per se* unlawful, not because some "less restrictive alternative" exists, but because it is a type of agreement the Supreme Court has condemned.

## CONCLUSION

   For the foregoing reasons, the Blues' boycott is unlawful *per se*.

Dated: July 12, 2021                               Respectfully submitted,

/s/ Edith M. Kallas                                /s/ Joe R. Whatley, Jr.
Edith M. Kallas – *Co-Lead Counsel*               Joe R. Whatley, Jr. – *Co-Lead Counsel*
WHATLEY KALLAS, LLP                                W. Tucker Brown
152 West 57th Street                               WHATLEY KALLAS, LLP
41st Floor                                         2001 Park Place North
New York, NY  10019                                1000 Park Place Tower
Tel:  (212) 447-7060                               Birmingham, AL 35203
Fax:  (800) 922-4851                               Tel:  (205) 488-1200
Email: ekallas@whatleykallas.com                   Fax:  (800) 922-4851
                                                   Email: jwhatley@whatleykallas.com
                                                          tbrown@whatleykallas.com


Patrick J. Sheehan                                 Deborah J. Winegard
WHATLEY KALLAS, LLP                                WHATLEY KALLAS, LLP
101 Federal Street                                 1068 Virginia Avenue, NE
19th Floor                                         Atlanta, GA 30306
Boston, MA 10019                                   Tel:  (404) 607-8222
Tel:  (617) 573-5118                               Fax:  (404) 607-8451
Fax:  (617) 371-2950                               Email: dwinegard@whatleykallas.com
Email: psheehan@whatleykallas.com


Henry C. Quillen                                   E. Kirk Wood, Jr. – *Local Facilitating*
WHATLEY KALLAS, LLP                                *Counsel*
159 Middle Street, Suite 2C                        WOOD LAW FIRM LLC
Portsmouth, NH  03801                              P. O. Box 382434
Tel:  (603) 294-1591                               Birmingham, AL 35238
Fax:  (800) 922-4851                               Tel:  (205) 612-0243
Email: hquillen@whatleykallas.com                  Fax:  (205) 705-1223
                                                   Email: ekirkwood1@bellsouth.net


Charles Clinton Hunter                             Aaron S. Podhurst – *Plaintiffs' Steering*
HAYES HUNTER PC                                    *Committee*
4265 San Felipe, Suite 1000                        Peter Prieto – *Chair, Expert Committee*
Houston, TX 77027                                  PODHURST ORSECK, P.A.
Tel:  (281) 768-4731                               One S.E. 3rd Avenue
Fax: (713) 583-7047                                Suite 2300
Email: chunter@hayeshunterlaw.com                  Miami, FL  33131
                                                   Tel:  (305) 358-2800
                                                   Fax:  (305) 358-2382
                                                   Email: apodhurst@podhurst.com
                                                          pprieto@podhurst.com

11

Dennis Pantazis – *Plaintiffs' Steering Committee*
Brian Clark – *Discovery Committee*
WIGGINS CHILDS PANTAZIS FISHER
  GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel:  (205) 314-0500
Fax:  (205) 254-1500
Email: dgp@wcqp.com
        bclark@wcqp.com

U.W. Clemon – *Plaintiffs' Steering Committee*
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL  35222
Tel: (205) 837-2898
Email: clemonu@bellsouth.net

Dennis C. Reich – *Chair, Damages Committee*
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (713) 622-7271
Fax:  (713) 623-8724
Email:  dreich@rbfirm.net

J. Mark White – *Litigation Committee*
Augusta S. Dowd – *Chair, Litigation Committee*
Linda G. Flippo – *Discovery Committee*
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel:  (205) 323-1888
Fax:  (205) 323-8907
Email: mwhite@whitearnolddowd.com
        adowd@whitearnolddowd.com
        lflippo@whitearnolddowd.com

Nicholas B. Roth – *Chair, Discovery Committee*
Julia Smeds Roth – *Discovery Committee*
EYSTER KEY TUBB ROTH MIDDLETON
  & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email: nbroth@eysterkey.com
        jroth@eysterkey.com

Van Bunch – *Chair, Class Certification Committee*
BONNETT FAIRBOURN FRIEDMAN &
  BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel:  (602) 274-1100
Fax:  (602) 274-1199
Email: vbunch@bffb.com

David A. Balto – *Expert Committee*
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email: david.balto@dcantitrustlaw.com

Robert J. Axelrod – *Chair, Written Submissions Committee*
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
Tel: (646) 448-5263
Fax: (212) 840-8560
Email: rjaxelrod@axelrodllp.com

Joey K. James – *Litigation Committee*
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel:  (256) 764-0095
Fax:  (256) 767-5705
Email: joey@bunchandjames.com

W. Daniel Miles, III – *Written Submissions Committee*
BEASLEY ALLEN CROW METHVIN PORTIS
  & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel:  (800) 898-2034
Fax:  (334) 954-7555
Email: dee.miles@beasleyallen.com

Richard S. Frankowski – *Discovery Committee*
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL  35233
Tel:  (205) 390-0399
Fax: (205) 390-1001
Email: richard@frankowskifirm.com

Michael C. Dodge – *Expert Committee*
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel:  (972) 419-7172
Email: mdodge@gpm-law.com

John C. Davis – *Written Submissions Committee*
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel:  (850) 222-4770
Email: john@johndavislaw.net

Michael E. Gurley, Jr. – *Discovery Committee*
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel:  (205) 908-6512
Email: mgurleyjr@yahoo.com

Mark K. Gray – *Discovery Committee*
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel:  (502) 805-1800
Fax:  (502) 618-4059
Email: mgray@grayandwhitelaw.com

Lynn W. Jinks, III – *Expert Committee*
Christina D. Crow – *Discovery Committee*
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel:  (334) 738-4225
Fax:  (334) 738-4229
Email: ljinks@jinkslaw.com
          ccrow@jinkslaw.com

Stephen M. Hansen – *Class Certification Committee*
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel:  (253) 302-5955
Fax:  (253) 301-1147
Email: steve@stephenmhansenlaw.com

Myron C. Penn – *Discovery Committee*
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel:  (334) 738-4486
Fax:  (334) 738-4432
Email: myronpenn28@hotmail.com

Harley S. Tropin – *Damages Committee*
Javier A. Lopez – *Discovery Committee*
KOZYAK TROPIN &
  THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email: hst@kttlaw.com
           jal@kttlaw.com

C. Wes Pittman – *Settlement Committee*
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel:  (850) 784-9000
Fax:  (850) 763-6787
Email: wes@pittmanfirm.com

Robert B. Roden – *Litigation Committee*
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel:  (205) 933-8383
Fax:  (205) 933-8386
Email: rroden@shelbyroden.com

Gary E. Mason – *Class Certification Committee*
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel:  (202) 429-2290
Fax:  (202) 640-1160
Email: gmason@wbmllp.com

Michael L. Murphy – *Discovery Committee*
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC  20006
Tel:  (202) 463-2101
Fax: (202) 463-2103
Email: mmurphy@baileyglasser.com

J. Preston Strom, Jr. – *Litigation Committee*
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel:  (803) 252-4800
Fax:  (803) 252-4801
Email: petestrom@stromlaw.com

Thomas V. Bender – *Discovery Committee*
Dirk L. Hubbard
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Tel:  (816) 421-0700
Email:  tbender@hab-law.com
            dhubbard@hab-law.com

Gregory S. Cusimano – *Litigation Committee*
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL  35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email:  greg@alalawyers.net

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel:  (320) 289-2363
Fax:  (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
Email: alamb@archielamb.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel:  (719) 471-1984
Fax:  (719) 577-4356
Email: lance@searsassociates.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA  51101
Tel:  (712) 234-3030
Fax:  (712) 234-3034
Email:  paul@lundberglawfirm.com

Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK  99501
Tel:  (907) 277-5400
Fax:  (907) 277-9896
Email:  Jessica@dillonfindley.com
          Ray@dillonfindley.com
          Molly@dillonfindley.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com

Cynthia C. Moser
HEIDMAN LAW FIRM
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA  51101
Tel:  (712) 255-8838
Fax  (712) 258-6714
Email:  Cynthia.Moser@heidmanlaw.com