FILED

2021 Jul-12  PM 06:08
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |
| --- | --- |
| **IN RE:  BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This document relates to Provider-Track cases.** |

## DEFENDANTS' REPLY ON THE ANTITRUST STANDARD OF REVIEW APPLICABLE TO PROVIDER PLAINTIFFS' SECTION 1 CLAIMS

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................................................................. ii

**CITATION KEY** ........................................................................................................... iv

**PRELIMINARY STATEMENT** ......................................................................................1

**DEFENDANTS' RESPONSE TO PROVIDERS' ADDITIONAL
      PURPORTED FACTS**........................................................................................1

**ARGUMENT**................................................................................................................2

     I.     Providers' Brief Confirms that ESAs Are Not *Per Se* Unlawful............................2

          A.    Trademark Settlements Are Procompetitive and Fall Outside
               *Sealy*/*Topco*...............................................................................................2

          B.    Providers Misconstrue the Procompetitive Efficiencies from ESAs. ..........7

     II.    Providers Have No Triable NBE Claim....................................................................8

**CONCLUSION** .............................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts v. F.T.C.*,
 – F.4th –, 2021 WL 2385274 (2d Cir. June 11, 2021) ................................................... passim

*Bd. of Regents of the Univ. Sys. of Ga. v. Buzas Baseball*,
 176 F. Supp. 2d 1338 (N.D. Ga. 2001) .................................................................................4

*Clorox v. Sterling Winthrop*,
 117 F.3d 50 (2d Cir. 1997)...........................................................................................2, 3, 5

*Comcast v. Behrend*,
 569 U.S. 27 (2013)................................................................................................................9

*F.T.C. v. Actavis*,
 570 U.S. 136 (2013)..........................................................................................................2, 5

*Hanover Star Milling v. Metcalf*,
 240 U.S. 403 (1916)..............................................................................................................4

*Hawaii v. Standard Oil*,
 405 U.S. 251 (1972)..............................................................................................................9

*Massachusetts v. Microsoft*,
 373 F.3d 1199 (D.C. Cir. 2004) ...........................................................................................9

*McClure v. Undersea Indus.*,
 671 F.2d 1287 (11th Cir. 1982) .........................................................................................10

*McGlinchy v. Shell Chem.*,
 845 F.2d 802 (9th Cir. 1988) ...............................................................................................9

*McPherson v. Fla. Dep't of Corr.*,
 2020 WL 5805539 (N.D. Fla. July 16, 2020) .......................................................................9

*Med. Ctr. at Elizabeth Place v. Atrium Health Sys.*,
 922 F.3d 713 (6th Cir. 2019) ...............................................................................................8

*NCAA v. Alston*,
 141 S. Ct. 2141 (2021)..........................................................................................................8

*Neo4j v. PureThink*,
 480 F. Supp. 3d 1071 (N.D. Cal. 2020) ...............................................................................4

*Procaps v. Patheon*,
  845 F.3d 1072 (11th Cir. 2016) ....................................................................................7

*Spring Pharm. v. Retrophin*,
  2019 WL 6769988 (E.D. Pa. Dec. 11, 2019) ..............................................................9

*Sunbeam Television v. Nielsen Media Rsch.*,
  711 F.3d 1264 (11th Cir. 2013) ..................................................................................10

*Tally-Ho v. Coast Cmty. Coll. Dist.*,
  889 F.2d 1018 (11th Cir. 1989) ....................................................................................4

*Timken Roller Bearing v. U.S.*,
  341 U.S. 593 (1951) ......................................................................................................2

*TransUnion v. Ramirez*,
  – S. Ct. –, 2021 WL 2599472 (2021) .........................................................................10

*U.S. v. Sealy*,
  1964 WL 8089 (N.D. Ill. Oct. 6, 1964) ........................................................................6

*U.S. v. Timken Roller Bearing*,
  83 F. Supp. 284 (N.D. Ohio 1949) ...............................................................................2

*U.S. v. Topco Assocs.*,
  405 U.S. 596 (1972) ......................................................................................................6

*Valley Drug v. Geneva Pharms.*,
  344 F.3d 1294 (11th Cir. 2003) ....................................................................................5

*VMG Enters. v. F. Quesada & Franco*,
  788 F. Supp. 648 (D.P.R. 1992) ...................................................................................2

*Wooden v. Bd. of Regents of Univ. Sys. of Ga.*,
  247 F.3d 1262 (11th Cir. 2001) ....................................................................................2

*Zenith Radio v. Hazeltine Rsch.*,
  395 U.S. 100 (1969) ......................................................................................................9

**Statutes & Rules**

Fed. R. Civ. P. 56 ...............................................................................................................9

**Other Authorities**

3 *McCarthy on Trademarks and Unfair Competition* § 17:17 (5th ed.) ............................4

**CITATION KEY**

| Citation | Reference |
|---|---|
| Boycott Ex. | Citations to Defendants' Exhibits identified in the Evidentiary Submission accompanying their Brief in Opposition to Provider Plaintiffs' Motion for Partial Summary Judgment Regarding the Standard of Review Applicable to Providers' Group Boycott Claim |
| Br. | Citations to Defendants' Opening Brief on the Antitrust Standard of Review Applicable to Provider Plaintiffs' Section 1 Claims Pursuant to Federal Rule of Civil Procedure 56 (Doc. 2728) |
| Compl. | Citations to the Consolidated Fourth Amended Provider Complaint (Doc. 1083) |
| Doc(s). | Citations to Documents filed on the Docket in MDL 2406 (2:13-CV-20000-RDP) |
| Opp. | Citations to Provider Plaintiffs' Response in Opposition to Defendants' Motion Regarding the Standard of Review Applicable to Provider Plaintiffs' Section 1 Claims Pursuant to Federal Rule of Civil Procedure 56 (Doc. 2747) |
| SoR | Citations to the Court's April 5, 2018 Memorandum Opinion re: Section 1 Standard of Review and Single Entity Defense (Doc. 2063) |

## PRELIMINARY STATEMENT

"Agreements to protect trademarks . . . should not immediately be assumed to be anticompetitive"; instead, courts should "presume they are *procompetitive*." *1-800 Contacts v. F.T.C.*, – F.4th –, 2021 WL 2385274, at *7 (2d Cir. June 11, 2021). Because Providers cannot dispute this principle, they try to divert the Court's attention by asking it to go back in time to declare a definitive owner of the Blue Marks at common law. But the Court need not answer that question to determine the standard of review. In fact, Providers themselves vacillate between multiple possibilities for who owned what in the 1930s and '40s, thus making the very point that leads to rule of reason: the Blues were allowed to settle their rights and protect their trademarks through license agreements with service areas. That alone defeats *per se* treatment. (Section I.A.) ESAs are also subject to the rule of reason because they arose in a novel factual context and offer procompetitive efficiencies. (Section I.B.) Finally, Providers are wrong that the Court's decision regarding the aggregation of ESAs and NBE applies here. That decision was a Subscriber-focused ruling at a time when the Subscriber and Provider cases were joined. With the Provider case now decoupled, and discovery now closed, it is plain that Providers have no triable claim for NBE. (Section II.) The rule of reason thus governs Providers' case in full.

## DEFENDANTS' RESPONSE TO PROVIDERS' ADDITIONAL PURPORTED FACTS

Defendants dispute the materiality of Providers' Additional Facts, and deny the legal inferences that Providers seek to draw from them. In particular:

2, 3. **Disputed.** The St. Paul and Buffalo Plans had no right to control use of the Marks in geographic areas where they did not use the Marks. (Doc. 2735-3 at 4; Doc. 1353-4 at 22, 28, 30; Doc. 1353-5 at 38, 40; SoR 5–6; *see also infra* Section I.A.)

4, 5, 6. **Disputed.** The standards promulgated by the national organizations did

1

not resolve ownership of the Marks at common law.  (Doc. 2735-5 at 4–6; Doc. 2735-9 at 2;

Doc. 1353-11 at 9–10; Doc. 1353-50 at 2–4; Doc. 1353-48 at 2–4; *see also* Br. 14–17.)

## ARGUMENT

## I.   **PROVIDERS' BRIEF CONFIRMS THAT ESAs ARE NOT *PER SE* UNLAWFUL.**

With NBE now eliminated, Providers' injunction claim necessarily challenges

ESAs alone (Compl. ¶¶ 460–65), as does any damages claim from April 27, 2021 (the day NBE

was eliminated) to the present.[1]  Such claims should be analyzed under the rule of reason.

### A.   **Trademark Settlements Are Procompetitive and Fall Outside *Sealy/Topco*.**

In the Blues' opening brief, we explained that ESAs derive from historical use of

the Blue Marks at common law, but that the Court need not make a final determination of rights

to apply the rule of reason because, at a minimum, the law permits parties to settle their

trademark rights and protect their marks.  (Br. 25–28.)  Providers all but ignore the body of case

law establishing that trademark settlement agreements are inherently procompetitive, and thus

evaluated under the rule of reason.  *1-800 Contacts*, 2021 WL 2385274, at *7–9; *Clorox v.

Sterling Winthrop*, 117 F.3d 50, 55–56, 60 (2d Cir. 1997); *VMG Enters. v. F. Quesada &

Franco*, 788 F. Supp. 648, 657 (D.P.R. 1992); *see also F.T.C. v. Actavis*, 570 U.S. 136, 159

(2013) (patent rights).  Providers do not even cite *1-800 Contacts*, *VMG* or *Actavis*, and they

relegate *Clorox* to a footnote.[2]  The reason is simple:  Providers have no answer to these cases.

---

[1] Providers assert two types of claims:  (i) a claim for damages that accrued between 2008 and the present; and (ii) an injunction claim, which, by its very nature, has no end date because it is purely forward looking, *see Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1283–84 (11th Cir. 2001).  Both types of claims present a live controversy with respect to the appropriate antitrust standard for evaluating ESAs standing alone.

[2] Providers' attempt to distinguish *Clorox* as "completely different" (Opp. 17 n.1) fails.  As here, the settlements in *Clorox* prohibited parties from selling particular products under certain tradenames to reduce confusion and protect trademarks.  *Compare Clorox*, 117 F.3d at 53, 60, *with* (Br. 15–17 (¶¶ 16–21)).  Providers' suggestion that ESAs are akin to the restraints in *Timken Roller Bearing v. United States*, 341 U.S. 593, 598–99 (1951) (Opp. 17 & n.1), is similarly wrong.  *Timken* began with a single entity seeking to divide markets, *U.S. v. Timken Roller Bearing*, 83 F. Supp. 284, 289–90, 314–15 (N.D. Ohio 1949); and the subsequent trademark

In fact, just last month, the Second Circuit held that "[a]greements to protect trademarks . . . should not immediately be assumed to be anticompetitive"; instead, courts should "presume they are *procompetitive*." *1-800 Contacts*, 2021 WL 2385274, at *7.  There, horizontal competitors agreed not to bid on each other's tradenames during internet ad auctions, *id.* at *1, agreements the FTC characterized as "the digital equivalent of agreements to allocate territory," FTC Br. at 49, *1-800 Contacts v. F.T.C.*, No. 18-3848 (2d Cir. Oct. 7, 2019) (ECF No. 153).  The court determined that those horizontal arrangements were subject to, and satisfied, the rule of reason because restrictions "born of typical trademark settlement agreements" serve the "procompetitive goal of promoting trademark policy."  2021 WL 2385274, at *11.  This includes both litigation-related settlements and business resolutions to protect trademarks.[3]  *Id.* at *3.  In so ruling, the Second Circuit declined to "weigh[] the potential validity of the trademark claims" because even "aggressive" efforts to protect trademarks "serve the competitive purpose of furthering trademark policies."  *Id.* at *9 (quoting *Clorox*, 117 F.3d at 61).

Providers do not dispute these legal principles (nor could they).  Instead, they suggest that the Blues could not have been settling rights because any such settlement was unnecessary.  But, ironically, even Providers cannot offer a straightforward account of the Blues' common-law trademark rights, arguing instead that *either* (i) the Plans held common-law rights to the Marks but abandoned them through "naked licensing," or, alternatively, (ii) the Plans were mere licensees of national organizations.  (Opp. 8, 15–16.)  Of course, the fact that even Providers cannot name a definitive owner only proves the point:  it is precisely because of

---

provisions "were subsidiary and secondary to the central purpose of allocating trade territories," *Timken*, 341 U.S. at 598.  Here, by contrast, ESAs merely codified pre-existing practice, *see VMG*, 788 F. Supp. at 657; (Br. 17–18); and their purpose was primarily to protect the Marks, as contemporaneous documents show (Br. 15–18).

[3] Indeed, in *1-800 Contacts*, one of the trademark agreements arose out of a broader business arrangement between 1-800 Contacts and a lens supplier, Luxottica—not any direct threat of litigation.  2021 WL 2385274, at *3.

multiple interests in the Marks around the country that the Blues resolved to protect their trademark rights through federal registration in the wake of the Lanham Act.  (Br. 15–17.)  In any event, neither Providers' scenarios saves them from the rule of reason.

*First*, the St. Paul and Buffalo Plans could not possibly have engaged in naked licensing because *there were no licenses* between those Plans and other Blue Plans.  *See Neo4j v. PureThink*, 480 F. Supp. 3d 1071, 1078 (N.D. Cal. 2020) (a license is a prerequisite to naked licensing); *Bd. of Regents of the Univ. Sys. of Ga. v. Buzas Baseball*, 176 F. Supp. 2d 1338, 1349 (N.D. Ga. 2001).  And to the extent Providers are arguing that these Plans abandoned their rights because they failed to police *unlicensed* users in *other* territories,[4] that is also wrong—those Plans had no legal authority (nor obligation) to police such use since their common-law rights were limited to their own geographies.  *See Hanover Star Milling v. Metcalf*, 240 U.S. 403, 416 (1916) (user may not "monopolize markets that his trade has never reached, and where the mark signifies . . . [goods] of another"); *Tally-Ho v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1023, 1028 (11th Cir. 1989) (user's rights are "limited to . . . territories in which it actually uses its mark or into which it might naturally expand," which can be "one small area, such as one city").

*Second*, Providers' alternative (and contradictory) theory—that Plans were mere licensees of the national organizations (Opp. 10–11)—ignores the contemporaneous evidence that, when the 1950s agreements were adopted, Plans had pre-existing interests in the Marks.[5] (Br. 15–17.)  In fact, Providers concede that "[t]he 1954 Blue Cross agreement and the 1952

---

[4] It is difficult to credit Providers' argument that one of the most well-known trademarks in existence today was "abandoned" decades ago.  *See* 3 *McCarthy on Trademarks and Unfair Competition* § 17:17 (5th ed.) (abandonment requires proving the mark is a generic name or "has lost all significance as an indication of origin").

[5] For example, Providers baldly assert that BCBS-AL has always been a mere licensee (Opp. 15), but ignore the undisputed evidence that, to this day, BCBS-AL maintains that it developed rights to both Marks at common law (Br. 12–14 (¶¶ 8, 10) (citing Doc. 2735-16 at 3–4 (Tr. at 94:24–95:4))).

Blue Shield agreement purport to describe pre-existing rights in the Blue Cross and Blue Shield marks."[6]  (Opp. 8.)

Ultimately, the Court need not decide who would have prevailed in trademark litigation decades ago in order to determine the standard of review because the Blues were allowed to resolve their trademark rights to protect the Marks.  *See Actavis*, 570 U.S. at 159; *1-800 Contacts*, 2021 WL 2385274, at *9–10 & n.13; *Clorox*, 117 F.3d at 60–61; *see also Valley Drug v. Geneva Pharms.*, 344 F.3d 1294, 1308 (11th Cir. 2003).  Contemporaneous evidence shows that this is *exactly* what the Blues were doing when they first adopted written license agreements with service areas.  (Br. 15–17 (¶¶ 15–17, 21).)  Providers' argument that, in some areas, use of the Marks was "not necessarily exclusive" (Opp. 16) only confirms that a resolution was necessary to protect trademark rights.[7]  *See 1-800 Contacts*, 2021 WL 2385274, at *10 n.15.  Such an agreement is procompetitive and not "inherently suspect."  *Id.* at *6–7.

Providers' remaining critiques are likewise misguided.  *First*, the Court has not previously rejected this argument (Opp. 16–17); indeed, it has never considered it.  In the April 2018 Order, the Court addressed the argument that the Plans are vertical licensees of the Association (SoR 37–40)—not that there were multiple interests in the Marks at common law that were permissibly resolved through license agreements with service areas.

*Second*, Providers are wrong that the Blues' development at common law is irrelevant because of consolidations that took place in the 1980s during the Long-Term Business

---

[6] Providers also concede that, under the 1954 Cross Agreement, "any rights conveyed by the plans to the AHA would revert to those plans."  (Opp. 9 (¶ 25).)  It is difficult to imagine what "rights" Providers mean, if not common-law rights to the Mark.  Moreover, Providers are wrong that the 1972 license agreement vested these reversionary rights exclusively with the national organization.  (Doc. 1353-100 at 3–4; Doc. 1353-57 at 3–4.)

[7] Although irrelevant, Providers are incorrect that non-exclusivity was common.  (Opp. 7 (¶ 9).)  Though there are a handful of instances where multiple Plans historically operated in one state, in most cases those Plans served distinct, non-overlapping areas of the state and did not compete against each other.  (*See, e.g.*, Doc. 1353-10 at 10 (Tr. at 63:21–64:11); Doc. 1353-15 at 6 (Tr. at 47:18–48:17); Doc. 1353-4 at 28; Doc. 1353-5 at 40.)

Strategy and Assembly of Plans.  (Opp. 16.)  Providers do not dispute that the nature of a

restraint must be assessed *at the time it was adopted* (Br. 22 (collecting cases)); *accord 1-800

Contacts*, 2021 WL 2385274, at *9 n.13, making these decades-later mergers irrelevant.  In any

event, the mergers did not change the fundamental nature of the license agreements.  As

Providers concede, the licenses entered in 1991 (following those mergers) "did not redraw any

territorial lines" (Opp. 10 (¶ 27)), but instead referred back to the same areas that Plans served

historically—*before* these consolidations occurred (Br. 19).[8]  And as Plans consolidated over the

years, their service areas were simply combined as a result.  (Doc. 1349-1 at 241:10–242:21.)

Thus, these merged territories still flow from the original common-law trademark rights.  (*Id.*)

   *Third*, Providers are wrong that the standard of review for ESAs alone is

controlled by *Sealy* and *Topco* (Opp. 19–24), neither of which involved the settlement of

trademark rights.  Nor is the Blues' history "exactly what the Sealy manufacturers did."  (*Id.*

at 20.)  In *Sealy*, a single entity already had national rights to the Sealy trademark *before*

licensing occurred (not true here); the licensees lacked any prior claims to the mark or territory

(not true here); and the *Sealy* licensor "shifted territory among licensees" over time (not true

here).  *U.S. v. Sealy*, 1964 WL 8089, at *3–4, *17 (N.D. Ill. Oct. 6, 1964).  And in *Topco*, the

licensor was formed for the very purpose of allocating a brand new trademark among the

licensees (also not true here).  *See U.S. v. Topco Assocs.*, 405 U.S. 596, 598–600 (1972).[9]

---

[8] The 1991 license agreements were not the first license agreements to impose a prohibition on branded
Provider contracting.  (*See* Opp. 10 (¶ 26).)  Just as at common law, the 1950s licenses gave Plans the right "to use"
the Blue Marks in their business relationships with both subscribers and providers.  (*E.g.*, Doc. 1353-50 at 4;
Doc. 1353-48 at 3; *see also* Boycott Ex. 323 at 47:7–48:18.)

[9] Providers' argument that the Topco system also had redeeming virtues is likewise misguided.  (Opp. 21.)  In
*Topco*, the proffered benefit was *the reduction in competition* among its member grocers.  405 U.S. at 600, 610.
Here, by contrast, the procompetitive benefits include cooperative features such as avoiding litigation regarding
trademark rights and the development of a nationwide Blue-branded product to compete with other national health
insurers.  (Br. 33.)  Separately, Providers misunderstand the import of the Seventh Circuit's subsequent decision in
*Sealy* (Opp. 22–24), which simply instructs that not all "exclusive areas" are *per se* unlawful (Br. 33–34).

**B.** **Providers Misconstrue the Procompetitive Efficiencies from ESAs.**

ESAs are also subject to the rule of reason because they have unique, lawful origins and facilitate the Blues' cooperative venture.  Providers mischaracterize the Blues' argument on this point and are wrong that the Court previously rejected it.

To start, Providers claim the Blues argue that "Plaintiffs must demonstrate, with uncontroverted evidence, an agreement that . . . has no plausible procompetitive benefits." (Opp. 14.)  That is not our argument.  Rather, the point is that the Blue System is unlike anything addressed in case law, meaning, under *Procaps*, it cannot be prejudged to be anticompetitive, particularly given its many procompetitive features.[10]  (Br. 28–32.)

Nor do the Blues argue that ESAs are necessary to allow any particular Plan to offer a nationwide health insurance product—the strawman Providers attack when attempting to distinguish *Polk Bros*.  (Opp. 18–19.)  Rather, such arrangements are necessary to offer a nationwide *Blue-branded* product because no Plan currently has, or has ever had, the right to use the Blue Marks nationwide.  (Br. 20 (¶ 29).)  Providers' response—that the St. Paul and Buffalo Plans would have had such a right (Opp. 10 (¶ 29))—underscores Providers' fundamental misunderstanding of common-law trademarks:  even first users of marks possess exclusive common-law rights *in their respective geographic areas only*.  (*See supra* at p. 4.)

Providers also suggest that ESAs are unnecessary for a nationwide offering

---

[10] While the Court previously distinguished *Procaps* (Opp. 18 n.2), it did so on the facts of the case because the agreement there "involved an alleged procompetitive joint venture that the plaintiff claimed became anticompetitive in light of the defendant's subsequent unilateral conduct."  (SoR 45 (citing *Procaps v. Patheon*, 845 F.3d 1072, 1082–84 (11th Cir. 2016)).)  Here, the Blues cite *Procaps* for the legal principle, also found in Supreme Court and other Eleventh Circuit precedent (Br. 23), that the *per se* rule does not automatically apply "just because an agreement is capable of being characterized as a market allocation agreement."  (*Id*.)  That is particularly true where, as here, the court "ha[s] never examined a practice like this one before" and "procompetitive efficiencies . . . might flow from" the challenged conduct.  (*Id.* at 22, 29, 31 n.5.)  Indeed, in *Procaps*, the procompetitive efficiencies that the court deemed important flowed from the original joint venture, *i.e.*, prior to the unilateral conduct that this Court found distinguishable.  (*Id.* at 31 n.5.)  The Court has not previously rejected or distinguished this aspect of *Procaps*.

because, during their early history, the Blues developed syndicates to service national accounts. (Opp. 18.)  But this only proves that cooperation among Plans has always been essential to a national Blue-branded product.  And even if, contrary to fact, ESAs were not strictly necessary to such an offering, the rule of reason would still apply so long as ESAs plausibly allow the Blues to offer a national product more efficiently than they otherwise could, as is plainly the case. *See NCAA v. Alston*, 141 S. Ct. 2141, 2155 (2021) ("[M]ost joint venture restrictions . . . are subject to the rule of reason" because "many joint ventures are calculated to enable firms to do something more cheaply or better than they did it before," which "surely stands as a caution against condemning their arrangements too reflexively"); (*see also* Br. 31 n.5).  This is precisely why the Court previously (and correctly) found BlueCard outside the *per se* rule.  (SoR 53–54.)

Finally, while conceding that factual disputes can preclude *per se* treatment on summary judgment, Providers suggest that the standard of review may be resolved after trial. (Opp. 14.)  But the standard of review can, and should, be resolved now.  Disputed facts around the effects of an alleged conspiracy preclude application of the *per se* rule, and mandate rule of reason.  *Med. Ctr. at Elizabeth Place v. Atrium Health Sys.*, 922 F.3d 713, 724 (6th Cir. 2019).

## II.    PROVIDERS HAVE NO TRIABLE NBE CLAIM.

Providers spend pages compiling their every mention of NBE prior to April 2018. (Opp. 24–27.)  But nothing they say changes the fact that we are nearly a decade into this case, discovery is closed, and Providers offer no evidence to support a triable NBE claim.  Instead, the record Providers have chosen to develop confirms that NBE is not relevant to their case— making it likewise irrelevant to the standard of review.

To start, Providers cannot rescue their failure of proof on NBE by concocting some nebulous "injunction" claim.  (Opp. 34.)  No plaintiff can have an injunction claim based

on NBE for the simple fact that NBE has already been eliminated.[11]  *Massachusetts v. Microsoft*, 373 F.3d 1199, 1213–14 (D.C. Cir. 2004); *Spring Pharm. v. Retrophin*, 2019 WL 6769988, at *5 (E.D. Pa. Dec. 11, 2019); *cf. Hawaii v. Standard Oil*, 405 U.S. 251, 261 (1972).  Rather, NBE is relevant, if at all, only to Providers' damages claim during the period the rule was in place.  As a result, for NBE to be relevant to the standard of review, it must be because Providers have a backwards-looking (*i.e.*, pre-April 27, 2021) damages claim based on the rule.  They do not.

Providers do not dispute that they have not done the basic work of calculating NBE damages—or even prescribing a methodology.  In stark contrast to what they did for ESAs, Providers have not put forward a but-for world without NBE (Doc. 2454-6 ¶ 550), have not itemized damages from NBE (Opp. 33), and have not even included NBE damages among their ESA damages (Br. 36–37).  Instead, Providers ask the Court to forgive this deficiency because individual Providers might prove damages at trial.  (Opp. 33.)  But, at the summary judgment stage, evidence of damages is not satisfied by an I.O.U.  Rather, there must be *some* record evidence that damages can be quantified in a non-speculative fashion.  *See McGlinchy v. Shell Chem.*, 845 F.2d 802, 808–09 (9th Cir. 1988).  Providers offer none, and that failure has consequences:  because Providers have no damages for ESAs + NBE, they cannot claim the benefit of the Court's *per se* ruling based on that aggregation.  That is because, under Supreme Court precedent, plaintiffs' liability and damages theories must match.  *See Comcast v. Behrend*, 569 U.S. 27, 35–38 (2013).  Notably, in attacking this principle, Providers do not cite a single case discussing an aggregation of restraints.  (Opp. 27–28.)  The result is that Providers fail on

---

[11] Recognizing this problem, Providers try to manufacture an injunction claim against "the consequences" of NBE, but offer no insight into what such an injunction would even look like.  (Opp. 34.)  And Providers' complaint about hypothetical conduct that "could mitigate the benefit" of NBE's elimination (*id.* at 35 n.6) is based solely on imaginary future action, *Zenith Radio v. Hazeltine Rsch.*, 395 U.S. 100, 130 (1969) ("significant threat of injury" required), and an untimely and speculative expert declaration, *see McPherson v. Fla. Dep't of Corr.*, 2020 WL 5805539, at *3–4 (N.D. Fla. July 16, 2020); *see also* Fed. R. Civ. P. 56(c)(2).

both the law and the proof—leaving them with damages claims for ESAs alone, to which the rule of reason applies.

With no proof of quantifiable damages from NBE, Providers instead pivot to injury.  But in this Circuit, proof of injury alone cannot support a damages claim.  *McClure v. Undersea Indus.*, 671 F.2d 1287, 1289 (11th Cir. 1982); *cf. TransUnion v. Ramirez*, – S. Ct. –, 2021 WL 2599472, at *10 (2021).  And even if it could, the Court should not credit Providers' theory of injury because it, too, lacks evidence.  For example, though they claim to have proven injury "in spades" (Opp. 29), nearly everything Providers cite simply summarizes NBE's origins (*id.* (citing Doc. 2454-6 ¶¶ 126–30, 344–45; Doc. 2454-3 ¶¶ 321–30))—a history lesson, not proof of injury.  And when Providers' experts tried to articulate a theory of injury, they offered only speculation that NBE likely affects Providers because of how ESAs affect subscribers.  (*Id.* at 30–31.)  Notably, Providers did not (and could not) account for NBE in their own econometric analysis (Br. 36–37), in stark contrast to Subscribers, who modeled that NBE "accounted for 97% of [their] total damages" (Doc. 2641 at 48).

In any event, Providers' theory of injury (*see* Opp. 30) exposes yet another fundamental problem:  it is *Subscribers*, not Providers, who are the appropriate plaintiffs to redress NBE—and they have.  *See Sunbeam Television v. Nielsen Media Rsch.*, 711 F.3d 1264, 1271 (11th Cir. 2013) (considering "whether other potential plaintiffs were better suited to vindicate the harm").  Providers do not deny that NBE does not impose *any* restraint on unbranded provider contracting, and that Subscribers already secured full elimination of the rule. (Br. 35–36.)  Absent damages, which Providers do not claim, there is no further injury to redress.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be granted in full.

10

Dated:  July 12, 2021

Respectfully submitted,

/s/ *Evan R. Chesler*
Evan R. Chesler
Christine A. Varney
Karin A. DeMasi
Lauren R. Kennedy
David H. Korn
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
Tel: (212) 474-1000
Fax: (212) 474-3700
echesler@cravath.com
cvarney@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com
dkorn@cravath.com

*Coordinating Counsel for Defendant Blue Cross and Blue Shield Association; Counsel for Defendants Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of North Carolina, Inc.; BlueCross BlueShield of Tennessee, Inc.; California Physicians' Service d/b/a Blue Shield of California; CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.; Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.*

Craig A. Hoover
E. Desmond Hogan
Justin Bernick
Peter Bisio
Elizabeth Jose
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com
peter.bisio@hoganlovells.com
elizabeth.jose@hoganlovells.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY & SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255-9421
Fax: (803) 256-7500
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

David J. Zott, P.C.
Daniel E. Laytin, P.C.
Sarah J. Donnell
Christa C. Cottrell, P.C.
Zachary Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com
sarah.donnell@kirkland.com
christa.cottrell@kirkland.com
zachary.holmstead@kirkland.com

*Counsel for Blue Cross Blue Shield Association*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF & BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants Blue Cross Blue Shield Association; Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.;*

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action; Blue Cross and Blue Shield of North Carolina, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon; Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Triple-S Salud, Inc; Defendants Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; BlueCross BlueShield of Tennessee, Inc.*

Cavender C. Kimble
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action; Blue Cross and Blue Shield of North Carolina, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue*

*California Physicians' Service d/b/a Blue Shield of California; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii)*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL 35203
Tel: (205) 254-1000
Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com

Pamela B. Slate
HILL CARTER FRANCO COLE & BLACK, P.C.
425 South Perry Street
Montgomery, AL 36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*With Cravath, Swaine & Moore LLP, counsel for Defendant Blue Cross Blue Shield of Alabama*

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
Erica B. Zolner
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
hwitt@kirkland.com

*Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA  98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

*Counsel for Defendants Premera Blue Cross, d/b/a Premera Blue Cross Blue Shield of Alaska*

Brian K. Norman
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX  75234
Tel: (214) 987-1745
Fax: (214) 521-9033
bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
RSA Tower, 27th Floor
11 North Water Street
Mobile, AL  36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

*Counsel for Defendants CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.*

R. David Kaufman
M. Patrick McDowell
BRUNINI, GRANTHAM, GROWER
& HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS  39201
Tel: (601) 948-3101
Fax: (601) 960-6902

jzeiger@kirkland.com
ezolner@kirkland.com

*Counsel for Defendants Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.; Highmark Western and Northeastern New York Inc.*

Jonathan M. Redgrave
REDGRAVE, LLP
14555 Avion Parkway, Suite 275
Chantilly, VA  20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark Defendants*

Todd M. Stenerson
Brian C. Hauser
Edmund Y. Saw
SHEARMAN & STERLING LLP
401 9th Street, N.W., Suite 800
Washington, DC  20004
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com
brian.hauser@shearman.com
edmund.saw@shearman.com

Sarah L. Cylkowski
Thomas J. Rheaume, Jr.

dkaufman@brunini.com
pmcdowell@brunini.com

Cheri D. Green
BLUE CROSS BLUE SHIELD OF MISSISSIPPI,
A MUTUAL INSURANCE COMPANY
P.O. Box 1043
Jackson, MS  39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

*Counsel for Defendant Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company*

Michael A. Naranjo
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA  94104
Tel: (415) 984-9847
Fax: (415) 434-4507
mnaranjo@foley.com

Alan D. Rutenberg
Benjamin R. Dryden
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, DC  20007
Tel: (202) 672-5300
Fax: (202) 672-5399
arutenberg@foley.com
bdryden@foley.com

*Counsel for Defendant USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue Shield*

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Jess R. Nix
Morgan B. Franz
SPOTSWOOD SANSOM & SANSBURY LLC
Financial Center
505 20th Street North, Suite 700
Birmingham, AL  35203
Tel: (205) 986-3620

BODMAN PLC
1901 Saint Antoine Street
6th Floor at Ford Field
Detroit, MI  48226
Tel: (313) 259-7777
Fax: (734) 930-2494
scylkowski@bodmanlaw.com
trheaume@bodmanlaw.com

Andy P. Campbell
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL PARTNERS LLC
505 North 20th Street, Suite 1600
Birmingham, AL  35203
Tel: (205) 224-0750
Fax: (205) 224-8622
andy@campbellpartnerslaw.com
todd@campbellpartnerslaw.com
yawanna@campbellpartnerslaw.com

*Counsel for Defendant Blue Cross and Blue Shield of Michigan*

John Briggs
Rachel Adcox
Jeny M. Maier
AXINN, VELTROP & HARKRIDER, LLP
1901 L Street, N.W.
Washington, DC  20036
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
radcox@axinn.com
jmaier@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, AL  35203
Tel: (205) 250-5000
Fax: (205) 250-5034
steve.rowe@arlaw.com

Fax: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
jnix@spotswoodllc.com
mfranz@spotswoodllc.com

*Counsel for Defendant Capital BlueCross*

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL  35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendants Blue Cross and Blue
Shield of Florida, Inc.; Blue Cross and Blue Shield
of Massachusetts, Inc.; BlueCross BlueShield
of Tennessee, Inc.*

Edward S. Bloomberg
John G. Schmidt Jr.
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY  14203
Tel: (716) 847-8400
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com

Stephen A. Walsh
WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL
100 Corporate Parkway
One Lake Level
Birmingham, AL  35242
Tel: (205) 572-4107
Fax: (205) 572-4199
swalsh@wwhgd.com

aaron.mcleod@arlaw.com

*Counsel for Defendant Independence
Blue Cross*

Kathleen Taylor Sooy
Tracy A. Roman
Sarah Gilbert
Honor Costello
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com
sgilbert@crowell.com
hcostello@crowell.com

John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN & WHITE
LLC
The Clark Building
400 20th Street North
Birmingham, AL  35203
Tel: (205) 581-0700
Fax: (205) 581-0799
jjohnson@lightfootlaw.com
bkappel@lightfootlaw.com

*Counsel for Defendants Blue Cross of
Idaho Health Service, Inc.; Blue Cross
and Blue Shield of Kansas, Inc.; Blue
Cross and Blue Shield of Kansas City;
Blue Cross and Blue Shield of
Nebraska; Blue Cross Blue Shield of
Arizona; Blue Cross Blue Shield of
North Dakota; Blue Cross Blue Shield
of Wyoming*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle

*Counsel for Defendant, Excellus Health Plan, Inc.,*
*d/b/a Excellus BlueCross BlueShield, incorrectly*
*sued as Excellus BlueCross BlueShield of*
*New York*

Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com

*Counsel for Defendants Wellmark of*
*South Dakota, Inc. (Wellmark Blue*
*Cross and Blue Shield of South Dakota);*
*Wellmark, Inc. (Wellmark Blue Cross*
*and Blue Shield of Iowa); Hawaii*
*Medical Service Association (Blue*
*Cross and Blue Shield of Hawaii);*
*Triple-S Salud, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

  I hereby certify that on July 12, 2021, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ <em>Evan R. Chesler</em>  <br>
Evan R. Chesler
