FILED

2021 Jul-20 PM 04:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 3



Deposition of:

# CONF. Deborah Haas-Wilson Ph.D. , Non-time stamped

*May 10, 2019*

In the Matter of:

# Blue Cross Blue Shield Antitrust Litigation/in Re

Freedom Court Reporting
800.808.4958 | calendar-freedom@veritext.com | 205-397-2397

identify or is it some subset of those providers?

A.      So the -- the at-issue agreements --

MR. HOGAN:  Time out.

(Off-the-Record discussion was held.)

MR. HOGAN:  Back on the Record.

Q.      Are you ready, Doctor?  Sorry, we had some technical problems, it seems.

A.      Sure.  If you wouldn't mind repeating your question --

Q.      I wish I could.  I now forget where I am.

But -- So why don't I try it again.  Is it your opinion that all members of the acute care hospital provider class have suffered the nonprice harms that you just talked about or is it some subset?

A.      The -- All the general acute care hospitals in the class suffer from the nonprice harm as well as the price harm.

Q.      Is it your opinion that all members of the nonacute care hospital provider classes suffered from nonprice harms that you

identify?

A.    Yes.  So the other healthcare providers, other than general acute care hospitals, also suffered the harm of less choice, the nonprice harm.

Q.    So one nonprice harm you identify is reduction in the choice available to providers as you just said.  And so that --

From reading your report, and I was looking at pages two forty-five to two forty-eight of your report, is based on the economic literature you cite in those pages; right?

A.    So my opinion on nonprice harm is based on economic theory, the economic literature.

Q.    In paragraph three eighty-one you say:  Much of the economic literature has focused on consumer's reference for product variety.

Is that right?

A.    I see where you're reading from. You're right, the first part of that sentence says:  While much of the economic literature has focused on consumer's preferences for product variety comma.

Do you want me to read the rest?

Q.    I was just orienting to where I'm asking questions.

So do you cite any literature regarding insurer choice available to healthcare providers in this section of your report?

A.    Give me a minute just to review.

It looks like at least one paper, this paper by Leemore Dafny and Kate Ho and Mauricio Varela, the paper called:  Let Them Have Choice:  Gains from Shifting Away from Employer-Sponsored Health Insurance and Toward Individual Exchange, that came out in the American Economic Journal, Economic Policy, in about 2013.

Q.    Can you show me where that is, what footnote that's in?

A.    Five eight one.

Q.    Yeah, I'm sorry.  I was asking about providers.  You don't cite any literature regarding insurer choice available to healthcare providers, not to -- not to subscribers, which it sounds like this paper is about.

A.      The general theory of choice and the advantages of choice, apply, from an economic theory perspective, across all types of economic actors, whether they be healthcare providers or healthcare consumers.

Q.      But you're not aware of any empirical study of the effect of additional insurer choice on providers?  Not on subscribers, but on providers.

A.      I am not aware of anyone who has studied that very specific --

Q.      Understood.  So that's why the report doesn't cite anything on that specific side; right?

A.      In the literature review --

MR. WHATLEY:  Object to the form.

A.      -- I did not find a paper on that very narrow, specific question.  But, again, the economic theory applies across the board.

Q.      Is your opinion that all providers in Alabama would prefer more choice with regard to who they can contract with?

A.      In my opinion, based on economic theory, providers, as are individuals or other kinds of input suppliers, whatever that --

choice is better, choice -- having choice allows whoever the economic actor is to be better off.

Q.    And I understand from an economic theory perspective where you're coming from. But in the real world, is it possible that some providers in Alabama do not prefer more choice?

MR. WHATLEY:  Object to the form.

A.    So having the alternative options, even if you don't take that option, is not saying that the individual or the provider is better off.  It's -- What makes them better off is if they have that choice; they don't actually have to act on that choice or make that particular decision, but just having options.

Q.    Did you see any testimony in the record that providers wanted more choice in Alabama?

A.    Again, I've reviewed and -- so many different depositions.  Sitting here at this point in time, I don't want to do a memory test.  I would have to reacquaint myself with the different deposition testimony from different providers to be able to answer that

question.

Q.    You didn't cite any of that testimony in your report, if there is any; right?

A.    Well, I certainly include depositions from healthcare providers in Alabama in the materials that I relied on.  I did not pull quotes from those transcripts to put into my report, if that's what you're asking.  I don't -- There aren't any in there.

Q.    And you didn't conduct a survey of providers in Alabama on this issue, did you?

A.    I did not conduct a survey.

Q.    And did you do any interviews of the providers in Alabama to ask about this issue?

A.    Early on in the case, I had the opportunity to talk, via phone, with some of the hospitals.  I don't remember the conversations, it was quite a long time ago.  But I did have access to talk to healthcare providers, yes.

Q.    And if they had said something about wanting more choice, is that the kind of thing that you would have cited to and relied