FILED
2021 Jul-22  AM 10:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 339

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

IN RE: BLUE CROSS BLUE SHIELD

Master File No. 2:13-CV-20000-RDP

ANTITRUST LITIGATION

MDL NO. 2406

DEPOSITION OF JOSEPH OAKS

Maynard, Cooper & Gale

1901 Sixth Avenue North

Suite 2400

Birmingham, Alabama

June 1, 2017

9:45 a.m.

REPORTED BY:  Lane C. Butler

Certified Realtime Reporter,

Registered Professional

Reporter and Notary Public

**Joe Oakes** 37

A.    No, sir.

Q.    Okay.  You had other payors that you had to negotiate with also.  Is that correct?

A.    Correct.

Q.    What else did you do besides negotiating reimbursement with payors?

A.    Worked with our business office to monitor payments, to track performance of payments, if they matched contractual terms.  Also, as part of my role, I did maintain responsibility in terms of the occupational medicine network.  That was one of those things that, like a lot of hospital people that stay around awhile, you just kind of get additional jobs.  So that was one of the ones that I -- I kept.

Q.    Couldn't get rid of it, huh?

A.    Right.

Q.    So let's talk about your interactions with Blue Cross Blue Shield of Alabama as it relates to -- to reimbursement while you were at Baptist.  What -- what exactly did you do?

A.    We would, upon the anniversary date of the -- the contract, we would engage Blue Cross, as we would all payors, about negotiating a new rate.

Q.    Okay.  And in doing that, you would come up with some number and tell them that's what you'd like them to increase your reimbursement to? Is that correct?

A.    We would -- we would arrive at a number and -- and begin the negotiation.

Q.    Okay.  And did the -- did Blue Cross ever pay you that number?

MR. BURKHALTER:  Object to the form.

A.    ████████████████████████

████████████████████████████

Q.    ████████████████████████

████████████████████████

A.    ███████

Q.    ████████████████████████

████████████████████████████

███████████████

A.    █████████████

Q.    Okay.  But did they ever give you what you asked for in the first place?

MR. BURKHALTER:  Object to the form.

A.    I don't recall exactly if they gave us exactly what we asked for.

Q.    Well, during the time that you were doing the negotiation for Baptist, did you -- were

actually translate into a lower Medicare Plus.

Q.    But if you have a higher case mix but a lower average length of stay and you've got -- then you really can't compare apples to apples with the others in the peer group, can you?

MR. BURKHALTER:  Objection.

A.    You can compare apples to apples in terms of what that hospital would have been paid by Medicare versus what other hospitals were being paid by Medicare.

Q.    Okay.  Was this your final offer?

A.    I don't recall.

Q.    The final e-mail is to Eddie Harris. And it said, "Eddie - here is Jim's e-mail regarding the counter."

Did you turn it over to Eddie Harris to negotiate from that point forward?

A.    No.

Q.    And you don't know as you sit here today whether you ever made him any other different offer.  Is that correct?

MR. BURKHALTER:  Objection, asked and answered.

A.    I don't know.

Q.    ███    ████████████████████



MR. BURKHALTER:  I think I'm going to object to that question.

MR. ROTH:  I'm shocked.

A.    I would disagree with that statement.

Q.    You would disagree with it.  What parts of it would you disagree with?

A.

Q.

A.

Q.

A.



Q.    Can you tell me where you've done that?

A.    Not here in front of me.  But we have done that.

Q.    ███████   ████████████████████████████

████████████████████████████████████████████████████

████████   ████████████████████████████   ████████████

████████████████████████

A.    I can't say exactly.

Q.    Was it more than one?

A.    Yes.

Q.    More than five?

MR. BURKHALTER:  Objection.

A.    I don't know if it was more than five.

Q.    Okay.  And since it's so few numbers, I'm sure you can tell me which hospital it is so I can check with them if I wanted to; right?

A.    We would have to look at the records because I don't have it in the top of my head which ones those were.

Q.    ███████   ████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

MR. BURKHALTER:  █████████████████

Q.   Are you familiar with this document?

A.   Vaguely.  It's a 2012 document.  But I do see my name here, so I did get it, yes, and created some of it.

Q.   Okay.  Do you know -- well, let's do it this way.  What do you think is being discussed in this document?

A.   This is a specialty contract for behavioral health outpatient services.  PHP means partial hospitalization provider, and IOP means intensive outpatient provider.  So it's two types of outpatient services specifically for behavioral health.

Q.   Okay.  Let's look at the May 11th, 2012, e-mail to Amy Thomason.  There may be two of them.  Yeah, the one at 9:58 a.m.

Okay.  So you've just told us what PHP stands for.  In paragraph number 3?

A.   Yes, sir.

Q.   ████████████████████████

████████████████

MR. BURKHALTER:  ████████

A.   ████████████████████

████████████████████████

████████████████████████



Q.

A.

Q.

MR. BURKHALTER:

A.

Q.    And so the POF/ASC contract would fall into physician provider and ancillary provider area that you've already spoken to.  Is that correct?

A.    No, sir.

Q.    No?

A.    It falls into facilities.

Q.    Okay.

A.    POF/ASC is facilities.

Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮    ▮▮▮▮▮▮▮▮▮

A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

Q.    ▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

A.    ▮▮▮▮▮▮▮

MR. BURKHALTER:    ▮▮▮▮

A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

Q.    ▮▮▮

A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

Q.    So, how many different fee schedules are there for the POF/ASC contract?