FILED

2021 Jul-27  PM 03:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE:<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This Document Relates to**<br>**Provider Track Cases** |

## PROVIDER PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DEFENDANTS' SINGLE ENTITY DEFENSE

**Filed Under Seal Pursuant to Qualified Protective Order (Dkt. 550)
and the Order Regarding Revised Sealing Procedures (Dkt. 758)**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

UNDISPUTED RELEVANT MATERIAL FACTS ....................................................................1

ARGUMENT .............................................................................................................................4

    I.    The Association Admits That It Is Not a Single Entity ...........................................4

    II.    Allocating Territory or Restricting Output Among Potential
        Competitors Can Never Be the Work of a Single Entity .......................................6

        A.    Potential Competitors Are Not a Single Entity When They
            Purportedly Use Trademark Rights to Justify Allocating
            Territory or Restricting Output ..................................................................6

        B.    The Blues Have Asked This Court to Treat Them Like the
            NFL – Which Is Not a Single Entity When It Allocates
            Territories or Restricts Output ..................................................................9

CONCLUSION...........................................................................................................................13

# TABLE OF AUTHORITIES

## Cases

*Am. Needle, Inc. v. Nat'l Football League,*
    560 U.S. 183 (2010) ................................................................................................. passim

*Copperweld Corp. v. Indep. Tube Corp.,*
    467 U.S. 752 (1984) ................................................................................ 6, 10, 11, 12

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,*
    726 F.2d 1381 (9th Cir. 1984) ...................................................................... 10, 11

*Lawrence ex rel. Lawrence v. Chater,*
    516 U.S. 163 (1996) ..................................................................................................... 11

*North American Soccer League v. National Football League,*
    670 F 2d 1249 (2d Cir. 1982) ........................................................................ 11, 12

*Sullivan v. Nat'l Football League,*
    34 F.3d 1091 (1st Cir. 1994) ............................................................................... 11

*Timken Roller Bearing Co. v. United States,*
    341 U.S. 593 (1951) ................................................................................... 7, 8, 10

*United States v. Sealy, Inc.,*
    388 U.S. 350 (1967) ............................................................................ 7, 8, 10, 11

*United States v. Topco Associates,*
    405 U.S. 596 (1972) ............................................................................ 7, 8, 10, 11

## Other Authorities

Herbert Hovenkamp & Christopher R. Leslie,
    *The Firm as Cartel Manager*, 64 Vand. L. Rev. 813 (2011) ............................................. 8

XI Phillip E. Areeda & Herbert Hovenkamp,
    Antitrust Law ¶ 1907 (3d ed. 2011) ................................................................................ 7

## Rules

Fed. R. Civ. P. 56(a) .................................................................................................. 6

## INTRODUCTION

This Court's opinion on the parties' motions for summary judgment established several facts. Among them are that the Blues' exclusive service areas "must be examined as horizontal allocations, not vertical ones," and that the "National Best Efforts" Rule is an output limitation with no connection to the Blues' trademark rights. Doc. No. 2063 at 38, 46–47. The opinion left unresolved, however, whether the Blues were a single entity when they agreed to these restraints, pointing out factual disputes over the validity and enforceability of the Blue marks, as well as the Blues' willingness to compete under the Blue brand. *Id.* at 30–35. The Plaintiffs are nevertheless entitled to summary judgment on the Blues' "single entity" defense, in whole or in part, for two reasons. One is that documents not before the Court when it decided the previous summary judgment motion contain admissions by the Association that it is not a single entity. The other is that while potential competitors may be a single entity when managing jointly owned intellectual property, they cannot, as a matter of law, be a single entity to the extent they allocate territory or limit output.

## UNDISPUTED RELEVANT MATERIAL FACTS

1.      In 2012, the Blue Cross Blue Shield Association prepared a presentation to a "CEO Workgroup" called "Consumer Market: Strategic Brand and Marketing Plan." Ex. 1 at BCBSA00719423. Among the slides in this presentation was one titled, "But the single entity model is not a good analogy for the Blue system." *Id.* at BCBSA00719429.

2.      On or about April 5, 1993, Roger G. Wilson, Senior Vice President, General Counsel, and Corporate Secretary of the Association, sent a memorandum to "Holders, Service Mark Use Manual." Ex. 2 at BCBSA00265024. The memorandum prohibits any "public communications" that "refer to the Blue Cross and Blue Shield system as a single entity unless the

1

materials also adequately disclose that it is composed of independent Plans" or "refer to the Blue Cross or Blue Shield organization or system without a specific indication that it is composed of independent plans." *Id.* at BCBSA00265025.

3.      In a document dated January 14, 2008, Arkansas Blue Cross and Blue Shield stated

4.      The Board of Directors of the Association comprises a representative of each member plan (Plan), "which person shall be the duly elected and qualified CEO (even if such CEO is the CEO of more than one Regular Member) or, if none, and if the Chair of the Board consents, the Acting CEO of the Regular Member," as well as the Chief Executive Officer of the Association. Doc. No. 1350 at 2 (undisputed).

5.      The governance structure of the Association is set out in the Association's bylaws. The Plans may amend or repeal the bylaws, and adopt new bylaws, by vote of three-fourths of all Regular Members and three-fourths of the total then current weighted votes of all Regular Members. Doc. No. 1350 at 2 (undisputed); Ex. 4 BCBSA-CID015337, 359.

6.      The Plans are governing members of the Association. Doc. No. 1350 at 2 (undisputed).

7.      The Association owns the Blue Cross and Blue Shield names and marks (the "Blue marks"), and it grants licenses to the Plans to use the Blue marks. The license agreements may be amended by a vote three-fourths of the Plans and three-fourths of the total then current weighted

vote of all Plans. Doc. No. 1350 at 2–3 (undisputed); Doc. No. 1350-3 at BCBSA03877386, 387, 407.

8.      The license agreements identify a "Service Area" for each Plan. Doc. No. 1350 at 3 (undisputed).

9.      The majority of the Plans' service areas are exclusive, meaning that they do not overlap with another Plan's service area. Doc. No. 1350 at 3 (undisputed).

10.     Except for certain limited circumstances (primarily ceded National Accounts and Government Programs), under the license agreements, the Association's rules, or both, a Plan may not sell insurance outside its service area using the Blue marks. Doc. No. 1350 at 3; Doc. No. 1432 at 3.

11.     Under the license agreements, the Association's rules, or both, a Plan may not bid on a National Account headquartered outside its service area using the Blue marks unless the Plan in whose service area the National Account is headquartered agrees to "cede" the right to bid. Doc. No. 1350 at 3 (undisputed).[1]

12.     Under the license agreements, the Association's rules, or both, a Plan generally may not develop a provider network or contract with a healthcare provider outside its service area for services to be provided under the Blue marks. A Plan may contract with a healthcare provider in a county contiguous to the Plan's service area under certain conditions and for limited purposes. A Plan may contract with certain types of providers nationwide, such as laboratories, durable medical equipment providers, and specialty pharmacies, but medical professionals, hospitals, and outpatient facilities are not among these types. Doc. No. 1350 at 3–4 (undisputed).

---

[1] The Subscriber Settlement, if approved, would allow a second Blue bid for certain National Accounts. Doc. No. 2610-2 at 29–30.

13.     "The National Best Efforts rule, implemented in 2005, requires a Plan to derive at least sixty-six and two-thirds percent (66 2/3%) of its national health insurance revenue from its Blue brand. (Doc. # 1349-16 at 7). Thus, any health revenue a Blue Plan may generate from services offered under any non-Blue brand is limited in relation to its Blue branded health revenue. (Doc. # 1432 at 20–21). The National Best Efforts rule, therefore, operates as an output restriction on a Plan's non-Blue brand business." Doc. No. 2063 at 46.[2]

## ARGUMENT

### I.     The Association Admits That It Is Not a Single Entity.

In 2012, the year this case was first filed, the Association prepared a presentation to a "CEO Workgroup" called "Consumer Market: Strategic Brand and Marketing Plan." Ex. 1 at BCBSA00719423. The subject of the presentation was what the Blues now claim they undertake as a single entity: "governance of the use of the Blue Marks." Defendants' MSJ, Doc. No. 1353, at 20. Specifically, the presentation focused on the need to implement more consistent branding throughout the Blue system. Ex. 1 at BCBSA00719424–47. The Association recognized that its competitors branded themselves consistently, then stated, as the heading of a slide, "But the single entity model is not a good analogy for the Blue system." *Id.* at BCBSA00719429.

In the slide where it admitted that it is not a single entity, the Association also disclaimed any comparison between itself and sports leagues, contrary to its position now that it governs the Blue marks the way the NFL governs the NFL marks. The slide contained two clusters of logos, one with McDonald's, Toyota, and Ford, and the other with the logos of seven Major League Baseball teams surrounding the logo of Major League Baseball. *Id.* The first group of logos is

---

[2] The National Best Efforts rule was repealed on April 27, 2021. Doc. No. 2728 at 12. It remains relevant to this litigation, as the Providers explain in their opposition to the Blues' motion for summary judgment on the standard of review.

circled to indicate that they better represent the Blue model, as the slide explains: "Automotive and restaurant examples are closest to the Blue model …" *Id.* Thus, even if the teams of the NFL are a single entity when they manage the NFL mark, as the Blues claim, the Association does not see itself as comparable to the NFL.

The Association's own legal guidance to its members also disclaims that the Blues operate as a single entity. A 1993 memo from Association General Counsel Roger Wilson to the Blue plans prohibits any "public communications" that "refer to the Blue Cross and Blue Shield system as a single entity unless the materials also adequately disclose that it is composed of independent Plans" or "refer to the Blue Cross or Blue Shield organization or system without a specific indication that it is composed of independent plans." Ex. 2 at BCBSA00265025. Behind the scenes, the Association's own General Counsel took a position that contradicts the Blues' public arguments.



Because the Blues have admitted that they are not a single entity with respect to the very function at issue in this case, their single-entity defense fails.

## II.     Allocating Territory or Restricting Output Among Potential Competitors Can Never Be the Work of a Single Entity.

Even if disputed issues of fact preclude summary judgment on the single-entity defense in its entirety, summary judgment should still be granted on the single-entity defense as it relates to two of the Blues' agreements: their agreements to allocate territory through exclusive service areas, and to restrict output through their "National Best Efforts" rule. *See* Fed. R. Civ. P. 56(a) (permitting summary judgment on "part of [a] claim or defense").

### A.     Potential Competitors Are Not a Single Entity When They Purportedly Use Trademark Rights to Justify Allocating Territory or Restricting Output.

As the Provider Plaintiffs understand it, the Blues' position is that they govern the use of the Blue marks through a single entity (the Association), and therefore they are a single entity for antitrust purposes when they establish exclusive service areas and implement the National Best Efforts rule through the Association. There is no support for this position in the law. Even assuming for the sake of argument that there are legitimate areas of joint governance of the marks that do not "deprive[] the marketplace of the independent centers of decisionmaking that competition assumes and demands," *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984), such as requiring that the marks be used consistently in advertising, allocating territory and restricting output are not among them.

If the Blues' exclusive service areas merely enforce pre-existing common-law rights to use the Blue marks in particular territories, as the Blues repeatedly claim,[3] then the Blues have no need to coordinate in order to do so. Trademark law gives the Blues all the tools they need to keep infringers out of their exclusive service areas. That is why courts reject defenses that "collusion or

---

[3] In their previous summary judgment briefs, the Plaintiffs have explained why the Blues have no such rights. But this brief will assume *arguendo* that they do.

market division is necessary to prevent firms from violating one another's intellectual property rights, or to discipline others who are violating them." XI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1907 (3d ed. 2011). The Supreme Court warned against using the single-entity defense to justify unlawful activity in *American Needle*:

> But it is not dispositive that the teams have organized and own a legally separate entity that centralizes the management of their intellectual property. An ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label. "Perhaps every agreement and combination in restraint of trade could be so labeled."

*Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 197 (2010) (quoting *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598 (1951)). The opinion the Supreme Court quoted here, *Timken*, specifically held that allocation of territories was unlawful, despite the defendant's use of trademark licensing to justify it: "A trademark cannot be legally used as a device for Sherman Act violation." 341 U.S. at 599.

*American Needle*'s holding that the single-entity defense cannot protect an "ongoing § 1 violation" plainly applies to allocation of territories. *American Needle* cited *United States v. Sealy, Inc.*, 388 U.S. 350 (1967), and *United States v. Topco Associates*, 405 U.S. 596 (1972), as examples of "concerted action covered by § 1." 560 U.S. at 197, 200–01. As the Court knows, the Plaintiffs and the Blues have disputed whether *Sealy* and *Topco* require the Court to apply the *per se* rule to the Blues' agreements to allocate territories and restrict output. But regardless of whether the *per se* rule or the rule of reason applies, no one has suggested that the defendants in *Topco* and *Sealy* were immune from liability under Section 1 because they functioned as a single entity when they allocated territories. Even Professor Herbert Hovenkamp, who has criticized *Topco* and *Sealy* on other grounds,[4] has explained at length that *American Needle* is consistent with the findings of

---

[4] Professor Hovenkamp believes that *Topco* and *Sealy* incorrectly applied "an overly aggressive per se rule to restraints that were ancillary to legitimate, efficiency-enhancing joint ventures by

concerted action in those cases. Herbert Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager*, 64 Vand. L. Rev. 813, 859–65 (2011). In *American Needle*, he notes, the Supreme Court focused on substance over form, and "[i]n substance, the Sealy structure was the result of agreements among independent actors." *Id.* at 861. That the Sealy arrangement was contractual, like the Blues' arrangement, also supported a finding of concerted action because "a single entity does not contract with itself." *Id.* Moreover, Sealy's arguments for the necessity of coordination "present[ed] no reason to suggest that Sealy and its licensees should constitute a single entity for antitrust purposes." *Id.* at 863. In the end, "[a] finding of conspiratorial capacity was obvious in *Sealy* because the individual bedding manufacturers were its only stockholders and completely controlled the corporation itself. … When control flows from the members to a central agent, concerted action is involved." *Id. Topco* is consistent with *American Needle* for the same reasons. *Id.* at 865.

With respect to the National Best Efforts rule, the single-entity defense is even weaker. The Blues' sole argument that they are a single entity is that they jointly govern the Blue marks. But this Court has found that "there is nothing in the Rule 56 record which indicates that there is any valid connection between trademark rights and the National Best Efforts rule." Doc. No. 2063 at 46. To find that the National Best Efforts rule is concerted action, then, would be consistent not only with the Court's holding but also *Timken*, in which the defendant unsuccessfully used its trademark rights to justify its restriction of sales not under the trademarks. 341 U.S. at 598. There

---

firms that lacked significant market power." Herbert Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager*, 64 Vand. L. Rev. 813, 864 (2011). The Blues, however, are among the largest and most powerful insurers in the country. Doc. No. 1350 (Providers' Motion for Summary Judgment) at 32.

is simply no connection between the function the Blues have supposedly integrated and the National Best Efforts rule.

> ### B.   The Blues Have Asked This Court to Treat Them Like the NFL—Which Is Not a Single Entity When It Allocates Territories or Restricts Output.

Based on *American Needle*'s suggestion that the NFL may be a single entity when it licenses the NFL marks, the Blues have repeatedly compared themselves to the teams of the NFL. Doc. No. 1349 at 23 ("Defendants fit comfortably within" cases relating to licensing the NFL marks); Doc. No. 1432 at 20 (similar); Doc. No. 1556 at 10 (similar). In fact, the Blues went so far as to attach as an exhibit to their summary judgment reply brief a copy of the NFL's Constitution and Bylaws, specifically citing those portions in which "the NFL establishes exclusive territorial rights for each team and restricts teams' ability to own non-NFL football clubs or teams." Doc. No. 1556 at 11 (citing Doc. No. 1551-4). Because this case is pending in Alabama, where college football is king, the Blues might be forgiven for forgetting that the exact functions of the NFL that they claim to share—establishing exclusive territorial rights and restricting their ability to do business under different marks—have been held unlawful, and the NFL has been held *not* to be a single entity with respect to those functions.

As fans of the Raiders know all too well, that team moved in 1982 from Oakland to Los Angeles. The move was opposed not only by Oakland fans, but also by the teams of the NFL. Under Section 4.3 of the NFL's Constitution, which the Blues have cited in support of their claims here, relocation of an NFL team into the territory of another team (in this case, the Los Angeles Rams), required a three-quarters vote of the NFL teams. *L.A. Mem'l Coliseum Comm'n v. Nat'l*

*Football League*, 726 F.2d 1381, 1385 (9th Cir. 1984).[5] When the Raiders announced their intention to move to Los Angeles, the NFL's vote was 22–0 against. *Id.* Both the Raiders and the Los Angeles Memorial Coliseum Commission then sued the NFL for violating the Sherman Act. *Id.* at 1384–85. In that litigation, the district court held that the NFL was not a "single entity" when it attempted to bar the Raiders from moving into the Rams' territory. *Id.* at 1385. A jury then found that the NFL had violated the Sherman Act and awarded damages to the Raiders and the Coliseum Commission. *Id.* at 1386. The Ninth Circuit affirmed, with a lengthy explanation that the NFL was not a single entity when it voted to enforce its rules on exclusive territories. The Ninth Circuit pointed out that other courts had held the NFL liable for violations of Section 1, and cited the Supreme Court's opinions in *Timken*, *Sealy*, and *Topco* in support of its holding that the NFL was not a single entity. *Id.* at 1387–89. As the Court pointed out, "These attributes operate to make each team an entity in large part distinct from the NFL. It is true that cooperation is necessary to produce a football game. However, as the district court concluded, this does not mean, 'that each club can produce football games only as an *NFL* member.'" *Id.* at 1390.[6]

Following its loss at the Ninth Circuit, the NFL petitioned for certiorari, and that petition was denied. 105 S. Ct. 397 (1984). The timing was significant because while the petition was pending, the Supreme Court decided *Copperweld*, a case the Blues cite extensively. If the Supreme Court had thought that *Copperweld* might affect the correctness of the Ninth Circuit's decision, it could have done what it often does in this situation: grant the petition, vacate the lower court's decision, and remand for further consideration in light of the new precedent. *See Lawrence ex rel.*

---

[5] Similarly, the Blues can change any of their rules, including rules governing exclusive territories, by a "double three-quarters" vote, in which one vote is weighted by plan size and one vote is not. Facts 5, 7.
[6] This Court has held that "it cannot be said that the market allocations were *necessary* to market the Blues' health insurance product at all." Doc. No. 2063 at 44.

*Lawrence v. Chater*, 516 U.S. 163, 165–68 (1996) (discussing the use of "GVR orders"). Instead, the Court denied the petition. Other courts have since held that *Copperweld* does not affect the Ninth Circuit's decision. *E.g.*, *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1099 (1st Cir. 1994).

The next time the Supreme Court discussed the Raiders case was in *American Needle*, where it cited the Ninth Circuit's opinion with approval, alongside *Sealy* and *Topco*:

> The 32 teams capture individual economic benefits separate and apart from NFLP [(National Football League Properties)] profits as a result of the decisions they make for the NFLP. NFLP's decisions thus affect each team's profits from licensing its own intellectual property. "Although the business interests of" the teams "will *often* coincide with those of the" NFLP "as an entity in itself, that commonality of interest exists in every cartel." *Los Angeles Memorial Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1389 (C.A.9 1984) (emphasis added). In making the relevant licensing decisions, NFLP is therefore "an instrumentality" of the teams. *Sealy*, 388 U.S., at 352–354, 87 S.Ct. 1847; see also *Topco Associates, Inc.*, 405 U.S., at 609, 92 S.Ct. 1126.

560 U.S. at 201. In other words, the Supreme Court relied on a case about the NFL's territorial allocation as an example of the NFL's potential status as a "cartel." Because the Blues have argued that they should be treated the same as the NFL, they must also be capable of concerted action, and thus not be a single entity, when they enforce their territorial allocation.

The teams of the NFL are also not a single entity when they restrict their ability to operate under marks other than the NFL marks. This was the holding of *North American Soccer League v. National Football League*, which evaluated the NFL's ban on its team owners holding an interest in a team in another sport. 670 F.2d 1249 (2d Cir. 1982), *cert. denied*, 103 S. Ct. 499 (1982). That ban had been used to choke off competition from the upstart North American Soccer League. *Id.* at 1254–55. As the Second Circuit explained,

> The characterization of NFL as a single economic entity does not exempt from the Sherman Act an agreement between its members to restrain competition. To tolerate such a loophole would permit league members to escape antitrust responsibility for any restraint entered into by them that would benefit their league

or enhance their ability to compete even though the benefit would be outweighed by its anticompetitive effects. … The NFL members have combined to protect and restrain not only leagues but individual teams. The sound and more just procedure is to judge the legality of such restraints according to well-recognized standards of our antitrust laws rather than permit their exemption on the ground that since they in some measure strengthen the league competitively as a "single economic entity," the combination's anticompetitive effects must be disregarded.

*Id.* at 1257–58. Like the Raiders case, the Supreme Court approvingly cited this case in *American Needle* when explaining why the NFL teams were not a single entity:

The NFL teams do not possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action. Each of the teams is a substantial, independently owned, and independently managed business. "[T]heir general corporate actions are guided or determined" by "separate corporate consciousnesses," and "[t]heir objectives are" not "common." *Copperweld*, 467 U.S., at 771, 104 S.Ct. 2731; *see also North American Soccer League v. NFL*, 670 F.2d 1249, 1252 (C.A.2 1982) (discussing ways that "the financial performance of each team, while related to that of the others, does not ... necessarily rise and fall with that of the others").

*American Needle*, 560 U.S. at 196.

The NFL's rejected justifications for its ban on ownership of teams in other sports are the same justifications that the Blues have used for the National Best Efforts rule, which limits the amount of business they can do under marks other than the Blue marks. Just as the NFL teams claimed that their restraints "would benefit the league or enhance their ability to compete," *North American Soccer League*, 670 F.2d at 1257, the Blues have argued that "the Best Efforts rules ensure that each Plan is primarily focused on building Blue-branded business, which enables, facilitates, and enhances Defendants' ability to compete against other national insurers," Doc. No. 1349 at 35. And just as the NFL's rules reduced the output of sports entertainment by choking off professional soccer, this Court has held that the National Best Efforts rule "operates as an output restriction on a Plan's non-Blue brand business." Doc. No. 2063 at 46. Because the Blues have asked to be treated like the NFL, they should be held not to be a "single entity" when they agree to restrict their output.

**CONCLUSION**

Potential competitors never act as a single entity when they agree to insulate themselves from competition by allocating territory or restricting output. The Blues, who resisted being called a single entity until this case was filed, are no exception. The Court should grant summary judgment to the Plaintiffs on the Blues' "single entity" defense, either in full or with respect to exclusive service areas and the National Best Efforts rule.

Dated: June 21, 2021                                   Respectfully submitted,

/s/ Edith M. Kallas                                     /s/ Joe R. Whatley, Jr.
Edith M. Kallas – *Co-Lead Counsel*           Joe R. Whatley, Jr. – *Co-Lead Counsel*
WHATLEY KALLAS, LLP                          W. Tucker Brown
152 West 57th Street                            WHATLEY KALLAS, LLP
41st Floor                                       2001 Park Place North
New York, NY  10019                            1000 Park Place Tower
Tel:  (212) 447-7060                            Birmingham, AL 35203
Fax:  (800) 922-4851                            Tel:  (205) 488-1200
Email: ekallas@whatleykallas.com                Fax:  (800) 922-4851
                                                 Email: jwhatley@whatleykallas.com
                                                        tbrown@whatleykallas.com


Patrick J. Sheehan                              Deborah J. Winegard
WHATLEY KALLAS, LLP                          WHATLEY KALLAS, LLP
101 Federal Street                              1068 Virginia Avenue, NE
19th Floor                                       Atlanta, GA 30306
Boston, MA 10019                                Tel:  (404) 607-8222
Tel:  (617) 573-5118                            Fax:  (404) 607-8451
Fax:  (617) 371-2950                            Email: dwinegard@whatleykallas.com
Email: psheehan@whatleykallas.com


Henry C. Quillen                                E. Kirk Wood, Jr. – *Local Facilitating*
WHATLEY KALLAS, LLP                          *Counsel*
159 Middle Street, Suite 2C                     WOOD LAW FIRM LLC
Portsmouth, NH  03801                           P. O. Box 382434
Tel:  (603) 294-1591                            Birmingham, AL 35238
Fax:  (800) 922-4851                            Tel:  (205) 612-0243
Email: hquillen@whatleykallas.com               Fax:  (205) 705-1223
                                                 Email: ekirkwood1@bellsouth.net

Charles Clinton Hunter
HAYES HUNTER PC
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (281) 768-4731
Fax: (713) 583-7047
Email: chunter@hayeshunterlaw.com

Aaron S. Podhurst – *Plaintiffs' Steering Committee*
Peter Prieto – *Chair, Expert Committee*
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue
Suite 2300
Miami, FL  33131
Tel:  (305) 358-2800
Fax:  (305) 358-2382
Email: apodhurst@podhurst.com
        pprieto@podhurst.com

Dennis Pantazis – *Plaintiffs' Steering Committee*
Brian Clark – *Discovery Committee*
WIGGINS CHILDS PANTAZIS FISHER
  GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel:  (205) 314-0500
Fax:  (205) 254-1500
Email: dgp@wcqp.com
        bclark@wcqp.com

U.W. Clemon – *Plaintiffs' Steering Committee*
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL  35222
Tel: (205) 837-2898
Email: clemonu@bellsouth.net

Dennis C. Reich – *Chair, Damages Committee*
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (713) 622-7271
Fax:  (713) 623-8724
Email:  dreich@rbfirm.net

J. Mark White – *Litigation Committee*
Augusta S. Dowd – *Chair, Litigation Committee*
Linda G. Flippo – *Discovery Committee*
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel:  (205) 323-1888
Fax:  (205) 323-8907
Email: mwhite@whitearnolddowd.com
        adowd@whitearnolddowd.com
        lflippo@whitearnolddowd.com

Nicholas B. Roth – *Chair, Discovery Committee*
Julia Smeds Roth – *Discovery Committee*
EYSTER KEY TUBB ROTH MIDDLETON
  & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email: nbroth@eysterkey.com
        jroth@eysterkey.com

David A. Balto – *Expert Committee*
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email: david.balto@dcantitrustlaw.com

Joey K. James – *Litigation Committee*
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel:  (256) 764-0095
Fax:  (256) 767-5705
Email: joey@bunchandjames.com

Richard S. Frankowski – *Discovery Committee*
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL  35233
Tel:  (205) 390-0399
Fax:  (205) 390-1001
Email: richard@frankowskifirm.com

Van Bunch – *Chair, Class Certification Committee*
BONNETT FAIRBOURN FRIEDMAN &
  BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel:  (602) 274-1100
Fax:  (602) 274-1199
Email: vbunch@bffb.com

Robert J. Axelrod – *Chair, Written Submissions Committee*
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
Tel: (646) 448-5263
Fax: (212) 840-8560
Email: rjaxelrod@axelrodllp.com

W. Daniel Miles, III – *Written Submissions Committee*
BEASLEY ALLEN CROW METHVIN PORTIS
  & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel:  (800) 898-2034
Fax:  (334) 954-7555
Email: dee.miles@beasleyallen.com

Michael C. Dodge – *Expert Committee*
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel:  (972) 419-7172
Email: mdodge@gpm-law.com

John C. Davis – ***Written Submissions Committee***
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel:  (850) 222-4770
Email: john@johndavislaw.net

Mark K. Gray – ***Discovery Committee***
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel:  (502) 805-1800
Fax:  (502) 618-4059
Email: mgray@grayandwhitelaw.com

Stephen M. Hansen – ***Class Certification Committee***
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel:  (253) 302-5955
Fax:  (253) 301-1147
Email: steve@stephenmhansenlaw.com

Harley S. Tropin – ***Damages Committee***
Javier A. Lopez – ***Discovery Committee***
KOZYAK TROPIN &
   THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email: hst@kttlaw.com
        jal@kttlaw.com

Michael E. Gurley, Jr. – ***Discovery Committee***
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel:  (205) 908-6512
Email: mgurleyjr@yahoo.com

Lynn W. Jinks, III – ***Expert Committee***
Christina D. Crow – ***Discovery Committee***
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel:  (334) 738-4225
Fax:  (334) 738-4229
Email: ljinks@jinkslaw.com
        ccrow@jinkslaw.com

Myron C. Penn – ***Discovery Committee***
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel:  (334) 738-4486
Fax:  (334) 738-4432
Email: myronpenn28@hotmail.com

J. Preston Strom, Jr. – ***Litigation Committee***
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel:  (803) 252-4800
Fax:  (803) 252-4801
Email: petestrom@stromlaw.com

C. Wes Pittman – *Settlement Committee*
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel:  (850) 784-9000
Fax:  (850) 763-6787
Email: wes@pittmanfirm.com

Thomas V. Bender – *Discovery Committee*
Dirk L. Hubbard
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Tel:  (816) 421-0700
Email:  tbender@hab-law.com
        dhubbard@hab-law.com

Robert B. Roden – *Litigation Committee*
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel:  (205) 933-8383
Fax:  (205) 933-8386
Email: rroden@shelbyroden.com

Gregory S. Cusimano – *Litigation Committee*
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL  35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email:  greg@alalawyers.net

Gary E. Mason – *Class Certification Committee*
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel:  (202) 429-2290
Fax:  (202) 640-1160
Email: gmason@wbmllp.com

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel:  (320) 289-2363
Fax:  (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Michael L. Murphy – *Discovery Committee*
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC  20006
Tel:  (202) 463-2101
Fax: (202) 463-2103
Email: mmurphy@baileyglasser.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
Email: alamb@archielamb.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel:  (719) 471-1984
Fax:  (719) 577-4356
Email: lance@searsassociates.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA  51101
Tel:  (712) 234-3030
Fax:  (712) 234-3034
Email:  paul@lundberglawfirm.com

Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK  99501
Tel:  (907) 277-5400
Fax:  (907) 277-9896
Email:  Jessica@dillonfindley.com
           Ray@dillonfindley.com
           Molly@dillonfindley.com

Cynthia C. Moser
HEIDMAN LAW FIRM
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA  51101
Tel:  (712) 255-8838
Fax  (712) 258-6714
Email:  Cynthia.Moser@heidmanlaw.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com