**FIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This Document Relates to**<br>**Provider Track Cases** |

**PROVIDER PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON PROVIDERS' DAMAGES CLAIMS
AS TIME-BARRED AND SPECULATIVE**

**Filed Under Seal Pursuant to Qualified Protective Order (Dkt. 550)
and the Order Regarding Revised Sealing Procedures (Dkt. 758)**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ ii

LIST OF CITATIONS AND ABBREVIATIONS ...................................................... vi

INTRODUCTION ...................................................................................................... 1

RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED RELEVANT
     MATERIAL FACTS ......................................................................................... 2

ADDITIONAL UNDSIPUTED RELEVANT MATERIAL FACTS ........................... 8

ARGUMENT ............................................................................................................... 9

    I.    The Blues' Motion Rests on a Fundamental Mistake About the Providers'
        Theory of Damages ................................................................................. 9

    II.   The Providers' Claims Are Timely Because They Arise from Injuries Inflicted
        Within the Limitations Period ................................................................ 11

    III.  The Providers' Damages Calculations Come from a Multiple Regression
        Model, Not "Speculation and Guesswork." ......................................... 21

        A.    The Providers Calculate Damages by Applying Widely Accepted
            Methods to Real-World Data. ................................................... 21

        B.    A Sophisticated Multiple Regression Model That Controls for
            Important Variables Is Not "Speculation and Guesswork." ..................... 24

        C.    The Providers' Model of Damages Arising from BlueCard and
            Contracting Restrictions Is Consistent with the Evidence ......................... 29

CONCLUSION .......................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Maricopa Cnty. Med. Soc.*,
    457 U.S. 332 (1981) ................................................................................ 6

*Barnosky Oils, Inc. v. Union Oil Co. of Cal.*,
    665 F.2d 74 (6th Cir. 1981) .................................................................. 17

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) ................................................................. 13

*Bigelow v. RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946) ...................................................................... 21, 27

*Bray v. Bank of America Corp.*,
    784 F. App'x 738 (11th Cir. 2019) ....................................................... 16

*Champagne Metals v. Ken-Mac Metals, Inc.*,
    458 F.3d 1073 (10th Cir. 2006) ........................................................... 13

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) .............................................................................. 20

*City of Tuscaloosa v. Harcros Chems., Inc.*,
    158 F.3d 548 (11th Cir. 1998) ............................................................. 24

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*,
    175 F.3d 18 (1st Cir. 1999) ................................................................. 25

*Coleman Motor Co. v. Chrysler Corp.*,
    525 F.2d 1338 (3d Cir. 1975) ............................................................... 26

*Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*,
    710 F.2d 752 (11th Cir. 1983) ............................................................. 25

*E. Auto Distribs., Inc. v. Peugeot Motors of Am., Inc.*,
    795 F.2d 329 (4th Cir. 1986) ............................................................... 26

*Farbenfabriken Bayer, A.G. v. Sterling Drug, Inc.*,
    153 F. Supp. 589 (D.N.J. 1959) .......................................................... 16

*Fla. Mun. Power Agency v. Fla. Power & Light Co.*,
    64 F.3d 614 (11th Cir. 1995) ......................................................... 21, 28

*Gumwood HP Shopping Partners, L.P. v. Simon Property Group, Inc.*,
    221 F. Supp. 3d 1033 (N.D. Ind. 2016) ............................................... 17

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
    392 U.S. 481 (1968) ............................................................................... passim

*In re Cotton Yarn Antitrust Litig.*,
    505 F.3d 274 (4th Cir. 2007) ................................................................... 13

*In re Disposable Contact Lens Antitrust Litig.*,
    329 F.R.D. 336 (M.D. Fla. 2018) ........................................................... 25

*In re Domestic Air Transp. Antitrust Litig.*,
    37 F.R.D. 677 (N.D. Ga. 1991) ............................................................... 25

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F.2d 1144 (3d Cir. 1993) .................................................................. 13

*In re Multidistrict Vehicle Air Pollution*,
    591 F.2d 68 (9th Cir. 1979) ..................................................................... 16

*In re Processed Egg Prods. Antitrust Litig.*,
    81 F. Supp. 3d 412 (E.D. Pa. 2015) ........................................................ 25

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008) ................................................................... 21

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    752 F.3d 728 (8th Cir. 2014) ............................................................ 13, 19

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
    451 U.S. 557 (1981) ...................................................................... 21, 27, 28

*Kaw Valley Elec. Co-op Co. v. Kan. Elec. Power Co-op, Inc.*,
    872 F.2d 931 (10th Cir. 1989) ................................................................. 16

*Keener v. Sizzler Family Steak Houses*,
    597 F.2d 453 (5th Cir. 1979) ................................................................... 26

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ............................................................................... passim

*Kloth v. Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006) ................................................................... 26

*Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*,
    954 F.2d 1279 (7th Cir. 1992) ................................................................. 25

*Mayor of Baltimore v. Actelion Pharms., Ltd.*,
    995 F.3d 123 (4th Cir. 2021) ................................................................... 19

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) ........................................................... 26

*Midwestern Waffles, Inc. v. Waffle House, Inc.*,
   734 F.2d 705 (11th Cir. 1984) ................................................... 15, 16

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,
   198 F.3d 823 (11th Cir. 1999) ................................... 13, 14, 18, 20

*Murphy Tugboat Co. v. Crowley*,
   658 F.2d 1256 (9th Cir. 1981) ........................................................ 26

*Nat'l Souvenir Ctr. v. Historic Figures, Inc.*,
   728 F.2d 503 (D.C. Cir. 1984) ....................................................... 13

*Oliver v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014) ........................................................ 13

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
   797 F.2d 370 (7th Cir. 1986) .......................................................... 26

*Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.*,
   517 F.2d 117 (5th Cir. 1975) .......................................................... 13

*Premier Concrete LLC v. Argos North America Corp.*,
   2021 WL 1209354 (N.D. Ga. Mar. 31, 2021)................................ 16

*Samsung Elecs. Co. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ........................................................ 13

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
   171 F.3d 912 (3d Cir. 1999)............................................................ 26

*Sunbeam Television Corp. v. Nielsen Media Research, Inc.*,
   711 F.3d 1264 (11th Cir. 2013) ................................................. 27, 28

*Toscano v. PGA Tour, Inc.*,
   201 F. Supp. 2d 1106 (E.D. Cal. 2002)......................................... 26

*UPPI, LLC v. Jubilant Draximage Inc.*,
   2020 WL 6220818 (S.D. Ala. Sept. 18, 2020), *report and recommendation adopted*,
   2020 WL 6219793 (S.D. Ala. Oct. 22, 2020) ............................... 28

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*,
   108 F. Supp. 2d 549 (W.D. Va. 2000) ........................................... 26

*Watson Carpet & Floor Covering, Inc. v. Mohawk, Indus., Inc.*,
   648 F.3d 452 (6th Cir. 2011) ................................................... 13, 17

*Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*,
    549 U.S. 312, 321–22 (2007) ........................................................... 14

*Z Techs. Corp. v. Lubrizol Corp.*,
    753 F.3d 594 (6th Cir. 2014) ........................................................... 16

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971)............................................................... 12, 16, 20

**Statutes**

15 U.S.C. § 1 ................................................................................................... 11

15 U.S.C. § 15b ............................................................................................... 12

**Other Authorities**

2 Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 338b (rev. ed. 1995).......................... 13

Kyle Graham, *The Continuing Violations Doctrine*, 43 Gonz. L. Rev. 271 (2008).............. 12, 20

Louis Altman & Maria Pollack, 6 Callmann on Unfair Competition, Trademarks, and
    Monopolies § 23:32 (4th ed.)........................................................... 19

U.S. Census Bureau Population Estimates ................................................... 5

# LIST OF CITATIONS AND ABBREVIATIONS

| Dkt # | Ex | Document | Citation |
|---|---|---|---|
|  | 1 | July 19, 2017 Deposition of Terry Kellogg (excerpt) | Kellogg 7/19/17 Tr. |

## INTRODUCTION

The Supreme Court and the Eleventh Circuit have made clear that regardless of when a defendant entered into an unlawful conspiracy, every purchase from that conspiracy at an anticompetitive price is a new act for which an antitrust cause of action will accrue. The Providers have alleged that they are harmed every time there are paid at anticompetitive reimbursement rates due to the Blues' ongoing conspiracy. Therefore, they may assert claims for damages beginning four years before they filed suit. In the Blues' understanding of antitrust law, once a conspiracy is four years old, it cannot be the subject of an action for damages, even if it is ongoing, and even if it is currently causing harm. If this sounds absurd, that's because it is. Needless to say, the Blues cite no case in which a court shielded such a conspiracy from a claim for damages based on the statute of limitations.

The Blues also claim that the Providers' damages model is so speculative that it cannot even create a genuine dispute that the Providers are entitled to relief. Mostly, the Blues rely on the Providers' inability to specify exactly when and where other Blue Plans would have entered Alabama in the past, had the Blues not violated the antitrust laws. The Blues persist, however, in overlooking that not all of the Providers' estimates of damages assume entry into Alabama at all. For the estimates that do involve entry into Alabama, the Providers' experts have made estimates based on a multiple regression analysis of data whose accuracy the Blues do not question. That is standard practice in antitrust litigation, and courts have rightly derided defendants who insist that a plaintiff did not do enough to reconstruct the world as it would have existed without the defendants' own violations of the antitrust laws. The Providers have done more than enough work to get their damages claims to a jury, and the motion for summary judgment should be denied.

## RESPONSE TO DEFENDANTS' STATEMENT OF
## UNDISPUTED RELEVANT MATERIAL FACTS

The Blues' purported facts, even if they were undisputed, do not entitle the Blues to summary judgment. The headings in the Blues' fact section make this clear enough:

"The Challenged Blue Rules Have Been Open And Obvious Since Their Inception": A plaintiff's knowledge of an ongoing antitrust conspiracy does not give rise to a statute of limitations defense as a matter of law. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n.15 (1968); *see infra* Part II.

"Providers' Harm and Damages Methodology": The Blues mischaracterize the Providers' damages methodology as relying critically on blocked entry by the Blues, which it does not. The Providers' damages methodology is based on a multiple regression model of the kind routinely used to justify estimates of damages in antitrust cases. *See infra* Parts I and III.

"BlueCard Increased The Blues' National Account Membership By Combining The Strength Of Each Blue's Local Networks": The Blues claim that the Providers' damages are speculative because without BlueCard, the Blues would not have had the same amount of national account business. But the Providers are not attacking BlueCard in its entirety, only the price-fixing aspect of BlueCard, which the Blues have not claimed is the source of their national account business. *See infra* Part III.

"Insurers Are Highly Selective About The Areas In Which They Choose To Enter, Row They Enter, And Whether To Continue Competing After Entry": Unlike the Blues' generalities about how insurers make decisions, the Providers' damages model specifically examines the extent to which Blue Plans compete against each other when they are permitted to do so. Consistent with other evidence in this case that the Blues would compete against each other if given the chance, the Providers' analysis finds significant Blue-on-Blue competition. *See infra* Part III.

Turning to the facts themselves, the Providers do not dispute Facts 1, 4, 5, and 12. The Providers dispute the remaining facts as follows:

2. **Disputed.** BlueCard is one of the tools the Blues use to maintain their Exclusive Service Areas (ESAs). Because the Blues can aggregate their market power and pay providers at the local Blue Plan's contracted reimbursement rates, they have reduced their incentive to compete with each other by selling healthcare financing services or contracting with healthcare providers outside their ESAs.

3. **Disputed.** Although the Blue Cross Blue Shield Association (BCBSA) has granted BCBS-AL the exclusive right to use the Blue Marks in Alabama (with certain exceptions, such as contiguous county contracting, national accounts, and ceding), that right was not the BCBSA's to give because the Blue Marks had long since been abandoned. Doc. No. 2749 (Provider's Trademark Motion for Summary Judgment) at 1–7. Moreover, if BlueCard were eliminated tomorrow, Blue Plans would have an incentive to eliminate or relax ESAs, which they could do through their joint control of BCBSA.

6. **Disputed.** The Providers' theory of harm for healthcare providers, including Alabama hospitals, is also found in the report of Dr. H.E. Frech, III. Doc. No. 2454-3 (Frech Report) ¶¶ 301–35, 389–98.

7. **Disputed.** As described in Part I below, Drs. Haas-Wilson and Slottje did not assume entry into Alabama by other Blue Plans in all of their damages scenarios.

8–9. **Disputed.** When the Blues discuss the "Providers' damages theory for service areas," they apparently mean damages arising from the Blues' agreements not to sell healthcare financing services outside their ESAs. *See* Motion at 4–5 (describing the "Providers' damages estimates for service areas" as depending on an assumption that other Blue Plans would have taken

market share from BCBS-AL, and referring to entry "to sell insurance"). As described in Part I below, Drs. Haas-Wilson and Slottje did not assume entry into Alabama to sell healthcare financing services in all of their damages scenarios.

10.     **Disputed.** As the Blues' own quotations state, Dr. Haas-Wilson and Dr. Slottje do have an opinion on when a second Blue would have entered Alabama to sell insurance: long enough before the beginning of the class period to take market share from BCBS-AL. And as described in Part I, Drs. Haas-Wilson and Slottje did not assume entry into Alabama to sell healthcare financing services in all of their damages scenarios.

11.     **Disputed.** In only one of the Providers' seven damages scenarios is "the hypothetical blocked entry of a second Blue to sell insurance" the sole conduct that underpins the Providers' estimate of damages. Doc. No. 2454-6 (Haas-Wilson Report) ¶¶ 529–37. As described in Part I, three of the Providers' damages scenarios do not involve blocked entry to sell insurance at all.

13.     **Disputed.** Dr. Haas-Wilson identified a number of likely candidates for entry, including Anthem and HCSC, both of which have larger market shares in Alabama than other insurers who have built networks in the state. Doc. No. 2454-6 (Haas-Wilson Report) ¶ 326. Other likely candidates are BCBS-MS, BCBS-TN, BCBS-FL, and Anthem BCBS-GA, two of which have a sizeable market share in markets on the Alabama side of the border, and all of which have substantial shares on their side of the border that drop off substantially on the Alabama side of the border. *Id.* ¶ 327. Additionally, Blue Plans whose states host many employees of large national accounts based in Alabama would have an incentive to compete in Alabama, including Anthem, BCBS-AZ, BCBS-TN, BCBS-FL, BCBS-LA, BCBS-MS, and HCSC. *Id.* ¶ 328. Anthem in particular has expressed a desire to compete in all fifty states. *Id.* ¶ 330. Dr. Haas-Wilson also cited

record evidence of Blue Plans requesting cedes from BCBS-AL for national accounts, which constitutes direct evidence of those Plans' desire to pursue business in Alabama. *Id.* ¶ 329.

14. **Disputed.** Dr. Haas-Wilson's report does not state that "out-of-area Blues would have attracted the same customers as they had from July 24, 2008 to present under the current Blue system." Her model is agnostic about the identity of the Blues' customers. Instead, she reaches conclusions about the market share of the various Blues in her damages scenarios based on a multiple regression analysis. *See* Part III below.

15. **Disputed.** As the Blues' own quotations state, Dr. Haas-Wilson and Dr. Slottje do have an opinion on when other Blues would have entered Alabama to contract independently with Providers: long enough before the beginning of the class period to have established provider networks.

16. **Disputed.** BlueCard is the Blues' attempt at a solution to the self-imposed problem of Exclusive Service Areas. The cited portions of Dr. Murphy's report say nothing about why BlueCard was adopted, nor do they draw any firm conclusions about the degree to which BlueCard was responsible for the Blues' growth. Docs. 2564-49 & 2565-50 (Murphy 7/15/2019 Report) ¶ 107 & Ex. 24. Dr. Murphy simply assumes, based on nothing that he cites, that BlueCard must have been a cause—a prime example of the *post hoc ergo propter hoc* fallacy. The increase in Blue enrollment from 65 million in 1995 to 100 million in 2013 can be attributed to many things other than BlueCard, including the increase in the United States population of about 55 million people during that time, as well as economic factors. U.S. Census Bureau Population Estimates, http://bit.ly/2uQgQFS, https://bit.ly/3j1KBPC; Doc. 1431-64 at 144:16-146:25 (Kolodgy Tr.), Doc. 1431-65 (Kolodgy Ex. 20 at 10). Even if increased Blue enrollment can be attributed to BlueCard, the Blues have not claimed that the price-fixing aspect of BlueCard specifically is

responsible. Had they done so, they would run afoul of binding Supreme Court precedent, which rejected a medical society's claim that "the doctors' agreement not to charge certain insureds more than a fixed price facilitates the successful marketing of an attractive insurance plan." *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 349 (1981).

17–18. **Disputed.** The Blues had been integrating their networks to create broad geographic coverage for decades before BlueCard was introduced. Local plans did compete with the uniform nationwide offerings of commercial insurers by forming syndicates, which offered uniform benefits by the mid-1950s. 1431-6 (BCBSA00050066, 145). By 1953, Blue plans were part of 240 syndicate agreements covering more than a million subscribers, with participation expected to double by 1955. *Id.* at 146. The testimony of the CEO of BCBS-AL that BCBS-AL's national accounts business would be "almost nothing" without BlueCard is irrelevant because the Providers are not seeking to enjoin the BlueCard program in its entirety. Integration of the Blues' networks differs from price fixing, which is the aspect of BlueCard the Providers have challenged.

19.     **Disputed.** While Dr. Frech discussed problems with the Blues' efforts at collaboration before BlueCard, he did not testify that those efforts were "not effective." Doc. No. 2782-7 (Frech 1/11/21 Tr.) at 96:13–98:1. Nor did he state or imply that the price-fixing aspect of BlueCard, which the Providers challenge here, was necessary to the effective functioning of BlueCard.

20–24. **Disputed.** The Providers do not dispute that insurers generally analyze multiple factors when deciding whether to sell insurance or contract with providers in a particular location. The record evidence here, however, shows that when the Blues have been allowed to compete against each other, they have done so robustly. Plans have competed against each other using the Blue Cross names and marks in Illinois, Kentucky, Maryland, New York, North Carolina, Ohio,

and Virginia. Doc. 1350-27 (Rotunno Ex. 2-A); Doc. 1350-28 at 47:18-53:8 (Rotunno Tr.). Plans have competed against each other using the Blue Shield names and marks in Idaho, Illinois, Maryland, New York, Ohio, and Wisconsin. Doc. 1350-27 (Rotunno Ex. 2-A); Doc. 1350-28 at 47:18-53:8 (Rotunno Tr.). Dr. Haas-Wilson found that the average homed share of Blue Plans in markets with limited Blue-on-Blue competition is 34.2 percent lower than the average homed share of the Blue Plans in markets without Blue-on-Blue competition, and that this difference is statistically significant. Doc. No. 2454-6 (Haas-Wilson Report) ¶ 460. The Blues appear to agree that they would compete without service areas: Anthem has expressed a desire to compete in all fifty states, *id.* ¶ 330, and the CEO of BCBS-AL testified that if Exclusive Service Areas were abolished, Anthem and other Blues Plans would "be in direct competition" in Alabama. Ex. 1 (Kellogg 7/19/17 Tr.) 74:10–23, 75:22–76:13. Even when the Blues have not been allowed to compete, they have sometimes done so anyway, a form of competition the Blues call "Blue Sharking." Doc. 1350-11 (BCBSA00124434, 451). Moreover, the Blues' review of the evidence is a flawed forward-looking one, starting from the world as it exists with the Blues' restraints and BCBS-AL's status as a dominant firm. Doc. No. 2636-1 (Haas-Wilson Decl.) ¶¶ 33–37 (explaining how forward-looking analyses of entry are flawed because they are tainted by the Blues' anticompetitive conduct). For example, the price-fixing aspect of BlueCard reduces the incentive for Blue Plans to contract with providers outside their service areas, as BCBS-AL's own experience shows. *See infra* Providers' Fact 2.

Even in a world tainted by the Blues' conduct, entry is still possible. Dr. Haas-Wilson reviewed two examples of successful *de novo* entry into Alabama by Complete Health Services, Inc. and Viva Health. Doc. No. 2636-1 (Haas-Wilson Decl.) ¶¶ 48–55. She also examined several examples or successful *de novo* entry from elsewhere in the United States, showing that entry

happened with breadth and depth. *Id.* ¶¶ 56–93. UnitedHealthcare, whose Alabama membership is comparable to Anthem's, contracts with all or virtually all hospitals in the state. *See infra* Providers' Fact 1.

## ADDITIONAL UNDISPUTED RELEVANT MATERIAL FACTS

1.      Non-Alabama Blue Plans have more than 400,000 members in Alabama. Doc. No. 2063 (Standard of Review Opinion) at 14. UnitedHealthcare has approximately as many members in Alabama as Anthem. *Id.* at 13 (150,912 Anthem members in 2016); Doc. No. 2632-1 (Slottje Decl.) ¶ 71 (approximately 148,400 United members from 2008 to 2014). UnitedHealthcare has all or virtually all the hospitals in Alabama in its network. Doc. No. 2632-1 (Slottje Decl.) ¶ 71.

2.      Blue Cross and Blue Shield of Alabama formerly contracted with twenty-nine hospitals in counties contiguous to Alabama, but it terminated all of those contracts because it could obtain lower reimbursement rates through the BlueCard program. Doc. 1350-33 at 247:11-15, 251:10-11, 258:3-6 (Baker Tr.).

3.      In 1985, Community Mutual Insurance Company and the Attorney General of Ohio alleged in a suit against the Association that its use of service areas is a *per se* violation of the Sherman Act. Doc. 1350-45 (*Blue Cross and Blue Shield Ass'n v. Community Mut. Ins. Co.*, No. C 85-7872 (N.D. Ohio Oct. 18, 1985) (Findings of Fact and Conclusions of Law)). The Association agreed to a settlement that allowed Community Mutual to compete using the Blue marks throughout the State of Ohio. Doc. 1350-20 (BCBSA00188064) (Tresnowski Letter).

4.      In the 1980s, the Attorney General of Maryland sued the Association, alleging that its use of service areas is a *per se* violation of the Sherman Act. Doc. 1350-21 (BCBSA02722338) (Settlement Agreement). The Association agreed to a settlement that allowed two Plans to compete using the Blue marks throughout the State of Maryland. *Id.* at 342.

**ARGUMENT**

**I.** **The Blues' Motion Rests on a Fundamental Mistake About the Providers' Theory of Damages.**

The linchpin of the Blues' motion to dismiss is this statement about the nature of the Providers' alleged damages: "Providers' asserted damages all flow from the perspective that the challenged Blue rules prevented unidentified Blues from developing Blue-branded business in every Alabama county/CBSA by selling insurance and contracting with hospitals decades before 2008." Motion at 1. This assertion, which the Blues refer to as the "blocked entry" theory, underlies the Blues' argument that the Providers' claims are untimely and their damages are speculative. *Id.* at 12, 25. Not only is this a mistake, but it is a mistake that the Providers pointed out to the Blues when they made it in an earlier *Daubert* motion. Doc. No. 2557-1 (Haas-Wilson *Daubert* Motion) at 1; Doc. No. 2636 (Haas-Wilson *Daubert* Opposition at 4–5. The Blues ignored that correction in their *Daubert* reply brief, *see generally* Doc. No. 2691 (Haas-Wilson *Daubert* Reply), and they ignore it here.

To understand the Blues' mistake, it is necessary to understand the way the Providers have calculated their damages. The Providers' model of damages involves three separate sets of agreements among the Blues:

- Market Allocation Agreements on Selling: The Blues will not sell healthcare financing services under the Blue brands outside their Exclusive Service Areas (with certain exceptions). Doc. No. 2454-6 (Haas-Wilson Report) ¶¶ 91–104.

- Market Allocation Agreements on Contracting: The Blues will not contract with healthcare providers under the Blue brands outside their Exclusive Service Areas (with certain exceptions). *Id.* ¶¶ 78–90.

- Price Fixing Agreements: Healthcare providers must treat patients of out-of-area Blue Plans at the price set by the local Blue Plan, through the BlueCard program. *Id.* ¶¶ 105–125.

Given these agreements, Dr. Haas-Wilson calculates harm in seven potential but-for worlds, each of which she calls a "scenario."[1] In four of these scenarios, Dr. Haas-Wilson assumes that the Court determines that the Market Allocation Agreements on Selling are impermissible,[2] and states that she expects that at least one additional Blue Plan would have been selling healthcare financing services in Alabama in the corresponding but-for world.[3] In three other scenarios, however, Dr. Haas-Wilson assumes that the Court determines that the Market Allocation Agreements on Selling are permissible.[4] For these scenarios, Dr. Haas-Wilson acknowledges that entry to sell would *not* have happened in the relevant but-for world, and that Blue Cross and Blue Shield of Alabama (BCBS-AL) would have remained the *only* Blue Plan selling healthcare financing services in Alabama.[5] Even in these scenarios, she finds that hospitals in Alabama were damaged by the Market Allocation Agreements on Contracting, the Price Fixing Agreements, or both. The Providers' expert Dr. Slottje calculated these damages to be between approximately $1.5 billion and $2.5 billion, depending on the scenario. Doc. No. 2454-14 (Slottje Report) ¶ 88(a), (d), (f). These scenarios all assume "No Entry" by another Blue. *Id.* ¶ 86 (Figure 5).[6] Even if the Blues'

---

[1] Doc. No. 2636-1 (Haas-Wilson Decl.), ¶ 31. Doc. No. 2454-6 (Haas-Wilson Report), Section IX.

[2] Dr. Haas-Wilson assumes that the Market Allocation Agreements on Selling are ruled impermissible in her Scenarios 1, 3, 4, and 6. Doc. No. 2636-1 (Haas-Wilson Decl.) ¶ 31 n. 25.

[3] Doc. No. 2636-1 (Haas-Wilson Decl.) ¶ 31; Doc. No. 2454-6 (Haas-Wilson Report) ¶ 493.

[4] Dr. Haas-Wilson assumes that the Market Allocation Agreements on Selling are ruled permissible in her Scenarios 2, 5, and 7. Doc. No. 2636-1 (Haas-Wilson Decl.) ¶ 31 n. 27.

[5] Doc. No. 2636-1 (Haas-Wilson Decl.) ¶ 31; Doc. No. 2454-6 (Haas-Wilson Report) ¶ 502.

[6] In the real world, out-of-state Blue Plans collectively have about 400,000 members in Alabama. Providers' Fact 1. In this sense, they have already "entered" Alabama. In two of Dr. Haas-Wilson's scenarios, there is no additional entry into Alabama by any Blue Plan, and healthcare providers are allowed to contract directly with these Blue Plans to serve their Alabama members. In another

motion uses "entry" to encompass an out-of-state Blue Plan contracting with an Alabama provider, the Providers still have calculated significant damages in the scenario in which the Blues do not enter Alabama to sell healthcare financing services *or* contract with Alabama providers. Doc. No. 2454-6 (Haas-Wilson Report) ¶¶ 538–42; Doc. No. 2454-14 (Slottje Report) ¶ 88(f).

Because the Providers have multiple theories of damages that do not assume "blocked entry," the Blues are not entitled to summary judgment on the Providers' damages claims even if they are correct that the Providers' allegations of blocked entry are untimely and speculative. And, as the Providers explain below, the Blues are not correct about that either, as their arguments contradict well-established precedent.

## II.     The Providers' Claims Are Timely Because They Arise from Injuries Inflicted Within the Limitations Period.

The Providers maintain that the Blues' Market Allocation Agreements on Selling, Market Allocation Agreements on Contracting, and Price Fixing Agreements each constitute an unlawful conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Providers have calculated damages to Alabama hospitals caused by these conspiracies, based on the difference between the price the hospitals were paid for their services and the price they would have been paid in the absence of these conspiracies. Doc. No. 2604 at 26–27 (Providers' Renewed Class Certification Motion); Doc. No. 2454-6 (Haas-Wilson Report) ¶¶ 323–39. Therefore, the Providers seek damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. *See* Doc. No. 1083 (Consolidated Fourth Amended Provider Complaint) ¶¶ 466–506. While the Blues disagree that their agreements violate the Sherman Act, they do not dispute that they are all parties to these agreements, that they

scenario, there is no additional entry *and* providers cannot contract directly with out-of-state Blue Plans. In this scenario, the damage to providers flows entirely from the Price Fixing Agreements.

have the ability to change these agreements, or that the agreements have been in force throughout this litigation. *See* Doc. No. 2063 (Standard of Review Opinion) at 8–10.

As the Blues point out, a suit for damages under Section 4 of the Clayton Act is subject to a four-year statute of limitations: "Any action to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. The question, then, is when the Providers' causes of action accrued. According to the Blues, the causes of action accrued more than four years before this suit was filed because "Providers have not identified any new conduct occurring during the limitations period (*i.e.*, July 24, 2008 and forward) that caused their damages." Motion at 12. The Supreme Court and the Courts of Appeals, however, have definitively held otherwise: "[E]ach sale made to a consumer pursuant to a price-fixing or market-allocation conspiracy will give rise to a separate claim with its own limitations period, even if these sales were the completely predictable result of a notorious agreement to manipulate the market perfected outside of the limitations period." Kyle Graham, *The Continuing Violations Doctrine*, 43 Gonz. L. Rev. 271, 314 (2008) (summarizing precedent).

In *Zenith Radio Corp. v. Hazeltine Research, Inc.*, the Supreme Court explained when a cause of action "accrues" under the Clayton Act: "In the context of a continuing conspiracy to violate the antitrust laws, … [the Clayton Act] has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." 401 U.S. 321, 338 (1971). That injury occurs every time a plaintiff purchases an item from the defendant at a price affected by the conspiracy:

> Antitrust law provides that, in the case of a "continuing violation," say, a price–fixing conspiracy that brings about a series of unlawfully high priced sales over a

period of years, "each overt act that is part of the violation and that injures the plaintiff," *e.g.*, each sale to the plaintiff, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quoting 2 Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 338b, at 145 (rev. ed. 1995)). The Eleventh Circuit has adopted the same rule: "As a cause of action accrues with each sale, the statute of limitations begins to run anew." *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999) (citing *Klehr*). The continuing violation doctrine applies to ongoing conspiracies beyond price-fixing, including market allocation. *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 736–37 (8th Cir. 2014) ("Under *Klehr*, a monopolist commits an overt act each time he uses unlawfully acquired market power to charge an elevated price."); *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1203 (9th Cir. 2014). Thus, a plaintiff who purchases at an unlawfully high price (or in this case, is paid at an unlawfully low price) because of an ongoing conspiracy may seek damages for purchases made up to four years before filing suit, even if the conspiracy began before the limitations period. That is the plain holding of the Supreme Court in *Klehr*, the Eleventh Circuit in *Morton's Market*, and every other Court of Appeals that has considered this issue.[7]

Here, the Providers have modeled damages based on the difference between what they were paid by the Blues during the limitations period and what they would have been paid had the Blues not conspired. Doc. No. 2454-6 (Haas-Wilson Report) ¶¶ 467–73. This injury—lower

---

[7] *In re Wholesale Grocery Prods.*, 752 F.3d 728, 736–37 (8th Cir. 2014); *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014); *Watson Carpet & Floor Covering, Inc. v. Mohawk, Indus., Inc.*, 648 F.3d 452, 460–61 (6th Cir. 2011); *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 290–91 (4th Cir. 2007); *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1088–90 (10th Cir. 2006); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1171–73 (3d Cir. 1993); *Nat'l Souvenir Ctr. v. Historic Figures, Inc.*, 728 F.2d 503, 509–10 (D.C. Cir. 1984); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979); *Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 126–28 (5th Cir. 1975).

payments caused by harm to competition among buyers—is the monopsony counterpart to the "unlawfully high priced sales" that restart the limitations period in monopoly cases. *Klehr*, 521 U.S. at 179 ("each sale to the plaintiff" at an "unlawfully high price[]" restarts the limitations period); *Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312, 321–22 (2007) (describing the "the close theoretical connection between monopoly and monopsony"). Because the Providers' damages are based entirely on injuries suffered within the limitations period, they are timely. *Morton's Market*, 198 F.3d at 829 ("Should the jury find that plaintiffs purchased milk at fixed prices beyond 1989, even though plaintiffs could have sued in the 1970s, they were equally entitled to sue in 1993.").

Despite the uniform authority against them, the Blues deny that the Providers' claims are timely. Their argument, ostensibly based on *Klehr*, is that "no new overt acts occurring during the limitations period caused any of the damages [the Providers] are seeking." Motion at 19. But the Supreme Court held in *Klehr*, and the Eleventh Circuit held in *Morton's Market*, that each sale to the plaintiff is an "overt act" that injures the plaintiff and restarts the limitations period. *Klehr*, 521 U.S. at 189; *Morton's Market*, 198 F.3d at 828 (quoting *Klehr*). There is no dispute that the Blues paid the Providers during the limitations period, or that the Providers base their damages calculations on these payments. Each of those payments is, as a matter of binding precedent, an "overt act" that restarted the limitations period.

The Blues' claim that their payments to the Providers are not "overt acts" is based on cases in which the plaintiff never made a purchase from (or sale to) the alleged conspirators during the limitations period. In *Klehr*, for example, two farmers bought a grain silo, relying on the manufacturer's representations that the silo would prevent grain from spoiling. 521 U.S. at 183–84. The sale of the silo was the only economic interaction between the farmers and the

manufacturer. *See id.* at 184. Nearly twenty years later, the farmers discovered that the silo did not prevent their grain from spoiling, and they sued the manufacturer under RICO. *Id.* at 185. Because a civil RICO action borrows the statute of limitations from the Clayton Act, the question was whether the manufacturer's acts within the limitations period, such as "such as sales to other farmers or the printing of new … advertisements," restarted the limitations period. *Id.* at 190. The Supreme Court held that they did not, because the farmers had not shown "how any new act could have caused them harm over and above the harm that the earlier acts caused." *Id.* The statement the Blues repeatedly cite from *Klehr*, that a plaintiff "cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period," *id.* at 190, referred to the farmers' attempt to use acts that did not harm them as a means to restart the limitations period for a claim for an act that had harmed them decades ago. But here, the Providers are seeking damages only from acts that harmed them during the limitations period: unlawfully low payments beginning four years before the suit was filed. That is the type of claim that *Klehr* held a plaintiff may bring. *Id.* at 189.

The Blues' main authority from the Eleventh Circuit explicitly contradicts their position as well. In *Midwestern Waffles*, a franschisor refused to grant the plaintiffs a franchise years before the limitations period began, due to a market allocation agreement. Motion at 14 (citing *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705 (11th Cir. 1984)). The plaintiffs' alleged damages flowed from that refusal, not any purchases or sales during the limitations period. *Midwestern Waffles*, 734 F.2d at 715 ("Plaintiffs have not shown that the damages they seek for the alleged horizontal territorial allocation could not have been proved at the time defendants first told them no Alabama franchise was available."). In a part of the opinion the Blues fail to cite, however, the Eleventh Circuit considered an alleged tying arrangement by the same franchisor,

which may have affected the price of purchases made by the plaintiff during the limitations period. *Id.* at 711–13. Here, the Eleventh Circuit noted, "Defendants do not contend plaintiffs' tying claim is barred because each payment under a contract which constitutes an illegal tie is new injury." *Id.* at 714. Thus, for the portion of the claim that more closely resembled the Providers' claim in this case, it was well understood that the statute of limitations was no bar to recovery.

The Blues' other authorities likewise do not involve purchases from or sales to an ongoing conspiracy. The Eleventh Circuit's unpublished opinion in *Bray v. Bank of America Corp.* involved a plaintiff who conceded that the statute of limitations began to run more than four years before he brought suit, but argued that a supposedly threatening email restarted it. 784 F. App'x 738, 740 (11th Cir. 2019). The Court concluded that the continuing violation doctrine did not apply because the email was not threatening and was unrelated to the economic harm the plaintiff alleged. *Id.* at 741. In *Premier Concrete LLC v. Argos North America Corp.*, the plaintiffs alleged no purchases from the conspirators—or even any injury at all—during the limitations period. 2021 WL 1209354, at *6 (N.D. Ga. Mar. 31, 2021). Both opinions reiterated that if the plaintiffs had alleged purchases from conspirators during the limitations period, their claims would not have been barred. *Bray*, 784 F. App'x at 741; *Premier Concrete*, 2021 WL 1209354, at *6. The Blues have not identified a case with facts remotely resembling this one in which the continuing violation doctrine failed to apply.[8]

---

[8] *See also Kaw Valley Elec. Co-op Co. v. Kan. Elec. Power Co-op, Inc.*, 872 F.2d 931, 932–33 (10th Cir. 1989) (plaintiff alleged a refusal to deal, but no purchases from the conspirators); *Farbenfabriken Bayer, A.G. v. Sterling Drug, Inc.*, 153 F. Supp. 589, 591–92 (D.N.J. 1959) (plaintiff was a competitor, not a customer, who alleged no purchases from the defendant; also, the case did not apply the Clayton Act's statute of limitations, and it preceded the Supreme Court's opinion in *Zenith*); *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 69–70 (9th Cir. 1979) (plaintiff alleged that its product had been excluded from the market; plaintiff did not allege any purchases during the limitations period); *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 598, 602 (6th Cir. 2014) (completed acquisition of a competitor that allowed the acquirer to charge higher

Because their damages accrued entirely during the limitations period, the Providers are not relying on a "snowball" model of damages like the one in *Gumwood HP Shopping Partners, L.P. v. Simon Property Group, Inc.*, 221 F. Supp. 3d 1033. In that case, the plaintiff did not purchase anything from the defendant at all; it was a shopping mall that complained that its competitor's unilateral conduct, which occurred before the limitations period, caused it to lose tenants before and during the limitations period. *Id.* at 1043–45. The effects of that conduct were described as a snowball because "the loss of one or more key tenants at a shopping center can have spillover effects and cause the center to lose revenues from other actual and prospective tenants, as well." *Id.* at 1037. The District Court held that this created a limitations problem because the plaintiff "can only recover damages for those new injuries that accrued within the limitations period[,]" and the expert testimony did not specify what portion of the plaintiff's damages accrued before the limitations period began, and what portion occurred after. *Id.* at 1043–45.[9] The Providers, on the other hand, have limited their damages claim to discrete events that all occurred within the limitations period: the Blues' purchases of their services within four years of filing the complaint.

At the heart of the Blues' argument is their confusion about "the difference between facts and claims." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 460 (6th Cir. 2011). Once it is determined that a *claim* has accrued during the limitations period (as it has here, because the Providers were paid less during the limitations period due to the Blues'

---

prices was not a continuing violation; continuing violation doctrine would have applied if the plaintiff had alleged an ongoing conspiracy); *Barnosky Oils, Inc. v. Union Oil Co. of Cal.*, 665 F.2d 74, 80–82 (6th Cir. 1981) (theory of harm was that the defendant oil company refused to allow the plaintiff oil wholesaler to sell gasoline to a particular retailer, via an agreement that pre-dated the limitations period; the plaintiff did not allege any harm based on purchases it made from the defendant).

[9] Dr. H.E. Frech III, who is one of the Providers' experts here, was the expert in *Gumwood*. Here, Dr. Frech has not quantified damages. And the methodology he used in *Gumwood* differs fundamentally from the methodology Dr. Haas-Wilson uses in this case.

ongoing conspiracy), a plaintiff can rely on *facts* occurring before the limitations period to support its claim for damages. For example, in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, the plaintiff, a shoe manufacturer, alleged that the defendant, a distributor of shoe machinery, had monopolized the shoe machinery market by leasing and refusing to sell its machines. 392 U.S. 481, 483–84 (1968). The plaintiff had been impacted by the "lease-only" policy as early as 1912, but the plaintiff did not sue until 1955. *Id.* at 502 n.15. Nevertheless, the Supreme Court allowed the plaintiff to sue for damages it suffered within the limitations period: "[W]e are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on [the plaintiff] Hanover. Although Hanover could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955." *Id.* Likewise, the Supreme Court held three years later in *Zenith* that the plaintiff, who filed suit in 1963, was entitled to seek "damages suffered during the 1959–1963 period as a result of pre-1954 conduct of the conspiracy." 401 U.S. at 340. To turn a blind eye to anticompetitive conduct before the limitations period, the Court explained, would deprive plaintiffs of the opportunity to recover for certain meritorious claims. *Id.* at 340–42. The Eleventh Circuit applied this same principle in *Morton's Market*: "Should the jury find that plaintiffs purchased milk at fixed prices beyond 1989, even though plaintiffs could have sued in the 1970s, they were equally entitled to sue in 1993." 198 F.3d at 829 (citing *Hanover Shoe*).

The Eighth Circuit has explained the absurdity that would result from the Blues' argument that damages cannot be based on a market allocation that pre-dated the limitations period, even if the plaintiff's injury occurs within the limitations period:

> If the [defendants'] logic were accepted, two parties could agree to divide markets for the purpose of raising prices, wait four years to raise prices, then reap the profits of their illegal agreement with impunity because any antitrust claims would be time

barred. That is not the law. Under *Klehr*, a monopolist commits an overt act each time he uses unlawfully acquired market power to charge an elevated price.

*In re Wholesale Grocery*, 752 F.3d at 736; *see also* Louis Altman & Maria Pollack, 6 Callmann on Unfair Competition, Trademarks, and Monopolies § 23:32 (4th ed.) ("Where the defendants consummated an unlawful horizontal division of geographic markets, they restarted the statute of limitations each time they used the resulting acquired power in one of those markets to charge an elevated price."). The rule the Blues advocate would also wipe out "pay-for-delay" suits, in which plaintiffs claim that they paid more for drugs because the defendants colluded to block generic entry into the market, often more than four years before the plaintiffs suffered any harm. "Virtually every court faced with similar allegations [that the defendant illegally obtained a monopoly before the limitations period] has held, citing the continuing-violation doctrine, that a new cause of action accrues to purchasers upon each overpriced sale of the drug." *Mayor of Baltimore v. Actelion Pharms., Ltd.*, 995 F.3d 123, 132 (4th Cir. 2021) (citing numerous cases) (internal quotations marks omitted). It is not surprising that the Blues are unable to locate a single case, anywhere in the country, in which a plaintiff paid a supracompetitive price (or was paid a sub-competitive price) during the limitations period due to the defendant's unlawful monopoly or conspiracy, but was unable to recover damages because the monopoly had been acquired or the conspiracy had begun before the limitations period.

Without any relevant precedent on their side, the Blues turn to a policy argument: that it would be unfair for Providers to "recover damages caused by blocked entry decades ago," when "Providers have known about their supposed claims from the outset." Motion at 22. As a reminder, "blocked entry" is not the Providers' only theory of damages. But even if it were, the Blues' policy argument would be misplaced for several reasons. First, policy arguments should be "addressed to legislators or administrators, not to judges." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council,*

*Inc.*, 467 U.S. 837, 864 (1984). Second, existing law has already taken policy arguments like the Blues' into account when developing the Clayton Act's statute of limitations and the continuing-violation doctrine. *E.g.*, *Klehr*, 521 U.S. at 187–89 (recognizing defendants' interest in repose but reiterating that each sale to the plaintiff begins the statute of limitations anew). Third, the premise of the Blues' argument—that "Providers have not pointed to any new conduct occurring during the limitations period (as distinct from the effects felt from old blocked entry) that caused their alleged damages," Motion at 22—flatly contradicts binding law that each purchase of the Providers' services is itself new conduct by the Blues that caused the Providers' alleged damages. *Hanover Shoe*, 392 U.S. at 502 n.15; *Zenith*, 401 U.S. 321, 338; *Klehr*, 521 U.S. at 189; *Morton's Market*, 198 F.3d at 828. Fourth, the policy of antitrust law, which is to promote competition, does not recognize a defendant's interest in continuing to reap the rewards of unlawfully obtained market power through an ongoing conspiracy. The Blues especially cannot claim some sort of reliance interest in their agreements not to compete against each other, as they should have known for a long time that a challenge like this would come. When the Attorney Generals of Maryland and Ohio and one of the Ohio Blue Plans challenged the Blues' rules as *per se* antitrust violations in the 1980s, the Blues temporarily allowed competition in those states to settle the cases and avoid an adverse ruling, but they did not change their practices elsewhere. Providers' Facts 3–4. Fifth, the continuing-violation doctrine does give plaintiffs an incentive not to sleep on their claims, by limiting damages to those accrued in the four years before the complaint was filed. Here, although some of the Providers have been injured for decades by the Blues' conduct, they cannot seek any damages that accrued before 2008. Graham, *The Continuing Violations Doctrine*, 43 Gonz. L. Rev. at 315 ("Limiting the plaintiff to recovery for harm suffered within the limitations period … comes across as an appropriate "penalty."). Sixth, the Supreme Court has held that in the context of a

continuing violation, a plaintiff's prior knowledge of the defendant's conduct is irrelevant. *Hanover Shoe*, 392 U.S. at 502 n.15.

In short, neither antitrust law nor antitrust policy allow the Blues to participate in a decades-long conspiracy that injures healthcare providers every day, and then claim that those providers are out of luck when then seek damages that are currently accruing.

## III.    The Providers' Damages Calculations Come from a Multiple Regression Model, Not "Speculation and Guesswork."

In an antitrust case, "it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981) (internal quotation marks omitted). "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946). For this reason, "[e]stimates are permissible and unavoidable in antitrust damages computations." *Fla. Mun. Power Agency v. Fla. Power & Light Co.*, 64 F.3d 614, 617 (11th Cir. 1995) (citing *J. Truett Payne*); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 533 (6th Cir. 2008) ("Once liability is established, therefore, a plaintiff's proof of damages is evaluated under a more lenient standard."). And "juries are allowed to act on probable and inferential as well as (upon) direct and positive proof." *Bigelow*, 327 U.S. at 264 (internal quotation marks omitted). Dr. Haas-Wilson's model of the Providers' damages clears this lenient standard by a mile.

### A.    The Providers Calculate Damages by Applying Widely Accepted Methods to Real-World Data.

The first part of Dr. Haas-Wilson's model is an empirical analysis that measures the extent to which the prices paid to General Acute Care hospitals are related to the market share of

commercial buyers.[10] Dr. Haas-Wilson assembled a database of claims from the Blue Plans, Aetna, UnitedHealthcare, and Humana across nearly all states for five years. Doc. No. 2454-6 (Haas-Wilson Report) ¶ 408. With this database, Dr. Haas-Wilson constructed measures of average prices paid to hospitals by each commercial buyer, in each year, for inpatient and outpatient services. *Id.* ¶¶ 409–10. These measures were normalized by adjusting for the mix and complexity of services provided. *Id.* ¶ 411. Dr. Haas-Wilson also constructed commercial buyer shares for Blue Plans and non-Blue Plans in each relevant market. *Id.* ¶ 413. For each hospital, Dr. Haas-Wilson also collected more than a dozen data points about each of the hospitals in her database, such as the hospital's market share, the median household income in the hospital's county, and whether the hospital is rural. *Id.* ¶¶ 422, 434, 437; *id.* Ex. E. She then performed a multiple regression analysis to determine the extent to which a commercial buyer's market share affects prices paid to hospitals, while controlling for many other factors that might affect those prices. *Id.* ¶¶ 433–34. The result was a statistically significant negative relationship between buyer market share and prices—that is, when market share increased, prices decreased. *Id.* ¶ 434, 437. This finding was consistent with the academic literature, which has found a similar negative relationship between commercial buyer concentration and prices. *Id.* ¶¶ 403–06. This finding was also robust to alternative specifications, meaning that when Dr. Haas-Wilson changed the model, the result was still statistically significant. *Id.* ¶¶ 440–43.

The second part of Dr. Haas-Wilson's model measures the extent to which Blue Plans' "homed shares,"[11] a measure of Blue Plans' market share, are associated with the presence (or

---

[10] Because General Acute Care hospitals are the only type of hospital at issue in this brief, the Providers will refer to them simply as "hospitals."

[11] A Blue Plan's "homed share" in a given market is the number of that plan's enrollees in that market divided by the total commercial enrollment in that market.

absence) of limited Blue-on-Blue competition in the Service Areas of those Blue Plans. Here, Dr. Haas-Wilson compared the incumbent Blue Plan's homed share in markets without any Blue-on-Blue competition to the incumbent Blue Plans' homed share in markets with limited Blue-on-Blue competition. *Id.* ¶ 449. This comparison is conservative because the Blues' agreements restrict competition among Blue Plans even in markets with limited Blue-on-Blue competition. *Id.* Applying another regression analysis to data on Blue market shares from Core-Based Statistical Areas (CBSAs) and counties across the country, Dr. Haas-Wilson found that the average homed share of Blue Plans in markets with limited Blue-on-Blue competition is 34.2 percent lower than the average homed share of the Blue Plans in markets without Blue-on-Blue competition, and that this difference is statistically significant. *Id.* ¶ 460. This analysis controlled for factors such as CBSAs crossing state borders, or changes from year to year. *Id.* ¶ 456. Dr. Haas-Wilson performed sensitivity checks by adjusting her model, and the result remained statistically significant. *Id.* ¶ 461. Thus, Dr. Haas-Wilson confirmed empirically the intuitive result that when Blues are allowed to compete against each other, they do, at the expense of each other's market share. *Id.* ¶ 462. That result is consistent with historical examples of Blue-on-Blue competition, the Blues' own acknowledgment that without Exclusive Service Areas, "there would be open warfare," and the publicly stated desire of Anthem (the largest Blue Plan) to compete nationwide. Doc. No. 2454-6 (Haas-Wilson Report) ¶¶ 361–75; Doc. No. 2454-3 (Frech Report) ¶ 306; Doc. No. 2063 (Standard of Review Opinion) at 13, 20.

With these two results—the negative relationship between commercial buyer share and hospital prices, and the finding that Blue-on-Blue competition reduces the homed share of Blue Plans—Dr. Haas-Wilson used her model to calculate damages for every hospital in Alabama under seven different "but-for" scenarios, taking into account the unique characteristics of each hospital.

Doc. No. 2454-6 (Haas-Wilson Report) ¶¶ 467–542.[12] In all seven scenarios, she found that the Blues' agreements damaged every hospital. *Id.* ¶ 547.

### B. A Sophisticated Multiple Regression Model That Controls for Important Variables Is Not "Speculation and Guesswork."

To the Blues, Dr. Haas-Wilson's work, which is likely the most robust analysis of the effect of insurer competition on hospital prices ever performed, is just "speculation and guesswork." Motion at 23. Because they have moved for summary judgment, the Blues implicitly contend that her work is not just "speculation and guesswork," but that its worthlessness is beyond any genuine dispute. Their argument for this proposition is that the Providers have not pinpointed which Blue Plan would have entered the market and when.

Dr. Haas-Wilson's methodology, however, is a widely accepted one for calculating the effect of reduced competition. Because the Providers are seeking the difference between what they were paid and what they would have been paid in a world without the Blues' agreements not to compete and to fix prices, their claims are analogous to "overcharge" claims, for which the measure of damages is the difference between the price the plaintiff paid and the price it would have paid in a world without the unlawful restraint. *E.g.*, *Hanover Shoe*, 392 U.S. at 487–88; Doc. No. 2454-14 (Slottje Report) ¶¶ 26–28 (explaining the overcharge methodology and its application to cases involving underpayments). One of the best ways to calculate the overcharge is through a multiple regression analysis, which compares conditions in a market unaffected by the restraint on competition with the affected market, while controlling for other factors that might affect those conditions. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 566 (11th Cir. 1998) ("multiple regression analysis [is] a methodology that is well-established as reliable"); *Matter of*

---

[12] Three of these scenarios did not involve any additional entry into Alabama by other Blue Plans. Doc. No. 2454-6 (Haas-Wilson Report) ¶¶ 487–542. For these three scenarios, the Blues' argument that entry is speculative does not apply. *See supra* Part I.

*Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 954 F.2d 1279, 1320 (7th Cir. 1992) ("If done right, regression analysis permits an inference of causation, and of the size of the effect."); *In re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336, 419 (M.D. Fla. 2018) (in an overcharge case, plaintiffs can demonstrate predominance by using a regression model to show that a conspiracy raised prices above the "but-for" level for all plaintiffs); *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 429–32 (E.D. Pa. 2015) (rejecting a challenge to a regression analysis that calculated overcharges for egg products due to collusion); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 689–92 (N.D. Ga. 1991) (rejecting a challenge to an expert's calculation of overcharges based on regression analysis). In their motion for summary judgment, the Blues do not point out anything wrong with Dr. Haas-Wilson's multiple regression analysis, or dispute that the data show that when the Blues are allowed to compete, they do so, and take significant market share from each other.

The Blues' own authorities reveal just how different the Providers' analysis is from one that relies on speculation. In *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, for example, the plaintiff alleged that the defendant forced it out of business. 175 F.3d 18, 22 (1st Cir. 1999). The First Circuit held that although the plaintiff was entitled to damages in the amount of its going-concern value, that value had to be calculated as of the time the plaintiff went out of business, because calculating years' worth of financial results for a non-existent business would require "speculation and conjecture." *Id.* at 27. Here, the Providers are doing no such thing. They are seeking damages based on reduced prices of services they actually provided during the limitations period, and they have calculated that reduction in price with a regression analysis based on real-world data. In *Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*, the plaintiff's expert calculated future lost profits using assumptions unsupported by, and sometimes

contradicting, the plaintiff's actual financial records. 710 F.2d 752, 786–89 (11th Cir. 1983). The Providers have not calculated any future damages; they seek past damages based on data whose accuracy the Blues have not questioned. In *Keener v. Sizzler Family Steak Houses*, the only evidence of damages was the plaintiff's own personal speculation about how much his sales would have increased in the absence of the alleged conspiracy. 597 F.2d 453, 457 (5th Cir. 1979). A robust empirical analysis using well-accepted statistical methods for calculating damages is completely different. The list goes on, but the common thread is that the damages estimates in these cases did not remotely approach the level of sophistication and care the Providers have employed.[13]

---

[13] *E. Auto Distribs., Inc. v. Peugeot Motors of Am., Inc.*, 795 F.2d 329, 337–38 (4th Cir. 1986) (assumptions about plaintiff's growth in the absence of anticompetitive were either unsupported by any evidence or failed to take account of important factors); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1352–53 (3d Cir. 1975) (plaintiff's experts made no attempt to distinguish between the effects of unlawful acts and lawful competition, failed to account for important factors, and did not offer "any rational explanation" for one of their results); *Va. Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*, 108 F. Supp. 2d 549, 596–97 (W.D. Va. 2000) (plaintiff used unrealistic assumptions to estimate twenty years of future lost profits); *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1124–26 (E.D. Cal. 2002) (plaintiff's expert offered no evidence of damages; plaintiff made his own calculation of damages based on speculation about his success in future golf tournaments, without any theoretical foundation); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (one expert never tied his estimate of lost profits to anything the defendant did, acknowledging that the cause of the plaintiff's decline in sales "theoretically could have been anything"; another expert misrepresented his methodology, which had no sound basis); *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1260–63 (9th Cir. 1981) (damages estimate depended on the unrealistic assumption that a dominant firm would not cut its prices in response to competition); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 382–83 (7th Cir. 1986) (plaintiff's assumption that it could have earned a 191% return on investment "bore no relation to [its] internal business planning or to economic reality"); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 929–30 (3d Cir. 1999) (link between tobacco companies' conspiracy to withhold information about the dangers of smoking and welfare funds' increased costs was "extremely indirect" and depended on a five-link causal chain; court noted that a conspiracy to exclude competition that results in higher prices to the plaintiff is not indirect or speculative); *Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) (plaintiffs could not calculate damages based on "generalized or abstract societal harms" based on the alleged loss of technologies that never existed).

The Eleventh Circuit's opinion in *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264 (11th Cir. 2013), does not help the Blues either. In that case, the plaintiff alleged harm due to the defendant's monopolization of the market for television audience measurement services. The Eleventh Circuit determined that the plaintiff was not an "efficient enforcer" of the antitrust laws because it could not identify another company "willing and able" to compete with the defendant, and because it was not an efficient enforcer, it lacked antitrust standing. *Id.* at 1272–73. The first problem with *Sunbeam*, as the Blues acknowledge, is that it is a case about antitrust standing, not damages, and the Blues have not challenged the Providers' standing. Motion at 24 n.6. If this case gets to the damages phase, the Providers will have established that the Blues violated the antitrust laws. And if the Blues violated the antitrust laws, the Providers need only meet the more lenient standard for proving damages, which reflects the unfairness of asking for exactitude when the defendants' actions themselves have made exactitude impossible. *See J. Truett Payne*, 451 U.S. at 566–67; *Bigelow*, 327 U.S. at 264. Because the plaintiff in *Sunbeam* lacked antitrust standing, it could not prove an antitrust violation and thus take advantage of the lenient standard. The plaintiff's burden in *Sunbeam* and the Providers' burden here are not comparable, and *Sunbeam* has never been extended beyond the context of standing. The second problem with *Sunbeam* is that the "blocked entry" that underlies some (but not all) of the Providers' damage scenarios resulted from a conspiracy to divide markets in violation of Section 1 of the Sherman Act, while *Sunbeam* was about single-firm monopolization under Section 2. In light of the Supreme Court's warning against letting wrongdoers profit from their wrongdoing, *Bigelow*, 327 U.S. at 264, it would make little sense to require a plaintiff to show that a defendant contractually prohibited from entering a market pursuant to an unlawful agreement was willing and able to do so. The agreement itself is evidence that there were willing

and able entrants; if no one were willing and able to compete, the agreement would have been unnecessary. The third problem with *Sunbeam* is that the plaintiff had not provided enough evidence to create even a disputed issue of fact on the existence of a company that was both willing and able to compete. 711 F.3d at 1273; *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 763 F. Supp. 2d 1341, 1355–57 (S.D. Fla. 2011) (discussing the lack of evidence). Here, Anthem, which is the largest Blue Plan and the second-largest health insurer in the United States, has testified under oath that it would be "exhilarating" if it could "be a national plan that operates in all 50 states and have unfettered access" to customers, but that it cannot do so because of the Blues' agreements. Doc. No. 2454-6 (Haas-Wilson Report) ¶ 330. Thus, Anthem has admitted that it is willing to compete in Alabama, and it would be able to do so but for the Blues' agreements not to compete. Even if this were not a party admission, it suffices to create a disputed issue of fact. In addition to this evidence, Dr. Haas-Wilson has also shown empirically that when the Blues are allowed to compete against each other, they do so. The plaintiff in *Sunbeam* had no such evidence.[14]

The Blues' remaining arguments about "blocked entry" similarly demand a specificity that the law does not require. Again, "[e]stimates are permissible and unavoidable in antitrust damages computations." *Fla. Mun. Power Agency*, 64 F.3d at 617. When the Blues themselves have precluded competition through unlawful agreements, it "does not come with good grace" for them to demand that the Providers nail down the exact areas of Alabama in which they would have competed. *J. Truett Payne*, 451 U.S. at 566–67. Nor must the Providers identify exactly when entry would have occurred; in *Hanover Shoe*, the Supreme Court allowed damages claims to proceed

---

[14] The same distinctions apply to *UPPI, LLC v. Jubilant Draximage Inc.*, 2020 WL 6220818 (S.D. Ala. Sept. 18, 2020), *report and recommendation adopted*, 2020 WL 6219793 (S.D. Ala. Oct. 22, 2020), which applied *Sunbeam* in the context of a motion to dismiss.

when the defendant's monopolization had affected the plaintiff for forty-three years before the plaintiff filed suit. 392 U.S. at 502 n.15. The record in this case is more than enough to allow the Providers' damages claims to go to a jury.

**C.    The Providers' Model of Damages Arising from BlueCard and Contracting Restrictions Is Consistent with the Evidence.**

With respect to the Blues' Market Allocation Agreements on Contracting, the Blues claim that there is no record evidence that the out-of-state Blues would contract with the same hospitals with which BCBS-AL contracts. Yet the Blues do not dispute that they need a way to access Alabama hospitals to serve their more than 400,000 Alabama members. Moreover, the Providers have shown that the Blues' competitor United, whose membership in Alabama is comparable to Anthem's, contracts with all or virtually all Alabama hospitals. Providers' Fact 1. A jury would be entitled to infer that Anthem and other large Blue plans would do the same if it were necessary to serve their Alabama members.

Finally, the Blues' criticism of the Providers' BlueCard damages misses the point by focusing on what might happen if BlueCard did not exist. Motion at 28. The Providers are not seeking to enjoin BlueCard; they are seeking to enjoin the price-fixing aspect of BlueCard, which requires healthcare providers to participate in BlueCard at BCBS-AL's reimbursement rates if they contract with BCBS-AL. Doc. No. 2454-6 (Haas-Wilson Report) ¶¶ 333–35 (explaining the Providers' theory of harm from the price-fixing aspect of BlueCard); Doc. No. 2729 (Providers' Motion for Partial Summary Judgment on the Standard of Review for Group Boycott Claims) at 7 n.2 (explaining the relief the Providers seek). If the Blues want to offer healthcare providers the option to participate in BlueCard, or to continue to pursue the administrative convenience that they claim BlueCard provides, they are welcome to do so. The Blues do not need to fix prices to offer

inter-plan processing of claims, and therefore it is not speculative for the Providers to seek damages associated with BlueCard's price fixing.

## CONCLUSION

If this case reaches the damages phase, it will mean that the Providers have proven that the Blues have conspired to manipulate the market to the detriment of healthcare providers for decades, and that this harm is ongoing. The Blues' argument that they are now immune from liability for damages because they have been breaking the law for so long does not come with good grace. Moreover, the Providers have built a sophisticated, robust, and sensible model of their damages, based on the Blues' own behavior in areas where they are allowed to compete. The motion for summary judgment should be denied.

Dated: August 20, 2021                    Respectfully submitted,

/s/ Edith M. Kallas                          /s/ Joe R. Whatley, Jr.
Edith M. Kallas – *Co-Lead Counsel*          Joe R. Whatley, Jr. – *Co-Lead Counsel*
WHATLEY KALLAS, LLP                          W. Tucker Brown
152 West 57th Street                         WHATLEY KALLAS, LLP
41st Floor                                   2001 Park Place North
New York, NY 10019                           1000 Park Place Tower
Tel: (212) 447-7060                          Birmingham, AL 35203
Fax: (800) 922-4851                          Tel: (205) 488-1200
Email: ekallas@whatleykallas.com             Fax: (800) 922-4851
                                             Email: jwhatley@whatleykallas.com
                                                    tbrown@whatleykallas.com

Patrick J. Sheehan                           Deborah J. Winegard
WHATLEY KALLAS, LLP                          WHATLEY KALLAS, LLP
101 Federal Street                           1068 Virginia Avenue, NE
19th Floor                                   Atlanta, GA 30306
Boston, MA 10019                             Tel: (404) 607-8222
Tel: (617) 573-5118                          Fax: (404) 607-8451
Fax: (617) 371-2950                          Email: dwinegard@whatleykallas.com
Email: psheehan@whatleykallas.com

Henry C. Quillen
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH 03801
Tel: (603) 294-1591
Fax: (800) 922-4851
Email: hquillen@whatleykallas.com

Charles Clinton Hunter
HAYES HUNTER PC
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel: (281) 768-4731
Fax: (713) 583-7047
Email: chunter@hayeshunterlaw.com

Dennis Pantazis – *Plaintiffs' Steering Committee*
Brian Clark – *Discovery Committee*
WIGGINS CHILDS PANTAZIS FISHER
  GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel: (205) 314-0500
Fax: (205) 254-1500
Email: dgp@wcqp.com
        bclark@wcqp.com

E. Kirk Wood, Jr. – *Local Facilitating Counsel*
WOOD LAW FIRM LLC
P. O. Box 382434
Birmingham, AL 35238
Tel: (205) 612-0243
Fax: (205) 705-1223
Email: ekirkwood1@bellsouth.net

Aaron S. Podhurst – *Plaintiffs' Steering Committee*
Peter Prieto – *Chair, Expert Committee*
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue
Suite 2300
Miami, FL 33131
Tel: (305) 358-2800
Fax: (305) 358-2382
Email: apodhurst@podhurst.com
        pprieto@podhurst.com

U.W. Clemon – *Plaintiffs' Steering Committee*
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL 35222
Tel: (205) 837-2898
Email: clemonu@bellsouth.net

Dennis C. Reich – ***Chair, Damages Committee***
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (713) 622-7271
Fax:  (713) 623-8724
Email:  dreich@rbfirm.net

J. Mark White – ***Litigation Committee***
Augusta S. Dowd – ***Chair, Litigation Committee***
Linda G. Flippo – ***Discovery Committee***
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel:  (205) 323-1888
Fax:  (205) 323-8907
Email: mwhite@whitearnolddowd.com
        adowd@whitearnolddowd.com
        lflippo@whitearnolddowd.com

Nicholas B. Roth – ***Chair, Discovery Committee***
Julia Smeds Roth – ***Discovery Committee***
EYSTER KEY TUBB ROTH MIDDLETON
  & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email: nbroth@eysterkey.com
        jroth@eysterkey.com

Van Bunch – ***Chair, Class Certification Committee***
BONNETT FAIRBOURN FRIEDMAN &
  BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel:  (602) 274-1100
Fax:  (602) 274-1199
Email: vbunch@bffb.com

David A. Balto – ***Expert Committee***
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email: david.balto@dcantitrustlaw.com

Robert J. Axelrod – ***Chair, Written Submissions Committee***
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
Tel: (646) 448-5263
Fax: (212) 840-8560
Email: rjaxelrod@axelrodllp.com

Joey K. James – ***Litigation Committee***
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel:  (256) 764-0095
Fax:  (256) 767-5705
Email: joey@bunchandjames.com

W. Daniel Miles, III – ***Written Submissions Committee***
BEASLEY ALLEN CROW METHVIN PORTIS
  & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel:  (800) 898-2034
Fax:  (334) 954-7555
Email: dee.miles@beasleyallen.com

Richard S. Frankowski – ***Discovery Committee***
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL 35233
Tel: (205) 390-0399
Fax: (205) 390-1001
Email: richard@frankowskifirm.com

John C. Davis – ***Written Submissions Committee***
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel: (850) 222-4770
Email: john@johndavislaw.net

Mark K. Gray – ***Discovery Committee***
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel: (502) 805-1800
Fax: (502) 618-4059
Email: mgray@grayandwhitelaw.com

Stephen M. Hansen – ***Class Certification Committee***
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel: (253) 302-5955
Fax: (253) 301-1147
Email: steve@stephenmhansenlaw.com

Harley S. Tropin – ***Damages Committee***
Javier A. Lopez – ***Discovery Committee***
KOZYAK TROPIN &
  THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
Email: hst@kttlaw.com
        jal@kttlaw.com

Michael C. Dodge – ***Expert Committee***
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel: (972) 419-7172
Email: mdodge@gpm-law.com

Michael E. Gurley, Jr. – ***Discovery Committee***
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel: (205) 908-6512
Email: mgurleyjr@yahoo.com

Lynn W. Jinks, III – ***Expert Committee***
Christina D. Crow – ***Discovery Committee***
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel: (334) 738-4225
Fax: (334) 738-4229
Email: ljinks@jinkslaw.com
        ccrow@jinkslaw.com

Myron C. Penn – ***Discovery Committee***
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel: (334) 738-4486
Fax: (334) 738-4432
Email: myronpenn28@hotmail.com

J. Preston Strom, Jr. – ***Litigation Committee***
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel: (803) 252-4800
Fax: (803) 252-4801
Email: petestrom@stromlaw.com

C. Wes Pittman – *Settlement Committee*
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel: (850) 784-9000
Fax: (850) 763-6787
Email: wes@pittmanfirm.com

Robert B. Roden – *Litigation Committee*
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel: (205) 933-8383
Fax: (205) 933-8386
Email: rroden@shelbyroden.com

Gary E. Mason – *Class Certification Committee*
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel: (202) 429-2290
Fax: (202) 640-1160
Email: gmason@wbmllp.com

Michael L. Murphy – *Discovery Committee*
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC 20006
Tel: (202) 463-2101
Fax: (202) 463-2103
Email: mmurphy@baileyglasser.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel: (719) 471-1984
Fax: (719) 577-4356
Email: lance@searsassociates.com

Thomas V. Bender – *Discovery Committee*
Dirk L. Hubbard
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Tel: (816) 421-0700
Email: tbender@hab-law.com
        dhubbard@hab-law.com

Gregory S. Cusimano – *Litigation Committee*
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL 35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email: greg@alalawyers.net

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel: (320) 289-2363
Fax: (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
Email: alamb@archielamb.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA 51101
Tel: (712) 234-3030
Fax: (712) 234-3034
Email: paul@lundberglawfirm.com

Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK 99501
Tel: (907) 277-5400
Fax: (907) 277-9896
Email: Jessica@dillonfindley.com
        Ray@dillonfindley.com
        Molly@dillonfindley.com

Cynthia C. Moser
HEIDMAN LAW FIRM
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA 51101
Tel: (712) 255-8838
Fax (712) 258-6714
Email: Cynthia.Moser@heidmanlaw.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com