# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406) | **Master File No. 2:13-CV-20000-RDP** <br><br> **This document relates to Provider-Track cases.** |

## DEFENDANTS' OPPOSITION TO PROVIDER PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' COMMON-LAW TRADEMARK RIGHTS

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..................................................................................... ii

**INDEX OF EXHIBITS** ............................................................................................... v

**CITATION KEY** ........................................................................................................ vi

**PRELIMINARY STATEMENT** ................................................................................. 1

**RESPONSE TO PROVIDERS' "UNDISPUTED RELEVANT MATERIAL FACTS"** .............................................................................................................. 2

**DEFENDANTS' STATEMENT OF ADDITIONAL RELEVANT FACTS** ............ 5

**ARGUMENT** ............................................................................................................... 6

    I.    The Blues Did Not Abandon Their Common Law Trademark Rights Prior To Federal Registration ................................................................................. 7

        A.    The Blue Marks Were Not Abandoned Through "Naked Licensing." ..................................................................................... 7

        B.    Use of the Marks by Different Blues in Different Geographies at Common Law Did Not Result in Abandonment ......................... 9

        C.    Providers' Remaining Arguments Have Nothing To Do With Trademark Abandonment. .......................................................... 13

    II.    Providers Have Not Shown That Blue Plans Were "Mere Licensees" Of The National Organizations. ..................................................................... 16

    **CONCLUSION** ....................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. F.T.C.*,
   1 F.4th 102 (2d Cir. 2021) ............................................................................................15, 16

*Allen v. Tyson Foods, Inc.*,
   121 F.3d 642 (11th Cir. 1997) ............................................................................................6

*Am. Trading Co. v. H. E. Heacock Co.*,
   285 U.S. 247 (1932)............................................................................................................14

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..............................................................................................................6

*Application of Beatrice Foods Co.*,
   429 F.2d 466 (C.C.P.A. 1970) ............................................................................................15

*Babbit Elec., Inc. v. Dynascan Corp.*,
   38 F.3d 1161 (11th Cir. 1994) .......................................................................................14, 16

*Baglin v. Cusenier Co.*,
   221 U.S. 580 (1911)............................................................................................................12

*Bd. of Regents of the Univ. Sys. of Ga. v. Buzas Baseball, Inc.*,
   176 F. Supp. 2d 1338 (N.D. Ga. 2001).................................................................................7

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..............................................................................................................6

*Chapin-Sacks Mfg. Co. v. Hendler Creamery Co.*,
   254 F. 553 (4th Cir. 1918) ..................................................................................................11

*Clorox Co. v. Sterling Winthrop, Inc.*,
   117 F.3d 50 (2d Cir. 1997)..................................................................................................16

*Craggs Const. Co. v. Fed. Ins. Co.*,
   2007 WL 1452968 (M.D. Fla. May 15, 2007).....................................................................20

*Dep't of Parks & Recreation for Cal. v. Bazaar Del Mundo Inc.*,
   448 F.3d 1118 (9th Cir. 2006) ............................................................................................17

*El Chico, Inc. v. El Chico Cafe*,
   214 F.2d 721 (5th Cir. 1954) .........................................................................................13, 14

*Esso, Inc. v. Standard Oil Co.*,
  98 F.2d 1 (8th Cir. 1938) ...................................................................................10

*FreecycleSunnyvale v. Freecycle Network*,
  626 F.3d 509 (9th Cir. 2010) ..............................................................................7

*Gen. Baking Co. v. Goldblatt Bros.*,
  90 F.2d 241 (7th Cir. 1937) ................................................................................10

*Griesedieck W. Brewery Co. v. Peoples Brewing Co.*,
  149 F.2d 1019 (8th Cir. 1945) ............................................................................10

*Hanover Star Milling Co. v. Metcalf*,
  240 U.S. 403 (1916)..........................................................................9, 10, 11, 13

*Hemmeter Cigar Co. v. Cong. Cigar Co.*,
  118 F.2d 64 (6th Cir. 1941) ................................................................................10

*Iancu v. Brunetti*,
  139 S. Ct. 2294 (2019) .......................................................................................15

*In re Blue Cross Blue Shield Antitrust Litig.*,
  308 F. Supp. 3d 1241 (N.D. Ala. 2018) ...............................................................6

*KFC Corp. v. Diversified Packaging Corp.*,
  549 F.2d 368 (5th Cir. 1977) .........................................................................10, 12

*Littler v. Martinez*,
  2020 WL 42776 (S.D. Ind. Jan. 3, 2020) ...........................................................19

*Nat'l Ass'n for Healthcare Commc'ns., Inc. v. Cent. Ark. Area Agency on Aging, Inc.*,
  257 F.3d 732 (8th Cir. 2001) ..............................................................................11

*Nat'l Grocery Co. v. Nat'l Stores Corp.*,
  95 N.J. Eq. 588 (Ch. 1924) ................................................................................11

*Neo4j v. PureThink, LLC*,
  480 F. Supp. 3d 1071 (N.D. Cal. 2020) .......................................................7, 8, 14

*Nisley Shoe Co. v. Nisley Co.*,
  72 F.2d 118 (6th Cir. 1934) ................................................................................14

*Saxlehner v. Eisner & Mendelson Co.*,
  179 U.S. 19 (1900)..............................................................................................12

*Secular Orgs. for Sobriety, Inc. v. Ullrich*,
  213 F.3d 1125 (9th Cir. 2000) ............................................................................17

*Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*,
  486 F.2d 114 (5th Cir. 1973) ...........................................................................12

*Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*,
  743 F.2d 1039 (4th Cir. 1984) ...........................................................................8

*Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*,
  889 F.2d 1018 (11th Cir. 1989) ...............................................................9, 10, 11

*Tana v. Dantanna's*,
  611 F.3d 767 (11th Cir. 2010) ...................................................................9, 10

*Thoroughbred Legends, LLC v. The Walt Disney Co.*,
  2008 WL 616253 (N.D. Ga. Feb. 12, 2008) ......................................................17

*TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*,
  102 F. Supp. 3d 1321 (S.D. Fla. 2015) ...............................................................16

*Tumblebus Inc. v. Cranmer*,
  399 F.3d 754 (6th Cir. 2005) ...........................................................................12

*United Drug Co. v. Theodore Rectanus Co.*,
  248 U.S. 90 (1918).................................................................................11, 13

*VMG Enters. v. F. Quesada & Franco, Inc.*,
  788 F. Supp. 648 (D.P.R. 1992)........................................................................16

*White Tower Sys., Inc. v. White Castle Sys. of Eating Houses Corp.*,
  90 F.2d 67 (6th Cir. 1937) ...........................................................................14

**Statutes & Rules**

Lanham Act, Pub. L. 79-489, 60 Stat. 427 (1946)
  (codified as amended at 15 U.S.C. §§ 1051 et seq.) ...............................9, 11, 14, 15

Fed. R. Civ. P. 56.............................................................................................6

**Other Authorities**

1 Harry D. Nims, The Law of Unfair Competition and Trade-Marks
  (4th ed. 1947)...........................................................................................12, 17

3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
  (5th ed. Supp. 2021)................................................................................7, 14, 15

Restatement (Third) of Unfair Competition § 30 cmt. a (Am. L. Inst. 1995)..................9

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|:---:|:---|
| 1 | 4/12/2017 30(b)(6) Deposition Transcript of Blue Cross Blue Shield Association through Melissa Rotunno (excerpts) |

**CITATION KEY**

| Citation | Reference |
|----------|-----------|
| Add'l Facts | Citations to this Brief's Statement of Additional Relevant Facts |
| Disp. Facts | Citations to this Brief's Response to Providers' "Undisputed Relevant Material Facts" |
| Doc(s). | Citations to Documents filed on the Docket in MDL 2406 (2:13-CV-20000-RDP) |
| Ex. | Citations to Defendants' Exhibits identified in the Evidentiary Submission accompanying this Opposition |
| SoR Br. | Defendants' Opening Brief on the Antitrust Standard of Review Applicable to Provider Plaintiffs' Section 1 Claims Pursuant to Federal Rule of Civil Procedure 56 (Doc. 2728) |
| SoR Reply Br. | Defendants' Reply on the Antitrust Standard of Review Applicable to Provider Plaintiffs' Section 1 Claims (Doc. 2772) |
| Trademark Br. | Provider Pls.' Mot. for Partial Summary Judgment on Defendants' Claim to Common-Law Trademark Rights (Doc. 2749) |

## PRELIMINARY STATEMENT

Providers' motion for partial summary judgment is built on a fundamental misunderstanding of common law trademark rights and a disregard for the record.  Indeed, although they claim to be entitled to judgment as a matter of law, Providers cannot even decide who owned the Blue Cross and Blue Shield trademarks ("Blue Marks" or "Marks") before federal registration, instead advancing two contradictory theories for why Blue Plans could not have acquired common law trademark rights.  Providers' motion fails under either theory and, by its indecision, demonstrates why it should be denied.

*First*, Providers contend that the first users of the Blue Marks abandoned the Marks through "naked licensing."  However, "naked licensing" requires the existence of a license agreement; Providers do not (and cannot) claim there was ever a license agreement between the first users of the Blue Marks and other Blue Plans.  That alone defeats their "naked licensing" theory.  (*See* Section I.A.)  Nor is there anything unusual or problematic about different Blue Plans using the Blue Marks in different parts of the country:  this is exactly how geographically-limited trademark rights are acquired and exercised at common law. (*See* Section I.B.)  And Providers cannot save their "naked licensing" argument by invoking other trademark doctrines that have nothing to do with trademark abandonment. (*See* Section I.C.)

*Second*, Providers argue, alternatively, that all Blue Plans other than the St. Paul and Buffalo Plans were "mere licensees" of the national organizations from the start.  This directly contradicts their "naked licensing" argument.  Providers do not even attempt to offer evidence to support this theory and ignore all contrary record evidence.  Providers have not satisfied their burden on summary judgment.  (*See* Section II.)

**RESPONSE TO PROVIDERS' "UNDISPUTED RELEVANT MATERIAL FACTS"**

Defendants do not dispute Paragraphs 1, 5, or 7–9 of Providers' "Undisputed Relevant Material Facts." (Trademark Br. at 1–3.) Defendants dispute Providers' other purported undisputed facts, as set forth below:

2.      **Disputed.** Defendants do not dispute that other Plans used the Blue Marks in other parts of the country outside Minnesota and Western New York, where the St. Paul and Buffalo Plans were not themselves using the Marks. That includes, on the Blue Cross side, prepaid hospital plans headquartered in North Dakota (where there was one, state-wide Plan), Wisconsin (one state-wide Plan), and Iowa (two, geographically distinct Plans serving "central and Eastern Iowa" and "Western Iowa and part of South Dakota") (Doc. 1353-4 at 29–31); and, on the Blue Shield side, prepaid medical plans headquartered in Syracuse (serving "10 counties in central New York"), and Rochester (serving "6 counties – Rochester Area") (Doc. 1353-5 at 38). None of these prepaid hospital or medical plans, however, used the Blue Marks in the same territory as either the St. Paul or Buffalo Plan (Doc. 1353-4 at 27–31; Doc. 1353-5 at 38, 40), and, accordingly, the St. Paul and Buffalo Plans did not have the right to control their uses of the Marks. (Doc. 1353-4 at 22, 28, 30; Doc. 1353-5 at 38, 40; *see also infra* Section I.B.)

3.      **Disputed.** Defendants dispute this Fact to the extent it suggests the St. Paul and Buffalo Plans had the right to control use of the Marks in geographic areas where they did not themselves use the Marks. (*See supra* Disp. Facts ¶ 2.) Defendants do not dispute that there was no license agreement between the St. Paul and Buffalo Plans, on the one hand, and the remaining Blue Plans on the other (*see infra* Add'l Facts ¶ 3), and that St. Paul and Buffalo did not try to act as licensors, including by controlling the quality of others' uses of the Blue Marks.

4.     **Disputed.**  Defendants do not dispute that, by 1939, the American Hospital Association ("AHA") issued "Standards for Non-Profit Hospital Service Plans," which provided that member plans may "identify the plan by using the seal of the [AHA] superimposed upon a blue cross."  (Doc. 1350-13 at 6.)  Defendants dispute this Fact to the extent it implies these standards resolved ownership of the Blue Cross Mark at common law.  (Doc. 2735-5 at 4–6; Doc. 2735-9 at 2; Doc. 1353-50 at 2–4; *see also* Doc. 2728 (SoR Br.) at 14–17.)

6.     **Disputed.**  Defendants do not dispute that the American Medical Association ("AMA") "announced tentative standards of approval for medical plans" in 1946 that provided member plans were "entitled to display the Seal of Acceptance of the [AMA] on their contracts and literature," which was "a circle within which is a Blue Shield emblazoned with a caduceus and the letters 'A.M.A.'" (Doc. 1353-5 at 36; *see also* Doc. 1353-6 at 82–83), or that the Associated Medical Care Plans ("AMCP"), which administered this program, stated that approved members were "entitled to use the term 'Blue Shield' and the officially adopted Blue Shield symbol" (Doc. 1353-20 at 16).  Defendants dispute this Fact to the extent it implies these standards resolved ownership of the Blue Shield Mark at common law.  (Doc. 1353-11 at 9–10; Doc. 1353-48 at 2–4; *see also* Doc. 2728 (SoR Br.) at 14–17.)

10.     **Disputed.**  The 1952 Blue Shield "pooling agreement" ("1952 License Agreement") specifically states that, "[p]rior to the incorporation of the National Organization, several of the medical care plans that are now full members of the National Organization adopted and used, in both intra-state and interstate commerce, a service mark, consisting of the words 'Blue Shield,' either used alone or in conjunction with a symbol in the shape of a shield, colored blue."  (Doc. 1353-48 at 2–3.)  The national organization obtained permission to seek federal registration from all such "plans which had used the symbolism prior to filing the application."

3

(Doc. 2735-7 at 4.)  These Plans agreed to "prepare a suitable pooling agreement whereby local Plans will give to the Commission certain rights to the [Blue Shield] symbol."  (Doc. 2735-10 at 6.)  The 1952 License Agreement provides that member Plans did "not waive, forfeit or relinquish any legal right to the use of the words 'Blue Shield' or to the use of the Blue Shield symbol that may have been heretofore acquired by such member under the laws" of its state.  (Doc. 1353-48 at 4.)  To the contrary, every member Plans' permission to use the Blue Shield Mark under the 1952 License Agreement was "subject to" these "local right[s]," which were expressly preserved.  (*Id.* at 3–4.)

11.    **Disputed.**  The 1954 Blue Cross license agreement ("1954 License Agreement") explicitly recognized that, "as a result of their use of the words BLUE CROSS and the design of a blue cross with respect to prepayment plans for hospital care and related services, certain INDIVIDUAL PLANS hereto subscribing have developed certain territorial rights with respect to the words BLUE CROSS and the design of a blue cross in the particular areas served by such PLANS."  (Doc. 1353-50 at 2–3.)  Nevertheless, "the PLANS recognize that there should be a sole, exclusive ownership and control of all rights . . . to the words BLUE CROSS and the design of a blue cross, in order . . . to maintain and protect" the Mark and, therefore, Plans agreed to "assign" their common law rights to AHA.  (*Id.* at 3.)  AHA applied for and received federal registrations for the Blue Cross Mark after member Plans voted that AHA should "proceed with registration of the words 'Blue Cross', 'Blue Cross Plan', and the Blue Cross symbol."  (Doc. 2735-4 at 9–10.)  AHA then agreed in the 1954 License Agreement that, "[e]ach INDIVIDUAL PLAN shall have the rights, and shall be and hereby is licensed by [AHA] to use [the federally registered Blue Cross Marks], . . . within the area served by the INDIVIDUAL PLAN on the date of these presents, . . . which said right and license shall be

4

exclusive within said area, except to the extent that said area may overlap the area or areas served by another or other INDIVIDUAL PLANS licensed hereunder on the date of these presents."  (Doc. 1353-50 at 4.)

12.   **Disputed.**  Blue Cross and Blue Shield of Alabama ("BCBS-AL") first used the Blue Cross Mark by at least March 1, 1939 (Doc. 2735-13 at 2), and the Blue Shield Mark by at least 1947 (Doc. 2735-16 (30(b)(6) Dep. of BCBS-AL) at Tr. 98:8–19).  AHA published Standards for Non-Profit Hospital Care Insurance Plans on January 1, 1938.  (Doc. 1353-16.)  AHA published revised standards in June 1939, which stated, for the first time, that member Plans may "identify the plan by using the seal of the [AHA] superimposed upon a blue cross."  (Doc. 1353-19 at 6.)  BCBS-AL used both Blue Marks on a state-wide, exclusive basis before the Marks were federally registered and before there were written license agreements with exclusive service areas.  (Doc. 1353-4 at 29; Doc. 1353-5 at 38; Doc. 2735-16 (30(b)(6) Dep. of BCBS-AL) at Tr. 94:24–95:22, 98:8–24.)

## DEFENDANTS' STATEMENT OF ADDITIONAL RELEVANT FACTS

1.   The St. Paul Plan used the Blue Cross Mark exclusively in Minnesota.  It did not use the Blue Cross Mark in any other part of the country, and did not allow or encourage any other Blue Plan to use the Blue Cross Mark in its territory.  (Doc. 1353-4 at 22, 27–28, 30.)

2.   The Buffalo Plan used the Blue Shield Mark exclusively in Western New York.  It did not use the Blue Shield Mark in any other part of the country, and did not allow or encourage any other Blue Plan to use the Blue Shield Mark in its territory.  (Doc. 1353-5 at 38, 40.)

3.   The St. Paul and Buffalo Plans did not enter into license agreements with other Plans for use of the Blue Marks.  (Doc. 1350-28 (30(b)(6) Dep. of BCBSA) at Tr. 39:7–8

("The Minnesota Plan did not license other Plans."); Doc. 1429-3 (*id.*) at Tr. 119:6–20; Ex. 1

(*id.*) at Tr. 125:2–11 (other than "pooling agreement" with national organization, noting no other

"license agreements between Buffalo and any other entities" exist); *see also* Doc. 1353-7 at 26,

63–64.)

    4.  In the 1930s and 1940s, Plans other than St. Paul and Buffalo began using

the Blue Cross and/or Blue Shield Marks in distinct geographies around the country.  (*See, e.g.*,

Doc. 1353-7 at 26–27, 62–64; Doc. 2735-5 at 5 ("many Plans now own the rights to use 'Blue

Cross' in the area in which they operate because of prior use or registration of the mark");

Doc. 2735-10 at 6 (noting local registrations of Blue Shield mark); Doc. 1551-3 (30(b)(6) Dep.

of BCBSA) at Tr. 35:25–36:9, 37:9–38:24, 73:17–74:1; Doc. 2735-17 (*id.*) at Tr. 170:15–171:5;

Doc. 2735-15 (Dep. of P. Taffe, BCBSA) at Tr. 47:19–48:21, 155:13–157:3; Doc. 1353-10 (Dep.

of R. Wilson, BCBSA) at Tr. 30:10–20, 31:1–4, 256:1–9; Doc. 2735-19 (30(b)(6) Dep. of

BCBS-MS) at Tr. 27:1–24; Doc. 2735-16 (30(b)(6) Dep. of BCBS-AL) at Tr. 94:24–95:22,

98:8–24; Doc. 2735-5 at 4–5; Doc. 1353-50 at 2–3; Doc. 1353-48 at 2–3.)

## ARGUMENT

    As the moving party, Providers bear the burden of demonstrating through

undisputed evidence that they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "When evaluating a summary

judgment motion, a court must view all the evidence and all factual inferences drawn therefrom

in the light most favorable to the non-moving party."  *In re Blue Cross Blue Shield Antitrust*

*Litig.*, 308 F. Supp. 3d 1241, 1257 (N.D. Ala. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S.

317, 322–23 (1986); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)).  If there is

any genuine dispute as to any material fact, summary judgment must be denied.  *Id.*

I.   **THE BLUES DID NOT ABANDON THEIR COMMON LAW TRADEMARK RIGHTS PRIOR TO FEDERAL REGISTRATION.**

Providers mix and match various trademark doctrines to argue that the first users of the Blue Marks, the St. Paul and Buffalo Plans, abandoned the Marks decades ago through "naked licensing." (*See* Trademark Br. Section I.)  Providers not only misunderstand how "naked licensing" works, but they also invoke several legal doctrines that in fact have nothing to do with trademark abandonment.  Under proper trademark principles, Providers' "abandonment" argument fails.

A.   **The Blue Marks Were Not Abandoned Through "Naked Licensing."**

Providers contend that the St. Paul and Buffalo Plans abandoned the Blue Marks through "naked licensing" because they "allowed other Plans to use the . . . Marks without controlling the quality of their services." (Trademark Br. at 4–7.)  That argument fails for the simple reason that *there were never license agreements* between the St. Paul and Buffalo Plans and the other Blue Plans.  (Add'l Facts ¶ 3.)  Providers do not contend otherwise—nor could they.

Naked licensing occurs when a trademark owner grants a license to use its mark, but then fails to exercise quality control over its appointed licensee. *See* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:48 (5th ed. Supp. 2021).  In that case, "a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark." *Neo4j v. PureThink, LLC*, 480 F. Supp. 3d 1071, 1076 (N.D. Cal. 2020) (quoting *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 516 (9th Cir. 2010)).  Importantly, naked licensing requires the existence of a license agreement. *See id.* at 1077 ("Naked licensing does not occur where there is no trademark license at issue."); *Bd. of Regents of the Univ. Sys. of Ga. v. Buzas Baseball, Inc.*, 176 F. Supp. 2d 1338,

7

1349 (N.D. Ga. 2001) (failure to control use by "third party users, not licensees" cannot amount

to naked licensing); *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1047

(4th Cir. 1984) ("This rule of uncontrolled licensing of a trademark is inapplicable to the instant

case as no evidence of licensing has been presented.").

   The court's discussion in *Neo4j* is instructive.  There, defendants (PureThink)

alleged that plaintiffs (Neo4j) "allowed the unfettered and uncontrolled use of the Neo4j

trademarks" such that plaintiffs abandoned those marks.  480 F. Supp. 3d. at 1076–77.  However,

"neither party allege[d] that Neo4j entered into any express trademark licenses" with the alleged

users of those marks.  *Id.* at 1077 (noting that the referenced licenses were "copyright" licenses,

not "trademark" licenses).  The court held that "[t]his set of allegations does not fit comfortably

within the doctrine of naked licensing."  *Id.*  That is because "[a] 'naked license' occurs when a

trademark owner *grants a trademark license* then fails to monitor the quality of goods that the

licensee produces under the trademark to such an extent that the trademark can be deemed

abandoned."  *Id.* (emphasis added).  "Naked licensing does not occur where there is no

trademark license at issue."  *Id.*  Because "[t]here [was] no allegation of a trademark license

between Plaintiffs and [the other users]," the court concluded there could be no naked licensing.

*Id.* at 1078.  Indeed, the court noted, "[d]efendants have not identified any case, and the Court is

not aware of any, in which a trademark owner was found to have engaged in naked licensing

where no trademark license existed."  *Id.*

   The same is true of Providers' argument here.  Providers do not claim there was a

license agreement between the St. Paul and Buffalo Plans and the other Blue Plans.  To the

contrary, Providers claim it was the *national organizations* that were licensors of the Blue Marks

to all Plans but the St. Paul and Buffalo Plans.  (*See* Trademark Br. at 7–8.)  It is therefore

impossible for the St. Paul and Buffalo Plans to have engaged in "naked licensing" with the other

Blues, and the Court can reject Providers' "naked licensing" argument for this reason alone.

### B. Use of the Marks by Different Blues in Different Geographies at Common Law Did Not Result in Abandonment.

Despite invoking the "naked licensing" label, Providers' real complaint is that the

St. Paul and Buffalo Plans failed to police *unlicensed* uses of the Blue Marks in other parts of the

country where they were not themselves using the Marks.  But this fact does not show

abandonment either—and instead is entirely consistent with the geographically limited rights to

the Blue Marks that Plans acquired at common law.  Providers' argument to the contrary relies

on the incorrect premise that the St. Paul and Buffalo Plans acquired nationwide rights to use and

police use of the Marks outside their own areas of use.  (*See* Trademark Br. at 5.)  They did not.

Unlike federal trademark rights based on registration under the Lanham Act—

which include "the unlimited right to use the mark nationwide," *Tana v. Dantanna's*, 611 F.3d

767, 780 (11th Cir. 2010)—common law trademark rights derive only from "actual prior use in

commerce."  *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022 (11th Cir. 1989) (at

common law, "[t]rademark ownership is always appurtenant to commercial activity").  As such,

a user of a mark develops common law trademark rights *only* in the "territory throughout which

it is known and from which it has drawn its trade."  *Tana*, 611 F.3d at 780; *see also Hanover

Star Milling Co. v. Metcalf*, 240 U.S. 403, 416 (1916) (trademark owner may not "monopolize

markets that his trade has never reached, and where the mark signifies not his goods, but those of

another"); *see also* Restatement (Third) of Unfair Competition § 30 cmt. a (Am. L. Inst. 1995)

("Priority [against subsequent users] at common law . . . extends only to the geographic areas in

9

which the trademark owner uses the designation or in which the designation is associated with the trademark owner.").[1]

For this reason, it is not unusual at common law for multiple users to establish rights to the same mark in different locations.  *See Hanover Star*, 240 U.S. at 416, 419–420 (concurrent use of "Tea Rose" trademark on flour by senior user in Ohio and junior user in Alabama and adjacent states); *Tally-Ho*, 889 F.2d at 1022–23 (concurrent use of video program name in separate markets within Florida); *Tana*, 611 F.3d at 781–82 (concurrent use of tradename by restaurants in California and Georgia); *KFC Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387–88  (5th Cir. 1977) (concurrent use of trademarks by one owner in 47 states, and another in Florida, Montana and Utah where there was a separate ownership conveyance); *Esso, Inc. v. Standard Oil Co.*, 98 F.2d 1, 6–8 (8th Cir. 1938) (concurrent use of tradename by separate corporations once owned by single parent company upheld within the limited territory where each had been using under the parent); *Gen. Baking Co. v. Goldblatt Bros.*, 90 F.2d 241, 242 (7th Cir. 1937) (concurrent use of "Bond" trademark on bread in Illinois by one user in St. Louis and another user in Chicago); *Hemmeter Cigar Co. v. Cong. Cigar Co.*, 118 F.2d 64, 66, 71 (6th Cir. 1941) (granting injunction only in Michigan, Ohio and Indiana where "great bulk of sales" of cigars were made by senior user, permitting concurrent use outside these states by junior user); *Griesedieck W. Brewery Co. v. Peoples Brewing Co.*, 149 F.2d 1019, 1022–23 (8th Cir. 1945) (concurrent use of "Stag" beer trademark by one user with a market of "a radius of 150 miles of the City of Duluth, Minnesota" and another user in neighboring states).  This was especially common historically and where the industry at issue is local in nature.  *See, e.g.*,

---

[1] In trademark terms, "[t]he first to use a mark on a product or service in a particular geographic market" is the "senior user," and a user that "subsequently use[s] the same or similar mark on similar products or services" is the "junior user."  *Tally-Ho*, 889 F.2d at 1023.

*Chapin-Sacks Mfg. Co. v. Hendler Creamery Co.*, 254 F. 553, 557 (4th Cir. 1918) (trademark territories must be "[c]onsidered with respect to the usual area of sale and distribution" and the type of business); *Nat'l Grocery Co. v. Nat'l Stores Corp.*, 95 N.J. Eq. 588, 593 (Ch. 1924) (nearby grocery stores were in separate markets because customers "will not patronize a store unless within their immediate neighborhood").

Providers overlook this key distinction between common law trademark rights (which are geographically limited) and rights to federally registered marks under the Lanham Act (which are national in scope). This error leads Providers wrongly to assert that the St. Paul Plan and Buffalo Plan owned nationwide rights to the Blue Cross and Blue Shield marks, respectively (Trademark Br. at 5), and that those Plans were thus obligated to police use of "their" Marks nationwide—including in territories where they did not use the Marks. But because they acquired rights at common law, St. Paul and Buffalo "owned" their respective Marks *only* in their local areas of use (*see* Add'l Facts ¶¶ 1–2). *See, e.g.*, *Tally-Ho*, 889 F.2d at 1028 ("Under common law principles . . . [i]f the senior user is static, and has restricted use to only one small area, such as one city, a good-faith junior user may expand into a nationwide use of the mark, subject only to an exception in the small area occupied by the senior user."); *Nat'l Ass'n for Healthcare Commc'ns., Inc. v. Cent. Ark. Area Agency on Aging, Inc*., 257 F.3d 732, 738 (8th Cir. 2001) (distinguishing ownership in "six-county" area in Arkansas from the rest of the state).

The St. Paul and Buffalo Plans had no right—let alone obligation—to control uses of the Marks by other Plans in other geographies around the United States. *See Hanover Star*, 240 U.S. at 416 (senior user in Ohio and Pennsylvania could not assert infringement by junior user in Alabama); *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 99 (1918) (senior

11

user in Massachusetts did not have "any rights in Kentucky").  And they certainly did not abandon their common law rights to the Marks in their respective areas by failing to police such uses outside those areas.  *See KFC*, 549 F.2d at 387 (rejecting abandonment based on lack of control in certain states where plaintiff "does not own the marks," because "[t]he trademark owners in those three states [] are not Kentucky Fried's licensees . . . but rather concurrent owners.  Concurrent ownership of marks in separate geographical territories is clearly permissible.").[2]

Finally, even if (contrary to fact and law) the St. Paul and Buffalo Plans had some obligation to police unlicensed uses of the Blue Marks in other parts of the country, their failure to do so would still not result in abandonment.  At most, that would mean that the St. Paul and Buffalo Plans did not maintain rights to the Marks in *those other areas* where they "allowed" other Plans to use the Marks (*e.g.*, in Alabama).  *See, e.g.*, *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124–25 (5th Cir. 1973) (senior user that abandoned rights in certain states maintained rights in areas where it continued to use mark, but junior user acquired rights in states where senior user had abandoned); *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 765 (6th Cir. 2005) (holding that "abandonment defense lacks force because it relies on abandonment of the [] mark in other parts of the United States to effectuate a forfeiture of [the owner's] rights to the mark in the greater Louisville area").  In other words, even if Providers were right that the St. Paul and Buffalo Plans could have (but failed) to police other Blues' uses of the Blue Marks

---

[2] Moreover, at common law in the 1930s and 1940s, trademark abandonment was "purely a question of intent." 1 Harry D. Nims, The Law of Unfair Competition and Trade-Marks, 1264–65 (4th ed. 1947); *see also Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 31 (1900) (abandonment requires "not only acts indicating a practical abandonment, but an actual intent to abandon"); *Baglin v. Cusenier Co.*, 221 U.S. 580, 597–98 (1911) ("There must be found an *intent* to abandon, or the property is not lost.").  Providers do not even attempt to argue—much less prove through undisputed evidence—that the St. Paul and Buffalo Plans intended to abandon the Blue Marks.

in other parts of the country, all that would mean is that St. Paul and Buffalo's rights would be geographically limited to Minnesota and Western New York, respectively—exactly as the Blues maintain.

**C.    Providers' Remaining Arguments Have Nothing To Do With Trademark Abandonment.**

Unable to establish abandonment through naked licensing, Providers invoke other trademark doctrines that have nothing to do with trademark abandonment. Each of these other arguments is meritless.

*First*, Providers argue that "the Blues would not have qualified for concurrent use under the common law" because other Plans used the Blue Marks "with knowledge" of the first users in areas that were "not geographically remote" of those first users. (Trademark Br. at 6.) These are elements of the "good faith remote user" doctrine that has nothing to do with trademark abandonment. The "good faith remote user" doctrine is used in alleged infringement cases to define the scope of one party's trademark rights as against another party using the trademark—not to determine whether one entity has abandoned previously-acquired rights. *See Rectanus*, 248 U.S. at 100–01; *Hanover Star*, 240 U.S. at 416–17. The doctrine arises when a senior user of a trademark in one area alleges infringement by a junior user of a trademark in another area: so long as the junior user made use of the trademark in its own geographic area and in good faith, there is no trademark infringement, and the senior user cannot enjoin the junior user's use. *El Chico, Inc. v. El Chico Cafe*, 214 F.2d 721, 725 (5th Cir. 1954).[3]

---

[3] For example, the doctrine could have hypothetically arisen if the St. Paul Plan (which made use of the Blue Cross in Minnesota in 1934), tried to enjoin BCBS-AL (which first used the Blue Cross in Alabama roughly five years later, in 1939) from continuing to use the Blue Cross in Alabama. BCBS-AL might have defended against this hypothetical claim of trademark infringement by arguing that it was a "good faith remote user," such that its use did not actually infringe on the rights of St. Paul, which did not have rights to the Blue Cross in Alabama. *See El Chico*, 214 F.2d at 725–26 (New York restaurant could not enjoin use of name by junior users in Texas and Louisiana that was not in bad faith); *see also Rectanus*, 248 U.S. at 100–01; *Hanover Star*, 240 U.S. at 416–17.

This doctrine has no relevance here, where the Blues are not alleging infringement by one another.  To the contrary, the Blues—including the St. Paul and Buffalo Plans—fully acknowledge that they acquired geographically limited rights to the Blue Marks at common law.  Nor have Providers cited a single case holding that the inapplicability of the "good faith remote user" doctrine results in the owner of a trademark abandoning its rights to the mark in its own territory of use.  This is not surprising:  it is well-settled that trademark infringement is distinct from trademark abandonment.  *See Neo4j*, 480 F. Supp. 3d at 1078 ("[A] trademark owner's failure to sue potential infringers does not constitute abandonment."); *Babbit Elec., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1180 (11th Cir. 1994) ("[F]ailure to institute legal action against an infringer is insufficient to establish abandonment of a trademark.").[4]

> *Second*, Providers argue the Blue Plans would "not have qualified" for concurrent use registration under the Lanham Act because later Blues were not "unknowing" users. (Trademark Br. at 5-6.)  This argument, again, conflates distinct legal principles.  Concurrent use registration is a creature of the Lanham Act.  *See* 15 U.S.C. § 1052(d).  The doctrine balances the fact that, at common law, different entities could acquire trademark rights to the same mark in different geographies, but that federal registration affords nationwide rights.  McCarthy § 20:81.  Accordingly, a concurrent use registration allows multiple users of a trademark to seek federal

---

[4] And even if the doctrine were relevant, Providers have not offered any evidence that later Blues acted in bad faith—*i.e.*, with an intent to appropriate the goodwill of the St. Paul and Buffalo Plans—as required in this Circuit. *See El Chico*, 214 F.2d at 726.  Providers cannot carry their burden on summary judgment through their own say-so. (*See* Trademark Br. at 6 n.1 (arguing, without citing any support, that "the entire point of using the Blue Cross and Blue Shield Marks was to benefit from the goodwill associated with them")).)  This is especially so because the St. Paul and Buffalo Plans were aware of, acquiesced in, and encouraged other Plans' uses of the Marks (Trademark Br. at 1–2), which defeats bad faith.  *See, e.g.*, *Nisley Shoe Co. v. Nisley Co.*, 72 F.2d 118, 119–20 (6th Cir. 1934) ("It is true that protection in the use of a trademark in a district other than the district in which it was first used by another is sometimes made to depend upon the later user's lack of knowledge of the earlier use.  This rule cannot be invoked" where the senior user "not only acquiesce[s] in the defendants' use of the name but actually promote[s] and encourage[s] it."); *see also Am. Trading Co. v. H. E. Heacock Co*., 285 U.S. 247, 254, 260–61 (1932); *White Tower Sys., Inc. v. White Castle Sys. of Eating Houses Corp.*, 90 F.2d 67, 69–70 (6th Cir. 1937) (stating rule that "when the original adopter consents" to use by junior user "the injunction against the junior user is denied").

registration of the same trademark (limited to their own geographic areas of use) in narrow circumstances where (i) more than one party became entitled to use the trademark prior to the first application for federal registration, and (ii) allowing such concurrent use to continue would not result in confusion. *Application of Beatrice Foods Co.*, 429 F.2d 466, 474 (C.C.P.A. 1970).

Here, of course, it is undisputed that Blue Plans did not apply for a concurrent use registration under the Lanham Act. Instead, they decided the Marks should be "nationally owned" by a "central body . . . in order that each [Plan] may have a part of something of secure value under the protection afforded by federal law." (Doc. 2735-5 at 6; Doc. 2728 (SoR Br.) at 7.) The Blues did not abandon their common law rights, which developed prior to that point, by choosing a single, national registration option rather than a concurrent use registration—nor does it matter whether Blue Plans hypothetically *could have* filed for concurrent use. *See* McCarthy § 19:8 ("Federal registration and state common law rights stand independent of each other. The requirements of common law state protection and the requirements of federal registration are parallel but separate."); *Iancu v. Brunetti*, 139 S. Ct. 2294, 2297 (2019) ("Registration of a mark is not mandatory."); *1-800 Contacts, Inc. v. F.T.C.*, 1 F.4th 102, 119 (2d Cir. 2021) ("[A]greements to protect trademark interests are common, and favored, under the law.") (internal quotation marks and citations omitted). Indeed, Providers do not cite a single case—and Defendants are not aware of any—where a trademark was deemed "abandoned" at common law because its owner did not, or even was not entitled to, seek a concurrent use registration under the Lanham Act.[5]

---

[5] In any event, Providers are wrong that the Blues would have been ineligible for a concurrent use registration, had they chosen to seek one. (Trademark Br. at 6.) Providers' only support for this position is that subsequent Blues had knowledge of the first uses of the Blue Marks by the St. Paul and Buffalo Plans. However, Providers ignore that a concurrent use registration is available where the senior registrant consents to the junior user's registration, irrespective of notice of the senior user's rights. 15 U.S.C. § 1052(d). Thus, the St. Paul and Buffalo

Providers' attempt to distinguish *VMG Enterprises v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648 (D.P.R. 1992), on this same basis fails.  The Blues cited *VMG* in our standard of review briefing not because we contend that the Blues received a concurrent use registration (we do not and the Blues did not), but rather because *VMG* confirms that it is lawful to codify in writing pre-existing common law rights, just as the Blues did here when they adopted written license agreements with service areas.[6]  (*See* Doc. 2728 (SoR Br.) at 26–27; Doc. 2772 (SoR Reply Br.) at 7 n.2.)

## II.   PROVIDERS HAVE NOT SHOWN THAT BLUE PLANS WERE "MERE LICENSEES" OF THE NATIONAL ORGANIZATIONS.

Providers argue, in the alternative, that all Plans "other than the St. Paul Plan and the Buffalo Plan were at most vertical licensees" because the national organizations' membership standards should be "considered a license."  (Trademark Br. at 7–8.)  Providers cite no support for the proposition that, from the beginning, the national organizations owned the Blue Marks and granted an implied license to all Plans "other than" St. Paul and Buffalo.  And Providers completely ignore the record evidence to the contrary.

Courts find an implied license where one can be inferred from the parties' objective course of conduct.  *TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*, 102 F. Supp. 3d 1321, 1326–27 (S.D. Fla. 2015).  This may include evidence of permission to use the owner's mark, quality control over that use, the "parties' mutual intentions" and "course of

---

Plans could have consented to a concurrent use registration with the other Blues, just as they consented to pooling the Marks and registering them through the national organizations.  (*See* Trademark Br. at 1–2.)

[6] Providers rightly do not raise the limited areas of overlap that existed at common law, which the Plans settled through lawful license agreements with service areas.  *See 1-800 Contacts*, 1 F.4th at 119; *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 55–56, 60 (2d Cir. 1997).  The limited areas of overlap have no bearing on whether and to what extent the St. Paul and Buffalo Plans (or any other non-overlapping Blue Plan, for that matter) developed or maintained trademark rights in entirely distinct geographies.  (*See supra* Section I.B.)  And even as between the rights of the Blue Plans in areas of overlapping use, "failure to institute legal action against an infringer is insufficient to establish abandonment of a trademark."  *Babbit*, 38 F.3d at 1180.

dealing." *Dep't of Parks & Recreation for Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1129

(9th Cir. 2006).  Importantly, only the owner of a trademark may license its use.

*See Thoroughbred Legends, LLC v. The Walt Disney Co.*, 2008 WL 616253, at *6 (N.D. Ga.

Feb. 12, 2008); *see also* Doc. 1431-27 (excerpt of 1 Harry D. Nims, The Law of Unfair

Competition and Trade-Marks (4th ed. 1947)) at 3 (a license may result from "permission by a

trade-mark owner to another to use a trade-mark").

        Providers contend that the national organizations owned the Blue Marks (and thus

licensed them from the very beginning), because these organizations promulgated membership

standards.  (Trademark Br. at 7–8.)  Providers' reliance on the existence of membership

standards alone misses the mark, as standards do not in and of themselves prove ownership.

*See, e.g., Secular Orgs. for Sobriety, Inc. v. Ullrich*, 213 F.3d 1125, 1131 (9th Cir. 2000) (finding

"claim of an implied license [] utterly devoid of merit" despite existence of membership

standards).  In fact, Providers concede that many Plans used the Blue Marks in their local

territories *before* standards related to the Marks were promulgated.  (Trademark Br. at 4 ("By the

beginning of 1938, which is before the AHA allowed approved plans to use the Blue Cross

Marks, there were thirty-eight such plans. . . . By the beginning of 1946, when the AMA

announced standards for medical service plans, thirty-two plans were using the Blue Shield

Marks.").)  They do not even try to explain how these Plans could have been operating under an

implied license at this time.  And Providers' only legal citations on this issue are two early

treatises which simply explain that, in the 1930s and 1940s, a trademark owner did not forgo its

own rights by allowing, for example, a manufacturer to stamp goods with the owner's mark.

(*See* Doc. 1431-27 at 3; Doc. 1431-28.)

Providers also ignore the significant record evidence that other Blues—in addition to St. Paul and Buffalo—developed rights to the Marks at common law (Add'l Facts ¶ 4):

- The 1952 Report of the Special Committee on a Licensing Agreement of the Blue Cross Commission expressly observes "that *many Plans now own the rights* to use 'Blue Cross' in the area in which they operate because of prior use or registration of the mark." (Doc. 2735-5 at 5 (emphasis added).)  Nevertheless, in order to protect the Marks, it was agreed that "ownership of the mark should rest with [AHA]," which would be accomplished by "each Plan agreeing to transfer to [AHA] by assignment all rights, title and interest in the Blue Cross emblem and the words 'Blue Cross' *each now owns*." (*Id.* at 5 (emphasis added).)

- The 1954 License Agreement acknowledges that, "as a result of their use of the words BLUE CROSS and the design of a blue cross with respect to prepayment plans for hospital care and related services, certain INDIVIDUAL PLANS hereto subscribing *have developed certain territorial rights* with respect to the words BLUE CROSS and the design of a blue cross in the particular areas served by such PLANS." (Doc. 1353-50 at 2–3 (emphasis added).)  The Plans expressly "assign[ed]" those rights to AHA. (*Id.* at 3.)

- The 1952 License Agreement—also called the "pooling agreement" (Doc. 1353-48 at 6)—likewise acknowledges that, "[p]rior to the incorporation of the National Organization, several of the medical care plans that are now full members of the National Organization adopted and used [the Blue Shield Mark]," and specifically provides for a "reservation" of this "local right" notwithstanding the Plans' nationwide coordination. (*Id.* at 2, 4.)

18

- Several deponents from the Association and the Plans confirmed these common law rights. (*See, e.g.*, Doc. 1353-15 (30(b)(6) Dep. of BCBSA) at Tr. 73:15-74:1 ("The Plans that began using the Blue Cross marks established common-law rights in the respective local areas."); Doc. 2735-15 (Dep. of P. Taffe, BCBSA) at Tr. 47:19–48:21 ("[T]here is a history where Plans had common law rights to the trademarks in their individual communities."); *id.* at Tr. 155:13-157:3 ("[T]he history of the Blue system is that the Plans were the original owners of the marks. They had common law rights in the marks in their geographic territories, in their communities, going all the way back to the early part of the last century. And over time there were assignments."); Doc. 1353-10 (Dep. of R. Wilson, BCBSA) at Tr. 30:10–20 ("[A] number of the Blue Cross Plans, I can't say how many, who had begun using the marks in the '30s and the '40s had filed registrations with various states to protect their rights. And of course they also had common-law rights related to the use of the brand in the – in their service areas."); Doc. 2735-16 (30(b)(6) Dep. of BCBS-AL) at Tr. 94:24–95:4 ("Q. Does Blue Cross Blue Shield of Alabama claim a common-law trademark? A. Yes. Q. To both Blue Shield and Blue Cross? A. Yes."); *id.* at Tr. 98:8–24 ("We [BCBS-AL] have common-law right[s]. We have been using the cross publicly since, I found, 1939; we've been using the shield publicly since 1947.").

Providers do not even acknowledge this evidence, much less explain why the Court should ignore it in considering their motion. Nor do Providers explain what rights were assigned, pooled and reserved in historic documents *decades ago*, if not common law claims to the Blue Marks. In the face of this evidence, Providers' argument must fail. *See, e.g.*, *Littler v. Martinez*, 2020 WL 42776, at *31 (S.D. Ind. Jan. 3, 2020) ("Ignoring the plaintiff's version of events and

hoping the Court will improperly grant summary judgment in her client's favor is not an option."); *Craggs Const. Co. v. Fed. Ins. Co.*, 2007 WL 1452968, at *2 (M.D. Fla. May 15, 2007) (movant cannot "pick and choose the portions" of the evidence "that support its case, while ignoring other portions" that don't).

## CONCLUSION

For the foregoing reasons, Providers' motion for partial summary judgment should be denied in its entirety.

Dated:  August 20, 2021

Respectfully submitted,

/s/ *Evan R. Chesler*
Evan R. Chesler
Christine A. Varney
Karin A. DeMasi
Lauren R. Kennedy
David H. Korn
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
Tel: (212) 474-1000
Fax: (212) 474-3700
echesler@cravath.com
cvarney@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com
dkorn@cravath.com

*Coordinating Counsel for Defendant Blue Cross and Blue Shield Association; Counsel for Defendants Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of North Carolina, Inc.; BlueCross BlueShield*

*of Tennessee, Inc.; California Physicians' Service d/b/a Blue Shield of California; CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.; Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.*

Craig A. Hoover
E. Desmond Hogan
Justin Bernick
Peter Bisio
Elizabeth Jose
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC  20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com
peter.bisio@hoganlovells.com
elizabeth.jose@hoganlovells.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont;*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
Sarah J. Donnell
Christa C. Cottrell, P.C.
Zachary Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com
sarah.donnell@kirkland.com
christa.cottrell@kirkland.com
zachary.holmstead@kirkland.com

*Counsel for Blue Cross Blue Shield Association*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF & BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL  35209
Tel: (205) 870-0555

*Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY & SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel: (803) 255-9421
Fax: (803) 256-7500
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action; Blue Cross and Blue Shield of North Carolina, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota; Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon; Blue Cross Blue & Shield of Mississippi, a Mutual Insurance Company; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Triple-S Salud, Inc; Defendants Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; BlueCross BlueShield of Tennessee, Inc.*

Cavender C. Kimble

Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants Blue Cross Blue Shield Association; Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.; California Physicians' Service d/b/a Blue Shield of California; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii)*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL 35203
Tel: (205) 254-1000
Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com

Pamela B. Slate
HILL CARTER FRANCO COLE & BLACK, P.C.
425 South Perry Street
Montgomery, AL 36104

BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc.,
and all of its named subsidiaries in this
consolidated action; Blue Cross and Blue Shield of
North Carolina, Inc.; Louisiana Health Service &
Indemnity Company (Blue Cross and Blue Shield
of Louisiana); BCBSM, Inc. (Blue Cross and Blue
Shield of Minnesota); Blue Cross and Blue Shield
of South Carolina; Horizon Healthcare Services,
Inc. (Horizon Blue Cross and Blue Shield of New
Jersey); Blue Cross & Blue Shield of Rhode
Island; Blue Cross and Blue Shield of Vermont;
Cambia Health Solutions, Inc.; Regence Blue
Shield of Idaho; Regence Blue Cross Blue Shield
of Utah; Regence Blue Shield (of Washington);
Regence Blue Cross Blue Shield of Oregon*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA  98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

*Counsel for Defendants Premera Blue Cross,
d/b/a Premera Blue Cross Blue Shield of Alaska*

Brian K. Norman
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX  75234
Tel: (214) 987-1745
Fax: (214) 521-9033
bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
RSA Tower, 27th Floor

Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*With Cravath, Swaine & Moore LLP,
counsel for Defendant Blue Cross Blue
Shield of Alabama*

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
hwitt@kirkland.com
jzeiger@kirkland.com

*Counsel for Defendants Health Care
Service Corporation, an Illinois Mutual
Legal Reserve Company, including its
divisions Blue Cross and Blue Shield of
Illinois, Blue Cross and Blue Shield of
Texas, Blue Cross and Blue Shield of
New Mexico, Blue Cross and Blue
Shield of Oklahoma, and Blue Cross and
Blue Shield of Montana; Caring for
Montanans, Inc., f/k/a Blue Cross and
Blue Shield of Montana, Inc.; Highmark
Inc., f/k/a Highmark Health Services;
Highmark West Virginia Inc.; Highmark
Blue Cross Blue Shield Delaware Inc.;
Highmark Western and Northeastern
New York Inc.*

Jonathan M. Redgrave
REDGRAVE, LLP
14555 Avion Parkway, Suite 275
Chantilly, VA  20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com

*Additional Counsel for HCSC and*

11 North Water Street
Mobile, AL  36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

*Counsel for Defendants CareFirst, Inc.; CareFirst*
*of Maryland, Inc.; Group Hospitalization and*
*Medical Services, Inc.; CareFirst BlueChoice, Inc.*

R. David Kaufman
M. Patrick McDowell
BRUNINI, GRANTHAM, GROWER
& HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS  39201
Tel: (601) 948-3101
Fax: (601) 960-6902
dkaufman@brunini.com
pmcdowell@brunini.com

Cheri D. Green
BLUE CROSS & BLUE SHIELD OF
MISSISSIPPI, A MUTUAL INSURANCE
COMPANY
P.O. Box 1043
Jackson, MS  39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

*Counsel for Defendant Blue Cross & Blue Shield*
*of Mississippi, a Mutual Insurance Company*

Michael A. Naranjo
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA  94104
Tel: (415) 984-9847
Fax: (415) 434-4507
mnaranjo@foley.com

Alan D. Rutenberg
Benjamin R. Dryden
FOLEY & LARDNER LLP

*Highmark Defendants*

Todd M. Stenerson
Brian C. Hauser
Edmund Y. Saw
SHEARMAN & STERLING LLP
401 9th Street, N.W., Suite 800
Washington, DC  20004
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com
brian.hauser@shearman.com
edmund.saw@shearman.com

Sarah L. Cylkowski
Thomas J. Rheaume, Jr.
BODMAN PLC
1901 Saint Antoine Street
6th Floor at Ford Field
Detroit, MI  48226
Tel: (313) 259-7777
Fax: (734) 930-2494
scylkowski@bodmanlaw.com
trheaume@bodmanlaw.com

Andy P. Campbell
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL PARTNERS LLC
505 North 20th Street, Suite 1600
Birmingham, AL  35203
Tel: (205) 224-0750
Fax: (205) 224-8622
andy@campbellpartnerslaw.com
todd@campbellpartnerslaw.com
yawanna@campbellpartnerslaw.com

*Counsel for Defendant Blue Cross and*
*Blue Shield of Michigan*

John Briggs
Rachel Adcox
Jeny M. Maier
AXINN, VELTROP & HARKRIDER,
LLP

3000 K Street, N.W., Suite 600
Washington, DC  20007
Tel: (202) 672-5300
Fax: (202) 672-5399
arutenberg@foley.com
bdryden@foley.com

*Counsel for Defendant USAble Mutual Insurance
Company, d/b/a Arkansas Blue Cross and
Blue Shield*

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Jess R. Nix
Morgan B. Franz
SPOTSWOOD SANSOM & SANSBURY LLC
Financial Center
505 20th Street North, Suite 700
Birmingham, AL  35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
jnix@spotswoodllc.com
mfranz@spotswoodllc.com

*Counsel for Defendant Capital BlueCross*

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL  35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendants Blue Cross and Blue
Shield of Florida, Inc.; Blue Cross and Blue Shield
of Massachusetts, Inc.; BlueCross BlueShield
of Tennessee, Inc.*

Edward S. Bloomberg

1901 L Street, N.W.
Washington, DC  20036
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
radcox@axinn.com
jmaier@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, AL  35203
Tel: (205) 250-5000
Fax: (205) 250-5034
steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendant Independence
Blue Cross*

Kathleen Taylor Sooy
Tracy A. Roman
Sarah Gilbert
Honor Costello
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com
sgilbert@crowell.com
hcostello@crowell.com

John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN & WHITE
LLC
The Clark Building
400 20th Street North
Birmingham, AL  35203
Tel: (205) 581-0700
Fax: (205) 581-0799
jjohnson@lightfootlaw.com

John G. Schmidt Jr.
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY  14203
Tel: (716) 847-8400
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com

Stephen A. Walsh
WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL
100 Corporate Parkway
One Lake Level
Birmingham, AL  35242
Tel: (205) 572-4107
Fax: (205) 572-4199
swalsh@wwhgd.com

*Counsel for Defendant, Excellus Health Plan, Inc.,
d/b/a Excellus BlueCross BlueShield, incorrectly
sued as Excellus BlueCross BlueShield of
New York*

bkappel@lightfootlaw.com

*Counsel for Defendants Blue Cross of
Idaho Health Service, Inc.; Blue Cross
and Blue Shield of Kansas, Inc.; Blue
Cross and Blue Shield of Kansas City;
Blue Cross and Blue Shield of
Nebraska; Blue Cross Blue Shield of
Arizona; Blue Cross Blue Shield of
North Dakota; Blue Cross Blue Shield
of Wyoming*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com

*Counsel for Defendants Wellmark of
South Dakota, Inc. (Wellmark Blue
Cross and Blue Shield of South Dakota);
Wellmark, Inc. (Wellmark Blue Cross
and Blue Shield of Iowa); Hawaii
Medical Service Association (Blue
Cross and Blue Shield of Hawaii);
Triple-S Salud, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2021, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Evan R. Chesler*
Evan R. Chesler