FILED
2021 Sep-03  PM 05:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **IN RE BLUE CROSS BLUE SHIELD** | : | |
| **ANTITRUST LITIGATION** | : | **Master File 2:13-cv-20000-RDP** |
| **MDL 2406** | : | |
| | : | |
| | : | |
| | : | **This document relates to** |
| | : | **Subscriber Track cases** |

## SUBSCRIBER PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     FACTUAL BACKGROUND ............................................................................... 5

        A.      The Terms of the Proposed Settlement ................................................... 5

                1.      The Settlement Class Members .................................................... 6

                        a.      The Damages Class ........................................................... 6

                        b.      The Injunctive Relief Class .............................................. 8

                2.      Relief for the Benefit of the Settlement Class Members ............ 8

                        a.      The Settlement Fund ........................................................ 8

                        b.      Injunctive Relief ............................................................... 9

                                i.      Eliminating Restrictions on Non-Blue Competition ......... 10

                                ii.     Opening the Door to Expanded Blue Bids and
                                        Competition .......................................................... 10

                                iii.    Local Best Efforts .............................................. 11

                                iv.     Acquisitions ....................................................... 11

                                v.      Contracting Provisions for Self-Funded Accounts ........... 12

                                vi.     Most Favored Nation Clauses ............................. 12

                                vii.    Monitoring Committee ....................................... 13

                3.      Settlement Class Release ............................................................ 13

                4.      Attorneys' Fees and Costs .......................................................... 15

                5.      Plan of Distribution ................................................................... 16

        B.      Preliminary Approval ............................................................................ 21

        C.      Notice Plan ............................................................................................ 23

        D.      CAFA Notice ......................................................................................... 28

III.    LEGAL STANDARD ....................................................................................... 28

IV.     THE COURT SHOULD FINALLY APPROVE THE SETTLEMENT. ................... 30

        A.      Class Representatives and Lead Counsel Have More than Adequately
                Represented the Settlement Class. ........................................................ 31

        B.      The Settlement Is the Result of Arm's-Length Negotiations ................ 32

        C.      The Relief Provided to the Settlement Classes Is Far More than Adequate,
                Based on the Considerations Set Forth in Rule 23(e)(2)(C). ................. 34

                1.      The Costs, Risks, and Delay of Trial and Appeal ..................... 34

i

| | 2. | The Effectiveness of Any Proposed Method of Distributing Relief to the Class, Including the Method of Processing Class Member Claims ................................................................... 38 |
| D. | | The Terms of Any Proposed Award of Attorneys' Fees and Expenses, Including Timing of Payment ................................................. 40 |
| E. | | The Proposed Settlement Treats Class Members Equitably Relative to One Another. .......................................................................... 41 |
| F. | | The Remaining Non-Duplicative *Bennett* Factors Are Satisfied. ............ 43 |
| | 1. | The Settlement Is Well Within the Range of Reasonableness Considering the Possible Alternatives. ............................................ 43 |
| | 2. | The Stage of Proceedings at which Settlement Was Achieved Strongly Supports Approval. ....................................................... 45 |

**V.** **THE PROPOSED CLASSES SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES. ......................................................... 46**

| A. | | The Classes Satisfy Rule 23(a). ............................................... 46 |
| | 1. | Rule 23(a) Requirements ........................................................ 46 |
| | | a. | Numerosity—Rule 23(a)(1) ........................................... 46 |
| | | b. | Commonality—Rule 23(a)(2) .......................................... 46 |
| | | c. | Typicality—Rule 23(a)(3) ............................................. 47 |
| | | d. | Adequacy—Rule 23(a)(4) .............................................. 49 |
| B. | | The Proposed Classes Also Satisfy Rules 23(b)(2) and (b)(3). ............ 50 |
| | 1. | Because the Blues Have Acted on Grounds Generally Applicable to the Injunctive Relief Class, Certification Is Appropriate under Rule 23(b)(2). .................................................................... 50 |
| | 2. | Certification of a Settlement Damages Class and a Self-Funded Sub-Class Is Appropriate under Rule 23(b)(3). .......................... 52 |
| | | a. | Common Issues Predominate. .......................................... 52 |
| | | b. | A Class Action Is Superior to Other Methods of Adjudication. ............................................................. 53 |

**VI.** **THE PROPOSED PLAN OF DISTRIBUTION WARRANTS FINAL APPROVAL. ..................................................................... 55**

**VII.** **THE COURT SHOULD OVERRULE THE OBJECTIONS AND GRANT FINAL APPROVAL. ......................................................... 60**

| A. | | The Injunctive Relief Is Fair and Reasonable. .............................. 64 |
| | 1. | ESAs and Post-Settlement Conduct .......................................... 64 |
| | | a. | The Settlement Plainly Does Not Perpetuate Conduct That Is "Clearly Illegal." ................................................. 64 |

|   |   | b. | The Court Need Not Provide an Advisory Opinion to Approve the Settlement............................................................ 68 |
|   |   | c. | The Settlement Does Not Improperly Release Future Conduct. ......................................................................... 70 |
|   | 2. | Second Blue Bids.................................................................. 75 |
|   |   | a. | The General Motors and Home Depot Objections Are Meritless............................................................................. 80 |
|   |   | b. | The QNA Definition Is Reasonably Limited to Employers, Excluding Taft Hartley and Other Multi-Employer Plans........... 82 |
|   |   | c. | The Dispersion Criteria Is Reasonable, and Does Not Protect Anthem. ................................................................ 86 |
|   |   | d. | The Remaining SBB Objections Should Also Be Overruled. ......................................................................... 87 |
|   | 3. | Local Best Efforts ................................................................ 89 |
|   | 4. | Miscellaneous Injunctive Relief Objections ............................ 91 |
| B. | The Monetary Relief Is Within the Range of Reasonableness. ...................... 92 |
|   | 1. | The Objection that the Settlement is Too Low Lacks Merit.................. 92 |
|   | 2. | The Settlement Will Not Result in Higher Premiums ............................ 93 |
|   | 3. | That the Blues May Be Good Companies Is Not a Valid Basis for Objection.............................................................................. 93 |
| C. | ASO Sub-Class Objections ................................................................ 94 |
|   | 1. | Self-Funded Sub-Class Settlement Period .................................... 94 |
|   | 2. | Separate Representation of ASO Sub-Class .................................. 98 |
| D. | Settlement Class Counsel's Requested Attorneys' Fees and Reimbursement of Expenses Are Reasonable. ...................................... 99 |
| E. | Notice Satisfied Due Process. ........................................................ 102 |
| F. | The Plan of Distribution Is Fair and Reasonable.................................. 104 |
|   | 1. | Allocation Between FI Class and ASO Sub-Class .............................. 105 |
|   | 2. | Allocation Between Employers and Employees.................................... 111 |
|   | 3. | Miscellaneous Plan of Distribution Objections ...................... 115 |
| G. | The Claims Process Is Streamlined and Appropriate. ........................ 116 |
| H. | Arbitration Clauses ................................................................... 117 |
| I. | Non-Disparagement ................................................................... 120 |
| J. | Additional Objections ................................................................ 120 |

VIII. **THE DEPARTMENT OF LABOR'S VIEWS, WHICH CONCERN DOWNSTREAM EMPLOYER ERISA OBLIGATIONS, DO NOT BEAR ON THE FAIRNESS AND REASONABLENESS OF THE SETTLEMENT. ...... 123**

    1. Adequacy of Representation ................................................. 126

    2. Double Recovery ................................................................ 130

    3. Satisfaction of Fiduciary Obligations .................................. 130

    4. Prohibited Transactions ...................................................... 131

    5. Exemption under Prohibited Transaction Exemption 2003-39 ............. 135

    6. Release of ERISA Claims .................................................... 136

    7. Distribution of Settlement Fund............................................ 136

IX. **THE COURT SHOULD APPROVE JUDGE GONZALEZ AS SETTLEMENT ADMINISTRATOR AND ENTER AN AMENDED DATA PRODUCTION ORDER. ........................................................... 138**

X. **CONCLUSION ........................................................... 140**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*,
   938 F.3d 1170 (11th Cir. 2019) ...................................................................... 50, 51

*Adams v. S. Farm Bureau Life Ins. Co.*,
   493 F.3d 1276 (11th Cir. 2007) ......................................................................... 103

*Am. Pipe Constr. Co. v. Utah*,
   414 U.S. 538 (1974) .............................................................................................. 97

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   568 U.S. 455 (2013) .............................................................................................. 53

*Arena v. Intuit, Inc.*,
   2021 WL 834253 (N.D. Ca. March 5, 2021) ....................................................... 118

*Ass'n for Disabled Ams. v. Amoco Oil Co.*,
   211 F.R.D. 457 (S.D. Fla. 2002) .......................................................................... 60

*Austin v. Pennsylvania Dept. of Corr.*,
   876 F. Supp. 1437 (E.D. Pa. 1995) ...................................................................... 60

*Babineau v. Fed. Express Corp.*,
   576 F.3d 1183 (11th Cir. 2009) ............................................................................ 52

*Baker v. Castle & Cooke Homes Hawaii, Inc.*,
   2014 WL 1669131 (D. Haw. Jan. 31, 2014) ....................................................... 118

*Bellocco v. Curd*,
   2006 WL 4693490 (M.D. Fla. Apr. 6, 2006) ....................................................... 55

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) ....................................................................... *passim*

*Blue Cross & Blue Shield Ass'n v. Grp. Hosp. & Med. Servs., Inc.*,
   744 F. Supp. 700 (E.D. Va. 1990) ......................................................................... 3

*Bonner v. City of Prichard*,
   661 F.2d 1206 (11th Cir. 1981) ............................................................................ 67

iv

7872588.1

*Burrows v. Purchasing Power, LLC*,
   2013 WL 10167232 (S.D. Fla. Oct. 7, 2013)................................................................ 34

*Busby v. JRHBW Realty, Inc.*,
   513 F.3d 1314 (11th Cir. 2008) ................................................................................ 49

*Camden I Condo. Ass'n, Inc. v. Dunkle*,
   946 F.2d 768 (11th Cir. 1991) ................................................................................ 101

*Camp v. City of Pelham*,
   2014 WL 1764919 (N.D. Ala., May 1, 2014).............................................................. 43

*Carnegie v. Mut. Sav. Life Ins. Co.*,
   2004 WL 3715446 (N.D. Ala. Nov. 23, 2004) ...................................................... 44, 105

*Carriuolo v. Gen. Motors Co.*,
   823 F.3d 977 (11th Cir. 2016) ................................................................................ 47

*Carroll v. Macy's, Inc.*,
   2020 WL 3037067 (N.D. Ala. June 5, 2020)............................................................... 30

*Cent. Benefits Mut. Ins. Co. v. Blue Cross & Blue Shield Ass'n*,
   711 F. Supp. 1423 (S.D. Ohio 1989) ......................................................................... 3

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012).............................................................................................. 135

*Cifuentes v. Regions Bank*,
   2014 WL 1153772 (S.D. Fla. Mar. 20, 2014).............................................................. 43

*City of Livonia Emp. Ret. Sys. v. Wyeth*,
   2013 WL 4399015 (S.D.N.Y. Aug. 7, 2013)............................................................... 59

*City P'ship Co. v. Atl. Acquisition Ltd. Partnership*,
   100 F.3d 1041 (1st Cir. 1996)................................................................................. 71

*Cliff v. Payco General American Credits, Inc.*,
   363 F.3d 1113 (11th Cir. 2004) ......................................................................... 96, 97

*Collins v. Quincy Bioscience, LLC*,
   2020 WL 7135528 (S.D. Fla. Nov. 16, 2020) ............................................................ 123

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) ................................................................................ 28

*Davenport v. United States*,
   217 F.3d 1341 (11th Cir. 2000) ............................................................................... 97

v

*Deas v. Russell Stover Candies, Inc.*,
　　2005 WL 8158201 (N.D. Ala. Dec. 22, 2005) ........................................................... 43

*DeBoer v. Mellon Mortg. Co.*,
　　64 F.3d 1171 (8th Cir. 1995) ...................................................................................... 48

*Dubin v. Miller*,
　　132 F.R.D. 269 (D. Colo. 1990) ................................................................................. 48

*Dujanovic v. MortgageAmerica, Inc.*,
　　185 F.R.D. 660 (N.D. Ala. 1999) ............................................................................... 46

*Edwards v. Nat'l Milk Producers Fed'n*,
　　2017 WL 3616638 (N.D. Cal. Jun. 26, 2017) ............................................................ 61

*Fabricant v. Sears Roebuck*,
　　202 F.R.D. 310 (S.D. Fla. 2001) ................................................................................ 50

*Faught v. Am. Home Shield Corp.*,
　　668 F.3d 1233 (11th Cir. 2011) ........................................................................ 40, 101

*Ferrick v. Spotify USA Inc.*,
　　2018 WL 2324076 (S.D.N.Y. May 22, 2018) .......................................................... 122

*Ferron v. Kraft Heinz Foods Co.*,
　　2021 WL 2940240 (S.D. Fla., July 13, 2021) ............................................................ 60

*Fitzgerald v. P.L. Mktg., Inc.*,
　　2020 WL 3621250 (W.D. Tenn. July 2, 2020) ............................................. 39, 42, 116

*Florida Trailer & Equip. Co. v. Deal*,
　　284 F.2d 567 (5th Cir. 1960) ..................................................................................... 67

*FMC Corp. v. Holliday*,
　　498 U.S. 52 (1990) ...................................................................................................... 95

*Fox Midwest Theatres v. Means*,
　　221 F.2d 173 (8th Cir. 1955) ..................................................................................... 73

*Fraley v. Batman*,
　　638 Fed.Appx. 594 (9th Cir. 2016) ............................................................................ 64

*Friedman v. Guthy-Renker, LLC*,
　　2017 WL 6527295 (C.D. Cal. Aug. 21, 2017) ........................................................... 93

*Georgine v. Amchem Prods., Inc.*,
　　83 F.3d 610 (3d Cir. 1996) ................................................................................... 46, 49

vi

*Granger v. Sears Roebuck & Co.*,
  2008 WL 11424140 (N.D. Ala., Aug. 4, 2008) ...................................................... 51

*Granillo v. FCA US LLC*,
  2018 WL 4676057 (D.N.J. Sept. 28, 2018) .......................................................... 122

*Grp. Hosp. & Med. Servs., Inc. v. Blue Cross & Blue Shield Ass'n*,
  1 U.S.P.Q.2d 1893 (D.C. Super. Sept. 26, 1986)..................................................... 3

*Grp. Hosp. & Med. Servs., Inc. v. Blue Cross & Blue Shield of Va.*,
  No. 85-1123-A (E.D. Va. Apr. 8, 1986) ................................................................. 3

*Grunin v. Int'l House of Pancakes*,
  513 F.2d 114 (8th Cir. 1975) ....................................................................... 64, 67

*Gunnells v. Healthplan Servs., Inc.*,
  348 F.3d 417 (4th Cir. 2003) ............................................................................ 127

*Hall v. Accolade, Inc.*,
  2019 WL 3996621 (E.D. Pa. Aug. 23, 2019) ....................................................... 84

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ........................................................................... 61

*Henderson v. Emory Univ.*,
  2020 WL 9848975 (N.D. Ga. Nov. 4, 2020) ........................................................ 61

*Henderson v. Thomas*,
  289 F.R.D. 506 (M.D. Ala. 2012)...................................................................... 127

*Herrera v. LCS Fin. Servs. Corp.*,
  274 F.R.D. 666 (N.D. Cal. 2011)....................................................................... 118

*Hill v. State Street Corp.*,
  2015 WL 127728 (D. Mass. Jan. 8, 2015) ........................................................... 59

*Holmes v. Cont'l Can Co.*,
  706 F.2d 1144 (11th Cir. 1983) ......................................................................... 55

*In re Advanced Battery Techs., Inc., Sec. Litig.*,
  298 F.R.D. 171 (S.D.N.Y. 2014) ....................................................................... 59

*In re Am. Exp. Fin. Advisors Sec. Litig.*,
  672 F.3d 113 (2d Cir. 2011) ............................................................................ 119

*In re Blue Cross Blue Shield Antitrust Litig.*,
  2020 WL 8256366 (N.D. Ala. Nov. 30, 2020) ............................................... *passim*

*In re Blue Cross Blue Shield Antitrust Litig.*,
   238 F. Supp. 3d 1313 (N.D. Ala. 2017) ........................................................................ 37, 38

*In re Blue Cross Blue Shield Antitrust Litig.*,
   308 F. Supp. 3d 1241 (N.D. Ala. 2018) ............................................................ 45, 65, 66, 95

*In re Blue Cross Blue Shield Antitrust Litig.*,
   908 F. Supp. 2d 1373 (J.P.M.L. 2012) ......................................................................... 54, 55

*In re Checking Account Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) ............................................................................. 44

*In re Checking Acct. Overdraft Litig.*,
   2020 WL 4586398 (S.D. Fla., Aug. 10, 2020) ........................................................... 60, 117

*In re Checking Acct. Overdraft Litig.*,
   275 F.R.D. 654 (S.D. Fla. 2011) .......................................................................... 33, 52, 53

*In re Chicken Antitrust Litig. Am. Poultry*,
   669 F.2d 228 (5th Cir. 1982) ......................................................................... 55, 56, 113

*In re Chocolate Confectionary Antitrust Litig.*,
   470 F. App'x 67 (3d Cir. 2012) ....................................................................................... 94

*In re Citigroup Secs. Litig.*,
   2014 WL 3610988 (S.D.N.Y. July 21, 2014) ................................................................ 120

*In re Corrugated Container Antitrust Litig.*,
   643 F.2d 195 (5th Cir. 1981) .................................................................................... 67, 71

*In re Credit Default Swaps Antitrust Litig.*,
   2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) ................................................................. 56

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
   317 F.R.D. 675 (N.D. Ga. 2016) ..................................................................................... 47

*In re Domestic Air Transp. Antitrust Litig.*,
   137 F.R.D. 677 (N.D. Ga. 1991) ..................................................................................... 53

*In re Domestic Air Transp. Antitrust Litig.*,
   148 F.R.D. 297 (N.D. Ga. 1993) ............................................................................. 67, 100

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   2008 WL 2566867 (S.D. Tex. June 24,2008) ............................................................... 123

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
   2020 WL 256132 (N.D. Ga. Mar. 17, 2020) ...................................................... 31, 33, 40, 45

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
999 F.3d 1247 (11th Cir. 2021) ...................................................................... *passim*

*In re Ford Motor Co. Spark Plug & Three Valve Engine Prods. Liab. Litig.*,
2016 WL 6909078 (N.D. Ohio Jan. 26, 2016) ......................................................... 59

*In re Gilat Satellite Networks, Ltd.*,
2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ......................................................... 59

*In re GSE Bonds Antitrust Litig.*,
414 F. Supp. 3d 686 (S.D.N.Y. 2019) ..................................................... 42, 56, 113

*In re Home Depot Inc.*,
931 F.3d 1065 (11th Cir. 2019) ............................................................... 100, 101

*In re Initial Pub. Offering Sec. Litig.*,
728 F. Supp. 2d 289 (S.D.N.Y. 2010) .................................................................. 122

*In re Ins. Brokerage Antitrust Litig.*,
282 F.R.D. 92 (D.N.J. 2012) ............................................................................. 110

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
327 F.R.D. 483 (S.D.N.Y. 2018) ........................................................................ 58

*In re Managed Care Litig.*,
2010 WL 6532982 (S.D. Fla. Aug. 15, 2010) ......................................................... 73

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
2007 WL 4526593 (S.D.N.Y. Dec. 20, 2007) ......................................................... 59

*In re Motorsports Merch. Antitrust Litig.*,
112 F. Supp. 2d 1329 (N.D. Ga. 2000) ................................................................. 29

*In re Mut. Funds Inv. Litig.*,
2011 WL 1102999 (D. Md. Mar. 23, 2011) ............................................................ 59

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................................... 104

*In re Oppenheimer Champions Fund Sec. Fraud Class Actions*,
2012 WL 13005663 (D. Colo. March 15, 2012) ...................................................... 119

*In re Packaged Ice Antitrust Litig.*,
322 F.R.D. 276 (E.D. Mich. 2017) ....................................................................... 52

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y. 1997) .................................................................. 56, 105

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) ...................................................... 41, 73, 75, 110

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   330 F.R.D. 11 (E.D.N.Y. 2019) ...................................................................................... 42, 105

*In re Polyurethane Foam Antitrust Litig.*,
   168 F. Supp. 3d 985 (N.D. Ohio 2016) .............................................................................. 61, 81

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
   2015 WL 4528880 (E.D. La. July 27, 2015) ............................................................................ 44

*In re Spring Corp. ERISA Litig.*,
   443 F. Supp. 2d 1249 (D. Kan. 2006) ....................................................................................... 59

*In re Sunbeam Sec. Litig.*,
   176 F. Supp. 2d 1323 (S.D. Fla. 2001) .................................................................................... 55

*In re Tremont Sec. Law, State Law & Ins. Litig.*,
   2015 WL 5333494 (S.D.N.Y. Sept. 14, 2015) ......................................................................... 57

*In re U.S. Oil & Gas Litig.*,
   967 F.2d 489 (11th Cir. 1992) ................................................................................................. 28

*In re United States Sugar Corp. Litig.*,
   2011 WL 13173854 (S.D. Fla. Jan. 24, 2011) ......................................................................... 33

*In re Vitamins Antitrust Litig.*,
   2000 WL 1737867 (D.D.C. Mar. 31, 2000) ............................................................................. 71

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) .................................................................................... 105

*Ingram Corp. v. J. Ray McDermott & Co.*,
   698 F.2d 1295 (5th Cir. 1983) ................................................................................................. 72

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981) .................................................................................................................. 56

*Johnson v. NPAS Solutions, LLC*,
   975 F.3d 1244 (11th Cir. 2020) ................................................................................................ 15

*Juris v. Inamed Corp.*,
   685 F.3d 1294 (11th Cir. 2012) ................................................................................. 99, 103, 104

*Kennedy v. Tallant*,
   710 F.2d 711 (11th Cir. 1983) ................................................................................................. 49

*Kerr v. City of W. Palm Beach*,
　875 F.2d 1546 (11th Cir. 1989) ................................................................. 52

*Kornberg v. Carnival Cruise Lines, Inc.*,
　741 F.2d 1332 (11th Cir. 1984) ................................................................. 48

*Kreuzfeld A.G. v. Carnehammar*,
　138 F.R.D. 594 (S.D. Fla. 1991) ................................................................ 46

*Langbecker v. Electronic Data Systems Corp.*,
　476 F.3d 299 (5th Cir. 2007) ................................................................... 135

*Lawlor v. National Screen Serv. Corp.*,
　349 U.S. 322 (1955) ................................................................... 70, 71, 72, 73

*Lazy Oil Co. v. Witco Corp.*,
　95 F. Supp. 2d 290 (W.D. Pa. 1997) .......................................................... 44

*Leverso v. SouthTrust Bank of Ala., N.A.*,
　18 F.3d 1527 (11th Cir. 1994) ................................................................. 55

*Liberty Nat'l Ins. Cases*,
　2006 WL 8436814 (N.D. Ala. Mar. 31, 2006) ...................................... 28, 29

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
　2015 WL 5626412 (N.D. Ala. Sept. 14, 2015) ....................................... 105

*Lockheed Corp. v. Spink*,
　517 U.S. 882 (1996) ........................................................................ 132, 134

*Luviano v. Multi Cable, Inc.*,
　2017 WL 3017195 (C.D. Cal. Jan. 3, 2017) ............................................ 118

*Madison Square Garden, L.P. v. National Hockey League*,
　2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ...................................... 72, 74

*Makro Cap. of Am., Inc. v. UBS AG*,
　543 F.3d 1254 (11th Cir. 2008) ............................................................... 96

*Martens v. Smith Barney, Inc.*,
　181 F.R.D. 243 (S.D.N.Y. 1998) ......................................................... 61, 62

*Mass. Mut. Life. Ins. v. Russell*,
　473 U.S. 134 (1985) ............................................................................. 129

*McAnaney v. Astoria Fin. Corp.*,
　2006 WL 2689621 (E.D.N.Y. Sept. 19, 2006) .......................................... 48

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
   161 F.3d 443 (7th Cir. 1998) ........................................................................ 72

*McWhorter v. Ocwen Loan Servicing, LLC*,
   2019 WL 9171207 (N.D. Ala. Aug. 1, 2019) ............................................. 28

*Metzler v. Med. Mgmt. Int'l, Inc.*,
   2020 WL 5994537 (M.D. Fla. Oct. 9, 2020) ............................................. 16

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985)..................................................................................... 74

*Mora v. Harley-Davidson Credit Corp.*,
   2012 WL 1189769 (E.D. Cal. Apr. 9, 2012) ........................................... 118

*Morgan v. Pub. Storage*,
   301 F. Supp. 3d 1237 (S.D. Fla. 2016) ..................................... 28, 102, 103, 104

*Murray v. Auslander*,
   244 F.3d 807 (11th Cir. 2001) .................................................................. 48

*Nichols v. SmithKline Beecham Corp.*,
   2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ............................................. 44

*Nitsch v. Dreamworks Animation SKG Inc.*,
   315 F.R.D. 270 (N.D. Cal. 2016)............................................................. 118

*Parsons v. Brighthouse Networks*,
   2015 WL 13629647 (N.D. Ala. Feb. 5, 2015) ..................................... 35, 36

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985).................................................................................. 103

*Radcliffe v. Hernandez*,
   794 F. App'x 605 (9th Cir. 2019) ................................................ 83, 84, 110

*Record Club of Am., Inc. v. United Artists Records, Inc.*,
   611 F. Supp. 211 (S.D.N.Y. 1985) ........................................................... 72

*Redel's Inc. v. Gen. Elec. Co.*,
   498 F.2d 95 (5th Cir. 1974) ....................................................... 70, 71, 73

*Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*,
   545 F.2d 18 (7th Cir.1976) ........................................................................ 72

*Riley Mfg. Co. v. Anchor Glass Container Corp.*,
   157 F.3d 775 (10th Cir. 1998) ................................................................. 119

*Robertson v. Nat'l Basketball Ass'n*,
  556 F.2d 682 (2d Cir. 1977) ................................................................. 64, 67, 68, 69

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ........................................................................... 44

*Ross v. Trex Co.*,
  2013 WL 6622919 (N.D. Cal. Dec. 16, 2013) ................................................. 61

*Saccoccio v. JP Morgan Chase Bank, N.A.*,
  297 F.R.D. 683 (S.D. Fla. 2014) ...................................................................... 34

*Schulte v. Fifth Third Bank*,
  805 F. Supp. 2d 560 (N.D. Ill. 2011) ............................................................. 122

*Schwartz v. TXU Corp.*,
  2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) ................................................... 55

*Shane v. Humana, Inc.*,
  2009 WL 7848518 (S.D. Fla. Nov. 5, 2009) ..................................................... 74

*Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*,
  2021 WL 1986564 (D.R.I. May 18, 2021) ...................................................... 118

*Singer v. AT&T Corp.*,
  185 F.R.D. 681 (S.D. Fla. 1998) ...................................................................... 46

*Smith v. Floor & Decor Outlets of Am., Inc.*,
  2017 WL 11495273 (N.D. Ga. Jan. 10, 2017) .................................................. 55

*Sosna v. Iowa*,
  419 U.S. 393 (1975) ....................................................................................... 126

*Sprint Commc'ns Co. L.P. v. APCC Services, Inc.*,
  554 U.S. 269 (2008) ....................................................................................... 129

*Stott v. Cap. Fin. Servs., Inc.*,
  277 F.R.D. 316 (N. D. Tex. 2011) .................................................................. 118

*Strube v. Am. Equity Inv. Life Ins. Co.*,
  226 F.R.D. 688 (M.D. Fla. 2005) ..................................................................... 34

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011) ............................................................................ 59

*Swaney v. Regions Bank*,
  2020 WL 3064945 (N.D. Ala., June 9, 2020) ............................................ *passim*

*Sweda v. Univ. of Pennsylvania*,
   923 F.3d 320 (3d Cir. 2019) ........................................................ 132

*Swinton v. SquareTrade, Inc.*,
   2019 WL 617791 (S.D. Iowa, Feb. 14, 2019) .................................. 30, 78

*Three Rivers Motors Co. v. Ford Motor Co.*,
   522 F.2d 885 (3rd Cir. 1975) .......................................................... 72

*Trauth v. Spearmint Rhino Cos. Worldwide, Inc.*,
   2011 WL 13134046 (C.D. Cal. Apr. 4, 2011) ..................................... 57

*Turner v. Murphy Oil USA, Inc.*,
   472 F. Supp. 2d 830 (E.D. La. 2007) ............................................... 22

*United States ex rel Balko v. Senior Home Care, Inc.*,
   2017 WL 9398654 (M.D. Fla. May 2, 2017) ....................................... 67

*United States v. Anthem*,
   236 F. Supp. 3d 171 (D.D.C. 2017) ................................................. 78

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ............................................... 31, 126

*Vermont Agency of Natural Res. v. United States ex rel. Stevens*,
   529 U.S. 765 (2000) .................................................................. 129

*VKK Corp. v. NFL*,
   244 F.3d 114 (2d Cir. 2001) ........................................................... 72

*Wade v. Kroger Co.*,
   2008 WL 4999171 (W.D. Ky. Nov. 20, 2008) .................................... 59

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ............................................................... 47, 61

*Walsh v. Great Atl. & Pac. Tea Co.*,
   726 F.2d 956 (3d Cir. 1983) ......................................................... 104

*Waters v. Int'l Precious Metals Corp.*,
   190 F.3d 1291 (11th Cir. 1999) ..................................................... 101

*Williams v. Mohawk Indus., Inc.*,
   568 F.3d 1350 (11th Cir. 2009) ....................................................... 48

*Winston v. Jefferson Cty.*,
   2006 WL 6916381 (N.D. Ala., June 26, 2006) .................................... 52

xiv

*Wolin v. Jaguar Land Rover N. Am., LLC,*
    617 F.3d 1168 (9th Cir. 2010) ............................................................ 54

*Xerox Corp. v. Media Scis., Inc.,*
    609 F. Supp. 2d 319 (S.D.N.Y. 2009) ........................................ 70, 72, 75

**Statutes**

28 U.S.C. § 1715(d) ........................................................................ 28

29 U.S.C. § 1002(14)(B) ................................................................ 131

29 U.S.C. § 1102(A) ............................................................... 124, 127

29 U.S.C. § 1104(a)(1)(A) .............................................................. 124

29 U.S.C. § 1106(a)(1)(A) .............................................................. 131

29 U.S.C. § 1108(c)(3) ............................................................ 128, 131

29 U.S.C. § 1132(a)(2) .................................................................. 129

29 U.S.C. § 1132(d) ...................................................................... 124

29 U.S.C. § 1183 ........................................................................... 85

**Rules**

Fed. R. Civ. P. 23 ...................................................................... *passim*

**Regulations**

*Class Exemption for the Release of Claims and Extensions of Credit
    in Connection With Litigation,*
    68 Fed. Reg. 75632 (Dec. 31, 2003) ......................................... 134, 135

*Preamble to Adoption of Amendment to PTE 2003-39,*
    75 Fed. Reg. 33830 (June 15, 2010) ................................................ 135

**Administrative Reports & Decisions**

U.S. Dep't of Labor Advisory Opinion 1995-26A (Oct. 17, 1995) ............... 133, 134, 135

**Other Authorities**

3 Newberg on Class Actions § 7:31 (5th ed.) ................................... 126

4 Newberg on Class Actions § 12:15 (5th ed.) ................................... 56

5 MOORE'S FEDERAL PRACTICE § 23.25(4)(b)(ii) ........................................................................ 127

5 MOORE'S FEDERAL PRACTICE—CIVIL § 23.102 ........................................................... 103, 104

Subscriber Plaintiffs[1] respectfully submit this memorandum in support of their Motion for Final Approval of Class Settlement. The Settlement Agreement was previously submitted to the Court in conjunction with Subscriber Plaintiffs' Motion for Preliminary Approval of Class Settlement. ECF No. 2610-2 (the "Settlement" or "Settlement Agreement").[2]

## I.   INTRODUCTION

The Settlement represents a monumental achievement. The Settlement secures "historic and substantial" structural changes that will reshape competition in the health insurance industry and offer increased choice in the market for health insurance to millions of Americans, along with one of the largest monetary recoveries ever achieved in an antitrust class action settlement. ECF No. 2641, Order Granting Preliminary Approval, ("Preliminary Approval Order") at 4; *see also* ECF No. 2733-3, Declaration of Professor Charles Silver ("Silver Decl."), ¶ 63; ECF No. 2733-4, Declaration of Professor Brian Fitzpatrick ("Fitzpatrick Decl."), ¶ 17 (this "may very well end up

---

[1] Subscriber Plaintiffs are Galactic Funk Touring, Inc.; American Electric Motor Services, Inc.; CB Roofing, LLC; Pearce, Bevill, Leesburg, Moore, P.C.; Pettus Plumbing & Piping, Inc.; Consumer Financial Education Foundation of America, Inc.; Fort McClellan Credit Union; Rolison Trucking Co., LLC; Conrad Watson Air Conditioning, Inc.; Linda Mills; Frank Curtis; Jennifer Ray Davidson; Pete Moore Chevrolet, Inc.; Jewelers Trade Shop; Saccoccio & Lopez; Angel Foster (*fka* Angel Vardas); Monika Bhuta; Michael E. Stark; G&S Trailer Repair Incorporated; Chelsea L. Horner; Montis, Inc.; Renee E. Allie; John G. Thompson; Avantgarde Aviation, Inc.; Hess, Hess & Daniel, P.C.; Betsy Jane Belzer; Bartlett, Inc., d/b/a Energy Savers; Matthew Allan Boyd; Gaston CPA Firm; Rochelle and Brian McGill; Sadler Electric; Jeffrey S. Garner; Amy MacRae; Vaughan Pools, Inc.; Casa Blanca, LLC; Jennifer D. Childress; Clint Johnston; Janeen Goodin and Marla S. Sharp; Erik Barstow; GC/AAA Fences, Inc.; Keith O. Cerven; Teresa M. Cerven; Sirocco, Inc.; Kathryn Scheller; Iron Gate Technology, Inc.; Nancy Thomas; Pioneer Farm Equipment, Inc.; Scott A. Morris; Tony Forsythe; Joel Jameson; Ross Hill; Angie Hill; Kevin Bradberry; Christy Bradberry; Tom Aschenbrenner; Juanita Aschenbrenner; Free State Growers, Inc.; Tom A. Goodman; Jason Goodman; Comet Capital, LLC; Barr, Sternberg, Moss, Lawrence, Silver & Munson, P.C.; Mark Krieger; Deborah Piercy; and Lisa Tomazzoli. This memorandum is also submitted on behalf of Self-Funded Plaintiff Hibbett Sports, Inc.

[2] Capitalized terms not otherwise defined herein shall have the meaning given them in the Settlement Agreement.

as the largest class action settlement in federal court this entire year"); and ECF No. 2610-12, Declaration of Edgar C. Gentle ("Gentle PA Decl."), ¶ 33.

Most notably, this Settlement provides:

- **Monetary Relief.** Defendants will pay $2.67 billion to the Settlement Fund, which will include distributions to the Damages Class, Notice and Administration Costs, and any Fee and Expense Award.

- **Equitable Relief.** The Settlement provides equitable relief to enhance competition in the market for health insurance, to the benefit of all Settlement Class Members. This structural relief includes:

  o elimination of the Blues' national revenue cap on competition when they are not using the Blue names and marks—that cap, which the Blues call the "National Best Efforts" provision ("NBE"), requires that two-thirds of each Settling Individual Blue Plan's (referred to herein as "Blue Plans" or "Plans") national healthcare-related revenue come from Blue-branded products as opposed to non-Blue ("Green") business;

  o modifications to a local revenue cap known as the "Local Best Efforts" provision;

  o the ability for certain Qualified National Accounts to seek bids from two Blue Plans such that Qualified National Accounts comprising at least 33 million Members can request competing Blue bids;

  o limits on BCBSA's rules regarding acquisitions;

  o guidelines to better enable contracting between Non-Provider Vendors and Self-Funded Accounts; and

  o limits on use of Most Favored Nations ("MFN") Clauses and Differentials.

- **Five-Year Monitoring Period.** For a period of five years from the Court's entry of Final Judgment and Order of Dismissal, a Monitoring Committee comprised of members appointed by the Settling Defendants, Settlement Class Counsel, Self-Funded Sub-Class Counsel, and the Court shall review any rules or regulations submitted by BCBSA to the Monitoring Committee, and shall mediate certain disputes, if any, related to the Injunctive Relief.

With nine weeks remaining to the Claim Filing Deadline, this Settlement has garnered overwhelmingly positive support of the class. Over *six million claims* have already been filed. Exhibit A, Declaration of Jennifer Keough ¶ 96 ("Keough Decl."). Per JND's experience, this is a

"very robust filing rate for a class of this size" particularly given the time remaining in the claims period. *Id*. Only 2,049 Class Members have submitted timely opt-out requests, and just 123 have objected (submitting 40 total objections)—a small number compared to the class size and the number of claimants participating in the Settlement's financial relief. *Id*. ¶ 195; Appendix A.

Subscriber Plaintiffs address the objections in detail in Section VII of this brief. As a threshold observation, however, it is worth reminding the Court that many of the core features of the BCBS rules and practices challenged in this case were public knowledge for decades before this case was filed, yet neither the government agencies charged with enforcing the Sherman Act nor any of the objectors ever sought to challenge those rules and practices. One can find public statements by BCBS executives going all the way back to 1946 that describe a system in which "*only one Blue Cross Plan is established in each enrollment area*." ECF No. 1353-94. In 1971, the Blue Cross president testified before a Senate antitrust subcommittee that the Blue Plans had "*exclusive territorial arrangements*." ECF No. 1353-95 to -96. In 1979, a report by the Federal Trade Commission ("FTC")—which is tasked with enforcing the nation's antitrust laws—recognized that "*Blue Shield plans generally do not compete with each other*." ECF No. 1353-21 to -22. A number of courts also recognized the existence of the ESA restrictions.[3] And despite knowing about the BCBS system for decades, the federal antitrust enforcement agencies chose never to challenge them. Even as this litigation has been pending for almost a decade, they never chose to bring any action or to submit anything in support in this case.

---

[3] *See Grp. Hosp. & Med. Servs., Inc. v. Blue Cross & Blue Shield of Va.*, No. 85-1123-A (E.D. Va. Apr. 8, 1986), *aff'd*, 819 F.2d 1138 (4th Cir. 1987); *Cent. Benefits Mut. Ins. Co. v. Blue Cross & Blue Shield Ass'n*, 711 F. Supp. 1423, 1425 (S.D. Ohio 1989); *Blue Cross & Blue Shield Ass'n v. Grp. Hospitalization & Med. Servs., Inc.*, 744 F. Supp. 700, 704 (EDVA 1990); *Grp. Hosp. & Med. Servs., Inc. v. Blue Cross & Blue Shield Ass'n*, 1 U.S.P.Q.2d 1893, 1895 (D.C. Super. Sept. 26, 1986).

Recognizing this history is critical to understanding the achievements of this Settlement in their proper context. This was not a case in which government agencies uncovered a secret cartel, followed by the inevitable class action lawsuits. This was not even a case in which private actors uncovered some secret arrangement that was previously not public. Instead, this was a case in which a small group of class representatives and their counsel (which was initially a small group too) chose to challenge a well-known, decades-old, and overtly public system for arranging the activities of the entire BCBS system. It was an audacious challenge, and it is not surprising that it resulted in close to a decade of trench-warfare litigation, with hundreds of lawyers deployed by the parties. Since the cases' inception, no government agencies saw fit to intervene or do anything else to support the private plaintiffs. Nor did any of the objectors, not even the handful of Fortune 500 companies that have now been signed up to object. General Motors, Home Depot, FedEx, Boeing, Dollar General—these are companies that have the resources to fight any injustice that harms them, yet they chose never to challenge the BCBS system, not even during the eight long years between when this case was first filed and when this Settlement was announced. Instead, they chose to remain on the sidelines, only to come to Court now to complain that the Settlement does not go far enough, leaves too many things in place, or fails to give them as much as their lawyers now say they deserve. The Court should not give credence to these objections for the reasons set forth below.

Subscriber Plaintiffs now move for final approval of the Settlement and for appointment of a Settlement Administrator. This Memorandum of Law is supported by the Declaration of Jennifer Keough in Support of Final Approval (Exhibit A); the Declaration of Dr. Daniel Rubinfeld in Support of Final Approval (Exhibit B); a List of Regional and National Insurers (Exhibit C); the Declaration of Dr. Joseph Mason (Exhibit D); several documents produced by the Settling

4

Defendants during the litigation (Exhibit E, BCBS-AZ_MDL000124422; Exhibit F, CAREFIRST_ESI_06681777; Exhibit G, ARKBCBS0047016); the July 28, 2021 Letter from W. Berry to Settlement Class Counsel and Counsel for Settling Defendants (Exhibit H); the Resume of Proposed Settlement Administrator Judge Irma E. Gonzalez (Ret.) (Exhibit I); the Proposed Order Appointing Settlement Administrator (Exhibit J); and the Proposed Amended Stipulation and Order Regarding Protected Health Information and Personally Identifiable Information for Subscriber Settlement (Exhibit K). Also attached at Exhibits 1-40 are the relevant portions of all timely submitted objections.[4]

The Settlement creates substantial benefits and opens pathways to more competition, lower costs, greater innovation, more consumer choice, and increased availability of products for millions of Settlement Class Members. It is fair, reasonable, and adequate, and meets all the requisite criteria for final approval under Rule 23. The overwhelmingly positive response by members of the Settlement Class confirms that final approval is warranted. Accordingly, this motion should be granted, and the Settlement finally approved. Subscriber Plaintiffs have submitted a proposed Final Approval Order (Exhibit L) with this brief which contains the specific approvals requested herein.

## II.   FACTUAL BACKGROUND

### A.   The Terms of the Proposed Settlement

The following is a summary of the Settlement Agreement's material terms.[5]

---

[4] The objections have been redacted to remove personal information, including street addresses, individual telephone numbers and email addresses, and plan numbers, employment information, and coverage dates, along with non-substantive exhibits. Subscriber Plaintiffs will provide full copies of all objections and supporting materials for the Court's *in camera* review.

[5] All descriptions of the Settlement Agreement's terms in this brief are for summary, descriptive, and illustrative purposes only, and are not intended to, and shall not be deemed to, modify the

### 1.     The Settlement Class Members

The Settlement Classes include a damages class under Rule 23(b)(3), as well as an injunctive relief class under Rule 23(b)(2). The Settlement Classes include any person or entity within the Injunctive Relief Class or the Damages Class, excluding Government Accounts and Opt-Outs. Settlement ¶ 1(llll). The Settlement Class Period is February 7, 2008 through October 16, 2020 ("FI Class Period"), except for Self-Funded Accounts for which the Settlement Class Period is September 1, 2015 through October 16, 2020 ("Self-Funded Class Period"). *Id.* ¶ 1(nnnn).

The Settlement Classes are defined as follows:

### a.     The Damages Class

The Damages Class includes "all Individual Members (excluding dependents and beneficiaries), Insured Groups (including employees, but excluding non-employee Members), and Self-Funded Accounts (including employees, but excluding non-employee Members) that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product[6] (unless the person or entity's only Blue-Branded Commercial Health Benefit Product during the Settlement Class Period was a stand-alone vision or dental product) sold, underwritten, insured, administered, or issued by any member plan during the Settlement Class Period." *Id.* ¶ 1(v).

---

Settlement Agreement in any way, or affect the meaning or interpretation of the Settlement Agreement.

[6] Commercial Health Benefit Products mean "any product or plan providing for the payment or administration of health care services," including but not limited to medical, pharmacy, dental, and vision services. *Id.* ¶¶ 1(o), 1(v). However, if a person or entity's only Blue-Branded Commercial Health Benefit Product during the Settlement Class Period was a stand-alone vision or dental product, that person or entity is not included in the Damages Class. *Id.* ¶¶ 1(o), 1(v).

The Damages Class includes employees[7] of Insured Groups and Self-Funded Accounts who were covered by a Blue-Branded Commercial Health Benefit Product during the Settlement Class Period, whether or not they expressly contributed towards their premiums or the cost of that Product, but it does not include their beneficiaries and dependents. The Damages Class also excludes "Government Accounts,[8] Medicare Accounts of any kind, Settling Defendants, and any parent or subsidiary of any Settling Defendant (and their covered or enrolled employees)" as well as any Opt-Outs, "the judge presiding over this matter, and any members of his judicial staff, to the extent such staff were covered by a Commercial Health Benefit Product not purchased by a Government Account during the Settlement Class Period." *Id.*

Subscriber Plaintiffs are also seeking certification of a "Self-Funded Sub-Class" consisting of Self-Funded Accounts and their employees during the applicable Settlement Class Period, September 1, 2015 through October 16, 2020. The Self-Funded Sub-Class is represented by Self-Funded Sub-Class Settlement Counsel and the Self-Funded Sub-Class Representative. *Id.* ¶¶ 1(dddd), 1(eeee).

---

[7] Employees "means any current or former employee, officer, director, partner, or proprietor of an entity." *Id.* ¶ 1(v).

[8] Government Accounts are defined in the Settlement as "only a state, a county, a municipality, an unincorporated association performing municipal functions, a Native American tribe, or the federal government (including the Federal Employee Program). Government Account includes all Members of the Government Account. No other entity that is not a state, county, municipality, unincorporated association performing municipal functions, Native American tribe or the federal government is a Government Account, unless it is required by law to provide any health care coverage it makes available to Members only under, or as a participant in, a Commercial Health Benefit Product approved, selected, procured, sponsored or purchased by a Government Account. Entities that are not Government Accounts (e.g., utility companies, school districts, government-funded hospitals, public retiree benefit plans, public libraries, port authorities, transportation authorities, waste disposal districts, police departments, fire departments) will receive notice and an opportunity to submit a claim form to the extent they are otherwise within the definition of the Damages Class." *Id.* ¶ 1(hh).

### b.        The Injunctive Relief Class

The Injunctive Relief Class includes "all Individual Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Settlement Class Period." *Id.* ¶ 1(pp). The Injunctive Relief Class includes beneficiaries and dependents of employees (including minors).

### 2.        Relief for the Benefit of the Settlement Class Members

The Settlement provides: (a) a $2.67 billion settlement fund; and (b) significant structural changes to Defendants' practices, to be closely monitored for compliance with both the antitrust laws and the injunctive terms of the Settlement by the Monitoring Committee for five years following the entry of judgment.

### a.        The Settlement Fund

The Settlement requires Defendants to establish a Settlement Fund of $2.67 billion, to be deposited into an Escrow Account for ultimate distribution. The Settlement Fund includes the Notice and Administration Fund and Fee and Expense Award(s). *Id.* ¶ 1(oooo).

The Settlement Fund will: (1) pay all Settlement Class Members who are entitled to a distribution from the Net Settlement Fund ("Authorized Claimants") in accordance with a Court-approved Plan of Distribution, Settlement ¶ 27; (2) fund a $100 million Notice and Administration Fund to pay Notice and Administration Costs, *id.* ¶¶ 1(ggg), 29(a), as well as up to $7 million to "reimburse plaintiffs' counsel's actual and reasonable fees and expenses incurred for Notice and Administration," *id.* ¶ 28(h) and costs of monitoring, *id.* ¶ 21; and (3) pay Court-awarded attorneys' fees and expenses, together not to exceed a combined total of 25% of the Settlement Amount, *id.* ¶ 28.

If there is any balance remaining in the $100 million Notice and Administration Fund, it will be returned to Settling Defendants after the completion of the administration and the Monitoring Period. *Id.* ¶ 30. Defendants have no other reversionary interest in the Settlement Fund, and if any money remains in the Settlement Fund (apart from any remainder of the $100 million Notice and Administration Fund) after distributions to Authorized Claimants, the Fee and Expense Award, and any Court-awarded Service Awards, the Claims Administrator will, subject to Court approval, allocate the remaining Escrow Account balance to Settlement Class Members. *Id.*[9] Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel may petition the Court for replenishment by Defendants of the Notice and Administration Fund upon a showing of necessity for such replenishment. *Id.* ¶ 1(ggg).

Settling Defendants have already transferred into the Escrow Account $100 million for the Notice and Administration Fund and advanced $300 million of the remaining Settlement Amount. *Id.* ¶ 23(a). Within 30 calendar days of the Court's entry of the Final Judgment and Order of Dismissal, Settling Defendants will transfer the remaining portion of the Settlement Amount into the Escrow Account. *Id.* ¶ 23(b).

### b.    Injunctive Relief

In addition to the $2.67 billion in monetary recovery, Class Representatives, Settlement Class Counsel, and Self-Funded Sub-Class Settlement Counsel secured substantial injunctive relief on behalf of the Settlement Classes. That relief includes unprecedented and far-reaching structural changes to BCBSA's rules and regulations, and the establishment of a Monitoring Committee to oversee compliance with the Settlement. As explained by Dr. Daniel Rubinfeld, each

---

[9] If it is not economical to distribute any remaining money to Settlement Class Members, subject to Court approval, the Claims Administrator may follow the directions set forth in the Plan of Distribution approved by the Court. Settlement ¶ 30.

of these hard-won changes to Defendants' rules provides significant additional relief to the Class, creating opportunities for more competition in the market for health insurance and providing the potential for Settlement Class Members to achieve greater consumer choice, better product availability, and increased innovation. *See* ECF No. 2610-10, Declaration of Daniel Rubinfeld ("Rubinfeld PA Decl.").

Key provisions of the injunctive relief include the following.

### i.      Eliminating Restrictions on Non-Blue Competition

BCBSA's license agreements with each Blue Plan have included limitations on Blue Plans' ability to generate revenue using Green brands, from outside the Blue Plan's assigned territorial service area; this restriction is identified as the National Best Efforts requirement. Rubinfeld PA Decl. ¶ 8. Settling Defendants have agreed to "eliminate and no longer enforce the National Best Efforts Requirement," and to "not adopt or implement any equivalent requirement or any rule in any future License Agreement or Membership Standard that imposes a cap, ratio, or other quantitative limit on a Settling Individual Blue Plan's non-Blue Branded healthcare business outside of its Service Area." Settlement ¶ 10. The Settlement's elimination of this restriction unleashes the substantial force of Green competition for the benefit of the class.

### ii.     Opening the Door to Expanded Blue Bids and Competition

Class Representatives also secured valuable equitable relief to pave the way for increased competition among Blue Plans for national accounts, in three important ways. *First*, certain Qualified National Accounts (defined as Employers with more than 5,000 employees and which also meet certain dispersion criteria, as discussed in more detail below) will be able to seek a second, previously prohibited bid from the Blue Plan of their choosing. *Id.* ¶ 15. This provision covers at least 33 million Members in the aggregate and will promote competition across the

market. *Id.* ¶ 1(u).[10] *Second*, for accounts with Independent Health Benefit Decision Locations in more than one Blue Plan's Service Area, each Independent Health Benefit Decision Location may request a bid from the Blue Plan in its Service Area to cover employees working at that Location. *Id.* ¶ 14(b). *Third*, when multi-Service Area National Accounts (those with more than 250 total Members and Headquarters in the bidding Blue Plan's Service Area) seek bids, and the Blue Plan for that Service Area decides to bid the Account under a non-Blue brand, the right to bid the Account under the Blue brands must be "ceded" to another Blue Plan, thereby allowing increased choice for that account. *Id.* ¶ 14(a). All three of these provisions will produce increased choice for accounts, a major achievement and structural change to the current system.

### iii.        Local Best Efforts

The Local Best Efforts ("LBE") rule requires that 80% of a Blue Plan's healthcare-related revenue within the Blue Plan's Service Area must come from Blue-branded business. The Settlement limits this requirement to 80% and limits the measurement of revenue for purposes of compliance with this requirement to no larger than the state level. *Id.* ¶ 11.

### iv.        Acquisitions

BCBSA currently controls—through Blue Plan voting—whether any individual Blue Plan may be acquired by another Blue Plan. Under the Settlement Agreement, Settling Defendants are only permitted to impose "legal and reasonable conditions on the acquisition of a member plan, but only to the extent that those conditions are reasonably necessary to prevent impairment of (1) the value of the Blue Marks, or (2) the competitiveness or efficiency of the Blue Branded business or of the Blue Marks," and any condition must provide that the potential acquirer may challenge

---

[10] This figure includes accounts that already have the right to request a bid from more than one Blue Plan, which will not receive the right to request additional bids. *Id.* ¶ 15.

any rejection by BCBSA before the Monitoring Committee, followed by binding arbitration. *Id.* ¶ 17.

### v.        Contracting Provisions for Self-Funded Accounts

The Settlement permits direct contracting between Non-Provider Vendors and Self-Funded Accounts. *Id.* ¶ 12(a). It also permits Blue Plans to do business with Self-Funded Accounts that directly contract with Specialty Service Provider Vendors, subject to certain conditions. *Id.* ¶ 12(b). Further, during the Monitoring Period and unless otherwise agreed to by the Settling Individual Blue Plan and Self-Funded Account, the Settlement requires that for a given contracted Provider, the Settling Individual Blue Plan will not enter into different standard commercial fee schedules for medical and surgical claims for its Self-Funded Accounts, on the one hand, and Insured Groups (other than Insured Groups who purchase an ACA-compliant individual or small-group product), on the other hand, if the products, networks, administrative services, and plan designs are the same, excluding differences in reimbursement rates individually negotiated with a contracted Provider. *Id.* at ¶ 12(d).

### vi.        Most Favored Nation Clauses

Blue Plans must abide by state laws, and any written agreements with a state regulatory agency as of November 2019 disclosed to Settlement Class Counsel, expressly regulating the use of Most Favored Nations ("MFN") or Most Favored Nation-Differential ("MFN-Differential") clauses in provider contracts. If there is no governing law or applicable written agreement, the Blue Plan entering into a MFN Differential[11] must demonstrate to the Monitoring Committee that the provision does not violate the terms of the Settlement. *Id.* ¶ 18.

---

[11] An MFN Differential is "an MFN which requires that the Provider offer a health plan financial terms that are more favorable by a specified rate than those it offers any comparable health plan during the performance period of the contract." *Id.* ¶ 1(bbb).

### vii.        Monitoring Committee

To oversee compliance with the Settlement for five years from the Court's entry of Final Judgment and Order of Dismissal,[12] *Id.* ¶¶ 1(xx), 1(zz), the Settlement establishes a Monitoring Committee "made up of (1) two members appointed collectively by Settling Defendants, (2) one member appointed collectively by Settlement Class Counsel, (3) one member appointed by Self-Funded Sub-Class Settlement Counsel, and (4) one member appointed by the Court." Additionally, the Monitoring Committee will mediate certain disputes related to the Settlement. *Id.* ¶ 20.

During the Monitoring Period, BCBSA may advise Settlement Class Counsel, Self-Funded Sub-Class Settlement Counsel, and the Monitoring Committee of BCBSA Board actions to be taken adopting rules or regulations that are within the scope of Paragraphs 10–18. *Id*. If the proposed rule or measure is not reported to the Monitoring Committee, or if an arbitrator finds that the proposed rule or measure does not comply with the terms of the Settlement, the rule or measure will not constitute a Released Claim and will not be covered under the Settlement. *Id.* As a result, the inclusion of the Monitoring Committee in the Settlement affords the Settlement Classes substantial assurance of the Settling Defendants' compliance with the Settlement. Any reporting obligation and the authority of the Monitoring Committee shall cease at the conclusion of the Monitoring Period. *Id.*

### 3.        Settlement Class Release

Upon the Effective Date of the Settlement, Releasors (Class Representatives and Settlement Class Members) who do not timely and validly exclude themselves will have fully

---

[12] Any reporting obligation and the authority of the Monitoring Committee shall cease at the conclusion of the Monitoring Period. *Id.* ¶ 20. The Monitoring Committee's fees and expenses reasonably incurred will be paid from the Notice and Administration Fund upon approval by the Court. *Id.* ¶ 21.

released all claims against the Releasees ((i) Individual Blue Plans, (ii) BCBSA, (iii) NASCO,[13] and (iv) Consortium Health Plans, Inc.,[14] as well as related entities). *Id.* ¶¶ 32, 1(vvv), 1(www). Opt-Outs will still release all claims for injunctive or declarative relief against the Releasees, with the sole exception that if a Self-Funded Account that opts out meets the criteria to request a Second Blue Bid under the terms of the Settlement Agreement, that Self-Funded Account does not release any claims for declaratory or injunctive relief to request a Second Blue Bid during any time it meets the criteria to request such a bid under the terms of the Settlement Agreement (as specified in the proposed Final Approval Order attached as Exhibit L). The releases apply to Releasors and their related persons and entities, such as dependents and beneficiaries under their benefits plans.

The Releasors agree to release any and all known and unknown claims "based upon, arising from, or relating in any way to: (i) the factual predicates of the Subscriber Actions (including but not limited to the Consolidated Amended Class Action Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) any issue raised in any of the Subscriber Actions by pleading or motion; or (iii) mechanisms, rules, or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10 through 18 approved through the Monitoring Committee Process during the Monitoring Period." Settlement ¶ 1(uuu). Thus, the Released Claims in certain circumstances will include those "mechanisms, rules or regulations" enacted after the Effective Date that are approved by the Monitoring Committee during the Monitoring Period, but only to the extent those "mechanisms,

---

[13] NASCO is a healthcare technology company owned by several Blue Plans and is involved in processing claims.

[14] Consortium Health Plans, Inc. is a marketing company owned by several Blue Plans and provides marketing assistance regarding national accounts to BCBSA and the Blue Plans.

rules or regulations" relate to the provisions enumerated in Paragraphs 10 through 18 of the Settlement.

The Releasors retain their right to assert certain claims relating to coverage, benefits and administration of claims that arise in the ordinary course of business and are not "based in whole or in part on the factual predicates of the Subscriber Actions or any other component of the Released Claims discussed in this Paragraph." *Id.* ¶ 1(uuu). Additionally, Providers who are Settlement Class Members retain the right to assert any claims arising from their sale or provision of health care products or services, and Settling Defendants have agreed not to raise Providers' releases under this Settlement as a defense to Providers' claims brought in their capacity as Providers of health care products or services in MDL No. 2406. *Id.*

### 4. Attorneys' Fees and Costs

Settlement Class Counsel have applied to this Court separately for: (i) an award of attorneys' fees, plus (ii) reimbursement of expenses and costs reasonably and actually incurred in connection with prosecuting the Subscriber Actions, for a combined total of 25% of the Settlement Amount. ECF No. 2733, Subscriber Counsel's Motion for Approval of their Attorneys' Fees and Expenses Application ("Fee Brief").[15] A proposed order approving this fee request is attached as Exhibit M.

---

[15] The Settlement Agreement contemplated that Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel would seek Service Awards for Class Representatives as part of their Fee and Expense Application. Settlement ¶ 28. In their Fee Brief, Settlement Class Counsel noted that while the Subscriber Class owes an enormous debt of gratitude to the 67 class representatives, whose substantial effort contributed significantly to win this historic relief for the class, the Eleventh's Circuit's intervening decision in *Johnson v. NPAS Solutions, LLC* prohibits service awards and thus Subscriber Plaintiffs must reluctantly elect not to seek service awards as they are not legally viable in this Circuit. 975 F.3d 1244, 1264 (11th Cir. 2020); Fee Brief at 5 n.2. Nonetheless, the Fee Brief requests that this Court retain "jurisdiction for the limited purpose of revisiting the denial of service awards if the Eleventh Circuit holds a rehearing *en banc* in *Johnson v. NPAS Sols., LLC* and reverses its decision," or another decision overrules *NPAS*, and Settlement

### 5.      Plan of Distribution

The Claims Administrator, JND, will make all valid distributions for Authorized Claimants in accordance with the terms of the Settlement and the proposed Plan of Distribution. ECF No. 2610-5, Plan of Distribution; Preliminary Approval Order at 52. JND has provided notice to the class about the Plan of Distribution. Keough Decl. (outlining extensive notice efforts). The Settlement Agreement contemplates Court appointment of a Settlement Administrator to assist in the implementation of the Plan of Distribution and to resolve any disputes concerning the claims process. As discussed *infra* § IX, and for the reasons stated therein, Settlement Class Counsel are seeking appointment of Judge Irma E. Gonzalez (Ret.) as Settlement Administrator.

The Net Settlement Fund is allocated between Individual Members and Insured Groups on the one hand ("Fully Insured Claimants") and the Self-Funded Sub-Class on the other hand. Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel (together, "Class Counsel") sought the assistance of Mr. Feinberg as Allocation Mediator to facilitate the determination of an appropriate allocation of the Net Settlement Fund between Fully Insured Claimants and the Self-Funded Sub-Class. ECF No. 2610-6, Declaration of Settlement Class Counsel Decl. ¶ 33 ("Settlement Class Counsel PA Decl."); ECF No. 2610-7, Declaration of Self-Funded Sub-Class Settlement Counsel ¶ 9 ("Self-Funded Sub-Class Settlement Counsel PA Decl."); ECF No. 2610-8, Declaration of Kenneth J. Feinberg ¶ 6 ("Feinberg PA Decl."). Class Counsel presented evidence concerning the relative volume of payments and differing strengths of claims for Self-Funded Accounts and Fully Insured Claimants. Settlement Class Counsel PA Decl. ¶ 33; Self-Funded Sub-Class Settlement Counsel PA Decl. ¶ 10; Feinberg PA Decl. ¶ 12.

---

Class Counsel have proposed reserving up to $1 million for service awards should that decision be reversed. Fee Brief at 5 n.2 (citing *Metzler v. Med. Mgmt. Int'l, Inc.*, No. 8:19-CV-2289-T-33CPT, 2020 WL 5994537, at *3 (M.D. Fla. Oct. 9, 2020)).

Class Counsel ultimately presented an allocation to Mr. Feinberg for his review. Settlement Class Counsel PA Decl. ¶ 33; Self-Funded Sub-Class Settlement Counsel PA Decl. ¶ 10; Feinberg PA Decl. ¶ 13. Mr. Feinberg reviewed the allocation recommendation and determined that it was reasonable. Feinberg PA Decl. ¶ 14. The allocation is based on numerous factors including the strengths of the respective claims, the substantially shorter Self-Funded Class Period, and the fact that premiums paid for fully-insured coverage dwarf the administrative fees charged for self-insured coverage. Settlement Class Counsel PA Decl. ¶ 33; Self-Funded Sub-Class Settlement Counsel PA Decl. ¶ 10; Feinberg PA Decl. ¶ 14. Under this allocation, the Self-Funded Sub-Class (including Self-Funded Account employees) will receive 6.5% of the Net Settlement Fund ("Self-Funded Net Settlement Fund"), with the remainder allocated to Fully Insured Claimants (and their employees) ("FI Net Settlement Fund"). Plan of Distribution ¶ 3.

In order to develop an equitable distribution of the Self-Funded Net Settlement Fund and the FI Net Settlement Fund among Authorized Claimants for each fund, Class Counsel retained The Brattle Group to assist with designing a Plan of Distribution, which will be administered by JND. Settlement Class Counsel PA Decl. ¶ 34. All distributions to Authorized Claimants are subject to a $5 minimum payment threshold to ensure that the resources involved in processing a claim are not out of proportion to the value of the individual claim. Plan of Distribution ¶ 28.

For the FI Net Settlement Fund, JND will first calculate the actual premiums paid by Individual Members and Insured Groups, using data produced by Settling Defendants. Plan of Distribution ¶ 12. Those premiums will be used to calculate the *pro rata* share of the FI Net Settlement Fund available to each claiming Individual Member and Insured Group. *Id.* ¶ 13. For Individual Members, no further calculation is required, and a claiming Individual Member will receive his or her full *pro rata* share of the FI Net Settlement Fund. *Id.* ¶¶ 13, 16. For any Insured

17

Group where only the employer makes a claim, and no employees do, the employer will be eligible for 100% of the Insured Group's *pro rata* distribution. *Id.* ¶ 18. If any employees make a claim, the Insured Group's *pro rata* share must be appropriately allocated between the employer and any claiming employees.[16]

Typically, both employers and employees bear a portion of the burden of the premiums paid by Insured Groups. ECF No. 2610-9, Declaration of Darrell Chodorow ("Chodorow PA Decl."). Based on this economic reality, Class Counsel propose a "Default" option for apportioning premiums between employers and employees. Plan of Distribution ¶ 19(f). Given the difference in contribution percentages for single and family coverage, the Plan of Distribution utilizes a Default option, which sets contribution percentages for Insured Group employees with single coverage at 15% and for family coverage at 34%. Feinberg PA Decl. ¶ 18; Chodorow PA Decl. ¶ 31 (discussing the economic reasonableness of setting different Default contribution percentages for single and family coverage based on employers historically sharing more of the burden for single coverage than family coverage).

The Default option was chosen by Class Counsel after consideration of several factors including: (a) Defendants' lack of data showing how much, if anything, each employee directly or indirectly contributed toward the payment of the premiums paid by the employer, and the inability to access such data from any other readily available source; (b) the information provided from national data gathered by Kaiser (which shows that the average employee contribution rate for Insured Groups during the FI Class Period ranged from 33% to 39% for family coverage and from 14% to 19% for single coverage); (c) that some employees do not contribute anything out-of-

---

[16] These allocations relate solely to what an employer or employee receives under the Settlement, and do not in any way purport to dictate or address what, if any, obligations employers may have as fiduciaries of ERISA plans, or how that may impact their use of any funds received.

pocket towards their employer-sponsored health insurance; (d) the economic literature relating to a potential contention that, regardless of out-of-pocket contributions by employees, employees may indirectly contribute by receiving lower wages than they would absent employer-provided health insurance; (f) the legal authorities as to the relative strengths and weakness of antitrust claims brought by employers versus those brought by employees; and (g) the fact that unclaimed employee premium amounts or employee claims valued at less than the $5 minimum will revert to employers. Plan of Distribution ¶ 19(f)(i-vi); Chodorow PA Decl. ¶ 18 (concluding that use of Default option is economically reasonable based on these factors). Any Authorized Claimant will automatically be assigned the Default option on their Claim Form, at which point they will not be required to provide further evidence of their premium payments, and their claims will be administered using Settling Defendants' data to the extent possible, as outlined herein.

Where both the employer and any employees make a claim, the first step in calculating the employer and employees' portion of the Insured Group's *pro rata* distribution is to estimate the amount of the Insured Group's premiums attributable to each claiming employee. Plan of Distribution ¶ 19(a). JND will use Settling Defendants' data to calculate the "Unallocated Employee Premium" for each claiming employee. *Id*. Then, the appropriate Default contribution percentage (based on the type of coverage for the claiming employee during any period for which a claim is made) will be applied to the Unallocated Employee Premium to determine which portion of the Unallocated Employee Premium is deemed to have been paid by the employee as opposed to the employer. *Id.* ¶ 19(e). The employee will receive credit only for the portion of their Unallocated Employee Premium as reduced by the Default contribution percentage. *Id.* ¶ 19(f). So, for example, if an employee has an Unallocated Employee Premium of $100 for family coverage, with the Default option of 34% applied, they will receive credit for $34 of the premium.

*Id.* Once these calculations have been made for the entire FI Class Period, the employer and any claiming employees will receive a payment from the Insured Group's *pro rata* distribution of the FI Net Settlement Fund in proportion to their share of the total premiums paid by the group. To the extent any employee has a payment calculated to be below the $5 minimum threshold, they will not receive a check, and those funds will revert to the employer. *Id.* ¶¶ 19(f)(vi), 27.

Rather than accepting the Default option on the Claim Form, any employer or employee believing that they paid a higher contribution percentage than the Default may select the "Alternative" option and can provide materials to the Settlement Administrator to support that contribution percentage. *Id.* at ¶ 19(h). If sufficient data or records are submitted by either the employer or the employee(s), then the Settlement Administrator, in his or her exercise of sound discretion, shall determine the appropriate amount by which to increase or decrease the allocation between the employer and the employees, taking into account the same factors considered in setting the Default option as well as the reliability of the data presented by the claimant selecting this Alternative option. *Id.* at ¶ 19(i). Finally, if an employee files a claim and his or her employer does not, the employee will receive credit only for their portion of the Unallocated Employee Premium as determined by the allocation methodology described above. *Id.* at ¶ 20.

Similarly, for the Self-Funded Sub-Class, payments will be allocated from the Self-Funded Net Settlement Fund by the same method based on an employee's estimated share of the employer's administrative fees, with slightly different set contribution percentages for the Default option (18% for employees with single coverage and 25% for employees with family coverage),[17]

---

[17] The Default option for the Self-Funded Sub-Class was similarly determined by Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel, and determined to be reasonable by the Allocation Mediator, through consideration of the same factors discussed above; however, employee contributions for the Self-Funded Sub-Class during the Self-Funded Class Period were

and the same ability to select an Alternative option with presentation of data. Plan of Distribution ¶¶ 22-26; Chodorow PA Decl. ¶ 51.[18]

### B.    Preliminary Approval

On October 30, 2020, Subscriber Plaintiffs submitted their Motion for Preliminary Approval. ECF No. 2610 ("PA Motion"). Subscriber Plaintiffs demonstrated the fairness and reasonableness of the Settlement, in consideration of recent Rule 23 amendments requiring "a solid record supporting the conclusions that the proposed settlement will likely earn final approval after notice and the opportunity to object." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. Subscriber Plaintiffs methodically evaluated each of Rule 23's stringent requirements for class certification and settlement approval with support from evidentiary declarations submitted by experts Dr. Daniel Rubinfeld, Dr. Ariel Pakes, and Darrell Chodorow, as well as declarations submitted by Settlement Class Counsel, Self-Funded Sub-Class Settlement Counsel, and mediators Kenneth R. Feinberg and Edgar C. Gentle. ECF No. 2610.

On November 17, 2020, this Court held a hearing on Settlement Class Counsel's Motion for Preliminary Approval. Throughout the course of the thorough, day-long hearing, Settlement Class Counsel further illustrated the myriad benefits of the injunctive and monetary relief provided by the Settlement and responded to various questions from the Court. The parties and the Court also considered and discussed at length various concerns raised by certain class representatives

---

on average higher for single coverage (18% to 19% compared to 14% to 19% for fully insured) and lower for family coverage (24% to 26% compared to 33% to 39% for fully insured), which is reflected in the Default percentages of 18% and 25%. Plan of Distribution ¶¶ 22-26; Feinberg PA Decl. ¶ 18; Chodorow PA Decl. ¶ 51.

[18] As with Insured Groups, the amounts allocated to employers is for purposes of the Settlement distribution only, and does not address what, if any, obligations those employers may have under ERISA.

from Texas, California, and Minnesota in their Response to Motion for Preliminary Approval of Proposed Class Settlement. ECF No. 2623.

On November 30, 2020, the Court issued a thorough Opinion and Order preliminarily approving the Settlement. *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2020 WL 8256366 (N.D. Ala. Nov. 30, 2020) ("PA Order" or "Preliminary Approval Order"). The Court began by acknowledging that this "litigation has been extraordinarily complex, protracted, and hard-fought" and that settlement negotiations were "protracted, complicated, and challenging." *Id.* at *2. Ultimately, the parties reached agreement on "historic and substantial" structural relief as well as a "common fund for the monetary benefit of the class," which the Court recognized is "the product of over four years of hard-fought, arms-length, and neutral supervised negotiations by counsel who are highly experienced in complex litigation and antitrust law." *Id.* at *2, *3.

After determining that the named Subscriber Plaintiffs had standing and that preliminary class certification was appropriate, the Court examined the Settlement to determine "the overall fairness, reasonableness, and adequacy of the proposed settlement as compared to the alternative of litigation." *Swaney v. Regions Bank*, No. 2:13-CV-00544-RDP, 2020 WL 3064945, at *3 (N.D. Ala., June 9, 2020) (quoting *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007)). In addition to the monetary settlement, which the Court noted was "clearly significant," the Court found that the "business practice changes provide significant relief to the Class . . . , providing for opportunities for more competition in the market for health insurance and allowing the potential for Class Members to achieve greater consumer choice, better product availability, and increased innovation." PA Order, 2020 WL 8256366 at *14.

The Court also analyzed the Settlement using the six *Bennett* factors and the Rule 23(e) factors. *Id*. at *15. It had "no hesitation in concluding that all Class Representatives and all Class Counsel . . . more than adequately represented the Settlement Class," *id*., held there was "no reason to suspect collusion" given the parties' "extensive mediation efforts," *id*., recognized that the settlement will avert years of highly complex and expensive litigation, *id*., and noted that "the factual record in this matter was sufficiently developed to allow Class Counsel to make a reasoned judgment as to merits of the settlement," *id*. at *16. And because of "the uncertainties surrounding continued litigation and the fact that settlement provides for certain, significant, and immediate relief, the court conclude[d] that the recovery provided for in the Settlement Agreement is an excellent achievement." *Id*. at *17.[19]

### C.      Notice Plan

At the same time as Preliminary Approval, the Court also approved the appointment of JND as the Claims Administrator for the Settlement, along with the Notice Plan, and ordered dissemination of notice to the Settlement Classes. *Id.* at *30, 31. On November 2, 2020, the Court also issued its Order Regarding Protected Health Information and Personally Identifiable Information for Subscriber Settlement to govern the production of data for notice and administration of the Settlement. ECF No. 2615 ("Data Production Order"). Per the Preliminary Approval Order, all data produced under the Data Production Order was required to be produced by March 1, 2021. The Notice Program has successfully commenced, with initial notice efforts

---

[19] The Court also considered at length the concerns raised by certain class representatives in their Response to Motion for Preliminary Approval of Proposed Class Settlement (ECF No. 2623). PA Order, 2020 WL 8256366 at *17-*22. "[A]fter [a] careful review," the Court "preliminarily conclude[d] that" those arguments were "off the mark." *Id*. at *18.

23

completed by the Court-ordered deadline of May 31, 2021, and with continued notice efforts through the Claim Filing Deadline of November 5, 2019.

Due to the complexity of the Notice Plan and the large number of Settlement Class Members to be noticed, and the impending deadline for production of data, Settlement Class Counsel worked closely with JND throughout the entire notice process to ensure JND had the information necessary to effectuate the Notice Plan. Starting in December 2020, Settlement Class Counsel, JND, and the Settling Defendants' data vendor Charles River Associates ("CRA") began weekly calls to discuss the data transfer and ingestion process. Keough Decl. ¶ 16. Given the massive volume of data to be transferred to JND for purposes of sending notice and administering claims, it was imperative to begin planning as early as possible.

The Keough Declaration, submitted as Exhibit A, lays out in detail the significant amount of work that went into working through the data from 35 separate Settling Defendants, totaling over 420 million records of individual policyholders, employees, and businesses. *Id.* ¶¶ 15-29. Significantly, JND was able to process all of the data and deduplicate the data down to just 103 million unique records, saving tens of millions of dollars in postage costs alone. *Id.* ¶ 28. JND was able to do all of this work in the limited time period between receiving the data and the Court-ordered deadline of May 31, 2021 to complete initial notice efforts.

JND ultimately sent direct notice to over 100,000,000 Class Members. *Id.* ¶ 5. JND sent 77,360,606 postcard notices to Damages Class members for whom no email address was available and notice to 27,497,063 Damages Class members for whom email addresses were available. *Id.* ¶¶ 36, 44. With respect to direct mail notice, in order to ensure that these notices reached Damages Class members given the lengthy Settlement Class Period (back to 2008 for some Damages Class members) and the likelihood that many addresses may have changed over time, JND made

substantial efforts to confirm mailing addresses, including updating addresses through credit bureau advanced level searches and utilizing USPS's National Change of Address search functionality. Due to this work in perfecting the mailing database, 93.5% of all postcard notices were deemed deliverable and only 6.5% were deemed undeliverable. *Id.* ¶¶ 39-40.

Similarly, for email notice, JND utilized its industry-leading email solutions to ensure an efficient and effective email campaign, which included designing an email notice that would avoid spam filters and promote readability. *Id.* ¶ 42. Where emails bounced back for temporary reasons (such as a full email inbox), JND made multiple attempts to resend emails to increase the deliverability rates. *Id.* ¶ 43. Based on all of this work, JND successfully delivered email notice to 27,497,063 Damages Class Members. *Id.* ¶ 44.

Direct notice was complemented by a robust consumer media campaign, which alone reached more than 85% of potential members of the Settlement Classes. *Id.* ¶ 46. The consumer media campaign included digital, print, radio, and television efforts, with concerted outreach to African-American and Hispanic markets. *Id.* ¶¶ 47-55. In addition to consumer media notice, JND also targeted individuals responsible for filing claims on behalf of Damages Class members, including human resources employees and business owners. *Id.* ¶¶ 56-64. JND also purchased a list of HR/employment benefit and other relevant employees, and JND also directly reached out to these contacts to ask for assistance in getting notice out to constituents of these organizations, resulting in hundreds of direct calls informing her that these individuals were assisting in disseminating notice. *Id.* ¶ 66. Finally, JND instituted an internet search campaign and solicited and received extensive press coverage of the Settlement. *Id.* ¶¶ 67-69.

Initial notice efforts were completed by the Court-ordered May 31, 2021 deadline. Once complete, JND immediately began its efforts to encourage Class Members who had not filed a

claim to do so, including through reminder emails (to both email addresses provided by Settling Defendants and additional email addresses located by JND) and outreach to human resources groups. *Id.* ¶¶ 71-72. JND will also implement a reminder mailing to all entities with 30+ owned subsidiaries and to the largest entities measured by lives covered, as well as a reminder media campaign. *Id.* ¶¶ 74-78.

The Notice Plan directed Settlement Class Members to the settlement website, which JND established at www.BCBSsettlement.com, for more information about the Settlement. *Id.* ¶ 79. The settlement website contains key documents from the case, including the Long Form Notice, the Claim Form, the operative complaint, the Settlement Agreement, the Preliminary Approval Order, and the Plan of Distribution, along with answers to frequently asked questions (developed in conjunction with Settlement Class Counsel.) *Id.* The settlement website also allows for online filing of claims, of which over 99% of Class Members who have submitted claims have availed themselves. *Id.* ¶ 96. JND expended significant efforts in designing the website to withstand both an enormous volume of traffic and any threats of cyber-security attacks. *Id.* ¶¶ 79-84.

The settlement website has been a huge success; as of August 26, 2021, the website has tracked 14,844,643 unique visitors, 20,666,254 sessions, and 112,006,163 total pageviews, with no reports of slowness or latency. *Id.* ¶ 85.

In addition to the website, JND established a call center and an email address, info@BCBSsettlement.com, to answer questions from Class Members. *Id.* ¶ 86. JND initially established and maintained a toll-free telephone line with automated interactive voice response ("IVR"), available 24 hours a day, seven days a week, in October 30, 2020. *Id.* ¶¶ 87-88. The full call center, with live agents, launched on March 26, 2021, before the first postcard notices commenced. *Id.* ¶ 90. With input from Settlement Class Counsel and counsel for Settling

Defendants, JND developed an extensive phone script and trained 100 operators (later rising to 240 operators as call volume increased exponentially), with operators available to answer calls in English and Spanish. *Id.* ¶. JND also trained higher-level escalation officers to assist with more sophisticated questions. *Id.* ¶ 91. As of August 26, 2021, the toll-free line has received 1,062,431 incoming calls. *Id.* ¶ 92.

Similar to the call center agents, JND also fields a team of email agents to handle questions that arrive through the dedicated email address. *Id.* ¶ 93. These agents review and respond to incoming emails sent in many languages, including Spanish, French, Korean, and Chinese, among others. *Id.*

JND established two separate USPS P.O. boxes, one for Class Member inquiries and claim forms, and another dedicated strictly to receive objections and requests for exclusion. *Id.* ¶ 95. As of August 31, 2021, JND has received 2,049 timely exclusion requests and 40 timely objections from 123 objectors. *Id.* A list of exclusion requests is being submitted as Exhibit Q to the Keough Declaration. The objections are included as Exhibits 1-40 to this Memorandum of Law.

With respect to claims, while the claims filing deadline is not until November 5, 2021, as a result of JND's robust Notice Program, JND has already received 6,077,526 claims: 1,381,112 from individual policyholders, 4,194,942 from employees enrolled in their employers' group health plans, and 177,687 from businesses and their group health plans. *Id.* ¶ 96. Ninety-nine percent of claimants have elected the Default option, and claims have been filed by Settlement Class Members in every state in the country. *Id.* ¶ 97. This level of claims filing, with nine weeks to go before the claims filing deadline and before JND has undertaken its additional claims stimulation efforts, demonstrates the resounding success of the Notice Program.

The Court "must direct to class members the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2). The Notice Program described in the Keough Declaration utilized a combination of email, direct mail, publication notice, a toll-free hotline, and a website to provide Settlement Class Members with detailed information about the Settlement. *Morgan v. Pub. Storage*, 301 F. Supp. 3d 1237, 1262 (S.D. Fla. 2016) (granting final approval for notice program with similar attributes). The Notice Program provided the best notice practicable and comports with due process and Rule 23 requirements to apprise Class Members of the pendency of the Subscriber Actions, the Settlement Agreement, and their opportunity to object and to opt out.

### D.      CAFA Notice

On February 16, 2021, Settling Defendants filed a notice of compliance with the notice requirements of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715(d). ECF No. 2704. CAFA Notice was sent to 60 officials, including the Attorney General of the United States, the Attorneys General of each of the 50 states, the Attorney General for the District of Columbia, and the Attorneys General for Puerto Rico, Guam, American Samoa, the U.S. Virgin Islands, and the Northern Mariana Islands. *Id*.

### III.    LEGAL STANDARD

"[S]ettlements are 'highly favored in the law' because 'they are a means of amicably resolving doubts and uncertainties and preventing lawsuits.'" *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1257 (11th Cir. 2021) (citations omitted); *McWhorter v. Ocwen Loan Servicing, LLC*, No. 2:15-CV-01831-MHH, 2019 WL 9171207, at *8 (N.D. Ala. Aug. 1, 2019). This is especially true for class actions. *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); *In re Liberty Nat'l Ins. Cases*, No. 1:02-

CV-2741-UWC, 2006 WL 8436814, at *9 (N.D. Ala. Mar. 31, 2006) ("The policy of federal courts, favoring voluntary resolution of litigation through settlement, is particularly strong in the context of class actions."). "Settlements conserve judicial resources by avoiding the expense of a complicated and protracted litigation process . . . ." *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000). The Court has broad discretion in approving a settlement. *In re Liberty Nat'l Ins. Cases*, 2006 WL 8436814, at *9.

Federal Rule of Civil Procedure 23(e)(2) requires the Court to determine whether the Settlement Agreement is "fair, reasonable, and adequate" based on a number of factors. Under the 2018 amendments to Rule 23, Rule 23(e)(2) requires courts to consider whether:

    A.  the class representatives and class counsel have adequately represented the class;

    B.  the proposal was negotiated at arm's length;

    C.  the relief provided for the class is adequate, taking into account:

        i.  the costs, risks, and delay of trial and appeal;

        ii.  the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims;

        iii.  the terms of any proposed award of attorneys' fees, including timing of payment;

        iv.  any agreement required to be identified under Rule 23(e)(3)[20]; and

    D.  the proposal treats class members equitably relative to each other.

These factors are not intended to "displace" any factor previously adopted by courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that

---

[20] The parties have submitted to the Court *in camera* the specific terms of the provisions allowing termination of the settlement at a certain opt-out threshold. There are no other agreements to disclose.

should guide the decision whether to approve the proposal." Rule 23(e)(2) advisory committee's note to 2018 amendment; *see also Swinton v. SquareTrade, Inc.*, No. 4:18-CV-00144-SMR-SBJ, 2019 WL 617791, at *5 (S.D. Iowa, Feb. 14, 2019) (2018 amendments to Rule 23 "were not intended to displace the various factors that courts have developed in assessing the fairness of a settlement").

As this Court recognized in its Opinion and Order preliminarily approving the Settlement, the factors set forth in Rule 23(e)(2) should be viewed in tandem with the Eleventh Circuit's guidelines for settlement approval. *See also Equifax*, 999 F.3d at 1273. Courts in the Eleventh Circuit consider the following additional six factors when assessing the fairness of a settlement:

1)  the likelihood of success at trial;

2)  the range of possible recovery;

3)  the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable;

4)  the complexity, expense, and duration of the litigation;

5)  the substance and amount of opposition to the settlement; and,

6)  the stage of proceedings at which settlement was achieved.

*Id.* (quoting *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)); *see also Carroll v. Macy's, Inc.*, No. 2:18-CV-01060-RDP, 2020 WL 3037067, at *5 (N.D. Ala. June 5, 2020).

Evaluation of each of these factors demonstrates that final approval of the Settlement is warranted.

## IV.   THE COURT SHOULD FINALLY APPROVE THE SETTLEMENT.

As a prerequisite to directing notice of a proposed settlement, the Court determined that it would likely be able to approve the Settlement and certify the Settlement Classes. After inviting

and receiving the Class's reaction, and after a robust and effective Notice Program, the Court should now finally conclude that the Settlement is fair, reasonable, and adequate.

### A. Class Representatives and Lead Counsel Have More than Adequately Represented the Settlement Class.

The adequacy requirements are met where no "substantial conflicts of interest exist between the representatives and the class" and where representatives and their counsel "will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (citation omitted).

Here, Subscriber Class Representatives "share the same interests as absent class members, assert claims stemming from the same event that are the same or substantially similar to the rest of the class, and share the same types of alleged injuries as the rest of the class." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No, 1:17-md-2800-TWT, 2020 WL 256132, at *5 (N.D. Ga. Mar. 17, 2020), *aff'd in part, rev'd in part & remanded on other grounds* 999 F.3d 1247 (11th Cir. 2021). In furtherance of those shared interests, Subscriber Class Representatives have demonstrated their adequacy by selecting well-qualified counsel, who are highly experienced and capable in the fields of class action and antitrust litigation. Settlement Class Counsel have litigated scores of such cases to resolution and are recognized as top authorities in their field.

This Court has previously considered Settlement Class Counsel's qualifications when appointing Michael D. Hausfeld and David Boies as interim co-lead counsel for the Subscriber Plaintiffs, as well as Megan Jones, Greg Davis, William Isaacson, Cy Smith, Kathleen Chavez, and Charles Cooper as the Subscriber Plaintiffs' Steering Committee. ECF Nos. 62, 2673 Settlement Class Counsel have demonstrated particular success in antitrust class actions. They have invested vast resources to prosecute Subscriber Plaintiffs' claims against 37 well-funded Defendants over more than eight years of litigation, including through dispositive motions and an

31

extensive discovery period. With respect to discovery, Subscriber Plaintiffs obtained and analyzed over 15 million pages of documents and took over 100 depositions of Defendants and third parties. Settlement Class Counsel PA Decl. ¶¶ 13-17. Subscriber Plaintiffs also defended 16 class representative depositions and nine expert depositions. Settlement Class Counsel PA Decl. ¶ 15. Through those efforts, Subscriber Plaintiffs and Settlement Class Counsel were able to gain a thorough understanding of the facts and legal theories applicable to their claims before agreeing to the Settlement. Settlement Class Counsel PA Decl. ¶ 37. Subscriber Plaintiffs and Settlement Class Counsel have more than adequately represented the interests of the Settlement Classes throughout the extended duration of this case.

In addition, Self-Funded Sub-Class Settlement Counsel have vigorously represented the interests of the Self-Funded Sub-Class since joining the settlement process. Gentle PA Decl. ¶ 35. Self-Funded Sub-Class Settlement Counsel aggressively advocated on behalf of the Self-Funded Sub-Class, making use of expert economic analysis to maximize the relief obtained. *Id.* Self-Funded Sub-Class Settlement Counsel joined the settlement process before negotiations were completed and the term sheet executed and materially added to the Settlement's terms. *Id.* Self-Funded Sub-Class Settlement Counsel has decades of experience representing plaintiffs in class actions. Ex. A to Self-Funded Sub-Class Settlement Counsel PA Decl. To ensure a fair and reasonable outcome for the Self-Funded Sub-Class, Self-Funded Sub-Class Settlement Counsel retained its own experts and conducted its own analysis of the claims and defenses in this case, *id.* ¶¶ 5, 7, 10, assuring significant injunctive and monetary relief for the Self-Funded Sub-Class. *Id.* ¶¶ 10-12.

**B.    The Settlement Is the Result of Arm's-Length Negotiations.**

Rule 23(e)(2)(B) requires the Court to determine whether a proposed settlement "was negotiated at arm's length." A "strong initial presumption of fairness attaches to any class action

settlement reached by experienced counsel following arms-length negotiations." *In re United States Sugar Corp. Litig.*, 2011 WL 13173854, at *2 (S.D. Fla. Jan. 24, 2011); *see also In re Checking Acct. Overdraft Litig.*, 275 F.R.D. 654, 661-62 (S.D. Fla. 2011) (same). Courts often view class settlements that have been reached as the result of extensive mediation favorably. *In re Checking Acct. Overdraft Litig.*, 275 F.R.D. at 662 (approving settlement "reached in the absence of collusion [and] is the product of informed, good faith, arms-length negotiations between the parties and their capable and experienced counsel, and was reached with the assistance of a well-qualified and experienced mediator"); *Equifax*, 2020 WL 256132 at *6 (granting final approval of settlement that was "negotiated at arm's length" with the assistance of "Layn Phillips, a retired federal judge with a wealth of experience in major complex litigation"). The 2018 amendments to Rule 23 also make clear that use of a neutral mediator should be considered in determining "whether [negotiations] were conducted in a manner that would protect and further the class interests." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

The proposed Settlement was reached after more than four years of negotiations with the assistance of three experienced and well-respected mediators. Gentle PA Decl. ¶ 36; Settlement Class Counsel PA Decl. ¶ 36. At various times, counsel for Subscriber Plaintiffs, Self-Funded Accounts, Defendants, and Defendants' insurers were involved in the mediation. Settlement Class Counsel PA Decl. ¶ 30. It was negotiated at arm's length between Settlement Class Counsel and Defendants, without collusion. Gentle PA Decl. ¶ 35; Settlement Class Counsel PA Decl. ¶ 36. As part of the mediation process, Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel made use of economic analysis, took account of the relative strengths and weakness of the parties' claims, and aggressively advocated for the interests of the class. Gentle PA Decl. ¶ 35; Settlement Class Counsel PA Decl. ¶ 37. There can be no doubt that Settlement was reached as

the result of arm's-length negotiations by experienced counsel who were acutely aware of the strengths and weaknesses of their case. *E.g., Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014) ("It is clear that the negotiations between the parties proceeded at arms' length" after the parties "worked extensively with a mediator" and after the defendants "filed numerous dispositive motions that could have completely absolved themselves of liability.").

### C. The Relief Provided to the Settlement Classes Is Far More than Adequate, Based on the Considerations Set Forth in Rule 23(e)(2)(C).

Rule 23(e)(2)(C) asks courts to consider whether the "relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." *Id.* A review of those factors shows that the Settlement warrants final approval.

### 1. The Costs, Risks, and Delay of Trial and Appeal

In evaluating the fairness, reasonableness, and adequacy of a proposed settlement, a court "can limit its inquiry to determining whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of settlement." *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 697-98 (M.D. Fla. 2005) (quotation omitted). This factor weighs in favor of approval where "success at trial is not certain for Plaintiff." *Burrows v. Purchasing Power, LLC*, No. 1:12-CV-22800, 2013 WL 10167232, at *6 (S.D. Fla. Oct. 7, 2013); *see also Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 693-94 (S.D. Fla. 2014) (that the "parties have already expended significant energy and money litigating this case and propounding discovery, and, absent settlement, would have had to expend significant resources in litigating a protracted trial and

appeal" weighs in favor of settlement). Here, the "costs, risks, and delay of trial and appeal," Rule 23(e)(2)(C)(i), strongly support final approval of the Settlement. The history of this litigation demonstrates that continued litigation of this matter in Alabama and in dozens of other jurisdictions would be costly, risky, and protracted.

In the accelerated Alabama actions, Subscriber Plaintiffs put forward a sophisticated damages model estimating, for purposes of their class certification motion, impact and damages based on entry by Blue and Green competitors into Alabama. The but-for world constructed by Subscriber Plaintiffs' experts involved a complex modeling of factors estimating the impact of the entry of significant competition within the market, including estimated profitability of entry, timing of entry, type of entry, strength of entry, progression of entry, and competitive response to entry. Based upon these elements, Subscriber Plaintiffs' expert then modeled an estimate of damages in Alabama. Defendants' experts aggressively challenged Subscriber Plaintiffs' damages model and vigorously attacked Subscriber Plaintiffs' findings and experts' calculations. While confident in their modeling, Subscriber Plaintiffs faced a significant risk that a damages and/or injunctive class for purposes of litigation would not be certified. Additionally, if Subscriber Plaintiffs succeeded in certifying a class or classes, they faced a risk that class certification would be reversed on appeal (and that any such appeal would delay ultimate resolution of the case for additional years). These risks support the decision to reach a fair and reasonable Settlement for the benefit of the Settlement Classes. *Swaney v. Regions Bank*, No. 2:13-CV-00544-RDP, 2020 WL 3064945, at *4 (N.D. Ala. June 9, 2020) (Proctor, J.) ("Because 'the outcome on class certification and the ultimate outcome on the merits [was] uncertain for both [p]arties,' a settlement was reached and here that is appropriate.") (alteration in original) (quoting *Parsons v. Brighthouse Networks*, No. 2:09-cv-267-AKK, LLC, 2015 WL 13629647, *2 (N.D. Ala. Feb. 5, 2015)).

Even if Subscriber Plaintiffs succeeded in certifying a damages class for Alabama and an injunctive class, they would still need to *prove* their claims at trial before this Court. This would involve yet more contested issues, including but not limited to: (1) whether the BCBSA and the Blue Plans constitute a single entity for purposes of managing their trademark; (2) whether Blue Plans have entered into  a horizontal geographic market allocation agreement; (3) whether Blue Plans have entered into a horizontal output limitation agreement; (4) whether, absent the restraints, any other insurance company (Blue or Green) would in fact enter the Alabama market; (5) antitrust injury; (6) the amount of (and how to calculate) damages; and (7) as to the filed-rate defense, whether the out-of-state Blues qualify as "health care service corporations," and if so, whether they are protected by the application of the filed-rate doctrine in Alabama. *See* ECF No. 2408, at 20.

And not only would Subscriber Plaintiffs need to prevail on these issues (and others) at trial, they would need to successfully defend these rulings—as well as the Court's prior rulings, such as standard of review—in any appeals that would undoubtedly follow a judgment in their favor. The subsequent appeals would further prolong the case for years and underscore the ultimate outcome's uncertainty.[21]

 All of the risks identified above relate just to the accelerated Alabama actions—Subscriber Plaintiffs would then have to seek class certification and success at trial in all of the non-accelerated actions in their home jurisdictions. This would not occur until those cases were

---

[21] *See Parsons*, 2015 WL 13629647, at *4 ("[C]ontinued litigation would have risked delaying the class's potential recovery for years, further reducing the value of any such recovery. The Settlement resolves the case without any further delay and will, if finally approved, offer the Settlement Class an immediate and certain recovery, as well as correcting the practices complained of in the Complaint. Thus, this factor also speaks strongly in favor of final approval of the proposed Settlement.").

remanded after trial in the accelerated Alabama actions. Given that it has taken nine years to get to this point for the Alabama actions alone, it is difficult to estimate how many more years of hard-fought litigation it will take to complete the class certification process, summary judgment, trial, and appeal with respect to the remaining actions pending in this multidistrict litigation.

To conduct a single trial for the Alabama actions poses substantial risk—to conduct several dozen trials would be exorbitantly expensive and risky, and the threat of inconsistent decisions alone weighs heavily in favor of approval of the Settlement. Likewise, if the parties continue to litigate these cases, they would need to devote significant time and potentially enormous resources to preparing complex damages models across the country. Based on the parties' experience with respect to the Alabama example, the time and expense associated with these efforts would be staggering. Accordingly, the proposed Settlement represents a clear victory for Settlement Class Members.

Continued litigation also carries other significant risks to all parties because rulings have gone in both directions on key issues. Rule 23(e)(2)(C). For example, although Subscriber Plaintiffs prevailed in this Court on application of a *per se* standard to the aggregation of the NBE and ESAs, they face the risk of appellate reversal after trial. If this reversal occurred—given that class certification briefing was based on a *per se* framework—the parties would likely need to return to the trial court and conduct a detailed, Rule of Reason standard of review analysis for the Alabama actions before even having the opportunity to re-try the Alabama case. And, again, this might have to be repeated across the country.

On the other hand, Defendants prevailed on their partial summary judgment motion regarding whether the filed-rate doctrine precluded certain claims by Alabama Subscriber Plaintiffs concerning rates approved by AL DOI. *In re Blue Cross Blue Shield Antitrust Litig.*, 238

F. Supp. 3d 1313 (N.D. Ala. 2017).[22] This has narrowed damages for the putative Alabama damages class, and has the potential to similarly narrow damages classes in non-accelerated cases. Although Subscriber Plaintiffs have remained optimistic about their chances of defeating this defense in other jurisdictions, the risk of losing all or any significant percentage of such challenges also weighs in favor of the Settlement here. Many of these risks apply similarly to the Self-Funded Sub-Class.

As this Court acknowledged in its Opinion and Order preliminarily approving the settlement, there "is simply no guarantee that Subscriber Plaintiffs would recover a final judgment more favorable than the considerable $2.67 billion in monetary relief and injunctive relief secured by the Subscriber Plaintiffs in the Settlement." PA Order, 2020 WL 8256366 at *16. In contrast, the Settlement provides immediate tangible benefits to the Settlement Classes and eliminates the risk, delay, and expense associated with continued litigation. Rule 23(e)(2)(B) therefore weighs heavily in favor of approval.

### 2. The Effectiveness of Any Proposed Method of Distributing Relief to the Class, Including the Method of Processing Class Member Claims

The proposed method of processing the Settlement Class Members' claims and distributing relief to eligible claimants is efficient and effective. The Plan of Distribution will efficiently calculate the value of millions of claims based on data available from the Settling Defendants, rather than requiring every Authorized Claimant to provide years of information about their premium amounts and actual contribution percentages.

---

[22] The Court also held that "BCBSAL's conduct in charging rates which were neither filed with [AL] DOI, nor disclosed to [AL] DOI, is *not* insulated by the Filed Rate Doctrine." *In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d at 1328. The Court held open the possibility of reconsideration of the underlying ruling at a later stage in the case. ECF No. 1109 at 69-70, 4/12/17 Hearing Tr.

38

Class Counsel have retained JND to process claims. JND has a proven track record and has been chosen as the administrator in a number of large, complex, and high-profile class action settlements. As just one example, JND administered the settlement in *In re Equifax Inc. Customer Data Security Breach Litigation*, 999 F.3d 1247 (11th Cir. 2021) valued by plaintiffs' counsel in excess of $1.3 billion.[23] Class Counsel is also seeking appointment of Judge Irma E. Gonzalez (Ret.) as Settlement Administrator.

"[T]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." *Fitzgerald v. P.L. Mktg., Inc.*, No. 2:17-cv- 02251-SHM-cgc, 2020 WL 3621250, at *9 (W.D. Tenn. July 2, 2020) (alteration in original). The Plan of Distribution will use the available data to calculate each Authorized Claimant's premium payment (and, in the case of employers and employees, their estimated contribution to their estimate premium payment) and distribute the Net Settlement Fund accordingly.

The Plan of Distribution does not require Authorized Claimants to provide years of plan and premium data and specific contribution percentages, which may be virtually impossible to track down and produce and which would create a cumbersome process that would likely reduce claims submission rates, but rather allows for an automated process to identify valid claims and provide payment in a quick and efficient manner. Chodorow PA Decl. ¶¶ 24-26. This streamlined claims process has resulted in over six million Class Members filing claims as of the date of this filing. Keogh Decl. ¶ 96.

Payments falling below a $5 minimum threshold will not be paid but rather will be

---

[23] *Class Action Administration Cases*, JND Legal Admin., https://www.jndla.com/cases/class-action-administration (last accessed Aug. 4, 2020).

redistributed as described in the Plan of Distribution. Plan of Distribution ¶ 27. The Plan of Distribution also allows JND and the Settlement Administrator to focus their claims processing efforts on those Settlement Class Members who seek to use something other than the estimated Default option. Every Damages Class member will have an opportunity to make a claim, and if an Authorized Claimant does not agree with the Default option, that claimant can provide additional information in support of an Alternative option, to be reviewed and adjudicated by the Settlement Administrator.

### D.   The Terms of Any Proposed Award of Attorneys' Fees and Expenses, Including Timing of Payment

As described in their fee application, Settlement Class Counsel have requested a combined fee and expenses award from the $2.67 billion-dollar common fund of 25%. Fee Request at 4. Settlement Class Counsel also intend to apply for up to $7 million from the Notice and Administration Fund to "reimburse plaintiffs' counsel's actual and reasonable fees and expenses incurred for Notice and Administration."[24] Settlement ¶ 28(h). This award for fees and expenses is in line with benchmarks set by the Eleventh Circuit and this Court, for fees alone. *See Equifax*, 2020 WL 256132, at *31 ("Typically, awards range from 20% to 30%, and 25% is considered the 'benchmark' percentage."); *In re Equifax Inc. Customer Data Security Breach Litig.*, 999 F. 3d 1247 at 1281 (11th Cir. 2021) (citing favorably to similar authority); *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1243 (11th Cir. 2011) (noting "well-settled law from this court that 25% is generally recognized as a reasonable fee award in common fund cases"); *Swaney v. Regions Bank*, No. 2:13-CV-00544-RDP, 2020 WL 3064945, at *7 (N.D. Ala. June 9, 2020) (Proctor, J.) ("In

---

[24] Per the Settlement Agreement, Settlement Class Counsel were entitled to apply for a $75 million interim fee award, and with the oversight of Special Master Gentle, Settlement Class Counsel ultimately applied for and may receive up to $75 million, subject to an irrevocable letter of credit approved by Settling Defendants. Settlement ¶ 28(d).

determining an award of attorney's fees in a percentage-of-fund class settlement case, the 'benchmark' percentage is 25%, which is the dead center of the 20-30% range."). Accordingly, and for the additional reasons stated in Settlement Class Counsel's fee petition, Rule 23(e)(2)(C) is satisfied.[25]

**E.    The Proposed Settlement Treats Class Members Equitably Relative to One Another.**

The Court's analysis under this Rule 23(e)(2) factor includes "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment; *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB) (JO), 2019 WL 6875472, at *27 (E.D.N.Y. Dec. 16, 2019). Here, with respect to damages, the Plan of Distribution accounts for a number of factors that distinguish the claims of various types of Class Members and therefore ensures, to the greatest reasonably practicable extent, that Class Members are treated equitably.

First, the Allocation Mediator Mr. Feinberg assessed the proposed allocation based on the differences in the strength of claims as between Fully Insured Claimants and the Self-Funded Sub-Class. In doing so, he considered the factors outlined in his declaration. Feinberg PA Decl. ¶ 14. Based on his review and his experience mediating the allocation, he determined that an allocation between those members of the Damages Class consisting of 93.5% of the Net Settlement Fund for Fully Insured Claimants and 6.5% for the Self-Funded Sub-Class was reasonable. *Id.* Next, Mr.

---

[25] As to Rules 23(e)(2)(C)(iv) and (e)(3), requiring that "any agreement made in connection with the [settlement] proposal" be identified, the Settlement Class Counsel PA Declaration makes clear that all such agreements are set forth in the Settlement itself, plus the *in camera* supplement which addresses only rescission matters. *Id.*

Feinberg considered Class Counsel's proposed Plan of Distribution, including a recommended allocation as between employers and employees within Insured Groups and within Self-Funded Accounts. *Id.* Based on presentations by Class Counsel for the Damages Class and Self-Funded Sub-Class and review of materials relating to employer and employee contributions to premiums and administrative fees, he concluded that Class Counsel's proposed Plan of Distribution, including the recommended allocation between employers and employees, was reasonable. *Id.*

Thus, the Plan of Distribution incorporates and accounts for the differing risks and claim strengths for different class members and makes distribution decisions accordingly. *See Fitzgerald*, 2020 WL 3621250, at *9 (finding this Rule 23(e)(2) factor to favor approval where distribution took into account the greater risks some class members faced). Further, as discussed *infra* § VII in response to the objections, taken as a whole and in consideration of the substantial structural relief available to the class, the injunctive relief treats class members equitably with respect to each other.

The scope of the release does not affect apportionment of the Net Settlement Fund to class members. Every class member is subject to the same release, and the release does not affect the apportionment of relief to other class members. *See In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 699 (S.D.N.Y. 2019) (finding this element satisfied when all settlement class members sign the same release and where the release "does not appear to affect the apportionment of relief to other class members"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 47 (E.D.N.Y. 2019) ("Further, the scope of the release applies uniformly to putative class members, and does not appear to affect the apportionment of the relief to class members, apart from securing the opportunity to participate in the (b)(2) action. Accordingly, the Court finds that this factor will likely weigh in favor of granting final approval.").

**F.      The Remaining Non-Duplicative *Bennett* Factors Are Satisfied.[26]**

    **1.      The Settlement Is Well Within the Range of Reasonableness Considering the Possible Alternatives.**

The second and third factors in the Eleventh Circuit's *Bennett* analysis call for the Court to determine "the possible range of recovery" and then ascertain where within that range "fair, adequate, and reasonable settlements lie." *Deas v. Russell Stover Candies, Inc.*, No. CV-04-C-0491-S, 2005 WL 8158201, at *11 (N.D. Ala. Dec. 22, 2005) (quotation omitted). "These two range of recovery factors are 'easily combined and normally considered in concert.'" *Camp v. City of Pelham*, No. 2:10-cv-01270-MHH, 2014 WL 1764919, at *3 (N.D. Ala., May 1, 2014) (quoting *Cifuentes v. Regions Bank*, No. 11-CV-023455-FAM, 2014 WL 1153772, at *5 (S.D. Fla. Mar. 20, 2014)). The relief secured by the Subscriber Plaintiffs with this Settlement—both monetary and non-monetary—reflects an excellent result for the Settlement Classes and plainly falls within the range of reasonableness contemplated by these two factors.

At $2.67 billion, the Settlement represents one of the largest antitrust class settlements in history. Silver Decl., ¶ 63; Fitzpatrick Decl., ¶ 17; Gentle PA Decl. ¶ 33. Subscriber Plaintiffs have achieved a historic settlement value, especially in light of the time and expense of continuing the litigation and the risk of failing to prove damages in dozens of separate trials. Subscriber Plaintiffs developed a damages estimate only for the Alabama damages class due to the acceleration of the Alabama actions, and Subscriber Plaintiffs' expert Ariel Pakes calculated an overcharge ranging from 3.4% to 5.5% for Alabama class members. ECF No. 2411-1 ¶ 10 (Executive Summary of Dr. Pakes' Class Certification Expert Report). In support of Preliminary Approval, in extrapolating

---

[26] The first and fourth *Bennett* factors—the likelihood of success at trial and the complexity, expense and duration of the litigation—are effectively addressed in Subscriber Plaintiffs' analysis of Rule 23(e)(2) factors.

the Alabama damages model nationwide through 2019, Dr. Pakes estimated a potential maximum single damages recovery ranging from $18.6 billion to $36.1 billion. ECF No. 2610-11, Declaration of Dr. Ariel Pakes ("Pakes PA Decl.") ¶ 10. A recovery of $2.67 billion represents 7.3% to 14.3% of that estimated maximum full recovery, which is a reasonable recovery and consistent with other approved settlement amounts. *Bennett v. Behring Corp.*, 737 F.2d 982, 986-87 & n.9 (11th Cir. 1984) (approving $675,000 settlement representing 5.6% of claims with maximum potential recovery of $12,000,000); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) ("[S]tanding alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims."); *Nichols v. SmithKline Beecham Corp.*, No. CIV.A.00-6222, 2005 WL 950616, at *16 (E.D. Pa. Apr. 22, 2005) ("The Settlement Fund is $65 million, or between 9.3% and 13.9% of damages. This percentage is consistent with those approved in other complex class action cases."); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 318-19 (W.D. Pa. 1997) (approving settlement award representing 5.35% of expected recovery).[27] As discussed above, the likelihood of such a recovery through continued litigation is extremely risky, adding to the appropriateness of the results achieved. *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880, at *14 (E.D. La. July 27, 2015) (finding recovery of 8.5% of best case damages scenario appropriate, especially as weighed against "substantial risks of nonrecovery").

---

[27] *See also Carnegie v. Mut. Sav. Life Ins. Co.*, No. CV-99S3292NE, 2004 WL 3715446, at *21 (N.D. Ala. Nov. 23, 2004) (refusing to consider potential punitive damages award when determining the adequacy of settlement); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009) ("It is our impression that courts generally determine fairness of an antitrust class action settlement based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages.").

And the equitable aspects of the Settlement significantly increase its value. The business practice changes established in the Settlement, including but not limited to the abolition of the National Best Efforts revenue cap and the establishment of the Second Blue Bid for certain Qualified National Accounts, will enhance competition going forward. Rubinfeld PA Decl. ¶ 37.[28]

### 2. The Stage of Proceedings at which Settlement Was Achieved Strongly Supports Approval.

In assessing the final *Bennett* factor, the Court should consider whether the "the case settled at a stage of the proceedings where class counsel had sufficient knowledge of the law and facts to fairly weigh the benefits of the settlement against the potential risk of continued litigation." *Equifax*, *Inc. Customer Data Sec. Breach Litig.,* No. 1:17-md-2800-TWT, 2020 WL 256132, at *10 (N.D. Ga. Mar. 17, 2020). As explained above regarding Rule 23(e)(2)(A), Settlement Class Counsel have exhaustively researched and analyzed the applicable law and have engaged in substantial motion practice and discovery throughout more than nine years of hard-fought litigation. *See Swaney v. Regions Bank*, No. 2:13-CV-00544-RDP, 2020 WL 3064945, at *5 (N.D. Ala. June 9, 2020), 2020 WL 3064945, at *5 (settlement was appropriate where the parties "have litigated this case for over seven years, through dispositive motions," and "have had the opportunity to investigate the facts and law, review substantive evidence relating to the claims and defenses, and brief the relevant legal issues"); Settlement Class Counsel PA Decl. ¶ 37. Accordingly, this *Bennett* factor strongly supports final approval of the Settlement.

---

[28] The Court's Standard of Review Order was based on the aggregation of ESAs and NBEs imposed by the Blue System existing at the time of the decision. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1280 (N.D. Ala. 2018). Subscriber Plaintiffs believe that the Settlement Agreement remedies the most significant of those restraints and will provide for materially greater competition in the critical field of health care financing. Accordingly, if the remedies provided for in the Settlement Agreement are implemented, Subscriber Plaintiffs believe that the Court's Standard of Review Order would no longer apply to the Blue System.

**V.     THE PROPOSED CLASSES SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES.**

**A.     The Classes Satisfy Rule 23(a).**

Under Rule 23(a), certification is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class: and (4) the representative parties will fairly and adequately protect the interests of the class." As demonstrated below, the Settlement Classes satisfy each of these requirements.[29]

**1.     Rule 23(a) Requirements**

**a.     Numerosity—Rule 23(a)(1)**

The numerosity requirement is satisfied when the class is "so numerous that joinder of all [class] members would be impracticable." Fed. R. Civ. P. 23(a)(1). Here, the Damages Class, the Self-Funded Sub-Class, and the Injunctive Relief Class each consist of tens of millions of members, a number that easily meets this standard.

**b.     Commonality—Rule 23(a)(2)**

To demonstrate commonality under Rule 23(a)(2), a putative class must prove that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). It is "well established" that the commonality threshold "is not high." *Dujanovic v. MortgageAmerica, Inc.*, 185 F.R.D. 660, 667 (N.D. Ala. 1999); *see also Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 627 (3d Cir. 1996) (recognizing "very low threshold for commonality"). The legal claims among the class members do not need to be exactly the same, *Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594, 599 (S.D. Fla. 1991), and not all questions of law or fact must be common, *Singer v. AT&T Corp.*,

---

[29] With the exception of adequacy, no objector has objected to any of these elements. An objection to adequacy is discussed *infra* § VII(C)(2).

185 F.R.D. 681, 687 (S.D. Fla. 1998). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359, 369 (2011); *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016). Courts in the Eleventh Circuit "have consistently held that allegations of price-fixing, monopolization, and conspiracy by their very nature involve common questions of law or fact." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 694 (N.D. Ga. 2016) (citations omitted).

Here, Subscriber Plaintiffs allege that the Settling Defendants engaged in a common conspiracy to allocate geographic markets by agreeing with each other to split the country into defined "service areas" in which only one designated Blue Plan is permitted to use the Blue Marks. Subscriber Plaintiffs also allege that Settling Defendants implemented their "National Best Efforts" revenue cap to limit competition from Green business. The alleged effect of the conspiracy was nationwide, and the alleged restraints were applied uniformly throughout the entire country. This alleged conspiracy implicates several common questions of law or fact, including but not limited to: (1) whether Settling Defendants' national market allocation agreements violated the Sherman Act; (2) whether the Settling Defendants charged anti-competitive premiums as a result of these agreements; (3) whether the challenged restraints have resulted in foreclosure of entry and reduced consumer choice across the country; and (4) whether BCBSA and the Blue Plans constitute a nationwide single entity for purposes of managing their trademark. Accordingly, the classes satisfy Rule 23(a)(2).

### c.   Typicality—Rule 23(a)(3)

Rule 23(a)(3) provides that the "claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." With respect to this requirement, the Eleventh Circuit has explained:

> The claim of a class representative is typical if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. A class representative must possess the same

47

> interest and suffer the same injury as the class members in order to be typical under
> Rule 23(a)(3).

*Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009) (internal quotations and

citations omitted).

This burden "is fairly easily met so long as other [C]lass [M]embers have claims similar to

the named plaintiff." *McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101 (JFB)(WDW), 2006 WL

2689621, at *4 (E.D.N.Y. Sept. 19, 2006) (quoting *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171,

1174 (8th Cir. 1995)). And typicality will not be destroyed by factual variations between the class

representatives and the unnamed class members. *Kornberg v. Carnival Cruise Lines, Inc.*, 741

F.2d 1332, 1337 (11th Cir. 1984); *see also Williams*, 568 F.3d at 1357 ("The typicality requirement

may be satisfied despite substantial factual differences when there is a strong similarity of legal

theories." (quoting *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001))). The class

representatives simply must, "in pursuing and defending [their] own self[-]interest in the litigation,

be concomitantly advancing or defending the interest of the class." *Dubin v. Miller*, 132 F.R.D.

269, 274 (D. Colo. 1990).

The Subscriber Class Representatives consist of 66 individuals who purchased individual

insurance policies and/or were enrolled in employer-sponsored fully insured plans, and employers

that purchased fully-insured policies for their employees from Blue Plans, and the Self-Funded

Sub-Class Representative is Hibbett Sports, Inc. ("Hibbett"), which purchased "administrative

services only" ("ASO") contracts or accounts from Blue Plans. Settlement ¶¶ 1(n), 1(dddd),

1(vvvv). With respect to the Damages Class, these 67 Class Representatives' claims are typical

because they arise from the same alleged conduct of the Settling Defendants: illegally entering

into geographic market allocation and output-restricting agreements prohibiting competition in the

market for health insurance and administration of Commercial Health Benefit Products in the

United States and its territories, and agreeing to other restrictions on competition in the market for health insurance and administration of Commercial Health Benefit Products. With respect to the Self-Funded Sub-Class, the Self-Funded Sub-Class Representative's claims are typical of the sub-class because they arise from certain alleged conduct specific to other members of that sub-class such as alleged agreements restraining competition in the market for national accounts.

Therefore, the Class Representatives together seek the same relief sought by absent Class Members, and the proof that Subscriber Plaintiffs would present to support their claims directly supports the claims of the Class. Because the Class Representatives seek to prove that the Settling Defendants "committed the same unlawful acts in the same method against an entire class[,] . . . all members of this class have identical claims," and the typicality requirement has been satisfied. *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983).

### d.    Adequacy—Rule 23(a)(4)

The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 594. To determine whether the Class Representatives can adequately represent the interests of the Settlement Classes, the Court must determine: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008). Both inquiries are satisfied here. As set forth above, the Class Representatives are fully aligned with the rest of the class because they allege the same harms and seek the same relief as the Settlement Classes; for example, they seek relief for the alleged higher premiums paid by the employees, employers, and their health plans, as well as individual policyholders. With respect to the Self-Funded Sub-Class, to the extent that Self-Funded Accounts have divergent interests from Individual Members and Insured Groups, Hibbett has represented the interest of the sub-class through settlement negotiations and through

49

the allocation process. Hibbett's interests are aligned with absent class members within the Self-Funded Sub-Class, and Hibbett has the same incentives as those absent class members to seek an equitable share of the Net Settlement Fund. All of the Class Representatives have reviewed the Settlement Agreement and approved of its terms.

Furthermore, Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel have adequately represented the Settlement Classes given their qualifications and experience in this field of litigation, as well as the efforts expended on this case. *See generally* Settlement Class Counsel PA Decl. and Self-Funded Sub-Class Settlement Counsel PA Decl. (describing efforts expended on the case to date and qualifications and experience of counsel). Accordingly, class certification is also appropriate under Rule 23(a)(4).

### B.     The Proposed Classes Also Satisfy Rules 23(b)(2) and (b)(3).

As the Eleventh Circuit has held, "[i]njunction classes can go forward under Rule 23(b)(2); damages classes must satisfy Rule 23(b)(3)." *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1174 (11th Cir. 2019). And it is well-settled that a "court . . . may certify multiple classes: a class for injunctive relief under Rule 23(b)(2) and a damages class under Rule 23(b)(3)." *Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 315 (S.D. Fla. 2001). Both subsections are satisfied here and support certification of the Settlement Classes. No objector has raised a concern about certification under these elements.

### 1.     Because the Blues Have Acted on Grounds Generally Applicable to the Injunctive Relief Class, Certification Is Appropriate under Rule 23(b)(2).

For an injunction class, "the plaintiff must show that 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Suncoast*, 938 F.3d at 1174 (quoting Rule 23(b)(2)). As this Court has explained, class certification under Rule

23(b)(2) requires: "(1) class members must have been harmed in essentially the same way by the defendant's acts; and (2) the common injury may properly be addressed by class-wide injunctive or equitable remedies." *Granger v. Sears Roebuck & Co.*, No. 2:05-cv-1696-RDP, 2008 WL 11424140, at *10 (N.D. Ala., Aug. 4, 2008) (Proctor, J.). Moreover, "an injunction must be geared toward preventing *future* harm." *Suncoast*, 938 F. 3d at 1175. That is precisely the case here.

*First*, as demonstrated above with respect to Rule 23(a)(2), Subscriber Plaintiffs allege that the Settling Defendants engaged in a nationwide conspiracy involving several common questions of law or fact. That conspiracy affected each of the Injunctive Relief Class members in similar ways. In other words, the class members "have been harmed in essentially the same way by the defendants['] acts." *Granger*, 2008 WL 11424140, at *10.

*Second*, the Settlement provides significant relief to all members of the Injunctive Relief Class. The key provisions of the injunctive relief include: (1) the abolition of the NBE restriction on Green competition in BCBSA's past and future license agreements for the Blue Plans; (2) the ability for all national accounts with multiple headquarters with independent decision-making authority to request a bid from the Blue Plan in each headquarters' Service Area for employees working at that location; (3) restrictions on BCBSA's ability to impose conditions on the acquisition of Member Plans; (4) the ability for Self-Funded Accounts to directly contract with Non-Provider Vendors and Specialty Service Provider Vendors; and (5) the establishment of a Monitoring Committee, which will oversee compliance with the Settlement and consider new rules or measures proposed by BCBSA for the Monitoring Committee's review.[30]

---

[30] Some elements of the Settlement's injunctive relief may directly affect the sub-class of Self-Funded Accounts. But that is fully consistent with Rule 23(c)(5), which provides that "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule."

The injunctive relief described above is exactly the sort of far-reaching, forward-looking relief contemplated by Rule 23(b)(2). *See Winston v. Jefferson Cty.*, No. 2:05-cv-0497-RDP, 2006 WL 6916381, at *9 (N.D. Ala., June 26, 2006) (Proctor, J.). Thus, certification of the Injunctive Relief Class is appropriate under Rule 23(b)(2).

**2.    Certification of a Settlement Damages Class and a Self-Funded Sub-Class Is Appropriate under Rule 23(b)(3).**

Certification of the Damages Class and the Self-Funded Sub-Class is appropriate under Rule 23(b)(3), because "the common legal and factual issues here predominate over individualized issues, and resolution of the common issues for millions of Settlement Class Members in a single, coordinated proceeding[s] is superior to millions of individual lawsuits addressing the same legal and factual issues." *In re Checking Acct. Overdraft Litig.*, 275 F.R.D. 654, 660 (S.D. Fla. 2011). Both the predominance and superiority requirements are satisfied here. *See In re Packaged Ice Antitrust Litig.*, 322 F.R.D. 276, 287 (E.D. Mich. 2017) (certifying a damages class in a case involving, *inter alia*, claims of territorial market allocation).

**a.    Common Issues Predominate.**

To satisfy the predominance requirement, "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1557-58 (11th Cir. 1989) (quotation omitted). "Common issues of fact and law predominate if they ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009) (internal quotation omitted) (alteration in original). That said, the predominance inquiry does *not* require a plaintiff seeking class certification to prove that each

52

element of its claim is susceptible to classwide proof. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 469 (2013).

The predominance element is plainly satisfied here. The Subscriber Complaint alleges a nationwide conspiracy in which Defendants applied the alleged restraints in the same way in every state in which Class Members reside. ECF No. 2616, Fourth Amended Consolidated Class Action Complaint ("FACCAC"). Each Settlement Class Member—including the Class Representatives—must establish the exact same facts to prove that the Settling Defendants violated the Sherman Act. Moreover, as a result of the nationwide reach of the alleged conspiracy, Subscriber Plaintiffs allege that virtually every member of the Damages Class suffered antitrust injury through higher premiums, depressed competition, lessened innovation, and loss of consumer choice. ECF No. 2411-1 ¶ 4, Executive Summary of Dr. Rubinfeld's Class Certification Expert Report. Within the Self-Funded Sub-Class, predominance is also satisfied; in addition to the above, members of the Self-Funded Sub-Class also face common questions concerning the impact of the alleged conduct on administrative fees and the market for national accounts. Thus, "the predominance requirement is satisfied here because common questions present a significant aspect of the case and can be resolved for all Settlement Class Members in a single adjudication." *In re Checking Account Overdraft Litig.*, 275 F.R.D. at 660 (predominance satisfied for settlement certification purposes where "each Settlement Class Member's claims arise from the same or similar alleged BofA policies and practices and the same legal theories" and "the relationship between Settlement Class Members and BofA is governed by substantially uniform or similar account agreement").

### b.   A Class Action Is Superior to Other Methods of Adjudication.

"In addition to finding that common questions predominate over individual inquiries . . . the Court must find that the class action vehicle is superior to other available methods for adjudication." *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 693 (N.D. Ga. 1991).

Rule 23(b)(3) identifies four factors relevant to the superiority requirement: "(A) the Class Members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against Class Members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Factor (D), manageability of the class action, is of much less relevance when it comes to certification of a settlement class. Subscriber Plaintiffs therefore limit their analysis to the first three factors.

With respect to factor (A), there are tens of millions of Settlement Class Members, making a class action the only feasible method of resolving the claims against the Settling Defendants. Once again, each Settlement Class Member's potential claim rests on the predominant question of whether the Settling Defendants' conduct violated the Sherman Act. As a practical matter, that issue cannot be resolved through individual trials or settlement negotiations: the amount at stake for individual Settlement Class Members is often too small relative to the risks and expenses that would result if each class member chose to seek relief individually. *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification."). That is particularly true in light of the enormous cost of demonstrating antitrust injury and damages in cases like this.

As for factor (B), as the Judicial Panel on Multidistrict Litigation ("JPML") has explained, the actions "involve substantial common questions of fact relating to the state BCBS entities' relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity to exclusive service areas, among other restrictions." *In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d 1373, 1376 (J.P.M.L. 2012). The JPML has since transferred

dozens of actions to this Court for consolidated pretrial proceedings. Accordingly, factor (B) supports the certification of the Damages Class.

Finally, with respect to factor (C), the JPML chose this Court as a transferee court because it would "serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation" since it is "familiar with the contours of the litigation and has taken preliminary steps to organize the litigation." *Id*. Since then, this Court has overseen over nine years of substantial pretrial litigation. This Court's familiarity with the issues involved in this case make it the most desirable forum to evaluate the proposed Settlement.

## VI.    THE PROPOSED PLAN OF DISTRIBUTION WARRANTS FINAL APPROVAL.

A plan of distribution should be approved when it allocates relief in a way that is "fair, adequate, and reasonable." *See In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 241 (5th Cir. 1982). *See also Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983); *Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 (11th Cir. 1994); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1328 n. 2 (S.D. Fla. 2001); *Bellocco v. Curd*, No. 8:02-CV-1141-T-27TBM, 2006 WL 4693490, at *2 (M.D. Fla. Apr. 6, 2006); *Smith v. Floor & Decor Outlets of Am., Inc.*, No. 1:15-cv-04316-ELR, 2017 WL 11495273, at *5 (N.D. Ga. Jan. 10, 2017). A plan of distribution will pass muster so long as "it has a 'reasonable, rational basis,' particularly if 'experienced and competent' class counsel support it." MCLAUGHLIN ON CLASS ACTIONS, § 6.23 (17th ed. 2020). *See also Schwartz v. TXU Corp.*, 2005 WL 3148350, at *21 (N.D. Tex. Nov. 8, 2005) (approving a plan of allocation that "resulted in a settlement agreement that fairly and rationally allocates the proceeds of the settlement").

The Plan of Distribution allocates the Net Settlement Fund in an eminently fair, reasonable, and adequate manner. "The goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as

55

possible." William B. Rubenstein, 4 NEWBERG ON CLASS ACTIONS § 12:15 (5th ed.). Significantly, a perfectly-tailored plan of allocation, even if theoretically possible to construct, is not required, especially when implementation of such a plan would run counter to the need to ensure that the plan is administered, and relief distributed, in an efficient and timely manner. Thus, particularly in a large and complex class action such as this one, "the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997). Moreover, the "challenge of precisely apportioning damages to victims is often magnified in antitrust cases, as 'damage issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.'" *In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2016 WL 2731524, at *9 (S.D.N.Y. Apr. 26, 2016) (alteration in original) (*quoting J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981)).

Assisted by expert analysis performed by the Brattle Group, Class Counsel have devised a Plan of Distribution that is economically reasonable and will allocate compensation between and among the members of the Class and the Self-Funded Sub-Class in a manner that is fair, reasonable, and adequate. *See In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 241 (5th Cir. 1982) (plan of distribution properly approved where counsel negotiated allocation formula based upon available economic data); *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 694-95 (S.D.N.Y. 2019) (approving plan of distribution where experienced class counsel, working in consultation with industry and economic consultants, produced method of ensuring equitable and timely distribution of fund).

The Plan first distinguishes between Fully Insured Claimants, who purchased insurance from Defendants, and the members of Self-Funded Sub-Class, who purchased administrative

services only. After scrutinizing the evidence, presiding over arms-length negotiations, and considering the arguments presented to him by Class Counsel, Mr. Feinberg found reasonable Class Counsel's recommendation allocating 6.5% of the Net Settlement Fund to the Self-Funded Sub-Class, with the remainder allocated to the Fully Insured Claimants. Feinberg PA Decl. ¶¶ 13-14. This allocation reflects each group's aggregate payments, their different settlement class periods, and the relative strengths of their respective legal claims. This allocation is thus the product of arm's-length negotiations, *In re Tremont Sec. Law, State Law & Ins. Litig.*, No. 08-cv-11117, 2015 WL 5333494, at *5 (S.D.N.Y. Sept. 14, 2015), *aff'd in relevant part*, *vacated in part on other grounds*, 699 Fed. App'x. 8 (2nd Cir. 2017), driven by genuine differences between the classes and the claims they have asserted. *See, e.g., Trauth v. Spearmint Rhino Cos. Worldwide, Inc.*, No. 09-1316-VAP (DTBx), 2011 WL 13134046, at *16 (C.D. Cal. Apr. 4, 2011) (proposed plan that reflected both the distribution of unpaid wages and the relative strength of claims was "within the range of possible approval").

Once the allocation of the Net Settlement Fund between Fully Insured Claimants and the Self-Funded Sub-Class had been determined, Class Counsel, with the assistance of the Brattle Group, devised the mechanism by which the Plan of Distribution would provide compensation to each of the members of the Damages Class who submit claims. The overarching aim of the Plan is to efficiently allocate to each member of the Damages Class a *pro rata* share of the Net Settlement Fund that reflects that portion of the total premiums or administrative fees collected by Settling Defendants that can reasonably be attributed to that class member. This requires a determination of the amount of premiums or administrative fees paid to Blue Plans that can be attributed to each Authorized Claimant. In determining, as reasonably as possible, the amount that was paid in premiums or fees on behalf of each individual claimant, the Plan relies on data provided

by Settling Defendants; this relieves the class members of the onerous, and perhaps impossible for some, task of attempting to collect and submit years of employment and insurance records. For Individual Policyholders who purchased their own policies, the amount of premiums that they paid is the amount from which their *pro rata* share will be determined. For employers and employees within Insured Groups and Self-Funded Accounts (both Fully-Insured Claimants and members of the Self-Funded Sub-Class), using available data from Settling Defendants, the Plan of Distribution estimates the amount of overall premiums or administrative fees attributable to each individual employee. Then, the Plan apportions those payments between the employer and the employee using a Default contribution percentage derived by Class Counsel, in consideration of numerous factors. *See supra* § II(B).

Mr. Feinberg was provided with the Plan of Distribution, as well as the underlying analysis and factors used to determine the Default allocation ratios employed by that Plan. As reflected in his declaration, he has reviewed the Plan and agrees that it presents a fair, reasonable, and adequate basis upon which to allocate funds. Feinberg PA Decl. ¶ 20. Further, Class Counsel relied on the expert analysis of Mr. Chodorow and the Brattle Group to assist in developing and evaluating the economic reasonableness of the Default option. Settlement Class Counsel PA Decl. ¶ 34. Class Counsel's decisions to rely upon expert analysis of the data provided by Settling Defendants and to use a Default allocation methodology strikes a reasonable balance "between precision and efficiency," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 496 (S.D.N.Y. 2018), and ensures that the distribution of monetary relief will be fair and equitable. Any Authorized Claimant who nevertheless believes that they contributed more than the Default can pursue an Alternative option, under which they may submit data, records, and other materials supporting the use of a different contribution percentage. The Settlement Administrator, in the

exercise of sound discretion, will then analyze the available data and determine the appropriate allocation ratio to use in the individual case. Plan of Distribution ¶ 19(k). This Alternative option ensures that any Authorized Claimant who believes their case deviates significantly from the norm has the opportunity to make their case for more precisely tailored relief, and goes above and beyond the requirements for equitable distribution of the Net Settlement Fund.

Finally, Class Counsel recognized that there is an irreducible minimum cost of administering each individual class member's claim and that the claims of some Damages Class members would be too low to justify the cost of administering them. Accordingly, Class Counsel, consistent with the caselaw applying the standards for approving class action settlements, set a *de minimis* claim threshold of $5.00, an amount well below that which has been found justified in order to avoid unreasonable administrative costs in other class action settlements.[31]

For these reasons, the proposed Plan of Distribution allocates the monetary relief provided under the Settlement Agreement on a fair, adequate, and reasonable basis, and thus satisfies the standard for final approval.

---

[31] *See In re Ford Motor Co. Spark Plug & Three Valve Engine Prods. Liab. Litig.*, No. 11:12-MD-2316, 2016 WL 6909078, at *6 (N.D. Ohio Jan. 26, 2016) (approving $300 threshold); *Hill v. State Street Corp.*, No. 09-12146-GAO, 2015 WL 127728, at *12 (D. Mass. Jan. 8, 2015) ($10 threshold); *In re Advanced Battery Techs., Inc., Sec. Litig.*, 298 F.R.D. 171, 180 (S.D.N.Y. 2014) ($100); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 328–29 (3d Cir. 2011) ($10); *In re Mut. Funds Inv. Litig.*, No. 04-md-15863, 2011 WL 1102999, at *3 (D. Md. Mar. 23, 2011) ($10); Wade v. Kroger Co., No. 3:01CV–699–R, 2008 WL 4999171, at *2 (W.D. Ky. Nov. 20, 2008) ($50); *In re Gilat Satellite Networks, Ltd.*, No. CV–02–1510 CPS, 2007 WL 1191048, at *9 (E.D.N.Y. Apr. 19, 2007) ($5); *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, No. 02 MDL 1484(JFK), 2007 WL 4526593, at *12 (S.D.N.Y. Dec. 20, 2007) ($50); *In re Spring Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1268 (D. Kan. 2006) ($25); *City of Livonia Emp. Ret. Sys. v. Wyeth*, No. 07 Civ. 10329(RJS), 2013 WL 4399015, at *3 (S.D.N.Y. Aug. 7, 2013) ($10).

## VII.   THE COURT SHOULD OVERRULE THE OBJECTIONS AND GRANT FINAL APPROVAL.

After a robust Notice Program, with direct notice to over 100 million class members and an extensive media and outreach campaign, Settlement Class Counsel have now received 40 objections from 123 objectors that were validly submitted or postmarked by the July 28, 2021 deadline under the Court's Preliminary Approval Order. Keough Decl. ¶ 95; Appendix A. Eighty-one of these objectors—66% of all objectors—are represented by the same law firm.[32] The relevant portions of all the objections are attached as Exhibits 1-40, and a chart of all objectors is included as Appendix A.

As courts in the Eleventh Circuit have explained, "[i]t is settled that '[a] small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness.'" *In re Checking Acct. Overdraft Litig.*, No. 1:09-MD-02036-JLK, 2020 WL 4586398, at *15 (S.D. Fla., Aug. 10, 2020) (alteration in original) (quoting *Ass'n for Disabled Ams. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002)); *see also Ferron v. Kraft Heinz Foods Co.*, No. 20-CV-62136-RAR, 2021 WL 2940240, at *12 (S.D. Fla., July 13, 2021) ("This Court, like others, considers the reaction of the Settlement Class to the proposed settlement to be an important indicator as to its reasonableness and fairness."); *Austin v. Pennsylvania Dept. of Corr.*, 876 F. Supp. 1437, 1458 (E.D. Pa. 1995) ("Because class members are presumed to know

---

[32] This group of objectors is represented by a group of firms led by Sperling & Slater, P.C. This overall group consists of four separate sub-groups. The first three groups, the "Sperling/Sherrard Opt-Out Objectors", are represented by Sperling & Slater along with co-counsel Sherrard Roe Voigt & Harbison, PLC, Keller Lenkner LLC, and Kenny Nachwalter, P.A., and have all signed onto the same brief: Opt-Out Corporate Employer Plans, Opt-Out Taft-Hartley Plans, and Opt-Out Church Plans. The Sperling/Sherrard Opt-Out Objectors intend to opt out of the Damages Class and are also seeking the right to opt out of the Injunctive Relief Class or, in the alternative, bring an objection to various aspects of the Settlement. The last group, the Non-Opt-Out Taft-Hartley Plans, are represented by Sperling & Slater alone. The entities represented by these firms are listed in Appendix A.

what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider.").

For a settlement of this magnitude, with a class size not in the thousands, but in the ***tens of millions***, the relatively small number of objections provides a powerful testament to the widespread positive reaction to the Settlement. By contrast, as of the submission of this brief, over six million claims have been submitted by class members to participate in the Settlement. Settlement Class Counsel have reviewed each of the objections, and none of the objections warrants withholding final approval of the Settlement.

As an initial matter, the objections generally ignore both the standard for approval of a settlement under Rule 23 and the practical realities of continued litigation in this case specifically. In reviewing a proposed settlement, the "Court's role is not to examine whether a settlement 'could have been better by providing different or additional relief.'" *Edwards v. Nat'l Milk Producers Fed'n*, No. 11-cv-04766-JSW, 2017 WL 3616638, at 6 (N.D. Cal. Jun. 26, 2017) *(quoting Ross v. Trex Co.*, No. 09-CV-00670-JSW 2013 WL 6622919, at *4 (N.D. Cal. Dec. 16, 2013)). "'Settlement is the offspring of compromise; the question [that the courts] address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion.'" *Henderson v. Emory Univ.*, No. 1:16-cv-02920-CAP, 2020 WL 9848975, at *5 (N.D. Ga. Nov. 4, 2020) (*quoting Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)). "A settlement may pass judicial muster," therefore, "even though some members prefer different remedies." *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 265 (S.D.N.Y. 1998). *See also In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 1000 (N.D. Ohio 2016) (observing that "[t]he possibility that the settlement could have been better does not mean the settlement presented was

61

not fair, reasonable or adequate") (internal quotation omitted). Indeed, the "court's fiduciary duty to class members entails not only protecting an objecting minority, but also protecting a non-objecting majority from a "veto" by dissenting members." *Martens*, 181 F.R.D. at 265.

The standard for approval of the Settlement under Rule 23(e)(2) is whether it is fair, reasonable, and adequate. None of the objections even purports to show that the Settlement as a whole fails to meet that bedrock standard, given that the Settlement includes (1) historic injunctive relief, including the elimination of restrictions on Green competition throughout the United States by eliminating the NBE rule; and (2) monetary relief of $2.67 billion, a recovery that has rarely ever been achieved in private antitrust litigation.

The objections uniformly fail to recognize the extraordinary achievement of obtaining this historic relief in a purely private antitrust action that challenges conduct of the Defendants that has been openly known to the public, to the government, and to the objectors, for decades. As far back as 1946, a leading Blue Cross executive told a U.S. Senate committee as follows: "There is coordination in service to the enrollment areas of Blue Cross. As a general principle, only one Blue Cross Plan is established in each enrollment area." ECF No. 1353-94 (Prepared Statement by C. Rufus Rorem, Director of the Blue Cross Commission, Sen. Hr'g Apr. 22, 1946, at 7). Likewise, in 1971, the Blue Cross President testified before a Senate antitrust subcommittee that the Blue Plans had "***exclusive territorial arrangements***." ECF No. 1353-95 to -96 (High Cost of Hospitalization," Hearings Before the S. Subcomm. on Antitrust & Monopoly, 91st Cong. 210–11 (1971) (Stmt. of Walter J. McNerney)) (emphasis added). Over four decades ago, in ***1979***, a report by the FTC – which is tasked with enforcing the nation's antitrust laws – recognized that "***Blue Shield plans generally do not compete with each other***." ECF No. 1353-21 to -22 (1979 FTC Report at 68) (emphasis added). The report stated that each Blue Shield Plan "confines its

underwriting activities to the population of its own area, which is usually a state but sometimes includes parts of two or more states, and sometimes is only a portion of one state." *Id.*[33]

Despite the public knowledge over how the BCBS system is structured, the federal agencies tasked with enforcing our antitrust laws have chosen never to challenge the system. Even after this litigation was pending for almost a decade, no antitrust enforcement agency chose to bring any action or submit anything in support of the Subscriber Plaintiffs in this case. Now that the Class Representatives and Subscriber Class Counsel have spent close to another decade, and hundreds of millions of dollars in resources, challenging that system, certain entities have emerged (seemingly at the behest of a small number of law firms) to criticize a Settlement that provides a multi-billion dollar damages recovery and injunctive relief that will enable enormous amounts of new competition. Keeping the nature of this Settlement in historical perspective is warranted.

This Settlement is national in scope and ends what very likely would have been a state-by-state determination of class certification and trials establishing liability and damages, all of which would have been hotly-contested. The Settlement takes place after nearly nine years of exceptionally costly and intensive litigation, at a juncture where the first rulings on class certification and trial in the bellwether state, Alabama, had not happened (and no appeals thereafter resolved). The objectors completely ignore these realities, and simply ask for more from the Settlement. The objectors make no effort to explain how the Settlement achieved in this case could possibly be considered ***unfair*** or ***unreasonable***. The objectors jeopardize what has been achieved

---

[33] While the history of the Blues shows some amount of Blue-on-Blue competition in the early years, Subscribers alleged that this was virtually all eliminated through the 1987 "Assembly of Plans." FACCAC ¶ 369. Subscribers also alleged that in 1996 the Blues further insulated themselves from competition when they agreed to make it impossible for a non-Blue plan to gain control of a Blue Plan without the approval of a majority of all the Blue Plans. *Id*. ¶¶ 368–73.

for the Settlement Classes by asking that the certitude of this historic Settlement be scuttled in favor of years more of extremely costly and uncertain litigation in multiple forums. The Court should protect the Settlement Classes and deny the objections.

> **A.      The Injunctive Relief Is Fair and Reasonable.**

> **1.      ESAs and Post-Settlement Conduct**

The Sperling/Sherrard Opt-Out Objectors and Home Depot Inc., U.S.A. ("Home Depot") object that the Settlement should not be approved because doing so would: (a) perpetuate a *per se* violation of Section 1 of the Sherman Act, (b) require the Court to improperly issue an advisory opinion ruling that future conduct by the Defendants is not *per se* unlawful, and (c) impermissibly limit a private party's right to enforce the antitrust laws and result in releases of future claims for injunctive and equitable relief in violation of public policy. Exs. 1, 5. Each of these interrelated objections fails.

> **a.      The Settlement Plainly Does Not Perpetuate Conduct That Is "Clearly Illegal."**

That the Settlement permits the ESAs to remain in place, with material changes in their operations and the inclusion of procompetitive practices, is not legal cause to reject final approval. A "district court abuses its discretion in approving a settlement only if the agreement sanctions '***clearly illegal***' conduct." *Fraley v. Batman*, 638 Fed.Appx. 594, 597 (9th Cir. 2016) (quoting *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977) (approving settlement over objection that it perpetuated "classic group boycotts" in violation of Section 1 because "settlement authorizes no future conduct that is clearly illegal"); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 987 (11th Cir. 1984); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123–24 (8th Cir. 1975).

64

Thus, the Court need only satisfy itself that the arrangement left intact under the Settlement is **not** "clearly illegal." *Bennett*, 737 F.2d at 987. Here, the going-forward Blue system, with material changes and additional procompetitive features, cannot be said to be "clearly illegal." Further, even prior to the Settlement's alterations to the Blue system, the use of the ESAs by the Blue system has been public knowledge for decades. Yet the federal agencies charged with enforcing our antitrust laws have chosen never to bring the claims brought by the Class Representatives and Subscriber Class Counsel in this case. Nor did any of the objectors ever see fit to challenge the arrangement they now claim is "clearly illegal," even though it was public knowledge for decades before these lawsuits were filed. It is simply not tenable for the objectors now to arrive on the scene claiming that the ESAs they have been living with for decades are "clearly illegal," thus barring final approval of the Settlement.

The Sperling/Sherrard Opt-Out Objectors and Home Depot are incorrect to argue that this Court has already found the ESAs to be a horizontal agreement among competitors that is per se unlawful under *Sealy* and *Topco*. Ex. 1 at 17-20; Ex. 5 at 34-35. These objectors misread the Court's holding in at least two key respects. First, in its decision on the standard of review, this Court held only that "Defendants' **aggregation** of a market allocation scheme together with certain other output restrictions is due to be analyzed under the *per se* standard of review." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1279 (N.D. Ala. 2018) (emphasis added).[34] The Court's ruling addressed only the *aggregation* of the ESAs and the NBE, not the ESAs standing alone. And, in its Preliminary Approval Order, the Court correctly recognized that the structural changes achieved in the Settlement (including the elimination of the NBE rule),

---

[34] Further, the Court's use of the phrase "due to be" makes clear that, by its terms, the Order referred to future analysis to be applied at trial.

"when implemented, likely will move the Blues' system from the Per Se category into the Rule of Reason category and that procompetitive benefits will flow from these negotiated changes." PA Order, 2020 WL 8256366 at *25. It defies logic for objectors to argue that the going-forward system has already been found to be *per se* illegal when the Court expressly noted at preliminary approval that it is likely to be reviewed under a Rule of Reason standard and has procompetitive benefits.[35]

The Sperling/Sherrard Opt-Out Objectors also incorrectly contend that the Court concluded that "the Association is not a single entity, but rather is a group of competing or potentially competing Blue Plans acting in concert." Ex. 1 at 18. The Court expressly did not reach that conclusion. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1266 (N.D. Ala. 2018). To the contrary, the Court held that there was a genuine dispute of material fact over the Blues' affirmative defense as to whether they act as a single economic enterprise with respect to their management of the Blue Marks. The Sperling/Sherrard Opt-Out Objectors' reliance on this mischaracterization compounds their misreading of the Court's Standard of Review Order.

With no way to show that a system that has been in place for decades is somehow "***clearly illegal***", the objectors attempt to invert the legal standard by arguing that this Court must instead

---

[35] In arguing that the continuation of ESAs amounts to a *per se* violation notwithstanding the Settlement's elimination of the NBE rule, the Sperling/Sherrard Opt-Out Objectors take issue with the Court's reliance, in its Preliminary Approval Order, on Dr. Ariel Pakes' testimony that the NBE accounted for 97% of the damages in this case, and contend that there is no record basis to support the conclusion that the vast majority of the injury caused by Defendants' conduct is attributable to the NBE. Ex. 1 at 16 n.15. These objectors themselves concede that this observation is not central to their objection. *Id.* That concession was well-made. At any rate, Dr. Pakes made no such conclusion in his report. Dr. Pakes' report included separate damages estimates for Blue entry into Alabama and Green entry into Alabama. From those estimates, counsel for Settling Defendants at the preliminary approval hearing represented that Dr. Pakes' damages estimate for Green entry alone amounted to 97% of the total damages estimated for Blue entry alone. ECF No. 2626 at 160.

conclude that the ESAs are ***clearly legal*** under the Sherman Act before it may approve the Settlement. If the objectors' upside-down legal standard were to be accepted, it would require courts to resolve the ultimate merits of each dispute before approving a settlement of that dispute, thus defeating one of the central purposes of settlement and significantly undermining the policy favoring settlements of complex cases. As Home Depot itself acknowledges, courts have consistently rejected any such requirement. Ex. 5 at 26-27.

As the former Fifth Circuit has explained, the "very ***uncertainty*** of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981) (*quoting Florida Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960)) (emphasis added).[36] *See also United States ex rel Balko v. Senior Home Care, Inc.*, No. 8:13-cv-3072-T-17TBM, 2017 WL 9398654, at *9 (M.D. Fla. May 2, 2017); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *Robertson*, 556 F.2d at 686 ("It is true that a settlement that authorizes the continuation of clearly illegal conduct cannot be approved, but a court in approving a settlement should not in effect try the case by deciding unsettled legal questions."); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 313 (N.D. Ga. 1993) (same).

This Court was correct when it noted in its order preliminarily approving the settlement that "undetermined legal issues will not bar a fair and reasonable settlement." PA Order, 2020 WL

---

[36] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

8256366 at *25. This is especially true where there are, as here, "many procompetitive benefits" to the Settlement. *Id.*[37]

> **b.** **The Court Need Not Provide an Advisory Opinion to Approve the Settlement.**

Home Depot's suggestion that approving the Settlement would require the Court to render an unconstitutional advisory opinion, Ex. 5 at 27-31, fails for the same reason. The Court is not being asked to rule that ESAs under the Blue system (as revised by the Settlement) are clearly lawful. Rather, in order to approve the Settlement, the Court need only assure itself that the ESAs standing by themselves—without the aggregation of restraints that have been removed by the Settlement, and with the addition of material procompetitive benefits—are not clearly unlawful. *See, e.g., Bennett*, 737 F.2d at 987 ("[U]nless the illegality of an arrangement under consideration is a legal certainty, the mere fact that certain of its features may be perpetuated is no bar to approval."). Because the Court need not determine that the arrangement established under the Settlement Agreement is lawful in order to approve the Settlement, no advisory opinion is required.

The Second Circuit's decision in *Robertson* approving an antitrust settlement over the objection that "it perpetuates for ten years two 'classic group boycotts' in violation of Section 1 of the Sherman Antitrust Act" is particularly instructive. 556 F.2d at 686. The Court concluded that neither the "College Draft" nor the "Compensation Rule" were clearly illegal, in part because neither rule was held to be *per se* unlawful "in any previously decided case . . . ." *Id.* The court evaluated the settlement "as a whole," observing that, although it perpetuated some of the allegedly

---

[37] The Court also correctly noted in its Preliminary Approval Order that when the Court certified its Standard of Review Order for interlocutory appeal, it expressly held that there was "a substantial ground for difference of opinion as to its decision." *Id.* at *24. The objectors fail to recognize this, along with all of the other reasons this Settlement cannot possible be said to leave intact anything that is "clearly illegal."

*per se* unlawful restraints, it "radically modified draft practices; it virtually eliminated option clauses; and it modified the compensation rule, eliminating it altogether after ten years." *Id.*

Here, as in *Robertson*, neither the ESAs nor any other challenged features of the Blue system that may continue post-Settlement are clearly unlawful. The Settlement radically alters the challenged aggregation of Defendants' practices and will substantially increase competition to the benefit of all class and sub-class members, as described in detail above. As they stated at the preliminary approval hearing, Settlement Class Counsel believe that the remaining system is not clearly illegal and instead that any future challenge would be tested under the Rule of Reason, taking into account the procompetitive benefits of the system. *See* Ex. 5 at 28 (quoting ECF No. 2626 at 161-62).

As shown in Subscriber Plaintiffs' Preliminary Approval Motion, as this Court observed in its Preliminary Approval Order, and as no objector (including the Sperling/Sherrard Opt-Out Objectors and Home Depot) has seriously disputed, the transformative equitable relief of this Settlement is far more than has ever been obtained in a private antitrust settlement. It provides substantial benefits, both directly and in the form of increased competition in the relevant markets, to the members of the class and sub-class. *See* PA Order, 2020 WL 8256366 *2 ("The proposed structural relief is historic and substantial."); *id.* at *5 (finding that the Settlement's injunctive relief includes "significant, unprecedented, and far-reaching changes to BCBSA's rules and regulations," and that "each of these hard-won, negotiated changes to Defendants' practices provides significant relief to the Class . . . , allowing for opportunities for more competition in the market for health insurance and providing the potential for Class Members to achieve greater consumer choice, better product availability, and increased innovation"); *id.* at *14 (reaffirming

that the injunctive relief "offer[s] forward-thinking, pro-competitive reforms that will change the nature of Defendants' business moving forward").

### c.       The Settlement Does Not Improperly Release Future Conduct.

That the Settlement Agreement may result in the release of claims related to certain rules and regulations that may be adopted by the BCBSA Board and that the Monitoring Committee may review pursuant to Paragraph 20 of the Settlement Agreement likewise does not require the Court to issue an advisory opinion concerning the legality of conduct authorized by the settlement. *See* Ex. 5 at 10-13. The Monitoring Committee is not empowered to approve, much less immunize from antitrust scrutiny, any new restraints, new arrangements, or future conduct adopted by the Blues that are not within the scope of the matters addressed in the provisions of the Settlement Agreement providing the historic, procompetitive, and hugely beneficial injunctive relief secured by the Subscriber Class.[38] By the terms of the Settlement Agreement, the Monitoring Committee is charged with reviewing actions to be taken by the BCBSA Board "adopting rules or regulations that are within the scope of Paragraphs 10-18," Settlement Agreement ¶ 20, *i.e.*, actions taken to implement the equitable relief provisions of the settlement. Only a claim relating to a rule, regulation, or action that is within the scope of Paragraphs 10-18 could thus constitute a released

---

[38] *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 329 (1955), and its progeny suggest that a settlement agreement may not extinguish future antitrust claims alleging disparate types of anti-competitive conduct than was contemplated by the parties' settlement in earlier antitrust litigation. *See, e.g.*, *Xerox Corp. v. Media Scis., Inc.*, 609 F. Supp. 2d 319, 327-28 (S.D.N.Y. 2009) (discussing *Lawlor* and *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95 (5th Cir. 1974)). But while a release may not apply to claims arising from a "new, post-release agreement" in restraint of trade, mere "continued adherence" to an alleged pre-release restraint will not. Notably, the Settlement Agreement itself provides for the mediation and arbitration of disputes involving Monitoring Committee activities, and further provides that disputes on whether a newly adopted rule or regulation is within the scope of the release can by resolved by this Court. Settlement Agreement ¶ 20. Home Depot does not even mention, let alone object to or otherwise find fault with, these dispute resolution provisions.

claim. *Id.* at 34-35, ¶ 20(a)(iii). In other words, an action is covered by the release only if that action implements the relief that the Settlement provides. Any new agreement or anticompetitive restraint above and beyond those within the scope of the Settlement is not released and can be subject to legal challenge. Thus, the release does not violate public policy.

The Sperling/Sherrard Objectors and Home Depot both argue that the Settlement must be rejected because "the release of future antitrust violations is contrary to public policy and unenforceable." Ex. 1 at 14; Ex. 5 at 13-23. In support of their objection, the objectors rely upon several cases, each of which stands essentially for the same proposition, *i.e.*, that "[t]he prospective application of a general release to bar private antitrust actions arising from subsequent violations is clearly against public policy," Ex. 1 at 14, *quoting Redel's, Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974), and that public policy prohibits "granting defendant 'immunity for "civil liability for future violations'"" of the antitrust laws, *id.* (*quoting Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955)). Ex. 1 at 14; Ex. 5 at 14-15.

These cases do not bar the release of claims challenging the continuation of conduct or agreements that predated the release and that were the subject of the litigation and the settlement containing the release.[39] To the contrary, it is well-settled that although "there is an unquestioned public interest in the 'vigilant enforcement of the antitrust laws through the instrumentality of the

---

[39] Home Depot also objects to the scope of the release, inasmuch as it extends not only to the claims asserted in the Complaint, but also to factual predicates contained in the filings. Ex. 5 at 11. The law is clear, however, that "a court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) (internal quotations omitted). *See also In re Vitamins Antitrust Litig.*, No. 99-197 TFH, 2000 WL 1737867, at *5 (D.D.C. Mar. 31, 2000) ("[I]t is well-settled that 'in order to achieve a comprehensive settlement that would prevent relitigation of settled questions,' in a class action, a court may permit a broad release of claims based on overlapping factual predicates.") (quoting *City P'ship Co. v. Atl. Acquisition Ltd. Partnership*, 100 F.3d 1041, 1044 (1st Cir. 1996)).

71

private treble-damage action,' this public interest does not prevent the injured party from releasing his claim and foregoing the burden of litigation." *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 891–92 (3rd Cir. 1975) (*quoting Lawlor*, 349 U.S. at 329). *See also Ingram Corp. v. J. Ray McDermott & Co.* 698 F.2d 1295, 1313 (5th Cir. 1983) ("our view is that an adequately drawn and validly executed release will bar antitrust claims") (collecting cases); *Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*, 545 F.2d 18, 20 (7th Cir.1976) (per curiam) ("A general release ... is not ordinarily contrary to public policy simply because it involves antitrust claims.").

Public policy thus does not bar the enforcement of a release where the "future conduct" alleged to be unlawful flows from "continued adherence" to the restraint that was the subject of the release. *Madison Square Garden, L.P. v. National Hockey League*, 2008 WL 4547518, at *8 (S.D.N.Y. Oct. 10, 2008). And the "courts have enforced even general releases to bar antitrust claims predicated on continuing violations of pre-release conduct, such as 'conspiracies alleged to continue post-release.'" *Xerox Corp. v. Media Scis., Inc.*, 609 F. Supp. 2d 319, 326 (S.D.N.Y. 2009) (*quoting VKK Corp. v. NFL*, 244 F.3d 114, 126 (2d Cir. 2001)). *See also MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 161 F.3d 443, 448 (7th Cir. 1998) (finding that conduct was "clearly based" on pre-release conduct, and acknowledging that while "new, post-release agreement" in restraint of trade may be actionable, mere "continued adherence" to an alleged pre-release restraint of trade could not give rise to a viable claim); *Record Club of Am., Inc. v. United Artists Records, Inc.*, 611 F. Supp. 211, 217 n. 8 (S.D.N.Y. 1985) (enforcing release of an antitrust claim because "all of the harm alleged flows from and is related to the terms and conditions [of the release]" and was merely the continuing effect of pre-release conduct).

The cases relied upon by the objectors involved releases that were being interposed as a bar to claims that arose from future violations that went *beyond* conduct covered by the release. In

*Lawlor*, for example, the Supreme Court examined the *res judicata* effect of a prior judgment rather than the preclusive effective of a release, and held that a prior judgment did not bar a subsequent action where there were "new antitrust violations alleged here . . . not present in the former action," 349 U.S. at 328, and where five of the defendants in the subsequent action had not been parties to the agreement challenged in the earlier action, *id.* at 329. Likewise, in *Redel's Inc. v. General Electric Co.*, the Fifth Circuit held that a general release "is ineffective to bar claims arising subsequent to ... the date of its execution," 498 F.2d 95, 99 (5th Cir. 1974), and thus did not bar claims for price discrimination which the defendant was alleged to have engaged after the execution of a general release contained in a franchise agreement.[40]

Courts have distinguished this line of cases on the ground that the releases found to be void under public policy applied to "all types of claims, including 'future' entirely unrelated antitrust claims not circumscribed to an identical factual predicate or to claims that arose out of the alleged conduct or related conduct that could have been alleged." *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 05-MD-1720 (MKB) (JO), 2019 WL 6875472, at *26 (E.D.N.Y. Dec. 16, 2019). *See also In re Managed Care Litig.*, No. 00-MD-1334-MORENO, 2010 WL 6532982, at *12 (S.D. Fla. Aug. 15, 2010) (enforcing release that "applies to claims that relate to

---

[40] It is true that *dicta* in another decision cited by the objectors, *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955), is arguably broader. *Id.* ("Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy."). The court in *Fox* was called upon to interpret a release that explicitly preserved certain rights of the parties to engage in future conduct, and it held only that parol evidence regarding the meaning of the release was appropriately admitted where the supposedly unambiguous reading offered by the party opposing admission of the parol evidence would have rendered the provision meaningless surplusage. That opinion neither involved a decision about whether to approve a class settlement, nor addressed whether a court considering such a settlement is obliged to definitively determine whether a business practice left in place under the settlement would violate the antitrust laws, nor even actually invalidated a release as against public policy.

the course of conduct that originated before the date of the Preliminary Approval Order" because it "in no way ... immunize[s] [defendant] from liability against new RICO, antitrust or contractual violations that arise from a brand new set of events and course of conduct than the one settled in the MDL Litigation" and distinguishing the release found unenforceable in *Lawlor* on the ground that "it released future antitrust claims for disparate types of anti-competitive conduct"); *Shane v. Humana, Inc.*, No. 05-MD-1720 (MKB) (JO), 2009 WL 7848518, at *9 (S.D. Fla. Nov. 5, 2009) ("[C]onsiderable caselaw stands for the proposition that public policy considerations differ when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint on trade."); *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07 CV 8455 (LAP), 2008 WL 4547518, at *8–9 (S.D.N.Y. Oct. 10, 2008) (rejecting argument that enforcement of the release would violate public policy and finding "considerable support in the caselaw for the distinction relied upon here, namely that the public policy considerations differ when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint" (internal citation omitted)).[41]

Finally, Home Depot seeks support in the Supreme Court's observation that, if "choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies . . . , we would have little hesitation in condemning the agreement as against public policy." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 639 n.19 (1985). *See* Ex. 5 at 13 (discussing *Mitsubishi*). Even if this dictum, delivered while

---

[41] Home Depot also objects that the release is overbroad because it extends to future claims that arise after the Effective Date. Ex. 5 at 10. To be barred by the release, however, any such future claims would have to arise from continued adherence to the existing arrangements that are "the factual predicates of the Subscribers Actions" or other prongs of the release. Settlement ¶ 1(uuu). Were the Defendants to enter into a new agreement or to adopt a new arrangement, a future plaintiff would not be foreclosed from asserting a new antitrust violation arising under that agreement.

assessing the enforceability of an arbitration clause in a sales agreement, could be applied to a release executed pursuant to a settlement agreement,[42] it too stands only for the proposition that an agreement that prevents a party from effectively vindicating a future violation of the Sherman Act would be void as a matter of public policy. *Id.* It does not bar the release of claims predicated on the continued adherence to a pre-release arrangement or course of conduct. *Xerox*, 609 F. Supp. 2d at 325-26 (explaining that *Mitsubishi* does not bar release of claims predicated on continuation of pre-release conduct).

### 2.   Second Blue Bids

Some objectors argue that the Settlement Agreement is unfair because it gives a Second Blue Bid only to certain Qualifying National Accounts ("QNAs"), and not to every multi-state entity. These objections improperly isolate this particular provision from the whole of the Settlement in an attempt to argue that the Settlement is not fair and reasonable because not all Self-Funded Accounts can receive a Second Blue Bid. But this relief must be viewed in light of all of the relief obtained in the Settlement—including the elimination of the NBE rule, which has the potential to result in any number of additional bids for Class Members. When viewed in its proper context, the Settlement's Second Blue Bid provision, which will significantly increase competition in the market for national accounts, is more than fair and reasonable.

As background, under the existing system, national accounts (almost all of which are Self-Funded Accounts), that wish to solicit bids from a Blue Cross/Blue Shield licensee may only do so from the "Initial Control Plan" ("ICP"), the Defendant in whose ESA the account is

---

[42] *See, e.g., In re Payment Card Litig.*, 2019 WL 6875472, at *26 (E.D.N.Y. 2019) (observing that "[f]or many reasons, waiver in the context of arbitration agreements differs significantly from the provisions of a jointly negotiated release," before finding that *Mitsubishi* dicta did not somehow invalidate the release provision in an antitrust settlement).

headquartered. Rubinfeld PA Decl. ¶ 34. If the account seeks a cede to a different Blue Plan, that Blue Plan must seek permission from the ICL to make the bid. Id. If permission is received, the requesting plan becomes the "Alternative Control Licensee" ("ACL") and gains the sole right to submit a bid. *Id.* Taken together, these policies are referred to as "ceding".

The Settling Defendants have vigorously defended ESAs and the cede system throughout this litigation, arguing that, without ESAs and ceding, Defendants could not adequately service national accounts, because there would be no incentive for one Blue Plan to allow another Blue Plan to access its provider network. As such, they argue that ESAs and the ceding program together allow for a product—the BlueCard, which provides the ability to service national accounts—that would not otherwise exist.

After a long and contentious negotiation, Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel achieved a significant measure of relief—the Second Blue Bid (or "SBB"). As a result of this Settlement, Self-Funded Accounts will, for the first time, have the opportunity to request and receive a bid from a second Blue Plan, and to determine for themselves the Blue Plan from which they wish to request that bid. In total, with the inclusion of the Second Blue Bid relief in the Settlement, approximately 1/3 of all lives covered by Self-Funded Accounts, and half of all lives covered by Self-Funded Accounts with 5,000+ employees, will have the ability to request two Blue bids.

And the SBB is not the only opportunity for accounts to request additional Blue bids. The Settlement gives national accounts two additional opportunities to get a Blue bid that it would not otherwise get absent the Settlement: 1) where the ICP chooses to bid as a Green, it is required to allow another Blue Plan to bid the account, and 2) where a national account has an Independent Health Benefit Decision Location outside of the ICP's Service Area, that location can request a

bid from the Blue Plan in that Service Area. These additional opportunities for national accounts create even more competition nationwide, far above and beyond even the significant SBB relief.

Objectors attempt to downplay this extraordinary achievement. They demand from a settlement complete victory and that *every* Self-Funded Account receive bids from more than one Defendant. They ignore that the Settlement permits just that. By eliminating the NBE rule, accounts can already receive bids from every Blue Plan in the country—a Blue-branded bid from its local Blue Plan, and Green bids from all other Plans. Objectors ignore this historic relief permitting unconstrained bids under Green brands and instead insist on two bids under the Blue brands.

Settlements are negotiations that require compromises, and the compromise over the SBB provision contained in the Settlement is a reasonable one that benefits the Class, benefits the public, and is surely better than not obtaining any SBB relief at all. And those benefits flow to all Class Members, not just those receiving an SBB through the Settlement. As Dr. Rubinfeld notes, "all class members also benefit from the increased flow of pricing information to insurance brokers and otherwise throughout the market that results from increased bidding competition, including from bids not presented to or even available to them." Exhibit B, Declaration of Daniel Rubinfeld ("Rubinfeld Decl.") ¶ 16.

To ensure that the SBB's direct relief would go to those Self-Funded Accounts that would benefit most from an additional bid, the Settlement lays out objective criteria, called the "D&B Analysis", that apply across the entire Self-Funded Sub-Class, identifying certain Self-Funded Accounts to be designated as QNAs eligible for an SBB. Again, because not all Self-Funded Accounts can receive an SBB, objectors frame this as a question of equitable treatment of Class Members under Rule 23(e)(2)(D). But objectors ignore that the rule does not require every single

Class Member to be treated *identically*, but rather that they are treated *equitably* relative to each other. *Swinton v. SquareTrade, Inc.*, No. No. 4:18-CV-00144-SMR-SBJ, 2019 WL 617791, at *8 (S.D. Iowa Feb. 14, 2019) ("Rule 23(e)(2)(D) requires the Court to consider whether the 'proposal treats class members equitably relative to each other.' The Court is satisfied that it does. There is no requirement that all class members in a settlement be treated *equally.*") (quoting Fed. R. Civ. P. 23(e)(2)). And objectors refuse to view the SBB in context of the broader Settlement, which offers significant structural relief to all class members.

Even considering the SBB in a vacuum, as objectors do, the Settlement's standard for determining the QNAs entitled to an SBB treats all Class Members fairly and equitably. It uses objective criteria in the self-insured national account market designed to identify the largest and most dispersed employers. The Settlement uses an objective method that is rationally related to the goal of identifying the truly national employers who, given the inability to obtain SBBs for everyone, are those most likely to seek, receive, and benefit from an SBB.

First, the relief is limited to Self-Funded Accounts with over 5,000 employees. No objector challenges this threshold requirement, which was also adopted by the court in *Anthem* in defining a market for national accounts. *United States v. Anthem*, 236 F. Supp. 3d 171, 197–202 (D.D.C. 2017). Because smaller accounts are less likely to attract an SBB than are larger accounts, a 5,000 employee threshold directs the relief towards those employers more likely to benefit from it.

Second, a QNA must meet the dispersion criteria laid out in the Settlement Agreement. Using Dunn & Bradstreet, an independent, industry-recognized source of employment data, each Employer's dispersion outside of its ICL's Service Area will be calculated to determine what percentage of the Employer's Members are located outside of that Service Area. Settlement ¶¶ 1(u), (w). Then, in addition to accounts located in overlapping Service Areas, the Employers with

the highest Dispersion Percentages will be designated as QNAs, until the number of Members covered by such QNAs and Self-Funded Accounts located in overlapping service areas equals at least 33 million Members. Settlement ¶ 1(u).

The dispersion criteria outlined above were developed in consideration of competition in the health insurance industry. Less-dispersed local Self-Funded Accounts have access to numerous state or regional insurers that could potentially provide those accounts with a competing bid, whereas more dispersed Self-Funded Accounts are more limited to national insurers with larger geographic footprints.[43] More disperse accounts are also more likely to actually attract a bid from a Blue Plan outside of their home Service Area, as Blue Plans would be less likely to provide a bid to an account that was based mostly in another Service Area. Based on these considerations, Settlement Class Counsel and Self-Funded Sub-Class Counsel were able to negotiate a SBB provision for the most dispersed national accounts.[44]

The SBB provided under the Settlement Agreement is not only fair and reasonable, it is historic. For decades, Blue-on-Blue competition in the national account market has been limited to overlapping service areas, and is now open, with hundreds of QNAs able to actually choose a second Blue Plan from which to request a bid on their business (and this is in addition to the unlimited potential for Green bids.) Many of the objectors' issues with the SBB concern an alleged desire for more Self-Funded Accounts to be eligible for an SBB. But these are not really objections to the fairness or reasonableness of the criteria that the Settlement uses to identify QNAs, but rather a wish for relief that could not be reached in a negotiated settlement. Taken to their logical

---

[43] *See* Exhibit C, List of Regional and National Insurers.

[44] In order to be a QNA, a Self-Funded Account must also be an Employer. Excluded from the definition of Employer are "Taft-Hartley trusts, multiple employer welfare arrangements, association health plans, retiree groups, and Opt-Outs." This requirement is discussed in further detail below.

conclusion, these objections are effectively arguing that Class Counsel should have rejected any SBB relief that could not have provided multiple Blue bids to every single Self-Funded Account or the specific accounts of the objectors. If Class Counsel had taken that approach, there would be no SBB relief to anyone in the Settlement. That would clearly have been a worse result for everyone.

### a.   The General Motors and Home Depot Objections Are Meritless.

In a two-page objection, General Motors Company and General Motors LLC ("GM") object to the Settlement because GM currently does not satisfy the definition of a QNA and hence will not receive an SBB. GM says this "underscores why the Settlement Agreement as currently constituted is not fair to all Injunctive Relief Class Members." Ex. 4 at 2. It further states that the Settlement perpetuates unlawful conduct "at least insofar as it applies to GM," and therefore is "the antithesis of fairness." *Id*. Similarly, Home Depot argues that the Settlement should be rejected because it achieves "only" a second competing Blue bid, and Home Depot would like to have thirty-five Blue bids, so the Settlement fails to achieve the benefits that would flow from "competition among as many Blue Plans as may wish to bid for their business." Ex. 5 at 19; *see also id.* at 19-23.

These objections lack merit. First, they both ignore that the Settlement Agreement *does* permit all 34 Defendants outside of its state to submit a competing bid to GM and Home Depot under a Green brand, by virtue of eliminating the NBE rule. Second, GM cites no authority for the proposition that the specific, Blue-branded relief of the SBB must be directly provided either to everybody, a group that includes GM, or to nobody at all. But as discussed above, accepting a

compromise is not a defect in a settlement; it is essential to its nature.[45] "The objectors' armchair-quarterbacking and wishing-for-more does not provide valid grounds to disapprove the settlements." *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 1001 (N.D. Ohio 2016).

Both GM and Home Depot appear to be suggesting that the existence of ESAs and the absence of an additional Blue bid for GM (or 35 additional Blue bids for Home Depot) is so clearly illegal that it precludes approving a settlement that leaves any aspect of that system intact. For the reasons discussed above, that is not the case. The existing Blue system for ceding bids on national accounts flows directly out of the structure of the ESAs, and neither one is clearly illegal. If these two behemoths, with sophisticated counsel and plenty of resources to litigate, genuinely felt so strongly that they have, for decades, been buying ASO contracts under a clearly illegal system, one suspects they would have taken action some time ago. Instead, they were content with their options up until the Settlement was achieved, and now expect the Court to agree that the other aspects of the system (that they never challenged) are so fundamentally unfair to them that the Settlement cannot be approved.

Home Depot does not dispute that the ability of hundreds of QNAs to request two Blue bids (and the unlimited number of additional bids created by the opening up of Green competition) represents a significant improvement over the preexisting regime. It concedes, albeit grudgingly, that "two bids may be better than one." Ex. 5 at 21. Instead, Home Depot argues that a market with only two competitors would still be considered "highly-concentrated" under the inapposite standard used by the Department of Justice to evaluate a proposed merger. Ex. 5 at 22 & n. 54.

---

[45] GM skirts the fact that it may well satisfy the QNA definition **in the future**, as the determinations are refreshed every two years. That it does not meet the definition now is not a reason to reject a settlement that will benefit tens of millions of class members.

Home Depot ignores that there are already other competitors besides the Settling Defendants in the market for health insurance, and further that the Settlement opens up opportunities for Green competition to increase the number of bids to which Home Depot and others would have access.

As Dr. Rubinfeld has testified, the SBB, operating in tandem with the other relief provided to the national accounts, "will provide increased opportunity for competition in the market for national accounts." Rubinfeld PA Decl. ¶ 37. Dr. Rubinfeld has further elaborated that increased competition in the market for national accounts, which is created through the SBB (as well as the elimination of the NBE), benefits the general market for health insurance. Rubinfeld Decl. ¶ 13.

### b.   The QNA Definition Is Reasonably Limited to Employers, Excluding Taft Hartley and Other Multi-Employer Plans.

Three groups of objectors complain that the QNA definition is limited to "employers," and thereby unfairly excludes certain multiemployer plans (here, "Taft-Hartley plans") as well as certain church groups that band together to buy ASO contracts. The three groups consist of the Opt-Out Taft-Hartley Plans and Opt-Out Church Plans, who joined the Sperling/Sherrard Opt-Out Objectors (Ex. 1); the Non-Opt-Out Taft-Hartley Plan Objectors, all represented by the Sperling & Slater firm (Ex. 2); and two Oregon-based Taft-Hartley plans (Ex. 7). These groups are straightforward (and incorrect) in their attack on the 33 million-strong achievement contained in the SBB provisions, asserting that the "only apparent reason for these exclusions is the desire of the defendants to avoid as much Blue-on-Blue competition as possible." Ex. 1 at 24, 27.

As an initial matter, the objectors provide no evidence that any single Taft-Hartley plan they represent would be a QNA *even if the Taft-Hartley exception were removed*. The two Oregon objectors admit that only 13% of their participants (in one case) and 21.5% (in the other) live outside of Oregon. Ex. 7 at 7. One group of objectors concedes more generally that "many Taft-Hartley plans would not satisfy the dispersion analysis, which requires that approximately 70% of

a plan's employees be located outside the service area of the local Blue." Ex. 2 at 6. For their part, the multi-employer church plan objectors assert, while providing no evidence, that they provide benefits to large numbers of participants who are "broadly dispersed throughout the country." Ex. 1 at 25. This again does not establish that they would have qualified to be a QNA if the definition had been broadened to include non-employer groups.

At any rate, the starting point for analysis is Rule 23(e)(2)(D), added in 2018, which (as discussed above) provides that one element to consider in finding a proposed settlement "fair, reasonable and adequate" is whether, taken together and evaluated in its entirety, "the proposal treats class members *equitably* relative to each other." *Id.* at 239(e)(2) & (D) (emphasis added). As already explained above, "equitable" is not the same as "equal" or "identical," although the objectors use the words "equal" and "equitable" interchangeably.[46] In the context of Rule 23, "equitable" means there must be a reasonable explanation for different treatment under the terms of the agreement as a whole. The Advisory Committee notes state that "[m]atters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims . . . ." *Id.*, advisory committee's notes to 2018 amendments.

At least one circuit court, denying an objector's appeal, has held that this standard is "flexible" and, so long as the settlement remains "fair, reasonable, and adequate" and relies on "***legitimate considerations***" in fashioning relief, this standard is satisfied. *Radcliffe v. Hernandez,* 794 F. App'x 605, 607 (9th Cir. 2019) (emphasis added). Another court, reviewing the Rule 23(e)(2)(D) requirement, found it sufficient that "proposed class counsel has provided ***adequate support*** for the considerations behind these distinctions, which are driven by the risks inherent in

---

[46] It is troubling that two of the objector groups—all represented by the same counsel—inaccurately and misleadingly refer to this black-letter rule as a requirement to treat class members "equally." Ex. 1 at 3; Ex. 2 at 1.

each claim and the relative strength of each claim." *Hall v. Accolade, Inc.*, No. 17-3423, 2019 WL 3996621, at *5 (E.D. Pa. Aug. 23, 2019) (Mem. Opinion) (emphasis added).

With the legal standard in mind, it is clear that the exclusion of Taft-Hartley and multi-employer church plans from the definition of QNA is appropriate. In the first place, the attack offered by the objectors—that "the only apparent reason" for the exclusion is "to avoid as much Blue-on-Blue competition as possible"—is wrong. Ex. 1 at 24. Regardless of who is included in the definition of a QNA, the SBB provision covers at least 33 million lives (a major achievement). If the definition of a QNA was broadened to include Taft-Hartley and/or multi-employer church plans, the same threshold would exist. These plans would simply replace the Self-Funded Accounts currently just above the line on the QNA list. Thus, nothing about excluding these groups avoids Blue-on-Blue competition—and including aggregated employer groups, like Taft-Hartleys and multi-employer church plans, could lead to *less* Blue-on-Blue competition.

Second, there are "legitimate considerations," *Radcliffe v. Hernandez*, and "adequate support," *Hall v. Accolade*, to support the criteria used here. These exclusions reasonably distribute the limited option of a Second Blue Bid more equitably among the class by excluding entities that would meet the QNA definition only by combining the purchasing power and geographic scope of multiple different employers. Excluding such plans is "equitable" because these groups are foregoing options to purchase insurance as single employers from state and regional insurers—a choice not typically available to the QNAs as they are defined in the Settlement—and because they have already increased their bargaining power by aggregating their insurance purchases.

There are existing local and regional health insurance networks that can be used by smaller employers, whether they are unionized construction workers in Ohio, or Lutheran church employees in Missouri. *See, e.g.,* Exhibit C. In general, the larger and more dispersed a single

employer is, the more difficult it is for a regional carrier to provide an adequate network for that employer, and the more that employer has to rely only on the national insurers. Thus, the smaller and more localized an employer is, the more local and regional networks are a viable alternative.

Third, it is fair to characterize the Taft-Hartley and multi-employer church plan groupings as voluntary. Although the three objector groups have not provided organizational documents[47] for even one of the plans they represent, for the multi-employer church plans it appears that they are combinations of hundreds of individual churches, each of which could comfortably buy health care coverage in its own name and in its own market.[48]

As for the Taft-Hartley plans, each of its employer members has joined such a plan pursuant to a collective-bargaining agreement. But collective-bargaining agreements are not set in stone: they have terms of years, and their commitments must be renewed or renegotiated when they expire. Like every other ASO that does not make the initial 33 million Member cut, each employer member of a Taft-Hartley plan has the potential to become a QNA in the future. For example, UPS —a large, national employer—left its Taft-Hartley pension plan in 2007 in order to set up its own, stand-alone plan.[49] ERISA also provides for limited circumstances where a health insurer may cease offering group insurance to an employer in a multi-employer plan. 29 U.S.C. § 1183. Thus,

---

[47] For example: trust documents or collective bargaining agreements for the Taft-Hartley plans; articles of incorporation, operating agreements, or bylaws for the multi-employer church plans.

[48] The multi-employer church plan objectors make much of the fact that for some other, completely unrelated purposes under federal law, those plans' participants are "deemed" to be single-employer plans. Ex. 1 at 25 & n.28. This is irrelevant. It does not change the fact that the members of the church plans are not actually single employers, but merely addresses the concerns of unrelated areas of federal law. It therefore has nothing to do with whether those plans are treated "equitably" as to the Second Blue Bid.

[49] *See* Steven Greenhouse, *Teamsters and U.P.S. Reach Deal on Pensions*, N.Y. Times (Oct. 1, 2007), https://www.nytimes.com/2007/10/01/us/01labor.html.

it is possible for employer members of a Taft-Hartley plan to exit those plans if they wish and seek QNA status independent of any Taft-Hartley affiliation.

Finally, these objectors ignore the access to Green competition that is created by the Settlement. This relief—available to all Settlement Class Members, including all Taft-Hartleys and multi-employer church plans—is a major component of the equitable relief at issue in the Settlement, which provides *everyone* with the benefits of increased competition, whether through the SBB or through green entry. When viewed as a whole, the Settlement's equitable relief is fair and reasonable.

All in all, the test under Rule 23(e)(2)(D) is not stringent. Subscribers have offered both "legitimate considerations" and "adequate support" for making the distinctions found in the Settlement Agreement.

### c. The Dispersion Criteria Is Reasonable, and Does Not Protect Anthem.

The Sperling/Sherrard Opt-Out Objectors argue that the D&B Analysis used to determine who is eligible for a Second Blue Bid protects Anthem from Second Blue Bids. In support of their argument, the objectors baldly, and incorrectly, tell this Court that "no account headquartered in an Anthem state would be able to meet the dispersion requirement and receive a second Blue Bid." Ex. 1 at 22. In fact, the current Appendix C of QNA includes at least 20 accounts in Anthem's Service Area that are newly eligible for an SBB under the Settlement.

But even leaving that significant factual misstatement aside, part of the purpose of the dispersion criteria is to provide the right to request an SBB to those Self-Funded Accounts who are most likely to actually receive and benefit from an SBB once requested—i.e., those who have a significant number of Members outside of their current Service Area, such that another Blue Plan would want to bid for the business. If a Self-Funded Account is located mostly in the Exclusive

Service Area of any Blue Plan (which it necessarily must be if it is not dispersed outside of the Service Area), it would likely not be as attractive a candidate for another Blue to service, in contrast with a Self-Funded Account that has a significant number of employees located in other Service Areas. This is true whether the employer is located in Anthem's ESA or the ESA of any other Blue Plan. The Sperling/Sherrard Opt-Out Objectors, while they would prefer something different, offer no reason why this rationale is not reasonable and fair, and thus their objection should be overruled.

The Sperling/Sherrard Opt-Out Objectors also argue that use of dispersion criteria in and of itself violates Rule 23(e)(2)(D) because it "allows some class members to seek Blue bids while preventing many others from doing so." Ex. 1 at 27. This is another twist on the same "all or nothing" argument that has been addressed above—*i.e.*, that either **all** Self-Funded Accounts must receive an SBB, or **none** can. This argument—again, only on one portion of the Settlement relief, divorced from the broader relief provided—should be rejected as a basis for disapproving of the Settlement as a whole.

### d.    The Remaining SBB Objections Should Also Be Overruled.

The Sperling/Sherrard Opt-Out Objectors argue that class members in overlapping service areas are deprived of an SBB. But these class members are in areas that already have two Blue Plans. Ex. 1 at 28. As noted above, it was reasonable to settle the litigation such that direct SBB relief went to class members in areas with a single Blue Plan.

The Sperling/Sherrard Opt-Out Objectors and Home Depot further argue that the constitutional right of QNAs to opt out of the Damages Class is burdened because a QNA that opts out ceases to be a QNA (i.e., it loses its right to an SBB), while being barred by the release from suing for an SBB. Ex. 1 at 7-10, Ex. 5 at 35-36. This is incorrect for two, independent reasons. First, a Self-Funded Account that opts out of the Damages Class is entitled to seek damages based on any and all alleged antitrust violations, including the absence of an SBB (or multiple Blue bids)

for an ASO contract. Thus, a Self-Funded Account that would otherwise be a QNA but for its decision to opt out of the Damages Class is able to remedy the absence of an SBB (in the past and the future) through a damages claim. This fully protects the Opt-Out Self-Funded Account, and would on its own be sufficient to allay any concerns of a "burden" on the right to opt out.

Second, a Self-Funded Account that opts out of the Damages Class will also have the ability to sue for equitable relief entitling it to a Second Blue Bid, if and to the extent that Self-Funded Account would otherwise have been entitled to a Second Blue Bid had it not opted out of the Damages Class. In other words, a class member that would otherwise have become eligible for an SBB under the Settlement but for its decision to opt out of the Damages Class will, as part of that opt out, have the right to seek an SBB as equitable relief for any period it would have qualified for a SBB under the Settlement Agreement. The Long-Form Notice makes this clear: "For purposes of clarity, if a Self-Funded Account that opts out meets the criteria to request a Second Blue Bid under the terms of the Settlement Agreement, that Self-Funded Account does not release any claims for declaratory or injunctive relief to request a Second Blue Bid during any time it meets the criteria to request such a bid under the terms of the Settlement Agreement."[50] The Settling Defendants have agreed to this, and it is set forth in ¶ 16 of the proposed Final Approval Order, attached as Exhibit L. For each of these two, independent reasons, the due process right to opt out is not burdened.

Two objectors—Post Holdings, Inc. and Tenneco, Inc.—argue that they should have been considered QNAs based on the existing dispersion criteria. Exs. 8, 10. The Settlement relies on

---

[50] Long-Form Notice,
https://www.bcbssettlement.com/admin/services/connectedapps.cms.extensions/1.0.0.0/asset?id=
bac08427-3ee3-4547-85c7-cd8fac480acd&languageId=1033&inline=true (Response to Question
10).

objective criteria: dispersion as measured by D&B, an industry standard. The Settlement also accounts for potential disputes over the application of the objective SBB criteria: "If an Employer contends that the data BCBSA used for that particular Employer are different from the data that Dun & Bradstreet ("D&B") provided to BCBSA… such Employer shall have the right to appeal its status to the Monitoring Committee." Settlement ¶ 15(a).

Post's objection misreads the Settlement in calculating its own dispersion criteria. The Settlement measures the Dispersion Percentage as outside of the Employer's Service Area. Post has a large number of employees outside of its headquarters state, but within the broader Service Area, and so its Dispersion Percentage is not currently high enough to establish it as a QNA (this could change under future, biannual recalculations of the Dispersion Percentage and the QNA list).

Tenneco's objection centers on D&B's data concerning its employee locations. D&B's data shows that Tenneco has 37,000 employees attributed to its headquarters in Illinois, which means that the vast majority of its employees are located within its headquarters' Service Area. If D&B's data is inaccurate as to Tenneco, Tenneco should raise that issue with D&B and it can be resolved for future opportunities for an SBB, as the list refreshes every two years. Settlement ¶ 1(u). That is not an objection to the criteria for establishing a QNA.

### 3.   Local Best Efforts

BCBSA's LBE rule says that of all the revenue generated by each Blue Plan (or its affiliates) from business ***within its ESA***, no more than 20% can be attributable to use of Green marks. This rule is justified by the Blues as a trademark rule that requires each Blue Plan to focus its business within its ESA on its use of the Blue Marks. The Blues also contend that a Blue Plan is unlikely to initiate Green competition against itself within an ESA. The Settlement leaves this rule intact, while eliminating the NBE, which required that of all revenue generated by each Blue Plan (or its affiliates) from all geographic sources, at least 66% had to be from use of the Blue

89

Marks. Eliminating the NBE rule allows each Blue Plan to use Green marks to compete with all other Blue Plans anywhere in the country that is outside that Plan's Service Area. Keeping the LBE rule means that while each Plan is completely unfettered in using Green marks to compete with other Blues outside its ESA, it remains circumscribed in how much Green business it can do within its ESA in direct competition with its own Blue business.

The Sperling/Sherrard Opt-Out Objectors make two complaints about the Settlement leaving the LBE intact. Both are meritless on their face, and both are yet another species of wishing Class Counsel could have entered a settlement without having to make any compromises.

First, they hypothesize (with no evidence) that each Plan will be more likely to use its Green brand to offer insurance to small groups within that Plan's ESA than to large groups within that ESA, because the large groups are more likely to trigger a violation of the LBE requirement. Ex. 1 at 29. It is unclear why a Blue Plan would want to invest in a Green brand to compete with its own Blue-branded products within its ESA. Regardless, the benefits of the Settlement are obviously the ability for each Plan to compete on an unfettered basis *outside its ESA* under Green brands. Within its ESA, the rules remain largely the same.[51] However, if a Plan uses a Green mark within its ESA, its incentives are the same with respect to large and small groups. Either way, it must monitor its business to make sure it does not exceed the 20% limit. The chances that *any one* customer is going to break the limit will be very low so long as the Plan is monitoring the limit. Further, the business from large national accounts will often be ASO business, which generates less revenue for the LBE calculation because ASO customers pay only administrative fees, not premiums to cover insurance of health costs themselves.

---

[51] The Settlement does contain an important requirement that LBE compliance must be calculated on a geographic area no larger than a State—a settlement provision that no objector appears to challenge.

Second, the Sperling/Sherrard Opt-Out Objectors argue that if a Blue Plan uses a Green business to generate revenue from a National Account in another state, "the green revenue attributable to the National Account's employees will push down the percentage of local Blue revenue that the Blue receives from its Service Area." Ex. 1 at 30. That is wrong and reveals a basic misunderstanding of the rules about which these objectors complain. The LBE rule looks at the revenue generated from business *within* the Plan's ESA, not from outside of it.

It bears noting that Subscribers took extensive discovery and conducted expert analysis on the LBE rule, and after doing so (based on the facts in the record) chose not to address LBE in their summary judgment motion and their merits reports, as the Settling Defendants were in a position to argue that the requirement is reasonably tailored to encouraging investment in the Blue Marks in each of the local markets—unlike the NBE rule, which had real-world anticompetitive effects. The Sperling/Sherard Opt-Out Objectors appear not to understand the LBE rule, and their objections to it are once again merely objections to any compromise whatsoever.

### 4.    Miscellaneous Injunctive Relief Objections

Christie Bluhm argues that the settlement does not address the disproportionate impact of the lack of competition in certain areas of the country. Ex. 14 at 1. The Settlement can only address competition among the Settling Defendants—it cannot control the market for health insurance writ large and mandate competition between the Settling Defendants and other non-Blue insurers, or among non-Defendant insurers. In any event, the Settlement does create opportunities for competition among the Settling Defendants throughout the country. First, the elimination of the NBE has the potential to create competition anywhere in the country where the local market is underserved, as any Settling Defendant can now create Green insurance coverage anywhere in the country without concerns about hitting the NBE cap. Second, the SBB provides certain QNAs the opportunity to seek another Blue bid, so that nearly a third of all individuals covered by Settling

Defendants' Self-Funded Accounts could have direct Blue-on-Blue competition. As Dr. Rubinfeld notes, this has the potential to have competitive benefits even for those accounts who do not receive an SBB. Rubinfeld Decl. ¶ 16. Thus, given Settling Defendants' overall presence in insurance markets nationwide, the Settlement has the potential to increase competition everywhere.

### B. The Monetary Relief Is Within the Range of Reasonableness.

#### 1. The Objection that the Settlement is Too Low Lacks Merit

Several individual objectors argue, or could be construed as arguing,[52] that the $2.67 billion Settlement Fund is inadequate. Objectors Christie Bluhm and Kearney Hutsler argue that the damages relief is too low, and objector Robert Shattuck, Jr. argues that damages are speculative and the settlement amount is likely too low. Ex. 14 at 1; Ex. 27 at 3; Ex. 34 at 1. Objector Jack Kelley argues that the settlement is not "fair, reasonable and/or adequate" given "the extent of harm suffered by members of the Settlement Class and the extent of Defendants' wrongdoing." Ex. 30 at 1.

Rule 23(e)(2)(C) asks courts assessing the adequacy of relief to consider "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." As noted above, those factors amply support the relief here. This Settlement is not merely within the range of recoveries deemed reasonable by courts, *supra* § IV(F)(1), but also provides one of the largest monetary recoveries *ever achieved* in an antitrust class action settlement. Silver Decl. ¶ 63; Fitzpatrick Decl. ¶ 17; Gentle PA Decl. ¶ 33.

---

[52] Several of these objections fail to state with specificity the grounds on which they are based, as is required under Fed. R. Civ. P. 23(e).

## 2.    The Settlement Will Not Result in Higher Premiums

Objectors C. Demuth, Michael Duhon, Lea K. Sivilich, Lorraine Alden, Donald Pitsch, Michael L. Happe, Eric Jones, and Dave Sheppard object on the grounds that the settlement amount will result in higher premiums. Ex. 11; Ex. 22; Ex. 20 at 1; Ex. 24; Ex. 35; Ex. 28; Ex. 36 at 1.

They cite no basis for this speculation, which could be advanced in virtually all class action settlements. An objector can always claim that a defendant may try to recover the costs of settlement through higher prices in the future. In any event, the "historic and substantial" structural changes the Settlement offers are designed to increase potential competition in the health insurance market, which in turn would *decrease* premiums. Rubinfeld PA Decl. ¶ 16 (the Settlement's "injunctive relief is likely to generate significant pro-competitive effects in the marketplace in the forms of increased competition among Blues, unbranded ('Green') growth and competition").

## 3.    That the Blues May Be Good Companies Is Not a Valid Basis for Objection.

Objectors Betty Brown, Lea K. Sivilich, and Michael L. Happe note that they have no issues with the Defendants and believe them to be good companies, and object to any settlement on that basis. Ex. 16 at 1; Ex. 24 at 1; Ex. 36 at 2. Under the 2018 amendments to Federal Rule 23(e), "objections must state with specificity the grounds on which they are based, as well as whether the objection applies only to the objector, a specific subset of the class, or to the entire class." 7B Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice & Procedure § 1797.4 (3d ed.). This explicit requirement is meant to "ensure that the parties are able to respond to the objections and that the court can evaluate them." *Id.* These objectors fail to state with the requisite specificity the basis for their objections and fail to acknowledge both the claims in this case and that these good companies, represented by able counsel, have agreed to this Settlement. *Friedman v. Guthy-Renker, LLC*, No. 2:14-cv-06009, 2017 WL 6527295, at *9 (C.D. Cal. Aug.

21, 2017) (overruling an objection on the grounds that it is too vague for the court to properly analyze); *In re Chocolate Confectionary Antitrust Litig.*, 470 F. App'x 67, 70 (3d Cir. 2012) (per curiam) (affirming denial of "vague objections").

### C.   ASO Sub-Class Objections

#### 1.   Self-Funded Sub-Class Settlement Period

The Bradley Arant Boult Cummings LLP Objectors ("Bradley Objectors")[53] argue that the ASOs should have gotten the benefit of *American Pipe* tolling and so the Self-Funded Class Period should go back to 2008 just as the FI Class Period does. Ex. 3 at 17-22. This objection ignores that all of the complaints filed prior to the FACCAC alleged only that the Defendants unlawfully "divided U.S. health care markets *for insurance*" and "agreed to divide and allocate the geographic markets *for the sale of commercial health insurance*", resulting in the artificial inflation of "health insurance *premiums*". *See, e.g.,* ECF No. 1082, Third Amended Consolidated Class Action Complaint ("TACCAC") (emphasis added). For example, the original (*Cerven*/North Carolina) damages class was defined as:

> All persons or entities who, from February 7, 2008 to the present (the "Class Period") have paid **health insurance premiums** to BCBS-NC **for individual or small group full-service commercial health insurance**.

TACCAC ¶ 333 (emphasis added). As defined in the TACCAC, the proposed Injunction Class included only:

> All persons or entities in the United States of America who are currently ***insured*** by any ***health insurance plan*** that is currently ***a party to a license agreement*** with BCBSA that restricts the ability ***of that health insurance plan*** to do business in any geographically defined area.

---

[53] "Bradley Objectors" refers to the objections filed jointly by ServisFirst Bancshares, Inc. (Plan Sponsor of the ServisFirst Bank Flexible Benefits Plan), Topographic, Inc. (Plan Sponsor of the Topographic, Inc. Welfare Benefits Plan), and Employee Services, Inc. (Plan Sponsor of the Employee Services, Inc. Medical Plan).

TACCAC ¶ 314 (emphasis added); *see also Cerven et al. v. BCBS-NC et al.*, No. 2:12-cv-04169, ECF No. 1 ¶ 20 ("*Cerven* Complaint") (same). None of the underlying state-specific complaints, nor any of the consolidated complaints through the TACCAC, mentioned ASOs other than to explain why they were ***not*** part of the relevant product market at issue at that time in this litigation. *Cerven* Complaint ¶ 129; TACCAC ¶ 553.

The Bradley Objectors constitute neither "individuals" nor "small groups," and having self-insured, they paid no "premiums" for "health insurance" to the Blues or anyone else. They decided to ***forego*** the purchase of health insurance. They instead ***self-insured*** and purchased only third-party ASO services from Blue Plans. Ex. 3 at 9-10. Third-party ASO services are not "health insurance." *FMC Corp. v. Holliday*, 498 U.S. 52, 54 (1990). The Bradley Objectors accordingly were not members of any damages or injunctive relief class prior to the FACCAC.

Nor was there any allegation in any earlier complaint that Defendants allocated the markets for ASO services; that Defendants' "best efforts" rules or any other alleged restraints applied to the sale of ASO-related products; or that any fees paid for ASO-related services were artificially inflated as a result of any such unalleged restraints of trade. The only mention of ASO services in the earlier-filed complaints – whether in the class definitions or in the factual allegations – was to ***distinguish*** the market for health insurance from the market for ASO services. *See, e.g., Cerven* Complaint ¶ 129; TACCAC ¶ 553; *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1266 n.13 (N.D. Ala. 2018) (noting the distinction). The evidence obtained through discovery has borne out the distinction between the market for ASOs and that for fully-insured accounts; the two markets have different sets of competitors with different market power.

Because the claim that Defendants allocated markets for the sale of ASO products was not previously made in this litigation, and because ASO purchasers were not previously included in

any putative class definitions, Eleventh Circuit precedent does not permit these newly added claims to relate back to the first-filed case that addressed only health insurance.[54] The Eleventh Circuit has taken a conservative approach when deciding whether to allow claims added by new plaintiffs to relate back to the originally-filed complaint. In *Cliff v. Payco General American Credits, Inc.*, the Eleventh Circuit noted that while other circuits have sometimes been more generous with relation-back of the claims of newly added plaintiffs, this Circuit will require – at a minimum – that: (A) the new claims arise out of the same conduct set out in the original pleading, (B) the defendant will not be prejudiced, and (C) the defendant knew or should have known that it would have to defend against the newly-asserted claims and plaintiffs. 363 F.3d 1113, 1131 (11th Cir. 2004). *See also Makro Cap. of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1259 (11th Cir. 2008).

When applying these standards, the factual context of *Cliff* is particularly instructive. In *Cliff*, the named plaintiff filed a class action under a federal statute on behalf of a class of Florida residents. After the limitations period had expired, the plaintiff attempted to expand the class nationwide. The Eleventh Circuit ruled that although the nationwide claims arose out of the same conduct described in the Florida complaint, the commencement of the Florida-only class did not put the defendant on sufficient notice that it would need to defend the claims nationally, thereby unfairly prejudicing the defendants. *Cliff*, 363 F.3d at 1131-33. As the Eleventh Circuit explained, defendants in class actions are entitled to notice during the applicable statute of limitations "not only of the substantive claims being brought against them, but also of the number and generic

---

[54] As addressed below, however, as a material term of this Settlement, the Self-Funded Sub-class already obtained Defendants' agreement to extend the beginning date of the Self-Funded Class Period back to September 1, 2015, more than five (5) years prior to the filing of the FACCAC, the only complaint to assert claims regarding ASO products.

identities of the potential plaintiffs who may participate in the judgment." *Id.* at 1133 (quoting *Am. Pipe Constr. Co. v. Utah*, 414 U.S. 538, 554-55 (1974)).

Nothing in the *Cerven* complaint or in any of the earlier underlying or consolidated complaints told the Defendants they would have to defend against any un-pleaded claim of misconduct in the ***ASO market***, let alone a damages claim in that market. Rather, the case was limited to claims on behalf of fully-insured subscribers. This did not change until Hibbett and A. Duie Pyle, Inc. first appeared on behalf of the Self-Funded Sub-Class in the 2020 FACCAC. *See Davenport v. United States*, 217 F.3d 1341, 1345 n.8 (11th Cir. 2000) ("[T]he critical issue in Rule 15(c) determinations is whether the original complaint gave notice to the defendant of the claim now being asserted.").

The Bradley Objectors further contend that it is contradictory to allow full relation-back of the damages claims on behalf of large groups who bought fully-insured health insurance (who similarly were not included in the earlier Damages Class definitions) to the beginning of the litigation, while denying relation back for the Self-Funded Sub-Class. But there is no contradiction. While earlier definitions of the Damages Class did not include purchasers of large-group health insurance, the earlier Injunction Class definitions ***did*** include all entities (with no size limitation) who purchased "***health insurance***" from a Blue Plan licensed by the BCBSA and whose "premiums" for health insurance were alleged to have been artificially inflated, thereby satisfying *Cliff* by putting Defendants on notice that they would have to defend against claims of purchasers of any size who purchased "health insurance." In other words, the companies who bought large group, fully-insured health insurance policies had a more than colorable relation-back argument; the Bradley Objectors did not have such a colorable argument (at least not beyond the additional

14 months already negotiated on their behalf by Self-Funded Sub-Class Settlement Counsel in the Settlement Agreement).

Finally, the Bradley Objectors also complain that it is contradictory for their release to be as comprehensive as that of fully insured Class Members because they are subject to a shorter Settlement Class Period. But none of the Class Members, whether fully insured or self-funded, are permitted to limit their release so as not to cover claims relating to time periods in the distant past that precede the accrual of the statute of limitations. The fully-insured Class Members and the Self-Funded Sub-Class are treated equitably with respect to each other concerning the scope of their releases; *i.e.*, they all release the claims described in the Release "from the beginning of time to the present." *See supra* § IV(E). There is no "mismatch."

### 2.    Separate Representation of ASO Sub-Class

Objector Hutsler argues that a conflict of interest between Subscriber Class Counsel and the Self-Funded Sub-Class has resulted in a settlement agreement that allocates an insufficient portion of the Net Settlement Fund to the Self-Funded Sub-Class. Ex. 27 at 4. Hutsler argues that Settlement Class Counsel began negotiating this split with Self-Funded Sub-Class Settlement Counsel only after having negotiated a total settlement figure with Defendants—a figure which Hutsler argues is "presumably the amount of the common fund negotiated for the fully insured subscribers." *Id*. Apart from this unfounded presumption, Hutsler offers no reason why the Net Settlement Fund should be higher.

Contrary to this assertion, the Sub-Class has had adequate representation in entering the Settlement both through the Self-Funded Sub-Class Representative and Sub-Class Counsel. As this Court explained in its Preliminary Approval Order, "[t]o the extent that Self-Funded Accounts have divergent interests from fully insured Individual Members and Insured Groups, [Self-Funded Sub-Class Representative Hibbett Sports, Inc.'s] interests are aligned with absent class members

98

within the Self-Funded Sub-Class, and Hibbett has the same incentives as those absent class members it represents to seek an equitable share of the Net Settlement Fund." Preliminary Approval Order at 18. Objector Hutsler ignores the significance of this, as well as that of the appointment of Self-Funded Sub-Class Settlement Counsel, in ensuring that the interests of the Self-Funded Sub-Class were adequately represented. *See Juris v. Inamed Corp*., 685 F.3d 1294, 1324 (11th Cir. 2012) ("[S]eparate counsel . . . was specifically brought in for the sole purpose of representing those plaintiffs with only potential, future injuries. Thus, even prior to provisional certification of the class, the interests of those claimants with unmanifested injuries were represented and given a separate seat at the negotiation table through qualified and independent counsel").

This conclusion is further supported by the fact that, as Hutsler himself notes, the 6.5% portion of the Net Settlement Fund allocated to the Self-Funded Sub-Class was determined "after several months of negotiations" and was reviewed and approved by Allocation Mediator Feinberg.

### D.   Settlement Class Counsel's Requested Attorneys' Fees and Reimbursement of Expenses Are Reasonable.

Fifteen objectors can be construed to oppose the attorneys' fees and expense award contemplated by the Settlement.[55] Each suggests that the award is excessive on its face or as compared to what Class Members will recover. Several propose alternate methods of calculating attorneys' fees.[56]

---

[55]    Objectors Alden, Behenna, Cochran, Daugherty, Dean, Demuth, Happe, Higgitt, Hutsler, Jones, Pitsch, Shattuck, Sheppard, Sivilich, and Tykulsker and Associates. *See* Exs. 11, 13, 17, 18, 19, 20, 24, 26, 27, 28, 32, 34, 35, 36, and 38.

[56]    Objector Lorraine Alden argues that the amount of attorneys' fees could be halved and this amount would compensate 100 attorneys working full time for three years at a rate of $500 per hour (Ex. 11 at 1); objector James Dean proposes using an hourly rate of $2,000 per hour (Ex. 19 at 1-2); objector Paul Higgitt proposes an alternative of 10% "shared among all attorneys on both

These objections are misplaced, as the attorneys' fee award requested here—a combined attorneys' fee and expense award not to exceed 25% of the total common fund, plus up to $7 million from the Notice and Administration Fund to reimburse actual and reasonable fees and expenses incurred by counsel for Notice and Administration—is squarely in line with Eleventh Circuit benchmarks. Notwithstanding objector Behenna's suggestion to the contrary, Ex. 13 at 5-6, it is well-settled that when awarding attorneys' fees in a common fund settlement, courts use the percentage of recovery method, *not* the lodestar method that would otherwise be used to determine a statutory fee award. *In re Equifax Inc. Customer Data Security Breach Litigation*, 999 F.3d 1247, 1279 (11th Cir. 2021); *In re Home Depot Inc.*, 931 F.3d 1065, 1084–85 (11th Cir. 2019); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 349-50 (N.D. Ga. 1993). And contrary to Behenna's assertion, Ex. 13 at 6, neither the presence of a "clear sailing" provision in the Settlement Agreement nor the fact that the size of the settlement fund was negotiated before negotiations began on the size of the fee and expense award that would be paid out of that fund alters the analysis or renders this anything other than a common fund award. *See* Fee Brief at 71-73.[57]

---

sides" (Ex. 26 at 1); objector Lea Sivilich proposes $10 million "to be distributed equally amongst the different firms involved." (Ex. 36 at 1); objector Behenna argues that "Plaintiff's counsel's fee should be limited to lodestar" (Ex. 13 at 1, 6).

[57] Objector Behenna also suggests that the fact that the Settlement Agreement provided for a partial award of attorneys' fees and expenses following the entry of the Court's Preliminary Approval Order somehow renders this a fee-shifting case rather than a common fund case. Ex. 13 at 6-7. Leaving aside that the basis for Behenna's assertions is unclear, Behenna ignores that this partial award is both secured through irrevocable letters of credit and subject to repayment, with interest, in the event that the Settlement is not finally approved or the final fee and expense award is less than the amount paid. Notably, Behenna does not acknowledge, let alone challenge, the Court's finding that this "early distribution does not prejudice the class members: counsel still receives the same reasonable percentage of the common fund ultimately approved by the court if final approval is granted." Preliminary Approval Order at 46-47.

Nor do any objections to the size of the requested award from the common fund have merit. The Eleventh Circuit has repeatedly explained that the "majority of common fund fee awards fall between 20% to 30% of the fund." *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991). *See also Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1242 (11th Cir. 2011) ("This court has often stated that the majority of fees in these cases are reasonable where they fall between 20–25% of the claims." (citing *Camden*, at 774)); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1294 (11th Cir. 1999) ("the 'majority of common fund fee awards fall between 20% to 30% of the fund.'" (quoting *Camden*, at 774)). A fee of 25% is considered the benchmark in the Eleventh Circuit for fees alone and here, 25% is the amount for fees and expenses. *Swaney v. Regions Bank*, No. 2:13-CV-00544-RDP, 2020 WL 3064945, at *7 (N.D. Ala. June 9, 2020) (Proctor, J.) ("In determining an award of attorney's fees in a percentage-of-fund class settlement case, the 'benchmark' percentage is 25%, which is the dead center of the 20-30% range"); (citing *In re Home Depot Inc.*, 931 F.3d 1065, 1076 (11th Cir. 2019)) ("[i]n this Circuit, courts typically award between 20-30%, known as the benchmark range."). That calculation is not impacted by the size of the fund obtained. *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1280 (11th Cir. 2021).

The objectors do not acknowledge the above-cited authority and fail to offer any legitimate basis for their proposed alternatives. To the contrary, the Eleventh Circuit has made clear that "the percentage of the fund approach" is the better reasoned [approach] in a common fund case." *Camden*, 946 F.2d at 774. While objector Behenna suggests that the large size of the settlement fund secured for the Class requires a substantially lower-than-benchmark fee award, Ex. 13 at 8, he does not even acknowledge the Eleventh Circuit's binding decision in *Equifax*, in which this Circuit flatly rejected any contention that the 25% rule of thumb should not apply in "megafund"

cases. 999 F.3d at 1280. As this Court recognized in its Preliminary Approval Order, under the binding precedent of this Circuit and in light of the "the hard-fought, eight-year litigation that counsel has undertaken," the 25% fee award is a "reasonable percentage of the common fund" and thus should not preclude final settlement approval. Preliminary Approval Order at 46.

**E.**     **Notice Satisfied Due Process.**

Several objectors take issue with the settlement on the grounds that notice to Class Members was inadequate. Objector Lea K. Sivilich objects to the form of notice by email. Ex. 36 at 1. Objector Demuth objects to the difficulty he allegedly faced in contacting Class Counsel for more information about the Settlement and adds that claimants were never told they will be treated fairly and proportionately, "leaving them with little information to make an informed decision." Ex. 20 at 3. Objector Bluhm similarly objects that she was not "formally notified" and is not able to confirm that she had BCBS insurance at her different jobs or the dates of coverage. Ex. 14 at 2. Objector Dean objects to the claim form's requirements for details as to a Class Member's plan, group number, and coverage dates. Ex. 19 at 2. Objector LMS Innovations argues that it did not receive adequate time to object. Ex. 6.

As for Demuth's objection concerning lack of knowledge of the fairness and proportionality of relief, the Long Form Notice and the Plan of Distribution make clear that the settlement will be distributed on a *pro rata* basis. Proposed Long Form Notice at 7-8, Plan of Distribution ¶¶ 13, 16.

As for the objections concerning the form of notice, as the Court recognized in granting preliminary approval of the Settlement, the parties' proposed notice process more than meets the requirement of due process. Preliminary Approval Order at 54. This process is the "best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them and opportunity to present their objections.'" *Morgan v.*

*Pub. Storage*, 301 F. Supp. 3d 1237, 1261 (S.D. Fla. 2016) (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985)).

Class Counsel retained JND following a competitive bidding process, and the Court noted that JND has "a proven track record and extensive experience in large, complex matters" such as this. Preliminary Approval Order at 53. Since their appointment, as outlined above, JND has completed an extensive notice effort. JND utilized multiple strategies, including direct mail and email notice, a digital media campaign, a website, and a call center and dedicated email account for Class Member inquiries. These methods are well-established in this circuit as reasonable and sufficient for providing notice to Class Members consistent with due process. *Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1287 (11th Cir. 2007) (notice process was adequate where it included mail, newspaper and website publications, a telephone number, and other methods).

With respect to direct notice, JND received information for over 420 million individuals and entities from Settling Defendants, which resulted in sending out over 100 million direct notices, including notice to 27,497,063 Damages Class members for whom email addresses were available. Keough Decl. ¶¶ 36, 44. Through JND's efforts, only .03% of emails were marked as undeliverable. Keough Decl. ¶ 44. JND took extra care to ensure that email notices were designed to escape spam filters and directly reach Class Members. Keough Decl. ¶ 42. As the Court noted in its opinion, e-mail notice campaigns, when supplemented with U.S. mail, is an appropriate method of notice. Preliminary Approval Order at 53-54. JND also instituted a robust consumer media notice program and is continuing with its claims stimulation effort to maximize claims.

"The fact that some class members may not actually receive timely notice does not render the notice inadequate as long as the class as a whole had adequate notice." *Morgan*, 301 F. Supp. 3d at 1261 (quoting 5 MOORE'S FEDERAL PRACTICE—CIVIL § 23.102); *see also Juris v. Inamed*

*Corp.*, 685 F.3d 1294, 1321 (11th Cir. 2012) ("[D]ue process does not require that class members actually receive notice."). JND has ensured that a significant majority of the Settlement Classes have received notice of the Settlement, as confirmed by the high volume of calls, emails, and claims already filed. *Morgan*, 301 F. Supp. 3d at 1261 (citing *Juris v. Inamed Corp.*, 685 F.3d 1294, 1317 (11th Cir. 2012)); *see also* 5 MOORE'S FEDERAL PRACTICE—CIVIL § 23.102. Moreover, the fact that these and other objectors were able to raise objections belies their claims of inadequate notice. *See Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 964 (3d Cir. 1983) (finding that a vigorous objection, and those of other objectors, demonstrated that the notice selected was adequate).

The objections concerning the information that claimants are requested to submit are baseless. Subscriber Plaintiffs' motion seeking approval of the Notice Program made clear that claimants would be directed to identify, *to the extent possible*, the claimant's Blue health plan(s), group number(s), subscriber ID(s) (for individuals), and coverage dates. ECF No. 2611, Subscriber Plaintiffs' Motion for Approval of Plan for Notice and Appointment of Claims Administrator ("Notice Motion"), at 26. The Notice Motion also makes clear that the Claims Administrator will identify and flag any claims that are incomplete and will seek additional information from the claimant as necessary. *Id.* at 27-28.

### F.     The Plan of Distribution Is Fair and Reasonable.

As an initial matter, it is beyond dispute that "[i]t is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits." *In re Omnivision Techs.*, Inc., 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008); *see also* Advisory Committee Notes to Fed. R. Civ. P. 23 ("[A]pportionment of relief among class members" must "take[] appropriate account of differences among [class members'] claims."). Allocation among class members need not be exact, as an "allocation formula need only have a

reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 40 (E.D.N.Y. 2019) (quoting *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005)). *See also PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997) ("[A]pportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision."). *See also Carnegie v. Mut. Sav. Life Ins. Co.*, No. CV-99S3292NE , 2004 WL 3715446, at \*23 (N.D. Ala. Nov. 23, 2004) (determining that proposed allocation was "a fair and reasonable method of approximating" relief); *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, No. 2:10-cv-02847-KOB 2015 WL 5626412, at \*1 (N.D. Ala. Sept. 14, 2015) (same). The Distribution Plan here more than meets this standard.

### 1.    Allocation Between FI Class and ASO Sub-Class

The Bradley Objectors argue that the allocation of 6.5% of damages to ASOs is too small. Ex. 3. Although the Bradley Objectors repeatedly argue that this allocation renders the Settlement unfair and unreasonable, this objection is in fact to the Plan of Distribution, which lays out the allocation of the Net Settlement Fund, and not the Settlement Agreement, which is silent on this point.

As discussed in detail *supra* § II(B), the allocation of the Settlement Fund between Fully Insured Claimants and the Self-Funded Sub-Class was mediated by Allocation Mediator Feinberg. Because the damages suffered by the Self-Funded Sub-Class had not been litigated, both Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel retained economic experts to estimate those damages. Self-Funded Sub-Class Settlement Counsel sought and was provided full access to the record evidence from the Subscriber Actions, including data. Settlement Class Counsel PA Decl. ¶ 32. Self-Funded Sub-Class Settlement Counsel retained the BVA Group to provide economic analysis for the Self-Funded Sub-Class. The BVA Group examined the data

105

and used multiple methodologies to estimate how an overcharge would be passed to the Self-Funded Sub-Class, and the quantum of that overcharge. Self-Funded Sub-Class Settlement Counsel PA Decl. ¶ 10. The BVA Group estimated the potential overcharges by assessing and comparing net revenue, operating gains, and revenue proportions among Fully Insured Claimants and the Self-Funded Sub-Class. *Id.*

At the same time, Settlement Class Counsel asked Dr. Pakes to utilize his years of experience working on damages analysis for this litigation to determine the appropriate allocation of the Net Settlement Fund to the Self-Funded Sub-Class. Dr. Pakes conducted his own analysis by estimating the revenues each segment would have earned in a competitive market, calculating the actual revenues each segment earned, and comparing the share of total excess revenues accruing to each segment to determine the appropriate fraction of the Net Settlement Fund to allocate to each.

Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel participated in a daylong mediation. Based on these expert analyses, Self-Funded Sub-Class Settlement Counsel proposed a damages range of 7.6% to 16% of Net Settlement Fund for Self-Funded Accounts, and Settlement Class Counsel proposed 3.4% to 6.8%. Feinberg PA Decl. ¶ 12. Mr. Feinberg discussed with the respective parties the factors that either supported or undermined each side's position, including considerations relating to potential statute of limitations issues and the relative size of the administrative fees paid by Self-Funded Accounts vs. the premiums paid by Insured Groups. *Id.* Over the next several months, the parties continued to negotiate and ultimately reached agreement on a FI/Self-Funded Allocation that would assign 6.5% of the Net Settlement Fund to Self-Funded Claimants.

This allocation is rationally based on the damages estimates provided by each side and was negotiated at arm's-length with the assistance of an Allocation Mediator. The Bradley Objectors provide a competing expert report purporting to claim that the methods used by Self-Funded Sub-Class Settlement Counsel's experts were fatally flawed, and that instead the Self-Funded Sub-Class is entitled to between 44.4% and 55.5% of the Net Settlement Fund. Ex. 3 at 34-35; *id.* at Exs. 1, 2. But, as discussed by Self-Funded Sub-Class Settlement Counsel's retained expert in his declaration, this estimate is based on numerous erroneous assumptions and is inconsistent with generally accepted economic principles in the health insurance industry. *See* Exhibit D, Declaration of Dr. Joseph Mason ("Mason Decl.").

First, the Bradley Objectors' alternative allocation proposal ignores the claims at issue in the Subscriber Actions, which are limited to seeking to recover overcharges associated with the Settling Defendants' alleged anticompetitive conduct. Accordingly, an analysis of the allocation is appropriately limited to fees paid by Insured Groups and Self-Funded Accounts for the Blue-branded products at issue. Mason Decl. ¶ 53. This failure to account for the effect of the alleged horizontal territorial allocation renders their estimate of damages inherently unreliable.

Second, the Bradley Objectors ignore important economic differences in the markets faced by fully-insured and self-funded groups. The self-funded market is more competitive than the fully-insured market because additional substitute products—both third-party administrators and the option to administer healthcare plans in-house—are available to self-funded plans but are not available to fully-insured plans. As a result, economic theory suggests that the Settling Defendants were in a better position to impose an overcharge on fully-insured products compared to self-funded products. *Id.* ¶ 56. In combination with the material failure to account for the impact of the alleged conspiracy, the failure to account for market differences (including risk factors borne by

the fully insured in setting premiums and not by self-funded accounts in paying administrative fees and other costs) fatally flaws any projections by the Bradley Objectors. *Id.*

In addition to ignoring these economic realities, the Bradley Objectors argue that the Settling Defendants' monopolistic leverage with healthcare provider networks caused self-funded employers to pay more to healthcare providers than they otherwise would have paid. Again, amounts paid to third parties fall outside the scope of this litigation. More importantly, the Bradley Objectors provide no support for this assertion and ignore the likelihood that self-funded employers actually <u>benefited</u> from reduced provider network costs. *Id.* ¶ 54. Specifically, the overcharge self-funded employers paid on administrative fees to the Settling Defendants was likely partially (and potentially totally) offset by savings on claims costs that resulted from the Settling Defendants' ability to negotiate discounts with provider networks. *Id.*

The Bradley Objectors also argue that the Settlement allocation minimizes the contribution of the Self-Funded Sub-Class to "the overall success of BCBS." *Id.* ¶ 57. But here again, they reverse the economic logic of the markets. The value derived from administering large volumes of self-funded account claims incentivizes Settling Defendants are incentivized to offer competitive fees to self-funded accounts. *Id.* The Bradley Objectors' experts' own analysis indicates that the Settling Defendants earned the vast majority of their profits on revenue from fully insured plans. *Id.* ¶ 58.

Documents produced and identified in this litigation confirm this analysis, demonstrating the extent to which fully insured accounts were far more profitable to Settling Defendants than self-funded accounts:

- Anthem's contemporaneous 10-K filings described the ASO business as a "lower margin" business, that had the potential to materially and adversely impact the company's profits if more business moved from FI to ASO.[58]

- An internal BCBS Arizona report echoed this point, noting that administering networks and insurance "is a low margin business. Traditional functions such as claims and enrollment administration will generate very little profit or become loss leaders".[59]

- A November 2012 report prepared by Bernstein Research estimated that, for the industry as a whole, FI business produced four times the profit that ASO business did.[60]

- A 2010 report prepared by a consulting form showed that in a "typical" health insurer large group ASO account, ASO members made up 42% of total membership, while providing only 15% of operating profit. Conversely, small group FI membership would constitute approximately 16% of total membership, while providing 35% of the typical company's profit. Together, these numbers suggest that FI was more profitable than ASO by more than 4.25 to 1.[61]

This evidence also underscores the extent to which fully insured and self-funded accounts operate in different markets, with different competitive forces, further undercutting the Bradley Objectors' relation-back argument.

---

[58] 2016 Anthem 10-K, at p. 30; 2015 Anthem 10-K, at p. 29 (same); 2014 Anthem 10-K, at p. 29 (same).

[59] Exhibit E, BCBS-AZ_MDL000124422, at -24.

[60] Exhibit F, CAREFIRST_ESI_06681777, at -88.

[61] Exhibit G, ARKBCBS0047016, p. 7021.

Outside of the economic missteps in their analysis, the Bradley Objectors fail to grapple with the fact that Self-Funded Sub-Class members have weaker legal claims than Fully Insured Claimants. As discussed above, the Self-Funded Class Period is shorter than the FI Class Period. The Bradley Objectors' damages calculations ignore this fact and apportion the Net Settlement Fund as if the relevant class periods were the same. As a simple math proposition, taking into account the difference between the 12.5-year FI Class Period and the five-year Self-Funded Class Period and applying that difference to the 44.4% allocation at the lower bound of the Bradley Objectors' estimate brings the estimate down to 17.76%—roughly equivalent to the higher end of damages estimates by Self-Funded Sub-Class Settlement Counsel's experts at mediation, and without taking into account any further analysis of the other relative strengths and weaknesses of the claims. As such, even the Bradley Objectors' own estimates do not differ substantially from those of Self-Funded Sub-Class Settlement Counsel.

Class Counsel appropriately took into account the strengths and weaknesses of the respective claims in agreeing upon an allocation. *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 116-117 (D.N.J. 2012) ("strongest meritorious claims in the case" support higher proportion of settlement fund going to the portion of class with those claims); *Radcliffe v. Hernandez*, 794 F. App'x 605, 607 (9th Cir. 2019) ("Rule 23's flexible standard allows for the unequal distribution of settlement funds so long as the distribution formula takes account of legitimate considerations and the settlement remains 'fair, reasonable, and adequate.'") (quoting Fed. R. Civ. P. 23(e)(2)). Such an allocation need not be perfect, but rather must have a "reasonable, rational basis." *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *20 (E.D.N.Y. Dec. 16, 2019). Given the damages estimates and in

110

consideration of the legal merits of the respective claims, the FI/Self-Funded Allocation is reasonable.

The Bradley Objectors further attack Self-Funded Sub-Class Settlement Counsel for not having spent enough time litigating this case, arguing that "counsel who ended up negotiating for the Fully Insured Class spent seven years litigating this case and taking discovery, sub-class counsel had less than six months. The result was that sub-class counsel was forced to rely too heavily on work performed by Fully Insured Class's lawyers . . . ." Ex. 3 at 31. This objection actually establishes the effectiveness of Self-Funded Sub-Class Settlement Counsel's advocacy; without having had to litigate this case for seven years, counsel was able to secure significant injunctive relief and monetary damages for the Self-Funded Sub-Class now—not some hypothetical amount years down the road.

The Bradley Objectors and objector Beaman Automotive Company object to the allocation of 6.5% of the Net Settlement Fund to Self-Funded Accounts because they believe that stop-loss premiums should have been included in the allocation decision. Ex. 3 at 27; Ex. 29 at 1. This objection is based on a false premise; Self-Funded Sub-class Settlement Counsel's estimates of damages rely on data that included *all* revenue associated with Blue-branded products. Mason Decl. ¶ 55.

### 2.    Allocation Between Employers and Employees

Certain individual objectors take issue with the Settlement's Plan of Distribution, and in particular its allocation of the Net Settlement Fund between employers and employees.[62]

---

[62] The Plan provides a proposed pro-rata allocation of the Net Settlement Fund between employers and employees. (Settlement Class Counsel Decl. ¶ 7). The Plan includes a Default option that allocates damages between employers and employees as follows: (1) for FI Claimants with single coverage, 85% to employers and 15% to employees; (2) for FI Claimants with family coverage, 66% to employers and 34% to employees; (3) for Self-Funded Claimants with single coverage,

Philip Marker, William Faulkner, and Deanne Aldridge object to the Default option and argue they paid something different. Ex. 31 at 4; Ex. 23 at 1; Ex. 12 at 1. James L. Hart objects that the Plan of Distribution does not properly account for self-employed partners of companies. Ex. 25 at 2-7. William Faulkner and Jennifer Cochran object to the fact that any employee's unclaimed amount goes to the employer. Ex. 23 at 1-2; Ex. 17 at 4. Finally, objector Bluhm takes issue with the fact that "all dependents are excluded from any monetary compensation"—even though Bluhm's objection misreads the Settlement as her son is on a stand-alone individual plan that is eligible for compensation under the Settlement—as well as the fact that the "settlement does not seem to address the issue of disproportinate [sic] impact that people in certain regions experienced as they had no other option for their health insurance coverage because BCBS was the only option in the private marketplace." Ex. 14 at 1.

As explained above, Class Counsel engaged Darrell Chodorow of The Brattle Group, who has over 25 years of experience conducting damages analyses, to develop a proposed allocation. Chodorow PA Decl. ¶ 2. Class Counsel and Mr. Chodorow selected the relevant allocation percentages only after careful consideration of numerous factors which demonstrated that allocation was economically reasonable. Class Counsel and Mr. Chodorow considered the following factors: (a) Defendants' lack of data showing how much, if anything, each employee directly or indirectly contributed toward the payment of the premiums paid by the employer, and the inability to access such data from any other readily available source; (b) the information

---

82% to employers and 18% to employees; and (4) for Self-Funded Claimants with family coverage, 75% to employers and 25% to employees (these contribution percentages together will be referred to as the "Employer/Employee Allocation"). Plan of Distribution ¶¶ 19, 26. As noted above, the Plan also provides both employers and employees with the option of electing an alternative option, which allows them to present evidence to the Settlement Administrator demonstrating that in their specific case the actual percentages differed or other provable damages were higher.

provided from national data gathered by Kaiser (which shows, for example, that the average employee contribution rate for Insured Groups during the FI Class Period ranged from 33% to 39% for family coverage and from 14% to 19% for single coverage); (c) the fact that some employees do not contribute anything out-of-pocket towards their employer-sponsored health insurance; (d) the economic literature relating to a potential contention that, regardless of out-of-pocket contributions by employees, employees may indirectly contribute by receiving lower wages than they would absent employer-provided health insurance; (e) the relative strengths and weakness of antitrust claims brought by employers versus those brought by employees; and (f) the fact that unclaimed employee premium amounts or employee claims valued at less than the $5 minimum will revert to employers. Memorandum in Support of Preliminary Approval Motion at 24; Plan of Distribution ¶ 19(f)(i-vi); Chodorow PA Decl. ¶ 18 (finding use of the Default option to be economically reasonable based on these factors).

Based on this information and the Brattle Group's expert analysis, Class Counsel have devised an economically reasonable plan that will allocate compensation in a fair, reasonable, and adequate manner. *See supra* § IV (citing *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 241 (5th Cir. 1982) (plan of distribution properly approved where counsel negotiated allocation formula based upon available economic data); *In re GSE Bonds Antitrust Litigation*, 414 F. Supp. 3d 686, 694-95 (S.D.N.Y. 2019) (approving plan of distribution where experienced class counsel, working in consultation with industry and economic consultants, produced method of ensuring equitable and timely distribution of fund). Allocation Mediator Ken Feinberg then reviewed the Plan of Distribution and agreed that it is fair, reasonable, and adequate. Feinberg PA Decl. ¶¶ 7, 19-20.

As this Court noted in its Preliminary Approval Order, the "economic analysis conducted by Mr. Chodorow and the Brattle Group" enabled the parties to "to design a *reasonable and efficient* Plan of Distribution that would treat members of the Damages Class equitably and would not overly burden claimants." PA Order, 2020 WL 8256366, at *3 (emphasis added). In addition to explicitly noting the reasonableness of the Distribution Plan, this Court highlighted the fact that Class Counsel have "a wealth of experience and are fully competent in complex class actions." *Id*. at *22.

To the extent these objectors argue that they individually are entitled to a more favorable distribution allocation than provided for under the Default option, the Settlement provides a procedure for them to substantiate that contention. Specifically, the proposed Plan of Distribution makes clear that any employer or employee believing that they paid a higher contribution percentage than the Default may elect the "Alternative" option, allowing them to provide materials to the Settlement Administrator to support the claimed percentage. Plan of Distribution ¶¶ 19(h), 22-26. It is notable that only a small sliver—less than 1% thus far—of claimants chose the Alternative option, further ratifying the reliability of the Default option. Keough Decl. ¶ 97.

And to the extent the objectors take issue with the distribution of premiums to employers in cases where employees do not file claim forms, this issue was considered by Class Counsel in developing the Plan of Distribution. In determining the Default percentages, one of the factors considered by Class Counsel was the fact that FI Groups would retain 100% of the value of unclaimed FI Employee premiums, and this allowed for the Default percentages for employees to be higher than it otherwise might have been. Plan of Distribution ¶ 19(f); Chodorow PA Decl. ¶ 38. The Chodorow Declaration notes:

> FI Groups could benefit from their status as the residual claimant on FI Group premiums. Because part of the economic burden of FI Group premiums was borne

114

by claimants that will not submit claims or that cannot surpass the minimum distribution threshold, the Default percentage to FI Employees can be increased somewhat without necessarily harming FI Groups relative to other claimants. However, increasing the Default percentages could improve both the claims submission rate and the potential for employees to exceed the minimum distribution threshold. This would further the economically reasonable goal of providing broader-based relief to the FI Authorized Claimants.

Chodorow PA Decl. ¶ 40. This provision of the Plan of Distribution is thus reasonable and economically rational.

### 3. Miscellaneous Plan of Distribution Objections

Objectors William Faulkner, Deanne Aldridge, and James L. Hart object that the Settlement does not obligate employers, who allegedly have divergent interests from employees, to provide historical premium data to employees. Ex. 23 at 1; Ex. 12 at 1; Ex. 25 at 7. First, these objectors cite no authority that would have allowed this Court to force Settlement Class Members to provide information to other Settlement Class Members as condition for participating in the Settlement. Second, as noted in the Chodorow Declaration, it is likely that only 30% of businesses in existence at the beginning of the FI Class Period would still exist today, and even for those who remain, the practical realities of the lengthy Settlement Class Period and COVID-19 are likely to make tracking down and producing such data even more difficult. Chodorow PA Decl. ¶ 24. Notably, none of these objectors has stated that they sought this information from their employers and that their employer refused to provide it.[63] As such, Settlement Class Counsel's decision not to require such a production was reasonable under the circumstances.

Objector Beaman Automotive Company argues that stop-loss premiums should be used to calculate damages for Self-Funded Account Authorized Claimants. Ex. 29 at 1. The Plan of

---

[63] Ms. Aldridge states that she has been unable to obtain this information from her employer but she does not specify why.

Distribution does so. Plan of Distribution ¶ 24 (including stop-loss insurance premiums paid to Settling Defendants in the calculation of Administrative Fees). As such, the objection is unfounded.

###### G.     The Claims Process Is Streamlined and Appropriate.

Several objectors raise objections to the claims process in particular.

Objector Demuth argues that the claim form has changed and that has caused confusion. Ex. 20 at 2. This is inaccurate—the claim form was approved by the Court and has been the only claim form in use during the entire claims process. Moreover, Demuth has offered no basis for his speculation that earlier-filed claim forms could be disregarded.

A number of objectors (C. Demuth, Lorraine Alden, James M. Dean, William Faulkner, Deanne Aldridge, James L. Hart, Patrick Daugherty) complain that they lack the data concerning premiums or their coverage details and thus are unable to accurately fill out the claim form or to select the Alternative option. Ex. 20; Ex. 11; Ex. 19; Ex. 23; Ex. 12; Ex. 25; Ex. 18. Finally, objector Bluhm argues that she could not confirm whether she had coverage from a Settling Defendant or the dates of such coverage. Ex. 14 at 2.

These objections ignore that the Plan of Distribution is designed precisely to avoid requiring every Authorized Claimant to provide years of information concerning their premiums and contribution percentages, an approach that would thwart the goal of "get[ting] as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." *Fitzgerald v. P.L. Mktg., Inc.*, No. 2:17-cv- 02251-SHM-cgc, 2020 WL 3621250, at *9 (W.D. Tenn. July 2, 2020)). Instead, the Plan of Distribution uses available data to calculate premium payments and estimated contributions, while requesting that Class Members provide certain limited information for identification purposes or, to the extent they wish to select the Alternative option, to substantiate their contentions regarding higher premiums paid. And, as noted

116

above, the process thus provides procedures to assist claimants who are not able to supply the requested information.

Joseph & Michelle Boska object that the claim form drop-down menu does not include Lifewise Health Plan of Washington. Ex. 15 at 1. But Lifewise Health Plan of Washington is not a Settling Defendant.

### H.   Arbitration Clauses

The Sperling/Sherrard Opt-Out Objectors argue that "class members with arbitration rights should not have been forced into this proceeding."  Ex. 1 at 30-34. As an initial note, none of these objectors have ever actually sought to arbitrate their claims against Settling Defendants, nor have they even claimed any intent or desire to do so. At any rate, this objection is without merit for several reasons.

First, with respect to damages, these objectors have availed themselves of the opportunity to opt out of the Settlement, and so maintain all rights to arbitrate their damages claims against the Settling Defendants if they wish to do so. As such, they have not been "forced" into any damages proceedings.

 Second, these objectors do not contend that it is improper to certify the settlement classes because it includes members with arbitration agreements. That is because class certification law is decisively against them with regard to whether a class may be certified notwithstanding arbitration agreements with some members. *See In re Checking Acct. Overdraft Litig.*, No. 1:09-MD-02036-JLK, 2020 WL 4586398, *13 (S. D. Fla. Aug. 10, 2020) (approving inclusion of members with arbitration agreements in settlement class based on defendant's waiver of arbitration defense for

purposes of settlement).[64] Unlike the situation in *Arena v. Intuit, Inc.*, No. 19-cv-02546-CRB, 2021 WL 834253 (N.D. Ca. March 5, 2021) (cited at Ex. 1 at 33), where the court declined to approve a class action settlement that appeared to be designed to burden and thwart *already pending* arbitrations brought by class members, *id*. at *1, none of the objectors to this Settlement has sought to arbitrate an antitrust claim related to the matters in this action in the nine years since the first claim was filed, or the eight years the litigation has been pending in this Court.

Third, objectors may not invoke a contractual waiver on the right to *class arbitration* as a basis for opposing inclusion in a *litigation class*. *See* Ex. 1 at 31. If a class member fails to opt-out, or has no right to opt-out, the Court can enjoin arbitration of claims covered by a class action settlement. *Stott v. Cap. Fin. Servs., Inc.,* 277 F.R.D. 316 (N. D. Tex. 2011) (Rule 23(b)(1) class).

---

[64] *See also Nitsch v. Dreamworks Animation SKG Inc.,* 315 F.R.D. 270, 284–85, 314 (N.D. Cal. 2016) (LHK) (noting the fact that some class members other than representatives had arbitration or release agreements with some defendants did not defeat typicality, adequacy, or predominance)*; Luviano v. Multi Cable, Inc.,* No. CV15-05592-BRO-(FFM), 2017 WL 3017195, at *16 (C.D. Cal. Jan. 3, 2017) (merits of arbitration defense were not before the court and did not defeat certification)*; Baker v. Castle & Cooke Homes Hawaii, Inc.,* No. 11-00616 SOM-RLP, 2014 WL 1669131, at *10 (D. Haw. Jan. 31, 2014), *adopted as modified,* No. CIV. 11-00616 SOM, 2014 WL 1669158 (D. Haw. Apr. 28, 2014) ("the possibility that C & C may attempt to enforce an arbitration agreement entered into by a portion of the members of the class does not stand in the way of class certification"); *Mora v. Harley-Davidson Credit Corp.,* No. 1:08-CV-01453-AWI-BAM, 2012 WL 1189769, *12-*13 (E.D. Cal. Apr. 9, 2012) ("possibility that Harley may seek to enforce agreements to arbitrate with some of the putative Class members does not defeat class certification")*; and Herrera v. LCS Fin. Servs. Corp.,* 274 F.R.D. 666, 681 (N.D. Cal. 2011) ("The fact that some members of a putative class may have signed arbitration agreements or released claims against a defendant does not bar class certification."); *Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, No. CV 16-046 WES, 2021 WL 1986564, at *22 (D.R.I. May 18, 2021) ("that some putative class members may be subject to mandatory arbitration is not a bar to class certification.").

118

Fourth, neither the original contracts nor the Federal Arbitration Act confers any *right* to arbitrate released antitrust claims covered by the Settlement Agreement. A class settlement may release the claims of class members to litigate those claims in court or in arbitration without any special privilege afforded to arbitration. Conversely, the authority to arbitrate unreleased claims continues to apply to any claims that may still be litigated after the Settlement. Thus, for those who opt out from the (b)(3) damages class, nothing in the Settlement Agreement alters their contractual rights *vis-à-vis* their Blue insurers, and they may arbitrate any claims covered by those contracts that are not released in the Settlement (just as the Blues may). On the other hand, class members are not permitted to arbitrate any claims that are barred by the Settlement's release, any more than they are permitted to litigate those claims in court.

Fifth, any contract between a Class Member and one specific Blue cannot be understood to provide for arbitration of the claims in this case, which necessarily involve over thirty *other* Blue entities that are not a party to that arbitration agreement. Indeed, the arbitration provisions included with this objection, which are being provided to the Court for *in camera* review, provide for arbitration involving either "the parties" in its everyday meaning, or "the Parties" as a defined term limited to the accountholder and its particular Blue insurer.

Moreover, the Sperling/Sherrard Opt-Out Objectors assert the right to arbitrate claims that have been released pursuant to § 32 of the Agreement. And the arbitration agreements, to the extent they might provide a right to arbitrate that is inconsistent with the Settlement, have been superseded and revoked under § 51 of the Settlement. *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 133 (2d Cir. 2011); *In re Oppenheimer Champions Fund Sec. Fraud Class Actions*, No. 09-cv-386-JLK-KMT, 2012 WL 13005663, at *2 (D. Colo. March 15, 2012). *See also Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 778-784 (10th Cir. 1998). "As members of

119

the settlement class, claimants entered a new agreement with Citigroup—the Settlement Agreement—thereby displacing their arbitration agreements." *In re Citigroup Secs. Litig.*, Nos. 09-md-2070, 07-cv-9901 (SHS), 2014 WL 3610988, at *8 (S.D.N.Y. July 21, 2014).

## I.      Non-Disparagement

The Sperling/Sherrard Objectors argue that the Settlement's non-disparagement clause (Settlement ¶ 58) impermissibly burdens the free speech rights of Injunctive Relief Class members. Ex. 1 at 34-37; Ex. 2 at 12-14. It is true, as these objectors point out, that the Settlement defined "Parties" as "the collective of all Class Representatives, all Settlement Class Members, BCBSA, and all Settling Individual Blue Plans." Settlement ¶ 1(lll). But it is clear from the context of the Settlement—which includes the term "Parties" throughout in reference to the obligations of Class Representatives on behalf of Settlement Class Counsel and BCBSA and the Settling Individual Blue Plans—that the non-disparagement clause is not meant to apply to absent class members. *See, e.g., id.* ¶¶ 1(yyyy) (describing Term Sheet as having been negotiated by the "Parties"), 26(a) (describing escrow procedures for counsel for the "Parties"), 46(d) ("Parties" to agree on content of website postings and communications).

## J.      Additional Objections

Objector Prairie Island Indian Community argues that commercial enterprises related to Indian tribes should not be considered Government Accounts, and further that the Settlement and notice are unclear as to whether these entities are Settlement Class Members or not. Ex. 9 at 1-2. Commercial entities related to Indian tribes are not considered to be Government Accounts, so this objection is unfounded. The Settlement is clear that Government Account "means only a state, a county, a municipality, an unincorporated association performing municipal functions, a Native American tribe, or the federal government (including the Federal Employee Program)." Settlement ¶ 1(hh). The Settlement further clarifies that "[n]o other entity… is a Government Account, unless

120

it is required by law to provide any health coverage it makes available to Members only under, or as a participant in, a Commercial Health Benefit Product approved, selected, procured, sponsored or purchased by a Government Account." *Id.* Based on data provided by Settling Defendants to the Claims Administrator, class notice was provided to Class Members that are within the Damages Class definition (*i.e.*, that are not excluded as Government Accounts.)

Objector Beaman Automotive Company objects to the overall size of the Settlement Fund (in addition to its earlier objection to the allocation of the Net Settlement Fund) because it did not include damages for ASO stop-loss premium costs. Ex. 29 at 1. Self-Funded Sub-Class Settlement Counsel had access to data regarding, among other things, stop-loss premium costs in determining whether to agree to the Settlement. Thus, this objection is unfounded.

Objector Lea K. Sivilich objects to the notion of opt-out class actions, stating that it was "wrong" for her to have been included in a settlement without her permission and that such class actions "should be illegal." Ex. 36 at 1. The Federal Rules of Civil Procedure expressly contemplate opt-out class actions. *See* Fed. R. Civ. P. 23(b)(3).

Objector Robert Shattuck, Jr. objects and requests oversight of governmental officials to provide their input on the settlement. Ex. 34 at 2-3. As discussed above, Defendants have issued CAFA notice and federal and state officials have therefore been afforded the opportunity to weigh in on the settlement. ECF No. 2704, Settling Defendants' Proof of CAFA Notice.

Objector James M. Dean objects that the "information provided does not explain the relationship of plaintiff counsel(s) with JND and how JND will be compensated" and says that "[e]xtra court scrutiny of JND appears needed." Ex. 19 at 2. As Plaintiffs explained in the Notice Motion, JND—one of the leading legal administration firms in the country which frequently is engaged by U.S. government agencies—was selected after a lengthy interview process with

multiple providers. Notice Motion at 7-8. JND is being compensated from the Notice and Administration Fund established by the Settlement. Settlement ¶¶ 1(fff), 1(ggg).

Objector George W. Cochran objects to the requirement that objectors list their prior objections. Ex. 17 at 1-2. Courts routinely uphold settlements which require objectors to do just that. *Ferrick v. Spotify USA Inc.*, No. 16-cv-8412 (AJN), 2018 WL 2324076, at *8 (S.D.N.Y. May 22, 2018) ("Another Objector complains about the 'onerous requirement' that Objector's counsel identify any objections filed during the past five years, . . . but this requirement may help identify nonmeritorious objections"); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 567 n.5 (N.D. Ill. 2011) (approving a settlement agreement that "imposed a number of requirements on the objection itself" including that "objectors were required to include a list of all other objections filed by the objector during the five years prior to the date the objection was filed" (internal quotation omitted)); *Granillo v. FCA US LLC*, No. 16-153 (FLW) (DEA), 2018 WL 4676057, at *6 (D.N.J. Sept. 28, 2018) (rejecting the contention that a requirement to list prior objections is irrelevant and would chill potential objections, noting that "[t]he provisions are not irrelevant to whether the settlement is 'fair, reasonable or adequate,' as a professional objector can delay the settlement process and, thus, 'undermine the administration of justice'" (quoting *In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010))). Cochran offers no basis for the conclusion that such a well-accepted practice is impermissible here.

Objector Thomas Zakett objects to the Settlement because the Settling Defendants do not admit guilt. Ex. 40 at 1. Courts routinely approve settlements that do not require the defendants to admit guilt, and to the contrary, that expressly state that defendants are not admitting liability. *See, e.g.*, *Schulte*, 805 F. Supp. 2d at 594 ("Defendant is not required to admit that it did anything wrong when settling a case. In fact, it 'is common to most settlement agreements' that the defendant 'does

not admit liability.'") (internal citations omitted)); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. MDL-1446, 2008 WL 2566867, at *12 (S.D. Tex. June 24, 2008) ("A settlement is not tantamount to an admission of liability. Defendants settle for many reasons, such as the avoidance of bad publicity and litigation costs, the possibility of an adverse verdict, and the maintenance of favorable commercial relationships.").

Objectors Dugan, Stover, and Wallace have provided no grounds for their objections to which the parties can respond, and their objections should therefore be disregarded. Ex. 21, 37, 39.

The health insurance service complaints of objector Rosko (Ex. 33) are not at issue in this antitrust matter and are therefore irrelevant. *See Collins v. Quincy Bioscience, LLC*, No. 19-22864-CIV-Cooke/Goodman, 2020 WL 7135528, at *6 (S.D. Fla. Nov. 16, 2020)*, appeal dismissed sub nom. Collins v. Helfand*, No. 20-14492-J, 2020 WL 8770265 (11th Cir. Dec. 22, 2020) (striking an objection in part because the injury alleged by the objector was "vague . . . personal . . . [and] not at issue in this lawsuit").

## VIII.   THE DEPARTMENT OF LABOR'S VIEWS, WHICH CONCERN DOWNSTREAM EMPLOYER ERISA OBLIGATIONS, DO NOT BEAR ON THE FAIRNESS AND REASONABLENESS OF THE SETTLEMENT.

The U.S. Department of Labor ("DOL") has not objected to the Settlement, but rather has submitted a letter expressing concerns of the DOL Secretary regarding the Settlement. Exhibit H, July 28, 2021 Letter from W. Berry to Settlement Class Counsel and Counsel for Settling Defendants ("DOL Letter"). Settlement Class Counsel first heard from the DOL in June 2021, after several Class Members who had received notice of the Settlement contacted the DOL with questions about their obligations under ERISA with respect to any Settlement proceeds. Since then, Settlement Class Counsel, along with counsel for the Settling Defendants, have had several meetings with the DOL's counsel to provide additional information to help inform the DOL's views of the Settlement.

Central to all of the DOL's concerns is the fact that employers who provide health insurance for their employees typically do so through an employee benefits "plan" that the employer sponsors, and that is governed by ERISA ("the ERISA plan"). Although ERISA creates such plans, they are generally not incorporated or otherwise constituted as legal persons under state law and exist for purposes of the statute. The assets of a plan for a fully insured group, for example, typically consists of nothing more than the insurance contract that covers the sponsor's employees. Thus, while 29 U.S.C. § 1132(d) states that an employee benefit plan may "sue or be sued" as an entity, it adds the qualifying phrase "under this subchapter."

Each plan is controlled and administered by a fiduciary who owes duties of care, prudence and loyalty to plan participants. 29 U.S.C. § 1104(a)(1)(A). The "named fiduciary" (29 U.S.C. § 1102(A)) or administrator of such plans is generally—to the knowledge of Settlement Class Counsel—the employer itself, or an agent or employee of the sponsoring employer. Thus, in the real world, although ERISA recognizes the legal distinction between them, the employees/participants and their ERISA plans have common interests, and the employer in its fiduciary capacity, responsible for protecting those interests, has complete authority over the plan's management and administration.

At bottom, the DOL is concerned about the purely hypothetical possibility that employers may breach their fiduciary duties under ERISA in deciding what to do with damages they recover, or whether to opt-out or remain in the Damages Class. But the Settlement does not purport to do anything that impacts or alters those ERISA duties. All ERISA duties still apply, and all ERISA fiduciaries must comply with those duties. DOL's concerns are not supported by any evidence of misbehavior, and the future behavior of employer-fiduciaries, who are or should be aware of the responsibilities they discharge on a daily basis, is beyond the control of the settling parties and this

124

Court. It is instructive that the DOL does not outline how the Settlement could have been revised or reconfigured to address the concerns that the DOL now identifies. This suggests, in turn, that application of standard fiduciary duties under ERISA should be more than sufficient.

Importantly, the extensive Notice Program outlined above ensures that Settlement Class Members—including ERISA plans, their fiduciaries, and the employees/participants covered by the plans—have received notice of the Settlement, including about their opportunities to opt-out, object, and file a claim. Not one ERISA plan, plan fiduciary, or plan participant has objected on any of the bases raised by the DOL.[65] One objector group—the Bradley Objectors—actually references ERISA and claims to object "because they believe they have a federally mandated duty [under ERISA] to pursue equitable treatment for their Plans and Plan participants." Ex. 3 at 8. But the Bradley Objectors do not object that the Settlement violates ERISA—to the contrary, they are merely recognizing that they as Settlement Class Members have duties under ERISA, evidencing the fact that Settlement Class Members are well aware of their ERISA duties. Likewise, multiple ERISA plans, along with their employer sponsors/named fiduciaries, *have* objected to and opted out of the Settlement, and so have clearly received notice of the Settlement. *E.g.* Ex. 1 at 1 n.1. There is no evidence that these entities, or those that remained in the Class, are unaware of their fiduciary obligations under ERISA, let alone that they have shirked those duties. And to the extent any obligations are breached, employers, ERISA plans, and employees/participants each retain all

---

[65] Two individual objectors argue that "FI Group employers have a fiduciary duty to notify eligible employees of their rights under the Settlement," seemingly under ERISA. Ex. 17 at 4. ERISA imposes no obligation on employers to provide class action notice, nor did the Court's Notice Order. As discussed *supra* § II(C), the Notice Plan provided notice to Class Members in accordance with Rule 23 and due process. Further, in light of the Notice Plan, notice of the settlement by the plan fiduciary would have been duplicative, redundant, and an unreasonable use of plan resources. *See* ERISA § 404(a)(1)(A) (requiring fiduciaries to discharge duties to, among other things, defray reasonable expenses of plan administration).

of their rights with respect to claims against one another. The only Releasees in the Settlement are "(i) Settling Individual Blue Plans; (ii) BCBSA; (iii) NASCO; (iv) Consortium Health Plans, Inc." and related entities and individuals. Settlement ¶ 1(vvv).

Because the notice of the Settlement has accurately described the Settlement, and the Settlement in no way promotes or encourages improper behavior, the DOL has no basis to raise concerns to this Court.

### 1.      Adequacy of Representation

The DOL expresses the concern that ERISA plans may not be adequately represented by the Class Representatives because none of the Class Representatives is an ERISA plan. Settlement Class Counsel explained to the DOL that adequacy requirements under Rule 23 do not require an exact identity of interest. Rather, "the adequacy-of-representation requirement is satisfied when (i) the class representatives have no interests conflicting with the class; and (ii) the representatives and their attorneys will properly prosecute the case." PA Order, 2020 WL 8256366 at *10 (citing *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)). The "existence of minor conflicts alone will not defeat a party's claim to class certification [and thus settlement approval]: the conflict must be a 'fundamental' one going to the specific issues in controversy." *Valley Drug*, 350 F.3d at 1189. A conflict is fundamental only "when, for example, some class members claim to have been harmed by the same conduct that benefitted other class members." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1275 (11th Cir. 2021) (quoting *Valley Drug*, 350 F.3d at 1189). *See also* William B. Rubenstein, 3 NEWBERG ON CLASS ACTIONS § 7:31 at 2 (5th ed.) (same). No such fundamental conflict exists here, as Class Representative employers sought redress from Defendants for the exact same alleged unlawful conduct as was suffered by ERISA plans—namely, anticompetitive overcharges on premiums and administrative fees.

126

The DOL claims that ERISA plans have interests adverse to employers because employers, as such, do not owe fiduciary duties to plan members. The DOL does not explain why this is a conflict, nor does it address the fact that employers or their agents typically serve as their plan's named fiduciary, or plan administrator, under 29 U.S.C. § 1102(a). And the DOL agrees that both employers and their ERISA plans have an interest in monetary recovery for overpayment of premiums and fees. DOL Letter at 6-7. The supposed conflict seems to rest on a misunderstanding of the Settlement, as the DOL contends that both the ERISA plan and the employer may assert a claim for the same injury, and "paying both claims may reduce the ERISA plan's total recovery." DOL Letter at 6-7. But this is not a possible scenario under the Plan of Distribution—each Insured Group or Self-Funded Account is entitled to one payment. This potential conflict identified by the DOL is illusory, and as "a conflict 'must be more than merely speculative or hypothetical'" to defeat the adequacy requirement of Rule 23, the DOL's concerns regarding adequacy are misplaced. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) (quoting 5 MOORE'S FEDERAL PRACTICE § 23.25[4][b][ii] (2002)); *see also Henderson v. Thomas*, 289 F.R.D. 506, 512 (M.D. Ala. 2012) (rejecting an "illusory" conflict as a basis for challenging adequacy under Rule 23(a)(4)).

The DOL also claims that the fact that the Plan of Distribution uses a Default option, rather than collecting participant contribution records from millions of employers around the country dating back to 2008, is evidence that ERISA plans were not allowed input into the Settlement. But as discussed in detail above, the Default option developed with the assistance of economic experts and review by Mr. Feinberg minimizes the burden and delay of administering the Settlement and allows for efficient and timely payment of claims. Chodorow PA Decl. ¶ 26 (noting that a "large-scale effort to collect and analyze records maintained" by millions of employers "would be

extremely burdensome given issues of data quality" and would likely involve a "costly, time-consuming, and error-prone process."). The DOL provides no basis to conclude that somehow ERISA plans would have preferred such a process.

Beyond a Rule 23 analysis showing that DOL's concerns are unfounded, as a factual matter, it is important to recognize that several Class Representatives are both employers (plan sponsors) and their plans' named fiduciaries.[66] And even if they were not, because ERISA plans are managed and operated by their fiduciaries (normally their employer sponsors), there is no functional difference between having an ERISA plan as a class representative and having that plan's fiduciary as the class representative. The distinction is entirely formalistic, as ERISA recognizes—for example, while ERISA prohibits self-dealing, it allows a fiduciary to also serve as "an officer, employee, agent, or other representative of a party in interest" in recognition of the fact that the interests of the plan sponsor and fiduciary are often aligned. 29 U.S.C. § 1108(c)(3). And here, the operative complaint states that each Class Representative "has purchased" insurance and has a certain number of employees enrolled on its policy, not that it is suing merely as a plan sponsor. *See, e.g.,* FACCAC ¶¶ 17-24, 26, 30-31, 34, 37, 39-41, 43, 45-48, 50, 52-55, 57, 59, 61-68, 70, 72, 73, 77-78. These employer Class Representatives know that they have obligations under ERISA, and nothing in the Settlement purports to relieve them of those obligations.

Further, the Class Representatives also include employees who were participants covered by their employer-sponsored ERISA plans.[67] As Class Representatives, these individuals represent all of the participants in each of the ERISA plans within the class. Because the claims here relate

---

[66] For example, each of the following Class Representatives is both a plan sponsor and a plan administrator: CB Roofing; Consumer Financial Education Foundation of America, Inc.; Gaston CPA; Pete Moore Chevrolet; Pettus Plumbing; and Hibbett Sports, Inc.

[67] For example, Class Representative Jennifer Childress, who purchased insurance as an individual policyholder, was also a participant in at least two other employer-sponsored Blue Plans.

to premium payments attributable to the plan participants, the plans' interests are coextensive with those of the participants and the Class Representatives therefore adequately represent the interests of the plans themselves.

Even assuming that a given plan had the power to sue for the injuries alleged in this case, that plan's interests are protected and enforced by an exclusive group of persons specifically denominated by the statute.[68] As relevant here, ERISA expressly authorizes both fiduciaries and participants to represent the interests of their plans and recognizes that those interests align. Indeed, in the context of ERISA claims alleging harm to the plan, the Supreme Court has concluded that employees/participants may sue only to recover "for the plan itself,"[69] which in this case would be based on the premiums paid by the employees/participants. Where all of a plan's participants seek to recover based on their premium payments, such a recovery is, in effect, a recovery for the plan.[70] Accordingly, within the framework of ERISA and the settlement, the interests of the ERISA plans were adequately represented by the Class Representatives who approved the Settlement, making untenable DOL's concern that ERISA plans were not represented in the negotiations and the framework emanating from those negotiations. Again, the employer Class Representatives served both as plan sponsors and as named fiduciaries—plan administrators—under those plans.

---

[68] *See* ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) (empowering participants, beneficiaries, fiduciaries, and DOL to bring civil actions for relief on behalf of plan).

[69] *Mass. Mut. Life. Ins. v. Russell*, 473 U.S. 134, 144 (1985).

[70] *See* Brief of the Secretary of Labor as Amicus Curiae in Support of Plaintiffs-Appellants Urging Reversal at 16, *David v. Alphin,* No. 11-2181, ECF 48-1, filed Dec. 28, 2011 (4th Cir.) (stating that "ERISA section 502(a)(2) appropriately assigns a plan's action to participants whose legal victory 'would unquestionably redress the ***injuries*** [to the plan] for which [they] bring suit' regardless of how the plan's recovery is ultimately allocated" (quoting *Sprint Commc'ns Co. L.P. v. APCC Services, Inc.*, 554 U.S. 269, 286-87 (2008) (citing *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000) (emphasis in original)).

### 2. Double Recovery

The DOL argues that the Plan of Distribution may allow for double recovery by both ERISA plans and employer plan sponsors. That is incorrect. As explained in the Keough Declaration, the claims process here relies on data produced by the Settling Defendants, with claims values based on the actual data attributed to each claimant and each health benefit plan or ASO contract. If more than one claimant attempts to make a claim that points to the same data (for the same payments on the same policy or ASO contract), that will automatically be flagged by JND as a conflict for resolution. Keough Decl. ¶ 98. Thus, if an ERISA plan and the employer associated with that plan somehow both submit claims with respect to the same policy, those claims will all point to the same data showing the same payments made for the same policy; the potential conflict will therefore be readily apparent, making it easy for JND to identify and for JND or the Settlement Administrator to resolve, avoiding any risk of double recovery.[71]

### 3. Satisfaction of Fiduciary Obligations

The DOL raises concerns that employers will violate their fiduciary obligations in determining whether or not to participate in the Settlement and make a claim. The DOL states that "employers sponsoring ERISA plans may not be aware that the settlement releases the claims of their plans as well, and that they are obligated to comply with ERISA's standards in doing so." DOL Letter at 7. First, as noted above, Class Members have received extensive and robust notice of the Settlement, which contains details about the releases and opportunities to exclude oneself

---

[71] Paragraph 21 of the Plan of Distribution lays out a process for resolving a similar circumstance, where claims are made by two different groups with respect to the same payments made for the same policy (a purchasing entity and one or more employers on behalf of whom that entity made the purchase). It explains that the two groups should first try to resolve an allocation between them, and that if they are unable to do so, the Settlement Administrator will do so. Likewise, the Settlement Administrator would decide any claims by ERISA plans and employers over the same payments for the same policy or ASO contract.

from the Settlement. It is inconceivable that an employer could review those materials and believe that the release applied only to it, and not to the ERISA plan for which it is a fiduciary.

Second, the DOL's concern is not really a concern about the terms of the Settlement, but rather a concern that an employer sponsor may breach its duties under ERISA by participating in the Settlement. Nothing about the Settlement requires any employer to breach its obligations, and Settlement Class Counsel agree that employers must meet all of their applicable duties under ERISA, just as they must with any other statutory obligations (such as payment of taxes). And once again, the employer Class Representatives serve as both plan sponsors and as plan administrators; ERISA recognizes this dual status as permissible (*see* 29 U.S.C. § 1108(c)(3)); and the complaint does not limit the capacity of these Class Representatives to serve only in the role of plan sponsor as opposed to a plan fiduciary.

### 4. Prohibited Transactions

The DOL is concerned that the Settlement's release may constitute a prohibited transaction under ERISA § 406(a)(1)(A). DOL Letter at 8. That subsection prohibits a plan fiduciary from causing the plan to engage in a transaction where the fiduciary "knows or should know that such transaction constitutes a direct or indirect—(A) sale or exchange, or leasing, of any property between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(A). The DOL states that since the Settling Defendants will in many cases still be "service providers to the plan," that makes them "parties in interest" under ERISA. *See* 29 U.S.C. § 1002(14)(B) (defining "party in interest" with respect to a plan to include, among numerous other things, "a person providing services to such plan"). The DOL further states that since the plan's legal claims are "plan assets," the release of those claims constitutes an "exchange" of those assets for the benefits received under the settlement, and hence is a "prohibited transaction."

If correct, DOL's position would mean that, without an exemption, an ERISA plan could never settle the legal claims it has with an entity that provides services to that plan. But that obviously cannot be correct. Instead, as the Supreme Court and other courts have recognized, the language of ERISA § 406 must be read in light of the statute's overarching purpose, which is to regulate "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996). As the Third Circuit recently explained, the Supreme Court's *Lockheed* decision identified the "common thread" to each prohibited transaction in § 406(a)(1) as being "a special risk to the plan from a transaction presumably not at arm's length." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 338 (3d Cir. 2019). For that reason, the Supreme Court determined "that transactions that do not share that common thread are permissible." *Id.* Recognizing these points is necessary to avoid "absurdity in interpreting the statute." *Id*.

Here, the Settlement does not create "a special risk to the plan from a transaction presumably not at arm's length." Far from it, this Settlement reflects the culmination of almost a decade of intense litigation and several years of hard-fought settlement negotiations. Moreover, because it is a class action, the Settlement requires Court approval. That eliminates the "special risk" of an insider deal.

This Court has already received hundreds of pages of supporting documentation concerning the fairness and reasonableness of the Settlement and the protracted, arm's-length negotiations that led to its formation. The Court has issued preliminary findings on the fairness and reasonableness of the Settlement and the lack of collusion: "[The settlement] is the product of over four years of hard-fought, arms-length, and neutral supervised negotiations by counsel who are highly experienced in complex litigation and antitrust law." Preliminary Approval Order at 6.

*See also id.* at 28 ("This was not a quick resolution, and there was no suggestion of collusion."). The Court has approved an extensive Notice Plan, which has been effectuated, resulting in over 100 million direct notices to Settlement Class Members and a far-reaching media campaign. Class Members had the opportunity to exclude themselves from the Settlement for any reason, and over 1,000 have availed themselves of the opportunity. The Court will now consider, for final approval purposes, the fairness and reasonableness of the Settlement, including reviewing all objections, and must actually find, under Rule 23(e)(2)(B), that the Settlement was negotiated at arm's length and free from collusion. All of this Court scrutiny protects against the concerns underlying prohibited transactions.

The DOL ignores that the class action device itself protects against self-dealing and collusion. Instead, the DOL points to its 1995 advisory opinion, AO 95-26A, which noted the DOL's view that a plan's actual settlement releasing claims against a service provider was a "prohibited transaction." But that was before the Supreme Court's *Lockheed* decision, in which the Court held that a plan participant's release of claims against his or her employer in exchange for early retirement benefits was ***not*** prohibited by § 406 because it was not a "transaction"—*i.e.*, not a "commercial bargain"—presenting harm to the plan.

The Settlement here fits seamlessly within the *Lockheed* Court's reasoning. The Settlement is not a commercial bargain that poses any threat of harm to the ERISA plan Class Members. First, Settlement Class Counsel, on behalf of the Settlement Classes, negotiated at arm's length with counsel for Settling Defendants to resolve an actual controversy. Second, the Settling Defendants are not plan "insiders" and had no ability to influence any decisions being made by the ERISA plan Class Members. Third, as the Court has already noted at preliminary approval, there was no collusion between the parties, and there have been no allegations of sham or illegal arrangements

133

or schemes, or kickbacks. Quite to the contrary, negotiations over the Settlement were long and hard-fought, extending over five years and requiring the assistance of three outside mediators. The ERISA plan members of the Damages Class stands to gain from the allocation of settlement proceeds of approximately $2.7 billion. Although the release does benefit the Settling Defendants, that is incidental and permissible under ERISA and is not prohibited by § 406(a). *See Lockheed,* 517 U.S. at 895.

The *Lockheed* decision supersedes DOL's view to the contrary, as expressed in AO 95-26A. At a minimum, the decision casts significant doubt on the continued validity of anything to the contrary in AO 95-26A. DOL acknowledged as much when it issued, in 2003, PTE 2003-39, which exempts settlements between plans and parties in interest if certain conditions are met. In granting the exemption, DOL made clear that it was not taking the position that such settlements are prohibited transactions and recognized that there is "considerable uncertainty" on that issue:[72]

> As the Department noted in proposing this exemption, the fact that a transaction is subject to an administrative exemption is not dispositive of whether the transaction is, in fact, a prohibited transaction. Rather, the exemption is being granted in response to uncertainty expressed on the part of plan fiduciaries charged with the responsibility under ERISA for determining whether it is in the interests of a plan's participants and beneficiaries to enter into a settlement agreement with a party in interest. The comments have confirmed the Department's earlier conclusion that there was considerable uncertainty surrounding this issue. After considering all of the comments, the Department has determined that the exemption, as revised, appropriately balances the concerns of these commenters while allowing plan fiduciaries to properly carry out their responsibilities under ERISA.

---

[72] *See* Preamble to Class Exemption for the Release of Claims and Extensions of Credit in Connection With Litigation, 68 Fed. Reg. 75632, 75633-34 (Dec. 31, 2003). In the preamble, DOL cited *Lockheed* only for the proposition that "the payment of benefits is not a prohibited transaction." *Id.* at 75634 (citing *Lockheed*, 517 U.S. at 892-93). The holding and reasoning of the Court extend beyond that simple rule, as discussed above.

68 Fed. Reg. at 75633. If DOL intends to re-assert the position taken in AO 95-26A, DOL should issue guidance before acting on it so that regulated entities have notice and an opportunity to comment.[73]

### 5.    Exemption under Prohibited Transaction Exemption 2003-39

Even if the Settlement were covered by § 406(a)(1), it would satisfy the exemption from the prohibition set forth in DOL's PTE 2003-39: there is a genuine controversy involving the plans; any fiduciary approving the Settlement is independent of the Settling Defendants; the Settlement is the result of arm's length negotiations and is reasonable; the Settlement is not designed to benefit the Settling Defendants (and in fact requires them to make significant monetary contributions and structural changes to the benefit of the Settlement Classes); the terms of the Settlement are contained in a written settlement agreement; and no commissions are being paid in connection with the Settlement. *See* PTE 2003-39, § II(a)-(j); 68 Fed. Reg. at 75635.[74] Although DOL raises a concern about employers having a conflict of interest with the plans that would preclude

---

[73] The DOL Letter refers to the preamble to the final rule amending PTE 2003-39 in 2010, in which the DOL stated that a plan's release of claims against a party in interest was a prohibited transaction. *See* Preamble to Adoption of Amendment to PTE 2003-39, 75 Fed. Reg. 33830, 33831 (June 15, 2010). The DOL made this statement without prior notice or opportunity to comment and without citation, and it conflicts with Supreme Court precedent and DOL's prior guidance. It should be given no weight. *See Langbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 310-11 (5th Cir. 2007) (rejecting DOL position stated in preamble to regulation as unreasonable); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (rejecting deference to DOL interpretation under Fair Labor Standards Act where "there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question'," "when the agency's interpretation conflicts with a prior interpretation," or "when it appears that the interpretation is nothing more than a 'convenient litigating position'").

[74] The PTE also requires that the fiduciary authorizing the Settlement acknowledge its fiduciary status and that the plan maintain recordkeeping policies to retain documents reflecting the satisfaction of the PTE. *Id.* § II(k), (l). Although there is no information on these points, they are not material in light of the Court's settlement approval process, each plan's ability to opt out of the Settlement, and the fact that the Settlement Agreement and related documents are a matter of public record and maintained by the Court's filing system.

application of PTE 2003-39, the absence of any such conflict and the extensive oversight of the

Court should eliminate that concern.

### 6.      Release of ERISA Claims

The DOL expresses concern that the Released Claims could potentially provide a broad

release of ERISA claims. The definition of Released Claims is to the contrary:

> Nothing in this Release shall release claims, however asserted, that arise in the
> ordinary course of business and are based solely on (i) whether a particular product,
> service or benefit is covered by the terms of a particular Commercial Health Benefit
> Product, (ii) seeking resolution of a benefit plan's or a benefit plan participant's
> financial responsibility for claims, based on either the benefit plan document or
> statutory law, or (iii) challenging a Releasee's administration of claims under a
> benefit plan, based on either the benefit plan document or statutory law. Any claim,
> however asserted, (i) that a product, service, or benefit should be or should have
> been covered, but was not covered, (ii) seeking resolution of a benefit plan's or
> benefit plan participant's financial responsibility for claims, or (iii) challenging a
> Releasee's administration of claims under a benefit plan, based in whole or in part
> on the factual predicates of the Subscriber Actions or any component of the Released
> Claims discussed in this Paragraph, is released.

Settlement ¶ 1(uuu). This language was added expressly to exclude ERISA and related benefit

claims from the Settlement's releases. The release, therefore, is clear that ERISA claims unrelated

to the issues raised in this litigation are not released. And given the definition of Releasees as noted

above, nothing at all is released with respect to claims between and among employers, ERISA

plans, and employees.

There is no blanket release of ERISA claims. To the extent any Class Member was

concerned about releasing ERISA claims, they were provided notice of the Settlement and the

opportunity to exclude themselves. And despite comprehensive notice to Class Members, no Class

Member has objected to this release language.

### 7.      Distribution of Settlement Fund

The DOL is concerned that the Plan of Distribution may improperly allocate settlement

proceeds to employers as opposed to participants and beneficiaries. The DOL argues that the

136

Settlement "does not take into consideration the Secretary's guidance on allocation distributions from insurers to plans, employer sponsors, and plan participants." DOL Letter at 10. But the Secretary's guidance concerns "plan assets." Settlement proceeds cannot become a plan asset until such time as they are distributed to Damages Class members. Prior to that distribution, they remain in a QSF controlled by Settlement Class Counsel, Self-Funded Sub-Class Settlement Counsel, and the Settling Defendants. Because these funds are not plan assets at the time of distribution, it necessarily follows that any decision on how to distribute those funds—which is a purely ministerial decision, made pursuant to a Court-approved Plan of Distribution—should not implicate any concerns about plan assets. [75]

Thus, the DOL's concern is not with the Settlement or even the Plan of Distribution, but rather with what an employer may do with Settlement proceeds *after* distribution of the Settlement Fund. Employers and ERISA plans are responsible for complying with applicable ERISA and DOL guidance in all of their activities and, to reiterate, nothing in the Settlement or the Plan of Distribution contradicts those obligations.[76]

---

[75] To the extent the DOL believes that the ERISA plans have a property interest in the Settlement Fund before distribution, the Notice Plan, claims process, and dispute resolution procedure discussed above and set forth in the Plan of Distribution and Keough Declaration protect those interests and resolve the DOL's concerns by ensuring that the plans and their participants may submit claims to the Settlement Fund.

[76] The DOL also appears to be factually mistaken about some of the mechanics of the Plan of Distribution. Their summary states that an employee claimant receives only a percentage of the "estimate" of the portion of the premium allocable to the employee. DOL Letter at 4. The DOL seems to believe that the percentages used in the Default Option to determine the employee's share is multiplied against an estimate of the employee's contribution. That is incorrect. The percentages used in the Default option are applied to the estimate of the *total premium or administrative fees*, paid from all sources, that is allocable to the total cost of buying health coverage for that employee. Thus, the percentage itself represents the estimate of the employee's entire contribution.

IX.   **THE COURT SHOULD APPROVE JUDGE GONZALEZ AS SETTLEMENT ADMINISTRATOR AND ENTER AN AMENDED DATA PRODUCTION ORDER.**

The Settlement Agreement anticipates that the Subscriber Plaintiffs will seek this Court's approval for the appointment of a Settlement Administrator to effectuate the administration and distribution of the Settlement Fund. The Settlement Administrator will "assist in the implementation of the Plan of Distribution and the resolution of any disputes between Settlement Class Members and the Claims Administrator pursuant to the Plan of Distribution." Settlement ¶ 1(iiii). In particular, the Plan of Distribution provides that any Authorized Claimant who believes that they contributed more than the Default allocation methodology suggests can pursue an Alternative option, under which they may submit data, records, and other materials supporting the use of a different contribution percentage. Plan of Distribution ¶ 19. The Settlement Administrator, in the exercise of sound discretion, will then analyze the available data and determine the appropriate allocation ratio to use in the individual case. *Id.* The Settlement Administrator's fees, as well as all other costs and expenses associated with notice and administration, will be paid directly from the Notice and Administration Fund. Settlement ¶ 29.

Settlement Class Counsel seek appointment of Judge Irma E. Gonzalez (Ret.) as the Court-appointed Settlement Administrator. Judge Gonzalez brings 30 years of experience, both in private practice and as a judge. She spent 20 years as a federal judge in the United States District Court for the Southern District of California, where she was first appointed in 1992 and went on to serve as the Chief Judge of that district from 2005 to 2012. During her time on the bench, she oversaw numerous class actions and approved numerous class action settlements. Prior to her appointment as a federal judge, Judge Gonzalez worked as an Assistant U.S. Attorney in the District of Arizona and the Central District of California, as well as an attorney in private practice. She later served as a U.S. Magistrate judge and a San Diego County Superior Court judge.

138

Since retiring from the bench, Judge Gonzalez has spent nearly eight years as a special master and mediator for JAMS. As her JAMS profile states: "Highly regarded among counsel for her fairness and deep knowledge of legal issues, Judge Gonzalez brings an experienced approach to resolving even the most complex and contentious disputes. Her background makes her an ideal arbitrator, mediator, and special master for cases involving a wide range of issues, including business, class action, employment, intellectual property, and securities matters, among others." Judge Gonzalez's resume, with further detail regarding her experience, is attached as Exhibit I.

Judge Gonzalez is currently bringing her decades of experience to bear as Special Master in *USC Student Health Center Litigation*, No. 2:18-cv-04258-SVW (C.D. Cal.), where she oversees a settlement administration process for victims of sexual abuse at the University of Southern California. In that capacity, she has worked closely and developed an effective working relationship with JND, which will benefit the class here in resolving any disputed claims fairly and efficiently. Settlement Class Counsel have spoken with her about her experience and qualifications and are thrilled that she has agreed to serve as Settlement Administrator here, and request that the Court approve her appointment. A Proposed Order Appointing Settlement Administrator is attached as Exhibit J.

As part of her role as Settlement Administrator, the Data Production Order contemplates that Judge Gonzalez will be able to view and analyze some of the confidential data produced by Defendants under the Data Production Order. The Data Production Order anticipates that upon Subscriber Plaintiffs' motion to appoint a Settlement Administrator, the Settling Parties will move to amend the Data Production Order, as necessary. Data Production Order at 1. Subscriber Plaintiffs submit a Proposed Amended Stipulation and Order Regarding Protected Health Information and Personally Identifiable Information for Subscriber Settlement as Exhibit K.

## X.    CONCLUSION

For all the foregoing reasons, Subscriber Plaintiffs request that the Court enter the proposed

Final Approval Order (Ex. L). Subscriber Plaintiffs also request that the Court enter the Proposed

Order Appointing Settlement Administrator (Ex. J), appointing the Honorable Irma E. Gonzalez

as Settlement Administrator, and amend the Data Production Order by entering the Proposed

Amended Stipulation and Order Regarding Protected Health Information and Personally

Identifiable Information for Subscriber Settlement (Ex. K).

Date: September 3, 2021                                    Respectfully submitted,

  /s/ David Boies                                           /s/ Michael D. Hausfeld
David Boies – *Co-Lead Counsel*                   Michael D. Hausfeld – *Co-Lead Counsel*
BOIES, SCHILLER & FLEXNER LLP            Swathi Bojedla – *Discovery Committee*
333 Main Street                                          HAUSFELD LLP
Armonk, NY 10504                                     1700 K Street NW, Suite 650
Tel: (914) 749-8200                                    Washington, DC 20006
Fax: (914) 749-8200                                    Tel: (202) 540-7200
dboies@bsfllp.com                                       Fax: (202) 540-7201
                                                              mhausfeld@hausfeld.com
                                                              sbojedla@hausfeld.com


Charles J. Cooper – *Co-Chair, Written*           Megan Jones – *Settlement Committee & PSC*
*Submissions Committee & PSC Member*          *Member*
COOPER & KIRK, PLLC                             Arthur Bailey – *Discovery Committee*
1523 New Hampshire Avenue NW                  HAUSFELD LLP
Washington, DC 20036                               600 Montgomery Street, Suite 3200
Tel: (202) 220-9600                                    San Francisco, CA 94111
Fax: (202) 220-9601                                   Tel: (415) 633-1908
ccooper@cooperkirk.com                            Fax: (415) 358-4980
                                                              mjones@hausfeld.com
                                                              abailey@hausfeld.com

Chris T. Hellums – *Local Facilitating Counsel*
PITTMAN, DUTTON & HELLUMS, P.C.
2001 Park Place N, 1100 Park Place Tower
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
chrish@pittmandutton.com

William A. Isaacson – *Settlement Committee & PSC Member*
PAUL WEISS
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7313
Fax: (202) 379-4937
wisaacson@paulweiss.com

Gregory Davis – *Settlement Committee & PSC Member*
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Tel: (334) 832-9080
Fax: (334) 409-7001
gldavis@knology.net

Cyril V. Smith – *Settlement Committee & PSC Member*
ZUCKERMAN SPAEDER, LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Tel: (410) 949-1145
Fax: (410) 659-0436
csmith@zuckerman.com

Kathleen Chavez – *Settlement Committee & PSC Member*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
kcc@fmcolaw.com

David Guin – *Co-Chair, Written Submissions Committee*
Tammy Stokes – *Damages Committee*
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. North
Suite 600/Title Building
Birmingham, AL 35203
Tel: (205) 226-2282
Fax: (205) 226-2357
davidg@gseattorneys.com
tammys@gseattorneys.com

Carl S. Kravitz – *Expert Committee*
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: (202) 778-1800
Fax: (202) 822-8106
ckravitz@zuckerman.com

Richard Feinstein – *Expert Committee*
Hamish P.M. Hume – *Discovery Committee*
BOIES, SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
rfeinstein@bsfllp.com
hhume@bsfllp.com

Mindee Reuben
Lite DePalma Greenberg
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Tel:  (267) 314-7980
Fax: (973) 623-0858
mreuben@litedepalma.com

Nate Cihlar
Joshua Callister
Srauss & Boies
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel:  (703) 764-8700
Fax:  (703) 764-8704
ncihlar@straus-boies.com
jcallister@straus-boies.com

Patrick Cafferty – *Discovery Committee*
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
150 S. Wacker Drive, Suite 300
Chicago, IL 60606
Tel: (312) 782-4880
pcafferty@caffertyclobes.com

Bryan Clobes – *Litigation Committee*
Ellen Meriwether – *Written Submissions
Committee*
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
2005 North Monroe Street
Media, PA 19063
Tel: (215) 864-2800
Fax: (215) 864-2810
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

Andrew Lemmon – Chair, Discovery
Committee
LEMMON LAW FIRM
15058 River Road
PO Box 904
Hahnville, LA 70057
Tel: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Virginia Buchanan – Chair, Class Certification
Committee
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7000
Fax: (850) 435-7020
vbuchanan@levinlaw.com

Douglas Dellaccio – *Litigation Committee*
CORY WATSON CROWDER & DEGARIS,
P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 32505
Tel: (205) 328-2200
Fax: (205) 324-7896
ddellaccio@cwcd.com

Larry McDevitt – *Chair, Class Certification
Committee*
David Wilkerson – *Discovery Committee*
VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Tel: (828) 258-2991
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Edwin J. Kilpela, Jr.
Benjamin Sweet – *Litigation Committee*
DEL SOLE CAVANAUGH STROYD LLC
200 First Avenue, Suite 300
Pittsburgh, PA 15222
Tel: (412) 261-2393
Fax: (412) 261-2110
ekilpela@dsclaw.com
bsweet@dsclaw.com

Charles T. Caliendo – *Class Certification Committee*
GRANT & EISENHOFER
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
ccaliendo@gelaw.com

Daniel Gustafson – *Litigation Committee*
Daniel C. Hedlund – *Damages Committee*
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

John Saxon – *Litigation Committee*
JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203-3314
Tel: (205) 324-0223
Fax: (205) 323-1583
jsaxon@saxonattorneys.com

Robert M. Foote – *Damages Committee*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
rmf@fmcolaw.com

Robert Eisler – *Discovery Committee*
GRANT & EISENHOFER
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
reisler@gelaw.com

Brent Hazzard – *Litigation Committee*
HAZZARD LAW, LLC
447 Northpark Drive
Ridgeland, MS 39157
Tel: (601) 977-5253
Fax: (601) 977-5236
brenthazzard@yahoo.com

Lawrence Jones – *Damages Committee*
JONES WARD PLC
The Pointe
1205 East Washington Street, Suite 111
Louisville, Kentucky 40206
Tel:  (502) 882-6000
Fax: (502) 587-2007
larry@jonesward.com

143

Robert Methvin – ***Chair, Settlement Committee***
James M. Terrell – ***Class Certification Committee***
MCCALLUM, METHVIN & TERRELL, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, AL 35205
Tel: (205) 939-0199
Fax: (205) 939-0399
rgm@mmlaw.net
jterrell@mmlaw.net

Michael McGartland – ***Class Certification Committee***
MCGARTLAND & BORCHARDT LLP
1300 South University Drive, Suite 500
Fort Worth, TX 76107
Tel: (817) 332-9300
Fax: (817) 332-9301
mike@attorneysmb.com

H. Lewis Gillis – ***Co-Head Chair, Litigation Committee***
MEANS GILLIS LAW, LLC
3121 Zelda Court
Montgomery, AL 36106
Tel: 1-800-626-9684
hlgillis@tmgslaw.com

David J. Hodge – ***Chair, Settlement Committee***
MORRIS, KING & HODGE
200 Pratt Avenue NE
Huntsville, AL 35801
Tel: (256) 536-0588
Fax: (256) 533-1504
lstewart@alinjurylaw.com

*Counsel for Subscriber Plaintiffs*

*/s/ Warren T. Burns*
Warren T. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
wburns@burnscharest.com

*Counsel for the Self-Funded Sub-Class*

**APPENDIX A**

| Exhibit | Objector | Attorneys | Objections Addressed |
|---|---|---|---|
| 1 | **Opt-Out Objectors: Corporate Employer Plans** - Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc. Welfare Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; Albertsons Companies Inc., New Albertsons L.P., Albertson's LLC, New Albertson's Inc., and Safeway Inc; Albertsons Companies, Inc. Health and Welfare Plan, f/k/a Albertson's LLC Health & Welfare Plan; New Albertson's Inc. Health and Welfare Plan; Big Lots, Inc.; Big Lots Associate Benefit Plan; BNSF Railway Company; Burlington Northern Santa Fe LLC (f/k/a Burlington Northern Santa Fe Corp.); Burlington Northern Santa Fe Group Benefits Plan; Burlington Northern Santa Fe Corporation Welfare Benefit Trust; The Burlington Northern Santa Fe Employee Benefits Committee for the Burlington Northern Santa Fe Corporation Group Benefits Plan; The Boeing Company; Employee Benefits Plan Committee of The Boeing Company, as the plan administrator and named fiduciary of The Boeing Company Master Welfare Benefit Plan; Bridgestone Americas, Inc.; Bridgestone Americas, Inc. Employee Group Insurance Plan; Bridgestone Americas, Inc. Retiree Medical Plan; CHS/Community Health Systems Inc.; Community Health Systems Group Health Plan; Conagra Brands, Inc.; ConAgra Foods, Inc. Welfare Benefit Wrap Plan; Dollar General Corporation; Dollar General Health Plan (a component of the Dollar General Corporation Employee Benefits Plan); FedEx Corporation; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; Hy-Vee Inc.; Hy-Vee and Affiliates Benefit Plan and Trust; Kellogg Company; Kellogg Company Welfare Benefit Plan; The Kroger Co., 84.51 LLC, and Murray's Cheese LLC; The Kroger Co. Health | Sperling & Slater, P.C.; Sherrard Roe Voigt Harbison, PLC; Keller Lenkner, LLC; and Kenny Nachwalter, P.A. | VII(A)(1)(a) VII(A)(1)(b) VII(A)(1)(c) VII(A)(2) VII(A)(2)(c) VII(A)(1)(d) VII(A)(3) VII(H) VII(I) |

| Exhibit | Objector | Attorneys | Objections Addressed |
|---|---|---|---|
| | and Welfare Benefit Plan; 84.51, LLC Health & Welfare Plan; McLane Company, Inc.; McLane Company, Inc. Welfare Plan; Meijer Inc. including its affiliates Meijer Great Lakes LP, Meijer Stores LP, and Town Total Health LLC; Meijer Health Benefits Plan; Publix Super Markets, Inc.; Publix Super Markets, Inc. Group Health Benefit Plan; Tractor Supply Company; Tractor Supply Company Health & Welfare Plan; United Natural Foods, Inc., including its affiliates SUPERVALU, INC .. and Unified Grocers, Inc. ("UNFI"); UNFI Health and Welfare Plan; Walgreens Co.; Walgreen Health and Welfare Plan (Plan No. 501) f/k/a Walgreen Major Medical Expense Plan. | | |
| | **Opt-Out Objectors: Taft-Hartley Plans** - Indiana/Kentucky/Ohio Regional Council of Carpenters Welfare Fund; Ohio Carpenters Health Fund; SEIU Local 1 & Participating Employers Health Trust; The Local No. 1 Health Fund; Plumbers' Welfare Fund, Local 130, U.A.; The Sheet Metal Workers Local 73 Welfare Fund; Chicago Painters and Decorators Welfare Fund; The Carpenters and Joiners Welfare Fund; and Heartland Health & Wellness Fund. | Sperling & Slater, P.C.; Sherrard Roe Voigt Harbison, PLC; Keller Lenkner, LLC; and Kenny Nachwalter, P.A. | VII(A)(1)(a) VII(A)(1)(b) VII(A)(1)(c) VII(A)(2) VII(A)(2)(b) VII(A)(2)(c) VII(A)(2)(d) VII(A)(3) VII(H) VII(I) |
| | **Opt-Out Objectors: Church Plans** - GuideStone Financial Resources of the Southern Baptist Convention; The Church Pension Group (Episcopal); Wespath Benefits and Investments (The United Methodist Church's benefit board); Concordia Plan Services (the Missouri Synod Lutheran Church's benefit board); Portico Benefits Services (the Evangelical Lutheran Church in America's benefit board); Christian Brothers Services (a church plan benefits board created by | Sperling & Slater, P.C.; Sherrard Roe Voigt Harbison, PLC; Keller Lenkner, LLC; and Kenny Nachwalter, P.A. | VII(A)(1)(a) VII(A)(1)(b) VII(A)(1)(c) VII(A)(2) VII(A)(2)(b) |

| Exhibit | Objector | Attorneys | Objections Addressed |
|---|---|---|---|
| | the Christian Brothers religious order); and The Board of Pensions of the Presbyterian Church U.S.A. | | VII(A)(2)(c) <br><br> VII(A)(2)(d) <br><br> VII(A)(3) <br><br> VII(H) <br><br> VII(I) |
| 2 | **Non-Opt-Out Taft-Hartley Plan Objectors** - The Chicago Area I. B. of T. Benefits Health and Welfare Trust Fund; the Bakery Cracker Pie & Yeast Wagon Drivers Local 734 Welfare Fund; the Structural Iron Workers Local #1 Welfare Fund; the Building Material Chauffeurs, Teamsters and Helpers Welfare Fund of Chicago; and the United Food and Commercial Workers Local No. 1546 Food Handlers Welfare Fund; Allen Health Care – Local 389 Home Health Care Benefit Fund; Central Texas Health and Benefit Trust Fund; Construction Teamsters Security Fund for Sothern California; District Council 37 – Local 389 Health Fund; Division 1181 A.T.U. – New York Welfare Fund; Food Employers and Bakery and Confectionary Workers Benefit Fund for Southern California; Food Employers Labor Relations Association and United Food and Commercial Workers VEBA Fund; Glazing Employers and Glaziers' Union Local No. 27 Health and Welfare Fund for Active Journeymen Glaziers, Apprentices and Dependents and for Retired Journeymen Glaziers and Dependents; Hagerstown Teamsters and Motor Carriers Health and Welfare Fund; I.A.T.S.E. National Health & Welfare Fund; IATSE Local 33 Health & Welfare Fund; IBEW-NECA Southwestern Health and Benefit Fund; International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART") Local Union No. 36 Welfare Fund – Arkansas Plan; International Longshoremen's Association Health and Welfare Fund; Local 888 Health Fund; Northern New Jersey Teamsters Benefit Plan; Oklahoma Operating Engineers Welfare Plan; Plumbers and Pipefitters Local | Sperling & Slater, P.C.; | VII(A)(2)(b) <br><br> VII(I) |

| Exhibit | Objector | Attorneys | Objections Addressed |
|---|---|---|---|
| | Union No. 286 Health and Welfare Fund; Plumbers and Steamfitters Local 141 Health and Welfare Fund; Recycling and General Industrial Union Local 108 Welfare Fund; SEIU Health and Welfare Fund; Sheet Metal Workers Local 49 Family Health Plan Board of Trustees; Southern California Benefit Fund; Southern California Dairy Industry Security Fund; Southwest Health Benefits Fund; Southwest Multi-Craft Health & Welfare Trust Fund Board of Trustees; Teamsters Local 282 Welfare Trust Fund; Teamsters Miscellaneous Security Trust Fund; Texas Pipe Trades Health Benefit Fund; U.A.P.P. Local Union No. 142 Welfare Fund; UFCW Local One Health Care Fund; United Food & Commercial Workers Unions and Food Employer Benefit Fund; United Food and Commercial Workers Local 400 and Employers Health and Welfare Fund; United Food and Commercial Workers Unions and Employers Health and Welfare Fund – Atlanta; United Food and Commercial Workers Unions and Participating Employers Health and Welfare Fund; and Washington Wholesalers Health and Welfare Fund. | | |
| 3 | ServisFirst Bancshares, Inc.; Topographic, Inc.; and Employee Services, Inc. | Bradley Arant Boult Cummings LLP; McAfee & Taft A Professional Corporation | VII(C)(1) VII(F)(1) VIII |
| 4 | General Motors Company and General Motors LLC | King & Spalding LLP | VII(A)(2)(a) |

| Exhibit | Objector | Attorneys | Objections Addressed |
|---|---|---|---|
| 5 | Home Depot U.S.A., Inc. | Bondurant Mixson & Elmore LLP | VII(A)(1)(a)<br><br>VII(A)(1)(b)<br><br>VII(A)(1)(c)<br><br>VII(A)(2)<br><br>VII(A)(2)(a)<br><br>VII(A)(2)(d) |
| 6 | LMS Innovations, Inc. | LMS Innovations, Inc. (Marlon St. John, VP) | VII(E) |
| 7 | Oregon Teamster Employers Trust & UFCW Local 555-Employers Health Trust | Barlow Coughran Morales &Josephson, P.S. | VII(A)(2)(b) |
| 8 | Post Holdings, Inc. | Michael Best & Friedrich LLP | VII(A)(2)(d) |
| 9 | Prairie Island Indian Community Health | Jacobson, Magnuson, Anderson, & Halloran P.C. | VII(J) |
| 10 | Tenneco, Inc | Michael Best & Friedrich LLP | VII(A)(2)(d) |
| 11 | Alden, Lorraine | N/A | VII(B)(2)<br><br>VII(D)<br><br>VII(G) |

| Exhibit | Objector | Attorneys | Objections Addressed |
|---|---|---|---|
| 12 | Aldridge, Deanne | N/A | VII(F)(2)<br><br>VII(F)(3)<br><br>VII(G) |
| 13 | Behenna, David | N/A | VII(D) |
| 14 | Bluhm, Christie | N/A | VII(A)(4)<br><br>VII(B)(1)<br><br>VII(E)<br><br>VII(F)(2)<br><br>VII(G) |
| 15 | Boska, Joseph & Michelle | N/A | VII(G) |
| 16 | Brown, Betty L. | N/A | VII(B)(3) |
| 17 | Cochran, Jennifer & Craker, Aaron | Law Office of George W. Cochran | VII(D)<br><br>VII(F)(2)<br><br>VII(J)<br><br>VIII |
| 18 | Daugherty, Patrick O. | N/A | VII(D)<br><br>VII(G) |
| 19 | Dean, James M. | N/A | VII(D)<br><br>VII(E)<br><br>VII(G)<br><br>VII(J) |

| Exhibit | Objector | Attorneys | Objections Addressed |
|---|---|---|---|
| 20 | Demuth, C. | N/A | VII(B)(2)<br><br>VII(D)<br><br>VII(E)<br><br>VII(G) |
| 21 | Dugan, Erika | N/A | VII(J) |
| 22 | Duhon, Michael A. | N/A | VII(B)(2) |
| 23 | Faulkner, William J. | N/A | VII(F)(2)<br><br>VII(F)(3)<br><br>VII(G) |
| 24 | Happe, Michael L. | N/A | VII(B)(2)<br><br>VII(B)(3)<br><br>VII(D) |
| 25 | Hart, James L. | N/A | VII(F)(2)<br><br>VII(G) |
| 26 | Higgitt, Paul | N/A | VII(D) |
| 27 | Hustler, Kearney Dee | N/A | VII(B)(1)<br><br>VII(C)(2)<br><br>VII(D) |
| 28 | Jones, Eric | N/A | VII(B)(2)<br><br>VII(D) |

| Exhibit | Objector | Attorneys | Objections Addressed |
|---|---|---|---|
| 29 | Keene, Ruthie (on behalf of Beaman Automotive Group) | N/A | VII(F)(1)<br><br>VII(F)(3)<br><br>VII(J) |
| 30 | Kelley, John J. | N/A | VII(B)(1) |
| 31 | Marker, Philip E. | N/A | VII(F)(2) |
| 32 | Pitsch, Donald | N/A | VII(B)(2)<br><br>VII(D) |
| 33 | Rosko, Kathleen | N/A | VII(J) |
| 34 | Shattuck, Jr., Robert D. | N/A | VII(B)(1)<br><br>VII(D)<br><br>VII(J) |
| 35 | Sheppard, Dave | N/A | VII(B)(2)<br><br>VII(D) |
| 36 | Sivilich, Lea K. | N/A | VII(B)(2)<br><br>VII(B)(3)<br><br>VII(D)<br><br>VII(E)<br><br>VII(J) |
| 37 | Stover, Ronald | N/A | VII(J) |
| 38 | Tykulsker, David | David Tykulsker & Associates | VII(D) |
| 39 | Wallace, Antoinette | N/A | VII(J) |
| 40 | Zakett, Thomas | N/A | VII(J) |

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2021, the foregoing Memorandum of Law in Support of Subscriber Plaintiffs' Motion for Final Approval of Class Settlement was filed with the Clerk of the Court and served on counsel of record via ECF.

    /s/ Michael D. Hausfeld
Michael D. Hausfeld