FILED

2021 Sep-03  PM 05:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT

# 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ----------------------------------------------------- | x | |
| | x | MDL No. 2406 |
| **In re Blue Cross Blue Shield** | x | |
| **Antitrust Litigation** | x | Master File No. 2:13-cv-2000-RDP |
| | x | |
| ----------------------------------------------------- | x | |

**NATIONAL ACCOUNT OBJECTORS' MEMORANDUM IN SUPPORT OF MOTION TO OPT OUT OF ENTIRE SETTLEMENT OR, IN THE ALTERNATIVE, OPPOSITION TO THE APPROVAL OF THE PROPOSED INJUNCTIVE RELIEF CLASS SETTLEMENT**

# TABLE OF CONTENTS

**I. Introduction** ..... 1

**II. Relevant Procedural History** ..... 4

**III. Damage Class Opt-Outs Are Not Treated Equally Relative to Other Injunctive Relief Class Members** ..... 7

**IV. The Proposed Settlement Would Sanction and Release a *Per Se* Violation of Section 1 of the Sherman Act** ..... 10

A. The Summary Judgment Opinion ..... 10

B. Preliminary Approval of the Settlement Agreement ..... 12

C. Even in the Absence of Aggregation, the ESAs Are *Per Se* Unlawful ..... 14

D. The Single Entity Defense Has Been Rejected, as a Matter of Law ..... 17

**V. The Proposed Settlement Protects Anthem from Second Blue Bids** ..... 20

**VI. The Proposed Settlement Treats Class Members Unequally Relative to Each Other in Numerous Other Ways** ..... 23

A. Taft-Hartley Plans ..... 24

B. Church Plans ..... 25

C. The Dispersion Requirement ..... 27

D. Class Members in States Covered by Two Blue Plans ..... 28

E. The Effect of the Local Best Efforts Rule on Green Competition ..... 29

**VII. Class Members with Arbitration Rights Should Not Have Been Forced into this Proceeding** ..... 30

**VIII. The Proposed Settlement Imposes an Unconstitutional Gag Order on the Injunctive Relief Class Members** ..... 34

**Conclusion** ..... 37

# TABLE OF AUTHORITIES

*Abernathy v. Doordash, Inc.*,
U.S. Dist. Court N.D. Cal. No. C19-07545 WHA, Feb. 10, 2020 .......... 33

*Alexander v. U.S.*, 509 U.S. 544 (1993) .......... 35

*Allen v. Dairy Farmers of Am., Inc., et al.*,
No. 5:09-cv-230, 2015 WL 1517400 (D. Vt. March 31, 2015) .......... 7

*American Express Co. v. Italian Colors Restaurants*, 570 U.S. 228 (2013) .......... 32

*American Needle, Inc. v. NFL*, 560 U.S. 183 (2010) .......... 18, 19, 20

*Arena v. Intuit, Inc.*,
U.S. Dist. Ct. for N.D. Calif., Case No. 19-cv-02546-CRB, March 5, 2021, .......... 33

*Bernard v. Gulf Oil Co.*, 619 F.2d 459 (5th Cir. 1980) .......... 36, 37

*Burrow, et al. v. Forjas Taurus S.A., et al.*, No. 16-21606-Civ-TORRES, 2019 WL 4247284, *10 (S.D. Fla. Sept. 6, 2019) .......... 7

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1983) .......... 32

*Eubanks v. Bullington*, 110 F.3d 87 (D.C. Cir. 1997) .......... 2

*Fox Midwest Theatres, Inc. v. Means*, 221 F.2d 173 (8th Cir. 1955) .......... 14

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981) .......... 37

*In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241 (N.D. Cal. 2018) .......... *passim*

*In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237 (S.D.N.Y. 2004) .......... 32

*In re Equifax, Inc. Customer Data Security Breach Litig.*,
No. 1:17-md-2800-TWT, 2020 WL 256132 (N.D. Ga. 2020) .......... 6

*Johnson v. Meriter Health Serv. Employee Ret. Plan*, 702 F.3d 364 (7th Cir. 2012) .......... 2

*Kleiner v. First National Bank of America*, 751 F.2d 1193 (11th Cir. 1985) .......... 37

*Lawler v. National Screen Serv. Corp.*, 349 U.S. 322 (1955) .......... 14

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) .......... 12

*M.D. et al. v. Centene Corp.*, 2020 WL 7585033 (S.D. Fla. 2020) .......... 8

*McReynolds v. Richards-Cantave*, 588 F.3d 790 (2d Cir. 2009) ........................................2, 7

*Minnesota Mining and Mfg. Co. v. Graham-Fields Inc.*,
1997 U.S. Dist. LEXIS 4457 (S.D.N.Y. 1997) ........................................14, 18

*Moses H. Cone Mem. Hosp. v. Mercury Construction Corp.*, 460 U.S. 1 (1983) ........................32

*Mt. Healthy City Sch. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) ........................................9

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ........................................35

*New York Times Co. v. U.S.*, 403 U.S. 713 (1971) ........................................35

*Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971) ........................................35

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) ........................................12

*Penson v. Terminal Transportation Co., Inc.*, 634 F.2d 989 (5th Cir. 1981) ........................................2

*Peterson v. American General Life Ins. Co.*, 2019 WL 11093816 (M.D. Fla. 2019)......................8

*Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996)........................................35

*Redel's, Inc. v. General Electric Co.*, 498 F.2d 95 (5th Cir. 1974) ........................................14

*Toledo Mack Sales & Serv., Inc. v. Mack Truck, Inc.*, 530 F.3d 204 (3d Cir. 2008).....................14

*U.S. v. Anthem, Inc.*,
236 F. Supp. 3d 171 (D.C.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017) ........................20, 23

*U.S. v. Sealy, Inc.*, 388 U.S. 350 (1967) ........................................*passim*

*U.S. v. Topco Associates, Inc.*, 405 U.S. 596 (1972) ........................................*passim*

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*,
425 U.S. 748 (1976)........................................34

*Walmart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................9

## I. Introduction

The defendant Blues along with the class and subclass have asked the Court to approve a Rule 23(b)(3) opt-out damages class settlement and Rule 23(b)(2) non-opt-out injunctive relief class settlement. The Objectors[1] are all large self-funded (*i.e.*, Administrative Services Only or

[1] The Objectors are: Corporate Employer Plans: Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc. Welfare Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; Albertsons Companies Inc., New Albertsons L.P., Albertson's LLC, New Albertson's Inc., and Safeway Inc..; Albertsons Companies, Inc. Health and Welfare Plan, f/k/a Albertson's LLC Health & Welfare Plan; New Albertson's Inc. Health and Welfare Plan; Big Lots, Inc.; Big Lots Associate Benefit Plan; BNSF Railway Company; Burlington Northern Santa Fe LLC (f/k/a Burlington Northern Santa Fe Corp.); Burlington Northern Santa Fe Group Benefits Plan; Burlington Northern Santa Fe Corporation Welfare Benefit Trust; The Burlington Northern Santa Fe Employee Benefits Committee for the Burlington Northern Santa Fe Corporation Group Benefits Plan; The Boeing Company; Employee Benefits Plan Committee of The Boeing Company, as the plan administrator and named fiduciary of The Boeing Company Master Welfare Benefit Plan; Bridgestone Americas, Inc.; Bridgestone Americas, Inc. Employee Group Insurance Plan; Bridgestone Americas, Inc. Retiree Medical Plan; CHS/Community Health Systems Inc.; Community Health Systems Group Health Plan; Conagra Brands, Inc.; ConAgra Foods, Inc. Welfare Benefit Wrap Plan; Dollar General Corporation; Dollar General Health Plan (a component of the Dollar General Corporation Employee Benefits Plan); FedEx Corporation; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; Hy-Vee Inc.; Hy-Vee and Affiliates Benefit Plan and Trust; Kellogg Company; Kellogg Company Welfare Benefit Plan; The Kroger Co., 84.51 LLC, and Murray's Cheese LLC; The Kroger Co. Health and Welfare Benefit Plan; 84.51, LLC Health & Welfare Plan; McLane Company, Inc.; McLane Company, Inc. Welfare Plan; Meijer Inc. including its affiliates Meijer Great Lakes LP, Meijer Stores LP, and Town Total Health LLC; Meijer Health Benefits Plan; Publix Super Markets, Inc.; Publix Super Markets, Inc. Group Health Benefit Plan; Tractor Supply Company; Tractor Supply Company Health & Welfare Plan; United Natural Foods, Inc., including its affiliates SUPERVALU, INC.. and Unified Grocers, Inc. ("UNFI"); UNFI Health and Welfare Plan; Walgreens Co.; Walgreen Health and Welfare Plan (Plan No. 501) f/k/a Walgreen Major Medical Expense Plan. Taft-Hartley Plans: Indiana/Kentucky/Ohio Regional Council of Carpenters Welfare Fund; Ohio Carpenters Health Fund; SEIU Local 1 & Participating Employers Health Trust; The Local No. 1 Health Fund; Plumbers' Welfare Fund, Local 130, U.A.; The Sheet Metal Workers Local 73 Welfare Fund; Chicago Painters and Decorators Welfare Fund; The Carpenters and Joiners Welfare Fund; and Heartland Health & Wellness Fund. Church Plans: GuideStone Financial Resources of the Southern Baptist Convention; The Church Pension Group (Episcopal); Wespath Benefits and Investments (The United Methodist Church's benefit board); Concordia Plan Services (the Missouri Synod Lutheran Church's benefit board); Portico Benefits Services (the Evangelical

"ASO") National Accounts[2] and members of the sub-class. The Objectors will opt out of the damages class and pursue their own monetary relief. Objectors also move to opt out of the proposed non-opt-out injunctive relief settlement. Alternatively, if the Objectors are not allowed to opt-out of the injunctive relief settlement, they oppose approval of the injunctive relief settlement because it forces upon them unequal treatment relative to other class members and requires that they release, against their will, five years of future *per se* violations of the Sherman Act.

The attempt to force the Objectors into a non-opt-out injunctive relief settlement was not necessary. The courts have long held that an injunctive relief class settlement need not be non-opt-out and that the district court has discretion to grant opt-out rights to Rule 23(b)(2) injunctive relief class members. *Johnson v. Meriter Health Serv. Employee Ret. Plan*, 702 F.3d 364, 371 (7th Cir. 2012) ("notice and opt-out ... are permitted in a (b)(2) class action"); *Eubanks v. Billington*, 110 F.3d 87, 94 (D.C. Cir. 1997) (courts have discretion to allow opt-outs from a Rule 23(b)(2) class); *Penson v. Terminal Transport. Co., Inc.*, 634 F.2d 989, 993 (5th Cir. 1981) (opt-outs from a Rule 23(b)(2) class are allowed "pursuant to [the court's] discretionary power under Rule 23"); *McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009) ("the

Lutheran Church in America's benefit board); Christian Brothers Services (a church plan benefits board created by the Christian Brothers religious order); and The Board of Pensions of the Presbyterian Church U.S.A. Client declarations are submitted contemporaneously herewith.

The Objectors are represented by four law firms: Sperling & Slater, P.C.; Sherrard Roe Voigt Harbison, PLC; Keller Lenkner, LLC; and Kenny Nachwalter, P.A. Attached as Exhibit A hereto is a Statement of Objections to Class Action Settlements Made within the Last Five Years by Objectors' Counsel.

2 As used herein, the term "National Account" means a self-funded plan with 5,000 or more plan members located in two or more states. *See, e.g.*, Proposed Settlement Agree., Sec. A.1(sss); Memo in Support of Final Approval, Dkt. 2610-1, p .15. *See also In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1248 (N.D. Ala. 2018), and *U.S. v. Anthem, Inc.*, 236 F. Supp. 3d 171, 179 (D.C.D.C. 2017).

language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in … (b)(2) class actions"). Nonetheless, the proposed settlement agreement asks the Court to force the Objectors into a non-opt-out injunctive relief settlement class against their will and despite their unequal treatment relative to other class members by the terms of the proposed injunctive relief settlement. The Objectors seek the right to opt out of the injunctive relief class and file this objection only on their own behalves. If allowed to do so, Objectors will opt out of both the damages and injunctive relief settlement classes and pursue their own relief.

The proponent of a class settlement has the burden of proving "that it is fair, reasonable and adequate." FRCP Rule 23(e)(2). As explained below, Objectors seek to opt out because the proposed injunctive relief settlement fails to satisfy that test for at least five reasons:

> First, the proposed settlement fails to treat all members of the (b)(2) class equally relative to each other, as required by Rule (23)(e)(2)(D), as it punishes (b)(2) class members who exercise their constitutional right to opt out of the (b)(3) damages class by taking away injunctive relief benefits to which they would otherwise be entitled;
>
> Second, as a matter of law, the proposed settlement would release future *per se* illegal conduct. *U.S. v. Topco Assocs., Inc.* is controlling and explicitly rejects any implication from *U.S. v. Sealy, Inc.* that an aggregation of offenses is necessary to the application of the *per se* rule;
>
> Third, the proposed settlement inappropriately protects the market power of Anthem. Due to its terms, few if any National Accounts headquartered in Anthem's territory will be able to receive a second Blue bid;
>
> Fourth, the proposed settlement fails to treat all class members equally relative to each other as required by Rule 23(e)(2)(D) because it (1) arbitrarily excludes in various ways numerous National Accounts from ever being able to obtain a second Blue bid and (2) effectively prevents large class members from being able to receive green competitive bids by preserving the Local Best Efforts agreement; and
>
> Fifth, the proposed settlement includes an unconstitutional gag order that prohibits the members of the non-opt-out class from criticizing in any public forum or news outlet any

defendant "regarding any matter related to the Agreement or any of the allegations, claims or defenses in the complaint, answer and pleadings."[3]

## II. Relevant Procedural History

Objectors are large Administrative Services Only National Accounts. Collectively, their Blue ASO plans include approximately two million covered lives. The Objectors fall into three categories. First, the Objectors include some of the largest employers and their sponsored employee plans in the United States.[4] Second, the Objectors include nine Taft-Hartley plans.[5] Third, the Objectors include seven Church-sponsored plans.[6] The Church Plans Objectors are self-funded health plans that provide benefits for denominational churches and church-affiliated organizations to ministers, priests, lay employees and affiliated workers, and their dependents.

Over a year before the proposed settlement was announced, counsel for the Objectors reached out to the parties herein to learn how their clients' interests might be affected by this case. Objectors have substantial reservations about the injunctive relief aspects of the proposed settlement agreement that seeks to bind them and release their claims, but for which they have had no opportunity to provide any input. A brief synopsis of the procedural history of this case illustrates how the Objectors, until now, were afforded no opportunity to make known their views of the issues raised by the proposed injunctive relief settlement.

---

3 In addition, the proposed injunctive relief settlement impermissibly includes class members with enforceable arbitration rights and forces them into a court resolution of their antitrust claims. Although Objectors now intend to pursue their claims in court in light of the present circumstances, the fact remains that those with arbitration rights and other dispute resolution provisions should not have been forced to oppose on the merits the Court approval of the proposed settlement in the first place.

4 *See* fn.1, *supra*.

5 *See* fn.1, *supra*.

6 *See* fn.1, *supra*.

The original Class Action Complaint was filed July 1, 2013. Dkt. 85. The Complaint defined the injunctive class broadly in a manner that would include ASO plans. *Id.*, ¶262; *see also* Dkt. 1082, ¶314. The relevant damage class, however, did not include ASOs. In light of their inclusion in the injunctive class, but exclusion from the damages class, in late 2017 certain of the Objectors began working with counsel to analyze this case and its potential impact on their interests.

On April 5, 2018 this Court issued its opinion holding that the Blues' territorial trademark allocation is a *per se* violation of §1 of the Sherman Antitrust Act. Dkt. 2063. The Eleventh Circuit Court of Appeals declined to hear an interlocutory appeal of that decision.

Thereafter, on April 15, 2019, Plaintiffs filed for class certification. The motion to certify the class and the memorandum in support, for the first time, sought to explicitly remove the ASOs from the definition of the injunctive class:

> All persons or entities in the United States of America and Puerto Rico who are currently subscribers to any health insurance plan that is offered by any Defendant or any subsidiary, affiliate, or successor-in-interest thereof whose ability to do business in any geographically defined area is limited by a license agreement with BCBSA. ***Excluded from the Class are subscribers to Administrative Services Only or Administrative Service Contracts***, the Defendants themselves and any parent, subsidiary or affiliate of any Defendant.

Dkt. 2407 at 1.

Four days after Plaintiffs filed for class certification and excluded the ASOs from the class, this Court publicly inquired about the ASOs and how they "might fit into or relate to this MDL." Dkt. 2418 (ordering the parties to be prepared to discuss ASOs at the May 23, 2019 status conference). The Court's order relating to a discussion of the ASOs was subsequently continued. On May 15, 2019 the Court ordered that "in preparation for the June 20, 2019 status conference, the parties SHALL meet and confer and be prepared to discuss a plan for addressing

ASOs. In advance of the June hearing, the parties SHALL submit a joint report including a list of (1) all ASOs and (2) who may represent the ASOs in any discussion about resolution or other litigation matters." Dkt. 2429. That same order was repeated with minimal change on June 6, 2019, Dkt. 2446, and on July 17, 2019. Dkt. 2497.

The anticipated status conference at which ASOs would be discussed took place on August 15, 2019. Objectors sent a lawyer to Birmingham to attend that conference. Objectors hoped to learn how the parties intended to address the interests of the ASOs and what, if anything, Objectors needed to do to protect those interests. Nothing of substance, however, was discussed in open court. Whatever discussion was had pertaining to the ASOs took place in chambers. We now know that, a month earlier in July, 2019, Hibbet Sports was invited into the litigation to putatively represent a sub-class of ASOs with regard to both damages and injunctive relief. No amended complaint or other pleading, however, was filed showing that the ASOs were now represented by sub-class counsel or that settlement negotiations with regard to both damages and injunctive relief applicable to the ASOs were now taking place.

On October 30, 2020, the Fourth Amended Class Complaint was filed. Doc. #2609. This amended complaint asserted, for the first time, class claims for subscriber plans with more than 200 members and class damage claims for the ASOs. It also reinstated the ASO injunctive relief class claims that had been specifically abandoned on April 15, 2019. *Twenty-eight minutes* after the Fourth Amended Class Complaint was filed, the nearly 500-page motion for approval of a class settlement and supporting papers – including the settlement of the ASOs' newly minted damages and injunctive relief claims – was filed. Doc. #2610.

Objectors and the other sub-class members were afforded no opportunity between the filing of the Fourth Amended Complaint and the request for approval of a non-opt-out injunctive relief settlement to appear and be heard or to discuss the matter with sub-class counsel.[7]

Following the announcement of the class settlement, Objectors have attempted to meet with the Defendants to resolve their concerns. The Defendants have refused to meet.

## III. Damage Class Opt-Outs Are Not Treated Equally Relative to Other Injunctive Relief Class Members

One of the benefits of the proposed settlement agreement is the ability of a Qualified National Account to request a second Blue bid. Mem. in Support of Motion for Approval, p. 15; Settlement Agree., Sec. C.15. Although not previously brought to the Court's attention, the injunctive relief settlement does not allow all National Accounts who would otherwise be a Qualified National Account to request a second Blue bid. To the contrary, an ASO plan that satisfies all the criteria to be a Qualified National Account able to request a second Blue bid is punished by losing its right to seek a second Blue bid if it opts out of the damages class.[8]

Rule 23(e)(2) states that a class settlement can be approved "only … on a finding that it is fair, reasonable, and adequate." In 2018, Rule 23 was amended to add Section 23(e)(2)(D). The new section specifies that a proposed class settlement can be found to be "fair, reasonable and

---

7 District Courts must review a "proposed settlement to ensure fairness, adequacy, reasonableness and that is was not a product of collusion." *Allen v. Dairy Farmers of Am., Inc., et al.*, No. 5:09-cv-230, 2015 WL 1517400, at *5 (D. Vt. March 31, 2015) (*citing D'Amato v. Deutsche Bank*, 236 F. 3d 78, 85 (2d Cir. 2001). This requires a review of the procedural fairness, i.e. the negotiating process, as well as the settlement's substantive terms. *Id.* (*citing McReynolds v. Richards-Cantave*, 588 F.3d 790, 803-804 (2d Cir. 2009)).

8 *See* Settlement Agreement (Ex. A to Class Mem. In Support of Approval) at Sec. A.1(u) (stating that an employer will be removed from list of Qualified National Accounts if it opts out of Damages Class as contemplated by Sec. A.1.(z); Sec. A.1(z) (stating that "for clarity … Opt-Outs are not Employers"); Sec. A.1(sss) (stating that a "Qualified National Account" would be removed from the list of accounts entitled to request a second Blue bid if it opts out of the damages class).

adequate" only after the court considers whether "the proposal treats [class] members equitably relative to each other."

The determination that a proposed class settlement satisfies Rule 23(e)(2)(D) is "mandatory." *Peterson v. Am. Gen. Life Ins. Co.*, 2019 WL 11093816, at *5 (M.D. Fla. 2019). When applied to an injunctive relief settlement agreement, the rule is satisfied when all the members of the injunctive relief class receive the same future benefits and the same policy is applied to all of them. *See*, *e.g.*, *Burrow, et al. v. Forjas Taurus S.A., et al.*, No. 16-21606-Civ-TORRES, 2019 WL 4247284, *10 (S.D. Fla. Sept. 6, 2019) (proposed injunctive relief class settlement held to satisfy Rule 23(e)(2)(D) because "there is no distinction between the benefits offered, and all Settlement Class Members receive the [same warranty] benefit[.]" ); *M.D. et al. v. Centene Corp.*, 2020 WL 7585033, *7 (S.D. Fla. 2020); *In re Equifax, Inc. Customer Data Security Breach Litig.*, No. 1:17-md-2800-TWT, 2020 WL 256132 at *9 (N.D. Ga. 2020) (Rule 23(e)(2)(D) satisfied because the injunctive relief aspects of the settlement were available to all class members and all class members were treated the same).

The Motion for Approval of the Proposed Settlement does not set forth the language of Rule (23)(e)(2)(D) and does not argue that all members of the injunctive relief class are treated equitably relative to each other. Quite obviously, they are not. Members of the injunctive relief class who stay in the damages class can request a second Blue bid if they satisfy the Qualified National Account criteria. But members of the injunctive relief class who opt out of the damages class cannot, regardless of whether they satisfy the criteria for being a Qualified National Account.

This unequal treatment of injunctive relief class members relative to each other not only violates Rule 23(e)(2)(D), but is also particularly troublesome for two additional reasons. First,

the Supreme Court has made clear that a class member has a constitutional due process right to opt out of a damages class. *Walmart Stores, Inc. v. Dukes*, 564 U.S. 338, 362-63 (2011) (holding that the absence of the right to opt out of a damages class "violates due process").[9] Thus, the Objectors and the other injunctive relief class members will be punished and deprived of the opportunity to receive a benefit they would otherwise receive by virtue of the injunctive relief settlement solely because they choose to exercise their constitutional right to opt out of the damages class. The Supreme Court has long held that one cannot be deprived of an opportunity or benefit due to the exercise of a constitutional right. *See*, *e.g.*, *Mt. Healthy City Sch. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84, 288 (1977) (teacher could not be denied opportunity to be rehired due to the exercise of constitutionally protected right). As a result, members of the injunctive relief class cannot be deprived by order of this Court of a benefit or opportunity they would otherwise receive solely because they exercised their constitutional right to opt out of the damages class.[10] Furthermore, because the proposed settlement infringes on the exercise of a constitutional right, it cannot be deemed to be fair, reasonable or adequate.

Second, there is no apparent reason why opting out of the damages class should deprive a class member of the full benefits of the injunctive relief settlement – other than to punish the exercise of a constitutional right so as to discourage its exercise. No justification – plausible or otherwise – is offered for depriving damage class opt-outs of injunctive relief benefits to which

---

[9] The *Dukes* Court held that the right to opt out of a (b)(2) injunctive relief class was not required "when a class seeks an indivisible injunction benefitting all of its members at once." 564 U.S. at 362.

[10] The Court's order releasing the Objectors' claims and depriving them of the ability to seek additional Blue bids would constitute sufficient state involvement to implicate constitutional rights. *See*, *e.g.*, *Walmart Stores, Inc. v. Dukes*, 564 U.S. at 362-63 (class settlement could not be approved by court order if it would violate class member's constitutionally protected rights).

they would otherwise be entitled. Indeed, the moving papers do not even mention that damages class opt-outs will be categorically denied certain injunctive relief benefits but nonetheless required to provide the Blues a forward-looking release.

## IV. The Proposed Settlement Would Sanction and Release a *Per Se* Violation of Section 1 of the Sherman Act

### A. The Summary Judgment Opinion

Each member of the Blue Cross Blue Shield ("BCBS") Association enters into a trademark license agreement with the Association. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1251 (N.D. Ala. Apr. 5, 2018) ("SJ Op."). The license agreement grants to each Blue member an "exclusive service area" ("ESA"), in which the member can use BCBS trademarks and prohibits the member from using the BCBS trademarks outside of its exclusive territory. *Id.* Under the license agreement and the BCBS Association rules, a BCBS member is prohibited from bidding "on a National Account headquartered outside of its [exclusive] service area using the Blue Marks." *Id.* at 1256. The CEO of one of the Blue members admitted that "Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans" and that in the absence of the ESAs "There would be open warfare" – *i.e.*, free and open competition. *Id.* at 1253.

The BCBS Association and its member Blues have also agreed to a National Best Efforts rule and a Local Best Efforts rule. The National Best Efforts rule was adopted in 2005 and requires each Blue Plan to derive at least 66-2/3% of health insurance revenue from sale of Blue trademarked products. 308 F. Supp. 3d at 1256. The Local Best Efforts rule was adopted in 1994. It requires that at least 80% of a Blue Plan's health revenue from within its service area be derived from the sale of Blue trademarked products. *Id.* at 1255-56.

The class moved for summary judgment, asserting that the ESAs were a horizontal territorial allocation – *i.e.*, an agreement by the Blues that they would not enter each other's territory and compete against each other with Blue trademarked products. This Court held that the "critical" and controlling authorities were *U.S. v. Sealy, Inc.*, 388 U.S. 350 (1967), and *U.S. v. Topco Associates, Inc.*, 405 U.S. 596 (1972). 308 F. Supp. 3d at 1260-62. This Court explained that:

> As in *Sealy* and *Topco*, the Blue Plans entered into licensing agreements whereby they agreed to only sell branded health insurance plans and related products within a certain geographic region.... These license conditions between the association and the individual Blue Plans are directly comparable to the license conditions enacted by the defendants in *Sealy* and *Topco*.

*Id.* at 1268-69.

This Court agreed with the plaintiffs that both *Sealy* and *Topco* held horizontal territorial allocations granting licensees an exclusive territory within which each licensee could sell the trademarked products to be *per se* violations of §1 of the Sherman Act (15 U.S.C. §1). As to *Sealy*, this Court stated:

> [T]he Supreme Court held that the horizontal territorial restraints presented ... were unlawful *per se* "without the necessity for an inquiry in each particular case as to their business or economic justification, their impact on the marketplace, or their reasonableness.

308 F. Supp.3d at 1261. As for *Topco*, this Court stated:

> The Supreme Court held that the territorial restraints initiated by Topco were horizontal restraints, and, thus, *per se* violations of the Sherman Act.

308 F. Supp. 3d at 1261.

This Court correctly noted that in *Sealy* the horizontal competitors had not only agreed to exclusive territories within which each could sell the trademarked products, but had also "initiated 'an aggregation of trade restraints' that included price-fixing." 308 F. Supp. 3d at

1261.[11] This Court held that, "like *Sealy*," the plaintiff class herein had "presented evidence of an aggregation of competitive restraints – namely, the adoption of the ESAs and … the best efforts rules – which, considered together, constitute a *per se* violation of the Sherman Act." *Id.* at 1267. In other words, and as was made clear at the oral presentation of the Motion for Approval of the Class Settlement, because the National Best Efforts agreement was aggregated with the horizontal territorial trademark allocation, this Court held that the conduct was *per se* unlawful due to *Sealy*'s aggregation of offense holding. This Court further held that it "need not decide whether the Blue Plan's [territorial] service allocations alone constitute a *per se* violation of Section 1." *Id.* at 1266-67; *also* at 1258 ("The court expresses no view about whether the ESAs alone qualify as a *per se* Sherman Act violation").

**B. Preliminary Approval of the Settlement Agreement**

The proposed settlement agreement eliminates the National Best Efforts rules, which is one of the two aggregated offenses that resulted in the Court's *per se* ruling. As this Court stated at the oral presentation of the Motion for Preliminary Approval, "it was the combination … of the ESAs with other output restrictions – namely National Best Efforts – that I thought moved this from a rule of reason into *per se* analysis." Trans. Nov. 16, 2020, Dkt. #2626, at 36-37 (hereinafter "Trans.").[12] The proposed settlement, however, leaves the territorial trademark

---

11 *See Sealy*, 388 U.S. at 357.

12 Even if an aggregation of offenses was required for the territorial allocation to be *per se* illegal, the defendants here will maintain such an aggregation after the National Best Efforts rules are eliminated. The proposed settlement leaves untouched the Local Best Efforts rules, which are themselves a horizontal agreement among the Association and the Blues that prohibits each Blue from engaging in green competition that would generate more than 20% of its local revenue. This horizontal agreement to reduce green output and not to compete is, itself, a *per se* unlawful horizontal restraint. *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007) (horizontal agreement "that decreases output … is, and ought to be, *per se* unlawful"); *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 48-49 (1990) (horizontal agreement not to

allocation scheme in place.[13] This Court, therefore, inquired at the preliminary approval hearing whether the elimination of the National Best Efforts rules moved "the ESAs … from a *per se* analysis into a rule-of-reason analysis." Trans. at 38.

This Court was very clear that if the territorial allocation, by itself, was *per se* unlawful the proposed settlement could not be approved as it would authorize the defendants to commit a *per se* offense for five years into the future and force the injunctive relief class members to release their ability to challenge those future *per se* violations. As the Court stated:

> Would I, as the judge supervising this potential settlement and having to make a determination that what the parties agreed to going forward is not a Sherman Act violation? … I at least have to make a decision that it's not a *per se* violation.

Trans. at 41-2. The Court then reiterated that "I have to satisfy myself, because of the public interest in making sure that the Court does not approve something that is illegal going forward, that the conduct and structure that's put in place by the settlement [would not constitute] a *per se* violation of the Sherman Act. I think that's clear. I … think that's unassailable." *Id.* at 51. The Court concluded that it "could not approve a settlement" the effect of which would be "*per se* unreasonable under the Act." *Id.*

Counsel for the class agreed that the Court had to conclude that the conduct permitted by the injunctive relief settlement was not *per se* unlawful. Trans. at 42. Counsel for the BCBS Association summed it up for the parties and the Court:

> I think we all agree that if, going forward, the system was clearly illegal, Your Honor could not approve this deal. The Court must conclude that the go-forward system is not *per se* unlawful.

---

compete is a *per se* violation of §1). Even if the National Best Efforts rule is eliminated, the ESA territorial allocation will still be aggregated with the unlawful Local Best Efforts rules.

13 The settlement agreement, at most, offers one additional Blue bid to only some class members. The elimination of the horizontal territorial allocation would permit all Blues to bid on all accounts.

*Id.* at 160.

The parties and the Court were correct. As a matter of law, the release of future antitrust violations is contrary to public policy and unenforceable. *Redel's, Inc. v. General Electric Co.*, 498 F.2d 95, 99 (5th Cir. 1974) ("The prospective application of a general release to bar private antitrust actions arising from subsequent violations is clearly against public policy.... Releases may not be executed which absolve a party from liability for future violations of the antitrust laws"); *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 n.9 (3d Cir. 2008) ("parties may not waive liability for future antitrust violations," citing *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 896 (3d Cir. 1975)); *Lawler v. National Screen Serv. Corp.*, 349 U.S. 322, 329 (1955) (granting defendant "immunity from civil liability for future violations ... is consistent with neither the antitrust laws nor the doctrine of *res judicata*"); *Minnesota Mining and Mfg. Co. v. Graham-Fields Inc.*, 1997 U.S. Dist. LEXIS 4457 at *3 (S.D.N.Y. 1997) ("[plaintiff] could not have waived its antitrust claim in the release because a prospective waiver of an antitrust claim violates public policy"); *Fox Midwest Theatres, Inc. v. Means*, 221 F.2d 173, 180 (8th Cir. 1955) (any contractual provision which could be argued to "absolve one party from liability for future violations of the antitrust statute against another would to that extent be void as against public policy").

### C. Even in the Absence of Aggregation, the ESAs Are *Per Se* Unlawful

Due to the fact that the proposed settlement would eliminate the National Best Efforts rules, this Court must now decide the question which was unnecessary for it to answer at summary judgment: in the absence of the aggregation of the National Best Efforts rules with the horizontal territorial allocation, is the horizontal territorial allocation *per se* illegal? As explained below, *Topco* provides the definitive answer to that question: Yes – the defendants'

horizontal territorial allocation is, in the absence of aggregation with any other offense, *per se* illegal.

In *Topco*, regional supermarket chains formed an association to license and share the Topco brand. Each member of the association was independent and had its own capital, profits and management. 465 U.S. at 598. The association was controlled by its board of directors, which was made up of high-ranking executives of its members. *Id.*; *see* SJ Op., 308 F. Supp. 3d at 1261. The association rules gave each member a veto power over any competitor selling Topco-branded products in its territory and each member was given an exclusive territory in which no other member was allowed to sell Topco-brand goods. 405 U.S. at 602; SJ Op., 308 F. Supp. 3d at 1261. This Court correctly held that the "license conditions between the association and the individual Blue Plans are directly comparable to the license conditions" in *Topco*. SJ Op., 308 F. Supp. 3d at 1269. In *Topco*, of course, the Supreme Court held that the horizontal restriction on the ability of each Topco member to sell Topco-branded goods in each other's territory was "a *per se* violation of §1." 405 U.S. at 608; SJ Op., 308 F. Supp. 3d at 1261-62.

Critically, in *Topco* the association members were not prevented from entering each other's territory and competing with non-Topco-branded goods.[14] In other words, there was no restriction in *Topco* comparable to the National Best Efforts rules which eliminate non-trademark or "green" competition in each Blue member's territory. *Topco*, therefore, addresses the question whether a horizontal territorial trademark allocation, by itself, and in the absence of

[14] The Government asserted only that each co-conspirator agreed that it would "sell Topco-controlled brands only within the marketing territory allocated to it and will refrain from selling Topco-controlled brands outside such marketing territory" (405 U.S. at 601) and that the agreement "operates to prohibit competition in Topco-branded products." *Id.* at 603.

aggregation with a prohibition on "green" competition, is *per se* illegal. *Topco* clearly answers that question in the affirmative.

In fact, in *Topco*, the Supreme Court was quite explicit that the aggregation of offenses mentioned in *Sealy* was *not* required for the territorial allocation to be *per se* illegal. In *Topco*, the Supreme Court held that *Sealy* "is, in fact, on all fours with this case" because in both cases the defendants agreed that each licensee would have an exclusive territory in which no other licensee would be allowed to compete with trademarked products. 405 U.S. at 609. The Supreme Court then explicitly rejected any contention that the territorial allocation was *per se* illegal only when aggregated with another offense:

> It is true that the *Sealy* Court dealt with price-fixing as well as territorial restrictions. **To the extent that *Sealy* casts doubt on whether horizontal territorial limitations, unaccompanied by price-fixing, are *per se* violations of the Sherman Act, we remove that doubt today.**

405 U.S. at 609, n.9 (emphasis added).

In granting plaintiffs summary judgment on the application of the *per se* rule to the Blues' horizontal territorial allocation, this Court understandably relied on the aggregation language in *Sealy* as both the territorial trademark allocation and the National Best Efforts rules were present. The question now, however, is whether the territorial allocation remains *per se* illegal even if the National Best Efforts rules are eliminated. *Topco* answers that question. The horizontal territorial allocation is, by itself, *per se* illegal and cannot be authorized for five years into the future by the approval of a non-opt-out injunctive relief class settlement that compels the release of those future claims.[15]

---

[15] In granting preliminary approval of the proposed settlement, this Court stated that, according to class plaintiffs' expert, Dr. Pakes, the National Best Efforts provision "accounted for 97% of the damages in the case." Doc. 2641 at p. 48. In support of that proposition, this Court cited to Doc. #2626 at 160. As BCBS counsel, Mr. Zott, acknowledged, the study to

**D. The Single Entity Defense Has Been Rejected, as a Matter of Law**

In opposing summary judgment, the defendants argued that their conduct could be *per se* illegal only if it was pursuant to a horizontal agreement among competitors. This Court agreed and held "horizontal agreements among competitors to fix prices or to divide markets" are *per se* illegal. 308 F. Supp. 3d at 1259.

The defendants further claimed that the BCBS Association had to be treated as a single entity – not as a horizontal combination of competitors or potential competitors – and that the license agreements between the Association and individual Blues each had to be treated as a vertical agreement not subject to the *per se* rule. SJ Op., 308 F. Supp. 3d at 1267. This Court

---

which he there referred "was not [done] for the settlement." *Id.* The study was prepared by Dr. Pakes "during the litigation phase" of the case. *Id.* At the time that report was prepared, the damages case included only subscriber class members with 200 or fewer employees. Dr. Pakes' analysis did not include any ASOs or any large national accounts such as the Objectors, some of whom have hundreds of thousands of employees. Dr. Pakes was very clear that his damages report "does not contain an analysis of entry into the ASO market" or damages within the ASO market. Doc. #2601-11, ¶7. It may be that a Blue would not enter the state of another Blue to bid on a small subscriber account with 200 or fewer members. But that does not mean that a Blue would not enter the state of another Blue with a lower-priced competitive bid to obtain the business of a large subscriber or an ASO with tens or hundreds of thousands of members. The only damage estimate for ASOs mentioned by Dr. Pakes is the calculation that Mr. Feinberg accepted showing that the ASOs' share of the $2.7B settlement amount was only 6.5% of the total. *Id.* Mr. Feinberg, however, has no economic or accounting expertise, and the estimated damage apportionment he accepted was based on a comparison of the total amount of revenue received by the Blues from subscriber accounts to the total amount of revenue received by the Blues from ASO accounts. With all due respect to Mr. Feinberg, that comparison is meaningless. The total amount paid by subscribers to the Blues includes pass-through dollars paid by the subscribers to the Blue for the Blue to pay to the providers. The total amount paid by the ASOs to the Blues does not include the pass-through dollars as the ASO, not the Blue, pays that to the providers. Thus, the comparison that is the basis for Mr. Feinberg's estimated apportionment of the damages is truly apples-to-oranges. The Objectors do not make this point to object to the damages plan of apportionment. The Objectors will opt out of the damages class and take no position in this filing on the adequacy of the proposed apportionment or the plan of distribution. The Objectors' only point is that there is no basis in the record to believe that the vast majority of the injury caused by defendants' conduct is attributable to the National Best Efforts Rules, as opposed to the territorial trademark allocation and that this is especially true for larger ASOs and National Accounts.

rejected that argument. It held that the undisputed evidence shows that the "association's own bylaws demonstrate that the association is funded and controlled by the Blue Plans"; that "the association's Board of Directors consists of the CEOs of all licensee Plans"; that "amendments to the association's bylaws require approval by a three-quarters vote of the licensees"; that even the Association "describes itself as an organization controlled by the Blue Plans" and has stated that "Member Plans have the authority to establish or change the constitutional framework on matters that affect fundamental aspects of the Blue System"; that "the undisputed record evidence also reveals that the Blue Plans control the terms of each Blue's License Agreement"; and that the "Blue Plans vote on and approve amendments to the licensing agreements." SJ Op., 308 F. Supp. 3d at 1267.[16] In granting plaintiffs summary judgment on the *per se* rule, this Court stated: "For these reasons the Court finds the association is comparable to the licensee-controlled entities in *Sealy* and *Topco*. Thus, the ESAs established by the Association must be examined as horizontal allocations, not vertical ones." *Id.* at 1267.

In determining that the license agreements between the Association and the Blue Plans had to be viewed as horizontal agreements among competing entities, this Court necessarily concluded that the Association is not a single entity, but rather is a group of competing or potentially competing Blue Plans acting in concert. Conversely, if the Association were a single entity, each license would be a vertical agreement – which this Court explicitly rejected.

---

16 This Court further held that the undisputed evidence showed that "the Blue Plans are 36 independent companies"; that each sells health insurance services; that the Plans "are the governing members of the Association"; that each Plan is autonomous and financially independent; that the Plans are not joint venturers (308 F. Supp. 3d at 1250); that the terms of the license agreements were "adopted by a double three-quarters vote" of the Plan members (*id.* at 1255); and that the Best Efforts rules were adopted by the Plans. *Id.* at 1255-56.

For the same reasons, the undisputed facts, as found by this Court, necessarily satisfy the test for horizontal conduct set forth in *American Needle, Inc. v. NFL*, 560 U.S. 183 (2010). There, the Supreme Court held that the trademark licensing activity of a single entity, NFLP, was actually the concerted activity of its 32 independent corporate owners – the NFL teams.[17] The Supreme Court held that the test was whether the purported agreement "joins together 'independent centers of decisionmaking'" and stated that "if it does, the entities are capable of conspiring under §1…." 560 U.S. at 196. The Supreme Court held that test satisfied because – just as in the current case – the 32 independent entities that controlled the association were "separately controlled, potential competitors with economic interests that are distinct from the NFLP's financial well-being." 560 U.S. at 201. Indeed, the Supreme Court pointed to both *Sealy* and *Topco* – where, as here, the entity in question was controlled by a board of directors made up of the CEOs of the competing members – as examples of entities that were "not separate entit[ies] but instrumentalit[ies] of the individual manufacturers." *Id.* at 191-92, 201.

In deciding the summary judgment motions, this Court stated that *American Needle* left open the question of how the case would have been decided if the NFL trademark, not the marks of the individual teams, were at issue. SJ Op., 308 F. Supp. 3d at 1264. With all due respect, Objectors disagree. The general test for whether there is a horizontal agreement set forth in *American Needle*, as well as *Sealy* and *Topco*, is not limited to the situation where there are multiple trademarks as opposed to only one trademark shared by multiple competitors. Indeed,

[17] The Supreme Court emphasized that (just as in the current case) "each of the teams is a substantial, independently owned and independently managed business. 'Their general corporate actions are guided and determined' by 'separate corporate consciousness' and 'their objectives are' not common." 560 U.S. at 196. The Supreme Court further emphasized that (just as in the current case) the members of the NFLP ownership group compete in the market for the sale of the trademarked product. *Id.* at 197.

in both *Sealy* and *Topco* only one trademark commonly used by the competing association members was at issue. Furthermore, as this Court recognized, the "Rule 56 evidence here" shows that any individual or overlapping rights to use the Blue marks were integrated "under the control" of the BCBS Association. *Id.* at 1264-65. Thus, even if *American Needle* somehow required that the trademarks at issue be individually owned marks that are horizontally consolidated, this case involves just such consolidation.

## V. The Proposed Settlement Protects Anthem from Second Blue Bids

Anthem is the largest Blue and the second largest health insurer in the U.S. with exclusive Blue territorial rights in 14 states.[18] *See U.S. v. Anthem, Inc.*, 236 F. Supp. 3d 171, 178, 185 (D.C.D.C. 2017); *aff'd*, 855 F.3d 345 (D.C. Cir. 2017). Within its 14-state region, Anthem has approximately 40% of the market for National Accounts. *Id.* at 208.

In order to request a second Blue bid under the proposed settlement, a National Account must meet at least two requirements. First, it must include at least 5,000 employee plan members, as determined from Dun & Bradstreet data. Second, it must meet "dispersion requirements." Settlement Agree., Sec. A.1(sss). The term "dispersion" as used in this context refers to the percentage of employees of the National ASO Account that are located outside of the service area of the Blue in whose territory the National Account is headquartered. *Id.*, Sec. A.1(w). The proposed settlement agreement acknowledges that the Blues' self-funded ASO plans, in total, cover approximately 106 million people.[19] ASO plans with 5,000 or more

---

[18] California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia and Wisconsin.

[19] The Settlement Agreement states that Qualified National Accounts will have 33 million members, which is 31% of the members in self-funded plans. Settlement Agree., Sec. A.1(u). That means there are approximately 106 million members in all ASO plans (*i.e.*, 31% x 106M = 32.86M).

employees, excluding all Taft-Hartley union-sponsored and Church-sponsored plans that are never allowed to request a second Blue bid,[20] include plans with only 66 million members and of those 66 million plan members only half of them, or 33 million plan members, will be in plans that qualify to request a second Blue bid. Settlement Agree., Sec. A.1(u). Only 31% of all ASO plan members will be in plans that qualify to receive a second Blue bid. *Id.* Fully 69% of all ASO plan members will be in plans that do not qualify for and cannot request a second Blue bid. *Id.* In part, this is due to the fact that a cap is placed on the accounts that qualify to request a second Blue bid when accounts that qualify to request a second Blue bid reach a cumulative total of 33 million plan members. *Id.* Thus, many ASO plans that satisfy the 5,000 employee requirement will still not be eligible to request a second Blue bid. Settlement Agree., Sec. A.1(u) and A.1(sss). The determination of which National ASO Accounts are included or excluded by the 33 million member cumulative cap is made by dispersion analysis. The National Accounts, excluding all Taft-Hartley and Church Plans, with the highest dispersion rates fill the eligible pool up to the 33 million member cap and are allowed to become Qualified National Accounts that can request a second Blue bid. All other National Accounts are excluded and cannot seek a second Blue bid. *Id.*

The Objectors initially estimated that only National Accounts with a dispersion rate of approximately 70% would be able to become Qualified National Accounts and be able to request a second Blue bid. This means that National Accounts with 30% or more of their plan members located in the service area of their local Blue would be unable to request a second Blue bid. The exact dispersion rate that will be necessary to request a second Blue bid has been calculated by

---

20 As explained in Sections VI.A and B, below, Taft-Hartley plans and Church Plans are categorically ineligible to request a second Blue bid. Only corporate plan sponsors whose employee count is listed by Dun & Bradstreet can ever request a second Blue bid.

the economic consultants employed by sub-class counsel. That dispersion rate has been provided to Objectors' counsel on a confidential basis as the parties do not wish for that percentage to be in the public record. Contemporaneously with the filing of this Memorandum, Objectors are filing under seal the Declaration of Paul E. Slater, which sets forth the dispersion rate that the sub-class economic consultants calculated will be necessary in order for an account to request a second Blue bid. For purposes of discussion, Objectors will use our estimate that a 70% dispersion rate that will be necessary to request a second Blue bid.[21] For Anthem, this means that an account headquartered in one of its 14 states cannot become "Qualified" to receive a second Blue bid unless 70% of its employees are located outside of Anthem's 14-state territory.

The 14-state Anthem territory includes 33% of the population of the United States. Assuming that the National Account's employees are apportioned throughout the United States in proportion to the population, no account headquartered in an Anthem state would be able to meet the dispersion requirement and receive a second Blue bid. Under that assumption, the highest level of dispersion that a National Account could attain would be 67%. Furthermore, the likelihood that a National Account headquartered in Anthem's service area would be able to request a second Blue bid is even lower than that analysis indicates. The proportion of a National Account's employees living in the state of its headquarters is highly likely to exceed that state's proportion of the U.S. population – meaning that the dispersion rate outside of the Anthem service area is likely to be below the proportion of the U.S. population located outside of Anthem's service area. Under those very reasonable assumptions, the possibility of a National

[21] Objectors respectfully request that the Court compare our estimated rate of dispersion needed to qualify for a second Blue bid to the actual rate calculated by the sub-class economic consultants.

Account located in Anthem's service area being able to request a second Blue bid becomes unlikely.

The result is that the largest and most powerful Blue – which has already been held to have market power in the National Accounts market[22] – is unlikely to face any significant competition from second Blue bids. For example, due to being headquartered in an Anthem state large employers with a broad national presence – such as Objector Kroger, with over 220,000 covered employees, will be unable to seek a second Blue bid.[23] This result is neither fair, reasonable nor adequate as it (1) inappropriately shields the largest Blue with significant National Account market power from increased competition from second Blue bids, and (2) treats unequally, relative to other class members, accounts that are headquartered in Anthem's Service Area and will have little opportunity to seek a second Blue bid.

## VI. The Proposed Settlement Treats Class Members Unequally Relative to Each Other in Numerous Other Ways

As explained above, Objectors should be permitted to opt out of the injunctive relief settlement because the proposed settlement violates Rule 23(e)(2(D) by treating the injunctive relief class members unequally relative to each other by (1) denying class members who opt out of the damages class benefits provided for in the injunctive relief class settlement (Sec. III above) and (2) denying class members headquartered in Anthem's territory equal ability to request a second Blue bid (Sec. V above). But that is just the beginning. As explained below, the proposed settlement agreement treats the injunctive relief class members unequally in additional other ways.

---

22 *U.S. v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.C.D.C. 2017); *aff'd*, 855 F.3d 345 (D.C. Cir. 2017).

23 Kroger is headquartered in Ohio, which is an Anthem state.

### A. Taft-Hartley Plans

Taft-Hartley Plans are union-sponsored plans that often include the employees of more than one employer. Ten of the Objectors are Taft-Hartley Plans.[24] Taft-Hartley plans often include employees in multiple states and often include more than 5,000 plan members. Unlike other class members, however, the Taft-Hartley Plans are categorically excluded from ever being a Qualified National Account able to request a second Blue bid. Specifically, Section A.1(sss) of the proposed settlement agreement defines "Qualified National Account" as a "Self-Funded Account" that is "an Employer with at least 5,000 employees in the U.S. and satisfies the dispersion analysis based on the D&B data." Section A.1(z) of the proposed settlement, however, specifically states that "Taft-Hartley trusts ... are not Employers" within the meaning of the agreement. As a result, a Taft-Hartley Plan cannot be a Qualified National Account.[25] The proposed settlement agreement also precludes "multiple employer welfare arrangements, association health plans, [and] retiree groups..." from ever being a Qualified National Account. Settlement Agree. Sec. A.1(z). No explanation or reason is given for the exclusion of all of these class members from access to a second Blue bid. This unequal treatment of the Taft-Hartley and other plans was not mentioned in the moving papers or at the oral presentation of the motion.[26] The only apparent reason for these exclusions is the desire of the defendants to avoid as much Blue-on-Blue competition as possible. Objectors respectfully submit that the Court should not

---

24 *See* fn.1, *supra*.

25 *See* Settlement Agree., Sec. A.1(u), (z), and (sss).

26 Objectors do not mean to fault either class counsel or defense counsel for not previously bringing this or other issues to the Court's attention. The settlement is extensive and not every issue could possibly be mentioned in the moving papers or in open Court. Objectors' only point is that the Court has not previously been apprised of these issues and has not had the opportunity to evaluate or address them.

allow the defendants' desire to avoid competition to be achieved by treating class members unequally relative to each other in violation of Rule 23(e)(2)(D).

### B. Church Plans

The Church Plan Objectors are seven denominationally-sponsored church health care plans established for churches and ministry organizations associated with a particular church or convention or association of churches.[27] The Church Plan Objectors collectively provide health and welfare benefits through BCBS licensees to more than 185,000 covered lives – including ministers, priests, lay employees and their dependents--who are broadly dispersed throughout the country. Each Church Plan Objector provides health care coverage for the churches and other ministry organizations eligible to participate in a church plan. Federal and state law generally provides that church plans should be considered "single employer" plans.[28]

Each Church Plan Objector has purchased administrative services from a BCBS licensee and are treated as a single-employer national account by their respective licensee. The Church Plan Objectors contract with Blue Cross Blue Shield of Minnesota, Anthem Blue Cross Blue Shield, Highmark Blue Cross Blue Shield, and Blue Cross Blue Shield of Illinois.

The methodology used in the Settlement Agreement to determine what is a "Qualified National Account" is flawed and excluded the Church Plan Objectors from the Qualified National Account definition. As a result, the Church Plan Objectors cannot request a second Blue bid. Specifically, Section I.A(sss) of the Settlement Agreement requires that an employer must

---

27 *See* fn.1, *supra*.

28 For example, under section 414(e)(3) of the Internal Revenue Code, a church plan's members are deemed to be employed by a single employer, *i.e.*, by the church or a convention or association of churches (depending on the governance structure of a particular denomination). Likewise, a federal law (Public Law No. 106-244) provides that church health care plans are treated as a self-insured single employer plan for state insurance law purposes (not, e.g., MEWAs). Further church plans are not "association health plans.

have at least 5,000 plan members as measured by Dun & Bradstreet.  As a result,
notwithstanding the fact that each Church Plan Objector (i) covers more than 5,000 members, all
dispersed nationally, and (ii) is generally treated as a single employer under the federal laws *and
by the BCBS licensees themselves*, the Church Plan Objectors were excluded from the list of
Qualified National Accounts.  While the class representatives have not provided an explanation
for why this happened, it appears that the methodology employed ignores how church
denominations are structured and considered data regarding only the employees of the
denominational entity established to administer the church's benefit plans—disregarding the rest
of the participants enrolled in each plan. For example, the Benefits Plan of the Presbyterian
Church (U.S.A.) covers more than 27,000 ministers and lay employee participants and
dependents throughout the country, but the methodology used apparently counts only the 200
employees of the entity in Philadelphia that administers the benefits plan.

During the pendency of the litigation, denominational church plans have been confronted
with barriers under the BCBSA License Agreement National Account rules and other market
allocation policies of the defendants.  For example, a number of the church plans maintain an
informal purchasing group and have negotiated with BCBSA licensee Highmark as a church plan
user group for over 10 years (with each church plan maintaining an individual ASO agreement
with Highmark).  With the release of the preliminary Settlement Agreement, and the realization
that the Church Plan Objectors had been excluded from its second Blue bid provisions, several of
the Church Plan Objectors that use the administrative services of Highmark asked Highmark to
provide the second Blue bid right *contractually* in their renewal agreements with Highmark.
Highmark denied the request, stating that providing a second Blue bid would violate the BCBS
licensee terms.  This denial demonstrates that, instead of rectifying the harm to the Church Plan

Objectors, the Settlement Agreement will allow the BCBS licensees to continue *per se* illegal conduct to the detriment of the Church Plan Objectors' church health care plans. Moreover, other church health care plans have expressed interest in joining the Highmark purchasing group but have been prohibited from doing so because their current ASO agreements are with another Blues licensee, and they therefore are not permitted to obtain a competitive bid from Highmark.

Again, none of this harm to church plans was mentioned in the moving papers or at the oral presentation of the motion for approval of the settlement despite the Blues treating church plans as single employer plans from both operational and contractual perspectives. In fact, church plans were not addressed at all. The only apparent reason for excluding the Church Plan Objectors is the defendants' desire to avoid as much Blue-on-Blue competition as possible. That anticompetitive purpose, however, does not excuse the unequal treatment of the Church Plan Objectors relative to other class members, in direct violation of the requirements of Rule 23(e)(2)(D).

**C. The Dispersion Requirement**

As previously noted, the dispersion provision of the proposed settlement requires that approximately 70% of a plan's members be located outside of the service area of the local Blue in order for a National Account to request a second Blue bid. The proposed settlement acknowledges that National Accounts covering only half of the plan members who are in National Accounts will be allowed to request a second Blue bid and that ASOs with only 31% of the members who are in a self-funded plan will be able to do so. Settlement Agree., Sec. A.1(a), and A.1(u). This dispersion requirement violates Rule 23(e)(2)(D). The requirement allows some class members to seek second Blue bids while preventing many others from doing so. Why, for example, should an ASO with 50% of its employees located in the state where it is

headquartered and 50% dispersed into other states not be able to seek a second Blue bid? What legitimate policy is served by this unequal treatment of this ASO relative to other class members? The only apparent reason for this requirement is to protect the defendants from direct Blue-on-Blue competition. That reason, however, directly conflicts with policy of the Sherman Act and, in any event, is directly contrary to the requirements of Rule 23(e)(2)D).

**D. Class Members in States Covered by Two Blue Plans**

Some states have overlapping service areas in which two Blues are allowed to operate.[29] Settlement Agree., Appx. A. The proposed settlement agreement specifically provides that class members who reside in states covered by two Blue Plans cannot seek an additional Blue bid regardless of whether they satisfy the criteria for being a Qualified National Account.[30] The proposed settlement agreement categorically denies those class members an additional Blue bid while granting to other class members the right to request an additional Blue bid. Objector, Alaska Air Group, Inc., is among the class members who would be prevented from obtaining an additional Blue bid by this provision.

Once again, in direct contravention of Rule 23(e)(2)D), class members are treated unequally relative to each other by this "two Blues in a state" rule. And, once again, the only reason for this unequal treatment is the defendants' desire to avoid direct horizontal Blue-on-Blue competition wherever possible.

---

29 These states are: California, Missouri, New York, Pennsylvania, Virginia and Washington.

30 The proposed settlement agreement at Sec. C 15 states: "Where the Qualified National Account has the right to request a bid from more than one Settling Individual Blue Plan under the current BCBS rules (*e.g.*, the Qualified National Account's headquarters is located in multiple Settling Individual Blue Plans' Service Areas), this term is satisfied and the Qualified National Account should not have the right to request any additional bids from other Settling Individual Blue Plans."

**E. The Effect of the Local Best Efforts Rule on Green Competition**

Originally, the alleged damages class was defined to include only subscriber plans with less than 200 members. Only at the very last minute when the settlement negotiations were finished and the settlement was about to be presented to this Court was the sub-class, composed of much larger self-funded ASO plans and National Accounts with tens or hundreds of thousands of plan members, added to the case through the amendment of the complaint and the class definition.

The settlement agreement leaves unchanged the Local Best Efforts rules, which requires that "at least eighty percent of a Plan's annual health revenue from within its designated service area must be derived from services offered under the Blue Marks." SJ Op., 308 F. Supp. 3d at 1255-56. Because the original class members were small plans with only 200 or fewer members, it is reasonable to expect that the Blue whose service area includes the state in which the small plan is headquartered would be able to offer that plan a green proposal without pushing its local non-Blue revenue below the 80% floor.

The expectation, however, for the large National Account sub-class members is just the reverse. If a Blue offers a green bid to a large national account headquartered in its home state it is much more likely to push to the local non-Blue revenue below the 80% floor. The same result would occur for any Blue seeking to provide a green alternative to a National Account that had a large number of their covered lives in that Blue's ESA. The result, once again, is that class members are not treated equally relative to each other. The original damages class members with 200 or fewer plan members are significantly more likely to qualify for green competitive bids while the newly added sub-class members are significantly less likely to qualify.

But the negative effects of retaining the Local Best Efforts rules are far worse than just the unequal treatment of class members, as the retention of those rules will severely limit the amount of green competition that is permitted by the proposed settlement. If a Blue located in state X seeks to compete for a National Account located in adjacent state Y, it can do so by offering the account a green bid. However, the green revenue attributable to the National Account's employees will push down the percentage of local Blue revenue that the Blue receives from its Service Area. In other words, the retention of the Local Best Efforts rules is not innocuous. The Local Best Efforts rules will restrict the amount of green competition that can take place for the business of large National Accounts.[31]

It may be argued that the Local Best Efforts rules are intended to insure that each Blue spends adequate time, effort and resources in its territory marketing Blue products. Such rules would be unnecessary, however, if Blues could freely enter each other's territory. Competition would insure that adequate time, effort and resources would be devoted to marketing Blue products in each state. The consequence of preserving the Local Best Efforts rules is that green competition will be minimized and less available to large, self-funded, sub-class members. This too is directly in conflict with the policy of the Sherman Act and requirements of Rule 23(e)(2)(D).

## VII. Class Members with Arbitration Rights Should Not Have Been Forced into this Proceeding

A number of the Objectors have entered into agreements with one of the defendant Blues providing the Objector with the right to have its antitrust claims against that defendant resolved

---

31 Objectors have requested in writing that defendants and class counsel advise Objectors if we have misunderstood in any way how the green competition and the Local Best Efforts rules will work under the proposed settlement agreement. We have received no reply.

in arbitration outside of a mandatory class action. For example, Objector, Tractor Supply Medical Plan's agreement with BCBS of Tennessee provides that "any dispute related to this agreement … shall be resolved through binding arbitration."[32] The BCBS of Tennessee agreements with Objectors Bridgestone, Inc. and Dollar General contain that identical arbitration provision.[33] Similarly, the agreement between Objector, Indiana Kentucky Carpenters Welfare Fund and Anthem provides that any party that wishes to pursue "any dispute … relating to this Agreement … shall commence arbitration by filing an arbitration demand with the American Arbitration Association." The Agreement further provide that the Fund "shall not have the right to participate as a member of a class of claimants."[34] Objectors, United National Foods, Inc., Supervalu, Inc., and McLane Companies, Inc., similarly have agreements with their respective Blue provider/defendant that provide for the mandatory arbitration of disputes between the parties.[35] Although the damage has already been done by virtue of the fact that these Objectors

---

32 BCBS of Tennessee/Tractor Supply Medical Plan Agreement, attached to the Declaration of Paul E. Slater (filed under seal) as Ex. A, at ¶4.1.

33 BCBS of Tennessee/Bridgestone, Inc. Agreement, attached to the Declaration of Paul E. Slater (filed under seal) as Ex. B, at ¶4.1; BCBS of Tennessee, Inc./Dollar General, Inc. Agreement, attached to the Declaration of Paul E. Slater (filed under seal) as Ex. C, at ¶4.1.

34 Administrative Services Agreement between Indiana Kentucky Carpenters Fund and Anthem, Inc., attached to the Declaration of Paul E. Slater (filed under seal) as Ex. D, at Art. 26(a) and (b).

35 *See* Administrative Services Agreement between United National Foods, Inc. and Anthem Health Plans, d/b/a Anthem BC&BS, Art. 27(a) ("In the event any … claim … arises between the parties … the dispute shall be resolved through arbitration"), attached to the Declaration of Paul E. Slater (filed under seal) as Ex. E; BCBS of Minnesota 2019 Serv. Agree. With Supervalu, Inc., Art. VI, ¶5(a) ("Any controversy or dispute … arising between the parties ... shall be resolved by … binding arbitration"), attached to the Declaration of Paul E. Slater (filed under seal) as Ex. F; Administrative Services Agreement, Jan. 1, 2020, between BCBS of Texas and McLane Companies, Inc., ¶4.10(b) ("Employer may submit any dispute [with "regard to any matter"] to confidential binding arbitration…."), attached to the Declaration of Paul E. Slater (filed under seal) as Ex. G.

are now being forced into these legal proceedings, this Court should not allow the Blues to inflict further harm by mandating their inclusion in a non-opt-out class settlement.

The Federal Arbitration Act ("FAA") provides that "A written provision … to settle by arbitration a controversy … shall be valid, irrevocable and enforceable." 9 U.S.C. §2. The Supreme Court has held that Section 2 of the FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements" and that "any doubts concerning the scope of arbitration should be resolved in favor of arbitration." *Moses H. Cone Mem. Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983). The Supreme Court has further held that the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that the district court *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." (emphasis original). *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1983). The Supreme Court has further held that the language of §2 of the FAA "reflects the overarching principle that arbitration is a matter of contract" and that "courts must 'rigorously enforce' arbitration agreements according to their terms." *American Express Co. v. Italian Colors Restaurants*, 570 U.S. 228, 232-33 (2013). As a result, the Supreme Court has held that where there is a binding arbitration agreement, a class action cannot proceed in court and that "Congressional approval of Rule 23" does not "establish an entitlement to class proceeding for the vindication of statutory rights" in the face of an arbitration agreement. *Id.* at 234. Indeed, the Supreme Court has stated that where the parties have agreed to arbitrate, "it would be remarkable for a court to erase that expectation" (*id.*) and that an antitrust class action could not proceed in court even if the agreed-upon arbitration left a litigant without "a procedural path to vindication" of its legal rights. *Id.* at 233.

In *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237 (S.D.N.Y. 2004), the district court certified a class, but on reconsideration held that unless the arbitration agreements brought to its attention were tainted by unconscionability, class members who had signed arbitration agreements could not be included in the class. *Id.* at 250-52, 260. Similarly, in *Arena v. Intuit, Inc.*, U.S. Dist. Ct. for N.D. Calif., Case No. 19-cv-02546-CRB, March 5, 2021, the class sought approval of a proposed settlement. Some of the class members had entered into arbitration agreements and although the settlement allowed them to opt out of the class, the court held that opt-out requirements were unfair and "unduly burdensome" and "will seriously burden many arbitration claimants." *Id.* at 5-6, 12, 13, 17.[36] Due to the undue burden placed on class members with arbitration rights, the court denied the motion to approve the proposed settlement and held that, because of the undue burden on class members with arbitration rights, the proposed settlement "does not satisfy Rule 23(e)(2) because it is not fair, reasonable and adequate." *Id.* at 12. The current situation is, of course, far worse. Here, the

---

36 The unduly burdensome opt-out procedures identified by the Court in *Intuit* are also present in the opt-out procedures in this case. In *Intuit*, the court held that the requirement of mailing original "wet" ink signature on an opt-out request (Slip Op. at 6), as opposed to an electronic filing, was "unduly burdensome"; "will seriously burden many arbitration claimants"; and "serves little purpose but to burden those who wish to opt out." *Id.* at 17. As a result, the court held that the settlement agreement did not treat class members equally and could not be approved because it did not satisfy Rule 23(e) as it "is not fair, reasonable and adequate." *Id.* at 12, 13. The opt-out procedures required by the proposed settlement in this case similarly require "your personal, physical signature (electronic signatures … are not permitted and will not be considered personal signatures." Sec. 12, Long Form Notice attached to Mem. in Support of Motion for Approval of a Plan for Notice, Doc. #2611-2, Ex. D. The opt-out provision also provides that any opt-out forms signed "by your lawyer are not valid." *Id.* This provision too has been disapproved of by the courts. *See Abernathy v. Doordash, Inc.*, U.S. Dist. Court N.D. Cal. No. C19-07545 WHA, Feb. 10, 2020 (stating that provision that "seeks to prevent opt-outs via petitioners' counsel and instead requires an original ink signature by each individual … is an obvious attempt to make it as hard as possible for petitioners to opt out….").

arbitration claimants are not burdened with unreasonable opt-out procedures; they are precluded from opting out at all.

The posture of the current proceedings have already impaired Objectors' arbitration rights and Objectors have no reasonable alternative other than to pursue their claims in this court through direct action proceedings. The Objectors should not, however, have been placed in this position by the defendants. Allowing the Objectors to opt out of the proposed class settlement will at least protect their ability to seek their own relief against the Blues without further impairing their legal rights.

## VIII. The Proposed Settlement Imposes an Unconstitutional Gag Order on the Injunctive Relief Class Members

The proposed settlement agreement states that the "Parties … agree not to criticize or denigrate opposing Parties … to any person or entity (including but not limited to any media outlet, television station or program, radio station of program, newspaper, magazine … [or] journalist …) regarding any matter related to the Agreement or any [pleadings in this case]." Doc. #2610-2, Sec. I.58, p. 57. The proposed agreement defines "Parties" to include "any person or entity within the … Injunctive Relief Class." *See* Settlement Agree., Sec.A.1(lll) and (llll). This proposed restriction on speech runs for five years and is not limited to commercial speech, which "does no more propose a commercial transaction"[37] such as solicitation to represent opt-outs. To the contrary, the restriction prohibits completely truthful commentary on important matters of public debate – such as the competitiveness of the American health care system – for five years after the class action is resolved.

---

37 *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 761-62 (1976).

The proposed final order imposes this gag order on the Objectors and the other non-opt-out injunctive relief class members.[38] Thus, the motion for approval requests this Court to order the Objectors and others not to make truthful, non-defamatory statements of fact or opinion critical of the settlement or the defendants. As explained below, such an order would constitute (1) a violation of the First Amendment and (2) an abuse of discretion under Rule 23.

The Supreme Court has held that 'prior restraints on speech … are the most serious and the least tolerable infringements on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). The Court has also held that "court orders that actually forbid speech activities are classic examples of prior restraints." *Alexander v. U.S.*, 509 U.S. 544, 550 (1993). Because of the danger posed by prior restraints, they can be justified only by "a grave threat to a critical government interest" and even then they are permitted only when the threat "cannot be militated by less intrusive measures." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226-27 (6th Cir. 1996); *see also Nebraska Press Ass'n*, 427 U.S. at 570 (rejecting prior restraint purportedly designed to ensure defendant a fair trial); *New York Times Co. v. U.S.*, 403 U.S. 713 (1971) (rejecting prior restraint despite government claim that the speech would jeopardize national security). In *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419-20 (1971), the Supreme Court stated that "no prior decisions" support the contention "that the interest of an individual in being free from public criticism of his business practices" could justify a prior restraint.

---

38 *See* Proposed Final Order (Ex. C to Motion for Prelim. Approval), Doc. #2610-4, at ¶2 (incorporating the settlement agreement into the final order); ¶11 (approving of the settlement agreement "in all respects"); ¶23 (court retains jurisdiction to enforce the terms of the settlement agreement); ¶28 (ordering Parties (including class members) to implement settlement agreement "in accordance with its terms").

In *Bernard v. Gulf Oil Co.*, 619 F.2d 459 (5th Cir. 1980), the district court imposed a gag order on the class members, counsel and the parties that was far narrower than the gag order requested in this case. The *Bernard* order prohibited communications with class members, including the solicitation of legal representation, requests to opt out of the class, and descriptions of the class action. *Id.* at 465. On appeal, the Fifth Circuit held that "the order entered in this case is an unconstitutional prior restraint." *Id.* at 467. The Court held that the right of class members to discuss the case was protected speech (*id.* at 471) and that the restraint was not justified because it did not "prevent direct, immediate and irreparable damage" and, in any event, was not the least restrictive means of doing so." *Id.* The Court further held that the legal presumption against prior restraints "is not mitigated by a claim that the fair and orderly administration of justice is at stake" and that Rule 23 does not "create an exception to the principles governing prior restraints." *Id.* at 474-75. The Court also pointed out that no evidence supported the likelihood of future abuse and that the district court had made no finding of threatened and imminent harm. The Court therefore concluded that the "order restricting communication by the parties and their counsel … is an unconstitutional prior restraint." *Id.* at 477.

The gag order in the current case is even less defensible than the order held unconstitutional in *Bernard*. The order requested in this case not only prohibits communication with class members, but with the press. It is not even arguably directed at an imminent threat of irreparable harm. Indeed, it prohibits speech for five years into the future – long after the class action will be resolved. Worse, the motion for approval identifies no threat of abuse or harm, much less irreparable injury. Criticizing the defendants or the positions they have taken in this

case is not a cognizable injury. It is protected speech. Certainly, no evidence has been presented and no findings to the contrary have been made by this Court as is required by *Bernard*.[39]

The decision in *Bernard* was appealed to the Supreme Court. The Supreme Court held that it was not necessary to reach the constitutional/prior restraint issue even though "the order involved serious restraints on expression." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 104 (1981). Instead, the Supreme Court acknowledged that under Rule 23(d) a district court has discretion to issue orders dealing with procedural matters in class actions (*id.* at 99), but held nonetheless, as a matter of law, that it was an abuse of discretion for the district court to issue "an order limiting communications" (*id.* at 101) without "a specific record showing by the moving party of the particular abuses by which it is threatened" and "factual findings ... supporting the need for this sweeping restraint order (*id.* at 101-03).

In the current case, as in *Bernard*, there has been no showing or finding of any threatened abuse or harm. Nor has this Court made, or even been asked to make, any factual finding that the restraint requested is the least restrictive alternative necessary to achieve the desired result. Under these circumstances, as in *Bernard*, the requested order of restraint is unconstitutional and Objectors should be permitted to opt out in order to avoid such restraint on their speech.

**Conclusion**

The Objectors will opt out of the damages class and seek their own monetary relief. As a result, Objectors have no occasion to comment on the fairness or adequacy of the proposed monetary settlement or its allocation. Objectors also seek to opt out of the injunctive relief class

---

39 *See also Kleiner v. First National Bank of America*, 751 F.2d 1193, 1205 (11th Cir. 1985) (holding that the gag order in *Bernard* "was constitutionally deficient because the suppressed expression posed no certain threat of direct, immediate and irreparable harm; because the order was not narrowly drawn and limited to the least restrictive means of regulation; and because it lacked predicate findings of abuse.").

and seek their own forward-looking relief. Objectors ask for this opt out right because they strongly object to the terms of the proposed injunctive relief settlement. The terms of that proposed non-opt-out 23(b)(2) settlement (1) fail to equitably treat the Objectors relative to other class members by punishing the Objectors with the loss of injunctive relief benefits for exercising their constitutional right to opt out of the damages class; (2) enforce and require the release of future *per se* violations of §1 of the Sherman Act; (3) improperly shield from competition and protect the market power of the largest Blue, Anthem; (4) violate Rule 23(e)(2)(D) by treating inequitably the injunctive class members relative to each other by granting to some the ability to request a second Blue bid while denying it to others; (5) have already impaired the contractual arbitration rights of certain Objectors; and (6) unconstitutionally imposes a prior restraint of the Objectors' speech. For these reasons, the terms of the injunctive relief settlement cannot be deemed fair, reasonable and adequate and Objectors should be permitted to opt out of the injunctive relief settlement agreement. In the alternative, approval of the injunctive relief class settlement should be denied.

Dated: July 26, 2021

Respectfully submitted,

Paul E. Slater
Joseph M. Vanek
David P. Germaine
Eamon P. Kelly
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Email: pes@sperling-law.com
jvanek@sperling-law.com
dgermaine@sperling-law.com
ekelly@sperling-law.com

*Counsel for Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc. Welfare*

*Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; Big Lots, Inc.; Big Lots Associate Benefit Plan; Conagra Brands, Inc.; ConAgra Foods, Inc. Welfare Benefit Wrap Plan; FedEx Corporation; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; Kellogg Company; Kellogg Company Welfare Benefit Plan; McLane Company, Inc. McLane Company, Inc. Welfare Plan; Meijer Inc. including its affiliates Meijer Great Lakes LP, Meijer Stores LP, and Town Total Health LLC; Meijer Health Benefits Plan; Publix Super Markets, Inc.; Publix Super Markets, Inc. Group Health Benefit Plan; United Natural Foods, Inc., including its affiliates SUPERVALU, INC.. and Unified Grocers, Inc. ("UNFI"); UNFI Health and Welfare Plan; Indiana/Kentucky/Ohio Regional Council of Carpenters Welfare Fund; Ohio Carpenters Health Fund; SEIU Local 1 & Participating Employers Health Trust; The Local No. 1 Health Fund; Plumbers' Welfare Fund, Local 130, U.A.; The Sheet Metal Workers Local 73 Welfare Fund; Chicago Painters and Decorators Welfare Fund; The Carpenters and Joiners Welfare Fund; Heartland Health & Wellness Fund; GuideStone Financial Resources of the Southern Baptist Convention; The Church Pension Group (Episcopal); General Board of Pension and Health Benefits of the United Methodist Church; Concordia Plan Services (the Missouri Synod Lutheran Church's benefit board); Portico Benefits Services (the Evangelical Lutheran Church in America's benefit board); Christian Brothers Services (a church plan benefits board created by the Christian Brothers religious order); The Board of Pensions of the Presbyterian Church U.S.A.*

By: /s/ Phillip F. Cramer

Phillip F. Cramer
J. Scott Hickman
Eric G. Osborne
Sherrard Roe Voigt & Harbison, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Tel: (615) 742-4200
Fax: (615) 742-4539
Email: pcramer@srvhlaw.com

shickman@srvhlaw.com
eosborne@srvhlaw.com

*Counsel for The Boeing Company; Employee Benefits Plan Committee of The Boeing Company, as the plan administrator and named fiduciary of The Boeing Company Master Welfare Benefit Plan; Bridgestone Americas, Inc.; Bridgestone Americas, Inc. Employee Group Insurance Plan; Bridgestone Americas, Inc. Retiree Medical Plan; CHS/Community Health Systems Inc.; Community Health Systems Group Health Plan; Dollar General Corporation; Dollar General Health Plan (a component of the Dollar General Corporation Employee Benefits Plan); FedEx Corporation; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; Tractor Supply Company; Tractor Supply Company Health & Welfare Plan*

By: /s/ Jason A. Zweig
Jason A. Zweig
Keller Lenkner LLC
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
Tel: (312) 216-8667
Email: jaz@kellerlenkner.com

*Counsel for Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc. Welfare Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; Big Lots, Inc.; Big Lots Associate Benefit Plan; BNSF Railway Company; Burlington Northern Santa Fe LLC (f/k/a Burlington Northern Santa Fe Corp.); Burlington Northern Santa Fe Group Benefits Plan; Burlington Northern Santa Fe Corporation Welfare Benefit Trust; The Burlington Northern Santa Fe Employee Benefits Committee for the Burlington Northern Santa Fe Corporation Group Benefits Plan; FedEx Corporation; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; McLane Company, Inc.; McLane Company, Inc. Welfare Plan*

By: */s/ William Blechman*

William J. Blechman, Esquire
Samuel J. Randall, Esquire
KENNY NACHWALTER, P.A.
1441 Brickell Avenue, Suite 1100
Miami, Florida  33131
Tel:                        (305) 373-1000
Fax:                       (305) 372-1861
E-mail:                  wblechman@knpa.com
                              srandall@knpa.com

*Counsel for Albertsons Companies Inc., New Albertsons
L.P., Albertson's LLC, New Albertson's Inc., and Safeway
Inc..; Albertsons Companies, Inc. Health and Welfare
Plan, f/k/a Albertson's LLC Health & Welfare Plan; New
Albertson's Inc. Health and Welfare Plan; Hy-Vee Inc.;
Hy-Vee and Affiliates Benefit Plan and Trust; The Kroger
Co., 84.51 LLC, and Murray's Cheese LLC;  The Kroger
Co. Health and Welfare Benefit Plan; 84.51, LLC Health
& Welfare Plan; Walgreens Co.; Walgreen Health and
Welfare Plan (Plan No. 501) f/k/a Walgreen Major
Medical Expense Plan*

# Exhibit A

## Statement of Objections to Class Action Settlements Made within the Last Five Years by Objectors' Counsel

| Firm | Objections Made within Last Five Years |
|---|---|
| 1. Sperling & Slater, P.C. | None |
| 2. Sherrard Roe Voigt Harbison | None |
| 3. Kenny Nachwalter, P.A. | None |
| 4. Keller Lenkner LLC | See below |

Keller Lenkner LLC has made the following three objections to class-action settlements within the last five years:

1. *Arena et al., v. Intuit, Inc.*, 19-CV-02546 (N.D. Cal.)(Breyer, J.). Keller Lenkner LLC represented nearly 125,000 individual consumers in individual arbitrations and objected to a proposed class-action settlement with Intuit. The objection was granted, preliminary approval was denied, and the settlement was ultimately abandoned by the plaintiffs. Attached hereto is a copy of the March 15, 2021 memorandum denying preliminary approval of the settlement by Judge Breyer.

2. *Rimler et al v. Postmates, Inc.*, Case No. CGC-18-567868 (Superior Court of Cal., County of San Francisco). On November 6, 2019, on behalf of its clients who were parties to individual arbitrations against Postmates, Keller Lenkner LLC filed an objection to a class action settlement with Postmates. On November 26, 2019, the Court ordered that plaintiffs make modifications to the settlement. A copy of that order is attached.

3. *Marciano et al. v. Doordash, Inc.*, Case No. CGC-18-567869 (Superior Court of Cal., County of San Francisco). On December 20, 2019, on behalf of its clients who were parties to individual arbitrations against Doordash, Keller Lenkner LLC filed an objection to a class action settlement with Doordash. On March 26, 2020, before the objection was ruled upon, Keller Lenkner LLC withdrew the objection. Thus, there is no order to attach with respect to this objection.

**Statement of Counsel**

Under penalty of perjury, counsel for the Objectors state that all of the information set forth in the National Account Objectors' Memorandum in Support of Motion to Opt Out of Entire Settlement or, in the Alternative, Opposition to the Approval of the Proposed Injunctive Relief Class Settlement, including all of the attachments thereto, is true and correct to the best of counsel's knowledge and belief.

Counsel for Objectors

Paul E. Slater
Sperling & Slater, P.C.

Jason A. Zweig /pes
Jason A. Zweig
Keller Lenkner, LLC

William J. Blechman /pes
William J. Blechman
Kenny Nachwalter, P.A.

Phillip F. Cramer /pes
Phillip F. Cramer
Sherrard Roe Voigt Harbison

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **In re Blue Cross Blue Shield Antitrust Litigation** | MDL No. 2406<br>Master File No. 2:13-cv-2000-RDP<br>**Contains Confidential Information: TO BE FILED UNDER SEAL** |

**DECLARATION OF PAUL E. SLATER IN SUPPORT OF NATIONAL ACCOUNT OBJECTORS' MEMORANDUM IN SUPPORT OF MOTION TO OPT OUT OF ENTIRE SETTLEMENT OR, IN THE ALTERNATIVE, OPPOSITION TO THE APPROVAL OF THE PROPOSED INJUNCTIVE RELIEF CLASS SETTLEMENT**

1. Paul E. Slater submits this Declaration in Support of the National Account Objectors' Memorandum in Support of Motion to Opt Out of the Entire Settlement or, in the Alternative, Opposition to the Approval of the Proposed Injunctive Relief Class Settlement.

2. I am a partner in the law firm of Sperling & Slater, P.C., and am one of the attorneys representing the National Account Objectors.

3. On January 20, 2021, I participated in a Zoom conference call with my co-counsel, Mr. Phillip Cramer; counsel for the sub-class, Mr. Warren Burns; and five economists from the BVA Group, who were retained to advise the sub-class. The BVA Group economists were: Scott Dalrymple, Prof. Joseph Mason, Jody Bland, Todd Goldwasser, and Cooper Groves.

4. During the course of the conference call the BVA Group economists stated that they had calculated the dispersion rate that a National Account would have to attain in order to become a Qualified National Account able to request a second Blue bid before the cumulative

cap of 33 million covered lives within the Qualified National Account category was reached. We were specifically told that the dispersion rate that the BVA Group had calculated was 67.8%.

5.    This means that 67.8% of the employee plan members of a National Account will have to reside outside of the territory of the Blue in which the National Account is headquartered in order for it to be a Qualified National Account able to request a second Blue bid.

6.    Attached hereto are the respective agreements between each of seven Objectors and a defendant Blue.  The agreements are attached hereto as Exs. A, B, C, D, E, F and G.  Each agreement contains an arbitration clause identified below:

    i)    Agreement between Tractor Supply Co. Medical Plan and BlueCross and BlueShield of Tennessee, Inc. (Eff. Jan. 1, 2009), at Art. 4.1.  Attached as Ex. A.

    ii)    Agreement between Bridgestone Americas, Inc. and BlueCross BlueShield of Tennessee, Inc. (Eff. Jan. 1, 2016), at Art. 4.1.  Attached as Ex. B.

    iii)    Agreement between Dollar General Corp. and BlueCross BlueShield of Tennessee, Inc. (Eff. Jan. 1, 2018), at Art. 4.1. Attached as Ex. C.

    iv)    Agreement between Indiana Kentucky Carpenters Fund and Anthem Insurance Cos., Inc. (Eff. July 1, 2008), at Art. 26(a) and (b).  Attached as Ex. D.

    v)    Agreement between United National Foods, Inc. and Anthem Health Plans (Eff. June 1, 2004), at Art. 27(a) and (b).  Attached as Ex. E.

    vi)    Agreement between Supervalu Inc. and BlueCross and BlueShield of Minnesota (Eff. Jan. 1, 2019), at Sec. 5.  Attached as Ex. F.

vii) Agreement between McLane Companies, Inc. and BlueCross and BlueShield of Texas (Eff. Jan. 1, 2020), at Sec. 4.10(a) and (b). Attached as Ex. G.

I declare that the foregoing is true and correct to the best of my knowledge and belief.

July 26, 2021

Paul E. Slater

# EXHIBIT
# 2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ----------------------------------------------------x | |
| x | MDL No. 2406 |
| **In re Blue Cross Blue Shield** x | |
| **Antitrust Litigation** x | Master File No. 2:13-cv-2000-RDP |
| x | |
| ----------------------------------------------------x | |

**TAFT-HARTLEY PLAN OBJECTORS' MEMORANDUM IN OPPOSITION TO THE APPROVAL OF THE PROPOSED CLASS SETTLEMENT**

## I. Introduction

The class and subclass have asked the Court to approve class settlements for the opt-out-damages class under Rule 23(b)(3) and for the non-opt-out, injunctive-relief class under Rule 23(b)(2). The Taft-Hartley Objectors[1] are union affiliated "Taft-Hartley" plans that are part of both settling classes. They oppose the proposed settlement because it fails to treat all class members equally relative to each other as required by Rule 23(e)(2)(D).

The "Taft-Hartley" Objectors are all multiemployer health and welfare plans. All plans that provide health benefits are "welfare plans" under Section 3(1) of ERISA.[2] "Taft-Hartley" plans are organized under the Labor Management Relations (Taft-Hartley) Act.[3] Among other requirements, such plans must be administered through a trust whose trustees consist of equal numbers of employer-appointed trustees and employee-appointed trustees. There are Taft-Hartley welfare plans to which more than one employer contributes pursuant to collective bargaining agreements, which are multiemployer plans under Section 3(37)(A) of ERISA.[4] As of 2018, there were more than 1,600 multiemployer welfare plans providing health benefits, providing those benefits to more than 5 million participants.[5] Multiemployer plans are found in a variety of industries, such as construction, retail trade and service (including lodging and health care workers); manufacturing;

---

1 The Taft-Hartley Objectors include The Chicago Area I. B. of T. Benefits Health and Welfare Trust Fund; the Bakery Cracker Pie & Yeast Wagon Drivers Local 734 Welfare Fund; the Structural Iron Workers Local #1 Welfare Fund; the Building Material Chauffeurs, Teamsters and Helpers Welfare Fund of Chicago; and the United Food and Commercial Workers Local No. 1546 Food Handlers Welfare Fund.

2 Employee Retirement Income Security Act of 1974, as amended ("ERISA") 29 U.S.C. § 1002(1).

3 29 U.S.C. § 186(c)(5).

4 29 U.S.C. § 1002(37)(A).

5 Group Health Plans Report, 2018 data, U.S. Department of Labor, January 2021 *available at* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/statistics/retirement-bulletins/annual-report-on-self-insured-group-health-plans-2021-appendix-a.pdf.

mining; trucking and transportation; arts and entertainment (film, television and theater);mining and communication.[6] Multiemployer plans offer the same types of employee benefits that individual companies provide for their employees, including health care benefits.[7] The difference between a single employer plan and a multiemployer plan is that the multiemployer plan uses a trust vehicle to provide benefits to the employees of multiple employers—a different path with the same result. But as discussed below, certain single employer plans are eligible for Second Blue Bid injunctive relief whereas multiemployer plans (that may be the same size as, or larger than, eligible single employer plans) are categorically excluded, leading to an arbitrary result.

In particular, the proposed settlement arbitrarily excludes all Taft-Hartley plans from the right to obtain a second Blue bid as provided to other self-funded, administrative-services-only ("ASO") plans. Thus, for the Taft-Hartley plans, the proposed settlement would preserve the illegal territorial allocation restraints while simultaneously forcing those plans to give five years of prospective releases to the Blue Cross defendants for an unabated antitrust violation. And not only does the proposed settlement expressly exclude Taft-Hartley plans from the right to obtain a second Blue bid, but it also erects additional barriers—through a dispersion provision that requiring 70 percent of a plan's employees to be outside the service area of the local Blue, and through a minimum-employee threshold barring all Taft-Hartley plans because they do not employ their members. The proposed settlement further excludes any plan, irrespective of the other requirements, that views the settlement fund allocation for ASOs as insufficient and exercises the

---

6 *See* https://www.ifebp.org/news/featuredtopics/multiemployer/Pages/default.aspx; Pension Benefit Guaranty Corp., Introduction to Multiemployer Plans, *available at* https://www.pbgc.gov/prac/multiemployer/introduction-to-multiemployer-plans which, although describing multiemployer pension plans, also applies to multiemployer welfare plans.

7 https://www.ifebp.org/news/featuredtopics/multiemployer/Pages/default.aspx.

right to opt out of the damages class. It further fails to secure representation for Taft-Hartley plans and unions members on the Monitoring Committee, which is designated to make rules and set rates with immunity from antitrust scrutiny for the next five years.

Finally, the Taft-Hartley Objectors oppose the proposed settlement because it would impose an unconstitutional gag order, prohibiting members of the non-opt-out class from criticizing Defendant Blue Cross and its member Blues in any public forum or news outlet "regarding any matter related to the Agreement or any of the allegations, claims or defenses in the complaint, answer and pleadings."

## II. Relevant Procedural History

In the original Class Action Complaint, filed July 1, 2013, the injunctive class was broadly defined to include Taft-Hartley plans and other ASOs. Dkt. 85, ¶262; *see also* Dkt. 1082, ¶314. But the relevant damages class was not so defined and did not include Taft-Hartley plans or other ASOs.

On April 5, 2018, this Court issued its opinion that the Blues' territorial trademark allocation is a *per se* violation of §1 of the Sherman Antitrust Act, Dkt. 2063. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241 (N.D. Ala. 2018) ("SJ Op."). As the opinion states, each member of the BCBS Association enters into a trademark license agreement with the Association. *Id*. at 1251. The license agreement grants to each Blue member an "exclusive service area" ("ESA") in which the member can use BCBS trademarks, and it prohibits the member from using the BCBS trademarks outside of its exclusive territory. *Id*. Under the license agreement and the BCBS Association rules, each BCBS member is prohibited from bidding "on a National Account headquartered outside of its [exclusive] service area using the Blue marks." *Id*. at 1256. The CEO of one Blue member admitted that "Plans benefit from the exclusive service areas

because it eliminates competition from other Blue Plans" and that, in the absence of the ESAs, "[t]here would be open warfare"—*i.e.*, free and open competition. *Id*. at 1253.

The BCBS Association and its member Blues have also agreed to a National Best Efforts rule and a Local Best Efforts rule. The National Best Efforts rule was adopted in 2005 and requires that Blue Plans derive at least 66⅔ percent of health insurance revenue from sales of Blue trademarked products. SJ Op., 308 F. Supp. 3d at 1256. The Local Best Efforts rule was adopted in 1994; it requires that Blue Plans derive at least 80 percent of their service-area health revenue from sales of Blue trademarked products. *Id*. at 1255-56.

The class had moved for summary judgment on grounds that the ESAs operate as a horizontal territorial allocation—*i.e.*, an agreement by the Blues not to enter each other's territory and compete against each other with Blue trademarked products—and thus are *per se* violations of §1 of the Sherman Act under *United States v. Sealy*, 388 U.S. 350 (1967), and *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972). This Court agreed with plaintiffs' understanding of precedent, stating that, in *Sealy*, "the Supreme Court held that the horizontal territorial restraints presented … were unlawful *per se* 'without the necessity for an inquiry in each particular case as to their business or economic justification, their impact on the marketplace, or their reasonableness.'" 308 F. Supp. 3d at 1261. Likewise, this Court stated that, in *Topco*, "[t]he Supreme Court held that the territorial restraints instituted by Topco were horizontal restraints, and, thus, *per se* violations of the Sherman Act." 308 F. Supp. 3d at 1261.

This Court also noted that, in *Sealy*, the horizontal competitors had not only agreed to exclusive territories for selling the trademarked products, but also had "initiated 'an aggregation

of trade restraints' that included price fixing." SJ Op., 308 F. Supp. 3d at 1261.[8] Thus, "like *Sealy*," this Court held that the plaintiff class in this case had "presented evidence of an aggregation of competitive restraints – namely, the adoption of the ESAs and … best efforts rules – which, considered together, constitute a *per se* violation of the Sherman Act." *Id*. at 1267.

After the Court of Appeals for the Eleventh Circuit declined to hear an interlocutory appeal of this Court's decision, the plaintiffs amended their proposed injunctive-relief class to exclude large self-funded plans. On October 30, 2020, the plaintiffs filed their Fourth Amended Class Complaint, in which they asserted, for the first time, class claims for plans with more than 200 members and class damage claims for the ASOs. Dkt.. 2609. That Complaint also reinstated the ASO injunctive-relief class claims that had been specifically abandoned.

Twenty-eight minutes after plaintiffs filed the Fourth Amended Class Complaint, the motion to approve a class settlement of claims—including the plaintiffs' newly minted damages and injunctive-relief claims for ASOs—was filed. Dkt. 2610. The proposed settlement allocates to ASO plans only 6.8 percent of the settlement fund and excludes most ASO plans from receiving a second Blue bid under the injunctive-relief provisions relating to the horizontal territorial allocation.

With respect to the injunctive relief, the proposed settlement agreement eliminates the National Best Efforts rule, which is one of the two offenses that resulted in the Court's *per se* ruling. But the proposed settlement leaves the territorial allocation scheme in place[9]—subject only to an exception available to a select group of Qualified National Accounts allowed to request a

---

[8]     *See Sealy*, 388 U.S. at 357.
[9]     The settlement agreement, at most, offers one additional Blue bid to only some class members. The elimination of the horizontal territorial allocation would require that all accounts be able to request an unlimited number of Blue bids.

second Blue bid. Even for that select group, the second Blue bid is available only if (among other requirements) the Blue cross member submitting the second bid agrees to pay the Home Blue a "Local Service and Support Fee." In exchange for this limited "relief," all members of the injunctive relief class are compelled to release their antitrust claims challenging the rules for five years into the future.

The Taft-Hartley plans are excluded from ever becoming a Qualified National Account and entitled to request a second Blue bid. Under the proposed settlement, a "Qualified National Account" is a "Self-Funded Account" and "an Employer with at least 5,000 employees in the U.S. and satisfies the [dispersion analysis based on the D&B data]." Settlement Agreement, Section A.1(sss). But the proposed settlement expressly states that "Taft-Hartley trusts … are not Employers" within the meaning of the agreement. *Id*. at A.1(z). In addition, many Taft-Hartley plans would not satisfy the dispersion analysis, which requires that approximately 70 percent of a plan's employees be located outside the service area of the local Blue. And no multiemployer plans can satisfy the 5,000-employee threshold because its members are employed by a collection of employers, not the plans themselves. Moreover, the proposed settlement provides that "multiple employer welfare arrangements, association health plans, [and] retiree groups" cannot be Qualified National Accounts. *Id*. at A.1(z). No explanation is given for excluding all these class members from access to a second Blue bid.

The Taft-Hartley plans are also excluded from ever becoming Qualified National Accounts, irrespective of the other requirements, if they determine that the small settlement fund allocation for ASOs is insufficient and elect to exercise the right to opt out of the damages class.

And they are excluded from representation on the five-member "Monitoring Committee" that that would oversee compliance with the settlement for a period of five years from the entry of

final judgment and order of dismissal—and would have authority to make rules that are immune from antitrust scrutiny.

The unequal treatment of the Taft-Hartley plans was not mentioned in the moving papers or at the oral presentation of the motion. Following the announcement of the class settlement, the Taft-Hartley Objectors alerted Class Counsel and Defendants regarding the objections presented herein, but the Defendants have refused to address them.

Each Objector joining in this objection is a Taft-Hartley plan:

- The Chicago Area I. B. of T. Benefits Health and Welfare Trust Fund and the Plan of benefits sponsored by the Chicago Area I. B. of T. Health and Welfare Trust Fund Chicago Area I. B. of T. Benefits Trust Fund (I.B. of T. Fund), the I. B. of T. is a Teamsters fund;[10]

- The Bakery Cracker Pie & Yeast Wagon Drivers Local 734 Welfare Fund and The Local 734 Welfare Fund Plan of Benefits;

- The Structural Iron Workers Local #1 Welfare Fund and The Welfare Benefits Plan Sponsored by the Structural Iron Workers Local #1 Welfare Fund;

- The Building Material Chauffeurs, Teamsters and Helpers Welfare Fund of Chicago and the Welfare Benefit Plan Sponsored by The Building Material Chauffeurs, Teamsters and Helpers Welfare Fund of Chicago; and

- the United Food and Commercial Workers Local No. 1546 Food Handlers Welfare Fund and the United Food and Commercial Workers Local No. 1546 Food Handlers Welfare Fund Plan of Benefits.

Supporting declarations for each of the Taft Hartley Objectors are attached as Exhibit 1. In addition, more than thirty Taft-Hartley funds and other labor-affiliated plans have signed statements in support of these objections. Those statements are attached as Exhibit 2.

---

[10]    The Plan Manager of the I.B. of T. fund, a Teamsters fund, is Tom Stiede. He previously served as President of the International Foundation of Employee Benefit Plans, a leading organization providing education, information, and research to multiemployer Taft-Hartley plans.

## III. Argument

### a. The Taft-Hartley plans are not treated equally relative to other injunctive-relief class members.

Under Rule 23(e)(2), a class settlement can be approved "only … on a finding that it is fair, reasonable, and adequate." With respect to that requirement, Rule 23 was amended in 2018 to add Section 23(e)(2)(D). The new section specifies that a proposed class settlement can be found to be "fair, reasonable, and adequate" only after the court considers whether "the proposal treats class members equitably relative to each other."

The determination that a proposed class settlement satisfies Rule 23(e)(2)(D) is "mandatory." *Peterson v. American General Life Ins. Co.*, 2019 WL 11093816, *5 (M.D. Fla. Oct. 22, 2019). For a proposed injunctive-relief settlement, the rule is satisfied when all members of the injunctive-relief class receive the same future benefits and the same policy is applied to all. *See*, *e.g.*, *M.D. et al. v. Centene Corp.*, 2020 WL 7585033, *7 (S.D. Fla. Oct. 7, 2020) (proposed injunctive-relief settlement satisfied Rule 23(e)(2)(D) because there was no distinction between the future benefits offered to class members); *In re Equifax, Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132 at *9 (N.D. Ga. Mar. 17, 2020) (Rule 23(e)(2)(D) (same).

Despite the mandatory requirement of Rule 23(e)(2)(d), the motion seeking approval of the proposed settlement in this case does not address the rule or even argue that the proposed settlement treats all members of the injunctive-relief class equitably relative to each other. Indeed, the proposed settlement does not treat Taft-Hartley plans equally for at least five reasons.

***First***, the proposed settlement explicitly excludes Taft-Hartley plans from the definition of a Qualified National Account, which is the status necessary for a plan to be entitled to a second Blue bid. A "Qualified National Account" is defined as a "Self-Funded Account" and "an Employer with at least 5,000 employees in the U.S." Settlement Agreement, Section A.1(sss), but

the proposed settlement expressly states that "Taft-Hartley trusts … are not Employers" within the meaning of the agreement, *id.* at A.1(z). The proposed settlement agreement also precludes "multiple employer welfare arrangements, association health plans, [and] retiree groups…" from ever being a Qualified National Account. Settlement Agreement Sec. A.1(z).

No explanation is provided for excluding all these class members, including all Taft-Hartley plans, from the entitlement to receive a second Blue bid. This unequal treatment was not mentioned in the moving papers or at the oral presentation of the motion.[11] The most straightforward (and only apparent reason) for these exclusions is that the defendants seek to avoid as much Blue-on-Blue competition as possible. Respectfully, Objectors submit that the Court should not allow the defendants to avoid competition by violating Rule 23(e)(2)(D) in treating class members unequally relative to each other.

***Second***, the proposed settlement ties the right to request a second Blue bid to a dispersion provision, which provides that approximately 70 percent of the plan's employees must be located outside of the local Blue's service area. While many Taft-Hartley plans have members in more than one state, including several widely dispersed national plans, other Taft-Hartley plans are concentrated in particular states and regions. The proposed settlement's dispersion requirement thus violates Rule 23(e)(2)(D) for the same reasons that the express exclusion of Taft-Hartley plans violates it: The requirement does not treat class members equally relative to each other. It allows some class members to seek second Blue bids while preventing many others from doing so.

---

[11] Objectors do not mean to fault either class counsel or defense counsel for not previously bringing this or other issues to the Court's attention. The settlement is extensive and not every issue could possibly be mentioned in the moving papers or in open Court. Objectors' only point is that the Court has not previously been apprised of these issues and has not had the opportunity to evaluate or address them.

Why should a plan with 50 percent of its employees located in the state where it is headquartered and 50 percent dispersed into other states not be able to seek a second Blue bid? What legitimate policy is served by this unequal treatment relative to other class members? As above, the most straightforward (and only apparent) reason for this unequal treatment is to minimize Blue-on-Blue competition. But that reason directly conflicts with the policy of the Sherman Act and violates Rule 23(e)(2)(D).

***Third***, the proposed settlement allows a second Blue bid only for employers with at least 5,000 employees as determined by Dun & Bradstreet. While many Taft-Hartley plans have more than 5,000 members, those members are employed by multiple employers, not the Taft-Hartley plans themselves. Imposing the minimum-employee threshold as written would effectively block all Taft-Hartley plans, regardless of how many members are in the plans, from obtaining second Blue bids. Nothing in the proposed settlement provides a legitimate basis for treating large Taft-Hartley plans differently from large employers.

Nor does the proposed settlement provide a legitimate basis for any minimum threshold—which, by definition, treats class members differently from each other. The disparate treatment cannot be justified by arguing that, even if allowed, no Blue would offer a second Blue bid to a plan with less than 5,000 members. If no Blue would make such an offer, then there is no reason for a horizontal agreement among competitors to preclude it.

In truth, the reason for the horizontal agreement is to limit Blue-on-Blue competition. According to the proposed settlement, there are approximately 106 million members in self-funded Blue plans, but the proposed settlement would make a second Blue bid available to plans covering, at most, only 33 million of those members. *See* Settlement Agreement, Sec. A.1(u). The remaining 73 million members are part of ASO plans that would be blocked from even requesting a second

Blue by virtue of the minimum-employee threshold, the dispersion requirement, or both. This does not pass muster under Rule 23(e)(2)(D)'s mandatory requirement that class members be treated equally relative to each other.

***Fourth***, the Taft-Hartley plans are excluded from ever becoming Qualified National Accounts, regardless of the other requirements, if they determine that the small settlement fund allocation for ASOs is insufficient and elect to exercise their right to opt out of the damages class. That is a straightforward violation of Rule 23(e)(2)(D) and is especially pernicious because it infringes the class members' constitutional right to opt out of the damages class. *Walmart Stores, Inc. v. Dukes*, 564 U.S. 338, 362-63 (2011). Under the proposed settlement, any class member choosing to exercise that constitutional right automatically receives lesser rights under the injunctive-relief class settlement from which it is not allowed to opt out.

Members of the non-opt-out, injunctive-relief class cannot be deprived—based solely on the exercise of their constitutional right to opt out of the damages class—of a benefit they otherwise would have received. *See Dukes*, 564 U.S. at 362-63 (holding that class settlement could not be approved if it would violate class member's constitutionally protected rights). Indeed, the premise of a non-opt-out class is that a right to opt out is not required "when a class seeks an *indivisible* injunction benefitting all of its members at once." *Id*. (emphasis added). Contrary to that premise, the proposed injunction here does not benefit all members at once; it is expressly divisible based on whether the member opted out of the damages class. Respectfully, the Court should not approve such a settlement.

***Fifth***, the Taft-Hartley plans are excluded from representation on the five-member "Monitoring Committee" that would be commissioned by the settlement. Its five members include: two members appointed collectively by Settling Defendants, one member appointed collectively

by Settlement Class Counsel, one member appointed by Self-Funded Sub-Class Settlement Counsel, and one member appointed by the Court. There is no provision for union members or representative of Taft-Hartley plans.[12] That omission is significant because the Monitoring Committee would oversee compliance with the settlement for five years after the Court's entry of a final judgment and order of dismissal. Any new rule (or amendment to any rule contained in the settlement agreement) that is approved by the Monitoring Committee would be automatically shielded from antitrust scrutiny.

The Monitoring Committee's oversight would extend to the rules governing the bidding process proposed by the Blues, meaning that the Monitoring Committee would be empowered to set a rate that the Blues may charge a second Blue bidder. And the proposed methodology for setting that rate is flawed. BCBS's rate is based on the "Standard or default inter-Plan fee," but the proposed settlement provides no check to ensure the rate represents the actual cost or, at least, a competitive charge for renting the Home Blue's network. In other words, the Monitoring Committee is empowered to set a rate—beyond scrutiny from the Taft-Hartley Objectors (or any other class members)—that could further discourage second bids. Such power highlights the inequity in the proposed settlement's failure to provide for representation of Taft-Hartley plans on the Monitoring Committee.

**b. The proposed settlement imposes an unconstitutional gag order.**

The proposed settlement states that the "Parties … agree not to criticize or denigrate opposing Parties … to any person or entity (including but not limited to any media outlet, television

---

12 Although it is true that Taft-Hartley plans are members of the ASO subclass and that the ASO subclass appoints one member of the committee, the Taft-Hartley plans cannot rely on the ASO subclass's appointee to represent them. Indeed, the ASO subclass already agreed to exclude Taft-Hartley plans from the right to receive second Blue bids—an exclusion that is both express and unequal in violation of Rule 23(e)(2)(D).

station or program, radio station or program, newspaper, magazine … [or] journalist …) regarding any matter related to the Agreement or any [pleadings in this case].” Dkt. 2610-2, Sec. I.58, p. 57. The proposed settlement defines “Parties” to include “any person or entity within the … Injunctive Relief Class.” *See* Settlement Agreement, Sec.A.1(lll) and (llll). This proposed restriction on speech runs for five years and is not limited to commercial speech that “does no more than propose a commercial transaction”[13] such as solicitation to represent opt-outs. To the contrary, the restriction prohibits truthful commentary on important matters of public debate—including the competitiveness of the American health care system—for five years after the class action is resolved. And the proposed final order imposes this gag order on the Taft-Hartley Objectors and the other injunctive-relief class members.[14]

Thus, the motion for approval asks this Court to order the Taft-Hartley Objectors and others not to make truthful, non-defamatory statements of fact or opinion critical of the settlement or the defendants. Such an order would constitute (1) a violation of the First Amendment and (2) an abuse of discretion under Rule 23. *See Bernard v. Gulf Oil Co.*, 619 F.2d 459, 467 (5th Cir. 1980) (order prohibiting communications with class members, including the solicitation of legal representation, requests to opt out of the class, and descriptions of the class action “is an unconstitutional prior restraint”), affirmed at 452 U.S. 89, 104 (1981) (holding that gag orders were abuse of discretion,

---

13 *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 776 (1976).

14 *See* Proposed Final Order (Ex. C to Motion for Prelim. Approval), Dkt.2610-4, at ¶2 (incorporating the settlement agreement into the final order); ¶11 (approving of the settlement agreement “in all respects”); ¶23 (court retains jurisdiction to enforce the terms of the settlement agreement); ¶28 (ordering Parties (including class members) to implement settlement agreement “in accordance with its terms”).

as a matter of law, under Rule 26 grounds); *see also Alexander v. U.S.*, 509 U.S. 544, 550 (1993) ("[C]ourt orders that actually forbid speech activities [] are classic examples of prior restraints.").

## IV.   Conclusion

The terms of the injunctive settlement cannot be deemed fair, reasonable, and adequate. The Taft-Hartley Objectors respectfully ask this Court to deny approval of the settlement agreement to the extent the inequitable treatment of Objectors relative to the other class members is not addressed.

Dated: July 26, 2021          Respectfully submitted,

Eamon P. Kelly
Paul E. Slater
Joseph M. Vanek
David P. Germaine
Sperling & Slater, p.c.
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel:   (312) 641-3200
Email: ekelly@sperling-law.com
        pes@sperling-law.com
        jvanek@sperling-law.com
        dgermaine@sperling-law.com

*Counsel for the Chicago Area I. B. of T. Benefits Health and Welfare Trust Fund; the Bakery Cracker Pie & Yeast Wagon Drivers Local 734 Welfare Fund; the Structural Iron Workers Local #1 Welfare Fund; the Building Material Chauffeurs, Teamsters and Helpers Welfare Fund of Chicago; and the United Food and Commercial Workers Local No. 1546 Food Handlers Welfare Fund.*

**Statement of Counsel**

Under penalty of perjury, counsel for the Objectors states that counsel for the Objectors has not objected to class settlement in the last five years and that the information set forth in the Taft Hartley Plan Objectors' Memorandum in Opposition to the Approval of the Proposed Class Settlement, including all of the attachments thereto, are true and correct to the best of counsel's knowledge and belief.

Counsel for Objectors

Eamon P. Kelly
Sperling & Slater, P.C.

**CERTIFICATE OF SERVICE**

I, Eamon P. Kelly, certify that on July 26, 2021, I caused copies of Taft Hartley Plan Objectors' Memorandum in Opposition to the Approval of the Proposed Class Settlement and Supporting Exhibits to be served by email and by U.S. certified mail upon the following persons:

Special Master
Edgar C. Gentle, III
Gentle, Turner, Sexton, Harbison LLC
501 RiverChase Parkway East, Suite 100
Birmingham, AL 39244
edgentle@gtandslaw.com

Claims Administrator
Blue Cross Blue Shield Settlement
c/o JND Legal Administration
PO Box 91393
Seattle, WA 98111
info@BCBSsettlement.com

Self-Funded Settlement Class Counsel
Warren Burns
Charest Burns LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
burns@burnscharest.com

Settlement Class Counsel
Michael D. Hausfeld
HAUSFELD LLP
888 16th Street NW, Suite 300
Washington, DC 20006
mhausfeld@hausfeld.com

David Boies
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
dboies@bsfllp.com

Settling Defendants' Counsel
Dan Laytin
KIRKLAND & ELLIS LLP
300 N. LaSalle St. Chicago, IL 60657
daniel.laytin@kirkland.com

Eamon P. Kelly

**STATEMENTS IN SUPPORT OF TAFT-HARTLEY PLAN OBJECTORS' SUBMITTED
AS OF JULY 28, 2021 SUMMARY TABLE**

| Fund Name: |
|---|
| Recycling and General Industrial Union Local 108 Welfare Fund |
| Division 1181 A.T.U. – New York Welfare Fund |
| Food Employers Labor Relations Association and United Food and Commercial Workers VEBA Fund |
| United Food and Commercial Workers Unions and Employers Health and Welfare Fund - Atlanta |
| United Food and Commercial Workers Unions and Participating Employers Health and Welfare Fund |
| Washington Wholesalers Health and Welfare Fund |
| Local 888 Health Fund |
| UFCW Local One Health Care Fund |
| United Food and Commercial Workers Local 400 and Employers Health and Welfare Fund |
| Teamsters Local 282 Welfare Trust Fund |
| I.A.T.S.E. National Health & Welfare Fund |
| IBEW – NECA Southwestern Health and Benefit Fund |
| Texas Pipe Trades Health Benefit Fund |
| Plumbers and Steamfitters Local 141 Health and Welfare Fund |
| Southwest Health Benefits Fund |
| IATSE LOCAL 33 Health & Welfare Fund |
| Hagerstown Teamsters and Motor Carriers Health and Welfare Fund |
| Construction Teamsters Security Fund for Southern California |
| Food Employers and Bakery and Confectionary Workers Benefit Fund for Southern California |
| Southern California Dairy Industry Security Fund |
| SEIU Health and Welfare Fund |
| Sheet Metal Workers Local 49 Family Health Plan Board of Trustees |
| Northern New Jersey Teamsters Benefit Plan |
| Southwest Multi – Craft Health & Welfare Trust Fund Board of Trustees |
| District Council 37 – Local 389 Health Fund |
| Central Texas Health and Benefit Trust Fund |
| Plumbers and Pipefitters Local Union No. 286 Health and Welfare Fund |
| U.A.P.P. Local Union No. 142 Welfare Fund |
| International Longshoremen's Association Health and Welfare Fund |
| Allen Health Care – Local 389 Home Health Care Benefit Fund |
| Oklahoma Operating Engineers Welfare Plan |
| International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART") Local Union No. 36 Welfare Fund – Arkansas Plan |
| Southern California Benefit Fund |
| Teamsters Miscellaneous Security Trust Fund |
| Glazing Employers and Glazier's Union Local No. 27 Health and Welfare Fund for Active Journeymen Glaziers, Apprentices and Dependents and for Retired Journeymen Glaziers and Dependents |
| United Food & Commercial Workers Unions and Food Employer Benefit Fund |

# EXHIBIT

# 3

**J. Thomas Richie**
Partner
trichie@bradley.com
205.521.8348 direct
205.488.6348 fax

Bradley

July 28, 2021

VIA USPS FIRST CLASS MAIL

Sharon Harris
Clerk of Court
U.S. District Court
Northern District of Alabama
Hugo L. Black United States Courthouse
1729 5th Avenue North
Birmingham, AL 35203

Blue Cross Blue Shield Settlement
c/o Michael D. Hausfeld
Hausfeld LLP
888 16th Street NW, Suite 300
Washington, DC 20006

Blue Cross Blue Shield Settlement
c/o David Boies
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504

Dan Laytin
Kirkland & Ellis LLP
300 N. LaSalle Street
Chicago, IL 60657

RE: Notice of Intention to Appear in *In re: Blue Cross Blue Shield Antitrust Litigation*
Master File No: 2:13-CV-20000-RDP (DL No. 2406)

Dear Ms. Harris:

Please accept this letter as Notice of Intention to Appear in *In re: Blue Cross Blue Shield Antitrust Litigation* of ServisFirst Bancshares, Inc. (NYSE: SFBS), Employee Services, Inc., and Topographic, Inc. (collectively, the "Self-Funded Objectors"). Counsel J. Thomas Richie and Richard Nix wish to speak on behalf of the Self-Funded Objectors in support of their objection, attached hereto as Exhibit A, at the Fairness Hearing 10:00 am Central Time on October 20, 2021. Counsel's information is below:

J. Thomas Richie
Partner
Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, AL 35203
(205) 521–8348

Richard D. Nix
Shareholder
McAfee & Taft
211 N Robinson Avenue
Oklahoma City, OK 73102
(405) 552–2219

4825-5100-1074.2

Clerk of Court
July 28, 2021
Page 2

Very truly yours,

J. Thomas Richie
Partner

JTR

Enclosure

4825-5100-1074.2

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406),** | ) ) ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **Plaintiff,** | ) | **Master File No. 2:13-CV-20000-** |
| | ) | **RDP** |
| ______________________________ | ) ) | |

**OBJECTION**

This is an objection on behalf of all members of the Self-Funded Subclass as to the allocation of damages between the Self-Funded Subclass and the Fully Insured Class. The Self-Funded Subclass has not been treated equitably in this settlement, in blatant violation of Rule 23(e)(2)(D). To achieve equitable treatment for the subclass members, (1) the class period covering their claims needs to be extended and (2) their share of the monetary allocation needs to be increased. Self-funded plans cover over 50% of the total individuals carrying a BCBS insurance card, but they are to receive—astonishingly—a mere 6.5% of the settlement funds. This settlement treats the Self-Funded Subclass as if its members first became class members in 2019, even though the original class definition included self-funded plans when the first case in what became this MDL was filed in 2012. As a consequence, the Self-Funded Subclass loses more than seven-and-a-half years off of its recovery: the Fully Insured Class's claims go back to February 2008, but the

Self-Funded Subclass goes back to only September 2015. Nothing in the record justifies inequitable treatment of the Self-Funded Subclass as it relates to the class period.

Based on the information available as to how the self-funded portion was allocated, the methodology behind the allocation is also fatally flawed. The settlement fails to account for the economic reality of the Self-Funded Subclass and focuses exclusively on an upfront administrative services fee (the "ASO Fee") as the sole way in which the Subclass would have been harmed by the territorial allocation and anticompetitive conduct alleged in this case. This narrow view is untenable. The allocation methodology apparently relied on comparing only the ASO Fee (which ***excludes*** all of the costs of paying medical claims) paid by the Self-Funded Subclass with the total premiums (which ***includes*** both the projected costs of paying medical claims in addition to an insurance cost for the risk that claims will exceed projections) paid by the Fully Insured Class. As discussed below, there is no justification for excluding all of the medical claim costs paid by the Self-Funded Subclass while simultaneously giving full credit to the Fully Insured Class for the medical claims cost its premiums paid, as claims costs do not vary materially between self-funded and fully insured plans.

For example, BCBS does not retain all of the fully insured premiums paid. BCBS is required by law to ***pay out*** in healthcare claims ***80-85%*** of the premiums it

receives from fully insured groups. 42 U.S.C. § 300gg-18(b)(1). These amounts are not "revenue" that BCBS retains. They are pass-through revenue that does not benefit BCBS's bottom line. When these pass-through amounts are stripped out, the purported distinction between damage to fully insured versus self-funded plans becomes far less stark.

Moreover, the allocation methodology does nothing to account for numerous other critical facts. For example, the flawed methodology fails to account for the multiple fees (over and above the ASO Fee) that BCBS charges through multiple ancillary administration services performed by BCBS for self-funded plans. These ancillary contracts produce significant revenue for BCBS, covering items like collection of overpayments, pharmacy services, subrogation/recovery, or telehealth. These services were subject to the same territorial allocation and prohibitions on competing bids that caused Fully Insured Class members to pay higher premiums, and self-funded plans likewise paid higher prices for these ancillary services because of Defendants' conduct. In addition, members of this subclass frequently purchased "stop-loss" insurance from Defendants, which is insurance protecting the self-funded benefit plans from excessive outlays for claims. While the Plan of Distribution (agreed to nearly 5 months after the Settlement was executed) includes stop-loss coverage in the definition of "Administrative Fees," there is nothing in the documents available to class members which shows that the allocation of the

Settlement Fund between the subclasses took the costs of stop-loss coverage into account. And the allocation apparently ignores a host of other ancillary service costs and assigns them no value. But the value of these ancillary items is hardly novel, as documents submitted in support of this settlement recognize that the Self-Funded Subclass's injuries go far beyond mere ASO Fees charged to pay a healthcare claim. (*See*, *e.g.*, Doc. 2610-2 at ¶¶ 12, 15 (creating competitive procedures to benefit self-funded plans); Doc. 2610-8 (opining that those items strengthen the support for the allocation of settlement proceeds).[1]

The Court may approve a class-action settlement "only on finding that it is fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2). An essential criterion of such fairness is that "the proposal treats class members equitably relative to each other." FED. R. CIV. P. 23(e)(2)(D). This provision, added in the 2018 amendments to Rule 23, focuses on the ***substantive*** fairness of how a settlement treats class members "relative to each other." *Id.*; *see also* 2018 cmt to FED. R. CIV. P. 23(e)(C)-(D)). The Self-Funded Subclass has not received equitable treatment. It has been treated as an afterthought, and decisions made to benefit the Fully Insured Class have not been made to benefit the Self-Funded Subclass in similar fashion. While Rule

[1] Copies of sample Administrative Services Agreements and documents between the Objectors and BCBS are attached as Exhibits 2F through 2I, 9, 10, and 12. These documents show a sampling of fees (sometimes vaguely described) charged by BCBS. Objectors have filed Exhibits 2G, 2H, 2I, 9, 10, and 12 under seal.

23 does not require an equal split of class relief between the subclasses if their circumstances are materially different, it does require that one subclass not receive settlement benefits denied to the other without legitimate reason, and it does require that any differences in treatment be equitable under all the facts and circumstances.

## FACTS AND PROCEDURAL HISTORY

### I. The Objectors

ServisFirst Bancshares, Inc. is a full-service commercial bank headquartered in Alabama with over $12 billion in total assets. As of 2021, it has approximately 525 employees with locations in Alabama, Georgia, Florida, South Carolina, and Tennessee. The company is the sponsor of the ServisFirst Bank Flexible Benefits Plan (Plan Number 510, Group Number 55824, Corporate Code 558240001). During the class period it has retained Blue Cross Blue Shield of Alabama to act as the third-party administrator for the Plan. BCBSAL provides claims processing services to the Plan. BCBSAL has acted as the Plan's TPA since 2005. (Exhibit 9 at 1). BCBSAL charges an ASO Fee on a per-member/per-month basis for its claims processing services. (Exhibit 9 at p.6, Art. III(C)) (setting fee at $57.50) BCBS charges other fees to the Plan, including fees for costs of claims, access fees, pharmacy benefit manager fees and others. (*Id.* at 6, Art III(A)–(C). These services, fees and charges were largely bundled together. (*Id.*).

Topographic, Inc. is headquartered in Texas with offices in Texas, Oklahoma, Colorado and Wyoming. It has approximately 450 employees and provides land surveying, civil engineering, environmental, and various services to the oil and gas industry. The company is the sponsor of the Topographic, Inc. Welfare Benefits Plan (No. 501, Account Number: 593000, Group Numbers: 593001, 593002, 593003). During the class period it has retained Blue Cross Blue Shield of Oklahoma to act as the TPA for the Plan. BCBSOK provides claims processing services to the Plan. BCBSOK has acted as the Plan's TPA since January 1, 2009. BCBSOK charges an ASO Fee on a per-employee/per-month basis for its claims processing services. BCBS charges other fees to the Plan, including BCBS network access fees, utilization review and management fees, telehealth fees, and wellness incentive fees. These services, fees, and charges were bundled together. In addition to these fees, BCBS charges this plan subrogation fees for third-party liability recovery fees, fees for carving out stop-loss and for providing a reverse-eligibility file to the carved-out PBM, alternative provider compensation arrangements, and BlueCard multi-state network access fees. During the class period the Plan has been insured by a BCBS entity under a BCBS stop-loss policy.

Employee Services, Inc. is headquartered in Oklahoma. It has approximately 230 employees and provides pharmaceutical and home healthcare services. The company is the sponsor of the Employee Services, Inc. Medical Plan (No. 501,

Account Number: 117172, Group Numbers: 117172, 195151). It has retained Blue Cross Blue Shield of Oklahoma to act as the TPA for the Plan. BCBSOK provides claims processing services to the Plan. BCBSOK has acted as the Plan's TPA since January 1, 2015. BCBSOK charges an ASO Fee on a per-employee/per-month basis for its claims processing services. BCBS charges other fees to the Plan, including fees for network access, pharmacy benefit management administrative services, telehealth virtual visits, utilization review, and management services. These services, fees and charges were bundled together. In addition to these bundled fees, BCBS also charges this plan for stop-loss insurance premiums, third party liability recovery service fees, alternative provider compensation arrangements, Blue Card multi-state network access fees, and retains a portion of the employer-generated pharmacy rebates/manufacturer incentives. During the class period the Plan has been insured by a BCBS entity under a BCBS stop-loss policy and has been told by BCBS that it cannot carve out stop loss or pharmacy benefit management services. (Exhibit 2G, p.1).

## II. The Objectors' Federal Duties in this Matter

Under ERISA, employee benefit plans are distinct entities with sue-or-be-sued status. 29 U.S.C. § 1132(d)(1). The assets of a plan are deemed to be held in trust and can only be used to pay benefits or to defray reasonable costs of administering the plan. 29 U.S.C. § 1103(a), (c). The "assets" of a plan include

claims which the plan has against third parties. *See U.S. Dept. of Labor, Field Assistance Bulletin 2008-01* (Feb. 1, 2008) (claims for delinquent plan contributions are "assets" of the plan); ERISA Opinion Letter 92-24A, p. 2 (November 6, 1992) ("[A]pplying ordinary notions of property rights, the assets of a welfare plan generally include any property, tangible ***or intangible***, in which the plan has a beneficial ownership interest. The identification of plan assets therefore requires consideration of any contract or other legal instrument involving the plan, as well as the actions and representations of the parties involved") (emphasis added).

The Objectors are "fiduciaries" of their Plans under ERISA, 29 U.S.C. § 1002(21)(A), because they exercise discretionary authority, responsibility, and control over the management and administration of their Plans, as well as authority and control over the Plans' assets. *Coldesina v. Simper*, 407 F.3d 1126, 1138 (10th Cir 2005). As fiduciaries, the Objectors have a federal duty to marshal and conserve the assets of their plans. *See* 29 U.S.C. §§ 1103(a), 1104(a). They can have personal liability for permitting their Plans to incur losses. *See* 29 U.S.C. § 1109(a). The Objectors are therefore not only objecting because the settlement is unfair generally to their self-funded plans and to the Self-Funded Subclass; they are also objecting because they believe they have a federally mandated duty to pursue equitable treatment for their Plans and Plan participants.

## III. The Economics of Self-Funded Plans

Within their territories, the various BCBS entities have established provider networks (often called Preferred Provider Organization ("PPO" networks)), by contracting with hospitals, clinics, physicians, laboratories, and other medical providers to provide services to members of the networks at contracted rates. BCBS offers this network, and ancillary services, to consumers of health care coverage. Individuals can purchase individual policies from BCBS, and employers can purchase group health policies from BCBS or they can self-fund and retain BCBS to act as a claims processor (also known as a "claims administrator," a "third party administrator," or a "TPA"). In a fully insured BCBS plan the employer and employees pay a set premium upfront so they (and their eligible dependents) can enroll and receive insurance coverage under the BCBS group policy. In a self-funded BCBS-administered plan the employer and often the employees contribute the funds that are used to pay claims, and BCBS processes the claims for benefits. *See FMC Corp. v. Holliday*, 498 U.S. 52, 54 (1990).

Members in self-funded plans access the ***same*** BCBS network that members of fully insured plans access. This means that the charge for a specific service from a specific medical provider is the same regardless of whether the patient is enrolled in a fully insured plan or a self-funded plan. As a result, the cost of the provider's service is the same. Because everyone uses the same network with the same

contracted rates, a BCBS fully insured plan pays no more than a BCBS-administered self-funded plan pays for the same service from the same doctor. Therefore, there is no claim-cost differential between the two types of plans, and cost increases affect both plans equally. As costs for providers (and claims in general) have risen over the years, both types of plans have experienced those effects equally.

Given these market-wide realities and before pursuing an objection, counsel for Objectors pressed counsel for the Self-Funded Subclass, Burns & Charest, for answers as to why the Self-Funded Subclass was receiving such a small share of the settlement. They responded by providing a memorandum from the Burns & Charest firm (the "Burns Report"), attached as Exhibit 2B. The Burns Report explains the rationale of the firm and its expert for accepting 6.5% for the Self-Funded Subclass. But the Burns Report fails to recognize that (1) claim cost increases are and have been equal for both types of plans; (2) the general rise in health care costs during the damage period, including any claim cost increases in the BCBS networks, affect both types of plans equally; and (3) because medical claim costs represent 80% to 85% of both types of plans expenditures, BCBS's anticompetitive behavior had the greatest impact by restricting the existence of ***competing networks.*** The Burns Report instead wrongly focused exclusively on the administrative expenses for self-funded plans, and completely ignored that medical claim costs are paid by fully insured and self-funded and plans alike. And because the Burns Report was solely

focused on administrative expenses, it also did not address numerous items of ancillary expenses that self-insured plans pay and that caused damage to self-insured plans. (*See* BDO Report, Exhibit 1 at 12–13; Corley Report, Exhibit 2, pp. 6, 9-15).

But BCBS does not merely deliver either full insurance coverage on the one hand or ASO on the other hand services to group health plans. Instead, BCBS delivers various services to both self-funded and fully insured plans. These services include, for example, negotiating with out-of-network providers, recovering monies from tortfeasors who caused injuries that necessitated payment of benefits, and managing large claims, among others. All plans—whether fully insured or self-funded—need these services. In fact, BCBS generally ***requires*** group health plans to utilize the ancillary services it provides. (*See* Corley Report, Exhibit 2, pp.11-13). Those services are tied together and in many instances group health plans ***must*** use them. On the fully insured side, BCBS generally includes the charges into the premium cost. On the self-funded side, BCBS charges for the ancillary services in addition to the "base" ASO Fee. Examples of these ancillary services and the fees that inevitably accompany them, are analyzed more fully in the Corley and BDO Reports (Exhibits 1 and 2), and include, for example:

- **Subrogation Fees** – BCBS typically requires that a plan use BCBS's own subrogation services where BCBS charges 25%–30% of the savings from subrogation.

- **Audit/investigations** - claim recovery fees – BCBS typically charges a percent of savings for auditing its own claims and discovering and recovering the errors.

- **Care Coordination Fees** – BCBS charges various "buy up" care coordination fees for programs offered around care coordination. These include, for example, using hospitalists, quality nurses, non-medical specialists such as dieticians to coordinate delivery of alternate types of treatment.

- **Utilization management fees** – BCBS typically charges separate fees for utilization management/case management programs.

- **Stop-loss premium** – BCBS provides stop-loss insurance and charges stop loss premiums/profit on the self-funded groups they service.

- **Network Access Fees** – BCBS typically charges network access fees for plans to access their networks; they may also charge a percent of the claim value up to a cap to share the network access with other franchises across state lines (*i.e.*, BCBS Blue Card).

- **Telehealth** – BCBS typically offers its own telehealth and charges a per employee/per month for it or will take an override on the fees charged for telehealth from outside vendors.

- **Wellness programs** – BCBS typically charges a fee for offering wellness programs or offering biometric screenings and points-based systems/Health Reimbursement Arrangements.

- **Out of network negotiations** – BCBS typically charges a fee on the claims negotiated or repriced through an out-of-network negotiation process.

- **Data feed fees** – BCBS typically charges a fee to provide data feeds to an outside data warehouse when directed by the employer or plan.

- **Ownership in Specialty or Mail Order Pharmacies** – BCBS has arrangements with or ownership in their own mail order or specialty pharmacies that allow BCBS to generate additional revenues by steering membership to its own mail order pharmacies or implementing specialty locks across the self-funded book of business.

- **Carve-out coordination fees** – BCBS typically charges a "coordination fee" for carving out stop loss or pharmacy benefit management. Think of it as a "fee avoidance fee."

Consequently, the ASO Fee is only a small component of the total economic impact borne by self-funded plans from the territorial allocation and other anti-competitive conduct alleged in this action.

## IV. The Settlement and its Proffered Support

There are many documents filed under seal in this case.[2] However, the record that is available to the public reveals very little about the way that the parties reached the settlement allocation between the Fully Insured Class and the Self-Funded Subclass.

What can be pieced together is that the parties "recognized the need for a sub-class of Self-Funded Accounts and their employees" in July 2019. (Doc. 2641 at 5).

2 Objectors proceed, as they must, on the understanding that any submissions and materials under seal are not relevant to assessing the fairness or equity of the apportionment of the settlement. "Once a matter is brought before a court for resolution, it is no longer solely the parties' case, but also the public's case." *Brown v. Advantage Eng'g, Inc.*, 960 F.2d 1013, 1016 (11th Cir. 1992). What is true for the public at large is all the more necessary in a class action, where class members' rights are affected directly. The Eleventh Circuit has explained that "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern and the common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." *Romero v. Drummond Co.*, 480 F.3d 1234, 1245 (11th Cir. 2007) (quoting *Chi. Tribune Co. v. Bridgestone/ Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001) (internal punctuation omitted)). Material calling forth judicial action in any pretrial motion—such as a motion for approval of a class-binding settlement—is presumptively public. *Id.* at 1246 ("A motion that is presented to the court to invoke its powers or affect its decisions, whether or not characterized as dispositive, is subject to the public right of access") (quotation marks and citations omitted).

While the separate recognition of the sub-class was new, the involvement of self-funded plans in the litigation was not. One of the original claim definitions in the original subscriber case—*Cerven*—included "[a]ll persons or entities in the United States of America who are currently insured by any health insurance plan that is currently a party to a license agreement with BCBSA…." (*Cerven* Complaint, Exhibit 11, at ¶ 20). That definition covers all health plans that issue a card carrying the "Blue mark," which covers self-funded plans. ServisFirst, for example, has plan documents showing that "Employer… expressly acknowledges its understanding that this agreement constitutes a contract solely between Employer and Blue Cross and Blue Shield of Alabama, which is an independent corporation operating under a license from the Blue Cross and Blue Shield Association…permitting Blue Cross and Blue Shield of Alabama to use the Blue Cross and Blue Shield Service Marks in the State of Alabama…." (Exhibit 12, ServisFirst 2014 Enrollment Agreement Benefit Changes at 4-5). *Cerven* was filed in February 2012. Instead of giving the Self-Funded Subclass the benefit of the *Cerven* filing date, the settlement treats the Subclass's claims as if they were filed in September 2019.

In any event, the newly-retained subclass counsel came on board sometime around July 2019 and began to negotiate on two fronts: with the Defendants (to get a larger recovery) and with the Fully Insured Class (to determine how the recovery

would be divided between the classes). A final term sheet was signed in November 2019. (Doc. 2641 at 6).

The deal reached between the classes was one-sided. It allocated 93.5% of the proceeds to the Fully Insured Class and only 6.5% to the Self-Funded Subclass. All interested parties offer the same rationale for this lopsided division: they apparently looked at administrative fees only. The subclass's counsel discussed those fees, and no others, as the basis for his negotiating position. (Doc. 2610-7 at ¶ 10). The allocation mediator discussed "the relative size of the administrative fees paid by Self-Funded Claimants vs. the premiums paid by FI Claimants." (Doc. 2610-8 at ¶ 12). None of the claim costs paid by the Self-Funded Subclass were included in the analysis even though projected claims costs are by far the largest component of the fully insured premium. And apparently none of the revenue self-funded groups generate for BCBS beyond the ASO fee were considered either.

## SUMMARY OF THE ARGUMENT

The settlement allocation is grossly flawed in two ways.

***First,*** from the inception of these proceedings the Self-Funded Subclass has always been a member of the defined class, but it is only given less than half the time to "look back" as the Fully Insured Subclass.

***Second,*** the settlement allocation grossly ***understates*** the profitability to BCBS of the self-funded block, and grossly ***overstates*** the profitability to BCBS of

the fully insured block. These errors compound in a way that tilts the allocation unfairly and inequitably against the Self-Funded Subclass and leaves it with a fraction of the recovery it should receive.

The ratio of persons covered under fully insured plans is roughly equal. One would therefore intuitively expect the settlement allocation to reflect that ratio. It does not because it mistakenly makes an apples-to-oranges comparison of revenue streams, which resulted in the grossly distorted 93.5%-to-6.5% settlement allocation ratio.

**SPECIFIC GROUNDS FOR OBJECTION AND ARGUMENT**

A foundational rule in assessing the fairness is that a settlement must treat similarly situated claimants similarly. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855–56 (1999) ("[A] settlement must seek equity by providing for procedures to resolve the difficult issues of treating such differently situated claimants with fairness as among themselves."). There are several ways that the proposed settlement fails to treat the Self-Funded Subclass equitably under Rule 23(e)(2)(D). ***First***, instead of an artificially and inexplicably truncated claims period, equitable treatment would require that the self-funded plans get the same claims period as the Fully Insured Class. ***Second***, instead of an allocation based on the incorrect assumption that ASO Fees for claims payments were the sole economic harm self-funded plans suffered, they should receive a considerably larger allocation based on

the totality of the economic harms they suffered. The failure to consider anything beyond the gross premium payment made by the fully insured plan and the net ASO Fees paid by the self-funded plans resulted in an allocation that does not reflect reality and does not treat the Self-Funded Subclass equitably as compared to the Fully Insured subclass members. Equity requires making the claims periods equal and allocating a much greater portion of the relief to the Self-Funded Subclass.

## I. The Self-Funded Subclass's claims relate back to the original filing of the *Cerven* case, so their claims must go back to 2008.

Self-funded plans have been covered by class definitions from the very beginning of this case, which means that there is no possible justification for not giving them the benefit of the original 2012 filing date. Yet, without explanation, the settlement gives Fully Insured claimants a claim period that is almost two-and-a-half times longer than what the Self-Funded Subclass gets. A fully insured claimant gets to claim payments made to Blue Cross from October 16, 2020 to February 7, 2008, while the Self-Funded Subclass can only go back to September 1, 2015.

The claims date for the Fully Insured Class is four years before February 7, 2012, the date on which the *Cerven* complaint was filed in the United States District Court of the Western District of North Carolina. *Cerven* was the first-filed complaint in the dispute that was eventually consolidated into this MDL, and this class

definition for the injunctive relief class was carried forward. That complaint included this class definition for the injunctive relief class:

> All persons or entities in the United States of America who are currently insured by any health insurance plan that is currently a party to a license agreement with BCBSA that restricts the ability of that health insurance plan to do business outside of any geographically defined area.

(*Cerven* Complaint, Exhibit 11, at ¶ 20). This same definition appeared in this MDL's consolidated subscriber-track complaints. (*See*, *e.g.*, Doc. 99-1 at ¶ 277; Doc. 244 at ¶ 277; Doc. 897 at ¶ 306; Doc. 1082 at ¶ 314). Construing these pleadings to do justice as required by Rule 15(e), it is obvious that the plaintiffs were attempting to include ***all*** persons and entities (including "employee welfare benefit plans," whether insured "or otherwise," *see* 29 U.S.C. § 1002(1)) that have been harmed by BCBS's conduct.

This class definition of "persons" insured includes participants insured under self-funded plans licensed by BCBS. And the class definition of "entities" includes all self-funded plans, as such plans are licensed with BlueCross BlueShield Association ("BCBSA"). Many were also insured under BCBS stop-loss insurance, which insures and protects self-funded plans against catastrophic losses. (Corley Report, Exhibit 2, pp. 6, 11-12). In most cases, BCBS ***requires*** self-funded plans to purchase stop loss insurance from BCBS. (*Id.*; Exhibit 2G, p.1). Thus, a self-funded plan with BCBS stop-loss insurance is an "entity" that is "insured" by a BCBS

"health insurance plan"[3] that is a party to a license agreement with BCBSA, and most if not all of the BCBSA licenses restrict the ability of BCBS health insurance plans to do business outside of their geographically defined areas. And, as ServisFirst's agreement with its state's BCBS entity shows, BCBS itself described its relationship with self-funded plans in the same terms as this class definition. (Exhibit 12, ServisFirst 2014 Enrollment Agreement Benefit Changes at 4-5).

As members of the putative class, self-funded plans were and have remained parties with claims that relate back to the original filing. While Federal Rule of Civil Procedure 15(c) speaks to relation back in the context of adding defendants, it has been extended by analogy by some courts to apply to whether claims of different classes are timely in a class action. *See, e.g., Cliff v. Payco Gen'l Am. Credits, Inc.*, 363 F.3d 1113, 1131–32 (11th Cir. 2004). *See also* FED. R. CIV. P. 15 advisory committee's note to the 1966 Amendment. ("[T]he attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs."). Other courts disagree. *See Schillinger v. Union Pac. R.R. Co.*, 425 F.3d 330, 334 (7th Cir. 2005) ("[T]he expansion of a proposed class does not change the parties to the litigation nor does it add new claims."); *see also Schorsch v.*

[3] The vernacular term "health insurance plan" can be liberally construed to mean a BCBS entity (*e.g.*, Blue Cross and Blue Shield of Alabama). A stop-loss policy itself is a type of "health insurance plan" that protects self-funded arrangements, so a self-funded plan insured by a BCBS stop loss policy is an "entity" insured by a BCBS stop-loss "health insurance plan."

*Hewlett–Packard Co.*, 417 F.3d 748, 751 (7th Cir. 2005) ("Amendments to class definitions do not commence new suits."). But there is no interpretation or standard under which a mandatory, non-opt-out injunctive claim covering every affected person and entity in the country could not include the Self-Funded Subclass here. They were parties from the outset. BCBS knew from the outset that its conduct with respect to every contracted group health plan was at issue.[4]

If there were any question about whether the Self-Funded Subclass's claims should relate back, the treatment of the other damages class removes it. The original class definition for damages in *Cerven* applied narrowly to persons or entities who paid premiums to BCBS-NC for "individual or small group full-service commercial health insurance." (*Cerven* Complaint at ¶ 21). Yet this single-state action against one BCBS entity on behalf of a class insured through a particular type of plan now provides the opening claims date for ***every*** person or entity insured through ***any*** "full-service" BCBS plan in the settlement, no matter how large or small. Thus, for example, a large plan outside of North Carolina was never a member of a *Cerven* class except through the nationwide injunctive class—which is the same as the Self-Funded Subclass. Treating the Self-Funded Subclass equitably requires treating it in the same manner: because the Fully Insured Class gets the benefit of *Cerven*'s filing

---

[4] *Cerven*'s prayer for "any such other and further relief as may be just and proper" also put Defendants on notice that the injunctive class might seek further relief not yet explicitly stated in the original complaint. (*Cerven* Complaint at p. 61).

date through the injunctive class definition, the Self-Funded Subclass must be given that claim date, too. To do otherwise would violate Rule 23(e)(2)(D). *See In re Community Bank of N. Va.*, 622 F.3d 275, 307–08 (3d Cir. 2010) (reversing class action settlement on adequacy grounds where settlement applied inconsistent limitations periods to justify excluding certain claimants from settlement class). *Community Bank* is particularly relevant, as the Third Circuit reversed a class settlement because class counsel did not justify the decision to pursue claims arising under the Real Estate Settlement Practices Act ("RESPA") but not claims arising under the Truth in Lending Act ("TILA") or Home Ownership and Equity Protection Act ("HOEPA"). *Id.* at 303–08. While class counsel argued that the TILA and HOEPA claims might not relate back and thus might be time barred, class counsel's position "directly conflicts with the position taken for the RESPA claims." *Id.* at 306 n.23. "That is, if [the] borrowers cannot rely on the filing date of the *Davis* complaint to make their potential TILA/HOEPA claims timely, neither may they do so with respect to the RESPA claims that the named plaintiffs have asserted in this litigation." *Id.* The same logic applies here.

The scope of the release also counsels in favor of giving the Self-Funded Subclass and Fully Insured Subclass the same claims period. There is only one release covering claims from "the beginning of time to the present," and it applies to both classes—even though the Self-Funded Subclass gets a much shorter claim

period. This mismatch between claims periods and the scope of the release is an item the Advisory Committee Notes to Rule 23(e)(2)(D) specifically identifies as a "matter of concern." 2018 cmt to FED. R. CIV. P. 23(e)(C)-(D)).

Lastly, the motion for approval of attorney's fees slams the door on any idea that the Self-Funded Subclass arrived on the scene late. The fee motion seeks damages for the full $2.67 billion in settlement compensation to be paid and makes no distinction between work done for one subclass versus another. For purposes of requesting a fee, counsel treat all work as benefitting both subclasses. The fee motion does not seek, for example, separate fee awards for one subclass's counsel as compared to the work performed by another.

Thus, for all purposes, the Self-Funded Subclass has been part of the class action proposed from the beginning. That subclass should be given the same claim period as the other class members. No justification—in the record or otherwise—supports the differential and detrimental treatment the Self-Funded Subclass has received regarding the claim period. Members of the Self-Funded Subclass should be allowed to submit claims going back to February 7, 2008.

**II. The allocation determination ignores the substantial ways in which BCBS's anti-competitive conduct harmed the Self-Funded Subclass, making the settlement inequitable.**

The Self-Funded Subclass does not get a fair deal in this settlement for other reasons as well. The settlement allocation takes the ***gross revenues*** received by

BCBS on its fully insured block—without deducting things like claim expenses paid by employers as an upfront component of premiums—and compares that number to the ***ASO fees*** received by BCBS on its self-funded block—without accounting for other revenue streams on that block or any of the claim costs also paid by self-funded plans. The Self-Funded Subclass has also been harmed by BCBS's conduct in other ways that are not considered. All of these factors harm the Self-Funded Subclass as compared to the Fully Insured Class, and they result in an apportionment that creates "inequitable treatment of some class members vis-a-vis others." 2018 cmt to FED. R. CIV. P. 23(e)(C)-(D)).

To justify the 93.5%-to-6.5% allocation, subclass counsel apparently relied on an expert who compared gross premiums paid on the fully insured side to the net revenue on the self-insured side. Thus, the cost of health benefit claims was included for fully insured plans but excluded for self-insured plans. *See* Ex. 2B at 4. This comparison is inherently inequitable. Insurance companies collect premiums but they also have to pay claims. Throughout most of the class period federal law has mandated that an insurance company's claims must constitute approximately 85% of revenues. 42 U.S.C. § 300gg–18(b)(1). If an insurance company collects $1,000,000 in revenues it should pay approximately $850,000 in claims. But the settling parties completely ignore this reality. They pretend that BCBS has no claims expenses on fully insured claims, because they compare BCBS's gross revenues for

the fully insured subclass to the Self-Funded Class's net ASO Fees. In other words, the analysis used to justify the 6.5%-to-93.5% allocation makes no deduction for claims expenses on the fully insured side but looks only at costs exclusive of claims expenses on the self-funded side. The costs of claims on the fully insured side of the equation should have also been excluded, net-to-net, rather than gross-to-net. The methodology used compares watermelons to blueberries.

Moreover, on the self-funded side, the Subclass is apparently treated as if the sole and exclusive way in which it was harmed was paying for administrative services only. *See, e.g.*, Doc. 2641 at 50 ("Here, the Plan first distinguishes between Fully Insured Claimants, who purchased insurance from Defendants, and the members of the Self-Funded Subclass, who purchased administrative services ***only***.") (emphasis added). But, in reality, self-funded plans are harmed in ways that go far beyond merely paying for administrative services, as the Corley and BDO Reports discuss in detail. (*See generally* Exhibits 1 and 2).

- **Medical Claim Costs** – Self-funded plans also pay for medical claim costs and these costs account for 80% to 85% of all health care expenses. The rates for these claims are set and determined by the BCBS networks that cover their plans (and which also cover fully insured plans).
- **Retention of Pharmacy Rebates** – Each year benefit plans pay for hundreds of millions of dollars for prescription drugs. Pharmacy Benefit Managers

("PBMs") manage the distribution and sale of drugs to pharmacies, and they typically offer rebates on to purchasers. BCBS typically keeps these rebates. In the ASO agreement with their clients, BCBS discloses the receipt of these rebates but typically BCBS keeps all or part of these rebates.

- **Pharmacy Manufacturer Incentives** – Another common revenue stream for BCBS are manufacturer incentives which are paid to BCBS (and other carriers) to incentivize them to keep certain drugs on the formulary. These may be referred to as "administrative fees," "market shift bonuses," "technology fees," etc., but these are essentially monetary incentives paid by the manufacturer akin to pharmacy rebates. As with PBM rebates, BCBS typically keeps the revenue/benefit from these incentives, the self-funded plans do not.
- **Pharmacy Spread** – Many of the contracts between carriers and a PBM are built on a spread model where the carrier purchases inventory at one price, but when the drug is dispensed and the average wholesale price at dispensing is higher than the acquisition cost, the PBM-owned pharmacy and the PBM profit from the spread. This is true with BCBS and represents another revenue source for them from the self-funded plans.
- **Ownership in Specialty or Mail Order Pharmacies** – It is typical for insurance carriers to have lucrative arrangements with or ownership in their

own mail order or specialty pharmacies that allow them to generate additional revenues by steering membership to their own mail order pharmacies or implementing specialty locks across the self-funded book of business. Again, this is true with BCBS.

- **Subrogation Fees** – When a plan participant is injured through the wrongdoing of a third party, and a plan pays money for the participant's injuries, the plan is normally allowed to pursue a "subrogation" claim against the third party. For their self-funded plans, BCBS handles these subrogation services and typically charges 25%–30% of the recovery. This represents an additional revenue source for BCBS which is not reflected in the ASO Fees.
- **Audit/investigations** – Called "claim recovery fees," BCBS will often take a percent of savings for auditing claims that BCBS administered for a self-funded plan and discovering errors made by BCBS and recovering the errors. For example, if a self-funded plan overpays a claim because BCBS made a mistake when administering a medical provider's claim, and this is discovered in an audit, and the provider repays the overpaid amount, BCBS takes a percentage of the recovery caused by its own mistake even though it was the self-funded plan that paid the claim.
- **Carve-out coordination fees** – In most instances, BCBS will not allow smaller employers (employers with less than 500 employees) to carveout any

of the Other Programs because BCBS wants to protect its revenue stream from these programs. In situations where BCBS does allow an employer to carveout of programs, BCBS will usually charge a "coordination fee" for carving out programs like stop-loss insurance or a PBM.  So, if a self-funded employer wants to use a PBM that does not have a relationship with BCBS, the employer is charged a "fee" for this alteration.  When BCBS provides stop-loss insurance to a plan they prefer to act as the plan's TPA so they can monitor claims that might penetrate their layer of coverage.  If the employer wants to use another stop-loss carrier BCBS charges a similar "carve out" fee.

- **Utilization management fees** – "Utilization management" services are offered when a plan member has a complex or expensive regimen or treatment (a cancer patient, for example).  Carriers including BCBS will often charge self-funded plans separate fees for management/case management programs.

- **Stop-loss premium** – Stop-loss coverage is a form of reinsurance that provides protection for claims expenses above a certain limit.  Since BCBS is at risk under fully insured plans, stop-loss insurance does not come into play. Only self-funded plans need stop-loss insurance.  Carriers like BCBS offer the stop-loss insurance and earn commission/overrides for placing the stop-loss coverage on the self-funded groups.

- **Network Access Fees** – Because they own their own provider network, BCBS will charge "network access fees" for self-funded plans to access their provider network.  They may also charge a percent of the claim value up to a cap to share the network access with other BCBS franchises across state lines (*i.e.,* BCBS Blue Card).

- **Out-of-network negotiations** – BCBS typically charges a fee on the claims negotiated or repriced through an out-of-network negotiation process.  So, if a patient goes to an out-of-network provider, the provider has no contract with BCBS and can charge whatever it wants.  BCBS might negotiate for a reduction in the provider's fee and then charge the self-funded plan a percentage for the recovery.

- **Data feed fees** – BCBS sometimes charges a fee to provide data feeds to an outside data warehouse when directed by the employer/plan. All of these items generate revenue for Defendants.  All of them are paid by or apply to self-funded plans.  None is covered by ASO fees.  And yet none of these items was considered or accounted for in negotiating the allocation of settlement proceeds between the settlement classes.

While these items were apparently ignored for purposes or allocating damages, testimony submitted in support of the settlement shows the importance of these items such as the list above.  At paragraph 15 of his declaration (Doc. 2610-8,

copy attached as Exhibit 2E), Mr. Feinberg recognizes that the Self-Funded Subclass will benefit from injunctive relief in the settlement by being allowed to contract directly with vendors (Settlement Agreement at ¶ 12) and seek a "Second Blue Bid" to increase competition for the whole package of benefits available to a member of the Self-Funded Subclass. (*Id.* at ¶ 15). But Mr. Feinberg fails to carry his prospective analysis into the past. He ignores that the Self-Funded Subclass has been economically harmed by its inability since 2008 to contract directly with vendors or obtain competitive bidding, both of which have driven up amounts paid by the Self-Funded Subclass not only for administrative services, but for the ancillary services they purchased as well. Because the injunctive relief admittedly has impact and value beyond the narrow issue of ASO Fees prospectively, Defendants' actions in the past necessarily denied the Self-Funded Subclass the economic benefits now provided by the injunctive relief. This retrospective harm outside the ASO Fees must be accounted for in the damages aspect of the settlement. The settlement does not do so.

Counsel for the subclass did not adequately challenge the blinkered economic assumption that ASO Fees were the only way in which the Self-Funded Subclass was harmed (*i.e.,* those Fees are the ***only*** source of revenue for BCBS on the self-funded side). His declaration discusses the role of ASO Fees only, and then minimizes them: "Fully insured premiums inclusive of ASO Fees exceed by more

than an order of magnitude Administrative Service Only (ASO) fees paid by Self-Funded Subclass Members." (Doc. 2610-7 at ¶ 10). All of counsel's negotiations were based on this alleged "difference" between the subclasses. (*Id.*). Counsel looked solely for overcharges in ASO Fees for healthcare claims payments for the Self-Insured Subclass and revenue effects on Defendants to determine the subclass's negotiating position. (*Id.*). This flawed negotiation fails to account for the numerous other ways that Defendants harmed self-insured plans and inexplicably assigns them no value—at least historically. (Again, when analyzing the value of prospective injunctive relief, Mr. Feinberg made the opposite assumption and found the relief to be very valuable. (Doc. 2610-8 at ¶¶ 14–15)). And it suffers from the gross v. net problem discussed above—*i.e.*, fully insured premiums include costs of claims, while self-funded administrative fees do not. The negotiation hinged on the difference between ASO fees and fully insured premiums (Doc. 2610-7 at ¶ 10), but apparently did not recognize that the vast majority of the difference between those numbers is the cost of claims.

In fairness, subclass counsel was a stranger to his clients' Subclass until July 2019. (Doc. 2610-7 at ¶ 3). That is when he was recruited not by members of the Self-Funded Subclass, but by Settlement Class Counsel, who had represented both groups all along, but now recognized that the term sheet they had already signed required an allocation between two separate groups in their class, such that there was

an intraclass conflict. Subclass counsel indicates that he "requested and received access to the discovery record in the litigation" at some point after his retention (*id.* at ¶ 5), but his declaration makes clear that he did not receive all discovery because he later had to "ask[ ] for… additional discovery materials and data by defendants." (*Id.* at ¶ 7). Within a mere five months after first being contacted, counsel agreed that the Self-Funded Subclass would receive only 6.5 percent of the Settlement and that the harm to the subclass would be measured not by all payments made to BCBS, but only by ASO Fees and only going back to 2015. (*Id.* at ¶ 8).

This brief period of work strongly suggests that subclass counsel did not work with sufficient independence from the lawyers representing the Fully Insured Class to recognize all the ways the class was being treated inequitably. The fee motion states that a team of 178 lawyers spent years reviewing 75 million pages of documents. (Doc. 2733-1 at 13). Subclass counsel did not have adequate time or resources to perform anything approaching that same level of review and does not claim to have. While counsel who ended up negotiating for the Fully Insured Class spent seven years litigating this case and taking discovery, subclass counsel had less than six months. The result was that subclass counsel was forced to rely too heavily on work performed by the Fully Insured Class's lawyers, even though the subclasses were adverse to each other for purposes of negotiating an allocation of settlement funds between their respective subclasses.

Tellingly, the settlement documents do not define what fees were considered administrative fees for purposes of the Settlement's allocation between the subclasses. The Proposed Plan of Distribution in the Settlement, executed months after the allocation between subclasses was agreed to, does include "fees paid for administration of medical, pharmaceutical, vision, and dental plans" and amounts paid for "stop-loss insurance" in the formula used to divide the already agreed-upon 6.5% share among self-funded class members. (Doc. 2715-1 at ¶ 24). But there is no evidence that this same definition of administrative fees was used in negotiating the Settlement itself and the allocation between subclasses that it contains. And plan documents do not use a consistent definition for administrative fees, either. The Administrative Services Agreement between BCBS-AL and ServisFirst, for example, defines an "Administrative Charge" of a specified amount, but it does not include access fees, BCBS-AL's retention of prescription drug rebates, payments for certain reports to the Pharmacy Benefit Manager, and numerous other items. (Exhibit 9 at Art. III). The conclusion supported by the record is that the settlement is based on a narrow definition of what constitutes an "administrative fee" and that the somewhat broader definition in the plan of distribution (which was, after all, negotiated separately well after the allocation was finalized) was not used to negotiate the allocation.

In any event, the basis of the settlement allocation was an improper comparison and this fact is especially evident because:

- BCBS must pay claims on its fully insured business, those claims costs are projected in advance and built into the premiums it charges, and the claims it pays out of gross premiums do not represent profit or net revenue to BCBS. Fully insureds and self-funded plans are thus each paying claims costs, on the one hand through payment of premiums and on the other, directly. On the fully insured side, BCBS assumes the risk that claims will exceed their actuarial projections, but by definition that is not expected. And except to the statistically minimal extent this risk ever becomes reality, both fully insureds and self-fundeds are in reality paying their own claims costs. Therefore, in comparing the harm to the two groups, claims costs should be treated essentially the same, net-to-net, not gross-to-net;
- BCBS derives revenue on things other than ASO Fees on its self-funded business;
- The various fees BCBS charges to its fully insured and self-funded clients are roughly equal (BDO Report, Exhibit 1 at 18–23);
- 80% to 85% of the health care expenses of both the self-funded and fully insured plans are covered under the same BCBS network with the same claim rates and discounts; and

- The ratio of fully insured lives covered to self-funded lives covered is roughly equal. (Corley Report at 3–4).

These facts show that the 93.5%-to-6.5% settlement allocation is not equitable. Moreover, because self-funded plans have been a part of this action at least as much as fully insured plans from the very beginning, denying the Self-Funded Subclass an equal claims period is unfair, inadequate, and a glaring example of inequitable treatment.

**III. An equitable treatment of the Self-Funded Subclass requires allocating at least 50% of the settlement fund to the Self-Funded Subclass.**

The self-authenticating literature from the United States Department of Labor establish that during the relevant class period the ratio of fully insured plans to self-funded plans has been approximately 50% (fully insured) to 50% (self-funded). (*See* Exhibits 3 and 4). More importantly, the ratio of **lives covered** under fully insured plans to self-funded plans has been approximately 40% (fully insured) to 60% (self-funded). (*See id.*). The reports of experts Teah Corley and BDO (Exhibits 1 and 2) establish that BCBS charges roughly the same fees (*e.g.*, in-network pharmacy, out-of-network negotiation fees, subrogation/recovery fees) to fully insured plans as to self-funded plans, and generates roughly the same revenues (*e.g.*, PBM rebates) from fully insured plans and self-funded plans.

The only real economic difference between the two scenarios is that BCBS builds in a "mark up" of approximately 10% to 20% on its fully insured business as

"retention" to cover any additional expenses as a cost for being the insurer. (Corley Report at 5).

The analysis of the prevalence and structure of fees and revenues from self-funded and fully insured plans shows that the allocation ratio should approximate the number of lives covered under each type of plan. After stripping out the difference in class period and the inclusion of claim costs in the fully insured side of the analysis, Objectors' experts place the proper range of equitable treatment for the Self-Funded Subclass between 44.4 percent and 55.5 percent. (Corley Report at 19; BDO Report at 27). More precision within that range requires access to information not presently available to Objectors. But what is clear is that the Self-Funded Subclass is entitled to an allocation within this range, and the 6.5% currently allocated to them in the Settlement is too small several times over.

## IV. If this Objection increases the allocation to the Self-Funded Subclass, Objectors' Counsel should be awarded common-fund attorney's fees from the increase.

Objectors object to the Counsels' attorney's fees motion (Doc. 2733-1, the "Fee Motion") to the extent it seeks reimbursement for work that the Court finds has not resulted in equitable treatment of the Self-Funded Subclass. The Objectors do not contend that the total fee award in the Fee Motion is excessive either in absolute terms or as a percentage of the benefit made available to the class under the Eleventh Circuit's controlling standards. *See Camden I Condominium Association v. Dunkle*,

946 F.2d 768 (11th Cir. 1991); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 109 (1989).

Instead, and only to the extent this Objection results in an increased allocation for the Self-Funded Subclass, the Objectors' counsel respectfully request a common-fund fee equal to 25% of any increased allocation to the Self-Funded Subclass. An increase in the Self-Funded Subclass's allocation of the settlement fund would necessarily mean that the work performed on behalf of the Self-Funded Subclass did not obtain a fair and equitable result, implicating the eighth *Johnson* factor directly and several other factors indirectly.

In the Eleventh Circuit, "objectors are entitled to attorneys' fees only in the event that they can show either (1) that they conferred some benefit on the class or (2) that they substantially improved the settlement under consideration." *Faught v. Am. Home Shield Corp.*, 444 F. App'x 445, 446 (11th Cir. 2011) (*citing Uselton v. Commercial Lovelace, Inc.*, 9 F.3d 849, 855 (10th Cir.1993); *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir.1977)). An increase of benefit to the Self-Funded Subclass would improve the settlement as to that Subclass, justifying a fee. Thus, Objectors' counsel reserve the right to file a motion for approval of attorney's fees once the final allocation of settlement proceeds to the Self-Funded Subclass is determined.

**CONCLUSION**

As set forth herein, the Court should grant the Objector's objection to the settlement and find that, in its current form, it violates Federal Rule of Civil Procedure 23(e)(2)(D). The Court should give the Self-Funded Subclass the same claim period as the Fully Insured Class and increase the Self-Funded Subclass's allocation of the settlement proceeds accordingly. The Court should further increase the Self-Funded Subclass's allocation of the settlement proceeds so that the Self-Funded Subclass receives at least 45.5% of the available funds. The Court should further deny the Subscribers Counsel's Motion For Approval Of Their Attorneys' Fees And Expenses Application in part and modify its award so that Objector's counsel receive compensation commensurate with the benefit conferred upon the Self-Insured Subclass, subject to a motion for approval of attorney's fees filed by Objectors' counsel at a later date.

Dated July 28, 2021.

*s/J. Thomas Richie*
One of the Attorneys for Objectors

OF COUNSEL
Michael R. Pennington
J. Thomas Richie
Emily M. Ruzic
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

Scott Burnett Smith
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Avenue West, Suite 900
Huntsville, AL 35801-4900
Telephone: (256) 517-5100
Facsimile: (256) 517-5200

Richard D. Nix
Henry D. Hoss
M. Richard Mullins
Mark D. Spencer
MCAFEE & TAFT A PROFESSIONAL CORPORATION
Eighth Floor, Two Leadership Square
211 N. Robinson
Oklahoma City, OK 73102
Telephone: (405) 235-9621
Facsimile: (405) 235-0439

**CERTIFICATION BY OBJECTING PARTY**

The following Objector hereby declares and certifies under penalty of perjury that the factual information relating to it is true and correct based upon the records of the company.

Dated July 28th, 2021.

SERVISFIRST BANCSHARES, INC..

By [signature]

Print Name: Rodney E. Rushing

Its EVP & COO

**CERTIFICATION BY OBJECTING PARTY**

The following Objector hereby declares and certifies under penalty of perjury that the factual information relating to it is true and correct based upon the records of the company.

Dated July 27, 2021.

TOPOGRAPHIC, INC.

By [signature]

Print Name: Brian Krafft

Its President & CEO

**CERTIFICATION BY OBJECTING PARTY**

The following Objector hereby declares and certifies under penalty of perjury that the factual information relating to it is true and correct based upon the records of the company.

Dated July 27, 2021.

EMPLOYEE SERVICES, INC.

By [signature]

Print Name: Kent Abbott

Its President

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing in accordance with the Long Form Notice on the following recipients by United States Mail, First-Class Postage Prepaid on this 28th day of July, 2021.

Blue Cross Blue Shield Settlement
c/o JND Legal Administration
PO Box 91393
Seattle, WA 98111

BLUE CROSS BLUE SHIELD
SETTLEMENT
C/O MICHAEL D. HAUSFELD
HAUSFELD LLP
888 16th Street NW
Suite 300
Washington, DC 20006

DAN LAYTIN
KIRKLAND & ELLIS LLP
300 N. LaSalle St.
Chicago, IL 60657

BLUE CROSS BLUE SHIELD
SETTLEMENT
C/O DAVID BOIES
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504

*s/J. Thomas Richie*
One of the Attorneys for Objectors

# EXHIBIT 1

United States District Court
N.D. of Alabama

Case No: 2:12-cv-20000-RDP

IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION
MDL 2406

# EXPERT REPORT OF:

# THE BDO CENTER FOR HEALTHCARE EXCELLENCE AND INNOVATION

UGO OKPEWHO
AND
JIM WATSON

JULY 27, 2021

# Table of Contents

I. Report Purpose & Scope ....................3

II. Qualifications and Credentials....................3-4

III. Overview of Methodology and Approach....................4-5
  a. Documents Reviewed
  b. Research Performed

IV. Executive Summary ....................5-9

V. Analysis and Commentary on 6/2/21 Burns Charest Memo ....................9-13

VI. Summary of Potential Alternative Settlement Allocation Methodologies....................13-24

VII. Conclusions: Recommended Settlement Allocation Methodology ....................24-28

VIII. Appendix....................29-43

  a. The BDO Center for Healthcare Excellence and Innovation (BDO CHEI)
  b. CV: Ugo Okpewho, Director, BDO Insurance Advisory
  c. CV: Jim Watson, Principal, BDO CHEI
     Materials Relied Upon

## I. Report Purpose and Scope

The BDO Center for Healthcare Excellence and Innovation (BDO CHEI) has been retained by Counsel for the Objecting Parties to provide expert opinion on the following related to the Proposed BCBS Settlement Allocation Methodology:

1. Review and commentary on proposed Settlement Allocation Methodology
2. Summary of relevant healthcare industry business operations as it relates to the Dispute and the Settlement Allocation Methodology
3. Provide proposed Alternative Settlement Allocation Methodologies

Two experts in the relevant industry issues have authored this report (Ugo Okpewho, Jim Watson) whose qualifications and credentials are contained herein. The opinions expressed in this declaration are the result of the information available to us as of the date of this report, and we reserve the right to update this report should new information become available.

## II. Qualifications and Credentials Overview of Methodology

***Ugo Okpewho***

My name is Ugo Okpewho. I have been retained by counsel for the Objecting Group in this matter to review healthcare economic and actuarial science issues related to the BCBS Antitrust Settlement Allocation (the "Dispute Issue"). I have over 20 years healthcare actuarial experience, including experience working within the BCBS plans. During my tenure at BCBS, I was involved in the actuarial analysis related to the very issues we deliberate on in this report.

Specifically, I have been asked to assess the proposed Settlement Allocation, define relevant alternative Settlement Methodologies, and do comparative analysis of Self-Funded (SF) and Fully Insured (FI) customers in certain aspects of the analysis as detailed herein.

***Jim Watson***

My name is Jim Watson. I have been retained by counsel for the Objecting Group (collectively referred to as the "the Objecting Group") in this matter to review healthcare industry issues related to the BCBS Antitrust Settlement Allocation (the "Dispute Issue"). I have over 33 years healthcare experience, including experience with BCBS plans and other payors.

Specifically, I have been asked to assess the proposed Settlement Allocation, define relevant alternative Settlement Methodologies, and do comparative analysis of Self-Funded (SF) and Fully Insured (FI) customers in certain aspects of the analysis as detailed herein.

***The BDO Center for Healthcare Excellence and Innovation (BDO CHEI)***

The BDO Center for Healthcare Excellence & Innovation is a team of interdisciplinary healthcare industry leaders serving the healthcare industry across our service lines in Consulting, Assurance and Tax. The BDO CHEI is recognized as a national resource of data and information relevant to the industry.

The BDO CHEI professionals include Advisors, Actuaries, Accountants, Financial Analysts, Operations Engineers, Physicians, Nurses and other professionals that serve both the front office and the front line to address issues and opportunities in the healthcare industry.

## III. Overview of Methodology and Approach

In forming our opinions regarding the proposed BCBS Subscriber Class Settlement Allocation methodology, we first evaluated the complaint documents to get a sense of the complaints.

We then reviewed the proposed Settlement Agreement, including the proposed Settlement Allocation. We examined whether the factors that drive competitive harm were considered in the application of the Settlement, and its Allocation, to the Customers harmed. In this regard, we have affirmed that SF customers represent more than 50% of the class, and that SF and FI customers would have had similar levels of adverse economic impact from the anti-competitive market behaviors alleged.

We then set forth to define alternatives for a more appropriate Settlement Allocation in light of these facts. Our national team provided input with the latest research on market trends and statistics relevant to the discussion topics. We reviewed opinions from other parties hired to comment on the Settlement Allocation (Professor Joe Mason, Dr. Ariel Pakes). Based on the data, and the evidence produced via the data, we conclude that the Settlement Allocation methodology should be adjusted to align with the objective of the Settlement: To remedy those impacted fairly. Specifically, we recommend the Settlement Allocation methodology be based on Premiums and Premium Equivalents for the FI and SF groups, respectively. Below we provide scenarios of more appropriate Settlement Allocations based on two (2) core variables: Volume and Time Period within each Subclass.

## IV. Executive Summary of Opinion & Recommendations

As we detail herein, there are fundamental flaws in the analysis we reviewed in the Burns Report. Moreover, the expert retained by Self-Funded Subclass Settlement Counsel failed to consider key characteristics of the health insurance industry crucial to reaching a fair allocation between FI and SF subclasses.

The Burns Report includes analysis performed by an economist Joe Mason, who in determining the allocation of funds, compares an average FI premium to the average SF Administrative Services Only (ASO) fee paid by employers to BCBS. We believe that using the ASO fees as a proxy for the allocation to SF parties is the single biggest flaw in the Burns Report and Mason's methodology because it only accounts for a small portion of the actual costs borne by employers in providing health care costs. By including the entire premium (which included the projected medical claim costs) paid by FI customers but failing to include paid medical claim

costs for SF customers the analysis is materially flawed. This is a material flaw given that medical claim costs typically represent up to 85% of the total health plan costs. There are other inconsistencies in Mason's methodology-- for example, failure to include material revenue sources from SF customers in the Revenue Analysis-- that also discredit his method and his assumptions. What we have in the end is an "apples-to-oranges" comparison which may seem appropriate to an untrained observer but is not.

Another material oversight of the Burns Report was the lack of critical value analysis around the provider network and negotiated discounts from providers. Value of the network is central; payors are able to negotiate favorable contracts based on their anticipated volumes. Medical claims costs represent approximately 85% of healthcare costs for FI and SF customers. BCBS's anti-competitive practices allowed them to establish a dominant position in the network management aspects of health plan operations, which allowed them to leverage this position in pricing all their medical claim discounts. They also used this leverage in the negotiation of pricing for services with FI and SF customers. Consequently, BCBS leverage of their networks harmed both SF and FI the same. Subsequently, to state that notwithstanding the SI's 50%+ portion of a payor's covered lives equates to only 6.5% damages allocation makes no sense and there is no data-driven argument provided to support it.

This flaw speaks to a broader central flaw throughout the report, which is the minimization of the SF Customers to the overall success of BCBS. The SF Customers represent anywhere between 50-60% of BCBS covered lives. The core of the product that serves FI Customers and SF Customers – the provider network discounts and care management—represent the core tangible value of the product purchased by either type of customer. Rarely, if ever, are insurance products and networks sold exclusively for FI or SF Customers. There may be differentials in amounts each

group pays to BCBS, but none so significant to drive a material variance to overall value to the degree proposed in the Settlement Allocation. A core oversight in the analysis is the failure to recognize that FI and SF plans consist of primarily the same products—i.e., BCBS networks, Administrative Services, and Other Programs. Yet when considering how to allocate the $2.76B these factors were considered for the FI customers but ignored in significant respects for the SF customers.

The Burns Report spells out three (3) theories for Allocation (Comparison of Revenue, Comparison of Profitability, Comparison of Price Growth) all based on a purported economic theory that favors disproportional allocation to the FI Customers. For each of these narratives, there is no supporting analysis or data provided other than the stated theory. The general economic analysis of the market together with the quantitative analyses and the evaluation of the particular circumstances of the litigation indicate that an allocation of 6.5% of the settlement is an unreasonable allocation to the ASOs.

The Burns Report begins with a conclusory application of Price Elasticity/Economic Theory. In the context of a complex, localized health insurance market, this is not an "apples-to-apples" comparison. This lack of appropriate comparative analysis and analogy surface throughout the report. The Burns Report states: "The Licensees have more market power in the market for FI plans than they do in the market for SF plans, and they therefore have a greater ability to impose an overcharge on their FI plans than they do on their SF plans". [1] This is a fallacy. BCBS' Licensees' are dominant for SF plans just as much as its FI plans. In our experience, this

[1] Burns Charest LLP memo to Richard D. Nix "Allocation of BCBS Settlement" 6/2/21, p.9

is evidenced by the fact that BCBS operate at #1 or #2 in most major US markets with both FI and SF customers.

Mason goes on to add "But the two products are imperfect substitutes, so the Licensees have an incentive to overcharge the SF plans by some amount (but less than the FI overcharge) in order to optimize their product mix." This is a difficult sentence to understand especially with regard to optimization of product mix, other than when viewed through the eyes of a monopoly trying to manage competition among its affiliates while also stifling outside competition. The core product components are largely the same: Fixed cost allocations for administrative services from BCBS, common provider Network and Network Discounts, Medical Management program costs, and Other Program costs, etc.

Our analysis of the Burns Report concludes that (a) Mason's analysis based on Revenue, Profitability and Price Growth is flawed because key components were overlooked, (b) an actuarial approach supports a "total cost of coverage" analysis to better portray a true comparison of FI and SF costs and overall value, and (c) from that analysis the evidence supports different Settlement Allocation percentages based on Dispute Period and Volume variables, which are defined and explained.

After careful consideration of other credible options, we believe the best approach to an appropriate Settlement Allocation Methodology should be developed from a broader "overall cost of coverage" perspective. Our opinion is that the healthcare funding mechanism (FI or SF) does not dictate the degree of harm when determining the extent to which BCBS antitrust activities may have adversely affected members enrolled in health plans. Allocation of funds should be based on the average FI premium rate and the average SF "premium equivalent rate" developed for an employer – defined as the employer's projected "cost" to provide health care to its employees.

All else equal, based on our analysis set forth below, we calculate the average FI rate to be approximately 20% to 35% higher than an average SF premium equivalent rate for the reasons detailed. We also modeled several scenarios under different assumptions for national membership/enrollment weights between the two funding mechanisms (FI, SF) and different Class Periods for the SF subclass.

Based on this data and these calculations, we would expect to see a Settlement Allocation recommendation between 22.8-55.6% for the SF customers. Under no scenario would we expect to see an SF allocation in the single digits.

The details of the analysis of each component of this summary is included below in Section VI "Summary of Potential Alternative Settlement Allocation Methodologies" (pp.13-24) and in Section VII "Conclusions" (pp.29-42).

## V. Analysis and Commentary on 6/2/21 Burns Charest Memo

The Burns Report, which purports to rely on the analysis of an economist who appears to have no relevant healthcare industry experience, recommends a Settlement Allocation Methodology of 93.5% to FI Customers and 6.5% to SF Customers based "on the basis of relative Revenue, Profit and Price Growth." This recommendation is vague, inconsistent and unsupported by any detailed analysis. We believe the analysis is flawed in several key aspects, including omission of several important considerations not addressed in the Burns Report.

First, the biggest flaw, which is addressed above in the Executive Summary, is the inclusion of projected Medical Claim Costs for FI customers but failing to include any paid Medical Claim Costs for SF customers. This is a material flaw in an analysis that is intended to compare FI and SF characteristics, not confuse them. As detailed above, this omission makes that analysis not credible.

Second, the argument that "FI customers are less sensitive to price changes and, consequently, more susceptible to overcharges" is a gross overgeneralization without any referenced data to support that assertion. Under an unsupported and unproven "price elasticity" analogy, in the Burns Report it is argued that because there are more providers of administrative services than fully insured products, fully insured customers are less likely to move because there are less choices. This in and of itself is inaccurate and misleading. But in follow-up to this statement, Mason goes on to state: "In other words, FI customers are less sensitive to price changes and, consequently, more susceptible to overcharges". This is a complete generalization without any supporting analysis to prove this statement. The reality is that *any* insurance product *contains* administrative service support. For a FI customer, the total premium includes the projected cost of claims, the cost of insurance for additional claims risk, and cost of administrative support. For the SF customer, the total premium represents the cost of administrative support, the premium component for the insurance risk is retained by the SF customer. The SF customer purchases the administrative services from the insurer directly, and the FI customers pays for them as a component of the premium. Both are purchasing access to the essentially same provider network and discounts. There is no data to support an argument that there is in fact a real market deficit in either FI or SF health plan options in most services areas in the US.

Third, the underlying premise that SF plans are "loss leaders" is inconsistent with our collective healthcare experience, including work for BCBS plans. Moreover, it is common knowledge in the healthcare industry that SF plans generate positive margins. According to *Modern Healthcare,* margins for the larger national insurers on their SF plans can reach 5%. [2] Insurance industry participants, with BCBS at the top of that list, have produced margins and continue to produce margins far in excess of 0-2% on their products and services including administrative services. [3] Moreover, a 5% margin on SF plans almost certainly understates the complete value to insurance carriers by omitting profits from other

[2] *Modern Healthcare* 1/3/15 "Self-Service Insurance: Insurers forced to compete harder for self-insured customers"
[3] Oracle, 2020 "The Largest Health Plans are Eating Up the ASO and Stoploss Market"

programs sold to SF plans. The number is misleading in addition to being inaccurate.  No insurance company intending to stay in business will continue with a customer producing a negative or no margin for a long period of time.  But when taken in totality, an overwhelming majority of SF customers buy far more services than pure administrative services; therefore, the notion of BCBS "losing money" on SF business simply is not reality and is not supported by any data. It is common industry practice for SF customers to also purchase other types of *coverage* ( for example, Stoploss coverage, Pharmacy coverage) and *services* ( for example, Care Coordination, Wellness programs).  SF customers often pay other *fees* (for example, Data Feed fees, Network Access Fees, Subrogation Fees, Carve-Out Coordination fees). All of these coverage, service and fee types have Profit Loads built in which greatly increase the 0-2% margin on the customer.   Additionally, in BCBS' case, their SF customers sometimes are not allowed to buy competing ancillary products if they want to use BCBS Administrative Services and provider network; even if they are allowed to, they are often charged a free to be allowed to purchase a service from another competitor that BCBS could provide.

      Fourth, the lack of incorporation of provider network discounts into overall value weighting for FI and SSF customers is another misleading omission.  The largest expense/costs for both plans are the medical claim costs – representing over 85% + of the total costs of the health plans.  The negotiated discounts from a structured network engaged in active care management is the central value of any health plan. These value drivers are largely the same for FI and SF customers.  Lastly, BCBS generates both revenues and profits on amounts already being charged. For example, BCBS ownership interests in various Pharmacy-related enterprises produces additional revenues and profits off existing customers which is not often reflected when comparing revenue or profit statistics comparing FI and SF customers. Examples of this include Rebates, Manufacturer Incentives, Discounts, Specialty Drug Ownership, PBM Ownership, Mail Order Rx Ownership.  Another example of this is charging customers for Claims Audits/Recovery:  Charging customers to self-audit claims adjudication performed by BCBS, then typically keeping a portion of what they charge a customer to fix mistakes caused by BCBS in the first

place (i.e., claims processing errors, eligibility processing errors, COB errors). Like comparing Revenue, "Margin" can mean many things. While there may be isolated instances where SF customers generate only a 0-2% margin from the ASO service fee, in our experience this would be a rare occurrence. Insurance carriers take the total value of a customer into consideration, as discussed above, and take into account how margins may vary across the country for more complex customers present in multiple service areas.

Below is a brief summarization of our concerns with the Burns Report:

- **Flawed presentation of ASO Economics** (i.e., exclusion of SF medical claim costs in the comparative model, Margin Statistics). The simplistic price elasticity theory posited is simply not applicable in the complex healthcare market; a proper analysis requires an "apples to apples" comparison. What we have in the Burns Report is a casual--almost irresponsible—gathering of comparisons, inferences and conclusions. The most material and obvious flaw in the current Allocation model is that Burns recognized projected medical claim costs included in the premium on the FI side but failed to recognize paid claim costs on the SF side. Similarly, they only considered the ASO fees on the revenue side but failed to include many additional revenue sources on the SF side (Fees, Ancillary Services, Pharmacy Benefit charges, carveouts).
- **Not considering the importance of SF Customers to the overall makeup and size of BCBS which contributes to BCBS's market dominance** and in turn the value of that dominance to customers and subsequent carry through of that fact to the Damages Calculation and Settlement Allocation Methodology.
- **Not accurately depicting other sources of revenue and profits generated by SF customers in the context of the allocation determination.** Simply stated, if Revenue is used as a means to calculate damages and formulate allocation, it needs to be accurate and reflect the entirety of the SF business model.

- **Lack of incorporation of provider network discounts and care management programs** into overall value weighting for FI and SF customers.

- **Failing to Appropriately Account for the Fact that Retroactive Harm to the Self-Funded Group is Implicitly Admitted in the Settlement's Injunctive Relief**: The arguments supporting the settlement agreement clearly state that the leverage created by SF customers help enable BCBS monopolistic behavior, and that SF customers suffered damages because of that behavior. Certain portions of the Settlement Agreement were directed specifically to SF customers. It makes no sense that experts agree that SF customers were at least equal in the formation of BCBS dominance and entitled to injunctive relief to stop harm to them, but then BCBS and its counsel would argue that SF customers suffered little damage.

- **Lack of supporting analysis and external data sources** or research to support broad-brush statements. There is no supporting analysis, or data, or consideration of alternative methodologies provided in the Burns Report.

## VI.   Summary of Potential Alternative Settlement Allocation Methodologies

Our proposed Settlement Allocation is based on Premium and Premium Equivalents, as we believe that methodology best reflects application of justice to the core parties harmed (FI and SF customers). Below is a brief summarization of other potential Settlement Allocation methodologies:

**Based on Revenue:** Revenues received by an insurance company on a FI arrangement represent premium rates for all covered members. For a SF arrangement, employers pay the insurance companies an administrative fee (sometimes called ASO fee) for administrative claim services. Simply summing up the total premium collected FI customers versus the total ASO only fees collected from SF customers is flawed because the FI premium includes components for projected claims and for other services, but the ASO fee is only one component when considering the complete cost of healthcare for SF customers, and is generally not even the only fee SF customers pay to BCBS. There are many ways health insurers

generate revenue from SF customers, which sometimes is not reflected as Administrative Fee Revenue. Additionally, BCBS plans often "bundle" administrative services with additional fees, or worse, charge SF customers fees to "allow" the customer to purchase competing services from competitors. Further, BCBS plans charge fees to then implement and integrate such services with the rest of the BCBS customer coverage. The ASO fee is therefore only one of the components in our buildup of a SF premium equivalent rate in our analysis pertaining to performing the allocation based on premium rates.

**Based on Expense:** Insurance companies incur expenses during the normal course of business – marketing, sales, legal fees, etc. And these are all dependent on the size, complexity and product mix of each group. To base this settlement allocation on expenses alone would involve attempting to determine the insurer's expenses that go into the average SF versus FI contract and this would be very difficult to do. This method used alone would be flawed because it is just one component when considering the complete impact to the cost of healthcare. _Expenses is therefore only one of the components in our analysis pertaining to performing the allocation based on premium rates.

**Based on Profit Margin:** Profit margins on a FI premium represent the portion the insurer intends to keep after paying claims, expenses and taxes & fees. On the SF side, the employers pay an ASO fee to the insurer and it is difficult to determine if a profit is made on one employer versus another; employers vary by size, complexity, product mix, etc. and profit varies at the employer level from year to year. Basing the settlement allocation on profitability is a flawed approach because it does not capture the complete impact to the cost of healthcare. A profit assumption is therefore only one of the variables baked into the comparison of the FI premium rate and the premium equivalent rate used in our analysis.

**Based on Price Growth:** In the Burns Report, Price Growth on the FI side represents the historical increases in the average FI premiums. On the SF side, it represents the historical increases in the average ASO fees. This is another example of flawed approach in the analysis. FI premiums have historically increased at a larger magnitude than SF ASO fees. But basing the settlement allocation based on price growth is a flawed approach because it omits several key components of Price Growth in the SF

analysis. SF customers are exposed to the same types of Price Growth as FI customers: Medical Claim Expense increases, Administrative Expense increases, Pharmacy cost increases etc. There is no logic or fairness to argue that it should be based on Price Growth between the total premiums for the FI customers and only the ASO fees for the SF customers.

**Based on Covered Lives:** Lives covered by an insurance company refers to the people who are eligible to receive healthcare benefits from the insurance company. To base this settlement allocation on lives covered alone would involve splitting out the number of FI versus SF members covered and determining the percentages attributable to each. This method used alone is flawed because it is just one component when considering the complete impact to the cost of healthcare. The number of covered lives attributed to each funding mechanism is one of the variables we use in our analysis when calculating ranges of possible settlements allocations based on the information available to us.

**Based on Claims Paid:** When medical care is performed, an insurance company pays claims on behalf of its covered individual or group members. Under a FI arrangement, the insurance company accepts the risk for the paid claims in return for a monthly premium. That premium includes the projected costs of the medical claims. Under a SF arrangement, the insurance company pays the claims initially, but gets reimbursed by the employers, who also pay the insurers an administrative fee for their services. To base this settlement allocation on paid claims alone would involve splitting out the entire pool of paid claims between the two funding mechanisms and determining the percentages attributable to each. This method used alone is flawed because it is just one component when considering the complete impact to the cost of healthcare. _Claims paid is one of the components in our analysis pertaining to performing the allocation based on premium rates.

**Based on Premium Rates and Premium Equivalents:** Our methodology, based on Health Insurance Premiums and Premium Equivalents, addresses the central impact of BCBS' market behavior: Its impact on the overall cost of healthcare coverage. Our opinion is that the

healthcare funding mechanism (FI or SF) does not dictate the degree of harm when determining whether BCBS antitrust activities may have adversely affected members enrolled in health plans, and that the allocation of funds should be based on the average FI premium rate and the average "premium equivalent rate" developed for an employer – defined as the employer's projected "cost" to provide health care to its employees (prior to employee contributions). The section below details the analysis of each component and the relative percentage differences in rates.

The analysis demonstrates that (a) Mason's analysis based on Revenue, Profitability and Price Growth are flawed because key components were overlooked in that analysis, (b) actuarial analysis supports a "total cost of coverage" analysis to better portray a true comparison of FI and SF costs and overall value, and (c) from that analysis the evidence supports a few different Settlement Allocation percentages based on Dispute Period and Volume variables, which are defined and explained.

**A. <u>Analysis</u>**

This section below breaks down and compares the various components that build up the premium rates for the typical SF and FI plan. Due to the overall complexity of healthcare and the lack of available data for use in this analysis, we provide the variances in a percentage range format based on a combination of researched articles and years of actuarial expertise working for health insurance companies and employee benefits consulting firms.

**1. <u>Base Period Per Member Per Month (PMPM) Claims Cost</u>**

The largest component contributing to premium rates is the PMPM (per member per month) claims cost, which represents the average medical and prescription drug costs for a prior period measurement. Actuaries typically consider 1 year of prior year claims experience but

may consider an average of multiple years depending on how well they believe the claims represent the population under average circumstances. This is the foundation of any rate development as it used to project average costs for the upcoming plan year using trend assumptions. Claims costs are driven by the number of healthcare services consumed and the unit prices of the services consumed. Customers access care via networks of healthcare providers (i.e., physicians, hospitals). These providers sign contracts with health plans that specify unit prices and medical management program requirements. Medical management programs are all designed to control and manage the costs of healthcare for macro and micro populations of health plan enrollees. Because the networks are largely the same across FI and SF customers, the providers that provide care to the customers are largely the same. All these providers have signed agreements all very similar in structure and requirements, especially as it relates to the 2 variables noted above (Unit Price, Utilization). There are not substantial differences across FI and SF clients related to the underlying medical management programs (to manage the utilization of services) or the reimbursement (unit prices paid to providers). Consequently, there are not substantial differences between SF and FI PMPM base period costs because of network discounts since the network and rates apply to both FI and SF customers, and utilization of services will have more variability on a customer basis (since that is a function partly of the population's health status itself) than network discounts (which are same for all customers). In our collective 50+ years of experience, we have never seen health plans establish provider networks exclusively for SF or FI customers other than HMO networks which are federally regulated and available only to FI customers. In our experience we have seen health plans try to establish rate differentials across products (i.e., HMO vs. PPO) but never at a funding level (i.e., FI vs. SF).

These efforts have largely failed over time and are less prominent in today's market. In other words, SF and FI clients accessing BCBS's network will receive the materially the same discounts from providers. For this analysis, we have included a 15% adjustment factor to recognize the existence of rate differentials across HMO and PPO products.

⇨ ***Conclusion:*** ***No significant difference between FI and SF customers beyond typical line of business variations in rates of 10-15% between HMO and PPO products. The relevance of this conclusion is that for the single most critical health plan tool being purchased (the provider network), while there is arguably some variation recognized between "value" for FI vs. SF customers, that value differential is not as material as argued in Mason's method. The data herein provides evidence supporting a more scientific and supportable conclusion regarding Settlement Allocation.***

## 2. PMPM Claim Trend

This is the anticipated increase in claims cost that is used to project the base period PMPM to a future rating period. A SF plan's trend is usually specific to its own specific experience and mix of members, which often does not fluctuate significantly and is typically easier to manage through the years using programs specifically designed to lower healthcare spend in high costing categories. On the other hand, a health insurer typically utilizes a trend assumption for their FI plans that represents the weighted average trends of all their business

lines – which could lead to less profitable business segments subsidizing others in the company.[4]

⇨ ***<u>Conclusion</u>: Claims Trend for FI customers approximately 2% - 4% higher than Claims Trend for SF customers driven primarily by actuarial loads inserted by insurers (margin, cost shifting, conservatism)***

### 3. Additional Margin & Pricing Loads Applied

During the premium equivalent rate development for SF plans, employers typically include an additional percentage padding in their rates (referred to as margin) for unanticipated high claims – typically a number depending on the employer's appetite for their resulting overall premium increase. In the case of the FI premium development, a similar margin is applied as well as an additional one referred to as a morbidity load. This load typically accounts for the added risks of unanticipated high claims associated with the individual and small group markets. In the Individual market, individuals could obtain coverage only when they need medical care, which drives up claim costs (referred to as adverse selection). In the small group market, some groups may not have enough healthy members to balance out the sick members – which could lead to higher average claim cost for the group. [5]

[4] Self-Insured vs. Fully Insured (https://www.shrm.org/hr-today/news/hr-magazine/pages/0909wellsc.aspx). Self-Insured Employer Health Benefits Strategy Established a Negative Cost Trend While Improving Performance (https://www.liebertpub.com/doi/full/10.1089/pop.2018.0184)

[5] ACA Premium Impact – Variability of Individual Market Premium Rate Changes (https://www.in.gov/aca/files/Individual_Market_Premium_Rate_Change_Variability_under_the_ACA_Final.pdf)
Report on Merging the Individual and Small Group Markets (https://hbex.coveredca.com/stakeholders/plan-management/PDFs/Merged_Individual_and_Small_Group_Market_Report_DRAFT.pdf)

⇨ ***Conclusion:** Margin & Pricing Load Impact for FI customers is approximately 4-6% higher than SF customers driven primarily by actuarial loads inserted by insurers (margin, stoploss, cost shifting)*

## 4. Rebates

Pharmacy Benefit Managers (PBMs) manage prescription drugs on behalf of insurers and employers by negotiating rebates from drug manufacturers in exchange for better coverage terms -- often in the form of lower co-pays for brand name drugs. This makes it more likely that policyholders will choose a cheaper brand name medication over a competitor's version. Like many things in the health insurance industry, policy varies as to what percentages of savings that insurers pass along to employers, and employers in turn to consumers. There is profit margin for both in that decision.[6]

⇨ ***Conclusion:** No significant difference in cost between FI and SF customers*

## 5. Mandated Benefits (Essential Health Benefits)

Each state has unique mandate laws that govern benefits that must be covered by FI health plans. Even where states have the same mandate, it is typical for rules and regulations to vary by state. Consequently, it is typical for state mandate laws to increase health insurance premiums from 3% - 5%. These costs are not borne by SF plans, which are exempt from such laws and regulations. [7]

---

[6] https://www.commonwealthfund.org/publications/explainer/2019/apr/pharmacy-benefit-managers-and-their-role-drug-spending
[7] Employer Premiums and the ACA (https://www.factcheck.org/2017/03/employer-premiums-and-the-aca/)

⇨ ***Conclusion:*** ***FI approximately 3% - 5% higher than SF. The ACA has stimulated competition among FI and SF providers, as some employers choose self-funding over additional premium costs borne out of the ACA, while other employers choose FI products as a means to manage risk and financial exposure due to variability under SF models.***

### 6. Plan Design Deductible Leveraging

As healthcare costs increase and deductibles and copays for the average insured individual remain relatively flat or increase at a slower pace, the employer's burden of overall costs increases. This is called cost share (or deductible) leveraging, which is an increase in the actuarial value of the employer's share. Based on our actuarial experience in valuing these plan designs across funding types, there is no meaningful difference in the relative change in plan values year over year between the average FI and SF plans.[8]

⇨ ***Conclusion:*** ***No significant difference in cost between FI and SF customers***

### 7. Net Stop Loss & Federal Reinsurance

Stop loss and reinsurance are pooling mechanisms that offer protection against catastrophic losses. In the premium equivalent rate development process for SF plans, employers typically negotiate a stop loss premium with a stop loss provider – which is built into the premium equivalent rate.[9] The anticipated recoveries from the stop loss provider (a reduction

[8] Leveraged Trend: What It Means and How It Affects Self-Insured Employers (https://www.stoplossins.com/leveraged-trend-what-it-means-and-how-it-affects-self-insured-employers/). What is Leveraged Trend? (https://www.crumdalepartners.com/what-is-leveraged-trend/)
Behind the Numbers - Why Medical Trend Averages May Be Misleading (https://www.starmarkinc.com/getattachment/29ae27b5-654e-4a1c-b777-919c25f74c32/B680-T500-375-br-(sb)_UA.pdf.aspx)

[9] In the Plan of Distribution, the stop loss premium was included in the definition of "Administrative Fees".

to premium) are also built into the rates – and in some years, there is a net gain while some years yield a net loss. In the FI premium development, the reinsurance program is similar, but is federally run. The premiums the health insurer pays into the federal reinsurance pool are built into the rates, as well as the anticipated recoveries which are an offset to premiums. Based on our actuarial experience, including experience in pricing premiums across funding types, there is no meaningful difference in the net stop loss and reinsurance since they are cyclical and eventually balance out over a long period of time.

⇨ ***Conclusion:* No significant difference in cost between FI and SF customers**

## 8. Overhead & Marketing Expenses

Health insurers may include expense loadings in their FI premiums for new business sales, marketing expenses, and retention of current customers – and these costs can be as high as 2% to 4%. Additionally, SF employers will incur these same expenses.[10]

⇨ ***Conclusion:* FI customer costs approximately 3% - 5% higher than SF customers**

## 9. Taxes & Fees

Another component of a premium equivalent for SF plans is the Patient-Centered Outcomes Research Institute (PCORI) fee, which was first applied to plans in 2012. Aside from this fee, SF plans are exempt from taxes that are applicable to FI plans. These taxes include, health

[10] Insured vs. Self-Funded Healthcare (or Health Benefit Plans) (https://www.hfbenefits.com/sites/default/files/basic_page_files/WhitePaperHCAA.pdf)

exchange fee, state premium taxes & risk adjustment fees and contribute to approximately 4-6% increase in premiums.[11]

⇨ ***Conclusion:** FI customer costs approximately 4% - 6% higher than SF customers*

**10. Profit & Risk Loading**

Health insurers typically include a risk charge when developing FI premium rates to account for the fact that they are at risk if claims expenses exceed projections. The SF rate does not include this a risk charge since the employer is responsible for the claims. Insurers also add a profit as the cost of doing business.[12]

⇨ ***Conclusion:** FI customer costs approximately 3% - 5% higher than SF customers*

Table 1 below summarizes the components of the premium build-up as well as the estimated relative percentage variance between both funding mechanisms

[11] https://www.thehortongroup.com/taxes-and-fees-under-the-affordable-care-act

[12] Self-service insurance: Insurers forced to compete harder for self-insured customers
https://obamacarefacts.com/obamacare-taxes/
https://www.cigna.com/employers-brokers/insights/informed-on-reform/fees-taxes
https://www.optimahealth.com/documents/collateral-materials/2020-aca-taxes-and-fees-grid.pdf

**Table 1: Comparative Premium Build Up (Fully-Insured and Self-Funded Customers)**

| | Self-funded Rate | Fully Insured Rate | Variance |
|---|---|---|---|
| **Base Period PMPM Claim Cost** | Prior period average cost | | None |
| **Claim Trend** | Typically, employer-specific experience | Could be leveraged | Fully Insured approx. + 2% - 4% |
| **Morbidity Load & Fluctuation Margin** | Claims fluctuation margin | Fluctuation margin & morbidity load | Fully Insured approx. + 4% - 6% |
| **Rebates** | PBM passes share of rebates to Employer | PBM passes share of rebates to Insurer | None |
| **Mandated Benefits** | N/A; plan design flexibility | ACA mandates essential coverage | Fully Insured approx. + 3% - 5% |
| **Plan Design Leveraging** | Deductible leveraging typically increases plan actuarial values 1-2% | | None |
| **Net Stop Loss/Reinsurance** | The gain/loss from recoveries over fees are sometimes cyclical | | None |
| **Administrative Expenses** | Freedom to market drives down cost | Loaded for enterprise-wide initiatives | Fully Insured approx. + 3% - 5% |
| **Taxes & Fees** | PCORI Tax | Exchange, Premium, Risk Adj Fee & PCORI | Fully Insured approx. + 4% - 6% |
| **Profit & Risk Loading** | N/A | Profit (+ 1-2%); Risk Charge (+ 2-3%) | Fully Insured approx. + 3% - 5% |

| Combined Variance |
|---|
| **Fully Insured approx. + 20% - 35%** |

## VII. Conclusion: Recommended Settlement Allocation Methodology

The Burns Report includes analysis performed by an economist (Joe Mason) who, in determining the allocation of funds, compares an average FI customer premium (which includes medical claims costs) to the average Administrative Services Only (ASO) fee paid by employers to health insurers (which DOES NOT include medical claims costs). We believe that using the ASO fees as a proxy for the allocation to SF parties is flawed because it only accounts for a small portion of costs borne by employers in providing health care coverage. It completely ignores the SF customers' payments for medical claims costs—usually over 80% of the overall

cost of the health plan. FI customers also pay projected claim costs as part of their premium, and it is inconsistent to include such costs for one side but not the other in determining Settlement Allocation.

Our opinion is that the allocation of funds should be based on the average FI premium rate and the average "premium equivalent rate." We are approaching this from a perspective of estimating the relative percentage differences of each component in the buildup of the premium rates of both funding sources. The section below details the analysis of each component and the relative percentage differences in rates.

Our Recommended Settlement Allocation Methodology takes into account 2 key variables: FI/SF Volume and Settlement Periods. To adequately and appropriately make a qualified recommendation on Settlement Allocation, we must consider the relative weighting of value each customer brings to BCBS' overall market position and we must consider the periods of time. All else equal, we expect the average FI premium to be approximately 20% to 35% higher than an average SF premium equivalent rate for the reasons explained above. Using reasonable healthcare and actuarial methods in calculating premium rates, the table below provides reasonable ranges of what we would expect to see based on the information available to us. Table 2 below illustrates the low (20%) and high (35%) premium rate differential, coupled with enrollment assumptions and calculations for the "Burns Report Class Period" and the "Equal Class Period."

*Enrollment Assumptions:* Based on our research on the percentage of employers who are SF, we observe that from 2000 to 2020, that percentage range has been 49% to 67% -- an average of 57% over the 20-year span. We conclude there are two reasonable scenarios:

- Using a 50%/50% split meaning that there is an equal number of SF and FI members in the BCBS portfolio.
- Using a split of 60% for the SF and 40 % for the FI.

*Class Period Assumptions:*

- The Burns Report Class Period assumption is based on the Burns Report (SF: 09/2015 – 10/2020 & FI: 01/2008 – 10/2020) which results in the FI members incurring damages for a longer time period than the SF members.
- Equal Class Period: The other assumption is that there is no difference in class periods (equal amounts of time for both subclasses).

Table 1 provided a detailed comparison of health care Premium and Premium Equivalents to demonstrate the comparative total costs of coverage between FI and SF customers. From that table, we demonstrated that the data indicates that FI Premiums are 20-35% higher than SF premiums in aggregate. The next step of the analysis entails determining Settlement Allocation recommendations for each data point (low=20%, high =35%) and Enrollment Percentages (FI v SF). The next step of the analysis entails determining Settlement Allocation recommendations for each data point (low=20%, high =35%) and Enrollment Percentages (FI v SF).

Table 2 below summarizes those Allocation Calculations based on a Total Cost of Coverage analysis.

**Table 2: Allocation Calculations Based on Total Cost of Coverage:**

| | Self-funded | Fully Insured |
|---|---|---|
| **Scenario A: Fully Insured Rate 20% higher than Self-funded** | | |
| --> Enrollment Assumption | 50% | 50% |
| Burns Report Class Period | 24.9% | 75.1% |
| Equal Class Period | 45.5% | 54.5% |
| --> Enrollment Assumption | 60% | 40% |
| Burns Report Class Period | 33.3% | 66.7% |
| Equal Class Period | 55.6% | 44.4% |
| **Scenario B: Fully Insured Rate 35% higher than Self-funded** | | |
| --> Enrollment Assumption | 50% | 50% |
| Burns Report Class Period | 22.8% | 77.2% |
| Equal Class Period | 42.6% | 57.4% |
| --> Enrollment Assumption | 60% | 40% |
| Burns Report Class Period | 30.7% | 69.3% |
| Equal Class Period | 52.6% | 47.4% |

**Scenario A indicates that** at the lower end of the premium difference (20%) with an assumption of enrollment split equally (50/50) between SF and FI customers, data supports an appropriate Settlement Allocation of 24.9% SF / 75.1% FI (when considering the Burns Report Class Period) and a Settlement Allocation of 45.5% SF / 54.5% FI customers (when considering the Equal Class Period). Scenario A further indicates that if we keep all other assumptions the same except change the assumption of enrollment split to 40% SF / 60% FI, then, data supports an appropriate Settlement Allocation of 33.3% SF / 66.7% FI (when considering the Burns Report Class Period) and a Settlement Allocation of 45.5% SF / 54.5% FI customers (when considering the Equal Class Period).

**Scenario B indicates that** at the higher end of the premium difference (35%) with an assumption of enrollment split equally (50/50) between FI and SF customers, data supports an appropriate Settlement Allocation of 22.8% SF / 77.2% FI (when considering the Burns Report

Class Period) and a Settlement Allocation of 42.6% SF / 57.4% FI customers (when considering the Equal Class Period). Scenario B further indicates that if we keep all other assumptions the same except change the assumption of enrollment split to 40% FI/ 60% SF, then, data supports an appropriate Settlement Allocation of 30.7% SF / 69.3% FI (when considering the Burns Report Class Period) and a Settlement Allocation of 52.6% SF / 47.4% FI customers (when considering the Equal Class Period).

Nothing in the Court record, Burns Report or the Feinberg Report suggests any of the above mentioned factors were considered by the FI, SF, or their counsel in determining the Allocation percentages for the SF and FI groups. Given that the SF group, representing a majority of BCBS's covered lives and, paid more in health care costs than the FI group during the damage period then the natural conclusion is that BCBS's anticompetitive actions had the greatest impact on them. None of the theorical arguments made by the other experts successfully overcomes this simple truth.

The Allocation was flawed from the beginning. The allocation of 93.5% to the FI group and 6.5% to the SF group is not fair. The allocation should be more in line with what is outlined above, which is aligned the objective of the Settlement.

We declare under penalty of perjury the foregoing is true and correct.

**Executed this 27th day of July 2021:**

Ugo Okpewho, FSA, MAAA

Jim Watson, MBA

## VIII. Appendix

a. The BDO Center for Healthcare Excellence and Innovation (BDO CHEI)
b. CV: Ugo Okpewho, Director, BDO Insurance Advisory
c. CV: Jim Watson, Principal, BDO CHEI
d. Materials Relied Upon

# The BDO Center for Healthcare Excellence & Innovation

The BDO Center for Healthcare Excellence & Innovation brings together the best minds from different disciplines to think in new ways about how to address challenges and seize opportunities in healthcare.

Our goal is to deliver fresh insights to our clients and help them implement change. We leverage insight and experience across all aspects of the healthcare industry to help organizations anticipate change and overcome the many hurdles associated with risk-based reimbursement, policy change, and clinical outcomes. We help our clients find new opportunities to improve performance in the short-term as well as achieve longer-term transformational change.

Our practice brings together healthcare leaders with deep healthcare experience across financial, clinical, operational, data analytics, and legal disciplines. BDO is committed to a uniquely collaborative culture that breaks down barriers, building bridges between the many disciplines required to create robust organizational change, creating seats at the table for all invested parties.

We work closely with our clients, matching our resources to the complex and unique needs of each.

Our seasoned professionals include:

- Compliance Advisors
- Healthcare Executives
- Clinical Practitioners
- Financial Analysts
- Economists
- Statisticians
- Investment Bankers
- Forensic Technologists
- Tax Accountants
- Auditors
- Regulatory Specialists

VALUABLE HEALTHCARE ADVISORY SERVICES OUR TEAM PROVIDES:
Strategy, Operations, and Implementation
Audit Services
Tax Advisory and Compliance Services
Clinical Outcome Statements
Cybersecurity
ACO Development
Black Box Analysis
Five Star Rating Improvement
Financial Improvement
Bundled Payments
Fraud, Waste, and Abuse
Independent Review Organizations & Monitorships
Forensic Financial and Clinical Review
Post Acquisition Disputes
Physician Alignment /Engagement
System Optimization & Sunset of IT Legacy Systems Following Cerner Implementation
Due Diligence
Valuations
Delivery System Reform Incentive Payment Program
Revenue Cycle
Revenue Recognition and Reimbursement Issues
Market and Financial Feasibility Studies
Post Merger Integration
Risk Advisory Services
Transaction Advisory Services
HIPAA Risk Assessments and HITRUST CSF Assessment
SSAE 16 Reviews
The BDO Center for Healthcare Excellence & Innovation
BDO
Click here to learn more

# BDO's Healthcare Industry Thought Leadership

BDO's industry leaders are at the forefront of the healthcare conversation, remaining active in organizations and associations and contributing research and insights regularly to a wide variety of news outlets, trade publications, webinars, events, and thought leadership.

We value the importance of industry participation as a key opportunity to increase our knowledge on industry trends and issues and cultivate conversations to keep our clients up to date as changes happen.

## PUBLICATIONS AND TECHNICAL UPDATES

We share our knowledge through a variety of thought leadership, keeping clients abreast of relevant news and hot topics that go beyond balance sheets and financial statements.

- *BDOKnows Healthcare*: A quarterly newsletter examining issues and trends affecting healthcare organizations.
- *BDO 600: Healthcare*: A study conducted annually examining board compensation practices of 600 mid market public companies with annual revenues between $25m and $1b.
- *Perspective in Healthcare*: Features examining the role of private equity in the healthcare industry.

## RECENT THOUGHT LEADERSHIP

Click each thought leadership piece below to view the full article on our website

   

   

# BDO's Healthcare Client Experience

## ADDITIONAL HEALTHCARE CLIENT EXPERIENCE

### Hospitals & Health Systems

- Alaska Native Tribal Health Consortium
- Ardent Healthcare
- Brookhaven Memorial Hospital Medical Center
- CarePoint Health System
- Community Health Systems
- Hanover Hospital
- Henry Mayo Newhall Memorial Hospital
- Howard University Hospital
- Morehouse School of Medicine
- Integrated Healthcare Holdings Inc
- Lodi Memorial Hospital
- Lutheran Medical Center
- New York Hospital Queens
- New York Methodist Hospital
- New York Presbyterian Hospital
- NYU Langone Medical Center
- Prime Healthcare
- Prospect Medical Holdings Inc
- Rothman Institute Orthopaedics
- Richmond University Medical Center
- Select Medical Corporation
- South Nassau Communities Hospital
- Staten Island University Hospital
- Sutter Health
- The Villages Health
- University Medical Center of Southern Nevada
- Universal Health Services
- University of North Carolina
- Virginia Mason Medical Center
- White Plains Hospital
- Yukon Kuskokwim Health Corp

### Physician & Other Provider Groups

- Altean Health
- Anchorage Neighborhood Health Center
- Anchorage Heart & Vascular
- Brown & Toland IPA ACO
- Hospice Compassus
- Illinois Bone & Joint
- North American Partners in Anesthesia (NAPA)
- Surgery Partners
- The Oncology Institute

### Behavioral Health Services

- Anixter Center
- Behavioral Health Group
- Chicago Institute for Psychoanalysis
- Hopewell, Inc
- Huckleberry House, Inc.
- New Directions Behavioral Health
- Phoenix House
- Services for the Underserved
- Turning Point Behavioral Healthcare

### Long-term Care

- Aerocare
- American Health Companies
- BrightStar Care
- Diversicare Healthcare Services
- Health Essentials
- Hospice Compassus
- Reliant Senior Care Holdings
- Sava Senior Care
- Westchester Visiting Nurse Services Group Inc

*Includes audit, tax and advisory client

# BDO's National Presence

For more than 100 years, BDO USA has been recognized as a premier accounting, tax, and advisory organization for our exceptional client service; experienced, accessible service teams; focus on quality and efficiency; and our ability to adapt to, and navigate successfully in, a changing marketplace.

Founded as Seidman & Seidman in New York City in 1910, the firm has grown to serve clients through 65+ offices and over 740 independent alliance firm locations nationwide. Today, BDO USA, LLP, a Delaware limited liability partnership, is the U.S. Member of BDO International Limited, a UK company limited by guarantee, which forms part of the international BDO network of independent member firms.





[illegible]@bdo.com

Direct: 212-885-8[illegible]
Mobile: [illegible]

100 Park Avenue New York, NY 10017
212-885-8000
www.bdo.com

## Ugo Okpewho, FSA, MAAA
**Director, Insurance Advisory**

### EXPERIENCE SUMMARY

Ugo has over 20 years of healthcare actuarial experience, including serving clients from actuarial roles within public accounting and benefits consulting firms, and performing diverse roles within health insurance companies related to Commercial & Government programs (Individual, Small/Large Group, Medicare & Medicaid). His experience prior to joining BDO include positions with a national benefits consulting firm, Blue Cross Blue Shield regional health insurance carriers, National PBM, and a Big Four accounting firm.

Ugo has worked with leadership at insurance companies, self-insured organizations, and various state insurance regulators to help solve a wide variety of problems related to financial reporting, pricing, reserving, forecasting, due diligence for mergers and acquisitions, and meeting statutory requirements. He has provided feedback to executive management, audit committees, and Boards of Directors on reserve rate adequacy and financial reporting processes, including company-specific trends impacting its financial results and effects of market and industry changes on similar books of business.

### PROFESSIONAL AFFILIATIONS

Fellow of the Society of Actuaries (FSA), Member of the American Academy of Actuaries (MAAA)

### EDUCATION

B.S., Financial Analysis and Mathematics from State University of New York (SUNY) at Buffalo

### COMMUNITY INVOLVEMENT

International Association of Black Actuaries (IABA): Board Member
American Academy of Actuaries (AAA): Health Equity Task Force

**Ugo E. Okpewho, FSA, MAAA**
9 Barone Road ~ West Orange, NJ 07052 ~ 609-332-7872
Uokpewho@hotmail.com

## OBJECTIVE

I'm a health actuary with over 20 years of diverse healthcare experience with insurance companies and consulting firms. I have a passion for growth and development of myself and others. I am an excellent communicator skilled in data analysis, model building and research. I search a leadership role within an organization that utilizes my actuarial skills as well as passion for collaboration and innovation.

## EDUCATION and OTHER CREDENTIALS

- BS – Business Administration (Financial Analysis concentration), State University of New York at Buffalo, Amherst NY - December 1998 - National Dean's List
- Fellow of the Society of Actuaries (FSA)
- Member of the American Academy of Actuaries (MAAA)
- Fellow of the Conference of Consulting Actuaries (FCA)
- International Association of Black Actuaries (IABA): Board Member
- Insurance Licenses: Life and Health; Property & Casualty

## COMPUTER SKILLS

- Analysis: Mainly Microsoft Excel & Access (VBA & SAS programming earlier in career)
- Presentation: Microsoft Word & PowerPoint, Adobe PDF

## EMPLOYMENT HISTORY

**BDO, LLP, New York NY**
Director & Health Actuarial Leader, Insurance Advisory Services: May 2020 – Present

- Manage a staff of 5 and lead all healthcare related actuarial projects for BDO including pricing of healthcare policies/claims, actuarial value calculations, experience studies, developing projection models, reserve estimates, provide technical & audit support, etc.
- Business development
- Thought leadership: speaking engagements and published articles

**Cammack Health, LLP/Aon Risk Solutions, New York NY**
VP & Actuary, Aon Risk Solutions: September 2016 – April 2020

- Similar functions as the Cammack role below, excluding the managerial duties

SVP & Chief Actuary, Cammack Health LLP: June 2016 – August 2016
Cammack Health, LLP, New York NY *(Purchased by Aon in August 2016)*

- Lead a team of actuaries/analysts focusing on financial analytics and population health monitoring and reporting for mainly hospital clients involving:
  - IBNR valuation
  - Fully & Self-Insured pricing and rate determination for renewals for Medical, Prescription Drug, Dental, Vision & other ancillary products
  - Plan design strategy, consultations and revisions
  - Population health consulting (including ROI and feasibility studies)
- Re-design & construction of Cammack Health's financial & projection models

**Horizon Blue Cross Blue Shield of NJ, Newark NJ**
Lead Actuary, Individual Market: August 2010 – May 2016

- Lead/mentored a small team of actuaries & actuarial students. Also involved in various

    leadership & mentorship programs within the organization

- Monthly Incurred Claims and Reserve valuations (IBNR)
- Monthly financial analysis and P&L reconciliations
  - Including estimating accruals for the 3Rs (Reinsurance, Risk Corridor & Risk Adjustment) for the Individual market
- Quarterly forecasting/budgeting and financial projections; trend reporting
- Pre-ACA & ACA Rate Filings for the Individual & SG markets

**Medco Health Solutions, Franklin Lakes NJ**
Actuary, Retiree Solutions Group: February 2009 – July 2010

- Medicare D Prescription Drug Plan (PDP) bid support
- Design and construction of PDP cash flow, pricing and forecasting models
- Design and construction of Prescription Drug IBNR calculation model
- Perform Actuarial Equivalence (AE) attestation and signoffs

**PricewaterhouseCoopers, LLP, New York NY**
Consulting Actuary, Global HR Solutions (Health & Welfare): August 2006 -- January 2009

- Managerial role in which I had various junior actuarial analysts working on client deliverables
- IBNR calculations for employers and health plans
- Health care trend, cost & utilization analysis and reporting
- Health care strategy, health plan design and pricing
- Financial projections and analysis
- Benefit plan redesign, renewal review, vendor selection assistance
- Mergers & Acquisitions deal projects: Valuation of healthcare benefits

Research Actuary, Health Research Institute

- Macro-level health industry research, analysis & writing
- Published articles (contributing author):
  - Behind the Numbers -- Medical Cost Trends for 2009 http://wmimutual.com/publications/pdf/2009/hcregister.pdf
  - What employers want from health insurers (2009) http://www.nonprofithealthcare.org/archives/What_001.pdf

**CareFirst Blue Cross Blue Shield, Owings Mills MD**
Senior Actuarial Analyst, Large Group Pricing: January 2005 – July 2006

- Pricing of Specific and Aggregate Stop Loss coverage for 50+ groups
- Team with Underwriting, Marketing and Sales in renewals for current groups, and request for information (RFI/RFP) analysis for prospective accounts
- Quarterly Trend & Utilization reporting

Senior Actuarial Analyst, Actuarial Valuations: March 2003 – December 2004

- IBNR for Medical, Pharmacy, Dental and other products within Individual and Group businesses
- Quarterly Medical & Ancillary Trend reporting

**Horizon NJ Health (formerly Horizon Mercy), Trenton NJ**
Healthcare Analyst, Finance Department: August 2000 – February 2003

- IBNR for Medical, Pharmacy and Dental services
- Trend projections for hospital, pharmacy and ancillary services for medical budgeting purposes
- Return on Investment (ROI) models and Valuations for disease management programs
  - Contributing author in a 'best practice' published Asthma ROI Study
- Worked with Controller and independent auditors in establishing reasonability of revenue and

expenses for financial statements and statutory reporting
- Monthly calculation of Maternity and Pharmacy revenue receivables owed by the State of NJ

**INTERESTS and OTHER**
- Soccer: Earned All-Conference awards for 4 consecutive years in college.  Proceeded to a brief professional soccer career upon graduation
- Current passions: Golf, Tennis, Weight-training, Chess & watching my kids play sports
- Fluency in Ibo and Pidgin (Nigerian Languages)

BDO

[illegible]@bdo.com

Direct 847 410 [illegible]
Mobile 630 [illegible]

[illegible] Bryn Mawr Avenue
Suite 300
Rosemont IL 60018
Tel 847 [illegible] 2000
Fax 847-[illegible]

bdo.com

## Jim Watson
## Healthcare Advisory Partner

### EXPERIENCE

Jim Watson is a Partner with the BDO Healthcare Advisory practice with over 30 years of senior management experience in healthcare Strategy, Operations and Managed Care.

Jim has an extensive background in working with health systems, hospitals and physician networks on Managed Care and Value Based Contracting with relevant experience in Strategy Development & Execution, Payor Provider Contract Negotiation and Contract Implementation & Management. Jim's experience covers an array of business models including Global and Partial Risk Contracting, Shared Savings Programs, Patient Attribution Models across the entire spectrum of Payor Contract Models (Commercial, Medicare and Medicaid).

Jim led the development of several Chicago area Clinically Integrated Networks (CINs) including presentation of a CI Program to the Federal Trade Commission (FTC) in Washington DC.

Jim has relevant experience in Expert Witness work. As early as 1993, in a dispute between the City of Chicago and the Chicago Fraternal Order of Police, Jim presented Expert Testimony. The FOP won that case. Over the past 3 years, Jim has been involved in a couple major cases of relevancy. First, Jim represented a major US health system based on the East Coast in a dispute with a payor about reimbursement for imaging services. The case was settled out of court. Currently and for the past 18 months, Jim has been representing a major US health system on the West Coast in a dispute with a payor about pricing. Jim has very recently taken on a new case involving a national Out of Network Reimbursement based in Florida, a case that has national attention. Jim's extensive background, 30 years of relevant experience, combined with his professional presence and executive persona combine to make him a very effective leader in expert witness cases.

Jim's previous experience included Regional Vice President for CIGNA Healthcare with responsibility for Midwest operations including Illinois, Ohio, Indiana, Missouri and Oklahoma markets. Jim was with United Healthcare as Vice President, Medical Delivery Systems for the Illinois region and with Advocate Healthcare as Corporate Director of Managed Care. Jim also served as AVP Finance & Managed Care at Rush North Shore Medical Center in Chicago. Jim's career began with Maxicare Health Plans in 1985 as a Consumer Affairs representative.

Jim resides in Lombard, Illinois with his wife Irene. Jim and Irene are proud parents of four (4) children ages 18-28.

### PROFESSIONAL AFFILIATIONS

Healthcare Financial Management Association Illinois, President Emeritus

### COMMUNITY INVOLVEMENT

- Tri Town YMCA, DuPage County, Illinois
- Sacred Heart Parish, Lombard, Illinois
- Young Hearts For Life, Oak Brook, Illinois

### EDUCATION

MBA, BA – Northern Illinois University

**JIM WATSON, M.B.A.**

*847-410-5711*
*jwatson@bdo.com*

## SUMMARY

Jim Watson is an experienced healthcare leader with a 30+ year career in healthcare. Jim is a Principal in the BDO Healthcare Advisory practice, with senior management experience in healthcare operations and managed care, assisting hospitals, physician groups, medical networks, and managed care plans. Jim previously served as a partner of PBC Advisors, LLC, which joined BDO in February 2018.

Jim has an extensive background in working with health systems, hospitals and physician networks and payors in Managed Care and Value-Based Contracting. Jim has relevant experience in contract negotiations, contract implementation and contract management, as well as Performance Improvement. Jim's experience covers an array of business models including Global and Partial Risk Contracting, Shared Savings Programs, Patient Attribution Models across the entire spectrum of Payor Contract Models (Commercial, Medicare, and Medicaid). Jim also provides expert Interim Management and Project Management support to healthcare organizations large and small and has contributed to the success of several Provider-Sponsored Health Plans (PSHPs).

Jim has significant relevant experience in Expert Witness cases. As early as 1990, in a dispute between the City of Chicago and the Chicago Fraternal Order of Police, Jim presented Expert Testimony. The FOP won that case. Over the past 3 years, Jim has been involved in a couple major cases of relevancy: First, Jim represented a major US health system based on the East Coast in a dispute with a payor about reimbursement for imaging services. The case was settled out of court. Currently and for the past 18 months, Jim has been representing a major US health system on the West Coast in a dispute with a payor about pricing. Jim has recently taken on a new case involving a national Out of Network Reimbursement based in Ohio and Florida. Jim's extensive background, 30 years of relevant experience, combined with his professional presence and executive persona combine to make him a very effective leader in expert witness cases. Below are a couple recent relevant cases:

- Sentera Hospitals (Plaintiffs) v Anthem Health Plans of Virginia< Inc., d/b/a Anthem Blue Cross Blue Shield (Defendants). Case No. CL 18001639-00. Jim did Deposition, travelled to Norfolk to testify, case settled AM of trial.
- GTB Anesthesiology Associates, LLC (Plaintiffs) v. United Healthcare of Florida, Inc. and United Healthcare Insurance Company. Case No. 17-CA-011207; submitted Rebuttal 1/4/21.
- Emergency Professional Services, Inc., v AETNA Health Inc., Case No. 1:19-cv-01224, Deposition scheduled for February 2021.

**SUMMARY OF EXPERIENCE:**

**Payor Contracting:** Jim is viewed internally and externally as a national expert on Managed Care and Payor Contracting. Jim has a unique combination of experiences and leadership insights from his 33 years of work in Payor, Provider and Consulting organizations. His experience is deep across the spectrum of payor contracts (Commercial to Governmental, Fee For Service to Global Risk) and provider types (Physician Groups to Large Integrated Health Systems), and is able to understand, strategize and execute via the view of a payor or a provider.

**Interim & Outsourced Management (Hospitals, PHOs, IPAs, PSHPs):** Jim has led several Interim Management initiatives (long term and short term) in Finance, Managed Care, Payor Contracting, PHO/IPA Networks, Provider-Sponsored Health Plans (PSHPs), and other healthcare organizations. Sample engagements include Mercy Hospital (10 years) , Centegra Health System (5 years), Regent Surgical Health (5 years), Rush North Shore Practice Organization (5 years), University of Chicago (5 years Century PHO (2 years), Alexian Brothers Health System (2 years), Illinois Physician Alliance, Swedish Covenant Health (2 years), Parkview Health (2 years), Adena Health System (1 year).

**Clinical Integration:** Jim led the development of several Clinically Integrated Networks (CINs), including: Advocate Health Partners, Resurrection Health Partners, Rush North Shore Practice Association, Centegra Health & Wellness Network, University of Chicago Care Network Ingalls Provider Group. Experience includes presentation of a CI Program to the Federal Trade Commission (FTC) in Washington, D.C. (Northshore Physicians Association).

- **Assessment, Strategy & Turnaround:** Jim has led many Assessment Projects, Strategy Development Initiatives, and Turnaound Management engagements.
- **Value-Based Contract Experience:** Jim has an extensive background in working with health systems, hospitals and physician networks and payors in Managed Care and Value-Based Contracting. Jim has relevant experience in contract negotiations, contract implementation and contract management, as well as Performance Improvement. Jim's experience covers an array of business models including Global and Partial Risk Contracting, Shared Savings Programs, Patient Attribution Models across the entire spectrum of Payor Contract Models (Commercial, Medicare, and Medicaid).
- **Provider Sponsored Health Plans:** Jim has worked to start up an ACA CO-OP (Land of Lincoln Health), a Strategy Assessment and Interim Management for a Hospital-Owned Medicaid HMO (Family Health Network), and a self-insured self-administered Hospital EPO (University of Chicago Health Plan).

## 30 YEAR CAREER SUMMARY OF POSITIONS HELD:

***POSITIONS HELD:***

- Maxicare Health Plans (1988-1991)
  - Customer Service Representative
  - Grievance Committee Coordinator
  - Provider Relations Representative
- Advocate Health Care/EHS Healthcare (1991-1995)
  - Contract Specialist
  - Manager, Managed Care Contracting
  - Corporate Director, Managed Care
- FHP Healthcare, Inc. (1995-1996)
  - Director, Network Development
- CIGNA Healthcare (1996-1999)
  - VP, Medical Economics
  - VP, Network Management
  - Regional VP, Provider Contracting
- United Healthcare of Illinois (1999-2000)
  - VP, Network Management
- Tintari Group, LLC (2001-2003)
  - VP, Managed Care
- Rush North Shore Medical Center (2004-2006)
  - AVP, Managed Care
  - Executive Director, Rush North Shore Practice Organization (PHO)
- PBC Advisors (2006-2018)
  - Partner
- BDO USA, LLP (2018-present)
  - Partner

## ENGAGEMENT:

- Healthcare Financial Management Association (HFMA) Illinois, President Emeritus
- Tri-Town YMCA, DuPage County, Illinois
- Sacred Heart Parish, Lombard, Illinois
- Young Hearts For Life, Oak Brook, Illinois

## EDUCATION:

- M.B.A. '95 Northern Illinois University
- B.A., English '85 Northern Illinois University

## RECENT PRESENTATIONS & PUBLICATIONS:

***Summary of Recent Major Presentations:***

- 2021:
  - HFMA Health Executive Panel, 2/17/21, First Illinois HFMA Annual Managed Care Symposium
  - South Florida ACHE Panel Discussion on US Healthcare Legislative Update and President Biden Healthcare Plan 2/13/21
- 2020:
  - November: Overview of CMS Direct Contracting (with McDermott Will & Emory attorneys)
  - October: HFMA Post Pandemic Payor Contracting Considerations
  - July: ACHE Florida: Impact of COVID Pandemic and US Healthcare Trends
  - June: Risk Management Associates (RMA) Annual Meeting
  - March: Cardinal Health CPE Day "Value Based Care and Payor Contracting"

- Other recent:

  - HFMA Value-Based Care (Virginia Beach 2018, Illinois 2016-2018)
  - RMA Annual Conference 2016-2019
  - Illinois Association of Behavioral Health 2016
  - Illinois MGMA 2015-2017

***Articles & Publications:***

- Chicago Medical Magazine: January 2020 Healthcare Trends
- *Post Pandemic Payor Contracting Considerations*, Summer 2020, BDO
- HFMA Newsletter Spring 2020: Telehealth
- Medical Economics: Eldercare, November 2018
- *Telehealth Innovations*, Spring 2020, BDO
- 2018 Marketplace Updates & Implications, HFMA, October 2017
- Clinical Integration: The Future Value Proposition of Organized Physician Networks February 2003

## Materials Relied Upon<u>Matter Materials:</u>

- Class Action Complaint MDL No. 2406

- Final Approval Order of Settlement and Final Judgement and Order of Dismissal with Prejudice
- Declaration of Allocation Mediator Kenneth R. Feinberg
- Declaration of Dr. Ariel Pakes
- Memorandum Opinion and Order Preliminarily Approving Settlement, Plan of Distribution, And Notice Plan, And Directing Notice To the Class
- Memo dated 6/2/21 from Warren T. Burns/Burns Charest LLP to Richard D. Nix McAfee & Taft
- Order Preliminarily Approving Settlement
- Proposed Plan of Distribution
- Self-Funded Sub-Class Settlement Counsel Declaration In Support of Motion for Preliminary Approval of Proposed Subscriber Class Settlement
- Settlement Agreement In Re: BCBS Antitrust Litigation MDL 2406
- Settlement of Class Counsel Joint Declaration In Support of Motion for Preliminary Approval of Proposed Subscriber Class Settlement
- Subscriber Plaintiff' Memorandum of Law in Support of Motion for Preliminary Approval of Proposed Class Settlement

**Publicly Available:**

- Herman, Bob: "Self-service insurance: Insurers forced to compete harder for self-insured customers". *Modern Healthcare*, 1/3/15
- Janssen, Sarah-Beth: "Understanding Pharmacy Costs & Drug Rebates Can Save Money". *Strategic Risk Advisor*, 11/18/20
- Liss, Samantha: "Frustrated employers buck status quo, leave insurers for riskier arrangements". *Healthcare Dive*, 2/20/20
- Self-Insured Employer Health Benefits Strategy Established a Negative Cost Trend While Improving Performance (https://www.liebertpub.com/doi/full/10.1089/pop.2018.0184)
- Sood, Neeraj; Goldman, Dana; Van Nuys, Karen: "Follow the money to understand how drug profits flow". 12/15/17
- "Taxes and Fees under the ACA" The Horton Group, 2020
- "The Largest Health Plans are Eating up the ASO and Stop Loss Market". Oracle, 2020
- What's the Difference Between HMO and PPO Plans?" Cigna, https://www.cigna.com/individuals-families/understanding-insurance/hmo-vs-ppo.
- "What is Self- Funding?" Health Care Administrations Association, https://www.hcaa.org/page/selffunding

# EXHIBIT 2

**Declaration of Teah Corley**

**I, Teah Corley, declare:**

I am Teah Corley, founder and Chief Executive Officer of EmployerAdvocates, LLC, which is headquartered in Oklahoma City, Oklahoma.[1] A copy of my resume is attached as Exhibit A. I am being compensated at the rate of $500 per hour for any work performed in this matter, plus reimbursement of expenses. My compensation in this matter is not contingent on the outcome. I have not previously provided any expert reports and have not testified in either a deposition or at a trial.

## I. PROFESSIONAL BACKGROUND.

Over the past 20 years I have worked exclusively as a consultant in the group health plan and related employee benefit areas. I specialize in full-service health and welfare consulting with a strong emphasis on strategic employee benefit and cost-containment solutions, human resources consulting, regulatory compliance and overall risk mitigation strategy. I am frequently called upon by legislators and employer groups and associations to present industry updates and share health plan cost-containment and risk mitigation strategies, insights and expertise. I currently represent clients in numerous industries across a broad scope of for-profit and non-profit industry sectors. Such industries include but are not limited to: banking, manufacturing, retail, municipal, tribal, hospitality, professional services, professional sports, higher education, pharmaceuticals, oil and gas services, and healthcare. My clients span both fully-insured and self-funded clients ranging in size from our larger national accounts employing anywhere from 10,000 and 45,000 employees with plan members in up to 48 states, to our smaller market accounts employing as few as 50 to 100 employees in a concentrated geography, and many more in between. My knowledge

[1] https://employer-advocates.com.

and experience is on a long-term nationwide basis and not on a purely local or short-term basis. This includes the years that are pertinent to the lawsuits and the settlement in this MDL. Further, my affiliation with the Benefit Advisors Network, a national and international health and welfare consulting organization, has allowed me to combine resources and take our health care provider portfolio from approximately $200 million in premium volume to more than $1.1 billion in premium volume. This experience affords to me additional insight into the health care provider industry to better understand the competitive environment that exists relative to employer health plans. It further lends exposure to the nuances and importance of competition between independent preferred provider networks as well as carrier-owned networks.

During my career as a group employer health plan consultant, I have worked directly with BCBS entities on behalf of employers in various markets across the country. BCBS typically offers a few types of health plans and health plan services: 1) individual policies for individuals and/or their families; 2) group insurance policies for employers who wish to establish fully-insured plans; and 3) administrative services arrangements, including access to a BCBS provider network and a variety of other health care services for employers who wish to establish self-funded plans.

Of course, the BCBS entities are not the only health care insurers in these markets. Most markets are serviced by the four major health insurance entities--BCBS, United Healthcare, CIGNA, and Aetna, as well as smaller regional or local insurers, third-party administrators, and provider networks. Consequently, my knowledge and experience cover more than just BCBS entities.

## II.    Document Review and Requested Analysis.

I have been asked by the Objecting Parties and their Counsel (collectively the "Objecting Group") to (i) provide my analysis and overview of BCBS's revenue model for both fully-insured

and self-funded group health plans and (ii) review certain provisions of the Settlement Agreement (and related documents) regarding the allocation of the Net Settlement Funds between Individual Members and Insured Groups who purchased fully funded health insurance from BCBS (the "Fully-insured Group") and the Self-Funded Claimants (herein referred to as the "Allocation").

**A.     Documents Reviewed.**

For purposes of my analysis in this Report, in addition to the Settlement Agreement, I also reviewed the memorandum provided to the Objecting Group by the law firm of Burns Charest that briefly outlined the process used by counsel and damage consultants for the Fully-Insured Group and the Self-Funded Claimants (the "Burns Report"), Expert Reports of Dr. Ariel Pakes ("Pakes Report") and Darrell Chodorow ("Chodorow Report"), and the Declaration of Allocation Mediator Kenneth R. Feinberg ("Feinberg Declaration"). These documents are attached as Exhibits B – E, respectively. I have also reviewed, analyzed and relied on the documents and websites cited throughout this Report.

**B.     Self-Funded Plans vs. Fully-Insured Plans.**

When it comes to providing health plan benefits to their employees, almost all employers, no matter their size, recognize that the complexities, financial and regulatory risk exposure, and specialized expertise required to run their own health plan warrants partnering with outside experts and vendors to perform certain, if not all, functions of health plan administration on their behalf. Insurance carriers like BCBS fill this void by offering employers basically two types of group health plans – a fully-insured health plan or a self-funded health plan. The Kaiser Family Foundation reports that in 2020, 66% of covered workers employed by private firms were enrolled in self-funded plans. Historically, Kaiser Family Foundation recognized that self-funded plans

represented over 59% of all employer sponsored plans in 2010.[2] Based on my reading of the Chodorow, Pakes, and Feinberg summary reports, and the Burns Report, I believe all of the parties in this case acknowledge that the self-funded plans represent at least 50% of the BCBS business.

In both fully-insured and self-funded plans, the employers and employees pay for the "normal" healthcare expenses. In fully-insured plans these healthcare costs are included in the premium payments and in the self-funded plans the employers/employees pay them directly. The main difference between the two types of health plans is who assumes financial risk for health claims. In fully-insured plans, the carrier (e.g. BCBS) is responsible to pay the health claims, less a member responsibility (e.g. copayments or deductibles) that varies depending on the plan design. Actuaries for the carrier model the projected health claims and fixed costs to establish monthly premium payments charged to the employer/employee. The carrier is at financial risk for the cost of health claims that exceed the actuarial projection of expenses. Under a self-funded health plan, the employer is directly responsible for the payment of the health claims, less a member responsibility (e.g. copayments or deductibles) that varies depending on the plan design.

Under the fully-insured plan model, based on my experience working with BCBS on behalf of employers, BCBS projects the annual cost of these health claim expenses and builds these charges into the employer/employees monthly premium payments. BCBS will then use that portion of premium payments to pay the health care, pharmaceutical and other health related claims that are incurred during the year. Stated another way – a vast majority of the fully-insured "premium" payment (typically 80-85%) is expected by BCBS to be used to pay the actual health claim costs.

This 80-85% is what BCBS, along with other fully-insured carriers, refer to as the "*targeted* loss ratio." Under the Affordable Care Act, fully-insured carriers **must** expend at least 80-85% of

[2] *Plan Funding (Section 10), in* Employer Health Benefits (Kaiser Family Foundation 2020), https://www.kff.org/report-section/ehbs-2020-section-10-plan-funding (last visited July 23, 2021).

the total premium collected on claim charges. See, 42 U.S.C. §§ 300gg – 18(b)(i). The Affordable Care Act refers to this 80-85% requirement as the mandatory medical loss ratio. If they miss the mark on their projections and do not spend at least 80% (small plans) or 85% (large plans) of the total collected premiums in claim expenses across their entire book of business in aggregate, they are required to return a portion of the premium to the fully-insured policy holders at the end of the policy cycle. In order to cover the administration of the fully-insured plans and processing of the health claims, BCBS builds in an "additional" percentage above the targeted loss ratio of, on average, (variable by geography and carrier), approximately 20%, for retention (the "Retention"). It is important to note the Retention is made up of the following line items: a) administrative fees (includes all administrative services, care coordination, and network access fees), b) pooling charges (similar concept to stop loss for self-funded employers, discussed below), c) state premium taxes, and d) profit margin to BCBS. It is generally only a portion of the Retention that employers are saving by moving from a BCBS fully-insured plan to a BCBS self-funded plan. This is the primary differential in costs and expenses between a self-funded plan and a fully-insured plan.

Based on my experience working with BCBS on behalf of employers, under the self-funded plan model, BCBS operates as the plan third-party administrator and carries no direct risk of liability for health claim expenses. BCBS typically charges the employer an administration fee per employee per month (an "ASO Fee") based on the employees enrolled in the plan.[3] Since BCBS does not receive additional premiums to cover the projected claims from the employer upfront, the claims portion of their financial models are projected to be a breakeven for BCBS. In other words, no income or expense at all would be reflected under the self-funded model while the fully-insured BCBS model includes both the projected claims amount in the premium payment

[3] See Exhibit I, Benefit Program Application ("ASO BPA") for Topographic, Inc., at p.5.

and the liability of the actual paid claim costs, along with the Retention built into the fully-insured plans.

Again, based on my experience working with BCBS on behalf of employers, other than this fundamental difference with respect to health claims expenses, revenue models for fully-insured and self-funded plans operate basically the same and, in most cases, have comparable revenue streams to BCBS. In both types of plans, BCBS handles the "administrative services" and processes the health claims, works with the Pharmacy Benefit Managers (and receives and coordinates their rebates and other manufacturer incentives), places the stop-loss insurance (for those self-funded plans that elect to place stop-loss with BCBS) or administers the pooling point (fully-insured plans), and coordinates all the other related benefits/programs under the plans (hereafter referred to as "Other Programs"). For self-funded plans, these Other Programs are revenue streams BCBS typically receives *in addition to* the administrative fees received from the employer/employees under the ASO agreement. The Other Programs fees for fully-insured plans are already included as built-in components of their premium payments.

**C.    The Fundamental Errors in the Settlement Allocation.**

The Burns Report provides a summary of the assumptions of the self-funded class expert (Joe Mason): 1) BCBS charges fully-insured clients a "premium" which covers the entire cost of the insurance; 2) BCBS only charges self-funded employers an ASO Fee (for administrative services); 3) and BCBS breaks even, or even loses money, on the ASO Fee (and thus on its self-funded block of business in general). In addition, Professor Mason assumes that self-funded plans have more choices of third-party administrators that they can use versus insurers that fully-insured plans can use, and therefore somehow this purported opportunity of more choices for self-funded plans drives down the costs of administrative only services.

The Burns Report incorrectly concludes the self-funded ASO subclass has been damaged far less than the fully-insured subclass. As discussed below, the Burns Report fails to consider numerous critical items. It appears that only a fraction of the whole was researched and/or considered in the assessment of the allocation. When the broader considerations are analyzed, it is clear the self-funded plans have suffered far more damage than has been attributed to them in the settlement allocation.

In a self-funded plan, employers and employees pay for all the health care costs. These costs include fixed costs such as ASO fees, but also include all the medical and pharmacy claim costs. The medical claims costs typically represent 80-85% of total health care costs of plans. Inexplicably, under the current allocation model, the self-funded plans do not seem to get any credit for paying these medical claim costs, which in turn dramatically understates their portion of the Allocation. Further, the self-funded plans do not appear to get credit for the Other Program fees they pay to BCBS. As for Professor Mason's theory about choices among third-party administrators, regardless of the number of TPA's in a given market, this assumption completely disregards the limitations and limited choice that employers have when it comes to preferred provider networks, which typically drive employer decisions related to the selection of their health insurance.

**1. The failure to remove from the settlement allocation the 80-85% of fully-insured premiums paid out in health claims.**

In fully-insured plans, BCBS pays out 80 – 85% of the premiums it receives to cover the medical cost expenses incurred by the members in the plan. It does not keep those monies. By law (see 42 U.S.C. § 300gg – 18(b)(1)), it cannot keep these monies. The monies paid out for health claims on behalf of the fully-insured plans are not revenues to BCBS. They are a pass through that do not benefit BCBS. There should be no allocation of the settlement amount to the

fully-insured plans based on premium monies that BCBS did not keep and that were instead paid out for health claims that benefitted the members of the fully-insured plans. Instead, the Retention (on average 20%) for the fully-insured plans would be a more defensible "apples to apples" number to use for the Allocation. In the self-funded segment, BCBS's total revenue is a combination of ASO fees and fees from Other Programs since self-funded plans themselves are responsible for health claims. However, nowhere in the Burns Report does it provide that the fully-insured premium revenue received by BCBS should be offset by the fully-insured paid claims expense before it is compared to the self-funded net revenues received by BCBS. If that paid health claim offset does not occur then one would be comparing BCBS's "gross revenue" for the fully-insured plans to the "net revenue" of the self-funded plans for purposes of determining the Allocation percentages. Obviously, that would not be an apples-to-apples comparison. Nor would it be appropriate or fair.

**2. Ways BCBS and Other Self-Funded Carriers Generate Revenue in addition to ASO Fees.**

It is important to note the many ways BCBS earns revenue and generates a profit on its self-funded block of business that have been overlooked by the current assumptions incorporated into the allocation methodology. It seems to be the general understanding that self-funded plans represent over 50% of BCBS's covered lives/business. The idea that BCBS's self-funded business is a "loss leader" and actually operates at a loss is a conclusion/assumption that does not appear to be supported (i) in the ASO agreements with their clients, (ii) in BCBS's financial statements or (iii) in the market place. Based on my experience with competitive industry Requests for Proposal responses, BCBS's ASO fees are very comparable, and sometimes higher, than those of stand-alone third-party payers that do not own their own healthcare provider networks or have the ability to generate revenue from upcharges on the claims side, and that earn and report very healthy

profits. In fact, BCBS is very open about their self-funded business model, including their ASO Fees and their numerous different revenue streams from the Other Programs. The fact that Professor Mason, the damage consultant for the self-funded plans, and the damages expert for the fully-insured plans apparently base their allocation models on the assumption that BCBS's self-funded business is a "loss leader" is not supported by any of the above referenced documents or my knowledge of the industry as a whole. Unfortunately, none of the experts hired to assist in determining the Allocation filed any documentation with the Court to support their conclusions. Therefore, it is not clear at this point how they came to this conclusion/assumption.

It is important that I provide some additional background on where BCBS receives revenue within their self-funded health plan model to better understand the serious flaws in the Allocation. BCBS is not in business to lose money. The Burns Report did not recognize or otherwise take into consideration that BCBS receives **additional** revenue from the self-funded plans through the Other Programs fees and health claim upcharges over and above the ASO Fees charged to their self-funded plans. Most of the services provided in these Other Programs are services also provided to BCBS's fully-insured clients. However, as is described in the BCBS of Illinois filing attached as Exhibit F[4] and highlighted on page 4 of that document, these Other Program revenues are typically included in the fully-insured premium calculations but are **not** initially included in the self-funded revenue calculations as part of the upfront ASO fee. Therefore, when Professor Mason and the fully-funded plan experts in this case failed to consider the Other Programs as additional revenue for BCBS in their self-funded model, this error negatively and unfairly impacted the allocation to the self-funded plans by significantly understating the costs borne by Self-Funded Claimants. This

[4] Exhibit F is a publicly filed and available document. At page 4, it provides that "Eligible indirect compensation" to BCBS is identified, and those amounts are not necessarily passed on to its group customers or their members (employees).

error by Professor Mason is particularly puzzling because the Other Programs and the anti-competitive conduct impacting them are addressed in the injunctive relief described in the Settlement Agreement at pp. 27-28, Nos.10-12.

Below are examples of the additional revenue sources for BCBS from the Other Programs that are typically purchased by self-funded clients and should have been considered in determining the Allocation:

- **Retention of Pharmacy Rebates** – Each year self-funded benefit plans pay hundreds of millions of dollars for prescription drugs. Pharmacy Benefit Managers ("PBMs") manage the distribution and sale of drugs to pharmacies, and they typically offer rebates on to purchasers. In the ASO agreement with their clients, BCBS discloses the receipt of these rebates, retaining 100% of the rebates generated by the plan members' utilization and the plan's purchase of these rebate-eligible drugs, passing along an "Expected Rebate" as a means to pass-through a "portion" of the rebates to benefit the plan. Yet, despite the self-funded plans paying all of the claims costs, BCBS clearly states that they retain a portion of the rebates or other manufacturer incentives instead of passing them along to self-funded plans, that the rebate may not equal all of the rebate provided by the PBM to BCBS, and BCBS retains all such rebates. The employer and the plan have no right to any of that rebate. (See Exhibits F at pp. 4-5 and Exhibit H, Administrative Services Agreement for Topographic, Inc. at pp. 27-28, Section 14.1 – 14.3; Exhibit I, pp. 5-6.)

- **Pharmacy Manufacturer Incentives** – Another common revenue stream for PBMs are manufacturer incentives which are paid to incentivize them to keep certain drugs on the formulary. These may be referred to as "administrative fees," "market shift bonuses," "retention bonuses," "technology fees," etc., but these are essentially monetary incentives

paid by the manufacturer similar to pharmacy rebates. As with PBM rebates, PBMs often keep the revenue/benefit from these incentives. The self-funded plans do not receive them.

- **Pharmacy Spread** – Many of the contracts between carriers and PBMs are built on a spread model where the carrier purchases inventory at one price, but when the drug is dispensed and the average wholesale price at dispensing is higher than the acquisition cost, the PBM-owned pharmacy and the PBM profit from the spread. This is true with BCBS and represents another revenue source for them from the self-funded plans.[5]
- **Ownership in Specialty or Mail Order Pharmacies** – It is typical for insurance carriers to have lucrative arrangements with or ownership in their own mail order or specialty pharmacies that allow them to generate additional revenues by steering plan membership to their own mail order pharmacies or implementing specialty locks across the self-funded book of business. (See Exhibit F, pp. 6 – 7.) A specialty lock is a feature in the plan design that requires all specialty medication run through a specific specialty pharmacy (typically one owned or preferred for revenue-sharing reasons) by the pharmacy benefit manager (PBM). Again, this has been true with many plans where BCBS is the TPA and its bundled, exclusive, PBM is the PBM for the plan.
- **Stop loss premium** – Stop loss coverage is a form of reinsurance that provides protection for claims expenses above a certain limit. Since BCBS is at risk under fully-insured plans, stop loss does not come into play. Only self-funded plans need stop loss insurance. Carriers like BCBS offer the stop loss insurance and earn commission for placing the stop

[5] https://www.primetherapeutics.com/en/services-solutions/connect/contributors/follow_the_money.html. A Blue Cross-related entity, HCSC, owns 41% of Prime Therapeutics ("Prime"). Prime provides PBM services for BCBS. (Last visited July 27, 2021.)

loss coverage on the self-funded groups.[6] While larger self-funded plans may have the option of carving out stop loss to outside markets, BCBS restricts the ability to carve-out for some self-funded plans. (Exhibit G, p. 1.) For others, it may charge a coordination fee if stop-loss is carved out. When stop-loss is carved out, it has been my firm's experience that BCBS does not always provide the necessary prior authorization documentation and/or medical records necessary to cooperate with an outside stop-loss provider, making it generally restrictive to carve out stop-loss from BCBS. For this reason, many brokers and consultants comply with maintaining fully bundled programs with self-funded employers that use BCBS as the administrator. In the fully bundled model, BCBS serves as the third-party administrator, the network, the stop loss carrier, and the PBM (through its partially owned and/or controlled preferred PBM relationships).

- **Subrogation Fees** – When a plan participant is injured through the wrongdoing of a third party, and a plan pays money for the participant's injuries, the plan is normally allowed to pursue a "subrogation" claim against the third-party. For their self-funded plans BCBS handles these subrogation services and typically charges 25-30% of the recovery. This represents an additional revenue source for BCBS which is not reflected in the ASO Fees
- **Audit/investigations** – Called "claim recovery fees," it is common for carrier-owned ASO providers to take a percent of savings for auditing claims that they administered for a self-funded plan and discovering errors made by BCBS and recovering the errors. For example, if a self-funded plan overpays a claim because the carrier-owned ASO provider made a mistake when administering a medical provider's claim, and this is discovered in an audit

[6] I understand that the Plan of Distribution may include stop-loss coverage in the definition of "Administrative Fees". I have not seen in documents available to the class members showing the allocation of the settlement amount where the costs of stop loss coverage was taken into account, and have not seen where stop loss commissions were taken into account.

and the provider repays the overpaid amount, the carrier-owned ASO provider takes a percentage of the recovery caused by its own mistake even though it was the self-funded plan that paid the claim. It is our understanding that some BCBS plans engage in this practice. (Exhibit F, p. 6, ¶5.)

- **Pre-payment Claim Reviews** – BCBS may engage a third party to assist it in the review of a healthcare provider's claim for payment before paying the claim. The employer is responsible for payment of the fee, which is separate from and in addition to, the ASO fee. (Exhibit H, p. 13, Section 22.)
- **Carve-out coordination fees** – It is common for BCBS to not allow smaller employers (e.g., employers with less than 500 employees) to carve-out any of the Other Programs because BCBS wants to protect its revenue stream from these programs. In situations where BCBS does allow an employer to carve-out programs, BCBS will usually charge a "coordination fee" for carving out programs like stop loss insurance or a PBM. (See Exhibit I at p. 6.) Consequently, if a self-funded employer wants to use a PBM that does not have a relationship with BCBS, the employer is charged a "fee" for this nonstandard arrangement.
- **Utilization Review and Management fees** – "Utilization review and management" services include the review of member utilization patterns and case management services when a plan member has a complex or expensive regimen of treatment (a cancer patient, for example). Carriers, including BCBS, will often charge self-funded plans separate fees for management/case management programs.
- **Disease Management Programs** – BCBS offers disease management for an additional fee to self-funded plans/employers for providing disease management (telephonic outreach,

education and support) to members who have been diagnosed with specific chronic conditions.

- **Maternity Management** – BCBS offers a maternity management program to engage with members who are expecting. This is generally charged as a per employee per month fee to self-funded employers, and the employer/plan pays this fee whether or not any members were engaged in the program.

- **Network Access Fees** – Because they own their own provider network comprised of hospitals, physicians labs and other healthcare providers, BCBS charges "network access fees" for self-funded plans to access their provider network. While a portion of the access fee may be bundled into BCBS's standard administrative fee, BCBS also charges self-funded employers a percent of the claim value up to a cap to share the network access with other BCBS franchises across state lines (*i.e.*, BCBS Blue Card). (Exhibit H, pp. 28-33, Sections 15.2.c, 15.3.b, 15.7.b.)

- **Concierge Value-Based Steerage Fees** – BCBS offers a program where members who are planning an elective procedure can contact a Concierge to help steer them to the lowest-cost, highest-quality providers within the BCBS network. This program is offered on a per employee per month fee for self-funded employers.

- **Out of Network Negotiations** – TPAs that administer self-funded plans typically charge a fee on the claims negotiated or repriced through an out-of-network negotiation process. Consequently, if a patient goes to an out-of-network provider and the provider has no contract with BCBS, the provider can charge an undiscounted fee. BCBS might negotiate for a reduction in the provider's fee and charge the self-funded plan a fee for the negotiation.

- **Data feed fees** – BCBS sometimes charges a fee to provide data feeds to an outside data warehouse when directed by the employer/plan.

- **COBRA Administration Fees** – BCBS charges both fully-insured and self-funded employers a separate and additional administrative fee for COBRA administration services.

- **Third-Party Vendor Fees** – BCBS often enters into arrangements with preferred vendors such as Telehealth providers, nurse hotline, wellness vendors, targeted condition management vendors, etc., where BCBS up-sells the employer/plan additional services and has a revenue-sharing arrangement with the preferred vendor.

- **Third Party Recovery Vendors and Outside Attorneys** – BCBS may engage a third party to collect recovery amounts related to claims payments made under an ASO agreement. All fees for these services are to be paid by the employer and are separate and apart from the ASO fees. (Exhibit H, p. 13, Section 22.)

**All** of the revenue-generating examples described above apply to self-funded plans **AND** are in addition to BCBS's standard administrative services fees that are paid directly by the employers for administrative services. However, these additional revenue sources from the Other Programs were **NOT** included in BCBS's revenue for self-funded plans when the Allocation percentages were determined.

### 3. Professor Mason's unsupported theory about competition among third-party administrators.

As for Professor Mason's theory that self-funded plans have more choices for third-party administrators and that somehow drives down the costs of administrative services, I saw nothing in the publicly available record or Burns Report showing that any economic analysis was conducted to test this assumption. In my experience, whether an employer has meaningful choices

for self-funded plans varies widely by geographic market. Nothing in the record suggests that the experts developed a robust economic analysis to back up their conclusory assumption that ASO employers/plans have more choice and less damages than a fully-insured employer/plan.

Moreover, my experience is that the availability of a preferred provider network is the primary driver of an employer's decisions related to selection of their health insurance. BCBS offers its self-funded plans something that gives BCBS a significant competitive advantage over other TPAs – access to BCBS's extensive provider networks and provider discounts. Members in self-funded plans access the ***same*** BCBS network that members of fully-insured plans access. This means that the charge for a specific service from a specific provider is the same regardless of whether the patient is enrolled in a fully-insured plan or a self-funded plan. In other words, the cost of the contracted provider's service is the same. Since everyone uses the same network, with the same contracted rates, a BCBS fully-insured plan pays no more than a BCBS-administered self-funded plan pays for the same service from the same provider. Therefore, there is no claim-cost differential between the two types of plans, and any cost increases affect both plans equally. So as provider/claim costs have increased over the years, they have affected the BCBS network and have caused the claim costs to increase, but the increases have affected both types of plans equally. And other TPAs have not historically been able to offer the same network value, so the mantra of greater choice of TPAs is largely illusory.

In addition, the theory about third-party administrators seems to me to be beside the point when addressing the unfair Allocation. As admitted by all class Plaintiffs in the Settlement Agreement, the self-funded plans have been damaged. Yet, as discussed, Mr. Burns and Professor Mason fail to address the numerous items of revenue that flow from the Other Programs to BCBS from the self-funded plans that should be part of the Allocation, and also entirely fail to address

the fact that 80 – 85% of the premiums paid by fully-insured plans to BCBS are paid out in health claims and are not retained by BCBS.

**D.     Injunctive Relief.**

My opinion and conclusions are also reflected in and supported by the Injunctive Relief proposal in this matter as set forth on pages 27-35 of the Settlement Agreement.  As I understand the injunctive relief, it will require that BCBS eliminate certain anticompetitive practices and policies.  As a consequence, both the fully-insured plans and the self-funded plans will gain additional bargaining power to help negotiate down their health care costs in future years.  See Settlement Agreement, pp. 27-28, Nos. 10 – 12 at Doc. 2610-2.  In fact, several of the experts in this case and numerous outside commentators have acknowledged the importance of the changes flowing from the injunctive relief.  Both groups even recognized that certain portions of this relief were directed exclusively at assisting the self-funded plans only.  I agree with their conclusions and analysis.  Unfortunately, the injunctive relief changes are prospective in nature only.  These same problems exist now and they existed during the damage period.

The injunctive items addressed in Nos. 10-12 at pp. 27-28 of the Settlement Agreement relate to the Other Programs.  The items of injunctive relief designed to allow self-funded plans to obtain contracts with other vendors outside of BCBC for the Other Programs clearly demonstrate that the Other Programs must be considered in the settlement allocation because self-funded plans were damaged by BCBS's restrictions.   However, the Allocation model proposed in the settlement does not take these problems into consideration when allocating only 6.5% of the damages to the self-funded group.  It seems the allocation model arguments are trying to have it both ways – how can one recognize the importance of the injunctive relief going forward without also acknowledging the damages these same anticompetitive practices caused the self-funded plans during the damage period?

**Summary**

For the reasons set forth in this Report, it is my opinion that the damage experts retained by legal counsel in this matter may not have fully understood how BCBS's business model for self-funded plans and fully-insured plans actually operate when they recommended how to allocate the Net Settlement Funds. This is the only conclusion I could reach given their **failure** (i) to consider the additional revenue BCBS receives from the Other Programs when considering the damages caused to the self-funded plan and (ii) to reduce or offset the fully-insured premium payments received by BCBS by the actual claims costs/liabilities BCBS must pay under the fully-insured plans. The failures cause the current settlement allocation to be calculated based on the fully-insured plans "gross revenue" vs. the self-funded plans" "net revenue." These two major miscalculations caused a material decrease in the allocation awarded to the self-funded group and a major increase to the fully-insured plans.

Of course, I am at a disadvantage because none of the damage experts filed any report with the Court nor did they provide any documentation that support their allocation method. However, my 20 plus years of experience and knowledge dealing with BCBS and fully-insured and self-funded plans that BCBS has contracted with, allows me to conclude without any hesitation that the settlement Allocation as proposed in this matter disproportionately favors the fully-insured plans and is unfair to the self-funded group. In addition to my analysis as set forth in this Report, my opinion is supported by the financial statements of BCBS.

## III. Conclusion.

Given that BCBS plans, both fully-insured and self-funded, share the same preferred provider networks which largely dictate the actual plan claims expenses, the damages related to the claims portion of the total plan liability between a BCBS fully-insured plan and self-funded

plan is highly comparable, if not equal. Further, the maximum claims liability between a fully-insured plan and self-insured plan is very comparable, if not equal. Based on this fact and the foregoing, it is my opinion and recommendation that the only economic distinction to be made when comparing damages between a BCBS fully-insured plan and self-funded plan is in the Retention portion of 20% of the total premium of the fully-insured plans. As a reminder, this Retention represents the built-in premium mark-up of the fixed costs associated with a fully-insured plan by BCBS, which includes the profit margin for a fully-insured plan, the administrative fees, state insurance premium taxes, and pooling charges. By self-funding, employers save an average of 10-20% which reflects the net savings by not having to pay the Retention amount and after factoring in the addition of stop-loss premium that most self-funded employers purchase. As a result, assuming the highest savings rate of 20%, my opinion is that a fair allocation of the Net Settlement Funds would be closer to 55.5% for fully-insured plans and 44.5% for self-funded plans, which represents a 20% differential between the two types of plans.[7]

[7] My opinion is based on the assumption both types of plans have the same class period.

I declare under penalty of perjury the foregoing is true and correct.

Teah Corley
July 27, 2021
Oklahoma City, Oklahoma

# EXHIBIT 2A

# Teah R. Corley, SPHR, IAR
# Biography

**Experience**

As the principal and CEO of EmployerAdvocates, Teah Corley is responsible for the strategic oversight and operation of the firm and its various business units. Ms. Corley is experienced in the research and development of strategic human resources and health and welfare benefit solutions, as well as the implementation of creative and complex managed care solutions for health plans of all sizes. She has served on the Oklahoma Insurance Department's Summit addressing the high cost of health care and serves as an active consultant to numerous employer committees and boards from a variety of industries focused on effective employee benefits cost containment strategies and solutions. She is well-versed in a variety of funding models from fully insured, level-funded, fixed indemnity, medishare, captives, purchasing coalitions, and stand-alone self-funded models. She further represents a large block of healthcare provider groups working toward the effective contracting and integration of healthcare delivery solutions in a post-reform environment.

In 2010, Ms. Corley represented one of the first healthcare providers to participate in the CMS Medicare Acute Care Episode Demonstration (ACE) Pilot program, and was among the first consultants in the region to pioneer taking the ACE bundled payment programs to the commercial marketplace via direct employer contracting.

Working with multi-state employers, she collaborates frequently with state and federal legislators in the quest to bring solutions to the the many issues surrounding healthcare in the United States.

**Career Background**

Ms. Corley began her early career on the regulatory side of the industry by serving in the executive division of the Oklahoma Insurance Department. Following her tenure there, she served as the director of investor relations for a privately-held investment company in Denver, CO, supporting shareholders internationally and on the east and west coasts, then served several years as an executive vice president for a $2 billion financial services group based in Oklahoma City. She went on to co-found and serve as CEO of a full-service consulting firm alongside the shareholders of a large, reputable, law firm in the early 2000's. After helping to grow the firm to a multi-million dollar agency, in 2015, she and her senior management team founded a second full-service consulting firm, EmployerAdvocates. EmployerAdvocates has continued to follow a rapid growth trajectory serving employers across the country ranging from 25 employees to 45,000 employees.

**Education**

Ms. Corley holds a B.A. degree from Cameron University in organizational communication with a minor in business management. She holds the Senior Professional Human Resources (SPHR) designation, the SHRM designation SHRM-SCP, and is a federally registered investment advisory representative (IAR). She has completed financial studies through the Cannon Financial Institute at Pepperdine University, and the American College Registered Health Underwriter Program, among custom carrier training programs and others.

**Professional Memberships/Awards**

EmployerAdvocates is a member of C12, where its local chapter serves as the advisory board to EmployerAdvocates. Ms. Corley is a member of the Southwest Benefits Association, the Oklahoma Health Underwritters Association and the Society of Human Resources Management. She is also a member of the Healthcare Financial Management Association (HFMA), a leading membership organization for healthcare financial management executives and leaders. She has served on the board of Variety Care, a federally qualified health center (FQHC). She is an advisory board member of the Oklahoma City Chamber of Commerce and a member of the State Chamber of Commerce.

She has been a past recipient of the Southwest Oklahoma Award for Outstanding Young Business Leader and is a frequent lecturer for community outreach programs and universities.

# EXHIBIT 2B

To: Richard D. Nix

From: Warren T. Burns

Date: June 2, 2021

*Re*: Allocation of BCBS Settlement

We are providing this memorandum to give you and your clients additional information regarding our assessment of the reasonableness of the allocation of settlement proceeds between BCBS fully insured subscribers and administrative service only (ASO) clients.

As discussed during our previous conversations, before ASO counsel engaged in discussions regarding allocation with the fully insured subscribers, we engaged economic experts to assist us in identifying appropriate allocation ranges and to assess positions taken by the subscribers. Joe Mason, a chaired professor at LSU and Wharton fellow led our expert team at the BVA Group in conducting this analysis. What follows is a summary of opinions that Professor Mason is prepared to offer at final approval and which will form the basis of a declaration.

**A. Market Structure and Competitive Dynamics**

Economic theory suggests that the more (and closer) substitutes a good has, the more sensitive, or elastic, demand from any one supplier will be with respect to changes in price charged by that single supplier.[1] Because there are more providers of administrative services than insurance (*i.e.*, insurance is a more specialized segment than administrative services), administrative services providers face a higher price elasticity of demand than insurance

[1] The sensitivity of demand for a product with respect to changes in price is referred to as the elasticity of demand.

providers, *ceteris paribus*. In other words, fully-insured customers are less sensitive to price changes and, consequently, more susceptible to overcharges.

Models of industrial organization support this assertion, wherein a multi-product monopolist can be expected to "impose a higher markup on those goods with a lower elasticity of demand."[2] Another source notes that the "percentage deviation of price from marginal cost" is also inversely related to the elasticity of demand.[3] This relationship is frequently referred to as the "inverse elasticity rule" and is a common feature in economic modeling.[4] In this matter, the "goods with a lower elasticity of demand" are the fully-insured plans. As such, insurance companies have greater market power on their fully insured plans than they do on their ASO plans. Said differently, economic theory implies BCBS Licensees, acting on their market power, would impose a greater markup/overcharge on the fully insured products.[5]

This is not to say that there is no market power in providing administrative services. A portion of the administrative services product is the provider network associated with the insurance company providing such services, including any negotiated savings derived from the associated contracts. The rates negotiated by an insurance company with healthcare providers are paid by the employers for self-insured plans and by the insurance company for fully insured plans, and are in part a function of the total members represented by that insurance company across both fully-insured and ASO plans. Therefore, the employers that have an increased

2 Jean Tirole, "The Theory of Industrial Organization," 1988, p. 70.

3 Leonard J. Mirman, and David Sibley, "Optimal nonlinear prices for multiproduct monopolies," *The Bell Journal of Economics*, 1980, pp. 659-670.

4 Walter Nicholson, and Christopher Snyder, *Microeconomic Theory: Basic Principles and Extensions*, (11th Ed., 2012), p. 452.

5 It is worth noting that even though the multi-product monopolist has less market power over self-funded plans, it still has an incentive to also raise prices on self-funded plans to avoid undue switching between the two products due to changes in relative price. Thus, all the monopolist's product prices are affected by its market power, albeit at different levels.

propensity to self-insure are in a stronger position to negotiate reduced costs for administrative services, mitigating harm to the firms that comprise the Self-Insured Class in this matter.[6] This proposition is widely accepted. Industry research shows that markets for administrative services demonstrate lower profit margins than those for fully insured plans.[7]

The result of the foregoing is that a health insurer with market power can increase prices on (i) the administrative services and/or (ii) the claims cost certainty (risk-transfer) component. Because the cross-price elasticity of demand is lower for smaller firms that purchase more fully-insured plans and because the multi-product monopolist can be expected to "impose a higher markup on those goods with a lower elasticity of demand," which in this case are the insured plans, one would expect the Licensees to impose a greater price increase on the claims cost certainty component than the administrative services component.[8] However, even though the multi-product monopolist has less market power over self-funded plans, it still has an incentive to raise prices proportionally on administrative services in order to maintain parity between the two products and avoid undue switching due to changes in relative price.

Economic theory therefore implies that the overcharge on administrative services will be greater than zero (due to the limited market power that the Licensees have in the ASO market and their incentive to prevent undue switching from fully-insured to self-funded plans), but significantly less than the overcharge to fully-insured plans (because the overcharge to self-funded plans is constrained by the greater number of substitutes and corresponding higher

---

6 Viewed differently, the dynamics function in a way similar to standard "loss leader" concepts in pricing strategy whereby one product is sold at an accounting loss (i.e., the ASO plans) to stimulate greater profits from a second, more profitable product (i.e., fully-insured plans). In this case, the enhanced profitability from the second product is driven by a reduction in the costs associated with delivering that product (i.e., lower effective fees paid for healthcare services to providers from insurers).

7 Table 6 in https://www.ncsl.org/documents/health/MrktStrOfHlthIns.pdf

8 Tirole, Jean, "The Theory of Industrial Organization," 1988, p. 70.

elasticity of demand, as well as the benefits that accrue to the fully-insured business from each self-funded member—*i.e.*, the Licensees have less market power in the ASO market than they do in the fully-insured market).

**B. The Relative Magnitudes of the FI and ASO Markets**

Since 2008 there has been a gradual shift from fully insured plans to self-funded plans, but the overall breakdown over the ensuing time period has been split fairly evenly on a membership basis. See Table X. As explained above, the self-funded product is a subset of the fully insured product, and therefore the revenues per member are significantly higher for the fully insured product than for the self-funded product.

**1. BCBSA Financial and Enrollment Data used for Analysis**

BCBSA Licensee data are aggregated internally on a quarterly basis into Quarterly Financial Reports ("QFRs") and Quarterly Enrollment Reports ("QERs"). As their names imply, these reports provide the Licensees' financial and enrollment data, respectively. Professor Mason used these reports to calculate the revenues and other financial metrics attributable to the fully insured and self-funded plans as well as the number of covered lives on an aggregate basis (across Licensees) for each quarter during the class period.

The QFRs provide fields labeled "Premium Revenue", "Gross Revenue Incl Self-Funded", and "Net Revenue". A note in the report explains that "… gross revenue includes fully insured premiums and premium equivalents for self-funded business. Net revenue is net of self-funded benefit payments." [cite] Professor Mason used the Premium Revenue as the gross revenue for fully-insured plans and calculated the gross revenue for self-funded plans as the Net Revenue less the Premium Revenue (*i.e.*, the component of Net Revenue that is not attributable to fully-insured plans).

Professor Mason then adjusted the QFR and QER data to exclude federal, state and municipal plans. Professor Mason identified federal plans directly and removed those members from the QER data. He estimated the state and municipal plans based on MEPS data from 2015 to 2020 indicating that the state and municipal portion of fully-insured members is approximately 12.3% and the state and municipal portion of self-funded members is approximately 17.7%.

Professor Mason then estimated the revenue associated with these excluded members. Federal, state and municipal plans would not be expected to reflect a significant fee for risk transfer services relative to privately insured groups. This is due to a number of factors including: (i) premiums for federal employee benefits are capped based on Maximum Government Contributions; (ii) The Centers for Medicare & Medicaid Services ("CMS") annually sets capitation rates for Medicare Part C and Part D; and (iii) CMS and state and local governments set Medicaid contributions annually. For these reasons, Professor Mason assumed that the revenue per member for these excluded plans is the average value of the insured benefits plus the average administrative revenue per member charged to the self-funded plans.

**2. Comparison of revenue**

An initial metric by which to assess the relative overcharges between fully insured and self-funded plans is to look at the gross revenues for each product. The QFR data indicate that there was aggregate revenue from fully-insured plans in the Damages Class during the relevant class period (January 1, 2008 through October 1, 2020) of approximately [REDACTED] and aggregate revenue from self-funded plans in the Damages Class during the shorter class period of September 1, 2015 through October 1, 2020 of approximately [REDACTED][9] The ratio of the two

9 This is after the adjustment to account for the exclusion of federal, state and municipal employers.

reveals that ██████ of gross revenue was from fully-insured plans and █████ of gross revenue was from self-funded plans.

This methodology requires few assumptions regarding the relative costs or profitability of the two products but assumes a constant per dollar overcharge across the two products.

**3. Comparison of profitability**

Another approach is to estimate the overcharge as proportional to the relative profitability of the two products. In other words, instead of assuming a constant overcharge for every dollar of gross revenue, assume a constant overcharge for every dollar of profit. In this scenario, Professor Mason used operating gains as the measure of profitability.

While the QFR and QER reports do not directly report operating gains by product type, they do provide the data necessary to compute the average operating gain per member for each period.

Professor Mason relied upon industry observations of per member operating gain differentials to calibrate the allocation. Specifically, he relied on the following indications from the record in this case:

a) Indications from the record that ASOs operate at a loss.

b) A 2012 Blue Shield of California presentation

c) A 2010 Anthem presentation

Professor Mason then calculated the operating gain per fully-insured member and per-self-funded member using the overall operating gain per member and the indications of the spread between them described above.

In the first scenario in which it is assumed that the self-funded plans operate at a loss, all of the operating gains are attributed to the fully insured plans and therefore all of the overcharge is attributed to those fully insured plans, implying an allocation of 0% of the settlement amount to ASOs.

In the second scenario in which a [redacted] operating gain differential is assumed, the calculated total fully insured operating gain over the relevant class period is approximately [redacted], and the calculated total self-insured operating gain over the shorter class period is approximately [redacted] This breakdown implies an allocation of approximately 8.2% to the ASOs.

In the third scenario in which a [redacted] operating gain differential is assumed, the calculated total fully insured operating gain over the relevant class period is approximately [redacted] and the calculated total self-insured operating gain over the shorter class period is approximately [redacted] This breakdown implies an allocation of approximately 12.8% to the ASOs.

This methodology and the assumptions about the relative profitability of the two products as represented by the inputs in the three different scenarios, indicates a range of allocations to the ASOs of 0-12.8%. While this method takes profitability into account, it is driven by assumptions of relative profitability that are anecdotal. It further assumes that there is a static operating differential between the two products that does not change over time.

**4. Comparison of price growth**

Assuming the rational multiproduct firm with market power will seek to maintain a stable relative price differential among substitute products in order to forestall non-optimal substitution, the allocation between the two substitutes can also be calibrated by analyzing the difference in their revenue growth rates over time. Such an approach uses the economic logic of "differences in differences" to account for potentially different levels of market power across the functional administrative services and claims cost certainty products.

Professor Mason compared the growth rate associated with administrative services to that of claims cost certainty using the administrative revenue per member derived from self-funded plans. In doing so, he assumed that the overcharge differential between these two services is independent of claims (benefits) growth. From 2008 to 2020, net revenue per member for administrative services increased by approximately [REDACTED] (in line with overall inflation), while net revenue per member for claims cost certainty increased by approximately [REDACTED]. Thus, claims cost certainty revenue increased at a rate that was approximately [REDACTED] times that of the increase to administrative services [REDACTED] The ratio indicates that every dollar or, more generally, every unit of overcharge to self-funded plans (which incurred overcharge on only administrative services) corresponded to 11.2 units of overcharge to insured plans (which incurred 10.2 units of overcharge on claims cost certainty in addition to one unit of overcharge on administrative services).

Consequently, for each year of the respective class periods, Professor Mason multiplied the adjusted members covered by Insured and Self-funded plans by 11.2 units and one unit, respectively, to arrive at the total units of overcharge associated with each type of plan. This

suggests that self-funded plans sustained approximately 5.3% of total damages from overcharge during the class periods.[10]

If healthcare cost inflation impacted the two functional products differently, the ratio of nominal overcharges estimated in the prior section may obscure the real cost differential, and therefore the resulting allocation. To account for this possibility, Professor Mason adjusted for health care cost inflation using BCBS insured benefits inflation. With this adjustment, he found that insured plans incurred an inflation-adjusted 7.6 units of overcharge for every unit of overcharge to self-funded plans, suggesting that self-funded plans sustained approximately 7.6% of total overcharge.[11]

This methodology indicates a range of allocations to the ASOs of 5.3-7.6%.

**C. Settlement allocation in the context of qualitative and quantitative analyses**

Professor Mason will opine that the general economic analysis of the market together with the quantitative analyses and the evaluation of the particular circumstances of the litigation indicate that an allocation of 6.5% of the settlement amount is a reasonable allocation to the ASOs.

The Licensees have more market power in the market for fully insured plans than they do in the market for self-funded plans, and they therefore have a greater ability to impose an overcharge on their fully insured plans than they do on their self-funded plans. But the two products are imperfect substitutes, so the Licensees have an incentive to overcharge the self-funded plans by some amount (but less than the fully insured overcharge) in order to optimize their product mix.

---

10 These figures adjust for the portion of self-funded and insured plans composed of state, municipal and federal employers as well as Medicare, Medicaid, and other federally-sponsored plan members.

11 After adjusting for the proportion of self-funded and insured plans represented by state, municipal and federal employers as well as Medicare, Medicaid, and other federally-sponsored plan members.

Estimating relative overcharges on the basis of relative revenue, profit and price growth indicates a range of allocation percentages for the ASOs of 0-12.8%. The 6.5% allocation to the ASOs in the Settlement Agreement is within this range and in fact very close to the center of it.

Imposing a discount factor based on the risks that the ASOs would face in litigating their claims would only decrease the top end of that range and move the 6.5% allocation to the top half of it.

**D. Fully Insured Positions**

As I believe I noted during our conversations, fully insured counsel consistently represented that their own calculations of a reasonable allocation fell in a range between 0% and roughly 2% based on analyses performed by their own experts. Although we were not privy to the full analyses performed by their experts, we did have the opportunity to facilitate a discussion between both sides' experts to discuss their analyses.

**E. Resonableness of allocation**

In negotiating an allocation percentage, I had the benefit of preliminary assessments of appropriate ranges provided by BBVA and Professor Mason. Negotiations continued over a period of several months. Based on the information provided by our experts and my own assessment, I concluded that an allocation of 6.5% of the settlement fund to ASO accounts was reasonable under the circumstances.