FILED
2021 Sep-03  PM 05:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT

# 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

IN RE: BLUE CROSS BLUE SHIELD
ANTITRUST LITIGATION

(MDL No. 2406)

Master File No. 2:13-CV-20000-RDP

## OBJECTION OF GENERAL MOTORS COMPANY
## AND GENERAL MOTORS LLC TO THE CLASS SETTLEMENT

General Motors Company and General Motors LLC ("GM") respectfully submits the

following objection (the "Objection") to the October 16, 2020 Settlement Agreement (the

"Settlement Agreement") in the above-captioned matter.

1.       GM is headquartered at 300 Renaissance Center, Detroit, MI 48265-3000 and

may be contacted via undersigned counsel.

2.       GM is a self-funded employer that has utilized Blue Cross Blue Shield of

Michigan as a third-party administrator during the time periods covered by the Settlement

Agreement.

3.       This Objection applies only to GM.

4.       Undersigned counsel to GM have not objected to a class action within five years

preceding the submission of this Objection.

5.       GM has not entered into any agreements that relate to the objection or the process

of objecting.

6.       GM is a Self-Funded Account and a member of both the Damages Class and

Injunctive Relief Class, as those terms are defined in the Settlement Agreement.  GM is

headquartered in Detroit, Michigan and has significant operations in several other states.  Under

the current terms of the Settlement Agreement, GM has not been designated as a Qualified National Account and, therefore, is not eligible to receive a Second Blue Bid (*i.e.*, the process by which some, but not all, large, self-funded national employers will be able to request a bid for coverage from a second Settling Individual Blue Plan, in addition to their local Settling Individual Blue Plan).

      7.      The exclusion of GM—and potentially other similarly situated entities—from the list of Qualified National Accounts underscores why the Settlement Agreement as currently constituted is not fair to all Injunctive Relief Class members.  While the Settlement Agreement purports to resolve allegations that Settling Defendants violated the antitrust laws by agreeing to limit competition among themselves in selling health insurance and administrative services for health insurance, that conduct—at least insofar as it applies to GM—is perpetuated, not resolved, by GM's categorical exclusion from the Second Blue Bid process.  That result, should it stand, would be the antithesis of fairness.

      For the foregoing reasons, GM objects to the Settlement.  By separate correspondence to the Court, GM is also providing a Notice of Intention to Appear at the Fairness Hearing.

July 28, 2021

                               Respectfully Submitted,

/s/ Peter Boivin

Peter Boivin
Brittany Mouzourakis
**GENERAL MOTORS COMPANY**
300 Renaissance Center
Detroit, MI  48265-3000
Tel: (313) 665-4919
peter.boivin@gm.com
brittany.mouzourakis@gm.com

Robert M. Cooper
Hershel A. Wancjer
**KING & SPALDING LLP**
1700 Pennsylvania Ave., NW
2nd Floor
Washington, DC 20006
Tel: (202) 626-8991
Fax: (202) 626-3737
rcooper@kslaw.com
hwancjer@kslaw.com

*Counsel for General Motors Company*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

IN RE: BLUE CROSS BLUE SHIELD
ANTITRUST LITIGATION

(MDL No. 2406)

Master File No. 2:13-CV-20000-RDP

## DECLARATION OF PETER BOIVIN

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

    1.    I am Counsel - Antitrust, Government Contracts & GM Defense for General Motors Company, a position I have held since May 2013.

    2.    The accompanying Objection to the Class Settlement was prepared under my supervision in accordance with instructions authorized by the federal court in the above-captioned matter.

    3.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of July 2021.

Peter Boivin

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following individuals via U.S. Mail and email:

**Claims Administrator:**
Blue Cross Blue Shield Settlement
c/o JND Legal Administration
PO Box 91393
Seattle, WA 98111
(888) 681-1142

**Plaintiffs' Co-Lead Counsel:**
BLUE CROSS BLUE SHIELD
SETTLEMENT
C/O MICHAEL D. HAUSFELD
HAUSFELD LLP
888 16th Street NW, Suite 300
Washington, DC 20006
(202) 849-4141
BCBSsettlement@hausfeld.com

BLUE CROSS BLUE SHIELD
SETTLEMENT
C/O DAVID BOIES
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(888) 698-8248
BCBS-Settlement@bsfllp.com

**Counsel for Settling Defendants:**
DAN LAYTIN
KIRKLAND & ELLIS LLP
300 N. LaSalle St.
Chicago, IL 60657
(312) 862-4137
BCBSsettlement@kirkland.com

This 28th day of July 2021.

/s/ Hershel A. Wancjer
Hershel A. Wancjer

# EXHIBIT
# 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD** | ) | |
| | ) | **Master File No.:** |
| **ANTITRUST LITIGATION** | ) | **2:13-CV-20000-RDP** |
| **(MDL NO. 2406)** | ) | |
| _____ | ) | |

**<u>Home Depot U.S.A., Inc.'s Objection to Settlement Approval</u>**

#3260425v1

## Table of Contents

Summary of Objection ............................................................................1

Argument and Analysis...........................................................................5

I.     The proposed Settlement does not appear to allow opt outs from the
       Injunctive Relief Class........................................................................6

II.    The forced release of Home Depot and other class members' rights to
       pursue future equitable and injunctive relief would violate the public
       policy established by the antitrust laws .......................................10

       A.     The proposed Settlement requires members of the Injunctive
              Relief Class to release future claims for injunctive and equitable
              relief...................................................................................10

       B.     Public policy forbids the prospective release of a private party's
              right to enforce the antitrust laws against future conduct ..................13

       C.     The proposed Settlement's mandatory release of future claims
              for injunctive relief violates public policy ...........................17

III.   Any ruling that the *per se* standard would not govern challenges to
       defendants' post-Settlement conduct would be an unauthorized and
       advisory opinion, contrary to governing Supreme Court authority .............24

       A.     The Court cannot properly opine on the legality of future
              conduct, especially future conduct that no one currently
              challenges ...........................................................................26

              1.     Federal Rule 23 does not authorize merits rulings as part
                     of settlement approval................................................26

              2.     Deciding whether the *per se* rule would apply to post-
                     Settlement conduct would be an improper advisory
                     opinion ......................................................................28

B.      Binding Supreme Court precedent forecloses any ruling that the *per se* rule would not govern the defendants' continued market allocation ............................................................................. 31

IV.    The proposed Settlement conditions key injunctive relief on participation in a Damages Class that improperly requires the release of future antitrust claims ................................................................ 35

Conclusion ........................................................................................................... 40

**<u>Home Depot U.S.A., Inc.'s Objection to Settlement Approval</u>**

Home Depot U.S.A., Inc., together with all of its affiliates that would be members of the proposed Settlement Classes ("Home Depot"), respectfully objects to the proposed class settlement and asks to be heard at the final approval hearing.[1]

**<u>Summary of Objection</u>**

Home Depot has opted out of the Damages Class, as the proposed Settlement expressly permits. Home Depot also seeks to opt out of the Injunctive Relief Class. However, the proposed Settlement does not expressly authorize opt outs from that class, and the settlement approval record is unclear on that point. If—as Home Depot expects—class members may not opt out of the Injunctive Relief Class, then Home Depot objects to final approval of the proposed Settlement on three grounds:

*(1) The release of class members' future claims for injunctive and equitable relief would violate public policy.* The proposed Settlement would release the class members' future rights to challenge any ongoing anticompetitive conduct if it is even related to the practices that plaintiffs once vociferously challenged in this litigation. And, in addition to protecting existing restrictions, the Settlement would

---

[1] Exhibit A to this objection contains the information and verification required by the Court's Memorandum Opinion and Order Preliminarily Approving Settlement, Plan of Distribution, and Notice Plan, and Directing Notice to the Class ("Preliminary Approval Order"), ECF No. 2641, ¶ 22.

shield any newly-adopted competitive restraints that a five-person monitoring committee agreed were consistent with the negotiated injunctive relief. Any such new restrictions—no matter how violative of the antitrust laws or damaging to a particular class member—become released claims under the Settlement. Class members cannot even know what claims they are releasing because the full scope of the release cannot be determined until long after the Settlement is approved. Binding Supreme Court and Circuit precedent make clear that prospective release of the class members' statutory rights to seek injunctive and equitable relief violates the public policy established by the antitrust laws.

The right to opt out from the Damages Class provides Home Depot with insufficient protection. Seriatim damages claims are no substitute for prospective injunctive and equitable relief. As plaintiffs themselves have recognized, "equitable relief is far more likely to provide long-lasting relief [from the defendants' practices] than continual annual awards of damages."[2] Moreover, as noted below, opting out of the Damages Class means forfeiting a central feature of the injunctive relief—access to a second Blue Bid.

---

[2] ECF No. 2408 at 35. Home Depot cites to the page number in the ECF header at the top of a filing, rather than its internal pagination. Further, Home Depot uses capitalized terms as they are defined in the Settlement Agreement.

*(2) Adjudicating whether the per se standard of illegality applies to defendants' post-Settlement conduct would be an unauthorized, advisory, and erroneous opinion.* Discussion at the preliminary approval hearing raises the prospect that the Court may decide now whether antitrust law's *per se* standard would govern a challenge to the defendants' post-Settlement conduct. If that ruling favored defendants, they would surely argue that it binds all class members going forward, including members forced into the Injunctive Relief Class. Any such ruling would be both procedurally unauthorized and substantively wrong.

Procedurally, Federal Rule 23 does not contemplate or allow merits adjudications as part of settlement approval. And Article III of the Constitution does not allow the Court to decide the legality of future conduct that no party to this litigation currently challenges. Moreover, as a matter of substantive antitrust law, the continuing market allocation of Blue-branded competition is *per se* illegal under binding Supreme Court precedent that this Court may not properly second-guess.

*(3) The Settlement denies a Second Blue Bid to national employers who opt out from the Damages Class.* The proposed Settlement would allow qualifying national accounts, currently including Home Depot, to request a second Blue Plan bid. In urging preliminary approval, class counsel emphasized the value of this injunctive relief. But, in the fine print, the Settlement would deny that key

injunctive relief to any members of the Injunctive Relief Class who exercise their Due Process and Rule 23 rights to opt out of the Damages Class.

This dynamic disproportionately impacts self-funded employers, who were not separately represented for the great bulk of this litigation. A self-funded employer remaining in the Damages Class must release all future damages claims (in clear violation of public policy) and then compete with all other self-funded claimants for its share of 6.5% of the Net Settlement Fund (an estimated $120 million).[3] But a self-funded employer declining that deal loses the only injunctive relief that directly addresses Blue-branded competition for national accounts. The proposed Settlement trades away the best interests of self-funded employers in order to facilitate a global bargain overwhelmingly focused on the interests of premium-paying class members (who receive the other 93.5% of the compensation) and the defendants' desires for a broad prospective release.

* * * *

Home Depot recognizes that the proposed Settlement eliminates some of the defendants' anticompetitive restraints and may dampen the effect of others. The problem, however—and the core objection here—is that this Settlement bars Home Depot and other class members from pursuing any further injunctive relief that may be necessary to unlock the full benefits of competition among the Blue Plans.

---

[3] FAQ No. 12 (https://www.bcbssettlement.com/faq).

That statutory right may not be abridged simply to satisfy a bargain reached by the settling parties.

If the class representatives are content with the gains negotiated in the proposed Settlement, they need seek no further relief. The defendants can settle this class action and obtain releases for past conduct on whatever terms the Court approves. But the defendants cannot purchase—and the plaintiffs cannot sell—the right of Home Depot and other class members to seek prospective relief from anticompetitive conduct that continues or arises after the Settlement. Nor can defendants obtain an advisory ruling as to what standard of review would apply to their future conduct if it were challenged after the Settlement.

## <u>Argument and Analysis</u>

As the Court has explained, "the Blue Plans are 36 independent companies and each company sells health insurance."[4] Yet these should-be horizontal competitors have divided the health insurance market by territory. They have long abided by mutually-adopted rules under which only one Blue Plan could bid for the business of most national employers, including Home Depot. These rules, as plaintiffs have rightly characterized them, "constitute a naked customer allocation

---

[4] *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1250 (N.D. Ala. 2018).

agreement for national accounts."[5] And these horizontal restraints on competition for national accounts keenly affect Home Depot, which operates 2,000 stores across the country and employs well over 400,000 associates.

In seeking the Court's approval to represent a class, plaintiffs proposed to pursue injunctive relief "*eliminating* these restraints."[6] But under the proposed Settlement, defendants would largely continue to restrict Blue-branded competition by territory. National accounts could receive bids from at most two Blue Plans, rather than benefit from unrestrained competition among all three dozen, as antitrust law requires. Ultimately, the Settlement's injunctive relief allows defendants to continue restraining competition in significant ways through their market allocation arrangements. That makes it particularly critical that the Settlement not immunize those continued restraints from future challenge.

## I.    The proposed Settlement does not appear to allow opt outs from the Injunctive Relief Class.

"The Settlement Classes include a Damages Class under Rule 23(b)(3) as well as an injunctive relief class under Rule 23(b)(2)."[7] The Settlement Agreement expressly provides that class members may opt out from the 23(b)(3) Damages

---

[5] ECF No. 2408 at 15.

[6] *Id.* at 34 (emphasis added).

[7] Preliminary Approval Order at 6.

Class.[8] But it does not explicitly allow opt outs from the 23(b)(2) Injunctive Relief

Class.[9]

Despite that, the settlement approval proceedings suggest that class members

might be able opt out of the Injunctive Relief Class. At the preliminary approval

hearing, co-lead counsel for the Subscriber Classes unequivocally assured the

Court as follows:

> I think with respect to the injunctive relief, it's also worth
> remembering that no one is bound to this injunctive relief if they want
> to continue to argue that there are anticompetitive aspects that are
> illegal and ought to be changed. Everybody is going to be given
> notice. Everybody is going to have an opportunity to opt out. And so
> anyone who has a view that there are clearly illegal aspects that need
> to be pursued has an opportunity to do that. … [I]f somebody wants to
> pursue injunctive relief, they have the – they have the opportunity to
> do so.[10]

Class counsel offered this assurance as a reason that the Court should be

comfortable approving injunctive relief that would not eliminate some of the

---

[8] Settlement Agreement, ECF No. 2610-2 at 51, ¶ 38; Preliminary Approval Order at 62-63, ¶¶ 18-20; Settlement FAQs Nos. 28-29 (https://www.bcbssettlement.com/faq).

[9] *Id.*

[10] Hearing Tr., November 17, 2020, ECF No. 2626 at 53.

practices that plaintiffs had challenged as *per se* illegal.[11] No party, including the defendants, challenged this representation to the Court.

The notice documents further contribute to the lack of clarity. Those documents tell class members that they will not be bound by the Settlement if they opt out of the Damages Class, without any qualification that they will nonetheless be bound by the release of injunctive and equitable claims. For example, the Settlement Website states: "If you do not want to be legally bound by the Settlement, you may send a request for exclusion ('opt out'). You will not receive any money, but you will keep your right to sue Settling Defendants for the claims in this case."[12] Likewise, the Long Form Notice advises that opt outs from the Damages Class are not "legally bound by the terms of the Settlement," again without stating that they would still be bound by the release of injunctive and equitable relief claims.[13] Finally, the Preliminary Approval Order states: "All Class Members who submit valid and timely notices of their intent to be excluded from

---

[11] *Id.*

[12] FAQ No. 28.

[13] Long Form Notice § 12 ("If you are a member of the Damages Class, do not want the monetary benefits, and do not want to be legally bound by the terms of the Settlement, or if you wish to pursue your own separate lawsuit against Settling Defendants, you must exclude yourself from the Damages Class.").

the Damages Class … **WILL NOT** be bound by the terms of the Settlement Agreement."[14]

All of this language indicates that class members can opt out of the settlement entirely. But the Settlement Agreement itself states: "Persons or entities in both the Injunctive Relief Class and the Damages Class release all Released Claims. Persons or entities in the Injunctive Relief Class but not the Damages Class, release only claims for equitable or injunctive relief …."[15] That language, combined with the absence of any explicit provision for opting out of the Injunctive Relief Class, suggests that a class member can opt out of only the Damages Class and will in all events release injunctive and equitable claims. If so, then the notice documents are misleading.

In sum, the Settlement Agreement does not expressly provide a right to opt out of the Injunctive Relief Class, notwithstanding the assurance of class counsel and the assent-through-silence of the other settling parties at the preliminary approval hearing. And the notice documents are at best unclear. Accordingly, Home Depot has opted out of both the damages and injunctive classes, to the extent permitted. But to the extent the Injunctive Relief Class is mandatory and this

---

[14] Preliminary Approval Order at 63, ¶ 20 (emphasis original).

[15] Settlement Agreement at 47 ¶ 32.

Court determines that no opt-out right is available, Home Depot objects to the proposed Settlement.

## II.    The forced release of Home Depot and other class members' rights to pursue future equitable and injunctive relief would violate the public policy established by the antitrust laws.

### A.    The proposed Settlement requires members of the Injunctive Relief Class to release future claims for injunctive and equitable relief.

The proposed Settlement, if mandatory, would broadly extinguish Home Depot and the other class members' claims for injunctive and equitable relief from continuing and future antitrust violations. That is because, as quoted above, members of the Injunctive Relief Class who opt out of the Damages Class still lose their claims for injunctive and equitable relief.[16] Those forfeited claims expressly include "claims that arise *after* the Effective Date" of the proposed Settlement.[17]

This release is not merely prospective, but broad. It encompasses "any and all" claims for "equitable or injunctive relief of any nature (including but not limited to antitrust … based upon, arising from, *or relating in any way to*" any of the following categories:

> (i) the factual predicates of the Subscriber Actions … including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date;

---

[16] Settlement Agreement at 47 ¶ 32.

[17] *Id.* at 18-19 ¶ 1(uuu) (emphasis added).

(ii) any issue raised in any of the Subscriber Actions by pleading or motion; or

(iii) mechanisms, rules, or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10 through 18 approved through the Monitoring Committee Process during the Monitoring Period.[18]

Importantly, these categories include any claims arising from continuing or future anticompetitive conduct if they are based upon—or even related to—any conduct challenged in the litigation. Though the first category includes the phrase "through the Effective Date," that language describes the relevant body of *filings*, not the relevant body of *claims*. In other words, the Settlement releases all claims, including future ones, so long as they related in any way to *any* factual predicate contained in *any* filing made in the Subscriber Actions through the Effective Date. And the second category of released claims contains no temporal limitation at all; it covers any claim (whenever arising) that is related to any issue that was ever raised in this litigation.

Clearly, then, the proposed Settlement purports to release any claim for future equitable or injunctive relief challenging the defendants' continuing horizontal market allocation or their restriction on the number of Blue Bids that may compete for national accounts, which are "factual predicates" in various

---

[18] *Id.* (emphasis added).

Subscriber Action filings prior to the Effective Date and "issue[s] raised in any of the Subscriber Actions by pleading or motion."[19] If there were any doubt, the Settlement resolves it by expressly saying that the release includes future claims.[20]

Under the third category of released claims, the proposed monitoring process may add newly-adopted restrictions to the release. For five years, a Monitoring Committee would review newly-adopted restrictions and decide whether they are consistent with the Settlement's injunctive relief provisions. If so, then the release expands to cover restrictions not currently in effect.[21] If not, the new restrictions would fall outside the release.[22] Either way, though, the Monitoring Committee has no power to prohibit the defendants from making any change.[23] It merely oversees a one-way process that can expand the release to cover—and thereby immunize— new conduct. And class members have no way of knowing what conduct or restrictions the committee will approve and thereby add to the release.

Finally, the proposed Settlement would preemptively enforce these broad releases through the prospect of contempt, by permanently enjoining Settlement

---

[19] *Id.*

[20] *Id.*

[21] *Id.* at 37-38, ¶ 20(a)(ii) & (iii).

[22] *Id.* at 35, ¶ 20(a)(iv).

[23] *See generally id.* at 36-37, ¶ 20.

Class members from bringing suit seeking any relief "based in whole or in part upon, arising out of, or in any way connected or related to any Released Claim."[24]

**B.      Public policy forbids the prospective release of a private party's right to enforce the antitrust laws against future conduct.**

While Home Depot understands the defendants' desire to buy peace for the future as well as for the past, these features of the Settlement violate public policy. The Supreme Court has repeatedly emphasized that "[t]he antitrust laws represent a 'fundamental national economic policy'"[25] and that "private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws."[26] Accordingly, the law forbids waivers of a private party's right to enforce the antitrust laws against future conduct. Indeed, the Supreme Court has expressly warned that, if an agreement operates "as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."[27]

---

[24] *Id.* at 48 ¶ 32(a).

[25] *Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross of Kansas City*, 452 U.S. 378, 388 (1981) (citations omitted).

[26] *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 336 (1971) (quoting *Minnesota Mining & Mfg. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 318 (1965)).

[27] *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985).

The Supreme Court's admonition rests "on a firm principle of antitrust law that an agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void as a matter of public policy."[28] As the Second Circuit has noted:

> More than a half-century ago [in *Lawlor v. Nat'l Screen Serv. Corp.*], the Supreme Court stated that "in view of the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action," an agreement which confers even "a partial immunity from civil liability for future violations" of the antitrust laws is inconsistent with the public interest.[29]

This Circuit's law likewise condemns prospective releases of a private party's right to enforce the antitrust laws against future conduct. As the former Fifth Circuit held in *Redel's Inc. v. General Electric*:

> The prospective application of a general release to bar private antitrust actions arising from subsequent violations is clearly against public policy. A right conferred on a private party by federal statute, but granted in the public interest to effectuate legislative policy, may not be released if the legislative policy would be contravened thereby. Releases may not be executed which absolve a party from liability for future violations of our antitrust laws. … Therefore, as a matter of law, the general release in the case sub judice is ineffective to bar claims arising subsequent to … the date of its execution.[30]

---

[28] *In re Am. Express Merchants' Litig.*, 634 F.3d 187, 197 (2d Cir. 2011).

[29] *Id.* (quoting *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329, (1955)).

[30] *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974).

In so holding, the former Fifth Circuit approvingly cited the reasoning of a sister circuit: "Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy. This is because the effect of such a release could be to permit a restraint of trade to be engaged in, which would have impact, *not simply between the parties, but upon the public as well*."[31]

Other circuits have likewise reasoned that releases of future antitrust liability violate public policy because "[a] claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his [or her] rights under the Act has been likened to a private attorney-general who protects the public's interest."[32]

That this prospective release would occur in a class action does not salvage it. Like all Federal Rules, Rule 23 "shall not abridge, enlarge or modify any substantive right."[33] As a merely procedural rule, Rule 23 does not authorize an agreement that would violate the public policy established by Congress, not even to settle contentious litigation. As the Eleventh Circuit instructs, "[t]hough

---

[31] *Id.* (quoting *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955) (emphasis added).

[32] *Am. Safety Equip. Corp. v. J.P. Maguire & Co.*, 391 F.2d 821, 826 (2d Cir. 1968); *In re Am. Express*, 634 F.3d at 197.

[33] 28 U.S.C. § 2072(b).

settlements in accord and satisfaction are favored in law, they may not be sanctioned and enforced when they contravene and tend to nullify the letter and spirit of an Act of Congress."[34] The Court elaborated: "settlement against public policy typically involves endorsement of *continuing* violations of a statute, such as labor or securities codes, *or a waiver of protective rights under such statutes*," just as would occur here.[35]

Indeed, the public policy violation would be more pernicious because it comes in a class action. By imposing a release of future claims on a nationwide class of buyers that apparently cannot remove themselves from the Rule 23(b)(2) class, the Settlement prevents any of these potential private plaintiffs from seeking to enforce the antitrust laws against the settling defendants. If it violates public policy for even *one party* to agree to release future antitrust claims, surely it violates public policy for a Settlement to provide that *every* potential plaintiff releases their future claims.

The Second Circuit considered a similar attempt to use a class settlement to immunize future conduct from private antitrust challenges in the *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*. That proposed

---

[34] *In re Smith*, 926 F.2d 1027, 1029 (11th Cir. 1991) (quoting *Atlantic Co. v. Broughton,* 146 F.2d 480, 482 (5th Cir. 1944)).

[35] *Id.* (emphasis added).

settlement foundered on adequacy of representation grounds. One panel member wrote separately to elaborate about the problem that occurs when one class of plaintiffs benefits from a substantial settlement payment while others (like Home Depot and the other Damages Class opt outs here) receive no payment and "give up forever their potentially valid claims, without ever having an opportunity to reject the settlement by opting out of the class."[36] In words that apply equally well here,  the concurring judge wrote: "This is not a settlement; it is a confiscation."[37]

### C.    The proposed Settlement's mandatory release of future claims for injunctive relief violates public policy.

The proposed Settlement would do what Supreme Court and Circuit law forbids: broadly preclude Home Depot and other members of the 23(b)(2) class from seeking equitable or injunctive relief based on the settling defendants' continuing and future conduct.

It matters not whether some or even all of the released conduct may be characterized as a continuation of the defendants' pre-release conduct. In *Lawlor v. National Screen Service Corp.*, the Supreme Court considered and rejected such an argument.[38] The defendant argued that the plaintiff could not obtain injunctive

---

[36] 827 F.3d 223, 240 (2d Cir. 2016) (Level, J., concurring).

[37] *Id*. at 241 (collecting Supreme Court authority that would require the settlement to be rejected on those grounds).

[38] 349 U.S. at 324-29.

relief and damages based on the continuation of anticompetitive practices that the plaintiff had previously challenged in litigation between those parties. The parties settled their first lawsuit, and, when the plaintiff filed a second suit, the defendant invoked the release from the first case. But the Court held that the settlement agreement could not "confer … a partial immunity from civil liability for future violations" even if the settled lawsuit "involved essentially the same course of wrongful conduct" as the new one.[39] Thus, as *Lawlor* confirms, antitrust law does not tolerate waivers immunizing continuing violations any more than waivers immunizing new ones.

And to be clear, the proposed Settlement would not release only existing claims. As a matter of blackletter antitrust law, the continuation of past anticompetitive conduct after settlement gives rise to *new* claims, beyond those that existed on its effective date. If a horizontal restraint violates Sherman Act § 1, then every sale thereunder is a new and separate violation of antitrust law, giving rise to a new claim.[40] As the Eleventh Circuit has held, "[e]ven though the illegal act occurs at a specific point in time, if it inflicts 'continuing and accumulating harm' on a plaintiff, an antitrust violation occurs each time the plaintiff is injured

---

[39] *Id.* at 329, 327 (internal quotation omitted).

[40] *See, e.g., Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997).

by the act."[41] Ordinarily, any person facing even a "threatened loss" from such a violation may seek injunctive relief under 15 U.S.C. § 26(a). Yet the proposed Settlement would force Home Depot into an injunctive relief class and release its statutory right and that of other class members to seek such relief from conduct that will continue under the proposed Settlement.

That is no small matter. As plaintiffs have recognized, "equitable relief is *far more likely* to provide long-lasting relief [from the practices at issue in this litigation] than continual annual awards of damages."[42] And the proposed Settlement would leave intact key restraints on competition among the Blue Plans. These include the horizontal agreement limiting each Blue Plan to operating only within its service area.[43] Furthermore, national accounts will not benefit from full and free competition among as many Blue Plans as may wish to bid for their business; instead, they are limited to two Blue Plan bids. And requesting that second bid depends on meeting and maintaining the Settlement Agreement's stringent standards to be a qualified account.[44] Moreover, even an otherwise

---

[41] *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999), *amended in part,* 211 F.3d 1224 (11th Cir. 2000).

[42] ECF No. 2408 at 35 (emphasis added).

[43] *See, e.g.*, Settlement Agreement at 31, ¶ 13 ("nothing in this Agreement shall prevent any Settling Individual Blue Plan from continuing to operate its Blue-Branded business only in its Service Area, in according with the License Agreement(s) and Membership Standards as of the Execution Date").

[44] Settlement Agreement at 31-32, ¶ 15 & Appendix D ("Second Blue Bid

qualified account remains restricted to one Blue Plan bid if it opts out of the Damages Class and the accompanying unlawful release of future claims.[45]

This continuing restraint on Blue-Plan competition for national accounts is particularly troubling to nationwide employers such as Home Depot. The defendants' own documents and testimony, as well as plaintiffs' extensive expert analysis, showed that the existing rules—which are largely unmodified by the proposed Settlement—choke off Blue-branded competition for national accounts. As plaintiffs explain, "[u]nder the ceding policies, which constitute *a naked customer allocation agreement* for national accounts, a Member Plan can only enter the ESA of another Member Plan if that Member Plan grants permission."[46]

> Ceding fixes the right to bid for national accounts in the ESA in which the account is headquartered, unless the Member Plan in that ESA agrees to cede that right to a different Member Plan in a different ESA. That rule not only forecloses competition among Member Plans for national accounts, depriving those accounts of competitive bidding, but also prevents the national account itself from requesting and receiving a competitive bid from a Member Plan of its choice.[47]

---

Rules"). Whether an employer qualifies for a second bid depends on a complicated formula measuring the dispersion of its employees throughout the service areas of the Blue Plans. *Id.* at 8-9 ¶ 1(u), 10 ¶ 1(w), (z), and 17 ¶ 1(sss). That dispersion can change over time with business needs and growth, meaning that an employer like Home Depot cannot count on remaining qualified for a second bid.

[45] *See* § IV *infra*.

[46] ECF No. 2408 at 15 (emphasis added).

[47] *Id.*

The proposed Settlement would allow qualifying national accounts (that do not opt out of the Damages Class) to request a second Blue Plan bid, but no more.[48] While two bids may be better than one, some 36 independent companies offer Blue Plans.[49] Plaintiffs presented substantial evidence that, absent artificial restraint, these companies would compete fiercely outside of their service areas for national accounts such as Home Depot. "For many Blues, ceding is their only way to grow their business, given the limitations [on the amount of potential new business] within their own ESAs. … For this reason, Member Plans compete vigorously over who gets the right to bid on a national account."[50] Moreover, "Member Plans attempt to bid on accounts all over the country, not just those that are geographically close."[51]

As plaintiffs elaborated, the Member Plans have chafed at the existing restrictions and sought to compete outside their own service areas:

> [E]videncing the Member Plans' largely frustrated desire to compete is the fact that Member Plans take advantage of the limited marketing opportunity available to them under the ceding policies whenever they can; with the exception of [the Puerto Rico-based plan] every single Member Plan has sought and achieved Blue-branded business outside of its ESA through cedes. The Member Plans' own stated desires to grow outside of their ESAs, along with evidence that Member Plans

---

[48] Settlement Agreement at 32-33, ¶ 15.

[49] 308 F. Supp. 3d at 1250.

[50] ECF No. 2408 at 15 (citing defendants' documents).

[51] *Id.* at 16 (citing defendants' documents).

already seek business outside of their ESAs through cedes, demonstrate … that the ESAs deprive the class of the benefits of competition.[52]

Accordingly, there is every good reason to believe that—absent market allocation—national accounts could select among competing bids from many more than two Blue Plans. Competition by a third, fourth, or fifth Blue Plan would reduce price and improve quality. The antitrust laws exist to protect that type of unrestrained horizontal competition;[53] there is no rule that two competitors are enough. Quite to the contrary, the federal antitrust agencies regard a market with only two sellers as "highly concentrated"—the very least competitive of the agencies' classifications.[54] A contract that artificially limits competition to two sellers clearly restrains trade, and extinguishing class members' future rights to challenge the two-Blue-Bid limitation violates public policy.

---

[52] *Id.* (citations to defendants' discovery responses omitted).

[53] *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010).

[54] The Department of Justice and the Federal Trade Commission employ the Herfindahl-Hirschman Index (or HHI) as "a commonly accepted measure of market concentration." https://www.justice.gov/atr/herfindahl-hirschman-index. "The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers." *Id.* The lowest HHI for a two-seller market is 5,000 (50%$^2$ + 50%$^2$ = 5,000). These agencies "consider markets in which the HHI is in excess of 2,500 points to be highly concentrated." *Id.*

Plaintiffs once challenged the limits on Blue Plan bidding as "a naked customer allocation agreement for national accounts."[55] Now the settling parties apparently agree that the elimination of the National Best Efforts Requirement (which currently limits competition through *non*-Blue Branded Plans) will render the continuing restriction on Blue Plan competition acceptable. But the proposed Settlement should not and cannot release the right of Home Depot and other class members to later challenge those continuing restrictions if—as seems likely— plaintiffs' supposition about the effect of off-brand competition proves false. The Blue Plans are highly desirable, since "[n]ationwide, 96 percent of hospitals and 92 percent of physicians are in-network with the Blue Plans."[56] And defendants surely have some reason to maintain tight restrictions on Blue-branded competition even while they relinquish their National Best Efforts Requirement. They have evidently calculated that it remains in their collective economic interests to restrict fulsome competition involving their flagship products. Whether future market conditions will merit future litigation remains to be seen, but public policy does not allow the defendants to shield that restraint—or any set of restraints to which they may later agree—from future injunctive or equitable relief.

---

[55] ECF No. 2408 at 15.

[56] 308 F. Supp. 3d at 1257.

**III.   Any ruling that the *per se* standard would not govern challenges to defendants' post-Settlement conduct would be an unauthorized and advisory opinion, contrary to governing Supreme Court authority.**

Home Depot also objects to the extent that settlement approval depends on this Court preemptively ruling that, as modified, the Blue Plans' territorial allocation would comply with the antitrust laws or not be subject to the *per se* rule.

As the Court is well aware, "[s]ome types of restraints [on competition] have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*."[57] This Court has already determined that the defendants' existing package of competitive restraints is subject to the *per se* rule of illegality that has consistently doomed horizontal market allocations.[58] Absent settlement, defendants' only hope of defending their anticompetitive arrangements would be to convince a jury that they are but a single actor, despite their own contrary statements and organizational documents.[59]

---

[57] *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

[58] 308 F. Supp. 3d at 1266-71.

[59] *Id.* at 1263-66 (finding dispute of fact as to defendants' single-entity defense); *see* ECF No. 1552 at 12-17 (refuting this defense with the defendants' contrary statements and other evidence). As the Court summarized, "[t]he Association's bylaws recognize that each of its Member Plans is autonomous in its operations. The Plans are financially independent entities. The Blue Cross and Blue Shield License Agreements provide, 'Nothing herein contained shall be construed to constitute the parties hereto as partners or joint venturers....'" 308 F. Supp. 3d at 1250 (record citations omitted).

To be sure, this Court did not decide whether the *per se* rule would apply to the defendants' market-allocating restraints as they would remain in effect under the proposed Settlement.[60] That was not at issue on summary judgment, and it is not at issue now as the Court considers final settlement approval. However, the colloquy at the preliminary approval hearing suggests that the Court may contemplate deciding now whether the *per se* rule would govern a challenge to the post-Settlement restraints.[61] That is clearly what defendants propose: BCBSA's counsel urged that "[t]he Court must conclude that the go-forward system is not per se unlawful but, instead, is subject to the rule of reason."[62] And plaintiffs seemed to accede to this course of action.[63]

Defendants' purpose here is transparent. They seek a ruling that would foreclose any future *per se* challenge by any class member, including members of the mandatory Injunctive Relief Class. But any such ruling would be procedurally and substantively erroneous, inviting reversal on appeal.

---

[60] Preliminary Approval Order at 47-48.

[61] Hrg. Tr. Nov. 17, 2020, at 36-51; 160-62.

[62] *Id.* at 160.

[63] *Id.* at 36-51.

A.   **The Court cannot properly opine on the legality of future conduct, especially future conduct that no one currently challenges.**

1.   **Federal Rule 23 does not authorize merits rulings as part of settlement approval.**

Federal Rule 23 requires the Court to determine only whether the proposed Settlement "is fair, reasonable, and adequate."[64] It does not contemplate or authorize the Court to resolve legal or factual issues on the merits. As the Supreme Court instructs, "[c]ourts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement. *They do not decide the merits of the case or resolve unsettled legal questions*."[65]

Circuit precedent is clear on this point. The former Fifth Circuit warns that "[i]t cannot be overemphasized that neither the trial court in approving the settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute."[66] This Court, too, has recognized this important limitation,

---

[64] Fed. R. Civ. P. 23(e)(2).

[65] *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) (emphasis added and internal citation omitted).

[66] *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *see also United States v. Alabama*, 271 F. App'x 896, 902 (11th Cir. 2008) (same statement of law).

noting that "in context of considering approval of class settlements, courts do not decide the merits or resolve contested legal questions."[67] Likewise, in its order preliminarily approving the proposed Settlement at issue here, this Court observed that it "'may not resolve contested issue of fact or law[] but instead is concerned with the overall fairness, reasonableness, and adequacy of the proposed settlement as compared to the alternative of litigation.'"[68]

In deciding whether to grant final approval, this Court should consider whether the settlement terms are reasonable in light of the prospects that plaintiffs would or would not prevail on the merits if the case continued. But, as the authorities cited above make clear, the Court cannot decide the merits—or part of the merits—in that process.[69] In particular, it cannot decide a legal question that would arise in future litigation if the settlement were approved and if the post-settlement conduct were challenged under antitrust law.

---

[67] *Deas v. Russell Stover Candies, Inc.*, 2005 WL 8158201, at *9 (N.D. Ala. Dec. 22, 2005) (citing *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 678 (M.D. Ala. 1988) for the quoted proposition).

[68] Preliminary Approval Order at 24-25 (quoting *Swaney v. Regions Bank*, 2020 WL 3064945, at *3 (N.D. Ala. June 9, 2020)).

[69] *Compare* 15 U.S.C. § 16(e) (Tunney Act requiring the district court to determine whether consent decrees to resolve enforcement actions brought by the Department of Justice are in the public interest).

### 2.   Deciding whether the *per se* rule would apply to post-Settlement conduct would be an improper advisory opinion.

As clear from the preliminary approval hearing, no party to this litigation currently contends that the *per se* standard would govern the market allocations that would continue after settlement. Defendants' counsel carefully ensured that the class plaintiffs conceded that point on the record:

> MR. ZOTT:  [W]e believe that the subscribers agree with us on at least these three things—and we want to make clear on that; and if they don't agree, they should say so now, but I believe they do— which is, first, going forward, we all agree that the system will not be clearly illegal, *we all agree that the rule of reason will apply going forward*, and the subscribers agree that there are procompetitive benefits to the system going forward. I believe that's what they said.  I think that's what their slides said, and I think that's where they are. So—but if not, they should speak now. And –
>
> THE COURT:  Well, I think Mr. Boies got there. Mr. Hausfeld, you're co-lead counsel for the subscribers. … Do you agree with each of those points?
>
> MR. HAUSFELD:  Totally concur, Your Honor.[70]

As the Court is aware, however, "federal courts are constrained by the Constitution to decide only live cases and controversies. Federal courts may not render advisory opinions on abstract or hypothetical propositions of law."[71] Thus, as the Eleventh Circuit explains, "[a] federal court may not, consistent with the

---

[70] Hrg. Tr. Nov. 17, 2020, at 161-62 (emphasis added).

[71] *Dixie Elec. Co-Op v. Citizens of State of Ala.*, 789 F.2d 852, 857 (11th Cir. 1986) (citation omitted).

Constitution, entertain a proceeding … for the adjudication of potential issues that have not actually arisen."[72] "The prohibition on advisory opinions is a logical corollary of the case or controversy requirement."[73]

To present an issue for adjudication, the dispute must not only be concrete, but *adversarial*. As the Eleventh Circuit explains, "the purpose of the [case or controversy] requirement is readily apparent—to limit the federal courts to deciding issues *presented in an adversary framework* amenable to judicial resolution … ."[74] "[T]hose words [cases or controversies] limit the business of federal courts to questions presented in an *adversary* context."[75]

Whether the *per se* rule of illegality would govern defendants' post-Settlement conduct exhibits none of the essential characteristics of a case or controversy. First, there is no lawsuit before this Court challenging the defendants' post-Settlement conduct; indeed, there may never be such a lawsuit. The Court cannot declare now what law would apply if such a "hypothetical future lawsuit" were brought.[76] Federal courts are not "in the business of issuing advisory opinions

---

[72] *Id.*

[73] *Miller v. F.C.C.*, 66 F.3d 1140, 1145-46 (11th Cir. 1995).

[74] *Id.* (emphasis added).

[75] *Flast v. Cohen*, 392 U.S. 83, 95 (1968) (emphasis added); *see also GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.,* 445 U.S. 375, 382 (1980) (same language).

[76] *Sirpal v. Univ. of Miami*, 509 F. App'x 924, 932 (11th Cir. 2013) ("we

... that merely opine on 'what the law would be upon a hypothetical state of facts.'"[77]

Second, there is no "adversary framework," as constitutionally required for a case or controversy.[78] No one challenges defendants' post-Settlement conduct and no party to this litigation contends that the *per se* rule would govern such a challenge if it were brought. To the contrary, the settling parties have agreed on the record that it would not.[79] That is the opposite of "an adversary context."[80]

---

vacate … the portion of the magistrate judge's order addressing the issue of statutory tolling on a hypothetical future lawsuit as an impermissible advisory opinion").

[77] *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 733 (11th Cir. 2018) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)).

[78] *Miller*, 66 F.3d at 1145-46; *see, e.g., Pension Benefit Guar. Corp. v. Cafeteria Operators, L.P.*, 2004 WL 1800850, at *3 (N.D. Tex. Aug. 12, 2004) (requested declaration that pension payments "made pursuant to a court-approved settlement agreement" would be fully guaranteed under federal law would be an advisory opinion where the parties requesting the declaration "do not have 'adverse legal interests'").

[79] Hrg. Tr. Nov. 17, 2020, at 161-62. Home Depot's objection is no substitute for the absent adversary process. For one thing, Home Depot has not brought—and may never bring—a lawsuit challenging the legality of the defendants' post-Settlement conduct. Deciding what law would govern such a challenge would be an advisory opinion. Second, Home Depot, as mere objector, cannot access all of the sealed confidential documents and expert reports bearing upon the legality of the defendants' conduct and its impact on competition. Third, Home Depot represents no one but itself—it cannot speak for the absent class members that would be bound by the Court's determination of the standard of review if defendants have their way.

[80] *Flast*, 392 U.S. at 95.

In sum, neither Federal Rule 23 nor Article III allows this Court to decide whether the *per se* rule would govern an antitrust challenge to the defendants' post-Settlement conduct. As the Eleventh Circuit recently held *en banc*, [p]arties cannot "bargain around" the Article III case or controversy requirements as part of a class action settlement.[81] The parties' desire for such a ruling merely to facilitate settlement approval does not create a case or controversy that this Court may resolve.[82] If such a ruling is a condition of settlement, then the Court must decline to approve the settlement.

### B. Binding Supreme Court precedent forecloses any ruling that the *per se* rule would not govern the defendants' continued market allocation.

Even if the Court could decide what antitrust rule would apply to the defendants' post-Settlement conduct, it could not give the answer that defendants seek and the plaintiffs have agreed to accept. Plaintiffs are evidently content for the Court to rule that that elimination of the National Best Efforts Requirement (which currently limits competition through non-Blue Branded Plans) would render the continuing restriction on Blue Plan competition reviewable under only the Rule of

---

[81] *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 921, 924 (11th Cir. 2020) (en banc) (reversing approval of settlement).

[82] *See, e.g., Owners Ins. Co. v. Parsons*, 610 F. App'x 895, 897-98 (11th Cir. 2015) (party cannot obtain "a hypothetical advisory opinion to assist it in its ongoing settlement negotiations").

Reason. However, as the Court has recognized, the Supreme Court has condemned horizontal market divisions as *per se* illegal even where they allowed *unrestrained* off-brand competition.[83]

In *United States v. Sealy, Inc.*, the licensor (Sealy), assigned exclusive territories to its licensees, a group of mattress manufacturers.[84] Through this mechanism, the licensees (who together controlled the licensor and crafted its policies) agreed to not sell Sealy-branded products outside of their allotted areas. But they could sell private label (non-Sealy) products in any market they chose.[85] That allowance of private-label competition did not salvage the market allocation restricting sales under the Sealy brand. Instead, as the Supreme Court held, "[t]hese activities … constitute a violation of the Sherman Act. Their anticompetitive nature and effect are so apparent and so serious that the courts will not pause to assess them in light of the rule of reason."[86]

The Supreme Court followed *Sealy* in *United States v. Topco Associates, Inc.*, applying the *per se* rule to horizontal territorial restraints on competition through the Topco brands and products.[87] As this Court previously recognized, the

---

[83] 308 F. Supp. 3d at 1260-62, 1269.

[84] 388 U.S. 350, 352 (1967).

[85] *Id*.

[86] *Id.* at 355.

[87] 405 U.S. 596, 608-09 (1972).

brand licensees in *Topco*, like the licensees in *Sealy*, "remained free to sell any amount of non-branded products."[88]

Later, in *Palmer v. BRG of Georgia, Inc.*,[89] the Supreme Court followed *Topco*, again applying the *per se* rule to condemn horizontal market allocations. And the Supreme Court has repeatedly confirmed this *per se* rule even as it has reconsidered others. In *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, for example, the Court overturned the *per se* rule for vertical resale price maintenance, but explained that "[r]estraints that are *per se* unlawful include horizontal agreements among competitors … to divide markets."[90] *Leegin* cited *Palmer* with no hint of disfavor.[91] In 2010, the Supreme Court discussed *Sealy* and *Topco* extensively (particularly *Sealy*), again without suggesting that either case was inconsistent with modern antitrust law.[92] And in 2013, the Supreme Court cited *Palmer* for the proposition that agreeing to divide territorial markets is "'unlawful on its face.'"[93]

---

[88] 308 F. Supp. 3d at 1269.

[89] 498 U.S. 46, 49 (1990).

[90] 551 U.S. 877, 886 (2007).

[91] *Id.* at 886, 909.

[92] *Am. Needle*, 560 U.S. at 200-01.

[93] *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 146 (2013).

This Court has already rejected any factual basis to distinguish *Sealy* and *Topco* from the defendants' market allocations.[94] Apparently, the settling parties question the continuing legal value of these precedents. Based on these doubts, they would have the Court foreclose a future *per se* challenge to the horizontal market allocations that continue or might arise after the Settlement. However, this Court has already determined that "[t]he holdings in both *Sealy* and *Topco* have remained viable."[95] More fundamentally, the Court has recognized that it cannot properly base its rulings on a prediction that the Supreme Court would no longer adhere to its antitrust precedents:

> The Supreme Court jealously guards the precedential effect of its opinions. This is even true in antitrust law, where the economic principles of competition policy are subject to continual evolution. The Supreme Court has specifically cautioned district courts and appellate courts against reading the tea leaves and predicting which antitrust precedents are now disfavored. And the Eleventh Circuit has abided by that guidance in antitrust cases.[96]

Just as any doubts about the continuing viability of *Sealy*, *Topco*, and *Palmer* could not justify denying summary judgment, they cannot justify opining that the post-Settlement market allocation falls outside the *per se* rule. Nor can disputes over precedential value justify confiscating class members' rights to seek

---

[94] 308 F. Supp. 3d at 1269-71.

[95] *Id.* at 1262.

[96] *Id.* at 1279 (citations omitted).

injunctive relief from the defendants' future anticompetitive conduct. In sum, the Court cannot properly advise whether the *per se* rule would govern a challenge to the defendants' post-Settlement conduct and, even if it could, would have to answer "yes."

## IV.   The proposed Settlement conditions key injunctive relief on participation in a Damages Class that improperly requires the release of future antitrust claims.

Finally, Home Depot objects to the proposed Settlement because it would deny key injunctive relief to members of the Injunctive Relief Class that opt out of the Damages Class. Those members of the Injunctive Relief Class cannot request a second Blue Bid, even though access to such a bid is part of the "Class Injunctive Relief" section of the Settlement Agreement.[97]

Much like the mandatory nature of the Injunctive Relief class, this forfeiture is not at all easy to discern from the Settlement documentation. It follows from the Settlement Agreement's definition of "Qualified National Account," which applies to "Employers," and the separate definition of "Employer," which excludes those who opted out of the Damages Class.[98] In other words, a class member that opts out of the Damages Class is not an "Employer" (no matter how many people it employs) and only "Employers" can be "Qualified National Accounts," with the

---

[97] Settlement Agreement at 30, 32-33, ¶ 15.

[98] *See id.* at 10, ¶ 1(z) & at 17 ¶ 1(sss).

right under the proposed Settlement to request a second Blue Plan bid.  Through these definitions, the Settlement would deprive Home Depot—and every other national employer that opts out of the Damages Class—of a second Blue Plan bid. And that is the only injunctive relief that addresses—albeit insufficiently—Blue-branded competition for national employers.[99]

The Court should not approve a settlement that denies central injunctive relief to members of an injunctive relief class who exercise their Rule 23(b)(3) and Due Process rights not to participate in a damages class.[100] For one thing, participation in this Damages Class requires the release of future antitrust claims.[101] That is as much a public policy violation as requiring the prospective release of injunctive relief claims.[102] Conditioning key settlement benefits on agreement to forgo future antitrust damages claims therefore violates public policy.

Second, this aspect of the Settlement trades away the best interests of national self-funded employers in order to facilitate a deal that primarily benefits the remainder of the class and, through broad prospective releases, the defendants.

---

[99] *Id.* at 30-36, ¶¶ 10-19. The other injunctive relief provisions focus on off-brand competition or local competition, rather than the key interests of national accounts.

[100] Due Process requires that members be able to opt out of a damages class. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011).

[101] *See* § II(A) *supra*, explaining scope of release.

[102] *See* § II(B) *supra*.

A case brought solely on behalf of all national self-funded employers would not settle for total compensation of $120 million and the possibility of one more Blue Bid, especially not if it required releasing all future claims for damages and injunctive relief arising from practices that would still significantly restrict Blue-branded competition for the accounts of self-funded national employers. Here, the proposed Settlement is disproportionately driven by the interests of other class members—who will receive 93.5% of the settlement fund and do not share the interests of national employers in obtaining as many Blue bids as possible—along with the defendants' desire for prospective immunity.

The Eleventh Circuit interprets "Rule 23(a)(4) to preclude class certification where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members."[103] That was true of the settlement in the *Payment Card* litigation, based on tradeoffs between differently-interested members of the classes who would be bound.[104] One such tradeoff occurred between those class members most interested in recovering past damages and those most interested in prospective injunctive

---

[103] *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003).

[104] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 231.

relief.[105] That same conflict is manifest here. Self-funded employers and their employees will benefit little from their shares of 6.5% of the Net Settlement Fund (and none if they opt out). Yet self-funded employers must stay in the Damages Class (and release future damages claims) in order to obtain key injunctive relief that is of particular interest to them and, ultimately, their employees. That is not a bargain that a class of self-funded employers would make on its own.

Another conflict in the ill-fated *Payment Card* settlement lay within the 23(b)(2) class, which included members who (by virtue of their home states' laws) could not benefit from the primary injunctive relief that other members of that class would enjoy.[106] That is true here, too. Some members of the (b)(2) class— those who meet the requirements to be a qualified national account and remain in the Damages Class—can request a Second Blue Bid, while other members of that same class who do not qualify or who desire to preserve their damages claims do not share that benefit. Rule 23 forbids approval of a settlement that fails to treat "class members equitably relative to each other."[107] This proposed Settlement flunks that test, by treating members of the same 23(b)(2) class differently, depending on whether they elect to remain in a different, damages class.

---

[105] *Id*. at 232-36.

[106] 827 F.3d at 229.

[107] Fed. R. Civ. P. 23(e)(2)(D).

Finally, the Settlement documents differ on whether a national account who opts out of the Damages Class (thereby losing a Second Blue Bid) would still release all claims seeking injunctive or equitable relief from the existing rules limiting them to a single Blue Plan bid. The Long Form Notice advises class members of a narrow exception to the broad release of injunctive and equitable claims:

> For purposes of clarity, if a Self-Funded Account that opts out meets the criteria to request a Second Blue Bid under the terms of the Settlement Agreement, that Self-Funded Account does not release any claims for declaratory or injunctive relief to request a Second Blue Bid during any time it meets the criteria to request such a bid under the terms of the Settlement Agreement. All other claims for declaratory or injunctive relief released under the Settlement Agreement are released.[108]

That language appears to provide that a class member opting out from the Damages Class (1) has no right to a Second Blue Bid, but (2) retains the right to sue to obtain such a bid under the same terms and limitations otherwise available under the Settlement Agreement. To be clear, that class member would still waive all rights to pursue any broader right to a second bid than provided in the Settlement Agreement, let alone any right to receive more than two bids.

---

[108] Long Form Notice § 10.

The Settlement Agreement, however, purports to govern if it conflicts with any other documents associated with settlement approval.[109] And the Settlement Agreement does not appear to contain a provision consistent with the language quoted above from the Long Form Notice. In other words, that agreement contains no exception allowing an opt out from the Damages Class to sue to obtain a second bid. Absent such an exception, a class member opting out of the Damages Class (thus losing any right to request a Second Blue Bid) would still release all claims seeking injunctive or equitable relief from the existing rules limiting them to a single Blue Plan bid. That would both deny *any* Blue Plan competition to national employers who exercise their Due Process right to opt out of the Damages Class *and* confiscate their rights to remedy that situation through future injunctive or equitable relief. That would be absurd, unfair, and anticompetitive.

## **Conclusion**

The Court must not and should not approve the Settlement as proposed. Supreme Court and Circuit precedent forbid approving a settlement that would prevent members of an injunctive relief class from asserting claims for injunctive relief under the antitrust laws based on the defendants' continuing and future anticompetitive conduct. Nor can the settling defendants obtain (and bind class

---

[109] Settlement Agreement at 61, ¶ 62.

members to) a ruling that their future conduct will not be subject to the *per se*

standard under antitrust law. Finally, the Court should not approve a settlement

that denies key injunctive relief to members of an injunctive relief class unless they

also participate in a Damages Class that requires the release of future antitrust

claims.

      Respectfully submitted this 28th day of July, 2021.

                        Frank M. Lowrey IV
                        GA Bar No. 410310
                        lowrey@bmelaw.com
                        Ronan P. Doherty
                        GA Bar No. 224885
                        doherty@bmelaw.com

BONDURANT MIXSON & ELMORE, LLP
1201 West Peachtree Street, NW, Suite 3900
Atlanta, GA 30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

## CERTIFICATE OF SERVICE

I hereby certify that this 28th day of July, 2021, a copy of the foregoing

**HOME DEPOT U.S.A., INC.'S OBJECTION TO SETTLEMENT**

**APPROVAL** was served upon the attorneys of record in the case via U.S. Mail

and E-Mail addressed as follows:

Claims Administrator:
Blue Cross Blue Shield Settlement c/o JND Legal Administration
PO Box 91393
Seattle, WA 98111
info@BCBSsettlement.com

Plaintiffs' Co-Lead Counsel:
BLUE CROSS BLUE SHIELD SETTLEMENT C/O MICHAEL D. HAUSFELD
HAUSFELD LLP
888 16th Street NW
Suite 300
Washington, DC 20006
BCBSsettlement@hausfeld.com

BLUE CROSS BLUE SHIELD SETTLEMENT C/O DAVID BOIES BOIES
SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
BCBS-Settlement@bsfllp.com

Counsel for Settling Defendants:
DAN LAYTIN KIRKLAND & ELLIS LLP
300 N. LaSalle St.
Chicago, IL 60657
BCBSsettlement@kirkland.com

Self-Funded Settlement Sub-Class Counsel:
Warren T. Burns
BURNS CHAREST LLP
4725 Wisconsin Ave NW
Suite 200
Washington, DC 20016
wburns@burnscharest.com

_____
Frank M. Lowrey IV

**Exhibit A**
*Page 1 of 3*

### Home Depot U.S.A., Inc.'s Objection to Settlement Approval

**a.     The name of this Action and a description of the objections, including applicable legal authority and any supporting evidence the objector wishes to introduce;**

Home Depot U.S.A., Inc., together with all of its affiliates that would be members of the proposed Settlement Classes ("Home Depot"), objects to the proposed class settlement *In re: Blue Cross Blue Shield Antitrust Litigation* on the grounds set forth in the preceding memorandum.

**b. The objector's full name, address, email address, telephone number, and the plan name under which Blue Cross Blue Shield coverage was provided and dates of such coverage;**

> Home Depot U.S.A., Inc.
> Attn:  Ben Thorpe
>         Corporate Counsel, Home Depot U.S.A., Inc.
>         2455 Paces Ferry Road, Bldg. C-20
>         Atlanta, GA 30339
>         Telephone: (470) 649-6390
>         Facsimile: (770) 384-3655
>         Ben_Thorpe@homedepot.com

> Plan Names:
> - As of February 1, 2020 – The Home Depot Group Benefits Plan
> - Prior to February 1, 2020 – Home Depot Medical and Dental Plan

As best as Home Depot determine from review of available records, at least some Blue Cross Blue Shield coverage was provided under the Plan in each year between 2008 and the present.

**c. Whether the objection applies only to the objector, a specific subset of the Settlement Classes, or the Settlement Classes as a whole;**

While Home Depot does not act for other class members, some of its objections (Sections II and III of the preceding memorandum) would apply to members of all classes and subclasses and others (Section IV) would apply particularly to national, self-funded employers.

#3261199v1

**Exhibit A**
*Page 2 of 3*

**d. The identity of all counsel who represent the objector, including former or current counsel, who may be entitled to compensation for any reason related to the objection, along with a statement of the number of times (within five years preceding the submission of the objection) that counsel has, on behalf of a client, objected to a class action, the caption of the case for each prior objection, and a copy of any relevant orders addressing the objection;**

Home Depot is represented in this matter by:

> Frank M. Lowrey IV
> Ronan P. Doherty
> BONDURANT MIXSON & ELMORE, LLP
> 1201 West Peachtree Street, NW, Suite 3900
> Atlanta, GA 30309
> Telephone: (404) 881-4100
> Facsimile: (404) 881-4111
> lowrey@bmelaw.com
> doherty@bmelaw.com

These attorneys have not within the preceding five years filed or otherwise submitted an objection to a class action settlement on behalf of a client.

**e. Any agreements that relate to the objection or the process of objecting between the objector, his or her counsel, and/or any other person or entity;**

Home Depot is compensating its counsel on an hourly basis, and no part of that compensation depends on the outcome of the objection or the settlement approval process.

**f. The objector (and the objector's attorney's) signature on the written objection;**

See below.

**g. A statement indicating whether the objector intends to appear at the Final Approval Hearing (either personally or through counsel).**

**Exhibit A**
*Page 3 of 3*

Home Depot intends to appear at the Final Approval Hearing through the counsel identified above.

Signatures and verifications:

I declare under penalty of perjury and subject to 28 U.S.C. § 1746 that the information contained in items (a) and (c)-(g) is true and correct.

*Frank M. Lowrey IV*

_____

Frank M. Lowrey IV

Date: July 27, 2021

I declare under penalty of perjury and subject to 28 U.S.C. § 1746 that the information contained in items (a)-(c) and (e)-(g) is true and correct.

*Ben W. Thorpe*

_____

Ben W. Thorpe

Date: July 27, 2021

# EXHIBIT

# 6

LMS INNOVATIONS, INC.                                        *(312) 613-2345*
*a new way of getting things done*                2734 W. Leland Ave., Chicago, IL 60625

VIA U.S. MAIL

July 28, 2021

Blue Cross Blue Shield Settlement
c/o JND Legal Administration
PO Box 91393
Seattle, WA 98111

Received
AUG 0 2 2021
by JNDLA

**In re: Blue Cross Blue Shield Antitrust Litigation**

To Whom It May Concern:

As of December 15, 2015, our company purchased a BlueCare Direct Bronze 004 plan from Blue Cross Blue Shield of Illinois through the SHOP Exchange for our employees. This coverage was unilaterally terminated by BCBSIL as of September 20, 2017 as the SHOP Exchange was dissolved. This terminated coverage for the employees for 737 other Illinois businesses at the time.

Less than 24 ours ago I received Notice of this settlement with provisions to object. However, as all objections must be accompanied by counsel's signature and postmarked by today's date, I have not been given adequate notice to adequately review and evaluate the impact to my company and furnish a full and complete response.

I seek recourse for the disruption and displacement caused by BCBS of IL's arbitrary act against my company and its employees. Acting in good faith, I received SHOP Exchange's bona fide offer of insurance and, in turn, purchased it offering it to our employees as an employer administered Insurance. Our company paid out in excess of $25,900.00 in payments for coverage that was terminated without adequate due process due to arbitrary and egregious action taken by BCBS of IL. We did not then and do not now recognize any right of BCBS of IL to exit the SHOP Exchange without providing for substantive damages to our business caused by their adverse action.

I object to the inadequate notice served to me in this matter of the Antitrust Litigation and the requirements specified therein. I have had no opportunity to consult with counsel and must file this letter *pro se*. I cannot say whether my objection is applicable to the Settlement Class or a subset of the Settlement Class as there has been inadequate time to fully assess. I declare that the above is true and correct.

If you have any questions or comments, please do not hesitate to contact me.

Respectfully,

LMS INNOVATIONS, INC.

Marlon St. John
mstjohn@lmsinnovations.com
Vice President

# EXHIBIT

# 7

# Barlow Coughran Morales & Josephson, P.S.

A PROFESSIONAL SERVICES CORPORATION
ATTORNEYS AT LAW

1325 FOURTH AVENUE, SUITE 910
SEATTLE, WA 98101-2573
206.224.9900
FAX  206.224.9820

DAVID S. BARLOW◇
LES M. COUGHRAN●●●
FRANK J. MORALES◇◇
LINDA JOSEPHSON●
NOELLE E. DWARZSKI●●
DOUGLAS M. LASH*
*ASSOCIATE*
NATHANIEL O. PARR◇◇
*OF COUNSEL*
JEFFREY G. MAXWELL●●●
BRUCE MCKENZIE**
◇ALSO ADMITTED IN OREGON AND MINNESOTA
◇◇ALSO ADMITTED IN ALASKA
●ALSO ADMITTED IN ALASKA, CONNECTICUT AND MISSOURI
●●ALSO ADMITTED IN MICHIGAN, MONTANA AND OREGON
*ALSO ADMITTED IN MICHIGAN AND CALIFORNIA
**ALSO ADMITTED IN DISTRICT OF COLUMBIA
●●●ALSO ADMITTED IN OREGON AND ALASKA

July 27, 2021

**VIA EMAIL AND/OR REGULAR MAIL**

**Claims Administrator:**

Blue Cross Blue Shield Settlement
c/o JND Legal Administration
PO Box 91393
Seattle, WA  98111

**Counsel for Settling Defendants:**
BCBSsettlement@kirkland.com

Dan Laytin
Kirkland & Ellis LLP
300 N. LaSalle Street
Chicago, IL 60657

**Plaintiffs' Co-Lead Counsel:**
BCBSsettlement@hausfeld.com

Blue Cross Blue Shield Settlement
c/o Michael D. Hausfeld
Hausfeld LLP
888 16th Street NW, Suite 300
Washington, DC 20006

BCBS-Settlement@bsfllp.com

Blue Cross Blue Shield Settlement
c/o David Boies
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504

In Re:  *Blue Cross Blue Shield Antitrust Litigation – Case No. 2:13-cv-20000-RDP
Objection of Oregon Teamster Employers Trust and UFCW Local 555-Employers
Health Trust to Exclusion of Taft-Hartley Plans From Second Bid Provisions in
Proposed Settlement Agreement*

To Whom It May Concern:

**1.     Objections.**  The attached outlines the objection of the Oregon Teamster Employers
Trust and UFCW Local 555-Employers Health Trust to Class Injunctive Relief provisions of the
Settlement Agreement that categorically exclude any Taft-Hartley plan from obtaining a second Blue
bid.  The exclusion fails to treat class members equitably relative to each other.

**2.     The Objections are filed by:**

Oregon Teamster Employers Trust
c/o Ryan Stephens, Trust Administrator
William C. Earhart Co., Inc.

Blue Cross Blue Shield Settlement
*Case No. 2:13-cv-20000-RDP*
July 27, 2021
Page 2

> P.O. Box 4148
> Portland, OR 97208
> Email:  ryan.s@wcearhart.com

Oregon Teamster Employers Trust is a self-funded plan for which Regence Blue Cross Blue Shield of Oregon provides a PPO Network, medical management services and claims administration services.  Oregon Teamster Employers Trust has had an administrative services agreement with Regence Blue Cross Blue Shield of Oregon since 1984.

> UFCW Local 555-Employer's Health Trust
> c/o Pati Piro-Bosley, Trust Administrator
> Zenith American Solutions
> 12205 S.W. Tualatin Road, Suite 200
> Tualatin, OR 97062
> Email:  ppirobosley@zenith-american.com

The UFCW Local 555-Employer's Health Trust contracts with Regence Blue Cross Blue Shield of Oregon.  Since July 1, 2017, the Trust has contracted with Regence for a PPO Network. From 2008 through June 30, 2017, the Trust contracted with Regence to provide a PPO Network, medical management services and claims administrative services.

    **3.**    **Specific Objections**.  The Trusts object to the blanket exclusion of Taft-Hartley plans from the portions of the Class Injunctive Relief involving the ability to get a Second Blue Bid. *Settlement Agreement, Section C.15.*  The objection would apply to all similarly situated Taft-Hartley plans.

    **4.**    **The objecting Trusts are represented by:**

> David Barlow
> Barlow Coughran Morales & Josephson, P.S.
> 1325 Fourth Avenue, Suite 910
> Seattle, WA  98101
> Email:  DavidB@bcmjlaw.com

Counsel is filing the objection pursuant to its regular monthly fee arrangement with each Trust and will receive no additional compensation from the filing.  No other counsel is involved.  Counsel has not objected to any other class action settlements in the preceding five (5) years.

There is no agreement with the Trusts that relates to the objection or the process of objecting.

    **5.**    **Appearance at Final Fairness Hearing**

Neither objecting Trust nor counsel intend to appear at the Final Fairness Hearing

Blue Cross Blue Shield Settlement
*Case No. 2:13-cv-20000-RDP*
July 27, 2021
Page 3

6.    **Signatures**

**I declare under the penalty of perjury that the information provided is true and correct to the best of my knowledge and belief.**

Oregon Teamster Employer Trust          UFCW Local 555-Employers Health Trust

By: _____          By: *Pati Piro-Bosley*
Printed Name: _____          Printed Name: *Pati Piro-Bosley*
Title: _____          Title: *Administrative manager*
Date: _____          Date: *July 27, 2021*

**I declare under the penalty of perjury that the information provided is true and correct to the best of my knowledge and belief.**

BARLOW COUGHRAN MORALES & JOSEPHSON, P.S.

By: _____
Printed Name: David Barlow
Title:   President/Attorney at Law
Date:   July 27, 2021
Email: DavidB@bcmjlaw.com
Phone: (206) 674-5205

DSB:lb
Enclosure

Blue Cross Blue Shield Settlement
*Case No. 2:13-cv-20000-RDP*
July 27, 2021
Page 3

6.      **Signatures**

**I declare under the penalty of perjury that the information provided is true and correct to the best of my knowledge and belief.**

Oregon Teamster Employer Trust                UFCW Local 555-Employers Health Trust

By: _____                   By: _____
Printed Name: _STEPHEN ERDMANN_               Printed Name: _____
Title: _CHAIRMAN, BD OF TRUSTEES_             Title: _____
Date: _JULY 27, 2021_                         Date: _____

**I declare under the penalty of perjury that the information provided is true and correct to the best of my knowledge and belief.**

BARLOW COUGHRAN MORALES & JOSEPHSON, P.S.

By: _____
Printed Name: David Barlow
Title:   President/Attorney at Law
Date:   July 27, 2021
Email:  DavidB@bcmjlaw.com
Phone: (206) 674-5205

DSB:lb
Enclosure

5100.000 ltr cg12os01qd

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **In re Blue Cross Blue Shield Antitrust Litigation** | MDL No. 2406 N.D. Ala. <br><br> Master File No. 2:13-cv-20000-RDP |

**MEMORANDUM IN SUPPORT OF**
**OBJECTION OF OREGON TEAMSTER EMPLOYERS TRUST**
**AND**
**UFCW LOCAL 555-EMPLOYERS HEALTH TRUST**
**TO PROPOSED CLASS ACTION SETTLEMENT**

## A.        Overview

This objection is filed jointly by the Oregon Teamster Employers Trust ("Oregon Teamsters" or "OTET") and the UFCW Local 555-Employers Health Trust ("UFCW Local 555) (together "the objecting plans").   The objection involves the injunctive relief portion of the Settlement Agreement that allows self-funded employer plans with 5,000 or more employees to obtain a second bid from another settling Blue plan.   The Settlement Agreement, however, excludes Taft-Hartley plans from the plans allowed to obtain a second Blue Bid.  Self-funded Taft-Hartley plans based in states with only one Blue plan face the same, if not greater, anti-competitive issues as self-funded single employer plans.  The blanket exclusion of Taft-Hartley plans from the second bid provisions fails to treat class members equitably relative to each other as required by FRCP 23 (e)(2)(D) and must be modified.

The requested modification is to remove the exclusion of Taft-Hartley plans from the provision of the Class Injunctive Relief dealing with a second Blue Bid and allow Taft-Hartley plans to submit documentation allowing them to be recognized as a Qualified National Account. This modification would also require certain definitional changes and adding a provision allowing Taft-Hartley plans to submit documentation to establish that they qualify for a second Blue bid.

## B.        The Second Blue Bid Provision of the Settlement Agreement

Section C. of the Settlement Agreement sets out the class injunctive relief.  It includes the right of a Qualified National Account to receive a second bid from a Blue Plan in addition to the Blue Plan in the state where it is based:

> A Qualified National Account shall have the right to send a Second Blue Bid Request to any one Settling Individual Blue Plan, in addition to an Initial Control Plan, for a total of two bids.  Under all circumstances, the Qualified National Account shall have the right to select the Settling Individual Blue Plan bidder from these two bids.  Where the Qualified National Account has the right to request a bid from more than one Settling Individual Blue plan under the current BCBSA rules (e.g., the Qualified National Account's Headquarters is located in multiple Settling Individual Blue Plans' Service Areas), this term is satisfied, and the Qualified National Account shall not have the right to request any additional bids from other Settling Individual Blue Plans.

> *Settlement Agreement, Section C.15, Case 2:13-cv-20000-RDP, Document 2610-2* Filed 10/30/2020, pages 33-34 of 103.

The Settlement Agreement provides the following Definitions which are relevant to the Second Blue Bid provisions:

> sss.      "Qualified National Account" means a Self-Funded Account that (i) is an Employer with at least 5,000 employees in the U.S., and (ii) satisfies the D&B Analysis.  The initial list of Qualified National Accounts, subject to removal of Opt-Outs as contemplated by Paragraph 1.z, is included as Appendix C.

* * *

z.      "Employer" means entities (other than Settling Defendants) which are identified by Dunn and Bradstreet as employers.  For clarity, Government Accounts, Taft-Hartley trusts, multiple employer welfare arrangements, association health plans, retiree groups, and Opt-Outs are not Employers.

* * *

u.      "D&B Analysis" means the process that will be used to identify Qualified National Accounts.  Such Qualified National Accounts will have 33 million Members in the aggregate.  This number of Members in Qualified National Accounts approximates half of Members of Employers that have at least 5,000 employees in the U.S. and offer a Self-Funded Health Benefit Plan to their employees, and approximately 31% of Members of Self-Funded Accounts.  The D&B Analysis is objective and verifiable, and comprises the following steps: (1) using data from Dun & Bradstreet, identify Employers with at least 5,000 total U.S. employees; (2) compute each Employer's estimated Members, using data from Dun & Bradstreet, the Medical Expenditure Panel Survey promulgated by the U.S. Department of Health & Human Services' Agency for Healthcare Research and Quality, and Individual Blue Plans' aggregate average contract-to-member rate; (3) include Employers with the highest Dispersion Percentages up to and only until the aggregate number of estimated Member of such Employers totals at least 33 million after accounting for an estimate of Members of fully insured Employers in the Dun & Bradstreet data.  The resulting Employers, whose aggregate estimated membership totals at least 33 million, are the Qualified National Accounts.  The initial list of Qualified National Accounts, subject to removal of Opt-Outs as contemplated by Paragraph 1.z, is included as Appendix C.  Included in the list of Qualified National Accounts are all Employers that have at least 5,000 employees in the U.S. and are headquartered in overlapping Settling Individual Blue Plans' Service Areas based on the analysis in Paragraph 1.v, as designated in Appendix C.  BCBSA will refresh this list once every two years after the Effective Date using the methodology described in this Paragraph 1.u.

* * *

w.      "Dispersion Percentage" means the percentage of an Employer's employees that are located outside the Service Area that contains an Employer site meeting the first of the following criteria in the Dun & Bradstreet data:  (1) the only location flagged as a U.S. headquarter; (2) the U.S. location with the highest employee count, with one exception: if multiple locations are flagged as a U.S. headquarter and one portion of a Service Area up to a single state contains more headquarter locations than any other portion of a Service Area up to a single state, the U.S. headquarter

for purposes of the Dispersion Percentage will be the location with the highest employee count within the Service Area that has the most headquarter locations.  The Dispersion Percentage is calculated by dividing the number of employees that are located outside the Service Area by the total number of employees.

* * *

uu.   "Members" means any individual enrolled in or covered by a Commercial Health Benefit Product regardless what term or title is used to refer to the individual in documents that pertain to the Commercial Health Benefit Product, including employees, their spouses and dependents, beneficiaries, and ERISA participants.

*Settlement Agreement*, pp. 5-7, 10, and 14

The effect of these provisions is a blanket exclusion that prevents a Taft-Hartley plan from having an opportunity to establish that it is a Qualified National Account.  To be a Qualified National Account, an entity must be an Employer and an Employer by definition excludes Taft-Hartley Trusts.

In reviewing the posted documents dealing with the Class Injunctive Relief (Settlement Agreement, pp. 5-7, 14, 29-31; Subscriber Plaintiffs Memorandum of Law In Support of Proposed Class Settlement, pp. 14-16, 38-39, 48-49; Preliminary Approval Order) there is no discussion of or explanation for the decision to exclude, on a blanket basis, Taft-Hartley plans from the list of Qualified National Accounts allowed to seek a second Blue Bid.  There are also no Taft-Hartley Plaintiffs named in the Class Action Complaint.  *Class Action Complaint*, pp. 13-21.

As the situation of the two objecting plans highlights, Taft-Hartley plans have been impacted by the same anti-competitive practices of the settling Blue plans as the entities being treated as Qualified National Accounts if not more so.  The blanket exclusion of Taft-Hartley plans from the Settlement Agreement's Class Injunctive Relief is arbitrary and fails to treat class members equitably relative to each other as required by FRCP 23(e)(2)(D).

## C.      The Objecting Trusts

### 1.      A Taft-Hartley Plan Should Be Treated As A Single Entity

Counsel for the objecting Trusts sought clarification from class counsel, through an intermediary, about why Taft-Hartley plans were excluded from the class able to get a second Blue Bid.  The response received follows:

> The right to get a second Blue bid is determined by the nature of the insured (i.e., a self-funded insured), by the number of employees (i.e., more than 5,000), and by the dispersion of those employees.  A Taft-Hartley Plan could get a second Blue bid for a qualified employer that was part of the Plan if the Plan were to solicit a bid just for that employer.  However, the fact that the Plan included an employer that qualified for a second Blue bid

would not enable the Plan to get a second Blue bid for employers included in the Plan that did not meet the size and dispersion criteria (i.e., there would not be tag-along rights for employers who did not meet the criteria just because they were part of a Plan that also included an employer who did).

David Boies, March 28, 2021, 1:40 p.m. (P.T.)

The response shows a fundamental lack of understanding of Taft-Hartley Trusts, their legally mandated structure and how they operate.

Taft-Hartley Trusts are a product of federal law.  Section 302 of the Labor Management Relations Act (LMRA) makes it a criminal act for a labor organization or its representatives to receive anything of value from an employer.  29 U.S.C. 186(a).  There is an exception, however, under Section 302(c)(5) of the LMRA for amounts paid into a trust fund which provides listed types of benefits including health care, 29 U.S.C. 186(c)(5).  By statute, Taft-Hartley plans must have a joint labor management Board of Trustees which is legally responsible for the administration of the Trust and assuring that plan assets are used for the sole and exclusive benefit of Trust participants.  These joint labor-management entities are what are referred to as Taft-Hartley Trusts.

Taft-Hartley Trusts providing medical benefits are also regulated as employee welfare benefit plans by the Employees Retirement Income Security Act of 1974 (ERISA) 29 U.S.C. 1002(1).  ERISA also imposes an exclusive benefit requirement on a Taft-Hartley plan.  It also requires that an ERISA-regulated plan designate who is the Plan Sponsor (29 U.S.C. 1002(16B)) – Plan Administrator (29 U.S.C. 1002(16A)) – and Named Fiduciary (29 U.S.C. 1102 (a)).  For both objecting Trusts, the joint labor management Boards of Trustees fill all of these statutory roles.

Under the federal statutes governing Taft-Hartley Trusts the Board of Trustees is the entity with the legal authority and fiduciary responsibility to manage the Trust.  The assets contributed to the Trust belong to the Trust.  Once contributed, an individual employer has no claim upon or right to control the use of the plan assets.  The assets belong to the Trust as an entity.  The Board of Trustees is the entity which contracts with benefit providers such as a Blue Cross affiliate. Individual employers have no authority or ability to contract separately within a Taft-Hartley Trust because by law, that authority resides with the Board of Trustees.

The suggestion that a Taft-Hartley Trust could seek bids on behalf of individual employers with 5,000 or more employees reflects a basic lack of understanding of the legal requirements governing a Taft-Hartley Plan.  In determining if a Taft-Hartley plan is a Qualified National Account the analysis of whether a Trust is a Qualified National Account must be done at the Trust level with each Trust treated as a single legal entity.

### 2.      The Specific Objecting Trusts

The two objecting plans are the Oregon Teamster Employers Trust and the UFCW Local 555-Eployers Health Trust.  Both are administered in Oregon but have participants in other states. Both Trusts contract with Regence Blue Cross Blue Shield of Oregon (Regence BCBSO) which is the sole Blue affiliate in Oregon.

### a.    Oregon Teamster Employers Trust

The Oregon Teamster Employers Trust (OTET) is a Taft-Hartley employee welfare benefit plan regulated by the LMRA and ERISA.  It utilizes a third-party administrator (the William C. Earhart Company) based in Portland, Oregon.  The Trust provides benefits to approximately 9,800 active employees and 460 Non-Medicare retirees.  Approximately 8,650 of the active employees and 400 of the Non-Medicare retirees participate in self-funded medical plans.  See *Declaration of Sean Silva, Trust Consultant.*

The Trust has an Administrative Service Agreement with Regence Blue Cross Blue Shield of Oregon (Regence BCBSO) to provide a PPO network, claims administrative services and medical management services to its self-funded medical plans.  OTET's Board of Trustees contracts directly with Regence BCBSO for these services.  Silva Declaration.

Participation in the OTET Trust is pursuant to over 200 collective bargaining agreements and other written participation agreements.  The employers with the largest number of participants (United Parcel Service, Kroeger, Safeway/Albertsons) are large national employers.  The OTET Trust has approximately 24,800 Participants (employee and dependents) who participate in self-funded medical plans provided through Regence.  Of this total, 19,153 are in Oregon and live in 337 different zip codes.  There are 3,760 participants in Washington state who live in 110 different zip codes.  It has 1,493 participants in Idaho who live in 55 different zip codes.  It has 95 participants scattered across 14 other states with 44 in California, being the largest of these miscellaneous states.  Silva Declaration.

The OTET Trust has looked at other potential PPO arrangements as an alternative to Regence BCBSO.  The Trust has found through both formal and informal reviews, that there has not been a cost-effective alternative to a Blue network giving the wide geographic dispersion of its membership.  While there are competitive alternatives in the Portland Metropolitan area, there are not competitive alternatives for participants located outside Portland and the Willamette Valley.  *Silva Declaration.*  As the broad distribution of participants by zip code shows, Trust participants in neighboring Oregon are also widely dispersed.  As a result, the Trust effectively is limited to using a Blue network and in Oregon there is no alternative to Regence BCBSO.

### b.    UFCW Local 555 – Employers Health Trust

The second objecting Trust is the UFCW Local 555-Employers Health Trust (UFCW Local 555 Trust).  It is also a Taft-Hartley Trust under the LMRA and an employee welfare benefit plan under ERISA.  It utilizes a third-party administrator (Zenith American Solutions) located in Tualatin, Oregon.  The Trust's medical plans cover approximately 11,000 active employees.  Of this total, 90% (or approximately 9,600 employees and 16,200 employees and dependents combined) participate in self-funded medical plans which contract with Regence BCBSO for a provider network.  See *Declaration of Pati Piro-Bosley, Trust Administrator.*

Participation in the Trust is pursuant to collective bargaining agreement. Approximately 85% of the reported employees work for two large national employers (Kroeger and Safeway/Albertsons). As with OTET, the employees are widely dispersed across Oregon and Washington. The Trust has 8,498 employees who are Oregon residents who live in 319 different Oregon zip codes. The Trust has 1,096 Washington residents living in 52 different zip codes. *Piro-Bosley Declaration.*

The UFCW Local 555 Trust has also sought alternatives to Regence BCBSO. From 2011 through 2013 the predecessor funds which merged to form the UFCW Local 555 Trust conducted a lengthy analysis of PPO alternatives to Regence BCBSO. The Trust determined that given the geographical dispersion of its membership there was no competitive alternative to a Blue affiliate. In 2013 the Trust sought to move to another Blue Cross affiliate based in Washington (Premera) because of unhappiness with Regence BCBSO and its unwillingness to make its network available if it did not also provide claims administrative services. After agreeing in principle to the move, Premera refused to proceed after learning the Trust's principal administrative offices would remain in Oregon and within Regence BCBSO's territory. As with OTET, the UFCW Local 555 Trust is effectively limited to using a Blue network and in Oregon there is no alternative to Regence BCBSO.

## D.    The Exclusion of Taft-Hartley Plans from the Second Bid Provisions Is Inequitable

FRCP 23(e)(2) sets the legal standard for approving class action settlements. They are to be approved if they are fair, reasonable, and adequate in light of listed factors. One of these required factors is that "the proposal treats class members equitably relative to each other." That standard is not met here.

The settlement indicates that Qualified National Accounts will be identified by using a "D&B Analysis." The process used in this D&B analysis is not transparent. It appears to include:

- Identifying Employers with 5,000 or more employees who offer a self-funded plan utilizing a settling Blue Plan;
- For employers who meet this threshold determining their estimated members;
- Include Employers with the highest Dispersion Percentages until the estimated number of members totals at least 33 million;

Taft-Hartley plans should be allowed to demonstrate that they meet the requirements to be a Qualified National Account. The data for the two objecting Trusts shows the following:

- **Test 1** – Identifying Employers with 5,000 or more employees who offer a self-funded plan utilizing a settling Blue Plan.

  - Both the Oregon Teamsters and UFCW Local 555 Trusts utilize Regence BCBSO to provide services to their self-funded plans. The Board of Trustees of each plan is the party which contracts with Regence BCBSO.

o The 5,000-employee threshold test appears focused on an Employer's total employees and not necessarily those participating in a settling Blue Plan. The two objecting Trusts have well in excess of 5,000 participants. The Oregon Teamster's self-funded plans cover approximately 9,050 employees and Non-Medicare retirees and 24,800 employees, retirees, and dependents. The UFCW Local 555's self-funded plans cover approximately 9,500 employees and 16,200 employees and dependents.

- **Test 2** – For employees meeting this threshold determining their estimated Members

  o "Members" is defined to include any enrolled individual. *Settlement Agreement,* uu. Pursuant to this definition, the Oregon Teamsters have 24,800 members and UFCW Local 555 has 16,200 members.

- **Test 3** – Includes Employers with the highest Dispersion Percentage.

  o This appears to look at where the Employer's headquarters are located. Both objecting Trusts are administered in the Portland, Oregon metropolitan area where Regence BCBSO is the sole available Blue plan.

  o It appears dispersion percentage is based on the number of employees located outside of the service area of the Settling Blue Plan. This information for the two objecting Trusts (and any other Taft-Hartley Trusts for that matter) are readily available from the Trust's participant records.

  o Oregon Teamsters has 5,328 members outside of Oregon. Given the 24,800 members approximately 21.5% of the membership is located outside of Oregon. The UFCW Local 555 Trust has the cost for employers located in and outside of Oregon. Of the 9,600 employees, 1,096 employees, or approximately 13%, live outside of Oregon.

  o The two objecting Trusts do not have access to what level of dispersion the identified Qualified National Accounts have.

The two objecting Trusts if anything have faced greater anti-competitive forces than the Qualified National Accounts. Each has actively looked for alternatives to Regence BCBSO which is the sole Blue affiliate in Oregon. Each has found that the wide geographic dispersion of its participants in Oregon and elsewhere limits the availability of network alternatives to a Blue affiliate. The predecessor is to the UFCW Local 555 Trust sought to contract with an alternative Blue plan but was refused based on where its administrator was located. OTET has surveyed the market trying to find alternatives to Regence BCBSO. The reality Taft-Hartley Trusts face is that with so many dispersed work locations, there is not currently a realistic alternative to Regence BCBSO in Oregon. It is arbitrary and inequitable to exclude the two objecting funds from the group of Plaintiffs allowed to receive a second Blue Bid. The Settlement Agreement should not be accepted unless either:

- The exclusion for all Taft-Hartley plans is removed; or
- A mechanism is provided for Taft-Hartley plans to establish that they are a Qualified National Account. As discussed above, the necessary information about employee counts and geographical dispersion is readily available from Trust eligibility data; and
- The 33-million-member limit on Qualified National Accounts either be expanded to include Taft-Hartley plans, or the Taft-Hartley plans should be allowed to displace single employer plans currently recognized as Qualified National Accounts.

From the available documents there is no explanation for why Taft-Hartley plans are excluded from the Class being allowed to pursue a second Blue Bid. The issue is not addressed in the Settlement documents. It is clear that no Taft-Hartley Trust was included among the Plaintiffs. It appears that the exclusion reflects a basic lack of understanding of Taft-Hartley plans.

The Settlement Agreement Class Injunctive Relief should not be approved until this blanket exclusion of Taft-Hartley Trusts from receiving a second Blue bid is addressed.

BARLOW COUGHRAN MORALES & JOSEPHSON, P.S.

By:      David Barlow
Title:   Attorney at Law
Date:   July 27, 2021
Email:  DavidB@bcmjlaw.com
Phone: (206) 674-5205

*In re:* Blue Cross Blue Shield Antitrust Litigation MDL 2406, N.D. Ala. Master File No. 2:13-cv-20000-RDP

DECLARATION OF SEAN SILVA IN SUPPORT OF OREGON TEAMSTER EMPLOYERS TRUST'S OBJECTION TO BLUE CROSS BLUE SHIELD CLASS ACTION SETTLEMENT

I, Sean Silva, declare under penalty of perjury and state as follows:

1.      I am a principal and a consulting actuary with Milliman, an international actuarial consulting firm. I am based in Walnut Creek, California.

2.      Milliman has provided health consulting services to the Oregon Teamster Employers Trust since 2006. In that role, Milliman provides a wide range of services, including reviewing the Trust's current benefit providers and potential alternatives to their services.

3.      The Trust contracts directly with Regence Blue Cross Blue Shield of Oregon ("Regence BCBSO") to provide a Preferred Provider network, claims administrative service and other miscellaneous services. The Trust has had this relationship with Regence BCBSO since the early 1980's. Regence BCBSO is the only Blue affiliate serving Oregon.

4.      The Trust uses the William C. Earhart Company, Inc. of Portland, Oregon as its Third-party Administrator. As such, it processes contributions submitted on behalf of eligible employees and maintains Trust eligibility records. The numbers of employees and dependents listed in the objection, and their address information are taken from records that the William C. Earhart Company, Inc. maintains for the Oregon Teamsters Employers Trust.

5.      I do or have provided actuarial consulting services to other Taft-Hartley Trusts in Oregon. Based on my experience, there are other potential alternatives to Regence Blue Cross Blue Shield of Oregon in the Portland Metropolitan area and to some degree in the Willamette Valley. In the rest of Oregon, however, it is difficult to find a competitive network alternative to a Blue Cross plan.

Dated this 21 day of July 2021.

SEAN SILVA
Principal and Consulting Actuary
Milliman

| | |
|---|---|
| *In re:* Blue Cross Blue Shield Antitrust Litigation MDL 2406, N.D. Ala. Master File No. 2:13-cv-20000-RDP | DECLARATION OF PATI PIRO-BOSLEY IN SUPPORT OF UFCW LOCAL 555-EMPLOYERS HEALTH TRUST'S OBJECTION TO BLUE CROSS BLUE SHIELD CLASS ACTION SETTLEMENT |

I, Pati Piro-Bosley, declare under penalty of perjury and state as follows:

1.      I am a Senior Vice-President at Zenith American Solutions, Inc., a national Third-Party Administrator.  I am based in Tualatin, Oregon and my duties include overseeing the operation of Zenith American Solutions' Tualatin, Oregon Office.

2.      Among the Taft-Hartley plans administered by Zenith American Solutions, Tualatin office is the UFCW Local 555-Employers Health Trust.  The data about employee and dependent accounts and their geographical locations are taken from the eligibility records that Zenith American Solutions maintains for the Trust.    Approximately 85% of the Trust's employees work for Kroger or Safeway/Albertsons.

3.      From 2011 to 2013 the Trust (named at that time the Joint Labor Management Retail Trust) and another Trust that subsequently merged into the Joint Labor Management Retail Trust (the Portland Area UFCW Local 555- Employer Health Trust) did an extensive review of Preferred Provider networks and alternatives to Regence Blue Cross Blue Shield of Oregon ("Regence BCBSO").  The Boards of Trustees made a decision to move to Premera which is a Blue Cross affiliate based in Washington.  Premera refused to proceed, however, when it learned that the main office for the Trust would remain in Oregon.

4.      Contracts with Regence Blue Cross Blue Shield of Oregon are directly with the Trust and its Board of Trustees.  Individual employers have no ability to contract on behalf of its employees who participate in the Trust.

Dated this 17th day of July 2021.

_____
PATI PIRO-BOSLEY
Senior Vice President
Zenith American Solutions, Inc.

# EXHIBIT

# 8



**Via Certified Mail Return Receipt Requested**
**and Electronic Mail as Noted**

July 28, 2021

Blue Cross Blue Shield Settlement
c/o JND Legal Administration
P.O. Box 91393
Seattle, WA 98111

Blue Cross Blue Shield Settlement
c/o Michael D. Hausfeld
Hausfeld LLP
888 16th Street NW, Suite 300
Washington, DC 20006
**BCBSsettlement@hausfeld.com**

Blue Cross Blue Shield Settlement
c/o David Boies
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504
**BCBS-Settlement@bsfllp.com**

Mr. Dan Laytin
Kirkland & Ellis LLP
300 N. LaSalle St.
Chicago, IL  60657
**BCBSsettlement@kirkland.com**

**_In Re: Blue Cross Blue Shield Antitrust Litigation MDL 2406_, N.D. Ala. Master File**
**No. 2:13-cv-20000-RDP**
**Post Holdings, Inc. Objection to Settlement Agreement**

Dear Claims Administrator:

Please accept this letter from Post Holdings, Inc. ("PHI") as a formal objection to the
proposed Settlement Agreement in the class action antitrust lawsuit called _In Re: Blue Cross Blue
Shield Antitrust Litigation MDL 2406_, N.D. Ala. Master File No. 2:13-cv-20000-RDP (the

"Lawsuit"). Specifically, PHI is objecting to the determination that it is not a "Qualified National Account" for purposes of the Settlement Agreement. *See* Settlement Agreement published on the Blue Cross Blue Shield Settlement Website, available at https://www.bcbssettlement.com/documents (the "Settlement Agreement"). Background information regarding the terms of the Settlement Agreement applicable to the Qualified National Account determination, information about PHI, and a detailed description of PHI's objection to the determination excluding PHI from the list of Qualified National Accounts are set forth below.

## I.   Introduction & Background

Upon finalization of the proposed Settlement Agreement, the Defendants, including the Blue Cross Blue Shield Association ("BCBSA") and each of its individual settling blue member licensees (the "Settling Individual Blue Plans"), will provide Qualified National Accounts with the right to submit a second request for bid from a Blues entity ("Second Blue Bid") to another Settling Individual Blue Plan, in addition to the blue member licensee that has the contractual right to bid for the coverage, for a total of two bids. *See* Settlement Agreement, page 29. Entities that fail to meet the criteria of a Qualified National Accounts are not entitled to a Second Blue Bid under the Settlement Agreement. The Settlement Agreement provides a proposed methodology used to determine those entities that are "Qualified National Accounts" who will receive the right to a Second Blue Bid.

Under this methodology, a Qualified National Account is an employer with at least 5,000 employees in the U.S., that maintains a self-funded group health plan and that satisfies the Dun and Bradstreet ("D&B") Analysis. *Id.* at subsection sss, "Qualified National Account," page 14. The goal of the settlement is for employers with at least 33 million members covered by the Settling Individual Blue Plans to be included on the list of Qualified National Accounts. The D&B Analysis is applied by:

(1) using data from D&B to establish that the employer has at least 5,000 total U.S. employees;

(2) using data from D&B, the U.S. Department of Health and Human Services' Agency for Healthcare Research and Quality, and from the aggregate average contract-to-member rate of the Settling Individual Blue Plans, to establish the number of individuals enrolled in the employer's self-funded group health plan, including employees, spouses and dependents ("Members"); and

(3) including in the list of Qualified National Accounts, employers with the highest Dispersion Percentages up to and only until the aggregate number of estimated Members of all employers totals at least 33 million. *Id.* at subsection u, "D&B Analysis," pages 5-6.

The proposed Settlement Agreement defines "Dispersion Percentage" as the percentage of an Employer's employees located outside the "Service Area" that contains an Employer site meeting the first of the following criteria in the Dun & Bradstreet data: (1) the only location flagged as the U.S. headquarter; (2) the U.S. location with the highest employee count. *Id.* at subsection w. "Dispersion Percentage," page 7. The Dispersion Percentage is calculated by

dividing the number of employees located outside the Service Area by the total number of employees." *Id.*

"Service Area" for purposes of the Settlement Agreement means the area in which a Settling Individual Blue Plan is granted rights to use the "Blue Marks" under a license agreement with BCBSA. *Id.* at subsection gggg. "Service Area," page 18.

This methodology was used to develop an initial list of Qualified National Accounts that is included in the Settlement Agreement (the "List of Qualified National Accounts"). *Id.* at Appendix C, pages 68–81. The List of Qualified National Accounts will apply for two years after the Effective Date of the Settlement Agreement; thereafter, according to the terms of the proposed Settlement Agreement, BCBSA will refresh the list once every two years after the Effective Date using the same methodology. *Id.* at subsection u. "D&B Analysis," page 6.

## II.   PHI National Data

PHI is a consumer packaged goods holding company. Since PHI separated from Ralcorp Holdings in 2012, PHI has acquired a significant number of businesses and companies, and grown tremendously in size. The following chart provides a brief overview of entities acquired over the last seven (7) years.

| Entity Acquired | Date Transaction Closed | Date Joined PHI Health Plan |
|---|---|---|
| MFI Holding Company ("Michael Foods") | 6/2/2014 | 1/1/2015 |
| MOM Brands Company | 5/4/2015 | 1/1/2016 |
| Willamette Egg Farms, LLC | 10/3/2015 | 1/1/2016 |
| National Pasteurized Eggs, Inc. | 10/3/2016 | 10/3/2016 |
| The Weetabix Company, Inc. (part of the acquisition of the Weetabix Limited group of companies) | 7/3/2017 | 9/1/2017 |
| Bob Evans Farms, Inc. | 1/12/2018 | 1/1/2019 |
| Pineland Farms Potato Company, Inc. | 1/12/2018 | 1/1/2019 |
| Henningsen Foods, Inc. | 7/1/2020 | 1/1/2021 |

Each acquired entity had eligible employees (along with spouses and dependents) who subsequently joined the Post Holdings, Inc. Health Care Plan ("PHI Health Plan"). As of July 27, 2021, PHI along with its subsidiaries and affiliated companies ("Post") has over 12,000 employees globally, of which roughly 11,293 are employed in the United States. Currently, the only location flagged as a U.S. headquarter for Post Holdings, Inc. is 2503 S Hanley Rd, St. Louis, MO 63144 (the "Missouri Headquarter"). However, only 310 employees work at the Missouri Headquarter and at additional offices in the greater St. Louis area.

The overwhelming majority of Post employees do not work from the Missouri Headquarter. The majority of the employee population of the acquired entities listed in the table above were eligible for self-funded health plans sponsored by those entities before the entities were acquired (and in some cases, for a brief period after the acquisition). It is by virtue of these acquisitions, and more specifically, the resulting number of and location of Post employees, that requires PHI to be treated as a Qualified National Account. For example, PHI believes the data used by BCBSA and by D&B did not account for the number of or location of employees assumed by Post via the acquisition of the Michaels Foods (which had a headquarters located in Minnesota) in June 2014.

### III.    Objection to Failure to Include PHI as a Qualified National Account

PHI plainly satisfies the first two criteria of the Settlement Agreement to be considered a Qualified National Account. As established above, Post has more than 5,000 employees and maintains self-funded group health plans. While PHI does not have any information about the actual calculations performed to identify Qualified National Accounts, PHI assumes that as an entity it was found to have cleared these two initial threshold requirements.

PHI also maintains that a Dispersion Percentage calculation done based on accurate data will establish that its Dispersion Percentage is sufficiently high such that it should be included on the List of Qualified National Accounts. PHI provides benefits through the PHI Health Plan to roughly 7,500 employees (with spouses and dependents, 14,910 Members total). As of the date of this letter, Post Holdings, Inc., the sponsor of the PHI Health Plan, currently maintains only one headquarter in Missouri – the Missouri Headquarter. There are no other PHI headquarter locations. Under the definition of Service Area in the Settlement Agreement, the existence of only one headquarter location means the applicable Service Area for PHI is Missouri. While it is our understanding that the Missouri Service Area including the Missouri Headquarter excludes 30 counties in the Kansas City area, we have performed our analysis including all of Missouri (meaning the Dispersion Percentage would even be higher if the population was further refined). Of the Members included in the PHI Health Plan as of this date, only 419 Members are located in the Missouri Service Area with the remaining 14,491 Members, located outside of the area. The Dispersion Percentage is calculated by taking the number of Members located outside of the Service Area and dividing that number by the total number of Members. Accordingly, in this case, the Dispersion Percentage for PHI is 97.19% (14,491 / 14,910).

While the proposed Settlement Agreement indicates that only those employers with the highest Dispersion Percentages up to and only until the aggregate number of estimated Members of all employers totals at least 33 million will be considered Qualified National Accounts, PHI does not have the data necessary to compare itself to other entities and definitively establish that its Dispersion Percentage is high enough to be included on the List of Qualified National Accounts. The absence of the data used to perform this analysis is yet another basis for PHI's objection to the Settlement Agreement and the failure to classify PHI as a Qualified National Account. Based on the fact that the majority of Post's employees are located outside of the Missouri Service Area and with a Dispersion Percentage of greater than 97%, PHI struggles to understand how it does not qualify as a Qualified National Account and maintains that it should be included on the List of Qualified National Accounts.

PHI, without the benefit of any transparency or clarity in data used, can only assume that that it was incorrectly omitted from the List of Qualified National Accounts due to incorrect data being used for the calculation and a misunderstanding of Post's corporate structure. As detailed *supra*, Post is one entity with a multitude of subsidiaries benefiting under the PHI Health Plan self-funded, with a combined Member count of approximately 15,000. Based on its membership and the location of its headquarters in an area without a significant number of employees, it has a Dispersion Percentage of 97.19%. Due to the acquisitions of the above-referenced entities and the change in sponsor of the health and welfare plans sponsored by the Post companies, PHI believes that the data collected during the process to establish the List of Qualified National Accounts incorrectly treated various entities as separate and distinct from PHI. This mislabeling of these acquired entities as separate entities likely resulted in the miscalculation of the PHI Dispersion Percentage and the improper omission of PHI from the List of Qualified National Accounts.

PHI also objects to the fact that no meaningful data was shared to establish whether the List of Qualified National Accounts is accurate. The failure to share or provide this data or the basis for the List of Qualified National Accounts means that PHI cannot appropriately respond to the proposed Settlement Agreement. PHI is unable to review the Dispersion Percentage of those entities listed as Qualified National Accounts in the Settlement Agreement. Accordingly, PHI does not have the ability to fully analyze why certain entities were included on the List of Qualified National Accounts, while PHI was excluded. All data and calculations used to establish the List of Qualified National Accounts should be published as part of the Settlement Agreement and PHI hereby requests that such data be shared with PHI immediately. As it currently stands, the analysis conducted for purposes of the Settlement Agreement and for purposes of failing to classify PHI as a Qualified National Account is neither objective nor verifiable.

Based on the number of Post employees, in addition to their spouses and dependents who qualify as covered Members, PHI contends it meets the criteria to be a Qualified National Account under the Settlement Agreement. Like other employers included on the List of Qualified National Accounts, Post has employees across the country in multiple locations and PHI is currently restricted in its ability to seek multiple bids from Individual Blue Settling Plans. The ability for PHI to seek and receive a Second Blue Bid at its election (including as its contract expires, becomes open for renewal, or is otherwise reopened for bidding) is important to its continued ability to offer competitive and cost-effective benefit packages to Post employees. To that end, PHI respectfully objects to the determination that it is not a Qualified National Account, and hereby requests that PHI be added to the List of Qualified National Accounts prior to the finalization of the Settlement Agreement. Without waiving said objection, PHI requests the data used to develop the List of Qualified National Accounts be shared immediately so PHI can conduct a thorough review, comparison and analysis as it should be entitled to under the circumstances.

If the Claims Administrator requires additional information to make a determination on PHI's objection, please contact me at 314.665.3680. If the Claims Administrator makes a decision that does not result in PHI being added to the List of Qualified National Accounts, PHI requests a meeting with the Claims Administrator to discuss these issues and also intends to appear at the Final Fairness Hearing.

Sincerely,

Karen Little
VP, HR Transformation & Strategy
On behalf of Post Holdings, Inc.

## NAME, ADDRESS, CONTACT INFORMATION AND PLAN INFORMATION

Karen Little
VP, HR Transformation & Strategy
Post Holdings, Inc.
2600 S. Hanley Rd.
St. Louis, MO 63144
Karen.little@postholdings.com
314.665.3680

Post Holdings, Inc. Health Care Plan
September 1, 2015 through present

## IDENTITY OF COUNSEL

Jorge M. Leon
Michael Best & Friedrich LLP
444 West Lake Street
Suite 3200
Chicago, IL 60606
(312) 596-5831
jmleon@michaelbest.com

Lucas Habeeb
Michael Best & Friedrich LLP
444 West Lake Street
Suite 3200
Chicago, IL 60606
(312) 836-5073
ljhabeeb@michaelbest.com

The above counsel have not objected to a class action within the five (5) years preceding the objection of this submission.

## ATTORNEY SIGNATURES

## FINAL FAIRNESS HEARING

If Post Holdings, Inc. is not added to the List of Qualified National Accounts, it intends to appear at the Final Fairness Hearing through counsel.

## PENALTY OF PERJURY STATEMENT

Under penalties of perjury, I declare that I have examined this objection, and, to the best of my knowledge and belief, the facts presented in support of this objection are true, correct, and complete.

Dated: July 28, 2021                                **Post Holdings, Inc.**

Karen Little
VP, HR Transformation & Strategy

# EXHIBIT

# 9

**THE JACOBSON LAW GROUP**
JACOBSON · MAGNUSON · ANDERSON
& HALLORAN P.C.

**James K. Nichols | Attorney**
Phone: 651-644-4710
Fax: 651-644-5904
E-mail: jnichols@thejacobsonlawgroup.com

July 28, 2021

Blue Cross Blue Shield Settlement
c/o JND Legal Administration
PO Box 91393
Seattle, WA 98111
(888) 681-1142

Blue Cross Blue Shield Settlement
c/o Michael D. Hausfeld
Hausfeld LLP
888 16th Street NW, Suite 300
Washington, D.C. 20006
(202) 849-4141
BCBSsettlement@Hausfeld.Com

Blue Cross Blue Shield Settlement
c/o David Boies
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504
(888) 698-8248
BCBS-Settlement@bsfllp.com

Dan Laytin
Kirkland & Ellis LLP
300 N. LaSalle St.
Chicago, IL 60657
(312) 862-4137
BCBSsettlement@kirkland.com

Re:     *In re: Blue Cross Blue Shield Antitrust Litigation*
        Objection to Proposed Class Settlement

Dear Settlement Administrator, Plaintiffs' Counsel, and Defendants' Counsel:

Our firm represents the Prairie Island Indian Community ("the Community") in connection with the proposed settlement in *In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406*, N.D. Ala. Master File No. 2:13-cv-20000-RDP (the "Proposed Settlement").[1] The Community and its wholly-owned enterprises operate several self-insured health insurance plans for Community members and employees of Community enterprises ("the Community Plans"), including:

- Treasure Island Resort & Casino Exclusive Health Care Plan;

- Treasure Island Resort & Casino Preferred Provider Organization Health Care Plan; and,

- Prairie Island Indian Community Self-Funded Group Medical Benefits Plan for Community Members and their Eligible Dependents.

The Community Plans were administered by Blue Cross Blue Shield of Minnesota from August 1, 2018 through October 16, 2020 (the end of the settlement period). The Community believes that its plans, and the members of the plans, are part of the Damages Settlement Class, specifically the Self-Funded Group sub-class. Unfortunately, the communications to potential

---

[1] Jacobson, Magnuson, Anderson & Halloran, P.C. has not objected to any class action within the last five years.

class members are unclear regarding the status of plans affiliated with Indian tribes, and this may cause Indian tribes (including tribal enterprises), their members, and employees to miss their opportunity to participate in the Proposed Settlement. The Community objects to the Proposed Settlement on its own behalf and on behalf of all self-insured health plans operated by Indian tribes and tribally owned enterprises. The treatment of health plans operated by Indian tribes and tribal enterprises under the Proposed Settlement will lead to one of two unfair outcomes: tribal affiliated plans are either included in the Damages Settlement Class and told incorrectly that they cannot participate, or they have been improperly excluded from the Class. In either event, the Proposed Settlement is unfair and should not be approved until the defects are remedied.

The Community Plans are funded by the Community and its enterprises, with premiums paid by employee participants. The plans are not funded by the federal government. The plans are not part of the Indian Health Service, and are not operated under the Indian Self-Determination and Educational Assistance Act. The Community purchased administrative services for the plans on the open market in the same manner that a private company would purchase such services for a commercial health plan. The Community is not unique among Indian tribes in this respect. There are 574 federally recognized Indian tribes in the United States. Virtually all of them operate commercial enterprises, and many offer self-insured health plans to members and employees.

Under the Settlement Agreement, "Government Accounts" are excluded from the Settlement Damages Class. Government Account is defined as:

> [A] state, a county, a municipality, an unincorporated association performing municipal functions, a **Native American tribe**, or the federal government (including the Federal Employee Program). A Government Account includes all Members of the Government Account. No other entity that is not a state, county, municipality, unincorporated association performing municipal functions, Native American tribe or the federal government is a Government Account, unless it is required by law to provide any health care coverage it makes available to Members only under, or as a participant in, a Commercial Health Benefit Product approved, selected, procured, sponsored or purchased by a Government Account.

> Settlement Agreement, A.1.hh (ECF 2610-2 at 12) (emphasis added).

All tribal affiliated accounts are grouped with federal, state, county, and municipal accounts—even though the Community Plans (like many other tribal affiliated plans) purchase administrative services in the same market as commercial plans that are clearly included in the Damages Settlement Class. Nothing in the Settlement Agreement, or any other settlement materials, explains the rationale for treating "Native American Tribes" as Government Accounts. If it is the case that tribal plans are excluded based on class counsels' failure to understand how the plans operate, then the class definition is not appropriate and the Proposed Settlement should be rejected on that basis.

Assuming that there is some legitimate basis for the treating some plans operated by Indian tribes as Government Accounts, the Settlement Agreement and other materials do not

2

explain which tribal affiliated plans and participants are part of the Settlement Class. Would plans operated by a tribal government be excluded, but plans operated by a tribally owned enterprise be included? Would plans operated by a tribal government be excluded only under certain conditions? There is no way to tell from the Settlement materials.

The treatment of Indian tribes in this matter raises a final troubling issue. If class counsel did not understand the status of tribal affiliated plans with respect to the class claims and proposed settlement, then it is unlikely that class counsel represented tribal interests adequately in negotiating the settlement. This has implications for all class members. Class counsel may not have factored into the Proposed Settlement the damages incurred by the 574 federally recognized tribes and their enterprises. A settlement that does not account for those damages is likely unfair to all class members because it diminishes the settlement amount that will be divided among class members.

The Community requests that the court reject the Proposed Settlement, unless:

1) The status of tribal plans in the Damages Settlement Class is clarified;

2) Class counsel demonstrate that the interests of tribal plans were accounted for the in the Proposed Settlement; and,

3) The deadline for tribal plans to participate in the Proposed Settlement is extended, and the Settlement Administrator is directed to provide adequate notice to Indian tribes and plan members.

Sincerely,

James K. Nichols                                  Jessie Seim
Jacobson, Magnuson, Anderson, & Halloran,        General Counsel
P.C.                                              Prairie Island Indian Community
180 E. Fifth St., Ste. 940                        5636 Sturgeon Lake Road
St. Paul, MN 55101                                Welch, MN 55089
jnichols@thejacobsonlawgroup.com                  jessie.seim@piic.org
(651) 644-4710                                    (651) 385-4137


Counsel for the Prairie Island Indian Community


Enclosure:      Declaration of Jessie Seim, General Counsel for the Prairie Island Indian
                Community

3

**Declaration of Jessie Seim**

Jessie Seim declares as follows:

1.  I am the General Counsel of the Prairie Island Indian Community ("the Community") and submit this declaration in support of the Community's foregoing objection to the proposed class settlement in *In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406*, N.D. Ala. Master File No. 2:13-cv-20000-RDP.

2.  The Community is represented in this matter by the law firm Jacobson, Magnuson, Anderson, & Halloran, P.C. ("the Jacobson Law Group"), and by no other outside counsel.

3.  The Community has an agreement for general legal representation with the Jacobson Law Group, but has no agreements that relate specifically to the foregoing objection or the process of objecting. The Jacobson Law Group prepared the foregoing objection in connection with its general representation of the Community.

4.  The information in the foregoing objection is true and correct to the best of my knowledge.

5.  The Community reserves its right to appear through counsel at the Final Fairness Hearing, and is separately submitting a notice of intent to appear.


I declare under penalty of perjury that the foregoing is true and correct.


Executed: July 28, 2021


By: _____

Jessie Seim

General Counsel, Prairie Island Indian Community

4

# EXHIBIT
# 10



**Via Certified Mail Return Receipt and email to BCBSsettlement@hausfeld.com, BCBS-Settlement@bsfllp.com, and BCBSsettlement@kirkland.com**

July 23, 2021

Blue Cross Blue Shield Settlement
c/o JND Legal Administration
P.O. Box 91393
Seattle, WA 98111

Blue Cross Blue Shield Settlement
c/o Michael D. Hausfeld
Hausfeld LLP
888 16th Street NW, Suite 300
Washington, DC 20006

Blue Cross Blue Shield Settlement
c/o David Boies
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504

Mr. Dan Laytin
Kirkland & Ellis LLP
300 N. LaSalle St.
Chicago, IL  60657

**Objection to the *In Re: Blue Cross Blue Shield Antitrust Litigation MDL 2406*, N.D. Ala. Master File No. 2:13-cv-20000-RDP**

Dear Claims Administrator:

Please accept this letter from Tenneco Inc. ("Tenneco") as a formal objection to the determination made under the proposed Settlement Agreement in the class action antitrust lawsuit called *In Re: Blue Cross Blue Shield Antitrust Litigation MDL 2406*, N.D. Ala. Master File No. 2:13-cv-20000-RDP that failed to include Tenneco as a "Qualified National Account" for purposes of the Settlement Agreement. *See* Settlement Agreement published on the Blue Cross Blue Shield Settlement Website, available at *See* https://www.bcbssettlement.com/documents (the "Settlement Agreement"). The background regarding the terms of the Settlement Agreement applicable to the Qualified National Account determination, information about Tenneco, and a detailed description of our objection to the determination that excluded Tenneco from the list of Qualified National Accounts is set forth below.

## I.    Background

Once the proposed Settlement Agreement is finalized, the defendants, which includes the Blue Cross Blue Shield Association and each of its individual settling blue member licensees (the "Settling Individual Blue Plans") will agree

-2-

to provide certain Qualified National Accounts with the right to submit a second request for bid ("Second Bid Request") to another Settling Individual Blue Plan in addition to the blue member licensee that contractually has the right to bid for the coverage, for a total of two bids. *See* Settlement Agreement, page 29. Entities that do not meet the criteria to be treated as Qualified National Accounts are not contractually entitled to a Second Bid Request under the Settlement Agreement. The Settlement Agreement provides a proposed methodology that will be used to determine those entities that are "Qualified National Accounts" and will have the right to a Second Bid Request.

Under this methodology, a Qualified National Account is an employer with at least 5,000 employees in the U.S., that maintains a self-funded group health plan and that satisfies the D&B Analysis. *Id.* at subsection sss. "Qualified National Account," page 14. The goal is for employers with at least 33 million members covered by the Settling Individual Blue Plans to be included on the list of Qualified National Accounts. The D&B Analysis is applied by:

(1) using data from Dun & Bradstreet to establish that the employer has at least 5,000 total U.S. employees;

(2) using data from Dun & Bradstreet, the U.S. Department of Health and Human Services' Agency for Healthcare Research and Quality, and from the aggregate average contract-to-member rate of the Settling Individual Blue Plans, establish the number of individuals enrolled in the employer's self-funded group health plan, including employees, spouses and dependents ("Members");

(3) including in the list of Qualified National Accounts, employers with the highest Dispersion Percentages up to and only until the aggregate number of estimated Members of all employers totals at least 33 million. *Id.* at subsection u. "D&B Analysis," pages 5 and 6.

"Dispersion Percentage" for this purpose means the percentage of an employer's employees that are located outside the "Service Area" that contains an Employer site meeting the first of the following criteria in the Dun & Bradstreet data: (1) the only location flagged as the U.S. headquarter; (2) the U.S. location with the highest employee count. ….. The Dispersion Percentage is calculated by dividing the number of employees that are located outside the Service Area by the total number of employees." *Id.* at subsection w. "Dispersion Percentage," page 7.

"Service Area" for purposes of the definition of Dispersion Percentage means the area in which a Settling Individual Blue Plan is granted rights to use the "Blue Marks" under a license agreement with the Blue Cross Blue Shield Association. *Id.* at subsection gggg. "Service Area," page 18.

This methodology has been used to develop an initial list of Qualified National Accounts that is included in the Settlement Agreement (the "List of Qualified National Accounts"). *Id.* at Appendix C, pages 68–81. The List of Qualified National Accounts will apply for two years after the Effective Date of the Settlement Agreement. *Id.* at subsection u. "D&B Analysis," page 6.

## II. Tenneco Data

Tenneco is an American automotive components manufacturer and an aftermarket ride control and emissions products manufacturer. Tenneco has over 73,000 employees globally and approximately 16,000 employees in the United States. Currently, the only location designated as a U.S. headquarter for Tenneco is 500 North Field Drive, Lake Forest, IL, 60045-2595 (the "Illinois Headquarter"). However, the majority of employees of Tenneco do not work from the Illinois Headquarter. Tenneco currently maintains the following locations in the United States with the following number of employees at each location:

-3-

| Tenneco Division | Tenneco Location | Number of Employees |
|---|---|---|
| Global Services | Paragould, AR | 2 |
| Global Services | Ft. Lauderdale, FL | 1 |
| Global Services | Lake Forest, IL | 168 |
| Global Services | South Bend, IN | 1 |
| Global Services | Grass Lake, MI | 6 |
| Global Services | Marshall, MI | 1 |
| Global Services | Monroe, MI | 46 |
| Global Services | Southfield, MI | 263 |
| Global Services | Maryland Heights, MO | 3 |
| Global Services | Napoleon, OH | 1 |
| Global Services | Harrisonburg, VA | 1 |
| Clean Air | Elkhart, IN | 78 |
| Clean Air | Jeffersonville, IN | 214 |
| Clean Air | Ligonier, IN | 473 |
| Clean Air | Grass Lake, MI | 451 |
| Clean Air | Lansing, MI | 139 |
| Clean Air | Litchfield, MI | 386 |
| Clean Air | Marshall, MI | 795 |
| Clean Air | Romulus, MI | 107 |
| Clean Air | Kansas City, MO | 70 |
| Clean Air | Seward, NE | 519 |
| Clean Air | Kettering, OH | 4 |
| Clean Air | Smithville, TN | 377 |

-4-

| Clean Air | Spring Hill, TN | 179 |
|---|---|---|
| Clean Air | San Antonio, TX | 23 |
| Motorparts | Boaz, AL | 145 |
| Motorparts | Paragould, AR | 1,145 |
| Motorparts | Rancho Dominguez, CA | 1 |
| Motorparts | Van Nuys, CA | 1 |
| Motorparts | Ft. Lauderdale, FL | 22 |
| Motorparts | Miramar, FL | 1 |
| Motorparts | Norcross, GA | 1 |
| Motorparts | Lake Forest, IL | 5 |
| Motorparts | Skokie, IL | 1,008 |
| Motorparts | Stoughton, MA | 1 |
| Motorparts | Grass Lake, MI | 21 |
| Motorparts | Monroe, MI | 36 |
| Motorparts | Plymouth, MI | 5 |
| Motorparts | Southfield, MI | 412 |
| Motorparts | Maryland Heights, MO | 86 |
| Motorparts | Maryville, MO | 158 |
| Motorparts | Bronx, NY | 1 |
| Motorparts | Smithville, TN | 4 |
| Motorparts | Smyrna, TN | 916 |
| Motorparts | Harrisonburg, VA | 637 |
| Motorparts | Winchester, VA | 7 |
| Performance Solutions | Hartwell, GA | 2 |

-5-

| Performance Solutions | Lake Forest, IL | 1 |
|---|---|---|
| Performance Solutions | Angola, IN | 237 |
| Performance Solutions | Glasgow, KY | 183 |
| Performance Solutions | Monroe, MI | 149 |
| Performance Solutions | Plymouth, MI | 32 |
| Performance Solutions | Southfield, MI | 3 |
| Performance Solutions | Kettering, OH | 722 |
| Performance Solutions | Milan, OH | 63 |
| Performance Solutions | Napoleon, OH | 194 |
| Performance Solutions | Smithville, TN | 465 |
| Powertrain | Athens, AL | 504 |
| Powertrain | Burlington, IA | 371 |
| Powertrain | Frankfort, IN | 210 |
| Powertrain | South Bend, IN | 180 |
| Powertrain | Ann Arbor, MI | 12 |
| Powertrain | Greenville, MI | 344 |
| Powertrain | Plymouth, MI | 241 |
| Powertrain | Sparta, MI | 43 |
| Powertrain | Southfield, MI | 51 |
| Powertrain | Lake City, MN | 164 |
| Powertrain | Brunswick, OH | 27 |
| Powertrain | Cambridge, OH | 134 |
| Powertrain | Independence, OH | 5 |
| Powertrain | Van Wert, OH | 430 |

-6-

| Powertrain | Exton, PA | 59 |
| Powertrain | Sevierville, TN | 207 |
| Powertrain | El Paso, TX | 488 |
| Powertrain | Blacksburg, VA | 424 |
| Powertrain | Manitowoc, WI | 604 |
| Powertrain | Waupun, WI | 151 |

In 2018, Tenneco purchased an entity known as Federal Mogul Corporation ("Federal Mogul"). Federal Mogul was then merged into Tenneco and Tenneco became the sponsor of the Federal Mogul Corporation Health and Welfare Benefits Plan. Sponsorship of this plan was then transferred to Tenneco Automotive Operating Company Inc. ("TAOC"), the primary operating company of Tenneco and the plan was renamed the TAOC Health and Welfare Benefit Plan (the "TAOC Plan"). TAOC currently sponsors the TAOC Plan, which provides self-funded medical benefits to covered employees and their dependents through Blue Cross Blue Shield of Alabama ("BCBSAL"). The TAOC Plan provides medical benefits for approximately 14,901 Members1, including employees of Tenneco that are engaged in the automotive components manufacturer business and their spouses and dependents.

Furthermore, in connection with an internal restructuring after the Federal Mogul acquisition, Tenneco Inc. formed DRiV Inc. ("DRiV"). DRiV continues to be a as a wholly-owned subsidiary of Tenneco Inc. DRiV also sponsors a group health plan, which is known as the DRiV Inc. Health and Welfare Benefit Plan (the "DRiV Plan"). The DRiV Plan provides self-funded medical benefits to covered employees and their dependents through Blue Cross Blue Shield of Illinois, but intends to move this business to BBCSAL and to merge the two plans. The DRiV Plan provides medical benefits for approximately 10,612 Members, including employees of Tenneco that are engaged in the aftermarket ride control and emissions products manufacturer business and their spouses and dependents.

## III.   Objection to Determination that Tenneco is Not a Qualified National Account

Tenneco plainly satisfies the first two criteria of the Settlement Agreement to be considered a Qualified National Account. As established above, Tenneco has more than 5,000 employees and two entities in its control group maintain self-funded group health plans. Accordingly, Tenneco clearly fulfills the first two requirements to be treated as a Qualified National Account. While Tenneco does not have any information about the actual calculations performed to identify Qualified National Accounts, Tenneco assumes that as an entity it was found to have cleared these two initial threshold requirements.

Tenneco also maintains that a Dispersion Percentage calculation done based on accurate data will establish that its Dispersion Percentage is sufficiently high such that it should be included on the List Qualified National Accounts. As indicated in the Tenneco Data section above, Tenneco provides benefits through the TAOC Plan and the DRiV Plan to 25,513 Members. As of the date of this letter, Tenneco currently maintains only the Illinois Headquarter. Under

---

1 The number of Members identified in this letter reflects data from the records of the TAOC Plan and the DRiV Plan rather than data from Dun & Bradstreet, the U.S. Department of Health and Human Services' Agency for Healthcare Research and Quality, and from the aggregate average contract-to-member rate of the Settling Individual Blue Plans.

-7-

the definition of Service Area included in the Settlement Agreement the existence of only the Illinois Headquarter means the applicable Service Area for Tenneco is Illinois. Of the Members identified above, only 1,700 are located in the Illinois Service Area with the remaining 23,813 Members, located outside of the area. The Dispersion Percentage is calculated by taking the number of Tenneco Members located outside of the Service Area and dividing that number by the total number of Tenneco Members. Accordingly in this case, the Dispersion Percentage for Tenneco is 93.3% (23,813 / 25,513).

Only those employers with the highest Dispersion Percentages up to and only until the aggregate number of estimated Members of all employers totals at least 33 million will be considered Qualified National Accounts. Tenneco does not have data necessary to compare itself to other entities and definitively establish that its Dispersion Percentage is high enough to be included on the List of Qualified National Accounts. However, based on the fact that the majority of Tenneco's 15,621 employees are located outside of the Illinois Service Area and with a Dispersion Percentage of 93.3%, Tenneco is struggling to understand how it does not qualify to be treated as a Qualified National Account and maintains that it should be included on the List of Qualified National Accounts.

With such compelling data Tenneco can only presume that the reason why it was incorrectly omitted from the List of Qualified National Accounts lies in incorrect data being used for the calculation and a misunderstanding of Tenneco's corporate structure. As detailed above, Tenneco is one combined entity with over 25,000 Members in its two group health plans that will be merged into one plan. Based on its membership and the location of its Illinois Headquarter in an area without a significant number of employees, it has a Dispersion Percentage of 93.3%. Due to the recent transaction of Federal Mogul and the change in sponsor of the two health and welfare plans sponsored by the Tenneco controlled group, Tenneco believes that the data collected during the process to establish the List of Qualified National Accounts incorrectly treated various entities, such as DRiV and TAOC, as separate and distinct from Tenneco. This mislabeling of DRiV and TAOC as separate entities likely resulted in the miscalculation of the Tenneco Dispersion Percentage and the improper omission of Tenneco from the List of Qualified National Accounts.

Tenneco also objects to the fact that no meaningful data was shared to establish whether the List of Qualified National Accounts is accurate. As stated above, Tenneco is unable to review the Dispersion Percentage of those entities listed as Qualified National Accounts in the Settlement Agreement. Accordingly, Tenneco does not have the ability to fully analyze why certain entities were included on the List of Qualified National Accounts, while Tenneco was excluded. All data and calculations used to establish the List of Qualified National Accounts should be published as part of the Settlement Agreement and Tenneco hereby requests that such data be shared with Tenneco.

Based on the number of Tenneco employees and their spouses and dependents who qualify as covered Members under the TAOC Plan and the DRiV Plan, Tenneco contends it meets the criteria to be a Qualified National Account under the Settlement Agreement. Like other employers included on the List of Qualified National Accounts, Tenneco has employees across the country in multiple locations and Tenneco is currently restricted in its ability to seek multiple bids from Individual Blue Settling Plans. The ability for Tenneco to seek and receive a Second Bid Request is key to its continued ability to offer competitive and cost effective benefit packages to its employees. Tenneco respectfully objects to the determination that it is not a Qualified National Account and hereby requests that Tenneco be added to the List of Qualified National Accounts prior to the finalization of the Settlement Agreement.

If the Claims Administrator requires additional information to make a determination on Tenneco's objection, please contact Melinda D. Grosskopf at the contact information provided below. If the Claims Administrator makes a decision that does not result in Tenneco being added to the List of Qualified National Accounts, Tenneco requests a meeting with the Claims Administrator to discuss these issues and will also intend to appear at the Final Fairness Hearing.

-8-

Sincerely,

Kaled Awada
Senior Vice President &
Chief Human Resources Officer
On behalf of Tenneco Inc.

## NAME, ADDRESS, CONTACT INFORMATION AND PLAN INFORMATION

Tenneco Automotive Operation Company Health and Welfare Benefit Plan
Melinda D. Grosskopf
500 North Field Drive
Lake Forest, IL 60045-2595
Melinda.Grosskopf@driv.com
(847) 482-5000
10/01/2018 – Through the Present

DRiV Inc. Health and Welfare Benefit Plan
Melinda D. Grosskopf
500 North Field Drive
Lake Forest, IL 60045-2595
Melinda.Grosskopf@driv.com
(847) 482-5000
10/01/2018 – Through the Present

## IDENTITY OF COUNSEL

Carrie E. Byrnes
Michael Best & Friedrich LLP
444 West Lake Street
Suite 3200
Chicago, IL 60606
(312) 596-5838
cebyrnes@michaelbest.com

Courtney D. Tedrowe
Michael Best & Friedrich LLP
444 West Lake Street
Suite 3200
Chicago, IL 60606
(312) 596-5822
cdtedrowe@michaelbest.com

-9-

The above counsel have not objected to a class action within the five (5) years preceding the objection of this submission.

**ATTORNEY SIGNATURES**

Carrie E. Byrnes

Courtney D. Tedrowe

**FINAL FAIRNESS HEARING**

If Tenneco Inc. is not added to the List of Qualified National Accounts, it intends to appear at the Final Fairness Hearing through counsel.

**PENALTY OF PERJURY STATEMENT**

Under penalties of perjury, I declare that I have examined this objection, and, to the best of my knowledge and belief, the facts presented in support of this objection are true, correct, and complete.

Dated: _July 22, 2021_

**Tenneco Inc.**

Kaled Awada
Senior Vice President &
Chief Human Resources Officer

# EXHIBIT

# 11

Blue Cross/Blue Shield Settlement
c/o JND Legal Administration
P O BOX 91390
SEATTLE WA 98111

RE: BC/BS Antitrust Litigation MDL 2406, N.D. Ala File# 2:13-cv-200000-RDP
June 4, 2021

Dear Madam or Sir:

I am writing to object to the proposed settlement. I feel it is not fair or reasonable, and I have no way of knowing if it is or could be adequate. The claim notice was sent to my husband Bruce, however during the stated time period, I was the worker covered through a group plan, selected by my employer; I had no say in the decision. I no longer possess records to know the value of my contribution so how can I possibly make an accurate claim? Beyond that date, I participated with BC/BS as an ACA patient and later through a Medicare Advantage plan, but once again, I no longer have records.

My primary objection is that this sounds like a frivolous lawsuit with an outrageous claim. For example, if the allocation for attorney's fees were limited to just 1/2 of the proposed $667.4M, and if the law firm billed at the comparatively extreme rate of $500/hour, and if there were 100 lawyers working full time exclusively on this case, there would still be enough money to compensate them for over THREE YEARS.

My other objections are that:
1. Employees have no say in the insurer their employer chooses;
2. How can anyone prove that BC/BS engaged in anti-trust when they dominate a very small market but have a unique provider profile? (e.g. national scope but different relationships with each U.S. state; wide variances in medical network membership);
3. If the settlement were approved, paying the claims would merely raise costs for every current and future BC/BS insured and the business insurer. (However somehow I feel sure the BC/BS CEO would still be compensated millions.)

I cannot even imagine the insane amount of time and work to locate and identify every insured party to compensate them a few dollars. I consider this claim a waste of the Court's time that would not punish BC/BS itself, only current and future customers, and serve only to enrich the legal firm proposing it.

Thank you for allowing me to put in my 2¢ worth.

Cordially,

*Lorraine Alden*

Lorraine Alden
(Mrs Bruce Alden)

# EXHIBIT
# 12

Received
JUL 29 2021
by JNDLA

Austin, Texas 78745
July 15, 2021

Claims Administrator
Blue Cross Blue Shield Settlement
c/o JND Legal Administration
P.O. Box 91393
Seattle, WA 98111

Dear Sir:

I wish to object to the settlement in *In re:  Blue Cross Blue Shield Antitrust Litigation*.  I was insured by Blue Cross Blue Shield from

My objection to the settlement is its failure to require employers to provide historical premium data to employees.  By the terms of the settlement, the default allocation assumes that the insured paid 15% of an employee's premium for single coverage and that the employer paid 85%.  I do not believe that my employer *ever* paid as much as 85% of a health insurance premium; I would estimate that the district paid no more than 50% of the premium in 2008 and 2009.  Unfortunately, I no longer have records of the premiums paid during that time, and so far I have been unable to obtain this information from my employer.

Indeed, it is not in my employer's interest to provide this information.   I understand from Adam Shaw of Boies Schiller Flexner LLP that, if I can demonstrate that I paid *more* than 15% of the premium, then my share will be based on the larger amount and the employer's share will be reduced accordingly.   Any employer who paid less than 85% of the single-coverage premium has no interest in providing its employees with information that will reduce its share of the settlement.

I believe that this is a serious flaw in the settlement.  I would urge you to take action to correct this problem by requiring employers to provide historical premium data.

Claims Administrator, BCBS Settlement          July 6, 2021              Page 2

I believe that my objection applies to a subset of the Damages Class:  Individuals.

I do not have an attorney in this matter, and I do not have any agreements relating to
this matter.  I do not intend to appear at the Final Fairness Hearing.  I declare under
penalty of perjury that the information provided above is true and correct.

Very truly yours,

Deanne Aldridge
_____ Austin, TX 78745

cc:  Hausfeld LLP
     Boies Schiller Flexner LLP
     Kirkland & Ellis LLP

# EXHIBIT 13

Received
AUG 0 2 2021
by JNDLA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL NO. 2406) | ) ) ) ) ) |

Master File 2:13-CV-20000-RDP

## OBJECTION OF DAVID BEHENNA
## TO PROPOSED AMOUNT OF ATTORNEYS' FEES

David Behenna
*Pro Se*
▇▇▇▇▇▇▇▇▇▇
Portsmouth, NH   03801

July 28, 2021

TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ……………………………………....……………        ii

STATEMENT OF OBJECTION …………………………………………….…        1

I.      PLAINTIFFS' COUNSEL'S FEE SHOULD BE LIMITED TO LODESTAR ……        1

II.     THIS IS NOT A COMMON FUND CASE   ……………………………………        6

III.    CROSS-CHECK OF LODESTAR AND PERCENTAGE-OF-FUND METHOD        7

IV.     REDUCTIONS IN PROPOSED FEE ENHANCEMENT SHOULD ACCRUE TO        8
        THE CLASS ……………………………………………..………………...

IV.     ADDITIONAL INFORMATION   …..…………..…………………………..        9

TABLE OF AUTHORITIES

<u>Page</u>

*Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240 (1975) ................   2

*Blum v. Stenson*, 465 U.S. 886 (1984) ...................................................   3

*Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th. Cir. 1991)   8

*City of Burlington v. Dague,* 505 U.S. 557 (1992) ......................................   3

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ...........................................   2, 3, 4

*In re Volkswagen & Audi Warranty Extension Litigation*, 692 F.3d 4 (1st Cir. 2012)   7

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir 1974) ...............   3

*Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844 (5th Cir 1998) ..........   8

STATUTES AND RULES

Clayton Act, 15 U.S.C. §§ 15 and 26   ...............................................   2

Sherman Act, 15 U.S.C. §§ 1 and 3   .................................................   2

**STATEMENT OF OBJECTION**

David Behenna ("Objector"), who is a class member in this litigation, who is not an attorney and who is representing himself *pro se* in this matter, objects – on his behalf and in his role as trustee of the M. Elizabeth Behenna 2016 Revocable Trust – to the amount requested for attorneys' fees and other provisions of the Settlement Agreement on the following grounds:

The Court should award to Plaintiffs' Counsel's attorney's fees of no more than $194,226,322, the lodestar amount disclosed in Plaintiffs' Counsel's fee application.   The Court should reject the request for attorneys' fees based on the common fund percentage-of-recovery methodology.   This case settlement does not qualify for common fund treatment.   The federal antitrust statutes pursuant to which Plaintiffs brought their complaint are fee-shifting statutes. And the Court should reject Plaintiffs' Counsel's request for a lodestar multiplier.   Their performance falls short of earning any fee enhancement over and above the lodestar.

**I.      PLAINTIFF'S COUNSEL FEE SHOULD BE LIMITED TO LODESTAR**

Defendants have agreed to pay to Class members monetary consideration of $2.67 billion (" Settlement Consideration").   Settlement Agreement, p. 19.   In addition, Defendants have agreed to injunctive relief that will result in Defendants changing certain business practices. Settlement Agreement, para. 10-21.   Plaintiffs' Counsel submitted a fee application for $626,583,372 ("Proposed Fees").   Subscribers Counsel's Motion for Approval of Their Attorneys' Fees and Expenses Application ("Counsel Fee Mot."), p.1.   Plaintiffs' Counsel have filed for reimbursement of costs and expenses in the amount of $40,916,628 ("Attorney Costs"). Counsel Fee Mot., p. 1

Plaintiffs' Counsel has accumulated attorney's fees of $194,226,322 during the course of the litigation ("Lodestar").   Joint Declaration of Co-Lead Counsel in Support of Subscriber Counsel's Motion for Approval of Their Fee and Expense Application ("Lead Counsel Decl."), para. 134

Objector will refer to the difference ($432,357,050) between the Proposed Fees ($626,583,372) and the Lodestar ($194,226,322) as the "Proposed Fee Enhancement".

The Proposed Fees are calculated using the common fund percentage-of-recovery methodology.   The Proposed Fee equals 23.5% of the $2.67 billion gross monetary consideration

1

being paid by Defendants for damages inflicted on the Class.

In addition to monetary compensation, Defendants have agreed to certain injunctive relief that will change their operating procedures and might lead to future rate savings for Class members. Settlement Agreement, para. 10-21. Objector was unable to locate information in the Settlement Agreement or fee application that provides quantitative evidence of the monetary value Class members are certain to receive from the injunctive relief.

1.      Plaintiffs assert claims under the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and recover treble damages and costs of suit, including attorneys' fees, against defendants by reason of violations of §§1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3. Subscriber Track Fourth Amended Consolidated Class Action Complaint ("Amended Complaint"), p. 10. The Clayton Act is a fee-shifting statute.

> "What Congress has done, however, while fully recognizing and accepting the general rule, is to make specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal rights. (footnote omitted) These statutory allowances are now available in a variety of circumstances, but they also differ considerably among themselves. Under the antitrust laws, for instance, allowance of attorneys' fees to a plaintiff awarded treble damages is mandatory. Footnote 34
>
> Footnote 34:  Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor. . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U. S. C. § 15 (emphasis added)." *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 260-261 (1975).

2.      The U.S. Supreme Court has found that the calculation of reasonable attorney fees in statutory fee shifting cases starts with the lodestar calculation.

> "A plaintiff must be a "prevailing party" to recover an attorney's fee under § 1988. The standard for making this threshold determination has been framed in various ways. A typical formulation is that "plaintiffs may be considered `prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." (citation omitted). This is a generous formulation that brings the plaintiff only across the statutory threshold. It remains for the district court to determine what fee is "reasonable." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.   This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services.   The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed.   Where the documentation of hours is inadequate, the district court may reduce the award accordingly."   *Hensley v. Eckerhart*, supra at 433, 434.

3.      The U.S. Supreme Court has restricted fee enhancements in statutory fee shifting cases. *Blum v. Stenson*, 465 U.S. 886, 898 (1984) (lodestar represents a reasonable fee); *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) ("multiplier factors are subsumed within initial calculation of hours"); *City of Burlington v. Dague*, 112 S.Ct. 2638, 2639 (1992) (no fee enhancement for contingency).

4.      In determining reasonableness and the Plaintiffs' Counsel's request for a fee enhancement (also known as a lodestar multiplier), the Court must look at the results obtained for the Class by Plaintiffs' Counsel.   Based on "the amount involved and the results obtained," Plaintiffs' Counsel failed to meet the threshold to earn the Proposed Fee Enhancement.

"The amount of the fee, of course, must be determined on the facts of each case.   On this issue the House Report simply refers to 12 factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (CA5 1974).   (footnote omitted)   The Senate Report cites to *Johnson* as well and also refers to three District Court decisions that "correctly applied" the 12 factors. [Footnote 4]   One of the factors in *Johnson*, "the amount involved and the results obtained," indicates that the level of a plaintiff's success is relevant to the amount of fees to be awarded.   The importance of this relationship is confirmed in varying degrees by the other cases cited approvingly in the Senate Report."

[Footnote 4] "It is intended that the amount of fees awarded . . . be governed by the same standards which prevail in other types of equally complex Federal litigation, such an antitrust cases[,] and not be reduced because the rights involved may be nonpecuniary in nature.   The appropriate standards, see *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974), are correctly applied in such cases as *Stanford Daily v. Zurcher*, 64 F.R.D. 680 (ND Cal. 1974); *Davis v. County of Los Angeles*, 8 E. P. D. ¶ 9444 (CD Cal. 1974); and *Swann v. Charlotte-Mecklenburg Board of Education*, 66 F.R.D. 483 (W.D.N.C. 1975).   These cases have resulted in fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys.   In computing the fee, counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, `for all time reasonably expended on a matter.'"

*Davis, supra; Stanford Daily,* supra at 684." S. Rep. No. 94-1011, p. 6 (1976)." *Hensley v. Eckerhart,* supra at 430.

Plaintiffs allege damages of up to $36.1 billion.   Exhibit J, Pakes Declaration, Para. 10. After trebling allowed by statute, those damage claims could be up to $108.3 billion.   Before deducting the Proposed Fee and reimbursement of Attorney Costs, Defendants are paying $2.67 billion to Class members in settlement of their damage claims.   Before deducting Proposed Fees and Attorney Costs, Class members are projected to recover as little as **7.4 cents per claim dollar**, or **2.5 cents per claim dollar** when applying treble damages.   After deducting Proposed Fees and Attorney Costs, Class members are projected to recover as little as **5.7 cents per claim dollar**, and **1.9 cents per claim dollar** when applying treble damages

The Court must take into account the Class members' paltry claim recoveries when assessing the results obtained by Plaintiffs' Counsel and their request for a fee enhancement (lodestar multiplier).

Plaintiffs claim that this is a historic agreement based on the Settlement Consideration and the speculative value of the injunctive relief (changes in the Defendants' operating practices). Plaintiffs focus on the gross value of the monetary consideration without adequately addressing the paltry recovery-per-claim dollar Class members will receive.   And public reaction to the proposed settlement has shown that the injunctive relief may not create new competition thereby limiting value (rate relief) to Class members.   Please see attached articles, "Will Blue Cross settlement boost health plan competition in Minnesota," *Star Tribune* (June 26, 2021)" (Exhibit A) and "Anthem paying $594M to settle antitrust litigation, but deal terms might fuel growth," *Indianapolis Business Journal* (February 1, 2021) (Exhibit B).

5.    Injunctive relief warrants a lodestar.

Plaintiffs' Counsel implies that a material amount of time was spent on crafting the injunctive relief.

> "But even assuming, conservatively, that only three-quarters, or even only half, of the lodestar figure could be attributed to the effort to obtain non-monetary relief, a reasonable award of attorney fees would still amount to at least around $100 million."   Counsel's Fee

4

Memo, p. 43

Further, Plaintiffs' Counsel states that the value of the injunction relief could exceed $2.67 billion (the pecuniary value of the gross cash settlement amount).

> "Indeed, the Court found that the 'wide-reaching' injunctive relief secured under the proposed settlement 'bears greater importance for the class than the monetary relief.' PA Order at 26; *see also id.* at 32. *See also* Rubinfeld Decl., ¶ 16; Fitzpatrick Decl., ¶ 13 (observing that if this injunctive 'relief had been quantified, the fee requested by class counsel would have been *far below* the benchmark' fee award) (emphasis in original); Silver Decl., ¶ 63.

Interestingly, the above quote implies that the Plaintiffs have ***not*** been quantified the value of the injunctive relief. Given the relative amount of time spent on non-pecuniary injunctive relief and the speculative value of it, fee shifting is warranted.

6.   Federal policy argues for a statutory fee award based on the lodestar approach.

Federal antitrust statutes were enacted to encourage private enforcement of antitrust laws. The intent of Congress was clear. On other hand, common fund awards don't advance "a substantive policy." Fee shifting statutes preserve the right of plaintiffs to recover their attorney's fees from defendants. Common funds prevent non-plaintiff class members from free-riding off the efforts of plaintiffs that are funding the litigation. In this class action, the Plaintiffs did not finance the litigation. Plaintiffs' Counsel, in their entrepreneurial private enforcement effort, financed it.

> "Collectively, our firms contributed 101,740 hours (corresponding to $56,410,844 in lodestar) to litigating this case, in addition to $2,165,531.33 in out-of-pocket expenses. We have also made $12,836,766.60 in Litigation Fund contributions through the present, for a total of over $15 million in hard expenses outlaid with no guarantee of recovery." Lead Counsel Decl., para. 94

> "As noted in Exhibit B accompanying the Declaration of Special Master Edgar C. Gentle ("Gentle. Decl.")., Subscriber Counsel have made $37,088,369.52 in contributions to the Litigation Fund. The Special Master has authorized payments of $35,380,737.62 for reasonable expenses incurred in prosecuting the litigation. Gentle Decl. ¶1(E). Those expenses include, among other things, over $25 million for payment of expert fees (for, among other things, summary judgment on the standard of review, class certification, and

5

merits reports), ..."   Lead Counsel Decl., para. 129

"As noted in Exhibit C to the Gentle Decl., after auditing by the Special Master, Subscriber Counsel have incurred $3,832,258.38 in held expenses.   These totals have been regularly reported to the Court as they have been incurred since 2013.   When added to the $37,088,369.52 in Litigation Fund contributions, Subscriber Counsel has incurred a total of $40,916,627.90 in expenses."   Lead Counsel Decl., para. 138

## II.   THIS IS NOT A COMMON FUND CASE

This is not a common fund case because Defendants are paying Plaintiffs' Counsel's fees. Plaintiffs' Counsel and Defendants came to a "clear sailing" attorneys' fee agreement *after* agreement was reached on the amount of monetary and non-monetary consideration to be paid to the Class.

"Second, as the Court has found, the negotiation of attorney fees began only after the parties had reached an agreement in principle as to the relief, including the amount of compensation, that would be provided to the class.   67 See PA Order at 5. See also Mediator's Aff., ¶ 37"   Subscribers Counsel's Memorandum of Law in Support of Their Motion for Approval of Their Attorneys' Fees and Expenses Application ("Counsel's Fee Memo"), p.

That the parties created a fund mechanism from which to distribute to Class members the monetary consideration, that distribution scheme cannot mask the fact that the damages payment and Proposed Fee were negotiated separately, not from a "common fund".

The record shows that the Plaintiff's fee-shifted to Defendants $75,000,000 in attorney's fees and other costs (1) *before* Class members received any benefits of the settlement, (2) *before* the litigation was finally approved and (3) *before* Plaintiff's Counsel submitted to the Court a fee application.

"28. ... d.   A partial award of seventy-five million ($75,000,000) of the total attorneys' fees, expenses, and interest as are awarded by the Court shall be paid from the Escrow Account no later than 31 days after the entry of an order preliminarily approving the Settlement."   Settlement Agreement, para. 28.

Objector believes the order preliminarily approving the Settlement was entered November 30, 2020.

The record also shows that the Defendants paid into an escrow account $300,000,000, an amount coincidentally the same as the sum of (1) the partial attorney's fee award of $75,000,000, (2) the Lodestar ($194,226,322), and (3) Attorney's Costs ($40,916,628) *before* the settlement had been finally approved and *before* Plaintiffs' Counsel filed with the Court a fee application.

"23.   Payment Timing.   The Settlement Amount shall be paid in the following installments:

(a) Within 30 calendar days of entry of the Preliminary Approval Order, Settling Defendants shall cause to be transferred into the Escrow Account (1) the $100 million ($100,000,000.00) Notice and Administration Fund, and (2) an **advance** of $300 million ($300,000,000.00) of the remaining Settlement Amount.

(b)   Within 30 calendar days of the Court's entry of the Final Judgment and Order of Dismissal, Settling Defendants shall cause the remaining portion of the Settlement Amount to be transferred into the Escrow Account."   Settlement Agreement, para 23.

Objector could find no explanation why Defendants advanced $300 million to an escrow account a year or more *before* final approval of the litigation settlement and *before* the Class received any benefits of the settlement.   The $300 million advance is a de facto fee-shifting arrangement.   Plaintiffs' Counsel gained control of an amount that exceeds by almost $75,000,000 the Lodestar and Attorney's Costs.   As noted above, Objector believes the Preliminary Approval Order was entered November 30, 2020.

Given these facts, the common fund doctrine is not applicable.

"The basis for the award here is the agreement itself, a contract under state law, and not federal law.   The fact that attorneys' fees are provided for by the settlement agreement is one of several reasons why there is no basis to resort to these federal equitable doctrines. *Cf. United States ex rel. Bogart v. King Pharm.*, 493 F.3d 323, 331 (3d Cir.2007) (where plaintiffs' attorneys are awarded fees under statutory fee-shifting regime, there is no need to resort to the common fund doctrine because "there is no iniquity to redress" given that the defendants paid attorneys' fees)."   *In re Volkswagen & Audi Warranty Extension Litigation*, 692 F.3d 4, 16-17 (1st Cir. 2012)

## III.   CROSS-CHECK OF LODESTAR AND PERCENTAGE-OF-FUND METHOD

Even if it was found that the common fund doctrine might apply in this case, a cross-check

7

of the Lodestar fee, on the one hand, to a percentage-of-fund methodology fee calculation shows that the Lodestar represents a reasonable market-based fee based on settlements exceeding $1.0 billion in monetary consideration.   Plaintiff's cite *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th. Cir. 1991) ("*Camden I*") for the proposition that attorneys' fees of 20% to 30% of common fund recoveries represents a reasonable market rate for contingency cases involving common funds.   Since 2000, the award percentages (fees as a percentage of a class's recovery) in class action settlements of at least $1.0 billion using the percentage-of-fund methodology are materially less than 20%-30%.

According to evidence submitted by Plaintiff's Counsel's fee expert Professor Brian Fitzpatrick, attorneys' fees in 34 class actions (during the 2000-2021 timeframe) featuring settlements of at least $1.0 billion generated **median fees of 7.70%** and **average (mean) fees of 10.24%** of class recoveries.   Exhibit C, Declaration of Brian T. Fitzpatrick (5/28/21), Table 1, pp. 13-15.

Plaintiff's Counsel's Lodestar of $194,226,322 represents **7.27%** of the Gross Settlement Consideration of $2.67 billion.   This cross-check shows that the Lodestar represents a reasonable market-based fee for this $2.67 billion settlement.   Here, the market is the 20 year public track record of court-approved fee awards in very large, complex class actions.

## IV.   REDUCTIONS IN THE PROPOSED FEE ENHANCEMENT SHOULD ACCRUE TO THE CLASS

The Court should allocate to the Class as additional compensation any reduction in the Proposed Fee Enhancement that Plaintiffs' Counsel is not awarded from the "clear sailing" agreement.   Defendants are indifferent as to whether the Proposed Fee Enhancement goes to the Class members in the form of additional settlement consideration or whether it is paid to Plaintiffs' Counsel as attorneys' fees.   *Strong v. BellSouth Telecommunications, Inc.,* 137 F.3d 844, 849-51 (5th Cir. 1998) (settling defendant only concerned with total liability and allocation of class payment and fees is of little or no interest to defense).   The Court acts as guardian of the interests of the class members.   *Id.* at 850.   The court has this duty even when "parties agree to the amount of the fee" in a class action settlement. *Id.* at 849.

8

## V.    ADDITIONAL INFORMATION

Pursuant to the Long Form Notice, Objector is required to provide the following additional information.

1.  *Description of your objections, including any applicable legal authority and any supporting evidence you wish the Court to consider.*   Please see the objections and supporting legal authority within this Objection.

2.  *Your full name, address, email address, telephone number, and the plan name under which Blue Cross Blue Shield was provided and dates of such coverage.*   My name and contact information is included on the signature page of this Objection.   With respect to Blue Cross plan name, Objector has been enrolled in ▮▮▮▮ n ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ d ▮▮ O ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .   With respect to the Blue Cross plan in which M. Elizabeth Behenna, Objector's mother, and William H. Behenna, Objector's father, were enrolled, the information is being researched and is unavailable at this date.   Both of Objector's parents are deceased.   Objector serves as the Trustee of the M. Elizabeth Behenna 2016 Revocable Living Trust, the beneficiary of any monetary recoveries in this litigation.

3.  *Whether the objection applies only to you, a specific Settlement Class or subset of a Settlement Class, or both Settlement Classes.*   This Objection applies to both Settlement Classes.

4.  *The identity of all counsel who represent you, including former or current counsel who may be entitled to compensation for any reason related to the objection, along with a statement of the number of times in which that counsel has objected to a class action within five years preceding the submission of the objection, the caption of the case for each prior objection, and a copy of any relevant orders addressing the objection;.*   Objector is representing himself *Pro Se*.   Objector has not retained counsel to represent him in this class action.   No counsel is entitled to compensation related to this Objection.   In the last five years, Objector has not objected to any class action settlements.   In the last five years, Objector has not retained counsel to file objections to class actions on Objector's behalf.

9

5. *Any agreements that relate to the objection or the process of objecting between you, your counsel, and/or any other person or entity.*   No such agreements exist.

6. *Your (and your attorney's) signature on the written objection.*   Objector has signed this Objection

7. *A statement indicating whether you intend to appear at the Final Fairness Hearing (either personally or through counsel) .*   Objector hereby notifies the Court and the parties that he intends to appear *Pro Se* and present his arguments in support of his objections at the fairness hearing on October 20, 2021.

8. *A declaration under penalty of perjury that the information provided is true and correct.* I, David Behenna, hereby declare under penalty of perjury that the information I have provided in this section "Additional Information" is true and correct.

Executed on July 28, 2021, at Rye Beach, New Hampshire.

Respectfully submitted,

David Behenna
*Pro Se*

Portsmouth, NH   03801

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2021, the foregoing Objection of David Behenna to Proposed

Amount of Attorneys' Fees was mailed to the parties listed below.

David Behenna

| | |
|---|---|
| Plaintiffs' Co-Lead Counsel:<br>BLUE CROSS BLUE SHIELD<br>SETTLEMENT<br>C/O DAVID BOIES<br>BOIES SCHILLER FLEXNER LLP<br>333 Main Street<br>Armonk, NY 10504<br>(888) 698-8248<br>BCBS-Settlement@bsfllp.com | Plaintiffs' Co-Lead Counsel:<br>BLUE CROSS BLUE SHIELD<br>SETTLEMENT<br>C/O MICHAEL D. HAUSFELD<br>HAUSFELD LLP<br>888 16th Street NW, Suite 300<br>Washington, DC 20006<br>(202) 849-4141<br>BCBSsettlement@hausfeld.com |
| Counsel for Settling Defendants:<br>DAN LAYTIN<br>KIRKLAND & ELLIS LLP<br>300 N. LaSalle St.<br>Chicago, IL 60657<br>(312) 862-4137<br>BCBSsettlement@kirkland.com | |
| Claims Administrator:<br>Blue Cross Blue Shield Settlement<br>c/o JND Legal Administration<br>PO Box 91393<br>Seattle, WA 98111<br>(888) 681-1142 | |

EXHIBIT INDEX

|  | Exhibit |
|---|---|
| "Will Blue Cross settlement boost health plan competition in Minnesota," *Star Tribune* (June 26, 2021)" | A |
| "Anthem paying $594M to settle antitrust litigation, but deal terms might fuel growth," *Indianapolis Business Journal* (February 1, 2021) | B |

**EXHIBIT A**

# Will Blue Cross settlement boost health plan competition in Minnesota?

A class action lawsuit is generating a $2.67 billion payout and changes for insurers using the Blue Cross and Blue Shield brands.

By **Christopher Snowbeck** Star Tribune

JUNE 26, 2021 — 8:00AM



DREAMSTIME, TNS - TNS

Starting in June, about 500,000 Blue Cross and Blue Shield of Texas members with HMO policies - which require the use of in-network doctors except in emergencies - will need to think twice before going to an out-of-network emergency room. (Dreamstime) ORG XMIT: 1229926

Blue Cross and Blue Shield health insurers including the "Blue" health plan in Minnesota are paying $2.67 billion to settle allegations that carriers sharing the brands harmed consumers by not fully competing with one another.

Filed in 2013, the class action lawsuit alleges that dozens of Blue Cross and Blue Shield insurers across the U.S. and Puerto Rico violated antitrust laws through their operations. The insurers deny any wrongdoing, saying their conduct helped lower health care costs while expanding access to care for customers.

Last fall, the parties reached a preliminary settlement of the protracted litigation to avoid ongoing risks and costs. If finalized by a judge this fall, the settlement agreement would bring cash for customers who file claims as well as changes in how Blue Cross and Blue Shield carriers operate.

**EXHIBIT A**

Based in Eagan, Blue Cross and Blue Shield of Minnesota estimates it will pay $72 million, or about 2.7% of the total.

Insurance agents and analysts differ on whether they think individual consumers and businesses in Minnesota will recover meaningful sums from the settlement. The bigger question is whether structural changes for the Blues will generate more competition in the state's health insurance market, said Allan Baumgarten, an independent health care analyst in St. Louis Park.

"I think you may see some mergers of independent Blue Cross plans," Baumgarten said. "It could be full mergers, or it could be more of these joint ventures — because scale is huge in these things."

Collectively, Blue Cross and Blue Shield health insurers across the U.S. provide coverage to more than 100 million people. For decades, the insurers have existed as independent companies that share a brand they can use only in their primary service areas.

The carriers' trade group says cooperative agreements among the insurers have allowed for a "Blue System," where the health plans can compete like a nationally integrated health insurer while still preserving each carrier's local focus. The settlement would leave the exclusive service areas in place for the Blue plans, but it would alter other agreements among the carriers in hopes of promoting competition.

One settlement provision would eliminate caps on revenue that the companies can generate by selling coverage through non-Blue affiliates. In theory, the change could prompt an out-of-state Blue insurer to try doing more business in Minnesota, for example, through a subsidiary that doesn't use the Blue Cross and Blue Shield trademarks.

Another settlement provision would let certain large employers seek a competing bid from a second Blue Cross and Blue Shield insurer, where current rules can limit the employer's choice to just the local Blue carrier. Finally, the settlement would limit current restrictions on acquisition of Blue health plans.

"The settlement provides historic injunctive relief to enhance competition in the market for health insurance," U.S. District Judge R. David Proctor wrote in an order issued in November.

Taken together, the changes could promote a consolidation trend that typically benefits larger carriers, said Joshua Haberman, the owner of Alexander & Haberman, an insurance agency in Bloomington. Two of the largest operators of Blue plans are Indiana-based Anthem, which is publicly traded, and a non-profit based in Illinois called Health Care Services Corp.

"It strengthens the incentive for the Blue Cross plans to merge," Haberman said.

The payout for the Blue insurers is fairly manageable, which makes it a non-event from a ratings perspective, said James Sung, a director at S&P Global Ratings.

## EXHIBIT A

The provision allowing large national employers to seek a bid from a second Blue insurer when hiring an administrator for self-insured health plans could be significant in some cases, Sung said. Smaller Blue plans that have worked with these accounts might now face competition from larger carriers.

"There is some risk," he said, "that the smaller Blues might lose some business, hypothetically."

But getting Blue plans to enter one another's territories through non-Blue affiliates is easier said than done. For starters, they can't use the Blue trademarks, said Thomas Greaney of UC Hastings Law in San Francisco.

Plus, the real challenge for insurers expanding into new territories is negotiating competitive contracts with doctors and hospitals, Greaney said. New carriers have trouble getting the best rates because they don't enter a market with the leverage of a large subscriber base — a business reality that the settlement won't change.

"Will it promote a wave of competition?" Greaney said. "It certainly may occur at the margins, but the long-standing obstacle to new entry for insurance plans is forming a network."

The settlement provides monetary payments to members of the class who submit valid claims by Nov. 5. After attorney fees and administrative costs, the net settlement fund to be split among claimants is estimated at about $1.9 billion.

Most of the money will go to individuals and groups that bought fully insured health plans between February 2008 and October 2020. A claimant's share of the payout depends on how much premium they paid to the settling defendants during the class period, relative to overall premiums paid by claimants.

The court will decide whether to approve the settlement after a fairness hearing scheduled for Oct. 20. Class members have until July 28 to opt out or raise objections — and at least one raised concerns earlier this month.

"This settlement should be rejected because it is proportionately lopsided; benefitting attorneys and BCBS far more proportionately than it benefits the claimants (the real victims)," C. Demuth of Goodrich, Texas, said in a court filing.

**Christopher Snowbeck** covers health insurers, including Minnetonka-based UnitedHealth Group, and the business of running hospitals and clinics.

# Anthem paying $594M to settle antitrust litigation, but deal terms might fuel growth

February 1, 2021 | Greg Andrews, Indianapolis Business Journal and Indianapolis Business Journal Staff

KEYWORDS ANTITRUST / BUSINESS LAW / HEALTH & INSURANCE / HEALTH CARE / HEALTH CARE & INSURANCE / HEALTH CARE COSTS / INSURANCE / INSURERS / LAWSUIT / SETTLEMENT

Even for a company as big as Anthem Inc., the nation's largest marketer of Blue Cross Blue Shield insurance, paying a half-billion-dollar settlement might seem like a painful way to resolve litigation.

But some investment analysts and health care observers say changes to Blue Cross Blue Shield rules that are stipulated in the settlement are so favorable to Indianapolis-based Anthem's growth prospects that they view the deal as a huge win for the company.

The settlement, struck last fall and awaiting final approval in an Alabama federal court, resolves lawsuits filed in 2012 by insurance customers alleging the Chicago-based Blue Cross Blue Shield Association and the nation's 36 Blue Cross and Blue Shield insurers violated antitrust laws through practices that limited competition and caused higher prices. The total settlement is $2.7 billion, with Anthem shouldering $594 million.

Anthem, the exclusive Blue Cross Blue Shield licensee in Indiana and 13 other states, already is by far the largest Blues insurer, with triple the revenue of the No. 2 player, Chicago-based Health Care Service Corp., and it is the only multistate Blue that's publicly traded — giving it easy access to capital that other Blues insurers, many of which are not-for-profit or owned by policyholders, don't enjoy.

That strong footing should come in handy after the settlement does away with protections that bar Blues insurers from invading one another's territories. The deal also eliminates a cap preventing Blues insurers from generating more than one-third of their revenue from non-Blues business. In addition, it clears the way for national employers to request bids from more than one Blues insurer. Currently, only the Blues insurer for the employer's headquarters state can compete.

Investment analysts and health care observers say the new landscape could allow Anthem to add lucrative national accounts and to move into additional states with policies sold under the Blue Cross Blue Shield name — the top brand in health insurance.

"If I was a director or CEO of a small Blue plan and this settlement now gives Anthem the opportunity to compete with us, I'd be very scared," said Bill Bednar, principal and consulting actuary at Axene Health Partners in Southern California.

"In my opinion, it removes a big obstacle for Anthem to grow. The opportunity to grow is very much there."

Anthem spokesman Tony Felts issued a statement saying the plaintiffs deny the allegations but agreed to settle "because it allows us to remain focused on the goal we've had for more than 80

**EXHIBIT B**

years: leading in the transformation of health care by fulfilling the commitments we've made to consumers, communities and our health care system."

Two analysts asked about the impact of the settlement on Anthem during the company's third-quarter conference call in late October, but CEO Gail Boudreaux was coy.

"I really don't see this changing our stated strategy, and I think that we are very excited about the growth prospects we have across Anthem," she said on the call.

**Powerful brand**

The Blue Cross Blue Shield name is so ubiquitous that many health care consumers probably don't realize it is merely a trademark used by the three dozen Blue Cross Blue Shield licensees.

About 107 million people — one in three Americans — have Blue Cross Blue Shield coverage, according to the Blue Cross Blue Shield Association. That gargantuan market share stems in part from the Blues' pioneering role in developing health insurance. Few Americans had such coverage when Blue Cross launched in 1929 to provide prepaid hospital care. A year later, Blue Shield launched in 1930 to provide reimbursement for physician services. The two Blues merged in 1982.

In a Securities and Exchange Commission filing, Anthem says, "We believe our exclusive right to market products under the most recognized brand in the industry, BCBS, in our most significant markets provides us with greater brand recognition over competitive product offerings."

Yet its relationship with the association has sometimes been strained — most notably when it diverged in the 1980s and early 1990s from the standard Blue Cross Blue Shield playbook of just selling health insurance and doing so in a single state.

Anthem executives at the time said the company's diversification and move into other states was a matter of survival after it sputtered in the 1980s.

"We were in one line of business — traditional health insurance — and we were pretty much doing it the same way it had been done for 40 years," then-CEO L. Ben Lytle told IBJ in 1991.

"It had steadily been losing market share for a decade, and a lot of its business was auto and steel, which were going through a rapid contraction. The company had a terrible service reputation at that point and just wasn't looking toward the future."

Tensions between Anthem and the association came to light after the Indianapolis company spun off its insurance brokerage subsidiary, Acordia, in a $49 million initial public offering in 1992.

The association in response threatened to strip Anthem of the right to use the Blues brand, according to regulatory filings related to the offering, though it never did so. In one filing, Anthem said it had "engaged in certain actions which the staff of the BCBSA object to, including transforming itself into a for-profit enterprise [and] transferring customers, brokerage and administrative business" to Acordia.

An even bolder move came in 2001, when Anthem itself went public in a $1.7 billion initial public offering. As part of the transaction, Anthem con-verted from being policyholder-owned to investor-owned.

**Growing pains**

**EXHIBIT B**

Anthem grew explosively in the 1990s and early 2000s by snapping up other Blues plans. Its biggest deal came in 2003 when it acquired California-based WellPoint Health Networks, a similarly acquisition-minded Blues consolidator, for $16.4 billion.

But that strategy soon began to stall amid increasing opposition to the conversion of not-for-profit Blues companies to for-profit status—a move that typically was a precursor to being acquired by Anthem. From 2003 to 2007, regulators in Kansas, Maryland and Washington blocked for-profit conversions, and Blues insurers in two other states, New Jersey and North Carolina, backed away from conversions because of the cool response of regulators.

Anthem's next big acquisition play came in 2015 when the company agreed to buy Connecticut-based Cigna for $54 billion. But Anthem gave up the deal two years later after a federal judge sided with the Department of Justice's conclusion that the megamerger violated antitrust law.

In a testy letter to Anthem in mid-2015, before the two companies had signed a merger agreement, Cigna Chairman Isaiah Harris and CEO David Cordani argued that "Anthem's lack of a growth strategy [and] complications related to your membership in the Blue Cross Blue Shield Association" were significant impediments to a deal.

"We have serious questions about how the combined company would comply with the intricate rules and constraints administered by the BCBSA," the letter said.

Bloomberg News reported in 2016 that the then-pending deal would have knocked Anthem's Blues revenue below the two-thirds threshold, potentially prompting the Blue Cross Blue Shield Association to order the company to pay a $3 billion noncompliance fee.

**Stepped-up competition**

Analysts and health care observers say eliminating the two-thirds requirement and loosening the rules that limit competition among Blues insurers give Anthem new muscle to play hardball with rivals if it so chooses.

For example, Bednar said, if Anthem wanted to buy a Blues insurer in another state, it could lord over the target company that Anthem might launch its own operations there.

"It's the attitude of, 'Merge with us or you are going to be our competitor,'" he said.

Scott Fidel, an analyst at Stephens, added in a report that the settlement might provide "competitive momentum" to larger insurers, "mostly at the expense of single-state Blues … and also catalyze more cross-border M&A between Blues and non-Blues."

But not everyone is expecting a drastic change to the competitive landscape.

Julie Utterback, a senior equity analyst at Morningstar in Chicago, said the antitrust settlement is "mildly positive" for Anthem, positioning it to better compete for national employer accounts.

But she doesn't foresee Anthem charging into the markets of other Blues plans and building a presence from scratch. That's a tough way to build market share, she said, given the need for scale in order to negotiate the lowest possible reimbursement rates from health care providers.

And acquisitions of smaller Blues plans would be likelier if they were under financial strain, which isn't the case, said James Sung, a director in New York for the rating agency S&P Global.

**EXHIBIT B**

"A lot of the Blue Cross Blue Shield plans across the country are financially strong. There is not a big push to sell them," he said. "The ones that are left have been able to be successful on a stand-alone basis."

But Bednar said Anthem would be able to use its strong performance in existing markets to subsidize startup operations.

"I could see Anthem, with deeper pockets, accept losses for a couple of years to get market share, then get more aggressive in negotiations," he said.

Gloria Sachdev, CEO of Employers' Forum of Indiana, said she'd like to see another Blues plan come into Indiana to compete with Anthem, though she doubts that will happen, given that most other Blues are small, regional players.

Anthem is the undisputed king of the Indiana market, with 66% of the large group market, according to the Kaiser Family Foundation. Sachdev, whose group is concerned about high health care costs in the state, said she doesn't want Anthem's growth initiatives elsewhere to push costs even higher here.

"We will have to keep an eye on Anthem's premiums in Indiana to [ensure] they do not increase as they offer more competitive rates to gain market share in other states," she said in an email.

# EXHIBIT
# 14

07/24/2021

Christie Bluhm

Morgantown, Kentucky 42261

In re: Blue Cross Blue Shield Antitrust Litigation

As a Class Member, as a result of my BCBS plan from roughly

, I object to the BCBS settlement for the following reasons:

I find the proposed settlements as I understand them:

• Class members may receive a cash payment from the Net Settlement Fund. The distribution of the funds are laid out in the 19 page proposal plan of distribution and (loosely) the amount per class member depends on length of time they had the plan and the amount they themselves paid into the plan. All dependents are excluded from any monetary compensation.

• The Settling Defendents, BCBS, agree to change certain practices that were alleged to be anticompetitive. All class members would benefit from this portion of the settlement.

to be inadequate in coverage, amount, and scope given the grave and serious nature of the allegations leveled against Blue Cross Blue Shield that likely negatively impacted millions of Americans. The time period the settlement covers, 2008 to October of 2020. also included the period in which Covid-19 hit and many, including myself, lost their employment and health insurance. I also object for the following reasons:

1) Dependents are not included in the monetary portion of the settlement and they should be, especially in cases their parents are absorbing the full cost of the health care premiums. I have been paying the full premium for my son's stand-alone plan with Anthem BCBS for several years now, which has been steadily increasing. For comparison, during the 2017 plan year, I was paying $178 a month. In 2020 (This settlement covers plans from 2008 through October of 2020) I was paying $358.59 a month. Every single year it increases at an alarming rate.                 is the only individual on the plan.

2) This settlement does not seem to address the issue of disproportinate impact that people in certain regions experienced as they had no other option for their health insurance coverage because BCBS was the only option in the private marketplace. From 2016 to 2021, Anthem Blue Cross Blue Shield was the only option for private health insurance in the marketplace in Butler County, Kentucky where we reside.

3) The amount of the settlement is insufficient given the number of potential class members.

4) Additionally, I have not been formally notified I was identified as a class member but believe I had Anthem BCBS during my employment with [REDACTED]. Those individuals handling the settlement have advised we are not to contact BCBS regarding our plan coverage involved in the settlement so I am not able to confirm I had BCBS for all three employers and the dates of coverage. Given the approaching deadlines, I would ask the court to consider extending the deadlines so proper notice can be made to class members, additional objections can be submitted, and those with questions can speak to someone. I called the phone number listed on the settlement notification postcard, (888) 681-1142 more than once before I reached a live person and I was on hold for a long time.

I would also like to request to attend the Fairness Hearing on October 20th. I would prefer to do so via video but can travel to be there in person if that option is not available.

I declare under penalty of perjury that the information provided is true and correct.

Sincerely,

Christie Bluhm

Blue Cross Blue Shield Settlement
c/o JND Legal Administration
PO Box 91393
Seattle, WA 98111
(888) 681-1142

BLUE CROSS BLUE SHIELD
SETTLEMENT
C/O MICHAEL D. HAUSFELD
HAUSFELD LLP
888 16th Street NW, Suite 300
Washington, DC 20006
(202) 849-4141
BCBSsettlement@hausfeld.com

BLUE CROSS BLUE SHIELD
SETTLEMENT
C/O DAVID BOIES
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(888) 698-8248
BCBS-Settlement@bsfllp.com

DAN LAYTIN
KIRKLAND & ELLIS LLP
300 N. LaSalle St.
Chicago, IL 60657
(312) 862-4137
BCBSsettlement@kirkland.com