FILED
2021 Sep-03  PM 06:14
U.S. DISTRICT COURT
N.D. OF ALABAMA



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406)** | )<br>)<br>)<br>) **Master File No. 2:13-CV-20000-RDP**<br>)<br>) This Document relates to Subscriber<br>) Track cases.<br>)<br>) |

**<u>DEFENDANTS' BRIEF IN SUPPORT OF SUBSCRIBER PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF PROPOSED CLASS SETTLEMENT</u>**

## TABLE OF CONTENTS

**Page**

**INTRODUCTION**..................................................................................................... **1**

**LEGAL STANDARD** ............................................................................................... **3**

**ARGUMENT** ............................................................................................................. **5**

**I.     OBJECTORS MAY NOT OPT OUT OF THE INJUNCTIVE RELIEF
        CLASS.** ........................................................................................................... **5**

        A.     Objectors may not change the terms of the settlement by adding an opt-out
               right to the mandatory 23(b)(2) class. ..................................................... 5

        B.     Limited arbitration clauses do not create wholesale opt-out rights. ....................... 6

               1.     Arbitration clauses do not create a right to individual litigation. .............. 7

               2.     Objectors cannot extend the requirement to arbitrate to defendants
                      who are not parties to their agreements. ....................................... 9

        C.     Objectors' attempt to intervene as named plaintiffs is equally misguided
               and will not allow them to opt out of the mandatory 23(b)(2) class. ...................... 9

**II.    OBJECTORS' SUBSTANTIVE OBJECTIONS TO THE SETTLEMENT
        AGREEMENT ARE MERITLESS.** ...................................................................... **11**

        A.     The Settlement Agreement's preservation of Blue Plans' historical service
               areas does not prevent final approval. ....................................................... 11

               1.     Parties can agree to release antitrust claims based on a continuation
                      of conduct. ......................................................................... 11

               2.     The Settlement Agreement does not preserve clearly illegal
                      conduct. ............................................................................ 16

        B.     The Second Blue Bid term treats Class Members equitably. ................................. 18

               1.     The number of QNAs maintains procompetitive cooperation
                      among Blue Plans. .................................................................. 19

               2.     The Second Blue Bid relief is targeted towards accounts with the
                      fewest insurance options. ......................................................... 19

               3.     The Qualified National Account criteria do not protect Anthem. ............ 22

## TABLE OF CONTENTS (CONT'D)

**Page**

C.    The Local Best Efforts rule provides benefits to Class Members and
        increases competition.............................................................................................. 23

**CONCLUSION** .......................................................................................................... **24**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Bank Note Holographics, Inc.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001)....................................................................................4

*Am. Exp. Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013)............................................................................................................8

*Apollo Theater Found., Inc. v. W. Int'l Syndication*,
  2004 WL 1375557 (S.D.N.Y. June 21, 2004) ..................................................................8

*Arena v. Intuit Inc.*,
  2021 WL 834253 (N.D. Cal. Mar. 5, 2021)......................................................................8

*Ass'n for Disabled Americans v. Amoco Oil Co.*,
  211 F.R.D. 457 (S.D. Fla. 2002)......................................................................................13

*AT&T Tech., Inc. v. Commc'ns Workers of America*,
  475 U.S. 643 (1986)............................................................................................................9

*Balasanyan v. Nordstrom, Inc.*,
  2012 WL 1944609 (S.D. Cal. May 30, 2012).................................................................7

*In re Blue Cross Blue Shield Antitrust Litig.*,
  308 F. Supp. 3d 1241 (N.D. Ala. 2018)...................................................................16, 17

*Brickstructures, Inc. v. Coaster Dynamix, Inc.*,
  952 F.3d 887 (7th Cir. 2020) ............................................................................................8

*Brown v. Price*
  2017 WL 4698025 (D. Or. Oct. 18, 2017)....................................................................7, 8

*Carson v. Am. Brands, Inc.*,
  450 U.S. 79 (1981)............................................................................................................17

*In re Checking Acct. Overdraft Litig.*,
  2020 WL 4586398 (S.D. Fla. Aug. 10, 2020).................................................................7

*Citigroup Inc. Sec. Litig.*,
  2014 WL 3610988 (S.D.N.Y. July 21, 2014) ..................................................................7

*In re Currency Conversion Fee Antitrust Litig.*,
  361 F. Supp. 2d 237 (S.D.N.Y. 2005)...............................................................................8

*Dean Witter Reynolds, Inc. v. Byrd*
    470 U.S 213 (1985)............................................................................................8

*DeHoyos v. Allstate Corp.*,
    240 F.R.D. 269 (W.D. Tex. 2007) ....................................................................7

*In re Domestic Air Transp. Antitrust Litig.*,
    148 F.R.D. 297 (N.D. Ga. 1993).............................................................10, 17

*In re Equifax Customer Data Sec. Breach Litig.*,
    999 F.3d 1247 (11th Cir. 2021)........................................................................17

*Eubanks v. Billington*,
    110 F.3d 87 (D.C. Cir. 1997)........................................................................5, 6

*Fox v. Tyson Foods, Inc.*,
    519 F.3d 1298 (11th Cir. 2008) ......................................................................10

*Fraley v. Batman*,
    638 F. App'x 594 (9th Cir. 2016) ..............................................................11, 16

*Grilli v. Metro. Life Ins. Co.*,
    78 F.3d 1533 (11th Cir. 1996) ........................................................................10

*Grunin v. Int'l House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) ..........................................................................16

*Holmes v. Cont'l Can Co.*,
    706 F.2d 1144 (11th Cir. 1983) ........................................................................5

*Jim Walter Resources, Inc. v. United Mine Workers*,
    663 F.3d 1322 (11th Cir. 2011) ........................................................................9

*Kincade v. General Tire & Rubber Co.*
    635 F.2d 501 (5th Cir.1981) ...............................................................5, 6, 9, 10

*Klay v. All Defendants*
    309 F. App'x 294 (11th Cir. 2009) ................................................................13

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)........................................................................................17

*In re Liberty Nat'l Ins. Cases*,
    2006 WL 8436814 (N.D. Ala. Mar. 31, 2006) .................................................3

*Lurns v. Russell Corp.*,
    604 F. Supp. 1335 (M.D. Ala. 1984) ..........................................................4, 18

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
    2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ...................................................12, 13

*In re Managed Care*,
    756 F.3d 1222 (11th Cir. 2014) ...............................................................2, 12, 13, 14

*In re Managed Care Litig.*,
    2011 WL 1522560 (S.D. Fla. Mar. 8, 2011) .........................................................12

*In re Managed Care Litig.*,
    2008 WL 11333988 (S.D. Fla. 2008) ....................................................................13

*In re Managed Care Litig.*,
    2010 WL 6532985 (S.D. Fla. Aug. 15, 2010)........................................................12

*Mendoza v. Inch*,
    2021 WL 1138402 (N.D. Fla. Mar. 25, 2021) ........................................................5

*Mt. Hawley Ins. Co. v. Sandy Lake Props., Inc.*,
    425 F.3d 1308 (11th Cir. 2005) ............................................................................10

*Musselman v. Blue Cross & Blue Shield of Ala.*,
    2013 WL 4496509 (S.D. Fla. Aug. 20, 2013), *aff'd* 684 F. App'x 824 (11th
    Cir. 2017) ............................................................................................................12

*NCAA v. Alston*,
    141 S. Ct. 2141 (2021).........................................................................................18

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) .............................................................................4

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) .......................................2, 13, 14, 15

*Pedraza v. United Guar. Corp.*,
    2001 WL 37071199 (S.D. Ga. June 22, 2001)...................................................4, 18

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ...............................................................................4

*Redel's Inc. v. Gen. Elec. Co.*,
    498 F.2d 95 (5th Cir. 1974) ..................................................................................14

*Robertson v. NBA*,
    556 F.2d 682 (2d Cir. 1997)......................................................................... *passim*

*Saccoccio v. JP Morgan Chase Bank, N.A.*,
    2013 WL 5585230 (S.D. Fla. Oct. 9, 2013)......................................................10, 11

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
  157 F. Supp. 2d 561 (E.D. Pa. 2001) ...........................................................13

*Soc'y of Pro. Eng'g Emps. in Aerospace, IFPTE Loc. 2001 v. Boeing Co.*,
  2015 WL 13643720 (D. Kan. Sept. 3, 2015) ...............................................7

*Stott v. Cap. Fin. Servs., Inc.*,
  277 F.R.D. 316 (N.D. Tex. 2011) ............................................................7, 8

*Swaney v. Regions Bank*,
  2020 WL 3064945 (N.D. Ala. June 9, 2020) ................................................3

*Swinton v. SquareTrade, Inc.*,
  454 F. Supp. 3d 848 (S.D. Iowa 2020) .........................................................7

*United States v. Topco Assocs.*,
  405 U.S. 596 (1972) ..............................................................................16, 18

*VKK Corp. v. NFL*,
  244 F.3d 114 (2d Cir. 2001) .......................................................................13

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................................2, 5

**Statutes**

29 U.S.C. § 186(c)(5) ......................................................................................20

**Rules**

Fed. R. Civ. P. 23 ................................................................................*passim*

Fed. R. Civ. P. 24 ...............................................................................................9

## EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 1 | 9/19/17 Deposition of Beth-Ann Roberts (Harvard Pilgrim) (excerpt) |
| 2 | 11/15/17 Deposition of Randall Abbott (Willis Tower Watson) (excerpt) |
| 3 | 7/22/17 Deposition of Professor Kevin M. Murphy (excerpt) |
| 4 | 7/25/17 Deposition of Scott Serota (excerpt) |
| 5 | 8/8/17 Deposition of Robert Kolodgy (excerpt) |
| 6 | 9/1/17 Deposition of Professor Daniel Rubinfeld (excerpts) |
| 7 | 5/7/19 Deposition of Professor H.E. Frech, III (excerpt) |

## **INTRODUCTION**

The Settlement Agreement—reached after nearly a decade of intense litigation—gives Class Members historic monetary and injunctive relief.[1]  Class Members are eligible to recover from a $2.67 billion Settlement Fund, "one of the largest antitrust class settlements in history." Dkt. 2641 at 32.  And "the structural relief negotiated in this settlement is exceptional."  *Id.* Defendants have agreed to eliminate the National Best Efforts rule, which required Blue Plans to earn two-thirds of their revenue under the Blue brand.  Qualified National Accounts—Self-Funded Accounts that have at least 5,000 employees and meet certain other requirements—will have the right to request a Second Blue Bid unless there are already two Blue licensees in the Account's headquartered geography.  The elimination of NBE and the addition of a Second Blue Bid is in addition to other injunctive relief related to Most Favored Nation clauses, Specialty Service Providers, and Acquisitions.  Given the monetary and structural relief, the settlement easily passes muster under Rule 23.

After a robust notice program and a full opportunity to object or opt out, just 2,175 Class Members have attempted to opt out and 123 Class members have objected to the Settlement Agreement.  Of the more than 80 million Class Members, the opt outs and objectors collectively account for less than 0.003% of the entire class.  Of the 123 objections to the Settlement Agreement, a subset was submitted by institutional objectors (the "Objectors").  The relatively few opt outs and objections alone supports final approval.  Further, several of these opt outs are procedurally improper, and the substantive objections are wrong as a matter of law and do not detract from the Settlement Agreement's fairness.

---

[1] Capitalized terms have the same meaning as in the Settlement Agreement, unless indicated.

The Court should reject procedurally improper opt-out requests and objections. *First*, several Class Members purport to opt out of the Rule 23(b)(2) injunction class. The Supreme Court has made clear that Rule 23 does not entitle (b)(2) class members to opt out, particularly where the (b)(2) class does not receive monetary relief. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). *Second*, several Class Members object because the class settlement purportedly infringes their arbitration rights. But those members have never exercised any arbitration rights. They instead invoke the right to opt out "to pursue their claims in court."[2] Arbitration clauses do not give Class Members the right to opt out so they can pursue individual litigation in court.

Objectors' substantive objections are wrong as a matter of law. *First*, certain Objectors contend that a settlement cannot release future antitrust claims and that the Blue System's service areas, standing alone, are per se unlawful. Neither is true. A settlement agreement can include a prospective release of future antitrust claims that could be asserted against the defendant for continuing the released conduct. *In re Managed Care*, 756 F.3d 1222, 1236 (11th Cir. 2014); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *25 (E.D.N.Y. Dec. 16, 2019) (settlement agreements can release future antitrust claims "based on a continuation of conduct at issue and underlying the original claims."). And although the Court cannot approve "clearly illegal" conduct, *Robertson v. NBA*, 556 F.2d 682, 686 (2d Cir. 1997), the Blues' service areas standing alone have never been held per se unlawful. Because the Blues' service areas and the go-forward Blue System as modified by the Settlement Agreement are not per se illegal (*i.e.*, not clearly unlawful), they are subject to the rule of reason under Supreme Court and Eleventh Circuit case law.

---

[2] National Account Objectors' Mem. In Support of Mtn. to Opt Out of the Entire Settlement Or, In the Alternative, Opp. To the Approval of the Proposed Injunctive Relief Class Settlement ("Nat'l Acct. Objs.' Mem.") at 4 n.3.

*Second*, the Second Blue Bid term treats damages class members equitably because the contours of that relief are rationally based on legitimate considerations. The number of accounts eligible for a Second Blue Bid provides significant relief to the class and fosters the procompetitive cooperation necessary for the Blue System to function effectively. And the criteria to qualify—such as the Dispersion Percentage and the exclusion of Taft-Hartley Trusts—all target the relief towards geographically dispersed national accounts with the fewest carrier options, which would be most likely to receive and benefit from a Second Blue Bid.

Defendants steadfastly maintain the legality and procompetitive nature of the current Blue System. Subscribers would face extraordinary risk and expense through continued litigation. The Settlement Agreement offers a fair and reasonable alternative to the uncertainties of more litigation. The Court should grant final approval.

## <u>LEGAL STANDARD</u>

Under Rule 23(e)(2), a court should grant final approval of a class action settlement if it finds the settlement to be "fair, reasonable, and adequate." Review and approval of a class action settlement "is committed to the sound discretion of the district court." *Swaney v. Regions Bank*, 2020 WL 3064945, at *3 (N.D. Ala. June 9, 2020); *see also In re Liberty Nat'l Ins. Cases*, 2006 WL 8436814, at *9 (N.D. Ala. Mar. 31, 2006). In considering final approval, the Court should consider four factors, including whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate …; and
> (D) the proposal treats class members equitably relative to each other.

Rule 23(e)(2)(A)–(D).

Objectors focus on the last requirement, Nat'l Acct. Objs.' Mem at 2–3, but they incorrectly characterize it as requiring class members to be treated "*equally*."[3]  To the contrary, "there is no rule that a settlement benefit all class members equally."  *Lurns v. Russell Corp.*, 604 F. Supp. 1335, 1336 (M.D. Ala. 1984); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999) ("[A]lmost every settlement will involve different awards for different class members."). Rule 23(e)(2)(D), which Objectors rely on, requires only that class members be treated "*equitably*"—a rule intended to ensure that a settlement "takes appropriate account of *differences* among their claims."  Fed. R. Civ. P. 23(e)(2)(D) advisory committee's note to 2018 amendment (emphases added).   "Higher allocations to certain parties" need only be "based rationally on legitimate considerations."  *Pedraza v. United Guar. Corp.*, 2001 WL 37071199, at *7 (S.D. Ga. June 22, 2001); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429–30 (S.D.N.Y. 2001) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel.").  Indeed, "it is obvious that in the case of a large class action the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision."  *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997).

---

[3] *See, e.g.*, *id.* at 3 ("[T]he proposed settlement fails to treat all members of the (b)(2) class *equally* relative to each other, as required by Rule (23)(e)(2)(D) [*sic*] … .") (emphasis added); *id.* ("[T]he proposed settlement fails to treat all class members *equally* relative to each other as required by Rule 23(e)(2)(D) … .") (emphasis added); *id.* at 7 ("Damage Class Opt-Outs Are Not Treated *Equally* Relative to Other Injunctive Relief Class Members") (emphasis added); *id.* at 8 ("This *unequal* treatment of injunctive relief class members relative to each other not only violates Rule 23(e)(2)(D) ….") (emphasis added); *id.* at 23 ("The Proposed Settlement Treats Class Members *Unequally* Relative to Each Other in Numerous Other Ways.") (emphases added).

4

## ARGUMENT

### I.   OBJECTORS MAY NOT OPT OUT OF THE INJUNCTIVE RELIEF CLASS.

#### A.   Objectors may not change the terms of the settlement by adding an opt-out right to the mandatory 23(b)(2) class.

Certain Objectors seek to opt out of the 23(b)(2) injunctive relief class, even though the Settlement Agreement does not provide them with an opt-out right.  Dkt. 2610-2 ¶ 32.  Objectors have no legal basis for this request.  The plain text of Rule 23 does not provide an opt-out right, which the case law confirms:  "(b)(2) does not require that class members be given notice and opt-out rights."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011); *accord Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1153 (11th Cir. 1983) ("The general rule in this circuit [is] that absent members of (b)(2) classes have no automatic right to opt out of the lawsuit and to prosecute an entirely separate action."); *Mendoza v. Inch*, 2021 WL 1138402, at *1 (N.D. Fla. Mar. 25, 2021) ("Absent unusual circumstances not present here, a class member has no right to opt out of a (b)(2) class.").

Objectors' demand to add an opt-out right to a 23(b)(2) settlement class where not provided in the Settlement Agreement is ill-founded.  *See Cont'l Can Co.*, 706 F.2d at 1160–61.  In fact, in *Eubanks v. Billington*, 110 F.3d 87, 94 (D.C. Cir. 1997) (cited in Nat'l Account Objs.' Mem. at 2), the district court *rejected* an objector's request to add an opt out right to a 23(b)(2) class, and the circuit court affirmed.  And the former Fifth Circuit rejected an opt-out request similar to Objectors' in *Kincade v. General Tire & Rubber Co.*, holding that "objectors to the settlement of a Rule 23(b)(2) class action need not be provided an opportunity to opt out of the settlement."  635 F.2d 501, 507 (5th Cir. 1981).  There, objectors sought to opt out of a mandatory 23(b)(2) settlement class that provided for both injunctive and monetary relief.  *Id.*  The Fifth Circuit affirmed denial of that request because "allowing [23(b)(2)] objectors to opt out would" undermine

the "important policy consideration" in favor of settlement. *Id.* ("[C]lass action defendants would not be inclined to settle where the result would likely be a settlement applicable only to class members with questionable claims, with those having stronger [or larger] claims opting out to pursue their individual claims separately."). Here, too, Defendants would have had little incentive to offer significant changes to the Blue System if objectors could opt out and pursue additional structural relief at will. The former Fifth Circuit also emphasized that an opt out right was not necessary because of the procedural protections available in every 23(b)(2) settlement: objectors must be "given the opportunity to be heard," the court must "set forth on the record a reasoned response to the objections," and the court must determine that the settlement is "fair, adequate and reasonable." *Id.* The process implemented by this Court ensures that 23(b)(2) class members will receive those protections here. No more is required.[4]

### B.   Limited arbitration clauses do not create wholesale opt-out rights.

Certain Objectors incorrectly assert that the class settlement impairs their arbitration rights, so they should be permitted to opt out in order to pursue individual litigation. Nat'l Acct. Objs.' Mem. at 30–34. That argument fails for two reasons. First, class actions and class action settlements can and regularly do impair contractual rights, including arbitration rights. Objectors' contrary argument relies on cases in which a party sought to enforce its arbitration rights, such as by initiating arbitration proceedings. But Objectors here have never sought to enforce their arbitration rights. Second, even if Objectors were actually pursing arbitration, their arbitration agreements would be enforceable only against the parties to those agreements. Their request to

---

[4] In addition, imposing an opt-out requirement in spite of the settlement terms would give both sides the right to rescind the agreement. Dkt. 2610-2 ¶ 43(a); *Eubanks,* 110 F.3d at 95 ("Where the parties negotiate a class settlement on the assumption that it will be mandatory and binding on all class members, a court cannot permit members to opt out without giving the parties an opportunity to renegotiate the settlement.").

opt out of the class improperly attempts to impose an arbitration agreement on defendants who have not agreed to arbitrate.

>   1.   *Arbitration clauses do not create a right to individual litigation.*

"It is settled law that class membership can release all claims, including arbitration claims, notwithstanding a class member's earlier arbitration agreement." *Citigroup Inc. Sec. Litig.*, 2014 WL 3610988, at *8 (S.D.N.Y. July 21, 2014).   Because arbitration rights are contractual rights, "treated the same as other contracts," *Balasanyan v. Nordstrom, Inc.*, 2012 WL 1944609, at *3 (S.D. Cal. May 30, 2012), they may be impaired by non-opt-out class settlements, *see, e.g.*, *Soc'y of Pro. Eng'g Emps. in Aerospace, IFPTE Loc. 2001 v. Boeing Co.*, 2015 WL 13643720, at *4 (D. Kan. Sept. 3, 2015) (granting final approval to (b)(1) and (b)(2) class settlement that released "claims … whether in … tort or contract," including "the alleged breach of contractual promises to treat the Class Members as laid off …"); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 343 (W.D. Tex. 2007) (granting final approval to a (b)(2) class settlement that released claims "including but not limited to … contract claims"); *see also Stott v. Cap. Fin. Servs., Inc.*, 277 F.R.D. 316, 341 (N.D. Tex. 2011) (noting that refusing to certify a mandatory class due to an arbitration right "may imply that a contractually-provided right is more protected than rights provided by the Fifth or Seventh Amendments").

Class settlements often impair arbitration rights.  *See, e.g.*, *In re Checking Acct. Overdraft Litig.*, 2020 WL 4586398, at *14 (S.D. Fla. Aug. 10, 2020) (approving class settlement although some class members were parties to an enforceable arbitration agreement); *Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848, 868 (S.D. Iowa 2020) (approving class settlement reached before litigating the enforceability of an arbitration provision).  In *Brown v. Price*, for example, the court granted final approval to a non-opt-out class settlement and permanently enjoined

ongoing arbitration proceedings.  2017 WL 4698025, at *4–5 (D. Or. Oct. 18, 2017); *see also Stott*, 277 F.R.D. at 340 (approving non-opt-out class settlement and enjoining arbitrations).

Objectors have not offered any reason why this case should be different.  They instead rely on a series of cases in which a party to an arbitration agreement actively sought to enforce its right to arbitrate before settlement was reached.  *See, e.g.*, *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 231 (2013) (defendants moved to compel arbitration); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237 (S.D.N.Y. 2005) (defendants moved to stay litigation pending arbitration); *Arena v. Intuit Inc.*, 2021 WL 834253, at *4 (N.D. Cal. Mar. 5, 2021) (class members initiated arbitration).  In *Dean Witter Reynolds, Inc. v. Byrd*, for example, the Supreme Court explained that "the Arbitration Act requires district courts to compel arbitration … *when one of the parties files a motion to compel*."  470 U.S. 213, 217 (1985) (emphasis added).

That is not what Objectors are doing here.  They have never invoked their arbitration rights or sought to arbitrate their alleged claims.  Instead, they seek to use an arbitration clause in their plan contracts, post-settlement, as a tactic to try to opt out of a mandatory (b)(2) class in order to pursue litigation in court.  Defendants are not aware of any court that has sanctioned this maneuver.  The Court should reject Objectors' post-settlement attempt to convert a waived right to arbitration into a right to opt out of a class and pursue individual litigation.[5]

---

[5] Indeed, by announcing their intention to "pursue their claims in this court through direct action proceedings," Nat'l Acct. Objs.' Mem. at 34, Objectors have waived their arbitration rights, *see Apollo Theater Found., Inc. v. W. Int'l Syndication*, 2004 WL 1375557, at *3 (S.D.N.Y. June 21, 2004) ("A party may waive its right to arbitration … by expressly indicating that it wishes to resolve its claims before a court."); *see also Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 891 (7th Cir. 2020) ("A waiver can be express or implied through action. … The analysis can be short when the basis of the waiver is an express abandonment of the right.").

2.      *Objectors cannot extend the requirement to arbitrate to defendants who are not parties to their agreements.*

Further, each Objector's agreement is only "with *one* of the defendant Blues," and would provide each Objector—at most—"with the right to have its antitrust claims against *that defendant* resolved in arbitration."  Nat'l Acct. Objs.' Mem. at 30–31 (emphases added).  By attempting to opt out of the class wholesale, Objectors in effect seek to extend their arbitration agreements to the vast majority of defendants who are not parties to those agreements.  They should not be allowed to do so.  *See Jim Walter Resources, Inc. v. United Mine Workers*, 663 F.3d 1322, 1325 (11th Cir. 2011) ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (quoting *AT&T Tech., Inc. v. Commc'ns Workers of America*, 475 U.S. 643, 648 (1986)).

## C.      Objectors' attempt to intervene as named plaintiffs is equally misguided and will not allow them to opt out of the mandatory 23(b)(2) class.

Certain Objectors also seek to intervene as named plaintiffs so that their "request to opt out … will be deemed procedurally proper."  National Account Objectors' Mot. to Intervene (Mot. to Intervene.) at 2.  As a preliminary matter, becoming a named plaintiff will not save Objectors' flawed opt-out argument.  Their objections and requests to opt out fail on their own terms, not because of Objectors' status as unnamed class members.  *See Kincade*, 635 F.2d at 503 (objectors who unsuccessfully sought to opt out were "[f]ive of the original six named plaintiffs").  Because Objectors have no right to opt out of this mandatory (b)(2) class, their request to intervene is moot. In any event, they cannot satisfy the standards for mandatory or permissive intervention.  Fed. R. Civ. P. 24(a)(2), (b)(1)(B).

To intervene as a matter of right, Objectors must show, *inter alia*, that they are (1) "so situated that disposition of the action, as a practical matter, may impede or impair [their] ability to protect [their] interest," and (2) that [their] "interest is represented inadequately by the existing

parties to the suit." *Fox v. Tyson Foods, Inc.*, 519 F.3d 1298, 1303 (11th Cir. 2008).  On the "impede or impair" prong, Objectors argue that if they are not permitted to intervene or opt out "their legal claims against defendants will be released."  Mot. to Intervene at 7.  But that concedes that Objectors do not have strong enough arguments to defeat final approval and is not grounds to justify intervention.   Run-of-the-mill settlement objectors are not, by default, permitted to intervene because "[t]hey [can already] protect their interest … by objecting to" the settlement. *Grilli v. Metro. Life Ins. Co.*, 78 F.3d 1533, 1536 (11th Cir. 1996).  The fact that this settlement includes a mandatory 23(b)(2) class makes no difference.  Objectors have no right to opt out regardless of whether they have intervened as named plaintiffs, and thus "[a]nything [Objectors] wish to accomplish as intervenors, they can accomplish as objectors." *Kincade*, 635 F.2d at 503; *Saccoccio v. JP Morgan Chase Bank, N.A.*, 2013 WL 5585230, at *1 (S.D. Fla. Oct. 9, 2013) (denying both permissive intervention and intervention of right).

Objectors also fail the "inadequate representation" prong.  They do not assert that class counsel has not adequately represented the classes.  This Court could not approve the settlement if representation were inadequate.  Indeed, Objectors state they "do not mean to criticize sub-class counsel," and their only grounds for arguing inadequate representation is that they disagree with the terms of the Settlement Agreement.  Mot. to Intervene at 8.  But mere disagreement with the named plaintiffs is not enough to justify intervention.  *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 334 (N.D. Ga. 1993) ("Reaching a decision … contrary to the position urged by objectors does not render the representation inadequate.").

Objectors similarly cannot satisfy the permissive intervention standard.   Permissive intervention "is appropriate" only if "the intervention will not unduly prejudice or delay the adjudication of the rights of the original parties." *Mt. Hawley Ins. Co. v. Sandy Lake Props.*, *Inc.*,

425 F.3d 1308, 1312 (11th Cir. 2005) (citation omitted).  Given the stage of this case, intervention would cause both prejudice and delay.  *See Saccoccio*, 2013 WL 5585230, at *1 (denying permissive intervention).

## II.   OBJECTORS' SUBSTANTIVE OBJECTIONS TO THE SETTLEMENT AGREEMENT ARE MERITLESS.

### A.   The Settlement Agreement's preservation of Blue Plans' historical service areas does not prevent final approval.

Objectors make two related arguments about the Settlement Agreement's treatment of the Blue System's service areas.  First, certain Objectors argue the Court cannot approve a settlement agreement that releases future antitrust claims.  Nat'l Acct. Objs.' Mem. at 14; Home Depot Obj. at 10–25.  Second, those Objectors argue that the Court cannot approve this Settlement Agreement because Blue Plans' service areas are per se unlawful and that even addressing this issue would be an impermissible advisory opinion.  Nat'l Acct. Objs.' Mem. at 14–16; Home Depot Obj. at 31–35.  Neither is correct.  Courts routinely approve and enforce settlement agreements that release future antitrust claims based on a continuation of some aspects of the conduct underlying plaintiffs' original claims.  And although courts cannot approve a settlement that preserves an illegal business practice, *e.g.*, *Robertson*, 556 F.2d at 686; *Fraley v. Batman*, 638 F. App'x 594, 597 (9th Cir. 2016), service areas standing alone are not clearly illegal (*i.e.*, not per se unlawful) and so do not preclude final approval.

#### 1.   *Parties can agree to release antitrust claims based on a continuation of conduct.*

Objectors argue "the release of future antitrust violations is contrary to public policy and unenforceable," Nat'l Acct. Objs.' Mem. at 14, and "[p]ublic policy forbids the prospective release of a private party's right to enforce the antitrust laws against future conduct," Home Depot Obj. at 13.  This argument confuses the difference between the release of future antitrust claims based on

11

*new, unrelated* conduct and the release of future antitrust claims based on *pre-existing* conduct. Defendants do not dispute that a settlement cannot release future claims based on new conduct unrelated to the claims in the settling case.  But that is not what the Settlement Agreement does. It releases "any and all known and unknown claims ... based upon, arising from, or relating in any way to ... the factual predicates of the Subscriber Actions ... [and] any issue raised in any of the Subscriber Actions by pleading or motion."  Dkt. 2610-2 at ¶ 1(uuu).  The release is expressly limited to claims, antitrust or otherwise, that arise out of or relate to the allegations and conduct at issue in this case.  *See id.* ¶ 32.  A class settlement can release all claims—past, present, and future—that relate to conduct challenged in the settled case.  *See Managed Care*, 756 F.3d at 1236. Otherwise, there would be very few settlements.  *See Madison Square Garden, L.P. v. Nat'l Hockey League*, 2008 WL 4547518, at *8 (S.D.N.Y. Oct. 10, 2008) ("[T]he logical corollary of [this] position … is that parties can never settle antitrust claims predicated on 'ongoing violations' even if they are based on 'the same kind of acts repeated in the subsequent period.'").

"[C]onsiderable caselaw stands for the proposition that public policy [favors settlement] when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint on trade."  *In Re Managed Care Litig.*, 2010 WL 6532985, at *12 (S.D. Fla. Aug. 15, 2010) (citing *Madison Square Garden*, 2008 WL 4547518, at *8 (collecting cases)), *adopted*, 2011 WL 1522560 (S.D. Fla. Mar. 8, 2011); *see also Managed Care*, 756 F.3d at 1236. That is all the Settlement Agreement does:  it releases claims based on conduct that started before the settlement and that relate to the issues raised in the Subscriber case.  The Eleventh Circuit has repeatedly enforced settlements that release such claims.  *See, e.g., Musselman v. Blue Cross & Blue Shield of Ala.*, 2013 WL 4496509, *7 (S.D. Fla. Aug. 20, 2013) ("Both this Court and the Eleventh Circuit Court of Appeals have consistently rejected the argument that claims involving

12

post-settlement conduct cannot be enjoined by the Settlement Agreements."), *aff'd* 684 F. App'x 824 (11th Cir. 2017); *In re Managed Care Litig.*, 2008 WL 11333988, at *9 (S.D. Fla. 2008) ("[F]ederal class action settlements routinely include waiving future claims.") (quoting *Ass'n for Disabled Americans v. Amoco Oil Co.*, 211 F.R.D. 457, 471 n.10 (S.D. Fla. 2002)), *aff'd Klay v. All Defendants*, 309 F. App'x 294, 295 n.2 (11th Cir. 2009).

Objectors' reliance on *In re Payment Card Interchange Fee* is misplaced. *See* Home Depot at 16–17. On remand, the district court faced the same argument Objectors make here—that the settlement improperly released future antitrust claims. 2019 WL 6875472, at *24. The court explained that future claims can be released when they are "based on a continuation of conduct at issue and underlying the original claims." *Id.* And numerous other courts have reached the same conclusion: the release of future claims based on pre-existing conduct is permissible and does not violate public policy. *See, e.g.*, *Managed Care*, 756 F.3d at 1236; *VKK Corp. v. NFL*, 244 F.3d 114, 126 (2d Cir. 2001) ("It is not uncommon, we assume, for a release to prevent the releasor from bringing suit against the releasee for engaging in a conspiracy that is later alleged to have continued after the release's execution."); *Madison Square Garden*, 2008 WL 4547518, at *8–9 (rejecting argument that enforcement of the release would violate antitrust public policy because "the cases on which [the party] relies to support its public policy argument ... involve either releases that purport to bar claims based on future violations, i.e., truly 'new and distinctive incidents', or subsequent conduct by the defendant that goes beyond what was released in the first instance," and finding "considerable support in the caselaw for the distinction relied upon here, namely that the public policy considerations differ when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint" (internal citation omitted)); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 578 (E.D. Pa. 2001)

(recognizing "the law permits a release to bar future claims based on the past conduct of the defendant").

Objectors rely on *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95 (5th Cir. 1974), for the proposition that a settlement cannot release future antitrust claims.  Nat'l Acct. Objs.' Mem. at 14; Home Depot Obj. at 14–15.  *Redel's* is not that broad.  There, the court held that an unbounded release of future antitrust claims was unenforceable because "the effect of such a release could be to permit a restraint of trade to be engaged in."  498 F.2d at 99.  In other words, *Redel's* prohibits releasing *unknown* future antitrust claims based on *new conduct* that is *unrelated* to previously litigated claims in any way; it says nothing about releases of future claims based on past or ongoing conduct.  As one court has explained, the problem with the release in *Redel's* was that it did not "narrow[] the scope to antitrust violations alleged or that could have been alleged or those based on continuing conduct."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *26.  Any contrary reading would conflict with the well-established principle that courts may approve settlements that release antitrust claims against future conduct that is sufficiently related to the underlying litigation and is not clearly illegal.  *See, e.g.*, *Managed Care*, 756 F.3d at 1236; *Robertson*, 556 F.2d at 686.

That the Settlement Agreement's release covers "mechanisms, rules, or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10 through 18 approved through the Monitoring Committee Process during the Monitoring Period" does not change this outcome.  Dkt. 2610-2 at ¶ 1(uuu).  The Settlement Agreement establishes a Monitoring Committee of five individuals, two selected by Defendants, two selected by Subscribers, and one selected by the Court.  *Id.* at ¶ 1(xx).  The Monitoring Committee exists for five years.  *Id.* at ¶ 1(zz).  Within that time period, the Monitoring Committee is in part responsible for reviewing

and approving (or rejecting) Defendants' proposed changes to the Blue Rules. *See id.* at ¶ 20; *see also* ¶¶ 10–18. If the Monitoring Committee approves a rule change as within the scope permitted by the Settlement Agreement, the release applies; if the Monitoring Committee rejects a change, Defendants can still adopt the rule, but the release does not apply. *Id.* ¶¶ 16(h), 20. The Monitoring Committee thus merely applies the release to cover future rules—but only if the rules are proposed within the prescribed five-year period, related to the subject matter of this case, within the scope permitted by the Settlement Agreement, and agreed to by Subscribers' own representatives or a Court-appointed monitor.

The Settlement Agreement recognizes that some rules can have procompetitive benefits; for example, those ensuring Plans devote resources to developing the Blue Brand to prevent free riding. *See id.* at ¶ 16. If the Blue System did not have a way to pass new rules like these— designed to protect the Blue System and serve these procompetitive ends—Defendants would face serial lawsuits despite the settlement. Any time Defendants pass a new rule, no matter how legitimate, plaintiffs could bring new cases and argue for application of the per se rule based on a supposed "aggregation" of restraints. The Monitoring Committee affords the Defendants appropriate protections to pass procompetitive rules while simultaneously ensuring the release covers only rules that are related to those at issue in this case, are consistent with the Settlement Agreement, and are approved by a Committee the majority of whom will be appointed by Subscribers' Class Counsel and the Court. Courts have upheld similar settlements releasing unknown future rule changes so long as they do not also release "entirely unrelated antitrust claims." *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *26.

2.      *The Settlement Agreement does not preserve clearly illegal conduct.*

Objectors next argue the Court cannot approve the Settlement Agreement because it preserves Blue Plans' service areas, which they contend are per se unlawful. Nat'l Acct. Objs.' Mem. at 14–16; Home Depot Obj. at 31–35. The Court cannot approve a settlement agreement that upholds a "clearly illegal" business practice. *Robertson*, 556 F.2d at 686; *Fraley*, 638 F. App'x at 597 ("[A] district court abuses its discretion in approving a settlement only if the agreement sanctions 'clearly illegal' conduct.") (quoting *Robertson*); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123–24 (8th Cir. 1975) (holding that "a court cannot lend its approval to any contract or agreement that violates the antitrust laws" and that "the settlement terms were not illegal per se" in approving the settlement). But the Blue System's service areas, standing alone, are not per se unlawful, and thus do not preclude final approval.

The Court's standard-of-review opinion did not hold that the Blue System's service areas alone are per se unlawful. The Court explicitly did not address that question, stating it "need not decide whether the Blue Plans' service areas allocations alone constitute a per se violation of Section 1." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1266–67 (N.D. Ala. 2018); *see also* Dkt. 604 at 10 ("This court has not concluded that the ESAs, on their own, are a per se violation of the Sherman Act."). Rather, its per se ruling was limited to the "aggregation of competitive restraints—namely, the adoption of ESAs and, among other things, best efforts rules—which, considered together, constitute a per se violation of the Sherman Act." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1266–67. There can be no dispute on this point. Objectors acknowledge the standard-of-review opinion addressed the aggregation of service areas and NBE and did not address whether service areas standing alone implicated *Sealy* and *Topco*. Nat'l Account Objs.' Mem. at 11–12; Home Depot Obj. at 25.

The question, then, is whether Blue Plans' service areas and the go-forward Blue System are per se unlawful (*i.e.*, clearly illegal).  This analysis does not, as one Objector contends, require the Court to impermissibly "decide the merits of the case or resolve unsettled legal questions," Home Depot Obj. at 26 (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)), or issue "an improper advisory opinion," *id.* at 28.  Because "a settlement that authorizes the continuation of clearly illegal conduct cannot be approved," the Court must determine whether service areas, standing alone, are per se unlawful.  *Robertson*, 556 F.2d 682 at 686; 11/16/20 Hr'g Tr. 42:6–7 ("The Court:  I at least have to make a decision that it's not a per se violation."); Order on Preliminary Approval at 49, Dkt. 2641 ("[T]hese structural changes, when implemented, likely will move the Blues' system from the Per Se category into the Rule of Reason category.").[6] "Likelihood of success on the merits" is a key factor in determining whether the settlement is "fair, reasonable, and adequate," and thus there is nothing remarkable about a court considering the appropriate standard of review when approving an antitrust settlement.  *See, e.g.*, *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 315–16 (N.D. Ga. 1993) (approving settlement of claim that airlines "signal[led] their intent to raise prices to a designated level at an identified future date" because "advance announcement of prices without more is not per se unlawful").  Given that the rule of reason is the default rule and presumptively applies, the Court need not undertake an extensive inquiry.  *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1258 ("The rule of reason is the presumptive standard for testing whether a practice restrains trade in violation of § 1.")  (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007)).

---

[6] The concrete and adversarial nature of this determination is demonstrated by the Objectors' arguments that ESAs are per se unlawful.  *See In re Equifax Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1264–65 (11th Cir. 2021) (holding that "Article III's case-or-controversy requirement is satisfied throughout the settlement process" because the class has ongoing adversity with the defendant and "objectors cause the settlement process to be more adversarial").

As made clear by the renewed briefing on this issue in the Provider case, Dkts. 2727–28, 2734–35, 2747, 2772, 2786, which is incorporated herein, the Blue System's service areas standing alone are not per se unlawful.  Service areas are not a naked territorial market allocation, but instead derive from—and protect—Blue Plans' common-law trademark rights in the Blue Marks. In addition to this unique, lawful origin, service areas help to advance the Blues' cooperative joint venture, which in turn promotes output and enhances inter-brand competition.  *See NCAA v. Alston*, 141 S. Ct. 2141, 2155 (2021).  The agreement in *United States v. Topco Assocs.*, 405 U.S. 596 (1972), on which Objectors rely, is readily distinguishable as it neither protected pre-existing common-law trademark rights nor facilitated the creation of a new product or other redeeming virtues.  Dkt. 2728 at 23–25; Dkt. 2772 at 2–6, 6 n.9; Nat'l Acct. Objs.' Mem. at 15–16.  Blue Plans' service areas and the go-forward Blue System are not per se unlawful and are therefore governed by the rule of reason.

**B.      The Second Blue Bid term treats Class Members equitably.**

Self-Funded Accounts that are determined to be Qualified National Accounts ("QNAs") and are headquartered in an area with a single Blue licensee can request a Second Blue Bid.  Dkt. 2610-2 ¶ 15.  QNAs are identified by listing the self-funded single-employer entities with at least 5,000 employees that have the highest Dispersion Percentages or are located in areas with two Blue licensees, until the number of Members covered by those entities reaches 33 million.  This is 31% of Members of all Self-Funded Accounts, regardless of carrier.  *Id.* ¶ 1(u), (z), (cccc), (ffff); *cf.* Nat'l Account Objs.' Mem. at 20 (misunderstanding "Members of Self-Funded Accounts" as referring only to Blue members).

Contrary to Objectors' rhetoric, "there is no rule that a settlement must benefit all class members equally."  *Lurns*, 604 F. Supp. at 1336.  "Higher allocations to certain parties" need only be "based rationally on legitimate considerations."  *Pedraza*, 2001 WL 37071199, at *7.  Each of

the objected-to QNA criteria readily meets that standard. At the threshold, Objectors are wrong to complain that opt outs lose their ability to seek a Second Blue Bid. Nat'l Account Objs.' Mem. at 7. A Qualified National Account that opts out retains its right to seek declaratory or equitable relief for a Second Blue Bid for any period when it would otherwise qualify. Objectors' other arguments that merit discussion uniformly fail. *First*, the number of QNAs encourages procompetitive cooperation among Blue Plans that is necessary for the Blue System to exist. *Second*, the Second Blue Bid relief is targeted towards dispersed national employers who have fewer insurance options than regional employers. *Third*, none of these criteria shields Anthem from Second Blue Bids. On the contrary, dozens of accounts in Anthem's service area are eligible for a Second Blue Bid.

1.  *The number of QNAs maintains procompetitive cooperation among Blue Plans.*

The number of QNAs eligible to request a Second Blue Bid provides substantial relief to class members and preserves the incentive for Blue Plans to engage in procompetitive cooperation as they have done for decades. That cooperation ensures the continued existence of the Blue System and, with it, the promotion of inter-brand competition. *See supra*, Part II.A.2.

2.  *The Second Blue Bid relief is targeted towards accounts with the fewest insurance options.*

The Settlement Agreement is designed to direct the Second Blue Bid relief to truly national, dispersed employers that have the fewest insurance options if they choose to contract with a single insurer for national coverage (*e.g.*, United, Cigna, Aetna, or a Blue Plan). In contrast, less dispersed (*i.e.*, more regional) accounts typically have the same national options, plus numerous regional carriers, such as Kaiser Permanente, PacificSource, SelectHealth, and Tufts Health Plan among many others. *See* Ex. 1, 9/19/17 B. Roberts Dep. Tr. 17:25–18:12; Kaiser Permanente, "Fast Facts" (https://about.kaiserpermanente.org/who-we-are/fast-facts); PacificSource, "Our

History" (https://pacificsource.com/history); Select Health, "Who We Are" (https://selecthealth.org/who-we-are); Tufts Health Plan, "About Tufts Health Plan" (https://tuftshealthplan.com/visitor/about-us/about-us). Each of the QNA criteria directs the Second Blue Bid relief towards dispersed national accounts.

   ***Dispersion Percentage***. An employer's Dispersion Percentage is the percentage of its employees located outside the Blue service area containing the employer's headquarters.[7] Dkt. 2610-2 ¶ 1(w). These determinations are based on data from Dun & Bradstreet, a neutral, third-party, trusted source. Prioritizing the employers with the highest Dispersion Percentages directly targets the Second Blue Bid relief to employers with a significant portion of their employees in multiple Blue Plans' service areas, for whom regional carriers may not be realistic options and who therefore will benefit most from a Second Blue Bid.

   ***Taft-Hartley Trusts***. Taft-Hartley Trusts administer welfare plans organized under the Labor Relations Act for the benefit of employees covered by a collective bargaining agreement. 29 U.S.C. § 186(c)(5). As Objectors admit, Taft-Hartley Trusts are typically jointly created by, and provide health benefits for, multiple employers. Taft-Hartley Objs.' Mem. at 1. Those employers have all the health insurance options available to the Trust, plus the additional options available to them as separate employers. Many employer-members are small, regional employers with access to regional insurance carriers like those listed above, which are not viable options for

---

[7] Post Holdings, Inc. estimated its Dispersion Percentage based on employees outside its headquarters *state*, which misapplies the Dispersion Percentage criteria. Its Dispersion Percentage is based on the employees outside the *service area* in which its headquarters is located. Post Holdings, Inc. Obj. at 4; Dkt. 2610-2 § 1(w).

Tenneco's objection stems from differences between the data it reports regarding its domestic employees and the Dun & Bradstreet data. Tenneco Obj. at 7. The Settlement Agreement relies on Dun & Bradstreet as a neutral, third-party, trusted source. If Tenneco believes there are errors in that data, its remedy is to update its data with Dun & Bradstreet. The Settlement Agreement provides for a refresh of the QNA list every two years, which will reflect any changes in the underlying Dun & Bradstreet data. Dkt. 2610-2 § 1(u).

true national employers. *See, e.g.*, Ex. 2, 11/15/17 R. Abbott Dep. Tr. 42:14–43:8. And any employer-member of a Taft Hartley Trust that is a national employer does not lose its eligibility for a Second Blue Bid merely because it contributes to the Trust; it could qualify for a Second Blue Bid in its own right. The only effect of the exclusion is to ensure that small regional employers, for whom regional carriers are realistic options, cannot aggregate their employee bases to become eligible for a Second Blue Bid designed for large, national employers. Allowing them to do so would push large national employers, who cannot realistically use regional carriers, off the list.

   ***Multi-Employer Church Plans***. The Multi-Employer Church Plan Objectors are denominationally-sponsored health care plans established for churches and ministry organizations. Nat'l Acct. Objs.' Mem. at 25. Church-sponsored plans are not "categorically ineligible to request a second Blue bid." *Id.* at 21 n.20. But, as Objectors admit, some church plans are jointly established by a convention or association of churches and in that way are similar to a Taft-Hartley Trust. *Id.* at 25. Each individual church in that convention or association has an option not available to true national employers: it could exit the association and obtain healthcare benefits individually. Such churches are likely to be small regional employers with low levels of dispersion—exactly the type of organization for whom regional carriers are a viable option. *See, e.g.*, Ex. 2, 11/15/17 R. Abbott Dep. Tr. 42:14–43:8. Because a church-sponsored plan's members have more options than true national employers, they cannot aggregate their membership and displace true national employers.

   Their treatment under the Internal Revenue Code and the Church Plan Parity and Entanglement Prevention Act (Public Law No. 106-244) does not change that. Those laws have

different purposes and contexts than the Settlement Agreement. There is no requirement that the Settlement Agreement use the same definitions as unrelated federal laws.

***Accounts in Service Areas with Two Blue Licensees.*** Some employers are already headquartered in areas with more than one Blue licensee. This meaningfully differentiates them from employers in areas with a single licensee, and the Second Blue Bid term appropriately reflects that difference.

3. *The Qualified National Account criteria do not protect Anthem.*

Objectors are wrong that Anthem is shielded from Second Blue Bids by the dispersion requirement. Nat'l Acct. Objs.' Mem. at 23. There are dozens of Qualified National Accounts in Anthem's service area, including: Dollar Tree, Intercontinental Hotels, Roark Capital, Leidos, Stanley Black & Decker, Frontier Communications, Qurate Retail, Harden Healthcare, Abercrombie & Fitch, Wendy's, Red Robin, C&S Wholesale Grocers, United Rentals, Crane Co., Battelle Memorial Institute, Boston Market Holding Company, The Brink's Company, Modine Manufacturing, Tempur Sealy International, and Long John Silver's.

Basing the Dispersion Percentage on how many employees are located outside the Blue service area containing the employer's headquarters instead of the state in which the headquarters is located is rational and legitimate. Employers benefit if their employees live in the service area of the Blue Plan they contract with because their BlueCard fees are lower and a larger portion of their claims are administered directly by their local Blue Plan. Thus, the more concentrated an employer is within their Home Plan's service area, the less it benefits from a Second Blue Bid. Basing the Dispersion Percentage on states rather than service areas would ignore this reality because employers could be highly dispersed outside of their headquarters states but still be highly concentrated within their Home Plan's service area.

C.     **The Local Best Efforts rule provides benefits to Class Members and increases competition.**

Objectors' concerns over the Local Best Efforts rule rest on two strained and unsupported assumptions.[8]  First, Objectors assume that absent Local Best Efforts, Blue Plans would offer "green competitive bids" to national accounts in their own service areas—in other words, they would compete with themselves.  Nat'l Acct. Objs.' Mem. at 29.  Neither Subscribers nor Objectors provide evidence that this has ever happened.  Nor could they.  A profit-maximizing firm does not compete against itself, and Objectors cite nothing for their belief that Blues would act so aberrantly.  7/15/19 Murphy Rpt. ¶ 153, Dkt. 2491 Ex. 279.  But even if Objectors were correct, that would only limit the amount of green business a Blue Plan could develop in its *own* service area.  The other 34 Blue Plans would remain free to enter that Blue Plan's service area and offer a competitive green bid to any account in that area (and in all other Plans' service areas).

Second, Objectors incorrectly assume that the Local Best Efforts rule restricts competition for national accounts.  It in fact strengthens that competition:  without the Local Best Efforts rule, a Plan could underinvest in its service area, creating a gap in the national Blue System and undermining Blues' ability to compete for national accounts.  7/15/19 Murphy Rpt. ¶¶ 150-54, Dkt. 2491 Ex. 279.  The rule also encourages Blue Plans to develop the broadest and deepest provider networks and subscriber coverage in their service areas, where they have exclusive rights to the Marks.  This is a key competitive attribute and differentiating feature of the Blue System. Ex. 3, 7/22/17 K. Murphy Dep. Tr. 88:22–89:15; Ex. 4, 7/25/17 S. Serota Dep. Tr. 205:18–206:19;

---

[8] Objectors incorrectly assert that the Settlement Agreement "leaves unchanged the Local Best Efforts rules,"  Nat'l Acct. Objs.' Mem. at 29. The Settlement Agreement requires that compliance with the Local Best Efforts rules will be measured at the state level instead of the service area level.  Dkt. 2610-2 ¶ 11.

Ex. 5, 8/8/17 R. Kolodgy Dep. Tr. 93:11–94:17; Ex. 6, 9/1/17 D. Rubinfeld Dep. Tr. 143:1–144:21, 208:14–209:1; Ex. 7, 5/7/19 H. Frech Dep. Tr. 270:7–271:6.

## **CONCLUSION**[9]

The few objections to the Settlement Agreement have no basis in law or fact.  Because the settlement readily meets Rule 23's requirements of fairness, reasonableness, and adequacy, it should be finally approved.

---

[9] The Settlement Agreement's definition of "Parties" sweeps more broadly than intended when applied in the Non-Disparagement clause; Defendants have therefore agreed to limit that clause to named parties and their counsel.

Dated:  September 3, 2021

Respectfully submitted,

/s/ Daniel E. Laytin
David J. Zott, P.C.
Daniel E. Laytin, P.C.
Sarah J. Donnell
Christa C. Cottrell, P.C.
Zachary D. Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com
sarah.donnell@kirkland.com
christa.cottrell@kirkland.com
zachary.holmstead@kirkland.com

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendant Blue Cross Blue
Shield Association*

Craig A. Hoover
E. Desmond Hogan
Justin Bernick
Peter Bisio
Elizabeth Jose
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC  20004
Tel: (202) 637-5600
Fax: (202) 637-5910

Evan R. Chesler
Christine A. Varney
Karin A. DeMasi
Lauren R. Kennedy
David H. Korn
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
Tel: (212) 474-1000
Fax: (212) 474-3700

25

craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com
peter.bisio@hoganlovells.com
elizabeth.jose@hoganlovells.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC  29201
Tel: (803) 255-9421
Fax: (803) 256-7500
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action; Blue Cross and Blue Shield of North Carolina, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of*

echesler@cravath.com
cvarney@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com
dkorn@cravath.com

*Coordinating Counsel for Defendant Blue Cross and Blue Shield Association; Counsel for Defendants Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of North Carolina, Inc.; BlueCross BlueShield of Tennessee, Inc.; California Physicians' Service d/b/a Blue Shield of California; CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.; Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL  35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants Blue Cross Blue Shield Association; Health Care Service Corporation, an Illinois Mutual Legal*

*New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon; Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Triple-S Salud, Inc; Defendants Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; BlueCross BlueShield of Tennessee, Inc.*

Cavender C. Kimble
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action; Blue Cross and Blue Shield of North Carolina, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon*

*Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.; California Physicians' Service d/b/a Blue Shield of California; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii)*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL  35203
Tel: (205) 254-1000
Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com

Pamela B. Slate
HILL CARTER FRANCO COLE & BLACK, P.C.
425 South Perry Street
Montgomery, AL  36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA  98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

*Counsel for Defendants Premera Blue Cross, d/b/a Premera Blue Cross Blue Shield of Alaska*

Brian K. Norman
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX  75234
Tel: (214) 987-1745
Fax: (214) 521-9033
bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
RSA Tower, 27th Floor
11 North Water Street
Mobile, AL  36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

*Counsel for Defendants CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.*

R. David Kaufman
M. Patrick McDowell
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS  39201
Tel: (601) 948-3101
Fax: (601) 960-6902
dkaufman@brunini.com

*With Cravath, Swaine & Moore LLP, counsel for Defendant Blue Cross Blue Shield of Alabama*

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
hwitt@kirkland.com
jzeiger@kirkland.com

*Counsel for Defendants Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.; Highmark Western and Northeastern New York Inc.*

Jonathan M. Redgrave
REDGRAVE, LLP
14555 Avion Parkway, Suite 275
Chantilly, VA  20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark Defendants*

Todd M. Stenerson
Brian C. Hauser

pmcdowell@brunini.com

Cheri D. Green
BLUE CROSS & BLUE SHIELD OF
MISSISSIPPI, A MUTUAL INSURANCE
COMPANY
P.O. Box 1043
Jackson, MS  39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

*Counsel for Defendant Blue Cross & Blue
Shield of Mississippi, a Mutual Insurance
Company*

Michael A. Naranjo
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA  94104
Tel: (415) 984-9847
Fax: (415) 434-4507
mnaranjo@foley.com

Alan D. Rutenberg
Benjamin R. Dryden
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, DC  20007
Tel: (202) 672-5300
Fax: (202) 672-5399
arutenberg@foley.com
bdryden@foley.com

*Counsel for Defendant USAble Mutual
Insurance Company, d/b/a Arkansas Blue
Cross and Blue Shield*

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Jess R. Nix
Morgan B. Franz
SPOTSWOOD SANSOM & SANSBURY
LLC
Financial Center
505 20th Street North, Suite 700

Edmund Y. Saw
SHEARMAN & STERLING LLP
401 9th Street, N.W., Suite 800
Washington, DC  20004
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com
brian.hauser@shearman.com
edmund.saw@shearman.com

Sarah L. Cylkowski
Thomas J. Rheaume, Jr.
BODMAN PLC
1901 Saint Antoine Street
6th Floor at Ford Field
Detroit, MI  48226
Tel: (313) 259-7777
Fax: (734) 930-2494
scylkowski@bodmanlaw.com
trheaume@bodmanlaw.com

Andy P. Campbell
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL PARTNERS LLC
505 North 20th Street, Suite 1600
Birmingham, AL  35203
Tel: (205) 224-0750
Fax: (205) 224-8622
andy@campbellpartnerslaw.com
todd@campbellpartnerslaw.com
yawanna@campbellpartnerslaw.com

*Counsel for Defendant Blue Cross and
Blue Shield of Michigan*

John Briggs
Rachel Adcox
Jeny M. Maier
AXINN, VELTROP & HARKRIDER,
LLP
1901 L Street, N.W.
Washington, DC  20036
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com

Birmingham, AL  35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
jnix@spotswoodllc.com
mfranz@spotswoodllc.com

*Counsel for Defendant Capital BlueCross*

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL  35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendants Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; BlueCross BlueShield of Tennessee, Inc.*

Edward S. Bloomberg
John G. Schmidt Jr.
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY  14203
Tel: (716) 847-8400
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com

Stephen A. Walsh
WEINBERG, WHEELER, HUDGINS, GUNN & DIAL
100 Corporate Parkway
One Lake Level
Birmingham, AL  35242
Tel: (205) 572-4107
Fax: (205) 572-4199

radcox@axinn.com
jmaier@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, AL  35203
Tel: (205) 250-5000
Fax: (205) 250-5034
steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendant Independence Blue Cross*

Kathleen Taylor Sooy
Tracy A. Roman
Sarah Gilbert
Honor Costello
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com
sgilbert@crowell.com
hcostello@crowell.com

John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL  35203
Tel: (205) 581-0700
Fax: (205) 581-0799
jjohnson@lightfootlaw.com
bkappel@lightfootlaw.com

*Counsel for Defendants Blue Cross of Idaho Health Service, Inc.; Blue Cross and Blue Shield of Kansas, Inc.; Blue*

swalsh@wwhgd.com

*Counsel for Defendant, Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield, incorrectly sued as Excellus BlueCross BlueShield of New York*

*Cross and Blue Shield of Kansas City; Blue Cross and Blue Shield of Nebraska; Blue Cross Blue Shield of Arizona; Blue Cross Blue Shield of North Dakota; Blue Cross Blue Shield of Wyoming*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com

*Counsel for Defendants Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Triple-S Salud, Inc.*

31

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2021, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Daniel E. Laytin
Daniel E. Laytin