FILED
2021 Sep-03 PM 06:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 6

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF ALABAMA

 3                      SOUTHERN DIVISION

 4

 5   IN RE: BLUE CROSS BLUE SHIELD

 6   Master File No. 2:13-CV-20000-RDP

 7   ANTITRUST LITIGATION

 8   MDL NO. 2406

 9

10

11        VIDEO DEPOSITION OF DANIEL RUBINFELD, PH.D.

12             Boies, Schiller & Flexner LLP

13                  575 Lexington Avenue

14                      Seventh Floor

15                 New York, New York 10022

16                    September 1, 2017

17

18

19

20

21   REPORTED BY:  Laura H. Nichols

22                 Certified Realtime Reporter,

23                 Registered Professional

24                 Reporter and Notary Public

25
```

1   that -- refer you to a prior answer I gave this

2   morning, which is that I have not done a but for

3   analysis of exactly what the world would be like if

4   the exclusivity part of the -- exclusivity

5   restraint were eliminated.

6         Q.   (BY MR. LAYTIN:)  And you haven't

7   studied whether a primary service area model is

8   consistent with plans' local common law trademark

9   rights, correct?

10              MR. BROWN:  Object to the form.

11        A.    I have no opinion about the

12  development and changes in common law rights and

13  all of that.  I don't have any opinion about that.

14        Q.   (BY MR. LAYTIN:)  Understood.  How do

15  local best efforts restrict Blue-on-Blue

16  competition?

17        A.    Are you referring to a particular

18  part in my report or --

19        Q.    Paragraph 47 may be instructive for

20  you.

21        A.    Thank you.

22        Q.    It may not.  I don't guarantee it.

23        A.    Noted.  So could you repeat your

24  question again?

25        Q.    How do local best efforts rules

1   restrict Blue-on-Blue competition?
2           A.    I don't see the -- I don't see the
3   local best efforts restriction as focusing on
4   Blue-on-Blue competition.  I see that as more the
5   exclusivity restriction and, to some extent, the
6   national best efforts clause but less -- but not so
7   much the local best efforts clause.  I think that's
8   focused more on the -- it would be -- the effect
9   would be indirect.  It's more focused on the
10  development investment in the particular service
11  area.  And if you invest -- if you're induced to
12  invest very heavily in the local service area, that
13  could reduce your interest or incentive to invest
14  otherwise, but it would be kind of an indirect
15  effect.
16          Q.    By that, do I understand that you
17  believe that the local best efforts rules induce a
18  plan to invest heavily in its local service area?
19          A.    Not necessarily.  I think that's a
20  possibility but -- but it's not necessarily the
21  case.
22          Q.    It's a possibility, and you haven't
23  analyzed whether, in fact, it is true?
24          A.    By "it, "I take it you mean
25  whether -- what exactly the world would be like if

```
 1   this, yes.
 2            Q.     Is it fair to say that you and
 3   Professor Murphy have a disagreement about the
 4   extent to which you find the procompetitive
 5   justifications for ESA as compelling?
 6            A.     Yes.
 7            Q.     Best efforts, I believe, comes after
 8   BlueCard, and it is on Page 31.  Do you see
 9   Section C, the "Best Efforts Rules Provide
10   Incentives for Plans to Invest in the Blue Brand
11   and System"?
12            A.     I do see that.
13            Q.     And you accept that investing in the
14   brand is a procompetitive benefit, a valid
15   procompetitive benefit in evaluating restraints?
16                   MR. BROWN:  Object to the form.
17            A.     I agree -- I agree if one is doing a
18   rule of reason analysis, that from a theoretical
19   point of view one should consider best efforts --
20   I'm sorry, the investment that might be created by
21   best efforts.  In other words, I agree with the
22   theoretical construct that seems to underlie what
23   Professor Murphy is doing here if one were doing a
24   rule of reason analysis.  But it is a rule of
25   reason analysis, A.  And B, it is a theoretical
```

```
 1   construct.
 2        Q.    (BY MR. LAYTIN:)  Evaluating
 3   potential efficiency enhancing aspects of
 4   challenged restraints is part of the brief
 5   examination that is required to apply the per se
 6   rule, right?
 7              MR. BROWN:  Object to the form.
 8              MR. MARTIN:  Objection.
 9        A.    No, I don't agree with the way you
10   stated it.  I would just say in the abstract,
11   without necessarily characterizing Professor
12   Murphy's study, that simply pointing to theoretical
13   arguments about what might be a procompetitive
14   benefit would not for me be enough as an economist
15   for me to say that rule of reason should be
16   applied.
17        Q.    (BY MR. LAYTIN:)  I understand the
18   theoretical point versus proven point, established
19   through evidence point.  I understand that
20   distinction.
21              But you agree with me that an
22   agreement that would otherwise be per se illegal,
23   of the type that would be per se illegal but that
24   also would achieve procompetitive benefits from an
25   efficiency enhancing integration with economic
```