# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This Document Relates to**<br>**Provider Track Cases** |

# PROVIDER PLAINTIFFS' REPLY IN SUPPORT OF THEIR
# MOTION FOR PARTIAL SUMMARY JUDGMENT ON
# DEFENDANTS' CLAIM TO COMMON-LAW TRADEMARK RIGHTS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

LIST OF CITATIONS AND ABBREVIATIONS ............................................................... iv

RESPONSE TO DEFENDANTS' STATEMENT OF ADDITIONAL
     RELEVANT FACTS .................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

    I.    The Blues' Opposition Confirms That the St. Paul and Buffalo Plans Engaged
        in Naked Licensing ........................................................................................... 2

    II.   The Blues Have Already Admitted That They Were Vertical Licensees ................ 6

CONCLUSION ..................................................................................................................... 10

## TABLE OF AUTHORITIES

**Cases**

*Avirgan v. Hull*,
    932 F.2d 1572 (11th Cir. 1991) ................................................................................................ 9

*Barcamerica International USA Trust, Inc. v. Tyfield Importers, Inc.*,
    289 F.3d 589 (9th Cir. 2002) .................................................................................................... 5

*Board of Regents of the University System of Georgia v. Buzas Baseball, Inc.*,
    176 F. Supp. 1039 (N.D. Ga. 2001) .......................................................................................... 3

*Chapin-Sacks Mfg. Co. v. Hendler Creamery Co.*,
    254 F. 553 (4th Cir. 1918) ........................................................................................................ 4

*Esso, Inc. v. Standard Oil Co.*,
    98 F.2d 1 (8th Cir. 1938) .......................................................................................................... 4

*Gen. Baking Co. v. Goldblatt Bros.*,
    90 F.2d 241 (7th Cir. 1937) ...................................................................................................... 4

*Griesedieck W. Brewery Co. v. Peoples Brewing Co.*,
    149 F.2d 1019 (8th Cir. 1945) .................................................................................................. 4

*Hanover Star Milling Co. v. Metcalf*,
    240 U.S. 403 (1916) ................................................................................................................. 4

*Hemmeter Cigar Co. v. Cong. Cigar Co.*,
    118 F.2d 64 (6th Cir. 1941) ...................................................................................................... 4

*KFC Corp. v. Diversified Packaging Corp.*,
    549 F.2d 368 (5th Cir. 1977) .................................................................................................... 4

*Movie Mania Metro, Inc. v. GZ DVD's Inc.*,
    857 N.W.2d 677 (Mich. Ct. App. 2014) ................................................................................... 3

*Nat'l Grocery Co. v. Nat'l Stores Corp.*,
    123 A. 740 (N.J. Ch. 1924) ...................................................................................................... 4

*Neo4j v. PureThink, LLC*,
    480 F. Supp. 3d 1071 (N.D. Cal. 2020) .................................................................................... 3

*Ojeda v. Louisville Ladder Inc.*,
    410 F. App'x 213 (11th Cir. 2010) ........................................................................................... 9

*Pike v. Ruby Foo's Den, Inc., of Md.*,
    232 F.2d 683 (D.C. Cir. 1956) .................................................................................................. 9

*Secular Organizations for Sobriety, Inc. v. Ullrich*,
  213 F.3d 1125 (9th Cir. 2000) ................................................................................................ 8

*Sweetheart Plastics, Inc. v. Detroit Forming Co.*,
  743 F.2d 1039 (4th Cir. 1984) ................................................................................................ 4

*Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*,
  889 F.2d 1018 (11th Cir. 1989) .............................................................................................. 4

*Tana v. Dantanna's*,
  611 F.3d 767 (11th Cir. 2010) ................................................................................................ 4

*Thomas Pride Mills, Inc. v. Monsanto Co.*,
  1967 WL 7489 (N.D. Ga. June 14, 1967) ............................................................................... 3

*TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*,
  102 F. Supp. 3d 1321 (S.D. Fla. 2015) ............................................................................. 3, 8

*United Drug Co. v. Theodore Rectanus Co.*,
  248 U.S. 90 (1918) .................................................................................................................. 4

**Statutes**

15 U.S.C. § 1055 ............................................................................................................................ 8

15 U.S.C. § 1064(3) ....................................................................................................................... 8

**Other Authorities**

1 Harry D. Nims, The Law of Unfair Competition and Trade-Marks,
  1264–65 (4th ed. 1947) .......................................................................................................... 5

3 McCarthy on Trademarks and Unfair Competition
  § 18:48 (5th ed.) ......................................................................................................... 5, 8, 10

XI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law
  ¶ 1907 (3d ed. 2011) ............................................................................................................... 1

**Rules**

Fed. R. Evid. 701(c) ....................................................................................................................... 9

## LIST OF CITATIONS AND ABBREVIATIONS

| Dkt. # | Document | Citation |
|---|---|---|
| 2749 | Provider Plaintiffs' Memorandum of Law In Support of Motion for Partial Summary Judgment on Defendants' Claim to Common-Law Trademark Rights | Motion |
| 2800 | Defendants' Opposition to Provider Plaintiffs' Motion for Partial Summary Judgment on Defendants' Common-Law Trademark Rights | Opposition |

Before diving back into the weeds of the common law of trademarks, let's remind ourselves why the scope of the Blues' rights in their trademarks is at issue. The Blues claim that their agreements to divide the nation into exclusive territories cannot be unlawful *per se* because they merely "codify existing common-law trademark rights," including "the right to prevent others from using the same mark in the same location." Doc. No. 2728 at 8, 5 (cleaned up). So BCBS-AL's exclusive right to use the Blue Marks in Alabama under the Blues' agreements, the Blues contend, goes no farther than the same exclusive right it developed at common law by using the Blue Marks in Alabama in the 1930s and 1940s. Putting aside that this logic conflicts with basic principles of antitrust law,[1] it rests on a fundamentally mistaken premise: that BCBS-AL developed the right to exclude others from using the Blue Marks in its territory of use. Because that use was undisputedly undertaken with the permission of the first users of the Marks, any common-law rights BCBS-AL and other the Blues developed were non-exclusive; they were never entitled to be the only user of the Blue Marks in their territories. *See* Doc. No. 2063 (Standard of Review Opinion) ("And, not all common law marks were exclusive."). Whether the reason was abandonment of the Blue Marks, the nature of the Blues' licenses, or both, the result is the same: no Blue Plan, other than the St. Paul and Buffalo Plans, ever had a common-law right to exclude others from using the Blue Marks in their own territory.

**RESPONSE TO DEFENDANTS' STATEMENT OF ADDITIONAL RELEVANT FACTS**

The Providers do not dispute Defendants' Additional Facts 1 and 2, although these facts are irrelevant because the St. Paul and Buffalo Plans abandoned the Blue Marks regardless of where

---

[1] Doc. No. 204 (Motion to Dismiss Opinion) at 8 n.5 ("[E]ven if the alleged market allocation agreement merely enforced pre-existing trademarks …, that fact does not necessarily insulate the agreement from antitrust analysis. The Supreme Court has been clear on this issue in its *Sealy* decision."); XI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1907 (3d ed. 2011) (a defendant cannot claim "that collusion or market division is necessary to prevent firms from violating one another's intellectual property rights, or to discipline others who are violating them").

1

they used them or allowed and encouraged others to use them. The Providers dispute the remaining facts as follows:

3. **Disputed.** At common law, a trademark owner's grant of permission to another to use the mark was a license. *See* Part I below. The Blues do not dispute that the St. Paul and Buffalo Plans "'acquiesced in, and even encouraged, other Plans to use the Cross and Shield Marks.'" Motion at 1–2 (quoting this Court's opinion at Doc. No. 2063 at 5–6); Opposition at 2 (responding to this fact with additional information but not disputing it). Therefore, even if the St. Paul and Buffalo Plans never executed a formal license agreement, they still licensed the Blue Marks to other Blue Plans.

4. **Disputed.** The Providers do not dispute that "[i]n the 1930s and 1940s, Plans other than St. Paul and Buffalo began using the Blue Cross and/or Blue Shield Marks in distinct geographies around the country." The Providers dispute that those Plans gained an exclusive right at common law to use the Marks in those geographies, as the common law made those Plans licensees at best.

## ARGUMENT

### I. The Blues' Opposition Confirms That the St. Paul and Buffalo Plans Engaged in Naked Licensing.

The Blues do not dispute that the St. Paul and Buffalo Plans permitted, and even encouraged, other Plans to use the Blue Cross and Blue Shield Marks. Motion at 1–2 (Providers' Fact 2); Opposition at 2 (responding to this fact with additional information but not disputing it). Nor do the Blues dispute that the St. Paul and Buffalo Plans never controlled the quality of services provided by other users of the Marks. Motion at 2 (Providers' Fact 3); Opposition at 3 (responding to this fact with argument but not disputing it).

These undisputed facts alone establish that the St. Paul and Buffalo Plans engaged in naked licensing, destroying the ability of the Blue Marks to serve the functions of a trademark: "to

2

indicate a single source of origin of the articles to which it refers and to offer assurance to ultimate consumers that articles so labeled will conform to quality standards established and, when licensed to others, controlled by the trademark proprietor." *Thomas Pride Mills, Inc. v. Monsanto Co.*, 1967 WL 7489, at *4 (N.D. Ga. June 14, 1967). Shortly after they were created, the Blue Marks no longer indicated a single source of origin, nor did the services offered under those marks conform to quality standards controlled by the trademark proprietor. Therefore, the Blue Marks were not valid at common law. *Movie Mania Metro, Inc. v. GZ DVD's Inc.*, 857 N.W.2d 677, 683 (Mich. Ct. App. 2014) ("In the parlance of trademark law, naked licensing destroys a mark's 'distinctiveness' and renders it 'not valid' as a trademark.").

The Blues' first response to this straightforward conclusion is that the St. Paul and Buffalo Plans had no license agreements with the other Blue Plans. Opposition at 8. Although the Blues never explain this assertion, they seem to assume that the existence of a license depends on some sort of formality. This is incorrect. A license may be implied by the parties' course of conduct, as the Blues acknowledge. Opposition at 16 (citing *TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*, 102 F. Supp. 3d 1321, 1326–27 (S.D. Fla. 2015)). A trademark owner's permission to use the mark without any formalities or quality control is simply naked licensing on an "audacious scale." *Movie Mania Metro*, 857 N.W.2d at 690 (plaintiff allowed defendant to use its mark and "did not require him to sign a license agreement" or set any standards). The Blues cite several cases for the proposition that there can be no naked licensing without a license, but in each one, the trademark owner did not authorize, much less encourage, others' use of the mark.[2] Here, the St. Paul and Buffalo Plans undisputedly did.

---

[2] The Blues incorrectly imply that the decision in *Neo4j v. PureThink, LLC*, 480 F. Supp. 3d 1071 (N.D. Cal. 2020), turned on the lack of an allegation of an express trademark license. In fact, the "set of allegations" that did not amount to naked licensing were that the plaintiff explicitly denied permission to use its trademarks, and "unauthorized use of the trademark" was at issue. *Id.* at 1077. In *Board of Regents of the University System of Georgia v. Buzas Baseball, Inc.*, the plaintiff "was

The Blues also claim that because trademark rights are limited to the owner's area of use, the St. Paul and Buffalo Plans had no right or obligation to control use of the Blue Marks in other geographies. Opposition at 9. But when a senior user licenses its mark's use, as the St. Paul and Buffalo Plans did, "[c]ourts have long imposed upon trademark licensors a duty to oversee the quality of licensees' products." *KFC Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977). In the cases the Blues cite, the junior users were not licensees, naked or otherwise. Each junior user had developed exclusive rights to the mark at common law because it was a good-faith remote user,[3] because the senior user had conveyed those rights to the junior user,[4] or because the senior user had waived its right to challenge the junior user's infringing use.[5] In none of these cases did the junior user have the senior user's permission and encouragement (*i.e.*, a license) to use the senior user's marks in a nearby area.

Given these basic principles, the Blues are wrong to say that the Providers have assumed that "that the St. Paul and Buffalo Plans acquired nationwide rights to use and police use of the Marks outside their own areas of use." Opposition at 9. If a health plan far away from Minnesota or

---

either unaware of or has tolerated [others' use of the marks] for its own reasons," unlike the Blue Plans, who permitted and encouraged such use. 176 F. Supp. 2d 1039, 1349 (N.D. Ga. 2001). And in *Sweetheart Plastics, Inc. v. Detroit Forming Co.*, the plaintiff never gave the defendant permission to use its trademark, and sued the defendant for infringement. 743 F.2d 1039, 1042 (4th Cir. 1984). The plaintiff's failure to sue a different infringer (who also did not have permission) did not constitute abandonment. *Id.* at 1047.

[3] *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916); *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1918); *Tana v. Dantanna's*, 611 F.3d 767 (11th Cir. 2010); *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018 (11th Cir. 1989); *Esso, Inc. v. Standard Oil Co.*, 98 F.2d 1 (8th Cir. 1938); *Gen. Baking Co. v. Goldblatt Bros.*, 90 F.2d 241 (7th Cir. 1937); *Hemmeter Cigar Co. v. Cong. Cigar Co.*, 118 F.2d 64 (6th Cir. 1941); *Griesedieck W. Brewery Co. v. Peoples Brewing Co.*, 149 F.2d 1019 (8th Cir. 1945).

[4] *KFC Corp. v. Diversified Packaging Corp.*, 549 F.2d 368 (5th Cir. 1977).

[5] *Chapin-Sacks Mfg. Co. v. Hendler Creamery Co.*, 254 F. 553 (4th Cir. 1918). In this case, the court held that the senior user had waived the right to seek damages from the infringer, but might be entitled to an injunction against further infringement. *Id.* at 557–58. Therefore, the infringer's rights were not exclusive, even within its own territory of use. In another of the Blues' cases, there was no trademark involved. *Nat'l Grocery Co. v. Nat'l Stores Corp.*, 123 A. 740, 742 (N.J. Ch. 1924) ("Had the grievance of the complainant been the pirating of a trade-mark, a very different situation would be disclosed.").

New York had begun to use a "Blue Cross" or "Blue Shield" mark without knowledge of the St. Paul and Buffalo Plans' marks, the St. Paul and Buffalo Plans could not have policed or stopped that use. *See* Motion at 5–6 (describing the good-faith remote user doctrine). But that is not what happened here; the St. Paul and Buffalo Plans permitted and encouraged use of the marks close to their own territories. A senior user who gives permission to a junior user, no matter where the junior user is located, takes on the duty to control the quality of the junior user's product, on penalty of abandonment. *KFC*, 549 F.2d at 387. If a senior user could *never* police the use of its marks outside its own areas of use, franchising could not exist.[6]

Next, the Blues argue that even if the St. Paul and Buffalo Plans had a duty to "police unlicensed uses of the Blue Marks in other parts of the country, their failure to do so would still not result in abandonment." Opposition at 12. As with their other arguments, this one presumes incorrectly that the other Plans' use was "unlicensed." Other Blues Plans, however, had a naked license, because it is undisputed that they used the Marks with permission and encouragement and without quality control. An example of abandonment under these circumstances can be found in *Barcamerica International USA Trust, Inc. v. Tyfield Importers, Inc.*, 289 F.3d 589 (9th Cir. 2002). In that case, the owner of the "Leonardo Da Vinci" trademark for wine granted a vintner an exclusive license to use that mark in the United States, but did not exercise adequate quality control. *Id.* at 592. A distributor of Italian wine also called "Leonardo Da Vinci" successfully argued that the trademark owner had abandoned the mark through naked licensing, and therefore could not prevent the distributor from selling its wine in the United States. *Id.* at 595–98. Similarly,

---

[6] In a footnote, the Blues assert that "trademark abandonment was 'purely a question of intent.'" Opposition at 12 n.2 (quoting 1 Harry D. Nims, The Law of Unfair Competition and Trade-Marks, 1264–65 (4th ed. 1947) (Nims)). The Blues' own treatise explains that this principle does not apply to naked licensing: "A lease or license of a mark or name apart from the business with which it is used, constitutes an abandonment of the mark and rightfully so." Nims at 123; *see also* 3 McCarthy on Trademarks and Unfair Competition § 18:48 (5th ed.) (McCarthy) ("Abandonment because of uncontrolled licensing is purely an 'involuntary' forfeiture of trademark rights, for the mark owner probably has no subjective intent to abandon the mark.").

5

any health plan could have entered, say, Wisconsin, under the name "Blue Cross," and neither the St. Paul Plan nor its naked licensee in Wisconsin could have stopped it. In other words, the Blue Plans who used the "Blue Cross" mark subsequent to the St. Paul Plan had no common-law right to exclusive use of that mark.

Finally, the Blues take the Providers to task for discussing the "good faith remote user" doctrine and concurrent use, which have "nothing to do with trademark abandonment." Opposition at 13. The Providers discussed these doctrines because the Blues have relied on cases applying them for the last eight years. *E.g.*, Doc. No. 120 (Motion to Dismiss) at 23; Doc. No. 1432 (Opposition to Plaintiffs' Motions for Partial Summary Judgment) at 20–21. Even in their latest brief, they respond to the Providers' claims of abandonment with a slew of cases involving good-faith remote users. *See supra* p. 4 & n.2. Thus, the Blues are describing their own authority as irrelevant to trademark abandonment. To be clear, the Providers are not arguing that "the inapplicability of the 'good faith remote user' doctrine results in the owner of a trademark abandoning its rights to the mark in its own territory of use." Opposition at 14. The Providers are arguing that the Blues' examples of multiple users developing common-law rights to the same trademark are nearly all in cases involving the "good-faith remote user" doctrine or concurrent use, and that the Blues' undisputed history of using the Blue Marks with knowledge of each other's use precludes them from invoking those doctrines. Motion at 5–6. That is not the reason the Marks were abandoned; the reason is the St. Paul and Buffalo Plans' naked licensing of the marks.

## II. The Blues Have Already Admitted That They Were Vertical Licensees.

In their very first motion to dismiss, the Blues claimed that their "rights to local geographic exclusivity [were] acquired either independently by operation of trademark law, or vertically through *lawful licenses from the American Hospital Association (AHA) or the American Medical Association (AMA)*." Doc. No. 120 at 2 (emphasis added). BCBSA's Deputy General Counsel for

6

Brand, serving as a corporate representative, testified in this case that the AHA's approval program for Blue Cross Plans "constitute[d] a license agreement" no later than 1939, and that the approval of Blue Shield Plans by medical societies in the 1940s was "tantamount to a license agreement." Doc. No. 1436-11 at 40:10–41:12, 129:7–130:7. In 1947 and 1950, the Executive Director of the AHA signed a sworn declaration that the AHA was the owner of the Blue Cross mark, and that no one else had the right to use the mark except under the AHA's control. Doc. No. 1353-28 at 4–5, 33. In 1951, the President of Blue Shield Medical Care Plans (BSMCP) signed a sworn declaration that BSMCP was the owner of the Blue Shield mark, no one else had the right to authorize its use, and no one but its members had the right to use it. Doc. No. 1353-46 at 11–12.[7] When they moved for summary judgment on the standard of review, the Blues described how approval from the AHA and AMA entitled plans to use the Blue Cross and Blue Shield Marks. Doc. No. 1349 at 4. And when the Blues opposed the Plaintiffs' cross-motion, they said that "the early license agreements [with the AHA and AMA] were undisputedly vertical." Doc. No. 1349 at 41. At oral argument on these motions, the Blues told the Court that the Blue system is "a combination of the common law trademarks, vertical licensing, approval by standard setting organizations that are highly respected like the AHA and the AMA." Doc. No. 1613 (10/5/17 Tr.) at 100:9–12.

Now, it seems, the Blues are flabbergasted by the Providers' claim that the Blue Plans' rights to use the Blue Marks could have derived from vertical licenses from the AHA and AMA—the Blues' own litigating position for the entirety of this case, as well as the sworn testimony of BCBSA's corporate representative. Opposition at 16–20. The Blues even question whether the national organizations (the AHA and AMA/AMCP/BSMCP) owned the Blue Marks prior to the 1954 Blue Cross agreement and the 1952 Blue Shield agreement, when those organizations had

---

[7] BSMCP was the renamed Associated Medical Care Plans (AMCP), an organization incorporated by the AMA to administer its approval program for Blue Shield Plans. Doc. No. 1349 (Blues' Standard of Review Motion) at 6; Doc. No. 2063 (Opinion on Standard of Review) at 3.

previously sworn sole ownership in their applications to the U.S. Patent Office.[8] It is too late in the game for the Blues to repudiate their theory of the case, especially given the undisputed evidence that before 1954 (for Blue Cross) and 1952 (for Blue Shield) the Blue Plans used the Blue Marks with the permission of the national organizations under conditions they set—the definition of a license. *TracFone Wireless*, 102 F. Supp. 3d at 1327 ("A license is a limited grant of authority to use a trademark in a defined way.") (internal quotation marks omitted).[9]

The Blues then list two pages of purported evidence that "other Blues—in addition to St. Paul and Buffalo—developed rights to the Marks at common law." Opposition at 18–19. But the Providers have not disputed that other Blues had the common-law right to use the Marks. They did not, however, have an independently developed right to exclude others because they were licensees. For example, the AHA, which granted permission to Hospital Service Corporation of Alabama (HSCA) to use the Blue Cross mark, could have authorized a second Blue Cross plan in Alabama in the 1940s. Doc. No. 2063 (Standard of Review Opinion) at 39 (exclusive service areas were not a condition of AHA or AMA certification in the 1930s and 1940s). Even if the AHA had given HSCA the exclusive right to use the Blue Cross mark in Alabama, HSCA had no "independent" right to exclusivity because the AHA could revoke that right at will. McCarthy § 18:52 ("The licensee of a trademark is in the position of a renter of an apartment, who does not acquire real estate ownership rights, no matter how long the tenancy."). None of the Blues'

---

[8] If the AHA and BSMCP's sworn assertions of ownership were false, the Blues' federal trademark registrations are subject to cancellation. 15 U.S.C. § 1064(3).

[9] The Blues' reliance on *Secular Organizations for Sobriety, Inc. v. Ullrich*, 213 F.3d 1125 (9th Cir. 2000), reinforces that the Blue Plans used the marks under an implied license. In that case, the plaintiff could not show ownership of the mark at issue because it had not used the mark in commerce prior to the defendant's use, and the defendant was not a "related company" under the Lanham Act because there was virtually no connection between the two organizations. *Id.* at 1130–31 (citing 15 U.S.C. § 1055 (use controlled by trademark applicant inures to the applicant's benefit)). Here, the Blues have conceded that the Blue Plans used the Blue Marks under the national organizations' consent and control. Doc. No. 1432 (Blues' Standard of Review Opposition) at 7.

evidence contradicts this principle. Moreover, the statements in the Blues' documents and depositions about the scope of the marks' protection under common law consist of inadmissible legal conclusions and thus cannot form the basis for a genuine dispute of fact.[10] The undisputed facts of the Blue's early development (as opposed to the Blues' legal conclusions about those facts) are consistent with what the Blues up until this summer consistently admitted: the Blue Plans operated under a vertical license from the national organizations.

Perhaps the Blues are making a more limited claim: that the Blue Plans that started using the marks before the beginning of the AHA and AMA's certification programs had developed independent exclusive rights to the marks in their territories. That argument is irrelevant to the prioritized proceeding, as HSCA undisputedly began using the marks in Alabama after those certification programs began.[11] As to the minority of Blue Plans whose predecessors began using the marks this early, the naked licensing problem rears its head again. These Plans could not have developed independent exclusive rights as good-faith remote users. *Pike v. Ruby Foo's Den, Inc., of Md.*, 232 F.2d 683, 686 (D.C. Cir. 1956) ("The Federal cases are virtually unanimous against a knowing junior user."). Instead, they necessarily would have been naked licensees of the St. Paul and Buffalo Plans, and thus would not have had independent exclusive rights. *See supra* Part I. By the time the national organizations began to control the use of the Blue Marks, the best those plans

---

[10] *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991) (a party opposing summary judgment "cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial") (citation omitted). Lay witnesses may not offer legal conclusions. *Ojeda v. Louisville Ladder Inc.*, 410 F. App'x 213, 215 (11th Cir. 2010) (citing Fed. R. Evid. 701(c)).

[11] The Blues point out that HSCA began using the Blue Cross Mark three months before the AHA published the first version of its standards that referred to the use of the Blue Cross Mark. Opposition at 5. But regardless of when that version of the standards was first made available to the public, the Blues do not dispute that HSCA always used the Blue Cross Mark (which included the AHA's logo at the time) subject to the AHA's approval program. The Providers do not understand the Blues to be taking the factually absurd and legally erroneous position that HSCA pirated the AHA's logo for a few months, and somehow gained an exclusive common-law right to the Blue Cross Mark through its infringement.

9

could have hoped for was to be considered the national organizations' licensees. That would have given them some measure of protection, but still not an independent right to exclude others from their territory; such a right would have remained with the national organizations. McCarthy § 18:52 ("A licensee's use inures to the benefit of the licensor-owner of the mark and the licensee acquires no ownership rights in the mark itself.").

## CONCLUSION

The Court should grant partial summary judgment that the Blue Plans other than the St. Paul and Buffalo Plans never gained independent common-law exclusive rights to the Blue Marks, either because the Marks were abandoned or because the Blue Plans were licensees.

Dated: September 20, 2021                                             Respectfully submitted,

*/s/ Edith M. Kallas*                                                       */s/ Joe R. Whatley, Jr.*
Edith M. Kallas – ***Co-Lead Counsel***               Joe R. Whatley, Jr. – ***Co-Lead Counsel***
WHATLEY KALLAS, LLP                                          W. Tucker Brown
152 West 57th Street                                                  WHATLEY KALLAS, LLP
41st Floor                                                                      2001 Park Place North
New York, NY 10019                                                1000 Park Place Tower
Tel: (212) 447-7060                                                   Birmingham, AL 35203
Fax: (800) 922-4851                                                  Tel: (205) 488-1200
Email: ekallas@whatleykallas.com                         Fax: (800) 922-4851
                                                                                    Email: jwhatley@whatleykallas.com
                                                                                               tbrown@whatleykallas.com


Patrick J. Sheehan                                                    Deborah J. Winegard
WHATLEY KALLAS, LLP                                       WHATLEY KALLAS, LLP
101 Federal Street                                                    1068 Virginia Avenue, NE
19th Floor                                                                   Atlanta, GA 30306
Boston, MA 10019                                                  Tel: (404) 607-8222
Tel: (617) 573-5118                                                 Fax: (404) 607-8451
Fax: (617) 371-2950                                                Email: dwinegard@whatleykallas.com
Email: psheehan@whatleykallas.com

Henry C. Quillen
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH  03801
Tel:  (603) 294-1591
Fax:  (800) 922-4851
Email: hquillen@whatleykallas.com


Charles Clinton Hunter
HAYES HUNTER PC
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (281) 768-4731
Fax: (713) 583-7047
Email: chunter@hayeshunterlaw.com


Dennis Pantazis – *Plaintiffs' Steering Committee*
Brian Clark – *Discovery Committee*
WIGGINS CHILDS PANTAZIS FISHER
 GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel:  (205) 314-0500
Fax:  (205) 254-1500
Email: dgp@wcqp.com
          bclark@wcqp.com


Dennis C. Reich – *Chair, Damages Committee*
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (713) 622-7271
Fax:  (713) 623-8724
Email:  dreich@rbfirm.net

E. Kirk Wood, Jr. – *Local Facilitating Counsel*
WOOD LAW FIRM LLC
P. O. Box 382434
Birmingham, AL 35238
Tel:  (205) 612-0243
Fax:  (205) 705-1223
Email: ekirkwood1@bellsouth.net


Aaron S. Podhurst – *Plaintiffs' Steering Committee*
Peter Prieto – *Chair, Expert Committee*
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue
Suite 2300
Miami, FL  33131
Tel:  (305) 358-2800
Fax:  (305) 358-2382
Email: apodhurst@podhurst.com
           pprieto@podhurst.com


U.W. Clemon – *Plaintiffs' Steering Committee*
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL  35222
Tel: (205) 837-2898
Email: clemonu@bellsouth.net


J. Mark White – *Litigation Committee*
Augusta S. Dowd – *Chair, Litigation Committee*
Linda G. Flippo – *Discovery Committee*
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel:  (205) 323-1888
Fax:  (205) 323-8907
Email: mwhite@whitearnolddowd.com
           adowd@whitearnolddowd.com
           lflippo@whitearnolddowd.com

11

Nicholas B. Roth – *Chair, Discovery Committee*
Julia Smeds Roth – *Discovery Committee*
EYSTER KEY TUBB ROTH MIDDLETON
  & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email: nbroth@eysterkey.com
       jroth@eysterkey.com

David A. Balto – *Expert Committee*
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email: david.balto@dcantitrustlaw.com

Joey K. James – *Litigation Committee*
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel:  (256) 764-0095
Fax:  (256) 767-5705
Email: joey@bunchandjames.com

Richard S. Frankowski – *Discovery Committee*
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL  35233
Tel:  (205) 390-0399
Fax: (205) 390-1001
Email: richard@frankowskifirm.com

John C. Davis – *Written Submissions Committee*
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel:  (850) 222-4770
Email: john@johndavislaw.net

Van Bunch – *Chair, Class Certification Committee*
BONNETT FAIRBOURN FRIEDMAN &
  BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel:  (602) 274-1100
Fax:  (602) 274-1199
Email: vbunch@bffb.com

Robert J. Axelrod – *Chair, Written Submissions Committee*
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
Tel: (646) 448-5263
Fax: (212) 840-8560
Email: rjaxelrod@axelrodllp.com

W. Daniel Miles, III – *Written Submissions Committee*
BEASLEY ALLEN CROW METHVIN PORTIS
  & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel:  (800) 898-2034
Fax:  (334) 954-7555
Email: dee.miles@beasleyallen.com

Michael C. Dodge – *Expert Committee*
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel:  (972) 419-7172
Email: mdodge@gpm-law.com

Michael E. Gurley, Jr. – *Discovery Committee*
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel:  (205) 908-6512
Email: mgurleyjr@yahoo.com

12

Mark K. Gray – *Discovery Committee*
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel:  (502) 805-1800
Fax:  (502) 618-4059
Email: mgray@grayandwhitelaw.com

Stephen M. Hansen – *Class Certification Committee*
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel:  (253) 302-5955
Fax:  (253) 301-1147
Email: steve@stephenmhansenlaw.com

Harley S. Tropin – *Damages Committee*
Javier A. Lopez – *Discovery Committee*
KOZYAK TROPIN &
 THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email: hst@kttlaw.com
           jal@kttlaw.com

C. Wes Pittman – *Settlement Committee*
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel:  (850) 784-9000
Fax:  (850) 763-6787
Email: wes@pittmanfirm.com

Lynn W. Jinks, III – *Expert Committee*
Christina D. Crow – *Discovery Committee*
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel:  (334) 738-4225
Fax:  (334) 738-4229
Email: ljinks@jinkslaw.com
           ccrow@jinkslaw.com

Myron C. Penn – *Discovery Committee*
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel:  (334) 738-4486
Fax:  (334) 738-4432
Email: myronpenn28@hotmail.com

J. Preston Strom, Jr. – *Litigation Committee*
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel:  (803) 252-4800
Fax:  (803) 252-4801
Email: petestrom@stromlaw.com

Thomas V. Bender – *Discovery Committee*
Dirk L. Hubbard
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Tel:  (816) 421-0700
Email:  tbender@hab-law.com
           dhubbard@hab-law.com

Robert B. Roden – ***Litigation Committee***
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel:  (205) 933-8383
Fax:  (205) 933-8386
Email: rroden@shelbyroden.com

Gregory S. Cusimano – ***Litigation Committee***
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL  35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email:  greg@alalawyers.net

Gary E. Mason – ***Class Certification Committee***
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel:  (202) 429-2290
Fax:  (202) 640-1160
Email: gmason@wbmllp.com

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel:  (320) 289-2363
Fax:  (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Michael L. Murphy – ***Discovery Committee***
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC  20006
Tel:  (202) 463-2101
Fax: (202) 463-2103
Email: mmurphy@baileyglasser.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
Email: alamb@archielamb.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel:  (719) 471-1984
Fax:  (719) 577-4356
Email: lance@searsassociates.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA  51101
Tel:  (712) 234-3030
Fax:  (712) 234-3034
Email:  paul@lundberglawfirm.com

Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK  99501
Tel:  (907) 277-5400
Fax:  (907) 277-9896
Email:  Jessica@dillonfindley.com
            Ray@dillonfindley.com
            Molly@dillonfindley.com

Cynthia C. Moser
HEIDMAN LAW FIRM
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA  51101
Tel:  (712) 255-8838
Fax  (712) 258-6714
Email:  Cynthia.Moser@heidmanlaw.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com