FILED
2021 Sep-24  AM 11:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT

# D

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION** | § § § § § § | **Master File No. 2:13-CV-20000-RDP** |
| **(MDL NO.: 2406)** | | |

---

**EXPERT DECLARATION OF
DR. JOSEPH R. MASON**

**SEPTEMBER 3, 2021**

---



**TABLE OF CONTENTS**

                                                                                            **Page**

I.      Scope and Assignment ........................................................................................... 1

II.     Credentials and Compensation............................................................................... 2

III.    Information Considered ........................................................................................... 3

IV.     Summary of Opinions.............................................................................................. 3

V.      Settlement Background ........................................................................................... 4

VI.     Background on Health Insurance Plans .................................................................. 6

        A.      Overview of the markets for self-funded and fully-insured plans ................... 6

        B.      Relative profitability of self-funded and fully-insured plans .......................... 7

        C.      Evidence of substitution .................................................................................. 8

VII.    Assessment of Settlement Allocation..................................................................... 9

        A.      Uncertainty regarding litigation outcomes with regard to the Self-Funded Sub-Class ..... 10

        B.      Financial comparison of the fully-insured and administrative services markets .............. 11

                1)      Fully-Insured and ASO gross revenue................................................. 12

                2)      Fully-Insured and ASO net revenue .................................................... 12

                3)      Comparison of operating gain............................................................. 13

                4)      Comparison of changes in revenue per member associated with administrative
                        services and risk transfer ................................................................... 14

        C.      Summary of settlement allocation calculations ............................................ 15

        D.      Responses to objections regarding the Settlement Allocation ...................... 16

VIII.   Evaluation of Injunctive Relief............................................................................. 18

        A.      Elimination of National Best Efforts............................................................. 18

        B.      Second Blue Bidder ...................................................................................... 18

        C.      Procompetitive effects of the elimination of NBE together with the Second Blue Bidder . 19

        D.      Responses to objections regarding the injunctive relief................................. 20





| 7250 Dallas Parkway | 1000 Louisiana Street | 405 Lexington Avenue |
| Suite 200 | Suite 1150 | Floor 9 |
| Plano, Texas 75024 | Houston, Texas 77002 | New York, New York 10174 |
| +1.972.377.0300 | +1.713.457.3125 | +1.212.364.1926 |

Re: *In re Blue Cross Blue Shield Antitrust Litigation*, U.S. District Court, Northern District of Alabama, Southern Division, Master File No. 2:13-CV-20000-RDP

## I.     Scope and Assignment

1.      The above-styled case is a multidistrict class action litigation centralized in the Northern District of Alabama (the "Subscriber Track Matter") against Blue Cross Blue Shield Association ("BCBSA") and the entities ("Licensees" or "Blues") that offer products and services under Blue Cross and/or Blue Shield service marks, trademarks, names, and/or symbols ("Blue-Branded" products and services).[1]  It is my understanding that the plaintiff class alleges that Defendants in this matter violated U.S. federal and state antitrust laws by entering into an agreement regarding interstate (or, more precisely, inter-service area) competition in the sale of health insurance and administration of health insurance products.[2]

2.      I understand plaintiffs and Defendants reached a settlement agreement on October 16, 2020 (the "Settlement Agreement") "on behalf of individuals and companies that purchased or received health insurance provided or administered by a Blue Cross Blue Shield company."[3]  It is my understanding that the Settlement Agreement would cover a "Subscriber Class," consisting of insured ("Fully-Insured") groups and a "Self-Funded Sub-Class," consisting of self-funded ("Self-Funded" or "ASO") accounts, that purchased Blue-Branded Products during the following periods:[4]

   a.   February 7, 2008 through October 16, 2020 for the Subscriber Class ("FI Class Period");

   b.   September 1, 2015 through October 16, 2020 for the Self-Funded Sub-Class ("Self-Funded Class Period").[5]

3.      In addition to monetary relief, the Settlement Agreement also includes a series of injunctive relief provisions.[6]

---

[1]  Collectively, I refer to BCBSA and the Licensees as "Defendants."  Licensees include primary licensees and their controlled affiliate licensees, as defined in the Settlement Agreement.  A list of primary licensees is set forth in Appendix A of the Settlement Agreement (Doc. 2610).

[2]  *See, e.g.,* Subscriber Track Third Amended Consolidated Class Action Complaint dated April 17, 2017 ("Third Amended Complaint"), ¶¶ 813-2106.

[3]  *See* the Blue Cross Blue Shield Settlement website, at https://www.bcbssettlement.com/.  *See also,* Settlement Agreement at Doc. 2610).  Unless otherwise noted, defined terms are the same as those in the Settlement Agreement.

[4]  BCBS Settlement, Long Form Notice, pp. 4-5.  Classes also include employees.  ASO stands for "administrative services only" and generally refers to self-insured plans that purchase administrative services (as opposed to insurance) from healthcare insurers.  Self-Funded accounts include ASOs, ASCs (Administrative services contracts) and any other type of self-funded account.  For ease of reference, these will collectively be referred to as ASOs or self-funded plans in this report.

[5]  BCBS Settlement, Long Form Notice, pp. 4-5; Settlement Agreement, ¶ 1(nnnn).

[6]  Settlement Agreement, ¶¶ 10-18.



4.    I have been asked to opine upon the economic reasonableness of the Settlement Agreement on behalf of client Hibbett Sports, Inc. and the Self-Funded Sub-Class.  My opinions are limited to the economic reasonableness of specific components of the Settlement Agreement that relate to the Self-Funded Sub-Class, including the Settlement Amount and Class Injunctive Relief provided in Exhibit A to the Group Agreement and Acknowledgement of July 30, 2020.  Specifically, I opine on the reasonableness of the 6.5% of the Net Settlement Fund allocated to Self-Funded Authorized Claimants (the "<u>Settlement Allocation</u>") and the expected economic impact of elements of the injunctive relief efforts on competition for administration of commercial health insurance products.[7]

## II.    Credentials and Compensation

5.    I am a Professor of Finance at the Ourso School of Business, Louisiana State University, and Fellow at the Wharton Financial Institutions Center, part of the Wharton School at the University of Pennsylvania.  I have held long-term visiting appointments at the Federal Reserve Bank of Philadelphia and the Federal Deposit Insurance Corporation.  I hold a Ph.D. and a M.S. in Economics from the University of Illinois at Urbana-Champaign.

6.    My field of specialization as an economist lies in applying economic, financial, valuation, and statistical analyses to research and consulting.  I am an expert in these fields by virtue of my knowledge, skill, experience, training, and education.  The knowledge that I possess regarding these fields is beyond that of the average layperson and will help the trier of fact to understand the evidence that will be discussed in this case, and to determine facts at issue in this case.  Given my specialized knowledge in these areas, I have provided expert consulting services and testimony in a broad range of matters.

7.    I have been retained to provide expert advice and opinions on multiple matters involving settlement allocations.  I have testified in depositions or trials over fifty times, including matters involving anticompetitive conduct and similar claims.  A list of all cases in which I have testified at trial or deposition in the last four years appears in **Appendix A**.

8.    My academic research has been published in scholarly journals and books.  A list of my publications in the past ten years appears in **Appendix A**.  My research and economic commentary has been cited by media including The Wall Street Journal, The New York Times, The Washington Post, The Financial Times, The Economist, Barron's, BusinessWeek, die Zeit, Neue Zürcher Zeitung, Forbes, Fortune, Bloomberg Magazine, American Banker, and by press syndicates such as the Associated Press, Reuters, Bloomberg, KnightRidder, and MarketWatch-Dow Jones Newswire.  I have been a frequent guest on CNBC, Bloomberg Television, and Fox Business News, and I have appeared on NBC News, CNN Headline News, CNBC Asia, National Public Radio, BBC Radio, Bloomberg Radio, and NBC Radio.

---

[7]    Proposed Plan of Distribution dated March 12, 2021 ("<u>Plan of Distribution</u>"), ¶ 9.



9.     The BVA Group is being compensated for my work in this matter at my standard hourly rate of $850.   Other BVA Group professionals, working under my direction and supervision, assisted in my analyses and BVA Group was or will be compensated for their work at hourly rates of $190 to $700.  Neither my compensation nor BVA Group's compensation depends upon the results of my analysis in this report, any related testimony, or the outcome of the above-referenced matter.

10.     My opinions are based on information I have had the opportunity to analyze.  I may supplement my analysis as additional information is made available to me.  Conclusions and analysis contained in this report may be supplemented through deposition, live testimony, or future response or supplemental reports.

### III.    Information Considered

11.     In preparing my opinion, I have reviewed certain documents and data produced by the Licensees and the BCBSA, including production made available to me from the Subscriber Track Matter.[8] I was also provided with the Licensee Quarterly Financial Reports ("QFRs") and Quarterly Enrollment Reports ("QERs") by counsel for BCBSA, which I understand provide quarterly revenue and membership figures for insured and self-funded plans during the Class Periods.

12.     No data sources, studies, or analyses exist that quantify the overcharges borne by the Subscriber Class and/or the Self-Funded Sub-Class.   I utilize information produced in this matter in conjunction with relevant academic literature, industry commentary, and my economic expertise to form an opinion on the reasonability of the Settlement Allocation and injunctive relief provisions upon which I opine.

### IV.    Summary of Opinions

13.     It is my opinion that the allocation of 6.5% of the Net Settlement Fund to the Self-Funded Authorized Claimants is economically reasonable based on: (i) the relative differences between the market for ASO arrangements purchased by members of the Self-Funded Sub-Class and that for fully-insured plans purchased by members of the Subscriber Class, whether measured by the relative gross revenue, net revenue, operating gains, and change in net revenue components per member; (ii) the difference between the FI Class Period and the Self-Funded Class Period; and (iii) the relative circumstances of the Self-Funded Sub-Class and the Subscriber Class related to this Settlement Agreement.

14.     It is also my opinion that the injunctive relief provisions providing for, *inter alia*, the elimination of the National Best Efforts requirement and the addition of the Second Blue Bid provision, in conjunction with the other injunctive relief provisions, can be reasonably expected to reduce the mark-ups and associated exclusionary power of the Licensees.

---

[8]     I understand documents in the litigation, including documents produced by the Settling Defendants, third parties, and the Class Representatives, were hosted on a Relativity database.  My staff and I, along with Self-Funded Sub-Class Settlement Counsel, were provided access to the database to review and analyze documents.



## V.    Settlement Background

15.    The Settlement Agreement relates to allegations of "an ongoing conspiracy between and among the Individual Blue Plans and BCBSA to allocate markets in violation of the prohibitions of the Sherman Act."[9]    Plaintiffs alleged that Defendants established and maintained exclusive service areas ("ESAs") in order to allocate territorially the market for the Licensees' Blue-Branded products.[10]  In addition to the ESAs, plaintiffs alleged that Defendants curtailed competition by adhering to "best efforts" standards, including:

    a.    Local Best Efforts ("LBE") that required Licensees to generate at least 80 percent of the revenue in their service area from Blue-Branded Products.[11]

    b.    National Best Efforts ("NBE") that required Licensees to generate two-thirds of their national revenue from Blue-Branded Products.[12]

16.    Plaintiffs alleged that the effect of the ESAs in conjunction with NBE was to create horizontal restraints in a set of distinct geographic markets in which the relevant Licensee had market power.  This market power was derived from restricted competition from other Licensees, which could not compete for customers in a geographic market with a Blue-Branded plan (per the ESAs) and were limited in how much they could compete with a non-Blue-Branded plan (per NBE).  The Court in this matter found that NBE "operates as an output restriction on a Plan's non-Blue brand business" and "constitutes a *per se* violation of the Sherman Act, particularly when layered on top of other restrictions Defendants have placed on competition."[13]

17.    The Settlement Agreement compensates plaintiffs who are part of the "Damages Class" for the historical effects of market power derived from the supra-competitive prices that plaintiffs alleged resulted from Defendants' horizontal restraints.[14]  With respect to the Damages Class, the Settlement Agreement allocates:

    a.    93.5% of the Net Settlement Fund to Subscriber Class claimants; and

    b.    6.5% to Self-Funded Sub-Class claimants.[15]

---

[9]    Third Amended Complaint, ¶ 2.

[10]    Third Amended Complaint, ¶¶ 417-500.

[11]    Third Amended Complaint, ¶ 475.

[12]    Third Amended Complaint, ¶ 477.

[13]    Memorandum Opinion Section 1 Standard of Review and Single Entity Defense dated April 5, 2018, pp. 46 and 48.

[14]    Settlement Agreement, ¶ 1(v) ("Excluded from the Damages Class are Government Accounts, Medicare Accounts of any kind, Settling Defendants themselves, and any parent or subsidiary of any Settling Defendant (and their covered or enrolled employees)."  In addition, I understand that dependents and beneficiaries of Individual Members, non-employee Members, Opt-Outs, and the judge and judicial staff presiding over this matter are also excluded from the Damages Class.)

[15]    Plan of Distr bution, ¶ 9.



18.     The settlement also provides multiple forms of injunctive relief to curtail Defendants' market power going forward, including:[16]

    a.    Defendants "will eliminate and no longer enforce the National Best Efforts Requirement" and "will not adopt or implement any equivalent requirement or any rule in any future License Agreement or Membership Standard that imposes a cap, ratio, or other quantitative limit on a Settling Individual Blue Plan's non-Blue-Branded healthcare business outside of its Service Area."[17]

    b.    The LBE requirement "shall be based on a geographic area no larger than a state level."[18]

    c.    Defendants agree to not prohibit direct contracting between Self-Funded accounts and non-provider and specialty service vendors.[19]

    d.    A Licensee bidding on a multi-service area account with more than 250 members headquartered in its service area may choose to bid under a non-Blue-Brand and cede the right to submit a Blue-Branded bid to another Licensee (in order of priority set forth in the Settlement Agreement).[20]

    e.    National accounts with locations that make decisions for the purchase of commercial health benefits for local employees (independently from the account's headquarters) can request a bid from the Licensee in whose service area the decision location is situated rather than from the Initial Control Plan ("ICP").[21]

    f.    National Accounts that meet the size and dispersion criteria set forth in the Settlement Agreement, which are identified therein ("Qualified National Accounts") will have the right to request a "Second Blue Bid" of their choosing in addition to the bid from the ICP.[22]

19.     Below, I opine on the economic reasonableness of the Settlement Allocation, as well as the reasonableness of the injunctive relief for the Self-Funded Sub-Class with regard to whether such relief can reasonably be expected to reduce Licensees' market power going forward.

---

[16]    According to the Settlement Agreement, the "Injunctive Relief Class" refers to "all Individual Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Subscriber Class Period" (Settlement Agreement, ¶ 1 (pp)).

[17]    Settlement Agreement, ¶ 10.

[18]    Settlement Agreement, ¶ 11.

[19]    Settlement Agreement, ¶ 12.

[20]    Settlement Agreement, ¶ 14.

[21]    Settlement Agreement, ¶ 14.

[22]    Settlement Agreement, ¶¶ 14-15.  "Qualified National Accounts" refer to Self-Funded Sub-Class members that have at least 5,000 employees in the U.S. (as identified by Dun & Bradstreet) with the highest dispersion percentages (the number of employees located outside the service area divided by the total number of employees) based on the criteria set forth in the Settlement Agreement (at 1(u) and 1(sss)).  The initial list of Qualified National Accounts is included as Appendix C of the Settlement Agreement and will be re-determined every two years (Settlement Agreement at 1(u)).



## VI.   Background on Health Insurance Plans

### A.     Overview of the markets for self-funded and fully-insured plans

20.    From an economic perspective, the services provided by the Licensees can be thought of as being made up of two primary components: (1) administrative services for managing claims and billing and (2) financial funding of "claims cost uncertainty" (*i.e.*, risk transfer) among the pool of insured employees and dependents.[23]  In functional economic terms, fully-insured plans associated with the Subscriber Class provide employers "administrative services" and "claims cost certainty," while ASO plans associated with the Self-Funded Sub-Class provide only "administrative services" (allowing the employer to fund the claims cost certainty via other—ostensibly more economical—means).[24]  Licensees offer employers administrative services for self-funded plans and bundle administrative services and claims cost certainty (risk transfer) for fully-insured plans.[25]

21.    Economic theory suggests that the more (and closer) substitutes a good has, the more sensitive, or elastic, demand from any one supplier will be with respect to changes in price charged by that single supplier.  Economic models of industrial organization support this assertion.  Generally, a multi-product monopolist can be expected to impose a higher markup on those goods with a lower elasticity of demand.[26]  In addition, the "percentage deviation of price from marginal cost" is inversely related to the elasticity of demand.[27]  This "inverse elasticity rule" is well-known in microeconomics.[28]

22.    ASO subscribers purchase from a more competitive market than Fully-Insured subscribers.  In the pre-settlement market, a Fully-Insured subscriber to a Blue plan has the option to purchase a plan from another non-Blue commercial healthcare services provider (although there are relatively few such providers).  Subscribers purchasing ASO plans, on the other hand, are able to substitute away from Blue plans to other providers of administrative services with or without purchasing full insurance services.  Purchasers of ASO plans are often large firms that operate in multiple states, such that they have the option of purchasing administrative services from any entity (an insurer or Third-party Administrator ("TPA")) operating in one or more of those states.[29]  In addition to Blue and non-Blue competition for commercial healthcare insurance, therefore, self-funded accounts have access to substitute products that are not

---

[23]   The latter is the traditional "insurance" product, providing claims cost certainty for the ultimate insured party.

[24]   Such means may include, *inter alia*, funding such uncertainty from the business' own cash flows or purchasing stop loss coverage from an insurance company separately from the administrative services component.

[25]   Employers may offer different insurance options to their employees so there is not necessarily a one-to-one correspondence between an employer and an insurance product.  I understand a given employer could therefore be in the Self-Funded Sub-Class, the Subscr ber Class, or both.

[26]   *See, e.g.,* Jean Tirole, "The Theory of Industrial Organization," 1988, p. 70.

[27]   Leonard J. Mirman, and David Sibley, "Optimal nonlinear prices for multiproduct monopolies," *The Bell Journal of Economics,* 1980, pp. 659-670.

[28]   Walter Nicholson, and Christopher Snyder, *Microeconomic Theory: Basic Principles and Extensions* (11th ed., 2012), p. 452.

[29]   *See, e.g.,* Bob Herman, "Self-service insurance: Insurers forced to compete harder for self-insured customers," *Modern Healthcare,* January 3, 2015, available at https://www.modernhealthcare.com/article/20150103/MAGAZINE/301039980/self-service-insurance-insurers-forced-to-compete-harder-for-self-insured-customers; "2020 Directory of Third Party Administrators" published by the Society of Professional Benefits Administrators, available at www.spbatpa.org.



available to fully-insured accounts.[30]  While the number of available substitute products varies by region for both fully-insured and ASO plans, the scope of alternatives available to ASOs is greater than for entities seeking full insurance (and who therefore cannot administer through a TPA or directly with health systems). Economic theory suggests, therefore, that, all else equal, the Licensees exercising market power would impose a greater overcharge on the fully-insured products relative to ASOs.

23.    Because ASOs can elect to become Fully-Insureds and vice versa, the cross-price elasticity (*i.e*., change in demand for one product associated with a price change for a second product) between Blue-Branded fully-insured plans and ASOs influences the relative magnitude of markups imposed on each product.[31]  While the Licensees can rationally be expected to impose a greater price increase on Fully-Insured plans than on ASOs, the multi-product monopolist still has an incentive to raise prices on ASOs in order to avoid undue switching due to changes in relative price.

## B.    Relative profitability of self-funded and fully-insured plans

24.    The relative profitability of fully-insured plans and ASOs in the real world supports the hypothesis that the demand for fully-insured plans is less price sensitive than that for ASOs.  While accounting measures of profitability of the two products are only a rough guide to economic profit, industry commentary indicates that ASOs are generally less profitable than fully-insured plans.  For example, Jim Winkler of Aon's Health Solutions Group was quoted in "The Self-Insurer" in 2018 as stating that "health plans can make money in the fully-insured space certainly more so than they are likely to make in the self-insured space".[32]  Similarly, Bob Herman writing for Modern Healthcare noted in 2015 that "Insurers would rather keep companies in the more lucrative fully insured plans.  But they take the business they can get. And [the ASO business is] becoming an increasingly cutthroat one, with local governments and union health plans more willing to change third party administrators to keep costs down."[33]  Debra A. Donahue, writing for Mark Farrah Associates in 2013, posited that "[a] shift…to the more stable, but lower margin, administrative services … segment is one of the contributing factors for the narrowing of the profit margins among health plans."[34]

---

[30]    TPAs provide competition for all but the largest firms. According to the DOJ's expert David Dranove, TPA's "are not strong competitors for national accounts" citing to a 1% presence in the segment as well as non-compete agreements.  (Dranove defines national accounts as being >5000 employees on slide 24. Obtained from https://www.justice.gov/atr/page/file/914606/download) Judge Jackson's opinion (pp. 82-83) lays out evidence for why TPA's "steer clear" of national accounts. (https://www.justice.gov/atr/case-document/file/940946/download)

[31]    Jean Tirole, "The Theory of Industrial Organization," 1988, p. 70.

[32]    Bruce Shutan, "The 411 on ASOs," *The Self-Insurer,* September 2018, available at https://www.sipconline.net/files/The%20411%20on%20ASOs%20by%20Bruce%20Shutan.pdf.

[33]    Bob Herman, "Self-service insurance: Insurers forced to compete harder for self-insured customers," *Modern Healthcare,* January 3, 2015, available at https://www.modernhealthcare.com/article/20150103/MAGAZINE/301039980/self-service-insurance-insurers-forced-to-compete-harder-for-self-insured-customers.

[34]    Debra A. Donahue, "Profit Margins Converge for Top Health Plans," *Healthcare Business Strategy,* November 1, 2013, available at https://www.markfarrah.com/uploaded/mfa-briefs/profit-margins-converge-for-top-health-plans.pdf.



25.    An empirical academic study from 2010 further supports these observations.  In the study, the authors used variation in profit rates across firms to analyze whether insurance companies were using market power to sell insurance at higher prices to more profitable firms.[35]  While the study found clear evidence of such behavior for fully-insured plans, it did not find as strong a relationship for administrative services.  This was in line with the hypothesis that markups for administrative services would be lower because, among other things, "there are more competitors in the [administrative services] market, and fee structures for administrative services are far more transparent than pricing for fully-insured plans."[36]

26.    BCBSA's own documents highlight the low profitability and pricing pressure facing ASO plans. For example, a BCBS Arizona strategy report noted that administrative services "is a low margin business. Traditional functions such as claims and enrollment administration will generate very little profit, or may become loss leaders."[37]    A Blue Cross of Idaho document also noted the pricing pressure facing administrative services plans, stating, "when faced with highly competitive administrative fees…many Plans have opted to set prices such that the [administrative services] business makes some contribution to overhead, but does not fully cover fixed fees."[38]

## C.    Evidence of substitution

27.    Because they are substitutes, the prices of ASOs and fully-insured plans are each constrained in part by the price of the other.  The market for administrative services has more providers and is less concentrated than the market for fully-insured plans and is, thereby, more competitive than that for fully-insured plans.[39]

28.    Empirical evidence from Licensees and the health insurance industry indicates that employers switch between self-funded and fully-insured plans in response to changes in relative costs in a manner suggesting the two are substitutes.[40]  Industry data indicate that larger employers self-insure at a greater rate than smaller employers.  Data from the Medical Expenditure Panel Survey ("MEPS") Insurance Component show that 76% to 84% of private-sector businesses with five hundred or more employees offered at least one self-funded plan during the period 2013-2018.[41]  Only 25% to 31% of smaller employers,

---

[35]   *See* Leemore S. Dafny, "Are health insurance markets competitive?," *American Economic Review* 100(4), 2010, pp. 1399-1431.
[36]   *See* Leemore S. Dafny, "Are health insurance markets competitive?," *American Economic Review* 100(4), 2010, pp. 1399-1431.
[37]   BCBSC-AZ_MDL0000124422.
[38]   BC_IDAHO_MDL000247354.
[39]   *See* Bruce Shutan, "The 411 on ASOs," *The Self-Insurer,* September 2018, at https://www.sipconline.net/files/ The%20411%20on%20ASOs%20by%20Bruce%20Shutan.pdf.  *See also,* Bob Herman, "Self-service insurance: Insurers forced to compete harder for self-insured customers," *Modern Healthcare,* January 3, 2015, at https://www.modernhealthcare.com/article/20150103/MAGAZINE/301039980/self-service-insurance-insurers-forced-to-compete-harder-for-self-insured-customers; "2020 Directory of Third Party Administrators" published by the Society of Professional Benefits Administrators, available at www.spbatpa.org.
[40]   As noted above, an employer can offer multiple insurance products to its employees, some or all of which could be fully-insured products and some or all of which could be self-insured products. "Substitution" is this context refers to the replacing of one particular insurance product that was offered with a different one.
[41]   *See* Paul Fronstin, Ph.D., "Self-Insured Health Plans: Recent Trends by Firm Size, 1996-2018," Employee Benefits Research Institute.



those with fewer than five hundred but more than one hundred employees, offered at least one self-funded plan.[42]  For even smaller employers – those with fewer than one hundred employees – the percent of employers offering self-funded plans ranged from 13% to 17%.[43]  According to the Kaiser Family Foundation, on an employee basis, "about 91% of people in companies with 5,000 or more workers were in self-insured plans in 2014, compared with 15% of people in companies with fewer than 200 workers."[44]

29.    Those proportions change over time with changes in the relative prices of fully-insured plans and ASOs.  Affordable Care Act community ratings raised fully-insured premiums, making self-insurance relatively more attractive to many firms.[45]  In recent years, therefore, substitution has shifted the industry toward self-funding and away from fully-insured plans as relative costs shifted.[46]  A 2019 study by Deloitte estimated that "…27% of fully insured new plans with 5,000 or more participants changed funding mechanism, compared with less than 8% of plans with 1-500 participants."[47]  BCBSA data also shows that Fully-Insured membership declined between 2008 and 2020 while ASO membership rose significantly.[48]

## VII.  Assessment of Settlement Allocation

30.    From an economic perspective, one would expect the apportionment of settlement proceeds between the Subscriber Class and the Self-Funded Sub-Class to reflect the relative share of overcharges borne by Fully-Insured and ASO plans, respectively, during the relevant class periods.[49]  The theory of damages in this matter is grounded in the alleged impact of the horizontal restraints on entry maintained by Defendants, which resulted in certain overcharges assessed by the Licensees.  I do not possess specific measures of such overcharges for each Licensee nor have I been instructed to estimate overcharge for each Licensee.[50]  My analysis is, therefore, based upon proxies for such overcharges.

---

[42]    *See* Paul Fronstin, Ph.D., "Self-Insured Health Plans: Recent Trends by Firm Size, 1996-2018," Employee Benefits Research Institute.

[43]    *See* Paul Fronstin, Ph.D., "Self-Insured Health Plans: Recent Trends by Firm Size, 1996-2018," Employee Benefits Research Institute.

[44]    *See* Bob Herman, "Self-service insurance: Insurers forced to compete harder for self-insured customers," *Modern Healthcare,* January 3, 2015 at., https://www.modernhealthcare.com/article/20150103/MAGAZINE/301039980/self-service-insurance-insurers-forced-to-compete-harder-for-self-insured-customers.

[45]    *See, e.g.,* Bernadett D'Amico, Gunjan Khanna, Ph.D., and Jeris Stueland Ph.D., "Navigating the coming changes in the commercial group market," *McKinsey & Company,* January 2014, at https://healthcare.mckinsey.com/wp-content/uploads/2020/02/MCK_PayorBook_111-120_GroupMarkets_R6.pdf.

[46]    *See, e.g.,* Bernadett D'Amico, Gunjan Khanna, Ph.D., and Jeris Stueland Ph.D., "Navigating the coming changes in the commercial group market," *McKinsey & Company,* January 2014, at https://healthcare.mckinsey.com/wp-content/uploads/2020/02/MCK_PayorBook_111-120_GroupMarkets_R6.pdf.

[47]    Constantijn W.A. Panis, PhD and Michael J. Brien, PhD, "Self-Insured Health Benefit Plans 2019," Deloitte Advanced Analytical Consulting Group, January 7, 2019, at https://www.dol.gov/sites/dolgov/files/EBSA/researchers/statistics/retirement-bulletins/annual-report-on-self-insured-group-health-plans-2019-appendix-b.pdf.

[48]    Based on data provided in the BCBSA QFRs and QERs.

[49]    The Settlement Allocation would also be expected to reflect the relative circumstances of the Subscriber Class and the Self-Funded Sub-Class, specifically as they relate to the litigation that is being settled by the Settlement Agreement, as discussed below.

[50]    The Report of Ariel Pakes in this matter shows the extensive analysis required for estimating overcharge for only a single Licensee (BCBS Alabama).  *See,* Amended Merits Expert Report of Professor Ariel Pakes on Impact and Damages dated May 31, 2019.  I understand that equivalent data to repeat that analysis for other service areas has not been produced in this matter.



31.     The overcharges that are the basis for damages in this matter are related to relative gross revenue, net revenue, operating gains, and growth in net revenue components per member for ASO and Fully-Insured products, so that ratios of those measures are reasonable proxies for the ratio of overcharges to the Self-Funded Sub-Class and the Subscriber Class over the relevant class periods.  Because those ratios are not, in fact, ratios of actual damages to the two classes, no one of those ratios is likely to represent the precise apportionment of overcharge in this matter.  Nevertheless, the fact that the dispersion of the proxy ratios indicates that the overcharge borne by ASO accounts is less than 6.5% can be relied upon to conclude that the 6.5% Settlement Allocation to the Self-Funded Sub-Class is reasonable.

32.     As I explain in the remainder of this section, after adjusting for economic differences between Fully Insured and ASO plans and accounting for differences in the legal risk faced by the two classes, I am of the opinion that the dispersion of the ratios of reasonably estimated overcharge proxies leads to the conclusion that the Settlement Allocation is reasonable from the standpoint of the Self-Funded Sub-Class.

### A.     Uncertainty regarding litigation outcomes with regard to the Self-Funded Sub-Class

33.     I understand from counsel that the litigation was initially brought on behalf of the Subscriber Class and that the initial claims related to anti-competitive behavior associated with Fully-Insured plans offered by the Licensees.  I understand the litigation commenced in 2012 and has proceeded through a series of milestones, including a motion to dismiss and summary judgment on the filed rate doctrine and on the standard of review.  I also understand counsel for the Subscriber Class expended significant time and resources in the case, including participating in more than 30 hearings and status conferences, and taking and defending key depositions.  The initial plaintiffs in this case faced the significant risk, up to and until the Settlement Agreement was executed, that their investment of time and money would have resulted in no relief.[51]

34.     I further understand that it was not contemplated that the ASOs would be a part of the Settlement Agreement until approximately late 2019.  Purchasers of ASO plans, therefore, did not face the risk of litigating their claims and receiving an unfavorable outcome before this time.

35.     In this case, it is appropriate to apply a discount factor to reflect the different circumstances of Fully-Insured and Self-Funded class litigation when determining the reasonableness of a settlement amount.  Such a discount factor typically considers both the expected amount of time that would elapse before a litigation or settlement payment is made as well as the risk associated with that payment.   For instance, a conservative (understated) estimate of the discount rate that class members could apply would be based on their cost of equity, which for an average publicly-traded employer would be about 9% (noting

---

[51]     Those risks are set forth in detail in the Joint Declaration of Co-Lead Counsel In Support of Subscriber Counsel's Motion for Approval of Their Fee and Expense Application, ¶ 12 (ECF No. 2733-2).



that this figure could be significantly higher for certain employers).[52]  In reality, the discount rate applied to a prospective litigation would be much higher than the marginal cost of equity given the risks and uncertainty of litigation.  A conservative (understated) discount factor for the time and risk of litigation applied over the course of a litigation lasting many years would be no less than 50%.[53]

### B.    Financial comparison of the fully-insured and administrative services markets

36.    BCBSA Licensee data for Blue-Branded products are aggregated internally on a quarterly basis into QFRs and QERs, which summarize Licensees' financial and enrollment data, respectively.   I was provided Defendants' reports from 2008 to 2020, which I understand were produced in the discovery record. I am unaware of any similar data sources that exist in the public record.

37.    I use the QFRs and QERs to calculate average revenue per Fully-Insured and ASO member each year along with average benefits paid per Fully-Insured member.[54]  Based on this computation, I note that the average revenue per ASO member represents revenue associated with administrative services. The average revenue per Fully-Insured member represents revenue associated with: 1) administrative services; 2) claims cost recovery (recovery of claims paid by the Blues); and 3) risk transfer (revenue associated with the transfer of risk to the Licensees).

38.    In order to estimate revenue and membership associated with the Damages Class, I adjust the QFR and QER data to exclude federal, state and municipal plans, as I understand that those plans are excluded from the Damages Class.  I remove federal plan members, who are reported as insured members, from the reported QER data and reduce Fully-Insured revenue proportionally.[55]  To estimate the proportion of Fully-Insured and ASO members associated with state and municipal plans, I estimate the portion of nationwide fully-insured and self-insured plans comprised of state and municipal employers, as reported by MEPS, from 2015 to 2019.[56]

---

[52]  Based on an average 20-year Treasury constant maturity from 2008 to 2020 of approximately 3 percent (https://fred.stlouisfed.org/series/DGS20) plus an average equity risk premium of approximately 6 percent (based on the average supply side equity risk premium as published by the Duff & Phelps Cost of Capital Navigator from 2008 to 2020).

[53]  For instance, 1 / (1.09 ^ 8) = 0.50.

[54]  See **Exhibit 1**.  The QFRs provide fields labeled "Premium Revenue", "Gross Revenue Incl Self-Funded", and "Net Revenue". A note in the report explains that "… gross revenue includes fully insured premiums and premium equivalents for self-funded business.  Net revenue is net of self-funded benefit payments."  I use the Premium Revenue as the gross revenue for fully-insured plans and calculate the revenue for self-funded plans as the Net Revenue less the Premium Revenue (*i.e.*, the component of Net Revenue that is not attributable to fully-insured plans).

[55]  See **Exhibit 2**.  I note that reducing Fully-Insured revenue proportionally based on the number of members associated with federal plans would tend to understate actual revenue associated with Fully-Insured members remaining in the Damages Class since federal plans would not be expected to reflect a significant fee for risk transfer services relative to other plans.  This is due to a number of factors including: (i) premiums for federal employee benefits are capped based on Maximum Government Contr butions; (ii) the Centers for Medicare & Medicaid Services ("CMS") annually sets capitation rates for Medicare Part C and Part D; and (iii) CMS and state and local governments set Medicaid contr butions annually.  In the context of my analysis, this treatment would tend to overstate the portion of any overcharge borne by ASO plans.

[56]  This data indicates that the non-state/municipal portion of fully-insured members is approximately 85.9% and the non-state/municipal portion of self-funded members is approximately 79.8%.  See **Exhibit 7**.



### 1) Fully-Insured and ASO gross revenue

39.    I compare the gross revenues for each product (which I refer to as "Gross Revenue") in the Damages Class.  Based on the adjusted QFR data, aggregate (adjusted) revenue from Fully-Insured plans in the Damages Class during the FI Class Period was approximately $1.9 trillion.  This compares to aggregate (adjusted) revenue from ASOs in the Damages Class during the shorter Self-Funded Class Period of approximately $67 billion.[57]  Thus, 96.6% of Gross Revenue was from Fully-Insured plans and 3.4% of Gross Revenue was from ASO plans.[58]  Adjusting the ASO share by 50% results in an ASO proportion of approximately 1.7%.[59]

### 2) Fully-Insured and ASO net revenue

40.    A significant portion of revenue for Fully-Insured plans is used to cover the cost of claims, which is not the case for ASO plans.[60]  One way to account for this would be to subtract total claims paid on Fully-Insured plans from revenue associated with these plans, in order to compare what I refer to as the "Net Revenue" of Fully-Insured plans to revenue of ASO plans.  Under this approach, I find that 80.7% of Net Revenue associated with the Damages Class was derived from Fully-Insured plans and 19.3% of Net Revenue was derived from ASO plans.[61]  Adjusting the ASO share of this ratio by 50% results in an ASO proportion of approximately 10.7%.

41.    Relying on Net Revenue to apportion the settlement, however, would be unsound since  this approach implicitly assumes the mark-up arising from the exclusionary power of BCBS (the overcharge at issue in this case) is equi-proportional to each dollar of ASO and Fully-Insured Net Revenue.  Economic principles and the evidence I have reviewed in this matter, however, do not support the assumption that the overcharge is equi-proportional (since the ASO market is more competitive than that for Fully-Insured plans).  Therefore, the ratio derived without adjusting for such market differences can be taken as the theoretical maximum proxy ratio relevant to this matter.

---

[57]    This is after the adjustment to account for the exclusion of federal, state and municipal employers.

[58]    See **Exhibit 3**.

[59]    Applying the 50% discount to the 3.4% ASO share involves halving the 3.4% and then calculating its percentage of the remainder (1.7% + 96.6%, or 98.3%). 1.7% / 98.3% = 1.7%.

[60]    For instance, I understand that "[t]he Affordable Care Act requires insurance companies to spend at least 80% or 85% of premium dollars on medical care, with the rate review provisions imposing tighter limits on health insurance rate increases" and that to the extent an insurer does not meet the applicable Medical Loss Ratio ("MLR"), it "is required to provide a rebate to its customers" (https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Market-Reforms/Medical-Loss-Ratio).

[61]    See **Exhibit 4**.



### 3) Comparison of operating gain

42.    Overcharges are more closely related to profits than revenue.[62]  While the QFRs do not report profits for Fully-Insured and ASO accounts, other documents from Defendants contain quantitative estimates of operating gain differentials between Full-Insured and ASO plans.  These documents indicate that profitability of ASOs is less than that of Fully-Insured plans, which is consistent with the economic theory described above in which, all else equal, a market in which a seller has more market power will lead to a greater ability for that seller to increase prices and therefore greater profitability for that seller.  Similarly, industry participants recognize that "fully insured arrangements are [insurance companies'] cash cows."[63]

43.    While QFRs report total operating gain, they do not report operating gain for Fully-Insured and ASO accounts.  I allocate operating gain for Fully-Insured and ASO plans based on Defendants' observations of per member operating gain differentials and the number of members associated with each type of plan during the relevant periods to calibrate the allocation based on the following observations:

a.    Defendant documents at times indicate that ASO plans "may become loss leaders" or may "not fully cover fixed fees."[64]  Accordingly, it is possible that overcharges to the ASOs were *de minimis*.  Adjusting the ASO share of this ratio by 50% results in an ASO proportion of even less.

b.    A 2012 Blue Shield of California presentation titled ███████████████ ████████████████████████████████████████████████████████ ██████████"[65]  Applying this operating gain differential to the operating gain per member (as derived from the QFR and QER reports) implies an allocation of approximately 7.5% to the Self-Funded Sub-Class.[66]  Adjusting the ASO share of this ratio by 50% results in an ASO proportion of 3.9%.

c.    A 2010 Anthem presentation titled *Phase Three Strategic Options Assessment* indicates that the "fully insured business provides nearly 6 times as much Operating Gain PMPM [per member per month] as ASO."[67]  Applying this operating gain differential to the operating gain per member (as derived from the QFR and QER reports) implies an allocation of approximately 11.8% to the Self-Funded Sub-Class.[68]  Adjusting the ASO share of this ratio by 50% results in an ASO proportion of 6.3%.

---

[62]    While profit in and of itself is not entirely due to the anticompetitive conduct alleged here, the effect of such exclusionary activity (and indeed the economic impetus for such activity) is increased profits.

[63]    *See* Bruce Shutan, "The 411 on ASOs," *The Self-Insurer,* September 2018, available at https://www.sipconline.net/files/The%20411%20on%20ASOs%20by%20Bruce%20Shutan.pdf.

[64]    BC_IDAHO_MDL000247354; BCBSC-AZ_MDL0000124422.

[65]    BSC2_02767314.

[66]    See **Exhibit 5a**.

[67]    WLP-08220885.

[68]    See **Exhibit 5b**.



44.    When coupled with evidence that ASO plans may produce little or no operating gain, the comparison of operating gains associated with the two higher observations (10x and 6x) suggests that the ASO proportion is less than 3.9% to 6.3%.

### 4)  Comparison of changes in revenue per member associated with administrative services and risk transfer

45.    As previously discussed, economic principles predict that Licensees would implement a greater overcharge as a portion of total price on the Fully-Insured plans than they would on ASOs.  While overcharge is not directly observable from the available data, evidence of higher overcharges to Fully-Insured accounts is reflected in their higher revenue per member growth relative to ASO plans; for instance, between 2008 and 2020, administrative revenue per included member increased approximately 20% while, over the same time, risk transfer revenue per included member increased nearly 300%.[69]

46.    In order to examine the relationship between revenue per member growth and the overcharge differentials between the Fully-Insured and ASO markets, I start by observing that some level of overcharge would have existed in both the risk transfer component (borne only by Fully-Insured members) and administrative services component (borne by Fully-Insured and ASO members) of revenue in every year. In addition, I note that, in the absence of an overcharge, it is reasonable to expect that ASO and Fully-Insured Net revenue would each be expected to grow over time (as a function of factors unrelated to the overcharge) such that:

     a.    Risk transfer revenue per member would be expected to grow with benefits, which from 2008 to 2020 grew at a compound annual growth rate ("<u>CAGR</u>") or approximately 5.0%.[70]

     b.    Administrative services revenue per member would be expected to grow at approximately the rate of inflation; indeed, the actual CAGR from 2008 to 2020 was approximately 1.6% (roughly in line with core inflation). [71]

47.    Adjusting risk transfer and administrative services per member revenue by their respective levels of inflation, I compute both revenue categories in 2008 dollars for each year.  Based on this series, I identify the lowest amount (in 2008 dollars) as the benchmark year in which inflation-adjusted revenue per member was lowest.  Although revenue per member in the benchmark year would have had some degree of overcharge, the extent of overcharge in this year (or any year) is unobservable.  It is reasonable to infer that any increase in revenue per member relative to the benchmark year not explained by expected inflation is a function of market power and that such market power, in whole or in part, relates to the allegations in this matter.

---

[69]    See **Exhibit 1**.
[70]    See **Exhibit 6a**.
[71]    See **Exhibit 6a**.  *See* U.S. Bureau of Labor Statistics at https://www.bls.gov/cpi/data.htm.



48.    Applying this reasoning, I construct a benchmark series starting with the benchmark year (based on minimum adjusted revenue per member in 2009 for risk transfer and 2014 for administrative services), adjusting for inflation (5.0% for risk transfer and 1.6% for administrative services).[72] I compute the excess revenue per member for both risk transfer and administrative services relative to their respective benchmarks.  Multiplying the excess revenue per member by the applicable Fully-Insured members (who incur overcharge on risk transfer and administrative services) and Self-Insured members (who incur overcharge only on administrative services) in each year results in a ratio of 7.3%.  Adjusting the ASO share of this ratio by 50% results in an ASO proportion of 3.8%.

49.    Alternatively, rather than adjusting for inflation at 5.0% based on actual observed benefit growth, I estimate expected inflation for risk transfer services based on an average annual increase in healthcare costs of 3.0% between 2008 and 2020.[73] Following the same approach, this calculation results in an ASO ratio of 6.5%.  Adjusting the ASO share of this ratio by 50% results in an ASO proportion of 3.4%.

### C.    Summary of settlement allocation calculations

50.    The table below summarizes the calculated Self-Funded Sub-Class allocations based on the different methodologies described above.[74]  It is important to note that none of these numbers are the "correct" allocation split; they only indicate the ranges of a theoretical allocation based upon the analysis of a variety of reasonable proxies for the overcharges that are of concern in this matter.  It is also important to note that these values are conservative because while they include discounts for the time avoided in ASO litigation, they do not include discounts for the probability of success of such litigation.

| | Implied Settlement Allocation to Self-Funded Sub-Class |
|---|---|
| **Gross Revenue** | 1.7% |
| **Net Revenue** | < 10.7% |
| **Operating Gain Differential** | < 3.9% – 6.3% |
| **Revenue Per Member Growth** | 3.4% – 3.8% |

---

[72]    See **Exhibit 6a**.  I note that benchmarking against the year in which inflation-adjusted revenue per member is at a minimum increases the ASO ratio.

[73]    *See, e.g.,* https://fred.stlouisfed.org/series/CPIMEDSL; https://fred.stlouisfed.org/series/DMINRG3A086NBEA; https://fred.stlouisfed.org/series/WPS411103 and **Exhibit 6b**.

[74]    As discussed herein, the estimates I present are based on certain assumptions and techniques used to implement the calculations.  In addition to the calculations I present, I have confirmed the calculations supporting my opinion are robust to various specifications and implementation techniques.



51.    The general economic analysis of the market together with the quantitative analyses and the evaluation of the particular circumstances of the litigation indicate that an allocation of 6.5% of the Settlement Amount is an economically reasonable allocation to the Self-Funded Sub-Class.

### D.    Responses to objections regarding the Settlement Allocation

52.    I have reviewed certain objections raised by self-funded objectors in this matter.[75]  I note here responses to several themes that emerged in those objections.

53.    Objectors claim that fees paid to Defendants omit amounts paid to third party health care providers.  While this may be the case, I understand that this settlement relates to overcharges by Defendants associated with their alleged horizontal restraints; as such, an analysis of the Settlement Allocation is appropriately limited to fees paid by the Subscriber Class and Self-Funded Sub-Class members *to the Licensees* who extracted overcharges derived directly from such horizontal restraints.  I understand that BCBSA and the Licensees are not liable for overcharges made by third-parties and the Settlement Agreement does not release these third-parties from any such claims.  Contrary to what objectors contend, neither the Settlement proceeds nor the Settlement itself purports to remedy any overcharges (lawful or unlawful) imposed by third parties, nor are they intended to remedy any overcharges by Defendants that are unrelated to the claims at issue.

54.    Objectors' experts claim that Defendants' market power resulted in higher charges from third-party service providers, so that "[b]asing the settlement allocation on [Defendants'] profitability is a flawed approach because it does not capture the complete impact [of Defendants' horizontal restraints] to the cost of healthcare."[76]  Fees paid to third parties are, based on my understanding, outside the scope of the Settlement Agreement and therefore outside the scope of this analysis.  But even if that were within scope, standard economic models suggest that amounts paid by ASO customers directly to healthcare providers likely reflected reduced, not increased, rates because of Defendants' market power, such that those would offset – not increase – damages in this matter.

55.    Objectors claim that the Settlement Allocation does not account for various fees paid to Defendants for other services.  My analysis of Fully-Insured and ASO revenue is derived from the QFR and QER reports, which I understand include revenue associated with all Blue-Branded products.  The administrative service revenue that I derive reflects revenue associated with Blue-Branded ASO plans, derived as the difference between what I understand to be total Blue-Branded revenue and total premium revenue paid on Blue-Branded Fully-Insured plans.

---

[75]    Self-Funded Objectors' Notice dated July 28, 2021 and corresponding expert reports of Ugo Okpewho and Jim Watson dated July 27, 2021 ("BDO Report") and Declaration of Teah Corley dated July 27, 2021 ("Corley Declaration").
[76]    BDO Report, p. 14.



56.    Objectors' claims ignore differences in the economics of the markets faced by the Subscriber Class and Self-Funded Sub-Class, namely that the Blues had more market power in their Fully-Insured product than they did in their ASO product.  The Blues, therefore, were able to extract greater overcharges on Fully-Insured products than ASO products.  Such circumstances arise because, as discussed previously, ASO plans have access to outside alternatives that Fully-Insured plans do not, such that the market for ASO plans is necessarily more competitive than for Fully-Insured plans (consistent with information produced in this case and from industry observers).

57.    Objectors' experts also point to what they purport to be "the minimization of the SF Customers to the overall success of BCBS,"[77] which they claim is an "oversight" in the Settlement Allocation.[78]  Again, objectors' experts reverse the economic logic of the markets. The value that the Blues derive from administering large volumes of ASO claims (which are typically higher than claims brought by smaller Fully Insured accounts) is a key reason that the Blues are willing to keep ASO fees in check, even if that could mean earning negative profits on ASO accounts.  And it is profits, not overall healthcare costs to employers, that are the source of markups and overcharge.

58.    When one considers the direct relationship between profit and overcharge (*i.e.,* that a monopolist's profit on a product reflects the extent to which the monopolist is able to charge a price on that product in excess of cost), it is clear from objectors' experts' own analysis that the Blues earned the vast majority of profits on revenue from Fully-Insured plans.  Objectors' experts do not refer to a mechanism by which the Blues sustained overcharges on fees for Self-Insured plans.  Instead, they rely on premium-equivalents for Self-Insured accounts based on what they contend to be claims cost incurred by those accounts.  This is inapt since the Blues do not earn profits on ASO claims cost.

59.    While objectors and objectors' experts set forth alternative Settlement Allocation percentages, these assessments are fatally flawed in their approach since they are improperly grounded in an accounting analysis of total healthcare spend, as opposed to an economic analysis of the overcharge on Blue-Branded products arising from Defendants' alleged horizontal restraints.  Without properly deriving the overcharge – that is, mark-up arising from the exclusionary power of BCBS – objectors' experts are in no position to offer any opinion of any specific economically "correct" proportional settlement allocation.  My analysis, on the other hand, establishes that 6.5% is an economically reasonable allocation of the Settlement Amount to the Self-Funded Sub-Class.

---

[77]    BDO Report, p. 6.
[78]    BDO Report, p. 7.



## VIII. Evaluation of Injunctive Relief

60.    I understand that the objective of the injunctive relief is to increase competition within and between the Licensees for the benefit of their customers and the market as a whole.  As previously discussed, many of the injunctive relief provisions are based on changes to BCBSA's and Licensees' rules and policies.  Such policy changes would benefit all prospective Blue subscribers, regardless of whether a subscriber is included in the Injunctive Relief Class.  More generally, these changes would enhance competition for the entire market by forcing Licensees' offerings to be more competitive, to the benefit of all consumers.

61.    Below I discuss two critical components of the injunctive relief individually (Elimination of NBE and institution of the Second Blue Bidder provision) and then explain how they will likely work together to make the entire ASO market more competitive.

### A.    Elimination of National Best Efforts

62.    The elimination of NBE removes previous limitations on the extent to which Licensees could compete for business outside their services areas through non-Blue-Branded ("Green") products.  As a result, Licensees in one service area will be able to leverage (or develop) provider networks in other service areas in order to compete with other Blues by offering Green plans.

63.    The effect of the elimination of NBE is to add new potential competitors into the marketplace. This increased competition from Green plans will necessarily reduce the markups that Licensees are able to charge on Blue plans for all ASO customers.

### B.    Second Blue Bidder

64.    The Second Blue Bidder provision in the Settlement Agreement allows Qualified National Accounts to request a Second Blue Bid.  Qualified National Accounts ("QNAs") are self-funded accounts that have at least 5,000 US-based employees and whose members[79], when all such accounts are sorted by dispersion[80], are in the top thirty-three million of all members.[81]  For example, a QNA with a presence in multiple Blue service areas, including Arkansas (its headquarters state) and Michigan, will be able to request a bid for a Blue-branded ASO from BCBS Michigan to compete with what is offered to them by Arkansas BCBS.[82]

---

[79]   Members includes employees and their covered dependents.

[80]   Dispersion is measured as the percent of employees who are outside of the employer's US headquarters state or, alternatively, the location with the highest employee count. The sorting is from most to least dispersed.

[81]   This applies only to employers who are in the Dunn & Bradstreet database, which includes private employers but excludes Taft-Hartley plans. In the initial list, the QNAs include employers with a dispersion percentage of at least approximately 67%.

[82]   Per the Settlement Agreement, BCBS Michigan would have three days to decide whether or not to bid on this business. If it chose to decline, the QNA would have the right to request a Second Blue Bid from another Licensee.



65.    The initial effect of this provision is to add another potential Blue-Branded competitor in the ASO market for the QNAs.  In the context of the ASO market, large national accounts would be expected to realize the largest benefit from the Second Blue Bid, not only because of their size but also because offerings from TPAs are not as competitive for large national accounts.[83]   The non-QNAs, who are not entitled to receive the Second Blue Bid, will, however, benefit from the follow-on effects of this provision in conjunction with the elimination of the NBE.

### C.    Procompetitive effects of the elimination of NBE together with the Second Blue Bidder

66.    From the standpoint of all self-funded plans (QNAs and non-QNAs), these provisions will encourage the Licensees to develop systems and processes that incentivize them to compete with one another across service areas – for QNAs with Blue-Braded plans due to the Second Blue Bidder provision and for all ASO customers with Green plans due to the elimination of NBE.  The resulting economic impact of the injunctive relief will therefore be felt by all accounts, not just QNAs.  Said differently, the injunctive relief provisions in the settlement can act as a catalyst to competition, fostering an environment in which Licensees compete because it is in their interest to do so.  In that sense, the effects of any additional initial competition for the largest accounts via the Second Blue Bidder provision can be expected to ultimately impact smaller accounts as well.[84]

67.    Because each Licensee has, over time, partnered with providers in their home territory, a potentially competing Licensee is unlikely to *initially* compete effectively against others if they begin by offering plans to companies with few (or no) employees in their home territory.  Still, from an economic perspective, the opportunities to gain market share (and profit) from national accounts can reasonably be expected to outweigh the incentive to remain territorially allocated in the long term.

68.    As with any market, transitioning from a collusive to a competitive environment will take time. A fully competitive environment will not simply materialize the day after the settlement. Over time, however, economic principles suggest that the Licensees will develop the infrastructure and business processes necessary to bid on accounts outside their home territories, and the totality of the injunctive relief in the Settlement Agreement will likely benefit all accounts through greater competition.

---

[83]    I understand TPAs are generally more competitive for regional business, as only the Blues and other major carriers who offer full suite commercial healthcare insurance and other services are able to maintain a national network of providers.  *See, e.g.,* https://www.justice.gov/atr/page/file/914606/download; https://www.justice.gov/atr/case-document/file/940946/download.  I also understand that certain TPAs specialize in administering Taft Hartley plans, such that competition for these plans would be expected to be more robust than for other national accounts.  *See, e.g.,* "2020 Directory of Third Party Administrators" published by the Society of Professional Benefits Administrators, available at www.spbatpa.org.

[84]    Similarly, Taft-Hartley plans, which I understand cannot be QNAs, will benefit over time from the increased competition.



### D.    Responses to objections regarding the injunctive relief

69.    I have evaluated the injunctive relief in this case based on what I believe to be the likely effects of its provisions in their totality.  It is my opinion that the injunctive relief as a whole will lead to a more competitive ASO market and will benefit all members of the Self-Funded Sub-Class.  Taking only a single provision out of context of the whole, therefore, is not meaningful.

70.    Self-funded objectors in this case have raised objections with regard to the injunctive relief provisions in the Settlement Agreement.  Many of the objectors' arguments are legal in nature – some focus on limitations of the Second Blue Bid while others point to perceived discrepancies between the injunctive relief provisions (which are focused on ASOs) and the Settlement Allocation (which distributes the majority of monetary relief to Fully-Insured plans).  By focusing on single aspects or provisions in isolation, these arguments ignore the injunctive relief in its totality.  Furthermore, they ignore second-order effects that, in my opinion, will make the entire ASO market more competitive and will thereby benefit all ASO customers.

71.    From an economic perspective, the objectors' arguments are fatally flawed since they fail to consider the overall economic impact of the injunctive relief in the market for ASO products.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 3rd day of September, 2021.

_____

Joseph R. Mason, PhD



 

**Appendix A**

## JOSEPH R. MASON, PhD

SENIOR ADVISOR

| | |
|---|---|
| Direct | +1.212.364.1926 |
| Mobile | +1.610.805.9083 |
| Email | jmason@bvagroup.com |

Dr. Joseph Mason is a Professor at Louisiana State University and Senior Fellow at the University of Pennsylvania's Wharton School of Business.

He has more than 20 years of experience advising corporations, government agencies, and research institutions on financial risk management issues, reviewing corporate risk management systems and internal models and working on contemporary finance and valuation issues.

Dr. Mason is frequently retained as an expert in litigation involving financial markets, valuation, and macroeconomic dynamics, particularly with respect to securities analysis involving equities, debt instruments, derivative instruments (including options, futures, swaps, and associated underlying price dynamics), and a variety of structured financial products. Dr. Mason has been deposed more than fifty times and has testified at trials and hearings in the United States District Court in the Southern District of New York, the District of Connecticut, and others.

Dr. Mason has testified on economic causation, valuation, market efficient, and damages in the areas of antitrust, PSLRA and Rule 10(b)-5, Section 11, class certifications, breach of contract, suitability, standard of care, financial guarantees and representations and warranties. He has testified in several high-profile federal court cases, such as Assured Guaranty v. Flagstar Bank, In re WTI Oil Futures, and MBIA v. Bank of America.

In regulatory matters, Dr. Mason has opined in connection with banks' risk management systems, their use and classification of structured finance arrangements, and economic capital assessments. He has also been engaged as a principal in a variety of risk management and modeling reviews by institutions such as Fannie Mae, Credit Agricole CIB/Calyon, and ExxonMobil, among other firms.

With regard to public policy, Dr. Mason has testified on financial risk management and financial markets before numerous House and Senate Committees (approximately twenty times), the European Parliament, and the Federal Reserve Board. He has also advised Congress' Joint Economic Committee, the Government Accountability Office, the Congressional Research Service, the Federal Reserve Bank of Richmond, the Public Company Accounting Oversight Board, and the Financial Crisis Inquiry Commission. At the request of the European Parliament Committee on Economic and Monetary Affairs, he co-authored the study, "Financial Supervision and Regulation in the US: Dodd-Frank Reform" (December 2018). Prior to that study, Dr. Mason authored the "Overview and Structure of Financial Supervision and Regulation in the U.S." (September 2015) for that same committee.

Dr. Mason applies formal economic reasoning to issues involving litigation, risk management, and restructuring. His formal economic training and experience is reflected in published academic articles and in his consultations on issues such as the economic dynamics of liquidations and recoveries, the economics of loss causation, and in valuation and risk management in the presence of imperfect information. Not only is Dr. Mason an expert in finance, but also in regard to financial crises and the macroeconomic dynamics of losses and recoveries.

Dr. Mason was previously a Senior Financial Economist at the Office of the Comptroller of the Currency, where, among other things, he analyzed bank risks to support examination assignments and regulatory policy. He has performed similar work for the Federal Reserve Bank of Philadelphia, the Federal Deposit Insurance Corporation, and the World Bank.

Dr. Mason holds a Doctor of Philosophy in financial economics and monetary theory, as well as Master of Science in economics from the University of Illinois at Urbana-Champaign and a Bachelor of Science in economics from Arizona State University.



# JOSEPH R. MASON, PhD

SENIOR ADVISOR

## TESTIMONY AND PUBLICATIONS

**DEPOSITION TESTIMONY:**

*Phoenix Light SF Limited, et al. v. HSBC Bank USA, National Association*
No. 14-cv-10101-LGS-SN
United States District Court, Southern District of New York

*In re Acuity Brands, Inc. Securities Litigation*
No. 18-cv-02140-MHC
United States District Court, Northern District of Georgia, Atlanta Division

*SEB Investment Management AB, Individually and on Behalf of All Others Similarly Situated v. ENDO International PLC, et al.*
No. 17-cv-03711-TJS
United States District Court, Eastern District of Pennsylvania

*Atlantica Holdings, Inc., et al. v. BTA Bank JSC*
No. 13-cv-05790-JMF
United States District Court, Southern District of New York

*Atlantica Holdings, Inc., et al. v. Sovereign Wealth Fund "Samruk- Kazyna," JSC*
No. 12-cv-08852-JMF
United States District Court, Southern District of New York

*Homeward Residential, Inc., solely in its capacity as Master Servicer for the Option One Mortgage Loan Trust 2006-2, for the benefit of the Trustee and the holders of Option One Mortgage Loan Trust 2006-2 Certificates v. Sand Canyon Corporation, f/k/a Option One Mortgage Corporation*
No. 12-cv-05067-JFK-JLC
United States District Court, Southern District of New York

*Homeward Residential, Inc., solely in its capacity as Servicer for the Option One Mortgage Loan Trust 2006-3, for the benefit of the Trustee and the holders of Option One Mortgage Loan Trust 2006-3 Certificates v. Sand Canyon Corporation, f/k/a Option One Mortgage Corporation*
No. 12-cv-07319-JFK-JLC
United States District Court, Southern District of New York

*Phoenix Light SF Limited, et al. v. The Bank of New York Mellon*
No. 14-cv-10104-VEC
United States District Court, Southern District of New York

*Securities and Exchange Commission v. Amir Waldman*
No. 17-cv-02088-RMB
United States District Court, Southern District of New York

CONFIDENTIAL  |  DO NOT DISTRIBUTE WITHOUT CONSENT



# JOSEPH R. MASON, PhD

**Appendix A**

## SENIOR ADVISOR

*Securities and Exchange Commission v. Lawrence F. Cluff, Jr. and Roger E. Shaoul*
No. 17-cv-02460-RMB
United States District Court, Southern District of New York

*Nora Fernandez, et al. v. UBS Financial Services of Puerto Rico, et al.*
No. 15-cv-02859-SHS
United States District Court, Southern District of New York

*Vesta Halay Johnston and Lake Charles Rubber and Gasket Co. L.L.C. v. Susan Halay Vincent, Martin Bryan Vincent, Moby Goodwin, and Gulf Coast Rubber & Gasket, L.L.C*
No. 2015-4153-G
14th Judicial District Court, Calcasieu Parish, Louisiana

*Trust Instruction Proceeding regarding Deutsche Bank National Trust Co., solely as Trustee of Securitized Asset Backed Receivables LLC Trust 2007- BR2 (SABR 2007-BR2) and Securitized Asset Backed Receivables LLC Trust 2007-BR3 (SABR 2007- BR3 v. WMC Mortgage, LLC)*
No. 651789/2013
Supreme Court of the State of New York, County of New York

*Deutsche Bank National Trust Co., solely in its capacity as Trustee for the Morgan Stanley Structured Trust I 2007-1 v. Morgan Stanley Mortgage Capital Holdings LLC, as Successor-by-Merger to Morgan Stanley Mortgage Capital Inc.*
No. 14-cv-03020-LTS
United States District Court, Southern District of New York

*The Bank of New York Mellon solely as Securities Administrator for the J.P. Morgan Mortgage Acquisition Trust, Series 2006-WMC4 v. WMC Mortgage. LLC, et al.*
No. 654464/2012
Supreme Court of the State of New York, County of New York

*TMI Trust Company of New York, solely in its capacity as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006- WM2 v. WMC Mortgage LLC, f/k/a WMC Mortgage Corp.*
No. 12-cv-01538-CSH
United States District Court, District of Connecticut

*U.S. Securities and Exchange Commission v. Commonwealth Advisors, Inc. and Walter A. Morales*
No. 12-cv-00700-JWD
United States District Court, Middle District of Louisiana, Baton Rouge Division

*United States of America ex rel. Michael J. Fisher, Brian Bullock and Michael Fisher, Individually and Brian Bullock, Individually, v. Ocwen Loan Servicing LLC and Ocwen Financial Corporation*
No. 12-cv-00543-ALM
United States District Court, Eastern District of Texas, Sherman Division

*In re Barclays Bank PLC Securities Litigation*
No. 09-cv-01989-PAC
United States District Court, Southern District of New York

CONFIDENTIAL  |  DO NOT DISTRIBUTE WITHOUT CONSENT



# JOSEPH R. MASON, PhD

**Appendix A**

### SENIOR ADVISOR

*Federal Home Loan Mortgage Corporation v. Deloitte & Touche LLP*
No. 14-cv-23713-UU
United States District Court, Southern District of Florida, Miami Division

*Deutsche Bank National Trust Company, as Trustee for Morgan Stanley ABS Capital I Inc. Trust 2007-HE6 v. Decision One Mortgage Company, LLC*
No. 2013 L 005823
Circuit Court of Cook County, Illinois, County Department — Law Division

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*
No. 08-cv-10783-MGC
United States District Court, Southern District of New York

*Lavastone Capital LLC v. Coventry First LLC, et al.*
No. 14-cv-07139-JSR
United States District Court, Southern District of New York

*Public Employees Retirement Association of New Mexico, v. Clearlend Securities F/K/A Wachovia Global Securities Lending F/K/A Metropolitan West Securities, L.L.C.; Wachovia Bank, N.A.; Wells Fargo Bank, N.A.*
No. D-101-CV-2010-03651
State of New Mexico, County of Santa Fe, First Judicial District

### TRIAL AND HEARING TESTIMONY:

*Vesta Halay Johnston and Lake Charles Rubber and Gasket Co. L.L.C. v. Susan Halay Vincent, Martin Bryan Vincent, Moby Goodwin, and Gulf Coast Rubber & Gasket, L.L.C*
No. 2015-4153-G
14th Judicial District Court, Calcasieu Parish, Louisiana

*United States of America v. Tinghui Xie, also known as Kelly Xie, also known as Kelly Liu, et al.*
No. 17-92-JWD-EWD
United States District Court, Middle District of Louisiana

*Securities and Exchange Commission v. Amir Waldman*
No. 17-cv-02088-RMB
United States District Court, Southern District of New York

*Securities and Exchange Commission v. Lawrence F. Cluff, Jr. and Roger E. Shaoul*
No. 17-cv-02460-RMB
United States District Court, Southern District of New York

*TMI Trust Company of New York, solely in its capacity as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2 v. WMC Mortgage LLC, f/k/a WMC Mortgage Corp.*
No. 12-cv-01538-CSH
United States District Court, District of Connecticut

CONFIDENTIAL  |  DO NOT DISTRIBUTE WITHOUT CONSENT



# JOSEPH R. MASON, PhD

### SENIOR ADVISOR

*In re Crude Oil Commodity Futures Litigation*
No. 11-cv-03600-PGG
United States District Court, Southern District of New York

### LEGISLATIVE AND REGULATORY TESTIMONY, BRIEFS, AND PRESENTATIONS:

*Presentation to U.S. Securities & Exchange Commission Staff*
Confidential matter relating to whether and how a global asset management company applied algorithmic trading tools, models, and methods to emerging market debt portfolio management.
Washington, D.C.

Brief of Dr. Joseph R. Mason, et al., as Amici Curiae Financial Economists in support of Respondents, on *Writ of Certiorari to the United States Court of Appeals for the Second Circuit, in the Supreme Court of the United States*, Goldman Sachs Group, Inc., et al., Petitioners, v. Arkansas Teacher Retirement System, et al., Respondents, March 3, 2021.

Brief of Dr. Joseph R. Mason, et al., as Amici Curiae Economics and Finance Professors, in support of *Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and Defendant's Cross Motion-Motion for Summary Judgment*, People of the State of California, et al., Plaintiffs, v. The Office of the Comptroller of the Currency, et al., Defendants, United States District Court, Northern District of California (Oakland), January 21, 2021.

*Testimony before the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Energy and Mineral Resources,* "Climate Change: Preparing for the Energy Transition," February 12, 2019.

Co-Author (with Jeffrey D. Balcombe and W. Scott Dalrymple), "Financial Supervision and Regulation in the US: Dodd-Frank Reform," *European Parliament*, December 2018.

*Testimony before the U.S. Senate Committee on Energy and Natural Resources,* "Hearing on the Bureau of Ocean Energy Management's 2017-2022 OCS Oil and Gas Leasing Program," May 19, 2016.

*Testimony before the U.S. House of Representatives Committee on Natural Resources,* "The Impacts of Federal Policies on Energy Production and Economic Growth in the Gulf," September 15, 2015.

"Overview and Structure of Financial Supervision and Regulation in the U.S.," Prepared for the European Parliament's Committee on Economic and Monetary Affairs, Directorate General for Internal Policies, Policy Department A: Economic and Scientific Policy, IP/A/ECON/2012-16, PE 492.470, September 2015.

*Testimony before the U.S. Senate Committee on Environment and Public Works, Clean Air and Nuclear Safety Subcommittee, Minority Field Hearing,* "The EPA's Threat to Louisiana's Ozone Attainment," August 5, 2014.

*Testimony before the U.S. Senate Committee on Environment and Public Works, Clean Air and Nuclear Safety Subcommittee,* "Climate Change: The Need to Act Now," June 18, 2014.

*Testimony before the U.S. House of Representatives Committee on Natural Resources*, "One Year after President Obama's Gulf of Mexico 6-Month Moratorium Officially Lifted: Examining the Lingering Impacts on Jobs, Energy Production and Local Economies," October 12, 2011.



# JOSEPH R. MASON, PhD

**Appendix A**

### SENIOR ADVISOR

Brief of Dr. Brian C. Becker, Dr. Sara Fisher Ellison, and Dr. Joseph R. Mason as Amici Curiae in Support of Petitioners, on *Petition for a Writ of Certiorari to the United States Court of Appeals for the Second Circuit,* Sergeants Benevolent Association Health and Welfare Fund, on Behalf of Themselves and Others Similarly Situated, et al., Petitioners, v. Eli Lilly and Company, Respondent, April 25, 2011.

*Testimony before the House of Representatives, Committee on Natural Resources, Subcommittee on Energy and Mineral Resources.* "Legislative Hearing on H.R. 1229, H.R. 1230 and H.R. 1231," April 6, 2011.

*Testimony before the House of Representatives, Committee on Energy and Commerce, Subcommittee on Energy and Power,* "The American Energy Initiative," March 17, 2011.

*Testimony before the House of Representatives Committee on the Judiciary,* "Foreclosed Justice: Causes and Effects of the foreclosure Crisis," December 2, 2010.

Robert Litan and Joseph Mason as Amici Curiae Supporting Petitioners, on *Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit, in the Supreme Court of the United States,* Matrixx Initiatives, Inc., et al., Petitioners, v. James Siracusano and NECA-IBEW Pension Fund, Respondent, November 12, 2010.

*Testimony before the Senate Committee on Small Business and Entrepreneurship,* "The Deepwater Drilling Moratorium: A Second Economic Disaster for Small Businesses," July 27, 2010.

*Testimony before the House Financial Services Committee, Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises,* "Credit Default Swaps on Government Debt: Potential Implications of the Greek Debt Crisis," April 29, 2010.

*Testimony before the Senate Committee on the Judiciary, Subcommittee on Administrative Oversight and the Courts,* "Could Bankruptcy Reform Help Preserve Small Business Jobs," March 17, 2010.

### ACADEMIC PUBLICATIONS:

"Asset Sales, Recourse, and Investor Reactions to Initial Securitizations: Evidence Why Off-Balance Sheet Accounting Treatment Does Not Remove On-Balance Sheet Financial Risk," (with Eric J. Higgins and Adi Mordel), *Journal of Risk Finance*, Vol. 20, Issue 3, August 12, 2019.

"Self-reporting under SEC Reg AB and transparency in securitization: evidence from loan-level disclosure of risk factors in RMBS deals," (with Michael Imerman and Hong Lee), *Journal of Risk Finance*, Vol. 15, Issue 4, August 18, 2014.

"The Effects of Reconstruction Finance Corporation Assistance on Michigan Banks' Survival in the 1930s," (with Charles Calomiris and Marc Weidenmier), *Explorations in Economic History*, Vol. 50, Issue 4, October 2013.

"Blood and Treasure': Exiting the Great Depression and Lessons for Today," (with Kris Mitchener), *The Great Depression of the 1930s*, Peter Fearon and Nicholas Crafts, eds. Oxford University Press, 2013.

"Options-based Structural Model Estimation of Bond Recovery Rates," (with Robert R. Cangemi, Jr. and Michael S. Pagano), *Journal of Financial Intermediation*, Vol. 21, Issue 3, July 2012.

CONFIDENTIAL  |  DO NOT DISTRIBUTE WITHOUT CONSENT



# JOSEPH R. MASON, PhD

## SENIOR ADVISOR

"Blood and Treasure': Exiting the Great Depression and Lessons for Today," (with Kris Mitchener). *Oxford Journal of Economic Policy*, Vol. 26, Issue 3, October 2010.

"The Economic Impact of Eliminating Preemption of State Consumer Protection Laws," (With Hal Singer and Rob Kulick), *The University of Pennsylvania Journal of Business Law*, Vol. 12, Issue 3, Spring 2010.

"Real Options Approach to Life Settlements Valuation," (with Hal Singer) in *Life Markets: Trading Mortality and Longevity Risk with Life Settlements and Linked Securities*, Vishaal Bhuyan, ed., Wiley Finance, 2009.

"Structuring for Leverage: CPDOs, SIVs, and ARSs," in *Prudent Lending Restored: Securitization after the 2007 Mortgage Securities Meltdown*, part of the Brookings-Wharton Series on Financial Intermediaries, Robert Litan, Richard Herring, and Yasuyuki Fuchita, eds., Washington, DC: Brookings Institution Press, August 2009.

"The Evolution of the Reconstruction Finance Corporation as a Lender of Last Resort in the Great Depression," in *Bailouts and Government Rescues*, Robert E. Wright, ed., New York: SSRC/Columbia University Press, 2009.

"Regulating for Financial System Development, Financial Institutions Stability, and Financial Innovation," in *Financial Market Regulation after Financial Crises: The Historical Experience*, Gianni Toniolo and Eugene White, eds. 2009.

"Cliff Risk and the Credit Crisis," in *The First Credit Market Turmoil of the 21st Century: Implications for Public Policy*, Douglas Evanoff and George Kaufman, eds. World Scientific Studies in International Economics – Vol. 10. London: World Scientific Publishers Co. Pte. Ltd., 2009.

## BOOK CHAPTERS:

"Financial Regulation and Fraud in CO2 Markets," *Research Handbook of Investing in the Triple Bottom Line*, Sabri Boubaker, Douglas Cummings and Doc Nguyen, eds., Cheltenham: Edward Elgar, 2018, pp. 9-28.

"Contagion and Bank Failures during the Great Depression: The Chicago Banking Panic of June 1932," (with Charles Calomiris). American Economic Review, December 1997 (87:5), pp. 863-884. Reprinted in The International Library of Critical Writings in Economics –*Regulation and Governance of Financial Institutions*, edited by James R. Barth and Ross Levine, Cheltenham: Edward Elgar Publishers, 2016.

"Fundamentals, Panics and Bank Distress during the Depression," (with Charles Calomiris), *American Economic Review*, December 2003 (93:5), pp. 1615-1647. Reprinted in the International Library of Critical Writings in Economics – *Regulation* and *Governance of Financial Institutions*, James R. Barth and Ross Levine, eds., Cheltenham: Edward Elgar Publishers, 2016. Also reprinted in The International Library of Critical Writings in Economics – Financial Crises. Franklin Allen, ed., Cheltenham: Edward Elgar Publishers, 2008.

"'Blood and Treasure': Exiting the Great Depression and Lessons for Today," (with Kris Mitchener). *The Great Depression of the 1930s*, Peter Fearon and Nicholas Crafts, eds. Oxford University Press 2013, pp. 395-428.

"Real Options Approach to Life Settlements Valuation," (with Hal Singer), *Life Markets: Trading Mortality and Longevity Risk with Life Settlements and Linked Securities*, Vishaal Bhuyan, ed., Hoboken: Wiley Finance, 2009, pp. 135-152.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



# JOSEPH R. MASON, PhD

**Appendix A**

### SENIOR ADVISOR

"Structuring for Leverage: CPDOs, SIVs, and ARSs," *Prudent Lending Restored: Securitization after the 2007 Mortgage Securities Meltdown*, Brookings-Wharton Series on Financial Intermediaries, Robert Litan, Richard Herring, and Yasuyuki Fuchita, eds., Washington, DC: Brookings Institution Press, 2009, pp. 79-104.

"The Evolution of the Reconstruction Finance Corporation as a Lender of Last Resort in the Great Depression," *Bailouts and Government Rescues*, Robert E. Wright, ed., New York: Social Science Research Council/Columbia University Press, 2010, pp. 70-107.

"Regulating for Financial System Development, Financial Institutions Stability, and Financial Innovation," *Financial Market Regulation after Financial Crises: The Historical Experience*. Gianni Toniolo and Eugene White, eds. Rome: Banca d'Italia, 2009, pp. 225-242.

"Cliff Risk and the Credit Crisis," *The First Credit Market Turmoil of the 21st Century: Implications for Public Policy*, World Scientific Studies in International Economics – Vol. 10, Douglas Evanoff and George Kaufman, eds. London: World Scientific Publishers Co. Pte. Ltd., 2009, pp. 141-160.

### PROFESSIONAL PUBLICATIONS, CONFERENCE PROCEEDINGS, AND POLICY PAPERS:

"The Economics of the Proposed Mortgage Servicer Settlement," (with Charles Calomiris and Eric Higgins), May 2011.  Available at http://ssrn.com/abstract=1833729.  Cited in, "The Housing Bust Lobby: Obama is right to resist the foreclosure wails from the political left," *Wall Street Journal*, Editorial Staff, October 19, 2010.

"Critique of the Inter-Agency Economic Report 'Estimating the Economic Effects of the Deepwater Drilling Moratorium on the Gulf Coast Economy.'" Washington, DC: American Energy Alliance, September 2010.  Cited in, "The Real Gulf Disaster The well is plugged. The moratorium drags on." *Wall Street Journal*, Editorial Staff, September 23, 2010.

"Regional and National Economic Impact of Repealing the Section 199 Tax Deduction and Dual-capacity Tax Credit for Oil and Gas Producers," Washington, DC: *American Energy Alliance*, September 2010.

"The Economic Cost of a Moratorium on Offshore Oil and Gas Exploration to the Gulf Region," Washington, DC: *American Energy Alliance*, July 2010.

"The Information Content of Asset-backed securities Downgrades and the Motivation Behind Them," 46th Annual Conference on Bank Structure and Competition, *Proceedings,* Chicago: Federal Reserve Bank of Chicago, May 2010, pp. 298-316.

### COMMENTS, OPINIONS, EDITORIALS, AND FEATURE-LENGTH INTERVIEWS IN PRINT MEDIA:

"COVID-19 Recovery and Commercial Real Estate Dynamics," (with Jody Bland), *BVA Group*, April 17, 2020.

"Evaluating Economic Losses in the Age of Coronavirus," (with Jody Bland), *BVA Group*, April 16, 2020.

"PPP Loan Policy and Lenders' Litigation Risk," (with Jody Bland), *BVA Group*, April 6, 2020.

CONFIDENTIAL  |  DO NOT DISTRIBUTE WITHOUT CONSENT



# JOSEPH R. MASON, PhD

**Appendix A**

## SENIOR ADVISOR

"COVID-19 as a Natural Disaster and the Role of CARES," (with Jody Bland), *BVA Group*, April 2, 2020.

"Consumer Debt Defaults and the COVID-19 Pandemic," (with Jody Bland), *BVA Group*, March 27, 2020.

"Investing in a Consumer Debt Holiday," (with Jody Bland), *BVA Group*, March 25, 2020.

"COVID-19 Economic Policy to Fight the New War, " (with Jody Bland), *BVA Group*, March 24, 2020.

"Mortgage Payment Holidays, Servicing Advances, and Fed Policy," (with Jody Bland) *BVA Group*, March 23, 2020.

"Attacking Central Bank Independence," (with David Kotok), *Barron's*, May 21, 2011.

"Time for a Cease-Fire in the War on Oil," *Wall Street Journal*, April 25, 2011.

"Obama's Energy Policies are Crippling Economic Recovery," *Washington Examiner*, March 6, 2011.

"Why Regulators Should Let Banks Foreclose: Data Show that brief Additional Timeouts Don't Allow Borrowers to become Current," *Wall Street Journal*, February 24, 2011.

"Bankruptcy: Flaw in the Law?" *Credit Magazine*, March 2011.

"No Incentive to Improve," *Credit Magazine*, January 2011.

"Bailout Funds Miss the Point," *Credit Magazine*, November 2010.

"The Housing Bust Lobby," *Wall Street Journal*, October 19, 2010.

"The Real Gulf Disaster," *Wall Street Journal*, September 23, 2010.

"Saved from the Safe Harbor," *Credit Magazine*, July/August 2010.

"Congress's Hugo Chávez Bailout Bill," *Wall Street Journal*, July 30, 2010.

"The Value of Good Service," *Credit Magazine*, May 2010.

"TBTF: Not About Size, About Information," *Bank Accounting & Finance*, April 2010.



**EXHIBITS 1 – 6**

**FILED UNDER SEAL**

**In Re Blue Cross Blue Shield Antitrust Litigation**
**Exhibit 7**
**State and Municipal Membership Proportions**

*State and Municipal Adjustment Factors*

| | 2015 | 2016 | 2017 | 2018 | 2019 | Average |
|---|---|---|---|---|---|---|
| *Number of Employees in the United States (1)* | | | | | | |
| Private sector | 119,937,314 | 123,213,270 | 125,415,757 | 129,955,063 | 131,332,886 | 125,970,858 |
| State/local government sector | 19,297,960 | 19,406,337 | 19,543,868 | 19,600,027 | 19,688,212 | 19,507,281 |
| *Percent of employees with employers that provide health insurance (2)* | | | | | | |
| Private sector | 83.8% | 84.3% | 84.5% | 84.6% | 85.3% | 84.5% |
| State/local government sector | 99.2% | 99.3% | 99.3% | 99.3% | 99.4% | 99.3% |
| *Number of employees with employers that provide health insurance* | | | | | | |
| Private sector | 100,507,469 | 103,868,787 | 105,976,315 | 109,941,983 | 112,026,952 | 106,464,301 |
| State/local government sector | 19,143,576 | 19,270,493 | 19,407,061 | 19,462,827 | 19,570,083 | 19,370,808 |
| *Percent of employees that are enrolled in health insurance (3)* | | | | | | |
| Private sector | 57.0% | 56.0% | 56.5% | 56.5% | 55.8% | 56.4% |
| State/local government sector | 67.4% | 67.8% | 67.3% | 67.2% | 65.3% | 67.0% |
| *Number of employees that are enrolled in health insurance* | | | | | | |
| Private sector | 57,289,257 | 58,166,521 | 59,876,618 | 62,117,221 | 62,511,039 | 59,992,131 |
| State/local government sector | 12,902,770 | 13,065,394 | 13,060,952 | 13,079,020 | 12,779,264 | 12,977,480 |
| *Percent of enrollees that are enrolled in Insured plans (4)* | | | | | | |
| Private sector | 40.0% | 42.2% | 40.6% | 41.3% | 41.5% | 41.1% |
| State/local government sector | 32.9% | 30.0% | 30.0% | 29.6% | 34.0% | 31.3% |
| **Total Insured Employees** | | | | | | |
| Total Private Sector Employees | 22,915,703 | 24,546,272 | 24,309,907 | 25,654,412 | 25,942,081 | 24,673,675 |
| Total State and Municipal Sector Employees | 4,245,011 | 3,919,618 | 3,918,286 | 3,871,390 | 4,344,950 | 4,059,851 |
| **Non-State/Municipal Portion of Insured Employees** | **84.4%** | **86.2%** | **86.1%** | **86.9%** | **85.7%** | **85.9%** |
| **Total Self-Funded Employees** | | | | | | |
| Total Private Sector Self-Funded Employees | 34,373,554 | 33,620,249 | 35,566,711 | 36,462,808 | 36,568,958 | 35,318,456 |
| Total State and Municipal Sector Self-Funded Employees | 8,657,759 | 9,145,776 | 9,142,666 | 9,207,630 | 8,434,314 | 8,917,629 |
| **Non-State/Municipal Portion of Self-Funded Employees** | **79.9%** | **78.6%** | **79.6%** | **79.8%** | **81.3%** | **79.8%** |

**Sources and notes**

(1) Medical Expenditure Panel Survey Table XI.B.1.

(2) Medical Expenditure Panel Survey Table XI.B 2.

(3) Medical Expenditure Panel Survey Table XI.B 2 b.

(4) Medical Expenditure Panel Survey Table XI.B 2 b (1).  Table XI.B.2.b.(1) not published for years prior to 2015.

