FILED
2021 Sep-27  PM 04:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

```
-------------------------------------------------x
                                                 x     MDL No. 2406
In re Blue Cross Blue Shield                     x
Antitrust Litigation                             x     Master File No. 2:13-cv-2000-RDP
                                                 x
                                                 x
-------------------------------------------------- x
```

**NATIONAL ACCOUNTS' REPLY MEMORANDUM
IN SUPPORT OF THEIR MOTION TO OPT OUT
OF THE INJUNCTIVE RELIEF SETTLEMENT CLASS
OR, IN THE ALTERNATIVE, OPPOSITION TO THE APPROVAL OF THE
INJUNCTIVE RELIEF CLASS SETTLEMENT**

# TABLE OF CONTENTS

Introduction ..................................................................................................................1

Argument .....................................................................................................................2

I.   The Court Has Discretion to Allow Class Members to Opt Out of an
     Injunctive Relief Class .........................................................................................2

II.  The Defendants' Territorial Allocation Is Clearly Illegal ................................................4

     A.  An Aggregation of Offenses Is Not Required ....................................................4

     B.  Defendants' Single-Entity Defense Is Deficient as a Matter of Law ...........................5

     C.  Defendants' Common-Law Trademark Argument Fails as a Matter of Law ...........8

III. The Injunctive Relief Settlement Does Not Treat Class Members Equitably
     Relative to Each Other .........................................................................................12

     A.  The Injunctive Relief Is Not Indivisible ............................................................12

     B.  The Injunctive Relief Does Not Treat Class Members Equitably
         Relative to Each Other ....................................................................................14

         1.  Defendants and the Class Rely on Inapposite Authority ............................14

         2.  There Is No Rational Basis for the Unequal Injunctive Relief ...................15

             a.  Opt-outs from the monetary relief class are denied second Blue bids .................15

             b.  The dispersion requirement has no rational basis ...............................16

             c.  The dispersion requirement protects Anthem from Blue-on-Blue competition.....17

             d.  There is no rational basis to exclude the Taft-Hartley or Church Plans ...............19

             e.  There is no rational basis to deny second Blue bids to class members
                 in states with overlapping Defendants ................................................20

IV.  The Failure to Provide Any Relief from the Local Best Efforts Rule Is
     Neither Fair, Reasonable, Nor Adequate .............................................................20

V.   Defendants Have Breached Their Arbitration Agreements ...........................................21

VI.  Movants' Motion to Intervene Should Be Granted ......................................................23

**A.  Movants Meet the Requirements for Mandatory Intervention** ............................23

**B.  Movants Meet the Requirements for Permissive Intervention** ...........................25

**Conclusion** ..................................................................................................................25

## TABLE OF AUTHORITIES

*American Needle, Inc. v. NFL*, 560 U.S. 183 (2010) ............................................................. *passim*

*Belasanyan v. Nordstrom, Inc.*, 2012 WL 1944609 (S.D. Cal. 2012) ...........................................22

*Brown v. Price*, 2017 WL 4698025 (D. Or. 2017) .......................................................................22

*Chiles v. Thornburgh*, 865 F.2d 1197 (11th Cir. 1989) ..........................................................24, 25

*Citigroup, Inc. Sec. Litig.*, 2014 WL 3610988 (S.D.N.Y. 2014) .................................................22

*Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50 (2d Cir. 1997) .............................................10

*Copperweld Corp. v. Independence Tube*, 467 U.S. 752 (1984) ...............................................6, 8

*Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546 (11th Cir. 1986) ........................................2, 3

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007) ...................................................22

*Eubanks v. Billington*, 110 F.3d 87 (D.C. Cir. 1997) .....................................................................3

*Grilli v. Metro Life Ins. Co.*, 78 F.3d 1533 (11th Cir. 1996) .....................................................24

*Hall v. Accolade, Inc.*, 2019 WL 3996621 (E.D. Pa. 2019) ........................................................14

*Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983) ................................................3

*In re American Bank Note*, 127 F. Supp. 2d 418 (S.D.N.Y. 2001) ..............................................14

*In re Checking Acct Overdraft Litig.*, 2020 WL 4586398 (S.D. Fla. 2020) .................................22

*In re Paine Webber, Ltd.*, 171 F.R.D. 104 (S.D.N.Y. 1997) ........................................................14

*Kincaid v. General Tire & Rubber Co.*, 635 F.2d 501 (5th Cir. 1981).........................................3

*Leverso v. Southtrust Bank*, 18 F.3d 1527 (11th Cir. 1994) ........................................................4

*Lopez v. Progressive Select Ins. Co.*, 2020 WL 763571 (S.D. Fla. 2020)...................................24

*Lurns v. Russell Corp.*, 604 F. Supp. 1335 (M.. Ala. 1984) ........................................................14

*Northrop & Johnson Yacht-Ships, Inc. v. Royal Von Lent Shipyard, B.V.*,
855 Fed. App'x 468 (11th Cir. 2021) ...........................................................................................23

*Pedraza v. Untied Gar. Corp.*, 2001 WL 37071199 (S.D. Ga. 2001) ..........................................14

*Penson  v. Terminal Trans. Co.*, 634 F.2d 989 (5th Cir. 1981) ........................................................3

*Petrovic v. American Oil Co.*, 200 F.3d 1140 (8th Cir. 1999)........................................................14

*Radcliffe v. Hernandez*, 794 F. App'x 605 (9th Cir. 2019) ............................................................14

*Robertson v. NBA*, 556 F.2d 682 (7th Cir. 1997).........................................................................4

*Soc'y of Prof. Eng'g v. Boeing Co.*, 2015 WL 13643720 (D.. Kan. 2015) ...................................22

*Stott v. Cap. Fin. Serv., Inc.*, 277 F.R.D. 316 (N.D. Tex. 2011)....................................................22

*Swinton v. SquareTrade, Inc.*, 2019 WL 617791 (S.D. Iowa 2019)...............................................14

*Technology Training Associates v. Buccaneers Ltd. P'ship*, 874 F.3d 692 (11th Cir. 2017).........24

*U.S. v. Sealy, Inc.*, 388 U.S. 350 (1967) .....................................................................................4, 5

*U.S. v. Topco Associates, Inc.*, 388 U.S. 596 (1972) .................................................................5, 11

*VMG Enterprises, Inc. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648 (D.P.R. 1992)..............10

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .....................................................3, 12, 13, 14

*Whitson v. Heilig-Meyer Furniture*, 1995 U.S. Dist. LEXIS 4312 (N.D. Ala. 1995) ....................3

**Introduction**

Defendants and the Class oppose the motion of the Alaska Air Movants[1] ("Movants") to opt out of the injunctive relief class or, in the alternative, object to the injunctive relief settlement. Together, the opposition makes five arguments. Each is without merit.

First, Defendants assert that class members, as a matter of law, are not allowed to opt out of an injunctive relief class. The Eleventh Circuit, however, has rejected that position and holds that the trial court has discretion to grant opt-out rights to injunctive relief class members.

Second, Defendants and the Class assert that (1) the single-entity defense and (2) common-law trademark rights prevent the Defendants' territorial allocation from being "clearly unlawful." Thus, Defendants and the Class claim that class members can be compelled to release future claims against that continuing conduct. This Court, however, has already found there is no genuine dispute as to facts that dispose of the single-entity defense, as a matter of law. And, even if individual Defendants previously possessed the common-law trademark rights that Defendants hypothesize, as a matter of law, the rights of those individual and separate economic actors may not be placed in the hands of a group of competitors (*i.e.*, BCBSA) to be jointly administered so as to eliminate individual economic centers of decision-making.

Third, Defendants and the Class assert that injunctive relief class members are not inequitably treated relative to each other even though some are allowed to request a second Blue bid and others are not. Class injunctive relief, however, must be "indivisible" and apply equally to all class members. If it does not, the injunctive relief class members must be allowed to opt out of a (b)(2) class. Every case Defendants and the Class cite allowing class members to be treated differently involved instances in which class members could opt out. Moreover, those cases

---

[1]    *See* Dkt. # 2812-19, p. 1, n.1.

involved monetary relief  that allowed some class members to receive more money than others because they had suffered different degrees of injury.  None of the cited cases involved a settlement that granted injunctive relief to some class members but not to others.  Furthermore, even if class members could be given unequal injunctive relief, there is no rational basis for doing so here.

Fourth, Defendants and the Class deny that the restrictions on second Blue bids protect Anthem from any significant Blue-on-Blue competition.  Their own briefs, however, acknowledge that only 20 National Accounts in Anthem's 14-state territory will be able to request a second Blue bid.  Those 20 Accounts represent only 1.9% of the Qualified National Accounts in the proposed settlement agreement despite the fact that Anthem's territory covers 33% of the U.S. population.  In other words, Defendants' and the Class's own argument demonstrates how the agreement protects Anthem and disproportionally injures National Accounts located in Anthem's territory.  Many of the Movants are located in an Anthem territory and seek to opt out of the settlement in order to pursue their own injunctive relief.

Fifth, Defendants assert they can breach their arbitration agreements with impunity.  Movants disagree.  Defendants should not be rewarded for their breach.  Class members with arbitration agreements should be allowed to opt out of the proceedings in which they should not have been included in the first place.

## <u>Argument</u>

### I.     The Court Has Discretion to Allow Class Members to Opt Out of an Injunctive Relief Class

Defendants claim that class members are not allowed to opt out of a Rule 23(b)(2) injunctive relief class.  Dkt. #2813, p. 5.  The Eleventh Circuit, however, holds otherwise.  In *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1554 (11th Cir. 1986), the Court stated:

> A district court acting under its Rule 23(d)(2) discretionary power may require that an opt-out right … be given [to Rule 23(b)(2) class members] should it believe that such a right is desirable to protect the interest of the absent class members. [citations omitted]  Such a decision may be reversed only for abuse of discretion.

In support of this ruling, the Eleventh Circuit relied on *Penson v. Terminal Trans. Co.*, 634 F.2d 989, 994 (5th Cir. 1981).  In *Penson,* the Court stated that "there have been a number of 23(b)(2) class actions in which a district court has provided for notice and opt-out rights to be sent to the class members" and that such rights "have been implicitly approved by this Court."  *See also Whitson v. Heilig-Meyer Furniture*, 1995 U.S. Dist. LEXIS 4312, *56 (N.D. Ala. 1995) ("Both the former Fifth Circuit and the Eleventh Circuit have held that, in a Rule 23(b)(2) class action … district courts have discretion to require that class members be given the opportunity to opt out"); *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983) (holding district court abused its discretion by not allowing opt-outs from a 23(b)(2) class settlement).[2]

Movants respectfully submit that this Court should exercise its discretion and allow them to opt out of the injunctive relief settlement because the Movants should not be ordered to (1) release future violations of §1 of the Sherman Act; (2) stay in a (b)(2) class settlement that punishes them for opting out of the (b)(3) class and treats them unequally relative to other class members; (3) accept a (b)(2) class settlement that protects Anthem from any significant competition from

---

[2]      In support of their contrary position, Defendants rely primarily on *Kincaid v. General Tire & Rubber Co.*, 635 F.2d 501, 507 (5th Cir. 1981).  *Kincaid* and *Penson* were decided only seven days apart.  It is clear from *Whitson*, *Cox* and *Holmes* that the *Penson* view has prevailed in the Eleventh Circuit.  Defendants also rely on *Eubanks v. Billington*, 110 F.3d 87, 94 (D.C. Cir. 1997).  But there, the court agreed with *Penson* and *Holmes* that Rule 23 "affords district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions."  110 F.3d at 94.  Defendants also cite to *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011), for the proposition that Rule 23(b)(2) does not "require" opt-out rights.  Dkt. #2813, p. 5.  Movants, however, do not claim that (b)(2) opt-out rights are "required" – only that the court has discretion to grant them.

second Blue bids; and (4) participate in a settlement that rewards Defendants for breaching their contractual arbitration obligations.

## II.     The Defendants' Territorial Allocation Is Clearly Illegal

At the preliminary approval hearing, Defendants and the Class conceded that the proposed settlement could not be approved if the continuation of Defendants' territorial allocation was a *per se* violation of §1 of the Sherman Act.  *See* Dkt. #2812-19 at 13-14.  This Court concurred and stated it was "clear" that if the conduct allowed by the settlement constituted a *per se* violation, then the Court "could not approve [it]."  *Id*. at 13.  In their response, Defendants and the Class slightly change their position.  Relying on *Robertson v. NBA*, 556 F.2d 682, 686 (7th Cir. 1997), they now argue that a court can approve a settlement unless the authorized conduct is "clearly illegal."  Dkt. #2812-1, p. 64; Dkt. #2813, p. 16.  For current purposes, we will assume that the test is whether the conduct is "clearly illegal."  Regardless of the test, however, a class member should not be compelled to agree to a settlement if its terms are "invalid as a matter of law." *Leverso v. Southtrust Bank*, 18 F.3d 1527, 1531 (11th Cir. 1994).  As explained below, the reasons advanced by Defendants and the Class for why Defendants' territorial allocation is not clearly illegal have no merit.

### A.  An Aggregation of Offenses Is Not Required

Defendants and the Class continue to argue that Defendants' territorial allocation is *per se* unlawful or clearly illegal only if it is aggregated with Defendants' National Best Efforts Rule. Dkt. #2812-1 at pp. 65-66; Dkt. #2813 at pp. 16-17.  According to Defendants and the Class, such aggregation is required by *U.S. v. Sealy, Inc.*, 388 U.S. 350, 357 (1967), and the Court's summary judgment ruling. 308 F. Supp. 3d at 1261.

In *U.S. v. Topco Associates, Inc.*, 388 U.S. 596, 609, n.9 (1972), however, the Supreme Court explicitly rejected the contention that *Sealy* required an aggregation of offenses in order to find that a horizontal territorial trademark allocation is *per se* unlawful ("To the extent that *Sealy* casts doubt on whether horizontal territorial limitations unaccompanied by [other offenses] are *per se* violations of the Sherman Act, we remove that doubt today"). Defendants and the Class are unable to respond to *Topco*'s dispositive holding and ignore its rejection of their argument. Their silence concedes the issue.

Unable to defend their aggregation argument, Defendants and the Class now raise two additional arguments for why the Defendants' territorial allocation is not clearly unlawful. First, the Class argues that the Defendants' single-entity "affirmative defense" is still alive. Dkt. #2812-1, p. 66. Second, Defendants argue that pre-existing and separately owned common-law trademark rights somehow protect them from the clear illegality of *Topco*'s *per se* rule. Neither contention has merit.

### B. Defendants' Single-Entity Defense Is Deficient as a Matter of Law

In an about-face, the Class argues that Defendants' territorial allocation cannot yet be determined to be clearly unlawful because genuine issues remain as to whether the Defendants "act as a single economic entity." Dkt. # 2812-1, p. 66. In making this argument, the Class does not even assert that Defendants can meet the controlling "single entity" test set forth in *American Needle, Inc. v. NFL*, 560 U.S. 183 (2010). That test is whether the conduct in question "joins together 'independent centers of decision-making'" that would otherwise pursue "separate

economic interests" and "if it does, the entities are capable of conspiring under §1…." 560 U.S. 183, 196 (2010).[3]

The reason the Class does not argue that the Defendants can meet the *American Needle* test is simple: the undisputed facts, as found by this Court, preclude that result, as a matter of law. Specifically, in determining that Defendants entered into a *per se* unlawful horizontal agreement to allocate territories, this Court necessarily found that Defendants are actual or potential competitors capable of conspiring so as to satisfy the "contract, combination … or conspiracy" element of §1 Sherman Act. In doing so, the Court held that the undisputed evidence showed that "the Blue Plans are 36 independent companies," each of which sell health insurance services; that each plan is "autonomous in its operations" and a "financially independent entit[y]" with its own profits and losses; and that Defendants are not "partners or joint venturers." 308 F. Supp. 3d at 1250. In other words, this Court found that each Defendant is "a separate economic actor pursuing separate economic interests." *American Needle*, 560 U.S. at 196.

Nonetheless, each of these separate economic actors agreed to become a "member" of the BCBSA. 308 F. Supp. 3d at 1250. The Rules of the BCBSA are determined by a three-quarters weighted vote of its members and "each member Plan has agreed to be bound by the Association Rules." *Id*. Importantly, this Court has found that "the undisputed record evidence also reveals that the Blue Plans control the terms of each Blue's License Agreement" and that the Defendants "vote on and approve amendments to the licensing agreements." *Id*. at 1267. This Court further

---

[3]     The Supreme Court repeated this test several times: "The key is whether the alleged … 'conspiracy' … joins together separate decision-makers" (560 U.S. at 195); "the relevant inquiry … is whether there is a … 'conspiracy' among separate economic actors pursuing separate economic interests (citation omitted) such that the agreement deprives the marketplace of independent centers of decision-making … and thus of actual or potential competition" (*id*.); "the question is whether the agreement joins together 'independent centers of decision-making'" (*id*. at 196) (quoting *Copperweld*).

6

found that each Defendant has entered into a license agreement with the collectively controlled BCBSA. *Id*. at 1251. In each of those agreements the BCBSA—owned by the Defendants— grants to Defendant "an exclusive 'service area' where a Member Plan may use the Blue Marks" and, critically, each member is required to agree with collectively controlled BCBSA that "it may not use the licensed Marks and Name outside the service area." *Id*.

The determination of where an individual Defendant can compete by offering its BCBS trademarked services and in what areas it will refrain from competing is not left to the "independent decision-making" of each licensee or to the independent decision-making of a holder of common-law trademark rights. 560 U.S. at 195, 196. To the contrary, it is the BCBSA, composed of 36 separate economic interests each with its own interest in preventing competition from other members, that formulates the rules that govern where and with whom each Defendant can compete. Clearly, each Defendant is a separate economic actor with its own economic interests to pursue. By joining together with the other BCBSA members to decide how and where each licensee can compete, they have "depriv[ed] the marketplace of the independent centers of decision-making" that competition requires. *Id*. at 196. As a result, Defendants do not, as a matter of law, meet the single-entity test of *American Needle*.

In an effort to avoid this result, the Class asserts that the question is not whether the Defendants have agreed with each other so as to satisfy the conspiracy element of a §1 claim, but whether there is a single-entity "affirmative defense" to that cause of action. Dkt. #2812-1, p. 66. How that affirmative defense would differ from the conspiracy element of a §1 claim is never explained and, in any event, the assertion is incorrect. The issue decided in both *American Needle* and *Copperweld* was whether the contract, combination or conspiracy element of a §1 claim had been proved or whether such concerted action was absent because the Defendants acted as a single

entity.[4]   Neither case addresses or establishes a single-entity "affirmative defense."   Even Defendants acknowledge that the single-entity issue they have raised is whether they have engaged in concerted action that satisfies the contract, combination or conspiracy element of a §1 Sherman Act claim.  Dkt. #2801, p. 1.

### C.  Defendants' Common-Law Trademark Argument Fails as a Matter of Law

As Movants have already shown, *Topco* forecloses Defendants' "aggregation of offense" argument.  Dkt. #2812-19, pp. 14-16.  In response, Defendants futilely argue that *Topco* is "readily distinguishable" because the collectively managed BCBS trademarks originated with separately owned common-law trademarks.  In support of this purported common-law trademark distinction, Defendants cite to the briefs they previously filed against the provider class.

According to Defendants, they and their numerous predecessors each owned common-law trademark rights before those individual rights were consolidated under the collective ownership of the BCBSA; and, by placing all of those individual rights[5] into collective hands, they have done nothing more than "memorialize existing geographic rights to the Blue marks as those rights developed and existed at common law."  Dkt. #2728, p. 16, 17 (claiming that the territorial allocation does nothing more than "merely codify existing rights to use the Blue marks.").  Defendants then claim that the development of the BCBS common-law marks distinguishes *Topco*, because, in that case, the marks did not exist prior to their creation by the association.  The deficiencies in this argument are readily apparent.

---

[4]   *See American Needle*, 560 U.S. at 188 ("We have only a narrow issue to decide:  whether the NFL respondents are capable of engaging in a 'contract, combination … or conspiracy' as defined by §1 of the Sherman Act"); *Copperweld*, 467 U.S. at 755 (issue is whether a parent and subsidiary "are legally capable of conspiracy with each other under §1 of the Sherman Act").

[5]   This Court has already held that in 1982 defendants formed BCBSA and "deliberately consolidated indisputably separate marks in that entity."  308 F. Supp. 3d at 1265.

First, the existence of these supposed common-law rights is dubious, at best. The provider class has pointed out that any common-law rights that might have existed were abandoned long ago. Dkt. # 2747, pp. 10-12. The undisputed evidence shows that in many territories no Defendant ever had exclusive rights and competing firms used the trademarks in overlapping territories. 308 F. Supp. 3d at 1265. As a result, this Court held that "the validity and/or enforceability of the [common-law] Marks" is in doubt.[6]  *Id*. For current purposes, however, Movants are willing to assume *arguendo* that the questionable common-law rights previously existed.

The individual enforcement of common-law trademark rights, however, is not the equivalent of Defendants' collective enforcement of those rights. Common-law trademark rights give the holder the ability to exclude others from using the mark within a given territory. Defendants, however, have gone far beyond the grant of that ability to each of them. Through the BCBSA, Defendants also collectively extract a promise from each other that each will not venture beyond its borders and compete against other Defendants outside of its territory. 308 F. Supp. 3d at 1269. The Defendants have even agreed with each other that each can be fined or lose its individual rights altogether if it tries to break out of its territory and compete against another Defendant. *Id*. In other words, Defendants agreed that each ESA would not only be an exclusive territory, but also a jail – beyond which the Defendants have agreed none will venture. Common-law trademark rights do not include any comparable right that would allow a group of horizontal competitors to agree that none of them will go beyond their respective territories to compete against each other. Thus, the BCBSA does not merely enforce previously owned individual

---

[6]     Defendants inexplicitly state that their argument "does not turn on a final determination of ownership rights." Dkt. #2728, p. 18. Defendants do not even attempt to explain how non-existent common-law trademark rights could ever justify anything.

common-law rights.  It organizes a horizontal group promise that confines each licensee to its own territory.

Defendants' argument that the BCBSA is doing nothing more than enforcing the individual common-law trademark rights is also at war with the Supreme Court's ruling in *American Needle*. It may be that an individual common-law trademark holder can decide on its own to enforce (or not enforce) its common-law trademark rights, but it is precisely the abandonment of that individual decision-making in favor of collective decision-making by a group of competitors that *American Needle* holds to be a horizontal agreement among competitors within the meaning of §1 of the Sherman Act.  When such a horizontal agreement allocates territories among competitors using the same trademark, *Topco* clearly holds that agreement to be *per se* unlawful.

In support of their common-law trademark argument, Defendants cite repeatedly to *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50 (2d Cir. 1997), and *VMG Enterprises, Inc. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648 (D.P.R. 1992).  *See, e.g.*, Dkt. # 2728, pp. 17, 18, 19; Dkt. # 2756, pp. 12, 13, 18.  Both cases, however, merely highlight the legal deficiency in Defendants' argument.

In both *Clorox* and *VMG*, an individual trademark holder sued an alleged infringer.  The trademark holder and the infringer were each separate economic entities and made their own independent decisions as to whether and how to litigate the dispute.  In both cases, the alleged infringer independently decided to admit defeat and agree not to use the trademark to compete against the plaintiff.  It is precisely that individual decision-making by both the plaintiff and the defendant that is so clearly lacking in this case.  Here, it is the Defendants as a group through the BCBSA that have decided by a 75% vote (1) who will be allowed to use the Blue marks in exclusive territories and (2) that each Defendant must promise not to expand beyond its own ESA,

10

just as in *Topco*. *American Needle* clearly holds that the substitution of such collective decision-making for the independent decision-making of separate economic actors was the critical factor that caused the NFL's conduct to be condemned as a horizontal agreement that is not entitled to single-entity treatment.

If each individual Defendant still had its hypothesized common-law trademark rights, then each one of them would independently decide for itself whether to enforce or not enforce those questionable common-law rights. Thus, two insurance companies, each with an exclusive Blue territory, might decide to invade each other's ESA, but each could also independently decide not to object to the competition or to file suit. 308 F. Supp. 3d at 1253 (finding two plans had invaded each other's territory but "neither plan objected to the competition"). Each might be happy to let the other into its territory so long as it could expand beyond its own borders. Different Defendants exercising the hypothesized individual common-law rights would make different independent decisions – some more aggressive, some less so. Different settlements between them would be struck, some allowing expansion into another's territory. What is certain is that all of these events would be determined by separate economic entities making their own independent decisions so as to best serve their individual interest. What is equally certain is that Defendants through their collective control of the BCBSA have eliminated that individual decision-making and replaced it with the group decision-making through the BCBSA. Under *American Needle*, that group decision-making cannot, as a matter of law, constitute the conduct of a single entity.[7] Thus, the

---

[7]   Citing *American Needle* at 560 U.S. at 195, 200, Defendants assert that "the dispositive question in a single-entity inquiry is whether individual participants in the alleged agreement could perform the relevant function unilaterally." Dkt. # 2801, p. 8. The function performed by the conduct alleged to be unlawful in this case, however, is preventing 36 independent competitors from competing in any of the other Defendants' territories. That is not a function that can be achieved unilaterally. It is a decision that necessarily must be made by each of the 36 separate

Defendants' conduct is not codifying individually owned common-law rights. It is the transfer of those rights to a collectively controlled horizontal group which, according to *American Needle*, eliminates the independent decision-making by competitors that is required by market competition.

### III. The Injunctive Relief Settlement Does Not Treat Class Members Equitably Relative to Each Other

#### A. The Injunctive Relief Is Not Indivisible

In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011), the Supreme Court held that claims for individualized relief cannot be certified for class treatment under Rule 23(b)(2) ("claims for individualized relief ... do not satisfy the Rule"). The Court further held that the "combination of individualized and class-wide relief in a (b)(2) class is also inconsistent with the structure of Rule 23(b)." *Id*. at 361. Instead, the Court stated that "the key to the (b)(2) class is the 'indivisible nature of the injunctive or declaratory remedy'" and held (*id*. at 360):

> Rule 23(b)(2) applies only when a single injunction … would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction … against the defendant.

As a result, the Court held that class injunctive relief under Rule 23(b)(2) is appropriate only when the relief is "indivisible benefiting all members at once" (*id*. at 362) and "respecting the class as a whole." *Id*. at 360. The Court further held that it is precisely because (b)(2) injunctive relief is indivisible that opt-out rights from the injunctive relief class are not necessary. *Id*. at 362

---

competitors in concert with the other 35 participants. Furthermore, the cited pages of *American Needle* do not support Defendants' assertion. To the contrary, at 560 U.S. at 195, the Supreme Court states: "The key is whether the alleged … conspiracy is concerted action, that is whether it joins together separate decision-makers" and that "the relevant inquiry, therefore, is whether there is a … conspiracy among 'separate economic actors pursuing separate economic interests' [citation omitted] such that the agreement deprives the marketplace of independent centers of decision-making." At 560 U.S. at 200-01, *American Needle* states that agreements made by the members of an association "constitute concerted action covered by §1 when the parties to the agreement act on interests separate from the firm itself."

(holding that claims for individualized relief "belong in Rule 23(b)(3)" and that "the right to opt out" is absent from Rule 23(b)(2) because the "class seeks an indivisible injunction benefiting all its members at once.").

The injunctive relief provided by the proposed settlement violates the requirements of *Dukes*.  The injunctive relief is not "indivisible" as it grants the right to request a second Blue bid to some but not to others and does not apply to the class "as a whole."  Indeed, the Settlement acknowledges the divisible nature of the injunctive relief by depriving Qualified National Accounts who opt out of the damages class the injunctive relief to which they otherwise would have been entitled under the agreement.   The injunctive relief here is further "individualized," as it is based on individual criteria such as dispersion rates, whether the class member is a Taft-Hartley or Church Plan or whether it is headquartered in a state in which two Defendants operate. Where the (b)(2) relief is "individualized" and is not "indivisible," *Dukes* holds that opt-out rights are required, and, even if they were not required, this Court should exercise its discretion to allow the Movants to opt out of a proposed (b)(2) class settlement that grants greater individualized rights to others than it does to the Movants.  In the alternative, the Court should reject the settlement as neither fair, reasonable, nor adequate because it does not treat all class members equitably relative to each other as required by Rule 23(e)(2)(D).

Despite the foregoing, Defendants and the Class insist that they can cram down the individualized injunctive relief on a non-opt-out (b)(2) class if they can hypothesize a rational justification.  As explained above, this premise is incorrect.  Rule 23(b)(2) provides no authority for imposing individualized relief in a non-opt-out class.  And, as explained below, the Defendants and Class also have no rational basis for the gerrymandered second Blue bid settlement provisions.

13

### B.  The Injunctive Relief Does Not Treat Class Members Equitably Relative to Each Other

#### 1.  Defendants and the Class Rely on Inapposite Authority

Defendants and the Class cite a series of cases for the proposition that injunctive relief class members are treated equitably relative to each other if there is a "rational and legitimate" basis for the different treatment.  Dkt. # 2813 at pp. 18, 22; Dkt. # 2812-1, pp. 77-79.  Each of these cases, however, is clearly inapposite as every one of them addresses the allocation of *monetary* relief to class members who suffered varying degrees of loss.[8]  It is obviously not inequitable to allocate more of a monetary fund to those who have lost more money and, in any event, class members can opt out if they object to their allocated amount.  None of the cited cases involve a non-opt-out injunctive relief class in which every class member claims that the same conduct is unlawful, but the class settlement prohibits that conduct as to some class members but not as to others.  Such individualized and divisible injunctive relief without the right to opt out is not permitted by *Dukes*.

---

[8]     *See Lurns v. Russell Corp.*, 604 F. Supp. 1335, 1336 (M.D. Ala. 1984) (two class members allowed to opt out to pursue their own monetary relief and a third was allocated $2,000 out of the settlement fund, which the court found "fair"); *Pedraza v. United Gar. Corp.*, 2001 WL 37071199 at *7 (S.D. Ga. 2001) (higher monetary award for named class representatives was rational because they diligently pursued the case and expended substantial resources to advance them); *Petrovic v. American Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999) (different award of damages to class members warranted because the extent of their injury was different); *In re American Bank Note*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001) (greater allocation of monetary settlement fund awarded to those with stronger securities claims); *In re Paine Webber, Ltd.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997) (objection to plan of allocation of monetary fund rejected based on different strength of different claims); *Swinton v. SquareTrade, Inc.*, 2019 WL 617791 at *8 (S.D. Iowa 2019) (allocation of monetary award based on differing strength of claims held fair because there is no requirement that every class member receive the same monetary award); *Radcliffe v. Hernandez*, 794 F. App'x 605, 607 (9th Cir. 2019) (greater distribution of monetary fund to class members who suffered greater actual harm approved); *Hall v. Accolade, Inc.*, 2019 WL 3996621 at *5 (E.D. Pa. 2019) (allocation of monetary fund based on different strength of different claims approved).

### 2.  There Is No Rational Basis for the Unequal Injunctive Relief

Even if the law did allow class members asserting the identical legal claim to receive different levels of injunctive relief – and it does not – there is no rational or legitimate basis for the criteria that Defendants and the Class have agreed to employ in this case.

### a.  Opt-outs from the monetary relief class are denied second Blue bids

The settlement agreement provides that class members who exercise their constitutional right to opt out of the (b)(3) monetary relief class are to be punished by losing their right to request a second Blue bid.  Defendants and the Class offer no rational basis for this provision – not even a pretextual or baseless one.  It is plainly intended to serve an *in terrorem* function so as to dissuade and punish class members from exercising their constitutional rights.

Instead of attempting to justify this provision, Defendants and the Class argue that it really is not so bad, because (b)(3) opt-outs are allowed to file suit and prove that the territorial allocation is illegal, in which event the opt-out will get the right to request one additional Blue bid if it meets all the other second Blue bid requirements of the settlement.  In other words, the opt-outs can go to court and win the case on the merits in order to get what other class members get simply by not opting out of the (b)(3) class.  Worse, by winning the case on the merits, the opt-out will only be able to request one additional Blue bid instead of the 35 additional bids to which it should be entitled if it wins the case.  It is hardly surprising that Defendants and the Class make no attempt to justify this punitive and unwarranted settlement provision.

The settlement as presented to this Court for preliminary approval was even worse.  It did not even allow (b)(3) opt-outs to file suit and win what others were granted by staying in the (b)(3) class.  After preliminary approval, and after Movants complained in writing to sub-class counsel, this constitutionally offensive provision was hastily amended in the long form notice to add the

right of opt-outs to go to court and win the right to request one additional Blue bid.  Plainly, the parties got caught with their hand in the cookie jar – and they knew it.  Their belated attempt to make the settlement appear less oppressive fails.  There is no rational or legitimate reason to make (b)(3) opt-outs litigate for years to win the relief that goes to others without a fight.  The basis for this revised provision is the same as the original provision – to punish class members for exercising their constitutional right to opt out of the (b)(3) class.  This provision is obviously impermissible. Movants should be allowed to opt out of the injunctive relief settlement that imposes on them such blatantly inequitable and unlawful conditions.

### b.  The dispersion requirement has no rational basis

In order to request a second Blue bid, a National Account must satisfy the dispersion requirement – meaning that approximately 70% of the plan members reside outside the state of the National Account's headquarters.  Defendants admit that this results in less than a third of all National Account plan members receiving the injunctive relief. All others are precluded from seeking a second Blue bid.

The Defendants attempt to justify this unequal treatment of different National Accounts by arguing that plans with less dispersion (1) have more insurance options because they can obtain insurance services from local and regional insurers and (2) plans with more dispersion will benefit more from receiving a second Blue bid.  Defendants are incorrect for two reasons.

First, whether one class member will benefit more or less from the class relief has no relevance to whether the class members are treated equitably relative to each other.  If two class members each suffer $100 of money damage, they cannot be given different amounts of relief because one is poorer than the other and would benefit more from the recovery. Defendants cite

16

no case that supports their contention that class members can be awarded different relief based on how much they will benefit from that relief – and Movants are aware of no such case.

Second, the Defendants' dispersion argument is factually baseless.  Defendants offer no support for their conjecture that large National Accounts can avail themselves of local and regional insurance providers and, therefore, have more insurance options and benefit less from a second Blue bid.  Large National Accounts have tens of thousands or hundreds of thousands of plan members who are located all over the United States.  Such accounts are unable to use local and regional insurers precisely because they are national accounts.  Local and regional insurers cannot service National Accounts because those insurers do not do business where thousands upon thousands of the National Account's plan members are located.  The percentage of those plan members who are "dispersed" – *i.e.*, located outside of the headquarters state of the National Account – is irrelevant to the inability of the local and regional insurers to service the account.  Thus, contrary to the Defendants' argument, the less disperse National Accounts do not have more local and regional options and do not benefit less from a second Blue bid.  Tellingly, Defendants, themselves, admit that local and regional insurers "are not viable options for true national employers."  Dkt. #2813, pp. 20-21.  This express admission completely destroys Defendants' attempt to justify the dispersion requirement – even if it was relevant.

### c. The dispersion requirement protects Anthem from Blue-on-Blue competition

Anthem is the largest health insurer in the U.S. and has been judicially determined to possess market power in the National Accounts market.  Dkt. # 2812-19, p. 23.  In Movants' opening brief, we explained that because Anthem's ESA covers 14 states and one third of the U.S. population, it would be difficult for a National Account in an Anthem territory to have 70% of its

17

plan members located outside of Anthem's 14-state region – which means that Anthem is "unlikely to face any significant competition from second Blue bids."  Dkt. # 2812-19, p. 23.[9]

Defendants and the Class have responded that we are proven wrong by the fact that 20 National Accounts in Anthem's 14-state ESA will be able to request second Blue bids.  Dkt. # 2812-1, p. 86; Dkt. # 2813, p. 22.[10]  Their argument actually proves our point.  The fact that only 20 of the 1,038 Qualified National Accounts are Anthem accounts demonstrates that the settlement protects Anthem and disproportionally injures National Accounts in Anthem's territory.  From a statistical perspective, how else could only 1.9% of the Qualified National Accounts be in Anthem's territory, which includes 33% of the U.S. population?  Stated differently, of the 1,038 National Accounts that qualify for a second Blue bid under the settlement, 98.1% of them are located outside of Anthem's territory.[11]  The proposed settlement agreement plainly shields Anthem from any significant competition from second Blue bids.

---

[9]      The Class faults Movants for making "a significant factual misstatement" (Dkt. # 2812-1, p. 86) in asserting that "no account headquartered in an Anthem state would be able to meet the dispersion requirement and receive a second Blue bid."  *Id.*  The Class makes this accusation by quoting our brief out of context.  The full sentence, which the Class partially quotes, states: "Assuming that the National Account's employees are apportioned throughout the United States in proportion to the population, no account headquartered in an Anthem state would be able to meet the dispersion requirement and receive a second Blue bid."  Dkt. # 2812-19, p. 22.  That statement is 100% correct.

[10]     None of the 20 Accounts are large.  A few of them are mid-sized (*i.e.*, Dollar Tree, and Abercrombie and Fitch), but most of them are small accounts.

[11]     Defendants and the Class, with access to the discovery record, could easily have reported the total number of Anthem's National Accounts which would allow one to calculate the percent of Anthem's National Accounts that will be able to request a second Blue bid and the percent that will be shielded from that competition.  Tellingly, Defendants and the Class have chosen not to report that number.  We know, however, that Anthem's National Accounts include approximately 7,700,000 members (Anthem 2020 Annual & Corp. Responsibility Rep., Financial and Membership Highlights, customer type).  We also know that the industry average for National Accounts is approximately 27,500 members.  One can therefore estimate that Anthem has approximately 280 National Accounts.  The 20 Anthem National Accounts that can request a second Blue bid, therefore, represent only 7% of the estimated total – meaning that a full 93% of Anthem's National Accounts will be unable to request a second Blue bid.

### d.  There is no rational basis to exclude the Taft-Hartley or Church Plans

Each Taft-Hartley and Church Movant is one single entity.  The plan may be composed of employees from hundreds of churches or be a multi-employer union plan, but it is one entity that signs an ASO contract with a Defendant.  Each of those class members is categorically denied the ability to ask for a second Blue bid.[12]

Defendants and the Class attempt to justify the exclusion of the Taft-Hartley and Church Movants by arguing that the participating unions and churches could have remained separate and not joined with others to purchase ASO services through a single entity. In other words, Defendants and the Class do not explain why the Taft-Hartley or Church Movant should be categorically excluded from requesting a second Blue bid.  Instead, they simply hypothesize that the Taft-Hartley or Church Movants need not exist.  But federal law recognizes the authority to form such entities, which play a critical role in providing health care benefits to union members and Churches.  Furthermore, the criticism that the Taft-Hartley and Church entities need not exist could also be made of corporate class members where the purchasing entity is composed of employees of multiple subsidiaries of the corporate sponsor.  Defendants and the Class have no authority to simply imagine that a single-entity union and Church purchaser does not exist or might be structured differently than it is (and differently than how it contracts with a Defendant) and then justify its unequal treatment based on that counterfactual hypothesis.  The legal obligation is to treat all class members equitably relative to each other – not relative to some non-existent form which they could have, but have not taken.

---

[12]     Section A.1(z) of the proposed settlement states that "Taft-Hartley trusts … are not Employers" for the purpose of determining whether they can seek a second Blue bid.  Section 1.A(sss) of the proposed settlement measures the membership of eligible plans by Dun & Bradstreet ("D&B") data.  D&B does not measure the membership/employees of the Church Plans.

**e. There is no rational basis to deny second Blue bids to class members in states with overlapping Defendants**

Class members located in States where two Defendants operate are categorically denied the ability to request an additional Blue bid.  According to Defendants, it is equitable to deny an additional Blue bid to these class members, even though such benefits are given to others.  The only justification offered by Defendants or the Class is that class members in States where two Defendants operate can already ask both of them for bids.  The antitrust claim in this case, however, is that every class member should be allowed to request 36 Blue bids.  The settlement provides limited relief from this allegedly illegal conduct.  There is no basis for denying that relief for the alleged violation to class members located in states in which two Defendants operate.  If other class members receive some relief from the allegedly illegal conduct, then these class members should, too.  No equitable purpose is served by granting this relief to some while completely denying it to others.  The only purpose served by this provision is the Defendants' desire to minimize Blue-on-Blue competition.  That desire, however, hardly justifies discriminating against disfavored class members.

## IV.   The Failure to Provide Any Relief From the Local Best Efforts Rule Is Neither Fair, Reasonable, Nor Adequate

In our opening brief, Movants demonstrated that the preservation of the Local Best Efforts rule will allow Defendants to offer green bids to small employers in their ESA, but not large employers.  Dkt. # 2812-19, pp. 29-30.  In response, Defendants and the Class argue that this inequitable result will not occur because Defendants *will not offer* any green bids at all – to large or small accounts – in their home states.  *See* Dkt. # 2813, p. 23; Dkt. # 2812-1, pp. 89-90.  If true, this response proves too much.  If no Defendant would make such a green offer in its home state, why do Defendants need a horizontal agreement to prevent themselves from doing what they claim

none of them would do anyway?  Furthermore, if the horizontally agreed-to rule serves no purpose, then why have Defendants not surrendered that output restriction in the settlement?  Obviously, Defendants are fighting to hold onto the restraint – precisely because it serves the anticompetitive and inequitable purpose that Movants advance.

Further, Movants have demonstrated that due to the Local Best Efforts Rule, a Defendant cannot offer a green bid to a National Account that has a large number of plan members in Defendant's home state.  Dkt. # 2812-19, pp. 29-30.  If a Defendant does so, then it will push down the percentage revenue received from Blue plans in its home state and violate the Local Best Efforts Rule.  The Class responds by stating that if a Defendant enters into a green contract with an out-of-state employer, then the revenue generated by the in-state employees of that employer does not count against the 80% in-state Local Best Efforts requirement.  The Class is unable to cite to anything in support of this contention (Dkt. # 2812-1, p. 91), and Defendants make no such assertion.  Movants specifically asked the Defendants, in writing, if we accurately described how green competition and the Local Best Efforts Rule would work under the settlement.  *See* Dkt. # 2812-19, p. 30, n.31.  Defendants have not responded and their silence confirms our understanding.  Under the settlement, Defendants cannot offer green bids to National Accounts if the revenue attributable to covered employees in the home state of Defendant will push the in-state Blue revenue below the 80% level.  This seriously limits the procompetitive effect of the green competition and prejudices large National Accounts with significant numbers of employees in the home state of the Defendant.

## V.    Defendants Have Breached Their Arbitration Agreements

Some of the Defendants have entered ASO agreements with class members that require arbitration of any dispute relating to the agreement.  Dkt. # 2812-19, p. 31.  Some of those

agreements also explicitly prohibit participation in any class action.  *Id.*  In clear breach of those contractual obligations, Defendants have entered into a settlement agreement that requires the class members to stay in a non-opt-out class action in Court.

Defendants and the Class offer no credible excuse for this clear breach of contract and the cases they cite for the proposition that a class member with arbitration rights can be forced to stay in a non-opt-out class do not even remotely support that proposition.[13]  Instead, they argue that they should be able to force National Accounts, who have contractual rights not to be in court or in a class, into the non-opt-out (b)(2) class.  Defendants should not be rewarded for breaching their contractual obligations.  Movants with arbitration provisions should be allowed to opt out of the (b)(2) class in which they should never have been placed.

Defendants are also incorrect when they argue that class members with arbitration rights may be forced into court by Defendants with whom they have not contracted.  In the Eleventh

---

[13]      *See* Def. Br. at 7-8, Dkt. # 2813, pp. 7-8.  In *Citigroup, Inc. Sec. Litig.*, 2014 WL 3610988 (S.D.N.Y. 2014), the arbitration plaintiffs were not forced against their will into a non-opt-out class.  They were given notice and the right to opt out, but failed to do so.  *Id.* at *16.  In *Belasanyan v. Nordstrom, Inc.*, 2012 WL 1944609 (S.D. Cal. 2012), the court denied defendants' motion to compel arbitration.  No class member was precluded from opting out of anything.  In *Soc'y of Prof. Eng'g v. Boeing Co.*, 2015 WL 13643720 (D.. Kan. 2015), the class settlement released contract claims.  No arbitration issue or non-opt-out issue was even presented.  In *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007), the class released contract claims.  Neither opt-out rights nor arbitration are even mentioned.  *Stott v. Cap. Fin. Serv., Inc.*, 277 F.R.D. 316, 341 (N.D. Tex. 2011), is a limited funds case certified under Rule 23(b)(1)(B), in which other proceedings were enjoined to protect an inadequate fund so as to make it equally available to all claimants.  In *In re Checking Acct Overdraft Litig.*, 2020 WL 4586398 (S.D. Fla. 2020), defendant's motion to compel arbitration was denied because plaintiffs did not agree to arbitrate.  The court certified a (b)(3) class with opt-out rights and no class member was compelled to stay in non-opt-out class.  In *Swinton*, the court denied defendant's motion to compel arbitration and defendant then settled the case.  Class members were allowed to opt out of the settlement and no one was forced to stay in a non-opt-out class.  *Brown v. Price*, 2017 WL 4698025 (D. Or. 2017), is another limited fund case where the money available was inadequate to pay all the claims and a Rule 23(b)(1)(B) class was certified to protect the limited fund for fair distribution to all.  No one objected to the amount of the settlement or the inability to opt out.

Circuit, if a claim alleges interdependent or concerted conduct closely related to a contract that includes an arbitration obligation, the arbitration obligation applies to all Defendants. *See*, *e.g.*, *Northrop & Johnson Yacht-Ships, Inc. v. Royal Von Lent Shipyard, B.V.*, 855 Fed. App'x 468, 474, n.4 (11th Cir. 2021) (a non-party to an arbitration agreement may be subject to its terms "when the plaintiff-signatory alleges substantially interdependent and concerted conduct by the signatories and non-signatories, and such misconduct is founded in or intimately connected with the obligations of the underlying agreement"). Thus, the class members with arbitration agreements should be allowed to opt out of this litigation against all Defendants.

## VI.     Movants' Motion to Intervene Should Be Granted

Out of an abundance of procedural caution, Movants have requested to intervene in this matter in order to insure that our motion to opt out of the (b)(2) class settlement will be heard on the merits – regardless of how the Court rules on the motion for final approval of the class settlement.  In response, Defendants assert that the motion to intervene should be denied because Movants "have no right to opt out of a mandatory (b)(2) class."  Dkt. # 2813, p. 9.  Defendants' argument is pure tautology – and it is based on an incorrect proposition of law.  As Movants have already shown, this Court has discretion to allow Movants to opt out of the (b)(2) class and *Dukes* suggest that when the injunctive relief is divisible, Movants must have the right to opt out. Whether the Court should exercise that discretion should be decided on the merits and the Court should grant our motion to intervene to procedurally insure that it will be.

### A.  Movants Meet the Requirements for Mandatory Intervention

Defendants do not dispute that the Motion to Intervene was timely filed and that Movants have an interest in the subject matter of the dispute.  Defendants deny, however, that the settlement agreement "may as a practical matter impair or impede [Movants'] ability to protect [their]

23

interest." Dkt. # 2813, pp. 9-10. The settlement, however, forces Movants to release their injunctive relief claims and accept settlement terms that treat them unequally and punishes them for exercising their legal right to opt out of a (b)(3) class settlement. It is frivolous to assert that forcing Movants to stay in the (b)(2) class against their will not impair their ability to protect their own interests. *See Technology Training Associates v. Buccaneers Ltd. P'ship*, 874 F.3d 692, 696-97 (11th Cir. 2017) (holding that the "impair or impede" element of a Rule 24(a)(2) motion is satisfied by "the risk the movants will be bound by an unsatisfactory class action settlement" and stating as a general rule, class members should be allowed to intervene). The decision in *Grilli v. Metro Life Ins. Co.*, 78 F.3d 1533, 1536 (11th Cir. 1996), cited by Defendants, is not to the contrary. In *Grilli*, the rights of the party moving to intervene were not impaired because he had opt-out rights and could simply exit the class and pursue his own claim. Here, the opposite is true. Movants are denied the right to opt out of the settlement class, are forced to release their claims, and are prevented from protecting their own rights.

Defendants also assert that Movants fail the "inadequate representation" element of mandatory intervention. Defendants do not dispute that the "burden of making that showing should be treated as minimal," (*Chiles v. Thornburgh*, 865 F.2d 1197, 1214 (11th Cir. 1989), or that the "mere existence of colorable adequacy issues" is sufficient. *Lopez v. Progressive Select Ins. Co.*, 2020 WL 763571, *2 (S.D. Fla. 2020). Here, the proposed sub-class representative and its counsel, who were both *undisclosed* to the Movants until minutes before the motion to approve the class settlement was filed, has negotiated a settlement that provides for substantially less favorable and unequal treatment of Movants than other sub-class members. Indeed, a number of the Movants, including all of the Taft Hartley and Church Movants, are denied any right under the settlement to request a second Blue bid, which is a benefit that *is* afforded to the proposed class

24

representative.   These inequities between the relief offered to the class representative and the Movants are more than sufficient to satisfy Movants' "minimal burden" that they are not adequately represented.

**B.  Movants Meet the Requirements for Permissive Intervention**

Permissive intervention is allowed to any party with a claim that shares a common question of law or fact with the main action.  *Chiles*, 865 F.2d at 1213.  Defendants' only basis for opposing permissive intervention is the conclusory statement that "intervention would cause both prejudice and delay."  Dkt. # 2813, p. 11.  Defendants make no attempt to explain what prejudice or delay they would suffer.  Allowing Movants to intervene to file a motion that they have already filed and to which Defendants and the Class have already responded and which, in any event, is filed in the alternative as an Objection – will obviously delay nothing.  Nor is it conceivable that Defendants will suffer prejudice if the Motion to Intervene is granted.  The most that will happen is that the Movants' request to opt out of the (b)(2) class is decided on the merits.

Defendants' opposition to the Motion for permissive intervention is without merit and the Motion should be granted.  The elements for mandatory intervention have also been met.  Either basis justifies intervention.

**Conclusion**

For all of the foregoing reasons, the National Account Movants respectfully request that the Court grant their motion to opt out of the Rule 23(b)(2) class settlement or, in the alternative, deny approval to the proposed injunctive relief settlement.

Dated:  September 27, 2021          Respectfully submitted,

/s/ Paul E. Slater_____
Paul E. Slater
Joseph M. Vanek
David P. Germaine
Eamon P. Kelly
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois  60603
Tel:     (312) 641-3200
Email: pes@sperling-law.com
           jvanek@sperling-law.com
           dgermaine@sperling-law.com
           ekelly@sperling-law.com

*Counsel for Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc. Welfare Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; Big Lots, Inc.; Big Lots Associate Benefit Plan; Conagra Brands, Inc.; ConAgra Foods, Inc. Welfare Benefit Wrap Plan; FedEx Corporation; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; Kellogg Company; Kellogg Company Welfare Benefit Plan; McLane Company, Inc. McLane Company, Inc. Welfare Plan; Meijer Inc. including its affiliates Meijer Great Lakes LP, Meijer Stores LP, and Town Total Health LLC; Meijer Health Benefits Plan; Publix Super Markets, Inc.; Publix Super Markets, Inc. Group Health Benefit Plan; United Natural Foods, Inc., including its affiliates SUPERVALU, INC.. and Unified Grocers, Inc. ("UNFI"); UNFI Health and Welfare Plan; Indiana/Kentucky/Ohio Regional Council of Carpenters Welfare Fund; Ohio Carpenters Health Fund; SEIU Local 1 & Participating Employers Health Trust; The Local No. 1 Health Fund; Plumbers' Welfare Fund, Local 130, U.A.; The Sheet Metal Workers Local 73 Welfare Fund; Chicago Painters and Decorators Welfare Fund; The Carpenters and Joiners Welfare Fund; Heartland Health & Wellness Fund; GuideStone Financial Resources of the Southern Baptist Convention; The Church Pension Group (Episcopal); General Board of Pension and Health Benefits of the United Methodist Church; Concordia Plan Services (the Missouri*

26

*Synod Lutheran Church's benefit board); Portico Benefits Services (the Evangelical Lutheran Church in America's benefit board); Christian Brothers Services (a church plan benefits board created by the Christian Brothers religious order); The Board of Pensions of the Presbyterian Church U.S.A.*

By: /s/ Phillip F. Cramer
Phillip F. Cramer
J. Scott Hickman
Eric G. Osborne
Sherrard Roe Voigt & Harbison, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN  37201
Tel:  (615) 742-4200
Fax: (615) 742-4539
Email:  pcramer@srvhlaw.com
          shickman@srvhlaw.com
          eosborne@srvhlaw.com

*Counsel for The Boeing Company; Employee Benefits Plan Committee of The Boeing Company, as the plan administrator and named fiduciary of The Boeing Company Master Welfare Benefit Plan; Bridgestone Americas, Inc.; Bridgestone Americas, Inc. Employee Group Insurance Plan; Bridgestone Americas, Inc. Retiree Medical Plan; CHS/Community Health Systems Inc.; Community Health Systems Group Health Plan; Dollar General Corporation; Dollar General Health Plan (a component of the Dollar General Corporation Employee Benefits Plan); FedEx Corporation; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; Tractor Supply Company; Tractor Supply Company Health & Welfare Plan*

By: /s/ Jason A. Zweig
Jason A. Zweig
Keller Lenkner LLC
150 N. Riverside Plaza, Suite 4270
Chicago, IL  60606
Tel:  (312) 216-8667
Email:  jaz@kellerlenkner.com

*Counsel for Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc. Welfare*

27

*Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; Big Lots, Inc.; Big Lots Associate Benefit Plan; BNSF Railway Company; Burlington Northern Santa Fe LLC (f/k/a Burlington Northern Santa Fe Corp.); Burlington Northern Santa Fe Group Benefits Plan; Burlington Northern Santa Fe Corporation Welfare Benefit Trust; The Burlington Northern Santa Fe Employee Benefits Committee for the Burlington Northern Santa Fe Corporation Group Benefits Plan; FedEx Corporation; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; McLane Company, Inc.; McLane Company, Inc. Welfare Plan*

By:  */s/ William Blechman*
William J. Blechman, Esquire
Samuel J. Randall, Esquire
KENNY NACHWALTER, P.A.
1441 Brickell Avenue, Suite 1100
Miami, Florida  33131
Tel:                      (305) 373-1000
Fax:                     (305) 372-1861
E-mail:                 wblechman@knpa.com
                            srandall@knpa.com

*Counsel for Albertsons Companies Inc., New Albertsons L.P., Albertson's LLC, New Albertson's Inc., and Safeway Inc..; Albertsons Companies, Inc. Health and Welfare Plan, f/k/a Albertson's LLC Health & Welfare Plan; New Albertson's Inc. Health and Welfare Plan; Hy-Vee Inc.; Hy-Vee and Affiliates Benefit Plan and Trust; The Kroger Co., 84.51 LLC, and Murray's Cheese LLC; The Kroger Co. Health and Welfare Benefit Plan; 84.51, LLC Health & Welfare Plan; Walgreens Co.; Walgreen Health and Welfare Plan (Plan No. 501) f/k/a Walgreen Major Medical Expense Plan*

28