FILED
2021 Oct-12  PM 05:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406),<br><br>      Plaintiff,<br><br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CIVIL ACTION NUMBER:**
**Master File No. 2:13-CV-20000-RDP**

## SELF-FUNDED SUBCLASS OBJECTORS' REPLY
## IN SUPPORT OF THEIR OBJECTION TO THE SETTLEMENT

Objectors ServisFirst Bancshares, Inc., Topographic, Inc. and Employee Services, Inc., (the "Objectors") on behalf of all members of the Self-Funded Subclass, submit this Reply in support of their July 28, 2021 Objection (the "Objection"). The portions of the Motion for Final Approval of Class Settlement and Appointment of Settlement Administrator (Doc. No. 2812) that respond to the Objection and the new report of Dr. Mason miss the mark. Both as to the statute of limitations and the allocation of damages between the classes, the settlement is inequitable and relies on flawed and unreasonable allocation criteria.

At day's end, the settlement gives 93.5% of the money to barely 40% of the damages class, leaving 60% of the damages class to divide the remaining 6.5%. Nothing in the proponents' response or in Dr. Mason's declaration justifies this glaring disparity. Most notably, sworn testimony from Anthem executives supports

the allocation methodology the Objectors advance and undercuts the methods advanced by the proponents.  The Court should reject the settlement because it grossly favors class members who elected BCBS' fully insured programs at the expense of those who elected BCBS' self-funded programs.  Those two programs involve the same provider networks, the same BCBS services, and the same territorial allocations and competitive bid restrictions that lie at the heart of this lawsuit. Each year, class members had to choose either the fully insured or the self-insured version of BCBS card.  Each year, both sides of that choice were impacted by the same BCBS behavior.  Yet the settlement allocation ignores that reality and divides the settlement funds as if the costs of a BCBS self-funded program had little to do with BCBS at all.

## ARGUMENT

There are two main defects in the proposed settlement: the claims period for the Self-Funded Subclass is too short, and even within that arbitrarily shortened claims period, the allocation of compensation is tilted far too heavily in favor of the Fully Insured Class.  Both of these issues make the treatment of the Self-Funded Subclass inequitable. *See* FED. R. CIV. P. 23(e)(2)(D) (2018 amendment requiring the district court to determine if the class action settlement "treats class members equitably relative to each other"); *id.* advisory committee notes to 2018 Amendments ("Matters of concern could include whether the apportionment of relief among class

2

members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.").

## I.      Statute of Limitations

The settlement proponents rest the drastically shortened claims period for the Self-Funded Subclass on the incorrect assertion that self-funded plans were never members of the injunctive relief subclass until 2019.  The record belies this assertion.

The Self-Funded Subclass Objectors were members of the original injunctive relief class in *Cerven*.  That class was very broad:

> All persons or entities in the United States of America who are currently insured by any health insurance plan that is currently a party to a license agreement with BCBSA that restricts the ability of that health insurance plan to do business outside of any geographically defined area.

(*Cerven* Complaint at ¶ 20).  This language covers all people and plans insured by any plan that is a party to a license agreement.  It contains no limitation on the nature of the insurance relationship—whether self-funded or fully insured.  The term "insured" is given no special meaning in the complaint, so the Court should use the plain meaning—doubly so given that the rights of so many people are at stake. People enrolled in a self-funded plan carry blue-branded insurance cards with the policy numbers embossed on them and write down "Blue Cross Blue Shield" as their health insurer at the doctor's office.  They have access to the Blue Cross Blue Shield network.  These factors are what "insured by" means in everyday language.  What

happens downstream with the mechanisms for ultimate payment for claims is not the sole relevant fact.

Even if the Court were to parse the definition so narrowly, it is undisputed that most self-funded plans carry some sort of stop-loss insurance with one of the Defendants.  *See* Spencer James Group, *What is Stop Loss Insurance and How Does it Work?* at 5, Ex. A (Over 85% of self-insured employers with 5,000 or fewer employees buy stop loss insurance).  Stop-loss insurance is insurance; the settlement agreement recognizes as much.  (*See* Doc. 2610-2 at 9) (defining "Commercial Health Insurance" to include stop-loss policies).  Thus, even taking the proponents' new-found restrictive view of what it means to be insured, self-funded plans qualify.

The settlement proponents' narrow view of insurance is new because *Cerven* seeks an industry-wide injunction.  *Cerven* sought to "enjoin BCBSA… from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member plan may compete." (*Cerven* at 60).  This injunction touches every person or plan affected by the Defendants' geographic allocation in the sale of health insurance products because BCBSA member plans "may compete" for ASO contracts and self-funded plans and their stop-loss and other add-ons.  In terms of the traditional interpretive canons, the Court should interpret the class definition in light of the injunction requested for that class and read *Cerven* as a whole instead of reading snippets in isolation.  If the term

4

"insured by" in the class definition is ambiguous, the scope of the injunction gives the best guide to resolving that ambiguity.

To be sure, the Court has already found that removing geographic restrictions on competition benefits self-funded plans as well as fully insured plans: "The Settlement provides historic injunctive relief to enhance competition in the market for health insurance, to the benefit of **all** Settlement Class Members." (Doc. 2641 at 7) (emphasis added). Critically, the Court noted that all the injunctive class members benefit from competition in the market for ***health insurance***, even though the settlement proponents suggest that what the Self-Funded Subclass has is not insurance. The Court specifically tied this benefit to the removal of "best efforts" clauses—*see id.*—but the settlement proponents now bizarrely suggest that they did not know that the best efforts clauses affected the ASO/self-funded market, too. (Doc. 2812-1 at 95). They do not explain what kind of best efforts clause could affect some commercial health insurance services but not others. The truth of the matter is this: every person and entity who elected a self-funded plan in a given year had a choice for that year—to choose a fully insured plan or a self-funded plan. The anti-competitive behavior challenged in this case impacted that choice and impacted both sides of that choice. Both sides of that choice involved the same provider network, the same drug pricing, the same competitive bid restrictions, and so on.

Consider the practical implications of the settlement proponents' argument. Had *Cerven* resulted in class certification and a plaintiff's verdict enjoining the Defendants as requested in the complaint, the logical result of the settlement proponents' position is that the Defendants would be free to continue their business model of restricting geographic competition as it exists today despite that judgment as long as they offered ASO/self-funded products only.

The settlement proponents emphasize that the *Cerven* complaint does not mention ASO or self-funded plans except to distinguish those plans from fully-insured plans, but they have it backwards. At least as to injunctive relief, *Cerven* focuses on the ***entire*** commercial insurance market, not just the narrow sliver covered by the damages class. *Cerven* discusses the market shares of the individual Defendants in terms of their market share for ***all*** commercial health insurance products and services in their respective service areas without regard to whether the services are fully insured or self-funded. (*See*, *e.g.*, *Cerven* Complaint at ¶ 107) (discussing BCBS-AL's "stunning 93 percent share of the market for commercial HMO and PPO health insurance in its Service Area of Alabama.") *Cerven* thus counts self-funded plan members as part of the market and as proof of the Defendants' dominant market position.[1] And, as to damages, *Cerven* draws a bright

---

[1]    Again, the Court apparently counted ASO/self-funded and fully insured members together when assessing the reach of the Defendants' membership in its summary judgment opinion. *In re Blue Cross*, 308 F. Supp. 3d at 1256–57.

line not between fully insured and self-funded plans, but between small groups and large groups because small groups generally cannot self-insure but large groups can. (*Cerven* Complaint at ¶ 131.)   That is why the Court carefully noted that ASO/self-funded plans are "not available substitutes for ***all*** Subscribers because they are not viable options unless the Subscriber… can afford to self-insure."  *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp 3d 1241, 1266 n.13 (N.D. Ala. 2018) (emphasis added).   And, lastly, Defendants do not even treat fully insured or ASO/self-funded plans as separate business units.  (Ex. B (Kertesz) at 542:5–10.)

On the issue of relation back, the proponents are triply wrong.  ***First***, the Self-Funded Subclass's presence in the *Cerven* injunctive relief class makes the subclass's claims relate back as a matter of law.   The settlement proponents explicitly agree that membership in the injunctive relief class from the outset is enough to make damages claims relate back.  (Doc. 2812-1 at 97.)  Membership in that class is the ***only*** thread by which large fully insured groups get the benefit of the *Cerven* filing date, after all.  (*Id*.)  But that same thread must be given the same effect for Self-Funded Subclass members.

***Second***, it is incorrect that the Defendants could not anticipate that self-funded plans would assert damages claims.  If that were true of self-funded plans, it would have to be true of large group fully insured plans, too.  The proponents overreach badly when they urge that "misconduct in the ASO market" is nowhere in *Cerven*.

(Doc. 2812-1 at 97). *Cerven* attacks the very foundation of the Defendants' collusive business model and seeks to enjoin the enforcement of any contract limiting Defendants' ability to compete geographically.   It recognizes that markets for ASO/self-funded products and large-group fully insured products can be substitutes and constitute a single market.  (*Cerven* Complaint at ¶ 131).  The proponents continued similar allegations throughout this case.   (Doc. 1082 at ¶ 555).   If Defendants could anticipate a large group damages claim after *Cerven*, they could anticipate a self-funded claim, too.  Stated another way, ***large group*** fully insured employers (*i.e.,* non-individual or small group employers) did not fall within the *Cerven* Damage Class definition, and yet they are permitted to look back for the full 13-year period.  The settlement must treat self-funded plans the same way.

The proponents rely principally on the Eleventh Circuit's *Cliff* decision, but that reliance is misplaced.  Unlike the continuous and ongoing conduct at issue here, in which class members can and sometimes do switch between types of plan from one year to the next, *Cliff* analyzed relation back for a claim involving a definite end-date.  *Cliff v. Payco Gen'l Am. Credits, Inc.*, 363 F.3d 1113, 1120 (11th Cir. 2004). Allowing the relation back in that case would have imposed liability on the defendant that was never timely asserted in any complaint.  And the amendment in *Cliff* was––ironically—purely geographic: the plaintiff originally sought to represent Florida residents, but then amended to represent a nationwide class.  *Id*. at 1131.  The *Cliff*

plaintiff tried to do what the settlement proponents do here by giving a broad new geographic addition to the case the benefit of an earlier filing date.  The proponents here give *every* fully insured member of *every* Defendant nationwide the benefit of *Cerven*'s filing date, even though *Cerven* sought damages for individual and small-group fully insured members in North Carolina only.  Equity forbids imposing a strict reading of *Cliff* against the Self-Funded Subclass while simultaneously ignoring *Cliff* altogether for the Fully Insured Class. That is not treating class members equitably as between each other as Rule 23 requires.

Furthermore, here, unlike *Cliff,* since the Self-Funded Subclass's members fell within the Injunction Class's definition, the statute of limitation on all of their claims, including claims for damages, has been tolled from the time those early lawsuits were filed.  *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 555-59 (1974) (holding that limitations periods are tolled for any party that falls within the defined class); *accord China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804 (2018); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983).

***Third***, as a procedural matter, the class and subclass representatives argue against the interests of the Self-Insured Subclass by making a relation back argument that no Defendant made.[2]  The  lawyers and representatives for the class and subclass

---

[2]     Indeed, the silence of the Defendants' brief on this issue is deafening, especially because they could have responded on this point without any risk of prejudicing their position in future litigation.

have neither standing nor a factual basis to assert that the Defendants would not have anticipated a damages claim coextensive with the injunctive relief already requested in *Cerven*. It is extremely troubling that lawyers purporting to represent the class would outrun the Defendants in arguing that their own clients—the Self-Funded Subclass—should receive less money. Class counsel must zealously represent the interests of the class, not zealously oppose those interests by making arguments counter to their interests. *See, e.g.,* Fed. R. Civ. P. 23(a).

## II.    The Allocation of Damages Lacks Factual or Legal Support

The other overwhelming source of error in the allocation of damages between the subclasses is counting "paid claim costs" for the Fully Insured Class but not for the Self-Funded Subclass in comparing the two groups. The cost of paid claims should play no role in allocating damages because those costs pass through Defendants, who must either spend at least 85% of the premiums they receive from fully insured subscribers on claim costs or else refund the excess. 42 U.S.C. § 300gg-18(b)(1). The Defendants cannot keep these pass-through claim costs.

The settlement should have compared the self-funded and fully insured groups the same way the Defendants compare them—by putting self-insureds on a premium equivalent basis.[3] The largest of the Defendants, Anthem, admitted this when it gave

---

[3]    Either the allocation formula should include paid claims for both fully insured and self-funded plans or exclude them from both in order for the two types of plans to be compared on an equivalent basis. Defendants' methodologies show that

sworn testimony through Stephen Schlegel, its Vice President of Corporate Development, in a trial held in the United States District Court for the District of Columbia when the Department of Justice successfully enjoined the planned Anthem-Cigna merger.  Mr. Schlegel testified at length about how to properly compare what ASO/self-funded customers pay and what fully insured customers pay and emphasized that claim costs must be addressed in similar fashion on both sides to get a fair comparison.  He testified "to put an ASO on the same basis as a fully insured account, ***what we do*** is we take the ASO fee that we collect from the client, plus the claims that we pay on their behalf, and add that together to approximate what a fully insured premium might be.  That way an ASO account is on the same basis as a fully insured account."  (Emphasis added.)  (Ex. C (Schlegel) at 1407:1–7).  By adding back claim costs to the self-funded plans, Anthem gets to what it calls "premium equivalents" for self-funded plans.  (*Id*. at 1406:24–1407:7).  Premium equivalents are so important that Anthem itself used them to determine its compliance with the local Best Efforts test.  (*Id*. at 1406:15–23).  This is the same approach Objectors' experts BDO and Teah Corley have testified is appropriate here.  (*See* BDO Report at 8, 10, 12–13, 24–25; Corley Declaration, 7–8.)  Anthem has thus agreed under oath that using premium equivalents is the proper method for

---

Objectors' method is correct because Defendants themselves include paid claims for both fully insured and self-funded plans when evaluating the National Best Efforts Rules.

comparing self-funded and fully insured blocks of business, yet that method was inexplicably not used in apportioning the settlement. As a result, the settlement's apportionment of damages is inequitable. There is no justification for not using the same premium equivalent methodology here.[4]

While the failure to account for claims is the largest quantitative problem with the settlement apportionment, it is hardly the only problem. The apportionment also ignores the numerous other costs to self-funded plans through which BCBS admits that it profits. Such items are discussed on pages 24–28 of the Objection and include items like stop-loss premiums, pharmacy spreads, pharmacy benefit management fees, retention of pharmacy rebates, and utilization management fees, among many others. Indeed, a document entitled TPA Strategy Report from BCBS of Arizona, relied on by Dr. Mason in his new Report submitted in response to the Self-Funded Subclass's experts, states that these items are where BCBS makes money—and self-funded plans therefore incur costs: ". . . TPA margins are to be made with value-added services such as health management, PBM, and stop loss ***not*** claims administration . . ." (Doc. 2812-10 at 3.) Sworn testimony from another Anthem witness in the successful DOJ proceeding to enjoin the Anthem-Cigna merger

---

[4]     The original BDO Report and the Corley Declaration identify many errors committed by the settlement proponents and Dr. Mason in their allocation methodology. Attached as Exhibit D is a second BDO Report in which BDO addresses the multiple new errors committed by Dr. Mason in his new Report.

confirms that "you have to add in all the profitability, every one of those other lines of business associated with that national home and national home ASO, to do a true comparison…." (Ex. C at 1725:11–14). Again, this is entirely consistent with the Objectors' experts. (*See* BDO Report, pp. 10–11; Corley Declaration, pp. 9–15.) As discussed more below, Dr. Mason arbitrarily ignores those value-added services in his analyses.[5]

Instead of relying on concrete numbers to create premium equivalents and a real world methodology based on how BCBS (and BDO and Ms. Corley) compares self-funded and fully insured plans on an apples-to-apples basis, the settlement proponents have resorted to abstract theories and proxies. (Mason Report at ¶ 43) ("While [financial statements] report total operating gain, they do not report operating gain for Fully-Insured and ASO accounts [so] I allocate operating gain for Fully-Insured and ASO plans based on Defendants' observations of per member operating gain differentials and the number of members associated with each type of plan during the relevant periods of calibrate the allocation based on [certain] observations.") But these theories and proxies do not withstand scrutiny.

---

[5]     The Self-Funded Subclass also directs the Court to pp. 16 – 17, footnote 15 of the National Account Objectors' Memorandum in Support of Motion to Opt Out of Entire Settlement, or, in the Alternative, Opposition to the Approval of the Proposed Injunctive Relief Class Settlement. There, the National Account Objectors argue for application of the same methodology to the allocation between the subclasses. (Doc. No. 2812-19.)

*First*, the proponents urge that the Objectors should have focused on "fees paid by Insured Groups and Self-Funded Accounts for the Blue-branded products at issue." (Doc. 2812-1 at 107).  But this is precisely the point. By law, approximately 85 cents of every dollar of fees paid by the fully insured plans were not fees in the pockets of Defendants but amounts that passed straight through Defendants' hands either as payments to providers or as rebates to insureds.  42 U.S.C. § 300gg-18(b)(1).  The proponents offer no justification for including these pass-through amounts.  Put another way, the proponents criticize the Self-Funded Subclass Objection by asserting that "amounts paid to third parties fall outside the scope of this litigation." (Doc. 2812-1 at 126).  This assertion undercuts, rather than supports, their position.  Claims costs are paid to third parties; Defendants do not and cannot keep them, and they know that when they set and collect the premium.  Therefore, claim costs should not be included in the allocation process for either the fully insured or self-funded groups.

The proponents also fail to account for how claims for self-funded plans are actually paid.  Plans do not, as a general matter, pay providers directly whether they are fully insured or self-insured.  As Charles Kendrick, Anthem's president of national accounts, testified, Anthem's "standard practice" for self-funded accounts is to "pay [claims] through our general account and then invoice the customer." (Ex. E (Kendrick) at 1179:7–17).  A self-funded plan will reimburse its insurer for the

14

amounts of those claims (subject to any set-offs or stop-loss), but the plan does not pay providers. Thus, for both self-funded and fully insured plans, third parties are paid by the Defendants.

***Second***, the theoretical urgings that the self-funded market is more competitive than the fully insured market is once again directly contrary to admissions by Anthem. For one thing, Anthem used its market position to charge a very high, take-it-or-leave-it ASO rate. Anthem's vice president and head of new sales testified that Anthem did not negotiate ASO fees in any meaningful way, if at all. (Ex. B (Kertesz) at 561:11–562:14). "There was no negotiation," he testified. (*Id.* at 562:6). And he also noted that Anthem's ASO fees were 35% higher than its competitors' ASO fees. (*Id.* at 567:1–12). A spread of 35% is a wide disparity in fees. (*Id.* at 567:25–568:1). The combined market power of Defendants creates a barrier to entry in the  national account segment of the market that is so severe that expert testimony from the Anthem merger trial showed that "it's all but impossible" for smaller participants to compete with the large market players, such as the combination of Defendants. (Ex. F (Dranove) at 1005:4–1006:11).

More than that, Cigna testified through its CEO that the medical loss ratio (*i.e.*, the requirement to pay 80-85% of premiums on medical claims) caused the markets for full insurance and ASO insurance to converge because the rule limits what insurance companies can make on fully insured subscribers. (Ex. G, Cordani

at 526:12–527:10).  This market convergence occurs because the medical loss ratio limits an insurance company's upside on claims experience.  The rebate requirement treats fully insured customers more like self-funded customers because both now save money from more favorable claims experience.  And the insurance company has less incentive to push customers towards fully insured plans because it receives less benefit for taking on the risk of unfavorable claim experience.  As Mr. Cordani put it, "[E]ven in the guaranteed cost [*i.e.*, fully insured] marketplace, post the ACA, the medical loss ratio threshold would suggest that if you perform better than, if you delivered better medical costs, you're going to have to credit that back.  You don't get to unilaterally benefit."  (*Id*. at 527:6–10).  Or, as another witness put it, the medical loss ratio "forces there to be a high degree of pass-through on the full insurance side."  (Ex. H (Israel) at 4497:17–4498:11).

Putting these two things together, Defendants were charging less competitive ASO prices in a market environment in which ASO/self-funded and fully insured plans were becoming more competitive with each other and where fully insured plans looked increasingly like self-funded plans.  The settlement proponents do not engage with either of these market forces.  The testimony by Anthem's and Cigna's executives is consistent with the Subscriber Plaintiffs' own admissions about the antitrust injury suffered by the Self-Funded Subclass, which includes items in addition to those suffered by the Fully Insured Class.

On page 53 of the Motion (Doc. No. 2812), Subscribers admit that all class members suffered antitrust injuries that lead to significantly increased costs to plans: "virtually every member of the Damages Class suffered antitrust injury through higher premiums, depressed competition, lessened innovation, and loss of consumer choice . . . *[I]n addition to the above***,** members of the Self-Funded Sub-Class ***also*** face common questions concerning the impact of the alleged conduct on administrative fees and the market for national accounts." (Emphasis added.) Consequently, the antitrust injury includes higher costs, depressed competition, lessened innovation, and loss of consumer choice regarding ***all*** of the value-added services described in the testimony of the BCBS executives, the BCBS of Arizona TPA Strategy Report, and in the reports of Objectors' two experts.

***Third***, the proponents' focus on profitability instead of premium equivalents obscures more than it reveals. Again, based on testimony from Wayne DeVeydt, a former Anthem CFO, profitability depends heavily on how costs are allocated—that is, by accounting maneuvers. Looking at financial statements in isolation misses critical components. For example, Mr. DeVeydt gave an expansive and detailed answer when asked if reading an Anthem financial statement showed almost as much gain from its BlueCard fees as its entire ASO business:

> Well, that's a very simple way to look at it, and that would be incorrect because what you don't see from this is just to compare those two fees doesn't take into consideration all these supplemental services that are sold to national home fully insured and national home ASO.

So you have to go down and look at dental, vision, life, disability, and workers' comp because, again, if we sell a vision product to an ASO member, we put the revenue down there.

It also doesn't show you that we're able to spread out cost, our G&A [*i.e.*, general and administrative] cost, across a broader base which actually improves the profitability of small group/large group fully insured and large group ASO. So if you really want to – if you're trying to do a comparison of saying, well, BlueCard is as close to as profitable to national home ASO, you have to add in all the profitability, every one of those other lines of business associated with that national home and national home ASO, to do a true comparison, and I think you'd see a substantially larger difference in what you're saying here.

(Ex. I (DeVeydt) at 1724:18–1725:16).  This testimony directly rebuts Dr. Mason's reliance on his version of financial statement profitability, and there is no suggestion that he considered Anthem's own testimony or performed the corrections that are necessary to get a true picture of profitability.

In any event, the Anthem merger trial transcript includes direct testimony about Anthem's profit margin for ASO and fully insured products—though that testimony is redacted in a manner that prevents Objectors from knowing what those margins are.  The numbers are there for the viewing to anyone with access to the Defendants: "Dr. Dranove, you report in the first line that Anthem's ASO margin is approximately [redacted] for national accounts.  And the margin average in the second sentence for insured products is approximately [redacted], correct?"  (Ex. I (Dranove) at 2403:7–2404:22).  Any analysis of profitability should rely on the true numbers, and those numbers exist for the asking.  Why were they not obtained here?

Shouldn't the Court insist that they be before deciding whether or not to approve this settlement?

### A. Specific Problems with Dr. Mason's New Report

The source of many of the settlement proponents' errors is a late-breaking report from Dr. Mason. It did not exist when the settlement was reached. It did not exist when the allocation to the Self-Funded Subclass was decided. And it is full of misleading citations. These errors are consistent with Dr. Mason's numerous instances of having his testimony excluded or criticized. *See*, *e.g.*, *Phoenix Light SF Ltd. v. Bank of New York Mellon*, No. 14-CV-10104 (VEC), 2020 WL 2765044 at *2 (S.D.N.Y. May 28, 2020) (excluding Dr. Mason's damages calculation and finding that "Mason's calculation of Plaintiffs' damages is not grounded in reality"); TMI Trust Co. v. WMC Mortgage, LLC, Civil Action No. 3:12-cv-1538 (CSH), 2017 WL 6617050 at *3 (D. Conn. Dec. 28, 2017) (striking Dr. Mason's opinion regarding recessionary damages). *See also Forth Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) (declining to certify damages class because Dr. Mason's opinion did not satisfy the *Comcast* standard). Consider two egregious examples from a single page:

Dr. Mason cites the "TPA Strategy Report" from BCBS-Arizona for the proposition that "Defendant documents at times indicate that ASO plans 'may become loss leaders' …." (Mason Report at ¶ 43(a)). Dr. Mason's short quote cuts

off a paragraph that goes on to refute the notion that ASO plans are net losers: "Margins will be made with value added services such as health management, PBM, and stop loss." (Doc. 2812-10 at 3).[6] That is the precise point Objectors are asserting, and exactly what Objectors' experts BDO and Corley say in their reports. Dr. Mason declines to discuss these margins, instead choosing to give the misleading impression that the document says the opposite of what it shows. The main takeaway is in a highlighted box: "…TPA margins are to be made with value-added services such as health management, PBM, and stop loss **not** claims administration..." (*Id.*) (emphasis and ellipses in original).

On that same page of his new Report, Dr. Mason states that "industry participants recognize that 'fully insured arrangements are [insurance companies'] cash cows.'" (Mason Report at ¶ 43). This cite seems bland enough, but it is to a mere trade article, and it stretches the cited article far beyond what the source material can bear. The quoted article goes on to say that "other consultants take a more measured view" and then discusses "a growing number of midsize employers… switching from fully-insured to self-funded arrangements." (Ex. K, *The 411 on ASOs*, at 7). Dr. Mason apparently advances the less measured view,

---

[6]   BCBS is the largest player in the stop-loss market, accounting for $3.9 billion net premiums earned in 2016, which was 27% of the market. *See* Healthpayer Intelligence, *Stop-Loss Insurance Growing Market Opportunity for Healthcare*, p. 3, Ex. J.

but his citation would have the Court believe he is quoting an authoritative source. He isn't.

By this point, the game becomes clear.  Dr. Mason, having bound himself to proxies of profitability and having failed to use actual margin information already compiled by Defendants, grasps at weak citations to prop up the imagined profitability of fully insured plans and denigrate the profitability of self-funded plans.  But he is not done.

Dr. Mason next invents a "late to the party" theory to cut even his own measure of the Self-Funded Subclass's proper recovery *in half.*  In a series of unsourced "I understand" statements, he constructs a narrative of the case that matches exactly how the settlement proponents see the involvement of the ASOs in the case.  (Mason Report at ¶¶ 33–34).  He uses this theory to arbitrarily discount any recovery that the Self-Funded Subclass can obtain by "no less than 50%."  (*Id.* at ¶ 35).

This 50% discount runs through all of Dr. Mason's calculations to support the allocation, even though this discount appears in no materials predating his new declaration.  Dr. Mason's flawed methodology calculates that fully insured plans account for about 96.6% of BCBS's total revenues during the claims periods.[7]

---

[7]    He reached this number by using the shortened claim period.  (Mason Report Ex. 4).

(Mason Report at ¶ 39).  Inexplicably, he then cuts the self-funded revenue portion from 3.4% by half to 1.7%.  (*Id*.).  Slashing revenues in this context makes no sense because the revenues are what they are.  BCBS earned what it earned, and no discount rate arising from alleged litigation risk reduces what BCBS's financial statements show it earned.  Cutting revenues as Dr. Mason does produces a total revenue number that is demonstrably incorrect and ahistorical.

Then, in his sole acknowledgment that fully insured numbers include claims, Dr. Mason opines that 80.7% of BCBS's revenues attributable to the damages class are "net revenue" for the fully insured class—that is, gross revenues less the cost of claims.  (Mason Report at ¶ 40).  In mathematical terms, the remaining 19.3% must come from self-funded plans, but Dr. Mason waves his discount wand to decrease the self-funded share to 10.7% and increase the fully insured share to 89.3%.  (*Id*.).  It is important to note that Dr. Mason thus increases the fully insured share by pretending that half of the self-funded share does not exist.

The slashing continues.  Dr. Mason reasons ASO/self-funded plans are less profitable for BCBS than fully insured plans.  (*Id*. at ¶ 42).  He then cites three profitability metrics, each of which he inexplicably cuts in half.  (*Id*. at ¶ 42(a)–(c)).  Never mind that Dr. Mason ignores that one of the documents on which he relies shows that ASO revenues have three times higher profit margins than fully insured revenues—15% against 5%.  (Doc. 2812-11 at 3).  Not satisfied, he turns to trends

in revenue growth—which he once again cuts in half as to ASO/self-funded plans. (Mason Report at ¶¶ 45–49).

These compounding errors show that the only way Dr. Mason could support the apportionment of damages in the settlement was to make every assumption against the Self-Funded Subclass, and then take the shortest possible claim period. Even tilting the scales this way, the math produces numbers that are more than double what the settlement provided. The only tool available to close the gap is to invent a "late to the party" discount of 50% and apply it several times.

The Self-Funded Subclass's members were not "late to the party." They were simply treated as an afterthought. The proponents wanted to use them to offer the Blues more peace, so they offered the Blues the same "from the beginning of time" release from self-funded plans as from fully insureds. But counsel for the larger class knew that they were conflicted in trying to allocate monies between these two groups. Yet at the same time, counsel for the larger class had a powerful and class-antagonistic incentive not to share much of their fee with the new counsel they themselves recruited to represent Self-Funded Subclass. That incentive points to giving the Self-Funded Subclass as small a share of the settlement as they could and giving counsel for the subclass no ammunition at all with which to negotiate and no ability to acquire any.

There is no supportable argument for the imposition of the 50% discount, and Dr. Mason cites to no authority for it.  Instead, suggests that Self-Funded Subclass should be hit with a 50% "discount factor" for the "time and risk of litigation."  At best, the 50% discount factor is based on his misunderstanding of what the Subscribers counsel are requesting in this case.  They say that "Subscriber Class Counsel expended significant time, and resources in the case, including participating in more than 30 hearings and status conferences and taking and defending key depositions," which reflects risk or expense to the whole class—not just parts of it. (Mason Declaration, ¶ 33).  The whole class is paying for that work and compensating counsel for bearing the risk.  It is not as though the Self-Funded Subclass is paying a smaller proportion of attorneys' fees.  Moreover, Dr. Mason does not apply any discount rate to the fully insured subclass, even though the settlement resolves both sets of claims together.  His analysis treats recovery for the fully insured group as a mathematical certainty and treats recovery for the self-funded group as if it is starting at square one in the litigation process and has no better than a 50/50 chance of winning.  (This discount operates independently from the shortened claim period).  He never identifies what separate risks the fully insured group has undertaken; the litigation risks have been borne by the lawyers.

This notion that the Self-Funded Subclass was somehow late to the lawsuit cannot be squared with the proponents' representation that "as a result of the

nationwide reach of the alleged conspiracy, Subscriber Plaintiffs allege that virtually every member of the Damages Class suffered antitrust injury to higher premiums, depressed competition, lessened innovation, and loss of consumer choice, and that *in addition* to those items that increased costs, the Self-Funded Subclass *also* suffered increased costs due to the impact of the alleged conduct on administrative fees and the market for national accounts." (Doc. No. 2812 at 53). The proponents are trying to have it both ways. They want credit for fixing a problem that affected self-funded plans when advocating for the quality of the settlement, but they act as though nobody ever thought that self-funded plans could possibly be part of the case until 2019 when defending the slanted damages allocation.

The settlement allocation was premised on the ASO-fee-only-to-gross-premium comparison. The proponents admit as much when they urge that the settlement discussions with Mr. Feinberg centered around "potential statute of limitations issues and the relative size of the administrative [ASO] fees paid by the Self-Funded Accounts vs. the premiums paid by insured groups." (Doc. 2812-1 at 124). In other words, on the Self-Funded Subclass side, the parties considered only the ASO fees, and on the fully insured side the parties considered gross premium revenues with no offset for claim payment (as required by the 80%/85% rule). (Doc. No. 2812 at 106). Objectors and their experts demonstrated that this comparison is irredeemably flawed. Instead of defending this allocation methodology, the

settlement proponents and Dr. Mason simply swap horses. That alone shatters Dr. Mason's credibility.

The damages allocation never had any basis in fact, and Dr. Mason's decision to employ new methodologies to defend it *ex post facto* confirms as much. Dr. Mason's shifting methodologies are each fatally flawed. They are not the product of reliable principles or methods. They are not peer reviewed. They do not follow any treatise or teaching. They are not supported by his citations. And, the novel and unreliable methods he employs are not properly applied to the facts.

Dr. Mason has no helpful testimony to offer. He does not even try to suggest that he has any special knowledge or expertise with respect to health insurance matters, other than perhaps what he may have recently read in some generic industry publications. BDO and Ms. Corley, in contrast, have significant decades of experience and knowledge gained from dealing with the precise issues being decided here. BDO and Ms. Corley employ the same comparative analysis of fully insured and self-funded plans as does BCBS. They have facts and first-hand experience; Dr. Mason only theorizes. He does not compare the different plans on a real-world, factual basis.

Most tellingly of all, Dr. Mason tries to hold Objectors' experts to a standard he does not meet. He states "[w]ithout properly deriving the overcharge – that is, mark-up arising from the exclusionary power of BCBS – objectors' experts are in

no position to offer any opinion of any specific economically 'correct' proportional settlement allocation." (Mason Report at ¶ 59). But Dr. Mason offers no overcharge analysis of his own, meaning he cannot pass the test he demands of others. This fact is critical because the proponents, not Objectors, bear the burden here. To be sure, Objectors' experts are not offering one "correct" allocation; rather their analysis shows unreasonable and inadequate the proponents' allocation is. For all these reasons, Dr. Mason's opinions should not be considered by this Court. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Finally, Objectors adopt, incorporate, and assert: 1) the arguments set forth in the National Account Objector's Memorandum Support of Motion to Opt out of Entire Settlement or, in the Alternative, Opposition to the Approval of the Proposed Injunctive Relief Class Settlement (Doc. 2812-19, pp. 1-51); and 2) the arguments set forth on pages 9-14 (excluding argument "Fifth" on pp.11-12) of the Taft-Hartley Plan Objectors' Memorandum in Opposition to the Approval of the Proposed Class settlement (Doc. 2812-19, pp. 53-70. These arguments have been fully briefed and will not be rehashed here to avoid burdening the record. They constitute additional reasons why the Could should not approve the proposed settlement.[8]

---

[8]    Objectors' objection was submitted on the same day as the other objections, so Objectors did not have the benefit of seeing the latter until after their objection was filed. As a factual matter, Objectors had neither contacts nor agreements with other objectors. The proponents had notice and an opportunity to respond to those arguments and have done so.

## CONCLUSION

The Court should not approve the settlement because it does not treat the Self-Funded Subclass equitably as compared to the Fully Insured Class.

Respectfully submitted this 12th day of October 2021.

s/J. Thomas Richie

One of the Attorneys for Objectors

OF COUNSEL
Michael R. Pennington
J. Thomas Richie
Emily M. Ruzic
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

Scott Burnett Smith
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Avenue West, Suite 900
Huntsville, AL 35801-4900
Telephone: (256) 517-5100
Facsimile: (256) 517-5200

Richard D. Nix
Henry D. Hoss
M. Richard Mullins
Mark D. Spencer
MCAFEE & TAFT A PROFESSIONAL CORPORATION
Eighth Floor, Two Leadership Square
211 N. Robinson
Oklahoma City, OK 73102
Telephone: (405) 235-9621
Facsimile: (405) 235-0439

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2021, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ J. Thomas Richie*
J. Thomas Richie