FILED
2021 Oct-12  PM 05:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit D

**Supplemental Report of the BDO Center**

**for Healthcare Excellence and Innovation**

The BDO Center for Healthcare Excellence and Innovation issued its original Report on July 27, 2021 evaluating the proposed Settlement Allocation Methodology.  We have subsequently been asked to review the following documents and provide additional expert opinion in response to:

1. Subscriber Plaintiffs' Memorandum of Law in Support of Motion For Final Approval of Class Settlement

2. Expert Declaration of Dr. Joseph R. Mason, Dated September 3, 2021 ("Mason Declaration")

<u>**Summary**</u>

The Mason Declaration expresses support for the current proposed settlement allocation as "economically reasonable" based on three factors: first, the relative differences between the market for Administrative Services Only (ASO) arrangements purchased by Self-Funded (SF) plans and the market for Fully Insured (FI) plans; second, the differences in time periods for FI and SF members; and, third, the relative circumstances of the SF and FI classes related to the Settlement. These foundational statements made with no authority, no science, and no supporting detail reflect the sweeping generalities found throughout Prof. Mason's Declaration.  It is clear that Prof. Mason has once again failed to consider key characteristics of the health insurance industry and has failed to consider how Blue Cross Blue Shield ("BCBS") itself compares SF and FI plans to one another.

Prof. Mason contends that his proposed allocation methodology is correct *"after"* (1) Adjusting for economic differences between FI and ASO plans, and (2) Accounting for differences in the legal risks faced by the 2 classes. With regard to the former, we address that later in our response; with regard to the latter, in this context it feels like Prof. Mason is reaching and opening streams of argument for arguments sake with little relevancy to the method of allocation of Settlement Damages.

Moreover, Prof. Mason creates an argument that there are two separate markets, one for FI Customers and one for SF Customers, each with different competitor sets and market power. This is not the reality of how business is transacted in the US healthcare marketplace, as detailed below.

The BCBS organization is built like most commercial payors in US healthcare:  One central organization supporting different product lines.  The central organization provides the operating platform for things like product development, eligibility processing, claims processing, medical management, network management.  These are the core "value drivers" for the products; in this case, health plans:  HMOs, PPOs, EPOs.  The underlying funding mechanism for these products (Fully Insured and Self Insured Plans) is secondary to the product itself which they are purchasing.

Specifically, they are purchasing health insurance benefits products which are delivered via:

- A contracted network of healthcare providers, via agreements whose terms are materially the same for FI and SF patients/clients; and

- Health plan operations, Stop Loss Insurance, Pharmacy Benefit Services and other administrative support services (care management, network management, product development) which are materially the same whether the patient/client is from a FI plan or a SF plan.

- Payors leverage these assets, especially their network discounts, to provide equal/near equal value to FI and SF customers.

The other core value driver is Brand. And this is especially true as it relates to the Blues plans. In the case of the Blues plans, Brand is the strongest in the industry among its competitors. In our experience, Brand is worth 2.0-2.5% premium equivalent in the Blues plans. The Blues enjoy the rare status of Metonymy in Brand Awareness. Through usage a trademarked name or brand becomes a generic term — a common noun or verb used in daily conversation and writing. A generic trademark is considered a form of metonymy — a figure of speech that uses a word or phrase as a substitute for something for which it is closely related (e.g., the White House for U.S. Government or Wall Street for big business). (Cite: Ankins Bookshelf). A national Head of Sales for a large competing health insurer shared an anecdote about how at an Open Enrollment meeting a worker commented that "I get my Blue Cross through AETNA". The Blue Cross brand is equated to medical coverage, and in many consumers' minds, there isn't a difference between the provider of healthcare (i.e., the doctor) and the health insurer (i.e., Blue Cross)

**Background of Health Insurance Plans**

Prof. Mason's attempt to define FI and SF in section VI is flawed in many ways but the biggest flaw is oversimplifying the "claims cost uncertainty" aspect of his argument. The reality is that both types of the BCBS plans provide materially the same claims cost uncertainty via the network discounts and stop loss coverage.   BCBS's products offer both administrative services and claims cost uncertainty to materially the same level of value for SF and FI clients.

Consistent with the equal uncertainty to both SF and FI clients, in the Subscriber Plaintiffs' Memorandum of Law in Support of Motion for Final Approval of Class Settlement and Appointment of Settlement Administrator filed on September 3, 2021 at page 53, the Subscriber Plaintiffs admit that FI and SF plans were not only subject to the same anti-competitive conduct, but in fact that SF plans were subjected to additional conduct that FI plans were not.[1]

Another core misrepresentation carried throughout the argument is the "relative profitability" of SF and FI clients.   Profitability on FI v ASO is not as relevant a driver in allocation methodology as Prof. Mason attempts to argue.   This is another "apples-to-oranges" comparison.   It does not

---

[1] "The statement reads:  Moreover, as a result of the nationwide reach of the alleged conspiracy, Subscriber Plaintiffs allege that virtually every member of the Damages Class suffered antitrust injury through higher premiums, depressed competition, lessened innovation, and loss of consumer choice . . .  Within the Self-Funded Sub-Class, predominance is also satisfied;  *in addition to the above*, members of the Self-Funded Sub-Class *also* faced common questions concerning the impact of the alleged conduct on administrative fees and the market for national accounts."  (Emphasis added.)

really adequately reflect the effect and implications of BCBS' anti-competitive behavior across the two classes but rather quantifies it as such for their own benefit in allocation methodology.

Prof. Mason consistently minimizes the value of SF clients, and further, TPA/ASO business; yet the facts of the matter support that in fact SF/ASO/TPA clients/business was and is of increasing importance to BCBS plans, given the national employer purchasing trends and increased intense competition from United Healthcare plans nationally.  Additionally, in 2010 one of the largest Blues plans launched a "TPA Strategy" to address these very issues.  The strategy summarized that while the transactional TPA administrative services are low profit, the "value-added" services of Health Management, Pharmacy and Stop loss/Reinsurance are where "margins will be made".  This is consistent with margin build/profit load works in the insurance industry and why all insurers, including BCBS, increasingly are moving their business model to maximize that value.

It is important to note that Prof. Mason and Subscriber's counsel both reference this same 2010 report but completely misinterpreted the report's meaning and claims that the report stands for the proposition that ASO's are loss leaders when in fact the report stands for just the opposite – that ASO agreements include "value-added" services which create margins for BCBS and are very profitable.   We outlined the importance to BCBS of these "value-added" services to the ASO revenues in our initial BDO Report.  Prof. Mason and the Subscriber Plaintiffs are wrong about the SF plans being "loss headers".

On this point, sworn testimony from BCBS executives and the BCBS documents prove BDO's analysis to be correct and Prof. Mason and Subscriber Plaintiffs being wrong.  In an antitrust

injunctive action brought by the Department of Justice in the United States District Court for the District of Columbia, Stephen Schlegel, Vice President of Corporate Development for Anthem, the largest of the Blues, testified about how to compare what ASO customers pay and what fully-insured customers pay and emphasized that claim costs must be addressed to get a fair comparison: "to put an ASO account on the same basis as a fully-insured account, what we do is we take the ASO fee that we collect from the client, plus the claims that we pay on their behalf, and add that together to approximate what a fully-insured premium might be.  That way an ASO account is on the same basis as a fully insured account."  (Exhibit A at 1407:1–7) (emphasis added).  Anthem's VP described this as calculating a "premium equivalent" for self-funded plans, *id.,* the same approach BDO has declared is appropriate here in its original Report. Anthem has thus testified under oath that this is the proper method for comparing self-funded and fully-insured blocks of business, yet that method was inexplicably not used by Prof. Mason in apportioning the settlement. Prof. Mason's failure to use BCBS' own methodology is inappropriate.

While the failure to account for claims is the largest quantitative problem with the settlement apportionment, it is not the only problem.  The apportionment also ignores the numerous other cost and revenue items by which the Blues profit at the expense of the Self-Funded Class.  Such items are discussed in BDO's previous Report and at pages 24–28 of the Self-Funded Objectors' Objection, and include items like stop-loss premiums, pharmacy spreads, retention of pharmacy rebates, and utilization management fees, among many others.    Sworn testimony from another Anthem witness in the successful DOJ proceeding to enjoin the Anthem-Cigna merger confirms that "you have to add in all the profitability, every one of those other lines of business associated

with that national home and national home ASO, to do a true comparison…." (Exhibit B at 1725:11–14).

The "loss leader" contention made by Subscriber Plaintiffs and Prof. Mason is a red herring. It is contradicted by the very BCBS documents upon which Subscriber Plaintiffs and Prof. Mason try to rely. The ASO fees as a "loss leader" is, if anything, to persuade SF plans to use BCBS as a TPA, then BCBS makes its margins - profits – on the very same value – added services that BDO previously described. This also proves another point made in BDO's initial Declaration – BCBS makes significant profits from its SF business.

Employers on average see savings of approximately 20-35% when going from fully Insured to self-insured funding. Every savings scenario differs based on the particular employer and year of claims experience. Some scenarios could see little to no saving, while some scenarios could see as high as 40% savings. Per our analysis, the components of the 20-35% savings range are as follows: 2-4% for claim trend; 4-6% for claims fluctuation & morbidity margin; 3-5% for mandated benefits; 3-5% for administrative expenses; 4-6% for taxes & fees; 3-5% for profit & risk loading.

On the issue of Substitutability, we agree with Prof. Mason that FI and SF plans are essentially substitutes and each constrain the price of the other – because an employer performs the financial analysis of its OWN situation and chooses the better approach to suit its needs. See Mason Declaration, paragraphs 23, 27 and 28. The fact that there has been a continuous shift in employers from the fully insured to the self-funded mechanism indicates that on average, savings exist in doing so. As detailed in our analysis, these savings range from 20-35%.

**Assessment of Settlement Allocation**

Prof. Mason's various ratios as proxies for the overcharges mentioned in paragraph 31 present an overly simplistic and myopic view of healthcare and how health insurance works.  It is the Blue Cross entire membership portfolio (fully insured, self-funded, government, etc.) that enables them their leverage in negotiations with their partners (providers, etc.) – which in turn affect medical claim amounts and other programs that ultimately impact healthcare spend - and this equally impacts both the fully insured and self-funded market.  He puts a good deal of effort in creating numerical exhibits that compare the SF ASO fee to the FI premium rate.  That is a flawed methodology because they are not on the same basis as Prof. Mason ignores SF paid claim costs and ignores the value – added services that BCBS admits is where it makes its margins on SF plans – the ASO fee represents only a portion of the premium equivalent spend for SF employers, while the FI rate premium rate represents the 100% of the healthcare spend – including the medical claims BCBS are required to pay to outside providers.  Prof. Mason's failure to include the SF value – added services and the paid claim costs in the ASO revenues renders his analysis meaningless.  Prof. Mason cannot leave out margins from services that BCBS considers in its comparison of SF and FI plans and present a proper allocation model.

Prof. Mason's application of a discount factor is also inexplicable and unsupportable.  Actuaries have deep expertise in the application of discount rates regarding time value of money, and I have never seen a methodology that remotely resembles Prof. Mason's application of it.  A critical component of time value of money calculation translates the value of future investments into

8

today's dollars (present value) or today's dollars into future amounts (future value). Plainly said, a dollar today is worth more than a dollar tomorrow.

Prof. Mason takes a 9% discount rate (3% treasury + 6% risk premium) and discounts it for 8 years to arrive at a 50% discount factor – which he uses to discount the SF allocation he derives applying his overcharge methodology. So, he essentially compounds a flawed methodology with an even more flawed concept. <u>A discount rate should be applied to streams of cash to determine what those same amounts would be at certain points in time. A discount rate should never be used under a merit-based premise in determining who is entitled to what amount.</u> We were, therefore, not surprised that Prof. Mason cited to **no authority** for the use of a discount factor in this type of situation.

Prof. Mason proceeds to summarize his perspectives on "financial comparisons" of the FI, SF markets, centered around Gross Revenue, Operating Gain, and a difficult to follow comparison of "Changes in Revenue Associated with Administrative Services and Risk Transfer Per Member Revenue".

We've argued that Revenues are comparable between FI Premium and SF Premium Equivalents, and the data supports that. In fact, the BCBS "Best Efforts Rules" define Premium Equivalents as a measure of compliance with the BCBS Licensee agreement. To put an ASO client on the same comparative analytical basis as an FI client, the methodology is to take the ASO Fee (including revenue received by BCBS for "other services" under the ASO agreements) <u>plus</u> the Claims Costs

to approximate what a SF premium might be.  Most recently, this argument was also articulated in the Schlegel transcript.  To put it simply, BCBS and our BDO expert report are on the same page and follow the same sound logic and the same financial processes.  We both recognize that comparing the FI Premium to the SF Premium Equivalent is the best and most appropriate way to evaluate and compare the revenues generated by the FI and SF plans.  It is Prof. Mason who fails to follow or maybe even understand this logic.

Basing the Settlement Allocation Methodology on Operating Profit makes some sense to some degree, but it must be precise in terms of member mix and service mix to be accurate, and it depends on who you ask.  According to a recent Oliver Wyman study, which Prof. Mason also references, FI represents approximately 20% of a "Typical Multi-Segment Health Plan" profit, while SF represents approximately 15%. Another 35% is split across smaller SF and FI clients. These data also underscore the inaccuracy of the proposed 95.5%/6.5% Allocation, and that our Proposed Allocation of 45.5% SF/54.5% FI is supported by this analysis.

Our value drivers in financial comparisons and subsequent Settlement Allocation methodology are summarized above in the context of responding to Prof. Mason's introductory summary comments. But they are worth re-stating here in the context of his argument in section VII:   The core value drivers in the products purchased by FI and SF clients are the contracted provider network and health plan operations that support the product purchased (HMO/PPO/EPO).

In his concluding comments Prof. Mason states that Objectors ignore differences in the economics of the markets faced by the FI and SF subclasses, namely, that the Blues had more market power

in their FI product than in their SF product.  Objectors did not ignore this, but rather, argue that BCBS' "market power" is omni-present and of equal value to FI and SF.  This is borne out in all relevant comparative indicators, including Profit and Revenue.  Importantly, as quoted at p. 4, above, Subscriber Plaintiffs admit this at page 53 of their Memorandum supporting their motion for final approval of the class settlement where they describe the antitrust damage suffered by both FI and SF plans.  Moreover, Prof. Mason admits that FI and SF plans are substitutes for one another and that employers switch between them in response to changes in relative costs.  (Mason Report ¶ 28.)  Together these combine to clearly support the argument that the Proposed Settlement Allocation methodology is inappropriately skewed to the FI clients.  The Settlement Allocation should better reflect the actual impact of BCBS anti-competitive behavior on the market, and an allocation of damages reflective of the actual value of FI and SF clients.  It is clear and obvious that the Proposed Settlement Agreement Allocation substantially understates the damage allocation percentage of the SF plans.

**<u>Conclusion</u>**

In conclusion, we find four (4) significant errors in the Mason Declaration. First, not considering paid claims in the ASO revenue analysis when they are included in the FI revenue is unacceptable from an actuarial perspective and completely undermines Prof. Mason's expertise and credibility. In fact, BCBS's own executives have stated that it evaluates ASO revenues in terms of  Premium Equivalency for purposes of the National Best Efforts Rule. Second, consistent misrepresentation of the ASO business as a financial drag or loss leader is not only unfactual but it is misleading. The ASO business represents a very profitable line of business that is growing and increasing in profitability, in the BCBS plans and throughout the industry.  Third, application of a "Discount

Factor" to the allocation methodology is inappropriate and there is no support for it. It is absurd and an unprecedented use of a legitimate valuation tool for self-serving purposes. Fourth, we completely disagree with Prof. Mason's argument that there are market limits on Substitutability of services and he admits in his report that FI and SF are essentially substitutes for one another. As a result, our Proposed Settlement Allocation as set forth in our original Report remains unchanged.

We declare under penalty of perjury the foregoing is true and correct.

**Executed this 12th day of October, 2021:**


_____
Ugo Okpewho, FSA, MAAA


_____
Jim Watson, MBA

Exhibit 1

```
1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,      )  Civil Action
     et al.,                        )  No. 16-CV-1493
4                                    )
                      Plaintiffs,    )  Bench Trial
5                                    )
     vs.                            )  Washington, DC
6                                    )  November 30, 2016
     Anthem, Inc. and Cigna         )  Morning Session
7    Corporation,                   )  Time:  9:30 A.M.
                                     )
8                      Defendants.   )
         _____
9

10                   TRANSCRIPT OF BENCH TRIAL
                          HELD BEFORE
11         THE HONORABLE JUDGE AMY BERMAN JACKSON
                  UNITED STATES DISTRICT JUDGE
12       _____

13                    A P P E A R A N C E S

14   For the Plaintiffs:
       United States             Jon B. Jacobs
15                               Scott Ivan Fitzgerald
                                 Bryson Bachman
16                               U.S. DEPARTMENT OF JUSTICE
                                 Antitrust Division
17                               450 Fifth Street, NW
                                 Suite 4100
18                               Washington, DC 20530
                                 (202) 598-8916
19
       State of Colorado         Abigail Leah Smith
20                               ATTORNEY GENERAL'S OFFICE
                                 Consumer Protection Section
21                               1300 Broadway
                                 Denver, CO 80203
22

23

24

25
```

Case 2:13-cv-20000-RDP   Document 2845-4   Filed 10/12/21   Page 15 of 45

```
 1    For the Defendant:
        Anthem, Inc.              Christopher M. Curran
 2                                John Mark Gidley
                                  Heather Burke
 3                                Doug Jasinski
                                  Jared Danilson
 4                                WHITE & CASE LLP
                                  701 13th Street, NW
 5                                Washington, DC 20005-3807
                                  (202) 626-3600
 6
        Cigna Corporation         Charles F Rule
 7                                Joseph Bial
                                  Paul, Weiss, Rifkind, Wharton &
 8                                  Garrison LLP
                                  2001 K Street, NW
 9                                Washington, DC 20006-1047
                                  (202) 223-7300
10
      _____
11
      Court Reporter:           Janice E. Dickman, RMR, CRR
12                              Official Court Reporter
                                United States Courthouse, Room 6523
13                              333 Constitution Avenue, NW
                                Washington, DC  20001
14                              202-354-3267

15                                   *   *   *

16

17

18
```

Case 2:13-cv-20000-RDP   Document 2845-4   Filed 10/12/21   Page 16 of 45

```
19

20

21

22

23

24

25
```

```
1     *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

2              THE COURTROOM DEPUTY:  Your Honor, calling Civil

3     Action Number 16-1493, the United States of America, et al.

4     v. Anthem and Cigna.

5              THE COURT:  All right.  You can call your next

6     witness.

7              MR. CURRAN:  Good morning, Your Honor.

8              At this time Anthem calls Mr. Stephen Schlegel,

9     who's already on the witness stand.  And my colleague

10    Douglas Jasinski will be handling -- handling this

11    examination.

12             THE COURT:  All right.

13                        STEPHEN SCHLEGEL,

14    was called as a witness and, having been first duly sworn,

15    was examined and testified as follows:

16             MR. JASINSKI:  Good morning, Your Honor.

17                       DIRECT EXAMINATION

18    BY MR. JASINSKI:
```

Case 2:13-cv-20000-RDP  Document 2845-4  Filed 10/12/21  Page 17 of 45

```
19    Q.   Could you state your name for the record, please?

20    A.   Yes.  My name is Stephen Schlegel.

21    Q.   And what's your current role with Anthem?

22    A.   I am the Vice President of Corporate Development.

23    Q.   And how long have you been in that position?

24    A.   A little over 11 years.

25    Q.   And what was your involvement in the Cigna transaction?
```

1   A.   Yeah.   My involvement as Vice President of Corporate

2   Development was to analyze the -- the transaction.   It was

3   to develop the financial analysis of it, meet with our

4   executive leadership, our CEO and CFO, for example, meet

5   with Cigna on occasion, work with our investment bankers and

6   then prepare materials and analysis for our board of directors.

7   Q.   And what type of factors did you analyze for the Cigna

8   transaction?

9   A.   We start with, generally, strategic fit of the two

10   organizations, and then as a result of that strategic fit,

11   what are the potential synergies and efficiencies of the

12   combination, and then in -- in context of the synergies,

13   what would be the pro forma financials of the -- of the

14   entity and whether or not it would be of -- be attractive

15   for our shareholders.

16   Q.   Specific to synergies, how did you go about calculating

17   those for the transaction?

18   A.   Yeah.   Early on, typically I will use precedent

Case 2:13-cv-20000-RDP   Document 2845-4   Filed 10/12/21   Page 18 of 45

19   transaction, meaning prior transactions in our space, in

20   our -- in our industry, what was reported as synergy

21   opportunities, what was accomplished.   Also look at our own

22   history with synergies.   We've done other transactions.   The

23   Anthem, WellPoint Health networks, for example, and

24   Amerigroup, look at those synergies that we -- we were able

25   to capture there, and then generally look at the -- the

1    G & A, meaning general and administrative cost savings that

2    we might be able to generate from the combination, and then,

3    also, potential revenues synergies, meaning opportunities to

4    grow our business as a result of the combination.

5    Q.   In terms of G & A synergies, what -- what is in that

6    bucket of synergies?

7    A.   Yeah.  What we -- what we'll do is we'll look at public

8    information regarding the companies, the target, in this

9    case Cigna's general and administrative expense, look at

10   where we might be able to save between the two companies.

11   It's typically corporate overhead, administrative expenses

12   that we might be able to eliminate as a result of

13   duplication.

14   Q.   And did that include network efficiencies and medical

15   management efficiencies?

16   A.   Not as part of the general and administrative savings,

17   but we did look at the opportunity to combine the best

18   practices in medical management, wellness programs and

19   things like that, and how it would impact our MLR.  But,

20   that was actually a relatively small amount in comparison to

21   the G & A savings opportunity, which was probably about

22   three-quarters of the -- of the synergies.

23   Q.   And what part of the business did that -- the medical

24   management efficiencies and network efficiencies relate to

25   in the numbers that you put together for analyzing the

Case 1:16-cv-01493-ABJ   Document 445-4   Filed 10/12/21   Page 19 of 45

1   transaction?

2   A.   It -- it related just to our fully insured book.   So

3   with our ASO customers, our -- were that efficiencies in

4   savings passed directly on to our customers?   We didn't

5   necessarily size those efficiencies for the ASO customers at

6   that -- at that point in time, but we recognize that there

7   was going to be significant efficiencies that would flow to

8   them post transaction, you know, both on the medical side

9   and even on the PPM side.

10   Q.   And then in analyzing efficiencies for the transaction,

11   did you get input or -- or, interact with Cigna in any way

12   for the synergies and efficiencies?

13   A.   I did.   I was asked to work with my counterpart at

14   Cigna.   What we did was we each developed independently our

15   own viewpoints as to where the synergy opportunities would

16   be.   We developed independently our own ranges for those --

17   those synergies and then we came together and compared our

18   thoughts and talked about how we got to our calculations and

Case 2:13-cv-20000-RDP   Document 2845-4   Filed 10/12/21   Page 20 of 45

19   then compared those ranges.

20   Q.   And what were the ranges that you came up with when

21   analyzing the transaction?

22   A.   The total range, in total, was 1 .7 to $2.3 billion

23   of synergy savings.

24   Q.   And then what -- what synergy --

25          THE COURT:   But you're talking about exclusively

1   on the G & A piece?

2          THE WITNESS:  As well as the revenue opportunity

3   and -- and some of the network efficiencies, Your Honor.

4          THE COURT:  So synergy savings includes -- how

5   does synergies include increased revenue?

6          THE WITNESS:  Well, for example, with the combined

7   organization with our Medicaid asset, Amerigroup and their

8   Medicare asset, HealthSpring, we saw an opportunity to

9   better serve the dual eligible population, for example.  So

10  we believe that as a result of the combination we would be

11  able to capture more synergies from that particular market

12  opportunity.  Another was specialty penetration.  Cigna has

13  done a very nice job of penetrating their medical

14  membership --

15         THE COURT:  I wasn't actually -- my question was

16  if you're talking about synergy savings, I understand that a

17  savings could be G & A costs going down, but you're talking

18  about revenues going up.  So I'm just wondering how you get

19  a savings number out of costs going down and revenue going up?

20         THE WITNESS:  Yeah.  Thank you, Your Honor.

21         It's not necessarily a savings.  It's an

22  opportunity to improve our profitability as a result of

23  those additional revenues.

24         THE COURT:  Okay.

25  BY MR. JASINSKI:

1   Q.  So, Mr. Schlegel, the range that you described, what was

2   the number that -- that you provided to your executive team

3   and board for assessing the merger?

4   A.  Yes.  We -- we settled on the mid point of that range,

5   $2 billion.  That's what we used in our analysis from that

6   point forward in what we presented to our board of directors

7   and ultimately to Wall Street.

8   Q.  So -- so that 2 billion synergies number is the number

9   that the board relied on in making an offer to Cigna?

10  A.  It was, and obviously it's a high-level estimate at that

11  stage.

12  Q.  And so after the merger and agreement was signed and

13  announced, what was the next step in calculating and

14  estimating synergies and efficiencies between the companies?

15  A.  As part of the integration planning effort, one of the

16  teams that was put together was tasked with further refining

17  both the synergy opportunity and the efficiency opportunity.

18  I presented what I had prepared as part of the merger

19  analysis to that team, or to individuals on that team, which

20  included McKinsey.  And then from that point forward they

21  took that and developed their own tops-down, bottom-up

22  analysis to -- to get their own independent view of

23  the synergies and the efficiencies.

24  Q.  And that -- that would be the integration team that

25  would include both Anthem and Cigna and McKinsey?

Case 2:13-cv-20000-RDP  Document 2845-4  Filed 10/12/21  Page 22 of 45

```
 1    A.   That's correct.

 2    Q.   Okay.  Thank you.

 3              I'd just like to ask you some questions about the

 4    Blue Cross and Blue Shield association.  Can you just give

 5    an overview of how the association is structured?

 6    A.   Yeah.  The Blue Cross/Blue Shield association itself

 7    essentially owns and controls the trademarks Blue Cross and

 8    Blue Shield and the trade names.  They, in turn, license

 9    those marks and names to individual companies like

10    ourselves.  There's 36 independent companies, and it's

11    important to note that each of them have their own

12    management teams, board of directors, they make their own

13    independent decisions, but as a licensee, they, in turn,

14    govern the association through a board of directors.  So

15    each plan has a representative on the association board of

16    directors.

17              Now, the association itself then conducts trade

18    association type of activities to ensure the integrity and

19    the value of the -- the brand and marks for the member

20    plans.

21    Q.   And then how does the exclusive service area under the

22    association relate to the brands that you just described?

23    A.   Yeah.  So, the license grants the exclusive use of the

24    brands in a defined geography, so in our case, our 14.

25              THE COURT:  Which somewhat differentiates it from
```

1     the typical trade association.

2                    THE WITNESS:  Yes.

3                    THE COURT:  Okay.

4     BY MR. JASINSKI:

5     Q.  And then so, the license gives you the right to use that

6     brand in -- in exclusive service area?

7     A.  That's correct.  So, that means that we -- no one else

8     can use those brands within our defined geographies and we,

9     in turn, can't use the Blue Cross/Blue Shield brand in

10    somebody else's licensed territory.  But that exclusivity

11    doesn't entail we have to be exclusive to the brand.  We are

12    allowed to compete with nonBlue brands both in our markets

13    and outside of our markets.

14    Q.  Okay.  And can the exclusive service areas under the

15    association ever overlap?

16    A.  They do, and typically what that means is that the --

17    that the trademark Blue Cross and the trademark Blue Shield

18    are separated.  So perfect example of this is our Blue -- we

19    compete as Anthem Blue Cross in the California market

20    against the California Blue Shield.

21                    There's other examples of this.  For example, in

22    the state of Washington, Premier Blue Cross competes with

23    the Regency Blue Shield.  And in Idaho, the Idaho Blue Cross

24    competes with Regency Blue Shield there.  And then there's

25    some overlapping areas within the states of Pennsylvania and

Case 2:13-cv-20000-RDP  Document 2845-4  Filed 10/12/21  Page 24 of 45

1    New York that I'm aware of.

2    Q.   And are there any other instances where the Blue

3    Cross/Blue Shield licensees compete with each other?

4    A.   Yeah.   In addition to the fact that Anthem competes in

5    Medicare and Medicaid, for example, with our CareMore brand,

6    Amerigroup, and then recently Simply in the state of

7    Florida.   There are other examples, such as Independence

8    Blue Cross competes with a brand called AmeriHealth.   They

9    compete in Medicaid commercial and TPA services with that

10   brand.   So, for example, they compete as AmeriHealth

11   New Jersey against the Blue Cross/Blue Shield of New Jersey

12   plan.

13   Q.   And does Anthem compete against other Blues outside of

14   its 14 service areas?

15   A.   We do, primarily in the Medicare and Medicaid business

16   at this point.

17   Q.   And that would be Amerigroup, CareMore and Simply?

18   A.   Yes.   We also do compete with a brand called HealthLink

19   and have competed against the Blue Cross/Blue Shield plan of

20   Illinois for the Illinois state account, for example.

21   Q.   And HealthLink would be a commercial product?

22   A.   It is.   It's a -- it's primarily a TPA service, but it

23   does have the insured services on that account.

24   Q.   And then has Anthem ever competed against the Blue plans

25   with any other nonBlue commercial brands?

1  A.   We did.   We had a brand called UniCare.

2  Q.   And can you provide some background about the UniCare

3  brand?

4  A.   Yeah.   UniCare was -- was a by-product of the Anthem/

5  WellPoint Health Networks acquisition.   At one point

6  WellPoint Health Networks was simply the -- the Blue Cross

7  of California and they bought a couple smaller health plans

8  from Mass Mutual and John Hancock and as part of that there

9  was a brand called UniCare.   They used that brand to compete

10  outside of the California market.   So when Anthem bought

11  WellPoint Health Networks, that was something that we picked

12  up.   That was a line of business we picked up.

13  Q.   And then what happened to the UniCare brand?

14  A.   We ultimately sold the commercial membership.   We still

15  utilized the UniCare brand on some Medicare and Medicaid

16  products.   We are actually with Amerigroup, moving -- had

17  been moving to the Amerigroup brand.

18        But we had sold that during the recessionary

Case 2:13-cv-20000-RDP   Document 2845-4   Filed 10/12/21   Page 26 of 45

19  period of 2008 and 2009.   It was a business that was in

20  decline and over time there was -- there had been some

21  analysis, but at that point time, in 2008, we conducted a

22  complete portfolio review.   So we looked at UniCare, our

23  PBM, NextRX.   We looked at our existing state -- our

24  Medicaid business, which is called state-sponsored business

25  back then.   And we ultimately decided to sell the UniCare

1   business as well as the -- the PBM.

2           Ultimately we did acquire Amerigroup to gain scale

3   in the Medicaid business, but it was a part of a portfolio

4   review.

5   Q.   And so back to the Blue Cross and Blue Shield

6   association, you're familiar with the best-efforts rules?

7   A.   I am.

8   Q.   And there are two rules, correct?

9   A.   That's correct.  And I was responsible for analyzing

10  those rules.  I identified them as a potential concern, an

11  issue that we would have to -- to understand and -- and come

12  to terms with.

13  Q.   In relation to the Cigna transaction?

14  A.   Yes.

15  Q.   And for purposes of the Cigna transaction, which of the

16  best-efforts rules is most relevant?

17  A.   The most relevant one is the national Best Effort and --

18  and the two tests, the local Best Effort test simply says

19  that 80 percent of our revenues, premium and premium

20  equivalents within our defined geographies have to be Blue

21  branded.  The national test says that 66 and two-thirds or

22  66.6 percent of our revenues, premium and premium

23  equivalents, have to be branded Blue.

24          THE COURT:  What do you mean by premium and

25  premium equivalent?

```
 1                THE WITNESS:  Yeah, Your Honor, premium

 2      equivalent, to -- to put an ASO account on the same basis as

 3      a fully insured account, what we do is we take the ASO fee

 4      that we collect from the client, plus the claims that we pay

 5      on their behalf, and add that together to approximate what a

 6      fully insured premium might be.  That way an ASO account is

 7      on the same basis as a fully insured account.

 8                THE COURT:  Okay.  All right.  Thank you.

 9      BY MR. JASINSKI:

10      Q.  And why does the Blue Cross and Blue Shield association

11      have a best-efforts rule?

12      A.  It's to ensure that the licensed companies show some

13      commitment to the brand or -- or, ensure that we are

14      committed to the use of that brand.  It's -- it's realistic

15      to -- to -- for them, giving us an exclusive license for the

16      use of that brand, to expect that we will use it in the

17      markets they provide us access -- access to.

18      Q.  And --
```
Case 2:13-cv-20000-RDP  Document 2845-4  Filed 10/12/21  Page 28 of 45
```
19                THE COURT:  Well, then what's the point of the

20      national one?  I understand the local one.

21                THE WITNESS:  Again, it was -- it's simply to

22      ensure that the companies have a level of commitment to

23      the -- to the brand.

24                THE COURT:  Okay.

25      BY MR. JASINSKI:
```

# Exhibit 2

1    late tonight.  I think I can do the direct in 15 minutes.

2          THE COURT:  Well, stop talking and put him on the

3    stand.

4          MR. CURRAN:  All right.  At this time Anthem calls

5    Mr. Wayne DeVeydt.

6                  WAYNE DeVEYDT, Sworn

7                DIRECT EXAMINATION

8    BY MR. CURRAN:

9    Q.  Good afternoon, Mr. DeVeydt.

10    A.  Good afternoon.

11    Q.  Can you please state your name.

12    A.  Wayne DeVeydt.

13    Q.  All right.  And, sir, you are the former CFO of Anthem,

14    correct?

15    A.  That's correct.

16    Q.  Thank you for being here.

17          Sir, you retired on or about May 31st of this

18    year? Case 2:13-cv-20000-RDP  Document 2845-4  Filed 10/12/21  Page 30 of 45

19    A.  That's correct.

20    Q.  Okay.  And did your retirement have anything to do with

21    the merger that we're litigating here today?

22    A.  No.  No.  It was to spend more time with family and our

23    philanthropic work.

24    Q.  All right.  Sir, while you were CFO at Anthem, you were

25    one of the principal negotiators of the transaction,

1    correct?

2    A.   That's correct.

3    Q.   Sir, what was the rationale and the foreseen benefits

4    that led Anthem to do this transaction?

5    A.   I would break it down into three primary areas that we

6    focused on.   One was the business models were very

7    complementary.   There were areas that we were strong that

8    Cigna was not necessarily strong in, such as individual and

9    small group.   There were areas that they were quite strong,

10   such as what I'll call one of the vision, the dental

11   businesses, and the penetration within their businesses.

12   They are an international book.   We had no international

13   book.   So we had a lot of unique complements to each other.

14        The second thing I would say is it gave us an

15   immediate footprint to be much more competitive in all of

16   the states outside our 14 Blue states.   Now, that was very

17   relevant because when we acquired AmeriGroup we got a very

18   unique opportunity into what we could do with the scale and

Case 2:13-cv-20000-RDP   Document 2845-4   Filed 10/12/21   Page 31 of 45

19   having that concentration in certain markets coupled with

20   the value that we could bring to the transaction and become

21   highly competitive overnight.   And then finally the

22   economics of the transaction were very compelling for both

23   us and for the consumer.

24   Q.   So you had high expectations for the merger?

25   A.   Yes.

1    A.   That's correct.

2    Q.   And if we look at the column second to the left titled

3    "YTD Actuals," that's year-to-date actual financial results,

4    right?

5    A.   That's correct.

6    Q.   And if you look here, under -- for the ASO business, I'm

7    not going to use the figure because it's confidential, but

8    it's -- if you look at the screen, you can see what that

9    number is, correct?

10   A.   That's correct.

11   Q.   And if you look at the figure beneath it, that's the

12   annual operating gain for BlueCard fees.  Do you see that?

13   A.   That's correct.

14   Q.   And the BlueCard fees are less than 10 percent or 90

15   percent of the ASO fees or the ASO operating gained,

16   correct?

17   A.   That's correct.

18   Q.   So if you're reading this financial statement, what that

19   means is Anthem is making almost as much operating gain on

20   the BlueCard fees as it is on its own ASO business; is that

21   right?

22   A.   Well, that's a very simple way to look at it, and that

23   would be incorrect because what you don't see from this is

24   to just compare those two fees doesn't take into

25   consideration all these supplemental services that are sold

1    to national home fully insured and national home ASO.  So

2    you have to go down and look at dental, vision, life,

3    disability, and workers' comp because, again, if we sell a

4    vision product to an ASO member, we put the revenue down

5    there.

6            It also doesn't show you that we're able to spread

7    our cost, our G&A cost, across a broader base which actually

8    improves the profitability of small group/large group fully

9    insured and large group ASO.  So if you really want to -- if

10   you're trying to do a comparison of saying, well, BlueCard

11   is as close to as profitable to national home ASO, you have

12   to add in all the profitability, every one of those other

13   lines of business associated with that national home and

14   national home ASO, to do a true comparison, and I think

15   you'd see a substantially larger difference than what you're

16   saying here.

17   Q.  And, in fact, another way to compare is to look at the

18   per member per month, right?  That compares it on a per

Case 2:13-cv-20000-RDP  Document 2845-4  Filed 10/12/21  Page 33 of 45

19   person basis; is that right?

20   A.  Well, again, the PMPM is per member per months and

21   typically are based on what you see here divided by

22   membership.  It doesn't consider all the other profits that

23   are being generated from those lines of business.

24           THE COURT:  Excuse me one second.  If you took

25   this specialties that add up, which are added up, they're

1    totaled, would you -- you wouldn't just add that to

2    national.  That's spread over national and large group and

3    small group as well.

4         THE WITNESS:  That's correct, Your Honor.

5         THE COURT:  Okay.  So only portion of that would

6    affect the difference between national ASO and national

7    BlueCard.

8         THE WITNESS:  Absolutely.  Absolutely.

9         THE COURT:  Okay.

10         THE WITNESS:  The other comment that's a little

11    more complicated is the G&A affect.  So ultimately, as an

12    organization, you have a cost for a CEO and a CFO, and I'll

13    give an example of two because whether you're talking about

14    two thousand employees or two, the math works the same way.

15    But in essence, because we're able to have the member be our

16    member, not a BlueCard member, we actually get to spread the

17    cost of me or the CEO or others to some of those members as

18    well, so it actually reduces the profitability that you're

19    seeing in national home ASO but makes the other lines of

20    business more profitable because they're not bearing the

21    full freight of a CFO cost.

22         So that's why I also mention versus BlueCard

23    doesn't have a freight associated with it.  It's just this

24    is the fee you get, but you don't get to really see what

25    I'll call the real profitability, the other lines of

Case 1:16-cv-01493-ABJ   Document 471   Filed 02/12/21   Page 34 of 45

1    business and all the G&A they're covering for the company.

2    Q.   Okay.   And we'll actually get to that more in the next

3    document, but if we can just briefly go to the next page.

4              MR. FITZGERALD:   Blow up the same box.

5    Q.   Now, these are the same costs but now on a per-member-

6    per-month basis, right?

7    A.   That's correct.

8    Q.   And if we look at the same column, second to the left,

9    this actually shows, on a per-member-per-month basis, it's

10   actually more profitable for Anthem to win BlueCard business

11   than to win its own ASO business; is that right?

12   A.   Again, I disagree.   Similar to what I said when

13   Mr. Curran was asking me questions, one of the benefits of

14   actually winning the account directly is we get to sell

15   ancillary services.

16             Per member per month on dental and on vision and

17   on life and disability.   There's a piece of that profit that

18   actually belongs up top with national home and national home

Case 2:13-cv-20000-RDP   Document 2845-4   Filed 10/12/21   Page 35 of 45

19   fully insured and ASO.   You also have to consider the G&A

20   leverage and disleverage.

21             So no, back to the point of it's a very simple

22   view to look at that line without understanding all the

23   other services you're selling into those members and all the

24   other values you get on G&A leverage.

25   Q.   Right, and you don't always sell all those services,

1   right?

2   A.  Not always.

3           MR. FITZGERALD:  Okay.  If we can turn to

4   Plaintiff's Exhibit 128, please.  Turn to Page 2 before.

5   And if we could zoom in to the bottom paragraph here.

6   Q.  This is an email from Peter Welsh, who I believe is the

7   regional vice president of national accounts at Anthem; is

8   that right?

9   A.  I don't know who Peter is.

10  Q.  Okay.  You know what Jai Bills is?

11  A.  I know what Jai is.

12  Q.  Jai runs the interplan business at Anthem?

13  A.  My understanding is he does, but I don't interact

14  directly with Jai.  I haven't been with the company in six

15  months.

16  Q.  Okay.  This is an email that was sent in 2013?

17          MR. FITZGERALD:  And Caitlyn, if you can highlight

18  the sentence beginning with "There may be certain cases."

19  Q.  Now, Mr. DeVeydt, I'm not sure if you've actually seen

20  this email before.  Do you recognize it?

21  A.  I do not.

22  Q.  Do you want to take a moment to read it?

23  A.  Please.

24  Q.  I'm just going to ask you about this short email here.

25  A.  Is it just this section you're going to inquire about?

1   Q.   Just this short paragraph from Mr. Welsh.

2   A.   Okay.

3   Q.   So my understanding is here Anthem was re-evaluating its

4   ceding policy, is that right, the balance of trade, the

5   cedes to go in and the cedes that come out?

6   A.   Yes.   I interpret this -- I don't know who Peter is, but

7   I interpret this as Peter saying we should do an analysis to

8   make sure where we're making our money and where we're not

9   and whether it's better to cede or not cede.

10  Q.   And if it was true you were saying it's always better

11  for Anthem to win its business itself, then it would always

12  be better for Anthem to revoke its cedes, right?

13  A.   But relative to this email, a guy like Peter -- I don't

14  even know who he is, so he's further down in the

15  organization; that for him to have the broader view that I

16  just described to you, I would be very surprised at.   And

17  for him to understand the G&A leverage across the broader

18  company, I would be very surprised at.

Case 2:13-cv-20000-RDP   Document 2845-4   Filed 10/12/21   Page 37 of 45

19       So to try to draw some conclusion from a gentleman

20  that's pretty far down in the organization relative to

21  understanding the bigger picture to the organization, I

22  don't know, I'm struggling with that.

23  Q.   I'm sure you're right, that he doesn't have the finance

24  background you have.

25       THE COURT:   I think everybody's made their point

1    on this point.

2           MR. FITZGERALD:  Okay.  I just want to focus on

3    what he says here.

4    Q.  He says, "There may be certain cases that we cede to X

5    plan" -- that would be another Blue plan -- "that it makes

6    more sense to leave as is versus attempting to secure them

7    as home business."  Do you see that?

8    A.  I do.

9    Q.  So here he's suggesting it's actually better to let

10    another Blue have it than to let Anthem take the business

11    itself.  Is that right?

12    A.  I don't read it that way.

13           THE COURT:  He's asking if there's such

14    information that you are considering, and let's go into the

15    next question.

16           MR. FITZGERALD:  Just two more documents, and then

17    we're done.  If you can pull up Plaintiff's Exhibit 37,

18    please.  If we can go to the first page, the next page.

19    Q.  This is an email from the organization Anthem National

20    Accounts again talking about ceding best practices.  Do you

21    see that?

22    A.  I do.

23           MR. FITZGERALD:  And if we can go to Page 6,

24    please.

25    Q.  This talks about the financial ramifications of ceding.

Do you see that?
A. I do.
Q. And on the left it talks about ASO underwriting components. This is when Anthem wins its own ASO business?
A. I've never seen this document so I don't know if that's what he means by ASO underwriting components.
Q. So as a CFO, tell me if this makes sense, it says on the left, "Anthem earns revenue on ASO fees," right?
A. That's what it says.
Q. And then it spends money on costs, which are operating expenses and taxes, and what's left is the profitability, right?
A. That's correct. That's what it says.
Q. But if you look at the right, that's the financial ramifications of BlueCard, right?
A. Actually, I think this is really a poorly done document because you still pay taxes on BlueCard fees. You still pay taxes on profitability. You actually get a G&A operating expense leverage.
So, again, I can't really speak to this document other than I can tell you as a CFO, had I gotten this, I would have told him to go back and redo it because it's just wrong.
Q. Because what the national accounts organization is saying here is the BlueCard fees go straight to the bottom

1   line, right?

2   A.   Again, I don't -- there is a CFO that reported to me of

3   national accounts, and I can assure you that CFO would have

4   said that's not true, and I would have told you that's not

5   true.

6           So, again, I think you have that wrong instead of

7   giving some aspect of the business that they don't fully

8   understand, back to what I said earlier, all aspects of

9   taxation, G&A leverage, and other implications across the

10  company.

11          MR. FITZGERALD:   Okay.   And if we can pull up

12  Plaintiff's Exhibit 71, please.

13  Q.   And this, again, might be another case of another Anthem

14  executive that just doesn't know what they're talking about,

15  but I want to read one more email.

16          MR. FITZGERALD:   Caitlyn, if you can zoom in to

17  the paragraph in the second email.   This is from Gregory

18  Fox.

Case 2:13-cv-20000-RDP   Document 2845-4   Filed 10/12/21   Page 40 of 45

19  Q.   Do you know Mr. Fox?

20  A.   I do not know Mr. Fox.

21          MR. FITZGERALD:   Caitlyn, if you can highlight

22  towards the end of that email where it says -- beginning

23  with "Let's enjoy."

24  Q.   This is an email relating to a large national account,

25  correct?

```
 1    A.   Again, I've never seen this email before so.

 2    Q.   If you look at the subject line of the email, that's the

 3    name of a very large national account.

 4    A.   Okay.

 5    Q.   And that's an account that's based in Alabama, right?

 6    A.   Yes.

 7    Q.   And here Mr. Fox, the sales rep, says, "Let's enjoy the

 8    host fees from BlueCross of Alabama because that's more

 9    profit than we will ever see as the lead carrier."  Do you

10    see that?

11    A.   I do.

12    Q.   Okay.

13              MR. FITZGERALD:  No further questions, Your Honor.

14              THE COURT:  All right.  Mr. Curran.

15                     REDIRECT EXAMINATION

16    BY MR. CURRAN:

17    Q.   Mr. DeVeydt, Mr. Fitzgerald asked you some questions

18    about the UniCare experience.

19    A.   Yes.

20    Q.   How did that experience inform the strategy behind

21    Anthem's proposed acquisition of Cigna?

22    A.   The UniCare acquisition, if you go back to the mid-'90s,

23    was a culmination of several businesses that were sold off

24    from John Hancock and others, and it was clearly an attempt

25    to try to compete outside of our 14 states.  We're land-
```

Case 2:13-cv-20000-RDP  Document 2845-4  Filed 10/12/21  Page 41 of 45

1   locked, and one of the memos that we saw earlier, while it

2   wasn't referenced, specifically stated we're land-locked.

3         And the unfortunate aspect we didn't appreciate at

4   the time was how hard it would be to actually grow those

5   memberships in those states without the benefit of more

6   membership.  Again, the premise being that it was a brand

7   that nobody recognized, and more importantly, it just didn't

8   have scale.  We had some states where we had 50 customers so

9   it's really hard to put a wellness program in place for 50

10  customers and spread that cost.

11        The probably more difficult challenge was year

12  after year we were piling money into UniCare trying to make

13  it work.  We did a branding campaign of which very few

14  people still know or ever heard of UniCare today.  We tried

15  to lower our prices in certain markets to get more market

16  share.  We lost money because of it, and ultimately we came

17  to the conclusion that we just could not be successful with

18  the asset under the mechanisms that it was determined back

19  in the '90s.  That's when it was originally started, and

20  then we tried to make it work.

21        When I became CFO, we made a decision to sell the

22  asset or, as I said, not sell but try to sell, got no

23  buyers, so basically got a commission.  But we got a lot of

24  great lessons learned from it, and one of the lessons

25  learned was that if you're going to get outside of our 14

1    states, you need a meaningful scale on Day 1 or a path to

2    meaningful scale, and so we did the AmeriGroup transaction.

3    We saw it as a rapid growth arena.  It was a best in class

4    management team so we thought they could really help us

5    leverage their scale and win more contracts.

6            And the hypothesis proved to not only be true, but

7    was a much bigger success than we could have imagined.  In

8    fact, right before I left they were awarded the Iowa

9    contract in Medicaid in the state of Iowa where, again, they

10   competed against the Blues and others.

11           So they have a substantial presence in Florida,

12   the largest Medicaid, maybe -- either tied for first or

13   close to first.

14           So very sizeable states that have Blues presence

15   AmeriGroup competed in, and what it really did, if you look

16   at the timing, is it gave us great confidence in what we

17   could do with a Cigna transaction, and Cigna being uniquely

18   different in AmeriGroup in that it had great brand

Case 2:13-cv-20000-RDP  Document 2845-4  Filed 10/12/21  Page 43 of 45

19   recognition.

20           So imagine being outside of our 14 states where

21   you can't use BlueCross BlueShield but you get to use the

22   name "Cigna," and that was really valuable to us and then,

23   more importantly, not only to have scale, but we were

24   starting to accumulate scale with AmeriGroup, but if you

25   combined those two together and make investments over a

1   broader membership base in Florida, Texas, other arenas,

2   where the product would be even more affordable for the

3   consumer.  So we found it to be highly compelling from that

4   perspective.

5   Q.   Did Anthem sign the merger agreement with the intention

6   of letting Cigna wither away outside the 14 states and

7   Anthem just collecting BlueCard fees?

8   A.   Absolutely not.  I mean, the intention -- and, again,

9   I'm not CFO anymore, but I can assure you the intention was

10  to be a very aggressive competitor in every state outside

11  the 14 states using the Cigna brand.

12              MR. CURRAN:  Thank you.

13              Thank you, Your Honor.

14              THE COURT:  All right.  You can catch your flight.

15              THE WITNESS:  Thank you.

16              THE COURT:  I'll see everyone else tomorrow

17  morning at 9:30.  Thank you.

18              (Whereupon the hearing was

19              adjourned at 5:42 p.m.)

20

21

22

23

24

25

1

## CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8          Dated this 30th day of November, 2016.

9

10                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
                                Washington, DC 20001
13

14

15

16

17

18
Case 2:13-cv-20000-RDP   Document 2845-4   Filed 10/12/21   Page 45 of 45
19

20

21

22

23

24

25