FILED

2021 Oct-19  PM 05:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| In re Blue Cross Blue Shield Antitrust Litigation,<br><br>MDL No. 2406. | Master File No. 2:13-CV-20000<br><br>The Honorable R. David Proctor<br><br>This document relates to Subscriber Track cases |

## U.S. SECRETARY OF LABOR'S STATEMENT OF INTEREST CONCERNING SUBSCRIBER COUNSEL'S MOTION FOR FINALIZATION OF THE PROPOSED SETTLEMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

I.  INTRODUCTION ....................................................................................... 1

II.  BACKGROUND ......................................................................................... 3

    A.  How ERISA operates. ......................................................................... 3

    B.  How the settlement operates................................................................ 6

III.  ARGUMENT ............................................................................................ 10

    A.  The class-member ERISA plans are legal entities, and the proposed
         settlement asks them to dispose of plan assets. .................................... 11

    B.  The proposed settlement is inadequate, unfair, and unreasonable in its
         application to class-member ERISA plans. .......................................... 14

        1.  Class member ERISA plans are not adequately represented in this
             proposed settlement. ...................................................................... 15

        2.  Many class-member ERISA plans did not receive notice of the
             proposed settlement. ...................................................................... 18

        3.  The proposed settlement does not adequately address the ERISA
             plans economic and legal interests. .................................................. 20

    C.  If finalized, the proposed settlement could cause plan fiduciaries to
         violate ERISA ................................................................................ 24

        1.  If finalized, the proposed settlement would cause plan fiduciaries to
             violate ERISA their fiduciary duties................................................. 24

        2.  If finalized, the proposed settlement may cause ERISA plan
             fiduciaries to engage in prohibited transactions .............................. 26

IV.  CONCLUSION ........................................................................................ 32

# TABLE OF AUTHORITIES

**Federal Cases:**

*Allen v. Credit Suisse Sec. (USA) LLC*,
   895 F.3d 214 (2d Cir. 2018) ..................................................................................... 12

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................................................. 16

*Anderson v. Perdue Farms, Inc.*,
   604 F. Supp. 2d 1339 (M.D. Ala. 2009) ................................................................. 30 n.9

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) ............................................................................. 14, 15

*Brooks v. Ga. State Bd. of Elections*,
   59 F.3d 1114 (11th Cir.1995) .................................................................................. 22

*Bussian v. RJR Nabisco, Inc.*,
   223 F.3d 286 (5th Cir. 2000) .................................................................................... 25

*Cent. Laborers Welfare Fund v. Philip Morris, Inc.*,
   85 F. Supp. 2d 875 (S.D. Ill. 1998) .......................................................................... 12

*Christensen v. Harris Cty.*,
   529 U.S. 576 (2000) .............................................................................................. 30 n.9

*Cvelbar v. CBI Illinois Inc.*,
   106 F.3d 1368 (7th Cir. 1997), *abrogated on other grounds by IUOE Local 150 v.*
   *Rabine*, 161 F.3d 427 (7th Cir. 1998) ........................................................................ 1

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ..................................................................................... 16

*Donovan v. Walton*,
   609 F. Supp. 1221 (S.D. Fla. 1985), *aff'd sub nom.*, *Brock v. Walton*, 794 F.2d 586
   (11th Cir. 1986) ....................................................................................................... 26

*Ellis v. Liberty Life Assur. Co. of Bos.*,
   958 F.3d 1271 (10th Cir. 2020), *cert. denied*, No. 20-953, 2021 WL 1602656
   (U.S. Apr. 26, 2021) ................................................................................................. 4

**Federal Cases-continued:**

*Harris v. Koenig,*
   815 F. Supp. 2d 12 (D.D.C. 2011) ............................................. 25

*Hurtado v. Rainbow Disposal Co.,*
   No. 817CV01605JLSDFM, 2018 WL 3372752 (C.D. Cal. July 9, 2018).................. 25

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
   284 F. Supp. 2d 511 (S.D. Tex. 2003) ......................................... 5

*In re Equifax Inc. Customer Data Sec. Breach Litig.,*
   999 F.3d 1247 (11th Cir. 2021) ............................................. 14

*In re Katrina Canal Breaches Litig.,*
   628 F.3d 185 (5th Cir. 2010) ............................................... 18

*In re Microsoft Corp. Antitrust Litig.,*
   401 F. Supp. 2d 461 (D. Md. 2005) ....................................... 14 n.6

*In re NorthShore Univ. HealthSystem Antitrust Litig.,*
   No. 07-CV-4446, 2018 WL 2383098 (N.D. Ill. Mar. 31, 2018) .................. 12

*ITPE Pension Fund v. Hall,*
   334 F.3d 1011 (11th Cir. 2003) .............................................. 5

*Larson v. United Healthcare Ins. Co.,*
   723 F.3d 905 (7th Cir. 2013) ...............................................11

*Lockheed Corp. v. Spink,*
   517 U.S. 882 (1996).................................................. 28, 29, 30

*Maccaferri Gabions, Inc. v. Dynateria Inc.,*
   91 F.3d 1431 (11th Cir. 1996) .............................................. 25

*Mackey v. Lanier Collection Agency & Serv., Inc.,*
   486 U.S. 825 (1988).........................................................11

*Merrimon v. Unum Life Ins. Co.,*
   758 F.3d 46 (1st Cir. 2014) ................................................. 5

*Mertens v. Hewitt Assocs.,*
   508 U.S. 248 (1993)......................................................... 5

**Federal Cases-continued:**

*Mobile, Alabama-Pensacola, Fla. Bldg. & Const. Trades Council v. Daugherty,*
   684 F. Supp. 270 (S.D. Ala. 1988) ................................................................. 1

*Mullane v. Cent. Hanover Bank & Tr. Co.,*
   339 U.S. 306 (1950) ...................................................................................... 18

*N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.,*
   898 F.3d 461 (5th Cir. 2018) ........................................................................... 6

*Navarre v. Luna (In re Luna),*
   406 F.3d 1192 (10th Cir. 2005) ............................................................... 12, 26

*Ortiz v. Fibreboard Corp.,*
   527 U.S. 815 (1999) ...................................................................................... 16

*Pegram v. Herdrich,*
   530 U.S. 211 (2000) ........................................................... 4, 13, 17,  18, 19

*Petrovic v. Amoco Oil Co.,*
   200 F.3d 1140 (8th Cir. 1999) ......................................................................18

*Rawa v. Monsanto Co.,*
   934 F.3d 862 (8th Cir. 2019) ........................................................................ 22

*Reich v. Lancaster,*
   55 F.3d 1034 (5th Cir. 1995) ........................................................................... 5

*Rohm v. Halpin (In re Halpin),*
   566 F.3d 286 (2d Cir. 2009) .......................................................................... 12

*Soc'y of Pro. Eng'g Emps. v. Spirit Aerosystems, Inc.,*
   681 F. App'x 717 (10th Cir. 2017) ................................................................... 6

*United States v. Cooper Corp.,*
   312 U.S. 600  ............................................................................................ 7 n.2

**State Cases:**

*Hawaii Laborers' Tr. Funds v. Maui Prince Hotel,*
   81 Hawai'i 487 (1996) ...................................................................................11

**State Cases-continued:**

*W.G. Clark Const. Co. v. Pac. Nw. Reg'l Council of Carpenters*,
  180 Wash. 2d 54 (2014) ................................................................................................11

**Federal Statutes:**

15 U.S.C. § 1 ........................................................................................................................ 7

15 U.S.C. § 2, ..................................................................................................................... 12

15 U.S.C. § 3 ........................................................................................................................ 7

15 U.S.C. § 15 .................................................................................................................... 12

15 U.S.C. § 15(a) ................................................................................................................. 7

Employee Retirement Income Security Act of 1974, (Title I)
  *as amended*, 29 U.S.C. 1001 et seq.

Section 2, 29 U.S.C. § 1001 ................................................................................................ 1

Section 2(a), 29 U.S.C. § 1001(a) ....................................................................................... 4

Section 3(14), 29 U.S.C. § 1002(14) .............................................................................. 3, 26

Section 3(16)(A), 29 U.S.C. § 1002(16)(A) ........................................................................ 3

Section 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i) ................................................................ 5

Section 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii) ........................................................... 5

Section 402(a)(1), 29 U.S.C. § 1102(a)(1) .......................................................................... 3

Section 403(a), 29 U.S.C. § 1103(a) ................................................................................ 2, 4

Section 403(c)(1), 29 U.S.C. § 1103(c)(1) ......................................................................... 5

Section 404(a), 29 U.S.C. § 1104(a) ................................................................................... 2

Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) .......................................................... 5, 26

**Federal Statutes-continued:**

Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) ..................................................... 5, 26

Section 406(a), 29 U.S.C. § 1106(a) ....................................................... 5, 27, 29, 30

Section 406(a)(1), 29 U.S.C. § 1106(a)(1) ................................................................ 26

Section 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A) .............................................. 6, 26, 27

Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) ................................ 6,  26, 27, 29, 30

Section 408(a), 29 U.S.C. § 1108(a) ......................................................................... 27

Section 502, 29 U.S.C. § 1132 .................................................................................. 11

Section 502(a)(2), 29 U.S.C. § 1132(a)(2) ................................................................ 14

Section 502(d), 29 U.S.C. § 1132(d) ...................................................................... 2, 11

Section 502(d)(1), 29 U.S.C. § 1132(d)(1) ............................................................ 4, 11

Section 502(d)(2), 29 U.S.C. § 1132(d)(2) ............................................................ 4, 11

**Miscellaneous:**

Fed. R. Civ. P. 23 .................................................................................................... 15
     23(c)(5) .......................................................................................... 16
     23(e) ................................................................................. 3, 14, 18
     23(e)(1) .......................................................................................... 18
     23(e)(2) ................................................................................... 14, 20
     23(e)(3) .......................................................................................... 15

Cong. Budget Off., The Tax Treatment of Employment-Based Health Insurance (Mar.
   1994), tinyurl.com/4urs98s2. .............................................................................. 4

Dep't of the Treasury, Instructions for Form 8941 (Nov. 16, 2020),
   tinyurl.com/h37v8m86 ....................................................................................... 4

Adoption of Amendment to the Class Exemption for the Release of Claims and
Extensions of Credit,
75 Fed. Reg. 33,830 (June 15, 2010) ......................................................................... 27

**Miscellaneous-continued:**

Class Exemption for the Release of Claims and Extensions of Credit in Connection
  With Litigation 68 Fed. Reg. 75,632 (Dec. 31, 2003) ................................................. 30

3 William Rubenstein, *Newberg on Class Actions* § 8:15 (5th ed. 2013) ......................... 18

4 Newberg on Class Actions § 13:46 (5th ed. 2013) ....................................................... 22

7B Wright, Miller & Kane, *Federal Practice and Procedure* § 1797.1 (3d ed. updated
  April 2021) ..................................................................................................................... 15

Mr. Kevin M. Bernys,
  1994 WL 1635445 (P.W.B.A.) (Nov. 30, 1994) ...................................................... 14 n.6

Sara Rosenbaum & David M Frankford, *Law and the American Health Care System*
  (2d ed. 2012) .................................................................................................................. 6

Dep't of labor, Tech. Release No. 2014-01, *Guidance on State Regulation of Stop-Loss
  Insurance* (Nov. 6, 2014), bit.ly/3zr1SqJ. ....................................................................... 7

Dep't of Labor, Advisory Op. No. 95-26A, (Oct. 17, 1995)............................................. 12

Dep't of Labor, Advisory Op. No. 1994-39A, (Nov 28, 1994), tinyurl.com/spbscrff...... 14

Dep't of Labor, Advisory Op. No. 93-14A, 1993 WL 188473 (May 5, 1993) .................. 5

Dep't of Labor, Field Assistance Bull. 2006-01 (Apr 19, 2006), bit.ly/3kL9OIR. ........... 13

Restatement (Second) of Contracts § 77 cmt. a (AM LAW INST. 1981) ........................... 25

*Chose*, Black's Law Dictionary (11th ed. 2019)............................................................... 12

Martin J. Walsh, in his capacity as U.S. Secretary of Labor (Secretary), files this Statement of Interest to apprise the Court of his concerns over whether the settlement agreement reached in this case sufficiently accounts for the independent interests of health benefit plans governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq. While the Secretary is presently engaged in productive discussions with the parties in an effort to resolve his concerns, no agreement has been reached as of this filing.

## I. INTRODUCTION

When the Secretary learned about this case—at a late stage in May 2021, based on inquiries from ERISA practitioners—a troubling prospect emerged: a multi-billion dollar settlement might obtain approval without anyone having represented the distinct legal interests that class-member ERISA plans have in it. The proposed settlement requires many of the ERISA plans to dispose of a plan asset—their antitrust choses in action—without any monetary consideration promised in return. Instead, the settlement provides the plans' employer-sponsors a potential windfall at the expense of plans and their participants and beneficiaries. Because ERISA's fiduciary duties and prohibited-transaction provisions apply to the plans' decision to release their claims, its finalization would likely trigger a range of ERISA violations for some fiduciaries. The Secretary, who is charged with administering and enforcing ERISA and protecting the interests of plan participants and beneficiaries, thus has a significant interest in the resolution of this case. *See, e.g.*, *Cvelbar v. CBI Illinois Inc.*, 106 F.3d 1368, 1373 n.3 (7th Cir. 1997), *abrogated on other grounds by IUOE Local 150 v. Rabine*, 161 F.3d 427 (7th Cir. 1998); *Mobile, Alabama-Pensacola, Fla. Bldg. & Const. Trades Council v. Daugherty*, 684 F. Supp. 270, 278 (S.D. Ala. 1988).

The class-action antitrust complaint alleges that Blue Cross and Blue Shield Association and licensees of the Blue Cross and Blue Shield marks (Settling Defendants) engaged in anticompetitive market practices that resulted in ERISA-governed health plans paying inflated rates for health insurance, stop-loss insurance, and administrative-service contracts. The damages class has three kinds of members: (1) employers that created or maintained ERISA health plans, (2) employees who were promised benefits under those plans, and (3) the ERISA health plans themselves. As their class-member status indicates, ERISA plans are legal entities that can sue and be sued. 29 U.S.C. § 1132(d). In fact, a plan's cause of action—like the antitrust action here—is considered an asset of the plan that, like all other plan assets, must be disposed of only in accordance with ERISA's strict fiduciary standards. 29 U.S.C. §§ 1103(a), 1104(a). The ERISA plans' cause of action in this case is that they paid excessive premiums and administrative costs to Settling Defendants due to their anti-competitive practices, in violation of federal antitrust law.

The other class members' relevance in this action stems from how ERISA plans are funded. Generally, ERISA health plans pay their financial obligations by receiving typically pretax plan contributions from employers, employees, or both. Because the ERISA plans' payments were inflated, so the theory goes, so were the plan contributions needed to fund the plans' financial obligations. So Subscriber Plaintiffs have also alleged that the employer-sponsor and employee class members paid inflated plan contributions as a result of Settling Defendants' conduct. In this respect, the claims of ERISA plans, and their participants and beneficiaries, may conflict with those advanced by the employers, as they may seek damages for the same injury under different theories of liability.

Subscriber Plaintiffs filed a proposed settlement with this Court on October 30, 2020, and a proposed plan of distribution on March 12, 2021. Those

documents contemplate a $1.9 billion net settlement fund for distribution between the class members. But after any distributions to employees who make claims, the settlement documents allow the remainder to go entirely to the employer, with the plan itself getting nothing. Yet the ERISA plans are asked to give something nonetheless: a release of their claims against Settling Defendants. That renders it inadequate and unfair to the ERISA-plan class members under Federal Rule of Civil Procedure 23(e).

Finalizing this settlement could harm the class-member ERISA plans in other ways too. Between insufficient notice, the disposition of a significant plan asset, and the expiration of the opt-out period, many ERISA plan fiduciaries may have already passively agreed to this settlement, despite its unfairness. Litigation over whether that decision violated ERISA's fiduciary duties may follow. And because the settlement contract would cause the plan to dispose of a plan asset to Settling Defendants—who are generally "parties in interest" to the ERISA plans, *see* 29 U.S.C. § 1002(14)—the settlement would likely cause some fiduciaries to class-member plans to commit transactions prohibited by ERISA, without complying with an applicable exemption. *See* 29 U.S.C. § 1106(a). These practical effects further render the proposed settlement unfair to ERISA plans.

## II. BACKGROUND

*A. How ERISA operates.*

To sponsor an ERISA-covered health plan, an employer must "establish[] and maintain[]" it "pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), commonly known as the "plan document." Each health plan has a "named fiduciary" and "plan administrator," roles that often default to the plan sponsor if left unspecified. *Id.* § 1002(16)(A). For health plans, the plan document sets "[r]ules governing collection of premiums, definition of benefits, submission of

claims, and resolution of disagreements over entitlement to services." *Pegram v. Herdrich*, 530 U.S. 211, 223 (2000) (noting that an insurance contact between an employer and insurer is not necessarily "an ERISA plan," but that agreement still "provide[s] elements of a plan by setting out rules under which beneficiaries will be entitled to care"). And ERISA recognizes that the plan itself is its own entity that can sue and be sued. 29 U.S.C. § 1132(d)(1).

Congress incentivized employers to sponsor ERISA health plans with tax benefits, which flow from an ERISA plan's legal status. *See Ellis v. Liberty Life Assurance Co. of Bos.*, 958 F.3d 1271, 1278 (10th Cir. 2020), *cert. denied*, No. 20-953, 2021 WL 1602656 (U.S. Apr. 26, 2021). Thus, an employer's ERISA plan contributions are generally excluded from its tax base for calculating its payroll-tax obligations. Cong. Budget Off., *The Tax Treatment of Employment-Based Health Insurance* at 1 (Mar. 1994), tinyurl.com/4urs98s2. The employer may also take a 100% deduction for its contributions to ERISA health plans, in the form of an operating expense. *Id.* And eligible small employers may receive up to a 50% tax credit for offering their employees an ERISA health plan. *See* Dep't of the Treasury, Instructions for Form 8941 (Nov. 16, 2020), tinyurl.com/h37v8m86. These incentives make sponsoring an ERISA health plan more economically attractive than alternatives, like paying employees a higher (but taxable) wage so they could voluntarily afford to purchase health insurance themselves. CBO, *The Tax Treatment* at 1; *see* 29 U.S.C. § 1001(a); *Ellis*, 958 at 1278.

To the extent employers decide to sponsor ERISA plans, ERISA requires, with some exceptions, that all plan assets "be held in trust by one or more trustees," identified by either the plan document or a separate trust document. *Id.* § 1103(a). ERISA also says that "the assets of a plan shall *never* inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable

expenses of administering the plan." *Id.* § 1103(c)(1) (emphasis added). Plan assets "generally are to be identified by ordinary notions of property rights under non-ERISA law," *Merrimon v. Unum Life Ins. Co.*, 758 F.3d 46, 56 (1st Cir. 2014) (quoting U.S. Dep't of Labor, Advisory Op. No. 93–14A, 1993 WL 188473, at *4 (May 5, 1993)) (listing cases), and they include monetary plan contributions, health insurance policies, contracts, and choses in action.

Besides that, ERISA protects plan assets by imposing fiduciary duties on anyone who "exercises any discretionary authority or discretionary control respecting management of [the] plan," "exercises any authority or control respecting management or disposition of its assets," or "has any discretionary authority or discretionary responsibility in the [plan's] administration." 29 U.S.C. § 1002(21)(A)(i), (iii). Courts assess these "functional" definitions based on conduct and granted authority, not labels. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993); *see Reich v. Lancaster*, 55 F.3d 1034, 1048 (5th Cir. 1995); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 568 (S.D. Tex. 2003) (listing cases).

The U.S. Court of Appeals for the Eleventh Circuit has called ERISA's fiduciary duties "the highest known to law." *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003) (cleaned up). They include the duty to act (1) solely in the interest of participants and beneficiaries; (2) for the exclusive purpose of providing benefits to participants and beneficiaries, and defraying reasonable plan-administration expenses; and (3) "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A), (B). ERISA also categorically prohibits fiduciaries from causing a plan to engage in certain transactions with a "party in interest." 29 U.S.C. § 1106(a). Those categorical

prohibitions include transactions that are a direct or indirect exchange "of any property" between the plan and a party in interest, 29 U.S.C. § 1106(a)(1)(A), and a direct or indirect transfer of "any" plan assets to a party in interest, *id.* § 1106(a)(1)(D).

*B. How the settlement operates.*

The proposed settlement identifies two kinds of ERISA-covered health plans as class members: fully insured plans, and self-funded plans.[1] *See* Settlement Agreement at 6, 9–10, 17, ECF No. 2610-2. Under the fully insured arrangements, employer sponsors established ERISA-covered welfare plans that provided their employees with health benefits by way of a group health insurance policy with a Settling Defendant. Sara Rosenbaum & David M. Frankford, *Law and the American Health Care System* at 209 (2d ed. 2012); *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 468 (5th Cir. 2018). Thus these ERISA plans paid a Settling Defendant a monthly insurance premium for each enrolled plan participant and beneficiary, at a rate set by the insurance policy. The plans would have funded those premium payments through contributions (usually pretax) from participant-employees, the employer sponsor, or (usually) both.

In the self-funded arrangements, the plans are not insured by an insurance company but instead pay benefits themselves. Rosenbaum & Frankford at 209–10; *Soc'y of Pro. Eng'g Emps. v. Spirit Aerosystems, Inc.*, 681 F. App'x 717, 720 n.2 (10th Cir. 2017). Like the fully insured ERISA plans, the self-funded plans received funding from pretax employee contributions, employer contributions, or both, but the difference is that the plan, and not an insurer, took on the bottom line

---

[1]   The proposed settlement also references Taft-Hartley plans. Although this filing does not focus on those plans, the same kinds of problems explicated here generally apply to them.

(and risk) of paying benefits claims. To protect against catastrophic loss, these self-funded plans can purchase stop-loss insurance from Settling Defendants. *See* Dep't of Labor, Tech. Release No. 2014 *on State Regulation of Stop-Loss Insurance* (Nov. 6, 2014), bit.ly/3zr1SqJ. And these plans also contracted with Settling Defendants for administrative services, like recordkeeping and claims processing.

Subscriber Plaintiffs allege that Settling Defendants violated federal antitrust law by entering into anticompetitive agreements with each other. Fourth Am. Compl. at 6–10, ECF No. 2616. For relief, they seek damages under 15 U.S.C. § 15(a).[2] *Id.* at 10. On October 30, 2020, Subscriber Plaintiffs filed a proposed settlement, a notice plan, and a motion for the proposal's preliminary approval. This Court granted Plaintiffs' motion on November 30, 2020, "subject to further consideration by the court at a fairness hearing." Mem. Order at 56, ECF No. 2641. The parties submitted a proposed plan of distribution on March 12, 2021. Proposed Plan of Distribution, ECF No. 2715-1.

The settlement proposal's "Class Representatives" are the "Subscriber Class Representatives and Self-Funded Sub-Class Representatives." Settlement at 4. It defines "Subscriber Class Representatives" by listing all but one of the complaint's named plaintiffs. *Id.* at 20; Compl. ¶¶ 17–80. And it defines "Self-Funded Sub-Class Representative" as the remaining named plaintiff, "Hibbett Sports, Inc." Settlement at 17; Compl. ¶ 79. The Subscriber Class is represented by "Settlement Class Counsel," and the Self-Funded Sub-Class is represented by

---

[2] Under this section, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy." 15 U.S.C. § 15(a); *see United States v. Cooper Corp.*, 312 U.S. 600, 606 (1941) (interpreting the word "person" under 15 U.S.C. § 15(a) as referencing "natural and artificial persons").

the court-appointed firm Burns Charest LLP. Settlement at 18. This group of class representatives does not include ERISA plans.

The settlement proposal also describes how the parties will notify class members about the potential agreement, including their rights and obligations under it. The proposal requires Settling Defendants to provide the Claims Administrator[3] "data in their possession and kept in the ordinary course of business regarding the last known contact information of Class Members." Settlement at 22. To maintain confidentiality, "[s]uch information shall be provided directly to the Claims Administrator." *Id.* at 23. The notice plan "contemplates direct, individual notice to all members of the Damages Class for whom the Settling Defendants provide contact information as part of the Class Member data." Notice Plan at 13, ECF No. 2611-2.

The proposed settlement would release all class members' antitrust claims against Settling Defendants. Settlement at 15–17, 44–46. In return, class members might receive a portion of the "Net Settlement Fund," Notice Plan at 12, 35–44, estimated at "approximately $1.90 billion," Proposed Distribution at 2. Based on negotiations between the Subscriber Class and Self-Funded Sub-Class, 93.5% of the net settlement fund would go to "fully insured authorized claimants," and 6.5% to self-funded authorized claimants. *Id.* at 3. Only "authorized claimants" may receive a share of the net settlement fund. As relevant here, a "fully-insured authorized claimant" includes employee-participants in ERISA plans and "Employers or other groups"—including the ERISA plans themselves—"who purchased one or more fully-insured group policies directly from one or more Defendant." *Id.* at 4-5. "Self-funded authorized claimant" is defined similarly. *Id.*

---

[3]   The Court appointed JND Legal Administration LLC (JND) as Claims Administrator, noting its "proven track record and extensive experience in large, complex matters." Mem. Order at 53. Notwithstanding that, the record does not include information about JND's experience or expertise with ERISA, whether coming from past settlement administration or otherwise.

at 14-15. Thus, if the ERISA plan did not "purchase" the policy, then it is not an authorized claimant, and the entire recovery (minus employee claims) would go to the employer. The parties appear to confirm this point when they say that "each Insured Group or Self-Funded Account is entitled to one payment." Ps.' Mem. at 127, ECF No. 2812-1.

If only an "employer or other group" submits a claim and employees do not, then the employer gets all the employees' shares, and the employees get nothing. *Id.* at 6. If "one or more of its . . . [e]mployees" also submits a claim, however, the settlement applies a default estimate of how much of the monthly payments to Settling Defendants were attributable to the claimant employee, and allocates the share associated with the relevant ERISA plan between the employer or other group and claimant employees. *Id.* at 8. But the settlement would not guarantee an employee claimant with the entire amount of their own contributions. Under the default option for fully insured groups, the employee would receive just 15% of the premium paid to Settling Defendants for that employee's coverage for single-coverage periods, and 34% of it for family-coverage periods.[4] *Id.* at 8–10. Under the elective alternative option, any claimant (i.e., a group or its employee) may submit evidence showing they contributed more to the insurance premiums than the default option assumes. *Id.* at 10–11. The Claims Administrator would review that evidence and send its findings to the Settlement Administrator,[5] which in turn would determine the appropriate allocation amounts. *Id.* at 11–13.

---

[4]   For self-insured plans, the default option would provide the claimant employee with 18% of their pro-rata share for single-coverage periods, and 25% for family-coverage periods. Proposed Distribution at 16.

[5]   Subscriber Plaintiffs have asked this Court to appoint the Honorable Irma E. Gonzalez, retired District Judge for the U.S. District Court for the Southern District of California, as Settlement Administrator.

On learning about this case, the Secretary raised questions and concerns about it to the Parties. Then the Secretary sent a letter to the Parties and the Claims Administrator that "identified several substantial legal concerns" in need of resolution "before the proposed settlement is approved by the Court." DOL Letter at 2, Ps.' Mem. Ex. H. The letter did not advocate for any particular legal view or result, and it emphasized that "the Secretary raises these potential legal problems in the spirit of finding solutions." *Id.* at 10. The Parties did not take up the Secretary's invitation. Instead, Subscriber Plaintiffs formally opposed the Secretary's concerns as legally incorrect. Ps.' Mem. at 123–37. Settling Defendants did the same by separate filing, advancing similar arguments. Defs.' Resp., ECF No. 2814. To the Secretary's knowledge, those documents are the first to address how ERISA impacts the proposed agreement.

### III. ARGUMENT

The proposed settlement's central flaw is that it treats the class-member ERISA plans as if they are not legal entities in possession of antitrust claims. The proposed settlement, the notice plan, and the plan of distribution effectively ignore ERISA plans as class members, and they do not ensure that those plans share in the recovery. Class-member ERISA plans and their fiduciaries thus could violate ERISA by agreeing to this settlement and releasing their claims against the Settling Defendants. Those potential violations might result in litigation against ERISA plans and their fiduciaries. The Secretary thus urges the Court to ensure the Parties negotiate a solution that accounts for the legal interests of the class-member ERISA plans and their participants and beneficiaries.

*A. The class-member ERISA plans are legal entities, and the proposed settlement asks them to dispose of plan assets.*

ERISA health plans are legal persons that can sue and be sued under both federal and state law. *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 832 (1988); *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 914 (7th Cir. 2013) (ERISA departed from common-law rule that trust was not juristic person). ERISA confirms the point in section 502(d), titled "Status of employee benefit plan as entity," which plainly states, "[a]n employee benefit plan may sue or be sued under this subchapter as an entity." 29 U.S.C. § 1132(d)(1). The provision also creates legal separation between the plan and other legal persons. "Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter." *Id.* § 1132(d)(2).

In *Mackey*, the Supreme Court noted that at least two types of civil actions may be brought against ERISA welfare benefit plans. *Id.* First, "particular persons" may bring "civil enforcement actions" against ERISA plans under ERISA section 502, "to secure specified relief, including the recovery of benefits." *Id.* at 832–33. Second, "ERISA plans may be sued . . . for run-of-the-mill state-law claims such as unpaid rent, failure to pay creditors, or even torts committed by an ERISA plan." *Id.* at 833. ERISA welfare plans can affirmatively sue over those same kinds of claims. *See, e.g.*, *W.G. Clark Const. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wash. 2d 54, 59 (2014) (ERISA plans could sue under state lien statute to collect unpaid employer plan contributions; noting judicial consensus and listing cases); *Hawaii Laborers' Tr. Funds v. Maui Prince Hotel*, 81 Hawai'i 487, 490 (1996) (ERISA plans could sue to collect delinquent employer plan contributions under Hawai'i State Mechanic's and Materialman's Lien Law).

Indeed, ERISA health plans have previously led the charge in significant antitrust matters, under both federal and state law. *See Cent. Laborers Welfare Fund v. Philip Morris, Inc.*, 85 F. Supp. 2d 875, 878 (S.D. Ill. 1998) (plaintiff ERISA plans could seek recovery under Illinois Antitrust Act); *In re NorthShore Univ. HealthSystem Antitrust Litig.*, No. 07-CV-4446, 2018 WL 2383098, at *1 (N.D. Ill. Mar. 31, 2018) (ERISA health plan and plan participants could seek recovery for antitrust violations under Sherman Act); *see also Allen v. Credit Suisse Sec. (USA) LLC*, 895 F.3d 214, 221 (2d Cir. 2018) (noting ERISA plans were members of the settling classes in related antitrust litigation).

When circumstances exist under which an ERISA plan could sue to recover money, or to remedy the breach of an owed duty, the ERISA plan obtains a plan asset in the form of a chose in action. *See Rohm v. Halpin (In re Halpin)*, 566 F.3d 286, 290 (2d Cir. 2009) (plan's claim is a plan asset); *Navarre v. Luna (In re Luna)*, 406 F.3d 1192, 1199–2000, 1199 n.4 (10th Cir. 2005) (plan's chose in action constitutes plan asset); Dep't of Labor, Advisory Op. 95-26A (Oct. 17, 1995) (plan's claim against service provider is a "chose in action" that is plan's "property"); *see also Chose*, Black's Law Dictionary (11th ed. 2019). Here, each class-member ERISA plan has a chose in action that sounds in federal antitrust, under 15 U.S.C. §§ 1, 2, 3, and 15. Those choses in action arise from the common fact that the ERISA plans paid the artificially inflated premiums and fees to Settling Defendants. While the ERISA plans funded those payments with plan contributions from employer sponsors and participant-employees, those funding arrangements do not extinguish the ERISA plans' claims.

The Parties argue that there is no practical distinction between the interests of an ERISA plan and its employer sponsor, since the employer sponsor is generally the plan's administrator. *Id.* at 124. But that does not mean that the employer and the plan are legally indistinguishable. The Supreme Court has

explained that employers who also serve as plan fiduciaries can wear "two hats," and that they are fiduciaries only when wearing their fiduciary "hat." *Pegram*, 530 U.S. at 224–26. "Employers, for example, can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries, when they act as employers (e.g., firing a beneficiary for reasons unrelated to the ERISA plan), or even as plan sponsors (e.g., modifying the terms of the plan as allowed by ERISA to provide less generous benefits)." *Id.* That is because ERISA's fiduciary definition makes clear that an entity is a fiduciary "only to the extent that [an entity] acts in such a capacity in relation to a plan." *Id.* at 225–26 (cleaned up). The upshot, then, is that an employer's status as a plan administrator does not by itself mean that all actions of the employer must be taken in furtherance of the plan's interest, but rather only "when making fiduciary decisions." *Id.* at 225.

The distinction between an employer as employer and an employer as plan administrator is evident in ERISA itself, which expressly prohibits employers from taking plan assets for themselves. Under ERISA section 403(c), plan assets "shall not inure to the benefit of any employer, and shall be held for the exclusive purposes of providing benefits to participants and beneficiaries and defraying reasonable plan administration expenses." Settlement payments in satisfaction of an ERISA plan's claim become plan assets upon receipt by the plan or by an intermediary on the plan's behalf. Dep't of Labor, Field Assistance Bull. 2006-01 (Apr. 19, 2006), bit.ly/3kL9O1R. And once that happens, under ERISA section 403(c), "the proceeds of the settlement may not be used to benefit employers, fiduciaries or other parties in interest with respect to the plan." *Id.* That accords with the Secretary's broader guidance that employers generally cannot receive

distributions from the ERISA plans they sponsor.[6] *See* Dep't of Labor, Advisory Op. 1994-39A (Nov. 28, 1994), tinyurl.com/spbscrff. This limitation on funds obtained through a plan's chose in action shows the conflict between their claims and those of their employer sponsors.

The Parties also suggest that the employee class members are synonymous with the class-member ERISA plans. True, class-member employees are participants in the class-member ERISA plans, and participants can sue on their plan's behalf. 29 U.S.C. § 1132(a)(2). But that is not what the employee class members are doing in this case. Instead, they are seeking to recover a fraction of their plan's interest, based on a theory that their plan contributions were artificially inflated. If they had joined the settlement as a class of plan participants instead, to assert their *plan*'s antitrust claim, they would have a different theory and a different entitlement to relief.

*B. The proposed settlement is inadequate, unfair, and unreasonable in its application to class-member ERISA plans.*

Federal Rule of Civil Procedure 23(e) "requires judicial approval of any class action settlement." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). To do that, a district court must find that the proposed settlement is fair, adequate, and reasonable. *Id.* When determining a proposal's fairness, courts must consider "the Rule 23(e)(2) factors." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1273 (11th Cir. 2021). Those factors ask whether (1) "the class representatives and class counsel have adequately represented the class"; (2) "the proposal was negotiated at arm's length"; (3) "the proposal treats

---

[6]   ERISA contains one exception to this for single-employer plans, for cases involving mistakes of fact. "Congress intended this exception to be narrowly construed," Mr. Kevin M. Bernys, 1994 WL 1635445, at *3, and agreeing to a contract that is affected by an antitrust violation is not enough, *see In re Microsoft Corp. Antitrust Litig.*, 401 F. Supp. 2d 461, 465 (D. Md. 2005).

class members equitably relative to each other"; and (4) "the relief provided for the class is adequate, taking into account (i) the costs, risks, and delay of trial and appeal, (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, (iii) the terms of any proposed award of attorney's fees, including timing of payment, and (iv) any agreement required to be identified under Rule 23(e)(3)."

The Eleventh Circuit instructs district courts to consider six additional factors: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." *Id.* at 1273 (cleaned up) (quoting *Bennett*, 737 F.2d at 986 (11th Cir. 1984)). The fairness determination is left to the district court's sound discretion, *id.*, and the burden is on the settlement's proponents to show that it meets the standard of fairness, reasonableness, and adequacy, 7B Wright, Miller & Kane, *Federal Practice and Procedure* § 1797.1 (3d ed. updated April 2021).

*1. Class member ERISA plans are not adequately represented in this proposed settlement.*

To decide whether this settlement is fair, this Court must consider whether the class representatives and counsel have adequately represented the class. This procedural concern "look[s] to the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23 Advisory Comm. Note, 2018 amend. The focus is "on the actual performance of counsel acting on behalf of the class," including whether counsel "had an adequate information base" and whether negotiations "were conducted in a manner that would protect and further class interests." *Id.* "The adequacy inquiry . . . serves to uncover conflicts of

15

interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

The class representatives and class counsel do not adequately represent the class-member ERISA plans. The group of class representatives includes employer sponsors and a smattering of their employees, but no ERISA plans. The ERISA plans' claims seek the same pot of money as those of employer and employee class members. Because the employer and ERISA-plan claims are adverse, a significant conflict of interest exists "between the named parties and the class they seek to represent." *Windsor*, 521 U.S. at 625. Indeed, the Parties admit that, between employer and plan, only one can obtain recovery under the settlement. Ps.' Mem. at 127.

The Parties have already addressed an antagonism among the *employer sponsors*, specifically, the one between sponsors of fully insured and self-funded plans. Because those class members are situated slightly differently, Settlement Class Counsel obtained separate counsel for the self-funded sponsors, so they could effectively negotiate an allocation of the net settlement fund between the two groups. *See* Burns Decl. at 3, ECF No. 2610-7; *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) (conflict of interest within class may be cured by dividing class into separate "homogeneous subclasses . . . with separate representation to eliminate conflicting interests of counsel."); *see also* Fed. R. Civ. P. 23(c)(5). Comparatively, the conflict between employer sponsors and ERISA plans is much more significant. Yet the ERISA plans did not receive separate counsel to advance their specific class interests. Thus, in the Secretary's view, the proposed settlement

fails to address the conflict between the class representatives and the ERISA plans they profess to represent.

The Parties argue that this conflict does not matter, because "the ERISA plans' interests were . . . adequately represented by employer Class Representatives in the negotiation process," in their "dual capacity as both the plan sponsor . . . and a plan fiduciary." Defs.' Resp. at 5. But there is no indication that the employers also acted for the plans, especially given that the settlement documents consistently treat the plans as though they are not independent entities (and class members) on par with the employers. Again, the mere fact that some employers are also plan administrators is not by itself sufficient to ensure that they were acting in the latter capacity. *See Pegram*, 530 U.S. at 224–26 (recognizing that an employer who is also a fiduciary is not a fiduciary for all purposes). More broadly, the Parties' effort to conflate employers with the ERISA plans again ignores the plans' legal significance, a deficiency that is structural and flows from the ERISA plans' lack of representation in this case.

This inadequacy with the settlement is not saved by the presence of employee class members within the collection of named plaintiffs. There is no indication in the record that the employees are acting on their ERISA plan's behalf. Instead, they are advancing *individual* claims based on their plan contributions. Indeed, the settlement's claims release recognizes that the plans are separate class members with separate claims from the employees. Settlement at 15–17, 44. And if employees do not make claims, their contributions revert to the employers. Thus the Parties are incorrect when they suggest that "the plan's interest is limited to the amount attributable to the payments made by the participants." Defs.' Resp. at 5.

2. *Many class-member ERISA plans did not receive notice of the proposed
   settlement.*

Under Rule 23(e), a court must "direct notice in a reasonable manner to all
class members who would be bound by the proposal" before approving a
settlement. Fed. R. Civ. P. 23(e)(1). The settlement notice must satisfy the "broad
reasonableness standards imposed by due process." *Petrovic v. Amoco Oil Co.*, 200
F.3d 1140, 1153 (8th Cir. 1999) (cleaned up); 3 William Rubenstein, *Newberg on
Class Actions* § 8:15 (notice must comply with Constitution's due process
requirements, "would likely be individualized in nature"). Before a court finalizes
a settlement, the Constitution's Due Process Clause requires, at a minimum, "that
deprivation of life, liberty, or property by adjudication be preceded by notice and
opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent.
Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950). "Notice of a mandatory class
settlement, which will deprive class members of their claims, therefore requires
that class members be given information reasonably necessary for them to make a
decision whether to object to the settlement." *In re Katrina Canal Breaches Litig.*,
628 F.3d 185, 197 (5th Cir. 2010).

The Secretary expressed concern to the Parties that ERISA plans may have
not received notice of the settlement, given the inattention they received in the
settlement documents. In response, the Parties argued that the ERISA plans did not
need *separate* notices, because the notices sent to employers and employees were
enough. Ps.' Mem. at 127–29; Defs.' Resp. at 4–6.

Here again, this Parties ignore that ERISA plans are distinct legal entities,
and that their legal interests here and elsewhere are materially different from their
employer sponsors. Returning to *Pegram*, an employer sponsor can keep a
fiduciary hat and an employer hat, but it can wear only the fiduciary hat when
making fiduciary decisions. A notice about the employer sponsor's potential

claim—which is a different theory than the ERISA plan's antitrust claim—is simply insufficient. The same is true for employee class members. Those plaintiffs seek relief for themselves, not for the ERISA plan they participated in.

Significant questions remain about whether class-member ERISA plans received any individualized notices, or if notices just went out to the employers and employees. The proposed settlement and notice plan relied on the Settling Defendants' data of "the last known contact information of Class Members." Settlement at 22. The proposed settlement also required the Settling Defendants to provide that information "directly to the Claims Administrator to maintain Confidentiality." *Id.* Thus one cannot tell from the record whether Settling Defendants included contact information for the class-member ERISA plans in the data they sent the Claims Administrator. But Subscriber Plaintiffs' memorandum in support suggests a deficiency. Subscriber Plaintiffs state that the "robust Notice Program" sent "direct notice to over 100 million class members." Subscriber Mem. at 60. Yet by the Secretary's count, only 54 ERISA plans opted out of the settlement. *See* Second Keough Decl., Ex. Q, ECF No. 2816-6. Of those, 7 were church plans (which are generally exempt from ERISA's fiduciary provisions, *see* 29 U.S.C. § 1003(b)(2)), nine were Taft-Hartley plans,[7] and 36 were plans that opted out alongside their employer sponsor. *Id.* That leaves just two relevant opt outs by single-employer ERISA plans. And just two plans, out of 100 million direct notices, suggests that class-member ERISA plans did not receive sufficient notice of this settlement.

The notice plan has substantive flaws too. The Parties' notice-by-proxy theory does not hold up to the notices they sent, and the notices lack the minimum information that due process requires. The emails sent to class members do not

---

[7]   The Secretary's brief does not address the proposed settlement's impact on Taft-Hartley plans, *see supra* n.1, or church plans.

mention ERISA, and they do not warn that the notice should be construed as also notifying the recipient about their potential responsibilities and claims in connection with an ERISA plan. Second Keough Decl., ECF No. 2812, Ex. B. The same is true for the notice plan's postcards, its online and print adverts, its multichannel news release, and its long-form notice. *Id.* Exs. A, C–H, M, O. Even the proposal's claim form omits mentioning ERISA and its potential impact. *Id.* Ex. P.

Thus, the Parties' notice plan did not provide class-member ERISA plans with sufficient information reasonably necessary for them to decide whether to ignore the settlement (as immaterial to the ERISA plan), object to it, opt out of it, or submit a claim under it. Finalizing this settlement would therefore raise significant due process issues with respect to the class-member ERISA plans.

### 3. *The proposed settlement does not adequately address the ERISA plans' economic and legal interests.*

This Court may approve the proposal "only on a finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). To decide that, this Court must consider whether "the relief provided for the class is adequate," and whether "the proposal treats class members equitably relative to each other." *Id.*

On its face, the settlement proposal is not designed to ensure that ERISA plans participate in it, even though it is binding and requires those plans to dispose of plan assets. As explained, Subscriber Plaintiffs admit that the proposed plan of distribution allows a payment to either the employer or the plan it sponsors, but not both. And it appears from other settlement documents that Subscriber Plaintiffs contemplate that the sole authorized claimant will be the employer.

For example, the Notice Plan states, "[d]irect notice will include a personal identifier number . . . assigned to each potential claimant" "for whom Settling Defendants provide contact information." First Keough Decl. at 9, ECF No. 2611-

2 (cleaned up). The Plan later describes the "Claim Form" as "direct[ing] the claimant (*whether an employer, self-insured or an employee*)" to provide their identifying information. *Id.* at 25 (emphases added); *id.* Ex. D. So the Parties anticipated direct notice to employers, "self-insured[s]," and employees, but not ERISA plans more generally.

And the Claim Form itself entirely omits the plans, as it has three sections for class members to use: one for "businesses," one for "individual members," and one for "employees." Blue Cross Blue Shield Settlement Claim Form at 3–5, tinyurl.com/2a4ueytc. The "businesses" section is "To be Completed Only on Behalf of Companies/Businesses/Entities That Purchased BCBS Health Insurance or Administrative Services Plans from a BCBS Company." *Id.* at 3. The section asks for the "full name of company," its "primary headquarters mailing address," and information for a "company contact." *Id.* Faced with this form, it is difficult to see how an ERISA plan—which does not have a company name, a primary headquarters, or a company contact—would fill it out. And none of the form's sections ask the claimant to identify the associated ERISA plan's name, address, or contact. Instead, all three sections confusingly ask for the "name of contracted Blue Cross or Blue Shield branded health plan." *Id.* at 3–5. The proposed settlement's definitions clarify that this field seeks information about an associated Settling Defendant, not an ERISA plan. Settlement at 3. All this to say, a plan fiduciary, confronted with this claim form, would not have reason to think that it applied to ERISA plans. Again and again, the settlement documents ignore the class-member ERISA plans by building settlement infrastructures that do not apply to them.

The Parties now contend that if an employer and the ERISA plan it sponsors both file claims for the same settlement share, "the claims would be submitted for decision to the Settlement Administrator who would review the evidence

supporting each claim." Defs.' Resp. at 9. But the Parties' late-stage attempt to address this problem lacks any support in the written settlement proposal, the plan of distribution, or their supporting declarations. The parties cannot amend those documents through argument at this stage, and neither can this Court. The choice before this Court is instead whether to approve or deny this proposed settlement, as written. *Rawa v. Monsanto Co.*, 934 F.3d 862, 871 (8th Cir. 2019) ("District courts do not rewrite settlement agreements."); *Brooks v. Ga. State Bd. of Elections*, 59 F.3d 1114, 1119–20 (11th Cir.1995); 4 Newberg on Class Actions § 13:46 (5th ed.). The Parties are essentially asking ERISA plans to dispose of a plan asset based on extra-contractual promises contained in their briefs. Those promises have also come after the objection and opt-out deadlines passed. This again raises issues around sufficient notice to the ERISA plans, and it is otherwise an unreasonable and unfair ask.

Last, the Parties' late-arrived solution does not provide ERISA plans any certainty on how the settlement will dispose of their claims, or what monetary compensation they will receive in return. For instance, because the settlement never addressed the Parties' new idea, it also fails to explain how the Settlement Administrator would determine which entity, the employer sponsor or the ERISA plan, should receive the sole settlement allocation, in cases where both the plan and the employer file claims. It does not explain what evidence the Settlement Administrator would consider, what standards it would apply, what procedures it would follow, or what role the Claims Administrator would play. Subscriber Plaintiffs hinted at the resolution they anticipate too, by incorrectly asserting that ERISA plans are not legal entities under state law. If ERISA plans are not legal entities, then they would not have as strong a claim to the settlement share as the employer—or so the argument would go. Of course, ERISA plans are legal

persons, and each class-member ERISA plan possesses a chose in action that sounds in antitrust.

The parties also argue that no matter these facts, the proposed plan of distribution is nonetheless fair, because it is supported by two expert declarations. Mr. Chodorow's declaration identifies him as someone with "over 25 years of experience conducting damages analyses," who has "testified as an expert on damages and valuation issues" in myriad fora. Chodorow Decl. at 1, ECF No. 2610-9. The declaration explains that someone provided him the proposed Plan of Distribution, and that Class Counsel asked him to "provide an opinion to this Court on whether the Plan will distribute fairly the" net settlement fund "among the Authorized Claimants for each fund." *Id.* at 1–2. Mr. Chodorow reviewed those documents and concluded that the plan of distribution's "allocation approach" was "reasonable from an economic perspective." *Id.* at 2. He thus attested that he found "the methodology for performing the allocation between employers and employees is reasonable." *Id.* Mr. Chodorow made similar attestations throughout the declaration about how he was concerned with allocation between employers and employees only. *Id.* at 4, 16, 20, 23, 25.

Mr. Chodorow's conclusions about the fairness of allocations between employer and employee plan contributors are materially different from an expert declaring that the settlement allocation is fair to ERISA plans. Mr. Chodorow was not asked that question, and his declaration does not presume to answer it. Indeed, the declaration never discusses ERISA plans, the antitrust claims they possess, or the impact those claims should have on the plan of distribution. Thus Mr. Chodorow's attestation does not support finalizing the proposed settlement over the Secretary's concerns.

While the Parties also cite to Mr. Feinberg's declaration, that too shows the Parties ignored ERISA plans in their settlement negotiations. Mr. Feinberg, a

renowned settlement mediator, attests that in November 2019, Class Counsel asked him to "facilitate a reasonable allocation of the Net Settlement Fund between" fully insured and self-funded claimants. Feinberg Decl. at 3, ECF No. 2610-8. Then in October 2020, Class Counsel asked him to review for reasonableness the plan of distribution's allocation between employer and employee class members. *Id.* at 3–4. His conclusion makes clear that it was not based on any consideration of the distribution's equities towards ERISA plans: "Based on the considerations identified by Class Counsel in their presentation and supporting materials concerning the numerous factors bearing on the allocation of premiums and administrative fees between *employers and employees*, I conclude that Class Counsel's proposal is reasonable and the tools used by Class Counsel are realistic and appropriate under the circumstances." *Id.* at 7 (emphasis added).



In sum, the class representatives do not adequately represent the class-member ERISA plans. The ERISA plans did not receive sufficient notice to meet minimum due process requirements. And the settlement treats ERISA plans inequitably as class members, by requiring them to dispose of their chose of action for no monetary consideration.

*C. If finalized, the proposed settlement could cause plan fiduciaries to violate ERISA.*

*1. If finalized, the proposed settlement would cause ERISA plan fiduciaries to violate their fiduciary duties.*

As explained in Part III.B, this proposed settlement is not a square deal for ERISA plans. That means that a plan fiduciary may violate ERISA's duties of loyalty and prudence by agreeing to it.

Setting aside the notice infirmities, if a prudent fiduciary knew or should have known about the settlement proposal "under the circumstances then

24

prevailing," that ERISA plan would need to decide whether to agree to, object to, or opt out of the settlement. Because agreeing to the settlement would involve the exercise of "authority or control respecting management or disposition of its assets"—specifically, disposition of the plan's antitrust chose of action—ERISA's fiduciary duties would attach to the decision and the person who made it.

The question of whether a plan fiduciary has breached their ERISA duties of loyalty and prudence is a facts-and-circumstances inquiry. *See Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000). But some observations common to all the ERISA plans here suggest that not opting out of the proposed settlement could rise to a fiduciary breach. First, as noted in Part III.B, the proposed settlement does not ensure that ERISA-plan class members share in the settlement, and a plan would need to rewrite the claims form to use it correctly. And even if plan fiduciaries could have anticipated the Parties' recent clarification—that a Settlement Administrator would decide whether it would receive compensation for its claims release or not—a promise to a nonobligatory performance is illusory. *Maccaferri Gabions, Inc. v. Dynateria Inc.*, 91 F.3d 1431, 1443 (11th Cir. 1996) (promise to pay under conditions promisor alone controls is illusory and not consideration); Restatement (Second) of Contracts § 77 cmt. a (1981).

The Secretary believes that most class-member ERISA plans did not opt out of this settlement. Excluding Taft-Hartley plans and church plans, the opt-out list contains just 38 ERISA plans, and only two of them opted out without their employer sponsor doing the same. If this settlement is approved, all the remaining class-member ERISA plans would have agreed to dispose of a plan asset without any guarantee to a settlement share. Generally, giving something for nothing is not a prudent transaction. *See Harris v. Koenig*, 815 F. Supp. 2d 12, 25 (D.D.C. 2011) (denying defendants' summary judgment motion on plaintiffs' claims that ERISA plan fiduciaries violated ERISA section 404 when they released plan's chose-in-

action in settlement; and violated ERISA section 406 by doing the same thing, which was an exchange of choses in action between plan and party in interest); *Hurtado v. Rainbow Disposal Co.*, No. 817CV01605JLSDFM, 2018 WL 3372752, at *11–12 (C.D. Cal. July 9, 2018) (plaintiffs adequately pleaded violation of ERISA subsections 404(a)(1)(A) and (B) for failure to manage chose in action, where plan fiduciaries did not bring shareholder action based on plan investments).

   2. *If finalized, the proposed settlement may cause ERISA plan fiduciaries to engage in prohibited transactions.*

   ERISA section 406(a)(1) categorically prohibits plan fiduciaries from causing the plan to engage in certain kinds of transactions with parties in interest, two of which matter here. First, under subsection 406(a)(1)(A), a plan fiduciary cannot cause the plan to engage in a transaction when they know or should know that it constitutes "a direct or indirect sale or exchange, or leasing of any property between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(A). Second, under subsection 406(a)(1)(D), a plan fiduciary cannot cause the plan to engage in a transaction when they know or should know that it constitutes a direct or indirect "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." *Id.* § 1106(a)(1)(D). ERISA defines "party in interest" broadly to mean any plan fiduciary, service provider, or employer sponsor. *Id.* § 1002(14). "Absent a statutory or administrative exemption, plan fiduciaries are forbidden to cause a fund to engage in specified deals regardless of whether any harm actually results from the transaction." *Donovan v. Walton*, 609 F. Supp. 1221, 1246 (S.D. Fla. 1985), *aff'd sub nom. Brock v. Walton*, 794 F.2d 586 (11th Cir. 1986).

   Both prohibitions would apply to this proposed settlement. ERISA defines "party in interest" to include a plan's current service providers. Settling Defendants currently insuring or servicing class-member ERISA plans, then, are

generally ERISA parties in interest with respect to them. And again, an ERISA plan's legal claims are plan assets. *See In re Luna*, 406 F.3d at 1199. This settlement would thus likely cause ERISA-covered plans to engage in a transaction (the settlement contract) with parties in interest (Settling Defendants). ERISA would likely prohibit that transaction if it involved exchanging a plan asset (the ERISA plan's claim) for consideration from the party-in-interest Settling Defendants. 29 U.S.C. § 1106(a)(1)(A). ERISA would also likely prohibit that transaction because it involves the transfer of a plan asset for the benefit of party-in-interest Settling Defendants. *Id.* § 1106(a)(1)(D). So finalizing this settlement would potentially trigger a cascade of ERISA violations—depending on the particular facts and circumstances of each case—by causing ERISA plans to commit prohibited transactions.

The Secretary's longstanding guidance supports this view. In a 1995 opinion letter, the Secretary explained that "the settlement of [a] lawsuit" between an ERISA plan and a party in interest "would be an exchange of property (a chose of action) between such Plans and parties in interest as described in section 406(a)(1)(A)." Dep't of Labor, Advisory Op. 1995-26(a) (Oct. 17, 1995), tinyurl.com/2bd3mujt. And in 2010, the Secretary again explained, after notice and comment: "The Department understands that segments of the pension community question whether the receipt of property by a plan in consideration for the release of a claim arising out of litigation with a party in interest would constitute a prohibited transaction under section 406 of the Act. It is the Department's position that the release by the plan of a legal or equitable claim against a party in interest in exchange for consideration is an exchange of property (a chose in action) between the plan and the party in interest which is prohibited under section 406(a)(1)(A) of the Act in the absence of an exemption." Adoption of Amendment

to the Class Exemption for the Release of Claims and Extensions of Credit, 75 Fed. Reg. 33,830, 33,831 (June 15, 2010).

ERISA section 408(a) authorizes the Secretary to grant "a conditional or unconditional exemption of any fiduciary or transaction, or class of fiduciaries or transactions, from all or part of the restrictions" that section 406(a) imposes. 29 U.S.C. § 1108(a). Pertinent here, Prohibited Transaction Exemption (PTE) 2003-39 states that "the restrictions of section[] 406(a) . . . shall not apply to . . . [t]he release by the plan or a plan fiduciary of a legal or equitable claim against a party in interest in exchange for consideration, given by, or on behalf of, a party in interest to the plan in partial or complete settlement of the plan's or the fiduciary's claim." 75 Fed. Reg. at 33,831. But PTE 2003-39 is a conditional exemption, and one condition is that "[t]he authorizing fiduciary acting on behalf of the plan has acknowledged in writing that it is a fiduciary with respect to the settlement of the litigation on behalf of the plan." *Id*. at 33,837. Given the Parties' conflation of employers, employees, and ERISA plans, it is doubtful that this will have happened. And that is to say nothing of the other conditions necessary for the exemption to apply.[8]

The Parties mistakenly rely on *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996), to argue that the proposed settlement would not qualify as a prohibited transaction. They contend that, under *Spink,* "only 'commercial bargains' that present harm to the plan are prohibited by ERISA § 406," and that because settlement contracts are not commercial bargains, ERISA's prohibited transactions

---

[8]   In addition to the fiduciary-acknowledgment requirement, PTE 2003-39 also requires that "[t]he settlement terms, including the scope of the release of claims" and "the amount of cash . . . received by the plan" "are reasonable in light of the plan's likelihood of full recovery, the risks and costs of litigation, and the value of the claims foregone." *Id*. at 33,836. And it requires that the authorizing fiduciary have "no relationship to, or interest in, any of the parties involved in the claims, other than the plan, that might affect the exercise of such person's best judgment as a fiduciary." *Id*.

could not apply to them. Ps.' Mem. at 132–34. But *Spink* did not involve settlement agreements, fiduciary conduct, or an ERISA plan's release of claims. And it certainly did not rewrite ERISA section 406 to limit its application to "commercial bargains," a phrase Congress never wrote.

In *Spink*, defendant Lockheed Corporation wanted to amend its retirement plan to include financial incentives for early retirement. 517 U.S. at 885. The amendments increased retirement benefits for early retirees, but conditioned their receipt on the early retirees releasing "any employment-related claims they might have against Lockheed." *Id.* Plaintiff declined to participate based on the claims release, retired without the enhanced benefits, and sued for the difference. *Id.* at 885–86. Plaintiff argued that Lockheed's offer was prohibited under ERISA section 406. *Id.* at 886. The Supreme Court disagreed, because "Lockheed acted not as a fiduciary but as a settlor when it amended the terms of the Plan." *Spink*, 517 U.S. at 891. Here, in contrast, the plan fiduciaries, acting for the ERISA plans in agreeing to the settlement, would unquestionably be acting as fiduciaries, so this portion of *Spink* is distinguishable.

The *Spink* plaintiff also argued that Lockheed's retirement committee violated ERISA section 406(a)(1)(D) by implementing Lockheed's amendments. *Id*. at 892. The Court disagreed again. First, it noted and reserved the issue of whether the retirement committee acted as a fiduciary when they paid out benefits under the amended terms. *Id*. It then parsed section 406(a)(1)(D) to decide that a plan administrator's payment of benefits is not a "transaction" under that provision. *Id*. at 892–93. The Court looked to section 406(a)(1)(D)'s broader statutory context and observed that section 406(a) transactions "generally involve uses of plan assets that are potentially harmful to the plan." *Id*. at 893. The Court concluded, "[W]hatever the precise boundaries of the prohibition in § 406(a)(1)(D), there is one use of plan assets that it cannot logically encompass: a

*quid pro quo* between the employer and plan participants in which the plan pays out benefits to the participants pursuant to its terms." *Id*. at 895.

Unlike *Spink,* this case does not involve a *quid pro quo* between an employer and plan participants about amending the terms of an ERISA plan, or changing the level of benefits offered by it. And *Spink* did not involve a settlement contract, antitrust claims, or any claims release by an ERISA plan. It came nowhere near addressing the Secretary's guidance about prohibited transactions and settlements. The parties place all their eggs in a stray phrase from *Spink*'s dicta, suggesting that section 406(a) applies only to "commercial bargains," a descriptor the Court used to typify section 406(a)'s prohibitions. *Id.* at 893. But the Court disclaimed the authoritativeness of that descriptor two paragraphs later, by explaining it was *not* identifying "the precise boundaries of the prohibition in § 406(a)(1)(D)." Thus *Spink* is distinguishable on this point too.

The Secretary's view on *Spink* is not new. In the preamble to PTE 2003-39's finalization, the Secretary cautioned, after notice and comment: "As the Supreme Court noted in *Lockheed Corp. v. Spink*, 517 U.S. 882, 892–893 (1996), the payment of benefits is not a prohibited transaction." 68 Fed. Reg. 75,632, 75,634 (Dec. 31, 2003). And when the Secretary finalized the amendments to PTE 2003-39 in 2010, the preamble cited *Spink* and reiterated the same position: "[I]t is the view of the Department that, in general, no exemption is needed to settle benefits disputes." 75 Fed. Reg. at 33,832 n 8.

Finally, the Parties argue in lengthy footnotes that *Spink* "superseded" the Secretary's 1995 advisory opinion, and that the Secretary's reiteration of the 1995 position in 2010 "is unreasonable and has no weight."[9] Ps.' Mem. at 135 n.73;

---

[9] The Secretary's longstanding, well-reasoned position is at least entitled to *Skidmore* deference, *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000), and because the 2010 reiteration of it came in the preamble of a regulation promulgated through notice and

Defs.' Resp. at 12, 14 n.29. The Parties provide no support for these conclusory assertions besides *Spink*, which is distinguishable and does not apply. They also mischaracterize the Secretary's issuance of PTE 2003-39 as a "retreat" from the 1995 guidance. That is not true. Instead, PTE 2003-39 recognized that not every settlement between a plan and a party in interest would necessarily cause a prohibited transaction to occur. Indeed, the 2003 preamble makes that exact point by *citing* to *Spink*.



Finalizing the proposed settlement may cause ERISA plans to commit fiduciary violation and engage in transactions prohibited under ERISA section 406, without complying with an exemption. The proposal thus inequitably saddles ERISA plans with potential litigation, all while compensating employer sponsors for their tax-advantaged plan contributions. That is not a fair or reasonable resolution of the ERISA plans' claims here.

---

comment, that guidance should receive "the more deferential *Chevron* deference," *Anderson v. Perdue Farms, Inc.*, 604 F. Supp. 2d 1339, 1355 n.17 (M.D. Ala. 2009).

## IV. CONCLUSION

The ERISA plans did not have adequate representation in this settlement, and they received insufficient notice of it. As a predictable result, the proposal's settlement allocation treats ERISA plans inequitably. The proposal's finalization would threaten the interests of ERISA plan participants and beneficiaries and expose ERISA plans and fiduciaries to litigation and liability. Accordingly, the Secretary urges the Court to ensure the Parties negotiate a solution that accounts for the legal interests of the class-member ERISA plans and their participants and beneficiaries.

Date: October 19, 2021

Respectfully Submitted,

SEEMA NANDA
Solicitor of Labor

G. WILLIAM SCOTT
Associate Solicitor for
  Plan Benefits Security

JEFFREY M. HAHN
Counsel for Litigation

_____
EIRIK CHEVERUD
Trial Attorney

Plan Benefits Security Division
Office of the Solicitor
U.S. Department of Labor
200 Constitution Ave. NW, N4611
Washington, DC 20210
202.693.5516 | cheverud.eirik.j@dol.gov