1         IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ALABAMA
2                SOUTHERN DIVISION

3

4    IN RE:  BLUE CROSS BLUE SHIELD    CASE NO.:  2:13-cv-20000-RDP
     ANTITRUST LITIGATION MDL 2406
5

6                      VOLUME I

7            * * * * * * * * * *

8                  MOTION HEARING

9        FOR FINAL APPROVAL OF CLASS SETTLEMENT

10          OF SUBSCRIBER PLAINTIFFS' CLAIMS

11            * * * * * * * * * *

12       BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES

13   DISTRICT JUDGE, at Birmingham, Alabama, on Wednesday,

14   October 20, 2021, commencing at 10:12 a.m.

15   APPEARANCES:

16   SPECIAL MASTER:          Edgar C. Gentle III
                              Attorney at Law
17                            GENTLE TURNER SEXTON & HARBISON
                              501 Riverchase Parkway East, Suite 100
18                            Hoover, Alabama  35244

19   IN PERSON:               David Behenna
                              Eric R. Belin
20                            Alexander McInnis Boies
                              David Boies
21                            Swathi Bojedla
                              John D. Briggs
22                            Michael A. Buchwald
                              Carl S. Burkhalter
23                            Warren T. Burns
                              Elizabeth C. Chavez
24                            Kathleen Currie Chavez
                              J. S. Christie
25                            Vincent J. Colatriano

```
 1  APPEARANCES, Continued:

 2  IN PERSON:                Charles J. Cooper
                              Paul Davis Cooper
 3                            Phillip F. Cramer
                              Gregory L. Davis
 4                            Douglas A. Dellaccio Jr.
                              Kimberly Ann Fetsick
 5                            Edgar Dean Gankendorff
                              Theresa S. Gee
 6                            John Grivas
                              David J. Guin
 7                            Michael David Hausfeld
                              Katherine Harbison
 8                            Christopher T. Hellums
                              David J. Hodge
 9                            E. Desmond Hogan
                              Mark Montgomery Hogewood
10                            Zachary D. Holmstead
                              Hamish P.M. Hume
11                            William A. Isaacson
                              John M. Johnson
12                            Megan Jones
                              Eamon P. Kelly
13                            Cavender C. Kimble
                              Cason M. Kirby
14                            Daniel E. Laytin
                              Andrew Allen Lemmon
15                            Frank M. Lowrey IV
                              Jonathan S. Mann
16                            Larry S. McDevitt
                              Patrick McDowell
17                            Joseph Mason
                              R. G. Methvin Jr.
18                            M. Richard Mullins
                              W. Scott Nehs
19                            Jess Randall Nix
                              Richard D. Nix
20                            Ugo Okpewho
                              Alan Page
21                            Joshua K. Payne
                              Gwendolyn C. Payton
22                            Michael R. Pennington
                              Barry A. Ragsdale
23                            J. Thomas Richie
                              Stephen A. Rowe
24                            Emily M. Ruzic
                              Robin Sanders
25                            John G. Schmidt Jr.
```

```
 1  APPEARANCES, Continued:

 2  IN PERSON:              Adam Shaw
                            Paul Slater
 3                          Scott Burnett Smith
                            Kathleen Taylor Sooy
 4                          Cyril V. Smith III
                            Todd M. Stenerson
 5                          Tammy McClendon Stokes
                            James M. Terrell
 6                          Ben Thorpe
                            Michael Velezis
 7                          Hershel A. Wancjer
                            David M. Wilkerson
 8                          Helen E. Witt
                            David J. Zott
 9                          Jason A. Zweig

10  VIA VIDEOCONFERENCE:    Monte D. Beck
                            Jeffrey H. Bergman
11                          Sydney Best
                            William J. Blechman
12                          W. Tucker Brown
                            Virginia M. Buchanan
13                          Don Campbell
                            Evan Chesler
14                          Anna M. Clark
                            George Cochran
15                          Karin DeMasi
                            Ronan P. Doherty
16                          Jason Ethridge
                            Robert M. Foote
17                          David P. Germaine
                            Rueben Goetzl
18                          Zenola Harper
                            S. Scott Hickman
19                          Elizabeth Brooks Honkonen
                            Elizabeth A. Jose
20                          Rebecca Josefiak
                            Edith M. Kallas
21                          Joann M. Lytle
                            Deirdre MacCarthy
22                          Duncan McIntosh
                            Lucy Grey McIver
23                          Robert Meyer
                            Wilson Daniel Miles III
24                          Michael A. Naranjo
                            Catherine Nelson
25                          Elaine Nichenko
```

```
 1   APPEARANCES, Continued:

 2   VIA VIDEOCONFERENCE:      James K. Nichols
                              Eric Osborne
 3                            Allen Page
                              Dennis G. Pantazis
 4                            Aaron S. Podhurst
                              Karen Quirk
 5                            Brenda Ann Rigas
                              Nicholas B. Roth
 6                            Alan D. Rutenberg
                              Anthony F. Shelley
 7                            Richard Sherburne
                              Matthew Slater
 8                            Mark Spencer
                              Wendy Springer
 9                            Andrew M. Stone
                              Ami Swank
10                            Courtney Tedrowe
                              Jason J. Thompson
11                            Joseph M. Vanek
                              Brian Vick
12                            Amy Walker Wagner
                              Kimberly R. West
13                            Joe R. Whatley Jr.
                              Linda A. Willett
14                            Pamela Williams
                              Brian Wonderlich
15                            Edward Kirk Wood Jr.
                              W. Gregory Wright
16
     (Other counsel were present via telephone but not identified)
17
                   Proceedings reported stenographically;
18                      transcript produced by computer.

19                      * * * * * * * * * *

20

21

22

23

24

25
```

```
1          (The following proceedings were heard before the Honorable
2          R. David Proctor, United States District Judge, at
3          Birmingham, Alabama, on Wednesday, October 20, 2021,
4          commencing at 10:12 a.m.:)
5               THE CLERK:  Come to order, please, and remain seated.
6               THE COURT:  Have a seat.  Good morning, everyone.
7               COUNSEL IN UNISON:  Good morning, Your Honor.
8               THE COURT:  All right.  Well, we have a number of
9     things to accomplish over the next two days.
10               We're here in In Re:  Blue Cross Blue Shield Antitrust
11     Litigation, MDL Number 2406, our Case Number 13-cv-20000.  The
12     Court set today as the -- and tomorrow -- and I think tomorrow
13     will be necessary from what I can tell -- as the dates we would
14     conduct a fairness hearing in this case.
15               The Court has preliminarily approved a settlement that
16     involves the settlement of the subscribers' side of the case.
17     The Court entered a preliminary approval order about 11 months
18     ago, I think it was.  And obviously, in light of the 2018
19     amendments, the Court did try to frontload as much information
20     into that portion of the settlement approval process as possible
21     and did rigorously review the settlement on a preliminary basis.
22               Having said that, my view is that we're starting from
23     scratch today.  There is no -- there's no thumb on the scale.
24     There's no inclination toward approval of the settlement.  And I
25     think the proponents of the settlement have to establish the
```

1  requirements of Rule 23(e) and Eleventh Circuit case law.

2          As far as the basics of things, I'm being guided by the

3  *Bennett* factors that I think are still in play but emphasizing,

4  maybe, the Rule 23(e) factors that were input into the

5  amendments in 2018.  I don't think those make a big difference.

6  I think that analysis, regardless of which way you articulate

7  it, is pretty similar.

8          We'll start with the proponents of the class

9  settlement or the class settlements.  And I understand that

10 there's three different classes, a (b)(2) injunctive relief

11 class that involves indivisible injunctive relief, a (b)(3)

12 damages class, and a Rule 23(b)(3) what I would refer to as

13 divisible injunctive relief, but -- and I don't think it matters

14 how we characterize it, but that's the way I'm thinking about

15 it.

16         As far as things that I want to make sure we touch base

17 on, there will be a number of those.  I'm going to give you

18 five, but this is by no means the limit of things I'm concerned

19 about or have questions about.  I'm just wanting to hear your

20 arguments about.

21         First is ESAs and post-settlement structure, the effect

22 of continuing ESAs, the discontinuance of national best efforts

23 and the modification of local best efforts, and any other terms

24 that the settlement affects in terms of the Blue Cross Blue

25 Shield business structure going forward.

 1            Second, the divisible injunctive relief issue, how the

 2   second Blue bids were formulated, adequacy of representation

 3   that's been raised by some of the objectors with respect to that

 4   part of the self-funded class settlement, or ASO settlement, the

 5   class period that relates to that particular class settlement,

 6   the allocation between the -- of money damages or monetary

 7   relief, I should say, between the two groups.

 8            Who's here for the Department of Labor?  Anybody?

 9            That's interesting.  At 5:56 p.m. last night, we

10   received a filing from the Department of Labor asking to appear

11   as an amicus curiae.  I guess I'll hold off on my explanation of

12   what the difference is between a friend of the Court and an

13   enemy of the settlement, but I tend to think that the Department

14   of Labor is a governmental objector, not an amicus curiae.

15            Anybody have a different view of that than me?  Okay.

16            But I do think we'll need to address that.  And I

17   suspect the proponents of the settlement would like the

18   opportunity to respond to that belated brief that came in.  Am I

19   right?

20            MR. BOIES:  Yes, we would, Your Honor.  I do think --

21   the only thing that I would say is that with respect to whether

22   they're an objector or not, they have made clear that they're

23   expressing certain concerns; but they have not, at least up till

24   now, objected to the settlement.

25            THE COURT:  Right.  Well, I think last night tended to

1  be an objection.  Whether it was timely or not is an issue.  You

2  know, I think counsel may have questions about the Court over

3  the years, but one of the things I don't think you have a

4  question about is I tend to not go into form over substance.

5  And if it's a legitimate question that needs to be asked about

6  the settlement, I think it's fair game for the Court to

7  consider.

8          I'm a little -- I thought -- maybe I'm misrecollecting,

9  because I've reviewed a lot of materials over the last -- in

10 advance of preparing for this.  I thought they requested the

11 opportunity to speak at the hearing.  Maybe I'm misrecollecting

12 that.  In any event --

13         MR. BOIES:  They may have, Your Honor.  I don't recall

14 that, but they may have.

15         THE COURT:  All right.  Maybe they were just asking for

16 the opportunity to be heard in terms of the written -- all

17 right.

18         I will want the parties to address that.  I don't know

19 if we're going to get to it today or if it will be tomorrow, but

20 I've got some questions about the DOL concerns.

21         And the other thing I would note regarding what I

22 reviewed based upon the filing yesterday evening is that it

23 seems to me their positions have slightly morphed from concerns

24 about the settlement to actual arguments and objections about

25 the settlement in terms of adequacy of representation and

1   legality of some of the provisions of the settlement.  So I

2   think we'll have to address those.

3        Let me ask this.  Is there anyone here who thinks that

4   that's not a good starting point or a good list of starting

5   points of things the Court ought to be concerned about?  I --

6   and that's not to say that I'm not concerned about other issues.

7   I know that some of the issues raised are rifle shots rather

8   than shotgun blasts, and I haven't tried to include those here.

9   But I have tried to get and address some of the more fundamental

10  questions that I think we're going to have to take up.

11       For example, the Prairie Island Indian Community I

12  think has some concerns that we need to address, but I've not

13  included that on my preliminary list here because I think we're

14  going to necessarily get to that when they state their

15  objection.  I'm not sure that's something that proponents of the

16  settlement, though, are going to want to frontload in their

17  presentation.  They might just choose to address that when it

18  comes up and as it comes up.  All right?

19       Anyone want to be heard on that as far as what balls

20  our eye should be on going into this?

21       Hearing nothing, I think we have a satisfactory list.

22       I think it's now time for the settlement proponents to

23  make their presentations.  And I understand counsel have

24  negotiated a little bit about the agenda, which was -- every

25  agenda I put out -- an outline more than a mandate.  That's just

```
1   something to guide us through these issues in an orderly way.
2   But I'm going to leave it to counsel and the way they've worked
3   it out to present what they want to present; and if I think you
4   need to back up and cover something or you've missed something,
5   I'll certainly bring it to your attention.  All right?
6           Everyone ready to get started?  Mr. Boies?
7           MR. BOIES:  Thank you, Your Honor.
8           I will see if we can get our charts up on the screen.
9   I might begin by giving the Court just an overview of our
10  planned presentation.  I'm going to begin with some background
11  information and then go to responses to the objections.  And
12  we've divided those responses by the type of objection by the
13  objectors.  Part one, the so-called Sperling and Slater
14  objections and national account objectors.  And we will go
15  through these first --
16          THE COURT:  Let's pull that microphone a little closer
17  to you.
18          MR. BOIES:  Thank you.
19          THE COURT:  Appreciate your masking up.  You don't have
20  to mask up when you're speaking.  I'm going to leave it to your
21  discretion.  We'll keep you socially distanced while you're
22  sitting there.
23          MR. BOIES:  Thank you, Your Honor.
24          THE COURT:  All right.
25          MR. BOIES:  That will help.
```

```
 1            And the second --

 2            THE COURT:  And that goes for everyone else who is

 3    speaking.  When you're speaking, if you would prefer to remove

 4    your mask or if we're having difficulty hearing you, we'll

 5    suggest that.

 6            MR. BOIES:  Then the second part will be the so-called

 7    ASO subclass issues, the Bradley Arant objectors.  And in each

 8    case, what we'll do is we'll make our presentation, they'll have

 9    an opportunity to make their presentation, and then we and the

10    defendants can respond.

11            And then on the second day, there will be the responses

12    to the objections relating to monetary relief, notice, plan of

13    distribution and claims process, attorneys' fees and expenses,

14    and any additional objections.  And we will also try to deal at

15    that time with the Department of Labor concerns.  And I would

16    say to the Court that we are continuing in conversation with the

17    Department of Labor about their concerns.

18            THE COURT:  So you're talking to them; I'm just not

19    able to.

20            MR. BOIES:  We have -- we have been communicating.  And

21    they may choose to communicate with the Court if our

22    communications are not successful.

23            THE COURT:  Fair enough.

24            MR. BOIES:  But their concerns have been to be sure

25    that when the money is distributed, people are aware of what
```

 1  their ERISA obligations are with respect to those funds.  And

 2  we're trying to cooperate in terms of making sure that those

 3  people are given the kind of notice that the Department of Labor

 4  thinks they should be given.  And I'm hopeful that we'll be able

 5  to work that out, but you never can tell.

 6          THE COURT:  Well, I had some soul-searching to do in

 7  2012 when I was asked to take this case.  If you would have told

 8  me then that ERISA was going to become a part of it, I'm not

 9  sure I would have had the same response.  And maybe some people

10  are now saying to themselves, if only we had mentioned ERISA

11  back then.

12          MR. BOIES:  Well, if I had known it would be an ERISA

13  case, Mr. Hume might have been spending more time on this than I

14  have.

15          The next thing I want to do is I want to go through a

16  little bit of a history of the case and sort of how we got here.

17  And as the Court is aware, we -- and just indicated this

18  litigation was filed in 2012; but I think in terms of

19  background, it's useful to keep in mind that the core features

20  of what we've challenged here have been public knowledge for

21  decades, going all the way back to 1946.  Blue Cross Blue Shield

22  executives described their system as a system in which, quote,

23  only one Blue Cross plan is established in each enrollment area.

24  In 1971, just as an example, the Blue Cross president testified

25  before a Senate antitrust subcommittee and testified expressly

1    about the fact that the Blue plans had, quote, exclusive

2    territorial arrangements.  In 1979, a report by the Federal

3    Trade Commission reported, quote, Blue Shield plans generally do

4    not compete with each other, closed quote.

5           And as I think the Court is aware from the many years

6    of this litigation, those kind of public statements, those kind

7    of public acknowledgments about the restraints that we have

8    challenged in this case were very public, very well known, known

9    to all the major participants in this industry, known to the

10   Department of Justice, known to the Federal Trade Commission.

11   And yet there was never any challenge.  The Department of

12   Justice didn't challenge it.  The Federal Trade Commission

13   didn't challenge it.  And none of the very large corporations,

14   including some of the corporations that you're going to hear

15   from today, challenged it.  It was not that people were not

16   aware of the restraints.  It was not that they did not have

17   resources to challenge those restraints if they had chosen to.

18   They simply didn't.

19          And I think that in thinking about some of the

20   objections that are made in terms of we should have gotten more

21   money, we should have gotten more injunctive relief, I think it

22   is useful context to keep in mind that until we brought this

23   case in 2012, no one was seeking that injunctive relief.  No one

24   was seeking those damages.

25          I think it's also useful to keep in mind -- because the

1   Court is going to hear today and tomorrow about a number of

2   views by ASO participants -- that even after we filed this case

3   in February of 2012 -- and as the Court will recall, the case

4   that we originally filed did not assert claims on behalf of

5   ASOs.  It only asserted claims on behalf of insured individuals

6   and groups.

7           THE COURT:  What do you say in response to one of the

8   objectors that said the class definition in *Cervin* necessarily

9   encompassed ASOs?

10          MR. BOIES:  We think it's clear it did not.  We think

11  it's clear from the language, but it's also absolutely clear

12  from the context of the litigation.

13          Throughout the litigation, we made clear that it was

14  only the fully insured.  And indeed, the Court will recall that

15  our complaint -- until it was expanded in the last couple of

16  years, our complaint was limited not merely to fully insured

17  plans, but was limited to individuals and small groups so that

18  it was absolutely clear that ASOs were not included.  And

19  indeed, when the complaint talks about ASOs, it talks about why

20  they are not in the market, why they are distinguishable from

21  the fully insured plans.

22          So I don't think that you can in any way fairly read

23  either the actual text of the complaint itself or the conduct of

24  this litigation as including the ASOs.

25          THE COURT:  So what you're saying is that even putting

 1   aside what -- how one would interpret the *Cervin* scope of the

 2   class definition in the complaint, if you read in context the

 3   *Cervin* complaint and particularly the master complaint, it was

 4   clear that you were seeking to represent the class that you're

 5   actually representing now, not a broader class.

 6           MR. BOIES:  That is correct, Your Honor, until the

 7   amended complaint was filed.

 8           THE COURT:  Until the amended complaint.  That's what

 9   I -- and technically, Mr. Burns is representing that group;

10   right?

11           MR. BOIES:  He is the subclass counsel.

12           THE COURT:  All right.

13           MR. BOIES:  Obviously, we've been representing the

14   entire class.

15           THE COURT:  One of the things that I recall was fairly

16   early on, when I had you and Mr. Laytin and Mr. Zott in chambers

17   one time, we got into a discussion about the scope and size of

18   the class.  And at that point, you were contending it was a much

19   smaller class than the Blues were interpreting it or advocating

20   the concern about it.  I think it -- so -- and I think -- I do

21   recall that.

22           MR. BOIES:  Yes.  They believed that -- and

23   with sensible reasons -- that if we were going to have a

24   settlement that would substantially increase competition, it was

25   necessary to bring in the entire marketplace.

```
 1              THE COURT:  Right.
 2              MR. BOIES:  We had originally started off with a much
 3   narrower approach because we thought that would expedite things,
 4   but as we got into it --
 5              THE COURT:  I bring that up not -- and I do understand
 6   that you did broaden the class because, as I recall, you also
 7   characterized at one point this settlement as heavier on
 8   injunctive relief emphasis than monetary relief, even though
 9   it's substantial monetary relief that you claim you've
10   negotiated with the class.  But prior to that, I think that's
11   consistent with your position that you didn't view the Cervin
12   complaint as seeking to represent ASOs.  That was never the
13   intent of class counsel, and it still wasn't the intent up until
14   the time the subclass was alleged in the amended complaint.
15              MR. BOIES:  I think that's -- I think that's fair, Your
16   Honor.
17              THE COURT:  All right.
18              MR. BOIES:  Now, in part because of the fact that no
19   one had challenged these restraints previously and in part
20   because of the enormous resources and abilities of defendants
21   and their counsel, the litigation of this case, as I think the
22   Court is aware, has been an enormous undertaking.
23              THE COURT:  Yes.  I think you do need to establish that
24   for the record, but I don't think you need to convince me of it.
25              MR. BOIES:  I mean, the Court will recall that we have
```

 1  incurred more than $35 million in out-of-pocket costs.  We have

 2  devoted approximately $200 million in lodestar, and that is at

 3  some discounted rates.  We've had to review over 75 million

 4  documents and terabytes of data, the production of which

 5  required substantial litigation across 36 different defendants.

 6          THE COURT:  I am curious about your icon in the upper

 7  right corner of this slide.  What exactly is that?

 8          MR. BOIES:  That's -- that's a really good question,

 9  Your Honor.  The --

10          THE COURT:  For some reason, I think I'm asking the

11  wrong person about the graphics.

12          MR. BOIES:  Yeah.  The icons on this document were put

13  on by people considerably younger than myself.

14          THE COURT:  And more talented?

15          MR. BOIES:  And more talented.  Considerably

16  more talented in putting on icons.

17          THE COURT:  At least in that area.

18          MR. BOIES:  We also -- and I guess -- I guess, as I

19  sort of look at this, I think that is supposed to be a deponent.

20          THE COURT:  Raising his hand and being sworn in,

21  perhaps.

22          MR. BOIES:  Raising his hand and being sworn in,

23  because it is sort of connected to the observation that we had

24  taken over 120 offensive depositions as well as 16 class

25  representative depositions.

 1          THE COURT:  "Offensive" meaning you took them, not that

 2    you were offensive during them.

 3          MR. BOIES:  Hopefully, Your Honor, yes, by offensive,

 4    we mean they were part of our affirmative case as opposed to our

 5    defense case.

 6          As this Court will remember, I'm sure we've had over a

 7    hundred status conferences, discovery conferences, and other

 8    hearings, for which we greatly appreciate the Court's attention

 9    to this matter, particularly --

10          THE COURT:  And we should give Judge Putnam a lot of

11    credit for that.  He's now retired from our magistrate judge

12    team --

13          MR. BOIES:  Yes.

14          THE COURT:  -- but he did -- regardless of how this

15    particular issue works out, we would all acknowledge he just did

16    yeoman's work.

17          MR. BOIES:  He did a terrific job.  And we appreciate,

18    you know, his attention to this as well as Your Honor's,

19    particularly -- and I might say particularly during the last two

20    years where, although a lot of cases, in my experience, stalled

21    over the last two years, this case really kept going.  And we

22    very much appreciate the Court and Judge Putnam and the efforts

23    of the special master in making sure that that happened.

24          There have been over a hundred discovery motions and

25    briefs and 91 discovery orders.  We have had to review and

 1  challenge over 700,000 privilege log entries, resulting in 45

 2  orders concerning privilege issues.  And as the Court is aware,

 3  we succeeded in successfully challenging a very large number of

 4  privileges, which have resulted in some very important evidence

 5  that we have submitted.  But that was something that took an

 6  enormous amount of time and attention and resources.

 7        There have been multiple rounds of briefings on motions

 8  to dismiss.  I think that the Court is well aware and I would

 9  acknowledge the tremendous effort that the defense counsel have

10  made in terms of defending their clients in this case.

11        There has been summary judgment briefing and hearings

12  including on filed rate and standard of review.  We've had two

13  days of economic testimony where we brought to the Court and

14  prepared eminent economists to testify about the economic issues

15  that were presented by this litigation.

16        There has been briefing and expert discovery on class

17  certification, including two expert reports on class

18  certification and five merits expert reports and related

19  discovery.

20        I say that because I think it's important to understand

21  how hard this road has been, how long this road has been when we

22  take into account what we've accomplished.  And while this

23  litigation has already lasted nine years, if this case were to

24  proceed to trial, the costs in time and uncertainty would

25  continue.

1          And one of the things that younger people do is they

2    prepare these charts so that the chart doesn't all come up at

3    once.  I think they think that that makes it more dramatic or

4    something.

5          But we would face substantial uncertainty as to class

6    certification, which has not yet been granted, liability,

7    damages, the scope of injunctive relief.  And as the Court is

8    aware, we have 51 nonaccelerated actions, which would involve

9    additional risk, additional time.

10          One of the things that I think is attractive about this

11   settlement is that it provides not only some substantial

12   monetary recovery, but really dramatic injunctive relief that

13   will change the character of this industry.  And the faster that

14   that happens, the sooner the benefits of competition will inure

15   to the benefit of our class members.

16          And I think that one of the advantages of this

17   settlement that we need to keep in mind is that it gets us to

18   that injunctive relief years, many years, faster than we could

19   get by litigation.  And I think that when you think about what

20   we've accomplished, not only have we accomplished a dramatic

21   change in the health care insurance market, but we have done so

22   today, or at least once this gets approved and any objections

23   get resolved; but as soon as that happens, the benefits of this

24   increased competition can begin.  And so I think that the

25   advantage of doing this by settlement, as opposed to wading

 1    through all that we'd have to do in terms of litigation, is

 2    something that needs to be taken into account.

 3           Now, in terms of an overview of the settlement, the

 4    financial relief is $2.67 billion.  And in addition to that --

 5    and as the Court has said before and as I have said to the Court

 6    before, more important than the money -- and the money is a

 7    substantial amount, but much more important than the money is

 8    the structural relief that this settlement brings.

 9           It eliminates the national-best-efforts restraint.  And

10    that restraint, of course, was the restraint on Blue plans

11    competing with each other outside of their exclusive service

12    areas, even if they didn't use the Blue trademark.  And I -- I

13    said to the Court early on that I thought that that was the most

14    important and the most egregious restraint.

15           You know, whatever the justifications were for the

16    exclusive service areas as applied to protecting integrity of

17    trademarks, that did not apply when you were talking about

18    restraints on what we've sometimes in this case referred to as

19    green competition.  We've also limited the use of MFN

20    differentials.  We've limited acquisition restrictions and other

21    new rules.

22           THE COURT:  Can you brief -- just particularly for the

23    benefit of those who may be watching or listening from outside

24    the courthouse today -- I take it most people in the courtroom

25    today understand the limits on the use of MFN differentials, but

1  would you just give us a summary of that?

2          MR. BOIES:  Sure, Your Honor.

3          One of the restraints that we thought was

4  anticompetitive was the way the Blues used most-favored-nation

5  agreements to enable them to have a differential, an advantage

6  over their competitors.  And there were some states in which

7  there were laws against that, but there were many states in

8  which there were not laws against that.

9          And one of the things that we sought, really, from the

10 beginning of this litigation was to limit the use of these

11 most-favored-nation differentials so that there would be a more

12 level playing field in terms of competition and in terms of

13 entry as well.  And I think that is a -- I think that is an

14 important accomplishment.  I think it is not at the same level

15 as the elimination of the so-called national-best-efforts

16 restraint.  I think the elimination of the national-best-efforts

17 restraint is really a core element of the structural relief.

18 But the limits on the use of most-favored-nation differentials I

19 think is very positive and goes with the elimination of the

20 national-best-efforts restraint to improve competition.

21          And I would note that the limits on the use of the

22 most-favored-nation differentials applies even to just their

23 Blue business.  That is, even with respect to the business using

24 the Blue trademark in exclusive service areas, they are still

25 going to be limited as to the use of most-favored-nation

1  differentials.

2       We also, as I indicated a moment ago, limited

3  acquisition restrictions and limited the imposition of new rules

4  that would try to perhaps bring back some of these restraints in

5  a different guise.  We also set up a monitoring and reporting

6  regime for five years that will help to ensure the success of

7  these efforts to increase competition.

8       Now, the last major piece of structural relief was the

9  right to request an additional Blue bid.  As I said, the center

10 of what we were doing was to try to eliminate the restrictions

11 on so-called green competition, but we also wanted to enhance a

12 competition even between Blue plans using the Blue trademark.

13 And I think maybe it's useful to just spend a moment on this,

14 given the questions that the Court raised.

15      This was a heavily and aggressively, I think I can say,

16 negotiated issue.  The defendants did not want any additional

17 Blue bids.  And they had a number of very serious arguments as

18 to why they should not have to have any competition between the

19 individual Blue plans that were part of the Blue system.  We

20 wanted to secure additional Blue bids.  And I think in an ideal

21 world, we would have tried to secure a second Blue bid for any

22 large ASO that had employees dispersed among different states or

23 regions.

24      The provision that we have in the settlement agreement

25 is the result of a hard-fought compromise.  And I think the

1   special master and mediator can attest to the difficulty of

2   reaching this compromise.  In that compromise, the defendants

3   agreed to provide an additional Blue bid to ASOs with a total of

4   approximately 31 million covered lives.

5          To have the greatest procompetitive impact of the

6   second Blue bids or additional Blue bids, we specified that

7   those additional Blue bids would be provided to those ASOs with

8   more than 5,000 employees and the greatest dispersion.  And by

9   "dispersion," we mean the dispersion of employees into different

10  regions or states.

11         The effectiveness of a second Blue bid and the impact

12  of a second Blue bid is obviously greatest for those companies

13  that are larger and that have the employees dispersed among a

14  number of states.  And the 31 million lives represents about

15  half of all lives covered by ASOs with more than 5,000 employees

16  and a larger share of ASOs with employees in multiple service

17  areas.

18         Now, in the settlement as originally presented, we

19  presented this second-Blue-bid injunctive relief as part of the

20  (b)(2) injunctive class.  We did that for a number of reasons.

21         THE COURT:  And I think I told everyone early on, just

22  as a heads-up at the last status conference, that I had some

23  serious concerns about that being classified under (b)(2) with

24  no opt-out right and the potential burden that might have on the

25  opt-out right.

 1          MR. BOIES:  You did, Your Honor.  And we took that --

 2   that comment very seriously, which is -- which is why we are now

 3   proposing that that relief be part of a (b)(3) class with

 4   opt-out rights.

 5          THE COURT:  And to be clear -- so I taught complex

 6   civil litigation at Alabama and Cumberland, and I've taught

 7   multi-district litigation at Georgia, Miami, and Tennessee.  And

 8   I've always just kind of divided the universe of class relief

 9   into two halves, divisible and indivisible relief.  Monetary

10   damages clearly falls into divisible.  Different class members

11   may, in fact, get different monetary awards based upon this

12   settlement administration, if this settlement is approved.

13   That's typically the case -- not always the case but typically

14   the case.

15          Injunctive relief generally, particularly when it's

16   across the board, tends to be indivisible.  You can't break up

17   an injunction to benefit some and not benefit others.  But

18   because of the unique feature of this structural relief, I think

19   it is divisible.  Disagree?

20          MR. BOIES:  I don't, Your Honor.

21          THE COURT:  Some will benefit from second Blue bids;

22   some will not.

23          MR. BOIES:  I think that's right.  As Professor

24   Rubinfeld says and as we have said in our papers, we think the

25   additional Blue bids to a large number of ASOs will drive

1  innovation and price reductions that will benefit the entire

2  health insurance market generally and all ASOs in particular.

3        However, we also recognize that the effect is

4  differentiated.  And after the Court raised the issue, not only

5  did we think about it, but we also looked at some of the recent

6  case law that talks about injunctive relief that is divisible or

7  individualized.  And I think that having done that, I think

8  we're more -- we agree with the Court that it is better that

9  this relief be in a (b)(3) class than in a (b)(2) class.

10        THE COURT:  So I'm going to -- I don't want to jump you

11  ahead because I think you're going to address this, based upon

12  my skimming of your materials, but I think that will affect

13  probably the requirement for a supplemental notice to ASOs.

14        MR. BOIES:  We believe that as well, Your Honor, that

15  there -- although there was some opportunity for people to opt

16  out and the long-form notice --

17        THE COURT:  In fairness, they ought to be given a

18  second chance with this knowledge because before, they would

19  have said if I opt out, I don't get the benefit of the (b)(2)

20  relief.  Now, if this -- if your proposal stands firm -- and I

21  think the Blues are shoulder to shoulder with you on this, and I

22  think Mr. Burns is as well.  But if this proposal stands, then

23  an ASO could opt out for (b)(3) purposes as to monetary damages

24  and divisible injunctive relief.  They would, of course, remain

25  in a (b)(2) class because there's no opt-out right from an

1    indivisible-relief (b)(2) class.

2           MR. BOIES:  I think that that's exactly right, Your

3    Honor.  And I believe that -- as I say, while I think the prior

4    notice could have been interpreted for people to understand they

5    had an opportunity to do that, I agree with the Court that it

6    was not as clear as it could have been.  And I think in

7    fairness, they ought to be given now an explicit opportunity.

8    The ASOs should be given an explicit opportunity to opt out.

9           THE COURT:  Which -- did an objector raise this?  Did

10   this come up from the parties?  Was it a combination of things?

11          MR. BOIES:  I think it was a combination of things.  I

12   don't know that the objectors raised this exactly, but I think

13   it underlies a number of the objections.  It is something that

14   the Court raised with us earlier as well.  But I think a

15   combination of our going back and looking at it in light of some

16   of the recent case authority, the comments that the Court made,

17   the comments that objectors have made -- I think all of that led

18   us both to conclude, first, that it should be in a (b)(3) class

19   and --

20          THE COURT:  Well, I thought it would be important to

21   notify or give some indication on the record that I did raise

22   that, because I'm not sure -- at that point, I didn't know who

23   the objectors were or what their objections would be.

24          MR. BOIES:  Right.

25          THE COURT:  They might have been filtering in, but I

1    didn't focus on the objections until the deadline.

2            MR. BOIES:  Correct.

3            THE COURT:  And they obviously would not have had the

4    benefit of being at a status conference in New York a month-plus

5    ago.  So I just thought it would be important for us to just

6    acknowledge on the record I'd raised a concern about this fairly

7    early on.

8            MR. BOIES:  Yes.  And after you did, as I said, Your

9    Honor, and even before we began addressing the objections, we

10   went back and we looked at it.  And as I say, we concluded,

11   first, that it should be in the (b)(3).  And once we concluded

12   that it should be in (b)(3), we then thought a lot about whether

13   we needed to have supplemental notice to give the ASOs an

14   opportunity to opt out, and we ultimately concluded that that

15   was the better thing to do.

16           And I think that that is something that both the

17   defendants and we are now in agreement on, that under all the

18   circumstances -- and I don't want to speak for the defendants.

19   They'll speak for themselves.  But certainly we have concluded

20   that the better approach, given the fact that it's going to be

21   in the (b)(3) class, given the fact that the original notice did

22   not make that explicit, that the right thing to do is to have

23   supplemental notice.  And an advantage of that is that it does

24   address a number of the objections.

25           I think it's also worth, just as part of the

1   introduction, to note that the accomplishments of this

2   settlement have been recognized, you know, not just by the

3   proponents of it, but by outside experts.  As I think the Court

4   is aware, a leading health care antitrust lawyer, James Burns of

5   the Akerman LLP law firm, published in *Lexology* an analysis of

6   the settlement.  And he noted that while the money that will be

7   paid out of the proposed settlement, if approved, is

8   substantial -- and this is key -- quote, the injunctive relief

9   terms are even more significant, as they have the potential to

10  reshape the state of competition in health insurance markets

11  going forward.

12          And he goes on to say, quote, if approved, the changes

13  to the Blue Cross rules potentially could spur additional

14  competition in health insurance markets all across the country

15  and notes that, specifically, the elimination of the restriction

16  on a Blue licensee's non-Blue business should permit

17  out-of-state Blues to compete more often with a home Blue for

18  new business, particularly for businesses from larger employers

19  with dispersed employees.

20          There was also -- the Washington insurance

21  commissioner, Mike Kreidler, said, quote, This settlement should

22  increase competition, which is great news.

23          The American Antitrust Institute recognized this

24  settlement's achievement by awarding it both the Outstanding

25  Antitrust Litigation Achievement in Private Law Practice award

 1   as well as the Outstanding Antitrust Litigation Achievement in

 2   Economics award as a result of their analysis of what this

 3   litigation has accomplished.  And I think the recognition of

 4   this settlement's achievement by prestigious independent

 5   organizations like the American Antitrust Institute is something

 6   that is properly taken into account in assessing this settlement

 7   and its overall fairness.

 8          The *Global Competition Review*, you know, a leading

 9   publication, international publication, concerning competition

10   policy and antitrust issues, also awarded us the team award for

11   the litigation of the year, cartel prosecution.  And, again, I

12   think this is part of the context that is -- it's worth keeping

13   in mind as we go through the various aspects of this settlement

14   over the course of the next two days.

15          Now, of course, it's not just the outside analysts'

16   views who are important.  It's also important to look at what

17   class members have done.  To date, there have been more than 7.1

18   million claims filed.  As the Court is aware, we still have two

19   weeks to go in the claims-filing period, and I'm sure there will

20   be additional claims filed.  But as of today, there are more

21   than 7.1 million claims that have been filed.  That represents

22   over 215,000 businesses and group health plans, over 1.5 million

23   individual policyholders, and over 4.8 million employees.

24          The number of claims filed here is massive not only in

25   its own terms, but also in comparison to the kind of response

1    that you ordinarily get in class-action settlements.

2            THE COURT:  I remember asking the parties what would be

3    an acceptable claims rate.

4            MR. BOIES:  Right.

5            THE COURT:  And I think I might have had a discussion

6    or two with the special master.  And the goal was to get above 2

7    percent based upon national --

8            MR. BOIES:  Right.

9            THE COURT:  -- tracking and averages.  I want to say 2

10   percent of the people reached out to me and asked me if this was

11   for real.

12           MR. BOIES:  But that's exactly right, Your Honor,

13   that we had -- we had hoped to get 2 percent.  We were very

14   happy when we passed the one million claims mark.  And I think

15   to get here shows the overwhelmingly positive reaction.

16           And as the Court is aware, the percentage of claims in

17   a class action like this, you know, tends to be very small.  And

18   I think that in comparison to what you would ordinarily expect,

19   I think the claims that have been submitted here are a good

20   illustration that people generally recognize the significance of

21   this.

22           And this, of course, relates to the money, which, as I

23   say, is important.  It's certainly one of the very largest

24   antitrust recoveries in history.  I think it is -- I think it is

25   the largest antitrust recovery in a case where there was not a

1  government investigation.  So it is -- the monetary relief is

2  important.  But I keep coming back to the fact that as the Court

3  has said itself, the injunctive relief is really what is a game

4  changer for the health insurance market.

5        Only 2,049 class members have opted out.

6        THE COURT:  How does that compare to your expectations

7  going in?

8        MR. BOIES:  Well, it's a very small fraction, I think,

9  of what we and the defendants projected based on --

10        THE COURT:  No concern about a blow provision here.

11        MR. BOIES:  There's no -- not even close.  Not even in

12  the ballpark.  And that relates to only 307 businesses and group

13  health plans and 1,742 individuals.

14        THE COURT:  Let me take you back to your point about

15  the financial recovery and the financial relief.  Did I hear you

16  say this is the largest financial recovery in a private

17  antitrust case that you're aware of?

18        MR. BOIES:  Where there was not a government

19  investigation.

20        THE COURT:  That's what I'm saying.  A private --

21  private action.

22        MR. BOIES:  Yeah.  Well, there --

23        THE COURT:  And there could be some private actions

24  which originated from a government -- that's the distinction

25  you're making is --

```
 1              MR. BOIES:  Yes.
 2              THE COURT:  -- if FTC or DOJ had done the investigation
 3    and a plaintiff had picked up on that and filed an action with
 4    the benefit of that investigation.
 5              MR. BOIES:  Right.  It's easy when you come in behind
 6    the FTC or the Department of Justice.  It's not so easy when
 7    you're starting from scratch.  But even with respect to
 8    antitrust class actions, even those that follow a government
 9    investigation, this is certainly one of the top two or three or
10    four of those.  So even in the broader context, this is one of
11    the very largest antitrust class-action recoveries in history.
12    And as I say, I believe it's the largest for a case in which
13    there was never any antitrust investigation.
14              We have 123 objectors with a total of 40 objections.
15    Two- --
16              THE COURT:  Have there been any formal or informal
17    communications that your group has had, your -- that class
18    counsel has had with any of the governmental investigative
19    bodies, FTC or otherwise, about the settlement?
20              MR. BOIES:  Not other than what we've talked about
21    before in terms of Department of Labor, Your Honor.
22              THE COURT:  Right.  Okay.  And, obviously, the
23    Washington State --
24              MR. BOIES:  Yes.
25              THE COURT:  -- situation you brought to my attention.
```

1            MR. BOIES:  Right.  But not the Department of Justice

2     or the Federal Trade Commission.

3            Two-thirds of the objectors are represented by the same

4     law firm.  And while we certainly respect the right of people to

5     object -- and as I say, we've certainly taken some of those

6     objections into account in our views with respect to the

7     placement of the additional-Blue-bid provision in a (b)(3)

8     class -- we think that if you look at the entire settlement as a

9     whole and you look at what has been accomplished for each of the

10    members of the class, both fully insured and self-funded, and

11    you compare this to the fact that prior to the time that we

12    brought this litigation, no one was complaining about this, no

13    one was bringing lawsuits, no one was seeking to recover

14    overcharges, no one was seeking to eliminate these restraints, I

15    think that you can fairly conclude that this is an enormously

16    positive settlement.  It provides a very large amount of money

17    and, more important, it provides injunctive relief that has the

18    capacity to change the state of competition in the important

19    health insurance market.  And as I've said, that's not just our

20    view.  That's the view of respected, independent outside

21    experts.

22            Unless the Court has additional questions about what I

23    have covered, Mr. Cooper will now address his overview of what

24    the final approval standards are.  And then we will go on to try

25    to demonstrate that we, in my view, easily meet those standards.

1          THE COURT:  Is this a good time to take a short break

2    for everyone?

3          MR. BOIES:  It is, Your Honor.

4          THE COURT:  Realizing we have this many people here,

5    someone needs a break.

6          All right.  We'll break for about ten minutes.

7          MR. BOIES:  Thank you.

8      (Recess at 11:14 a.m. until 11:30 a.m.)

9          THE COURT:  All right.  Let's come to order.

10         All right.  Mr. Cooper.

11         MR. COOPER:  Good morning again, Judge Proctor.  And

12   may it please the Court.

13         THE COURT:  Good morning.

14         MR. COOPER:  As Mr. Boies mentioned, I am going to go

15   through an overview of final approval standards.  And in doing

16   so, I'm mindful that there's no one in this courtroom who is

17   more closely familiar with those approval standards, Your Honor,

18   you having presided over a number of settlements, including some

19   sense of 2018 amendments.  I'm also mindful that we've put 140

20   pages of briefing and voluminous exhibits before you, and I'm

21   sure you've been through those as well.

22         But in the spirit of starting from scratch, as you put

23   it, I am going to go through these standards and principles, but

24   I think we can move through them pretty quickly.

25         Underlying all of the standards, Your Honor, as the

 1   Eleventh Circuit recently reiterated in the *Equifax* case, is

 2   this principle that settlements -- and I'm quoting from

 3   *Equifax* -- are highly favored in the law and will be upheld

 4   whenever possible because they are a means of amicably resolving

 5   doubts and preventing lawsuits.

 6        And this is a principle, Your Honor, that many courts

 7   have acknowledged and have emphasized is particularly strong in

 8   the context of class actions.

 9        I'm going to now address the legal standards under Rule

10   23(e)(2).  And those are well known, certainly, to you, but

11   everyone in the courtroom.  And the Court should find and grant

12   a final approval of a class action if it finds the settlement

13   simply to be fair, reasonable, and adequate.  And that is a

14   discretion standard, Your Honor.  The Court has broad

15   discretion; and that discretion, many courts have emphasized,

16   should be exercised in light of the general policy favoring

17   settlement.

18        And beyond that, Your Honor, there's a strong

19   presumption of fairness that attaches to a settlement agreement

20   when it is the result of arm's-length negotiations.  And I'll

21   return to that point.

22        Next slide here.  Under Rule 23(e)(2), Your Honor, to

23   determine if a settlement is fair, reasonable, and adequate, the

24   rule requires that the Court consider four core factors, as

25   follows:  the class representatives and class counsel have

1    adequately represented the class.  Of course, here, Your Honor,

2    we have 67 class representatives and scores, Your Honor, of

3    highly experienced and, I might add, talented class counsel on

4    our side of the case.

5            THE COURT:  Not to mention the other side.

6            MR. COOPER:  I certainly concede that.  Absolutely,

7    Your Honor.

8            And the proposal was, secondly, negotiated at arm's

9    length.  Third, the relief provided for the class is adequate,

10   taking into account four factors, which the Court is familiar

11   with and I won't trudge through.  And finally, that the proposal

12   treats class members equitably relative to each other.

13           The 2018 Advisory Committee notes make clear that these

14   four core concerns are intended to supplement and not to

15   displace any factors or considerations that individual circuits

16   have developed over the years.  And, Your Honor, the Eleventh

17   Circuit has developed what are well known to all the courts and

18   practitioners in this circuit as the six *Bennett* factors, named

19   after the *Bennett* case from 1984, to determine whether a

20   settlement is fair, reasonable, and adequate.  And the courts

21   have consistently applied both the 23(e) core considerations and

22   the *Bennett* factors.  And they do have some overlap.

23           But those six *Bennett* factors, Your Honor, again, have

24   recently been reiterated by the Eleventh Circuit in the *Equifax*

25   case, and I've listed them here in the slide that's before

1  you.  One is the likelihood of success at trial; two and three

2  are always considered essentially in tandem, the range of

3  possible recovery and the point on or below the range of

4  recovery at which a settlement is fair, adequate, and

5  reasonable; four, the complexity, expense, and duration of

6  litigation; five, the substance and amount of opposition to the

7  settlement; and six, the stage of proceedings at which the

8  settlement was achieved.

9        Your Honor will well recall that we made a detailed

10  presentation concerning both the four 23(e) factors and the six

11  *Bennett* factors at the preliminary approval hearing.  Since

12  then, objectors have made some very specific objections to

13  portions of the settlement.  And we'll be addressing those later

14  today.  But the Court's preliminary approval order recognized

15  preliminarily the Court's view that the settlement was fair,

16  reasonable, and adequate.  And it emphasized some of the

17  following reasons.

18        First, the class was adequately represented.  The Court

19  pointed out that class counsel have litigated scores of

20  antitrust cases to resolution and are recognized as top

21  authorities in the field.  And the Court, of course, had, by

22  then, eight years of experience with all the lawyers in this

23  courtroom and was, therefore, well acquainted with the

24  performance of class counsel.  And so the Court concluded that

25  all class representatives and all class counsel have more than

```
1   adequately represented the settlement class.

2          Your Honor, I would like to just say that -- and I

3   think I can say this on behalf of all of the scores of lawyers

4   who have worked on this case and been before you -- that it has

5   been a privilege to work alongside and under the leadership of

6   Mr. Boies and Mr. Hausfeld.  And I want to also offer a

7   collective hat-tip on behalf of settlement-class counsel to our

8   friends representing the Blues; in particular, Mr. Zott,

9   Mr. Laytin, and the lawyers working under their leadership

10  throughout this.  They have dealt with us in completely good

11  faith and almost always with good cheer.

12         I should point out here that there is an objection to

13  the adequacy of representation with respect to the self-funded

14  class, and you'll be hearing more about that later.

15         Your Honor, secondly, the settlement was clearly

16  negotiated at arm's length.  This was not a quick resolution.

17  And there's no suggestion of collusion, as this Court noted in

18  the preliminary approval order.

19         And, Your Honor, the parties have held dozens -- I

20  would say scores -- of unilateral, bilateral, and multi-lateral

21  conferences over a four-year period of time, meeting in person,

22  virtually, and pretty much constantly over these four years.

23         And, Your Honor, the only thing I would say that was

24  probably lacking from our marathon negotiations is that we never

25  met at Camp David and Henry Kissinger never did get involved.
```

 1  But we had our own Henry Kissinger, Your Honor, Special Master

 2  Ed Gentle, who was preceded, at least for a short time, by Judge

 3  Phillips.  And as the Court quite correctly recognized in your

 4  preliminary approval order, Mr. Gentle was extremely helpful in

 5  helping the parties to ultimately, now, attempt here before you

 6  to lay down their swords and make peace.

 7          As the Court pointed out, Mr. Gentle has submitted a

 8  declaration attesting to the fact that there was no collusion

 9  involved; therefore, it is clear that the settlement was

10  negotiated at arm's length.  And the Court has no reason to

11  suspect collusion.  And, Your Honor, I would just add that far

12  from collusive, this negotiation over four years was adversarial

13  in every possible respect.  In fact, if we had been colluding,

14  we wouldn't have taken anywhere close to four years to come to

15  the agreements that we have come to.

16          THE COURT:  The only thing I'd note is that knowing Ed

17  as I do, he might align himself more with Dean Acheson.  I could

18  be wrong.

19          MR. COOPER:  Well, I think he performed as well as

20  either Mr. Acheson or Mr. Kissinger.  We're all deeply indebted

21  to him for his constant perseverance and his efforts.

22          Now, Mr. Boies has covered at some length the fact that

23  the settlement -- if ultimately it wins your approval, Your

24  Honor, and the objections are resolved, it has and it will avert

25  years of complex, expensive, and risky litigation for the class.

 1   I won't elaborate on that other than to say that this Court, in

 2   the *Swaney* decision, pointed out that when the outcome on class

 3   certification and the ultimate outcome on the merits is

 4   uncertain, a settlement is appropriate.

 5        And, Your Honor, the factual record that was developed

 6   over eight years of what -- I think this Court called it trench

 7   warfare litigation was voluminous, to say the least.  Mr. Boies

 8   described it, but the bottom line is, as this Court put it in

 9   its preliminary approval order, it is clear that the factual

10   record in this matter was sufficiently developed to allow class

11   counsel to make a reasoned judgment as to the merits of the

12   settlement.

13        And, Your Honor, the settlement provides enormous

14   benefits to the class that we have represented.  And they are

15   reasonable when compared to any potential likely recovery.  The

16   Court itself recognized, again, in the preliminary approval

17   order, that at 2.67 billion, the settlement does represent one

18   of the largest antitrust class settlements in history.  And as

19   Mr. Boies has emphasized previously and here today, we believe

20   that the structural relief that the plaintiffs have obtained is

21   more important than the dollar amount of the settlement.  This

22   Court agreed with that in the preliminary approval order and

23   said as follows:  The injunctive aspects of the settlement

24   significantly alter the Blues' business practices and

25   substantially increase the value of the settlement to the class

 1  members.

 2          And the Court noted that the recovery of 2.67 billion

 3  does fall well within the range that a host of precedents have

 4  suggested is appropriate when measured against the potential

 5  recovery.

 6          Your Honor, now I'm going to move to the question of

 7  the standards governing certification of the settlement class.

 8  And the essential standard for certifying a class is that the

 9  determination whether to certify a class for settlement purposes

10  is left to the sound discretion of the court, much like Your

11  Honor approving a settlement as fair, reasonable, and adequate.

12          And here, Your Honor, as you discussed with Mr. Boies

13  in his introduction, we seek to certify three settlement

14  classes:  a nationwide 23(b)(2) injunctive relief class, a

15  nationwide 23(b)(3) damages class, and a self-funded 23(b)

16  subclass.

17          And, Your Honor, I want to come back to the issue that

18  you raised in your opening remarks and that you and Mr. Boies

19  discussed earlier about the question of whether this is -- the

20  second Blue bid, which is afforded to qualified national

21  accounts, is (b)(2) relief or is more appropriately viewed as

22  (b)(3) relief.  And as Mr. Boies mentioned, we have come around

23  to the view, which is a shift from the papers that we filed

24  before the Court in our preliminary approval round, that this

25  relief better fits the (b)(3) rubric in light of *Wal-Mart* and

1   *Wal-Mart*'s teaching that (b)(2) relief is for indivisible

2   injunctive relief that benefits all members of the class at

3   once.

4           And, Your Honor, again, after careful thought once this

5   concern surfaced and a lot of research and debate, frankly,

6   among ourselves and with our friends representing the Blues, we

7   have come to the view that it much better fits (b)(3) because it

8   appears much more like individualized injunctive relief than the

9   kind of indivisible injunctive relief that *Wal-Mart* says is

10  reserved for (b)(2).

11          But, Your Honor, to the extent there is uncertainty on

12  this for the subscribers' class counsel, we believe that

13  uncertainty should be resolved and the default should be (b)(3)

14  class.  Certainly that's more protective of the class that we

15  represent because it does carry with it the procedural

16  protections of notice and opt-out.  And we have come to the view

17  that as (b)(3) relief, we should provide supplemental notice.

18          THE COURT:  If we were in the law school classroom, we

19  might have a roundabout on (b)(2) discretionary opt-out versus

20  (b)(3) opt-out as a matter of right.  I think in this context,

21  the (b)(3) opt-out as a matter of right is just clearer.  I

22  don't know that I have to -- I don't know that this is a

23  discretionary matter for the Court.  I think it's just a matter

24  of protecting class members who may wish to opt out.  And

25  that's kind of where I've landed on this, subject to hearing

1    everyone out over the next two days.

2         MR. COOPER:  Sure, Your Honor.  And through this

3    process of, you know, careful analysis and debate, we too have

4    landed -- we too have landed there, and we're advocating to you

5    that this be viewed as (b)(3).

6         And I guess kind of the overarching point I would

7    make -- and this perhaps, maybe, is more fitting for the

8    classroom; but I would just say that it surely cannot be that

9    Rule 23's class certification buckets, (b)(2) and (b)(3), are so

10   procrustean that a type of valuable, meaningful, procompetitive

11   injunctive relief is impermissible if it does not fit neatly,

12   like a glove, in one bucket or the other, Your Honor.  And it

13   cannot be that the same settlement agreement -- if we had come

14   to the Court seeking approval for a settlement agreement that

15   didn't include the second-Blue-bid relief, which Mr. Boies has

16   quite correctly and I think appropriately emphasized as key

17   relief that we believe is very, very important to this

18   settlement, but if we --

19        THE COURT:  One question -- I'm sorry.  I didn't mean

20   to interrupt you.  Go ahead.  Finish that thought and I've got a

21   question.

22        MR. COOPER:  Well, I was just going to say that if we

23   had come without the second Blue bid, we would also have thought

24   it's fair, reasonable, and adequate.  And surely it can't be

25   that successfully negotiating that additional Blue-on-Blue, for

1  the first time, procompetitive feature, that that feature is

2  impermissible or it would make the settlement agreement, as a

3  whole, not approvable.  That doesn't make any sense.

4       And so, Your Honor, we would just say, in the spirit of

5  the classroom, I guess, as well as this courtroom, that this

6  release -- relief clearly has to fit in one or the other, and we

7  think it much better fits in the category of individualized

8  injunctive relief.

9       THE COURT:  And perhaps I'm overstating this.  I don't

10  think I am.  But this is a fairly cutting-edge issue.  There's

11  not a lot of litigation out there that lands with injunctive

12  relief ending up in a (b)(3) category.  Again, I -- my

13  preliminary leaning right now is that's the appropriate way to

14  handle this.

15       Is there any other divisible injunctive relief other

16  than monetary relief -- obviously, divisible monetary relief

17  squarely fits in (b)(3) and has since *Wal-Mart versus Dukes*.

18  But -- and by the way, that finding, that conclusion by the

19  Court, was 9-0 on the (b)(3) issue.  It was the 23(a) issue that

20  divided the Court on commonality.

21       MR. COOPER:  That's right.

22       THE COURT:  But I wonder, though, if there's any -- if

23  the scope of the opt-out right should be to pursue divisible

24  relief that would not be inconsistent with the (b)(2) injunctive

25  relief granted by the Court.  And that's perhaps a broader

 1  category than the parties have discussed; maybe it's not.  But

 2  that means that we are protecting adequately, it seems to me,

 3  the opt-out right to pursue whatever relief someone who opts out

 4  would be able to pursue consistent with the (b)(2) injunctive

 5  relief that they're bound by.

 6          MR. COOPER:  Right, Your Honor.  And consistent with

 7  any type of individualized injunctive relief that an opt-out

 8  believed that it, standing in its own shoes, not only a class or

 9  anyone else, but standing in its own shoes, should be entitled

10  to as an opt-out as it decides -- but also, Your Honor, bound by

11  the indivisible (b)(2) relief.

12          And, you know, Your Honor, you asked about -- you

13  mentioned the possibility of judicial discretion in a (b)(2)

14  context to actually order relief.  Certainly before *Wal-Mart*,

15  there were a number of cases where that was done.  Since

16  *Wal-Mart*, there have been a couple of cases -- at least our

17  research has only turned up a couple of cases, because we

18  thought about exactly this possible approach.  But we haven't

19  been able to find a case where that's actually been done as

20  opposed to dicta suggesting that that kind of discretion did

21  survive *Wal-Mart*.  There are some cases that say it did not,

22  Your Honor.  But it is an interesting -- very interesting

23  classroom discussion.

24          But for our purposes, both as representing the class

25  and, we think, for the safety of our --

```
1          THE COURT:  This (b)(3) solution takes the academia out
2   of it.
3          MR. COOPER:  It does.  It does, Your Honor.
4          And, Your Honor, on this slide, slide number 32, we
5   simply identify the existing class definitions in the settlement
6   agreement, with which the Court is familiar.
7          And, Your Honor, the requirements for certifying a
8   class, a settlement class, the courts must find under, you know,
9   hornbook law, one, that the named plaintiff has standing; two,
10  that all four prerequisites for class certification under 23(a)
11  are satisfied -- those are numerosity, commonality, typicality,
12  and adequacy of representation -- and finally, that at least one
13  of the requirements of 23(b), Your Honor, is met.
14         And in this case, of course, Your Honor, standing
15  needn't detain us.  It's clear that the class representatives
16  have standing in the class, and no one has suggested otherwise.
17         Your Honor, with respect to the 23(a) requirements, the
18  Court found in its preliminary approval order in which it
19  granted preliminary approval that all the requirements of 23(a)
20  were satisfied, numerosity, commonality, typicality, and
21  adequacy.  And those are not controversial here today at all.
22         Your Honor, just to articulate here for the record what
23  certification under 23(b)(2) does require, it's proper if the
24  party opposing the class has acted or refused to act on grounds
25  that apply generally to the class so that final injunctive
```

1   relief or corresponding declaratory relief is appropriate

2   respecting the class as a whole.  It is this requirement that

3   the court obviously was keying off of in the *Wal-Mart* case to

4   say this is for indivisible injunctive relief.

5         Certification under a (b)(3), Your Honor, is proper if

6   the court finds that questions of law or fact common to the

7   class members predominate over any questions affecting only

8   individual members and that a class action is superior to other

9   methods for fairly and efficiently adjudicating the controversy.

10        And as Justice Scalia recognized in *Wal-Mart*, this is

11  the more protective category of class action, and it is

12  essentially -- I think "catchall" is not the right phrase, but

13  the place where any uncertainties should be resolved.  And it's

14  a default category.

15        Your Honor, we submit, as we did in the preliminary

16  approval hearing, that certification of the proposed (b)(2)

17  injunctive relief class is clearly justified and appropriate.

18  The Court, in its preliminary approval order, said that the

19  proposed settlement provides significant relief to all members

20  of the injunctive relief class.  And specifically, the Court

21  found that in the final analysis, it will likely conclude the

22  proposed injunctive relief will prevent injuries similar to

23  those at issue in this case from occurring, greatly increase

24  competition among the Blues, and substantially benefit all

25  members of the classes.  Therefore, the requirements for

```
1    certification of a class under Rule 23(b)(2) are satisfied.
2         Your Honor, we also submit that the requirements for
3    certification of the proposed (b)(3) class and the subclass is
4    likely -- is likewise justified.  Both the requirement of
5    predominance is clearly satisfied and, as the Court noted, class
6    action is plainly superior, given the fact -- in this case,
7    given the fact there are tens of millions of settlement class
8    members.  And so a class action is the only feasible method of
9    resolving all the claims against the settling defendants.
10        So with that, Your Honor, I've concluded a survey of
11   the standards that govern the Court's consideration and will
12   call upon my colleague, Mr. Hausfeld, to take it from here.
13        THE COURT:  Thank you.
14        MR. HAUSFELD:  I believe I still have a few more
15   moments, Your Honor, to say good morning.
16        And in the interests of brevity and efficiency and in
17   light of the comments that have been already made to the Court
18   and with Your Honor's assent, I will preliminarily introduce the
19   overall response to the essentially ASO objectors.  Mr. Burns,
20   of course, you know, he's here, fully prepared to answer any
21   additional questions or submit any additional comments, if that
22   is agreeable to Your Honor.
23        THE COURT:  That's fine.  I'll be glad to hear from
24   both of you at the appropriate time.
25        MR. HAUSFELD:  Thank you, Your Honor.
```

```
 1            If we could look at slide 40.
 2            Again, following on what Mr. Boies said in his
 3   introduction, there have been 40 objections submitted by 123
 4   objectors, but that's out of over 100 million potential class
 5   members that received notice.  We put the percentage of
 6   objections to total noticed class members, and it's virtually
 7   one in a million.
 8            As Mr. Cooper has said, looking at slide 41, the
 9   standard for approval --
10            THE COURT:  Wouldn't that be closer to one in a
11   hundred- -- no, you're, I guess, right.  I guess that's right.
12   A little over one in a million.
13            MR. HAUSFELD:  It took me a while to make sure of that.
14            THE COURT:  Yes.  I had to do the math too.  But I got
15   confused looking at the decimal rather than just looking at the
16   two numbers.
17            MR. HAUSFELD:  Yes.  Thank you, Your Honor.
18            The standard for approval, as Mr. Cooper explained,
19   under Rule 23(e)(2) is whether the agreement, the settlement as
20   a whole, overall is reasonable and adequate.
21            And what you have here, despite the fact that there are
22   many objections, there are three essential categories of
23   objections:  one, you should not approve the agreement without
24   first determining to a legal certainty the legality of the
25   going-forward system; two, that many of the ASO -- or a certain
```

 1   number of the ASO objectors merely want more additional bids

 2   without any eligibility criteria; and three, there is at least

 3   one set of objectors who just want a larger share of the

 4   settlement fund without making any comment or accepting the

 5   fairness and adequacy of the settlement fund as a whole.

 6           I could not have summed up the law with regard to these

 7   types of objections, in consideration of the Court's obligation

 8   to review the fairness and adequacy and reasonableness of the

 9   settlement as a whole, other than to quote from the *Henderson*

10   case that the settlement is the offspring of compromise.  The

11   question that the Court needs to address is not whether the

12   final product could be prettier, smarter, or snazzier, but

13   whether it is fair, adequate, and free from collusion.

14           Many of the objectors, as I said, just simply ask for

15   something more.  But the essence of the objectors is to seek to

16   jeopardize what has been achieved for the settlement classes by

17   asking that the certainty that this historic settlement

18   provides and as Mr. Boies said, initiates far earlier than

19   otherwise could have occurred if this were to play out in

20   endless forms of litigation -- to scuttle the certainty of the

21   settlement for years of extremely costly and complex litigation

22   in multiple forums.

23           And now, Your Honor, again, with the Court's

24   permission, I'd like to bring back Mr. Cooper to discuss the

25   objections regarding the going-forward system.

```
 1              THE COURT:  All right.  Thank you.

 2              MR. HAUSFELD:  Thank you.

 3              THE COURT:  Of course, Mr. Cooper, this is one of the

 4  areas I flagged.

 5              MR. COOPER:  It is indeed, Your Honor.

 6              THE COURT:  So I'll let you get started before I pounce

 7  upon you like a wildcat.

 8              MR. COOPER:  Okay.  Well, let me get going, at least.

 9              As Mr. Hausfeld mentioned, I'm going to speak to

10  objections regarding post-settlement conduct.  And I plan to

11  address three objections that have been lodged against the

12  settlement agreement.  The -- and they come from the

13  Sperling-Sherrard opt-out objectors and Home Depot.  They object

14  that the settlement should not be approved because doing so

15  would, one, perpetuate a per se violation of Section 1 of the

16  Sherman Act, specifically by leaving the ESAs in place, Your

17  Honor --

18              THE COURT:  And you would agree that if there was

19  either a per se violation that would be attributable to the

20  continued operations of the Blues and any restrictions on

21  competition, I could not approve that?

22              MR. COOPER:  I do agree with that, Your Honor.  And --

23              THE COURT:  Would you also agree that if I determine

24  the rule of reason applies to this new set of circumstances,

25  that I have to make a determination that the procompetitive
```

 1    benefits outweigh the anticompetitive effects to approve it --

 2              MR. COOPER:  Your Honor, I don't --

 3              THE COURT:  -- or is it just clearly a legal standard?

 4              MR. COOPER:  Our survey of the cases, Your Honor,

 5    satisfies us completely that you need only conclude that neither

 6    the going-forward Blue system in the aggregate, which you

 7    examined in your standard of review order, nor any feature of

 8    that system going forward is clearly illegal.  And I'm going to

 9    come to the cases that we believe satisfy us, anyway, and we

10    would suggest should satisfy you that that's your

11    responsibility.

12              But you are absolutely right.  You cannot -- you cannot

13    approve the settlement if you conclude that there's a clear --

14    something clearly illegal, if there's a per se violation that

15    remains after these reforms that we've achieved.

16              And, Your Honor, I think it appropriate for me to say

17    that if we did not believe -- we, class counsel, did not believe

18    that there is no per se violation in this settlement agreement

19    that will be perpetuated either in the aggregate or looking at

20    any of its features -- if we did not believe that, if we thought

21    there was, we could not conscientiously have agreed to it and we

22    could not place it before you conscientiously for approval, Your

23    Honor.

24              THE COURT:  And would not.

25              MR. COOPER:  And would not.

1          The second objection that I will address is that the

2    settlement, it is claimed, requires the Court to improperly

3    issue an unconstitutional advisory ruling that conduct by the

4    defendants under the post-settlement system is not per se

5    unlawful.

6          And finally, Your Honor, third, they say that the

7    settlement impermissibly limits a private party's right to

8    enforce the antitrust laws and will result in the release of

9    future antitrust claims for injunctive and equitable relief in

10   violation of public policy.  I'll answer each -- I'll address

11   each of these in turn, Your Honor.

12         But first, as you've noted, the standard for approving

13   a settlement clearly includes a determination by the Court that

14   the settlement agreement does not authorize clearly illegal

15   conduct.  The classic formulation, Your Honor, is that a

16   district court abuses its discretion in approving a settlement

17   only if the agreement sanctions clearly illegal conduct.

18         And, Your Honor, I think -- I think that this is simply

19   to say that a settlement agreement that does sanction patently

20   illegal conduct could hardly ever be found by this or any court

21   to be fair, reasonable, and adequate.  So it seems to just be

22   inherent in the standard that governs this Court's discretion in

23   the first place.

24         And I'd now like to jump, if I may, Hamish, to slide

25   number 50 because I think the --

```
 1            I want to identify the legal standards, Your Honor,
 2    here all together.  Yes.
 3            THE COURT:  Well, let me ask you this.
 4            MR. COOPER:  Yes, sir.
 5            THE COURT:  I'm focusing in -- if you could flip back
 6    one page.
 7            I'm focusing in on the second bullet point about the
 8    advisory ruling.  In this area where any antitrust settlement
 9    that involves this type of across-the-board conduct and these
10    type of alleged restraints, isn't any settlement in this area
11    necessarily going to require the Court to pass, or not pass,
12    approval of the settlement by stating an opinion about the
13    legality of the structural relief?
14            MR. COOPER:  Yes, Your Honor.
15            THE COURT:  I don't know that that's advisory.  I think
16    that's just -- that's a case or controversy that's before the
17    Court, should I approve the settlement or not.  That sits in
18    equipoise, it seems to me.  And at this point, it's certainly a
19    dispute in the case because the objectors say I should not and
20    proponents of the settlement say I should.
21            So I don't think advisory opinion is the correct
22    language.  There may be arguments that the Court doesn't have
23    enough information or experience at this point to approve it.
24    We can address those things.  But I don't think stating that
25    this is an advisory ruling makes sense.
```

```
1              MR. COOPER:  No, Your Honor.

2              THE COURT:  What's your take on that?

3              MR. COOPER:  Absolutely, Your Honor.  And I'll just

4  fast-forward to this point, and that is that it appears that the

5  objectors think that because the formerly contesting parties who

6  are here basically in an effort to lay down their swords, as I

7  said earlier, are united in their view that, for example, this

8  settlement that they're presenting -- that we are presenting to

9  you is not clearly illegal, it does not perpetuate any per se

10  violation of the Sherman Act, that that has eliminated the

11  adversarial context in which the case has to be litigated for

12  Article III purposes, Your Honor.  But it -- first, it doesn't

13  make sense, as I think the Court was saying, to say that the

14  Court must find, as a host of cases say, that nothing in the

15  settlement agreement that would resolve this class action

16  perpetuates clearly illegal conduct or sanctions it.  Obviously,

17  if that's a requirement, the Court has to find it.  It must have

18  Article III jurisdiction to render that judgment.

19              And, Your Honor, this issue was essentially -- or at

20  least this proposition, I think, was dealt a fatal blow in

21  Equifax where the court said as follows.  And I've set this out

22  on slide number 51:  We hold that Article III's

23  case-or-controversy requirement is satisfied throughout the

24  settlement process because the litigation remains in an

25  adversarial posture during that process.  Indeed, the parties
```

1  remain adversaries all throughout the settlement approval

2  process because until approval, the settlement is not final; and

3  if the district court rejects the settlement, the parties would

4  continue their litigation.

5           THE COURT:  Far be it for me to tweak the Eleventh

6  Circuit --

7           MR. COOPER:  Right, Your Honor.

8           THE COURT:  -- but it seems to me that the better

9  position there is not that you remain potential competitors, if

10 I could mix my metaphors, with the Blues because if the

11 settlement is not approved, you would pick the swords back up

12 and commence to hammering --

13          MR. COOPER:  Yes, sir.  Yes, sir.

14          THE COURT:  -- but the case or controversy is met here

15 particularly when objectors come in and litigate before the

16 Court an objection like this.

17          Rule 23 acknowledges, though, I think, the Court's

18 authority to pass on the -- applying the correct standards --

19 the propriety of the settlement without a case or controversy in

20 terms of the settlement, if I could again mix my metaphors.

21          I've actually had class action settlements where there

22 were no objections.  I didn't for a moment think that this was

23 going to be one of those, but I've had that.  And I still think

24 I had the authority -- and maybe it's, in part, because of what

25 the Eleventh Circuit said in *Equifax*, but I also think it's

 1   because Rule 23 invests in the Court -- congressionally approved

 2   Rule 23 invests in the Court, with amended standards as recently

 3   as 2018, the responsibility to assess and make sure that a

 4   settlement is fair, adequate, and reasonable.

 5          MR. COOPER:  That's exactly right, Your Honor.  And as

 6   I mentioned earlier, inherent in the notion of fairness and

 7   reasonableness surely must be that it doesn't give the

 8   defendants some kind of a green light or a license to engage in

 9   patently anticompetitive per se behavior.

10          So, Your Honor, we just would --

11          THE COURT:  Now, it does help the Court when we have

12   high-quality counsel, like we have in this case, objecting.  It

13   does bring issues into focus that may have otherwise escaped the

14   Court's attention.  So before they even get up, I'm going to

15   tell my objectors that I appreciate their presence in this case

16   and appreciate the opportunity that affords the Court to really

17   assess this settlement carefully, particularly in such a big

18   case and an important matter.

19          MR. COOPER:  Well, I'm not sure I'm going to join the

20   Court with that.

21          THE COURT:  I'm singing solo there.

22          MR. COOPER:  But, Your Honor, I am going to come back

23   to your point that the objectors themselves, to the extent there

24   would be any merit to the idea that we're no longer adversaries

25   and you're --

```
1          THE COURT:  Well, you know, there are five types of

2   objectors, at least:  philosophical objectors; objectors that

3   are self-interested; governmental objectors; disgruntled,

4   dumped-at-the-altar, didn't-get-my-class-certified objectors or

5   got-excluded-from-the-team objectors; and then positional

6   objectors, the ones who bring issues before the Court that

7   require some attention.

8          MR. COOPER:  Yes.

9          THE COURT:  So maybe I cast my net too wide when I talk

10  about objectors generally, but I'm talking about these

11  objectors.

12         MR. COOPER:  Absolutely, Your Honor.  But these

13  objectors have been -- and they are certainly experienced,

14  skilled, highly credentialed and qualified lawyers, make no

15  mistake.  But, Your Honor --

16         THE COURT:  Despite all that, you disagree with

17  everything they said.

18         MR. COOPER:  Every last word, Your Honor.  But I think

19  you've made an excellent point -- and the *Equifax* court came

20  very close to making it as well -- that to the extent that we

21  would lose our -- the adversary -- the adversity necessary to

22  Article III jurisdiction here, the objectors themselves supply

23  it.  So...

24         THE COURT:  It would be kind of a strange turn of

25  events in the law and be counterintuitive if only settlements
```

```
1   that were so solid that there were no objections the Court did

2   not have jurisdiction -- subject-matter jurisdiction to rule on

3   them because there was no case or controversy before the Court.

4   That would be kind of an odd twist in jurisprudence.

5        MR. COOPER:  Yes.  Yes, it would, Your Honor.  It's --

6   we just believe there's no merit to the point, and we'll leave

7   it there.

8        But coming back to slide 50, then, to further outline

9   the -- and I guess put a little bit more meat on the bone of the

10  clearly illegal standard, it's clear that while the Court must

11  find that there's nothing clearly illegal in the settlement

12  agreement, it's not required to resolve the ultimate merits of

13  the legal claims.  The --

14        THE COURT:  And, hence, not required to apply the rule

15  of reason because this would only be done after protracted

16  litigation.

17        MR. COOPER:  Your Honor, just to put it in terms I

18  think that we in this courtroom understand, if your standard of

19  review order concluding that in the aggregate, the Blues' system

20  was a per se violation had been reviewed in the Eleventh

21  Circuit, they had disagreed with you -- let's say that they

22  agreed that *Sealy* and *Topco* have been undermined and they're not

23  going to follow them -- and we had come back to try a

24  rule-of-reason case, Your Honor, we would be in this courtroom

25  for weeks and weeks and weeks.  And that's under --
```

```
 1              THE COURT:  And may settle then.

 2              MR. COOPER:  Well, very -- possibly.  But that would be

 3    under the Blues' system --

 4              THE COURT:  Maybe you wouldn't have got a favorable

 5    return.  But --

 6              MR. COOPER:  Your Honor --

 7              THE COURT:  -- that's the point; right?

 8              I guess that's my question, though, is it seems to me

 9    that even if we were litigating this case under the rule of

10    reason, the case law suggests that -- to make sure there's

11    compliance with Rule 23, fair, adequate, and reasonable, and the

12    Bennett factors in the Eleventh Circuit.  The point of a

13    settlement means that the parties have told the court, we don't

14    want to go forward and litigate to the finish anymore.  We would

15    prefer to settle our case.  We've had enough time to evaluate

16    our positions.  We have enough information to evaluate our

17    positions.  We think we've had an arm's-length negotiation.

18              And in this case, I told the parties early on one of my

19    requirements if they wanted to go negotiate -- and this was

20    years ago -- was there had to be a third-party mediator involved

21    to make sure that things were on point.

22              MR. COOPER:  Yes.

23              THE COURT:  I don't think that's necessary -- it

24    probably wasn't necessary in this case in light of the quality

25    of counsel, but I just think that's an added protection, check
```

1    and benefit, on behalf of the absent class members to make sure

2    that there is a neutral supervising the negotiations.

3              MR. COOPER:  Absolutely, Your Honor.  And the advisory

4    committee notes since the 2018 amendments make exactly that

5    point.  So the Court was completely consistent with the --

6              THE COURT:  But the point is that we are saying we're

7    not going to continue litigating even a rule-of-reason case.  We

8    want to settle it, and we think we have enough information to do

9    so.

10             MR. COOPER:  That's right, Your Honor.  The parties

11   have now, after eight years of the trench warfare, Your Honor,

12   that you described -- we can now fully appreciate and I think

13   assess the strengths and weaknesses of our case, the litigation

14   risks that we run, both in this court and in the other courts

15   where we would ultimately end up.  So you're absolutely right.

16             And, again, to I guess further -- just to quickly

17   elaborate the clearly illegal point, the Fifth Circuit has said

18   in its *Corrugated Container* case that the very uncertainty of

19   outcome in litigation as well as the avoidance of wasteful

20   litigation expense, the Court's comment just now, lay behind the

21   congressional infusion of a power to compromise.  This is a

22   recognition of the policy of law generally to encourage

23   settlements.  This could hardly be achieved if the test on

24   hearing for approval meant establishing success or failure to a

25   certainty.

1            The next --

2            THE COURT:  And even *Bennett* makes that point; correct?

3            MR. COOPER:  I beg your pardon?

4            THE COURT:  Even *Bennett* makes that same point.

5            MR. COOPER:  Yes.  Yes.  In fact, *Bennett* is my last

6   quote here.  I'll jump to it right now.  Unless the illegality

7   of an arrangement under consideration is a legal certainty, the

8   court said -- unless the illegality, if I didn't articulate

9   that, of an arrangement under consideration is a legal

10  certainty, the mere fact that certain of its features may be

11  perpetuated is no bar to approval.

12           So to return now to our slide number 44 -- actually, to

13  45 -- I've identified two cases on this slide, Your Honor, one

14  from the Second Circuit, which is a well-known case called

15  *Robertson against The National Basketball Association*.

16           THE COURT:  Is that Oscar?

17           MR. COOPER:  That's Oscar Robertson.  Sure is.  Yes,

18  sir.

19           THE COURT:  What a legend.

20           MR. COOPER:  Absolutely.  Well, Your Honor, just some

21  stories about Oscar Robertson just started flooding into my

22  mind.

23           THE COURT:  We'll tell those later.

24           MR. COOPER:  Your Honor, that case approved the

25  settlement over the objection that it perpetuated the very kinds

1    of conduct that were challenged in the case, classic group

2    boycotts.  And it approved the settlement because the court

3    found that the settlement authorizes no future conduct that is

4    clearly illegal.

5            And, Your Honor, the most important point that the

6    *Robertson* court made, the Second Circuit made there, was that

7    there's no case that's been decided that has held that this

8    alleged group boycott was unlawful.  Of course, there's no case

9    that the Court can look to that would enlighten the Court one

10   way or another with respect to the Blues' system, either before

11   the settlement and certainly not after.

12           This *Grunin* case is of a similar nature, Your Honor.

13   It comes from the Eighth Circuit.  It too is often cited.  And

14   that court approved a settlement over an objection that it

15   perpetuated a per se unlawful tying arrangement, the tying

16   arrangement that was challenged in the case, because the court

17   could not say -- I'm quoting now -- as a matter of law that the

18   settlement agreement included any such per se violations.

19           So, Your Honor, we would submit to you also that the

20   objectors' arguments along these lines rest on what we believe

21   are misunderstandings, mischaracterizations of the Court's

22   summary judgment opinion on the standard of review concerning

23   the ESAs.  In fact, you know, to tell you the truth, Your Honor,

24   their briefing to the Court reads, to me, like a petition for

25   reconsideration of your standard of review order.

```
 1          First, Your Honor, the Court did not analyze ESAs
 2   standing alone in their own shoes.  The Court concluded only --
 3   and I'm quoting now from the opinion -- that defendants'
 4   aggregation of a market allocation scheme together with certain
 5   other output restrictions is due to be analyzed under the per se
 6   standard of review.
 7          And in fact, the Court went on and said specifically
 8   that it need not decide whether the Blue plans' service area
 9   allocations alone constitute a per se violation of Section 1.
10   So the Court really just could not possibly have been any
11   clearer.
12          The other thing, Your Honor, I need to point out is
13   that the objectors are simply wrong when they say that the Court
14   rejected -- effectively rejected the defendants' single-entity
15   defense.  The Court clearly didn't, nor did the Court find the
16   facts that would make rejection of the single-entity defense
17   follow a fortiori, as is suggested by the objectors.
18          THE COURT:  I think I said that's an issue for the
19   trier of fact to determine, that I didn't have a Rule 56 record
20   that permitted me to make a ruling on that one way or the other.
21          MR. COOPER:  Exactly, Your Honor.  You kicked that to
22   the jury.  We were going to have to try that up.
23          Now, Your Honor, I can't help but reiterate, really,
24   here what Mr. Boies has said in his opening remarks, and that is
25   to simply note that the ESAs that the objectors now say are
```

1   patently illegal never bothered them until now.  They were

2   content, Your Honor, in the face of this patently illegal

3   antitrust violation, to suffer in silence under the Blues'

4   predations, some of them for decades, even though their

5   existence was a matter of public record, as Mr. Boies pointed

6   out, for, again, decades.

7         Now, they weren't alone in that, as Mr. Boies pointed

8   out.  The market allocation areas were noted by a number of

9   courts; never suggested that there was a problem.  They were

10  well known to the federal antitrust agencies for decades and

11  especially after we brought this litigation, and they've never

12  been challenged until this litigation that's before you.

13        Your Honor, just to -- now, coming into the home

14  stretch here, we would submit that given the sweeping,

15  procompetitive reforms that would result under the settlement

16  agreement if the Court grants its approval, we believe that the

17  Blues' system in the aggregate and the ESAs --

18        THE COURT:  Let me just back you up on one point.

19        MR. COOPER:  Sure.

20        THE COURT:  When you say that several courts have

21  recognized the existence of the ESA restrictions, none have ever

22  determined that they're unlawful, are you talking about in the

23  context of Blue Cross Blue Shield ESAs?

24        MR. COOPER:  Yes.

25        THE COURT:  I think Judge Bucklo in the Northern

 1  District of Illinois this year issued an opinion on Delta Dental

 2  that I think I was on the panel when we sent that case to her,

 3  an MDL.

 4          MR. COOPER:  Okay.

 5          THE COURT:  And she concluded that the ESAs in that

 6  case were a per se violation.

 7          MR. COOPER:  I stand corrected.  My research I guess is

 8  not one --

 9          THE COURT:  You have the lunch hour to get up to speed

10  on that.

11          MR. COOPER:  Yes.  Well, my associates will hear about

12  this, Your Honor.

13          THE COURT:  Take it easy on them.  I just happened to

14  know about that because I followed that since we sent that case

15  to her.

16          MR. COOPER:  Very well, Your Honor.  But certainly the

17  Blues' system --

18          THE COURT:  They can redeem themselves by

19  double-checking my homework.  Maybe they would disagree with me

20  on my conclusion there.

21          MR. COOPER:  Well, we'll -- I doubt that very

22  seriously, Your Honor.

23          So, Your Honor, again, we believe that the sweeping,

24  procompetitive reforms that the settlement agreement reflects,

25  that the Blues' system in the aggregate going forward and that

1   the individual features of that system going forward, including

2   the ESAs as modified -- and I'm going to come back to that --

3   are not clearly illegal under the Sherman Act.

4           And, Your Honor, here we would emphasize two points.

5   One of them, of course, this Court very much emphasized, and

6   that is the national-best-efforts rules, which were, according

7   to Dr. Rubinfeld, the enforcement mechanism ensuring that the

8   ESAs' borders were intact and rigid, has been eliminated

9   altogether, Your Honor.  Eliminated altogether.  And this Court

10  said that the elimination of the NBE rule is a significant

11  change -- and I'm quoting -- that will drastically alter the

12  forward-looking landscape such that the Court's

13  standard-of-review opinion would no longer apply.  So the Court

14  placed that much emphasis, at least preliminarily, in what it

15  knows and what is before it in terms of the importance of the

16  NBE rule to any competitive impact of the ESAs.

17          The second point, Your Honor, I want to come back to

18  the second Blue bid.  My colleague, Mr. Hausfeld, will shortly

19  come to the lectern to discuss the second Blue bid in

20  particular.  But, Your Honor, that relief -- for the first time,

21  health care consumers -- large, qualified national accounts,

22  they're defined -- will have the opportunity to request and

23  receive a bid from a second Blue plan and to determine for

24  themselves the Blue plan from which they wish to request a bid.

25          Your Honor, so this opens the door to Blue-on-Blue

1   competition for the first time.  Again, Mr. Boies emphasized how

2   important that term was to us.  We know and believe our friends

3   for the Blues will acknowledge what an important concession they

4   believe that was from them.  So the point is the exclusive

5   service areas are no longer completely exclusive.  There's been

6   this second-Blue-bid breach to allow Blue-on-Blue competition,

7   Your Honor.

8          So, Your Honor, as we stated at the preliminary

9   approval hearing, settlement-class counsel believed that the

10  going-forward system, as I've mentioned earlier, is not clearly

11  illegal.  Again, if we did -- if we believed there was a feature

12  of this that was a per se violation of the Sherman Act, we would

13  not be able to place it before you conscientiously, Your Honor,

14  for approval.

15         And that -- and we also reiterate now what Mr. Boies

16  and what Mr. Hausfeld both said at the preliminary approval

17  hearing, and that is we believe that any future challenge to the

18  reformed system going forward would be tested under the rule of

19  reason, taking into account the system's procompetitive

20  benefits.  And this Court, in the preliminary approval order,

21  Your Honor, said -- preliminarily, to be sure, but said that it

22  had determined -- the Court had determined that when

23  implemented, the settlement likely will move the Blues' system

24  from the per se category into the rule-of-reason category and

25  that procompetitive benefits will flow from these negotiated

 1  changes.

 2          THE COURT:  So you say the test would be that the Court

 3  need satisfy itself only -- and "only" is probably not the right

 4  word to use there -- that the Court need satisfy itself that the

 5  new system likely would be evaluated under the rule of reason.

 6          MR. COOPER:  Your Honor, I --

 7          THE COURT:  And that it would likely not be a per se

 8  violation, or is that going too far?

 9          MR. COOPER:  I don't think that's going too far.  I

10  think the only --

11          THE COURT:  You would say it's not going far enough.

12          MR. COOPER:  Well, I think that would be the only

13  question.  I don't think there's a question on the other end of

14  that whether -- saying it would likely be judged by the rule of

15  reason, I don't think that is going too far.  I think it is a

16  legitimate question whether or not -- and here's the point, Your

17  Honor.

18          THE COURT:  I'm just trying to --

19          MR. COOPER:  This is a binary --

20          THE COURT:  -- translate this case to the Eleventh

21  Circuit's language in *Bennett* that unless the illegality of an

22  arrangement under consideration is a legal certainty, the mere

23  fact that certain of its features may be perpetuated is no bar

24  to approval.

25          Well, if there's at least -- does that mean it should

 1  be likely that it is not illegal?  Does that mean that the Court
 2  cannot say, as a matter of law, that it's illegal?  And maybe
 3  those are -- maybe that's the "per se" definition:  As a matter
 4  of law, this combination of restraints is illegal; we don't need
 5  to evaluate the pro- or anticompetitive effects of them.
 6          MR. COOPER:  That's the definition of a per se
 7  violation, Your Honor.  And that's what I think -- and because a
 8  per se violation is a violation that is presumed, irrebuttably,
 9  to violate the antitrust laws, if there is one that is before
10  you, you believe, you've concluded, then you can't accept that
11  settlement.
12          And this is a binary inquiry.  This -- in other words,
13  if it's not a per se violation, then it perforce has to be
14  judged under the rule-of-reason standard.  That's what's left.
15  That's the presumptive standard in cases.  It's only in these
16  rare per se violation contexts that the law doesn't require the
17  parties to put on evidence to support that the anticompetitive
18  effects outweigh any procompetitive effects.
19          And, Your Honor, we've ourselves kind of gone round and
20  round on whether saying that something that is clearly illegal
21  is different from saying something is a per se violation.  And
22  we haven't been able to come up with an articulable --
23          THE COURT:  Distinction between the two
24          MR. COOPER:  -- distinction.  We haven't.  And so --
25  and if the Court concludes that it does not believe, as both

1  sides now believe, that this settlement does not perpetuate

2  clearly illegal conduct, it does not perpetuate a per se

3  violation, then it follows your -- that's the same as making the

4  decision because it is a binary choice that it is a -- that

5  going forward, the system will be judged by the rule of reason.

6         Your Honor, we've already trudged through my slide

7  number 50, and we've already discussed at some length the

8  advisory opinion point.  I don't think I have anything else to

9  offer the Court on that.  And, Your Honor, I think we've

10 already, as well, discussed the points that are made on slide

11 52.

12        So I'm going to now wrap up by making a comment about

13 the monitoring committee because we think it's -- the objectors'

14 concerns about the monitoring committee are not well taken.  The

15 committee is not empowered to approve, much less to immunize

16 from antitrust scrutiny, any new restraints, any new

17 arrangements, or new forms of conduct adopted by the Blues that

18 are unrelated to the practices that have been challenged here in

19 this case and that have been now modified, if the Court approves

20 this settlement -- will be modified by the reforms that are

21 before the Court.  Rather, the monitoring committee's review is

22 limited to rules and regulations that implement the injunctive

23 relief provisions of the settlement.

24        And so this, Your Honor, also gets back to another

25 argument that the objectors have made when they say that this

```
 1  sanctions and that this violates public policy because it
 2  handcuffs them from bringing antitrust claims in the future.
 3          Your Honor, the cases that they cite -- and I guess I
 4  am coming back to slide number 52.  But the cases they cite on
 5  that point, they do not bar the enforcement of a release where
 6  the future conduct alleged to be unlawful flows from continued
 7  adherence to restraint that was the subject of the release.
 8  Rather, all those cases make clear that a release cannot bar
 9  future antitrust claims that arise from allegedly illegal
10  conduct that differs from -- that goes beyond, that is
11  new conduct different from the conduct alleged and challenged in
12  the lawsuit and, therefore, covered by the release.
13          In other words, to quote the Supreme Court's decision
14  in Lawlor, which they rely on, but only new antitrust violations
15  not present in the former actions cannot be -- cannot be
16  released, Your Honor, by the parties.
17          And so, Your Honor, with those points about the
18  objectors' arguments that I've addressed, I will subside unless
19  the Court has some questions.
20          THE COURT:  I don't.  I guess my question would be
21  this.  Should we take the lunch break now?
22          MR. COOPER:  Your Honor, that's an easy one to answer,
23  I believe.  Yes, sir.
24          THE COURT:  All right.  Then the second question would
25  be this.  Before we move in -- so I know y'all have a carefully
```

```
 1   negotiated agenda and order of presentation.  I wonder, if we
 2   start tackling these issues on an issue-by-issue basis, if it
 3   wouldn't make sense to let the objectors respond to what you've
 4   said, limited to this presentation, or have them hold all their
 5   water until the end.  Is there a preference there?  It would
 6   help me if I'm hearing tit and tat --
 7           MR. COOPER:  Sure.
 8           THE COURT:  -- in conjunction with each other so I can
 9   not have to remember back what Mr. Cooper said a few hours ago.
10           MR. COOPER:  So let it be said; so let it be done.
11           THE COURT:  All right.  And I think if the Blues would
12   like to respond on the ESAs -- they are, after all, your new
13   system if this is going to be approved --
14           MR. ZOTT:  Right, Your Honor.  And it probably makes
15   sense for us to take a few minutes before the objectors go so
16   they can get the full scope of the argument.
17           THE COURT:  That's what I was going to suggest.
18           MR. ZOTT:  Right.  I'm happy to do that.
19           THE COURT:  When we come back from lunch, Mr. Zott,
20   you'll be up for --
21           MR. ZOTT:  Very good.
22           THE COURT:  -- you know, whatever period of time you
23   need.  And then we'll hear from the objectors on ESAs and
24   structural relief objections going forward.  And then we'll come
25   back and Mr. Hausfeld will take the next subject, which I think
```

1  is second Blue bid.

2          MS. BOJEDLA:  Yes, Your Honor.

3          MR. ZOTT:  Very good.

4          THE COURT:  And we'll follow that same format there.

5          MR. ZOTT:  Thank you, Your Honor.

6          THE COURT:  Now, a few scheduling matters.  I'd say

7  let's aim to be back at 1:50.  That's an hour and six minutes.

8  I think everybody knows from my last nine years I'm a lot better

9  in the afternoon if you let me get my run in at lunch, so I plan

10 to take a run at lunch real quick.

11         Second of all, I do have one limitation.  I'm supposed

12 to be somewhere at six o'clock tonight about 30 minutes from

13 here.  So I think we ought to plan on breaking about 5:30.  I

14 realize that's squeezing things a little bit into tomorrow, but

15 we'll get started at nine a.m. in the morning.

16         I couldn't -- I know there was an expression of

17 interest in moving us up to nine o'clock this morning, but I

18 felt like we had already given notice to everyone, sent out the

19 link, the telephone numbers.  So I thought it was important to

20 start when I said we were going to start.  I think I've got a

21 little more discretion about when we start tomorrow.  Okay?

22 Fair -- everyone -- satisfactory with everyone?

23         MR. COOPER:  Yes, Your Honor.

24         THE COURT:  All right.  See you back at 1:50.

25     (Recess at 12:45 p.m. until 1:56 p.m.)

1          THE CLERK:  Remain seated, please.

2          THE COURT:  Okay.  Mr. Zott, I think you're up.

3          MR. ZOTT:  Thank you, Your Honor.  Good afternoon, Your

4   Honor.

5          Your Honor, this has been a long, tough battle over

6   nine years to get to the point where we are today.  The

7   subscribers' settlement, as has been very capably described by

8   subscribers' counsel, including Mr. Boies, Mr. Cooper,

9   Mr. Hausfeld, has been the product of extremely hard-fought

10  arm's-length negotiations over six years overseen by two

11  mediators as well as Special Master Ed Gentle.  And as we said

12  at the preliminary approval hearing, we're all especially

13  indebted to Special Master Ed Gentle for the tireless service

14  that he performed in getting us to the point where we are today.

15         The standard, as we've also heard, is fair, reasonable,

16  and adequate.  The standard is not if the settlement is perfect

17  or if it's optimal or if it could be better.  Settlements are

18  human endeavors that involve compromise.  Lines have to be

19  drawn.  And wherever a line is drawn, someone can object and say

20  it's drawn in the wrong place.

21         But here, given the size of the classes and the

22  magnitude of the litigation, there were very, very few

23  objections; as Mr. Hausfeld put it, one in a million, the

24  majority of those from a single firm.  And we think that fact

25  alone is powerful testament to the fairness of the deal.  Like

 1   the subscribers, we believe that the case and the settlement

 2   easily meets the hurdle of being fair, reasonable, and adequate

 3   both under Rule 23 and under the *Bennett* factors.

 4        Given the structure we're going to follow today, Your

 5   Honor, I'm going to address really ESAs.  I think that's the

 6   current task at hand.  And then I can address the other issues

 7   down the line.

 8        I think we've sort of beaten it over the head; but just

 9   to be clear first, that this decision, as Your Honor noted, I

10   think correctly, it's not an advisory opinion.  I think everyone

11   agrees that the Court cannot approve this settlement if it

12   perpetuates clearly unlawful or per se unlawful conduct.  The

13   objectors state that explicitly, and they're right about that.

14        A settlement, as Mr. Cooper noted, that perpetuates per

15   se unlawful conduct, by definition, is not fair, reasonable, and

16   adequate.  So it's part of Your Honor's overall review under the

17   fair, reasonable, and adequate standard to ensure that the

18   settlement does not perpetuate clearly illegal conduct.  For

19   that reason alone, it's not advisory.  It's part of the review

20   and the decision the Court has to make.

21        Beyond that, the issue has been explicitly joined by

22   the objectors who have said explicitly they think that the

23   settlement does continue per se unlawful or clearly unlawful

24   conduct, so it's been put at issue.

25        And then lastly, Your Honor, you're not being asked to

1  decide the ultimate merits.  You're not being asked to

2  ultimately rule on the legality or illegality of either service

3  areas or the go-forward system.  You're simply being asked to

4  decide that they are not per se unlawful and, therefore,

5  instead, subject to the default rule of reason.

6          In terms of the challenge that the objectors have

7  brought that service areas alone remain per se unlawful, a

8  couple points to put it in context, and then I would hit on a

9  few points after that, Your Honor.

10         First, everyone recognizes that the Court's prior

11  decision dealt with the aggregation of service areas and NBE, so

12  the Court has not addressed the legality of service areas alone

13  or the standard that should be applied to them as well as the

14  go-forward system with all the changes that are being made.  We

15  also heard from the subscribers -- and they're right -- that

16  although the objectors now claim that service areas alone are

17  per se, they have been public knowledge for many decades and

18  they've been actively litigated for nine years and yet no

19  objector -- no one here today has come forward and suggested

20  that service areas alone are per se unlawful.

21         The subscribers' expert, Professor Rubinfeld -- recall

22  at the preliminary approval hearing, he submitted a declaration

23  where he said with the changes being made, and particularly the

24  elimination of NBE, it directly addressed the competitive

25  restraints that he had earlier criticized and earlier had

 1   concerns with.  And he recognized procompetitive benefits going

 2   forward.

 3           THE COURT:  So let me ask you a question.

 4           MR. ZOTT:  Sure.

 5           THE COURT:  And pretend -- I think I've played this

 6   video before for y'all.  It's the Michael Scott *Office* video

 7   where -- the Surplus episode where it says, explain this to me

 8   like I'm an eight-year-old.  Then he has to back up and say,

 9   explain it to me like I'm a five-year-old.

10     (Brief interruption)

11           THE COURT:  Okay.  So let's talk about NBE and green

12   business/Blue business distinctions, if any.  All right?

13           MR. ZOTT:  Sure.

14           THE COURT:  Obviously, elimination of national best

15   efforts allows what we've been referring to as green businesses

16   to go into other exclusive service areas and compete directly

17   with Blues in their ESAs.

18           MR. ZOTT:  Correct.

19           THE COURT:  Is the -- how many green businesses are

20   there among the various plans?

21           MR. ZOTT:  Well --

22           THE COURT:  I take it not all of them have a green

23   business.

24           MR. ZOTT:  No, no.  And in part, as the subscribers

25   point out, the argument is that, as they would maintain, it's

```
 1   because of the existence of the rule, that the existence of the
 2   rule has discouraged the development of green businesses.
 3            THE COURT:  So the first thing is --
 4            MR. ZOTT:  That's the claim.
 5            THE COURT:  -- at least theoretically --
 6            MR. ZOTT:  Right.
 7            THE COURT:  -- we would expect there to be more green
 8   businesses going forward with the elimination of national best
 9   efforts.
10            MR. ZOTT:  That's the assertion.  That's what their
11   experts have attested to that that's their full expectation.
12   Correct.
13            THE COURT:  All right.  So pick -- let's pick an
14   example of a Blue business that has had a green business.  And
15   can you, for hypothetical reasons -- I'm sorry -- for anecdotal
16   reasons, can you name one for me?
17            MR. ZOTT:  Blues that have had green businesses in the
18   past.  Yeah, I think there are Blues that currently have green
19   business and have had it in the past.  And I can try to come up
20   with some names, but I don't want to get the names wrong.  But I
21   know it exists.  I know it exists and it existed in the past as
22   well.
23            THE COURT:  Is the green business a separate actor in
24   the market, or is it just a separate corporate entity operated
25   by the same actors?
```

```
 1              MR. ZOTT:  Well, yeah.  I think the green business
 2   would be a separate -- a separate -- I think it's fair to
 3   characterize it as a separate actor.  I mean, it would
 4   ultimately be owned -- ultimately, I think, by the ultimate
 5   parent, but it would be an independently -- a business that
 6   would be run to compete directly with other Blues on an
 7   unbranded basis.  Ultimately, it would probably roll up to the
 8   same ultimate parent.
 9              THE COURT:  But when we say that there will be
10   increased competition, are we saying that there will be
11   increased competition because green businesses can go in and
12   complete with Blues, or are we saying that Blue businesses in an
13   exclusive service -- in exclusive service area one can develop
14   green businesses that go into exclusive area two and compete
15   with Blue businesses, or is there a distinction between those
16   two?
17              MR. ZOTT:  I think what we're saying is that any plan,
18   any of the 36 plans, can develop a green -- unbranded health
19   insurance and go anywhere in the country and compete directly
20   with Blues on that basis.  So they can do any other service area
21   or, if they so choose, in their service area, although that's
22   probably unlikely for other reasons.
23              THE COURT:  Okay.
24              MR. ZOTT:  And so you've sort of --
25              THE COURT:  And so that's looking at it from the lens
```

```
 1  of the ESA sending a green business into an exclusive --
 2  different exclusive service area.  If we look at it from the
 3  lens of the Blue that's in the second exclusive service area,
 4  the point is these rules will enable increased competition for
 5  them to deal with in their exclusive service area.
 6          MR. ZOTT:  Correct.  That's exactly right.  Right.
 7          And you sort of, Your Honor, got to the first -- sort
 8  of the first justification going forward for why service areas,
 9  standing alone, are not per se.  And that's because before, we
10  had the aggregation of service areas and national best efforts;
11  but once you eliminate the national-best-efforts restrictions,
12  then it returns the service area rule to what, at its root, it
13  has always been, which is their trademark rule.  You're
14  basically not limiting competition among plans because they can
15  compete on an unbranded basis anywhere they want.  All you're
16  saying is that with respect to the use of the brand, with
17  respect to the use of that trademark, they're restricted and
18  they can't use it in a way that would violate other plans'
19  rights.  So...
20          THE COURT:  You heard me reference Judge Bucklo's
21  decision.
22          MR. ZOTT:  I did.
23          THE COURT:  And you're familiar with that decision.
24          MR. ZOTT:  I am.
25          THE COURT:  That is in your backyard; right?
```

 1          MR. ZOTT:  It is.  I've been in front of Judge Bucklo,

 2   and I have great respect for Judge Bucklo.

 3          THE COURT:  Now, I told you guys -- "you guys" in its

 4   gender-neutral sense -- three years ago you didn't have to take

 5   one district judge's word for it.  That's why I certified your

 6   appeal to the Eleventh Circuit and let you take me up on the

 7   standard-of-review order.

 8          MR. ZOTT:  Right.

 9          THE COURT:  And I think similarly, we don't have to

10   take one district judge's view for it here, but I'm curious what

11   you think of that particular opinion and what I should make of

12   it.

13          MR. ZOTT:  Well, I think the key takeaway from that

14   opinion is that it comes in a different procedural posture than

15   we are today.  That was a motion to dismiss.  And so it was very

16   much where we were, Your Honor, I guess five or six years ago

17   when your Court was called upon to decide whether or not the per

18   se claim stated a claim.  And the Court held it did state a

19   claim.

20          And that's all that Judge Bucklo held.  She basically

21   held that under the governing legal standard, they made a

22   plausible allegation and they put the right words on a piece of

23   paper; and so therefore, she could not grant the motion to

24   dismiss.

25          THE COURT:  Under *Twombly,* with its --

 1          MR. ZOTT:  Correct.  But that's all it is.  It's on a

 2 dismissal.  It's not with a full record.  She didn't have the

 3 ability to assess procompetitive benefits.  She didn't have the

 4 discovery record.  She didn't have experts.  It was simply a

 5 motion to dismiss, which is the lowest threshold to get across.

 6 I think that's the key takeaway from that case.

 7          Okay.  So, Your Honor --

 8          THE COURT:  Maybe Mr. Cooper's associates are saved

 9 after all.

10          MR. ZOTT:  Yeah, maybe so.  That's what Mr. Cooper

11 meant to say earlier.  I think that's where he was heading with

12 that.  But that's our view.  They may have a different view,

13 obviously.  You know, I don't speak for them.

14          So the first thing is without NBE, service areas get

15 returned to their roots as really a restriction on brand use,

16 not on competition, because competition is free now.  You can

17 compete anywhere you want on an unbranded basis.

18          And cases like the *Clorox* case, which Your Honor relied

19 on in the first standard-of-review decision, the later Second

20 Circuit case, the *Contacts* case, which follows *Clorox*, made

21 clear that trademark restrictions are generally not a problem

22 because they're not exclusionary.  They don't prevent

23 competition.  They just prevent the use of a brand, not

24 competition.  And for that reason, they're favored.  So that's

25 issue one.  And, in fact, in those cases, the Second Circuit --

 1   not only did it have no problem applying the rule of reason, but

 2   it actually sustained those restraints as a matter of law.

 3          Now we're not suggesting, Your Honor, that you need to

 4   or should go that far.  All you need to do here, in our view, on

 5   final approval is to determine that service areas are not per se

 6   unlawful but subject to the rule of reason, and that's it.  You

 7   don't have to go further and then evaluate their legality under

 8   the rule of reason.  We think that would have to be an issue

 9   decided in the future.  I think you asked that question earlier,

10   and that's our view of where you need to be.

11          THE COURT:  Well, and I might even tweak it a little

12   bit more to say I have to evaluate whether this structure --

13   before, I think your side particularly would like me to have

14   isolated ESAs on the standard-of-review order and give a

15   thumbs-up or thumbs-down on them, and I declined to do that then

16   because I said that's not the case.

17          MR. ZOTT:  Yeah.

18          THE COURT:  The case is that there are other output

19   restrictions that you have to factor into the analysis.

20          Well, here if there are inputs that factor into ESAs,

21   those have to be considered in terms of evaluating the structure

22   of the structural relief; correct?

23          MR. ZOTT:  Yes.  I think it's right that you'd be

24   looking at the system going forward.

25          But having said that, let me also say this.  The

 1   settlement does continue ESAs.  They are -- in paragraph 13, it
 2   says they're going to go forward.  And I think that if Your
 3   Honor had concerns that the service areas remained per se
 4   unlawful, even without regard to the other elements, I think
 5   that -- I think you would -- you should rightfully be reluctant
 6   to approve the settlement.  I don't understand how -- you know,
 7   you would be relying on some offsetting, you know, feature of
 8   the system to get it through rule of reason.
 9              THE COURT:  Well, I appreciate that.
10              MR. ZOTT:  Yeah.
11              THE COURT:  That tells me you're not running away from
12   them.
13              MR. ZOTT:  Not at all.  We think that -- we think that
14   they are independently not per se unlawful, but rule of reason.
15   And I think that any judge -- but Your Honor I know is very
16   responsible -- would want to be comfortable before you approved
17   it.
18              The second -- so the first reason is this point,
19   without NBE, we're really talking about a trademark restriction,
20   not a competition restriction.
21              The second point is that the Blues' history, whatever
22   else we can say about it, it's truly unique, and there is
23   nothing in history or in law that is like the Blues.  For
24   example, there is no question that the service areas arose
25   originally through common-law trademarks.  That plan developed

1 independently in different service areas.  As Your Honor noted

2 in your last ruling, the preliminary approval ruling, those were

3 then rolled up into a, you know, licensing entity and then

4 licensed back to the plans.  And those licenses recognized the

5 preexisting common-law rights.

6        So it would be very difficult to say that those service

7 areas were a simple, naked horizontal agreement among

8 competitors.  In fact, it seems obvious that they would have to

9 be viewed as being ancillary to a cooperative venture among

10 various plans to offer products that they could not do alone and

11 thereby increase interbrand competition.  And that's the core of

12 the procompetitive justification.

13        So then the third point, Your Honor, is that once you

14 eliminate NBE and you're sitting with ESAs alone, you can

15 proceed down the well-trodden path that courts have followed for

16 decades in evaluating the restraints, including the path Your

17 Honor followed with respect to BlueCard.  Service areas

18 facilitate cooperation integration.  They allow plans to

19 cooperate in order to offer products, like nationwide coverage

20 as well as an individual, local focus, that no one plan could do

21 on its own.  And that increases interbrand competition, and

22 that's procompetitive.  Those justifications, as I really think

23 not just our experts but, really, where Professor Rubinfeld is

24 today, would take this case out of the per se rule and into the

25 rule of reason.

```
 1          You know, the last point, then, Your Honor, is Sealy

 2   and Topco.  And I think the starting point there is what Your

 3   Honor recognized in the preliminary approval order and your

 4   earlier 1292.  It's true that those cases have not been

 5   expressly overruled.  Absolutely.  But it's also true, as Your

 6   Honor noted, that their continued precedential value has been

 7   called into question both by later courts and by commentators.

 8          What that means is at a minimum, they should be

 9   carefully applied and construed narrowly.  Sealy clearly is not

10   on point because Sealy was an aggregation case.  It involved an

11   aggregation of both a straight horizontal allocation plus

12   price-fixing.  That's not what we have here.

13          Topco involved a history that's entirely different than

14   the Blue history.  It didn't involve preexisting common-law

15   rights that already conferred exclusivity and were rolled into a

16   later license agreement.  And it didn't involve the kind of

17   cooperative integration of activity that allowed a group of

18   plans or defendants to create something that none of them could

19   create on their own and thereby have another national competitor

20   to compete against the other big three national competitors.

21   The case did not involve that.

22          So lastly, Your Honor, I wanted to address -- if I

23   haven't already, at least I've implied it.  But you mentioned

24   Bennett, and you mentioned how far should I go and how far

25   should I not go.  So just to be very clear, we think the right
```

1  place for the Court to be is to find that service areas alone as

2  well as the overall Blue system going forward are not per se

3  unlawful and, therefore, subject to the default rule of reason

4  given potential procompetitive justifications.  At the same

5  time, we're not suggesting that Your Honor should go further and

6  actually engage in the balancing act under the rule of reason.

7  We think that's going too far, and we actually think the case

8  law says you shouldn't go that far.

9         Now, *Bennett*, it uses that language "clearly illegal to

10  a legal certainty."  And I think it's the "legal certainty"

11  language that Your Honor was raising earlier and does that

12  somehow mean all you have to do is find likely or not likely.

13         But the issue with *Bennett* is twofold.  First, *Bennett*

14  cites back to *Grunin*.  *Grunin* is the lead case, and that's

15  really the case that the other cases follow.  In *Grunin*, it

16  didn't -- it did have that "clearly illegal" language.  But then

17  in the very next sentence, it says -- because it's not clearly

18  illegal to a legal uncertainty, then the court goes on to say

19  it's not per se unlawful, and so it's subject to a rule of

20  reasonableness under the settlement.  So right after the court

21  mentioned the legal certainty language, it went on to say not

22  per se, therefore, subject to a reasonableness test.

23         My point is the words "clearly unlawful," "per se

24  unlawful," or "legal certainty" are equated throughout that

25  decision.  They mean essentially the same thing.  *Robertson* came

 1  along after that, another similar case; said exactly the same
 2  thing.  It used that language, but it said because no court has
 3  found these practices to be per se, I can sustain the settlement
 4  going forward.
 5          The last thing about *Bennett* is *Bennett* was not
 6  actually a per se case, and so the court didn't have to grapple
 7  with exactly the issue you're dealing with here.  In that case,
 8  it was a tying claim involving a small Florida developer.  So by
 9  definition, for tying to be per se, you have to have market
10  power; and there's no way that that Florida developer had market
11  power.  And there's no discussion of per se.
12          What was happening in that case is the objectors wanted
13  the court to make the ultimate merits ruling.  They actually
14  wanted the Court to find and decide on the ultimate legality of
15  the go-forward conduct because it wasn't a per se versus rule of
16  reason.  And it was in that context that the court says we don't
17  need to go that far as long as it's not illegal to a legal
18  certainty.  It's citing back to *Grunin*.
19          So I hope that's helpful and clear, Your Honor.
20          THE COURT:  It is.
21          MR. ZOTT:  And if you have any questions -- otherwise,
22  I'm happy to yield at this point.
23          THE COURT:  All right.  I guess we'll hear from any
24  objectors that are challenging this area.
25          MR. ZOTT:  Thank you, Your Honor.

```
 1            THE COURT:  Thank you.

 2            MR. SLATER:  Good afternoon, Your Honor.

 3            THE COURT:  Good afternoon.

 4            MR. SLATER:  Paul Slater on behalf of what has been

 5  called in the papers the Alaska Air movants.

 6            Your Honor, we are 40 national ASO accounts.  Of those,

 7  26 are corporate-sponsored entities, nine are Taft-Hartley

 8  plans, and seven are church plans.  The church plans and the

 9  Taft-Hartley plans, of course, were excluded by the current

10  settlement that's before the Court from receiving a second Blue

11  bid.

12            Your Honor asked for comment with regard to the

13  exclusive service areas and by which I understand you to mean

14  the horizontal territorial allocation amongst the defendant

15  Blues whereby each agrees that it will not invade the other's

16  territory by the use of a Blue mark.  And I actually had four

17  things I wanted to address today.  Each of them relate to that

18  topic.

19            THE COURT:  All right.  Thank you.

20            MR. SLATER:  And the four things I'd like to discuss

21  is, first, whether the per se rule applies to the conduct going

22  forward.  The second thing is something I think I probably don't

23  need to discuss anymore.  I wanted to address the propriety of

24  an injunctive relief class that granted divisible or

25  individualized relief.
```

```
 1            THE COURT:  Are you satisfied with the way we're
 2  handling that, at least as articulated today?
 3            MR. SLATER:  I would say encouraged but not satisfied,
 4  because I don't know what it entails.  We --
 5            THE COURT:  Well, what it would entail is resending
 6  notice to the ASOs, having a (b)(3) divisible relief class --
 7  now, I think it's called something else in the papers, but
 8  that's essentially what I understand it would be.
 9            MR. SLATER:  The (b) --
10            THE COURT:  That distinguishes it from a (b)(2)
11  indivisible relief class and a (b)(3) damages class, so this
12  fairly unique creature in the law, perhaps.  And then we
13  would -- then you can either opt out, and that gives you the
14  full right to pursue not just a second Blue bid but a third or
15  fourth or all of the Blue bids in litigation.  The limitation
16  would be that the claim cannot attempt to relitigate, if the
17  settlement is approved, any aspect of the (b)(2) injunctive
18  relief.
19            MR. SLATER:  Your Honor, I've spoken with several class
20  counsel, several of the defense counsel, and I think there were
21  some significant differences between what I was told by each one
22  of them.  Nobody was exactly sure --
23            THE COURT:  Well, maybe you're talking to the right
24  person, then.
25            MR. SLATER:  That's good.  Thank you.
```

```
 1            My question is this.  If the release of the claim that
 2   the horizontal territorial allocation is unlawful, be it
 3   pursuant to the rule of reason or per se rule, if that release
 4   is left in a (b)(2) class that I cannot opt out of, then how do
 5   I bring a claim in the (b)(3) or in a courtroom to the effect
 6   that I have not released that claim?  In other words --
 7            THE COURT:  I think you've not released your claim
 8   that, under the new structural relief, you should be entitled to
 9   a second Blue bid or that you should have the right to pursue
10   other Blue bids.
11            MR. SLATER:  Okay.  And the merits of that claim, as I
12   understand it, would be that the territorial allocation is
13   unlawful pursuant to either rule of reason or per se rule and
14   that because of that, I'm entitled to injunctive relief to
15   preclude the Blues from not granting me up to 36 -- since there
16   are 36 Blues -- new bids.  And my question is am I completely
17   free in my injunctive relief lawsuit that I'm allowed to bring
18   to pursue any relief that is allowable at law?
19            THE COURT:  Specific to your client.
20            MR. SLATER:  No.
21            THE COURT:  No.  I'm answering your question.
22            MR. SLATER:  Oh.
23            THE COURT:  Specific to your client.
24            MR. SLATER:  So I would be --
25            THE COURT:  You would not be able to go back and
```

1   represent essentially what would be -- and again, this is all

2   hypothetical.  If the settlement is approved and if the (b)(2)

3   injunctive relief class is approved and that class is certified,

4   you would not be able to go back and relitigate on behalf of

5   that entire class, other people who you don't represent.  So

6   think about this -- maybe -- I don't know if this is the perfect

7   analogy, and I'm a little worried about throwing it out there

8   because I haven't thought it all the way through, but let me

9   give it a shot.

10          MR. SLATER:  Please.

11          THE COURT:  Think about -- what would you be entitled

12   to do under the All Writs Act?  You would not be able to go back

13   and attack the judgment.  You would be able to go back and

14   litigate claims that are unique to your client, that your client

15   possesses, that are not inconsistent with the (b)(2) class.  And

16   if you've opted out of the divisible relief aspect of things --

17   and that would include the second blue bid; everyone agrees with

18   that -- then I think you can argue that my client -- or clients

19   in this situation are entitled to get multiple Blue bids, up to

20   36.  The Blues are going to have to defend that action, but

21   they're not going to have to defend that action across the

22   waterfront.  It's going to be only defend that action as to your

23   boundaries.  They're only fighting over your beachfront

24   property, not the entire oceanfront.

25          Now, let me -- before you answer that, let me ask class

 1  counsel and the Blues counsel if you disagree with any aspect of

 2  that hypothetical.

 3          MR. ZOTT:  A little bit, Your Honor.  Let me say --

 4          THE COURT:  Well, that's why it's a good thing you're

 5  all talking to me.

 6          MR. ZOTT:  I appreciate that, Your Honor.  Let me start

 7  with the -- there's two issues.  I'm going to take them in

 8  reverse order.  So let me start with what an opt-out of -- we're

 9  now going to -- I can properly and correctly put the second Blue

10  bid -- because it's divisible, individualized, we'll put it in

11  the (b)(3) class.

12          THE COURT:  Right.

13          MR. ZOTT:  So that means that if somebody exercises

14  their opt-out rights, they could seek -- obviously, they could

15  seek damages in any amount, including damages flowing from ESAs

16  or anything else.  Then they could seek individualized

17  injunctive relief, including a second Blue bid.  I think they

18  could probably seek multiple Blue bids.  But I think that at the

19  same time, they remain bound by the (b)(2) -- by the (b)(2)

20  release.

21          THE COURT:  I thought that's what I said.

22          MR. ZOTT:  You did say that, Your Honor.  But here's

23  what I don't think they could do.  Because they -- as a member

24  of the (b)(2) class, which is not an opt-out class, it binds

25  each and every one of them individually.  It binds them all in

 1   their individual capacity.  So if they decide that they're going

 2   to just bring an individual lawsuit and they say -- let's just

 3   take the extreme case -- I would like an injunction against

 4   service areas, I don't think they could do that because they

 5   released that claim as part of the (b)(2) class.  They are a

 6   member of the class.  They released to the full extent permitted

 7   by law.  Because ESAs are classwide, a classwide policy that

 8   cuts across the class, that claim is released.  So they can't do

 9   that.

10         Now, instead, they say, fine, I'm not going to do that;

11   I want to seek, but I want to seek 36 bids.  See, I think at

12   some point, what's happened is although they're not calling the

13   relief -- you know, I'm not seeking an injunction as to ESAs.

14   Effectively, if you can get 36 bids, then you've just

15   basically -- you've violated the rule of ESAs.  You're basically

16   saying I'm entitled to competition from all 36 plans.  I think

17   that would violate the (b)(2) release because, remember, that

18   release would apply to everyone, including that claimant.

19         THE COURT:  Well, I don't know that any court could

20   require a Blue to bid on business.

21         MR. ZOTT:  No.  They couldn't.

22         THE COURT:  But the distinction, it seems to me, is

23   they can argue that there should not be any restriction from any

24   Blue bidding on our business, as far as competition would be

25   exclusive-service-area Blue that otherwise would be the sole

1  bidder.

2      MR. ZOTT:  Well, but if their argument is there should

3  be no restriction on any Blue's ability to give a bid to me,

4  service areas impose that restriction right now.  And so they

5  would basically be saying, at least as to me, you shouldn't

6  enforce service areas; but they've already released the claim

7  that they can challenge service areas.

8      THE COURT:  Yes.

9      MR. ZOTT:  That's gone.  So what they could do, though,

10 is they could say I'm entitled to two bids or three bids or four

11 bids.  The point will come, though, I think, when they would be

12 crossing the line from what's legitimately individualized relief

13 to what's really just a backdoor way of --

14     THE COURT:  So how do we articulate and define that so

15 that it's clear?

16     MR. ZOTT:  I think the best formulation -- we've worked

17 on this too, quite a bit, and we can work on the language more,

18 Your Honor.  But so, again, without binding, I think it's

19 something along the lines of they would be able -- an opt-out

20 could seek individualized relief, including a second Blue bid or

21 any other individualized relief, to the fullest extent permitted

22 by law provided it doesn't violate the (b)(2) release.  I think

23 somewhere in there --

24     THE COURT:  Is this going to be like Justice Potter

25 Stewart's definition of pornography?  We can't tell you what it

1   looks like for it to be indivisible, but we'll know it when we

2   see it?

3         MR. ZOTT:  Well, it's a little -- here's the issue.  I

4   think for a court to draw the exact line of when something

5   goes -- crosses the line from being legitimate individualized

6   divisible injunctive relief to really violating the (b)(2)

7   release, it probably should be done in a specific factual

8   context where the issues are joined and the litigants have an

9   opportunity to present their case.

10         I think it would be hard for Your Honor today to say

11   precisely where that line is.  I think, though, you can come up

12   with language that embraces both points legitimately and

13   effectively and fairly in a way that's consistent with the law.

14         THE COURT:  Well, and what gives part of the audience

15   pause and part of it comfort is it seems like I'm the one who's

16   going to be having to decide that on a case-by-case basis --

17         MR. ZOTT:  I think that's correct.

18         THE COURT:  -- because I have to enforce the integrity

19   of my judgment if I end up entering a judgment.

20         MR. ZOTT:  That's exactly right, Judge.  It's

21   exclusively in your hands.

22         THE COURT:  Yes.  I think -- and, again, All Writs Act.

23         MR. ZOTT:  Yes, sir.  So does that make sense what I

24   said, Your Honor?

25         THE COURT:  It does.  And maybe that's not what I said

```
 1  earlier this morning, but that's what I intended to say is I
 2  wonder if there's a way to call -- just distinguish divisible
 3  relief that doesn't overly limit a class member's right but
 4  doesn't allow them to go in and assail the entire judgment at
 5  the same time.  Just --
 6           MR. ZOTT:  Yeah.  You used words earlier --
 7           THE COURT:  And it sounds like I've got smart groups on
 8  both sides continuing to work on this issue.
 9           MR. ZOTT:  So there's one last point I want to address
10  since you asked for any other comments.  Your Honor, so we have
11  a (b)(2) class that's indivisible classwide.  You have a (b)(3)
12  divisible class.  And that would -- but one, I think, slight
13  distinction that -- is we think there should be a single (b)(3)
14  class.  That is, it should simply be a (b)(3) class that
15  includes both damages as well as any other -- because that's
16  individual relief -- as well as any other individual relief,
17  such as individualized injunctive relief, rather than two (b)(3)
18  classes.
19           And part of that is because the settlement has
20  already -- at great negotiating effort and great angst, we've
21  already properly defined an injunctive class and, really, a
22  damages (b)(3) class.  Now, we didn't use the nomenclature of
23  (b)(3), and probably that -- you know, in retrospect, that would
24  have been a little better to do that.  But they've already been
25  defined, and the members of both of them have been heavily
```

1  negotiated and defined.  I think to now sit down and create an

2  additional class of (b)(3) individualized relief, it's not

3  necessary because it's already in the settlement, and it also

4  could create problems.

5          For example, who would be in that?  And if somebody is

6  not in that class, then they wouldn't be giving us a release.

7  That is, if they're not in there and they don't opt out, they're

8  not giving us a release anyway because they're not defined to be

9  within the class.  That would be an issue that we've already --

10          THE COURT:  Well, we're not dealing with a fourth

11 class.  We're dealing with opt-outs; right?

12          MR. ZOTT:  You're dealing with opt-outs; but I think if

13 you define a class, you need to give, you know, an opportunity.

14          THE COURT:  Sure.

15          MR. ZOTT:  But if somebody isn't within the scope of

16 that class, depending upon how you define it, you don't have

17 to --

18          THE COURT:  Yes.  We have to define it well so we know

19 whether you have a -- you're in the class such that you can opt

20 out of it, clearly.

21          MR. ZOTT:  Correct.  And what I'm saying is we already

22 have a well-defined damages, slash, (b)(3) class that's already

23 been hammered out.  And I think subscribers would agree that the

24 most straightforward way is to simply have a single (b)(3) and a

25 single (b)(2) but then to clarify this issue that we've got

1  here, which is, you know, the issue about where does the second

2  Blue bid fall.  I think we need to do that, Your Honor, for all

3  the reasons under *Wal-Mart*, but I don't think we need to create

4  two (b)(3)s.

5          THE COURT:  So your argument is we don't need a (b)(3)

6  divisible relief class.  We just need a (b)(3) class.  Damages

7  and divisible relief both can fit neatly in it.

8          MR. ZOTT:  Yes.  Because by definition, it's divisible

9  both as to damages and injunctive relief.

10          THE COURT:  We'll see.  I'm not sure.

11          MR. ZOTT:  Okay.  Understood.  I wanted to put it down,

12  though, because you wanted all the --

13          THE COURT:  Yes.  That's right.

14          MR. ZOTT:  Thank you, Your Honor.

15          THE COURT:  Does that help you at all?

16          MR. SLATER:  Well, it helps me understand, but I have

17  multiple problems with what was just said.

18          THE COURT:  Okay.

19          MR. SLATER:  First, I don't think you can separate the

20  release from the relief.  If the relief to which is predicated

21  on the horizontal territorial Blues allocation is going to -- if

22  the relief addresses that claim, if I opt out of that relief, I

23  am opting out of that claim.

24          THE COURT:  No.

25          MR. SLATER:  You can't leave the release --

```
 1          THE COURT:  No.  You can't opt out of a (b)(2) class.
 2    And that claim is solidly in the (b)(2) bucket.
 3          MR. SLATER:  Well, we have filed a motion to opt out of
 4    the (b)(2) class, and we have a number of arguments on why we
 5    can't properly --
 6          THE COURT:  Well, I will have to address all those
 7    arguments.
 8          MR. SLATER:  -- be held in those.
 9          THE COURT:  Hold on.  Hold on.  I will have to address
10    each of those arguments.  But if you don't prevail on those
11    objections and the (b)(2) class stays as is with this possible
12    distinction of divisible relief moving over to (b)(3), then
13    you're not going to be able to go back and attack the (b)(2)
14    relief granted to the class.  You will have lost that objection
15    to your -- what you will do is have a ticket to Atlanta.
16          MR. SLATER:  No.  I --
17          THE COURT:  But save reversal there -- unless I don't
18    approve it and unless you get the approval reversed at the
19    Eleventh Circuit, I don't think your clients are going to be
20    able to come in and relitigate (b)(2) issues.
21          MR. SLATER:  Your Honor, I understand that.
22          THE COURT:  Yes.
23          MR. SLATER:  My point is this.  If I opt out of the
24    (b)(2) relief, in order for me to bring a claim to get one, two,
25    three, four, or 36 additional Blue bids, I have to have that
```

```
 1   claim unreleased.  So I have to be able to say to a court, I
 2   have not released my claim that the horizontal territorial
 3   allocation is per se illegal and I assert that claim and I say
 4   that I am entitled to injunctive relief that, at a minimum,
 5   allows me to go to every one of the 36 Blues and get a bid.
 6           Secondly --
 7           THE COURT:  Well, wait.  I think that's where we're
 8   breaking down a little bit.  You don't have a right under any
 9   circumstance to get a bid from a Blue.
10           MR. SLATER:  If I --
11           THE COURT:  The Blue has to be willing to --
12           MR. SLATER:  Fair.
13           THE COURT:  -- offer the bid.
14           MR. SLATER:  I misspoke, Your Honor.
15           THE COURT:  So the question isn't whether you have a
16   right to -- and even under the settlement, no one has a right to
17   a second Blue bid.  They have a right to seek --
18           MR. SLATER:  Point taken, Your Honor.
19           THE COURT:  -- see if anybody is willing to give a
20   second Blue bid.
21           MR. SLATER:  You and I are on the same page.  I
22   misspoke.  I was talking about the right to seek a second,
23   third, fourth --
24           THE COURT:  Okay.  We're -- I need not say anything
25   further, then.
```

```
 1                MR. SLATER:  Okay.
 2                THE COURT:  I'm just making sure we were on the same
 3     page there.
 4                MR. SLATER:  No.  We are.  I misspoke.
 5                So I have to have that merits claim in order for me to
 6     proceed and claim that the conduct is illegal and that I want
 7     the conduct enjoined so that I can go and request --
 8                THE COURT:  Well, are you seeking -- are you seeking
 9     that relief on behalf of anyone other than your particular
10     client?
11                MR. SLATER:  That's the second issue I wanted to get
12     to.  There are cases -- and I have not consulted with my
13     economist or my clients on this.  We heard about placing this
14     relief into the (b)(3) class for the first time as we sat in
15     your courtroom this morning, so I haven't checked this with my
16     clients or with my economist.
17                There are certainly antitrust cases -- and I've been
18     involved in many of them -- where the claim for injunctive
19     relief was marketwide even though the claimant was not a class
20     and even though the claimant was only asserting rights for
21     himself.  And the reason for that is that in certain
22     circumstances and situations, in order for the client to get the
23     benefits of competition, competition has to be opened up
24     marketwide.
25                THE COURT:  So if one of your clients had actually
```

 1  filed a suit, not even on behalf of a class, but just -- who's

 2  your lead -- Alaska Air?

 3          MR. SLATER:  Right.  They're the first alphabetically,

 4  so --

 5          THE COURT:  Yes.  Okay.  That's the lead client on our

 6  docket sheet.

 7          MR. SLATER:  Yes, sir.

 8          THE COURT:  If Alaska Air had actually filed suit at

 9  some point since 1972 or 19- -- the eighties, whatever date you

10  want to pinpoint as when this structure came into place --

11          MR. SLATER:  Right.

12          THE COURT:  -- you're right, they don't have to have a

13  class.  And that's one thing we've discussed with -- that was an

14  issue we've been discussing all along during the course of this

15  case is it doesn't necessarily take a class to get --

16          MR. SLATER:  Not denied relief.

17          THE COURT:  -- injunctive relief that benefits everyone

18  because it would require the Blues to change their structure.

19  Okay?  You're right there.

20          Where I think you're running into the rocks, though, is

21  hypothetically, a settlement is approved by a court that

22  maintains jurisdiction over that settlement and then you go in

23  and try -- even on behalf of a single plaintiff -- to try to

24  litigate that injunctive relief claim and one of the arguments

25  you make is the Blues have to change their structure.  That's

```
 1   where I think you're going to run into an All Writs Act issue.
 2           Again, this is all hypothetical.  We have to have an
 3   approval of settlement.  There's got to be a final judgment.
 4           MR. SLATER:  Could --
 5           THE COURT:  But, for example, if you were -- last
 6   year -- let's say in December of last year, you went and filed
 7   the Alaska Air suit and you said, I am seeking injunctive relief
 8   on behalf of Alaska Air to have the Blues change and --
 9           MR. SLATER:  Abolish the ESAs.
10           THE COURT:  -- abolish their ESAs --
11           MR. SLATER:  Yeah.
12           THE COURT:  -- I would have shut you down in a
13   heartbeat under a different component of the All Writs Act, and
14   that is protecting my jurisdiction to consider the propriety of
15   the settlement.  But if the judgment goes in place, we shift to
16   protecting the integrity of the judgment.  So --
17           MR. SLATER:  That assumes the propriety of the judgment
18   that causes me to release, in the (b)(2) class, claims --
19           THE COURT:  Well, that's why you're here objecting.
20   You don't --
21           MR. SLATER:  Yes.  Correct.
22           THE COURT:  But that's your avenue to challenge, not
23   going into a separate court and filing either a smaller-sized
24   class or an individual claim which collaterally attacks any
25   judgment that would be entered by this Court.
```

 1          MR. SLATER:  Yeah.  And, Your Honor, we actually have

 2  filed.

 3          THE COURT:  I know you have.  It's in front of Judge

 4  Manasco, and we're not sure exactly what to do with it yet, but

 5  we'll figure that out after this is all over.

 6          MR. SLATER:  Okay.  We actually have filed the suit,

 7  and it actually does ask for injunctive relief.

 8          THE COURT:  I think I have it right here.

 9          MR. SLATER:  I'm not surprised.  So another --

10          THE COURT:  But you understand what I'm saying.

11          MR. SLATER:  I do.

12          THE COURT:  That's just classic All Writs Act

13  application.

14          MR. SLATER:  I do.  And like I say --

15          THE COURT:  And go -- if you want to, for example, see

16  what the Eleventh Circuit thinks of this -- and you probably

17  already know -- go look at a case like *American Home Shield*,

18  which was my case, where counsel tried to do exactly the same

19  thing.

20          They were in California, in San Diego, in state court.

21  I had approved or was in the process of approving a settlement.

22  They went into California state court and argued that they ought

23  to go forward with their Rule 23 claims there.  The state judge

24  agreed with them that they could go forward.  I entered an

25  injunction saying no, you can't do that.  I have -- you have to

 1  give me time and opportunity to evaluate the propriety of the

 2  settlement.  Okay?

 3          Then they went back into the court on a second bite at

 4  the apple, the state court, and said, all right, we're not going

 5  to pursue our Rule 23 claims.  We just want to pursue our

 6  California unique creature, private attorney, general claims

 7  related to consumer conduct and consumer benefits.  I don't --

 8  I'm not hitting the nomenclature right, but it was -- and I

 9  entered a second injunction and said -- or, actually, a

10  clarification of the injunction that said no, what you can

11  pursue is claims on behalf of a client that you have actually

12  been retained to represent who's opted out of this settlement,

13  and you can only pursue certain individual-relief claims.  You

14  can't pursue claims that would be inconsistent with the

15  settlement.

16          Now, interestingly, I got reversed at the Eleventh

17  Circuit on that because what Judge Per Curiam said was that I

18  should not -- I should not have enjoined them that second

19  time -- and I don't think I enjoined them.  I think I clarified

20  my earlier injunction, which I don't even think the Eleventh

21  Circuit had appellate jurisdiction over the case for that

22  reason.  But anyway, they said what I should have done is gone

23  straight to contempt and had a hearing on whether or not the

24  party in California and the counsel were in contempt of my

25  order.

```
 1          So I think the Eleventh Circuit takes all this pretty
 2   seriously is the bottom line.
 3          MR. SLATER:  With regard to the individual claim, Your
 4   Honor said at the beginning that the individual clients would be
 5   entitled to seek injunctive relief for themselves, not for the
 6   market.  And that would --
 7          THE COURT:  Not inconsistent with the (b)(2) relief,
 8   which means I -- you know, and I guess that's what we have to --
 9          MR. SLATER:  Well, I --
10          THE COURT:  -- pencil out here is what does that mean
11   and what does that look like.
12          MR. SLATER:  I was told that the -- it was not
13   contemplated that there would be a new agreement.
14          THE COURT:  I'm sorry?
15          MR. SLATER:  I was told that it was not contemplated
16   that there would be a new written settlement agreement.  Now,
17   I -- maybe that's bad information I got in the hallway, but --
18          THE COURT:  Well, there would still be my order, which
19   is pretty good, I think.
20          MR. SLATER:  Your Honor, the order is very good.  But I
21   would certainly -- if we are not going to be able to pursue a
22   claim for all 36 Blues to submit a second Blue bid for a third
23   and fourth and fifth, et cetera, to my clients, I would like to
24   know about that in advance, because we will certainly object to
25   that.
```

```
 1              THE COURT:  I think you are.  I think that's what
 2   you're here for; right?
 3              MR. SLATER:  Well, not --
 4              THE COURT:  That's what we're doing right now, right in
 5   front of everybody.
 6              MR. SLATER:  I'm objecting to what's been proposed for
 7   today.  We would also --
 8              THE COURT:  No.  I think you're objecting to the -- at
 9   least as I read your objection, you're objecting to this deal.
10              MR. SLATER:  Yes, sir.
11              THE COURT:  You're saying this deal leaves in place
12   what you contend is either clearly illegal or per se illegal
13   structures and that those would be in place even if this
14   settlement is approved.  Right?
15              MR. SLATER:  Correct.
16              THE COURT:  So that's what we're here arguing about.
17   Now, if you lose on that, what I'm telling you is you have one
18   direction to go, and that's up, not sideways.
19              MR. SLATER:  That --
20              THE COURT:  Okay?  You can't go to Judge Manasco --
21              MR. SLATER:  I hear you.
22              THE COURT:  -- or me, if I get that case, and say,
23   Judge Proctor, we disagree with Judge Proctor.  We should be
24   able to pursue these claims.
25              MR. SLATER:  Okay.  The four items that I wanted to
```

1    touch on today are, one, the per se rule and whether it remains

2    applicable; two, whether injunctive relief can be ordered that

3    is divisible or individualized -- I believe -- well, I'm not

4    sure where we are on that because I think some of the relief

5    that is now contemplated would still be individualized and

6    divisible as to my clients, but I'll get to that.  I heard what

7    Your Honor said earlier today that you regard --

8            THE COURT:  So how do you respond to some of the things

9    I've heard from both -- principally from subscribers, but I

10   think the Blues have echoed it from time to time -- and that is,

11   Judge, these objectors are coming in in the bottom of the ninth.

12   These structures have been in place forever and a day and not

13   one of them, institutionally or otherwise, has stepped up to the

14   plate and challenged them.

15           MR. SLATER:  You're --

16           THE COURT:  And, you know, it's one thing to critique

17   our work.  We know that's part of it.  But our work is being

18   critiqued by people who never had a critique until this

19   settlement was in place.

20           MR. SLATER:  It wasn't until the settlement was in

21   place that my clients were told that they were going to be

22   compelled to release claims but were going to be treated

23   unequally within the injunctive relief class and that they would

24   not get a second Blue bid, including for having exercised their

25   constitutional right to opt out of the (b)(3) class.

```
 1              THE COURT:  Well, and that's, quite frankly, the --
 2    that's what spawned my concern and the need, I think, for a
 3    (b)(3) class and an opportunity for your clients to opt out,
 4    because we don't want to burden your clients' opt-out rights.
 5    And I think I am duty bound to protect that opt-out right.
 6              I guess what we're -- now what we're arguing about is
 7    not whether they have the right to opt out.  They're going to
 8    have that right.
 9              MR. SLATER:  Well, a limited right to opt out.
10              THE COURT:  I'm sorry.
11              MR. SLATER:  A limited right to opt out.
12              THE COURT:  Well, they're going to have a right to opt
13    out.  They can't opt out of something they're not entitled to
14    opt out of.  They're not entitled to opt out of (b)(2),
15    across-the-board, indivisible injunctive relief.  They're just
16    not.  I mean, that's black-letter law.
17              MR. SLATER:  Your Honor --
18              THE COURT:  I didn't make up that rule.  That rule is
19    in place.
20              MR. SLATER:  Your Honor has discretion to grant opt-out
21    rights to members of a (b)(2) class.
22              THE COURT:  Even if that were so, would it make any
23    sense to do?  Because then we might as -- you know what's going
24    to happen?  We might as well just keep litigating the case
25    because I don't know how we're going to have a settlement if
```

 1    everybody is arguing about where the line ought to be drawn.

 2            And if the line can be drawn fairly, reasonably, and

 3    adequately, your client doesn't have a right to opt out of that

 4    except as it relates to the -- what I think is fairly divisible

 5    relief, and that is this -- because of the unique circumstance

 6    your client is in that an individual policyholder, for example,

 7    would not be in, you may have the right to seek additional bid

 8    or bids.  And that's what we're having a focus on, I think, is

 9    where is the -- we've drawn the line of who gets a second Blue

10    bid.  Now we're drawing the line of what's divisible and what's

11    not indivisible -- I'm sorry -- what's divisible and what's

12    indivisible.

13            So what I'm telling you is if you are trying to

14    convince me that you have the right to opt out of indivisible

15    (b)(2) relief, save your words for the Eleventh Circuit.  I'm

16    not going to buy that.

17            MR. SLATER:  I believe the relief here that we're

18    trying to opt out of is both divisible and individualized.  In

19    *Wal-Mart versus Dukes*, the Supreme Court, in a rather brief

20    paragraph, covered both of those items and said that (b)(2) is

21    not an appropriate vehicle for the granting of individualized or

22    divisible relief.

23            It's individualized in this case, Your Honor, because

24    the characteristics of my individual clients determine whether

25    they get the second Blue bid or not.  How much dispersion

1   does -- do they have or not have?  That's an individualized

2   issue.  Are they in a state that has two Blue bids?  That's an

3   individualized issue -- two Blue entities competing so they can

4   already get two Blue bids.  Are they a Taft-Hartley plan?  Are

5   they a church plan?  Those entities are precluded from getting a

6   second Blue bid solely because of who they are.

7          And this harkens somewhat to the brief that the

8   Department of Labor submitted last night where they said the

9   defendants are trying to treat the Taft-Hartley plans as if they

10  weren't real plan member -- real class members and real entities

11  that were the primary initial purchaser of the services that are

12  in question here.

13         And the same thing is true of the argument made against

14  the church plans and the Taft-Hartley plans.  The defendants say

15  they justified the exclusion of those plans from being able to

16  get a second Blue bid solely by pointing to the fact that they

17  could have been formed differently than they were formed.  But

18  they are class members and they were formed the way they are.

19  They are the entity that enters into a direct contract with a

20  Blue, and they can't be denied an injunctive relief provision

21  solely because they could have been formulated differently than

22  they actually were formulated.

23         That would be true of every corporate entity as well.

24  Every corporation could be one corporate parent and 50

25  subsidiaries.  And in that case, the Blues would be arguing,

1  what, that the corporate entity couldn't get a second Blue bid

2  because they -- all of them could have formulated --

3          THE COURT:  Well, let me ask you what happens in the

4  typical class action, because this may be somewhat atypical in

5  some respects.  In the typical class action, when it comes to

6  (b)(3) relief, your client has one choice to make:  stay in or

7  opt out.  Right?

8          MR. SLATER:  Correct.

9          THE COURT:  Once they opt out, then they have a choice

10 to make.  Did we opt out on principle and we're not going to do

11 anything about it, or are we going to actually go try to enforce

12 our rights somewhere.

13          MR. SLATER:  Correct.

14         THE COURT:  And if they decide to go and enforce their

15 rights somewhere, they file a lawsuit.  Okay?

16         MR. SLATER:  Yes.

17         THE COURT:  And once they file that lawsuit and not

18 until they file that lawsuit do we know exactly whether the

19 relief they're pursuing is inconsistent with the class

20 settlement.  Right?

21         MR. SLATER:  Yes.

22         THE COURT:  And if you go all the way back to

23 common-law class litigation, that's the way it worked.  Somebody

24 filed a lawsuit, the court passed a judgment, and nobody knew

25 exactly what the effect of that judgment was until someone else

 1  came along and filed a similar lawsuit.  And then it was up to

 2  the second court to decide the effect of that.

 3          So what's wrong with just leaving it at this for right

 4  now?  Your client has a right to opt out.  We don't have to get

 5  into what's fish or fowl at this point.  Your client -- I'm just

 6  telling you right now as a public service announcement that if

 7  your client comes in under those circumstances and tries to

 8  collaterally attack the (b)(2) relief, I'm going to be duty

 9  bound under Eleventh Circuit law to shut it down.  But I'm

10  not -- I don't think it's my job to give you or your client

11  advice about what that lawsuit ought to look like in light of

12  the settlement.  Why wouldn't we just leave it at that?

13          MR. SLATER:  Your Honor, now I think what you're

14  telling me is the agreement, the settlement agreement, is so

15  vague that I can't know and can't advise my clients as to what

16  they're able to do, having opted out of that settlement.

17          THE COURT:  No.  I'm just saying that why is it the

18  Court's obligation to give you particularized advice?  Why can't

19  the settlement agreement speak for itself?

20          MR. SLATER:  I think it's the obligation of the class

21  to give me a clear agreement, where I know what my rights are.

22  And if they haven't done that, then the approval of the

23  settlement agreement should be withheld.  I should not be put in

24  a position where there's a settlement agreement that I'm not

25  told what the terms are and what the impact would be on any

1  clients.

2          THE COURT:  Well, you know what the terms are.

3          MR. SLATER:  Well, I don't know what they mean.

4          THE COURT:  No.  You know what the terms are if you

5  stay in the class on the divisible relief.  You know how we're

6  going to generally calculate --

7          MR. SLATER:  But I don't know what the release means.

8          THE COURT:  Excuse me.  You know generally how we're

9  going to calculate the damages.

10          MR. SLATER:  Yes.

11          THE COURT:  You know what the criteria are for you to

12  get a second Blue bid.  Okay.  And if you stay in the class,

13  you're releasing any and all claims under the act; right?  If

14  you stay in the class --

15          MR. SLATER:  Yes.

16          THE COURT:  -- and don't opt out.

17          MR. SLATER:  Yes.

18          THE COURT:  All right.  So I don't think it's accurate

19  to say you don't know what the terms of the settlement say.

20          MR. SLATER:  I don't know what the terms of release

21  are.

22          THE COURT:  Any and all claims if you stay in.

23          MR. SLATER:  No.  If I opt out.  I don't know what --

24          THE COURT:  If you opt out, now, that's -- okay.  So

25  let's go.  Because I was --

```
1              MR. SLATER:  Yes.

2              THE COURT:  All right.  If you opt out --

3              MR. SLATER:  If I opt out --

4              THE COURT:  -- you are bound by the (b)(2) relief, and

5    you're free to pursue what would be categorized as (b)(3) relief

6    in an individual action on behalf of yourself, no one else.

7              MR. SLATER:  And what does that entail?  Does that

8    entail bids from all 36 of the Blues?

9              THE COURT:  We just said you're not entitled to that.

10   You conceded that earlier.  You're not entitled to --

11             MR. SLATER:  If I stayed in the class, I would be.  I

12   don't think I can be --

13             THE COURT:  No, you would not.  No, you would not.

14             MR. SLATER:  Your Honor, I don't think my clients can

15   be compelled to release claims from a class that they're opting

16   out of.  If they are opting out of the (b) --

17             THE COURT:  You're not opting -- so, look, we're --

18   Okay.  I'm about to move along here, but --

19             MR. SLATER:  Okay.

20             THE COURT:  -- we've said multiple times you're not

21   opting out of a (b)(2) class, period.  End of paragraph, end of

22   story, end of book.  That's -- you're not doing that.

23             What you can opt out of is (b)(3), not (b)(2).  So I

24   don't think I have to keep saying that, but you keep -- you keep

25   straying us -- straying us back to that alley.
```

```
 1            MR. SLATER:  I apologize, Your Honor.  Let me phrase it
 2   this way, if I could.
 3            THE COURT:  Okay.
 4            MR. SLATER:  What would my rights be as an opt-out from
 5   the (b)(3) class with regard to the ability to get second,
 6   third, fourth, fifth, et cetera, additional Blue bids or request
 7   them?
 8            THE COURT:  All right.  So the parties are negotiating
 9   this and talking about this.
10            Does anyone want to weigh in on that question?
11            MR. ZOTT:  Your Honor, this is where -- I think I tried
12   to answer it before, but it's -- I agree that, you know, this
13   is not easy.  This is Advanced Civil Procedure probably.  So I
14   think the answer is they could seek an additional Blue bid
15   because that's divisible.  I think they would be able to see
16   more than one, two or three.  I think there would come a point,
17   as I said before, if you sought -- if the Court said you're
18   entitled to seek 36 Blue bids, I think that essentially is
19   the --
20            THE COURT:  They could seek -- let me just cut to the
21   chase.
22            MR. ZOTT:  Okay.
23            THE COURT:  They could seek a ruling from the Court
24   that as it relates to their business, the Blues cannot agree
25   not -- to restrict bids.  Right?
```

 1            MR. ZOTT:  I think -- no, I don't think so.  Because if

 2  the Court -- in essence, as to their individual business, the

 3  Blues could not enforce ESAs, they couldn't --

 4            THE COURT:  I didn't say they couldn't enforce ESAs.

 5            MR. ZOTT:  Okay.  But they couldn't restrict bids,

 6  which is -- since service areas don't allow plans to compete

 7  with each through bids -- yeah.

 8            THE COURT:  All right.  But the point is as it relates

 9  to this limited opportunity for this unique group to get a

10  second bid, that is attacking the service areas, isn't it?

11            MR. ZOTT:  But that's within the structure of the

12  settlement.  So the settlement already recognizes we're

13  preserving service areas.

14            THE COURT:  So then why would you be entitled to get a

15  third Blue bid?

16            MR. ZOTT:  Because I think that a third Blue bid would

17  fairly be characterized as divisible, you know, injunctive

18  relief.

19            THE COURT:  So what number does it become indivisible?

20            MR. ZOTT:  I think that's a line that would have to be

21  drawn under the specific facts and circumstances of the case.  I

22  think you would get to the point when you're, in essence,

23  eradicating ESAs.  Even though you're not using those words,

24  functionally, that's what you're doing.  And I don't think --

25            THE COURT:  But you're not eradicating ESAs.  You would

```
1   be altering the way your -- whether your business is -- whether

2   the Blues can agree on this one unique client not to compete

3   with each other.  Right?

4           MR. ZOTT:  Right.  But that client, even though he's

5   bringing an individual case -- the vehicle doesn't matter.  If

6   he's bringing an individual or a class case, he is bound by the

7   (b)(2) release.  Individually -- it doesn't matter what kind

8   of lawsuit it is.

9           THE COURT:  But the (b)(2) release does not include a

10  second bid; right?  That's now become (b)(3) relief.

11          MR. ZOTT:  That's right.  Because that's legitimately

12  individualized, and we agree with that.

13          THE COURT:  The opportunity for a unique -- for

14  a self-funded account or an ASO -- I don't know if those are

15  synonymous or not.  I'm still trying to figure that out.

16          MR. ZOTT:  For today.

17          THE COURT:  Yes.  For purposes of this discussion,

18  let's say they are.

19          MR. ZOTT:  Yes.

20          THE COURT:  There's an exception under the settlement

21  for them to move beyond the exclusive service areas; right?

22          MR. ZOTT:  Yes.  They -- yes.

23          THE COURT:  All right.  So why would -- if they -- if

24  that's -- and that now moves into -- for this unique class --

25  subclass of entities, that moves over to (b)(3).  That's
```

1    indivisible.  I mean -- excuse me.  That's divisible.

2            MR. ZOTT:  Correct.

3            THE COURT:  Well, if it's divisible because it's unique

4    to them, does it matter what the quantity is?  Does it matter

5    what the terms are that they're litigating over to say that they

6    ought to be able to get this additional bid or bids?

7            MR. ZOTT:  It -- yeah.  It's divisible because it is

8    not a challenge to a policy that would apply across the board to

9    the entire class.

10           THE COURT:  Right.

11           MR. ZOTT:  So -- and so if they seek -- and a second

12   Blue bid under the structure isn't given to everyone.  It's only

13   given to certain class members.  That would make it divisible.

14   It doesn't apply to the class as a whole.  That's why it's

15   divisible.  But if their relief, even if not stated this in

16   substance -- or in form, in substance, it's actually a challenge

17   to service areas at large.  Because they get ten bids or 15

18   bids, that is a challenge to a policy that they released their

19   challenge to that policy.

20           And what I'm saying is I don't think today we have to

21   decide where that line is drawn, because that should be drawn --

22   we can articulate the principles that would govern the

23   settlement, but where exactly that line is drawn should wait

24   until we have, you know, a concrete litigating case in the

25   future.  Ultimately, I think it's going back to Your Honor.  But

1   all I'm saying is I don't think three Blue bids would basically

2   be tantamount to a challenge to the policy itself, which they

3   can't do --

4           THE COURT:  Doesn't that come down to a decision by

5   your clients about whether to challenge something or whether to

6   let something slide?

7           MR. ZOTT:  Well --

8           THE COURT:  If it's three, we may let it slide.  If

9   it's four, we're going to take the position that they can't go

10  to four.

11          MR. ZOTT:  I think that's -- partly, that's right.  It

12  would be partly litigation strategy, facts and circumstances.

13          THE COURT:  So how does he advise his clients about

14  their rights to opt out of this, what their rights would be if

15  they do opt out?

16          MR. ZOTT:  I think we have to say that you're bound by

17  the (b)(2) to the fullest extent of the law.  You can bring

18  under the (b)(3) claims for individualized relief, including

19  damages and injunctive relief, provided they don't violate the

20  (b)(2) release.  Then, you know --

21          THE COURT:  All right.  Let's say I determine for

22  purposes of this settlement that a second Blue bid is

23  sufficient; putting aside employer -- putting aside size and

24  geographic dispersion, that a second Blue bid is enough to put

25  this outside the category of clearly illegal.  All right?

1  That's one of the components that makes it not clearly illegal.

2          MR. ZOTT:  Okay.

3          THE COURT:  All right?  And what the objectors are

4  saying is not that we're entitled to a -- and I realize this is

5  hypothetical.  This is not what you're saying.

6          But objectors are saying second Blue bid is fine, but

7  everybody ought to get a second Blue bid.  You shouldn't draw

8  the line on size and geographic dispersion.

9          Would it be divisible relief, then, to let them opt out

10 and say you can pursue only a second bid, nothing else?

11         MR. ZOTT:  It is --

12         THE COURT:  You can go litigate your case about whether

13 you're entitled to a second Blue bid?

14         MR. ZOTT:  I think it is divisible relief for them to

15 opt out and pursue a second Blue bid.  I think they can opt out

16 and challenge the criteria.  I think if they opt out, they can

17 say, you know --

18         THE COURT:  Well, that would be essentially --

19         MR. ZOTT:  Yeah.  I mean, they're not bound by the --

20         THE COURT:  -- litigating the second Blue bid.  They'd

21 be challenging the criteria.

22         MR. ZOTT:  Right.  They're not bound by the divisible

23 relief.  Right.  Exactly.  But they can't go so far as to

24 violate the release they gave as a member of a nonopt-out (b)(2)

25 that assuming Your Honor approves it, it binds every member of

```
 1   that class.
 2           THE COURT:  And to some degree, we've got the next
 3   topic up.  It's going to be the second Blue bid.  So this may
 4   make more sense once we've hashed out some of the arguments in
 5   favor of the second Blue bid and some of the arguments against
 6   it.
 7           MR. ZOTT:  Sure.  Okay, Judge.  Very well.
 8           Anything else?
 9           MR. LAYTIN:  Your Honor, could I say one more sentence
10   on this point?
11           THE COURT:  You may.
12           MR. LAYTIN:  I just think --
13           THE COURT:  You're always invited to say one more
14   sentence.
15           MR. LAYTIN:  Thank you, Your Honor.
16           THE COURT:  I have a bet it's going to be more than one
17   more sentence.
18           MR. ZOTT:  That was one more sentence.
19           MR. LAYTIN:  This discussion underscores why it depends
20   on the facts and circumstances, because it is not just this one
21   axis we've been talking about about individualized, but it is
22   when the requested relief turns into a challenge that would
23   undermine the service-area system.  And that may not just be
24   this pure legal question of divisibility.  It may -- the
25   determination of whether it runs afoul of the (b)(2) release may
```

 1   actually depend on the facts and circumstances of the plaintiffs

 2   and their requests.  And Justice Potter -- you know, Justice

 3   Stewart might actually be the fact-finder.  That might actually

 4   have to be something that is determined in that collateral

 5   proceeding.

 6           THE COURT:  And my point is -- so a couple of things

 7   strike me.  One, in a case of this magnitude, this is not an

 8   unexpected occurrence that we have a wrinkle that comes up that

 9   has to be revisited during the -- even during the hearing.  So

10   that's the first point I'd make.

11           The second point is I'm probably going to want some

12   briefing on this beyond the hearing and give everybody a chance

13   to collect their thoughts, particularly our friends on the

14   objector side, who just heard this for the first time this

15   morning, go back and talk to their expert and process it.

16           But the only thing I've tried to do very clearly with

17   you is to say I'm happy to let you make your arguments about why

18   you ought to be able to opt out.  And you can tell I'm already

19   in your camp there.  I'm happy to let you make your arguments

20   about what your opt-out rights ought to look like.  What I'm not

21   going to be happy about is if it turns out your opt-out rights

22   are essentially the exception that swallows the rule,

23   undermining the (b)(2) relief that I'm considering.

24           And I used my analogy about, you know, a suit filed

25   during the course of the settlement, one, because there was a

 1  suit filed during the course of the settlement, but also because

 2  it clarifies I think what the concern is.  And that is

 3  regardless of whether we're applying the effect on judgment or

 4  the preservation of jurisdiction to consider the settlement, the

 5  whole point is we can't have people coming in and collaterally

 6  attacking a proposed settlement or a settlement.  And that's my

 7  only distinction I've tried to draw with you at this point.

 8          MR. SLATER:  Understood, Your Honor.

 9          THE COURT:  Yes.

10          Mr. Boies --

11          MR. BOIES:  Yes, Your Honor.

12          THE COURT:  -- please bring clarity to this situation.

13          MR. BOIES:  Well, I'm not sure it's possible.

14          THE COURT:  All I'm asking you to do is to help us all

15  understand.

16          MR. BOIES:  Well, if I hadn't been a lawyer, I would

17  have been a high school history teacher like my father.  So let

18  me talk a little bit about the history, because I think it may

19  be illustrative here.

20          THE COURT:  I think I would have liked to have taken

21  one of your history classes if you would have --

22          MR. BOIES:  It was great.  He was a great teacher.

23          But the history here is that we started off in which

24  the compromise was -- they were going to give us green

25  competition; we were going to not attack the ESAs.  And there

```
 1  were a lot of reasons for that, a lot of good reasons, we think.
 2  And despite the fact that we weren't going to attack the ESAs,
 3  they were going to give us some second Blue bids.  And we
 4  thought that was important, to be sure, to benefit the people
 5  who got the second Blue bids but, more important, because we
 6  thought that would have an ability to drive competition and
 7  innovation.  It would benefit the entire market.
 8         When we came to the point where we were convinced that
 9  people had to opt out, initially, we started out with a
10  proposition that if you opted out, you ought to be able to get
11  your second Blue bid like the people who stayed in.  The
12  thought -- and I'm not sure I personally agreed with this
13  thought, but the consensus on both the Blues' side and the
14  subscribers' side was that you couldn't limit it to just one
15  Blue bid; that once you concluded that it was individualized,
16  you had to permit people to have more than one -- or seek --
17         THE COURT:  To litigate their claim.
18         MR. BOIES:  -- to litigate their claim for more than
19  one Blue bid.
20         But it's clear that moving from two Blue bids to
21  multiple Blue bids was not going to be a way to sort of swallow
22  the compromise that allowed the ESAs to remain in place.
23         Now, I can't stand here and tell you where that line
24  is, and I think probably that line may depend on an
25  individualized basis with respect to particular litigants.  But
```

```
 1   it is -- I think it's a lot closer to two Blue bids than it is
 2   36 Blue bids.
 3           THE COURT:  So -- but what is the criteria?  What's the
 4   test I should apply in defining what that is?
 5           MR. BOIES:  Now --
 6           THE COURT:  That's what I'm struggling with.
 7           MR. BOIES:  Now, again, going back to the history, we
 8   got to the second Blue bid in part because national accounts,
 9   large national accounts, operated in more than one ESA.  And the
10   idea was that they should be able to go to any ESA in which they
11   had significant operations and get another Blue bid.  And I
12   still think that that is one way to cabin the number of Blue
13   bids that people could get, by saying you may be able to get
14   Blue bids from people -- from Blues in which you have
15   significant operations, because that doesn't --
16           THE COURT:  And that may actually make sense, because
17   I'm not sure what the incentive for someone on the other side of
18   the country is to come in and offer your business a deal --
19           MR. BOIES:  Right.
20           THE COURT:  -- if they're not servicing in that area to
21   begin with --
22           MR. BOIES:  Right.
23           THE COURT:  -- and have no interest in doing it.
24           MR. BOIES:  I think that's right.
25           THE COURT:  And you can always go get a bid from a
```

1  green business if that's what you're looking for.

2        MR. BOIES:  You could always get a bid from a green

3  business, no matter where they're located.

4        But I'm sympathetic to the objectors' view that says we

5  ought to define and cabin what the extent of the second --

6  multiple Blue bids or additional Blue bids are.  I think we

7  can't have it be that you can get 36.  That just swallows the

8  compromise.  So I think that --

9        THE COURT:  Let me ask counsel for the objectors this

10 question.  If your -- if there had been no line drawn of where

11 the second Blue bid was, would your client be unhappy with the

12 deal, with that aspect of it?

13       MR. SLATER:  I'd actually have to ask the clients.

14 Since that wasn't the condition they were looking at, I don't

15 have that --

16       THE COURT:  That's a fair response.

17       MR. SLATER:  I can say this.  We've spoken with the

18 economists, and one of the theories that we've been looking at

19 is an auction bid theory and how many bids do you need for

20 the competitive environment to maximize the price.

21       THE COURT:  Well, so -- yes.  That makes sense.

22       MR. SLATER:  But --

23       THE COURT:  But I'm going back to this.  We keep

24 talking about this in the context of X number of bids, I'm

25 entitled to X number of bids.  Alaska Air isn't going to -- if

 1    they were to be free from any of this, if the Blues had no ESAs,

 2    if there was no agreement in place that we're having to navigate

 3    through about a second Blue bid and Alaska Air said, you know

 4    what, we'd like to buy health insurance from a Blue, you

 5    wouldn't get 36 bids.  Not all 36 Blues would want your

 6    business.  I think your economists would tell you that; right?

 7              MR. SLATER:  Our plan -- again, I'd have to ask that

 8    question, but --

 9              THE COURT:  I'd be concerned about an economist that

10    told you differently.

11              MR. SLATER:  Well, if you have Federal Express with

12    500,000 employees, as we do --

13              THE COURT:  Now we're talking turkey.  But they haven't

14    objected; right?

15              MR. SLATER:  No.

16              THE COURT:  I'm just kidding.  I was trying to set you

17    up there.

18              MR. SLATER:  They --

19              THE COURT:  So they want -- they clearly qualify for a

20    second Blue bid; right?

21              MR. SLATER:  No, they don't.

22              THE COURT:  They don't?

23              MR. SLATER:  No, they do not.  They lose that right --

24              THE COURT:  Okay.  Because of geographic dispersion?

25              MR. SLATER:  No.  They lose that right because they've

 1   opted out of the (b)(3) class.  I have eight clients --

 2           THE COURT:  No.  I'm talking about if they didn't opt

 3   out, if they didn't object, would Federal Express -- where would

 4   they be on that list?

 5           MR. BOIES:  Federal Express I believe would qualify.

 6           THE COURT:  They would qualify for a second Blue bid.

 7           MR. SLATER:  If they hadn't opted out of the (b)(3)

 8   class.

 9           THE COURT:  Yes.  No, I'm saying they would have

10   qualified for a second Blue bid.

11           MR. SLATER:  Yeah.  If --

12           THE COURT:  Would have.  So -- but their argument is we

13   want more than two bids.

14           MR. SLATER:  Well, no.  Their argument is they want to

15   opt out of the (b)(3) class and pursue their monetary relief, as

16   they are constitutionally allowed to do, without losing the

17   right to seek a second bid.

18           THE COURT:  But they've also -- yes.  But the point is

19   they wanted more than two Blue bids or else they would have just

20   opted out of the monetary relief class, stayed in the (b)(2)

21   class, and never raised an objection to any of the (b)(2)

22   relief.

23           MR. SLATER:  Correct.

24           THE COURT:  All right.  So let's be linear here in our

25   communication.  I guess my point is this.  So the answer is you

1    do have some clients who were unhappy with just two Blue bids.

2              MR. SLATER:  Yes.

3              THE COURT:  So but what if I were to determine -- and

4    this is hypothetical -- that two Blue bids is enough to create

5    competition in the market because -- especially when you put it

6    with the green business?  I guess that's what we're getting at

7    here is to what extent are you going to be able to go back and

8    assail the entire structure of the settlement.  And Federal

9    Express is probably a good example of someone who may be tempted

10   to do just that; right?

11             MR. SLATER:  Tempted to do just what?

12             THE COURT:  To attack the entire (b)(2) structure --

13             MR. SLATER:  Your Honor, I truly don't know.  I've

14   never had that discussion with Federal Express or any of the

15   other clients.  That was never an option, and I never heard that

16   that could possibly be on the table until this morning.

17             THE COURT:  Okay.  Fair.

18             MR. SLATER:  So it would be unfair to the client for me

19   to, you know, opine on it here.

20             THE COURT:  All right.  Let me ask you this before we

21   move on to the next topic.  Because I think we've kind of

22   reached an impasse here and I think we've got to do some more --

23   I've got to have some more information.

24             Do you agree with the way that both sides have

25   articulated the legal standard?  And that is that the question

1  here is whether the structure going forward is clearly illegal;

2  and if it is not illegal to a legal certainty or unless the

3  illegality of an arrangement under consideration is a legal

4  certainty, the mere fact that certain of its features may be

5  perpetuated would not bar approval.

6          MR. SLATER:  Your Honor, I think the test is whether

7  the conduct that goes forward is illegal as a matter of law.  In

8  this case, the way that trans- --

9          THE COURT:  Is that synonymous to a per se violation?

10         MR. SLATER:  Yes, sir.  And I think the parties have

11 agreed here today and I think at the preliminary approval

12 hearing that if the horizontal territorial allocation remains

13 per se illegal after the national-best-efforts rule is

14 eliminated, that if it's per se illegal as a stand-alone

15 offense, that then the settlement could not be approved.

16         THE COURT:  All right.  And then the follow-up question

17 to that would be you've heard *Topco* and *Sealy* distinguished.

18         MR. SLATER:  Yes, sir.

19         THE COURT:  I take it you don't agree with those

20 arguments?

21         MR. SLATER:  No, I do not.

22         THE COURT:  Okay.

23         MR. SLATER:  Well, to be perfectly fair to the

24 defendants and fair to Your Honor, *Sealy* clearly talks about an

25 aggregation --

1            THE COURT:  Right.

2            MR. SLATER:  -- of offenses.  And --

3            THE COURT:  So you're hanging your hat on *Topco*, I

4    would think.

5            MR. SLATER:  Yes.  And at the summary judgment point,

6    Your Honor pointed to that, understandably, and said, I have

7    *Sealy*, and here in this case, I have an aggregation, a

8    national-best-efforts rule, along with the horizontal

9    territorial allocation.  I don't need to go further than saying

10   *Sealy* --

11           THE COURT:  And we had local best efforts and a couple

12   other ornaments on the tree.

13           MR. SLATER:  Correct.  So now the question, I believe,

14   is something that Your Honor did not confront at the summary

15   judgment stage, whether the territorial allocation is per se

16   illegal in the absence of any aggregated second offense.

17           And I think the answer to that question can clearly be

18   found in *Topco*.  In *Topco*, the defendants agreed that no one of

19   them would be able to invade the other's territory using

20   *Topco*-brand marks.  There was no prohibition on what we've

21   called here a green competition.  Any one of the defendants in

22   *Topco* could have invaded the territory of his coconspirators

23   with an XYZ brand.  Nothing prohibited it.  Yet the Supreme

24   Court said -- and this goes to the trademark piece as well.  The

25   Supreme Court said the use of the trademark in that way to

1   exclude competition against each other using that mark is a per

2   se violation of the Sherman Act.

3         And the Court even addressed specifically the

4   aggregation issue that had come up in *Sealy*.  And they said

5   *Sealy* is just like *Topco*, meaning that there would be no

6   aggregation if it were just alike.  And at the point where the

7   Supreme Court said that, it then left a footnote.  And the

8   defendants, in their papers, have never responded to this

9   footnote.  And I think it totally disposes of the question of

10  whether you need aggregation under *Sealy* in order to have a per

11  se violation.  Footnote nine appears at 405 U.S. 609.  It is

12  true that in *Sealy*, the court dealt with price-fixing as well as

13  territorial restrictions.

14        Here, Your Honor, you've dealt with the

15  national-best-efforts rule, which is a horizontal output

16  restriction, which is a form of price-fixing.

17        And the Supreme Court goes on:  To the extent that

18  *Sealy* casts doubt on whether horizontal territorial limitations

19  unaccompanied by price-fixing are per se violations of the

20  Sherman Act, we remove that doubt today.

21        That puts to rest the question of whether aggregation

22  is required and answers the question Your Honor did not have to

23  answer when you decided the summary judgment decision.

24        Now, the defendants have two additional explanations

25  for why this conduct should not be per se illegal.  One is the

1  single-entity defense, which revolves around, of course,

2  *American Needle*.  Your Honor, the defendants claim that the

3  single-entity defense protects them because what they are

4  accused of is managing the Blue Cross Blue Shield trademarks and

5  that for purposes of managing the Blue Cross Blue Shield marks,

6  they can be considered a single entity.

7       Your Honor, under *American Needle*, the criteria laid

8  out by the Supreme Court is pretty clear.  The criteria is

9  whether the agreement joins together separate decision-makers

10 and whether the agreement is, quote, among separate economic

11 actors such that the agreement deprives the marketplace of

12 independent centers of decision-making and, thus, actual or

13 potential competition.

14      Now, *American Needle* then goes on and announces a

15 functional test, and the functional test asks whether this

16 criteria has been met with regard to the alleged unlawful

17 conduct.  That's the test laid out in *American Needle*, whether

18 the criteria that I've laid out satisfies the functional test

19 asking whether the conduct is -- asking whether the conduct that

20 has been alleged to be unlawful could be the conduct of a single

21 entity.  That appears at 560 U.S. 191, also 560 U.S. 198.  The

22 Supreme Court discusses that functional application in both

23 places.

24      Professor Hovenkamp, who was cited 11 times in the

25 *American Needle* decision, has interpreted the *American Needle*

1  case to be that the proper analysis under *American Needle* is to

2  focus on the particular practice under antitrust scrutiny; in

3  other words, the same thing I said before, focus with a

4  functional test on the alleged unlawful conduct.

5       The Department of Justice, in a case that was argued in

6  the Eleventh Circuit on September 20th, a case called *Arrington*

7  *versus Burger King* -- in *Arrington versus Burger King*, Burger

8  King claimed that it was a single entity along with its

9  franchisees because they all use the Burger King trademark.  Or

10  that was one of the bases for the single-entity objection.

11       The Department of Justice Antitrust Division weighed in

12  with an amicus brief.  And in the amicus brief, which we'd be

13  happy to make available to the Court, the DOJ said that the

14  proper analysis under *American Needle* is to evaluate

15  functionally whether the defendants had disparate economic

16  interests with respect to the challenged restraint.

17       So what is the challenged restraint here?  The

18  challenged restraint is that each of the Blues, an actual or

19  potential competitor with the other Blues, agreed that none of

20  them would enter each other's territory and compete with the

21  Blue marks.  Each of these entities is a separate corporation

22  with its own profits and losses and its own sales and its own

23  incentives to make money.  Each of them is separate for the

24  purposes of determining whether they will invade a competitor's

25  territory and compete against that competitor to take away sales

1  from them.  I don't think there's any way that that challenged

2  restraint could satisfy the functional test laid out in *American*

3  *Needle* that it is the challenged restraint which must be

4  justified as the conduct of a single entity.

5          Now, in order to avoid the result that the conduct is

6  per se because the single-entity defense is unavailable -- in

7  order to justify that, the defendants, with all due respect,

8  Your Honor, misstate the rule -- misstate the test.  They say

9  that the test is whether the conduct is that of a single entity

10 for purposes of managing the Blue Shield Blue Cross trademarks.

11 Your Honor, nobody is alleging that management of the mark is

12 illegal.  The specific thing which is alleged to be illegal is

13 the agreement not to invade each other's territories.

14 Potentially, they could be a single entity with regard to

15 managing the overall quality of the mark, but --

16          THE COURT:  What do you say to the argument that they

17 can invade each other's territories, they just have to leave --

18 unlike American Express, you just have to leave the mark at

19 home?

20          MR. SLATER:  You have to what?

21          THE COURT:  Leave the mark at home.

22          MR. SLATER:  The green competition.

23          THE COURT:  You know, don't leave home without it.

24 You've seen that commercial.

25          MR. SLATER:  The green competition.  The answer to that

 1  is what Your Honor touched on earlier today.  It's *Topco*.  *Topco*

 2  says that's per se illegal.  What you're -- and the argument

 3  that this is just a trademark and you can invade the green

 4  competition, that was true in *Topco,* and the Supreme Court held

 5  that it was per se illegal.  Now, I understand Your Honor's

 6  comments that *Topco* has been criticized.

 7          THE COURT:  No.  If you go back to my preliminary

 8  approval order --

 9          MR. SLATER:  No.  I --

10          THE COURT:  -- I was quite clear that the Supreme Court

11  has told me and many people like me, it's for us to decide

12  whether our precedent is no longer valid, not for you.

13          MR. SLATER:  Your Honor and I are on the same page.

14          THE COURT:  The question is whether it's

15  distinguishable, not that it's invalid.

16          MR. SLATER:  Yeah.  I don't think it's distinguishable.

17  In *Topco*, you had the possibility of green competition amongst

18  each of the defendants, but the Supreme Court still said it was

19  per se illegal and that the linchpin of using the mark and

20  saying you can't compete against each other in each other's

21  territory by using the mark is per se illegal.

22          And, you know, the old saying you can't get there from

23  here, the defendants can't get there from here.  *Topco* controls.

24  It says this is per se illegal.  Once you dispose of the

25  single-entity defense, you're left with nothing more than *Topco*.

1          And this is true with regard to the common-law

2    trademark arguments that they make as well.  According to the

3    defendants, the fact that there were 36 entities -- actually, it

4    would have been more because there were predecessors and

5    mergers -- but 36 entities that had common-law trademark rights

6    where each of those individually owned trademark rights went to

7    one particular Blue who could choose to exercise that mark how

8    he wanted -- he might get sued by another Blue, but that would

9    be fought out in a litigation between them.  But each of the

10   separate Blues who owned those marks could go and compete with

11   them where they wanted.

12          The defendants then say that all of the Blues got

13   together and they hypothesized that they all transferred their

14   individual independent trademark rights to one entity, Blue

15   Cross Blue Shield Association, controlled by a 75 percent vote

16   of all of them.  And they say that somehow this distinguishes

17   themselves from *Topco*.  No, it doesn't.

18          Their defense argument is not a defense; it's a

19   confession.  They are admitting that what their entire argument

20   is based on is the proposition that *American Needle* is wrong.

21   Their entire argument is that under *American Needle*, we can take

22   36 independent entities, put all of the rights into one Blue

23   Cross Blue Shield Association, and that association, as a group,

24   can then make group decisions as to how and where each one of

25   these independent entities can compete.  No, they can't.  That's

```
 1   exactly what American Needle prohibits.  Once you've gotten

 2   through the analysis of their arguments on common-law

 3   trademarks --

 4            THE COURT:  Let me ask you this.

 5            MR. SLATER:  Yes, sir.

 6            THE COURT:  Have you looked at the Rule 56 record in

 7   this case?

 8            MR. SLATER:  Yes, I have.

 9            THE COURT:  Do you think I missed the mark, then, on

10   saying that was an issue for the trier of fact?  That's a

11   legit -- I'm an adult.  I can take it.

12            MR. SLATER:  Yes.

13            THE COURT:  Okay.

14            MR. SLATER:  Yeah.  I --

15            THE COURT:  But that's what you'd have --

16            MR. SLATER:  The argument --

17            THE COURT:  The argument here isn't whether or not

18   American Needle actually wins the day for you or the Blues or,

19   more appropriately, the subscribers or the Blues in this case.

20   The question is whether -- how is that issue going to come out

21   based upon a ruling of the trier of fact.  Because whether I'm

22   right, wrong, or somewhere in between, that's what the parties

23   dealt with when they sat down at the negotiating table after the

24   standard-of-review order and the orders that followed it in that

25   I said the Court cannot decide this question as a matter of law,
```

1  we're going to have to litigate this issue further.  And so to

2  litigate this issue further, the parties had a decision to make:

3  Should we litigate or should we settle?  And that was the

4  landscape they settled under; right?

5        MR. SLATER:  I wasn't privy to the settlement

6  negotiations, but I believe so.

7        THE COURT:  No.  I mean that's -- the settlement -- I

8  can represent to you -- I'm pretty certain I'm right on this --

9  the settlement negotiations bore fruit and ended up in the

10  settlement that's before the Court after I said --

11        MR. SLATER:  Yeah.

12        THE COURT:  -- there's an issue under *American Needle*

13  that has to be decided by the trier of fact.  There's

14  conflicting evidence in the Rule 56 record.  I can't make that

15  decision as a matter of law.

16        MR. SLATER:  I believe you can.  I'm arguing to

17  persuade Your Honor today that that was incorrect.  You can make

18  the decision as a matter of law.  None of the facts which I have

19  related --

20        THE COURT:  Well, how does that assail the parties'

21  position on the settlement?  You're telling me that I missed the

22  mark and I gave the parties incomplete information, perhaps.

23  But does that really go to the adequacy, reasonableness, and

24  fairness of the settlement if the parties are stuck with a

25  ruling that, to some degree, the Eleventh Circuit could have, if

 1   it decided to, taken up interlocutory?  They -- we punted the

 2   standard.  I worked just as hard on the 1292(b) order as I did

 3   the standard-of-review order because, believe me, I would have

 4   liked nothing more than two or three judges in Atlanta to tell

 5   me whether I was right or wrong.  Because we were at a fork in

 6   the road and the parties were at a fork in the road, and they

 7   had to make a decision about whether they were going to litigate

 8   for other decade or resolve the case.

 9         MR. SLATER:  Yeah.  And what I'm saying, Your Honor, is

10   that as a matter of law, without getting into any disputed fact,

11   that the analysis that I have made of *American Needle* is not

12   predicated on any legitimate disputed fact.  We know we have 36

13   independent companies.  We know they have their own

14   profit-and-losses.  The hypothesis is that they all got together

15   and --

16         THE COURT:  But you understand my question.  My

17   question is --

18         MR. SLATER:  I do.  And I guess --

19         THE COURT:  I'm accepting as true everything you're

20   telling me --

21         MR. SLATER:  Your Honor --

22         THE COURT:  -- that you believe that, that that would

23   be -- let's say it's a valid argument.  Let's say you're right.

24   You're armchair-quarterbacking me in that situation, not the

25   parties.

```
 1           MR. SLATER:  I'd phrase it a little differently, Your
 2   Honor, and more in my own favor.  What I would say is that I'm
 3   arguing that the violation, the horizontal territorial
 4   allocation, is per se illegal wherever it is in the litigation
 5   that Your Honor decides that.  And that per se rule precludes a
 6   settlement which orders people, against their will, to release
 7   the claims against those per se violations for five years going
 8   forward.  I think we're all agreed that if the conduct is per se
 9   illegal, there cannot be release going forward.  And certainly
10   it shouldn't be released in a nonopt-out (b)(2) class where
11   objectors are saying, I don't want to release that claim, you
12   shouldn't make me do it, it's per se illegal.  And I think that
13   is the condition that we're facing today.
14           And the defendants made three arguments on why Topco
15   does not mean their behavior is per se illegal.  One is
16   aggregation.  I submit that that's eliminated by footnote nine
17   to Topco.  Two is the single-entity defense.  I submit that
18   that's rendered nugatory by the fact that if you properly apply
19   the test and ask whether they can justify the allegedly unlawful
20   conduct as being that of a single entity, that that answers the
21   dispute and says no, that's not joint behavior that's -- or
22   that's not a single-entity behavior, that's joint behavior and,
23   therefore, fits right into what?  Topco.
24           Once the American Needle single-entity defense is gone,
25   as I believe it is without any disputed facts, then you're left
```

 1   with nothing but *Topco*.  An agreement among these people not to

 2   compete against each other in their respective territories using

 3   the mark unrelated to aggregation or any other offense is per se

 4   illegal, so saith the Supreme Court.  Whether they were right or

 5   wrong is beyond, you know, my pay grade.  And Your Honor has

 6   weighed in and said it's not for you to decide that either.  So

 7   once you're at that point, I think you have to -- I think

 8   everybody has to concede this conduct is per se illegal.  And if

 9   you --

10           THE COURT:  And yet they're not.

11           MR. SLATER:  Excuse me?

12           THE COURT:  And yet they're not.

13           MR. SLATER:  Your Honor, I don't want to waste more

14   time by going through that.

15           THE COURT:  No, I appreciate the argument.  You've cut

16   right to the quick on some things.  You danced around a couple

17   others, but I really do appreciate you cutting right to the

18   quick on a couple things.

19           MR. SLATER:  Let me touch on a few other items.

20           The Supreme Court in *Wal-Mart versus Dukes* very clearly

21   held that conduct cannot be included in a (b)(2) release if it

22   is individualized or divisible.  The conduct here that they want

23   released, whether they're letting me get one second Blue bid in

24   the (b)(3) class or not is divisible and is individualized.  And

25   as I said when I first stood up, it's divisible because some

1  people get it and some people don't.  For example, you know,

2  take Federal Express, as we mentioned a minute ago.  They would

3  have gotten the second Blue bid but for the fact that they

4  individually decided to opt out of the (b)(3) class, so it was

5  taken away.  That's clearly individualized relief and it's

6  clearly divisible relief.

7          THE COURT:  Now, it does strike me that in *Wal-Mart*

8  *versus Dukes,* the question was whether -- they're assessing what

9  I think was an incorrect -- incorrectly decided line of cases

10  that said that monetary relief under certain circumstances could

11  be certified under (b)(2).  And it was no surprise to me at all

12  when the Supreme Court straightened that out.

13          MR. SLATER:  Yeah.

14          THE COURT:  Of course, they amended cert and then

15  reached out and took on the (a)(2), (a)(3) question.

16          MR. SLATER:  Yeah.  And what they --

17          THE COURT:  But the (b)(2), (b)(3) question was clear

18  cut in *Wal-Mart versus Dukes*, I thought, but it doesn't deal

19  with divisible injunctive relief.  It was just damages.  Judge

20  Breyer, in the Northern District of California, had certified

21  this class under (b)(2).  He relied upon a lot of Ninth Circuit

22  authority to do that, the Ninth Circuit had affirmed him, and

23  the Supreme Court set us all straight.

24          MR. SLATER:  And what the Supreme Court said is this.

25  And the language is pretty clear.  I understand the factual

 1  distinction Your Honor is pointing to, but the language is

 2  pretty clear.  Claims for individual relief do not satisfy the

 3  rule.  The key to the (b)(2) class is, quote, the indivisible

 4  nature of the injunctive or declaratory remedy warranted, the

 5  notion that the conduct is such that it can be enjoined or

 6  declared unlawful only as to all of the class members or as to

 7  none of them.

 8          In other words, Rule 23(b)(2) applies only when a

 9  single injunction or declaratory judgment would provide relief

10  to each member of the class -- and plainly, not each member gets

11  a Blue bid -- to each member of the class.  It does not

12  authorize certification when each individual class member would

13  be entitled to a different injunction or declaratory judgment

14  against the defendant.

15          That's precisely what the settlement in this case does.

16  It gives each of the class members a different relief.  And in

17  the case of my clients, it's different in that they don't get --

18          THE COURT:  Well, technically yes; technically no.

19  Right?  I mean, it really divides the world into two parts,

20  those who get a second Blue bid and those who do not.

21          MR. SLATER:  For various and different reasons, yes.

22          THE COURT:  Professor Gentle took over my Complex Civil

23  Litigation class at Cumberland.  Maybe he's going to put

24  something like this on his next final.

25          SPECIAL MASTER GENTLE:  Absolutely.

```
1              MR. SLATER:  I've taught law school for a while, Your
2    Honor.  I'm not sure I would do this to any law student.
3              THE COURT:  Oh, I was known to do worse than this.  I
4    used to tell them I would rather be held down and physically
5    beaten with an aluminum bat than take my exam.
6              MR. SLATER:  Your Honor, let me get to the third of
7    four points.  And this -- you know, I've expressed my
8    reservations with regard to the fix expressed or dealt with this
9    morning.  But short of, you know, my reservations on that, what
10   we have is a class where there is an agreement to punish certain
11   class members for exercising their constitutional right to opt
12   out of the damages class.
13             Mr. Boies tried to explain the derivation of this and
14   why it's there, but I didn't hear a rationale or justification
15   for why somebody who opts out of the (b)(3) class would be
16   punished by losing his (b)(2) relief, a class from which he
17   cannot opt out of.
18             Your Honor, we've mentioned FedEx.  I would be remiss,
19   I think, if I didn't mention my other clients who would have
20   received a second Blue bid but for the fact that they opted out
21   of the (b)(3) class.  That includes Albertson's, which I believe
22   is the third largest supermarket chain in America.
23             THE COURT:  And my second employer ever.
24             MR. SLATER:  I hope they treated you well.
25             THE COURT:  They did.
```

1          MR. SLATER:  Boeing, Bridgestone Tire, Conagra, Dollar

2  General, FedEx, Tractor Supply, and United Natural Foods, which

3  is a name change of SuperValu, the supermarket chain out of

4  Minneapolis.

5          Your Honor, it was very difficult to explain to the

6  general counsel of these people why their firms were being

7  denied a second Blue bid.  You know, they were -- these are

8  enormous companies.  You know, Boeing and FedEx alone have over

9  800,000 employees.  And they're saying people should want my

10  business, and these guys are agreeing they won't give me even a

11  second Blue bid because I didn't like the monetary relief that

12  was allocated to me.

13          You know, Mr. Lowrey for Home Depot has a few words to

14  say after I sit down.  But, you know, it's very difficult to

15  explain to people like this why is it that they're being

16  discriminated against and punished for exercising what we told

17  them -- I told them -- was a constitutional right.  And I didn't

18  make that up.

19          THE COURT:  But, in all fairness, I think the Court's

20  proposal resolves all that.  Now, what we're quibbling about now

21  is exactly what relief they can pursue after they've opted out,

22  but there's no burden on the constitutional right to opt out or

23  the procedural right to opt out of Rule 23, so --

24          MR. SLATER:  Fair point, Your Honor.  Yeah.

25          THE COURT:  But that is a good drum beat.  It's just

1   an --

2           MR. SLATER:  Thank you.

3           THE COURT:  It's an old drum beat.

4           MR. SLATER:  Well, as long as I'm beating a drum, let

5   me comment on one thing that's been particularly troublesome,

6   and that's the way that this was handled.  At the preliminary

7   approval stage, the agreement that was presented to Your Honor

8   and the long-form notice that was attached to that agreement

9   provided that if you opted out of the (b)(3) class, you lost any

10  right to a second Blue bid, period, full stop.

11          We sent a letter to subclass counsel complaining that

12  this was unconstitutional.  After we sent that letter, the

13  long-form notice was changed.  Nobody came before Your Honor and

14  sought approval of that change.  They just changed it.  And they

15  sent out a notice that was actually -- it looks to have been

16  attached to the wrong paragraph.  But the notice says that you

17  can opt out of the injunctive relief, but all you can get in a

18  courtroom when you file your claim would be the second Blue bid

19  if you would otherwise qualify for all the criteria, including

20  dispersion, for a second Blue bid.  And then you would still

21  have to release your claims for all other relief from the

22  horizontal territorial allocation.  And it is that provision

23  that was put in there without Your Honor's --

24          THE COURT:  Well, but, again, aren't we -- hasn't the

25  Court addressed all that?

```
 1              MR. SLATER:  I'll move on.

 2              THE COURT:  Okay.  Thank you.

 3              MR. SLATER:  My last point, Your Honor, when this -- we

 4    mentioned this earlier, whether Your Honor has authority to

 5    grant opt-out rights to a (b)(2) class.  The defendants have

 6    argued that you do not, that (b)(2) does not allow for opt-outs.

 7              THE COURT:  Is there a material distinction between the

 8    Court exercising its discretion to allow people to opt out of

 9    (b)(2), as you've contended the Court has discretion to do, and

10    the Court simply migrating whatever opt-out rights and class

11    over to (b)(3) and saying you can opt out of that?  Is there any

12    real distinction between those two?

13              MR. SLATER:  Only the distinctions that you and I

14    discussed some time ago today with regard to what rights opting

15    out of a (b)(3) class that now includes the second-Blue-bid

16    relief would grant to my clients.

17              THE COURT:  Yes.  So to be honest with you, the reason

18    I think (b)(3) makes more sense than (b)(2) is it's cleaner.

19    It's clearly individualized relief, as you've articulated, or

20    divisible relief, as I've articulated.

21              MR. SLATER:  Yes.

22              THE COURT:  I think those are synonymous for purposes

23    of our discussion.  And we don't have to litigate -- that means

24    nobody has to litigate in the Eleventh Circuit whether or not I

25    had the right to let somebody out of a (b)(2) class.  I'm
```

 1  letting them opt out of a (b)(3) class, and there's plenty of

 2  case law that permits that.

 3          MR. SLATER:  Well, I believe the case law requires that

 4  you be able to opt out of a (b)(3).  *Wal-Mart* --

 5          THE COURT:  Right.  I'm just saying it's cleaner.

 6          MR. SLATER:  Your Honor, I've used up a lot of the

 7  Court's time.  Thank you very much.

 8          THE COURT:  No, you've done well with the time.  I

 9  appreciate it very much.

10          MR. SLATER:  And I believe Mr. Lowrey for Home Depot --

11          THE COURT:  I'll be glad to hear from Mr. Lowrey.

12          MR. SLATER:  -- has made much of the same arguments

13  that we have.

14          THE COURT:  But he's signaling time-out.

15          MR. LOWREY:  I'm just going to be a lot more

16  comfortable making this argument if we take a short break, Your

17  Honor.

18          THE COURT:  I understand.  We call that a quiet

19  sidebar.

20          MR. LOWREY:  You have correctly discerned my --

21          THE COURT:  Yes.  Why don't we all take a break so

22  we'll be more comfortable hearing your argument.

23          MR. LOWREY:  No guarantees on that, Your Honor.

24          MR. SLATER:  Thank you, Your Honor.

25          THE COURT:  Thank you.  Appreciate you.

```
 1       (Recess at 3:45 p.m. until 4:05 p.m.)

 2              THE COURT:  All right.  Everybody ready?

 3              MR. LOWREY:  Yes, sir.

 4              THE COURT:  I think we've reached an agreement that

 5   we're going to put on witnesses tomorrow; correct?

 6              MR. BURNS:  Yes, Your Honor.

 7              THE COURT:  And just to avoid -- to protect the public

 8   from me and to protect the witnesses from my dilatory tactics, I

 9   think we ought to do that -- plan on doing it first thing.

10   Fair?

11              MR. BURNS:  Thank you, Your Honor.

12              THE COURT:  Because if I start asking questions,

13   getting involved, next thing you know it's three o'clock and we

14   haven't put the witnesses on yet.  Okay.

15              MR. LOWREY:  Thank you for the break, Your Honor.  I

16   appreciate that.

17              THE COURT:  Thank you for being here today.

18              MR. LOWREY:  Also the welcome chance to take off the

19   mask.

20              Miss Risa, I am not going to talk fast.

21              THE COURT:  That may be the sole reason you really

22   wanted to speak; right?

23              MR. LOWREY:  It may be.  It's good enough, certainly.

24              I have my instructions:  No fast talking on Wednesday

25   afternoons, so I'm not going to do that.
```

```
1              THE COURT:  That's for her benefit more than mine.

2              MR. LOWREY:  It is.

3              THE COURT:  Because I also talk too fast sometimes.

4              MR. LOWREY:  She mentioned that, Your Honor.

5              THE COURT:  I'm sure she did.

6              MR. LOWREY:  That's not true.  I made that up.

7              THE COURT:  She would have if you had asked her.

8              MR. LOWREY:  So good late afternoon.  It's Frank Lowrey

9    representing the Home Depot, only the Home Depot.  Anything I

10   ask you about today is something that I want to do for the Home

11   Depot and no one else.  We are self-insured.  We are an ASO.  If

12   there's a difference between those things, I don't know it.  But

13   I do know --

14             THE COURT:  I was just being careful earlier.

15             MR. LOWREY:  I do know that we employ somewhere over

16   400,000 insured lives.  We have opted out of the (b)(3) damages

17   class.  As you probably know, we have endeavored to opt out of

18   the (b)(2) class; but I've heard you on that, and I'm not going

19   to spend time talking about that.

20             THE COURT:  So can I ask one question?

21             MR. LOWREY:  Yes, Your Honor.

22             THE COURT:  And I'm treating you as the reasonably

23   prudent person from corporate America.  Before Mr. Hausfeld and

24   Mr. Boies showed up on the scene, where were y'all?  Why hasn't

25   big corporate America ever challenged the Blues on these things?
```

```
 1              MR. LOWREY:  You know, I can't speak for large

 2   corporate America, and I've never -- you know, if you're asking

 3   me a factual question, I've never had a discussion with my

 4   client about what sort of decision-making they have or haven't

 5   done on that.

 6              THE COURT:  But your counsel has appeared here saying

 7   this is so clearly per se --

 8              MR. LOWREY:  Well --

 9              THE COURT:  -- that it's hang on the rim, slam dunk; in

10   fact, we probably shattered the glass.  And yet for none --

11   Federal Trade Commission, Department of Justice, Home Depot,

12   Federal Express, anyone -- ever brought these claims before any

13   other court before; right?

14              MR. LOWREY:  As far as I know.  Well --

15              THE COURT:  So what do I make of that?

16              MR. LOWREY:  Well, I don't -- I don't think anything

17   with respect to the points I want to make to you.  I don't think

18   that it relates.  And we mostly just want to be out and be able

19   to reserve our rights to assert our claims in the future as may

20   seem right to us for a variety of business reasons that things

21   like that do.

22              And so -- and maybe I should start with this.  You

23   know, we come here with great respect.  We come here with great

24   respect for the lawyers, for the Court, for the parties, for the

25   work that all of you have put into this settlement.  Truth be
```

 1    told, I'd like not to be here at all, but I am here and I am in

 2    the (b)(2) class.  And I want to talk to you about three aspects

 3    of it that are important to my client, and I think I can be

 4    useful to the Court on those topics as well.

 5          And the first one I wanted to talk about was what sort

 6    of ruling you should or should not make, can or cannot make,

 7    regarding whether the going-forward structure is per se illegal.

 8          And so I may need a little bit of assistance, because I

 9    want to use this document camera here, and I think somebody

10    probably needs to turn it on.

11          THE COURT:  Well, that's certainly not in my category.

12          MR. LOWREY:  I wasn't instructing the Court to do it,

13    certainly.  I just knew I wasn't able to do it.

14          Before we talk even about Article III, there's some

15    very clear Rule 23 law that instructs courts that you weigh the

16    likelihood of success and failure and all of the *Behring* factors

17    that we've talked about, but you do not decide the merits of the

18    case and you do not resolve unsettled legal questions.

19          Former Fifth made that same point.  It cannot be

20    overemphasized -- now, I wouldn't let my associates write that

21    way.  I would strike that out if I was editing a brief.  But the

22    Fifth Circuit says, it can't be overemphasized that neither the

23    trial court, in approving the settlement, nor this court, in

24    reviewing that approval, have the right or duty to reach any

25    ultimate conclusions on the issues of fact and law which

1    underlie the merits of the dispute.

2         It doesn't just say you don't decide the whole case.

3    It says you don't decide the issues of law and fact that

4    underlie the dispute.

5         So let's skip *Dixie Electric* for a minute and talk

6    about *Bennett versus Behring*.  What do we make of this language

7    here that you have quoted to us?  And quite rightly so.  In

8    *Bennett versus Behring*, the Eleventh Circuit instructs --

9    because the argument was the settlement didn't go far enough;

10   right?  And Eleventh Circuit's reaction is unless the illegality

11   of an arrangement under consideration is a legal certainty, the

12   mere fact that certain of its features may be perpetuated is no

13   bar to approval.

14        So how do you put that law together?  What does it

15   mean?  And I took what I think is kind of a Michael Scott

16   approach to this.  This is what I think you can say consistent

17   with the case law:  I have not decided and I am not certain that

18   the conduct that would continue is per se unlawful.  And I gave

19   that one a red check because that's perfectly consistent with

20   all of the authorities that I just read to you.  This is what I

21   believe the case law prohibits you from saying:  I have decided

22   that the conduct that would continue is not per se unlawful.

23        Now, those are two different things.  In the first

24   instance, you were saying, look, this is a complicated issue and

25   I haven't decided it.  Just because it's an issue of law that

 1   would ultimately have one answer, per se or not per se, doesn't

 2   mean it's clear.  It doesn't mean it's certain.  I haven't

 3   decided it in this case.  This settlement obviates my need to

 4   decide it.  Now, if I had decided that it was per se illegal, I

 5   might have a different case on my hands, but that is within the

 6   ambit of what Rule 23 allows.

 7             THE COURT:  So pick that piece of paper up and go back

 8   to your previous piece of paper.

 9             MR. LOWREY:  Yes, sir.  I already lost it.  There we

10   go.  Which one?

11             THE COURT:  Very bottom.  *Bennett*.  If the illegality

12   of an arrangement is legally certain --

13             MR. LOWREY:  Yes, sir.

14             THE COURT:  -- I can't approve the settlement.

15             MR. LOWREY:  If you are legally certain -- if you are

16   legally certain that the going-forward conduct is per se

17   illegal, then you can't approve the settlement.

18             THE COURT:  And do you -- I can't remember what you

19   said a moment ago, and I apologize for that.  But do you think

20   that's synonymous with if the settlement structure presents what

21   would be a per se violation, I can't approve the settlement?

22             MR. LOWREY:  If you are certain, if you have decided to

23   a legal certainty that this is a per se issue and not a

24   rule-of-reason issue, I don't think you could approve it; but

25   more to the point, it's clear that you're not going to.

```
1              THE COURT:  Right.
2              MR. LOWREY:  So that's essentially academic.
3              THE COURT:  That goes without saying.
4              MR. LOWREY:  Sure.  So -- but what --
5              THE COURT:  Okay.  But your point is nothing the Court
6    should do in the -- if I, in fact, approve the settlement --
7              MR. LOWREY:  Yes, sir.
8              THE COURT:  -- and I guess to some degree if I don't
9    approve the settlement -- I'm not making a legal ruling on
10   whether it's per se or not.  I'm just saying that if it appears
11   to me to be per se, I can't approve the settlement.  But beyond
12   that -- and I don't know the difference between legal certainty
13   and "appears to me."  I mean, if something is legally certain,
14   it's certainly going to appear to me to be so.
15             Let me ask you this, though.  If it seems to be per se,
16   I shouldn't approve the settlement, should I?
17             MR. LOWREY:  As a matter of power or as a matter of
18   discretion?
19             THE COURT:  Either.
20             MR. LOWREY:  I don't presume to question the Court, of
21   course, but my concern is more with the limits of your power and
22   what findings you can make in the settlement context.
23             THE COURT:  And you're singing out of my songbook here,
24   because I am very much federalism driven.
25             MR. LOWREY:  I have read your stuff.
```

```
1          THE COURT:  I think too many -- to be honest, too many
2   of my colleagues in the past, shall we say -- we won't even
3   count the ones in the present -- but in the past have
4   misunderstood their role in our limited branch of government.
5          So you're right.  I don't want to do anything that
6   would be beyond my authority.  But I do have a responsibility to
7   make sure that the arrangement under consideration is not
8   illegal.
9          MR. LOWREY:  I respectfully don't agree.  What I think
10  you need to do is weigh the Bennett versus Behring factors.  And
11  so, for example, you might say were this litigation to proceed,
12  the plaintiffs might persuade me -- and ultimately, a trier of
13  fact on this single-entity issue -- that this is a per se
14  illegal agreement.  And that's --
15         THE COURT:  I thought that's what I just said.  So you
16  picked --
17         MR. LOWREY:  No.
18         THE COURT:  You said you did not agree with what I just
19  said?
20         MR. LOWREY:  I did not agree with what you just said.
21         THE COURT:  I just basically read you Bennett versus
22  Behring, I thought.  I've got to make certain that the
23  arrangement under consideration is not illegal.
24         MR. LOWREY:  No, Your Honor.  Respectfully, you're
25  transposing the language.  As long as you are not legally
```

```
 1   certain that it is illegal.  It's the difference between these
 2   two things.  One, the Bennett --
 3            THE COURT:  No, I don't think it is.  I think it's
 4   somewhere in between.  I think it's --
 5            MR. LOWREY:  I --
 6            THE COURT:  -- maybe 1.5.  And I'm not sure that your
 7   one and two are necessarily capturing the correct legal standard
 8   that I apply here.  I wonder if the standard isn't actually
 9   between those two.
10            Pull that up again.
11            MR. LOWREY:  Which one do you want?
12            THE COURT:  The pink one.  Yes.
13            Okay.  Unless the illegality of an arrangement under
14   consideration is a legal certainty -- now, the Eleventh Circuit
15   has said that different ways and at different times.  Refer back
16   to the Blues' presentation earlier:  Although the Court must
17   conclude that the going-forward system is not clearly illegal,
18   it need not resolve the ultimate merits of the legal claims.
19            That's your point.
20            MR. LOWREY:  Right.  You cannot decide -- and I'm
21   always cautious when I tell a court it can't do something, and
22   it's obviously not me saying you can't.
23            THE COURT:  Yes.  You're an advocate.  I'm not taking
24   it personally.
25            MR. LOWREY:  Fair enough, Your Honor.
```

```
 1            That is right.  I am telling you that in the context of
 2  settlement approval, you can't decide a legal issue of that
 3  sort.
 4            THE COURT:  I think the point is I can't try the legal
 5  issue.  I can't decide on the merits of the legal issue, but I
 6  have some obligation before I approve this settlement to make
 7  sure that the settlement doesn't authorize a continuation of
 8  clearly illegal conduct.
 9            MR. LOWREY:  I -- if you have decided that the conduct
10  is clearly illegal, if you have decided that, you're in one
11  position.  My point is if you have not decided that, unless you
12  are certain that it is illegal, that's not an issue you resolve
13  in the context of settlement.
14            THE COURT:  By the way, I think the proponents of the
15  settlement are glad you're saying these things.
16            MR. LOWREY:  Well, they may be.  But this is my worry.
17  So you might say, Frank, why do you care about this?
18            THE COURT:  Yes.
19            MR. LOWREY:  Well, my concern is that --
20            THE COURT:  I figured you were getting there.
21            MR. LOWREY:  My concern is that I have opted out of the
22  (b)(3) damages class.  What the Blues would like for you -- and
23  I always hesitate to speak for, you know, another party; but in
24  my belief, what the Blues would like you to do is make a legal
25  ruling that they will claim has resolved the standard that's
```

 1  going to apply to my future damages lawsuit, should I ever bring

 2  one.

 3         THE COURT:  No.  I don't think that's their argument.

 4  I think their argument is you're free to go try to convince

 5  Judge Manasco, Judge XYZ, Judge Proctor in your unique case,

 6  uniquely filed case on your own behalf, that the arrangement

 7  that you're challenging -- and that would be the presettlement

 8  arrangement -- let me -- let me --

 9         MR. LOWREY:  Certainly, Your Honor.  Go ahead.

10         THE COURT:  I'm going to get to where you want me to

11  be.  So when you go in for a damages class, the damages are

12  based upon your case as it existed during the period of the

13  statute of limitations; right?

14         MR. LOWREY:  So if I were to file suit --

15         THE COURT:  Are you in the Alaska Air case?

16         MR. LOWREY:  I'm not.

17         THE COURT:  Okay.

18         MR. LOWREY:  No, Your Honor.  I don't have a lawsuit.

19         THE COURT:  Let's say you were.  Let's say you were.

20         MR. LOWREY:  Okay.

21         THE COURT:  Your argument there is the aggregation of

22  output restrictions, including ESAs and national best efforts in

23  the past, is a violation of the Sherman Act.  You would also

24  argue, though, that going forward, as applied to us, the

25  settlement violates our rights.  In either event, your money

1   damages is going to be based upon what the conduct was basically

2   presettlement because there's not a settlement right now if you

3   were in the Alaska Air case.

4           MR. LOWREY:  Okay.

5           THE COURT:  Make sense?

6           MR. LOWREY:  I think it does.

7           THE COURT:  Following me?

8           MR. LOWREY:  But I don't think anything about the

9   Alaska Air case.

10          THE COURT:  Well, let's say it's a copycat of the --

11  and maybe that's an unfair -- that's not a derisive term.  It's

12  just a descriptive term.  It's asserting the claims on Alaska

13  Air that was asserted individually -- that were asserted an

14  behalf of Alaska Air as an absent class member in this case.

15          MR. LOWREY:  So right now they have no post-settlement

16  damages claim is your point.

17          THE COURT:  Yes.  Because there's not a settlement.

18          MR. LOWREY:  Right.  That's correct.  And so maybe I

19  could save --

20          THE COURT:  My hypothetical is if Home Depot were in

21  that case, your (b)(3) damages claim is going to be based upon

22  what occurred prior to the settlement.

23          MR. LOWREY:  I think that's correct.

24          THE COURT:  Okay.  Now, your injunctive relief claims

25  might be a little different, because that's going-forward

1  relief --

2           MR. LOWREY:  That's correct.

3           THE COURT:  -- that has to take into account a judgment

4  of a court of competent jurisdiction who has put in place a

5  structural relief judgment going forward and the restrictions in

6  the law that exist on your ability to collaterally attack that

7  judgment and go your own way.

8           What's in between those two things, though, is this

9  category that we've been talking about of (b)(3) divisible

10 relief, of unique individualized injunctive relief that you're

11 seeking on behalf of your client that would be, one, unique to

12 your client and, two, not inconsistent with the judgment as it

13 affects others in the class settlement.  Right?

14          MR. LOWREY:  I understand you were describing how the

15 settlement would work if -- if approved, I believe.

16          THE COURT:  Well, I'm not -- I'm actually

17 distinguishing monetary damages --

18          MR. LOWREY:  Right.

19          THE COURT:  -- under (b)(3) that your -- that Home

20 Depot can pursue.

21          MR. LOWREY:  Sure.

22          THE COURT:  And injunctive structural relief under

23 (b)(3) that would be individualized --

24          MR. LOWREY:  Correct.

25          THE COURT:  -- that Home Depot could pursue.

```
 1          MR. LOWREY:  Right.  What I -- and let's suppose --
 2   just to add the third wrinkle, let's suppose the settlement is
 3   approved, becomes final, I file suit a year or so later.  I have
 4   damages for both pre- and post-settlement conduct.  I also have
 5   injunctive relief claims.  Obviously, all injunctive relief
 6   claims are prospective.
 7          What I don't believe, respectfully, that you have the
 8   power to do and what you should not do is make a ruling in this
 9   case about what legal standard, per se or rule of reason, is
10   going to govern my damages lawsuit --
11          THE COURT:  I can't disagree with you on that at all.
12          MR. LOWREY:  Perfect.  Well, then, that is my concern.
13          THE COURT:  It's not my -- I don't think anything I do
14   here is going to be binding on a -- because otherwise, that --
15   any ruling I make would affect not just (b)(3) individualized
16   injunctive relief, it could affect (b)(3) monetary damages.
17          MR. LOWREY:  Absolutely, Your Honor.  And if I'm
18   suspicious, everyone should accept my apology.  But I very much
19   believe that what the Blues would like is a ruling that the per
20   se standard does not govern their going-forward conduct, that
21   they --
22          THE COURT:  Well, why don't we just ask them because
23   they're right here.
24          You're not going to get in and argue that I've made, by
25   approving a settlement, a legal merits decision on whether this
```

```
 1   system, going forward, is per se that would bind an opt-out from
 2   litigating that claim in front of Judge Manasco, for example?
 3             MR. ZOTT:  What we've said -- and the objectors -- the
 4   other objectors agree with this, the Sperling objectors and
 5   subscribers -- is you need to decide whether the settlement --
 6             THE COURT:  Get close to that microphone, just for the
 7   benefit of Risa.
 8             MR. ZOTT:  Yeah.  You would need --
 9             THE COURT:  I can hear you, but I just want to make
10   sure she gets you.
11             MR. ZOTT:  Sorry.  You would need to decide whether the
12   go-forward system is per se unlawful or clearly illegal -- we
13   think those are synonymous under Grunin and Robertson -- or
14   instead, whether it's subject to the default rule of reason.  We
15   think you need to make that finding.
16             If you make that finding, it doesn't mean that it would
17   bind a future judge because you're -- Your Honor, you're not the
18   Eleventh Circuit, with all respect.  But it could be cited as
19   precedential value, just like we cite other district court
20   cases, but --
21             THE COURT:  Or persuasive value.
22             MR. ZOTT:  Yeah.  Persuasive.  And they would be free
23   to argue otherwise.  But we do think you need to make a finding
24   in this case.  And I'm not going to lie to you.  We would argue
25   it.
```

1          THE COURT:  Well, the finding in this case would be

2   that the going-forward structure is not clearly illegal.

3          MR. ZOTT:  Right.  Or per se.

4          THE COURT:  Or per se.

5          MR. ZOTT:  And as, you know, the plaintiffs pointed

6   out, therefore, it's binary.  If it's not per se, it's rule of

7   reason.  There is no in-between.  And then --

8          THE COURT:  But if the objector who opts out or an

9   opt-out who's not even an objector -- let's just say an

10  opt-out --

11         MR. ZOTT:  Yeah.

12         THE COURT:  -- travels into a different case and

13  litigates its Sherman Act rights in that additional case,

14  nothing about the approval of my settlement affects their

15  ability to prove in their individual case a Sherman Act

16  violation; right?

17         MR. ZOTT:  Well, no.  Absolutely -- I totally agree.

18  First of all, even if --

19         THE COURT:  Now, there may be some limit on what

20  injunctive relief they can seek.

21         MR. ZOTT:  Right.  Right.

22         THE COURT:  For example, nothing would affect them

23  stepping in -- outside this settlement -- into a different case

24  and saying the presettlement structure was a per se violation

25  and we're entitled to money -- treble damages for that reason.

 1            MR. ZOTT:  The presettlement structure?

 2            THE COURT:  Yes.

 3            MR. ZOTT:  Right.  I think Your Honor has already --

 4    that's been your ruling up till now, so --

 5            THE COURT:  Yes.  And you agree with that.

 6            MR. ZOTT:  I agree that they could argue that.  Yes.

 7            THE COURT:  Yes.  They've got to prove it --

 8            MR. LOWREY:  Right.

 9            MR. ZOTT:  Yes.

10            THE COURT:  -- but nothing cuts them off at the pass on

11    asserting that claim.

12            MR. ZOTT:  Right.

13            THE COURT:  All right.  So then we get to --

14            MR. ZOTT:  The future.

15            THE COURT:  -- what really is the rubber hitting the

16    road for purposes of the majority of our discussion today, and

17    that is what about structural relief in the settlement approved

18    by a court?

19            Going forward, nothing prohibits them from seeking

20    individualized injunctive relief, whatever that turns out to be,

21    and arguing that whatever theory they have for that, that we're

22    entitled to this structural -- unique, individualized structural

23    relief because while the court said in In Re Blue Cross Blue

24    Shield Antitrust Litigation that it could not say or that the

25    illegality of the arrangement was not a legal certainty or the

```
 1  court said it wasn't clearly illegal or the court said for
 2  purposes of the classes involved in that case, it wasn't a per
 3  se violation, that doesn't limit them from arguing
 4  individualized claims for individualized relief departing from
 5  that conclusion, does it?
 6          MR. ZOTT:  I think as a legal matter, the answer is no.
 7  We would -- I won't lie to you.  We would cite that opinion and
 8  say with all these changes, we think that's persuasive.
 9          THE COURT:  You'd say you don't have to follow
10  Proctor --
11          MR. ZOTT:  We think you should.
12          THE COURT:  -- but he's really smart --
13          MR. ZOTT:  Yeah.  He's very smart.  Exactly.
14          THE COURT:  -- and you should follow Proctor.
15          MR. ZOTT:  That's what we would say.
16          THE COURT:  Okay.  Not that --
17          MR. ZOTT:  Not that you're bound by it.
18          THE COURT:  Judge Manasco, you cannot even trod this
19  ground because Proctor has already trod it and it's now a
20  no-pass zone.
21          MR. ZOTT:  I think that's right, Judge.
22          THE COURT:  Does that satisfy you?
23          MR. LOWREY:  Maybe.  I'm not exactly --
24          THE COURT:  It should.
25          MR. LOWREY:  Well, I understand.  But a lot of words
```

1  there, and let me make sure I understand.  Because here's my

2  worry.  My worry, just to state it, is that, you know, I'm in

3  the (b)(2) class as Your Honor is going to reform it and as

4  you've indicated --

5          THE COURT:  If I approve it, you're in the (b) --

6  there's not a (b)(2) class right now.  There's a preliminary

7  approved (b)(2) class, which you'd be happy to be in at this

8  point.

9          MR. LOWREY:  If you don't approve this, I'm out of your

10  hair.  So if you approve it, if you approve a (b)(2) class and

11  you don't let me out, which I know you've said you aren't going

12  to, I believe --

13          THE COURT:  If I approve it, you're right, you're not

14  getting out.

15          MR. LOWREY:  I hear you, Your Honor.  I believe that

16  the Blues will take whatever ruling you make in your approval

17  order, whether you say it's not clearly illegal, not per se

18  illegal, whatever you say, and argue that I am bound as a class

19  member --

20          THE COURT:  He just said on the record he's not going

21  to make that argument.

22          MR. LOWREY:  If that is crystal clear in your order.

23  And I don't want to have to be digging out a transcript someday

24  when I file my suit and reading a multi-page colloquy to, you

25  know --

```
 1          THE COURT:  Tell you what.  If you would like, you may
 2   submit to chambers the three sentences you want in the order
 3   that makes that clear.
 4          MR. LOWREY:  Now we're talking.  Perfect.  Thank you.
 5          THE COURT:  That doesn't mean I'm going to adopt it,
 6   but that means --
 7          MR. LOWREY:  You let me get my foot in the door, and
 8   you never know what's going to happen.
 9          THE COURT:  I'm going to -- but I will not do anything
10   that's inconsistent with that -- that's my commitment to you
11   today -- unless I follow up with more questions and give you an
12   opportunity to respond to them because something didn't occur to
13   me and now, all of the sudden, I've got some questions about
14   what we may or may not have reached agreement on today.
15          MR. LOWREY:  I hear you.
16          THE COURT:  Fair?
17          MR. LOWREY:  You'd give me a chance to reengage.
18          THE COURT:  Absolutely.  I don't think I need to hear
19   anything more today.  If I do need to hear more, you'll be the
20   second to know, because I'll just tell the special master to
21   hunt you down.
22          MR. LOWREY:  That sounds great.  So I'm going to close
23   that folder and open my folder that says second Blue bid.  And I
24   don't have a lot to say about this.
25          THE COURT:  Can you hold off on that until I hear
```

1   argument on the second Blue bid?

2         MR. LOWREY:  Happy to.

3         THE COURT:  Because I don't think we've done that yet.

4         MR. LOWREY:  Happy to.  This has to do --

5         THE COURT:  We've certainly touched and concerned it,

6   but I haven't really had the proponents get up and explain to me

7   what they agreed to, why they agreed to it, and why it's fair,

8   adequate, and reasonable.

9         MR. LOWREY:  Yes, Your Honor.  And so all of my remarks

10  have to do with the issue that you've heard pretty substantial

11  debate on, which is what's going to happen now that we're moving

12  second Blue bid to (b)(3).  It doesn't have to do with --

13        THE COURT:  Okay.  You may address that.  I thought you

14  were going to be attacking the whole second-Blue-bid

15  methodology.

16        MR. LOWREY:  No.  No, Your Honor.  I do think that

17  probably is best deferred.  I think that's right.

18        So first of all, thank you.  I mean, it is clear that

19  there is some motion happening here on the second-Blue-bid issue

20  as a result of the Court's involvement, and we appreciate that.

21  And so I just have a few -- I don't even want to call them

22  concerns, just thoughts about, you know, what needs to get

23  worked out.  I definitely understand that you're moving the

24  second Blue bid or the second Blue bid is going to move to a

25  (b)(3) class.  It may or may not be the same class as the

1   damages class.  We think it --

2          THE COURT:  I think it probably will not if my thinking

3   on the matter stays as it is.  It will be a separate (b)(3)

4   divisible injunctive relief class.

5          MR. LOWREY:  And so we absolutely agree, Your Honor.  I

6   won't belabor that point.  The other thing -- the thing that I

7   can't tell -- and I think I can't tell it because it just hasn't

8   been resolved -- is I can't tell how much of the release is

9   coming with the relief into (b)(3).  That was an awkward way of

10  saying this.

11         THE COURT:  You don't know exactly what you're --

12  you're saying, I don't know exactly what I'm releasing by

13  remaining in the (b)(2) class but getting out and going into

14  the -- and opting out of the (b)(3) class.

15         MR. LOWREY:  That is exactly right.  And my real

16  bottom-line plea to you is that whatever it is, let's have it be

17  clear.  It can't just be you can seek multiple Blue bids up to

18  the point that it's, you know, inconsistent with the (b)(2)

19  relief.  You can't do that to yourself or the judges that come

20  after or to me or to all of the people who will be trying to

21  figure out what that means.

22         Settlement is compromise.  It would be pretty easy just

23  to specify a number of bids.  It would be maybe a formula based

24  on where your employees are or something like that that was

25  suggested as well.  I don't so much have answers as just the

 1  request that that be clean and clear so I can advise my client

 2  and, you know, not be held in contempt when I file my lawsuit

 3  because I asked for too many Blue bids.  That is really all I

 4  wanted to say about that.

 5          THE COURT:  I notice you heard that story.

 6          MR. LOWREY:  I listened very carefully.  Whenever the

 7  "contempt" word comes out of a judge's mouth --

 8          THE COURT:  Yes.

 9          MR. LOWREY:  -- I tend to listen.  I've been doing this

10  long enough to --

11          THE COURT:  Well, it wasn't my idea.

12          MR. LOWREY:  I understand.

13          THE COURT:  And believe it or not, magically, the

14  parties all resolved their differences after that ruling came

15  out and I didn't have to hold a contempt hearing.

16          MR. LOWREY:  It is funny how contempt or the threat of

17  contempt --

18          THE COURT:  I will say this.  One of the judges -- and

19  I won't say who -- who was on that panel subsequently remarked

20  that he was very surprised that the parties who he thought he

21  had ruled for, the objectors, had filed a motion to reconsider.

22          And I said, well, you know, the fact that they're no

23  longer just enjoined but now enjoined and going to a contempt

24  hearing might have had something to do with that.

25          MR. LOWREY:  I think that's right.  You know, Your

1  Honor, I had one more thought on second Blue bid.  And I don't

2  know --

3          THE COURT:  And that was all after the fact, obviously.

4          MR. LOWREY:  Right.  I don't know whether it fits in

5  what you're hearing now, but I think it is because it's more

6  procedural than merits.  And it is simply this observation.

7  There isn't a self-insured class representative in our position.

8  So we don't get a second --

9          THE COURT:  What do you mean by "in our position"?

10          MR. LOWREY:  I will tell you.  We don't get a second

11  Blue bid because we opted out of the damages class.  We would

12  otherwise qualify --

13          THE COURT:  But you're not in that class anymore.

14          MR. LOWREY:  And so if we get a second bid, perhaps

15  this point becomes moot.  But -- okay.  So maybe I'll -- maybe

16  I'll just table this point until we decide what we're going to

17  do.

18          THE COURT:  And are there not representatives in the

19  class that qualify for a second bid and don't qualify for a

20  second bid, both?

21          MR. LOWREY:  Not that are self-insured, Your Honor.

22          THE COURT:  All right.

23          MR. LOWREY:  They're the ones who get 93 percent of the

24  damages fine.  The only, as I understand it, self-insured class

25  rep is Hibbett, and Hibbett is getting a second bid.

```
 1          And so my point is just this.  And this is obviously no
 2   cut on Hibbett at all.  But there ought to be a class
 3   representative that gets the same mix of benefits and losses
 4   that we do if we're going to be adequately represented.  And so
 5   the only self-insured representative is getting a major
 6   settlement benefit -- self-described major settlement benefit,
 7   as the proponents say, that we don't get.  And I think that
 8   creates an adequacy problem.
 9          The trade-off that that class representative has made
10   between what he's giving up and what he's keeping is different
11   than the one that we have to make.  And, you know, we understand
12   that what you do with the number of Blue bids may moot that
13   argument; but if it doesn't, we make that argument.
14          THE COURT:  Well, let me ask you this.  You heard my
15   exchange with counsel for the objectors a moment ago.  And do
16   you agree with me that this isn't a question of how many bids
17   you're entitled to, it's just a question of whether the Blues
18   can agree between themselves if you travel to a -- if you opt
19   out of the (b)(3) class and no longer are bound by the structure
20   of who gets two Blue bids and who doesn't, you can assert the
21   claim that the Blues should not be able to agree as it relates
22   to us?
23          MR. LOWREY:  Oh, that's -- and again --
24          THE COURT:  No one else.  We're not here on behalf
25   of -- we're not here on behalf of South --
```

```
 1              MR. LOWREY:  Anyone but Home Depot.

 2              THE COURT:  Entity A, entity B, entity C.

 3              MR. LOWREY:  Right.

 4              THE COURT:  We're here on behalf of Home Depot only.

 5   And our complaint is the Blues should not be able to agree among

 6   themselves that only one person can give us a Blue bid.

 7              MR. LOWREY:  That is correct.  And --

 8              THE COURT:  Okay.  So it doesn't -- we don't get into

 9   how many bids that should be.  We just get into whether -- in

10   that situation, we get into we've opted out of the (b)(3)

11   class --

12              MR. LOWREY:  Uh-huh.

13              THE COURT:  -- we're pursuing limited injunctive

14   relief, individualized to us, that says we should be able to get

15   however many bids that the Blues decide they want to bid on.

16   And, you know, we have 400,000 employees.  You would think a

17   few -- a couple of Blues, anyway, would want to bid on our work

18   if they had that opportunity.

19              MR. LOWREY:  That would be great, Your Honor.  I would

20   love the opportunity to be able to make that argument.

21              THE COURT:  But isn't it as simple as that?

22              MR. LOWREY:  Well, I don't think that my colleagues

23   back here are going to say that.  I don't --

24              THE COURT:  I'm not asking your colleagues back there.

25              MR. LOWREY:  Well, I mean the settlement proponents.
```

```
 1              THE COURT:  No.  I'm not asking them either.

 2              MR. LOWREY:  Fair enough.

 3              THE COURT:  I'm asking you.

 4              MR. LOWREY:  So it absolutely should be as simple as

 5    that.  I think I should be able to opt out, pursue individual

 6    injunctive relief, and get an order that says you can't agree

 7    amongst yourselves how many Blue bids the Home Depot can get.

 8    As many people can bid as want to bid, and we're going to have

 9    competition.  We're going to have an auction for our over

10    400,000 --

11              THE COURT:  Because before the settlement, that was at

12    least a theory or a claim that you expected class counsel might

13    be pursuing for you; right?

14              MR. LOWREY:  That's correct.  And so I ought to be able

15    to --

16              THE COURT:  And if you don't agree with the settlement,

17    whether or not it's fair, adequate, and reasonable, you don't

18    agree with it.  You don't want to be that portion of the

19    settlement.

20              MR. LOWREY:  That is correct, Your Honor.  And if

21    you -- you know, if I can get out of the release of that claim,

22    if I can pursue my claim for I'll just call it unlimited Blue

23    bids -- and let me be clear.  Your point is well taken.  I'm not

24    trying to force anyone to give me a bid.  That's up to them.

25    All I want it to be is freely competitive.  And so if I can
```

1  make, in a damages and injunctive relief lawsuit, the claim that

2  I'm entitled to, you know, unlimited Blue bids, whoever wants to

3  bid, I'm a much happier man.

4         THE COURT:  All right.  Fair enough.  I think I've got

5  your position.

6         MR. LOWREY:  Fair enough.

7         Let me talk about an issue that hasn't had a lot of

8  discussion yet.  And it is a very important issue to my client

9  and it's the one that we led with in our briefing, which is that

10 we don't think that you can and we definitely don't think that

11 you should approve a mandatory (b)(2) settlement that releases

12 claims for future injunctive relief.  That was a mouthful.

13        THE COURT:  I think I have your argument, though.

14 Release of future -- related to future conduct?

15        MR. LOWREY:  So I want to talk about that distinction

16 because -- I want to do two things, if it pleases the Court.  I

17 want to talk to you about the circuit authority that I believe

18 binds you, and then I want to talk about their effort to

19 distinguish it.  Is that acceptable?

20        THE COURT:  Yes.

21        MR. LOWREY:  So the circuit authority that I believe

22 binds you is *Redel's versus General Electric*.  Could hardly be

23 too much plainer.  Releases may not be executed which absolve a

24 party from liability for future violations of our antitrust

25 laws.  The prospective application of a general release to bar

 1   private antitrust action arising from subsequent violations is

 2   clearly against public policy.

 3            THE COURT:  So forgive me.  That's the former Fifth

 4   Circuit, which is binding.

 5            MR. LOWREY:  Yes, Your Honor.

 6            THE COURT:  But I haven't memorized every case recited

 7   by the former Fifth Circuit.  So was *Redel's* a class action?

 8            MR. LOWREY:  *Redel's* was not a class action.  I

 9   wouldn't expect you to go back to 1974 with your encyclopedic

10   knowledge of the cases.  It was not a class action.  It was a

11   one-on-one settlement.  Now, that fact makes it better for me

12   than if it were a class action, and here's the reason why.

13            THE COURT:  I'm not following you on that, but I can't

14   wait to hear the explanation.

15            MR. LOWREY:  I can tell you exactly that.  Even in a

16   one-on-one settlement, it violated public policy for *Redel's* to

17   give up its right to enforce the antitrust laws in the future

18   against General Electric.  *Redel's* on steroids would be this

19   case where in a mandatory class, every Blue Cross subscriber is

20   forced to give up their right to seek future injunctive relief.

21   That has a far greater, far more pernicious effect --

22            THE COURT:  How can you have a class settlement that

23   includes structural relief that's enforceable without doing just

24   that?

25            MR. LOWREY:  But you could have a class settlement that

```
 1  doesn't immunize challenges to going-forward restraints.  And --
 2          THE COURT:  But if the Court approves the going-forward
 3  structural relief, do you have -- let me ask it this way.  Do
 4  you have a case where a class settlement was put in place under
 5  the Sherman Act and a court said that can't bind nonopt-out
 6  class members -- whether they could opt out or not, that can't
 7  bind them from going back and relitigating the claims that were
 8  settled and approved by the court?
 9          MR. LOWREY:  And so we need to distinguish between
10  looking-forward claims and claims that existed on the settlement
11  date.
12          THE COURT:  Uh-huh.
13          MR. LOWREY:  Redel's makes this distinction.  I mean,
14  these are not --
15          THE COURT:  Yes.  But that's not a class settlement
16  where --
17          MR. LOWREY:  It's not, but the public policy that's at
18  issue in Redel's is the fact that we -- that private enforcement
19  is the hallmark of the federal antitrust regulatory system.
20          THE COURT:  And that's what we have here.  We have
21  private enforcement.
22          MR. LOWREY:  You will not have private enforcement of
23  the antitrust law --
24          THE COURT:  I kind of picked on you earlier about Home
25  Depot not showing up until the bottom of the ninth.  Guess who
```

1  else didn't show up?

2          MR. LOWREY:  The government.

3          THE COURT:  Yes.

4          MR. LOWREY:  And that's why private enforcement is the

5  hallmark of antitrust law.  And that's why we don't allow

6  parties to give away their right to enforce it in the future.

7          THE COURT:  How do you distinguish that, though, from a

8  class settlement with structural relief in place -- you know,

9  for example, Baby Bells.  Could a consumer have gone in and

10 collaterally attacked the Baby Bell settlement back in the

11 seventies or eighties?

12         MR. LOWREY:  In what sense, Your Honor?  I mean --

13         THE COURT:  Say, hey, you're asking me -- the court has

14 put in place a settlement that has structural relief going

15 forward.  We're going to break up the Bells; we're going to do

16 X, Y, and Z; and this is going to be a resolution of the

17 antitrust claims filed by the plaintiff class.

18         Well, what if I am a class member who doesn't like that

19 and I want to -- and I don't think that went far enough?

20         MR. LOWREY:  Right.

21         THE COURT:  And you're -- and you're saying, well,

22 you're asking me to release injunctive relief claims which

23 absolve a party from -- insulate a party from my filing my own

24 lawsuit, which will have the effect of collaterally attacking

25 the settlement.

```
 1            MR. LOWREY:  Well, if -- the point I'm making is that
 2   the settlement should never, in the first place, release future
 3   antitrust claims.  And it's not that we want to
 4   collaterally attack --
 5            THE COURT:  Well, it's not a matter -- I don't think
 6   it's releasing future antitrust claims.  It's just saying that
 7   the settlement, unless you opt out -- and I understand your
 8   distinction under (b)(2), you can't opt out.
 9            MR. LOWREY:  Right.
10            THE COURT:  But if the court approves it, it's got to
11   approve it across the board for everyone because you can't
12   have -- it's not a democracy at that point.  You can't say 6
13   percent of the people disagree with the settlement, injunctive
14   relief settlement, and they have the right to go their own way.
15   That would destroy the whole purpose of (b)(2) where the class
16   is being treated the same.  That's your typical (b)(2)
17   injunctive relief class.
18            So I don't think *Redel's* has a lot to say about a
19   23(b)(2) class settlement that meets the Rule 23(e) requirements
20   for approval.
21            MR. LOWREY:  And so I have to respectfully disagree.
22   Rule 23 is merely a procedural rule.  It can't change the same
23   substantive public policy interest that was at issue in *Redel's*.
24   And the court -- the *Redel's* court notes, yes, there are two
25   policies that must be accommodated.  The first requires the
```

1   greatest respect for private enforcement as the hallmark of the

2   federal antitrust regulatory system.  The second policy requires

3   us to respect the amicable settlement and release --

4           THE COURT:  I guess what we're getting into is this.

5   How are you defining "future violation"?

6           MR. LOWREY:  Let's talk about that.  This is how --

7           THE COURT:  Because it seems to me that essentially

8   what you're wanting to do in making this argument is to

9   relitigate or separately litigate or differently litigate

10  violations that occurred prior to the settlement -- and that is

11  the structure of these ESAs -- or, alternatively, you're wanting

12  to challenge what the Court may approve as the structural relief

13  that should be in place as part of the settlement.

14          Now, for example, let's say -- and Mr. Laytin and

15  Mr. Zott are about to cringe when I say this.  Let's say that

16  you stuck in.  You hung in there.  You didn't opt out.  And

17  let's say you're entitled to a second Blue bid.  And let's say

18  you went from 400,000 to four billion employees and yet, at that

19  point, only one bid came through.

20          You may have an argument, there they go again, they're

21  conspiring to limit the bids and the business that the Blues can

22  do with me, there's not adequate competition.

23          That is a separate violation of the Sherman Act.  It

24  may be consistent with the settlement in that I have a right to

25  request a second Blue bid, but I didn't get it, and it may be

1    that that's an additional violation in the future.

2             I think what *Redel's* says is they can't waive that.

3             MR. LOWREY:  So --

4             THE COURT:  What *Redel's*, I don't think, says, though,

5    is that you can't come in and say, you know, the more I've

6    thought about this, two Blue bids just isn't enough.  Even

7    though I didn't opt out, even though I'm part of this injunctive

8    relief class, I'm ready to start litigating to get more than two

9    bids.  Okay?  I don't think you -- I don't think *Redel's* says

10   you can do that.

11            MR. LOWREY:  I think *Redel's* says that the release --

12   and I don't mean to get crosswise with you, obviously, Your

13   Honor.  I believe that *Redel's* says that prospectively, after

14   the settlement, it's not effective.  And I can --

15            THE COURT:  Well, you remember first year of law school

16   with the professor that looked just like you hoped he wouldn't

17   and --

18            MR. LOWREY:  His name was Fear, Your Honor, actually.

19            THE COURT:  Yes.  Mine was Durward Jones.  And he said,

20   you cannot take a sentence from a -- he used to lecture us about

21   the use of highlighter pens, as if you can highlight two

22   sentences in an opinion and say that's what this case stands

23   for, the proposition.  A case can't stand for a proposition

24   beyond the four corners of the case.

25            MR. LOWREY:  I agree, Your Honor.

```
 1          THE COURT:  So that's the first thing I would say is I
 2   don't -- if Redel's isn't in the class settlement context, I
 3   think it's got limited value to our discussion here.  Now, there
 4   may be a general principle out there that you can't ask somebody
 5   to release future antitrust claims.
 6          MR. LOWREY:  There is.
 7          THE COURT:  I totally get that.  And I don't think
 8   that's inconsistent with the settlement I'm being asked to
 9   approve.  But I think if it's fair, adequate, and reasonable,
10   adequately representing class counsel can get with the defendant
11   sued in the class, negotiate a settlement and say, it doesn't
12   matter, woulda shoulda coulda, it matters now what we've agreed
13   to do.  And if it passes Rule 23 muster, that's that.
14          Do I see Judge Putnam back there?  All right, folks.
15   Let's all give Judge Putnam a hand.
16       (Applause and standing ovation)
17          THE COURT:  I don't know if you've been here this
18   morning, but your ears were burning if you weren't.  Because we
19   sung your praises.  We wouldn't have been at this juncture if it
20   hadn't have been for your extremely diligent and highly skilled
21   work.
22          JUDGE PUTNAM:  Well, thank you, Your Honor.
23          THE COURT:  All right.  Now, that doesn't affect
24   whether I'm going to approve this settlement or not, but I think
25   credit is due.
```

```
 1          MR. LOWREY:  I've got a couple more points I'd like to

 2  make on this.  And if you still think I'm wrong, I'm not going

 3  to keep beating my head against it.  But I do have a couple

 4  things I want you to think about.  Would that --

 5          THE COURT:  I'm not sure I'm going to call you wrong.

 6  I think I'm going to call you off the mark.

 7          MR. LOWREY:  Well, I've been called a lot worse, Your

 8  Honor.

 9          First of all, to your point that a case has to be

10  judged within its four corners -- I do make my own graphics

11  sometimes.  This is what was at issue in Redel's.  From 1969 to

12  1971, allegedly GE engaged in price discrimination.  That was

13  the wrong.  In March 1969, there was a settlement.  And the

14  former Fifth Circuit said everything above this red line is

15  released by the general release in the settlement, including

16  antitrust claims.  And the Fifth Circuit said -- the former

17  Fifth, binding Fifth Circuit, says nothing after that is

18  released, period.  And that is because of the public policy

19  behind the antitrust laws, reasoning that antitrust violations

20  affect not just the plaintiff, but the entire economy.

21          So this is a continuing course of conduct.  If this

22  were this case, the Blues would say we're doing the same thing

23  here that we were doing here, so that claim is released.  And

24  the Fifth Circuit says you can't do that.

25          Now, let me build on that.  You talked about future
```

```
 1   antitrust violations.  It's important to understand in the eyes

 2   of antitrust law what a future violation is.  The Eleventh

 3   Circuit in Morton's Market:  Even though the illegal act occurs

 4   at a specific point in time, if it inflicts continuing and

 5   accumulating harm on a plaintiff, an antitrust violation occurs

 6   each time the plaintiff is injured by the act.

 7           Every time we don't get a third, a fourth, a fifth Blue

 8   bid --

 9           THE COURT:  So let me ask you this.

10           MR. LOWREY:  Yes, Your Honor.

11           THE COURT:  Back to the employment context.

12           MR. LOWREY:  Yes.

13           THE COURT:  You are -- because I think a similar thing

14   is a release in a Title VII context could not abate future

15   violations by the employer; correct?

16           MR. LOWREY:  I don't know, but I'll take your word for

17   it.  I certainly hope that's the law.

18           THE COURT:  I mean, it seems like that would be a legal

19   principle that doesn't just apply in the Sherman Act context.

20   Right?

21           MR. LOWREY:  I agree.

22           THE COURT:  So you fire me because I'm over 40.

23           MR. LOWREY:  Right.

24           THE COURT:  And I sue you.  And we're on the eve of

25   trial, and we settle the case.  You pay me $100,000; you agree
```

 1  not to disparage me; I release any and all claims against you

 2  going forward.

 3          MR. LOWREY:  Right.

 4          THE COURT:  The next morning I wake up and I come down

 5  here and I file a separate lawsuit that says, you know what, I

 6  still don't have a job with you.  That's another violation.

 7          MR. LOWREY:  So the firing violation in your

 8  hypothetical occurs entirely before the settlement.  I'm not

 9  understanding what the violation that occurs after the

10  settlement is.

11          THE COURT:  All right.  Let's say it's a pay claim.

12          MR. LOWREY:  Okay.

13          THE COURT:  I say, you paid me less because of my age.

14  We settle.  And the next day I come down and say, I'm still

15  getting paid less.  I'm still employed with you.  We settled my

16  case, but I'm still not getting paid what I deserve to be paid.

17          MR. LOWREY:  Yeah.

18          THE COURT:  You paid me back pay, but it's still

19  because of my age that I'm not where I should be on the pay

20  scale.

21          MR. LOWREY:  So I really -- I really am out of my depth

22  on the employment law stuff.  I can tell you I'm not out of my

23  depth on the antitrust stuff.  And this is the law for

24  antitrust, which is it is a new violation every time I am

25  injured by a conduct, even if the price-fixing conspiracy was

 1   formed a hundred years ago.

 2          THE COURT:  Well, there could never be a settlement.

 3          MR. LOWREY:  Well, there can't be a settlement that

 4   immunizes defendants' conduct going forward.  That's the --

 5          THE COURT:  Doesn't -- isn't there required to be a

 6   separate and discrete act for a new claim to be brought if it's

 7   been released in a settlement, though?

 8          MR. LOWREY:  Well, there is a new -- I mean,

 9   settlements are driven by their language.  And the question is

10   whether --

11          THE COURT:  Now, is *Morton's Market* a settlement case,

12   a case where it was settled and they are asserting claims after

13   the settlement --

14          MR. LOWREY:  No.

15          THE COURT:  -- or is this like a statute of limitations

16   case?

17          MR. LOWREY:  I think it's a statute of limitations

18   case, Your Honor.

19          THE COURT:  That's distinguishable.

20          MR. LOWREY:  Well, it goes to your --

21          THE COURT:  Because the parties haven't knowingly and

22   voluntarily released their rights in the individual context or

23   had a court approve the release of the rights in a class

24   settlement context.  So again, I think -- I think you have to

25   read the case in the context of the case.

```
 1              MR. LOWREY:  Well, I'll tell you, I can tell I'm not
 2    making progress on the --
 3              THE COURT:  You're not.
 4              MR. LOWREY:  -- you can't do this.  And so I'm --
 5              THE COURT:  You preserved all your arguments, though.
 6              MR. LOWREY:  -- sharp enough to do that.
 7              I do want to make a slightly different argument, which
 8    is that I think you should not, even if you could.  It's a
 9    different point.
10              And these are my thoughts on that.  And it won't take
11    long.  Again, as I said earlier, I have great respect for all
12    the lawyers and parties here, great respect.  But if everyone is
13    being honest, everyone should be willing to acknowledge
14    something, which is this.  The post-settlement structure would
15    be an untested experiment with unknown, unknowable, and
16    unquantifiable effects on future competition in one of the most
17    important sectors of our economy, which is health care.
18              THE COURT:  Isn't that answered by the fact that I'm
19    going to maintain jurisdiction over the case for at least five
20    years?
21              MR. LOWREY:  So you don't have jurisdiction, for
22    example, to take away the aspects of the settlement structure
23    that the Blues are guaranteed.  So, for example, if this goes
24    forward and it's a disaster, hypothetically, you would not have
25    the --
```

```
 1            THE COURT:  Let's pray that's not the case if it goes
 2   forward, but go ahead.
 3            MR. LOWREY:  You would not have, for example, the
 4   discretion to say, yeah, these ESAs, I know you get those in the
 5   settlement agreement, but no, I'm getting rid of them.  You
 6   can't do stuff like that.
 7            THE COURT:  Of course not.
 8            MR. LOWREY:  The settlement structure that they want
 9   you to lock in, nobody knows how this is going to affect
10   competition.
11            THE COURT:  Well, we have some indications, though.
12            MR. LOWREY:  We have some --
13            THE COURT:  We know, for example, that at least in the
14   laboratory, there are incentives for there to be increased
15   competition in each and every exclusive area.  Okay?  We know
16   that there will be higher opportunities under the settlement for
17   entities to get a second Blue bid than currently exists; right?
18            MR. LOWREY:  (Nods head)
19            THE COURT:  We know that we are eliminating certain
20   output restrictions that should increase competition.  I've
21   gotten declarations, and I take it I'm going to hear some
22   testimony tomorrow that fills in the gaps on some of these
23   things.  So it's not like we threw a dart at the board and said
24   we hope this works.
25            MR. LOWREY:  Well, I'm not suggesting that you threw a
```

1   dart at the board.  I am suggesting this, that no one -- for

2   example, Dr. Mason included -- no one can quantify the

3   improvement.  They can say, look, the post-settlement structure

4   is more competitive than the presettlement structure.

5          THE COURT:  Is that or should that even be a standard

6   for approval of a class settlement?

7          MR. LOWREY:  If you are locking in a structure that's

8   going to govern the economy for decades, yes.  That's what

9   they're asking you to do.

10          THE COURT:  I think it governs for five years, doesn't

11   it?

12          MR. LOWREY:  No, Your Honor.  Five years -- unless I'm

13   dreadfully mistaken, five years is the period in which this

14   special management committee can add things to the release by

15   deciding they are consistent with the injunctive relief.  These

16   release of claims that they're asking you to approve, they're

17   perpetual.  I can't sue in year six or seven or eight or 20 or

18   30.  They are asking you to make national economic policy for

19   decades.

20          And this isn't a criticism of you or Dr. Mason.  It's

21   just a reflection of the reality that the future is hard to

22   predict.

23          THE COURT:  Well, and this is not a defense for the

24   Blues, the subscribers, the ASO counsel, or anyone who's

25   advocating approval of the settlement, but it is a question in

```
 1    the back of my mind.  I asked you earlier where you were, where
 2    your client was.
 3              MR. LOWREY:  That's right.
 4              THE COURT:  I asked earlier where the FTC was, where
 5    the Department of Justice has been.  They were all well aware --
 6    the governmental entities that enforce our nation's antitrust
 7    laws, they're well aware of this settlement.  They've studied
 8    it.  Right?
 9              MR. LOWREY:  Okay.
10              THE COURT:  Would you agree with me?
11              MR. LOWREY:  I don't know, Your Honor.  I'm not
12    disputing it, certainly.
13              THE COURT:  You wouldn't disagree with me.
14              MR. LOWREY:  Apparently the Department of Labor has
15    studied it.  I don't know who else has looked at it.
16              THE COURT:  Yes.  They're going to talk about ERISA,
17    which I don't know if you heard what I said earlier.  If
18    somebody had told me that ERISA was going to be an issue, I
19    probably would have turned it down.
20              MR. LOWREY:  No, I laughed at that one too.
21              THE COURT:  But that's not down the main thoroughfare
22    of the Sherman Act, what they're raising.  They're raising some
23    things unique to the coverage of ERISA.  All right?
24              So having said that, if dogs and cats were falling from
25    the sky in this one, wouldn't the FTC and DOJ show up and say,
```

```
 1   time out, we've got concerns?
 2           MR. LOWREY:  I -- I don't know, Your Honor.
 3   Evidently -- and I don't know --
 4           THE COURT:  And again, that's not a defense --
 5           MR. LOWREY:  No.  I hear you.
 6           THE COURT:  -- but it is a legitimate question; right?
 7           MR. LOWREY:  So essentially, what do we know?  We know,
 8   as Mr. Boies -- and my father also was a history teacher as
 9   well, but he gave us the history.  And the history is apparently
10   this structure that you ruled is -- and I'm leaving aside the
11   single-entity defense.  The structure that you ruled is subject
12   to per se illegality, the summary judgment ruling that you made,
13   evidently that ruling was not enough to gain government
14   attention.  So I don't think that you can approve the settlement
15   on the premise that if these were ill- -- if these proved to be
16   long-term, ill-advised restraints on competition, the government
17   will come in and save the day.  I don't think so.
18           And nobody knows, for example, how the green plans
19   things is going to work.  Maybe it will work great.  If so,
20   maybe we'll never file a lawsuit.  But I know that, you know, 96
21   percent of hospitals and 92 percent of physicians are in Blue
22   plans and that Blue plans are very important.
23           And so the -- my point to you is that you should not
24   lock in a structure that is indefinite, will last for decades,
25   at a minimum, and you certainly shouldn't do it involuntarily.
```

1   It would be one thing if the parties could say, I'm willing to

2   do this bargain, Your Honor, I'm willing to give up -- I'm

3   willing to take that future chance for what I'm getting now.

4   But --

5            THE COURT:  But isn't that completely divorced from the

6   reality of class litigation?

7            MR. LOWREY:  It's not, Your Honor.  This phenomenon of

8   setting in place a structure that's going to govern a major

9   section of the economic against private enforcement for decades,

10  that's not classic class litigation.  It is -- and, you know,

11  this speaks to the federalist in me and maybe the federalist in

12  you.  It is essentially government management of our national

13  economic policy as opposed to competition managing it.  You

14  know, the government is saying these restrictions are okay,

15  these aren't, and I've made a decision and it can't be undone.

16           That's the end of my pitch on that, Your Honor.

17  Obviously, happy to answer any questions you may have on any of

18  this.

19           THE COURT:  I appreciate your remarks.

20           MR. LOWREY:  Thank you, Your Honor.

21           THE COURT:  Okay.  We've got another 30 minutes or so.

22           MR. SMITH:  Good afternoon, Your Honor.

23           THE COURT:  I guess that means you're up next.

24           MR. SMITH:  Well, I'm actually hoping to pave the way

25  for Mr. Isaacson.  So, Your Honor, just so you understand what

```
 1   remains to be done on the second Blue bid -- and I just don't
 2   think we're going to get it done this afternoon.
 3           THE COURT:  I think you're right.
 4           MR. SMITH:  Okay.  So there's probably going to be some
 5   brief --
 6       (Off-the-record discussion)
 7           MR. SMITH:  Your Honor, there's -- as Mr. Zott --
 8           THE COURT:  We can all arm wrestle.
 9           MR. SMITH:  As Mr. Zott was just, frankly, pointing out
10   to me, there's a lot still to be done on second Blue bid, so
11   there needs to be some reply to Mr. Slater and Mr. Lowrey.
12   There's probably some more explanation of how we got there from
13   Mr. Hausfeld.  There's finishing the discussion about moving the
14   divisible relief over to (b)(3).  And then finally, there's the
15   Taft-Hartley and the church plan.  We just can't -- we can't get
16   that done today.
17           THE COURT:  We'll get it done tomorrow.
18           MR. SMITH:  Right.  And so what I wanted to suggest is
19   there a divisible piece that I think we could get done this
20   afternoon by your 5:30.
21           THE COURT:  I'm all for that.
22           MR. SMITH:  Okay.  And that's why I'd like to introduce
23   Mr. Isaacson to talk about that divisible -- no pun intended --
24   piece, which is the attorneys' fees, and reserving all rights to
25   the Blues and to everyone else on finishing those
```

```
 1   second-Blue-bid issues tomorrow.

 2         THE COURT:  Yes.  I realize we haven't actually started

 3   the discussion of the merits of the second Blue bid.  We've been

 4   talking about what do opt-out rights look like vis-a-vis second

 5   Blue bid or additional bids.

 6         MR. SMITH:  Correct.  And some of those will benefit

 7   from discussion between now and tomorrow morning.

 8         THE COURT:  Right.

 9         All right.  Welcome back.  Do you need something from

10   him?

11         MR. ISAACSON:  Thank you, Your Honor.  No, from my

12   colleague, Hamish.

13         THE COURT:  Okay.

14         MR. ISAACSON:  Have you got the --

15         It's nice to fall under the word "divisible."  It seems

16   to be the word of the day.

17         THE COURT:  "Divisible" has created some divisions

18   today.

19         MR. ISAACSON:  Yes.  But let me get started and then

20   hopefully he'll catch up and put the slides on the screen.

21   There we go.

22         No.  The slides for attorneys' fees that you have been

23   emailed.  Maybe Swathi can help Hamish.  I'm not going to be

24   talking about arbitration clauses.

25         (Brief pause)
```

1        MR. ISAACSON:  So as the Court knows, the request for

2  fees is for $626,583,372 and then close to $41 million in

3  expenses.  We believe this -- even though this is a lot of

4  money, we believe this meets the reasonableness standard.  And

5  you've heard a lot of the reasons today because of the complex,

6  protected litigation.

7        I'm happy to be speaking to this issue because we've

8  talked about history a couple times today.  And at the beginning

9  of this history, which is now almost ten years ago, we would

10  have been extraordinarily proud -- and are extraordinarily

11  proud -- of this result both in terms of monetary relief and

12  injunctive relief.

13        In listening to today, you heard certain objections to

14  burdening the opt-out rights, which sound like that they have

15  been mitigated because of the fact that now we're just talking

16  about clarifying that.  There's also an objection to allocation,

17  which you're going to hear about tomorrow.  That doesn't go to

18  the fees or the reasonableness of the settlement.

19        What there are in terms of the fees overlapping with

20  objections to the settlement is you should have done better.

21  You should have gotten more or perhaps done it for less money.

22  And those don't meet the standards for an objection in this

23  case.

24        I thought Mr. Lowrey was interesting in saying he

25  doesn't want any uncertainty over the next five years.  If you

1  want uncertainty over the next five years, the best way to do

2  that is for this litigation to continue without a settlement,

3  because we've been doing this for ten years and it's required

4  $40 million of investment of expenses, $200 million of attorney

5  time, all to lead to this result.

6            And when the objections come to you, both to the fees,

7  you're not hearing comparisons.  You're not hearing, well, look,

8  here's what was done in this case or, even, more importantly,

9  what usually gets done.  This is not fair because usually,

10  someone does better.  Instead, what the record reflects is this

11  is an extraordinary result, not merely a reasonable result.  And

12  they're saying why couldn't you have just done a little bit more

13  and then would throw us into the process of years and years of

14  litigation across many states.

15            The -- moving to the next, if we could, Hamish.  Or do

16  I have the clicker?  Do you want me to do the clicker?

17  Excellent.

18            You've got a lot of clarity in the law in this circuit

19  about attorneys' fees.  And the objectors -- the objections

20  really, by and large, are taking issue with the benchmarks in

21  the Eleventh Circuit.  This is, you know, 20 to 30 percent, 25

22  percent in the middle, and we are doing -- we are below 25

23  percent.  The Eleventh Circuit has given this guidance over and

24  over again, and we have followed that in this case.  The numbers

25  are there, 23.47 percent of the common fund.  That's attributing

1   no value to the injunctive relief.

2          We've also presented a record to show you how this

3   compares to other cases through two professors --

4          THE COURT:  It would have created an interesting

5   question if you were saying the common fund should include

6   injunctive relief, but you're not taking that position.

7          MR. ISAACSON:  We are not.  One of the factors -- one

8   of the benefactors, I think, does take that into account, and

9   I'll mention that.  But purely mathematically, if we had

10  achieved no injunctive relief, this would have been a standard

11  fee within -- under the Eleventh Circuit guidelines.  The --

12         THE COURT:  Slightly under the benchmark.

13         MR. ISAACSON:  Yes.  Yes.  And -- well, at this number,

14  slightly under, but it's more than 1 percent under.  And each

15  point matters when you're starting with 25 points.

16         You know, Professor Fitzpatrick did an analysis of 35

17  class action cases in the Eleventh Circuit and found that the

18  median -- average and median fees awarded in those cases were 28

19  to 30 percent, so the higher end of the range that the Eleventh

20  Circuit permits.

21         Professor Silver analyzed 62 so-called megafund cases,

22  and which -- all of which the attorney fee percentage awarded

23  was over 23.5 percent.  And courts nationwide have repeatedly

24  awarded fees of 30 percent or higher in so-called megafund

25  settlements.

```
 1        (Brief interruption)

 2            THE COURT:  There's some feedback on Zoom, for some

 3    reason.  I'm going to ask everyone to mute if you're on the

 4    phone.  Or if you're on Zoom, please mute.

 5            Go ahead.

 6            MR. ISAACSON:  And that statement I just read is not

 7    from an expert.  That's from the Eleventh Circuit.  Well, I

 8    guess, in a way, it's from an expert, but it establishes the

 9    reasonability of the fees in this case.

10            Professor Silver has a chart where he goes through all

11    of these cases, showing in the so-called megafund cases that

12    the results are similar to what you get in this case.  And then

13    he also explains what's wrong with the notion that you should

14    have a sliding scale the higher you get.  In fact, none of these

15    big companies that have come before you would enter such an

16    arrangement because it means that they would incent their

17    lawyers to accept lower settlements where they get a higher

18    percentage fee.  And there's examples that have been given.  So

19    you're going to have bad results if you have a 25 percent fee

20    for up to a hundred million dollars, but 20 percent at $200

21    million.  Then someone is going to want to settle at a hundred

22    million dollars or slightly below and not settle for 125- or

23    even up to $140 million.

24            So the Johnson factors are outlined there, and I'll

25    walk through those briefly.  They are optional in the Eleventh
```

 1  Circuit.  But given what's at issue here, we expect that the

 2  Court will walk through them.  But --

 3          THE COURT:  Let me ask you this.  Do you have a copy of

 4  these slides?

 5          MR. ISAACSON:  I do.  And we will give them to you.

 6          THE COURT:  You'll supply that?

 7          MR. ISAACSON:  Yes.  The --

 8          THE COURT:  Do you have one now?

 9          MR. ISAACSON:  Apparently the answer is yes.

10          THE COURT:  It's been helpful for me to have a copy so

11  I could take notes on them.

12          MR. ISAACSON:  Yes.

13      (Brief pause)

14          THE COURT:  All right.  Please continue.

15          MR. ISAACSON:  And basically, what happens is if you

16  walk through the *Johnson* factors, they become a pitch for us

17  getting something higher than the benchmark.  They are all

18  factors for elevating above the benchmark, which is not what

19  we're seeking in this case.

20          But when you walk through them, the first factor is the

21  degree of success.  And this is where the *Johnson* factors say,

22  well, what else did you achieve besides just money?  So they

23  allow you to incorporate the concept of injunctive relief.  And

24  here you have historic injunctive relief, which is the whole

25  reason for having this factor.  And it's part of the degree of

1    success that was obtained here.

2          And then a *Johnson* factor is what is the monetary

3    relief.  Professor Silver explains that this fund, as of the

4    2019 reporter, is the largest in the history of antitrust

5    litigation and more than $300 million larger than its closest

6    rival.

7          Dr. Pakes submitted a report saying that we've

8    recovered somewhere between 7 to 14 percent of our estimated

9    maximum potential recoveries.

10         Now, it's always interesting that you present these

11   percentages based on what the plaintiffs would have projected as

12   damages because of course the defendants would not have agreed

13   to these numbers.  And I think they review this as many

14   multiples times the amount of damages that the defendants would

15   have expected us to recover.  And if you do something like a

16   median, these percentages become much higher.  But even based on

17   us winning everything that Dr. Pakes would have estimated, this

18   is a result that's supported by the case law.  And as the Court

19   knows, this is not a settlement where any money is going to

20   revert to the defendants.  This money is going to the class.

21         I've talked about -- and we've talked about today --

22   the transformative injunctive relief.  Dr. Rubinfeld's

23   declaration explains that this forward-looking relief opens up

24   competition amongst substantial entities in the enormous health

25   insurance market, stands as economically significant by itself.

1          Professor Fitzpatrick has an interesting way of looking
2    at it, and I think it's an appropriate way to look at it, and
3    it's not a way that you get from the objectors.  What is your
4    decision tree?  And if you had a decision tree that began from
5    the beginning of this case some ten -- almost ten years ago and
6    multiplied the probability of success and all the outstanding
7    issues and then go through the probability of losing on appeal
8    and all the legal issues, it's not difficult to conclude, he
9    says, that the cash portion of the settlement is, by itself, a
10   good outcome for the class.  But in light of the injunctive
11   relief also won by class counsel, it's not difficult to conclude
12   the outcome here is beyond good.  It is excellent.

13          And that's not a decision-tree analysis.  You don't get
14   a decision-tree analysis from objectors saying if we go forward,
15   here's the decision tree about when we achieve more, how we
16   achieve more, or at what cost.  We know it would be a lot
17   because of what we have had to incur.

18          Again, one of the *Johnson* factors is that there are
19   difficult factual issues and complex questions of law.  And
20   in -- antitrust cases are notorious for that.  This Court knows
21   the complexity of this case.  And Professor Fitzpatrick has
22   found that nearly 80 percent of awards in antitrust cases were
23   equal to or greater than 25 percent.

24          One of the *Johnson* factors is substantial discovery.
25   We've talked about how many terabytes of data and documents.  We

1   have had three dozen competitors at issue here, and we had

2   history going back to the 1930s.

3         And then we have the enormous efforts that were

4   expended here:  434,000 hours, 40 million -- almost $41 million

5   in expenses.  And as Professor Fitzpatrick says, this is more of

6   an upfront investment than in all but one billion-dollar class

7   actions cases, all but one.  And I say to you if we had a

8   meeting back before we filed this case --

9         THE COURT:  It would have been the same effect as

10  mentioning ERISA to me.

11        MR. ISAACSON:  Right.  Right.

12        -- and those of us who were there at the beginning had

13  explained to our firms this is going to cost $40 million over

14  the next eight years and we're going to put 434,000 hours into

15  this and we didn't know the results, this courtroom would be a

16  lot emptier today and there would be fewer people on the phone

17  willing to take that risk.

18        This is the definition of taking risk.  And part of

19  that risk is if we had said -- we've talked about the quality of

20  the plaintiff counsel.  We mentioned the quality of defense

21  counsel.  But this is quite a group of lawyers that have been

22  against us for all these years, and that's part of the

23  assessment of risk, that these types of firms were going to come

24  in to oppose us.

25        THE COURT:  But just think of the friendships that have

 1  been formed.

 2          MR. ISAACSON:  And as cases go on for ten years, lives

 3  change.  People have retired.  There are some friendships --

 4  friends I don't know where they are, and others of us had

 5  changes during this time period.  So the point is the group of

 6  lawyers before you took on a huge risk and have continued to

 7  take on that risk during the history of this case.  And that

 8  risk is what justifies a benchmark fee.

 9          Professor Silver said, my review of the preliminary

10  approval materials convinces me that the risks inherent in this

11  litigation were severe.  They included challenges to the

12  plaintiffs' damages model, a difficult path to class

13  certification, the prospect of having to certify classes in

14  multiple states, the difficulty of proving damages if their

15  model was accepted, the absence of a preceding or

16  contemporaneous governmental investigation, and many others.

17          We undertook what was not just an antitrust case but a

18  challenge to a business model, which, by definition, is harder

19  to resolve.

20          And so as I've said, I believe few attorneys would have

21  been willing to have taken this on if they had known exactly

22  what was coming.  And we are proud of the result and proud that

23  we did undertake this and achieve this result.

24          All of this would favor an upward adjustment from 25

25  percent, but we are not seeking that and we're not even seeking

1 quite 25 percent.

2   The lodestar cross-check is sometimes used.  It's not

3 always economically rational, but it really -- it doesn't change

4 anything in this case.  Because when you do that check, you're

5 getting a multiplier of approximately 3.2.  And Professor Silver

6 has looked at that and confirmed the reasonableness by comparing

7 it to others' cases and comparing it to the risks of this case,

8 and that includes a blended hourly rate of $447.

9   And in looking at the lodestar cross-check, you also

10 have to remember that the $200 million in fees is using

11 historical rates.  They haven't been brought up to the current

12 date.  And the converse of that is we -- that any fee that has

13 been paid has been waiting for almost a decade and after an

14 investment of $40 million in hard cash and an investment of $200

15 million in our time, all to achieve this forward-looking result

16 both in economics and in injunctive relief.

17   And we've talked about the -- we've cited in our papers

18 the cases that -- that support this type of multiplier and

19 higher multipliers.  The clear-sailing agreement has been

20 mentioned in the papers by the objector -- by some of the

21 objectors.  And the case law on that is fairly -- is clear that

22 the clear-sailing clauses are valid as long as there's no lack

23 of collusion in this case.  And I don't think -- I've not

24 actually been involved in a settlement involving collusion, but

25 this would be as far away from one as you could possibly get.

```
1              And you have our expenses, which I've mentioned.  And
2    I'm not going to walk through the objections because basically,
3    the objections -- I've responded to the objections at this
4    point.  The objections are questioning providing us the
5    benchmark fee given the results that have been obtained and
6    saying that the amount of money that should be awarded should be
7    less, which is not supported by the success of the case, both in
8    terms of the economics and the injunctive relief, and by the
9    standards of the Eleventh Circuit.
10             So unless you have any questions, Your Honor --
11             THE COURT:  I do not at this point.
12             Anyone want to speak briefly?  Mr. Cooper?
13             MR. BURNS:  Your Honor, if I may, would you like to
14   hear brief argument on adequacy of counsel?
15             THE COURT:  Actually, I was just wondering if there was
16   anyone who wants to speak to fees and expenses.
17             MR. BURNS:  I'm sorry.
18             THE COURT:  That's what I was -- and I didn't complete
19   that thought.  I should have.  Anyone want to be heard on fees
20   and expenses?  Yes?
21             MR. BEHENNA:  Your Honor, my name is David Behenna, and
22   I'm one of the objectors to the fee application.  And I was
23   scheduled for tomorrow, so I'd ask that -- if I could respond at
24   that time.
25             THE COURT:  Well, can you give me a summary of what
```

1   your concerns are?

2          MR. BEHENNA:  Well, I guess the first question I have,

3   Your Honor, is did you receive a copy of my written objection?

4          THE COURT:  I believe I did.

5          MR. BEHENNA:  Okay.  Well, I think to begin with, as I

6   mentioned, I'm David Behenna, and I'm a class member.  I'm

7   representing myself pro se.

8          The reason I'm objecting to the fee application

9   primarily has to do with the fact that I believe you should

10  start with the lodestar approach.  This is a statutory

11  fee-shifting case brought under the statutes.

12         THE COURT:  But it created a common fund, did it not?

13         MR. BEHENNA:  Well, my understanding, sir, is under

14  Supreme Court guidance, that under fee-shifting statutes, there

15  are certain cites where you should start -- a reasonable fee

16  starts with lodestar.  Now, it can be enhanced based on the

17  performance, including the *Johnson* factors.  But given the

18  performance and some other issues I have I believe it was

19  Mr. Isaacson that pointed some things out that I made some notes

20  on.

21         I did not get a -- just as a side note, I did not get a

22  reply to my objection, so the first I'm hearing a response is in

23  this courtroom a few minutes ago.  So that's one of the reasons

24  I would appreciate --

25         THE COURT:  That's typically how it works, though.  You

1   make an objection, you assert your objection to the Court, and

2   the other parties propose and then respond to your objection.

3            MR. BEHENNA:  Okay.  So just coming back to it, it's my

4   belief on prior precedence that the -- on fee-shifting statutes,

5   whether or not a fund is created, the analysis -- the Court's

6   analysis begins with the lodestar and whether the performance

7   deserves --

8            THE COURT:  What do you say to what was actually my

9   case, *Faught versus American Home Shield,* where the Eleventh

10  Circuit intimated that if the fee falls within the benchmark

11  range in a common fund settlement, the Court need not use the

12  factors discussed in *Johnson* to cross-check it?

13           MR. BEHENNA:  Well, I had seen the cite that the

14  Eleventh Circuit has historically used, and I don't believe

15  that's a fee-shifting -- that case was brought under a

16  fee-shifting statute approved by -- you know, this is, again,

17  congressionally approved law.

18           THE COURT:  Okay.

19           MR. BEHENNA:  So -- so I -- one of the things I was

20  going to point out -- and again, it would be interesting.  I had

21  read through the preliminary -- the papers filed for the

22  preliminary approvement -- approvement of the settlement.  And I

23  looked at the exhibits that were referenced by Mr. Isaacson,

24  including Professor -- I believe it was Fitzpatrick and Silver,

25  and I came to a different conclusion in my objection as to what

 1   a good benchmark is in mega cases.  So, you know, one of the

 2   issues is I need to see, for example, whether that chart that

 3   Mr. Isaacson produced today --

 4        THE COURT:  Do you have any Eleventh Circuit case law

 5   that would support your position on what the appropriate

 6   benchmark is in what you would call a mega case?  And I think

 7   this probably would qualify, whatever definition we apply, as a

 8   mega case.

 9        MR. BEHENNA:  Sorry.  In the Eleventh Circuit?

10        THE COURT:  Yes.

11        MR. BEHENNA:  No, sir.  I was just -- all I looked at

12   were the cases that Fitzpatrick cited in his declaration that I

13   believe ran for the last 20 years, and they were all over a

14   billion dollars.  Those were the mega cases I saw in the papers

15   provided by plaintiffs' counsel.  And that 20-year range, I

16   believe, came after the Eleventh-Circuit-referenced case that I

17   believe was in the late nineties.

18        THE COURT:  Even if the *Johnson* factors apply here, how

19   would you contend we should apply the *Johnson* factors, given the

20   risks undertaken by plaintiffs' counsel in this case?

21        MR. BEHENNA:  Well, again, I may be addressing this

22   indirectly.  But my understanding is under Supreme Court

23   precedent in -- it may have been *Hensley* -- I'd have to check

24   another reference.  The comment in one of the cases -- in that

25   case, I believe, was that contingency is not a factor.  Risk is

1   not a factor in fee enhancement.

2           THE COURT:  Well --

3           MR. BEHENNA:  And I believe it's --

4           THE COURT:  -- do you think those cases have overruled

5   *Johnson*?

6           MR. BEHENNA:  Well, *Johnson* -- I believe *Hensley* or

7   *Alyeska* referenced some of the *Johnson* factors, but what they

8   focused on there was actually success.  And in terms of -- there

9   were a number -- Mr. Isaacson went through a number of factors.

10  But a number of those factors, honestly, I think are subsumed in

11  the average hourly rate, which I noted was about $450 per hour,

12  and also subsumed in the number of hours, which was 434,000

13  hours, which I believe was referenced.

14          THE COURT:  What do you --

15          MR. BEHENNA:  And I believe the Supreme Court focused

16  on the results.

17          THE COURT:  What do you make of the fact that the

18  benchmark applied to the common fund here was only related to

19  the monetary value of the settlement and not even calculating in

20  what I think, if approved, would be the more valuable aspect of

21  the settlement, and that is the nonmonetary, structural relief?

22          MR. BEHENNA:  Well, I -- my understanding is that any

23  sort of injunctive relief is speculative.  And counsel for the

24  Home Depot mentioned that.  Alaska Air -- the counsel that was

25  representing Alaska Air also mentioned that.  So when it comes

```
1    to the injunctive relief side, I --

2             THE COURT:  Well, it's not --

3             MR. BEHENNA:  There's no -- in other words, there's

4    no -- I'm sorry.

5             THE COURT:  We're not speculating to say that it's

6    going to increase the level of competition.  It does away with

7    national best efforts, which Mr. Boies said he identified as

8    even more pernicious than the exclusive service areas early in

9    the case.  He told me that early in the case.

10            I guess the question is there -- undoubtedly, there's

11   some value to the injunctive relief.  You're not suggesting that

12   otherwise, are you?

13            MR. BEHENNA:  Well, I don't know what the value --

14   honestly, because if plaintiffs have not presented quantitative

15   evidence, I don't believe the evidence -- there's evidence that

16   it has value.  So it hasn't been quantified.  So my -- as I --

17            THE COURT:  Well, I'm not asking if it's been

18   quantified.  I'm saying are you saying there's no value?

19            MR. BEHENNA:  I don't know.  I don't know what's going

20   to happen in the future with, you know, other competition in

21   these markets.  I don't know.

22            THE COURT:  All right.

23            MR. BEHENNA:  The fact that it wasn't quantified, to

24   me, is a major issue.

25            THE COURT:  All right.  Anything else?
```

 1          MR. BEHENNA:  So -- yes.  I just would also like to

 2   point out in terms of why this is a fee -- evidence in the

 3   record that this is a fee-shifting case is that under the

 4   preliminary approval --

 5          THE COURT:  Let me ask you this.  Are you wanting to

 6   still reserve some time tomorrow to address some things?

 7          MR. BEHENNA:  Yes.

 8          THE COURT:  Then this would be the appropriate time for

 9   you to take leave to do that.

10          MR. BEHENNA:  Thank you, Your Honor.

11          THE COURT:  We're at 5:30, almost right at 5:30.

12          Okay.  So we'll resume tomorrow at nine a.m.  We will

13   suspend discussion of fees and expenses and put on the experts

14   straightaway; right?

15          MR. BURNS:  Yes, Your Honor.

16          THE COURT:  And then we will resume this discussion,

17   second Blue bids, and whatever else the parties would like to

18   discuss tomorrow with me and the objectors would like to discuss

19   with me tomorrow.

20          Let me just say this.  We have a day left.  Govern

21   yourselves accordingly.  But never fear.  I have a feeling I'm

22   going to be requiring posthearing submissions.  So if there's

23   something that you're just dying to say tomorrow and you don't

24   quite get the opportunity to say it, something tells me you're

25   going to get the opportunity.  All right?

1          If there's nothing further, we'll be in recess until

2   nine a.m. in the morning.

3          MR. BOIES:  Thank you, Your Honor.

4      (Proceedings concluded at 5:30 p.m.)

5                      *  *  *  *  *  *  *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Risa L. Entrekin, RDR, CRR, Official Court Reporter*
*U.S. District Court, Northern District of Alabama*
*1729 5th Avenue North, Birmingham, Alabama  35203  *  334.531.0686*

1                    COURT REPORTER'S CERTIFICATE

2           I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4           This 3rd day of November, 2021.

5

6

7                          Risa L. Entrekin
                           Registered Diplomate Reporter
8                          Certified Realtime Reporter
                           Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25