1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ALABAMA
2                     SOUTHERN DIVISION

3

4  IN RE:  BLUE CROSS BLUE SHIELD     CASE NO.:  2:13-cv-20000-RDP
   ANTITRUST LITIGATION MDL 2406
5

6                        VOLUME II

7                  * * * * * * * * * *

8                     MOTION HEARING

9         FOR FINAL APPROVAL OF CLASS SETTLEMENT

10           OF SUBSCRIBER PLAINTIFFS' CLAIMS

11                 * * * * * * * * * *

12         BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES

13  DISTRICT JUDGE, at Birmingham, Alabama, on Thursday, October 21,

14  2021, commencing at 9:07 a.m.

15  APPEARANCES:

16  SPECIAL MASTER:        Edgar C. Gentle III
                           Attorney at Law
17                         GENTLE TURNER SEXTON & HARBISON
                           501 Riverchase Parkway East, Suite 100
18                         Hoover, Alabama  35244

19  IN PERSON:             David Behenna
                           Eric R. Belin
20                         David Benck
                           Alexander McInnis Boies
21                         David Boies
                           Swathi Bojedla
22                         Michael A. Buchwald
                           Warren T. Burns
23                         Kathleen Currie Chavez
                           J. S. Christie
24                         Vincent J. Colatriano
                           Charles J. Cooper
25                         Paul Davis Cooper

```
 1   APPEARANCES, Continued:

 2   IN PERSON:                Phillip F. Cramer
                               Gregory L. Davis
 3                             Douglas A. Dellaccio Jr.
                               Kimberly Ann Fetsick
 4                             Edgar Dean Gankendorff
                               Theresa S. Gee
 5                             David J. Guin
                               Katherine Harbison
 6                             James L. Hart
                               Michael David Hausfeld
 7                             Christopher T. Hellums
                               David J. Hodge
 8                             E. Desmond Hogan
                               Mark Montgomery Hogewood
 9                             Zachary D. Holmstead
                               Hamish P.M. Hume
10                             William A. Isaacson
                               John M. Johnson
11                             Megan Jones
                               Eamon P. Kelly
12                             Cavender C. Kimble
                               Amanda Klevorn
13                             Daniel E. Laytin
                               Frank M. Lowrey IV
14                             Jonathan S. Mann
                               Joseph Mason
15                             Larry S. McDevitt
                               Patrick McDowell
16                             Timothy McMichael
                               R. G. Methvin Jr.
17                             M. Richard Mullins
                               W. Scott Nehs
18                             Jess Randall Nix
                               Richard D. Nix
19                             Ugo Okpewho
                               Alan Page
20                             Joshua K. Payne
                               Gwendolyn C. Payton
21                             Michael R. Pennington
                               Barry A. Ragsdale
22                             J. Thomas Richie
                               Stephen A. Rowe
23                             Emily M. Ruzic
                               Robin Sanders
24                             John G. Schmidt Jr.
                               Adam Shaw
25                             Paul Slater
```

```
 1  APPEARANCES, Continued:

 2  IN PERSON:              Cyril V. Smith III
                            Scott Burnett Smith
 3                          Kathleen Taylor Sooy
                            Tammy McClendon Stokes
 4                          James M. Terrell
                            Ben Thorpe
 5                          Michael Velezis
                            Hershel A. Wancjer
 6                          David M. Wilkerson
                            Helen E. Witt
 7                          David J. Zott
                            Jason A. Zweig
 8
     VIA VIDEOCONFERENCE:   Monte D. Beck
 9                          Jeffrey H. Bergman
                            Sydney Best
10                          William J. Blechman
                            W. Tucker Brown
11                          Virginia M. Buchanan
                            Don Campbell
12                          Evan Chesler
                            Anna M. Clark
13                          George Cochran
                            Karin DeMasi
14                          Ronan P. Doherty
                            Jason Ethridge
15                          Robert M. Foote
                            David P. Germaine
16                          Reuben Goetzl
                            Zenola Harper
17                          S. Scott Hickman
                            Elizabeth Brooks Honkonen
18                          Elizabeth A. Jose
                            Rebecca Josefiak
19                          Edith M. Kallas
                            Joann M. Lytle
20                          Deirdre MacCarthy
                            Duncan McIntosh
21                          Lucy Grey McIver
                            Robert Meyer
22                          Wilson Daniel Miles III
                            Michael A. Naranjo
23                          Catherine Nelson
                            Elaine Nichenko
24                          James K. Nichols
                            Eric Osborne
25                          Allen Page
```

```
 1  APPEARANCES, Continued:

 2  VIA VIDEOCONFERENCE:      Dennis G. Pantazis
                             Aaron S. Podhurst
 3                           Karen Quirk
                             Brenda Ann Rigas
 4                           Nicholas B. Roth
                             Alan D. Rutenberg
 5                           Anthony F. Shelley
                             Richard Sherburne
 6                           Matthew Slater
                             Mark Spencer
 7                           Wendy Springer
                             Andrew M. Stone
 8                           Ami Swank
                             Courtney Tedrowe
 9                           Jason J. Thompson
                             Joseph M. Vanek
10                           Brian Vick
                             Amy Walker Wagner
11                           Kimberly R. West
                             Joe R. Whatley Jr.
12                           Linda A. Willett
                             Pamela Williams
13                           Brian Wonderlich
                             Edward Kirk Wood Jr.
14                           W. Gregory Wright

15  (Other counsel were present via telephone but not identified)

16              Proceedings reported stenographically;
                  transcript produced by computer.
17
                      * * * * * * * * * *
18
                         EXAMINATION INDEX
19
    JOSEPH MASON, Ph.D.
20       DIRECT BY MR. BURNS                    40
         CROSS BY MR. CRAMER                    58
21       CROSS BY MR. RICHIE                   200

22  UGO OKPEWHO
         DIRECT BY MR. BOIES                  234
23       CROSS BY MR. BOIES                   247
         REDIRECT BY MR. MULLINS              257
24       RECROSS BY MR. BOIES                 258

25
```

```
 1       (The following proceedings were heard before the Honorable

 2        R. David Proctor, United States District Judge, at

 3        Birmingham, Alabama, on Thursday, October 21, 2021,

 4        commencing at 9:07 a.m.:)

 5

 6

 7

 8             THE CLERK:  Come to order, please.

 9             THE COURT:  All right.  Good morning, everyone.  Have a

10  seat.

11             COUNSEL IN UNISON:  Good morning, Your Honor.

12             THE COURT:  So we have -- let me ask this.  I did get

13  from the special master a proposed agenda for today.  I

14  wonder who all participated in that.  Was it the objectors as

15  well, or was this just the proponents of the settlement?

16             SPECIAL MASTER GENTLE:  Just the proponents, Your

17  Honor.

18             THE COURT:  Okay.  That's what I thought.

19             MR. RICHIE:  I haven't seen it, Your Honor.

20             THE COURT:  All right.  So do we have a hard copy that

21  we can provide to the objectors since this would affect their

22  time limits as well?  And I do want to just -- I do want to

23  address a few things on it, but I thought that's the first step

24  is just making sure everybody understands the baseline we're

25  starting from as a proposal, not an absolute.
```

 1          MR. BURNS:  Your Honor, would you like me to put it on

 2   the Elmo?

 3          THE COURT:  Yes.  That might be good.  We can put it on

 4   the Elmo for everyone who -- that's why you get paid the big

 5   bucks, Warren.  You figure stuff like that out.

 6          MR. BURNS:  There you go.

 7          THE COURT:  Okay.  So it seems to me I do want to hear

 8   about second Blue bids.  We never got to that yesterday.  What

 9   was the deal?  How did the line get drawn?  What's the

10   rationale?  I do need to hear about that.

11          I do think it's fine for counsel to address ESAs as

12   we -- before we leave that -- before we get started with the

13   witnesses this morning.

14          You know, I'll be honest with you.  As far as argument

15   today, unless it's just kind of introduction to make sure I

16   understand what a witness is going to tell me on these issues

17   this morning, you're going to have a full opportunity to present

18   written argument, because I'm not ruling from the bench on this.

19   You can imagine.  I'm not even taking this under submission

20   because I may give y'all some homework to provide me.  I might

21   give it today and I might give it after today through the

22   special master.  This is too important a matter just to worry

23   about how quickly I'm getting a ruling out.  I do expect I'll

24   have a ruling out as soon as possible.

25          But as far as the class members that want to still be

1  heard, my understanding is Mr. Shattuck no longer wishes to

2  speak.  I understand Mr. Cochran has provided us a transcript of

3  what he's going to say.  So if there's anything he wants to add

4  to that, I'm going to give him that opportunity.

5           And, Mr. Behenna, I'm going to ask you just to address

6  one thing, and that is why isn't this a common fund settlement.

7  If this creates a common fund, I'm not sure that fee-shifting --

8  the fact that it's a fee-shifting statute makes a difference,

9  but I want you to address that argument in particular.  I think

10 I have the rest of your argument based upon what you presented

11 yesterday.  All right?

12          I don't know that we need to spend three and a half

13 hours on -- are the Bradley objectors mainly going to be dealing

14 with the allocation?

15          MR. RICHIE:  Well, yes, Your Honor.  There are a couple

16 of issues there.  And there are some additional issues that may

17 arise from Dr. Mason's testimony.

18      (The court reporter interrupts for clarification)

19          THE COURT:  There may be some additional issues that

20 arise from Dr. Mason's testimony?

21          MR. RICHIE:  Yes, Your Honor.

22          THE COURT:  Well, we'll use this as the order of

23 operation as far as time limits.  I may move you along.  Just

24 don't get offended if I do it.  Okay.

25          MR. RICHIE:  Your Honor, this is the first time I'm

1   seeing this document.  I do not anticipate argument lasting for

2   two hours on our presentation.

3          THE COURT:  Well, that's the best news I've had all

4   day.  You must have clerked for a pretty doggone good judge.

5          All right.  Now, we left off -- are the ESAs -- are we

6   going to deal with the whole issue of divisible versus

7   indivisible relief on the second Blue bid?  Is that what's going

8   to take place in the first ten minutes, a report on that, or

9   something else?

10          MR. BOIES:  I think, Your Honor, what we contemplated

11   in the first ten minutes was simply to try to respond to the

12   statements that were made yesterday at the end, leaving aside

13   the attorneys' fees issue.

14      (The court reporter interrupts for clarification)

15          THE COURT:  You're going to have to get close to that

16   microphone.

17          MR. BOIES:  Excuse me, Your Honor.

18          What we thought for the first ten minutes, we were

19   simply going to respond to the issues raised at the end of the

20   day yesterday, not the attorneys' fees issues but the

21   information that was presented to the Court about what the right

22   standard was in terms of clearly illegal, whether the ESAs would

23   be per se unlawful going forward.  Those issues.

24          THE COURT:  Well, then why don't you start right there.

25          MR. BOIES:  Okay.  I think that the defendants are

 1   going to go and then I'm going to go.  Thank you.

 2            MR. ZOTT:  Thank you, Your Honor.

 3            So briefly, Your Honor, I just wanted to respond to

 4   some of the arguments you heard yesterday.  The first is the

 5   future release argument.  And there the law is very clear, Your

 6   Honor, that the parties can release future claims when the

 7   claims are based on the continuation of prerelease conduct.  And

 8   that's very typical in antitrust cases like this case where you

 9   have a set of practices that are challenged.

10            THE COURT:  Isn't that exactly what sort of happened in

11   this case early on with a bunch of the providers who wanted to

12   come in and weren't even signatories to the settlement in *In Re*

13   *Managed Care*?

14            MR. ZOTT:  I think that's right.  I think that's right.

15   And --

16            THE COURT:  The large settlement agreements?

17            MR. ZOTT:  And that's true of, like, the cases like

18   *Grunin* and *Robertson* where the plaintiff challenged a whole set

19   of practices either of the NBA or the NFL.  Some practices were

20   changed through the settlement, but some continued.  And the

21   court said that's fine and you can release those claims

22   regarding the continuing conduct because it was something that

23   had been raised and litigated and come to a settlement.  And

24   there's a lot of cases that support that point.

25            The *Redel's* case that Home Depot cited, you may recall,

 1  with the little flip chart there, that case is completely

 2  different.  I mean, that is a case where the court found that

 3  the release was overbroad.  And while Home Depot's counsel told

 4  you that that release was part of a settlement -- you may recall

 5  that from the way he wrote the chart -- there was no settlement

 6  in that case at all.  Now, that was GE.  Every time they entered

 7  into a franchise agreement, they included a general release so

 8  the franchisees had to release every claim they could possibly

 9  bring.  And when they were later sued in an antitrust violation,

10  the court said, well, you know, you can't do that, there wasn't

11  any prior litigation, it wasn't tethered to any prior conduct,

12  so it's a completely different case.  And later cases have

13  distinguished it on that basis.

14        That's not what we're doing here.  We have a release

15  that's tied specifically to the factual predicate of the

16  lawsuits or to issues raised in the litigation.  That's

17  perfectly appropriate under the law and under these various

18  cases, particularly in this context.

19        Second, on the whole clearly illegal, you know, what

20  Your Honor has to determine on service areas, I think the

21  subscribers, the defendants, and the Slater objectors recognize

22  and agree that the Court has to determine whether or not service

23  areas as well as the system going forward -- whether it will be

24  per se or clearly illegal or, if not, then it would be subject

25  to the rule of reason.  The only --

 1          THE COURT:  Wouldn't I just do this to be on the safe

 2   side?  How about we just all agree I'm going to evaluate it as

 3   to whether it's clearly illegal and whether it would be a per se

 4   violation going forward and say it doesn't matter, then, which

 5   test it is.  If they -- it seems to me they're either -- this is

 6   going to either sink under both tests or stay above the surface

 7   on both tests.

 8          MR. ZOTT:  I agree.

 9          THE COURT:  I don't know that there's -- even if -- I

10   think you're arguing there's not a material distinction.  Well,

11   then what are the odds of this arrangement being so unique that

12   it actually slides between whatever crack there is between those

13   two tests?

14          MR. ZOTT:  I agree.  That would be the safest way to do

15   it.  And the only point I was going to make is, you know, they

16   rely on *Bennett,* and they rely on one sentence from *Bennett.*

17   And Your Honor pointed out yesterday -- I think it was your law

18   professor that said don't pick specific sentences, you have to

19   look at the context overall.

20          *Bennett* is citing back to *Grunin.*  And if you take a

21   look at *Grunin,* there is that language about legal certainty.

22   But in the very next breath, the very next sentence, *Grunin* says

23   because the conduct is not per se unlawful, we're going to

24   approve it.  And earlier in the opinion, in the prior paragraph,

25   the court says we look to see whether it's per se; if it's not,

 1  we subject it to a rule of reasonableness.  So you need to look

 2  at the whole context and --

 3          THE COURT:  I think I've got that.

 4          MR. ZOTT:  Yeah.  Okay.  You've got that.

 5          And then the last point, just on distinguishing *Topco*,

 6  I raised two fundamental issues.  First, Your Honor, I said that

 7  unlike *Topco*, here we have ongoing cooperative conduct where

 8  we've integrated our offerings to create a product that no

 9  individual plan could offer.  And that's not *Topco*.  That didn't

10  happen in *Topco*.

11          THE COURT:  Right.

12          MR. ZOTT:  Second, I said we have a unique history here

13  that's unlike anything in the law or in history, including the

14  rule of common-law trademarks.  In response to that -- they

15  didn't address my first argument at all about integration.  In

16  response to the second argument about common-law trademark, they

17  referred back to *American Needle*.  And they tried to then get

18  into the whole single-entity discussion.

19          THE COURT:  Well, they also point out that *Topco* was

20  trademarks -- was dealing with trademarks or at least branded

21  products.

22          MR. ZOTT:  Right.  But *Topco* did not deal -- I mean, it

23  dealt with branded products, but it did not deal with common-law

24  trademarks, the preexisting common-law trademarks that were

25  developed independently and that conferred exclusivity prior to

1  any agreement among the parties.  That's what we have here.

2  That was not *Topco*.  But my point is --

3          THE COURT:  Well, and the fact of the matter is the

4  Eleventh Circuit never addressed your argument there.  I did

5  look at Mr. Clement's brief where that was -- those -- it seemed

6  to me those were the two arguments made.  And actually, the

7  common-law trademark issue led with that.

8          MR. ZOTT:  Right.

9          THE COURT:  So that's what I've got to sort through is,

10 okay, well, now, in light of the tweaks to the system and now

11 that I'm being asked to focus on ESAs in particular, I've got to

12 go back and address -- I've never addressed that argument.

13         MR. ZOTT:  Agreed.  Understood.

14         And lastly, I would just say *American Needle*, you know,

15 is a different case because that dealt with the issue of whether

16 the conduct is within Section 1 at all, is it concerted action

17 at all.  And that's the whole single-entity discussion.  The

18 part of *American Needle* that they don't mention, though, is

19 after the Court found --

20         THE COURT:  I've got *American Needle* figured out, I

21 think.

22         MR. ZOTT:  Okay.  You got it.

23         THE COURT:  Now, I could be -- look, the circuit, if

24 this gets appealed, may tell me I'm dead wrong.

25         MR. ZOTT:  You got it, Judge.

```
 1            THE COURT:  But the way I'm analyzing American Needle
 2   is this.  If there was a mistake made by anybody, it wasn't the
 3   parties in settling with the American Needle thread hanging over
 4   their head.  It was my mistake in saying that American Needle
 5   could not be decided -- the American Needle issue could not be
 6   decided on the facts before me in the Rule 56 record.
 7            MR. ZOTT:  Agreed, Your Honor.
 8            THE COURT:  And so that is a risk for both sides going
 9   forward.  Now, there may be some second-guessing on how you
10   assess that risk or how the class has assessed that risk, but it
11   is a risk.  And that's one of the things, I think, that
12   Mr. Isaacson talked about yesterday is if we want -- you know,
13   and this is a heavy factor for me, to be honest with everybody.
14   If we want uncertainty and speculative -- speculation about what
15   might happen down the road, let's just keep litigating.
16            MR. ZOTT:  I agree.  I agree with that.  And that's a
17   main motivator for why we're here today.
18            The only final point I'd make is once you get through
19   all that discussion on American Needle, it applied the rule of
20   reason.  The Court said it's concerted, but it's under the rule
21   of reason.
22            So thank you, Your Honor.  That's it on those issues.
23            THE COURT:  Yes.  That's one of the things you pointed
24   out to me many times early in this case when we were talking
25   about per se.
```

 1            MR. ZOTT:  I'm nothing if not repetitive, Your Honor.

 2            MR. BOIES:  Your Honor, I can be very brief.  We agree

 3    that the standard is whether the conduct that was going to

 4    continue is or is not clearly or per se illegal.  You have to

 5    make that finding that it's not, but you don't have to go any

 6    further than that.

 7            With respect to whether the conduct going forward is

 8    clearly illegal, even before we made the changes, we had 70, 75

 9    years where nobody challenged this.  I think it's hard to say

10    that it's clearly illegal under those circumstances.

11            I won't talk about the single enterprise.  I think the

12    Court has that completely right.

13            I think that because the standard is whether something

14    is clearly illegal or not, even though this Court is, as we've

15    argued to the Court, armed by Supreme Court precedent in terms

16    of an assessment as to whether it's clearly illegal or not, you

17    do have to take into account whether *Topco* continues to be good

18    law.  Even if it is continuing to be good law, I agree to some

19    extent with defendants' counsel that you have to look at

20    questions like integration, questions like the difference

21    between products and services, to determine whether or not it's

22    clearly applicable or not.  We have argued and I would argue

23    again that it is applicable, but I would say to the Court I

24    could not say that it's clearly beyond any legal certainty

25    applicable.  And I think that's the right standard.

```
 1            THE COURT:  To make no mistake about it, if this case

 2   were to continue, you'd continue to make that assertion.  But

 3   what you're saying for purposes of resolving the case is that

 4   that is not a legal certainty.

 5            MR. BOIES:  Right.  And as I said to the Court in one

 6   of the economic days, while I did think that the prohibition on

 7   green competition was clearly illegal, the issue with the

 8   trademarks is more complicated.  I've said that to the Court

 9   from the beginning.

10            THE COURT:  Let me ask you this.  Has anybody gone back

11   to look at Delta Dental?  And does anybody have a position on

12   how -- I realize it's not binding, but what do you make of Judge

13   Bucklo's analysis and how it might apply here, if at all?

14            MR. BOIES:  I personally agree with that analysis, but

15   that's maybe in part because we have some involvement in that

16   case.  But I would note to the Court that the stage of that

17   decision is one that --

18            THE COURT:  You're standing on Mr. Zott's distinction

19   too in terms of you're not able to ride that case in this

20   situation because it was on a motion to dismiss.

21            MR. BOIES:  Exactly, Your Honor.

22            THE COURT:  But you're absolutely advocating that she

23   got it right on that?

24            MR. BOIES:  We do advocate that, Your Honor.

25            THE COURT:  Okay.  I'm just kidding.  All right.  Fair
```

1   enough.

2            All right.  Anything else on ESAs?

3            All right.  Let's just real quickly -- before we start

4   on the evidence and the presentation by -- with Dr. Mason, let's

5   real quickly revisit this whole (b)(2) versus (b)(3), divisible/

6   indivisible relief issue.  Fair enough?

7            MR. BOIES:  Yes, Your Honor.

8            THE COURT:  What if where we landed on this was

9   something along these lines?  Because, again, my point is this.

10  It's not for me to tell an opt-out what they can't do in terms

11  of pursuing litigation.  It's my job to tell them what they

12  can't do vis-a-vis any settlement that I approve.  And, again,

13  we won't -- I appreciate the argument made yesterday by one of

14  the objectors that, well, what are we supposed to tell our

15  clients.  Well, you tell your client if they're opting out, they

16  pursue all the remedies they think they can get.  But if it gets

17  to a certain point where it affects my judgment, then someone

18  will bring it to my attention and we'll have to address it.

19           So what if the language in a release, settlement

20  agreement, notice, second notice went along these lines:  A

21  (b)(3) opt-out reserves the right to pursue divisible relief,

22  including monetary relief and divisible injunctive relief.

23  Divisible injunctive relief may include the right to pursue in

24  litigation a second Blue bid.  The parties acknowledge that

25  based upon a claimant's individual business and the facts and

1   circumstances of the claims, divisible injunctive relief may

2   include possible additional Blue bids to the extent they are

3   merited by the circumstances surrounding the individual claimant

4   business, provided, however, the relief pursued by an opt-out

5   may not infringe on the indivisible (b)(2) injunctive relief

6   approved by the Court.

7          Wouldn't it be that simple?  And other than that, I

8   don't know how I can legislate anything else.

9          MR. ZOTT:  Well, from our perspective, Your Honor --

10  David Zott.  We agree that that's the general concept.  And I

11  think to go beyond that would be -- I think you'd have a problem

12  because you're now -- at that point, you almost are issuing an

13  advisory opinion that's divorced from the specific facts and

14  circumstances, ironically.  So I think that's the construct.

15  And we're working with the subscribers on language to try to get

16  to an acceptable construct.

17         MR. BOIES:  I agree with that, Your Honor.  I think

18  everything --

19         THE COURT:  You agree with that or that?

20         MR. BOIES:  I agree with both --

21         THE COURT:  Okay.

22         MR. BOIES:  -- in the sense that I agree that what the

23  Court has said is exactly the right analysis.  And I also agree

24  with counsel that we are working together to try to come up with

25  language that we can agree on that --

```
1              THE COURT:  Language that will look prettier in a

2   document.

3              MR. BOIES:  And our concern is simply that we give the

4   class adequate notice.  And I think the principles that the

5   Court articulates are exactly the right principles, and the

6   question is how do we be sure that we have implemented those

7   principles in a way that gives the class adequate notice.

8              THE COURT:  Well, my point is this.  I appreciate the

9   fact that counsel for an opt-out may want to have an opportunity

10  to advise the opt-out of what the opt-out's legal rights are

11  going forward.  I don't think you can advise -- I don't think we

12  can give you enough information, though, for you to advise the

13  opt-out of what the outcome is going to be if they go forward.

14             And quite frankly, no lawyer can do that, even in the

15  context of, you know, a single party on either side of the (b)

16  litigation.  You have a landscape of the law.  You think you

17  know the facts of your case.  You give them advice about what

18  the outcome of that case might be, but there's no guarantees

19  based upon any legal principles as to what the outcome of your

20  case is going to be because it's going to largely be applying

21  the law to the facts of the case.

22             Having said that, I think there's two things you can

23  tell your opt-out client.  First, you have a right to pursue any

24  divisible relief that would be appropriate in your case.  You

25  don't have the right to pursue any relief that would undermine a
```

 1  class settlement enjoyed by millions of others.  Okay?  And I

 2  think that -- isn't that clear enough?

 3         MR. BOIES:  I think it is -- I think it is absolutely

 4  clear as a matter of principle.  I think we have an unusual

 5  situation here because of the fact that we have both a (b)(2)

 6  and a (b)(3) injunctive relief class.  And I think that in the

 7  usual case, you get a very broad release and no one ever defines

 8  what it means.  And as the Court just noted in connection with

 9  the provider case, people afterwards have to litigate what it

10  means.  And that's --

11         THE COURT:  That's what happened early in this case.

12         MR. BOIES:  Exactly.

13         THE COURT:  We had -- the providers came in.  You know,

14  I asked Judge Moreno:  All right.  Judge Moreno, this is your

15  settlement, not mine.  I think it's -- you know, unless you're

16  going to tell me you want me to do it, I'm going to ask you to

17  define what the rights are of the parties in my case.

18         And I think he reserved jurisdiction to do just that in

19  the *Managed Care* settlement.  So he made a decision, got

20  appealed to the Eleventh Circuit, and it was for me to apply the

21  Eleventh Circuit case.  And I think I did that in document 2324

22  on the partial summary judgment against certain defendants that

23  were not signatories to the settlement agreements in *Love versus*

24  *Blue Cross Blue Shield Association*.

25         MR. BOIES:  I don't remember the docket number, but I

1    do remember the Court doing it.  And I think that --

2           THE COURT:  I don't remember the document either.  I'm

3    just reading it.

4           MR. BOIES:  I think that just illustrates the point I'm

5    making, which is that in a usual case, there's no advisory

6    opinion, there's no -- there's no definition of exactly what

7    people can and can't do other than the general statement and the

8    nature of the release.

9           I think the thing that we're -- I wouldn't say

10   struggling over but that we're addressing is how we make sure

11   that that's applicable to a case where you have both a (b)(2)

12   and a (b)(3) injunctive relief class.  And I think the Court's

13   language is very good on that.  And that language may very

14   well -- we end up believing it's sufficient, but we just want to

15   have a chance to really think about it in a thoughtful way.

16          THE COURT:  I will give you my best -- I'll give

17   everyone my best paragraph that I can come up with by the end of

18   the day, and you can take that and do with it as you may.

19          MR. BOIES:  Right.

20          THE COURT:  All right?

21          MR. BOIES:  Thank you, Your Honor.

22          MR. LOWREY:  Your Honor, could I be heard on the

23   (b)(2)/(b)(3) question that you just addressed in the settlement

24   context?

25          THE COURT:  Very briefly, because I think we've pounded

 1   this into submission.

 2            MR. LOWREY:  Well, I guess very briefly, it is exactly

 3   the function of a release to tell me what I can't do in

 4   subsequent litigation.  That's what releases do.

 5            This can't be a conventional release because we're

 6   carving up (b)(2) and (b)(3) and divisible and indivisible

 7   injunctive relief.  And so my question, quite simply, is this.

 8   You know, when I -- am I releasing a claim to seek unlimited

 9   Blue bids?  And if the answer is yes, then, you know, we can

10   object and appeal on that basis.  If the answer is no, you know,

11   I'm good.  But the release ought to be clear enough to tell me

12   that.  Just as we're carving up damages --

13            THE COURT:  What would be your argument --

14            MR. LOWREY:  I'm sorry?

15            THE COURT:  What would be your argument in the court

16   you file in as to why you're entitled to 36 Blue bids?  It would

17   be based on the facts and circumstances of your case; right?

18   First of all, I think your argument would be, when you get to

19   that other court, the Blues cannot agree together --

20            MR. LOWREY:  Right.

21            THE COURT:  -- not to give me a bid.

22            MR. LOWREY:  It's bid-ridden.  Yeah.

23            THE COURT:  Right?  And they would have to defend that.

24            MR. LOWREY:  Well, they'll defend it by saying you

25   released that claim, Mr. Lowrey.

```
 1              THE COURT:  Well --

 2              MR. LOWREY:  Look at this settlement, this (b)(2)

 3   settlement that you were stuck in.  You released that claim.

 4              And we shouldn't be arguing after the fact about

 5   something like this.  This -- you know, the claims that we give

 6   up and don't give up are going to be defined by the release.

 7   This isn't a question where there's like a general judgment

 8   and --

 9              THE COURT:  You haven't released a claim, first of all,

10   because you have opted out.  You have the (b)(3) monetary

11   damages claim.  All right?

12              MR. LOWREY:  Well --

13              THE COURT:  So that's -- hold on.

14              MR. LOWREY:  I'm sorry.

15              THE COURT:  Yes.  You have the claim.  You can pursue

16   money damages on that claim.  So you've not released the claim.

17              MR. LOWREY:  I've not released --

18              THE COURT:  What they may argue is the relief you're

19   seeking violates -- essentially would undermine a (b)(2)

20   injunctive relief award by a different court that has continuing

21   jurisdiction over that (b)(2) relief.  So it's not a matter of

22   release.  I think you're mixing apples and oranges here.  It's a

23   matter of whether you're precluded, for example, under the All

24   Writs Act, from pursuing that particular remedy.  It's not

25   waiving the claim.  It's not releasing a claim.  It's whether
```

1    you can pursue that particular remedy.

2           And depending upon the circumstances, I can't tell you

3    whether you can pursue that particular remedy because I'm -- you

4    haven't filed that case.  But what I can tell you is that if you

5    pursue a remedy that's consistent with -- that doesn't undermine

6    the (b)(2) relief I'm contemplating here, you'll be fine.  If

7    you pursue a remedy that undermines the (b)(2) relief that I may

8    or may not approve, you will not be fine.

9           MR. LOWREY:  Well --

10          THE COURT:  It's not a release.  Okay?  So I think I've

11   heard your argument.  I think it's time to move on.

12          MR. LOWREY:  Thank you, Your Honor.

13          THE COURT:  Thank you.

14          Does anybody disagree with me that it's not a release,

15   it's just a matter of what relief can be sought?  And it's an

16   All Writs Act issue unless the court recognizes that -- the

17   second court recognizes, no, you can't do this consistent with

18   (b)(2).  I'm not going to allow you to do it.

19          MR. HAUSFELD:  I think we're in agreement with the

20   Blues on Your Honor's recitation of how this might work.

21          THE COURT:  You'll have to pull that microphone closer.

22   Right there.

23          MR. HAUSFELD:  I believe the subscribers and the Blues

24   are in alignment with Your Honor's recitation of how this would

25   play out.

```
 1            THE COURT:  Yes.  It's not a release.  It may be a
 2   limitation upon certain relief that can be sought under a
 3   release, but it's not a waiver of a claim.
 4            Okay.  Thomas?  Are you ready to get started?
 5            MR. RICHIE:  Your Honor, just a couple of clarifying
 6   questions, one on the issue that you're addressing right now,
 7   one on the issue that's next on the agenda.  I'm trying to save
 8   time, not waste it.
 9            THE COURT:  I'm all for that.
10            MR. RICHIE:  The issue about the scope of a release and
11   the relief, I just want to be clear what the Court is
12   considering at this point.  Is this a proposed new class for
13   which there will be the normal Rule 23(e) process of preliminary
14   approval, notice, a chance to object, opt out, and then a
15   fairness hearing?  Or is this something the Court is proposing
16   to approve --
17            THE COURT:  I think we're holding a fairness hearing
18   right now.  I think I've --
19            MR. RICHIE:  So --
20            THE COURT:  Okay.  So no, I think what we're talking
21   about is when the -- I think we've all agreed that if this
22   distinction occurs, there will have to be notice to the ASO
23   class.  I don't think we're thinking about picking and choosing
24   who gets notice.  It's the ASO class; right?
25            Mr. Burns, am I right about that?
```

```
 1            MR. BURNS:  Yes.  That's correct, Your Honor.

 2            THE COURT:  Okay.  With an opportunity to reconsider

 3   whether they want to opt out.

 4            MR. RICHIE:  Your Honor, I just -- I don't understand

 5   exactly how any of this may or may not affect my client's

 6   rights.  And --

 7            THE COURT:  It may.

 8            MR. RICHIE:  It may not.  But at this point, we have to

 9   just raise the procedural objection that --

10            THE COURT:  What's the procedural objection?

11            MR. RICHIE:  That any proposed class that has not yet

12   been certified or proposed has to go through the full Rule 23(e)

13   process.

14            THE COURT:  That's what we're doing today.

15            MR. RICHIE:  There hasn't been -- again, I don't know

16   what's behind door number two.  So I just, on behalf of my

17   clients, would object that we need to have --

18            THE COURT:  Well, I don't think -- does the class

19   definition change in any way?

20            MR. BURNS:  No, Your Honor.

21            THE COURT:  The class definition is what the class

22   definition is.  There's been notice of that.

23            MR. RICHIE:  Your Honor, yesterday I thought there was

24   discussion about what the class definition would be.  I've not

25   seen any concrete proposal about exactly what class is proposing
```

1    to be certified and what the effect of opt-out rights will be.

2         THE COURT:  I thought that was on a different issue.

3         But Mr. Boies?

4         MR. BOIES:  Yes, Your Honor.  There may be some

5    confusion, but there shouldn't be.  The class definitions aren't

6    changing.  What we have is -- we've always had an injunctive

7    relief class and we've always had a damages class.  What we're

8    focusing on is the fact that one aspect of the injunctive relief

9    class, the divisible aspect --

10        THE COURT:  The divisible injunctive relief class under

11   (b)(3).

12        MR. BOIES:  Exactly.  And what we're saying is that

13   rather than having all of the injunctive relief in a (b)(2)

14   class --

15      (Telephone interference)

16        MR. BOIES:  -- a portion of that injunctive relief

17   needs to be in a (b)(3) class.  And that's all that we're

18   dealing with.  We're not dealing with changing any of the

19   claims.  We're not dealing with changing any -- actually, any of

20   the relief.  The relief is the same.  The injunctive relief is

21   the same.  The damages relief is the same.  The people getting

22   it are the same.  The only thing that's different is that for

23   all the reasons that we've been talking about over the last day,

24   what we are doing is we're finding a way to give the recipients

25   of the individualized injunctive relief an opt-out right.

1          MR. RICHIE:  And, Your Honor, this sounds like a

2     fruitful process, an important process.  I just want to make

3     sure that instead of discussing concepts in the abstract, that

4     the class receives appropriate notice of exactly how they're --

5          THE COURT:  Well, that's the whole point is I think the

6     class gets notice.  I don't think the class definition, like the

7     scope of the class, changes in any way.  It's still an ASO

8     class.  The question is going to be this.  All we're telling

9     them is, you know, this may not have been clear to you before;

10    but if you opt out, you can pursue (b)(2) and (b)(3) -- I'm

11    sorry -- (b)(3) monetary damages and (b)(3) divisible injunctive

12    relief.  Okay?  You don't lose your second Blue bid if you opt

13    out.  Your opt-out right is not being burdened.  And if you do

14    decide to opt out, then you can file your suit.  You can

15    individually claim that.

16         Now, here's the caveat.  What you can't do is

17    collaterally attack or undermine this settlement that everybody

18    else has agreed to on a classwide basis.

19         And I think -- so I don't think it's anything -- I

20    don't think there's anything that burdens that class.  It's

21    actually good news.  You can opt out and pursue claims that

22    maybe -- a claim that maybe wasn't clear to you as far as remedy

23    or you thought might have been unavailable to you if you opted

24    out.  And we're giving you the -- we're giving you the chance to

25    make another decision about whether you want to opt out.

```
 1              MR. RICHIE:  Certainly, Your Honor.

 2              THE COURT:  I think this is a mulligan, not anything

 3   else, a mulligan with more information.

 4              MR. RICHIE:  Again, I have no -- I have nothing but

 5   hope for the substance.

 6              THE COURT:  Yes.

 7              MR. RICHIE:  Just not knowing what's behind door number

 8   two, I have to object on procedural grounds.  It might be

 9   that --

10              THE COURT:  Well, what's the procedural ground?

11              MR. RICHIE:  So this may affect clients' opt-out

12   rights.  This may affect their decision to opt out.  The

13   changing of relief from (b)(2) to (b)(3) may raise

14   individualized issues that can't be properly certified.

15              THE COURT:  No.  That actually gives them more

16   opportunity to opt out.  That doesn't change -- if it changes

17   their opt-out right, it changes it to their benefit.  And it

18   way -- can you explain to me how this in any way would

19   negatively affect someone who's now been given a second choice

20   about whether they wish to opt out of the same settlement?

21              MR. RICHIE:  So, Your Honor, my problem with answering

22   that question, which I would love to be able to answer, you said

23   what is the problem with this or with it.  And I don't know what

24   exactly "it" or "this" is.  It's not written down anywhere.

25   We've never had notice of it.  Now, I understand we're going to
```

 1  get notice, but I don't know the scope of exactly what is going

 2  to change.

 3          THE COURT:  Well, just as there will be an opportunity

 4  to make a decision about whether to opt out, you can object to

 5  the notice.  We might have to deal with that.  I don't think

 6  anybody would be surprised if we get an objection to the notice,

 7  would you?

 8          MR. BURNS:  No.

 9          MR. RICHIE:  I just --

10          THE COURT:  Okay.  So we'll deal with that if and when

11  it comes.  But the point is when you say, I don't know what "it"

12  and "this" is, "it" and "this" is what it always has been.  When

13  you opt out, you have a right to seek individualized relief.

14  That's *American Home Shield*.  That's the case that always comes

15  to mind when I think about this -- okay? -- for the reasons I

16  explained yesterday.

17          "This" is -- so that's "it."  And "this" is you can't

18  do anything seeking what you contend would be an individualized

19  relief that would undermine a class-based -- a classwide

20  settlement.  Okay?  That's -- that's the law.  That's been the

21  law since I became a judge.

22          Now, how it plays out in each case and the permutations

23  in each case, you're right, I can't make any promises to you

24  about how those pretty pillared legal principles might get

25  applied to whatever claim you dream up for a client that hasn't

 1  even filed a suit yet, hasn't even opted out yet.  But that's no

 2  different than the beginning of any other lawsuit, as I

 3  explained earlier.

 4          MR. RICHIE:  So, Your Honor, as I understand our

 5  colloquy right now, you're talking about what happens in a

 6  future case.  And I guess what I'm trying to say is I just want

 7  to be clear on precisely what is being considered today in this

 8  hearing.  Just is there --

 9          THE COURT:  We are considering whether we ought to

10  reclassify divisible injunctive relief under the ASO class

11  definition as (b)(3) divisible injunctive relief.

12      (Telephone interference)

13          THE COURT:  All right.  Folks, I'm -- this is going to

14  be a long day.  I am not in a great mood right now, to be honest

15  with you.  Everybody get your phones out right now and turn them

16  off.  Okay?  Just make sure they're off.

17          Okay.  So if you need to use your phone, step out and

18  then turn it off before you come back in.  Let's just not have

19  that continuing today.

20          All right.  So back to you, Thomas.  I'm struggling

21  with what you're trying to articulate.  I think what you're

22  trying to articulate is we don't know what might happen if we

23  opt out and file a suit.

24          MR. RICHIE:  No --

25          THE COURT:  Guess what?  You're aligned with every

 1  other party who's ever filed litigation, then, because we don't
 2  know what's going to happen if you file suit.  What I can tell
 3  you is two things:  One, you can pursue individualized
 4  injunctive relief.  That's unique.  Can you -- I don't know many
 5  cases where we've dealt with this issue.
 6          MR. RICHIE:  So --
 7          THE COURT:  I've never had one.  And I don't know that
 8  there's a whole lot in American jurisprudence.  So we're on a
 9  little bit of a cutting edge here.  I acknowledge that.
10          But we have some tried-and-true principles that help us
11  navigate this field.  And that is it's -- you know, there are
12  situations in which the monetary relief that a party would
13  pursue might undermine a class settlement, and they may be
14  prohibited from doing that.  I so ruled in *American Home Shield*.
15  I said there are certain monetary claims you can't pursue
16  because of the settlement despite the fact that you've opted
17  out.
18          So you could just as easily be standing here in a more
19  traditional -- on a more traditional issue saying we're not sure
20  exactly what monetary damages claims we can assert on behalf of
21  our client in this other case.  And I'd say, well, I understand
22  that.  We'll just have to see how that works its way out.
23          Now, but again, all we're doing is for the benefit of
24  the ASO class, not in any way to the detriment of the ASO class.
25  We are doing two things.  We are considering reclassifying to

 1  subdivision (b)(3) of Rule 23 the divisible injunctive relief

 2  they might pursue, and we are giving them an opportunity to

 3  reconsider the decision they've already made about whether to

 4  opt out.  That's all.

 5          MR. RICHIE:  So --

 6          THE COURT:  Does anybody think we're doing anything

 7  else?

 8          MR. BURNS:  No, Your Honor.

 9          THE COURT:  All right.  So anything else?

10          MR. RICHIE:  No, Your Honor.  I'll move on.

11          The other thing that I was going to propose to save

12  time today, both the objectors and the settlement proponents

13  have put forward expert testimony by declaration.  This proposed

14  schedule, which, again, we weren't consulted on, proposes to

15  have --

16          THE COURT:  You were consulted on it.  That's why I

17  asked you earlier, at the beginning.

18          MR. RICHIE:  Oh, indeed.  I was consulted 20 minutes

19  ago.

20          THE COURT:  You got it about, I don't know, an hour

21  after I got the proposal.  So --

22          MR. RICHIE:  Certainly.  Your Honor, we would propose

23  that the parties put in their direct testimony by declaration.

24  We don't have any need to replow that ground.  If those

25  witnesses weren't here, the Court would consider their

```
 1   declarations in the record.  And we could just dispense with
 2   that two hours of time.
 3            THE COURT:  What does everyone think of that?  I can
 4   read.
 5            MR. CRAMER:  Your Honor, we support that.
 6            THE COURT:  All right.  So I won't hear any live
 7   testimony from -- which experts are we specifically referring
 8   to?
 9            MR. RICHIE:  Your Honor, there are two experts here
10   today, one for the self-funded subclass --
11            THE COURT:  Are we talking yours and Dr. Mason both?
12            MR. RICHIE:  Yes.
13            THE COURT:  Everyone -- anyone just really thought, I
14   got my popcorn, I bought my ticket, I wanted to see this?
15            MR. RICHIE:  And excuse me, Your Honor.  Just to
16   clarify, we do want to cross-examine them and leave the door
17   open for recross but except in the style, perhaps, of an
18   arbitration.
19            THE COURT:  So you're just saying we would dispense
20   with the direct --
21            MR. RICHIE:  Yes.  We will treat --
22            THE COURT:  -- and just get right to the crucible of
23   cross.
24            MR. RICHIE:  That's my proposal, Your Honor.
25            THE COURT:  Okay.  So we do want to keep the popcorn in
```

1   hand.

2          MR. RICHIE:  Yeah.  But we want to skip straight to the

3   popcorn part and dispense with the part where they read the

4   declaration into questions.

5          MR. BOIES:  We agree, Your Honor, that we can go right

6   to cross-examination.  We don't have to --

7          MR. BURNS:  Actually, Your Honor, on behalf of the ASO

8   subclass, I think we would prefer to keep direct to ground the

9   Court in the principles that are at stake.

10      (The court reporter interrupts for clarification)

11          THE COURT:  Yes.  Guys, we have to remember my court

12   reporter can't hear you with a mask on if you're not near a

13   microphone.

14          MR. BURNS:  Thanks, Thomas.

15          Your Honor, we would actually like to maintain the

16   direct.  And we'll try to make it as brief as possible, but --

17          THE COURT:  How long is your direct going to be?

18          MR. BURNS:  I can probably cut it down to 30 minutes,

19   Your Honor.

20          THE COURT:  You have 15.

21          MR. BURNS:  Fifteen will work too.

22          THE COURT:  All right.

23          MR. BURNS:  Thank you.

24          THE COURT:  That will be the warm-up.

25          MR. BURNS:  Thank you.

```
 1              THE COURT:  Now, are there any disputes about any of
 2   the parties' expert qualifications?
 3              MR. RICHIE:  Your Honor --
 4              THE COURT:  That would go to the admissibility of their
 5   opinion as opposed to the weight to be given to it.
 6              MR. RICHIE:  Your Honor, we believe that after the
 7   Court has heard the bases for Dr. Mason's testimony, it will
 8   discredit him in its entirety.  But he's a --
 9              THE COURT:  I'm sure you think that.
10              MR. RICHIE:  He's a Ph.D.  We're not going to that --
11              THE COURT:  But the question is does anybody think that
12   it's not admissible under the 700 series?  That's the question
13   I'm asking.
14              MR. RICHIE:  Not as an initial matter until the Court
15   has heard the testimony.
16              MR. BOIES:  Your Honor, with respect to the objectors'
17   witness, we're content to have the Court hear the testimony and
18   then make a decision afterwards about what weight, if any, and
19   what qualifications, if any --
20              THE COURT:  That's the question is what weight should
21   be given to it, not whether it's admissible.
22              MR. BURNS:  And from the subclass, Your Honor, I think
23   that's clearly in your discretion.
24              THE COURT:  All right.  Then are we ready to start with
25   that?
```

```
 1              MR. BURNS:  The subclass is ready, Your Honor.

 2              THE COURT:  All right.  Let's call Dr. Mason.

 3              The good news is, Mr. Burns, you have 15 minutes.

 4   That's the bad news, actually.  The good news is that I will not

 5   apply the Judge Clemon rule.  The light will not go on right at

 6   15 minutes.  I'll let you wrap it up if you're not wrapped up by

 7   then.

 8              MR. BURNS:  Well, thank you, Your Honor.

 9              And, Your Honor, you mentioned this morning wanting a

10   brief summary at the outset in lieu of formal arguments on the

11   submissions.  Is that still the case?

12              THE COURT:  Yes.  Just give me on overview of where

13   you're going with this.

14              MR. BURNS:  Okay.  Happy to do that, Your Honor.

15              So obviously, Dr. Mason has submitted an expert report.

16   He's an expert economist.  He's been qualified in courts

17   throughout the country.

18              I think it's very important to understand one thing,

19   and we will get this out for sure in his direct testimony.

20   Dr. Mason used four separate, independent analyses to inform his

21   consideration of the reasonableness of the allocation in this

22   case.  The self-funded objectors spend dozens of pages in nearly

23   60 pages of briefing attacking one of those methodologies.  As

24   to two of the remaining methodologies, their experts agree that

25   they're generally informative of the question in the case.  And
```

 1   as to the fourth, they state that they don't really understand

 2   it.  So let's just ground ourselves and be clear.  One out of

 3   four is the only analysis that is really substantively being

 4   attacked, and we'll go over reasons why the attacks just aren't

 5   relevant in the context of this case.

 6            These are the types of analyses, the types of

 7   questions, that any expert antitrust economist would ask in a

 8   case like when trying to consider a settlement allocation.  And

 9   Dr. Mason's testimony and the work he's done in this case

10   clearly fall into the norm of what an expert antitrust economist

11   would do.  Fundamentally, Your Honor, the one thing that I do

12   want to leave the Court with with respect to the self-funded

13   objectors' objections is that there is a basic failure in their

14   analysis.  And that relates to an acceptance and understanding

15   that there are two different markets in this case, one for ASO

16   services, one for the fully insured.

17       (Telephone interference)

18            THE COURT:  Did somebody not turn a phone off?

19            All right.  Guys, seriously, this is kindergarten

20   stuff.  We turn phones off when we're in a courtroom,

21   particularly when the judge, just ten minutes ago, said turn

22   your phones off.

23            All right.  Go ahead.

24            MR. BURNS:  All right, Your Honor.  And just briefly on

25   that point, Dr. Mason will discuss briefly why the markets are

 1  separate and why that impacts his analysis.  Because the markets

 2  are different, the ASO market and the fully insured markets can

 3  bear levels of overcharges that are different.  But it's that

 4  distinction between the market, so it's very important for the

 5  Court to understand.

 6          So unless the Court has questions for me, I'll call

 7  Dr. Mason.

 8          THE COURT:  Call Dr. Mason.

 9          MR. BURNS:  Dr. Mason, would you come to the stand.

10          THE CLERK:  Raise your right hand.

11      (The witness is administered the oath)

12          THE CLERK:  Thank you.  State your name for the record,

13  first and last name for the record.

14          THE WITNESS:  Joseph Mason.

15          THE CLERK:  And spell your first and last name.

16          THE WITNESS:  J-O-S-E-P-H, M-A-S-O-N.

17          MR. BURNS:  Your Honor, with your permission, may I

18  hand out a couple of hard-copy exhibits?

19          THE COURT:  You may.

20          MR. BURNS:  Thank you.

21          THE COURT:  And you need not further seek permission to

22  approach him and hand him things.

23          MR. BURNS:  Thank you, Your Honor.

24

25

```
 1                    JOSEPH MASON, Ph.D.

 2   The witness, having sworn or affirmed to speak the truth, the

 3   whole truth, and nothing but the truth, testified as follows:

 4                    DIRECT EXAMINATION

 5   BY MR. BURNS:

 6   Q.  Dr. Mason, good morning.

 7   A.  Good morning.

 8   Q.  And notwithstanding careful preparation, we're going to try

 9   to make this quick and to the point.  So I have handed you two

10   things, Dr. Mason.  One is a copy of, in your case, your

11   unredacted report, and the second is a PowerPoint slide deck.

12          MR. BURNS:  And just so the Court can understand,

13   Dr. Mason's exhibits to his report were submitted under seal.

14   And by agreement with the defendants, we're not going to place

15   these slides on the screen.  We'll just go over them in the hard

16   copy.

17   Q.  So, Dr. Mason, is the declaration that I have handed you

18   your declaration in this case?

19   A.  Yes, it is.

20   Q.  And is that the only declaration that you've submitted in

21   this case?

22   A.  Yes.

23   Q.  And did you prepare it personally?

24   A.  I did.

25   Q.  And does it contain the opinions you're willing to offer in
```

 1  this case?

 2  A.  Yes.

 3  Q.  All right.  So turning to the first page in the slide deck,

 4  which is an excerpt of page 3 in your declaration, paragraphs 13

 5  and 14, are these the opinions you're prepared to offer,

 6  Dr. Mason?

 7  A.  They are.

 8  Q.  And what is your opinion as to the reasonableness of the

 9  settlement allocation in this case?

10  A.  My opinion is that the allocation of six and a half percent

11  of the settlement amount to the self-funded claimants is

12  reasonable after taking into account relative differences in the

13  markets for self-funded and fully insured arrangements, the

14  difference in the class period applicable to each class, and the

15  relative circumstances of each in the context of this

16  litigation.

17  Q.  So, Dr. Mason, those are considerations that I believe you

18  made in tendering your opinion in this case; is that right?

19  A.  That's correct.

20  Q.  And I do want to address some of those in turn because I

21  think they are important for the Court to consider.  So let us

22  turn to the second page in your slide deck.

23      Now, the first consideration that you mention are

24  differences in the markets.  So, Dr. Mason, is it your opinion

25  or is it your understanding in this case that the ASO and fully

1  insured markets are, indeed, different?

2  A.   Yes.

3  Q.   And are there unique characteristics that attach to both?

4  A.   Absolutely.

5  Q.   All right.  So looking at the slide, Dr. Mason, at the top

6  of the slide are bullet points relative to some of those

7  characteristics.  And I'd first like you to explain for the

8  Court the unique characteristics that fall within the fully

9  insured market and how they informed your opinion.

10  A.   Fully insured products are sold to a market that values not

11  only the administrative services of claims processing and other

12  administrative services like that, but also seeks to purchase

13  risk transfer or risk certainty in terms of the arrangements;

14  that is, the certainty that they'll only pay a certain amount no

15  matter how high their health costs go in a particular year.

16  Q.   And you also mentioned fewer substitutes under the fully

17  insured market.  What do you mean by that?

18  A.   These fully insured arrangements are purchased from

19  insurance companies, per se.  They're one specific product that

20  can only be bought from one specific type of company.

21  Q.   Okay.  And is it your understanding that -- and with respect

22  to substitutes, is that sometimes interchangeable with the

23  competition, other offerings from other companies?

24  A.   Sure.  Generally, the more substitutes there are for a good,

25  the less -- or the more difficult it is for a supplier of those

1    goods to hold up prices to an artificially high level.

2    Q.   Okay.  Now, Dr. Mason, did you observe that there was

3    greater or less competition in the fully insured market as

4    opposed to the self-funded market?

5    A.   Less competition in fully insured than in self-funded.

6    Q.   Okay.  So let's take a look at the self-funded market

7    characteristics you've identified.  Would you explain this to

8    the Court.

9    A.   In self-funded markets, you're -- you're purchasing the

10   administrative services from the supplier here.  You may be

11   purchasing other things as well, but you're not necessarily

12   purchasing that risk transfer from anybody or from an insurance

13   company necessarily.  There are a lot of different ways to take

14   care of that.  Or, of course, you can substitute and purchase a

15   fully insured plan if you want.  So this greater degree of

16   substitutability creates greater options for those who

17   participate in the ASO market.

18   Q.   So is it your view, then, that there was greater competition

19   in the ASO market, or self-funded market?

20   A.   Yes.

21   Q.   Okay.  The next item you have on this -- on this slide deck

22   sheet relates to price sensitivity.  And that is an antitrust

23   economics term, is it not, Dr. Mason?

24   A.   Yes.

25   Q.   Okay.  And can you explain for the Court what you generally

1  mean by price sensitivity?

2  A.  Price sensitivity, it's typically referred to price

3  sensitivity of demand.  That is the ability of the customer to

4  go elsewhere if a single supplier raises their prices.

5  Q.  Okay.  And in your view -- did you make any observations as

6  to whether the markets in this case were either more or less

7  price sensitive?

8  A.  My opinion is that the market for fully insured arrangements

9  is less price sensitive than the market for self-funded

10  arrangements.

11  Q.  Now, Dr. Mason, the final entry on this page refers to an

12  ability to sustain overcharges.  What do you mean by that

13  concept?

14  A.  I mean that because there's less price sensitivity in the

15  fully insured market because there are less alternatives, the

16  suppliers of fully insured plans can raise prices on those plans

17  more -- in context, a monopoly power can raise prices

18  artificially -- by more than they can with regard to markets for

19  self-funded with greater -- greater number of alternatives, face

20  greater competition and, therefore, are more price-sensitive.

21  Q.  Okay.  So to boil this down to one concept, Dr. Mason, as an

22  expert economist or an antitrust economist and as a matter of

23  antitrust principles, would you expect to see in this case that

24  the fully insured market could sustain larger overcharges?

25  A.  Absolutely.  This is Economics 101.

1    Q.   Okay.   Now, Dr. Mason, if you'll turn to the next page, you

2    have a slide on relative profitability, and I just want to touch

3    on one or two concepts.   First, why do you want to discuss

4    relative profitability, and how does that bear on your analysis?

5    A.   I discuss relative profitability because at all times here,

6    we're allocating a settlement in a case where damages are based

7    on this overcharge, this ability to charge more due to monopoly

8    power.   So we want to get closer and closer to overcharge in

9    everything that we do here.   All overcharge must derive from

10   profit, though not all profit is overcharge.   So the next step

11   here is to look not just at markets in general, but to look at

12   indicia of overcharge.   So the next step is to look at profit.

13   Q.   Okay.   And so, Dr. Mason, just to zero in on that point, you

14   said that all overcharge is profit; is that correct?

15   A.   That's right.   Overcharge has to be a subset of profit.

16   Q.   But all profit is not overcharge.   Is that fair?

17   A.   That's correct.   I'm not an expert on the law, but I don't

18   know that it's illegal to profit.

19   Q.   Now, costs are distinct -- or expenses that a firm has to

20   pay are distinctive -- are distinct from profit and overcharges,

21   are they not?

22   A.   Yes.   Costs are subtracted from revenue on the way to

23   becoming profit.   And generally costs are thought to be equal

24   among both products supplied here.   There's nothing

25   controversial about that.

1    Q.  Now, just a couple of questions before we move on to your

2    financial analyses in this case.  Dr. Mason, you, in conducting

3    those financial analyses, made deductions for litigation risk

4    and for relative profitability; is that correct?

5    A.  That's correct.

6    Q.  And I just want the Court to understand.  Are these -- first

7    of all, you've been qualified as an expert in assessing

8    settlement allocations; is that correct?

9    A.  That's correct.

10   Q.  And how many times have you done that?

11   A.  Somewhere in the neighborhood of ten times.

12   Q.  Okay.  And have you employed deductions like litigation risk

13   and profitability in that context?

14   A.  Absolutely.

15   Q.  And are those standard deductions or standard inquiries that

16   an expert economist like yourself would make in the context of

17   assessing the reasonableness of an allocation?

18   A.  Absolutely.

19   Q.  Okay.  Now, Dr. Mason, if you'll turn with me to page 7 in

20   the slide deck, we've been talking generally about

21   considerations that are relevant for your inquiry into the

22   reasonableness of the settlement allocation in this case, but

23   did you conduct specific financial analyses to assess the

24   reasonableness of that settlement allocation?

25   A.  Yes, I did.

1  Q.  Okay.  And how many?

2  A.  As you noted earlier, I conducted four analyses, two of

3  which I conducted two different ways.

4  Q.  Okay.  And looking at slide deck number seven, are these the

5  four analyses that you performed in this case?

6  A.  Yes, they are.

7  Q.  And so they --

8  A.  These are the results of the four.

9  Q.  I'm sorry, Dr. Mason.

10  A.  I'm sorry.  These are the results of the four.  Yes.

11  Q.  Okay.  And so we have gross revenue, net revenue, operating

12  gain, and revenue per member growth.  Is that fair?

13  A.  That's correct.

14  Q.  Okay.  So let's focus, Dr. Mason, turning to page 8 in the

15  slide deck, on adjusted gross revenue.  Can you describe for the

16  Court your methodology in conducting this analysis?

17  A.  Sure.  First I begin this analysis -- I began my analysis in

18  general by obtaining quarterly financial reports and quarterly

19  enrollment reports that were supplied by the BCBS licensees.

20  Those record revenues and enrollment that is the subject matter

21  of this case.  It has to do with BCBS-licensed plans that are

22  alleged to have been affected by horizontal restraints.

23  Q.  And just to stop you there for a second, Dr. Mason, did you

24  have an opportunity -- or you or your team -- to speak to Blue

25  Cross Blue Shield and inquire as to the sources for that data

1  and the data itself?

2  A.  Absolutely.  We had extensive discussions with BCBS about

3  the data, its content, its nature --

4  Q.  Okay.  Thank you.

5  A.  -- before we proceeded.

6  Q.  So sorry to interrupt.  You were describing your methodology

7  in the use of these reports.

8  A.  So that was important because certain covered lives or

9  enrollees are not part of this lawsuit, government employees,

10  state and local government employees and the like.  So we needed

11  to adjust the overall numbers of -- for those lives that were

12  not part of this lawsuit.

13      After doing so, we began to undertake the four analyses

14  here.  The first one, the slide -- on slide eight, which you

15  have before you, is the gross revenue analysis.  This is our

16  starting point.  This is the simplest comparison available out

17  of the four.  Its value is that it's simple.  Of course, it has

18  other liabilities to it too, as objectors note, but the value is

19  that --

20  Q.  And so can I just stop you --

21  A.  -- it's simple.

22  Q.  Thank you, Dr. Mason.  Just stopping you there, just so the

23  Court's clear, you were -- you were analyzing and assessing the

24  reported revenue for the self-funded subclass versus reported

25  revenue for the fully funded subclass; is that right?

1    A.   That's correct.   That revenue reported by the BCBS entities

2    at issue in this case.

3    Q.   Okay.   And what conclusion did this lead to in your

4    financial analysis, if you can describe that?

5    A.   So if we undertake this comparison, add up the revenue, we

6    get a proportional allocation to the self-funded class of 1.7

7    percent.

8    Q.   Okay.   Now, Dr. Mason, you're aware that the self-funded

9    objectors have lodged various arguments with respect to your

10   gross revenue analysis and attacked it as unsound.   Is that your

11   understanding?

12   A.   Yes.

13   Q.   Okay.   And what's the basic criticism that you have taken

14   from the objectors' papers?

15   A.   I -- I would say there are two at its heart.   The first is

16   there's an assumption, which they state is an assumption they

17   make, that when I present total self-funded revenue in slide

18   eight, that that is only ASO fees.   That is incorrect.   And --

19   Q.   Just to pause you there, it's incorrect why?

20   A.   Because it's total self-funded revenue.   Even the way that I

21   describe how this data is treated -- and as I understand, this

22   description was provided verbatim in the Burns memorandum that

23   was issued for some purposes in this matter much earlier -- I

24   utilize this quarterly financial report data supplied by the

25   BCBS entities.   And what they supply is total revenue, total

1   actual revenue, and they supply premium revenue to fully

2   insureds.  I subtract from total revenue premium revenue to

3   fully insureds in order to obtain this total self-funded

4   revenue.  So this category is not limited to ASO fees.

5   Q.  And so I believe what you're --

6   A.  It is a residual remainder.

7   Q.  And I believe what you're saying is the remainder you're

8   describing includes revenue from ASO fees and any other -- any

9   other revenue that the Blues associate and report with -- in

10  that regard; right?

11  A.  That's correct.  It contains every --

12          THE COURT:  Repeat that question.

13          MR. BURNS:  Sure.  So the ASO revenue that Dr. Mason is

14  focused on in his analysis includes both ASO fees as well as any

15  other items of revenue that would flow to the ASO submarket,

16  according to the Blues.

17          THE COURT:  Thank you.

18  Q.  Is that correct, Dr. Mason?

19  A.  That is correct.

20  Q.  Okay.  And that was your first -- your first explanation of

21  the criticism.  What was your -- what was your understanding of

22  the additional criticism that the objectors lodged?

23  A.  The second point seems to be that objectors say I should not

24  stop here with the revenues associated with the horizontal

25  allocation scheme but should take into account all of the

1  expenditures that are made by companies on health care.

2  Q.  And so the distinction here is that the premium paid -- the

3  revenue associated with fully insured premium includes revenue

4  that the Blues may pay to other third parties; is that correct?

5  A.  Right.  I was thinking that as a third that I left out.  But

6  this is somewhat separate.  They're saying we go beyond the

7  horizontal allocation scheme.  But there is also the criticism

8  that they offer that I include, for fully insureds, money that

9  is paid to third-party providers and I do not include that for

10  the self-funded portion of this comparison.

11  Q.  And the Blues, in the documents that you reviewed, do not

12  report payments in the ASO market that might be made to

13  third-party providers as part of their revenue; is that correct?

14  A.  That's correct.  It's just not revenue to the firm.  It

15  hasn't been taken into their possession in the normal course of

16  business the same way that, say, a firm that sells microphones

17  receives money in return for those microphones and accounts for

18  that money as revenue and subtracts from it costs and derives

19  profit.

20  Q.  And the objectors say that you should have used something

21  called a premium equivalent; is that right?

22  A.  That's right.

23  Q.  And you're an expert economist.  You've conducted this gross

24  revenue analysis before.  Have you ever used anything called a

25  premium equivalent in an analysis?

1  A.  No.  We use premiums.

2  Q.  Okay.  And turning, Dr. Mason, if I may, to the next page,

3  number 9, is it your understanding that in arguing that premium

4  equivalents should be used, that the objectors point to the

5  testimony of Mr. Schlegel in the *Anthem* case as suggesting that

6  premium equivalents must be used in this type of analysis?

7  A.  That's my understanding of their use of this document, yes.

8  Q.  Okay.  And I've called out this testimony or some excerpts

9  of Dr. Schlegel's testimony.  Now, do you have any understanding

10 whether Mr. Schlegel was an antitrust economist?

11 A.  I have no idea.

12 Q.  Okay.  Do you have any understanding whether he was being

13 asked to perform a gross revenue analysis like you performed in

14 this case?

15 A.  My understanding is that he was not, given the context

16 provided here.

17 Q.  And in fact, the context that you were referring to in his

18 testimony is that he said it was proper to use premium

19 equivalents when assessing whether an individual Blue was

20 meeting best-efforts requirements; is that right?  Both national

21 and local.

22 A.  That's what I understand him to say, yes.

23 Q.  All right.  So Mr. Schlegel never said that in this type of

24 gross revenue analysis that you're conducting, that you must use

25 premium equivalents; is that right?

1  A.  That's right.  He doesn't say anything regarding overcharges

2  in an antitrust horizontal allocation case.

3  Q.  Okay.  Now, turning back to page 7, the summary of your

4  financial analyses, focusing first on gross revenue, what was

5  the allocation to the self-funded class that your gross revenue

6  analysis suggested would be appropriate?

7  A.  1.7 percent.

8  Q.  Okay.  In looking at this page, that's the lowest allocation

9  that you reached in conducting your financial analysis; is that

10  correct?

11  A.  That's right.

12  Q.  Okay.  And looking at these other financial analyses you

13  conducted, net revenue suggested an allocation somewhere under

14  10.7 percent; is that right?

15  A.  That's right.  So taking the next step in my analysis, kind

16  of thinking like objectors do, I said, well, why don't we take

17  these claims that are paid under fully insured plans out of the

18  mix and do the comparison there.  And I get somewhere less than

19  10.7 percent as a result of that calculation.

20  Q.  Okay.  So then you did an operating gain financial analysis.

21  And that's described in your report; correct?

22  A.  That's correct.

23  Q.  All right.  And that yielded a range of allocations.

24  A.  That's correct.

25  Q.  And what was that range?

1  A.  I run that two different ways based upon two different

2  observations from the record provided by BCBS licensees, and the

3  results are somewhere between less than 3.9 percent and 6.3

4  percent.

5  Q.  Okay.  And your final analysis was revenue per member

6  growth; is that right?

7  A.  That's right.

8  Q.  And just so the Court understands, was that the most

9  sophisticated of the analyses you performed?

10  A.  Sure.  This method follows standard econometric procedures,

11  in fact, procedures related to the professors to whom the Nobel

12  prize in economics in 2021 was just awarded this month.

13  Q.  All right.  So a couple of other questions briefly on these

14  analyses.  Did the self-funded objectors' experts take any

15  quarrel with the use of a net revenue or operational --

16  operating gain differential analysis?

17  A.  No.

18  Q.  And in fact, did they agree that those might be used in this

19  context?

20  A.  Yes.

21  Q.  Okay.  And how about the revenue per member growth?  Did you

22  see any criticism of that analysis?

23  A.  No.  The only comment they made about that was that they

24  didn't understand it.

25  Q.  Okay.

1  A.  And that struck me as odd because they're saying they didn't

2  understand what's become now mainstream economics over the last

3  30 years, for which the Nobel Prize was just awarded this month.

4  This is standard stuff in economics.

5  Q.  Okay.  So, Dr. Mason, I'm going to wrap up here very

6  quickly.  Going back to the gross revenue analysis and the

7  information or data that the self-funded objectors maintain that

8  you should have used or should have included -- and this is

9  found on pages 24 through 28 of the self-funded objectors'

10 opening brief.  And I'm just going to -- well, I'll ask you

11 first you understand that one of the sources of information that

12 they maintain you should have used in your gross revenue

13 analysis was medical claim costs for the self-funded class; is

14 that right?

15 A.  That's right.

16 Q.  All right.  Dr. Mason, as an antitrust economist, you

17 generally take the allegations in the complaint as informing the

18 scope of your analysis.  Is that fair?

19 A.  Absolutely.

20 Q.  All right.  Have you seen any allegations in this case that

21 medical claim costs were somehow subject to the conspiracy

22 alleged in this case?

23 A.  No.

24 Q.  All right.  Have you seen any allegations that indicate that

25 medical claim costs were somehow increased by the conspiracy

1    alleged in this case?

2    A.   No.

3    Q.   Accordingly, did you take these into account in performing

4    your analysis?

5    A.   I'm sorry.   Take these?

6    Q.   Medical claim costs in performing your gross revenue

7    analysis.

8    A.   Well, by taking them into account, my gross analysis leaves

9    them in for fully insureds because they are revenue.   So I leave

10   them in as revenue --

11   Q.   Because they're reported.

12   A.   -- in a raw form.   But I take them out when I perform my net

13   revenue comparison, which Ms. Corley seems to agree is a valid

14   approach.

15   Q.   Well, and just to clarify, Dr. Mason, you weren't aware of

16   any allegations of anticompetitive conduct that implicated

17   medical claim costs.   Is that fair?

18   A.   That's correct.

19   Q.   Okay.   So I'm going to summarize the types of information

20   they insist you should have used:   retention of pharmacy

21   rebates, pharmacy manufacturer incentives, pharmacy spread,

22   ownership in specialty or mail-order pharmacies, subrogation

23   fees, audit investigations, carve-out coordination fees,

24   utilization management fees, stop-loss premiums, network access

25   fees, out-of-network negotiations, data fees.

1       Dr. Mason, are you aware of any allegations in this case

2  that any of the items I just listed were subject to the

3  conspiracy that was actually alleged in this case?

4  A.  I know of no such allegations specifically with regard to

5  these products.  And I was instructed that the revenue data that

6  I used would contain all revenue to which the horizontal

7  allocation scheme was applied.

8  Q.  And with respect to, again, that list -- that litany of

9  suggested information that you omitted, according to the

10  self-funded objectors, are you aware of any allegation that any

11  of those particular items were increased or subject to an

12  overcharge by the conspiracy alleged in this case?

13  A.  Absolutely not.

14          MR. BURNS:  Your Honor, unless you have further

15  questions, I'll --

16          THE COURT:  I don't.  I'll allow cross.

17      (Brief pause)

18          THE WITNESS:  I'm sorry.  Before we get going, I left

19  my water bottle in the back thinking there might be one up here.

20          THE COURT:  Would somebody retrieve his water bottle

21  for him?

22          THE WITNESS:  Thank you.

23          UNIDENTIFIED MALE:  And while we're waiting for that,

24  Your Honor --

25          MR. RICHIE:  Your Honor, I've got one.

```
1              MR. BURNS:  I've got one for him.

2              MR. RICHIE:  Your Honor, may I?

3              MR. BURNS:  Oh, thanks.

4         THE WITNESS:  Thank you so much.

5         THE COURT:  You almost had three water bottles.

6         You may proceed when you're ready.

7              MR. CRAMER:  Thank you, Your Honor.

8         And may it please the Court, Phillip Cramer for the

9    national account group in this case.

10        Your Honor, with Mr. Richie, we will be -- we've

11   coordinated our cross-examination so as not to plow the same

12   ground.  I will be covering the injunctive relief portions of

13   his opinion and the market definition with which he just

14   started, and then Mr. Richie will go into the allocation issues

15   that are subject to their objection.

16             THE COURT:  How much time do you think you're going to

17   allot for yours?

18             MR. CRAMER:  We would -- a half hour.

19             THE COURT:  All right.

20                         CROSS-EXAMINATION

21   BY MR. CRAMER:

22   Q.  Good morning, Dr. Mason.

23   A.  Good morning.

24   Q.  As you heard me mention, we represent about 40 national

25   accounts with upwards of approximately two and a half to three
```

 1   million covered lives.  And I want to ask you some questions

 2   about the injunctive relief aspects of your opinions in your

 3   declaration.

 4       I want to make sure, though, to start off that we're both on

 5   the same page when we refer to the term "national accounts."

 6   You're familiar with the court's decision in *Cigna-Anthem* in

 7   which it found and defined a separate antitrust market for

 8   national accounts?

 9   A.  No.  I'm not familiar with precedent on the legal side of

10   this matter.

11   Q.  Okay.

12           MR. CRAMER:  Your Honor, if I may approach.

13           THE COURT:  You may.  And you don't have to ask either.

14   You can approach as necessary.  Thank you so much.

15           MR. CRAMER:  Thank you, Your Honor.

16   Q.  In your declaration, you cite in a number of places or at

17   least several places to this PowerPoint slide -- this PowerPoint

18   deck from the *Cigna-Anthem* case; correct?

19   A.  I seem to recall this.  Yes.

20   Q.  And this is the PowerPoint for the testimony of a Dr. David

21   Dranove; is that correct?

22   A.  That appears to be correct.

23   Q.  And if we look at page 3 of this PowerPoint that you cite in

24   your declaration, we see the information, the evidence, that

25   Dr. Dranove considered in his expert testimony, on which the

1  court relied on in *Cigna-Anthem*; correct?

2  A.  I see the slide, yes.

3  Q.  Any reason to dispute that Dr. Dranove, on whom you relied,

4  had access to the breadth and depth of evidence when it came to

5  national accounts in assisting him to determine the market

6  definition?

7  A.  I would have to review what he determined here.  I don't

8  know -- if you'd like to point me to something within the deck,

9  I'm happy to take a look at it --

10  Q.  Okay.

11  A.  -- in terms of his determination, but this slide seems to

12  say he looked at some things.

13  Q.  And this is a PowerPoint that you cite in your declaration;

14  correct?

15  A.  Right.

16  Q.  And you wrote your declaration and presumably found this

17  PowerPoint testimony to be sufficiently credible to rely upon;

18  correct?

19  A.  Sure.  I found pieces that were clear enough to rely upon.

20  But a PowerPoint deck, being any PowerPoint deck, doesn't fully

21  describe the report in this matter.  If you're going to ask me

22  about Dr. Dranove's analysis, it would make more sense to look

23  at the report and a full explanation.  I'm sure he spends

24  paragraphs deciding -- I'm sorry -- describing what he means by

25  the bullets on slide 3.  But I'll take it on its face for

1   purposes here.

2   Q.  Thank you.  And turning to page 12 of this PowerPoint, we

3   see characteristics of national accounts.  And Dr. Dranove

4   explains that these tend to be ASO plans but that they can

5   include fully insured plans; correct?

6   A.  Sure.

7   Q.  And we see his ultimate conclusion that commercial health

8   insurance sold to national accounts is a relevant product

9   market; correct?

10  A.  I'm sorry.  Can you restate that quote?  I just want to make

11  sure you read it correctly.

12  Q.  We see his conclusion that commercial health insurance sold

13  to national accounts is a relevant product market.

14  A.  Is a relevant product market.  Correct.

15  Q.  And as we heard from Mr. Burns at the very beginning of your

16  testimony, the distinction of the market is of critical

17  importance.  Those aren't my words.  That was Mr. Burns's words.

18  A.  Was that in his introduction before I spoke?

19  Q.  Correct.

20  A.  Those were his words, I suppose.

21  Q.  Do you disagree with them?

22  A.  Well, it's my understanding Dr. Dranove's analysis is

23  undertaking merger analysis.  So in a merger analysis, yes, one

24  critically has to define the market.  I'm evaluating a

25  settlement for which we have a definition given by the extent of

1  the horizontal allocation scheme.  But yes, market definition is

2  certainly important.

3  Q.  Okay.  And you asked for the support.  And as you mentioned,

4  this was a merger analysis.  And we see how Dr. Dranove went

5  about determining a national account market.  First we see

6  that --

7           THE COURT:  Counsel, do you have a position on how, if

8  in any way, a merger analysis considered by, for example, the

9  D.C. district court, would differ from an analysis of a

10  geographic market division scheme and determining and allocating

11  damages?

12           MR. CRAMER:  So, again, my questions go to the

13  injunctive relief and to the claims made in Dr. Mason's report

14  that --

15           THE COURT:  This is the same question as relates to

16  injunctive relief.

17           MR. CRAMER:  Yes.  That the ASO market is,

18  quote-unquote, more competitive or less price sensitive than the

19  fully insured market.  And I think what we'll see through these

20  slides --

21           THE COURT:  So you would say that a merger analysis and

22  an analysis that we're engaging in here in this case would be

23  similar in terms of determining price sensitivity,

24  competitiveness in the market, matters like that?

25           MR. CRAMER:  I think maybe the best explanation, Your

 1    Honor, would be a merger tries to look into the future and says

 2    this is where the market is today, let's look into the future

 3    and see the effect this merger will have on the market tomorrow.

 4            THE COURT:  The effect of a change in the market will

 5    be.

 6            MR. CRAMER:  And here we have injunctive relief.  We

 7    have a market today; and this settlement process is asking you

 8    to decide what will that market be like in the future, will this

 9    injunctive relief change the market, have procompetitive

10    effects, or won't it?

11            And to undertake that analysis, we submit you start

12    with what is the market, what characterizes the market, and then

13    you can understand, I think -- or we can analyze what does the

14    elimination of the national-best-efforts restraint without the

15    elimination of the ESAs have on the national account market.

16            THE COURT:  You can proceed.

17            MR. CRAMER:  Correct.

18            THE COURT:  I'm just trying to make sure I understand

19    what your contention was in terms of bids.

20            MR. CRAMER:  And I think a market that has been found

21    already to be a national accounts market, that analysis, which

22    is premerger -- right? -- it's what is the relevant market --

23    would apply equally in a merger context as it would in this

24    context.

25            THE COURT:  All right.  Thank you.

 1  Q.  (Mr. Cramer, continuing:)  And in fact, you're familiar with

 2  the concept of SSNIP?  We're looking at a hypothetical

 3  monopolist for determining a market, and that applies whether

 4  it's horizontal restraint that's being challenged or whether it

 5  is a prospective merger being challenged; correct?

 6  A.  I'm not sure that's correct.  I've not been asked to perform

 7  a SSNIP analysis in this case.  I think that's more of a legal

 8  question with regard to a horizontal allocation scheme and the

 9  difference between that and a horizontal merger.

10  Q.  Okay.  So the -- just so the Court and everyone else is

11  clear, you were not asked to define a market or conduct a test

12  with respect to reasonable interchangeability or price

13  elasticity?

14  A.  Not reasonable sustainability.  I also was not asked to

15  perform a formal test of price elasticity.  That test is similar

16  to the analysis of Dr. Ariel Pakes, who provided a report in

17  this matter.  It is my understanding after discussions with BCBS

18  licensees that similar data to that used by Dr. Pakes for the

19  State of Alabama does not exist for every service area, so it is

20  not clear that that analysis can be performed for every service

21  area.  I would have liked to have done that formally, but we

22  don't have the data.

23  Q.  But you cited some secondary sources -- correct? -- where I

24  think in your PowerPoint, I saw you maintained that ASOs have

25  more options and, therefore, lower price sensitivity.

1   A.   Generally yes.  Yeah.

2   Q.   But in this PowerPoint on which you've relied in your

3   declaration, we see two studies of elasticity of demands, and we

4   see Dr. Dranove's conclusion that, indeed, actual elasticity is

5   less than critical elasticity for purposes of defining the

6   market and, in fact, is quite low; correct?

7   A.   Where are you?  Slide 16?

8   Q.   Slide 16.  I'm sorry, Dr. Mason.

9   A.   Okay.  Having looked at slide 16, can you please repeat your

10  question?

11  Q.   Sure.  Well, maybe I'll make an easier question.  You do not

12  offer, as you mentioned, any SSNIP analysis -- you did not

13  perform any SSNIP analysis or elasticity test that would

14  contradict or call into question the earlier work cited here by

15  Dr. Dranove?

16  A.   As I testified previously, I did not perform a SSNIP

17  analysis.

18       I have to say I am confused by one thing because there have

19  been a number of allegations that my report cites specific

20  documents that I do not in fact cite or rely upon.  And I have

21  looked through my report here for -- at least looked through the

22  footnotes to see where I cite Mr. Dranove.  I do remember seeing

23  it in preparing for my analysis, but if I did cite it, I'd

24  appreciate you pointing out where.

25  Q.   Sure.  And I'll show you the slides -- one of the actual

1  slides you do cite.

2  A.  I might.  I just can't find it.  And for what purpose.  And

3  I think that might help shape your question --

4  Q.  Sure.

5  A.  -- understanding for what purpose I might cite this.

6  Q.  You cited to Dr. Dranove with respect to whether TPAs were a

7  substitute or a viable alternative for national accounts.  Does

8  that refresh your recollection?

9  A.  No.  I don't see the cite in my report.  Is this in my

10  report?  Some of these cite -- some of these claims seem to

11  point to the Burns memorandum, which I did not author.  I want

12  to make sure that's not what you're referring to here before we

13  go further with this testimony, if you don't mind.

14  Q.  No.  You could start with footnote 83 of your declaration.

15  A.  Thank you.  And thank you for clarifying.

16          MR. BURNS:  Mr. Cramer, what footnote was that?

17          MR. CRAMER:  83.

18          MR. BURNS:  83.

19  A.  83.

20     (Brief pause)

21  A.  Okay.  I see that.

22  Q.  And you can also look at footnote 30.  It's not very clear

23  there.  I'll just read you footnote 30.

24     TPAs provide competition for all but the largest firms.

25  According to the DOJ's expert, David Dranove, TPAs are not

 1   strong competitors for national accounts, citing to a 1 percent

 2   presence in this segment as well as noncompete agreements.

 3   Judge Jackson's opinion, pages 82 to 83, lays out evidence for

 4   which TPAs steer clear of national accounts.

 5        So there you're not only citing Dr. Dranove -- and I believe

 6   you're citing this slide right here -- but you're also citing

 7   the court's opinion from the *Anthem-Cigna Merger* case; correct?

 8   A.  Footnote 30 points to slide 24.  You're showing me slide 43.

 9   Is that what's being referred to in footnote 83?

10   Q.  I'm sorry.  It might be.  I'm sorry.  You quote the line,

11   less than 1 percent of major consultants, 1,100 U.S. clients,

12   are TPAs; correct?

13   A.  Where?

14        (Brief pause)

15   Q.  I don't have an encyclopedic knowledge of your declaration.

16   I'm sorry, Dr. Mason.  But I will find that 1 percent cite that

17   you give.

18        I guess maybe to distill all this down, you agree that TPAs

19   are not strong competitors for national accounts; correct?  And

20   you cite that in your declaration and explain that in your

21   declaration.

22   A.  Just to be specific, my footnote 30 reads:  TPAs provide

23   competition for all but the largest firms.  According to the

24   DOJ's expert, David Dranove, TPAs, quote, are not strong

25   competitors for national accounts, unquote, citing to a 1

1   percent presence in the segment as well as noncompete

2   agreements.

3       And that reference points to the Dranove presentation at

4   slide 24 and Judge Jackson's opinions at pages 82 and 83.

5       Oh, I'm sorry.  I follow up:  Judge Jackson's opinion, pages

6   82 and 83, lays out evidence for why TPAs, quote, steer clear,

7   unquote, of national accounts.

8   Q.  So we have a market for national accounts.  And we

9   understand that for national accounts, there are really only

10  four options, according to the opinion as well as according to

11  Dr. Dranove; correct?

12  A.  Four options?

13  Q.  Correct.  United, Cigna, Aetna, and the combination of the

14  Blue defendants.

15  A.  I'm saying your only four options for what?

16  Q.  For national accounts.  I'm sorry.

17  A.  For national accounts to do what?

18  Q.  For their ASO services or other commercial -- other

19  commercial insurance products.

20  A.  I don't -- I'm not sure where -- is this a question?

21  Q.  Yes.  You have maintained that national accounts are

22  different than other ASOs, and you have cited Dr. Dranove and

23  Judge Jackson's opinion for the fact that these TPAs, which you

24  explain provide additional outlets for ASOs, aren't available to

25  national accounts; correct?

1    A.   I'd say it slightly differently.   I'd say national accounts

2    are big, and so they typically rely upon a big provider of ASO

3    services in order to meet their needs.   But as far as options

4    that they have, they can always purchase fully insured from

5    these same companies, same large companies.

6         Again, it would probably be a large company.   Dranove

7    doesn't say that TPAs aren't active at all with the largest

8    firms, just that when firms become so large, yes, there's fewer

9    sources from which they can buy services that meet their needed

10   scale.

11   Q.   And the only market in which Judge Jackson struck down the

12   proposed merger was in a national accounts market; correct?

13   A.   I don't know about what Judge Jackson struck down, so I

14   really can't say.

15   Q.   How many lives are encompassed by national accounts?

16   A.   I don't know off the top of my head.   Part of that depends

17   upon how you define a national account.   I know we did some

18   analysis of this, but I don't recall off the top of my head.

19   Q.   Do you understand the complaint defines a national account

20   as greater than 5,000 covered lives?

21   A.   Sounds generally correct.   I haven't committed the complaint

22   to memory, for sure.

23   Q.   And for those national accounts, some are qualified under

24   the settlement agreement and some are not; correct?

25   A.   I understand there are rules in the settlement agreement

1  that define which national accounts are treated in a certain way

2  for purposes of the settlement.

3  Q.  And is it your understanding that there are approximately 66

4  million covered lives by national accounts, of which 33 million

5  are -- receive the right to seek a second Blue bid under the

6  settlement?

7  A.  As I said, I haven't committed those numbers to memory.

8  Q.  So you have no idea if the majority of covered lives in this

9  country for which a Blue provides insurance services are under a

10 national account?

11 A.  The -- the vast majority?  I don't know that I've made that

12 calculation for purposes of this matter.

13 Q.  Were you in the courtroom yesterday?

14 A.  Yes.  I think all but the last 20 or 30 minutes.

15 Q.  All right.  Did you see the presentation about there being

16 approximately a hundred million potential claimants out there?

17 A.  I heard some numbers like that thrown around.

18 Q.  And if 66 million of the hundred million were national

19 accounts, would that be a majority of all covered lives in a

20 national account?

21 A.  Sixty-six million lives out of a hundred million lives?  I

22 suppose.  I'd have to check those numbers before I'd agree.

23 Those aren't my numbers, so I really can't say.

24 Q.  Now, you understand that within the national account market,

25 the defendants have allocated these customers amongst

 1  themselves?

 2  A.  Are you talking about part of the history leading to this

 3  case or --

 4  Q.  I'm talking about today, that the defendants have divided up

 5  the territories.  And for a national account headquartered in a

 6  particular territory, one Blue defendant and only one Blue

 7  defendant is entitled to bid on that business.  Do you

 8  understand that basic premise in this case?

 9  A.  I think that's generally correct.  Again, this is not

10  something that I specifically looked at.

11  Q.  And you're -- do you know any of the history, for example,

12  that in 1984, there was 110 and then in 1989, there were 75, in

13  1996, there were 62?  Are you familiar with that gradual wave of

14  consolidation?

15  A.  Are those numbers referring to the number of national

16  accounts?

17  Q.  Yeah.  Just number of Blue defendants or Blue licensees.

18  A.  Okay.

19  Q.  Does that sound -- does that comport with your understanding

20  of the history here of the concentration and consolidation that

21  has occurred?

22  A.  I haven't committed the specific numbers to memory from the

23  eighties and the long history of the Blues, but I understand

24  generally there's been consolidation over the time that's

25  brought us to today.

1  Q.  And did you perform an HHI analysis as part of your

2  declaration to measure market concentration?

3  A.  No.  I wasn't evaluating merger.

4  Q.  You understand that HHI can be used to understand the level

5  of concentration in any market; correct?

6  A.  Sure.

7  Q.  And any reason to doubt that -- that the market for national

8  accounts, as Dr. Dranove illustrates here, is classified as

9  highly concentrated under an HHI analysis?

10 A.  Well, Dr. Dranove concludes what Dr. Dranove concludes for

11 the purposes of his analysis.

12 Q.  And if we look at market share, we see that for the national

13 accounts, the Blue defendants essentially have the same amount

14 of shares as all other providers in that market combined;

15 correct?

16 A.  I'm sorry.  I'm looking at the page.  Could you please

17 restate that?

18 Q.  Sure.  According to Dr. Dranove's analysis in the national

19 account market, we see that the Blue defendants in this case

20 have approximately half of the market.

21 A.  His charts show what they show.

22 Q.  Okay.  And in your declaration, you explain -- and I believe

23 you testified earlier that, quote, a market in which a seller

24 has more market power will lead to a greater ability for that

25 seller to increase price and, therefore, greater profitability

1  for that seller; correct?

2  A.  Sure.

3  Q.  And we can agree that the defendant Blues in this case have

4  used their market power to extract higher prices from national

5  accounts; correct?

6  A.  I think you asked can we use that statement alone to

7  conclude that these companies extracted higher prices from

8  national accounts.  If that was your question, I would say no,

9  that's not correct.

10  Q.  Are you familiar with --

11       THE COURT:  That may be the lawyer for your side's

12  position in this case, though, if we kept litigating.

13  Q.  Are you familiar with the operative complaint in this case?

14  A.  Yes.

15       THE COURT:  All right.  Counsel, I think we're bogging

16  down a little bit.

17       MR. CRAMER:  Okay.

18       THE COURT:  I think you're -- I think I just made the

19  key distinction, what's alleged.  But if you want to tie this to

20  what I'm considering, feel free; but let's not get into a debate

21  about --

22       MR. CRAMER:  Understood, Your Honor.  I'm sorry.  And

23  I'll move along.

24  Q.  And I guess -- are you familiar, then, with -- and I'll skip

25  along everything that your clients have alleged and get right to

1  the -- the nub, which is that, currently, your clients seek an

2  injunction prohibiting the individual Blue plans in the

3  association from entering into, honoring, and enforcing any

4  agreements that restrict territories or geographic areas in

5  which any member may compete.

6      Are you familiar with that request for an injunction?

7  A.  You're using the legal terms.  I have not committed those to

8  memory.  I understand generally that part of this settlement

9  will wipe away the horizontal allocation scheme, yes.

10  Q.  Well, I'm talking about the -- the injunction in the

11  complaint.  You understand the settlement purports to bless the

12  continuation of the geographic territorial allocation amongst

13  the Blue defendants; correct?

14  A.  Can you please restate that?  I'm sorry.  You're jumping

15  around with the legal language.  I'm an economist here.  I am

16  not here to testify to the legal nature of this case, and I'm

17  happy to follow as best I can.

18  Q.  You give an opinion --

19  A.  Perhaps it would be helpful if I had some of the language in

20  front of me to see.

21  Q.  Okay.  I guess I was -- I put the language up there.  I'm

22  sorry.  This is from page 539 of the complaint.

23      (Brief pause)

24  A.  Okay.  Paragraph 539 says what it says.

25  Q.  And that would apply to all national accounts equally and

1    indivisibly; correct?

2    A.  I don't see any distinction in paragraph 539 between

3    national accounts or other accounts, so I would presume the

4    answer to your question is correct.  Again, I don't want to be

5    seen as making a legal determination here.  That's not what I'm

6    here to do.  This is not my specialty, reading legal language

7    and interpreting it.

8    Q.  But you do interpret the effects -- or you purport to

9    interpret the effects of the injunctive portion of the

10   settlement in this case; correct?

11   A.  I provide an economic interpretation of my reading of the

12   injunctive provisions that are proposed as part of this

13   settlement.

14   Q.  And those injunctive provisions that are proposed with

15   respect to the territorial allocation provide some national

16   accounts with the ability to seek out a second Blue bid, but not

17   all; correct?

18   A.  That's my understanding, yes.

19   Q.  And Appendix C to the proposed settlement agreement lists

20   about 1,038 entities that would have the right to seek a second

21   Blue bid; correct?

22   A.  I remember a list.  I'm not sure if that's the list that

23   have the right to seek a second Blue bid.  But yes, I understand

24   that the largest of those entities has a right to seek a second

25   Blue bid.

1  Q.  But that list includes about 375 entities that already have

2  the ability to seek a second Blue bid because of some

3  consolidation yet to be complete amongst the Blue defendants

4  because there are some pockets in Pennsylvania and California

5  where a -- where there is what we've referred to as Blue-on-Blue

6  purported competition; correct?

7  A.  I understand that concept generally, yes.

8  Q.  Now, the vision of who gets the right to seek a second Blue

9  bid versus who doesn't, that's not based on size; correct?

10       THE COURT:  Folks, I think this is one of the concerns

11  I had going in.  And I wish I had thought about this earlier.  I

12  wish what we'd done is had the proponents of the settlement put

13  on the board their arguments about second Blue bids, because I

14  think that's really what you're after in this examination --

15  right? -- in large part?

16       MR. CRAMER:  It's certainly part of it.  It is

17  certainly a significant part of it.

18       THE COURT:  Yes.  But yet we're a number of minutes

19  into it and this is the first time we've hit it.  I realize

20  you've tried to lay the groundwork on markets and how they

21  compare.  But to be honest with you, it may be more helpful to

22  me if we call a time-out, have them present the rationale for

23  the second Blue bid, and then you can ask him about what they

24  just said.  Wouldn't that make more sense than the shadowboxing

25  we're doing now?

```
 1              MR. CRAMER:  Your Honor, I'm all for efficiency and

 2    productivity.

 3              THE COURT:  Okay.  What say everyone about that?

 4              MR. BOIES:  Fine with us, Your Honor.

 5              MR. HAUSFELD:  If we can have a short break to prepare

 6    for the change, that would be appreciated.

 7              THE COURT:  Well, I think it's time for a short break

 8    anyway, so we'll do that.

 9              MR. HAUSFELD:  Thank you, Your Honor.

10              THE COURT:  But folks, we're running -- we're going to

11    run short on time if we keep this pace up.  I mean, this is -- I

12    hate to say it, but I felt like two days for a fairness hearing

13    in this case was more than adequate, reasonable, and fair.

14    Okay?  So we've got to be efficient.  And I'm just telling you

15    if things get -- if you don't hit your major points, that's not

16    my problem.  Okay?  Everybody understand that?  And I'm not just

17    addressing the lawyer at the lectern.  I think that goes for

18    everyone.

19              MR. BURNS:  Yes, Your Honor.

20              THE COURT:  All right.  And again, there will be

21    opportunities to make your points that you think you didn't

22    flesh out enough today in written form later.  I assure you of

23    that.  But what I would suggest to you is it is time to major on

24    the majors and make the most important things the most important

25    things.  All right?
```

```
 1              Take a short, ten-minute break and resume after that.

 2              MR. BURNS:  Thank you, Your Honor.

 3        (Recess at 10:57 a.m. until 11:23 a.m.)

 4              THE COURT:  All right.  Before we start with second

 5   Blue bid, let me see a representative from each group up here.

 6              MR. RICHIE:  Including objectors, Your Honor?

 7              THE COURT:  Yes.  Objectors who care about (b)(2)

 8   versus (b)(3).

 9              Here are ten copies of what I have outlined earlier.

10   Why don't y'all take those and discuss them.  Okay?  Actually,

11   give me one back.

12              MR. HAUSFELD:  My pleasure.

13              THE COURT:  Thank you.  Okay.

14              MR. RICHIE:  Your Honor --

15              THE COURT:  You're not talking about second Blue bid,

16   so why are you standing there?

17              MR. RICHIE:  I have a proposal.  It's not just one

18   proposal --

19              THE COURT:  Okay.  I like proposals.

20              MR. RICHIE:  I'm trying to save time.

21              This is our first chance to talk to Dr. Mason and

22   potentially our only chance.  We haven't deposed him.  It is

23   hard to be very concise with our questions.  We haven't been

24   able to build a foundation for --

25              (The court reporter interrupts for clarification)
```

```
 1            MR. RICHIE:  My microphone was off.  My apologies.

 2       Your Honor, our proposal on behalf of the objectors who

 3  are going to take Dr. Mason's testimony would be that for all

 4  live witnesses, the hearing is adjourned for us to take -- not

 5  stopped, but held open for us to take their testimony by

 6  deposition and to submit to the Court excerpts that are where

 7  we've majored on the majors.

 8       But we've never been able to examine him about any of

 9  his work, about his assumptions, about those things.  It would

10  help us to be able to build that foundation.  Some of those may

11  be dry wells; some things may have really important

12  consequences.  And I can't know, without asking the questions,

13  what those things are.

14       This is the first time an ASO witness has been on the

15  stand in this case.  And I would like to think I could do an

16  adequate job in 30 minutes.  I'm just not sure that's the case.

17       I understand that counsel for the subscribers object to

18  that proposal, and I'll -- unless the Court has questions, I'll

19  yield for them.

20            MR. BOIES:  We think this hearing ought to just go

21  forward, Your Honor.  We don't think it ought to be adjourned or

22  there ought to be any, you know, further delay.  We don't think

23  there's a need for depositions.

24       I frankly don't think it's particularly productive to

25  ask an economist to interpret paragraphs in the complaint.  I
```

 1   think that is not a sensible use of time.  I think if they just

 2   focused on the points that they need to make, they can make

 3   their cross-examination in the time period that they have.

 4         If there were to be depositions, those depositions

 5   ought to take place today, tonight.  We ought to have this over

 6   with, not drag this on for an indefinite period of time.

 7         THE COURT:  Okay.  Let me -- so let me tell you what my

 8   reaction is.

 9         MR. RICHIE:  Certainly, Your Honor.

10         THE COURT:  But I'd need to think about it more.  But

11   the reaction is no one asked for depositions leading up to the

12   hearing, even though we knew there was a request to have

13   Dr. Mason here.  We -- the agenda that the proponents of the

14   settlement had worked out last night and provided the Court this

15   morning allotted a couple of hours for you to do this.  And I

16   thought you told me earlier you didn't need a couple of hours,

17   you could do it in a shorter period of time.  And if what I've

18   seen so far on the examination of Dr. Mason is what would occur

19   in the deposition, I'm not sure that would be terribly helpful

20   for the Court.

21         MR. RICHIE:  Your Honor, first of all, a page of

22   history.  We received the right to get testimony from

23   Dr. Mason --

24         THE COURT:  Because I ruled and said you could.

25         MR. RICHIE:  Yes.  And that order proposed either that

1    we do it by some combination of live or by deposition.  We met

2    and conferred with Mr. Burns, and there wasn't time to organize

3    a deposition or availability to make that happen.  No one is

4    pointing fingers about that.  But we could not anticipate the

5    number of items that would come up in this case, the time

6    pressures --

7            THE COURT:  There are two things you really want to get

8    his views on, it seems to me:  the whole concept of the second

9    Blue bid and how it was decided upon; right?

10           MR. RICHIE:  That's not specifically my objection, Your

11   Honor, but --

12           THE COURT:  No.  There's two things.  That's one.  And

13   the other is allocation and how it was decided upon.

14           MR. RICHIE:  Yes.

15           THE COURT:  Anything else that you would depose or

16   examine him about in front of me?

17           MR. RICHIE:  Allocation goes a long way, Your Honor.

18   There's a lot of factual issues --

19           THE COURT:  Anything else besides those two topics that

20   you would examine him about in front of me?

21           MR. RICHIE:  His general qualifications, his -- Your

22   Honor, the subject of the hearing --

23           THE COURT:  I thought we said earlier there wasn't an

24   objection to his qualifications.  There may be objections to his

25   opinions and to the extent his qualifications may affect the

1  weight that should be given the opinions.

2         MR. RICHIE:  Yes, Your Honor.  We don't believe he's

3  got experience that he can bring to bear on this specific issue,

4  I think, that's related to allocation.  I'm trying to be as

5  forthright and forthcoming so that no one says I hid anything.

6         The communications that he had with whom is an issue

7  that we've already been before the Court on.  I need to build a

8  factual record of that.  That's not a great use of time today --

9         THE COURT:  And we didn't have a court reporter, but

10 what I said to you was that communications that counsel for the

11 subscribers had with Dr. Mason after a settlement had been

12 reached and was being proposed to the Court and that related to

13 Dr. Mason's testimony in support of approval of the settlement,

14 there was a common interest and that you were not entitled,

15 based upon the common-interest privilege that I think everyone

16 agrees would apply, if it applies -- I said it does apply in

17 this circumstance and you're not entitled to get to

18 communications that, for example, subscriber counsel had with

19 Mr. Burns or with Dr. Mason directly.

20        Is that a fair summary of what the ruling was?

21        MR. RICHIE:  Yes, Your Honor.  That's a -- that's a

22 fair summary.  Yes.

23        THE COURT:  All right.  So that's the ruling.  So

24 you're not going to be able to go into any of that.

25        MR. RICHIE:  I would like the chance with this witness

1  to lay a factual predicate to support any appeal of that ruling,

2  Your Honor.

3          THE COURT:  What's the factual predicate you need to

4  support, that there were -- first of all, if there were no

5  communications, then there's no reason to appeal.

6          MR. RICHIE:  Correct.

7          THE COURT:  If there were, you can appeal.

8          MR. RICHIE:  His reliance, what he relied upon, the

9  identity of people that were sending things to him, the timing

10 of those as they relate to his initial engagement as it carries

11 all the way through his work in this case, which seems to have

12 moved through several phases.

13          It's not a long examination, Your Honor.  I do believe

14 that --

15          THE COURT:  Okay.  Look.  So we are -- understand this.

16 Correct me if I'm wrong, and I may be misunderstanding how

17 experts apply here.  His testimony doesn't go to whether or not

18 allocation was what the Court would have done if the Court was

19 counsel, what you would have done if you were counsel, or even

20 what your colleagues on the other side -- for example, the

21 Blues -- would have done if they were counsel.  The question is

22 was the allocation fair, adequate, and reasonable.

23          We're not -- it's not a definitive point and line that

24 can be drawn to say this is where the line should have been

25 drawn.  We're dealing with ranges of reasonableness here.

```
 1          MR. RICHIE:  Absolutely.

 2          THE COURT:  So, you know, I think that's one of the

 3   things I think we're losing sight over is, you know, for

 4   example, the expert for the United States in the Cigna-Anthem

 5   issue before the D.C. district court may have analyzed this

 6   differently in terms of where the line was drawn, second Blue

 7   bid, whatever.

 8          I want to hear argument on why it was unreasonable for

 9   them to do this.  So I think that's one of the issues I had is

10   we put the cart in front of the horse earlier.  We didn't

11   even -- we haven't had the proponents explain allocation and

12   second Blue bid before y'all started.  This is what I said we

13   were going to do right after the break, and we get into the

14   firestorm about whether or not we need to take depositions.

15          MR. RICHIE:  Your Honor, my only interest is in

16   obtaining the relevant testimony the most efficient way.

17          THE COURT:  Let's do this.  I don't know.  I don't know

18   what's in dispute here at this point.  I know you have some

19   disputes and some arguments.  I don't know how they mirror with

20   what they're going to present in the hearing.  So let's table

21   this discussion.  Let's do what I asked us to do.

22          MR. RICHIE:  Certainly.

23          THE COURT:  Let's put up -- let's get going on the

24   second Blue bid, let's talk about the allocation, and then you

25   guys might have a little bit of opportunity to narrow down what
```

```
 1   you really want to ask about --
 2           MR. RICHIE:  Certainly, Your Honor.
 3           THE COURT:  -- and then we'll have a better context of
 4   whether or not it makes sense to do what you're asking to do.
 5           I'm inclined against it, but I've not made a decision
 6   about that.  But my view is, look, we've had 11 months since
 7   preliminary approval.  We've had over a year since the
 8   settlement notice went out; right?  I mean -- I'm sorry.  Not
 9   over 11 months.  Over -- when did -- when did the notice go out?
10           MS. JONES:  End of March, Your Honor.
11           THE COURT:  I'm sorry?
12           MS. JONES:  End of March.
13           MR. BOIES:  End of March, Your Honor.
14           THE COURT:  End of March.  So we're now, you know, six
15   and a half months or so since notice went out.
16           MR. RICHIE:  Your Honor, only --
17           THE COURT:  Everybody has been educated on what this
18   settlement was.  Everybody knew this was the hearing that was
19   going to kind of set things in place.  It seems to me if there
20   were depositions necessary, the parties and objectors would have
21   come forward and said that before today.
22           MR. RICHIE:  Yes, Your Honor.  I'm happy to share the
23   history of requesting testimony from Dr. Mason, but his first
24   report is dated September 3rd of this year.  It was not
25   submitted with any of the settlement -- we've been more than
```

1    diligent in trying to get his testimony, so --

2            THE COURT:  All right.  Very well.  I understand what

3    you're saying.

4            MR. HAUSFELD:  Morning, Your Honor.

5            THE COURT:  Be brief.  Cut to the chase.

6            MR. HAUSFELD:  I will.  In addressing the issue of

7    injunctive relief, we had two overriding concerns, one, for the

8    rules themselves and, two, to do -- to remove the restraints --

9            THE COURT:  Pull that microphone a little closer to

10   you.

11           MR. HAUSFELD:  -- to remove the restraints that were in

12   the market and to introduce the inclusion of procompetitive

13   effects that would open competition in the market.

14           With regard to the tests under Rule 23 for purposes of

15   judging the adequacy, reasonableness, and fairness of a

16   settlement, in the context of Rule 23, the advisory committee

17   notes and the rules themselves state "equitable" means there

18   must be a reasonable explanation for different treatment under

19   the terms of the agreement as a whole.  The advisory committee

20   notes further state that matters of concern can include whether

21   the apportionment of relief among class members takes

22   appropriate account of differences among their claims.

23           And in the *Radcliffe* case, which we cited in our brief,

24   the court upheld settlement relief that had different forms for

25   different class members because the proposed relief was

```
 1   adequately supported by considerations behind those
 2   distinctions.  That was the approach that we took.
 3             And, Your Honor, if I may turn to slide 31 --
 4             THE COURT:  Is this a different set of slides than I
 5   was provided yesterday?
 6             MR. HAUSFELD:  No.
 7             THE COURT:  Okay.  Because it's not -- my pages are not
 8   matching up with your pages.
 9             MR. HAUSFELD:  That's usually the condition that I get
10   them in.
11             MS. BOJEDLA:  Your Honor, I can give you a set.
12             THE COURT:  Please.  Thank you, Swathi.
13             MS. BOJEDLA:  We have a lot of slides.
14             THE COURT:  I understand.  I don't, though.  I need the
15   ones we're looking at.  Thank you.
16             All right.  You may proceed.
17             MR. HAUSFELD:  We looked at the market and we said
18   where and how can we introduce competition not just in one form
19   but in multiple forms so that there would be greater choice and
20   opportunity for consumers and the ability of the Blues to
21   respond to that choice by competing not only with others in the
22   market but with themselves as well.
23             Ultimately, we came to a tiered system.  And if we look
24   at slide 31 -- and I'd like to start kind of at the bottom of
25   the tier, and that is those ASOs with under 5,000, you know,
```

1  employees.  The settlement provides for opportunities for

2  competition beyond the second Blue bid itself.

3          Most importantly, note the settlement allows for

4  unlimited green bids by eliminating the national-best-efforts

5  rule.  And a green bid really is merely a Blue bid under a

6  different color.  And it's different than *Topco* because here

7  there clearly were Blues that had green businesses of

8  significant size and were operating in competition with Blues in

9  areas outside their ESAs.

10         But on top of that --

11         THE COURT:  Did you ever think you'd be standing before

12  a court trying to distinguish *Topco*?

13         MR. HAUSFELD:  No.

14         THE COURT:  Go ahead.

15         MR. HAUSFELD:  And counsel for the national accounts

16  raised the *Anthem* case.  And the *Anthem* case offered another

17  insight into the elimination of the national-best-efforts rules.

18  One of the factors inhibiting the merger raised by the

19  Department of Justice was the fact that Anthem would have

20  acquired Cigna businesses; but under the Blues'

21  national-best-efforts rules, it would have had to have converted

22  those Cigna plans into Blue plans, which, under the

23  national-best-efforts rules, would have reduced the ability of

24  those firms to compete.

25         THE COURT:  I understand how green business injects

 1   additional competition potentially into the market.  So let's

 2   move along to the second Blue bid, the relief that it provides,

 3   and what your thinking was in terms of eligibility requirements

 4   for the second Blue bid, why more groups did not get the benefit

 5   of a second Blue bid.

 6              MR. HAUSFELD:  Again, what counsel for the national

 7   accounts demonstrated by referencing the *Anthem* opinion was the

 8   fact that the Court, in that merger case, certified or

 9   recognized the existence of national accounts with 5,000

10   employees or over.

11              We understood that, and we took account of that

12   because --

13              THE COURT:  So you're looking at this fairly

14   significant piece of litigation litigating issues -- or at least

15   markets similar to what you're looking at.  You notice that the

16   court and the experts in that case identified this market of

17   5,000 or more.  Take it from there.

18              MR. HAUSFELD:  Right.  And below that number, below

19   that threshold, if we look at national account slide 42 that I

20   just put up --

21              THE COURT:  Which I don't have.

22              MR. HAUSFELD:  -- there are regional or local carriers

23   below the 5,000 level that provide competitive opportunities for

24   ASOs at that level in addition to the Blues.

25              THE COURT:  That's from the exhibit that was being used

1  with the witness?

2          MR. HAUSFELD:  Yes, Your Honor.

3          THE COURT:  I'm sorry.  I misunderstood.  Go ahead.

4          MR. HAUSFELD:  And we also took note of the fact that

5  TPAs, which operate heavily in the market for ASO accounts below

6  the national account level, are not strong competitors for the

7  national accounts with 5,000 employees or more.

8          And the third chart that was referenced indicated that

9  there was a further distinction of national accounts of 5,000 or

10  more employees geographically dispersed.

11          We took those factors into account in creating the

12  second Blue bid.  And the second Blue bid covers one-third of

13  all national accounts and over one-half of all accounts with

14  5,000 employees or more up to at least 33 million lives.

15          So we concluded that if we could open that market up to

16  competitive bids, that would provide a greater pressure on price

17  and on services and on innovation and on product offerings that

18  otherwise did not exist in the market.

19          But we added a bit of a twist to it.  And the twist was

20  it wasn't just another Blue plan could make a bid in addition to

21  the Blue plan in which the national account was headquartered,

22  we said the second Blue bid could be directed by the national

23  account itself so that the Blue system doesn't determine who

24  gets the Blue bid, but the national account itself can request

25  its choice of who it wants to receive a Blue bid from.

```
 1              And it goes further with regard to the second Blue bid
 2    that --
 3              THE COURT:  And I take one of the things about that
 4    proposal is it makes you more comfortable, since you've accused
 5    the Blues of agreeing not to pursue certain business --
 6              MR. HAUSFELD:  Exactly.
 7              THE COURT:  -- that it takes that decision-making out
 8    of their hands and allows -- it allows members of this
 9    particular class to designate who they want to do -- seek the
10    opportunity to do business with.
11              MR. HAUSFELD:  Yes.
12              THE COURT:  Okay.
13              MR. HAUSFELD:  And the agreement goes further.  And if
14    the national account's choice of a second Blue bid declines,
15    then they have the right to put up another request for a bid
16    until there are at least two competitive Blue bids.
17              What we found, if I've got the right slide up -- I
18    think I do -- is in doing that, we took this to our -- to
19    Dr. Rubinfeld, who is a world-renowned economist, and said what
20    will this do if we're able to achieve it.  And he told us in no
21    uncertain terms not only does that benefit that portion of the
22    market which -- in which the largest ASOs covering insured lives
23    reside -- is most likely -- and most likely to ask for and
24    benefit from a second Blue bid --
25              THE COURT:  And I think you've addressed this, but
```

 1  let's just be very clear on the record about why you cut it off

 2  at 5,000 employees and why you added the additional template of

 3  geographic dispersion.

 4          MR. HAUSFELD:  Because it was rationally based in the

 5  criteria in the market.

 6          THE COURT:  Meaning?

 7          MR. HAUSFELD:  Meaning --

 8          THE COURT:  That was a conclusion.

 9          MR. HAUSFELD:  Meaning the 5,000 was recognized by the

10  court in *Anthem* as being the threshold for the existence of a

11  new market --

12          THE COURT:  The parties viewed that as a solid

13  benchmark.

14          MR. HAUSFELD:  Yes.

15          THE COURT:  Okay.

16          MR. HAUSFELD:  -- as well as the dispersion criteria,

17  which, again, was in the chart that the market itself -- that

18  the Court took cognizance of -- that the market itself

19  reflected.

20          THE COURT:  All right.

21          MR. HAUSFELD:  And then in doing that, we understood

22  that we would be benefiting not only that segment of the market

23  by giving them an additional Blue bid which they direct but,

24  additionally, that there would be increased competition

25  throughout the market because of the flow of pricing information

1    at that high level all the way down the market.

2         Also, Your Honor, that the qualified national account

3    list, if you meet the eligibility criteria, is refreshed every

4    two years.  So that is both flexible and dynamic in terms of its

5    fluidity.  It accepts companies that move up, that grow, and

6    removes those that contract so that we're covering effectively

7    the same body in the aggregate, you know, of covered lives.

8         That has never been achieved before.  And we felt that,

9    in and of itself, establishes a benefit not only to the national

10   account market that they otherwise did not have nor could direct

11   as well as the entirety of the ASO market as well as the market

12   generally, including fully funded, in terms of the introduction

13   of competition at the very top level, reducing prices,

14   increasing innovation and product services availability.

15        THE COURT:  All right.

16        MR. HAUSFELD:  All of which boils down --

17        THE COURT:  And this is where you land the plane;

18   right?

19        MR. HAUSFELD:  This is where I land the plane.  On the

20   next -- the two bullets at the bottom, the dispersion criteria

21   is objective.  We went to an outside source and said, okay, who

22   makes up the national accounts in the largest single category?

23   And that was employers because those are the companies that have

24   the greatest number of covered lives as well as the greatest

25   dispersion, making them true national accounts.

```
 1            And then we looked at whether or not this was rational.
 2  And there was, as you said, a rational benchmark upon which to
 3  base those distinctions.  And that's it in short.
 4            THE COURT:  All right.  That was succinct.  I
 5  appreciate that.
 6            Please, everyone, use that as a high-quality example of
 7  what you should do when you step to the microphone.
 8            MR. HAUSFELD:  And, Your Honor, as --
 9            THE COURT:  And then you're going to say something
10  else.
11            MR. HAUSFELD:  Only if you want to hear -- you gave out
12  those sheets about how --
13            THE COURT:  Yes.  Let's hold off on that.
14            MR. HAUSFELD:  Okay.
15            THE COURT:  I do appreciate you being willing to
16  address that, but I want to keep focused on apples, so let's
17  stay focused on apples.
18            MR. HAUSFELD:  Thank you, Your Honor.
19            THE COURT:  Thank you.
20            MR. SLATER:  Your Honor, could I have 30 seconds?
21            THE COURT:  You may.
22            MR. SLATER:  Thank you.  I really will be very brief.
23            With regard to the 5,000 members in the national
24  account, we have not objected to that.  With regard to the
25  dispersion issue, we briefed that, Your Honor.  We'll stand on
```

1    our briefs.  Same thing with regard to the Taft-Hartley and the

2    church plans.

3              THE COURT:  Yes.  And we haven't addressed that.  I'm

4    going to give you a chance to address that.

5              MR. SLATER:  I think the answer is going to be we're

6    going to stand on our briefs.  We've --

7              THE COURT:  And that would be a perfect answer too, but

8    I'm not going to pretermit any discussion you would like to give

9    me on that.

10             MR. SLATER:  Thank you, Your Honor.

11             THE COURT:  Thank you.

12             All right.  Who's got -- so how about the other set of

13   objectors?  What response to that?

14             MR. RICHIE:  Your Honor, that's not my objection.

15   That's my coverage of my objection.  I was just --

16             THE COURT:  Okay.  That's fine.  So do we need to do

17   any further examination of this witness about that, then?

18             MR. CRAMER:  I have additional questions for the

19   witness based on the presentation.

20             THE COURT:  What are those?

21             MR. CRAMER:  Well, we're looking -- sorry.

22             THE COURT:  Come to the microphone.

23             MR. CRAMER:  A few --

24             THE COURT:  I just wonder what this witness can help me

25   figure out based upon what Mr. Hausfeld has just told us was the

1   rationale behind the settlement, not whether or not we draw the

2   line somewhere else, but whether the line drawn is unreasonable.

3   All right?  So --

4           MR. CRAMER:  So on that question, it is probably

5   unlikely the witness can assist.  I think where the witness

6   could assist is on the question of does this relief provide

7   anything of substance in a national account market going

8   forward.

9           Now, I have --

10          THE COURT:  Are you -- is it your contention that

11   second Blue bids that were not otherwise available and green

12   competition that was not otherwise permitted would have no

13   effect on competition, or are you just saying, we're not sure

14   it's going to have the effect on competition that the class

15   advocates?

16          MR. CRAMER:  So let me answer those two pieces because

17   they're different.  On the 663 national accounts that are

18   entitled to seek out a second Blue bid, theoretically, that

19   should improve competition.  Now, there's buried in the

20   agreement a $25 local service and support fee that this Court is

21   being asked to set, which we think is a horizontal price fix.

22          But let's, you know, go past the mechanics.  Yes, if

23   663 national accounts had the right to receive or seek a second

24   Blue bid, then for those 663 entities, that should be a plus,

25   assuming that they can seek a second Blue bid that is not

 1    precluded by the mechanics buried in the settlement agreement.

 2    Agree there.

 3           With respect to green competition -- and I apologize

 4    for not majoring in the majors.  What I was trying to set up

 5    with the earlier testimony was that the national account market

 6    is distinct.  And for green competition to have an effect in the

 7    national accounts market, it must satisfy those criteria that

 8    Dr. Dranove explained.  And the combination, we believe, of the

 9    local-best-efforts rule and the continued prohibition of Blue --

10           THE COURT:  Isn't that answered by the fact that it's

11    not just any random Blue whose green business would be

12    attractive to a national account, but particular green

13    businesses?  For example, if Anthem has a green business, a

14    major giant, that's going to make a significant difference and

15    there may be national accounts that want to deal with Anthem

16    green business.  There may be people who don't qualify for a

17    second Blue bid who would be more than happy to go to Anthem's

18    green business.

19           MR. CRAMER:  And we think that if Anthem could enter

20    into the green business for national accounts, that that would

21    obviously be a plus.  We do not believe, though --

22           THE COURT:  Your argument is that this is set up where

23    Anthem doesn't have that opportunity as much as others.

24           MR. CRAMER:  Well, for example, Anthem's area is

25    protected from Blue-on-Blue competition because of the

 1  geographic dispersion.

 2          THE COURT:  Yes.

 3          MR. CRAMER:  Second, for Anthem, as we heard earlier

 4  about the premium equivalent testimony -- we heard Mr. Burns

 5  talk about how premium equivalents were used for

 6  local-best-efforts restraint.  So if I'm Anthem and I can only

 7  receive, you know, 20 percent of my revenue from green accounts

 8  and I own a third of the United States, well, my ability to

 9  provide green competition to a national account that has covered

10  lives in Anthem territories is limited.

11          THE COURT:  Based on the local best efforts.

12          MR. CRAMER:  That is correct.  And that aggregation of

13  restraints --

14          THE COURT:  So, Mr. Hausfeld, do you want to address

15  that issue?  And I think I ought to give the Blues the

16  opportunity to address the issue as well.

17          MR. HAUSFELD:  The local-best-efforts rules would not

18  preclude that because it only accounts for revenue derived from

19  the locality in which both the plan and the ASO are in.  So if

20  there are revenues outside --

21          THE COURT:  It's not the entire service area when it

22  comes to Anthem?

23          MR. HAUSFELD:  Correct.

24          THE COURT:  I'm sorry?

25          MR. HAUSFELD:  Yes.

```
 1              THE COURT:  So that's what I thought, but I -- let's
 2    see if the Blues agree with that.
 3              MR. ZOTT:  Could you repeat the question, Your Honor?
 4    I'm sorry, Your Honor.  I was --
 5              THE COURT:  Go ahead, Mr. Hausfeld.  Would you please
 6    restate it for us.
 7              MR. HAUSFELD:  The local-best-efforts rule requires
 8    that the standards be met by the operation of the ASO and the
 9    Blue plan in that state and that state alone.
10              THE COURT:  Not the entire service area, but just the
11    state.
12              MR. ZOTT:  Correct.  That's exactly right.
13              THE COURT:  Because Anthem's service area obviously
14    branches across different states, but LBE only -- as modified,
15    as I understand it, only applies on a state-by-state basis?
16              MR. ZOTT:  It's measured at the state level under the
17    modification.  Correct.
18              THE COURT:  All right.  So that means that Anthem would
19    be freed up to do more green business outside -- depending upon
20    the state.
21              MR. HAUSFELD:  And it would be free under its green
22    business to operate anywhere.
23              THE COURT:  Well, and that's the point is not only --
24    and so one question is -- and maybe somebody could answer this
25    question for me, because I've seen these arguments about, well,
```

1  if your local best efforts is restricting green business, then

2  green business does -- there's not an incentive for a Blue to

3  develop a green business within its service area.  And I asked

4  earlier if those are really -- obviously, they are technically

5  separate actors if they're different entities, but what would be

6  the incentive just on a -- not in terms of a Section 1

7  conspiracy, but just as far as that decision-making center to

8  say, you know what we need to do, we need to compete with

9  ourselves?

10         MR. HAUSFELD:  There was a time, I believe, where

11  Anthem was, you know, very active as a green business because

12  any health insurer does not necessarily cover the full range of

13  products or the bundle of services that are available.  So yes,

14  there's room, you know, for having both.  You've got to measure

15  that, possibly, you know, by business opportunity.

16         THE COURT:  But it seems to me that the one argument

17  against what the Court just hypothesized would be this.  If

18  Anthem is unhappy with restrictions placed upon it by the

19  association and how it goes about its business and is unhappy

20  with having to do things like focus in on strengthening the

21  Blue -- the Blue mark, then there may be some incentive to do

22  some of the business through the green where they can take some

23  shortcuts or alleyways or what have you.

24         But that's the point, isn't it, that the local best

25  efforts encourages each Blue to focus on the mark?  It seems to

 1  me, at least, there's an argument -- I'm not saying that this is

 2  true.  I'm not saying I'm finding this as a finding of fact or a

 3  conclusion of law.  But we just all agreed yesterday my job here

 4  is not to address the issues on the merits but just to see if

 5  they're clearly illegal.  I don't think we can say it's clearly

 6  illegal for a Blue to decide -- and the Blue -- and each Blue to

 7  be required to say, we want you to focus on the mark and we want

 8  you to strengthen the mark.  That's -- that's a --

 9          Yes, Mr. Laytin.

10          MR. LAYTIN:  I'd be happy to take that from

11  Mr. Hausfeld.

12          THE COURT:  I think you're going to sing a clearer song

13  with better harmony than I did.  But go ahead.

14          MR. LAYTIN:  Well, not necessarily than you did, but as

15  someone representing the Blues.

16          Three points.  The first is, you know, there's an adage

17  in the Blue system that if you know one Blue plan, you know one

18  Blue plan.  And so obviously, there's a diversity of views in

19  different types of plans on points like this.

20          But the second point is common -- is the point you

21  raised, which is it is incredibly important that there is a

22  nationally strong network of Blue plans, and local best efforts

23  ensures that folks invest in the local service areas.  If you

24  don't do that, we don't have a nationwide system.

25          But then the third point is --

```
 1              THE COURT:  And that's a benefit to --

 2              MR. LAYTIN:  That is it a benefit to --

 3              THE COURT:  -- to the insureds.

 4              MR. LAYTIN:  -- consumers and, we think, providers too

 5  and et cetera.

 6              And then the third point is, yeah, within -- you know,

 7  once you accept those first two premises, there's a lot to be

 8  said for the logic that you don't want to compete against

 9  yourselves.  Now, you know, Toyota has Toyota and Lexus.  And so

10  there's obviously different views on segmentation, et cetera,

11  and that's where you get to the diversity of views among the

12  system.  But I think those first two points are really

13  controlling as it relates to the procompetitive benefits.  And

14  then obviously, as you said, the fact that especially under this

15  go-forward system, any Blue plan can compete on a green basis

16  outside their service area.

17              MR. ZOTT:  Your Honor, could I just add, if it's

18  appropriate, one point --

19              THE COURT:  Yes.

20              MR. ZOTT:  -- if it would be helpful, which is the

21  other issue is we've litigated for nine years in a very

22  adversarial setting and through nine years of discovery, expert

23  reports, some of the best experts in the country.  No plaintiff

24  has been able to assess or quantify any harm flowing from LBE.

25  So the mere fact that we've litigated for nine years and there's
```

1  no ability even to advocate for any harm flowing from it is

2  powerful evidence that that rule -- unlike the NBE rule, which

3  has been challenged and there's experts, et cetera -- that that

4  rule does not have any effect.

5          THE COURT:  Well, if there had been that type of

6  evidence in this case or at least indication of harm in this

7  case, I'd say Mr. Boies would have been in your grill about it.

8          MR. ZOTT:  Yeah.  And that's the reason it's still in

9  the agreement is because we've litigated it and that's been the

10  end result.

11         And then the only other thing I'd say is our briefs

12  pointed out that their -- that the LBE -- excuse me -- that the

13  second Blue bid is effective for Anthem.  And we pointed to the

14  fact that there are at least 20 qualified national accounts that

15  would qualify --

16         THE COURT:  So Anthem is sitting there on the second

17  Blue bid and, for whatever reason, it's not the one invited to

18  the dance.

19         MR. ZOTT:  Right.

20         THE COURT:  It can still, outside of its state, for a

21  second -- when a second Blue bid is at issue, it becomes aware

22  of that, directly or indirectly, however; it can approach

23  that insured, potential insured or self-insured, whatever the

24  case may be, that organization, and say we would like to earn

25  your business.

```
 1              MR. ZOTT:  Correct.

 2              THE COURT:  And we're going to compete against the two

 3      Blue bids that you're getting.

 4              MR. ZOTT:  That's right.

 5              THE COURT:  Without restriction; right?

 6              MR. ZOTT:  On a green -- absolutely.

 7              THE COURT:  In terms of outside their service area.

 8              MR. ZOTT:  On a green business.  That's right.

 9              THE COURT:  So that's at least two additional bids that

10      ASO gets that they wouldn't have gotten presettlement.

11              MR. ZOTT:  Right.  And the only point --

12              THE COURT:  And not to mention there may be others

13      besides Anthem that would like to take a swing at some green

14      business too.

15              MR. ZOTT:  Right.  And I was just responding to the

16      argument that because of the size of Anthem's service area,

17      there won't be that many qualified -- Anthem accounts that would

18      qualify as qualified national accounts and meet the dispersion

19      criteria.  And the point there is we put 20 in the brief.  I

20      just want the Court to understand there's at least 150 more.  So

21      there's at least 170 Anthem accounts that are qualified national

22      accounts and are entitled to a second Blue bid.  And that's a

23      very material relief in our view with respect to Anthem as well

24      as with respect to the rest of the class for the reasons

25      discussed yesterday.
```

```
 1              THE COURT:  All right.

 2              MR. HAUSFELD:  And we are aligned with both the Court

 3   and the Blues' description that the reasonably tailored local

 4   best efforts rules designed to encourage local investment are

 5   historically and traditionally virtually universally upheld.

 6              THE COURT:  All right.  Back to our objector friends.

 7              MR. CRAMER:  If I may be heard on three points, Your

 8   Honor.

 9              THE COURT:  You may.  Do we need Dr. Mason sitting

10   there any further?

11              MR. CRAMER:  I think he can sit down.

12              THE COURT:  You may -- don't leave.

13              MR. RICHIE:  Your Honor --

14              THE COURT:  Don't leave.

15              MR. CRAMER:  Correct.  I think --

16              THE COURT:  He just doesn't need the front row seat

17   right now.  He can go drink some water.

18              MR. RICHIE:  We have allocation testimony later, but

19   nothing further right now.

20              MR. CRAMER:  Your Honor, my first point, the remark was

21   made just now -- it's been made at other times -- that there was

22   nine years of discovery, there was terabytes of information.

23   But we've also heard that that discovery was focused on the

24   damages class that had been alleged, which was fully --

25              THE COURT:  Where did you hear that?
```

```
 1          MR. CRAMER:  -- fully insured individuals and the less
 2  than 200 group employees.
 3          THE COURT:  All right.  I understand what you're
 4  saying.
 5          MR. CRAMER:  And the danger when you have a settlement
 6  agreement that's filed 28 minutes after a complaint that, for
 7  the first time, alleges a subclass is that the factual record
 8  wasn't created.  And so with respect to local-best-efforts
 9  restraint, for fully insured individuals who work within a
10  single state, which means the only competitor that would come in
11  for green -- right? -- would be an out-of-state Blue defendant,
12  that makes perfect sense.
13          For a national account, though, that's dispersed
14  throughout the United States -- you know, if we look at -- turn
15  the document viewer back on, the effects on a national account
16  may be very different such that if I have lives throughout the
17  United States and they fall in these Anthem territories and
18  Anthem wants to provide me a green bid -- right? -- say I'm --
19  my home state of Tennessee.  Say I'm located there and Anthem
20  wants to come in to a FedEx that's located in Tennessee and
21  provide a green bid.  Well, it has to make sure that that green
22  product that it provides to FedEx through the entire nation
23  doesn't mess up its local best efforts restraints in California
24  and New York and Georgia, Ohio, and everywhere else.
25          THE COURT:  How would it?
```

```
 1            MR. CRAMER:  And that just has never been tested.
 2            THE COURT:  No.  How would it?
 3            MR. CRAMER:  So if a -- let's take the hypothetical of
 4   a -- well, let's not take a hypothetical.  Let's look at our
 5   client, Kroeger, here.  We see it has stores throughout the
 6   United States.  Well, if Anthem wants to be a strong green
 7   competitor to national accounts, well, then it's going to have
 8   to offer products -- the green product; right? -- in California.
 9   It's going to have to offer this nationwide.  And if it's so
10   successful in offering that green product, it's going to run
11   askew of the 80 percent limit, 80/20 percent limit.
12            This is not about --
13            THE COURT:  You started talking off talking about FedEx
14   in Memphis or a Memphis location --
15            MR. CRAMER:  Correct.
16            THE COURT:  -- and then you switched.
17            MR. CRAMER:  I did.  I did.  And that's because --
18            THE COURT:  Okay.  Because that wasn't going to work
19   for you, was it?
20            MR. CRAMER:  It would work.
21            THE COURT:  Okay.  Explain how that would work.
22            MR. CRAMER:  So if FedEx has employees throughout the
23   United States and Anthem wants to offer FedEx a green product
24   because it's located in Tennessee, then Anthem has to make sure
25   that, okay, how many lives do you have in California?  Because I
```

 1  can't ensure that many lives to the point where it becomes 20

 2  percent of my revenue.  And I can't do that in New York.  And I

 3  can't do that in Ohio.  I can't do that in all these states

 4  where I'm restrained.

 5          Now, at the end of the day, maybe in practicality, this

 6  doesn't plan out as we theorize.  But it's a pretty big leap to

 7  say that a class that was in existence for 28 minutes before the

 8  settlement agreement is filed and for which there had not been a

 9  factual record, that we can just say --

10          THE COURT:  Well --

11          MR. CRAMER:  -- the national-best-efforts restraint is

12  blessed.

13          THE COURT:  That's not the realities of how litigation

14  works, though -- right? -- nor the realities of what occurred

15  here.  What occurred here is there was prefiling discovery,

16  formal and informal.  Am I right?

17          MR. BURNS:  Yes, Your Honor.  Significant.

18          THE COURT:  There was retention of counsel who was

19  looking at potentially pursuing a class long before that.  There

20  was the availability of years of litigation handed to counsel by

21  other counsel -- here it is; go through it; here's expert

22  reports; here's discovery; oh, here's all the smoking guns from

23  the Blues' stuff that we -- Judge Putnam worked through in

24  discovery; here's access to whatever you need to assess this --

25  and the idea being if we are going to get finality and repose on

1  a new business structure for the Blues, why not give the benefit

2  of that to these other groups.

3          So the question becomes is it really a benefit to the

4  other groups, not whether there was 28 minutes between filing of

5  the complaint and filing of a settlement, because we all know,

6  realitywise, much, much work went into that before the filing.

7          MR. CRAMER:  And I don't want to -- fair.

8          THE COURT:  And I just -- you know, that's the kind of

9  thing that just isn't really helpful to me to hear arguments

10 like that.

11         MR. CRAMER:  And I'm sorry.  Maybe the better -- a

12 better articulation of what I should have said is --

13         THE COURT:  You're free to argue and explain to me why

14 you don't think there's a sufficient record at this point.

15         MR. CRAMER:  And -- and I --

16         THE COURT:  But that has nothing to do with when the

17 complaint was filed and when the settlement was announced.

18         MR. CRAMER:  Correct.  And it was in response to this,

19 you know, nine years of discovery when people weren't looking at

20 the effects of the national -- of the local-best-efforts rule on

21 national accounts as a distinct market.

22         THE COURT:  But there was a Venn diagram there.

23         MR. CRAMER:  Absolutely.

24         THE COURT:  And it seems to me there's a pretty

25 substantial amount of information within the Venn of the

1  diagram.

2          MR. CRAMER:  Correct.  But what was missing from that

3  Venn diagram or missing from the overlap that we would expect is

4  what Dr. Mason says in paragraph 30 of his declaration, which is

5  there were no data sources of information available to him to do

6  an overcharge analysis.  And if you can't do an overcharge

7  analysis of the damages that national accounts receive, then you

8  can't weigh that against the future benefits.  We're looking to

9  the future here.  And if we don't know what the overcharge is

10 for national accounts in the current market and then run that

11 same modeling with the injunctive relief that's being

12 proposed --

13         THE COURT:  Are you helping Mr. Richie a little bit

14 there on the allocation?

15         MR. CRAMER:  No.  This is injunctive relief; right?

16 Because I'm concerned --

17         THE COURT:  But when you're talking about overcharges,

18 I think that goes to monetary damages too; right?

19         MR. CRAMER:  Absolutely.  But my concern is -- you

20 know, we've opted out of the damages class.  And so my concern

21 is about the injunctive relief and how you evaluate it.  And so

22 that's, you know --

23         THE COURT:  Well, but so how do -- what aspect of the

24 injunctive relief in the (b)(2) area are you specifically

25 saying, this should be different?  You're making a lot of

```
 1   arguments about, okay, they didn't take account of this, they
 2   maybe didn't have enough account to do that, they perhaps rushed
 3   this.  What specifically in the (b)(2) relief are you saying
 4   should be different?
 5            MR. CRAMER:  The (b)(2) relief, I guess what I'm saying
 6   is should be congruent with the (b)(2) release.  And what I mean
 7   by that is we've disaggregated the output restriction that was
 8   national best efforts and the territorial restriction, which was
 9   the Blue-on-Blue ESA allocation of customers.  And if the
10   (b)(2) -- if we understand the (b)(2) now to say we have
11   resolved the output restriction, we have provided -- we've
12   struck down the national-best-efforts restraint, then I don't
13   have a complaint about the (b)(2).  But if the (b)(2) relief
14   dips down into the (b)(3) -- if the (b)(2) release dips down
15   into the (b)(3) relief --
16            THE COURT:  Did you read my little vignette?
17            MR. CRAMER:  I did, Your Honor.  And --
18            THE COURT:  What did you think?
19            MR. CRAMER:  I think it -- well, let me -- if I may
20   resolve -- reserve comment to that so that I can confer with --
21            THE COURT:  Well, but I thought you were just referring
22   to that.  You just said if the (b)(2) relief crowds out some of
23   the (b)(3) injunctive relief we might otherwise be able to seek,
24   we have a concern with that.
25            MR. CRAMER:  Correct.
```

```
 1          THE COURT:  And I just -- and what I've just provided
 2   you is, I thought, a swing at trying to make sure that doesn't
 3   occur, individualized to your client.  But anyway...
 4          MR. CRAMER:  Correct.  And I can -- divisible
 5   injunctive relief may include the right to pursue in litigation
 6   a second Blue bid.  In our way of thinking, if the basis for a
 7   second Blue bid is that the ESAs are unlawful, then that
 8   unlawfulness applies whether it's two or five or 30.  You know,
 9   an agreement to allocate customers -- you know, we would -- we
10   don't think the case law would make a distinction.
11          THE COURT:  But look, we went through this --
12          MR. CRAMER:  And I'm not -- that's why I --
13          THE COURT:  Hold on.  I don't like to be interrupted,
14   particularly in my own courtroom.
15          We went through this yesterday.  The tail does not wag
16   the dog.  If they're -- I understand what you're saying is if
17   the ESAs are illegal.  I've got to decide if they're clearly
18   illegal.  And if they're not, then assuming other things are in
19   place, I should approve this settlement, assuming the other
20   requirements of 23(e) are met; right?
21          MR. CRAMER:  Correct.
22          THE COURT:  Disagree with that?
23          MR. CRAMER:  No.
24          THE COURT:  Okay.  If I do approve the settlement and
25   it provides for what at least the parties tell me is historic
```

1  structural relief, you don't have the right to travel with your

2  client to a different court and undermine that relief, whether

3  your theory is the ESAs are illegal or that the sun rises in the

4  west.  It doesn't matter what your theory is.  You don't get to

5  go back and undermine structural relief approved by a court of

6  proper jurisdiction ruling on a Rule 23 class and providing --

7  and approving a Rule 23 class settlement.  It's as simple as

8  that.

9        Now, beyond that, you guys keep wanting me to -- and

10 you keep wanting to make arguments out, well, where does that

11 get carved?  At the joint?  Mid-thigh?  Look, I've told you the

12 law is pretty clear.  You cannot undermine the (b)(2) relief.

13       Now, again, you can go and litigate whether ESAs are

14 illegal in your individual case and you can seek individualized

15 relief if a court determines that they are.  That's that.

16 That's easy, it seems to me.  And I don't understand -- I think

17 we are overly complicating this.  All right?

18       MR. CRAMER:  Thank you, Your Honor.

19       THE COURT:  All right.

20       Mr. Boies, you're the one who seemed to me not to be

21 singing with the rest of the proponents yesterday on this issue.

22 Maybe I misperceive.  Maybe you just don't sing well.

23       MR. BOIES:  I think I'm basically singing the same

24 theme, although the melody may shift a little bit.

25       If I could just spend 60 seconds and clear up a couple

 1    of things.  First, while we started off representing only a much

 2    narrower class, we did discovery that related to the entire

 3    market.  Our complaint --

 4              THE COURT:  And you shared that with Mr. Burns.

 5              MR. BOIES:  And we shared that with Mr. Burns.  And

 6    we --

 7              THE COURT:  And, Mr. Burns, did you have adequate time

 8    to work your way through all that discovery before you took a

 9    position in this case?

10              MR. BURNS:  Absolutely, Your Honor.  And I can speak to

11    that if you'd like.

12              THE COURT:  Eventually you will.

13              MR. BURNS:  Okay.

14              MR. BOIES:  And in our complaint, we distinguished the

15    ASOs from the fully insured.  And so we had to do discovery

16    about what those different markets were and how the competitive

17    restraints affected each of those markets.  So this is something

18    that we have been -- in terms of the discovery, in terms of the

19    underlying facts as opposed to the allegations, we've been

20    looking at for a long time.

21              THE COURT:  And I think there was at least an

22    understanding that the Blues even had that you were reserving

23    your right all along to broaden the class definition and you

24    yourself pursue -- it may have been in a subclass.

25              MR. BOIES:  Yes.

1      THE COURT:  Because of lack of common characteristics,

2  it may have required a subclass.  But I think what Judge Putnam

3  supervised was broad-ranging discovery across all markets not

4  only because you needed to distinguish the effects in one market

5  that you weren't necessarily at that point trying to represent

6  and contrast it with the lack of competition in the market you

7  were -- and you acknowledged, I think, that there may be more

8  competition in the ASO market, but your position was there was

9  less competition in the subscriber market.

10      MR. BOIES:  Exactly right, Your Honor.

11      THE COURT:  And so one of the things you would have

12  focused on is, all right, so why is there more competition in

13  the ASO market, what are the effects of that competition, and

14  what can we learn from that to educate us about what arguments

15  or remedies we should pursue in the subscriber market.

16      MR. BOIES:  Exactly right, Your Honor.  And that

17  discovery went directly to the way we approached the second Blue

18  bid issue.  As I said yesterday, getting 31 million covered

19  lives was a compromise.  If we could have gotten 62, we would

20  have gotten 62.  If they could have gotten none, they would have

21  gotten none.  This was a compromise.

22      THE COURT:  Mr. Hausfeld kind of told us about the

23  objective benchmarks that were used to reach that compromise.

24      MR. BOIES:  Exactly.  And now, once we knew we were

25  going to get some substantial second Blue bids, we had to be --

```
 1            THE COURT:  And I say objective.  That doesn't
 2   necessarily mean they're perfect.
 3            MR. BOIES:  No.  Absolutely not.
 4            THE COURT:  It doesn't even necessarily mean that if we
 5   put them to the test of litigation, they'd turn out to be
 6   accurate.
 7            MR. BOIES:  Right.
 8            THE COURT:  But they were something that you were aware
 9   that the United States -- a United States District Court and
10   other actors in the markets, in similar markets, had ended upon
11   through the litigation process, not even a settlement process.
12            MR. BOIES:  Right.  And we looked at it from the
13   standpoint of what we thought was reasonable.  People can
14   disagree with us.
15            THE COURT:  Yes.
16            MR. BOIES:  And sometimes the defendants disagreed with
17   us a lot.  But this was something in which we thought a lot
18   about it.  We analyzed the data.  We came to a conclusion that
19   we thought was the right conclusion and that we're now urging
20   the Court was at least a reasonable conclusion.
21            And I think it's important to remember that once we had
22   a certain number of second Blue bids that we were going to be
23   able to get, we had to decide how do we use that to maximize
24   competition, what's going to have the greatest effect.  And as
25   Professor Rubinfeld said, if we can have a significant effect on
```

 1  that many customers, it's going to permeate the rest of the

 2  market.  It's going to help the health insurance market

 3  generally and particularly all ASOs.

 4          And so we picked size and we picked dispersion because

 5  we thought those would result in the second Blue bid going to

 6  places where it would have the greatest effect on competition.

 7  We also thought it would have the greatest effect on actually

 8  getting a second Blue bid.  Remember, we can't force them to

 9  bid.  All we can do is remove the restraints that keep them from

10  bidding.  And so what we wanted to do was make these accounts

11  that were going to get a second Blue bid attractive to the

12  Blues.

13          We also wanted them to be the most useful to

14  the customers.

15          THE COURT:  If we were in junior high school --

16          MR. BOIES:  Yes.

17          THE COURT:  -- you get to be the one who invites them

18  to the dance, not sit at home and wait to be invited.

19          MR. BOIES:  Right.  And you get to determine whether

20  they are underage.

21          THE COURT:  Now, that doesn't mean they have to go to

22  the dance with you.

23          MR. BOIES:  Right.  Right.  And as my -- and the parent

24  gets to decide whether it's an acceptable date or not.  And

25  hopefully that is whether it's reasonable, not whether that's

1    the person that they would necessarily pick for you.

2              But I think there's one more point, Your Honor, because

3    Anthem was talked about in terms of green competition.

4              THE COURT:  Hasn't Anthem given us some exciting

5    moments in this case?

6              MR. BOIES:  It has.  I can remember their attack on the

7    mediation privilege, Your Honor.

8              The -- but Anthem is a huge company.  I just -- you

9    know, while counsel was talking, I went over to the Blues and I

10   asked what Anthem's revenues were.  And I understand they're

11   $120 billion a year.  Now, if that is right, 20 percent of that

12   is $24 billion just in their service area that can be green

13   competition.  If their service area is, as counsel said, a third

14   of the country, that means they can have green competition, even

15   if it's evenly spread throughout the country, of $72 billion.

16   And that's just one company.  That is the kind of impact

17   eliminating the restraints on green competition can have.

18             So is it -- is it perfect?  Have we dismantled the Blue

19   system?  No, we haven't.  But that's not a hundred percent clear

20   that that would be in our clients' interests.  What we have done

21   is we have eliminated the restraints in ways that would

22   massively improve competition.

23             THE COURT:  Are you telling me that there were points

24   in which Mr. Zott and Laytin were arguing before the Court about

25   the advantages of the Blue system and you sat over at your table

```
 1   and said, you know, they may have a point there?
 2          MR. BOIES:  Well, as Your Honor recalls, during the
 3   economics day, I acknowledged that there were certain aspects of
 4   a Blue system --
 5          THE COURT:  That were very favorable to their insureds.
 6          MR. BOIES:  Exactly.  And that didn't mean that we
 7   didn't think there were serious competition problems, but we
 8   think we've gone a long way towards making this industry more
 9   competitive.
10          THE COURT:  All right.  Mr. Hausfeld, unless you're
11   going to add something more substantial than that, I think we're
12   ready to move to allocation.
13          MR. HAUSFELD:  I'm fine with that.  I was only going to
14   ask if Your Honor wanted to direct any questions with regard to
15   your proposal.
16          THE COURT:  I thought we'd hold off on the proposal
17   until we get allocation.  Because as soon as we get allocation
18   done, I think Dr. Mason is free to go.  Right?
19          MR. HAUSFELD:  Yes.
20          THE COURT:  I just didn't want him to be sitting in the
21   corner of the room during this whole argument.
22          MR. HAUSFELD:  Thank you, Your Honor.
23          THE COURT:  All right.  Well, let's -- who's doing
24   allocation for the proponents of the settlement, explaining
25   that?
```

```
 1            MR. BOIES:  Mr. Burns and I are.

 2            THE COURT:  All right.  Let's set the target up so the

 3   subscribers can take aim at it -- I'm sorry -- the objectors can

 4   take aim at it.

 5            In case you were wondering, if you were ordered lunch,

 6   it will be a good dinner.

 7            MR. BURNS:  Well, Your Honor, if you'll indulge me, I

 8   think I am going to take a couple of minutes to talk about my

 9   firm's involvement in this case and what we did, because I think

10   it --

11            THE COURT:  And that probably makes sense since I

12   pretermitted your discussion of that a moment ago.  So tell

13   me -- just tell me how you got in the case, why you think you've

14   adequately represented the class, why you think you had

15   sufficient time, information, and attention to detail to reach a

16   settlement and advocate a settlement.

17            MR. BURNS:  Absolutely, Your Honor.

18            So, Your Honor, a little background.  Until 2015, I was

19   a partner at Susman Godfrey.  And in that year, one of my other

20   partners and I formed our own firm.  Since that time we've I

21   think grown to about 30 lawyers, an equivalent number of staff.

22   I've done much the same thing I've done throughout my career,

23   which is representing class actions.

24            THE COURT:  And employed Judge Coogler's daughter, as I

25   recall.
```

```
 1             MR. BURNS:  That's right, Your Honor.  And hope to get
 2   her back, so -- I hear she's doing transaction --
 3             THE COURT:  I shouldn't mention that in front of all
 4   these other firms because they may make a dash to find her
 5   resume.
 6             MR. BURNS:  Yeah.  I don't need the competition.  But
 7   in any event, she was great.
 8             My point is since 2015, I've been doing much the same
 9   thing since I've done throughout my career.  I've served as lead
10   counsel in both MDL and other class actions in large commercial
11   cases.
12             I was approached in August of 2019 by Mr. Hausfeld and
13   Mr. Boies to come into this case.  And it was apparent, given
14   where the case was at that point and the number of years that
15   had passed to that point that that was a clear-the-decks kind of
16   case for my firm, for large portions of my firm; and it was
17   because I viewed it as important then, I view it as important
18   now, and I wanted to devote the resources that were necessary.
19             I'm going to summarize some of those resources for you,
20   Your Honor.  We jumped in fully and as quickly as possible.
21   During the last two years in my firm, we have had roughly 21
22   different timekeepers who have worked on this case, including
23   five partners with significant experience in antitrust matters
24   and other complex commercial cases.
25             For a stretch of about a year from August of 2019
```

 1   through July of 2020, when the final settlement agreement was

 2   actually signed, I devoted roughly 50 percent of my personal

 3   time to this case, to the exclusion of other cases I'm involved

 4   in and other new matters that were coming in.  That was the

 5   workload we were facing, but it was something that we were

 6   prepared for and something that he -- we put the resources into.

 7          Over that same period, we've expended nearly $2

 8   million, largely on expert fees, working closely with our

 9   experts to make sure we understand all the issues.  A relatively

10   small proportion of that was spent on allocation itself.  Much

11   of it was to do with the case as a whole and the many issues

12   that are involved in the case.

13          From August 2019 through the signing of the settlement

14   agreement, we attended every mediation.  I think that both

15   parties -- or all parties in this matter will tell you that not

16   only did we attend, but that we took a very active role in that

17   mediation on behalf of the subclass we sought to represent and

18   that the result of our efforts is embodied in many aspects and

19   many provisions of that settlement agreement.

20          I will tell you, Your Honor, I'm very proud of the work

21   I did in this case.  I'm very proud of the outcome, because I

22   think it has effected real change.  And it's wonderful to be a

23   part of that and to see that.

24          And I'll also tell you -- the Court will know I have a

25   15-month-old son.  And I'm going to tell him one day about this

 1   case and how important it was to our system and to our market

 2   and the efficacy of our laws, largely because I'm going to need

 3   to explain why I was taking calls from Mr. Hausfeld and Mr. Nehs

 4   during his actual birth.

 5            But all joking aside, Your Honor --

 6            THE COURT:  There is no *Johnson* factor that addresses

 7   that.

 8            MR. BURNS:  There really isn't.

 9            But I will tell you with some discretion -- I mean,

10   literally, I am standing next to my wife in the delivery room

11   and my phone starts buzzing.  I look down, and it's Michael

12   Hausfeld.  And I said, I'm going to wait on this one.  And he

13   was gracious about it, but --

14            THE COURT:  But if it had been Nehs or --

15            MR. BURNS:  If it had been Nehs, I probably would have

16   taken it.  So, you know, the moral of this long story, Your

17   Honor, I don't think anyone can accuse us of not putting the

18   resources we needed to in this case.  And despite the complexity

19   of the case and despite its longevity and despite the issues, I

20   think that we brought the right team to bear, we brought the

21   right experts to bear, and we did everything we could to make

22   sure that we represented the subclass effectively.

23            Allocation, from the beginning, has been one of the key

24   focuses, main focuses of the work I've done in this case.  I

25   would have gotten into this with Dr. Mason had time permitted,

1   but we engaged Dr. Mason and his shop in September of 2019,

2   roughly.  And one of the first things we started working on on a

3   parallel track with the other issues in the case was how do we

4   look at this settlement fund and what is going to be fair and

5   appropriate under the circumstances.

6           Dr. Mason and his team advised me every step of the

7   way.  We spent months developing analyses that yielded various

8   ranges of potential allocation.  I was armed with those

9   analyses, worked closely with them to develop them, and they

10   formed the basis of my negotiating posture as we went into a

11   mediation with the subscribers.

12           As the Court is well aware -- and there was a separate

13   declaration from him in this case -- Ken Feinberg mediated the

14   allocation dispute between the parties.  And it truly was a

15   dispute.  This was a dispute that stretched over a period of at

16   least three or four or five months.  And I will tell you -- I

17   will tell you the parties were pretty far apart at the beginning

18   and that it was only through multiple discussions, formal

19   mediation, and back-channel communications with the mediator,

20   Mr. Feinberg, that we were able to ultimately resolve it.  This

21   was very much at arm's length, as Mr. Feinberg represents in his

22   declaration.

23           And at the end of the day, we were able to settle on an

24   allocation that I think, under the circumstances and as

25   Dr. Mason has opined on, was fair, adequate, and reasonable in

```
 1   the case, 6.5 percent.  The ranges, as you'll see from the
 2   submissions that myself and Mr. Hausfeld presented to the Court,
 3   falls in the middle.  I think that when we originally -- or at
 4   one point communicated our ranges with Mr. Feinberg of
 5   somewhere, on the ASO side, of 7 to 16 percent.  I think on the
 6   subscriber side it was more like, you know, 2 to 8, somewhere
 7   around in there.  We largely, you know, got to a place where --
 8   that was something like the middle between those positions.
 9           Now, what I think cannot fairly be disputed -- and we
10   went through this this morning with Dr. Mason on direct -- is
11   that Dr. Mason conducted multiple financial analyses.  Only one
12   of them has been substantively challenged in this case by the
13   self-funded objectors; and that on a basis that, from an
14   economic perspective, makes no sense whatsoever to an antitrust
15   economist.  It defies the utility of what he was trying to do,
16   and it would force him to add numbers in and create numbers that
17   he just doesn't want to do and he doesn't think would be useful
18   for any antitrust economist.
19           Dr. Mason did what you would expect an economist to do
20   in this case.  He looked at the markets.  He looked at their
21   differences, their characteristics.  He will tell you -- and he
22   will testify to this -- that any economic analysis that did not
23   take those into account would just not be reliable.  You just
24   couldn't conduct it.
25           Then he went and did four specific financial analyses,
```

```
 1  all of which revealed different ranges of appropriate
 2  settlements.  On the high end, he calculated about 10.7 percent.
 3  Most of his ranges fall below the actual 6.5 percent allocation
 4  that we agreed to in this case.  And he looked at those.  He
 5  looked at the totality of the circumstances of the case.  He
 6  looked at the differences between the markets and he said, look,
 7  in my expert opinion -- I've looked at settlements before, I've
 8  looked at allocations -- as he testified this morning, he's done
 9  it about ten times -- under these circumstances, this allocation
10  is perfectly reasonable and does a good job -- that may be my
11  words -- but ends up with a good result for the self-funded
12  class.
13          THE COURT:  All right.  So I'm going to back you up --
14          MR. BURNS:  Certainly.
15          THE COURT:  -- and make sure I understand the process
16  of the settlement more so than what an expert tells me about a
17  reasonable range.  To the extent you're not violating the
18  mediation privilege, walk me through what the parties and
19  mediator did and what all went into the mediation.
20          MR. BURNS:  Absolutely, Your Honor.
21          So probably over a course of two to three months after
22  I first became involved in the case, we started, on the ASO
23  side, looking very carefully at these allocation issues in the
24  context of an agreement on the ultimate settlement fund in the
25  case.  On the other side, the subscribers were doing the same
```

```
 1   thing.  The lead experts on both sides were Dr. Pakes for the
 2   subscribers and Dr. Mason for the ASO subclass.
 3           During that process, we had at least one or two phone
 4   conversations -- and actually, I'm getting this a little bit out
 5   of sequence.  Our goal during that initial period was to come to
 6   some view of where the allocations should land.  We then engaged
 7   Mr. Feinberg to conduct a mediation on the issue.  And at that
 8   formal mediation, we presented our views.  At that point, we
 9   were pretty far apart.
10           THE COURT:  So usually you hire a mediator for two
11   reasons.  One is you can't get it done on your own.
12           MR. BURNS:  Right.
13           THE COURT:  And two, because you want to make sure
14   there's a neutral supervising the process so there's not
15   questions raised about untoward things.  Both reasons apply
16   here?
17           MR. BURNS:  Both reasons apply, Your Honor.  At some
18   point -- and this was an oral communication, so I don't have a
19   date.  But when I -- at some point, I spoke with Mr. Hausfeld
20   for that exact purpose of exchanging some initial view.  And,
21   you know, my recollection is I came in and said, Michael, we're
22   probably somewhere north of 10 percent; you know, I would think
23   a 15 percent allocation may be reasonable in this case.  I knew
24   that was relatively high in terms of where we were at.
25           He came in and said, you know, look, I think it's, you
```

```
 1   know, zero to two.  I'm deliberately putting some ambiguity --
 2          THE COURT:  You were pretty far apart.
 3          MR. BURNS:  We were pretty far apart.  He then
 4   suggested -- and this came from Michael -- hey, why don't we get
 5   someone involved to see if we can actually hammer a deal on this
 6   after we've had more time to work through some of this analysis.
 7   He suggested Mr. Feinberg.  I've worked with Mr. Feinberg in a
 8   number of cases before myself and have a view on his abilities
 9   and efficacy, and I readily agreed.
10          THE COURT:  I take it that's a favorable view.
11          MR. BURNS:  Yes.  Very favorable.  I'm in the middle of
12   a mediation, actually, now with Mr. Feinberg, but I find him
13   very effective.
14          THE COURT:  And how hands-on was he?
15          MR. BURNS:  Very.  Very.  The way -- and no different
16   in this case.  I probably had about two, maybe three, hour-long
17   sessions with Mr. Feinberg individually before we got to the
18   mediation discussing our side, what our views were and what our
19   views were on allocation.  I assume that Mr. Hausfeld had the
20   same.
21          And then once we actually engaged in the
22   negotiations -- and Your Honor will probably appreciate this
23   too -- Mr. Feinberg stayed involved.  So we were not able to
24   resolve it on the first day when we actually met, but
25   Mr. Feinberg stayed involved until the end.  And that involved
```

```
 1   multiple conversations and trading back and forth different
 2   offers and counters.
 3            THE COURT:  All right.
 4            MR. BURNS:  So -- so after those -- that initial
 5   presentation of views, scheduling Mr. Feinberg --
 6            THE COURT:  He didn't make a mediator's proposal.  He
 7   just --
 8            MR. BURNS:  He did not.  He did not.
 9            THE COURT:  Okay.  This is just a -- he supervised
10   negotiations that landed upon a parties' agreement.
11            MR. BURNS:  That's right.  And my recollection is, you
12   know, this process took three to four months and there were
13   multiple counters over that period, and we got to a place that
14   we were close enough where we could close it.
15            THE COURT:  Okay.
16            MR. BURNS:  So that's generally the nature.  I
17   obviously don't want to get too much into those discussions, but
18   that's generally the nature.  And I think Mr. Feinberg has
19   spoken about it in his declaration as well as in terms of the
20   process.  So that ultimately resolved the allocation issue.  We
21   recognized that that was one piece in terms of the overall
22   settlement that needed to be taken care of; but at the same
23   time, we were working towards the goal of finalizing the
24   settlement agreement.
25            And Your Honor will recall that beginning in
```

 1  probably -- we signed the term sheet -- I think it was finally

 2  executed in December of 2019 -- and began work immediately

 3  trying to work towards a final agreement.  The pandemic slowed

 4  us down initially; but around about April or May of 2020, a

 5  small group amongst counsel really got together to push this

 6  matter forward.

 7          And on the plaintiffs' side, that group was myself,

 8  Mr. Boies, and Mr. Hausfeld primarily, with some other people

 9  coming in from time to time.  On the defense side, it was

10  primarily Mr. Zott, Mr. Nehs, Mr. Laytin, and Mr. Holmstead.

11  And, you know, at various points, I felt like I was embedded --

12  I think we all did -- with each other.  I mean, my days -- and

13  these were pandemic days.  So everyone will recall this.  So I

14  would wake up in the morning about six a.m. and have my first

15  phone call with Michael.  About seven, it was a call with

16  Mr. Laytin or Mr. Nehs.  We were on Zooms that often spread

17  hours.  And usually those days concluded sometime in the

18  evening, eight or nine o'clock calls to try to work through

19  particular issues.

20          Along the way, Mr. Gentle was intimately involved in

21  every step, trying to move us forward, trying to put pressure on

22  us, keep deadlines moving.  It was an exhausting process but

23  ultimately a fruitful one.  And I think, you know, that's the

24  view of all the parties here today.

25          So, Your Honor, that's my basic presentation on why the

 1   allocation is reasonable in this case.  I think we've heard from

 2   Dr. Mason.  We have expert testimony on that fact.

 3           I'll touch briefly on the objection from the

 4   self-funded objectors.  You know, I give a lot of leeway to

 5   quality lawyers, and we do have quality lawyers on the other

 6   side.  And obviously, many of these things that I have just

 7   spoken to they were not privy to and could not very well

 8   appreciate from the outside looking in, but that is the full

 9   story.

10           I began talking to ASOs and their counsel really

11   beginning in November or December of last year about this

12   settlement.  And so when you hear today about the Burns

13   memorandum that Dr. Mason was talking about, that was a memo

14   that I drafted and communicated to the self-funded objectors'

15   counsel largely to explain to them the process we had gone

16   through and why we had reached that decision.  We spent hours

17   and hours and hours with self-funded objectors and other lawyers

18   and other ASOs around the country, trying to be as open as

19   possible about what we had done and why we viewed the allocation

20   and other issues in the case that were resolved by the

21   settlement as reasonable.

22           Focusing on the objection, the principal attack on

23   Dr. Mason's reasonableness opinion really focuses on this gross

24   revenue analysis.  As the Court heard this morning, this is one

25   of four analyses.  It actually yielded the smallest number,

 1   allocation percentage, of any of the analyses.  And while

 2   Dr. Mason, as an economist, says there is utility to going

 3   through this process -- and I can understand and appreciate

 4   that -- as a lawyer trying to cut to the chase, I would say,

 5   Your Honor, if you want to, ignore that 1.7 percent and look at

 6   the other three analyses that yield percentages that are right

 7   around and inform the 6.5 percent.

 8           I don't want to get caught on stuff that takes us down

 9   too many rabbit holes, but in essence, that's the type of

10   journey that the self-funded objectors are inviting this Court

11   and the parties to go down.  They have attacked in dozens of

12   pages the analysis around gross revenue, which was the least

13   robust, the simplest analysis that Dr. Mason engaged in.  And

14   for the reasons he's testified to this morning, his approach as

15   an economist was perfectly appropriate.  But the result is what

16   it is, and I think he viewed it and he testified that he viewed

17   it with the appropriate attention that an economist would.

18           So at the end of the day, most of the objection is

19   focused on this one element of a multi-pronged analysis.  And,

20   you know, it's hard to fault an expert economist's approach to

21   this case that encompassed many more and many more thoughtful

22   analyses.

23           As to the other three analyses that Dr. Mason

24   performed, the self-funded objectors' own experts don't quibble

25   with a net revenue approach.  They don't quibble with the

 1   optimal gains approach, the third approach that Dr. Mason

 2   proposed.  And as to the fourth approach, I think their own

 3   background and experience really didn't allow them to appreciate

 4   what Dr. Mason was doing there.

 5          So the other approaches stand.  I don't think they're

 6   fairly challenged.  And I think that ultimately Dr. Mason's

 7   opinion rests on them, as well as his consideration of the other

 8   market characteristics and distinctions that define the markets

 9   in this case.

10          And if there is one principal failing amongst the work

11   that the objectors and their experts have done, it's a failure

12   to understand and appreciate those critical distinctions between

13   the markets.  You cannot, in a case like this, just take the

14   fully insureds and the ASOs and say, hey, let's just divide this

15   baby.  It's close enough to equal, and therefore, the allocation

16   should have been 50/50 or 60/40.  On the one hand, I would love

17   that to be the case for the subclass, but it just doesn't match

18   reality and doesn't match, you know, my responsibility to the

19   facts to say that.

20          What Dr. Mason testified to and described in more

21   detail in his report is that because of the unique

22   characteristics of these markets -- primarily their price

23   sensitivities, the profitability differences between the

24   markets -- you would expect -- an expert economist would expect

25   that the fully insured market would bear much more significant

 1   overcharges than the ASO or self-funded market.  And that's just
 2   a matter of economic principle that I don't think is fairly
 3   challenged in this case.
 4           Unless the Court has further questions for me --
 5           THE COURT:  I do not at this point.  I may later.
 6           MR. BURNS:  -- I would like to pass it to Mr. Boies.
 7   Certainly, Your Honor.
 8           THE COURT:  Mr. Richie.
 9           MR. BURNS:  I think Mr. Boies may have --
10           THE COURT:  I'm sorry.  Mr. Boies.
11           MR. BOIES:  Your Honor, I'll be very brief.  I might
12   begin, though, just with an analysis of why ASOs were not
13   included in our complaint to start with.
14           As I think the Court knows, we spent a considerable
15   amount of time analyzing this industry before we brought the
16   complaint.  And one of the things that we concluded was that a
17   claim on behalf of ASOs was going to be much more difficult to
18   make than a claim on behalf of the fully insureds.  The ASOs had
19   more competition.  It was a more competitive market.  The ASOs
20   generally had greater bargaining power.  They were larger
21   organizations, and they had greater bargaining power.
22           And even if you assumed that you were able to establish
23   the same level of liability, the damages were considerably less.
24   The ASO business was less profitable.  There was a lower level
25   of what we perceived as an overcharge.  And a lot of the

1  payments that were made by ASOs for health care, because they

2  were self-insured, went to providers as opposed to going to the

3  Blues.  And as the Court is aware, under the antitrust laws,

4  because of direct purchaser provisions, it's very problematic to

5  try to recover damages for amounts that you have paid out to

6  persons other than the defendant that you're -- that you are

7  suing.

8         Now, when it came to the allocation issue, all of those

9  things were important, the fact that it was more competitive,

10 they had more bargaining power, they were less profitable, there

11 was lower overcharge, there were legal issues in terms of direct

12 purchaser principles.  All of those were important.  And in

13 addition to that, there was a shorter time period that they were

14 entitled to recover damages for.  The fully insured went all the

15 way back to 2008.  The self-funded began no earlier than 2015.

16 It could be -- it could even have been more recent than that.

17        So for all of those reasons, we began with a

18 proposition that the amount of damages that should have been

19 allocated to the ASOs was relatively small.  They were going to

20 be beneficiaries of the injunctive relief, as everybody was in

21 the industry.  But in terms of the damages, it was very, very

22 hard to really calculate any damages for the ASOs from our

23 perspective.

24        The way we went at it was that first --

25        THE COURT:  I take it these are all concerns you shared

```
 1    with Mr. Burns during the allocation discussions?

 2            MR. BOIES:  They're all concerns that we shared and I

 3    will say shared emphatically with Mr. Burns because while we

 4    were happy to have him and the ASOs in and we were very

 5    committed to the injunctive relief that we thought would benefit

 6    everybody, in terms of actually allocating a portion of the

 7    damages, we thought that they were entitled to either nothing or

 8    a very, very small amount.

 9            We also noted that the ASOs were getting the benefit of

10    the second Blue bid.  That was not something that was going to

11    the fully insured.  That was something that was only going to

12    the ASOs.  Everybody benefited from the general injunctive

13    relief, but the ASOs had the advantage of the second Blue bid.

14            So we pointed all those things out to him.  And he

15    had --

16            THE COURT:  And that's a good point to make is when

17    we've been talking about divisible injunctive relief,

18    individualized injunctive relief in this case, that rests solely

19    in the ASO class.

20            MR. BOIES:  Exactly.

21            THE COURT:  There's no divisible injunctive relief for

22    anybody in the class you're representing.

23            MR. BOIES:  Exactly, Your Honor.  And --

24            THE COURT:  And the concern would be -- your concern

25    would be not allowing any divisible injunctive relief to affect
```

 1    the structure you've negotiated with the Blues.

 2           MR. BOIES:  Exactly.  That is exactly what our concern

 3    was because our --

 4           THE COURT:  And the other point I would ask about is

 5    the inclusion of the ASOs benefited your class because that made

 6    it more likely for the Blues to agree to resolve this case,

 7    because they wanted something out in repose with the idea that

 8    there may be opt-outs.  But they didn't want to settle with your

 9    client and turn right around and get a complaint from Mr. Burns.

10           MR. BOIES:  Exactly right.  And what we wanted to do

11    was to come up with the best overall settlement that we could

12    and then to allocate it in the fairest way we could.

13           And incidentally, I would never say to this Court that

14    it's 6.5 percent precisely.  I don't know what the exact

15    percentage is.  What I know is that we came to the best

16    percentage that we could all agree on that -- I believe strongly

17    that it's reasonable, it's fair --

18           THE COURT:  And there were times during the allocation

19    negotiations and mediation you weren't sure you were going to be

20    able to agree.

21           MR. BOIES:  That's right.  I mean, there were times

22    when we thought we were going to have to have an arbitration

23    about it or have some nonnegotiated dispute resolution.  And

24    there were even times --

25           THE COURT:  Or it could have derailed the settlement

1   altogether.

2          MR. BOIES:  It could have derailed the settlement,

3   although I think we were both committed --

4          THE COURT:  To not letting that happen.

5          MR. BOIES:  -- to not letting that happen.

6          THE COURT:  But theoretically --

7          MR. BOIES:  Theoretically, it could have.

8          THE COURT:  -- if you don't reach an agreement and

9   nobody agrees to an alternative dispute resolution --

10          MR. BOIES:  Right.

11          THE COURT:  -- then you couldn't, in good conscience,

12   come before here and advocate an incomplete settlement.

13          MR. BOIES:  We would not have been able to do that,

14   Your Honor, although before I did that, I would have come to the

15   Court and said please intervene.

16          THE COURT:  I may or may not have.

17          MR. BOIES:  The --

18          THE COURT:  I probably would have said if Mr. Feinberg

19   can't get this done, what makes you think I can.

20          MR. BOIES:  I mean, and I've got to -- I've got to say

21   we've given a lot of justified praise to all the other people

22   that have helped, but I think Mr. Feinberg also deserves

23   considerable credit.  He spent a lot of time on this.  He is a

24   very forceful individual.  He -- I'm sure he was very forceful

25   with Mr. Burns; I know he was very forceful with us.  While he

```
 1  never gave a mediator's proposal, he did push us into a range

 2  and made very clear to both sides --

 3            THE COURT:  There was an invisible hand operating?

 4            MR. BOIES:  It was a heavy hand.  If you've ever met

 5  Mr. Feinberg --

 6            THE COURT:  I was trying to borrow an economics

 7  principle.

 8            MR. BOIES:  He's a very emphatic person and was -- and

 9  was very critical to getting this done.

10            But before we got to Mr. Feinberg, we each got experts.

11  Each got good experts.  They did an analysis.  They came in, and

12  we were, you know, several times apart.

13            Now, none of the experts, even in the beginning, were

14  anywhere where the objectors are, anywhere close to where the

15  objectors are.  But it might have been between 2 and 16 percent.

16  And -- and then we began to negotiate.  We began to analyze.

17  They pointed out some things about our expert work.  We pointed

18  out some things about their expert work.  And we gradually

19  reached -- you know, moved towards the center.

20            And I think that -- I think -- while I would never say

21  that this is the exactly right result -- and if it were just up

22  to me, I think it would have been a little bit lower -- what I

23  am confident of is that this is a fair and reasonable result and

24  it is the result of arm's-length negotiations and aided by a

25  very effective mediator.
```

```
 1              THE COURT:  All right.  Thank you.

 2              MR. BURNS:  Your Honor, may I just add one thing

 3    briefly?

 4              THE COURT:  Yes.

 5              MR. BURNS:  Okay.  And I would be remiss if I actually

 6    didn't acknowledge and, for the Court, introduce David Benck,

 7    the general counsel of Hibbett Sports, the class representative

 8    in this case, Your Honor.

 9              THE COURT:  Well, David needs no introduction to the

10    Court, but you're welcome to introduce him to everyone else.

11              MR. BURNS:  Yes.  I don't want to belabor this, but,

12    Your Honor, I've spent my entire career representing classes in

13    disputes.  There hasn't been a year when I didn't.  I have never

14    had as active and committed class representative as I had in

15    Hibbett Sports and Mr. Benck.  And I say that without hyperbole.

16    David Benck was there every step of the way.  More than that,

17    was digging through discovery, was trying to advise on what the

18    mind-set of an ASO would be.  This is a person that devoted

19    significant time and effort to this case.

20              And, you know, it's fair to note that during this case,

21    the Eleventh Circuit came down with an opinion that said, you

22    know, folks that are in the shoes of class representatives

23    aren't entitled to incentive awards.  That didn't deter David.

24    I don't think he even went into it with that expectation.  But

25    he worked very, very hard every step of the way to make sure
```

1    that the ASO interests were adequately represented.  I wanted to

2    thank him for that publicly and certainly call it to the Court's

3    attention.

4              THE COURT:  And you've represented classes with reps

5    who are laypeople and --

6              MR. BURNS:  Absolutely.  And businesses.

7              THE COURT:  -- frontline workers and --

8              MR. BURNS:  It runs the gamut from businesses to

9    dentists, believe it or not, in the last couple years, to just

10   average consumers.

11             THE COURT:  But now you've represented a class whose

12   rep was a better lawyer than you.

13             MR. BURNS:  That's right.  That's absolutely right.  So

14   kudos to Mr. Benck.

15             THE COURT:  All right.  Thank you.  And that's no

16   disparagement on your lawyering.

17             MR. BURNS:  Of course, Your Honor.

18             THE COURT:  I guess it would actually be the

19   representative's representative.  But be that as it may.

20             MR. BURNS:  It is, Your Honor.

21             MR. RICHIE:  Thank you, Your Honor.

22             THE COURT:  So what -- we've kind of set the target up

23   for you.  What are you swinging at now?

24             MR. RICHIE:  Okay.  This is what I'm going to do.  I'm

25   going to double the allocation that's due to the self-funded

 1   subclass and I'm going to double it again.  And I'm going to do

 2   that in two moves only.

 3          THE COURT:  Okay.

 4          MR. RICHIE:  The first thing that needs to happen is

 5   we've got to go back and look at the statute of limitations

 6   issue that limits the self-funded subclass's claims period,

 7   because it's not justifiable.

 8          We've briefed this issue a lot.  I'm confident that the

 9   Court understands the brief.  Here's the nub of the issue.  It

10   is true the original damages class in *Cervin* did not include any

11   ASOs.  It excluded them.  But it also excluded large fully

12   insured plans.  So the question is not whether ASOs are in the

13   damages class.  The question is however large fully insured

14   plans are brought into the damages class and given the original

15   filing date of *Cervin*, does that logic apply equally to the ASO,

16   the self-funded subclass.  And the answer is clearly yes, it

17   does.  There's no equitable basis to exclude the self-funded

18   subclass from the benefit given to the fully insured subclass.

19          Specifically, Your Honor, we can look at the language

20   of the *Cervin* injunctive relief class.  There's been lots of

21   talk through the couple days of this hearing about how the

22   injunctive relief that's being proposed in this class settlement

23   benefits everybody.  The injunctive relief class in *Cervin* is

24   even broader than what's being considered today.  It covered all

25   persons or entities in the United States who are currently

1  insured by any health insurance plan that's currently a party to

2  a license agreement.

3          THE COURT:  So what do you make of this?  *Cervin* was a

4  case filed in North Carolina?

5          MR. RICHIE:  Yes, Your Honor.

6          THE COURT:  It was one of the cases centralized for

7  multi-district litigation, along with others?

8          MR. RICHIE:  Yes, Your Honor.

9          THE COURT:  After that, the Court held a beauty

10 contest, supervised by Mr. Gentle, in which it selected lead

11 counsel for the subscriber class and landed upon, based upon the

12 special master's recommendation, Mr. Boies and Mr. Hausfeld.

13 For the record, I didn't meet with them in advance of that.  I

14 didn't think that Mr. Zott and Mr. Laytin would be particularly

15 thrilled about me sitting down with Mr. Boies at the table ex

16 parte at the beginning of the case and hearing all his great

17 theories, so those got filtered through the special master.  And

18 at that point, the special master made a recommendation, and I

19 appointed lead counsel and then asked lead counsel to fill out

20 the slate.

21         And then I required a master complaint to be filed for

22 purposes of this multi-district litigation.  And that became the

23 controlling complaint that we dealt with throughout the last

24 nine years subject to some amendments along the way.

25         MR. RICHIE:  Okay.

```
 1          THE COURT:  All right?  So I guess my first question is
 2  as it relates to settling this multi-district litigation, even
 3  if you're right that Cervin, originally filed in North Carolina,
 4  had a broader injunctive relief class, does that portray any
 5  reality to how this multi-district litigation has been
 6  litigated?
 7          MR. RICHIE:  Your Honor, again, to cut straight to the
 8  quick, Cervin provides -- the filing date of Cervin is the date
 9  by which every fully insured class member can claim to, every
10  single one of them.  Included in any class --
11          THE COURT:  So your argument is a relation-back issue
12  now.
13          MR. RICHIE:  Actually, Your Honor, this is just you
14  have to treat all the subclasses equitably.
15          THE COURT:  Okay.
16          MR. RICHIE:  What you give to one, you have to give to
17  another unless there's a principal reason not to.
18          THE COURT:  All right.
19          MR. RICHIE:  And there's just no principal reason here.
20  Now, could --
21          THE COURT:  So that's the first argument is they
22  shouldn't have been cabined from a five-year limitations period
23  starting in 2019?
24          MR. RICHIE:  The argument is that the self-funded
25  subclass was 100 percent included in the original injunctive
```

 1   class in *Cervin*.

 2           THE COURT:  And therefore?

 3           MR. RICHIE:  Therefore, they have to get to go back to

 4   claim whatever the benefit of *Cervin* is that's given to the

 5   fully insured.

 6           THE COURT:  All right.  Let's hold that.

 7           Mr. Burns, do you want to address -- you or subscribers

 8   want to address that argument?

 9           MR. BURNS:  In terms of our division of labor, I think

10   Mr. Hausfeld drew statute of limitations.

11           THE COURT:  Fair enough.

12           MR. HAUSFELD:  Your Honor, I think the controlling

13   authority is the *Payco* case.  And if I may read from the portion

14   that deals with relation back.  Relation back, at least on the

15   facts of this case, would not accord with one of the rationales

16   of *American Pipe* that commencement of the class action

17   adequately notifies the defendants not only of the substantive

18   claims being brought against them, but also of the number and

19   generic identities of the potential plaintiffs who may

20   participate in the judgment.  Within the period set by the

21   statute of limitations, the defendants must have the essential

22   information necessary to determine both the subject matter and

23   size of the prospective litigation.

24           With respect to the fully insured class, what was

25   always in play at that point was fully insured individuals

```
1   paying premiums to the Blues for accepting the risk of insurance
2   and providing that coverage.  ASOs were specifically excluded
3   from the damage class.  When we were looking back at injunctive
4   relief, that was prospective, not with relation to damages which
5   had accrued.
6           THE COURT:  All right.  So let me ask you this.  Just
7   like the merits of the ESAs, I'm not being asked to address what
8   the actual statute of limitations is for the ASO class.
9           MR. HAUSFELD:  Yes.
10          THE COURT:  I'm not being asked to address whether
11  their claims, their damage claims, would travel back to the
12  Cervin complaint.
13          MR. HAUSFELD:  Correct.
14          THE COURT:  You just explained to me why you don't
15  think they would --
16          MR. HAUSFELD:  Correct.
17          THE COURT:  -- but putting that aside --
18          The question, Mr. Richie, isn't it this?  Counsel can
19  disagree with you and think that their claims may not be as
20  forceful or meritorious as you think they are.  The question is
21  whether their handling of the settlement was reasonable in light
22  of all those factors.
23          MR. RICHIE:  No, Your Honor.  I'm just making a
24  simple --
25          THE COURT:  Hold on.
```

```
 1              MR. RICHIE:  Go ahead.
 2              THE COURT:  And if it's reasonable, there would be a
 3    legitimate basis for distinguishing between the classes?  In
 4    other words, equity -- what does it mean to deal with the
 5    classes equitably?
 6              MR. RICHIE:  Certainly, Your Honor.
 7              THE COURT:  If there are distinguishing defenses and
 8    arguments, whether it's statute of limitations, whether it's the
 9    limitation on pursuit of injunctive relief or damages relief,
10    whether it's their claims just aren't as strong, whether it's a
11    difference in competition in the markets, those are all things
12    that would at least suggest that they don't have to be treated
13    exactly the same when it comes to resolution of their claims.
14    Am I off the mark?
15              MR. RICHIE:  I think so, Your Honor.  Because the basis
16    that was just articulated was that ASOs were excluded from the
17    original damages class.  Well, so were large fully insured
18    plans.  So how can there -- how can those two be treated
19    differently when they are situated exactly the same?  They
20    are -- to treat them equitably is to say they were both excluded
21    from the original damages class.
22              THE COURT:  What does master complaint do with large
23    claims?
24              MR. RICHIE:  My understanding is that large fully
25    insured claims were not included in the damages class until the
```

```
 1   settlement, but I will defer to subscribers' counsel on that
 2   one.
 3            THE COURT:  Is that true?
 4            MR. HAUSFELD:  They were not included, Your Honor.
 5            THE COURT:  Yes.  That's what I thought.  Okay.
 6            MR. RICHIE:  So we think that if there's --
 7            THE COURT:  So, Mr. Hausfeld, then, why don't you just
 8   address Mr. Richie's concern.  Why are you treating them
 9   differently?
10            MR. HAUSFELD:  This was raised and the subject of
11   mediation, with Mr. Burns taking the position that the relation
12   back with regard to ASOs should extend back.  We brought this up
13   to Mr. Feinberg.  And then every once in a while, you get an
14   invisible hand at the back of your head, and Mr. Feinberg
15   indicated that there was a rational basis, you know, for a
16   reasonable difference with regard to including the larger fully
17   insureds because that was the subject of the complaint from its
18   origin, that it was designed to recover damages for those who
19   paid the Blues for premiums for assuming the risk, you know, of
20   health insurance coverage and covered -- and charged premiums
21   for them.
22            With regard to the ASOs --
23            THE COURT:  So what you're saying is -- well, let me --
24   Mr. Boies, I think, was about to chime in.  Before I ask my
25   question, let me make sure I take account of what he's about to
```

1    say.

2           MR. BOIES:  Your Honor, I just wanted to bring to your

3    attention two distinctions between the larger fully insured and

4    the ASOs.

5           THE COURT:  Which is what my question was about to try

6    to get at, but I figured you were about to make a point.

7           MR. BOIES:  Right.  First, in terms of the overall

8    class definition, we talked about insured, not ASOs.  We talked

9    about the insured.  And the ASO people don't receive insurance.

10   They receive the administrative services.  And they are

11   providing their own self-insurance, by definition.

12          So we thought that there was a much stronger argument

13   for the relation back for the larger group, fully insured

14   people, than there were for the ASOs.

15          THE COURT:  Large and small.

16          MR. BOIES:  Right.  Large and small.

17          The second thing, when we had our damages class

18   definition and we were talking about individual or small groups,

19   we thought that there was a much closer nexus between fully

20   insured with a distinction based on size compared to ASOs, which

21   were an entirely different market.  And that was -- this -- both

22   of these were important because they go to the legal standard

23   that Mr. Hausfeld was articulating, which is the extent to which

24   people seeking relation back can point to the notice that is

25   being provided to the defendants that puts them on notice as to

1     the nature of the claim.

2          The third aspect of it was that -- and both

3     Mr. Hausfeld and I have mentioned this before -- the complaint

4     actually distinguished the ASOs and put them in a different

5     market.  It didn't put the larger group of fully insured in a

6     different market.

7          THE COURT:  Early on, you were not necessarily inclined

8     to take on the larger -- you were looking at smaller-sized

9     insured, if I can be colloquial, the little guy --

10         MR. BOIES:  Yeah.

11         THE COURT:  -- when settlement discussions broke out.

12    And you took on the large and small, broadened the class --

13         MR. BOIES:  Right.

14         THE COURT:  You did not feel you could, in good

15    conscience, create a subclass of ASOs and thought they needed

16    separate counsel because we're going to run into this -- this

17    and other issues.

18         MR. BOIES:  Yes.

19         THE COURT:  It would have been inappropriate for you to

20    decide the relation-back issue for the ASOs.  You were going to

21    let highly competent counsel come in and assess that argument

22    and try to make that argument in front of either the Court or

23    Mr. Feinberg or whoever else might listen to it.

24         MR. BOIES:  Yes.

25         THE COURT:  And so, again, I'm going back to this.  If

 1   this is something that was considered and discussed in the

 2   settlement and was a factor in the allocation, I'm not being

 3   asked, I don't think, to make a ruling on what the relation-back

 4   rule is here.  The question is whether the parties' approach to

 5   it was a reasonable one such that it does not inequitably treat

 6   different groups differently.

 7          MR. RICHIE:  Your Honor, I'll respond to that, if I

 8   may.

 9          THE COURT:  Yes.

10          MR. RICHIE:  Excuse me.  Rule 23(e) is not merely

11   procedural.  There are substantive components to the fairness of

12   the settlement that have to be considered.  And we can't merely

13   say that the parties negotiated it.

14          THE COURT:  Well, when you say it's not merely

15   procedural but I have to consider the fairness of the

16   settlement, is that a -- that's not a substantive issue.  It

17   takes into account substantive issues, like the merits of the

18   claim, the danger of continuing litigation, the uncertainty of

19   litigation, the benefits to the class of ending litigation after

20   nine years or three years or 25 years.

21          MR. RICHIE:  So allocation is a zero-sum game.  It's a

22   piece of pie.  It's a pie.  Someone is going to get this much

23   and someone is going to get the rest.  So these subclasses are

24   directly adverse to each other, and every dollar that they

25   convince Mr. Burns to give up is a dollar that the subclass

```
 1  loses and their class gains.

 2          THE COURT:  And vice versa.

 3          MR. RICHIE:  True.

 4          THE COURT:  Every dollar that Mr. Burns convinces them

 5  to give up is a dollar they don't get for their class they're

 6  representing.

 7          MR. RICHIE:  And so, Your Honor, we can't see behind

 8  the economics of the situation.  I can tell you how the

 9  subclasses benefit, but we don't know how the fees are split

10  between the classes.  That's not something that we know --

11          THE COURT:  When you say fees, you're talking about

12  attorneys' fees?

13          MR. RICHIE:  Yes.  We don't know what -- the impact

14  this allocation has on attorneys' fees.  That's not something

15  that --

16          THE COURT:  How does that relate to the argument I

17  thought you were making?

18          MR. RICHIE:  So I want to get into the -- there are

19  both procedural and substantive components to treating the

20  subclasses equitably.  And so showing that a settlement is fair,

21  reasonable, and adequate.  And there's another element to that,

22  which is not the product of collusion.  I certainly don't think

23  this is a collusive settlement, but we don't have the --

24          THE COURT:  There's no indication at all --

25          MR. RICHIE:  No, no.  There's not.
```

```
 1            THE COURT:  -- in any area code of the United States
 2   that this is a collusive settlement.
 3            MR. RICHIE:  No, no, no.  I want to be clear on that up
 4   front.  However, there are -- it's helpful --
 5            THE COURT:  It becomes less clear when you mention the
 6   C word, but I'm just making sure I understand our --
 7            MR. RICHIE:  No.  It's in the standard.  It's the
 8   Eleventh Circuit's word, not mine.
 9            THE COURT:  I gotcha.
10            MR. RICHIE:  But here's the issue that I have looking
11   at this, which is I can't understand the incentives that the
12   class counsel were facing as it relates to the allocation.  Now,
13   that may be something we can take up in allocation later where
14   we're talking generally about the legal standard that applies.
15   And I wanted to go ahead and flag that there's a procedural and
16   substantive element to equity and to the fairness of the
17   settlement.
18            Specifically, on the element of the statute of
19   limitations, as we talk about this, I cannot conceive of a
20   scenario in which it would be equitable to say we will take one
21   expressly excluded group of plans and we'll include them and
22   we'll give them the benefit of a very early filing date, and
23   we'll take another expressly excluded group of plans --
24            THE COURT:  Well, you just heard the explanation.  They
25   think under the rational basis -- I'm sorry -- under the
```

```
 1   relation-back test there's a better argument that the Blues were

 2   on notice that larger accounts, even within --

 3              MR. RICHIE:  Okay.

 4              THE COURT:  -- previous single-filed case

 5   definitions -- a better argument that they were on notice that

 6   those people may have rights that are held in abeyance pending a

 7   class determination in that case than ASOs that they say really,

 8   you know, unless you just parse the definition in one case,

 9   Cervin, can't be found in any of the class definitions.

10              MR. RICHIE:  I'm sorry, Your Honor.  I don't think that

11   Cervin is -- the only reason we're talking about Cervin is not

12   because I've looked around the room and found my friend.  I'm

13   pretty sure that this language or something very similar to it

14   is in every one of these complaints.  It's just that Cervin was

15   first.  And the fully insureds get to go back as far as

16   possible.  Now, the ASOs are treated as if they didn't know up

17   until -- they were the last to the game.

18              Now, we've talked -- you've mentioned and they've

19   mentioned the doctrine of relation back.  Now, the doctrine of

20   relation back --

21              THE COURT:  So let me give you an example of something

22   I specifically recall --

23              MR. RICHIE:  Okay.

24              THE COURT:  -- that occurred during a status conference

25   that I think makes Mr. Boies' point.
```

```
1              MR. RICHIE:  I would love to hear it.  I don't know
2    what this is.
3              THE COURT:  And I'm going to ask Mr. Zott and Mr. Boies
4    to correct me if I'm wrong, because I'm about to drag you -- one
5    of our conversations into all this.
6              I remember Mr. Zott and Mr. Laytin standing on their
7    heads in one particular status conference explaining to me about
8    the unreasonableness -- and this is when we were in full
9    litigation mode.  This was before anybody was even thinking
10   about a settlement -- the unreasonableness and unfairness and
11   the lack of continuity between this huge class of a hundred
12   million people that Mr. Boies was trying to certify and how -- I
13   think they were explaining how unreasonable this whole
14   litigation was in some context like that, to which Mr. Boies
15   responded, Judge, I'm only seeking -- the class I'm actually
16   pursuing is much smaller than they're representing to the Court.
17             MR. RICHIE:  So this is the best fact for me that
18   anyone has ever said because --
19             THE COURT:  I don't think so.
20             MR. RICHIE:  No.  Because --
21             THE COURT:  Hold on.
22             MR. RICHIE:  Let me tell you.  Let me tell you why the
23   Eleventh Circuit thinks so.
24             THE COURT:  Because no one at that point was
25   contemplating anything about ASOs being in the case.
```

```
 1            MR. RICHIE:  To get to a hundred million, you have to
 2   include ASOs.  It's the only way.
 3            THE COURT:  Well, I don't remember if it was a hundred
 4   million.  But my point is that the argument that Mr. Zott and
 5   Mr. Laytin were representing was that this is this huge class.
 6            MR. RICHIE:  That's great for me.  That's exactly my
 7   point because the only state of mind --
 8            THE COURT:  Not if it didn't include ASOs at that point
 9   under anybody's consideration.  In other words, the point is
10   what did the Blues understand was relating -- potentially they
11   were facing?
12            MR. RICHIE:  They thought this was huge.  They thought
13   it was everybody.
14            THE COURT:  Exactly.  They thought it was large -- they
15   were contemplating it was larger insureds.  And at that point is
16   when Mr. Boies said, I'm only looking to represent the little
17   guy here.
18            MR. RICHIE:  Your Honor, it's going to take something
19   really specific in the record that's not currently there that
20   would say that --
21            THE COURT:  Well, that's not in the record.
22            MR. RICHIE:  Right.
23            THE COURT:  I'm just telling you this forms some of
24   my -- I won't call it a predisposition, but my understanding of
25   what Mr. Boies is saying to me in this respect.
```

 1          MR. RICHIE:  If the defendants were contemplating a

 2     large class, they're the only one whose state of mind matters.

 3     What the plaintiffs' counsel thought of their class is not

 4     relevant to any test for relation back.

 5          THE COURT:  Exactly.  But my point is -- and I think

 6     you're missing the last sentence of the paragraph.  I think

 7     you're focusing on the first three sentences of the paragraph

 8     and you're ignoring the punch line.  And that is even with

 9     that --

10          MR. RICHIE:  Okay.

11          THE COURT:  -- when ASOs got introduced into this, that

12     was news to me.  At no point at any time did the Blues or the

13     subscribers suggest to me that ASOs were ever part of a target

14     of this litigation.  In fact, I think Mr. Boies is right.  From

15     time to time it might have been -- it may have come up -- I

16     don't recall specifically -- but if it was, it would have been

17     that's a different market.

18          MR. RICHIE:  Couple of responses.  First, I heard for

19     the first time today that discovery was being done on ASO issues

20     throughout the entire case.  So it simply cannot be that no one

21     anticipated that ASOs could be here.

22          THE COURT:  No.  Again, you're cherry-picking, to be

23     perfectly candid here.

24          MR. RICHIE:  I'm new.  So I'm not trying to do so.  I

25     can only go --

```
 1            THE COURT:  Tell me what you heard and let's compare it
 2    to what was said.
 3            MR. RICHIE:  So what I heard was that there was
 4    discovery being done for ASOs for a couple -- I've heard a
 5    couple of different reasons.  And again, I don't have the
 6    transcript.  It's not my intention --
 7            THE COURT:  No.  Tell me what you heard.
 8            MR. RICHIE:  Right.  That's what --
 9            THE COURT:  You said, I heard something.
10            MR. RICHIE:  That's right.
11            THE COURT:  You had to have heard something.  What did
12    you hear?
13            MR. RICHIE:  That's all I did.  I heard a couple of
14    things.  One, there was an anticipation -- I'll go with three
15    things, one I've already said.  The defendants thought the case
16    was much bigger than the subscriber plaintiffs thought it was.
17            THE COURT:  But not ASOs.  You keep leaving that off.
18    But go ahead.
19            MR. RICHIE:  That distinction was not at the time clear
20    to me, but --
21            THE COURT:  I just made it clear to you.
22            MR. RICHIE:  Okay.  Number two --
23            THE COURT:  Because what happened was you jumped into
24    the fray before I completed what I was explaining to you.  But
25    go ahead.
```

```
 1              MR. RICHIE:  That's my fault, Your Honor.
 2              Number two was that there was discovery being done
 3      about ASOs throughout the case.  Perhaps there was some mention
 4      about whether that was to distinguish the markets.
 5              But third -- this is from yesterday -- there was a view
 6      at some point that ASOs might be brought in.  And that makes
 7      perfect sense because from the Blues' perspective, they can't do
 8      a settlement --
 9              THE COURT:  No.  Well, and I think in fairness,
10      everybody always understood that ASOs were in the background of
11      all this.  There was always a chance that multi-district
12      litigation of this type could include that.
13              But I -- Mr. Boies, I'm not going to put words in your
14      mouth again.  I might have already done it.  How did ASOs play
15      into your understanding?  And then I'll let the Blues address
16      the argument as well.
17              MR. RICHIE:  Thank you, Your Honor.
18              MR. BOIES:  And, Your Honor, let me just clarify.  When
19      we took discovery, we took discovery that related to the entire
20      market.  And that, to some extent, included ASOs.  And we were,
21      as I said, trying to distinguish ASOs from the fully insured to
22      try to show that they were different markets.
23              But whether it came to the structured data that related
24      to statistics that would go to showing damages and the like, the
25      Court will recall that Blues didn't produce the stuff with
```

 1   respect to ASOs.  They produced the stuff with respect to --

 2           THE COURT:  And you didn't pursue that.

 3           MR. BOIES:  And we didn't pursue that.  They did

 4   produce the data that related to fully insured, both larger ones

 5   and smaller ones.  We got -- we got that, but we didn't get the

 6   ASO.  From the very beginning --

 7           THE COURT:  But you did from time to time explain to

 8   me, Judge, the Blues can have more competition in the market

 9   we're pursuing because they have more competition in the ASO

10   market.

11           MR. BOIES:  Exactly right.  Exactly right, Your Honor.

12           THE COURT:  That wasn't the focus of your damages model

13   or even an injunctive relief target, but that was a constant

14   reminder to me of, Judge, you know, they say that they need

15   these exclusive service areas and they say they need national

16   best efforts and that say they're trying to strengthen their

17   mark and they say this is a new product and they say all these

18   things, but yet, look at the ASOs.  They let the ASOs actually

19   violate the exclusive service agreement rule based upon the

20   Blues' own rules at that time.

21           MR. BOIES:  And --

22           THE COURT:  They -- you could actually do business with

23   someone who wasn't in your service area even under preexisting

24   Blue rules; right?

25           MR. BOIES:  Under certain circumstances.

```
 1            THE COURT:  At least that's what I'm -- under

 2  certain -- yes.  That's what I'm talking about.  Under the

 3  Blues' model at that time.

 4            Okay.  So I'm trying -- you know, look, not -- the

 5  objectors don't have the benefit --

 6            MR. BOIES:  Sure.

 7            THE COURT:  -- of where we've been.  And I'm trying

 8  to -- maybe I'm stumbling all over the block trying to do it.

 9  I'm trying to explain where we've been and what it means.  So

10  maybe you can do a better job of that than I've done.

11            MR. BOIES:  I don't think I can, Your Honor, because, I

12  mean, the point is very simple.  From the beginning, we were

13  focusing on the fully insured market.  That's what our papers

14  said.  That's what our discovery was about.  That's what the

15  defendants were on notice about.  When we talked about them

16  saying we had a big class, they were talking about the fully

17  insured.  They weren't talking about the ASOs.  No one was ever

18  suggesting that the ASOs were part of our -- part of our

19  litigation.

20            We found out a lot of stuff about them as part of the

21  discovery.  We knew a lot about them.  We were able to

22  distinguish those markets from the fully insured markets.  That

23  was important to showing why the impact was particularly great

24  on the class that we were initially representing.

25            But in our view, there was just no basis for a
```

 1   relation-back argument with respect to the ASOs.  In our view,

 2   there was --

 3          THE COURT:  All right.  Let me -- but Mr. Richie may

 4   have a point.  The key is what did the Blues understand.

 5          MR. BOIES:  Well, I --

 6          THE COURT:  What were they on notice of?

 7          MR. BOIES:  I think they were -- I'll let them speak

 8   for themselves, but I think the record shows that they were on

 9   notice of a fully insured set of claims, not the administrative

10   service organization set of claims.

11          And I would just emphasize again -- I know the Court

12   has already done this, but I would emphasize again that what's

13   important here is not are we right about the relation-back

14   theory.  The question is did we make a fair and reasonable

15   judgment.  And --

16          THE COURT:  And does it result in inequitable

17   treatment.

18          MR. BOIES:  And does it result in unequal treatment.

19   And the argument that he's making is really an argument on

20   behalf of certain fully insured people.  It's not on behalf of

21   his objector.

22          THE COURT:  Okay.  Mr. Laytin?

23          MR. LAYTIN:  Thanks.  Hopefully four sentences.  The

24   first, we agree that you don't need to decide the applicable

25   statute of limitations.  The second is if you do want to create

 1  new law, though, I'd love law that says that it's the hearts and

 2  minds of defendants to decide the plaintiffs' statute of

 3  limitations.  So feel free.

 4          THE COURT:  Are you saying if that was the actual rule,

 5  you would feign ignorance?

 6          MR. LAYTIN:  The ostrich rule.  I think we would end up

 7  as a bunch of --

 8          THE COURT:  But I think it's really what objectively

 9  you're on notice of.

10          MR. LAYTIN:  Agreed.

11          THE COURT:  That's the question.

12          MR. LAYTIN:  So the third point is the context for the

13  standing on our head, which I recall doing quite often on this

14  point, was really the size of the Blue system, the impact that

15  this kind of case would have on, you know, anyone, just given

16  the markets we're talking about in general, not really applying

17  to the particular plaintiffs on which they were -- we're suing

18  on behalf of.

19          And the final point is, you know, we did -- and I think

20  it was in front of Your Honor -- have questions on this point.

21  And plaintiffs, as masters of their complaint, defined it.

22          THE COURT:  So who has coached Little League Baseball

23  before?

24      (Counsel responds)

25          THE COURT:  Okay.  And when your son plays Little

 1   League Baseball and you're a head coach, you live two lives.

 2   The first life is the Little League Baseball draft that starts

 3   the season off each year.  My son was a pretty good baseball

 4   player; I coached him.  Some other coaches in the league thought

 5   their sons were pretty good baseball players; they coached them.

 6   But when we show up to the draft, I assure you my son was no

 7   better than a third-round draft pick because he was going to

 8   automatically be assigned to my team.  And I didn't -- I wanted

 9   to get two people in the draft before I had to take Jake -- or

10   before I got to take Jake.

11           MR. LAYTIN:  Is that what you told him later?

12           THE COURT:  Yeah.  So every dad in the room is

13   explaining in the draft why my son is a third-, second-, fifth-,

14   later than a fifth-round pick.  Then you play the season and

15   then you get to the All Star vote.  Jake is no longer a

16   third-round pick.  He is one of the top 12 players in the

17   league.  And that is a microcosm of the difference between

18   litigating a class for the parties and settling a class for the

19   parties.

20           Parties may take all manner of different positions in

21   litigation.  Mr. Boies and Mr. Hausfeld have done just that.  If

22   this was litigation, they would not be conceding some of the

23   things they're conceding today.  Okay?  If this was litigation,

24   Mr. Burns may very well have a different view and present it on

25   what his damages model ought to look like in a

1  contested-before-the-jury case.  What we're looking here,

2  though, is what happens when the parties agree to turn the

3  swords into plowshares, plow common ground, reach an agreement,

4  and move on.

5        So, Mr. Richie, you're right.  These can't -- these

6  groups can't be treated inequitably.  And there has to be a

7  rational reason behind where we are with respect to the proposal

8  of this settlement.

9        But guess what?  Not only do the parties' roles change,

10  the Court's role changes.  I'm no longer -- I'm no longer making

11  findings of fact as appropriate or conclusions of law as

12  appropriate on the merits of things in the litigation track.

13  I'm now having to now assess fairness, adequacy, reasonableness,

14  and compliance with Rule 23 requirements in the settlement

15  contest.

16        MR. RICHIE:  Correct.

17        THE COURT:  All right.  So -- and I think a lot of the

18  argument I've heard has blurred those lines.  So help me.

19        MR. RICHIE:  Yeah.  That's what I would like to do.

20        And if I might use the microphone here.  Thank you.

21        THE COURT:  You may.

22        MR. RICHIE:  I'm not trying to relitigate or to

23  litigate this matter.  What I'm trying to say is that sauce for

24  the goose is sauce for the gander.  And if -- there are a lot of

25  factual reasons why I think that I'm right.  For example, we

```
 1   will hear from Dr. Mason on the stand when I cross him --
 2   because he wrote it in his report -- that large fully insured
 3   plans and ASOs are substitutes for each other.  They are in the
 4   same market.  That's where plans move back and forth.  Now,
 5   maybe not at the very largest end of the ASO market, but if
 6   someone is large enough to be a large fully insured plan --
 7           THE COURT:  But you haven't explained why ASOs --
 8           MR. RICHIE:  And fully insureds are similarly situated.
 9   And so what we keep --
10           THE COURT:  Except for the fact that one purchases a
11   product to insure a risk and one doesn't.
12           MR. RICHIE:  Except that when you're a large plan --
13   this is Dr. Mason talking, not me -- they can -- and I think
14   Your Honor even noted this in the standard-of-review opinion.
15   At the larger end of fully insured, the ASO market is a direct
16   substitute.  Those parties can move back and forth.
17           The point is not to argue the economic theory.  It's
18   just to argue that these are similarly situated groups and they
19   have to be treated similarly.
20           THE COURT:  Except -- except when it comes to, it seems
21   to me, how you get to purchase your insurance, what steps you go
22   through purchasing your insurance.
23           MR. RICHIE:  I think --
24           THE COURT:  Do you think those are similar for a large
25   national account and an ASO?
```

```
 1            MR. RICHIE:  So I'm sorry, Your Honor.  I think that
 2   they're similar between members of the ASO class and members of
 3   large group, fully insured class.  Yes, Your Honor.  I don't
 4   think there's any record evidence --
 5            THE COURT:  Well, let me ask you this.  If you -- and
 6   I'm just trying to break it down to simple bases here.
 7            MR. RICHIE:  Certainly.
 8            THE COURT:  You're the broker representing both a
 9   national account and an ASO account.
10            MR. RICHIE:  Uh-huh.
11            THE COURT:  And I tell you, all right, we will offer
12   insurance to your national account and we will insure all risks
13   they have and we will offer services to your ASO account and we
14   will administer their self-funded account, and we want you to
15   pay the same for both services.
16            MR. RICHIE:  So wait.  Were both of those instances
17   ASOs?
18            THE COURT:  No.
19            MR. RICHIE:  Okay.
20            THE COURT:  One is a national account that's --
21            MR. RICHIE:  Okay.  National account is fully insured.
22            THE COURT:  -- fully insured.  One is an ASO that's
23   self-insured.
24            MR. RICHIE:  Okay.  Yes.  Those two are competing in
25   the same market.
```

```
1            THE COURT:  No.  But the price would be different.

2            MR. RICHIE:  The price would be different because --

3            THE COURT:  Okay.  Well, isn't the damages model based

4    upon what you paid for your service and what you should have

5    paid for your service if competition had been in that market?

6            MR. RICHIE:  At a very high level of generality, yes.

7    But we're missing a -- there's a lot more that goes into that.

8    So I don't want to give an unqualified yes, it's that simple.  I

9    think it's a lot more complicated than that.

10            But I'll just take -- I'll take Dr. Mason's viewpoint

11    that says that the large group plans are in the same market and

12    their price is constrained by ASOs.  Now, there might be

13    customers that prefer the certainty of a fully insured plan:  I

14    don't have to worry about it; my risk is fixed.  A lot of them

15    want to manage their risk and have a lower price.  But those

16    large group plans --

17            THE COURT:  Am I just missing the logic of this?  And

18    maybe I'm just -- I've only run one business.  I formed my own

19    firm in 1993 and operated it until 2003.  But for that ten

20    years, if you would have told me that Blue Cross Blue Shield

21    would pay me if I had an insurance claim, health insurance

22    claim, versus I would have to pay out of my own pocket if I had

23    a claim for the medical provider --

24            MR. RICHIE:  So that's not actually --

25            THE COURT:  -- but they were going to administer both
```

1  plans and handle all the stuff, but I could pay the same for

2  both, I would think that's not a great deal.  So am I missing

3  something?

4       MR. RICHIE:  Your Honor, I did not ever -- excuse me if

5  I've given the wrong impression.  I'm not -- I don't intend to

6  say that they are -- they charge the exact same price for those.

7  Obviously, they don't.  One of them includes the cost of claims;

8  one of them doesn't.

9       THE COURT:  Right.

10       MR. RICHIE:  But I've heard -- I mean, I don't want

11  to -- I'm getting ahead of myself a little bit.  I would

12  really -- if it's possible to focus back on the statute

13  question.

14       THE COURT:  So my point is you may be -- I'm not making

15  an opinion about this, but you may be right that they're in the

16  same market --

17       MR. RICHIE:  Right.

18       THE COURT:  -- when it comes to what we expect for a

19  level of computation and what we should expect for a level of

20  competition.  They are not in the same damages model in any way,

21  shape, or form, because they put different numbers on the board

22  if they're in front of a jury or in front of a mediator; right?

23       MR. RICHIE:  So there are certainly ways that they

24  could be done -- it could be done the way that it's been done.

25  There are other ways that actually do put them on the same board

 1   because the cost --

 2         THE COURT:  If the same lack of competition affected

 3   the price point for someone who's paying less and a different

 4   entity who's paying more, doesn't it follow that the entity

 5   paying more would have a greater damages claim, just generally,

 6   then the entity who pays less for a service?

 7         MR. RICHIE:  If you take into account all the payments

 8   that are --

 9         THE COURT:  And I'm assuming you're right that they're

10   all in the same market with a lack of competition.

11         MR. RICHIE:  So maybe I can answer that question.  I'm

12   not trying to dodge it, so stop me if I'm going down a rabbit

13   trail.

14         THE COURT:  Stop.  Just answer the question.

15         MR. RICHIE:  Okay.  Well, this is what I'm trying to

16   do.  When most ASO plans -- again, it's done differently for

17   different plans, but --

18         THE COURT:  I think the answer to the question is yes.

19   Those would be -- there would be higher damages that party A

20   could expect compared to party B.  But go ahead.

21         MR. RICHIE:  But so this is why -- I'm not trying to be

22   inaccurate, and this is not a presidential debate.  So I've

23   heard you say it before.  I want to be straight to the point.

24         Most fully insured plans, from the information that

25   I've -- excuse me.  Most self-insured plans, from the

 1  information that I've reviewed -- and again, I've got limited

 2  access -- actually pay the Blues for their claims.  The Blues

 3  pay their claims.  They administer the claims and then they pay

 4  them and then they invoice the self-funded plan and the

 5  self-funded plan writes a check.  That's not universal.  It's

 6  not always done, but it's very commonly done.  And that's how

 7  the Blues measure their compliance.

 8          THE COURT:  That's part of the servicing agreement,

 9  though.

10          MR. RICHIE:  But that is a common way that it happens.

11  So can you put those two on the board together?  You can put

12  those two on the board together.

13          THE COURT:  All right.  But that's --

14          MR. RICHIE:  I mean --

15          THE COURT:  Maybe.  Maybe.  I've got --

16          MR. RICHIE:  We're speaking in generalities.

17          THE COURT:  I'd probably have to think through that,

18  but -- because, actually, I would think the price points would

19  be different because the Blues can count on we are going to have

20  zero loss on you as an insured if we're just fronting the money

21  and you're reimbursing us for it.

22          MR. RICHIE:  Yeah.  There's some risk involved --

23          THE COURT:  On the other hand, this other large

24  account, we may -- they may pay a premium and we may pay 15

25  times that during a period because they have such a high

1  experience rating.  And it seems to me that would be built into

2  pricing.

3          MR. RICHIE:  They're constrained a little bit, though,

4  by the medical loss ratio.  So the best they can ever do is --

5  if you're talking about a large plan, a large plan has to pay

6  out 85 cents on the dollar of premiums as medical claims.  So

7  really, they only have 15 cents to play with.  But at that

8  point, we're now -- you've got that 15 cents on the dollar.

9          THE COURT:  Let's let the subscribers and the ASO --

10 hold on.  Let me let them weigh in on our little debate here.

11         MR. RICHIE:  Certainly.  But can I move on and

12 finish --

13         THE COURT:  No.  No.  I told you to hold on.

14         MR. RICHIE:  Certainly.

15         THE COURT:  Because, believe me, it helps me if I put

16 apples next to apples.  And if you're moving on to the next

17 point, I'd like them to have the opportunity to address that.

18         MR. RICHIE:  Certainly, Your Honor.

19         MR. HAUSFELD:  Your Honor, Warren and I conducted the

20 mediations principally with Mr. Feinberg.  Both positions were

21 put forward.  They argued vigorously that their claim could

22 relate back.  We argued vigorously no, it didn't.

23         THE COURT:  No.  I'm asking you a different question.

24         Mr. Burns, would you expect your ASO clients to be

25 charged at the same price point as Mr. Hausfeld's clients --

```
 1            MR. BURNS:  No.

 2            THE COURT:  -- even if you're not asking them to insure

 3    a risk?

 4            MR. BURNS:  Absolutely not, Your Honor, because risk is

 5    the deal.

 6            THE COURT:  I mean, that's simple economics, isn't it?

 7            All right.  Blues, you know your business model better

 8    than anybody else here.

 9            MR. ZOTT:  Agree with Mr. Burns.  He's right.

10            THE COURT:  All right.  So, I mean, again, I don't

11    understand why this took 15 minutes.  This seems like this

12    should have taken 15 seconds.  Those are different -- those

13    would have to be different price points, even if they're in the

14    same market, that would affect a damages calculation in

15    litigation or in settlement discussions.

16            MR. RICHIE:  Could -- and, Your Honor, I never meant to

17    represent that they were exactly the same.  My question was can

18    you put them in the same pot, can you compare them and compare

19    apples to apples.  And I think the answer is yes.  And I don't

20    think that's a controversial position.  I would certainly agree

21    and our experts have agreed --

22            THE COURT:  Well, it's fairly controversial to me

23    because I don't understand it.

24            MR. RICHIE:  Our expert certainly has testified --

25            THE COURT:  Look, I don't know that I need an economics
```

1  expert to explain to me that if I am getting you -- let's just

2  do car insurance.  If I'm hiring you to handle an insurance

3  claim but I'm paying for my car if it's damaged or if I'm paying

4  for somebody's claim of liability against me if I'm liable

5  versus I'm asking you, as the insurance company, to not only

6  process the claim, hire a lawyer for me if necessary, and also

7  pay for the claim.  That's going to cost me more money.  And if

8  there's some -- if there's some nonsense in the way they're

9  going about ordering the market that causes me to pay more than

10 I should and I've already -- I'm going to be out more money if

11 I'm paying more for the premium.

12       MR. RICHIE:  So, Your Honor, in that circumstance you

13 just described, hundred percent, absolutely.

14       THE COURT:  Okay.

15       MR. RICHIE:  I think, reality, my understanding of the

16 market that's actually at issue here doesn't map perfectly onto

17 that hypothetical, but I agree completely with the principle

18 that you just articulated.

19       THE COURT:  All right.  But it seemed like you were

20 pushing back on that.

21       MR. RICHIE:  No, Your Honor.  I think I made the

22 mistake of saying that your -- I was trying to say that reality

23 is more complicated than that example, and I should not have

24 done that.  I apologize.

25       THE COURT:  Okay.  Go ahead.

```
1            MR. RICHIE:  Your Honor, I would like to --

2       (Telephone interference)

3            MR. RAGSDALE:  Sorry, Judge.  Not a phone call.

4            MR. RICHIE:  I would like to, if possible --

5            THE COURT:  At least you were the only one to own up to

6   it in the whole courtroom today.  Everybody else just kind of

7   started looking at somebody else like it was them.

8            MR. RAGSDALE:  I'm not (inaudible).

9            MR. RICHIE:  No.  Your Honor, I don't want to get too

10  far -- well, the easiest way to resolve this entire issue is

11  just to look at the class definition.  Instead of dealing with

12  states of minds, instead of dealing with what someone intended,

13  it's long been my understanding that the best place to look for

14  what someone intended is to look at the words that they used.

15           And the requirement of rejecting my position gets to a

16  kind of absurd interpretation of what it means to have health

17  insurance.  You would have to say that someone who is -- has a

18  self-funded plan isn't health insurance under the *Cervin*

19  complaint because it -- I've got the complaint.  I would have to

20  move off the podium here, Your Honor, but --

21           THE COURT:  I guess while you're finding that, my point

22  that I'm trying to make is this.  There are multiple factors

23  that go into whether or not an ASO and even a national account

24  should be treated similarly.  One is what is appropriately

25  calculated to be a statute of limitations based upon some
```

 1   relation-back doctrine, but that's not the only one.  One --

 2   another would be what we just -- the process we just engaged in,

 3   and that is are they in the same market?  Is there more

 4   competition?  An ASO -- do you seriously dispute here today, in

 5   light of everything you know about the case and what you've

 6   heard the last two days, that an ASO, as opposed to a national

 7   account, doesn't have more competition for its business than a

 8   national account?

 9            MR. RICHIE:  We might dispute the degree, but I don't

10   dispute the general proposition.

11            THE COURT:  There's a difference.  Yes.  There's a

12   difference.  So what we're doing now is quantifying degrees, not

13   qualifying the difference.

14            MR. RICHIE:  And with the reservation that those

15   degrees can be different based on other factors.

16            THE COURT:  Sure.  Sure.  That's a factor.

17            MR. RICHIE:  So --

18            THE COURT:  Another factor is how much you pay for the

19   product and, therefore, what damages you'd be able to put on the

20   board if you are ultimately successful in proving liability.

21   So --

22            MR. RICHIE:  Your Honor, what I'm wanting to say is

23   that ASOs are persons or entities in the United States who were

24   at the time currently insured by any health insurance plan that

25   was at the time a license -- was a party to a license agreement

1   with the Blue Cross Blue Shield Association.

2           I don't understand there to be any basis to dispute

3   that fact.  They were members of the injunctive relief class at

4   the time, at the very beginning.  If it's enough to be a member

5   of the injunctive relief to relate back, then ASOs are

6   absolutely covered.  And if there were any doubt on that, if

7   that was ambiguous --

8           THE COURT:  Would they relate back only to the -- I'm

9   not sure of this.

10          MR. RICHIE:  But --

11          THE COURT:  Would it relate back only to the injunctive

12  relief class?

13          MR. RICHIE:  But if it was listed in the --

14          THE COURT:  If they're not listed in a (b)(3) damages

15  class --

16          MR. RICHIE:  So that's the --

17          THE COURT:  -- can they rely upon a (b)(2) injunctive

18  relief class to say we didn't have to come in and assert our

19  damages claim?

20          MR. RICHIE:  That's what the fully -- that's what the

21  large group, fully insureds did.  So if you're going to give it

22  to one, you can't deny it to the other.  Because those were

23  also, undisputably, not members of any damages class.

24          THE COURT:  All right.  So let me ask you this, because

25  this is an important bottom-line question for me.

```
 1            MR. RICHIE:  Yeah.

 2            THE COURT:  Do you think Mr. Feinberg was smart enough

 3   to grapple with all these arguments that were bandied back and

 4   forth?  Because Mr. Burns made similar arguments that you're

 5   making today.

 6            MR. RICHIE:  I can't possibly comment on Mr. Feinberg.

 7   He emphasized the statute of limitations as being a defense that

 8   he used to lean on.  I have his declaration, but he was leaning

 9   on the --

10            THE COURT:  Yes.  No, he thought that was an issue

11   for -- he thought that was a large issue for Mr. Burns' clients

12   in the case.  He thought that was a weak point for them.  He's

13   made that very clear to us.

14            MR. RICHIE:  Yes.  I think that was --

15            THE COURT:  And he's a -- he's not representing

16   Mr. Hausfeld's clients.  He's not trying to represent your

17   clients.  He's a neutral.  And that's just the way he sized it

18   up as he assessed the parties' various mediation positions.

19            MR. RICHIE:  Uh-huh.

20            THE COURT:  So --

21            MR. RICHIE:  I think there's procedural fairness there.

22   But I also think that he got it wrong.  If that was his

23   position --

24            THE COURT:  Well, how is there procedural fairness

25   there?  Because Mr. Burns' clients --
```

```
 1              MR. RICHIE:  I said fairness.  I thought that

 2    procedurally --

 3              THE COURT:  Oh, you say that was procedurally fair to

 4    have a -- okay.

 5              MR. RICHIE:  Yeah.  Right.  I think the involvement of

 6    a third party is great.  But I have to be able to look at the

 7    results and square the result with a principle that I can

 8    articulate.  Because I can't articulate the principle, I cannot,

 9    on a principle basis, say that a --

10              THE COURT:  Here's the problem.  I was an advocate once

11    too, but you are now.

12              MR. RICHIE:  Uh-huh.

13              THE COURT:  And I could get so enamored with my case

14    that I couldn't see that far to see the other side.  So I guess

15    my question to your side would be this.  If I'm a neutral and I

16    understand the argument and if Mr. Feinberg is a neutral and he

17    understood the argument and Mr. Burns and Mr. Hausfeld are not

18    neutrals but they understand the argument, then why doesn't your

19    side understand the argument?

20              MR. RICHIE:  Your Honor, I'll let everyone --

21              THE COURT:  And I'm not -- that's not a shot.  That's

22    just trying to get a handle on everybody else sees this, I'm not

23    sure you see it, and I'm trying to understand why.

24              MR. RICHIE:  So here's what I'm really struggling --

25    I -- in our briefs, the response that we got back when we raised
```

 1  this argument about, well, you have to treat the fully insured

 2  large groups the same as the ASOs, if the large fully insured

 3  groups are getting added back, then the ASOs have to be too, the

 4  response was ASOs aren't health insurance.  Except they are in

 5  every sense of the word that matters.

 6         THE COURT:  Well, but you've acknowledged that even if

 7  they should have been treated equitably for the statute of

 8  limitations, which is your position, there should have been a

 9  larger recovery period attributable to them in these allocation

10  negotiations, which Mr. Burns, by the way, argued, did you not?

11         MR. BURNS:  Yes, sir.

12         THE COURT:  Yes.  But you also have acknowledged that

13  they're not similarly situated when it comes to this price point

14  we just talked about and they wouldn't be similarly situated

15  when it comes to a damages model that we've talked about.

16  They're not similarly situated when it comes to the level of

17  competition for their business that we've talked about.

18         MR. RICHIE:  That's not the justification that the

19  proponents of the settlement have advanced.  It's a different

20  argument.

21         THE COURT:  I think they've advanced all of them.  But

22  whether they've advanced it or not, that's what the Court

23  understands in evaluating this circumstance.

24         MR. RICHIE:  If I were a person who was looking at this

25  class definition that seeks -- *Cervin* sought to completely

```
 1   undo --

 2           THE COURT:  I'm trying to move you off that argument

 3   and address the other two arguments, in case you haven't noticed

 4   that.

 5           MR. RICHIE:  Okay.  Well, let's go, then.  The Blues

 6   refer to covering more than a hundred -- they refer to covering

 7   well in excess --

 8           THE COURT:  I'm trying to move you off that argument --

 9           MR. RICHIE:  Okay.

10           THE COURT:  -- and get you to address the other two

11   arguments on lack of -- dissimilar amount of competition --

12           MR. RICHIE:  Okay.

13           THE COURT:  -- for the business and different economics

14   on the monetary damages, because that's really what we're

15   focused on here.  We're not -- when it comes to allocation,

16   we're not focused on anything about injunctive relief.

17           MR. RICHIE:  Okay.  So, Your Honor, we're -- if I

18   understand you correctly -- and I want to make sure, because my

19   notes are organized differently.  You have -- you've heard

20   argument about -- all that you want to hear about the claims

21   period and you want me to move on to substantive issues --

22           THE COURT:  I'm not going to pretermit that.  I asked

23   you a question, and you are kind of being a political candidate

24   now --

25           MR. RICHIE:  I'm not trying to.
```

```
 1            THE COURT:  -- and trying to put what you think is your
 2   best argument forward.
 3            MR. RICHIE:  So --
 4            THE COURT:  Focus on the two things I've asked you
 5   about:  lack of competition in the national account market as
 6   compared to the ASO market and a higher damages model, at least
 7   arguably, in the national account market as compared to the ASO
 8   market.
 9            MR. RICHIE:  So, Your Honor, I don't have -- I've
10   objected on behalf of the entire ASO class.  So I don't think
11   that there is or should be a different damages model as between
12   large national accounts and ASOs.  That's not an objection I'm
13   advancing.  I don't -- if there is, that makes no difference
14   to my objection as we've articulated it.  I don't know if we
15   have anything responsive on that point.
16            THE COURT:  Okay.  What about competition?
17            MR. RICHIE:  So our difference --
18            THE COURT:  What about the difference in competition?
19            MR. RICHIE:  Yes, Your Honor.  I just want to make sure
20   that I understand.  Are we speaking of this in terms of the
21   allocation itself or in terms of whether these are similarly
22   situated classes for purposes of determining the claims period?
23            THE COURT:  No, not the -- I told you I'm not asking
24   anything about a claims period.
25            MR. RICHIE:  Okay.
```

```
 1              THE COURT:  I'm asking you about what would be the --
 2   so one of the things we evaluate, as you know, is what are the
 3   likelihood of success on the merits.  What can a party
 4   reasonably expect about, A, winning their case and, B, what the
 5   recovery would be if they won?  So I'm asking about those two
 6   things.  I'm asking about, okay, are they more likely to prove a
 7   violation of the Sherman Act if there's more competition in the
 8   market they're participating in as compared to less competition
 9   in the market that someone -- for the business that another is
10   and, two, what happens when, even if we win, our damages model
11   probably is more limited because our price point for the
12   insurance we paid for, the service we paid for, is different
13   compared to our comparator.
14              MR. RICHIE:  It's a critical question, Your Honor.  I'm
15   going to start at the very beginning with answering it, which is
16   what's in the record.  Because there is no evidence in the
17   record at all relating to the *Bennett* factor of the likely
18   recovery of the ASO class.  Zero.  There was no analysis done.
19              The only declaration that speaks to that issue is
20   Dr. Pakes.  And Dr. Pakes says two things:  one, I performed an
21   analysis of the fully insured; and then, number two, it has been
22   determined by somebody else that 6.5 percent is reasonable.  And
23   so the settlement number is used to determine what's the likely
24   recovery.  And the likely recovery is then parroted back to say
25   the settlement is fair.  That same number is in two places.
```

```
1            THE COURT:  But yet you've just heard the explanation
2   of how that came about with the brackets that were in place,
3   Feinberg's involvement with the mediation, the fact the parties
4   couldn't agree on an allocation, they agreed to get a
5   third-party neutral involved, they presented this to the
6   third-party neutral, and he navigated them toward this
7   allocation that we have in place.  So the record -- there is
8   evidence in the record about how we reached the allocation.
9            MR. RICHIE:  There is certainly evidence about
10  allocation, but allocation is not the same as what's the likely
11  recovery in litigation.  That analysis was never done.  It was
12  done for one class, it wasn't done for the other.
13           THE COURT:  Yes.  I don't know -- I don't think there's
14  anything in the record about what the likely recovery for the
15  subscribers would be to the quantifiable point that I think
16  you're advocating.
17           MR. RICHIE:  Your Honor, actually, all that I'm
18  advocating for is the difference from something and nothing,
19  because Dr. Pakes gives something for the fully insured class
20  and gives nothing but the settlement number for the ASO class.
21  As a matter of law, I think that's insufficient.
22           And it is literally all that is in the record.
23  Paragraph seven -- just a second.  In paragraph seven of
24  Dr. Pakes' declaration, that's the representation.  It just says
25  that the settlement number is what was used.  So we have to
```

 1  start from there, that there's nothing in the record about the

 2  *Bennett* factor, which applies in this case and will govern, that

 3  says what the ASO class's likely recovery in litigation could

 4  have been.

 5          So we don't have what's required.  We don't have that

 6  "what's my best day" comparison that we can then work back to

 7  and so we can determine, as the fourth *Bennett* factor says,

 8  where on that line are we being reasonable and adequate, where

 9  have we hit -- recognizing all the risks and delays of

10  litigation, where have we hit the point where we can say it's

11  fair, reasonable, and adequate.  We don't know what the

12  denominator is.  What's my best day?  We don't even have an

13  estimate of it.  So whatever that numerator is, we don't know

14  what it's over.  It's divide by zero, invalid, go back.  So

15  that's where I start.

16          But if we were to base -- you know, using market data,

17  using the reports that our experts have provided, using I think

18  some important facts that find their way through Dr. Mason's

19  report, if we use general industry data, we can actually

20  backfill and come up with some estimates, but they're not -- no

21  one has done the required analysis.

22          THE COURT:  All right.

23          MR. RICHIE:  My cocounsel would like to speak.

24          MR. MULLINS:  Good afternoon, Your Honor.

25          THE COURT:  Good afternoon.

 1          MR. MULLINS:  I'm Rick Mullins from the McAfee & Taft

 2   Law Firm in Oklahoma City and cocounsel with Mr. Richie with the

 3   self-funded objectors.

 4          THE COURT:  Welcome.

 5          MR. MULLINS:  Thank you.  I'm glad to be here.

 6          So I just wanted to address a couple of these issues on

 7   allocation and percentages and the competition things that you

 8   asked about.

 9          And first of all, we have provided in our expert

10   reports -- we've got three of them, two of them by the BDO firm

11   and one of them by Teah Corley.  And in all three of the

12   reports, they describe the allocation that they think is

13   appropriate here.  All of those involved in this actually are in

14   the health care business.  Dr. Mason is not in the health care

15   business, but these folks are.  They do this for a living.

16          And Ugo, our witness today, is going to talk about what

17   is -- what goes into the pricing.  And what does not go into the

18   pricing for plans for both fully insured and self-funded is this

19   purported lack of competition for self-funded plans.  He will

20   tell you -- and he worked at Blue Cross for 12 years doing the

21   exact kind of thing that we're talking about here.  Now he's in

22   the private world working for a consulting firm; but in his 12

23   years at Blue Cross Blue Shield, he employed the exact same

24   methodology that he employed to come up with a spread of damages

25   in this case or how -- what's a fair allocation.  And that's the

 1  premium equivalent method.  And we'll hear about that in a few

 2  minutes.

 3         But what he has done is he says this is the industry

 4  standard for determining the spread between what a fully insured

 5  plan pays for and what a self-funded plan pays for.  They all

 6  pay for the same services.  Now, in a self-funded plan, they can

 7  pick and choose some of these ancillary services that we've

 8  mentioned in our briefing, but they pay for every one they get.

 9  All of those are the same things that are wrapped up in the

10  fully insured premium that the fully insureds paid.  So --

11         THE COURT:  All right.  Let me stop you because I'm

12  reminded from two different directions that not everyone can sit

13  still for three hours like me.  So we're going to take a short

14  break, and I'm going to let you conclude your remarks after

15  that.

16         MR. MULLINS:  Great.  Thank you.

17         MR. RICHIE:  Thank you, Your Honor.

18      (Recess at 1:58 p.m. until 2:31 p.m.)

19         THE COURT:  All right.  Ready to get started back?

20         MR. MULLINS:  Yes, sir.

21         THE COURT:  I think I interrupted you, sir, but with

22  good reason.

23         MR. MULLINS:  Very good reason.  And we're all

24  thankful.

25         Your Honor, just to pick back up where I left off,

 1   so this pricing is done based on the products purchased.  It's

 2   not based on something -- on an alleged lack of competition in

 3   self-funded versus fully funded, not at all.  And our expert,

 4   whose name is Ugo Okpewho -- and he has given us permission to

 5   just call him Ugo -- if we had more time, I'd tell you how he

 6   got to immigrate here when his dad was hired as a professor at

 7   Harvard.

 8        But in any event, Ugo will testify about how this is

 9   all price and what the pricing mechanisms are and how you have

10   to include all the claims costs for both fully insured and

11   self-funded because that's the only way you can get a fair

12   analysis.  And that's the premium analysis that's identified in

13   the BDO expert reports.  There's no difference in the way that

14   they price self-funded versus fully insured other than the risks

15   involved to Blue Cross for carrying fully funded business in the

16   sense that they -- Blue Cross builds in what's called a

17   retention in order to preclude them from being harmed if they

18   have to pay additional claims in excess of what the fully

19   insured premiums have been.

20        That's the difference.  That's the primary driver of

21   difference in prices for both types of plans.  It has nothing to

22   do with the lack of competition in one area versus the other.

23   And he is prepared to testify and will testify this afternoon

24   that in his 12 years at Blue Cross, at no time did they factor

25   in competition in one area versus another in how they priced

 1  products.  And they priced the same types of products for both

 2  types of plans.  They price for --

 3          THE COURT:  But doesn't that go to potential for

 4  success on the liability issue?

 5          MR. MULLINS:  No.  I think it goes directly to the

 6  damages allocation.

 7          THE COURT:  No.  What's the first thing you've got to

 8  do before you get a damages award?

 9          MR. MULLINS:  You have to find liability.

10          THE COURT:  Yes.

11          MR. MULLINS:  Right.

12          THE COURT:  So doesn't it go -- so if there's more

13  competition for national accounts -- I'm sorry -- more

14  competition for ASOs -- and less competition, that's something

15  that you'd have to consider in assessing what damages were

16  because the first component is trying to find are you going to

17  succeed on the merits.

18          MR. MULLINS:  Right.  And to that point, Your Honor, at

19  page 53 of their September 3rd filing, which was their motion

20  for final approval of settlement agreement and certification of

21  class, at page 53, they said the same conduct applied to both

22  types of plans.  And they identified a couple of additional

23  items of conduct that applied to the self-funded plans.  So in

24  their own briefs, they've admitted that the same conduct

25  applied.

```
 1              THE COURT:  Well, you know, again, this is not merits
 2    issues.  So I'm less concerned with what everybody is saying and
 3    more concerned with just trying to isolate some commonsense
 4    applications here.  And I'm asking you about, I think, a fairly
 5    commonsense thing.
 6              MR. MULLINS:  Well, the only evidence that we've been
 7    able to see in the pleadings that we have and the filings that
 8    we've had where this alleged difference in competition has been
 9    described based -- you know, in preparation for today is from
10    one of Dr. Mason's reports where he talks about the different
11    levels in competition.  Other than that, we haven't seen what
12    evidence there is of that.  And we know something about
13    Dr. Mason.  He doesn't know about the health insurance.
14    Economics, yes; but he doesn't know how health insurance
15    products are priced and what goes into that.  And in order to
16    find --
17              THE COURT:  So your argument goes to one of the four
18    analyses; correct?
19              MR. MULLINS:  No.  That's incorrect, Your Honor.
20              THE COURT:  Okay.  So explain that to me.
21              MR. MULLINS:  And so our -- we have challenged all four
22    of his analyses in both reports that have been submitted,
23    directly taking him on on all four of them.  And Ugo is prepared
24    this afternoon to describe why we disagree with each of his four
25    analyses.
```

```
 1              THE COURT:  Okay.
 2              MR. MULLINS:  The primary one -- the primary reason on
 3    all of his analyses is in order to fairly compare the two
 4    different types of plans for a damage allocation -- here, the
 5    allocation of how we're going to divide the settlement funds --
 6    is based on the risks involved to the plans.  And when you do
 7    that, it's not 93 and a half to six and a half.
 8              A fair -- that's a shocking allocation, by the way, to
 9    people in the industry, to the people we've been talking to.
10    They saw that and they couldn't believe it because there is so
11    much more that goes into the ASO side of the business than just
12    this ASO fee.  You have to include all the other products that
13    go along with ASO services.
14              THE COURT:  For example?
15              MR. MULLINS:  So there's -- there's a list of about 14
16    items, and they're all described in our expert reports in our
17    filings.  But there's stop-loss insurance, there's actuarial
18    services, there's pharmacy benefits that Blue Cross provides.
19    There is rebate issues.  There's all kinds of things.  There's
20    about 14 or 15 of them.  And every single one of those applies
21    to the fully insured, and every single one of those is available
22    to self-funded.  Some purchase some; some purchase all.  But
23    they're all there.  And you have to account for every single one
24    of those items that is paid for by the self-funded.
25              So the way they do that in the industry is they say,
```

1  okay, we're going to put them on a premium equivalent basis.

2  We're going to take the fully insured, and we know that 85

3  percent of the fully insured premium is a pass-through.  It

4  either has to be paid out in claims or rebated to the employer.

5  Under the Affordable Care Act, that's the law.

6         On the self-funded, they say, okay, we're going to put

7  them on a premium equivalent basis by understanding the amount

8  of claims that the employer believes they're going to pay.  And

9  there are actuarial calculations that go into all that.  Then

10 they take the ASO fee itself, which is not large, and then they

11 add in all of these extra services that are purchased by the ASO

12 plans, by the self-funded plans.  And they take those costs and

13 they see what the -- then they compare what the costs really

14 look like.  And it's not on the 85 versus 85, because that money

15 goes someplace else.

16        THE COURT:  And this is what your expert is going to

17 tell me?

18        MR. MULLINS:  Absolutely.  And those are --

19        THE COURT:  Okay.  Does he need to tell me that if I

20 understand that?

21        MR. MULLINS:  It's in our reports.  And we're prepared

22 to submit our reports to --

23        THE COURT:  Is he going to tell me anything that's not

24 in your report?

25        MR. MULLINS:  He can talk about some of his experiences

 1  at Blue Cross that's not in the report that will explain exactly

 2  what I'm telling you now, Your Honor.  And that includes --

 3           THE COURT:  Kind of anecdotals that prove the point?

 4           MR. MULLINS:  Absolutely.  And he's got 20-plus years

 5  in the business.  He has dealt with the exact issues we're

 6  dealing with today since he started in the business.  He is at

 7  the highest level of actuarials in the country.  He deals with

 8  employers today.  He dealt with employers when he was at Blue

 9  Cross for 12 years.  He knows what he's talking about.  He knows

10  what goes into all of these things we're talking about and what

11  the distinctions are and why this notion of competition and how

12  it affects the pricing is meaningless in terms of pricing

13  differences.

14           Now, the thing about the competition and does that

15  impact liability, what I would say to that is we don't think so.

16  I've already explained what they've said in their brief about

17  the same conduct applying to both types of plans in addition to

18  some additional things that apply to the self-funded.

19           But what we're talking about here is allocating a

20  settlement fund.  Everybody agrees that these plans were all

21  damaged by the Blue Cross conduct.  How do we allocate those

22  damages?  Well, we know the conduct was the same.  Now we can

23  tell you what the pricing differentials are and why that

24  happens.  And it's a risk factor.  It's not a lack of or more

25  competition or anything like that.  It's risk of Blue Cross,

1  primarily, for why they price them differently.

2          So what's a fair allocation based on that?  The ranges

3  are in Ugo's report.  Those are based on industry standards.

4  Those are based on his 22-plus years' experience of working both

5  sides of the fence.  And it's not six and a half to 93 and a

6  half.  It is -- depending on time frame that we're talking

7  about -- we've got the statute of limitations issues that you've

8  already addressed with Mr. Richie.  We've got that issue and

9  we've also got, okay, earlier in the period, if we're talking

10  about going back to 2008 for a damages period, probably more

11  like 50-ish percent were self-funded, 50 percent of the lives

12  were fully funded.  Over time, that's changed to more like 60

13  percent self-funded lives versus 40 percent fully insured lives.

14          So depending on time frame and number of lives, the

15  spread is different.  It's about 23 percent up to 54 or 55

16  percent that should go to the self-funded class on a fair

17  allocation, not 93 and a half percent to the fully insured.

18          It's simply not reasonable what has been presented to

19  the Court in terms of an allocation percentage.  That's why

20  we're here.  We haven't objected to anything else.  But this

21  allocation percentage really was shocking to people in the

22  industry who know what's going on.

23          THE COURT:  Thank you.

24          MR. MULLINS:  You're welcome.

25          THE COURT:  Mr. Burns.

```
 1              MR. BURNS:  Can I be heard, Your Honor?
 2              THE COURT:  You may.
 3              MR. RICHIE:  Warren, can I just move my stuff out of
 4   the way?  I won't even interrupt you.
 5              MR. BURNS:  I was going to draw on it.
 6              MR. RICHIE:  Well, if you want a coloring sheet, I can
 7   bring one for you.
 8              MR. BURNS:  Don't tempt me.
 9              Your Honor, I'd like to ground us for a second.  So I
10   think, first of all, we started with statute of limitations.
11   We've moved back into allocation a little bit.  So I want to
12   cover both, but I'm going to start with the allocation since
13   it's freshest and just based on the arguments we heard.
14              Your Honor, it's our contention their expert,
15   respectfully, Mr. Ugo -- and unfortunately, I can't pronounce
16   that name, and so I will take the invitation to --
17              THE COURT:  I think he's given you the permission.
18              MR. BURNS:  I will take the invitation.
19              But fundamentally here, our expert, Dr. Mason, has been
20   qualified as an antitrust economist.  And Mr. Ugo -- it's like
21   they're talking Greek and Latin; and, you know, pick the
22   language for each.
23              Where Mr. Ugo's expertise and testimony might be
24   relevant is if he got on the stand and I was able to say to him:
25              Mr. Ugo, when you were pricing your Blue Cross fully
```

 1  funded and self-insured plans, how much of an overcharge did you

 2  build into the self-funded plan?  $10.

 3         How much of an overcharge did you build into the fully

 4  funded -- or fully insured plan?  $34.

 5         All right.  Pricing is different than determining an

 6  overcharge in an antitrust case.  And of course Mr. Ugo is not

 7  going to come here to testify to that.  If he did, I think he'd

 8  have lawyers scattering for the doors and we'd probably want to

 9  get this settlement approved.  But there are fundamental

10  distinctions between what they have done with their expert --

11  and I'm not here to quibble.  He has a lot more experience in

12  pricing than I do.  But he doesn't have the experience that

13  Dr. Mason has in actually looking at issues that are relevant to

14  the case, including the ability of these two markets to bear an

15  overcharge and then saying what's a reasonable allocation.

16         Now, back to statute of limitations, which begs the

17  broader question, Your Honor is absolutely right.  The broader

18  question is whether -- how the self-insureds -- how the ASOs are

19  treated by the settlement is fair and reasonable and equitable.

20  That inquiry is broader than just statute of limitations.  I

21  would submit to you that as it relates to these arguments, it

22  pertains to both amount and the claims period at issue in the

23  case.  But all of this is interwoven, and it was interwoven in

24  the context of negotiations in this case.

25         And what I think the Court needs to understand and

1  think about in terms of the reasonableness of this allocation is

2  that, one -- let's start with claims period.  Yes, we had

3  diametrically opposed views on what the appropriate look-back

4  period was for these two -- for the subclass and the

5  subscribers' class.  And yes, we argued about that.  And yes, we

6  talked about it with Mr. Feinberg.

7        Now, I'll tell you, Your Honor, I mean, I looked at

8  these issues and I argued from a perspective that's largely been

9  the objectors' argument.  I may have reached a different

10  conclusion about the ability to succeed on those arguments.  But

11  that, in turn, points to the reasonableness of the settlement.

12  If there's a dispute, if there's a valid, rational dispute, then

13  how we ultimately resolve it points to the reasonableness

14  because we've taken it into account.  And that's certainly

15  occurred here.

16        Second, I would say look at the actual claims period we

17  got for the ASOs in this case.  Now, ordinarily, as Your Honor

18  is well aware, four-year look-back period on antitrust claims.

19  And there was a contention at various points that that was what

20  we were entitled to.  We got a five-year look-back period.  Why?

21  How?  Because I argued for it and said at a minimum, we needed

22  that for the claims period, largely because I became involved

23  before we actually filed the complaint.  And I said, there's no

24  way I'm going to agree to a four-year look-back from the date of

25  the complaint I file when I've been involved for longer than

 1   that period.  The class needs more than that, deserves more than

 2   that.  I got it.  That was part of the negotiations we conducted

 3   and agreed to.

 4         Second, on the amount, Your Honor, I was aware of the

 5   issues regarding class period.  I argued them, as I said.  If

 6   Your Honor looks at the amount that was agreed to here, six and

 7   a half percent, and then looks at the financial analyses that

 8   Dr. Mason has conducted, it's nearly double the low end of the

 9   range in -- let me say it differently.  In the most robust of

10   Dr. Mason's economic analyses, okay -- and that's the

11   revenue-per-member growth -- the six and a half percent we

12   actually obtained was nearly double, somewhere between 50

13   percent to a hundred percent higher than what the low end of

14   those ranges was.  It was one of the reasons I was pushing for

15   additional money, pushing for additional dollars to come into

16   the ASO class.

17         And if you're judging the reasonableness of that six

18   and a half, even if you look at the shorter class period, you

19   have to say that the economic analyses that have been presented

20   by an antitrust economist in this case fully support a six and a

21   half allocation given that entire context.

22         So when you look at the settlement as a whole as it

23   pertains to the ASO class and you take into account the value

24   from the injunctive relief as well -- because that's out there

25   too -- I submit it's nearly impossible to say this isn't a

 1   reasonable and fair settlement under the circumstances.

 2          THE COURT:  All right.  Are we ready to start calling

 3   some witnesses back?

 4          MR. BURNS:  Yes, Your Honor.

 5          THE COURT:  Now, with Dr. Mason, do we need Dr. Mason

 6   back on the allocation issue?

 7          MR. RICHIE:  Yes, Your Honor.  I promised you two

 8   doublings.  I only got to talk about one of them.  The other one

 9   relates directly to Dr. Mason's report.

10          THE COURT:  I'm sorry.  What did you say?

11          MR. RICHIE:  Forgive me, Your Honor.  I promised you

12   that I could double the amount that was due to the self-funded

13   subclass.  One of them deals directly with Dr. Mason's

14   testimony.

15          THE COURT:  All right.  So we're ready to call him

16   back?

17          How much time do you need, Mr. Richie, to double?

18          MR. RICHIE:  Your Honor, I can -- well, it depends on

19   what he says, but ten minutes.

20          THE COURT:  All right.

21          You're still under oath.

22          THE WITNESS:  Thank you.

23                         **JOSEPH MASON, Ph.D.**

24   The witness, previously having been sworn, resumed the stand and

25   testified further, as follows:

```
 1                        CROSS-EXAMINATION
 2   BY MR. RICHIE:
 3   Q.  Dr. Mason, my name is Thomas Richie.  I represent some
 4   objectors in this case.  Do you still have a copy of your report
 5   in front of you?
 6   A.  I do.
 7   Q.  Thank you.  If you would turn with me to page 10 of that
 8   report.  I'm going to speak with you about paragraphs 33 through
 9   35.  Please let me know when you're there.
10   A.  Okay.  I'm there.
11   Q.  So we can start off with the scale of the issue.  The
12   principle you articulate in these paragraphs has the net effect
13   of reducing the allocation to the self-funded subclass by 50
14   percent; correct?
15   A.  Well, my opinion is in fact more than 50 percent, but 50
16   percent is a conservative, small adjustment.
17   Q.  Okay.  As you performed the math throughout your report, you
18   used 50 percent; correct?
19   A.  That's correct.
20   Q.  We'll start with paragraph 33.  You know what?  I'm actually
21   going to skip that.
22       Let's talk about what a discount rate means generally.  As I
23   understand it -- and correct me if I'm wrong -- you used the
24   term "discount rate" and a concept of a discount rate to account
25   for the delay that would occur in the self-funded subclass
```

1   obtaining a money judgment in this case; is that correct?

2   A.  I think that's about correct.  The way I think of it is that

3   if the self-funded subclass filed a suit today, they could

4   expect to be roughly eight years behind this suit as it

5   currently stands for which we're currently discussing

6   settlement.

7   Q.  Okay.

8   A.  So to reach a settlement in that suit eight years later, the

9   time value of the money received would be discounted today by a

10  discount factor that, according to a 9 percent cost of capital,

11  which is the typical cost of capital for a corporate firm, a

12  discount factor of 50 percent.

13  Q.  Okay.  And so the principle here is that the self-funded

14  subclass is eight years away from a judgment.  So we have to

15  discount the cost of capital it's going to take to reach the

16  time of that judgment.  Again, is that generally correct?

17  A.  We're not discounting cost of capital.

18  Q.  So are we using --

19  A.  We're discounting an expected future cash flow.

20  Q.  Okay.  You heard yesterday testimony about -- excuse me --

21  lawyer argument about how long it would take for the fully

22  insured class to obtain a judgment in this case; correct?

23  A.  I recall discussing a judgment, but here we're discussing a

24  settlement.

25  Q.  Okay.  Well --

```
 1  A.  So I'm not sure what the equivalence is.

 2  Q.  But for the discount rate, we were talking about judgment;

 3  correct?

 4  A.  No.

 5  Q.  So you weren't discounting to the date of an anticipated

 6  future judgment?

 7  A.  No.

 8  Q.  Okay.  What were you discounting to?

 9  A.  Apologies if I misspoke earlier.  I don't think I said that.

10  I'm discounting --

11          THE COURT:  Speak up a little bit.  I'm having trouble

12  hearing you.

13  A.  I'm discounting to a stage of the litigation --

14  Q.  Okay.

15  A.  -- similar to this stage, at which we are negotiating a

16  settlement.  With regard to this litigation currently before us,

17  eight years have elapsed to get us to this stage where we are

18  talking about a settlement that amounts to something on the

19  order of $3 billion, roughly, on claims estimated by Dr. Pakes

20  in his declaration to be somewhere in the order of 18 to $36

21  million if this was to go to judgment and plaintiffs were to

22  prevail.

23      So even in this litigation, there is a discount in the

24  settlement.  And my point is that if we engaged in a similar

25  exercise of starting a lawsuit today and eight years later
```

 1  reached a point where we were talking about a settlement, the

 2  value of that money that might be recovered in such a settlement

 3  eight years later, just the time value of the money, not the

 4  risk of the litigation and the other milestones involved --

 5  Q.  Okay.

 6  A.  -- would be assessed a 50 percent discount factor by

 7  standard financial math.

 8  Q.  By what amount do you discount the claims of the fully

 9  insured class?

10  A.  Well, the claims of the fully insured class, as I said, are

11  already discounted by an amount of up to 90 percent of the

12  judgment that might occur sometime in the future, as estimated

13  by Dr. Pakes.  I don't need to discount that further.  They have

14  been involved in the litigation for eight years.  They started

15  eight years ago.

16      The way I think of this is I'm looking at a but-for world

17  where the self-funded claimants pursued their own litigation.

18  And the savings derived from participating in this litigation,

19  coming in late to the game, so to speak, for whatever reason, as

20  discussed earlier today, but taking on their face what's been

21  represented about their participation in the case today.

22  Q.  So just so we're clear, you don't discount -- you don't

23  apply any discount factor in your analysis to the claims of the

24  self- -- excuse me -- to the fully insured subclass?

25  A.  Well, no.  They don't -- they started when they started.

 1  Another way to think of this is what would -- the easiest way to

 2  think of it is they started -- self-funded started eight years

 3  later.  To put things on an apples-to-apples basis, we have to

 4  discount what they're getting for starting eight years later for

 5  those eight years.

 6  Q.  And you're aware that -- as an economist that -- well, not

 7  even as an economist.  As someone who was sitting in court

 8  yesterday, you're aware that counsel for the class is being

 9  compensated for the risk that they took; correct?

10  A.  I heard that.  This is not about the risk that counsel took,

11  although I suppose that's another way to think about it, that

12  the self-funded class is getting this settlement without risk.

13  Q.  So --

14  A.  But we're not talking about the risk that's been undertaken

15  by counsel and investment of attorneys' fees along the way, just

16  that they didn't -- they're coming in having the benefit of

17  sitting through what I refer to in paragraph 33, more than 30

18  hearings and status conferences and other milestones at which,

19  potentially, this case could have ended right there.

20  Q.  Are you aware that the recovery of the self-funded subclass

21  is being reduced in any amount by the payment of attorneys' fees

22  in this case?

23  A.  I know generally that's the case -- well, I'm sorry.  The

24  self-funded subclass?  I'm not sure how that's allocated across

25  classes.  I guess I'd have to say I don't know.

1  Q.  Would that be relevant --

2  A.  I understand fees are there somewhere.

3  Q.  Would that be relevant at all to your analysis, something

4  you would consider in your expertise?

5  A.  I don't look at the imposition of attorneys' fees.  I

6  understand that is a matter for the Court.

7  Q.  But you wouldn't look at differential loading of those fees

8  on classes if you were determining an allocation and applying a

9  discount factor?

10  A.  You'd have to explain to me the relevance for including such

11  fees.  I don't see it on its face.  The fees are the fees.

12  Q.  Okay.  But differences in how those fees are allocated is

13  totally irrelevant to you right now is what you're telling me?

14  A.  I don't see the relevance sitting here.  I've been asked to

15  compute a relative incidence of overcharge in this matter by

16  which to base a reasonable settlement allocation.  I focus on

17  overcharge, not so much on attorneys' fees.

18  Q.  But, in fact, you don't perform an overcharge analysis, do

19  you, Dr. Mason?

20  A.  Oh, that's absolutely false.

21        THE COURT:  I think we just went past the ten-minute

22  mark.

23        MR. RICHIE:  Well, I wasn't expecting --

24        THE COURT:  No.  I'm talking about based on the answer

25  to that question.

```
 1          MR. RICHIE:  Thank you.  Give me just a second, Your
 2   Honor.
 3      (Brief pause)
 4   Q.  Let's turn to your report, page 11, paragraph 30.  Sorry.
 5   That's not on page 11.  Paragraph 30 appears on page 9.  And I
 6   will read this.  Tell me if I read it correctly.  It's from the
 7   bottom of paragraph 30.
 8      I do not possess specific measures of such overcharges for
 9   each licensee, nor have I been instructed to estimate overcharge
10   for each licensee.
11      Did I read that correctly?  It's the next-to-last sentence.
12   A.  I would like that read in the context of paragraph 30, if I
13   can -- it's in print.  If the Court would like to save time, I
14   don't need to go through it, but --
15          THE COURT:  Give us the context.
16          THE WITNESS:  Paragraph 30 reads in whole:  From an
17   economic perspective, one would expect the apportionment of
18   settlement proceeds between the subscriber class and the
19   self-funded subclass to reflect the relative share of
20   overcharges borne by fully insured and ASO plans respectively
21   during the relevant class periods.  The theory of damages in
22   this matter is grounded in the alleged impact of the horizontal
23   restraints on entry maintained by defendants which resulted in
24   certain overcharge assessed by the licensees.
25          Here's your passage.
```

1  Q.  Okay.

2  A.  I do not possess specific measures of such overcharges for

3  each licensee, nor have I been instructed to estimate overcharge

4  for each licensee.  My analysis is, therefore, based on proxies

5  for such overcharges.

6      I explain further about such proxies in paragraph 31.  But

7  at all points my analysis is targeted to the overcharges, not --

8          THE COURT:  Would you explain to the Court what you

9  mean by each licensee?  When you say I have been instructed --

10  I've not -- nor have I been instructed to estimate overcharge

11  for each licensee, define "each licensee."

12          THE WITNESS:  So, for instance, Dr. Pakes undertook a

13  damages analysis in this matter for the State of Alabama.  I

14  have -- I say elsewhere in my report I understand that the

15  data or similar data used by Dr. Pakes in order to take -- that

16  could be used to undertake such an analysis for all of the 36

17  market areas does not exist.  So when I talk about each

18  licensee, I'm talking about each of the 36 areas.

19          And I found it interesting that a BCBS representative

20  said earlier something to the effect of if you understand one

21  BCBS plan, you understand one BCBS plan, which struck a

22  resonance with me with regard to that data availability and

23  ability to replicate Dr. Pakes' analysis another 35 times.

24  Q.  So if I understand you correctly, Dr. Mason, your opinion

25  today is what it says in your report at paragraph 12 that

1  there's no data sources, studies, or analyses that exist that

2  quantify the overcharges borne by the subscriber class and/or

3  the self-funded subclass?

4  A.  I'm sorry.  Let me get to paragraph 12.

5  Q.  Certainly.

6  A.  All right.  I didn't have it before me to -- for the

7  accuracy of your statement.  But paragraph 12 reads --

8  Q.  Fair enough.

9  A.  -- no data sources, studies, or analyses exist that quantify

10  the overcharges borne by the subscriber class and/or the

11  self-funded subclass.  I utilize information produced in this

12  matter in conjunction with relevant academic literature,

13  industry commentary, and my economic expertise to form an

14  opinion on the reasonability of the settlement allocation and

15  injunctive relief provisions upon which I opine.

16      I'd also like to point the Court to paragraph 31, which

17  followed paragraph 30, which we previously read from, which also

18  explains my strategy in generating proxies for overcharges

19  seeking measures that get closer and closer to the overcharge in

20  this matter.  Again, I won't read it and bore the Court with

21  what's already there.

22  Q.  So, Dr. Mason, I'm having a hard time.  Have you performed

23  an overcharge analysis?  Yes or no.

24  A.  Sure.  My analyses are always targeted toward overcharges.

25  And that is my chief objection to objectors' quibbles about one

1  of my approaches, a gross revenue approach, which is also the

2  most distant from an overcharge concept.

3      I perform a gross revenue comparison, then I perform a net

4  revenue comparison, which, according to Ms. Corley, is a valid

5  approach and addresses properly objectors' main complaint that

6  claims payments are included for fully insureds and not for

7  self-funded.  The solution to that is not to add in something

8  artificial to self-funded.  It is to take out claims paid from

9  fully insureds.

10     But then I go on to undertake a relative profitability

11  analysis as well as an analysis of changes in net revenues,

12  which reflect changes to the prices that were discussed with

13  regard to Mr. Ugo, changes of which are indicative of the

14  relative market power.

15     Since the beginning of this class, the group with the higher

16  market power has raised prices by more than the group with the

17  lower market power, quite simply.  That analysis has received no

18  reply whatsoever from objectors save for a statement that they

19  found it confusing.

20     Again, the style of analysis is a style of economic analysis

21  that has been of growing importance in the field of economics

22  for the last 30 years and for which, just this month, three

23  individuals and one posthumously -- not really posthumously, but

24  many people do like the origins of this with them -- was awarded

25  the Nobel Prize.  So for objectors' experts to say they find

```
 1  this difficult to follow I find unfathomable.

 2      I have four analyses, only one of which is really objected

 3  to, the one furthest from the concept of overcharge.

 4  Q.  So was that a yes or a no?

 5  A.  I can repeat it back if you'd like.

 6          THE COURT:  I'm not a jury.

 7          MR. RICHIE:  Okay.

 8          THE COURT:  This is not helpful.  I understood his

 9  answer.

10          MR. RICHIE:  Okay.  Yes, Your Honor.

11  Q.  You undertook an analysis --

12          THE COURT:  And let me make sure I understood your

13  answer.  What you're saying is you don't have the data for each

14  licensee, and it would be difficult to acquire the data for each

15  licensee.  And therefore, you used proxies for the data to

16  inform your analysis.  Is that a layperson's explanation of what

17  you did?

18          THE WITNESS:  Yes, with only one minor correction.

19          THE COURT:  And I'm glad to be corrected by someone

20  smarter than me.

21          THE WITNESS:  Only in a certain very narrow area,

22  potentially.

23          Such data is not only unavailable to me, in some cases,

24  it doesn't exist.  Dr. Pakes, just by way of comparison and the

25  simplest explanation, derived his overcharges from his report on
```

```
 1   Alabama by undertaking something fairly similar to an event
 2   study, looking at what happens to prices when there is entry.
 3   So he doesn't have overcharge either.
 4            It's difficult to look at profits and say how much of
 5   that profit is overcharge and how much is legitimate.  And as
 6   objectors have noted, if you start going down an accounting
 7   rabbit hole, it might -- it doesn't really lead you anywhere
 8   because in economics, as I said earlier -- and in real life --
 9   it's not illegal to make profits.  But there's an amount of
10   profit that we consider overcharge that comes about from market
11   power.  We're trying to tease out what is that extra amount.
12            Now, when I'm saying I haven't undertaken an overcharge
13   analysis, I mean I haven't gone through all 36 market areas.
14   But I'm doing the same thing Dr. Pakes is doing.  I'm trying to
15   get closer and closer to that overcharge.  In my last method of
16   looking at the changes and inflation-adjusted net revenue over
17   time from the beginning of the class period where it's not
18   alleged there was any market power, I find that the price of
19   fully insured coverage rises by a lot more than the price of the
20   self-funded coverage, which, to me, is indicative of the market
21   power -- the greater market power in the fully insured area.
22   And by such ratio, I'm able to look at the ratio of market power
23   between the two areas and utilize that in my assessment of an
24   appropriate settlement multiple in this matter.
25            THE COURT:  Thank you.
```

```
 1            MR. RICHIE:  Your Honor, I'm going to assume your
 2    permission to approach still stands.
 3            THE COURT:  You may.  And you need not ask.
 4            MR. RICHIE:  Thank you.  Your Honor, copies for you.
 5            THE COURT:  Thank you.
 6            MR. RICHIE:  Some of this is duplicative, but...
 7            THE COURT:  This is just his expert report and another
 8    couple of documents?
 9            MR. RICHIE:  The exhibits to his expert report, Your
10    Honor, which were filed under seal.
11            THE COURT:  Yes.  And the declaration of Mr. Feinberg?
12            MR. RICHIE:  Yes, Your Honor.
13            THE COURT:  Thank you.
14    Q.  (Mr. Richie, continuing:)  A couple of questions about --
15    we'll start with the declaration of Mr. Feinberg.  I'm going to
16    be asking questions --
17    A.  If I can -- if I may for just a moment.  I'm sorry.
18    Q.  Yes.
19    A.  I would like to clarify something that was said earlier
20    before I got on the stand.  Another attorney from your firm, I
21    believe, said that I issued two reports in this matter.  I did
22    not.  This is the only report that I've issued in this matter.
23    Q.  Thank you.  I was actually going to ask you that.  Prior to
24    September 2020, have you issued any formal report in this
25    matter?
```

1  A.  No, I have not.

2  Q.  Okay.  Have you reviewed the Burns memo that he referred to?

3  A.  I've seen it in preparation for today.  I believe you

4  attached it to some materials that you sent along.

5  Q.  And did you generally -- did it generally accurately reflect

6  your opinions in this matter?

7  A.  I didn't really look at it for that purpose.  I was

8  surprised that your experts misattributed quotes from that

9  report to me and alleged those were my arguments.  I didn't

10 review it for accuracy.  No.

11 Q.  Okay.

12 A.  I presumed that Mr. Burns accurately represented what I was

13 doing today.  In fact, including the various methods that I

14 applied here, which were certainly more than one at that point

15 in time.

16 Q.  Thank you.  Let's look at paragraph 12 of Mr. Feinberg's

17 declaration.

18    Some background.  Were you present at any sessions with

19 Mr. Feinberg?

20 A.  What do you mean by "sessions"?

21 Q.  Did you ever meet Mr. Feinberg face to face?

22 A.  I recall I was on a Zoom call where Mr. Feinberg was there.

23 I don't know if that was a session in any sense of the word.

24 Q.  I don't mean it in a technical sense.  I meant have you met

25 the man.  I guess by a Zoom call.  About how many times did you

1  speak on Zoom with him?

2  A.  I'm not sure I spoke on Zoom with him during that call.

3  Q.  Okay.  No.  I didn't mean to put words in your mouth.  Thank

4  you.

5  A.  That's the only one I remember.  Yes.

6  Q.  Okay.  So other than that one time where you may or may not

7  have spoken, you do not recall communicating with him orally?

8  A.  Yeah.  I don't recall having any direct conversation with

9  him during that call.

10 Q.  Do you recall sending him any written materials?  I'm not

11 asking what they said, just do you recall sending them.

12 A.  No.  Certainly not directly.  I never had any direct

13 communications with Mr. Feinberg.

14 Q.  Okay.  Did you ever receive any feedback about concerns that

15 Mr. Feinberg had in connection with the mediation?  And again,

16 I'm not asking for the substance of those concerns, just, you

17 know, did someone ever tell you the mediator is interested in

18 this point?

19 A.  Not that I recall.  No.

20 Q.  And do you have any reason to believe that Mr. Feinberg's

21 description of the mediation contained in paragraph -- or at any

22 point in his declaration, but specifically in paragraph 12, is

23 incorrect?

24      (Brief pause)

25 A.  Okay.  Now that I've read that paragraph, can you please ask

 1  that question again?

 2  Q.  Yeah.  Do you have any reason to disagree with how

 3  Mr. Feinberg has summarized the course of the mediation?

 4  A.  I have no reason to disagree with anything in paragraph 12,

 5  no.

 6  Q.  Thank you.  That's my only question about that document.

 7      I'm now going to turn to the packet of your exhibits.

 8          MR. RICHIE:  And, Your Honor, I understand all of these

 9  documents to already be in the record, so I'm not separately

10  marking them as exhibits.

11          THE COURT:  Say that again.

12          MR. RICHIE:  I understand that all of these documents

13  are already in the record.  I'm not separately marking them as

14  exhibits.

15          THE COURT:  That's fine.

16  Q.  I want to speak with you in general so we can see how these

17  documents fit together as what you referred to as a proxy for an

18  overcharge analysis, or building up towards one.

19      You use some documents that you say you received from the

20  defendants in preparing these exhibits; correct?

21  A.  Are you pointing to a specific passage here?

22  Q.  Just the -- I'm referring generally to these printouts and

23  spreadsheets that you prepared and attached as exhibits to your

24  report.  They're full of numbers.  Most of the data in these

25  spreadsheets came from documents you received from the

1  defendants; is that correct?

2  A.  Well, the source of the data is listed in footnote 54 of my

3  report.  This is the text that I did represent earlier was

4  repeated verbatim in the Burns memorandum.

5  Q.  Okay.

6  A.  And this is the paragraph that describes the data.  That's

7  why I was so surprised that objectors claimed they had no idea

8  where I got the data from.

9  Q.  And you don't attach any of these financial and membership

10  data -- you don't attach the sources to your report, do you?

11  A.  I don't attach the sources to my report?

12  Q.  Yeah.  The underlying quarterly financial reports and

13  quarterly enrollment reports, you haven't provided that to the

14  Court, have you?

15  A.  I received them from BCBS.  I'm not sure the degree to which

16  they're protected.  The attorneys have them.  And to the extent

17  that they're available to others, I'm sure they would be willing

18  to pass them along.

19  Q.  What other information, if any, did you receive from the

20  defendants in this case?  Directly from the defendants, I mean,

21  not through a database of discovery information.

22  A.  Direct?  I don't know.  There could have been more.  I never

23  thought about such distinction before.

24  Q.  Okay.  How about in the database?  What kinds of documents

25  did you look at?

```
 1  A.  I cite here internal BCBS presentations of relative
 2  profitability of fully insured and self-funded accounts.  Those
 3  come to mind.  I'm sure there are others.
 4  Q.  But you're referring to the two documents, one of which you
 5  used as the basis for the 6 percent, the other you used as the
 6  basis -- or sorry -- six times over, and the other you used as
 7  the source for ten times over.
 8  A.  Sure.
 9  Q.  Okay.  Other than those two documents -- they're listed by
10  Bates number.  Other than those two and then these quarterly
11  financial and enrollment reports, anything else that you
12  reviewed?
13  A.  Oh, what did I review?  That's another question.
14  Q.  I'm sorry.  Specifically from defendants.
15  A.  There was a great deal of material reviewed.  But what was
16  cited in my report, those are the things that come to mind.  I
17  typically cite things by Bates number if they're from the
18  record, so that would be indicated in my report.
19  Q.  Let's talk about the second line -- excuse me -- the second
20  row of Exhibit 1.  It says self-funded revenue.  Please tell us
21  exactly what that line -- that row includes.
22  A.  So to, in part, link to your prior question, we received a
23  great deal of material from -- we had full access to the
24  Relativity database of all discovery material in this matter.
25  As you noted, I also received material from BCBS in this matter.
```

1   The BVA Group represents about 15 experts, and we have staff of

2   35 to 40 analysts, all -- many of whom -- a large team of whom

3   were involved in understanding the discovery materials and

4   understanding what was in the record that could lead -- or

5   contribute to our analysis in this matter.

6       What we have before us here, as reflected in the description

7   in footnote 54 and also, as I noted, verbatim in the Burns

8   memorandum, is data from the quarterly financial reports, which

9   we were instructed identify the revenues that are subject to the

10  horizontal restraints alleged in this matter.  We have before us

11  in line one the insured premium revenue, which is a defined term

12  in those reports.

13  Q.  I don't mean to cut you short.  I was really just asking

14  about line two, the second row.  All my question was just tell

15  me precisely what that second row includes.

16  A.  Well, one cannot understand what the -- I'll go back to

17  footnote 54 since you seem to be a little bit behind the eight

18  ball here.  I'll read it directly.

19      The QFRs provide fields labeled Premium Revenue, Gross

20  Revenue Included Self-Funded, and Net Revenue.  A note in the

21  report explains that, quote, gross revenue includes fully

22  insured premiums and premium equivalents for self-funded

23  business.  Net revenue is net of self-funded benefit payments.

24  I use the premium revenue as the gross revenue for fully insured

25  plans and calculate the revenue for self-funded plans as the net

1  revenue less the premium revenue, in parentheses, i.e., the

2  component of net revenue that is not attributable to fully

3  insured plans.

4      That is what I call self-funded revenue.  And contrary to

5  what objectors perpetuate in their filings, that is not limited

6  to ASO fees.

7  Q.  Exactly.  I would like for you to tell me everything that's

8  included in that number.

9  A.  I am not the expert on this data.  I think that question

10 would be better posed to BCBS representatives.  This footnote,

11 as I noted, was included verbatim in the Burns memorandum and

12 was transparent since July of this year.

13 Q.  Yes.

14 A.  And my understanding is no one has asked for the data.  No

15 one has asked any questions about the data.  No one has even

16 acknowledged this approach.  Merely there's been an assumption.

17 And objectors have stated in the report that it is an assumption

18 based on what they consider to be a lack of detail in my report

19 about where my data came from that this self-funded revenue

20 merely consists of ASO revenues.

21 Q.  The people that --

22 A.  But if one has questions about the BCBS data -- and

23 specifically, are there particular items in that data -- I would

24 direct them to the BCBS representatives that we also spoke with,

25 which were very helpful and answered every question we had,

1   and they can tell you exactly what's in the data.

2   Q.  So --

3   A.  This data is the data that is directly associated with the

4   horizontal restraints in this matter and, as I understand, is

5   that which is directly related to the claims in this matter.

6   Q.  Thank you.  So you did not ask Blue Cross Blue Shield

7   exactly what's included in self-funded revenue on the second

8   line?

9   A.  I did not need a laundry list of what's included.  My

10  understanding was this is the maximum amount of revenue that

11  could be attributed to the self-funded revenue as represented in

12  line two, and I was comfortable with that for purposes of my

13  assignment.  If objectors have questions, again, I would suggest

14  that they reach out to attorneys in this matter and perhaps

15  attempt to set up some communications with BCBS, who produced

16  this data.

17          MR. RICHIE:  Your Honor, I am considering whether it's

18  the most efficient time now for me to propose the deposition I

19  was speaking about earlier.  I'm trying to ask --

20          THE COURT:  We'll take that up at the end of the

21  hearing.  I'm not ready to make a ruling on that yet.

22          MR. RICHIE:  Thank you.  Should I continue?  I have

23  more questions on this matter, but I just -- I'm worried I'm

24  not -- I'm trying to ask rifle-shot questions; I'm getting long

25  answers.  It's not the witness's fault, but we need to -- I want

1   to be respectful.  And I don't want to keep going, but this is

2   my only chance to talk to him.

3          THE COURT:  Well, look, here's the deal.  We've been at

4   this for a day and three-quarters.  If -- based upon the

5   schedule, we have two hours left.

6          MR. RICHIE:  Yes, Your Honor.

7          THE COURT:  We have your expert that needs to go on.

8          MR. RICHIE:  Yes.

9          THE COURT:  Okay?  We've spent a lot of time me trying

10  to understand what your arguments were before we got to this

11  point, and I think we got wrapped around the pole a few times

12  there.  That killed time.  I think you've got five minutes to

13  wrap it up with this witness.

14         MR. RICHIE:  Yes, Your Honor.  Thank you.  I will --

15  while I'm sorting out my questions and picking the best of the

16  rest, I will lodge an objection.  This is our sole chance, but

17  I'm going to keep moving.

18         THE COURT:  What objection are you lodging?

19         MR. RICHIE:  This is our only chance to speak with this

20  witness.  I don't believe we've been given an adequate time.  I

21  object to the narrative answers I've been receiving.  I've not

22  objected to them to this point, but I would -- I'm trying

23  to move as quickly as possible.

24         THE COURT:  Okay.  I'm overruling that objection.  I

25  don't think there's anything inappropriate about the witness's

1  answers to your questions.

2          MR. RICHIE:  Thank you.

3  Q.  You would agree, would you not, that large fully insured

4  plans and ASO plans or self-funded plans are substitutes;

5  correct?

6  A.  Again, that's misquoting my report.  My report characterizes

7  them as imperfect substitutes.

8  Q.  Okay.

9  A.  Using almost the same description as the Court used in their

10 April 2018 -- I'm sorry -- I'm not sure if it's a ruling or

11 other document in this matter, but the Court's April 2018

12 writing.

13 Q.  You would agree that most large plans can self-fund;

14 correct?

15 A.  I don't think I disagree with that.  Most large plans do

16 self-fund.

17 Q.  So a large fully insured plan has the choice to self-fund as

18 a general matter.

19 A.  I can't say what a large plan that self-funds' choice is.

20 Generally larger firms tend to be the ones that self-fund

21 because they have the financial capacity to do so and they have

22 the ability to devote staff to monitoring that function, where

23 smaller firms typically don't.  Some small firms self-fund and

24 some large firms don't self-fund.

25 Q.  But it's their choice.  It's not a lack of capacity.  It's

```
 1  not that they can't.  It's that they choose not to.
 2  A.  Who's they?
 3  Q.  The firms themselves.
 4  A.  The large firms or the small firms?
 5  Q.  The large firms.
 6  A.  On the large firm side, well, I'm not sure that I agree with
 7  that.  Some large firms run -- have a great deal of cash flow
 8  volatility such that they wouldn't want to tie some of that
 9  volatility up with an ASO plan or might just find the function
10  so far outside of their regular operations that they don't feel
11  capable of running an ASO plan.  I think you'd have to ask one
12  of those firms.
13  Q.  Thank you.  One factual question for you.  Are you aware
14  that any self-funded plans reimburse the Blues for cost of
15  claims and the Blues pay those claims directly to providers?
16  A.  I've heard something similar to that quote.  I understand
17  that can happen sometimes.  I understand typically one can think
18  of -- there's an arrangement that one can think of as a margin
19  account that's held at the provider -- I'm sorry -- not the
20  provider, the -- the company providing the ASO services such
21  that they can pay out of that account.
22      Now, the company will need to top up that account, as they
23  would a margin account.  Sometimes expenditures might exceed
24  that account, and the ASO company might make payment out of
25  their own account and ask for that to be reimbursed.  So there
```

```
 1   are a lot of potential arrangements this way and a lot of ways
 2   that things can work out idiosyncratically, occasionally.
 3   Q.  But it's your opinion that payments to third parties in this
 4   case are irrelevant for the damages analysis that you've
 5   performed; correct?
 6   A.  Well --
 7   Q.  Sorry.  Not damages analysis, just the analysis that you
 8   performed.
 9   A.  Well, yes, payments to third parties are payments to third
10   parties.
11   Q.  Uh-huh.  What about payments to the Blues?  Do you view
12   those as being irrelevant?
13   A.  What types of payments to the Blues?
14   Q.  Any payment to the Blue.
15   A.  I'm sorry.  That question -- can you refocus that a little
16   bit?  That doesn't make sense to me.
17   Q.  I'm going to start with a categorical question.  A payment
18   is made to a Blue by a member of the damages class.  Do you view
19   that as being irrelevant to your analysis?
20   A.  Well, you'd have to define "paid to the Blue."
21   Q.  You can give me whatever definition you like.
22   A.  If we go back to the concept of revenue and this distinction
23   between revenue and premium equivalent, particularly in the
24   context of paid claims, I'm satisfied with my gross revenue
25   analysis, and it's reasonable in accuracy because those payments
```

1  that come through the ASO to pay claims are not characterized as
2  revenue.  They're just not.  Revenue has a meaning in economics
3  and in accounting, and it is money that's taken in, for
4  instance, in return for the sale of goods and set against the
5  cost of those goods, upon which there is earned a profit.  Those
6  flow-through payments are not revenue in the same sense.
7      That being said, I don't rely exclusively or solely upon
8  that gross revenue analysis.  I merely set it up as the most raw
9  application of the data for purposes of comparing a starting
10  multiple and work from there.  As was noted previously, that's
11  my lowest multiple.
12  Q.  Okay.
13  A.  I don't seek to drive that any lower, but it's there as a
14  data point.  And I think Mr. Burns suggested if one wanted to,
15  one would Winsorize my observations, throw out the highest and
16  the lowest, and you'd be left with a grouping that's, in fact,
17  lower than six and a half percent.
18  Q.  I've got two more questions.  I recall you giving testimony
19  when Mr. Burns was asking you questions where he was asking you
20  about certain items and fees that are listed in our brief that
21  say these are items that Dr. Mason should have considered.  At
22  that time, we were talking about what we call the Burns report.
23  Do you recall that testimony?
24  A.  I remember him listing some items.  I'm not sure that ended
25  up being a question for me, but I recall such listing and I

1  recall that from objectors' reports in this matter.

2  Q.  And I seem to recall you saying that those -- and I might be

3  misremembering.  Either you saying or him saying that those fees

4  weren't at issue in the current complaint.  Do you recall that

5  line of questioning?

6  A.  You'd have to -- perhaps you could reread that from the

7  record.  I'm sorry.  This is a function of that being this

8  morning and this being this afternoon.

9  Q.  I understand.  We're human.

10 A.  And I want to -- this sounds like something I want to make

11 sure is accurate before we go down this rabbit hole.

12 Q.  Certainly.  I can give you -- I can give you a copy of that

13 brief if you hold on just a second.

14     (Brief pause)

15 A.  Also, just to help save time -- my point is not to hold

16 things up, and I think I can answer this in a more general

17 sense.

18     To the extent that any of those are relevant revenue from

19 the perspective of the horizontal allocation scheme that we have

20 before us, those are included in the QFR data which I've used.

21 To the extent that they're not included in the QFR data, they're

22 not directly affected by the horizontal allocation scheme, and

23 they don't seem to me to be relevant to this matter.

24 Q.  Okay.  What I wanted to harken you back to -- and I

25 appreciate that clarification.  You said that if -- you did not

 1  understand that those fees were the subject of the allegations

 2  in the complaint.  And I've put the list there in front of you.

 3  Do you recall that testimony, saying that you were triggering

 4  what you analyzed based on what was alleged in the complaint?

 5  A.  That seemed to be two questions.  In answer to the second

 6  question, I would say yes.  Throughout my analysis, I sought to

 7  link my analysis to monies that were found at issue in this

 8  matter, in particular, monies affected by the horizontal

 9  restraints here, realizing there's some boundary across which

10  it's difficult or potentially impossible to show an effect of

11  the horizontal restraints.

12      I believe Mr. Boies mentioned earlier that at a certain

13  point, you might get two different theories of antitrust to

14  involve these other moneys that were not directly affected by

15  the horizontal territorial restraints.  And my understanding is

16  that plaintiffs and objectors have never alleged that any other

17  monies are involved here, and no other analysis has been done on

18  other theories of antitrust that would implicate such monies.

19  Q.  But you would agree that if the fees are alleged in the

20  complaint to be a part of the horizontal price-fixing or the

21  antitrust behavior described -- anticompetitive behavior

22  described in the complaint, that they are something that should

23  be analyzed?

24  A.  Let's see.  Are we referring now to the extra fees that

25  objectors allege should be included --

1  Q.  What I'm trying to do is --

2  A.  -- penning that little bit of language in the complaint?

3  Well, those extra frees are already included in the fully

4  insureds, so they're on both sides.

5  Q.  This is my first time to talk to you.  I'm just trying to

6  get the outlines of your opinion about what's relevant to be in

7  and what should be out of the analysis.  So that was the basis

8  of my question.

9      As you understand it, if it's in the complaint, it's fair

10  game for your analysis.  If it's out of the complaint, it's

11  outside your analysis.  Is that a fair summary?

12  A.  No.

13  Q.  Okay.  Please, can you say what that summary is with that?

14  It's my last question.

15  A.  As I said before, my footnote 54 reflects the data that I've

16  used for my analysis.  It's my understanding that BCBS

17  representatives have represented to me and my team that this is

18  the data that is directly affected by the alleged horizontal

19  restraints in this matter and, therefore, this is the data

20  regarding the money at issue in this case that would be the

21  source of a potential overcharge arising from such horizontal

22  territorial restraints.

23  Q.  Okay.  So footnote 54 is where I should go, not the

24  allegations of the complaint?

25  A.  Well, the data that's described in footnote 54 was matched

1    against the complaint.  If you have questions about what's

2    included in that data and whether it includes elements of the

3    complaint, I'm happy to answer those questions as I can.

4        As I've said, the allegation by objectors that my

5    self-funded revenue is limited only to ASO fees is patently

6    false.  But beyond that, what is included and excluded can be

7    indicated to you by BCBS representatives.  I would suggest you

8    talk to attorneys in this matter and ask for this data and

9    analyze this data to better answer your own questions about

10   what's in this data that I think objectors have been aware of

11   since July.

12           MR. RICHIE:  Your Honor, can I move to strike that last

13   answer as --

14           THE COURT:  No.

15           MR. RICHIE:  Okay.

16           THE COURT:  We're not in front of a jury.  I can weed

17   through things.

18           MR. RICHIE:  Yes, Your Honor.

19           THE COURT:  And for every time you mention something

20   like that, it's just something else we can't get to.

21           MR. RICHIE:  It is legitimate for me to want to know

22   the sources on which he's relying.  I asked him what's in the --

23   what he got, what he included.

24           THE COURT:  All right.  So what were the sources you

25   relied upon in reaching this particular conclusion in your

1    report?

2         THE WITNESS:  There was the sources described in

3    footnote 54, the quarterly financial reports, and the quarterly

4    enrollment reports issued by BCBS that contain all the revenues

5    that are associated with national best efforts and local best

6    efforts and used to measure those.  So they're all the revenues

7    that relate to the horizontal territorial restraints in this

8    matter.

9         THE COURT:  Any questions about that answer?

10   Q.  My question was specifically how those relate to the

11   categories in the complaint that you testified about earlier.

12   Did you compare that list against the categories of fees that

13   were alleged in the complaint?

14   A.  I'll repeat my same answer or not, if the Court wishes me --

15        THE COURT:  Let me ask this before we --

16        THE WITNESS:  Thank you.

17        THE COURT:  I'm laying a foundation for that question.

18   Did you use the complaint as one of your primary sources of

19   information to piece through your economic analysis, or did you

20   use something else in addition to the complaint, or did you not

21   use the complaint at all?

22        THE WITNESS:  Thank you.  Sorry to retread ground.

23   I'll try to do so quickly.

24        Let's go back to our discussion about the if you know

25   one Blue, you know one Blue.  This data is different for every

 1  Blue.  It -- and in fact, I think objectors even say there are
 2  different terms for these things in their lists, and they're
 3  difficult to track through Blue by Blue.  What I needed was a
 4  consistent set of reported data that related to the horizontal
 5  territorial restraints, our part of the complaint.  So in that
 6  sense, I sought to equate the data that I used to the claims in
 7  the complaint.
 8          Your question seems to be did I go through and look for
 9  these different classifications, which objectors admit are not
10  called the same things in every Blue --
11          MR. RICHIE:  Okay.
12          THE WITNESS:  -- or even every plan that's issued by
13  every Blue.  And the answer is obviously not, because they don't
14  even go by the same name.  And reconciling those would be
15  difficult, if not impossible, as objectors point out.  So I
16  didn't undertake that exercise.
17  Q.  So you don't --
18          THE WITNESS:  I relied upon the Blues themselves to
19  represent to me what revenue is touched by these horizontal
20  territorial restraints, which is the main piece of the complaint
21  with which we're concerned here.  To some extent, it's my
22  understanding this revenue does cover some of these categories
23  expressed in general terms.  But did I try to forensically put
24  those back together and say exactly what's in that bucket?  No,
25  I did not.  As you note -- as objectors note, that would be a

1  Herculean exercise and also of little value to my exercise here,

2  which is to allocate or look for indicia by which to judge that

3  an allocation that's been negotiated may or may not be

4  reasonable in this matter.

5  Q.  (Mr. Richie, continuing:)  Who specifically at the Blues did

6  you communicate with?

7  A.  That, I do not recall.

8  Q.  Generally, who did you communicate with at the Blues?

9  Describe the person as best you can.

10  A.  I think the attorneys here would be better situated to

11  answer that question.  They set up all such communications and

12  were party to all such communications.

13  Q.  How did you receive that communication from the Blues?

14  A.  I know there were a number of telephone calls --

15  Q.  When did those calls --

16  A.  -- with representatives that understood this data and were

17  there to answer our questions.

18  Q.  When did those calls occur?

19  A.  They would have occurred in late 2019, maybe going into

20  early 2020, but they might have -- we started work on this in

21  about September 2019.  I think we strived to answer our

22  questions and get a reliable data source as quickly as possible.

23          THE COURT:  Mr. Richie, I gave you five more minutes 17

24  minutes ago.

25          MR. RICHIE:  I know, Your Honor.

```
 1                THE COURT:  All right.  You may sit down.

 2                MR. RICHIE:  Thank you.

 3                THE COURT:  All right.  Anything further with this

 4    person?

 5                MR. BURNS:  Nothing further, Your Honor.

 6                THE COURT:  All right.  Dr. Mason, you may step down.

 7                All right.  So I am going to give the same courtesy to

 8    the objectors that I gave to Mr. Burns, and that is in

 9    presenting your expert, I'm going to give you up to 15 minutes

10    to lay the foundation or give me some context of what he's going

11    to testify about.  And then we'll turn it over to

12    cross-examination.  Fair enough?

13                MR. MULLINS:  Yes, sir.  Yes, Your Honor.

14                THE COURT:  Okay.  And I know we know who it is, but

15    formally announce your next witness.

16                MR. BURNS:  Your Honor, just briefly, can Mr. Mason

17    be -- or Dr. Mason be excused?

18                THE COURT:  Yes.

19                MR. BURNS:  Thank you.

20                MR. MULLINS:  Your Honor, the self-funded objectors

21    would call Ugo Okpewho as our witness.

22                THE COURT:  Thank you.

23                Welcome, sir.

24                THE WITNESS:  Thank you.

25                MR. CRAMER:  I just want to hand out and make sure
```

1   everyone has a copy of his report.

2       (Off-the-record discussion)

3           THE COURT:  Do you have a copy for me?

4           MR. CRAMER:  I do.

5           THE COURT:  Thank you.  I think I have one, but that

6   will keep me from digging.  Thank you.

7           THE CLERK:  Raise your right hand, please.

8       (The witness is administered the oath)

9           THE CLERK:  Be seated, please.

10          State your name for the record, please.

11          THE WITNESS:  Ugo Okpewho.

12          THE CLERK:  And spell your first and last names for the

13  record.

14          THE WITNESS:  First name, U-G-O.  Last name

15  O-K-P-E-W-H-O.

16          THE COURT:  All right.  You may proceed when you're

17  ready.

18          MR. CRAMER:  Thank you, Your Honor.

19                          **UGO OKPEWHO**

20  The witness, having sworn or affirmed to speak the truth, the

21  whole truth, and nothing but the truth, testified as follows:

22                          DIRECT EXAMINATION

23  MR. MULLINS:

24  Q.  And you have given us permission to call you Ugo.  Thank

25  you.

1  A.  Correct.

2  Q.  Mr. Ugo, you've been employed at BDO since May of 2020; is

3  that correct?

4  A.  Correct.

5  Q.  And your position is director and health actuarial leader;

6  is that right?

7  A.  Health care -- health care advisory, health care actuarial

8  leader.  Yes.

9  Q.  Thank you.  And for purposes of today's hearing, you and

10  Mr. Watson, also from BDO, have prepared two reports for the

11  Court.  Am I right about that?

12  A.  Correct.

13  Q.  Can you quickly explain for the Court what training you have

14  had to become an actuary.

15  A.  Sure.  Unlike you lawyers who go to law school for three

16  years, we -- you know, we actually take rigorous exams -- that

17  was a joke.  We take very rigorous mathematical quantitative

18  exams for, you know, a period of eight to 12 years.  We

19  specialize in, you know, a sector.  I specialized in health

20  care.

21      I've worked for -- I've been in the health care industry for

22  about 21, 22 years, 12 years working with various Blues plans,

23  Blue Cross of Maryland, New Jersey.  I've also done health care

24  consulting work on this, you know, very matter for a long time

25  as well.  So...

```
1    Q.   Thank you.  And I believe you told me at one point in time
2    that there are more lawyers in Brooklyn than there are
3    credentialed actuaries in the entire country.
4    A.   That is true.  Yes.
5    Q.   Can you explain briefly what you do in your job currently at
6    BDO?
7    A.   Sure.  At BDO, I work for -- I work on behalf of employers
8    of all sizes, all types of industries, you know, tackling health
9    care risk, health care claims costs, projecting their claims,
10   their forecasting, pricing, helping them get the best health
11   care deals possible.
12        Health care is, you know, 17 to 20 percent of the GDP.  It's
13   rising.  It's the most, you know, unsustainable sector of our
14   country.  And, you know, people come up with different ways to
15   try to, you know, cut costs and save money.  And, you know, my
16   job is to work with fully insured groups as self-funded groups
17   to, you know, try to get them the best health care deals and
18   save them money as possible, using a variety of programs and
19   measures.
20   Q.   And so part of what you do includes analyzing and comparing
21   the differences in costs that health care insurers want to
22   charge employers for purchasing either a fully insured plan or a
23   self-funded plan.
24   A.   Exactly.  You know, we do an exercise with all our clients
25   every year.  We say, okay, is this the -- you know, if they're
```

```
 1  fully insured, we say is this the year you go self-funded?  And
 2  we do an analysis.  We say, okay.  What -- you know, we look at
 3  all the carriers, you know, Blues Cross's quotes, Aetna's
 4  quotes, United's quotes; and we take them through the exercise
 5  saying, you know, under a fully insured engagement, this is how
 6  much you end up paying.  And that's more -- more easily
 7  forecasted because you know it's a fixed cost and, you know, you
 8  essentially multiply it by the number of employees you have
 9  every month or every year and you know -- plus or minus, you
10  know, some degree of uncertainty -- you know how much you're
11  going to spend.
12      For the self-insured, we -- you know, we do a claims
13  projection.  We say, okay, you know, since you're at risk for
14  the claims, this is how much we expect you to expend on the
15  claims side.  And then you take the ASO fee, you attach that,
16  attach all the fees like stop-loss and all the programs that
17  the employer chooses to, you know, provide for the employees.
18  And we compare the cost every year.  Some years, you know, it's
19  advantageous for you to go fully insured.  Some years it's
20  better for you to go self-insured.  So this is an exercise we do
21  with all our clients.
22  Q.  And so it sounds like what happens from year to year is
23  there are some employers that switch back and forth between a
24  fully insured plan and a self-funded plan.
25  A.  Absolutely.  Yes.
```

```
 1  Q.  And would you consider them substitutes one to another?

 2  A.  I would say so in that context, yes.

 3  Q.  So when you're analyzing the potential cost of the

 4  self-funded coverage, it doesn't sound like you analyze just the

 5  ASO or this administrative fee that the employer will incur.

 6  You also analyze the cost to the employer of what have been

 7  referred to here as value-added services and other programs

 8  along with the projected medical claims cost as well.  Am I

 9  right about that?

10  A.  Exactly.  Yep.

11  Q.  And at BDO, do you analyze Blue Cross plans?

12  A.  Yes, we do.

13  Q.  And these value-added or other programs, there's a whole

14  laundry list, and I promised Judge I'd let him know what they

15  were.  Stop-loss insurance?

16  A.  Yes.

17  Q.  Actuarial services?

18  A.  Exactly.  Yes.

19  Q.  Provider network access?

20  A.  Yes.

21  Q.  Medical management -- medical cost management services?

22  A.  Yeah.  That's a big one.  Yeah.

23  Q.  Disease management?

24  A.  Uh-huh.  Yes.

25  Q.  Wellness programs?
```

```
 1  A.  Yes.

 2  Q.  Other administrative and PBM services?

 3  A.  Yes.

 4  Q.  Which would be pharmacy benefit management services?

 5  A.  Yes.

 6  Q.  Dental insurance?

 7  A.  Yes.

 8  Q.  Vision insurance?

 9  A.  Yes.

10  Q.  Life and disability insurance?

11  A.  Yes.

12  Q.  Radiology benefit management and analytics?

13  A.  Yes.

14  Q.  And personal health care services?

15  A.  Yes.

16  Q.  And those are all of these value-added services that are

17  included in self-funded plans if an employer chooses to use

18  them?

19  A.  Yes.

20  Q.  And they have to pay for each one of those?

21  A.  Exactly.  Yes.

22  Q.  Do these items also include -- are they also included in

23  fully insured plans?

24  A.  Yes.  Exactly.  They are.  They're just bundled in one rate

25  that the -- that the employer is comfortable paying.
```

1  Q.  So these value-added services are included in both types of

2  plans?

3  A.  Both types of plans, yes.

4  Q.  And so when you're doing your analysis, you have to account

5  for both -- for all services for both plans.

6  A.  Precisely.  Yes.

7  Q.  The value-added products that we've talked about that are

8  paid for by the fully insured plans as a part of this bundle,

9  are those impacted by the Blue Cross conduct in this case?

10 A.  Yes.

11 Q.  And would the cost of the value-added services incurred by

12 the self-funded plans also be impacted by the Blue Cross conduct

13 in this case?

14 A.  Yes.

15 Q.  Do you make any distinction when you're trying to price

16 these plans and figure out what the costs are going to be

17 between a fully insured plan and a self-funded plan in terms of

18 these value-added services?

19 A.  No.  I mean every -- you know, Blue Cross, every member is

20 treated the same.  That's -- that's -- I think that's the basic

21 thing that's being missed here.  You know, if -- you know, this

22 case is about an antitrust case; right?  You know, Blue Cross

23 Blue Shield, you know, values each member the same.  You know,

24 they need a multitude of members so they can position themselves

25 better when they're negotiating contracts with, you know,

```
 1   physicians and hospitals.
 2       And, you know, one individual that happens to work for a
 3   firm, same exact plan, same risk profile, same morbidity,
 4   average morbidity, you know, same lifestyle, they -- you know,
 5   they have two separate -- they have, you know, pretty much the
 6   same plan.  One works for a firm that self-funds and another
 7   works for a firm that fully insured -- fully insures.  They
 8   incur the same costs when they go to the hospitals or, you know,
 9   see the physicians buying the same plan.  And, you know, Blue
10   Cross's power is essentially in their networks and how, you
11   know, deep they can negotiate discounts with hospitals and
12   providers.
13       And that's why you must include the claims cost on the
14   self-insured side to build up the fully insured rate because
15   that's being done on the same side.  When you look at the fully
16   insured rate, it's essentially the same thing.
17       You know, the only -- I'm sorry.  The only real difference
18   is, you know, who takes the risk on the claims.  On the
19   self-insured side, the -- you know, the employer says, you know
20   what, I mean, I think I can manage my claims a little better
21   this year.  Next year it may be different; but this year, I
22   think I may be able to, you know, manage my claims a little
23   better.
24       So on the fully insured side, the -- Blue Cross pays -- you
25   know, takes risk on the claim and adds a little premium on that
```

 1  risk.  So, really, you know, the claims are on the same basis

 2  but just a little bit of, you know, risk markup on the claims

 3  because they're the ones taking on the risk for the claims.

 4  So...

 5  Q.  So when you're pricing these plans for employers and they're

 6  trying to make a decision about fully insured or self-funded, do

 7  you account for some purported lack of competition among fully

 8  insured plans versus self-insured and TPA competition that may

 9  be there against Blue Cross?

10  A.  Not at all.  No.

11  Q.  Have you ever heard anything like that when you're trying to

12  decide who's going to pay what?

13  A.  No, I haven't.  I've been in the industry two decades.  I

14  have a deep network of, you know, not just actuaries like

15  myself, but health care professionals in, you know, marketing,

16  sales, advertising, working for Blues, United, Aetna, different

17  firms.  And this has never come up.

18  Q.  So is what I'm hearing from what you said earlier that the

19  difference in how you price a fully insured product for a Blue

20  Cross plan versus a self-funded plan is you build -- Blue Cross

21  will build in a risk factor into the fully insured premium

22  because of the potential that claims costs could get higher than

23  what they were intended to be initially when premiums began

24  being paid?

25  A.  Yeah.  Largely.  Exactly.  So that and -- you know, you have

1  the individual market, the small group market.  There are a lot

2  of transient members that go in and out of the individual

3  market.  There's -- you know, there's some more risk to that.

4  Small group market, you have smaller -- you know, under 50

5  lives.  You know, you don't have as many -- as many people --

6  you don't have enough people to dampen some of the, you know,

7  catastrophic claims or, you know, claims that things may be

8  adverse.  So, you know, you're taking a little bit more risk and

9  you're insuring these people that you're mandated to insure.

10 So, you know, there's -- so, you know, there's a risk factor

11 with just, okay, these are claims that I'm paying.  But you

12 also, you know, tack on a couple of things for risk as well.

13 Q.  So just to be clear, the rates and the differences in the

14 prices that are being paid for fully insured versus self-funded

15 is based primarily on risk to Blue Cross, not on some alleged

16 competition --

17 A.  No.

18 Q.  -- or lack of competition out in the self-insured versus

19 fully insured markets?

20 A.  Yeah.  Risk, taxes and fees, you know, their building a

21 profit, things like that.  But, you know, I have it in my

22 report.  You know, on average, it's 20 to 35 percent of spread

23 between the average fully insured plan and a fully built-up

24 premium equivalent self-funded plan.

25 Q.  And is this premium equivalent methodology that you've used

 1  in your report to determine this risk -- or the allocation, 20

 2  to 35 percent higher cost to the fully insured, is premium

 3  equivalent the industry standard to do that?

 4  A.  Absolutely.  Yeah.  I mean, because it's -- you know, no

 5  employer comes to you and says, oh, you know, I'd like to see

 6  what the ASO fee is.  You know, that's -- that's just a small

 7  portion of things.  You know, people are concerned about what's

 8  my health care cost going to be, how much am I going to pay, how

 9  much am I going to, you know, charge to my employees in terms of

10  contributions.  You know, it can be a very, very complicated

11  analysis, especially for a large plant who have, you know,

12  unions and different types of groups that they want to protect.

13  But, you know, the basic premise of it is what's my health care

14  cost going to be.

15      You know, and in the self-funded arrangement, the employer

16  takes the -- you know, takes on the risk for it.  But it's --

17  you know, it's part of -- you know, it's the same network.  It's

18  the same network for the fully insured plans and the self-funded

19  plans.  People are seeing the same doctors, the same -- you

20  know, the same, on average, procedures are being done.  So, you

21  know, looking at just an ASO fee and comparing it to a fully

22  insured premium is a completely flawed way to look at things.

23  Q.  In your 12 years of working at Blue Cross, did anyone ever

24  suggest to you that these rate differentials between fully

25  insured and self-insured were based on anything other than the

1  risk factors that you've testified about plus the taxes and

2  fees?

3  A.  No, not at all.  It's a --

4  Q.  Never heard that from anybody?

5  A.  Yeah.  Yeah.  I mean, you have to be in the health care

6  industry to -- it's a very, very, you know, nuanced, complicated

7  industry.

8      And, you know, I respect Dr. Mason.  And, you know, I'm sure

9  he's -- I mean, he's obviously a very bright man.  But, you

10  know, you need to possess a deep health insurance, health care

11  knowledge to understand these things.  Even his reports -- you

12  know, I mean it's clear that, you know, he probably just took

13  the report and, you know, talked to a couple of people and, you

14  know, used it.  You know, even within Blue Cross sometimes we

15  got data and we had to scrub it and, you know, look at it

16  different ways and understand where it came from and talk to all

17  the parties involved.  And, you know, you really have to

18  understand the data that you're using.

19  Q.  Did he use some economic theories that don't apply to the

20  health care industry in this case versus real-world analysis

21  that you did?

22  A.  I think that, you know -- I mean, I think that his analysis

23  was -- you know, would work on a different setting.  You know, I

24  mean, I just think that his basic -- you know, the basic premise

25  of his work was flawed to begin with.  You know, he used -- you

 1  know, his whole argument is using an ASO rate.  And he's looking

 2  at profitability and, you know, price increase differences and

 3  everything and comparing that to a fully insured rate.  And

 4  that's -- like that's not apples to apples when you're talking

 5  about health care costs, especially when you're dealing with an

 6  antitrust case where Blue Cross is affecting the market by, you

 7  know -- you know, dominating the market by, you know, provider

 8  contracts --

 9       (Technical interference)

10           THE WITNESS:  I'm sorry.  Did you guys hear that?

11           THE COURT:  Yes.  I think we all heard that.  We're not

12  sure what it was.

13           I think you're about at your time.

14           THE WITNESS:  Okay.  Yes.  Sorry.

15  Q.  So we heard from Dr. Mason that his theory is that Blue

16  Cross is able to get self-funded business because there's a lack

17  of competition in the TPA industry.  In your professional

18  experience of 20-plus years, what is it that drives self-funded

19  business to Blue Cross?  Is it this lack of competition in the

20  TPA marketplace, or is it something else?

21  A.  It's the networks, Blue Cross's networks.  They -- you know,

22  it allows, you know, people to -- it allows them to negotiate,

23  you know, deep discounts and, you know, get favorable pricing in

24  the marketplace.  It's the networks that attract everyone.

25           THE COURT:  I think you became the Blues expert just

```
 1   then.
 2          THE WITNESS:  You think I did?  I mean, I was with them
 3   for 12 years, so...
 4          THE COURT:  All right.  Thank you.
 5          Cross-examination?
 6          MR. BOIES:  Thank you, Your Honor.
 7          THE COURT:  How much time do you think you need,
 8   Mr. Boies?
 9          MR. BOIES:  I'll try not to take longer than they did.
10   I don't know whether I'll succeed.
11                          CROSS-EXAMINATION
12   BY MR. BOIES:
13   Q.  Good afternoon.
14   A.  Good afternoon.
15   Q.  We haven't met, but my name is David Boies.
16   A.  Hello, David.  Nice to meet you.
17   Q.  And you understand that I represent the plaintiffs here?
18   A.  I do.
19   Q.  Now, you said that the prices that Blue charge -- Blue Cross
20   charged for all of the services were impacted by the Blue Cross
21   conduct in this case.  Do you recall that?
22   A.  I recall saying that, you know, if -- if this matter, which
23   I believe it is, refers to the antitrust practices of Blue
24   Cross, then, you know, all claims -- all health care claims,
25   which represent 80 to 85 percent of total premiums, are
```

1  affected.  And that impacts self-funded and fully insured

2  employers and employees the same way.

3  Q.  Are you saying that Blue Cross charges to both ASOs and

4  fully insured customers include an overcharge because of the

5  anticompetitive conduct that's involved in this case?

6  A.  I'm not saying that.  No.

7  Q.  You're not saying that.

8  A.  No.

9  Q.  Does it?

10  A.  Can you speak into the mike?  I'm sorry.

11  Q.  Sure.  When Blue Cross charges fully insured companies

12  premiums, in your opinion, does that include an overcharge as a

13  result of the competitive constraints alleged in this case?

14  A.  I'm not claiming that.  No.  Blue Cross charges fully

15  insured customers a fully insured rate.  They turn around and

16  they charge self-funded employees an ASO rate.  But that ASO

17  rate is only a fraction of the health care costs for them.

18  Q.  Let me ask you to listen to my question.  Blue Cross charges

19  fully insured customers a premium; correct?

20  A.  Yes.

21  Q.  Does that premium include an overcharge as a result of the

22  conduct that is alleged in this case?

23  A.  I'm not stating that.  No.  I mean, that was --

24  Q.  I'm asking you, sir.  Does it?

25  A.  I don't know that.  I mean, I don't know.  I mean, that's

1   not the scope of my -- of my analysis and my involvement.

2   Q.  When you were working for Blue Cross of Maryland, did Blue

3   Cross of Maryland overcharge customers?

4   A.  I can't state that.  I don't know.

5   Q.  Well, when you were working for Blue Cross of New Jersey,

6   did Blue Cross of New Jersey add in a charge as a result of

7   their competitive market power resulting from the competitive

8   constraints that are involved in this case?

9   A.  I can't state that.  I don't know.

10  Q.  Did you ever make any effort to determine how much

11  overcharge, if any, Blue Cross's fully insured customers paid?

12  A.  No.  I don't know -- no.

13  Q.  Did you ever make any effort to determine how much

14  overcharge, if any, Blue Cross's self-funded customers paid?

15  A.  No, I did not.

16  Q.  Have you ever been involved in a case to try to allocate

17  damages among class members?

18  A.  An antitrust case, no.  But my partner, who's a partner at

19  BDO's Center For Health Care Excellence, he and I wrote this

20  report.  He's been in multiple of those.  I have never.

21  Q.  He's been in all sorts of what?

22  A.  He's been involved in antitrust cases before, but I have

23  not.

24  Q.  This partner of yours who is not here, has he ever been

25  involved in allocating damages among class members?

1  A.  You'll have to ask him.  No, I don't know.

2  Q.  Okay.  You said that Blue Cross values each member the same,

3  whether it's fully insured or self-funded.  Did I hear you

4  right?

5  A.  I believe so, yes.  That's my belief.  Yeah.

6  Q.  That's your belief?

7  A.  That's my belief working there for a dozen years, yeah.

8  Q.  When you were working at Blue Cross, did you ever see any

9  reports that said that a fully insured member is worth ten times

10  a self-funded member?

11  A.  I did not.  No.

12  Q.  At any time, have you ever seen any evidence of that?

13  A.  I don't believe I have.

14  Q.  Did -- did the counsel that employed you show you any

15  documents that said that a fully insured member is worth ten

16  times a self-funded member?

17  A.  I do recall seeing something like that.  I don't -- you

18  know, it wasn't -- it wasn't part of my argument.  It wasn't

19  parts of my point.  But I do recall seeing something like that.

20  Yeah.

21  Q.  So you did -- you did see a document that said Blue Cross

22  valued a fully insured member ten times a self-funded member;

23  correct, sir?

24  A.  I -- I think I did.  Yeah.

25  Q.  And that would indicate, would it not, sir, that Blue Cross

1   does not value each member the same?

2   A.  You know -- you know, who wrote that report?  I'm not sure,

3   you know, the validity.  I don't know what data they used.  I

4   don't know the accuracy of it.  I -- you know.

5   Q.  Well, it was a Blue Cross document, though; right, sir?

6   A.  I don't remember it being a Blue Cross document.

7   Q.  Did you make any effort to investigate how reliable it was?

8   A.  I did not.  No.  I was focused on -- on, you know, the

9   points that I was making and, you know, I looked at it from

10  different perspectives.  And, you know, many -- you know, many

11  other routes were incorrect, but this -- the route I took, I --

12  I thought was, you know, the most accurate.

13  Q.  One of the points you made was that Blue Cross believes

14  every covered life is equally valuable.  That's one of the

15  points you made in your testimony; right?

16  A.  Yes.  And I do believe that.  Yeah.

17  Q.  And you do understand that this document that you saw is

18  inconsistent with that; correct?

19  A.  Sure.  Could be.

20  Q.  Well, it is inconsistent; right?  It says ten times.  That's

21  obviously not the same.

22  A.  Right.  But I believe that Blue -- you know, having worked

23  there over a decade, I believe that Blue Cross values every

24  member equally.  You know, it is -- it is the empire.  I mean,

25  they need the members in the empire to be able to help them in

1  negotiations with hospitals and, you know, providers and

2  physicians.  And that's -- and that's what they value the most.

3  Q.  When you talk about the Blue Cross empire, talking about the

4  Blue Cross system?

5  A.  Yeah.  System -- the system, number of -- number of lives,

6  number of accounts they have, fully insured lives, self-insured

7  lives, Medicaids, Medicare.  I know that's beyond the scope of

8  this, but government, everything.

9  Q.  Accepting that Blue Cross wants to have a lot of covered

10 lives of all kinds, do you accept that some of those covered

11 lives are more profitable to Blue Cross than others?

12 A.  It's hard to -- to gauge that.  I mean, it's -- it's very

13 hard to, you know, calculate profitability.  It's hard.  I mean

14 even -- even I think Dr. Mason said that.  You know, I'm not

15 quoting him, but this is a very difficult exercise.

16     And trying to get a data to come up with this allocation, I

17 mean, as he did, you know -- I mean, he did it in a -- in an

18 incorrect -- you know, he got a report and he did it in an

19 incorrect fashion.  You know, he took fully insured premiums and

20 he took ASO premiums, which are only a fraction of health care

21 costs, so, you know, I mean --

22 Q.  Sir, do you remember what question you're answering?

23 A.  I'm trying to answer your question.  Yes.

24 Q.  Let me ask you have you seen documents that say that the

25 fully insured business for Blue Cross provides nearly six times

1   as much operating gain per member per month as an ASO?

2   A.  I saw that document.  Yes, I did.

3   Q.  And that was another Blue Cross document; right, sir?

4   A.  I believe it was.  Yeah.

5   Q.  And in fact, that was an Anthem document, wasn't it?

6   A.  I don't exactly remember.  Yeah, but I -- I did see that

7   document.

8   Q.  And you don't have any reason to doubt the accuracy of that

9   document, do you, sir?

10  A.  Listen, I'm an actuary.  I don't take anything that I see at

11  face value.  I -- you know, I would want to investigate it

12  thoroughly and make sure that, you know, it's being used in the

13  right context and, you know, it's, you know, reporting the right

14  thing.

15  Q.  Did you make any effort to investigate it, sir?

16  A.  I did not.

17  Q.  Now, in your report, you quote a publication, I think Modern

18  Health.  Remember that?

19  A.  Yes.

20  Q.  And you quote it to the effect that for the larger national

21  insurers on the self-funded plans, margins can reach five

22  percent; correct?

23  A.  Correct.  Correct.

24  Q.  And did you believe that the *Modern Healthcare* magazine that

25  you were quoting was a reliable source?

1   A.   I thought it was a good enough proxy because that -- you

2   know, because it's in line with, you know, what I've seen in my

3   experience.   Yes.

4   Q.   Now, what you quote here -- you say, according to *Modern*

5   *Healthcare*, margins for the national -- for the larger national

6   insurers on their SF plans can reach five percent.

7        That's on page 10, the last paragraph of your report;

8   correct, sir?

9   A.   Correct.

10  Q.   Now, with the Court's permission, I'm going to hand you a

11  copy of Plaintiffs' Exhibit 1, which is that *Modern Healthcare*

12  report.

13             MR. BOIES:   I think the Court already has one.

14             Do you have a copy of this, Your Honor?

15             THE COURT:   I could use a copy, just for ease of

16  reference.

17             MR. BOIES:   Great.

18             THE COURT:   Thank you.   Yes, I do have this now that I

19  see it.

20  Q.   Now, *Modern Healthcare*, in this article, in addition to

21  saying what can happen in certain instances, also talks about

22  what happens on average, correct, sir?

23  A.   Correct.

24  Q.   And what it says is that on average, commercial ASO

25  contracts are break-even; correct, sir?

```
 1   A.  What page is that on?

 2           THE COURT:  Page 3.

 3   Q.  Page 3.

 4           THE COURT:  First full paragraph.

 5           MR. BOIES:  Yes.

 6   A.  Okay.  Yep.

 7   Q.  That's what it says; correct, sir?

 8   A.  Correct.

 9   Q.  In fact, it says the Congressional Research Service reported

10   that commercial ASO contracts are break-even deals on average.

11   Correct, sir?

12   A.  Correct.

13   Q.  So that means that if there are some that are 5 percent

14   positive, there are some that are 5 percent negative; correct,

15   sir?

16   A.  Okay.

17   Q.  Right?

18   A.  Generally, yes.  That's what break-even means.

19   Q.  Right.  Now, you know that Blue Cross's fully insured

20   contracts are not break-even; correct, sir?

21   A.  That's -- that's not a definitive -- that's not a definitive

22   statement.  That's not a definitive statement.

23   Q.  Well, you know that Blue Cross makes money; right, sir?

24   A.  I mean, they build in a profit, yes.  I mean, they build in

25   a profit to their rates.  Yes.
```

1  Q.  And, in fact, you know from working with Blue Cross or maybe

2  just from reading the newspapers that Blue Cross makes a lot of

3  money every year; right?

4  A.  Well, I mean -- I mean Blue Cross is heavily -- on the fully

5  insured plans, they've heavily regulated; right?  You know,

6  there's a medical loss ratio limit for -- you know, for

7  individuals and small groups, 80 percent; for large groups, 85

8  percent.  If the loss ratio is below that, they have to refund

9  members, you know, their money.  There's a -- there's a ceiling

10 to your gain, but there's no floor to your losses.  So, you

11 know, some years they make exactly what they bake into profit.

12 And on the bad years, they don't necessarily -- you know, there

13 is a risk adjustment and other things that go into recycling of

14 funds between insureds with the worst risk, but that's another

15 discussion.

16     But your statement, you know, that they make money every

17 year is not always accurate.

18 Q.  When was the last time Blue Cross didn't make money, sir?

19 A.  I don't know.

20 Q.  Approximately.

21 A.  I don't know all Blue Cross plans.  I worked for two, so I

22 can't speak for all Blues plans.

23 Q.  Well, did Blue Cross make money last year?

24 A.  I don't know.

25 Q.  Did you investigate that?

```
 1  A.  I did not.  No.

 2  Q.  Did you think that was at all relevant to your testimony --

 3  A.  No.

 4  Q.  -- how much money they made?

 5  A.  No, not at all.

 6  Q.  You do know that Blue Cross fully insured plans pricing is

 7  not break-even.  You know that at least; right, sir?

 8  A.  Yes.

 9       MR. BOIES:  Okay.  No more questions at this time, Your

10  Honor.

11       THE COURT:  All right.  I take it there's no follow-up

12  to that?

13       MR. MULLINS:  Just a few brief questions.

14       THE COURT:  You may.

15                    REDIRECT EXAMINATION

16  BY MR. MULLINS:

17  Q.  Ugo, Mr. Boies asked you some questions dealing with

18  profitability and did Blue Cross make or not make money.  And

19  you said that was not relevant to your analysis.  Can you tell

20  the Court why not?

21  A.  Because my analysis was -- I was -- I was asked to -- to,

22  you know, determine funds based on allocation.  You know, what

23  should a self-funded plan -- an average self-funded plan get

24  versus a fully insured plan get based -- based on the damages,

25  an allocation.
```

1  Q.  So was your allocation methodology, then, based on this

2  premium -- premium equivalent analysis and the costs -- the

3  out-of-pocket costs to fully insured versus self-insured?

4  A.  Exactly.  Yes.

5  Q.  So you were looking at what are they actually out of pocket;

6  right?

7  A.  Yes.

8  Q.  And in your professional opinion after 20-plus years, that

9  was the best methodology to use in determining how this

10  settlement fund ought to be allocated?

11  A.  Exactly.

12  Q.  The cost -- actual cost -- actual out-of-pocket to these

13  plans.

14  A.  Yes.

15          MR. MULLINS:  Your Honor, that's all I have.

16          THE COURT:  All right.  Thank you.

17          MR. BOIES:  Just one more question, Your Honor.

18          THE COURT:  You may.

19                      RECROSS-EXAMINATION

20  BY MR. BOIES:

21  Q.  Sir, do you believe that the allocation of damages should be

22  based on the relative amounts of overcharges that the two groups

23  of customers paid?

24  A.  No.

25          MR. BOIES:  That's it, Your Honor.

```
 1              THE COURT:  All right.  You may step down, sir.

 2              THE WITNESS:  Thank you.

 3              MR. MULLINS:  Your Honor, may he be excused from

 4    further participation?

 5              THE COURT:  He may.

 6              And thank you for your attendance today.

 7              THE WITNESS:  Thank you, sir.  Appreciate it.

 8              THE COURT:  I'm going to thank you even though I think

 9    you're getting paid for it.

10              THE WITNESS:  Sir?

11              THE COURT:  I'm going to thank you even though I think

12    you may be getting paid for it.

13              Okay.  So here's where I think -- and I think we're

14    about to take a short break, Risa.  Just bear with me one second

15    here.

16              We have several class members who want to be heard.  I

17    know the subscriber -- do the subscriber plaintiffs still want

18    to respond any further to this issue, or do you think your

19    posthearing briefing can handle that?  And same with the ASO

20    counsel and the Blues.

21              MR. BOIES:  I think our posthearing briefing can handle

22    it, Your Honor.

23              THE COURT:  All right.

24              MR. BURNS:  Same for the self-funded class.

25              MR. LAYTIN:  Same.
```

```
 1              THE COURT:  All right.

 2              MR. MULLINS:  We agree.

 3              THE COURT:  All right.  Great.

 4              I'm going to make a suggestion to make sure everybody

 5    is comfortable with getting on their planes tonight because I've

 6    had a number of requests about that.  The DOL has some concerns,

 7    but they're not here.  I know they're available by Zoom.  What

 8    if we just reassembled next week at an appointed time on Zoom

 9    and hashed out the DOL issues?

10              MR. BOIES:  That works for us, Your Honor.

11              MR. LAYTIN:  Fine, Your Honor.  Fine for defendants.

12              MR. MULLINS:  Sure.  That works.

13              THE COURT:  Okay.  That makes sense to me.  And that

14    way we can give them the time and attention those issues may

15    require.

16              So when we come back, we will hear from the class

17    members that requested to be heard.  I understand that

18    Mr. Cochran is going to provide us a transcript of what his

19    remarks would be, and we'll hear from Mr. -- and I may be

20    butchering some of these names.  I apologize.  Mr. Bluhm.

21              Is he here?  B-L-U-H-M.

22         (No response)

23              THE COURT:  Okay.  He's not here.  We won't hear from

24    him.

25              Mr. Tykulsker?
```

```
 1        (No response)

 2             THE COURT:  Okay.  Mr. Hart?

 3             SPECIAL MASTER GENTLE:  Your Honor, Mr. Hart dropped

 4   off some comments in lieu of speaking.

 5             THE COURT:  All right.  That's good.

 6             Prairie Island?

 7             MR. NICHOLS:  James Nichols on Zoom for Prairie Island,

 8   Your Honor.

 9             THE COURT:  All right.  And y'all be available to give

10   us your comments after the break?

11             MR. NICHOLS:  Yes, I will.

12             THE COURT:  Thank you.

13             And then Mr. Behenna.  You're still here.  I see you

14   back there.  Thank you.

15             Well, we'll hear from Prairie Island and Mr. Behenna

16   when we resume in about ten minutes.

17             SPECIAL MASTER GENTLE:  And, Your Honor, there's also

18   someone on Zoom for Tenneco.

19             THE COURT:  Oh, yes.  I thought -- we'll hear from

20   them, then.  I responded to that email.  Maybe Sally hasn't

21   gotten you that word yet.

22             SPECIAL MASTER GENTLE:  All right, sir.  Thank you.

23             THE COURT:  But we'll hear from Tenneco also.

24             SPECIAL MASTER GENTLE:  Yes, sir.

25             THE COURT:  All right.  Besides that, what remains to
```

1   be done today other than maybe just a short wrap-up?

2           MR. HAUSFELD:  We don't believe anything from the

3   subscribers, Your Honor.

4           THE COURT:  Anything on this arbitration issue?

5           MR. SMITH:  Your Honor, Cy Smith for the subscribers.

6       (The court reporter interrupts for clarification)

7           MR. SMITH:  Cy Smith for the subscribers.  On both

8   arbitration and on the Taft-Hartley church things --

9           THE COURT:  Yes.

10          MR. SMITH:  -- I think that we don't need to present

11  any argument today.  We might have a couple of pages that we

12  would submit posthearing.  I don't think --

13          THE COURT:  Does anybody -- so arbitration is

14  different.  I'm going to hit Taft-Hartley, but let's just do

15  that.  Anyone want to be heard on Taft-Hartley today?

16          MR. SLATER:  Your Honor, that would be our argument.

17  We'll stand on the briefs on it.

18          THE COURT:  All right.  So y'all can -- I'll give you a

19  chance to respond to anything they say.  How does that sound?

20          MR. SLATER:  Fine.

21          THE COURT:  Okay.  And that goes to the church plans as

22  well?

23          MR. SLATER:  Yes, it does, Your Honor.

24          THE COURT:  All right.  Church plans have particularly

25  good retirement benefits.  Think about that for a second.

```
 1              All right.  Very well.  Well, we'll be in a ten-minute

 2  recess and come right back, and we'll hear from Tenneco, Prairie

 3  Island, and Mr. Behenna.  Thank y'all.

 4       (Recess at 4:26 p.m. until 4:40 p.m.)

 5              THE COURT:  Okay.  Let's come to order.

 6              All right.  I think next up is Prairie -- let's start

 7  with Prairie Island.  How does that sound?

 8              MR. NICHOLS:  Your Honor, this is James Nichols for

 9  Prairie Island, and that sounds good to me.  I'll get my video

10  going here.

11              THE COURT:  You're going to have to give us one second

12  where we can hear you a little better.

13              MR. NICHOLS:  Okay.

14              THE COURT:  Do you have any more volume on your end?

15              MR. NICHOLS:  I think I've got this turned up as much

16  as I can.  Is it coming through any better here?

17              THE COURT:  Okay.  We're just going to have to be very

18  quiet in the courtroom so I can hear you.

19              MR. NICHOLS:  Okay.  Well, and, Your Honor, if I --

20  I'll speak as loud as I can.  And if something isn't clear,

21  please let me know and I will try to cover that.

22              My name is James Nichols.  I'm an attorney with the

23  Jacobson Law Firm in St. Paul, Minnesota, and I'm here on behalf

24  of the Prairie Island Indian Community.  Prairie Island is a

25  relatively small tribe that operates a casino in southern
```

 1   Minnesota; but that being said, Prairie Island does have three

 2   self-insured health plans.  One of those health plans is

 3   operated for members of the tribe.  So this is something that

 4   the tribal government funds for the members as a supplement to

 5   other health care benefits that are available to the members.

 6   This is, you know, unique in some respects, but it's very much

 7   like the other self-insured plans that are part of the class in

 8   many other respects.  The Prairie Island government goes out and

 9   purchases the Blue Cross administrative services on the open

10   market just like any other private employer.

11          In addition to that plan, Prairie Island operates two

12   self-insured plans for employees of its casino.  Just like it

13   does with the member -- the tribal member plan, these are

14   self-insured plans that are just like those of any other private

15   employer provided for the employees of the casino.  The tribe

16   goes out and buys administrative services for those plans just

17   like anybody else, any other employer, on the open market.

18          Now, in this respect also, Prairie Island is not unique

19   as compared to other tribes.  There are 574 tribes in the United

20   States.  Many of them are much larger than Prairie Island.  And

21   it's really -- there's no telling how many of those operate

22   self-insured plans that may have been subject to the antitrust

23   violations that are at issue here, you know, by virtue of their

24   purchasing administrative services from Blue Cross.

25          Now, that being said, it is unclear, at best, from the

 1  current definition of the settlement class whether any of the

 2  Prairie Island self-insured plans can participate in the

 3  settlement.  Quite frankly, the definition of "government

 4  account" is -- well, it's incomprehensible when you look at it

 5  from the perspective of an Indian tribe.

 6         So first of all, we have this issue where Native

 7  American tribes are singled out as not part of the class.

 8  Those -- you know, "government account" includes Native American

 9  tribe.  I'm not sure what that is supposed -- what that's

10  intended to carve out or why.  That just doesn't make a whole

11  lot of sense.

12         But in addition to that, even if we take that at face

13  value and say, okay, maybe this does exclude the self-insured

14  plan that a tribe operates for its tribal members, well, what

15  about the commercial operations that the tribes have?  And why

16  are -- why would a commercial operation that a tribe has and

17  where it gets self-insurance benefits for its employees be

18  treated any differently from any other private employer?  It's

19  impossible to tell from the class definition how that analysis

20  would play out.

21         I've tried to get straight answers from the -- from

22  class counsel and the settlement administrator with absolutely

23  no luck.  I have been told everything from, you know, there was

24  an intentional decision to exclude tribes, you know, for no

25  reason, though.  Apparently, you know, there is -- there's

1  nothing in the way that Blue Cross marketed or priced the plans

2  or administrative services to tribes that is any different than

3  what it did for any other commercial employer that is part of

4  the class.

5          The bottom line is that there is no reason to exclude

6  tribes or tribal plans from the settlement class.  Doing so is

7  unfair.  And, you know, with the current class definition, even

8  assuming that the Court does approve it, this just creates a lot

9  of confusion for tribes about whether or not, you know, they

10  should submit claims and try to get those adjudicated by the

11  administrator or if they're only left to pursue their claims

12  individually.  And I mean, quite frankly, it is vague enough

13  that we are very concerned that under the current class

14  definition, if it is determined that tribes are, you know,

15  unfairly excluded, that they would also, you know, face

16  arguments from Blue Cross that, you know, they can't bring their

17  own individual claims because of how Blue Cross interprets the

18  class definition.

19          So, you know, at -- you know, the best case we're

20  looking at here is that the class definition is so vague as to

21  be unworkable for tribes.  But beyond that, it's unfair in any

22  respect.  I mean, there's just no good reason to treat tribes in

23  such a different way, such a detrimental way, in comparison to

24  other similarly situated employers and providers of self-insured

25  health benefits.

```
 1            Just to sort of clarify the confusion here -- you know,
 2   this is probably my last main point here is that, you know, when
 3   we look at self-insured plans that are, you know, affiliated
 4   with tribes, we've really got I guess three levels of them.  The
 5   first is do self-insured plans apply for tribal members?  How
 6   are those treated?  Self-insured plans for tribal enterprises,
 7   how are those treated under the settlement?  And then finally,
 8   self-insured plans where a tribe owns another business -- you
 9   know, something that may be incorporated under state law -- and
10   has a self-insured plan for employees of that business.  Does
11   the fact that the tribe has incorporated the business under
12   state law instead of operating it as an arm of the tribe make a
13   difference?  I mean, it's unclear from the settlement.
14            You know, this is something that has been a source of
15   confusion for tribes across the country.  I've had discussions
16   with them in addition to, obviously, my representation of
17   Prairie Island in this matter.  It is a concern, and it is
18   something that should be addressed.  You know, tribe --
19   there's -- you know, if the settlement needs to be modified to
20   account for the interests of tribes, that would be one way to
21   go; but at the very least, we need some clarification on where
22   they stand.
23            THE COURT:  All right.  Why don't we get that
24   clarification from -- start with -- Mr. Burns, would that be
25   your category?
```

 1          MR. HUME:  Your Honor, I think I was going to address

 2  this for subscribers, if I may.  Sorry.

 3          THE COURT:  You may.  Sorry.  I heard a voice coming

 4  from somewhere.

 5          MR. HUME:  Coming at you from all angles, Judge

 6  Proctor.

 7          This is Hamish Hume from Boies Schiller.  And I was

 8  going to briefly address -- is it possible for the courtroom --

 9          THE COURT:  Can you hear him all right, sir?

10          MR. NICHOLS:  Yes, I can.

11          THE COURT:  All right.  Thank you, Mr. Nichols.

12          MR. HUME:  Is it possible for the courtroom deputy to

13  switch back on the screen share so I can show what's on the

14  screen?  We can see the definition.

15          Thank you.  And I hope Mr. Nichols can see that.  I'm

16  not sure, Your Honor --

17          MR. NICHOLS:  I can.

18          MR. HUME:  -- if it's large enough for you to see.

19          But here's the basic -- and I think there have been

20  efforts to communicate with Mr. Nichols or his colleagues

21  representing Prairie Island on this.  We do not think there's

22  anything unclear in the definition of "government account," Your

23  Honor.  The first thing that is very clear and not unusual is

24  the first sentence of paragraph 1.hh.  "Government account" is

25  excluded from the definition of "insured groups."

```
 1            Then the question becomes what's a government account.
 2    And it's defined in paragraph 1.hh.  And the first sentence is
 3    very clear.  "Government account" means only a state, a county,
 4    a municipality, an unincorporated association performing
 5    municipal functions, a Native American tribe.  The tribe itself
 6    is a government account and excluded.  Or the federal
 7    government --
 8            THE COURT:  Are you telling me that Blue Cross Blue
 9    Shield categorizes, for example, the Prairie Island account as a
10    government account?
11            MR. HUME:  I think that is correct.
12            THE COURT:  Can someone from the Blues confirm or deny
13    that?
14            MR. HOLMSTEAD:  That's right, Your Honor.  The Blue
15    Cross Blue Shield plan characterizes Prairie Island as a
16    government -- as a Native American tribe and, hence, a
17    government account.
18            THE COURT:  And are all the Native American ASOs
19    categorized as government accounts?
20            MR. HOLMSTEAD:  Well, certainly Prairie Island is one
21    of the 574 federally recognized tribes.  And so they certainly
22    would fit that qualification, as would the other 573.
23            THE COURT:  All right.
24            MR. HUME:  So, Your Honor -- and it's not unusual to
25    exclude government accounts and government entities from class
```

 1    actions.  Mr. Nichols was wondering why that is.  They're

 2    obviously well equipped to represent their own interests.  They

 3    are sovereign entities, state AGs, federal government, and

 4    Native American tribes as well.  And so I don't know that

 5    there's a huge burden to justify that, but I think it is

 6    eminently justifiable.

 7         Now, Mr. Nichols has referenced other related entities,

 8    like a casino or casino employee, you know, preferred

 9    provider --

10         THE COURT:  It's my understanding those would not be

11    government accounts.

12         MR. HUME:  Exactly, Your Honor, with one proviso that

13    he and his client will be far better situated to understand and

14    interpret based on their individual circumstances.

15         The next sentence of the definition says no other

16    entity other than the tribe itself -- no other entity that is

17    not one of these things, including the tribe, is a government

18    account unless it is required by law to provide any health care

19    coverage it makes available to members only under, or as a

20    participant in, a commercial health benefit product approved,

21    selected, procured, sponsored, or purchased by that government

22    account.

23         So in other words, if the Prairie Island tribe says,

24    we're going to have casinos, we're going to set up a subsidiary

25    that does this, a subsidiary that does that, we're going to have

 1   lots of different enterprises, they could do one of two things.

 2   They can say you guys go and figure out your insurance situation

 3   for your employees on your own, or they could say all of us are

 4   going to band together and we're going to buy health insurance

 5   that we're going to negotiate up here at the top as a tribe or

 6   that we're going to require all of us to negotiate together.

 7          And that's the one play in the joints here that we

 8   negotiated with the Blues to ensure that government-like

 9   entities are treated like the government and that if they are

10   not, if they're truly operating on their own and only

11   quasi-governmental and purchasing insurance on their own, not

12   under the mandate of a government entity, then they are

13   participants in the class and would have gotten notice and could

14   submit a claim.

15          So it should be clear.  I think, in fact -- you know,

16   we regret that there's confusion by Prairie Island and

17   Mr. Nichols, and we're happy to talk more with him, but I think

18   the fact that there's only one such objector suggests that

19   it's --

20          THE COURT:  All right.  Mr. Nichols.

21          MR. NICHOLS:  Well, Your Honor -- this is -- thank you,

22   Your Honor.

23          You know, this is very much like other conversations

24   I've had where we go in circles and it seems like no one is

25   willing to actually listen to the concerns of the tribes.  So

1 here -- here -- so number one, I just want to reiterate that

2 there is no good reason to separate the tribes from the other --

3 other plans.  I mean --

4          THE COURT:  Well --

5          MR. NICHOLS:  -- they were priced and marketed through

6 the same.

7          THE COURT:  Well, let me ask you this.  If the

8 intention of counsel was to exclude governmental accounts as a

9 category and you are categorized as a governmental account, then

10 I don't understand what the confusion would be.  And I don't

11 understand anything other than your potential argument that they

12 shouldn't have done that.

13          MR. NICHOLS:  Okay.  Well, as it relates to the

14 self-insured plan for tribal members, Your Honor, I have little

15 disagreement with what you said.  I don't think it was a fair

16 decision to exclude government accounts -- to include tribes as

17 government accounts.  My client disagrees with that decision.

18 But I can at least understand the logic of saying that a

19 self-insured plan for tribal members is a government account.  I

20 disagree with the logic, but I understand it.  You're -- I don't

21 disagree with you there, Your Honor.  But --

22          THE COURT:  But doesn't it matter here what the

23 Blues -- how you're categorized within the Blue system?  So --

24          MR. NICHOLS:  Well, I -- it potentially could.  I mean,

25 if there was some substantive difference about how the Blues

 1   priced or marketed the plans, I would certainly recognize that

 2   as a legitimate basis for the exclusion.  But if tribes and, you

 3   know -- if self-insured plans operated by tribes are priced to,

 4   marketed, in the same way as any other commercial employer, I

 5   mean, it -- the logic doesn't line up.  It makes no sense.

 6   There's just no basis for the exclusion.

 7        But I also just want to home in on one other point too

 8   that's related to this.  I mean, we --

 9        THE COURT:  Well, and Mr. Nichols --

10        MR. NICHOLS:  Oh, okay.

11        THE COURT:  Mr. Nichols, I think what they said was

12   that government plans usually are uniquely equipped to assert

13   their own claims and have lawyers like yourself.  And that's one

14   of the -- that's the basis that I've heard articulated today in

15   the courtroom.  Now, it rings --

16        MR. NICHOLS:  Well, that could apply to any class

17   member.

18        THE COURT:  No.  General -- not every plan has a lawyer

19   and not every plan is uniquely categorized by the Blues as a

20   governmental account.  That's why I asked the Blues if they

21   could confirm that.

22        So I'm glad to hear you out.  One more shot to explain

23   exactly how -- one, why you have any rights under an agreement

24   that excludes you and, second, how you're prejudiced in any

25   event.  Because it seems to me the only thing you can't do under

1   this agreement that you could do if you were under the agreement

2   is either opt out, which if you did that, it would be easy, or

3   you cannot make a claim under the agreement for any type of

4   (b)(3) damages.  Having said -- and you would not necessarily be

5   included on a second Blue bid.  I don't know if you're large

6   enough and geographically dispersed enough for that to even be

7   an issue.

8          But what this means is that you're -- you get the

9   benefit of the (b)(2) relief that everybody who does business

10  with the Blues is going to get, it seems to me, and then the

11  second thing is you can pursue your claims independent of this

12  class action if your client chooses to do.  Am I wrong on any of

13  those points?

14         MR. NICHOLS:  Yes.  Well -- you are not wrong.  I will

15  make one last point relating to the self-insured plan for tribal

16  members, and then I want to make a point relating to the

17  self-insured plan for the casino employees.

18         With respect to the self-insured plan for members, you

19  know, excluding tribes on the same basis that state governments

20  are excluded, I think, is -- doesn't add up because, you know,

21  Prairie Island is fortunate in the sense that it has resources

22  to hire attorneys and to look at all of these issues.  But there

23  are many tribes that are smaller or do not have the same

24  resources.  And to deprive them of even the opportunity of

25  benefiting from this class action that is supposed to have

 1   been -- to address these anticompetitive injuries that they have

 2   suffered just like anybody else just seems profoundly unfair to

 3   me.  And that's part of why Prairie Island did, you know, seek

 4   to present this objection on behalf of all tribes.

 5         THE COURT:  You're objecting on behalf of Prairie

 6   Island, and you've made an objection today on behalf of Prairie

 7   Island, not 573 other tribes, have you?

 8         MR. NICHOLS:  Well, we don't -- only as -- only

 9   representing the tribal interests here.  I don't know of any

10   other tribe that has stepped forward.  And so I mean, we did,

11   you know, mention that in our objection, that we feel like this

12   is something that does apply beyond Prairie Island.  And I

13   will -- I understand your position on this, Your Honor, and I

14   will -- that's all I'll say on the self-insured plan as it

15   relates to tribal members.

16         I think that the casino self-insured plans do raise an

17   issue that does need to be addressed still and has not been

18   addressed yet.  So I think that the Blues and the class counsel

19   are operating under an assumption that there is a clear line

20   between a tribe and its businesses.  And, you know, that is

21   often not the case, and it's certainly not the case for Prairie

22   Island's casino.

23         The casino operates as an arm of the tribe.  It is a

24   part of the government whose function is to raise revenue for

25   governmental services.  So it's not, you know, Prairie Island

 1  Casino, Incorporated.  It is Prairie Island Casino, an

 2  enterprise of the tribe.

 3       Now, I think it is exceedingly unclear how that plays

 4  out under the current class definition.

 5       THE COURT:  Let me just ask you this.  Why wouldn't you

 6  just go ahead and file a claim?

 7       MR. NICHOLS:  Right.

 8       THE COURT:  If the settlement administrator approves

 9  the claim, then problem solved.  If the claim gets denied, there

10  is a process for you to contest the denial of the claim; right?

11       MR. NICHOLS:  We certainly plan to avail ourselves of

12  that, but objecting is also a way to avail -- is also something

13  that's open to us.  And part of why we wanted to take this path

14  is because we do want clarity so that this can be communicated

15  to other tribes.  I mean, we are not the only one in this

16  situation.  This business structure is not unique.  And, you

17  know, like I said, I mean, I'm -- I represent Prairie Island on

18  this, but our motivation for the objection is that we have

19  interests that are not unique.

20       THE COURT:  Well --

21       MR. NICHOLS:  And I think that something that would be

22  very helpful here -- I mean, class counsel and the Blues have

23  had our objection for months.  The objection identifies each of

24  the three self-insured plans that Prairie Island operates.  They

25  always want to say, oh, the self-insured plan for members is a

 1  government account, but I have not heard anything addressing the

 2  Treasure Island plans, the casino plans for members.  I mean,

 3  there's two of those plans.

 4          THE COURT:  Well, again --

 5          MR. NICHOLS:  Can we get that clarity?

 6          THE COURT:  Do we have any clarity on that?

 7          MR. HOGAN:  Your Honor, Des Hogan.  Prairie Island

 8  Indian Community, doing business as Treasure Island Resorts and

 9  Casinos, is included in the class and should have received

10  notice and they should file a claim if they have one.

11          THE COURT:  Apparently they did.

12          MR. NICHOLS:  Well --

13          THE COURT:  So you're in the class.  You can assert

14  your claim on behalf of the casino business, if I can

15  generically refer to it that way.

16          But having said that, you know, you might have heard

17  Mr. Hausfeld say yesterday that objections in this case are

18  literally one in a million.  Well, your objection on behalf of

19  tribes is one in 574.  None of the others are here.  I'm not

20  going to entertain any objection based upon that because I don't

21  think you have -- I don't think you can represent them.  Maybe

22  you can.  Maybe you've been authorized, retained, hired.  But

23  the point is is they're all excluded based upon the definition

24  of a government account.  Same clarity applies to them as you.

25  And it sounds like now, with respect to your secondary concern,

 1  you may be in business.  At least, that's what I just heard.

 2          MR. NICHOLS:  Well, you know, considering that we filed

 3  this objection in July and I've been, you know, pestering

 4  these --

 5          THE COURT:  Well --

 6          MR. NICHOLS:  -- everyone for an answer on these --

 7          THE COURT:  -- Mr. Nichols.  Mr. Nichols.

 8          MR. NICHOLS:  Yes.

 9          THE COURT:  You understand you filed an objection with

10  the Court.

11          MR. NICHOLS:  Yes, I do.

12          THE COURT:  You're not objecting to the other parties.

13  You're objecting to the Court on the -- so this is the date in

14  which your objection has been heard.

15          MR. NICHOLS:  Right.

16          THE COURT:  And I am overruling your objection to not

17  being included as a government account, and I am declaring as

18  moot your secondary objection that your -- that the casino

19  business should not be excluded because I've just been informed

20  that they are included.  You can assert the claim.

21          And we'll now move on to GM.

22          MR. NICHOLS:  Your Honor, may I -- may I -- I'm sorry.

23  I just want to make one final point, one final request here.

24          I know that you're skeptical of our capacity to

25  represent other tribes, but I do want to say that there is an

1    intense amount of confusion about what tribal plans can
2    participate.  And I really am afraid that there are tribal plans
3    out there, you know, similar plans for tribal enterprises that
4    have self-insured plans for employees, that think they are
5    excluded because of how the "government account" definition was
6    set up.  And it would really be an injustice if, you know, that
7    lack of clarity in the definition caused those tribes to lose
8    their rights.  And that's part of why we're here today, and
9    that's all I will say on the matter.
10            THE COURT:  Well, they had every opportunity to do
11   exactly what you've done in this case, to object.
12            MR. NICHOLS:  That's right, Your Honor.  And --
13            THE COURT:  And they have every opportunity to do what
14   I've told you that you should do in this case, file a claim.  I
15   don't know what else to say.
16            MR. NICHOLS:  Well, I will take -- I will spread that
17   message to Indian country, Your Honor.
18            THE COURT:  Take the good news to the people.
19            MR. NICHOLS:  Well, in these short two weeks, I will do
20   that.
21            THE COURT:  Thank you.
22            MR. NICHOLS:  Thank you.
23            THE COURT:  All right.  We'll now hear from General
24   Motors.
25            Thank you, Mr. Nichols.

```
 1            MR. NICHOLS:  Thank you, Your Honor.

 2            MR. WANCJER:  Thank you, Your Honor.

 3            THE COURT:  I know you're not a governmental account.

 4            MR. WANCJER:  That is correct.  My name is Hershel

 5    Wancjer.  I represent General Motors.  And we previously

 6    submitted an objection in connection with our inability to

 7    solicit a second Blue bid.  I simply wanted to note on the

 8    record that we join the national account objectors in the

 9    arguments they have made during the fairness hearing and in

10    their papers concerning the provision of the second Blue bid for

11    injunctive relief.

12            THE COURT:  Is your objection in any way

13    indistinguishable from what I've already heard about the second

14    Blue bid objection?

15            MR. WANCJER:  Yes.  That's why I have nothing to add to

16    the discussion.  I just wanted to note it on the record.

17            THE COURT:  All right.  You just want to make sure

18    you've not waived it.

19            MR. WANCJER:  That's right.

20            THE COURT:  You have not.

21            MR. WANCJER:  Thank you, Your Honor.

22            THE COURT:  Thank you.

23            All right.  I think next is Tenneco.

24            MR. TEDROWE:  Good afternoon, Judge Proctor.

25            I just want to thank you for letting me participate by
```

1 Zoom today in getting my objection on behalf of Tenneco on the

2 record.  I know you and probably everyone else in the courtroom

3 is exhausted right now, and so I'll keep this succinct and to

4 the point.

5       The objection that Tenneco is lodging has to do with

6 the second Blue bid, but it is an objection not to the concept

7 of the second Blue bid, but to the procedural mechanism through

8 which it's determined.

9       Tenneco is an automotive manufacturer of parts

10 nationwide.  And in the last several years, it's acquired a

11 company called Federal-Mogul, took over its self-funded plan,

12 and also formed its wholly-owned subsidiary called DRiV.  That's

13 going to be relevant to the objection, and you'll see why I

14 mentioned that in a second.

15       As you know, a second Blue bid is not provided to all

16 ASOs but only to some that satisfy a couple criteria largely

17 based on data from Dun & Bradstreet.  They have to have at least

18 5,000 U.S. employees, and they have to have a high enough

19 dispersion percentage to make it onto the list.  And my

20 information is that the dispersion percentage -- the cutoff to

21 make the list was roughly 67 percent.  So if you had a 67

22 percent or higher dispersion percentage, you made the list.

23       Tenneco, using its own data and including Federal-Mogul

24 and DRiV, its recent acquisitions, has a dispersion percentage,

25 roughly, of 90 percent.  That's using its own data.  However, it

1   did not make the list that's attached to the proposed settlement

2   agreement as Appendix C.  And it's our belief -- and I think

3   it's a justified belief -- that it is not because the folks

4   calculating the dispersion percentage can't do math, it's

5   because the numbers that they received from Dun & Bradstreet

6   were erroneous.  We believe it has to do with something --

7           THE COURT:  Or out of date.

8           MR. TEDROWE:  Or out of -- exactly, Your Honor.

9   There's something having to do with the corporate structure and

10  these acquisitions that did not make it into the data.

11          THE COURT:  All right.  What would be objectionable,

12  though, to the parties agreeing that, you know, when it comes to

13  ASOs and who's eligible based upon the fact that they're an

14  employer -- I think there's three requirements; maybe I'm

15  wrong -- but they have to be an employer, they have to have at

16  least 5,000 employees -- and these are eligibility, not

17  necessarily where the line gets drawn -- and then the geographic

18  dispersion requirement has to be met.  Anybody disagree with the

19  three-element test here?

20          MR. BOIES:  No.

21          MR. BURNS:  No, Your Honor.

22          THE COURT:  All right.  So what's wrong, though, with

23  the parties saying, you know, when it comes to determining

24  geographic dispersion, we're going to use an objective benchmark

25  of Dun & Bradstreet, which is not always accurate, but a pretty

 1    handy business tool.  And you're in a unique situation in that

 2    through acquisitions, you have maybe increased your geographic

 3    dispersion just recently; right?

 4          MR. TEDROWE:  In the last three or four years.

 5          THE COURT:  Okay.  And when are the most recent Dun &

 6    Bradstreet figures?  How old are those that you say don't

 7    account for your recent acquisitions?

 8          MR. TEDROWE:  Well, we were not provided, actually,

 9    with the data that the Blues used to calculate it.  We requested

10    it in the mediation process but did not receive it.  So I can't

11    really say for certain.  But we do believe it's out of date,

12    regardless of when the last time D&B updated their data.

13          THE COURT:  All right.  So let me call a time-out,

14    Mr. Tedrowe, and ask counsel for the subscribers.

15          What do we do with outdated Dun & Bradstreet data, if

16    anything?

17          MS. BOJEDLA:  Sure.  I have had several conversations

18    with Mr. Tedrowe and his colleagues about this issue, and we did

19    actually provide them with the data that Dun & Bradstreet has

20    for Tenneco.  And what that data shows is that there are 36,000

21    out of 53,000 of their employees located in Illinois and, in

22    total, about -- they have a dispersion percentage of about 27

23    percent outside of their ESA based on the Dun & Bradstreet data.

24          THE COURT:  What year was the Dun & Bradstreet data?

25    Do you have that at your fingertips?

```
 1              MS. BOJEDLA:  That, I don't have at my fingertips.  And
 2   I'm not sure if my colleagues --
 3              MR. HOLMSTEAD:  Settlement date.
 4              MS. BOJEDLA:  Excuse me?
 5              MR. HOLMSTEAD:  When the settlement was executed.
 6              MS. BOJEDLA:  When the settlement was executed.
 7              THE COURT:  Okay.  Is that the date the parties decided
 8   to use as the fixed point?
 9              MS. BOJEDLA:  Yes.  So the settlement, as written, says
10   that the Appendix C reflects the first list of qualified
11   national accounts, and that list will be refreshed every two
12   years after the effective date.
13              THE COURT:  So in two years, they may be eligible for a
14   second bid, but not now, is what your position would be.
15              MS. BOJEDLA:  Correct.
16              THE COURT:  And, Mr. Tedrowe, of course, you want one
17   now.
18              MR. TEDROWE:  Tenneco certainly would like the
19   opportunity to work with D&B to correct the data and resubmit
20   it.  Absolutely.
21              THE COURT:  Even if you did that, if the parties
22   agreed -- you know, we have to know before the Blues agree to a
23   settlement.  The Blues need to know what they're dealing with in
24   terms of who gets a second bid and who doesn't.  Because they're
25   going to take that back to their client, and their client is
```

 1   going to make decisions about whether they're willing to enter

 2   into a settlement with that.  Their position all along, as you

 3   know, is no one should get a second bid, we've got a great

 4   system in place.

 5          MR. TEDROWE:  Yes.

 6          THE COURT:  And the position of the subscriber class

 7   was, oh, no, no, no -- or actually, the ASO class -- no, no, no,

 8   many people ought to get a second bid.  In fact, we might even

 9   have contended during the litigation that people ought to get

10   more than two bids.  But the parties negotiated a resolution of

11   their dispute and said as of this date, we're going to use Dun &

12   Bradstreet.

13          Now, you may be right.  Dun & Bradstreet's data may not

14   have been up to date, but that's not the parties' fault if they

15   agreed that was the default that would use.  But the parties

16   also built in room for your situation.  And that is the data

17   will refresh every two years and there will be an expanded or

18   contracted or different list of who's eligible for a second bid

19   when the data refreshes.

20          Okay.  So explain to me -- I don't think that treats

21   you inequitably compared to other class members because

22   everybody is either in Dun & Bradstreet at that fixed point as

23   being geographically dispersed or not based on the information

24   Dun & Bradstreet has.  Or I don't think it -- I can't say it's

25   an unreasonable drawing of the line because no matter where the

 1    line got drawn, somebody was going to be in and out.

 2          So explain to me the basis of your objection and what

 3    you think I ought to do about it.

 4          MR. TEDROWE:  Yes.  So the basis of the objection is

 5    that -- it goes to a couple things.  The problem isn't Dun &

 6    Bradstreet.  The problem is not the date.  The problem is that

 7    there's no mechanism for review of the D&B data that's going to

 8    be used before it's used.  There's no mechanism for appealing it

 9    on the grounds that the data that was used was inaccurate.  And

10    so the only recourse is to wait two years, which is a recourse.

11    But if -- what it really means, Your Honor, is that it goes to

12    the competitive benefits that's supposed to accrue to class

13    members because of the dispersion percentage.

14          We heard this morning -- there was a slide that said

15    more disperse accounts are also more likely to actually attract

16    a bid from a Blue plan outside of their home service area.  If

17    you have -- if you have a system in place for choosing the

18    highest dispersion percentage employers, then the interest of

19    the settlement has got to be to ensure that the data being used

20    is accurate.  And in this case -- and admittedly, I don't think

21    there are many in this situation; I don't profess to know -- but

22    in Tenneco's case, an error was clearly made, and it undermines

23    the intent of increasing competition between Blues.

24          I would also argue --

25          THE COURT:  No.  I guess I would disagree with you

1  there because I think that your objection, if sustained, would

2  undermine the intent of the parties.  Because what that means is

3  the Blues now have -- what if there are others in this category

4  and what the parties negotiated in terms of the number of second

5  Blue bids that have to be given -- what if it turns out that the

6  geographic dispersion requirement drops the number of people

7  eligible for a Blue bid?  Well, then the subscribers have ended

8  up with less than they negotiated for.  What if that number

9  increases just on the geographic dispersion criteria?  Then

10  you've got a wholly different people who are now at least

11  eligible to be considered before we draw the line, I guess;

12  right?

13         So it's not going to necessarily change the number of

14  second Blue bids, but it's going to create a lot of confusion

15  about who should be -- who's eligible and who should be

16  considered for that line.  And I think the parties -- the whole

17  idea was the parties said, we don't want to have to deal with

18  this.  We're going to consult Dun & Bradstreet at the time of

19  the settlement, we're going to see who is qualified, we're going

20  to put them on a list, we're going to rank them in high-to-low

21  order, and we're going to draw a certain line at 31 percent --

22         MS. BOJEDLA:  33 million covered lives.

23         THE COURT:  -- or 33 million lives?

24         MS. BOJEDLA:  33 million covered lives.

25         THE COURT:  Yes.  And so the problem is if you're

```
 1  right -- okay.  Let's say you're right.  Do you bump somebody

 2  off the list that -- if you're big enough to bump somebody off

 3  the list?  Well, then that creates a lack of clarity for them.

 4  They're going to say, wait a minute, we should get a second Blue

 5  bid.  Dun & Bradstreet doesn't even say Tenneco qualifies.

 6          MR. TEDROWE:  Well --

 7          THE COURT:  So I think that's the confusion the

 8  parties, I suspect, were trying to avoid.  And so I'm going to

 9  overrule the objection, but I'm going to tell you that it sounds

10  to me like you're going to be in great shape in two years.

11          MS. BOJEDLA:  Thank you, Your Honor.

12          MR. TEDROWE:  I certainly hope so, Your Honor.  Thank

13  you.  I appreciate the time.

14          THE COURT:  All right.  Thank you.  And I appreciate

15  your succinctness too.

16          All right.  Does anybody disagree with anything I've

17  just said in terms of that ruling?  This is your chance to

18  speak.

19          MR. HOLMSTEAD:  No, Your Honor.

20          MR. BURNS:  No, Your Honor.

21          THE COURT:  Did I capture correctly the parties'

22  intentions in getting this list in the first place?

23          MR. HOLMSTEAD:  Yes, you did, Your Honor.

24          THE COURT:  Clarity?

25          MR. BURNS:  You did, Your Honor.
```

```
 1            THE COURT:  And, Mr. Holmstead, you wanted to make sure
 2   your client knew exactly what it was signing up for if it signed
 3   onto this agreement?
 4            MR. HOLMSTEAD:  That's right, Your Honor.
 5            THE COURT:  All right.  I think next is we're back to
 6   Mr. Behenna, who I gave some homework to this morning.
 7            And, Mr. Whatley, I haven't forgotten y'all.  I don't
 8   want you to think I have.  But I thought in fairness, you ought
 9   to have the opportunity to hear all of the objections before I
10   ask you about your position.  Fair?  I'll take your silence as
11   acquiescence.
12      (Ms. Kallas waves)
13            MR. WHATLEY:  Judge, you should take my silence as
14   inability in working with Zoom.
15            THE COURT:  Well, I'm going to come back to you.  Fair?
16            MR. WHATLEY:  Fair.
17            THE COURT:  All right.  Thank you.
18            All right.  First, Mr. Behenna, I thank you for sitting
19   through two days of this, because I know much of it did not deal
20   with your objection.  And you have been -- I think you might get
21   the gold star for sitting through everybody else's arguments
22   because I notice the courtroom is mysteriously less packed than
23   it was even this morning, much less yesterday.  So I'm going to
24   commend you for that.
25            MR. BEHENNA:  It's been quite an education.
```

```
 1              THE COURT:  I'm sure it has.

 2              MR. BEHENNA:  Can you hear me okay?

 3              THE COURT:  I may -- I can.  Yes.  Thank you.

 4              MR. BEHENNA:  So with regard to my homework assignment

 5    and why the common fund is not applicable here, I looked at a

 6    recent case from the Eleventh Circuit called Home Depot Customer

 7    Data Security Breach, and it --

 8              THE COURT:  Judge Thrash's settlement over in Atlanta

 9    on a multi-district case that I think I and others sent to him.

10              MR. BEHENNA:  Okay.  2019.

11              THE COURT:  I'm familiar with that case.

12              MR. BEHENNA:  Okay.  There are a couple things there.

13    It goes into great --

14              THE COURT:  As I recall, the Eleventh Circuit treated

15    that as a constructive common fund.

16              MR. BEHENNA:  Actually, I believe --

17              THE COURT:  It's been a while since I read the

18    decision, but I think that's right.

19              MR. BEHENNA:  It was actually treated as a fee-shifting

20    via contract.

21              THE COURT:  Does anybody disagree with that?  Maybe

22    not.  Okay.  Go ahead.

23              MR. BEHENNA:  Okay.  So a couple of bullet points, and

24    I might be paraphrasing a little bit and not quoting exactly as

25    it was in the opinion.  The first point is that in the decision,
```

 1   they found that a common fund is -- can be a situation where a

 2   defendant negotiates a payment to the class and attorney fees as

 3   a package deal.  And I would note here in the documentation and

 4   the papers filed with the court that the fees were negotiated

 5   separately from the consideration paid to the class.  And I made

 6   the cite in my objection.

 7          And they also made the point that the common fund does

 8   not apply when a group provides attorney's fees will be paid

 9   separately from the settlement fund.  Now, on the face, it -- of

10   the settlement agreement, it looked like that's the case, but a

11   couple things are a little unusual here.  First, the Court

12   allowed a $75 million quick fee to be paid last November as part

13   of the preliminary approval.  I think that's unusual, and I

14   think Your Honor made that comment or said that comment was made

15   in the motion papers.

16          And the point I tried to make in my paper -- in my

17   objection was that that $75 million that was approved being paid

18   to plaintiffs' counsel was paid before the class -- the classes

19   received any benefits, it was paid before any fee application

20   was made to the Court, and it was paid before the settlement

21   agreement has been approved, which it hasn't.  We are here for

22   that now.

23          THE COURT:  It was actually a quick-pay provision, but

24   yes.

25          MR. BEHENNA:  I've never -- okay.  Quick -- okay.

 1   Quick-pay.  I've never -- a very unique thing.  So that -- those

 2   monies went directly from the defendants to plaintiffs' counsel.

 3          The second thing is I noticed in the papers --

 4          THE COURT:  Let me ask you this.  Are you contesting

 5   that?  Are you objecting to that?

 6          MR. BEHENNA:  No, no.  I'm trying to respond to my

 7   homework assignment, which is --

 8          THE COURT:  Okay.  I'm just making sure I understood

 9   the context of your remark.

10          MR. BEHENNA:  Gotcha.  And the second thing in the

11   papers, which there was no -- I could not find it, and it may be

12   my oversight.  $300 million was also approved to be moved into

13   an escrow account.  And in the papers, I couldn't find any

14   reason why that $300 million was moved.  And perhaps it was in

15   the transcripts in the hearing, but I did not review those

16   transcripts.  And it's -- maybe it's a coincidence -- but I

17   don't believe in coincidences -- that on the math, when you add

18   the lodestar, the fees, and the 75 million, you get about $300

19   million.

20          So one of the questions is why was $300 million moved

21   into an escrow account as part of the preliminary approval.

22          THE COURT:  But in Home Depot, the parties specifically

23   did not negotiate a fee arrangement and left it to the district

24   court to decide.  Right?

25          MR. BEHENNA:  I --

```
 1          THE COURT:  That's why it wasn't a constructive common
 2   fund.  It was left to the district court to award a fee.
 3          MR. BEHENNA:  Right.
 4          THE COURT:  They -- I think what happened was they
 5   negotiated a settlement, could not agree on a fee, and said,
 6   punt, we'll let the district court decide it.  Am I remembering
 7   this correctly?
 8          MR. BEHENNA:  Right.
 9          THE COURT:  Okay.
10          MR. BEHENNA:  That's correct.
11          THE COURT:  And the district -- and then Home Depot
12   said, it's got to be lodestar.  Plaintiffs' counsel said, it can
13   be lodestar or a percentage, either way.  And I think what the
14   Eleventh Circuit said was it wasn't a percentage because it
15   wasn't taken -- it's not being taken out of the settlement fund.
16   There's a fund created, and it may be called a common fund, but
17   there was no agreement that the fee come out of the fund.  So --
18          MR. BEHENNA:  The point I'm making, Your Honor, is this
19   $300 million is important because there's no explanation why
20   $300 million was paid from the defendants into the escrow fund
21   here.  And what I'm saying is that given the math --
22          THE COURT:  You're going to have to explain that to me.
23   I didn't -- I'm not following what you're saying.
24          MR. BEHENNA:  Okay.  As part of the preliminary
25   approval, two things were approved.  $75 million was paid from
```

1   the defendants -- I guess it maybe went through an escrow

2   account, went to plaintiffs' counsel.

3            THE COURT:  That's the quick-pay.

4            MR. BEHENNA:  That's the quick-pay.  So we already have

5   established --

6            THE COURT:  And you realize that gets -- if there's no

7   settlement, what happens to that?

8            MR. BEHENNA:  Well, I think there was an irrevocable

9   letter of credit attached.  I think it comes -- it comes back.

10           THE COURT:  Yes.

11           MR. BEHENNA:  But the question is it's already gone

12   out.  So --

13           THE COURT:  Okay.  That's just the quick-pay.

14           MR. BEHENNA:  That's a credit --

15           THE COURT:  You said you're not objecting to that.

16           MR. BEHENNA:  I'm not objecting to it.  I'm just trying

17   to build the basis here for why this is not a common fund --

18           THE COURT:  Okay.

19           MR. BEHENNA:  -- and why there is evidence here that

20   defendants have already paid or put into a payment situation the

21   combination of the lodestar, the fees and expenses of about $40

22   million, which I'm not objecting to, plus the $75 million.  And

23   as I said before -- and perhaps plaintiffs' counsel are here and

24   they can explain it.  Why was $300 million approved to be moved

25   a year ago before there was a fee application, before there were

 1  any benefits received by the class, and before the settlement

 2  agreement was approved?  Why does $300 million go from the

 3  defendants to an escrow account?

 4          THE COURT:  All right.

 5          MR. BEHENNA:  Okay.  And the only second point I wanted

 6  to make -- so to me, it's based on payment.  Follow the dollars.

 7  Follow the dollar.  Follow the cash.

 8          My second point is it has to do with the fact that the

 9  consideration paid to the class -- excuse me -- as everyone

10  knows, the claims are brought pursuant to the Sherman and

11  Clayton Acts.  And as I said, a little bit of a repetition,

12  those acts include a fee-shifting provision.

13          And based on the settlement, there is a partial --

14  prevailing on partial success because the class, if you approve

15  the settlement, will get $2.7 billion plus the injunctive

16  benefits.  So the other side of the coin of not being a common

17  fund is I believe this meets the merits of a lodestar case based

18  on prevailing and getting consideration for release of the

19  claims.  And that's it.

20          THE COURT:  All right.  Thank you.

21          MR. BEHENNA:  Thank you very much, Your Honor.

22          THE COURT:  Stand by, because you might want to reply

23  to what the parties to the settlement agree -- argue about how

24  this is characterized.

25          MR. BOIES:  Your Honor, I think I can clear up the

 1   issue about the $300 million quickly.  At the time that we

 2   negotiated, the plaintiffs' view was that when we signed the

 3   settlement agreement, the defendants ought to put the entire

 4   amount of the settlement in escrow.  They didn't want to put

 5   anything in escrow until the final approval hearing.  And there

 6   was a recommendation from the special master that we compromise

 7   at $300 million, so that's what we did.  We obviously wanted as

 8   much put in as possible because once it gets into escrow, if we

 9   succeed in implementing the settlement --

10           THE COURT:  You might get some interest on that.

11           MR. BOIES:  -- we get the interest on it.

12           THE COURT:  Yes.  That's -- who gets the benefit, the

13   time value benefit of the money if it's approved?

14           MR. BOIES:  Well, if it's approved, we get the

15   interest.

16           THE COURT:  Right.  That's what I'm saying.  Who gets

17   the time value of the money?

18           MR. BOIES:  The Blues.

19           THE COURT:  Yes.

20           MR. BOIES:  The Blues, which is why we wanted as much

21   as we could get.  They wanted as little.

22           THE COURT:  No.  Who gets the time value of the money

23   put in the escrow?  Who gets the -- who recovers the interest in

24   the escrow if it's put into escrow?

25           MR. BOIES:  We do.  We do.

```
 1              THE COURT:  So with respect to that 300 million, you

 2   get the time value of the money --

 3              MR. BOIES:  Exactly.

 4              THE COURT:  -- if it's approved.

 5              MR. BOIES:  If it's approved.

 6              THE COURT:  And they get the time value of the money --

 7   the balance of the resolution if it's approved.

 8              MR. BOIES:  Right.

 9              THE COURT:  They get to hold on to their money a little

10   longer.

11              MR. BOIES:  Exactly.

12              THE COURT:  Okay.  So it's a negotiated division of --

13              MR. BOIES:  It was a negotiated compromise.  And it

14   didn't have anything to do with lodestar or anything like that.

15              The quick-pay provision is just a normal quick-pay

16   provision.  Again, it --

17              THE COURT:  Y'all expended 40 million of your own

18   money, thereabouts?

19              MR. BOIES:  Right.  Right.

20              THE COURT:  And this was an opportunity to -- and not

21   to mention your billed time not collected at this point?

22              MR. BOIES:  Yeah.  Exactly.

23              THE COURT:  It's not a lodestar agreement, but you're

24   still out the time value of your -- the money value of your

25   time, I guess is the way I'd put it.
```

```
 1              MR. BOIES:  Or the time value of the expenses we put

 2  in.

 3              THE COURT:  Exactly.

 4              MR. BOIES:  And again, you have quick-pays sometimes in

 5  common fund --

 6              THE COURT:  No one has challenged the quick-pay --

 7              MR. BOIES:  Right.

 8              THE COURT:  -- provision that I've noticed.  You know,

 9  I did give that -- as you know, I gave that a hard look --

10              MR. BOIES:  You did.

11              THE COURT:  -- last year on preliminary approval

12  because I hadn't had that come up before.

13              MR. BOIES:  Right.

14              THE COURT:  It turns out I think in big cases, some

15  courts consider that and approve it.  I plumbed the well, didn't

16  have an issue with it after I'd plumbed the well.

17              MR. BOIES:  Right.

18              THE COURT:  But I didn't just pass -- let you pass go

19  and collect your $75 million.

20              MR. BOIES:  Right.  And as the Court said, there's an

21  irrevocable letter of credit to make sure that the money comes

22  back if the settlement is not approved.

23              With respect to the basic issue, *Home Depot*, as the

24  Court correctly says, was a situation in which the fee did not

25  come out of the common fund.  It was a fee that was awarded by
```

```
 1   the court over and above what the common fund provided.  And
 2   the Eleventh Circuit, in its wisdom, decided that that meant
 3   that you were limited to lodestar.
 4          Now, that has nothing to do with the situation where
 5   the money comes out of a common fund.  This is just a typical
 6   common fund case.  We've got a common fund on the -- the amount
 7   of the fee that comes out of the common fund will be awarded by
 8   the Court.  And all we did was negotiate with the defendants as
 9   to what the maximum amount of that fee would be.
10          THE COURT:  All right.
11          MR. BOIES:  Thank you.
12          THE COURT:  So what's your -- I told you I'd give you a
13   chance to respond.  What's your response to all that?
14          MR. BEHENNA:  Well, my response goes back to $75
15   million still was paid.  I understand there's a letter of credit
16   backing it, but it still was paid from the defendants.  Even
17   though it's, you know, not the full lodestar, it's still a
18   significant amount of money.  And I still say -- I understand
19   counsel's -- I listened to counsel's explanation, but the papers
20   don't explain why $300 million was put in escrow.  So --
21          THE COURT:  I think he just explained that there's --
22   the class, not counsel but the class, benefits if -- and it may
23   be counsel ultimately because of the common fund claim to 25
24   percent.  But everyone on Mr. Boies' side of the case benefits
25   if they can make a return on the money that is agreed to be paid
```

 1  from the time there's an agreement until the time it's actually

 2  paid.  The Blues were not going to put all that money in escrow.

 3  And I think it was -- was it not just a negotiated amount that

 4  went into escrow so that there would be some return on the

 5  subscriber and ASO side of the case for that money not getting

 6  into anyone's pockets early?  Maybe I'm oversimplifying it,

 7  but --

 8          MR. BOIES:  No, no.  You're exactly right, Your Honor.

 9  It was entirely designed to give us -- the class -- not us, the

10  class --

11          THE COURT:  Right.  Well, and -- but, you know, it

12  benefits the class because you get 25 percent.

13          MR. BOIES:  Right.

14          THE COURT:  I guess that's actually right.  It does

15  benefit the class.  It's just extra interest earned on 300

16  million.  Now, if you could have got them to put 2.67 billion

17  into escrow --

18          MR. BOIES:  We would have done it.

19          THE COURT:  -- you would have been happy with that,

20  wouldn't you?

21          MR. BOIES:  We would have been, Your Honor.

22          THE COURT:  You know, a billion here, a billion there,

23  pretty soon you're talking real money.

24          MR. BOIES:  Even at low interest rates.

25          THE COURT:  Yes.  Okay.

```
 1            MR. BEHENNA:  So my only comment, Your Honor, is I
 2   understand that the defendants weren't going to put 2.7 billion
 3   in, and I understand that.  But there's really no explanation
 4   underlying the math underlying the $300 million.  So --
 5            THE COURT:  That was just negotiated is the
 6   explanation.  That was the amount that -- that was the amount
 7   that, pardon the pun, the subscribers could pry out of the
 8   Blues' cold, steel hands.
 9            MR. BEHENNA:  And the last comment I make on that is
10   the -- I looked for the draft escrow agreement in the documents.
11   I could not see it.  I did note that two or three members on --
12   that are going to control the escrow provisions are plaintiffs'
13   counsel.  I believe the third may be from the defendants.  I
14   don't know.
15            So I think in terms of also understanding it was just a
16   negotiated number kind of thing is understanding the release
17   provisions and the timing of when that $300 million might be
18   released to plaintiffs' counsel as opposed to the balance being
19   released to the class, I guess (b)(3) you've been calling it,
20   and also the proposed fee enhancements of over $400 million.  So
21   I think that escrow agreement, you know, is not available at
22   this time, but that also may have some -- some issues of --
23   language of concern in it.  So...
24            THE COURT:  Are you objecting to it?
25            MR. BEHENNA:  No, I'm --
```

```
 1            THE COURT:  I'm here to deal with objections, not

 2    theoretical concerns.

 3            MR. BEHENNA:  No, no.  I'm dealing with my homework

 4    assignment --

 5            THE COURT:  All right.

 6            MR. BEHENNA:  -- which is how the terms of an escrow

 7    agreement can affect whether or not someone is really being paid

 8    from a fund or was being paid separately.

 9            THE COURT:  Why would that in any way move these -- a

10    fee claim out of a below-the-line 23 point something percent of

11    the fund, common fund, into the Sherman Act's fee-shifting

12    provisions?  How --

13            MR. BEHENNA:  I'm sorry.  Can you repeat that?

14            THE COURT:  Yes.  So what the parties to the settlement

15    tell me is they are not riding on any fee recovery based upon

16    the Sherman Act's fee-shifting provisions.  I thought yesterday

17    you were saying this should be a fee-shifting -- statutory

18    fee-shifting case.

19            MR. BEHENNA:  I still feel that way.  I haven't

20    changed.

21            THE COURT:  All right.  And that was certainly an

22    option of the parties.  They could have done like in *Home Depot*.

23    They could have negotiated a fund for the class that the

24    plaintiffs' counsel made no claim on and then just -- if it was

25    structured this way, presumably, there could have been
```

1  litigation over a statutory fee that would be sent to the Court

2  for resolution, for essentially a fees trial, bench trial.

3  That's not what they chose to do, though.  They chose to

4  negotiate a common fund and allow -- and I think after that,

5  plaintiffs' counsel are now making the claim based upon pretty

6  well settled Eleventh Circuit case law that when you have a

7  common fund for a group, counsel can make a claim against that

8  fund for a benchmark.  It's 20 to 30 percent, but the benchmark

9  is generally 25 percent.

10          Is there anything else going on in this case other than

11  that, Mr. Boies?

12          MR. BOIES:  No, Your Honor.

13          THE COURT:  Okay.  So that was the parties' intention.

14  I don't know that there's any case law that I can put my fingers

15  on in the Eleventh Circuit or otherwise that would suggest that

16  that's an inappropriate way to handle it.

17          Now, I do understand just the public view of class

18  settlements and fees.  But the -- you know, the public view

19  doesn't always track with what the legal authorities are in this

20  area.  And we -- you know, I would be glad if I were at a

21  symposium for you to explain to me why all the legal authority

22  in this area is off the mark and the Eleventh Circuit should not

23  permit this.  I'm not on the Eleventh Circuit, so I have to

24  follow what they say.  If I was on the Eleventh Circuit, I'd

25  have to follow what they said unless I could convince the

 1  majority of my court to go along and overrule the precedent.  So

 2  I think that's where we are.

 3         MR. BEHENNA:  Thank you for your time, Your Honor.

 4         THE COURT:  Thank you.

 5         All right.  Anything else before I go back to

 6  providers' counsel to see if they have any thoughts on this?

 7  I'm going to give y'all deadlines for your homework in just a

 8  moment, which I know Megan Jones and others are particularly

 9  interested in hearing what those might be.

10         So do -- Joe, appreciate you being available.  I bet

11  you've been attentively listening to everything and watching

12  everything.

13         MR. WHATLEY:  Yes, sir.

14         THE COURT:  And my sense is that you are -- it's now

15  confirmed that you made the right decision by staying there.

16         MR. WHATLEY:  I believe so, Judge.  My mother doesn't

17  agree, but I believe so.

18         THE COURT:  All right.  So do the providers have any

19  statement they wish to make about this settlement?

20         MR. WHATLEY:  Judge, I think given the hour, unless you

21  would prefer us to do something else, we'll just -- I gather

22  you're going to have submissions after the fact.  At some point,

23  we're glad to submit anything that makes sense for us to send in

24  rather than keeping everybody here.

25         THE COURT:  All right.  Well, this is your time to talk

 1  to me, though.  I mean, otherwise, you're just writing me a

 2  letter.

 3          MR. WHATLEY:  Well, Judge, I think the main thing is

 4  that the release carves our claims out of the settlement.  I'm

 5  not complaining about it.  It's -- we're glad it did.  And so --

 6          THE COURT:  That means you can keep litigating.

 7          MR. WHATLEY:  It means we can keep litigating or we can

 8  try to resolve it.

 9          THE COURT:  Right.

10          MR. WHATLEY:  And, you know --

11          THE COURT:  Well, you know what?  While we're on that

12  subject, I have no problem with that.

13          MR. WHATLEY:  We don't either, Your Honor.  We

14  appreciate that.  I think you'll recall in slide 20, in fact, in

15  the preliminary -- at the preliminary approval hearing that that

16  issue of the exemption of loss was covered and Mr. Boies stated

17  the providers are not parties to the settlement, they did not

18  participate in the settlement, and our view is that this has no

19  effect on their case.  And of course, we agree.  We agree

20  wholeheartedly.

21          We're on record, Your Honor, about the effect of the

22  relief in the providers' settlement -- I mean subscribers'

23  settlement on providers; for example, docket number 2747 and

24  docket number 2786-1.  But since we're carved out of the

25  settlement, we're not parties to it, we don't think today is the

 1    time to talk about those issues.

 2         And so that's I think everything we had to say today.

 3    I'm sure that probably I could be -- in the letter to you, maybe

 4    I could be a little more articulate and give you a little more

 5    information, but that's essentially all we have to say unless

 6    the Court has questions.  And, of course, we're always glad to

 7    answer any questions the Court has.

 8         THE COURT:  Can anybody think of any counsel I should

 9    pose to provider counsel about the subscribers' settlement?

10         MR. BOIES:  We can't.

11         MR. WHATLEY:  I appreciate the invitation.

12         THE COURT:  All right.  And y'all are officially

13    claiming Barry Ragsdale now; right?

14         MR. RAGSDALE:  That's an unfair question.

15         MR. WHATLEY:  Your Honor, we have been for some time,

16    ever since your award appointing him.

17         THE COURT:  He's sitting over here, so I think that was

18    what he asked me to ask.

19         Okay.  Anything else we need to take up?

20         Thank you, Joe and Edith.  Appreciate y'all.

21         Anything else --

22         MR. WHATLEY:  Yes, sir.

23         THE COURT:  -- we need to take up from any other

24    objector?

25         Anything we need to take up, subject to briefing, from

1  any objector or any proponent of the settlement?

2          MR. BOIES:  Not from us at this time, Your Honor.

3          MR. LAYTIN:  No, Your Honor.  I know that you've talked

4  about scheduling the Zoom hearing or conference with --

5          THE COURT:  I'm going to coordinate with the special

6  master about that.

7          MR. LAYTIN:  But --

8          THE COURT:  And that's the one thing we're going to

9  leave open on this hearing is just doing the DOL issues that we

10  need to address.

11          MR. LAYTIN:  And what I want to clarify is there might

12  be posthearing briefing; but that otherwise, the record is

13  closed with respect to --

14          THE COURT:  Any reason we shouldn't take the snapshot

15  on the record that I should consider at this point?  Take the

16  team picture, as the saying goes?

17          MS. JONES:  This concludes the fairness hearing for

18  final approval.

19          THE COURT:  For anything other than the Department of

20  Labor's objection regarding ERISA plans.  Okay.  Fair enough.

21          Now, having said that, if something comes up, we'll

22  have to address it; but at this point, unless something comes

23  up, there's nothing else to address.  All right?  I just -- you

24  know, I'm a neutral.  I don't have any horse in this race, so

25  I'm just -- I am hesitant to put down the never, ever, ever

 1  language.

 2          MS. JONES:  Your Honor, for clarity for future class

 3  members -- I'm sorry.  Megan Jones with Hausfeld.

 4          For clarity for future class members, any hearing

 5  related to this hearing will be posted on the settlement

 6  website --

 7          THE COURT:  Yes.

 8          MS. JONES:  -- WWW dot BCBS settlement dot com.

 9          THE COURT:  And we'll make it available at least by

10  telephone for those who want to listen in on that conference

11  with the Department of Labor.  You can't record it, as we've

12  said before, although I realize why portions of this would make

13  you think that if you could record it, it may help with some

14  insomnia issues at night.

15          The deadline for the proponents to file any further

16  written submissions in favor of the settlement is November 12.

17  The deadline for any objectors or other interested persons to

18  respond to the proponents' written submissions is December 1.

19  And the deadline for any reply from the proponents or interested

20  parties in the settlement responding to the objectors is

21  December 10.  I think that gives everyone time to get their

22  thoughts in order.

23          Remember the advice that is usually attributable to

24  Mark Twain but goes back, I think, to a Roman citizen centuries

25  ago:  You now have time to write a shorter letter.

1          Okay?  All right.  Anything else?

2          MR. BOIES:  No, Your Honor.

3          MR. ZOTT:  No, Your Honor.  Thank you.

4          THE COURT:  All right.  5:45.  We will call it a day.

5          COUNSEL IN UNISON:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7      (Proceedings adjourned at 5:45 p.m.)

8                     * * * * * * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Risa L. Entrekin, RDR, CRR, Official Court Reporter*
*U.S. District Court, Northern District of Alabama*
*1729 5th Avenue North, Birmingham, Alabama 35203 * 334.531.0686*

1              COURT REPORTER'S CERTIFICATE

2              I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4              This 5th day of November, 2021.

5

6

7              Risa L. Entrekin
               Registered Diplomate Reporter
8              Certified Realtime Reporter
               Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25