FILED

2021 Nov-05 PM 04:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

III-

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ALABAMA
2                  SOUTHERN DIVISION

3

4  IN RE:  BLUE CROSS BLUE SHIELD    CASE NO.:  2:13-cv-20000-RDP
   ANTITRUST LITIGATION MDL 2406
5

6                    VOLUME III

7          *  *  *  *  *  *  *  *  *  *

8                  MOTION HEARING

9      FOR FINAL APPROVAL OF CLASS SETTLEMENT

10       OF SUBSCRIBER PLAINTIFFS' CLAIMS

11         *  *  *  *  *  *  *  *  *  *

12       BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES

13  DISTRICT JUDGE, at Birmingham, Alabama, on Wednesday,

14  October 27, 2021, commencing at 9:59 a.m.

15  SPECIAL MASTER:            Edgar C. Gentle III
    (via videoconference)     Attorney at Law
16                            GENTLE TURNER SEXTON & HARBISON
                              501 Riverchase Parkway East, Suite 100
17                            Hoover, Alabama  35244

18  VIDEOCONFERENCE
    REGISTRATION LIST:        Monte D. Beck
19                            Jeffrey H. Bergman
                              Wayne R. Berry
20                            Sydney Best
                              Peter R. Bisio
21                            William J. Blechman
                              David Boies
22                            Swathi Bojedla
                              Katherine R. Brown
23                            W. Tucker Brown
                              Virginia M. Buchanan
24                            Carl S. Burkhalter
                              Warren T. Burns
25                            Don Campbell

```
1    VIDEOCONFERENCE
     REGISTRATION LIST:        Kathleen Currie Chavez
2                              Evan Chesler
                               Eirik Cheverud
3                              Anna M. Clark
                               George Cochran
4                              Vincent J. Colatriano
                               Charles J. Cooper
5                              Jason S. Cowart
                               Phillip F. Cramer
6                              Gregory L. Davis
                               Karin DeMasi
7                              Ronan P. Doherty
                               Augusta S. Dowd
8                              Jason Ethridge
                               Kimberly Ann Fetsick
9                              Michael J. Fleming
                               Robert M. Foote
10                             Linda G. Flippo
                               Theresa S. Gee
11                             David P. Germaine
                               Reuben Goetzl
12                             Michael E. Gurley Jr.
                               Jeffrey M. Hahn
13                             Katherine Harbison
                               Zenola Harper
14                             Michael David Hausfeld
                               Christopher T. Hellums
15                             S. Scott Hickman
                               E. Desmond Hogan
16                             Mark Montgomery Hogewood
                               Zachary D. Holmstead
17                             Elizabeth Brooks Honkonen
                               Craig A. Hoover
18                             Hamish P.M. Hume
                               Emily Curran Irvin
19                             William A. Isaacson
                               John M. Johnson
20                             Megan Jones
                               Elizabeth A. Jose
21                             Rebecca Josefiak
                               Edith M. Kallas
22                             Lauren R. Kennedy
                               Cavender C. Kimble
23                             Daniel E. Laytin
                               William Lehman
24                             Casey Langston Lott
                               Joann M. Lytle
25                             Deirdre MacCarthy
```

```
 1   VIDEOCONFERENCE
     REGISTRATION LIST:          Jonathan S. Mann
 2                               David Maxwell
                                 Patrick McDowell
 3                               Duncan McIntosh
                                 Lucy Grey McIver
 4                               Robert Meyer
                                 Wilson Daniel Miles III
 5                               Susan Miller
                                 Michael A. Naranjo
 6                               W. Scott Nehs
                                 Catherine Nelson
 7                               Elaine Nichenko
                                 James K. Nichols
 8                               Jess Randall Nix
                                 Richard D. Nix
 9                               Eric Osborne
                                 Allen Page
10                               Dennis G. Pantazis
                                 Joshua K. Payne
11                               Michael R. Pennington
                                 Aaron S. Podhurst
12                               Henry C. Quillen
                                 Karen Quirk
13                               Barry A. Ragsdale
                                 Brenda Ann Rigas
14                               William V. Rossi
                                 Nicholas B. Roth
15                               Stephen A. Rowe
                                 Alan D. Rutenberg
16                               John G. Schmidt Jr.
                                 Anthony F. Shelley
17                               Richard Sherburne
                                 Matthew Slater
18                               Paul Slater
                                 Cyril V. Smith III
19                               Scott Burnett Smith
                                 Kathleen Taylor Sooy
20                               Mark Spencer
                                 Robert K. Spotswood
21                               Wendy Springer
                                 Todd M. Stenerson
22                               Andrew M. Stone
                                 Ami Swank
23                               Courtney Tedrowe
                                 Jason J. Thompson
24                               Ben Thorpe
                                 Joseph M. Vanek
25                               Brian Vick
```

```
 1  VIDEOCONFERENCE
    REGISTRATION LIST:        Amy Walker Wagner
 2                            Kimberly R. West
                              Joe R. Whatley Jr.
 3                            J. Mark White
                              Austin Whitten
 4                            Linda A. Willett
                              Pamela Williams
 5                            Helen E. Witt
                              Brian Wonderlich
 6                            Edward Kirk Wood Jr.
                              W. Gregory Wright
 7                            David J. Zott
                              Jason A. Zweig
 8
    (Other counsel were present via telephone but not identified)
 9
            Proceedings reported stenographically via remote
10          videoconference; transcript produced by computer.

11                      * * * * * * * * * *

12      (The following proceedings were heard before the Honorable

13      R. David Proctor, United States District Judge, at

14      Birmingham, Alabama, on Wednesday, October 27, 2021,

15      commencing at 9:59 a.m.:)

16          THE COURT:  All right.  There's a saying in life:  If

17  you're not early, you're late.  We're about a minute till, but I

18  thought we'd go ahead and get started.

19          We're here in In Re:  Blue Cross Blue Shield Antitrust

20  Litigation, MDL Number 2406, our master file number 13-cv-20000.

21          The Court conducted a full two-day fairness hearing

22  last week.  The Secretary of Labor had requested leave to file a

23  statement of interest and to participate in the fairness

24  hearing.  I granted that by order yesterday.  Last week, we

25  agreed, though, that we would take up the Secretary's concerns
```

1  in a Zoom call this week.  That's been scheduled, and we are

2  here.

3          I know we've got 68 participants on Zoom and probably a

4  many number -- a greater number than that participating or

5  listening in by phone.  I appreciate everyone maintaining

6  yourself on mute unless you are not -- unless you're presenting

7  to the Court, just to avoid any background noise.

8          Who will be speaking on behalf of the Secretary of

9  Labor?

10          MR. HAHN:  Your Honor, I will be.  This is Jeff Hahn.

11          THE COURT:  Thank you.

12          MR. HAHN:  And my colleague, Wayne Berry, is here as

13  well.

14          THE COURT:  All right.  Thank you.

15          So I'm going to get -- let you get started.  Just a

16  couple of clarifying questions.  Your request had made a

17  reference to appearing as amicus curiae.  Technically, in the

18  district courts, we don't have friends.  We have people who have

19  an interest in the case, and I recognize you as that.  The

20  Supreme Court and Court of Appeals, they have more friends than

21  us, as it turns out.

22          MR. HAHN:  (Nods head)

23          THE COURT:  I'm wondering, though, if you're properly

24  characterized as a governmental objector or just a government

25  agency stating a concern about the settlement.  How would you

 1   characterize yourself?

 2         MR. HAHN:  Well, at this point, I think consistent with

 3   the -- how we styled our brief, I think we are a government

 4   entity stating concern about the case.  As I can get into, we

 5   are talking with the parties about ways to resolve those

 6   concerns.  So at this point, I would just characterize us as

 7   stating concerns.

 8         THE COURT:  All right.  And I've got your written

 9   submission regarding those concerns.  I feel like I probably

10   ought to let you go ahead and get started.  How would you give

11   me a helicopter ride over the concerns at this point?

12         MR. HAHN:  Sure.  Well, before I do that, Your Honor, I

13   just want to thank you for allowing us to appear today and file

14   our statement of interest.  And I also, as I was alluding to,

15   want to make clear before I get into an overview of our concerns

16   that, you know, our -- even though those concerns are very real,

17   the -- our intention is to be practical and constructive.  And

18   to that end, we have been talking to the parties for some time

19   about ways to resolve those concerns while retaining the

20   existing structure of the agreement.  We have no such agreement

21   with the parties at this point.  We did not have one last week.

22   So obviously, we felt we needed to file our statement of

23   interest.

24         So in terms of why we're here in the first place, as

25   Your Honor knows, ERISA plans are among the class members in

 1    this case alongside the employers responsible for those plans

 2    and the employees who participate in those plans.  And as their

 3    status as class members I think indicates, ERISA plans are

 4    distinct entities that -- from the employers that can sue and be

 5    sued.  And ERISA makes that explicitly clear.

 6            Furthermore, the fiduciaries who oversee ERISA plans

 7    have duties that run exclusively to those plans and not to the

 8    employers that sponsor them.  And that is true even if the

 9    employer is also the fiduciary.  When acting as fiduciary, the

10    employer must act only in furtherance of the plan's interests

11    and not its own.  And this distinction between employer and plan

12    is also reflected in ERISA's prohibition on plan assets inuring

13    to the employer's benefit.  So the upshot, as background, is

14    that plans and employers are in no sense one and the same.

15            And so with that as backdrop, the central problem from

16    our perspective with this agreement is that it does not treat

17    the ERISA plans as distinct class members with distinct -- with

18    the distinct interests that they have.  It, instead, appears to

19    give the lion's share of the recovery to the employers -- and

20    this is the important point -- while, at the same time,

21    requiring the plans to release their claims against the Blue

22    Cross defendants, which are plan assets, in exchange for their

23    potentially nonexistent recovery.  And that act, in our view,

24    could be a fiduciary breach and what's called a prohibited

25    transaction in ERISA.

```
 1              So just to illustrate our problem I think most vividly,
 2    make it a little bit more concrete, is when you consider what
 3    happens with employees when employees in ERISA plans do not make
 4    claims to the claims administrator.  As I'm sure the Court
 5    knows, when an employee makes a claim -- let's assume it's a
 6    fully insured plan and let's assume also the employee is not
 7    making a claim under the alternative method.  They're making a
 8    claim under the default option.  They are entitled to recovery
 9    based on an assumption, in a self-only situation, that they
10    paid -- 15 percent of their premiums came from their own
11    employee contributions.  And the employer, in that instance,
12    gets the recovery for that employee's premiums under the
13    assumption that the employer paid 85 percent of the premiums.
14              But when employees do not make a claim, then a hundred
15    percent of the premium for that employee gets -- reverts to the
16    employer.  And, of course, a hundred percent includes the
17    portion of the premium that was paid for with employee
18    contributions.  And in our view, it's one thing for employers to
19    obtain recoveries attributable to their own employer
20    contributions, but there is no conceivable justification, in our
21    opinion, for employers to obtain recoveries attributable to
22    employee contributions.  That -- those recoveries should, in the
23    first instance, go to the employees if they make claims.  If
24    they do not make claims, they should go to the plan in which the
25    employees participated and to which they made contributions.
```

1          And so the fact that the settlement agreement -- and

2   this is sort of the low-hanging fruit here -- does not ensure

3   that these what I'll call unclaimed employee contributions go to

4   the plan exemplifies -- or best exemplifies, in our view, why

5   the plans do not seem to be adequately represented in this

6   negotiation.  And it also --

7          THE COURT:  Let me ask you this.  On adequate

8   representation, we do have several class members who are plan

9   named fiduciaries; correct?

10          MR. HAHN:  It's for -- I think that's correct.

11          THE COURT:  So why wouldn't that, in and of itself, be

12   adequate representation, at least on the surface?  And then the

13   question becomes, well, did they act -- have they acted

14   inconsistently with class member interests.  So how would you

15   respond to that?

16          MR. HAHN:  Well, certainly -- so, many employers are

17   also fiduciaries.  So this is a point that's been made quite a

18   bit by the parties.  And so to that extent, yes.

19          THE COURT:  For example, Hibbett Sports.  Hibbett

20   Sports is one; correct?

21          MR. HAHN:  I don't know for sure if they are a plan

22   administrator, but we can stipulate that they are for purposes

23   of this discussion.

24          THE COURT:  Okay.

25          MR. HAHN:  I think that the concern is that, you

1  know -- that they may well have been -- you know, many of these

2  class members are fiduciaries.  We can stipulate to that.  But,

3  again, the fact that this agreement does not, at the very least,

4  ensure that these unclaimed employee contributions go to the

5  plan's benefit indicates that they were not acting or thought of

6  themselves as fiduciaries in the context of this agreement.

7        THE COURT:  Let's say XYZ Company has -- is a plan

8  fiduciary and has a responsibility along the lines you've just

9  outlined with respect to your -- to an ERISA plan fiduciary and

10 they make a claim as part of the claims administration procedure

11 in this case.  They receive funds.  At that point, what occurs

12 to those funds downstream may or may not be consistent with

13 ERISA obligations; correct?

14       MR. HAHN:  Well, that's correct.  Yeah.  And I think I

15 would say -- I would say -- one thing I want to make clear is

16 it's not clear what ERISA obligations would apply.  Once there's

17 been a distribution made to an employer under this agreement, I

18 mean, it's not exactly clear what the ERISA obligations are.

19 And even if they -- even if that --

20       THE COURT:  Forgive me if I say this.  There's not a

21 lot clear about ERISA to begin with.

22       But my point is this.  The settlement does not dictate

23 what a plan fiduciary does with the money it receives as part of

24 a claim.  It can act wholly consistent with its ERISA

25 obligations and distribute the money consistent -- the

1   settlement proceeds consistent with those obligations.  Your

2   position, I think, would be they in fact have the responsibility

3   to do just that; correct?

4          MR. HAHN:  Well, certainly to the extent they have

5   ERISA obligations over their settlement recoveries, they

6   absolutely have that obligation.

7          THE COURT:  So what --

8          MR. HAHN:  I think the question --

9          THE COURT:  So what about the settlement prohibits or

10  makes it unlikely or more difficult for a plan fiduciary to

11  comply with ERISA?

12         MR. HAHN:  Well, certainly nothing prohibits compliance

13  with ERISA.  The question, I guess, is would ERISA even apply to

14  a recovery by an employer under the terms of this agreement.

15  Because, you know -- and I'm -- I can't say one way or the other

16  at this point.  Still looking at that.  But, you know, it's not

17  at all clear that -- let me just give you an example of when I

18  think it clearly would apply.

19         If this agreement earmarked money for the plans and

20  money were distributed to an employer for the benefit of the

21  plan, then clearly the plan would have an interest in that

22  distribution.  The employer's receipt of that distribution would

23  be something over which they would have fiduciary obligations.

24  And, you know, we may not even be here.  But it's not at all

25  clear that that is the state of play here.

1          I mean, it -- you know, the employers are getting this

2    money under this agreement, which does not appear to give the

3    plans money.  And so in that circumstance, it's not at all clear

4    what obligations they have.  And even if -- even if we could,

5    you know, say that they had some obligations, it's a question of

6    whether or not they would follow that.

7          But I think the first -- the first --

8          THE COURT:  Let me ask you this.  If you were drafting

9    this settlement agreement in a way that you think is consistent

10   with your arguments today, what would look differently about it?

11   What would it say?

12         MR. HAHN:  Well, again, just as an example -- I mean,

13   and not going to say this would be the only thing, but just as

14   an example, I think in our view, at the very least, what I

15   referred to earlier as the unclaimed employee contributions.  So

16   when employees fail to make claims, instead of, as it currently

17   stands, that a hundred percent of that employee's premium goes

18   to the employer, at the very least, the employee contribution

19   portion of that premium would go -- would be separately

20   earmarked for the plan.  I think that would be something, just

21   as an example, that we would have expected in -- if -- in this

22   agreement.

23         THE COURT:  Well, but if the employer, in some --

24   through whatever operation the claims procedure currently has in

25   place, ends up with those funds, the employer still may have

1   responsibilities to take some action with respect to those funds

2   consistent with its fiduciary duty; right?

3          MR. HAHN:  Well, that's a difficult question, quite

4   honestly.  And I think -- I think the concern is if the ERISA

5   plans, as class-member plaintiffs in this case, agreed in the

6   settlement agreement, arguably, to -- that the employers could

7   have that money, then, you know, it's not clear what ERISA

8   obligations the employers would have over that.  That's money

9   they're getting under an agreement which the plans, as class

10  members, appear to agree.  So I don't want to answer

11  definitively on that at this point because we're still looking

12  at that, but it's a difficult question under this agreement,

13  as --

14         THE COURT:  Y'all received notice of this within the

15  time frame contemplated by CAPA.  It doesn't really help me a

16  lot as I'm sitting here trying to approve this and you say,

17  well, we're still studying that.

18         MR. HAHN:  Well --

19         THE COURT:  If it's that murky, then I don't know that

20  I'm going to be able to figure it out.

21         MR. HAHN:  Well, I think the murkiness is -- well, just

22  on the notice thing, we did -- unfortunately, we got notice of

23  this much later than when we hoped to have; but regardless,

24  that's water under the bridge.

25         THE COURT:  When did you get -- when did you receive

1  a -- when did you receive your notice of the settlement?

2       MR. HAHN:  From what I understand, we didn't -- we

3  weren't notified of the settlement or we didn't hear about the

4  settlement until I think May.  And my colleague, Wayne Berry,

5  can speak more to it if you're interested, but that's my

6  understanding.

7       So -- but to answer your question, the murkiness of

8  that question I think sort of just underscores the point, which

9  is that, you know, this is not how, if this were properly

10 negotiated, that this would go because, you know, it's just

11 entirely unclear what would happen if, again, this money is

12 distributed to employers and then they're just -- they are left

13 with their own offices to allocate it as they see fit, whether

14 under ERISA or otherwise.

15      THE COURT:  Let me back you up on this May date.  My

16 understanding was that on November 7, 2020, so almost a year

17 ago, the settling defendants provided notice of the settlement

18 to appropriate federal and state officials under CAPA, and that

19 included the United States Department of Justice.  According to

20 your letter, DOL did not learn of the settlement until six

21 months later.  Is that because Justice fell down on its job in

22 getting you notice of this settlement?

23      MR. HAHN:  That -- yeah.  I don't -- I don't know --

24 that's -- it might not have been clear that -- you know, from

25 this settlement that DOL's, you know, equities would be

1    implicated.  So I don't want to blame Justice, per se, but it

2    didn't wend its way to us from Justice.  We learned about it

3    through outside practitioners.  Again, my colleague can add more

4    color, I think, to that if -- that's fairly --

5            THE COURT:  Justice is responsible for disseminating

6    the notice within the United States under CAPA internally;

7    right?

8            MR. HAHN:  I'm sorry.  Did you say somebody is?

9            THE COURT:  Someone at Justice has the responsibility

10   of notifying its clients -- Justice is your lawyer in this -- at

11   least in this respect; right?

12           MR. HAHN:  As far as I understand, that's correct.

13           THE COURT:  So they've got a responsibility internally

14   and within the United States to provide notice, so -- all right.

15   Let's say that you should have gotten notice earlier than May.

16   You still got notice five months ago.  The settlement

17   agreement's -- I guess I'm still trying to figure out exactly

18   what your -- what you would -- if you would have been sitting at

19   the table from day one and you had your way, how this settlement

20   would look -- provisions would look differently.

21           MR. HAHN:  Well, yeah.  Again, I mean, I just want to

22   give you that example because that, to me, is the most salient

23   example, which, again, is --

24           THE COURT:  Okay.  So unclaimed employee contributions

25   should have been separately earmarked into a separate fund that

 1   the claims administrator would have made sure went to employees

 2   rather than relying upon the employer to get them into the right

 3   fund after receipts.

 4          MR. HAHN:  Correct.  And I think it is that any money

 5   attributable to employee contributions should not go to the

 6   employers.  It should go to the employees or to the plan.  And

 7   that should be clear in the -- that should have been clear in

 8   the agreement.

 9          THE COURT:  Employees can make their own claim --

10          MR. HAHN:  Yes, sir.

11          THE COURT:  -- with respect to the premium portions

12   they've paid; right?

13          MR. HAHN:  Correct.

14          THE COURT:  All right.  You're talking about the

15   percentage of the employer contribution that you think benefits

16   the employees.

17          MR. HAHN:  Yeah.  I'm talking about -- again, I'm

18   talking about to the extent employees don't make claims -- and

19   of course, not all of them will be making claims.  That's sort

20   of baked in the cake here.  We know that that's going to be the

21   case.  The current agreement contemplates that in that instance,

22   100 percent of the premium paid for that employee will go to the

23   employer.

24          THE COURT:  So let me ask you this.  What's been your

25   experience in the past with respect to these large financial

1  settlements with multiple -- in this case, it looks like we're

2  going to have millions of claims.  Is it not reasonable for the

3  parties to task the settlement administrator with making a

4  payment to an employer in this instance and then the employer

5  has the legal obligation about what should be done with respect

6  to that payment?  And the -- otherwise, the claims administrator

7  becomes almost the supervisor of ERISA obligations.  Why not

8  just pass that -- why not pass that downstream to the employer?

9  And if the employees think the employer has not done -- not

10 fulfilled its responsibility under ERISA, they could bring an

11 administrative or litigation claim against the employer in that

12 instance rather than making a settlement administrator police

13 this for what may be millions of employers.

14        MR. HAHN:  So let me just clarify.  The central problem

15 in this settlement is not what ERISA requires of the settlement

16 funds.  The problem is that there appeared to have been no, you

17 know, representation and, thus, assurance -- or adequate

18 representation and, thus, assurance that the settlement itself

19 earmarks money for the plans.  And so --

20        THE COURT:  My -- I think you're -- and maybe I wasn't

21 clear with my question.  Let me take another shot at it.

22        You're saying this money should be earmarked up front

23 by the settlement agreement, in effect, the settlement

24 administrator; right?

25        MR. HAHN:  Well, yeah.  You asked me what would be --

```
1   how would I -- what would be the ideal way of making --
2            THE COURT:  Yes.
3            MR. HAHN:  Yes.
4            THE COURT:  You said we should have had a -- we should
5   have a separate procedure when we have a situation like this
6   where the money -- rather than being paid directly to an
7   employer and trusting the employer to do what's right, we should
8   have forced that issue earlier on in the process, in the claims
9   process, and simply earmarked that money into a separate fund
10  for employees to come make a claim at that point.
11           MR. HAHN:  Correct.
12           THE COURT:  Is that your argument?
13           MR. HAHN:  Well, for -- yeah, for that.  It would be
14  separately earmarked such that it was clearly money for the
15  plan's benefit.  And the importance of that is that once that
16  is -- if that was the case, then -- clearly the plan has an
17  interest in that money.  That is a plan asset.  And so if the
18  employer gets that money sort of on behalf of the plan, there's
19  no question at that point; but if the employer has --
20           THE COURT:  All right.  Let me ask you this.  I
21  understand your argument.  I'm trying to get a question to you
22  now.
23           MR. HAHN:  Sorry.
24           THE COURT:  Each plan is different, though; right?
25  There's not going to be a uniform percentage across the board
```

1   that applies to all plans about what would be earmarked under

2   your example; true?

3           MR. HAHN:  Well, again, it wouldn't -- I don't know if

4   I would -- again, the way I was just conceptualizing it, it

5   would simply be -- you take the same exact default percentages

6   that are in the agreement.  It would simply be that for the

7   employees who don't submit claims -- you know, instead of if

8   they submit a claim, 15 percent goes to the employee, the change

9   that I'm referring to is if they don't submit a claim, then the

10  15 percent that would have gone to them had they submitted a

11  claim would go to the plan.  So that's the only thing --

12          THE COURT:  You're the settlement administrator.

13  You're the settlement administrator.  Are you going to have to

14  then figure out with respect to each plan whether and how many

15  employees submitted claims before you'll know what the earmark

16  should be?

17          MR. HAHN:  I think that would be -- that would have to

18  be the case because what I -- what I just described to you would

19  be a situation where all unclaimed employee contributions are

20  going to the plan; thus, you would have to know how many, you

21  know, people have submitted --

22          THE COURT:  How many employees made claims.

23          MR. HAHN:  Correct.

24          THE COURT:  So you're going to have a pretty

25  complicated case-by-case calculation or analysis for each of the

1  many different plans that are at issue in your statement of

2  concerns as opposed to simply saying, all right, employers,

3  here's the money for employee claims, employer claims; you treat

4  this money as you should under the law.

5       That goes without saying, doesn't it, that the employer

6  should have to do that?

7       MR. HAHN:  Yeah.  I guess -- again, the problem,

8  though, it is not at all clear what the law requires of

9  employers in receipt of distributions under the terms of this

10  agreement.

11       THE COURT:  Is it clear what the law requires in terms

12  of what would be earmarked in each -- on an across-the-board --

13  in other words, what I'm -- your procedure that you're

14  suggesting may increase the settlement administrator's work

15  exponentially.  Do you see that?

16       MR. HAHN:  Well, so -- you know, and this question

17  might be better put in the first place to the parties' counsel.

18  We have not talked to them in any granular detail about the

19  logistics of how this particular proposal would work if the

20  administrator were to have to figure out how much to -- how many

21  unclaimed employee contributions there were.

22       THE COURT:  I think that's an excellent idea.  I think

23  that's an excellent idea, and you're being practical.  So let's

24  let them weigh in at this point on this particular concern.  And

25  maybe I'm just misperceiving it.  I'm trying to understand your

1    argument.  I'm trying to see how this would work practically on

2    the ground, if your proposal won the day, for our settlement

3    administrator.

4         Who wants to speak to that in terms of a proponent of

5    the settlement and someone who opposes the Department of Labor's

6    concerns?

7         MR. BOIES:  Your Honor, this is David Boies.

8         I think Mr. Hume is going to address this generally,

9    but I wonder if I could just ask a question.  Because I think I

10   might -- I might see a way through this if I understand

11   Mr. Hahn's position.

12        As I understand Mr. Hahn's position -- and correct me

13   if I'm wrong -- the concern here is that the settlement

14   agreement, the way it's drafted, may immunize or take away an

15   obligation that the employer would have under ERISA.

16        Do I understand that correctly?

17        MR. HAHN:  Yeah.  That is one way of putting it.  I

18   guess I would just say the agreement arguably, you know, by

19   granting -- by seeming to grant employers this right,

20   essentially might answer the ERISA question.  If plans are

21   giving away their rights to the employer, then that's the end of

22   the -- that's the end of the -- yeah.

23        MR. BOIES:  And I wonder whether, if that's the case,

24   if that's the concern, this couldn't simply be solved by

25   providing in the final approval order -- and providing notice of

 1   that to the employers -- that this does not in any way affect

 2   their obligation under ERISA and that, for example, if they have

 3   employee contributions that they are getting paid for, they have

 4   an obligation to put that into the ERISA plan.  Wouldn't that

 5   solve the problem that you're talking about?

 6           MR. HAHN:  Well, again, I mean, look, any order we

 7   could get that would require that I think would be good.  It's a

 8   question of, you know, in fact, what does ERISA require of

 9   employers who are in receipt of distributions under the terms of

10   this agreement, which, again, appears to give employers, you

11   know, the full -- you know, the full boatload of contributions.

12           THE COURT:  I think Mr. Boies is highlighting the fact

13   that there are two concerns that you may be articulating.  One

14   is -- and the one he's addressing is the bigger one for me.

15           The first, though, is that you think the procedure

16   should force the claims administrator to police the division on

17   a plan-by-plan basis such that these funds that you contend

18   should be going directly to the plans for the benefit of the

19   employees don't end up in the employer's pocket.  So you think

20   there should be a procedure to make sure that occurs.  Okay?

21   That's the first concern.

22           My answer to that would be, all right, I think it would

23   be more efficient to have the employer be able to make the claim

24   on behalf of the plan and the employer.  And in many instances,

25   an employer is both the sponsor of a plan and the fiduciary of

1  the plan.  But let them make the claim, and then the expectation

2  is they will comply with their fiduciary responsibilities in the

3  unique facts and circumstances of the proceeds that come forward

4  on that claim.

5          Mr. Boies has highlighted a second concern that makes

6  sense to me, and that is we don't want to make sure anything in

7  the settlement immunizes the employer from having to perform its

8  duties after the fact and would, in some way, run end-around the

9  efficiency we're trying to build in there.

10          MS. JONES:  Your Honor, that's -- I apologize if you

11  weren't done.

12          THE COURT:  Go ahead, Megan.

13          MS. JONES:  Yeah.  So one of the -- I'm happy to report

14  that what you just articulated is one of the actual points we

15  all agree on, which is that the rights of an ERISA plan to an

16  employer are not affected by this agreement, which is --

17          David, which is what you were trying to articulate.

18          And the settlement agreement between the parties -- you

19  can see Zach is nodding.  We all agree from the plaintiffs and

20  the defendants that an ERISA plan's rights to sue an employer if

21  they don't like what happens is unaffected by this agreement.

22          THE COURT:  And does that -- do we have to do anything

23  to clarify that in the approval order?

24          MS. JONES:  No, we do not, Your Honor.

25          THE COURT:  But it wouldn't hurt.

```
 1              MS. JONES:  I just -- I apologize.

 2              THE COURT:  It would not hurt, though.

 3              MS. JONES:  It --

 4              THE COURT:  It would not hurt to acknowledge that the

 5   parties --

 6              MS. JONES:  Correct.

 7              THE COURT:  -- have drafted the settlement agreement --

 8              MS. JONES:  Correct.

 9              THE COURT:  -- and the only thing the Court is

10   approving is a limitation on any waiver such that a plan would

11   not waive any claims against the employer.

12              MS. JONES:  That's correct.  And to set the table for

13   what Hamish is going to talk about and what Your Honor briefly

14   touched on, we do have approximately seven million claims to

15   date.  230,000 of those are employers.  We have some

16   individuals.  We have many, many employees.  And to be able to

17   do the kind of granular work that the DOL is perhaps suggesting

18   would require granularity on all of those claims because we

19   would have to find out within the seven million are there Google

20   employees if Google submitted a plan.

21              And so I think administratively, you know, if you did

22   the math of, you know, one hour per claim -- you know, per

23   claimant of seven million people, you can see the amount of

24   expense -- because someone is going to have to pay for that --

25   and as well as the burden and timing of getting money to the
```

```
 1    class.
 2             THE COURT:  It would slow down everybody getting
 3    funds --
 4             MS. JONES:  It --
 5             THE COURT:  -- and particularly -- and it would
 6    particularly, arguably, slow down even more the beneficiaries of
 7    the provision.  Because if you're an employee and you've got a
 8    Google employer who got flagged, it may be that some people get
 9    checks cut because it's clear they're not employed by any of the
10    250,000 employers --
11             MS. JONES:  That's right.  That's right.
12             THE COURT:  But there's going to have to be substantial
13    work done trying to separate wheat and chaff.
14             MS. JONES:  That's right.  And, you know --
15             THE COURT:  So my idea is efficiencywise, it makes
16    sense to let that process occur downstream, after the money is
17    paid in, with the full understanding, though, that if it's not
18    done, everyone has recourse.
19             MS. JONES:  That's right.  And this is -- you know,
20    Your Honor is well familiar with the kind of class settlements
21    that occur.  You know, in the municipal bonds case in front of
22    Judge Marrero, we distributed tax-exempt proceeds back to
23    municipalities.  And we did not confer with the IRS about making
24    sure they did the right thing with those funds.
25             I think Your Honor knows, from medical devices to
```

```
 1    drugs, we make distributions to claimants.  We don't check about
 2    divorce settlements or beneficiaries or where the money actually
 3    goes and whether they report it to the IRS.  That's usually not
 4    aligned with --
 5            THE COURT:  And the end result of that would be if
 6    there is actually a dispute that occurs between a plan and an
 7    employer --
 8            MS. JONES:  That right is unencumbered.
 9            THE COURT:  -- the plan is going to be much more able
10    to enforce rights efficiently if they can go straight into a
11    court of competent jurisdiction and assert that claim as opposed
12    to get in line with everyone else here and eventually work their
13    way to my desk and have me enforce that.
14            MS. JONES:  That's our view.
15            THE COURT:  That seems to me to be another huge
16    efficiency with the current system.
17            But I think Mr. Hahn's point -- second point is well
18    taken, and that is we need to make sure that there's no bar
19    built in here that would immunize an employer from that.
20            MR. BOIES:  Yes.
21            MR. HOLMSTEAD:  Your Honor, this is Zach Holmstead for
22    the defendants.  I just wanted to confirm that we agree that the
23    settlement agreement does not release any claims that an ERISA
24    plan might have against the employer.  And that's been clear in
25    the agreement since day one.  We're comfortable if the Court
```

 1  wants to state that in the final approval order.  This obviously

 2  wouldn't require renotice or anything like that or supplemental

 3  notice because it's been in the agreement.  The agreement was on

 4  the settlement website.  But to the extent there's a statement

 5  in the final approval order on this, that would be fine with us.

 6          THE COURT:  All right.

 7          MR. BERRY:  Your Honor, if I might, Wayne Berry for the

 8  Department of Labor, Your Honor.  If I might just say a few

 9  words.

10          THE COURT:  Yes, you may.

11          MR. BERRY:  So the Department definitely believes that

12  something in the final order, if it's, you know, language we

13  could all agree on, could go a long way to helping the

14  situation.

15          But just a few things to bring to the Court's

16  attention.  The notion that, you know, this is like every other

17  settlement and everything occurs downstream, I understand the

18  appeal of that.  And to a certain extent, it's absolutely

19  correct except one difference here is that the ERISA plans are

20  class members and could have been given a seat at the table but

21  were not.

22          The other thing about --

23          THE COURT:  Am I to understand -- I guess I don't

24  understand that.  Are they -- how were they not adequately

25  represented by the groups that were at the table?

```
 1          MR. BERRY:  Well, because if the employer is acting as

 2  the employer when he's negotiating as opposed to the plan

 3  fiduciary, he's not acting for the benefit of the plan.

 4          THE COURT:  All right.  So --

 5          MR. BERRY:  It's a little difficult -- it's a little

 6  difficult for the employer to act in both capacities and do

 7  both -- represent each equally well.

 8          THE COURT:  Let's -- we're talking about the monetary

 9  relief that you're concerned about, not any type of structural

10  relief; correct?

11          MR. BERRY:  Yes.

12          THE COURT:  All right.  So monetary relief.  What would

13  someone -- what would a plan have done differently sitting at

14  the table?  It would have tried to maximize the amount that

15  every member of the class got; correct?

16          MR. BERRY:  I believe it -- that would be true.  But I

17  think it would have been focused on -- as Mr. Hahn has alluded,

18  on making sure that there is some representation in the division

19  of the proceeds --

20          THE COURT:  Okay.  Let's --

21          MR. BERRY:  -- between an employer's share --

22          THE COURT:  Let me see if I can get an answer to my

23  question.

24          MR. BERRY:  Yep.

25          THE COURT:  The first thing is let's maximize the
```

1    amount everybody gets; correct?

2          MR. BERRY:  Correct.

3          THE COURT:  All right.  No question -- you're not

4    raising a concern on behalf of the Department of Labor that that

5    failed, are you?

6          MR. BERRY:  No, sir.  No, sir.

7          THE COURT:  All right.  So your question is allocation.

8          MR. BERRY:  Well --

9          THE COURT:  Should we have something built into the

10   process that makes sure that an ERISA plan gets what an ERISA

11   plan is entitled to legally in the settlement; right?

12         MR. BERRY:  Yes.  To put it in your terms, that the

13   ERISA plan maximized its return under the settlement.

14         THE COURT:  But each plan's maximization is going to

15   depend upon the unique circumstances of how many claimants there

16   are within that plan; correct?

17         MR. BERRY:  It could, yes.

18         THE COURT:  I think it would.  Won't it?

19         MR. BERRY:  Well, I think there's a couple of things

20   that could impact that.  There's a provision in the settlement,

21   as I understand it, if a claim actually turns out to be $5 or

22   less, the claim isn't going to be paid.  So if a large number of

23   employees file claims, that's going to drive down the dollar

24   amount for each of that employee's claims.  So we could --

25         THE COURT:  That would be an across-the-board concern;

1     right?  That's not just unique to ERISA plan members.  That's --

2            MR. BERRY:  No.  That's absolutely right.  But I think

3     it illustrates sort of the points that we were making where you

4     could have a situation where just because of the way the

5     settlement is structured in that sense, those employees whose

6     claims won't be paid -- they've already submitted a claim, so we

7     already know there's a claim on that.  But that pot of money, I

8     believe, then goes back into the group money and goes back to

9     the employer.

10           THE COURT:  Well, at that point --

11           MR. BERRY:  So it's not -- it's not just one claim.

12           THE COURT:  At that point, then -- let's say we have an

13    ERISA plan that is particularly affected by that provision.

14    They've got a number of employees who have made claims but

15    they're all under the $5 limit and they're not paid out and,

16    therefore, the employer ends up with what might be a larger

17    amount of money based upon these de minimis claims being

18    aggregated into its payment to the employer.

19           Those -- if there's no immunization of the employer

20    with respect to ERISA obligations, those employees, then, are

21    virtually identical to employees who made no claim.  They can

22    assert to the ERISA plan -- on behalf of the ERISA plan to the

23    employer, hey, you've got a responsibility to put that money

24    back in where it should be based upon your obligations.  And

25    it's going to end up back in the ERISA plan on a downstream

1   procedural mechanism.  Am I missing something?

2          MR. BERRY:  I think Your Honor is correct.  I just

3   wonder if because we know that claim has been filed and been

4   determined to be *de minimis*, if that addresses some of the

5   concern on the settlement administrator's side of having to

6   identify on a case-by-case basis, you know, claims that weren't

7   made.  Right?  I mean those claims would have been made.

8          THE COURT:  Let me ask this.  Let's say you could even

9   retain Mr. Hahn to help you.  How much would you charge me to be

10  the claims administrator that has to do all this granular

11  analysis in this settlement?

12         MR. BERRY:  I understand Your Honor's point, and I

13  agree with you a hundred percent.  This is not going to be

14  something that is going to be inexpensive.  I can't put a number

15  on it, but I can agree with you that there is going to be

16  additional cost for this.  But one other --

17         THE COURT:  It would slow down -- it would slow down

18  the claim proceeds getting to everyone who makes a claim and,

19  arguably, it would slow down the claim process for the ERISA

20  plans to get their money.  Even if they could get it directly

21  through the settlement, I can make a pretty strong argument, I

22  think, that they're going to get this money more quickly if we

23  don't include this type of granular analysis on the -- place

24  that on the claims administrator's plate, pay the money to the

25  employer, and let each plan assess whether the employer has

1  fulfilled its responsibility by distributing -- allocating the

2  money correctly.

3          And if they haven't, it's -- you know, ERISA litigation

4  is usually on a pretty quick track in my court.  We don't have

5  juries.  It's usually decided on the papers.  I think most of

6  the facts in a case like that would be undisputed.  It seems to

7  me they would have a much more quick resolution of their

8  concerns than they would if they had to have the claims

9  administrator do this on a one-by-one basis and then, if they

10 didn't like the claim administrator result, go to whatever

11 appeal committee and ultimately end up in the court.  That could

12 take years.

13         MR. BERRY:  Your Honor could absolutely be correct.  I

14 can't -- I can't say that you're not.

15         One thing, to address something else that was said here

16 about there not being any -- you know, anything skewing this one

17 way or another, there's one particular FAQ, number 38, which

18 asks the question:  Is the employer required to share their

19 recovery?  And it says no.  So at the very --

20         THE COURT:  All right.  Hold on.  Hold on.  Do you have

21 frequently asked question number 38 there before you?

22         MR. BERRY:  I can pull it up.

23         THE COURT:  Because I think it doesn't just say no.

24 There's a qualification there.

25         MR. BERRY:  No, no, I understand that.  But I think --

1    and the parties --

2          THE COURT:  If we were in front of Judge Pointer, I

3    would object and say, "Ought, in fairness, Your Honor."  They

4    have to read the whole response, not just the part they like.

5          MR. BERRY:  I understand.  And the parties -- we

6    have -- part of our discussions with the party is changing that

7    language.  And so I don't think that's really going to be an

8    issue.  I'm just pointing out that the impression that's created

9    by some of the terms of the settlement agreement are that the

10   employer doesn't have to share or comply with any other

11   obligations.

12         THE COURT:  Well, the point is that the settlement

13   agreement is clear that it makes no statement about an

14   employer's responsibility under ERISA with respect to what to do

15   with the funds it receives on its own behalf and on behalf of

16   others, including an employee plan.  Then that frequently asked

17   question number 38 would cut no ice at all for an employer

18   saying, I get to keep this money.

19         MR. BERRY:  It could be read that way.  That's correct,

20   Your Honor.  I think it can also be read differently.

21         THE COURT:  But the point of the frequently asked

22   question is not --

23         MR. BERRY:  Understood.

24         THE COURT:  It does not create any legal rights --

25         MR. BERRY:  Understood.

1          THE COURT:  -- or defenses.

2          MS. GEE:  Your Honor -- oh, sorry.

3          THE COURT:  Go ahead, Theresa.

4          MS. GEE:  Your Honor, Theresa Gee.  And this is my

5   first time before you.  I'm here on --

6          THE COURT:  I think I said hello to you at the fairness

7   hearing, though, didn't I?

8          MS. GEE:  You did.  And thank you very much.  And that

9   was -- not being an antitrust lawyer -- I'm an ERISA lawyer.  So

10  hearing two days of arguments was very informative and made me

11  thank my stars that I deal with ERISA and not antitrust.

12         THE COURT:  And I think, Theresa, in fairness, you

13  heard what I said.

14         MS. GEE:  Yes, I did.  And so --

15         THE COURT:  Mr. Isaacson said that if they had known

16  how much money and time they were going to put in this case,

17  they might not have taken it.  I said, well, if I had known I

18  was going to be dealing with ERISA, I may not have taken it.

19         But go ahead.  I appreciate that there's smart,

20  committed people like you and Mr. Berry and Mr. Hahn out there

21  that deal with this stuff on the front lines.

22         MS. GEE:  I appreciate that, Your Honor.  I just wanted

23  to make a couple of observations before we move on to Mr. Hamish

24  Hume's points.  One deals with the authority of the settlement

25  administrator and what that settlement administrator should or

1    should not do.

2         And we've heard, you know, the Department's views about

3    the settlement administrator having this allocation authority

4    essentially adjudicating ERISA claims, you know, through an

5    antitrust settlement process.  And just to quickly point out

6    that in DOL guidance dealing with situations like this and in

7    class action settlements not in antitrust, but in a securities

8    context, the DOL's view has been that what the employer does

9    with the funds that they receive after the distribution is left

10   to the employer and to the plan fiduciary.  In other words,

11   neither the court nor the litigating parties put themselves into

12   the shoes of the employer or the fiduciaries when it comes time

13   to figuring out how to dispose of the settlement proceeds after

14   they have been distributed.

15        And the reason for that is, for example, in this

16   context, even though the DOL guidance would say that the -- a

17   portion of the settlement proceeds attributable to employee

18   contributions should be repaid to the employees, in a class that

19   covers -- or class period that covers 12 years, that may not be

20   the fiduciarily prudent thing to do because of the cost.  It may

21   be that those proceeds are used by the plan to benefit current

22   participants as opposed to past participants, or perhaps those

23   settlement proceeds are used to pay administrative costs, but

24   it's left to the fiduciary's discretion to decide how those

25   proceeds should be used.  And it should not be in the -- the

1  settlement administrator should not have that responsibility

2  because the settlement administrator is acting under the

3  framework of a court -- cross-court reviewed and appointed

4  process in an antitrust action.

5        THE COURT:  Theresa, are you suggesting someone might

6  show up if we had the process that the Department of Labor

7  suggested and say that, yes, it may very well be the plan

8  administrator totally botched this very complicated ERISA

9  calculation on this particular plan -- on behalf of this

10 particular plan, but there's no review of that because even

11 though he or she is not an ERISA expert and may have gotten it

12 wrong, that decision is inoculated if we're forcing the plan

13 administrator -- I'm sorry -- the claims administrator to do

14 that?

15        MS. GEE:  So --

16        THE COURT:  Again, on a case-by-case basis, we have

17 tribunals, we have parties, we have mechanisms to enforce ERISA

18 rights.  And it's -- one, I don't think our claims

19 administrator -- the advertisement was that you had to know

20 something about ERISA and be able to adjudicate what may or may

21 not be somewhat off-the-beaten path ERISA claims on allocation

22 like this.  And second, we have people that are duly authorized

23 under the law to adjudicate those, and we would have a more

24 timely, quicker process for those issues to be joined and

25 decided if there was -- an employer steps out of line with

 1  respect to how it allocates the funds.  That would be a much

 2  easier, quicker way to get the right result.

 3          MS. GEE:  And obviously, Your Honor, we agree with

 4  that.

 5          With respect to Mr. Hahn's point about the unclaimed

 6  employee contributions, you know, those moneys that were paid by

 7  employees, slash, participants over the 12-year period and for

 8  which the participant or the employee chose not to submit a

 9  claim, that sort of ignores the fact of the notice that was

10  provided in this Court to 100,000 -- or I'm sorry -- 100 million

11  class members and notice that was sent out via email, via

12  postcard, via media, press releases, TV, radio announcements.  I

13  mean, the airwaves were inundated with notice about this

14  settlement.  And if a plan participant wanted to submit a claim,

15  they had every right and reason to submit a claim.

16          The default option that was arrived at in this Court

17  and as supported by Mr. Chodorow's declaration, as found

18  reasonable by both the special master and by Mr. Feinberg, if

19  that default option had been presented in an ERISA lawsuit

20  involving, you know, excessive premium payments, it would be

21  very difficult to challenge those findings as being unreasonable

22  or imprudent because those findings were based on studies of the

23  health industry, studies of the split between employees, both

24  individually and as families, and contributions paid by the

25  employers.

1          So even though those findings were made in an antitrust

2    context and by an economist without regard to, you know, what it

3    would mean in an ERISA world, looking at it through an ERISA

4    lens, the standards that were applied to arrive at those

5    conclusions are very similar to the prudence and loyalty

6    standards that would apply to ERISA fiduciaries.  And so I --

7    you know, I'm sure we'll get to those issues later, but I did

8    just want to raise those and flag them for the Court now.

9          THE COURT:  Thank you for that.  Mr. Hume, have we left

10   anything for you to say?

11         MR. HUME:  Not much, Your Honor, but that's okay.  I

12   think my colleagues have done a great job making the relevant

13   points.  There are just one or two to add to the Court's

14   observations that we agree with, that it would be both -- the

15   Court's observation that it would be inefficient and unduly

16   burdensome to try to task the claims administrator or the

17   settlement administrator with resolving ERISA allocations.  I

18   just wanted to add, with some points that haven't been made,

19   that in addition to that, it would also be conceptually

20   inappropriate to do that for reasons that have been acknowledged

21   but have not been fully fleshed out.

22         First and foremost, conceptually, this was an antitrust

23   case against the Blue plan, the Blue entities, not an ERISA case

24   between employers and ERISA plans.  And that's why the release

25   in the settlement clearly does not release ERISA claims between

1    employers and their plans and participants.  That is also why

2    the ERISA plans were absolutely adequately represented because,

3    as Your Honor said, all the class representatives wanted the

4    same thing those ERISA plans wanted, which is the maximum

5    possible recovery.  There was no effort in the settlement

6    agreement to allocate money between plans and employers;

7    therefore, there was no need for separate representation because

8    that is an ERISA issue, not an antitrust issue.  It was

9    downstream.  And that is why there was adequate representation.

10          It's also why there was adequate and proper and more

11   than abundant notice.  Because the best evidence of who the

12   antitrust claimants were are the people who were the purchasers

13   and policyholders.  And the best evidence that exists in the

14   world of that is in the data of the defendants of the

15   (unintelligible) of these plans.  And that's what was used to

16   give notice.

17          THE COURT:  The default option that Ms. Gee referenced

18   earlier is just that, a default option.  That doesn't set

19   anything in stone in terms of downstream processing of these

20   funds.  But that was based upon the Kaiser Family Foundation and

21   other academic studies that analyzed out-of-pocket contributions

22   by plan participants for health care coverage?

23          MR. HUME:  That's correct, Your Honor, as well as other

24   factors and multiple factors that are set forth specifically in

25   the plan of distribution.  But it was based on that objective

1   (unintelligible) and related factors about who the antitrust

2   claimants were without any prejudice to anyone's ability to

3   raise an ERISA claim downstream of the receipt of the settlement

4   funds.

5           And just finally, Your Honor, there's really one more

6   point, which is to emphasize this conceptual distinction between

7   downstream ERISA issues and the distribution.  The Department of

8   Labor has pointed to guidance it issued in the context of

9   rebates under the Affordable Care Act under the medical loss

10  ratio rule that went into effect in 2012, which essentially said

11  that if health insurance companies made more than a certain

12  amount of profit, they needed to rebate that amount back to

13  their subscribers; in essence, a statute for a rebate of

14  an amount that was deemed congressionally to be too high, too

15  much of an overcharge, and so it had to be paid back.

16          And the Department of Labor did not go to CMS, the

17  agency charged with administering that, and say, well, wait a

18  minute, you need to issue rules between the ERISA plans and the

19  employers and the subscribers as suggested.  They didn't go to

20  the insurance company and say, wait, before you issue any money,

21  any MLR rebate, you need to do an ERISA allocation.

22          Instead, they recognized that the ERISA allocation was

23  downstream of the distribution of the money.  And they issued

24  guidance 2011-04 -- technical release 2011-04, and they relied

25  on the employer or the recipient of the MLR money to comply with

1    that guidance and sort it out and do exactly what the Court is

2    saying here, which is rely on the employers and the ERISA plans

3    to sort it out and to comply with ERISA.

4         Furthermore, to underscore the Court's observation that

5    this could be highly factually complex, if you read that

6    technical release, it's remarkable just how many forks in the

7    road there are.  I count seven or eight, potentially nine, "if"

8    clauses in that release as to where the -- how the money should

9    be shared.  If the policy was held by the plan, one thing

10   happens.  If the policy was held by the employer, another thing

11   happens.  If the policy was held by the employer and the plan

12   paid the policy premiums, then one thing happened.  If the plan

13   was held by the employer but the employer and the employee paid

14   the premiums, then another thing happened, and on and on and on,

15   multiple "if" clauses, multiple factual inquiries that would be

16   very burdensome for a settlement administrator to undertake.

17        And it's conceptually inappropriate because this is an

18   ERISA allocation issue that is downstream of the distribution of

19   the antitrust settlement money, just as the ERISA allocation was

20   downstream of the return of MLR rebates under the Affordable

21   Care Act.

22        So we very much respect the Department of Labor's

23   desire to (unintelligible) ERISA (unintelligible).  And we've

24   offered to inform recipients and to remind everyone that ERISA

25   still applies.  No ERISA claims between employers and plans

 1  (unintelligible) release.  Reminding people is one thing.  But

 2  assuming the burden of implementing ERISA allocations seems to

 3  cross a conceptual line which is not -- and the burden and

 4  efficiency line that is not in anyone's interest, in our view.

 5  So I think that's it, Your Honor.  Thank you.

 6          THE COURT:  All right.  Thank you.  I guess I ought to

 7  let the Department of Labor respond to that if there is a -- if

 8  they care to.

 9          MR. HAHN:  Yeah, Your Honor.  I think there are a

10  couple points.

11          We can -- we can stipulate to a number of things for

12  purposes of this argument.  The default option being reasonable,

13  we can agree to that for purposes of this argument.  Fine.  We

14  can agree that no ERISA claims are waived by this agreement.

15  Fine.  We can agree that potentially, yeah, an employer could

16  get a distribution and then they would have, you know, their,

17  quote-unquote, downstream -- they could handle this downstream.

18  And -- fine.

19          The question is, when the employer is handling this

20  downstream, whether in fact they have any ERISA obligations to

21  allocate money of a distribution that they got under a

22  settlement agreement that was agreed to by the plans which

23  appeared to give the employers this money.  And so to put all of

24  the -- all of this sort of -- our eggs in this basket of this

25  sort of downstream scenario where employers are distributing

```
 1    money that they negotiated -- that the plans negotiated -- under
 2    this agreement that appears to give it them, it's completely
 3    unclear what obligation they would have to allocate it other
 4    than altruism.  And so --
 5            THE COURT:  Well, if it's unclear, isn't it unclear
 6    because ERISA is unclear?
 7            MR. HAHN:  Well, I --
 8            THE COURT:  I mean, to me, the whole point is you're
 9    trying --
10            MR. HAHN:  The --
11            THE COURT:  Let me finish.  You're trying to
12    incorporate obligations that an employer has that you contend
13    that an employer has under law, and you're wanting to fold those
14    into a process where we adjudicate those, essentially, or at
15    least administer those as part of this settlement.  All right?
16            So if it was -- if it's unclear what the obligation is
17    once the employer has the money, it seems to me you'd have to
18    say that it would be unclear about what the settlement
19    administrator should do with the money before it actually pays
20    it out.  It's the same -- it's the same question, the same
21    analysis.
22            So what we're doing, again, is, you know, it seems to
23    me, clogging up the system if we try to push that type of
24    analysis into the claims administrator's repertoire before the
25    money is actually earmarked or distributed.  I didn't -- I gave
```

 1   Mr. Berry the opportunity to tell me, but I'll give you the

 2   opportunity.  What would it take to convince you to be the

 3   settlement administrator doing all that?

 4            MR. HAHN:  I -- I understand your concerns.  On that

 5   point, I just want to say we have not -- we're talking now in

 6   realtime with the parties about the specific logistics of the

 7   administrator, how they would go about handling the situation

 8   that we're talking about pertaining to distributions.  I

 9   honestly just can't tell you here exactly how burdensome that

10   is.  It may well be.  And maybe there's ways to, you know, make

11   that more efficient.

12            THE COURT:  I think I can tell you how burdensome it

13   would be.  I think I have.

14            MR. HAHN:  Sure.  And that -- again, I -- well, I guess

15   my -- my point, though, is that I just want to be clear that

16   this -- what sounds like a very, you know, palatable, sensible

17   scenario where employers are tasked downstream with this

18   distributing money, it, I think, in our view, provides no

19   assurance whatsoever that these -- that plans will be getting

20   these contributions.  And so our -- our essential goal here is

21   to try to get there to be allocations, at least in the interest

22   or for the benefit of the plans in the first instance.

23            THE COURT:  Doesn't this -- and, again, I realize that

24   ERISA rights are unique and they're dictated by the statute.

25   But doesn't this basic analogy play out in a number of different

 1   areas?

 2          Blue Cross Blue Shield insures John Doe, who's involved

 3   in an accident at the corner of Elm and Main.  And he hires a

 4   very reputable personal injury attorney, who sues the driver.

 5   Blue Cross Blue Shield, though, goes ahead and makes payments

 6   for the medical care of John Doe.  The hospital covers uninsured

 7   portions of that and provides the service and provides a bill to

 8   John Doe for those services.  John Doe either gets a settlement

 9   or a judgment against the driver.  And downstream, once he's

10   entitled to that money, we're also working out all the liens

11   that deal with that.  We don't ask the jury or the trial judge

12   to determine, in the first instance, what everybody is entitled

13   to from the pie.  We award the pie, and then we let the parties

14   figure that out on its own.

15          How is this situation really any different from that

16   other than we've got the unique interests of ERISA, we have

17   fiduciary obligations that some parties have, we have statutory

18   obligations some parties have?  Can you imagine how it would

19   slow things down in the trial court if the jury was not only

20   supposed to decide who was at fault and how much damage there

21   would be but also start taking into account third-party

22   interests in claims and assessing all -- how to split the pie up

23   at that point?

24          MR. HAHN:  Let me -- just to make another point here.

25   I don't necessarily see what the settlement administrator would

```
 1   be doing here as implementing ERISA in this allocation.  What
 2   they would be doing is not dissimilar to what they are --
 3   currently would be doing in a scenario where there's
 4   multi-employer plans, union plans, and there are multiple claims
 5   submitted by the purchasing entity and also by the contributing
 6   employers.  In that scenario --
 7            THE COURT:  You just lost your practical approach if
 8   you don't see -- I understand in most cases it may not be a
 9   unique, specialized ERISA issue that has to be resolved, but
10   there may be.  I don't know.  I can't say that.  But what he
11   would -- what he or she would have to be doing is slowing down
12   the process to take in account, as Megan Jones said, this
13   granular analysis of what money gets earmarked, what money gets
14   allocated, as opposed to letting each different group go figure
15   that out, either by negotiation or litigation, if necessary.
16            MR. HAHN:  Yes.  Again, I agree it would certainly be a
17   more cumbersome process.
18            THE COURT:  Yes.
19            MR. HAHN:  You know, most likely.
20            THE COURT:  And I think I have your argument.  Anything
21   else you want to raise other than we ought to force this issue
22   into the claims administrator's hands on the front end?
23            MR. HAHN:  We have nothing else to add.
24            THE COURT:  All right.  Anyone else -- anyone else not
25   been given an opportunity to make their point?
```

```
 1              MS. GEE:  Your Honor, I've had an opportunity, but I'd
 2    like to have another opportunity.  I know we're running a little
 3    late, but I just wanted to raise two things very quickly.
 4              THE COURT:  Well, we made you sit through two days of
 5    antitrust argument, so the least we can do is listen to a couple
 6    more points on ERISA from you.
 7              MS. GEE:  There may be three, so I promise it won't be
 8    more than three --
 9              THE COURT:  Well -- (participants speaking
10    simultaneously)
11              MS. GEE:  First, on the approach Mr. Hahn and Mr. Berry
12    would suggest, what they would like to do is essentially have
13    the settlement fund administered as if it were holding a pot of
14    money that belongs to the ERISA plan.  I mean, that's really
15    what they're -- what they would like.  I mean, they haven't come
16    out and said that --
17              THE COURT:  That's kind of a built-in assumption.
18              MS. GEE:  Yes.  But as a legal matter -- and this is a
19    very technical ERISA matter.  But their position stems from the
20    view that -- although the Department does not say it explicitly,
21    that the settlement funds hold plan assets; that is, something
22    in which the plans have a property interest under ERISA.  And
23    that is a legal point that they have not made in their papers.
24    That is a legal point that is completely unsettled.  And, in
25    fact, there are, you know -- there is fairly good authority out
```

1    there that settlement funds held in a fund before distribution

2    to an ERISA plan is not an ERISA plan asset.  That becomes a

3    plan asset after it has been distributed.

4            So the -- and, you know, as much as the parties have

5    been talking and trying to work with the Department to allay

6    some of these concerns, to explicitly say that the settlement

7    administrator should be instructed to make distributions only in

8    accordance with ERISA or only in accordance with DOL guidelines

9    is presuming a legal point that doesn't exist here.

10           The second point I'd like to make is that the

11   Department has said a couple of times and they have said in

12   their papers that the release by the settlement class of the

13   settling defendants is a prohibited transaction.  That is --

14   it's not the case.  The Department says that it's prohibited

15   because the plans are not receiving anything of value.

16           As we've talked about here, the plans' interests in

17   this context is represented by the premiums paid by the plan

18   participants.  There are close to five million plan participants

19   who have so far -- and, you know, there are more claims coming

20   in every day -- who have so far submitted claims for premiums

21   that they have contributed to over the class period.  So the

22   plans are receiving something of enormous value.  They're also

23   receiving great value through the injunctive relief provisions

24   that the Court will be overseeing.  So there is -- you know,

25   there's just absolutely nothing to the point that the release is

 1  something that the plans are giving away and getting nothing in

 2  return.

 3          And finally, on the due process point that they raise

 4  in their papers, the Department says, well, you know, ERISA was

 5  never mentioned.  It's not -- there's nothing about ERISA in the

 6  claim.  There's -- you know, surprisingly, you know, in an

 7  antitrust case, ERISA was never brought up.  And, you know, the

 8  notice and the various announcements and things that JND has

 9  been issuing talk about the fundamental issues in this case,

10  which is excessive premiums, a class period of 12 years.  If you

11  think you have paid a premium or contributed to the cost of a

12  premium for an insurance policy that was excessive because of

13  this alleged anticompetitive conduct, come forward and bring

14  your claims.  Yes, that does not mention ERISA.

15          But just to quote a Nobel laureate from a few years

16  ago, just like a weather man doesn't need to know which -- or

17  doesn't need to be told which way the wind is blowing, an ERISA

18  fiduciary does not need to be told that there are ERISA issues

19  when they receive notice or hear about a claim or litigation

20  involving an ERISA plan.  So the due process notion and argument

21  I believe is just, you know, highly technical and just ignores

22  the substance of the information that's been provided.

23          And the final point, Your Honor -- this, again, goes

24  back to the release and whether or not it's prohibited.  The

25  Supreme Court has said, you know, back in 1996, 25 years ago,

1   that unless there's some collusion, self-dealing, kickbacks,

2   some insider sweet deal, the ERISA prohibited transaction rules

3   do not apply and that making them apply in this context is

4   hypertechnical.

5          And having sat through the two days of hearing, one of

6   the great nuggets that I got from the hearing was Your Honor's

7   comment -- I think it was on the second day -- in which you said

8   something like there is no evidence of collusion.  There's no

9   indication of collusion in any area code in the United States

10  with respect to this settlement agreement.  And I don't have the

11  transcript, Your Honor.  I tried to -- I think that's roughly

12  close to what you said.

13          THE COURT:  I think that's close.

14          MS. GEE:  And in that context, Your Honor, there's just

15  nothing prohibited about the release of this case.

16          THE COURT:  What would be -- I think everybody involved

17  with the settlement agreed with that, that there's -- no one has

18  come forward and said this settlement is, in any way, shape, or

19  form, a product of any type of collusion.

20          MS. JONES:  That's correct, Your Honor.  Including the

21  objectors in the courtroom.

22          THE COURT:  Yes.  It was hard-fought.  Now, I think

23  objectors have other questions and concerns about it.  That just

24  doesn't happen to be one of them.  Okay.

25          MS. GEE:  Thank you, Your Honor.

 1          THE COURT:  I think I have enough to take this under

 2     submission.  I've probably given some indication of where I'm

 3     leaning right now, but this is something that I think we just

 4     need to make sure that rights are not in any way surrendered or

 5     no one is immunized from this type of analysis.  But I do think

 6     it would be much too difficult to expect our plan -- I'm

 7     sorry -- our settlement administrator -- I've got too many

 8     administrators here -- our settlement administrator to perform

 9     this type of function as part of the claims processing, but

10     that's not to say that that type of analysis shouldn't occur or

11     won't occur.  It's just where -- at what point does it make the

12     most sense for it to occur.

13          And I think I'm leaning heavily towards saying that

14     that is something that ought to occur downstream.  I think the

15     parties will have the same, if not greater, rights to enforce --

16     greater opportunities to enforce their rights.  They'll have a

17     much more quick and efficient process, and there will be

18     individualized detail that could be given more quickly to those

19     type of disputes, if they do occur, by the parties that normally

20     are called upon to referee those; i.e., district judges around

21     the country.  And the parties are going to be free to negotiate

22     a proper allocation on a case-by-case basis before we ever get

23     to that point.

24          I don't want any of my colleagues around the country to

25     think I'm trying to stir up extra business for them, but they're

 1    there if they need to be there and the parties need them to be

 2    there.

 3            All right.  I think that concludes what I need to hear

 4    on the Department of Labor issues.  I really want to thank the

 5    Department for being available and particularly thank you for

 6    deferring your time last week and agreeing to an audience this

 7    week.  That really helped out with our scheduling of things.

 8    That was very gracious of you.

 9            MR. BERRY:  Thank you.

10            THE COURT:  I also thank the parties for the same

11    courtesy you've given the Court.  That gave the Court some

12    opportunity to deal with this issue off-line and devote more

13    time during the hearing to a couple of the other issues, like

14    the second Blue bid and the allocation issues that were raised

15    by other objectors.

16            All right.  And speaking of other objectors, I think

17    I'm going to have the parties who I indicated should stay on to

18    discuss the issue of retention agreements by the objectors'

19    counsel.  Anybody who has an interest in that should stay on.  I

20    am going to protect, until I make a ruling, the contents of any

21    such retention agreements.  We're just going to talk about the

22    issues globally at this point.  Okay?

23        (Off-the-record discussion)

24            THE COURT:  I think we ought to say whoever has an

25    interest.  If you don't have an interest, it would really help

1  us to not have 72 participants that I'm trying to find on the

2  screen.  Okay?  So I'll bid everyone else a good day.

3         MR. BERRY:  Thank you, Your Honor.

4         MR. HAHN:  Thank you, Your Honor.

5   (Brief pause)

6         THE COURT:  All right.  By way of background, the week

7  before the fairness hearing, so week before last, I was called

8  upon to referee a discovery dispute that was between the ASO

9  subclass and some objectors.

10        And earlier, objectors had indicated that class counsel

11  should provide any retention agreements they have with their

12  class-representative clients so that that would be clear to

13  everyone involved in this settlement, those who are litigating

14  it, those who are observing it, those who are interested in it,

15  to make sure that there's not any conflict of interest that

16  class counsel would have vis-a-vis a class-representative

17  client, individually signed-up client.

18        So I did require class counsel to disclose their

19  retention agreements.  It occurred to me as I was going through

20  the process of analyzing that, though, that in the 2018

21  amendments, the rules committee and eventually Congress

22  sanctioned some changes to Rule 23(e) that focuses on objectors

23  and puts the spotlight on why someone is objecting.

24        Now, that's an important point to me, it seems, because

25  in this instance, I don't know if anybody is really questioning

 1   that we have a philosophical objector or a disgruntled "I lost

 2   out on my class claims" objector or anything along those lines.

 3   It seems like these are legitimate objections stated by counsel

 4   on behalf of clients.  So I don't think this is in any way

 5   questioning counsel's involvement.

 6          The question that I think some have raised is, okay,

 7   well, what about -- what about the parties that have retained

 8   counsel and their motivation behind this objection.  So --

 9          One second, please.

10          Kecia, do you need me?

11      (Brief pause)

12          THE COURT:  We're still on the phone.  I think we're

13   fine to be on the phone.  Yes.  That's fine.  Thank you.

14          Kecia was just making sure I knew we were still on the

15   phone.  And I take it those who are interested on the phone

16   stayed on and those who aren't signed off.

17          All right.  So I'm just trying to set the background

18   here and set the stage for this -- any questions that are raised

19   here.  I said, well, I don't know that the public has any right

20   to see the retention agreements of objectors because it's not a

21   question of whether you're out policing the interests of the

22   class.  You're objecting on behalf of specific members of the

23   class.  But it seemed to me that it made sense in that light to

24   have each person, perhaps, provide their retention agreement to

25   those who are proponents of the settlement just so they'll --

 1   and the Court -- so they'll know where you're coming from with

 2   respect to the objection, at least in that limited sense.

 3          I've gotten -- I've -- one group of objectors I think

 4   had no issue with that and has provided.  Another group has

 5   pushed back and said, we don't think we should be required to do

 6   that.

 7          Mr. Cochran, if you wouldn't mind just turning your

 8   video off.  Because it looks like you're having a nice walk, but

 9   it is a little distracting to see all the trees going by you.

10   Thank you.

11          All right.  So does that adequately set the stage for a

12   discussion about where we ought to go from here?

13          Not everybody at once.

14          MR. BOIES:  I think it does, Your Honor.  I think it

15   does.

16          THE COURT:  Okay.  So I think probably what we ought to

17   start off with is any counsel for an objector who now has

18   another objection, and that is objection to sharing any contents

19   of the retention agreement.  And the Court never contemplated

20   the entire retention agreement would have to be shared.  I think

21   there's many aspects of a retention agreement that may be

22   proprietary to a firm.  I realize that y'all are fish in the

23   same ponds for clients.  Some of you are big enough that you

24   fish in the same oceans for clients.  So I never expected that

25   you have to just turn over your retention agreement, but it

1   seems that there may be some aspects -- for example,

2   compensation, how you're being compensated -- that may be

3   relevant to the objection, may not be.  I'll be glad to hear

4   from you.

5          MR. SLATER:  Your Honor, Paul Slater on behalf of the

6   objectors who raised this issue.  First, I'd like to thank Your

7   Honor for giving us time to address this this morning.  This is

8   a matter of some importance to us and some importance to our

9   clients.

10          Your Honor I believe correctly identified that this

11   came up with a motion brought by the Bradley Arant firm with

12   regard to agreements by subclass counsel.  We were not part of

13   that motion nor, like the Bradley Arant people, have we

14   challenged the financial allocation within the settlement

15   agreement.

16          I think the first point I'd like to make is that

17   neither we, by which I mean myself and my cocounsel -- neither

18   we nor our clients are professional objectors.  My cocounsel and

19   I, to my knowledge, have only once before objected to a class

20   settlement; and that was in a case about five years ago or six

21   years ago, involving American Express.  And in their case, our

22   objection was not only upheld, but class counsel was removed

23   from representing the class for ethical breaches which we

24   pointed out in the papers.

25          So the only thing that we have sought, Your Honor, from

1    the beginning is to -- as I told Mr. Boies and Mr. Hausfeld at

2    the hearing last week, is to let my people go.  We would like to

3    be able to pursue our own injunctive relief with regard to Blue

4    bids, and we have neither sought nor have we been offered

5    anything in exchange for dropping our objection.  Indeed, our

6    objection is really a motion to be -- to opt out.

7          And given Your Honor's -- I don't know if it's a

8    ruling, Your Honor, but given what was said at the hearing last

9    week and I think what was a pretty clear indication of what Your

10   Honor -- how Your Honor views this, we have, you know, given

11   some thought as to what we will do if we can get language in the

12   new agreement or the Court's approval order that satisfies us

13   that we can meaningfully go forward and seek additional Blue

14   bids for our clients.

15         And I -- again, the devil is in the detail, and we

16   don't have the exact language yet.  But there's a very good

17   chance that if that language is satisfactory to our clients and

18   ourselves, that we would not go forward with our objections or

19   our motion to opt out at all.  We would just avail ourselves of

20   the opportunity which Your Honor has indicated you will give to

21   class members to pursue their own injunctive relief with

22   limitations of not infringing on Your Honor's (b)(2) settlement

23   release.

24         And in light of that, we have been in contact with

25   class counsel and have discussed meeting and trying to resolve

1   the exact language that would be, you know, approved by Your

2   Honor providing for the -- (participants speaking

3   simultaneously)

4          THE COURT:  -- if you would be willing to stipulate the

5   three things that may resolve all this.

6          MR. SLATER:  Sure.

7          THE COURT:  One, you have been retained by certain

8   clients --

9          MR. SLATER:  Yes, sir.

10          THE COURT:  -- to come in and clarify or enforce what

11   they contend are their rights to opt out and receive a second

12   Blue bid or additional Blue bids by pursuing their antitrust

13   claims as opt-outs in courts of competent jurisdiction.  That's

14   the first thing.

15          MR. SLATER:  Yes.  I --

16          THE COURT:  Second thing is you're not making any

17   challenge to the monetary aspects of the class settlement,

18   whether that is the amount that was negotiated or how it ought

19   to be allocated.

20          And third, that your client's sole interest and the

21   only thing you've been retained to do and perhaps compensated to

22   do is to pursue issue number one, not issue number two.

23          MR. SLATER:  I'm not sure I understand the third point.

24   The first two, yes, but -- (participants speaking

25   simultaneously)

```
1          THE COURT:  In other words, the only thing you can --
2   the only thing you're being compensated to do is to pursue their
3   rights to opt out and assert monetary damage claims under (b)(3)
4   that they're entitled to do clearly under the agreement --
5          MR. SLATER:  Yes.
6          THE COURT:  -- and also to pursue individualized
7   injunctive relief, whatever that might look like.  And I know
8   you're talking to the Blues and the subscribers and the ASO
9   class about that.  You're not -- in other words, that's the only
10  thing you've been retained to do is to deal with the -- that
11  limited structural aspect of the settlement.
12         MR. SLATER:  Yes, sir.  I can stipulate to all of that.
13         MR. BLECHMAN:  As can I, Your Honor.
14         THE COURT:  All right.  Great.  Well, then, I take it
15  Mr. Slater is speaking on behalf of everyone, but that's the
16  interest here.  So --
17         MR. BLECHMAN:  Okay.
18         THE COURT:  Who -- is there anyone who would say if
19  they stipulate to those three things, we have to know what the
20  terms of their compensation are in pursuing that relief?  I
21  don't know that that's similar to someone who -- for example,
22  like the Bradley Arant objectors who had a deal with their
23  clients that they were being compensated on a percentage of
24  increase in settlement value to various persons monetarily.  It
25  seems to me this is pretty straightforward, and I don't know
```

1  that I -- based upon that, I don't know why I should require

2  them to disclose their retention agreements.

3          MR. HAUSFELD:  With regard to your stipulation -- their

4  agreement to your stipulations -- sorry, Your Honor -- subject

5  to, again, hearing from Mr. Boies, but I would find that

6  acceptable in terms of resolving the issue of producing the

7  retention agreements.

8          THE COURT:  All right.  David?

9          MR. BOIES:  I agree.  I agree completely, Your Honor.

10          MS. JONES:  And, Your Honor --

11          THE COURT:  So essentially, this is easy.  And, you

12  know, I felt like rather than make a -- I was inclined to not

13  require Mr. Slater to disclose that, but I thought everybody

14  ought to have their chance to weigh in.

15          Anybody who thinks, no, that's not good enough, we

16  ought to make Mr. Slater and his colleagues disclose any aspects

17  of the retention agreements under those circumstances?

18          MS. JONES:  No, Your Honor.  As long as it's clear on

19  the record Mr. Slater speaks for all of his cocounsel.

20          MR. SLATER:  In this context, I do.

21          THE COURT:  You're confident to; right, Mr. Slater?

22          MR. SLATER:  Well, we've all had the rug pulled out

23  from under us before, but yes, I am confident --

24          THE COURT:  The thing to pass along is if they take any

25  position different than what you've just articulated in this

```
1   case, then we may or may not have to revisit this ruling.
2          MR. SLATER:  Well, Your Honor, you know, not to be cute
3   about this, my cocounsel are on this phone -- on this call right
4   now.  Mr. Blechman is on the call.  Mr. Phil Cramer is on the
5   call.  Mr. Jason Zweig is on the call.  Between those people I
6   just identified, those are all the lead counsel for the
7   claimants that I am speaking for.  And I am quite sure that if I
8   had said something out of school, that they would have piped up.
9   So I can speak for all of the cocounsel I have with regard to
10  our objections and motion to opt out of the class settlement.
11         THE COURT:  Mr. Slater, as I'm used to you doing
12  already, you've presented your position clearly and
13  articulately.  And I think you're right.  I don't think there's
14  any reason to make you disclose that information under these
15  circumstances.
16         So let me ask -- let me move to another kind of
17  surprise question -- probably not a surprise, just not on the
18  agenda.  I gave you my -- a few thoughts last week about how
19  this might play out.  I got the strong signal from all camps,
20  Judge, we appreciate your input, let us do our work and report
21  back to you.  I take it that's still where we are.
22         MR. SLATER:  Your Honor, I believe that is where we
23  are.  We had some conversations.  Mr. Blechman had some
24  conversations with Mr. Hausfeld.  Mr. Hausfeld is an old -- old
25  friend and an old acquaintance, so we know the players very
```

1   well.  And we have arranged with Michael to get together

2   sometime in the very near future and see if we can agree on

3   language that would allow my clients to just say we are

4   satisfied with the resolution as outlined by the judge and the

5   language that will implement that resolution and then take that

6   to the defendants and see if we could obtain their consent to

7   that language and that logistics, if you will.

8           THE COURT:  Would it be fair -- would it be fair for me

9   to say I'd like to keep things moving by establishing another

10   soft backstop, meaning that maybe early next week, we set

11   another Zoom call up to discuss this issue, unless the parties

12   agree that that would get in the way of a resolution?  I just

13   want to keep things moving on this.

14           MR. BLECHMAN:  Your Honor, may I --

15           If I might address that, Paul.

16           William Blechman for Kroeger and several other of the

17   objectors, Your Honor.

18           Mr. Hausfeld and I have actually discussed a meeting to

19   occur next week on a date that yet -- as far as I know, hasn't

20   yet been set, but what we've actually talked about is talking

21   this week about setting up a date certain and time certain for

22   next week so that we can work at this problem, Your Honor.  And

23   whatever time frame Your Honor has for reporting back is fine,

24   but I want you to know it's possible that you may end up setting

25   a report date to the Court that may occur before we've actually

 1   had the meeting next week.  But our intention is for next week

 2   to be engaging with all the class counsel on this.

 3          THE COURT:  Well, so the reason I set those report

 4   dates is so that you'll accelerate your discussions.

 5          MR. BLECHMAN:  Sure.

 6          THE COURT:  But on the other hand, I realize this is

 7   not everyone's only case or matter in life, so -- it's a pretty

 8   significant one.

 9          MR. BLECHMAN:  Your Honor, I've told Mr. Hausfeld that

10   on that note, my son is getting married next week.  And as long

11   as he promises not to tell my wife or to show this transcript to

12   anyone in my family, that I would make myself available at times

13   later next week, if necessary, if we're not able to meet

14   before -- if we're not able to meet earlier in the week, Your

15   Honor.

16          THE COURT:  Well, it sounds like what I ought to do is

17   set my backstop for week after next, early in the week.

18          MR. SLATER:  Your Honor --

19          THE COURT:  My son is getting married that week, so

20   I've got to be careful.

21          MR. BLECHMAN:  I'll let you know how it goes, Your

22   Honor.

23          THE COURT:  Yes.

24          MR. SLATER:  Your Honor, one other point.  We have

25   advised Mr. Gentle of the conversations that we have had and

 1   intend to continue with.  And if it's all right with the Court,

 2   I think it might be helpful to continue to engage with

 3   Mr. Gentle on this process and seek his good offices and help us

 4   get the yes.

 5            THE COURT:  I have no objection to that.  Now, it

 6   sounds to me like this is a three-step dance.  One step is --

 7   we've got scheduled for next week, and that is objectors and

 8   class counsel get together on what the language might be.

 9   Second step is bring in Mr. Zott and Mr. Laytin and their

10   colleagues and make sure that they have input and are

11   comfortable.  And the third step is presenting it to the Court

12   to make sure I'm comfortable.

13            So all I'm saying is with the two weddings coming up,

14   let's just, to the extent possible, keep the pedal to the metal

15   on trying to make progress.

16            MR. SLATER:  Understood, Your Honor.

17            THE COURT:  All right.  Anything else we need to take

18   up for any purpose now?

19            MR. HAUSFELD:  No, Your Honor.

20            MR. BOIES:  No, Your Honor.

21            MR. BLECHMAN:  No.

22            THE COURT:  All right.  Keep up the hard work.

23   Appreciate y'all.

24            MR. HAUSFELD:  Thank you.

25            MS. JONES:  Thank you, Your Honor.

1          MR. SLATER:  Thank you, Judge.

2          MR. BLECHMAN:  Thank you, Your Honor.

3          THE COURT:  I don't want to conclude without me saying

4    that.

5      (Proceedings concluded at 11:35 a.m.)

6                        * * * * * * * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2            I certify that the foregoing is a correct transcript

 3  from the record of proceedings in the above-entitled matter.

 4            This 5th day of November, 2021.

 5

 6

 7                         Risa L. Entrekin
                          Registered Diplomate Reporter
 8                         Certified Realtime Reporter
                          Official Court Reporter
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```