FILED

2021 Nov-12  PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **IN RE BLUE CROSS BLUE SHIELD** | : | |
| **ANTITRUST LITIGATION** | : | **Master File 2:13-cv-20000-RDP** |
| **MDL 2406** | : | |
| | : | |
| | : | |
| | : | |
| | : | **This document relates to** |
| | : | **Subscriber Track cases** |

**SUBSCRIBERS' POST-HEARING BRIEF**
**IN SUPPORT OF FINAL APPROVAL OF CLASS SETTLEMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 1

    I.     The Settlement's Structural Relief Creates A Post-Settlement System
         That Is Procompetitive And Not Clearly Illegal. ...................................................... 1

    II.    The Settlement Provides The Second Blue Bid To Eligible Members
         Of The Proposed Self-Funded Sub-Class To Be Certified Under
         Rule 23(b)(3). ........................................................................................................ 6

           A.     Opt Outs from the Self-Funded Sub-Class Are Free to Pursue Their
                  Claims for Individualized Relief So Long As That Relief Does
                  Not Infringe Rule 23(b)(2) Indivisible \Injunctive Relief and
                  Release Approved By The Court ........................................................... 13

           B.     Supplemental Notice Will Be Provided To The Self-Funded
                  Accounts. ............................................................................................. 18

    III.   The Allocation Between The Self-Funded Sub-Class Members And
         The Fully Insured Class Members Was Reasonable And Rationale. .................. 20

           A.     The legal standard for the allocation is reasonableness, not perfection.... 22

           B.     The mediation before Mr. Feinberg was a rational process
                  that resulted in a reasonable allocation. ...................................... 24

           C.     The Self-Funded Sub-Class was not included in any complaint
                  before 2020, and Eleventh Circuit case law would not allow
                  their addition to relate back to 2012. ........................................ 25

           D.     The allocation of settlement funds was based on a reasonable, rational
                  basis, and the Bradley objectors failed to show otherwise. ..................... 27

    IV.   It Is Clearer Than Ever That The "Arbitration Clause" Objection
         Lacks Merit. ...................................................................................................... 31

    V.    The Hart And Cochran Objections To The Plan Of Distribution
         Are Meritless....................................................................................................... 34

CONCLUSION.............................................................................................................. 35

# **TABLE OF AUTHORITIES**

## **Cases**

*A.R. v. Connecticut State Board of Education*,
   2020 WL 2092650 (D. Conn. May 1, 2020) ......................................................................... 12

*Alaska Air Group, Inc., et al. v. Anthem, Inc., et al.*,
   2:21-cv-01209 (N.D. Ala. 9/4/21) ...................................................................................... 31

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) ............................................................................................ 4

*Berry v. Schulman*,
   807 F.3d 600 (4th Cir. 2015) ............................................................................................ 15

*C.G.B. v. Wolf*,
   464 F.Supp.3d 174 (D.D.C. 2020) ..................................................................................... 9

*Castañeda Juarez v. Asher,*
   2020 WL 6434907 (W.D. Wash. July 6, 2020) ................................................................... 9

*Chicago Teachers Union, Local No.1 v. Board of Education*,
   797 F.3d 426 (7th Cir. 2015) ............................................................................................ 13

*Cholakyan v. Mercedes-Benz, USA, LLC*,
   281 F.R.D. 534 (C.D. Cal. 2012) ........................................................................................ 9

*Cicero v. DirecTV, Inc.*,
   2010 WL 2991486 (C.D. Cal. July 27, 2010) ................................................................... 18

*Cliff v. Payco General American Credits, Inc.*,
   363 F.3d 1113 (11th Cir. 2004) ........................................................................................ 26

*Easterling v. Connecticut Dept. of Correction*,
   278 F.R.D. 41 (D. Conn. 2011) ........................................................................................ 13

*Faught v. American Home Shield Corp.*,
   660 F.3d 1289 (11th Cir. 2011) ........................................................................................ 17

*Grunin v. Int'l House of Pancakes*,
   513 F.2d 114 (8th Cir. 1975) ............................................................................................. 4

*Gulino v. Board of Education of City School Dist. of City of New York*,
   907 F.Supp.2d 492 (S.D.N.Y. 2012) ................................................................................ 11

*In re Am. Bank Note Holographics, Inc.*,
   127 F. Supp. 2d 418 (S.D.N.Y. 2001) ................................................................. 22

*In re AOL Time Warner ERISA Litig.*,
   2006 WL 2789862 (S.D.N.Y. Sep. 27, 2006) ..................................................... 18

*In re Blue Cross Blue Shield Antitrust Litig.*,
   2020 WL 8256366 (N.D. Ala. Nov. 30, 2020) ...................................................... 3

*In re Blue Cross Blue Shield Antitrust Litig.*,
   308 F.Supp. 3d 1241 (N.D. Ala. 2018) ................................................................. 2

*In re Checking Account Overdraft Lit.*,
   2020 WL 4586398 (S.D. Fla. Aug. 10, 2020) ...................................................... 32

*In re Delta Dental Antitrust Litig.*,
   484 F.Supp.3d 627 (N.D. Ill. 2020) .............................................................. 4, 5, 6

*In re Ins. Brokerage Antitrust Litig.*,
   282 F.R.D. 92 (D.N.J. 2012) ............................................................................... 23

*In re Motor Fuel Temperature Sales Practices Litigation*,
   279 F.R.D. 598 (D. Kan. 2012) .......................................................................... 13

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997) .......................... 23

*In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*,
   2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) ..................................................... 22

*In re Stock Exchanges Options Trading Antitrust Litig.*,
   2005 WL 1635158 (S.D.N.Y. July 8, 2005) ........................................................ 18

*In re Toll Roads Litigation*,
   2018 WL 4952594 (C.D. Cal. 2018) ................................................................... 13

*In re Wells Fargo Mortgage-Backed Certificates Litigation*,
   2011 WL 13240287 (N.D. Cal. Nov. 14, 2011) ................................................... 18

*In re: Google Inc. Cookie Placement Consumer Privacy Litigation*,
   934 F.3d 316 (3rd Cir. 2019) .............................................................................. 15

*Jamie S. v. Milwaukee Pub. Sch.*,
   668 F.3d 481 (7th Cir. 2012) ................................................................................ 9

*Jennings v. Rodriguez*,
   138 S.Ct. 830 (2018 ............................................................................................. 8

*Keepseagle v. Vilsack*,
   102 F.Supp.3d 306 (D.D.C. 2015) ........................................................................ 20

*Klee v. Nissan N. Am., Inc.*,
   2015 WL 4538426 (C.D. Cal. July 7, 2015) ......................................................... 20

*Knuckles v. Elliott*,
   2016 WL 3912816 (E.D. Mich. July 20, 2016) .................................................... 20

*Lavigne v. Herbalife, Ltd.,*
   967 F.3d 1110 (11th Cir. 2020) ............................................................................ 33

*Makro Cap. of Am., Inc. v. UBS AG*,
   543 F.3d 1254 (11th Cir. 2008) ............................................................................ 26

*Mansfield v. Air Line Pilots Ass'n Intern.*,
   2009 WL 2601296 (N.D. Ill. 2009) ...................................................................... 19

*Marriot v. County of Montgomery*,
   227 F.R.D. 159 (N.D.N.Y. 2005) ......................................................................... 12

*Northrop & Johnson Yachts-Ships, Inc. v. Royal Van Lent Shipyard, B.V.*,
   855 Fed. App'x 468 (11th Cir. 2021) .................................................................... 32

*Parsons v. Brighthouse Networks, LLC*,
   2015 WL 13629647 (N.D. Ala. Feb. 5, 2015) ........................................................ 3

*Radcliffe v. Hernandez*,
   794 Fed. App'x 605 (9th Cir. 2019) ..................................................................... 23

*Shaffer v. Cont'l Cas. Co.*,
   362 F. App'x 627 (9th Cir. 2010) ......................................................................... 19

*Snyder v. Ocwen Loan Servicing, LLC*,
   2019 WL 2103379 (N.D. Ill. 2019) ...................................................................... 20

*Stair ex rel. Smith v. Thomas & Cook*,
   254 F.R.D. 191 (D.N.J. 2008) .............................................................................. 19

*Swaney v. Regions Bank*, No.
   2020 WL 3064945 (N.D. Ala. June 9, 2020) ......................................................... 3

*Thomas v. Blue Cross and Blue Shield Ass'n*,
   594 F.3d 823 (11th Cir. 2010) ............................................................................. 17

*Topco United States v. Topco Associates., Inc.*,
   405 U.S. 596 (1972) .................................................................................... 2, 3, 5

*United States v. Sealy, Inc.*,
    388 U.S. 350 (1967)..................................................................................... 2, 3, 5

*Wal-Mart Stores, Inc. v. Dukes*.
    564 U.S. 338 (2011)........................................................................................ passim

*Wesch v. Folsom*,
    6 F.3d 1465 (11th Cir. 1993) ................................................................... 17

*West Morgan-East Lawrence Water and Sewer Authority v. 3M Company*,
    737 Fed. Appx. 457 (11th Cir. 2018)...................................................... 14

## Other Authorities

*Class Actions, Indivisibility, and Rule 23(b)(2),*" 99 B.U.L.Rev 59 (2019) ................................. 8

*Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 98 (2009) ........................ 8

Principles of the Law of Aggregate Litigation, ("ALI") § 2.04(a)..................................... 9

## Rules

Fed. R. Civ. P. 12(b)(6)............................................................................................ 5

Fed. R. Civ. P. 23(e)(2)............................................................................................ 23

## INTRODUCTION

In accordance with this Court's request during the final approval hearing held on October 20 and 21, 2021, Settlement Class Counsel for Subscribers submit this post-hearing brief in support of final approval of the settlement reached between Subscribers and Defendants.  We address below (1) the legality of the Defendants' system as it will exist after the settlement becomes effective; (2) the treatment of the Second Blue Bid relief as relief available to the Self-Funded Sub-Class included in the certification under Rule 23(b)(3); (3) the allocation of settlement funds between Self-Funded Sub-Class and the Fully Insured Claimants;[1] (4) the objection that the settlement somehow violates contractual rights to arbitrate claims (it does not); and (5) certain objections filed after the hearing relating to the Plan of Distribution.

As shown below, the objections fail to show that the Settlement is unfair, unreasonable, or inadequate.  Accordingly, the Court should overrule the objections and approve the Settlement.

## ARGUMENT

I.     **The Settlement's Structural Relief Creates A Post-Settlement System That Is Procompetitive And Not Clearly Illegal.**

At the hearing on final approval of the proposed settlement, challenges were raised that it is improper to have a settlement that does not eliminate the Exclusive Service Areas ("ESAs") Rule because, even standing alone, it is a per se violation of the Sherman Act. Transcript of Final Approval Hearing dated October 20, 2021 at 134:10 to 139:15 and 145:1 to 146:9.[2] As Subscriber Plaintiffs explained both in their brief in support of final approval, (Final Approval

---

[1] Capitalized terms not otherwise defined herein shall have the meaning given them in the Settlement Agreement, ECF No. 2610-2.

[2] The transcript of the Final Approval Hearing is cited as "Tr. I" for October 20, 2021 and "Tr. II for October 21, 2021.

1

Br., ECF No. 2812-1 at 64-68), and at the fairness hearing, (Tr. I at 52:1 to 73:20), the Court need only satisfy itself that the arrangement that is being left intact under the Settlement is not "clearly illegal" or "per se illegal." Here, ESAs and the going-forward Blue system, with the significant procompetitive benefits created by the Settlement, easily satisfies this standard. The Objectors do not consider these changes, and essentially ignore the Court's ruling on standard of review in *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F.Supp. 3d 1241 (N.D. Ala. 2018), *interlocutory certification granted*, 2018 WL 3326850 (N.D. Ala. June 12, 2018), *leave to appeal denied*, 2018 WL 71522887 (11th Cir. Dec. 12, 2018) ("*BCBS*").

The conduct that the Court deemed potentially subject to a *per se* rule of antitrust liability in *BCBS* was composed of the combination of each Blue plan agreeing, as a condition of licensing the Blue Marks, "to not sell health insurance plans and services with the Blue Marks outside of their respective geographic service areas" and each Blue Plan "limit[ing] the output of non-branded health insurance and related health financing products by the licensees nationwide [the National Best Efforts ('NBE') Rule]." 308 F.Supp. 3d at 1269. The Court in *BCBS* emphasized that it was the *combination* of these practices *operating together* that was subject to potential *per se* treatment:

> Today, the court faithfully applies *Sealy* [*United States v. Sealy, Inc*., 388 U.S. 350 (1967) ("*Sealy*")] and *Topco* [*United States v. Topco Associates., Inc*., 405 U.S. 596 (1972) ("*Topco*")] to the Rule 56 record before it and determines that, in navigating the antitrust landscape in this case, those decisions and their progeny remain polestars. Thus, the court concludes that Defendants' aggregation of a market allocation scheme together with certain other output restrictions is due to be analyzed under the per se standard of review.

308 F.Supp. 3d at 1279 (emphases added). *See* ECF No. 2812-1 at 65-66. The Court noted this fact at the final approval hearing. Tr. I at 85:11 to 85:22.

The proposed settlement eliminates this aggregation and includes acknowledged procompetitive relief. Pursuant to it, the NBE Rule is banned. Pursuant to it, Blue Plans will be able to compete on a non Blue-branded basis (*i.e.,* on a "green" basis) in the ESAs of other Blue Plans. And pursuant to it, Qualified National Accounts are able to solicit a Second Blue Bid from Blue Plans located outside the geographic region where the account is headquartered. Thus, while ESAs may remain, they function under the proposed settlement in a radically changed competitive environment. The Court made this point explicitly in its order granting preliminary approval of the proposed settlement, where it explained why the marketplace going forward if the proposed settlement is approved will be quite unlike the marketplaces deemed to be anticompetitive in *Sealy* and *Topco*:

> In any event, however, this court's decision was based on the aggregation of restraints that existed during the class period. The proposed Settlement currently under consideration alters Defendants' business model.
>
> Where there are many pro-competitive benefits to a settlement -- such as here where the resolution abolishes National Best Efforts, makes available a second Blue bid in certain circumstances, removes restrictions on acquisitions, and when the "ultimate outcome on the merits [of the legality of the conduct as modified by the settlement is] uncertain" --undetermined legal issues will not bar a fair and reasonable settlement. *See Swaney* [*v. Regions Bank*, No.] 2020 WL 3064945, at *3 [(N.D. Ala. June 9, 2020) (quoting *Parsons* [*v. Brighthouse Networks, LLC*,] 2015 WL 13629647, at *2 [(N.D. Ala. Feb. 5, 2015)]]). Here, the court believes it has sufficient experience with the practices at issue in this case that were challenged by Subscribers (and Providers) to say, again preliminarily, that these structural changes, when implemented, likely will move the Blues' system from the Per Se category into the Rule of Reason category and that procompetitive benefits will flow from these negotiated changes.

*In re Blue Cross Blue Shield Antitrust Litig.*, 2020 WL 8256366, at *24-25 (N.D. Ala. Nov. 30, 2020).

There is no basis therefore to conclude that the competitive world created by the proposed settlement is in any way perpetuating a *per se* violation of the antitrust laws by allowing ESAs to continue in use. The Eleventh Circuit has stressed that "unless the illegality of an arrangement under consideration is a legal certainty, the mere fact that certain of its features may be perpetuated is no bar

to approval." *Bennett v. Behring Corp.*, 737 F.2d 982, 987 (11th Cir. 1984). *See* ECF No. 2812-1 at 68-70. In doing so, the Eleventh Circuit relied on the Eighth Circuit's *Grunin* decision, which equated that legal standard with whether the go-forward conduct is per se illegal.  *Id.*; *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975). No objector at the final approval hearing convincingly demonstrated that this stringent standard is satisfied here.[3] As they have previously stated, Settlement Class Counsel believe that ESAs in the go-forward system are not clearly illegal and instead that any future challenge would be tested under the Rule of Reason, taking into account the procompetitive benefits of the go-forward system.[4]

Since *BCBS* was decided, only one reported case has addressed it substantively and then only in passing on a different topic: *In re Delta Dental Antitrust Litig.*, 484 F.Supp.3d 627 (N.D. Ill. 2020) ("*Delta Dental*"). The Court at the final approval hearing asked the proponents of the settlement to address the significance, if any, of that opinion in the present context. Tr. I at 66:20 to 67:20. We believe that the *Delta Dental* decision should have little if any significance for the Court's resolution of the questions that are before it as it determines whether to grant final approval to the Settlement.  To begin with, the court in that case was not called upon to assess, and did not assess or purport to assess, the legality of the pre-Settlement Blue system, much less the legality of the Blue system as it will operate in the event the Court approves the Settlement. The *Delta Dental* decision thus does not assess whether that post-Settlement Blue system is "clearly illegal" within the meaning of the caselaw governing the

---

[3] As Subscriber Plaintiffs have already explained, Final Approval Br., ECF No. 2812-1 at 66, the Court also expressly declined to resolve the question whether the Blues acted as a single entity with respect to their management of the Blue marks, finding that affirmative defense depended on facts that were in genuine dispute and required a trial.  *BCBS*, 308 F. Supp. 3d at 1266.

[4] At the Final Approval hearing, Subscribers' counsel explained: "if we did not believe--we, class counsel, did not believe that there is no per se violation in this settlement agreement that will be perpetuated either in the aggregate or looking at any of its features--if we did not believe that, if we thought there was, we could not place it before you conscientiously for approval".  Tr. I at 53:17 to 53-22.  .

Court's inquiry at the final approval stage.  And even had the court ruled that the Delta Dental system is unlawful under Section 1—and, make no mistake, it did not—the *Delta Dental* decision would still have virtually no bearing on the Court's determination of whether the going forward Blue system would be clearly illegal because there is no indication that the court considered the Delta Dental system to be indistinguishable, in all relevant respects, from the post-Settlement Blue system that is now before this Court.

This point is itself sufficient to address *Delta Dental*'s significance to the questions before the Court.  But *Delta Dental's* significance is further reduced for two additional reasons: The opinion was handed down in the completely different context of resolving a motion to dismiss under Fed. R. Civ. P. 12(b)(6), and the court hedged its bets by also analyzing the alleged practices under the Rule of Reason.  First, the *Delta Dental* decision addresses only the threshold question whether the complaint stated a claim under the Sherman Act.  The court ruled only that plaintiffs had adequately alleged a plausible *per se* claim based on *Sealy* and *Topco* "[p]rior to any factual development." 484 F.Supp. 3d at 635. The court also declined to dismiss claims that Delta Dental's exclusive territories for branded competition led to collusive artificially low reimbursement rates for dentists, noting that "[a]lthough the factual basis for plaintiffs' belief that defendants have agreed to restrict their non-Delta Dental branded business is indeed modest, they have alleged facts that, if proven, may entitle them to relief." *Id*. at 639. In a footnote, it added that "[t]he basis for plaintiffs' belief that a revenue restriction agreement exists seems to be largely inferential. Plaintiffs allege that Delta Dental State Insurers in fact conduct little to no competing business despite having the wherewithal to do so, and they point to 'broad language' governing defendants' relationship that they construe as giving [Delta Dental of Pennsylvania] the authority to impose and police the revenue restriction mechanism. This is perhaps a slim reed on which to base their claim, but in the context of their allegations as a whole, I conclude that

it is enough to entitle them to discovery." *Id*. at 639 n.4 (citations omitted). This is quite unlike the situation now before the Court.

Second, the court in *Delta Dental* also separately examined the challenged conduct under a Rule of Reason theory. It said, in connection with its analysis of whether the complaint had adequately stated a claim for a violation under the Rule of Reason, that "Plaintiffs will undoubtedly have to develop the record to define more precisely the geographic market that is relevant to their claims, but given that they seek to represent a nationwide class and claim that defendants insure patients across the country, their identification of the United States and the respective territories in which defendants participate in the market as buyers of dental goods and services is sufficient at this stage." *Id*. at 641. Likewise, it rejected defendants' assertion that market shares were inadequately pled, saying that "Defendants' remaining arguments do not convince me that Rule 8 requires more detailed factual allegations than those plaintiffs articulate concerning defendants' market power." *Id*. at 642.

Thus, because the lawfulness of the Blues' exclusive service areas was not at issue, and given both the procedural posture in *Delta Dental* and that court's application of the lenient standard of pleading, the decision denying defendants' motion to dismiss is not useful in addressing the adequacy of the proposed settlement here.

## II.     The Settlement Provides The Second Blue Bid To Eligible Members Of The Proposed Self-Funded Sub-Class To Be Certified Under Rule 23(b)(3).

Subscriber Plaintiffs have proposed certification of two classes and one sub-class: an Injunctive Relief Class under Rule 23(b)(2), and a Damages Class under Rule 23(b)(3), which includes a Self-Funded Sub-Class.  Initially, in support of our preliminary approval motion, we described the second Blue bid ("SBB") relief provided under Paragraph 15 of the Settlement Agreement as relief provided to the members of the Injunctive Relief Class being certified under Rule 23(b)(2).  We believed then, and still believe now, that the SBB relief both addresses

anticompetitive conduct that applies generally to the (b)(2) Injunctive Relief Class and provides procompetitive relief that "will drive innovation and price reductions that will benefit the entire health insurance market generally and ASOs[5] in particular." Tr. I at 25:25 to 26:2.[6]  For the reasons set forth below, however, and as discussed at length at the final approval hearing, Subscriber Plaintiffs have concluded that the SBB relief is more properly classified as divisible relief that is being provided to the Self-Funded Sub-Class that is being certified under Rule 23(b)(3).

By way of background, as we negotiated the terms of this Settlement with the Blues, counsel for Subscriber Plaintiffs and counsel for the Self-Funded Sub-Class sought to obtain as many additional Blue bids for as many ASOs as we could; ideally, as we have explained to the Court, we would have secured a SBB for every large ASO that has employees dispersed among different States or regions. *See* Tr. I at 23:20 to 24:20. The Blues, in turn, resisted this demand, tenaciously seeking to preserve the existing features of the Blue system to the greatest extent possible.  Months of arms-length negotiations and hard bargaining ultimately resulted in the compromise that is now before the Court; namely, the requirement that the Blues provide the right to request an SBB to so-called "Qualified National Accounts"—a selection of national self-funded accounts that meet certain dispersion criteria and that serve 33 million Members in the aggregate.

---

[5] The Self-Funded Sub-Class comprises those members of the Damages Class who purchased administrative services only ("ASO") plans, as well as the employees covered by those ASO plans. The Sub-Class members are sometimes referred to herein as "ASOs".

[6] As Subscriber Plaintiffs have consistently maintained, although an SBB will be provided only to those ASOs satisfying the criteria for a Qualified National Account, the increased Blue-on-Blue competition for those accounts will nevertheless benefit the entire ASO sub-class as a whole "by generating new, innovative products and services that can be then made available to the marketplace generally and lowering the overall prices that are paid." Preliminary Approval Hr'g Tr., Nov. 16, 2020 at 27:13 to 23.  In addition, as Dr. Rubinfeld has opined, "all class members also benefit from the increased flow of pricing information to insurance brokers and otherwise throughout the market that results from increased bidding competition, including from bids not presented to or even available to them." Rubinfeld Suppl. Decl., ECF No. 2812-7 at ¶ 16.

Settlement Agreement, ECF No. 2610-2 at ¶¶ 1.u, 15. *See also* Final Approval Br., ECF No. 2812-1 at 75–89.

Not long after completion of the preliminary approval proceedings, the Court advised the parties that it had "serious concerns about [the SBB relief] being classified under (b)(2) with no opt-out right and the potential burden that might have on the opt-out right." Tr. I at 24:23 to 24:25. Subscriber Plaintiffs and Defendants, accordingly, carefully studied the question whether the SBB relief qualifies not only as classwide relief, but also as "indivisible" relief within the meaning of recent caselaw interpreting Rule 23(b)(2) to require that (b)(2) class relief be "indivisible." *Wal-Mart Stores, Inc. v. Dukes*. 564 U.S. 338, 360 (2011).[7]

As the Supreme Court in *Wal-Mart* explained, "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Id.* (*quoting* Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.REV. 98, 132 (2009). Rule 23(b)(2) thus demands that plaintiff seek "an indivisible injunction benefitting all its members at once." *Id.* at 362. The Supreme Court has since reaffirmed that certification under Rule 23(b)(2) is proper " 'only when a single injunction or declaratory judgment would provide relief to each member of the class.' " *Jennings v. Rodriguez*, 138 S.Ct. 830, 851-852 (2018) (quoting *Wal-Mart*, 564 U.S. at 362).[8] Lower courts have applied the teaching of *Wal-Mart* to deny certification where the injunctive relief sought does

---

[7] Maureen Carroll, "*Class Actions, Indivisibility, and Rule 23(b)(2)*," 99 B.U.L.REV 59, 63 (2019) (observing that, prior to *Wal-Mart*, "[t]hat term ("indivisible" or "indivisibility") had never before appeared in a published federal opinion as a Rule 23(b)(2) requirement").

[8] *See also id.* (observing that *Wal-Mart's* "holding may be relevant on remand because the Court of Appeals has already acknowledged that some members of the certified class may not be entitled to bond hearings as a constitutional matter").

not indivisibly benefit all class members at once, *C.G.B. v. Wolf*, 464 F.Supp.3d 174, 206 (D.D.C. 2020), where the injunction does not provide a uniform remedy, *Castañeda Juarez v. Asher,* 2020 WL 6434907, at *7 (W.D. Wash. July 6, 2020), or where the injunctive relief combines an array of remedies, some of which will benefit only certain subsets of the class. *Cholakyan v. Mercedes-Benz, USA, LLC,* 281 F.R.D. 534, (C.D. Cal. 2012). *See also Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 499 (7th Cir. 2012) (holding that Rule 23(b)(2) is not satisfied where "the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made").

The somewhat unique features of the far-reaching injunctive relief provided under this Settlement Agreement, and in particular the features of the SBB relief provided under Paragraph 15, do not easily lend themselves to a simple, binary classification under either Rule 23(b)(2) or Rule 23(b)(3).  Because Blue-on-Blue competition will benefit the entire market for ASO services, the SBB relief is in the nature of classwide relief.[9]  But the mechanism used to create this classwide benefit can also be characterized as individualized and divisible;[10] the Settlement provides a right to request a SBB only to those individual Self-Funded Sub-Class members who satisfy the

---

[9] *See, e.g.*, American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION, ("ALI") § 2.04(a) ("Divisible remedies are those that entail the distribution of relief to one or more claimants individually, without determining in practical effect the application or availability of the same remedy to any other claimant."). *See id.*, Comment a ("When a claimant seeks a prohibitory injunction or a declaratory judgment with respect to a generally applicable policy or practice maintained by a defendant, those remedies—if afforded—generally stand to benefit or otherwise affect all persons subject to the disputed policy or practice, even if relief is nominally granted only as to the named claimant.").

[10] Subscriber Plaintiffs will follow the practice of courts and commentators in the post-*Wal-Mart* era, and the practice of this Court in this case, and will use the terms "divisible" and "individualized" interchangeably to describe the relief available to the members of a (b)(3) class.

definition of a "Qualified National Account."[11]   As the Court noted at the final approval hearing, "some [ASOs] will benefit from second Blue bids, some will not."   Tr. I at 25:21 to 25:22.   The SBB relief thus does not fall neatly within either (b)(2) or (b)(3); it has characteristics of both indivisible and divisible forms of injunctive relief.

After extensive additional analysis, Subscriber Plaintiffs have come to the view that the SBB relief is more appropriately treated as (b)(3) relief for purposes of class certification.   Several factors supported this decision.   First, given that only certain qualifying ASOs will be entitled to directly request a second Blue bid, the SBB relief seems more readily characterized as "divisible" and thus tips the balance over to the (b)(3) side.

Second, treating the SBB relief as individualized (b)(3) relief more readily conforms to the Settlement Agreement, which provides that class members who opt out of the Damages Class do not meet the definition of an Employer, and thus cannot satisfy the definition of a Qualified National Account eligible to receive a SBB.   Under the terms of the Settlement, in other words, an ASO that opts out from damages relief is opting out of the right to receive a second Blue bid as well. The Settlement Agreement thus places the SBB relief in the same category as individualized damages, and does not equate it with the indivisible relief that is provided to the members of the (b)(2) Injunctive Relief Class.

Finally, the dispositive consideration for Subscriber Plaintiffs is that characterizing the SBB relief as (b)(3) relief will afford greater protection to the rights of absent sub-class members.   Rule 23(b)(3) "allows class certification in a much wider set of circumstances but with greater procedural protections." *Wal-Mart,* 564 U.S. at 362. These protections include mandatory notice

---

[11] *See, e.g.,* ALI § 2.04(b) ("Indivisible remedies are those such that the distribution of relief to any claimant as a practical matter determines the application or availability of the same remedy to other claimants.").

and opt out rights—neither of which applies to members of a (b)(2) class. *Id. See also Gulino v. Board of Education of City School Dist. of City of New York*, 907 F.Supp.2d 492, 505 (S.D.N.Y. 2012) (declining to certify under Rule 23(b)(2) in case "where each class member would be entitled to a different injunction or declaratory judgment" and observing that "[i]n order to obtain individualized relief, a putative class must satisfy the requirements of Rule 23(b)(3), which includes greater procedural protections, such as notice and opportunity for members to opt out of the litigation.") (internal citations and quotation marks omitted).  At the final approval hearing, the Court made clear its view that the ASO sub-class should be provided with supplemental notice and a renewed opportunity to opt out.  Subscriber Plaintiffs agree. Providing these additional safeguards and protections can only benefit the members of the sub-class.

    In sum, characterizing the SBB relief as (b)(3) relief is simply a better fit than (b)(2) and is the framework that best protects the interests of absent class members.[12]  Subscriber Plaintiffs therefore submit that the SBB relief is properly treated as relief awarded to the Self-Funded Sub-

---

[12] As discussed at the Final Approval hearing, the fact that the historic and valuable SBB relief achieved in this Settlement may not fit neatly under the rubric of either (b)(2) or (b)(3) relief as those provisions of Rule 23 are applied in more conventional, run-of-the-mill class action litigation cannot mean that it may not be provided at all. *See* Tr. I at 44:8 to 44:12 (Mr. Cooper:  "[I]t surely cannot be that Rule 23's class certification buckets, (b)(2) and (b)(3), are so procrustean that a type of meaningful, procompetitive injunctive relief is impermissible if it does not fit neatly, like a glove, in one bucket or the other."). Similarly, it would be an absurd result if a settlement class that could otherwise properly be certified under Rule 23 had to forego some of the relief for which it had successfully bargained—relief that would provide the members of the class with substantial economic benefits—in order to remain amenable to certification under a single provision of that Rule.  Rule 23 avoids producing such a result when the relief won for the class does not all fit perfectly under either Rule 23(b)(2) or Rule 23(b)(3) by permitting hybrid certification, whereby some of the injunctive relief is provided to a class certified under Rule 23(b)(2) and the rest provided to a class certified under Rule 23(b)(3), of the sort Subscriber Plaintiffs here propose.

Class that is being certified under Rule 23(b)(3), rather than to the Injunctive Relief Class being certified under Rule 23(b)(2).[13]

That the Settlement Agreement provides both injunctive relief that is individualized and divisible, and injunctive relief that is indivisible and classwide, raises no obstacle to the certification of the classes proposed by Subscriber Plaintiffs.  Where the criteria of both Rule 23(b)(2) and Rule 23(b)(3) are satisfied, the Court may certify an indivisible class under Rule 23(b)(2) and a divisible, individual class under Rule 23(b)(3). *See, e.g., Marriot v. County of Montgomery*, 227 F.R.D. 159, 175 (N.D.N.Y. 2005) (certifying a class under Rule 23(b)(2) because "final injunctive or declaratory relief would be appropriate to the class as a whole pertaining to the official Jail change-out policy" and a class under Rule 23(b)(3) because "[t]he claims of the putative class members have common questions of law and fact that predominate over such questions as to the individuals" and "[t]he circumstances of this case present a situation where a class action is a superior method for fair and efficient adjudication of the claims"). In the wake of *Wal-Mart,* courts have found certification of both a (b)(2) and a (b)(3) class to be appropriate where, as here, a class action has obtained both injunctive relief that is indivisible and classwide, as well as injunctive relief that is divisible and individualized. *See, e.g., A.R. v. Connecticut State Board of Education*, 2020 WL 2092650 (D. Conn. May 1, 2020) (certifying claims for injunctive relief that addressed systemic violations under Rule 23(b)(2), and claims for divisible injunctive relief—i.e., individualized remedial education—under Rule 23(b)(3));

---

[13] To be clear, in seeking to classify the SBB relief as Rule 23(b)(3) relief, Subscriber Plaintiffs are neither seeking to certify any classes for which they have not already sought certification, nor altering the membership of any of these three classes. As the Court has recognized, "the class definition, like the scope of the class" will not "change[] in any way" under this proposal to clarify how the SBB relief is classified.  Tr. I at 28:6 to 28:7. The pending request to certify these classes, and the analysis of the criteria under Rule 23(a), Rule 23(b)(2), and Rule 23(b)(3), thus continue to support certification.

*Easterling v. Connecticut Dept. of Correction*, 278 F.R.D. 41 (D. Conn. 2011) (certifying plaintiffs' claims for classwide declaratory and injunctive relief pursuant to Rule 23(b)(2) and their claims for individualized injunctive relief—i.e., reinstatement to their positions—pursuant to Rule 23(b)(3)).[14]

### A.    Opt Outs from the Self-Funded Sub-Class Are Free to Pursue Their Claims for Individualized Relief So Long As That Relief Does Not Infringe Rule 23(b)(2) Indivisible \Injunctive Relief and Release Approved By The Court.

Several objectors have raised questions concerning how the release that Settlement Class members will provide pursuant to Paragraph 32 of the Settlement Agreement will affect the ability of those who opt out of the Self-Funded Sub-Class to pursue individualized claims for injunctive relief, and specifically claims for a second or for additional Blue bids. They question whether the scope of the relief and release being provided by members of the (b)(2) Injunctive Relief Class renders illusory their right to opt-out of the Self-Funded Sub-Class and to pursue additional Blue bids individually. These concerns are unfounded, and they present no obstacle to the final approval of the Settlement.

The release provided under the Settlement Agreement is, by its own terms, to "be interpreted and enforced broadly." Settlement Agreement, ECF No. 2610-2 at ¶ 32. "Released Claims" are defined to include, *inter alia*, all known and unknown claims based upon, arising from, or relating to the "factual predicates" of the Subscriber Actions and any issue raised in those

---

[14] *See also Chicago Teachers Union, Local No.1 v. Board of Education*, 797 F.3d 426, 443-45 (7th Cir. 2015) (certification proper where "plaintiffs siphoned that portion of the complaint that requested monetary relief and individual remedies into a request for 23(b)(3) class certification"); *In re Toll Roads Litigation*, 2018 WL 4952594, at *8 (C.D. Cal. 2018) ("Though the Court doesn't certify the class under Rule 23(b)(2), the Court isn't aware of any authority prohibiting the class from seeking forms of injunctive relief just because the class is certified under Rule 23(b)(3)."); *In re Motor Fuel Temperature Sales Practices Litigation*, 279 F.R.D. 598, 615 (D. Kan. 2012) (approving certification of (b)(3) class seeking injunctive relief and monetary damages that had originally been certified as (b)(2) class prior to *Wal-Mart*).

actions.  The release also provides that "[p]ersons or entities in both the Injunctive Relief Class and the Damages Class release all Released Claims." *Id*.  The important point for present purposes, however, is that the Settlement Agreement further provides that a Settlement Class member who opts out of the Damages Class provides a more limited release.  Specifically, the Agreement provides, subject to certain exceptions not relevant here, that "[p]ersons or entities in the Injunctive Relief Class but not the Damages Class, release *only* claims for equitable or injunctive relief." *Id.* (emphasis added).

Read in isolation, these provisions could be interpreted to require class members who opt out of the (b)(3) Self-Funded Sub-Class to release even claims for individualized injunctive relief, including claims for a second Blue bid.  This ambiguity requires clarification of two points regarding the scope of the release provided by (b)(2) class members.

First, all parties agree that members of the (b)(2) Injunctive Relief Class release *only* their claims for equitable and injunctive relief that is *indivisible*; therefore, the release provided by the members of the Injunctive Relief Class will not bar any claims for individualized relief by a class member who opts out of the Self-Funded Sub-Class.  This interpretation of the (b)(2) class release is effectively mandated by *Wal-Mart*'s holding that claims for individual and divisible relief may not be resolved in a class action certified under Rule 23(b)(2).  It comports, moreover, with subsequent decisions recognizing that *Wal-Mart* calls into question any (b)(2) class settlement that purports to release a range of claims that is broader than that which could have been asserted on behalf of a (b)(2) class. *See*, *e.g., West Morgan-East Lawrence Water and Sewer Authority v. 3M Company*, 737 Fed. Appx. 457, 466-467 (11th Cir. 2018) (concluding that district court abused its discretion by certifying a settlement class under Rule 23(b)(2) that purported to release

individualized damage claims of class members).[15]   The Settlement Agreement itself states that, although its releases are to be interpreted and enforced broadly, they also are to be interpreted only "to the fullest extent permitted by law." Settlement Agreement, ECF No. 2610-2 at ¶ 32. Because a (b)(2) class may not lawfully release claims for individualized injunctive relief, the release being executed on behalf of the (b)(2) Injunctive Relief Class does not extend to any claims for divisible individualized injunctive relief under (b)(3).

Second, the release provided by members of the (b)(2) Injunctive Relief Class does not render the right to opt out of the (b)(3) Self-Funded Sub-Class illusory, but will permit opt outs to pursue any claims for individualized relief that they may be able to assert and prove after prevailing in a damage liability trial, so long as the relief they seek does not undermine the (b)(2) class's injunctive relief provisions.  As noted above, the Release provides that it extends no further than permitted by law.

The short of it is this: After *Wal-Mart*, the law is now clear that a (b)(2) class may assert, and a (b)(2) class release may bar, only claims that challenge conduct that "can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart,* 564 U.S. at 360 (internal quotations marks omitted). The (b)(2) class release here, therefore, can lawfully bar only those claims that challenge conduct that is capable of being enjoined only as to all of the class members or as to none of them.  A class member who opts out of the Self-Funded Sub-Class

---

[15] *See also Berry v. Schulman*, 807 F.3d 600, 609 (4th Cir. 2015) (approving (b)(2) class settlement's release of indivisible injunctive relief and claims for statutory damages, since these "are not the kind of individualized claims that threaten class cohesion and are prohibited by *Dukes*"); *In re: Google Inc. Cookie Placement Consumer Privacy Litigation*, 934 F.3d 316, 329-330 (3rd Cir. 2019) (questioning, and leaving "to the District Court on remand, whether a defendant can ever obtain a class-wide release of claims for money damages in a Rule 23(b)(2) settlement, and if so, whether a release of that kind requires a heightened form of notice either under Rule 23(c)(2)(B) or due process tenets").

retains the right to pursue divisible relief including monetary relief and divisible injunctive relief on any legal or factual basis. The release provided by the members of the (b)(2) class cannot and does not bar a claim for a SBB and/or similar individualized injunctive relief.

The Objectors have voiced the concern that the line between the type of (b)(3) individualized injunctive relief that is not released by opt-outs, and the indivisible (b)(2) injunctive relief that will be covered by the release, is not clear and well-defined.  The parties, the Objectors, and the Court have all devoted significant time and attention to this question in a good faith effort to provide as much guidance as is possible to members of the (b)(3) Self-Funded Sub-Class who will be faced with the decision regarding whether to exercise their opt-out rights.  But let there be no mistake: any remaining uncertainty that the Objectors are confronting is not ultimately a product of the terms of the Settlement Agreement, but rather of the law itself.  The Objectors will now have to follow the same path and perform the same tasks as Subscriber Plaintiffs have: they must consider "the landscape of the law" and review the caselaw interpreting *Wal-Mart*, determine whether their claims seek the sort of relief that the courts have characterized as divisible and individualized, and advise their clients accordingly on whether to exercise their right to opt out of the litigation.  *See* Tr. II at 19:16 to 19:21. Neither the parties nor the Court can resolve here and now the merits of any claims for such relief that opt-out claimants may assert against individual Blue plans in the future in a materially altered Blue system. Tr. II at 19:11 to 19:16 and 30:22 to 31:3.

That said, the Settlement Agreement by no means leaves the Objectors without guidance. Read in its entirety, its terms and provisions indicate the understanding of the Parties as to what constitutes individualized relief that should not trigger the bar of the (b)(2) relief or release.  In particular, by providing the SBB relief to large national ASO accounts that have a significant

16

presence in more than one ESA, the Settlement Agreement itself identifies certain (b)(3) Self-Funded Sub-Class members who have an individualized basis for obtaining ASO bids from more than one Blue Plan and specifies the criteria it uses to identify them.  An ASO with a significant presence in more than one ESA that opts out of the Self-Funded Sub-Class, therefore, could argue based upon the terms of the Settlement Agreement itself that it has an individualized basis for asserting a claim that it is entitled to request more than one Blue bid in order to prevent economic injury to itself.  Although such an ASO would be barred by the release provided by all members of the (b)(2) Injunctive Relief Class from asserting a wholesale challenge to the lawfulness of the ESAs,[16] it would not be barred from asserting a claim that, under the particular business facts and circumstances of its own case, it is nonetheless entitled under the law to seek more than one Blue bid for its business.  An opt-out claimant could assert any legal claim that would potentially entitle it to individualized relief; as the Court acknowledged, the key question is "whether you can pursue the particular remedy." Tr. II at 23:25 to 24:1.  To reiterate, if a (b)(3) opt-out claimant seeks divisible, individual injunctive relief after it prevails on liability, and it demonstrates that it is

---

[16] As the Court has itself recognized, the injunctive relief pursued by a (b)(3) opt out may not infringe on the (b)(2) indivisible injunctive relief approved by the Court.  Tr. II at 18:4 to 18:6.  A claim seeking an injunction prohibiting the operation of the ESAs, the local best efforts rules, or the acquisition rules would thus be barred by the (b)(2) release because those features of the Settlement Agreement could "be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360. An action seeking an injunction prohibiting the operation of the ESAs would thus be seeking indivisible relief under *Wal-Mart*.  An opt-out's action seeking such an injunction would also likely run afoul of any order by this Court approving the Settlement Agreement.  A claim seeking the invalidation of the ESAs would thus thwart the (b)(2) release provided by the (b)(2) class and deprive the Court's approval order of its effect. This Court would, in that situation, be empowered by the All Writs Act to issue an injunction to effectuate its judgment. *Wesch v. Folsom*, 6 F.3d 1465, 1470 (11th Cir. 1993). *See also Faught v. American Home Shield Corp.*, 660 F.3d 1289, 1293 (11th Cir. 2011) (*citing Thomas v. Blue Cross and Blue Shield Ass'n*, 594 F.3d 823, 829 (11th Cir. 2010) ("injunctions are enforced through the district court's civil contempt power.") (internal quotation marks omitted) (collecting cases); Tr. II at 24:14 to 24:18, 30:10 to 30:21, 32:10 to 32:17, 112:24 to 113:8.

necessary to request additional Blue bids in order to prevent economic harm to itself, such a request will not be barred by any release in the Settlement Agreement as long as it does not seek to infringe on the (b)(2) relief or release.

The task of adjudicating the merits of any future claim brought by an opt out seeking individualized injunctive relief must be left to a court of competent jurisdiction called upon to interpret and apply the (b)(2) release to the opt-out's specific claims for individualized relief in a live controversy.  This Court need not, and indeed should not, decide in this proceeding how the (b)(2) release would operate in the context of specific claims for individualized relief that may be asserted in future proceedings. *See, e.g., In re AOL Time Warner ERISA Litig.*, 2006 WL 2789862, at *12 (S.D.N.Y. Sep. 27, 2006) (declining to rule on whether certain state court claims of objector would be released by the settlement because the "facts necessary for a resolution of this question are not before the Court, nor does the Court have jurisdiction to formally dispose of the action"). *See also Cicero v. DirecTV, Inc.*, 2010 WL 2991486, at *7-8 (C.D. Cal. July 27, 2010) (refusing to address whether particular claims fell within the release because to do so would involve "rendering an advisory opinion").[17]

**B.      Supplemental Notice Will Be Provided To The Self-Funded Accounts.**

Courts have not hesitated to require supplemental notice under Rule 23(d)(1)(B) to provide class members with additional relevant information that may materially affect their decision to opt

---

[17] *See, e.g., In re Stock Exchanges Options Trading Antitrust Litig.*, 2005 WL 1635158, at *15 (S.D.N.Y. July 8, 2005) (preliminarily approving class settlement and holding that the "Court cannot provide an advisory opinion as to the scope of the release"); *In re Wells Fargo Mortgage-Backed Certificates Litigation*, 2011 WL 13240287, at *1 (N.D. Cal. Nov. 14, 2011)  (declining to require additional "'clarifying' language" to proposed release contained in settlement agreement because "[i]n the face of nothing more than unidentified and purely hypothetical 'potential' claims held by the Offerings' trusts, such clarifying language would amount to an advisory opinion, which is generally disfavored").

out. *Mansfield v. Air Line Pilots Ass'n Intern.*, 2009 WL 2601296, *2-*4 (N.D. Ill. 2009) (ordering notice and a new right to opt out of a (b)(3) class when the original notice did not fully lay out potential conflicts between the interests of various class members); *Stair ex rel. Smith v. Thomas & Cook*, 254 F.R.D. 191, 204 (D.N.J. 2008) (ordering supplemental notice to inform class members of a cap on damages that would limit the class's recovery and to permit class members to opt out).

Subscriber Plaintiffs have agreed that, pursuant to a Court-approved notice plan, a supplemental notice should be provided to the Self-Funded Accounts to clarify that the SBB relief is (b)(3) relief and that opting out of the Self-Funded Sub-Class thus entails opting out not only of the right to damages but also of the right to receive a second Blue bid. This notice will also ensure that no Self-Funded Account makes the decision whether to opt out of the (b)(3) Damages Class under a misapprehension about the scope of its opt-out right.  The supplemental notice will explain that the SBB relief is deemed individualized and divisible injunctive relief, and that opting out to make an individualized claim seeking such relief would not be barred by the (b)(2) class release unless the relief sought would undermine or infringe the (b)(2) relief or release. The Supplemental Notice will also explain to Self-Funded Accounts that, regardless whether they previously elected to opt out, they may exercise their right to opt-out by a date to be set by Court order.

Finally, because this supplemental notice will clarify the opt out rights of members of the Self-Funded Sub-Class, and does not materially alter the terms of the Settlement Agreement itself, an opportunity to submit additional objections to the Settlement Agreement is unnecessary. Rule 23(e) requires that a new fairness hearing be conducted only when material terms of the settlement agreement have been renegotiated, and an additional opportunity to object is not required where the changes are favorable to the members of the class. *See, e.g., Shaffer v. Cont'l Cas. Co.*, 362 F.

19

App'x 627, 631 (9th Cir. 2010) ("Although changes were made to the release after potential class members received the notice, the changes did not render the notice inadequate because they narrowed the scope of the release."). *See also Snyder v. Ocwen Loan Servicing, LLC*, 2019 WL 2103379, *9 (N.D. Ill. 2019) ("no new notice is required where changes to a proposed settlement are objectively favorable for class members and do not prejudice any benefit previously promised"); *Knuckles v. Elliott*, 2016 WL 3912816, at *5 (E.D. Mich. July 20, 2016); *Klee v. Nissan N. Am., Inc.*, 2015 WL 4538426, at *5 (C.D. Cal. July 7, 2015); *Keepseagle v. Vilsack*, 102 F.Supp.3d 306, 313 (D.D.C. 2015).

### III. The Allocation Between The Self-Funded Sub-Class Members And The Fully Insured Class Members Was Reasonable And Rationale.

At the final approval hearing, the Bradley Objectors asked the Court to reject and override the arm's-length allocation negotiation between Settlement Class Counsel and Self-Funded Sub-Class Counsel that was approved by mediator Mr. Kenneth Feinberg, and replace that negotiated resolution with one that they contend, without proof, is better. The presentations by all parties at the final approval hearing amply demonstrated why these objections are meritless.

While the discussion below walks through the major errors in the arguments made by the Bradley objectors, one point stands out. The Bradley objectors and their proffered experts ignore the differences between the fully insured and self-funded ASO markets, and thereby ignore the fact that during the relevant time periods the fully insured business was vastly more profitable for the Defendants than was the ASO business. This is evident both from public record evidence and from documents produced in discovery. Indeed, some of these documents show that the fully insured business could be anywhere from as much as ***four to ten times more profitable*** for some

Defendants than the ASO business.[18]  Other documents show that the ASO business was often not

profitable at all, and could be a loss leader or only a break-even line of business.[19]  This large

difference in relative profitability is highly relevant to the allocation issue because higher

profitability is likely to correlate with a stronger claim that the prices generating those profits

contained a significant overcharge; conversely, the low levels of profitability, or zero profitability,

for the ASO business means that the Self-Funded Sub-Class would face much more difficulty in

showing an overcharge, and any overcharge it could show would likely be substantially smaller

than the overcharge in the fully insured market.  The Bradley objectors ignore this.  The actuarial

expert they presented at the final approval hearing admitted that he was vaguely aware of

documents reporting on this large difference in profitability, but said he did not investigate them.

Tr. II at 250:14 to 251:12, 252:24 to 253:16 and 255:9 to 257:3.  He then gave this stunning

---

[18]*See* 2012 BCBS-CA Report at 4 and 9 (attached hereto as Ex. A) (showing predicted profits for FI and losses for ASO and stating "in an environment where corporate g&a is not driven by membership volume a fully insured member is worth 10 times a self funded member"); 2010 Anthem Report at 147 (attached hereto as Ex. B) ("Fully Insured business provides nearly 6 times as much Operating Gain PMPM as ASO."); 2010 BCBS-AR Report, ECF No. 2812-12 at 3 (showing that FI was more profitable than ASO by more than 4.25 to 1).

[19] "The Congressional Research Service reported that commercial ASO contracts are break-even deals on average . . . ."  Bob Herman, *Self-Service Insurance: Insurers Forced to Compete Harder For Self-insured Customers*, Modern Healthcare, January 03, 2015, at 3 (attached hereto as Ex. C and cited by Bradley objector's actuarial expert, Mr. Okpewho, ECF No. 2812-19 at 10 n.2).  *See also* 2016 Anthem 10-K at 30 (attached hereto as Ex. D) (describing ASO as a business with "lower margins" that had the potential to materially and adversely impact the company's profits if more business moved from FI to ASO"); 2011 BCBS-ID Report at 4 (attached hereto as Ex. E) ("many Plans have opted to set prices such that the self-funded business makes some contribution to overhead, but does not fully cover fixed costs."); BCBS-AZ Report, ECF No. 2812-10 at 2  (noting that administering networks and insurance "is a low margin business. Traditional functions such as claims and enrollment administration will generate very little profit or become loss leaders"); 2013 BCBS-FL Report at 8 (attached hereto as Ex. F) ("In order to remain in the market, Florida Blue has utilized a market based approach to setting ASO fees which does not cover all our costs.").

admission, which undermines both the relevance of his methodology and opinions, as well as the arguments made by the Bradley objectors:

> Q.    "Sir, do you believe that the allocation of damages should be based on the relative amounts of overcharges that the two groups of customers paid?
>
> A.    No."

Tr. II at 258:21 to 258:24.

This admission is fatal to the Bradley objectors. The point of the allocation is to reflect a reasonable estimate of the relative size of the damages that the two groups of customers could potentially have recovered. While it is very difficult to do that perfectly, and many different metrics could reasonably be considered, a methodology that completely ignores that fundamental question is obviously irrelevant.

For these and other reasons given below, the Court should reject the allocation arguments made by the Bradley objectors.

### A.    The legal standard for the allocation is reasonableness, not perfection.

The Bradley objectors fail to come to grips with the relevant legal standard.  The question is not whether the allocation to the Self-Funded Sub-Class is perfect, or even whether the Court believes it is the best conceivable allocation and the same allocation that the Court would have ordered if the issue had been fully litigated.  Rather, the inquiry is whether the allocation is "reasonable" and "rational."  *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *20 (E.D.N.Y. Dec. 16, 2019).  "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429–30 (S.D.N.Y. 2001) (quotation marks omitted) "Rule 23's flexible standard allows for the unequal distribution of settlement funds so long as the distribution formula takes account of legitimate considerations and

the settlement remains 'fair, reasonable, and adequate.'" *Radcliffe v. Hernandez*, 794 Fed. App'x 605, 607 (9th Cir. 2019) (quoting Fed. R. Civ. P. 23(e)(2)). Whether the allocation plan is equitable is "squarely within the discretion of the district court." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997) (*per curiam*); *id.* ("in the case of a large class action the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision."). The Bradley objectors never address this legal standard, and therefore never tailor their arguments to an effort to show why the standard has not been met here. It plainly has, as shown in our prior briefs and below.

Moreover, the case law also recognizes that it is justifiable to allocate larger portion of the settlement to the class members with the "strongest meritorious claims in the case." *See also In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 116-117 (D.N.J. 2012). Here, for a number of reasons, the fully insured class members have stronger claims than the Self-Funded Sub-Class members. As shown below, the fully-insured class members have been in this case from the beginning, and their damages claims indisputably include the entire period going all the way back to January 1, 2008. By contrast, Self-Funded Sub-Class members have damages claims for a smaller period, going back only to October of 2017. That means that fully insured class members have a damages period that is 2.5x that of the Self-Funded Sub-Class members.

In addition, the fact that not a single Self-Funded Account sought to file suit during the eight years between the *Cerven* complaint and the settlement – as compared to dozens of fully insured class members stepping forward to do so – speaks volumes about the extent to which ASO sub-class members felt themselves to be suffering antitrust injury as a result of Defendants' conduct. The ASO objectors who have come forward since the settlement was announced are mostly large entities with very substantial resources; yet none saw fit to lend its resources to this

litigation, or even to join it in a nominal way, during more than eight years of trench warfare litigation.

Further, as demonstrated by the economics expert presented by the Self-Funded Sub-Class Settlement Counsel, the ASO market is more competitive than the fully-insured market because additional substitute products—including third-party administrators, the option to administer healthcare plans in-house, and the existence of large national health plan administrators like United, Cigna, and Aetna—are available to self-funded ASO customers that are often not available to fully-insured customers. Tr. II at 41:8 to 44:25. And as we have shown in our prior submissions and again at the final approval hearing, the fully-insured market was vastly more profitable for Defendants than the ASO market during the relevant time periods, and thus far more likely to yield a substantial overcharge had the antitrust claims in this case gone all the way to trial.[20]

For all these reasons, there was a substantial difference in terms of the strength and overall value of the claims held by fully-insured class members versus ASO sub-class members.

## B. The mediation before Mr. Feinberg was a rational process that resulted in a reasonable allocation.

As shown above, the Subscribers showed that the inquiry for the Court is whether the allocation was rational and reasonable, not whether it was perfect. Here, the Subscribers and the separate counsel and class representative for the Self-Funded Sub-Class engaged in an arm's-length mediation over the allocation issue before the highly reputable mediator Mr. Kenneth Feinberg. At that mediation, both sides presented a settlement range to Mr. Feinberg: Settlement Class Counsel's estimates of the appropriate recovery for the Self-Funded Sub-Class ranged from

---

[20]*See* Final Approval Br., ECF No. 2812-1 at 108-110; Mason Expert Report, ECF No. 2812-9 at 7-8 and 15-16 (describing ASOs as less profitable than FI plans). *See also supra* notes 18 and 19.

3.4% to 6.8%, while the Self-Funded Sub-Class Settlement Counsel's estimates varied from 7.6% to 16%. The two sides ultimately agreed on a compromise allocation of 6.5%, and presented that to Mr. Feinberg. Mr. Feinberg approved the allocation compromise, and stated in his sworn declaration:

- "the negotiated number falls towards the low end of Self-Funded Sub-Class Settlement Counsel's estimate, and the high end of Settlement Class Counsel's estimate . . . one would expect an outcome in that range" (ECF No. 2016 at ¶ 14);

- "The relative size of the Self-Funded Claimants' share makes sense given the statute of limitations and premiums vs. administrative fees issues" (*id.)*;

- "The fact that the division resulted from protracted negotiations between sophisticated counsel also supports its reasonableness." *Id.*

The legal and factual arguments presented by Subscribers and Self-Funded Sub-Class counsel at the final approval hearing overwhelmingly support both the reasonableness of this outcome, and the judgment of Mr. Feinberg in approving it.

**C.    The Self-Funded Sub-Class was not included in any complaint before 2020, and Eleventh Circuit case law would not allow their addition to relate back to 2012.**

As shown at the final approval hearing, the original *Cerven* complaint did not include any ASO customer as a class representative, did not purport to include ASO customers in the class definition, and only referenced the ASO market to show that it was different from the product market being alleged in the case. Tr. II at 149: to 150:24, 159:18 to 162:15. The *Cerven* Complaint expressly defined the product market as follows: "The relevant product market is the sale of full-service commercial health insurance products to individuals and small groups." *Cerven v. Blue Cross and Blue Shield of North Carolina,* 12-cv-17 (W.D.N.C) ECF No. 1 at ¶ 124. ("*Cerven* Complaint"). This definition clearly refers to fully insured customers only, and excludes ASOs. Indeed, the *Cerven* Complaint proceeds to allege facts showing that the ASO market is ***different*** from the fully-insured market, in a paragraph entitled "Fully-insured health insurance versus ASO

products." *Id*. at ¶ 129 (emphasis in original).  There is thus no way to read the *Cerven* Complaint as bringing claims on behalf of ASO customers, or as putting Defendants on notice that they were likely going to face such claims in this class action.  The same is true for each of the other complaints filed in this case prior to the 2020 amendment that was filed at the time of the settlement.  Quite simply, the ASOs were never included – there was no ASO class representative; there were no claims advanced on behalf of ASOs; the product market quite clearly excluded the ASO market; and ASOs were only ever mentioned to show why they were ***not*** part of the relevant product market at issue in the case.

Under Eleventh Circuit case law, the foregoing facts make clear that the addition of ASOs to this case in 2020 – as part of the overall settlement – does not relate back to the 2012 filing of the *Cerven* Complaint.  In *Cliff v. Payco General American Credits, Inc*., the Eleventh Circuit held that courts in this Circuit may not allow relation back unless, at a minimum, it is shown that: (A) the new claims arise out of the same conduct set out in the original pleading, (B) the defendant will not be prejudiced, and (C) the defendant knew or should have known that it would have to defend against the newly-asserted claims and plaintiffs. 363 F.3d 1113, 1131 (11th Cir. 2004). *See also Makro Cap. of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1259 (11th Cir. 2008).

Here, the claims in *Cerven* and all subsequent complaints expressly put Defendants on notice that they were ***not*** facing claims from ASO customers, and that the relevant product market in the case ***excluded*** the ASO market.  There would therefore have been no way for the ASO sub-class to achieve the relation back that the Bradley objectors insist would have been the only possible outcome.

The only response the Bradley objectors had to this point at the final approval hearing was to argue that large, fully-insured groups were also not in the *Cerven* Complaint, yet they have been

given the benefit of the fully-insured class period going back to 2008.  But there is an obvious difference between how claims on behalf of large fully-insured groups relate to the claims in *Cerven* and how those of ASO customers do: the former purchased the same type of product (i.e., fully-insured health insurance) as did the other class members in the *Cerven* Complaint; the latter do not. ASO products and fully insured products are significantly different products.  Fully-insured products put the insurance company at risk for unexpectedly high healthcare costs, in exchange for a premium calculated in advance; by contrast, ASO products provide "administrative services only" and leaves the employer "at risk" for any unexpectedly high healthcare costs.

Moreover, the *Cerven* and other complaints in this case defined "small groups" as including all employers who purchased fully insured policies and had up to 200 employees.  *Cerven* Complaint at ¶ 130. That definition actually captures groups that go all the way up to the size where self-insurance starts to become a viable option. Thus, most fully-insured groups fell squarely within *Cerven*'s class definition, and there is a reasonable argument – and far better than that of the Bradley Objectors -- that Defendants were put on notice that they may face the same claims from other fully insured groups who fell outside the 200 employee cut-off.

**D.    The allocation of settlement funds was based on a reasonable, rational basis, and the Bradley objectors failed to show otherwise.**

As shown at the final approval hearing, there is no merit to the Bradley objectors' demand that the Court should alter the allocation between the Self-Funded Sub-Class and the fully-insured class members.

Other than the issue of the length of the respective damages periods, the Bradley objectors make no serious effort to address the fact that the value of the claims held by fully-insured class members was substantially larger than the value of the claims held by Self-Funded Sub-Class members. Instead, they simply assert, with no support, that the antitrust violations are the same

27

and therefore the harm suffered must also be the same. But that is not correct. The extent of the harm depends upon the nature of the relevant product market – including the availability of other viable competitors, and the extent to which the Defendants were able to extract substantial profits from the customers in that market.  Tr. II at 41:8 to 44:25. The Bradley objectors never address that. They merely assume that the profitability and alleged overcharges in the ASO and fully insured markets were the same. But they present no basis for that assumption, and the evidence in the case, and in the public domain, directly contradicts it.

As shown at the hearing, the expert retained by the Self-Funded Sub-Class (Dr. Joseph Mason) performed a far more searching and thorough analysis than the experts retained by the Bradley objectors. Dr. Mason explained at the hearing that he analyzed four different metrics that could be used to compare the defendants' ASO business to their fully insured business as a potential basis for the allocation of settlement funds: gross revenues; net revenues; operating gain differential; and revenue per member growth. Tr. II at 46:19 to 47:13.  Pasted below is the chart from Dr. Mason's report showing the conclusions he reached as to the implied allocation to the ASO sub-class using each one of these different metrics:

| | Implied Settlement Allocation to Self-Funded Sub-Class |
|---|---|
| Gross Revenue | 1.7% |
| Net Revenue | < 10.7% |
| Operating Gain Differential | < 3.9% – 6.3% |
| Revenue Per Member Growth | 3.4% – 3.8% |

Mason Expert Report, ECF No. 2812-9 at 15.

The Bradley objectors focus all their complaints on the very first of these four metrics – gross revenue. It is that measure alone that contains what the Bradley objectors complain is an

"apples to oranges" comparison by comparing total gross revenues from ASO customers to total gross revenue from fully insured customers.  Tr. II 49:9 to 52:1, and 55:5 to 57:13. As Dr. Mason explained, that criticism was unfounded because the payments ASO customers made to providers were not paid to Defendants and were never part of this case (and could not ever form the baseline for any damages claimed from Defendants), whereas the full amount of the premiums paid by fully- insured subscribers to Defendants was always part of this case (and could form the baseline for any damages analysis).Tr. II at 49-8 to 52:1, 55:5 to 57:13, and 224:3 to 224:6.  Regardless, the fact is that Dr. Mason's other metrics are not subject to this criticism.  In particular, by looking at "net revenue" and "operating gain differential," Dr. Mason did something none of the alleged experts for the Bradley objectors did – i.e., he looked at the ***relative profitability*** of the ASO and fully-insured business, which is highly relevant because it correlates to the extent to which Defendants could have extracted anticompetitive overcharges from those respective types of different business. Tr. II at 45:1 to 45:25 and 208:22 to 211:24. Dr. Mason took this into account as obviously relevant to the allocation issue (*see id.* and Mason Expert Report, ECF No. 2812-9 at 7-8); the Bradley objectors and their proffered experts totally ignored it.  *See* Tr. II at 248:11 to 257:8.

Both public record information and the documents produced in discovery in this case show that the fully insured business is far more profitable to Defendants than the ASO business, which has often been a barely break-even or even loss-making business. For example, a 2015 document that is cited (for other reasons) by the Bradley objectors' proffered actuarial expert, Mr. Okpewho, states that "The Congressional Research Service reported that commercial ASO contracts are break-even deals on average . . . ."  Modern Healthcare, January 03, 2015, at 3 (attached hereto as Ex. C and cited in ECF No. 2812-19 at 10 n.2). Likewise, the 2016 10-K filed

by Anthem (the largest of Defendants), states that the ASO business has "lower margins" which had the potential to materially and adversely impact the company's profits if more business moved from FI to ASO. 2016 Anthem 10-K at 30 (attached hereto as Ex. D)  Documents produced in discovery in this case state that "many Plans have opted to set prices such that the self-funded business makes some contribution to overhead, but does not fully cover fixed costs." 2011 BCBS-ID Report at 4 (attached hereto as Ex. E).  *See also* BCBS-AZ Report, ECF No. 2812-10 at 2 (noting that administering networks and insurance "is a low margin business. Traditional functions such as claims and enrollment administration will generate very little profit or become loss leaders"); 2013 BCBS-FL Report at 8 (attached hereto as Ex. F) ("In order to remain in the market, Florida Blue has utilized a market based approach to setting ASO fees which does not cover all our costs."). Other documents produced in discovery state that the fully insured business could be anywhere from ***4 to 10 times more profitable*** than the ASO business.[21] *See also* Final Approval Br., ECF No. 2812-1 at 108-110 and Mason Expert Report, ECF No. 2812-9 at 7-8 and 15-16 (describing ASOs as less profitable than FI plans).

During cross-examination, the actuarial expert proffered by the Bradley objector (Mr. Okpewho) gave several admissions establishing that his opinion and methodology cannot be relied upon in determining whether the allocation in this case was reasonable. He admitted:

---

[21] *See* 2012 BCBS-CA Report at 4 and 9 (attached hereto as Ex. A) (showing predicted profits for FI and losses for ASO and stating "in an environment where corporate g&a is not driven by membership volume a fully insured member is worth 10 times a self funded member"); 2010 Anthem Report at 147 (attached hereto as Ex. B) ("Fully Insured business provides nearly 6 times as much Operating Gain PMPM as ASO."); 2010 BCBS-AR Report, ECF No. 2812-12 at 3 (showing that FI was more profitable than ASO by more than 4.25 to 1).  *See also* 2012 Bernstein Research Report, ECF No. 2812-11 at 11-12 (estimated that, for the industry as a whole, FI business produced four times the profit that ASO business did); Booz Allen Hamilton Report at 3-5 (attached hereto as Ex. G) (ASO business was  "not profitable," whereas FI business is "profitable" and is a "Major sweet spot of underwriting").

- That he was never previously involved in an effort to allocate damages among class members.  Tr. II at 249:16 to 249:23.

- That he never made "any effort to determine how much overcharge, if any, Blue Cross's self-funded customers paid."  Tr. II at 249:13 to 249:15.

- That he was aware of a document stating that the fully insured business could be ten times as profitable as the ASO business.  Tr. II at 250:14 to 250:24

- That this document is inconsistent with his contention that the Defendants valued ASO and fully insured lives the same. Tr. II at 251:17 to 252:2.

- That he relied upon a Modern Healthcare Magazine article, and that in one paragraph not cited in his report, it states that according to the Congressional Research Service, ASO contracts are on average "break-even". Tr. II 254:20 to 255:18.

- That he did not investigate whether Defendants made any money as part of his analysis, but that he knew Blue Cross fully insured pricing is not break even. Tr. II 255:10 to 257-8.

- That he did not believe that the allocation of damages should be based on the relative amounts of overcharges that the two groups of customers paid. Tr. II at 258.21 to 258.24.

These admissions foreclose the Bradley objectors and the Court from placing any reliance on Mr. Okpewho's opinions regarding allocation.  Far from showing that the allocation arrived at through the arm's-length mediation was irrational and unreasonable, Mr. Okpewho's testimony on cross-examination shows instead that it is the objections made by the Bradley objectors which are unreasonable, unreliable, and meritless.

## IV.    It Is Clearer Than Ever That The "Arbitration Clause" Objection Lacks Merit.

The National Account Objectors originally contended that the Settlement should be disapproved because it would "damage" them by displacing arbitration clauses in their Blue contracts. In their reply, ECF No. 2812-19 at 30-34, they asserted that the Blues had "breached" these arbitration agreements by entering into the Settlement.

31

In the wake of the Final Approval hearing, it is even more apparent that this objection is without merit. In the first place, as numerous Settlement proponents pointed out at the hearing, these Objectors (like virtually every other private and public litigant in the last 50 years) had never bothered to assert the underlying antitrust claims in any forum at all, including by arbitration. And when Objectors finally did assert them, **they filed a lawsuit, not an arbitration demand**. *See* Complaint, *Alaska Air Group, Inc., et al. v. Anthem, Inc., et al.*, 2:21-cv-01209-AMM (N.D. Ala. 9/4/21, ECF No. 1).

Second, Objectors fail to address the most relevant in-Circuit authority, *In re Checking Account Overdraft Lit.*, 2020 WL 4586398 (S.D. Fla. Aug. 10, 2020). There, Judge King found **in the class settlement context** that the existence of arbitration clauses in some class members' contracts was no bar to approval, because the defendants had waived their arbitration rights. *In re Checking Account* is thus closely aligned to the facts here: it is a class settlement; it overruled a class member objection based on the existence of arbitration clauses; and it did so based on defendants' waiver of those clauses, through their agreement to the settlement. By contrast, Objectors' authority addresses objections to class certification **by defendants**; Objectors cite no case, in or out of this Circuit, where a class member objected to the loss of arbitration "rights," much less one where that objection was sustained.

Third, Objectors' position makes no sense unless they are losing the right to assert the same claim in arbitration that they would have in court: a claim against every Blue in the country for a nationwide conspiracy to suppress competition, as presented in this MDL proceeding from the outset. But Objectors effectively concede that their arbitration clauses are limited on their face to the single Blue with which they have contracted. And their only response to this point is to suggest via an unpublished, non-precedential decision, *Northrop & Johnson Yachts-Ships, Inc. v. Royal*

*Van Lent Shipyard, B.V.*, 855 Fed. App'x 468 (11th Cir. 2021), that the non-contracting Blues could somehow be forced into arbitration.  ECF No. 2380 at 22-23.

Here too, Objectors' authority comes up short.  *Northrop & Johnson* holds only that non-signatories may be joined in arbitration when "the plaintiff-signatory alleges substantially interdependent and concerted misconduct by the signatories and non-signatories, *and such alleged misconduct is founded in or intimately connected with the obligations of the underlying agreement*," quoting *Lavigne v. Herbalife, Ltd.,* 967 F.3d 1110, 1118-19 (11th Cir. 2020) (emphasis added).

In this case, the "underlying agreement" is the contract between individual Objectors and individual Blues to provide insurance services.  In *Lavigne*, which is controlling, the Eleventh Circuit made it clear that "it is not enough that the alleged misconduct is somehow connected to the obligations of the underlying agreements; the misconduct must be *founded in* or *inextricably bound up with* such obligations." (Emphasis in original, citations omitted.) The anti-competitive schemes alleged by Subscribers, such as the ESAs and National Best Efforts clauses, do not come close to meeting this test. Those schemes are not referenced by, let alone incorporated in, the insurance contracts between the Blues and their ASO/Objector clients. As in *Lavigne*, the Blues' contracts with objectors are "at least one step" – and really more like two or three steps – "removed from the actual transactions that generated" the class action complaints here. Thus, the arbitration clauses at issue could not possibly cover the national class claims asserted by Subscribers, and the Settlement cannot be less than "fair, reasonable and adequate" for folding those clauses into an overall settlement agreement.[22]

---

[22] The other reasons for overruling this objection are comprehensively set forth in the Final Approval Br., ECF No. 2812-1 at 117-20, and need not be repeated here.

**V.      The Hart And Cochran Objections To The Plan Of Distribution Are Meritless.**

Objectors James Hart and George Cochran have objected to the Plan of Distribution, and have submitted additional materials supporting their objections, though the substance of their objections remains the same. Mr. Hart argues that self-employed individuals, who pay 100% of their premiums, should not be subject to the Default option. As outlined in the Plan of Distribution, any individual who believes that the Default option should not apply to them has the ability to elect the Alternative option and provide documentation for a different allocation. Plan of Distribution, ECF No. 2715-1 at 10-13.  Thus, the basis of Mr. Hart's objection is obviated by the Plan of Distribution itself.

Mr. Cochran complains that any unclaimed employee premiums revert to the employer, rather than to the respective Net Settlement Fund. This issue was considered by Class Counsel in developing the Plan of Distribution. In determining the Default percentages, one of the factors considered by Class Counsel was the fact that FI Groups would retain 100% of the value of unclaimed FI Employee premiums, and this allowed for the Default percentages for employees to be higher than it otherwise might have been. Plan of Distribution, ECF No. 2715-1 at ¶ 19(f); Chodorow PA Decl., ECF No. 2610-9 at ¶ 38.  The Chodorow Declaration notes:

> FI Groups could benefit from their status as the residual claimant on FI Group premiums. Because part of the economic burden of FI Group premiums was borne by claimants that will not submit claims or that cannot surpass the minimum distribution threshold, the Default percentage to FI Employees can be increased somewhat without necessarily harming FI Groups relative to other claimants. However, increasing the Default percentages could improve both the claims submission rate and the potential for employees to exceed the minimum distribution threshold. This would further the economically reasonable goal of providing broader-based relief to the FI Authorized Claimants.

Chodorow PA Decl., ECF No. 2610-9 at ¶ 40. This provision of the Plan of Distribution is thus reasonable and economically rational, which is all that is required.

## **CONCLUSION**

For all the foregoing reasons, Subscriber Plaintiffs request that the Court enter an order granting final approval to the Settlement.

Date: November 12, 2021                        Respectfully submitted,

  /s/ David Boies                                  /s/ Michael D. Hausfeld
David Boies – *Co-Lead Counsel*              Michael D. Hausfeld – *Co-Lead Counsel*
BOIES, SCHILLER & FLEXNER LLP                Swathi Bojedla – *Discovery Committee*
333 Main Street                              HAUSFELD LLP
Armonk, NY 10504                             888 16th Street NW, Suite 300
Tel: (914) 749-8200                          Washington, DC 20006
Fax: (914) 749-8200                          Tel: (202) 540-7200
dboies@bsfllp.com                            Fax: (202) 540-7201
                                             mhausfeld@hausfeld.com
                                             sbojedla@hausfeld.com

Charles J. Cooper – *Co-Chair, Written*      Megan Jones – *Settlement Committee & PSC*
*Submissions Committee*                      *Member*
COOPER & KIRK, PLLC                          Arthur Bailey – *Discovery Committee*
1523 New Hampshire Avenue NW                 HAUSFELD LLP
Washington, DC 20036                         600 Montgomery Street, Suite 3200
Tel: (202) 220-9600                          San Francisco, CA 94111
Fax: (202) 220-9601                          Tel: (415) 633-1908
ccooper@cooperkirk.com                       Fax: (415) 358-4980
                                             mjones@hausfeld.com
                                             abailey@hausfeld.com

Chris T. Hellums – *Local Facilitating Counsel*   William A. Isaacson – *Settlement Committee &*
PITTMAN, DUTTON & HELLUMS, P.C.              *PSC Member*
2001 Park Place N, 1100 Park Place Tower     PAUL WEISS
Birmingham, AL 35203                         2001 K Street, NW
Tel: (205) 322-8880                          Washington, DC 20006-1047
Fax: (205) 328-2711                          Tel: (202) 223-7313
chrish@pittmandutton.com                     Fax: (202) 379-4937
                                             wisaacson@paulweiss.com

Gregory Davis – *Settlement Committee & PSC*  Cyril V. Smith – *Settlement Committee & PSC*
*Member*                                     *Member*
DAVIS & TALIAFERRO, LLC                       ZUCKERMAN SPAEDER, LLP
7031 Halcyon Park Drive                       100 East Pratt Street, Suite 2440
Montgomery, AL 36117                          Baltimore, MD 21202-1031
Tel: (334) 832-9080                           Tel: (410) 949-1145
Fax: (334) 409-7001                           Fax: (410) 659-0436
gldavis@knology.net                           csmith@zuckerman.com

Kathleen Chavez – *Settlement Committee & PSC Member*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
kcc@fmcolaw.com

David Guin – *Co-Chair, Written Submissions Committee*
Tammy Stokes – *Damages Committee*
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. North
Suite 600/Title Building
Birmingham, AL 35203
Tel: (205) 226-2282
Fax: (205) 226-2357
davidg@gseattorneys.com
tammys@gseattorneys.com

Carl S. Kravitz – *Expert Committee*
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: (202) 778-1800
Fax: (202) 822-8106
ckravitz@zuckerman.com

Richard Feinstein – *Expert Committee*
Karen Dyer – *Expert Committee*
Hamish P.M. Hume – *Discovery Committee*
BOIES, SCHILLER  FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
rfeinstein@bsfllp.com
kdyer@bsfllp.com
hhume@bsfllp.com

Mindee Reuben
Lite DePalma Greenberg
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Tel:  (267) 314-7980
Fax: (973) 623-0858
mreubin@litedepalma.com

Nate Cihlar
Joshua Callister
Srauss & Boies
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel:  (703) 764-8700
Fax:  (703) 764-8704
ncihlar@straus-boies.com
jcallister@straus-boies.com

Patrick Cafferty – *Discovery Committee*
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
150 S. Wacker Drive, Suite 300
Chicago, IL 60606
Tel: (312) 782-4880
pcafferty@caffertyclobes.com

Bryan Clobes – *Litigation Committee*
Ellen Meriwether – *Written Submissions Committee*
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
2005 North Monroe Street
Media, PA 19063
Tel: (215) 864-2800
Fax: (215) 864-2810
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

Andrew Lemmon – Chair, Discovery Committee
LEMMON LAW FIRM
15058 River Road
PO Box 904
Hahnville, LA 70057
Tel: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Douglas Dellaccio – *Litigation Committee*
CORY WATSON CROWDER & DEGARIS, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 32505
Tel: (205) 328-2200
Fax: (205) 324-7896
ddellaccio@cwcd.com

Edwin J. Kilpela, Jr.
Benjamin Sweet – *Litigation Committee*
DEL SOLE CAVANAUGH STROYD LLC
200 First Avenue, Suite 300
Pittsburgh, PA 15222
Tel: (412) 261-2393
Fax: (412) 261-2110
ekilpela@dsclaw.com
bsweet@dsclaw.com

Charles T. Caliendo – *Class Certification Committee*
GRANT & EISENHOFER
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
ccaliendo@gelaw.com

Daniel Gustafson – *Litigation Committee*
Daniel C. Hedlund – *Damages Committee*
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

Virginia Buchanan – Chair, Class Certification Committee
LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7000
Fax: (850) 435-7020
vbuchanan@levinlaw.com

Larry McDevitt – *Chair, Class Certification Committee*
David Wilkerson – *Discovery Committee*
VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Tel: (828) 258-2991
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Robert M. Foote – *Damages Committee*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
rmf@fmcolaw.com

Robert Eisler – *Discovery Committee*
GRANT & EISENHOFER
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
reisler@gelaw.com

Brent Hazzard – *Litigation Committee*
HAZZARD LAW, LLC
447 Northpark Drive
Ridgeland, MS 39157
Tel: (601) 977-5253
Fax: (601) 977-5236
brenthazzard@yahoo.com

John Saxon – ***Litigation Committee***
JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203-3314
Tel: (205) 324-0223
Fax: (205) 323-1583
jsaxon@saxonattorneys.com

Lawrence Jones – ***Damages Committee***
JONES WARD PLC
The Pointe
1205 East Washington Street, Suite 111
Louisville, Kentucky 40206
Tel:  (502) 882-6000
Fax: (502) 587-2007
larry@jonesward.com

Robert Methvin – ***Chair, Settlement Committee***
James M. Terrell – ***Class Certification Committee***
MCCALLUM, METHVIN & TERRELL, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, AL 35205
Tel: (205) 939-0199
Fax: (205) 939-0399
rgm@mmlaw.net
jterrell@mmlaw.net

Michael McGartland – ***Class Certification Committee***
MCGARTLAND & BORCHARDT LLP
1300 South University Drive, Suite 500
Fort Worth, TX 76107
Tel: (817) 332-9300
Fax: (817) 332-9301
mike@attorneysmb.com

H. Lewis Gillis – ***Co-Head Chair, Litigation Committee***
MEANS GILLIS LAW, LLC
3121 Zelda Court
Montgomery, AL 36106
Tel: 1-800-626-9684
hlgillis@tmgslaw.com

David J. Hodge – ***Chair, Settlement Committee***
MORRIS, KING & HODGE
200 Pratt Avenue NE
Huntsville, AL 35801
Tel: (256) 536-0588
Fax: (256) 533-1504
lstewart@alinjurylaw.com

*Counsel for Subscriber Plaintiffs*

/s/ Warren T. Burns
Warren T. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
wburns@burnscharest.com

*Counsel for the Self-Funded Sub-Class*

39

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2021, the foregoing Subscribers' Post-Hearing Brief In Support Of Final Approval Of Class Settlement was filed with the Clerk of the Court and served on counsel of record via ECF.

<u>/s/ Michael D. Hausfeld</u>

Michael D. Hausfeld