FILED
2021 Nov-12  PM 04:45
U.S. DISTRICT COURT
N.D. OF ALABAMA



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406)** | **Master File No. 2:13-CV-20000-RDP** <br><br> This Document relates to Subscriber Track cases. |

### <u>DEFENDANTS' POST-HEARING BRIEF IN SUPPORT OF FINAL APPROVAL</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................... 1

I.      THE GO-FORWARD SYSTEM IS NOT "PER SE" OR "CLEARLY
        ILLEGAL," BUT RATHER SUBJECT TO THE RULE OF REASON. ................... 2

        A.      This Court must address the standard of review for the go-forward Blue
                System to confirm that the Settlement Agreement does not sanction
                "clearly illegal" conduct but rather is "fair, reasonable, and adequate." ............... 2

        B.      Because service areas and the go-forward System are not per se or clearly
                illegal, the rule of reason applies. ........................................................................ 5

                1.      Service areas and the go-forward System protect and strengthen
                        trademark rights. ........................................................................................ 6

                2.      The Blue System's service areas enable a procompetitive
                        integration of the Blue Plans. ..................................................................... 7

                3.      *Sealy* and *Topco* are distinguishable. ........................................................ 9

II.     A FUTURE RELEASE OF CONTINUING CONDUCT IS PERMISSIBLE. ......... 12

III.    THE SECOND BLUE BID PROVISION IS APPROPRIATE RULE 23(B)(3)
        RELIEF ....................................................................................................................... 14

        A.      Recognizing that the Second Blue Bid is (b)(3) relief does not change the
                Settlement Agreement's class definitions, relief, or release. ............................... 15

        B.      Supplemental notice, if necessary, should be appropriately tailored. ................... 16

IV.     THE SECOND BLUE BID ELIGIBILITY CRITERIA ARE BOTH
        REASONABLE AND EQUITABLE ........................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. FTC,*
1 F.4th 102 (2d Cir. 2021) ............................................................6, 9, 10

*Augusta News Co. v. Hudson News Co.,*
269 F.3d 41 (1st Cir. 2001)........................................................8, 11

*Authors Guild, Inc. v. Google, Inc.,*
No. 1:05-cv-08136, Dkt. No. 772 (S.D.N.Y. Nov. 19, 2009)................................18

*Bennett v. Behring Corp.,*
737 F.2d 982 (11th Cir. 1984) ............................................1, 2, 4, 5

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
441 U.S. 1 (1979)........................................................................8

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.,*
846 F.3d 1297 (10th Cir. 2017) ...............................................12

*Cal. Dental Ass'n v. FTC,*
526 U.S. 756 (1999)...................................................................7

*Clorox Co. v. Sterling Winthrop, Inc.,*
117 F.3d 50 (2d Cir. 1997)......................................................6, 9

*Devlin v. Scardelletti,*
536 U.S. 1 (2002).......................................................................4

*Easterling v. Conn. Dep't of Corr.,*
278 F.R.D. 41 (D. Conn. 2011).................................................14

*Faught v. Am. Home Shield Corp.,*
2010 WL 10959223 (N.D. Ala. Apr. 27, 2010)........................12, 19

*Faught v. Am. Home Shield Corp.,*
2011 WL 12607338 (N.D. Ala. Jan. 24, 2011)..............................17

*Fraley v. Batman,*
638 F. App'x 594 (9th Cir. 2016) ..............................................2

*FTC v. Actavis, Inc.,*
570 U.S. 136 (2013)..............................................................6, 7

*Genesys Software Sys., Inc. v. Ceridian Corp.*,
    664 F. App'x 865 (11th Cir. 2016) ........................................................17

*Grunin v. International House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) ..................................................... *passim*

*In re BCBS Antitrust Litig.*,
    2020 WL 8256366 (N.D. Ala. 2020) ......................................................9

*In re Blue Cross Blue Shield Antitrust Litig.*,
    2018 WL 3326850 (N.D. Ala. 2018) ................................................7, 8, 9

*In re Blue Cross Blue Shield Antitrust Litig.*,
    26 F. Supp. 3d 1172 (N.D. Ala. 2014) ..................................................11

*In re Blue Cross Blue Shield Antitrust Litig.*,
    308 F. Supp. 3d 1241 (N.D. Ala. 2018) ........................................6, 7, 8, 10

*In Re: C.D. Jones & Co., Inc.*,
    658 F. App'x 1000 (11th Cir. 2016) ........................................................4

*In re Delta Dental Antitrust Litig.*,
    484 F. Supp. 3d 627 (N.D. Ill. 2020) ....................................................11

*In re Managed Care*,
    756 F.3d 1222 (11th Cir. 2014) ............................................................12

*In re Managed Care Litig.*,
    2010 WL 6532985 (S.D. Fla. Aug. 15, 2010) ........................................12

*In re Managed Care Litig.*,
    2012 WL 4335018 (11th Cir. Sept. 11, 2012) ........................................12

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) ..................................13, 14

*In re Sprint Corp. ERISA Litig.*,
    443 F. Supp. 2d 1249 (D. Kan. 2006) ....................................................16

*Lawlor v. Nat'l Screen Serv. Corp.*,
    349 U.S. 322 (1955)..............................................................................14

*Lazy Oil Co. v. Witco Corp.*,
    95 F. Supp. 2d 290 (W.D. Pa. 1997)......................................................16

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
    2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ........................................13

*Nat'l Bancard Corp. v. VISA U.S.A., Inc.*,
  779 F.2d 592 (11th Cir. 1986) ...................................................................................7

*NCAA v. Alston*,
  141 S. Ct. 2141 (2021) .............................................................................................8

*Petrovic v. Amoco Oil Co.*,
  200 F.3d 1140 (8th Cir. 1999) ................................................................................20

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
  776 F.2d 185 (7th Cir. 1985) ................................................................................7, 8

*Procaps S.A. v. Patheon, Inc.*,
  845 F.3d 1072 (11th Cir. 2016) .......................................................................11, 12

*Redel's Inc. v. Gen. Elec. Co.*,
  498 F.2d 95 (5th Cir. 1974) .......................................................................12, 13, 14

*Robertson v. NBA*,
  556 F.2d 682 (2d Cir. 1977)...................................................................... *passim*

*Rosner v. United States*,
  2005 WL 8155968 (S.D. Fla. Oct. 3, 2005)...........................................................18

*Rothery Storage & Van. Co. v. Atlas Van Lines. Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) .................................................................................9

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997)......................................................................................................8

*Tennille v. Western Union Co.*,
  785 F.3d 422 (10th Cir. 2015) ...............................................................................16

*United States v. Anthem, Inc.*,
  2017 WL 527923 (D.D.C. Feb. 8, 2017) ...............................................................20

*United States v. Sealy, Inc.*,
  388 U.S. 350 (1967).....................................................................................1, 5, 9, 10

*United States v. Sealy, Inc.*,
  1964 WL 8089 (N.D. Ill. Oct. 6, 1964)..................................................................10

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972).................................................................................... *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).................................................................................................14

*Weber v. Gov't Emps. Ins. Co.*,
  No. 07-1332, , Dkt. No. 119 (D.N.J. Aug. 11, 2009)............................................................19

*White v. NFL*,
  836 F. Supp. 1458 (D. Minn. 1993)....................................................................................3, 18

*Xerox Corp. v. Media Scis., Inc.*,
  609 F. Supp. 2d 319 (S.D.N.Y. 2009)...................................................................................14

**Rules**

Fed. R. Civ. P. 23 ................................................................................................... *passim*

## INTRODUCTION

The Court's Final Approval Hearing on October 20–21, 2021, amply demonstrated that this Settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Objectors have not established that the significant injunctive and monetary relief in this Settlement is unfair, unreasonable, or inadequate under the law.  The Court should therefore grant final approval to the Settlement.

Defendants' and Subscribers' pre-hearing briefing sets forth more fully the legal basis for approval of the Settlement.  This brief provides supplemental authority on four issues addressed during the Final Approval Hearing.  ***First***, the Court should hold that the Blues' service areas, as well as the go-forward Blue System as a whole, are not per se unlawful.  Only Home Depot insists that the Court may not reach this issue.  But under *Grunin*, *Robinson*, and *Bennett*, this inquiry is necessary to determine whether the settlement is "fair, reasonable, and adequate."  With the elimination of the National Best Efforts ("NBE") rule, there can be no question that service areas and the go-forward System are not per se unlawful, but rather subject to the rule of reason.  Service areas arose from independent common-law trademark rights and today facilitate the procompetitive integration at the heart of the Blue System.  Subscribers agree that these factors distinguish *Sealy* and *Topco*.

***Second***, the Settlement appropriately releases claims related to the go-forward System.  Objectors' cases are inapposite as they address overbroad releases of unrelated claims.  ***Third***, the Second Blue Bid is appropriate divisible Rule 23(b)(3) relief, and the clarified understanding of the (b)(3) divisible relief class would require, at most, limited supplemental notice to Self-Funded Accounts.  ***Fourth***, the Qualified National Account ("QNA") criteria are grounded in established economics and antitrust principles.  Objectors have shown nothing to justify second-guessing the parties' reasoned judgments and hard-fought compromises on this or any other issue.

I.   **THE GO-FORWARD SYSTEM IS NOT "PER SE" OR "CLEARLY ILLEGAL," BUT RATHER SUBJECT TO THE RULE OF REASON.**

A.   **This Court must address the standard of review for the go-forward Blue System to confirm that the Settlement Agreement does not sanction "clearly illegal" conduct but rather is "fair, reasonable, and adequate."**

To approve a class settlement, a district court must determine that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  A settlement that sanctions the continuation of clearly illegal conduct is not fair, reasonable, and adequate by definition, and so the district court automatically abuses its discretion if it approves a settlement that allows "clearly illegal" conduct to continue.  *Robertson v. NBA*, 556 F.2d 682, 686 (2d Cir. 1977) ("It is true that a settlement that authorizes the continuation of clearly illegal conduct cannot be approved."); *Fraley v. Batman*, 638 F. App'x 594, 597 (9th Cir. 2016) ("[A] district court abuses its discretion in approving a settlement only if the agreement sanctions 'clearly illegal' conduct."); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 987 (11th Cir. 1984).

In the antitrust context, courts have repeatedly equated "clearly illegal" and "illegal to a legal certainty" with "per se illegal."  The leading case on this issue is *Grunin v. International House of Pancakes*, 513 F.2d 114 (8th Cir. 1975), which involved an antitrust settlement between IHOP and its franchisees.  The settlement eliminated some of IHOP's challenged practices, but allowed others to continue.  *Id.* at 119.  The objectors asserted that the settlement "perpetuate[d] antitrust violations by virtue of the fact that it" kept in place a per se illegal tying arrangement.  *Id.* at 123.

On appeal, the Eighth Circuit agreed with "appellant's statement that a court cannot lend its approval to any contract or agreement that violates the antitrust laws." *Id.*  The court explained that, "unless the terms of the agreement are per se violations of the antitrust law, we must apply a 'reasonableness under the totality of the circumstances' standard to the court's approval." *Id.* at

124.   The court then analyzed the challenged restraints that would continue to exist under the settlement.  Based on this "survey of the theories advanced by the parties," it concluded that "the alleged *illegality of the settlement agreement is not a legal certainty*.  Thus, having determined that the settlement terms were *not illegal per se*, we must test appellant's remaining claims of error against the broad area of discretion left to the district court."  *Id.* at 124 (emphasis added).  As this discussion makes clear, *Grunin* equated and used interchangeably the concepts of "per se" illegality under the antitrust laws and illegal to a "legal certainty."  *Id.*  The court ruled that the per se standard did not apply in order to conclude to a "legal certainty" that the settlement did not condone illegal conduct.  *Id.*

Subsequent courts have explicitly followed *Grunin*'s approach.  For example, in *Robertson v. NBA*, Oscar Robertson and other players challenged various NBA rules under the antitrust laws.  As part of a settlement, the NBA eliminated some, but not all, of the challenged rules.  556 F.2d at 686.  (That, of course, is also the situation here.)  As in *Grunin*, the *Robertson* court concluded that the settlement was not "clearly illegal" because the go-forward System was not per se unlawful:  "[T]he alleged illegality of the settlement agreement is not a legal certainty.  The challenged practices have not been held to be illegal per se in any previously decided case," and thus "the settlement authorizes no future conduct that is clearly illegal."  *Id.* (internal quotation marks omitted); *see also White v. NFL*, 836 F. Supp. 1458, 1468 (D. Minn. 1993) (following *Grunin* and *Robertson* and explaining that "a settlement agreement should be approved unless the terms of the agreement are *per se* illegal, or illegal to a 'legal certainty' or authorize future conduct that is clearly illegal").

Subscribers agree.  At the Final Approval Hearing, Subscribers' Counsel explained that the Court must confirm that neither the go-forward system nor "any feature of the system" is clearly

illegal.  Tr. I at 53:5–8 ("[The Court] need only conclude that neither the going-forward Blue system in the aggregate, which you examined in your standard of review order, nor any feature of that system going forward is clearly illegal.").  And they agreed that, to make this determination, the Court must find that the Settlement "doesn't give the defendants some kind of a green light or a license to engage in patently anticompetitive per se behavior."  *Id.* at 58:7–9; *see also id.* at 71:19–24 ("[W]e've ourselves kind of gone round and round on whether saying that something that is clearly illegal is different from saying something is a per se violation.  And we haven't been able to come up with an articulable . . . distinction.").

National Account Objectors also concur that "this Court must now decide the question" of whether the go-forward System is "*per se* illegal."  Nat'l Account Obj. Pre-Hearing Br. at 14; Tr. I at 134:6–10 (acknowledging the clearly illegal standard is "synonymous to a per se violation").  In fact, the only party to contest this point is Home Depot, which alone contends the Court cannot reach the per se issue without issuing an impermissible advisory opinion.   Home Depot Pre-Hearing Br. at 24–31.  That position is plainly incompatible with *Grunin*, *Robertson*, *Bennett* and subsequent cases approving the same standard of review determination Home Depot objects to here.[1]

Home Depot argued at the Final Approval Hearing that *Bennett v. Behring Corp.* broke from this uniform precedent and "prohibits [this Court] from saying:  I have decided that the conduct that would continue is not per se unlawful," even though this is exactly what the *Grunin*

---

[1] Apart from being contrary to *Grunin*, *Robertson* and *Bennett*, none of which were advisory, Home Depot's advisory opinion argument is wrong because (1) the clearly illegal/per se illegal issue is a necessary part of the Court's "fair, reasonable, and adequate" inquiry; (2)  the clearly illegal/per se question has been fully joined by parties with standing, *see Devlin v. Scardelletti*, 536 U.S. 1, 6–7 (2002) ("As a member of the [ ] class, [the objector] has an interest in the settlement that creates a 'case or controversy.'"), and (3) no party is advocating for a final, binding determination on the merits—*i.e.*, the legality or illegality of service areas or the go-forward System—nor could a settlement final approval order have that effect.   *See In Re: C.D. Jones & Co., Inc.*, 658 F. App'x 1000, 1002 n.2 (11th Cir. 2016) (settlement approval order would not have "preclusive effect as a final judgment on the merits").

court did.  Tr. I at 158:21–22; *contrast Grunin*, 513 F.2d at 124 ("having determined that the settlement terms were not illegal per se . . .").  But *Bennett* explicitly followed *Grunin*.  *Bennett*, 737 F.2d at 987 (citing *Grunin* as the sole authority for the "legal certainty" standard it set forth). There is nothing to indicate the Eleventh Circuit was creating a circuit split and adopting a divergent approach.  Indeed, *Bennett* did not address the standard of review for the simple reason that it was not faced with conduct that could possibly be characterized as per se illegal.  The defendant real estate developer in that case could not have had market power, and so the tying claim at issue was necessarily subject to the rule of reason.  *See id.* at 984.  Because the standard of review was not reasonably subject to dispute, the objectors in *Bennett*, unlike here, were seeking a ruling on the *ultimate legality* of the post-settlement system, an invitation the district and circuit courts correctly declined.  *Compare id.* at 986 ("[Objectors] contend that the settlement should be set aside because it perpetuates a violation of the Sherman Antitrust Act.") *with* Tr. I at 111:1–2 (Nat'l Account Objectors' Counsel seeking court ruling on "the per se rule and whether it remains applicable").

### B. Because service areas and the go-forward System are not per se or clearly illegal, the rule of reason applies.

As articulated more fully in Defendants' prior briefing, service areas and the go-forward Blue System are not per se unlawful, but instead subject to the rule of reason.  *See* Dkts. 2727–28, 2734–35, 2752, 2755, 2772.  The purpose of the Blue System's service areas is to protect the value and utility of the Blue Marks, and these procompetitive benefits at the very least justify rule of reason review.  Objectors rely on *Sealy* and *Topco*, but these decisions are distinguishable because they did not involve preexisting trademark rights or the kind of ongoing cooperative integration that is at the heart of the Blue System.

1.     *Service areas and the go-forward System protect and strengthen trademark rights.*

The Blue System's service areas—which existed long before NBE—settle trademark rights and protect the Blue Marks.  As the Second Circuit has explained, "trademarks are by their nature non-exclusionary," and thus presumptively procompetitive.  *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 56 (2d Cir. 1997).  For this reason, "[a]greements to protect trademarks . . . should not immediately be assumed to be anticompetitive—in fact . . . [courts] presume they are procompetitive." *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 116 (2d Cir. 2021) (holding the FTC "should not apply an abbreviated rule of reason analysis" to agreements designed to protect parties' trademark rights).  *See also FTC v. Actavis, Inc.*, 570 U.S. 136, 159 (2013) (holding the rule of reason applies to settlements designed to protect drug patent rights).  As Subscribers' Counsel acknowledged at the Final Approval Hearing: "while I did think that the prohibition on green competition was clearly illegal, the issue with trademark is more complicated.  I've said that to the Court from the beginning."  Tr. II at 16:6–9.

Service areas in the Blue System originated from Blue Plans' common-law trademark rights, not from a horizontal market-division agreement.  As this Court previously explained, Plans that used the Blue Marks in their respective areas gained common-law trademark rights and the ability to exclude others from using those marks in the same regions.  *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1264 (N.D. Ala. 2018)  ("The Rule 56 evidence here shows that certain Plans initially developed 'individual' trademark rights.").  Blue Plans subsequently centralized their rights with national organizations, which secured federal trademark protections for the Blue Cross and Blue Shield marks, and licensed those marks back to the Plans in the same areas where the Plans had previously used the marks.  *Id.* at 1264–65.  In other words, the modern

service area system merely codifies pre-existing, independently acquired common-law trademark rights, and allows for greater protection of the Blue Marks than existed at common law.

> 2.   *The Blue System's service areas enable a procompetitive integration of the Blue Plans.*

Service areas and the go-forward Blue System facilitate procompetitive integration, cooperation, and joint products.  If service areas and the go-forward System "might plausibly be thought to have a net procompetitive effect," they should not be subject to the per se rule.  *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999); *Actavis*, 570 U.S. at 159 ("[A]bandonment of the 'rule of reason' . . . is appropriate only where 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" (citation omitted))*; see also Nat'l Bancard Corp. v. VISA U.S.A., Inc.*, 779 F.2d 592, 599 (11th Cir. 1986) (per se rule does not apply when agreement "potentially could create an efficiency enhancing integration to which the restraint is ancillary").

Here, such benefits are not only plausible—they are well-established.  The Blue System's service areas enable the System to provide a unique national network of locally focused insurers that provide coverage in remote and rural areas where other insurers are unwilling to go.  *See In re Blue Cross Blue Shield Antitrust Litig.*, 2018 WL 3326850, at *1 (N.D. Ala. 2018).  Without service areas, the incentive to engage in such "productive cooperation" would be severely diminished if not eliminated.  *See Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 190 (7th Cir. 1985).  As just one example, the Blue System's service areas facilitate the creation and maintenance of the BlueCard Program.  As this Court recognized, the BlueCard Program has plausible procompetitive benefits, including "allow[ing] the Blue Plans to provide subscribers a single point of contact like insureds enjoyed with the national insurers" and "allow[ing] the Plans to offer nationwide coverage."  308 F. Supp. 3d at 1255.

Service areas and the go-forward System enable Plans to offer integrated products and services that no Plan could offer on its own—specifically, a nationwide *Blue-branded* insurance product. This, in turn, increases "interbrand competition," which is "the primary purpose of the antitrust laws." *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997). Consequently, such procompetitive collaboration cannot be labeled a per se violation. *See Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 14–15 (1979); *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 48 (1st Cir. 2001) ("It is not a per se violation for local competitors to join in providing region-wide service that none alone provided before."); *Polk Bros.*, 776 F.2d at 188–89 ("A court must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by new [] products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote.").

Even if the Blue System's service areas were not strictly necessary for the System to offer a nationwide Blue product, they would nevertheless be subject to the rule of reason for the independent reason that they "enable [the Blues] to do something more cheaply or better than they did it before." *See NCAA v. Alston*, 141 S. Ct. 2141, 2155 (2021). In particular, the trademark protection guaranteed by the Blue System's service areas has incentivized and enabled Blue Plans to maintain a unique focus on local brand promotion and insurance coverage in their individual service areas, leading to unparalleled depth and breadth of coverage. *See In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1256 n.9. Blue Plans are "often the only health insurance option in rural areas" while non-Blue insurers "have demonstrated a willingness to pull out of markets and leave populations uninsured." *Id.*; 2018 WL 3326850, at *1.

In addition, with the elimination of NBE, Blue Plans can compete freely in each other's service areas on a non-Blue-branded basis while respecting the historic system of trademark rights

8

that form the Blue System. Thus, the Blue System's service areas are well-crafted as trademark rules to protect the utility of the Blue Marks. These procompetitive benefits are precisely why courts do not apply the per se standard to agreements to protect trademark rights. *See 1-800 Contacts*, 1 F.4th at 119 (acknowledging "reduced litigation costs and protecting . . . trademark rights" as procompetitive justifications for trademark settlements); *Clorox*, 117 F.3d at 61 ("Efforts to protect trademarks, even aggressive ones, serve the competitive purpose of furthering trademark policies.").[2] The Blue System's service areas are no exception.

3.    Sealy *and* Topco *are distinguishable.*

National Account Objectors rely on *Sealy* and *Topco* to argue that the Blue System's service areas are per se unlawful. Nat'l Account Obj. Pre-Hearing Br. at 14–16; Tr. I at 134:16–21. As the Court has recognized, "[t]he continued precedential value of *Sealy* and *Topco* has been called into question." *In re Blue Cross Blue Shield Antitrust Litig.*, 2020 WL 8256366, at *24 (N.D. Ala. 2020); *see also* 2018 WL 3326850, at *4 (citing *Rothery Storage & Van. Co. v. Atlas Van Lines. Inc.*, 792 F.2d 210, 226 (D.C. Cir. 1986)); Tr. II at 15:16–19 (Subscribers' Counsel: "[Y]ou do have to take into account whether *Topco* continues to be good law."). At a minimum, caution should be exercised in applying these decisions beyond their specific facts.

All parties agree that the Court's Standard of Review ruling addressed only the aggregation of service areas and NBE. *See* 2020 WL 8256366, at *24 ("[T]his court's decision was based on the aggregation of restraints that existed during the class period."); Subs. Pre-Hearing Br. at 37 ("Subscriber Plaintiffs prevailed in this Court on application of a *per se* standard to the aggregation of the NBE and ESAs."); Nat'l Account Obj. Prelim Approval Pre-Hearing Br. at 14 (framing

---

[2] Notably, not a single objector even cited *1-800 Contacts* in their written submissions or at the final approval hearing, let alone offered a compelling reason why the Court should break from the Second Circuit's reasoning.

court's current inquiry as whether per se standard applies "in the absence of the aggregation").  For this reason alone, *Sealy* is distinguishable, as it involved the aggregation of, *inter alia*, territorial restraints and price fixing. *United States v. Sealy, Inc.*, 388 U.S. 350, 354 (1967) (listing the "aggregation of trade restraints" present in that case).

Further, neither *Sealy* nor *Topco* involved an arrangement to protect independently acquired trademark rights.  In *Topco*, the defendants created a ***new*** mark and formed a licensing organization for the purpose of allocating territories among its members.  *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 598–600 (1972).  Moreover, the *Topco* territories were "often allocated to members who d[id] no actual business in those areas."  *Id.* at 602.  And in *Sealy*, there was "no dispute that exclusive [trademark] territories were allotted to the manufacturer-licensees," who did not previously have any rights to that mark,  388 U.S. at 352, and the licensor "shifted territory among [those] licensees" over time, *United States v. Sealy, Inc.*, 1964 WL 8089, at *3–4, *17 (N.D. Ill. Oct. 6, 1964).  In contrast, the Blues used their license agreements only as a tool to settle and protect their existing common-law rights in the Blue Marks, and the licensed service areas matched precisely the Plans' use of the marks at common law.   *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1264–65.  Both of these distinctions plainly pull the Blue System outside the reach of *Topco* and *Sealy*.  *See 1-800 Contacts*, 1 F.4th at 116.

*Sealy* and *Topco* also did not involve the kind of cooperative integration, creation of new products and services, and other procompetitive benefits present here.  *See Topco*, 405 U.S. at 607 (explaining the allocations under consideration "lack[ed] . . . any redeeming virtue" whatsoever); *Sealy*, 388 U.S. at 351–55 (indicating no ongoing interaction among Sealy licensees beyond "flagrant and pervasive price fixing").  More recent decisions have made clear that these cases do not categorically mandate application of the per se rule to any agreement capable of being

10

characterized as a horizontal market allocation: "Despite unguardedly broad language in [*Topco*], *it is commonly understood today* that *per se* condemnation is *limited to 'naked'* market division agreements, that is, to those that are *not part of a larger procompetitive joint venture*." *Augusta News Co.*, 269 F.3d at 48 (emphases added); *see also Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1083 (11th Cir. 2016) ("Our precedent makes clear that just because an agreement is capable of being characterized as a market allocation agreement does *not* mean that the per se rule applies." (emphasis added)).[3]  Even Subscribers' Counsel acknowledged that bases exist for distinguishing *Topco*.  Tr. II at 15:18–21 ("I agree to some extent with defendants' counsel that you have to look at questions like integration, questions like the difference between products and services."); *id.* 88:6–9 ("And [the go-forward system is] different than Topco because here there clearly were Blues that had green businesses of significant size and were operating in competition with Blues in areas outside their ESAs.").[4]

Thus, the Court should hold that the service areas and the go-forward System are not per se unlawful.[5]  Since the per se standard does not apply, the default rule of reason perforce applies

---

[3] In *Procaps*, because there were "some procompetitive efficiencies that might flow" from the challenged agreement, the Eleventh Circuit was "not prepared to condemn the Collaboration Agreement out of hand."  *Id.* at 1084.

[4] *Delta Dental* likewise does not support the argument that the Blue System's service areas are per se unlawful.  There, the district court found that, at the Rule 12 stage, "[p]rior to any factual development," the plaintiffs had adequately pled a per se claim regarding the Delta Dental territorial allocations.  484 F. Supp. 3d 627, 635 (N.D. Ill. 2020).  That decision reflected those particular plaintiffs' allegations about Delta Dental, not the extensive factual record about the historical development of the Blue System that exists in this case.  As this Court explained in its 2014 motion to dismiss ruling, "while the mode of analysis is certainly a question of law, 'underpinning that purely legal decision are numerous factual questions.'"  26 F. Supp. 3d 1172, 1186 (N.D. Ala. 2014) (citation omitted).  The inquiry here must take account of the extensive factual record, not the threshold pleading question addressed in *Delta Dental*.  Subscribers agree that *Delta Dental*'s procedural posture distinguishes it from the inquiry before the Court.  Tr. II at 16:10–21.

[5] No party has claimed that any aspect of the go-forward System other than service areas is per se unlawful.  *See* Nat'l Account Obj. Pre-Hearing Br. at 14–16.  Nor could they.  The Local Best Efforts rule, for example, serves a key function in ensuring that Blue Plans develop a strong Blue brand in their respective service area, as Subscribers have explained.  Subs. Pre-Hearing Br. at 89 ("This rule is justified by the Blues as a trademark rule that requires each Blue Plan to focus its business within its ESA on its use of the Blue Marks."); Tr. II at 105:3–4 (Subscribers' Counsel recognizing "that the reasonably tailored local best efforts rules designed to encourage local investment are historically and traditionally virtually universally upheld").  In any event, through almost a decade of litigation with Subscribers,

to the go-forward System and service areas.  *See* Tr. I 71:12–15 (Subscribers' counsel: "And this is a binary inquiry . . . . [I]n other words, if it's not a per se violation, then it perforce has to be judged under the rule-of-reason standard.  That's what's left.  That's the presumptive standard in cases."); *see also Procaps*, 845 F.3d at 1083 ("We start with the general assumption that the rule of reason applies."); *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1306 (10th Cir. 2017) ("The rule of reason is the default approach, and there is a presumption in favor of its application.").

## II.    A FUTURE RELEASE OF CONTINUING CONDUCT IS PERMISSIBLE.

This Court and courts around the country recognize defendants' legitimate interest in achieving broad finality.  Without broad finality, "there would be no reason for a defendant to enter into a settlement." *Faught v. Am. Home Shield Corp.*, 2010 WL 10959223, at \*15 (N.D. Ala. Apr. 27, 2010) (Proctor, *J.*).  Accordingly, a settlement agreement can include a prospective release of future antitrust claims for continuing released conduct so long as that conduct is not clearly illegal.  *In re Managed Care*, 756 F.3d 1222, 1236 (11th Cir. 2014); *Robertson*, 556 F.2d at 686. While a court may not release unknown future antitrust claims based on *new, different conduct* after a settlement, *see Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974), a forward-looking release covering a *continuation* of pre-release conduct is wholly appropriate, especially in antitrust cases (as long as the conduct is not per se illegal).[6]  *See, e.g.*, *In re Managed Care Litig.*, 2010 WL 6532985, at \*12 (S.D. Fla. Aug. 15, 2010) (release of future claims based on pre-existing

---

and despite extensive discovery and expert work, no Subscriber expert has identified or quantified any harm flowing from Local Best Efforts.

[6] In *In re Managed Care*, the Eleventh Circuit rejected the precise argument advanced by Home Depot concerning forward-looking releases of claims against continuing violations.  *Compare* Tr. I at 189:21–190:6 (citing *Morton's Market* and *Redel's*), *and* Appellants' Br., *In re Managed Care Litig.*, 2012 WL 4335018, at \*28–32 (11th Cir. Sept. 11, 2012) (same), *with In re Managed Care*, 756 F.3d at 1236 ("The fact that Appellants seek to base the new claims on certain conduct post-dating the Effective Date does not change this conclusion.  Because they merely constitute a continuation of the conspiracy alleged in MDL 1334, WellPoint's purported bad acts are best seen as new, overt acts within an ongoing conspiracy, rather than new claims in and of themselves.").

conduct is permissible and "considerable caselaw stands for the proposition that public policy [favors settlement] when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint on trade"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *25 (E.D.N.Y. Dec. 16, 2019) (settlements can release future antitrust claims "based on a continuation of conduct at issue and underlying the original claims"); *Madison Square Garden, L.P. v. Nat'l Hockey League*, 2008 WL 4547518, at *8 (S.D.N.Y. Oct. 10, 2008) (enforcing prospective release where it permitted "continued adherence to a pre-release restraint").

The Settlement Agreement here permissibly releases claims based on the continuation of conduct that started before the settlement.[7]  Because the go-forward System, and service areas alone, are not clearly illegal, there is no concern with the forward-looking release incorporated into the Settlement Agreement.  *See, e.g.*, *Grunin*, 513 F.2d at 123–24; *Robertson*, 556 F.2d at 686; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *25–26 (upholding release of claims related to future rule changes so long as they do not also release "entirely unrelated antitrust claims").

The cases Objectors cite to support their contrary argument are materially different from this settlement.  Contrary to Objectors' representations at the final approval hearing, Tr. I at 183:8–12; 185:21–186:3, *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95 (5th Cir. 1974), did not involve a settlement that released claims based on continued conduct.  Instead, a franchisor inserted a general

---

[7] The Monitoring Committee created by the Settlement is entirely consistent with this framework.  For a five-year period, it may only approve "mechanisms, rules, or regulations . . . within the scope of" the Class Injunctive Relief articulated in Paragraphs 10 through 18 of the Settlement Agreement, and that "are not prohibited by this Agreement." Dkt. 2610-2 § 1(oo), (uuu); §§ 10–18; § 16(h).  The Monitoring Committee's release decisions must be unanimous, and of the five members, two are appointed by Subscribers and one by the Court.  *Id.* 1§(xx); App'x E ¶ 1(h).  This narrow role means that the Monitoring Committee is not an "impermissibly broad release[] . . . including 'future' entirely unrelated antitrust claims."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *26.

release into all its franchise agreements, then attempted to enforce that release to bar an antitrust claim. *Id.* at 98. The court determined that the release was overbroad because the language indemnified the franchisor against "'all claims, demands, contracts, and liabilities' without narrowing the scope to antitrust violations alleged or that could have been alleged or those based on continuing conduct." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *26 (quoting and distinguishing *Redel's*). *Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322 (1955), is similarly distinguishable because it dealt with res judicata, not settlement; the Court simply recognized that res judicata cannot bar future claims that could not have been brought in the earlier action. *Id.* at 328 (holding that a previous judgment "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case"); *see also Xerox Corp. v. Media Scis., Inc.*, 609 F. Supp. 2d 319, 326 (S.D.N.Y. 2009) (distinguishing, among other cases, *Lawlor* and *Redel's* because they "do[] not prevent the injured party from releasing his claim and foregoing the burden of litigation" (citation omitted)).

## III.   THE SECOND BLUE BID PROVISION IS APPROPRIATE RULE 23(B)(3) RELIEF.

The Second Blue Bid provision is divisible injunctive relief, and is therefore appropriately considered (b)(3) relief. Courts recognize a distinction between indivisible injunctive relief, which is properly treated as non-opt out (b)(2) relief, and divisible injunctive relief, which should be treated as (b)(3) relief. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) ("[C]laims for *individualized* relief . . . do not satisfy [ ] Rule [23(b)(2)]."); *Easterling v. Conn. Dep't of Corr.*, 278 F.R.D. 41, 51 (D. Conn. 2011) ("[T]he plaintiff's claims for class-wide declaratory and injunctive relief are certified under Rule 23(b)(2), while the plaintiff's claims for monetary and individualized injunctive relief are certified under Rule 23(b)(3)."). The Second Blue Bid

provision is divisible injunctive relief appropriately treated under Rule 23(b)(3) because it is not afforded to all class members; rather, entitlement to such relief depends on a class member's individualized circumstances.  Notably, no Settlement proponent or Objector criticized that treatment at the Final Approval Hearing.  Tr. II at 18:9–25 (Defendants and Subscribers concurring); Tr. I at 102:23–103:5 (Nat'l Account Objectors acknowledging structure without objection).

### A.    Recognizing that the Second Blue Bid is (b)(3) relief does not change the Settlement Agreement's class definitions, relief, or release.

As this Court has recognized, the Settlement classes were always divided into a class receiving divisible relief and a class receiving indivisible relief.  Tr. II at 28:6–7 (The Court:  "I don't think the class definition, like the scope of the class, changes in any way."); *id.* at 27:9–13 (Subscribers' counsel:  "[W]e've always had an injunctive relief class and we've always had a damages class.").  The Second Blue Bid has always been directed to a sub-class of the divisible relief class, which had separate representation and counsel:  the Self-Funded Sub-Class. Dkt. 2610-2  § 1(sss) (defining "Qualified National Account" to require "a Self-Funded Account").[8]  This is confirmed by Settlement Agreement provisions stating that, like (b)(3) monetary relief, the Second Blue Bid relief is not available to Opt-Outs from the (b)(3) class.  *Id.* § 1(u), (z).  The Settlement Agreement does not require opt-outs from the (b)(3) class to release claims for divisible injunctive relief.  Rather, the release is explicitly limited to the "extent permitted by law."  *Id.* § 32.

---

[8] At the Final Approval Hearing, certain Objectors challenged the allocation to the Self-Funded Sub-Class on grounds that the Sub-Class's claims relate back to the filing of the *Cerven* complaint in 2012.  See Tr. II at 144–46.  Objectors' relation-back arguments lack legal merit, including for the reasons articulated in Plaintiffs' briefing.  See Plfs. Pre-Hearing Br. at 94–98.

**B.    Supplemental notice, if necessary, should be appropriately tailored.**

As a preliminary matter, no new notice is required because the Long Form Notice was "not materially misleading." *In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1266 (D. Kan. 2006). The Long Form Notice directed class members to the Settlement Agreement and accurately explained that a "Self-Funded Account does not release any claims for declaratory or injunctive relief to request a Second Blue Bid during any time it meets the criteria to request such a bid under the terms of the Settlement Agreement."[9] Long Form Notice, Dkt. 2812-5, Ex. O, at 10. *See Tennille v. Western Union Co.*, 785 F.3d 422, 436–37 (10th Cir. 2015) (rejecting argument that notice was inadequate, in part because it "inform[ed] class members of several ways they could obtain additional information about the claims that they would be releasing"). Moreover, any clarification concerning individual injunctive relief is unlikely to "influence[] or alter[ their] response to the Settlement in a significant manner." *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 306 (W.D. Pa. 1997).

If the Court nonetheless orders supplemental notice, it should be tailored to the circumstances. The Court's proposed final approval language would serve this purpose by explicitly communicating the distinction between the two existing classes defined in the Settlement Agreement: the 23(b)(2) indivisible relief class and the 23(b)(3) divisible relief class, which includes the right for QNAs to request a Second Blue Bid. Any supplemental notice should be limited to Self-Funded Accounts, as they are the only class members who could arguably have suffered any prejudice. And in case of supplemental notice, the Court should only allow objections

---

[9] The Settlement Agreement in turn explains: "The Parties intend that the releases in this Agreement be interpreted and enforced broadly and to the fullest extent permitted by law"—it does not purport to release claims more broadly than the law allows. Dkt. 2610-2 § 32.

related to the new notice, as there is no authority or justification for a more general reopening of the objection period.

*First*, the Court's proposed clarifying language to be added to the Final Approval Order is appropriate:

> A Rule 23(b)(3) opt out reserves the right to pursue divisible relief including monetary relief and divisible injunctive relief.  Divisible injunctive relief may include the right to pursue in litigation a Second Blue Bid.  The parties acknowledge that, based on a claimant's individual business and the facts and circumstances of the claims, a Rule 23(b)(3) opt out may pursue divisible injunctive relief that includes possible additional Blue bids.  Whether such a remedy is merited will depend on the circumstances surrounding the individual claimant's claim.  However, the relief pursued by a Rule 23(b)(3) opt out may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the court.

This language recognizes and communicates the key legal principles, including that any injunctive relief pursued by a (b)(3) Opt-Out must be divisible injunctive relief and may not infringe on the Rule 23(b)(2) indivisible injunctive relief.  Nor, obviously, may an Opt-Out pursue a claim for indivisible injunctive relief it has released as a member of the mandatory (b)(2) class.  For example, each member of the (b)(2) class has individually released any claim for injunctive relief that service areas or other Blue policies are illegal or unenforceable.  Opt-Outs "do not have the right to prosecute an action . . . if doing so would . . . interfere with the parties' settlement in this case." *Faught v. Am. Home Shield Corp.*, No. 2:07-CV-1928-RDP, 2011 WL 12607338, at *4 (N.D. Ala. Jan. 24, 2011), *vacated*, 660 F.3d 1289, 1293 (11th Cir. 2011) (holding settlement injunction enforceable by contempt proceedings, rather than by additional injunction); Tr. II 19:24–20:1 (The Court: "[Objectors] don't have the right to pursue any relief that would undermine a class settlement enjoyed by millions of others.").

Moreover, the Court's proposed language appropriately does not attempt to delineate the specific relief a (b)(3) Opt-Out could seek in subsequent litigation.  Whether a subsequent suit is barred by the releases in this case, or interferes with the Settlement Agreement, will depend on the

specific facts and claims of that suit.  *See, e.g.*, *Faught*, 2011 WL 12607338, at *5 (finding suit re-litigated settled claims based on what the "amended complaint . . . expressly seeks"); *Genesys Software Sys., Inc. v. Ceridian Corp.*, 664 F. App'x 865, 870 (11th Cir. 2016) (holding settlement release barred suit based on the "undisputed facts" of subsequent case).  As Subscribers' Counsel explained, the appropriate (b)(3) relief "may depend on an individualized basis with respect to particular litigants," but is "a lot closer to two Blue bids than it is 36 Blue bids."  Tr. I at 128:24–129:2.  The Court's proposed language appropriately communicates these principles.

**Second**, any supplemental notice and opt-out period should be directed only to the Self-Funded Sub-Class.  The Second Blue Bid right is only available to eligible Self-Funded Accounts, and thus they are the only class members who would require supplemental notice.  *See* Tr. II at 136:21–23 ("The Court:  There's no divisible injunctive relief for anybody in the class you're representing.  Mr. Boies: Exactly, Your Honor."); *see also, e.g.*, *White*, 836 F. Supp. at 1468 (D. Minn. 1993) (for class of current and former NFL players, notice of changes to player-movement rules was required  for "only those class members who continue to play for NFL clubs" because they "will likely be affected by the proposed amendments"); *Rosner v. United States*, 2005 WL 8155968, at *10 (S.D. Fla. Oct. 3, 2005) (explaining supplemental notice need only go to "those Class Members adversely affected by the change").  The Long Form Notice's comments on the Second Blue Bid exclusively discuss Self-Funded Accounts; any clarification should similarly be directed only to them.

**Third**, any supplemental notice should not allow new objections to the Settlement's relief or release.  When supplemental notice is issued, the choice of which (if any) deadlines are re-opened is tailored to the issue that necessitated the notice.  For example, if an amendment to the settlement necessitates supplemental notice, new objections are only permitted regarding the

amendment.  *See, e.g.*, *Authors Guild, Inc. v. Google, Inc.*, No. 1:05-cv-08136, Dkt. No. 772 (S.D.N.Y. Nov. 19, 2009) (approving supplemental notice of an amendment to the settlement and re-opening the objection deadline only as to the amendment); *see also Weber v. Gov't Emps. Ins. Co.*, No. 07-1332, Dkt. No. 119, at 10 (D.N.J. Aug. 11, 2009) (not reopening the opt-out or objection deadlines where the notice "was clear and more than sufficient" regarding those deadlines).  Here, there is no change to the Settlement's relief or release.  All class members have had ample opportunity to object to those features of the Settlement.  The only change, and therefore the only appropriate grounds for new objections, is the supplemental notice language.

## IV.    THE SECOND BLUE BID ELIGIBILITY CRITERIA ARE BOTH REASONABLE AND EQUITABLE.

After hard-fought negotiations, the parties agreed to define "Qualified National Accounts" such that they "will have 33 million Members in the aggregate."  Dkt. 2610-2 § (1)(u).  The 33 million number encompasses approximately half of the members of large employers (greater than 5,000 employees) and approximately 31% of members of self-funded accounts, regardless of carrier.  *Id.* § 1(u), (z), (cccc), (ffff).  According to Subscribers' expert Daniel Rubinfeld, this relief "will provide increased opportunity for competition in the market for national accounts."  *See* Dkt. 2610-10, Declaration of Daniel Rubinfeld, ¶¶ 33–37.

This Settlement reflects a compromise that appropriately balances competing interests. During settlement negotiations, Subscribers advocated to secure as many Second Blue Bids as possible.  Defendants worked to ensure that Second Blue Bids changes would not discourage the inter-Plan collaboration essential to the unique, national Blue System structure.  The final QNA definition appropriately balances these competing concerns.  Objectors point to no basis for overturning this compromise, other than a desire for greater relief.  But that is not the appropriate inquiry for final approval of a settlement agreement.  *See Faught*, 2010 WL 10959223, at *22

("[T]he Court should keep in mind that compromise is the essence of a settlement, and should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." (internal quotation marks omitted)).

Significantly, no Objector has challenged the 5,000-employee cutoff for QNAs.  While there is no formal definition for what qualifies as a "national account," courts have recognized 5,000 as a reasonable cutoff.  *See United States v. Anthem, Inc.*, 2017 WL 527923, at *1 (D.D.C. Feb. 8, 2017) ("While various brokers and insurance carriers may draw differing lines to define the boundaries of a 'national account,' the government's use of 5000 employees as the threshold is consistent with how both Anthem and Cigna identify the accounts within their own companies.").  The smaller an employer, the more likely its needs can be met by local or regional carriers.  This QNA criteria reflects this commercial reality.

The dispersion criteria is also grounded in practical economics.  The core goal of the Second Blue Bid provision is to provide additional relief to employers least able to turn to local or regional carriers.  Thus, the dispersion criteria channels the Second Blue Bid relief to truly "national" accounts and away from geographically concentrated employers that are more likely to have viable local or regional alternatives.  Objectors challenging this criteria are simply asking the Court to "substitute [its] own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148–49 (8th Cir. 1999).[10]

Objectors are also wrong to argue that the dispersion criteria somehow protect Anthem. Defendants identified approximately 20 accounts in Anthem's service area that are eligible to

---

[10] Objectors raised no new argument regarding Taft-Hartley and Church Plans at the Final Approval Hearing.  Tr. II at 94:22-95:6.  These arguments fail for the reasons detailed in Defendants' pre-hearing briefing.  *See* Defs. Pre-Hearing Br. at 20–21.

request a Second Blue Bid.  And as explained at the Final Approval Hearing, these are just a sample; there are at least *150 more* examples.  Tr. II at 104:15–25.  In sum, Objectors' various challenges to the Second Blue Bid criteria are meritless, and certainly do not show that the settlement is not "fair, reasonable, and adequate."

## CONCLUSION

For the reasons stated above, this Court should grant final approval to the Subscriber Settlement.

Dated:  November 12, 2021

Respectfully submitted,

/s/ *Daniel E. Laytin*
David J. Zott, P.C.
Daniel E. Laytin, P.C.
Sarah J. Donnell
Christa C. Cottrell, P.C.
Zachary D. Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com
sarah.donnell@kirkland.com
christa.cottrell@kirkland.com
zachary.holmstead@kirkland.com

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendant Blue Cross Blue Shield Association*

Craig A. Hoover
E. Desmond Hogan
Justin Bernick
Peter Bisio
Elizabeth Jose
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC  20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com
peter.bisio@hoganlovells.com
elizabeth.jose@hoganlovells.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY & SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC  29201
Tel: (803) 255-9421

Evan R. Chesler
Christine A. Varney
Karin A. DeMasi
Lauren R. Kennedy
David H. Korn
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
Tel: (212) 474-1000
Fax: (212) 474-3700
echesler@cravath.com
cvarney@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com
dkorn@cravath.com

*Coordinating Counsel for Defendant Blue Cross and Blue Shield Association; Counsel for Defendants Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of North Carolina, Inc.; BlueCross BlueShield of Tennessee, Inc.; California Physicians' Service d/b/a Blue Shield of California; CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.; Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Hawaii*

Fax: (803) 256-7500
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Anthem, Inc., f/k/a WellPoint,
Inc., and all of its named subsidiaries in this
consolidated action; Blue Cross and Blue
Shield of North Carolina, Inc.; Louisiana
Health Service & Indemnity Company (Blue
Cross and Blue Shield of Louisiana); BCBSM,
Inc. (Blue Cross and Blue Shield of
Minnesota); Blue Cross and Blue Shield of
South Carolina; Horizon Healthcare Services,
Inc. (Horizon Blue Cross and Blue Shield of
New Jersey); Blue Cross & Blue Shield of
Rhode Island; Blue Cross and Blue Shield of
Vermont; Cambia Health Solutions, Inc.;
Regence Blue Shield of Idaho; Regence Blue
Cross Blue Shield of Utah; Regence Blue
Shield (of Washington); Regence Blue Cross
Blue Shield of Oregon; Blue Cross & Blue
Shield of Mississippi, a Mutual Insurance
Company; Wellmark of South Dakota, Inc.
(Wellmark Blue Cross and Blue Shield of
South Dakota); Wellmark, Inc. (Wellmark
Blue Cross and Blue Shield of Iowa); Hawaii
Medical Service Association (Blue Cross and
Blue Shield of Hawaii); Triple-S Salud, Inc;
Defendants Blue Cross and Blue Shield of
Florida, Inc.; Blue Cross and Blue Shield of
Massachusetts, Inc.; BlueCross BlueShield
of Tennessee, Inc.*

Cavender C. Kimble
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

*Counsel for Anthem, Inc., f/k/a WellPoint,
Inc., and all of its named subsidiaries in this
consolidated action; Blue Cross and Blue
Shield of North Carolina, Inc.; Louisiana*

*Medical Service Association (Blue
Cross and Blue Shield of Hawaii)*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants Blue Cross Blue
Shield Association; Health Care Service
Corporation, an Illinois Mutual Legal
Reserve Company, including its
divisions Blue Cross and Blue Shield of
Illinois, Blue Cross and Blue Shield of
Texas, Blue Cross and Blue Shield of
New Mexico, Blue Cross and Blue
Shield of Oklahoma, and Blue Cross and
Blue Shield of Montana; Caring for
Montanans, Inc., f/k/a Blue Cross and
Blue Shield of Montana, Inc.; Highmark
Inc., f/k/a Highmark Health Services;
Highmark West Virginia Inc.; Highmark
Blue Cross Blue Shield Delaware Inc.;
California Physicians' Service d/b/a
Blue Shield of California; Wellmark of
South Dakota, Inc. (Wellmark Blue
Cross and Blue Shield of South Dakota);
Wellmark, Inc. (Wellmark Blue Cross
and Blue Shield of Iowa); Hawaii
Medical Service Association (Blue
Cross and Blue Shield of Hawaii)*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza

23

*Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA  98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

*Counsel for Defendants Premera Blue Cross, d/b/a Premera Blue Cross Blue Shield of Alaska*

Brian K. Norman
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX  75234
Tel: (214) 987-1745
Fax: (214) 521-9033
bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
RSA Tower, 27th Floor
11 North Water Street
Mobile, AL  36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

Birmingham, AL  35203
Tel: (205) 254-1000
Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com

Pamela B. Slate
HILL CARTER FRANCO COLE & BLACK, P.C.
425 South Perry Street
Montgomery, AL  36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*With Cravath, Swaine & Moore LLP, counsel for Defendant Blue Cross Blue Shield of Alabama*

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
hwitt@kirkland.com
jzeiger@kirkland.com

*Counsel for Defendants Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.;*

24

*Counsel for Defendants CareFirst, Inc.;*
*CareFirst of Maryland, Inc.; Group*
*Hospitalization and Medical Services, Inc.;*
*CareFirst BlueChoice, Inc.*

R. David Kaufman
M. Patrick McDowell
BRUNINI, GRANTHAM, GROWER
& HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS  39201
Tel: (601) 948-3101
Fax: (601) 960-6902
dkaufman@brunini.com
pmcdowell@brunini.com

Cheri D. Green
BLUE CROSS & BLUE SHIELD OF
MISSISSIPPI, A MUTUAL INSURANCE
COMPANY
P.O. Box 1043
Jackson, MS  39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

*Counsel for Defendant Blue Cross & Blue*
*Shield of Mississippi, a Mutual Insurance*
*Company*

Michael A. Naranjo
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA  94104
Tel: (415) 984-9847
Fax: (415) 434-4507
mnaranjo@foley.com

Alan D. Rutenberg
Benjamin R. Dryden
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, DC  20007
Tel: (202) 672-5300
Fax: (202) 672-5399

*Highmark Western and Northeastern*
*New York Inc.*

Jonathan M. Redgrave
REDGRAVE, LLP
14555 Avion Parkway, Suite 275
Chantilly, VA  20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com

*Additional Counsel for HCSC and*
*Highmark Defendants*

Todd M. Stenerson
Brian C. Hauser
Edmund Y. Saw
SHEARMAN & STERLING LLP
401 9th Street, N.W., Suite 800
Washington, DC  20004
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com
brian.hauser@shearman.com
edmund.saw@shearman.com

Sarah L. Cylkowski
Thomas J. Rheaume, Jr.
BODMAN PLC
1901 Saint Antoine Street
6th Floor at Ford Field
Detroit, MI  48226
Tel: (313) 259-7777
Fax: (734) 930-2494
scylkowski@bodmanlaw.com
trheaume@bodmanlaw.com

Andy P. Campbell
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL PARTNERS LLC
505 North 20th Street, Suite 1600
Birmingham, AL  35203
Tel: (205) 224-0750
Fax: (205) 224-8622

arutenberg@foley.com
bdryden@foley.com

*Counsel for Defendant USAble Mutual
Insurance Company, d/b/a Arkansas Blue
Cross and Blue Shield*

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Jess R. Nix
Morgan B. Franz
SPOTSWOOD SANSOM & SANSBURY
LLC
Financial Center
505 20th Street North, Suite 700
Birmingham, AL  35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
jnix@spotswoodllc.com
mfranz@spotswoodllc.com

*Counsel for Defendant Capital BlueCross*

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL  35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendants Blue Cross and Blue
Shield of Florida, Inc.; Blue Cross and Blue
Shield of Massachusetts, Inc.; BlueCross
BlueShield of Tennessee, Inc.*

Edward S. Bloomberg
John G. Schmidt Jr.
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside

andy@campbellpartnerslaw.com
todd@campbellpartnerslaw.com
yawanna@campbellpartnerslaw.com

*Counsel for Defendant Blue Cross and
Blue Shield of Michigan*

John Briggs
Rachel Adcox
Jeny M. Maier
AXINN, VELTROP & HARKRIDER,
LLP
1901 L Street, N.W.
Washington, DC  20036
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
radcox@axinn.com
jmaier@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, AL  35203
Tel: (205) 250-5000
Fax: (205) 250-5034
steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendant Independence
Blue Cross*

Kathleen Taylor Sooy
Tracy A. Roman
Sarah Gilbert
Honor Costello
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com

125 Main Street
Buffalo, NY  14203
Tel: (716) 847-8400
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com

Stephen A. Walsh
WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL
100 Corporate Parkway
One Lake Level
Birmingham, AL  35242
Tel: (205) 572-4107
Fax: (205) 572-4199
swalsh@wwhgd.com

*Counsel for Defendant, Excellus Health Plan,
Inc., d/b/a Excellus BlueCross BlueShield,
incorrectly sued as Excellus BlueCross
BlueShield of New York*

sgilbert@crowell.com
hcostello@crowell.com

John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN & WHITE
LLC
The Clark Building
400 20th Street North
Birmingham, AL  35203
Tel: (205) 581-0700
Fax: (205) 581-0799
jjohnson@lightfootlaw.com
bkappel@lightfootlaw.com

*Counsel for Defendants Blue Cross of
Idaho Health Service, Inc.; Blue Cross
and Blue Shield of Kansas, Inc.; Blue
Cross and Blue Shield of Kansas City;
Blue Cross and Blue Shield of
Nebraska; Blue Cross Blue Shield of
Arizona; Blue Cross Blue Shield of
North Dakota; Blue Cross Blue Shield
of Wyoming; Highmark Western and
Northeastern New York Inc.*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com

*Counsel for Defendants Wellmark of
South Dakota, Inc. (Wellmark Blue
Cross and Blue Shield of South Dakota);
Wellmark, Inc. (Wellmark Blue Cross
and Blue Shield of Iowa); Triple-S
Salud, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2021, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Daniel E. Laytin
Daniel E. Laytin