FILED
2021 Dec-08  PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD** | ) | |
| | ) | **Master File No.:** |
| **ANTITRUST LITIGATION** | ) | **2:13-CV-20000-RDP** |
| **(MDL NO. 2406)** | ) | |
| | ) | |

## Home Depot U.S.A., Inc.'s
## Renewal of Objections and Post-Hearing Response

## Table of Contents

**Home Depot U.S.A., Inc.'s Renewal of Objections and Post-Hearing Brief** ..........................1

**Argument and Analysis** ...................................................................................................3

**I.    The Court cannot and should not affirmatively decide that the Rule of
Reason, rather than the *per se* standard, governs the go-forward system** ...................3

    A.      Summary of Home Depot's position ........................................................3

    B.      The hearing and the Court's invitation to Home Depot...........................5

    C.      Home Depot's proposed language ..........................................................5

    D.      The Court cannot affirmatively decide that the go-forward system is
subject to the Rule of Reason, rather than the *per se* standard ................6

          1.      In approving a settlement, a district court cannot resolve unsettled
legal questions...........................................................................6

          2.      Deciding whether the go-forward system would be *per se* unlawful
involves resolving an unsettled legal question.............................7

          3.      *Bennett* does not bar approval so long as the illegality of the go-
forward system remains unresolved and uncertain as a matter of
fact or law ................................................................................8

          4.      *Grunin* decided only whether the go-forward conduct was illegal
"to a legal certainty" ................................................................9

    E.      Because the Court *need not* decide whether the *per se* or Rule-of-Reason
standard would govern the go-forward system, it should not do so ....................10

    F.      Any approval order should state on its face that the Court is not deciding
on the merits whether the post-Settlement conduct is *per se* unlawful.................12

**II.   The Court should condition any Settlement approval upon clear language
ensuring that opt outs retain a meaningful right to pursue additional Blue
Bids** ...........................................................................................................................13

    A.      Summary of Home Depot's position ........................................................13

    B.      Home Depot's proposed language ...................................................16

    C.      Superseding language is necessary because the current Settlement
Agreement would extinguish an opt out's right to seek even *divisible*
injunctive relief, including multiple Blue Bids.....................................17

    D.      The Court should clarify its suggested language to address the already
apparent dispute over what rights an opt out would release .................20

i

1.      The Blues contend that, even under the Court's draft language, opt outs would release the right to seek *any* form of injunctive relief by challenging the enforceability of the post-Settlement restrictions............20

2.      The Subscribers appear to acknowledge that opt outs may challenge the enforceability of the post-Settlement restrictions to seek individual access to multiple Blue Bids..............................................24

3.      The Court should clarify now whether opt outs would release the right to seek individual access to multiple Blue Bids by challenging the enforceability of the post-Settlement restrictions............25

E.      The Court should incorporate Home Depot's proposed language into any supplemental notice and order of final approval...................................28

III.    **The Court cannot approve the Settlement Agreement because it purports to release even an opt out's rights to enforce the antitrust laws against post-Settlement conduct**................................................................................................28

A.      Substantive antitrust law prohibits the release of claims based on future conduct in a class action settlement.........................................................29

1.      Supreme Court and Eleventh Circuit precedent bars releases of claims based on future conduct in antitrust cases.....................................29

2.      The Blues cannot distinguish *Redel's* .................................................31

B.      The substantive antitrust limitation on releases of future conduct applies to class action settlements.......................................................................34

C.      The Blues' authorities do not justify the proposed release of post-Settlement conduct...................................................................................37

1.      *In re Managed Care* involved a different kind of proceeding—enforcement of an already-approved settlement—and a release of future *claims* based on conduct occurring by its effective date...............37

2.      The district court in *In re Payment Card* misread *Redel's*, and the (b)(2) release proposed here contains the same features that originally doomed such a release in that case..............................39

D.      The Blues' desire for perpetual protection of their post-Settlement restraints cannot override the public policy forbidding releases of future anticompetitive conduct........................................................................41

**Conclusion** ...............................................................................................................43

## Table of Authorities

**Cases:**                                                                                                        **Page**

*Adams v. S. Farm Bureau Life Ins. Co.*,
  493 F.3d 1276 (11th Cir. 2007) ................................................................................. 25-26

*Atlantic Co. v. Broughton*,
  146 F.2d 480 (5th Cir.1944) .......................................................................................30

*Authors Guild v. Google, Inc.*,
  770 F. Supp. 2d 666 (S.D.N.Y. 2011)........................................................................42

*Bennett v. Behring Corp.*,
  737 F.2d 982 (11th Cir. 1984) .............................................................................*passim*

*Carson v. American Brands*,
  450 U.S. 79 (1981)................................................................................................*passim*

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984)....................................................................................................10

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977) ............................................................................*passim*

*Demsheck v. Ginn Dev. Co., LLC*,
  No. 3:09-CV-00335-J-25TEM, 2009 WL 10663051 (M.D. Fla., 2009) ...................34, 39

*Fox Midwest Theatres v. Means*,
  221 F.2d 173 (8th Cir. 1955) ................................................................................30, 33

*Gagliardi v. TJCV Land Tr.*,
  889 F.3d 728 (11th Cir. 2018) ...................................................................................10

*Grunin v. Int'l House of Pancakes, Inc.*,
  513 F.2d 114 (8th Cir. 1975) ..............................................................................*passim*

*In re Just. Oaks II, Ltd.*,
  898 F.2d 1544 (11th Cir. 1990) ..................................................................................12

*In re Literary Works in Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011)........................................................................................33

*In re Managed Care*,
  756 F.3d 1222 (11th Cir. 2014) ...........................................................................34, 37-39

*In re Nissan Motor Corp. Antitrust Litig.*,
 552 F.2d 1088 (5th Cir. 1977) ................................................................. 25-26

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
 No. 05-MD-1720, 2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) ........................34, 37, 39

*In re Payment II*,
 827 F.3d 223 (2d Cir. 2016)...........................................................................40

*In re Payment III*,
 330 F.R.D. 11 (E.D.N.Y. 2019) ......................................................................40

*In re Smith*,
 926 F.2d 1027 (11th Cir. 1991) ......................................................................30

*Int'l Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*,
 389 U.S. 64 (1967).......................................................................................26

*Lawlor v. Nat'l Screen Serv. Corp.*,
 349 U.S. 322 (1955)...................................................................................2, 38

*Lighton Indus., Inc. v. Allied World Nat'l Assurance Co.*,
 348 F. Supp. 3d 167 (E.D.N.Y. 2018) .............................................................20

*Madison Square Garden, L.P. v. National Hockey League*,
 No. 07CV8455, 2008 WL 4547518 (S.D.N.Y. 2008) .................................34, 38

*Minnesota Mining & Mfg. v. N.J. Wood Finishing Co.*,
 381 U.S. 311 (1965)...................................................................................30

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
 473 U.S. 614 (1985)...................................................................................2, 29

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
 198 F.3d 823 (11th Cir. 1999), *amended in part,* 211 F.3d 1224 (11th Cir. 2000)...........32

*Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross of Kansas City*,
 452 U.S. 378 (1981)...................................................................................30, 35

*Ortiz v. Fibreboard Corp.*,
 527 U.S. 815 (1999)...................................................................................21, 35

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*,
 604 F.3d 1291 (11th Cir. 2010) ......................................................................35

*Redel's Inc. v. Gen. Elec. Co.*,
    498 F.2d 95 (5th Cir. 1974) ............................................................ *passim*

*Robertson v. Nat'l Basketball Ass'n*,
    556 F.2d 682 (2d Cir. 1977) ....................................................... 6-7, 10, 34

*Schmidt v. Lessard*,
    414 U.S. 473 (1974) ........................................................................ 26

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
    157 F. Supp. 2d 561 (E.D. Pa. 2001) ............................................. 33

*Shane v. Humana, Inc.*,
    No. 00-MD-1334, 2009 WL 7848518 (S.D. Fla. Nov. 9, 2009) ......................... 38

*Swaney v. Regions Bank*,
    No. 2:13-CV-00544-RDP, 2020 WL 3064945 (N.D. Ala. June 9, 2020) ............... 8

*Thomas v. Blue Cross & Blue Shield Ass'n*,
    594 F.3d 814 (11th Cir. 2010) ......................................................... 34

*TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*,
    959 F.3d 1318 (11th Cir. 2020) ..................................................... 24, 38

*Valley Drug Co. v. Geneva Pharms., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ....................................................... 41

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ....................................................................... *passim*

*Xerox Corp. v. Media Sciences, Inc.*,
    609 F. Supp. 2d 319 (S.D.N.Y. 2009) ............................................ 34, 38

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    401 U.S. 321 (1971) ...................................................................... 30, 35

## **Other**:

15 U.S.C. § 26 ...................................................................................... 35

28 U.S.C. § 2072(b) .............................................................................. 35

James Grimmelmann, *Future Conduct and the Limits of Class-Action Settlements*,
    91 N.C. L. Rev. 387, 410 (2013) ........................................................ *passim*

<u>**Home Depot U.S.A., Inc.'s**</u>
<u>**Renewal of Objections and Post-Hearing Response**</u>

Home Depot U.S.A., Inc., together with all its affiliates that would be members of the proposed Settlement Classes ("Home Depot"), respectfully renews its objections to the proposed class Settlement. Home Depot appreciates the Court's invitation to submit this post-hearing brief, which addresses the following issues:

(1)    *The Court cannot and should not decide that the Rule of Reason, rather than the* per se *standard, governs the competitive restraints that would persist after approval of the Settlement*. Doing so would violate Supreme Court and Circuit authority prohibiting a court from resolving contested factual and legal issues when approving a settlement. Circuit authority calls for this Court to determine only whether the illegality of the post-Settlement structure is a legal certainty. Here, the Court has already identified unresolved factual and legal issues rendering that issue uncertain. As the Court invited, Home Depot proposes language for the Court's consideration in addressing this issue. *Infra* at 5–6.

(2)    *The Court should condition any Settlement approval upon clear language ensuring that opt outs retain a meaningful right to pursue additional Blue Bids, which the Court and now the Parties have rightly recognized as divisible injunctive relief, subject to the 23(b)(3) right of opt out.* As the Court is aware, Home Depot respectfully contends that public policy prohibits *any* release of future antitrust claims based on post-Settlement conduct. However, the Court was not inclined to accept this position at the fairness hearing. Accordingly, Home Depot first addresses the Court's announced inclination that opt outs should be allowed to seek at least some number of additional Blue Bids, solely for themselves, by challenging the enforceability of the post-Settlement restraints that would limit them to a single bid. But the post-hearing briefing already reveals a fundamental disagreement (even between the Blues and the Subscribers) about

1

whether the Settlement, as modified by the Court's draft language, would allow that.  The Blues say that, despite the Court's draft language, the release would bar opt outs from challenging the single-bid restriction, even purely for themselves; the Subscribers and Home Depot disagree.

The right to opt out from the divisible injunctive relief would be illusory if the Court approves a mandatory (b)(2) class that releases (or otherwise forecloses) the right to challenge any post-Settlement rules limiting opt outs to a single Blue Bid. The right to opt out to pursue a released claim is no right at all. Accordingly, Home Depot proposes a clarifying revision that resolves the dispute over the effect of the Court's draft language and ensures a meaningful right of opt out from the divisible Second Blue Bid relief that this Court has rightly recognized falls under 23(b)(3). *Infra* at 16–17. This issue should be resolved before the Court issues supplemental notice, so that the notice clearly states the scope of the release and the effect of opting out.

(3)     *The Court should not approve any Settlement imposing a release of antitrust claims based on post-Settlement conduct.* Under Supreme Court and binding Circuit law, "[r]eleases may not be executed which absolve a party from liability for future violations of our antitrust laws."[1] Yet this Settlement, as written, would force every prospective private plaintiff to release any right to seek injunctive relief based on the Blues' post-Settlement restraints. And it would release those rights forever, not merely for the five-year monitoring period.

Below, Home Depot addresses the Court's concern that this substantive antitrust limitation does not apply to class action settlements. In short, nothing in the Supreme Court or

---

[1] *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974); *see also Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) (both discussed in Home Depot's objection, Ex. 5 to Motion for Final Approval, Dkt. 2812-20, at 13–15).

binding Circuit cases excepts class actions from this policy. Moreover, if it violates public policy for a settlement agreement to sideline an individual plaintiff from challenging future antitrust violations, then forcing an entire class of plaintiffs to forever forego challenges to ongoing competitive constraints is a far more serious public policy violation.

## Argument and Analysis

I.    **The Court cannot and should not affirmatively decide that the Rule of Reason, rather than the *per se* standard, governs the go-forward system.[2]**

A.    **Summary of Home Depot's position.**

As the Supreme Court directed in *Carson v. American Brands*, federal courts "do not decide the merits of the case *or resolve unsettled legal questions*" when approving a settlement.[3] Indeed, as *Cotton v. Hinton*, the former Fifth Circuit case outlining the standard for settlement approval, warns: "It cannot be overemphasized that neither the trial court in approving the settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute."[4]

Against this legal backdrop, the Blues and Home Depot dispute whether the Court may and should decide whether the *per se* or Rule-of-Reason standard would govern the Blues' go-forward system under the Settlement. In *Bennett v. Behring*, the Eleventh Circuit instructs that "unless the illegality of an arrangement under consideration is a legal certainty, the mere fact that certain of its features may be perpetuated is no bar to approval."[5] Relying on their overbroad

---

[2] To be clear, Home Depot's position that the Court may not and should not rule on this issue is without waiver of its position (to be resolved in later litigation as necessary) that some or all aspects of the Blues' continued conduct are *per se* unlawful.

[3] 450 U.S. 79, 88 n.14 (1981) (emphasis added).

[4] *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

[5] 737 F.2d 982, 987 (11th Cir. 1984) (citing *Grunin v. Int'l House of Pancakes, Inc.*, 513 F.2d 114 (8th Cir. 1975)).

interpretation of the Eighth Circuit's *Grunin* opinion—rather than the Eleventh Circuit's language in *Bennett*—the Blues insist that the Court must affirmatively decide which standard would apply in any challenge to the go-forward system. But doing so would contradict *Carson's* and *Cotton's* proscription on deciding unsettled legal issues in the settlement context. By contrast, Home Depot contends—consistent with that authority—that the Court need decide only whether the illegality of that system is a legal certainty.

Uncertainty exists regarding the illegality of the go-forward system both as a factual matter and a legal matter. This Court has already found a disputed issue of *fact* whether the Blues constitute horizontal competitors at all, as opposed to a single entity. Even if the Blues were to lose this factual dispute, there would remain a disputed *legal* issue whether the *per se* standard would apply to the go-forward restrictions—specifically, whether the Blues' history of alleged common law trademarks takes their post-Settlement arrangement out of the *per se* category and whether that arrangement is illegal under *Sealy* and *Topco*. The Court has refrained from deciding that issue as to the subset of the current restrictions that would continue post-Settlement. Thus, the legality of the post-Settlement conduct is uncertain as a matter of fact and law. Recognizing that uncertainty requires no new analysis.

To press for more than the law requires or allows, the Blues present this Court with a false choice. Because antitrust claims are resolved, *on the merits,* under either the *per se* or Rule-of-Reason standard, the Blues say that the Court, in approving the Settlement, must decide which legal standard would apply if they were later to lose the unresolved fact question whether their conduct is horizontal at all. But that choice is not relevant to settlement approval, which does not allow or require the Court to answer the merits questions that the Blues' post-Settlement conduct

may pose in subsequent litigation. Instead, settlement approval inquires only whether the

illegality of that conduct is certain as a matter of fact and law.

**B.      The hearing and the Court's invitation to Home Depot.**

Under the Court's direct questioning, the Blues conceded that the any ruling on the

legality of their post-Settlement conduct could not bind future challengers:

> THE COURT: Going forward, nothing prohibits [opt-outs like Home Depot] from
> seeking individualized injunctive relief, whatever that turns out to be, and arguing
> that ***whatever theory*** they have for that, that we're entitled to this structural --
> unique, individualized structural relief because while the court said in *In Re Blue
> Cross Blue Shield Antitrust Litigation* that it could not say or that the illegality of
> the arrangement was not a legal certainty or the court said it wasn't clearly illegal
> or the court said for purposes of the classes involved in that case, it wasn't a *per
> se* violation, that doesn't limit them from arguing individualized claims for
> individualized relief departing from that conclusion, does it?
>
> MR. ZOTT:  I think as a legal matter, ***the answer is no***. We would -- I won't lie to
> you. We would cite that opinion and say with all these changes, we think that's
> persuasive.[6]

When Home Depot emphasized the need for this limitation to show on the face of the Court's

order, rather than merely in hearing colloquy, the Court invited Home Depot to "submit to

chambers the three sentences you want in the order that makes that clear."[7]

**C.      Home Depot's proposed language.**

In keeping with the Court's invitation and Circuit law, Home Depot respectfully submits

the following three sentences for inclusion in any order approving the Settlement:

> Having (1) found that "there remain genuine issues of material fact as to whether
> Defendants operate as a single entity with regard to the enforcement of the Blue
> Marks" [Dkt. 2064], (2) not previously evaluated the legality of Defendants'
> Exclusive Service Areas in isolation [*see id.*], and (3) considered arguments
> presented by both Parties as well as objectors to the Settlement Agreement, the

---

[6] Hearing Transcript, Day 1, at I-170–71 (emphasis added).

[7] *Id.* at 172–73.

Court is unable to conclude that the illegality of the conduct that would continue following the Settlement Agreement is "a legal certainty." *Bennett v. Behring Corp.*, 737 F.2d 982, 987 (11th Cir. 1984). Mindful that the Court must "not decide the merits of the case or resolve unsettled legal questions," *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981), and may not "reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute," *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977), the Court makes no finding as to the standard that would apply to any future challenge of that conduct or the outcome of such a challenge. The Court's approval of the Settlement shall not preclude anyone excluded from the class, including opt outs, from challenging the legality of the Blues' ongoing practices in future proceedings nor constitute legal precedent supporting the outcome of such a challenge one way or the other.

These sentences are well-supported by the governing law. This language balances the prohibition on deciding the merits of the legality of post-Settlement conduct with the need to assess the fairness, reasonableness, and adequacy of the Settlement. By contrast, the Blues' proposed approach ignores the former constraint.

**D.     The Court cannot affirmatively decide that the go-forward system is subject to the Rule of Reason, rather than the *per se* standard.**

**1.     In approving a settlement, a district court cannot resolve unsettled legal questions.**

In citing to the out-of-Circuit authorities of *Grunin* and *Robertson*, the Blues omit critical language prohibiting a district court from deciding unsettled legal questions when approving a settlement. While *Grunin* admonishes "that a court cannot lend its approval to any contract or agreement that violates the antitrust laws," its very next sentence highlights the limitations on that responsibility: "However, we are equally mindful of the fact that *neither the trial court in approving the settlement nor this Court in reviewing the approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute.*"[8] Likewise, the Blues quote part of a sentence from *Robertson v. NBA*, but omit the

---

[8] 513 F.2d at 123 (emphasis added).

italicized portion that follows: "It is true that a settlement that authorizes the continuation of clearly illegal conduct cannot be approved, *but a court in approving a settlement should not in effect try the case by deciding unsettled legal questions*."[9]

And it isn't just the non-binding *Grunin* and *Robertson* opinions saying this. In *Carson*, the Supreme Court makes clear that courts approving settlements "do not decide the merits of the case or resolve unsettled legal questions."[10] And *Cotton v. Hinton*, the binding former Fifth Circuit case that *Bennett* cites, says that this limitation "cannot be overemphasized."[11] Despite that emphatic admonition, the Blues ask the Court to do exactly what these cases prohibit.

### 2. Deciding whether the go-forward system would be *per se* unlawful involves resolving an unsettled legal question.

The Blues urge that that "the Court should hold that the service areas and the go-forward System are not *per se* unlawful."[12] That tracks their position at the hearing, asking the Court "to decide that [the post-Settlement restrictions] are not *per se* unlawful and, therefore, instead, subject to the default rule of reason."[13]

But doing that would require resolving an unsettled legal question. There is no way around that, and the Blues do not attempt to argue otherwise. The closest they come is to say that "no party is advocating for a final, binding determination on the merits—*i.e.*, the legality or illegality of service areas or the go-forward System," conceding further, "nor could a settlement final approval order have that effect."[14] But the prohibition expressed in both *Carson* and *Cotton*

---

[9] *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977).

[10] *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981).

[11] 559 F.2d at 1330.

[12] Defendants' Post-Hearing Brief, Dkt. 2869, at 11.

[13] Hearing Transcript, Day 1, at I-78.

[14] Defendants' Post-Hearing Brief, Dkt. 2869, at 4 n.1.

is not limited to "a final, binding determination on the merits"—rather, the language of those cases bars a court from deciding any "unresolved legal questions" or any "*issues* of law or fact which underlie the merits." In short, binding Supreme Court and Eleventh Circuit authority precludes this Court, through the vehicle of settlement approval, from deciding the merits of the legal standard that would govern post-Settlement conduct.

### 3. *Bennett* does not bar approval so long as the illegality of the go-forward system remains unresolved and uncertain as a matter of fact or law.

*Bennett* does not require the Court to resolve the *per se* versus Rule-of-Reason issue. *Bennett* simply directs this Court to decide whether the illegality of the post-Settlement conduct is "a legal certainty,"[15] and *Carson* forbids resolving "unsettled legal questions."[16] Doubt *whether* the *per se* or Rule-of-Reason standard would apply is enough; indeed, doubt is what drives settlements and permits their approval.[17] Here, as noted above and explained in more detail below, there are both factual grounds (the single entity dispute that this Court has already held must go to a jury) and legal grounds (the Blues' common law trademark argument and other proposed distinctions of *Sealy* and *Topco*) that render the *per se* illegality of the post-Settlement conduct uncertain.

---

[15] 737 F.2d at 987.

[16] 450 U.S. at 88 n.14.

[17] *See, e.g.*, *Swaney v. Regions Bank*, No. 2:13-CV-00544-RDP, 2020 WL 3064945, at *4 (N.D. Ala. June 9, 2020) ("Because the outcome on class certification and the ultimate outcome on the merits was uncertain for both parties, a settlement was reached and here that is appropriate.").

**4.** *Grunin* **decided only whether the go-forward conduct was illegal "to a legal certainty."**

As the Court has admonished, "you cannot take a sentence . . . in an opinion and say that's what this case stands for."[18] Instead, you have to look at what the court actually did. The Blues' interpretation of *Grunin* conflicts both with what that opinion says and what the Eighth Circuit actually did.

In *Grunin*, the Eighth Circuit did not decide whether the go-forward conduct was *per se* unlawful. Instead, it decided only that the conduct was not illegal "to a legal certainty." Now, it is true that the opinion uses loose language, formulating the inquiry in different ways even in back-to-back sentences.[19] But the important question is what that court *actually did*, which was merely to satisfy itself that the conduct was not illegal "to a legal certainty."[20]

*Grunin*'s consideration of this issue was limited to a few sentences outlining a "brief survey of the theories advanced by the parties" and highlighting the difference of opinion about whether the claims were *per se* illegal.[21] *And that was it.* The Eighth Circuit's only "legal determination" was that reasonable people could disagree on the question. In keeping with its earlier admonition against reaching conclusions on merits issues, that court did not determine whether the conduct amounted to a *per se* violation. Indeed, it noted explicitly that its brief survey of the issue was "not intended to be an appraisal of the merits of the claims in

---

[18] Hearing Transcript, Day 1, at I-187.

[19] 513 F.2d at 124.

[20] *See id*.

[21] *Id.*

contention."[22] What it did—all it did—was determine that the illegality of the conduct was not clear "to a legal certainty."

That is why the Eleventh Circuit cited *Grunin* only for the proposition that a court may approve a settlement "unless the illegality of an arrangement under consideration is a legal certainty."[23] That formulation reflects what the *Grunin* court had actually done and, far more importantly here, the Eleventh Circuit's desired articulation of *this* Circuit's law. Notably, the *Robertson* court understood *Grunin* in the same way, citing it for the conclusion that "the alleged illegality of the settlement agreement is not a legal certainty."[24] The Blues' broader interpretation would contradict not only *Grunin*, but more importantly *Carson* as well as *Cotton*, the binding Circuit precedent that *Bennett* cited.

### E. Because the Court *need not* decide whether the *per se* or Rule-of-Reason standard would govern the go-forward system, it *should not* do so.

Even if the Court *could* decide which standard would govern the Blues' future conduct, it *should not* do so. As a fundamental principle of judicial restraint, federal courts should not rule on issues unnecessary to the decision before them.[25] Here the only question necessary to evaluate the Settlement is whether it is legally certain that the Blues' post-Settlement conduct would be illegal. To answer that question "no," the Court need only cite its prior summary judgment ruling that there is a disputed issue of fact whether the Blues' conduct is a horizontal restriction *at all*.[26]

---

[22] *Id.*

[23] 737 F.2d at 987.

[24]   556 F.2d at 686.

[25] *See, e.g.*, *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 733 (11th Cir. 2018) (noting that courts do not "merely opine on what the law would be upon a hypothetical state of facts") (internal quotation marks omitted).

[26] A Section 1 challenge requires an agreement between separate entities. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("Section 1 of the Sherman

In that Order, the Court found that "there remain genuine issues of material fact as to whether Defendants operate as a single entity as to the enforcement of the Blue Marks" and declined to rule on the standalone legality of the Blues' exclusive service areas.[27] At the hearing, the Court noted that, even if its prior ruling was incorrect as the Objectors respectfully suggested, that ruling not only set the stage for the Parties' negotiation of the Settlement, but also meant that the inquiry shifted from the substantive question—does the Objectors' argument "actually win[] the day for you or the Blues"—to the more process-oriented question—"how is that issue going to come out based upon a ruling of the trier of fact."[28] Put simply, the Court need only point to its prior ruling and note that the continued existence of a fact dispute means that the illegality of the go-forward conduct is not "a legal certainty."

Even if the Court decided to speak to the legal standard that would apply *if* the Blues were to lose that single-entity dispute, it would be enough to observe that the Parties offer conflicting legal positions as to that standard—positions as to which the Court has already found substantial ground for a difference of opinion.[29] The unresolved factual and legal disputes—singly and certainly in combination—eliminate any legal certainty that the post-Settlement structure would be illegal. That uncertainty is all that *Bennett* requires and so is as far as this Court should go. The first sentence of Home Depot's proposed language reflects these pragmatic

---

Act, in contrast, reaches unreasonable restraints of trade effected by a 'contract, combination ... or conspiracy" between separate entities.'").

[27] Dkt. 2063 at  35–37.

[28] Hearing Transcript, Day I, at I-142.

[29] *See* Order Allowing Interlocutory Appeal, Dkt. 2202, 2203. Of course, the Eleventh Circuit's denial of the appeal cannot be read as rejecting the court's evaluation of that one prong—though even if it could, that would hardly be a reason to approve the Settlement.

and properly-restrained approaches.[30]

### F. Any approval order should state on its face that the Court is not deciding on the merits whether the post-Settlement conduct is *per se* unlawful.

Under this Court's questioning, the Blues conceded that any decision approving the Settlement will not bind a future court as to the applicable legal standard in any future challenge to the Blues' conduct or preclude opt outs from arguing that the go-forward conduct is *per se* unlawful.[31] Those conclusions are well-supported by the law.[32] And the Court appeared to agree in the hearing.[33] Whatever disputes arise in opt-out actions, they should not include avoidable disputes over what this Court has and has not done in *this* case. Home Depot's third sentence in the proposed language provides the needed clarity.[34]

---

[30] Home Depot's proposed first sentence is as follows:

> Having (1) found that "there remain genuine issues of material fact as to whether Defendants operate as a single entity with regard to the enforcement of the Blue Marks" [Dkt. 2064], (2) not previously evaluated the legality of Defendants' Exclusive Service Areas in isolation [*see id.*], and (3) considered arguments presented by both Parties as well as objectors to the Settlement Agreement, the Court is unable to conclude that the illegality of the conduct that would continue following the Settlement Agreement is "a legal certainty." *Bennett v. Behring Corp.*, 737 F.2d 982, 987 (11th Cir. 1984).

[31] *See* Hearing Transcript, Day 1, at I-170–72; Defendants' Post-Hearing Brief, Dkt. 2869 at 4 n. 1 (noting that a settlement approval would not have preclusive effect).

[32] *See, e.g., In re Just. Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990) (bankruptcy court order approving settlement did not constitute final judgment on the merits and so was not a basis for claim preclusion).

[33] Hearing Transcript, Day 1, at I-167 ("I don't think anything I do here is going to be binding."); *see also* Hearing Transcript, Day 2, at II-113 ("[Y]ou can go and litigate whether ESAs are illegal in your individual case").

[34] The proposed third sentence is as follows:

> The Court's approval of the Settlement shall not preclude anyone excluded from the class, including opt outs, from challenging the legality of the Blues' ongoing practices in future proceedings nor constitute legal precedent supporting the outcome of such a challenge one way or the other.

To be sure, including clarifying language, while important, would be no substitute for abiding by the limitations of *Bennett* and *Cotton* (as urged above). After all, the Blues admit that they would cite as persuasive authority any ruling whether the *per se* or Rule-of-Reason standard would govern a future challenge.[35] The fundamental point remains that the Court should not decide this issue *at all* because it is unnecessary to Settlement approval and improper under the limitations imposed by Circuit law.

For the reasons above, the Court should not decide whether the *per se* or Rule-of-Reason standard would govern a future challenge and should adopt the language Home Depot proposes.

## II.    The Court should condition any Settlement approval upon clear language ensuring that opt outs retain a meaningful right to pursue additional Blue Bids.[36]

### A.    Summary of Home Depot's position.

The settling Parties agree that an opt out may sue to recover individual damages caused by the rules restricting its access to multiple Blue Bids.[37] In such a damages lawsuit, an opt out may assert that the rules that persist after Settlement, including the ESAs, violate antitrust law. Under the terms of the Settlement Agreement and as a matter of law, an opt out does not release that right, since individual damages constitute divisible relief under *Wal-Mart Stores, Inc. v. Dukes*.[38]

---

[35] *See* Hearing Transcript, Day 1, at I-170–72.

[36] To be clear, Home Depot stands upon its objection that the Court should not approve *any* release of its right to pursue relief under the antitrust laws for post-Settlement conduct. *See* Objection 3, *infra*. However, if the Court is not inclined to require those modifications, as it was not at the fairness hearing, it should condition approval upon the superseding language proposed in Section II(C) below.

[37] *See* Hearing Transcript, Day 1, at I-95 (Mr. Zott: "if somebody exercises their opt-out rights, they could seek -- obviously, they could seek damages in any amount, including damages flowing from ESAs or anything else") (emphasis added); Subscribers' Post-Hearing Brief, Dkt. 2868, at 16–17.

[38] 564 U.S. 338 (2011).

Following the Court's lead, the Parties now acknowledge that injunctive relief allowing an individual employer access to multiple Blue Bids likewise constitutes divisible relief under *Wal-Mart*. The Court had expressed "some serious concerns about that being classified under (b)(2) with no opt-out right and the potential burden that might have on the opt-out right."[39] The Parties had to heed this concern because the Settlement Agreement *itself* proposed to divide such relief within the Class, allowing some members access to a Second Blue Bid, while denying that same relief to others, depending on their individual characteristics and whether they opt out of the Damages Class. Clearly, access to multiple Blue Bids is not an all-or-nothing proposition within the Class.

Because access to multiple Blue Bids constitutes divisible injunctive relief, a class member must have the right to opt out and pursue that relief from the go-forward system through individual litigation. Yet that right would be illusory if the Court approves a mandatory (b)(2) class that releases (or otherwise forecloses) the right to challenge the post-Settlement rules that limit opt outs to a single Blue Bid. Under those circumstances, opt outs would simply lose their right to a Second Blue Bid under the Settlement Agreement, without preserving their right to litigate for multiple Blue Bids. That would not satisfy Rule 23(b)(3) or the important due process interests requiring the right to opt out of a divisible-relief class.[40]

In its current form, the Settlement Agreement does not distinguish between divisible and indivisible injunctive relief for any purpose. Members of the mandatory 23(b)(2) class would release *all* claims for injunctive relief of any sort. Accordingly, the Court should—as it was

---

[39] Hearing Transcript, Day 1, at I-24.

[40] In a suit for divisible relief, the "absence of notice and opt out violates due process." *Wal-Mart*, 564 U.S. at 363.

inclined at the hearing—condition any approval upon superseding language that expressly preserves an opt out's right to seek individualized injunctive relief under the antitrust laws (or otherwise) to gain access to multiple Blue Bids. The Court should include such language, not only in any final order of approval, but also in the proposed supplemental notice informing members of the Self-Insured Subclass of their opt-out rights.

Furthermore, the Parties' post-hearing briefs confirm that the Court should revise the draft language it suggested at the fairness hearing.[41] There is already a fundamental disagreement about what right that language actually preserves—a disagreement that critically affects the value of opting out. The Blues claim that, even with the Court's suggested language, the Settlement Agreement precludes an opt out from seeking additional Blue Bids—solely for itself—by challenging the enforceability of the ESAs or other rules restricting them to a single bid. Instead, they say, each (b)(2) member "has *individually* released *any* claim for injunctive relief that service areas or other Blue policies are illegal or unenforceable."[42]

Yet it is the ESAs that supposedly foreclose an employer's access to multiple Blue Bids,[43] and if an opt out could not challenge the enforcement of the ESAs (as against that opt

---

[41] The Court tentatively proposed:

> A Rule 23(b)(3) opt out reserves the right to pursue divisible relief including monetary relief and divisible injunctive relief. Divisible injunctive relief may include the right to pursue in litigation a Second Blue Bid. The parties acknowledge that, based on a claimant's individual business and the facts and circumstances of the claims, a Rule 23(b)(3) opt out may pursue divisible injunctive relief that includes possible additional Blue Bids. Whether such a remedy is merited will depend on the circumstances surrounding the individual claimant's claim. However, the relief pursued by a Rule 23(b)(3) opt out may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the court.

[42] Defendants' Post-Hearing Response, Dkt. 2869, at 17 (emphasis added).

[43] *See, e.g.*, Hearing Transcript, Day 1, at I-97 (counsel for the Blues: "Well, but if their argument is there should be no restriction on any Blue's ability to give a bid to me, service areas

out), then it could not win even a second bid, let alone a third or fourth. The Blues' position, therefore, is flatly inconsistent with the concept the Court articulated at the hearing: "Now, again, you [an opt out] can go and litigate *whether ESAs are illegal* in your individual case and you can seek individualized relief if a court determines that they are."[44] As the Court advised the objectors, "you can … opt out, and that gives you the full right to pursue not just a second Blue bid but a third or fourth or all of the Blue bids in litigation."[45]

The Subscribers' brief heightens the need for clarity. Although not free from ambiguity, their brief appears to support the meaningful opt-out right that the Court described at the hearing, rather than the Blues' position. The Court should resolve this disagreement now, before issuing supplemental notice, so that class members weighing whether to opt out will know whether doing so would preserve their right to seek additional Blue Bids as individualized relief under antitrust law. Class members cannot be expected to know the answer to that question when even the Settlement proponents do not agree upon it.

## B.   Home Depot's proposed language.

If the Court does not accept Home Depot's broader objection to the release of any future claims, Home Depot respectfully submits that the Court should condition any Settlement approval upon the following language, which modifies the draft suggested by the Court during the hearing to address the already-manifest, material dispute over its meaning.  This language should appear both in any supplemental notice and in any order of final approval:

---

impose that restriction right now."), I-120 (counsel for the Blues: "[S]ervice areas don't allow plans to compete with each through bids.").

[44] Hearing Transcript, Day 2, at I-113 (emphasis added).

[45] Hearing Transcript, Day 1, at I-92.

Notwithstanding any provision of the Settlement Agreement, including ¶ 62,[46] an opt out reserves and possesses the right to pursue divisible relief, including monetary relief and divisible injunctive relief, on any legal or factual basis. Divisible injunctive relief includes the right to pursue access—solely for that opt out—to more than one Blue Bid. Whether such a remedy is merited will depend on the circumstances surrounding the individual opt out's claim. However, the injunctive relief pursued by an opt out may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the Court.[47] For example, an opt out may not seek to enjoin enforcement of the ESAs against other entities.

C.    **Superseding language is necessary because the current Settlement Agreement would extinguish an opt out's right to seek even *divisible* injunctive relief, including multiple Blue Bids.**

As the Court has indicated, the Second Blue Bid afforded to some class members under Paragraph 15 of the Settlement Agreement must be re-classified as 23(b)(3) relief, based upon *Wal-Mart*'s distinction between divisible and indivisible injunctive relief. But those categories appear nowhere in the Settlement Agreement, which distinguishes only between *damages* and *injunctive* relief and provides only for a *Damages* Class and an *Injunctive Relief* Class.[48] The Settlement Agreement treats the Second Blue Bid as part of the "Class Injunctive Relief," along with all other non-monetary relief.[49] And it provides that an opt out releases *all* claims for injunctive relief: "Persons or entities in the Injunctive Relief Class but not the Damages Class, release only *claims for equitable or injunctive relief.*"[50]

---

[46] Paragraph 62 provides: "In the event of a conflict between the terms of this Settlement Agreement, the *In Camera* Supplement, any escrow agreement, or any other document arising out of this Settlement Agreement, the terms of the Settlement Agreement, including the Appendices hereto, shall control."

[47] Home Depot included this sentence to reflect the Court's stated view and the Court's proposed language. Respectfully, however, Home Depot does not agree that the permissibility of future injunctive relief turns on whether it "infringes" on indivisible injunctive relief approved in the Settlement and does not waive any objection to that standard.

[48] *See, e.g.*, Settlement Agreement, Dkt. 2610-2, ¶ 1(l).

[49] *Id.* ¶ 15.

[50] *Id.* ¶ 32 (emphasis added).

17

Thus, under the current Agreement, an opt out would release *all* injunctive relief claims, by virtue of its mandatory membership in the 23(b)(2) class. That would be flatly inconsistent with treating access to multiple Blue Bids as 23(b)(3) relief, with its attendant—and mandatory—right of opt out.  It is certainly true, as the Parties note, that the Settlement Agreement proposed to provide the Second Blue Bid relief to only some class members and not to others (including any otherwise qualifying class member who opted out of the (b)(3) class). But the fact that the Second Blue Bid relief was divisible (and in fact divided) was not reflected in the terms of the *release*, which does not distinguish between divisible and indivisible injunctive relief.

This conclusion is not surprising. After all, reclassifying the Second Blue Bid relief was an effort to avoid a fatal flaw in the Settlement Agreement—it improperly treated divisible and indivisible injunctive relief the same for purposes of release, opt-out, and class definitions. That flaw persists because, rather than negotiating agreed-upon modifications to the Agreement to fix this problem, the Parties attempt to rely entirely upon the addition of superseding language in the Court's approval order. Yet they already interpret the Court's draft language differently from each other and, in the case of the Blues, in conflict with the Court's explanation at the approval hearing.

Notwithstanding the straightforward language of the Settlement Agreement, the Blues now say that that Agreement "does not require opt-outs from the (b)(3) class to release claims for divisible injunctive relief."[51] The Subscribers are more realistic; they concede that "[r]ead in isolation, these provisions could be interpreted to require class members who opt out of the (b)(3) Self-Funded Sub-Class to release even claims for individualized injunctive relief,

_____

[51] Defendants' Post-Hearing Brief, Dkt. 2869, at 15.

including claims for a second Blue bid."[52] They describe that as an "ambiguity."[53] But there isn't any ambiguity in those provisions of the Agreement; the only "ambiguity" is introduced by reclassifying the Second Blue Bid relief as divisible relief (without modifying the terms of the Settlement Agreement, including the release).[54]

Ultimately, both Parties rely on the idea that the release is not overbroad because it is "explicitly limited to the 'extent permitted by law.'"[55] In other words, they say no one should worry that the Settlement Agreement violates *Wal-Mart* because that violation is so obvious that it will be sorted out later. Though the Blues are more circumspect, the Subscribers urge that limiting the (b)(2) class release to *indivisible* injunctive relief is "effectively mandated by *Wal-Mart's* holding" and that the release itself "can lawfully bar only those claims that challenge conduct that is capable of being enjoined only as to all of the class members or as to none of them."[56]

Home Depot agrees that the release as written is unlawful, but disagrees that the "extent permitted by law" clause solves the problem. That clause isn't intended to narrow the scope of enforcement, but to broaden it. The full sentence states: "The Parties intend that the releases in this Agreement *be interpreted and enforced broadly **and*** to the fullest extent permitted by

---

[52] Subscribers' Post-Hearing Brief, Dkt. 2868, at 14.

[53] *Id.*

[54] To be sure, as Home Depot noted previously, the Parties introduced ambiguity on this point at the preliminary approval hearing and in *other* Settlement documents. *See* Home Depot's Objections, Ex. 5 to Motion for Final Approval, Dkt. 2812-20, at 7–9. But again, that only highlighted the problem with the governing—and unambiguous—Settlement Agreement.

[55] Defendants' Post-Hearing Brief, Dkt. 2869, at 15.

[56] Subscribers' Post-Hearing Brief, Dkt. 2868, at 14–15.

law."[57] Read in context of the immediately-surrounding words,[58] this is a broadening clause, not a narrowing one.

Regardless, Plan A should not be to approve an overbroad release and count on the "extent permitted by law" proviso to fix things later. That is particularly true where it is already clear that the Blues materially disagree with others (including the objectors and, it seems, the Subscribers) on what release is "permitted by law." That disagreement shows in the Blues' unjustifiably narrow interpretation of divisible injunctive relief, as discussed further below. The scope of the release should be as clear as possible on this important issue *before* the Court issues supplemental notice and decides whether to grant final approval.

### D. The Court should clarify its suggested language to address the already apparent dispute over what rights an opt out would release.

Although the Court's proposed language limits an opt out's challenge only insofar as it "may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the court," there is already a fundamental disagreement about what that language would mean—a disagreement that would critically affect the value of opting out.

#### 1. The Blues contend that, even under the Court's draft language, opt outs would release the right to seek *any* form of injunctive relief by challenging the enforceability of the post-Settlement restrictions.

The Blues urge that, in reclassifying a Second Blue Bid as 23(b)(3) relief subject to opt out, "there is no change to the Settlement's … release."[59] Even more clearly, they write that, if

---

[57] Settlement Agreement, Dkt. 2610-2, ¶ 32 (emphasis added).

[58] *See Lighton Indus., Inc. v. Allied World Nat'l Assurance Co.*, 348 F. Supp. 3d 167, 188 (E.D.N.Y. 2018) (interpreting a contract under New York law) (noting that courts "interpret a word by the company it keeps (the doctrine of *noscitur a sociis*)"). The Settlement Agreement (¶ 56) selects New York law.

[59] Subscribers' Post-Hearing Brief, Dkt. 2868, at 19.

the Settlement Agreement is approved, "each member of the (b)(2) class has individually released *any* claim for injunctive relief that service areas or other Blue policies are illegal or unenforceable."[60] In other words, the Blues contend that, as to injunctive relief, all (b)(2) class members would release any right to challenge the legality or enforceability of the ESAs or other restrictions that prohibit their access to multiple Blue Bids.

That would defeat the Court's stated intent that an opt out "can go and litigate whether ESAs are illegal in your individual case and you can seek individualized relief if a court determines that they are."[61] *The right to opt out to pursue a released claim is no right at all.* The Supreme Court has rejected far more limited restrictions as unduly burdening an opt out's right to exclude itself from a class and pursue individual relief.[62]

To be sure, the Blues now say that "[t]he Settlement Agreement does not require opt-outs from the (b)(3) class to release claims for divisible injunctive relief."[63] This is mere sleight of hand. The trick is that the Blues interpret *any* antitrust challenge to the enforceability of ESAs or other post-Settlement restraints as *indivisible*, even if the only *relief* an opt out seeks is access, solely for itself, to additional bids to avoid threatened injury to that opt out.

In so arguing, the Blues appear to reason that the logical implications of even one opt out winning access to additional Blue Bids under an antitrust theory is that the ESAs (and other post-

---

[60] *Id.* at 17 (emphasis added).

[61] Hearing Transcript, Day 2, at II-113.

[62] *See, e.g., Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 847 n.23 (1999) ("It is no answer in this case that the settlement agreement provided for a limited, back-end 'opt out' in the form of a right on the part of class members eventually to take their case to court if dissatisfied with the amount provided by the trust. The 'opt out' in this case requires claimants to exhaust a variety of alternative dispute mechanisms, to bring suit against the trust, and not against Fibreboard, and it limits damages to $500,000, to be paid out in installments over 5 to 10 years ….").

[63] Defendants' Post-Hearing Brief, Dkt. 2869, at 15.

Settlement restrictions) must be unlawful for all purposes as to all subscribers. But that cannot be enough to make *relief* indivisible; after all, that would also be the logical implication if an opt out wins individual damages based on an antitrust challenge to the ESAs. Yet no one contends that the Settlement could release an opt out's damages claims.

The problem is that the Blues wrongly focus on the *liability* elements of the opt out's claim, rather than the *relief* it seeks. Yet, as this Court explained, the scope of the requested relief—not the underlying legal theory—is the crucial difference between a permissible opt out claim and an impermissible intrusion upon the 23(b)(2) relief.[64]

Relatedly, the Blues speculate that a future court allowing even one self-funded employer access to multiple Blue Bids would extend that relief to prohibit any enforcement of the ESAs as against others. But injunctive relief is divisible or indivisible based on what a court *can* do, not

---

[64] For example, in colloquy with counsel for the largest objector group, the Court focused on the scope of relief, advising that an opt out could pursue any relief "[s]pecific to your client," but not on behalf of anyone else:

> [MR. SLATER] … And my question is am I completely free in my injunctive relief lawsuit that I'm allowed to bring to pursue any relief that is allowable at law?
>
> THE COURT: Specific to your client.
>
> MR. SLATER: No.
>
> THE COURT: No. I'm answering your question.
>
> MR. SLATER: Oh.
>
> THE COURT: Specific to your client.
>
> MR. SLATER: So I would be --
>
> THE COURT: You would not be able to go back and represent essentially what would be -- and again, this is all hypothetical. If the settlement is approved and if the (b)(2) injunctive relief class is approved and that class is certified, you would not be able to go back and relitigate on behalf of that entire class, other people who you don't represent.

Hearing Transcript, Day 1, at I-93–94.

what someone speculates that a court *might* do, *i.e.*, "whether the conduct … *can* be enjoined or declared unlawful only as to all of the class members or as to none of them."[65]

Certainly, a court can grant only the individual injunctive relief requested by the moving party, nothing more. If an opt out seeks to enjoin enforcement of the ESAs only to the degree necessary to allow it access to additional Blue Bids and avoid injury, a court can grant that relief as requested. Translated into *Wal-Mart* terms, the "conduct" challenged in such an opt out suit is denying *that opt out* access to enough bids to confer the benefits of competition, and that conduct "can be enjoined … only as to" the opt out bringing suit.[66] Indeed, the Settlement Agreement itself establishes that allowing some large national employers additional Blue Bids does not somehow require extending that right to others.[67]

Finally, it is no answer to suggest that an opt out could somehow seek additional Blue Bids under the Settlement Agreement itself, rather than by attacking the enforceability of the ESAs and other restrictions under antitrust law. For example, the Subscribers venture that "[a]n ASO with a significant presence in more than one ESA that opts out of the Self-Funded Sub-Class … could argue based upon the terms of the Settlement Agreement itself that it has an individualized basis for asserting a claim that it is entitled to request more than one Blue bid in order to prevent economic injury to itself."[68] But the right to request a Second Blue Bid under the

---

[65] *Wal-Mart*, 564 U.S. at 360 (emphasis added).

[66] *Id.* Such a tailored request for individual injunctive relief would not require an opt out to seek declaratory relief at all, to the extent that is a basis of the Blues' concern.

[67] As for the adage that a single injunction is as good as a hundred, it depends upon the scope of relief. A single injunction tailored to granting relief solely to an individual opt out does not grant relief to others.

[68] Subscribers' Post-Hearing Brief, Dkt. 2868, at 17.

Settlement Agreement is purely a creature of contract.[69] And that contract right is now to be part of the 23(b)(3) relief, subject to opt out. An opt out has no contract right to divisible injunctive relief provided by the Settlement, any more than it has a contract right to receive a share of the monetary relief provided by the Settlement. And being otherwise similarly situated to an ASO that didn't opt out (and thus receives access to a Second Bid as a matter of contract) would not entitle an opt out to anything under the Settlement Agreement.

In sum, there is no meaningful right of opt out unless the opt out can avail itself of antitrust law to attack the enforceability of any rules that otherwise preclude its access to more than one Blue Bid.

> **2. The Subscribers appear to acknowledge that opt outs may challenge the enforceability of the post-Settlement restrictions to seek individual access to multiple Blue Bids.**

The Subscribers write that "[a] class member who opts out of the Self-Funded Sub-Class retains the right to pursue divisible relief including monetary relief and divisible injunctive relief on *any* legal or factual basis. The release provided by the members of the (b)(2) class cannot and does not bar a claim for a [Second Blue Bid] and/or similar individualized injunctive relief."[70] They confirm that an opt out "could assert *any* legal claim that would potentially entitle it to individualized relief."[71]

---

[69] *Cf., e.g.*, *TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*, 959 F.3d 1318, 1329 (11th Cir. 2020) ("[W]e interpret the settlement agreement according to traditional principles of contract law.").

[70] Subscribers' Post-Hearing Brief, Dkt. 2868, at 15–16 (emphasis added).

[71] *Id.* at 17 (emphasis added). Even the Subscribers' brief is not free from ambiguity. In a footnote, they write that "[a] claim seeking an injunction prohibiting the operation of the ESAs, … would … be barred by the (b)(2) release.'" *Id.* at 17 n.16 (citing *Wal-Mart*). If the Subscribers mean that an opt out could not sue to enjoin the operation of the ESAs for all purposes as to all employers, that is consistent with the Court's commentary at the fairness hearing and with Home Depot's proposed language. But if an opt out could not seek individual relief from the ESAs

The Subscribers' language seems to confirm that an opt out may attack the enforceability of the ESAs under antitrust law, so long as it sought only individual damages and individual access to additional Blue Bids. Yet that is fundamentally inconsistent with the Blues' insistence that, upon Settlement approval, a (b)(2) class member "has *individually* released *any* claim for injunctive relief that service areas or other Blue policies are illegal or unenforceable."[72] That dispute should not remain unresolved.  And if it cannot be resolved now without killing the deal, that means that there is no deal, at least not one consistent with *Wal-Mart's* distinction of divisible and indivisible relief.

> ### 3.      The Court should clarify now whether opt outs would release the right to seek individual access to multiple Blue Bids by challenging the enforceability of the post-Settlement restrictions.

Under Circuit law, "the notice required by subdivision (c)(2) must contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment."[73]

Here, the Parties propose to send a supplemental notice to "explain that the [Second Blue Bid] relief is deemed individualized and divisible injunctive relief, and that opting out to make an individualized claim seeking such relief would not be barred by the (b)(2) class release unless the relief sought would undermine or infringe the (b)(2) relief or release."[74] Notably, the

---

solely to secure its individual access to multiple bids, then the opt-out right would be swallowed by the (b)(2) release.

[72] Defendants' Post-Hearing Brief, Dkt. 2869,  at 17 (emphasis added).

[73] *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977); *Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1287 (11th Cir. 2007) (confirming and applying the same principle).

[74] Subscribers' Post-Hearing Brief, Dkt. 2868, at 19.

Subscribers add "or release"—which was not in the Court's formulation and not what the Court described at the hearing.[75] A recipient of that notice should know whether "opting out to make an individualized claim seeking such relief" preserves its right to challenge ESAs under antitrust law for the limited purpose of obtaining, solely for itself, additional Blue Bids. That information is critical to "making an informed, intelligent decision of whether to opt out or remain a member of the class" so should be conveyed as clearly as possible in the supplemental notice.[76] On top of this, the release provision is enforceable in contempt, which is another good reason why it should be clear now.[77]

The Blues urge that the Court cannot now resolve whether a member of the mandatory (b)(2) class releases the right to seek additional Blue Bids for itself by challenging the enforceability of the ESAs and other post-Settlement restrictions under antitrust law. They claim that resolving that issue would require speculation about the particulars of some future lawsuit.

---

[75] *See* Hearing Transcript, Day II, at II-23 ("You haven't released a claim,"), II-23 ("you've not released the claim"), II-23 ("it's not a matter of release"), II-24 ("It's not a release."), II-23–24 ("It's a matter of whether you're precluded, for example, under the All Writs Act, from pursuing that particular remedy. It's not waiving the claim. It's not releasing a claim. It's whether you can pursue that particular remedy."), II-25 ("it's not a waiver of a claim"). Notably, the Parties appeared to agree with this position at the hearing. *Id.* at II-24. And elsewhere, the Court explained, for example, that opt outs retained the right post-Settlement to "litigate whether ESAs are illegal" and "seek individualized relief if a court determines that they are." *Id.* at II-113; *see also* Hearing Trascript, Day I, at I-93 ("you've not released your claim that, under the new structural relief, you should be entitled to a second Blue bid or that you should have the right to pursue other Blue bids.").

[76] *In re Nissan*, 552 F.2d at 1105; *Adams*, 493 F.3d at 1287.

[77] *Int'l Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) ("The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid."); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("[B]asic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.").

But that contradicts their claim that the Settlement Agreement, as written and properly interpreted, means that each (b)(2) member "has individually released *any* claim for injunctive relief that service areas or other Blue policies are illegal or unenforceable."[78] Not *some* claims, but "any" claim. That is purely a matter of the release language, not the nuances of some future lawsuit.

To be clear, Home Depot does not contend that the Court need specify now whether there is some maximum number of Blue Bids an individual opt out could receive. Nor is there any need to speculate whether any given opt out will be able to prove that it needs any particular number of additional Blue Bids to avoid future economic injury. The question now is simply whether—as the Blues contend—the (b)(2) release forces an opt out to surrender any right to seek additional Blue Bids solely for itself on the same antitrust theory that all agree permits it to seek individual damages. That can easily be made clear now, and the language Home Depot proposes does so.[79]

---

[78] Defendants' Post-Hearing Brief, Dkt. 2869, at 17 (emphasis added).

[79] By way of reminder, Home Depot proposes the following language:

> Notwithstanding any provision of the Settlement Agreement, including ¶ 62, an opt out reserves and possesses the right to pursue divisible relief, including monetary relief and divisible injunctive relief, on any legal or factual basis. Divisible injunctive relief includes the right to pursue access—solely for that opt out—to more than one Blue Bid. Whether such a remedy is merited will depend on the circumstances surrounding the individual opt out's claim. However, the injunctive relief pursued by an opt out may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the Court. For example, an opt out may not seek to enjoin enforcement of the ESAs against other entities.

E.    **The Court should incorporate Home Depot's proposed language into any supplemental notice and order of final approval.**

Home Depot's proposed language accomplishes the goals the Court articulated at the fairness hearing and is most consistent with treating access to a Second Blue Bid as divisible relief. That language would ensure that an opt out does not release its right to pursue multiple Blue Bids (solely for itself) based on any theory, including the theory that the rules prohibiting multiple Blue Bids violate antitrust law. In doing so, it would resolve the dispute over that point that is already evident from the Parties' papers. And Home Depot's proposed language would advise recipients of the supplemental notice as clearly as possible about the benefits and consequences of opting out.

Accordingly, Home Depot respectfully submits that, if the Court overrules Home Depot's objection to the release of *any* future antitrust claims, the Court should incorporate its proposed language into any supplemental notice and final approval order.

III.    **The Court cannot approve the Settlement Agreement because it purports to release even an opt out's rights to enforce the antitrust laws against post-Settlement conduct.**

As written, the mandatory (b)(2) release forces all class members to release their rights to seek injunctive relief under the antitrust laws if they face economic injury from post-Settlement conduct. And though there may have been some confusion at the fairness hearing about the duration of this immunity,[80] this release is not limited to the five-year monitoring period; it continues into perpetuity.[81] That violates public policy.

---

[80] *See* Hearing Transcript, Day 1, at I-195.

[81] *See* Settlement Agreement Dkt. 2610-2, ¶ 32. The Monitoring Committee's sole function is to decide whether any *new* rules adopted by the Blues in the five years following Settlement are consistent with the injunctive relief portions of the Settlement. *Id.* ¶¶ 20(a)(ii) & (iii). If so, then the release expands to cover restrictions not currently in effect. If not, the only implication is that the *new* rules are not subject to the release. *Id.* ¶ 20(a)(iv). Under no

### A.     Substantive antitrust law prohibits the release of claims based on future conduct in a class action settlement.

#### 1.     Supreme Court and Eleventh Circuit precedent bars releases of claims based on future conduct in antitrust cases.

As Home Depot outlined in its original objection,[82] substantive antitrust law bars a release of future conduct. The Supreme Court has warned that, if an agreement operates "as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."[83] And as the former Fifth Circuit held in *Redel's Inc. v. General Electric*:

> The prospective application of a general release to bar private antitrust actions arising from subsequent violations is clearly against public policy. A right conferred on a private party by federal statute, but granted in the public interest to effectuate legislative policy, may not be released if the legislative policy would be contravened thereby. Releases may not be executed which absolve a party from liability for future violations of our antitrust laws. … Therefore, as a matter of law, the general release in the case sub judice is ineffective to bar claims arising subsequent to … the date of its execution.[84]

In so holding, the former Fifth Circuit approvingly cited the reasoning of a sister circuit: "Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy. This is because the effect of such a release could be to permit a restraint of trade to be

---

circumstances can the Committee prevent the Blues from doing anything. *See generally id.* ¶ 20. In particular, the Committee can do nothing about the continued enforcement of rules that originated pre-Settlement, but continue to cause new injuries thereafter, such as the ESAs. *Id.*

[82] *See* Home Depot's Objection, Dkt. 2812-20, at 13–17.

[83] *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985).

[84] *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974).

engaged in, which would have impact, *not simply between the parties, but upon the public as well.*"[85]

It makes sense that antitrust law would prohibit such releases: after all, antitrust's "*raison d'être* is to prohibit forms of private ordering that have serious negative effects for competition and consumers.*"*[86] The Supreme Court has repeatedly emphasized that "[t]he antitrust laws represent a 'fundamental national economic policy'"[87] and that "private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws."[88]

Those strong national interests also explain why the bar on future-conduct releases outweighs the otherwise strong preference in favor of settling cases. *Redel's* addresses this point head-on:

> There are two policies which must be accommodated. The first requires the greatest respect for private enforcement as the hallmark of the federal antitrust regulatory system. The second policy requires us to respect the amicable settlement and release of antitrust claims by the parties themselves. Where these policies are brought into conflict, *the first must prevail.*[89]

The Eleventh Circuit later expressed the same principle, noting that "[t]hough settlements in accord and satisfaction are favored in law, they may not be sanctioned and enforced when they contravene and tend to nullify the letter and spirit of an Act of Congress."[90]

---

[85] *Id.* (quoting *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955)) (emphasis added).

[86] *See* James Grimmelmann, *Future Conduct and the Limits of Class-Action Settlements*, 91 N.C. L. Rev. 387, 410 (2013).

[87] *Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross of Kansas City*, 452 U.S. 378, 388 (1981) (citations omitted).

[88] *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 336 (1971) (quoting *Minnesota Mining & Mfg. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 318 (1965)).

[89] 498 F.2d at 100 (emphasis added).

[90] *In re Smith*, 926 F.2d 1027, 1029 (11th Cir. 1991) (quoting *Atlantic Co. v. Broughton*, 146 F.2d 480, 482 (5th Cir.1944)).

### 2.    The Blues cannot distinguish *Redel's*.

At the hearing, the Blues endeavored to distinguish *Redel*'s because it concerned a release in a franchise renewal agreement, rather than a release in a settlement.[91] But the vehicle for the release has no logical bearing on the reasoning in that case. The *Redel's* release could not immunize post-release conduct from antitrust challenge because that would frustrate the national economic policy of private antitrust enforcement, to the possible detriment of nonparties.[92] That rationale remains true whether such a release appears in a franchise agreement, a settlement agreement, or any other sort of agreement. Indeed, as recounted above, *Redel's* specifically addressed the priority of the legislative policy barring releases of antitrust claims based on future conduct over the judicial policy favoring "settlement."[93] That word choice ("settlement") underscores that *Redel's* did not turn on any distinction between a release in a franchise renewal and a release in a settlement agreement.

The Blues have also tried to portray *Redel's* as a case about the *generality* of the release, rather than its application to post-release conduct.[94] But, for two reasons, that can't be right. First, despite some criticism in dicta, the *Redel's* court *enforced* the general release to bar antitrust claims arising on or before its effective date[95]; it held the release invalid only insofar as it purported "to bar claims arising subsequent to … the date of execution."[96] Second, the court based that outcome on the overriding public policy interest in the prospective enforcement of

---

[91] *See* Hearing Transcript, Day 2, at II-9–10.

[92] 498 F.2d at 99 (quoted above).

[93] *Id.* at 100 (quoted above)

[94] *See* Defendants' Post-Hearing Response, Dkt. 2869, at 13–14; Hearing Transcript, Day 2, at II-10.

[95] 498 F.2d at 99–100 (enforcing release retroactively)

[96] *Id.* at 99.

antitrust law.[97] Specificity would not have solved that problem; the same reasoning would have invalidated the future release even if it had specifically singled out antitrust claims.

Finally, the Blues endeavor to distinguish between "new, different" future conduct and future conduct that is "a continuation of pre-release conduct."[98] They claim *Redel's* bars only the former. Yet *Redel's* says nothing of the sort. Quite to the contrary, that lawsuit alleged conduct (price discrimination) that continued from 1965 through 1971.[99] The *Redel's* release was effective March 1969—partway through the allegedly actionable conduct. The release was ineffective to bar Redel's claims for conduct after March 1969 and effective to bar its claims based on conduct before that date.[100] So *Redel's* is squarely inconsistent with the Blues' argument that a release of future antitrust claims is fine so long as those claims are based on post-settlement conduct that is like pre-settlement conduct. If that were right, *Redel's* would have gone the other way.

Nor would the Blues' distinction make sense, given the underlying public policy interest. There is no reason to believe that a continuation of prior anticompetitive conduct would be any less injurious to the public (particularly carried into the indefinite and unforeseeable future) than some new anticompetitive restraint. Indeed, antitrust law treats every transaction consummated under an unlawful restraint as a new violation and a new cause of action.[101] So, for example, post-Settlement enforcement of the ESAs to restrict an employer's access to multiple Blue Bids

---

[97] *Id.* at 99–100.

[98] Defendants' Post-Hearing Response, Dkt. 2869, at 12 (emphasis omitted).

[99] 498 F.2d at 98.

[100] *Id.* at 99–100.

[101] *See, e.g., Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999), *amended in part,* 211 F.3d 1224 (11th Cir. 2000).

is a new violation, giving rise to a new cause of action and a new injury to the economy, even if the Blues had engaged in such conduct before.

To be sure, there are *other* doctrines that protect class members against overbroad releases of claims that are not sufficiently related to pre-settlement conduct, such as the requirement that "[a]ny released claims not presented directly in the complaint … must be 'based on the identical factual predicate as that underlying the claims in the settled class action.'"[102] But that doctrine is not driven by and does not vindicate the antitrust policy recognized in *Redel's*. The policy recognized in *Redel's* is not about protecting class members from the unwitting release of unrelated claims, but about protecting the entire public from the broader economic effects of an antitrust violation.[103] As scholarly commentary explains, those are *different* interests, and the public policy favoring private enforcement of antitrust law should preclude *any* release of future conduct from antitrust scrutiny, whether or not it is similar to pre-settlement conduct at issue in the litigation.[104] In short, in antitrust cases, the principle is clear: releases of future conduct are void as against public policy.

---

[102] *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011) (citations omitted).

[103] 498 F.2d at 99 (quoting *Fox Midwest Theatres*, 221 F.2d at 180).

[104] For example, Professor Grimmelmann analyzes the court's refusal to approve a release of future conduct in a proposed antitrust class settlement in *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 578 (E.D. Pa. 2001). While the release there had a "parity of preclusion" problem (it released conduct that was broader than what was at issue in the litigation) it had an *independently fatal* future release problem. *See* Grimmelmann, *supra* note 86, at 471–73. The antitrust restriction would have been sufficient to reject the deal. Though the "flat rule [in *Schwartz*] may sound too sweeping," "recall that *Schwartz* was an antitrust case . . . . Thus, the settlement could not prospectively bless any form of bundling," including the one at issue in the litigation. *Id.* at 472–73.

**B.      The substantive antitrust limitation on releases of future conduct applies to class action settlements.**

At the fairness hearing, the Court doubted whether the principle expressed in *Redel's* applies to class action settlements. To be sure, no case in this Circuit appears to have relied on *Redel's* in a class action.[105] But relatively few cases address a release of future conduct in any class action, much less an *antitrust* class action.[106] That is perhaps why the Blues cite not a single case approving a no-opt out antitrust class settlement that released future conduct. Every such case[107] they cite featured language expressly limiting the release to conduct occurring on or before the effective date,[108] or an opt-out right,[109] or both. Yet the proposed (b)(2) release here features neither of those protections.

For several reasons, the substantive antitrust bar against releases of future conduct must apply with full effect to class action settlements, just as it applies to individual settlements. First,

---

[105] The only district court in this Circuit to have meaningfully considered the *Redel's* rule determined straightforwardly that a prospective release was barred. *See Demsheck v. Ginn Dev. Co., LLC*, No. 3:09-CV-00335-J-25TEM, 2009 WL 10663051, at *2–3 (M.D. Fla., 2009) (citing *Redel's*) ("Since the releases in the present case have prospective application, the Court finds them to be invalid as contrary to public policy."). But that was not a class-action case.

[106] Grimmelmann, *supra* note 86, at 394–95 (listing cases).

[107] Some cases do not present this situation at all, either because they do not involve a release, *see Robertson*, 556 F.2d at 686; *Grunin*, 513 F.2d 114, or they do not involve a class action, *see Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07CV8455, 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008); *Xerox Corp. v. Media Scis., Inc.*, 609 F. Supp. 2d 319, 326 (S.D.N.Y. 2009).

[108] *See In re Managed Care*, 756 F.3d 1222, 1226 (11th Cir. 2014) (discussed below); *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 814, 817 (11th Cir. 2010) (settlement released claims "arising on or before the Effective Date").

[109] *See In re Managed Care*, 756 F.3d at 1227 (settlement approved after deadline for "opting out of the class"); *Thomas*, 594 F.3d at 817 ("all class members were given an opportunity to object to and opt out of the settlement agreement"); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2019 WL 6875472, at *3 (E.D.N.Y. Dec. 16, 2019) (approving 23(b)(3) settlement).

that conclusion flows from the sources of the governing rules. As an act of Congress, the "Clayton Act creates a private *right* of action" for redress against violations of antitrust law.[110] And, together with the Sherman Act, that legislation establishes private antitrust enforcement as "one of the surest weapons"[111] to vindicate our "'fundamental national economic policy.'"[112]

In contrast to these Acts of Congress that grant *substantive* rights and create a policy favoring private antitrust enforcement, Rule 23 is merely a *procedural* mechanism. And the Rules Enabling Act explicitly "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'"[113] Rule 23 supplies a procedure for bringing and settling large numbers of individual claims, not the authority to do something that would contravene a substantive public policy in an individual lawsuit. That is why, as one of the few academic analyses to address this issue concluded, "[f]uture-conduct releases for antitrust claims are impermissible in settlements, *regardless of whether they are class actions or not*."[114]

Second, the public policy implications of immunizing future conduct would be *greater* in class action settlements than in individual cases. In *Redel's*, the prospective release violated public policy even though it would have eliminated only one potential plaintiff (Redel's itself) that could sue GE. Foreclosing antitrust enforcement by a mandatory class of every possible private plaintiff would be an even more egregious intrusion upon that policy. Given the broad

---

[110] *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1298 (11th Cir. 2010) (emphasis added); *see also* 15 U.S.C. § 26 (private right to seek injunction).

[111] *Zenith*, 401 U.S. at 336.

[112] *Nat'l Gerimedical*, 452 U.S. at 388 (citations omitted).

[113] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (citing 28 U.S.C. § 2072(b)); *Ortiz*, 527 U.S. at 845).

[114] Grimmelmann, *supra* note 86, at 472–73 (emphasis added).

(b)(2) class definition, the release disarms every existing entity in the country that could bring a private antitrust action based on the Blues' post-Settlement conduct.

Moreover, unlike the voluntary surrender of rights in *Redel's*, the no-opt-out Settlement proposed here would force this future, perpetual release on numerous potential enforcers against their will. That cannot be less of an intrusion upon national public policy than the two-party, voluntarily-entered agreement in *Redel's*. If, as this Circuit has held, a single private party cannot voluntarily surrender its right to enforce the antitrust laws against post-settlement conduct, then neither can an entire class of potential plaintiffs—particularly in an involuntary 23(b)(2) settlement.

Finally, Rule 23(e)'s settlement approval procedure does not constitute the type of government oversight that could render a future antitrust release permissible. A court reviewing a settlement under that rule determines merely whether the proposed terms fall within the range of reasonable compromise, given mutual litigation risks, costs, delays, and other factors collateral to the ultimate merits. The reviewing court makes no merits determination that the conduct at issue does not violate the antitrust laws.[115] Moreover, the approving court's only continuing role is to enforce the settlement's terms, not to guard against future harm caused by post-settlement conduct. Private enforcement thus remains critical if post-settlement practices later prove injurious to competition.

---

[115] *See* Part I, above.

### C.     The Blues' authorities do not justify the proposed release of post-Settlement conduct.

The Blues rely primarily on two cases in an effort to defend their release of post-Settlement conduct: *In re Managed Care Litigation*[116] and *In re Payment Card*.[117] But neither case means what the Blues say, and neither salvages the release here.

### 1.     *In re Managed Care* involved a different kind of proceeding—enforcement of an already-approved settlement—and a release of future *claims* based on conduct occurring by its effective date.

The Blues wrongly lean on *In re Managed Care* to support their proposed distinction between "new, different" future conduct and future conduct that is "a continuation of pre-release conduct."[118]   As discussed above, *Redel's* involved a continuation of pre-release conduct. That case shows that the relevant question is whether the conduct on which a claim is based pre-dates the settlement (meaning it can be released) or post-dates the settlement (meaning it cannot be released).

In *Managed Care*, the defendant (Wellpoint) sought to enforce the release in its previously-approved class action settlement to extinguish a new lawsuit. But Wellpoint's settlement released only claims arising "'on or before the Effective Date.'"[119] So if "the acts giving rise to the complaint occurred ... after the effective date of the settlement agreement," the agreement would not release them; whereas, if they arose prior to the effective date of the

---

[116] 756 F.3d 1222, 1226 (11th Cir. 2014).

[117] No. 05-MD-1720, 2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019).

[118] Defendants' Post Hearing Brief, Dkt. 2869, at 12 (emphasis omitted).

[119] 756 F.3d 1226 (quoting Settlement Agreement § 13.1(a)).

agreement, they would be barred.[120] That is far narrower than the release proposed here, which would expressly release "claims that arise *after* the Effective Date."[121]

The release discussed above was the only one at issue in *Managed Care* because Wellpoint was the only defendant to the follow-on suit. There was another release recited in the opinion, but it was not at issue because it did not apply to Wellpoint (only to the non-party Blue Cross/Blue Shield Association).[122] And even the BCBSA release that was *not* at issue didn't immunize claims based on post-settlement *conduct*—it released claims "that might arise in the future" but only if they "arise from, or are based on, conduct on or before the Effective Date." Thus, the release at issue (and even the one not at issue) in *Managed Care* did not release claims based on post-settlement conduct, as the Blues propose here.

Furthermore, *Managed Care* involved enforcement of an already-approved settlement against subsequent litigation, not a settlement approval decision.[123] The opinion was not about whether a settlement could be properly approved in an antitrust case—the settlement had already been approved, and these plaintiffs had not opted out or, it seems, objected to the validity of the release during the settlement approval process. Instead, *Managed Care* simply considered

---

[120] *Id.* at 1235.

[121] Settlement Agreement, Dkt. 2610-2, at ¶ 1(uuu) (emphasis added).

[122] 756 F.3d at 1226 (quoting Settlement Agreement § 13.1(b), which the Court notes is "applicable only to claims against" BCBSA).

[123] Indeed, many of the cases cited by the Parties involved collateral enforcement proceedings, rather than approval decisions. *Shane v. Humana, Inc.*, No. 00-MD-1334, 2009 WL 7848518, at *1 (S.D. Fla. Nov. 9, 2009) (motion to enforce injunction); *Xerox Corp.* 609 F. Supp. 2d at 321 (motion for summary judgment on counterclaims in subsequent case); *Madison Square Garden,* 2008 WL 4547518, at *5 (motion to dismiss subsequent claim); *see also Lawlor,* 349 U.S. at 325 (motion to dismiss); *TVPX ARS, Inc.*, 959 F.3d at 1321 (motion to enjoin proceedings).

whether conduct at issue fell under the already-approved settlement's terms. Ultimately, it is a contract interpretation case, not a license to approve a release that would violate *Redel's*.

Finally, the settlement underlying *Managed Care* allowed opt out, yet the plaintiffs initiating the later action against Wellpoint had elected to remain in the settlement. It is one thing to say that a class member is bound in later litigation by a release that it did not challenge and that was approved in a case in which it declined to opt out. It is quite another to force a release of future conduct upon an entire class, with no right of opt out. The Blues cite no case doing that.

> **2.   The district court in *In re Payment Card* misread *Redel's*, and the (b)(2) release proposed here contains the same features that originally doomed such a release in that case.**

The Blues cite the district court's analysis of *Redel's* in *In re Payment Card Interchange*. That district court, like the Blues here, endeavored to distinguish *Redel's* based on the scope of the released claims, which included "'all claims, demands, contracts, and liabilities' without narrowing the scope to antitrust violations alleged or that could have been alleged or those based on continuing conduct."[124] But as explained above, *Redel's* did not turn on the breadth of the release; it turned on timing of the released conduct. *Redel's* enforced the release at issue as to pre-release conduct, but invalidated it as to post-release conduct. And the relevant conduct (price discrimination) started years before and continued after the release.[125] *Redel's* was squarely about continuing conduct.

---

[124] *In re Payment Card*, 2019 WL 6875472, at *26 (citing *Redel's*, 498 F.2d at 98-99).

[125] The timing issue was one of two grounds for the outcome, but the court addressed both with equal force. *Redel's*, 498 F.2d at 99 ("There are two answers, both of which conclusively deny prospective effect."). Indeed, the only district court in this Circuit to have meaningfully considered the *Redel's* rule determined straightforwardly that a prospective release was barred by way of timing. *See Demsheck*, 2009 WL 10663051, at *2–3.

Another problem with the Blues' reliance on *Payment Card* lies in that case's procedural posture. The Second Circuit rejected the first settlement,[126] noting that "[t]he (b)(2) class had no notice and no opportunity to opt out of this deal" and the settlement "preclude[d] new suits for similar conduct in the future."[127] On remand, the (b)(3) settlement proceeded without objection from the (b)(2) representatives only because "the Release Provision in the Superseding Settlement Agreement does not release 'injunctive relief claims.'"[128] And of course, the (b)(3) class members could opt out, rather than challenge the release. None of that is true here.

Finally, the Blues cannot defend the (b)(2) release under *Payment Card* because, as Home Depot argued in its written objection and again at the fairness hearing, this Settlement suffers from the same mismatch of interests and potential for trade-offs as the settlement rejected in that case.[129] The Second Circuit rejected the original *Payment Card* settlement because the interests of (b)(2) class members were not the same as the interests of (b)(3) class members, yet they were represented by the same class representatives and counsel.[130]

Here, a member of the (b)(2) class who opts out of the (b)(3) class does not share in either the monetary payments that the class receives or the Second Blue Bid that some members (including the *only* self-insured named plaintiff) will receive under the Settlement. The (b)(2) class member who opts out gets neither of those benefits (regardless of whether the Second Blue Bid is reclassified as (b)(3) relief). Yet the (b)(2) class members are represented by the *same*

---

[126] *See In re Payment II*, 827 F.3d 223, 238 (2d Cir. 2016).

[127] *Id.* at 240.

[128] *In re Payment III*, 330 F.R.D. 11, 45 n. 43 (E.D.N.Y. 2019).

[129] *See* Home Depot's Objection, Ex. 5 to Motion for Final Approval, Dkt. 2812-20, at 16–17, 37–38; Hearing Transcript, Day 1, at I-177–78.

[130] *In re Payment Card II*, 827 F.3d at 231–36.

representatives and the *same* counsel as the (b)(3) class members. Just as in *Payment Card*, the (b)(3) stakeholders in this case have the same inherent structural incentive to trade off injunctive relief for monetary compensation.[131] Just as in *Payment Card*, no one who was disinterested in the (b)(3) relief negotiated for the (b)(2) class. That constitutes inadequate representation, and it is fatal here, too.[132]

### D. The Blues' desire for perpetual protection of their post-Settlement restraints cannot override the public policy forbidding releases of future anticompetitive conduct.

The Blues urge that applying the principle recognized in *Redel's* would impermissibly impede settlements in (b)(2) class actions. Of course, that principle also impedes settlements of individual claims. *Redel's* expressly acknowledged that reality, holding that the public policy forbidding releases of future antitrust claims outweighs the resulting impediment to settlement. Moreover, *Redel's* does not mean that class actions can't settle; it simply means that they cannot settle in exchange for immunizing the defendant's future conduct from private antitrust enforcement. If a defendant's concern over the legality of its future conduct is so serious that this substantive limitation precludes a deal, then that may well be a case to be litigated, rather than settled. As one academic commentator expressed the point:

> [A] future-conduct settlement is never necessary in this sense. Litigation is always an option. The resulting judgment will define the defendant's rights and duties vis-à-vis the class, and it will therefore provide a roadmap for their future dealings. The outcomes available in litigation may not be socially optimal, but if they are not, it is the legislature's responsibility to fix the problem, not the courts'.

---

[131] In the case of self-insured, administrative-services-only employers, there is only one class representative and one set of lawyers.

[132] Like the Second Circuit, the Eleventh Circuit interprets "Rule 23(a)(4) to preclude class certification where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003).

The purpose of class certification is "to generate common answers apt to drive the resolution of the litigation," not social reform.[133]

Moreover, the Settlement before this Court presents a particularly dangerous case in which to eschew *Redel's*. The Blues ask the Court to approve a no-opt-out release of antitrust challenges to their post-Settlement conduct that would bind every private party that could bring such a claim, with no right to opt out of the release. And the release would be perpetual. Compare that to the rejected release in the ill-fated *Google Books* copyright settlement[134]— which would have eventually expired.[135] That court was unwilling to enshrine a new economic regime for the long-term future.[136] But here, the release *never* expires.

The perpetual release proposed here also concerns a particularly impactful and dynamic part of our economy. It would protect competitive restrictions affecting thousands of employers and millions of consumers—even though no one can say now what the competitive outcome will be. This go-forward system of restraints is an untested experiment with unknown, unknowable, and unquantifiable effects on competition. The competitive effects of the mix of relief and restraints embodied in this proposed Settlement is speculative, based on the prognostications of a

---

[133] Grimmelmann, *supra* note 86, at 429–30 (quoting *Wal-Mart*, 131 S. Ct. at 2551).

[134] *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 682 (S.D.N.Y. 2011).

[135] Grimmelmann, *supra* note 86, at 390 (citing *Google*). The time was uncertain due to the copyright laws calculations.

[136] The settlement at issue there not only resolved past copyright claims against Google, but proposed to establish a going-forward structure for copyright sharing that "would release Google (and others) from liability for certain future acts." *Google Books*, 770 F. Supp. 2d at 676–77. The district court "conclude[d] that this second part of the [settlement] contemplates an arrangement that exceeds what the Court may permit under Rule 23." *Id.* Moreover, the court made that determination even though copyright law has no public policy against future releases in the same way that antitrust law does. *See* Grimmelmann, *supra* note 86, at 409–10.

few party-retained economists.[137] And the effects become increasingly speculative the longer the system endures, judicially protected from challenge.

Ultimately, the proposed release of future conduct amounts to legislation by court-enforced private agreement, prospectively regulating how health insurance will be delivered nationwide in perpetuity. That leaves a court playing out of position, by determining national economic policy rather than allowing the market to foster competition as required by federal law. As one academic commentator expressed the point: "courts should not be in this business at all. Future-conduct releases open the door to sweeping prospective changes in the substance of the law. This is the province of legislation, not adjudication."[138]

## <u>Conclusion</u>

Home Depot raises no objection to the Settlement's resolution of the complex dispute over the Blues' liability for past conduct. But the Blues seek more prospective protection than the law allows.

First, they ask this Court to rule that their future conduct would face challenge under only the Rule of Reason. In doing so, they would have the Court violate binding precedent forbidding courts from resolving such contested issues of law and fact in approving a Settlement. Second, they seek perpetual immunity from injunctive relief based on their ongoing conduct, no matter what injury it may cause in the future. Substantive antitrust law does not allow that, and no settlement procedure can change that rule. Third, they aspire to prevent 23(b)(3) opt outs from

---

[137] That is not a criticism of Dr. Rubinfeld or Dr. Mason, but rather a recognition that forecasting the long-term economic effects of untested systems is hazardous at best. Moreover, both experts extol the benefits of the injunctive relief granted, but do not address the future anticompetitive effects of the restraints that would remain. Mason Report ¶¶ 69–71; Rubinfeld Report ¶ 13.

[138] Grimmelmann, *supra* note 86, at 393–94.

any meaningful pursuit of divisible injunctive relief, which *Wal-Mart* would not allow in any type of class action.

Accordingly, Home Depot respectfully submits that the Court should not rule whether the Rule of Reason or the *per se* standard would govern litigation challenging post-Settlement conduct. Further, the Court should condition any approval on the Parties' agreement to remove the proposed release of claims based on post-Settlement conduct. If the Court is not inclined to do that, it should adopt Home Depot's proposed language ensuring that opt outs preserve a meaningful right to seek individual injunctive relief to gain access to multiple Blue Bids.

Respectfully submitted this 8th day of December, 2021.


*/s/ Frank M. Lowrey IV*
Frank M. Lowrey IV
GA Bar No. 410310
lowrey@bmelaw.com
Ronan P. Doherty
GA Bar No. 224885
doherty@bmelaw.com
E. Allen Page
GA Bar No. 640163
page@bmelaw.com


BONDURANT MIXSON & ELMORE, LLP
1201 West Peachtree Street NW, Suite 3900
Atlanta, GA 30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2021, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *Frank M. Lowrey IV*
Frank M. Lowrey IV
GA Bar No. 410310