FILED

2021 Dec-08  PM 05:10
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

-------------------------------------------------------x
                                           x     MDL No. 2406

**In re Blue Cross Blue Shield**      x

**Antitrust Litigation**           x     Master File No. 2:13-cv-20000-RDP

                                           x

-------------------------------------------------------x

**ALASKA AIR MOVANTS' POST FAIRNESS HEARING BRIEF**

## <u>TABLE OF CONTENTS</u>

I.  Introduction .................................................................................................1

II. Reclassifying the QNA Injunctive Relief from a (b)(2) Class to the
    (b)(3) Class as Clarified by the Court Resolves Several Issues.........................1

    A.  The Meaning of the Term "Relief" in the Final Sentence ...........................4

    B.  The Meaning of "indivisible injunctive relief approved by
        the court." ...........................................................................................5

    C.  Final Approval of the Settlement Should Contain No Limitations Against
        Opt-Outs Other than Prohibiting Infringement on the Approved Rule 23(b)(2)
        Indivisible Injunctive Relief ..................................................................9

III. The Court Does Not Need to Decide whether Defendants' Going-Forward Market
    Allocation Is *Per Se* Illegal ...........................................................................14

IV. Defendants Are Not Entitled to a Ruling that their Going-Forward Market
    Allocation Is Not *Per Se* Unlawful ..................................................................18

    A.  Defendants' Proffered Procompetitive Justification Does Not Allow Them to
        Avoid the *Per Se* Rule .........................................................................19

    B.  Defendants' Procompetitive Justification Is Based on
        Disputed or Rejected Facts ...................................................................22

    C.  Defendants' Common Law Trademark Argument Cannot Avoid the *Per Se*
        Rule......................................................................................................25

V.  The Significance of *Delta Dental* ....................................................................28

Conclusion ........................................................................................................31

i

# TABLE OF AUTHORITIES

*1-800 Contacts, Inc. v. FTC*, 1 F.4th 102 (2d Cir. 2021)................................................................27

*Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117 (11th Cir. 2005).......................5, 6, 11

*AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341 (2021) ......................................5

*American Needle, Inc. v. NFL*, 560 U.S. 138 (2010)................................................................18, 28

*Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332 (1982) ......................................................19

*Arrington v. Burger King Worldwide, Inc.*, No. 20-13561 ............................................................18

*Augusta News Co. v. Hudson News Co.*, 269 F.3d 41 (1st Cir. 2001)...........................................20

*Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984) ......................................................15, 17

*Bennett v. Behring Corp.*, 96 F.R.D. 343 (S.D. Fla. 1982)...........................................................16

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979) ..............................20, 30

*Butzen v. Mid-States Exp., Inc.*, No. 07 C 5716, 2008 WL 515165 (N.D. Ill. Feb. 25, 2008) ......10

*C.G.B. v. Wolf*, 464 F.Supp.3d 174 (D.D.C. 2020)........................................................................6

*Castañeda Juarez v. Asher*, 2020 WL 6434907 (W.D. Wash. July 6, 2020) ................................6

*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980)...........................................................19

*Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012)................................6

*Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50 (2d Cir. 1997) .............................................27

*Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) ........................................................25

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) ...........................................................10

*Faught v. Am. Home Shield Corp.*, No. 2:07-CV-1928-RDP, 2010 WL 10959223
(N.D. Ala. Apr. 27, 2010), *aff'd*, 668 F.3d 1233 (11th Cir. 2011)..........................................10, 11

*FTC v. Actavis*, 570 U.S. 136 (2013).........................................................................................25

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir. 1975).....................................15, 16, 17

*In re Blue Cross Blue Shield Antitrust Litig.*, 2018 U.S. Dist. LEXIS 113563 ............................28

*In re Delta Dental Antitrust Lit.*, 484 F. Supp. 3d 627 (N.D. Ill. 2020) ................................29, 30

*In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330 (N.D. Ohio 2001) ..........................10

*Int'l Longshoremen's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*,
389 U.S. 64 (1967) ........................................................................................................................3

*Jeff. Parish Hosp. v. Hyde*, 466 U.S. 2 (1984) ...........................................................................15

*Jennings v. Rodriguez*, 138 S.Ct. 830 (2018) ..............................................................................6

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092 (11th Cir. 2004)................................11

*LabMD, Inc. v. Fed. Trade Comm'n*, 894 F.3d 1221 (11th Cir. 2018)........................................5, 8

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007)...............................19, 21

*Lucas v. Bolivar Cty., Miss.*, 756 F.2d 1230 (5th Cir. 1985) ........................................................8

*Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996)....................................................10

*NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984)................................................20, 30

*Palmer v. B.R.G. of Ga., Inc.*, 498 U.S. 46 (1990) ................................................................21, 31

*Polk Bros., Inc. v. Forest City Enters., Inc.*, 775 F.2d 185 (7th Cir. 1985) ..................................20

*Procaps S.A. v. Pantheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016) ................................................25

*Quality Auto Painting v. State Farm Indem. Co.*, 870 F.3d 1262 (11th Cir. 2017),
*rev'd on other grounds*, 917 F.3d 1249 (11th Cir. 2019) .............................................................20

*Robertson v. NBA*, 556 F.2d 682 (2d Cir. 1977)....................................................................16, 26

*Schmidt v. Lessard*, 414 U.S. 473 (1974) .....................................................................................3

*Sec. & Exch. Comm'n v. Graham*, 823 F.3d 1357 (11th Cir. 2016)..............................................5

*Tennessee Valley Auth. v. Long*, No. 4:12-CV-704-VEH, 2013 WL 387933
(N.D. Ala. Jan. 18, 2013).............................................................................................................6

*Ulstein Mar., Ltd. V. United States*, 833 F.2d 1052\ (1st Cir. 1987).......................................5, 8, 9

*United States v. Oregon State Med. Soc.*, 343 U.S. 326 (1952) ....................................................6

*U.S. v. Cadillac Overall Supply Co.*, 568 F.2d 1078 (5th Cir. 1978) ................................18, 20, 21

*U.S. v. Goodman*, 850 F.2d 1473 (11th Cir. 1988) .........................................................................21

*U.S. v. Sealy*, 398 U.S. 350 (1967) .........................................................................22, 27, 28, 31

*U.S. v. Topco Assoc.*, 405 U.S. 596 (1972)........................................................................ *passim*

*U. S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236 (5th Cir. 1975)........................5

*Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011) .........................................................4, 6, 8, 9

*West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079 (2d Cir. 1971) .............................................16

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969)..................................................6

## I.        Introduction

The Alaska Air Movants[1] ("Movants" or "Opt-Outs") respectfully submit this supplemental brief to address two issues arising out of the Fairness Hearing: (i) re-classifying the injunctive relief for certain qualified national accounts ("QNA Injunctive Relief") from the (b)(2) class to the (b)(3) class; and (ii) approving the class settlement without deciding the merits of whether Defendants' continued market allocation constitutes a *per se* violation.

The Opt-Outs seek confirmation in any final approval order that they may separately pursue their antitrust claims, including their *per se* claims, for their own damages and divisible injunctive relief.  To this end, the Opt-Outs request that the Court: (a) clarify that the only restriction on the relief the Opt-Outs may pursue is the prohibition on seeking injunctive relief that infringes upon the Rule 23(b)(2) indivisible injunctive relief approved by the Court; (b) affirm the Court's statements during the Fairness Hearing that opt-outs are not releasing or waiving any claim; and (c) refrain from deciding whether Defendants' going-forward market allocation is *per se* illegal.  Such clarifications/confirmations would allow the Opt-Outs to withdraw their motion and objections to the Settlement Agreement.[2]

## II.       Re-Classifying the QNA Injunctive Relief from the (b)(2) Class to the (b)(3) Class as Clarified by the Court Resolves Several Issues

The Opt-Outs timely excluded themselves from the Rule 23(b)(3) damages settlement class, and they moved to be excluded from the injunctive relief class.  ECF 2812-6, 2812-19.  The primary reason for these exclusion requests was the continued harm to the Opt-Outs resulting from Defendants' unlawful market allocation of national accounts.  *Id*. at 14-20.  Thus, the settlement

---

[1]        A complete definition of Opt-Outs or Movants can be found at ECF 2812-19, p. 1, n.1.

[2]        In addition, the Opt-Outs incorporate by reference Section III of Home Depot USA, Inc.'s Renewal of Objections and Post Hearing Brief (Dec. 8, 2021) and otherwise join in the remainder of that brief as well.

proponents' announcement at the Fairness Hearing that the injunctive relief designed to address that market allocation, the QNA Injunctive Relief or Second Blue Bid ("SBB"), would be re-classified and moved from the non-opt-out (b)(2) injunctive relief class to the (b)(3) opt-out class was welcome news to the Opt-Outs.  Tr. I-26 (Class Counsel: "we agree with the Court that it is better that this relief be in a (b)(3) class than in a (b)(2) class").

While the settlement proponents have not tendered a revised Settlement Agreement or proposed final approval order, the Court has provided the parties with a preview of potential language that may be used to implement this change in the final approval order:

> A Rule 23(b)(3) opt out reserves the right to pursue divisible relief including monetary relief and divisible injunctive relief. Divisible injunctive relief may include the right to pursue in litigation a Second Blue Bid. The parties acknowledge that, based on a claimant's individual business and the facts and circumstances of the claims, a Rule 23(b)(3) opt out may pursue divisible injunctive relief that includes possible additional Blue bids. Whether such a remedy is merited will depend on the circumstances surrounding the individual claimant's claim. However, the relief pursued by a Rule 23(b)(3) opt out may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the court.

Tr, II-78.

The Opt-Outs believe that moving the SBB relief[3] from the (b)(2) injunctive relief class to

---

[3] The SBB relief is set forth in, *inter alia*, Section 15 and Appendices C and D of the Settlement Agreement. Defendants contend that Opt-Outs take no issue with how the SBB relief is constructed.   Defendants' contention is incorrect.  Opt-Outs have many issues with the construction of the SBB relief: (i) only approximately 663 national accounts are receiving the right to seek a potential SBB; (ii)  qualification is not based on account size such that any one of the thousands of national accounts who do not receive an opportunity to seek an additional Blue bid may be larger than any one of the accounts who receive that opportunity; (3) qualification is not based on actual geographic dispersion such that any one of the thousands of national accounts who do not receive an opportunity to seek an additional Blue bid could be spread across more states and be more geographically disperse than any one of the national accounts who receive that opportunity; (4) entire categories of national accounts are excluded such as Church and Taft Hartley plans; (5) Qualified National Accounts who opt out of the damages class are excluded from receiving the SBB; (6) most all national accounts in an Anthem service area are ineligible to be a Qualified National Account; and (7) the setting of the so-called Local Service and Support Fee is an impermissible horizontal price fix.

the (b)(3) class along with the Court's clarifying language will likely resolve the Opt-Out's request to be excluded from the (b)(2) injunctive relief class.  Of course, the Opt-Out's recognize that the actual changes to the (b)(2) and (b)(3) relief may not be the same as proposed by the Court, and, therefore, they appreciate the opportunity to submit this supplemental brief to attain clarity and, hopefully, confirmation.

The Opt-Outs seek to proceed with their own suit to seek individual damages and injunctive relief without "infring[ing] on the Rule 23(b)(2) indivisible injunctive relief approved by the court."  The Opt-Outs do not want to run afoul of any final approval order; and they request as much clarity regarding the proposed language as the Court can provide. *Cf. Int'l Longshoremen's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) ("The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid."); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("[B]asic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.").

The clarity requested by the Opt-Outs originates from the final sentence in the Court's proposed language: "However, the relief pursued by a Rule 23(b)(3) opt out may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the court."  Respectfully, the Opt-Outs have three questions about this language.  <u>First</u>, when the Court refers to "the relief pursued" by an opt-out, is it referring <u>only</u> to injunctive relief?  (We think so.)  <u>Second</u>, which provisions of the Settlement Agreement constitute the "Rule 23(b)(2) indivisible injunctive relief"?  (We think only Sections 10 and perhaps 17 do.)  <u>Third</u>, are there any limitations on an Opt-Out's individual action by virtue of final approval other than such an action will not infringe on the Rule 23(b)(2)

indivisible injunctive relief?  (We think not other than imposed by law.)  These three questions are addressed in turn.

A.      **The Meaning of the Term "Relief" in the Final Sentence**

The Opt-Outs understand the Court's use of "the relief pursued" in the final sentence to refer to *injunctive* relief.  This understanding is informed by statements made by the Court and the settlement proponents during the Fairness Hearing.  *See, e.g.,* Tr. I-25 (Court: "Monetary damages clearly falls into divisible."); Tr. I-26 (Court: "an ASO could opt out for (b)(3) purposes as to monetary damages"); Tr. I-95 (Defendants: "if somebody exercises their opt-out rights, … they could seek damages *in any amount*, including damages flowing from ESAs or anything else") (emphasis added); *see also* Class Supp. Br. at 16.  In addition, the Opt-Outs' understanding is consistent with a class member's constitutional right to opt out of a damages class to pursue its own monetary recovery.  *See Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 363 (2011).

If our understanding is correct, then we respectfully request that the Court add the word "injunctive" before "relief pursued" in the final sentence to clarify: "However, the *injunctive* relief pursued by a Rule 23(b)(3) opt out may not infringe…."  Such clarification would guard against

future assertions that requests for non-injunctive relief[4] are subject to the Court's limitation.[5]

### B.      The Meaning of "indivisible injunctive relief approved by the court"

The Opt-Outs do not seek to infringe on "the Rule 23(b)(2) indivisible injunctive relief approved by the court." The Settlement Agreement, however, does not identify which provisions— among the 87 pages, 64 sections, and 5 appendices—constitute "the Rule 23(b)(2) indivisible injunctive relief."[6]  Likewise, neither the original approval motion papers nor the supplemental briefs filed by the settlement proponents identify what the parties contend constitute "the Rule 23(b)(2) indivisible injunctive relief."[7]

Case law is helpful in classifying injunctive relief as indivisible.  "Injunctive relief" for an

---

[4]      "[A]n injunction is limited to prospective relief."  *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1133 (11th Cir. 2005).  Courts distinguish "injunctive relief" from other types of relief, such as damages or declaratory relief.  *See, e.g., AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341, 1347 (2021) ("An 'injunction' is not the same as an award of equitable monetary relief.");  *Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987) ("Injunctions and declaratory judgments are different remedies.  An injunction is a coercive order by a court directing a party to do or refrain from doing something, and applies to future actions. A declaratory judgment states the existing legal rights in a controversy, but does not, in itself, coerce any party or enjoin any future action.  Courts have on occasion refused to grant declaratory relief in cases where the effect would be identical to a legally impermissible injunction.");  *cf. Sec. & Exch. Comm'n v. Graham*, 823 F.3d 1357, 1362 (11th Cir. 2016) ("A declaration of liability…is designed to redress previous infractions rather than to stop any ongoing or future harm.").

[5]      The requested clarification would, for example, foreclose an assertion that a finding of liability or a declaration of illegality by a judge or jury "infringes on the Rule 23(b)(2) indivisible injunctive relief" because it may induce defendants to alter certain practices in order to avoid having to pay future damages or face governmental enforcement.

[6]      While it does contain a heading entitled "Class Injunctive Relief," the Settlement Agreement expressly states that "[t]he headings used in this Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of the Agreement."  Settlement Agreement (ECF 2610-2) ("SA")  at § 54.

[7]      *Cf. LabMD, Inc. v. Fed. Trade Comm'n*, 894 F.3d 1221, 1235 (11th Cir. 2018) ("Specificity is equally important in the fashioning and enforcement of an injunction.");  *U. S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 (5th Cir. 1975) (explaining that the Rule 65(d) specificity requirement "embodies the elementary due process requirement of notice").

alleged violation of the Sherman Act is relief that prohibits "threatened conduct that will cause loss or damage." 15 U.S.C. § 26.  It is designed to "pry open to competition a market that has been closed by defendants' illegal restraints." *Zenith Radio Corp. v. Hazeltine Rsch., Inc*., 395 U.S. 100, 133 (1969) (internal quotation omitted).[8]  Injunctive relief does not include all court orders, as the Court in *Alabama v. U.S. Army Corps of Engineers* observed:

> In a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam* by which, upon certain established principles of equity, a party [*i.e*., a Settling Blue Plan here] is required to do or refrain from doing a particular thing.

424 F.3d 1117, 1127 n.14 (11th Cir. 2005). (quotation and citation omitted).

Injunctive relief is "indivisible" when it "provide[s] relief to each member of the class" and "benefit[s] all its members at once."  *Wal-Mart Stores, Inc.*, 564 U.S. at 360, 362; *see also Jennings v. Rodriguez*, 138 S.Ct. 830, 851-852 (2018) (same).  Following *Wal-Mart*, courts have refused to classify injunctive relief as indivisible for a number of reasons, as Class Counsel here has aptly summarized:

> Lower courts have applied the teaching of *Wal-Mart* to deny certification where the injunctive relief sought does <u>not indivisibly benefit all class members at once</u>, *C.G.B. v. Wolf*, 464 F.Supp.3d 174, 206 (D.D.C. 2020), where the injunction does <u>not provide a uniform remedy</u>, *Castañeda Juarez v. Asher*, 2020 WL 6434907, at *7 (W.D. Wash. July 6, 2020), <u>or</u> where the injunctive relief <u>combines an array of remedies, some of which will benefit only certain subsets of the class</u>. *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012).

Class Supp. Br. at 8-9 (ECF 2868) (emphasis added).

The Settlement Agreement defines the (b)(2) injunctive relief class as "*all* Individual

---

[8]      This is consistent with the purpose of injunctive relief in general - to "undo existing conditions" in order to "forestall future violations." *United States v. Oregon State Med. Soc*., 343 U.S. 326, 333 (1952); *Tennessee Valley Auth. v. Long*, No. 4:12-CV-704-VEH, 2013 WL 387933, at *3 (N.D. Ala. Jan. 18, 2013) ("[I]njunctions are prospective and are fashioned to prevent future injury.").

Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Settlement Class Period." SA at §1.pp (emphasis added). This expansive class definition includes current *and* former fully-insured individuals, self-insured individuals, health benefit plans, group accounts, employers, employees (including their spouses and dependents), sponsors, administrators, fiduciaries, trade associations, and both ERISA and non-ERISA plans and participants. SA at §§1.mm, uu, qq, ccc.

Application of the established meaning of "Rule 23(b)(2) indivisible injunctive relief" to the terms of the Settlement Agreement, reveals that only sections 10 (National Best Efforts) and perhaps 17 (Acquisitions) could provide indivisible injunctive relief to all members of the (b)(2) class as defined.[9] In other words, sections 10 and 17 are the only ones that prohibit Defendants from engaging in conduct that harms all class members. By contrast, Sections 12 (Self-Funded Vendors), 14 (National Accounts), 15 (Second Blue Bid), and 18 (Most Favored Nations Clauses) do not "provide relief to each member of the class," but instead are directed toward addressing

---

[9]  This sets aside the fact that the injunctive relief class definition includes millions of deceased individuals and entities no longer in existence who, despite being part of the class, will not receive any benefit from any injunctive relief in the Settlement Agreement. *Compare* BlueCross BlueShield Association, *Blue Facts* (May 2018), https://www.bcbs.com/sites/default/files/file-attachments/page/BCBS.Facts__0.pdf (Blues cover "more than 106 million people – one in three Americans) *with* Centers for Disease Control and Prevention, *Deaths and Mortality* (Oct. 19, 2021), https://www.cdc.gov/nchs/fastats/deaths.htm (reflecting approximately 3 million deaths annually during the Settlement Class Period) and U.S. Small Business Administration Office of Advocacy, *Small Business Facts* (May 2018), https://cdn.advocacy.sba.gov/wp-content/uploads/2019/06/06192013/Small_Biz_Facts_Why_Do_Businesses_Close_May_2018_0.pdf ("Over the last 25 years, about 7–9 percent of employer firms close every year and a slightly higher share open.").

discreet conduct targeting only certain class members and only providing relief to certain class members depending on their state residency, employee size, geographic dispersion, or claim funding mechanism. *Wal-Mart Stores, Inc.*, 564 U.S. at 360; *see also McLaughlin on Class Actions* § 5:15 ("class members must have been harmed in essentially the same way so that success by the plaintiff translates into success for all class members").

There are no other provisions of the Settlement Agreement, including Sections 11 (Local Best Efforts),[10] 13 (Service Areas),[11] or 16 (Additional Brand-Protection Mechanisms), prohibiting Defendants from harm-causing conduct or provide relief to any class member. Thus, by definition, no section of the Settlement Agreement, other than Sections 10 and 17, provide "indivisible injunctive relief." *See, e.g., LabMD, Inc.*, 894 F.3d at 1236 (vacating injunctive order because it "contains no prohibitions" and "does not instruct [the defendant] to stop committing a specific act or practice"); *Lucas v. Bolivar Cty., Miss.*, 756 F.2d 1230, 1235 (5th Cir. 1985) ("[T]he effect and character that makes an order an injunction is that it requires a party to do or refrain from doing something that is an integral part of the very matter in litigation, and invokes the normal equitable principles underlying the injunctive process.") (quotation omitted); *Ulstein Mar., Ltd. v.*

---

[10]    Before the settlement, Defendants agreed to a LBE output restriction requiring 80% of each Defendants' local revenue be derived from a Blue-branded product. The settlement neither prohibits the LBE output restriction nor lowers the 80% threshold. In fact, the provision is worse than the status quo. Instead of a multi-state Defendant being able to dip below this 80% restriction in some of the states in which it operates by aggregating its revenue amongst all the states in which it operates, the Settlement Agreement actually eliminates this flexibility and renders the LBE output restriction more harmful to competition, especially for national accounts. SA at § 11 ("Compliance with the Local Best Efforts Requirement shall be based on a geographic area no larger than a state level."). While this may be "indivisible," it is not "relief" under any legally cognizable definition of the term.

[11]    Section 13 of the Settlement Agreement is entitled "Service Areas" and contains no injunctive relief. In fact, its very terms recite that the Settlement Agreement contains no *indivisible injunctive relief* to "prevent any Settling Individual Blue Plan from continuing to operate its Blue-Branded business only in its Service Area." SA at § 13.

*United States*, 833 F.2d 1052, 1055 (1st Cir. 1987) ("An injunction is a coercive order by a court directing a party to do or refrain from doing something, and applies to future actions.").

To avoid uncertainty or later disputes, we respectfully ask the Court to confirm that provisions of the Settlement Agreement that provide either "divisible" injunctive relief or no injunctive relief at all do not constitute "the Rule 23(b)(2) indivisible injunctive relief approved by the court." Such a clarification comports with both the accepted definition of injunctive relief and the guidance from the Supreme Court in *Wal-Mart*. 564 U.S. at 360 (holding that Rule 23(b)(2) indivisible injunctive relief "provide[s] relief to each member of the class") (emphasis added).[12]

### C.   Final Approval of the Settlement Should Contain No Limitations Against Opt-Outs Other than Prohibiting Infringement on the Approved Rule 23(b)(2) Indivisible Injunctive Relief

This Court should not impose any additional limitations on the Opt-Outs beyond a prohibition on infringing the Court approved Rule 23(b)(2) indivisible injunctive relief. For example, any language suggesting that the Opt-Outs have released any claim pertaining to additional Blue bids or the continuing market allocation of national account customers should not be included in the Final Approval Order. As the Court repeatedly confirmed during the Fairness Hearing, the opt-outs do not release or waive any claim. *See, e.g.,* Tr. II-23 ("You haven't released a claim."); II-23 ("you've not released the claim"); II-23 ("it's not a matter of release"); II-24 ("It's not a release."); II-25 ("It's not a release."); II-25 ("it's not a waiver of a claim"). The Court

---

[12]   The Opt-Outs recognize that there are other limitations in seeking injunctive relief in their own suits. For example, opt-outs cannot bring a class action or seek indivisible injunctive relief on behalf of an injunctive relief class. *See, e.g.,* 2 AREEDA, HOVENKAMP & BLAIR, ANTITRUST LAW ¶ 335 (2d ed. 2000). In order for an opt-out to obtain divisible injunctive relief, it still must prove "threatened conduct that will cause loss or damage" to itself. 15 U.S.C. §26. These legal limitations are already embedded in the law and are unchanged by the clarification sought by the Opt-Outs. To be clear, the Opt-Outs understand that they will be able to pursue only injunctive relief for themselves and will not be permitted to obtain market-wide injunction for all national accounts.

explained, for example, that opt-outs retained the right post-settlement to, *inter alia*, "litigate whether ESAs are illegal" and "seek individualized relief if a court determines that they are." Tr. II-113; *see also* I-93 ("you've not released your claim that, under the new structural relief, you should be entitled to a second Blue bid or that you should have the right to pursue other Blue bids").

The Court's pronouncements comport with Supreme Court precedent that opt-outs "preserve absolutely their right to litigate." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 385 (1996); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 351 (1983); *Butzen v. Mid-States Exp., Inc.,* No. 07 C 5716, 2008 WL 515165, at *2 (N.D. Ill. Feb. 25, 2008) (an opt-out of a class settlement "will not be bound by it"); *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 353–54 (N.D. Ohio 2001) ("If the claimant timely and properly exercises his opt-out right, he may initiate, continue with, or otherwise prosecute any legal claim against the defendants, without any limitation, impediment or defense arising from the terms of the settlement agreement.").

Given the clarity of this Court's statements, the uniformity of the case law, and Defendants' own acknowledgement during the Fairness Hearing,[13] the Opt-Outs had no intention of raising this third question as it seemed settled. However, Defendants have made the following assertion in their supplemental brief: ***"each member of the (b)(2) class has individually released any claim for injunctive relief that service areas or other Blue policies are illegal or unenforceable."*** Def. Supp. Br. at 17 (ECF 2869) (emphasis added).[14] In light of this assertion, the Opt-Outs ask the

---

[13]    The Court asked Defendants' counsel if he agreed that "nothing about the approval of my settlement affects their ability to prove in their individual case a Sherman Act violation; right?" Tr. I-169. Counsel responded: "Absolutely – I totally agree." Tr. I-169.

[14]    Defendants cite two authorities for this proposition. First, they cite to *Faught v. Am. Home Shield Corp.*, in which this Court enjoined opt-outs from prosecuting "any and all representative aspects" of their post-class settlement action. The Opt-Outs have not sought and do not seek to

Court to memorialize its statements during the Fairness Hearing and reject Defendants' contention for at least three reasons.

First, to borrow a phrase from the Court, Defendants are "mixing apples and oranges." Tr. II-23. An injunction is not a claim. "An injunction is a 'remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed.'" *U.S. Army Corps of Eng'rs*, 424 F.3d at 1127 (quoting *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004)). "There is no such thing as a suit for a traditional injunction in the abstract. For a traditional injunction to be even theoretically available, a plaintiff must be able to articulate a basis for relief...." *Id.* ("[A]ny motion or suit for either a preliminary or permanent injunction must be based upon a cause of action.").

As this Court explained at the Fairness Hearing:

> It's a matter of whether you're precluded, for example, under the All Writs Act, from pursuing that particular remedy. It's *not* waiving the claim. It's *not* releasing a claim. It's whether you can pursue that particular *remedy*.

Tr. II-23-24 (emphasis added) (explaining that opt-outs may pursue any remedy "that doesn't

---

represent anyone except themselves. Furthermore, the customer allocation of national accounts is directed at only a small minority (0.003%) of class members – *i.e.*, national account plans. This stands in stark contrast to the facts in *Am. Home Shield* where this Court found that "[t]he Class Members claim to have been harmed by a common course of conduct—Defendant's alleged 'uniform' corporate policies designed to deny claims and which otherwise adversely affect policyholders." *Faught v. Am. Home Shield Corp.*, No. 2:07-CV-1928-RDP, 2010 WL 10959223, at *11 (N.D. Ala. Apr. 27, 2010), *aff'd*, 668 F.3d 1233 (11th Cir. 2011). Likewise, in *Am. Home Shield,* "Plaintiffs allege that the Class Members all suffered harms in the same manner," whereas here both the Class and Defendants acknowledge that the allocation of national accounts "has always been directed to a sub-class of the divisible relief class." Def. Supp. Br. At 15 (ECF 2869).

Second, Defendants cite to this Court's statement that objectors "don't have the right to pursue any relief that would undermine a class settlement enjoyed by millions of others." As explained herein, any relief pursued by the Opt-Outs to address Defendants' unlawful allocation of the national account market would do nothing to infringe upon any Rule 23(b)(2) indivisible injunctive relief approved by the Court and would be applicable only to themselves.

undermine the (b)(2) relief"). The Court then asked the settlement proponents directly: "Does anybody disagree with me that it's not a release, it's just a matter of what relief can be sought?" Tr. II-24. Counsel responded: "I believe the subscribers and the Blues are in alignment with Your Honor's recitation of how this would play out." Tr. II-24. Opt-Outs understand the Court's distinction between the release of a claim and the prohibition on certain relief. They ask that any final approval order reflect this distinction.

<u>Second</u>, to borrow another phrase used by the Court, "what is sauce for the goose is sauce for the gander." ECF 2841 at 2. Defendants cannot place the relief for a claim in a (b)(3) class while placing the release for the same claim in a (b)(2) class. The SBB injunctive relief seeks to address the claim that Defendants have allocated the national account market to prevent national accounts from receiving more than one Blue bid.[15] Defendants' acknowledge that the allocation of national accounts "**has always been directed to a sub-class of the divisible relief class**." ECF 2869 at 15 (emphasis added) (further explaining that this subset must have at least 5,000 covered lives). Defendants further admit that the SBB injunctive relief is "appropriately considered (b)(3) relief."[16] (Def. Supp. Br. at 14 (ECF 2869)). Therefore, any release of the claim that the SBB injunctive relief seeks to address is a (b)(3) claim and is not released by a (b)(3) opt out. This same

---

[15]     *Cf.* Fourth Am. Compl. At ¶ 384 ("The Blue Plans also enacted rules regarding allocation of customers of national accounts amongst Blue Plans."); ¶ 6 ("Defendants have engaged and are still engaging in per se illegal market division."); ¶ 537 ("These territorial allocation agreements are per se illegal under Sections 1 and 3 of the Sherman Act."). Competitors can allocate markets either by allocating exclusive territories or by allocating identified customers. Both forms of market allocation are *per se* illegal. *See U.S. v. Topco Assoc.*, 405 U.S. 596, 608-09, 612 (1972) (allocation of exclusive retail sales territories and allocation of wholesale customers both held *per se* illegal). Here, Defendants have combined aspects of both forms of market allocation. National accounts, by definition, are present in multiple territories and each national account customer is allocated to a Defendant based on the location of its headquarters.

[16]     The Class also shares this understanding. *See* Class Supp. Br. At 7 (ECF 2868) ("the SBB relief is more properly classified as divisible relief").

logic explains why a (b)(3) opt-out does not release claims that the (b)(3) class damages were designed to address.

<u>Third</u>, Defendants' attempt to completely insulate "service areas <u>or other Blue policies</u>" is an overreach.  It goes far beyond this Court's prohibition on infringing upon "the Rule 23(b)(2) indivisible injunctive relief."  It also exceeds any constitutionally permissible benefit of the bargain in the Settlement Agreement.  Much ink has already been spilled about Defendants' service areas or "ESAs."  For national accounts, however, the ESAs themselves are not necessarily the issue as national accounts (by their very nature) transcend the ESAs.  When a Defendant services a national account, it is already operating *outside* of its ESA.

For example, FedEx has employees in all 50 states and in every ESA.  Defendants, however, have decided among themselves that only one of them—BCBS-TN—has the right to bid to service FedEx's hundreds of thousands of employees across <u>all</u> of the ESAs.  This customer allocation has no essential connection to the ESAs; FedEx is in <u>all</u> of the ESAs and has more employees outside of BCBS-TN's ESA than it does inside of BCBS-TN's ESA. [17]  This is true of many national accounts, including a number of Opt-Outs.

Defendants use the ESAs as a means to implement their customer allocation by dividing up national accounts based upon the ESA in which the account is headquartered.  Yet, Defendants could just as easily—and unlawfully—allocate them based on where a national account has the most covered lives or where it is incorporated.  Likewise, Defendants could achieve their same (unlawful) objective by allocating national accounts alphabetically or by random draw.  There is nothing inherent about Defendants' allocation of national accounts that requires the ESAs nor does

---

[17]    Perhaps for this reason, BCBS-TN has "ceded" FedEx to Anthem. In other words, Anthem and BCBS-TN, two horizontal competitors, agreed as to the allocation of FedEx. Such an agreement runs contrary to the stated procompetitive justifications for the ESA's.

the continuation of the ESAs require the allocation of national accounts.[18]

A national account's complaint about unlawful market allocation is not about the continuation of the ESAs.[19]  Rather, it is about an agreement among the Defendants to limit which one of them can offer services to a national account.  The SBB seeks to begin to address this unlawful allocation for some sub-class members, but the Opt-Outs should not be foreclosed from addressing the allocation further in their own suits.

The Court should refuse any request by Defendants to include language in any final approval order that forecloses Opt-Outs from challenging the national account allocation or concludes that "other Blue policies" (Def. Supp. Br. at 17, ECF 2869) such as the national account allocation are in any way immunized from challenge "on any legal or factual basis" (Class Supp. Br. at 16 (ECF 2868)) beyond the Court's prohibition on infringing the Rule 23(b)(2) indivisible injunctive relief.

### III.    The Court Does Not Need to Decide whether Defendants' Going-Forward Market Allocation Is *Per Se* Illegal

Defendants ask the Court to affirmatively hold that their going-forward allocation of national accounts does not violate the *per se* rule.  Defendants admit that they intend to rely on that holding as authority in defending the merits of the claims brought by opt-out litigants. Tr. I-168.

---

[18]    For this reason, if the ESAs are illegal, then so too is the national account allocation.  But if the ESAs are deemed lawful, then it does not follow that the national account allocation is lawful.

[19]    Conversely, when Defendants seek to justify their ESAs as they do in their supplemental brief, they are not actually addressing the anticompetitive conduct about which the national accounts complain.  For example, Defendants' assertion that ESAs encourage individual Defendants to promote the brand within their ESAs has no relationship to the scheme whereby a single Defendant is allocated the exclusive right to bid on a national account with employees *outside* of that Defendant's ESA.

The Court need not and should not decide whether the going-forward national account customer allocation violates the *per se* rule in the context of a settlement approval hearing. The test for whether a class settlement may be approved is whether it is "clear" or a "legal certainty" that the settlement authorizes conduct that is *per se* illegal. The Court need not go any further to approve the settlement and conclude that it is neither "clear" nor "certain" what the outcome of the *per se* analysis will be. Defendants' insistence that the Court decide the merits of the *per se* issue in the context of the settlement approval hearing is contrary to controlling authority and would likely result in the rejection of the proposed settlement.

The controlling authority is *Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984). In *Bennett*, the class brought *per se* illegal tying claims. A settlement was reached, and objectors argued it could not be approved because it would perpetuate a *per se* violation. *Id.* at 985, 987. The trial court approved the settlement and the Eleventh Circuit affirmed, holding that whether the settlement perpetuated *per se* illegal conduct "properly goes to the merits of the case" and "is inapposite in our review of the settlement." *Id.* at 987. The appellate court further held that "whether there is some merit to plaintiffs' contention that the … tie-in arrangements constitute antitrust violations is *not* the issue" and that "unless the illegality of an arrangement under consideration is a *legal certainty*, the mere fact that certain of its features may be perpetuated is not a bar to approval." *Id.* (emphasis added).

Defendants ignore *Bennett* and relegate it to a "see also" cite. ECF 2869 at 2.[20] Instead, Defendants rely principally on out-of-circuit decisions in *Grunin v. Int'l House of Pancakes*, 513

---

[20]    Defendants' only analysis of *Bennett* is to incorrectly assert that it was not a *per se* case because the defendant lacked market power. ECF 2869 at 5. There is no such holding in *Bennett*, and neither the appellate nor the district court even mention market power. Furthermore, the *Bennett* settlement was approved in 1982. It was not until 1984 that market power was a required element of a *per se* illegal tying claim. *Jeff. Parish Hosp. v. Hyde*, 466 U.S. 2, 13-14 (1984).

F.2d 114 (8th Cir. 1975), and *Robertson v. NBA*, 556 F.2d 682 (2d Cir. 1977), for the proposition

that "clearly illegal," "illegal to a legal certainty," and "*per se* illegal" are synonyms, and this Court

must, therefore, decide the merits of whether the going-forward market allocation is *per se* illegal.

ECF 2869 at 2.  The fallacy in Defendants' argument is that conduct that is eventually found to be

*per se* illegal may not be "clearly" *per se* illegal or *per se* illegal "to a legal certainty" when the

settlement is presented for approval.[21]  Furthermore, neither *Robertson* nor *Grunin*, much less

*Bennett*, support Defendants' position.

　　In *Robertson*, objectors asserted that a proposed class settlement could not be approved

because it perpetuated a *per se* violation.  The Second Circuit held that "it is true that a settlement

that authorizes the continuation of clearly illegal conduct cannot be approved, but a court in

approving a settlement should not in effect try the case by deciding unsettled legal questions."  556

F.2d at 686.  The court further held that because the applicable case law was not completely clear,

"the alleged illegality of the settlement agreement is *not* a legal certainty" and that the settlement,

therefore, could be approved because it did not authorize "clearly illegal conduct."  *Id.*  (emphasis

added).  Contrary to Defendants' assertion, *Robertson* did not hold that the going-forward conduct

was not *per se* illegal – just that it was not *clearly per se* illegal.[22]

　　In approving the settlement in *Grunin*, the court held that neither the trial nor appellate

---

[21]　　The absence of a properly developed record, the lack of a truly adversarial proceeding, disputed issues of fact, or arguments about the applicable law may cloud the issues and necessitate further litigation.  *Bennett v. Behring Corp.*, 96 F.R.D. 343, 354 (S.D. Fla. 1982) (holding that the settlement could be approved "[i]n view of the substantial dispute which exists as to the legality of the [allegedly *per se* illegal] tie-ins").

[22]　　*Robertson* relies on *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1086 (2d Cir. 1971), which holds that an objector "must show … that the rules of law for which she is contending are so clearly correct that it was an abuse of discretion for… court to approve the settlement."

court "have the right or duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute." 513 F.2d at 123.  The court further held that "in examining a proposed compromise for approval or disapproval … the court does not try the case" and the very purpose of such a compromise "is to avoid the delay and expense of such a trial."  *Id*. at 124.[23]

The *Grunin* court also noted that the parties had "vigorously contested" whether the *per se* rule applied to the conduct in question and that relevant issues of law and fact were unresolved. 513 F.2d at 124.  The court explained that its survey of the conflicting cases "is not intended to be an appraisal of the merits of the claims in contention" but is recited to "illustrate … that the alleged [*per se*] illegality of the settlement agreement is not a legal certainty."  *Id*.  As a result, the Eighth Circuit concluded it was within the trial court's discretion to approve the settlement.  *Id*.

Here, Defendants' argument that this Court should affirmatively decide that their going-forward national account market allocation is "clearly" not *per se* illegal is inconsistent with this Court's prior order granting Defendants' motion for an interlocutory appeal – suggesting the issue is neither "clear" nor "certain."  Furthermore, Defendants' *per se* argument is based on disputed issues of law and fact that allow the Court to hold under present circumstances that  resolution of the *per se* issue is not "clear" or "certain."  Under these circumstances, *Bennett*, *Grunin* and *Robertson* all hold that the settlement can be approved, but that the Court need not and should not decide the mode of analysis or the ultimate merits of the *per se* claim.

---

[23]    The views expressed in *Grunin* relating to the compromise of uncertain positions faced by the parties at the time of settlement are similar to views expressed by this Court at the Final Approval hearing.  *See* Tr. I-142-43 ("Because whether I'm right, wrong, or somewhere in between, that's what the parties dealt with when they sat down at the negotiating table after the standard-of-review order and the orders that followed it in that I said the Court cannot decide this question as a matter of law, we're going to have to litigate this issue further. And so to litigate this issue further, the parties had a decision to make: Should we litigate or should we settle? And that was the landscape they settled under; right?").

## IV.   Defendants Are Not Entitled to a Ruling that their Going-Forward Market Allocation Is Not *Per Se* Unlawful

Defendants initially argued that the going-forward market allocation is not *per se* illegal due to: (1) the need for an aggregation of offenses; and (2) the single-entity defense.  The Opt-Outs responded that *U.S. v. Topco Associates, Inc.*, 405 U.S. 596, 609 n.9 (1972), disposed of any need for an aggregation of offenses,[24] and Defendants' market allocation could not be single-entity conduct under *American Needle, Inc. v. NFL*, 560 U.S. 183 (2010).[25]  In light of those arguments, Defendants have abandoned their aggregation and single-entity arguments.[26]

Defendants do, however, advance two arguments for why their going-forward market allocation scheme should not be *per se* illegal.  First, Defendants argue that the *per se* rule is inapplicable because their agreement has procompetitive benefits.  As explained below, this argument: (1) misunderstands the *per se* rule, which does not allow for procompetitive justifications; and (2) is based on disputed or rejected assertions of fact.  Second, Defendants claim

---

[24]     *See also U.S. v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1088-89 (5th Cir. 1978) (stating that the Supreme Court held in *Topco* that an aggregation of offenses "is not required when a horizontal market division has been shown").

[25]     *See* ECF 2812-19 at 17-20 and ECF 2830 at 5-8.  *American Needle* requires that defendants act as a single entity with regard to the challenged conduct.  560 U.S. at 191, 195, 198; Areeda & Hovenkamp, *Antitrust Law*, ¶ 1489(d)(3) (the *American Needle* functional test "focus[es] on the particular practice under antitrust scrutiny"); Dept. of Justice *Amicus* Brief submitted to the 11th Circuit in *Arrington v. Burger King Worldwide, Inc.*, No. 20-13561 (copy attached as Ex. A) at 18 (proper test under *American Needle* is to "evaluate[] functionally whether the [defendants] … had disparate economic interests *with respect to the challenged restraint*" (emphasis original)); Tr. I-136-142.  The Opt-Outs submit that it is not possible for the independently owned Defendants to be a single entity for purposes of the challenged restraint in this case – *i.e.*, an agreement not to invade each other's territory and take sales away from each other.

[26]     The class does refer to the aggregation analysis in this Court's summary judgment and preliminary approval rulings.  Both of those opinions were issued before the Opt-Outs pointed out that footnote 9 of *Topco* conclusively eliminated any need for aggregation in order to find that a *per se* violation.  The class does not dispute the import of footnote 9 of *Topco* and relied on it in arguing to the 11th Circuit that "[t]he Supreme Court specifically rejected [defendants' aggregation] argument."  USCA11 Case: 18-90020 (7/2/18) at 16.

that prior existing common-law trademark rights prevent the *per se* rule from applying to their market allocation scheme.  This Court has already held, however, that whether these common law trademark rights even existed is uncertain and disputed.

### A. Defendants' Proffered Procompetitive Justification Does Not Allow Them to Avoid the *Per Se* Rule

Defendants claim that the *per se* rule is inapplicable because their going forward market allocation might plausibly have procompetitive effects.   ECF 2869 at 7.  This argument misunderstands the *per se* rule.  As acknowledged by the Class: "The whole point of the *per se* standard is that when it applies, it obviates the need to examine whether a plausible pro-competitive justification for the challenged practice exists."  Class §1292(b) Br., USCA11 Case: 18-90020 (7/2/18) at 19.

Supreme Court authority holds that procompetitive benefits are irrelevant to the *per se* rule. *See*, *e.g.*, *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 344 (1982) (conduct that is *per se* illegal is subject to "a conclusive presumption" that "it has an unreasonable effect on competition");  *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of the individual restraint in light of the market forces at work.").   Thus, the Supreme Court has rejected efforts to avoid the *per se* rule by advancing purported procompetitive effects:

> The respondents' principal argument is that the *per se* rule is inapplicable because their agreements are alleged to have procompetitive justifications.  This argument indicates a misunderstanding of the *per se* concept.   The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some.

*Maricopa Cnty.*, 457 U.S. at 351, n.23; *see also Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647, 648-49 (1980) (holding certain practices *per se* unlawful and stating "the fact that a practice

may turn out to be harmless in a particular set of circumstances would not prevent its being declared unlawful *per se*."). *Quality Auto Painting v. State Farm Indem. Co.*, 870 F.3d 1262, 1271 (11th Cir. 2017) ("*per se* violations … are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use"), *rev'd on other grounds*, 917 F.3d 1249 (11th Cir. 2019).[27]

Horizontal market allocation can be achieved either by allocating territories or by allocating customers. Both have the same effect on competition, and the courts do not distinguish between them. *Cadillac*, 568 F.2d at 1088 (the difference between a territorial allocation and a customer allocation "is a distinction without substance" and "we fail to see any significant difference between an allocation of customers and an allocation of territory"). In *Topco*, defendants not only allocated retail territories, but also allocated wholesale customers. 405 U.S. at 603, 612 (restrictions on sales to wholesalers held to be "regulation of the customers to whom members of Topco may sell Topco-branded goods"). The Supreme Court held both forms of market allocation to be *per se* illegal. *Id.* at 608, 612; *Cadillac*, 568 F.2d at 1089 (stating that *Topco* addressed restrictions on sales to wholesalers "and expressly condemned customer

---

[27]     Defendants' reliance on *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 14-15 (1979) ("*BMI*"), *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 48 (1st Cir. 2001), and *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188 (7th Cir. 1985), for the proposition that procompetitive effects obviate the *per se* rule is seriously misplaced. *BMI* recognized an exception for the *per se* rule if the product in question would otherwise not be available at all. *See NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100-01 (1984) (explaining that *BMI* created an exception to the *per se* rule where "horizontal restraints on competition are essential if the product is to be available at all"). This Court, however, has already held "the market allocations at issue are not necessary to market, sell or produce health insurance." 308 F. Supp. 3d at 1269-70. *Augusta* addresses the applicability of the *per se* rule to joint ventures (269 F.3d at 43), but this Court has already held that Defendants are not a joint venture. 308 F. Supp. 3d at 1250. *Polk Bros.* is another joint venture case in which the joint venturers agreed to construct a new building that they would both occupy. The restraint was deemed ancillary to the creation of a new productive asset. Here, Defendants are not joint venturers and their restraint is not ancillary to the construction of new productive assets.

allocations as a *per se* violation").

The Supreme Court holds market allocations to be "naked restraints of trade with no purpose except stifling of competition" and "[o]ne of the classic examples of a *per se* violation of §1." *Topco*, 405 U.S. at 608 (quotation omitted); *Palmer v. B.R.G. of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (market allocation is a "classic example[] of a *per se* violation" "regardless of [how] the parties split a market"); *Leegin*, 551 U.S. at 886 ("Restraints that are *per se* unlawful include horizontal agreements among competitors to … divide markets."); *Cadillac*, 568 F.2d at 1090 ("we hold that the allocation of customers is a *per se* violation"); *U.S. v. Goodman*, 850 F.2d 1473, 1476 (11th Cir. 1988) ("customer allocation agreement alone is a *per se* illegal violation").

Any doubt as to whether a purported procompetitive justification is relevant to the *per se* rule against market allocations is resolved by *Topco*. There, a group of small grocers formed an association to share private-label goods in order to better compete with national chains. 405 U.S. at 599, n.3. Each Topco member was given an exclusive retail territory in which to sell Topco-branded products, and each agreed not to sell Topco products in another member's territory. *Id.* at 601-03. The defendants argued, just as do the Blue-licensees here, that the market allocation was not *per se* illegal because it had the procompetitive effect of "increasing competition by enabling its members to compete successfully with larger regional and national chains." *Id.* at 605. The district court agreed. It held that the purported procompetitive justification was relevant to the analysis and applied the rule of reason. *Id.* at 606-07 (quotation omitted). The Supreme Court reversed. It held that a horizontal market allocation is a "classic … *per se* violation" (*id.* at 608), which "conclusively" presumes an illegal effect without inquiry into the competitive harm it has caused or the "business excuse for [its] use." *Id.* at 606. As a result, the Supreme Court held that "the district court erred" by considering the purported procompetitive justification and failing

21

to apply the *per se* rule.  *Id*. at 608.[28]  The Court explained that "[it] has consistently rejected the notion that naked restraints are to be tolerated because they are well intended or because they are allegedly developed to increase competition."  *Id*. at 610.

In light of the foregoing clear and well settled law, Defendants' contention that procompetitive justifications prevent their going-forward market allocation from being *per se* illegal is mistaken.  Abundant case law rejects the relevance or even the consideration of any purported procompetitive justification to the *per se* rule.

### B.  Defendants' Procompetitive Justification Is Based on Disputed or Rejected Facts

Even if the law allowed procompetitive effects to justify otherwise *per se* illegal conduct, Defendants' argument that the going-forward market allocation is not *per se* unlawful depends on disputed, untested, or rejected facts.  Specifically, Defendants claim that their ESAs "might plausibly be thought to have a net procompetitive effect" because: (1) their "purpose … is to protect the value and utility of the Blue Marks" (ECF 2869 at 5); (2) they "facilitate" "productive integration" and "cooperation" (*id.* at 7); and (3) they increase interbrand competition (*id*. at 8).

As an initial matter, Defendants fail to tie these purported procompetitive benefits to the allocation of the national accounts, let alone explain how the allocation is necessary to obtain the purported benefits.  As explained above, the ESAs could exist without allocating the national accounts.  For example, Defendants' attempt to justify their ESAs has no rational connection to

---

[28]      *Topco* also disposes of Defendants' argument that future "green" competition is a procompetitive effect that allows their market allocation to escape *per se* condemnation.  In *Topco*, the defendants agreed only to refrain from competing in each other's retail territories with Topco-branded products.   405 U.S. at 601, 603.  There was no prohibition on "green" competition. Nevertheless, the Supreme Court applied the *per se* rule to the stand-alone territorial allocation. *See also U.S. v. Sealy*, 388 U.S. 350, 352 (1967) (agreement to allocate market for Sealy-branded products held *per se* illegal even though defendants could sell non-Sealy-branded products in any geographic market they chose).

the allocation of opt-out Boeing to the Illinois Blue.  Boeing has 43 times more employees in Washington state than it does in Illinois, and the allocation of Boeing to the Illinois Blue advances none of Defendants' purported procompetitive benefits.

Furthermore, none of the Defendants' claimed procompetitive effects are supported by a record citation.  The closest Defendants come is to misrepresent this Court's decision to certify the *per se* issue for interlocutory review.  Defendants cite to 2018 WL 3326850 at *1, in support of the contention that their exclusive service areas "enable[]" them to provide "a unique national network" and provide health insurance in rural areas.  ECF 2869 at 7, 8.  The cited passage, however, says nothing of the sort.  It does not even mention the exclusive service areas, or state that they enable anything.[29]  Even if the law allowed a procompetitive effect to set aside the *per se* rule, none of the Defendants' assertions of effect have been proved and all of them are disputed.  These unsupported factual assertions cannot possibly support the Defendants' request that this Court conclude, as a matter of law, that their conduct is procompetitive and, therefore, exempt from the *per se* rule.

In addressing the factual record, the Opt-Outs are at a significant disadvantage.  Defendants have refused to grant them access to the record while continuing to assert that their conduct should be exempt from *per se* treatment for factual reasons.[30]  Nonetheless, the limited publicly-available

---

[29]     Defendants also cite to the Court's summary judgment opinion at 308 F. Supp. 3d at 1255 for the proposition that the Blue Card has procompetitive benefits.  ECF 2869 at 7.  The cited passage says nothing about procompetitive benefits, much less a benefit attributable to the allocation of the national accounts.  Defendants also claim that their ESAs enable service to remote areas.  *Id.* at 8.  The referenced passage comes from footnote 9 of the summary judgment opinion (308 F. Supp. 3d at 1256, n.9), and does not mention ESAs or state that they enable anything.

[30]     On July 26, 2021, the Opt-Outs served a motion to intervene which would grant them access to the record.  The Motion was provided to the Administrator and counsel for the settlement proponents in accord with Section 14 of the Notice authorized by this Court.  The Motion is attached as Ex. B.  The Defendants have opposed the motion and repeatedly refused to grant Opt-

record demonstrates that Defendants' assertions of procompetitive effect are, at a minimum, uncertain and are likely false. Indeed, some of the Defendants' purported procompetitive facts have already been rejected by this Court. Others are sharply at odds with the Defendants' own admissions.

For example, Defendants assert that their market allocation is procompetitive because its purpose is to protect the value of the Blue Marks (ECF 2869 at 5) and enable "productive cooperation" (*id*. at 7). This Court, however, has already found that Defendants admitted to a more nefarious purpose and effect:

- "One CEO reported that 'Plans benefit from the exclusive services areas because it eliminates competition from other Blue Plans and that without service areas there would be open warfare.'" 308 F. Supp. 3d at 1253.

- "A summary of conversations with four Blue CEOs states 'the major advantage of an exclusive franchise area was seen in the lessening of competition....'" *Id*.

- "Plan CEOs stated that ESAs create 'larger market share because other Blues stay out and do not fragment the market.'" *Id*.

The Opt-Outs have also been able to glean from the partial publicly-available record additional evidence of anticompetitive purpose and effect:

- Defendants admit that their market allocation scheme is not necessary to protect the Blue Marks: "Unique issues arising in overlapping service areas can be addressed by reasonable interpretations of the BCBSA rules and regulations, which preserve the integrity of the Brands yet allow Plans to coexist in overlapping service areas." ECF 1436-100 at 8; ECF 1436-77.

- The BCBSA VP of Consumer Strategy stated that "Brands are not protected by the ESAs but the ESAs protect the Plans' business model...." ECF 1436-82.

- Defendants admit that the effect of their market allocation is to suppress competition and that without it "Plans would not be able to protect themselves from out of area [Blue] competition" (ECF 14436-13 at BCBSF-00181534); and that

---

Outs' counsel access to the discovery record from the MDL. ECF. 2813. The Opt-Outs' reply in support of their motion to intervene may be found at ECF 2830. The Motion is fully briefed and pending.

"Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans." ECF 1436-19 at BDCBSA 00083738.

Defendants also argue that ESAs "enable" procompetitive integration and a "unique" service with competitive benefits.  ECF 2869 at 7.  This Court, however, has already found otherwise:

> [Defendants] cannot claim they produce a unique product.  The market allocations at issue are not necessary to market, sell or produce health insurance.…  The plan to go to ESAs constituted a new marketing/sales strategy, not a new product.  The products remain exactly the same – commercial insurance and insurance services.

308 F. Supp. 3d at 1269-70.[31]

Defendants' contention that their allocation of national accounts facilitates interbrand competition is also incorrect.  Interbrand competition means competition between horizontally competing producers of a product. *See Cont'l T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 57 & n.27 (1977) (observing that *Topco* "involved a horizontal restriction among ostensible competitors").  Here, although they sometimes utilize a common trademark, each Defendant is a competing producer of insurance services.  308 F. Supp. 3d at 1267.  Their market allocation scheme eliminates that horizontal competition.

In sum, even if a procompetitive effect could set aside the *per se* rule, the existence of the procompetitive effect would have to be proved.  Mere allegations – especially in the face of admissions and judicial findings to the contrary – cannot carry the day.

### C.  Defendants' Common Law Trademark Argument Cannot Avoid the *Per Se* Rule

Defendants assert that pre-existing common law trademark rights somehow exempt their

---

[31]     Defendants also rely on authority already rejected by this Court.  Defendants cite *FTC v. Actavis*, 570 U.S. 136 (2013), and *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016), for the proposition that horizontal market allocations are not *per se* illegal.  ECF 869 at 6, 7, 11, 12.  This Court has explicitly held both cases to be inapposite.  308 F. Supp. 3d at 1271.

going-forward market allocation from the reach of the *per se* rule.  Specifically, Defendants claim that: (1) *Topco* is distinguishable because it did not involve pre-existing trademark rights (ECF 2869 at 5, 9-12); (2) trademarks by their nature are not exclusionary (*id*. at 6); and (3) unlike *Topco*, their going-forward market allocation has procompetitive effects (*id*. at 7-9).  These arguments have no merit.  At best, Defendants' contentions are factually and legally disputed.[32]

This Court has already held that *Topco* is the controlling authority.  308 F. Supp. 3d at 1260-62.  Nonetheless, Defendants claim *Topco* is "distinguishable because [it] did not involve pre-existing trademark rights."  ECF 2869 at 5.  Defendants argue that they individually owned exclusive common law trademark rights before they transferred those rights to BCBSA, and by placing those independently owned rights into the collective hands of the BCBSA, they "merely codified existing rights."  ECF 2728 at 16, 17; ECF 2869 at 9-10.  Defendants' argument fails for four reasons.

<u>First</u>, no court has ever accepted this argument or held the transfer of individual trademark rights to a horizontal group of competitors who agree not to compete against each other in the sale of trademarked products is beyond the reach of the *per se* rule.  This alone is sufficient to reject Defendants' claim that the *per se* rule is "clearly" inapplicable to their conduct.  *Robertson*, 556 F.2d at 686 (holding that for purposes of approving a class settlement, an asserted legal proposition was not "a legal certainty" because it had not been recognized "in any previously decided case").

<u>Second</u>, Defendants provide no rationale for why the prior existence of common law trademarks should make any difference.  They merely claim that common law trademark rights

---

[32] The Class previously dismissed Defendants' common law trademark arguments as baseless and contrary to *Topco*.  Class Br. At 17-18, USCA 11 Case: 18-90020 (7/2/18).  Thus, even the proponents of the settlement disagree as to whether it is "clear" or "certain" that *per se*  rule applies or that *Topco* is distinguishable.

were previously owned by individual Defendants and then blithely conclude that their market allocation is "plainly" beyond the reach of *Topco*'s *per se* rule.  ECF 2869 at 10.  As previously noted by the Class, "there is no hint in *Sealy* or *Topco* that the historical origin of the trademarks was in any way relevant to the analysis."  Class §1292(b) Br., USCA11 Case: 18-90020 (7/2/18) at 18.  Furthermore, the undisputed evidence shows that in many territories, no Defendant ever owned exclusive common law trademark rights that could be transferred to anyone; and, this Court has already held that "the validity and/or enforceability of the [common law] marks" is in doubt. 308 F. Supp. 3d at 1251-53, 1265. In addition, the Provider Class has credibly argued that any common law rights that might have existed prior to the formation of BCBSA were abandoned long ago.  ECF 2747 at 10-12. Defendants cannot reasonably ask this Court to conclude that pre-existing common law trademark rights "clearly" save them from the *per se* rule when the existence of those common law rights is credibly disputed and in doubt.

Third, Defendants' contention that their group control of the BCBSA license terms merely codifies common law trademark rights is demonstrably false.  Common law trademark rights allow the holder to exclude others from using the mark in a defined territory.  The BCBSA licenses, however, do far more.  They include an agreement among Defendants to mutually refrain from competing against another Blue, even when it comes to providing service to a national account with covered lives in its own territory.  308 F. Supp. 3d at 1269.  There is no common law trademark right that would allow a group of horizontal competitors with no ongoing disputes over trademark territories to collectively agree that all of them would refrain from entering each other's territory, much less refrain from competing against each other inside its own territory.[33]  *See* ECF

---

[33]     Defendants' reliance on *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50 (2d Cir. 1997), and *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102 (2d Cir. 2021), is misplaced.  As the Opt-Outs previously pointed out (ECF 2830 at 5-12), where an individual trademark holder and an alleged

2830 at 8-12.

Fourth, Defendants argue that trademark rights are not exclusionary and do not prevent a competitor from competing under a different mark.  ECF 2869 at 6.  This argument is refuted by *Topco*.  There, Defendants did not agree to refrain from entering each other's territories with non-Topco brands.  They only agreed not to compete against each other using the Topco marks.  This is also true of *Sealy*, where the Defendants could sell "non-Sealy products in any geographic market they chose."  308 F. Supp. 3d at 1260. Contrary to Defendants' argument, the Supreme Court did not hold that the elimination of Topco v. Topco or Sealy v. Sealy competition was not exclusionary or anticompetitive.  Rather, it held the conduct was a naked restraint and *per se* unlawful in both cases.  *Topco* and *Sealy* are controlling, and Defendants cannot escape their holdings.

## V.     The Significance of *Delta Dental*

The Opt-Outs have argued in these proceedings and continue to believe that Defendants' going-forward market allocation is *per se* illegal.  Defendants disagree.  The merits of that dispute, however, can and should be left for another day.  This is especially true as Defendants themselves have argued that "there is a substantial ground for difference of opinion among courts" as to whether their market allocation "in isolation or in aggregation" violates the *per se* rule and that "this is not a case" where the resolution of the *per se* issue "is so clear" because "there is room for a difference of opinion on that issue." *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-

---

infringer are separate economic actors and each exercises its own independent decision-making with regard to an actual trademark dispute, the group decision-making that is prohibited by *American Needle, Inc.*, 560 U.S. 183, is absent.  However, where, as here, a horizontal group of separate economic actors join together "such that the agreement deprives the marketplace of independent centers of decision-making …" an actionable horizontal agreement is present.  560 U.S. at 195-96 (quotation omitted)*; see also* Tr. I-137; ECF 2812-19 at 17-20.

20000-RDP, 2018 WL 3326850, at *1, *3 (N.D. Ala. June 12, 2018).[34]   Under that view, the *Bennett* test is satisfied; the proposed settlement can be approved; and the merits of the *per se* claim left for another day.  737 F.2d 982.

If the Court disagrees and believes it is appropriate in the context of the settlement approval process to decide the merits of the *per se* claim, then we respectfully and reluctantly request that the Court hold the going-forward conduct is *per se* unlawful.  Although such a result would unfortunately preclude approval of the settlement, we believe it would be the correct result.  This is especially true in light of the recent decision in *In re Delta Dental Antitrust Lit.*, 484 F. Supp. 3d 627 (N.D. Ill. 2020).  There, each of 39 dental insurers were licensed by an association they jointly controlled to use the Delta Dental mark in an exclusive territory.  Just as the Blues have done, the *Delta Dental* defendants agreed that "none would sell … dental insurance outside of its own allocated territory."  *Id*. at 631, 633.  Plaintiffs alleged a *per se* violation, and the Defendants moved to dismiss – making the same arguments and citing the same cases as the Blues do here.  The court denied the motion and held that the allegations "articulate a viable *per se* violation."  *Id*. at 638.  The court rejected the contention that the *per se* rule was subject to the justification that the conduct was "necessary 'to compete more effectively.'"  *Id*. at 634.  The court based its decision on *Topco*'s holding that market allocations "are naked restraints that violate[] the Sherman Act *per se*."  *Id*. at 634.

*Delta Dental* also addressed the argument that the *per se* rule was inapplicable because the agreement created a new product, holding that defendants would have to prove that fact.  *Id*. at 635.  That holding is of no aid to the Blues.  This Court has already found that Defendants' market

---

[34]      As the Court and parties recognized at the Fairness Hearing, this was one of the reasons why the parties settled.  *See, e.g.*, *supra* note 23.

allocation does not produce a new or unique product.  308 F. Supp. 3d at 1270.  *Delta Dental* also rejected defendants' reliance on *BMI* and *NCAA*, holding that the exception to the *per se* rule recognized in those cases applies only when the agreement "is necessary to market the product at all."  484 F. Supp. 3d at 635.  That exception to the *per se* rule is unavailable to the Blues, as this Court has already found that "the market allocations at issue are not necessary to market, sell or produce health insurance" or to market "insurance products at all."  308 F. Supp. 3d at 1270-71.

The Class futilely tries to distinguish *Delta Dental*.  ECF 2868 at 4-6.  First, it claims that *Delta Dental* has no significance because it was a ruling on a motion to dismiss.  The facts alleged in *Delta Dental*, however, are in all material respects the same as the undisputed facts in this case, and *Delta Dental* holds those facts state a *per se* violation.  Second, the Class claims *Delta Dental* is distinguishable because it addresses both the *per se* rule and the rule of reason, which were alleged in the alternative.  How this "distinguishes" *Delta Dental* is a mystery.  *Delta Dental* clearly held that the facts alleged stated a *per se* violation.  That holding is in no way diminished by a ruling that those facts also state a rule of reason violation.[35]

The Opt-Outs recognize that *Delta Dental* is not binding on this Court.  It is, however, directly on point and strongly cautions against reaching the opposite result requested by Defendants – especially when it is not necessary to decide that issue at the present time.  If, however, the Court decides to resolve the *per se* issue at this time, then *Delta Dental* strongly

---

[35]    Class counsel in this case also represent the class in *Delta Dental*, and there argued: "defendants' market allocation mechanism is *per se* unlawful;" defendants cannot "point to any authority supporting their position that a naked territorial restraint should be considered under the rule of reason;" and "efforts to explain *Blue Cross* are unavailing."  ECF 276, Case: 1:19-cv-06734 (N.D. Il.) (5/14/20) at 16, 22, 29-30.

counsels that Defendants are wrong and that the going-forward market allocation is *per se* illegal.[36]

<u>**Conclusion**</u>

For all the foregoing reasons, the Opt-Outs respectfully request that the Court include in any final settlement approval order the following clarifications and holdings:

1.  The Court clarify the final sentence of its proposed language so that it reads: "However, the *injunctive* relief pursued by a Rule 23(b)(3) opt out may not infringe…."

2.  The Court confirm that its reference to "the Rule 23(b)(2) indivisible injunctive relief" refers to relief in the Settlement Agreement that enjoins defendants from conduct that is causing harm to the entire class.

3.  The Court affirm its statements during the Fairness Hearing that opt-outs are not releasing or waiving any claim.

4.  The Court refrain from deciding whether Defendants' going-forward market allocation is *per se* illegal.

Dated:  December 8, 2021           Respectfully submitted,

                                    s/ Paul E. Slater
                                   Paul E. Slater
                                   Joseph M. Vanek
                                   David P. Germaine
                                   Eamon P. Kelly
                                   SPERLING & SLATER, P.C.
                                   55 West Monroe Street, Suite 3200
                                   Chicago, Illinois  60603
                                   Tel:   (312) 641-3200
                                   Email: pes@sperling-law.com
                                          jvanek@sperling-law.com
                                          dgermaine@sperling-law.com
                                          ekelly@sperling-law.com

                                   *Counsel for Alaska Air Group, Inc.; Alaska Airlines, Inc.;*

---

[36]     The class previously agreed with this position and argued that "horizontal agreements allocating exclusive geographic territories among actual or potential competitors are *per se* illegal" under *Topco*, *Sealy* and *Palmer*, and Defendants' conduct "is indistinguishable from the geographic market division condemned in *Topco* and *Sealy* as unlawful *per se*." Class § 1292(b) Br., U.S.C.A.11 Case: 18-90020 (7/2/18) at 10.

*Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc. Welfare Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; Big Lots, Inc.; Big Lots Associate Benefit Plan; Conagra Brands, Inc.; ConAgra Foods, Inc. Welfare Benefit Wrap Plan; FedEx Corporation; FedEx Group Health Plan; FedEx Corporation Retiree Group Health Plan; The Federal Express Corporation Group Health Plan for Pilots; Federal Express Corporation Retiree Group Health Plan for Pilots; Federal Express Corporation Retiree Group Health Plan; Federal Express Corporation; FedEx Freight, Inc.; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; Kellogg Company; Kellogg Company Welfare Benefit Plan; Kellogg Company Retiree Benefit Plan; McLane Company, Inc. McLane Company, Inc. Welfare Plan; Meijer Inc. including its affiliates Meijer Great Lakes LP, Meijer Stores LP, and Town Total Health LLC; Meijer Health Benefits Plan; Publix Super Markets, Inc.; Publix Super Markets, Inc. Group Health Benefit Plan; United Natural Foods, Inc., including its affiliates SUPERVALU, INC.. and Unified Grocers, Inc. ("UNFI"); UNFI Health and Welfare Plan; United Natural Foods Employee Benefit Plan; SUPERVALU Group Health Plan; SUPERVALU Retiree Benefit Plan; Unified Grocers, Inc. Retiree Medical Plan; Indiana/Kentucky/Ohio Regional Council of Carpenters Welfare Fund; Ohio Carpenters Health Fund; SEIU Local 1 & Participating Employers Health Trust; SEIU Local 1 & Participating Employers Health Trust – Plan 1; SEIU Local 1 & Participating Employers Health Trust – Plan 3; The Local No. 1 Health Fund; Plumbers' Welfare Fund, Local 130, U.A.; The Sheet Metal Workers Local 73 Welfare Fund; Chicago Painters and Decorators Welfare Fund; Chicago Painters and Decorators Retiree Welfare Fund; The Carpenters and Joiners Welfare Fund; Heartland Health & Wellness Fund;  GuideStone Financial Resources; Guidestone Group Plan; Guidestone Personal Plan; Church Pension Group Services Corporation; Episcopal Health Plan; Episcopal Health Plan for Qualified Small Employer Exception; General Board of Pension and Health Benefits of the United Methodist Church d/b/a Wespath Benefits and Investments; UMC Benefit Board, Inc.; Employee Health Benefit Trust of the*

*United Methodist Church; HealthFlex Plan; Concordia Plan Services;  Concordia Health Plan; Portico Benefits Services (the Evangelical Lutheran Church in America's benefit board);ELCA Medical and Dental Benefits Plan; Christian Brothers Services (a church plan benefits board created by the Christian Brothers religious order); Christian Brothers Employee Benefit Trust; The Board of Pensions of the Presbyterian Church U.S.A.; The Benefits Plan of the Presbyterian Church (U.S.A.)*

By: /s/ Phillip F. Cramer
Phillip F. Cramer
J. Scott Hickman
Eric G. Osborne
Sherrard Roe Voigt & Harbison, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN  37201
Tel: (615) 742-4200
Fax: (615) 742-4539
Email:  pcramer@srvhlaw.com
          shickman@srvhlaw.com
          eosborne@srvhlaw.com

*Counsel for The Boeing Company; The Boeing Company Master Welfare Benefit Plan; Bridgestone Americas, Inc.; Bridgestone Americas, Inc. Employee Group Insurance Plan; Bridgestone Americas, Inc. Retiree Medical Plan; Dollar General Corporation; Dollar General Health Plan (a component of the Dollar General Corporation Employee Benefits Plan); FedEx Corporation; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; FedEx Group Health Plan; The FedEx Corporation Retiree Group Health Plan; The Federal Express Corporation Group Health Plan for Pilots; Federal Express Corporation Retiree Group Health Plan for Pilots; Federal Express Corporation Retiree Group Health Plan; Federal Express Corporation; FedEx Freight, Inc.; Tractor Supply Company; Tractor Supply Company Medical Plan*

By: /s/ Jason A. Zweig
Jason A. Zweig
Keller Lenkner LLC
150 N. Riverside Plaza, Suite 4270
Chicago, IL  60606

33

Tel:  (312) 216-8667
Email:  jaz@kellerlenkner.com

*Counsel for Alaska Air Group, Inc.; Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc. Welfare Benefit Plan; American Electric Power Service Corporation; American Electric Power System Comprehensive Medical Plan;  Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; Big Lots, Inc.; Big Lots Associate Benefit Plan; Burlington Northern Santa Fe LLC; Burlington Northern Santa Fe Group Benefits Plan; Burlington Northern Santa Fe Corporation Welfare Benefits Trust; FedEx Corporation; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; FedEx Group Health Plan; FedEx Group Health Plan; FedEx Corporation Retiree Group Health Plan; The Federal Express Corporation Group Health Plan for Pilots; Federal Express Corporation Retiree Group Health Plan for Pilots; Federal Express Corporation Retiree Group Health Plan; Federal Express Corporation; FedEx Freight, Inc.; McLane Company, Inc.; McLane Company, Inc. Welfare Plan*


By:  */s/ William Blechman*
William J. Blechman, Esquire
Samuel J. Randall, Esquire
KENNY NACHWALTER, P.A.
1441 Brickell Avenue, Suite 1100
Miami, Florida  33131
Tel:                        (305) 373-1000
Fax:                       (305) 372-1861
E-mail:                   wblechman@knpa.com
                             srandall@knpa.com

*Counsel for Albertsons Companies Inc., New Albertsons L.P., Albertson's LLC, New Albertson's Inc., and Safeway Inc..; Albertsons Companies, Inc. Health and Welfare Plan, f/k/a Albertson's LLC Health & Welfare Plan; New Albertson's Inc. Health and Welfare Plan; Hy-Vee Inc.; Hy-Vee and Affiliates Benefit Plan and Trust; The Kroger Co., 84.51 LLC, and Murray's Cheese LLC;  The Kroger Co. Health and Welfare Benefit Plan; 84.51, LLC Health &*

34

*Welfare Plan; Walgreen Co.; Walgreen Health and Welfare Plan (Plan No. 501) f/k/a Walgreen Major Medical Expense Plan*

/s/ Jay M. Ezelle
Jay M. Ezelle (ASB-4744-Z72J)
H. Thomas Wells, III (ASB-4318-H62W)
Benjamin T. Presley (ASB-0136-I71P)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
jme@starneslaw.com
htw@starneslaw.com
btp@starneslaw.com