FILED

2021 Dec-08  PM 05:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406), | ) ) ) |
| | ) **CIVIL ACTION NUMBER:** |
| **Plaintiff,** | ) **Master File No. 2:13-CV-20000-RDP** |
| | ) |
| _____ | ) |

### SELF-FUNDED SUBCLASS OBJECTORS'
### POST–FAIRNESS HEARING BRIEF

The 93.5%-to-6.5% ratio used to sell out the claims of the Self-Funded Subclass violates the procedural and substantive requirements of Federal Rule of Civil Procedure 23(e)(2). The proponents offered no evidence to justify such a disproportionate allocation ratio, and the Court cited none, when the settlement was preliminarily approved. The allocation ratio is not equitable in comparison to the total monetary relief due the Subclass. It is not equitable when compared to the strength of the Subclass's claims. It is not equitable based on the relative size of the Subclass, which makes up over 60% of the total. Nor is it equitable in terms of scope of release. Because of this "disproportionate and facially unfair allocation," the Court should deny it final approval under the binding authority of *Holmes v. Continental Can*, 706 F.2d 1144, 1150 (11th Cir. 1983).

**1. Standards of decision.**

Rule 23(e)(2) was amended in 2018 to specify the requirements for approval of a class action settlement. The amended rule now provides:

> **(2)** *Approval of the Proposal.* If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>> **(A)** the class representatives and class counsel have adequately represented the class;
>> **(B)** the proposal was negotiated at arm's length;
>> **(C)** the relief provided for the class is adequate, taking into account:
>>> **(i)** the costs, risks, and delay of trial and appeal;
>>> **(ii)** the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>> **(iii)** the terms of any proposed award of attorney's fees, including the timing of payment; and
>>> **(iv)** any agreement required to be identified under Rule 23(e)(3); and
>> **(D)** the proposal treats class members equitably relative to each other.

FED R. CIV. P. 23(e)(2).

The Advisory Committee notes explain that these are the core "procedural considerations" and "substantive qualities" that govern the Court's decision. *Id.* advisory committee's note (2018 amendments). Subparagraphs (A) and (B) identify "'procedural' concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement." *Id.* Subparagraphs (C) and (D) focus on "'substantive' review of the terms of the proposed settlement." *Id.* There

are several substantive concerns outlined. One is the "relief that the settlement is expected to provide to class members." *Id.* Another is "the cost and risk involved in pursuing a litigated outcome," which requires the Court to "forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results." *Id.* "Examining the attorney-fee provisions may also be valuable in assessing the fairness of the proposed settlement," stressing the "relief actually delivered to the class" as a "significant factor in determining the appropriate fee award." *Id.* And finally, subparagraph (D) "calls attention to" the "inequitable treatment of some class members vis-a-vis others." *Id.* "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *Id.* "A distribution of relief that favors some class members at the expense of others may be a red flag that class counsel have sold out some of the class members at the expense of others, or for their own benefit." 4 NEWBERG ON CLASS ACTIONS § 13:56 (5th ed. 2021).

The Eleventh Circuit's leading case on judging the fairness of monetary apportionment among class members is *Holmes v. Continental Can*. The proponents of the settlement bear the burden of "proving" that the "disparate allocation of the award [i]s fair, adequate and reasonable." 706 F.2d at 1145. This is a burden of both

production and persuasion. The proponents first have a burden of "developing a record" to demonstrate the allocation is fair, reasonable and adequate." *Id.* at 1147. Second, where a "settlement explicitly provides for preferential treatment" of some class members over others, the burden of persuasion becomes heavier. *Id.* A "substantial burden" falls upon the proponents "to demonstrate and document its fairness." Rule 23(e)'s procedural and substantive standards apply with equal force to the Court's review of the intraclass allocation as they do to review of the overall settlement. *Id.* The Court must give the allocation "close judicial scrutiny" to ensure that "the burden of settlement is not shifted arbitrarily to a small group of class members." *Id.* at 1148. The Court cannot "allow a majority, no matter how large, to impose its decision on the minority." *Id.* If the proposed settlement contains a "disparate distribution" of "benefits," an inference of unfairness arises. "The inference of unfairness may be rebutted by a factual showing that the higher allocations to certain parties are rationally based on legitimate considerations." *Id.* Assurances or opinions of class counsel is not sufficient to justify a "disproportionate and facially unfair allocation." *Id.* at 1150. This is especially true where, as here, the defendant agreed to a lump sum settlement and the "intraclass distribution of the fund was left to the class and its representatives." *Id.* at 1146. Reliance on the assurances of class counsel thus recedes, and any disproportionate relief must be justified by an "adequately developed factual record." *Id*. at 1151.

Applying these principles, the Eleventh Circuit in *Holmes* reversed an allocation that gave the 8 named plaintiffs half of the $43,775 lump sum and left 118 class members to divide the rest. *Id.* at 1146. The same problems—and more— bedevil the 93.5%-to-6.5% allocation of this $2.67 billion lump sum settlement fund. The principles of *Holmes*, properly applied, prevent this Court from approving such a disproportionate allocation plan.

**2. The allocation violates Rule 23(e)(2)'s procedural fairness concerns.**

The 93.5%-to-6.5% allocation violates Rule 23(e)(2)'s procedural fairness concerns on several levels.

***First***, there are indications that the allocation was not negotiated at arm's length. The overall settlement amount agreed to by the BCBS Defendants was a $2.67 billion lump sum. In exchange, the BCBS Defendants insisted on inclusion of the Self-Funded Subclass in the release to achieve global peace. *See* Tr. I-15; Tr.II-137. Allocation of the lump sum between the Fully Insured Class and the Self-Funded Subclass was left to class counsel. *See* Tr. II-126–27; Doc. 2610-8 at 5.

At the recommendation of Subscribers' counsel, Mr. Burns was appointed to represent the Subclass in July 2019.  In November 2019, Mr. Burns determined his range for the Subclass's share and started his negotiations at "7 to 16 percent." Tr. II-125. There is no evidence to suggest that anyone with expertise in healthcare insurance issues was involved in determining this range. Had Mr. Burns been

advocating for a 12½- year claims period on behalf of the Subclass, his starting highest number should have been closer to 50 or 60 percent, given that the Subclass makes up over 60 percent of the covered lives. *See* Exhibits 1 & 2 to Mason Report. Moreover, Mr. Feinberg says counsel for the Fully Insured Class started the allocation mediation in the range of 3.4% to 6.8%. Doc. 2610-8 at 6. Settling on a final allocation for the Subclass of 6.5%—a mere 0.3% below the Fully Insured Class's initial high end—indicates this was not a contentious negotiation.

***Second***, there is nothing in the record to justify an allocation so disproportionate as 93.5% to 6.5%. The explanation of the allocation appears on one page of the motion for preliminary approval. Doc. 2610-1 at 32. There is no evidence to support that explanation. No expert declarations were presented by either the Subscribers or the Subclass.  Once you parse the citations in support of the allocation ratio, all you are left with is the assurances of counsel and Mr. Feinberg. *See id.* (citing Doc. 2610-6 ¶ 33, Doc. 2610-7 ¶¶ 9–10 & Doc. 2610-8 ¶¶ 6, 12–14). Contrary to the Subscribers' argument (Doc. 2868 at 28), those assurances are not enough. *Holmes*, 706 F.2d at 1150–51. None of the "evidence concerning the relative volume of payments and differing strengths of claims for Self-Funded Accounts and Fully Insured Claimants" (Doc. 2610-1 at 32) or the "numerous factors including the strengths of the respective claims, the shorter Self-Funded Class Period, and the large differences in premiums paid for fully-insured coverage as opposed to

administrative fees charged for self-insured coverage" (*id.*) can be found in the record. Anywhere. With "no support in the record" to support the allocation, the Court should refuse to approve it. *Day v. Persels & Assocs.*, 729 F.3d 1309, 1326–27 (11th Cir. 2013) (vacating class action settlement allocation; "a court commits a clear error when it makes a factual finding that has no support in the record.").

**Third**, Dr. Mason's report shortchanges the Self-Funded Subclass from receiving a fair allocation and is post-hoc rationalization. Dr. Mason's report played no role in the allocation. The first document Dr. Mason signed in the record in this case appears in September 3, 2021, months after objections were submitted. *See* Tr. II-212–13. Dr. Mason's report attempts to defend the allocation, not recite the factors considered in the allocation. Mason Report at ¶ 4 (stating that he "was asked to opine upon the economic reasonableness of the Settlement Agreement…" as to the allocation).

If the Court looks to Kenneth Feinberg, who was directly involved in mediating the allocation dispute, it will see the factors that motivated the allocation. Mr. Feinberg emphasized two factors: "considerations relating to potential statute of limitations issues and the relative size of the administrative fees paid by Self-Funded Claimants vs. the premiums paid by FI Claimants." Doc. 2610-8 at ¶ 12. Dr. Mason had "no reason to disagree with anything in paragraph 12" of Mr. Feinberg's declaration. Tr. II-215:2–5.

We deal below with the limitations issue, but the gross difference between fully insured premiums and administrative fees is an unsound basis for the allocation. The majority of the gross amount of premiums consists of mere pass-through charges that end up being paid to third parties. The proponents have conceded that "amounts paid to third parties fall outside the scope of this litigation." Doc. 2812-1 at 126; see also Mason Report at ¶¶ 53–54.

As Dr. Mason recognized, the Affordable Care Act requires Defendants to spend 85% (in most instances) of fully insured premiums on medical claims. Mason Report at ¶ 40 n.60. This is known as the "medical loss ratio." As a result, Defendants *cannot* earn a profit on 85% of the money they receive from fully insured subscribers—85 cents of every dollar must pass through Defendants, either to a provider as a claim payment or as a refund to the subscribers. The overcharge must come from the 15% of premiums left over after paying claims or refunding premiums.[1]

In the fairness hearing, the Court posed a hypothetical about automotive insurance. It posited two insurance products, one that merely processed the claim and one that also provided a defense to the insured and paid the claim. It asked

---

[1]      Neither the Feinberg Declaration (which is the only declaration supporting the allocation percentages prior to our Objection being filed) nor the Burns Report (which was provided by Mr. Burns to Objectors as an explanation for the allocation) acknowledged the medical loss ratio.

which product would cost more.  Tr. II-173:25–174:11. While the automotive insurance product that covered claims would cost more, the hypothetical fails to account for the critical role played by the medical loss ratio.  If there were an automotive-insurance equivalent of the medical loss ratio, the difference in premiums between the two insurance products would mostly disappear because the insurer would either have to pay the money out in claims or else return the difference to its subscribers.  Moreover, to fit the hypothetical to the facts of the health insurance industry, the people insured under the competing auto insurance policies would have to be getting the same repairs from the same shops at the same rates and being represented by the same lawyers.  All these claims-based items cost what they cost, and there is no allegation in this case that the claims costs for the fully insured group are different than the claims costs for the self-funded group.  The overwhelming majority of the difference between what the groups pay is comprised of claims costs that cannot and do not include an overcharge.

Ugo Okpewho's testimony establishes this point, and the proponents have not rebutted it.  He walks through how Defendants create a premium and how that process differs for self-funded and fully insured plans.  In the end, Mr. Okpewho's unrebutted testimony is that once the cost of healthcare claims paid by either type of plan is removed, the only distinction in what self-funded plans pay for versus fully insured plans is that Blue Cross builds in a cushion to cover risks it incurs if a fully

insured plan's claims cost exceeds 85% of the premium paid, plus taxes. Otherwise, the cost of services purchased by both types of plans are the same and alleged differences in markets or competition play no role. Tr. II–236:5–246:24.

The proponents attack Mr. Okpewho for not performing an overcharge analysis, but they miss the point. Neither he nor Dr. Mason performed an overcharge analysis.[2] In the absence of an overcharge analysis, Dr. Mason relied on theoretical proxies based on unsubstantiated and unverified revenues and profits of BCBS. Mr. Okpewho relied on his knowledge and experience gained from working for over 20 years in the health insurance industry, including working for three different Blue Cross entities over twelve years, to identify the components of the prices charged to the competing classes that could include an overcharge. He is the only person with industry experience and knowledge of how and why rates are set who has provided evidence in this case. His testimony shows the weaknesses in the analysis that took place in the allocation. The proponents bear the burden of showing that the allocation was reasonable, and he shows that it was not.

Even setting Mr. Okpewho's testimony aside, two sweeping problems infect Dr. Mason's analysis and render it unhelpful. The first problem is the one-sided

---

[2] Dr. Mason's report states that "I do not possess specific measures of such overcharges for each Licensee nor have I been instructed to estimate overcharge for each Licensee." Mason Report at ¶ 30. Instead, Dr. Mason defers to Dr. Pakes for even an estimate of an overcharge of a single defendant. *Id*. at ¶ 30 n.50.

discount rate.  Dr. Mason discounted every profit and revenue number for the Self-Funded Subclass by half.  *See* Mason Report at ¶¶ 39–40, 43, 48–49.  The 50% Discount argument was not included in the Feinberg Declaration or the Burns Report nor has it ever been argued by the Subscribers.  This argument was not introduced to the Court until September 2021 in Dr. Mason's Declaration. He applied this "late to the game" discount (Tr. II-203) solely to account for the delay that Self-Funded Subclass would face if it had to litigate its claims.  *See* Mason Report at ¶ 50 (his allocation values "include discounts for the time avoided in ASO litigation, they do not include discounts for the probability of success of such litigation.")  He assumed that the Self-Funded Subclass would have to wait many years (his exemplar calculation assumed eight years) to get a judgment.  *Id*. at ¶ 35 n.53.  But he applied ***no*** discount factor to the Fully Insured Class, which has the effect of assuming that the Fully Insured Class's recovery is cash in hand today.

This unequal discounting conflicts directly with the proponents' statements that this case would require years to bring to a collected judgment.   The proponents repeatedly urged the Court to approve the settlement precisely because it would take years to get to a judgment.  *See* Tr. I-19:23–25 ("[W]hile this litigation has already lasted nine years, if this case were to proceed to trial, the costs in time and uncertainty would continue"); Tr. I-40:22–25 ([T]he settlement… will avert years of complex, expensive, and risky litigation for the class"); Tr. I-51:14–22 (urging that

the settlement grants benefits "far earlier than otherwise could have occurred if this were to play out in endless forms of litigation" and predicting "years of extremely costly and complex litigation in multiple forums" absent settlement approval).

Dr. Mason admitted under cross examination that he did not discount the claims of the Fully Insured Class at all, and he attempted to justify that choice by noting that he understood that the Fully Insured Class started litigating sooner. Tr. II-203:22–25. But, setting aside that Self-Funded plans were always members of the injunctive relief class, Dr. Mason's rationale for discounting is the time it would take from the present to obtain a paid-up judgment. Mason Report at ¶ 35 ("Such a discount factor typically considers both the expected amount of time that would elapse before a litigation or settlement payment is made as well as the risk associated with that payment.").[3] The time remaining to judgment is relevant; the time spent litigating already is not. Everyone agrees that a paid-up judgment is years away for both subclasses, but Dr. Mason ignored this fact and discounted one subclass's claims only. That decision infects all four of his analyses and effectively took half of the money from the Self-Funded Subclass and gave it to the Fully Insured Class.[4]

---

[3]    As noted above, Dr. Mason did not use risk as a component of his discount factor. His discount rate addresses "time avoided," but "they do not include discounts for the probability of success in such litigation." Mason Report at ¶ 50.

[4]    Moreover, large fully insured plans were not added to this case until November, 2020, the same time Subscribers say that the Self-Funded Subclass was added. Yet, Dr. Mason applies his 50% discount theory to the Self-Funded Subclass,

Another weakness that touches every part of Dr. Mason's analysis is his inability to say what revenue items he included for the Self-Funded Subclass and the Fully Insured Class. He treats every plan as unique by urging that knowing what one plan provides tells you nothing about any other plan. Tr. II-207:19–23. When asked what items of revenue he included in his analysis of ASO revenues, he deflected, saying "I'm not an expert on this data." Tr. II-219:7–10. He directed Objectors to ask the Defendants. *Id*. Nothing in the record shows what revenues Dr. Mason considered, and Dr. Mason did not show his work. The line items in his analysis are essentially black boxes in which he asks us to take on faith that the appropriate revenues (but only the appropriate revenues) are included—even though he cannot say what those revenues are. He even admits that "reconciling" the different items of revenue across the different Defendants "would be difficult, if not impossible, as objectors point out." Tr. II-231:14–16. The best he could say, in the end, is that "[t]o some extent, it's my understanding this revenue does cover some of these categories expressed in general terms." Tr. II-231:21–23. Such hedged opinions are too thin a reed to support useful opinions or defend the shockingly uneven allocation between the classes. Dr. Mason's inability to answer basic

---

not to the large fully insured plans added the same day. That inequitable treatment is supported by no evidence and is patently unfair.

questions like what kinds of revenues comprise the categories he uses to compare the classes shows that his work lacks the necessary rigor.

Subscribers and Dr. Mason seek to rely on revenues and profits to Blue Cross from the two types of plans to support the allocation, even though they do not anywhere state in the record what the true revenue or profit numbers are. The undisputed evidence is that Blue Cross accounts for self-funded revenue in ways that actually make fully insured business look more profitable, as shown at length in our discussion of testimony from the Anthem trial—none of which was rebutted at the hearing or in any brief. *See* Doc. 2845 at 17–19 and accompanying exhibits. Blue Cross allocates revenue from value-added services sold to self-funded plans in ways that allow Blue Cross to spread general and administrative expenses across product lines. Likewise, revenues from self-funded value-added services are not placed in an ASO revenue category, but are instead placed in separate and specific categories of revenue for identifiable items such as vision, dental, and other value-added services. By employing these accounting measures, Anthem's former CFO testified that Anthem "improves the profitability of small group/large group fully insured and large group ASO." Doc. 2845-4 at 33 (DeVeydt Transcript at 1725:6–9). Spreading the general and administrative expenses across product lines appears to reduce the profitability of national home ASO, but "makes the other lines of business more profitable." Doc. 2845-4 at 34 (DeVeydt Transcript at 1726:10-21). One of the

benefits of winning an ASO account is that Anthem gets to sell the ancillary value-added services, which then allows Anthem to spread the revenues of those services across all product lines. *Id*. at 35 (DeVeydt Transcript at 1727:12–24). To know the actual profitability of the self-funded business, the revenues must be pulled from each of the separate categories of services in which the revenues are placed. *Id*. But BCBS does not account for self-funded business that way. *Id*. at 32–33 (DeVydt Transcript at 1724:18–1725:16); *see also* Exhibit B (collecting relevant Anthem transcript pages).

Exhibits A–F to Subscribers' post-hearing brief suffer from the same complexity, lack of transparency, and confusion as to what may be the actual revenues and profitability from the self-funded plans described by Mr. DeVeydt. As set forth by BDO in its Report responding to the Subscribers' post-hearing brief and new exhibits, none of the exhibits describe what fully insured premiums and self-funded fees contain.

In contrast, BDO's report relies on Mr. Okpewho's years of industry experience, including his twelve years at Blue Cross, to describe the problems with Subscribers' arguments from their exhibits. In short, Blue Cross's accounting for the various revenues from self-funded plans is incredibly complicated and is not transparent. BDO Report, Ex. A.

*Fourth*, the Court erred in preventing the Self-Funded Subclass from examining input from counsel for the Fully Insured Class on Dr. Mason's report. *See* Doc. 2862; Tr. II-82. The Court has a fiduciary obligation to ensure that the settlement is not collusive and to guard against settlements that benefit the class representatives or their counsel at the expense of absent class members. *In re Equifax*, 999 F.3d 1247, 1265 (11th Cir. 2021). The allocation of $2.67 billion between the Fully Insured Class and the Self-Funded Subclass is a "zero-sum" game: "a gain to one party entails a corresponding loss for the other parties." *Holmes*, 706 F.2d at 1160. Thus, counsel for either side of this intraclass divide will remain adversaries "until the district court approves the settlement." *Equifax*, 999 F.3d at 1264. Plus, objectors to the allocation "cause the settlement process to be more adversarial." *Id.* at 1265. The Court thus erred in holding that counsel for the Fully Insured Class and counsel for the Self-Insured Subclass somehow had a "common interest" in crafting Dr. Mason's post-hoc report. The common interest privilege does not apply to this adversarial situation. *United States v. Almeida*, 341 F.3d 1318, 1324–25 (11th Cir. 2003); *Garner v. Wlfinbarger*, 430 F.2d 1093, 1103 (5th Cir. 1970); 1 McCormick on Evidence § 91.1 (8th ed. 2020); Restatement (Third) of the Law Governing Lawyers § 75 (2000).

This privilege assertion is especially troubling because Subscribers described Dr. Mason as the expert for the Self-Funded Subclass, suggesting that he was

independent of the Fully Insured Class.  Doc. 2812-1 at 107.  His report says that he is opining on behalf of the Self-Funded Subclass, not both subclasses together. Mason Report at ¶ 4.  For the Subclass's retained expert to urge that its claims could have *de minimis* value raises troubling and unanswered questions. Mason Report at ¶ 43. For example, Dr. Mason includes the Gross Revenue formula in his analysis even though he admits that this formula overstates the fully insured allocation percentage by up to 85%.  Mason Report at ¶ 60 n.60.  Similarly, Dr. Mason' decision to apply a new 50% discount rate to all of his proposed formulas is neither supported by any published rationale nor appropriate in view of the facts.  Indeed, the discount theory was not mentioned by either the Subscribers or the Subclass until after Objectors submitted their initial expert reports.

These factors, combined, reveal the unfairness of the opaque process that produced this disproportionate allocation.

### 3. The allocation violates Rule 23(e)(2)'s substantive fairness concerns.

Under Rule 23(e)(2), there are four cross-checks that test the substantive fairness of an allocation: the amount a subclass is allocated compared to (1) the amount allocated to the other class members, (2) the subclass's possible recovery, (3) the strength of the subclass's claims, and (4) the scope of the subclass's release. The allocation here fails all four substantive cross checks.

*First*, the mathematical disproportion between 93.5% and 6.5% is "facially unfair[]." *Holmes*, 706 F.2d at 1148. Such extreme disproportion creates an inference of unfairness. *Id.* And such extreme disproportion can only be justified with proof that is extraordinary. *Id.* at 1147. The proponents of the settlement have not rebutted the inference of unfairness with any evidence, much less substantial evidence, that shows "the higher allocations to certain parties are rationally based on legitimate considerations." *Id.* at 1148. The assurances of counsel and a mediator and the post-hoc rationalization of an economist, with no "proven facts" to substantiate those opinions, is not sufficient. *Id.* at 11150–51.

*Second*, the record contains no evidence of the Self-Funded Subclass's possible recovery.  The "range of possible recovery" is a necessary factor to be considered under *Bennett*. *In re Equifax Inc. Customer Data Security Breach Litig.*, 999 F.3d 1247, 1273 (11th Cir. 2021). Dr. Pakes explains that he did not do any separate analysis of the possible recovery for the Self-Funded Subclass. Doc. 2610-11 at 4. He simply "underst[oo]d" that the Subclass's damages were "6.5% of total damages" and thus "used that fraction to estimate damages to ASOs." *Id.* ¶ 7.  This logic is circular: the sole number used to calculate the Self-Funded Subclass's recovery is the settlement number that must be defended.  Circular logic equals null analysis; a 6.5% allocation cannot justify itself.

With no analysis of the value of the Subclass's claims, the allocation cannot stand. *See Mirfasihi v. Fleet Mortg.*, 356 F.3d 781, 786 (7th Cir. 2004) (reversing allocation where the district court "made no estimate of the value of the legal claims" of the subclass who received 0% of monetary fund); *Staton v. Boeing*, 327 F.3d 938, 975–76 (9th Cir. 2003) (reversing 16:1 ratio for lack of direct evidence supporting plaintiffs' counsel's opinion on the strength of preferred subclass's claims). Indeed, the Eleventh Circuit reversed a settlement where there was no record evidence establishing the range of possible recovery. *Day*, 729 F.3d at 1327–28.

Relatedly, Subscribers and Dr. Mason assert without evidence that the Self-Funded Subclass's claims are not as strong as the Fully Insured Class's claims. They incorrectly allege that significant competition in the self-funded market supports that assertion. But Dr. Mason admits that he did not do any analysis of competition. He was not asked and did not do a price elasticity test and he did not have the data to do one. Tr. II-64:15–22. He also did not do a SSNIP analysis, which would determine the market within which a monopolist could impose a profitable increase in price. Tr. II-66:11–17. Dr. Mason is just guessing about what levels of competition exist and what price increases could be imposed on one type of plan versus the other. Both Mr. Hausfeld and Dr. Mason admit they are aware that TPAs do not provide competition to BCBS in the National ASO market. Tr. II-66–70, 90. The

19

unsupported arguments about the relative strength of the Self-Funded claims should

be disregarded.[5]

   ***Third***, nothing justifies the shorter claims period for the Self-Funded

Subclass. As set forth in the Objectors' opening briefs, the *Cerven* complaint—

which the settlement used to calculate the claims period for the Fully Insured

Class—must provide the claim date for the Self-Funded Subclass.  This argument is

primarily legal and has been adequately briefed, but a few facts and concessions

from the Fairness Hearing show that the Self-Funded Subclass must receive the

benefit of the *Cerven* filing date.

   For one thing, the hearing confirmed that *Cerven* attacks the entire Blue

network.  The class definition for the injunctive relief class is extremely broad:

> All persons or entities in the United States of America who are currently
> insured by any health insurance plan that is currently a party to a license
> agreement with BCBSA that restricts the ability of that health insurance
> plan to do business outside of any geographically defined area.

---

[5]    Dr. Mason also made the unsupported conclusion that premiums for fully insured plans rose faster than for self-funded because of a difference in the market power and therefore fully insured suffered more damage.  Tr. II–211:18–21.  Of course, Dr. Mason did no market power study.  And, his lack of knowledge of the health insurance industry is exposed – premiums rose for fully insured plans because of increasing healthcare costs.  These same increased costs were borne by self-funded plans, they were just paid by self-funded plans to healthcare providers while the fully insured plans' increased costs pass through Blue Cross to healthcare providers.  *See* BDO Report, Ex. A.

*Cerven* Complaint at ¶ 20.  This definition is not limited to certain types of plans. Any member whose plan is subject to geographic restrictions is covered.  The *Cerven* complaint bolsters this analysis by discussing such things as Most Favored Nations clauses, which reduce competition for all plans, regardless of plan type.  *Cerven* Complaint at ¶¶ 114–122.  *Cerven* alleged anti-competitive behavior affecting the prices insureds paid for the provision of health care "services" (*id*. at ¶¶ 35, 113, 159.d, 189.d), which would apply to every plan using the challenged networks, regardless of plan type.  *Cerven* also lumps fully insured and self-funded members together in its count of total members that are subject to territorial restrictions.  *Id*. at ¶¶ 105–110.

The Defendants admitted at the Fairness Hearing that they understood that the relief sought would affect everyone in the Blue system—"the impact that this kind of case would have on, you know, anyone, just given the markets we're talking about in general…."  Tr. II-163:12–18.[6]  The Court suggested that the Defendants referenced a "huge class of a hundred million people that Mr. Boies was trying to certify…," (Tr. II. 155:9–12), though the Court allowed that "I don't remember if it a hundred million."  Tr. II-156:1–5.  Subscribers' counsel identified the total number

---

[6]     A fair reading of the *Cerven* complaint would cause any member of the Self-Insured Subclass to believe that they were included in it.  They would also have considered that their claims were tolled under *Am Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 555-59 (1974), while the litigation continued.

of class members across both classes as approximately 100 million people.  Tr. I-50:2–7.  The exhibits to Dr. Mason's report show that there are more than 50 million self-funded members in many years and constitute most of the class for every full year in which they are included.  Mason Report at Exhibit 1, Exhibit 2.  As noted at the Fairness Hearing, the only way for the number of affected members to approach 100 million is to include Self-Funded plans.  Tr. II-156:1–2.  The settlement numbers do not estimate the enrollment of large fully insured plans, but *Cerven* emphasizes that 83% of large groups self-insure (*Cerven* Complaint at ¶ 131) and notes "the vast majority of large group consumers purchase ASO products rather than fully-insured health insurance products…."  *Id*. at ¶ 132.  Indeed, in a remarkable concession on this point, the Subscribers' post-hearing brief asserts that "most fully-insured groups fell squarely within *Cerven*'s [damages] class definition." Doc. 2868 at 27.

Additionally, the Subscribers articulated no reason why the Self-Funded Subclass should not receive the same claim period as large fully insured plans.  Both types of plans were excluded from the damages classes in every complaint up until the complaint filed with the settlement.  Both groups' damages claims were added on the same day.  But one group gets to claim back to 2008 and the other gets to claim back only to 2015.  In sum:

|  | **Large Fully Insured Plans** | **Self-Funded Plans** |
|---|---|---|
| The Self-Funded Subclass is factually similar to large fully insured plans… | | |
| **Date of first damages claim** | November 2, 2020 | November 2, 2020 |
| **Included in *Cerven* injunctive class?** | Yes | Yes |
| **Understood by Defendants to be in injunctive class?** | Yes | Yes |
| **Represented by a separate class representative?** | No | No |
| …But the settlement treats them differently by inequitably benefitting the large fully insured plans at the expense of the Self-Funded Subclass. | | |
| **Given the benefit of *Cerven* for purposes of damages claim?** | Yes | No |
| **Beginning date of claims period** | February 7, 2008 | September 1, 2015 |
| **Days in Claims Period** | 4,635 | 1,872 |
| This inequitable treatment gives fully insured plans a claims period that is almost 2.5 times longer than the Self-Funded Subclass, even though they were added to the case on the same day. | | |

At the hearing, Subscribers articulated no principle of law justifying treating these similarly-situated groups so differently. Instead, they confessed that Mr. Feinberg—acting as "an invisible hand at the back of your head"—thought there was a "rational basis" to give large fully insured plans benefits denied to the Self-Funded Subclass. Tr. II-148:10–21. A mediator's opinion is not evidence to support a

massive disparity in the allocation.  To be sure, Subscribers' counsel at the hearing and in their post-hearing briefs repeated various arguments about how Self-Funded plans are not insurance, but those arguments have been adequately briefed already. Doc. 2812-19 at 91–96; Doc. 2845 at 3–10.

*Fourth*, the release that will bind the Self-Funded Subclass has the exact same scope as the Fully Insured Class's release, yet the Subclass is receiving a single-digit payout. A 93.5%:6.5% ratio on monetary relief, contrasted with a 1:1 ratio on the scope of the release, is incongruous and substantively unfair. *See Petruzzi's v. Darling-Delaware*, 880 F. Supp. 292, 299 (M.D. Penn. 1995) (refusing to approve allocation that "provides compensation to 50% of the class but requires the entire class to release its claims against the settling defendant."). This is especially true for the ERISA Plans. As the Department of Labor has pointed out, the Plans are allocated 0%, but will be bound 100% by the same release. *See* Tr.III-7. Given that the release binds all class members equally, a "share-and-share-alike formula" is the only fair outcome. *See In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1329 (5th Cir. Unit A 1981) (affirming equal distribution to pre- and post-1972/73 claimants, despite statute of limitations issues, where "all of the settlements contain a provision releasing claims" stretching back to the earlier period).

### 4. An allocation is not necessary; claims should be paid based upon premiums and premium equivalents.

There is no need for a subclass or an allocation among class members. Dr. Mason testified that the BCBS Defendants do not separately account for the fully insured versus the self-funded sources of their revenues. Tr.II-230–32. The Self-Funded Subclass Objectors have shown that the BCBS Defendants instead track premiums and premium equivalents for fully insured and self-funded customers, respectively. Doc. 2845 at 10–13 (discussing Anthem testimony regarding premium equivalents). *See also* Doc. 2812-9 at 14 n.54 (explaining that the quarterly reports Dr. Mason received from the BCBS Defendants include in "gross revenue" "fully insured premiums and premium equivalents for self-funded business"). Thus, there is no need for an allocation. Rather, the settlement's monetary relief should be distributed to claimants based on the premiums or premium equivalents paid during the claims period, and the claims should be paid to the Plans, not the employers themselves. Where, as here, there is a fundamental intraclass conflict over the allocation, one solution for the inherent unfairness is to do away with the allocation. *Dewey v. Volkswagen*, 681 F.3d 170, 189 (3d Cir. 2012). This Court should follow *Dewey* and eliminate the allocation altogether.

## CONCLUSION

For these reasons and those offered by the Self-Funded Subclass in their objection, in their prior briefing, and at the Fairness Hearing, the Court should refuse to finally approve the settlement proposal.

Respectfully submitted this 8th day of December 2021.

/s/ Scott Burnett Smith

*One of the Attorneys for Objectors*

OF COUNSEL
Michael R. Pennington
J. Thomas Richie
Emily M. Ruzic
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

Scott Burnett Smith
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Avenue West, Suite 900
Huntsville, AL 35801-4900
Telephone: (256) 517-5100
Facsimile: (256) 517-5200

Richard D. Nix, OBA # 11453
Henry D. Hoss, OBA #11354
M. Richard Mullins, OBA # 13329
Mark D. Spencer, OBA # 12493
McAfee & Taft A Professional Corporation
Eighth Floor - Two Leadership Square
211 N. Robinson Oklahoma City, OK 73102
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
Richard.nix@mcafeetaft.com
Henry.hoss@mcafeetaft.com
Richard.mullins@mcafeetaft.com
Mark.spencer@mcafeetaft.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 8, 2021, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Scott Burnett Smith*
OF COUNSEL
