
FILED
2021 Dec-17  PM 05:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **IN RE BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION MDL 2406** | : : : : : : : | **Master File 2:13-cv-20000-RDP** |
| | | **This document relates to Subscriber Track cases** |

**SUBSCRIBERS' POST-HEARING REPLY BRIEF
IN SUPPORT OF FINAL APPROVAL OF CLASS SETTLEMENT**

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.      ARGUMENT ................................................................................................................ 2

     A.      The Going-Forward Blue System, as Altered by the Settlement, Warrants Final Approval. ........................................................................................................ 2

         1.      The Settlement Does Not Perpetuate A Clearly Unlawful Arrangement. .. 2

         2.      There Is No Material Difference Between the "Clearly Illegal" and the "*Per Se*" Standards in the Context of Antitrust Cases. .............................. 3

         3.      No Prior Ruling Regarding the Blue System Holds that the Existing System and ESAs, Much Less the Post-Settlement System and ESAs, Are *Per Se* Unlawful or Otherwise Clearly Illegal. .......................................... 6

         4.      The Proposed Settlement Agreement, if Approved, Would Create a Blue System Fundamentally Different from that before the Court in Its 2017 Summary Judgment Decision. ................................................................... 9

             a.      The Proposed Settlement Agreement Will Open ESAs to Interbrand Competition between Blue Plans. .............................. 10

             b.      The Proposed Settlement Agreement Will Introduce Significant Blue-on-Blue Competition in Several Important Ways............... 13

             c.      The Post-Settlement ESAs Would Be Distinguishable from the Exclusive Service Areas Held Unlawful in *Sealy*, *Topco*, and *Palmer*. ........................................................................................ 15

         5.      The Proposed Settlement Does Not Improperly Release Future Antitrust Violations. .............................................................................................. 17

     B.      Characterizing the SBB Relief as Rule 23(b)(3) Relief Ensures that the Opt-Out Rights of Putative Class Members Are Adequately Protected. .......................... 22

         1.      Opt-Outs from the Rule 23(b)(3) Damages Class May Not Seek Relief that Would Infringe the Rule 23(b)(2) Injunctive Relief. ................................ 24

         2.      With the Exception of the SBB Relief, All of the Injunctive Relief Described in Paragraphs 10 through 18 of the Proposed Settlement Agreement Is "Rule 23(b)(2) Indivisible Injunctive Relief." .................. 24

         3.      Members of the Injunctive Relief Class Who Have Opted Out of the Damages Class May Assert Any Legal Claim that Would Entitle Them to Individualized and Divisible Relief. ........................................................ 33

i

C.    The New Arguments Advanced by the BA Objectors Are as Meritless as Their Prior Arguments. ................................................................................. 37

D.    GM's Continued Objection that It Does Not Receive a Second Blue Bid Should Be Overruled. .............................................................................................. 50

E.    Huang's Untimely Complaint Is Both Procedurally and Substantively Flawed... 54

F.    The Court Need Not Address The Providers' Litigation in the Final Approval Order as Their Claims Are Not Released by the Settlement. ............................... 55

III.    CONCLUSION............................................................................................................... 56

# TABLE OF AUTHORITIES

## Cases

*A.R. v. Connecticut State Board of Education*,
2020 WL 2092650 (D. Conn. May 1, 2020) ........................................................................ 27

*Alexander v. National Football League*,
1977 WL 1497 (D. Minn. Aug. 1, 1977) ............................................................................. 4

*American Needle, Inc. v. National Football League*,
560 U.S. 183 (2010) ........................................................................................................... 9

*Amin v. Mercedes-Benz USA, LLC*,
2020 WL 5510730 (N.D. Ga. Sept. 11, 2020) .................................................................... 52

*Armstrong v. Board of School Directors of City of Milwaukee*,
616 F.2d 305 (7th Cir. 1980) ............................................................................................. 4

*B.K. v. Snyder*,
922 F.3d 957 (9th Cir. 2019) ............................................................................................. 28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................... 9

*Bennett v. Behring Corp.*,
737 F.2d 982 (11th Cir. 1984) .......................................................................................... 4, 7

*Bennett v. Behring Corp.*,
96 F.R.D. 343 (S.D. Fla. 1982) .......................................................................................... 4

*Blue Cross and Blue Shield Ass'n v. Group Hosp. & Med. Servs., Inc.*,
744 F. Supp. 700 (E.D. Va. 1990) ..................................................................................... 6

*Braggs v. Dunn*,
317 F.R.D. 634 (M.D. Ala. 2016) .......................................................................... 26, 27, 28, 32

*Calibuso v. Bank of America Corp.*,
299 F.R.D. 359 (E.D.N.Y. 2014) ....................................................................................... 4

*Carnegie v. Mutual Savings Life Ins. Co.*,
2004 WL 3715446 (N.D. Ala. Nov. 23, 2004) .................................................................. 54

*Chan v. Sutter Health Sacramento Sierra Region*,
2016 WL 7638111 (C.D. Cal. June 9, 2016) ...................................................................... 26

*Cole v. City of Memphis*,
   839 F.3d 530 (6th Cir. 2016) ................................................................... 28

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) ................................................................... 2

*Day v. Persels & Assocs.*,
   729 F.3d 1309 (11th Cir. 2013) ................................................................ 43

*Easterling v. Connecticut Dept. of Correction*,
   278 F.R.D. 41 (D. Conn. 2011)................................................................. 27

*Etter v. Thetford Corp.*,
   2016 WL 11745096 (C.D. Cal. Oct. 24, 2006)........................................ 54

*F. T. C. v. Consol. Foods Corp.*,
   396 F. Supp. 1353 (S.D.N.Y. 1975)........................................................ 19

*Fraley v. Batman*,
   638 Fed. Appx. 594 (9th Cir. 2016)........................................................... 3

*Gayle v. Meade*,
   2020 WL 3041326 (S.D.Fla. 2020) ........................................................ 29

*Grunin v. International House of Pancakes*,
   513 F.2d 114 (8th Cir. 1975) ..................................................................... 4

*Holmes v. Continental Can*,
   706 F.2d 1144 (11th Cir. 1983) ........................................... 42, 43, 52, 53

*In  re Warner Commc'ns Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y.1985)........................................................... 54

*In re Blue Cross & Blue Shield Antitrust Litig.*,
   2020 WL 8256366 (N.D. Ala. Nov. 30, 2020) ...................................... 10

*In re Blue Cross Blue Shield Antitrust Litig.*
   2018 WL 71522887 (11th Cir. Dec. 12, 2018)........................................ 8

*In re Blue Cross Blue Shield Antitrust Litig.*,
   308 F. Supp. 3d 1241 (N.D. Ala. 2018)................................................... 8

*In re Chinese-Manufactured Drywall Prods. Liability Litig.*,
   424 F. Supp. 3d 456 (E.D. La. 2020)...................................................... 53

*In re Corrugated Container Antitrust Litig.*,
   643 F.2d 195 (5th Cir. 1981) ........................................................... 38, 49

*In re Delta Dental Antitrust Litig.*,
    484 F. Supp. 3d 627 (N.D. Ill. 2020) ............................................................ 7, 8, 55

*In re Equifax Inc. Customer Data Security Breach Litig.*,
    2020 WL 256132 (N.D. Ga. March 17, 2020) ........................................................ 52

*In re Equity Funding Corp. of America Securities Litigation*,
    603 F.2d 1353 (9th Cir. 1979) ........................................................................... 39

*In re Gypsum Cases*,
    386 F. Supp. 959 (N.D.Cal.1974) *aff'd*, 565 F.2d 1123 (9th Cir. 1977) ............... 39

*In re Managed Care,*
    756 F.3d 1222 (11th Cir. 2014) ......................................................................... 19

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) ...................................................... 20

*In re Pool Products Market Antitrust Litig.*,
    988 F. Supp. 2d 696 (E.D. La. 2013) .................................................................... 9

*In re Veeco Instruments, Inc. Sec. Litig.*,
    2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ........................................................ 52

*In re Vitamins Antitrust Class Actions*,
    215 F.3d 26 (D.C. Cir. 2000) ............................................................................. 54

*J.M. v. Crittenden*,
    337 F.R.D. 434 (N.D. Ga. 2019) ........................................................................ 26

*Joh v. Am. Income Life Ins. Co.*,
    2020 WL 109067 (N.D. Cal. Jan. 9, 2020) .......................................................... 52

*Johnson v. American Credit Co. of Georgia*,
    581 F.2d 526 (5th Cir. 1978) ............................................................................. 28

*Johnson v. Montgomery Cty. Sheriff's Dept.*,
    604 F. Supp. 1346 (M.D. Ala. 1985) .................................................................. 54

*Kincade v. General Tire & Rubber Co.*,
    635 F.2d 501 (5th Cir. 1981) ............................................................................. 52

*Kuhr v. Mayo Clinic Jacksonville*,
    530 F. Supp. 3d 1102 (M.D. Fla. 2021) .............................................................. 53

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ........................................................................................... 4

*Lippert v. Baldwin*,
  2017 WL 1545672 (N.D. Ill. Apr. 28, 2017) ........................................................ 28

*Lurns v. Russell Corp.*,
  604 F. Supp. 1335 (M.D. Ala. 1984) .................................................................... 54

*M.H. v. Berry*, No. 1:15-CV-1427-TWT,
  2017 WL 2570262 (N.D. Ga. June 14, 2017) ...................................................... 26

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
  161 F.3d 443 (7th Cir. 1998) ............................................................................... 18

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
  198 F.3d 823 (11th Cir. 1999) ............................................................................. 19

*Murphy v. Eyebobs, LLC*,
  2021 WL 4594679 (W.D.Penn. Oct. 6, 2021) ...................................................... 26

*N.B. v. Hamos*,
  26 F. Supp. 3d 756 (N.D. Ill. 2014) ..................................................................... 26

*National Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
  468 U.S. 85 (1984) ............................................................................................... 14

*Ne. Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*,
  896 F.2d 1283 (11th Cir. 1990) ........................................................................... 29

*Palmer v. BRG of Ga., Inc.*,
  498 U.S. 46 (1990) ................................................................................... 10, 16, 17

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) ........................................................... 26, 28, 29, 30

*Petrovich v. Amoco Oil Co.*,
  200 F.3d 1140 (8th Cir. 1999) ............................................................................. 52

*Petruzzi's v. Darling-Delaware*,
  880 F. Supp. 292 (M.D. Pa. 1995) ...................................................................... 49

*Record Club of Am., Inc. v. United Artists Records, Inc.*,
  611 F. Supp. 211 (S.D.N.Y. 1985) ....................................................................... 19

*Redel's, Inc. v. General Electric Co.*,
  498 F.2d 95 (5th Cir. 1974) ........................................................... 18, 19, 20, 21

*Robertson v. National Basketball Ass'n*,
  556 F.2d 682 (2nd Cir. 1977) ............................................................................ 2, 4

*Shane v. Humana, Inc.*,
   2009 WL 7848518 (S.D. Fla. Nov. 5, 2009) ......................................................... 18

*State of Md. v Blue Cross Blue Shield Ass'n*,
   620 F. Supp. 907 (D. Md. 1985) ......................................................................... 6

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997) ........................................................................................... 11

*Stearns Airport Equipment Co., Inc. v. FMC Corp.*,
   170 F.3d 518 (5th Cir. 1999) ............................................................................ 12

*United States v. Brown University in Providence in State of Rhode Island*,
   5 F.3d 658 (3rd Cir. 1993) ................................................................................ 14

*United States v. DuPont & Co.*,
   366 U.S. 316 (1961) ........................................................................................ 16

*United States v. Sealy*,
   388 U.S. 350 (1967) ............................................................................... 6, 10, 16

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940) ........................................................................................ 17

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972) ................................................................................. passim

*VKK Corp. v. NFL*,
   244 F.3d 114 (2d Cir. 2001) ............................................................................. 18

*Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc.*,
   546 U.S. 164 (2006) ........................................................................................ 10

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................... 27, 28

*White v. National Football League*,
   822 F. Supp. 1389 (D. Minn. 1993) ................................................................. 3, 4

*Xerox Corp. v. Media Scis., Inc.*,
   609 F. Supp. 2d 319 (S.D.N.Y. 2009) ................................................................ 18

*Zepeda v. Paypal, Inc.*,
   2015 WL 6746913 (N.D.Cal. Nov. 5, 2015) ....................................................... 26

## **Rules**

Fed. R. Civ. P. 23 ............................................................................... 1, 51, 53, 54

**<u>Other Authorities</u>**

American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION, § 2.04(a) .................................................................................................................... 35

## I.     INTRODUCTION

After the Court's hearing on final approval of the Settlement,[1] and pursuant to the Court's order concerning supplemental briefing, the Subscriber Plaintiffs and Defendants each filed supplemental briefs in support of the proposed Settlement. ECF No. 2868 ("Subscribers Supp. Br."); ECF No. 2869 ("Defs. Supp. Br."). In response, five briefs were filed by Settlement Class members. Two briefs were filed by prior objectors to the Settlement—the Sperling/Sherrard Objectors and Home Depot U.S.A., Inc. ("Home Depot"). ECF No. 2876 ("Sperling/Sherrard Br."); ECF No. 2875 ("HD Br."). These briefs indicate that those responders are willing to accept the proposed Settlement as clarified by the parties but want additional language concerning the scope of their abilities to pursue opt-out claims for relief encompassed by Fed. R. Civ. P. 23(b)(3). Two briefs were filed by prior objectors to the Settlement—the Bradley Arant Objectors ("BA Objectors") and General Motors Corporation ("GM")—who maintain their objections. ECF No. 2877 ("BA Br."); ECF No. 2874 ("GM Br."). A fifth brief was filed by Shiyang Huang ("Huang"), an individual who did not timely file an objection, but whose arguments are nonetheless addressed herein. ECF No. 2873 ("Huang Br."). Finally, the putative Provider Class ("Providers") filed a response seeking clarification of the effect of final approval of the proposed Settlement on their claims. ECF No. 2878 ("Providers Br.").

---

[1] ECF No. 2610-2. Capitalized terms not otherwise defined herein shall have the meaning given them in the Settlement.

## II.    ARGUMENT

### A.  The Going-Forward Blue System, as Altered by the Settlement, Warrants Final Approval.

#### 1.  The Settlement Does Not Perpetuate A Clearly Unlawful Arrangement.

Subscribers, Defendants, the Sperling/Sherrard Objectors,[2] and Home Depot[3] appear to agree on the following important propositions.  *First*, the fact that a specific pre-settlement practice, system, or arrangement (for purposes of this discussion, an "arrangement") was alleged in the Complaint to be *per se* unlawful is not itself a bar to approving a settlement that perpetuates that arrangement or certain of its features. *Second*, in deciding whether to approve a settlement, the Court need not, and indeed must not, decide the merits of the challenge to the arrangement and affirmatively rule that it is clearly lawful.[4]   Rather, as discussed below and in previous submissions, in order to approve a settlement designed to resolve a complex antitrust case, the Court must find only that perpetuation of the arrangement is not "clearly illegal."  *Third*, the Court's decision to grant final approval to a settlement perpetuating the arrangement would not constitute a judgment on the merits regarding the ultimate legality of the arrangement; it would not be entitled to preclusive effect and would not otherwise bind courts presiding over future

---

[2] Sperling/Sherrard Br. at 14-30.

[3] HD Br. at 3-12.

[4] *See, e.g., Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977) ("*Cotton*") ("It cannot be overemphasized that neither the trial court in approving the settlement nor [the appellate court] in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute."); *Robertson v. National Basketball Ass'n*, 556 F.2d 682, 686 (2nd Cir. 1977) ("*Robertson*") ("It is true that a settlement that authorizes the continuation of clearly illegal conduct cannot be approved, but a court in approving a settlement should not in effect try the case by deciding unsettled legal questions.").  *Cf.* ECF No. 2864, Transcript of Fairness Hearing, Vol. I ("Tr. I"), 77:25-78:3 (acknowledgement by Defendants at Final Approval Hearing that the Court was "not being asked to decide the ultimate merits.  You're not being asked to ultimately rule on the legality or illegality of either service areas or the go-forward system.").

litigation challenging that arrangement.[5]

Much of the Sperling/Sherrard Objectors' and Home Depot's briefing is not devoted to the foregoing propositions, which are essentially undisputed. Instead, these objectors focus on the meaning of the "clearly illegal" standard in the context of a settlement of a Sherman Act case, and in particular, the relationship between that standard and the "*per se*" standard of antitrust liability. But because, as discussed below, there is little if any practical difference between the "clearly illegal" and "*per se*" standards in the circumstances of this case, and because the proposed Settlement satisfies either standard (even assuming the objectors are correct that there is a difference between the standards), and because this Court's determinations with respect to the legality of the going-forward Blue system will not be preclusive in any future opt-out litigation, any remaining dispute over any differences between these standards raises no obstacle to the final approval of the proposed Settlement.

### 2. There Is No Material Difference Between the "Clearly Illegal" and the "*Per Se*" Standards in the Context of Antitrust Cases.

A "district court abuses its discretion in approving a settlement only if the agreement sanctions 'clearly illegal' conduct." *Fraley v. Batman*, 638 Fed. Appx. 594, 597 (9th Cir. 2016). *See also Robertson*, 556 F.2d at 686 (approving settlement over objection that it perpetuated "classic group boycotts" because "settlement authorizes no future conduct that is clearly illegal");

---

[5] As Counsel for the Blue Plans explained at the Final Approval hearing, were this Court to find that the Blue system as perpetuated by the proposed Settlement Agreement is neither clearly unlawful nor clearly a *per se* violation of Section 1, that finding would not bind a future judge. Tr. I, 168:15-25. Defendants made the same point in their post-hearing brief. Defs. Supp. Br. at 4 n.1 ("no party is advocating for a final, binding determination on the merits—*i.e.*, the legality or illegality of service areas or the go-forward System—nor could a settlement final approval order have that effect"). *See also White v. National Football League*, 822 F. Supp. 1389, 1426 & n.55 (D. Minn. 1993) ("*White*") (while system perpetuated by settlement "would probably be subject to analysis under the rule of reason," "if there is future litigation concerning the legality of any NFL player rules, plaintiffs' argument may be adopted by some court").

*Grunin v. International House of Pancakes*, 513 F.2d 114, 123-24 (8th Cir. 1975) ("*Grunin*") (approving settlement over objection that it perpetuated *per se* unlawful tying arrangement because court could not say "as a matter of law that the settlement agreement included any such violations"). As the Eleventh Circuit has made clear, "unless the illegality of an arrangement under consideration is a legal certainty, the mere fact that certain of its features may be perpetuated is no bar to approval." *Bennett v. Behring Corp.*, 737 F.2d 982, 987 (11th Cir. 1984) ("*Bennett*").

Where an alleged restraint of trade has been challenged under Section 1 of the Sherman Act, the concepts of "*per se* illegal" and "clearly illegal" overlap. The *per se* rule treats certain categories of restraints as "necessarily illegal" and thus as essentially facial violations of Section 1. *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Thus, if the terms of a settlement agreement perpetuate a restraint that falls into the category of *per se* illegality, that settlement would be perpetuating something that is "necessarily illegal." It is understandable, therefore, that several courts, when reviewing a settlement challenged as perpetuating an arrangement claimed to be *per se* illegal under Section 1, have used the terms "*per se* illegal," "illegal to a legal certainty," and "clearly illegal" interchangeably. *See, e.g., Robertson*, 556 F.2d at 686; *Grunin*, 513 F.2d at 124.[6]

Relying on *Grunin* and *Robertson*, Defendants contend that in the antitrust context, there

---

[6] *See also White,* 822 F. Supp. at 1425-26 ("The court concludes that at the present time, absent a full trial on the merits, it is unlikely that the proposed settlement, taken as a whole, would be deemed a *per se* violation of the antitrust laws because the Agreement would probably be subject to analysis under the rule of reason."); *Alexander v. National Football League*, No. 4-76-CIVIL-123, 1977 WL 1497, at *21 (D. Minn. Aug. 1, 1977) (under the *Robertson* standard, settlement "is entitled to approval unless the terms of the agreement are *per se* illegal, or are illegal to a 'legal certainty,' or the settlement authorizes future conduct that is 'clearly illegal.'"); *Calibuso v. Bank of America Corp.*, 299 F.R.D. 359, 372 (E.D.N.Y. 2014) (same); *Bennett v. Behring Corp.*, 96 F.R.D. 343 (S.D. Fla. 1982). *Cf. Armstrong v. Board of School Directors of City of Milwaukee*, 616 F.2d 305, 320 (7th Cir. 1980) (observing that the "illegality or unconstitutionality must appear as a legal certainty on the face of the agreement before a settlement can be rejected on this basis.").

is no meaningful difference between the concepts of "clearly illegal," "illegal to a legal certainty," and "*per se* illegal."  Defs. Supp. Br. at 2-4.  The Sperling/Sherrard Objectors and Home Depot contend that Defendants have misread those decisions, arguing that the "clearly illegal" standard does not require the Court to make a determination that the going-forward Blue system is not *per se* illegal under Section 1 of the Sherman Act, but rather only requires it to determine  "whether the illegality of that system is a legal certainty."  HD Br. at 4.  *See also* Sperling/Sherrard Br. at 15 ("The test for whether a class settlement may be approved is whether it is 'clear' or a 'legal certainty' that the settlement authorizes conduct that is *per se* illegal.  The Court need not go any further to approve the settlement and conclude that it is neither 'clear' nor 'certain' what the outcome of the *per se* analysis will be.").

The Subscribers submit that these objectors are splitting hairs. As they acknowledged at the Final Approval hearing, Subscribers have not been able to identify "an articulable … distinction" under the case law between saying a particular practice, system, or arrangement is "clearly illegal" and saying it is a "*per se* violation." Tr. I, 71:19-24.  The Subscribers have found no case suggesting that there is any appreciable daylight between those two statements.  To the contrary, the courts appear to equate "clear" and "*per se*" illegality, which courts have used interchangeably.[7]  Fortunately, this question, in the context of the Settlement before the Court, is academic.

---

[7] Notably, notwithstanding the position they have taken in their most recent filing, the Sperling/Sherrard Objectors have themselves previously found it difficult to find a meaningful distinction between the two standards.  At the Final Approval hearing, in fact, counsel for the Sperling/Sherrard Objectors described the test as whether the going-forward Blue system was "illegal as a matter of law," and agreed with the Court that that test was "synonymous" with the concept of a *per se* violation. Tr. I, 134:6-10.

Whatever conceptual or theoretical differences may exist for purposes of settlement evaluation between a practice that is "clearly illegal" and a practice that amounts to a *per se* Sherman Act violation, there is no practical difference between the standards when they are applied to the historic Settlement in this matter. Both roads, in short, lead to the same destination, as it is clear that the going-forward Blue system, including the remaining, revised features of its exclusive service areas ("ESAs"), are neither clearly illegal nor a *per se* violation, even assuming there is any daylight between those two concepts. As discussed below and in previous submissions, the significant modifications to the operation of the ESAs (including the elimination of the NBE rule) that have been secured under the proposed Settlement Agreement leave little room for doubt that the post-Settlement ESAs would be, in the event the proposed Settlement is approved, neither *per se* violations of Section 1 nor clearly illegal.

### 3. No Prior Ruling Regarding the Blue System Holds that the Existing System and ESAs, Much Less the Post-Settlement System and ESAs, Are *Per Se* Unlawful or Otherwise Clearly Illegal.

As an initial matter, it is instructive that no prior precedent examining the existing Blue system stands in the way of Settlement approval, as no court has previously determined that that system, or the ESAs that were a central feature of that system, constitute a *per se* violation of the antitrust laws.[8] This matters, as the Court should not approve a settlement that perpetuates a

---

[8] *See, e.g., Blue Cross and Blue Shield Ass'n v. Group Hosp. & Med. Servs., Inc*., 744 F. Supp. 700, 720 n. 7 (E.D. Va. 1990) ("The anticompetitive conduct in *Sealy* affected those who sought to sell Sealy products in an area already granted to a designated licensee. The arrangement between Sealy and its licensees completely foreclosed others from selling Sealy products in a particular area. In this case, the Association, in seeking to protect its rights in the Marks, has not completely foreclosed the D.C. Plan from engaging in foreign business. The Association has indeed encouraged such business, provided that the Marks are not used without its consent and authorization"); *State of Md. v Blue Cross Blue Shield Ass'n*, 620 F. Supp. 907, 917 (D. Md. 1985) (denying cross-motions for summary judgment on the former insurance antitrust exception, noting that material fact issues existed as to whether "exclusive geographic territories directly facilitate risk spreading and transfer through the provision of insurance").

practice or arrangement that another court has determined to be *per se* unlawful, at least absent compelling justification for disregarding such a prior ruling. *See, e.g., Robertson*, 556 F.2d at 686 (approving settlement that perpetuated "practices [that] have not been held to be per se illegal in any previously decided case"). The absence of prior rulings on the lawfulness of the pre-Settlement ESAs, much less a ruling that they amount to a *per se* Sherman Act violation, is particularly instructive here, given that the ESAs have been "openly known to the public, to the government, and to the objectors, for decades," and had not previously been challenged as *per se* illegal until Subscribers did so in this case.  ECF No. 2812-1 ("Subscribers' Final Approval Br.") at 62. That fact, especially when coupled with the inherent uncertainty of litigation and the inherent complexity of antitrust litigation, render suspect any contention that the post-Settlement ESAs, which are materially different from the pre-Settlement ESAs (including because the NBE rule has been eliminated), constitute an arrangement whose "illegality … is a legal certainty." *Bennett*, 737 F.2d at 987.

Nor does the recent district court decision in *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627 (N.D. Ill. 2020) ("*Delta Dental*") have any bearing on the question whether the post-Settlement—or, for that matter, the existing—Blue system of ESAs is clearly illegal or *per se* invalid. *See* Subscribers' Supp. Br. at 3-4.  *First*, the Delta Dental system is neither the BCBS system nor indistinguishable from it. *Second*, the decision merely denied a motion to dismiss and addressed only the threshold question whether the allegations of the plaintiffs' complaint had stated a claim under the Sherman Act. And *finally*, the Court analyzed those claims under both the *per se* standard and, in the alternative, the rule of reason.  *Delta Dental* thus does not establish that the ESAs in this case are clearly unlawful or *per se* invalid.[9]

---

[9] The Sperling/Sherrard Objectors contend that the fact that *Delta Dental* involved only a ruling

Moreover, this Court's own prior rulings in this case do not establish that the post-Settlement ESAs, or other aspects of the post-Settlement Blue system, would be clearly illegal or a per se violation of the Sherman Act.  To the contrary, this Court expressly declined to resolve the question whether the existing ESAs, standing alone, are *per se* violations of Section 1 of the Sherman Act. Instead, the "court conclude[d] that Defendants' aggregation of a market allocation scheme together with certain other output restrictions is due to be analyzed under the *per se* standard of review." *In re Blue Cross  Blue Shield Antitrust Litig.*, 308 F.  Supp. 3d 1241,  1279 (N.D.  Ala.  2018) ("*BCBS I*"), *interlocutory certification granted,* 2018 WL 3326850 (N.D. Ala. June 12, 2018)*, leave to appeal denied*, 2018 WL 71522887 (11th Cir. Dec. 12, 2018). *See also* Subscribers' Final Approval Br. at 65-66; Subscribers' Supp. Br. at 2-3.

Moreover the single entity defense asserted by the Blues remains unresolved. "The question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade." *American Needle, Inc. v. National Football League*, 560 U.S. 183, 186 (2010).  "Absent any agreement, there is no Section 1 claim, because an anticompetitive agreement is the *sine qua non* of a Section 1 violation." *In re*

---

on a motion to dismiss, and that it also analyzed the claims under the Rule of Reason, does not diminish the strength of its holding or its applicability here.  Sperling/Sherrard Br. at 30.  But the *Delta Dental* court emphasized time and again the preliminary stage at which it was analyzing these issues.  *See, e.g.,* 484 F. Supp. 3d at 634 ("But *Topco* and *Sealy* need not be interpreted so broadly to support plaintiffs' claims *at this stage*.") (emphasis added); *id.* at 635 ("It does not appear *at this stage* that the circumstances warranting the Court's departure from the *per se* mode of analysis in *BMI* and *NCAA* justify the same treatment here.") (emphasis added); *id.* ("*Prior to any factual development*, defendants' argument that their collaboration resulted in a 'new and effective product' does not warrant dismissal of plaintiffs' *per se* claim.") (emphasis added); *id.* (referring to "the difficulty of answering" the question regarding ancillary restraints "at the pleadings stage"). The fact that the *Delta Dental* court was not willing to decide that the providers' Section 1 claims, whether analyzed under the *per se* or Rule of Reason standard, must fail as a matter of law at the pleading stage provides little support for the contention that the Blue system, as modified under an historic Settlement achieved after years of hard-fought litigation and factual development, must be held to constitute a *per se* violation of the Sherman Act.

*Pool Products Market Antitrust Litig.*, 988 F. Supp.2d 696, 708 (E.D. La. 2013). *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007). As the Subscribers have already explained, the Court found that it is "genuinely disputed whether" "Defendants are acting as a single entity" in connection with the conduct challenged in this action: "Under these facts, the court cannot say, as a matter of law, whether Defendants' conduct can be shielded by the single entity defense." Subscribers' Final Approval Br. at 66; *BCBS I*, 308 F. Supp. 3d at 1265-66.

In sum, nothing in the legal landscape directly pertaining to the pre-Settlement Blue system speaks directly to the issues currently before the Court, much less compels the conclusion that the Settlement would perpetuate a clearly illegal system or arrangement.

### 4.   The Proposed Settlement Agreement, if Approved, Would Create a Blue System Fundamentally Different from that before the Court in Its 2017 Summary Judgment Decision.

Even leaving the points discussed in the previous section aside,[10] the going-forward Blue system, including the ESAs *as modified by the Settlement Agreement*, would fall comfortably on the safe side of both *per se* and clear illegality (if there is a difference).  The aggregation of restraints that the Subscribers originally challenged in this action either eliminated or significantly restricted both intrabrand ("Blue-on-Blue") and interbrand ("Green-on-Blue") competition.  Far from perpetuating the *status quo*, the proposed Settlement Agreement substantially alters the pre-existing system, perforating the boundaries of the ESAs, introducing Blue-on-Blue competition throughout the system as outlined in the Settlement Agreement, and removing virtually all limitations on Green-on-Blue competition. With the elimination of the NBE rule and other modifications contemplated by the Settlement, the going-forward ESAs would no longer be truly

---

[10] The Sperling/Sherrard Objectors and Home Depot appear to agree that many of Subscribers' points above support a determination by the Court that the going-forward Blue system is not clearly illegal and can be approved on that basis. Sperling/Sherrard Br. at 17, 28-29; HD Br. at 4, 8.

"exclusive," and they would be distinguishable from the exclusive territorial market allocations that the Supreme Court ruled unlawful in decisions such as *United States v. Sealy*, 388 U.S. 350 (1967) ("*Sealy*"), *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972) ("*Topco*") and *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46 (1990) ("*Palmer*"). In short, it is clear on the face of the proposed Settlement Agreement that the ESAs it perpetuates are materially different from, and plainly less anti-competitive than, those that Plaintiffs challenged in 2012.

The Court itself has acknowledged this fact, saying in its preliminary approval opinion that:

> this court's decision was based on the aggregation of restraints that existed during the class period. The proposed Settlement currently under consideration alters Defendants' business model…. [T]he elimination of that policy [NBEs] is a significant change that the court preliminarily finds will drastically alter the forward-looking landscape such that the court's standard of review opinion would no longer apply. Of course, the Settlement does not change the facts as they existed during the class period.

*In re Blue Cross & Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2020 WL 8256366, at *24 (N.D. Ala. Nov. 30, 2020) ("*BCBS II*").

Accordingly, although in considering whether to approve the Settlement, this Court has neither "the right [nor] the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute," (*Cotton*, 559 F.2d at 1330), the Subscribers submit that the Court may, and should, determine that the going-forward Blue system would not amount to a *per se* violation. Importantly, the Court's limited determinations for purposes of considering whether to approve the Settlement would *not* bind a future court considering such a challenge.

### a. The Proposed Settlement Agreement Will Open ESAs to Interbrand Competition between Blue Plans.

The proposed Settlement will permit free and unrestricted interbrand competition. The promotion of such interbrand competition "is the 'primary concern of antitrust law.'" *Volvo Trucks*

*North America, Inc. v. Reeder-Simco GMC, Inc.,* 546 U.S. 164, 180 (2006) (citations omitted). *See also State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) ("[T]he primary purpose of the antitrust laws is to promote interbrand competition.").

The proposed Settlement accomplishes this goal by eliminating the National Best Efforts ("NBE") standards, which had capped Green-branded revenue at 33-1/3 percent of the total revenue generated by a Member Plan's Green and Blue Businesses.[11]   ECF No. 2610-10 ("Rubinfeld PA Decl."), ¶ 21 (Oct. 30, 2020).   The NBE standards were "a clear competitive restraint" (*id.* ¶ 22), "a pure revenue cap untethered to any specific actions to promote the Blue brand" (*id.* ¶ 25), that restricted the growth of Green businesses by limiting their potential to grow into viable competitors with the other Blues. As Dr. Rubinfeld explained, they "serve[d] as the system's crucial enforcement mechanism for the ESAs and [were] used to limit any competition among the Plans – whether Blue or non-Blue branded ('Green'), and whether occurring inside or outside of ESAs." ECF No. 2812-7 ("Rubinfeld FA Decl."), ¶ 14.   The NBEs were "the most pernicious competitive restraints imposed by the BCBSA." *Id.*

The elimination of the NBE requirement is critically important relief that on its own will have significant pro-competitive effects. As the Blues have explained, with the abolition of the NBE rule, "[y]ou can compete anywhere you want on an unbranded basis." Tr. I, 84:16-17. And by introducing Green-on-Blue competition, "[y]ou're basically not limiting competition among plans because they can compete on an unbranded basis anywhere they want." Tr. I, 82:13-15.

The proposed Settlement also caps the Local Best Efforts ("LBE") requirement at 80% and

---

[11] The Defendants have agreed to "eliminate and no longer enforce the National Best Efforts Requirement," and to "not adopt or implement any equivalent requirement or any rule in any future License Agreement or Membership Standard that imposes a cap, ratio, or other quantitative limit on a Settling Individual Blue Plan's non-Blue Branded healthcare business outside of its Service Area." Settlement Agreement, ¶ 10.

provides that compliance with the requirement will be based on a geographic area no larger than a state level. Settlement Agreement, ¶ 11. This ensures that the restriction that had been imposed directly by the NBE rule cannot be reimposed indirectly either by increasing the LBE percentage or enlarging the area subject to the restriction in order to deter the expansion of Green competition. This prevents the emergence of the sort of "de facto" exclusivity that rendered the arrangement in *Topco* unlawful *per se*.[12]

Unleashing Green competition will have significant benefits for consumers. Rubinfeld PA Decl. ¶¶ 26-32.  Because the largest and strongest Blue Plans have the most developed Green-branded businesses, and those Green businesses are already operating outside the Member Plans' ESAs, permitting virtually unfettered Green competition not only will promote vigorous competition in terms of price and quality (*see, e.g., Stearns Airport Equipment Co., Inc. v. FMC Corp.*, 170 F.3d 518, 525 (5th Cir. 1999) ("*Stearns*") ("Competition grounded in nonprice considerations such as reliability, maintenance support, and general quality is competition on the merits.")), it should do so quickly.

Just as the post-dissolution Standard Oil companies and the Baby Bells, which were barred from using the "Standard" and "Bell" marks when doing business outside their respective territorial markets, developed their own independent brands and trademarks in order to compete throughout the nation, (Mobil, Amoco, Chevron, and Exxon among the Standards; Ameritech, NYNEX, and now Verizon among the Baby Bells), so too the Blues, free of the NBE restraint, can now be expected to make increasingly substantial investments in the development and promotion of their Green brands.

---

[12] For this reason as well as the others discussed *infra* at 29-30, the Sperling/Sherrard Objectors are simply incorrect when they suggest that the LBE provisions of the Settlement Agreement provide no "relief" to the class.  Sperling/Sherrard Br. at 8.

**b.  The Proposed Settlement Agreement Will Introduce Significant Blue-on-Blue Competition in Several Important Ways.**

But even leaving aside that the proposed Settlement Agreement will open the BCBS system to virtually unlimited Green-on-Blue competition, the Settlement Agreement also promotes Blue competition in at least three separate additional ways.  *First*, it authorizes Qualified National Accounts ("QNAs") to request a Second Blue Bid ("SBB") from the Member Plan of the customer's choice.  *Second*, it permits an Independent Health Benefit Decision Location ("IHBDL") to request a bid from its local Blue Plan.  And *third*, the proposed Settlement alters the Blues' "ceding" rules so that, whenever a Member Plan chooses to bid an account within its assigned service area using one of its Green brands, it must "cede" the right to bid for that account to another Blue plan.  These three provisions represent a negotiated and reasonable compromise between Subscribers' interest in promoting intrabrand competition and Defendants' interest in protecting the reputation and ensuring the integrity of the Blue trademarks.

i.    *The SBB relief introduces Blue-on-Blue competition for self-funded national accounts*. Under the Settlement Agreement, a QNA would be permitted to send a second Blue Bid request to any Settling Individual Blue Plan, in addition to an Initial Control Plan, for a total of two bids. Settlement Agreement ¶ 15. The SBB relief thus effectively pits every Blue Plan against every other Blue Plan, competing to be the plan chosen to receive that request for a second bid. The SBB relief thereby introduces significant Blue-on-Blue competition for self-funded national accounts.

Although the SBB relief directly confers the right to request a second Blue Bid only on QNAs, this relief (like the elimination of the NBE rule) will *benefit all consumers* by, *inter alia*, stimulating the free flow of price and product information and promoting the proper function of the price mechanism. As Dr. Rubinfeld explained: "As a fundamental economic matter, all class

members also benefit from the increased flow of pricing information to insurance brokers and otherwise throughout the market that results from increased bidding competition, including from bids not presented to or even available to them." Rubinfeld FA Decl. ¶ 16. "In other words, it is to be expected that class members that do not or cannot obtain a second Blue bid will nonetheless benefit economically not only from the actual or potential Green bidding for their account, but also from the potential for Blue bidding available to qualified others." *Id.* This is in on top of the procompetitive benefits which flow to consumers from Green-on-Blue competition.

As noted above, the SBB relief permits QNAs to choose this potential second bidder rather than leaving this decision up to the Blues themselves. Such "[e]nhancement of consumer choice is a traditional objective of the antitrust laws and has also been acknowledged as a procompetitive benefit." *United States v. Brown University in Providence in State of Rhode Island*, 5 F.3d 658, 675 (3rd Cir. 1993). *See also National Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 102 (1984) ("In performing this role [of establishing the rules necessary to create the product of amateur college athletics, the NCAA's] actions widen consumer choice— not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive."). This is simple common sense. When it is the consumer, not the producers, who decides with whom that consumer will do business, then the producers must compete to win that consumer's business.

ii.      *The proposed Settlement introduces competition for other accounts.* The Settlement Agreement punches another hole in the existing system of ESAs by permitting accounts (whether fully-insured or self-insured) with IHBDLs that are located outside the Initial Control Plan's service area to request a bid for the employees covered by such an IHDBL from the Blue in whose

14

service area that decision center is situated.[13]   This provision will create the opportunity for addition competition for corporations with multiple IHDBLs.  Settlement Agreement ¶ 14.b.

        iii.       *The proposed Settlement also introduces Blue competition where a controlling Plan elects to bid an account within its service area using a Green brand.*  Under the existing license agreements, a Member Plan that chooses to submit a Green bid for a national account (whether fully-insured or self-insured) that is located within its ESA *may* voluntarily "cede" to another member plan the opportunity to submit a Blue-branded bid to the national account, but is not required to do so.  Under the proposed Settlement Agreement, should a controlling Blue plan elect to bid a national account using a Green brand, it would now *be required* to cede the right to submit a Blue-branded bid to another Blue Plan.  Settlement Agreement ¶ 14.a.i.  Thus, although now a Blue electing to bid an account using a Green business may decide not to subject itself to any competition from another Blue Plan, if the proposed Settlement is approved, it will have to *invite* this Blue-on-Green competition.

In short, whether viewed separately or together, these features of the injunctive relief secured under the proposed Settlement Agreement will introduce significant Blue-on-Blue competition.

        **c.**  **The Post-Settlement ESAs Would Be Distinguishable from the Exclusive Service Areas Held Unlawful in *Sealy*, *Topco*, and *Palmer*.**

To be sure, the proposed Settlement Agreement does not entirely eliminate the ESAs.  But although "any Settling Individual Blue Plan [may] … continu[e] to operate its Blue-Branded

---

[13] The Settlement Agreement defines an IHDBL as "any location of a national account which makes decisions for the purchase of a Commercial Health Benefit Product for its local employees independently from the Headquarters of the account." Settlement Agreement, ¶ 1.ll.  And it defines the "Initial Control Plan" as any settling Blue plan "that has the right to bid on an account using the Blue Marks under current BCBSA rules and policies."  *Id.* ¶ 1.nn.

business only in its Service Area, in accordance with the License Agreement(s) and Membership Standards as of the Execution Date," any such ability to so operate is expressly made "[s]*ubject to the provisions of the Agreement establishing the injunctive relief secured by the Settlement.*" Settlement Agreement ¶ 13 (emphasis added). Given the elimination of the NBE requirement and the other modifications required by the Settlement, the post-Settlement ESAs, as discussed above, will thus no longer be "exclusive" in the way that they were when Subscribers brought this action, and they would thus be distinguishable from the rigid exclusive territorial market allocations that the Court held *per se* unlawful in *Sealy*, *Topco*, and *Palmer*.[14]

The agreement in *Sealy* required "each licensee not to license . . . in the designated area; and the licensee agreed not to manufacture or sell 'Sealy products' outside the designated area." 388 U.S. at 352. That option is foreclosed here, both because the Settlement eliminates the NBE rule and because the Settlement *mandates* the opening of the service areas to substantial Blue-on-Blue competition. "The key to the whole question of an antitrust remedy is of course the discovery of measures effective to restore competition." *United States v. DuPont & Co.*, 366 U.S. 316, 326 (1961).  Not only does the Settlement Agreement open the Blues' ESAs to virtually unlimited Green competition, it also restores and promotes competition by: 1) *requiring* Blues to accept requests for second Blue bids from qualifying large and dispersed national self-funded accounts, 2) permitting an IHBDL to request a separate bid from its local Blue Plan, and 3) requiring a Blue that chooses to serve its local market using a Green brand to cede the right to bid the account to another Blue Plan.[15]

---

[14] Moreover, given that the SBB relief is properly characterized as divisible injunctive relief under Rule 23(b)(3), additional Self-Funded Accounts will have the opportunity to opt out and to seek additional Blue bids based upon their particular business facts and circumstances.

[15] The licensees in *Sealy* had no right to compete using the Sealy brand, though they were permitted to manufacture and sell non-Sealy mattresses without restriction. *Sealy*, 388 U.S. at 352.

The ESAs, as modified under the Settlement Agreement, are also readily distinguishable from the rigidly exclusive horizontal territorial market allocations ruled unlawful in *Topco* and *Palmer*. The Court's holding in *Topco* was premised on the fact that "[m]ost [of the Topco] licenses are exclusive, and even those denominated 'coextensive' or 'non-exclusive' prove to be de facto exclusive."  405 U.S. at 602.  *See also id.* at 603. *Topco* thus stands for the proposition that an agreement to create a horizontal territorial market allocation like the exclusive service areas in *Topco* is *per se* unlawful.  And the allocation agreement in *Palmer* was exclusive on its face, with one company assigned the State of Georgia, while the other "received the remainder of the United States" and "[e]ach agreed not to compete in the other's territories." 498 U.S. at 49.

From an economic standpoint, an exclusive territorial market allocation is far more pernicious than a non-exclusive or only partially-exclusive market allocation, where there is still some level of competition that will compel each competitor to develop and market a higher-quality product (*Stearns,* 170 F.3d at 525 ("Competition grounded in nonprice considerations such as reliability, maintenance support, and general quality is competition on the merits.")), and that will permit the operation of the price mechanism (*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940) ("Any combination which tampers with price structures is engaged in an unlawful activity.")). Both elements are lacking in the case of the Blues' historical ESAs. The proposed Settlement Agreement brings these procompetitive elements to the markets in which the Blues compete.

## 5.  The Proposed Settlement Does Not Improperly Release Future Antitrust Violations.

Home Depot argues that this Court cannot approve the proposed Settlement Agreement because it requires class members to release their right to seek injunctive relief under the antitrust laws for certain post-Settlement conduct.  ECF No. 2875, at 27.  Home Depot incorrectly claims

that—as a blanket rule—"releases of future conduct are void as against public policy." *Id*. at 33. The law permits future releases relating to continued adherence to pre-release conduct and therefore the release here is valid.

In support of its objection, Home Depot relies largely on the Fifth Circuit's holding in *Redel's, Inc. v. General Electric Co.,* 498 F.2d 95 (5th Cir. 1974) ("*Redel's*") that "the prospective application of a general release to bar private antitrust actions arising from subsequent violations is clearly against public policy." *Id*. at 99.   Home Depot's objection here is without merit, as it largely ignores the "considerable caselaw" following *Redel's* which "stands for the proposition that public policy considerations differ when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint on trade." *Shane v. Humana, Inc.*, No. 00-MD-1334-MORENO, 2009 WL 7848518, at *9 (S.D. Fla. Nov. 5, 2009).

In direct contrast to Home Depot's claims of a blanket prohibition, courts have routinely "enforced even general releases to bar antitrust claims predicated on continuing violations of pre-release conduct, such as 'conspiracies alleged to continue post-release.'" *Xerox Corp. v. Media Scis., Inc.*, 609 F. Supp. 2d 319, 326 (S.D.N.Y. 2009) (quoting *VKK Corp. v. NFL*, 244 F.3d 114, 126 (2d Cir. 2001)). *See also Madison Square Garden, L.P. v. National Hockey League*, No. 07 CV 8455(LAP), 2008 WL 4547518, at *8 (S.D.N.Y. Oct. 10, 2008) ("*Madison Square Garden*"); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 161 F.3d 443, 448 (7th Cir. 1998); *Record Club of Am., Inc. v. United Artists Records, Inc.*, 611 F. Supp. 211, 217 n. 8 (S.D.N.Y. 1985).  As the Eleventh Circuit explained in *In re Managed Care,* 756 F.3d 1222, 1236-37 (11th Cir. 2014) ("*Managed Care*"), a settlement agreement may bar future claims—even if based on post-settlement conduct—when that conduct "merely constitutes a continuation" of an alleged conspiracy.

*Redel's*—a single-defendant price discrimination case—did not involve a "continuing violation" of antitrust law.  *See, e.g. F. T. C. v. Consol. Foods Corp.*, 396 F. Supp. 1353, 1356 (S.D.N.Y. 1975) ("[I]n a situation involving price discrimination by means of illegal discounts— which by definition are individual in nature— each discriminatory transaction or sale must be the measure, since the granting of each illegal discount is a wholly independent and separately identifiable act which ends as soon as the specific transaction is consummated"); *cf. Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000) ("An act constitutes a 'continuing violation,' if it injures the plaintiff over a period of time. Even though the illegal act occurs at a specific point in time, if it inflicts 'continuing and accumulating harm' on a plaintiff, an antitrust violation occurs each time the plaintiff is injured by the act."); *see also Managed Care,* 756 F.3d at 1236 ("[Defendant's] purported bad acts are best seen as new, overt acts within an ongoing conspiracy, rather than new claims in and of themselves.").[16]  Home Depot fails to appreciate this fact, erroneously equating the alleged pre- and post- release instances of price discrimination in *Redel's* with other types of conduct that might constitute a "continuing violation," such as an ongoing conspiracy.  ECF No. 2875, at 32.

Other courts have rejected the notion that *Redel's* casts a blanket prohibition as Home Depot contends.  For example, in *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB) (JO), 2019 WL 6875472, at *26 (E.D.N.Y. Dec. 16, 2019) ("*Interchange*"), a district court in the the Eastern District of New York noted that "it does not appear that [*the Redel's*] the court set forth a general prohibition of release of antitrust claims in

---

[16] Home Depot argues that "the Blues wrongly lean on *In re Managed Care* to support their proposed distinction between 'new, different' future conduct and future conduct that is "a continuation of pre-release conduct" on the grounds that *Redel's* also involved continuation of pre-release conduct.  HD Br. at 37.  Among other reasons, Home Depot's argument fails because it does not appreciate that *Redel's* did not involve such a continuation.

the future where those claims were or could have been alleged as opposed to claims based on new conduct." Instead, the Eastern District narrowed public policy violations to only those "impermissibly broad releases that released all types of claims, including 'future' entirely unrelated antitrust claims not circumscribed to an identical factual predicate or to claims that arose out of the alleged conduct or related conduct that could have been alleged"; *see also Madison Square Garden,* 2008 WL 4547518, at *8–9.

Home Depot argues that the Eastern District of New York "misread" *Redel's* and thus misunderstands its reach. HD Br. at 39. Again, it is Home Depot that misses the crux of the issue. It fails to understand that release permissibility determinations do not turn strictly on the time of the alleged violation, but instead on whether the antitrust claims arose after execution of the agreement and are wholly unrelated to pre-release conduct.[17] This was true in both *Redel's* and *In Re Payment*, as both cases stand for the proposition that a valid release can extend to post-release conduct which necessarily implicates pre-release conduct. Even the *Redel's* language on which Home Depot leans limits public policy violations to antitrust actions "arising from *subsequent* violations." 498 F.2d at 99 (emphasis added).

Unlike the release in *Redel's,* which extended to future price discrimination claims, prospective application here would extend only to those claims flowing from continuing violations

---

[17] Home Depot also attempts to distinguish *Interchange* on the grounds that the Second Circuit took issue with the original settlement because it "precluded new suits for similar conduct in the future" for (b)(2) members. HD Br. at 40. As the Eastern District of New York subsequently clarified however, the issue there was that the phrase "similar conduct" was disfavored release language, as courts had previously held this language to be impermissibly broad given that it could trigger a waiver claims of completely unrelated to the settlement action. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 43 (E.D.N.Y. 2019). Neither the Second Circuit nor the Eastern District of New York suggested that all settlements which released future conduct for non-opt-out plaintiffs were impermissible.

of the alleged pre-settlement market allocation scheme.  The release here—like the release in *Interchange*—extends to only those claims "based upon, arising from, or relating in any way to . . . (i) the factual predicates of the Subscriber Actions . . . (ii) any issue raised in any of the Subscriber Actions by pleading or motion; or (iii) mechanisms, rules, or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10 through 18 approved through the Monitoring Committee Process during the Monitoring Period."  ECF No. 2610-2, at 15. As such, the terms of the proposed Settlement Agreement release do not run afoul of the public policy considerations set forth in *Redel's*.[18]

In an attempt to distinguish the present release from the releases approved by the courts—such as *Managed Care*—Home Depot incorrectly frames the present release as applying to all future conduct.  In support of this framing, Home Depot points to Settlement Agreement language stating that "Released Claims include, but are not limited to, claims that arise after the Effective Date."  ECF No. 2610, at 16.  Home Depot conveniently ignores the fact that any such claim must still be based upon, arise from, or relate to the factual predicates of the action.  *Id*. at 15.  Similarly, in *Managed Care*, the Eleventh Circuit held that the claims at issue—which flowed from post-release conduct—had been released because they "arose 'on or before the effective date,' 'could have been asserted' against [Defendant], and arose "out of, or [were] in any way related to any of the . . . facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances, or other matters referenced.'" 756 F.3d at 1236-37.

---

[18] Home Depot offers several arguments as to why the "principle expressed in *Redel's*" applies to class action settlements."  ECF 2875, at 34.  Whether the principles expressed in Redel's apply to class action settlements is immaterial here given that, as just explained, *Redel's* does not preclude a release of future conduct.

**B. Characterizing the SBB Relief as Rule 23(b)(3) Relief Ensures that the Opt-Out Rights of Putative Class Members Are Adequately Protected.**

The bulk of the objections to the proposed Settlement Agreement's injunctive relief provisions have focused on the question of how the injunctive relief achieved under the Settlement should be characterized, and the effect of that characterization on putative class members who exercise their right to opt out of the Rule 23(b)(3) class and sub-class. The Sperling/Sherrard Objectors and Home Depot have previously focused virtually exclusively on their concerns regarding the characterization of the SBB relief as Rule 23(b)(2) relief. ECF No. 2830 at 13, 14-20 (Sperling/Sherrard); HD Br. at 35-36.[19]

Those concerns—which were shared in part by the Court—are addressed in the Supplemental Notice Plan,[20] as both Subscribers and Defendants are clarifying that the SBB relief of the proposed Settlement Agreement should be characterized as divisible, individualized injunctive relief under Rule 23(b)(3), thus entitling class members who opt out of any Rule 23(b)(3) class or subclass certified by the Court to seek to obtain that relief in future litigation. In order to address questions regarding how the release applicable to the indivisible injunctive relief class would impact the rights of opt-outs from the Rule 23(b)(3) class and subclass, the Court has proposed language to be included in its order approving the proposed Settlement (assuming, of

---

[19] At the final approval hearing, both the Sperling-Sherrard Objectors (Tr. I, 113:17-119:7; 146:19-153:7) and Home Depot (Tr. I, 173:22-181:6) focused their objections regarding the proper categorization of the class injunctive relief solely on the SBB relief, and at no point suggested that any of the other injunctive relief had not properly been categorized as (b)(2) relief. *See, e.g.,* Tr. I, 150:5-7 (Sperling-Sherrard objecting that "it was very difficult to explain to the general counsel of these people why their firms were being denied a second Blue bid"); Tr. I, 174:9-12 ("And so all of my remarks have to do with the issue that you've heard pretty substantial debate on, which is what's going to happen now that we're moving second Blue bid to (b)(3).").

[20] The parties will file the Supplemental Notice Plan and a Proposed Order Regarding Supplemental Notice next week.

course, that the Court decides that the Settlement Agreement satisfies the standards governing final approval):

> A Rule 23(b)(3) opt out reserves the right to pursue divisible relief including monetary relief and divisible injunctive relief. Divisible injunctive relief may include the right to pursue in litigation a Second Blue Bid. The parties acknowledge that, based on a claimant's individual business and the facts and circumstances of the claims, a Rule 23(b)(3) opt out may pursue divisible injunctive relief that includes possible additional Blue bids. Whether such a remedy is merited will depend on the circumstances surrounding the individual claimant's claim. However, the relief pursued by a Rule 23(b)(3) opt out may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the Court.

Both the Sperling/Sherrard Objectors and Home Depot generally agree with the classification of the SBB relief as (b)(3) relief and with the Court's proposed final approval language. Sperling/Sherrard Br. at 2-3; HD Br. at 13-14. Both objectors, however, seek "clarifications" regarding several points regarding the Court's suggested language. Subscribers discuss below the clarifications sought by the Sperling/Sherrard Objectors and Home Depot.

But it is important to emphasize at the outset that the Sperling/Sherrard Objectors go well beyond seeking legitimate "clarifications" regarding the impact of the (b)(2) release on the rights of the (b)(3) opt outs. Rather, the Sperling/Sherrard Objectors move the goalposts significantly from their prior position and seek for the first time to characterize other critical features of the injunctive relief provisions of the Settlement as something other than indivisible injunctive relief that is appropriately provided to the (b)(2) class. The Sperling/Sherrard Objectors thus seek not to "clarify," but rather to substantially alter, the Court's approach in a way that, whether intended or not, could have the effect of inappropriately expanding the rights of opt-outs and jeopardizing the indivisible injunctive relief that was painstakingly crafted by the parties in an effort to resolve this lengthy, complex, and resource-intensive litigation.

23

**1. Opt-Outs from the Rule 23(b)(3) Damages Class May Not Seek Relief that Would Infringe the Rule 23(b)(2) Injunctive Relief.**

The Sperling/Sherrard Objectors request that the Court clarify that it was referring only to "injunctive relief" when it specified that "the relief pursued" by a Rule 23(b)(3) opt-out will not be permitted to infringe on any Rule 23(b)(2) indivisible injunctive relief that is approved by the Court. Sperling/Sherrard Br. at 3. The Court should not revise its language. The Subscribers take the position that those who opt out of the Rule 23(b)(3) damages class remain free to pursue any claims for damages and individualized injunctive or declaratory relief that they may have, *provided* that the relief they seek would not infringe on the Rule 23(b)(2) indivisible injunctive relief. Were the Court to revise its language to refer only to "injunctive" relief, as the Sperling/Sherrard Objectors suggest, it could be read to allow opt-outs to seek *any* type of declaratory relief, including expansive declaratory relief that would clearly not be individualized or confined to the particular facts and circumstances of the opt out litigant (*e.g.*, a declaration that the Blues' ESAs are unlawful and unenforceable in all respects without regard to context or the individual circumstances of the opt out litigant). *See, e.g.,* Sperling/Sherrard Br. at 5 n.4 (drawing distinctions between injunctive and declaratory relief).

Although adopting the Objectors' proposed modification might not have much effect in practice, the Court's proposed language is correct and should not be revised to refer only to "injunctive relief."

**2. With the Exception of the SBB Relief, All of the Injunctive Relief Described in Paragraphs 10 through 18 of the Proposed Settlement Agreement Is "Rule 23(b)(2) Indivisible Injunctive Relief."**

The Sperling/Sherrard Objectors have asked that the Court clarify "which provisions of the Settlement Agreement constitute the 'Rule 23(b)(2) indivisible injunctive relief.'" Sperling/Sherrard Br. at 3, 5. They further argue for the first time that the injunctive relief

24

described in seven of the nine paragraphs in the Settlement Agreement "provide either 'divisible' injunctive relief or no injunctive relief at all." *Id.* at 9. Only the elimination of the NBE rule, they now argue, definitely qualifies as Rule 23(b)(2) indivisible injunctive relief.[21]   The Sperling/Sherrard Objectors' proposed "clarification" would have the effect of substantially narrowing the scope of the release provided by the proposed (b)(2) class and expanding the relief that may be pursued by opt outs from the proposed (b)(3) class and subclass. In any event, their newly attempted recharacterization of this indivisible injunctive relief fails.

The classification of the injunctive relief as (b)(2) or (b)(3) relief is determined not by the proposed Settlement Agreement but by the Court's order certifying the classes that are parties to the proposed Settlement.  The Subscribers have moved to certify an injunctive relief class under Rule 23(b)(2) and a damages class and a self-funded sub-class under Rule 23(b)(3). The Subscribers have proposed—and all now appear to agree—that SBB relief described in paragraph 15 of the proposed Settlement Agreement should be classified as divisible injunctive relief awarded to the (b)(3) subclass rather than indivisible injunctive relief awarded to the (b)(2) class. But with the exception of the SBB relief, all of the injunctive relief that is described in paragraphs 10 through 18 of the proposed Settlement Agreement should be classified as "Rule 23(b)(2) indivisible injunctive relief."

Rule 23(b)(2) is satisfied where, as here, a class challenges a defendant's generally applicable rules and practices and seeks injunctive relief that would address that harm by modifying or eliminating those rules and practices, even if those modifications would not benefit each class member in the same way, to the same degree, or even, for that matter, at all. *Braggs v.*

---

[21] The Sperling-Sherrard Objectors also concede that the limitations placed on acquisition conditions are "perhaps" indivisible.  *Id*. at 7.

*Dunn*, 317 F.R.D. 634, 667 n.44 (M.D. Ala. 2016) ("*Braggs*"). *See also* 1966 Advisory Committee Note ("Action or inaction is directed to a class within the meaning of this subdivision [(b)(2)] even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class."). The requirements of Rule 23(b)(2) are "unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014) ("*Parsons*").[22] By "their very nature such policy changes are generally applicable, and therefore would benefit all class members." *N.B. v. Hamos*, 26 F. Supp. 3d 756, 774 (N.D. Ill. 2014). *See also M.H. v. Berry*, No. 1:15-CV-1427-TWT, 2017 WL 2570262 at *5-6 (N.D. Ga. June 14, 2017) (same).

One key to the characterization of injunctive relief as divisible or indivisible in this context is whether the injunctive relief modifies such rules in a way that will require that a court or other fact finder (such as a settlement administrator) "conduct individualized reviews of the putative class members' claims and situations." *J.M. v. Crittenden*, 337 F.R.D. 434, 454 (N.D. Ga. 2019) ("*Crittenden*") It is for this reason that a class seeking, for example, injunctive relief that would modify or eliminate a defendant's illegal pattern or practice may be certified under Rule 23(b)(2),

---

[22] *See also Murphy v. Eyebobs, LLC*, No. 121-cv-00017 (Erie), 2021 WL 4594679, at *4 (W.D.Penn. Oct. 6, 2021) (approving a (b)(2) class action settlement that required defendant "to modify the policies and practices that have created or allowed" barriers that prevent access to Defendant's website by the blind and the visually impaired); *Chan v. Sutter Health Sacramento Sierra Region*, No. LACV15-02004JAK (AGRx), 2016 WL 7638111, at *7 (C.D. Cal. June 9, 2016) (certifying a (b)(2) class where proposed injunction "requires Defendant to change its policy and practice in order to ensure with greater certainty that only individuals who have provided prior written consent [to receive text messages from Defendant will] receive Defendant's text messages"); *Zepeda v. Paypal, Inc.*, No. C 10-2500 SBA, 2015 WL 6746913, at *7 (N.D.Cal. Nov. 5, 2015) (certifying a (b)(2) class seeking "changes to PayPal's business practices regarding its hold and reserve policies [that permitted PayPal to unilaterally place a hold on a seller's account when a customer disputed a transaction], including additional disclosures to PayPal customers").

but a class seeking injunctive relief to remedy the individualized harms caused by that very same pattern or practice would be certified under Rule 23(b)(3). *See, e.g., Braggs* 317 F.R.D. at 667-69 (certification under Rule 23(b)(2) was proper where plaintiffs identified "specific [medical treatment] policies and practices in which they ask[ed] the court to order defendants to stop engaging," but would have been improper had Defendants sought "an order requiring that each named plaintiff be provided the specific forms of treatment he has been denied" because of those policies and practices); *A.R. v. Connecticut State Board of Education*, No. 3:16-cv-1197 (CSH), 2020 WL 2092650 (D. Conn. May 1, 2020) (certifying under Rule 23(b)(2) claims for injunctive relief that addressed systemic violations, and injunctive claims for individualized remedial education under Rule 23(b)(3)); *Easterling v. Connecticut Dept. of Correction*, 278 F.R.D. 41 (D. Conn. 2011) (certifying claim for injunctive relief seeking modification of physical fitness eligibility requirement pursuant to Rule 23(b)(2) and claims for individualized reinstatement pursuant to Rule 23(b)(3)).

It is no obstacle to certification under Rule 23(b)(2) that different class members may benefit differently from the modifications made to a defendant's rules.[23] Although "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class" (*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) ("*Wal-Mart*")), "[a]ll the class members need not be aggrieved by or desire to challenge defendant's conduct in order for some of them to seek relief under Rule 23(b)(2)." *Braggs*, 317 F.R.D. at 667 n.44 (*quoting Johnson*

---

[23] *See Braggs*, 317 F.R.D. at 667 n.44 (where "the problems of which they complain and the remedies they seek are *systemic*," "the fact that some class members may have thus far received appropriate mental-health care and therefore might not yet have been harmed by the challenged policies and procedures does not defeat certification [under Rule 23(b)(2)]. Additionally, even if not all of the class members were subjected to a substantial risk of serious harm—that is, even if it were sure that the risk would not materialize with respect to some mentally ill prisoners—certification would still be appropriate") (emphasis in original).

*v. American Credit Co. of Georgia*, 581 F.2d 526, 532 (5th Cir. 1978)). *See also Parsons*, 754 F.3d at 688 (although "policies and practices of uniform and statewide application . . . may not affect every member of the proposed class and subclass in exactly the same way, they constitute shared grounds for all inmates in the proposed class and subclass"); *Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672, at *9 (N.D. Ill. Apr. 28, 2017) (same).

What matters for purposes of Rule 23(b)(2) is that the injunctive relief requires and implements uniform changes to the rules of the system, not that those changes will have a uniform effect on each class member. In *B.K. v. Snyder*, 922 F.3d 957 (9th Cir. 2019) for example, the Ninth Circuit affirmed the certification of a (b)(2) class that challenged "a specified set of centralized [foster care] policies and practices of uniform and statewide application," even though "different foster children face different potential harms," because "[a] single, indivisible injunction ordering state officials to abate those policies and practices 'would provide relief to each member of the class' . . . ." *Id*. at 971 (*quoting Wal-Mart*, 564 U.S. at 360). Likewise, in *Parsons*, the Court of Appeals affirmed the issuance of a (b)(2) injunction, requiring the State to provide specific medical, dental, and mental health services to a class comprising all state prison inmates, even though some class members might benefit from a root canal, others might benefit from treatment for high blood pressure, and still others might never need to visit the infirmary. As the Court of Appeals explained, "the acknowledged dissimilarities . . . between members of the proposed class do not in any way bear on or disrupt what they allegedly have in common, and it is that common exposure to . . . policies that constitutes the core factual predicate of their shared legal claim." 754 F.3d at 680 n.23. *See also Cole v. City of Memphis*, 839 F.3d 530, 541-42 (6th Cir. 2016) (approving (b)(2) injunction that prohibited police from randomly "sweeping" a specific street,

even though it would not be possible to ascertain which, if any, of the class members would directly benefit from that injunction).

The Subscribers' class action and the injunctive relief that Subscribers can obtain under the proposed Settlement (with the exception of the SBB relief) fall comfortably under the Rule 23(b)(2) rubric.  The Subscribers' suit challenged "policies and practices that [were] generally applicable to the class as a whole," *Parsons*, 754 F.3d at 688.  These systemic rules and policies severely restricted competition between Defendants. The Subscribers have now negotiated a settlement that provides injunctive relief that will modify these rules in a way that will materially promote competition.  Specifically, Paragraph 11 of the proposed Settlement Agreement both prohibits Defendants from modifying their rules to raise their LBE requirement above their current level of 80% and limits the LBE rule's area of coverage to no more than a single state.[24]  Paragraph 12 requires the elimination of certain restrictions on direct contracting with vendors.  Paragraph 14 modifies rules that govern how the Blues compete for national accounts.  Paragraph 17 places limitations on the ability of the BCBSA and the individual Member Plans to impose conditions on

---

[24] The Sperling/Sherrard Objectors' argument that prohibiting the Blues from assessing compliance with the LBE requirements on an area larger than a state level and prohibiting the Blues from raising that requirement above 80% is not injunctive relief because it "neither prohibits the LBE output restriction nor lowers the 80% threshold," Sperling/Sherrard Br. at 8, n.10, fails as a matter of fact and of law. *First*, the LBE relief affirmatively benefits the class members by imposing a new prohibition on raising the LBE percentage requirement, which would restrain Green competition, and by requiring that the calculation is conducted on a state-by-state basis, which ensures that the LBE requirement functions to protect the Blue marks uniformly in each State, and not manipulated to restrain competition in some States. *Second*, even if the injunction merely maintained the status quo, that is a proper function of injunctive relief (*Ne. Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990) (observing that "chief function of a preliminary injunction is to preserve the status quo")), a form of injunctive relief that is routinely provided to (b)(2) classes (*e.g.*, *Gayle v. Meade*, No. 21553-Civ-COOKE/GOODMAN, 2020 WL 3041326 (S.D. Fla. 2020) (certifying class under Rule 23(b)(2) and granting preliminary injunction)).

the acquisition of a Member Plan. Paragraph 18 modifies the Defendants' MFN rules so that they will ensure that, whenever any Member Plan comes into possession of a controlling market share, that Plan may no longer enter into MFN differential contracts. None of this relief will require conducting "individualized reviews of the putative class members' claims and situations." *Crittenden*, 337 F.R.D. at 454. These modified rules remain systemic.

These modifications to the BCBS system rules are thus precisely the sort of uniform changes to systemic rules and policies addressing a common harm that courts have routinely recognized as proper (b)(2) relief, and the Sperling/Sherrard Objectors' last-minute, newly-adopted attempt to recharacterize most of these changes as "divisible" relief (or no relief at all) that is outside of the ambit of Rule 23(b)(2) should be rejected. That an individual class member who seeks to purchase administrative services from a Blue Plan may benefit differently from a class member who seeks to purchase full insurance coverage does not render the relief divisible or individualized. The acknowledged dissimilarities in the personal circumstances of individual members of the (b)(2) class do not in any way bear on or disrupt what they have in common, and it is that common exposure to the Defendants' amalgamation of restraints on competition that constitutes the core factual predicate of their shared legal claim. *Parsons*, 754 F.3d at 680 n.23.

The Sperling/Sherrard Objectors also argue that Paragraphs 13 (ESAs) and 16 (Additional Brand-Protection Mechanisms) fall outside Rule 23(b)(2) because those paragraphs do not themselves provide "relief" of any kind. *See, e.g.*, Sperling/Sherrard Br. at 8 (these provisions do not "prohibit[] Defendants from harm-causing conduct or provide relief to any class member"). This argument is incorrect even on its own terms. Although Paragraphs 13 and 16 are not technically phrased in terms of stand-alone injunctions, they clearly define the scope and boundaries of the indivisible class injunctive relief that is provided in the Settlement, specifically

by enumerating the rights of the Member Plans that are not abrogated by the injunctive relief and detailing the actions that the Member Plans may continue to take without violating the class injunctive relief.  Notably, Paragraph 13 does not leave the Blues' ESAs in place and unchanged, but explicitly cross-references the other provisions of the proposed Settlement's injunctive relief that will modify the operation of the ESAs if the Settlement is approved.[25]  To contend that these provisions fall outside the scope Rule 23(b)(2) is tantamount to contending that that rule is inapplicable to *any* settlement providing injunctive relief that modifies rather than wholly eliminates challenged rules and practices; after all, to the extent the settlement's injunctive relief leaves some features of the challenged rule or practice in place, it would, to that extent, not constitute "relief" under the Sperling/Sherrard Objectors' reading. The Sperling/Sherrard Objectors cite no authority that even suggests Rule 23(b)(2) should be so read, and their position would all but eviscerate the rule.

This suffices to answer the Sperling/Sherrard Objectors' suggestion that only the relief provided in paragraphs 10 and 17 of the proposed Settlement Agreement should qualify as "Rule 23(b)(2) indivisible injunctive relief" because only those provisions "prohibit Defendants from engaging in conduct that harms all class members." NAO Br. at 7. The Sperling/Sherrard Objectors "err in forgetting that the language of Rule 23(b)(2) focuses on the nature of defendants' acts and omissions and the suitability of class-wide relief, and does not require that the class-wide relief benefit each class member in precisely the same way." *Braggs*, 317 F.R.D. at 668.

---

[25] *See* Settlement Agreement ¶ 13 ("*Subject to the provisions of Paragraphs 10-12 and 14-18, nothing in this Agreement shall prevent any Settling Individual Blue Plan from continuing to operate only in its Service Area, in accordance with the License Agreement(s) and Membership Standards as of the Execution Date.*" (emphasis added).  *See also id.* ¶ 16.h (Nothing in this Agreement shall prevent BCBSA from making additional changes it deems appropriate in the future governance of the Blue System *as long as such changes are not prohibited by this Agreement.*") (emphasis added).

It is clear that the peculiar qualities and characteristics of the SBB relief are not shared by the remaining provisions of the Class Injunctive Relief. As the Subscribers explained in their opening post-hearing brief, the SBB relief proved particularly difficult to classify because it shares features of both Rule 23(b)(3) divisible relief and Rule 23(b)(2) indivisible relief. Subscribers' Supp. Br. at 9-13. The SBB relief resembles (b)(2) relief insofar as it benefits the entire class on a classwide and indivisible basis by stimulating competition, by promoting the free flow of price and product information, and by facilitating the proper functioning of the price mechanism. It modifies the rules of the Defendants' system, which supported its classification as (b)(2) relief, but does so in a way that will require individualized reviews of the class members' individual situations, (*Crittenden*, 337 F.R.D. at 454), which supported its classification as (b)(3) relief. Nor can every member of the class take advantage of the SBB relief simultaneously by satisfying uniform eligibility criteria; instead, only a group of large national employers having 33 million Members in the aggregate can qualify for this relief, and those employers *are individually listed, by name*, in an appendix to the proposed Settlement Agreement.  And, finally, no member of the (b)(2) class who has opted out of the (b)(3) damages class would be eligible to receive the SBB relief provided under the Settlement.  These features of the SBB relief combine to tip the scale in favor of affording the procedural safeguards and protections that attach to Rule (b)(3) relief to the SBB relief.

In sum, the SBB relief has features of both Rule 23(b)(2) and 23(b)(3) relief. But all of the remaining injunctive relief provided under the proposed Settlement Agreement does not share the peculiar, hybrid characteristics of the SBB relief, but instead falls well within under the requirements of Rule 23(b)(2). All of the remaining injunctive relief that is being provided under

the Settlement, therefore, can be characterized only as indivisible relief and has accordingly been classified as relief under Rule 23(b)(2).

### 3. Members of the Injunctive Relief Class Who Have Opted Out of the Damages Class May Assert Any Legal Claim that Would Entitle Them to Individualized and Divisible Relief.

Both Home Depot and the Sperling/Sherrard Objectors seek clarification that those who opt out of the (b)(2) Damages Class would retain the right to pursue additional Blue bids and, in the case of the Sperling/Sherrard Objectors, to pursue other relief from other components of the amalgamation of restraints that Subscribers challenged in this Action. Sperling/Sherrard Br. at 9-14; HD Br. at 13-28.

Home Depot requests clarification regarding how opt-out plaintiffs may obtain additional Blue bids given that they would be barred by both the (b)(2) release and the All Writs Act from challenging the enforcement of the ESAs. HD Br. at 14-16. Subscribers reiterate their position that while an opt-out "would be barred by the release provided by all members of the (b)(2) Injunctive Relief Class from asserting a wholesale challenge to the lawfulness of the ESAs, it would not be barred from asserting a claim that, under the particular business facts and circumstances of its own case, it is nonetheless entitled under the law to seek more than one Blue bid for its business." Subscribers' Supp. Br. at 17. And the Subscribers' position is by no means "fundamentally inconsistent" with that of the Defendants. HD Br. at 25. Quite to the contrary, the Settling Parties are in complete agreement that an opt-out would be free to assert any legal challenge to the lawfulness of the Defendants' rules that they may devise, but they may do so only in support of a request for damages or for individualized injunctive relief.  They may pursue a damages claim that a rule is unlawful under the Sherman Act, in other words, but they may seek an injunction that

provides them with relief only on a truly individualized basis.[26]

The Sperling/Sherrard Objectors, for their part, are incorrect that those who opt out of the (b)(3) class do not release *any* claims for relief.[27] Sperling/Sherrard Br. at 9. Any such opt-outs remain members of the (b)(2) Injunctive Relief Class and, thus, remain bound by the release provided by the members of that class. Settlement Agreement, ¶ 32 ("Persons or entities in the Injunctive Relief Class but not the Damages Class, release only claims for equitable or injunctive relief . . . ."). *See also* Subscribers' Supp. Br. at 17, n.16. As Subscribers have explained, because the (b)(2) class could not have asserted claims for individualized and divisible relief, it could not have released and has not released claims seeking individualized injunctive relief. Subscribers' Supp. Br. at 13-14. Each member of the (b)(2) class who opts out of the (b)(3) damages class is

---

[26] For example, Subscribers object to Home Depot's proposed language that "an opt-out may not seek to enjoin enforcement of the ESAs against other entities." Subscribers believe this language is unnecessary to protect an individual opt-out's ability to seek additional Blue bids as relief for any meritorious claim it may be able to bring. And to the extent this language implies that the opt-out may obtain relief that amounts to an injunction against any enforcement of the ESAs *as to it*— *i.e*., relief that amounts to the invalidation of the operation of the ESAs as to the opt-out—it could infringe upon the Rule 23(b)(2) injunctive relief.

[27] The Sperling/Sherrard Objectors offer several quotations from the Court in support of their claim that the Court repeatedly confirmed that "the opt-outs do not release or waive *any* claim." Sperling/Sherrard Br. at 9 ("You haven't released a claim.") (citing ECF No. 2865, Transcript of Fairness Hearing, Vol. II ("Tr. II"), 23); Sperling/Sherrard Br. at 9 ("you've not released the claim") (citing Tr. II, 23). But it is clear from the context of the relevant discussion that the Court was not suggesting that opt outs may pursue *any* claim for *any* type of relief, but was simply making the point that an opt out from the (b)(3) class would, by virtue of the (b)(2) relief and release, be releasing claims for particular *types of relief—indivisible* injunctive relief—and would not be releasing claims for *other types of relief*--claims for money damages and *divisible* injunctive relief. *See, e.g.*, Tr. II, 23:9-11 ("You haven't released a claim, first of all, because you have opted out. You have the (b)(3) monetary damages claim. All right?"); *id.* at 23:15-16 ("Yes. You have the claim. You can pursue money damages on that claim. So you've not released the claim."); *id*. at 23:25-24:1 ("It's not releasing a claim. It's whether you can pursue that particular remedy."); *id.* at 25-1-3 ("It may be a limitation upon certain relief that can be sought under a release, but it's not a waiver of a claim."). And the Court's proposed final approval order language drives home this point, by focusing on the *relief* that opt-outs may or not be able to pursue without infringing upon the (b)(2) relief.

thus free to pursue individual and divisible injunctive relief under any appropriate legal theory, including the theory that, based on the opt-out's individual business and the facts and circumstances of its specific claims, the ESA contractual requirements of individual Blue Plans cannot prevent that opt-out from receiving the economic benefits of competition for its business, including the benefit of potentially receiving additional Blue bids.  But the opt-out may not assert a cause of action seeking to obtain indivisible relief.

The Sperling/Sherrard Objectors urge that the final approval order should contain "no limitations against opt-outs" other than the prohibition on infringement of the Rule 23(b)(2) indivisible injunctive relief.  This means, according to these objectors, that the final order should be cleansed of any suggestion that "Opt-Outs have released any claim pertaining to additional Blue bids or the continuing market allocation of national account customers."  Sperling/Sherrard Br. at 9.  But the (b)(2) release does preclude opt-out suits "pertaining to additional Blue bids or the continuing market allocation of national account customers," except to the extent the suit seeks only individualized divisible injunctive relief and/or damages based on the opt-out's individual business and circumstances. Any such omission would thus fundamentally alter the Settling Parties' agreement. *Id.*

The Subscribers thus agree with the Sperling/Sherrard Objectors that the Final Approval Order should make clear that (b)(3) opt-outs remain free to assert any and all legal theories that would entitle them to an award of individualized and divisible injunctive relief.[28]  *See*

---

[28] The Sperling/Sherrard Objectors acknowledge that "opt-outs cannot bring a class action or seek indivisible injunctive relief on behalf of an injunctive relief class." Sperling/Sherrard Br. at 9 n.12. Subscribers add only the qualification that opts outs also cannot seek indivisible injunctive relief in an individual action. *See, e.g.*, American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION ("ALI"), § 2.04(a), Comment a ("When a claimant seeks a prohibitory injunction or a declaratory judgment with respect to a generally applicable policy or practice maintained by a defendant, those remedies—if afforded—generally stand to benefit or

Sperling/Sherrard Br. at 11-12.  Again, opt-outs are not barred by the Settlement from asserting any legal claim that would entitle them to an individualized divisible remedy, *i.e.*, a remedy that "entail[s] the distribution of relief to one or more claimants individually, without determining in practical effect the application or availability of the same remedy to any other claimant." Subscribers' Supp. Br. at 9 n.9 (quoting ALI § 2.04(a)).

Finally, for the reasons set forth in the preceding section, Subscribers reemphasize their disagreement with the Sperling/Sherrard Objectors' contention that the Class Injunctive Relief pertaining to national accounts (and, for that matter, any of the injunctive relief set out in Paragraphs 10-18 of the proposed Settlement Agreement, with the exception of the SBB relief) is divisible injunctive relief and that opt-outs may seek injunctive relief that modifies or invalidates those national account rules.  The Subscribers alleged that the rules allocating national accounts were an integral component of the amalgamation of restraints that the Member Plans adopted to allocate exclusive territorial markets and restrain competition among themselves.[29]   The Defendants and even the other objectors acknowledge, moreover, that it is the continuing enforcement of the ESAs that limits the number of Blue bids that a national account may receive. [30] As such, a claim seeking, for example, the invalidation of the ceding rules applicable to national

---

otherwise affect all persons subject to the disputed policy or practice, even if relief is nominally granted only as to the named claimant.").

[29] As Subscribers earlier explained, the ceding rules regulate how national accounts are allocated within the system of exclusive service areas. *See, e.g.*, ECF No. 2408 at 7 (Apr. 15, 2019) ("Ceding fixes the right to bid for national accounts in the ESA in which the account is headquartered, unless the Member Plan in that ESA agrees to cede that right to a different Member Plan in a different ESA."). *See also* HD Br. at 20 (same).  A modification to the ceding rules applicable to national accounts is thus a modification to the ESA rules.

[30] *See, e.g.*, Tr. I, 97:2-4 (Counsel for Defendants: "if their argument is there should be no restriction on any Blue's ability to give a bid to me, service areas impose that restriction right now. And so they would basically be saying, at least as to me, you shouldn't enforce service areas . . . ."). *See also* Sperling/Sherrard Br. at 22-23.

accounts falls well within the definition of "Released Claims" within the proposed Settlement. Settlement Agreement, 1.uuu.[31] And because the modifications to those rules are indivisible relief, moreover, an injunction invalidating or modifying those rules would infringe the Rule 23(b)(2) Injunctive Relief.

As Subscribers explained in their opening post-hearing brief, any remaining questions that the objectors wish to have answered are not about the meaning of the proposed Settlement Agreement, but about the merits of the claims for individualized relief that they intend to bring. Those questions are for another day.

### C. The New Arguments Advanced by the BA Objectors Are as Meritless as Their Prior Arguments.

The crux of the BA Objectors' argument regarding allocation is that Dr. Mason's and Dr. Pakes's economic-based methodologies are improper and that an actuarial approach focused on medical claims costs should have been used instead. More specifically, they criticize the purported "absence of an overcharge analysis" by Dr. Mason and accuse Dr. Ariel Pakes of failing to perform a "separate analysis" of the Self-Funded Sub-Class's damages. BA Br. at 10, 18. They are wrong on both points.

---

[31] The Sperling/Sherrard Objectors' argument that opt-outs should be free to challenge the national account rules because Defendants could have allocated them alphabetically instead of as part of a territorial allocation scheme misses the mark. Sperling/Sherrard Br. at 13. The Subscribers challenged the amalgamation of restraints—including the National Account rules--that the Member Plans *actually adopted*. That Defendants might have entered into a different arrangement is irrelevant. Were Defendants to allocate national accounts alphabetically, or to adopt a new arrangement different from the one perpetuated by the Settlement, then opts-outs and class members alike would, of course, be free to challenge that new arrangement. But for the present, the (b)(3) opt-outs may not assert claims that seek indivisible relief against the actual system that is being perpetuated by the proposed Settlement because those claims have been released by all members of the (b)(2) class.

Dr. Pakes did perform an econometric damages analysis that allowed him to calculate a rough estimate of the respective allocation of damages between the Fully Insureds *and* the Self-Funded Sub-Class.  He first developed a damages estimate for the Alabama damages class, and then extrapolated the Alabama damages model nationwide through 2019 to estimate a potential maximum single damages recovery range. ECF No. 2610-11, Declaration of Dr. Ariel Pakes ("Pakes PA Decl.") at ¶ 10.  His conclusions regarding the respective total damages incurred by the Fully Insureds and Self-Funded Sub-Class are presented in his declaration in support of preliminary approval at Table 1.  *Id.* at ¶ 9, Table 1.  While the BA Objectors may not like Dr. Pakes's method for estimating damages in this case, it is not true that he failed to consider the Self-Funded Sub-Class's damages *at all*; nor have the BA Objectors shown that Dr. Pakes's methodology was unsound or that it led to a flawed or unreasonable allocation result.

However, even if Dr. Pakes had *not* analyzed the respective damages in this case, the allocation would still be sound and fit for final approval because the Self-Funded Sub-Class's independent counsel and experts had "information sufficient to allow them to formulate a reasonable division." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 219 (5th Cir. 1981) ("*Corrugated*").  The Fifth Circuit's reasoning in *In re Corrugated Container Antitrust Litigation* is instructive.  The *Corrugated* objectors similarly argued that the allocation should not have been negotiated without an "economic analysis of the comparative injuries suffered by each subclass." *Id.*  The Fifth Circuit disagreed, noting that when there are subclasses that are "each independently represented," an allocation may be negotiated without each subclass undertaking an "extensive analysis of its relative damages if the available evidence is, at the time of the negotiations, insufficient to indicate a need for it." *Id.*  This is in accord with a long line of cases where courts have approved the practice of negotiating a formula for allocating settlement

proceeds to subclasses. *Id.* (citing *In re Equity Funding Corp. of America Securities Litigation*, 603 F.2d 1353, 1365 (9th Cir. 1979); *In re Gypsum Cases*, 386 F. Supp. 959, 964-5 (N.D.Cal.1974) *aff'd*, 565 F.2d 1123 (9th Cir. 1977)).  This practice lifts the burden of allocating settlement funds among claimants from the court and is therefore desirable so long as the respective subclass representatives have "information sufficient to allow them to formulate a reasonable division." 643 F.2d at 219.

The record is clear that the Self-Funded Sub-Class's counsel and expert Dr. Mason had more than enough information to confidently evaluate and determine a reasonable allocation in this case.  Dr. Mason obtained and relied on the reported revenue data (both for the Fully Insureds and the Self-Funded Sub-Class) in BCBS's internal quarterly financial reports and quarterly enrollment reports for his four separate allocation analyses. Tr. II, 47:17-22. He testified that he and his team had ample opportunity to speak with BCBS about the sources of the data and the data itself. Tr. II, 47:23-48:3 (Mr. Burns: "…Dr. Mason, did you have an opportunity – or you or your team – to speak to Blue Cross Blue Shield and inquire as to the sources for that data and the data itself?" Dr. Mason: "Absolutely. We had extensive discussions with BCBS about the data, its content, its nature…"). Dr. Mason and his large team also had unfettered access to the database containing all of the discovery materials and data produced by BCBS in the case. Tr. II, 217:23-218:5. There is zero evidence in the record to indicate that Dr. Mason did not have "information sufficient" to allow him to formulate a reasonable allocation, nor did he testify that he was in any way hampered from adequately performing his analyses. The BA Objectors mischaracterize Dr. Mason's testimony regarding the revenue data he relied upon.  BA Br. at 13.  As Dr. Mason repeatedly noted during his testimony, the revenue data that he relied upon was described in footnote 54 of his report (the text of which had previously been provided, verbatim, to the BA

Objectors' counsel) and made clear that he received the data directly from defendants, that it was not (despite objectors' repeated assertions to the contrary) limited to ASO fees, and that further information about the precise composition of that data was not necessary to his analysis but could be obtained from defendants if objectors so desired.  Tr. II, 216:2-4; 218:6-220:16.

Dr. Mason relied on the data to perform *four separate* allocation analyses, the results of which all coalesced around a Self-Funded Sub-Class allocation number far below the range advocated for by the BA Objectors' expert Mr. Okpewho. First, Dr. Mason conducted a gross revenue analysis. The BA Objectors focus the bulk of their criticism on this one analysis. However, Dr. Mason has acknowledged that this is the "simplest comparison available" and is only a starting point for calculating a very rough number (in this case, the analysis yields an allocation of only 1.7% to the Self-Funded Sub-Class). Tr. II, 48:13-19. Dr. Mason refuted the BA Objectors' contention that the revenue data he relied on for the Self-Funded Sub-Class only accounted for ASO fees (it also includes "any other items of revenue that would flow to the ASO submarket"). Tr. II, 50:7-19. Dr. Mason also addressed the BA Objectors' contention that he should have looked beyond the actual revenue recovered by BCBS in the Self-Funded market and included all healthcare costs borne by Self-Funded Sub-Class members as well—more specifically, that he should have calculated and used "premium equivalents" based on medical claims costs for the Self-Funded Sub-Class in his analysis. Put simply, expert economists do not use "premium equivalents" to conduct gross revenue analyses in antitrust cases—"we use premiums," i.e. real data grounded in real money paid and received—and the Anthem trial cited by the BA Objectors to support their "premium equivalent" argument had nothing to with calculating "overcharges in an antitrust horizontal allocation case." Tr. II, 51:20-53:2. Just as important, there was no

allegation that medical claims costs were subject to or increased by the anticompetitive conspiracy actually alleged in this case. Tr. II, 56:15-18.

Dr. Mason did not stop with his gross revenue analysis, however. He also performed a net revenue analysis (suggesting an allocation for the Self-Funded Sub-Class somewhere below 10.7%), an operating gain analysis (yielding a range somewhere between 3.9% and 6.3%), and a sophisticated revenue per member growth analysis (yielding a range somewhere between 3.4% and 3.8%). Tr. II, 53:12-54:12. The BA Objectors did not address or critique these three allocation analyses in any meaningful way. Even setting aside the gross revenue analysis, the 6.5% Self-Funded Sub-Class allocation achieved in this settlement is well within the outer bounds of the ranges Dr. Mason arrived at with his other three analyses (3.4% on the lowest end and 10.7% on the highest end). The BA Objectors' failure to grapple with the results of these three alternate analyses is fatal to their critique of Dr. Mason's work, which does not rest solely on the gross revenue analysis.

Indeed, when the BA Objectors accuse Dr. Mason of failing to perform an overcharge analysis, they betray how poorly they understand his work. Tr. 11, 205:18-20 ("Q. But, in fact, you don't perform an overcharge analysis, do you, Dr. Mason? A. Oh, that's absolutely false."). All four of Dr. Mason's analyses are designed to calculate overcharge, and the results of those analyses coalesce around a range. As he explained:

> *My analyses are always targeted toward overcharges.* And that is my chief objection to objectors' quibbles about one of my approaches, a gross revenue approach, which is also the most distant from an overcharge concept. I perform a gross revenue comparison, then I perform a net revenue comparison, which…addresses properly objectors' main complaint that claims payments are included for fully insureds and not for self-funded. The solution to that is not to add in something artificial to self-funded. It is to take out claims paid from fully insureds. But then I go on to undertake a relative profitability analysis as well as an analysis of changes in net revenues…the style of analysis is a style of economic analysis that has been of growing importance in the field of economics for the last

41

30 years…for objectors' experts to say they find this difficult to follow I find unfathomable. I have four analyses, only one of which is really objected to, the one furthest from the concept of overcharge.

Tr. II, 208:24-210:4 (emphasis supplied). The BA Objectors' expert, Mr. Okpewho, candidly admitted that he did not believe that the allocation of damages between groups of plaintiffs in an antitrust case should be based on the relative amounts of the overcharges that the two groups of plaintiffs paid. Tr. II, 258:21-258:24. The simple truth is that Dr. Mason, an antitrust economist, attempted to estimate the relative overcharges incurred by each group of plaintiffs, which is a necessary prerequisite for analyzing the potential damages available to each such group of plaintiffs in an antitrust lawsuit, while Mr. Okpewho—an actuary who lays claim to no antitrust expertise—made no effort whatsoever to answer that critical question.[32]

The BA Objectors' reliance on *Holmes v. Continental Can,* 706 F.2d 1144 (11th Cir. 1983) is also misplaced. *Holmes* bears no resemblance to this case. In *Holmes*, class counsel unilaterally allocated the $43,775 lump sum back pay damages award as follows: (a) $21,000 to be split among the eight named plaintiffs, (b) $16,925 to be split among 32 unnamed, female class members, (c) $5,850 to be split among nine unnamed, African-American class members, and (d) $0 to go to the remaining 77 unnamed class members. *Id*. at 1146 & n.2. Class counsel in that case allocated that disproportionate share to the named plaintiffs based upon his judgment that "they had individual claims worth more than the amounts allocated to them" (*id.* at 1149), but admitted at the fairness hearing that "*he knew little . . . of the [unnamed] class members' individual claims*" and had done little or nothing to investigate them. *See id.* at 150 & n. 5 (emphasis added).[33] Thus, the record in

---

[32] It is presumably for this reason that, as discussed at pages 30-31 of Subscribers' supplemental brief, Mr. Okpewho's analysis fails to account for the substantial evidence that the ASO market was more competitive and significantly less profitable than the fully insured market.

[33] Moreover, the objectors in *Holmes* noted that the supposedly strong individual claims of several of the named plaintiffs were time-barred, as to which the Eleventh Circuit remanded for further

*Holmes* showed that there was *literally no rational basis for the allocation* reached unilaterally by class counsel in that case, no attempt made to consider the *relative* valuations of the individual claims of the class members, and a process in which no one represented the interests of the unnamed class members.

Here, by contrast, the Self-Funded Sub-Class was independently represented in the allocation process by Warren Burns and his firm as well as by the Self-Funded Sub-Class Representative's designee, David Benck; they in turn retained Dr. Mason, a respected antitrust economist, to estimate the value of the Self-Funded Sub-Class's antitrust claims. As discussed above, they estimated a range of potential valuations for the claims, considered the valuations of the Fully Insured claims prepared by Subscribers' expert Dr. Ariel Pakes, and engaged in an arm's length negotiation under the guidance of a highly respected neutral. In short, this case is not in any way like *Holmes* in which the court was asked to accept an allocation produced by a single lawyer based solely on his wholly uninformed view of the relative value of class members' claims.[34]

During the Fairness Hearing, the BA Objectors expressly disclaimed any assertion that the ASO allocation was collusive.[35]  Yet now that Subscribers have shown that the other grounds for the BA objections were meritless, they abandon most of their prior arguments and seek instead to impugn the integrity of the allocation process.  *See, e.g.,* BA Br. at 5 ("*First*, there are indications

---

consideration because "[t]he present record is insufficient to support any conclusion on the issue." 706 F.2d at 1151 n.6.

[34] Nor does *Day v. Persels & Assocs.*, 729 F.3d 1309, 1326-27 (11th Cir. 2013) ("*Day*") bear any resemblance to this case. *Day* rejected a zero-dollar settlement premised on counsel's belief that none of the defendants could satisfy a judgment where the only evidence in the record was that one of seven defendants was insolvent and there was absolutely no evidence regarding the financial condition of the other six.  *Id.*  Here, by contrast, the record amply supports the proposition that the proposed allocation is rationally-based, fair, and reasonable.

[35] *See* Tr. II, 152:22-153:9 (BA Objector counsel, in discussing the procedural fairness of the allocation, stating: "I certainly don't think this is a collusive settlement…")

that the allocation was not negotiated at arm's length."). Notably, however, virtually all of the supposed indicia that the allocation negotiations were collusive boil down to the BA Objectors' assertion that the results of those negotiations should have been different.

The few efforts the BA Objectors make to identify procedural concerns contradict the record. They claim that the allocation negotiation "was not a contentious negotiation." BA Br. at 6. The record shows that "This was a dispute that stretched over a period of at least three or four or five months." *See, e.g.*, Tr. II, 124:12-22 (Mr. Burns: "it truly was a dispute……And I will tell you – I will tell you the parties were pretty far apart at the beginning and that it was only through multiple discussions, formal mediation, and back-channel communications with the mediator, Mr. Feinberg, that we were ultimately able to resolve it. This was very much at arm's length as Mr. Feinberg represents in his declaration."); *id.* at 139:10-25 (Mr. Boies: "before we got to Mr. Feinberg, we each got experts. Each got good experts. They did an analysis. They came in, and we were, you know, several times apart. Now none of the experts, even in the beginning, were anywhere where the objectors are, anywhere close to where the objectors are. But it might have been between 2 and 16 percent. And – then we began to negotiate. We began to analyze. They pointed out some things about our expert work. We pointed out some things about their expert work. And we gradually reached – you know, moved towards the center. And I think that – I think – while I would never say that this is the exactly right result – and if it were just up to me, I think it would have been a little bit lower – what I am confident of is that this is a fair and reasonable result and it is the result of arm's length negotiations and aided by a very effective mediator."). Mr. Feinberg's declaration confirms that this was a contentious negotiation in which the parties put forward substantially different allocation ranges, and had to work to find a middle ground. ECF. No. 2610-8 at 6, ¶¶ 12-13 (Declaration of Mr. Feinberg).

The BA Objectors also claim that counsel for the Self-Funded Sub-Class was not advised by an expert with the necessary expertise. BA Br. at 5. That is false. The Self-Funded Sub-Class retained Dr. Mason in September of 2019, well before the negotiations began, and used his expertise during those negotiations to determine the range of potential allocations. ECF No. 2847-2. Dr. Mason is an experienced antitrust economist, a chaired professor at LSU, and a fellow at the Wharton School at the University of Pennsylvania. ECF No. 2812-9 at 24-32 (Dr. Mason's CV). While the BA Objectors seem to think it would have been better to have used an actuary, the presentation at the final approval hearing demonstrated that their proffered actuary did not even consider the difference in profitability between the Self-Funded and FI businesses and was oblivious as to the relationship between the overcharges that could plausibly be alleged in each market and the appropriate allocation. Tr. II, 258:21-24. In any event, the standard is one of reasonableness; while the BA Objectors may claim they would have done a better job (which they have utterly failed to show), that is not the relevant inquiry.

The BA Objectors also assert that there is "nothing in the record to justify" the allocation. That is obviously false. The declarations of Mr. Burns and Mr. Feinberg, Dr. Mason's report, and the evidence and presentations at the Final Approval Hearing, along with other evidence of the type marshalled at pages 24-30 of Subscribers' supplemental brief, amply justify a finding that the allocation was rationally based and reasonable. Unable to rebut the merits of Dr. Mason's report, the BA Objectors try to denigrate it as a *post hoc* rationalization. But that is false. Dr. Mason's formal report establishes the objective reasonableness of the allocation, and the BA Objectors have failed to conclusively show otherwise.[36]

---

[36] The BA Objectors' semantic game (BA Br. at 7) concerning the date and phrasing of Dr. Mason's September 3, 2021 report in support of final approval cannot obscure the following facts: (a) he was retained by ASO counsel a full two years prior to the date of his report, on September 12,

None of the BA Objectors' remaining criticisms of Dr. Mason's work, or the allocation generally, hold water. To the contrary, they reflect the objectors' highly partisan spin on the analysis that was actually done, and frequently ignore or distort the record.

*First*, the BA Objectors again trot out their claim (BA Br. at 8) that Dr. Mason's analysis is unsound because it supposedly does not account for the Affordable Care Act ("ACA") provision requiring 85% of premiums collected from certain fully insured customers be spent on medical care. This claim was thoroughly debunked at pages 28-30 of Subscribers' supplemental and by Dr. Mason during his testimony when he explained, among other things, that three of the four techniques that he employed to estimate ASO overcharges are not subject to this criticism. *See, e.g.,* Tr. II, 53:12-55:4. Furthermore, the BA Objectors fail to make clear to the Court that (a) none of these ACA rules took effect until 2011, and therefore are irrelevant to almost 25% of the Fully Insured Class Period, and (b) the requirement is only 80% for individual and small group fully insured customers, and is 85% only for large, fully insured customers.[37]

*Second*, having insisted that the ACA limits the profits that the Blues can make on the Fully Insured business, the BA Objectors insist that the Blues disproportionately and misleadingly

---

2019 (ECF No. 2847-2); (b) he did substantive work before and during the allocation negotiations, and (c) independent counsel for the ASOs relied on his work and opinions throughout the mediated negotiations process. *See, e.g.,* June 2, 2021 Memorandum from Warren T. Burns to Richard D. Nix (ECF No. 2812-19 at 185) at 1 ("[B]efore ASO counsel engaged in discussions regarding allocation with the fully insured subscribers, we engaged economic experts to assist us in identifying appropriate allocation ranges and to assess positions taken by the subscribers. Joe Mason, a chaired professor at LSU and Wharton fellow led our expert team at the BVA Group in conducting this analysis."); Tr. II, 123:23-124:11 (Mr. Burns: "Dr. Mason and his team advised me every step of the way. We spent months developing analyses that yielded various ranges of potential allocation. I was armed with those analyses, worked closely with them to develop them, and they formed the basis of my negotiating posture as we went into a mediation with the subscribers.").

[37]https://content.naic.org/cipr_topics/topic_medical_loss_ratio.htm#:~:text=The%20MLR%20rul es%20became%20effective,a%20minimum%20MLR%20of%2085%25.

allocated their expenses to their ASO line of business.  BA Br. at 14.  This makes no sense. Under the ACA's medical loss ratio rules limiting profitability on the Fully Insured business, the Blues had an incentive to allocate costs more to their Fully Insured business, and less to their ASO business.  Yet the BA Objectors claims they did the opposite.  That is because they otherwise have no answer to the host of documents showing that *the ASO business was not profitable for the Blues*, and instead was often a *loss leader* or merely break even. Subscribers' Supp. Br. at 28-32.  Those documents demonstrate a substantial difference in profitability between the Fully Insured and ASO business, and thus support the proposition that the overcharge would be much higher in the former than the latter.

*Third*, the BA Objectors also appear to misunderstand the discount factor Dr. Mason applies to the claims of the ASOs, asserting that he assumed the ASOs would "have to wait many years" to get a judgment while assuming that "the Fully Insured Class's recovery is cash in hand today."  BA Br. at 11.   But Dr. Mason's testimony makes it clear that those were not his assumptions.   During cross-examination, Dr. Mason carefully explained that he was not discounting to the date of an anticipated future judgment, but rather was discounting "to a stage of the litigation similar to this stage, at which we are negotiating a settlement.  With regard to this litigation currently before us, eight years have elapsed to get us to this stage…." Tr. II, 202. Put differently, as the Court is well aware, the ASOs were a late addition to the litigation. If, instead of settling simultaneously with the Fully Insureds, the ASOs were required to litigate their claims to a comparable stage of litigation, they would be starting many years behind, and thus could expect to reach judgment long after the Fully Insureds.  This is simply a recognition of reality.  For example, as Mr. Boies explained during the Fairness Hearing, the extensive discovery that has taken place to date related to the entire market, and thus to some extent included ASOs, but did

not include ASO-related documents, ASO-related structured data, and the like. Tr. II, 159:18-160:6. All of that would have to be produced, reviewed, and analyzed. Relevant depositions would have to be taken. Extensive expert work and discovery would have to be done. Undoubtedly, in that but-for world, there would have been substantial ASO-specific motions practice. That represents time that the Fully Insured plaintiffs have already invested in this matter and thus would put any ASO judgment years behind a Fully Insured judgment. Therefore, the discount factor used by Dr. Mason accounts for a reasonably anticipated *relative* differential in time-to-judgment in the absence of a settlement, rather than the absolute differential that the objectors appear wrongly to assume it does.

*Fourth*, on pages 18-19 of their brief, the BA Objectors simply assume away the record evidence supporting the allocation. The record shows that the Self-Funded Sub-Class's counsel, supported by a highly qualified economic expert, attempted to estimate the range of overcharges suffered by the Self-Funded Sub-Class and translate those into an estimate of potentially achievable antitrust damages, taking into account legal (statute of limitations) and practical (the additional delay in reaching judgment relative to the Fully Insureds) factors that would affect the value of their claims. This Court has received ample explanation of how that estimation process fed into the mediated negotiation that resulted in the allocation. The BA Objectors appear to be asserting that Self-Funded Sub-Class Settlement Counsel should have insisted on conducting full-blown discovery and economic analysis sufficiently extensive to be used in litigation before they could agree on an allocation. But such an unrealistic insistence would be inconsistent with the very notion of a settlement, one of the key benefits of which is that the parties are not required to fully litigate complex issues.

*Fifth*, the BA Objectors' assertion that the scope of the releases mandates a different allocation is not well-founded, and the cases they cite are inapposite. *Petruzzi's v. Darling-Delaware*, 880 F. Supp. 292, 299 (M.D. Pa. 1995) involved a coupon settlement in which half of the class was to receive no consideration at all despite being expected to execute a full release. Here, the ASOs complain that they should receive more, not that they are receiving nothing.[38] And *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1329 (5th Cir. Unit A 1981) affirmed a distribution plan that did not account for limitations issues only because the district court, on remand, found that most class members made purchases both before and after the limitations watershed, the relative value and number of the problematic claims would be small, and "devising and implementing a distribution formula weighting the relative value of pre-1973 and post-1972 claims would be costly, complex, and burdensome." *Id.*

*Finally*, the BA Objectors' assertion that no allocation is necessary is simply incorrect and amounts to nothing more than a claim that the greater strength of the antitrust claims of the Fully-Insured class members should be ignored for the benefit of the Self-Funded Sub-Class. Applicable law neither requires nor permits such a result. In any event, as Dr. Mason's numbers show, the total amount paid to the Blues by FI subscribers during their class period was approximately $3.1 trillion; whereas the amounts paid by ASOs to the Blues during their relevant class period was approximately $87 billion. Subscribers' Final Approval Br., Ex. D (Declaration of Dr. Joseph Mason) at Ex. 1 (totals not given in Exhibit, but amounts for each year total to the approximate numbers given here). Thus, if the parties had in fact simply used these numbers to do the allocation, that would have translated into an allocation of 97.3% to the Fully Insureds and 2.7%

---

[38] The BA Objectors, who are not ERISA plans, lack standing to raise the ERISA-plan-specific aspect of this untimely claim on behalf of ERISA plans and, in any event, are mistaken about the ability of ERISA plans to assert claims in the settlement.

to the Self-Funded Sub-Class. As the Subscribers have explained before, that "gross revenue" approach was not the only, or even the principal, method used by the parties in their negotiations. However, it is a relevant data point: an antitrust plaintiff can only seek damages based on an assertion that the amounts paid to the defendant was inflated by a certain amount; thus, the Self-Funded subscribers could not seek to recover any alleged overcharge on the amount they paid to healthcare providers, whereas the Fully Insured subscribers could seek an overcharge based on the entire amounts they paid the Blues, subject to the Blues having to show whether some of those amounts were paid to providers, and whether those amounts did or did not contain an overcharge to subscribers. Thus, the gross amount paid is relevant, and provides one possible baseline for any damages claim. And the disparity is stark: 97.3% versus 2.7%. Even looking past the disparity in gross amounts paid to the Blues, Dr. Mason's numbers also show that even after subtracting out all healthcare costs paid by the blues for Fully Insured subscribers, that still leaves over $553 billion paid by the Fully Insured subscribers, as compared with only $87.3 billion from Self-Funded subscribers – translating to a percentage breakdown of 84% to the Fully Insureds and 16% to the ASOs. And this disparity does not take into account the enormous difference in the profitability of the two markets as discussed at pages 30-32 of Subscribers' supplemental brief or any discount for the *relatively* longer time that it would take the Self-Funded Sub-Class to obtain a judgment if they were litigating their case rather than settling it.

### D. GM's Continued Objection that It Does Not Receive a Second Blue Bid Should Be Overruled.

GM has filed a supplemental brief challenging the proposed Settlement on the ground that it is treated unfairly because it is not eligible for a SBB. The reason for this difference in treatment is straightforward. Under the proposed Settlement, eligibility is dependent in part not only on whether a proposed Class member has over 5,000 employees covered by BCBS, but also on the

geographic dispersion of those employees. As GM concedes, while it has 196,000 covered employees, only 88,000 (44.8%) reside out of the State of Michigan, where its manufacturing facilities are predominantly located. GM Br. at 7. Accordingly, it is currently unable to satisfy all of the criteria to be denominated as a QNA under the proposed Settlement. But GM *is* entitled to the other relief under that Settlement, including monetary relief, the elimination of BCBSA's NBE requirements, and the ability to solicit Blue Plans to obtain their ASO bids on a Green basis.

There are several solutions to the issue GM identifies. *First*, it is clear that the Court plans to treat SBBs as divisible injunctive relief under Fed. R. Civ. P. 23 (b)(3), rather than indivisible injunctive relief under Fed. R. Civ. P. 23(b)(2). GM will have the opportunity to opt out of the Rule 23(b)(3) Settlement class and attempt to pursue a SBB in its own litigation, should it so wish.

*Second*, the composition of QNAs under the proposed Settlement is not fixed immutably, but is subject to review and modification every two years. While GM is not currently eligible as a QNA, it may become one in the future.

*Third,* and perhaps most importantly, the proposed Settlement allows GM to solicit ASO business from other Blue Plans on a Green basis, thus causing its ASO provider—BCBS of Michigan—to face unprecedented competition that previously did not exist under the BCBSA's NBE requirement. This will have the effect of affording GM an opportunity to negotiate better ASO rates. In its brief, GM contends that the promises being made about SBBs and Green competition cannot both be equally important and there is thus a "logical inconsistency" about the assertions of the significance of both. GM Br. at 2. Both are significant forms of relief, but to the extent a proposed Settlement Class member cannot meet the criteria for being a QNA, it is still entitled to avail itself of the opportunity to solicit Green business from Blue plans.

GM relies on decisions in *Amin v. Mercedes-Benz USA, LLC,* No. 1:17-CV-01701-AT, 2020 WL 5510730 (N.D. Ga. Sept. 11, 2020); *In re Equifax Inc. Customer Data Security Breach Litig.*, No. 1:17-md-2800-TWT, 2020 WL 256132 (N.D. Ga. March 17, 2020) ("*Equifax*"), *aff'd in part and rev'd in part*, 999 F.3d 1247 (11th Cir. 2020) and *Joh v. Am. Income Life Ins. Co.*, No. 18-CV-06364-TSH, 2020 WL 109067 (N.D. Cal. Jan. 9, 2020) as supporting the position that class members *must always* receive the same benefits or be subject to the same policy under a proposed settlement. GM Br. at 3-4. The cases do not support such a broad proposition. In *Amin*, the court approved the settlement at issue, even though it allegedly failed to meet the needs of certain class members who had ongoing repair problems for their vehicles or health concerns about moldy odors in them. It noted that claimants with specialized concerns not addressed by the settlement could always pursue a separate suit. 2020 WL 256132, at *2. In *Equifax*, a settlement was approved, even though the settlement treated class members who suffered out-of-pocket losses differently from those who did not. 2020 WL 256132, at *9. And in *Joh*, the court rejected a proposed settlement on grounds inapplicable here—that trainees who did not become sales agents were compensated on a *pro rata* basis under the proposed settlement even though only 25% of damages were suffered by them. 2020 WL 109067, at *9.

Moreover, the Eleventh Circuit also has noted that "there is no rule that settlements benefit all class members equally…." *Holmes*, 706 F.2d at 1148 (citing *Kincade v. General Tire & Rubber Co.*, 635 F.2d 501, 506 n. 5 (5th Cir. 1981)). *Accord, e.g., Petrovich v. Amoco Oil Co.*, 200 F.3d 1140, 1152 (8th Cir. 1999) (citing *In re Veeco Instruments, Inc. Sec. Litig.*, No. 05 MDL 01695, 2007 WL 4115809, at *13 (S.D.N.Y. Nov. 7, 2007) (citing *Holmes* and saying that "[i]nstead, the general rule us that an allocation formula need only have a reasonable and rational basis, particularly if recommended by experienced and competent counsel").

52

The 2018 amendments to Fed. R. Civ. P. 23 also make it clear that class members are *not* required to be treated *equally*, but only "*equitably* relative to each other."  Fed. R. Civ. P. 23 (e)(2)(D) (emphasis added).  Subsequent cases have applied this test. *See, e.g.*, *Kuhr v. Mayo Clinic Jacksonville*, 530 F. Supp. 3d 1102, 1117 (M.D. Fla. 2021) (citing the rule and saying the settlement accounted for differences among individual class members and treated them "equitably in the division of the settlement")*; In re Chinese-Manufactured Drywall Prods. Liability Litig.*, 424 F. Supp. 3d 456, 490-91 (E.D. La. 2020) (enough if relief is allocated pursuant to a model that assigns "relative values to a handful of objective criteria that collectively determine each individual award" so that relief is "efficiently and effectively" distributed "on an equitable basis that considers relevant, objective factors");  *Equifax*, 2020 WL 256132, at *9 (the proper focus is whether "the settlement provides equitable 'treatment of some class members vis-à-vis others'").

Here, there is absolutely no basis to conclude that the proposed Settlement provides inequitable preferential treatment for named plaintiffs or other class members. The criteria for identifying QNAs in the proposed Settlement are properly based on objective dispersion data. The fact that GM could not satisfy those criteria does not make the proposed Settlement unfair. It was treated equitably based on objective criteria and that is all it could reasonably ask for.

Finally, it should be noted that the Eleventh Circuit in *Holmes* said that disparate treatment of proposed class members is also justifiable if it is "rationally based on legitimate considerations…." 706 F.2d at 1148. Courts in this Circuit have relied on considerations such as: (a) whether the proposed settlement unfairly favors class plaintiffs; (b) the actions taken by class representatives and their counsel to protect class members; (c) the totality of the benefits offered to class members by a proposed settlement; (d) the number of objectors relative to the size of the proposed class; (e) the judgment of experienced counsel for the parties who are fully familiar with

the case at issue; and (f) the fact that a settlement is a compromise that may not satisfy all the wishes of objectors. See *Lurns v. Russell Corp.*, 604 F. Supp. 1335, 1336-37 (M.D. Ala. 1984); *Carnegie v. Mutual Savings Life Ins. Co.*, No. Civ.A.CV-99S3292NE, 2004 WL 3715446, at *23-24 (N.D. Ala. Nov. 23, 2004). *See also Johnson v. Montgomery Cty. Sheriff's Dept.*, 604 F. Supp. 1346, 1349 (M.D. Ala. 1985).

### E.  Huang's Untimely Complaint Is Both Procedurally and Substantively Flawed.

Huang, who never filed a timely objection to the Settlement,[39] has filed a supplemental brief responding to the proposed Settlement that can be summarily rejected.

*First*, Huang argues against certification of a settlement class under Fed. R. Civ. P. 23 (b)(3) on the ground that indvidual members of that proposed Class will each receive only a small amount of compensation. Huang Br. at 1-2. But Huang admits to having opted out of the Rule 23(b)(3) Class. *Id.* at 1. It is black letter law that an opt out from a settlement class has no standing to object to the settlement. *E.g., In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 28-29 (D.C. Cir. 2000); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 753 (S.D.N.Y.1985), aff'd, 798 F.2d 35 (2d Cir.1986); *Etter v. Thetford Corp.*, No. SACV 13-00081-JLS (RNB), 2016 WL 11745096, at *7 n.3 (C.D. Cal. Oct. 24, 2006). Thus, Huang's first objection should be rejected out of hand.

*Second*, with respect to the proposed classwide injunctive relief under Fed. R. Civ. P. 23(b)(2), Huang argues that there is no material risk of future harm and hence no standing for class members.  Huang Br. at 2-4. That argument is at odds with what this Court already ruled in granting preliminary approval for the proposed Settlement. *BCBS II*, 2020 WL 8256366, at *8.

---

[39] Huang first filed a Motion for Leave to Appear as Amicus Curiae on September 30, 2021, over two months after the objection deadline. ECF No. 2833. The Court denied that motion. ECF No. 2834.

Here, the entire purpose of the injunctive relief sought pursuant to the proposed Settlement is to remedy the *ongoing, concrete* harms caused by Defendants' practices; there is not merely "imminent" harm, but *actual* harm that the injunctive provisions of the proposed Settlement are designed to prevent.

Given the legal deficiencies in his arguments, and considering his status as an opt-out, Huang's brief is unavailing. To the extent that Huang wishes for his brief to be construed as an objection, it should be stricken as untimely, having been filed over four months after the July 28, 2021 objection deadline.

### F.   The Court Need Not Address The Providers' Litigation in the Final Approval Order as Their Claims Are Not Released by the Settlement.

The Providers are correct that the proposed Settlement explicitly carves out their antitrust claims in their related litigation, and that the Settling Defendants have agreed not to raise Providers' releases under this Settlement as a defense to Providers' claims brought in their capacity as Providers of health care products or services in MDL No. 2406. Settlement Agreement ¶ 1(uuu). Given that Providers' claims are not covered by the Settlement, the Court need not do anything more to protect their right to litigate.

The Providers go one step further and ask this Court to make a ruling as part of any final approval of the proposed Settlement that it does not affect the standard of review applicable to the Providers' claims, including any arguments they may have with respect to the *per se* unlawfulness of ESAs standing alone. Provider Br. at 1-3. The only authority that the Providers cite in support of their argument is *Delta Dental*, but as the Subscribers pointed out in their initial supplemental brief, that case is distinguishable because it arose in the context of a motion to dismiss. Subscribers' Supp. Br. at 4-6. It certainly provides no basis to make a prophylactic statement in the final

approval order with respect to the proposed Settlement here that sanctions the scope of legal arguments that Providers can make in the future.[40]

## III.      CONCLUSION

For all of the foregoing reasons, the Subscriber Plaintiffs request that the Court enter an order granting final approval to the proposed Settlement.

Date: December 17, 2021                                    Respectfully submitted,

   /s/ David Boies                                                       /s/ Michael D. Hausfeld
David Boies – ***Co-Lead Counsel***                 Michael D. Hausfeld – ***Co-Lead Counsel***
BOIES, SCHILLER & FLEXNER LLP           Swathi Bojedla – ***Discovery Committee***
333 Main Street                                                  HAUSFELD LLP
Armonk, NY 10504                                          888 16th Street NW, Suite 300
Tel: (914) 749-8200                                          Washington, DC 20006
Fax: (914) 749-8200                                          Tel: (202) 540-7200
dboies@bsfllp.com                                             Fax: (202) 540-7201
                                                                         mhausfeld@hausfeld.com
                                                                         sbojedla@hausfeld.com


Charles J. Cooper – ***Co-Chair, Written***      Megan Jones – ***Settlement Committee &***
***Submissions Committee & PSC Member***        ***PSC Member***
COOPER & KIRK, PLLC                                 Arthur Bailey – ***Discovery Committee***
1523 New Hampshire Avenue NW                     HAUSFELD LLP
Washington, DC 20036                                     600 Montgomery Street, Suite 3200
Tel: (202) 220-9600                                          San Francisco, CA 94111
Fax: (202) 220-9601                                          Tel: (415) 633-1908
ccooper@cooperkirk.com                                  Fax: (415) 358-4980
                                                                         mjones@hausfeld.com
                                                                         abailey@hausfeld.com

---

[40] The Providers suggest that the Subscribers' lead counsel represents the class of plaintiff providers in that case. Provider Br. at 4. In fact, the interim class counsel appointed by the Court consist of unrelated law firms.

Chris T. Hellums – *Local Facilitating Counsel*
PITTMAN, DUTTON & HELLUMS, P.C.
2001 Park Place N, 1100 Park Place Tower
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
chrish@pittmandutton.com

William A. Isaacson – *Settlement Committee & PSC Member*
PAUL WEISS
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7313
Fax: (202) 379-4937
wisaacson@paulweiss.com

Gregory Davis – *Settlement Committee & PSC Member*
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Tel: (334) 832-9080
Fax: (334) 409-7001
gldavis@knology.net

Cyril V. Smith – *Settlement Committee & PSC Member*
ZUCKERMAN SPAEDER, LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Tel: (410) 949-1145
Fax: (410) 659-0436
csmith@zuckerman.com

Kathleen Chavez – *Settlement Committee & PSC Member*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
kcc@fmcolaw.com

David Guin – *Co-Chair, Written Submissions Committee*
Tammy Stokes – *Damages Committee*
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. North
Suite 600/Title Building
Birmingham, AL 35203
Tel: (205) 226-2282
Fax: (205) 226-2357
davidg@gseattorneys.com
tammys@gseattorneys.com

Carl S. Kravitz – *Expert Committee*
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: (202) 778-1800
Fax: (202) 822-8106
ckravitz@zuckerman.com

Richard Feinstein – *Expert Committee*
Karen Dyer – *Expert Committee*
Hamish P.M. Hume – *Discovery Committee*
BOIES, SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
rfeinstein@bsfllp.com
kdyer@bsfllp.com
hhume@bsfllp.com

Mindee Reuben
Lite DePalma Greenberg
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Tel:  (267) 314-7980
Fax: (973) 623-0858
mreubin@litedepalma.com

Nate Cihlar
Joshua Callister
Srauss & Boies
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel:  (703) 764-8700
Fax:  (703) 764-8704
ncihlar@straus-boies.com
jcallister@straus-boies.com

Patrick Cafferty – *Discovery Committee*
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
150 S. Wacker Drive, Suite 300
Chicago, IL 60606
Tel: (312) 782-4880
pcafferty@caffertyclobes.com

Bryan Clobes – *Litigation Committee*
Ellen Meriwether – *Written Submissions Committee*
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
2005 North Monroe Street
Media, PA 19063
Tel: (215) 864-2800
Fax: (215) 864-2810
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

Andrew Lemmon – Chair, Discovery
Committee
LEMMON LAW FIRM
15058 River Road
PO Box 904
Hahnville, LA 70057
Tel: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Virginia Buchanan – Chair, Class
Certification Committee
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR,
P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7000
Fax: (850) 435-7020
vbuchanan@levinlaw.com

Douglas Dellaccio – *Litigation Committee*
CORY WATSON CROWDER & DEGARIS,
P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 32505
Tel: (205) 328-2200
Fax: (205) 324-7896
ddellaccio@cwcd.com

Larry McDevitt – *Chair, Class Certification Committee*
David Wilkerson – *Discovery Committee*
VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Tel: (828) 258-2991
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Edwin J. Kilpela, Jr.
Benjamin Sweet – *Litigation Committee*
DEL SOLE CAVANAUGH STROYD LLC
200 First Avenue, Suite 300
Pittsburgh, PA 15222
Tel: (412) 261-2393
Fax: (412) 261-2110
ekilpela@dsclaw.com
bsweet@dsclaw.com

Charles T. Caliendo – *Class Certification Committee*
GRANT & EISENHOFER
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
ccaliendo@gelaw.com

Daniel Gustafson – *Litigation Committee*
Daniel C. Hedlund – *Damages Committee*
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

John Saxon – *Litigation Committee*
JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203-3314
Tel: (205) 324-0223
Fax: (205) 323-1583
jsaxon@saxonattorneys.com

Robert M. Foote – *Damages Committee*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
rmf@fmcolaw.com

Robert Eisler – *Discovery Committee*
GRANT & EISENHOFER
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
reisler@gelaw.com

Brent Hazzard – *Litigation Committee*
HAZZARD LAW, LLC
447 Northpark Drive
Ridgeland, MS 39157
Tel: (601) 977-5253
Fax: (601) 977-5236
brenthazzard@yahoo.com

Lawrence Jones – *Damages Committee*
JONES WARD PLC
The Pointe
1205 East Washington Street, Suite 111
Louisville, Kentucky 40206
Tel:  (502) 882-6000
Fax: (502) 587-2007
larry@jonesward.com

Robert Methvin – ***Chair, Settlement Committee***
James M. Terrell – ***Class Certification Committee***
MCCALLUM, METHVIN & TERRELL, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, AL 35205
Tel: (205) 939-0199
Fax: (205) 939-0399
rgm@mmlaw.net
jterrell@mmlaw.net

Michael McGartland – ***Class Certification Committee***
MCGARTLAND & BORCHARDT LLP
1300 South University Drive, Suite 500
Fort Worth, TX 76107
Tel: (817) 332-9300
Fax: (817) 332-9301
mike@attorneysmb.com

H. Lewis Gillis – ***Co-Head Chair, Litigation Committee***
MEANS GILLIS LAW, LLC
3121 Zelda Court
Montgomery, AL 36106
Tel: 1-800-626-9684
hlgillis@tmgslaw.com

David J. Hodge – ***Chair, Settlement Committee***
MORRIS, KING & HODGE
200 Pratt Avenue NE
Huntsville, AL 35801
Tel: (256) 536-0588
Fax: (256) 533-1504
lstewart@alinjurylaw.com

*Counsel for Subscriber Plaintiffs*

/s/ Warren T. Burns
Warren T. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
wburns@burnscharest.com

*Counsel for the Self-Funded Sub-Class*

60

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2021, the foregoing Subscribers' Post-Hearing

Reply Brief In Support Of Final Approval of Class Settlement was filed with the Clerk of the

Court and served on counsel of record via ECF.

/s/ Michael D. Hausfeld

Michael D. Hausfeld