FILED
2021 Dec-17  PM 08:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406)** | ) ) ) ) ) ) ) ) ) |

**Master File No. 2:13-CV-20000-RDP**

This Document relates to Subscriber Track cases.

**DEFENDANTS' POST-HEARING REPLY BRIEF
IN SUPPORT OF FINAL APPROVAL**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

I.  THE GO-FORWARD SYSTEM IS NOT *PER SE* OR CLEARLY
    ILLEGAL. ....................................................................................................... 1

    A.  Continuing conduct can be released only when that conduct is not
    "clearly" illegal or *per se* illegal. ........................................................... 2

    B.  Deciding whether the go-forward System is *per se* unlawful would not
    require a merits ruling. ............................................................................. 6

    C.  The go-forward System is subject to the rule of reason and thus not
    "clearly illegal." ...................................................................................... 6

II.  THE SETTLEMENT'S FORWARD-LOOKING RELEASES ARE
     PROPER. ..................................................................................................... 10

III.  THE COURT'S LANGUAGE ON DIVISIBLE INJUNCTIVE RELIEF,
      WHEN READ TOGETHER WITH THE (B)(2) RELEASE, IS
      APPROPRIATE. .......................................................................................... 12

    A.  Objectors play semantic games in an attempt to deprive the (b)(2)
    Settlement of its proper preclusive effect. ........................................... 12

        1.  Indivisible injunctive relief does not depend on the procedural
        vehicle used to pursue the relief. ............................................ 13

        2.  Objectors attempt to hollow out the core of the Court's proposed
        language. ................................................................................. 14

        3.  The Final Approval Order should explicitly reference the legal
        effect of the (b)(2) release, either within the Court's proposed
        language or elsewhere. ............................................................. 17

IV.  THE SECOND BLUE BID CRITERIA ARE NO OBSTACLE TO
     APPROVAL. ................................................................................................ 18

V.  PROVIDERS' ARGUMENTS ARE UNTIMELY AND LACK MERIT. ................ 19

CONCLUSION ...................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. FTC,*
1 F.4th 102 (2d Cir. 2021) ...................................................................................8, 10

*Arizona v. Maricopa Cnty. Med. Soc'y,*
457 U.S. 332 (1982)......................................................................................................7

*Behfarin v. Pruco Life Ins. Co.,*
2019 WL 7188575 (C.D. Cal. Nov. 26, 2019)......................................................18

*Bennett v. Behring Corp.,*
737 F.2d 982 (11th Cir. 1984) ..................................................................................3, 4

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
441 U.S. 1 (1979)...........................................................................................................7

*Carson v. Am. Brands, Inc.,*
450 U.S. 79 (1981).........................................................................................................6

*Clorox Co. v. Sterling Winthrop, Inc.,*
117 F.3d 50 (2d Cir. 1997)..........................................................................................8

*Cont'l T.V., Inc. v. GTE Sylvania,*
433 U.S. 36 (1977).........................................................................................................7

*Cotton v. Hinton,*
559 F.2d 1326 (5th Cir. 1977) ...................................................................................6

*D.S. ex. rel S.S. v.N.Y.C. Dep't of Educ.,*
255 F.R.D. 59 (E.D.N.Y. 2008) ...............................................................................18

*G.F. v. Contra Costa Cnty.,*
2015 WL 4606078 (N.D. Cal. July 30, 2015)...................................................15, 16

*Grunin v. Int'l House of Pancakes,*
513 F.2d 114 (8th Cir. 1975) ........................................................................ *passim*

*Hawaii v. Standard Oil Co. of Cal.,*
405 U.S. 251 (1972)....................................................................................................14

*Holloway v. Best Buy Co., Inc.,*
2011 WL 13258077 (N.D. Cal. Aug. 4, 2011) .....................................................16

*In re Blue Cross Blue Shield Antitrust Litig.*,
  2020 WL 8256366 (N.D. Ala. Nov. 30, 2020) ................................................................20, 21

*In re Blue Cross Blue Shield Antitrust Litig.*,
  308 F. Supp. 3d 1241 (N.D. Ala. 2018) ......................................................................7, 9, 22

*In re Delta Dental Antitrust Litigation*,
  484 F. Supp. 3d 627 (N.D. Ill. 2020); ...................................................................7, 9, 10, 23

*In re Domestic Air Transp. Antitrust Litig.*,
  148 F.R.D. 297 (N.D. Ga. 1993) ........................................................................................6

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
  999 F.3d 1247 (11th Cir. 2021) ........................................................................................10

*In re Managed Care*,
  2012 WL 4335018 (11th Cir. Sept. 11, 2012) ..................................................................12

*In re Managed Care*,
  756 F.3d 1222 (11th Cir. 2014) ........................................................................................12

*In re Managed Care Litig.*,
  2010 WL 6532985 (S.D. Fla. Aug. 15, 2010) ..................................................................11

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) ..................................................................11

*In re Visa Check/Mastermoney Antitrust Litig.*,
  2003 WL 25704042 (E.D.N.Y. June 6, 2003) ..................................................................15

*Int'l Salt Co. v. United States*,
  332 U.S. 392 (1947)............................................................................................................4

*Jefferson Parish Hospital District No. 2 v. Hyde*,
  466 U.S. 2 (1984)................................................................................................................4

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)............................................................................................................7

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
  72 F.3d 1538 (11th Cir. 1996) ............................................................................................8

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
  2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008)....................................................................11

*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1 (1958)................................................................................................................4

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
   779 F.2d 592 (11th Cir. 1986) ...................................................................................9

*Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*,
   325 F.3d 712 (6th Cir. 2003) ................................................................................5, 9

*NCAA v. Alston*,
   141 S. Ct. 2141 (2021)............................................................................................9

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984)..................................................................................................7

*Petrovic v. Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) ..............................................................................19

*Procaps S.A. v. Patheon, Inc.*,
   845 F.3d 1072 (11th Cir. 2016) ....................................................................5, 7, 8, 9

*Redel's Inc. v. Gen. Elec. Co.*,
   498 F.2d 95 (5th Cir. 1974) ..................................................................................12

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
   442 F.3d 741 (9th Cir. 2006*)* ..............................................................................10

*Robertson v. NBA*,
   556 F.2d 682 (2d Cir. 1977)............................................................................ *passim*

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) ...............................................................................7

*Scholz v. United States*,
   2019 WL 2303769 (E.D. Wisc. May 30, 2019)....................................................22

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006)...........................................................................................2, 5, 9

*United States v. Sealy*,
   1964 WL 8089 (N.D. Ill. Oct. 6, 1964)..................................................................8

*United States v. Sealy, Inc.*,
   388 U.S. 350 (1967)................................................................................................8

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972)................................................................................................8

*VKK Corp. v. Nat'l Football League*,
   244 F.3d 114 (2d Cir. 2001)..................................................................................12

*VMG Enters. v. F. Quesada & Franco, Inc.*,
    788 F. Supp. 648 (D.P.R. 1992) ................................................................................8

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...............................................................................................13

*White v. NFL*,
    836 F. Supp. 1458 (D. Minn. 1993) ............................................................3, 4, 10

**Rules**

Fed. R. Civ. P. 8 ...........................................................................................................16

Fed. R. Civ. P. 23 ................................................................................................ *passim*

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .....................................................................16

James Grimmelmann, *Future Conduct and the Limits of Class-Action Settlements*,
    91 N.C. L. Rev. 387 (2013) .............................................................................11, 12

Principles of the Law of Aggregate Litigation (Am. L. Inst. 2010) .............................14

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*,
    84 N.Y.U. L. Rev. 97 (2009) ................................................................................14

**<u>INTRODUCTION</u>**

Following ten years of litigation, Subscribers and Defendants reached a settlement that provides significant monetary and injunctive relief to Class Members while still permitting the century-old Blue System to continue offering unparalleled healthcare coverage and service to one in three Americans.  Objectors seek to deprive the Settlement of the preclusive effect for which Defendants have bargained, largely retreading their prior arguments without adding any new or legitimate reason for the Court to deny final approval.  For all the reasons discussed in our prior briefing and at the two-day Final Approval Hearing, the Court should approve the Settlement.

Defendants submit this reply to rebut Objectors' principal arguments.  ***First***, the go-forward System is not *per se* illegal.  ***Second***, because the System post-settlement is not *per se* illegal, a prospective release is proper.  Absent such a release, Defendants would have not agreed to such important monetary and injunctive relief.  ***Third***, the Court's current language on divisible injunctive relief is proper when read in conjunction with the (b)(2) release and the Settlement as a whole.  None of Objectors' proposed changes should be adopted.  ***Fourth***, the heavily-negotiated Second Blue Bid rules do not pose an obstacle to approval.

***Finally***, the Court should likewise reject the arguments made by Providers, who have not objected to the Settlement and whose claims are expressly preserved therein.  Any impact of the Settlement on Providers' case is a result of changes to the Blue System—the very same System Providers continue to challenge.

## I.      THE GO-FORWARD SYSTEM IS NOT *PER SE* OR CLEARLY ILLEGAL.

In an egregious about-face, National Account Objectors now argue that the Court does not need to decide whether the *per se* standard applies to the go-forward System, and must only "conclude that it is neither 'clear' nor 'certain' what the outcome of the *per se* analysis will be." Nat'l Acct. Objs.' Post-Hr'g Br. (Dkt. 2876) at 15.  That is wrong.  To approve a settlement, courts

1

must satisfy themselves that the conduct condoned by the settlement is not clearly or *per se* illegal. *See, e.g.*, *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *Robertson v. NBA*, 556 F.2d 682, 686 (2d Cir. 1977). Objectors cite no instances where a court expresses uncertainty about whether the *per se* standard applies, and then approves the settlement anyway. Nor could a court take such an equivocal approach, as the *per se* standard is reserved for only clear-cut cases of "plainly anticompetitive" conduct. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (explaining that the rule of reason "presumptively applies"). Instead, the Court should find that, with the elimination of National Best Efforts, service areas and the go-forward System are not "clearly illegal."

National Account Objectors' arguments are particularly egregious, as they previously admitted (in both their pre-hearing brief and at the Final Approval Hearing itself) that the clearly illegal standard is "***synonymous*** to a per se violation," and that "this Court must ***now*** decide the question" of whether the go-forward System is "per se illegal." Final Approval Hr'g Tr. I at 134:6–10 (emphasis added); Nat'l Acct. Objs.' Pre-Hr'g Br. at 14 (emphasis added). Apparently recognizing from the Final Approval Hearing that service areas and the go-forward System are plainly rule of reason (*see infra* Section I.C), they have done a complete about-face and now claim the Court "does not need to decide" that issue. Nat'l Acct. Objs.' Post-Hr'g Br. at 14–15. National Account Objectors were correct the first (and second) time.

## A. Continuing conduct can be released only when that conduct is not "clearly" illegal or *per se* illegal.

Objectors concede, and leading cases all recognize, that "a court cannot lend its approval to any contract or agreement that violates the antitrust laws." Home Depot's Post-Hr'g Br. (Dkt. 2875) at 6 (quoting *Grunin*, 513 F.2d at 123); *see* Nat'l Acct. Objs.' Post-Hr'g Br. at 15. In other words, the Court must conclude that the go-forward System is not clearly illegal, meaning that it

is not *per se* illegal.  *See* Final Approval Hr'g Tr. I 71:19–24 (Subscribers' Counsel:  "[W]e've ourselves kind of gone round and round on whether saying that something that is clearly illegal is different from saying something is a *per se* violation.  And we haven't been able to come up with an articulable . . . distinction.").  Objectors strain to avoid this conclusion by selectively quoting *Grunin* and *Robertson* to eliminate reference to *per se* illegality as a synonym for "clearly illegal," and by misrepresenting the reasoning of *Bennett*.  *See* Home Depot's Post-Hr'g Br. at 6–7, 9–10 (discussing *Grunin*, *Robertson*, and *Bennett*); Nat'l Acct. Objs.' Post-Hr'g Br. at 14–17 (same).  Read in full, these cases require this Court to decide whether the go-forward System is subject to the *per se* standard.

Objectors extensively quote *Grunin* but omit its two key holdings.  First, *Grunin* held that "**unless the terms of the agreement are per se violations of antitrust law**, we must apply a 'reasonableness under the totality of the circumstances' standard to the court's approval."  *Grunin*, 513 F.2d at 124 (emphasis added).  Second, *Grunin* directly and explicitly equated "illegal to a legal certainty" with "*per se* illegal," stating:

> This brief survey of the theories advanced by the parties . . . illustrate[s] . . . that **the alleged illegality of the settlement agreement is not a legal certainty.  Thus, having determined that the settlement terms were not illegal per se**, we must test appellant's remaining claims of error against the broad area of discretion left to the district court.

*Id.* (emphasis added).

*Robertson* likewise equated "*per se* illegal" with "clearly illegal."  556 F.2d at 686 ("The challenged practices have not been held to be illegal *per se* in any previously decided case" and therefore, "the settlement authorizes no future conduct that is clearly illegal").  Objectors ignore this language in the courts' holdings, which permitted the continuation of challenged conduct **because it was not per se illegal**.  *Grunin*, 513 F.2d at 124; *Robertson*, 556 F.2d at 686; *see also White v. NFL*, 836 F. Supp. 1458, 1468 (D. Minn. 1993) (following *Grunin* and *Robertson* and

3

explaining that "a settlement agreement should be approved unless the terms of the agreement are *per se* illegal, are illegal to a 'legal certainty' or authorize future conduct that is clearly illegal").

In addition, National Account Objectors incorrectly claim that *Bennett* signals a departure from the holdings of *Grunin* and *Robertson.* To the contrary, *Bennett* followed those cases, albeit in a context where the standard of review was not at issue and those objectors were explicitly seeking a decision on "the merits of the case."[1]  *Bennett v. Behring Corp.*, 737 F.2d 982, 986–87 (11th Cir. 1984).  Most importantly, the *Bennett* court upheld the settlement over arguments that "certain [anticompetitive] features may be perpetuated" and further recognized that it could not have done so if it permitted the continuation of illegal conduct.  *Id.* at 987 (explaining that it could not approve a settlement where "the illegality of an arrangement under consideration is a legal certainty").  *Bennett*—which exclusively relied on *Grunin* for its articulation of the legal standard—is thus entirely consistent with *Grunin*, *Robertson*, and *White*.  *Id.*

At bottom, Objectors' arguments are reduced to the sophistry that, while the Court cannot approve a settlement that continues "clearly *per se*" conduct, it is okay to approve one that permits the continuation of conduct that is just "*per se*."  Nat'l Acct. Objs.' Post-Hr'g Br. at 16.  If conduct is not "clearly" *per se*, it is not *per se* at all since *per se* analysis is reserved for only the clearest

---

[1] National Account Objectors wrongly suggest that the standard of review was meaningfully in dispute in *Bennett*.  As explained in the Blues' opening brief, *Bennett* concerned the settlement of a tying claim, which necessarily would have proceeded under the rule of reason given that the defendant lacked market power.  Defs.' Post-Hr'g Br. at 5, 11.  Objectors only response is to argue that, at the time, such market power was not required for a *per se* tying claim.  Nat'l Acct. Objs.' Post-Hr'g Br. at 15 n.20.  That is wrong.  The Supreme Court's decision in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984), which confirmed that *per se* tying claims require market power, was handed down **months** before the Eleventh Circuit's affirmance in *Bennett*.  And while the district court did not have the benefit of *Jefferson Parish* when it originally approved the settlement, *Jefferson Parish* was not a sea change in the law, but rather was the culmination of at least **four decades** of Supreme Court precedent permitting *per se* tying claims only where the defendant had market power in the tying market.  *See, e.g.*, *Int'l Salt Co. v. United States*, 332 U.S. 392 (1947) (tying arrangement held to be unlawful *per se* where company used its market power in salt-processing machines to forcibly sell more salt); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6, 11 (1958) (tying arrangements "are unreasonable in and of themselves whenever a party has **sufficient economic power with respect to the tying product** to appreciably restrain free competition in the market for the tied product . . . . [T]he vice of tying arrangements lies in **the use of economic power in one market** to restrict competition on the merits in another . . . .") (emphases added).

cases.  *See* 1 Health Care and Antitrust L. § 2A:12 (2021) ("The per se rule applies only in clear-cut cases."); *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1083 (11th Cir. 2016) ("The per se rule is reserved only for those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality,' or that are 'naked restrain[ts] of trade with no purpose except stifling of competition.'" (internal citations omitted)); *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003) ("The Supreme Court has stated that the *per se* rule . . . should be applied only in clear cut cases."); *see also Texaco*, 547 U.S. at 5 ("[T]his Court presumptively applies rule of reason analysis . . .").

And, as both Subscribers and Defendants have made clear, if the Court is persuaded that service areas and the go-forward System are *per se* illegal, then it should not approve the Settlement.  *See* Final Approval Hr'g Tr. I at 53:16–23 (Subscribers' Counsel:  "[W]e, class counsel, did not believe that there is [a] *per se* violation in this settlement agreement that will be perpetuated either in the aggregate or looking at any of its features . . . . [I]f we thought there was, we could not conscientiously have agreed to it and we could not place it before you conscientiously for approval."); *id.* at 85:25–86:6 (Defense Counsel:  "The settlement does continue ESAs . . . if Your Honor had concerns that the service areas remained *per se* unlawful, even without regard to the other elements, I think that [] you should rightfully be reluctant to approve the settlement.").

Because a settlement that continues clearly illegal conduct could never be fair, reasonable and adequate, Objectors essentially ask the Court to eschew its responsibility to ensure that the Settlement meets the requisite standard.  *See* Home Depot Post-Hr'g Br. at 5–6 (suggesting the Court should make "no finding as to the standard that would apply to any future challenge of that conduct or the outcome of such a challenge"); Nat'l Acct. Objs.' Post-Hr'g Br. at 5 ("The Court

need not and should not decide whether the going-forward national account customer allocation violates the *per se* rule."). The Court should decline the invitation.

**B.     Deciding whether the go-forward System is *per se* unlawful would not require a merits ruling.**

Objectors also claim that the Court should not consider the *per se* standard because this would require an improper ruling "on the merits." Home Depot's Post-Hr'g Br. at 7. But deciding whether service areas and the go-forward System are clearly illegal is not equivalent to determining the "merits of the case or resolv[ing] unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). Defendants agree that courts may not reach "ultimate conclusions" or binding merits judgments. *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). But no party seeks such a determination here. Rather, in order to determine that the Settlement is "fair, reasonable, and adequate," the Court need only conclude that service areas and the go-forward System are not subject to the *per se* rule. *See, e.g.*, *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 315–16 (N.D. Ga. 1993) (determining that price communications are "not per se unlawful" in order to approve settlement). No one is asking the Court to determine ultimate liability.

**C.     The go-forward System is subject to the rule of reason and thus not "clearly illegal."**

As explained in Defendants' opening post-hearing brief, the proper standard of review for service areas and the go-forward System is rule of reason. *See* Dkt. 2869. Objectors' arguments to the contrary misunderstand both the Supreme Court's standard-of-review case law and the record in this case.

***First,*** National Account Objectors argue that the Court cannot consider procompetitive benefits if a "horizontal market allocation" label can be applied to the Blue System. Nat'l Acct. Objs.' Post-Hr'g Br. at 19–20. That is not the law. As Objectors' cited authority, *In re Delta*

*Dental Antitrust Litigation*, explains, the "law has evolved since *Topco* and *Sealy* were decided, and that to the extent these cases 'stand for the proposition that all horizontal restraints are illegal per se,' the Court's later cases have narrowed that holding."  484 F. Supp. 3d 627, 634 (N.D. Ill. 2020); *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8 (1979) (creation of new product justified rule of reason treatment even though conduct was in a literal sense "price fixing"); *NCAA v. Bd. of Regents of Univ. of Okla.,* 468 U.S. 85, 134 (1984).  This has been confirmed by recent Supreme Court decisions, which "reformed the law of horizontal restraints" to make clear that courts cannot rely on labels to ignore plausible procompetitive benefits when deciding the standard of review.  *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 226 (D.C. Cir. 1986); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007) ("[A] 'departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing.'") (quoting *Cont'l T.V., Inc. v. GTE Sylvania*, 433 U.S. 36, 58–59 (1977)).  As the Eleventh Circuit has explained, "just because an agreement is capable of being characterized as a market allocation agreement does not mean that the per se rule applies."  *Procaps*, 845 F.3d at 1083.[2]

**Second,** National Account Objectors deliberately misconstrue the significance of the Blue Plans' common-law trademarks.  As this Court has already correctly concluded, Blue Plans held rights to common-law trademarks in their respective areas ***well before*** adoption of License Agreements with service areas.  *See In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1264 (N.D. Ala. 2018) ("The Rule 56 evidence here shows that certain Plans initially developed 'individual' trademark rights.").  Far from originating through a horizontal market

---

[2] Objectors' case law is not to the contrary.  *See* Nat'l Acct. Objs.' Post-Hr'g Br. at 19.  They cite *Arizona v. Maricopa Cnty. Med. Soc'y*, but there the Supreme Court explained that mere "alleg[ations]" of procompetitive benefits based on a "limited record" that are "unlikely to prove significant" did not justify abandoning *per se* treatment.  457 U.S. 332, 351 (1982).  Here, the Court has extensive evidence of service areas' procompetitive benefits, *see infra* at 8–9.

allocation, ESAs developed independently at common law through these lawfully acquired, pre-existing trademark rights. *See* Dkt. 2728 at 16–19 (explaining that the License Agreements merely codify existing common law trademark rights); *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 56, 61 (2d Cir. 1997); *VMG Enters. v. F. Quesada & Franco, Inc.*, 788 F. Supp. 648, 657 (D.P.R. 1992) (concluding that a territorial division between horizontal competitors was permissible because "the division was already a reality as a matter of trademark law"). This alone distinguishes *Topco* and *Sealy*, both of which involved the allocation of a trademark to competitors who previously had no rights to them. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 598–600 (1972); *United States v. Sealy, Inc.*, 388 U.S. 350, 352–53 (1967); *see also United States v. Sealy*, 1964 WL 8089, at *3–4, *17 (N.D. Ill. Oct. 6, 1964). Subsequent case law confirms that service areas should be "presume[d] . . . procompetitive" precisely because they settle and protect pre-existing trademark rights. *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 116 (2d Cir. 2021).

*Third,* National Account Objectors misrepresent both the significance and presence of factual disputes. National Account Objectors cherry pick a few executive statements about the Blue System, and claim that they create disputes such that the ESAs do not have **plausible** procompetitive benefits. Nat'l Acct. Objs.' Post-Hr'g Br. at 24–25. That is not how courts determine the standard for antitrust liability. As the Eleventh Circuit has explained, if there are "**some procompetitive efficiencies**" that "**might flow**" from the challenged conduct, the court should not be "prepared to condemn [that conduct] out of hand" by applying the *per se* standard. *Procaps*, 845 F.3d at 1079, 1084 (emphasis added); *accord Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1549–51 (11th Cir. 1996) (declining to apply *per se* standard where plaintiff "has not proven" an agreement warranting *per se* treatment). Thus, the fact disputes simply mean that the *per se* rule cannot apply, since it is reserved only for "clear cut cases." *Plymouth Whalers*

*Hockey Club*, 325 F.3d at 718; *see also Texaco*, 547 U.S. at 5.  If a restraint has plausible procompetitive justifications—even if disputed—the *per se* standard cannot apply.  *See Procaps*, 845 F.3d at 1079.[3]

National Account Objectors also claim that the parties have not built a sufficient record to allow the Court to examine these procompetitive benefits and determine the standard of review for the go-forward System.  *See* Nat'l Acct. Objs.' Br. at 16 n.21 (claiming that "[t]he absence of a properly developed record . . . necessitate[s] further litigation"); *id.* at 23 (attacking Defendants for insufficient record citations).  But that argument ignores that there is already full briefing—based on a full record—on service areas standing alone that the Court will decide in the Provider case.  *See generally* Dkts. 2728, 2747, 2772.  That record, and those arguments, are the same ones that the Court has before it on final approval.[4]

**Fourth,** Objectors ignore the changes wrought to the System by the Settlement itself.  With these changes, Subscribers agree that service areas and the go-forward Blue System should be evaluated under the rule of reason.  Final Approval Hr'g Tr. I 71:19–24

**Fifth,** Objectors rely on the motion-to-dismiss ruling in *Delta Dental*, but that decision offers no guidance on the standard of review for the Blue System.  484 F. Supp. 3d at 631.  As an initial matter, because *Delta Dental* addressed a motion to dismiss, the Court concluded, "at this

---

[3] National Account Objectors also claim that ESAs have "no rational connection" to the Blue System rules regarding national account bids.  Nat'l Acct. Objs.' Post-Hr'g Br. at 22–23.  To the contrary, the bid rules (as modified by the Second Blue Bid) governing National Accounts are a straightforward application of service areas to National Accounts.  They permit companies to have their health insurance administered by a local plan in the same geographic area as their company headquarters.  The local plan will have valuable experience in the area with most of the companies' employees, while also having access to the national Blue System.  This procompetitive arrangement could not exist without ESAs and Blue Plans' local focus.

[4] Similarly, National Account Objectors argue that "this Court has already held that Defendants are not a joint venture." Nat'l Acct. Objs.' Post-Hr'g Br. at 20.  That is at best incomplete, as this Court has recognized.  *See In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1276.  Like Visa in the *NaBanco* case, the Blue System "exhibits characteristics of a joint venture, even if it is not technically a 'joint venture.'"  *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 601 (11th Cir. 1986).  These collaborative features weigh in favor of applying the rule of reason.  *See NCAA v. Alston*, 141 S. Ct. 2141, 2155 (2021).

stage," "[p]rior to any factual development," plaintiffs' complaint allegations (including that there were no plausible procompetitive benefits from the challenged conduct) were controlling, and thus denied the motion to dismiss. *Id.* at 635. Even Subscribers' Counsel—who are also plaintiffs' counsel in *Delta Dental*—acknowledged that *Delta Dental* does not apply here. *See* Final Approval Hr'g Tr. II 16:10–21 (Subscribers' Counsel agreeing that Subscribers are "not able to ride [*Delta Dental*] in this situation because it was on a motion to dismiss"). But even on the merits, *Delta Dental* is easily distinguished because defendants did not make—and, thus, the Northern District of Illinois did not consider—standard of review arguments about trademark rights. Not only is the Blue System's unique trademark history a core reason for why the rule of reason should govern the Blues' exclusive service areas, but subsequent precedent since *Delta Dental* has only further confirmed that courts must presume that agreements to resolve trademark rights are procompetitive. *See 1-800 Contacts*, 1 F.4th at 116.[5]

## II.   THE SETTLEMENT'S FORWARD-LOOKING RELEASES ARE PROPER.

Home Depot takes the extreme view that any release of future conduct is categorically impermissible and would violate public policy. Home Depot's Post-Hr'g Br. at 29. That is not the law, and were it the law, the settlements in *Grunin*, *Robertson*, *White* and nearly every other antitrust settlement could not have been approved. *Grunin*, 513 F.2d at 118 (upholding settlement and release over argument that settlement "agreement perpetuated a number of the antitrust

---

[5] This Court need not resolve all potential questions regarding the preclusive effect (including, for example, issue preclusion) of its final approval order in the abstract. Such questions should be resolved on a case-by-case basis as the need arises. For example, dual objector/opt-outs like National Account Objectors, which already raised and argued for a per se ruling, may be differently situated from other opt-outs. *See In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1265 (11th Cir. 2021) ("[O]bjectors cause the settlement process to be more adversarial. While the settling parties may agree about the prospect of settlement, class action settlements are routinely subjected to objections that 'provide the court an adversarial presentation of the issues under review, bringing the decision-making process closer to a familiar judicial decision.'"); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 750 (9th Cir. 2006) ("We apply the doctrine of issue preclusion to bar Plaintiffs from relitigating their objections to the Wal-Mart settlement."). The question of preclusion is thus a fact- and plaintiff-specific question for another day.

violations that were the primary focus of the initial litigation"); *Robertson*, 556 F.2d at 686 (upholding same over argument that "the settlement agreement perpetuates for ten years" two boycotts); *White*, 836 F. Supp. at 1486–87 (upholding same over argument that "various portions" of the settlement agreement "violate the antitrust laws"); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *25–26 (E.D.N.Y. Dec. 16, 2019) (upholding release related to future rule changes).

Courts regularly approve antitrust settlements that release future claims for the continuation of some of the conduct challenged in that litigation. *E.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *25 (approving forward-looking release); *In re Managed Care Litig.,* 2010 WL 6532985, at *12 (S.D. Fla. Aug. 15, 2010) (same); *Madison Square Garden, L.P. v. Nat'l Hockey League*, 2008 WL 4547518, at *8 (S.D.N.Y. Oct. 10, 2008) (enforcing prospective release).[6]

Even the law review article cited extensively by Home Depot recognizes that a "future conduct" release is appropriate when released future conduct relates to claims that were or could have been raised in the litigation. James Grimmelmann, *Future Conduct and the Limits of Class-Action Settlements*, 91 N.C. L. Rev. 387, 440–46 (2013) ("Any past-conduct claim [that the class could have brought] can be barred by claim preclusion, and hence can be settled. Any future-conduct claim that depends on an issue essential to a past-conduct claim can be barred by issue preclusion, and hence can also be settled."); Home Depot's Post-Hr'g Br. at 30, 33–35, 42–43 (citing same). As Professor Grimmelmann explains, only settlements that release "'novel' future-

---

[6] *See also* Defs.' Post-Hr'g Br., at 12–14; Defs.' Pre-Hr'g Br. (Dkt. 2813) at 2, 11–15; Defs.' Br. in Supp. of Subscribers' Mot. for Prelim. Approval (Dkt. 2612) at 4.

conduct claims" that are "materially different from any past-conduct claims the class can bring" may not be approved. Grimmelmann, *supra*, at 442.

Here, the release is tethered to the Subscribers' complaints and the issues raised in their pleadings. Settlement Agreement (Dkt. 2610-2) at ¶ 32. The release is thus exactly the type that the law permits.[7] *See, e.g.*, *VKK Corp. v. Nat'l Football League*, 244 F.3d 114 (2d Cir. 2001) (in cases involving ongoing business practices, class settlement can leave intact some challenged practices and include a release of future claims based on those same practices); *In re Managed Care*, 756 F.3d 1222, 1236 (11th Cir. 2014).[8] In fact, it is precisely because settlements *can* release future claims involving continuing conduct that the Court must ensure that such conduct is not "clearly illegal" (*i.e.*, not *per se* illegal). *Grunin*, 513 F.2d at 123–24; *Robertson*, 556 F.2d at 686.

## III.   THE COURT'S LANGUAGE ON DIVISIBLE INJUNCTIVE RELIEF, WHEN READ TOGETHER WITH THE (B)(2) RELEASE, IS APPROPRIATE.

### A.   Objectors play semantic games in an attempt to deprive the (b)(2) Settlement of its proper preclusive effect.

Both Home Depot and National Account Objectors rely on semantic gamesmanship rather than legal substance in their efforts to prevent the proposed settlement from having any preclusive

---

[7] Home Depot continues to claim that *Redel's* prohibits antitrust settlements that release claims for continuing conduct. Home Depot continues to be wrong. First, in *Redel's*, the release was expressly limited to claims that existed "as of the date of the execution of" the release, and thus the Fifth Circuit found that it did not prohibit claims for future conduct. *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 98 (5th Cir. 1974). This fact-specific holding says nothing about the permissible scope of a settlement release where the conduct was challenged, investigated and litigated, and where a settlement permitted some challenged conduct to continue. Second, the *Redel's* general release purported to cover "all claims, demands, contracts, and liabilities, if any there be." *Id.* Here, by contrast, the Settlement Agreement unremarkably releases claims based on the continuation of conduct that started before the Settlement, was the subject of hard-fought litigation, and was resolved by an arm's length settlement. Third, Home Depot has no apposite authority for its misreading of *Redel's*. It admits that "no cases in this Circuit appears to have relied on *Redel's* in a class action." Home Depot's Post-Hr'g Br. at 34.

[8] Home Depot also badly misstates the holding of *Managed Care*. Although the settlement agreement in *Managed Care* referred to claims arising "on or before the Effective Date," the Eleventh Circuit was clear that this language extinguished all claims challenging the alleged conspiracy that existed on or before the Effective Date, even if those claims were predicated on "conduct post-dating the Effective Date." 756 F.3d at 1236. In fact, Home Depot's argument is the ***precise*** position that the appellants in *Managed Care* pressed, and which the Eleventh Circuit expressly rejected. *See* Appellants' Br., *In re Managed Care*, 2012 WL 4335018, at *28–32 (11th Cir. Sept. 11, 2012).

effect on their claims.  National Account Objectors use a crabbed parsing of the Court's proposed language, while Home Depot proposes new language.  Their shared purpose is to permit an opt-out, in an individual case, to enjoin the application of service areas ostensibly to themselves.  *See, e.g.*, Home Depot's Post-Hr'g Br. at 17 (proposing language that "an opt out may not seek to enjoin enforcement of the ESAs ***against other entities***") (emphasis added).

That is not what the Settlement Agreement provides or what the Court made clear at the Final Approval Hearing.  Final Approval Hr'g Tr. I at 92:15–18 (Court:  "The limitation would be that the claim cannot attempt to relitigate . . . any aspect of the (b)(2) injunctive relief."); *id.* at 97:6–8 (Defense Counsel:  "[T]hey've already released the claim that they can challenge service areas."  Court:  "Yes.").  Adopting Objectors' approaches would be contrary to the terms of the Settlement Agreement, which expressly preserves service areas, and to the (b)(2) release, in which each member of the (b)(2) class releases all of its claims for indivisible injunctive relief to "the fullest extent permitted by law."  Settlement Agreement § 32.  The law permits a (b)(2) Settlement to release indivisible injunction claims involving policies and practices of general application, like service areas, but not claims that seek monetary or divisible injunctive relief.

1. *Indivisible injunctive relief does not depend on the procedural vehicle used to pursue the relief.*

Home Depot's and National Account Objectors' arguments rest on a false premise:  as long as service areas are challenged on an individual basis, rather than in a class action, they can be enjoined as to that plaintiff.  But whether relief is indivisible or divisible turns on the nature of the claim and relief sought, not the procedural vehicle used to assert the claim.  While Objectors may challenge the legality of service areas as part of their liability arguments, they are a corporate policy of general applicability, and "can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011)

(quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)); *see also* Fed. R. Civ. P. 23(b)(2) (applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class").

According to Objectors, almost no injunction is indivisible because instead of enjoining the unlawful practice as a whole, the Court could enjoin it only as to the particular plaintiff. That is not the law. "When a claimant seeks a prohibitory injunction or a declaratory judgment with respect to a generally applicable policy or practice maintained by a defendant, those remedies—if afforded—generally stand to benefit or otherwise affect all persons subject to the disputed policy or practice, even if relief is nominally granted only as to the named claimant." Principles of the Law of Aggregate Litigation § 2.04 cmt. a (Am. L. Inst. 2010); *see also Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 261 (1972) ("[T]he fact is that one injunction is as effective as 100."); *see also* Principles of the Law of Aggregate Litigation § 2.04 Illustration 1 (declaratory judgment adjusting retirement plan benefits formula is indivisible remedy "because the retirement plan could not realistically be administered so as to apply different calculation methods to beneficiaries who are similarly situated"). A claim to enjoin service areas even as to a single individual plaintiff is therefore a claim for indivisible injunctive relief released by each member of the (b)(2) class.[9]

> 2.   *Objectors attempt to hollow out the core of the Court's proposed language.*

National Account Objectors attempt to undermine the (b)(2) relief and release by parsing the Court's proposed language that "the relief pursued by a Rule 23(b)(3) opt-out may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the court." Nat'l Acct. Objs.' Post-

---

[9] For the same reason, and contrary to Objectors' arguments, declaratory relief that service areas are unlawful even as to a single litigant would be equally impermissible and violate the (b)(2) release. Nat'l Acct. Objs.' Post-Hr'g Br. at 5 n.4. Indeed, both injunctive and declaratory relief are expressly within the scope of Rule (b)(2). *See* Fed. R. Civ. P. 23(b)(2) (applying rule to final "injunctive relief or corresponding declaratory relief").

Hr'g Br. at 2–3.  They argue that only Paragraphs 10 and 17 of the Settlement Agreement are indivisible injunctive relief, and that the only limit on an opt-out's individual action is that it not infringe on this indivisible injunctive relief.  Nat'l Acct. Objs.' Post-Hr'g Br. at 7–8.  Their argument ignores that the Settlement's structural injunctive relief is set out in Section C of the Settlement Agreement ("Class Injunctive Relief") and also encompasses Paragraphs 10–14 and 16–21.  These provisions set forth what conduct is prohibited, what is mandated, and what is permitted.  An injunction can be both prohibitory and mandatory, and can explain what is, as well as what is not, allowed.  *See, e.g.*, *G.F. v. Contra Costa Cnty.*, 2015 WL 4606078, at *4 (N.D. Cal. July 30, 2015) (settlement of suit against juvenile detention facility allowed use of confinement for up to four hours in specified circumstances); *In re Visa Check/Mastermoney Antitrust Litig.*, 2003 WL 25704042 (E.D.N.Y. June 6, 2003) (Settlement Agreement § 4(e) & (f) permitting Visa to adopt and enforce certain types of rules).

Perhaps more importantly, the argument ignores Paragraph 32, which encompasses the (b)(2) class's release of all claims for equitable or injunctive relief, including challenges to service areas, to the fullest extent permitted by law.  Accordingly, there are at least two limits on future opt-out actions:  they may not pursue relief that infringes on the Rule 23(b)(2) indivisible injunctive relief (triggering the All Writs Act, for example) ***and*** they may not pursue relief released by the Rule 23(b)(2) class.

As to this point, National Account Objectors attempt to take undue advantage of the Court's comments and colloquy with counsel by drawing a distinction between a claim and relief.  Under the terms of the Settlement Agreement, claims by Rule 23(b)(3) opt-outs for certain relief— damages and divisible injunctive relief—are clearly permitted because a (b)(2) class cannot release them.  But all claims for indivisible injunctive or declaratory relief are released.  Whether they are

referred to as "claims," "causes of action," "legal challenge," or other sobriquet is immaterial. Contrary to National Account Objectors' flat assertion that an "injunction is not a claim," courts (and litigants) regularly refer to "claims" for a specific form of relief. *See, e.g.*, *G. F.*, 2015 WL 4606078, at *7 (noting that settlement did not "affect the rights of class members to pursue individual claims for compensatory education or other individual relief"); *Holloway v. Best Buy Co., Inc.*, 2011 WL 13258077, at *13 (N.D. Cal. Aug. 4, 2011) (settlement did not "release any claims for individual injunctive or declaratory relief"); *see also* Fed. R. Civ. P. 8 (defining a "claim for relief" to include "a demand for the relief sought, which may include relief in the alternative or different types of relief")*;* Black's Law Dictionary (11th ed. 2019) (defining "Claim" as a "demand for money, property, or a legal remedy to which one asserts a right").

Finally, Home Depot and National Account Objectors attempt to challenge in isolation and out of context Defendants' statement that "each member of the (b)(2) class has individually released any claim for injunctive relief that service areas or other Blue policies are illegal or unenforceable." Defs.' Post-Hr'g Br. at 17; *see also* Home Depot's Post-Hr'g Br. at 15. Their analysis misses the prior sentence, which makes clear the quoted statement concerns the distinction between indivisible and divisible injunctive relief. It explains that each member of the (b)(2) class, by virtue of their individual release of all (b)(2) claims, cannot seek to enjoin or declare service areas (or other generally applicable corporate policies challenged in the litigation or approved in the settlement) unlawful as to them or anyone else. They can, however, consistent with the law and the Settlement Agreement, assert that service areas are illegal as part of a claim for monetary or divisible injunctive relief.

The only claim for divisible injunctive relief that any party has suggested asserting in opt-out litigation is a claim for additional Blue Bids. As the Court's language and the Final Approval

Hearing made clear, claims for additional Blue Bids are contemplated by the Settlement and, if warranted by the facts and circumstances of an individual case, would be divisible relief. But at some point, an award to even a single litigant of multiple bids would move beyond divisible relief and instead be a de facto challenge to service areas themselves. *See* Tr. I at 128:24–129:2. As explained in Defendants' and Subscribers' opening briefs, where that line is drawn can only be determined in the context of a specific, concrete dispute. Defs.' Post-Hr'g Br. at 17–18; Subscribers' Post-Hr'g Br. (Dkt. 2868) at 18. The Court should not attempt to draw that line now.

3.   *The Final Approval Order should explicitly reference the legal effect of the (b)(2) release, either within the Court's proposed language or elsewhere.*

As discussed, Home Depot and National Account Objectors are attempting to parse the Court's proposed language into meaninglessness by ignoring the legal effect of the (b)(2) release being given by each and every member of the (b)(2) class. Because the (b)(2) release is critical to defining the scope of a (b)(3) opt out's rights, it should be explicitly referenced either within the Court's proposed language or elsewhere in the Final Approval Order. For example, a slight modification to the Court's proposed language, emphasized below, would accomplish this:

> A Rule 23(b)(3) opt out reserves the right to pursue divisible relief including monetary relief and divisible injunctive relief. Divisible injunctive relief may include the right to pursue in litigation a Second Blue Bid. The parties acknowledge that, based on a claimant's individual business and the facts and circumstances of the claims, a Rule 23(b)(3) opt out may pursue divisible injunctive relief that includes possible additional Blue bids. Whether such a remedy is merited will depend on the circumstances surrounding the individual claimant's claim. However, the relief pursued by a Rule 23(b)(3) opt out may not infringe on the Rule 23(b)(2) indivisible injunctive relief *or (b)(2) release* approved by the court.

This will clarify that Rule 23(b)(3) opt-outs may not seek indivisible injunctive relief, because they remain members of the (b)(2) class and have released any right to seek such relief. Whether the relief sought in opt-out litigation undermines the Settlement's (b)(2) relief (triggering the All Writs Act, for example) would be an independent basis to preclude that litigation.

17

## IV.     THE SECOND BLUE BID CRITERIA ARE NO OBSTACLE TO APPROVAL.

General Motors challenges the Second Blue Bid criteria, arguing that the criteria are "arbitrary" and "treat[ ] class members differently (by allowing only a minority of them to solicit a Second Blue Bid)."  General Motors' Post- Hr'g Br. at 2.

As General Motors recognizes, a settlement agreement must "treat class members *equitably* relative to each other," not equally.  *Id.* (emphasis added).  General Motors further admits that differential treatment of class members "may be appropriate if it is 'based rationally on legitimate considerations.'" *Id*. at 7 (citation omitted).  The Second Blue Bid criteria easily satisfy this standard.  As explained at length in Defendants' previous briefing and at the Final Approval Hearing, the criteria are based on legitimate considerations and treat class members equitably relative to each other.  *See* Defs.' Post-Hr'g Br. at 20; *see also, e.g.*, Final Approval Hr'g Tr. II at 87:17–94:3 (explaining rationale of Second Blue Bid criteria).   General Motors' contrary arguments fail.

*First,* General Motors offers no authority for the incorrect proposition that "[a] system that makes a certain type of injunctive relief available only to a subset of otherwise similarly situated class members fails that test."  General Motors' Post- Hr'g Br. at 5.  As a preliminary matter, even if the proposition were correct, General Motors is not "similarly situated" to the accounts that will receive Second Blue Bids because it does not meet the Second Blue Bid criteria.  Moreover, a Rule 23(b)(3) settlement class may establish a structure that provides certain relief only to a subset of class members.  *See, e.g., Behfarin v. Pruco Life Ins. Co*., 2019 WL 7188575, at *3 (C.D. Cal. Nov. 26, 2019) (granting preliminary approval to class settlement which (1) changed certain business policies affecting one category of class members, and (2) offered another category the option to reinstate insurance policies); *D.S. ex rel. S.S. v.N.Y.C. Dep't of Educ.*, 255 F.R.D. 59, 69 (E.D.N.Y. 2008) (granting preliminary approval to settlement that provides certain educational

relief to some, but not all, affected students by specifying that "[n]o less than 160 [(b)(3)] subclass members will have access to a service center for the duration of the Agreement Period").

*Second,* General Motors argues that the criteria are based solely on which class members would benefit the most from a Second Blue Bid.  But this misunderstands the logic of the heavily negotiated Second Blue Bid criteria.  Among other things, the criteria are based on the likelihood and magnitude (if any) of harm an account might be able to prove.  Accounts that are not geographically dispersed or that have fewer than 5,000 employees face different competitive circumstances, partly because they have many more non-Blue options than the largest, most highly dispersed accounts.  Thus, the Second Blue Bid rules recognize ***both*** the relative strength of accounts' claims and which accounts are most likely to benefit from the relief.

General Motors' arguments boil down to second-guessing the hard fought compromise and logic of the Second Blue Bid criteria and whether the current provision is the best possible term that Subscribers could secure.  But that is not the legal standard, and such arguments are not sufficient to prevent approval of the Settlement.  *See Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148–49 (8th Cir. 1999) (explaining that the court may not "substitute [its] own judgment as to optimal settlement terms for the judgment of the litigants and their counsel"); *see also* Defs.' Post-Hr'g Br. at 19–21; Subscribers' Post-Hr'g Br. at 7.

## V.     PROVIDERS' ARGUMENTS ARE UNTIMELY AND LACK MERIT.

Providers have not objected to the Subscriber Settlement, and their claims are expressly preserved therein.  Providers' Post-Hr'g Br. (Doc. 2878) at 1; Settlement Agreement § 1(uuu). Nevertheless, Providers have submitted a multi-page brief to "explain why their claims would not be affected by approval of the Subscriber settlement."  Providers' Post-Hr'g Br. at 1.  The Court should reject those arguments in full.

***First***, Providers argue that "it would be procedurally improper for a final approval order to hold that the Providers' claims must be evaluated under the rule of reason by virtue of the Subscriber settlement." Providers' Post-Hr'g Br. at 4. But the Blues do not argue that the Subscriber Settlement itself dictates the standard of review. Rather, it is structural changes to the Blue System—including the elimination of the NBE—that affect the System going forward, including the standard of review for Providers' claims. Indeed, the elimination of NBE—which is settlement relief that has already occurred—is one of the primary bases for Defendants' renewed standard of review motion.

Of course, the fact that the changes affect Providers' case makes perfect sense; after all, those changes, have been (and will be) made to ***the very same Blue System*** that Providers challenge. Providers try to distinguish between claims "based on the Blues' sale of health insurance" and those "based on the Blues' purchase of healthcare goods and services," Providers' Post-Hr'g Br. at 1, but Providers' claims challenge effects to ***both*** sides of the market, each of which flows from ***the very same exclusive service areas***. *Compare* Providers' ESA Opp'n (Dkt. 2747) at 25 (arguing that Providers challenge subscriber-facing rules such as the alleged "Market Allocation Agreements On Selling"), *with* 2019 Slottje Rep. (Dkt. 2454-14) ¶ 88(e) (asserting that the alleged market allocation agreements on selling caused Alabama-based hospitals more than $3.8B in economic damages). Indeed, this Court has already correctly recognized that changes to the Blue System may impact the Providers' claims. *See, e.g.*, *In re Blue Cross Blue Shield Antitrust Litig.*, 2020 WL 8256366, at *25 (N.D. Ala. Nov. 30, 2020) ("Here, the court believes it has sufficient experience with the practices at issue in this case that were challenged by Subscribers ***(and Providers)*** to say, again preliminarily, that these structural changes, when implemented, likely will move the Blues' system from the Per Se category into the Rule of Reason category[.]"

(emphasis added)).   Thus, any ruling the Court makes that addresses the legal standard for evaluating ESAs or the go-forward Blue System will inevitably bear upon the Provider case.

**Second**, Providers already argued at the Preliminary Approval Hearing that the Court should limit its ruling to Subscribers.  Defendants explained that the Court must conclude that service areas, as well as the go-forward System, are not *per se* illegal, in order to approve the settlement.  Prelim. Approval Hr'g Tr. at 64; *see also* Providers' Reply to Defs.' Submission Regarding Proposed Prelim. and Final Approval Orders (Dkt. 2637) at 1 (recognizing Defendants "say that the Subscriber Settlement will affect the Provider Plaintiffs' Claims").

It was based on competing arguments and proposed orders that the Court held in its Preliminary Approval Order that the settlement's structural changes "likely will move the Blues' system from the Per Se category into the Rule of Reason category and that procompetitive benefits will flow from these negotiated changes."  *In re Blue Cross Blue Shield Antitrust Litig.*, 2020 WL 8256366, at *25.  Providers' response make essentially the same arguments that did not carry the day on preliminary approval.

**Third**, Providers argue that neither NBE nor Second Blue Bid can affect the standard of review because they "do not affect whether the Blues' continued use of exclusive territories for contracting with Providers must be judged under the *per se* rule."  Providers' Post-Hr'g Br. at 1–2.  Of course, with respect to NBE, that is the very point that the Blues made (and Providers disputed) in their renewed standard of review motion.  Providers cannot have it both ways:  either NBE mattered to Providers and the elimination of that rule is, thus, significant to the standard of review, or NBE did not matter to Providers, in which case Providers cannot benefit from the Court's 2018 ruling on the aggregation of ESAs and NBE.

Providers further argue that any benefit from NBE's elimination may be offset through the Blues' use of "all-products" or "affiliates" clauses.  Providers' Post-Hr'g Br. at 2.  But such an argument is pure guesswork:  Providers identify no record evidence to suggest that the Blues would (or even could) use these sorts of contractual clauses in the fashion Providers suggest.  Indeed, prior to NBE's elimination, Providers barely acknowledged these contractual provisions.  The only source on which Providers rely is a declaration submitted by their economic expert months after NBE was eliminated, which does not contain a single record cite to support its claims concerning these contractual clauses.  *See* Providers' Post-Hr'g Br. at 2 (citing Decl. of H.E. Frech (Doc. 2786-1) ¶¶ 4–6); *see also Scholz v. United States*, 2019 WL 2303769, at *4 (E.D. Wisc. May 30, 2019) ("The fact that Scholz relies not on the reports but on the declarations in opposing the United States' summary judgment motion certainly supports the United States' argument that the declarations do more than merely set forth what is already stated in the experts' reports.").

If, as Providers contend, service areas may remain *per se* illegal as applied to them, it is difficult to see how—or why—the Court would approve the Settlement.  The Subscriber Settlement expressly continues service areas.  As discussed at length *supra*, the Court must conclude that this continuation is not clearly illegal.  *See supra* Section I.  Defendants are not aware of any cases, and Providers do not cite any, that approved an antitrust settlement that has permitted the continuation of conduct that the Court viewed as likely *per se* illegal.

***Fourth***, Providers' arguments as to Second Blue Bid center on BlueCard, which this Court has already held to be subject to the rule of reason.  *See* Providers' Post-Hr'g Br. at 3 ("Allowing a second Blue Bid . . . will likely harm Providers . . . . Because BlueCard creates inefficiency and delay, more of the Providers' payments will be delayed, and their administrative costs will rise."); *see also In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1279 ("BlueCard and

other alleged Section 1 violations are due to be analyzed under the Rule of Reason."). Additionally, Providers' speculation that Second Blue Bid might harm them at some point in the future—because it could theoretically lead to more Blue members receiving care through BlueCard, *see* Providers' Post-Hr'g Br. at 2–3—is contradicted by the very criteria for Second Blue Bid. The right to request a Second Blue Bid is reserved for national accounts with high member dispersion—*i.e.*, accounts with relatively few members living or working in their local Plan's service area. *See* Subscribers' Final Approval Br. (Doc. 2812-1) at 75–76; Settlement Agmt. ¶ 1(u), (w). In other words, Second Blue Bid will affect those accounts whose members already rely most heavily on BlueCard. In fact, far from resulting in more BlueCard claims, Second Blue Bid could actually *reduce* such claims if, for example, a number of accounts request bids from the out-of-area Blue Plans in whose service area the majority of their members reside. So Providers' stated concern is not only hypothetical, but also incorrect.[10]

**Fifth**, contrary to Providers' position, *Delta Dental* is entirely distinguishable from the instant case. As discussed above, not only was *Delta Dental* decided at the motion to dismiss stage, but the Northern District of Illinois did not confront arguments concerning a unique common-law trademark history akin to the Blue System.

## <u>CONCLUSION</u>

For the reasons stated above, as well as those stated in Defendants' previous briefing, this Court should grant final approval to the Subscriber Settlement.

---

[10] Though not necessary to address here, the Blues of course do not agree that an increase in BlueCard claims would negatively impact Providers.

Dated:  December 17, 2021                     Respectfully submitted,

                                              /s/ Daniel E. Laytin
                                              David J. Zott, P.C.
                                              Daniel E. Laytin, P.C.
                                              Sarah J. Donnell
                                              Christa C. Cottrell, P.C.
                                              Zachary D. Holmstead
                                              KIRKLAND & ELLIS LLP
                                              300 North LaSalle
                                              Chicago, IL 60654
                                              Tel: (312) 862-2000
                                              Fax: (312) 862-2200
                                              david.zott@kirkland.com
                                              daniel.laytin@kirkland.com
                                              sarah.donnell@kirkland.com
                                              christa.cottrell@kirkland.com
                                              zachary.holmstead@kirkland.com

                                              Kimberly R. West (Liaison Counsel)
                                              Mark M. Hogewood
                                              WALLACE, JORDAN, RATLIFF &
                                              BRANDT, LLC
                                              First Commercial Bank Building
                                              800 Shades Creek Parkway, Suite 400
                                              Birmingham, AL 35209
                                              Tel: (205) 870-0555
                                              Fax: (205) 871-7534
                                              kwest@wallacejordan.com
                                              mhogewood@wallacejordan.com

                                              *Counsel for Defendant Blue Cross Blue
                                              Shield Association*


Craig A. Hoover                               Evan R. Chesler
E. Desmond Hogan                              Christine A. Varney
Justin Bernick                                Karin A. DeMasi
Peter Bisio                                   Lauren R. Kennedy
Elizabeth Jose                                David H. Korn
HOGAN LOVELLS US LLP                          CRAVATH, SWAINE & MOORE LLP
Columbia Square                               Worldwide Plaza
555 13th Street, N.W.                         825 Eighth Avenue
Washington, DC  20004                         New York, NY  10019
Tel: (202) 637-5600                           Tel: (212) 474-1000

Fax: (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com
peter.bisio@hoganlovells.com
elizabeth.jose@hoganlovells.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC  29201
Tel: (803) 255-9421
Fax: (803) 256-7500
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action; Blue Cross and Blue Shield of North Carolina, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services,*

Fax: (212) 474-3700
echesler@cravath.com
cvarney@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com
dkorn@cravath.com

*Coordinating Counsel for Defendant Blue Cross and Blue Shield Association; Counsel for Defendants Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of North Carolina, Inc.; BlueCross BlueShield of Tennessee, Inc.; California Physicians' Service d/b/a Blue Shield of California; CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.; Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL  35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon; Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Triple-S Salud, Inc; Defendants Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; BlueCross BlueShield of Tennessee, Inc.*

Cavender C. Kimble
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this consolidated action; Blue Cross and Blue Shield of North Carolina, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue*

*Counsel for Defendants Blue Cross Blue Shield Association; Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.; California Physicians' Service d/b/a Blue Shield of California; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii)*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL  35203
Tel: (205) 254-1000
Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com

Pamela B. Slate
HILL CARTER FRANCO COLE & BLACK, P.C.
425 South Perry Street
Montgomery, AL  36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

26

*Shield (of Washington); Regence Blue Cross Blue Shield of Oregon*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA  98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

*Counsel for Defendants Premera Blue Cross, d/b/a Premera Blue Cross Blue Shield of Alaska*

Brian K. Norman
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX  75234
Tel: (214) 987-1745
Fax: (214) 521-9033
bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
RSA Tower, 27th Floor
11 North Water Street
Mobile, AL  36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

*Counsel for Defendants CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.*

R. David Kaufman
M. Patrick McDowell
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS  39201

*With Cravath, Swaine & Moore LLP, counsel for Defendant Blue Cross Blue Shield of Alabama*

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
hwitt@kirkland.com
jzeiger@kirkland.com

*Counsel for Defendants Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.*

Jonathan M. Redgrave
REDGRAVE, LLP
14555 Avion Parkway, Suite 275
Chantilly, VA  20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark Defendants*

Todd M. Stenerson
Brian C. Hauser
Edmund Y. Saw
SHEARMAN & STERLING LLP

Tel: (601) 948-3101
Fax: (601) 960-6902
dkaufman@brunini.com
pmcdowell@brunini.com

Cheri D. Green
BLUE CROSS & BLUE SHIELD OF
MISSISSIPPI, A MUTUAL INSURANCE
COMPANY
P.O. Box 1043
Jackson, MS  39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

*Counsel for Defendant Blue Cross & Blue
Shield of Mississippi, a Mutual Insurance
Company*

Michael A. Naranjo
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA  94104
Tel: (415) 984-9847
Fax: (415) 434-4507
mnaranjo@foley.com

Alan D. Rutenberg
Benjamin R. Dryden
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, DC  20007
Tel: (202) 672-5300
Fax: (202) 672-5399
arutenberg@foley.com
bdryden@foley.com

*Counsel for Defendant USAble Mutual
Insurance Company, d/b/a Arkansas Blue
Cross and Blue Shield*

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Jess R. Nix
Morgan B. Franz

401 9th Street, N.W., Suite 800
Washington, DC  20004
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com
brian.hauser@shearman.com
edmund.saw@shearman.com

Sarah L. Cylkowski
Thomas J. Rheaume, Jr.
BODMAN PLC
1901 Saint Antoine Street
6th Floor at Ford Field
Detroit, MI  48226
Tel: (313) 259-7777
Fax: (734) 930-2494
scylkowski@bodmanlaw.com
trheaume@bodmanlaw.com

Andy P. Campbell
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL PARTNERS LLC
505 North 20th Street, Suite 1600
Birmingham, AL  35203
Tel: (205) 224-0750
Fax: (205) 224-8622
andy@campbellpartnerslaw.com
todd@campbellpartnerslaw.com
yawanna@campbellpartnerslaw.com

*Counsel for Defendant Blue Cross and
Blue Shield of Michigan*

John Briggs
Rachel Adcox
Jeny M. Maier
AXINN, VELTROP & HARKRIDER,
LLP
1901 L Street, N.W.
Washington, DC  20036
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
radcox@axinn.com

SPOTSWOOD SANSOM & SANSBURY
LLC
Financial Center
505 20th Street North, Suite 700
Birmingham, AL 35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
jnix@spotswoodllc.com
mfranz@spotswoodllc.com

*Counsel for Defendant Capital BlueCross*

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL 35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendants Blue Cross and Blue
Shield of Florida, Inc.; Blue Cross and Blue
Shield of Massachusetts, Inc.; BlueCross
BlueShield of Tennessee, Inc.*

Edward S. Bloomberg
John G. Schmidt Jr.
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY 14203
Tel: (716) 847-8400
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com

Stephen A. Walsh
WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL

jmaier@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5000
Fax: (205) 250-5034
steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendant Independence
Blue Cross*

Kathleen Taylor Sooy
Tracy A. Roman
Sarah Gilbert
Honor Costello
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com
sgilbert@crowell.com
hcostello@crowell.com

John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN & WHITE
LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
Tel: (205) 581-0700
Fax: (205) 581-0799
jjohnson@lightfootlaw.com
bkappel@lightfootlaw.com

*Counsel for Defendants Blue Cross of
Idaho Health Service, Inc.; Blue Cross
and Blue Shield of Kansas, Inc.; Blue
Cross and Blue Shield of Kansas City;*

100 Corporate Parkway
One Lake Level
Birmingham, AL  35242
Tel: (205) 572-4107
Fax: (205) 572-4199
swalsh@wwhgd.com

*Counsel for Defendant, Excellus Health Plan,
Inc., d/b/a Excellus BlueCross BlueShield,
incorrectly sued as Excellus BlueCross
BlueShield of New York*

*Blue Cross and Blue Shield of
Nebraska; Blue Cross Blue Shield of
Arizona; Blue Cross Blue Shield of
North Dakota; Blue Cross Blue Shield
of Wyoming; Highmark Western and
Northeastern New York Inc.*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
david.zott@kirkland.com
daniel.laytin@kirkland.com

*Counsel for Defendants Wellmark of
South Dakota, Inc. (Wellmark Blue
Cross and Blue Shield of South Dakota);
Wellmark, Inc. (Wellmark Blue Cross
and Blue Shield of Iowa); Hawaii
Medical Service Association (Blue
Cross and Blue Shield of Hawaii);
Triple-S Salud, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 17, 2021, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Daniel E. Laytin
Daniel E. Laytin