FILED

2022 Feb-16  PM 12:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

§§§IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: BLUE CROSS BLUE SHIELD | ) | Master File No. 2:13-CV-20000-RDP |
| ANTITRUST LITIGATION | ) | |
| (MDL No. 2406) | ) | This document relates to the Provider Track |

## MEMORANDUM OPINION

This matter is before the court on Certain Defendants'[1] Motion for Partial Summary Judgment. (Doc. # 2753). That Motion seeks to dismiss with prejudice the claims of certain named provider plaintiffs (the "*Love* Providers"),[2] who were also members of the settlement classes in *Love v. Blue Cross and Blue Shield Association, et al.*, No. 1:03-cv-21296-FAM (S.D. Fla.) ("*Love*").

There were four separate settlement agreements encompassing different defendants in the *Love* case: the Blues Settlement Agreement (Doc. # 2221-4); the WellPoint Settlement Agreement (Doc. # 2221-6); the Highmark Settlement Agreement (Doc. # 2221-7); and the Capital Settlement Agreement (Doc. # 2221-8). The motion at issue here is based exclusively on the WellPoint and Capital Settlement Agreements. (Doc. # 2754 at 9; Doc. # 2822 at 8). As Certain Defendants explain, "The WellPoint and Capital Agreements contain no BlueCard

---

[1] As the court has previously referred to them for convenience in this litigation, "Certain Defendants" are Blue Cross Blue Shield of Arizona, Blue Cross and Blue Shield of Kansas, Inc., Blue Cross and Blue Shield of Kansas City, Blue Cross of Idaho Health Service, Inc., Blue Cross and Blue Shield of Nebraska, Blue Cross Blue Shield of North Dakota, Blue Cross Blue Shield of Wyoming, Highmark Western and Northeastern New York Inc. (formerly HealthNow New York Inc. d/b/a BlueCross BlueShield of Western New York and BlueShield of Northeastern New York), USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield, Highmark BCBSD Inc. d/b/a Highmark Blue Cross Blue Shield Delaware, Blue Cross and Blue Shield of Vermont, California Physicians' Service d/b/a Blue Shield of California, and Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield.

[2] The "*Love* Providers" are Charles H. Clark III, M.D., Robert W. Nesbitt, M.D., Luis R. Pernia, M.D., Corey Musselman, M.D., Julie McCormick, M.D., L.L.C., Harbir Makin, M.D., Hillside Family Medicine, LLC, Ear, Nose & Throat Consultants and Hearing Services, P.L.C., and Kathleen Cain, M.D. (*Conway v. Blue Cross and Blue Shield of Alabama et al*, Case No. 2:12-cv-02532-RDP, Doc. # 457 at ¶ 559).

Exception, and they therefore release the second category of claims preserved by the Blue Agreement that does contain the BlueCard Exception (claims arising from services provided to the settling defendants' members through BlueCard)." (Doc. # 2822 at 8; *see also* Doc. # 2324 at 14 ("WellPoint and Capital BlueCross executed separate settlement agreements which did not contain BlueCard Exceptions"); Doc. # 2221-6 at § 13.1; Doc. # 2221-8 at § 9.1).

## I.      Relevant Undisputed Facts

In May 2003, a group of medical providers filed an action in the Southern District of Florida against numerous Blue entities, alleging that several managed care companies had engaged in a scheme to systematically deny, delay, and diminish payments to healthcare providers. *Love v. Blue Cross & Blue Shield Ass'n*, Case No. 1:03-cv-21296-FAM (S.D. Fla.). The *Love* case was consolidated into the *In re Managed Care Litigation* MDL, Case No. 1:00-mdl-1334 (S.D. Fla.). (Doc. # 2120 at 5). The litigation was assigned to Judge Frederico A. Moreno, a distinguished judge sitting in the Southern District of Florida. Judge Moreno described the litigation this way: "This MDL case concerned, *inter alia*, reimbursement for health care services by managed care companies and was divided into two tracks: one involving broad claims by health care providers and the other involving broad claims by subscribers to health care plans. The provider track litigation, namely *Love*, was a class action brought on behalf of all providers who submitted claims to health care companies, including the [defendants in *Conway v. Blue Cross Blue Shield of Alabama*, Case No. 2:12-cv-02532 (N.D. Ala.),[3]] for the

---

[3] *Conway v. Blue Cross and Blue Shield of Alabama et al.*, Case No. 2:12-cv-02532-RDP, is one of the prioritized Alabama Provider cases in this litigation, *In Re Blue Cross Blue Shield Antitrust Litigation* MDL 2406. (Doc. # 575).

provision of medical services." *Musselman v. Blue Cross & Blue Shield of Alabama*, 2013 WL 4496509, at *1 (S.D. Fla. Aug. 20, 2013), *aff'd*, 684 F. App'x 824 (11th Cir. 2017).

Between 2005 and 2008, certain Blue defendants in *Love* entered into settlement agreements with provider plaintiffs. (Doc. # 2120-1 at 2). "Under each agreement, the Defendants agreed to make substantial payments to the class members and their counsel and to implement numerous business practice initiatives. Pursuant to these agreements, Defendants paid class members and their counsel more than $384 million in cash and spent more than $535 million making business practice changes that the *Love* plaintiffs stated had a value to the settlement class of more than $3.4 billion." *Musselman* 2013 WL 4496509, at *1.

A.      **The WellPoint Settlement**

On July 11, 2005, "Representative Plaintiffs" in *Love*, Rick Love, M.D., Joe Frank Smith, M.D., Scott Elledge, M.D. and Andreas Melendez-Desos, M.D., "on behalf of themselves and each of the Class Members," entered into a class settlement with WellPoint, Inc. and its affiliates (the "WellPoint Settlement Agreement" or "WSA"), which was granted final approval by the *Love* court in December 2005. (Doc. # 2221-7; Doc. # 2795-2).

The *Love* court certified the following WellPoint settlement class:

> Any and all Physicians, Physician Groups and Physician Organizations who provided Covered Services to any Plan Member or any other individual enrolled in or covered by a plan offered or administered by any Person named as a defendant in the [Love] Complaints or by any of their respective current or former Subsidiaries or Affiliates, in each case from August 4, 1990 through the Preliminary Approval Date [December 31, 2005].

(Doc. # 2795 at 5, ¶ 2).

Under the WellPoint Settlement Agreement, "Released Parties" include WellPoint entities that were defendants in *Love* (the "WellPoint Released Parties"). (Doc. # 2221-7 at §§

3

1.27, 13.1(a)). On December 27, 2005, the *Love* court entered a final judgment dismissing the WellPoint Released Parties with prejudice. (Doc. # 2795-2). Many of the WellPoint Released Parties are defendants in this MDL, and through corporate changes now operate under the Anthem name. (*Conway v. Blue Cross and Blue Shield of Alabama et al*, Case No. 2:12-cv-02532-RDP, Doc. # 457 ¶¶ 47, 55, 57-59, 64, 69, 72, 74, 80, 85-86, 96, 110, 113).

Turning to the language of the WellPoint Settlement Agreement, "Released Parties" as used in that document are defined as:

> Company and each of its present and former parents, present and former wholly-owned Subsidiaries, present and former divisions and Affiliates and each of their respective current or former officers, directors, employees, agents, insurers and attorneys (and the predecessors, heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing), and all persons who provided claims processing services, software, proprietary guidelines or technology to Company or its Subsidiaries and Affiliates, and those contracted agents processing claims on their behalf, together with each such person's or entity's predecessors or successors (but only to the extent of such person's or entity's services and work done pursuant to contract with Company or its Subsidiaries or Affiliates), but excluding all Delegated Entities, shall be released and forever discharged by the Signatory Medical Societies and all Class Members who have not validly and timely requested to Opt-Out of this Agreement, and by their respective heirs, executors, agents, legal representatives, professional corporations, partnerships, assigns, and successors, but only to the extent such claims are derived by contract or operation of law from the claims of Class Members … .

(Doc. # 2221-6 at 75 § 13.1(a)). Also under the WellPoint Settlement Agreement, the Releasing parties agreed:

> to forever abandon and discharge any and all Claims that exist now or that might arise in the future *against BCBSA and/or any Blue Cross and/or Blue Shield licensee or wholly-owned subsidiary of such licensee*, which Claims arise from, or are based on, conduct by any of the Released Parties that occurred on or before the Effective Date and are, or could have been, alleged in the Complaints, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons.

4

(Doc. # 2221-6 at 76 § 13.1(b)) (emphasis added). Further, the "Bar Order" section of the WellPoint Settlement Agreement provides:

> It is an essential element of the Agreement that Company obtain the fullest possible release from further liability to anyone relating to the Released Claims, and it is the intention of the parties to this Agreement that the Agreement eliminate all further risk and liability of Company relating to the Released Claims.

(Doc. # 2221-6 at 76 § 13.3).

In Judge Moreno's Amended Final Approval Order, which approved the WellPoint Settlement, he noted that:

> The Releasing Parties further agree[d] to forever abandon and discharge any and all Claims that exist now or that might arise in the future *against BCBSA and/or any Blue Cross and/or Blue Shield licensee or wholly-owned subsidiary of such licensee*, which Claims arise from, or are based on, conduct by any of the Released Parties that occurred on or before the Effective Date and are, or could have been, alleged in the Complaints, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons.

(Doc. # 2795-2 at 7, ¶ 6) (emphasis added). The Amended Final Approval Order also notes that "[n]othing in the Settlement Agreement prevents the Plaintiffs and the Class from pursuing claims to hold any person or party *that is not either a Released Party, BCBSA, or a Blue Cross and/or Blue Shield licensee or wholly owned subsidiary of such licensee* liable for damages caused by any Released Party." (Doc. # 2795-2 at 9, ¶ 15) (emphasis added).

Despite the broad language of the release, the only Blue licensees who were dismissed in *Love* as a result of the WellPoint Settlement Agreement were WellPoint-related entities (the "Released Parties"). (Doc. # 2795-3).

## B.     The Capital Settlement

On February 1, 2008, "Representative Plaintiffs" in *Love*, Rick Love, M.D., Joe Frank Smith, M.D., Scott Elledge, M.D. and Andreas Melendez-Desos, M.D., "on behalf of themselves

5

and Class Members," entered into a class settlement with Capital BlueCross, Capital Advantage Insurance Company and Keystone Health Plan Central (the "Capital Settlement Agreement" or "CSA"), which was granted final approval by the *Love* court in June 2008. (Doc. # 2221-8; Doc. # 2795-4).

> The *Love* court certified the following Capital settlement class:
>
> Any and all Physicians, Physician Groups and Physician Organizations who provided Covered Services to any Plan Member or to any individual enrolled in or covered by a Plan offered or administered by any Person named as a defendant in the [*Love*] Complaint or by any other primary licensee of the BCBSA or by any of their respective current or former subsidiaries or Affiliates, from January 1, 1996 through March 12, 2008.

(Doc. # 2795-4 at 7, ¶ 2).

A review of the Capital Settlement Agreement shows that "Released Parties" include Capital BlueCross, Capital Advantage Insurance Company, and Keystone Health Plan Central (the "WellPoint Released Parties"). (Doc. # 2221-8 at 2, 10 (§ 9.1). On June 23, 2008, the *Love* court entered a final judgment dismissing these entities with prejudice. (Doc. # 2795-4).

> Under the Capital Settlement Agreement, "Released Parties" are defined as:
>
> Blue Plan and each of their present and former parents, subsidiaries, divisions and Affiliates and each of their respective current or former officers, directors, employees, agents, insurers and attorneys (and the predecessors, heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing), and all Persons who provided claims processing services, software, proprietary guidelines or technology to Blue Plan, their subsidiaries or Affiliates, and those contracted agents processing claims on their behalf (including, without limitation NASCA), together with each such person's or entity's predecessors or successors (but only to the extent of such person's or entity's services and work done pursuant to contract with Blue Plan or their Subsidiaries or Affiliates), but excluding all Delegated Entities, shall be released and forever discharged by all Class Members, and by their respective current and former officers, directors, employees, attorneys, heirs, executors, administrators, agents, legal representatives, professional corporations, partnerships, assigns and successors, but only to the extent such claims are derived by contract or operation of law from the claims of Class Members … .

6

(Doc. # 2221-8 at 10 (§ 9,1)). Also under the Capital Settlement Agreement, the Releasing

parties agreed:

> to forever abandon and discharge any and all Claims that exist now or that might arise in the future *against any other persons or entities*, which Claims arise from, or are based on, conduct by any of the Released Parties that occurred on or before the Effective Date and are, or could have been, alleged in the Complaints, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons.

(Doc. # 2221-8 at 11 (§ 9.1(b)) (emphasis added). Further, the "Bar Order" section of the Capital

Settlement Agreement provides:

> The Parties intend that this Agreement eliminate all further risk and liability of the Released Parties relating to the Released Claims … .

(Doc. # 2221-8 at 11 (§ 9.3)).

In his Final Approval Order regarding the Capital Settlement Agreement, Judge Moreno

noted that "Any claims released or discharged pursuant to Sections 9.1(a) and 9.1(b) of the

Settlement Agreement shall be referred to collectively as "Released Claims." (Doc. # 2795-4 at

9, ¶ 6). Of course, Section 9.1(b) addresses "any and all Claims that exist now or that might arise

in the future *against any other persons or entities*, which Claims arise from, or are based on,

conduct by any of the Released Parties … ." (Doc. # 2221-8 at 11 (§ 9.1(b) (emphasis added))).

Despite the broad language of the release, the only Blue licensees who were dismissed in

*Love* as a result of the Capital Settlement Agreement were Capital-related entities (the "Released

Parties"). (Doc. # 2795-5).

The four *Love* settlement agreements all generally contain similar release language. (Doc.

# 2221-4 at § 13.1; Doc. # 2221-6 at § 13.1; Doc. # 2211-7 at § 13.1; Doc. # 2221-8 at § 9.1).

Notably, however, the WellPoint and Capital agreements do not contain the first sentence of

Section 13.1(b) contained in the Blues Settlement Agreement, which has become known as the

"BlueCard Exception." (*Compare* Doc. # 2221-6 at § 13.1 and Doc. # 2221-8 at § 9.1 *with* Doc. # 2221-4 § 13.1(b)).

Non-Settling Defendants did not move for dismissal in *Love* based on either the WellPoint Settlement Agreement or the Capital Settlement Agreement after the *Love* "Plaintiffs filed an Amended Complaint removing references to WellPoint following the WellPoint settlement[.]" (Doc. # 2824-2 at 2, n.1; *see also* Doc. # 2824-13 at 5 ("The requested amendments seek to: 1) remove defendants who are affiliated with WellPoint … ."); (Doc. # 2221-10 at 9 ("The Plaintiffs should have hastened to correct their pleadings and motions to remove all allegations premised on conduct by BCBSA, as they did with WellPoint. Since they have not, this Court's intervention is necessary to enforce the Settlement and Final Approval Order.")).

## C. Litigation Over the *Love* Release Language

On April 27, 2007, after the WellPoint Settlement in 2005 and before the Capital Settlement in 2008, the *Love* physician plaintiffs entered into a class settlement with BCBSA, BCBS-AL, and additional Blue Plans (the "Blue Settlement Agreement" or "BSA"), which was granted final approval by the *Love* court on April 19, 2008. (Doc. # 2221-4; Doc. # 2221-5). The second sentence of Section 13.1(b) of the Blue Settlement Agreement contains language almost identical to that found in Section 13.1(b) of the Capital Settlement Agreement. (Doc. # 2221-4 at § 13.1; Doc. # 2221-8 at § 13.1). The Blues Settlement Agreement Section 13.1(b) provides:

> [T]he Releasing Parties further agree to forever abandon and discharge any and all Claims that exist now or that might arise in the future *against any other Persons* which Claims arise from, or are based on, conduct by any of the Released Parties that occurred on or before the Effective Date and are, or could have been, alleged in the Complaint, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons.

(Doc. # 2221-4 at § 13.1(b) (emphasis added)).

On June 16, 2008, the *Love* plaintiffs filed a Sixth Amended Complaint against the Non-Settling Defendants alleging that BCBSA was the "hub" of a RICO and fraud conspiracy among all Blue Plans to undercompensate physicians for their services. (Doc. # 2221-9 at ¶¶ 17, 163, and 203). The *Love* Sixth Amended Complaint also alleged that BCBSA's BlueCard Program, the electronic network for claims processing and reimbursement, was central to the success of the conspiracy. (Doc. # 2221-9 at ¶ 201).

On July 28, 2008, BCBSA moved to enforce the Blues Settlement Agreement on the grounds that Section 13.1(b) of that Agreement barred the claims in the *Love* Sixth Amended Complaint, even against Non-Settling Defendants, because those claims were alleged to "arise from, or are based on" conduct of BCBSA. (Doc. # 2221-10). In their response, the *Love* plaintiffs did not argue that Section 13.1(b) did not operate to bar claims against the Non-Settling Defendants. Rather, they asserted that the claims in the Sixth Amended Complaint fell within Section 13.1(b)'s so-called BlueCard Exception in the first sentence of that paragraph, which excepts "[c]laims for damages against defendants in the [*Love*] Action that are not Parties [to the settlement] relating to providing Covered Services to Blue Plans' Plan Members in connection with the BlueCard Program…." (Doc. # 2221-11 at 6).

Magistrate Judge Edwin G. Torres issued a report and recommendation on BCBSA's motion to enforce in which he noted that "the language of the Court's Final Approval Order and the Settlement Agreement *clearly prohibits Class members from initiating claims against any party, both 'Released' and 'Non-Released*,' which 'arise from, or are based on, conduct by any of the 'Released Parties.'" (Doc. # 2221-12 at 5) (emphasis added). Nonetheless, Judge Torres

recommended that BCBSA's motion be denied because the *Love* Sixth Amended Complaint's claims fell within the BlueCard Exception. (Doc. # 2221-12). Judge Moreno "affirmed and adopted" Judge Torres's Report and Recommendation. (Doc. # 2221-13).

On January 7, 2013, three *Love* settlement class members, Corey Musselman, M.D., Rick Love, M.D., and Charles Shane, M.D., filed suit in *Musselman v. Blue Cross and Blue Shield of Alabama, et al.*, Case No. 1:13-cv-20050-FAM (S.D. Fla.), against the *Love* Settling Defendants seeking a declaration that Providers' antitrust claims in *Conway*, Case No. 2:12-cv-02532-RDP (a part of this MDL), are not "Released Claims" as defined in the *Love* Settlement Agreements. (Doc. # 2221-16 at ¶ 2). Judge Moreno dismissed the *Musselman* Complaint. He held that Providers' claims in *Conway* against the *Love* Settling Defendants were released in the *Love* Settlement Agreements. *Musselman*, 2013 WL 4496509, at *8 ("Pursuant to the plain language of the releases and the prior decisions of this Court and the Eleventh Circuit, the Court holds that the claims asserted in *Conway* are Released Claims.").[4]  The Eleventh Circuit affirmed "on the basis of the District Court's thorough and well-reasoned order []." *Musselman v. Blue Cross & Blue Shield of Alabama*, 684 F. App'x 824, 825 (11th Cir. 2017).

---

[4]  In *Musselman*, Judge Moreno noted:

> [T]he Eleventh Circuit has rejected the argument that the release does not apply simply because a lawsuit involves different allegations than *Love* or asserts a different cause of action. The determination of whether a claim is a Released Claim under the language of the Settlement Agreement depends not on the cause of action alleged but on the nucleus of operative fact underlying the claim. *See Thomas* [*v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 814, 822 (11th Cir. 2010)]. In *Health Care Serv. Corp. v. Kolbusz*, 594 F.3d 814, 822 (11th Cir. 2010), the Eleventh Circuit held that, under the broad language of the release, tortious interference and defamation claims were Released Claims even though such claims had never been asserted in *Love*, stating that it was "irrelevant that [plaintiff's] claims depend on a different legal theory than the claims asserted in the class action or require [the plaintiff] to prove matters in addition to or different from the claims asserted in the class action."

*Musselman v. Blue Cross & Blue Shield of Alabama*, 2013 WL 4496509, at *5 (S.D. Fla. Aug. 20, 2013), *aff'd*, 684 F. App'x 824 (11th Cir. 2017).

On April 18, 2017, Provider Plaintiffs filed an amended complaint in this MDL, which states that the *Love* Providers bring claims against only the Non-Settling *Love* Defendants. (*Conway*, Case No. 2:12-cv-02532-RDP, Doc. # 457 at ¶¶ 43, 559). On April 25, 2018, Provider Plaintiffs filed a Motion for Partial Summary Judgment against Certain Defendants That Were Not Signatories to Settlement Agreements in *Love v. Blue Cross and Blue Shield Association*. (Doc. # 2120). Provider Plaintiffs argued that the Non-Settling *Love* Defendants' release, waiver, *res judicata*, or collateral estoppel affirmative defenses failed because they were not signatories to the *Love* Settlement Agreements. *Id*. On October 17, 2018, this court denied Provider Plaintiffs' motion "for two reasons. First, Providers' claims in this MDL fall squarely within the scope of the *Love* releases because they arise from, or are based on, conduct by the Released Parties. *Musselman*, 2013 WL 4496509, at *8. Second, not all of Providers' claims" fall within the BlueCard Exception. (Doc. # 2324 at 11-12).

### D.    *Love* **Providers Who Are Named Plaintiffs in** *Conway*

The operative *Conway* Complaint in this MDL alleges that "[c]ertain of the named Provider Plaintiffs [] were members of the Settlement classes in class settlements with some of the Defendants consummated in" *Love*. (*Conway*, Case No. 2:12-cv-02532-RDP, Doc. # 457 at ¶¶ 43, 559). That is, the *Love* Providers are members of the WellPoint and Capital settlement classes.

In *Conway*, the *Love* Providers and other Provider Plaintiffs allege that the Non-Settling *Love* Defendants are liable for alleged participation in two purported nationwide conspiracies involving all defendants and resulting in alleged unlawful agreements among all defendants to restrict competition: (1) the "Market Allocation Conspiracy" and (2) the "Price Fixing and

Boycott Conspiracy." (*Conway*, Case No. 2:12-cv-02532-RDP, Doc. # 457 at ¶¶ 1, 4, 8). They further allege that both conspiracies were carried out through the conduct of all defendants, including Anthem and Capital. (*See, e.g., id*. at ¶ 328 ("Defendants achieved the Price Fixing and Boycott Conspiracy by agreeing that all Defendants would participate in the national programs including the Blue Card and National Accounts Programs . . . ."); ¶ 5 ("In furtherance of the Market Allocation Conspiracy, Defendants agreed that each Defendant would be allocated a defined Service Area and further agreed . . . not to compete with each other within those markets."); ¶ 20 ("[A]ll of the Defendants have conspired with Blue Cross and Blue Shield of Alabama."); and ¶ 523 ("All Defendants have taken overt acts in furtherance of this conspiracy by signing the various agreements that restrict competition among them.")). Provider Plaintiffs have explicitly identified the alleged conduct of both Capital and Anthem as bases of their claims. (*Id*. at ¶ 288 "Capital Blue Cross has attempted to operate outside of its Service Area" but subsequently "agreed to restrict its competition" and would compete with other Blue Plans "if it were not for the agreement not to expand outside of each Blue's Service Area."); ¶ 118 ("But for the illegal territorial restrictions summarized above, Anthem would be likely to offer its health care financing throughout the United States in competition with the other Blues, including in Alabama . . . If Anthem did develop and operate a Provider Network in Alabama, it would provide increased competition, and such competition would result in higher payments to Providers."); ¶ 358 ("Evidence will be introduced that shows Anthem is prevented from crossing the Georgia line to compete in Alabama, and other empirical evidence is consistent with all the other Blues agreeing not to compete in Alabama in health insurance markets as well.")).

The *Love* Providers and the other Provider Plaintiffs do not dispute that their Market Allocation Conspiracy claims are based on Defendants' alleged agreement to allocate geographic markets among themselves. (Doc. # 2306 at 7, ¶ 3). They state that their monopsonization claims are not based "solely" on Defendants' alleged agreement to allocate geographic markets among themselves, yet they do not dispute that the claims are based in part on Defendants' alleged agreement. (*Id*. at ¶ 4).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and – by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file – designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

### III.   Analysis

In their Consolidated Fourth Amended Provider Complaint, Provider Plaintiffs have offered the following brief description of their claims in this MDL:

> In the claims related to the Market Allocation Conspiracy, Plaintiff healthcare providers challenge the explicit agreement reached by Defendants to divide the United States into what Defendants term "Service Areas" and then to allocate those geographic areas among the Blues, free of competition. In the claims related to the Price Fixing and Boycott Conspiracy, Plaintiffs also challenge the agreement reached by Defendants to fix prices for goods, services and facilities rendered by healthcare providers such as Plaintiffs and to boycott the healthcare providers outside of their Service Areas.

(Doc. # 1083 at ¶ 4). Count One of that pleading is a "Claim for Injunctive Relief, 15 U.S.C. § 26." (Doc. # 1083 at ¶¶ 460-465). Provider Plaintiffs' remaining claims, asserted in Counts II through X, all seek treble damages. (Doc. # 1083 at ¶¶ 466-526).

### A.   The *Love* Providers' Claims Fall Within the Scope of the WellPoint and Capital Releases

As an initial matter, Certain Defendants note that this court has already held that "Providers' claims in this MDL fall squarely within the scope of the *Love* releases because they arise from, or are based on, conduct by the Released Parties." (Doc. # 2754 at 21 (quoting Doc. # 2324 at 11)). Second, they point out that this court has "held that *Love* Settlement Agreements 'clearly prohibit[] Class members from initiating claims against' non-signatories, including the Non-Settling *Love* Defendants." (*Id.* (quoting Doc. # 2221-12 at 6)). And third, they observe that this court has previously "rejected provider plaintiffs' argument that their claims in this MDL are preserved by *Love* Settlement Agreement release language retaining claims for the Non-Settling

14

*Love* Defendants' 'own conduct or conduct of other Persons who are not Released Parties.'" (*Id.* (quoting Doc. # 2221-12 at 12-13)). Defendants have further referenced the court's explanation about this third point: "while this language retains claims against a Non-Settling Love Defendant 'for [its] own, separate conduct,' it does not preserve claims that Non-Settling *Love* Defendants acted 'in conjunction with the Released Parties.'" (*Id.* (quoting Doc. # 2221-12 at 12-13)).

As they did in briefing on their previous motion, the *Love* Providers strive mightily to distance themselves from the actual language of the releases at issue. In response to Certain Defendants' initial argument, the *Love* Providers contend that their "claims for services provided to persons enrolled in or covered by a plan other than the Released Parties in the WellPoint and Capital Settlement Agreements are not barred by those agreements." (Doc. # 2799 at 19-20). Rather, they argue the Non-Settling Defendants are simply third-party beneficiaries of the WellPoint and Capital Settlement Agreements. (*Id.* at 20-21). And, they also contend that the Non-Settling Defendants should be estopped from making an argument not previously made. (*Id.* at 22) ("Until now, no Blue Plan has ever moved for dismissal based on the WellPoint or Capital Settlement Agreements other than the Released Parties.").

In reply, Certain Defendants re-orient the court to the actual release language. The WellPoint and Capital releases do not limit their application to services provided to WellPoint or Capital subscribers. Under the WellPoint Settlement Agreement, the Releasing Parties agreed:

> to forever abandon and discharge any and all Claims that exist now or that might arise in the future *against BCBSA and/or any Blue Cross and/or Blue Shield licensee or wholly-owned subsidiary of such licensee*, which Claims arise from, or are based on, conduct by any of the Released Parties that occurred on or before the Effective Date and are, or could have been, alleged in the Complaints, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons.

15

(Doc. # 2221-6 at 76 § 13.1(b)) (emphasis added). Under the Capital Settlement Agreement, the

Releasing Parties agreed:

> to forever abandon and discharge any and all Claims that exist now or that might arise in the future *against any other persons or entities*, which Claims arise from, or are based on, conduct by any of the Released Parties that occurred on or before the Effective Date and are, or could have been, alleged in the Complaints, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons.

(Doc. # 2221-8 at 11 (§ 9.1(b) (emphasis added))).

At least in some key respects, the court finds itself refereeing a familiar skirmish, albeit

in a slightly different (but not materially distinguishable) context. As this court stated previously,

> [T]he court begins its analysis by observing the fundamental proposition that it must construe a contract to give meaning to each word. That is, a construction of a contract that would render a clause meaningless would violate a foundational rule of contract interpretation. *See Equity Lifestyle Props., Inc. v. Fla. Mowing and Landscape Serv., Inc*., 556 F.3d 1232, 1242 (11th Cir. 2009) ("[This court] must read the contract to give meaning to each and every word it contains, and ... avoid treating a word as redundant or mere surplusage 'if any meaning, reasonable and consistent with other parts, can be given to it.'" (quoting *Roberts v. Sarros*, 920 So.2d 193, 196 (Fla.Dist.Ct.App.2006))).

> Moreover, in addressing Providers' Motion, this court is cognizant that it is not writing on a blank slate. As to the scope of the *Love* releases, in *Musselman*, Judge Moreno held "that the *Conway* claims are Released Claims" under the *Love* Settlement Agreement. 2013 WL 4496509, at *3. More specifically, as Judge Moreno explained:

>> [T]he claims in *Conway* are also released. *Conway* arises out of and relates to the "facts, acts, events ... or other matters" in *Love*. *Conway* is based on Plaintiffs' allegation that Defendants conspired to "suppress competition and to increase their profits ... by decreasing the rates paid to healthcare providers...." *Conway* Am. Compl. ¶ 226. *Love* was based on the similar allegation that the defendants had engaged in a common scheme to systematically deny, delay, and diminish the payments due to doctors. *See Love* Compl. ¶ 5. In short, both complaints are based on allegations that Defendants, acting through BCBSA, conspired to reduce provider reimbursement. As a result, *Conway* falls within the scope of the first sentence of the release.

16

*Id.*, at *5. Judge Moreno further found that "[t]he Settlement Agreement is clearly intended to embrace all potential claims and not merely those that were expressly pled at the time the record was frozen based on the parties' decision to conduct settlement negotiations." *Id.*, at *6.

In *Love,* Judge Torres and Judge Moreno each addressed the specific question of whether the Settlement Agreement prohibits claims against Non-Released Defendants. Judge Torres found that "[t]he language of the Court's Final Approval Order and the Settlement Agreement *clearly* prohibits Class members from initiating claims against any party, both "Released" *and* "*Non-Released,*" which "arise from, or are based on, conduct by any of the 'Released Parties.'" (Doc. # 2221-12 at 5 (citing judge Moreno's Final Approval Order ¶ 6 and the Settlement Agreement § 13.1(b)) (emphasis added).

(Doc. # 2324 at 10-11).

Based on this broad release language in the WellPoint and Capital Settlement Agreements, the court rejects Providers' contention that "the scope of any potential bar for non-released parties is necessarily limited to services provided to the insureds of Released Parties." (Doc. # 2799 at 23). The court understands quite clearly that its prior analysis related to the Blues Settlement Agreement. However, the language contained in the WellPoint and Capital Settlement Agreements is similarly broad. Thus, consistent with this court's previous opinion regarding the scope of the Blues Settlement Agreement in *Love*, and the opinions of Judges Moreno and Torres, the court concludes that the *Love* Providers' claims in this MDL fall squarely within the scope of the WellPoint and Capital Settlement Agreements because they arise from, or are based on, conduct by the Released Parties. (*See* Doc. # 2324); *see also Musselman*, 2013 WL 4496509, at *8.

First, none of the *Love* Providers' claims in this MDL relate only to Non-Settling *Love* Defendants' "own[, separate] conduct." Provider Plaintiffs allege that the Non-Settling *Love* Defendants are liable for alleged participation in two purported nationwide conspiracies involving *all* Defendants and resulting in alleged unlawful agreements among *all* Defendants to

17

restrict competition: (1) the "Market Allocation Conspiracy" and (2) the "Price Fixing and Boycott Conspiracy." (*Conway*, Case No. 2:12-cv-02532-RDP, Doc. # 457 at ¶¶ 1, 4, 8). They allege that both conspiracies were carried out through the conduct of all Defendants. (*Id.*).

Second, the fact that the WellPoint and Capital final approval orders state that the class certification analysis under Rule 23 is satisfied "for purposes of settlement only … solely with respect to [Released Parties]" does not affect this court's interpretation of the broad release language from the Settlement Agreements.

Finally, as to the question of whether the Notice to the classes fully explained the extent of the Releases, the court observes that the Capital and WellPoint settlement notices directed potential class members to the settlement administrator's website so they could review a full copy of the settlement agreement, which contained additional details about the settlement and released claims. Therefore, "all material facts were available to class members because a full copy of the settlement agreement, and the release, were available on a website referenced in the Notice." *Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628, 634 (11th Cir. 2015).

As the *Love* Providers' claims in this MDL are within the scope of the WellPoint and Capital Settlement Agreement releases (as they arise from, or are based on, conduct by the Released Parties) they are foreclosed. (*See* Doc. # 2324 at 11-12); *see also Musselman*, 2013 WL 4496509, at *8.

**B.    The WellPoint and Capital Settlement Agreements Do Not Contain the BlueCard Exception**

In the Blues Settlement Agreement, the first sentence of the release paragraph reads: "[e]xcept for Claims for damages against defendants in the Action that are not Parties relating to providing Covered Services to Blue Plans' Plan Members in connection with the BlueCard

Program and other similar national account delivery programs governed by BCBSA (including but not limited to NASCO-to-NASCO arrangements) … ." (Doc. # 2221-4 at § 13.1(b)). This provision serves as a carve out from the release. But, the parties' carve out is limited in scope. In addressing the Blues Settlement Agreement, Judge Torres explained that "[i]n order for Plaintiffs to benefit from the exception, the plain terms of that Agreement require that their claims must: "(1) be Claims for damages; (2) against Defendants in the Action that are not Parties; (3) relate to providing Covered Services to Blue Plans' Plan Members; and (4) be in connection with the BlueCard Program and other national account delivery programs governed by BCBSA." (Doc. # 2221-12 at 8). Judge Moreno affirmed and adopted Judge Torres's Report and Recommendation and its rationale related to the Blues Settlement Agreement. (Doc. # 2221-13 at 3).

Importantly, however, the WellPoint and Capital Settlement Agreements do not contain the "BlueCard Exception." (*Compare* Doc. # 2221-6 at § 13.1 and Doc. # 2221-8 at § 9.1 *with* Doc. # 2221-4 § 13.1(b)). Therefore, under the release provisions of the WellPoint and Capital Settlement Agreements, there is no exception to save certain of the *Love* Providers' damages claims. Certain Defendants' Motion seeks summary judgment only under the WellPoint and Capital Settlement Agreements, and neither of those Agreements contains the BlueCard Exception. Therefore, the *Love* Providers' damages claims, like their injunctive relief claim, are barred by the release provisions of the WellPoint and Capital Settlement Agreements, and there is no Blue Card Exception to save them.

### C.     Claim Preclusion Also Bars The *Love* Providers' Claims

"[C]laim preclusion applies to class actions just the same as to other types of lawsuits." *Thomas v. Blue Cross & Blue Shield Ass'n*, 333 F. App'x 414, 417 (11th Cir. 2009) (citing

*Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1289 (11th Cir. 2007)). "'In order for claim preclusion to apply, four elements are required: (1) a final judgment on the merits; (2) rendered by a court of competent jurisdiction; (3) identity of the parties; (4) identity of the causes of action.'" *Thomas*, 333 F. App'x at 417 (quoting *Adams*, 493 F.3d at 1289). "'Claim preclusion applies not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact.'" *Id.* (quoting *Adams*, 493 F.3d at 1289).

"Where the parties consent to [] a dismissal based on a settlement agreement, [] the principles of *res judicata* apply (in a somewhat modified form) to the matters specified in the settlement agreement, rather than the original complaint." *Norfolk S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1288 (11th Cir. 2004). In the settlement context, a court may "consider the parties' settlement documents to determine the claims at issue in a prior action." *TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*, 959 F.3d 1318, 1326 (11th Cir. 2020) (citing *Adams*, 493 F.3d at 1290-91). "The expressed intent of the parties is [] the determining factor in whether a consent-based judgment is given collateral estoppel effect." *Norfolk Southern*, 371 F.3d at 1288 (citing *Balbirer v. Austin*, 790 F.2d 1524, 1528 (11th Cir. 1986)). And "[t]he best evidence of that intent is, of course, the settlement agreement itself." *Id.* at 1289.

In *Thomas*, the Eleventh Circuit considered the preclusive effect of the Blue Settlement Agreement from *Love*. 333 F. App'x at 416. Here, as in *Thomas*, the *Love* Providers do not appear to challenge the first three elements of claim preclusion. "It is clear that the *Love* action reached a final judgment on the merits, [and] that the United States District Court for the Southern District of Florida had jurisdiction … ." *Id.* at 417. Moreover, according to the *Conway*

20

Complaint, certain named Provider Plaintiffs were "*Love* Providers:" Charles H. Clark III, M.D., Robert W. Nesbitt, M.D., Luis R. Pernia, M.D., Corey Musselman, M.D., Julie McCormick, M.D., L.L.C., Harbir Makin, M.D., Hillside Family Medicine, LLC, Ear, Nose & Throat Consultants and Hearing Services, P.L.C., and Kathleen Cain, M.D. (*Conway v. Blue Cross and Blue Shield of Alabama et al*, Case No. 2:12-cv-02532-RDP, Doc. # 457 at ¶¶ 42, 559). Therefore, these *Love* Providers were parties to the *Love* action and WellPoint and Capital Settlement Agreements for the purpose of claim preclusion. *See Thomas*, 333 F. App'x at 417. And, "[a]s alleged co-conspirators, all Defendants in this case are in privity with [each other], thus meeting the element of identical parties for res judicata purposes." *Powell v. Gorham*, 2013 WL 3151632, at *10 (N.D. Ala. June 14, 2013) (collecting cases); *see also Sheba Ethiopian Rest., Inc. v. DeKalb Cty., Georgia*, 820 F. App'x 889, 898 (11th Cir. 2020) "[C]o-conspirators are considered to be in privity for purposes of *res judicata*.").

The *Love* Providers do dispute that the *res judicata* effect of the WellPoint and Capital Final Judgments extends to the claims at issue in this MDL. More specifically, they argue that Defendants rely on a *res judicata* standard that does not apply in the settlement context. (Doc. # 2799 at 24). But, that argument misses the mark. The court has set forth the correct standard above. That is, the determining factor in whether a consent-based judgment is given preclusive effect is "[t]he expressed intent of the parties," the "best evidence" of which is "the settlement agreement itself." *Norfolk Southern,* 371 F.3d at 1288-89.

Again, in the WellPoint Settlement Agreement, the Releasing parties agreed:

to forever abandon and discharge *any and all Claims that exist now or that might arise in the future* against BCBSA and/or any Blue Cross and/or Blue Shield licensee or wholly-owned subsidiary of such licensee, *which Claims arise from, or are based on, conduct by any of the Released Parties that occurred on or*

> *before the Effective Date and are, or could have been, alleged in the Complaints,*
> *whether any such Claim was or could have been asserted by any Releasing Party*
> *on its own behalf or on behalf of other Persons.*

(Doc. # 2221-6 at 76 § 13.1(b)) (emphasis added). In the Capital Settlement Agreement, the

Releasing parties agreed:

> to forever abandon and discharge *any and all Claims that exist now or that might*
> *arise in the future* against any other persons or entities, *which Claims arise from,*
> *or are based on, conduct by any of the Released Parties that occurred on or*
> *before the Effective Date and are, or could have been, alleged in the Complaints,*
> *whether any such Claim was or could have been asserted by any Releasing Party*
> *on its own behalf or on behalf of other Persons.*

(Doc. # 2221-8 at 11 (§ 9.1(b)) (emphasis added).

In this Circuit, "[i]f a case arises out of the same nucleus of operative facts, or is based

upon the same factual predicate, as a former action, ... the two cases are really the same 'claim'

or "cause of action" for purposes of res judicata.'" *Baloco v. Drummond Co*., 767 F.3d 1229,

1247 (11th Cir. 2014) (quoting *Griswold v. Cnty. of Hillsborough*, 598 F.3d 1289, 1293 (11th

Cir. 2010)). As Judge Moreno has already correctly held, the *Musselman* and *Conway*

Complaints are both "based on allegations that Defendants, acting through BCBSA, conspired to

reduce provider reimbursement" and those parties "could have asserted these claims before *Love*

[were] settled." *Musselman*, 2013 WL 4496509, at * 5. Although the claims in *Love* and in

*Conway* were based on different causes of action, for purposes of claim preclusion they arose out

of the same nucleus of operative facts. Therefore, all elements of claim preclusion are present

here.

The *Love* Providers' argument that it would violate class members' due process rights to

apply *res judicata* to their claims is also without merit. But, that simply is not so. Again, as noted

above, "all material facts were available to class members because a full copy of the settlement

agreement, and the release, were available on a website referenced in the Notice." *Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628, 634.

## IV.     Conclusion

For all the reasons discussed above, Certain Defendants are entitled to summary judgment on the claims asserted by the *Love* Providers is due to be granted.

A separate order will be entered in this MDL, and in *Conway v. Blue Cross and Blue Shield of Alabama et al*, Case No. 2:12-cv-02532-RDP.

**DONE** and **ORDERED** this February 16, 2022.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE