**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD | } | Master File No.:  2:13-CV-20000-RDP |
| | } | |
| ANTITRUST LITIGATION | } | |
| (MDL NO.: 2406) | } | |

**FINAL ORDER AND JUDGMENT GRANTING APPROVAL OF SUBSCRIBER CLASS
ACTION SETTLEMENT AND APPOINTING SETTLEMENT ADMINISTRATOR**

This matter is before the court on Subscriber Plaintiffs'[1] Motion for Final Approval of

Class Settlement and Appointment of Settlement Administrator. (Doc. # 2812). The Motion has

been thoroughly briefed by the parties and certain objectors, both before and after a lengthy

fairness hearing. The motion is ripe for decision.

**I.      Relevant Procedural History**

This litigation began more than nine years ago and involves the consolidation of a number

of actions filed by Subscriber Plaintiffs against the Blue Cross and Blue Shield Association

("BCBSA") and its Member Plans (the "Member Plans" or "Blue Plans") (collectively,

"Defendants" or "Blues"). Subscriber Plaintiffs allege, among other things, that Defendants

---

[1] Subscriber Plaintiffs are Galactic Funk Touring, Inc.; American Electric Motor Services, Inc.; CB Roofing, LLC; Pearce, Bevill, Leesburg, Moore, P.C.; Pettus Plumbing & Piping, Inc.; Consumer Financial Education Foundation of America, Inc.; Fort McClellan Credit Union; Rolison Trucking Co., LLC; Conrad Watson Air Conditioning, Inc.; Linda Mills; Frank Curtis; Jennifer Ray Davidson; Pete Moore Chevrolet, Inc.; Jewelers Trade Shop; Saccoccio & Lopez; Angel Foster (fka Angel Vardas); Monika Bhuta; Michael E. Stark; G&S Trailer Repair Inc.; Chelsea L. Horner; Montis, Inc.; Renee E. Allie; John G. Thompson; Avantgarde Aviation, Inc.; Hess, Hess & Daniel, P.C.; Betsy Jane Belzer; Bartlett, Inc., d/b/a Energy Savers; Matthew Allan Boyd; Gaston CPA Firm; Rochelle and Brian McGill; Sadler Electric; Jeffrey S. Garner; Amy MacRae; Vaughan Pools, Inc.; Casa Blanca, LLC; Jennifer D. Childress; Clint Johnston; Janeen Goodin; Marla S. Sharp; Erik Barstow; GC/AAA Fences, Inc.; Keith O. Cerven; Teresa M. Cerven; Sirocco, Inc.; Kathryn Scheller; Iron Gate Technology, Inc.; Nancy Thomas; Pioneer Farm Equipment, Inc.; Scott A. Morris; Tony Forsythe; Joel Jameson; Ross Hill; Angie Hill; Kevin Bradberry; Christy Bradberry; Tom Aschenbrenner; Juanita Aschenbrenner; Free State Growers, Inc.; Tom A. Goodman; Jason Goodman; Comet Capital, LLC; Barr, Sternberg, Moss, Lawrence, Silver & Munson, P.C.; Mark Krieger; Deborah Piercy; and Lisa Tomazzoli. This memorandum is also submitted on behalf of Self-Funded Plaintiff Hibbett Sports, Inc.

violated Sections 1, 2, and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-3, by entering into an unlawful agreement that restrained competition between them in the markets for selling health insurance and the administration of Commercial Health Benefit Products in the United States and its territories. Subscriber Plaintiffs contend that the Blues: (1) allocated geographic territories; (2) limited the Member Plans from competing against each other, even when not using a Blue name, by mandating a minimum percentage of business that each Member Plan must do under that name, both inside and outside each Member Plan's territory; (3) restricted the right of any Member Plan to be sold to a company that is not a member of BCBSA; and (4) further agreed to other ancillary restraints on competition. (Doc. # 1082). Subscriber Plaintiffs seek actual damages, treble damages, and injunctive relief to prevent future loss or damage resulting from Defendants' conduct. (*Id.*).

Over the past nine years, this multidistrict litigation has been extraordinarily complex, protracted, and hard-fought. (Doc. # 2625-1 at 3-8). Defendants filed, and the court addressed, over a dozen motions to dismiss. The parties spent substantial time on the production of terabytes of structured health insurance data from thirty-seven separate Defendants, many with different data management systems. (Doc. # 2610-6 ¶ 14). With the invaluable assistance of Magistrate Judge T. Michael Putnam (Ret.), the parties briefed and the court ruled on over 150 discovery motions, which led to 91 discovery orders. Subscriber Plaintiffs obtained and analyzed over 15 million pages of documents, conducted over 120 depositions of Defendants and third-party witnesses, and defended over 20 depositions of class representatives and various experts. (*Id.* ¶¶ 14-15). Subscriber Plaintiffs reviewed and challenged hundreds of thousands of privilege log entries, resulting in 45 Reports & Recommendations by Privilege Special Master R. Bernard Harwood, Jr. and the full or partial de-designation of over 450,000 documents. (*Id.* ¶ 16).

The parties briefed several rounds of summary judgment motions. (Docs. # 1348; 1350; 1353; 1434). Subscriber Plaintiffs prevailed on their motion seeking application of a *per se* standard of review to Defendants' alleged "aggregation of competitive restraints." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1267 (N.D. Ala. 2018). Although this court certified its standard of review order under 28 U.S.C. § 1292(b), the Eleventh Circuit declined to hear the appeal. *In re Blue Cross Blue Shield Antitrust Litig.*, 2018 WL 7152887 (11th Cir. Dec. 12, 2018). More recently, the parties briefed motions for class certification of a nationwide injunctive relief class and an Alabama damages class, each side supporting its claims with expert reports totaling hundreds of pages respectively. (Docs. # 2407-2416; 2421; 2422; 2453-2457).

After nearly three years of litigation, the parties first began settlement discussions in 2015. The parties initially hired a mediator and participated in several mediation sessions from 2015 through 2017. Those discussions involved counsel for the Subscriber Plaintiffs, Provider Plaintiffs, Defendants, and Defendants' insurers. (Doc. # 2610-6 ¶¶ 28-29). In November 2017, after the mediation sessions in 2015, 2016, and 2017 failed to gain traction, Special Master Edgar C. Gentle assisted the parties in their settlement discussions. Over the course of the next two years, there were scores of additional mediation sessions. The negotiations were protracted, complicated, and challenging. Ultimately the parties (with Gentle's able assistance) reached an agreement on proposed structural relief. That relief is historic and substantial. After agreeing to structural relief, the parties also were required to address financial relief. They continued their work and agreed on a common fund for the monetary benefit of the class. Only after the parties agreed on structural relief and the common fund did they begin negotiations about attorneys' fees and costs. (Doc. # 2610-6 ¶ 30).

Three years ago, during their negotiations in July 2019, Subscriber Plaintiffs and the Blues recognized the need for a sub-class of Self-Funded Accounts and their employees (together, the "Self-Funded Sub-Class"), and Subscriber Plaintiffs coordinated the recruitment of separate class counsel for that sub-class and a class representative. (*Id.* ¶ 31).

Self-Funded Sub-Class Counsel asked for and received access to the discovery record in the litigation, along with relevant briefing on class certification and summary judgment. They then engaged their own independent experts to analyze possible damages claims on behalf of the Self-Funded Sub-Class. In September 2019, Self-Funded Sub-Class Counsel began attending mediation sessions. In November 2019, an agreement was reached on a full term sheet. Over the next several months, the parties worked closely with Gentle to reduce the term sheet to a written settlement agreement. This process involved numerous additional conferences and intense negotiation sessions between the parties. (*Id.* ¶ 32).

Subscriber Plaintiffs and Self-Funded Sub-Class Counsel then engaged Kenneth Feinberg,[2] a highly respected mediator who is preeminent in the field of settlement allocations, to serve as Allocation Mediator. Feinberg was tasked with facilitating the determination of an appropriate allocation of the Net Settlement Fund between fully insured Class Members and the Self-Funded Sub-Class. After presentation of the evidence and an in-person mediation, counsel for the parties, with the guidance of Gentle and Feinberg, agreed that an equitable allocation would distribute 93.5% of the Net Settlement Fund among fully insured Class Members and 6.5% of the Net Settlement Fund among the Self-Funded Sub-Class. Feinberg reviewed this proposal and determined it to be reasonable in his professional judgment. (*Id.* ¶ 33).

---

[2] Feinberg has worked on a number of complex matters, including the September 11th Victim Compensation Fund, the Troubled Asset Relief Program, the BP Deepwater Horizon Disaster Victim Compensation Fund, and the Boeing 737 MAX victim fund to name a few.

In August 2020, Subscribers' Counsel and Self-Funded Sub-Class Counsel engaged experts Darrell Chodorow and the Brattle Group to assist with designing a Plan of Distribution. The parties relied on economic analysis conducted by Chodorow and the Brattle Group, along with an analysis of the data available from Settling Defendants. With that input, they sought to design a reasonable and efficient Plan of Distribution that would treat members of the Damages Class equitably and would not overly burden claimants. (*Id.* ¶ 34). Feinberg was again engaged to review the proposed Plan of Distribution. He concluded that the proposed Plan of Distribution was reasonable. (*Id.* ¶ 35).

On October 16, 2020, the Subscriber Class Representatives, the Self-Funded Sub-Class Representative, and Settling Defendants entered into a Settlement Agreement, which, if approved, would resolve Subscriber Plaintiffs' classwide claims in this litigation. (Doc. # 2610-2).[3] Under the Settlement, the Settling Defendants agreed to pay $2.67 billion ($2,670,000,000.00) (the "Settlement Fund") and, even more crucially, to provide certain injunctive relief consisting of changes to their business practices. (*Id.*).

On November 30, 2020, this court entered an order granting preliminary approval of the Settlement, Plan of Distribution, and Notice Plan. (Doc. # 2641). Thereafter, JND Legal Administration ("JND"), the court-appointed notice and claims administrator, effectuated the court-approved Notice Plan. (Doc. # 2812-2). On September 3, 2021, Subscriber Plaintiffs moved

---

[3] The capitalized terms used herein shall have the same meaning as in the Settlement Agreement. The Settlement Agreement is attached as Exhibit A to Subscriber Plaintiffs' Memorandum of Law in Support of their Motion for Preliminary Approval of the Settlement Agreement. (Doc. # 2610-2).

The term "Subscriber Actions" means lawsuits brought by persons and entities within the Settlement Classes and consolidated in *In re Blue Cross Blue Shield Antitrust Litigation*, including the Consolidated Amended Class Action Complaint, which is currently pending in the court, all actions that may be transferred or consolidated prior to the time Class Notice is mailed, and all actions that are otherwise based, in whole or in part, on the conduct alleged in MDL No. 2406, including *Piercy v. Health Care Service Corp.*, Case No. 124-28, in the Circuit Court for the First Judicial Circuit, Union County, Illinois.

for final approval of the Settlement and for the appointment of a Settlement Administrator. (Doc. # 2812). In October 2021, the court conducted a multi-day Fairness Hearing and heard arguments from the parties in support of the Settlement and from class members objecting to the Settlement. (Doc. # 2859).

During the Fairness Hearing, it became clear to the court that the Second Blue Bid relief, which under the Settlement was provided only to certain Self-Funded Accounts (sometimes also referred to as "ASOs"), (1) was problematic because it could burden the opt out rights of those Self-Funded Accounts and, in any event, (2) should be construed as divisible injunctive relief under Federal Rule of Civil Procedure 23(b)(3). (*See, e.g*., Doc. # 2865 at 25-27, 42-44, 95). Subscriber Plaintiffs moved for the opportunity to provide Supplemental Notice to Self-Funded Accounts to address these concerns. (Doc. # 2885). On February 4, 2022, the court granted that motion and ordered the Settlement Administrator to issue supplemental notice to Self-Funded Entity Accounts (*i.e.*, Self-Funded Accounts themselves, not including Members thereof) to make the following explicit: if they opt out of the Rule 23(b)(3) Class (sometimes referred to as the "Damages Class"), they nevertheless retain the right to seek monetary damages and individualized injunctive relief (which may include a Second Blue Bid or other such individualized injunctive relief, depending on the circumstances surrounding a Self-Funded Entity Account's claim). (Doc. # 2897). These accounts were afforded an additional opportunity to opt out upon receipt of this information. (*Id.*). In ordering Supplemental Notice, the court overruled objections to the Settlement relating to the inability to opt out of the Second Blue Bid injunctive relief. (*Id.*).

On May 10, 2022, Settlement Class Counsel filed a Notice Certifying Compliance with the court's Order requiring Supplemental Notice. (Doc. # 2914). In response to the Supplemental Notice to Self-Funded Entity Accounts, the Settlement Administrator received thirty-nine timely

exclusion requests (opt-outs) but no additional timely objections. (Doc. # 2914-1 at ¶ 27, pp. 65-66).

On May 16, 2022, the court conducted a status conference with the parties and certain interested objectors. In response to the court's inquiry, no one expressed the need for any additional briefing regarding the proposed Settlement.

Subscriber Plaintiffs' Motion for Final Approval of Class Settlement and Appointment of Settlement Administrator (Doc. # 2812) is, therefore, now properly before the court. In the Motion, Subscriber Plaintiffs ask the court to (1) enter a Final Approval Order and (2) enter an Order Appointing the Honorable Irma E. Gonzalez (Ret.) as Settlement Administrator.[4] (*Id.*). Subscriber Plaintiffs' Counsel also seek approval of their Attorneys' Fee and Expense Application. (Doc. # 2733).

The court has carefully considered the Settlement Agreement, Subscriber Plaintiffs' Motion, the memoranda of law and exhibits filed in support thereof by the parties, the proposed Plan of Distribution, the Objections, and briefing by the Objectors, the parties, and other interested persons. For the reasons discussed below, the Motion for Final Approval of Class Settlement and Appointment of Settlement Administrator (Doc. # 2812) is due to be granted.

## II.    The Settlement Terms and Class Relief

The Settlement Classes include a damages and divisible injunctive relief class under Rule 23(b)(3), as well as an indivisible injunctive relief class under Rule 23(b)(2). The Settlement Classes include any person or entity within the Injunctive Relief Class or the Damages and divisible injunctive relief Class, excluding Government Accounts and Opt-Outs. (Doc. # 2610-2 ¶ 1(llll)). The Fully Insured Settlement Class Period is February 7, 2008 through October 16, 2020

---

[4] The court has already entered an Amended Stipulation and Order Regarding Protected Health Information and Personally Identifiable Information for Subscriber Settlement. (Docs. # 2615; 2879).

("FI Class Period"). (Doc. # 2610-2 ¶ 1(nnnn)). The Settlement Class Period for the Self-Funded Accounts is September 1, 2015 through October 16, 2020 ("Self-Funded Class Period"). (*Id.*).

## A. The Settlement Class Members

The Settlement Classes agreed to by the parties are defined as follows:

### 1. The Damages Class

The Damages Class includes "all Individual Members (excluding dependents and beneficiaries), Insured Groups (including employees, but excluding non-employee Members), and Self-Funded Accounts (including employees, but excluding non-employee Members) that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product[5] (unless the person or entity's only Blue-Branded Commercial Health Benefit Product during the Settlement Class Period was a stand-alone vision or dental product) sold, underwritten, insured, administered, or issued by any member plan during the Settlement Class Period." (Doc. # 2610-2 ¶ 1(v)).

The Damages Class includes employees[6] of Insured Groups and Self-Funded Accounts who were covered by a Blue-Branded Commercial Health Benefit Product during the Settlement Class Period, whether or not they expressly contributed towards their premiums or the cost of that Product, excluding their beneficiaries and dependents. The Damages Class also excludes "Government Accounts,[7] Medicare Accounts of any kind, Settling Defendants, and any parent or

---

[5] Commercial Health Benefit Products mean "any product or plan providing for the payment or administration of health care services," including but not limited to medical, pharmacy, dental, and vision services. (Doc. # 2610-2 ¶¶ 1(o), 1(v)). However, if a person or entity's only Blue-Branded Commercial Health Benefit Product during the Settlement Class Period was a stand-alone vision or dental product, that person or entity is not included in the Damages Class. (*Id.*).

[6] Employees "means any current or former employee, officer, director, partner, or proprietor of an entity." (Doc. # 2610-2 ¶ 1(v)).

[7] "Government Account" is defined in the Settlement as "only a state, a county, a municipality, an unincorporated association performing municipal functions, a Native American tribe, or the federal government

subsidiary of any Settling Defendant (and their covered or enrolled employees)" as well as any Opt-Outs, "the judge presiding over this matter, and any members of his judicial staff, to the extent such staff were covered by a Commercial Health Benefit Product not purchased by a Government Account during the Settlement Class Period." (Doc. # 2610-2 ¶ 1(v)). Subscriber Plaintiffs are also seeking certification of a "Self-Funded Sub-Class" consisting of Self-Funded Accounts and their employees during the applicable Settlement Class Period, September 1, 2015 through October 16, 2020. The Self-Funded Sub-Class is separately represented by Self-Funded Sub-Class Counsel and the Self-Funded Sub-Class Representative. (Doc. # 2610-2 ¶¶ 1(dddd), 1(eeee)).

## 2. The Injunctive Relief Class

The Injunctive Relief Class includes "all Individual Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Settlement Class Period." (Doc. # 2610-2 ¶ 1(pp)). The Injunctive Relief Class includes beneficiaries and dependents of employees (including minors).

## B. The Class Relief

The Settlement provides: (a) a $2.67 billion settlement fund; and (b) significant structural changes to Defendants' practices that are to be closely monitored for compliance with both the antitrust laws and the injunctive relief terms of the Settlement by a Monitoring Committee (more

---

(including the Federal Employee Program). The term Government Account includes all Members of the Government Account. No other entity that is not a state, county, municipality, unincorporated association performing municipal functions, Native American tribe or the federal government is a Government Account, unless it is required by law to provide any health care coverage it makes available to Members only under, or as a participant in, a Commercial Health Benefit Product approved, selected, procured, sponsored or purchased by a Government Account. Entities that are not Government Accounts (e.g., utility companies, school districts, government-funded hospitals, public retiree benefit plans, public libraries, port authorities, transportation authorities, waste disposal districts, police departments, fire departments) will receive notice and an opportunity to submit a claim form to the extent they are otherwise within the definition of the Damages Class." (Doc. # 2610-2 ¶ 1(hh)).

fully described below) for a period of five years following the entry of judgment approving the Settlement.

### 1.    The Settlement Fund

The Settlement requires Defendants to establish a Settlement Fund of $2.67 billion, to be deposited into an Escrow Account for ultimate distribution. The Settlement Fund includes the Notice and Administration Fund and Fee and Expense Award(s). (Doc. # 2610-2 ¶ 1(oooo)).

The Settlement Fund will: (1) pay all Settlement Class Members who are entitled to a distribution from the Net Settlement Fund ("Authorized Claimants") in accordance with a court-approved Plan of Distribution (Doc. # 2610-2 ¶ 27); (2) fund a $100 million Notice and Administration Fund to pay Notice and Administration Costs (Doc. # 2610-2 ¶¶ 1(ggg), 29(a)), as well as up to $7 million to "reimburse plaintiffs' counsel's actual and reasonable fees and expenses incurred for Notice and Administration" (Doc. # 2610-2 ¶ 28(h)) and costs of monitoring (Doc. # 2610-2 ¶ 21); and (3) pay court-awarded attorneys' fees and expenses, together not to exceed a combined total of 25% of the Settlement Amount. (Doc. # 2610-2 ¶ 28).

If there is any balance remaining in the $100 million Notice and Administration Fund, it will be returned to Settling Defendants after the completion of the administration and the five-year Monitoring Period. (*Id.* ¶ 30). That is, Defendants' only reversionary interest in the Settlement Fund, if any money remains in the Settlement Fund (apart from any remainder of the $100 million Notice and Administration Fund) after distributions to Authorized Claimants, the Fee and Expense Award, and any court-awarded Service Awards, the Claims Administrator will, subject to court approval, allocate the remaining Escrow Account balance to Settlement Class Members. (*Id.*).[8]

---

[8] If it is not economical to distribute any remaining money to Settlement Class Members, subject to court approval, the Claims Administrator may follow the directions set forth in the Plan of Distribution approved by the court. (Doc. # 2610-2 ¶ 30).

Settlement Class Counsel and Self-Funded Sub-Class Counsel may petition the court for replenishment by Defendants of the Notice and Administration Fund upon a showing of necessity for such replenishment. (*Id*. ¶ 1(ggg)).

Settling Defendants have already transferred $100 million for the Notice and Administration Fund into the Escrow Account and advanced $300 million of the remaining Settlement Amount. (*Id*. ¶ 23(a)). Within thirty calendar days of the court's entry of the Final Judgment and Order of Dismissal, Settling Defendants will transfer the remaining portion of the Settlement Amount into the Escrow Account. (*Id*. ¶ 23(b)).

### 2. Injunctive Relief

In addition to the $2.67 billion in monetary recovery, Class Representatives, Subscriber Plaintiffs' Counsel, and Self-Funded Sub-Class Counsel secured substantial injunctive relief on behalf of the Settlement Classes. That relief includes structural changes to BCBSA's rules and regulations and the establishment of a Monitoring Committee to oversee compliance with the Settlement. As explained by Dr. Daniel Rubinfeld, each of these hard-won changes to Defendants' rules provides additional relief to the Class, creating opportunities for more competition in the market for the purchase and administration of health insurance and providing the potential for a more competitive environment in which Settlement Class Members may achieve greater consumer choice, better product availability, and increased innovation. (Doc. # 2610-10). Defendants have already taken steps to implement the injunctive relief following entry of the Preliminary Approval Order.

Key provisions of this injunctive relief include the following:

### a.  Eliminating Restrictions on Non-Blue Competition

BCBSA's license agreements with each Blue Plan have included limitations on Blue Plans' ability to generate revenue using "Green" brands outside the Blue Plan's assigned territorial service area; this restriction is known as the National Best Efforts ("NBE") requirement. (Doc. # 2610-10 ¶ 8). Settling Defendants have agreed to "eliminate and no longer enforce the National Best Efforts Requirement," and to "not adopt or implement any equivalent requirement or any rule in any future License Agreement or Membership Standard that imposes a cap, ratio, or other quantitative limit on a Settling Individual Blue Plan's non-Blue Branded healthcare business outside of its Service Area." (Doc. # 2610-2 ¶ 10). The Settlement's elimination of this restriction unleashes Green competition, which will directly benefit the class.

### b.  Opening the Door to Expanded Blue Bids and Competition

Class Representatives also secured a path to increased competition among Blue Plans for national accounts in three important ways. First, certain Qualified National Accounts ("QNAs") (defined as Employers with more than 5,000 employees and which also meet certain dispersion criteria, discussed in more detail below) will be able to seek a second bid from the Blue Plan of their choosing, an option that was previously prohibited. (*Id*. ¶ 15). This provision applies to at least 33 million[9] Members in the aggregate and will promote competition across the market. (*Id*. ¶ 1(u)). Second, for accounts with Independent Health Benefit Decision Locations in more than one Blue Plan's Service Area, each Independent Health Benefit Decision Location may request a bid from the Blue Plan in its Service Area to cover employees working at that Location. (*Id*. ¶ 14(b)). Third, when Multi-Service Area National Accounts (*i.e.*, those with more than 250 total Members and Headquarters in the bidding Blue Plan's Service Area) seek bids, and the Blue Plan for that

---

[9] To be clear, this figure includes accounts that already have the right to request a bid from more than one Blue Plan. These accounts will not receive the right to request additional bids. (Doc. # 2610-2 ¶ 15).

Service Area decides to bid the Account under a non-Blue brand, the right to bid the Account under the Blue brands must be "ceded" to another Blue Plan, thereby allowing increased opportunities and choice for that account. (*Id*. ¶ 14(a)). All three of these provisions represent structural change to the current system that will produce additional choices for accounts and increased competition.

### c.      Local Best Efforts

The Local Best Efforts ("LBE") rule requires that 80% of a Blue Plan's healthcare-related revenue within the Blue Plan's Service Area must come from Blue-branded business. The Settlement limits this requirement to 80% and limits the measurement of revenue for purposes of compliance with this requirement to no larger than the state level. (*Id*. ¶ 11).

### d.      Acquisitions

BCBSA currently controls -- through Blue Plan voting -- whether any individual Blue Plan may be acquired by another Blue Plan. Under the Settlement Agreement, Settling Defendants are only permitted to impose "legal and reasonable conditions on the acquisition of a member plan, but only to the extent that those conditions are reasonably necessary to prevent impairment of (1) the value of the Blue Marks, or (2) the competitiveness or efficiency of the Blue Branded business or of the Blue Marks." (*Id*. ¶ 17). Any condition must provide that the potential acquirer may request that the Monitoring Committee review any rejection by BCBSA, followed by binding arbitration. (*Id*.).

### e.      Contracting Provisions for Self-Funded Accounts

The Settlement permits direct contracting between Non-Provider Vendors and Self-Funded Accounts. (*Id*. ¶ 12(a)). The Settlement also permits Blue Plans to do business with Self-Funded Accounts that directly contract with Specialty Service Provider Vendors, subject to certain conditions. (*Id*. ¶ 12(b)). Further, during the Monitoring Period and unless otherwise agreed to by

the Settling Individual Blue Plan and Self-Funded Account, the Settlement requires that for a given contracted Provider, the Settling Individual Blue Plan will not enter into different standard commercial fee schedules for medical and surgical claims for its Self-Funded Accounts, on the one hand, and Insured Groups (other than Insured Groups who purchase an ACA-compliant individual or small-group product), on the other hand; provided, however, that the products, networks, administrative services, and plan designs are the same, excluding differences in reimbursement rates individually negotiated with a contracted Provider. (*Id*. at ¶ 12(d)).

### f.    Most Favored Nation Clauses

Blue Plans must abide by state laws, and any written agreements in effect as of November 2019 with a state regulatory agency must be disclosed to Settlement Class Counsel, which expressly regulate the use of Most Favored Nations ("MFN") or Most Favored Nation-Differential ("MFN-Differential") clauses in Provider contracts. If there is no governing law or applicable written agreement, the Blue Plan entering into an MFN Differential[10] must demonstrate to the Monitoring Committee that the provision does not violate the terms of the Settlement. (*Id*. ¶ 18).

### g.    Monitoring Committee

To oversee compliance with the Settlement for five years from the court's entry of Final Judgment and Order of Dismissal, the Settlement establishes a Monitoring Committee "made up of (1) two members appointed collectively by Settling Defendants, (2) one member appointed collectively by Settlement Class Counsel, (3) one member appointed by Self-Funded Sub-Class Settlement Counsel, and (4) one member appointed by the Court."[11] (*Id*. ¶¶ 1(xx), 1(zz)).

---

[10] An MFN Differential is "an MFN which requires that the Provider offer to a health plan financial terms that are more favorable by a specified rate than those it offers any comparable health plan during the performance period of the contract." (*Id*. ¶ 1(bbb)).

[11] The Monitoring Committee's reasonable fees and expenses will be paid from the Notice and Administration Fund. (*Id*. ¶ 21).

Additionally, the Monitoring Committee will mediate certain disputes related to the Settlement. (*Id*. ¶ 20). During the Monitoring Period, BCBSA may advise Settlement Class Counsel, Self-Funded Sub-Class Settlement Counsel, and the Monitoring Committee of BCBSA Board actions to be taken adopting rules or regulations that are within the scope of Paragraphs 10-18. (*Id*.). If the proposed rule or measure is not reported to the Monitoring Committee, or if an arbitrator finds that the proposed rule or measure does not comply with the terms of the Settlement, the rule or measure will not constitute a Released Claim and is not covered under the Settlement. (*Id*.). The inclusion of the Monitoring Committee in the Settlement affords the Settlement Classes and the court substantial assurance of the Settling Defendants' compliance with the Settlement. Any reporting obligation as well as the authority of the Monitoring Committee shall cease at the conclusion of the Monitoring Period. (*Id*.).

### C.      Settlement Class Release

Upon the Effective Date of the Settlement, Releasors (Class Representatives and Settlement Class Members) who have not timely and validly excluded themselves (*i.e*., opted out) will have fully released all claims against the Releasees ((i) Individual Blue Plans, (ii) BCBSA, (iii) NASCO,[12] and (iv) Consortium Health Plans, Inc.,[13] as well as related entities). (*Id*. ¶¶ 32, 1(vvv), 1(www)). Opt-Outs will release all claims for indivisible injunctive or declarative relief against the Releasees. However a Self-Funded Account opt-out meeting the criteria to request a Second Blue Bid under the terms of the Settlement Agreement does not release any claims for individualized declaratory or injunctive relief to request a Second Blue Bid during any time it

---

[12] NASCO is a healthcare technology company owned by several Blue Plans and is involved in processing claims.

[13] Consortium Health Plans, Inc. is a marketing company owned by several Blue Plans and provides marketing assistance regarding national accounts to BCBSA and the Blue Plans.

meets the criteria to request such a bid under the terms of the Settlement Agreement. The releases

apply to Releasors and their related persons and entities, such as dependents and beneficiaries

under their benefits plans.

> The Releasors agree to release any and all known and unknown claims:
>
> based upon, arising from, or relating in any way to: (i) the factual predicates of the Subscriber Actions (including but not limited to the Consolidated Amended Class Action Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) any issue raised in any of the Subscriber Actions by pleading or motion; or (iii) mechanisms, rules, or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10 through 18 approved through the Monitoring Committee Process during the Monitoring Period.

(*Id*. ¶ 1(uuu)). Thus, the Released Claims in certain circumstances will include those "mechanisms,

rules or regulations" enacted after the Effective Date that are approved by the Monitoring

Committee during the Monitoring Period, but only to the extent those "mechanisms, rules or

regulations" relate to the provisions enumerated in Paragraphs 10 through 18 of the Settlement.

The Releasors retain their right to assert certain claims relating to coverage, benefits and

administration of claims that arise in the ordinary course of business and are not "based in whole

or in part on the factual predicates of the Subscriber Actions or any other component of the

Released Claims discussed in this Paragraph." (*Id*.).

Additionally, Providers who are Settlement Class Members retain the right to assert any

claims arising from their sale or provision of health care products or services, and Settling

Defendants have agreed not to raise Providers' releases under this Settlement as a defense to

Providers' claims brought in their capacity as Providers of health care products or services in MDL

No. 2406. (*Id*.).

### D.     Attorneys' Fees and Costs

In their Motion for Approval of Their Attorneys' Fees and Expenses Application (Doc. # 2733), Settlement Class Counsel have applied to this court separately for: (i) an award of attorneys' fees, plus (ii) reimbursement of expenses and costs reasonably and actually incurred in connection with prosecuting the Subscriber Actions, for a combined total of 25% of the Settlement Amount. (*Id.*). The court will address this request in more detail below and in a separate order.

### E.     Plan of Distribution

The Claims Administrator, JND, will make all valid distributions for Authorized Claimants in accordance with the terms of the Settlement and the proposed Plan of Distribution. (Doc. # 2610-5; Doc. # 2641 at 52). JND has provided notice to the Classes about the Plan of Distribution. (Doc. # 2812-2; Doc. # 2914-1 (outlining extensive notice efforts)). The Settlement Agreement contemplates that the court will appoint a Settlement Administrator to assist in the implementation of the Plan of Distribution and to resolve any disputes concerning the claims process. Settlement Class Counsel are seeking appointment of Judge Irma E. Gonzalez (Ret.) as Settlement Administrator. The court addresses this issue below.

The Net Settlement Fund is allocated between Individual Members and Insured Groups on the one hand ("Fully Insured Claimants") and the Self-Funded Sub-Class on the other. Settlement Class Counsel and Self-Funded Sub-Class Counsel (together, "Class Counsel") sought the assistance of Feinberg as Allocation Mediator to facilitate the determination of an appropriate allocation of the Net Settlement Fund between Fully Insured Claimants and the Self-Funded Sub-Class. (Doc. # 2610-6 ¶ 33; Doc. # 2610-7 ¶ 9; Doc. # 2610-8 ¶ 6). Counsel presented evidence to Feinberg concerning the relative volume of payments and differing strengths of claims for Self-

Funded Accounts and Fully Insured Claimants. (Doc. # 2610-6 ¶ 33; Doc. # 2610-7 ¶ 9; Doc. # 2610-8 ¶ 6).

Counsel ultimately presented an allocation to Feinberg for his review. (Doc. # 2610-6 ¶ 33; Doc. # 2610-7 ¶ 10; Doc. # 2610-8 ¶ 13). Feinberg reviewed the allocation recommendation and determined that it was reasonable. (Doc. # 2610-8 ¶ 14). The allocation is based on numerous factors including the strengths of the respective claims, the substantially shorter Self-Funded Class Period, and the fact that premiums paid for fully-insured coverage dwarf the administrative fees charged for self-insured coverage. (Doc. # 2610-6 ¶ 33; Doc. # 2610-7 ¶ 10; Doc. # 2610-8 ¶ 14). Under this allocation, the Self-Funded Sub-Class (including Self-Funded Account employees) will receive 6.5% of the Net Settlement Fund ("Self-Funded Net Settlement Fund"), with the remainder allocated to Fully Insured Claimants (and their employees) ("FI Net Settlement Fund"). (Doc. # 2610-5 ¶ 3).

In order to develop an equitable distribution of the Self-Funded Net Settlement Fund and the FI Net Settlement Fund among Authorized Claimants for each fund, Class Counsel retained the Brattle Group to assist with designing a Plan of Distribution to be administered by JND. (Doc. # 2610-6 ¶ 34). All distributions to Authorized Claimants are subject to a $5 minimum payment threshold to ensure that the resources involved in processing a claim are not out of proportion to the value of the individual claim. (Doc. # 2610-5 ¶ 28).

For the FI Net Settlement Fund, JND will first calculate the actual premiums paid by Individual Members and Insured Groups using data produced by Settling Defendants. (Doc. # 2610-5 ¶ 12). Those premiums will be used to calculate the pro rata share of the FI Net Settlement Fund available to each claiming Individual Member and Insured Group. (*Id*. ¶ 13). For Individual Members, no further calculation is required, and a claiming Individual Member will receive his or

her full pro rata share of the FI Net Settlement Fund. (*Id*. ¶¶ 13, 16). For any Insured Group where only the employer makes a claim, and no employees do so, the employer will be eligible for 100% of the Insured Group's pro rata distribution. (*Id*. ¶ 18). If any employees make a claim, the Insured Group's pro rata share must be appropriately allocated between the employer and any claiming employees. Significantly, these allocations relate solely to what an employer or employee receives under the Settlement, and do not in any way purport to dictate or address what, if any, obligations employers may have as fiduciaries of ERISA plans, or how an allocation may impact their use of any funds received.

Typically, both employers and employees bear a portion of the burden of the premiums paid by Insured Groups. (Doc. # 2610-9). Based on this economic reality, Class Counsel proposed a "Default" option for apportioning premiums between employers and employees. (Doc. # 2610-5 ¶ 19(f)). Given the difference in contribution percentages for single and family coverage, the Default option under the Plan of Distribution sets contribution percentages for Insured Group employees with single coverage at 15% and with family coverage at 34%. (Doc. # 2610-8 ¶ 18; Doc. # 2610-9 ¶ 31 (discussing the economic reasonableness of setting different Default contribution percentages for single and family coverage based on employers historically sharing more of the burden for single coverage than family coverage)). Any Authorized Claimant will automatically be assigned the Default option on their Claim Form, at which point they will not be required to provide further evidence of their premium payments, and their claims will be administered using Settling Defendants' data to the extent possible.

Where both the employer and any employees make a claim, the first step in calculating the employer and employees' portion of the Insured Group's pro rata distribution is to estimate the amount of the Insured Group's premiums attributable to each claiming employee. (Doc. # 2610-5

¶ 19(a)). JND will use Settling Defendants' data to calculate the "Unallocated Employee Premium" for each claiming employee. (*Id*.) Then, the appropriate Default contribution percentage (based on the type of coverage for the claiming employee during any period for which a claim is made) will be applied to the Unallocated Employee Premium to determine which portion of the Unallocated Employee Premium is deemed to have been paid by the employee (as opposed to the employer). (*Id*. ¶ 19(e)). The employee will receive credit for the portion of their Unallocated Employee Premium as reduced by the Default contribution percentage. (*Id*. ¶ 19(f)).

This procedure is not fixed in stone. Rather than accepting the Default option on the Claim Form, any employer or employee believing that they paid a higher contribution percentage than the Default may select the "Alternative" option and can provide materials to the Settlement Administrator to support that contribution percentage. (*Id*. at ¶ 19(h)). If sufficient data or records are submitted by either an employer or by employees, then the Settlement Administrator, in the exercise of sound discretion, shall determine the appropriate amount by which to increase or decrease the allocation between the employer and the employees, taking into account the same factors considered in setting the Default option, as well as the reliability of the data presented by the claimant selecting this Alternative option. (*Id*. at ¶ 19(i)). Finally, if an employee files a claim and his or her employer does not, the employee will receive credit only for their portion of the Unallocated Employee Premium as determined by the allocation methodology described above. (*Id*. at ¶ 20).

Similarly, for the Self-Funded Sub-Class, payments will be allocated from the Self-Funded Net Settlement Fund using this same method but based on an employee's estimated share of the employer's administrative fees, with slightly different set contribution percentages for the Default

option (18% for employees with single coverage and 25% for employees with family coverage)[14] and the same ability to select an Alternative option with the presentation of data. (Doc. # 2610-5 ¶¶ 22-26; Doc. # 2610-9 ¶ 51). Again, as with Insured Groups, the amount allocated to employers is for Settlement distribution only, and does not address what, if any, obligations those employers may have under ERISA.

### F. Approval of Class Notice

#### 1. Notice to the Classes

JND, the Notice and Claims Administrator, sent direct notice to over 100,000,000 Class Members. (Doc. # 2812-2 ¶ 5). JND sent 77,360,606 postcard notices to Damages Class Members for whom no email address was available and electronic notice to 27,497,063 Damages Class members for whom email addresses were available. (*Id.* ¶¶ 36, 44). With respect to direct mail notice, in order to reasonably ensure that these notices reached Damages Class members given the lengthy Settlement Class Period (back to 2008 for some Damages Class members) and the likelihood that many addresses may have changed over time, JND made substantial efforts to confirm mailing addresses, which included updating addresses through credit bureau advanced-level searches and utilizing USPS's National Change of Address search functionality. Due to this rigorous work in perfecting the mailing database, 93.5% of all postcard notices were deemed deliverable, and only 6.5% were deemed undeliverable. (*Id.* ¶¶ 39-40). Similarly, for email notice, JND utilized its industry-leading email solutions to ensure an efficient and effective email

---

[14] The Default option for the Self-Funded Sub-Class was similarly determined by Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel, and found reasonable by the Allocation Mediator, through consideration of the same factors discussed above; however, employee contributions for the Self-Funded Sub-Class during the Self-Funded Class Period were on average higher for single coverage (18% to 19% compared to 14% to 19% for fully insured) and lower for family coverage (24% to 26% compared to 33% to 39% for fully insured), which is reflected in the Default percentages of 18% and 25%. (Doc. # 2610-5 ¶¶ 22-26; Doc. # 2610-8 ¶ 18; Doc. # 2610-9 ¶ 51).

campaign, which included designing an email notice that would avoid spam filters and promote readability. (*Id*. ¶ 42). Where emails bounced back for temporary reasons (such as a full email inbox), JND made multiple attempts to resend emails to increase the deliverability rates. (*Id*. ¶ 43). Based on all of this work, JND successfully delivered email notice to 27,497,063 Damages Class Members. (*Id*. ¶ 44).

In addition to direct notice, JND conducted a robust consumer media campaign, which alone reached more than 85% of potential members of the Settlement Classes. (*Id*. ¶ 46). The consumer media campaign included digital, print, radio, and television efforts, with concerted outreach to African-American and Hispanic markets. (*Id*. ¶¶ 47-55). In addition to consumer media notice, JND also targeted individuals responsible for filing claims on behalf of Damages Class members, including human resources employees and business owners. (*Id*. ¶¶ 56-64). JND also purchased a list of HR/employment benefit and other relevant employees and directly reached out to these contacts to ask for assistance in getting notice out to constituents of these organizations. (*Id*. ¶ 66). This resulted in hundreds of direct calls stating that these individuals were assisting in disseminating notice. (*Id*.). Finally, JND instituted an internet search campaign, and solicited and received extensive press coverage of the Settlement. (*Id*. ¶¶ 67-69).

Once notice was complete, JND immediately began its efforts to encourage Class Members who had not filed a claim to do so, including through reminder emails (to both email addresses provided by Settling Defendants and additional email addresses located by JND) and additional outreach to human resources groups. (*Id*. ¶¶ 71-72).

The Notice Plan directed Settlement Class Members to the settlement website that JND established (www.BCBSsettlement.com) for more information about the Settlement. (*Id*. ¶ 79). The settlement website contains key case documents, including the Long Form Notice, the Claim

Form, the operative complaint, the Settlement Agreement, the Preliminary Approval Order, and the Plan of Distribution, along with answers to frequently asked questions (developed in conjunction with Settlement Class Counsel). (*Id*.). The settlement website also allowed for online filing of claims, of which over 99% of Class Members who have submitted claims have availed themselves. (*Id*. ¶ 96). JND expended significant efforts in designing the website to withstand both an enormous volume of traffic and any threats of cyber-security attacks. (*Id*. ¶¶ 79-84). As of August 26, 2021, the website had tracked 14,844,643 unique visitors, 20,666,254 sessions, and 112,006,163 total pageviews, without any reports of slowness or latency. (*Id*. ¶ 85).

JND also established a call center and an email address, info@BCBSsettlement.com, to answer questions from Class Members. (*Id*. ¶ 86). JND initially established and maintained a toll-free telephone line with automated interactive voice response ("IVR"), which was available 24 hours a day, seven days a week. (*Id*. ¶¶ 87-88). The full call center, with live agents, was launched on March 26, 2021, before the first postcard notices commenced. (*Id*. ¶ 90). With input from Settlement Class Counsel and counsel for Settling Defendants, JND developed an extensive phone script and trained 100 operators (later rising to a high of 240 operators as call volume increased exponentially), with operators available to answer calls in English and Spanish. (*Id*.). JND also trained higher-level escalation officers to assist with more sophisticated questions. (*Id*. ¶ 91). As of August 26, 2021, the toll-free line had received 1,062,431 incoming calls. (*Id*. ¶ 92). JND also employed a team of email agents to field questions that arrive through the dedicated email address. (*Id*. ¶ 93). These agents review and respond to incoming emails sent in many languages, including Spanish, French, Korean, and Chinese, among others. (*Id*.).

JND established two separate United States Postal Service Post Office boxes: one for Class Member inquiries and claim forms, and another dedicated strictly to receiving objections and

requests for exclusion. (*Id*. ¶ 95). As of August 31, 2021, JND had received 2,049 timely exclusion requests and 40 timely objections from 123 objectors. (*Id*.).

As of September 3, 2021, JND had already received 6,077,526 claims: 1,381,112 from individual policyholders; 4,194,942 from employees enrolled in their employers' group health plans; and 177,687 from businesses and their group health plans. (*Id*. ¶ 96). Ninety-nine percent of claimants elected the Default option, and claims have been filed by Settlement Class Members in every state in the country. (*Id*. ¶ 97).

Some Objectors complained that there was an improper burden placed on the ability of Self-Funded Accounts to opt out (because opt outs would lose their opportunity to receive a Second Blue Bid). But that concern has been resolved. After the October 2021 Fairness Hearing, Subscriber Plaintiffs requested the opportunity to provide Supplemental Notice to Self-Funded Accounts to allow for that opportunity. (Doc. # 2885). On February 4, 2022, the court granted that motion and ordered the Settlement Administrator to issue supplemental notice to Self-Funded Entity Accounts (*i.e.*, Self-Funded Accounts themselves, not including Members thereof) to make explicit that, if they opt out of the 23(b)(3) Class (sometimes referred to as the "Damages Class"), they retain the right not only to seek monetary damages, but also to seek divisible, individualized injunctive relief, which may include a Second Blue Bid or other individualized injunctive relief, depending on the circumstances surrounding the Self-Funded Entity Account's claim. (Doc. # 2897).

Supplemental direct notice to Self-Funded Accounts was accomplished through mail and email. Both notices provided important summary information about the opt-out and objection rights of Self-Funded Entity Accounts. Both notices also directed Self-Funded Entity Accounts to the Settlement Website, where updated and detailed information was available, including all of the

Settlement documents and a Second Blue Bid section. And, both notices provided a toll-free telephone number and a dedicated email address so that recipients could ask additional specific questions. (Doc. # 2914-1 ¶¶ 12-26).

The Self-Funded Accounts were afforded an additional opportunity to opt out upon receipt of this information. (*Id.*). As of May 10, 2022, JND had received thirty-nine timely exclusion requests and zero timely objections from Self-Funded Entity Accounts related to the Supplemental Notice. (Doc. # 2914-1 at ¶ 27).

### 2. CAFA Notice

On February 16, 2021, Settling Defendants filed a notice of compliance with the notice requirements of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715(d). (Doc. # 2704). In compliance with § 1715, CAFA Notice was sent to sixty officials, including the Attorney General of the United States, the Attorneys General of each of the fifty states, the Attorney General for the District of Columbia, and the Attorneys General for Puerto Rico, Guam, American Samoa, the U.S. Virgin Islands, and the Northern Mariana Islands. (*Id.*).

### 3. Court Approval of Notice

The Class has been notified of the Settlement Agreement pursuant to the plan and supplemental plan approved by the court. Class Members have had the opportunity to be heard on all issues regarding the resolution and release of their claims by submitting objections to the Settlement Agreement to the court. Appropriate and sufficient notice of the Fairness Hearing and the rights of all Class Members has been provided to all people and entities entitled to such notice. In addition, pursuant to CAFA, 28 U.S.C. § 1711 *et seq.*, notice was provided to the Attorneys General for each of the states in which a Class Member resides and to the Attorney General of the United States. (Doc. # 2704). Therefore, the court finds that the form and methods of notifying

Class Members of the terms and conditions of the proposed Settlement Agreement constituted the best practicable notice under the circumstances and meets the requirements of Rule 23(c)(2) of the Federal Rules of Civil Procedure, any other applicable law, and due process.

## III.    Applicable Legal Standards for Final Approval

Federal Rule of Civil Procedure 23(e) requires judicial approval of any class settlement. To be approved, a settlement must be fair, reasonable, and adequate. Fed. R. Civ. P. 23(e). The procedure for judicial approval is well established:

> (1) Certification of a settlement class and preliminary approval of the proposed settlement after submission to the court of a written motion for preliminary approval.

> (2) Dissemination of notice of the proposed settlement to the affected class members.

> (3) A final approval hearing, at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement are presented.

Manual for Complex Litig. (Fed. Jud. Center, 4th ed. 2004), § 21.63.

For the reasons more fully explained below, after considering the Settlement Agreement, the arguments and authorities presented by the parties in their motions and briefing, all objections and comments regarding the Settlement Agreement, the arguments at the Fairness Hearing held in October 2021, and the entire record in this case, the court reaffirms its findings in the Preliminary Approval Order and makes a final determination that the Settlement Agreement is fair, reasonable, and adequate within the meaning of Federal Rule of Civil Procedure 23.

### A.    Certification of the Classes for Settlement Purposes Under Rule 23(a) and (b)

When presented with a motion for final approval of a class action settlement, a court first evaluates whether certification of a settlement class is appropriate under Federal Rule of Civil Procedure 23(a) and (b). The Federal Rules provide that a class action may be maintained if Rule 23(a) is satisfied and if the provisions of Rule 23(b)(1), (b)(2), or (b)(3) are satisfied. Fed. R. Civ.

P. 23(b). The court analyzed these Rules in its Preliminary Approval Order. (Doc. # 2614). It reaffirms its findings here. Specifically, the court finds that all of the prerequisites of Rule 23(a) and the requirements of (b)(2) and (b)(3) have been satisfied for certification of the settlement class for settlement purposes only.

With regard to Rule 23(a), Subscriber Plaintiffs easily satisfy the necessary elements of the Rule. The Damages Class, the Self-Funded Sub-Class, and the Injunctive Relief Class consist of tens of millions of members, a number that is so numerous that joinder of all members is impracticable. The alleged conspiracy at the heart of the Subscriber case implicates several questions of law and fact common to the settlement class. The claims of the settlement class representatives are typical of the claims of the absent settlement class members. And, the settlement class representatives and settlement class counsel have and will adequately and fairly protect the interests of the settlement class.

With regard to Rule 23(b), the proposed classes also satisfy the requirements of Rules 23(b)(2) and (b)(3). Subscriber Plaintiffs have alleged that the Settling Defendants engaged in a nationwide conspiracy and that the conspiracy affected each of the Injunctive Relief Class members in similar ways. The class claims involve common questions of law and fact. And, because the Settling Defendants are alleged to have acted on grounds generally applicable to the injunctive relief class, injunctive relief is appropriate with respect to the class under Rule 23(b)(2).

As to the damages class under Rule 23(b)(3), "[i]n addition to finding that common questions predominate over individual inquiries . . . the Court must find that the class action vehicle is superior to other available methods for adjudication." *In re Domestic Air Transp. Antitrust Litig*., 137 F.R.D. 677, 693 (N.D. Ga. 1991). Rule 23(b)(3) identifies four factors relevant to the superiority requirement: "(A) the Class Members' interests in individually controlling the

prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against Class Members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

With respect to factor (A), there are at least tens of millions of Settlement Class Members, which makes the class action device the only feasible method of resolving the claims against the Settling Defendants. Factor (B) also supports certification of the Damages Class. The Judicial Panel on Multidistrict Litigation ("JPML") explained at the outset of this matter that the actions "involve substantial common questions of fact relating to the state BCBS entities' relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity to exclusive service areas, among other restrictions." *In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d 1373, 1376 (J.P.M.L. 2012); *see* 28 U.S.C. § 1407. Moreover, since § 1407 centralization in this court, the court has overseen over nine years of substantial pretrial litigation and is confident in this finding. Factor C also favors certification. The JPML chose this court as a transferee court because it would "serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation" *Id*. Factor D, manageability of the class action, is of little relevance when a court is faced with certification of a settlement class. *See, e.g., In re Nat. Football League Players' Concussion Inj. Litig.*, 307 F.R.D. 351, 371 (E.D. Pa. 2015), *amended sub nom. In re Nat'l Football League Players' Concussion Inj. Litig.*, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd sub nom. In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410 (3d Cir. 2016), as amended (May 2, 2016).

Having carefully considered the factors set forth above, the court concludes that the Damages Class satisfies the relevant requirements of Rule 23(b)(3).

### B. The Settlement is Fair, Reasonable, and Adequate Under Rule 23(e)(2) and the *Bennett* Factors

Next, the court must determine whether the proposed settlement is fair, reasonable and adequate under Rule 23(e)(2). That rule subpart provides as follows:

> If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> > (A) the class representatives and class counsel have adequately represented the class;
> >
> > (B) the proposal was negotiated at arm's length;
> >
> > (C) the relief provided for the class is adequate, taking into account:
> >
> > > (i) the costs, risks, and delay of trial and appeal;
> > >
> > > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > >
> > > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > >
> > > (iv) any agreement required to be identified under Rule 23(e)(3); and
> >
> > (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

In addition to Rule 23(e)(2), courts in the Eleventh Circuit also consider the following six factors when assessing the fairness of a settlement: 1) the likelihood of success at trial; 2) the range of possible recovery; 3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable; 4) the complexity, expense, and duration of the litigation; 5) the substance and amount of opposition to the settlement; and, 6) the stage of proceedings at which settlement was achieved. *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1273 (11th Cir.), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431 (2021), and *cert. denied sub nom. Watkins v. Spector*, 142 S. Ct. 765 (2022) (quoting *Bennett v. Behring Corp.*, 737 F.2d

982, 986 (11th Cir. 1984)); *see also Carroll v. Macy's, Inc*., 2020 WL 3037067, at *5 (N.D. Ala. June 5, 2020).

### 1. Class Members Were Adequately Represented

Subscriber Class Representatives here "share the same interests as absent class members, assert claims stemming from the same event [, which] are the same or substantially similar to the rest of the class, and share the same types of alleged injuries as the rest of the class." *In re Equifax Inc. Customer Data Sec. Breach Litig*., 2020 WL 256132, at *5 (N.D. Ga. Mar. 17, 2020), *aff'd in part, rev'd in part & remanded on other grounds* 999 F.3d 1247 (11th Cir. 2021). Subscriber Class Representatives have demonstrated their adequacy by working collaboratively with well-qualified counsel who are highly experienced and capable in the fields of class action and antitrust litigation. Class Counsel have litigated scores of these cases to resolution, and are recognized as top authorities in their field. And, Class Counsel have vigorously, professionally, and successfully litigated this extremely hard-fought case for nine years.

Self-Funded Sub-Class Counsel have also vigorously represented the interests of the Self-Funded Sub-Class since joining the settlement process. To ensure that any potential settlement was fair, the Self-Funded Sub-Class Counsel obtained significant discovery materials, retained their own experts, and conducted their own searching analysis of the claims and defenses in this case. (*Id.*).

The court is well-acquainted with Class Counsel's performance in this case. It has spent scores of hours with them and observed their work. The court has no hesitation in concluding that they have more than adequately represented the Settlement Classes in accordance with Rule 23(e)(2)(A).

### 2. The Settlement Was Negotiated at Arm's Length

Rule 23(e)(2)(B) requires the court to determine whether a proposed settlement "was negotiated at arm's length." Relatedly, one of the *Bennett* factors requires the court to rule out the possibility of fraud or collusion behind a class settlement. *Leverso v. SouthTrust Bank of Ala., Nat. Assoc.*, 18 F.3d 1527, 1530 (11th Cir. 1994).

As this court previously discussed, this was by no means a quick resolution. There is absolutely no evidence of any collusion. The Settlement was extensively negotiated over the course of five years with the assistance of experienced mediators and with input from a number of subject matter experts. The parties experienced multiple impasses and worked diligently to navigate those difficult decisions. Moreover, only after reaching agreement on the terms of the relief for the Classes did the parties even begin to negotiate attorneys' fees for Class Counsel. Under the terms of the Settlement, the payment of fees does not impact the amount of relief available to Class Members. Moreover, the court's Special Master, Ed Gentle, who helped the parties reach the ultimate agreement, has submitted a declaration attesting to the fact that there was no collusion involved. (Doc. # 2610-12). The court is more than satisfied that the Settlement was negotiated at arm's length, and there was no collusion.

### 3. The Relief Provided to the Classes Is Adequate

As explained more fully below, the court concludes that a review of the Rule 23(e)(2)(C) factors weighs heavily in favor of granting final approval to the Settlement.

#### a. The Significant Costs, Risks, and Delay of Trial and Appeal

The Settlement provides immediate and substantial benefits to tens of millions of Class Members. The antitrust claims and defenses before the court are complex. Although this litigation has been pending for nine years, and the parties have spent more than enough time litigating to

fully evaluate the case, much remains to be done on the litigation track. If there is no resolution, there will be expensive and hard fought litigation for more years in this court, transferor courts, and appellate courts. This court would be able to try the accelerated Alabama cases. But there are forty-one subscriber cases. Absent a settlement, most of those will be remanded to transferor courts and the parties will be faced with many years of further litigation. *See In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (noting that complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive"). The history of this litigation demonstrates that continued litigation in Alabama and in dozens of other jurisdictions would be costly, risky, and protracted.

Although the parties have litigated substantial motions, it could still be some years before the court and the parties are in a position to set even the accelerated Alabama cases for trial. In the accelerated Alabama actions, in relation to the class certification motion, Subscriber Plaintiffs have presented a sophisticated damages model estimating impact and damages based on the potential of entry by Blue and Green competitors into Alabama. This but-for world constructed by Subscriber Plaintiffs' experts involves a complex modeling of factors estimating the impact of the entry of competition within the market, including estimated profitability of entry, timing of entry, type of entry, strength of entry, progression of entry, competitive responses to entry, and the effects of entry on competition. Plaintiffs' experts then modeled an estimate of damages.

Defendants' experts have aggressively challenged Subscriber Plaintiffs' damages model and vigorously attacked Subscriber Plaintiffs' proposed findings and their experts' calculations. Without a settlement, the court will be required to consider contested class certification motions, and complicated motions regarding the admissibility of the parties' respective experts. One side or the other (if not both) is likely to appeal whatever decision the court makes on the class certification

and *Daubert* motions. Even if Subscriber Plaintiffs were to succeed in certifying a damages class for Alabama and an injunctive relief class, they would still need to prove their claims and damages at trial. Furthermore, one side or the other is likely, absent a settlement, to appeal the outcome of any trial.

If the parties continue to litigate these cases, they would be required to devote significant time and enormous resources to these cases. There is simply no guarantee that Subscriber Plaintiffs would recover a final judgment more favorable than the considerable $2.67 billion in monetary relief and the injunctive relief secured by the Subscriber Plaintiffs in the Settlement. There is certainly a range on the spectrum of outcomes wherein they could do worse. Therefore, the court concludes that the "costs, risks, and delay of trial and appeal," Fed. R. Civ. P. 23(e)(2)(C)(i), strongly support final approval.

### b. The Method of Distributing Relief to the Class Is Effective

The parties' proposed method of processing the Settlement Class Members' claims and distributing relief to eligible claimants is efficient and effective. The Plan of Distribution will efficiently calculate the value of millions of claims based on data available from the Settling Defendants, rather than requiring every Authorized Claimant to provide years of information about their premium amounts and actual contribution percentages. Every Damages Class member is given an opportunity to make a claim, and if an Authorized Claimant does not agree with the Default option, that claimant can provide additional information in support of an Alternative option, which will be reviewed and adjudicated by the Settlement Administrator.

Class Counsel have retained JND to process claims. JND has a proven track record and has been chosen as the administrator in a number of large, complex, and high-profile class action

settlements.[15] Class Counsel is also seeking appointment of the Honorable Irma E. Gonzalez (Ret.) as Settlement Administrator to adjudicate any challenges to claim determinations. Judge Gonzalez is a distinguished retired jurist who has continued to make substantial contributions to the law since leaving the bench. The court finds that the method of distributing relief to the Class Members is effective.

### c.    The Requested Attorney's Fees Are Reasonable

Settlement Class Counsel have requested a combined fee and expenses award from the $2.67 billion-dollar common fund of 25%. (Doc. # 2733-1 at 4). Settlement Class Counsel also intend to apply for up to $7 million from the Notice and Administration Fund to "reimburse plaintiffs' counsel's actual and reasonable fees and expenses incurred for Notice and Administration." (Doc. # 2610-2 ¶ 28(h)). This request for fees and expenses is in line with benchmarks set by the Eleventh Circuit and this court for fees alone. *See In re Equifax*, 2020 WL 256132, at *31 ("Typically, awards range from 20% to 30%, and 25% is considered the 'benchmark' percentage."); *In re Equifax*, 999 F. 3d at 1281 (citing favorably to similar authority); *Faught v. Am. Home Shield Corp*., 668 F.3d 1233, 1243 (11th Cir. 2011) (noting "well-settled law from this court that 25% is generally recognized as a reasonable fee award in common fund cases.").

As noted above, in addition to the requested fees being reasonable, the payment of the requested fee award does not in any way affect the amount of relief available to Class Members. Finally, there are no agreements required to be identified by Rule 23(e)(3). Accordingly, the requirements of Rule 23(e)(2)(C) are satisfied.

---

[15] For example, JND administered the settlement in *In re Equifax Inc. Customer Data Security Breach Litigation*, 999 F.3d 1247 (11th Cir. 2021), valued by plaintiffs' counsel in excess of $1.3 billion.

### 4.    Class Members Are Treated Equitably Relative to One Another

Under Rule 23(e)(2)(D), courts must consider "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *See* Fed. R. Civ. P. 23 Advisory Committee's note to 2018 amendment; *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *27 (E.D.N.Y. Dec. 16, 2019). The allocation in the settlement between Class Members was negotiated at arm's length under the auspices of Ken Feinberg, the country's leading authority on allocations of large settlements and compensation funds. Feinberg -- who has worked on such matters as the September 11th Victim Compensation Fund, the Troubled Asset Relief Program, and the BP Deepwater Horizon Disaster Victim Compensation Fund, to name just a few -- confirmed that the allocation is reasonable. (*See* Doc. # 2610-8).

With respect to damages, the Plan of Distribution accounts for the differing risks and claim strengths for different Class Members; therefore, it ensures, to the greatest reasonably practicable extent, that Class Members are treated equitably. *See Fitzgerald v. P.L. Mktg., Inc.*, 2020 WL 3621250, at *9 (W.D. Tenn. July 2, 2020) (finding this Rule 23(e)(2) factor to favor approval where distribution took into account the greater risks some class members faced). The Plan of Distribution distinguishes between Fully Insured Claimants, who purchased insurance from Defendants, and Self-Funded Sub-Class Claimants, who purchased administrative services only. Under the Plan, Fully Insured Claimants are allocated 93.5% of the settlement, while Self-Funded Sub-Class Claimants are 6.5%.

Feinberg concluded that distributing 93.5% of the Net Settlement Fund among Fully Insured Claimants and the remaining 6.5% of the Net Settlement Fund among Self-Funded

Claimants constituted a reasonable allocation of the Net Settlement Fund. (Doc. # 2610-8 ¶ 6). In Feinberg's opinion, the proposed FI/Self-Funded Allocation "treats class members equitably relative to each other" as is required by Rule 23(e)(2)(D). (*Id.* ¶ 13). As Feinberg explained:

> [T]he proposed FI/Self-Funded Allocation meets [the Rule 23(e)(2)(d) standard], for multiple reasons. First, the negotiated number falls towards the low end of Self-Funded Settlement Sub-Class Counsel's estimate, and the high end of Settlement Class Counsel's estimate. In any negotiation, absent unusual factors, one would expect an outcome in that range. Second, the relative size of the Self-Funded Claimants' share makes sense given the statute of limitations and premiums vs. administrative fees issues discussed above. And finally, although not necessary to my decision, the fact that the division resulted from protracted negotiations between sophisticated counsel also supports its reasonableness. I note that some of the injunctive relief in the Settlement Agreement (such as direct contracting with vendors for self-funded accounts, ¶ 12; and the Second Blue Bid, ¶ 15) applies exclusively to Self-Funded Accounts, rather than to Individual Members and Insured Groups. My conclusion that the Settlement's allocation of relief is equitable for Self-Funded Accounts is only strengthened by this additional injunctive relief, which applies solely to those Class Members.

(Doc. # 2610-8 ¶¶ 14-15).

At the Fairness Hearing, Class Counsel and Self-Funded Sub-Class Counsel reiterated that the allocation agreement was the product of a multi-month, vigorous negotiation. (*See* Doc. # 2685 at 124, 135). A guiding principle in these matters is that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *8 (N.D. Cal. Mar. 18, 2013) (quoting *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009)). "The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *In re Omnivision Techns., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2009) (quoting *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979)); *see also In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007). But, the court fully understands its role under Rule 23 to ensure fairness, adequacy, and reasonableness.

The outcome of this hard-fought negotiation was an economically reasonable allocation, as confirmed by Dr. Joseph Mason, who is an experienced antitrust economist, a chaired professor at LSU, and a fellow at the Wharton School at the University of Pennsylvania. (Doc. # 2825-1). Dr. Mason explains that "one would expect the apportionment of settlement proceeds between the Subscriber Class and the Self-Funded Sub-Class to reflect the relative share of overcharges borne by Fully-Insured and ASO plans, respectively, during the relevant class periods." (*Id.* ¶ 30). To approximate these overcharges, Dr. Mason examined four proxies: relative gross revenue, net revenue, operating gain differential, and growth in net revenue components per member for ASO and Fully-Insured products. (*Id.* ¶¶ 30-31). Using these four proxies, the implied settlement allocations for the Self-Funded Sub-Class were, respectively, 1.7%, <10.7%, <3.9-6.3%, and 3.4-3.8%. Thus, Dr. Mason's proxies demonstrate that a 6.5% allocation for the Self-Funded Class is fair, adequate, and reasonable.

Also, as Dr. Mason has explained, "ASO subscribers purchase from a more competitive market than Fully-Insured subscribers." (*Id.* ¶ 22). For some Blues, fully insured business runs anywhere from as much as four to ten times more profitable than ASO business. (*See* Docs. # 2868-1; 2868-2; 2812-12 at 3). And, for others, ASO business may be break-even or even serve as a loss leader. (*See* Docs. # 2868-3; 2868-4; 2868-5; 2868-6; 2868-7). Because of the availability of substitute products -- such as other third party administrators, the option to administer healthcare plans in-house, and the existence of large national health plan administrators -- the ASO market is significantly more competitive than its counterparts. (*See* Doc. # 2865 at 41-44).

Moreover, the allocation is justified by the different time periods for the classes and the uncertainty regarding litigation outcomes. (Doc. # 2825-1 ¶¶ 30 n.49; 33-35). The Fully Insured

Class Period spans twelve and a half years while the Self-Funded class spans five years.[16] Because the ASOs did not become involved in the lawsuit until late 2019, they did not face the same litigation perils and expenses as the rest of the Class. Therefore, a discount factor is appropriate in assessing their portion of the settlement as such a discount reflects "the expected amount of time that would elapse before a litigation or settlement payment is made[,] as well as the risk associated with that payment." (*Id.* ¶ 35). Here, according to Dr. Mason, a "conservative" discount factor would be no less than 50%. (*Id.*).

Finally, every class member is subject to the same release, and the release does not affect the apportionment of relief to other Class Members.

In light of all of these factors, the court finds that the Settlement Agreement treats Class Members equitably.

### 5. The Proposed Settlement is Fair, Adequate, and Reasonable Under the Remaining *Bennett* Factors

"[I]n order to approve a settlement, the district court must find that it 'is fair, adequate, and reasonable and is not the product of collusion between the parties.'" *Bennett*, 737 F.2d at 986 (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). A settlement is fair, reasonable, and adequate when "the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *In re Lorazepam & Clorazepate Antitrust Litig.*, MDL No. 1290, 2003 WL 22037741, at *2 (D.D.C. June 16, 2003) (quoting *Manual for Complex Litig.* (Third) § 30.42 (1995)). In evaluating a proposed settlement, the court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class

---

[16] "'Settlement Class Period' means February 7, 2008, through the Execution Date, except for the Self-Funded Accounts, for whom the Settlement Class Period is September 1, 2015 through the Execution Date." (Doc. # 2610-2 ¶ 1(nnnn)).

members will receive as much from a settlement as they might have recovered from victory at trial." *In re Checking Acct. Overdraft Litig.*, 2020 WL 4586398, at *8 (S.D. Fla. Aug. 10, 2020), *aff'd sub nom. In re Checking Account Overdraft Litig.*, 2022 WL 472057 (11th Cir. Feb. 16, 2022) (quoting *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000) (citations omitted)).

> **a.     Likelihood of Success at Trial and Complexity, Expense, and Duration of the Litigation**

The court considers the first and fourth *Bennett* factors together. Throughout this case, Defendants have vigorously disputed liability and have pressed a number of affirmative and other defenses. In order to proceed to trial, the parties would have to initially devote significant time to briefing class certification motions and motions to exclude expert testimony. Preparation for trial would involve a slew of new motions and require months of intense work. Even assuming that Plaintiffs prevail at trial, they may not establish damages in the amount of the monetary relief in the Settlement. Finally, if Plaintiffs did prevail at trial, they would certainly face a protracted appellate process.

Counsel have invested over 444,000 hours of attorney time to litigate this case and have made significant investments in expenses. This case has been (and would continue to be) incredibly complex, expensive, and time-consuming. When this reality is combined with the uncertainty of recovery, it is clear that a range of possible recovery includes amounts that are far less than the amount agreed to in the Settlement.

Here, the Settlement provides significant relief to Settlement Class Members. At $2.67 billion, the Settlement represents one of the largest antitrust class settlements in history. And even if the monetary benefit that is actually distributed between Settlement Class Members is not in an amount that a lay observer might expect, as discussed more fully below, the injunctive aspects of

the Settlement significantly alter the Blues' business practices and substantially increase the value of the Settlement to the Class Members.

To be clear, the dollar amount of the Settlement is substantial. But, to put it in a context of expected outcomes, Subscriber Plaintiffs' expert Ariel Pakes calculated an overcharge ranging from 3.4% to 5.5% for Alabama class members. (Doc. # 2411-1 ¶ 10). In extrapolating the Alabama damages model nationwide through 2019, Dr. Pakes, estimated Subscriber damages as ranging from $18.6 billion to $36.1 billion. (Doc. # 2610-11 ¶ 10). A recovery of $2.67 billion represents 7.3% to 14.3% of that estimated damage range, which easily falls within the range of reasonable recoveries. *See Bennett*, 737 F.2d at 986-87 & n.9 (approving $675,000 settlement representing 5.6% of claims with maximum potential recovery of $12,000,000); *In re Checking Account Overdraft Litig*., 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) ("[S]tanding alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims."). The bottom line is this: this financial settlement is one of the largest ever in history, particularly considering that this is a private enforcement settlement.

As significant as the monetary amount of $2.67 billion is, the truly exceptional aspect of this settlement is the structural relief agreed upon. The business practice changes established in the Settlement are significant and are designed to enhance competition going forward. (Doc. # 2610-10 ¶ 37). Subscriber Plaintiffs have explained that the Settlement Agreement remedies the most significant of those restraints by abolishing the National Best Efforts revenue cap and establishing the Second Blue Bid for Qualified National Accounts. In doing so, the settlement will provide for materially greater competition in the field of health care financing. (Doc. # 2610-1 at 52 n.31). To put the value of the negotiated injunctive relief in context, during the litigation phase, Dr. Pakes

estimated "that NBE accounted for 97 percent of the total damages in the case." (Doc. # 2626 at 160).

"In a case where experienced counsel represent the class, the Court 'absent fraud, collusion, or the like, should hesitate to substitute its own judgment for that of counsel.'" *Ingram v. The Coca-Cola Co*., 200 F.R.D. 685, 691 (N.D. Ga. 2001) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).[17] In light of Class Counsel's qualifications, which include substantial experience litigating MDLs, class actions, and other complex cases, the court "has confidence in their collective judgment that the benefits of this settlement far outweigh the delay and considerable risk of proceeding to trial." *Ingram*, 200 F.R.D. at 691. The relief secured by the Subscriber Plaintiffs with this Settlement—both monetary and non-monetary—reflects an excellent result for the Settlement Classes and plainly falls within the range of reasonableness contemplated by these factors.

### b. The Stage of the Proceedings/Development of the Factual Record

The second and third *Bennett* factors are "easily combined and normally considered in concert." *Camp v. City of Pelham*, 2014 WL 1764919, at *3 (N.D. Ala. May 1, 2014). "The law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992). The *Bennett* factors require a court to consider whether "the case settled at a stage of the proceedings where class counsel had sufficient knowledge of the law and facts to fairly weigh the benefits of the settlement against the potential risk of continued litigation." *In re Equifax*, 2020 WL 256132, at *10.

---

[17] The United States Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (1981).

Here, Plaintiffs conducted exhaustive discovery. They obtained and reviewed over 75 million pages of documents and over 100 terabytes of data, took over 100 depositions, and worked extensively with experts on liability and damages analyses. Plaintiffs have had ample opportunity to investigate the facts and law to obtain substantive rulings from the court. Thus, it is clear that the factual record in this matter was sufficiently developed to allow Class Counsel to make a reasoned judgment as to the merits of the settlement. *See Swaney v. Regions Bank*, 2020 WL 3064945, *5 (N.D. Ala., June 9, 2020) (holding that settlement was appropriate where the parties "have litigated this case for over seven years, through dispositive motions" and "have had the opportunity to investigate the facts and law, review substantive evidence relating to the claims and defenses, and brief the relevant legal issues"). The court is satisfied that Class Counsel were able to adequately evaluate the desirability of the settlement as opposed to continuing with the litigation.

### 6.       The Substance and Amount of Opposition to the Settlement

In determining whether a proposed settlement is fair, reasonable, and adequate, the reaction of the class is an important factor. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 117-18 (2d Cir. 2005). Thus, a low percentage of objections as compared to the size of the class points to the reasonableness of a proposed settlement and supports its approval. *Bennett*, 737 F.2d at 986.

As of August 31, 2021, after direct notice was sent to over 100 million class members and after an extensive media and outreach campaign, JND had received 2,049 timely and valid exclusion requests  (opt-outs) and 40 timely objections from 123 Objectors. (Doc. # 2812-2 ¶ 95).[18] Over two months before the deadline to file a claim, JND had already received a total of 6,077,526 claims comprised of 177,687 claims on behalf of companies/businesses/entities, 1,381,112 claims

---

[18] Eighty-one of these Objectors, or 66% of all objectors, are represented by the same law firm.

from individuals reporting that they purchased health insurance directly from a BCBS Company, and 4,194,942 claims from employees. (*Id.* at ¶ 96). More than 99% of claims opted for the default option. (*Id.* at ¶ 97). As of May 10, 2022, after Supplemental Notice was issued to the Self-Funded Sub-Class, JND had received only thirty-nine timely exclusion requests and zero timely additional objections. (Doc. # 2914-1 at ¶ 27).

As one court has held, forty-one objections based on 8,822,803 notices mailed constitutes an infinitesimal ratio (.00050%) when compared to the millions of potential class members. *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005). Here, proportionally there actually are *far fewer* objections when comparing the relative sizes of the classes. And, as of the filing of the Motion for Final Approval of Class Settlement, over six million claims had been submitted by class members seeking to participate in the Settlement.

As courts in the Eleventh Circuit have explained, "[i]t is settled that '[a] small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness.'" *In re Checking Acct. Overdraft Litig.*, 2020 WL 4586398 at *15 (alteration in original) (quoting *Ass'n for Disabled Ams. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002)); *see also Ferron v. Kraft Heinz Foods Co.*, 2021 WL 2940240, at *12 (S.D. Fla., July 13, 2021) ("This Court, like others, considers the reaction of the Settlement Class to the proposed settlement to be an important indicator as to its reasonableness and fairness."). The miniscule number of opt-outs and objections to this proposed Settlement in comparison to the tens of millions of Class Members and the large number of claims filed, militates in favor of approval of the Settlement. *See, e.g., In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 355 (E.D.N.Y. 2000) (approving settlement based on small number of opt outs and objections in light of the "huge number of potential Class members and massive nationwide notice"); *Taifa v. Bayh*, 846 F. Supp.

723, 728 (N.D.Ind. 1994) (approving class settlement, and noting that objectors represent "little more than 10 percent" of the class).

## IV.     Objections to the Settlement

Federal Rule of Civil Procedure 23(e)(5)(A) affords class members who oppose a settlement the right to object. "Often times objectors play a beneficial role in opening a proposed settlement to scrutiny and identifying areas that need improvement." *In re Equifax*, 999 F.3d at 1257 (quoting David F. Herr, *Annotated Manual for Complex Litigation* § 21.643 (4th ed. 2021)) (internal quotation marks omitted)). All of the objections were publicly filed on the court's docket and are of record. (Docs. # 2812-19; 2812-20; 2812-21; 2812-22). Additionally, certain Objectors filed post-fairness hearing briefs further detailing their objections to the settlement. (Docs. # 2873; 2874; 2875; 2876).

On February 4, 2022, the court addressed the substance of certain objections related to the Second Blue Bid relief provided to certain Self-Funded Accounts and whether that relief should be properly construed as divisible injunctive relief under Federal Rule of Civil Procedure 23(b)(3). (Doc. # 2897). The court granted Subscriber Plaintiffs' Motion (Doc. # 2885) and provided the parties the opportunity to send Supplemental Notice to Self-Funded Accounts. In particular, the court ordered the Settlement Administrator to issue supplemental notice to Self-Funded Entity Accounts to make explicit that, if they opt out of the 23(b)(3) Class (sometimes referred to as the "Damages Class"), they retain the right not only to seek monetary damages, but also to seek individualized injunctive relief, which may include a Second Blue Bid or other such individualized injunctive relief, depending on the circumstances surrounding the Self-Funded Entity Account's claim. (Doc. # 2897). In ordering Supplemental Notice, the court overruled the objections to the Settlement relating to the inability to opt out of the Second Blue Bid injunctive relief. (*Id.*)

44

As discussed more fully below, after carefully considering the objections to the Settlement, the court has determined that none of the remaining objections cast any doubt on the fairness of the Settlement. Accordingly, the court overrules all of the remaining objections not already addressed in its February 4, 2022 Memorandum Opinion and Order Granting Motion for Supplemental Notice to Self-Funded Accounts. (Doc. # 2897).

The remaining objections to the Settlement can be broadly categorized as follows:

1. Whether the Settlement perpetuates conduct that the court already found to be *per se* illegal;

2. Whether the Settlement requires the court to issue an advisory opinion that the revised ESAs are lawful;

3. Whether the Settlement Improperly Releases Future Conduct;

4. Whether the allocation between the Subscribers and Self-Funded Sub-Class is fair;

5. Whether the Self-Funded class period should go back to 2008;

6. Whether the QNA Definition is too narrow or the requirements to obtain a Second Blue Bid are unreasonable;

7. Whether the Local Best Efforts Rule should be left intact;

8. Whether Tribal-related entities should be part of the Settlement;

9. Whether Attorney Fees are too high;

10. Whether the Settlement Monetary Relief is too low;

11. Whether the Self-Funded Sub-Class Counsel had a conflict; and

12. The Department of Labor's ERISA concerns.

(Docs. # 2812-19; 2812-20; 2812-21; 2812-22). The court addresses each category in turn.

## A.    Whether the Settlement perpetuates conduct that the court already found to be *per se* illegal

The Sperling/Sherrard Opt-Out Objectors and Home Depot Inc., U.S.A. ("Home Depot") contend that the Settlement should not be approved because doing so would perpetuate a *per se* violation of Section 1 of the Sherman Act. The court disagrees.

First, the premise of this objection is wrong. To the extent these objectors argue that the court already found ESAs to be *per se* illegal, they misread the court's standard of review opinion. The court did not find ESAs alone to be *per se* unlawful under *Sealy* and *Topco*.[19] (Docs. # 2812-19 at 17-20; 2812-20 at 43). In the April 5, 2018 Memorandum Opinion and Order Regarding Section 1 Standard of Review, the court held that "Defendants' [then] aggregation of a market allocation scheme *together with certain other output restrictions* is due to be analyzed under the *per se* standard of review. . . ." (Doc. # 2063 at 59) (emphasis added). In fact, the court did not even address ESAs alone. Rather, the court addressed the then-existing accumulation of alleged restraints.

Under *Bennett*, "unless the illegality of an arrangement under consideration is a legal certainty, the mere fact that certain of its features may be perpetuated is no bar to approval." *Bennett*, 737 F.2d at 987. *See also Fraley v. Batman*, 638 F. App'x 594, 597 (9th Cir. 2016) ("a district court abuses its discretion in approving a settlement only if the agreement sanctions 'clearly illegal' conduct.") (citing *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977) (approving an antitrust settlement over the objection that "it perpetuates for ten years two 'classic group boycotts' in violation of Section 1 of the Sherman Antitrust Act" because "the alleged

---

[19] *United States v. Sealy, Inc.*, 388 U.S. 350 (1967); *United States v. Topco Associates, Inc.*, 405 U.S. 596, 598 (1972).

illegality of the settlement agreement is not a legal certainty") (citing *Grunin v. International House of Pancakes*, 513 F.2d 114, 124 (8th Cir.), *cert. denied*, 423 U.S. 864 (1975))).

Furthermore, the court certified its standard of review decision -- and its conclusion about the legal effect of the aggregation of restraints -- for interlocutory appeal. (Doc. # 2023). In doing so, the court necessarily found that there is a substantial ground for difference of opinion as to its decision. 28 U.S.C. § 1292(b). If there is a substantial ground for a difference of opinion as to the legality of the aggregation of restraints, it follows that the alleged illegality of one of those restraints alone is not a legal certainty.

To be clear, this Settlement permits ESAs[20] to remain in place. But, that is not cause to reject final approval. *See Fraley*, 638 F. App'x at 594; *Robertson*, 556 F.2d at 686; *Bennett*, 737 F.2d at 987; *Grunin*, 513 F.2d at 123-24. After careful review, the court concludes that the arrangement that will exist upon implementation of the Settlement is not clearly illegal. Even more to the point, Defendants' Motion Regarding the Antitrust Standard of Review Applicable to Provider Plaintiffs' Section 1 Claims (Doc. # 2722) tees up the issue of whether ESAs alone constitute a *per se* violation of Section 1. That issue is more fully addressed in a Memorandum Opinion and Order on Defendants' Motion, which the court has entered contemporaneously with this Final Order and Judgment. In that Memorandum Opinion and Order the court concludes that it must apply the rule of reason analysis to those of Providers' claims that challenge the ESAs alone in the absence of a National Best Efforts Agreement.

---

[20] As the Blues note, "the use of the ESAs by the Blue system has been public knowledge for decades. Yet the federal agencies charged with enforcing our antitrust laws have chosen never to bring the claims brought by the Class Representatives and Subscriber Class Counsel in this case. Nor did any of the Objectors ever see fit to challenge the arrangement they now claim is 'clearly illegal,' even though it was public knowledge for decades before these lawsuits were filed. It is simply not tenable for the Objectors now to arrive on the scene claiming that the ESAs they have been living with for decades are 'clearly illegal,' thus barring final approval of the Settlement." (Doc. # 2812-1 at 83).

As the court's opinion on that motion concludes, there have been material changes to the Blues' going-forward system which add significant procompetitive features. In light of these changes, and the uncertainty which impelled the court to certify its 2018 standard of review ruling under § 1292(b), the court concludes that the post-settlement Blue system will not be clearly illegal.[21]

Therefore, the objection asserting that the Settlement perpetuates a *per se* violation of Section 1 of the Sherman Act is **OVERRULED**.

**B.** **Whether the Settlement requires the court to issue an advisory opinion that the revised ESAs are lawful**

Home Depot also objects to the Settlement to the extent its approval may contain an advisory opinion regarding the legality of the going-forward Blues system. (Doc. # 2812-20 at 33). The National Account, Church Plan, and Taft-Hartley Objectors have made similar arguments. (Doc. # 2812-19 at 15-21). Subscribers respond by noting that "the [c]ourt need only satisfy itself that the arrangement left intact under the Settlement is not 'clearly illegal.'" (Doc. # 2812-1 at 83) (citing *Bennett*, 737 F.2d at 987).

The Settlement Proponents' draft order approving the Settlement contains a section regarding the Standard of Review which reads:

Standard of Review.

21.     The Court finds that its April 5, 2018 Memorandum Opinion Regarding Section 1 Standard of Review and Single Entity Defense (ECF No. 2063) and the accompanying Order (ECF No. 2064) no longer apply to the Blue System, as revised by this Settlement Agreement.

---

[21] The sum and substances of the Objectors' arguments appears to be that the post-settlement changes to the Blue System do not render the system clearly legal. That is not the test. Over the years, the courts have settled on the "clearly illegal" standard because it best comports with the policy favoring settlements.

(Doc. # 2812-17 at 11). However, the court is not required to adopt any proposed Order and has conducted its own, independent analysis of the Settlement. Moreover, even the proposed Order does not suggest that the court issue an advisory opinion.

In the Preliminary Approval Order, the court noted that:

> The proposed Settlement currently under consideration alters Defendants' business model. The Settlement eliminates the National Best Efforts revenue cap[]. [T]he elimination of that policy is a significant change that the court preliminarily finds will drastically alter the forward-looking landscape such that the court's standard of review opinion would no longer apply. Of course, the Settlement does not change the facts as they existed during the class period.

(Doc. # 2641 at 48). The court need not say more. Indeed, to do so would actually involve issuing an advisory opinion on the merits of issues that are not currently before the court. In reviewing a class action settlement, the court does not "have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute." *United States v. Alabama*, 271 F. App'x 896, 902 (11th Cir. 2008) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)); *see also Fraley*, 638 F. App'x at 597 ("When approving a settlement, a district court should avoid reaching the merits of the underlying dispute.") (citing *Isby v. Bayh*, 75 F.3d 1191, 1198 (7th Cir. 1996)).

Therefore, Home Depot's objection relating to an advisory opinion is **OVERRULED**. Nonetheless, as noted above, in ruling on Defendants' Motion Regarding the Antitrust Standard of Review Applicable to Provider Plaintiffs' Section 1 Claims (Doc. # 2722), the court was called upon to directly address the issue of whether ESAs alone constitute a *per se* violation of Section 1 in deciding a fully briefed Rule 56 Motion. In the court's Memorandum Opinion and Order on that Motion, which has been entered contemporaneously with this Final Order and Judgment, the court concludes that it must apply the rule of reason analysis to Providers' claims based on ESAs alone.

## C. Whether the Settlement improperly releases future conduct

Home Depot also objects to the scope of the proposed release provision of the Settlement Agreement. Home Depot argues that the release is impermissible because it requires members of the injunctive relief class to release future claims for injunctive and equitable relief. (Doc. # 2812-20 at 19). Building on that objection, Home Depot further argues that public policy forbids such a prospective release of a private party's right to enforce the antitrust laws against future conduct. (*Id*. at 22). That objection is off the mark.

The Settlement Agreement defines "Released Claims" as follows:

"Released Claims" means any and all known and unknown claims, causes of action, cross-claims, counter-claims, charges, liabilities, demands, judgments, suits, obligations, debts, setoffs, rights of recovery, or liabilities for any obligations of any kind whatsoever (however denominated), [] known or unknown, suspected or unsuspected, asserted or unasserted, direct or derivative, *based upon, arising from, or relating in any way to: (i) the factual predicates of the Subscriber Actions (including but not limited to the Consolidated Amended Class Action Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) any issue raised in any of the Subscriber Actions by pleading or motion; or (iii) mechanisms, rules, or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10 through 18 approved through the Monitoring Committee Process during the Monitoring Period.* Nothing in this Release shall release claims, however asserted, that arise in the ordinary course of business and are based solely on (i) whether a particular product, service or benefit is covered by the terms of a particular Commercial Health Benefit Product, (ii) seeking resolution of a benefit plan's or a benefit plan participant's financial responsibility for claims, based on either the benefit plan document or statutory law, or (iii) challenging a Releasee's administration of claims under a benefit plan, based on either the benefit plan document or statutory law. Any claim, however asserted, (i) that a product, service, or benefit should be or should have been covered, but was not covered, (ii) seeking resolution of a benefit plan's or benefit plan participant's financial responsibility for claims, or (iii) challenging a Releasee's administration of claims under a benefit plan, based in whole or in part on the factual predicates of the Subscriber Actions or any other component of the Released Claims discussed in this Paragraph, is released. Notwithstanding any other provision of this Agreement, a Provider who is a Settlement Class Member as defined in this Agreement does not release any claims arising from his, her or its sale or provision of health care products or services (as opposed to the purchase of a Commercial Health Benefit Product). Settling Defendants agree not to raise Providers' releases under this Agreement as

a defense to Providers' claims brought in their capacity as Providers of health care products or services in MDL No. 2406. For purposes of clarity, Released Claims include, but are not limited to, claims that arise after the Effective Date.

(Doc. # 2610-2 ¶ uuu) (emphasis added).

Paragraphs 10 through 18 of the Settlement Agreement describe the "Class Injunctive Relief." (*Id.* at ¶¶ 10-18). Paragraph 20 provides:

> 20.    <u>Monitoring and Reporting</u>. During the Monitoring Period, BCBSA may advise Settlement Class Counsel, Self-Funded Sub-Class Settlement Counsel, and the Monitoring Committee of BCBSA Board actions to be taken adopting rules or regulations that are within the scope of Paragraphs 10-18. The communications shall remain Confidential. During the Monitoring Period, Settlement Class Counsel, Self-Funded Sub-Class Settlement Counsel, and Settlement Class Members will report to the Monitoring Committee any and all disputes related to the Agreement, and Settling Defendants will report drafts of new rules or measures for approval under Paragraphs 10 through 18 to the extent Settling Defendants advise of such potential rules or measures and disputes related to obligations created by this Agreement. Any reporting obligation and the authority of the Monitoring Committee shall cease at the conclusion of the Monitoring Period.

(Doc. # 2610-2 ¶ 10). Under paragraph 20, the Monitoring Committee is charged with reviewing actions to be taken by the BCBSA Board and "adopting rules or regulations that are within the scope of Paragraphs 10-18," *i.e.*, actions taken relating to the equitable relief provisions of the Settlement. (Doc. # 2812-1 at 88).

The "Released Claims and Covenant Not to Sue" provision of the Settlement Agreement provides:

> 32.    <u>Released Claims and Covenant Not to Sue</u>. In addition to the effect of any final judgment entered in accordance with this Agreement, upon the Effective Date as set out in Paragraph 8, and in consideration of the Injunctive Relief and payment of the Settlement Amount into the Settlement Fund, and for other valuable consideration, the Releasors shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against any and all of the Releasees. Persons or entities in both the Injunctive Relief Class and the Damages Class release all Released Claims. Persons or entities in the Injunctive Relief Class but not the Damages Class, release only claims for equitable or injunctive relief, provided that persons or entities that are within the definition of the Damages Class release any claims for damages that may be asserted by persons or entities

(including dependents and beneficiaries) who claim by, for, under, or through a Damages Class member or the Commercial Health Benefit Product that a Damages Class member purchased, was covered by, or was enrolled in.

*The Parties intend that the releases in this Agreement be interpreted and enforced broadly and to the fullest extent permitted by law.* Each Releasor shall be deemed to have released all Released Claims against the Releasees regardless whether any such Releasor ever seeks or obtains by any means, including without limitation through the Claim Process, any distribution from Settlement Fund. Class Representatives and Settling Defendants acknowledge, and Settlement Class Members shall be deemed by operation of the Final Judgment and Order of Dismissal to have acknowledged, that the foregoing waivers and releases were separately bargained for and a key element of the settlement of which these releases are part.

(Doc. # 2610-2 at 48-49) (emphasis added).

Thus, three categories of claims (including future claims) are released under these provisions. These categories include claims arising from:

> (i)      *the factual predicates of the Subscriber Actions* (including but not limited to the Consolidated Amended Class Action Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date;

> (ii)     *any issue raised in any of the Subscriber Actions* by pleading or motion; or

> (iii)    *mechanisms, rules, or regulations* by the Settling Individual Blue Plans and BCBSA *within the scope of Paragraphs 10 through 18* approved through the Monitoring Committee Process during the Monitoring Period.

(*Id.* at ¶ uuu) (emphasis added).

Home Depot argues that "[u]nder the third category of released claims, the proposed monitoring process may add newly-adopted restrictions to the [scope of the] release." (Doc. # 2812-20 at 21). That is, Home Depot asserts that the release "expands to cover restrictions not currently in effect" because for five years, if the Monitoring Committee reviews a newly-adopted rule or regulation relating to the Subscriber Settlement's injunctive relief provisions and decides

it is consistent with the Settlement's injunctive relief provisions, claims regarding any such regulations will be included within the release. (*Id.*).

Subscribers respond that "[t]he Monitoring Committee is not empowered to approve, much less immunize from antitrust scrutiny, any new restraints, new arrangements, or future conduct adopted by the Blues that are not within the scope of the matters addressed in the provisions of the Settlement Agreement[.]" (Doc. # 2812-1 at 88). They argue that "[t]o be barred by the release [] any such future claims would have to arise from continued adherence to the existing arrangements that are 'the factual predicates of the Subscribers Actions' or other prongs of the release." (Doc. # 2812-1 at 92 n.41). They further point out that "[w]ere the Defendants to enter into a new agreement or to adopt a new arrangement, a future plaintiff would not be foreclosed from asserting a new antitrust violation arising under that agreement." (*Id.*).

"Although it is well established that 'federal class action settlements routinely include releases waiving future claims,'[] only those claims that arise from an 'identical factual predicate' as the settled litigation may be released by the terms of a class action settlement agreement." *In re Managed Care Litig.*, 2008 WL 11333988, at *5 (S.D. Fla. Apr. 21, 2008), *report and recommendation adopted*, No. 00-1334-MD, 2008 WL 11333876 (S.D. Fla. May 14, 2008) (citing *Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 471 n.10 (S.D. Fla. 2002) ("[F]ederal class action settlements routinely include releases waiving future claims.")); *see also McClendon v. Georgia Dep't of Cmty. Health*, 261 F.3d 1252, 1254 (11th Cir. 2001) (approving release of future claims in tobacco litigation); *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 239 (5th Cir. 1982) (noting that a release of future claims is an important element of antitrust class settlements); *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 95-96 (2d Cir.), *cert. denied sub nom. Bowes v. Melito*, 140 S. Ct. 677, 205 L. Ed. 2d 440 (2019) ("'The law is well established

in [the Second] Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct.'") (quoting *Wal-Mart Stores*, 396 F.3d at 107, in turn quoting *TBK Partners, Ltd. v. W. Union Corp*, 675 F.2d 456, 460 (2d Cir. 1982)); *Williams v. General Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 274 (7th Cir. 1998) ("It is not at all uncommon for settlements to include a global release of all claims past, present, and future, that the parties might have brought against each other.").

Subscribers argue that, here, "[t]o be barred by the release [] any such future claims would have to arise from continued adherence to the existing arrangements that are 'the factual predicates of the Subscribers Actions' or other prongs of the release" (Doc. # 2812-1 at 92 n.41), and that "an action [by the Blues] is covered by the release only if that action implements the relief that the Settlement provides." (Doc. # 2812-1 at 89).

The court agrees that the only new rules and regulations that may be subject to the release are those based on an identical factual predicate and related to the injunctive relief provided by Paragraphs 10 through 18 of the Settlement Agreement. Any new agreement or anticompetitive restraint that is above and/or beyond those within the scope of the Settlement is not released and can be subject to a legal challenge.

Objectors next argue that public policy prohibits the prospective release of future claims. That is a true statement in the most general sense, but the Objectors' argument is nevertheless off target. In the area of antitrust, there is "considerable caselaw stand[ing] for the proposition that public policy considerations differ when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint on trade." *In re Managed Care Litig.*, 2010 WL 6532982, at *12 (S.D. Fla. Aug. 15, 2010), *report and recommendation adopted*, 2011

WL 1522561 (S.D. Fla. Mar. 8, 2011) (citing *Madison Square Garden, L.P. v. Nat'l Hockey League*, 2008 WL 4547518, at *8-9 (S.D.N.Y. Oct. 10, 2008) (rejecting defendant's argument that enforcement of the release would violate public policy surrounding antitrust claims where "the cases on which [the party] relies to support its public policy argument ... involve either releases that purport to bar claims based on future violations, *i.e.*, truly 'new and distinctive incidents', or subsequent conduct by the defendant that goes beyond what was released in the first instance," and finding "considerable support in the caselaw for the distinction relied upon here, namely that the public policy considerations differ when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint") (internal citation omitted) and *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 161 F.3d 443, 448 (7th Cir. 1998) (taking a functional approach to the question of enforceability, the court found the conduct "clearly based" on pre-release conduct and thus enforced the release, while acknowledging that a "new, post-release agreement" in restraint of trade may be actionable, but noted that mere "continued adherence" to an alleged pre-released agreement" in restraint of trade could not give rise to a viable claim)).

Cases finding releases void due to public policy "largely contemplate impermissibly broad releases that released all types of claims, including 'future' entirely unrelated antitrust claims not circumscribed to an identical factual predicate or to claims that arose out of the alleged conduct or related conduct that could have been alleged[.]" *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *26 (citing *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 575-76, 78 (E.D. Pa. 2001) (finding a release too broad because it released future claims based not only on past conduct but also on future conduct which did not form the basis of the litigation) and *Madison Square Garden*, 2008 WL 4547518, at *8-9).

Because any released claim here would by definition arise from continued adherence to the existing arrangements that are "the factual predicates of the Subscribers Actions" or the injunctive relief provided under the Agreement, the cases cited by Home Depot are inapposite, and its objections relating to the scope of the release are **OVERRULED**.[22]

### D.   Whether the allocation between the Subscribers and Self-Funded Sub-Class is fair

A plan of distribution should be approved when it allocates relief in a way that is "fair, adequate, and reasonable." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d at 241; *see also Holmes v. Cont'l Can Co*., 706 F.2d 1144, 1147 (11th Cir. 1983); *Leverso*, 18 F.3d at 1530; *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1328 n.2 (S.D. Fla. 2001); *Bellocco v. Curd*, 2006 WL 4693490, at *2 (M.D. Fla. Apr. 6, 2006); *Smith v. Floor and Decor Outlets of Am., Inc*., 2017 WL 11495273, at *5 (N.D. Ga. Jan. 10, 2017). A plan of distribution will pass muster so long as "it has a 'reasonable, rational basis,' particularly if 'experienced and competent' class counsel support it." McLaughlin On Class Actions, § 6.23 (17th ed. 2020); *see also Schwartz v. TXU Corp*., 2005 WL 3148350, at *21 (N.D. Tex. Nov. 8, 2005) (approving a plan of allocation that "resulted in a settlement agreement that fairly and rationally allocates the proceeds of the settlement").

Not surprisingly, the Bradley Objectors assert that a larger proportion of the Settlement Funds for the Self-Funded Claimants should have been negotiated. There are two problems with this argument. First, the Bradley Objectors have failed to credibly show that they would have been able to have successfully done so. Second, and more fatally, this argument does not address the relevant inquiry: whether the distribution plan is fair, adequate, and reasonable. It is.

---

[22] Whether any particular claim has an identical factual predicate and/or falls within the scope of the release is of course merely hypothetical, and currently unanswerable. Until a particular claim is asserted, comment by the court would likely be an inappropriate advisory opinion. If the court is presented with such a claim, it will be in a position to make an appropriate determination.

The Plan distinguishes between Fully Insured Claimants, who purchased insurance from Defendants, on the one hand, and Self-Funded Sub-Class Claimants who purchased only administrative services from Defendants, on the other. Under the Plan, Fully Insured Claimants are allocated 93.5% of the settlement, while Self-Funded Sub-Class Claimants are allocated 6.5%.

The Bradley Objectors argue that "there are indications that the allocation was not negotiated at arm's length" and "there is nothing in the record to justify an allocation so disproportionate as 93.5% to 6.5%." (Doc. # 2877 at 5-6). The Bradley Objectors are simply wrong. First and foremost, the Bradley Objectors' counsel admitted that this was not a collusive settlement. (*See* Doc. # 2865 at 152 ("I certainly don't think this is a collusive settlement[.]")). Second, the record clearly shows that the settlement was negotiated at arm's length, under the auspices of Ken Feinberg, the country's leading neutral on allocations of large settlements and compensation funds. (*See* Doc. # 2610-8). And, there is expert evidence in the record regarding the reasonableness of the allocation. (Docs. # 2812-9; 2825-1).

The economic reasonableness of the allocation was confirmed by Dr. Mason, an experienced antitrust economist. (Doc. # 2825-1). Dr. Mason utilized four proxies to analyze the reasonableness of the allocation. In their argument, the Bradley Objectors targeted only the first of those four proxies – related to the comparative share of the overcharges borne by Fully-Insured and ASO plans. They argue that "the gross difference between fully insured premiums and administrative fees is an unsound basis for the allocation." (Doc. # 2877 at 8). But, Dr. Mason has noted that this particular proxy -- in which 1.7% of the full amount is allocated to the Self-Funded Sub-Class -- is particularly imprecise. (*See* 2825-1 ¶ 40 & n.60).

Dr. Mason's second proxy -- net revenue -- "subtract[s] total claims paid on Fully Insured-Plans from revenue associated these plans," so that they are on equal footing with ASO Plans,

resulting in a less than 10.7% allocation to the Self-Funded Sub-Class. (*Id.* ¶ 40). This, in fact, seems to be more or less what the Objectors assert should be the basis for the allocation. Instead of subtracting the claims from Fully-Insured-Plans, they argue that the allocation formula should add in the claims for Self-Funded Plans. (Doc. # 2877 at 25). However, both of these approaches are also imperfect because they "implicitly assume[] the mark-up arising from the exclusionary power of BCBS (the overcharge at issue in this case) is equi-proportional to each dollar of ASO and Fully-Insured Net Revenue." (Doc. # 2825-1 ¶ 41). This is an improper assumption.

As Dr. Mason has explained, "ASO subscribers purchase from a more competitive market than Fully-Insured subscribers." (*Id.* ¶ 22). Because of the greater availability of substitute products -- such as third party administrates, the option to administer healthcare plans in-house, and the existence of large national health plan administrators -- the ASO market actually is significantly more competitive. (*See* Doc. # 2865 at 41-44). Indeed, for some Blues, fully insured business is anywhere from four to ten times more profitable than ASO business. (*See* Docs. # 2868-1; 2868-2; 2812-12 at 3). For some Blues, ASO business may in fact be break-even or even a loss leader. (*See* Docs. # 2868-3; 2868-4; 2868-5; 2868-6; 2868-7). The Bradley Objectors overlook these crucial differences between the markets. Surprisingly, their expert believes "the allocation of damages should [not] be based on the relative amounts of overcharges that the two groups of customer[s] paid[.]" (*Id.* at 258).

Overcharges are what this case is about. The differences in the markets -- along with the differences in Class Periods -- mean that the Fully Insured Claimants suffered a much greater antitrust injury. In fact, any overcharge an ASO customer paid on administrative fees was likely offset by savings on claims costs, given this customer's ability to directly negotiate discounts with provider networks. (Doc. # 2825-1 ¶ 54). Accordingly, Fully Insured Claimants are deserving of a

much greater proportion of the settlement.

Dr. Mason's remaining proxies -- operating gain differential, which indicates a settlement allocation for ASOs of <3.9-6.3%; and revenue per member growth, which indicates a settlement allocation for ASOs of 3.4-3.8% -- reflect the relative profitability of the ASO and fully-insured business. (*See id.* ¶¶ 42-49). Notably, the Self-Funded Objectors do not address these proxies in their arguments. These unchallenged proxies support a finding that a 6.5% allocation for the Self-Funded Class is fair, adequate, and reasonable.

For all of these reasons, the Bradley Objectors' objection regarding the allocation between the Fully-Insured and Self-Funded Classes is **OVERRULED**.

### E.    Whether the Self-Funded class period should go back to 2008

The next questions to be addressed involve whether the allocation is justified by the different time periods for the classes and the uncertainty regarding litigation outcomes. (*Id.* ¶¶ 30 n.49; 33-35).

The Fully Insured Class Period spans twelve and one-half years while the Self-Funded Class spans five years.[23] Because ASOs did not become involved in the lawsuit until late 2019, they did not face the same litigation expenses, burdens, and perils as the rest of the Class. Even more, they clearly benefitted from the work the Fully Insured counsel had performed for all those years. Accordingly, a discount factor is appropriate in determining the two groups' respective portions of the settlement to reflect "the expected amount of time that would elapse before a litigation or settlement payment is made[,] as well as the risk associated with that payment." (*Id.* ¶ 35). Here, a "conservative" discount factor would be no less than 50%. (*Id.*). Dr. Mason applied

---

[23] "'Settlement Class Period' means February 7, 2008, through the Execution Date, except for the Self-Funded Accounts, for whom the Settlement Class Period is September 1, 2015 through the Execution Date." (Doc. # 2610-2 ¶ 1(nnnn)).

this 50% discount to each of his proxies. (*Id.* ¶¶ 39, 40, 43, 48). The Bradley Objectors argue this discount factor is unfair because he applied no discount to the Fully Insured Class. That argument misses the point. As Dr. Mason explained at the Fairness Hearing, "[t]o put things on an apples-to-apples basis, we have to discount what [the Self-Funded Class is] getting for starting eight years later." (Doc. # 2865 at 204). The court agrees.

The Bradley Objectors also question whether the ASO Class Period should go back further in time. They argue they should get the benefit of the 2012 filing date in *Cerven, et al. v. BCBS-NC*, No. 2:12-cv-04169, as the starting point of their class period. (*See* Docs. # 2812-19 at 91-96; 2845 at 3-10). As an initial matter, it is worth noting that Self-Funded Accounts only became involved in this MDL in July 2019 (Doc. # 2610 ¶ 31), yet their claims get the benefit of a class period going back to September 2015.[24]

But in any event, and even more fundamentally, the Bradley Objectors misconstrue the *Cerven* complaint. The proposed damages class in the *Cerven* complaint was:

> All persons or entities who, from February 7, 2008 to the present (the "Class Period") have paid *health insurance premiums* to BCBS-NC *for individual or small group full-service commercial health insurance*.

(*Cerven* Doc. # 1 ¶ 21 (emphasis added)). The *Cerven* complaint mentions ASOs but only in the context of distinguishing them from the proposed class and explaining that "fully-insured health insurance products and ASO products are only substitutes for those consumers able to self-insure[.]" (*Id.* ¶ 129). Accordingly, as the *Cerven* complaint makes clear, "it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance product market" because of, among other things, "the prevalence of ASOs in each market." (*Id.* ¶ 131).

---

[24] Of course, this further illustrates that Feinberg mediated what was plainly a hard-fought series of negotiations.

The *Cerven* complaint plainly did not contemplate ASOs being part of that case or the relevant class.[25] "[T]he critical issue in Rule 15(c) determinations is whether the original complaint gave notice to the defendant of the claim now being asserted." *Davenport v. United States*, 217 F.3d 1341, 1345 n.8 (11th Cir. 2000). The *Cerven* complaint simply gave no notice to Defendants whatsoever that they would have to defend against alleged misconduct in the ASO market. So, ASOs cannot get the benefit of the *Cerven* filing date. *See Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1131 (11th Cir. 2004).

The Bradley Objectors argue there is a further asymmetry in the allocation. They question how the settlement proponents can allow relation-back of damages claims for large insured groups, but not ASOs, despite the *Cerven* proposed damages class being limited to individual or small group insurance. Of course, the answer lies in *Cerven*'s proposed injunction class:

> All persons or entities in the United States of America who are currently *insured by any health insurance plan* that is currently a party to a license agreement with BCBSA that restricts the ability of that health insurance plan to do business outside of any geographically defined area.

(*Cerven* Doc. # 1 ¶ 20 (emphasis added)). The *Cerven* injunction class includes all entities, regardless of their size, who are "insured by any health insurance plan." (*Id.*). Those who are Self-Funded are just that—self-funded. That is, they did not buy insurance from the Blues. Therefore, under a fair reading of the *Cerven* Complaint, ASOs are excluded from both the proposed damages and the injunction classes.

For all of these reasons, the objection that the Self-Funded Class period should go back to 2008 is **OVERRULED**.

---

[25] Nor did the ASOs themselves—not a single Self-Funded Account sought to file suit during the eight years between the *Cerven* complaint and the settlement.

### F. Whether the QNA Definition is too narrow or the requirements to obtain a Second Blue Bid are unreasonable

Under the proposed Settlement, Self-Funded Accounts that are determined to be Qualified National Accounts and are headquartered in an area with a single Blue licensee are entitled to request a Second Blue Bid. (Doc. # 2610-2 ¶ 15). QNAs are identified by listing the self-funded single-employer entities with at least 5,000 employees that have the highest Dispersion Percentages or are located in areas with two Blue licensees, until the number of Members covered by those entities reaches 33 million. This is 31% of Members of all Self-Funded Accounts, regardless of carrier. (*Id*. ¶ 1(u), (z), (cccc), (ffff)). The composition of the QNA list is not fixed immutably, but is subject to review and modification every two years.

General Motors challenges the Second Blue Bid criteria, arguing that the criteria are "arbitrary" and "treat[ ] class members differently (by allowing only a minority of them to solicit a Second Blue Bid)." (Doc. # 2874 at 2). Three other groups of Objectors complain that the QNA definition is limited to "employers," and thereby unfairly excludes certain multi-employer plans (here, "Taft-Hartley plans") and church groups, which collectively buy ASO contracts. These objections miss the mark.

Rule 23(e)(2)(D) provides that one of the elements to consider in determining whether a proposed settlement is "fair, reasonable, and adequate" is whether, taken together and evaluated in its entirety, "the proposal treats class members *equitably* relative to each other." Rule 23(e)(2) & (D) (emphasis added). "Higher allocations to certain parties" need only be "based rationally on legitimate considerations." *Pedraza v. United Guar. Corp*., 2001 WL 37071199, *7 (S.D. Ga. June 22, 2001). In the Eleventh Circuit, "there is no rule that settlements benefit all class members equally" so long as any differences are "rationally based on legitimate considerations." *Holmes v.*

*Continental Can*, 706 F.2d 1144, 1148 (11th Cir. 1983) (citing *Kincade v. General Tire & Rubber Co.*, 635 F.2d 501, 506 n. 5 (5th Cir. 1981)).

First, these Objectors overlook the context of the settlement, in particular the effect of the elimination of the NBE Rule. The NBE Rule previously placed limits on the business a Blue Plan could do under its non-Blue brands. By eliminating the NBE rule, accounts are now potentially able to receive bids from every Blue Plan in the country—*i.e.*, a Blue-branded bid from the local Blue Plan, and unconstrained Green bids from any other Plan. Moreover, some employers are already headquartered in areas with more than one Blue licensee and so while they may be excluded from receiving a Second Blue Bid under the Settlement, they are already eligible to receive two Blue bids, which meaningfully differentiates them from employers in areas with a single licensee. The Second Blue Bid relief appropriately reflects this difference.

It is also important to note that the Settlement Agreement is a compromise. This portion of it was designed to direct the Second Blue Bid relief to truly national, dispersed employers that have the fewest insurance options when (or if) they choose to contract with a single insurer for national coverage (*e.g.*, United, Cigna, Aetna, or a Blue Plan). In contrast, less dispersed (*i.e.*, more regional) accounts typically have the same national options, plus numerous regional carrier options (*e.g.*, Kaiser Permanente, PacificSource, SelectHealth, and Tufts Health Plan). (Doc. # 2813 at 27).

An employer's Dispersion Percentage is the percentage of its employees located outside the Blue service area containing the employer's headquarters, and is determined by Dun & Bradstreet, a neutral, third-party source. (Doc. # 2610-2 ¶ 1(w)). Prioritizing the employers with the highest Dispersion Percentages for Second Blue Bid relief directly targets employers with a significant portion of their employees in multiple Blue Plans' service areas, for whom regional

carriers may not be realistic options, and who therefore will benefit most from a Second Blue Bid. (Doc. # 2813 at 28). The Second Blue Bid criteria reflect the different competitive circumstances for these accounts and recognize both the relative strength of accounts' claims and which accounts are most likely to benefit from the relief. These considerations are rational and legitimate.

Moreover, the QNA definition is reasonably limited to employers, excluding Taft Hartley Plans and other multi-employer plans. The exclusion of these multi-employer plans is equitable because these groups have options to purchase insurance as single employers from state and regional insurers, a choice not typically available to QNAs as defined by the parties' Agreement. These multi-employer plans have already increased their bargaining power by aggregating their insurance purchases. Each of these employers could comfortably buy health care coverage in its own name and within its own, more competitive market than the market available to QNAs. Each of these considerations, which the parties plainly considered in "drawing lines," are rational and legitimate.

Accordingly, the objections asserting that the QNA definition is too narrow or that the requirements to obtain a Second Blue Bid are unreasonable are **OVERRULED**.

### G.     Whether the Local Best Efforts Rule should be left intact

In 1994, the Association and the Blues adopted the Local Best Efforts Rule. (Docs. # 2063 at 17-18; 1349-15 at 20-21; 1349-16 at 7). Under the original Blues' LBE, at least 80% of a Plan's annual health revenue from within its designated service area must be derived from services offered under the Blue Marks. (*Id.*). The LBE applies only to health revenue "attributable to health care plans and related services and hospital services . . . offered within the designated Service Area." (Docs. 2063 at 17-18; 1350-10 at 4).

Certain objectors have expressed concern regarding the fact that the LBE was left in place "unchanged." (*See* Doc. # 2812-19 at 34-35 ("The settlement agreement leaves unchanged the

Local Best Efforts rules.")). First, the objectors are incorrect in asserting that the LBE is "unchanged." To the contrary, the Settlement Agreement provides that compliance with the LBE going forward will be measured at the state level instead of the service area level. (Doc. # 2610-2 at 31, ¶ 11). Second, even keeping the LBE in place in that modified form, the elimination of NBE has now set the stage for each Blue Plan to have the unfettered ability to use Green marks to compete with other Blues outside of its ESA. The only limit left in place relates to how much Green business a Blue can do within its own state (*i.e.*, in competition with its own Blue business).

Objectors assume, without pointing to any evidence that, absent LBE, a Blue Plan would offer "Green competitive bids" to national accounts in their own service areas (*i.e.*, they would compete against themselves with Green business). (Doc. # 2812-19 at 34). However, this assumption simply ignores the convincing evidence presented by the Blues' expert, Dr. Kevin M. Murphy, the George J. Stigler Distinguished Service Professor of Economics in the Booth School of Business and the Department of Economics at the University of Chicago. (Doc. # 2565-49 at 8). According to Dr. Murphy, as an economic matter, profit-maximizing firms do not compete with themselves. (*Id.* at 100). Moreover, under LBE, all Blues remain free to offer a competitive Green bid in every other Blue Plan's service area.

The court notes that Subscribers took extensive discovery and conducted substantial expert analysis on the LBE rule. After doing so, they negotiated the changes noted above. In its current form, the LBE allows virtually unlimited Green competition by any Blue Plan that is a competitor or potential competitor. The court concludes that, post-settlement, the LBE rule is reasonably tailored to encourage investment in the Blue Marks in each Blue Plan's local market. This is actually pro-competitive because that approach will inure to the benefit of the customer.

Therefore, the objection regarding keeping LBE in place is **OVERRULED**.

## H. Whether Tribal-related entities should be part of the Settlement

The Prairie Island Indian Community filed an objection on behalf of three health care plans: (1) Prairie Island Indian Community Self-Funded Group Medical Benefits Plan for Community Members and their Eligible Dependents; (2) Treasure Island Resort & Casino Exclusive Health Care Plan; and (3) Treasure Island Resort & Casino Preferred Provider Organization Health Care Plan. (Doc. # 2812-20 at 84-86). Prairie Island argues that the Settlement and related communications are unclear about whether these plans are within the Self-Funded Damages Sub-Class or are excluded as a Government Account. (*Id.*).

Under the Settlement Agreement, "Government Accounts" are excluded from the Settlement Damages Class.

> hh. "Government Account" means only a state, a county, a municipality, an unincorporated association performing municipal functions, a Native American tribe, or the federal government (including the Federal Employee Program). A Government Account includes all Members of the Government Account. No other entity that is not a state, county, municipality, unincorporated association performing municipal functions, Native American tribe or the federal government is a Government Account, unless it is required by law to provide any health care coverage it makes available to Members only under, or as a participant in, a Commercial Health Benefit Product approved, selected, procured, sponsored or purchased by a Government Account. Entities that are not Government Accounts (e.g., utility companies, school districts, government-funded hospitals, public retiree benefit plans, public libraries, port authorities, transportation authorities, waste disposal districts, police departments, fire departments) will receive notice and an opportunity to submit a claim form to the extent they are otherwise within the definition of the Damages Class.

(Doc. # 2610-2 at 12-13, & 1(hh)).

At the Fairness Hearing, Subscribers' Counsel explained that they:

> negotiated with the Blues to ensure that government-like entities are treated like the government and that if they are not, if they're truly operating on their own and only quasi-governmental and purchasing insurance on their own, not under the mandate of a government entity, then they are participants in the class and would have gotten notice and could submit a claim.

(Doc. # 2865 at 271). Blues' Counsel further explained that,

> Prairie Island Indian Community, doing business as Treasure Island Resorts and Casinos, is included in the class and should have received notice and they should file a claim if they have one.

(*Id*. at 277). Moreover, despite Prairie Island's confusion about whether the Casino Plans were part of the Self-Funded Sub-Class, it was the only one of five hundred seventy-four Tribes to file such an objection.

The court is satisfied that the Settlement Agreement is clear enough that 573 of 574 Indian Tribes recognized that commercial entities related to Indian tribes are not considered to be Government Accounts, but the Tribe itself is within the definition of Government Account. (Doc. # 2610-2 at 12-13, & 1(hh)). Moreover, those entities would have received Notice under the Settlement.

Accordingly, Prairie Island Indian Community's objection is **OVERRULED**.

## I.     Whether Attorney Fees are Too High

Fifteen objectors have expressed their opinion that the attorneys' fees sought by Subscribers' Counsel are too high.[26] (Docs. # 2812-19; 2812-20; 2812-21; 2812-22). One such objector, David Behanna, presented argument on his objection at the Fairness Hearing. Behanna made the following arguments: (1) Subscribers' counsel's fees should be limited to the lodestar[27] because the Sherman Act is a fee shifting statute, and (2) this is not a common fund case. (Doc. # 2812 at 104-117). The court disagrees.

---

[26] None of these objections specifically take issue with reimbursement of counsels' expenses.

[27] Under the lodestar method, a district court determines the number of hours worked by plaintiffs' counsel, multiplies those hours by a reasonable hourly rate, and then adjusts the final amount upward or downward based on various factors. *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 772 (11th Cir. 1991).

### 1.    The Subscriber Settlement Created a Common Fund

"It is well established that when a representative party has created a 'common fund' for or has conferred a 'substantial benefit' upon an identifiable class, its counsel is entitled to attorneys' fees based upon the benefit obtained." *Dorado v. Bank of Am., N.A*., 2017 WL 5241042, at *7 (S.D. Fla. Mar. 24, 2017). To be sure, the Supreme Court in *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) has made clear that a "lawyer who recovers a common fund for the benefit of persons other than ... his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing*, 444 U.S. at 478; *see Amorin v. Taishan Gypsum Co., Ltd*., 2021 WL 2349920, at *3 (11th Cir. June 9, 2021) ("[I]n complex litigation, courts have broad managerial power that includes significant discretion in awarding fees"); *see also Camden I Condominium Ass'n*, 946 F.2d at 774 (establishing rule in Eleventh Circuit that percentage-of-fund approach rather than lodestar would apply in common fund cases); *In re Domestic Air Transp. Antitrust Litig*., 148 F.R.D. 297, 325 (N.D. Ga. 1993) (awarding attorneys' fees as a percentage of a common fund in a Sherman Act case). Here, the Subscriber Settlement produced a substantial monetary award and significant injunctive relief for the class. More specifically, the Settlement created a common fund of $2,670,000,000. It also provides transformative, pro-competitive injunctive relief that will benefit the members of the Subscriber Class.

"[C]ommon benefit fees—grounded in the courts' equity power—need not satisfy rigid eligibility requirements." *Amorin*, 2021 WL 2349920, at *3 (citing *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1019 (5th Cir. 1977)). "[T]he key distinction between common-fund and fee-shifting cases is whether the attorney's fees are paid by the client (as in common-fund cases) or by the party (as in fee-shifting cases)." *Id.* (citing *In re Home Depot Inc*., 931 F.3d at 1089). "[T]he 'broad grant of authority' awarded to trial courts when consolidating

cases [such as in an MDL] necessarily includes the ability to compensate appointed counsel that carry 'significant duties and responsibilities.'" *Id.* (citing *Fla. Everglades*, 549 F.2d at 1013-14, 1016). Here, Subscribers' Counsel seek attorneys' fees from the $2,670,000,000 common fund they negotiated for the Class, without regard to the value of the injunctive relief they also secured.

An objector in *In re Equifax* made a similar argument to the one advanced here. That objector argued that the court should apply the lodestar method rather than the percentage method because there is a statutory fee-shifting provision. 999 F.3d at 1279. However, as the district court noted in considering that argument, "[t]he Supreme Court has never categorically prohibited the percentage method in common fund cases." *Id.* The Eleventh Circuit agreed, holding that "[w]ithout a categorical prohibition on the percentage method in common fund settlement cases, *Camden I* and the percentage method remain the law in this Circuit."[28] *Id.* at 1280. Through their efforts in resolving this case, Subscribers' Counsel created a common fund. That is an unassailable fact. Therefore, a percentage fee is appropriate.

## 2. The Appropriate Percentage Fee Award

"[A]ttorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I*, 946 F.2d at 774. The fee sought by Subscribers' Counsel, 23.47%[29] of the Common Fund, is at or below the percentage fee

---

[28] Recently, in *Muransky v. Godiva Chocolatier, Inc*., a panel of the Eleventh Circuit specified that "[t]he common-fund doctrine applies to class settlements that result in a common fund even when class counsel could have pursued attorney's fees under a fee-shifting statute." 922 F.3d 1175, 1195 (11th Cir. 2019) (citing *Staton v. Boeing Co*., 327 F.3d 938, 968-69 (9th Cir. 2003); *Florin v. Nationsbank of Ga*., 34 F.3d 560, 563 (7th Cir. 1994)). Although the *Muransky* decision was later vacated, 939 F.3d 1278 (11th Cir. 2019), and the matter was reheard *en banc*, 979 F.3d 917 (11th Cir. 2020), the full court found that the representative plaintiff lacked standing to pursue the class claims and, therefore, did not evaluate the fairness of the settlement. *See Muransky*, 979 F.3d at 921. "Because the *en banc* court [in *Muransky*] did not reach the attorneys' fees issue, the [c]ourt finds the vacated panel decision on this point, and the cases to which it cites, to be persuasive, albeit not binding authority." *Kuhr v. Mayo Clinic Jacksonville*, 2021 WL 1207878, at *11, n.13 (M.D. Fla. Mar. 30, 2021). Moreover, these cases are consistent with the Eleventh Circuit's pronouncement that the percentage method should be employed in common fund cases.

[29] The requested fees and expenses together amount to 25% of the common fund. However, once the $40,916,627 in requested expenses is deducted, the requested fees amount to approximately 23.47% of the fund.

typically awarded in similar cases. The "benchmark range" in this Circuit is 20% to 30% of the common fund. *In re Home Depot Inc*., 931 F.3d at 1076. In fact, numerous decisions have found that a 30% fee is well within the range of a customary fee. *See, e.g*., *Cty. of Monmouth New Jersey v. Fla. Cancer Specialists, P.L*., 2020 WL 11272691, at *2 (M.D. Fla. Mar. 17, 2020) (approving award of 30% of the settlement fund in Sherman Act case); *Wave Lengths Hair Salons of Fla., Inc. v. CBL & Assocs. Properties, Inc*. 2019 WL 13037028, *14 (M.D. Fla. Aug. 22, 2019) (approving a 30% fee); *In re Terazosin Hydrochloride Antitrust Litig*., 2005 WL 8181045, at *5 (S.D. Fla. Apr. 20, 2005) (awarding 33-1/3% of the gross Settlement Fund in Sherman Act case); *In re Managed Care Litig. Class Plaintiffs v. Aetna*, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) (awarding a 35.5% fee). The court therefore finds that the requested attorneys' fee award of 23.47% of the Common Fund is well within the reasonable range, particularly given the fact the claimed fees do not account for the value of the substantial injunctive relief also secured by the Settlement.

Because the requested fee -- even when including expenses -- does not exceed 25%, the court need not consider the factors set out in *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714, 717-19 (5th Cir. 1974),[30] to determine the reasonableness of the requested fees. *Faught v. Am. Home Shield Corp*., 668 F.3d 1233, 1242 (11th Cir. 2011) ("Where the requested fee exceeds 25%, the court is instructed to apply the twelve *Johnson* factors."). Nevertheless, even if those factors were applied here, that process confirms the requested fee is reasonable.

The Johnson factors include:

(1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results

---

[30] *Johnson* was *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 109 (1989).

obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases.

*Camden I*, 946 F.2d at 772 n.3. The court evaluates these factors below.

(a)     The Settlement has resulted in significant, historic injunctive relief for the class in addition to a substantial monetary award;

(b)     This case required an immense amount of time and labor by Subscribers' Counsel (Doc. # 2733 at 13-33), and is a private enforcement action that challenges practices long overlooked by public agencies;

(c)     This case presented a plethora of difficult factual issues, and navigating these thorny questions required substantial discovery and pretrial litigation, including the production of millions of pages of documents, the taking of dozens of depositions, and the prosecution and defense of scores of motions;

(d)     This case raised novel and complex legal questions, and unlike other historic antitrust actions, is a private-enforcement action that did not follow on a government investigation;

(e)     Subscribers' Counsel are among the nation's most experienced and able litigators in the antitrust arena, and they conducted the litigation and worked adeptly to achieve the Settlement with skill, zeal, and expertise;

(f)     For many of the Subscriber firms, both large and small, the significant commitment of time and resources that were required to litigate this case undoubtedly precluded them from tackling other cases and/or other work. Through August 15, 2020, Subscribers' Counsel had already devoted 434,054.6 hours to litigating the complex factual and contested legal questions presented in the Subscriber Actions. Using historic blended billing rates, this work resulted in a lodestar of $194,226,321.65. These figures do not include the substantial additional time (9,205.2

hours as of May 28, 2021) spent mediating and finalizing the Settlement Agreement after that date; drafting the preliminary approval papers; and preparing for and attending the day-long preliminary approval hearing. Since May 2021, several thousand additional hours have been spent acquiring data from Defendants for notice and claims administration, working with the notice and claims administrator to provide notice to over 100 million class members, answering calls and emails from thousands of class members once notice was disseminated, and preparing for the final approval hearing. (Doc. # 2273-2 at 411-42).

(g) The fee in this case was contingent on obtaining class relief, and Subscribers' Counsel invested their own money in fronting the expenses in this litigation, all in the face of significant risk that they would recover nothing and lose millions and millions of dollars;

(h) Given the enormous commitments of time and resources, as well as the significant risk entailed in developing and litigating this MDL, few attorneys would have been willing to take on this litigation;

(i) The $2.67 billion Settlement Fund that Subscribers' Counsel negotiated in this case may represent the largest antitrust class action settlement on record (Docs. # 2733-3; 2733-4), and, even more significantly, it is accompanied by historic structural relief which rarely arises out of private enforcement actions;

(j) The amount of attorneys' fees awarded and costs and expenses to be paid from the Settlement Fund are fair, adequate, and reasonable, and consistent with awards in similarly complex cases;

(k) Use of the lodestar cross-check is not required in this Circuit. *In re Home Depot*, 931 F.3d at 1091 n.25; *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1298 (11th

Cir. 1999) ("[W]hile we have decided in this circuit that a lodestar calculation is not proper in common fund cases, we *may* refer to that figure for comparison."); *Wilson v. Everbank*, 2016 WL 457011, at *19 (S.D. Fla. Feb. 3, 2016) ("'Under *Camden I*, courts in this Circuit regularly award fees based on a percentage of the recovery without discussing lodestar at all.'" (quoting *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1363 (S.D. Fla. 2011)). Nonetheless, as the expert testimony presented in support of the Fee Motion confirms, a lodestar multiplier of 3.23 that the percentage fee award represents would be fully consistent with the multipliers that courts have found reasonable in similarly complex mega-fund cases. *See, e.g.*, *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 696 (N.D. Ga. 2001) (noting that courts have approved lodestar multipliers greater than five); *Cox v. Cmty. Loans of Am., Inc.*, 2016 WL 9130979, at *3 (M.D. Ga. Oct. 6, 2016) (noting that lodestar multipliers "in large and complicated class actions range from 2.26 to 4.5 while three appears to be the average[.]"). Moreover, the underlying hours used for the lodestar calculation do not include the substantial additional time spent mediating and finalizing the Settlement.

Therefore, the objections asserting that Attorney Fees are too high are **OVERRULED**.

## J.     Whether the Settlement Monetary Relief is Too Low

Several individual objectors argue (or at least could be construed as arguing) that the $2.67 billion Settlement Fund is inadequate. Rule 23(e)(2)(C) requires a court to assess the adequacy of relief and, in doing so, to consider "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."

The monetary relief provided for in this Settlement falls easily within the range of recoveries deemed reasonable by courts, and represents one of the largest monetary recoveries ever achieved in an antitrust class action settlement. (Docs. # 2733-3 ¶ 63; 2733-4 ¶ 17; 2610-12 ¶ 33). The court previously evaluated each of the Rule 23(e)(2)(C) factors above. (*Supra* § III(B)). Moreover, there is no indication that the Blues would have paid more. The court is well aware of the intensity, length, and tenacity of the parties' negotiations in this matter. This was not just hard-fought litigation, but this matter truly involved collision-course negotiations overseen by an able neutral mediator. Contrary to the objections, the significant monetary relief achieved by the Settlement actually favors final approval.

Accordingly, the objection that the Settlement Monetary Relief is too low is **OVERRULED**.

### K.    Whether the Self-Funded Sub-Class Counsel had a Conflict

Objector Hutsler argues that a conflict of interest between Subscriber Class Counsel and the Self-Funded Sub-Class has resulted in a settlement agreement that allocates an insufficient portion of the Net Settlement Fund to the Self-Funded Sub-Class. (Doc. # 2812-21 at 61). That argument misses the mark for two reasons. First, the court has already addressed the reasonableness of the allocation. (*Supra* §§ II(E), III(B)(1), III(B)(4)). Second, Hutsler's argument is premised on a misunderstanding of the timing and procedural history of the mediation process that occurred in this case.

During their negotiations in July 2019, while mediation was ongoing, Subscriber Plaintiffs and the Blues recognized the need for a sub-class of Self-Funded Accounts and their employees. Subscriber Plaintiffs thereafter coordinated the recruitment of separate class counsel for that sub-class and a class representative. (Doc. # 2610-6 ¶ 31). Subscriber Plaintiffs approached Warren

Burns of Burns Charest LLP to inquire about serving as counsel for a sub-class of Self-Funded Accounts and their employees. Burns agreed, and was retained by Hibbett Sports, Inc., an Alabama-based, publicly-traded retailer of sporting goods that is a Self-Funded Account. Burns became settlement counsel to the putative Self-Funded Sub-Class, with Hibbett as the Self-Funded Sub-Class Representative. (*Id.*). The potential split of the Net Settlement Fund between fully insured and self-funded claimants was not a condition of Burns's retention, and a split was never discussed before Burns was engaged. (*Id.*).

Self-Funded Sub-Class Counsel asked for and received access to the voluminous discovery record in the litigation, along with relevant briefing on class certification and summary judgment. In turn, they engaged independent experts to analyze possible damages claims on behalf of the Self-Funded Sub-Class. In September 2019, Self-Funded Sub-Class Counsel began attending mediation sessions. Over the next several months, the parties worked to develop a written settlement agreement. This process involved numerous additional conferences and intense negotiations between the parties, including the Self-Funded Sub-Class. (*Id.* ¶ 32).

Following those negotiations with the Blues, Subscriber Plaintiffs and Self-Funded Sub-Class Counsel engaged Feinberg as an Allocation Mediator to facilitate the determination of an appropriate allocation. The economic reasonableness of the agreed-upon allocation was thereafter examined and confirmed by Dr. Mason, an experienced antitrust economist. (Doc. # 2825-1).

Because the Self-Funded Sub-Class was separately represented by competent counsel, there was expert review of the settlement allocation, the negotiations and agreement about the allocation were in good faith, and the allocation is reasonable given the unique circumstances of this litigation, the objection that Sub-Class Counsel had a conflict is **OVERRULED**.

## L.     The Department of Labor's ERISA Concerns

The Department of Labor ("DOL") has not objected to the proposed Subscriber Settlement, nor has it actually opposed the Settlement. Rather, the DOL has expressed concerns about the Settlement to both the Settlement Proponents and the court. The DOL issued a letter to the Settlement Proponents, and filed a Statement of Interest with the court. Additionally, at its request, the court allowed the DOL to present argument regarding its concerns at the Fairness Hearing. (Docs. # 2863; 2866).

At the Fairness Hearing, it became clear that the DOL was concerned with various hypothetical questions about whether this settlement affects any duties employers or plan fiduciaries might have under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et. seq.* (Doc. # 2866). However, as the Settlement Proponents have made clear, (1) ERISA plan rights are not affected by the Settlement and, further, (2) the Settlement Agreement does not release any claims that an ERISA plan may have against an employer. (*Id*. at 23, 26, 38). To be clear, all ERISA duties still apply, all ERISA fiduciaries must comply with those duties, and this Settlement does nothing to change or alter ERISA rights. To the extent an ERISA plan does not approve of what an employer does with Settlement proceeds, the plan's right to sue the employer under ERISA is wholly unaffected by this Settlement. (*Id.* at 23).

The DOL expressed concern that Class-member ERISA plans appear to be inadequately represented in the proposed Settlement. However, several Class Representatives are both employers (plan sponsors) and their plans' named fiduciaries–*e.g.*, CB Roofing; Consumer Financial Education Foundation of America, Inc.; Gaston CPA; Pete Moore Chevrolet; Pettus Plumbing; and Hibbett Sports, Inc. The Class Representatives also include employees who were participants covered by their employer-sponsored ERISA plans. The employer Class

Representatives understand that they have obligations under ERISA, and that nothing in the Settlement relieves them of those obligations.

The DOL also expressed concern that the proposed Settlement does not address the possibility of double recovery. That is incorrect. The claims process relies on data based on each claimant and each health benefit plan or ASO contract. If more than one claimant attempts to make a claim pointing to the same data (for the same payments on the same policy or ASO contract), that will automatically be flagged by JND as a conflict for resolution. The potential conflict will be readily apparent, making it easy for JND to identify and for JND (or the Settlement Administrator) to resolve, avoiding any risk of double recovery. The Settlement Administrator would decide any claims by ERISA plans and employers over the same payments for the same policy or ASO contract.

The DOL expressed another concern about whether the proposed plan of distribution may result in violations of ERISA's trust requirements. However, ERISA recognizes an employer's dual status as both plan sponsor and as plan administrator as permissible (*see* 29 U.S.C. § 1108(c)(3)). Therefore, this concern is not really a concern about the terms of the Settlement, but rather a concern that an employer sponsor may breach its duties under ERISA by participating in the Settlement. Again, nothing in the Settlement relieves plan fiduciaries of their ERISA obligations.

The DOL also raised its concern that, in some circumstances, the proposed settlement's release of claims (plan assets) may also involve prohibited transactions for which an exemption is required. However, as the Third Circuit recently explained, the Supreme Court's decision in *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996), identified the "common thread" to each prohibited transaction in § 406(a)(1) as being "a special risk to the plan from a transaction

presumably not at arm's length." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 338 (3d Cir. 2019). Here, the Settlement was most certainly reached at arm's length, and thus does not contain the "common thread" of a prohibited transaction.

The DOL also questioned whether prohibited transactions are likely to occur under the Settlement, which do not appear to be covered by Prohibited Transaction Exemption ("PTE") 2003-39. First, even if the Settlement were covered by § 406(a)(1), it would satisfy the exemption from the prohibition set forth in DOL's PTE 2003-39: there is a genuine controversy involving the plans; any fiduciary approving the Settlement is independent of the Settling Defendants; the Settlement is the result of arm's length negotiations and is reasonable; the Settlement is not designed to benefit the Settling Defendants (and in fact requires them to make significant monetary contributions and structural changes to the benefit of the Settlement Classes); the terms of the Settlement are contained in a written settlement agreement; and no commissions are being paid in connection with the Settlement. *See* PTE 2003-39, § II(a)-(j); 68 Fed. Reg. at 75635. Moreover, the absence of any conflict of interest and the court's extensive review and approval of the Settlement should eliminate any concerns regarding conflicts.

The DOL asks whether the proposed Settlement's release is overbroad. However, there is no blanket release of ERISA claims. Indeed, the Settlement and release make clear that ERISA claims unrelated to the issues raised in this litigation are not released. To be sure, the parties added language that expressly excludes ERISA and related benefit claims from the Settlement's releases. *See* Doc. 2610-2 at & 1(uuu).

Finally, the DOL expressed concern that the proposed Settlement does not take into consideration the Secretary's guidance on allocating distributions from insurers to plans, employer sponsors, and plan participants. However, these funds are not plan assets at the time of their

distribution. The DOL's real concern appears to be with what an employer may do with settlement proceeds after distribution of the Settlement Fund. The simple answer is that employers and ERISA plans are responsible for complying with applicable ERISA and DOL guidance, and nothing in the Settlement or the Plan of Distribution relieves them of those obligations.

For the foregoing reasons, the DOL's objections are **OVERRULED**.

### M.      Shiyang Huang's Objection

Shiyang Huang is neither a lawyer nor a professional objector. However, in *In re Equifax*, he objected to the settlement, and argued that Plaintiffs lacked Article III standing to bring their claims. *In re Equifax*, 999 F.3d at 1261. The court rejected Huang's contentions. *Id*. at 1261-64.

Here, Huang argues that the court cannot approve the Subscribers' Settlement because the court lacks Article III subject-matter jurisdiction to provide injunctive relief for those class members without a "real" or "immediate" risk of future harm. (Doc # 2833). Huang's objections fail for two reasons: (1) ironically, he lacks standing to assert them and (2) his objections are without merit.

Huang timely opted out of the Subscribers' Settlement damages class (Doc. # 2812-6) and never filed a timely objection to the Settlement. (Doc. # 2812-1 at 163-171). One who opts out of a class settlement lacks standing to object to a settlement. *Aboltin v. Jeunesse LLC*, 2019 WL 1092789, at *2 (M.D. Fla. Feb. 15, 2019); *see also Jones v. United Healthcare Servs., Inc*., 2016 WL 8738256, at *4 (S.D. Fla. Sept. 22, 2016) (noting that a "successful opt-out" like Huang "cannot also file an objection to the Settlement."); *see also Zamora v. Lyft, Inc*., 2018 WL 5819511, at *1 (N.D. Cal. Nov. 6, 2018) (noting that a class member "cannot both object and opt out under the terms of the settlement"). "[I]t is well established that class members may either object or opt out, but they cannot do both." *Carter v. Forjas Taurus S.A.*, 2016 WL 3982489, at *13 (S.D. Fla.

July 22, 2016) (quoting *Newberg on Class Actions* § 13.23 (5th ed.) ("Class members who opt out of the class . . . are no longer considered class members, and hence Rule 23 does not give them standing to object to the settlement.")).

But, even putting aside that defect, Huang's arguments are off the mark. As this court has already held, "Subscriber Plaintiffs easily satisfy the necessary elements of standing." *In re Blue Cross Blue Shield Antitrust Litig.*, 2020 WL 8256366, at *8 (N.D. Ala. Nov. 30, 2020). Here, the purpose of the injunctive relief sought pursuant to the Settlement is to remedy ongoing, actual harm.

Therefore, Huang's objection is **OVERRULED**.

## N.    Overruling of Objections

The court hereby **OVERRULES** all remaining objections to the Settlement Agreement and finally **APPROVES** the Settlement Agreement in all respects, and **FINDS** that the Settlement Agreement is fair, reasonable, and adequate, and is in the best interest of the Class Members.

# V.    Conclusion

"Public policy strongly favors the pretrial settlement of class action lawsuits." *Swaney*, 2020 WL 3064945, at *3 (quoting *In re U.S. Oil & Gas Litig.*, 967 F.2d at 493). Having carefully considered the Motion for Final Approval of Proposed Class Settlement Agreement, the Settlement Agreement, the Proposed Plan of Distribution and Proposed Notice Plan, the Objections, all briefing and argument thereon, as well as all matters of record, the court finds that the proposed Settlement Agreement is sufficiently fair, reasonable, and adequate to be approved.

For all these reasons, Subscriber Plaintiffs' Motion for Final Approval of Class Settlement and Appointment of Settlement Administrator. (Doc. # 2812) is **GRANTED**.

## APPROVAL OF THE SETTLEMENT AGREEMENT

It is further **ORDERED** as follows:

1.      Having reviewed and considered the Settlement Agreement, all papers filed and proceedings held in connection with the Settlement, all oral and written comments and objections received regarding the Settlement, and the record in the Action, and for the reasons set forth in detail above, the court **APPROVES** the Settlement Agreement under Rule 23(e)(2). Pursuant to the Settlement Agreement, Settling Defendants have agreed to pay $2.67 billion to create the Settlement Fund, which will be disbursed to Authorized Claimants of the Damages Class, used to pay Notice and Administration Costs, and for any Fee and Expense Award. The Settlement Agreement also provides significant injunctive relief for the benefit of the Settlement Classes.

2.      This court **CONCLUDES** it has subject matter jurisdiction over this Action and personal jurisdiction over the parties and the members of the Settlement Classes described below.

3.      This Final Order and Judgment incorporates as if set forth verbatim herein the following documents: (a) the Settlement Agreement; (b) the Notice Plan and Claim Form, which were each approved on November 30, 2020; (c) the Supplemental Notice to Self-Funded Accounts, which was approved on February 4, 2022; and (d) the Plan of Distribution, which was preliminarily approved on November 30, 2020.

### Certification of the Settlement Classes

4.      Pursuant to Rule 23(a) and 23(b) of the Federal Rules of Civil Procedure, and based on the record before the court, including the submissions in support of the Settlement and objections and responses thereto, the court hereby affirms its forecast in the Preliminary Approval Order and **CERTIFIES** the following Settlement Classes for settlement purposes only:

> **Damages Class:** All Individual Members (excluding dependents and beneficiaries), Insured Groups (including employees, but excluding non-employee

Members), and Self-Funded Accounts (including employees, but excluding non-employee Members) that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product (unless the person or entity's only Blue-Branded Commercial Health Benefit Product during the Settlement Class Period was a stand-alone vision or dental product) sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan from February 7, 2008 through October 16, 2020 (in the case of all Damages Class members other than the Self-Funded Sub-Class, for whom the Class Period is September 1, 2015 through October 16, 2020).

**Self-Funded Sub-Class:** All Self-Funded Accounts (including employees, but excluding non-employee Members) that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product (unless the person or entity's only Blue-Branded Commercial Health Benefit Product during the Settlement Class Period was a stand-alone vision or dental product) sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan from September 1, 2015 through October 16, 2020.

**Injunctive Relief Class:** All Individual Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Settlement Class Period (February 7, 2008 through October 16, 2020, except for Self-Funded Accounts for whom the Settlement Class Period is September 1, 2015 through October 16, 2020).

5.      Excluded from the Damages Class and the Self-Funded Sub-Class are Government Accounts, Medicare Accounts of any kind, Settling Defendants themselves, and any parent or subsidiary of any Settling Defendant (and their covered or enrolled employees). Also excluded from the Damages Class and the Self-Funded Sub-Class are Opt-Outs, the judge presiding over this matter, and any members of his judicial staff, to the extent such staff were covered by a Commercial Health Benefit Product not purchased by a Government Account during the Settlement Class Period.

6.      For purposes of the Damages Class and the Self-Funded Sub-Class, the term "employee" means any current or former employee, officer, director, partner, or proprietor of an entity.

7. The court **FINDS** that the requirements of Rule 23(a) and 23(b) of the Federal Rules of Civil Procedure are satisfied solely for settlement purposes. In particular, the court determines that:

a. Pursuant to Rule 23(a)(l), the Settlement Class members are so numerous that their joinder before the court would be impracticable.

b. Pursuant to Rule 23(a)(2), there are one or more questions of fact or law common to the Settlement Classes.

c. Pursuant to Rule 23(a)(3), Subscriber Plaintiffs' claims are typical of the claims of the Settlement Classes.

d. Pursuant to Rule 23(a)(4), the Class Representatives have fairly and adequately protected the interests of the Settlement Classes. Class Representatives are certified as class representatives on behalf of their Settlement Classes; and the Self-Funded Sub-Class Representative is certified as class representative on behalf of the Self-Funded Sub-Class.

e. Pursuant to Rule 23(b)(2), the Settling Defendants have acted and refused to act on grounds that apply generally to the Injunctive Relief Class, so that final injunctive relief is appropriate respecting the class as a whole.

f. Pursuant to Rule 23(b)(3), common questions of law and fact predominate over questions affecting only individual members.

g. Also pursuant to Rule 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this Action.

### Class Counsel and Class Representatives

8. Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the court **APPOINTS** Hausfeld, LLP and Boies Schiller Flexner, LLP as Settlement Class Counsel for the

Settlement Classes and Burns Charest, LLP as Self-Funded Sub-Class Settlement Counsel for the Self-Funded Sub-Class.

9. The court also **APPOINTS** the following individuals and entities as class representatives:

a. For the Settlement Classes: Galactic Funk Touring, Inc.; American Electric Motor Services, Inc.; CB Roofing, LLC; Pearce, Bevill, Leesburg, Moore, P.C.; Pettus Plumbing & Piping, Inc.; Consumer Financial Education Foundation of America, Inc.; Fort McClellan Credit Union; Rolison Trucking Co., LLC; Conrad Watson Air Conditioning, Inc.; Linda Mills; Frank Curtis; Jennifer Ray Davidson; Pete Moore Chevrolet, Inc.; Jewelers Trade Shop; Saccoccio & Lopez; Angel Foster (*fka* Angel Vardas); Monika Bhuta; Michael E. Stark; G&S Trailer Repair Inc.; Chelsea L. Horner; Montis, Inc.; Renee E. Allie; John G. Thompson; Avantgarde Aviation, Inc.; Hess, Hess & Daniel, P.C.; Betsy Jane Belzer; Bartlett, Inc., d/b/a Energy Savers; Matthew Allan Boyd; Gaston CPA Firm; Rochelle and Brian McGill; Sadler Electric; Jeffrey S. Garner; Amy MacRae; Vaughan Pools, Inc.; Casa Blanca, LLC; Jennifer D. Childress; Clint Johnston; Janeen Goodin; Marla S. Sharp; Erik Barstow; GC/AAA Fences, Inc.; Keith O. Cerven; Teresa M. Cerven; Sirocco, Inc.; Kathryn Scheller; Iron Gate Technology, Inc.; Nancy Thomas; Pioneer Farm Equipment, Inc.; Scott A. Morris; Tony Forsythe; Joel Jameson; Ross Hill; Angie Hill; Kevin Bradberry; Christy Bradberry; Tom Aschenbrenner; Juanita Aschenbrenner; Free State Growers, Inc.; Tom A. Goodman; Jason Goodman; Comet Capital, LLC; Barr, Sternberg, Moss, Lawrence, Silver & Munson, P.C.; Mark Krieger; Deborah Piercy; and Lisa Tomazzoli.

b. For the Self-Funded Sub-Class: Hibbett Sports, Inc.

## Notice

10.     The court finds that the notice provisions of the Class Action Fairness Act, 28 U.S.C. § 1715, have been satisfied.

11.     The court also finds that the dissemination of Notice and Supplemental Notice: (a) was implemented in accordance with the Notice Plan Approval Order; (b) constituted the best notice practicable under the circumstances; (c) constituted notice that was reasonably calculated, under the circumstances, to apprise the Settlement Classes of (i) the pendency of the Action; (ii) the effect of the Settlement Agreement (including the releases to be provided thereunder); (iii) Class Counsel's motion for an award of attorneys' fees and reimbursement of expenses; (iv) the right to object to any aspect of the Settlement, the Plan of Distribution, and/or Class Counsel's motion for attorneys' fees and reimbursement of expenses; (v) the right to opt out of the Damages Class opt out of divisible injunctive relief; and (vi) the right to appear at the Fairness Hearing; (d) constitutes due, adequate, and sufficient notice to all persons and entities entitled to receive notice of the Settlement; and (e) satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure and the United States Constitution (including the Due Process Clause).

## Final Approval of the Settlement Agreement

12.     Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the court hereby **GRANTS** final approval of the Settlement Agreement in all respects (including, without limitation: the Settlement Fund amount; the releases; the Injunctive Relief; and the dismissal with prejudice of the claims asserted against Settling Defendants in the Action), and finds that the Settlement Agreement is, in all respects, fair, reasonable, and adequate to the Settlement Classes. In reaching this conclusion, the court has considered the factors set forth in Rule 23(e) as well as the factors set forth in *Bennett*, 737 F.2d at 986. Moreover, the court **CONCLUDES** that:

a.  the Settlement Agreement was fairly and honestly negotiated by counsel with significant experience litigating class actions and is the result of vigorous arm's-length negotiations undertaken in good faith and with the assistance of mediators who are experienced and well-regarded mediators of complex cases;

b.  the Action involves contested issues of law and fact, such that the value of an immediate monetary recovery, in conjunction with the significant other relief provided pursuant to the Settlement Agreement (including but not limited to the relief described as "Class Injunctive Relief" in Paragraphs 10-21 of the Settlement Agreement), outweighs the mere possibility of any additional future relief after protracted and expensive litigation;

c.  success in antitrust cases such as this one is inherently uncertain, and there is no guarantee that continued litigation would yield a superior result (particularly given the costs, risks, and delay of trial and appeal); and

d.  there is a substantial basis for Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel's judgment that the Settlement Agreement is fair, reasonable and adequate.

13.  The court **FINDS** the proposed method of distributing relief to the Settlement Classes is adequate, including the method of processing Damages Class member claims.

14.  The court **FINDS** the Settlement treats Class Members equitably relative to each other when considering the differences in their claims.

15.  The court further **GRANTS** final approval to the Plan of Distribution, which was preliminarily approved by the court on November 30, 2020. The Plan of Distribution was developed and recommended by experienced class counsel with the support of expert economic analysis. The Plan of Distribution represents an efficient and equitable means of distributing the

Net Settlement Fund to the Damages Class in a timely fashion, without overly burdening claimants, and treats members of the Damages Class equitably relative to each other. In particular, the court **FINDS** that the allocation of the Net Settlement Fund among different types of claimants is appropriate, and **FURTHER FINDS** that the Plan of Distribution's use of default contribution percentages to calculate employer-employee allocation of premiums paired with an alternative option for claimants who believe they are entitled to more than the default option is reasonable based on the factors identified in the Plan. The Plan of Distribution's methodology strikes a reasonable balance between precision and efficiency.

## Releases

16. Except as to any claim of those Rule 23(b)(3) Opt-Outs identified in Document # 2928 who have validly and timely requested exclusion from the Damages Class and the divisible Second Blue Bid relief, the Action and all claims contained therein, as well as all of the Released Claims against any of the Releasees by Releasors, are each hereby **DISMISSED WITH PREJUDICE**.

17. The Opt-Outs identified in Document # 2928 are **EXCLUDED** from the Damages Class and the divisible Second Blue Bid relief pursuant to properly made exclusion requests. They may not make any claim on or receive any benefit from or under (a) the Settlement Fund, whether monetary or otherwise, or (b) any benefit under Paragraph C(15), the Second Blue Bid portion of the injunctive relief. Nonetheless, the identified Opt-Outs may not pursue any claims released under the Settlement Agreement regarding indivisible relief on behalf of those who are bound by this Final Judgment. For purposes of clarity, if a Self-Funded Account that opted out meets the criteria to request a Second Blue Bid under the terms of the Settlement Agreement, that Self-Funded Account does not release any claims for declaratory or injunctive relief to request a Second

Blue Bid during any time it meets the criteria to request such a bid under the terms of the Settlement Agreement. All other claims for indivisible declaratory or injunctive relief released under the Settlement Agreement are released. Each Settlement Class Member not appearing in Document # 2928 is **BOUND BY THIS FINAL JUDGMENT AND WILL REMAIN FOREVER BOUND**.

18.     The releases set forth in Paragraphs 32 and 33 of the Settlement Agreement, together with the Definitions contained in Paragraph 1 of the Settlement Agreement relating thereto, are **EXPRESSLY INCORPORATED** herein in all respects. The releases are effective as of the Effective Date.

19.     Upon the Effective Date, the Releasors: (a) **SHALL** be deemed to have, and by operation of the Final Judgment and Order of Dismissal **SHALL** have, fully, finally, and forever released, relinquished, and discharged (i) all Released Claims against any and all of the Releasees, and (ii) any rights to the protections afforded under California Civil Code §1542 and/or any other similar, comparable, or equivalent laws; and (b) covenant not to sue any Releasee with respect to any Released Claim, and are permanently barred and enjoined from commencing, maintaining, prosecuting, causing, cooperating with, advising to be commenced or maintained, or encouraging any action, suit, proceeding, or claim in any court, tribunal, administrative agency, regulatory body, arbitrator, or other body in any jurisdiction against any Releasee based in whole or in part upon, arising out of, or in any way connected or related to any Released Claim.

20.     This Final Order and Judgment **SHALL NOT** affect, in any way, the right of Releasors to pursue claims, if any, outside the scope of the Released Claims.

## Monitoring Committee

21.     The court **RESERVES** the issue of the makeup of the Monitoring Committee established in the Settlement. The court will appoint the members of the Monitoring Committee by separate order.

## Standard of Review

22.     The court **FINDS** that its April 5, 2018 Memorandum Opinion Regarding Section 1 Standard of Review and Single Entity Defense (Doc. # 2063) and the accompanying Order (Doc. # 2064) only apply to the then-in-effect accumulation of restraints actually addressed in the Memorandum Opinion and Order.

## Further Matters

23.     Nothing in the Settlement Agreement, this Final Order and Judgment, or any and all negotiations, documents, or discussions associated with them, or any proceedings undertaken in accordance with the terms of the Settlement Agreement constitutes (i) an admission or concession by any of the Settling Defendants (or evidence thereof) in any action or proceeding, (ii) evidence of any violation of any statute or law or of any liability or wrongdoing whatsoever by any Settling Defendant, or (iii) evidence of the truth or validity of any of the claims or allegations contained in any complaint or any other pleading that Class Representatives or Class Members have or could have asserted against Settling Defendants, including without limitation that Settling Defendants have engaged in any conduct or practice that violates any antitrust statute, or other law, regulation, or obligation. Settling Defendants expressly deny any wrongdoing or liability whatsoever for any and all such claims and allegations.

24.     Without affecting the finality of this Final Order and Judgment in any way, this court hereby **RETAINS** continuing jurisdiction over: (a) implementation of the Settlement

Agreement and any award or distribution of the Settlement Fund, including interest earned thereon; (b) disposition of the Settlement Fund; and (c) all Parties hereto for the purpose of construing, enforcing, and administering the terms of the Settlement Agreement consistent with those terms. Settling Defendants and each Settlement Class Member have submitted to the exclusive jurisdiction of this court for any suit, action, proceeding, or dispute arising out of or relating to the Settlement Agreement or the applicability of the Settlement Agreement (except those arising under Paragraphs 17 and 20 during the Monitoring Period, which are subject to binding arbitration as further described in those Paragraphs) to resolve any disputes or controversies, including but not limited to enforcement regarding Released Claims and Paragraphs 32 and 33 of the Settlement Agreement. Settling Defendants and Settlement Class Members have agreed that, in the event of such dispute, they are and shall be subject to the jurisdiction of this court and that this court is a proper venue and convenient forum.

25.     In the event that (a) the Settlement Agreement is rescinded or terminated, (b) the Settlement Agreement does not become effective in accordance with the terms of the Settlement Agreement, (c) the Effective Date does not occur, or (d) the Net Settlement Fund, or any portion thereof, is returned to Settling Defendants in accordance with the Settlement Agreement, then this Final Order and Judgment shall be rendered null and void to the extent provided by and in accordance with the Settlement Agreement and shall be vacated, and, in such event, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Settlement Agreement.

26.     In the event the Settlement Agreement does not become final, or is otherwise rescinded or terminated, litigation of the Subscriber Actions against Settling Defendants will resume in a reasonable manner to be approved by the court upon application by the Parties, and

any and all parts of the Settlement Fund caused to be deposited in the Escrow Account (other than Notice and Administration Costs reasonably and actually incurred), along with any income accrued thereon, shall be returned to the entities that paid such amounts into the Escrow Account, in proportion to their respective contributions, within ten (10) calendar days of rescission, termination, or the court's final determination denying final approval of the Agreement and/or any of the Settlement Classes, whichever occurs first.

27. The Parties expressly reserve all of their rights if this Agreement is rescinded or does not otherwise become final.

28. If the Effective Date does not occur with respect to the Settlement Agreement because of the failure of a condition of the Settlement Agreement, the court's assessment of class certification of the Settlement Classes **SHALL** be deemed null and void and the Parties shall retain their rights to seek or to object to certification of this litigation as a class action under Rule 23 of the Federal Rules of Civil Procedure or under any other state or federal rule, statute, law, or provision thereof, and to contest and appeal any grant or denial of certification in this litigation or in any other litigation on any other grounds.

29. The Parties are **DIRECTED** to implement the Settlement Agreement in accordance with its terms once the Settlement Agreement becomes final. Without further order of the court, the Parties may agree to reasonable extensions of time to carry out any of the provisions of the Settlement Agreement.

## Dismissal of the Subscriber Actions

30. The Subscriber Actions are hereby **DISMISSED WITH PREJUDICE** and, except as provided for in the Settlement Agreement and any order of this court granting fee, expense, or service awards as contemplated under the Settlement Agreement, without costs. As set out in

Paragraph 16, any dismissal with prejudice shall not apply to unreleased claims of the Opt-Outs identified in Document # 2928.

31.      There is no just reason for delay in the entry of this Final Order and Judgment. The dismissed Subscriber Actions are severable from all remaining Provider Actions and immediate entry of this Final Order and Judgment by the Clerk of the Court is expressly directed.

## APPOINTMENT OF SETTLEMENT ADMINISTRATOR

In addition to moving for final approval of the Class Settlement, Subscriber Plaintiffs have moved the court to appoint the Honorable Irma E. Gonzalez (Ret.) as the Settlement Administrator. (Doc. # 2812). The Motion (Doc. # 2812) in this regard is **GRANTED**.

The Honorable Irma E. Gonzalez (Ret.) is **APPOINTED** as the Settlement Administrator, with responsibility limited to assisting in the "implementation of the Plan of Distribution and the resolution of any disputes between Settlement Class Members and the Claims Administrator pursuant to the Plan of Distribution, as set forth in the Settlement Agreement." (Doc. # 2610-2 ¶ 1(iiii)). The Settlement Administrator's fees, as well as all other costs and expenses reasonably incurred and associated with notice and administration, will be paid directly from the Notice and Administration Fund Settlement upon written authorization by Class Counsel, Self-Funded Sub-Class Settlement Counsel, and a designated representative of the Settling Defendants, and such authorization shall not be unreasonably withheld. (Doc. # 2610-2 ¶¶ 26(a), 29).

**DONE** and **ORDERED** this August 9, 2022.

_R. David Proctor_
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE