## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| | } | |
| IN RE:  BLUE CROSS BLUE SHIELD | } | Master File No.:  2:13-CV-20000-RDP |
| ANTITRUST LITIGATION | } | |
|   (MDL NO.: 2406) | } | |
| | } | |

## MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION REGARDING THE ANTITRUST STANDARD OF REVIEW APPLICABLE TO PROVIDER PLAINTIFFS' SECTION 1 CLAIMS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56

This matter is before the court on Defendants' Motion Regarding the Antitrust Standard of Review Applicable to Provider Plaintiffs' Section 1 Claims. (Doc. # 2722). The Motion has been fully briefed. (Docs. # 2728; 2747; 2772).

This multi-district litigation has now entered its tenth year. But, even at this advanced stage of the litigation, the court has not had the occasion to address "whether the Blue Plans' service area allocations alone constitute a *per se* violation of Section 1." (Doc. # 2063 at 37). That is because in the court's April 2018 standard of review opinion (Doc. # 2063), the record before the court presented it with "an aggregation of competitive restraints," which included the National Best Efforts ("NBE") rule. The court concluded that combination of restrictions was to be analyzed under the *per se* rule. (*Id.*). However, in April 2021, in connection with the settlement between the Subscriber Plaintiffs and the Blues, Defendants eliminated the NBE rule.[1] (Doc. # 2735-33). The question now presented is whether the elimination of the NBE rule distinguishes this matter from

---

[1] Defendants agreed as part of the settlement to eliminate the NBE rule, but did not await final approval and unilaterally implemented that change in practice last year.

the aggregation of competitive restraints found in *Sealy*[2] and necessitates a further analysis of *Topco*.[3] The answer is "yes." As explained in more detail below, the court concludes that Defendants' new system is distinguishable from *Sealy* and *Topco* and that, for the period following the elimination of the NBE rule (*i.e.*, after April 2021), and for purposes of determining (or evaluating) any structural relief, it must apply the rule of reason analysis to Providers' Market Allocation Conspiracy claims.

In their Motion, Defendants argue that the appropriate antitrust standard of review for Providers' challenges to the Blue Plans' Exclusive Service Areas ("ESAs") (their Market Allocation Conspiracy claims) is the rule of reason, and that ESAs, alone, are not subject to the *per se* rule for two primary reasons. First, Defendants contend that without NBE, there is no longer an "aggregation of competitive restraints" similar to that addressed in the court's April 2018 standard of review opinion. (Doc. # 2728 at 10). Second, Defendants assert that Providers' claims have "never involved an aggregation of restraints on branded and unbranded business." (*Id.*).

Providers respond that (1) the elimination of NBE does not affect the standard of review for the Providers' claims from 2008 (the beginning of the limitations period) to April 2021 (when NBE was eliminated), and (2) because Providers still seek injunctive relief to remedy the ongoing effects of the NBE rule, the ESA and NBE rules can still be viewed in tandem for purposes of determining the standard of review. (Doc. # 2747 at 6). Providers further argue that ESAs did not "develop independently through existing trademark rights," and, even if they did, their historical origin makes no difference to the standard of review, as there is still "no daylight" between the facts of this case and the Supreme Court's decisions in *Topco* and *Sealy*. (Doc. # 2747 at 17, 19).

---

[2] *United States v. Sealy*, 388 U.S. 350 (1967).

[3] *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972).

In their reply, Defendants assert that it was permissible to settle their trademark rights and protect their trademarks through the license agreements containing the ESAs, and that alone defeats *per se* treatment. (Doc. # 2772 at 6). Defendants further argue that a determination about the legal effect of their ESAs, standing alone, implicates the rule of reason because they arose in a novel factual context and offer procompetitive efficiencies. (*Id.*). Finally, Defendants argue that the court's April 2018 standard of review decision should not apply to Providers' claims against them because it was a Subscriber-focused ruling made at a time when the Subscriber and Provider cases were joined, and Providers have no viable claim related to NBE. (*Id.*).

## I.     Background

The Blue Plans historically began with the development of prepaid hospital and medical plans in the 1930s. (Docs. # 1353-4 at 21-22; 24; 1353-10 at 8-9). Local plans began using the Blue Cross or Blue Shield symbol: the Blue Cross for prepaid hospital care was first used by the St. Paul, Minnesota Plan in 1934; and the Blue Shield for prepaid medical care was first used by the Buffalo, New York Plan in 1939. (Doc. # 1353-7 at 25-26, 63-64). Other Plans began using these same symbols as well. (Docs. # 1350-35 at 2; 1349 at 11; 1431 at 15; 1435 at 12).

In 1938, the American Hospital Association ("AHA") developed a program to grant membership to local prepaid hospital plans. Forty plans were approved for membership, including BCBS-AL's predecessor, Hospital Service Corporation of Alabama ("HSC-AL"). (*Compare* Doc. # 2728 at ¶ 12; Doc. # 2747 at ¶ 12). By 1938, the American Medical Association ("AMA") "endorsed [the] principle of 'Medical service plans'" "and set forth guiding principles" for such plans. (Doc. # 1353-5 at 36).

HSC-AL enrolled its first subscribers in 1936, and began using the Blue Cross mark in 1939 and the Blue Shield mark in 1947. This was after the AMA and the AHA had set their

respective standards for use of the marks. (Doc. # 2747 at 7). After 1939, HSC-AL continuously used the Blue Cross mark. (Doc. # 2735; Doc. # 1353-13 at 12-3, 7-19). By 1949, BCBS-AL was advertising its "medical-surgical" plan as the "Blue Cross – Blue Shield" plan, and it used both the Blue Cross and Blue Shield marks together in commerce. (Doc. # 2735; Doc. # 1353-13 at 54-56). So, by 1949, BCBS-AL was using both marks on a state-wide, exclusive basis. (Doc. # 2735; Doc. # 1353-13 at 54-56). Other Blue Plans similarly used the Blue Cross and/or Blue Shield marks in the 1930s and 1940s, but not always in an exclusive manner or on a state-wide basis. (Doc. # 2747 at 7). Some Blues registered their marks locally. (Doc. # 2747 at 8).

In 1946, Congress enacted the Lanham Act, which provided national protection for trademarks by virtue of federal registration. 15 U. S. C. §1051(a)(1). Given this change in law, the Blue Plans and the national organizations discussed how best to protect their marks. (Doc. # 2735 -5 at 4; Doc. # 2735 at 6; Doc. # 2735-8). In 1947 and 1948, the national organizations applied for federal registration of their Blue Cross and Blue Shield marks (collectively, the "Blue Marks"). (Docs. # 1353-28; 1353-29; 1353-31; 1353-47; 1353-48 at 2; 2735-7 at 4; 2735-4 at 9).

Federal trademark registrations were issued to the national organizations in 1952. (Docs. # 1350-36; 1350-37; 1350-38; 1350-40; 1350-41; 1350-42; 1353-30). After the federal trademarks were issued, the local Plans entered into written license agreements with the national organizations. (*See, e.g.*, Doc. # 1353-48; Doc. # 1353-50). The 1952 and 1954 license agreements confirmed that the Plans had centralized local rights to the Marks in the national organizations and that the national organizations, in turn, licensed the federal Blue Mark(s) back to each Plan. (Doc. # 1353-48 at 2-4; Doc. # 1353-50 at 2-4). In areas where a single Blue Cross Plan had historically operated, such use was deemed "exclusive"; but, in areas where multiple Plans had historically operated, the

license agreements reflected that reality with respect to those particular Plans. (*See, e.g.*, Doc. # 1353-50 at 4).

In 1972, AHA transferred ownership of the Blue Cross Marks to the Blue Cross Association (Doc. # 1353-57), and the Association issued new license agreements to the Plans. (Doc. # 1353-100 at 2). In 1982, the Blue Cross Association merged with the Blue Shield Association (formerly BSMCP) to create the Blue Cross and Blue Shield Association. (Doc. # 1353-10 at 33:10-24; Doc. # 1349-43 at 4-6; Doc. # 1349-27 at 44). In 1991, the Association reissued License Agreements to the Plans. (*See, e.g.*, Doc. # 1349-11 at 3; Doc. # 1349-12 at 3).

In 2005, the NBE Rule was adopted. It required a Blue Plan to derive at least sixty-six and two-thirds percent of its national health insurance revenue from its Blue brands. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1256 (N.D. Ala. 2018) (citing Doc. # 1349-16 at 7). Thus, under NBE, any health revenue a Blue Plan generated from services offered under any non–Blue brand was limited in relation to its Blue branded health revenue. *Id.* (citing Doc. # 1432 at 20–21). NBE did not specifically address contracting with Providers, nor did it place any limits on contracting with Providers under non-Blue brands.

## II.    Standard of Review

Summary judgment is warranted if, viewing the facts in the light most favorable to the nonmoving party, no material fact is subject to a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The appropriate standard for evaluating conduct challenged under the Sherman Act—rule of reason or *per se*—is a question of law for the court to decide. *Food Lion, LLC v. Dean Foods Co., (In re Milk Antitrust Litig.)*, 739 F.3d 262, 271 (6th Cir. 2014) ("The district court's decision to use the rule of reason is a question of law[], which we review de novo."). While the selection of a mode of analysis (*per se* or rule of reason) is a question

of law, sometimes "underpinning that purely legal decision are numerous factual questions." *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 733-34 (8th Cir. 2014).

### III.    Analysis

As the Supreme Court recently explained,

> Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. This Court has long recognized that, "[i]n view of the common law and the law in this country" when the Sherman Act was passed, the phrase "restraint of trade" is best read to mean "undue restraint." *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59–60, 31 S.Ct. 502, 55 L.Ed. 619 (1911). This Court's precedents have thus understood § 1 "to outlaw only *unreasonable* restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (emphasis added).

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018).

A restraint may be deemed unreasonable "either because it fits within a class of restraints that has been held to be '*per se*' unreasonable, or because it violates what has come to be known as the 'Rule of Reason.'" *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 457–58 (1986) (quoting *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)). "Determining whether a restraint is undue for purposes of the Sherman Act 'presumptively' calls for what we have described as a 'rule of reason analysis.'" *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2151 (2021) (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)).

### A.    There is Daylight Between the Current Facts of this Case and *Topco* and *Sealy*

Defendants argue that ESAs alone are not *per se* unlawful and that, with the elimination of NBE, Providers' Section 1 claims should be subject to the Rule of Reason. Providers maintain that there is "no daylight between this case and *Topco* and *Sealy*," and that those cases dictate a finding that ESAs alone are *per se* unlawful. (Doc. # 2747 at 19). The court disagrees.

In *United States v. Sealy, Inc.*, the licensor, Sealy, agreed to allot exclusive territories to its licensee-members, a group of mattress manufacturers. 388 U.S. 350, 352 (1967). Sealy also,

however, set the prices its members could charge for their products. *Sealy*, 388 U.S. at 354-55. Therefore, as the Supreme Court noted, "[i]n the present case, we are [] faced with an 'aggregation of trade restraints.'" *Id.* at 354. In *Sealy*, the "territorial exclusivity['s] connection with the unlawful price-fixing [was] enough to require that it be condemned as an unlawful restraint[]." *Id.* at 356-57. Under these facts, the Supreme Court held that "territorial limitations [that] are part of 'an aggregation of trade restraints' [] are unlawful under § 1 of the Sherman Act without the necessity for an inquiry in each particular case as to their business or economic justification, their impact in the marketplace, or their reasonableness." *Id.* at 357-58. The court in *Sealy*, like this court previously, did not evaluate the issue of a horizontal market allocation alone. Rather, the *Sealy* Court was confronted with an aggregation of trade restraints. So, the posture of the claims in *Sealy* was similar to what this court faced when it issued its 2018 ruling. But, now that the NBE rule has been eliminated, this court is not dealing with the same aggregation of restraints, at least for purposes of assessing (1) injunctive relief and (2) damages beginning in April 2021.

In *United States v. Topco Associates, Inc*., a group of small and medium-sized supermarket chains associated together to sell private-label goods under Topco's brand names. 405 U.S. 596, 598, 601-02 (1972). Membership in the association had to be "approved by the board of directors, and thereafter by an affirmative vote of 75% of the association's members." *Topco*, 405 U.S. at 602. "[T]he procedure for approval provide[d], in essence, that members have a veto of sorts over actual or potential competition in the territorial areas in which they are concerned." *Id*. Nothing in *Topco*, however, indicates that any of the member chains had any right to use the Topco brand prior to becoming a member of the association. *Id*. ("*Following approval*, each new member signs an agreement with Topco designating the territory in which that member may sell Topco-brand products." (emphasis added)). The fact that, here, the Blue Plans had at least some sort of

preexisting common law trademark rights to the Blue Marks before the License Agreements memorialized or settled those rights is a distinction *with* a difference. Therefore, *Topco* is also distinguishable on these grounds.

Of course, "the mere fact that an agreement implicates intellectual property rights does not "immunize [the] agreement from antitrust attack." *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 113 (2d Cir. 2021) (quoting *FTC v. Actavis*, 570 U.S. 136, 147 (2013) and citing *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000) ("Intellectual property rights do not confer a privilege to violate the antitrust laws.")). However, "[a]greements to protect trademarks [] should not immediately be assumed to be anticompetitive – in fact, *Clorox* tells us instead to presume they are procompetitive." *1-800 Contacts*, 1 F.4th at 116 (citing *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 55-56 (2d Cir. 1997) ("Such agreements are common, and favored, under the law.")).

In 2018, this court discounted Defendants' trademark justification for ESAs when it considered the aggregation of ESAs and NBE because "there [was] nothing in the Rule 56 record which indicate[d] that there [was] any valid connection between trademark rights and the National Best Efforts rule." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1272. Where restraints are derived from trademark agreements, however, they "could plausibly be thought to have a net procompetitive effect[]. *1-800 Contacts*, 1 F.4th at 116. ("Crucially, the restraints at issue here could plausibly be thought to have a net procompetitive effect because they are derived from trademark settlement agreements."). In light of *1-800 Contacts*, and the elimination of the NBE rule, Defendants' argument that the ESAs arose from common law trademark rights warrants a closer look. "[E]ven though trademark agreements inherently prevent competitors 'from competing as effectively as [they] otherwise might' [] 'it is difficult to show that an unfavorable

trademark agreement creates antitrust concerns.'" *1-800 Contacts*, 1 F.4th at 119 (citing *Clorox*, 117 F.3d at 55, 57).

In *VMG Enterprises, Inc. v. F. Quesada & Franco, Inc*., cited by Defendants, two manufacturers of baby diapers (VMG and non-party UCI) separately acquired the right to use the mark "BABY'S CHOICE" in their own geographies. 788 F. Supp. 648, 651, 654 (D.P.R. 1992). Following competing filings to register their respective marks, VMG and UCI entered into a concurrent use agreement in which they agreed that each manufacturer could use the mark in its exclusive territorial region, which for VMG included Puerto Rico. *VMG*, 788 F. Supp. at 651-52, 657. VMG then sued the defendant, who was selling baby diapers in Puerto Rico under the name "BABY'S CHOICE." *Id*. at 650. The defendant filed a counterclaim asserting the "theory [that] VMG's and UCI's concurrent use registrations are based on agreements which divide trademark territories" and therefore violate antitrust laws. *Id*. at 657. The court disagreed. It reasoned that "the territorial division in question is legitimate under both common law and by statute, as intended to promote the underlying principles of the trademark laws in general and the Lanham Act," including the "protection of a party's investment in developing the goodwill of its products." *Id*. (citing *In re Beatrice Foods Co*., 429 F.2d 466, 472, n.10 (3d. Cir. 1970) (discussing the legislative history of the Lanham Act)). Moreover, the court held, "[t]he concurrent use agreement, and the registration that followed it, did not 'create' a trademark territorial division for the BABY'S CHOICE mark between VMG and UCI; it merely recognized it." *Id*. "[T]he division was already a reality as a matter of trademark law." *Id*.

Something similar can be said about the Blue Marks and the ESAs in this case. Prior to the introduction of the License Agreements with the Association and with its predecessors, the Blue

Plans had been using the Blue Marks and had already acquired at least some common law trademark rights in the Marks.

Providers dispute that the Blue Plans had any preexisting common law trademark rights to the Blue Marks. (Doc. # 2747 at 15-16). Providers argue that any common law rights to the Marks were abandoned through "naked licensing," or, alternatively, that the Plans were mere licensees of national organizations. However, as they admit, "1954 Blue Cross [license] agreement and the 1952 Blue Shield [license] agreement [] describe pre-existing rights in the Blue Cross and Blue Shield marks." (Doc. # 2747 at 8, ¶ 21). Those agreements came about to provide clarity on the rights to the Blue Cross and Blue Shield marks following the passage of the Lanham Act. (Doc. # 2735 -5 at 4; Doc. # 2735 at 6; Doc. # 2735-8). And, agreements settling trademark rights "are not so obviously anticompetitive to consumers that someone with only a basic understanding of economics would immediately recognize them to be so." *1-800 Contacts, Inc*. 1 F.4th at 117. Furthermore, such a "settlement" of trademark rights need not arise from litigation. In *1-800 Contacts*, one of the trademark agreements at issue arose out of a business arrangement between 1-800 Contacts and a lens supplier, Luxottica—not any direct threat of litigation. 2021 WL 2385274, at *3.

In any event, the court need not define the exact nature or extent of the Blue Plans' common law rights in the marks. According to *Clorox*, "[w]e begin with the fact that [Providers] challenge a trademark agreement [which] are common, and favored, under the law." *Clorox*, 117 F.3d at 55 (citing 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:25 (4th ed.1996)). Importantly, ESAs "do[] no more than regulate how the [Blue Mark] may be used; [they] do[] not in any way restrict [a Blue Plan] from producing and selling products that compete directly with the [Blue] brand, so long as they are marketed under a brand name other than [a Blue

Mark]." *Clorox*, 117 F.3d at 57. ESAs, and the License Agreements effecting them, "[do] not restrict a competitor's ability to market products under names other than the one precluded by the agreement," *i.e.*, the Blue Marks. *Id.* (citing *California Packing Corp. v. Sun-Maid Raisin Growers*, 165 F. Supp. 245 251 (S.D. Cal. 1958), *aff'd*, 273 F.2d 282 (9th Cir. 1959)). That is, the ESAs do not limit a Blue Plan's ability to operate under non-Blue brands. It was the now-defunct NBE rule that operated to preclude that. Without NBE, even under the Blues' ESAs, the Plans are free to enter into any market under a non-Blue brand. The only market in which the Blue Plans' ability to compete under a non-Blue brand is limited is the market to which their License Agreement applies, and in that market they are already naturally disincentivized to operate a non-Blue business there because they would be competing against themselves.

Because (1) courts "presumptively" apply a "rule of reason analysis" *NCAA*, 141 S. Ct. at 2151, (2) trademark agreements are "common, and favored, under the law," *Clorox*, 117 F.3d at 55, and (3) trademark agreements do not immediately appear "obviously anticompetitive," *1-800 Contacts, Inc.* 1 F.4th at 117, the court concludes that the appropriate standard of review under which the court will evaluate ESAs alone is the Rule of Reason. The court emphasizes that this holding is applicable only to the period of time following the elimination of the NBE rule in April 2021.

### B.    NBE Is Relevant to Providers' Claims

Defendants argue that Providers' Section 1 claims should be evaluated under the Rule of Reason for the entire class period, rather than just following the elimination the NBE rule, because NBE was a Subscriber-facing rule that has nothing to do with Provider claims. (Doc. # 2728 at 34-36 ("NBE was a subscriber-facing rule that governed solely the percentage of *subscriber-related*

revenue that a Plan may earn from non-Blue-branded sales on a nationwide basis.") (emphasis in original)). The court disagrees.

Providers respond that they have asked for relief in relation to NBE from the beginning of this case. Indeed, in their Consolidated Fourth Amended Complaint, Providers summarized the basis for their Market Allocation Conspiracy claims as follows:

> In furtherance of the Market Allocation Conspiracy, Defendants agreed that each Defendant would be allocated a defined Service Area *and further agreed that each Defendant's ability to operate and to generate revenue outside its geographic Service Area would be severely restricted.*

(Doc. # 1083 at ¶ 5) (emphasis added). They further alleged that:

> The non-Blue revenue restriction agreement, which the Blues call "best efforts rules" to hide the obvious anti-competitive effects of this agreement also reinforces the other agreements and prevents the Defendants from engaging in meaningful competition in any manner.

(*Id*. at ¶ 15). Providers also alleged that the effect of NBE is to "put[] an artificial limit on competition" and "reduce[] the incentive for the Blues to develop business out of their Service Areas because they know that the potential for that business is limited." (*Id*. at ¶ 365). In their brief in response to Defendants' July 2017 Motion for Summary Judgment, Providers included a section headed, "[t]he "Best Efforts" Rules Are Unlawful Limitations on Output." (Doc. # 1431 at 61). They argued that "the Blues' limits on non-Blue revenue [NBE] restrain potential competition." (*Id*. at 32).

Defendants are wrong that NBE is only relevant to the Subscriber case. Providers have also alleged that NBE is part of their Market Allocation Conspiracy claim. And restricting the development of non-Blue insurance options for Subscribers could also have the effect of reducing the options available to Providers to contract with non-Blue health insurers. Therefore, Providers' Section 1 Market Allocation Conspiracy claims involving the aggregation of ESAs and NBE will

remain subject to the court's 2018 standard of review decision for the period of time before NBE was eliminated.

## IV.    Conclusion

For all of the foregoing reasons, Defendants' Motion Regarding the Antitrust Standard of Review Applicable to Provider Plaintiffs' Section 1 Claims (Doc. # 2722) is **GRANTED IN PART AND DENIED IN PART.**

The Motion is **GRANTED** to the extent that the court concludes that ESAs, viewed alone (*i.e.*, divorced from NBE), "should not immediately be assumed to be anticompetitive," *1-800 Contacts*, 1 F.4th  at 116, and thus are not "naked restraint[s] of trade with no purpose except stifling competition." *Levine v. Cent. Fla. Med. Affiliates, Inc*., 72 F.3d 1538, 1550 (11th Cir. 1996). Therefore, for the period of time following the elimination of the NBE rule (after April 2021), the court concludes that it must apply the rule of reason analysis to Providers' Market Allocation Conspiracy claims.

In all other respects, the Motion is **DENIED**.

**DONE** and **ORDERED** this August 9, 2022.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE