IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |
|---|---|
| IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL NO.: 2406) | Master File No.: 2:13-CV-20000-RDP |

### MEMORANDUM OPINION AND ORDER ON PROVIDER PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE STANDARD OF REVIEW FOR THEIR GROUP BOYCOTT CLAIMS

This matter is before the court on Provider Plaintiffs' Motion for Partial Summary Judgment Regarding the Standard of Review for their Group Boycott Claims. (Doc. # 2729). The Motion has been fully briefed. (Docs. # 2760, 2776, 2918, 2923, and 2924). In their Motion, Providers contend that Defendants have agreed that a Provider in Alabama can either (1) contract with BCBS-AL on dictated terms and thereby gain access to the other Blues' subscribers or (2) be excluded from the network of every single Blue Plan. (Doc. # 2729 at 6). Providers argue that this horizontal agreement, when combined with BCBS-AL's overwhelming share of the market for commercially insured patients in Alabama, constitutes a *per se* unlawful group boycott. (*Id.*). Providers further argue that Defendants have imposed an "absolute exclusion" and that they cannot compete in the relevant market without gaining access to Defendants' commercially insured patients. (*Id.*).

Defendants respond that Providers' group boycott claims actually have nothing at all to do with BlueCard and what Providers are actually challenging in their "group boycott" claims are Exclusive Service Areas ("ESAs"). (Doc. # 2760 at 10). Defendants further argue that, even if Providers have made out a group boycott claim, their allegations do not describe the rare type of group boycott that is subject to the *per se* rule. (*Id.*).

**I.     Background**

Provider Plaintiffs have asserted *per se*, quick look, and rule of reason claims related to Defendants' alleged "Boycott Conspiracy." (Doc. # 1083 at 172, 174, 176). In their Consolidated Fourth Amended Provider Complaint, Provider Plaintiffs allege that, as a result of the Market Allocation Conspiracy (ESAs), Defendants achieved market dominance and low pricing for healthcare provider services in each Service Area. (Doc. # 1083 at ¶ 326). They further allege that under the License Agreements, which memorialize the ESAs, every Blue agrees to participate in the Blue Card Program (among other programs). (*Id.* at ¶¶ 326-28). And, through the Blue Card Program, Providers allege that the Blues have leveraged the low provider pricing they have achieved in each Exclusive Service Area to benefit all Blues. (*Id.*). In Alabama, Providers assert that they can join the network of all the Blues under the terms and prices imposed by BCBS-AL, or be precluded from joining any Blue network. (*Id.*).

The Plans are potential competitors, and Providers claim that in the absence of the ESAs, the Plans would in certain instances be actual competitors. One of BCBS-AL's corporate representatives, Tony Carter, testified that he defined BCBS-AL's competitors as follows: "in the broadest of sense, a competitor is anybody that sells a similar product." (Doc. # 1352-211 at 14, 44).

The majority of the Plans' service areas are exclusive (*i.e.*, they do not overlap with another Plan's service area). *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1252 (citing Doc. # 1432 at 11). ESAs create "[l]arger market share because other Blues stay out and do not fragment the market," *Id.* at 1253 (citing Doc. # 1350-22 at 3) and they allow for aggressive bargaining. *Id.* (Doc. # 1350-23 at 3).

There are exceptions to the ESAs. One such exception allows Defendants to contract on a Blue-branded basis with Providers located one county into a neighboring Plan's service area. (Doc. # 2455-6 at 139:6-20; Doc. # 2775-1 at 85:2-20; Doc. # 1352-127 at 129; Doc #. 1352-128 at 127; *see also* Doc. 2454-6 ¶ 82).

The BlueCard program was developed in 1992. *Id.* at 1254. BlueCard was designed to "ensure that Blue Cross and Blue Shield subscribers . . . receive consistent benefits outside of their Plans' service areas," for example while traveling. (Doc. # 1353-56 at 4). BlueCard enables Providers to access significantly more patients on an in-network basis. (Doc. # 1353-77 at 9; *see also* Doc. # 2777-8 ¶¶ 168, 176–78 & tbl. VII-1; Doc. # 1353-78 at 5; Doc. # 1353-79 at 13).

*"*In 1995, Member Plans adopted a license standard requiring all Plans to participate in BlueCard." *Id.* at 1254-55 (citing Doc. # 1352-44 at 56). Under BlueCard, Plans were required to make their local provider discounts available to all Blue Members, even if a Blue Member lived in another Plan's service area. *Id.* at 1254 (citing Doc. # 1352-44 at 56).

Although "participation in the BlueCard program is a requirement of the License Agreement between the Association and each individual Plan[,] under the Association Rules, a Plan could create a provider network that is not made available to BlueCard-eligible Members or Subscribers." *Id.* at 1255 (citing Doc. # 1432 at 12). However, BCBS-AL does not honor assignment of benefits for out-of-network providers. Stated another way, BCBS-AL will pay the subscriber, not the provider, for the service, and the provider will have to collect from the subscriber. (Doc. # 2740-1 at 14:12-23). Also, when a provider treats a BCBS-AL subscriber on an out-of-network basis, BCBS-AL generally pays less than it would to an in-network provider. (*Id.* at 17:6-10). Government programs also generally pay less for medical services than commercial insurance. (Doc. # 2454-6 ¶ 242).

In Alabama, more than 80% of commercial patients are covered by the Blues. (Doc. # 2454-6 ¶ 275). Across all CoreBased Statistical Areas (CBSAs) and counties not part of a CBSA in Alabama, the Blues' share of commercial patients ranges from 62% to 94%. (*Id.*). Additionally, other Blue Plans had in excess of 400,000 members residing in Alabama. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1253 (citing Docs. # 1350 at 17-18; 1432 at 17).

None of Defendants' rules prohibit Providers from (1) contracting with other commercial insurers that have Alabama subscribers, (2) treating patients insured by government programs, or (3) treating patients on an out-of-network basis. ((Doc. # 2454-6 at ex. III.5, ¶ 64; Doc. # 2775-1 at 131:4-24). Some providers make a profit on government payors and, in some instances, government reimbursement rates are competitive with the rates paid by commercial insurers. (Doc. # 2777-3 at 50:4-13 (noting that "in Alabama, Medicaid is a fairly good payer."); Doc. # 2777-1 at 28:24-29:14 (noting that "on certain things, Medicaid and Medicare pay more than Blue Cross."). Moreover, "Alabama physicians [] earn salaries that are higher than the national average." (Doc. # 2565-49 at ¶ 188 ("Despite BCBS-AL having a market share that is among the highest of all Blue Plans,[] the salaries of physicians and surgeons in Alabama are typically above the U.S. average.").

**II.     Standard of Review**

Summary judgment is warranted if, viewing the facts in the light most favorable to the nonmoving party, no material fact is subject to a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). Although a motion for summary judgment addressing a *per se* claim involves underlying facts, the propriety of *per se* treatment "is normally a question of legal characterization that can often be resolved by the judge on a motion ... for summary judgment." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57, 61

(1st Cir. 2004); *see also Ariz. v. Maricopa Cty. Med. Socy.*, 457 U.S. 332, 337 n.3 (1982) (whether challenged conduct belongs in the *per se* category is a question of law).

### III.    Analysis

A group boycott is included within the Sherman Act's prohibition on any unreasonable contract, combination, or conspiracy in the restraint of interstate trade or commerce. 15 U.S.C. §§ 1, 1013(b); *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 541 (1978). "Group boycotts [] generally consist of agreements by two or more persons not to do business with other individuals, *or to do business with them only on specified terms*." *Balaklaw v. Lovell*, 14 F.3d 793, 800 (2d Cir. 1994) (emphasis added) (citing *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 73 (2d Cir. 1988).

Providers have not presented evidence that Defendants have refused to deal with them at all. Rather, the evidence presented by Providers indicates that Defendants entered into agreements among themselves to do business with them only on certain terms. *See Balaklaw*, 14 F.3d at 800.

Group Boycotts "may in some limited circumstances constitute *per se* violations of the Sherman Act." *Balaklaw*, 14 F.3d at 800; *see also In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1277 (N.D. Ala. 2018) ("The Eleventh Circuit has recognized that certain group boycotts constitute *per se* violations of the Sherman Act." (citing *All Care Nursing Serv., Inc. v. High Tech Staffing Servs.*, 135 F.3d 740, 746 (11th Cir. 1998)). "Group boycotts generally are only subjected to a *per se* analysis if (1) the boycott blocks access to a necessary product, facility, or market for competition, or (2) if the boycotting firms possess market power within the relevant market." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1277 (citing *All Care Nursing*, 135 F.3d at 746 (in turn quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294)); *see also FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458

(1986) ("[T]he category of restraints classed as group boycotts is not to be expanded indiscriminately, and the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor.").

    The Eleventh Circuit has explained a group boycott as follows:

> A group boycott consists of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target. The ultimate target of the agreement can be either a competitor or a customer of some or all of the [boycotters] who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the [boycotters]. For boycotting to be *per se* illegal, it must involve horizontal agreements among direct competitors.

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co*., 917 F.3d 1249, 1271 (11th Cir. 2019) (alterations in original) (citations and quotation marks omitted). *See also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (Supreme Court "precedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors.") (discussing *Klor's, Inc. v. Broadway-Hale Stores, Inc*., 359 U.S. 207 (1959)). Nevertheless, "a concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment." *Nw. Wholesale Stationers*, 472 U.S. at 295.

    As the Supreme Court has recognized, "'there is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine.'" *Nw. Wholesale Stationers, Inc*., 472 U.S. at 294 (quoting L. Sullivan, Law of Antitrust 229-230 (1977)). "[T]here are no bright lines." *All Care Nursing*, 135 F.3d at 746 (11th Cir. 1998). "Some care is therefore necessary in defining the category of concerted refusals to deal that mandate *per se* condemnation." *Nw. Wholesale Stationers, Inc*., 472 U.S. at 294 (citing *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 543 (1978)). Indeed, the Supreme Court and

the circuits have cautioned district courts against any haphazard imposition of *per se* liability in relation to a group boycott claim. *Retina Assoc., P.A. v. S. Bapt. Hosp. of Fla., Inc.*, 105 F.3d 1376, 1381 (11th Cir. 1997) (citing *Ind. Fed'n*, 476 U.S. at 458; *Levine v. Cent. Fla. Medical Affiliates*, 72 F.3d 1538, 1548 (11th Cir. 1996)).  Importantly, "[t]he labeling of a restraint as a group boycott does not eliminate the necessity of determining whether it is a 'naked restraint of trade with no purpose except stifling competition.'" *Levine v. Cent. Fla. Med. Affiliates, Inc*., 72 F.3d 1538, 1550 (11th Cir. 1996) (quoting *Consultants & Designers, Inc. v. Butler Serv. Group, Inc*., 720 F.2d 1553, 1561 (11th Cir. 1983) (in turn quoting *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963))).

Here, Providers have presented evidence of a horizontal agreement among direct competitors and that BCBS-AL possesses market power in at least some portion of the market for commercial healthcare patients. But that does not end the inquiry. The court still must consider whether the boycott at issue is a "naked restraint of trade with no purpose except stifling competition." *Levine,* 72 F.3d at 1550.

On this issue, there is Rule 56 evidence that the refusal of out-of-state (or out-of-area) Blue Plans to contract with Alabama providers under a Blue brand is related to each Blue Plan's exclusive right to use the Blue Cross and/or Blue Shield trademarks in their ESA. The Association owns the Blue Cross and Blue Shield names and trademarks (the "Blue Marks"), and it in turn grants licenses to the Member Plans to use the Blue Marks in certain defined areas. *In re Blue Cross Blue Shield Antitrust Litig*., 308 F. Supp. 3d at 1251 (citing Doc. # 1352-41 at 7). Despite these trademark-related restrictions, BlueCard allows the Blue Plans to integrate their geographically limited Blue provider networks to serve subscribers on a nationwide basis. This allows a subscriber from another state to be treated by an Alabama provider on an in-network

basis. And, separate and apart from the Blue Marks, Blue Plans are now free to contract with any provider anywhere under a non-Blue brand.

The Rule 56 record also contains evidence that Alabama Providers earn salaries that are higher than the national average. (Doc. # 2565-49 at ¶ 188). Successful performance by a plaintiff during the period of an alleged group boycott weighs against the application of a *per se* analysis of the boycott. *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1383 (11th Cir. 1997) ("The determination that *per se* analysis is inapplicable in this case is reinforced by [Plaintiff]'s remarkable success during the years of the alleged boycott.").

Finally, although the court is not currently in a position to determine whether the market(s) at issue in this case are truly two-sided, the court is cognizant that Provider reimbursement rates have at least some effect on Subscriber premiums. (Doc. # 2777-8 at ¶ 76 (stating that "there is extensive evidence that subscriber premiums and provider reimbursement rates are highly interrelated. Providers and health insurers recognize that higher reimbursement rates lead to higher premiums. Economic studies of pricing by health insurers recognize that premiums and reimbursement rates are interdependent." (citations omitted))). Thus, the court cannot on this record conclude that an attempt by Blue Plans to keep Provider reimbursement rates low so that Subscriber premiums remain low has no pro-competitive benefits. This determination is also supported by the fact that Providers' Boycott Conspiracy theory fails to give *any* consideration to the indirect effects of their reimbursement rates on Subscribers. Therefore, the court concludes that this analysis also counsels against applying a *per se* standard of review to Providers' Boycott Conspiracy claim. And, given that the Blues have pointed to this plausible pro-competitive benefit, this court cannot say with confidence that this arrangement almost always decreases output rather

than increasing efficiency. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986).

## IV.     Conclusion

For all of the foregoing reasons, the court determines that Providers' alleged Boycott Conspiracy is not a "naked restraint of trade with no purpose except stifling competition." *Levine*, 72 F.3d at 1550. Therefore, the court reaffirms its conclusion that it must apply the rule of reason analysis to Providers' Boycott Conspiracy claim. *See In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1277.

**DONE** and **ORDERED** this August 9, 2022.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE