FILED
2022 Sep-21 PM 02:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NO. 2:13-cv-20000-RDP | March 24, 2017
| 1:00 p.m.
IN RE:  BLUE CROSS BLUE SHIELD |
ANTITRUST LITIGATION MDL 2406 | Birmingham, Alabama

**TRANSCRIPT OF THE DISCOVERY STATUS CONFERENCE**
**BEFORE THE HONORABLE T. MICHAEL PUTNAM**
**UNITED STATES MAGISTRATE JUDGE**

Proceedings recorded by mechanical stenography, transcript produced by computer.

**PRESENT:**

Edgar C. Gentle III
Gentle Turner Sexton & Harbison
501 Riverchase Parkway East, Suite 100
Hoover, Alabama 35244
205-716-3000
Escrowagen@aol.com
  Special Master

Stephen A. Rowe
Adams & Reese LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, Alabama 35203
205-250-5000
Steve.rowe@arlaw.com
  On behalf of Defendant Independence Blue Cross

**SABRINA LEWIS, CCR, RDR, CRR**
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama 35203
(205) 278-2065
sabrina_lewis@alnd.uscourts.gov

**PRESENT:   (continued)**

Rachel J. Adcox
Axinn Veltrop & Harkrider LLP
950 F Street N.W.
Washington, DC 20004
202-912-4700
Rja@avhlaw.com
   On behalf of Defendant Independence Blue Cross

Bruce F. Rogers
Bainbridge Mims Rogers & Smith LLP
600 Luckie Drive, Suite 415
P.O. Box 530886
Birmingham, Alabama, 35253
205-879-1100
Brogers@bainbridgemims.com
   On behalf of Hogan Lovells Defendants

Cavender (Chris) Kimble
Balch & Bingham LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 1500
P.O. Box 306 (35201)
Birmingham, Alabama 35203-4642
205-251-8100
Ckimble@balch.com
   On behalf of Hogan Lovells Defendants

Jessi Meeks
Beasley Allen Crow Methvin Portis & Miles PC
218 Commerce Street
P.O. Box 4160
Montgomery, Alabama 36104
334-269-2343
Jessi.meeks@beasleyallen.com
   On behalf of Provider Plaintiffs

John K. Bush (via telephone)
Rosmond J. Dolen (via telephone)
Benjamin M. Weyman (via telephone)
Bingham Greenebaum Doll LLP
3500 National City Tower
101 South Fifth Street
Louisville, Kentucky 40202
502-589-4200
Jbush@bgdlegal.com
Rdolen@bgdlegal.com
Bweyman@bgdlegal.com
   On behalf of Humana, Inc.

**PRESENT:   (continued)**

Sarah Lynn Cylkowski (via telephone)
Bodman PLC
1901 Saint Antoine Street
Detroit, Michigan 48226
313-392-1077
Scylkowski@bodmanlaw.com
  On behalf of Blue Cross Blue Shield of Michigan

Joseph B. Mays, Jr.
Emily M. Ruzic
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2119
205-521-8000
Jmays@bradley.com
Eruzic@bradley.com
  On behalf of Grandview Medical Center

M. Patrick McDowell (via telephone)
Benje Bailey (via telephone)
Brunini Grantham Grower & Hewes PLLC
190 East Capitol Street, Suite 100
Jackson, Mississippi 39201
601-948-3101
Pmcdowell@brunini.com
Bbailey@brunini.com
  On behalf of Blue Cross Blue Shield of Mississippi

Andrew Phillip Campbell
Stephen D. Wadsworth
Campbell Guin Williams Guy and Gidiere LLC
505 20th Street North, Suite 1600
Birmingham, Alabama 35203
205-224-0750
Andy.campbell@campbellguin.com
Stephen.wadsworth@campbellguin.com
  On behalf of Blue Cross Blue Shield of Michigan

Tracy A. Roman
Crowell and Moring LLP
1001 Pennsylvania Avenue N.W.
Washington, DC 20004-2595
202-624-2500
Rrogart@crowell.com
Troman@crowell.com
  On behalf of Blue Cross Blue Shield of Arizona; Blue Cross of
  Idaho Health Service, Inc.; HealthNow New York Inc.; Blue

**PRESENT:   (continued)**

Cross and Blue Shield of Kansas; Blue Cross and Blue Shield of Kansas City; Blue Cross and Blue Shield of Nebraska; Blue Cross Blue Shield of North Dakota; and Blue Cross Blue Shield of Wyoming

Gregory L. Davis
Davis & Taliaferro LLC
7031 Halcyon Park Drive
Montgomery, Alabama 36117
334-832-9080
Gldavis@knology.net
   On behalf of Subscriber Plaintiffs

Nicholas B. Roth
Eyster Key Tubb Roth Middleton & Adams LLP
402 E. Moulton Street
P.O. Box 1607
Decatur, Alabama 35602
256-353-6761
Nbroth@eysterkeylaw.com
   On behalf of Provider Plaintiffs

Alan D. Rutenberg (via telephone)
Foley & Lardner LLP
3000 K Street NW, Suite 600
Washington, DC 20007
202-672-5491
Arutenberg@foley.com
   On behalf of USAble Mutual Insurance Company, dba Arkansas
   Blue Cross and Blue Shield

Claudia M. Barrett (via telephone)
Gibson Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
202-955-8226
Cbarrett@gibsondunn.com
   On behalf of Aetna, Inc.

Megan Jones
Scott Allen Martin
Hausfeld LLP
1700 K Street, N.W.
Washington, DC 20006
202-540-7200
Mjones@hausfeldllp.com
Smartin@hausfeld.com
   On behalf of Subscriber Plaintiffs

**PRESENT:  (continued)**

Charlanna W. Skaggs (via telephone)
Hill Hill Carter Franco Cole & Black PC
425 S. Perry Street
Montgomery, Alabama 36104
334-834-7600
Cskaggs@hillhillcarter.com
  On behalf of Blue Cross Blue Shield of Alabama

Emily M. Yinger
Hogan Lovells US LLP
7930 Jones Branch Drive
Ninth Floor, Park Place Building
McLean, Virginia 22102
703-610-6100
Emily.yinger@hoganlovells.com
   On behalf of Hogan Lovells Defendants

Zachary W. Best
Hogan Lovells US LLP
555 13th Street NW
Washington, DC 20004
202-637-5600
Zachary.best@hoganlovells.com
   On behalf of Hogan Lovells Defendants

Todd M. Stenerson
Timothy J. Slattery (via telephone)
Hunton & Williams LLP
2200 Pennsylvania Ave N.W.
Washington, DC 20037
202-419-2184
Tstenerson@hunton.com
Tslattery@hunton.com
   On behalf of Blue Cross Blue Shield of Michigan

Anne Salomon
Casey R. Fronk (via telephone)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
312-862-2000
Anne.salomon@kirkland.com
Cfronk@kirkland.com
   On behalf of BCBSA, HCSC, Highmark, NASCO, CHP

**PRESENT:   (continued)**

Andrew Allen Lemmon (via telephone)
Lemmon Law Firm
15058 River Road
Hahnville, Louisiana 70057
985-783-6789
Andrew@lemmonlawfirm.com
  On behalf of Subscriber Plaintiffs

Virginia M. Buchanan (via telephone)
Levin Papantonio Thomas Mitchell Rafferty & Proctor PA
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502
850-435-7000
Vbuchanan@levinlaw.com
  On behalf of Subscriber Plaintiffs

Carl S. Burkhalter
John T.A. Malatesta III
Maynard Cooper & Gale, P.C.
Regions Harbert Plaza
1901 6th Avenue North, Suite 2400
Birmingham, Alabama 35203
205-254-1000
Jmalatesta@maynardcooper.com
Cburkhalter@maynardcooper.com
  On behalf of BCBS of Alabama

Lucile Cohen (via telephone)
Nelson Mullins Riley & Scarborough LLP
1320 Main Street, 17th Floor
Columbia, South Carolina 29201
803-799-2000
Lucie.cohen@nelsonmullins.com
  On behalf of Anthem, Inc., f/k/a WellPoint, Inc., and all of
  its named subsidiaries in this consolidated action; Blue Cross
  and Blue Shield of North Carolina, Inc.; Blue Cross and Blue
  Shield of Florida, Inc.; Louisiana Health Service & Indemnity
  Company (Blue Cross and Blue Shield of Louisiana); Blue Cross
  and Blue Shield of Massachusetts, Inc.; BCBSM, Inc. (Blue
  Cross and Blue Shield of Minnesota); Blue Cross and Blue
  Shield of South Carolina; Blue Cross and Blue Shield of
  Tennessee, Inc.; Hawaii Medical Service Association (Blue
  Cross and Blue Shield of Hawaii); Horizon Healthcare Services,
  Inc. (Horizon Blue Cross and Blue Shield of New Jersey);
  Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue
  Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross
  and Blue Shield of Iowa); Blue Cross & Blue Shield of Rhode
  Island; Blue Cross dand Blue Shield of Vermont; Cambia Health

**PRESENT:   (continued)**

Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon; Blue Cross Blue Shield of Mississippi, A Mutual Insurance Company

Joseph J. Bial (via telephone)
Michelle S. Kallen (via telephone)
Paul, Weiss
2001 K Street, NW
Washington, DC 20006-1047
202-223-7300
Jbial@paulweiss.com
Mkallen@paulweiss.com
   On behalf of Cigna Health and Life Insurance Company

Anna Mercado Clark (via telephone)
Phillips Lytle LLP
620 Eighth Avenue, 23rd Floor
New York, New York 10018
212-759-4888
Aclark@phillipslytle.com
   On behalf of Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield

John G. Schmidt, Jr. (via telephone)
Phillips Lytle LLP
125 Main Street One Canalside
Buffalo, New York 14203-2887
716-847-7095
Jschmidt@phillipslytle.com
   On behalf of Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield

Robert R. Riley, Jr.
Riley & Jackson PC
3530 Independence Drive
Birmingham, Alabama, 35209
205-879-5000
Rob@rileyjacksonlaw.com
   On behalf of Blue Cross Blue Shield of Tennessee

**PRESENT:   (continued)**

Barry A. Ragsdale
Sirote & Permutt PC
2311 Highland Avenue South
P.O. Box 55727
Birmingham, Alabama 35255-5727
205-930-5100
Bragsdale@sirote.com
   Plaintiffs' Liaison Counsel

Joshua K. Payne
Jess Randall Nix
Spotswood Sansom & Sansbury LLC
1819 5th Avenue North, Suite 1050
Birmingham, Alabama 35203
205-453-4189
Jpayne@spotswoodllc.com
Jnix@spotswoodllc.com
   On behalf of Capital Blue Cross

Iain R. McPhie (via telephone)
Squire Patton Boggs
2550 M Street Northwest
Washington, DC 20037
202-457-6000
Iain.mcphie@squirepb.com
   On behalf of United Health Group, Incorporated

Mark Montgomery Hogewood
Wallace Jordan Ratliff & Brandt, LLC
800 Shades Creek Parkway, Suite 400
P.O. Box 530910 (35253)
Birmingham, Alabama 35209
205-870-0555
Mhogewood@wallacejordan.com
   Defendants' Liaison Counsel

Helen Lynne Eckinger
Patrick J. Sheehan
Whatley Kallas LLC
2001 Park Place North, Suite 1000
Birmingham, Alabama 35203
205-488-1200
Heckinger@whatleykallas.com
Psheehan@whatleykallas.com
   On behalf of Provider Plaintiffs and Dr. John Waits

**PRESENT:   (continued)**

Augusta S. Dowd
Linda G. Flippo
White Arnold & Dowd, PC
2025 3rd Avenue North, Suite 500
Birmingham, Alabama 35203
205-323-1888
Adowd@whitearnolddowd.com
Lflippo@whitearnolddowd.com
   On behalf of Subscriber Plaintiffs

Dennis G. Pantazis
Wiggins Childs Pantazis Fisher & Goldfarb LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203-3204
205-314-0531
Dgp@wigginschilds.com
   On behalf of Provider Plaintiffs

Michael E. Gurley, Jr.
Edward K. (Kirk) Wood, Jr.
Wood Law Firm LLC
P.O. Box 382434
Birmingham, Alabama 35238-2434
205-908-4906
Mgurleyjr@yahoo.com
Ekirkwood1@bellsouth.net
   On behalf of Provider Plaintiffs

THE COURT:  Good afternoon.  Beautiful day.  Friday afternoon in Birmingham, Alabama.  And the spring practice has started in Tuscaloosa, so all is right with the world.

One of the things that Judge Proctor wanted me to check on was basically to get a report on the parties' situation or status relating to the motions for extension of time that were filed.  And I know I've received written responses, as I understand it, basically indicating that the plaintiffs are not opposed to extensions for all of the defendants except the Hogan Lovells defendants and for which there's opposition to that.  So I'm happy to hear whatever changes, updates, or anything that may have occurred in relation to those motions for extension.

Mr. Ragsdale?

MR. RAGSDALE:  Thank you, Your Honor.

I think that is correct; that we have agreed to the extensions by all of the defendants other than the Hogan Lovells defendants.

Now, that is to say we've agreed conditionally based upon discussions, meetings, et cetera, that we believe indicate that we will get to a resolution of what data and documents will be produced.  That's not to say that we might be back here if those optimistic expectations don't bear fruit.  But we anticipate certainly that we're going to be able to work it out with all of those defendants and we certainly withdraw the motions to compel at this point as to them and any objection to extension of time

for those additional defendants.

THE COURT:  All right.  It's my understanding that the objection to Hogan Lovells defendants' request for extension is interrelated back into the question of whether there can be an agreement reached over crosswalks and things of that sort; is that correct?

MR. RAGSDALE:  It is.

We have no objection to the extension of time so long as at the end of that extension we think we're going to get data that we can use.  What we're concerned about is the extension of time and then finding ourselves with data that our experts can't use, which we think would delay the process by a number of months.

So I guess the easy way to say is we have no problem with the extension so long as Hogan's in a position to comply with the request that we've made in terms of the form, nature, and crosswalk discussion.  And ultimately, that boils down to our request that we have an option of being able to talk with their technical people and have explanations.  And that's a solution, frankly, which most all the other defendants have allowed us to do, and it's proved productive.

And so all we're asking, frankly, is that the -- I think it's twelve Hogan-represented Blues follow suit and allow us to do that.  If that goes forward, then, frankly, April 28th is fine with us.

THE COURT:  All right.  Any other -- other than Hogan

Lovells -- and I'll get to you in just a minute.  Any other defendants wish to update or change that understanding or anything else anybody -- any other defendants wish to address?

All right.  Ms. Yinger, you look anxious to speak.

MS. YINGER:  I'm anxious to speak but not that anxious to speak, which is why I brought my colleague, Zachary Best, who is the nonclaims structured data expert.  But I do just want to make a couple of points.

The first is that the Hogan Lovells plans actually took the lead in this process of responding to the plaintiffs' request for nonclaims structured data.  And at this point, seven out of our twelve plans have actually produced data.  But in the -- I think in the realm of no good deed goes unpunished, the plaintiffs have singled us out in terms of being completely... oh, I would say unreasonable in their demands.

Mr. Best will provide the context since he was involved in the nitty-gritty and the complete timeline.  He took the lead for us.  But I think it is significant that the plaintiffs have overstated a number of things.

First of all, Mr. Ragsdale just said that a -- I think he said the majority of other plans have allowed the plaintiffs to talk to their technical people, and that is not true.  That's not our understanding.  We've talked to the majority of plans, and they have not agreed to that.

And he has said that we asked for an April 28th deadline.

We actually only asked for an April 18th deadline.  I believe in their papers they have said April 28th is okay, but we are fine with that.

And then a key point is that the explanatory information that they're seeking they asked for as of April 1st.  We've already produced it for a number of plans but, obviously, April 1st is still a week or so away.

So I just want to -- I want to ask the court to recognize that this is a motion that was brought prematurely like some other motions the plaintiffs have brought against the Alabama plan and against the rest of the defendants.  And it's a tactic that is really not helpful to our discussions.  It's a tactic to file a motion before meet and confers have taken place or been completed to put extra pressure on us.

And, again, it's really not proper.  We were the plan that took the lead in this process, and other plans came along with us.

But I'll let Mr. Best get into the --

THE COURT:  All right.  Thank you.

MR. BEST:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. BEST:  My name is Zachary Best.  We've never met before, but it's good to be here today.

THE COURT:  It is good to be in Birmingham today.

MR. BEST:  It is.  It's a beautiful day.  Beautiful day.

So as Emily just said, it's true that seven of our twelve clients have produced all or almost all of their nonclaims structured data at this point.  With respect to the other five, four of them have produced at least some data.  And the fifth, their data is essentially pulled from their systems.  They just need to de-identify it.  So that should probably be ready to produce next week.

The bottom line is that we've been working in good faith on this.  And we and our clients have been working very hard on it.  And we've been cooperating with the subscribers throughout the process.

In fact, we reached out to the subscribers last week to hold a meet and confer about our motion for extension of time, as the court ordered.  And we had that conversation with them.

We even offered a compromise on the explanatory information issue, and they basically closed the door in our faces.  They said, We're not going to talk about it.

They wouldn't hear about the compromise that we wanted to offer on explanatory information.  They categorically refused to give us any extension at all.

And the reason boils down to the fact that we went ahead and started pulling data once the court entered its order imposing a March 15 deadline.  And we took that deadline seriously.  It was a court-ordered deadline.  We didn't want to miss it.  So we went pedal to the metal to meet that deadline.

And they said, Well, hang on a second.  You should have kept on meeting and conferring with us; because we hadn't come to an agreement on the scope of the data.

But I think it's necessary to sort of take a step back, and I'd like to give the court a little bit of context here.  I think it's really essential to understanding why the subscribers' position in this instance is a little bit hard to wrap our heads around.  So I'll just back up and give you a little bit of history about what this is all about.

The subscribers issued a whole host of structured data requests for production way back in 2015.  The RFPs spanned pages and pages and pages and pages of data that they were asking for.

And the way that it was set up, it was just completely unworkable.  I mean, you read the RFPs and you have no idea how to fulfill what the plaintiffs were asking for.

So we went to the plaintiffs and we said, Why don't we hammer out a proposal where we can agree on a certain number of categories of information that we will try to provide you under your RFPs?  And so we started that process.

The Hogan Lovells plans, as Emily said, blazed the trail on that front for the entire defense group.  We hammered out a list of categories with the subscribers over a period of several months.

We finally reached agreement on those indicators, but we

were clear up front that we couldn't guarantee that any of those were available for any of our clients because all of our clients maintain data differently.  They have different systems.  Their data goes back different amounts of time.  So we couldn't make any guarantees, but we said, This is what we're going to try to do for you.

So fast-forward a few months.  We spent months and months crosswalking this data.  And when I say crosswalk, I want to make sure that the court understands what that means.

THE COURT:  Yeah, there are a lot of terms here that I'm trying to figure out what we're talking about:  indicators and crosswalks and all kind of stuff.

MR. BEST:  Yeah.  So let me try to break that down.

The scope agreement that the parties reached, we call that Appendix D.  And that's just because it was an appendix to some correspondence and it happened to be Appendix D at that point.

Appendix D has 44 categories of structured data that the parties had agreed on.  In order to -- in order for everyone to understand what was going to be produced before we produced it, we proposed that we put together what are called crosswalks or structured data crosswalks.

And those crosswalks basically take each data element in Appendix D and for each plan, it tells you what source system for that plan this piece of data is located in, what table within that source system that data is located in, and what

field within that table that that data is located in.

When you look at the crosswalk, you sort of get an understanding of what the data is going to look like, what data is available, what data is not available.

It also tells you about the level of detail that the data is going to be provided in, because there are a range of levels of detail for this data. You could be at the group level or you could be at the product level or you could be at the subscriber level. So all that gets hashed out in the crosswalks.

As I think I mentioned a couple minutes ago, our clients worked incredibly, incredibly hard on that. I mean, the burden to do that was enormous: 44 categories of information. The scope of it spanned from premium information, to geographic information, to fees, to membership and enrollment in each group going back ten years for every single group that subscribes to commercial insurance.

THE COURT: Do I understand correctly -- just to be sure that I'm still following here -- that, for example, if you take one of those categories of data and try to create a crosswalk for it, that that crosswalk might identify multiple databases, certainly multiple data fields that would be the source of the data that fills in that category?

MR. BEST: In this case, that would be true. For the nonclaims structured data, that is correct in almost every instance. And the reason is because these different data

elements, they go to different parts of the business and they're located --

THE COURT:  You might have to look on a business database.

MR. BEST:  Right.

THE COURT:  You might have to look on a finance database.

MR. BEST:  Right.

THE COURT:  You might have to look on a premium database.

MR. BEST:  Right.  You might --

THE COURT:  All of which would relate to the same indicator or category of information.

MR. BEST:  Generally speaking, you can find one category of information in one database.

THE COURT:  Okay.

MR. BEST:  But I don't think I can think of a single instance where all 44 categories of information were available in one database or even two databases.  You might have to go to the data warehouse.  You might have to go to an operational system.  You might have to go to a financial system.  Because the data just is so broad in scope and really unprecedented for our clients in this case.  I mean, they just -- they hadn't done this before, and it was extremely, extremely hard to do.

It's not so simple as saying, Hey, I know where this data element is.  Let me just go and find it and give it to you.  It's not that simple at all.  You need to do investigation.  You need to do research, analysis.  You need to problem-solve when

you can get something that's close but not quite what you're looking for.  There are a lot of hurdles to jump over, and that process took a long time.

So now we're in sort of fall of 2016.  A couple of our clients have produced the crosswalks that they were able to put together, and several of them had not.

Subscribers filed a motion to compel for us to produce our crosswalks.  In exchange for subscribers agreeing to withdraw that motion, the parties agreed that the Hogan Lovells plans would produce their crosswalks by certain dates.  Some of them had to produce them by December 1st.  Some of them had to produce them by December 21st.  We agreed to that.

Subscribers agreed, also, that all of us would reach agreement on those crosswalks by certain dates.  So if we produced crosswalks on December 1st, we've all got to reach agreement by December 21st.  And if we produced crosswalks on December 21st, we've got to reach agreement by January 19th.

THE COURT:  And when you say that the parties reached agreement about that, you're saying that the subscriber plaintiffs would have the opportunity to review what you describe in each particular crosswalk.

MR. BEST:  Right.

THE COURT:  And either agree or -- I guess the point is to reach agreement; that, ultimately, they would agree that your description of the source data in any particular crosswalk is

accurate and complete.

MR. BEST:  Accurate and complete and fulfills what, you know, the defendants are looking for, fulfills what the plaintiffs are looking for.  You're exactly right.  That was the purpose of the crosswalk was to share with the plaintiffs and say, This is what we plan to do.  Give us your input.

So we needed their input.  And the problem is we met our end of the bargain, that bargain that we struck in November.  We produced all of our crosswalks by the dates that we said we would.

THE COURT:  Well, I guess the problem I'm having trying to understand at this point is okay, you create your crosswalks because you do that directly based on your knowledge of your computer systems.

MR. BEST:  Uh-huh.

THE COURT:  You know what's there.  You know how it's divided up.  You then turn those over to the subscriber plaintiffs, who don't have access to your computer system.

I guess where I'm having trouble is how is it they're supposed to assess the completeness and thoroughness and accuracy of the crosswalks in order to agree?  What are they looking at?

MR. BEST:  Well, the crosswalks explain very, very specifically what we're providing.  You know, they say, Okay, group name.  Here's where it's coming from.  Here's the table.

Here's the name of the field where that's coming from.  Group number.  Same thing.  Annual premium amount.  Same thing. Number of people in that group.  Same thing; here's the field where that's coming from.  Well, if it doesn't exist, you know what?  We'll derive it for you, and here's how we're going to derive it.  Okay?

The crosswalks also explain, you know, Look, we can't -- we can't produce it at a certain level of aggregation, but we can produce it at this level of aggregation because that's what the system allows for.  Okay.  So the crosswalks lay all of that out.

Then, you know, if the subscribers had questions -- which they did; usually about every single indicator -- then the parties met and conferred about the crosswalks.

And we spent hours on the phone.  Hours.  I can't tell you how many questions I answered on the phone.  These meet and confers, which were each about one crosswalk, lasted two hours, three hours, three-and-a-half hours, just answering question after question.  And if I couldn't answer a question on the phone, I said, You know, what?  I'll take it back to the client, I'll get you an answer, and I'll send you a letter within a week with the answer.  And that's what we did.

The problem came when the subscribers wouldn't respond to the crosswalks.  They just didn't respond.

We were supposed to reach agreement on seven crosswalks by

January 17th, and we hadn't even heard from them about the crosswalks.  They didn't say anything.  Anything at all.  So there was no way for us to reach agreement by January 17th without their participation.

The strange part came on January 19th, two days after that deadline.  The subscribers filed a status report about an amended scheduling order, and we filed a status report about an amended scheduling order.  And our status report basically said, We're still hashing this crosswalk thing out.  We haven't reached agreement, and we need more time to do that.  And once we reach agreement, we also need a good chunk of time to pull that data because it's not as simple as just hitting a button.  It takes a lot of time.

So we requested, I think it was April 28th or within 90 days of reaching agreement on the crosswalks.  We wanted to do that.

Subscribers said, No, no, no.  That's too far out.  It's too much time.  We want an aggressive deadline.  That was the word that the plaintiffs used:  We want an aggressive deadline of March 1st.  Which didn't make any sense because they hadn't responded to our crosswalks.  They knew it would take weeks to pull the data.  They knew it would be impossible by March 1st, but they requested that anyway.

That same day we sent a letter to them and said, Hey, look.  These crosswalks, you've had them for a month.  You need to

respond or else we're taking the position that you've waived your right to have any input in this process because you're being dilatory; you're dragging your feet.  Well, they didn't respond to that.

We gave them another chance, which we probably shouldn't have done, but we gave them another chance.  We wrote them another letter on February 10th and we said, Look, these are still outstanding.  We're moving forward unless we hear from you.

And then the court -- the second amended scheduling order came down on February 13th.  And it imposed a March 15th deadline -- 30 days -- to produce all this data.  And we still hadn't heard from subscribers on a number of crosswalks.  I mean, several.  And we -- honestly, we hadn't reached agreement on any of them because the plaintiffs just were not engaging.

So we sent them a letter and we said, We can't continue to meet and confer.  We can't continue to drag this out.  You had your chance to meet and confer.  You missed it.  We've got a court-ordered deadline that we need to comply with, so we need to start pulling the data now.  It takes several weeks.  The only way we can meet that March 15th deadline is if we start pulling data right now.  We might not -- we still might not meet it.  But we're going to try.

So that's exactly what we did.  And it's confusing, frankly.  The plaintiffs have now taken a complete 180 and said,

Well, you should have been meeting and conferring, when that's what we were trying to do all along.  That's what we tried to do with our status report.  That's what we tried to do with the deadline in March.  And the plaintiffs didn't play ball.  And now they're getting data and they're saying that it's not good enough and they're not saying why.

So we're in a position where we feel that we did what we had to do.  I think if you would sort of put yourself in our position when that February 13th order came down -- and I'll be honest; I almost had a heart attack.  But if you would, just put yourself in our shoes.

We couldn't file a motion for extension of time because the court had just told us that we weren't going to get an April deadline via the amended scheduling order.  So we couldn't file a motion for extension of time.

We couldn't continue to meet and confer with the plaintiffs because we didn't know how long that was going to take.  We didn't know when they were going to respond.  And there was no way we'd meet the deadline if we did that.

So they really put us in an impossible position where we had to make a choice between continuing to meet and confer or try to meet the deadline.  And we chose to try to meet the deadline.  And we were able to do that with several of our plans, but some of them are still working on it.

I'm sorry; I know that was long, but I hope that gives you

a little bit of context.

THE COURT:  That was quite all right.  Thank you.

MS. YINGER:  Just one thing to add to that which is that the plaintiffs have had through this whole process experts retained who are reviewing the crosswalks and participating directly with us on all those meet and confers.  We had meet and confer after meet and confer after meet and confer.  Lots of correspondence.  As Zach said, just a huge number of questions posed that we willingly answered.

We did not push back on answering questions.  We took them back to our clients, which often took a lot of resources at the client to figure out how to answer those questions.  But they had experts on the phone.  They had experts reviewing our crosswalks.  And it's not as though, you know, they didn't have substantial help in trying to understand all the information we were giving them.

THE COURT:  All right.

Mr. Ragsdale?

MR. RAGSDALE:  In just a minute I'm going to ask Mr. Lemmon to come forward for our side to give a nonfiction version of the history of the negotiations.

But what I will say is this, Judge.  There is a reason we withdrew our motion to compel against every defendant that wasn't represented by Hogan Lovells.  It was because they engaged, cooperated, worked with us, made their technical people

available, attempted to solve the problem.

This is not a client-specific problem.  I don't think it's a coincidence that the twelve Blues who have refused to provide this information are all represented by the same law firm.  I don't think that just happened to happen.  The other defendants worked with us.

Now, Hogan Lovells interprets this to be an attempt to somehow besmirch their character or attack them personally.  It is simply that they find themselves in a category all alone, which is defendants who have refused to provide the needed information.

Now, a lot of that, obviously, dealt with their interpretation of how we got here.  I'm a lot more concerned of how we go forward to be able to try to solve the problem.

What I haven't heard is any reason why we can't set up conference calls between their technical people and our technical people and allow those discussions which have taken place with other defendants and which have taken place in other contexts to get the answers that we need.  The process that you heard described was not only cumbersome, it was ineffective because it had to be filtered through two sets of lawyers instead of having the computer guys with the pocket protectors talking to each other about what they actually need.

Otherwise, I guess what would be helpful is look at what the future's going to look like if you don't grant this motion

and if you do grant this motion.

If you don't grant this motion, what we're going to be required to do is take a number of technical-specific depositions of each of those twelve individuals, notice them.

Now, we tried to ask them, Tell us who the people are that put this information together.  Give us their names.  They refused to do that.  So we're guessing based on org charts, other disclosures, other information we've got of who those people are.  And what we'll be required to do is notice and take their depositions under oath for things that could take place in a 30-minute or an hour-long telephone call.

In addition to that, assuming that that is not entirely successful, what we will be is back here in a protracted motion practice over the fact that the data that they have unilaterally decided is good enough for us is not good enough for us.  We'll be back here fighting over that.

But I haven't heard any argument that it's unduly burdensome or impossible or impractical for us to set up what we -- I think our motion asks that they be brought here.  Obviously, we can do it by telephone.  And that makes sense for us to be able to do, to do it quickly to make sure that we have the data that could be usable to our experts.

And as I said, that is a solution that was made available to other defendants and they accepted that and worked with us and they all worked with us with the exception of this one

group.

Now, I'd like Mr. Lemmon maybe to respond to some of the comments specifically.

THE COURT:  All right.

Mr. Lemmon?

MR. LEMMON:  Your Honor, Andrew Lemmon on behalf of the subscriber plaintiffs.  And I'm happy to be in Birmingham, also.

So, rather than go and try and rebut what Mr. Best said point by point, unless you have specific questions --

THE COURT:  Well, you know, while it is sometimes necessary to look at the context and history of things, I mean, it always reminds me when I hear that of a comment somebody made years ago that American litigation is simply post hoc blame assessment.

MR. LEMMON:  Right.

THE COURT:  So, you know, I'd rather try to avoid that.  My job that I've been given here is to try to get this discovery done.  And so I guess I'm more interested in looking to what the future looks like.

MR. LEMMON:  Well, we totally agree with that.  And that is really what everything that's before the court today is directed towards.

I think that you zeroed in on a really important point when Mr. Best was talking when you said, you know, Isn't it true that you had all of your systems to go through and then they had to look at them?  And so we had to begin looking at the systems as

soon as we received the crosswalks that came in from them.  And in some of the crosswalks, they revealed new systems for the first time, things that weren't maybe contained in the data disclosures and maybe we didn't have data dictionaries for.

We have a lot of questions and we still have a lot of questions about the proposals that they make, you know, in the crosswalks to give us the information that we have -- that we need.  We're not trying to give people busywork.  We are truly, you know, interested in engaging between our experts or our technical folks and their technical folks like was done with Alabama to get to the end, to get to the end so that when we get data on or about April the 28th from everyone, that we're getting the data that we asked for in the RFPs.

And it was their idea to take the RFPs from the -- RFPs themselves and create them into indicators.  And I think that probably was, you know, a manageable way to do it and we agreed with that.  But that was almost a year ago that we came to that agreement.

We're still at a point where we feel that if the data is presented to us in the condition of the crosswalk as it was last given to us by the Hogan defendants -- so, in other words, basically we got to a point and whatever that point was -- and it's different for various defendants depending on where we were in the negotiation.  But every single one of their clients is sitting on a list of questions or a list of issues that we have

with the specific indicators from Appendix D.  And some of them were really very simple questions like, you know, what's the date range of this particular set of data or something like that.  It's some really simple stuff.

And some of it is a whole lot more complicated where, you know, what they say doesn't really make sense in light of the Affordable Care Act, for example.  You know, we know that they may have to keep certain data in a certain way for purposes of the Affordable Care Act and they're telling us, We don't have that data or we don't have it at that level of granularity or something to that effect.

And so what it's going to take in order for us to get from the point we are now to the point where we get meaningful data is to sit down and say, Okay, maybe you don't call it the same thing as we're calling it, but where is this -- something that looks like this or something that satisfies this portion of data that you need to report to, you know, to the association or something you need to report to the government for purposes of the Affordable Care Act or whatever it is.  You know, some data that we know it exists.

So the questions -- and, you know, it's very detailed and it's mostly way over my head.  But the technical people within, they have been on every single one of our calls with every single one of the Blues.  We have our technical people on those calls so that they can say, We don't understand and here's why,

and so there's no loss in translation between them and what they're asking for and what they need in order to run their models and us asking the other side to -- you know, to provide answers to questions or to help us to understand how they keep their data different in their systems than maybe somebody else does in a different system.

THE COURT:  Have you had actual instances where you've had conversations between your technical people and the technical people representing some of the other Blue defendants?

MR. LEMMON:  Yes.  Yes, we've had a number of those conversations.

THE COURT:  All right.  How many times?

MR. LEMMON:  Every time that we've asked for that -- at least -- and I could be a little bit wrong about this, but I'm pretty close to accurate; that every time that we asked for that, they at least got somebody on the line for some period of time to answer the specific technical question that we had except with the Hogan Lovells defendants.  And in those instances when we asked for the same technical meet and confers, they've said, you know, We have too many people.  We can't get everybody involved.  And so basically it's no.

And then how do you respond to no?  You know, I mean, we can't then say, Well, maybe if we ask the question differently we might get the answer that we need.  You know, we tried that and we really didn't get very far.  And so it really is the

technical people from our side who don't know their systems who need to be able to ask technical people from their side who do know their systems.  And that will give us the bridge that we need.

So that's -- that's the kind of the big picture.  There's a little bit of nuance to that I did want to mention and that is there is the motion to compel that's still pending against the Hogan Lovells defendants.  And they responded today and -- in a paper that they filed, in a response paper, that they have substantially complied and, you know, we should be able to know or we should be able to derive the information as easily as they could do.  And so that they've complied with all but two of the reports.

You asked another question about that particular issue when you said, you know, they came with fields from different data systems.  This information that we're requesting is specifically to bridge the data from the various data systems.  And if we don't have from them some of that information or some of that mapping to help us with the bridge, all we're really doing is guessing whether we're really bridging from one to the next to the next.

And it has -- this has been an issue that we've talked about with every single other defendant and it has not been controversial with one.  Not one has objected to that mapping information contained in those two bullet points, number 3 and

number 4.

And so it is something that we really do need.  We're not looking to give them busywork.  We want to get to the finish line.  We want the data so that we can run the models that we need to run through our experts.

And I think that it's pretty clear what we're asking for.  And if we can do it -- you know, we're trying to do it in the most painless way possible.  And if we can get on the phone with them rather than come into here, that would be fine.

They've asked for an extension till April the 18th.  We're happy to go till the 28th.  But we need to have the information in the way that we asked for it in order to meet those deadlines.

THE COURT:  All right.

MR. LEMMON:  Thank you.

MS. JONES:  Your Honor, can I be heard for one second?

THE COURT:  Yes, please.

MS. JONES:  So, I just wanted to echo Mr. Lemmon and just put in a plea for the explanatory items number 3 and number 4, particularly given the context of the negotiations between these two plans.

If we don't have the bridge fields, what you heard Mr. Best talk about, it's not that simple, which is someone who's deep into the data; that we got something from operations and we got something from business and we got something from the data

warehouse.  He may know where that is, but we will not.  And we will get a pile of information and have to ferret it out.

THE COURT:  In the response that was filed earlier today, one of the points made in it was that finding the bridge fields was quite simple.

MS. JONES:  Right.  And I'm sure to Mr. Best that may be the case.  And if it is, it shouldn't be that hard to comply with item number 3.  And number 4, mapping between the indicators and the files, that's the exact process where he was saying this is the Rosetta Stone between the things.  Then why can't we get it?

And so it's my great fear that, you know, the seven out of twelve produced databases which have not been the subject as much of cooperative negotiations as it has been with other defendants, that we're going to have to figure it out.

And we asked informally if we could talk to the people.  They said no.  We asked if we could have their names so that we could depose them.  They said no.  And now we have noticed via LinkedIn and org charts people we think that may have the answers.

We have a very aggressive schedule in this case.  And if we had another 18 months, we would not be here today.  We would not be pressing on this issue.  But we have got a very expedited schedule, and we don't have time to take 50 depositions if we can get the answers on a phone call.

Thank you.

THE COURT:  Mr. Best?

MR. BEST:  Thank you, Your Honor.

I just -- I have to say it's surprising to hear about the urgency given the time that our crosswalks sat in their laps.  I mean, I just -- it doesn't add up to me.

There's one point I wanted to make which is just a procedural one.  We've been talking about technical people.  We've been talking about those sorts of solutions.  There's no motion pending on that issue.  It came up in a response.  We -- I mean, at the very least, we should have the opportunity to respond to that, have the ordinary amount of time to respond to that request, because at this point we've been --

THE COURT:  What would be the response to the idea that you simply make available by telephone conference call appropriate technical people to answer questions put to them by technical people on the other side of the equation?  I mean, I'm not -- I mean, I know that you haven't had an opportunity to think through that, but sort of, you know, what's the two-and-a-half-minute preview of what the objection to that would be?

MR. BEST:  Well, the first objection is who do you pick to put on the phone?  Some of our clients have 15 or 20 people who contributed to the crosswalks, who did this research, this investigation.  They know different things.  One person knows

about this system.  One person knows about that system.  One person --

THE COURT:  On a conference call, couldn't you put them all on there?

MR. BEST:  Well, I suppose you could, but I don't think it would be that useful to have that many people --

THE COURT:  Well, I mean, it might be.  If you put 20 people on a conference call even if they're scattered all over the country and one of the plaintiffs' people says, Well, where do I find this, whoever can answer that among the 20 could chime up and say, Oh, I can tell you about that.

MR. BEST:  Well, it's also not that easy, Your Honor.  I mean, I've asked these people questions after questions after questions.  I don't get answers on the spot.  It's not like they know exactly where this stuff is like the back of their hand.  This is complicated --

THE COURT:  Well, wouldn't it be more efficient if there was a phone call and the question is asked and sort of everybody sort of quizzically looks at each other and says, We don't really know the answer to that.  Let me look into that and let's have another conference call two days from now.

MR. BEST:  Uh-huh.

THE COURT:  Rather than it go to the lawyer, the lawyer go to the technical people.  They then look around for a couple of days or so, come back to the lawyer.  The lawyer then has to --

I mean, that seems to be a very cumbersome process.

MR. BEST:  It's marginally more efficient at best because you might not get clear answers.  You might get an I don't know.  And then you're going to get follow-up questions from the subscribers, a whole new set of questions, and they're going to want more detail about this and more detail about that.  And then our people are going to have to go back and do it all over again.

What I think the most efficient way forward is, Your Honor -- and this goes to your point about how do you solve this problem, how do you move forward.  We've produced data.  The plaintiffs should look at it and they should work with it and they should see what's there.  And if there are questions that they have, we've been more than willing.  We've said time and time again, We will meet up with you.  We will get on the phone.  We'll talk about those questions and we'll talk then.

THE COURT:  You just won't put your technical people on the phone?

MR. BEST:  What's that?

THE COURT:  You just won't put your technical people on the phone?

MR. BEST:  Well, not necessarily.  I mean, to us it's just not necessary because we've answered so many of their questions already.

THE COURT:  Okay.

MR. BEST:  They haven't talked about that, but we've answered just question after question after question.

THE COURT:  Oh, I don't doubt that.

MR. BEST:  Okay.

THE COURT:  As complex as this issue is, I don't doubt there's been a lot of conversation, a lot of questions, a lot of answers.  But I guess what I'm looking at is if there are a lot more questions still, how do we move that along as quickly as possible?

MR. BEST:  Well, first, the plaintiffs have to look at the data and they've got to see what's been produced.  And they'll see when they look at it very clearly, Oh, here's a column with the group name.  And here's a column with the group number.  And here's what their SIC code is.  And here's their annual premium amount.  And here was the effective date of their policy.

I mean, it's all there in the data right at the top.  It tells you what they're looking at.

Plaintiffs haven't done that.  They've just assumed that it's going to be completely useless.  And they haven't articulated at all with any specificity whatsoever why it is that it's deficient, why they can't use it.  It sounds like they haven't looked at it at all.  Because I have, and to me it looks pretty clear.

If anything's not clear, again, we can get together and we can talk about it.  And maybe at that point we do talk about the

possibility of putting technical people on the phone.  But right now, it's completely theoretical, and we haven't narrowed anything down at all.

THE COURT:  All right.  Well, when, then, from your standpoint -- the message I'm hearing is, Plaintiffs should get the data and look at it before they complain about it.

MR. BEST:  Yeah.  And they have a lot of it.

THE COURT:  When are you going to get the data to them?

MR. BEST:  Well, as I said, seven of our plans have produced all or almost all the data.  They could have started looking at that ten days ago.

THE COURT:  When are the next five going to?

MR. BEST:  I think it's going to trickle out over the next probably three weeks or so.

THE COURT:  All right.  So it may be three weeks down the road before they even get an opportunity to look at it --

MR. BEST:  Well, those plans have all produced something. So they've got plenty to chew on already.  They've got plenty, plenty that they can look at.

So that's what we're asking:  Why don't they actually try. We don't they look at it.  Once they look at it, they'll see that maybe 90 percent of it is obvious to them and is what they're looking for and maybe 10 percent is unclear.  Well, let's talk about the 10 percent instead of talking about the whole thing.

I just want to also go back to the motion to compel explanatory information.  It sounds like you read the paper that we filed yesterday.

THE COURT:  I did.

MR. BEST:  I'm sorry.  This morning.  And it really isn't rocket science to figure out the bridge.

THE COURT:  Uh-huh.

MR. BEST:  Because you're going to have one file that has a column that says group i.d.  And you're going to have another file that has a column that says group i.d.  So it really doesn't take much intellectual effort to connect those two things.  Or maybe it's product i.d. and product i.d.  It depends on what you're looking at.  But it's really -- it's not that difficult.

And if anything is confusing, again, they can get in touch with us.  We'll do our best to answer their questions.  We'll take them back to our client and we'll give them an answer as soon as we can.

THE COURT:  All right.

MR. BEST:  And, also, on the mapping point, I think for the same reason, it's just not necessary.  You don't need me to tell you that this column that says group number ties back to the indicator for group number.  Does that make sense?

THE COURT:  I understand.

MR. BEST:  Okay.

THE COURT:  Keeping in mind that I've never seen any of these indicators.

MR. BEST:  I should have brought some with me today in my pocket.

THE COURT:  All right.  Thank you.

MR. BEST:  Thank you.

THE COURT:  Ms. Yinger?

MS. YINGER:  Thank you, Judge.

I think what we want to make clear is that we have been -- the reason why we went through the context is because we have been trying our level best to get this done as quickly as possible.  We want it over.  We want our experts to be able to look at data.  We want to move forward.  We have been forestalled.  And once that court order came down, we did our level best to comply with it.

And we have -- we have produced data.  We gave them many last clear chances to give us input.  And we incorporated the input they did give us along the way.  But we were under the clear order from this court to produce data by March 15th after we had filed a motion asking for a different date.  And that's what we went ahead and did.  We had a very short time fuse.

As far as the technical people are concerned, as Mr. Best pointed out, there's no motion.  The plaintiffs have basically morphed their motion for some explanatory information and our motion for an extension into some motion to now talk to

technical people about data about which they have not identified any deficiency.  So we think that is really premature and we do not think that they have a pending motion on that issue.

We are willing absolutely to address questions.  And as Mr. Best said, they should look at the data.  They have experts. We have gone way beyond what the federal rules require in terms of giving them information about our data and actually taking our data out of the way it's normally held in the ordinary course of business as the rules refer to and making it easier for them to deal with.  We've gone way beyond that.

And I also think we had the clear message from this court that the days of long meet and confers needed to wind up and needed to be over.  So we were trying to move forward.

THE COURT:  Oh, I agree with that.  I agree with that.

MS. YINGER:  Thank you.

THE COURT:  Okay.

MS. JONES:  Just a few points.

The solution that we proposed about talking with tech people is exactly what happened with Alabama.  We filed a motion to compel about data, and that was part of the solution that this court formed.  So to say that that's not right is not on all fours.  But it is explanatory.  Because now we would have to file a motion to talk to their tech people.

And as far as we have plenty to chew on because they've made a partial production, how are we supposed to know what's

missing if we don't have the whole production, which we're not going to get for three weeks?

And then, lastly, if you look at page 5 of their filing this morning, you'll see a column called "linking information." And that -- what that linking information means is like there's a column in a database A.  There's a column in database B.  And there's a column in database C.  And that equals D.  And I fully understand that that's clear to you, but it will not be clear to us.  And if it is that simple, producing all of this data without it -- which none of them did.  All of that column is "no" -- is going to cost us a lot of time.

And so I implore this court to order that the bridge fields, which is the shorthand of how these things are linked, to order that be produced because, also, what's going to happen is if we get it wrong, we're going to find out about it in our class certification expert report deposition.  And then it's going to blow up that schedule because we would have linked the data wrong because we didn't know how to do it.  And so we can avoid that whole sideshow if we actually get it from the defendants.

And, also, if you look on page 5, the indicator to file map, which it says here's where you find the thing, there's one "yes."  There's one yes.  There's one out of the twelve Hogan plans that have told us where to find the thing.  And I just don't think, given the accelerated schedule, that we should have

to do formal discovery in order to find the thing when every other defendant in this case has provided it.

THE COURT:  Anything else on that question, then?

Well, I will try to get you something out to try to assist in moving that along in some sort of way.  I take it that that also resolves whatever report needs to be made for Judge Proctor in the sense that all of this is intertwined with the motions for extension.

Going back to a much earlier piece of old business is plaintiffs' motion to compel production of structured data that's been rocking around since November.  There were discussions about it.

MS. JONES:  Are you referring to the Alabama motion, Your Honor?

THE COURT:  Yes.  Yes.

MS. JONES:  Okay.

Do you want to address that or should I?

MR. LEMMON:  No, go ahead.

MS. JONES:  Okay.

Our status report is identical to February.  Nine out of the thirteen tables have been resolved.  The individual billing data is not.  I will represent to the court if we don't resolve it this month, it will be squared up for April.

THE COURT:  All right.  So you just want me to roll it one more month?

MS. JONES:  Yes.

THE COURT:  Okay.  All right.

MR. MALATESTA:  Your Honor, if I may make one quick response?

THE COURT:  Sure.

MR. MALATESTA:  I was sitting in the back hoping I'd be able to stay out of the fray today --

THE COURT:  You can't.  You have to be in the middle of it.

MR. MALATESTA:  -- but I guess Alabama never gets to do that.

I'm a little confused by the remark.  I sent Mr. Lemmon an email -- I don't have a date in front of me -- probably 10, 14 days ago specifically asking for some information for us to better understand their concern.  I don't have a response.  So if she wants to have this heard in front of the court, we need the feedback.  So that's where we are.  I mean, we're willing to work through an issue.  We just don't understand the issue.

THE COURT:  Can you get with him by next week sometime?

MS. JONES:  Absolutely.

MR. LEMMON:  Yes.

MR. RAGSDALE:  Sure.

THE COURT:  All right.  Anything else on that?

MR. LEMMON:  No, sir.

THE COURT:  The last thing I have on my list is the defendants' status report on nonparty Alabama provider

discovery.  There's not really a motion.  There's just a status report.

Mr. Stenerson, you want to address that?

MR. STENERSON:  Yes, Your Honor.

We just wanted to update the court where we were.  We had mentioned it at the end of the last hearing.  And we have provided the vendor information.  You've got to go through, I think, their W-9s and other things to make payments to vendors.  The four providers have that information and we're helping them fill that out.  And we are -- with reservations we put in our status report, we are just going to go ahead and make the payments that we indicated and reserve rights afterward.

The other thing we did provide to the court was a summary of some of the other third parties that have produced information without requests for expenses.  It's all detailed there in the chart.  Over 250,000 pages with no expenses let alone outside attorneys' fees.

And the one in particular that I would just point out to the court is the last one on page 3, and that is a nonparty Alabama provider that we agreed to pay a one-time $7,500 payment for copying and collection costs.  That payment has already been made.  That nonparty Alabama provider produced over 33,000 documents.  That was, for the court's background, the only non-Alabama -- nonparty Alabama provider that didn't object.

So it was -- there were five or six depositions -- or

subpoenas that went out together.  This is the one that we cooperated with and they've willingly produced that information before we made the payment.

The only reason I mention that, Your Honor, is because what we still don't know is we still don't know how many pages are being produced.

Again, we're going to go ahead and make the payments because we want to get this going.  But I just want to flag that we may be back here.  And the one -- one hard position we have taken is that our interpretation of order 34 is it does not include outside fees for attorneys; only in-house lawyers and/or in-house employees.

We think that is the right line to balance.  It incentivizes people to do things as efficiently as possible and just get the documents that we need.  And we think any payment of outside fees would create wrong incentives and shift costs too much.

THE COURT:  All right.

MR. STENERSON:  Thank you.

THE COURT:  Thank you.

Although there's not any motion, any nonparty Alabama provider wish to address that?

Mr. Mays, you filed a response earlier today, I saw.

MR. MAYS:  Thank you, Your Honor.  Joe Mays for Grandview.

I do think there's an issue that the court will have to

address at some point on this and that is we submitted a cost bill to Mr. Stenerson on March 10th.  And we divided the fees we had -- costs and fees we'd incurred into three categories.

Category number 1 -- and let me say the documents are ready to produce once we get this.  We have assembled them.  We've numbered them.  We've done what you do.  And they're ready to produce for Grandview.

Category number 1 is payment for time expended by Grandview employees.  That's $4,027.

Category number 2 is time expended by Bradley Arant employees -- principally paralegals but some attorney time -- that's directly related to the production of documents: assembling them, numbering them, making copies; the kinds of things that we do to produce documents.  That's $8,772.

We would submit that all of those costs are directly unquestionably related to the production of these documents and should be reimbursed.

Mr. Stenerson has taken the position that the $8,000 for Bradley Arant time is not going to be -- he's not going to pay. He just says, I'm not paying.  He will -- he has agreed to pay the $4,000 for the Grandview time.

Category number 3 is time that Bradley Arant lawyers have spent in resisting the subpoena and ultimately getting the subpoena modified under discovery order 34 -- getting several of the categories taken out -- and also responding to the appeal of

discovery order 34 that the Blues filed.  That's $56,000 and change.  Actually, it's $56,843.

That does not include any of the time that we have spent responding to other subpoenas such as the provider plaintiffs' subpoenas.  It doesn't include any of the time that we spent appealing discovery order 34.  Just responding to their appeal.

I will agree that that one is perhaps debatable under Your Honor's rulings in discovery order 26 and discovery order 34.  I think it is reimbursable particularly under the language of discovery order 26 which says that the subpoena should be capable of being responded to without need of counsel and not burdensome or expensive.  That's the direct language of discovery order 26, page 3.

I am willing to go ahead and produce the documents on behalf of Grandview if we are paid for category 1 and category number 2 the direct costs of producing the documents including our lawyer and paralegal time.  I'll fight later -- or negotiate later, if that's successful -- about category 3.

I think I am clearly entitled to be reimbursed -- or Grandview is -- for category 1 and 2.

Now, there's no motion pending before Your Honor.  As I read the clear language of discovery order 34, it's my place to say we're not producing these until we're paid.  That's almost the literal language of discovery order 34.  And if Mr. Stenerson wants to insist upon his position, I think it's

incumbent on him then to bring it before the court rather than me.  And, of course, if he does that, we will respond.

Thank you, sir.

THE COURT:  Thank you.  Thank you.

Any other nonparty providers wish to address that question?

All right.  Mr. Stenerson, anything else you wish to add on that?

MR. STENERSON:  Just one thing, Your Honor.  I just, again, would note that over a dozen parties produced 250,000 pages without any contribution of expenses or costs.  And I would submit to you that that's because they were able to do it at a reasonable cost and it's not unusual for our clients to produce subpoenas.  We have a department that responds to over 200 subpoenas a month.  We don't ask for costs.  It is the unusual case that a party gets costs.  And we think the right line is for the employee time.  Thank you.

THE COURT:  Thank you.

All right.  Well, that's all that I have on my agenda for this afternoon.  Any other issues, questions, problems?

Mr. Ragsdale?

MR. RAGSDALE:  Your Honor, I just wanted to update you on an issue that was brought to your attention by a letter from Mr. Hellums and then a responsive letter from Mr. Kimble which involves a subpoena issued out of the chancery court in Delaware, ultimately issued by the circuit court here in

Jefferson County.  The status of that is the parties -- Cigna and Blue Cross -- have had a series of -- maybe "series" may be too generous -- but have had several meet and confers in an effort to narrow that subpoena and see if it could be worked out.  My understanding is that that at least to date has been unsuccessful.

This morning, Blue Cross filed a motion to quash that subpoena in state court here in Jefferson County.

Where we find ourselves now, the plaintiffs do not object to the subpoena.  It is Blue Cross that is objecting to the subpoena.

We, that is, the plaintiffs, will be filing next -- early next week a motion that asks this court to amend the protective order in this court because it has become the subject of both the debate and the response and the motion to quash in state court.

And just to give you a heads-up that that is coming, the Delaware action is on an extremely expedited schedule heading towards, I think, a preliminary injunction hearing.  It may become necessary for that motion that we will file next week to have a special setting.  And certainly we would include any request for that with our motion.

THE COURT:  In the motion.  Great.  All right.

Any other updates?

MR. KIMBLE:  Your Honor, I'm Chris Kimble.  And I wanted to

respond to what Barry had to say.

Bruce Rogers and I filed a motion to quash today in the circuit court for Jefferson County to quash the Cigna subpoena. That has been set for hearing a week from today at 8:30.

Up until this time, we have understood the plaintiffs to be disinterested recipients of a third-party subpoena. I now understand that they have now moved over into the Cigna camp and are intending to file a motion that's intended to provide relief to Cigna to this court next week. And I just wanted to flag for you that the circuit court is going to hear that motion on Friday.

THE COURT: Okay.

MR. KIMBLE: The subpoena is pending in that court, and that judge should be allowed to rule on that subpoena.

I will also just mention that if the protective order entered in the case and the confidentiality designations that the defendants make are worthless, I can only imagine the volume of discovery disputes this court is now about to receive as productions continue to be made. And I wanted to flag that for you.

THE COURT: All right. Thank you.

Anyone else wish to comment about the Delaware/Jefferson County subpoena?

All right. Any other reports, problems, concerns anybody wish to raise?

MR. RAGSDALE:  Two small issues that I do -- well, they're not small.  There are no small issues in this case -- but that I do want to flag for you, one of which is that we have started, thank goodness, taking depositions.  There have been somewhere just south of a dozen that have been taken so far.  And we have run into a couple of problems, one of which I think will be easy to resolve.  The other may be a little more difficult.

One is we have experienced a failure to comply with the discovery deposition protocol, which requires that we get dates, parties exchange dates for depositions within ten days of the request for those dates.  That happened in particular with Blue Cross of Alabama.

Mr. Burkhalter this morning came and said to me, My bad.  Sorry.  Missed it.  We'll fix that, and has assured us that that will not be an issue going forward.  And I believe that's true.

In addition to that, one of the things that we have experienced as well is having the defendants produce documents related to our class representatives either on the eve of or, on one occasion, during their deposition which had not previously been produced.  We have asked the defendants to reach an agreement to prevent that from happening in the future.

Ms. Yinger, I discussed it with her, and she has told me that she will talk to her group and try to get us that issue resolved so that we don't have to bring it back before this court.

One of those depositions is set for Monday.  We got documents, I think, a couple of days ago, produced late.  We're going to go forward with that deposition, but we do want to flag that issue for future consideration.

THE COURT:  All right.

Mr. Burkhalter?

MR. BURKHALTER:  Good afternoon, Your Honor.  Carl Burkhalter, Maynard Cooper, for Blue Cross Blue Shield of Alabama.

To address Barry's last point, he's right.  We had an internal miscommunication at my law firm.  It was like the infield fly falling between the first baseman and the second baseman.  But --

THE COURT:  You take it; I got it.

MR. BURKHALTER:  That's right.

But it's my responsibility.  It's my error ultimately.  I apologize profusely.  And I'm going to fix it.

THE COURT:  Okay.  Thank you.

All right.  Any other questions, problems, issues?

Ms. Yinger?

MS. YINGER:  That's okay.

THE COURT:  All right.

All right.  Thank y'all very much, then, and I'll try to get you something out early next week.  Thank you.

(The proceedings were concluded at 2:13 p.m.)

C E R T I F I C A T E

I, Sabrina Lewis, RDR, CRR, Official Court Reporter for the United States District Court for the Northern District of Alabama, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the court and the Judicial Conference of the United States.

Dated:  March 29, 2017

*Sabrina Lewis*

SABRINA LEWIS, OFFICIAL COURT REPORTER