FILED
2022 Sep-21 PM 02:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NO. 2:13-cv-20000-RDP          |   May 28, 2015
                                    |   11:13 a.m.
IN RE:   BLUE CROSS BLUE SHIELD     |
ANTITRUST LITIGATION MDL 2406       |   Birmingham, Alabama


**TRANSCRIPT OF THE DISCOVERY CONFERENCE**
**BEFORE**
**THE HONORABLE T. MICHAEL PUTNAM**
**UNITED STATES MAGISTRATE JUDGE**


    Proceedings recorded by mechanical stenography, transcript
produced by computer.

**PRESENT**:

Kenina Lee
Axinn Veltrop & Harkrider LLP
950 F Street NW
Washington, DC 20004
202-912-4700
Kjl@avhlaw.com
   on behalf of Defendant Independence Blue Cross

Cavender (Chris) Kimble
Balch & Bingham LLP
1901 6th Avenue North
Suite 1500
P.O. Box 306
Birmingham, Alabama 35201
205-226-3437
ckimble@balch.com
   on behalf of certain Defendants


**SABRINA LEWIS, CCR, RDR, CRR**
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama 35203
(205) 278-2065
sabrina_lewis@alnd.uscourts.gov

**PRESENT**:   (continued)

Charles L. Sweeris
Law Department, Blue Shield of California
50 Beale Street, 22nd Floor
San Francisco, California 94105
415-229-5101
charles.sweeris@blueshieldca.com
  on behalf of Blue Shield of California

Stephen D. Wadsworth
Campbell Guin Williams Guy and Gidiere LLC
505 North 20th Street, Suite 1600
Birmingham, Alabama 35203
205-224-0750
stephen.wadsworth@campbellguin.com
  on behalf of BCBS-M2

Tracy A. Roman
Crowell and Moring LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
202-624-2500
troman@crowell.com
  on behalf of certain Defendants

Nicholas B. Roth
Eyster Key Tubb Roth Middleton & Adams LLP
402 E. Moulton Street
P.O. Box 1607
Decatur, Alabama 35602
256-353-6761
nbroth@eysterkey.com
  on behalf of Provider Plaintiffs

Edgar C. Gentle III
Gentle Turner Sexton & Harbison
501 Riverchase Parkway East, Suite 100
Hoover, Alabama 35244
205-716-3000
Hoover, Alabama 35244
escrowagen@aol.com
  Special Master

**PRESENT**: (continued)

William Butterfield
Hausfeld LLP
1700 K Street, NW
Washington, DC 20006
202-540-7143
wbutterfield@hausfeldllp.com
  on behalf of Subscriber Plaintiffs

Justin W. Bernick
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
202-637-5485
justin.bernick@hoganlovells.com
  on behalf of certain Defendants

Emily M. Yinger
HOGAN LOVELLS US LLP
7930 Jones Branch Drive
Ninth Floor, Park Place Building
McLean, Virginia 22102
703-610-6100
emily.yinger@hoganlovells.com
  on behalf of certain Defendants

Sarah J. Donnell
Daniel E. Laytin
Helen E. Witt
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
312-862-2000
sdonnell@kirkland.com
daniel.laytin@kirkland.com
hwitt@kirkland.com
  on behalf of BCBSA, HCSC, Highmark, NASCO, CHP

Carl S. Burkhalter
John T.A. Malatesta III
Maynard Cooper & Gale
AmSouth Harbert Plaza
1901 6th Avenue North, Suite 2400
Birmingham, Alabama 35203
205-254-1000
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com
  on behalf of BCBS of Alabama

**PRESENT**:  (continued)

John Martin
Nelson Mullins Riley & Scarborough LLP
1320 Main Street, 17th Floor
Columbia, South Carolina 29201
803-255-9421
john.martin@nelsonmullins.com
  on behalf of certain Defendants

Chris T. Hellums
Pittman Dutton & Hellums PC
2001 Park Place Tower, Suite 1100
Birmingham, Alabama 35203
205-322-8880
chrisH@pittmandutton.com
  Plaintiffs' Liaison Counsel

Carlos M. Hernandez-Burgos
Reichard & Escalera
P.O. Box 364148
San Juan, Puerto Rico 00936-4148
787-777-8819
hernandezc@reichardescalera.com
  on behalf of Triple-S Salud

Barry A. Ragsdale
Sirote & Permutt PC
2311 Highland Avenue South
P.O. Box 55727
Birmingham, Alabama 35255-5727
205-930-5100
bragsdale@sirote.com
  Plaintiffs' Liaison Counsel

Joshua K. Payne
Spotswood Sansom & Sansbury LLC
1819 5th Avenue North, Suite 1050
Birmingham, Alabama 35203
205-986-3620
jpayne@spotswoodllc.com
  on behalf of Capital Blue Cross

**PRESENT**:   (continued)

Mark Montgomery Hogewood
Kimberly R. West
Wallace Jordan Ratliff & Brandt, LLC
P.O. Box 530910
Birmingham, Alabama 35253
205-870-0555
mhogewood@wallacejordan.com
kwest@wallacejordan.com
  Defendants' Liaison Counsel

W. Tucker Brown
Whatley Kallas LLC
2001 Park Place North, Suite 1000
Birmingham, Alabama 35203
205-488-1200
tbrown@whatleykallas.com
  on behalf of Provider Plaintiffs

Patrick J. Sheehan
Whatley Kallas LLC
60 State Street, 7th Floor
Boston, Massachusetts 02109
617-573-5118
psheehan@whatleykallas.com
  on behalf of Provider Plaintiffs;

Dennis G. Pantazis
Wiggins Childs Pantazis Fisher & Goldfarb LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203-3204
205-314-0531
dgp@wigginschilds.com
  on behalf of Provider Plaintiffs

Michael E. Gurley, Jr.
Wood Law Firm LLC
P.O. Box 382434
Birmingham, Alabama 35238-2434
205-908-6512
mgurleyjr@yahoo.com
  on behalf of Provider Plaintiffs

**PRESENT VIA TELEPHONE:**

Henry James Koch
Armbrecht Jackson LLP
P.O. Box 290
Mobile, Alabama 36601
251-405-1300
hjk@ajlaw.com
  on behalf of certain Defendants

Lucy Grey McIver
Blue Cross Blue Shield of South Carolina
I-20 @ Alpine Road Mail Code AA-270
Columbia, South Carolina 29219-0001
803-264-3395
lucy.grey.mciver@bcbssc.com
  on behalf of Blue Cross and Blue Shield of South Carolina

Norman E. Bailey, Jr.
M. Patrick McDowell
Brunini Grantham Grower & Hewes PLLC
190 East Capitol Street, Suite 100
Jackson, Mississippi 39201
601-948-3101
bbailey@brunini.com
pmcdowell@brunini.com
  on behalf of certain Defendants

Arthur Fritzinger
Cozen O'Connor
One Liberty Place
1650 Market Street
Philadelphia, Pennsylvania 19103
215-665-7264
afritzinger@cozen.com
  on behalf of certain Plaintiffs

Michael A. Naranjo
Foley & Lardner LLP
555 California Street, Suite 1700
San Francisco, California 94589
415-984-9847
mnaranjo@foley.com
  on behalf of USAble Mutual Insurance Company, dba Arkansas
  Blue Cross and Blue Shield

THE COURT:  Good morning.  I welcome everybody to the Blue Cross Blue Shield Multi-District Litigation discovery conference.  I'm just back from ten days in Italy, so I feel great.  I thought not once about the complexities of the medical insurance market.

We have a number of things that the parties have suggested for discussion this morning.  Just briefly -- and let me run through them.  If there's anything I'm missing, please let me know.

First question to be dealt with are relevant time periods for the subscriber and provider plaintiffs' request for production of defendants, whether that relates to going back to 1995 or some shorter period or some longer period of time for production of documents.

Number two is whether or not the chief medical officer and immediate past chief medical officer of Blue Cross Blue Shield Association will be designated as production custodians, discovery limits to be proposed.  That is just things such as numbers of interrogatories, numbers of document requests, numbers of depositions, things of that sort.

A couple of things that I want to at least raise initially after we deal with these other matters are discovery questions that arise from Judge Proctor's conference on May 19th, special discovery regarding in personam jurisdiction involving the amount of business transacted in the Northern District of

Alabama and the Western District of North Carolina as well as special discovery issues and a schedule for discovery regarding NASCO and... I guess it's CHP, C-H-P.

The parties may or may not be prepared to discuss those latter two because I'm adding those just as something that arose out of the conference with Judge Proctor.  But we'll start first, Mr. Ragsdale, the three matters that I have on the agenda; that is, the relevant time periods, the designation of a production custodian and the chief medical officer, and then generally discovery limits.  Any other issues that you can think of that I'm missing there?

MR. RAGSDALE:  I don't think so.

THE COURT:  All right.  Hear what you have to say.

MR. RAGSDALE:  Your Honor, we intend to present our argument in Italian if that is...

THE COURT:  I'll understand it about as much as I understood ordering with waiters in Italy, so...

MR. RAGSDALE:  It may not sound like Italian by the time I'm done.

As regards the first issue, Judge, which is the time periods that we're dealing with, we're really talking about trying to define a process by which the parties can continue to discuss not only the scope of particular requests for productions but to move the process off of kind of where it is now.

THE COURT:  Uh-huh.

MR. RAGSDALE:  And that's because we've been meeting and conferring for some time and have, frankly, reached a point where we seem to be saying the same things to each other kind of like an old married couple.

THE COURT:  Well, and that's what I was saying to my law clerks this morning.  I'm all in favor of meet and confers as long as they don't go on forever.  And I guess that's sort of where, at least from the plaintiffs' perspective, that's where you think we are.

MR. RAGSDALE:  We are.  They have become interminable. And as I said, we've reached a point where I think each side has staked out clearly what their position is, and we don't seem to be making much progress towards trying to resolve that.  And our position is on -- particularly for these requests for production is that we really can't have a substantive, meaningful discussion about the burden that it might impose on the defendants and the proportionality of the requests and the discovery until we know and can agree or, frankly, have this Court set a boundary as to the temporal aspects of those requests.  And we've -- and frankly, we have discussed and debated that for some time --

THE COURT:  But those are going to vary from request to request, aren't they?  I mean, there are going to be some where -- or at least the defendants say in their letter briefs

that there are some where you acknowledge that you don't need information back to 1995.  And then there are others where you clearly need information perhaps going back into the 1940s.  So it's going to vary from request to request, isn't it?

MR. RAGSDALE:  Well, I think there are certainly some categories of requests, for example, that we know go back to the 1940s.

THE COURT:  Uh-huh.

MR. RAGSDALE:  And there are certainly some categories where we believe, particularly based upon a burden aspect of it, that we may not feel that we need to go back further than a period that comes close to that.

What we can't do and what we've been unable to do is try to take each request one by one and try to come up with a different time period that makes sense.  And part of that is, I think, because generally we're not dealing with a case -- and we think this differentiates this case from a lot of cases -- where we're having to try to identify when the agreement to restrain trade occurred.  We know when that occurred.  And, frankly, the defendants take the position it's open and obvious.  It happened a long time ago.

So that many of these requests in part are not attempts to identify a discrete act that might have been in furtherance of the conspiracy, although many of them do address that.  But some of them also have to look at what the effect of that conspiracy

was.  And that, frankly, spans the full breadth of time.  And there are going to be differences and changes in the market over the course of all those years, even back to the '40s, that we believe both our experts and, frankly, the defendants' experts are going to look to to determine what effect changes in the nature of the competition had effect on things like premiums and reimbursement rates.

So I would agree with you that some of those requests probably we may ultimately conclude with individual defendants when we start talking about both proportionality and the burden of production.  But we think we've got to put a stake in the ground at some point to say, Here's the default date.

THE COURT:  Uh-huh.

MR. RAGSDALE:  Here's the default date that we think we are entitled to have requests cover.  And then individual defendants can come forward and say it would cost a gazillion dollars to do that or it wouldn't.  But that until we have that -- for example, there's no way to meaningfully evaluate the claims which, by the way, they've set forth in their response to you about the tens of millions of dollars that it might cost to do that.  There's no way to make that analysis and, frankly, for us to be in a position to evaluate that analysis unless we know how far back we're talking about going.

And as I said, we think this case, because of its nature -- and in some ways, it's unique but because of its nature is not

the kind of case where you should limit discovery, as the defendants have suggested, to just the statute of limitations time period or even a year or two before that; that the nature of this business, the nature of the conspiracy, the nature of the plaintiffs' allegations require that we go back further than that.

And, frankly, we picked 1995 because we think historically that date makes some sense in light of changes that the Court's already aware of in terms of the market, the BlueCard, and other factors.

THE COURT:  Uh-huh.

MR. RAGSDALE:  That that date, frankly, I think we could justify going back much further than that.  But in an attempt to try to move this process forward -- because, ultimately, what we are seeking the Court's help with is trying to move the process forward rather than continuing to have the same argument with the defendants over and over again.  And that argument essentially goes along the lines of, You have to establish -- you have to convince us of why information prior to 2007 or 2005 -- whatever date they might suggest -- You have to persuade us as to why that is relevant.

And we contend that's not really the determination that has to be made for purposes of these discovery requests.  But more importantly, it's impossible to evaluate the burden that might be imposed on them unless we have a target down the road that

establishes the date that we go back to.

Now, that does not preclude individual defendants from coming to us and saying, 1995 is an unreasonable date because of this burden that it would impose on us for this particular request. But that only becomes a substantive analysis once we have that stake in the ground. And we think the most reasonable aspect of the stake in the ground is 1995.

THE COURT: All right. Let me just hear what the others have to say about the -- about the time frame, and then we'll come back and deal with the chief medical officer.

MS. WEST: Your Honor, Ms. Yinger will be addressing this issue.

THE COURT: Yes, thank you.

Good morning.

MS. YINGER: Good morning, your Honor. I -- you know, I hear what Mr. Ragsdale has to say about how we have met and conferred. Actually, we, our group of 14 defendants, have only met and conferred on the scope of the 159 RFPs with the plaintiffs once. And we didn't even get through all 159 RFPs.

Beforehand, we actually sent the plaintiffs -- before we had the time period meet and confer with the joint group, we sent the plaintiffs a list of categories grouping individual RFPs into categories to try and make it easier. And that's basically the same categories that we used at our meet and confer with the plaintiffs.

Again, it was one meet and confer about scope.  It was not an interminable number.  It wasn't -- you know, they weren't going on forever.  It was one meet and confer.

We sent a letter afterwards which we attached to our brief. And that letter set out our proposal on scope.  It also asked plaintiffs to come back to us, because they agreed that there were many of their RFPs that needed to be narrowed and revised.

My point is that we are still in the middle of productive meet and confers.  At least we think so.  We've made a good faith proposal that actually walks through categories of RFPs, tries to group them together and tie them to a time period instead of doing this broad-brush, one time period applies to 159 RFPs.

THE COURT:  That's the appendix A that's attached to the letter and your brief.

MS. YINGER:  That's right, your Honor.

THE COURT:  All right.

MS. YINGER:  And, really, what's important here is to keep all this in the context that we proposed it.  I mean, we went to the plaintiffs and we said, We understand that there are important issues for which you need discovery all the way back in time.  And we said, You know, look, we've read the complaint. It's about exclusive service areas and license agreements. We're going to give you those all the way back in time.

It's about two rules.  It's about the best efforts rule,

which controls how much revenue a Blue plan can derive from unbranded non-Blue business -- and acquisition rules, about how someone can get a controlling interest in a Blue.  And we said, We're going to give you that stuff back in time.

The plaintiffs said, You know, this is also about the -- provider plaintiffs also said, You know, this is also about BlueCard.  And we think when you created BlueCard, you created a price-fixing mechanism.  And we said, Okay, we're going to give you the creation of BlueCard documents back in time.

The point is that for the rest of the 159, which deal with routine operational documents like marketing materials, they don't need those back to 1995.  And they haven't engaged with us and given us any reason why they would need 20 years of routine marketing materials.  They haven't engaged with us and told us why they would need structure documents each time a corporate entity changes a structure for 20 years.  They want that back in time.

I mean, so, you know, this picture that Mr. Ragsdale has painted that we've had these interminable meet and confers isn't accurate.  And the context of how these proposals have been made aren't accurate.

We have said we're going to give them the core information all the way back in time for their claims in their complaint. And what we're really fighting about are the rest of those 159 RFPs, which we've tried to categorize into different categories

to make it easier, for which we have made a proposal for which the plaintiffs have agreed they need to narrow scope for several of them and haven't come back yet with that.

And we understand.  That takes some time.  But the notion that, you know, we're all stalled and we can't make any progress until some arbitrary default time period is set across 159 different categories of documents just isn't right.

So I think, you know, it may be -- it may be convenient for the plaintiffs to kind of pluck that issue out and present it to the Court.  But, actually, we think it is very tied up in scope and that until we actually get into the negotiations about these categories of RFPs and what their scope is and the plaintiffs come back with their revised proposal, we don't think we can talk about time period in that way.

THE COURT:  Well, you're also -- you've couched all of these categories in terms of being subject to burden and accessibility questions as well.  You know, I guess what I hear Mr. Ragsdale saying is we have -- if we agree to some variable scopes in time, then the next thing is we're going to be faced with the question -- the objection that all of these requests now are unduly burdensome or they're inaccessible or whatever they may be.  And how are we to analyze that without some basic information about how many documents we're talking about, about the computer technicalities of getting access to some of this stuff.

MS. YINGER:  You're right.  We need to address those in individual meet and confers, and we've offered to do that. When I say that we have put RFPs into categories with respect to scope, I mean scope -- substantive scope, not time period scope.

THE COURT:  Right.

MS. YINGER:  So the point is that, actually, we don't know the substantive scope yet of what the plaintiffs need because they have agreed to work with us on that and they have agreed to come back on many of them.  So we don't know the substantive scope yet.  And that is going to be determinative. In fact, how do you do that sort of negotiating about incremental burden?  How do you say, you know, Well, we'll go back another year, or, We'll go back another two years, unless you understand what the scope of the request is actually seeking because you won't know what the burden is.  You won't be able to tie it to a specific set of documents until you know what the substantive scope of that request is.

THE COURT:  But the question that we're faced with today, as I understand it, is whether or not as sort of a default baseline -- because I don't hear Mr. Ragsdale as being -- as saying rigidly that all of these requests for production have to meet some 1995 time frame.  But at least as some kind of a default baseline or something, that in responding to the request for production, the defendants will go back to 1995 and perhaps earlier in some, but at least 1995.  And then

based on that initial marshalling or gathering of that information, we'll have some basic information about how burdensome is it really to get to that stuff.

MS. YINGER:  I think the trouble is that, first of all, if you look at the RFPs, they request a huge range of things.  So some of those, a default date outside of the statute of limitations period -- which I would assert is the proper --

THE COURT:  Uh-huh.

MS. YINGER:  -- is actually the proper default date. I mean, if you look at the case law, what the case law says is that there are narrow times when you go beyond the claims that are actually assertable in a case.  There are narrow times.  And even the cases that the plaintiffs cite, the Quonset case, those cases all stand for the proposition that there is a limited discovery period, but then the plaintiffs articulate a particular -- in that case, I think it was a sales manager who needed to be deposed or a handful of documents in another one of the cases that they cite.  We're not talking about 159 RFPs that cut across the entire operational, basically, function of, you know, 37 different companies.

THE COURT:  Uh-huh.

MS. YINGER:  It's just a huge -- a huge difference.

And I think our proposal actually tracks what the case law and what Rule 26 contemplates, which is the default is actually the time period within which the plaintiffs can assert a claim,

which is the class period and the statute of limitations period. And then where the plaintiffs have articulated a basis for going beyond that, we've actually responded and we've actually made a proposal for the kinds of documents that we're willing to entertain that for and we're willing to go ahead and agree to do that for. But, you know, painting 159 RFPs that are so broad -- everything, you know, from financial reports to claims administration policies to organizational structure to provider contracting -- with the same brush isn't really workable.

I think I answered the question. Did I answer the question?

THE COURT: Yes, thank you. Yes.

MS. YINGER: Okay. But, you know, fundamentally I think we're hamstrung because -- well, I guess I should mention this is the first time we've heard from the plaintiffs that they're actually willing to come off the 1995 date. That wasn't their position in our meet and confer. So this is the first time that we've heard that.

But, you know, to paint 159 RFPs that are so broad with one default date, I think, is really not workable. And I think it -- you know, the plaintiffs -- it may be helpful to the plaintiffs and may give them some leverage, but that's really not what this process is about.

THE COURT: Uh-huh.

MS. YINGER: This process should really be about, you

know, good faith meet and confer, good faith exchange. Plaintiffs do hold the burden here to justify their -- you know, how their RFPs relate to their case.  They really do hold that burden.  And I don't think they have met it with respect to 159 RFPs.

THE COURT:  All right.

All right.  Mr. Ragsdale?

MR. RAGSDALE:  Let me start, if I might, with the notion that we're here prematurely.  I think it depends on your definition of what a productive meet and confer is.

The plaintiffs take the perspective it's when we make progress.  I think the defendants can sit with us for 8 hours and we make no progress and they leave and they say, Well, that was productive.

Our point is we're not going forward with this process. It's getting nowhere because we're repeating the same positions.

And we recognize there are going to have to be additional meet and confers about the substantive scope of these requests. And I need to make it clear.  We have not backed off the 1995 date, either, in our discussions with the defendants for some time.  As long back as I can remember we have taken that position.  Nor have they, frankly, backed off.

And I did not mean to imply that to the Court.  My position was that if we stake that date out there, we then move on to discussion of the substantive scope of those RFPs.  And,

ultimately, then if we've reached agreement, we then get to the question of whether or not there is a burden to be assessed.

If individual defendants are able to present to us that kind of evidence, we may very well make the decision that, on a proportionality basis, that we won't push that issue in front of you.  That's not backing off the initial date, which I think we put that stake and feel like that stake needs to be in the ground.

I mean, ultimately, what their position is, not that we have not engaged with them about these discussions but we haven't persuaded them that we are right.  And I think the point we've reached is we don't believe we're ever going to persuade them that we are right and that, ultimately, we need the Court's assistance to move the process going forward.

THE COURT:  Well, I guess help me understand what the difference is between setting a 1995 time frame and some substantive scope of a request.  I mean, if you request some sales production documents or something and I say, Okay.  All right.  Get those all the way back to 1995, and then the question becomes -- as I understand what you're saying, the question then becomes is, Well, do we really need to know about sales production documents for purposes of our lawsuit?

Am I misunderstanding you, or are we getting the cart before the horse on the types of things that you really need to try to find?

MR. RAGSDALE:  Well, I do think there may be discrete examples where substantively -- and that's what we have continued to meet and confer on is, for example, if we've asked for all marketing materials and they're able to present to us, well, that includes things you really don't want, and if you narrow it to a more narrow request --

THE COURT:  Yeah, I mean, for example, things like marketing materials.  I mean, every year, as a federal employee, Blue Cross Blue Shield sends me a nice little pamphlet every year.  Do you really need that pamphlet for every year?

UNIDENTIFIED SPEAKER:  Yes.

MR. RAGSDALE:  Yes.

THE COURT:  Okay.

MR. RAGSDALE:  We do.  And, again, to some degree, that is a nature -- the nature of the claims in this case --

THE COURT:  Okay.

MR. RAGSDALE:  -- which span so many decades.

But let me also say if they're sending it to you in the mail every year, it's probably not that hard for them to find a copy laying around the office that they could produce.

THE COURT:  Well, it might be hard to find a copy back to 1995, though.

MR. RAGSDALE:  It might be.  And that's what they would have to be able to -- we could have a discussion with once we've determined that the date we're going back to is 1995.

What we can't have is that discussion in a vacuum until we know where the beginning date is that we're talking about.  And once we have that staked out, then they can come forward to us and say, Look, we've got them back to 2000 in a cabinet somewhere in Chicago, but the other ones we're going to have to go to a warehouse for.

That allows us to have that substantive discussion about that narrow scope of documents that might fall within that range.  But that -- we can't get to that point till we know where we're starting.  And that's why we think it makes the most sense to create this as a default date -- which does not prejudice the defendants at all.  It doesn't commit them any further than that, then, we have to engage in a discussion both of the substantive limits of or substantive modifications of the request and also then get into discussion of the burden that might be imposed, which they still freely can make.

Otherwise, I will say I think we're going to be -- and I know you have to be here every month.  But we're going to be back in front of you every month fighting on individual requests both in terms of the date and the substance and then on the burden.  And, frankly, that does not seem like an efficient process.

THE COURT:  So what would be the effect -- let's say I agree with you and I say, Okay, all of these are going to have a default date of 1995.  And all of the Blues go off and do what?

They take your RFPs and see, I guess, preliminarily, Do we have documents fitting these categories going back to 1995?  Or do we only have them back to 2002?  Or they're going to give you different responses, say, you know, for request for production number 36, we have documents going back to 2002.  That's all we have.

MR. RAGSDALE:  I actually think that's exactly how the process would work.  And some of those documents are going to be easily accessible with very little burden imposed on them and, let me say, well beyond the statute of limitations that they've advocated for.  And then -- and, frankly, I anticipate, although we don't know, but I anticipate the burden will increase the further back that you go --

THE COURT:  Sure.

MR. RAGSDALE:  -- after that date.  But it might not.  Those documents might all be maintained going back any further than that.

THE COURT:  But they're going to have to incur a large part of that burden just making that initial determination to tell you, aren't they?  I mean, they're going to have to look at everything they've got to see, Do I have something back to 1995?

MR. RAGSDALE:  But, I mean, let me say there is some burden imposed on them to do that.  But if we don't know the start date, they still have to incur that burden and, in fact, they've still got to make a determination of what documents they

have for what temporal period in one form as opposed to another --

THE COURT:  Even if I set the default date as 2008, they're still going to have to go look at all their documents.

MR. RAGSDALE:  Correct.  I mean, that doesn't change.

THE COURT:  Right.

MR. RAGSDALE:  The only way for them to make a, I think, reasoned and supportable argument regarding burden is to make that analysis.  And all we're doing is saying, Let's create the parameters temporally for what that analysis is so that we can then discuss what the relative burden is in terms of producing documents in between 1995 and the statute of limitations date that they've suggested.

And, again, this is about moving the process forward.  It is not about trying to unnecessarily burden these defendants but to make it in a process where we make some progress, which, frankly, has been lacking.

THE COURT:  You would anticipate or -- or tell me what you would anticipate; that is, if I set the default date -- whatever.  1995, 2008, 2000, whatever -- that there would be some period of time, then, that the Blues would go examine their documents in light of the request for production and that deadline and come back to you, I guess, and say in response to each request for production, We have documents here.  We have documents there.  We have documents that fit this date but not

that date.  And then based on that, you then begin a discussion about, Do we really need that?

MR. RAGSDALE:  Yes.  But let's make no mistake; they're not starting from scratch with that analysis.  We have had years of discussions about preservation of documents before we even began talking about production.  And they've had to make that analysis in terms of preservation of those documents going back some time already.  And so that analysis, frankly, has to have already been performed to some degree.

THE COURT:  So you say much of that burden has already been incurred?

MR. RAGSDALE:  Yes.

THE COURT:  All right.

All right.  Ms. Yinger?

MS. YINGER:  Let me address the last point that Mr. Ragsdale made first because it's just inaccurate.  We haven't had a year of discussions of preservation.  That's just not right.  In fact, I don't think we've talked about preservation with respect to our clients for over a year.  So I think the real problem here --

THE COURT:  Now, let me be sure I understand that. There have been no discussions at all about the need for the Blues to preserve certain documents over a certain time period? There's been no talk about preservation?

MS. YINGER:  No, I said in the last year.

THE COURT:  Oh, in the last year?

MS. YINGER:  At the beginning of the case -- at the beginning of the case, again, we initiated a conversation with some categories of documents that we wanted to get preservation agreement on, but that hasn't happened with respect to our clients.  I think some other defendants have had some preservation discussions.  I think the Association has had some.  I think a couple of the other defendants.

THE COURT:  All right.

MS. YINGER:  But a global preservation discussion, I don't want to leave you with the impression that that's been going on for a year because it hasn't.

THE COURT:  All right.

Yes, sir?

MR. LAYTIN:  Dan Laytin for the Association.  That has been defendant-specific, and we've engaged in a long preservation discussion with plaintiffs.  I don't think it's covered at all, in fact -- and I think as Ms. Yinger is going to explain -- doesn't at all cover the burden that --

THE COURT:  Okay.

MR. LAYTIN:  -- discussions with Mr. Ragsdale.  But we certainly have been having those discussions.

THE COURT:  All right.

MS. YINGER:  Yeah, that's right.

So the notion that the plaintiffs should get a 1995 blanket

default time period without first tying their specific requests to their claims in the case, which are from the period of 2008 to the present, is completely unprecedented.

I mean, we have scoured the case law.  We've presented it to the Court.  And what the case law says very clearly -- and each one of those courts goes through a Rule 26 balancing analysis where they have before them burden.  They have before them substantive scope of what the RFPs actually cover.

What the courts do there is they do the balancing.  They stick very closely within a few years of the statute of limitations period, and they go beyond it only for very narrow reasons.

We've already done that.  We have already made a proposal that goes way beyond the statute of limitations period for specific documents that are tied directly to the plaintiffs' claims in this case.  So the notion that this Court would, you know, sort of impose this blanket 20-year-long default time period is really unprecedented.  And I think, actually --

THE COURT:  Your argument is just a 26(b)(1) not relevant discovery argument.  It's beyond the scope of discoverable information.

MS. YINGER:  Actually, it's not.  Because, again, we don't yet know what the scope is of the RFPs.  We're negotiating the scope.

THE COURT:  Okay.

MS. YINGER:  And each one is different.  And they've -- and we've put them in categories, which we think is helpful, and I think that helps move the process forward.  The plaintiffs haven't engaged with that, but --

THE COURT:  But the reformulation now of 26(b)(1) has injected the burdensomeness and accessibility questions up into scope now.

MS. YINGER:  That's right.  That's right.  But I think the way this has to happen is the plaintiffs narrow the scope of their RFPs first.  Then we talk about burden.  And then we talk about time period.  Because I think, as I said -- I tried to explain, that once we know what the scope is, is it really all our marketing materials back to 1995?  You know, how is the brochure that your Honor gets every year tied to their market allocation claims?  How is it tied to the, you know, assembly of plans and long-term business strategy that we've already agreed to produce?  How is it tied to any of those things in their complaint?  It's not.

They don't need -- they don't need 20 years of brochures.  That's cumulative, duplicative, unnecessary.  How is that tied to their claims?  That's their burden to articulate.  And they haven't.  They have a sort of stock answer, which is set forth in their letter brief where they say, Well, everything's sort of encompassed by the conspiracy.  Well, actually, that's not true.  Their complaint actually lays out what their allegations are.

And we directly tailored our proposal to their allegations.

It certainly would not be -- it certainly would not be efficient for us to be producing 20 years of marketing materials for no apparent reason.  They need to tie their RFPs to their claims in the case.

So first the scope, the substantive scope has to be defined.  I don't really think they want 20 years of brochures.  There are probably some marketing materials that they think are important.  And they can probably narrow that request.  They have offered to do that, but they haven't come back yet.  But I think they're going to do that.

And once we have that narrowed scope, then we can determine the burden and then we can do that balancing.  We can say, Okay, here's the burden for going back five years.  Here's the burden for going back six years.  But we can't do that without knowing the scope of what they're seeking.

THE COURT:  Okay.  All right.  Thank you.

The next question deals with designating the chief medical officer as a productions custodian.

Mr. Ragsdale?

MR. RAGSDALE:  Actually, Mr. Patrick Sheehan is going to make that argument.

THE COURT:  All right.  Thank you.

MR. SHEEHAN:  Good morning, your Honor.

THE COURT:  Good morning.

MR. SHEEHAN:  So, what I'd like to do, your Honor, is address a couple points relating to the Association CMOs, number one, why we believe they're relevant to discovery and, number two, why we believe they're relevant now.

THE COURT:  We're talking here specifically about the Blue Cross Blue Shield Association's chief medical officer and past chief medical officer?

MR. SHEEHAN:  That is correct, your Honor.

THE COURT:  Okay.

MR. SHEEHAN:  All right.  We're talking about the present chief medical officer and the immediate past chief medical officer.

THE COURT:  All right.  So we're talking about two people here?

MR. SHEEHAN:  Correct.

THE COURT:  Okay.

MR. SHEEHAN:  Correct, your Honor.

You know, first of all, as we have said in our meet and confers with the Association as well as in the letter that we submitted to your Honor, we've been litigating against the Blues as well as other national health insurance for a long time.  We know what a chief medical officer does.  And based on our experience, we think the chief medical officers, you know, participate in virtually every aspect of an insurer's relationship with healthcare providers.

But specifically, as the Association said in its letter to your Honor, the CMOs' -- and this is Association CMOs -- responsibilities include providing strategic direction regarding medical and clinical affairs in areas such as healthcare quality, patient safety, and medical policies.  And that's on page 2 of their letter.

You know, while they say that, they also say that the chief medical officers don't play any role whatsoever in setting reimbursement rates.  We contest that notion.  And even if the Association claims as a technical matter that they don't set rates for a particular procedure, let's say, that's paid for by a particular plan, they certainly provide strategic direction that relates to how providers are paid and ultimately how much they are paid at the end of the day.

For example, the Association's views on what procedures or treatments are medically necessary may be taken as direction by the plans and factor into whether or not those plans will cover the cost of a particular procedure.  The Association may not set the rate and they may not technically make the final decision on whether or not a particular plan determines that that procedure is medically necessary, but they have influence.

In addition, we know that the Association is heavily involved in the proliferation or development of payment models that are not based on fee for service and not a hundred dollars for an office visit per se but more complicated models that take

into account things like quality; which, again, is part of the core responsibility of the Association's chief medical officer.

And just in reviewing their letter, your Honor, that they sent to you, I did a quick Internet search to see if we could test this notion that the chief medical officers don't have any responsibilities that relate to reimbursement. And with your Honor's permission, I'd like to hand you a document that I found --

THE COURT:  Sure.

MR. SHEEHAN:  -- after a cursory review.

THE COURT:  Sure.

MS. DONNELL:  And, your Honor, we haven't seen a copy of that.

MR. SHEEHAN:  I'll be happy to give you a copy.

Your Honor, as you can see, this is a document that was apparently prepared by the Blue Cross Association.  If you look at the second page in the top right-hand corner, it is dated February 13th, 2014.  And it appears to be a newsletter of some sort entitled "Blue Perspective" at the top.  And below that is a heading or a title which states "Value-Based Programs."

And if you look at the portion of the first page that I highlighted, it states that, "The Blue Cross and Blue Shield Association (BCBSA) and BCBS Plans are spearheading initiatives to ensure our 100 million members receive safe, high-quality, coordinated, and affordable care."

And the document goes on to say that, "Blue Initiatives use an interconnected approach involving:" and the first bullet point states, "changing payment incentives by moving away from fee for service, which rewards volume, and linking reimbursement to quality and outcomes."

And so, again, we're talking about reimbursement models and quality, the core of responsibility of the Association's CMO, as discussed in a document from last year that was produced by the Association.

And so from our perspective, we think there's absolutely no question that the CMO plays a role that's relevant to reimbursement. Whether or not, again, they set the dollar amount that a particular plan pays for a procedure is not the point. It's that they have influence as an Association through their CMOs on how these payment models are created in the first instance and, ultimately, that model how the providers get paid affects how much they're paid in the end. That goes right to the heart of our case: you know, were the defendants in this case able to impose lower-than-market reimbursement rates and models on providers?

So that's the reimbursement point. More broadly than that, in our experience we know that healthcare providers communicate with CMOs both locally and at the national level on areas of concern to them. And so we would expect there to be communication about things like reimbursement but also

potentially other things.  We can't sit here today and tell you exactly what we expect to be there, but we know that happens based on our experience.

So those are, I think, our basic arguments as to why we think the chief medical officers would be relevant.  There are also, you know, a number of RFPs that are in our requests that go right to these matters of reimbursement quality.  And so we think there's really no question about the relevance.

In terms of, you know, when we should do this, the Association has suggested that, We don't need to designate these people as custodians now, but we're willing to engage you in a conversation in December when the additional discovery period commences about including them at that point.

We think that makes absolutely no sense.  We're confident that we're going to want discovery from these people now.  And so we want to get moving on this front and get going now rather than wait six months and have to make this request then.

And, you know, another reason we don't want to wait is because in that supplemental discovery stage, the Court's Discovery Order Number 1 contemplates designating a limited number of additional custodians at that point.  If we're going to be charged for two more custodians, you know, six months down the line when we know we want discovery from them now, I mean, that really limits us in terms of being able to designate additional custodians at that time.

So unless your Honor has questions, I think I'll yield to defense counsel.

THE COURT:  All right.  Thank you.

MS. WEST:  Your Honor, Ms. Donell will be addressing the defense.

THE COURT:  Thank you.  Thank you.

MS. DONNELL:  Good morning, your Honor.

THE COURT:  Good morning.

MS. DONNELL:  We're here today because four months ago, the Association proactively met with plaintiffs and said, We want to start production custodian negotiations in advance of responding to your RFPs and get that process started.

We initially proposed 14 custodians.  And over the next three months we've met with plaintiffs and talked about their additional custodians that they proposed, what our response was to that.  We ultimately agreed in early April to 26 custodians. And a third of those custodians are officer-level custodians. That includes our CEO.  So despite some serious reservations we had about certain custodians that they asked for, we, in a spirit of compromise, agreed to include officer-level custodians.

Where we had to draw the line, though, was with the chief medical officer.  We simply do not see how the chief medical officer's responsibilities, particularly for the Association, are relevant to any of the claims in this case.

Plaintiffs' claims are based on market allocation, the service areas, the license agreements, the operation of BlueCard.  We have designated custodians in all those areas. We've, in fact, designated multiple custodians on those areas.

As for reimbursement rates, plaintiffs claim that they are being paid lower reimbursement rates.  The CMO has absolutely nothing to do with reimbursement rates.  The CMO does not set those reimbursement rates.  In fact, the Association does not. Those are plan-specific tasks that are done.  So for plaintiffs to come up and link that to -- the CMO's duties to reimbursement rates is incredibly attenuated.

Going to their arguments -- and, again, we've asked during the meet and confers, we've asked for justification as to why they wanted to include the CMO, and we never felt like we got a concrete explanation.

They discuss that over the years they've litigated many cases with providers against Blue plans.  They discuss that we understand that CMOs might talk about providers with various issues of concern.  But we've never gotten specifics as to what those issues of concern were.  We've asked for that.  They haven't come forward to give anything to even show facially that the CMO might be relevant on those topics.

And, again, the CMO doesn't communicate on service areas or license agreements or BlueCard.  Those would be from other players or other employees within the Association.

On the medical policy issue, what the Association does -- and I want to break it down stepwise -- is that the Association under the CMO has a staff that evaluates medical literature for certain medical technologies.  And what they will do is create a model medical reference policy.

I think we all agree that this case -- I think plaintiff has conceded it's not about medical policies.  It's not about whether a certain policy existed at the Association and what it said.  It's not about the fact of whether a particular procedure is covered.

They've said that in their letter.  And as made clear at the hearing last week on May 19th, this is not the LifeWatch case.  That case actually was about medical policies.  It was about an alleged conspiracy among the Blue plans related to medical policies.  That's not this case.

When the Blue Cross Blue Shield Association CMO sets the medical reference policy manual, the Blue plans are free to use that as they see fit.  All it is, is a reference book for them to pull.  So they may disregard it.  They may make their own medical reference policy based on their own research.  They may choose to adopt the medical policy.  It's simply not binding on the Blue plans.

THE COURT:  Do you have any information about how frequently individual Blue plans vary from the model presented by the Association?  Is it something that happens all the time,

pretty routine?  Or is it a fairly rare event for a Blue plan to vary from the model?

MS. DONNELL:  I do not have that information specifically overall --

THE COURT:  Well, I guess that's part of the question they're asking.

MS. DONNELL:  I mean, I know in the LifeWatch case when we've looked at that and in the allegations of that, they alleged a conspiracy with respect to one medical policy.  Well, there are certain plans such as Highmark that is a defendant in that case, they don't follow our medical policy at all.  There's other plans that are defendants in there that they do follow the medical policy.  So it's certainly an independent decision that's crystal clear in the Blue Cross Blue Shield Association policies that it is an independent decision on the Blue plans as to whether to follow the medical policy.

And it's -- really, the medical policy as well, the fact as to whether the Blue Cross Blue Shield Association determines if a procedure is medically necessary, not medically necessary -- or the third option, I believe, is investigative -- again, not binding on the plans.  But, also, the fact as to whether they make that determination is still very attenuated to how plans make reimbursement decisions or to decide how to reimburse a particular procedure.

So the medical reference policy might say, Yes, this

procedure is medically necessary.  A plan may then say, I agree or disagree.  The plan then says, I'll decide to cover it or not cover it.  And, again, those coverage policies as to whether to cover a procedure or not cover a procedure, that, again, is separate from the medical reference policy, which is evaluating the literature, going through what supports or doesn't support the medical necessity of a procedure.

And it's -- those coverage policies, the fact of coverage, the yes or no, is different than what plaintiffs are alleging. They're alleging you've already, yes, decided to cover a procedure and now you're going to pay X amount for that procedure.  You're going to reimburse X amount for that procedure.

So, really, that's very attenuated from what plaintiffs are alleging what their damages are on the reimbursement rates. It's particularly when you consider the Association, which, again, doesn't set any binding policies on the plans.

As for the document that Mr. Sheehan handed up, again, we just saw that today for the first time.  But what I can say is there's nothing on the face of this document that links this to BCBSA CMO.  There's many parts of the BCBSA that are looking at quality and looking at different programs that can be implemented.

I'd note, also, this is from our D.C. office.  Our CMO is not in our D.C. office.  That being said, I'd need more time to

look at this, but I simply don't think that changes the analysis as to why the CMO is not relevant here and that plaintiffs haven't met the threshold showing of showing that it's relevant, that the CMO is relevant.

Your Honor, what we proposed, and I think it was reasonable, was for plaintiffs to take the discovery we were going to give from our 26 custodians, some of whom are officer level and they all have interacted with the CMO, I'm sure.  And there may be emails, and the plaintiffs can see from the discovery and we can evaluate what the CMO -- whether the CMO truly does have any relevance to this matter.

Now, we don't think that will be the case, but that's what the point of the Discovery Order 1 is, is to have that second step where we can say, Yes, through discovery or depositions of other custodians, we think now that this person is relevant, and negotiate.

If they believe, then, in December that the CMO has relevant unique information that does go to their claims and they can substantiate it, we're happy to start talks again on it.  We're happy to negotiate it.  But right now we just don't see that these broad-brushed assertions that in prior cases we have found that they talked to physicians a lot really substantiates the justification of going on the burden for -- going involving the CMO as a production custodian here.  We just don't see that as appropriate right now.

THE COURT:  All right.  Thank you.

Mr. Sheehan?

MR. SHEEHAN:  Thank you, your Honor.

If I could, I'd first like to address the first point made by my colleague which was that they have agreed to produce information from a number of custodians and that enough is enough.

You know, while I would grant that we have had productive meet and confers with the Association and we have had, I think, a good faith back-and-forth about who the custodians should be who produce information, of the custodians who have been designated by the Association, none of them is a healthcare provider in a case brought by healthcare providers.  And so there is clearly a piece missing that we know we want and we know we want it now.

And, again, I think, you know, a big piece of that is that the CMOs, we know, are focused on how to provide quality healthcare at what they call an affordable price or in an affordable way.  So what does affordable mean?  It means, you know, how much you pay for it.  That obviously affects providers.

And so we think from, you know, the standpoint of this not being cumulative, it being relevant, there should be no question that we should get discovery from the CMOs.

I also want to say that I think my colleague oversimplified

our theory of the case.  This is, you know, a little bit more complicated than challenging the dollar amount they paid for one procedure.  As I said before, you know, reimbursement is moving away from a fee for service model and moving toward more complex models.  And so we need to understand those models.  We need to understand the rationale.

We think that the CMOs who are certainly providing, quote-unquote, strategic direction for how to provide quality care are going to be relevant to understanding reimbursement models based on, quote-unquote, quality.  And so, you know, we think there's no reason to wait, there's no additional discovery we need to make this determination, and we'd like to get moving on this now.

And so unless your Honor has more questions, I think that's all I have at this time.

THE COURT:  Thank you.

The third matter that is -- was on the agenda this morning are the need for discovery limits consistent with the earlier discovery orders that set a May 8 deadline for setting discovery limits.

Mr. Ragsdale?

MR. RAGSDALE:  To be clear, your Honor, we did not ask that this issue be brought before you.  But our position, I think, set forth in the filing that we made on May 8th is that there is no need to set those limits at this stage and, more

importantly, we believe that our obligation to try to even set those limits has not yet been triggered because of the deficiencies in some or all of the defendants' Rule 26 disclosures.

So we're not sure there's anything for you to decide today.

THE COURT:  Okay.

MR. RAGSDALE:  We think that our -- as I said, our report sets forth the fact that we believe that there is much to be done before those limits can practically be set.

THE COURT:  Is there something I need to be doing to make sure that the Rule 26 disclosures we finally get that wrapped up?

MR. RAGSDALE:  I think we're continuing to talk. We're actually meeting and conferring -- I know that's surprising to hear.  But we are talking with those defendants with which we believe there are deficiencies in order to get those forward.  I don't believe there's anything that the Court needs to do at this point to foster that process.

THE COURT:  All right.  Okay.

Ms. Yinger?

MS. YINGER:  I tend to disagree.

THE COURT:  I'm surprised.

MS. YINGER:  I'm not aware of any meet and confers they have occurred with respect to what plaintiffs say are our deficient Rule 26(a) disclosures.  The first we saw of the

deficiency was in the -- the alleged deficiency was in the filing that they made with the Court in which, you know, they acknowledged that the defendants identified something like -- I don't know -- 600 -- hundreds and hundreds of potential people with knowledge, primary employees with knowledge of claims and defenses.

We haven't heard anything since that filing. I think, as the Court knows, Discovery Order Number 1 originally provided for discovery limits for the parties to talk about that, to make a proposal. The Court at the plaintiffs' request moved that date until after those Rule 26(a) disclosures were going to be made --

THE COURT: I guess my very simplistic view of what I thought was going to happen was the 26(f) disclosures would be made. Everybody would then look at those and say, Oh, okay; based on those disclosures, we need X number of interrogatories, we need X number of depositions, whatever it might be. And we -- that day of May 8th was set for that. And I guess it's come and gone and we're still -- I guess the plaintiffs still say, We haven't got all the 26(f) stuff.

MS. YINGER: Right. And we actually -- we initiated the process in April, about a month before the deadline, and we made a proposal. We didn't get a counter from the plaintiffs for, I think, you know, several weeks. When we got their counter, they proposed no limits on depositions, requests for

admissions, and requests for production; and they proposed 100 interrogatories per side.

We countered.  They claimed that our custodian lists were insufficient.  As I said, you know, in addition to those custodian lists or, I guess, witness lists, they've also had our org charts for over a year.  So I would think that they could look at the information that they have.  They could at least engage with us about the alleged insufficiencies and make a counter-proposal about deposition hours, requests for production, requests for admission.

We think 100 interrogatories is too many.  But they could at least make some sort of numerical proposal like the order contemplates, like is done in many cases, is recommended by the Manual on Complex Litigation, you know.  But they haven't done that.

We really think we are, you know, in full discovery now. We really think those types of limits need to be set now so that parties know what they're drawing against when they start serving more interrogatories and more requests for production, noticing depositions, and things of that nature.

They're presumptive limits.  So if they have good cause to seek additional discovery over those presumptive limits, they can come to the Court.  So I -- you know, I don't think this is such an onerous task, and I do think it's something that needs to happen right away.

THE COURT:  All right.

Mr. Ragsdale?

MR. RAGSDALE:  I guess one of the problems that we're facing is that the defendants and perhaps the plaintiffs view the negotiations differently.  And so to the extent I haven't done so, I would like to disagree vigorously with how the defendants have characterized everything that we've said previously.

These are ongoing process.  The Rule 26 disclosures, we have complained to them about them being deficient.  For example, Alabama Blue Cross has designated, I think, only four custodians, and much smaller Blue Crosses have designated more: total of 650 people amongst the defendants.

We certainly believe that we need to drill down into those disclosures further before we can be in a position to try to get locked in to a number that ultimately is not going to come into play for years or more when we talk about overall concluding numbers.  And we believe that it's not productive to simply make a guess at this point, which is what the plain -- I mean, the defendants have done.

The defendants have given us a number, frankly, which is outrageous on its face, and they want us in return to make an equally outrageous response.  And we think that's not productive.  So as a consequence, what we would ask is that until we start to face some complaint that we have begun to take

too many depositions -- which right now I would point out is hardly going to be the argument since we've not taken any depositions in this case yet.

But I'd also point out I think part of this discussion in terms of Rule 26 is kind of tied back to the whole discovery process that we're going through on the request for production as well.  And we don't think it's productive to set the outer limits at this point before we've even started to run the race, which is kind of where we are at this point.

As I said, we did not refuse to engage with them.  What we told them was we don't have enough information to make a guess. And that's all it would have been at this point in terms of a number.  And what we did not want to do is be in a position where we then have to come to you and try to defend that guess without enough information to be able to support it.

THE COURT:  At what point in time are we going to get to a point where people are going to be able to identify how much -- or I'm -- not a precise number but some ballpark figure of how much discovery they're going to have to conduct?  When are we going to get to that point of being able to make the guess?

MR. RAGSDALE:  I can make a guess about that.

THE COURT:  Let's say an educated guess.

MR. RAGSDALE:  Okay.  I believe that once we have completed the process of fleshing out the Rule 26 disclosures so

that we really have an idea of that and, frankly, have taken a few depositions.  I think we have to start that process in order to determine and be able to weed out some of the custodians, for example, that we probably don't need to talk to.  But at this point it's kind of hard to do that in a vacuum.  But I would think we would be in a position to do that by the end of this year, as an educated guess.

THE COURT:  All right.

Ms. Yinger?

MS. YINGER:  Well, I think, your Honor, that, you know, the Manual on Complex Litigation is pretty clear that these kinds of limits need to be set early in a case.

We are not asking the plaintiffs, you know, sort of to commit in blood or anything or be straight, you know.  There's room for error here.  I mean, these are very experienced lawyers.  As Mr. Sheehan pointed out, he's been litigating with health insurance companies, including us, for a long time.  They have a sense for how many depositions they're going to need.

You know, we've proposed a number of hours that exceeds 100 depositions.  I don't think I've ever been in a case with Mr. Sheehan where he took that many depositions.  I think it's not an outrageous proposal that we made.

They've already served 200 requests for production.  That's a lot of requests for production.

So I do think there's a need for limits.  And I don't think

that the way to go about it is for the plaintiffs to take depositions.

I think they need to talk to us about custodians for document production. I think they need to talk to us about narrowing their requests for production. I think they need to talk to us about what is deficient about our Rule 26(f) disclosures. Like I said, there's about 600 people identified there. They need to look at our org charts, engage with us about this.

I don't think running and taking depositions is an efficient way to go about this. And I think your Honor imposing a deadline -- you know, your Honor had imposed a May deadline, and I think it sounds like --

THE COURT: For what it was worth.

MS. YINGER: We thought it was worth something.

THE COURT: Yeah.

MS. YINGER: So I think I've said my piece.

THE COURT: All right. Thank you.

A couple of others matters that I just wanted to raise, I guess, preliminarily, and I'm not sure if the parties are ready to really talk about these or not, but the special discovery issues that arose from Judge Proctor's conference a couple weeks ago.

MR. RAGSDALE: We are ready -- well, at least, I would say we're ready to talk about the fact that we're ready to talk

about it.  But -- and we've discussed with the defendants in both instances, frankly, we need to meet and confer a little bit certainly about NASCO and the Consortium, about trying to do that.  And I've talked to Mr. Laytin about us doing that promptly as well.

As far as the personal jurisdiction, our intent is to, frankly, propound that discovery very quickly.

THE COURT:  Okay.

MR. RAGSDALE:  And start that process.  And then once the defendants, the moving defendants, the discrete group of -- I don't know if discrete is the proper term -- but the identified group of defendants who are pursuing those motions, we'll have an opportunity to meet and confer about the requests. I would anticipate --

THE COURT:  We're talking here about some of the defendants who contend there is not jurisdiction here and the question of how much business is conducted in the Northern District and the Western District of North Carolina?

MR. RAGSDALE:  Correct.

THE COURT:  And then, apparently, these -- as I understand.  I mean, I wasn't at Judge -- I was luckily in Italy, but I was not at the conference, but -- so I'm understanding NASCO and this -- the other entity to be sort of sub-entities of the Association of some sort of way?

MR. RAGSDALE:  Depending on how you characterize it,

yes.

THE COURT:  Depending on whose point of view.

MR. RAGSDALE:  Was that discrete enough?

The -- I bet Dan won't let me call them co-conspirators, but --

MR. LAYTIN:  Go ahead.

MR. RAGSDALE:  I was going to say.  But yes, those -- and there is some discrete discovery that Judge Proctor, I think, identified in the course of the arguments that --

THE COURT:  As to whether or not they had been used as tools or pawns as part of the conspiracy?

MR. RAGSDALE:  Correct.

THE COURT:  Okay.

MR. RAGSDALE:  Is that fair enough?  He couldn't resist, I knew.

MR. LAYTIN:  The key for us and the issue is, I think, plaintiffs' allegation that both NASCO and Consortium are somehow instrumentalities of a conspiracy.

THE COURT:  Right.

MR. LAYTIN:  That's the issue.

THE COURT:  Right.

MR. LAYTIN:  And I think what Judge Proctor concluded is that there was potentially discrete discovery on those points that could be dispositive, you know, potentially in a Rule 56 way on those issues.  And I think the key for us, and we're

certainly going to meet and confer with plaintiffs on it, but the key for us is identifying the discrete issue so that this can be efficiency enhancing in the way that I think Judge Proctor envisioned.

THE COURT:  Well, I guess that's what I'm trying to get at is rather than folding these discovery issues into the larger discovery issues, it looks like Judge Proctor intended and perhaps the parties intend that there be sort of a very relatively quick, rapid way of conducting the discovery on these narrow issues and getting those Rule 56 issues teed up for Judge Proctor, as I understand.

MR. LAYTIN:  I mean, that's what we're going to talk about with our clients, then we're going to talk to plaintiffs about it.  And the key is going to be, you know, identifying, if we can, the narrow types of discovery that can be done in that fashion.

THE COURT:  Okay.

MR. LAYTIN:  Thank you.

THE COURT:  All right.

MR. RAGSDALE:  And based on our history, I can't imagine we'll have any disagreements.  But we intend to work within that framework as well.

THE COURT:  It sounds like at this point, then, the parties are just requesting an opportunity to meet and confer on those issues and nothing needs to be done by the Court at this

point.

MR. LAYTIN:  That's right.

THE COURT:  Okay.

MR. LAYTIN:  Thank you.  At least as it relates to NASCO and Consortium.

MS. ROMAN:  Your Honor, I represent five of the defendants who were dismissed on personal jurisdiction and venue grounds.  I'm Tracy Roman.  I just want to agree with Mr. Ragsdale.  We just think the process is the plaintiffs need to figure out what it is that they want, issue those requests to us, we'll get our written responses off to them, and then we'll meet and confer.  And if there are any issues, we'll come back to the Court.  But we don't expect that we need to do any special meeting and conferring about that process.

THE COURT:  Now, just so everybody can understand, I'm envisioning this, quote, special discovery as being sort of separate and apart from the larger discovery issues.  So in that spirit, to the extent that there are a set of interrogatories or requests for production or something of that sort, we're not going to have an argument about whether those count toward any limits in the larger discovery.

MS. ROMAN:  No, your Honor --

THE COURT:  Okay.

MS. ROMAN:  -- we don't intend to do that.  And we do hope that there are seven requests for production on the

jurisdictional issues instead of --

THE COURT:  Right.

MS. ROMAN:  -- 400.  So we'll keep our fingers crossed on that.

THE COURT:  All right.

MR. RAGSDALE:  Just to be candid and transparent, the discovery that we may need to do on personal jurisdiction and venue may involve more than just the five moving defendants.

THE COURT:  Okay.

MR. RAGSDALE:  In particular, I would say Blue Cross of Alabama and Blue Cross of North Carolina may also have some discovery directed to them regarding the scope of business being done here.  But I -- we'll cross that or burn that bridge when we get to it either way.  But I wanted to make that clear.

THE COURT:  All right.

All right.  Any other issues, concerns, problems, worries, anybody needs to raise, wants to take up at this time while we're here on the discovery aspects of the case?  And I am -- my intent is to try to get another -- some kind of guidance out to you on the three issues that we've talked about early next week sometime, hopefully -- well, I'm going to be out Monday, but Tuesday or Wednesday next week, try to get something out to you then.  But are there any other concerns, issues?  Anybody need a room for meeting and conferring, anything of that sort that we can take up while we're here?  All right.

MR. RAGSDALE:  The only thing I would tell you, Judge, just so that we leave on a good note, we do have a meet and confer set next week in Chicago.

THE COURT:  Okay.

MR. RAGSDALE:  So the process is ongoing.

THE COURT:  All right.  And as I understand it from Judge Proctor's conference, there is also a meeting with a mediator at some point as I understand; is that correct?

MR. RAGSDALE:  Yes.

THE COURT:  Okay.  All right.  All right.  Thank y'all very much.

MR. RAGSDALE:  Thank you, your Honor.

(The proceedings were concluded.)

C E R T I F I C A T E

I, Sabrina Lewis, RDR, CRR, Official Court Reporter for the United States District Court for the Northern District of Alabama, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Dated:  July 12, 2015

*Sabrina Lewis*

SABRINA LEWIS, FEDERAL OFFICIAL COURT REPORTER