1        IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF ALABAMA

3                 SOUTHERN DIVISION

4

5   IN RE BLUE CROSS BLUE SHIELD        CASE NO. 2:13-cv-20000-RDP
    ANTITRUST LITIGATION MDL 2406
6

7                   *   *   *   *   *   *   *

8            **TRANSCRIPT OF STATUS CONFERENCE**

9                   *   *   *   *   *   *   *

10

11        BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES

12   DISTRICT JUDGE, at Birmingham, Alabama, on Monday, February 13,

13   2023, commencing at 10:08 a.m.

14

15   APPEARANCES:

16   SPECIAL MASTER:          Edgar C. Gentle III
                              Attorney at Law
17                            GENTLE, TURNER & BENSON, LLC
                              501 Riverchase Parkway East
18                            Suite 100
                              Hoover, Alabama 35244
19

20   IN PERSON:              Benje Bailey
                             Stan Baudin
21                           Katherine Benson
                             William Blechman
22                           Alexander McInnis Boies
                             David Boies
23                           Swathi Bojedla
                             John Briody
24                           W. Tucker Brown
                             Carl S. Burkhalter
25                           Elizabeth Chavez

```
 1   APPEARANCES CONTINUED:

 2   IN PERSON:              Kathleen Chavez
                             Evan Chesler
 3                           Chris Coffin
                             Vincent Colatriano
 4                           Davis Cooper
                             Jon Corey
 5                           Phillip Cramer
                             Greg Davis
 6                           Karin DeMasi
                             Doug Dellaccio
 7                           Augusta Dowd
                             Katherine DuBois
 8                           Jay Ezelle
                             Anne Miles Golson
 9                           Mark Gray
                             Wilson Green
10                           Jill Greenfield
                             David Guin
11                           Michael E. Gurley
                             Chris Hellums
12                           Zenola Harper
                             Ryan Hodinka
13                           Mark Hogewood
                             Des Hogan
14                           Craig A. Hoover
                             Hamish Hume
15                           Bill Isaacson
                             John Johnson
16                           Megan Jones
                             Edith M. Kallas
17                           Lauren R. Kennedy
                             Chris Kimble
18                           Cason Kirby
                             David H. Korn
19                           Frank Lowrey
                             Jeny Maier
20                           Jon Mann
                             David Maxwell
21                           Patrick McDowell
                             Robert Methvin, Jr.
22                           Dee Miles
                             Jess Nix
23                           Dennis G. Pantazis
                             Joshua Payne
24                           Gwendolyn Payton
                             Pat Pendley
25                           Myron Penn
```

```
 1    APPEARANCES, CONTINUED:

 2    IN PERSON:                 Wes Pittman
                                 Aaron Podhurst
 3                               Ben Presley
                                 Henry Quillen
 4                               Barry A. Ragsdale
                                 Jonathan Redgrave
 5                               Thomas Ritchie
                                 Robert Roden
 6                               Julia Roth
                                 Nick Roth
 7                               Emily Ruzic
                                 Robin Sanders
 8                               Patrick Sheehan
                                 Paul Slater
 9                               Cyril V. Smith, III
                                 Todd M. Stenerson
10                               Tammy Stokes
                                 Trey Wells
11                               Joseph M. Vanek
                                 Michael Velezis
12                               Joe R. Whatley, Jr.
                                 Mark White
13                               E. Kirk Wood
                                 Jeffrey Zeiger
14                               Jason Zweig

15
      VIA VIDEOCONFERENCE:       Alexa Barrett
16                               Norman Beck
                                 Mark Botti
17                               Brian Charlton
                                 Anna Mercado Clark
18                               Honor Costello
                                 Christy Crow
19                               Mike Dodge
                                 R. Dukes
20                               David Gaertner
                                 David George
21                               Sarah Gilbert
                                 Reuben Goetzl
22                               Zenola Harper
                                 Michelle Heikka
23                               Elizabeth Jose
                                 Casey Lott
24                               Joann Lytle
                                 Alexandra Markel
25                               Dierdre MacCarthy
```

```
1   APPEARANCES, CONTINUED:

2   VIA VIDEOCONFERENCE:      Hope Marshall
                             Larry McDevitt
3                            Lucy Grey McIver
                             Michael Pennington
4                            Nicholas Peterson
                             Paula Plaza
5                            Harold Reeves
                             Dennis Reich
6                            Alan Rutenberg
                             Silvie Saltzman
7                            Paul Sand
                             Donald Savery
8                            John Schmidt
                             Emma Scully
9                            Richard Sherburne
                             Cristina Silva
10                           Scott Smith
                             Kathleen Sooy
11                           Andy Stone
                             Brian Vick
12                           Melissa Vogt
                             Amy Walker Wagner
13                           Helen Witt
                             Michael Wolfe
14                           Rachel Zieminski
                             Michael Zipfel

15

16  VIA TELEPHONE:           Jenna Adamson
                             Stephen Dampier
17                           Michael Ford
                             Bill Horton
18                           Rebekah McKinney
                             Patricia Murphy
19                           Sean O'Connell
                             Jason Thompson

20

21                 *   *   *   *   *   *   *

22        The proceedings were reported by a stenographic court

23  reporter.  The transcript was produced using computer-aided

24  transcription.

25                 *   *   *   *   *   *   *
```

```
 1                (Proceedings commenced at 10:08 a.m.)
 2           THE COURT:  We are here for a status conference in In
 3  Re Blue Cross Blue Shield Antitrust Litigation MDL 2406, our
 4  Master File 13-cv-20000.  Yes, I did say 13.  This is pretty
 5  much the ten-year anniversary; right?
 6           MR. BOIES:  It is, Your Honor.
 7           THE COURT:  Didn't it come, like, in January of '13?
 8  I think the panel met in Boise late 2012 maybe?
 9           SPEAKER FROM AUDIENCE:  I think Dallas.
10           THE COURT:  What's that?
11           SPEAKER FROM AUDIENCE:  Dallas.
12           THE COURT:  Was it in Dallas?
13           SPEAKER FROM AUDIENCE:  Yeah.
14           THE COURT:  Oh, Boise was BP Deepwater Horizon.  In
15  Dallas.  Okay.  So Dallas, I can always blame Dallas for this.
16           All right.  So I think the main order of business,
17  separate and apart from reports from the two sides on
18  Subscriber track cases, would be argument on the appeal bond
19  matter.  Anything we need to take up before we begin that,
20  though?
21           MR. BOIES:  Not from the Plaintiffs or Subscribers in
22  any event, Your Honor.
23           MR. WHATLEY:  And there's nothing from the Providers
24  either.
25           MS. DEMASI:  And nothing from the Blues, Your Honor.
```

```
1            THE COURT:  All right.  So we have Mr. Smith and Mr.
2   Smith, Smith versus Smith?
3            MR. SCOTT SMITH:  Yes, Your Honor.
4            THE COURT:  All right.
5            MR. SCOTT SMITH:  Thank you, Your Honor.  I'm sorry.
6   Can you hear me?
7            THE COURT:  I can hear you.  We're going to need to
8   pump your volume up just a little bit, either on your side or
9   on my side.
10            MR. SCOTT SMITH:  Thank you.  I'm in the middle of a
11   jury trial in Texas, so thank you for allowing me to appear
12   virtually.  I wish I was there in person.
13            THE COURT:  Where are you in Texas?
14            MR. SCOTT SMITH:  I'm actually in Denton, Texas, which
15   is about 40 miles north of Dallas.
16            THE COURT:  I know where Denton is.
17            MR. SCOTT SMITH:  In the 362nd.  We're in state court
18   in the middle of a jury trial right now, so --
19            THE COURT:  Okay.  Well, I appreciate them sparing
20   you.  I take it you're observing, just noting all the ways you
21   can try to get the judge reversed, though.
22            MR. SCOTT SMITH:  Embedded appellate counsel, yes,
23   Your Honor.
24            THE COURT:  I know how that works.
25            Yes, sir?
```

1          MR. LOWREY:  I don't mean to interrupt.  I'm Frank

2     Lowrey, here for the Home Depot.  We also may be heard

3     responding to this motion.  But the seats look full here, so

4     I'll just hide back here.

5          THE COURT:  Well, we have a seat at the end of that

6     table right there.  I don't think the Blues will give you any

7     cooties.  You can sit right there, too.  Okay.  I guess you

8     guys do have cooties.

9          All right.  Mr. Smith, are you kicking us off?

10          MR. CYRIL SMITH:  I am, Your Honor.  And I guess I

11     should say, as to my adversary in Texas, no relation, to the

12     best of my knowledge.

13          THE COURT:  You know, that happens when your last name

14     is Smith from time to time.

15          MR. CYRIL SMITH:  From time to time.  So good morning,

16     and may it please the Court, Cy Smith, on behalf of the

17     Subscriber class.  And we do appreciate the opportunity to be

18     heard on this issue.  It's a very important matter for the

19     class, over 100 million people and business entities.

20          And, Your Honor, I've a couple points to make, but my

21     biggest goal today is obviously to answer the Court's

22     questions after there's been substantial briefing on this to

23     make sure that the Court is --

24          THE COURT:  You know me.  I'll have some questions

25     along the way, but I'm going to at least let you get started.

1          MR. CYRIL SMITH:  Okay.  Good.  Well, let me start

2     with the facts, because there's a suggestion by some of the

3     Objectors that this is somehow just a hypothetical, that the

4     risk in damages to the class are not real and substantial.

5     And two things about that.  The first is that the delay is

6     real.  The order was entered on August 9th, the final approval

7     order modified September 7th and, but for the Objectors'

8     appeals, would have become final in September or October of

9     last year.  So we're now four or five months into the appeals

10     process.  The briefing is not yet complete.  And although the

11     Eleventh Circuit has agreed to expedite those appeals -- and

12     we're grateful for that -- there's no guarantee as to when

13     this --

14          THE COURT:  What does that mean, "expedite" the

15     appeals?

16          MR. CYRIL SMITH:  It was not clear from the order,

17     Your Honor, so we don't have an oral argument date.  They

18     haven't said whether there will be oral argument or, if there

19     is, what it'll be.  And certainly --

20          THE COURT:  Briefing is complete, though?

21          MR. CYRIL SMITH:  The briefing is not yet complete,

22     Your Honor.  Should be --

23          THE COURT:  When will the briefing be complete?

24          MR. CYRIL SMITH:  Roughly 45 days, I'm told by

25     appellate counsel.

1          THE COURT:  Subject to extensions being granted?

2          MR. CYRIL SMITH:  Subject to extensions being granted,

3    and one or two has been requested, I think by the Bradley

4    Arant Objectors.  So the briefing's not yet complete.  We

5    don't know when a decision will issue.  And I think the

6    Court's familiar with the fact that disappointed Objectors,

7    even after they lose, they've been known to file petitions for

8    rehearing and cert petitions.  That's what happened in

9    *Equifax*.  And so our projection of up to two years of delay

10   from these appeals we think is a reasonable one.

11          The second point I'd make is that the injury to the

12   class is real.  Our motion was supported by detailed

13   decorations by credentialed experts.  It described the impact

14   in terms of the administrative expenses, the lost investment

15   returns, the lost value of the injunctive relief.  And, Your

16   Honor, we also have the Court's own assessment of the value of

17   that injunctive relief.  At the time of final approval, the

18   Court said that as significant as the monetary amount of $2.67

19   billion is, the truly exceptional aspect of this settlement is

20   the structural relief.  And, of course, the Court can make

21   assessments like that; it's empowered to do that in resolving

22   all kinds of class controversies.

23          THE COURT:  Are your arguments here really targeting

24   Rule 8?

25          MR. CYRIL SMITH:  There are three independent routes

1    to the relief that we're seeking.

2        THE COURT:  All right.

3        MR. CYRIL SMITH:  And they -- and I'll be happy to

4    turn to them.

5        THE COURT:  Rule 7 has to do with the risk of

6    nonpayment of appeal costs; right?

7        MR. CYRIL SMITH:  Certainly of appeal costs, and the

8    question is, What does "cost" mean?  And so the three routes

9    are Rule 8, which you just mentioned, they're the inherent

10   power of the Court, and Rule 7.

11       THE COURT:  All right.  What do you think is your best

12   route?

13       MR. CYRIL SMITH:  Your Honor, I think it's a tie of

14   the sort we saw last night up until the very last seconds.

15   It's a tie between Rule 8 and inherent authority, with Rule 7

16   a little bit behind, maybe half and --

17       THE COURT:  Rule 7, there's really not a great risk of

18   nonpayment of appeal costs here, is there?  Not a record that

19   would support that in any way?

20       MR. CYRIL SMITH:  I completely disagree with that.  So

21   the issue here, all of these cases -- the Court has a lot of

22   discretion about whether to impose a bond and in what amount.

23   And in the case of -- in this case --

24       THE COURT:  Well, each appellant has submitted itself

25   or is subject at least in part to the jurisdiction of the

1   Court; correct?

2        MR. CYRIL SMITH:  It has, but that's really just the

3   start of the sentence.

4        THE COURT:  Well, that means that if there -- and

5   usually, appeal costs, the appellate court allows the district

6   court to do the pick-and-shovel work on that; right?

7        MR. CYRIL SMITH:  It does, but there's a big

8   difference between the ability to pay a judgment and the fact

9   of payment; right?  That the personal jurisdiction that the

10  Objectors have submitted to just means that we can start the

11  proceeding in this Court.  It doesn't mean that we can collect

12  on the judgment.  That's the purpose of a bond.  And that's

13  why the Court in *Equifax* said that the meaning of "insure" in

14  Rule 7 is to make certain -- to make certain -- so that you're

15  safe and sure.  And I would just say, as a matter of personal

16  history -- yes?

17        THE COURT:  Yes, but the size of most -- so we have

18  some individual Objectors, like Behenna, Cochran, Craker, but

19  the -- we have some large institutional Objectors here that I

20  just don't see there being a great threat to nonpayment.  Tell

21  me why I'm wrong.

22        MR. CYRIL SMITH:  I would just say that there's a

23  difference between having a judgment and collecting on it.  I

24  think it's likely, when you're talking about tens of millions

25  of dollars, that certainly for Topographic and Employee

1   Services you're going to have to docket your judgment in

2   another jurisdiction and go chase them.  And even for Home

3   Depot, Your Honor --

4          THE COURT:  I'm talking about Rule 7 appeal costs at

5   this point.

6          MR. CYRIL SMITH:  I'm sorry?

7          THE COURT:  I'm talking about Rule 7 appeal costs.

8   But you're relying upon your expanded definition of costs?

9          MR. CYRIL SMITH:  I am, Your Honor, I am.  So that's

10  my --

11         THE COURT:  Any case law that says costs aren't

12  out-of-pocket costs under a Rule 7?

13         MR. CYRIL SMITH:  Absolutely.  I mean, take a look at

14  -- in this circuit take a look at *Allapattah*; right?  Take a

15  look at *In Re Checking Account Litigation*.  And I think

16  there's -- actually, if you look at the decision, the district

17  court decision in *Equifax*, coming out of the Northern District

18  of Georgia, that --

19         THE COURT:  Judge Thrash?

20         MR. CYRIL SMITH:  That's correct, Your Honor.  That

21  Court observed that Rule 7 costs include increased

22  administrative expenses and lost interest.  I mean, that's in

23  his 2020 opinion that went up to the Eleventh Circuit.

24         So that's -- let me circle back now to the top and

25  I'll come back to Rule 7, if that would be helpful.  So in

1   terms of inherent authority, you know, the Eleventh Circuit

2   has expressly recognized in *Pedraza v. United Guaranty* that

3   the Court has inherent authority to require a bond from an

4   Objector.  And it's not just the Eleventh Circuit talking;

5   right?  They cite *Chambers v. NASCO*.  That's the Supreme Court

6   case from 1991.  And we cite more modern case law at page nine

7   of our reply because that inherent authority goes back more

8   than 200 years, really almost to the time of the founding.

9   And that authority exists even though there might be rules or

10   even statutes that address the same sort of -- or related

11   matters.

12           *Chambers* held that the inherent power of the Court can

13   be invoked even if procedural rules exist which sanction the

14   same conduct.  And once that inherent authority is recognized,

15   normal equitable rules will apply.  And so the Court's duty is

16   to balance the massive harm to the class against the

17   inconvenience, frankly, to the Objectors of posting a bond,

18   and always bearing in mind, Your Honor, that the cost of the

19   bond is the premium; right?  And we put in our reply -- I

20   don't think there's been any counterargument from the

21   Objectors on this -- that that premium can be as little as

22   .3 percent of the principal amount, or 1 percent, something

23   like that.  And the authority that this Court has with respect

24   to this isn't limited, obviously, to situations where there's

25   bad faith or frivolous appeals, but as a matter of equity, the

1  Court certainly can consider the merits of the appeals that

2  are pending.

3        And I'd just like to mention a couple of things that

4  the Court said about certain of the objections which are now

5  on appeal.  This is at pages 56 to 60 of the final approval

6  order.  The Court pointed out that the Objectors had failed to

7  make a credible showing, overlooked crucial evidence, missed

8  the point and were simply wrong.  And I would also say that

9  the Court should be very comfortable in assessing the merits

10 of the appeal.

11       The Eleventh Circuit said this in a case that we cite

12 in our papers, *Young v. New Process Steel*, in 2005.  It said

13 that, quote, District courts have a great deal of experience

14 in weighing the merits of potential appeals, unquote.  And the

15 Court went on to give the example of habeas appeals where the

16 Court has to make exactly that type of judgment.  In other

17 words, would an effective appeal lie based on the facts that

18 are presented to the Court.  And the Court, I think,

19 therefore, has that ability, has that power, has the right to

20 do so.

21       In the final analysis, with respect to inherent

22 authority, this power, this historical power of equity, gives

23 to the Courts the power to, as the Eleventh Circuit -- or

24 actually, this is the Fifth Circuit -- binding authority from

25 before the schism, to process litigation to a just --

1       THE COURT:  I'm going to tell Judge Tjoflat that you

2   just called it a schism.

3       MR. CYRIL SMITH:  I'm sorry.  I'm coming from the

4   Fourth Circuit, Your Honor.  -- to process litigation to --

5       THE COURT:  Judge Tjoflat would say it was a surrender

6   of appellate jurisdiction.

7       MR. CYRIL SMITH:  Okay.  I'm going to engrave that on

8   my forehead and make sure I refer to it that way.

9       So a case coming from before the lawful transfer of

10  appellate authority, *ITT v. Barton*, 569 F. 2nd 1359, said it's

11  the power to process the litigation to a just and equitable

12  conclusion.  And to do that here, plainly, counsel is in favor

13  of the bond.  So that's path number one.

14      Path number two is Rule 8, and the result is much the

15  same.  Rule 8(a), as the Court knows, directs the parties to

16  move first in the district court for, quote, approval of a

17  bond or other security provided to obtain a stay of judgment.

18  And Objector Cochran concedes, at page eight of his brief --

19  he says, Rule 8 can secure against an appeal's postponement of

20  benefits, unquote.

21      The best case to illustrate this principle, Your

22  Honor, is in In Re Checking Account Litigation [sic], where

23  Judge King, who I understand has seen a few things in his time

24  on the bench, approved a $410 million class settlement, but

25  there were nine groups of Objectors who appealed.  Judge King

1    ordered the bond based on what he called the high likelihood

2    the order will be affirmed and that such appeal bonds will

3    provide the protections typically afforded appellees during

4    the pendency of the appeal, particularly in the context of

5    class actions.

6         Now, like the Objectors here, the Objectors in Judge

7    King's case objected and insisted they cannot be required to

8    post a supersedeas bond under FRAP 8 because they have not

9    sought a stay.  Judge King responded and he said, Because the

10   filing of this appeal prevents distribution of the settlement

11   proceeds as ordered by the Court's final judgment, it is an

12   actual stay of judgment; bond is appropriate.  There's another

13   in-circuit case on this --

14        THE COURT:  Is he essentially saying it's a de facto

15   stay?

16        MR. CYRIL SMITH:  He is.  He's saying they have, in

17   fact, obtained a stay, and therefore, met the requirements or

18   brought Rule 8 into play.

19        And there's another in-circuit case on this, Your

20   Honor, under Rule 8.  You can take a look at Aboltin,

21   A-B-O-L-T-I-N, versus Jeunesse.  That's a 2019 decision from

22   the Middle District of Florida where the Court held to the

23   same effect.  Either of those, inherent authority or Rule 8,

24   gets us to a bond.  And with respect to Rule 7, we've talked

25   about that.

1          I would say one more thing about Rule 7, Your Honor.

2    You just focused on the risk of nonpayment.  I would say that

3    the four-part test has not been abolished in this circuit, the

4    four-part test for imposing a bond, where you look also at

5    whether or not the bond can be posted, you look at the merits

6    of the appeal, things of that nature.  If you look at the

7    language in *Equifax* on which the Objectors relied, that

8    language is plainly dictum on this point.  And so we would

9    submit that given the lack of merits of these appeals, given

10   the fact that Home Depot proclaims that it can post a bond and

11   that the others have not objected in terms of their ability,

12   not provided any proof that they can't, the four-part test

13   governs and we meet, really, all of the elements of that

14   four-part test.

15         THE COURT:  What -- give me your best argument as to

16   what -- let's say the bond -- let's say we're at the end of

17   the day two years after the fact, two years after the appeal

18   was filed, and lightning strikes and I get affirmed; okay?

19   And now we're having to determine what the costs of appeal

20   are.  Obviously, it's easy to determine what I kind of view as

21   the Rule 7 costs of what was the cost of copying, hard

22   out-of-pocket costs.  How have courts gone about determining

23   these soft costs of delay?

24         MR. CYRIL SMITH:  Well, first of all --

25         THE COURT:  So what did Judge -- let's start with what

1    Judge King said.  How would you characterize that?

2         MR. CYRIL SMITH:  Okay.  So in terms of how soft, how

3    hard those are, if you start with administrative expenses,

4    there's no way, respectfully, that I think that those can be

5    called soft costs.  They are actual invoices, you know, that

6    were incurred and paid during the time of the delay, because

7    you can't consummate the settlement until you've resolved all

8    the issues that have been raised by the Objectors.  And so

9    that's a monthly element in terms of keeping the phone lines

10   open, responding to calls.  You've got a massive cyber

11   insurance premium.  And so the record evidence -- and there's

12   nothing to the contrary -- is that the two-year cost of that

13   is $13.9 million.  That's hard.

14        The second point, with respect to the delay in the

15   injunctive relief and the lost investment opportunities,

16   right, the lost interest, if you will, the investment losses,

17   those are just like the sorts of costs that you have to

18   assess, for example, if you're executing on another type of

19   bond, like a preliminary injunction bond.  It's subject to

20   proof; right?  We'd have to show that we had a reasonable

21   estimate of the damages.  The Defendants -- excuse me -- the

22   Objectors could argue against that, but when you execute on a

23   bond after a TRO or a preliminary injunction, exactly these

24   sorts of issues come up.  And so this is really not a question

25   of whether there should be a bond.  Plainly there should be.

1    This is a question of whether they have some argument to make

2    to prevent execution on the bond later.

3        And in terms of setting that bond, I just want to

4    suggest that the Court needs to bear in mind, first of all,

5    it's got a lot of discretion on this.  But second, if there's

6    any uncertainty about this, the Court should err in terms of

7    making sure that, first of all, there is a bond and, second,

8    that it's very substantial, because from our perspective and,

9    really, from anyone's perspective, the bond is an insurance

10   policy to make sure that the entire class, all

11   hundred-million-plus of the Subscribers, is made whole for

12   these damages.  And if you're looking at an insurance policy,

13   you want to make absolutely sure that it covers every last

14   dollar of potential loss.  If you were buying, you know, a

15   different type of insurance policy, like a homeowners policy,

16   you'd want to make sure that it covered the possibility of

17   complete loss of the house if there was a tornado or a massive

18   tree fell on it.  You wouldn't want to say, Well, let me put

19   it, you know, partways there or let me gamble that there will

20   not be a loss.  You'd want to make sure that the whole thing

21   gets covered.

22        THE COURT:  Well, doesn't the settlement agreement

23   itself, though, contemplate that there would be delay in the

24   effective date based upon what was anticipated to be

25   objections and appeals?

1    MR. CYRIL SMITH:  Certainly the settlement agreement

2  had provisions for when it becomes effective and it had

3  provisions for what the investments can be, but there's

4  nothing in the settlement agreement, Your Honor, that gives

5  rights to the Objectors that immunizes the Objectors from the

6  harm that they cause.  You know, if I could borrow a term from

7  tort law, the Objectors have to take their victim as they find

8  them; right?  We've got the hundred million members of the

9  class who are suffering this injury.  Nothing in this

10  agreement, right, which is 100-plus pages long -- nothing in

11  this agreement gives rights to the Objectors.  Nothing in it

12  says that they're not at risk when they cause delay and they

13  cause harm to the class.

14    So if you look at other types of cases, Your Honor,

15  one that the Objectors cite is *Vaughn v. American Honda* from

16  the Fifth Circuit.  That was a case where the Court found that

17  the agreement didn't give the right -- any rights -- to the

18  Plaintiffs in terms of gain in value from the funds invested

19  in the settlement.  Here, the Subscriber class is supposed to

20  receive the full benefit of that, and we would have received

21  the full benefit but for the appeals.

22    So for all of those reasons, you know, you've got to

23  give -- you've got to make sure that the Objectors take

24  responsibility for the damages that they potentially cause,

25  and to err on the side -- because the Court is in effect a

 1    fiduciary for the class -- to err on the side of

 2    overinclusiveness and protection for the class.  And if that's

 3    the default, which we think it should be, we think the way

 4    forward is relatively clear.

 5            I'd be happy to answer any other questions for you.

 6            THE COURT:  I may have questions for you when you get

 7    up once again.

 8            MR. CYRIL SMITH:  Okay.  Thank you, Your Honor.

 9            THE COURT:  All right.  Anyone else speaking on behalf

10    of the bond?  I didn't think so.  I thought you would be

11    covering that for everyone.

12            MR. CYRIL SMITH:  I hope so.

13            THE COURT:  All right.  Who -- what order are we going

14    to take this up from those opposing bond?

15            MR. LOWREY:  Mr. Smith and I spoke about this earlier,

16    and we thought since he's in Texas, I would start and he would

17    follow up.

18            THE COURT:  All right.  Fair enough.

19            MR. LOWREY:  Good morning, Your Honor.

20            THE COURT:  Good morning.

21            MR. LOWREY:  I appreciate you having us in to talk

22    about this.  I'll start the same way Mr. Smith did, which is

23    to ask whether the Court has a particular question for me, or

24    do you want me to start with the points that I think are

25    important?

1          THE COURT:  You relied in part, as I recall, on the

2     *Muransky* decision.  I'm sorry.  Your opponent relied in part

3     on the *Muransky* decision, saying that a supersedeas bond was

4     not appropriate on the appeal there.  Do you have any idea of

5     exactly what the costs on appeal were after *Muransky* got

6     reversed?

7          MR. LOWREY:  I have some more detailed notes at

8     counsel table, if I could grab them.

9          THE COURT:  Sure.

10          MR. LOWREY:  Let me see if they illuminate that issue,

11     Your Honor.  I apologize.

12          THE COURT:  That was a FACTA settlement, as I recall;

13     correct?  Or FACTA case?

14          MR. LOWREY:  My memory is, I think, not as good as

15     yours, but I've got a table of notes that may --

16          THE COURT:  It was a FACTA case, a class action

17     settlement that got reversed on appeal at the Eleventh

18     Circuit.

19          MR. LOWREY:  And the question from the Court was what

20     were the costs after the reversal?

21          THE COURT:  Yeah.  I'm just curious, you know, what --

22     I'm just curious.

23          MR. LOWREY:  Yeah, I have not followed that down, so

24     am not able to answer that question, Your Honor.

25          THE COURT:  That's fine.

1        MR. LOWREY:  And we could certainly do that later for

2  you and report back.

3        THE COURT:  Okay.

4        MR. LOWREY:  I thought maybe we would talk first about

5  Rule 7 and the necessity of payment.  I think the best reading

6  of Eleventh Circuit law, the Equifax case, is that the Court

7  can require a bond only if it finds it necessary to ensure

8  that a losing appellant can pay the costs on appeal, whatever

9  costs are assessed.  And the one thing that the parties seem

10  to be in agreement upon in this motion is that the Home Depot

11  could pay those costs.

12        THE COURT:  Would those costs be joint and several if

13  they were assessed?

14        MR. LOWREY:  I don't know, Your Honor.  I haven't

15  looked at that issue, and I would think that would be

16  something that we would take up with you were we to lose the

17  appeal.  For example, the Objectors raise different --

18        THE COURT:  That does affect ability to pay; correct?

19  Because we've got some individual Objectors who may not be

20  willing to pay if, in fact, Mr. Cy Smith is correct on the

21  amount the costs would equal.

22        MR. LOWREY:  So I certainly couldn't speak for the

23  ability of the other Objectors to pay and maybe should

24  clarify, I'm speaking --

25        THE COURT:  I'm just taking a wild guess that if he's

1    right and 113 million is the cost that individual Objectors

2    may not be able to bear that.

3         MR. LOWREY:  I think there's some risk of that, Your

4    Honor, and, of course, I speak only for the Home Depot and

5    whether there should be a bond levied against the Home Depot

6    or required of the Home Depot.  I'll have to let the

7    individual Objectors speak for themselves.

8         THE COURT:  But I was asking about joint and several

9    because if, in fact, costs are due and they are, in fact, high

10   and your client has deeper pockets than the others, that seems

11   to me to be something you'd need to address.

12        MR. LOWREY:  Well, it is certainly something that we

13   would address before you entered a cost award.  It would not

14   be a reason why you should require the Home Depot to post a

15   bond, because what --

16        THE COURT:  No, no.  It would be a reason I should not

17   require the Home Depot to post a bond if, in fact, one, this

18   is joint and several liability on a bond; and, two, I make the

19   determination that you're able to pay and there's not a risk

20   of nonpayment; three, you'd agree with me that that could come

21   back to me and I have jurisdiction based upon Home Depot's

22   partial participation in this settlement.  Correct?

23        MR. LOWREY:  I think I understand the points you've

24   made.  Before I agree to something, let me recite them back to

25   you.

1        THE COURT:  Take them one at a time.  That may be your

2  safer course.

3        MR. LOWREY:  And so the first point, Your Honor --

4  refresh me on -- your first point was --

5        THE COURT:  Whether this is joint and several.  And

6  maybe we'll get Mr. Scott Smith's view on that real quick.

7  Does he have one?

8        MR. SCOTT SMITH:  Your Honor, the costs under Rule 7

9  are marginal, 15 cents for in-house copies.  The Eleventh

10  Circuit only requires less than ten copies of the briefs, and

11  we have carried the water on the appendix.  There may be some

12  marginal things outside of our appendix, but we filed a

13  multivolume appendix covering all of those.  But I -- so if

14  we're talking about the costs awardable under Rule 7, I think

15  it is joint and several, but I've never filled out a cost bond

16  -- I mean a cost petition -- in my career in 25 years because

17  it costs more for me to fill it out than the money that's

18  recoverable.

19        THE COURT:  Right.

20        MR. SCOTT SMITH:  So I don't know if I answered your

21  question, but the Rule 7 costs are just minimal.

22        THE COURT:  Well, what about the Rule 8 costs?

23        MR. SCOTT SMITH:  Well, Your Honor, I don't know that

24  there are any Rule 8 costs here because this isn't a judgment

25  that has to be superseded insofar as there's injunctive relief

1    in play.  Paragraph, I believe, 19 of the settlement agreement

2    postpones implementation of that pending the outcome of the

3    appeal and any discretionary review in the Supreme Court.  And

4    so I don't know that there's any -- we haven't asked for a

5    stay and the parties have negotiated that delay on their own.

6    So they've taken that on and they've put the money in escrow

7    to protect against it.  So there's no need for an insurance

8    policy.  And thankfully, for the recipients of those funds,

9    the interest rates have gone up in the interim.  So, I mean,

10   this Court's already recognized in day two, at the end of that

11   transcript, that we're talking about real money when you've

12   got interest on $2.6 million.

13           THE COURT:  All right.  But what if -- and again, this

14   is a "what if" -- what if the Court were to accept for

15   purposes of argument only that it may, at the end of the day,

16   be an issue of whether this operated as a de facto stay of

17   judgment on an order of the district court pending appeal and

18   I were to determine that some bond would be appropriate to

19   provide for that?  The question becomes, would responsibility

20   for the bond and whether it's $2,000, the usual, maybe high

21   end of a Rule 7 bond or some much higher figure such that the

22   appellees are arguing for here, it seems to me it doesn't

23   matter what amount we're talking about.  The question is, is

24   responsibility for the bond joint and several among the

25   appellants?  So I'm taking the issue off the bond -- I'm

 1    taking the issue off the board of the amount of the bond.  I'm

 2    just saying is it joint and several?

 3            MR. LOWREY:  I have some thoughts --

 4            MR. SCOTT SMITH:  I would think so, Your Honor.  I

 5    wouldn't think that you would have the parties, in a Rule 8

 6    scenario, post separate bonds.  I think there would be one

 7    bond and you would hear arguments and we would litigate over

 8    the amount of that bond and --

 9            THE COURT:  I'm asking a slightly different question.

10    I'm obviously not doing it well because I've got two really

11    smart lawyers who are not realizing my question.  So let me

12    try it again.  The question is, there's not a bond and we're

13    at the end of the day and there's a determination that there's

14    a very large cost of this appeal.  Is that responsibility for

15    the cost of an appeal at the end of the day joint and several?

16            MR. LOWREY:  And so let me take a swing at that one,

17    if you don't -- if Scott doesn't mind.

18            THE COURT:  All right.

19            MR. LOWREY:  I think it depends -- I know that it

20    depends upon what the composition of that cost award is, and

21    here's why.  So, for example -- and I know you're not talking

22    specific numbers yet, but 54 million of the 113 million that

23    the Subscribers want covered with this bond is the lost time

24    value of the B3 funds as a -- I'm sure the Court recalls from

25    the papers.  And so, for example, we didn't appeal the B3

1    settlement at all.  The only reason why an appeal of the B2

2    settlement stays distribution of those funds is purely a term

3    of contract.  We would never have been --

4              THE COURT:  It's the way the parties designed it?

5              MR. LOWREY:  Exactly.  And you approved it.  It is

6    their request, not mine, that the distribution of those funds

7    were stayed, and so any liability for that wouldn't fall on me

8    as the Home Depot.

9              Let me add one more thought before I leave that point.

10   That 54 million wouldn't be assessable against anyone.  It is

11   the spread between the one-year T-bill rate that the

12   settlement agreement allows them to invest in and more

13   aggressive, like, corporate bond investments.  What that is is

14   an attempt to recover postjudgment interest in excess of the

15   statutory allowance.  So 1961 -- when you enter a judgment,

16   under 1961, the interest accrues at the one-year T-bill rate

17   for the week before the judgment was entered.  So they're

18   already getting, through the settlement investment, the most

19   postjudgment interest they could possibly get.  There is no

20   authority for someone to take --

21             THE COURT:  Okay.  Well, I feel like we're straying

22   from the scope of my question.

23             MR. LOWREY:  Let me --

24             THE COURT:  Here's why I'm asking this.

25             MR. LOWREY:  Sure.

1          THE COURT:  I could easily dispose of this bond issue

2     if I understand the following facts to be true:  One, it

3     doesn't matter what the cost -- what the appeal costs are.  We

4     can worry about that later, or not, as the case happens, more

5     particularly, as the appeal happens.  Two, regardless of what

6     the cost is, your client and others have the ability to bear

7     that cost.  And three, they're subject to my jurisdiction and

8     I could make sure they bear that cost.  They have the ability

9     and we have the opportunity.  If all those are true, it seems

10    to me there's really no threat of appeal costs not being

11    honored ultimately and, therefore, there's no need for a bond.

12    But if you're hesitant to concede that your client and maybe

13    other corporate clients are not jointly and severally liable

14    for this, then the next question in my mind becomes, well,

15    then, what should be the apportionment if there should be

16    separate appeal bonds as I think you just said a moment ago or

17    maybe Scott said a moment ago.  I'm going to say Scott, not a

18    lack of formality, but just to make sure we distinguish from

19    Cy; okay?

20         All right.  So if that's the case, then again, I'm not

21    too concerned about an appeal bond because, again, if there's

22    a readily discernible way to determine what the responsibility

23    is -- at this point we think that the corporate clients are

24    going to bear the substantial weight of the load on appeal

25    costs, whatever those may be later -- then I'm not real

1 concerned about a bond then; okay?  And then the third thing

2 is, it makes sense under those two scenarios to just not worry

3 about this now because, you know, we don't worry about appeal

4 bonds unless we get an affirmance --

5             MR. LOWREY:  That's right, Your Honor.

6             THE COURT:  -- or appeal costs unless we get an

7 affirmance, because the cost may be transferred to the losing

8 side.

9             MR. LOWREY:  The only part of that that I can't say is

10 I cannot stand here and agree that the Home Depot would be

11 jointly and severally liable for the entire amount.  This is

12 what I can say:  Whatever costs you assessed that you found

13 right to assess against the Home Depot, there is no risk of

14 nonpayment.  And so I can't -- I can't I guess, dispense with

15 your necessity to consider whether a bond might be required as

16 to others.

17             THE COURT:  Yeah, you're in a tough spot here because

18 you're a worthy advocate and an officer of the Court at the

19 same time.  So I'm asking you in both capacities, at the end

20 of the day, if -- let's say, it's not joint and several, at

21 the end of the day we're apportioning costs, whether it's

22 $2,000 or $113 million or some number in between those two

23 polar opposite figures, what would be the corporate

24 responsibility versus the individual responsibility for these

25 things?

1      MR. LOWREY:  It would depend on -- so the first thing

2    I said is always going to be true.  Whatever you decide the

3    Home Depot's responsibility is, the Home Depot has those

4    resources.

5      THE COURT:  Yeah.  But I'm asking you what my -- legal

6    test I'm supposed to apply.

7      MR. LOWREY:  So again, it would come up to what costs

8    are you assessing?  And I've just explained to you my views of

9    why, if the costs you are assessing is this lost-time value --

10   I've already explained my views on why that wouldn't be

11   appropriate against the Home Depot.

12     THE COURT:  But if it were --

13     MR. LOWREY:  But if it was awarded against us, then we

14   would be good for it --

15     THE COURT:  Yes.

16     MR. LOWREY:  -- that's right.  And I snuck in there my

17   argument about how this is illegitimate prejudgment interest,

18   which you almost let me finish.

19     THE COURT:  I let you finish the point.  I knew what

20   your argument was.

21     MR. LOWREY:  Good enough.  Suppose that -- suppose,

22   though, that the composition of the bond -- well, suppose it

23   was administrative costs, you know, something like -- that

24   might be a better argument for joint and several liability.

25   We'd have to cross that bridge when we came to it, but again,

 1    whatever liability you found was appropriately the share of

 2    the Home Depot --

 3         THE COURT:  Well, we're not crossing the bridge, but

 4    what Cy Smith is arguing is that we need to plan for the

 5    bridge and we need to have an insurance policy for the bridge.

 6         MR. LOWREY:  Sure.  And what I don't understand about

 7    that is they already have one.  Do you recall how -- perhaps

 8    you recall how the settlement works on this point, which is if

 9    they exceed the hundred-million-dollar cap and they got --

10         THE COURT:  There would be replenishment.

11         MR. LOWREY:  They've got replenishment from the Blues,

12    not from the class, from the Blues.  Under no circumstances,

13    even if we were to increase the administrative costs, do we

14    increase -- do we somehow diminish the class recovery.  So

15    that item can't be assessed against anyone.

16         And if the Court will bear my indulgence, the third

17    and final element of their 113 million is the lost time value

18    of injunctive relief.  And this one has me scratching my head,

19    too, because paragraph 19 of the settlement said that the

20    Blues were supposed to start taking necessary steps at

21    preliminary approval to implement that relief, and then -- and

22    the Subscribers left this out of their reply brief -- then

23    that they shall implement that injunctive relief as soon as

24    practicable.  So if the Blues are doing --

25         THE COURT:  Is that all the injunctive relief or

1   certain specific --

2        MR. LOWREY:  It's all the major paragraphs of it.  If

3   memory serves, that paragraph 19 exempts paragraph 16 of the

4   injunctive relief, but that's like a brand protection measure.

5   It's all of the stuff that the Subscribers tout as enhancing

6   competition.  So if the Blues are moving right now to

7   implement that relief as soon as practicable, then the appeal

8   isn't changing anything.  And if they aren't and that's

9   costing the class anywhere in the neighborhood of 45 million,

10  then I would think the Subscribers would be bringing that

11  issue to your attention and moving the Blues along.  But if

12  they are doing what the settlement agreement says --

13       THE COURT:  So as long as your client continues

14  selling wood, washers and wing nuts, we're okay?

15       MR. LOWREY:  And there is no prospect we will cease

16  selling any of those things, Your Honor, and the many other

17  fine products you can find in our aisles.  So --

18       THE COURT:  And often do with my home needs.

19       MR. LOWREY:  I am glad to hear that, Your Honor.

20       So, I have backed into my arguments about why none of

21  the 113 million could be laid on us under any circumstances.

22  I hope that I've answered your questions on necessity of

23  payment.  I suppose I have a few more points that I want to

24  make.  One of them is about the Exxon -- the Equifax case.

25  Mr. Smith says that the four-part test is still -- hasn't been

1    abandoned in this circuit and is still good law.  And I agree

2    with you that -- I agree with him that *Equifax* ultimately

3    upholds Judge Thrash's bond on the one ground that the Court

4    recognized as legitimate, which was risk of nonpayment.  But

5    about that four-factor test, what the Eleventh Circuit said

6    is, while most of these factors do not appear to be relevant

7    based upon our reading of Rule 7, the last factor, risk of

8    nonpayment, certainly is.  And so they certainly don't have a

9    case, a binding Eleventh Circuit case, saying that you can

10   award a bond for any reason other than necessity of payment.

11   And even if what I had is dicta, my dicta is Eleventh Circuit

12   2021 dicta.  Theirs is largely unpublished district court

13   out-of-circuit authority --

14         THE COURT:  My dicta is better than their dicta.

15         MR. LOWREY:  My dicta is better than their dicta.  And

16   I think we're going to cut this one short right now.

17         THE COURT:  Barry Ragsdale's speech to the Alabama

18   Supreme Court once upon a time.

19         MR. LOWREY:  But, I mean, if you -- you know, I

20   don't expect you to read my notes, but they spent from this

21   part to this part (indicating), like virtually an entire

22   published page, which is pages and pages of the double space

23   the way they format these things, talking about this

24   necessity-of-payment requirement.  I don't think they meant

25   district courts to ignore it.  So I wanted to make that point.

1          I want to make a point about *Pedraza*.  *Pedraza* is the

2     case where the Eleventh Circuit reversed the inclusion of

3     appellate attorneys' fees and a bond, and it reversed the

4     inclusion of those fees notwithstanding inherent power

5     arguments and rule-based arguments.  And what the Court said

6     is, Look, appeal costs, you don't just make it up as you go

7     along; there has to be some actual authority in a rule or in a

8     statute or in well-established court power that makes those

9     costs the costs on appeal.  And there's not anything in the

10    200 years of jurisprudence that lets you shift the costs

11    they're seeking to shift into an appeal bond.  It's not --

12    it's not carte blanche just to make up items.

13         What else shall we talk about?  Anything?

14         THE COURT:  Let's find out what Scott Smith wants to

15    talk about.

16         MR. LOWREY:  Fair enough, Your Honor.  I'm going to

17    take my seat, then, while he --

18         THE COURT:  You may.

19         MR. LOWREY:  All right.

20         MR. SCOTT SMITH:  Your Honor, we'd ask that you deny

21    this appeal bond.  It's really not necessary.  As far as my

22    appeal is concerned, it doesn't hold up to settlement by the

23    terms of the settlement itself.  Page 29 of the settlement,

24    which is document 2610-2, says that an appeal of allocation

25    has no effect on the timing of the effective date.  And so my

 1     appeal is not holding anything up.

 2          This is not a frivolous appeal.  The Court has already

 3     ruled on that in day three, on pages 53 and 54.  The Court

 4     recognized that these were all legitimate objections stated by

 5     counsel on behalf of clients.  That's page 54 of document

 6     2866, day three.

 7          I think we've set out in our briefing how

 8     unprecedented a bond of this magnitude would be.  I don't

 9     think the Eleventh Circuit has ever approved a five-figure,

10     much less a nine-figure, appeal bond.  Rule 7, as I've already

11     mentioned, covers very marginal expenses, and that's all that

12     would be in play here.

13          I think Frank did a good job of explaining about

14     paragraph 19 controlling the timing of the injunctive relief.

15     We haven't sought a stay.  Rule 8 just doesn't apply.  And

16     then lastly, I'd like to say that imposing a bond like this on

17     Objectors would be bad policy and make bad precedent.  It

18     would be cost prohibitive for Objectors.  It would discourage

19     meritorious objections.  The Equifax case and the Pedraza case

20     both address the importance of Objectors to this process.  And

21     so we would urge the Court to please deny this cost bond.

22          THE COURT:  All right.  Anyone else have any interest

23     opposing the bond here?  I've heard from counsel.  I didn't

24     know if there was any other Objectors that wanted to be heard

25     on that.

```
 1                 (No audible response.)

 2           THE COURT:  Okay.  I think we're to Cy Smith's reply

 3     arguments, if any.

 4           MR. CYRIL SMITH:  Thank you, Your Honor.

 5           THE COURT:  Do you feel a little bit better about the

 6     fact that whatever I would determine would be a feel cost,

 7     sounds like you're going to largely be able to collect that

 8     if, in fact, you're entitled to it?

 9           MR. CYRIL SMITH:  So my first preference on behalf of

10     the class is to not have any uncertainty whatsoever.  And to

11     quote from the Eleventh Circuit in Pedraza at page 1283 -- I'm

12     sorry, not Pedraza -- Equifax -- says that the word "insure"

13     means to make sure, certain, safe.  There shouldn't be any

14     muss and there shouldn't be any fuss about collecting those

15     costs at the end of the day.  And it's not good enough --

16           THE COURT:  What do you say about their arguments

17     about the limitations on appeal bonds that the Eleventh

18     Circuit has upheld or determined being, you know, four figures

19     usually, five figures on a way-high side, never nine figures

20     like you're arguing for?

21           MR. CYRIL SMITH:  Your Honor, the case just hasn't

22     gotten there.  There's plenty of Courts of Appeal.  So there's

23     the Sixth Circuit in In Re Cardizem, there's the Third Circuit

24     in In Re Nutella that have upheld appeal bonds of exactly the

25     type that we're talking about.  This is not a bleeding edge
```

1    type of issue at all.  So our first preference is to have a

2    bond so there's no question --

3         THE COURT:  Is there anything in the law of the

4    Eleventh Circuit that would indicate they'd go there, though?

5    I understand other circuits have, but the Eleventh Circuit

6    says that you can't have class service awards.  We have our

7    own brand of class-action jurisprudence.  I'm just curious --

8         MR. CYRIL SMITH:  Remember -- fair question, but

9    remember that *Equifax*, *Pedraza*, and Scott v. New Source -- the

10   New Source Steel, those are all Rule 7 cases; okay?

11        THE COURT:  Right.

12        MR. CYRIL SMITH:  Rule 8 and the inherent authority

13   are recognized in this district and Rule -- and inherent

14   authority is recognized in *Pedraza*.  So I think the answer is

15   yes on those, those are absolutely independent.  But the

16   second thing I want to say is I want to respond to the Court's

17   question in a way that, like my brethren did not -- yes?

18        THE COURT:  Go ahead.

19        MR. CYRIL SMITH:  Well, my first preference on behalf

20   of the class is let's have a bond, let's be certain and sure

21   and safe.  But our second preference is, if there is an

22   agreement to be jointly and severally liable for all costs at

23   the conclusion of this, that is a second-best alternative but,

24   you know, it's clearly better than the status quo.  So I don't

25   hear an agreement to that from either Home Depot or the

1    Bradley Arant Objectors, but that would be a second-best

2    alternative and, as I said, an improvement on things.

3         The third point I'd like to talk about is this idea

4    from both Home Depot and Bradley Arant that somehow the

5    settlement's being held up but it's not our fault, both of

6    them say.  And first, with respect to Bradley Arant, he says,

7    Well, all we're doing is appealing the allocation and that's

8    not something that holds things up.  But the problem, Your

9    Honor, is that's a great, sort of, technical argument, but in

10   the real world, JND can't divide up the money and pay it out,

11   right, until the allocation has been fully and finally

12   decided.  So as a practical matter, they are suspending the

13   operation of the judgment, the one that you issued final

14   approval for, right, regardless of whether it is technically

15   the type of appeal that would do that.

16        A similar argument is made by Home Depot.  They say,

17   Well, look at this, the -- everybody's supposed to be working

18   on implementing this relief, you know, you've got to implement

19   it as soon as practicable.  But I don't think that Mr. Lowrey

20   quoted the entire language that's in there.  If you look at

21   paragraph 19 of the settlement agreement, it says that the

22   settling Defendants shall begin taking steps necessary to

23   implement all the injunctive relief upon entry of preliminary

24   approval, and the settling Defendants shall implement as soon

25   as practicable but, in no event, no less than 60 days after

1    the effective date for most of the pieces of injunctive

2    relief, and the later of three months after the effective date

3    or April 1st, 2022, for paragraph 15, and that those deadlines

4    can only be extended by unanimous vote.

5            THE COURT:  What do you make of their argument that

6    any extra costs for administration would be replenished, paid

7    for by the current fund, and replenished by the Blues, if it

8    exceeds the current fund?

9            MR. CYRIL SMITH:  Well, I would go back to *Equifax* and

10   I would say that the point of the bond is to make sure and

11   certain and safe.  We have a right to go to the Blues to

12   replenish.  We have undisputed testimony from JND, a

13   declaration submitted with the motion, that says we're going

14   to go over that hundred million dollars.  But we shouldn't be

15   at risk.  The class should not be at risk.  And the potential

16   for being at risk --

17           THE COURT:  How are you at risk if the Blues are

18   required to replenish that fund?

19           MR. CYRIL SMITH:  I think that at the end of the day

20   we win that argument but it's not required.  We can request

21   it, and if there's a disagreement about it, the Court has to

22   decide it.  And so that's my point.  We're at risk for it.

23   It's a real --

24           THE COURT:  But you have a process to replenish that

25   fund is what I'm saying.

1           MR. CYRIL SMITH:  We have a process for asking for

2    replenishment for the fund, and I think that we should get

3    that.

4           THE COURT:  You have a process for replenishing the

5    fund.

6           MR. CYRIL SMITH:  That -- fair.  I'm not trying to --

7           THE COURT:  The settlement is not what our agreements

8    are about asking.  It's -- the settlement is, here are the

9    agreements we've reached about how the fund will be

10   replenished.

11          MR. CYRIL SMITH:  Again, it would depend on the

12   language and it would depend on the position the Blues took.

13   I think that we should get it replenished, but I go back, as I

14   said, to the language of *Equifax*.

15          So a couple of other points, if I might.  So the first

16   is, if you're looking at Rule 8 and inherent authority, then

17   you have to go beyond the test under Rule 7; right?  It's not

18   only the risk of nonpayment.  Even if they're right about what

19   *Equifax* held, I think if you look at the language, it says

20   these other considerations may not be relevant, which to me is

21   the warning sign of dictum to come.  But even if they're right

22   about that, under inherent authority in Rule 8, you do have to

23   look at the merits of things.  You do have to try and make the

24   best decision you can to protect the class as a matter of

25   exercising the Court's inherent authority.

1          With respect to the argument that the money is taken

2     care of because we've already accounted for the risk of delay

3     in the settlement agreement, I would respectfully say that

4     that argument is circular, because it's really a question of,

5     you know, heads we win, tails you lose.  From the Objectors'

6     perspective, they say, Well, you've already done something

7     about it, you've already done the best you could, and if we

8     cause more damages than that, more injury than that, that's

9     your problem.  I don't think that's the right way to run this

10    particular railroad.

11          The next thing that I would say is that if you look at

12    the question of -- at the question of inherent authority and

13    Rule 8, a lot of these Rule 7 arguments kind of fall away to

14    the wayside, and the question under inherent authority and,

15    really, essentially the same under Rule 8 is to say what's the

16    best thing that the Court can do acting as a fiduciary to

17    protect the class and not to have to wonder, right -- as class

18    counsel or for the Court, to have to wonder at night what's

19    going to happen in a year and a half or two years from now.

20    And the best way to fulfill that mission is to require a bond

21    or, second-best alternative, to require joint and several

22    liability of all of the Objectors to pay this.  Anything short

23    of that leaves open a lot of possibilities.  Some of them are

24    good, some of them are bad.  And the point under --

25          THE COURT:  So what would you think if I asked both

1   sides to brief "joint and several" for me before I make a

2   decision?

3          MR. CYRIL SMITH:  Again, my first preference is to

4   order a bond.  If the Court wants to proceed in that

5   fashion --

6          THE COURT:  Let's say you're not getting that today.

7          MR. CYRIL SMITH:  Right, I understand that, and I've

8   told you what our position is, that joint and several

9   liability is a second-best alternative but it's better than --

10          THE COURT:  My question is not where it falls in the

11   pecking order.  It's is it a viable option for the Court to

12   require?  Because it seems to me, look, at this point we are

13   doing some estimating work -- you're doing some estimating

14   work.  We don't know -- if we had a decision come down

15   tomorrow and there was no petition to rehear, no petition on

16   bond, no cert petition, I -- you might make some arguments

17   about appeal costs at that point.  But I think we're in a

18   completely different category than if this is three or four

19   years down the road; right?

20          MR. CYRIL SMITH:  Those are two totally different

21   situations.  I agree with that.

22          THE COURT:  So we're dealing a little bit with the

23   unknown at this point, but one of the things we can start

24   working on is what is the known, and is the known such that,

25   regardless of what the unknown is, is it joint and several and

```
 1    does it have to be apportioned?  And probably -- I don't think
 2    the parties -- for legitimate reasons, I don't think the
 3    parties really focused on that.  I might be interested in
 4    having the parties focus on that over the next couple weeks.
 5            MR. CYRIL SMITH:  That's fair.  I will remind the
 6    Court that we actually did talk a little bit about that at the
 7    end of our opening brief -- a little bit, a little bit -- and
 8    we pointed to situations where the courts have done that.  And
 9    I would say the Court has a fair amount of discretion about
10    that; right?
11            THE COURT:  That's what I'd like to hear from both
12    sides.
13            MR. CYRIL SMITH:  Okay.
14            THE COURT:  I think it's going to be easier for you to
15    write that brief than for them, if I might say that?
16            MR. SCOTT SMITH:  Well, Your Honor -- this is Scott
17    Smith -- all I would say is we can't be held jointly and
18    severally liable for delay costs for administration because
19    the settlement itself exempts our appeal from any delay.  And
20    so --
21            THE COURT:  Well, you can certainly --
22            MR. SCOTT SMITH:  I think it's -- I'm sorry, Your
23    Honor, if I stepped on your toes because of --
24            THE COURT:  You didn't, but -- I stepped on yours.
25            MR. SCOTT SMITH:  -- the delay on the computer.
```

1            THE COURT:  I stepped on yours.  Go ahead.

2            MR. SCOTT SMITH:  No, I'm just going to say I think

3    it's 8c.  It's on page 29 of the settlement agreement, Your

4    Honor.

5            THE COURT:  So is there's two questions, then.  One

6    is, can you be held jointly liable?  And second is, should you

7    be held jointly and liable -- jointly and severally liable I

8    should say?  So those are two questions.  I don't mind you

9    addressing both, but I am going to ask you all to file briefs

10   within two weeks from today on -- and just to make you feel

11   better, Scott -- whether the Court can hold appellants jointly

12   and severally liable for appeal costs and, if so, which ones.

13   There may be a difference there.  And second, just to make the

14   Objectors feel better, we'll address whether the Court should,

15   in fact, do that in its discretion if it has the authority.

16   But the first question is --

17           MR. SCOTT SMITH:  Your Honor --

18           THE COURT:  Go ahead.

19           MR. SCOTT SMITH:  -- I don't have any problem with the

20   jurisdictional issue.  I think you and I dealt with that with

21   Mr. Bottini years ago.  I think the jurisdictional issues are

22   pretty well established.

23           THE COURT:  Okay.

24           MR. SCOTT SMITH:  That was --

25           THE COURT:  And then I'll also allow -- look, on Zoom,

```
 1    look, it's fine.  Don't feel bad.  You're getting -- you're

 2    not getting realtime when I'm starting to talk, so I apologize

 3    to you for that.  But I would say this:  I'll let you add a

 4    third section on there of your briefing and that is anything

 5    else you wish you'd gotten one more lick in on this that you

 6    didn't get a chance to say if you wanted to; okay?

 7              MR. SCOTT SMITH:  Great.

 8              THE COURT:  So let's say two weeks from today I want

 9    briefs on authority for the Court to hold appeal costs, that

10    the Objectors are jointly and severally liable, second,

11    whether the Court should, and third, anything else the parties

12    think the Court needs to consider before making a final ruling

13    on the appeal bond; okay?  Does that work for everybody?

14              MR. CYRIL SMITH:  Understood, Your Honor.  Yes.  Thank

15    you.

16              THE COURT:  Scott Smith?

17              MR. SCOTT SMITH:  Thank you, Your Honor.

18              THE COURT:  All right.  And our --

19              MR. LOWREY:  Yes, Your Honor.

20              THE COURT:  -- Home Depot?

21              MR. LOWREY:  Thank you.

22              THE COURT:  Yes.  Thank you.

23              MR. CYRIL SMITH:  Thanks, Your Honor.

24              THE COURT:  All right.  Are we concluded on this?

25    Nobody else has any input on this?
```

 1          MS. DEMASI:  Your Honor, may I make one point?  Karen

 2   DeMasi, on behalf of the Blues.

 3          THE COURT:  I've been waiting for you to.

 4          MS. DEMASI:  So the Blues don't take a position on the

 5   motion for the appeal bond, but just in light of the argument,

 6   I just -- I want to make two points.

 7          THE COURT:  Okay.

 8          MS. DEMASI:  The first point --

 9          THE COURT:  You're going to probably address

10   replenishment.

11          MS. DEMASI:  I am going to -- that's point two.  Point

12   one, Your Honor, is with respect to implementation.

13          THE COURT:  Yes.

14          MS. DEMASI:  I just want to make clear for the record

15   that the Blues are in compliance with their implementation

16   obligations, taking steps necessary as practicable.  And as

17   Your Honor will recall, the Blues implemented the elimination

18   of the national best efforts rule in April of 2021 even --

19          THE COURT:  Straightaway before there was even final

20   approval.

21          MS. DEMASI:  Even ahead -- exactly.  Thank you, Your

22   Honor.

23          With respect to point two, replenishment, I want to

24   make sure everyone has in mind exactly what the settlement

25   agreement says.  That's in subparagraph ggg on page 13 of the

1  settlement agreement.  There isn't actually a right to

2  replenishment.  There is the ability of the Subscriber counsel

3  to petition for replenishment upon a showing of necessity.

4  That is the standard, and, of course, were that to come to

5  pass, the Blues would have a position on that.

6      THE COURT:  Yeah, you'll stand up when you need to

7  stand up if there's anyone talking about spending more money;

8  right?

9      MS. DEMASI:  Correct, Your Honor.  Thank you.

10      THE COURT:  Okay.  And that's paragraph 1ggg you're

11  referring to; right?

12      MS. DEMASI:  Yes, yes.  Thank you.

13      THE COURT:  And that provides that settlement class

14  counsel and self-funded class counsel may petition the Court

15  for replenishment of notice and administration fund upon a

16  showing of necessity for replenishment, and then we'd

17  obviously have to take that up if that occurred.  But we're

18  still -- and I realize this may be a dated cost figure.  Let

19  me just see -- we're still -- as of the last time I was

20  notified about this, I think the notice and administration

21  fund had been billed fees and expenses totaling

22  $73,666,447.74.  Is that still -- may be a little higher now,

23  but is that still the ballpark?

24      MS. DEMASI:  I think that is the ballpark, Your Honor.

25  I do think it's a little bit higher now -- I'm looking at

 1  Subscriber counsel, so there may well be -- updated, but

 2  that's a ballpark figure.

 3          THE COURT:  We've still got another 25 million left in

 4  that fund.  And nobody thinks there is any threat that we're

 5  going to need a replenishment anytime soon; fair?

 6          MS. DEMASI:  Absolutely fair from our perspective.

 7          THE COURT:  I know it would be fair from your -- let

 8  me hear from Megan Jones.

 9          MS. JONES:  I think that -- if you're asking me, yes,

10  we're not --

11          THE COURT:  You're not worried about -- you're not

12  thinking about a replenishment petition at this point?

13          MS. JONES:  I am not, Your Honor.

14          MS. DEMASI:  Thank you.

15          THE COURT:  That is helpful.  Thank you, Miss DeMasi.

16          All right.  What else on this issue?

17          MR. CYRIL SMITH:  Your Honor, I would just say on

18  this, we agree with the Blues that they're in compliance,

19  okay, and so effectively, contrary to the argument that the

20  Objectors make that --

21          THE COURT:  Well, at least they have that to take away

22  from this hearing today.

23          MR. CYRIL SMITH:  Exactly.  But in other words,

24  there's not some right we have to accelerate the

25  implementation of the injunctive relief.  That's just not a

1       thing under this agreement.

2                THE COURT:  Right, right.

3                Okay.  What else do we need to take up in the status

4       conference with everyone here on either track?  Any other

5       reports?  Beefs?  Good and welfare?

6                All right.  I guess the next thing that we're going to

7       do, then, is I would like to meet with counsel who are

8       involved in the opt-out cases.  How many -- stand up if you

9       think you're attending that meeting today.  Okay.  That will

10      not be in chambers, based upon my count here.  We will do that

11      in the judicial conference room next.  And you all have a

12      seat.  Let me have Mr. -- is it Mr. Ball and Mr. Pendley?  Do

13      you all have cars and/or planes to catch?  You-all want to get

14      on the road?  I'd like to meet with you-all before we do the

15      opt-out scheduling conferences and I'd like to do that in my

16      office here in just a moment if we're ready to conclude this

17      portion of the status conference; okay?

18               All right.  What else?  Are we ready to proceed on,

19      then?  At this point I'd like an affirmative motion to

20      adjourn.

21               MS. JONES:  There's nothing left for the Plaintiffs,

22      Your Honor.

23               THE COURT:  All right.

24               MS. DEMASI:  And same for the Defendants, Your Honor.

25               THE COURT:  All right.

1          MR. RAGSDALE:  Motion to adjourn.

2          THE COURT:  And nothing further.  All right.  Very

3     well.  Hey, I said this to the two caucus sessions today.

4     Subscribers haven't heard this as I usually want you to hear

5     it.  It's been a privilege and continues to be a privilege to

6     be your judge in this case.  Great lawyering.  The excitement

7     and fun of handling this far outweighs the headaches, not that

8     there aren't headaches.  But I really do appreciate the

9     lawyering and appreciate each of you personally; all right?

10    And with that, we'll be adjourned.

11             (Adjourned accordingly at 11:10 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5                    Dated:  February 16, 2023.

6

7

8    *Pamela G. Weyant*
     _____
     Pamela G. Weyant, RDR, CRR, CCR
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25